## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * | CIVIL ACTION 2:07-MD-1873 |
| | * | JUDGE ENGLEHARDT - DIV. N |
| PERTAINS TO: NELSON versus GULFSTREAM, U.S.D.C. W.D. LA No. 07-921 | * * * | MAGISTRATE ROBY - MAG. 4 |

**************************************************************************

### AMENDED AND RESTATED
### CLASS ACTION COMPLAINT WITH JURY DEMAND

**NOW INTO COURT,** through the undersigned counsel, come Kimberly G. Nelson, individually and on behalf of her minor children, Griffin Champagne and Baleigh Nelson, on behalf of a class of similarly situated persons, and amend their previously-filed class action complaint, naming additional defendants and stating additional causes of action, and aver as follows:

### Preliminary Statement

1.

Hurricane Katrina was the storm of the century, killing thousands, destroying the homes of hundreds of thousands and displacing nearly one million people. Katrina's landfall was followed by Hurricane Rita, a storm which brought added destruction to the already devastated Gulf Coast region and to Southwestern Louisiana. Thousands of residents were left without shelter, food, or

hope. They were left at the mercy of the Federal Emergency Management Agency (FEMA) for the basic means of survival.

Rendered homeless by the catastrophic winds, storm surges, and floods of the hurricanes in August and September of 2005, the plaintiffs and class members were moved into FEMA trailers manufactured by the Defendants. Deprived of their homes and displaced from their property, these FEMA trailer residents saw no end to their suffering when finally provided with a FEMA trailer. Housed in the shelter provided by the Federal Government, the hurricane victims soon began to notice that their eyes would burn while sitting indoors and inexplicable rashes and nosebleeds would befall their children daily. Severe headaches, nausea, and asthma attacks became every-day occurrences. These victims were housed in boxes stinking of an acrid stench. Their trailers were contaminated with formaldehyde, a flammable, carcinogenic gas, dangerous and toxic to humans.

Due to the fault of the Defendants, the FEMA trailers contain hazardous levels of this noxious substance. Children are especially vulnerable to the severe effects of this irritant carcinogen. While the long-term effects of formaldehyde on children are unknown, the scientific community agrees that the effects are more severe in children than in adults. For adults, exposure to formaldehyde causes a range of severe symptoms, ranging anywhere from headaches to leukemia. Every night, children in FEMA trailers are repeatedly exposed to toxic levels of formaldehyde while they sleep. FEMA and the defendant manufacturers are responsible for this.

Despite federal regulation of formaldehyde levels in manufactured housing, numerous lawsuits, and prior reports of hazardous levels of formaldehyde in FEMA trailers, Defendants failed to warn plaintiffs that they were in danger. Defendants failed to warn plaintiffs that the air in their homes could make them severely ill and that their children were especially at risk. Defendants failed to provide trailers with adequate ventilation, and failed and construct the trailers with materials that would prevent formaldehyde poisoning.

FEMA has a duty to provide safe and habitable housing to victims of natural disasters, but FEMA has failed to take any action to insure the safety of the hurricane evacuees. FEMA has known since 2005 that the trailers contained toxic levels of formaldehyde, but FEMA refused to take action to address the dangerous health risks until exposed by the media. FEMA has disregarded the health and well-being of the hurricane victims at their most vulnerable time by disallowing any testing for formaldehyde, thereby willfully placing the citizens they were charged with protecting in harm's way. FEMA has delayed help and treatment, choosing to ignore the threat of imminent danger to trailer occupants for nearly two years. FEMA has refused to respond to the cries of help from the hurricane victims and in doing so, has forced these displaced citizens into a situation wherein their only alternative to poisoned trailers is homelessness and destitution.

The Defendant's failure to provide safe housing for those displaced by the hurricanes has resulted in widespread formaldehyde poisoning and sickness. The plaintiffs have been forced to endure this injury and the attendant emotional distress despite FEMA's knowledge that the trailers posed a grave health risk. Plaintiffs seek to represent a class of **all similarly situated persons within the State of Louisiana, who are or have resided in FEMA travel trailers, between August 29, 2005 and the present.**

**Plaintiffs pray for this Court to grant all FEMA trailer residents declaratory, injunctive and mandatory relief, under the Civil Rights Act; 42 USC § 1983; and other causes of action, including but not limited to the Court entering orders that:**

1)      **Ordering Paulison and FEMA to test all of the travel trailers and inform the residents of the formaldehyde levels that they have been exposed to;**

2)      **Ordering Paulison and FEMA to immediately move all FEMA trailer residents who desire to leave out of the toxic trailers;**

3)      **Ordering Paulison and FEMA to provide immediate medical services and on-**

going medical monitoring to all class members for their present and future formaldehyde-related injuries and medical conditions;

4)      Ordering Paulison and FEMA to preserve all of the FEMA travel trailers that have and/or will be deactivated, so that testing for formaldehyde can be performed;

5)      Ordering Paulison and FEMA to maintain an inventory, preserve, maintain, and produce any and all records, documents, databases, communications, and/or tangible items that reflect the contracting, specification, manufacturing, inspection, testing, delivery, occupancy, maintenance, and/or residence in the FEMA trailers;

6)      Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to preserve, maintain and produce any and all records, documents, databases, communications, and/or tangible items that reflect the contracting, manufacturing, inspection, testing, delivery, occupancy, maintenance, and/or residence in the FEMA trailers;

7)      Ordering Paulison and FEMA to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect the names, ages, addresses and other contact information concerning all persons who resided in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;

8)      Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect the names, ages, addresses and other contact information concerning all

persons who resided in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;

9) Ordering Paulison and FEMA to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect complaints, inquiries, concerns and/or communications about formaldehyde exposure in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;

10) Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect complaints, inquiries, concerns and/or communications about formaldehyde exposure in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;

11) Ordering Paulison and FEMA to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect testing for formaldehyde in FEMA travel trailers, whether performed by or at the direction of FEMA, FEMA contractors, other federal, state or local government agencies, trailer residents, public health entities, non-profit organizations, including but not limited to the Sierra Club, counsel and/or others;

12) Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect testing for formaldehyde in FEMA travel trailers, whether performed

**by or at the direction of FEMA, FEMA contractors, other federal, state or local government agencies, trailer residents, public health entities, non-profit organizations, including but not limited to the Sierra Club, counsel and/or others; and**

13) **Ordering Paulison and FEMA to contact and instruct the United States Department of Homeland Security, the Environmental Protection Agency, the Agency for Toxic Substances and Disease Registry and/or other federal, state and/or local government agencies to maintain, preserve and produce any and all records, documents, databases, communications and/or tangible items that concern, reflect and/or relate to the topics listed in the above sub-sections 5 through 12.**

**Plaintiffs further seek compensatory damages from FEMA for their past, present and future medical expenses, pain, suffering and emotional distress, and establishment of a medical monitoring program, under the Federal Tort Claims Act.**

Plaintiffs also seek compensatory damages for their past, present and future medical expenses, pain, suffering and emotional distress, and establishment of a medical monitoring program, from the manufacturers of the hazardous trailers under the Louisiana Products Liability Act.

Plaintiffs further seek compensatory damages for their past, present and future medical expenses, pain, suffering and emotional distress, and establishment of a medical monitoring program, from the FEMA contractors that knew or should have known of the hazards of formaldehyde under negligence and other applicable causes of action

2.

