UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: FEMA TRAILER  FORMALDEHYDE PRODUCTS  LIABILITY LITIGATION | * * | CIVIL ACTION 2:07-MD-1873 |
| | * | JUDGE ENGLEHARDT - DIV. N |
| PERTAINS TO:   NELSON versus  GULF STREAM,  U.S.D.C. W.D. LA  No. 07-921 | * * * | MAGISTRATE ROBY - MAG. 4 |

**************************************************************************

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
<u>AND REQUEST FOR EXPEDITED HEARING</u>

**MAY IT PLEASE THE COURT:**

Over the past two years, the Federal Emergency Management Agency ("FEMA"), which is supposed to alleviate the suffering of disaster victims has caused and contributed to the medical problems and emotional distress of thousands of Hurricane Katrina and Hurricane Rita victims by ignoring scientific data, testing, complaints and Congressional investigations and hearing, all of which establish that FEMA trailer residents are being exposed to formaldehyde every day.

In the past six weeks, alone:

1. FEMA reported that 3,226 Louisiana residents living in FEMA trailers called FEMA's formaldehyde call center during September, 2007 asking to be moved out of FEMA trailers due to formaldehyde concerns. *See* FEMA - Louisiana: 1603/1607 Individual Assistance Program Global Report, dated October 3, 2007, p. 8. According to FEMA, 953 of those trailer residents moved to alternate housing. *See Id.* 2,273 people who actually called FEMA asking to be moved out trailers due to formaldehyde concerns are still living in FEMA trailers. *See Id.*

2. The federal Agency for Toxic Substances and Disease Registry ("ATSDR"), a unit of the Centers for Disease Control, issued an update and revision to its February, 2007 report on the FEMA trailers. *See* ATSDR - An Update and Revision of ARSDR's February 2007 Health Consultation - Formaldehyde Testing of FEMA Temporary - Housing Trailers (copy attached, Exhibit A). ATSDR's updated report stated that "formaldehyde levels on closed trailers averaged 1.04 parts per million (ppm), with some measurements exceeding 3.5 ppm. **Exposure in this range is sufficient to cause acute symptoms in some people. Allergic sensitization to formaldehyde may also occur. Risk of cancer will increase with increase formaldehyde concentration and duration of exposure."** *Id.*, Executive Summary, p. 4 (emphasis added). "The levels during air conditioning remained in a range that may be associated with acute symptoms in some people." *Id.*, p. 5. After stating the limitations of its testing of unoccupied trailers, ATSDR concluded that "**further analysis of exposure conditions and potential health effects in occupied FEMA trailers is warranted. Likewise, effective interventions to reduce the level and**

**duration of exposure and potential health effects should be identified.**" *Id.* (Emphasis added).

3. On October 18, 2007, the New York Times reported that none of the 56,000 occupied FEMA trailers had been tested, and that FEMA and CDC did not plan to test occupied trailers until late-October or early November, 2007. *See* Ralph Blumenthal, *Stalled Health Tests Leave Storm Trailers in Limbo*, N.Y. Times, 10/18/07 at A.20, column 0.

4. On October 31, 2007, National Public Radio's *All Things Considered* publicized the plight of residents of the Renaissance Village FEMA trailer park north of Baton Rouge, Louisiana.

5. On November 5, 2007, a CDC spokesman stated that FEMA had ordered CDC to delay formaldehyde testing of 150 occupied FEMA trailers in Mississippi and 150 FEMA trailers in Louisiana. *See* Ana Radelat*, CDC Postpones Air Quality Testing of FEMA Trailers*, Clarion-Ledger, 11/2/07. *See also* Associated Press, *Government Postpones Tests on FEMA Trailers' Air Quality*, Sun-Herald, 11/6/07 and other new papers.

6. On November 7, 2007, CBS News reported on internal FEMA e-mails directing FEMA employees to not enter unoccupied, stored FEMA travel trailers due to formaldehyde concerns and reported that FEMA had indefinitely halted even testing of a 300 trailer sample of the more than 50,000 occupied trailers. *See* CBS News, *FEMA Protecting Itself, But Not Evacuees?*, 11/7/2007, available at www.cbsnews.com.

