**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

| | |
|---|---|
| **IN RE: FEMA TRAILER** | **MDL NO. 1873** |
| **FORMALDEHYDE** | |
| **PRODUCT LIABILITY LITIGATION** | **SECTION "N-4"** |
| | |
| | **JUDGE ENGELHARDT** |
| | **MAG. JUDGE ROBY** |

**THIS DOCUMENT IS RELATED TO ALL CASES**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ADMINISTRATIVE MASTER COMPLAINT

This Complaint of certain persons of the full age of majority, more specifically referred to herein, who appear both individually and on behalf of all others similarly situated, through undersigned counsel, respectfully represent that:

## I.  INTRODUCTION

1.     Named Plaintiffs and Putative Class Members (alternatively "plaintiffs" and "class members") submit this Administrative Master Complaint (hereinafter "AMC") pursuant to the Court's direction and request.

2.     This AMC is being filed pursuant to the Court's Pretrial Order No. 2.

1

3.     This AMC incorporates the factual and legal allegations being presented on behalf of plaintiffs herein, in order to streamline motion practice and facilitate the disposition of common issues.  This AMC only supersedes the allegations in other actions filed in, or transferred into, this MDL to the extent these allegations present common issues which now will be disposed of through the AMC.

4.     This AMC otherwise does not merge the actions in this MDL into a single cause, or alter the substantive rights of any party to these actions.

5.     As to previously-named and served defendants, this AMC therefore shall not be given the same effect as a traditional complaint, but shall be considered as an administrative device to aid efficiency and economy, as provided for in Rule 42(a) of the Federal Rules of Civil Procedure.

## II. **PARTIES**

6.     All plaintiffs Named in any complaint or petition whose suits have been consolidated or cumulated herein ("Named Plaintiffs"), seek the certification of a class action consisting of: "All individuals who resided for any length of time in FEMA-provided housing units within the states of Louisiana, Mississippi, Alabama, and Texas after Hurricanes Katrina and Rita."  Plaintiffs will further refine the definition of the class to incorporate certain subclasses under the section entitled "**CLASS ACTION ALLEGATIONS**" below.

7.     The Named Plaintiffs herein are:

     a.     The following plaintiffs, who have exhausted the requirements under the Federal Tort Claims Procedure, 28 U.S.C. 2671, *et seq.*, to submit their claims against the United

2

States of America through the Federal Emergency Management Agency ("FEMA") for administrative review and adjustment, to no avail, and who now assert all claims enumerated below against all defendants named herein:

i.      Jessica R. Pujol, a minor and a resident of the Parish of Jefferson, State of Louisiana, through her natural tutors, Joseph M. Pujol and Stephanie G. Pujol;

ii.     Jill N. Pujol, a minor and a resident of the Parish of Jefferson, State of Louisiana, through her natural tutors, Joseph M. Pujol and Stephanie G. Pujol;

iii.    Joseph M. Pujol, a person of the full age of majority and resident of the Parish of Jefferson, State of Louisiana;

iv.     Stephanie G. Pujol, a person of the full age of majority and a resident of the Parish of Jefferson, State of Louisiana.;

v.      Elizabeth Lisa Nguyen, a minor and a resident of the Parish of St. Tammany, State of Louisiana, through her natural tutrix, Phuong Kim Thomas;

vi.     Isabella Nichole Thomas, a minor and a resident of the Parish of St. Tammany, State of Louisiana, through her natural tutors Sean Gary Thomas and Phuong Kim Thomas;

vii.    Phuong Kim Thomas, a person of the full age of majority and a resident of the Parish of St. Tammany, State of Louisiana; and,

viii.   Sean Gary Thomas, a person of the full age of majority and a resident of the Parish of St. Tammany, State of Louisiana.

b.      The following plaintiffs, who have not yet exhausted the above requirements under the Federal Tort Claims Procedure to submit their claims for administrative review and adjustment, and who now specifically assert all claims enumerated below against the Manufacturing Defendants named herein, reserving their rights to supplement this petition to include their claims, enumerated below, against **THE UNITED STATES OF AMERICA** through **FEMA** if their claims have not been administratively adjusted:

i.      Duran Battie, Sr., individually and on behalf of minors Duran Battie, Jr.,and Diamond Battie, and as representative of the Estate of Duronte Battie, a person of the full age of majority and a resident of the Parish of East Baton Rouge, State of Louisiana;

ii.     Joycelyn Beasley, individually and on behalf of a minor Heavenly Beasley, a person of the full age of majority and a resident of the Parish of East Baton Rouge, State of Louisiana;

iii.    Steven Beasley, individually and on behalf of a minor Heavenly Beasley, a person of the full age of majority and a resident of the Parish of East Baton Rouge, State of Louisiana;

iv.     Thomas Anthony Bergens, a person of the full age of majority and a resident of the Parish of St. Tammany, State of Louisiana;

v.      L. C. Bingham, a person of the full age of majority and a resident of the Parish of St. Bernard, State of Louisiana;

vi.     Barry Bourgeois, a person of the full age of majority and a resident of the

4

Parish of Jefferson, State of Louisiana;

vii.  Jesse Brown, individually and on behalf of a minor Tiesha Brown, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

viii. Trina Brown, individually and on behalf of a minor Tiesha Brown, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

ix.   Anthony Bruno, Jr., a person of the full age of majority and a resident of the Parish of Calcasieu, State of Louisiana;

x.    Patricia A. Burr, a person of the full age of majority and a resident of the Parish of Jefferson, State of Louisiana;

xi.   LaRay Maurice Carey, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

xii.  Jerome Culler, individually and as representative of the Estate of Joan Culler, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

xiii. Dionne Davis, individually and on behalf of a minor Trinity Guernon, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

xiv.  Dorothy Deal, individually and on behalf of the Estate of Edward Deal Edward Deal, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

5

xv.     Heather Robertson-Durand, a person of the full age of majority and a resident of the Parish of St. Tammany, State of Louisiana;

xvi.    Matthew Durand, a person of the full age of majority and a resident of the Parish of St. Tammany, State of Louisiana;

xvii.   Teresa Certoma Femia, a person of the full age of majority and a resident of the Parish of St. Tammany, State of Louisiana;

xviii.  Renay Marie Gardner, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

xix.    Damon Gordon, individually and on behalf of minor Angel Gordon,    a resident of the Parish of St. Charles, State of Louisiana;

xx.     Shelia Gordon, individually and on behalf of minor Angel Gordon,  a resident of the Parish of St. Charles, State of Louisiana;

xxi.    Latonya London, individually and on behalf of minors Edbony London, Mary London, Darrell Madison, Darren Madison, and Derrell Madison, a  person of the full age of majority and a resident of the Parish of East Baton Rouge, State of Louisiana;

xxii.   Lakeesha Lightell, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

xxiii.  Lois Perkinson, a person of the full age of majority and a resident of the Parish of Calcasieu, State of Louisiana;

xxiv.   Ashley Peters, individually and on behalf of minors Kam'Ren Zeno and Korey James, a person of the full age of majority and a resident of the Parish

6

of Orleans, State of Louisiana;

xxv.    Joyce Peters, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

xxvi.   Salvador Peters, Jr., a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

xxvii.  Salvador Peters, Sr., a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

xxviii. Trevor Raphiel, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

xxix.   Lawrence Robertston, individually and on behalf of minors Gavan Robertson, Jack Robertson, and Mercedes Robinson, a person of the full age of majority and a resident of the Parish of St. Tammany, State of Louisiana;

xxx.    Penny Robertston, individually and on behalf of minors Gavan Robertson, Jack Robertson, and Mercedes Robinson, a person of the full age of majority and a resident of the Parish of St. Tammany, State of Louisiana;

xxxi.   Carol Eleanor Salassi, a person of the full age of majority and a resident of the Parish of Jefferson, State of Louisiana;

xxxii.  David Semien, Jr., a person of the full age of majority and a resident of the Parish of Calcasieu, State of Louisiana;

xxxiii. Sandra Semien, individually and on behalf of a minor Danielle Semien, a person of the full age of majority and a resident of the Parish of Calcasieu, State of Louisiana;