Plaintiffs suffered from various health problems due to formaldehyde exposure including respiratory ailments, nausea, rashes, and other serious medical issues.  Plaintiffs fear for their health and safety, the health and safety of their children, as well as those similarly situated.  Plaintiffs file this Class Action Complaint, on their own behalf, and on behalf of a class of plaintiffs similarly situated but as yet unidentified, as plaintiffs herein represent that they have injuries common to all those similarly situated residents of the State of Louisiana who incurred damages arising out of the use of FEMA trailers which caused them injuries in the manner specified herein.

3.

Names plaintiffs herein are:

Kimberly G. Nelson, a person of the full age of majority and resident of Vermilion Parish, State of Louisiana; individually and on behalf of her minor children, Griffin Champagne, and Baleigh Nelson, residents of Vermilion Parish, State of Louisiana;

Gina Smith, a person of the full age of majority and resident of Orleans Parish, State of Louisiana, current residing in a FEMA travel trailer, serial number 1305035.

John R. Roy, a person of full age of majority and resident of Lafayette Parish, State of Louisiana; currently residing in a CVDH Gulfstream trailer, serial number 54-6-T-CVDH-32322;

4.

Made defendants herein are:

**Gulf Stream Coach, Inc.**,  an Indiana corporation with its principal office in Napanee, Indiana, which manufactured and supplied more than 50,000 FEMA trailers for use in Louisiana, Alabama, and Mississippi under contracts for more than $520,000,000..

**Fleetwood Enterprises, Inc.**, a Delaware corporation with its principle office in Riverside, California, which manufactured and supplied about 7,500 FEMA trailers pursuant to contracts to

provide trailers for use in Louisiana, Alabama, and Mississippi.  FEMA's travel trailer order, which was procured under limited competition bidding, was more than eight times greater than Gulf Stream's total shipments for January through July, 20005.[2]

**Morgan Buildings & Spas**, a Texas corporation with its principal office in Dallas, Texas, which is a wholly-owned subsidiary of GHM Corporation, which manufactured and supplied more than 10,000 travel trailers to FEMA under contracts for more than $250,000,000.

**Monaco Coach Corporation**, an Indiana corporation which manufactured and supplied approximately 3,000 travel trailers to FEMA.

**Stewart Park Homes**, a Georgia corporation with its principal office in Thomasville, Georgia, which manufactured and supplied more than a thousand travel trailers to FEMA under contracts for more than $25,000,000.

**Coachmen Recreational Vehicle Company, LLC**, an Indiana limited liability company with its principal office in Middlebury, Indiana, owned by Coachman Industries, Inc., an Indiana corporation with its principal office in Elkhart, Indiana.  Coachman produced approximately 3,500 travel trailers for FEMA during the fourth quarter of 2005 and the first quarter of 2006 with a value of approximately $36 million.  Sierra Club testing found Coachmen Industries  trailers contained formaldehyde levels at .13  ppm. exceeding the OSHA, NIOSH, and HUD standards.

**Jayco Enterprises**, an Indiana corporation, manufactured and supplied FEMA trailers pursuant to contracts to provide trailers for use by class members.  Sierra Club testing found Jayco trailers contained formaldehyde levels at .20 ppm. exceeding the OSHA, NIOSH, and HUD standards.

---

[2]     "Gulf Stream Coach built more than 50,000 stripped down trailers, [A Gulf Stream supervisor] says his crew worked at breakneck pace for months, which, he says, forced the company to use cheaper wood products.  "Quality suffered dramatically because of the drive and pressure to put these trailers out.'" Reported on MSNBC.com., May 16, 2006.

**Starcraft RV**, an Indiana corporation, with its principal office in Elkhart, Indiana, which manufactured and supplied FEMA trailers pursuant to contracts to provide trailers for use by class members. Sierra Club testing found Starcraft trailers contained formaldehyde levels at .20 ppm. exceeding the OSHA, NIOSHA, and HUD standards.

**Forest River**, an Indiana corporation with its principal office in Elkhart, Indiana, which manufactured and supplied FEMA trailers pursuant to contracts to provide trailers for use by class members. Sierra Club testing found Forest River trailers contained formaldehyde levels at .18 ppm. exceeding the OSHA, NIOSHA, and HUD standards.

**Thor Industries**, an Ohio corporation, manufactured and supplied FEMA trailers pursuant to contracts to provide trailers for use by class members. Sierra Club testing found Thor Industries trailers contained formaldehyde levels at .14 ppm. exceeding the OSHA, NIOSHA, and HUD standards.

**Recreation by Design, LLC**, an Indiana limited liability corporation with its principal office in Goshen, Indiana, which manufactured and supplied FEMA trailers pursuant to contracts to provide trailers for use by class members. Sierra Club testing found Recreation by Design trailers contained formaldehyde levels at .25 ppm. exceeding the OSHA, NIOSH, and HUD standards.

**R. David Paulison**, in his official capacity as, Administrator of the Federal Emergency Management Agency, an agency of the United States Department of Homeland Security, who has acted under color of law in depriving plaintiffs and class members of the rights to safe and habitable housing, and has caused injuries and damages to plaintiffs and class members..

**The Federal Emergency Management Agency**, an agency of the United States Department of Homeland Security, which has deprived plaintiffs and class members of the rights to safe and habitable housing, and has caused injuries and damages to class members and plaintiffs.

**Harkey, Wiiki and Benavides, Inc.**, a Texas corporation, with its principal place of

business in Woodlands, Texas, doing business as ICU-Environmental Health & Safety (hereinafter "Harkey Wiiki"), which has registered to do business in Louisiana.  According to Harkey Wiiki's April 22, 2006 Press Release, the "U.S. Department of Homeland Security has awarded at contract valued at up to $100 million to Harkey, Wiiki & Benavides, Inc., operating as ICU Environmental, Health & Safety, The Woodlands, Texas, for the maintenance and deactivation of manufactured homes and travel trailers.  The contract was awarded by the department's Federal Emergency Management Agency.  Work will be performed in Alabama, Louisiana, Mississippi and Texas." Published by US. Federal News Service.  Considering that Harkey Wiiki claims no expertise concerning travel trailers, in its published materials, Harkey Wiiki should be providing chemical exposure and assessment services to FEMA.  Plaintiffs allege on information and belief that Harkey Wiiki knew or should have known of the formaldehyde hazards in the FEMA trailers, and that Harkey Wiiki contracted with FEMA and/or voluntarily assumed a duty to observe, test, warn and/or otherwise protect class members from formaldehyde exposure, and breached that duty, causing injuries and damages to class members.

As yet **unnamed travel trailer manufacturers** whose products were used as housing by the Federal Emergency Management Agency through the U.S. Department of Homeland Security.

As yet **unnamed FEMA contractors** who contracted with FEMA and/or voluntarily assumed a duty to protect class members and negligently failed to observe, test, warn and/or otherwise protect class members from formaldehyde exposure, causing injuries and damages to class members.

## VENUE AND JURISDICTION

5.

The Defendants named herein each do substantial business in the State of Louisiana and

within this federal District, and at all times relevant hereto, they engaged in commerce both in this federal judicial district and in the State of Louisiana.

6.

Plaintiffs allege that they have suffered damages in an amount in excess of $75,000 exclusive of interest and court costs, as to themselves and each proposed class member. There is complete diversity of citizenship and/or federal question jurisdiction herein because defendants were contractors of the Federal Government as to the matters complained of herein.  Alternatively, there is jurisdiction due to ample diversity to meet the terms of the Class Action Fairness Act (CAFA), 28 U.S.C. 1332(d)(2).

7.

Further, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 5 U.S.C. §701, et seq, 28 U.S.C. § 1343(a), 28 U.S.C. §1346, and/or 28 U.S.C. §1357..

8.