7. On November 8, 2007, FEMA issued a press release addressing the above media reports, in which FEMA actually confirmed that formaldehyde testing of occupied travel trailers "was temporarily postponed when CDC, HHS and FEMA determined that the full parameters of the tests had not been determined," and indicated that "testing will resume - perhaps as early as later this month." *See* FEMA Press Release, *Myths & Facts: Travel Trailers*, 11/8/07, Release No. HQ-07-222. FEMA further confirmed that of the current 52,047 households occupying FEMA temporary housing on the Gulf Coast, "4,609 households or 8.7% - have expressed a health concern since July 21." *Id.*[1]

8. MSNBC reported on November 12, 2007, that private formaldehyde tests of 580 FEMA trailers and mobile homes found formaldehyde levels above CDC's long-term exposure level in 95 percent of the tested units. *See* Mike Brunker, *Toxic Gas Pervasive in FEMA Units, Tests Show*, MSNBC.com, 11/12/2007.

Yet, FEMA has not tested a single occupied trailer and is moving with less than "all deliberate speed" in moving hurricane victims out of the hazardous trailers.

In light of FEMA's inaction, delays and continuing refusal to acknowledge and address this public health crisis, Plaintiffs move this Court to grant all FEMA trailer residents declaratory, injunctive and mandatory relief, under the Civil Rights Act, and other causes of action, including but not limited to:

---

[1] What percentage of the hurricane victims would have to complain before FEMA considered formaldehyde exposure to be a public health emergency requiring immediate action?

1) **Ordering Paulison and FEMA to test all of the travel trailers and inform the residents of the formaldehyde levels that they have been exposed to;**

2) **Ordering Paulison and FEMA to immediately move all FEMA trailer residents who desire to leave out of the toxic trailers;**

3) **Ordering Paulison and FEMA to provide immediate medical services and on-going medical monitoring to all class members for their present and future formaldehyde-related injuries and medical conditions;**

4) **Ordering Paulison and FEMA to preserve all of the FEMA travel trailers that have and/or will be deactivated, so that testing for formaldehyde can be performed;**

5) **Ordering Paulison and FEMA to maintain an inventory, preserve, maintain, and produce any and all records, documents, databases, communications, and/or tangible items that reflect the contracting, specification, manufacturing, inspection, testing, delivery, occupancy, maintenance, and/or residence in the FEMA trailers;**

6) **Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to preserve, maintain and produce any and all records, documents, databases, communications, and/or tangible items that reflect the contracting, manufacturing, inspection, testing, delivery, occupancy, maintenance, and/or residence in the FEMA trailers;**

7) **Ordering Paulison and FEMA to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that**

>   reflect the names, ages, addresses and other contact information concerning all persons who resided in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;

8) **Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect the names, ages, addresses and other contact information concerning all persons who resided in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;**

9) **Ordering Paulison and FEMA to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect complaints, inquiries, concerns and/or communications about formaldehyde exposure in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;**

10) **Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect complaints, inquiries, concerns and/or communications about formaldehyde exposure in the FEMA trailers, subject to appropriate protective orders to be determined by this Court and counsel;**

11) **Ordering Paulison and FEMA to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that**

>   reflect testing for formaldehyde in FEMA travel trailers, whether performed by or at the direction of FEMA, FEMA contractors, other federal, state or local government agencies, trailer residents, public health entities, non-profit organizations, including but not limited to the Sierra Club, counsel and/or others;

12) **Ordering Paulison and FEMA to contact and instruct all travel trailer manufacturers and contractors to maintain, preserve and produce any and all records, documents, databases, communications, and/or tangible items that reflect testing for formaldehyde in FEMA travel trailers, whether performed by or at the direction of FEMA, FEMA contractors, other federal, state or local government agencies, trailer residents, public health entities, non-profit organizations, including but not limited to the Sierra Club, counsel and/or others; and**

13) **Ordering Paulison and FEMA to contact and instruct the United States Department of Homeland Security, the Environmental Protection Agency, the Agency for Toxic Substances and Disease Registry and/or other federal, state and/or local government agencies to maintain, preserve and produce any and all records, documents, databases, communications and/or tangible items that concern, reflect and/or relate to the topics listed in the above sub-sections 5 through 12.**

Plaintiffs further move for this Court to retain jurisdiction and supervise the conduct of FEMA for such time as may be necessary to assure that plaintiffs and those similarly situated are

able provided safe housing and medical care.