7

xxxiv.  Eric Albert Smith, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

xxxv.  Margaret Thomas, a person of the full age of majority and a resident of the Parish of Calcasieu, State of Louisiana;

xxxvi.  Alvin Williby, Sr., individually and as representative of the Estate of Sandra Williby, a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana;

xxxvii.  Luann Workman, a person of the full age of majority and a resident of the Parish of Jefferson, State of Louisiana;

xxxviii.  Letecheia Acker, individually and on behalf of minors Gyanni Smith and Dakyre Smith, a person of the full age of majority and a resident of Hancock County, State of Mississippi;

xxxix.  Sandra Anderson, a person of the full age of majority and a resident of the State of Mississippi;

xl.  Keena Magee, individually and on behalf of a minor Kierra Wilson, and as legal representative of the Estate of Khaliah Magee, a person of the full age of majority and a resident of Jackson County, State of Mississippi;

xli.  Charles Meschack, a person of the full age of majority and a resident of the State of Mississippi;

xlii.  George Posey, a person of the full age of majority and a resident of the State of Mississippi;

xliii.  Jerry Stewart, a person of the full age of majority and a resident of the State

8

of Mississippi;

xliv.   Angela Wilkerson, individually and on behalf of minors Christopher Wilkerson and Bridgete Wilkerson, and as representative of the Estate of Cedric Wilkerson, Jr., a person of the full age of majority and a resident of Hancock County, State of Mississippi;

xlv.   Cedric Wilkerson, Sr., individually and on behalf of minors Christopher Wilkerson and Bridgete Wilkerson, a minor, and as representative of the Estate of Cedric Wilkerson, Jr., a person of the full age of majority and a resident of Hancock County, State of Mississippi;

xlvi.   Sylvia Keyes, a person of the full age of majority and a resident of the State of Alabama;

xlvii.   Betty White, individually and on behalf of her minor child Erin McConnel, a person of the full age of majority and a resident of the State of Alabama;

xlviii.   Kellina Biddle, a person of the full age of majority and a resident of Liberty County, State of Texas;

xlix.   Adrina McCray, on behalf of minor Kody Wood, a person of the full age of majority and a resident of Bexar County, State of Texas;

l.   Ronald Morgan, a person of the full age of majority and a resident of Liberty County, State of Texas;

li.   Terra Morgan, a person of the full age of majority and a resident of Liberty County, State of Texas;

lii.   David Semien, Sr., a person of the full age of majority and a resident of

Brazoria County, State of Texas;

liii.    Brittney Stephens,  a person of the full age of majority and a resident of Polk County, State of Texas;

liv.    Cherish Stephens, a person of the full age of majority and a resident of Polk County, State of Texas; and,

lv.    Sherry Trollinger, individually and on behalf of minors Michael Shawn Davis and Susette Stephens, a person of the full age of majority and a resident of Polk County, State of Texas.

8.    Made defendants herein are:

a.    **THE UNITED STATES OF AMERICA** through the **Federal Emergency Management Agency** (FEMA), referred to, interchangeably as the "Federal Government," "Government" and "FEMA".

b.    Plaintiffs reserve their rights to supplement and amend this AMC to assert claims against the United States of America and FEMA under the laws of Alabama, Mississippi and Texas as additional plaintiffs become eligible to pursue their claims against the Federal Government under the provisions of the Federal Tort Claims Act.

c.    The "Manufacturing Defendants," designated below, are:

i.    **American Camper Manufacturing, LLC d/b/a AMERI-CAMP** is upon information and belief an Indiana limited liability company which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

10

ii. **American Homestar Corporation** is upon information and belief a Texas corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

iii. **Cavalier Home Builders, LLC** is upon information and belief a Delaware corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

iv. **Cavalier Homes Inc.** is upon information and belief a Delaware corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

v. **Circle B Enterprises, Inc.** is upon information and belief a Georgia corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

vi. **Clayton Homes Of Lafayette, Inc (f/k/a Clayton Homes, Inc.)** is upon information and belief an Indiana corporate entity which conducts business

11

in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

vii.   **Coachmen Industries, Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

viii.   **Coachmen Recreational Vehicle Company, LLC** is upon information and belief an Indiana limited liability company which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

ix.   **Design Homes, Inc.** is upon information and belief a Wisconsin corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

x.   **Destiny Industries, LLC** is upon information and belief a Georgia limited liability company which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with

12

FEMA for use in those states.

xi.     **DS Corp.** is upon information and belief an Indiana limited liability company which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xii.    **Dutch Housing, Inc. d/b/a Champion Homes** is upon information and belief a Michigan corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xiii.   **Dutchmen Manufacturing, Inc.** is upon information and belief a Delaware corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xiv.    **Fairmont Homes, Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xv.     **Fleetwood Canada, Ltd.** is upon information and belief a foreign corporate entity which conducts business in the states of Louisiana, Mississippi,

13

Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xvi.   **Fleetwood Enterprises, Inc.** is upon information and belief a California corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xvii.   **Fleetwood Homes of North Carolina, Inc.** is upon information and belief a North Carolina corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xviii.   **Forest River, Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xix.   **Frontier RV, Inc.** is upon information and belief a Texas corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xx.   **Giles Industries, Inc**. is upon information and belief an Alabama corporate

14

entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxi.   **Giles Industries of Tazewell, Incorporated** is upon information and belief a foreign corporate entity, with its principal office located in Tennessee, which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxii.   **Golden West Homes** is upon information and belief a California corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxiii.   **Gulf   Stream Coach, Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxiv.   **Horton Homes, Inc.** is upon information and belief a Georgia corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or

housing units as defined below pursuant to contracts with FEMA for use in those states.

xxv. **Indiana Building Systems, LLC d/b/a Holly Park** is upon information and belief an Indiana limited liability company which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxvi. **Integrity Midwest Inc. d/b/a US Adventure RV** is upon information and belief an Iowa corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxvii. **Jayco Enterprises, Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxviii. **Keystone Industries, Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below  pursuant to contracts with FEMA for use in those states.

16

xxix.    **Keystone RV Company** is upon information and belief a Delaware corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below  pursuant to contracts with FEMA for use in those states.

xxx.    **KZRV, LP** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxxi.    **Lakeside Park Homes, Inc.** is upon information and belief a Georgia corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxxii.    **Layton Homes Corp.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxxiii.    **Liberty Homes Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or

housing units as defined below pursuant to contracts with FEMA for use in those states.

xxxiv. **Liberty RV & Marine, Inc.** is upon information and belief a Florida corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxxv. **Monaco Coach Corporation** is upon information and belief a Delaware corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxxvi. **Morgan Buildings & Spas, Inc.** is upon information and belief a Nevada corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxxvii.      **Morgan Building Systems, Inc.** is upon information and belief a Texas corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

18

xxxviii.    **Oak Creek Homes, L.P.** is upon information and belief a Texas limited partnership which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xxxix.  **Oak Creek Homes, Inc.** is upon information and belief a foreign corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xl.    **Oakwood Homes, LLC** is upon information and belief a Georgia limited liability company which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xli.    **Palm Harbor Homes, Inc.** is upon information and belief a Florida corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xlii.    **Patriot Homes, Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi,

Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xliii.   **Philips Products, Inc.** is upon information and belief a Delaware corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xliv.   **Pilgrim International, Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xlv.   **Recreation By Design, LLC** is upon information and belief an Indiana limited liability company which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xlvi.   **Redman Homes Inc. (f/k/a Dutch Homes)** is upon information and belief a Delaware corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with

20

FEMA for use in those states.

xlvii.  **River Birch Homes, Inc. and/or River Birch Homes, L.L.C.** is/are upon information and belief an Alabama corporate entity/limited liability company which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xlviii.  **R-Vision, Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

xlix.  **Scotbilt Homes, Inc.** is upon information and belief a Georgia  corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

l.  **Silver Creek Homes, Inc.** is upon information and belief a Texas corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

li.  **Skyline Corporation** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi,

Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

lii.     **Starcraft RV, Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

liii.    **Southern Energy Homes, Inc.** is upon information and belief a Delaware corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

liv.     **Stewart Park Homes, Inc.** is upon information and belief a Georgia corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

lv.      **Sunray RV, LLC** is upon information and belief a Tennessee limited liability company which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

lvi.  **Superior Homes, LLC** is upon information and belief a South Dakota limited liability company which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

lvii.  **Tom Stinnett Holiday RV Center Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

lviii.  **Thor California, Inc., doing business in California as Thor Manufacturing** is upon information and belief a Delaware corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

lix.  **Thor Industries, Inc.** is upon information and belief a Delaware corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

lx.  **TL Industries, Inc.** is upon information and belief an Indiana corporate entity which conducts business in the states of Louisiana, Mississippi,

Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

lxi.    **Vanguard Industries of  Michigan, Inc. (a/k/a Palomino RV)** is upon information and belief a Michigan corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

lxii.   **Waverlee Homes, Inc.** is upon information and belief an Alabama corporate entity which conducts business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in those states.

lxiii.  Other as yet unnamed Defendants which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in Louisiana, Mississippi, Alabama and Texas.