Venue is proper in this District pursuant to 28 U.S.C. § 1391, 28 U.S.C. § 1392(a) and 28 U.S.C. §1402, because a large portion the negligent and wrongful actions of the defendants occurred in the Western District of Louisiana; the named plaintiffs reside in the Western District of Louisiana, the damages to the named plaintiffs occurred within the Western District of Louisiana and the many of the applicable facts which form the basis of this lawsuit occurred in the Western District of Louisiana.

9.

Plaintiffs and class members have presented administrative claims, demands and complaints to FEMA directly or through FEMA contractors or through state and local officials seeking relief and providing notice to FEMA of their injuries and damages.  More than six months has elapsed since FEMA first received notice of class members claims, injuries and damages.  Further, named

plaintiffs, individually and on behalf of all others reserve the right to contest the legal and/or jurisdictional necessity of administrative claim filing as a consequence of the inaction and failure on behalf of FEMA in failing to process, evaluate and respond to said claims, demands and complaints.

10.

Plaintiffs and class members, individually and on behalf of all others, expressly plead the futility doctrine on behalf of any and all members of the putative class herein who either did not timely file an administrative claim for money damages under any applicable law or regulation, or if they did file such a claim and six months has not yet run from the time of filing.   All administrative exhaustion requirements imposed by 28 U.S.C. § 2675 have been waived by the "futility of exhaustion" doctrine because they can serve no purpose at all.   Requiring all potential class members to present administrative claims to FEMA prior to filing suit would serve no purpose because FEMA has made it clear through its actions and inactions that it does not intend to resolve any of these claims through its administrative claim process.

11.

To the extent that plaintiffs and class members seek declaratory, injunctive and mandatory relief from FEMA, filing administrative claims is not required.

12.

Additionally, plaintiffs and class members challenge FEMA's administrative claim requirements, 44 C.F.R. Part 11.10, et seq., as a denial of access to courts, unduly burdensome, not reasonably justified and inadequate for the number and extent of claims caused by FEMA's failure to prevent and/or eliminate formaldehyde exposure, injuries and damages to thousands of hurricane victims.   Further, plaintiffs and class members cannot presently make claims for damages in a sum certain, because their formaldehyde exposures and injuries are increasing every day, and because

Page  of  45

most of the class members have been unable to obtain medical testing and advice that might allow quantifying their damages.

### 13.

FEMA has waived sovereign immunity pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671, et seq.

### 14.

R. David Paulison is sued in his official capacity pursuant to 42 U.S.C. § 1983.

## COMMON FACTUAL ALLEGATIONS:

### 15.

This is a class action brought on behalf of those person residing or living in travel trailers (hereinafter called "housing units") along the Gulf coast of the United States.  These housing units were provided by FEMA after the landfalls of Hurricanes Katrina and Rita.

## The Defendants Breached Multiple Duties

### 16.

When Hurricanes Katrina and Rita devastated the Gulf Coast in August and September of 2005, the region witnessed a tremendous loss. Homes were completely destroyed; electricity, food, and clean water became impossibly scarce; and entire cities were rendered uninhabitable. Hundreds of thousands of citizens lost everything in these storms. The homelessness, starvation, and utter impoverishment of the ruined Gulf Coast region marked it as the most catastrophic natural disaster site in this country's history.

### 17.

Yet, the devastating scope of the damage to Louisiana, Mississippi and Alabama was

foreseeable.  Experts warned the Federal Government several days before the storm that when the hurricane made landfall it would likely be category 4 or higher. Equipped with the data from the Hurricane Pam disaster-preparedness exercise of 2004, the Federal Emergency Management Agency had anticipated its response to a storm like Katrina. Yet, despite its foreknowledge, FEMA took no action to assist in the Katrina evacuation and the agency found itself completely unprepared to carry out its responsibility to reduce the loss of life and property and protect the Nation from the hazards posed by natural disasters. In the 2006 Congressional Report, "A Failure of Initiative", one finding of the bipartisan committee investigating Katrina preparedness and response was that "FEMA's strategy of ordering 200,000 trailers and mobile homes shortly after the storm was blind to the nation's manufacturing capacity of 6,000 units per month" (p. 314). This failure resulted in a tremendous delay of providing shelter, a delay that could have been prevented because it should have been foreseen. Despite the limit to the nation's manufacturing capacity, FEMA contracted the mass-production of trailers, eventually housing hurricane victims in these rapidly-produced structures.

18.

Directed by Congress, to "alleviate the suffering and damage" which result from disasters[3], FEMA, had the duty and the responsibility to provide housing those displaced[4]. Federal law places this duty with FEMA. Housing provided by FEMA must be safe, sanitary, habitable and suitable for the occupants, without health hazards -- to alleviate and not increase the suffering and damage incurred by disaster victims[5]. FEMA is required to take care to assure that "all practical means and measures are used to protect, restore, and enhance the quality of the environment, to avoid or

---

[3] *See* 42 U.S.C. § 5121(b).

[4] *See* Stafford Act, 42 U.S.C. §5121, et seq, and 67 Fed. Reg. 61446 (9/30/02)

[5] *See* 44 C.F.R. Part 206.111; 44 C.F.R. Part 206.117.

minimize adverse environmental consequences[6]". Not only did FEMA have the duty to provide housing, but the agency furthermore had the duty to provide safe and sanitary housing that would not cause any segment of the population to suffer from severe health problems. [7]

19.

On August 31, 2005, the FEMA began housing the homeless in trailers. FEMA requested that travel trailer manufacturers supply trailers for use by hurricane victims and purchased hundreds and thousands of travel trailers at a cost of $65,000 per trailer for manufacture and installation, totaling an expenditure of more than $2 billion dollars. Throughout the process of housing the displaced, FEMA spent a considerable amount of time playing an active role in the development, design, and construction phases of trailer production. FEMA worked closely with engineers from Gulf Stream Coach, one of the many FEMA trailer manufacturers, "to determine the most useful and viable trailer features", according to a September 2005 Gulf Stream Press Release from *Inside Indiana Business*, "in developing specialized trailers that would meet the temporary needs of Katrina's victims: the right product for the conditions." This phrase would later prove a mockery of the true conditions.

20.

FEMA was aware of its duty to provide safe housing, yet FEMA did nothing to ensure that the housing provided was, in fact, safe. In a July 2006 memo to Michael Chertoff, FEMA Administrator David Paulison articulates FEMA's involvement in the trailer production: "FEMA sent four observers to the Gulf Stream plant in Indiana...FEMA staff checked the quality of the units that came off the assembly line in increments of 50,000 over a six month period. **They did not test for formaldehyde.**" (emphasis added). This is a tremendous failure. Formaldehyde has been a problem

---

[6] *See* 44 C.F.R. Part 10.4.

[7] *See* 67 Fed. Reg. 61446 (9/30/02).

in the vehicle home industry since the 1980s due to its known presence in the manufactured woods produced used in the construction of travel trailers. FEMA and the defendant manufacturers acted with reckless disregard for the health and safety of hurricane evacuees in refusing to insure that the trailers they manufactured were free from toxic formaldehyde fumes.

**Prolonged Exposure to Carcinogenic Formaldehyde Is a Threat to Life**

21.

Formaldehyde is a colorless, strong smelling gas. The substance is a volatile organic compound which vaporizes, or turns into gas, at normal room temperatures. Formaldehyde exposure can cause a number of severe effects, including but not limited to, watery eyes, burning sensations in the eyes, nose and throat, nausea, coughing, chest tightness, wheezing, skin rashes and allergic reactions. Formaldehyde exposure may also trigger attacks in those with asthma - a particular concern for class members many of whom have asthma. Residential formaldehyde exposures have also been linked to shortness of breath, chest pain, head ache, fatigue, unusual thirst, sleeping difficulty, dizziness, diarrhea, rashes and menstrual irregularities. Children and senior citizens may be more susceptible to the negative health effects associated with formaldehyde exposure. At extremely high levels, formaldehyde can be immediately dangerous to health and life. According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency. National Cancer Institute researchers have concluded that exposure to formaldehyde may cause leukemia.