## STATEMENT OF FACTS[2]

Formaldehyde is a toxic, flammable, carcinogenic gas. Exposure can cause burning eyes, nose and throat, chest tightness, wheezing, skin rashes, asthma attacks, dizziness, nosebleeds, headaches, blurred vision, sinus infections, and nausea. Children are especially susceptible to the severe effects of this toxic gas. "FEMA" trailers, temporary housing units manufactured by the Defendants, are known to contain excessive levels of formaldehyde. Rendered homeless by the catastrophic winds, storm surges, and floods of Hurricanes Katrina and Rita in August and September of 2005, the plaintiffs and class members were moved into these FEMA trailers by the Defendants. Due to the fault of the Defendants, the FEMA trailers contain hazardous levels of formaldehyde, exposing the displaced hurricane victims to excessive amounts of the air-borne carcinogen. Despite federal regulation of formaldehyde levels in manufactured housing, numerous lawsuits, and prior reports of hazardous levels of formaldehyde in FEMA trailers, Defendants failed to warn plaintiffs that the air in their homes could make them severely ill and that their children were especially at risk. Defendants failed to warn plaintiffs that they were in danger. Defendants failed to provide trailers with adequate ventilation, and failed and construct the trailers with materials that would prevent formaldehyde poisoning. Despite the media reports and formaldehyde testing results

---

[2] Plaintiffs hereby re-aver and incorporate by reference the allegations contained in their original and amended petitions in this matter in support of this motion for preliminary injunction. Plaintiffs further request this Court to take judicial notice of the facts contained in the original and amended petitions regarding FEMA's decisions, acts and omissions since Hurricane Katrina and Hurricane Rita, which have resulted in thousands of disaster victims being poisoned. *See also McWaters v. Federal Emergency Management Agency*, 408 F.Supp.2d 221 (E.D. La. 2005)(Duval, J., describing FEMA's delayed and erratic response after Hurricane Katrina).

which demonstrated that FEMA trailers are in fact a health-hazard, Defendants have failed to take action to prevent or even address the health risks to plaintiffs and class members.

FEMA, through its managers, attorneys and staff, has disregarded the health and well-being of the hurricane victims at their most vulnerable time. FEMA's lawyers and managers disallowed any testing for formaldehyde, willfully placing the citizens they were charged with protecting in harm's way. The organization has a duty to provide safe and habitable housing to victims of natural disasters, but FEMA has failed to take any action to insure the safety of the hurricane refugees. FEMA has refused to respond to the cries of help from the trailer occupants and in doing so, has forced hurricane victims into a situation wherein their only alternative to poisoned trailers is homelessness and destitution.

FEMA failed to provide safe, habitable housing to hurricane victims and has known of the safety risks for nearly two years. FEMA trailers present a clear a present danger to the health and well-being of the plaintiffs and their families. All of the plaintiffs have spent significant time in the housing FEMA provided to them. Every day, the plaintiffs are exposed to dangerously high levels of formaldehyde gas. With the passing of every week, these residents are exposed to the carcinogenic formaldehyde fumes for hundreds of hours on end. One FEMA staffer who inspected a formaldehyde contaminated trailer could not last more than a few moments inside. Yet, for many of these hurricane victims, the trailers are the only option. FEMA placed the plaintiffs in the situation where their only choice is between formaldehyde poisoning and homelessness.