## III.  JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§ 1346 and 2671, *et seq.*.

10.    Certain Manufacturing Defendants named herein are subject to the *in personam* jurisdiction of this Court because they do substantial business in the State of Louisiana and within this federal district, and at all times relevant hereto engaged in commerce both in this federal

district and in the State of Louisiana.   The remaining Manufacturing Defendants do substantial business in the States of Mississippi, and/or Alabama, and/or Texas, and at all times relevant hereto engaged in commerce in federal districts in those States, which on remand from this MDL the courts in those districts would have *in personam* jurisdiction over these defendants.

11.   Plaintiffs allege that they individually have suffered damages in an amount in excess of $75,000.00 exclusive of interest and court costs.

12.   There is subject matter jurisdiction due to ample diversity pursuant to the terms of the Class Action Fairness Act (CAFA), 28 U.S.C. §1332(d)(2).

13.   This Court has subject matter jurisdiction pursuant to the provisions of 28 U.S.C. §1332(d)(2) because this is a class action in which there is at least minimal diversity and the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs.

14.   Venue is proper in this district pursuant to 28 U.S.C. §1391 because a large portion of the negligent and wrongful actions of the defendants occurred in the Eastern District of Louisiana.

15.   Venue is also proper in this district as to the United States of America and FEMA since individual plaintiffs reside in this district and the acts and/or omissions as to certain of the plaintiffs occurred in this district.

16.   Venue is also proper in this district under the provisions of 28 U.S.C. §1407, this Court having been determined the appropriate transferee Court pursuant to the order of the United States Judicial Panel on Multidistrict Litigation, entered October 24, 2007.

## IV.  <u>FACTS AND GENERAL ALLEGATIONS</u>

A.    **General Allegations.**

17.    This is a class action on behalf of those persons residing or living in  travel trailers, park models, and mobile homes (hereinafter all referred to as "housing units") along the Gulf Coast of the United States.  These housing units were provided by FEMA after the landfalls of Hurricanes Katrina and Rita in August and September of  2005.

18.    Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet.  They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD").  *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

19.    Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet.  They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities.  *Id.*

20.    Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area).  They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction.  *Id.*

21.    Despite the fact that the scope of the damage to the coastal areas of Louisiana, Mississippi,

Alabama and Texas was foreseeable, the Federal Government was unprepared to handle the devastation wrought by the Hurricanes and the damage was too great to be handled by the state and local governments.

22.     The homes of hundreds of thousands of citizens of the United States who resided along the Gulf Coast were rendered unhabitable leaving these citizens homeless. Eventually, the United States of America, through FEMA, began providing temporary housing to plaintiffs in the form of housing units which became known as "FEMA trailers".

23.     The provision of temporary housing to plaintiffs entailed a duty on the part of the Federal Government to insure that such housing was safe for habitation. Unfortunately, the housing provided was and is unsafe, and presents a clear and present danger to the health and well-being of the plaintiffs and their families.

24.     FEMA contracted with the Manufacturing Defendants to purchase thousands of the housing units, primarily travel trailers, for provision to the plaintiffs as temporary housing.

25.     Many of these housing units were purchased directly off the lots of some of the Manufacturing Defendants and/or their vendors.

26.     In addition, the Manufacturing Defendants rushed through production many of the housing units, using substandard materials and/or employing irregular practices during the manufacturing process which resulted in the housing units containing high levels of formaldehyde.

27.     Plaintiffs submit that the housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, were neither constructed nor designed in accordance with reasonably precise Government specifications.

28.     Plaintiffs submit that there existed no Governmental specifications addressed to the design/manufacture/construction and/or warnings relative to formaldehyde levels in the housing units.

29.     Plaintiffs submit that the housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units as pertains to formaldehyde levels.

30.     Plaintiffs submit that the housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to the Manufacturing Defendants' use of certain materials in their construction and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that the Manufacturing Defendants failed to warn the Federal Government about these dangers, which were not known to the Federal Government.

31.     Plaintiffs submit that Manufacturing Defendants ignored or deliberately and fraudulently concealed and/or condoned the concealment, and/or conspired with, advised, encouraged, or aided others and/or each other to conceal that  the housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to the Manufacturing Defendants' use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell the Manufacturing

28

Defendants' products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

32.   All of the plaintiffs have spent significant time in the FEMA-provided housing units manufactured by one or more of the named or unnamed Manufacturing Defendants and provided to plaintiffs by the Federal Government.  As a result, plaintiffs unwittingly have been exposed to dangerously high concentrations of the formaldehyde which is emitted from products used in the manufacture of the subject housing units.

33.   Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units.  Pursuant to federal law, the defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde.  Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure.  Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk.  Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air.  Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer.  Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels.  When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels.  Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

See 24 C.F.R. §3280.309.

34. According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

35. Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40 hour workweek, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3ppm to1 ppm. In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

36. HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD

has far stricter exposure limits for residential formaldehyde emissions.  By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...".  See 24 C.F.R. §3280.308.

37.     While federal standards exist for formaldehyde content in some building materials or in workplace exposures, there is no federal standard regulating indoor air quality. However, the EPA and the ATSDR have suggested values for safe exposure, which are reproduced below, keeping in mind that FEMA trailers/housing units are intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between two weeks and a year |
| | 0.008 ppm – exposures exceeding 365 days |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

38.     The Federal Government and the Manufacturing Defendants  knew or should have known of the health hazards inherent in the products they distributed and constructed, by familiarity with industry standards and published medical studies.

39.     Nevertheless, the Federal Government provided housing to the plaintiffs which contained formaldehyde capable of emitting levels which are dangerously unhealthy and exceed the levels permitted by law and have and will result in injury to the plaintiffs.

**B.     Allegations Addressing the Inapplicability of the "Discretionary Function" Exception to Plaintiffs' claims under the Federal Tort Claims Act.**

40.     Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

41.     FEMA was established in 1979  to provide a single point of  accountability for the Federal Government's disaster response.  Since its inception, FEMA has been charged with providing temporary housing to victims of numerous major disasters other hurricanes, earthquakes, wildfires, and civil unrest, and in many of those cases FEMA's response has been found to be woefully inadequate.  John K. Pierre and Gail S. Stephenson,    *AFTER KATRINA: A CRITICAL LOOK AT FEMA'S FAILURE TO PROVIDE HOUSING FOR VICTIMS OF NATURAL DISASTERS*, 68 La. L. Rev. 443, 444, 449, 458-477 (2008).

42.     The mission of FEMA as set forth in the Robert T. Stafford Disaster Relief Act ("Stafford Act") is to assist the efforts of the states "in  expediting the rendering of aid, assistance, and

emergency services, and the reconstruction and rehabilitation of areas devastated by disasters." 42 U.S.C. § 5121(a)(2) (2006).

43.     The Stafford Act authorizes federal aid to individuals and households and provides that the President may provide temporary housing assistance to individuals and households "who are displaced from their pre-disaster primary residences or whose pre-disaster primary residences are rendered uninhabitable ... as a result of damage caused by a major disaster." 42 U.S.C.A. § 5174(b)(1) (Supp. 2007).

44.     Under the federal regulations implementing the Stafford Act, a "displaced applicant" is one "whose primary residence is *uninhabitable*, inaccessible, made unavailable by the landlord...or *not functional* as a direct result of the disaster and has no other housing available in the area." The term "functional" is defined as "an item or home capable of being used for its intended purpose." The term "uninhabitable" is defined as meaning the "dwelling is not safe, sanitary or fit to occupy." 44 C.F.R. 206.11

45.     The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988).

46.     Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under

subparagraph (c)(1)(A).  *See also* 44 C.F.R. § 206.117(b)(ii).

47.   According to FEMA, the agency only provides temporary housing units when all other housing resources are unavailable, and are only used as a last resort to provide "safe, secure, and sanitary" housing for eligible disaster victims, but acknowledges that these units were never designed for long-term occupation.  Statement of Harvey E. Johnson, Jr., Acting Deputy Administrator and Chief Operating Officer, Federal Emergency Management Agency, Department of Homeland Security, before the Subcommittee on Disaster Recovery and Subcommittee on State, Local, and Private Sector Preparedness and Integration, Homeland Security and Governmental Affairs Committee, United States Senate, March 4, 2008, at 5.

48.   This temporary housing is available for an 18-month period beginning on the date of the declaration of the major disaster by the President, after which the Federal Government may charge fair market rent for each temporary housing unit provided. 42 U.S.C.A. § 5174 (c)(1) (B)(ii)(iii).  *See also* 44 C.F.R. § 206.117(b)(ii)(F).