22.

The substance has long been used as an embalming fluid. Formaldehyde is primarily used, however, in manufacturing the resins, or adhesives, which are used to produce certain construction

Page  of  45

materials such as particle board, and plywood for use in the manufactured home industry. Pursuant

to federal law, manufacturers of mobile homes larger than 8' wide by 40' long (320 square feet) are

required to display a "Health Notice" about exposure to formaldehyde which reads:

### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde.
Eye, nose and throat irritation, headache, nausea, and a variety of
asthma-like symptoms, including shortness of breath, have been
reported as a result of formaldehyde exposure.  Elderly persons and
young children, as well as anyone with a history of asthma, allergies,
or lung problems, may be at greater risk.  Research is continuing on
the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may
allow formaldehyde and other contaminants to accumulate in the
indoor air.  Additional ventilation to dilute the indoor air may be
obtained form a passive or mechanical ventilation system offered by
the manufacture.  Consult your dealer for information about the
ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels.
When a home is to be located in areas subject to extreme summer
temperatures, an air-conditioning system can be used to control
indoor temperatures levels.  Check the comfort cooling certificate to
determine if this home has been equipped or designed for the
installation of an air-conditioning system.

If you have any questions regarding the health effects of
formaldehyde, consult your doctor or local health department.

See 24 C.F.R. § 3280.309.

### 23.

There is no "safe" level of formaldehyde. As researchers study the affects of this gas on

human beings, the federal standards for acceptable levels in the workplace have decreased more

than threefold over the past ten years. In 1987, OSHA reduced the amount of formaldehyde to

which workers can be exposed over an 8 hour day from 3 p.p.m to 1 p.p.m.  In May, 1992 the

formaldehyde exposure limit was further reduced to 0.75 p.p.m. The Department of Housing and Urban Development ("HUD") has far stricter exposure limits when it comes to residential formaldehyde emissions. HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). By regulation, plywood "shall not emit formaldehyde in excess of 0.2 parts per million (PPM)..." Similarly, by regulation particle board materials "shall not emit formaldehyde in excess of 0.3ppm..." See 24 C.F.R. § 3280.308.

24.

The formaldehyde levels in FEMA trailers are well above the levels of concern. Since reports of formaldehyde in the trailers began surfacing at the end of 2005 and early 2006, FEMA has refused to test any occupied trailers to assess the risk to the hurricane victims living within them. From September to October in 2006, however, the EPA began sampling the air from 96 new, unused FEMA trailers. FEMA staff and EPA officials had developed a plan to test formaldehyde levels in occupied trailers, but FEMA officials rejected this idea. Instead, FEMA decided to test unoccupied trailers with their window open, their ventilation fans running and their air conditioning units operating, which FEMA staff correctly noted was unrealistic and did not reflect living conditions for class members. Yet, the unoccupied trailer test results were used by FEMA to claim that the risk of formaldehyde exposure was minimal. The test data was sent to ATSDR by FEMA's Office of General Counsel on December 6, 2006. ATSDR's February 1, 2007 Health Consultation report concluded that "A level of concern for formaldehyde in trailers used for temporary housing would be 0.3 ppm (369 ug/m3), which is an effect level associated with the narrowing of bronchi in sensitive individuals." ATSDR noted that formaldehyde levels in unoccupied trailers with only the air conditioning running and the bathroom vents open exceeded the level of concern for all but two days of the fourteen day test period. Even with all of the

windows and vents open and all of the vent fans running, it took four days for the formaldehyde levels in unoccupied trailers to drop below ATSDR's level of concern. Additionally, throughout April, May and June, 2006, the Sierra Club performed and publicized formaldehyde testing which found excessive levels of formaldehyde in more than 80 percent of the tested FEMA trailers.

25.

FEMA and the defendant manufacturers knew or should have known of the health hazards inherent in the products they constructed, by familiarity with industry standards and medical studies. While unknown to the plaintiffs, FEMA knew formaldehyde is a toxic gas. While unknown to the plaintiffs, FEMA knew formaldehyde is emitted from manufactured wood products. While unknown to the plaintiffs, FEMA knew that they were putting the hurricane victims at risk. Despite the Federal Government's knowledge of the dangers of formaldehyde emissions in the building components of FEMA housing, it provided trailers to the plaintiffs, exposing them to the proven unhealthy and dangerous levels of the carcinogenic gas. FEMA provided housing made from materials which emit levels of formaldehyde which exceed the levels permitted by law. FEMA's utter disregard for the health and safety of the hurricane victims has and will result in detrimental injury to the plaintiffs.

**Two Years of Neglect and Delay: FEMA's Refusals Put Children at Risk**

26.

FEMA repeatedly ignored complaints and cries for help from trailer residents who were suffering from these formaldehyde fumes. This is not a case of a few isolated incidents. FEMA trailer formaldehyde poisoning is a widespread, long-term pandemic. FEMA's Administrator stated that the agency cannot determine the number of formaldehyde complaints it received, "because FEMA does not have an Agency-wide database for collecting and sorting maintenance complaints including formaldehyde." FEMA refused to hear the complaints of the hurricane

victims. FEMA refused to move trailer residents to safe housing. FEMA refused to investigate reports of formaldehyde-related deaths and injuries.

27.

Reports of formaldehyde poisoning in FEMA trailers began to surface just months after FEMA ordered and designed the trailers. By at least December of 2005, FEMA knew about the hazards posed by formaldehyde in the trailers. FEMA received report after report from trailer residents, state and local officials, the Environmental Protection Agency ("EPA") and other federal government agencies, and even FEMA's own staff. But in December of 2005, FEMA took no action to protect those who needed it most.

28.

Beginning in March, 2006, news articles started to report dangerously high levels of formaldehyde in FEMA trailers.  FEMA's own staff requested immediate action and immediate testing. On March 28 and 29, 2006, FEMA tested trailers at their staging center in Purvis, Mississippi and found formaldehyde levels many times higher than the EPA and NIOSH standards. But these trailers were unoccupied and nothing was done after the test results indicated the threat. FEMA staff reported formaldehyde complaints to FEMA headquarters in March and April of 2006. But in March of 2006, FEMA took no action to protect those at risk.

29.

On April 5, 2006, a contract lab tested one occupied trailer for FEMA and reported formaldehyde levels 75 times higher than the NIOSH workplace safety level. On April 11, 2006, the issue of formaldehyde testing was referred to FEMA's Office of General Counsel. By April 18, 2006, FEMA and its contractors had received 39 calls reporting noxious fumes, suspected to be formaldehyde. At this time, FEMA only tested one occupied trailer. This trailer, manufactured by Coachmen in January of 2006 was found to have formaldehyde levels 75 times higher than the

National Institute for Occupational Safety and Health (NIOSH) workplace exposure level. This was in a Baxterville, Mississippi trailer occupied by a pregnant mother and her infant child.

30.

On May 17, 2006, FEMA issued a statement regarding formaldehyde on travel trailers, stating that, "FEMA and industry experts have evaluated the small number of cases where [odors] of formaldehyde have been reported, and we are confident that there is no on-going risk." Just two days later on May 19, 2006, FEMA staff, in an e-mail titled "Formaldehyde News Story Scare," communicated about a trailer occupant suffering breathing problems. The children living in the trailer were sleeping outside because their eyes were burning so badly while inside. The response from another FEMA staffer was "It's about to start." In May of 2006 FEMA did nothing to protect these children.