FEMA continues to receive complaints about formaldehyde poisoning[3]. Yet, FEMA has refused to go to any great lengths to protect the health and safety of those with complaints. For

---

[3] *See e.g.* Exhibit H to House Oversight and Government Reform, July 19, 2007 report

example, FEMA decided to not include a phone number on a notice about formaldehyde that was distributed to trailer occupants, because "we are trying to not generate a lot of calls, just get the facts out as we know them so we are not putting our number on it." FEMA withheld documents concerning formaldehyde complaints, investigation, testing and decision-making from Congress for more than a year.

At this time, more than 50,000 FEMA travel trailers continue to shelter those made homeless by Hurricane Katrina and Hurricane Rita, exposing these victims to formaldehyde on a daily basis. Yet, FEMA has not yet performed comprehensive testing; FEMA has not provided medical services and FEMA has not moved class members to safe housing. At long last, however, FEMA has temporarily ended the deployment and sales of travel trailers. As of August 1, 2007 FEMA reserved an unspecified period of time to assess health-related concerns raised by occupants.

FEMA's refusal to provide safe housing for those displaced by the hurricanes has resulted in widespread formaldehyde poisoning and sickness. The plaintiffs have been forced to endure this injury and emotional distress despite FEMA's knowledge that the trailers posed a grave health risk.

## STATEMENT OF LAW

Directed by Congress, to "alleviate the suffering and damage" which result from disasters[4], FEMA, and only FEMA, had the duty and the responsibility to provide housing those displaced[5]. States could not participate in providing temporary housing to disaster victims: this was FEMA's duty alone. Housing provided by FEMA must be safe, sanitary, habitable and suitable for the occupants, without health hazards -- to alleviate and not increase the suffering and damage incurred

---

[4] *See* 42 U.S.C. § 5121(b).
[5] *See* Stafford Act, 42 U.S.C. §5121, et seq, and 67 Fed. Reg. 61446 (9/30/02)

by disaster victims[6]. FEMA is required to take care to assure that "all practical means and measures are used to protect, restore, and enhance the quality of the environment, to avoid or minimize adverse environmental consequences[7]". Not only did FEMA have the duty to provide housing, but the agency furthermore had the duty to provide housing that would have a positive effect on families and **not** cause adverse health effects on any segment of the population. [8]

As recently stated by Judge Berrigan, "the Stafford Act under which FEMA operates would appear to favor error on the side of the victims of a disaster in a close call [on a preliminary injunction motion]. The mandate of the Stafford Act is 'to provide an orderly and continuing means of assistance by the Federal Government to alleviate suffering and damage which result from disasters.' 42 U.S.C. § 5121(b). The statute anticipates that 'disasters often cause lose of life, human suffering, loss of income, and property loss and damage.' 42 U.S.C. § 5121(a)(1)." *Ridgely v. FEMA*, No. 07-2146 (E.D. La. 6/13/07) 2007 U.S. Dist. Lexis 43002.

District Court's have authority to review any actions of FEMA that are mandated by statute or may rise to the level of constitutional violations. *See Id. See also Association of Community Organizations for Reform Now v. FEMA*, 463 F.Supp.2d 26, 31 (D. D.C. 2006)(finding jurisdiction to review FEMA's conduct); *McWaters v. FEMA*, 436 F.Supp.2d 802, 812 - 813 (E.D. La. 2006).

> "A preliminary injunction is appropriate where plaintiffs demonstrate either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in their favor. The district court must also consider whether the public interest favors issuance of the injunction. This alternative test for injunctive relief has also been formulated as follows: a plaintiff is required to

---

[6] *See* 44 C.F.R. Part 206.111; 44 C.F.R. Part 206.117.
[7] *See* 44 C.F.R. Part 10.4.
[8] *See* 67 Fed. Reg. 61446 (9/30/02).

establish (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiffs if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiffs, and (4) advancement of the public interest in certain cases." *Southwest Voter Registration Education Project v. Shelley*, 344 F.3d 914, 917 (9th Cir. 2003)(*citing Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir. 1988). *See also Hawksbill Sea Turtle v. Federal Emergency Management Agency*, 126 F.3d 461, 478 (3rd Cir. 1997).