49.   Under the terms of the Stafford Act and its implementing regulations if the Federal Government implements the "direct assistance" type of aid to the applicants (plaintiffs herein), the Government is required to provide housing which would not be declared unfit under the Stafford Act, that is the temporary housing must be habitable and functional. Therefore, once FEMA provides such housing, the safety and habitability of the housing is mandatory.

50.   For reasons more fully set forth herein, Named Plaintiffs and Putative Class Members assert

that the Federal Government violated its own mandatory regulations and policy when it knowingly provided dangerous housing units, which were capable of emitting and did emit harmful levels of formaldehyde causing injuries to the plaintiffs/applicants, not only when it initiated the direct assistance plan, but also when it continued to distribute the subject housing units when the Federal Government had notice/knowledge/evidence of the existence of dangerous levels of formaldehyde in the subject housing units through complaints filed with the Federal Government and testing performed by the Federal Government and independent sources.

51.     Hurricane Katrina alone left a 250-mile path of destruction along the Gulf Coast. Eighty percent of Orleans Parish, ninety-nine percent of St. Bernard Parish, and forty percent of Jefferson Parish were flooded. The storm rendered over 100,000 families homeless, destroyed approximately ninety-percent of the buildings along the Mississippi Coast, and submerged much of Mobile County, Alabama. Pierre and Stephenson, *supra* at 453-454.

52.     In response to Hurricanes Katrina and Rita, FEMA, upon information and belief, provided approximately143,000 housing units pursuant to the direct housing assistance provisions of the Stafford Act, which FEMA purchased from the Manufacturing Defendants, to Gulf Coast residents in the four states at issue. *See* FEMA, *Katrina/Rita Housing Facts,* HQ-08-008 Factsheet. January 29, 2008, *available at* http://www.fema.gov/news/newsrelease.fema?id=42417.

53.     The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for

HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith. *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

54.     Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off" - gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.  Plaintiffs do not suggest that this report was communicated in such a way so as to have notified all members of the class, nor do they suggest that this was the *first* specific notification of the formaldehyde problem to the Federal Government, as this information has not necessarily been published and will be the subject of discovery in this case.

55.     In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and

exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels. *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007.

56. Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the plaintiffs, the Inspector General of the Department of Homeland Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to plaintiffs. *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

57. The Federal Government also continued to supply the defective and dangerous housing units to the plaintiffs after March of 2006 .

58. The Federal Government continued to supply the defective and dangerous housing units to the plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

59. The Federal Government continued to supply the defective and dangerous housing units to

the plaintiffs even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied  housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value. Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http://oversight.house.gov/documents/20070719113015.pdf)   and D (*available at* http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

60.    The Federal Government continued to supply the defective and dangerous housing units to the plaintiffs even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, *supra*, and Exhibits E (*available at* http://oversight.house.gov/documents/20070719113322.pdf),   I (*available at* http://oversight.house.gov/documents/20070719113515.pdf)   and M (*available at* http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

61.    While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty

38

to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue." Union of Concerned Scientists, *supra*, and Supplemental A (various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B (various emails *available at* http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

62.   Plaintiffs aver that, even as plaintiffs and their families were being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the Manufacturing Defendants concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

63.   Evidence of communications among the defendants exists by way of emails emanating from the  FEMA Office of General Counsel (OCG).  For example, in June 16, 2006 the same email which states "OGC has advised that we do not do testing," states that "Gulfstream is working closely with FEMA to resolve the formaldehyde problem in smaller travel trailer (Cavalier) units."  A later email reflects relief of the FEMA OCG  at the "good news" that "one of the major manufacturers of national housing units (Gulfstream I think)...wanted to get with External Affairs so they could get on the same page...we may get the benefit of the manufacturer's 'science' and 'public relations' approaches."  *See* U.S. House of Representatives, Committee on Oversight and Government Reform, FEMA'S TRAVEL TRAILERS: LITIGATION CONSIDERATIONS V. HEALTH AND SAFETY CONSIDERATIONS, AND

THE WINNER IS?, July 19, 2007, *available at* http://republicans.oversight.house.gov/Media/PDFs/20070719FEMAEmails.pdf.

64.     FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher. The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light. Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at* http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

65.     FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers. This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists, and Exhibit R attached thereto, *supra*. *See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available at* http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report _0507.pdf.

66.     This testing methodology did not simulate the living conditions, temperatures, humidities,

standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.   Union of Concerned Scientists, *supra*.

67.     FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units supplied in the wake of the hurricanes in order to avoid legal liability for injuries to plaintiffs herein as a result of their exposure to formaldehyde. FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006.  *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

68.     FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review.  FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units.  *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

69.   FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this "level of concern," the average sampling results still were higher. *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents/20070719102502.pdf.

70.   Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw... I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/20071114164004.pdf.

71.   After the publication of the Original Health Consultation in February of 2007, the Director of the Division of Toxicology and Environmental Medicine, Chris De Rosa, M.D., the office specifically by-passed within the ATSDR during the review process, immediately wrote to

FEMA general counsel and Dr. Frumkin of the ATSDR advising that the Health Consultation was "incomplete and misleading" because formaldehyde is classified as "reasonably anticipated to be a human carcinogen" and there is "no recognized 'safe level' of exposure." *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Dr. Howard Frumkin, January 28, 2008, and attachments thereto.

72. On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

73. Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation"did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at* http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

74. The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

75. It was not until December of 2007 that the Federal Government initiated testing of occupied

housing units. Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units. *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC's RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

76. The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

77. The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the

CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions.  *Id.* at 5-6, 11.

78.   As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing.  The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

79.   As set forth above, plaintiffs assert that the Federal Government violated its own mandatory regulations and policies by initially issuing and/or continuing to issue the subject housing units when it was aware that the housing units were constructed with materials which emitted unsafe levels of formaldehyde, thus rendering the housing units provided under the "direct assistance" form of aid neither habitable nor functional and, thus, no better, if not worse, than the plaintiffs' primary residences which had been destroyed.

80.   Additionally and/or in the alternative, the Federal Government's actions in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions

which involve decisions grounded in social, economic, or political policy. Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

81. Additionally and/or in the alternative as owners/lessors of the subject housing units, the Federal Government had an obligation to provide the plaintiffs with safe and habitable housing under the "direct assistance" program, and, when the Federal Government became aware of the presence of formaldehyde in the housing units it provided, it was obliged to remove the danger or the plaintiffs from the housing units, as it ultimately has decided to do. The Federal Government's initial implementation of a flawed testing protocol and misinformation campaign, all in violation of objective, scientific guidelines, constitute not only a violation of the Government's obligations as premises owner/lessor, but also the Government's duty to implement safety measures which would have removed an obvious health hazard. As such, the Federal Government's failure to implement an adequate response to the known health hazards presented by plaintiffs' continuing to reside in the subject housing units is not protected under the discretionary function exception.

82. Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided. In light of the facts alleged herein, the Federal Government's acts and/or omissions are not susceptible to policy analysis and are not protected under the discretionary function exception.

## V. CLASS ACTION ALLEGATIONS

83.     Plaintiffs bring this action on behalf of themselves and on behalf of all other similarly situated in the respects stated herein below.

84.     The claims of the proposed class representatives are typical of the claims of the proposed class.

85.     Plaintiffs will fairly and adequately represent and protect the interests of all members of the described class.

86.     The common questions of law and fact as shown in this complaint predominate over individual questions of causation or individual damages.

87.     Concentrating this litigation in one forum will aid with judicial economy and efficiency and promote parity among the claims of the individual class members as well as judicial consistency.

88.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation, since the individual joinder of all members of each class is impracticable. Even if any class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by defendants' product.  By contrast, the class action device presents far and fewer management difficulties and provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.  Thousands of individual actions will create unnecessary burden on and delay to injured victims in addition to straining the judicial system.  Such individual actions will also magnify the expense for retaining expert witnesses, and prolong all parties' abilities to receive a speedy and efficient adjudication of

47

this matter.

89.   Additionally, class certification is appropriate because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the parties opposing the class. Incompatible standards of conduct and inconsistent or varying adjudications, on what would necessarily be the same universe of facts, proof and legal theories would also result in inconsistent and incompatible rights within the class.

90.   Furthermore, class certification is appropriate because the prosecution of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications and substantially impair their ability to protect their interests.