31.

In June, 2006, a FEMA trailer resident died. FEMA learned of this man's death and learned that formaldehyde may have been involved. After FEMA staff alerted headquarters that "the compressed boards of the travel trailers contain formaldehyde," FEMA lawyers intervened and halted a FEMA investigation into that death and halted testing of further FEMA trailers. On June 14, 2006, Scott Pullin, Vice President of Operations of Gulf Stream Coach, Inc., communicated to FEMA staff about a trailer resident's request for the Material Safety Data Sheet (MSDS) for a trailer, and recommended that FEMA request a letter from the resident's doctor before the MSDS would be provided. During this same month, FEMA was informed about the condition of a terminal cancer patient, living in a FEMA trailer. This trailer residents' doctor reported that the formaldehyde in the trailer was causing the patients' lungs to swell. After several e-mail exchanges, including comments that "these cases are getting considerable attention at the White House level," FEMA reimbursed the man's hotel expenses, and began efforts to move the man

into a mobile home without hazardous formaldehyde levels. In June of 2006 FEMA did nothing to protect other vulnerable victims.

32.

On July 13, 2006, FEMA's Office of Chief Counsel requested assistance from the federal Agency for Toxic Substances and Disease Registry ("ATSDR") for evaluation of formaldehyde testing on unoccupied FEMA trailers located in Baton Rouge. Yet, during that same month, FEMA refused a physician's request for information about the materials used in the FEMA trailers and instructed field staff to stop providing Material Safety Data Sheets to requesters. In July of 2006, FEMA received multiple warnings about dangerous levels of formaldehyde in FEMA trailers from EPA and Center for Disease Control ("CDC") officials.  FEMA knew that the EPA and CDC's "preliminary research has indicated that the acceptable level of formaldehyde will probably turn out to be much lower than we anticipated, and our units may be far above that level even after we ventilate them." But as of July of 2006, FEMA took no preventative action to protect those living in these hazardous trailers.

33.

In August, 2006, FEMA received a report of an infant girl's death. She was a FEMA trailer resident and her death may have been formaldehyde-related.  When a FEMA representative entered the trailer which had housed the deceased infant, she noted that the formaldehyde made her "nose burn."  Yet, FEMA never tested the trailer. Nor did FEMA warn future residents of that trailer about its demonstrated health risk. A FEMA staffer commented "This is so sad for everyone – I don't think we need to move on this with any particular speed – this may be partly how Mrs. _____ is grieving and trying to cope."  (Name redacted). After the infant's death, FEMA and EPA took conflicting positions. FEMA refused to consider the EPA's concerns. This led to a FEMA staffer's comment that "...I think EPA is being a butthead since it was one of their own

people that leaked the EPA / FEMA formaldehyde info to start with." *See* Exhibit X to House Report. In August of 2006 FEMA took no action to prevent the deaths of any other vulnerable children.

### Disregard for Human Decency: FEMA Knew of the Dangers and Delayed its Response

34.

FEMA documents show that the agency received multiple warnings about dangerous levels of formaldehyde in FEMA trailers, including warnings from the EPA and the CDC. In the course of the two years FEMA received these reports, complaints, and requests, FEMA stubbornly refused to conduct testing of occupied trailers because testing, in the words of a FEMA attorney, "would imply FEMA's ownership of the issue." FEMA's field staff recognized an immediate need for formaldehyde testing and FEMA action. But FEMA officials at headquarters, particularly the attorneys, refused to listen to their pleas. FEMA officials consistently refused to authorize testing of occupied trailers and repeatedly failed to protect those they had a duty to keep safe.

35.

Despite evidence of a formaldehyde problem in FEMA trailers, FEMA officials, acting on the advice of FEMA lawyers, refused to test occupied trailers. In fact, FEMA put out a request for bids for formaldehyde testing in April, 2006, but never executed a contract for formaldehyde testing. FEMA's refusal to conduct testing in occupied trailers or under conditions reflecting actual trailer use may have been part of a strategy to deny potential plaintiffs information that could be used in litigation. FEMA was more concerned with protecting itself from liability than with protecting the displaced storm victims. On July 26, 2006, FEMA Administrator Paulison sent a memo to Homeland Security Secretary Chertoff entitled "Status of Current Litigation", in which Paulison wrote,

> "FEMA's overall level of exposure for damages is low. Individual
> plaintiffs in order to succeed bear the burden of proof and must

> establish specific harm and damage.   Based on the limited
> information known so far, this is likely to be a very high threshold
> for them to meet."

This correspondence follows the June of 2006 *Hillard* lawsuit against FEMA which sought

damages and declaratory and injunctive relief under the Federal Tort Claims Act. FEMA's attitude

toward formaldehyde complaints and litigation is indicated by a FEMA attorney's June 14, 2006

e-mail, that "My guess is that just about the time we get a handle on ABA issues, formaldehyde

will fill the gap."

36.

On June 15, 2006, a FEMA attorney, directed that FEMA employees not conduct any

testing in FEMA trailers without prior approval from the Office of General Counsel, stating

> Do not initiate any testing until we give the OK.  While I agree that
> we should conduct testing, we should not do so until we are fully
> prepared to respond to the results.  Once you get results and should
> they indicate some problem, the clock is running on our duty to
> respond to them.

37.

In June of 2006, FEMA openly ignored their duty to protect those in danger. FEMA knew

that testing was necessary, yet the agency refused to expose itself to any potential lawsuit. From

a June 28th 2006 internal e-mail, FEMA states its position regarding its top priorities: "To be

moving forward with plans and consulting with other agencies prior to vetting this internally could

seriously undermine the Agency's position in this litigation and that is not acceptable.". FEMA

failed to take responsibility for the well-being of those whose health was threatened by

formaldehyde poisoning. FEMA refused to "take ownership" of the situation they created in the

first place.

FEMA failed to take appropriate measures to provide safe housing and instead attempted

to cover up its failures to this day. Before the House Committee on Oversight and Government

Reform in July of 2007, FEMA Administrator R. David Paulison issued the statement that, "FEMA and the entire Department of Homeland Security are committed to ensuring that victims of disasters have a safe and healthy place to live during the recovery period." At this point, FEMA knew that the "safe and healthy place to live" provided to hurricane victims was contaminated by hazardous levels of noxious formaldehyde gas. FEMA knew that the trailers specially designed as "the right product for the conditions" turned out to be products that emit toxic fumes to the hazard and harm of those FEMA had the duty to protect. Nothing excuses this; even when taking emergency action, FEMA must act to preserve human life[8].

### Hurricane FEMA

38.

FEMA failed to provide safe, habitable housing to hurricane victims and has known of the safety risks for nearly two years. FEMA trailers present a clear a present danger to the health and well-being of the plaintiffs and their families. All of the plaintiffs have spent significant time in the housing FEMA provided to them. Every day, the plaintiffs are exposed to dangerously high levels of formaldehyde gas. With the passing of every week, these residents are exposed to the carcinogenic formaldehyde fumes for hundreds of hours on end. One FEMA staffer who inspected a formaldehyde contaminated trailer could not last more than a few moments inside. Yet, for many of these hurricane victims, the trailers are the only option. FEMA placed the plaintiffs in the situation where their only choice is between formaldehyde poisoning and homelessness.

39.