"[A] sliding scale applies which measures the hardships that issuance or denial would cause balanced against the degree of likelihood of success on the merits. When other factors weigh in favor of injunctive relief then a showing of *some* likelihood of success on the merits can justify granting the preliminary injunction." *Ridgely v. FEMA*, No. 07-2146 (E.D. La. 6/13/07) 2007 U.S. Dist. Lexis 43002.

Here, as in *Association of Community Organizations for Reform Now v. FEMA*, 463 F.Supp.2d 26, 36 (D. D.C. 2006), "each additional day plaintiffs go without assistance, they are harmed further. Accordingly, the necessary irreparable harm element is overwhelmingly established." The FEMA trailer residents face the "choice" of continuing to live amidst formaldehyde fumes or homelessness. This Court must intervene when the federal government provides housing, but does not provide livable housing. *See GP-UHAB Housing Development Fund Corporation v. Jackson*, No. CV-05-4830 (E.D. N.Y. 2/7/06) 2006 U.S. Dist. Lexis 7420 (granting preliminary injunction ordering HUD to extend subsidy payments so the residents can have heat). *See also Price v. City of Stockton*, 394 F.Supp.2d 1256, 1269 (E.D. Cal. 2005)("the loss of the opportunity to live in replacement housing that is safe, sanitary, decent and integrated and that is accessible to jobs cannot be underestimated.").

**ARGUMENT**

As Judge Duval stated,

> It is undeniable that the human consequences of Katrina and other such disasters reverberate long after the events themselves, and it is FEMA's stated goal to deal with this aftermath as effectively as possible. At its most basic level this *must* mean attention to those individual American taxpayers who are most directly affected by the disaster. . . . [FEMA] must not forget that the foundations of all [government] institutions, including our own government and FEMA itself, are individual people – human beings – who must also be cared for, equally, equitably, and fairly. *McWaters v. FEMA*, 436 F.Supp.2d 802, 820 - 821 (E.D. La. 2006).

By familiarity with industry standards and medical studies, FEMA knew or should have known of the health hazards inherent in the products they manufactured. While unknown to the plaintiffs, FEMA knew formaldehyde is a toxic gas. While unknown to the plaintiffs, FEMA knew formaldehyde is emitted from manufactured wood products. While unknown to the plaintiffs, FEMA knew that they were putting the hurricane victims at risk. Despite the Federal Government's knowledge of the dangers of formaldehyde emissions in the building components of FEMA Housing, it provided trailers to the plaintiffs, exposing them to unhealthy and dangerous levels of the carcinogenic gas. FEMA provided housing made from materials which emit levels of formaldehyde which exceed the levels permitted by law. This is yet another instance FEMA's "notoriously erratic and numbingly insensitive" conduct. *McWaters v. FEMA*, 408 F.Supp.2d 221, 233 (E.D. La. 2005). FEMA's utter disregard for the health and safety of the hurricane victims has and will continue to result in detrimental injury to the plaintiffs, unless this Court grants immediate relief.

Here, as in *Dewakuku v. Martinez*, 226 F.Supp.2d 1199, 1206 (D. Ariz. 2002), this Court should order FEMA to "cure the defects in the design and construction" of the FEMA trailers and

to provide safe housing for the named plaintiffs and all class members, immediately.

**WHEREFORE**, for the foregoing reasons, plaintiffs, Kimberly Nelson, et al, pray that this Court, after a contradictory evidentiary hearing, grant this motion and enter preliminary injunctions as described above.

Respectfully submitted,

\_/s/ John K. Etter\_\_\_\_
ROY J. RODNEY, JR.(# 2079)
JOHN K. ETTER (# 25042)
RODNEY & ETTER, LLC
200 West Congress Street, Ste. 650
Lafayette, LA 70501
Telephone:(337) 232-6924
Fax: (337) 232-6854
**Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has this day been forwarded to all known counsel of record , by placing same in the United States Mail, properly addressed and postage pre-paid, or via electronic filing and transmission. Signed this 14th day of November, 2007. A copy of this pleading will also be hand delivered to the Office of the United States Attorney for the Eastern District of Louisiana.

_____/s/ John K. Etter_____

JOHN K. ETTER