91.   Class certification is also appropriate for the reasonable costs of medical monitoring for all class members under a court-supervised medical monitoring fund.  This action may be properly maintained as a class action for all necessary and appropriate final injunctive relief and/or corresponding declaratory relief for the following, non-exclusive reasons:

a.   The class members have had significant exposure to a known and proven hazardous substance;

b.   As a result of this exposure, members suffer a significantly increased risk of contracting a serious latent disease(s);

c.   Class members' risk of contracting a serious latent disease(s) is greater than (1) the

48

risk of contracting the same disease had they not been exposed and (2) the chances of members of the general non-exposed public of developing a disease(s);

d. A monitoring procedure exists that can make the early detection of any serious latent disease(s) possible;

e. The monitoring procedures are prescribed by medical professionals and such monitoring is reasonably necessary for early detection and treatment;

f. The increased risk of disease(s) from exposure warrants medical monitoring beyond that which an individual would normally pursue;

g. Medical benefits are gained through early detection of disease(s); and,

h. But for all defendants' action or inaction, the members would not have incurred the additional costs of medical monitoring and treatment resulting from exposure to formaldehyde.

92. Finally, the defendants have acted or refused to act on grounds generally applicable to the class, making injunctive relief appropriate.

93. Accordingly, class certification is appropriate under the Federal Rules of Civil Procedure, Rule 23(b)(3) and/or (b)(1)(A) and/or (b)(1)(B) and/or (b)(2), and the class action vehicle is the superior method of handling this litigation.

94. This is a class action pursuant to F.R.C.P. 23 on behalf of a class of plaintiffs similarly situated but as yet unidentified, as plaintiffs herein represent that they have injuries typical of and common to all those similarly situated who suffered damages from living in the FEMA-supplied housing units in the aftermath of Hurricanes Katrina and Rita.

95. Plaintiffs allege and propose that the class be defined as:

"All individuals who resided for any length of time in FEMA-provided housing units within the states of Louisiana, Mississippi, Alabama, and Texas after Hurricanes Katrina and Rita." Plaintiffs further propose that, with regard to their claims arising under the products liability statutes and/or tort liability and/or other state statutes of the four states included in the class definition, and asserted specifically against the Federal Government and the Manufacturing Defendants, there be four sub-classes established, each comprised of individuals within the states of (1) Louisiana, (2) Mississippi, (3) Alabama, and (4) Texas, who resided for any length of time in FEMA-provided housing units after Hurricanes Katrina and Rita, and who have been damaged as a result of the Federal Government's and/or the Manufacturing Defendants' design, manufacture, marketing, and distribution of defective FEMA-provided housing units, and/or these defendants' failure to warn plaintiffs of the housing units' defect(s) and dangers associated therewith, and/or these defendants' violations of any state-based causes of action."

96.     The proposed class action arises out of the catastrophic events of Hurricanes Katrina and Rita which rendered hundreds of thousands of people homeless thus causing them to use the FEMA-provided housing units. The exact number and identities of the class plaintiffs are unknown at this time, and can only be ascertained through appropriate discovery.

97.     This action is appropriate for determination through the Federal Class Action Rule (F.R.C.P. Art. 23, *et seq*.) for the foregoing enumerated reasons and for the following, non-exclusive, reasons:

a.      **NUMEROSITY**

The class consists of hundreds of thousands of people. The exact number and

identities of the class of plaintiffs are unknown at this time, and can only be ascertained through appropriate discovery.  Plaintiffs are of information and belief that the class of plaintiffs clearly consists of thousands of persons presenting a level of numerosity better handled through the class action procedure.

b.      **COMMON QUESTIONS OF LAW AND FACT**

There are common questions of law and fact applicable to all class members and which predominate over individual questions and which include but are not limited to the presence of formaldehyde in the FEMA-provided housing units and its capacity of causing the harm alleged by the Named Plaintiffs and Putative Class Members.

c.      **ADEQUATE REPRESENTATION**

Plaintiffs, through the proposed class representatives, will fairly and adequately represent the interests of the class, and are represented by skilled attorneys who are experienced in the handling of mass tort class action litigation and who may be expected to handle this action in an expeditious and economic manner in the best interest of all members of the class.

d.      **TYPICALITY**

The claims of the plaintiffs and the class members have a common origin and share a common basis.  Their claims originate from the same improper and culpable practices of the defendants, and the defendants acted in the same way toward the plaintiffs and class members.  As such, the plaintiffs and the class members have been the victims of the defendants' culpable conduct which resulted in the unhealthy and unlawful emissions of formaldehyde in FEMA-provided mobile homes provided to the plaintiffs.

The claims of the class representatives as named herein are typical of the claims of the class members they seek to represent.  If brought and prosecuted individually, the claims of such class members would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories and seek the same relief.

e.    **SUPERIORITY**

The class action procedural device affords a superior vehicle for the efficient disposition of the issues and claims herein presented, especially since individual joinder of each of the class members is impracticable.  Individual litigation by each of the class members, besides being unduly burdensome to the plaintiffs, would be unduly burdensome and expensive to the court system as well as the defendants.

## VI. CLAIMS ASSERTED AGAINST THE FEDERAL GOVERNMENT

**A.    LOUISIANA STATE-BASED CLAIMS**

### COUNT 1:

### CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT FOR LIABILITY PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2317, 2317.1 AND 2696

98.    Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

99.    At all times herein, the Federal Government was the owner/custodian of the housing units supplied to the plaintiffs.

100.    The Federal Government provided the housing units to the plaintiffs subject to the terms of a lease agreement and/or contract the Government required plaintiffs execute upon delivery of the housing  units.

101.   Under the provisions of the Stafford Act and Louisiana Civil Code, the Federal Government was and/or functioned as lessor of the housing units which are subject to this litigation.

102.   Under the provisions of the Stafford Act and Louisiana Civil Code, the lease agreement/contract between the Federal Government and the plaintiffs are and were considered to be residential leases.

103.   As lessor, the Federal Government warranted to the plaintiffs that the housing units at issue are suitable for the purpose for which they were leased, temporary residences, and are free of vices or defects that prevent the use of the housing units as residences.

104.   The warranty extended by the Federal Government applies to all persons who reside or resided in the housing units.

105.   As lessor, the Federal Government guarantees the plaintiffs that the housing units are free of defects, whether or not the Federal Government knew of the defects at the time the lease was made.

106.   Alternatively, the Federal Government knew or should have known, in light of the allegations set forth in this complaint, that the housing units were defective in their construction with materials which produce excessive formaldehyde emissions, causing plaintiffs' damages.

107.   The presence of materials used in the construction of the housing units which emit dangerous levels of formaldehyde in the housing units constitutes a defect which rendered the housing units unsuitable for habitation by the plaintiffs.

108.   The Federal Government failed to exercise reasonable care under the circumstances which could have prevented the distribution of the defective housing units to the plaintiff-lessees,

thus causing plaintiffs' damages for which the Government is answerable.

## COUNT 2:

### CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT FOR LIABILITY PURSUANT TO LOUISIANA CIVIL CODE ARTICLE 2316

109. Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

110. At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants, plaintiffs, of the subject housing units.

111. At all times herein, the Federal Government was under a duty to provide reasonably safe, functional and habitable housing units for the use of the plaintiffs.

112. The Federal Government assumed these duties when it implemented the "direct assistance" method of relief under the Stafford Act and as owner/lessor of the housing units which were ultimately provided to the plaintiffs.

113. The Federal Government was obligated to ensure that the housing units which it provided to the plaintiffs for use as temporary residences were free of defects which could visit harm upon plaintiffs through the anticipated and intended use of the housing units.

114. The Federal Government was obligated to  warn the plaintiffs of any defects in the housing units which could cause harm and of which the Federal Government knew or should have known at the time the housing units were transferred to the plaintiffs and/or very shortly thereafter.

115. The Federal Government violated all of the referenced duties to the plaintiffs, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

116.    As a direct and proximate result of the acts and/or omissions of the Federal Government, as well as its violation(s) of state and federal laws, the plaintiffs have suffered, and will continue to suffer, injuries and damages, for which they are entitled to recover from the Federal Government, all as alleged herein.

117.    Further, since the plaintiffs are within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, plaintiffs specifically plead the application of the doctrine of negligence *per se.*

118.    The Federal Government was negligent and at fault in the following non-exclusive particulars:

    a.      In providing unreasonably dangerous housing units to the plaintiffs;

    b.      In failing to ensure that the housing units it purchased and provided to the plaintiffs were habitable, functional, and suitable for their intended use;

    c.      In failing to warn the plaintiffs of the unreasonably dangerous nature of the housing units;

    d.      In failing to apply and/or adhere to an express or implied warranty of fitness and safety for the housing units provided to the plaintiffs;

    e.      In failing to remedy the dangerous nature of the housing units they provided to the plaintiffs;

    f.      In failing to timely implement adequate safety measures and procedures to remove the defects in the housing units or the plaintiffs from the defective housing units by providing them with alternative housing;

g.    Such other actions of negligence and fault as will be shown at the trial of this matter.