FEMA continues to receive complaints about formaldehyde poisoning[9]. Yet, FEMA has refused to go to any great lengths to protect the health and safety of those with complaints. For example, FEMA decided to not include a phone number on a notice about formaldehyde that was

---

[8] *See* 44 C.F.R. 10.13.
[9] *See e.g.* Exhibit H to House Oversight and Government Reform, July 19, 2007 report

distributed to trailer occupants, because "we are trying to not generate a lot of calls, just get the facts out as we know them so we are not putting our number on it." FEMA withheld documents concerning formaldehyde complaints, investigation, testing and decision-making from Congress for more than a year.

40.

At this time, more than 50,000 FEMA travel trailers continue to shelter those made homeless by Hurricane Katrina and Hurricane Rita, exposing these victims to formaldehyde on a daily basis. Yet, FEMA has not yet performed comprehensive testing; FEMA has not provided medical services and FEMA has not moved class members to safe housing. At long last, however, FEMA has temporarily ended the deployment and sales of travel trailers. As of August 1, 2007 FEMA reserved an unspecified period of time to assess health-related concerns raised by occupants.

41.

At a Congressional hearing in July 2007, FEMA Administrator told a Congressional committee that FEMA and the Centers for Disease Control and Prevention "are scheduled to begin Phase 1 of the study in the Gulf Coast next week." Ralph Blumenthal, *Stalled Health Tests Leave Storm Trailers in Limbo*, New York Times, October 18, 2007, at Sec. A, Column O, Pg. 20.

42.

The first FEMA and CDC teams did not reach New Orleans and Mississippi until the end of September and then began only a baseline assessment of unoccupied trailers. *See id.* As of October 18, 2007, FEMA HAS NOT TESTED ANY OF THE OCCUPIED FEMA TRAILERS. *See id.*

43.

As of October 18, 2007, approximately 4,110 people living in FEMA trailers have asked

to be relocated because of health concerns.  Of those 4,110 people, 771 have moved been moved to alternative housing, 546 have been given rent subsidies to live elsewhere and 83 have moved into hotels and motels at government expense.  The remaining 2,710 people who told FEMA that they want to move out of the trailers due to health concerns are still living in FEMA trailers.  *See id.*

### FEMA's Delay Makes Them Liable

44.

FEMA is responsible for violations of the law and is not entitled to any immunity preventing judgment in a court of law. FEMA's omissions and actions concerning formaldehyde complaints and formaldehyde exposure to disaster victims violated legal duties, mandatory standards and Congressionally-imposed duties of FEMA. These omissions and actions constitute operational decisions by FEMA officials, staff, and contractors.

45.

FEMA's omissions and actions concerning formaldehyde complaints and formaldehyde exposure of disaster victims did not constitute discretionary decisions nor discretionary functions by FEMA officials, staff and contractors. FEMA delayed its response in attempt to cover up the endemic problem. Concealment can never be a discretionary function.

46.

FEMA's omissions and actions concerning formaldehyde complaints and formaldehyde exposure of disaster victims are not shielded from liability under 42 U.S.C. §5148, because FEMA's conduct was not discretionary and violated mandatory standards and duties.

47.

FEMA has also violated its obligations to class members under Louisiana Civil Code articles 2682 , 2684, 2696 and 2698, because the FEMA travel trailers are unsafe and

uninhabitable.

48.

### **Medical Monitoring**

Plaintiffs and all class members are entitled to the reasonable costs of medical monitoring under a court supervised medical monitoring fund, because plaintiffs and all class members:

a.   Have significant exposure to a proven hazardous substance;

b.   As a result of this exposure, they suffer a significantly increased risk of contracting a serious latent disease;

c.   Their risk of contracting a serious latent disease is greater than (1) the risk of contracting the same disease had they not been exposed and (2) the chances of members of the general non-exposed public of developing a disease;

d.   A monitoring procedure exists that can make the early detection of the disease possible;

e.   The monitoring procedures are prescribed by medical professionals and such monitoring is reasonably necessary for early detection and treatment;

f.   The increased risk of disease from exposure warrants medical monitoring beyond that which a individual would normally pursue;

g.   Medical benefits are gained through early detection of disease;

h.   Such future medical treatment, services, surveillance and/or procedures are directly related to a manifest physical or mental injury or disease; and

I.   But for the Defendants' action or inaction, the members would not have incurred the additional costs of medical monitoring and treatment resulting from exposure.

## COUNT I

## LOUISIANA PRODUCTS LIABILITY ACT:

49.

Plaintiffs hereby re-allege and re-aver the allegations of paragraphs 1 through 48, against the FEMA travel trailer manufacturers.

50.

The FEMA trailers constitute products under the Louisiana Products Liability Act, thus the **trailer manufacturers** are liable exclusively under this act.

51.

The exposure to formaldehyde fumes from the Defendant trailer manufacturers' trailers resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration in the condition in which the Defendants sold these products and equipment.

52.

The design of the FEMA trailers, using plywood, press board or other composite wood products that contain formaldehyde is defective and poses an unreasonable risk of harm to the Plaintiffs and all class members.

53.

Alternatively, the use of plywood, press board or other composite wood products that contain formaldehyde constitutes a defect in composition or manufacture, that poses an unreasonable risk of harm to the Plaintiffs and class members.

54.

On information and belief, the federal government contracted with the trailer manufacturer defendants to purchase more than 100,000 trailers after Hurricane Katrina. Of those 100,000, only about 14,000 had been manufactured prior to Hurricane Katrina.

55.

The trailer manufacturers set up ad hoc assembly lines, advertised in local newspapers and hired temporary workers to fill the FEMA orders, operated their assembly lines for twelve hour shifts, six days per week, and required workers to produce trailers in as little as ten minutes per trailer, without the trailer manufacturers' usual quality control.

56.

The trailer manufacturers were unable to find enough construction materials from their usual suppliers of low-formaldehyde emitting materials, and, instead used high-formaldehyde emitting particle board, composite woods, adhesives and/or other materials for the FEMA trailers.

57.

The Defendant trailer manufacturers' products were in a defective condition, and were unreasonably dangerous under normal use at the time the products and equipment left the respective Defendants control.  The named Plaintiffs and members of the class were intended and foreseeable users of the trailers, and damages and loses to the named Plaintiffs and members could reasonably have been anticipated by the Defendants.  The defects in the Defendants' trailers include, but are not limited to, the following:

    a.    inherent (and known to the Defendants) characteristics that gave the products such a potential for causing health problems as to render the products unreasonably dangerous per se;

    b.    lack of warnings or lack of sufficient warnings of the inherently dangerous properties of the products when used in the fashion for which they were anticipated or should have been anticipated being used;

    c.    Lack of instructions or lack of sufficient instructions for eliminating or minimizing the health risks inherent in the use of the products;

d.      lack of sufficient inspections by the Defendants of their products to ensure that such products contained sufficient warnings of the dangerous properties of the products;

e.      lack of reasonable inspections by the Defendants of their products to ensure that such products contained sufficient instructions for eliminating or minimizing the health risks inherent in the use of the products;

f.      lack of testing or lack of sufficient tests to determine the effects and/or risks of formaldehyde fumes on intended users or guests; and/or

g.      defective designs calling for the inclusion of materials which included formaldehyde, when equally suitable materials that did not contain formaldehyde were available.

58.

The Defendant trailer manufacturers sold their products and equipment with disregard for the safety of users of the products and other persons who might be injured thereby.

59.

Plaintiffs further allege that as yet **unnamed travel trailer manufacturers** whose products were used as housing by the Federal Emergency Management Agency through the U.S. Department of Homeland Security are liable to class members under the Louisiana Products Liability Act.

## COUNT II

## NEGLIGENCE:

60.