**COUNT 3:**

**CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT FOR REDHIBITORY DEFECTS AND THE RESCISSION OF SALES OF HOUSING UNITS PURSUANT TO LOUISIANA CIVIL CODE ARTICLE 2520, *ET SEQ*. AND THE ARTICLES RELATING TO CONVENTIONAL OBLIGATIONS**

119.    Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

120.    At all times herein, the Federal Government was the owner of the housing units supplied to the plaintiffs.

121.    The Federal Government actually sold certain housing units to certain plaintiffs and class members herein.

122.    All sales of the subject housing units were made well after the Federal Government became aware that the subject housing units were defective in that they were composed of materials which caused the off-gassing of dangerous levels of formaldehyde.

123.    The defective condition affecting the subject housing units was present at the time of the initial delivery of the housing units to the plaintiffs and at the time the housing units were sold to the particular plaintiffs.

124.    The defective condition, the presence of dangerous levels of formaldehyde, affecting the subject housing units which were ultimately sold to the plaintiffs herein was such that it rendered the housing units sold useless and/or so inconvenient that the plaintiff purchasers would not have purchased the housing units if they had known of the defect.

125.    The defective condition, the presence of dangerous levels of formaldehyde, affecting the

subject housing units were neither known nor could have been discovered by the plaintiff purchasers at the time the housing units were conveyed to the particular plaintiffs.

126.    Under the facts as pled in this complaint the Federal Government was aware at the time the housing units were sold to the particular plaintiffs herein that the plaintiffs intended to use the housing units as residences and that the housing units were not fit for the plaintiffs-vendees' particular purposes.

127.    Under the facts as pled in this complaint the Federal Government had actual knowledge of the existence of the defective condition in the subject housing units which were sold to particular plaintiffs herein, and as such the Federal Government is considered to be a seller in bad faith under the codal articles relative to redhibition.

128.    The Federal Government conveyed the subject housing units to particular plaintiffs without disclosing to the plaintiffs-vendees the defective condition present in the housing units.

129.    Under the facts and circumstances as pled, the Federal Government is liable to the plaintiffs-vendees for all damages allowed under La. C.C. Art. 2545, including but not limited to general damages, the return of the purchase price with interest from the time it was paid, the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the housing units, expenses incurred through mitigation of damages, and attorneys fees.

130.    Additionally and/or in the alternative, and under the facts as pled in this complaint, because the Federal Government was aware at the time the housing units were sold to the particular plaintiffs herein that the plaintiffs intended to use the housing units as residences and that the housing units were not fit for the plaintiffs-vendees' particular purposes, the Federal

57

Government breached the contract of sale between it and the particular plaintiffs herein and did so in bad faith.

131.   Under the facts and circumstances as pled, the Federal Government is liable to the plaintiffs-vendees for all damages allowed under La. C.C. Arts. 2524 and 1994, 1995 and 1997, including all damages occasioned by the Federal Government's failure to perform its contractual obligations and all damages, whether foreseeable or not, that are a direct consequence of its failure to perform.

## VII. CLAIMS ASSERTED AGAINST THE MANUFACTURING DEFENDANTS

### A.   LOUISIANA STATE-BASED CLAIMS

#### COUNT 4:

#### CAUSE OF ACTION AGAINST THE MANUFACTURERS UNDER LOUISIANA PRODUCTS LIABILITY ACT

132.   Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

133.   The Manufacturing Defendants are manufacturers and their housing units constitute products under the Louisiana Products Liability Act [LPLA].

134.   The exposure to formaldehyde fumes from the Manufacturing Defendants' products and equipment resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration in the condition in which the Manufacturing Defendants' s sold these housing units.

135.   The design of the housing units, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and poses an unreasonable risk of

harm to the plaintiffs and to all class members.

136. Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that poses an unreasonable risk of harm to the plaintiffs and to all class members.

137. The Manufacturing Defendants' products, equipment and supplies were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left the respective Manufacturing Defendants' control. The plaintiffs and members of the class were intended and foreseeable users of the alleged defective products, and damages and losses to the plaintiffs and members of the class reasonably could have been anticipated by the Manufacturing Defendants.

138. The defects in the Manufacturing Defendants' housing units are the result of and/or include, but are not limited to, the following:

   a.    In failing to design their respective products so as not to emit dangerous levels of formaldehyde;

   b.    In providing housing units to the plaintiffs which, by virtue of their design and/or manufacture and/or composition were unreasonably dangerous under reasonably anticipated use;

   c.    In providing housing units to the plaintiffs which, by virtue of a lack of an adequate warning(s) were unreasonably dangerous under reasonably anticipated use;

   d.    In providing housing units to the plaintiffs which did not conform to the express warranties made by the Manufacturing Defendants regarding their fitness for use as reasonably anticipated;

59

e.      In manufacturing, testing, marketing, distributing, licensing and selling of unreasonably dangerous housing units;

f.      In failing to properly test the housing units to property evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

g.      In failing to warn plaintiffs of the unreasonably dangerous nature of the housing units or of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde.

h.      In failing to ensure that the housing units they manufactured and provided to the plaintiffs were suitable for their intended use;

i.      In failing to adhere to any and all express warranties of fitness and safety for the housing units they manufactured and provided;

j.      In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

k.      Such other indicia of fault under the LPLA  as will be shown at the trial of this matter

**B.      MISSISSIPPI STATE-BASED CLAIMS**

**COUNT 5:**

**STRICT PRODUCTS LIABILITY**
**MS CODE ANNOTATED § 11-1-63**

**1.  PRODUCTS LIABILITY: DEFECTIVE MANUFACTURING AND DESIGN**

139.    Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

60

140.   The Manufacturing Defendants, at the time the subject housing units left their control, knew or should have known that the products were defective because they deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications.

141.   The Manufacturing Defendants knew or should have known that the defective condition rendered the subject housing units unreasonably dangerous to the user or consumer or others; and

142.   The defective and unreasonably dangerous condition of the product (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by plaintiffs.

143.   At the time the subject housing units left the control of defendants, the subject housing units did not contain properly selected prepared and installed components.

144.   At all relative times, plaintiffs lacked actual or constructive knowledge of the defective condition of the products (housing units) and that the defective products were inconsistent with their safety.

145.   At all relevant times, plaintiffs did not appreciate the danger of the subject housing units' defective conditions.

146.   At all relevant times, plaintiffs did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

147.   The subject housing units in question failed to function as expected as a result of their design characteristics.

148.   An alternative design existed at the time the housing units left the control of the Manufacturing Defendants which would have not impaired the products' usefulness or desirability.

149.   The alternative design would have to a reasonable probability prevented the toxic exposure of the plaintiffs.

## 2.  PRODUCTS LIABILITY: FAILURE TO WARN

150.   The products (housing units) were defective because they failed to contain adequate warnings or instructions.

## 3.  PRODUCTS LIABILITY: BREACH OF EXPRESS WARRANTY

151.   The products (housing units) breached an express warranty and/or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use these products.

## 4.   COMPENSATORY DAMAGES UNDER MISSISSIPPI LAW

152.   Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

153.   As a direct and proximate result of the Manufacturing Defendants' acts and omissions, plaintiffs have suffered and will continue to suffer damages in an amount in excess of the minimum jurisdictional limits of the court for past and future physical pain and mental suffering, past and future reasonable and necessary medical expenses, past and future physical impairments and disability, past and future loss of earning capacity, and past and future  loss of enjoyment and quality of life and other damages and injuries as set forth above, including the damages plaintiffs suffered from exposure to formaldehyde, a

carcinogenic material.

154.    Plaintiffs, as a direct and proximate result of the Manufacturing Defendants' negligence, malicious, fraudulent and intentional acts and omissions, and as a direct result of the other causes of action described above, have experienced and continue to experience severe mental pain, anguish and suffering directly attributable to the occurrence made the basis of this lawsuit and directly attributable to their injuries and the harm they have sustained.

155.    Plaintiffs have suffered out-of-pocket expenses which include travel expenses, attorney's fees, costs of court, time from work and other expenses.  Accordingly, plaintiffs seek all general, special, incidental and consequential damages as shall be proven at the time of trial, including exemplary, enhanced and trebled damages, pre-judgment interest, and post-judgment interest.

156.    As a result of the housing units' component parts emitting excessive and dangerous levels of formaldehyde, the housing units are dangerous to human health.