Plaintiffs hereby re-allege and re-aver the allegations of paragraphs 1 through 48, against the FEMA contractors, particularly Harkey Wiiki.

61.

Harkey Wiiki's contracted with FEMA for up to $100 million to for the maintenance and deactivation of manufactured homes and travel trailers in Alabama, Louisiana, Mississippi and Texas.

62.

Harkey Wiiki represents to the public via the ICU Environmental Health & Safety web-site that it "can provide on-site industrial hygiene and safety consultation and services including facility inspections, industrial hygiene monitoring, and emergency management."

63.

The principals and staff of Harkey Wiiki have education, experience, certifications and licenses in the fields of chemistry, biology, industrial hygiene, safety engineering, environmental health science, and have conducted qualitative and quantitative chemical exposure assessments for chemical and petroleum industry and government clients.

64.

Considering that Harkey Wiiki claims no expertise concerning travel trailers, in its published materials, Harkey Wiiki should be providing chemical exposure and assessment services to FEMA.

65.

Plaintiffs allege on information and belief that Harkey Wiiki knew or should have known of the formaldehyde hazards in the FEMA trailers.  Harkey Wiiki contracted with FEMA and/or voluntarily assumed a duty to observe, test, warn and/or otherwise protect class members from formaldehyde exposure, and breached that duty, causing injuries and damages to class members.

66.

Plaintiffs further allege that as yet **unnamed FEMA contractors** who contracted with

FEMA and/or voluntarily assumed a duty to protect class members and negligently failed to observe, test, warn and/or otherwise protect class members from formaldehyde exposure, causing injuries and damages to class members.

## COUNT III

## CIVIL RIGHTS ACT

67.

Plaintiffs hereby re-allege and re-aver the allegations of paragraphs 1 through 48, against FEMA and R. David Paulison.

68.

R. David Paulison and the Federal Emergency Management Agency have deprived plaintiffs and class members of their rights to safe and habitable temporary housing, by failing to assure that the travel trailers did not contain hazardous levels of formaldehyde and by failing to take immediate action to remove plaintiffs and class members from the toxic trailers as soon as FEMA knew or should have known that the travel trailers were hazardous.

## COUNT IV

## LOUISIANA CIVIL CODE VIOLATIONS

69.

Plaintiffs hereby re-allege and re-aver the allegations of paragraphs 1 through 48, against FEMA and R. David Paulison.

70.

R. David Paulison and the Federal Emergency Management Agency have violated their duties as property owners and landlords under Louisiana Civil Code articles 2315, 2317,

2317.1, 2322, 2682, 2684, 2696, 2697, and/or 2698, to provide safe and habitable housing to plaintiffs and class members.

71.

R. David Paulison and the Federal Emergency Management Agency are liable to the plaintiffs and class members for injuries and damages caused by their violation of Civil Code articles 2315, 2317, 2317.1, 2322, 2682, 2684, 2696, 2697, and/or 2698.

## COUNT V

## FEDERAL TORT CLAIMS ACT

72.

Plaintiffs hereby re-allege and re-aver the allegations of paragraphs 1 through 48, against FEMA and R. David Paulison.

73.

Plaintiffs and class members are entitled to an award of compensatory damages against the Federal Emergency Management Agency for the injuries and damages caused by FEMA's non-discretionary acts and omissions.

## COUNT VI

## INJUNCTIVE RELIEF

74.

Plaintiffs and class members are entitled to a judgment ordering declaratory, injunctive and mandatory relief against R. David Paulison and FEMA, including but not limited to:

1) **Ordering Paulison and FEMA to test all of the travel trailers and inform the residents of the formaldehyde levels that they have been exposed to;**

2) **Ordering Paulison and FEMA to immediately move all FEMA trailer**

residents out of the toxic trailers;

3)   Ordering Paulison and FEMA to provide immediate medical services and on-going medical monitoring to all class members for their present and future formaldehyde-related injuries and medical conditions;

4)   Ordering Paulison and FEMA to preserve all of the FEMA travel trailers that have and/or will be deactivated, so that testing for formaldehyde can be performed;

5)   Ordering Paulison and FEMA to maintain an inventory, preserve, maintain, and produce any and all records, documents, databases, communications, and/or tangible items that reflect the contracting, manufacturing, inspection, testing, delivery, occupancy, maintenance, and/or residence in the FEMA trailers;

6)   Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to preserve, maintain and produce  any and all records, documents, databases, communications, and/or tangible items that reflect the contracting, manufacturing, inspection, testing, delivery, occupancy, maintenance, and/or residence in the FEMA trailers;

7)   Ordering Paulison and FEMA to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect the names, ages, addresses and other contact information concerning all persons who resided in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;

8)   Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to maintain, preserve and produce any and all

records, documents, databases, communications, and/or tangible items that reflect the names, ages, addresses and other contact information concerning all persons who resided in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;

9)  Ordering Paulison and FEMA to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect complaints, inquiries, concerns and/or communications about formaldehyde exposure in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;

10)  Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect complaints, inquiries, concerns and/or communications about formaldehyde exposure in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;

11)  Ordering Paulison and FEMA to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect testing for formaldehyde in FEMA travel trailers, whether performed by or at the direction of FEMA, FEMA contractors, other federal, state or local government agencies, trailer residents, public health entities, non-profit organizations, including but not limited to the Sierra Club, counsel and/or others;

12)  Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to maintain, preserve and produce any and all

**records, documents, databases, communications, and/or tangible items that reflect testing for formaldehyde in FEMA travel trailers, whether performed by or at the direction of FEMA, FEMA contractors, other federal, state or local government agencies, trailer residents, public health entities, non-profit organizations, including but not limited to the Sierra Club, counsel and/or others;**

13) **Ordering Paulison and FEMA to contact and instruct the United States Department of Homeland Security, the Environmental Protection Agency, the Agency for Toxic Substances and Disease Registry and/or other federal, state and/or local government agencies to maintain, preserve and produce any and all records, documents, databases, communications and/or tangible items that concern, reflect and/or relate to the topics listed in the above sub-sections 5 through 12.**

## CLASS ACTION ALLEGATIONS

### 75.

Petitioners bring this action on their own behalf and on behalf of all others similarly situated in the respects herein below stated. The claims of the proposed class representatives are typical of the claims of the proposed class. Plaintiffs will fairly and adequately represent and protect the interests of all members of the described class. The common questions of law and fact as shown in this complaint predominate over individual questions of causation or individual damages. Concentrating this litigation in one forum will aid with judicial economy and efficiency and promote parity among the claims of individual class members as well as judicial consistency. Plaintiffs have retained attorneys highly experienced in the prosecution of class actions, including

complex litigation, voting rights and civil rights actions, and mass tort class actions, to represent class members herein.

76.

A class action is superior to other available methods for the fair and efficient adjudication of this litigation, since individually joinder of all members of each class is impracticable.  Even if any class members could afford individual litigation, it would be unduly burdensome to the Courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by defendant's product.  By contrast, the class action device presents far and fewer management difficulties and provided the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.  Thousands of individual actions will create unnecessary burdens on and delay to injured victims in addition to straining the judicial system.  Such individuals actions will also magnify the expense for retaining expert witnesses, and prolong all parties' abilities to receive a speedy and efficient adjudication of this matter.

77.

Furthermore, class certification is appropriate because the prosecution of separate actions by individuals members o f the class would create a risk of adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members no parties to the adjudications and substantially impair their ability to protect interests.

78.

Accordingly, class certification is appropriate under the Federal Rules of Civil Procedure, Rule 23(b)(3) and/or (b)(1)(B), and the class action vehicle is the superior method of handling this litigation.