157.    The amount of total damages suffered by plaintiffs is significant and continuing in nature. Such amounts exceed the minimum jurisdictional limits of this Court.  Plaintiffs reserve the right to amend and state further with respect to their damages.

**5.      PUNITIVE / EXEMPLARY DAMAGES AS TO MANUFACTURING DEFENDANTS UNDER MISSISSIPPI LAW**

158.    Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

159.   Pursuant to Miss. Code Ann. § 11-1-65, inasmuch as the conduct of the Manufacturing

Defendants and their servant/employees constitutes willful, wanton, egregious and reckless

disregard for the rights and safety of the plaintiffs, an award of punitive damages is

appropriate and necessary under these facts.

C.   **ALABAMA STATE-BASED CLAIMS**

**COUNT 6:**

**ALABAMA EXTENDED MANUFACTURER'S LIABILITY DOCTRINE
Code of Ala. § 6-5-521**

**1.  PRODUCTS LIABILITY: DEFECTIVE MANUFACTURING AND DESIGN**

160.   Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully

repeated verbatim herein.

161.   The  Manufacturing Defendants were negligent in the manufacture, construction, design,

formula, preparation, assembly, installation, testing, warnings, instructions, marketing,

packaging or labeling of the subject housing units based upon (1) negligence, (2) innocent

or negligent misrepresentation, (3) the manufacturer's liability doctrine as it exists or is

hereafter constructed or modified, (5) breach of any implied warranty, and (6) breach of any

oral express warranty and no other.

162.   The  Manufacturing Defendants, at the time the subject housing units left their control, knew

or should have known that the products (housing units) were defective because they deviated

in a material way from the manufacturers' specifications or from otherwise identical units

manufactured to the same manufacturing specifications.

163.   The  Manufacturing Defendants knew or should have known that the defective condition rendered the subject housing units unreasonably dangerous to the user or consumer or others; and

164.   The defective and unreasonably dangerous condition of the products (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by plaintiffs.

165.   At the time the subject housing units left the control of the  Manufacturing Defendants, the subject housing units did not contain properly selected prepared and installed components.

166.   At all relative times, plaintiffs lacked actual or constructive knowledge of the defective condition of the products (housing units) and that the defective products were inconsistent with their safety.

167.   At all relevant times, plaintiffs did not appreciate the danger of the subject housing units' defective conditions.

168.   At all relevant times, plaintiffs did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

169.   The subject housing units failed to function as expected as a result of the design characteristics.

170.   An alternative design existed at the time the housing units left the control of the Manufacturing Defendants which would have not impaired the products' usefulness or desirability.

65

171.   The alternative design would have to a reasonable probability prevented the toxic exposure of the plaintiffs.

## 2.  PRODUCTS LIABILITY: FAILURE TO WARN

172.   The products (housing units) were defective because they failed to contain adequate warnings or instructions.

## 3.   PRODUCTS LIABILITY: BREACH OF EXPRESS AND IMPLIED WARRANTY OF MERCHANTABILITY

173.   The products (housing units) breached express warranties and/or failed to conform to other express factual representations and the warranties of merchantability upon which the claimants justifiably relied in electing to use the products.

## 4.   COMPENSATORY DAMAGES UNDER ALABAMA LAW

174.   Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

175.   As a direct and proximate result of the Manufacturing Defendants' acts and omissions, plaintiffs have suffered and will continue to suffer damages in an amount in excess of the minimum jurisdictional limits of the court for past and future physical pain and mental suffering, past and future reasonable and necessary medical expenses, past and future physical impairments and disability, past and future loss of earning capacity, and past and future  loss of enjoyment and quality of life and other damages and injuries as set forth above, including the damages plaintiffs suffered from exposure to formaldehyde, a carcinogenic material.

176. Plaintiffs, as a direct and proximate result of the Manufacturing Defendants' negligence, malicious, fraudulent and intentional acts and omissions, and as a direct result of the other causes of action described above, have experienced and continue to experience severe mental pain, anguish and suffering directly attributable to the occurrence made the basis of this lawsuit and directly attributable to their injuries and the harm they have sustained.

177. Plaintiffs have suffered out-of-pocket expenses which include travel expenses, attorney's fees, costs of court, time from work ad other expenses. Accordingly, plaintiffs seek all general, special, incidental and consequential damages as shall be proven at the time of trial, including exemplary, enhanced and trebled damages, pre-judgment interest, and post-judgment interest.

178. As a result of the housing units' component parts emitting excessive and dangerous levels of formaldehyde, the housing units are dangerous to human health.

179. The amount of total damages suffered by plaintiffs is significant and continuing in nature. Such amounts exceed the minimum jurisdictional limits of this Court. Plaintiffs reserve the right to amend and state further with respect to their damages.

## 5.   CODE OF ALABAMA § 6-11-23 PUNITIVE / EXEMPLARY DAMAGES AS TO MANUFACTURING DEFENDANTS UNDER ALABAMA LAW

180. Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

181. Pursuant to Alabama Law, inasmuch as the conduct of the Manufacturing Defendants and their servants/employees constitutes willful, wanton, egregious and reckless disregard for

the rights and safety of the plaintiffs, an award of punitive damages is appropriate and necessary under these facts.

D.    **TEXAS STATE-BASED CLAIMS**

**COUNT 7:**

**CAUSE OF ACTION AGAINST MANUFACTURERS UNDER
TEXAS PRODUCTS  LIABILITY LAW**

182.    Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

183.    The Manufacturing Defendants were in the business of designing and manufacturing the housing units for commercial gain and placed the housing units in the stream of commerce.

184.    The housing units contained design, manufacturing and/or marketing defects at the time the housing units left the Manufacturing Defendants' possession and/or control.

185.    Those defects caused the housing units to be unreasonably dangerous and such defects were a producing cause of plaintiffs' damages.

186.    The design of the housing units, using plywood, press board, other composite wood products or other products that contain formaldehyde, is defective and poses an unreasonable risk of harm to the plaintiffs.

187.    Further, the use of plywood, press board, other composite wood products, or other products that contain formaldehyde constitutes a defect in composition or manufacture, which poses an unreasonable risk of harm to the plaintiffs.

188.    Additionally, the Manufacturing Defendants failed to adequately warn plaintiffs, the end users of such products, of the dangers associated with formaldehyde exposure, the risk of exposure

68

to formaldehyde by using such products, and the means to mitigate such risks, which constitute a marketing defect.

189.   Specifically, the defects in Manufacturing Defendants' housing units  include, without limitation:

   a.      Inherent characteristics, known to Manufacturing Defendants, which gave the products such a potential for causing health problems as to render the products unreasonable *per se*;

   b.      Lack of warnings or lack of sufficient warnings of the inherently dangerous properties of the products when used in the fashion for which they were anticipated or should have been anticipated being used;

   c.      Lack of instructions or lack of sufficient instructions for eliminating or minimizing the health risks inherent in the use of the products;

   d.      Lack of sufficient inspections by the Manufacturing Defendants of their products to ensure that such products contained sufficient warnings of the dangerous properties of the products;

   e.      Lack of reasonable inspections by the Manufacturing Defendants of their products to ensure that such products contained sufficient instructions for eliminating or minimizing the health risks inherent in the use of the products;

   f.      Lack of testing or lack of sufficient tests to determine the effects and/or the risks of formaldehyde fumes on intended users of the products or their guests; and

   g.      Defective designs calling for the inclusion of materials which included formaldehyde, when equally suitable materials which did not contain formaldehyde were available,

69

would have prevented or significantly reduced the risk of plaintiffs' damages without substantially impairing the products' utility, and which were economically and technologically feasible at the time the products left the control of the Manufacturing Defendants.

190. The defects in the housing units rendered such products unreasonably dangerous and each was each a producing cause of plaintiffs' damages, as set forth herein.  Plaintiffs' damages resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration, in the condition in which the Manufacturing Defendants sold the housing units, or in which they left Manufacturing Defendants' control.

191. The plaintiffs were all intended and foreseeable users of the housing units, and damages and losses to the plaintiffs through normal, foreseeable and intended use of the products, could reasonably be anticipated by the Manufacturing Defendants.

192. If the Manufacturing Defendants claim that any of the housing units are governed by any local, state or federal government's procedures, regulations or requirements for building or marketing the housing units, then plaintiffs would show that:

a. The Manufacturing Defendants did not follow such procedures, regulations or requirements and the housing units did not and do not comply with such procedures, regulations or requirements;

b. Even if such procedures, regulations or requirements apply, and even if the Manufacturing Defendants built and manufactured the housing units according to such  procedures, regulations or requirements, then the housing units still contain manufacturing flaws or defects; and/or,

70

c.      Any such safety standards, regulations or requirements are or were inadequate to protect the public from unreasonable risks of injury or damage caused by the housing units; and/or,

d.      The Manufacturing Defendants withheld or misrepresented information or material relevant to the government's or agency's determination of adequacy of the safety standards or regulations at issue in this lawsuit.