79.

This is a class action pursuant to F.R.C.P. 23 on behalf of a class of plaintiffs similarly situated but as yet unidentified, as plaintiffs herein represents that they have injuries common to all those similarly situated who suffered damages from living in the FEMA supplied housing units in the wake of Hurricane Katrina.

80.

Plaintiffs allege and propose that the class be defined as:

**All residents, domiciliaries, and property owners of the State of Louisiana who reside or resided in FEMA provided travel trailers after Hurricanes Katrina and Rita.**

81.

The proposed class action arises out of the catastrophic events of Hurricanes Katrina and Rita which rendered hundreds of thousands of people homeless thus causing them to use the FEMA provided housing units.  The exact number and identities of the class plaintiffs are unknown at this time, and can only be ascertained through appropriate discovery, plaintiffs are of information and belief that the class of plaintiffs clearly consists of hundreds of thousands of persons presenting a level of numerosity better handled through the class action procedure.

82.

This action is appropriate for determination through the Federal Class Action Rule (F.R.C.P. art. 23, *et seq*.) for the following reasons:

**A.      NUMEROSITY**

The class consists of hundreds of thousands of people.  The exact number and identities of the class plaintiffs are unknown at this time, and can only be ascertained through appropriate discovery, plaintiffs are of information and belief that the class of plaintiffs clearly consists of hundreds of thousands of persons presenting a level of numerosity better handled through the class action procedure.

**B.      COMMON QUESTIONS OF LAW AND FACT**

There are common questions of law and fact applicable to all class members and which predominate over individual questions and which include but are not limited to the dangerous nature of the FEMA provided housing units, the duty, knowledge, acts and omissions of the trailer manufacturers and contractors, the duty, knowledge, acts and omissions of FEMA, and medical conditions and injuries that can result from formaldehyde exposure, injunctive relief for all class members, and medical monitoring.

**C.     ADEQUATE REPRESENTATION**

Plaintiffs will fairly and adequately represent the interests of the class, and the class representatives herein are represented by skilled attorneys who are experienced in the handling of mass tort class action litigation and who may be expected to handle this action in an expeditious and economical manner to the best interest of all members of this class;

**D.     TYPICALITY**

The claims of the class representatives as named herein are typical of the claims of the class members they seek to represent in that they are all claims seeking damages arising from the damages they received as a result of exposure to formaldehyde from the FEMA trailers.

**E.     SUPERIORITY**

The Class Action Procedure affords a superior vehicle for the efficient disposition of the issues and claims herein presented, especially since individual joinder of each of the class members is impracticable.  Individual litigation by each of the class members, besides being unduly burdensome to the plaintiffs would also be unduly burdensome and expensive to the court system as well as the defendants.

**<u>REQUEST FOR JURY TRIAL</u>**

83.

Plaintiffs are entitled to and demand a trial by jury, as to all parties, relief and causes of

action that can be determined by a jury

.

**WHEREFORE,** Plaintiffs, Kimberly Nelson, et al pray:

1.     That a summons be issued to the defendants so that they can be served the

       summons along with a copy of this Complaint and be cited to appear and answer

       same;

2.     That after due proceedings are had, that this action be certified as a class action pursuant to the provisions of F.R.C.P. 23 and the applicable local rules, in the respects alleged herein above, for the purposes of determining the common issues of liability for compensatory damages;

3.     That upon certification of the class action, the Court call for the formulation of a suitable management plan pursuant to the Federal Rules of Civil Procedure;

4.     That after due proceedings are had, and a trial by jury, there be a judgment in this matter in favor of the plaintiffs and against the defendants, declaring that the defendants are liable, to the plaintiffs and all members of the class for all applicable damages and thereafter;

5.     That the right of the plaintiffs and all members of the class to establish their entitlement to compensatory damages, and the amount thereof, be reserved for determination in their individual actions when appropriate;

6.     That plaintiffs recover their costs for the prosecution of this class action, and for interest on all damages from the date of judicial demand until paid.

7.     Plaintiffs further seek an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) and seek recovery of any expert costs and expenses pursuant to 42 U.S.C. §1988( c), and/or an award of attorneys' fees, costs and expenses pursuant to Rule 23(h).

Respectfully submitted,


___/s/ John K. Etter_____
ROY J. RODNEY, JR..(# 2079)
JOHN K. ETTER (# 25042)
RODNEY & ETTER
200 W. Congress Street, Ste. 650
Lafayette, LA 70501
Telephone: (337) 232-6924
Fax: (337) 232-6854

*Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has this day been forwarded to all known counsel of record , by electronic filing and transmission through the Court's ECF system. A copy of the foregoing pleading has been delivered to the Office of the United States Attorney for the Eastern District of Louisiana by U.S. Mail postage prepaid or by hand delivery.  Signed this 1st day of November, 2007.

_____/s/ John K. Etter_____
JOHN K. ETTER

**Please Issue Summons to:**

R. David Paulison, Administrator,
Federal Emergency Management Agency
United States Department of Homeland Security
500 C Street S.W.
Washington, DC 20472

R. David Paulison, Administrator
Federal Emergency Management Agency
United States Department of Homeland Security
Through the United States Attorney for the Eastern District of Louisiana
Hon. Jim Letten, Esq.
Hale Boggs Federal Building, Suite B-210
New Orleans, LA 70130

R. David Paulison, Administrator
Federal Emergency Management Agency
United States Department of Homeland Security
Through the Acting Attorney General
Hon. Peter D. Keisler, Esq.
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Federal Emergency Management Agency
Office of General Counsel
United States Department of Homeland Security
500 C Street S.W.
Washington, DC 20472

Federal Emergency Management Agency
United States Department of Homeland Security
Through the United States Attorney for the Eastern District of Louisiana
Hon. Jim Letten, Esq.
Hale Boggs Federal Building, Suite B-210
New Orleans, LA 70130

Federal Emergency Management Agency
United States Department of Homeland Security
Through the Acting Attorney General
Hon. Peter D. Keisler, Esq.
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Gulf Stream Coach, Inc.
Through Its Registered Agent
Kenneth C. Brinker
503 South Oakland
Napannee, Indiana 46550

Coachman Recreational Vehicle Company, LLC
Through Its Registered Agent
Corporation Service Company
251 East Ohio Street, Suite 500
Indianapolis, IN 46204

Fleetwood Enterprises, Inc.
Through Its Registered Agent
Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

JAYCO ENTERPRISES
Through its Registered Agent
Kennard R. Weaver
317 Franklin Street
Elkhart, Indiana 46516

STARCRAFT RV
Through its Registered Agent
Glenn E. Killoren
317 W. Franklin Street
Elkhart, Indiana 46516

FOREST RIVER
Through Its Registered Agent
J. Richard Ransel
228 W. High Street
Elkhart, Indiana 46516

THOR INDUSTRIES
Through its registered Agent
CT Corporation System
1300 East 9th Street
Cleveland, Ohio 44114

RECREATION BY DESIGN
Through Its Registered Agent
Randall K. Rush
17051 CR 20
Goshen, Indiana 46528

MORGAN BUILDINGS & SPAS
Through Its Registered Agent
CT Corporation System
350 North St. Paul Street
Dallas, TX 75201

MONACO COACH CORPORATION
Through Its Registered Agent
Jay Devoss
147 South 2nd Street
Decatur, Indiana 46733

HARKEY, WIIKI AND BENAVIDES, INC.
Through Its Registered Agent
Louisiana Corporate & Registered Agent, Services, Inc.
3867 Plaza Tower Drive, 1st Floor
Baton Rouge, LA 70816