### COUNT 8:

### CAUSE OF ACTION AGAINST MANUFACTURERS FOR NEGLIGENCE UNDER TEXAS LAW

193.    Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

194.    At all times material the Manufacturing Defendants were the designers, marketers, manufacturers, distributors, and/or sellers of the housing units, which have caused plaintiffs' injuries.

195.    The Manufacturing Defendants owed a duty to plaintiffs to provide safe housing units that did not emit unsafe levels of formaldehyde.

196.    The Manufacturing Defendants knew or should have known that when they provided the housing units to the general public or directly to FEMA that the housing units would be used in the manner that each plaintiff herein used the housing units.

197.    The Manufacturing Defendants breached their duty to plaintiffs in failing to act reasonably in the design, marketing, distribution and sale of the housing units; specifically by:

a.     Failing to provide any/or sufficient warnings regarding the inherently dangerous properties of the housing units when used in the fashion for which they were anticipated or should have been anticipated being used;

b.     Failing to provide any/or sufficient instructions for eliminating or minimizing the health risks inherent in the use of the housing units, in particular, the risk of the exposure to formaldehyde;

c.     Failing to adequately and properly inspect the housing units to ensure that the housing units contained sufficient warnings of their dangerous properties of the products, in particular, the risk of the exposure to formaldehyde;

d.     Failing to adequately and properly inspect the housing units to ensure that such products contained sufficient instructions for eliminating or minimizing the health risks inherent in the use of the products, in particular, the risk of the exposure to formaldehyde;

e.     Failing to test or lack of sufficient tests to determine the effects and/or the risks of formaldehyde fumes on intended users of the housing units or their guests;

f.     Failing to properly design the housing units, including inappropriate designs calling for the inclusion of materials which included formaldehyde, when equally suitable materials which did not contain formaldehyde were available, which would have prevented or significantly reduced the risk of plaintiffs' damages without substantially impairing the housing units' utility, and which were economically and technologically feasible at the time the housing units left the control of the Manufacturing Defendants;

72

g.  Failing to properly manufacture the housing units by incorporating materials in the housing units which included formaldehyde, when equally suitable materials which did not contain formaldehyde were available, which would have prevented or significantly reduced the risk of plaintiffs' damages without substantially impairing the housing units' utility, and which were economically and technologically feasible at the time the housing units left the control of the Manufacturing Defendants; and,

h.  Failing to disclose to FEMA or plaintiffs that the housing units emitted formaldehyde fumes and that such fumes caused health problems, despite the fact that the Manufacturing Defendants knew of the dangers of formaldehyde exposure and the emission of formaldehyde from the housing units.

198.  The Manufacturing Defendants' breaches were a proximate, direct and/or producing cause of plaintiff's damages, as set forth herein.

**COUNT 9:**

**CAUSE OF ACTION AGAINST MANUFACTURERS FOR BREACH OF IMPLIED WARRANTY UNDER TEXAS LAW**

199.  Named Plaintiffs and Putative Class Members incorporate the above allegations as if fully repeated verbatim herein.

200.  At times material herein, the Manufacturing Defendants impliedly warranted that the housing units were made in a good and workmanlike manner, and would be merchantable and habitable, and were fit for their intended purpose as safe and compliant housing units to be used, among other things, to house the plaintiffs.

201.    As set forth herein, the housing units were not fit for their intended purpose as safe and compliant housing units for the plaintiffs.

202.    Therefore the Manufacturing Defendants breached these warranties.

203.    Plaintiffs have notified the Manufacturing Defendants of this breach, or have been unable to do so because the housing units have been removed in many cases, and plaintiffs cannot identify the actual manufacturer of their particular housing unit.

204.    As set forth herein, the Manufacturing Defendants' conduct was a producing cause of plaintiff's damages incurred and set forth herein.

## COMPENSATORY DAMAGES: ALL STATES

In addition to and by way of summarizing the compensatory damages prayed for herein, the Named Plaintiffs and Putative Class Members aver that the defendants, the United States of America through FEMA and the Manufacturing Defendants, individually and/or jointly are responsible for all damages which plaintiffs herein have suffered and continue to suffer, proximately caused by the defendants' acts and/or omissions as pled, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, out-of-pocket expenses, travel expenses, attorney's fees, costs of court, time from work and other expenses, loss of use and/or opportunity to use safe and adequate shelter during the period of plaintiffs' displacement, all general, special, incidental and consequential damages as shall be proven at the time of trial, and post-judgment interest.

Additionally, for those who purchased housing units from FEMA, those certain plaintiffs are entitled to the return of the purchase price with interest from the time it was paid, the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the housing units, expenses incurred through mitigation of damages, attorney's fees, and all damages allowed under La. C.C. Arts. 2524 and 1994, 1995 and 1997, including all damages occasioned by the Federal Government's failure to perform its contractual obligations and all damages, whether foreseeable or not, that are a direct consequence of its failure to perform.

Damages are also due to the the estates and/or survivors of plaintiffs/decedents whose deaths were caused by exposure to formaldehyde as set forth herein under the applicable laws of the four States, which damages include, but are not limited to those available in wrongful death and survival actions, including those damages set forth above and including economic and incidental damages such as funeral and burial expenses.

## MEDICAL MONITORING

In addition to compensatory damages, and pursuant to the applicable laws of Louisiana, Mississippi, Alabama and Texas, all plaintiffs seek the reasonable costs of medical monitoring for all class members under a court-supervised medical monitoring fund.

## PUNITIVE DAMAGES

Under the laws of the States of Mississippi, Alabama and Texas, the plaintiffs seeking relief under the statutory provisions set forth herein under those States are also entitled to awards for punitive damages as are appropriate and necessary under these facts.

## REQUEST FOR JURY TRIAL

Plaintiffs are entitled to and demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs and Putative Class Members pray **that**:

1.    After due proceedings had, this action be certified as a class action pursuant to the provisions of F.R.C.P. 23, in the respects alleged herein above, for the purposes of determining the common issues of liability for compensatory damages;

2.    The Court enjoin the defendants from continuing to provide, lease and sell these housing units which violate federal and state regulations and are injurious to the health of the occupants;

3.    The Court order FEMA to provide immediate payments to plaintiffs for alternative housing;

4.    After due proceedings had, and a trial by jury, there be a judgment in this matter in favor of the plaintiffs and against the defendants, declaring that the defendants are liable to the plaintiffs and all members of the class for all applicable damages and thereafter;

5.    The rights of the plaintiffs and all members of the class and sub-classes to establish their entitlement to compensatory damages, punitive damages, and all other damages sought herein, including attorneys fees where permitted, and the amount thereof, be reserved for determination in their individual actions when appropriate;

6.    Plaintiffs recover their costs for the prosecution of this class action, and for interest on all damages from the date of judicial demand until paid; and,

7.    Plaintiffs be awarded such other and further relief as the Court deems just and proper.

Respectfully submitted:

**FORMALDEHYDE TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**


BY:   s/Gerald E. Meunier
       GERALD E. MEUNIER, #9471
       **PLAINTIFFS' CO-LIAISON COUNSEL**
       Gainsburgh, Benjamin, David, Meunier &
       Warshauer, L.L.C.
       2800 Energy Centre, 1100 Poydras Street
       New Orleans, Louisiana 70163
       Telephone:    504/522-2304
       Facsimile:     504/528-9973
       gmeunier@gainsben.com



       s/Justin I. Woods
       JUSTIN I. WOODS, #24713
       **PLAINTIFFS' CO-LIAISON COUNSEL**
       Gainsburgh, Benjamin, David, Meunier &
       Warshauer, L.L.C.
       2800 Energy Centre, 1100 Poydras Street
       New Orleans, Louisiana 70163
       Telephone:    504/522-2304
       Facsimile:     504/528-9973
       jwoods@gainsben.com



       **COURT-APPOINTED PLAINTIFFS'
       STEERING COMMITTEE**
       ANTHONY BUZBEE, Texas # 24001820
       RAUL BENCOMO, #2932
       FRANK D'AMICO, #17519
       MATT MORELAND, #24567
       LINDA NELSON, #9938
       RONNIE PENTON, #10462


77

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 18, 2008, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

s/Gerald E. Meunier<br>
GERALD E. MEUNIER, #9471