UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER                          MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION                 SECTION N-4
                                             JUDGE ENGELHARDT
                                             MAG. JUDGE ROBY


THIS DOCUMENT IS RELATED TO ALL CASES


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *



DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FTCA AND
CONTRACT CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     Hurricanes Katrina And Rita... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    Direct Temporary Emergency Housing Provided
           By FEMA In Areas Impacted By Hurricanes Katrina
           And Rita.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

           A.     FEMA's Assistance Programs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

           B.     FEMA's Plans To Respond To The Housing Shortage
                   Caused By Hurricanes Katrina and Rita. . . . . . . . . . . . . . . . . . . . . . . 4

    III.    Information Relating To Formaldehyde In EHUs And
           FEMA's Response. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    IV.    Plaintiffs Who Assert Claims Against The United States
           In The Administrative Master Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           A.     Pujol Family – Four Claimants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           B.     Thomas Family – Four Claimants. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    I.     The FTCA And Stafford Act Govern This Court's
           Analysis of Plaintiffs' Claims Brought Against
           The United States. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           A.     The FTCA Provides The Exclusive Waiver Of The
                   United States' Sovereign Immunity For Plaintiffs'
                   Tort Claims In This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B. The Stafford Act Governs The United States' Disaster Response Actions Such As Those At Issue In This Case.. . . . . . . . . . . . . . . . . . . . . 21

II. This Court Must Dismiss Plaintiffs' Claims Because They Are Barred By The Discretionary Function Exceptions of the FTCA And Stafford Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A. The FTCA Discretionary Function Exception. . . . . . . . . . . . . . . . . . . . 23

B. The Stafford Act Discretionary Function Exception. . . . . . . . . . . . . . . 25

C. Plaintiffs' Claims Fall Squarely Within The Discretionary Function Exceptions Of The FTCA and Stafford Act. . . . . . . . . . . . . . 27

 1. Plaintiffs Have Failed To Identify Or Allege Any Violation Of A Mandatory And Specific Statute, Regulation, Or Policy.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  a. FEMA Did Not Impose On Itself A Mandatory And Specific Obligation Regarding Formaldehyde Levels In EHUs. . . . . . . . . . . . 28

  b. Certain Terms Contained In FEMA's Regulations Or Statements Do Not Impose A Mandatory And Specific Duty Governing FEMA's Actions At Issue In This Case. . . . . . . . . . . . . . . . . . . . . . 30

  c. Neither Objective Scientific Standards, Nor Regulatory Standards, Imposed A Mandatory And Specific Obligation On FEMA With Respect To Formaldehyde Levels In Indoor Air Quality. . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

 2. The Challenged Conduct Is Susceptible To Policy Considerations... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

III. The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Contract Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

A. Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

B. The Court Lacks Subject Matter Jurisdiction Over Count 1 Contract Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

C.      The Court Lacks Subject Matter Jurisdiction Over
        Plaintiffs' Count 3 Contract Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

# TABLE OF AUTHORITIES

<u>CASE</u>                                                                                     <u>PAGE</u>

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970).................................................... 19

*Aix El Dorado v. Southwest Sav. & Loan Ass'n*,
    36 F.3d 409 (5th Cir. 1994)............................................ 21, 24

*Allen v. United States*,
    816 F.2d 1417 (10th Cir. 1987)..................................... 24, 32, 42

*Amoco Prod. Co. v. Hodel*,
    815 F.2d 352 (5th Cir. 1987)........................................... 48

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)..................................................... 19

*Andrade v. Chojnacki*,
    338 F.3d 448 (5th Cir. 2003)........................................... 25

*Aragon v. United States*,
    146 F.3d 819 (10th Cir. 1998).......................................... 24

*Aretz v. United States*,
    604 F.2d 417(5th Cir. 1979)............................................ 20

*Atorie Air, Inc. v. FAA*,
    942 F.2d 954 (5th Cir. 1991).......................................... 20, 21

*Autery v. United States*,
    992 F.2d 1523 (11th Cir.1993)......................................... 32

*Awad v. United States*,
    2001 WL 741638 *3 (N.D. Miss. Apr. 27, 2001)................... 46, 47, 48

*Baldassaro v. United States*,
    64 F.3d 206 (5th Cir. 1995)....................................... 23, 25, 39, 41

*Bennett v. United States*,
    2001 WL 417798, *4 (E.D. La. Apr. 20, 2001)........................ 29

<u>**CASE**</u>                                                                                    <u>**PAGE**</u>

*Benzman v. Whitman*,
     2006 WL 250527. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Berkovitz v. United States*,
     486 U.S. 531 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26, 34

*Bethlehem Steel Corp. v. Avondale Shipyards, Inc.*,
     951 F.2d 92 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Blackburn v. United States*,
     100 F.3d 1426 (9th Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Blanchard v. St. Paul Fire & Marine Ins. Co.*,
     341 F.2d 351 (5th Cir. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

*Brewer v. HUD*,
     508 F. Supp. 72. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Brooks v. A.R. & S. Enters., Inc.*,
     622 F.2d 8 (1st Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Buchanan v. United States*,
     915 F.2d 969 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*California-Nevada Methodist Homes, Inc. v. FEMA*,
     152 F. Supp. 2d 1202 (N.D. Cal. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Celotex  Corp. v. Catrett*,
     477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Centanni v. United States*,
     2004 WL 385057 *1 (E.D. La. Feb. 27, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*City Nat'l Bank v. United States*,
     907 F.2d 536 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 28

*Daigle v. Shell Oil Co.*,
     972 F.2d 1527 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 41

*Dalehite v. United States*,
     346 U.S. 15 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**CASE**                                                                **PAGE**

*Dardar v. Potter*,
    2004 WL 422008 *11 (E.D. La., March 4, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Davis v. United States*,
    2003 WL 30421 *2 (E.D. La., Jan. 2, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 45

*Davis v. United States*,
    961 F.2d 53 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47, 48, 49

*Dowl v. Tulane Univ. Hosp. and Clinic*,
    2005 WL 2060921 *2 (E.D. La., Aug. 22, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Dureiko v. United States*,
    209 F.3d 1345 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Elder v. United States*,
    312 F.3d 1172 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Fang v. United States*,
    140 F.3d 1238 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Gadd By and Through Gadd v. United States*,
    971 F. Supp. 502 (D. Utah 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Garza v. United States*,
    161 Fed. Appx. 341, 2005 WL 3478009 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . 32

*Gaubert v. United States*,
    499 U.S. 315 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 39, passim

*Gold v. Local 7 United Food & Comm. Workers Union*,
    159 F.3d 1307 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Graham v. FEMA*,
    149 F.3d 997 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Guile v. United States*,
    422 F.3d 221 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 23, passim

**CASE**                                           **PAGE**

*Hayes v. USPS,*
    859 F.2d 354 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Hercules, Inc. v. United States,*
    516 U.S. 417 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Hix v. Army Corps. of Engineers,*
    155 Fed. Appx. 121 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re: World Trade Center Disaster Site Litig.,*
    521 F.3d 169 (2d. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Jackson v. USPS,*
    799 F.2d 1018 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Kee v. City of Rowlett,*
    247 F.3d 206 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Keene v. United States,*
    508 U.S. 200 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Kelly v. United States,*
    241 F.3d 755 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Kennewick Irrig. Dist. v. United States,*
    880 F.2d 1018 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 31

*Kirchmann v. United States,*
    8 F.3d 1273 (8th Cir.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Koehler v. United States,*
    153 F.3d 263 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25

*Laird v. Nelms,*
    406 U.S. 797 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 45

*Lathers v. Penguin Industries, Inc.,*
    687 F.2d 69 (5th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Little v. Liquid Air Corp.,*
    37 F.3d 1069 (5th Cir. 1994) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**CASE**                                                                      **PAGE**

*Lively v. United States,*
  870 F.2d 296 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 45

*Lockett v. FEMA,*
  836 F. Supp. 847 (S.D. Fla. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Lockett v. United States,*
  938 F.2d 630 (6th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Loughlin v. United States,*
  286 F. Supp.2d 1 (D.D.C. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Martinez v. United States,*
  661 F. Supp. 762 (S.D. Tex. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Matsushita Elect. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*McNeily v. United States,*
  6 F.3d 343 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Miller v. United States,*
  163 F.3d 591 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 32

*Mortensen v. First Fed. Sav. & Loan Assoc.,*
  549 F.2d 884 (3rd Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*New Mexico v. HUD,*
  1987 WL 109007 *4 (10th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Osborn v. United States,*
  918 F.2d 724 (8th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Paul v. Igyarto,*
  2002 WL 1610962 *1 (E.D. La., July 18, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ramming v. United States,*
  281 F.3d 158 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Reily Elec. Supply Co. Inc. v. Hight's Enters., Inc.,*
  1998 WL 209457 *2 (E.D. La. Apr. 28, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 50

**CASE**                                                                                                        **PAGE**

*Rigdon v. USPS,*
 2003 WL 1618569 *2 (E.D. La., Mar. 26, 2003)................................. 20

*Rosas v. Brock,*
 826 F.2d 1004.1 (11th Cir. 1987). ........................................... 26

*Rothe Dev. Corp. v. DoD ,*
 194 F.3d 622 (5th Cir. 1999). ............................................... 46

*Sheridan v. United States,*
 487 U.S. 392 (1988)....................................................... 20

*Steel Co. v. Citizens for a Better Envir.,*
 523 U.S. 83 (1998)........................................................ 17

*Sunrise Village Mobile Home Park, L.C. v. United States,*
 42 Fed. Cl. 392 (Ct. Fed. Cl. 1998). .......................................... 26

*Trevino v. General Dynamics Corp.,*
 865 F.2d 1474 (5th Cir. 1989). .............................................. 50

*United States Fid. & Guar. Co. v. United States,*
 837 F.2d 116 (3d Cir. 1988)................................................ 43

*United States v. Idaho,*
 508 U.S. 1 (1993)......................................................... 20

*United States v. Mitchell,*
 445 U.S. 535 (1990)....................................................... 20

*United States v. Mitchell,*
 463 U.S. 212 (1983)..................................................... 21, 25

*United States v. Nicolet, Inc.,*
 1987 WL 8199 *4 (E.D. Pa. Mar 19, 1987)..................................... 43

*United States v. Orleans,*
 425 U.S. 807 (1976).................................................... 20, 21

**CASE**                                                              **PAGE**

*United States v. S.A. Empresa De Viacao Rio Grandense (Varig Airlines)*,
    467 U.S. 797 (1984)................................................ 24, 41, passim

*United States v. Sherwood*,
    312 U.S. 584 (1941)............................................................ 20

*United States v. Testan*,
    424 U.S. 392 (1976)............................................................ 20

*Wells v. United States*,
    851 F.2d 1471 (D.C. Cir. 1988)................................................ 43

*Western Greenhouses v. United States*,
    878 F. Supp. 917 (N.D. Tex. 1995)............................................ 43

*Wilkerson v. United States*,
    67 F.3d 112 (5th Cir. 1995).................................................. 48

*Williams v. United States*,
    50 F.3d 299 (5th Cir. 1995).............................................. 18, 30

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981).............................................. 17, 18

*Williamson v. U.S. Dept. of Agriculture*,
    815 F.2d 368 (5th Cir. 1987).................................................. 45

*Woodbury v. United States*,
    313 F.2d 291, (9th Cir. 1963)................................................. 46

*Wright v. USPS*,
    29 F.3d 1426 (9th Cir.1994)................................................... 47

## FEDERAL STATUTES

**PAGE**

1978 U.S.C.C.A.N. 5235 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

28 U.S.C. §1346(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 44, 46, passim

28 U.S.C. §§1346(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 46

28 U.S.C. § 1346(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28 U.S.C. §1491(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 44, 46, passim

28 U.S.C. §1500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

28 U.S.C. §2680(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 23

28 U.S.C. §2680(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

41 U.S.C. §§601-603 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

41 U.S.C. §§601-13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

41 U.S.C. § 609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

41 U.S.C. §602(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 46, 49, passim

41 U.S.C. §605(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 49

41 U.S.C. §606 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

42 U.S.C. §5121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21, 22

42 U.S.C. §5148 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 26

42 U.S.C. §5164 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

42 U.S.C. §5170 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

42 U.S.C. §5174(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

42 U.S.C. §5174(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 32, 38

**FEDERAL RULES**

                                                                    **PAGE**

Fed. R. Civ. P 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Civ. P. 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Civ. P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**FEDERAL REGULATIONS**

24 CFR §3280.308(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

24 CFR §3280.309. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

24 CFR §3282.8(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

29 CFR §1910.1048(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

29 CFR §1910.1048(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 CFR §206.110(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 38

44 CFR Part 206.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

44 CFR §206.110(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

44 CFR §206.111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

44 CFR §206.117(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

49 FR 31996.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## INTRODUCTION

Defendant United States of America (United States) files this memorandum in support of its motion to dismiss for lack of subject matter jurisdiction Plaintiffs' Federal Tort Claims Act claim (Count 2) and contract claims (Counts 1 and 3).[1]/  *See* Adm. Master Complaint (Complt.) ¶¶98-131 [Dkt. 119].  Through this lawsuit, Plaintiffs seeks to challenge decisions of the Federal Emergency Management Agency (FEMA) made in response to Hurricane Katrina, the most destructive natural disaster in the history of the United States, and Hurricane Rita, the third most expensive natural disaster in our history.  Complt. ¶7.[2]/  Specifically, Plaintiffs ask this Court to second-guess FEMA's decision to use travel trailers, park model trailers, and mobile homes (referred to as Emergency Housing Units or "EHUs") to provide temporary emergency housing for disaster victims and FEMA's actions in response to formaldehyde concerns in the EHUs.

This Court lacks subject matter jurisdiction over Plaintiffs' tort claims and should grant

---

[1]/     Joseph and Stephanie Pujol individually, and on behalf of two minor children, and Sean and Phuong Thomas, individually and on behalf of two minor children (referred to as "Pujol Family," Thomas Family" and/or "Plaintiffs") are the only Plaintiffs who have asserted claims against the United States in the Administrative Master Complaint.  *See* Complt. ¶7(a).

Plaintiffs in the following actions assert or seek to assert tort claims against the United States arising out of FEMA trailers: (1) *Oldenburg v. United States*, Civ. No. 07-2961 (E.D. La.), (2) *Curley v. United States,* Civ. No. 07-7389 (E.D. La.); and (3) *Joseph v. United States*, Civ. No. 2:08-CV-01672 (E.D. La.).  The United States, pursuant to the Court's instruction, will filed a separate a motion to dismiss those claims because those Plaintiffs failed to exhaust their administrative remedies before filing suit and/or failed to effectuate service within 120 days of filing their Complaint.

[2]/     *See also* Exhibit (Ex.) 1, WHITE HOUSE, THE FEDERAL RESPONSE TO HURRICANE KATRINA (WH Rept.) at WH-000013; Ex. 2, LOUISIANA RECOVERY AUTHORITY, THE RITA REPORT (Rita Rept.) at 00009.  All documents, except Declarations, are stamped with an alphabetical designation and page number.  For example, Exhibit 1 is assigned identification numbers "WH-00001 to WH-0000228."  For the sake of brevity, the alphabetical designation is omitted, thus, for example page WH-00005 of Exhibit 1, is cited as "Ex. 1, WH Rept. at 00005."

the United States' Fed. R. Civ. P. 12(b)(1), or alternatively, Rule 56(c), motion to dismiss.  The

Federal Tort Claims Act (FTCA), 28 U.S.C. §§1346(b), 2671-80, and Robert T. Stafford Disaster

Relief and Emergency Assistance Act (Stafford Act), 42 U.S.C. §5121, *et. seq*., retain the United

States' sovereign immunity for tort claims challenging discretionary decisions implicating public

policy, *see* 28 U.S.C. §2680(a), 42 U.S.C. §5148, and FEMA's decision as to how to house

hundreds of thousands of disaster victims left homeless by the Hurricanes is a quintessential

policy decision protected by the discretionary function exceptions in these two statutes.

Furthermore, the Court must also dismiss Plaintiffs' contract claims, contained in Counts

1 and 3, because those claims are barred by the jurisdictional requirements of the Tucker Act, 28

U.S.C. §§1346(a)(2), 1491(a), and the Contract Disputes Act, 41 U.S.C. §§601-03, which govern

claims based on contracts made with the government.

## FACTS

### I.    Hurricanes Katrina And Rita.

Hurricane Katrina made landfall on August 29, 2005, and was the most destructive

natural disaster in the history of the United States.  Ex. 1, WH Rept. at 000013.  That same day,

President Bush declared a major disaster and authorized FEMA to respond to that disaster.  Ex.

3, Fed. Reg. Notices.[3]/  Katrina's winds, and the accompanying twenty-seven (27) foot storm

surge, impacted nearly 93,000 square miles – a stretch of the Northern Gulf Coast from Mobile,

Alabama, to New Orleans, Louisiana, roughly an area the size of Great Britain.  Ex. 1, WH Rept.

at 00009, 13-14.  The overall destruction wrought by Katrina vastly exceeded that of any other

major disaster, such as the Chicago Fire of 1871, the San Francisco Earthquake and Fire of 1906,

---

[3]/    The Stafford Act provisions authorizing FEMA to provide assistance have been extended
until March 2009.  Ex. 4, 4/26/07, FEMA Fact Sheet, Release No. HQ-07-043.

and Hurricane Andrew in 1992.  Ex. 1, WH Rept. at 000013.  Over 1,326 people died in the

disaster.  Ex. 5, DEPT. OF HOMELAND SECURITY, FEMA DISASTER MANAGEMENT ACTIVITY IN

RESPONSE TO HURRICANE KATRINA (DHS Rept.) at 000118.  The hardest hit communities lost all

infrastructure: electricity; water and sewer; roads and bridges; communication systems including

telephone lines, cell phone towers, radio capabilities, and many satellite antennae; and, in some

instances, basic governmental operations, including law enforcement.  *Id*.  An estimated 300,000

homes were destroyed or made uninhabitable, leaving hundreds of thousands homeless and

without shelter.  Ex. 1, WH Rept. at 000015.  Of the 1.1 million people over the age of sixteen

who evacuated, approximately 600,000 people returned to the devastated areas by late December

2005.  *Id*. at 000017.  Those who returned faced a shortage of all basic services such as housing,

schools, transportation, and medical facilities.  *Id*. at 000017.

On September 24, 2005, Hurricane Rita made landfall along the Texas-Louisiana border,

and the President declared that it constituted a major disaster.  Ex. 6, Fed. Reg. Notices.  Rita's

winds brought with it a twenty (20) foot storm surge and impacted 85,729 square miles in Texas

and Louisiana.  Ex. 2, Rita Rept. at 00003, 11.  The devastation Rita left behind made it the third

most expensive natural disaster in our nation's history.  *Id*. at 00003, 11.  Rita destroyed or made

uninhabitable an estimated 23,000 homes in Texas and Louisiana, and forced the evacuation of

many Katrina victims who had sought refuge in the areas impacted by Rita.  *Id*. at 000012.

## II.    Direct Temporary Emergency Housing Provided By FEMA In Areas Impacted By Hurricanes Katrina And Rita.

### A.    FEMA's Assistance Programs.

FEMA's Public and Individual Assistance programs are the primary mechanism through

which it provides recovery aid and assistance to states and disaster victims.  The Public

Assistance program is intended to facilitate the repair, replacement, or restoration of disaster-damaged, publicly-owned facilities and certain private non-profit facilities.  This program provides federal disaster grants for: (1) Emergency Work consisting of debris removal and emergency protective measures, and (2) Permanent Work consisting of repair of roads and bridges, water control facilities, and utilities; repair or replacement of buildings and equipment; and repair and restoration of parks and recreation facilities.  Ex. 5, DHS Rept. at 000270-72.[4]/

FEMA administers four distinct Individual Assistance (IA) programs to aid disaster victims: (1) Individual and Household Assistance; (2) Crisis Counseling; (3) Disaster Unemployment Assistance; and (4) Legal Services.[5]/  The Individual and Household Assistance Program (IHP) provides both housing assistance and other needs assistance and is the primary mechanism to assist individuals and households to recover from damage and losses caused by the disaster.  Ex. 5, DHS Rept. at 000127, 264.  IHP assistance includes financial aid to repair and replace property lost or destroyed, rental assistance to renters and homeowners whose homes are uninhabitable, and, when housing resources are not available within an affected area, direct assistance such as EHUs.  Ex. 5, DHS Rept. at 00263; Ex. 8, Dec. Souza ¶4.

> ### B.    FEMA's Plans To Respond To The Housing Shortage Caused By Hurricanes Katrina and Rita.

Prior to Katrina making landfall, FEMA's Housing Area Command was activated and began planning contingencies to address potential shortfalls in shelter and housing.  Ex. 5, DHS Rept. at 000209.  FEMA engaged technical assistance contractors to support its temporary

---

[4]/      As of April 2008 FEMA has expended over $10 billion to fund more than 74,500 public assistance projects in the Gulf Coast region.  Ex. 7, 4/9/08, FEMA Press Release No. 1603-781.

[5]/      A more detailed description of the IA programs is set forth in the DHS Report.  Ex. 5, DHS Rept. at 000263-269.

housing mission and commenced procurement of manufactured housing units. *Id*. For temporary

emergency housing immediately following landfall, FEMA planned for displaced disaster victims

to stay in shelters, hotels, motels, cruise ships, tents, with friends and relatives, and in any other

available housing resources. *Id*. at 000154. Then, as quickly as possible, FEMA intended to

transfer the disaster victims to EHUs, and, as rebuilding and recovery efforts progressed, transfer

them from the EHUs into more permanent housing. *Id*.

The massive damage to housing stock in the Gulf Coast Region created an urgent and

immediate need for an unprecedented number of EHUs. Ex. 8, Dec. Souza ¶5.[6] EHUs consisted

primarily of travel trailers, park model trailers, and manufactured housing (hereinafter referred to

as "mobile homes"). Mobile homes are relatively large and their manufacture is regulated by the

United States Department of Housing and Urban Development (HUD). Complt. ¶¶18-20.[7]

---

[6]     As of May 2005, FEMA's existing temporary emergency housing inventory consisted of
approximately 4,832 mobile homes and travel trailer units. Ex. 5, DHS Rept. at 000264.

[7]     HUD requires manufacturers of mobile homes use special plywood and particle board in
the construction of the mobile home. Specifically the applicable regulation provides that:

> All plywood and particle board materials bonded with a resin system or coated with a
> surface finish containing formaldehyde shall not exceed . . . 0.2 parts per million . . .
> [and] . . . 0.3 ppm [respectively].

24 CFR §3280.308(a)(1) & (2). HUD's requirement that manufacturers use these materials
targets an indoor ambient formaldehyde air quality level of 0.4 ppm or 400 ppb. *See* Ex. 9, 49
FR 31996, 31998 §II(D) pp. 7-13 (HUD-000007 to HUD-000013) (Aug. 9, 1984). HUD also
requires that:

>   (a)  Each manufactured home shall have a Health Notice on formaldehyde emissions
> prominently displayed in a temporary manner in the kitchen (i.e., countertop or exposed
> cabinet face) . . .

>   (b)  The Notice shall be legible and typed using letters at least 1/4 inch in size. The title
> shall be typed using letters at least 3/4 inch in size.

Travel trailers and park model trailers are smaller units that are more transportable, and are exempted from the HUD regulations.  Complt. ¶¶18-20.[8]/

Initially, FEMA intended to rely primarily on mobile homes and locate disaster victims in mobile home cities set up throughout the Gulf Coast region.  Ex. 8, Dec. Souza ¶6.  State and local officials objected to this plan.  *Id.* ¶6.  They wanted to place disaster victims in, or as close as possible to, their devastated communities to encourage and promote rebuilding and recovery efforts.  *Id.* ¶6.  In response, FEMA modified its plan and agreed to rely primarily upon trailers which, unlike mobile homes, could be placed in, or at least in closer proximity to, the devastated communities.  *Id.* ¶6.

Therefore, FEMA commenced purchasing EHUs, primarily travel trailers, but also some park model trailers and mobile homes, soon after Katrina made landfall.  Ex. 8, Dec. Souza ¶5; Ex. 10, Dec. McCreary ¶3.  Ultimately, FEMA spent more than $2.5 billion dollars and purchased over 140,000 EHUs.  Ex. 10, Dec. McCreary ¶3.

---

(c) The Notice shall not be removed by any party until the entire sales transaction has been completed. . . .

24 CFR §3280.309 (a-c).

[8]/   The pertinent portion of the HUD regulation provides:

(g) *Recreational vehicles.*  Recreational vehicles are not subject to this part, part 3280, or part 3282.  A recreational vehicle is a vehicle which is:

(1) Built on a single chassis;
(2) 400 Square feet or less . . .;
(3) Self-propelled or permanently towable by a light duty truck;
(4) Designed primarily not for use as a permanent dwelling but as temporary living quarters . . . .

24 CFR §3282.8(g).  The travel trailers and park model trailers at issue in this case are recreational vehicles and exempted from the HUD regulations.  *See* Complt. ¶37.

Over 34,000 EHUs were purchased "off the lot" from recreational vehicle dealers, and more than 106,000 were purchased from manufacturers. Ex. 10, Dec. McCreary ¶3; Ex. 10-A, Summary EHU Purchases at 001101-119.  For "off the lot" purchases, Contract Officers contacted EHU vendors to identify available inventories. Ex. 10, Dec. McCreary ¶¶5-6. FEMA only purchased new units, and like any other purchaser of a new trailer, reasonably assumed that the vendors and manufacturers would provide a safe and habitable product.  Ex. 8, Dec. Souza ¶6; Ex. 10, Dec. McCreary ¶¶6-10.  Thus, consistent with this belief, FEMA contract officers search for and purchased from vendors EHUs that were:  (1) new and under warranty; (2) furnished; (3) contained basic amenities; and (4) meet certain size requirements.  Ex. 10, Dec. McCreary ¶¶5-6, 8, 10. .  *Id*. ¶¶5-6, 8; Ex. 10-B, Mobile Home Contract at 000208; Ex. 10-C, Trailer Contract at 000310; Ex. 10-E, Park Model Contract at 000272.  FEMA Contract Officers did not address nor consider formaldehyde in EHUs to be an issue of concern.  Ex. 10, Dec. McCreary ¶10.

FEMA also purchased travel trailers and mobile homes directly from manufacturers.  *Id*. ¶¶2-5, 7, 9; Ex. 10-A, Summary EHU Purchases at 001115-16; Ex. 10-D, Trailer Contract; Ex. 10-F, Mobile Home Contract.  FEMA's terms and conditions for these purchases were similar to those with respect to the off the-lot purchases and related primarily to dimensions and furnishing, and required that units comply with industry standards – again, FEMA specifications did not address formaldehyde and contract officers did not consider formaldehyde in EHUs to be an issue of concern.  Ex. 10, Dec. McCreary ¶10.  FEMA like any other purchaser of a product relied upon the manufacturer to warrant and provide it with a safe product; EHUs that complied with any applicable regulations, industry standards, and would provide safe, secure, sanitary,

habitable, and functional temporary emergency housing for the disaster victims. *Id*. ¶¶10-12; Ex. 10-D, Trailer Contract at 000280.

Consistent with its belief that it was purchasing safe, habitable and functional temporary emergency housing units, the walk-through inspections conducted by FEMA or its representatives prior to taking ownership and possession of a unit focused upon ensuring that the units satisfied FEMA's requirements; that the unit was new, included the contracted-for amenities, such as appliances and furnishings, and that it had not been physically damaged during transportation. Ex. 10, Dec. McCreary ¶¶11-12; Ex. 11, Dec. Miller ¶¶3-5, Ex. 11-A, FEMA Form 90-13 at 00073-74. Consistent with its belief that it was purchasing a safe, habitable and functional unit, FEMA did not test the EHUs to determine formaldehyde levels, nor did it have any regulation that required it to conduct any such testing. Ex. 10, Dec. McCreary ¶12; Ex. 11, Dec. Miller ¶¶4-5. FEMA like any other purchaser of an EHU relied upon the vendors and manufacturers, and their expertise and experience, to provide it with a safe product that complied with industry standards and any applicable regulations. Ex. 10, Dec. McCreary ¶12; Ex. 10-D, Trailer Contract at 000280; Ex. 11, Dec. Miller ¶¶4-5; Complt. ¶¶29-30 .

FEMA contracted with various companies to install, maintain, and retrieve EHUs from disaster victims. Ex. 12, Dec. Oliver ¶¶3-5. From September 2005 to approximately September 2006, FEMA employed four Individual Assistance/Technical Assistance Contractors (IA/TACs), Bechtel, Inc., Shaw, Inc., Fluor, Inc., and CH2M Hill, Inc., to provide these services. *Id.* ¶3. On or about September 2006, FEMA completed competitive procurement of the remaining housing support work and replaced the four IA/TAC Contractors with 36 Maintenance and Deactivation Contractors (MDCs) and 16 Group Site Maintenance Contractors. *Id.* ¶4. When an EHU was

assigned to a household or individual disaster victim, the IA/TAC or MDC contractor retrieved the unit from a FEMA staging facility, transported the unit to the installation site, installed the unit, and handed over the keys to the disaster victim. *Id*. ¶5. The IA/TAC and MDC contractors also were responsible for maintaining and repairing the units. *Id*. ¶5. When the disaster victim vacated an EHU, the IA/TAC and MDC were responsible for retrieving the unit, deactivating the unit, and returning the unit to a FEMA staging site. *Id*. ¶5.

      In mid-September 2005, the IA/TAC contractors commenced moving disaster victims into EHUs. Ex. 5, DHS Rept. at 000155; Ex. 8, Dec. Souza ¶4. Approximately 140,000 EHUs were issued; and, as rebuilding efforts have progressed, disaster victims have been moved from the EHUs into more permanent housing. Ex. 5, DHS Rept. at 000155-56; Ex. 8, Dec. Souza ¶4; Ex. 13, 2/12/08, FEMA Release No. HQ-08-002b. As of April 9, 2008, approximately 29,000 households remained in EHUs. Ex. 14, 4/9/06, FEMA Assistance Summary at 000326. Without EHUs, many, if not most, disaster victims who wanted to return to their devastated communities would have had no place to live. Ex. 8, Dec. Souza ¶5.

## III.    Information Relating To Formaldehyde In EHUs And FEMA's Response.

      Formaldehyde is an abundantly produced chemical that is found in many construction materials, home furnishings, household products such as fingernail polish, antiseptics, medicines, cosmetics, paper towels, and is also produced by the smoking of cigarettes and other tobacco products. Ex. 15, 2/1/07, Centers for Disease Control (CDC), Agency for Toxic Substances Disease Registry (ATSDR), Health Consultation (ATSDR Rept.) at 00005; Ex. 16, ATSDR, Toxicological Profile For Formaldehyde (ATSDR, Tox. Profile) at 0025. At room temperature, it is a colorless gas that may have an irritating odor. Ex. 15, ATSDR Rept. at

00005; Ex. 16, ATSDR Tox. Profile at 000020-21.  At certain concentrations, formaldehyde can

irritate bodily tissues with which it comes into contact.  Ex. 15, ATSDR Rept. at 00006; Ex. 16,

ATSDR Tox. Profile at 000023.  ATSDR recommends that "[o]pening windows or using a fan to

bring in fresh air is the easiest way to lower formaldehyde levels in the home and reduce the risk

of exposure . . ."  Ex. 16, ATSDR, Tox. Profile at 00025.

There is no formaldehyde regulation or standard governing residential or EHU air quality.

Complt. ¶37.  The Department of Labor, Occupational Safety and Health Administration

(OSHA) has promulgated regulations, a permissible exposure limit (PEL) and a Short-Term

Exposure Limit (STEL) that govern occupational exposure to formaldehyde.[9]  In addition, as

previously noted, HUD has promulgated regulations that govern the manufacturer of mobile

homes (travel trailers or park model trailers are exempted from these regulations because they are

considered recreational vehicles) and requires manufacturers to use certain materials that emit

lower levels of formaldehyde and to post a formaldehyde notice in the unit.  *See supra* at 5-6 n.7-

8.  Below is a summary of the facts relating to FEMA's discovery of, and response to, concerns

regarding formaldehyde in its EHUs.

Commencing in October 2005, OSHA, at the request of two IA/TACs, conducted

formaldehyde testing at the IA/TAC facilities.  Ex. 17, 3/21/06 OSHA Test Results at 000082-85.

In March 2006, FEMA received the first reported concerns of formaldehyde fumes by a Gulf

Coast trailer occupant; and, on March 19, 2006, that occupant's unit was replaced.  Ex. 8, Dec.

---

[9]    The OSHA permissible exposure limit (PEL) 8-hour time-weighted average (TWA) for
formaldehyde is 0.75 ppm and the 15-minute Short-Term Exposure Limit (STEL) at 2 ppm.  The
TWA is the amount of a substance to which workers can be exposed over an 8-hour period and
the STEL is the concentration to which workers can be exposed continuously for short periods of
time.  29 CFR §1910.1048(c)(1) & (2); *see also* Ex. 16, ATSDR, Tox. Profile at 00026.

Souza ¶10; Ex. 18, 7/19/08, Statement Paulison at 00002.

In mid-March 2006, FEMA's Office of Occupational Safety and Health (OSH) learned about the occupant's complaint, and learned about OSHA's October 2005 testing at the IA/TAC facilities.  Ex. 19, OSH Corresp. at 000086, 88, 90.  OSH obtained a copy of the OSHA occupation testing data and considered the information "poor, inconclusive, and of little or no help" in assessing occupational exposures and made the decision to conduct its own test to assess occupational exposure levels.  Ex. 19, OSH Corresp. at 000086; *see also* Ex. 17, 3/21/06 OSHA Test Results; Ex. 20, 5/31/06 OSH Memo. at 000163.  That testing was conducted at the end of March 2006, and the test results were issued in May 2006.  Ex. 20, 5/31/06, OSH Memo. at 000163.  All units that were tested, including units that simulated a "worst case scenario" – doors and windows closed – had formaldehyde levels that were below the time weighted average (TWA) for the permissible exposure level (PEL); and personal air monitoring results for workers required to enter trailers were below quantification levels.  *Id.* at 000164.  These tests gave "no indications that FEMA employees [had] the potential to be exposed above OSHA's [PEL] while performing job activities involving trailer staging operations."  *Id.*

In April 2006, newspapers reported that the Sierra Club had tested trailers and detected formaldehyde above 0.1 parts per million ("ppm"), *i.e.*, 100 parts per billion ("ppb") in most of the tested units.  On May 18, 2006, *Hillard v. United States, et. al.*, Civ. Action No. 06-2576 (E.D. La.) was filed.  *See Hillard*, Complaint [Dkt. 1].  The *Hillard* plaintiffs asserted tort claims against the United States, FEMA, and EHU Manufacturers, sought class action status, and also sought injunctive relief requesting an Order requiring the United States and FEMA to take action

to make EHUs formaldehyde-safe. *See Hillard*, Second Amended Complaint [Dkt. 7].[10]/

By mid-June 2006, FEMA had received notice that five occupants of EHUs in Louisiana had complained about formaldehyde, and that several complaints had also been received from EHU occupants in Mississippi. Ex. 8, Dec. Souza ; Ex. 11, Dec. Miller; Ex. 21, 6/18/06, FEMA Corresp. FEMA considered various response actions, such as testing individual units and installing vent fans. Ex. 8, Dec. Souza ¶13; Ex. 11, Dec. Miller; Ex. 21, 6/18/06, FEMA Corresp. Ultimately, FEMA decided that the appropriate response would be to address complaints on a case-by-case basis, switch out the EHU with an older unit if ventilation failed to resolve the complaint, study the effectiveness of ventilation, and issue a brochure to EHU occupants that explained what formaldehyde is and advised them to: (1) consult their medical care provider with any health concerns; and (2) ventilate their units to reduce formaldehyde levels. Ex. 8, Dec. Souza ¶14; Ex. 21, 6/18/06 FEMA Corresp.; Ex. 22, 7/06, Brochure. This decision was based on a number of considerations including: (1) the absence of any residential air quality formaldehyde standards; (2) the small number of complaints; (3) the number of households whose temporary emergency housing options would be affected by any decision; and (4) the risk that testing of individual occupied units in the absence of any residential air standards would not provide a programmatic solution. Ex. 8, Dec. Souza ¶¶13-14.

To implement this decision, FEMA set aside approximately fifty older, used, refurbished

_____

[10]/   On July 28, 2006, the *Hillard* plaintiffs voluntarily dismissed their FTCA claims, *see Hillard*, Partial Dismissal [Dkt. 39], and the court subsequently dismissed plaintiffs' claims for injunctive relief because they were barred by the Stafford Act's discretionary function exception. Plaintiffs argued that the Government "did not have the discretion to provide trailers which were unsafe and uninhabitable." *Hillard*, Order at 5 [Dkt. 138]. The court rejected that argument and ruled that the "only allegations of acts that implicate the Stafford Act are acts committed to agency discretion by law, and therefore the Government is immune from suit . . . ." *Id.*

trailers, which were more ventilated than newer units, to use as replacements for any occupant who requested a different trailer.  FEMA commenced distribution of a formaldehyde brochure to trailer occupants in July 2006, and, in September 2006, commenced a study to determine the effectiveness of ventilation.  Ex. 8, Dec. Souza ¶14; Ex. 15, 2/1/07, ATSDR Report at 00002; Ex. 21, 6/18/06, FEMA Corresp.; Ex. 22, 7/06, Brochure at 00013-14.

To study ventilation, FEMA relied upon the United States Environmental Protection Agency (EPA) to tests units and the ATSDR to assess the results of those tests.[11]/  Ex. 15, 2/1/07, ATSDR Report at 00004.  In September and October 2006, EPA sampled 96 new unused trailers; and, in December, the results were provided to ATSDR.  *Id*. at 00004.  In February 2007, ATSDR issued its Consultation Report.  *Id*. at 00001.  ATSDR reported that:

> The purpose of the ATSDR consultation is to provide FEMA a clearer understanding of the issues associated with formaldehyde in temporary housing units.  The consultation is not intended to establish FEMA's future policy concerning temporary housing units.  The conclusions derived from the sampling of the 96 trailers are for those trailers only, and are not necessarily applicable to all other trailers due to numerous variables for which the appropriate data and information are not available.

*Id*. at 00002.[12]/ The focus of the ATSDR consultations was to determine the effectiveness of

---

[11]/    ATSDR is an advisory, nonregulatory public health agency.  ATSDR-specific functions include public health assessments of waste sites, health consultations concerning specific hazardous substances, health surveillance and registries, response to emergency releases of hazardous substances, applied research in support of public health assessments, information development and dissemination, and education and training concerning hazardous substances. *See http://www.atsdr.cdc.gov/about.html*.

[12]/    In October 2007, ATSDR updated and revised the 2007 Consultation Report.  Ex. 23, 10/07, ATSDR Revised Report.  ATSDR updated and revised report because "there was insufficient discussion of the health implications of formaldehyde exposure and some language may have been unclear, potentially leading readers to draw incorrect or inappropriate conclusions."  *Id*. at 00004.  ATSDR, however, concluded that the further analysis supports its initial finding that "running air conditioning with the vents open (but exhaust fans not running) or opening windows decreases formaldehyde levels in trailers."  *Id*. at 00020.

ventilation in reducing formaldehyde levels in the EHU, rather than an assessment of the long-term effects of formaldehyde concentrations in trailers or potential health concerns related to formaldehyde exposure.  *Id*. at 00003, 10.  For purposes of that consultation, ATSDR used 0.3 ppm (300 ppb) as the formaldehyde "level of concern," a level that it reported in the consultation report was associated with constriction of the bronchi in sensitive individuals.  *Id*. at 00008.  ATSDR found the "method of ventilation which allowed for greatest number of air exchanges was the most effective in lowering concentration of formaldehyde."  *Id*. at 00008.  ATSDR concluded that after opening of all windows, static vents, and exhaust fan vents the average levels of formaldehyde were below 0.3 ppm.  *Id*. at 00009.

In July 2007, Administrator Paulison reported that FEMA had received a total of approximately 207 formaldehyde complaints.  These occupants were advised to vent the units, and ultimately only a small percentage of these occupants requested that their unit be replaced with a different older unit.  Ex. 18, 7/19/07, Statement Paulison at 000003; Ex. 24, 7/20/07 FEMA Release No. FNF-07-028 at 000191.  Nevertheless, in July 2007, because of concerns that ventilation or switching out the units may not sufficiently address potential health and safety concerns, FEMA took additional actions.  Ex. 18, 7/19/07, Statement Paulison at 000007-08; Ex. 24, 7/20/07, FEMA Release No. FNF-07-028 at 000191; Ex. 25, 7/20/07, FEMA Release No. HQ-07-143 at 00193-94.  First, FEMA established a dedicated formaldehyde call center to answer occupant questions and assist in relocating occupants who were not satisfied with their EHU.  Ex. 24, 7/20/07, FEMA Release No. FNF-07-028 at 000191; Ex. 25, 7/20/07, FEMA Release No. HQ-07-143 at 00193-94.  Second, FEMA prepared a Formaldehyde Fact Sheet that was distributed to EHU occupants and engaged ATSDR to conduct testing of occupied units and

conduct a public health assessment using data generated from that testing.  Ex. 25, 7/20/07

FEMA Release No. HQ-07-143 at 00193-94; Ex. 26, FEMA Fact Sheet at 000015.  Third,

FEMA updated travel trailer specifications to require manufacturers in the future to use low

emission materials that HUD required be used in mobile homes and FEMA also suspended the

sale of trailers.  Ex. 18, 7/19/07, Statement Paulison at 00008; Ex. 27, 1/17/08 FEMA Release

No. HQ-08-007 at 00198.

     Between July and November 2007, the dedicated formaldehyde hotline received

approximately 4,000 calls, and, between November 2007 and April 2008, it received

approximately 6,000 additional calls.  Ex. 28, 11/8/07 FEMA Release No. HQ-07-222 at 000195.

FEMA offered to move occupants who called to alternate housing, such as a hotel/motel if

acceptable alternate long-term housing was unavailable.  *Id*. at 000195; *see also* Ex. 14, 4/9/08

Individual Assistance Summary Fact Sheet at 000330.  As of April 4, 2008, FEMA had moved

3,618 household to alternate housing, and arrangements were underway to move another 85

families.  *Id*. at 000330.  In January 2008, FEMA offered to refund the purchase price to anyone

who bought a trailer prior to its July 2007 suspension of sales.  Ex. 27, 1/17/08, FEMA Release

No. HQ-08-007 at 000198-208.

     FEMA also decided to have ATSDR conduct additional testing, this time focusing on

occupied trailers.  ATSDR commenced testing occupied trailers in December 2007, and reported

the initial findings of that testing in February 2008.  Ex. 29, 2/14/08 CDC/FEMA Joint Release at

000471.  The average formaldehyde level in the tested units was 77 ppb (0.077 ppm) and the

levels ranged from 3 ppb to 519 ppb (0.003 ppm to 0.590 ppm).  *Id*. at 000471.  In response to

this report, FEMA continued its effort to relocate occupants to permanent housing as rapidly as

possible and has provided priority relocation to occupants who expressed health concerns and may be more susceptible to formaldehyde, such as the elderly, households with young children, and those with respiratory challenges. *Id*. at 000471. FEMA and CDC also prepared a flyer detailing CDC's initial findings and distributed it to trailer occupants. Ex. 30, 2/08, FEMA/CDC Formaldehyde Flyer 000011-12, 000017-18.

## IV. Plaintiffs Who Assert Claims Against The United States In The Administrative Master Complaint.

Eight Plaintiffs assert FTCA and contract claims against the United States in the Administrative Master Complaint. Complt. ¶7(a)(i-viii), ¶¶98-131.

### A. Pujol Family – Four Claimants.

On or about September 5, 2007, Plaintiffs Joseph and Stephanie Pujol submitted administrative tort claims to FEMA; and Mr. Pujol also filed claims on behalf of his two minor children, ("Pujol Family"). Ex. 31, Adm. Claims at 00022-34. Mr. Pujol seeks $100,000 in damages, Mrs. Pujol seeks $1 million in damages, and Mr. Pujol seeks to $1 million in damages on behalf of one minor child and $750,000 on behalf of the other minor child. *Id*. at 00023, 27, 31, 36. None of the claimants asserts property damage claims. *Id*.

The Pujol Family applied to FEMA for placement of a trailer at 1612 Vegas Drive, Metairie, Louisiana. Ex. 32, Pujol Doc. at 00507-11, 514. On or about November 26, 2005, the Pujol Family was assigned to a travel trailer manufactured by Pilgrim International, vehicle identification number 5L4TF292853010575, FEMA Bar Code 128257. *Id*. at 00507-11, 514. On or about December 7, 2006, the Pujol Family vacated the trailer and moved into an apartment. *Id*. at 00438-40, 491, 499-500. The Pujol Family asserts that they suffered personal injuries as a result of exposure to formaldehyde in the trailer. *Id.* at 000022-34.

**B.      Thomas Family – Four Claimants.**

On or about August 29, 2007, Plaintiffs Sean and Phuong Thomas submitted

administrative tort claims to FEMA; Mr. Thomas also filed a claim on behalf of a minor child,

and Ms. Thomas filed a claim on behalf of a minor child ("Thomas Family").  Ex. 31, Adm.

Claims at 00042-57.  Each member of the Thomas Family seeks $150,000 in damages.  *Id.* at

00042, 46, 50, 54.  None of the claimants asserts claims for property damage.  *Id.*

In December 2005, the Thomas Family applied to FEMA for placement of a travel trailer

at 2021 Kentucky Ave., Kenner, Louisiana.  Ex. 33, Thomas Doc. at 00231, 233, 236.  That

request was approved and, on or about February 6, 2006, the Thomas Family took possession of

a travel trailer vehicle identification number INLIGTR2861045805 and FEMA Bar Code

112577.  *Id.* at 00229-32.  On or about May 11, 2007, Mr. Thomas notified FEMA that he was

interested in purchasing the trailer; but, on September 7, 2007, FEMA notified Mr. Thomas that

the unit was not available for purchase.  *Id.* at 000196, 234.  On or before September 18, 2007,

the Thomas Family vacated the trailer.  *Id.* at 00237.

## STANDARD OF REVIEW

The United States moves, pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss Plaintiffs'

FTCA and contract claims for lack of subject-matter jurisdiction, or alternatively, for summary

judgment on those claims pursuant to Fed. R. Civ. P 56(c).  In deciding a Fed. R. Civ. P. 12(b)(1)

motion, the Court may consider exhibits outside the pleadings; indeed, "the trial court is free to

weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Mortensen*

*v. First Fed. Sav. & Loan Assoc.*, 549 F.2d 884, 891 (3rd Cir. 1977).  *See also Williamson v.*

*Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).  Rule 12(b)(1) motions are treated differently from

Rule 56 summary judgment motions because the jurisdictional issue presented in Rule 12(b)(1)

motion, whether it involves questions of law or fact, must be resolved by the court as a

preliminary matter.  *See Osborn v. United States*, 918 F.2d 724, 729 (8th Cir. 1990).

Moreover, because jurisdiction is a threshold issue, the separation of powers doctrine

requires that the Court determine whether it has jurisdiction at the outset, rather than defer the

issue until trial, as would occur with denial of a summary judgment motion.  *See Steel Co. v.

Citizens for a Better Envir.*, 523 U.S. 83, 93-95 (1998) ("The requirement that jurisdiction be

established as a threshold matter 'spring[s]' from the nature and limits of judicial power of the

United States' and 'is inflexible and without exception.'"); *Gold v. Local 7 United Food &

Comm. Workers Union*, 159 F.3d 1307, 1309-10 (10th Cir. 1998), *overruled on other grounds by

Styskal v. Weld County Comm'rs.*, 365 F.3d 855 (10th Cir.2004) ("*Steel* requires that a federal

court satisfy itself of subject matter jurisdiction before proceeding to the merits of a claim – even

when the question of the merits is the easier one and is substantively resolvable against the claim

over which jurisdiction is in doubt").  In *Williamson*, 645 F.2d 404, the court explained that:

> [A]t issue in a factual 12(b)(1) motion is the trial court's jurisdiction – its very power to
> hear the case – there is substantial authority that the trial court is free to weigh the
> evidence and satisfy itself as to the existence of its power to hear the case. . . . [T]he
> existence of disputed material facts will not preclude the trial court from evaluating for
> itself the merits of jurisdictional claims.

*Id*. at 412-13 (citing *Mortensen*, 549 F.2d at 891 ("no presumptive truthfulness attaches to

plaintiff's allegations")*.  See also Williams v. United States*, 50 F.3d 299, 304 (5th Cir. 1995).

Upon submission of evidence, courts "must decide the jurisdictional issue, not simply rule that

there is or is not enough evidence to have a trial on the issue." *Osborn*, 918 F.2d at 730.

Plaintiffs bear the burden of establishing that the Court has subject matter jurisdiction and

that their claims are not barred by the FTCA jurisdictional exceptions to the waiver of sovereign

immunity or by the Stafford Act's discretionary function exception.  *See Ramming v. United

*States*, 281 F.3d 158, 161 (5th Cir. 2001); *Dowl v. Tulane Univ. Hosp. and Clinic,* 2005 WL 2060921 *2 (E.D. La., Aug. 22, 2005) (Engelhardt, J.) (plaintiff must show that court has subject matter jurisdiction over FTCA claim).  In the instant case, the United States, through its arguments and proffered evidence, demonstrates that Plaintiffs have failed to meet their burden, and, accordingly, their claims should be dismissed under Rule 12(b)(1).

In the alternative, the government seeks summary judgment under Fed. R. Civ. P. 56(c). The standard for summary judgment is well-established.  Summary judgment should be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Summary judgment is proper against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Fed. R. Civ. P. 56(c); *see also Celotex v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elect. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986); *Kee v. City of Rowlett,* 247 F.3d 206, 210 (5th Cir. 2001); *Centanni v. United States*, 2004 WL 385057 *1 (E.D. La. Feb. 27, 2004)(Engelhardt, J.).

The moving party has the initial burden of showing the absence of a genuine issue of material fact, which burden may be discharged by showing an absence of facts supporting the non-moving party's case.  *See Adickes v. S.H. Kress*, 398 U.S. 144, 157 (1970); *Little v. Liquid Air*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*); *Centanni*, 2004 WL 385057 *1; *Celotex*, 477 U.S. at 324.  The moving party need not prove the absence of a genuine issue of material fact supporting the non-moving party's case, or negate the non-moving party's claim.  *Celotex*, 477 U.S. at 324.  Instead, the non-moving party must adduce evidence beyond the pleadings showing that there is a genuine issue for trial.  *See Celotex*, 477 U.S. at 324; *Centanni*, 2004 WL 385057

*1.  As we now show, the United States' motion to dismiss on jurisdictional grounds meets the standards of both Rules 12(b)(1) and 56(c).

## ARGUMENT

I.      **The FTCA And Stafford Act Govern This Court's Analysis of Plaintiffs' Claims Brought Against The United States.**

A.      **The FTCA Provides The Exclusive Waiver Of The United States' Sovereign Immunity For Plaintiffs' Tort Claims In This Case.**

The United States may not be sued without its consent, and the existence of consent defines the court's jurisdiction.  *See United States v. Mitchell*, 445 U.S. 535, 538 (1990); *United States v. Testan*, 424 U.S. 392, 399 (1976).  Moreover, the consent of the United States to be sued cannot be implied, but must be unequivocally expressed.  *See United States v. Sherwood*, 312 U.S. 584, 586 (1941); *Guile v. United States*, 422 F.3d 221, 229 (5th Cir. 2005).  The FTCA constitutes a limited waiver of sovereign immunity that must be strictly construed in favor of the United States.  *See United States v. Idaho*, 508 U.S. 1, 4 (1993); *United States v. Orleans*, 425 U.S. 807, 813 (1976); *Atorie Air, Inc. v. FAA*, 942 F.2d 954, 958 (5th Cir. 1991); *Paul v. Igyarto*, 2002 WL 1610962 *1 (E.D. La., July 18, 2002) (Engelhardt, J.)*.

The FTCA only waives sovereign immunity for claims arising out of the negligent or wrongful acts or omissions of federal employees, and not for claims based on other theories of liability, such as strict liability, nor for claims arising out of the acts of its contractors.  28 U.S.C. §§ 1346(b)(1), 2671.[13]/  Thus, to the extent any of Plaintiffs' claims in this case are based on any

---

[13]/     *See also Sheridan v. United States*, 487 U.S. 392, 400-01 (1988); *Dalehite v. United States*, 346 U.S. 15, 44 (1953) (the FTCA "is to be invoked only on a 'negligent or wrongful act or omission' of an employee"); *Laird v. Nelms*, 406 U.S. 797, 802-03 (1971); *Lively v. United States*, 870 F.2d 296, 300 (5th Cir. 1989); *Lathers v. Penguin Industries, Inc.*, 687 F.2d 69, 72 (5th Cir. 1982) (the FTCA precludes "liability of United States based on strict liability in tort"); *Aretz v. United States*, 604 F.2d 417, 427 (5th Cir. 1979); *Rigdon v. USPS*, 2003 WL 1618569 *2

such theories, those claims are barred by the FTCA.  *See*, *e.g.*, Complt. ¶¶103-105, 107 (alleging that FEMA warranted and owed duty to guarantee that EHUs were safe and free of defects and that materials used in EHU construction constituted a dangerous defect).[14]/

Furthermore, because the federal government "can be sued only to the extent that it has waived its immunity, due regard must be given to the [FTCA's] exceptions" to imposition of liability.  *Orleans*, 425 U.S. at 814.  *See also Atorie*, 942 F.2d at 958.  A court lacks subject matter jurisdiction unless the claimant demonstrates that the challenged conduct falls outside the exceptions to the FTCA waiver of sovereign immunity.  *See Guile*, 422 F.3d at 229; *Atorie*, 942 F.2d at 958.  Otherwise, the claim must be dismissed for lack of jurisdiction.  *See Aix El Dorado v. Southwest Sav. & Loan Ass'n*, 36 F.3d 409, 410 & n.5 (5th Cir. 1994).

### B.    The Stafford Act Governs The United States' Disaster Response Actions Such As Those At Issue In This Case.

Unlike the FTCA, the Stafford Act provides no waiver of sovereign immunity, but is a limitation on other waivers.  *See United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("the United States may not be sued without its consent and the existence of consent is a prerequisite for jurisdiction"); *Koehler v. United States*, 153 F.3d 263, 265-66 (5th Cir. 1998) ("no suit may be maintained against the United States unless the suit is brought in exact compliance with the terms of a statute under which the sovereign has consented to be sued").  Congress enacted the Stafford Act in recognition of the facts that "disasters often cause loss of life, human suffering, loss of

---

(E.D. La., Mar. 26, 2003) (Engelhardt, J.); *Davis v. United States*, 2003 WL 30421 *2 (E.D. La., Jan. 2, 2003) (Engelhardt, J.).

[14]/    In any event, negligence is irrelevant to the court's analysis of the discretionary function exception to the FTCA's waiver of sovereign immunity.  *See, e.g., Hix v. Army Corps. of Engineers*, 155 Fed. Appx. 121, 128 n.8 (5th Cir. 2005); *Kennewick Irrig. Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989).

income, and property loss and damage" and "often disrupt the normal functioning of governments and communities, and adversely affect individuals and families with great severity." 42 U.S.C. §5121.  The Stafford Act is "designed to assist the efforts of . . . affected States in expediting the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of devastated areas." *Id*.

A prerequisite to the provision of such assistance is a request by the State's governor for a Presidential declaration of the existence of a "major disaster" or emergency in the area.  42 U.S.C. §5170.  The governor's request must be based on "a finding that the disaster is of such severity and magnitude that effective response is beyond the capabilities of the State and the affected local governments and that Federal assistance is necessary."  *Id*.  Based on such a request, the President "may declare . . . that a major disaster or emergency exists," thus triggering the potential availability of FEMA assistance.  *Id*.  After such declaration, the President retains the discretion to determine and designate the types of assistance available and the areas eligible to receive assistance.  The President "may provide financial or other assistance . . . to respond to the disaster-related housing needs of individuals and households who are displaced from their predisaster primary residences or whose predisaster primary residences are rendered uninhabitable as a result of damage caused by a major disaster." 42 U.S.C. §5174(b)(1).

Determinations as to the appropriate types of housing assistance are "based on considerations of cost effectiveness, convenience to the individuals and households, and such other factors as the President may consider appropriate."  42 U.S.C. §5174(b)(2)(A).  Pursuant to this authority, direct housing assistance in the form of housing units acquired by purchase or lease may be provided directly to individuals or households.  *See* 42 U.S.C. §5174(c)(1)(B)(i).

Such assistance may not be provided "after the end of the 18-month period beginning on the date

of the declaration" unless "due to extraordinary circumstances an extension would be in the

public interest."  42 U.S.C. §5174(c)(1)(B)(ii).

FEMA, as the agency responsible for implementing the above duties for the President has

issued regulations, which provide that "FEMA shall determine the appropriate type of housing

assistance to be provided . . . based on considerations of cost-effectiveness, convenience . . . and

availability of the types of assistance."  44 CFR §§206.110(a), (c), 206.117.[15]/  FEMA is

explicitly authorized to "provide . . . direct assistance . . . to respond to the disaster-related

housing needs . . . ."  44 CFR §206.117(a).  Such direct assistance may consist of providing

"purchased or leased temporary housing units directly to individuals or households who lack

available housing resources."  *See* 44 CFR §206.117(b)(ii)(A).  The regulations also authorize

the placement of the temporary housing units on commercial sites, privates sites, or a group site

provided by the State, local government, or FEMA.  *See* 44 CFR §206.117(b)(ii)(E)(1-4).

## II.    This Court Must Dismiss Plaintiffs' Claims Because They Are Barred By The Discretionary Function Exceptions of the FTCA And Stafford Act.

### A.    The FTCA Discretionary Function Exception.

The FTCA discretionary function exception bars any tort claim against the United States

> based upon the exercise or performance or the failure to exercise or perform a
> discretionary function or duty on the part of a federal agency or an employee of
> the Government, whether or not the discretion involved be abused.

---

[15]/    The President may delegate "any power or authority conferred" by the Stafford Act to a
federal agency.  42 U.S.C. §5164.  The President's authorities under the Stafford Act have been
delegated to FEMA for the coordination of federal disaster relief efforts.  *See* Exec. Order Nos.
12,148 (July 20, 1979) and 12,656 (Nov. 18, 1988).  *See* 44 CFR Part 206, *et. seq*.

28 U.S.C. §2680(a).  The purpose of this statutory reservation of sovereign immunity is to protect against "judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *United States v. S.A. Empresa De Viacao Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).  *See also Guile*, 422 F.3d at 229; *Baldassaro v. United States*, 64 F.3d 206, 208 (5th Cir. 1995).

The Supreme Court has fashioned a two-part test for applying the discretionary function exception: (1) the challenged conduct must involve an element of judgment or choice, and (2) the judgment or choice must be susceptible to being based on considerations of public policy.  *See Gaubert v. United States*, 499 U.S. 315, 324-25 (1991); *Berkovitz v. United States*, 486 U.S. 531, 546-47 (1988); *Aix El Dorado*, 36 F.3d at 411.  Under the first part of the test, the claimant must show that the challenged conducted violated a mandatory and specific federal statute, regulation or policy.  *See Varig Airlines*, 467 U.S. at 816-17.  Only mandatory statutes, regulations, or policies that prescribe a specific course of action or conduct and withdraw discretion from the government actors are relevant to this inquiry.  *See Buchanan v. United States*, 915 F.2d 969, 971-72 (5th Cir. 1990) (statute requiring warden "to keep prisoner safe and free from harm" not relevant because it failed to prescribe a specific course of conduct).[16]/

The second-part of the discretionary function exception requires the Court to determine whether the conduct was of the type that the exception was intended to shield, *i.e.*, whether the challenged decision is *susceptible* to economic, social or political policy analysis.  *See Gaubert*,

---

[16]/     *See also Miller v. United States*, 163 F.3d 591, 594 (9th Cir. 1998); *Aragon v. United States*, 146 F.3d 819, 823-24 (10th Cir. 1998); *Allen v. United States*, 816 F.2d 1417, 1427 (10th Cir. 1987).

499 U.S. at 324-25; *Aix El Dorado*, 36 F.3d at 411.  In *Gaubert*, the Supreme Court defined the

contours of whether the activity at issue is susceptible to being based on policy analysis.  Plaintiff

sought to recover damages caused by the Federal Home Loan Bank Board's mismanagement of a

bank.  *Gaubert*, 499 U.S. at 319-20.  Rejecting the argument that only high level planning or

policy decisions were exempt from liability under the discretionary function exception, the Court

held that day-to-day activities at the operational level are immune from liability if the activities

involved are "susceptible to policy analysis."  *Id*. at 325.

The Court further explained that the government need not show that each challenged

action was actually rooted in a social, economic, or political policy consideration.  Rather, when

statutes, regulations, or guidelines allow a government agent to exercise discretion, "it must be

presumed that the agent's acts are grounded in policy when exercising that discretion."  *Id*. at

324.  *See also Baldassaro*, 64 F.3d at 208-09.  Finally, the Court instructed that the "focus of the

inquiry is not on the agent's subjective intent . . . , but on the nature of the actions taken and on

whether they are *susceptible* to policy analysis."  *Gaubert*, 499 U.S. at 325 (emphasis added).

*See also Andrade v. Chojnacki*, 338 F.3d 448, 457 (5th Cir. 2003) (no need for court to examine

evidence because the applicability of the discretionary function exception does not turn on

evidence of the actual decisions, but, rather, on whether the decision is "susceptible to policy

analysis"); *Baldassaro,* 64 F.3d at 209.  Thus, there is no need to point to a specific government

decision in applying the test; if the action questioned is one susceptible of discretion, it falls

within the exception, whether or not the agency actually conducted any such analysis.  *See Guile*,

422 F.3d at 228-31.

**B.     The Stafford Act Discretionary Function Exception.**

The Stafford Act contains no waiver of sovereign immunity.  *See Mitchell*, 463 U.S. at

212; *Koehler*, 153 F.3d at 265-66.  Indeed, the Stafford Act expressly shields from judicial

review FEMA's decisions made relating to the use of EHU for temporary emergency housing.

Specifically, §305 of the Stafford Act, titled "Nonliability of Federal Government," provides:

> The Federal Government shall not be liable for any claim based upon the exercise
> or performance of or the failure to exercise or perform a discretionary function or
> duty on the part of a Federal agency or an employee of the Federal Government in
> carrying out the provisions of this chapter.

42 U.S.C. §5148.  This provision precludes judicial review of "decisions involving the allocation

and deployment of limited government resources" following national disasters, which is

restricted to situations where the Stafford Act or its implementing regulations prescribe a

mandatory and specific course of action that federal employees must follow.  *Fang v. United*

*States*, 140 F.3d 1238, 1241 (9th Cir. 1998).[17]/

Review of the legislative history leaves no doubt that Congress intended to enact a broad

bar on claims arising from disaster relief actions.  During debate on the Disaster Relief Act of

1950, the first disaster assistance bill and the predecessor of the Stafford Act, Chairman of the

House Public Works Committee William M. Whittington stated:

---

[17]/     *See also Berkovitz*, 486 U.S. at 536-37; *Graham v. FEMA*, 149 F.3d 997, 1006 (9th Cir.
1998); *Benzman v. Whitman*, 2006 WL 250527 at *22 (S.D. N.Y., Feb. 2, 2006) ("The language
of the statute and legislative history of the Stafford Act clearly preclude discretionary actions
taken under the Stafford Act from judicial review."), *aff'd in pertinent part*, 2008 WL 1788401
(2d Cir. Apr. 22, 2008); *Rosas v. Brock*, 826 F.2d 1004, 1008 & n.1 (11th Cir. 1987) ("Congress
indicated its intent to preclude judicial review of all disaster relief claims based upon the
discretionary actions of federal employees"); *Dureiko v. United States*, 209 F.3d 1345, 1352
(Fed. Cir. 2000); *California-Nevada Methodist Homes, Inc. v. FEMA*, 152 F. Supp. 2d 1202,
1207 (N.D. Cal. 2001); *Sunrise Village v. United States*, 42 Fed. Cl. 392, 397 (Ct. Fed. Cl. 1998).

> We have further provided that if the agencies of the Government make a mistake in the administration of the Disaster Relief Act that the Government may not be sued.  Strange as it may seem, there are many suits pending in the Court of Claims today against the Government because of alleged mistakes made in the administration of other relief acts, suits aggregating millions of dollars because citizens have averred that the agencies and employees of the Government made mistakes.  We have put a stipulation in here that there shall be no liability on the part of the Government.

H.R. 8396, 81st Cong., 2d Sess., 96 Cong. Rec. 11895, 11912 (1950).  Congress barred claims to ensure the persons implementing emergency relief are not deterred from the primary goal of the bill: responding to a disaster.  These concerns have been reaffirmed in Congress, which has debated and changed other provisions, but has chosen not to change this key provision of the Stafford Act.  *See* H. Rep. No. 100-517, DISASTER RELIEF AND EMERGENCY AMENDMENTS OF 1988, 100th Cong., 2d Sess. (1988).  By immunizing FEMA from liability, Congress intended to allow FEMA to put aside concerns of potential adverse outcomes of its response and allow it to decide on what assistance to provide in the face of a significant disaster.  *See Lockett v. FEMA*, 836 F. Supp. 847, 854 n.14 (S.D. Fla. 1993) (failure to provide EHUs discretionary).

### C.     Plaintiffs' Claims Fall Squarely Within The Discretionary Function Exceptions Of The FTCA and Stafford Act.

In this case, either the discretionary function exception to the FTCA, or to the Stafford Act, by itself, preclude Plaintiffs' tort claims, and the analysis the Court must undertake under either statute is similar.  *See supra* Sections A & B; *In re: World Trade Center Disaster Site Litig.*, 521 F.3d 169, Discussion §C(1) (2d. Cir. 2008) ("the discretionary function immunity in the Stafford Act, like its counterpart in the FTCA, is obviously animated by separation of powers concerns").  Therefore, the United States discusses the allegations of this case in light of both

statutes below, which are complementary, and submits that the discretionary function exception

of the FTCA applies with special force in cases where, as here, the Stafford Act discretionary

function exception applies.

Contrary to Plaintiffs' assertion, FEMA's temporary emergency housing decisions that

Plaintiffs challenge were neither governed nor constrained by any mandatory and specific statute,

regulation or policy and the challenged decision all inherently required FEMA weigh and policy

concerns.  The reason Congress left these decision to FEMA's discretion is simple, constraining

the decision makers ability to respond will interfere with or potentially prevent issuance of

necessary aid or housing assistance to disaster victims.  In recognition of this fact, Congress in

the context of housing assistance has imbued FEMA with discretionary authority to decide

whether or not to provide temporary emergency housing, and it determines that such aid should

be provided, with discretion to determine what actions, if any, to take in response to health or

safety concerns associated with such temporary emergency housing.  *See* 42 U.S.C.

§5174(b)(2)(A); 42 CFR §206.110(c).

> 1.   **FEMA's Challenged Decisions Were Not Governed Or
> Constrained By Any Mandatory And Specific Statute,
> Regulation, Or Policy.**

In their Complaint, Plaintiffs anticipate this Motion and set forth legal arguments that the

discretionary function exceptions to the FTCA and Stafford Act do not apply, asserting that

FEMA violated mandatory and specific statutes related to formaldehyde levels in FEMA-

provided trailers.  Specifically, Plaintiffs erroneously assert that FEMA:  (a) failed to enforce

formaldehyde design and/or construction specifications, *see* Complt.  ¶¶28-29, 38-39;

(b) provided disaster victims with EHUs that were unsafe and unfit for occupancy, *see* Complt. ¶¶44-66, 81; and (c) ignored and/or rejected objective scientific standards.  *See* Complt. ¶¶64-74, 80-82.  These assertions, however, do not comport with the undisputable facts.

> **a.     FEMA Did Not Impose On Itself A Mandatory And Specific Obligation Regarding Formaldehyde Levels In EHUs.**

Plaintiffs appear to argue that FEMA knew or reasonably should have known that EHUs contain formaldehyde and as a result should have issued and enforced design and/or construction standards to protect disaster victims from being exposed to formaldehyde in EHUs.  Complt. ¶¶28-29, 38-39.  As demonstrated by the contracts and the testimony of Mr. McCreary, FEMA did not issue any design and/or construction specification pertaining to formaldehyde.[18]/  Rather, FEMA, like any other consumer, reasonably relied upon the vendors and manufacturers to provide a safe, habitable, functional product, and, consistent with that understanding inspected the units simply to ensure that they were in fact new, furnished with the basic amenities required by disaster victims, and had not been physically damaged during transportation.  Ex. 10, Dec. McCreary ¶¶ 11-12; Ex. 11, Dec. Miller ¶5.

Moreover, to the extent that the vendors or manufacturers may have used industry design and/or construction specifications that pertained to formaldehyde and failed to comply with them, the United States cannot be liable for such actions.  It is well-established that the United States is only liable in such situations if it supervised and directed day-to-day activities of its contractors, which did not occur in this case.  *See Guile*, 422 F.3d at 229 n.10; *Brooks v. A.R. & S. Enters.,*

---

[18]/     Indeed, FEMA did not have in place an ability to inspect EHUs to ensure compliance with any such specifications.  Ex. 10, Dec. McCreary ¶¶ 11-12; Ex. 11, Dec. Miller ¶5.

*Inc.*, 622 F.2d 8, 12 (1st Cir. 1980); *Martinez v. United States*, 661 F. Supp. 762, 764 (S.D. Tex.

1987); *Bennett v. United States*, 2001 WL 417798 *4 (E.D. La. Apr. 20, 2001) (reservation of

right to stop work for safety violations is not enough to impose liability).[19]/  In the instant case,

because of the urgent and immediate need for the EHUs, FEMA limited its activities prior to

taking custody, control, and ownership to walk-through inspections to ascertain that the units it

purchased were new, contained contracted-for amenities, and had not been damaged during

shipping.  Ex. 10, Dec. McCreary ¶¶ 11-12; Ex.11, Dec. Miller ¶5.  Such activities do not

constitute a basis for imposition of tort liability for any alleged negligent failure by the EHU

vendors or manufacturers to comply with their design or construction specifications.

> **b.    Certain Terms Contained In FEMA's Regulations Or
> Statements Do Not Impose A Mandatory And Specific
> Duty Governing FEMA's Actions At Issue In This Case.**

Plaintiffs next mistakenly argue that FEMA's definition of "uninhabitable" and

"functional," and a public statement by Mr. Harvey E. Johnson, FEMA's Acting Deputy

Administrator and Chief Operating Officer, that EHUs are used as temporary emergency housing

units only as a last resort to provide "safe, secure, and sanitary" housing, impose a mandatory and

specific requirement upon FEMA to ensure that disaster victims were not exposed to

formaldehyde.  Complt. ¶¶44-66, 81.  The Court should reject this argument because the terms

"uninhabitable" or "functional" relate to whether or not the damage to a primary residence justify

FEMA's issuance of housing assistance or financial aid to a disaster victim.  Neither term is

---

[19]/     The Government's decision to hire a contractor, the choice of contractor, and decisions
relating to supervision of a contractor's work, including the degree of oversight to exercise, are
inherently discretionary functions.  *See Guile*, 422 F.3d at 230-31; *Williams*, 50 F.3d at 310;
*Kirchmann v. United States*, 8 F.3d 1273, 1276-77 (8th Cir.1993).

found in either the statute or regulation that authorize FEMA to issue emergency temporary housing assistance and, as such, contrary to Plaintiffs' assertion, are not intended to curtail or restrict FEMA's choice of emergency temporary housing or what action, if any, to take in response to potential health and safety concerns associated with emergency temporary housing. Furthermore, neither term, nor Mr. Johnson's statement, impose a mandatory and specific requirement, but rather, demonstrate that FEMA must exercise discretion.

The regulations issued pursuant to the Stafford Act, define "uninhabitable" to mean a dwelling that is "not safe, sanitary, or fit to occupy," and "functional" to mean "capable of being used for its intended purpose."  44 CFR §206.111.  Neither term is used in either the statute or regulation authorizing FEMA to provide direct housing assistance, *i.e.,* EHUs.  42 U.S.C. §5174(b)(2)(A); 42 CFR §§206.110(c), 206.117(b)(ii)(A-I*).* Rather these two terms are used in the section of the regulations relating to FEMA determination of whether to provide a disaster victim with housing assistance and/or financial assistance to make repairs to their primary residence.  *See* 44 CFR §206.113(a)(8) (a person is eligible for housing assistance if their primary residence is "uninhabitable"); 44 CFR §206.117(b)(2)(i) & (c)(1) (financial assistance is limited to restoring primary residence to "functioning condition").  Indeed, Plaintiffs' argument in this regard, rests not on any explicit mandate in statute, regulation, or federal policy, but rather solely on an implication that is inconsistent with the statute and regulations that authorize FEMA to provide temporary housing assistance.  *Id*.

Even assuming that the two terms applied and governed FEMA's temporary emergency housing decisions, that argument, like Plaintiffs' assertion that FEMA owed and violated a duty

to provide "safe, secure, sanitary housing," by potentially allowing disaster victims to be exposed to formaldehyde in EHUs must be rejected because, to vitiate the first prong of the discretionary function exception, a statute, regulation, or policy must impose *both* a mandatory *and a specific* requirement.  *See Kennewick,* 880 F.2d at 1027.  *First*, neither the definitions of "uninhabitable" and "functional," nor Mr. Johnson's statement, imposes any mandatory and specific course of conduct.  Specifically, when, whether, and what actions if any FEMA should take in response to concerns that the EHUs may contain formaldehyde is left to FEMA's discretion.  *See Guile*, 422 F.3d at 231 fn. 12.[20]/

Second, contrary to Plaintiffs' rather convoluted argument, the applicable statute and regulations explicitly provided FEMA with discretion and do not require that FEMA to consider formaldehyde; nor does it specify what actions FEMA must take in response to health and safety

---

[20]/     *See also Garza v. United States*, 161 Fed. Appx. 341, 346, 2005 WL 3478009 *4 (5th Cir. 2005) (duty to keep prisoner "safe and free from harm" does not impose a specific course of action); *Elder v. United States*, 312 F.3d 1172, 1177-78 (10th Cir. 2002) ("for the safety and health of the public . . . from recognized hazards in . . . operations, on . . . lands, and in . . . facilities does not "specifically prescribe[ ] a course of action for an employee to follow"); *Kelly v. United States*, 241 F.3d 755, 761 (9th Cir. 2001) (broad mandates that do not specify a particular course of conduct do not remove discretion); *Miller*, 163 F.3d at 595 (firefighting regulations did not remove discretion because they did not require government to fight a fire in a specific manner); *Blackburn v. United States*, 100 F.3d 1426, 1432-33 (9th Cir.1996) (manuals imposing safety requirement, was not sufficiently specific because they failed to detail by what means the requirement were to be met); *Autery v. United States*, 992 F.2d 1523, 1528-29 (11th Cir.1993) (park service regulation that provided "safeguarding of human life takes precedence" was not sufficiently specific to remove discretion); *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1540-41 (10th Cir. 1992) (requirement that Army take all measures "necessary to prevent, minimize, or mitigate damage to the public health or welfare. . . ." and "attain a degree of cleanup of . . . at a minimum which assures protection of human health and the environment" do not constitute mandatory and specific requirements); *Allen*, 816 F.2d at 1427 (McKay, J. concurring opinion); *Gadd By and Through Gadd v. United States*, 971 F. Supp. 502, 507 (D. Utah 1997) (general requirements that leave unresolved the question of how to attain public health and safety goals are discretionary).

**Defendant United States of America's**
**Memo. In Support of Motion to Dismiss**                    32

concerns associated with formaldehyde or any other potential health or safety matter associated

with use of EHUs as temporary emergency housing.  Rather, the statutory and regulatory

provisions explicitly instruct that the "appropriate types of housing assistance" shall be "based

upon considerations of cost-effectiveness, convenience to the individuals and households, and

such other factors as the President may consider appropriate."  42 U.S.C. §5174(b)(2)(A); 42

CFR §206.110(c).  Simply put, the applicable statute and regulation provided FEMA with

discretion to decide whether or not to use trailers or mobile homes as temporary emergency

housing and whether or not to continue using them, even though there may be concerns regarding

formaldehyde in those units.

> c.     **Neither Objective Scientific Standards, Nor Regulatory Standards, Imposed A Mandatory And Specific Obligation On FEMA With Respect To Formaldehyde Levels In Indoor Air Quality.**

Plaintiffs further contend that FEMA violated objective scientific standards: Specifically,

Plaintiffs assert that FEMA: (1) impermissibly narrowed the nature and scope of the

EPA/ATSDR Fall 2006 study/investigation to assessing effectiveness of ventilation in reducing

formaldehyde levels in new, unoccupied trailers, *see* Complt. ¶¶61-67, 82; and (2) for purposes

of the Fall 2006 study/investigation, FEMA/ATSDR improperly used as the "level of concern"

an ambient indoor formaldehyde level of 0.3 ppm.  *See* Complt. ¶¶68-74, 82.

Plaintiffs' first contention is clearly without merit.  Plaintiffs have identified no

mandatory and specific statute, regulation, or policy that specified, first, whether FEMA was

required to conduct testing *at all*, in response to formaldehyde concerns; and, second, if FEMA

chose to conduct testing, the manner in which that testing was to be done.  In that regard, this

case is distinguishable from situations where detailed regulations specifically mandate that agencies perform certain testing, as in the case of the drug approval process.  For example, in *Berkovitz*, the Supreme Court found that a United States Food and Drug Administration "policy of testing all vaccine lots for compliance with safety standards," adopted pursuant to regulations, could constitute a mandatory and specific requirement that would vitiate the discretionary function exception.  486 U.S. at 547.  By contrast, in this case, FEMA was under no mandatory and specific obligation to conduct any indoor air quality testing.  Furthermore, in any event, FEMA's discretionary decision to study whether or not ventilation was effective, *see infra* at 11-13, was appropriate in the circumstances because it constituted a simple solution; a solution  that both ATSDR and EPA advise is an appropriate and effective way to lower formaldehyde levels and reduce the risks associated with exposure to formaldehyde.  Ex. 8, Souza Dec. ¶14;  Ex. 16, ATSDR, Tox. Profile at 000025; Ex. 34, EPA, Formaldehyde Basic Info. at 00002-3.

Plaintiffs further argue that FEMA/ATSDR's use of 0.3 ppm as the level of concern for formaldehyde violated objective mandatory and specific scientific standards.  Complt. ¶68-74, 82.  Plaintiffs apparently contend that FEMA/ATSDR were required to use a more conservative number as the level of concern – specifically, ATSDR's Minimum Risk Levels (MRLs), or possibly the level that EPA has indicated may cause health effects.  Complt. ¶¶69-70.  Contrary to Plaintiffs' assertion, the decision regarding the "level of concern" to use in the consultation report was discretionary because as Plaintiffs' concede there *is no standard* for formaldehyde air quality in EHUs or residential structures.  *See* Complt. ¶ 37.

In any event, ATSDR's report complied with objective scientific standards as follows:

The report stated that it was using 0.3 ppm as the level of concern and explained what that level represented;  a concentration level that may cause a sensitive person to suffer bronchi constriction.  Ex. 15, 2/1/07 ATSDR Report at 00008.[21]/  Furthermore, ATSDR's use of 0.3 ppm as the level of concern was not unreasonable.  In this respect, HUD requires mobile home manufactures to use low emission plywood and particle board; underlying that requirement is HUD's decision to use a formaldehyde indoor air quality target level of 0.4 ppm, a concentration level 33% higher than the 0.3 ppm level of concern used by ATSDR in its February 2007 consultation report.  Ex. 9, 49 FR 31999 §II(D) pp. 7-8 (HUD-000007 to HUD-000008).  HUD, in making the decision to use 0.4 ppm as the indoor air quality target level for mobile homes, explained that

> an indoor ambient formaldehyde level of 0.4 ppm provides reasonable protection to manufactured home occupants. . . . HUD believes that the product standards will result in a 0.4 ppm indoor level under the specified conditions and that this level, given economic considerations, is reasonable.  The Department realizes that this targeted level will not be achieved at all times.  However, the currently available medical and scientific evidence does not adequately establish the effect on health benefits of a level below 0.4 ppm.  In any event, it is not possible to implement a formaldehyde standard that will protect the entire population.

Ex. 9, 49 FR at 31999 §II(D) pp. 7-8 (HUD-000007 to HUD-000008).

     In contrast to HUD's 0.4 ppm target level, ATSDR Minimum Risk Levels (MRLs) are

---

[21]/     Consistent with its decision to use 0.3 ppm as the level of concern, ATSDR in its Toxicological Profile for Formaldehyde provides that:

> Formaldehyde is irritating to tissues when it comes into direct contact with them. Some people are more sensitive to the effects of formaldehyde than others. The most common symptoms include irritation of the eyes, nose, and throat, along with increased tearing, *which occurs at air concentrations of about 0.4–3 parts per million (ppm)*.

Ex. 16, ATSDR, Tox. Profile at 00023 (emphasis added).

not intended as ambient air quality standards for mobile homes, much less as air quality standards for trailers that are being used for provide temporary emergency housing for disaster victims.  ATSDR explains that:

> An MRL is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse noncancer health effects over a specified duration of exposure.  These substance specific estimates, which are intended to serve as screening levels, are used by ATSDR health assessors and other responders to identify contaminants and potential health effects that may be of concern at hazardous waste site.  *It is important to note that MRLs are not intended to define clean up or action levels for ATSDR or other Agencies.*

Ex. 35, ATSDR MRLs at 00001 (emphasis added).  The reason that MRLs are not intended to define cleanup or action levels for ATSDR or other agencies is because

> ATSDR uses a conservative (i.e., protective) approach to address these uncertainties consistent with the public health principle of prevention. . . . MRLs often must be based on animal studies . . . [and] [i]n the absence of evidence to the contrary, ATSDR assumes that humans are more sensitive than animals to the effects of hazardous substances that certain persons may be particularly sensitive.  *Thus the resulting MRL may be as much as a hundredfold below levels shown to be nontoxic . . .*

Ex. 35, ATSDR MRLs at 00001 (emphasis added).  In context of appropriate actions to take in response to formaldehyde fumes in a home, ATSDR explicitly instructs in document issued well before the event at issue in this litigation, that "[o]pening windows or using a fan to bring in fresh air is the easiest way to lower formaldehyde levels in the home and reduce the risk of exposure . . . ."  Ex. 16, ATSDR, Tox. Profile at 000025.[22]/

---

[22]/   ATSDR formaldehyde MRLs provide following guidance:

| Duration | MRL | LOAEL/NOAEL | Safety Factor |
|---|---|---|---|
| < 14 days | 0.04  ppm | 0.4  ppm | 9 |
| 15 – 364 days | 0.03  ppm | 0.98 ppm | 30 |
| > 365 days | 0.008 ppm | 0.24 ppm | 30 |

Similarly, EPA has not issued any formaldehyde air quality standards for EHUs or residences.  Rather what EPA provides is simply information regarding formaldehyde and that information is not binding on industry or any other governmental agency.  EPA reports that average concentrations of formaldehyde in "older homes without UFFI [urea-formaldehyde form insulation] are generally well below 0.1 ppm.  In homes with significant amounts of new pressed wood products, levels can be greater than 0.3 ppm."  Ex. 34,  EPA, Formaldehyde Basic Info. at 00002.  EPA further explains that formaldehyde can cause watery eyes, burning sensations in eyes and throat, nausea, and difficulty in breathing in some humans exposed at levels above 0.1

---

Ex. 23, 10/07, ATSDR Revised Report at 00010, Table 3.  To generate these MRLs, which may be as much as 9 to 30 times below levels shown to be nontoxic, ATSDR used following methodology:

> [The] acute inhalation MRL of 0.04 ppm . . . [is base upon] clinical symptoms (increased itching, sneezing, mucosal congestion, transient burning sensation of the eyes and of the nasal passages) and nasal alterations (elevated eosinophil counts and a transient increase in albumin content of nasal lavage fluid) in humans . . . . This MRL is based on a minimal [lowest observed adverse effect level] LOAEL of 0.4 ppm and an uncertainty factor of nine (three for use of a minimal LOAEL and three for human variability).

> An intermediate-duration inhalation MRL of 0.03 ppm was derived based on a [no observed adverse effect level] NOAEL of 0.98 ppm and a LOAEL of 2.95 ppm (22 hours/day, 5 days/week for 26 weeks) for clinical signs of nasopharyngeal irritation (hoarseness and nasal congestion and discharge) and lesions in the nasal epithelium . . . observed in monkeys. . . . An uncertainty factor of 30 (3 for extrapolation from animals to humans and 10 for human variability) was used to derive the MRL.

> A chronic inhalation MRL of 0.008 ppm was derived based on a minimal LOAEL of 0.24 ppm for histological evidence of mild damage to the nasal epithelial tissue . . . in formaldehyde exposed chemical workers . . . . To derive the MRL, the minimal LOAEL was divided by an uncertainty factor of 30 (3 for the use of a minimal LOAEL and 10 for human variability).

Ex. 16, ATSDR, Tox. Profile at 0000352.

ppm.  *Id*. at 00002.  Steps that EPA recommends to reduce formaldehyde exposure are: (1) using lower formaldehyde emitting construction materials; (2) using air conditioning and dehumidifiers to maintain moderate temperature and reduce humidity levels; and (3) increasing ventilation, particularly after bringing new sources of formaldehyde into the home.  *Id*. at 00001-02.

In short, as Plaintiffs concede, there exists no mandatory and specific statute or regulation governing formaldehyde levels in residential structures or EHUs, and FEMA/ATSDR's decision to use 0.3 ppm as the level of concern for purposes of the health consultation, a level that reflects the no observed or lowest observed adverse effect levels for formaldehyde and is 33% below HUD's ambient indoor formaldehyde target level for mobile homes, rather then ATSDR's MRLs that are potentially 9 to 30 times below levels shown to be nontoxic, was reasonable given the FEMA urgent and immediate need to assess what action, if any, it should take in response to EHU occupants potential exposure to formaldehyde in the EHUs.  *Cf. New Mexico v. HUD*, 1987 WL 109007 *5 (10th Cir. 1987) (an objective formaldehyde indoor air quality level necessarily requires arbitrary line-drawing and the standard selected need only be within the "zone of reasonableness").

## 2. The Challenged Conduct Is Susceptible To Policy Considerations.

Plaintiffs, through this litigation, seek to challenge decisions FEMA made in the course of responding to Hurricane Katrina and Hurricane Rita.  People and resources were rushed to the Gulf Coast region to aid the emergency response; nevertheless, the "magnitude of [Katrina] . . . and its catastrophic effects completely overwhelmed FEMA's disaster response system and resources, and those of state and local governments."  Ex. 5, DHS Rept. at 000118.  The

magnitude of the damage to housing stock impelled FEMA to quickly put into effect a temporary emergency housing plan that ultimately housed more than 140,000 families.  In making the decision on what housing should be used, the Stafford Act and applicable regulations explicitly invested FEMA with discretion and required it to base that decision on "upon considerations of cost-effectiveness, convenience to the individuals and households, and such other factors as the President may consider appropriate."  42 U.S.C. §5174(b)(2)(A).  *See also* 42 CFR §206.110(c) (FEMA "shall determine the appropriate types of housing assistance . . . based upon considerations of cost-effectiveness, convenience to the individuals and households and the suitability and availability of the types of assistance").  *See Gaubert*, 499 U.S. at 324 (where a statute or regulation authorizes the challenged conduct, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion"); *Baldassaro*, 64 F.3d at 208-08 (same).

In the instant case, FEMA exercised its discretion and made the decision to purchase and use EHUs as temporary emergency housing, and further exercised its discretion in determining the appropriate response to occupant complaints and concerns associated with formaldehyde fumes in EHUs.  Ex. 8, Dec. Souza ¶¶6-7, 13-19.  In so doing, FEMA inherently had to weighed and balanced competing policy considerations.  *Id*.  Specifically, FEMA made the decision to use trailers after consulting with state and local officials who wanted temporary emergency housing that would place as many disaster victims as possible in, or as close as possible to, devastated communities to promote and encourage recovery and rebuilding efforts.  *Id*. ¶¶6-7.  Trailers were used because they have a smaller footprint than mobile homes and could be located in the devastated communities and/or in closer proximity to the communities than mobile homes.  *Id*. ¶¶6-7.  Moreover, trailers could be placed on the property of homeowners who wished to remain

close to their homes while rebuilding, a factor that weighed into FEMA's policy decision to use trailers. *Id*. ¶¶6-7.

To meet the urgent and immediate massive demand for temporary housing, FEMA contract officers spent over $2.5 billion dollars to purchase over 140,000 new EHUs from recreation vehicle dealers and trailer manufacturers. *Id*. ¶6; Ex. 10, Dec. McCreary ¶4.  FEMA only purchased new units, and like any other purchaser of a trailer, reasonably assumed that the vendors and manufacturers would provide a safe and habitable product.  Ex. 8, Dec. Souza ¶6; Ex. 10, Dec. McCreary ¶¶6-10.  Thus, FEMA's requirements were simple – it sought from the vendors and manufacturers temporary emergency housing that would meet the disaster victims needs, and consistent with this contracted for and purchased units that were:  (1) new and under warranty; (2) furnished; (3) contained basic amenities; and (4) meet certain size requirements. Ex. 10, Dec. McCreary ¶¶5-6, 8, 10.  The emergency nature of FEMA's mission required reliance on the vendors and manufacturers, and consistent with that approach the contracts it issued did not contain specifications relating to formaldehyde.  Ex. 8, Dec. Souza ¶6; Ex. 10, Dec. McCreary ¶¶6-10.  FEMA reliance upon the vendors and manufacturers is also evidenced by the nature of its inspection of EHUs: FEMA conducted walk-through inspection of units prior to taking custody, and the purpose of that inspection was to ensure that the units it received were new, contained basic contracted for amenities, and had not been damaged during shipment to the staging site.  Ex. 10, Dec. McCreary ¶11; Ex. 11, Dec. Miller ¶¶3-5, Ex. 11-A, FEMA Form 90-13 at 00073-74.

Placed in the context of responding to the largest housing crisis of our nation's history and immediate and urgent need for temporary emergency housing, Plaintiffs imply that FEMA

could and should have (1) halted procurement of EHUs pending development of new EHU specifications, (2) postponed acceptance or issuance of EHUs pending promulgation and issuance of a ambient indoor air quality standards for formaldehyde, and/or (3) immediately and forcibly evicted disaster victims from EHUs because of health and safety concerns associated with formaldehyde.  But this is nothing more than an attempt by Plaintiffs to second-guess FEMA's discretionary decisions.  FEMA decisions on how to meet the immediate and urgent needs for temporary emergency housing are exactly the type of decision the FTCA and Stafford Act discretionary function exceptions are designed and intended to protect.  Whether or not those decisions are deemed reasonable in hindsight or not, the decisions made by FEMA were precisely the sorts of judgments Congress did not want to be second-guessed by the judiciary.  *See Gaubert*, 499 U.S. at 323; *Varig*, 467 U.S. at 814; *Guile*, 422 F.3d at 229; *Baldassaro*, 64 F.3d at 208.

Similarly, FEMA's discretionary response to formaldehyde complaints and health and safety concerns resulting from occupants' potential exposure to formaldehyde in EHUs is susceptible to policy analysis.  *See Daigle*, 972 F.2d at 1540-41 (how Army implemented health and safety provisions involves the very essence of social, economic, and political considerations); *Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991) (determinations about priorities of threats to public health and how to respond to those threats are protected policy judgments).  As Administrator Paulison explained:

> This was the largest emergency housing mission in our nation's history.  Given decades of successful history of using mobile homes and smaller travel trailers to provide temporary housing, we had no reason to anticipate problems with the habitability of travel trailer units.  Nevertheless, FEMA responded to the first reported concerns of formaldehyde fumes by a Gulf Coast travel trailer occupant in March 2006, and replaced

the unit on March 19, 2006. FEMA continued to monitor the number of formaldehyde reports, and once they began to increase, the agency took this as an indication that this might be more than an isolated concern. . . . FEMA implemented a system to address the complaints, case-by-case, as they were reported. . . . Of the 120,000 mobile homes and travel trailers that FEMA provided to individuals and families throughout the Gulf, only a small number of travel trailer formaldehyde complaints [had] come in to FEMA [by July 19, 2007]. As concerns continued into the summer [of 2006], FEMA also began widespread distribution of information to travel trailer occupants . . . Flyers capturing this information were hand delivered to all travel trailer occupants beginning in 2006.

Ex. 18, 7/19/07, Statement Paulison at 000003-04. *See also* Ex. 8, Dec. Souza ¶¶13-19.

Thus, FEMA's decisions inherently required it to weigh and balance the most effective means to provide basic shelter for hundreds of thousands of displaced residents, along with competing potential health and safety risks associated with temporary housing units, of which emerging concerns about formaldehyde was but one. *See* Ex. 8, Dec. Souza ¶¶13-19. In fulfilling its mission, FEMA purchased EHUs and hired contractors to maintain and repair those units at substantial cost, with the understanding that the units were safe and habitable; and it responded responsibly to concerns about formaldehyde when they became apparent. *See id*; Ex. 12, Dec. Oliver ¶¶3-5. In determining its proper course, FEMA had to weigh the significance of reports of formaldehyde fumes in trailers notwithstanding FEMA's past successful use of such trailers, along with the substantial cost incurred to purchase those trailers and the extremely limited availability of alternative emergency housing. *See* Ex. 8, Dec. Souza ¶¶13-19.

In assessing the risk, FEMA considered the absence of any applicable standard for formaldehyde in residences, and the belief that there was an effective and readily available remedy for the issue: increase ventilation and reduce the temperature inside the unit, a solution that EPA and ATSDR studied and found did, in fact, reduce formaldehyde levels. *See* Ex. 8, Dec. Souza ¶¶13-19. *See also* ATSDR, Tox. Profile at 000025; Ex. 34, EPA, Formaldehyde

Basic Info. at 00002-3.  Again, Plaintiffs' claims constitute nothing more than attempts to second-guess difficult policy decisions that the Congress has committed to FEMA's discretion.  *See Wells v. United States*, 851 F.2d 1471, 1477 (D.C. Cir. 1988) (decision to delay response is susceptible to policy analysis and not actionable).[23]/

In any event, it should be noted that, as expressed by Administrator Paulison, FEMA's response to formaldehyde in EHUs became increasingly proactive as its concern regarding risks to occupants health and safety increased.  Thus, the initial programmatic response was to address the complaints on a case-by-case basis, encourage the occupants who had complaints to ventilate their trailers, and if that did not resolve the concerns, to swap out the unit with an older refurbished unit.  Ex. 18, 7/19/07, Statement Paulison at 000007-08; Ex. 24, 7/20/07, FEMA Release No. FNF-07-028 at 000191; Ex. 25, 7/20/07, FEMA Release No. HQ-07-143 at 00193-94.  By mid-summer 2006, FEMA expanded its warning to all occupants by issuing a Formaldehyde Brochure to all trailer occupants instructing them, if they had concerns, to ventilate their units and if they had potential problems to seek medical advice.  Ex. 18, 7/19/07, Statement Paulison at 00007-08.  In September 2006, FEMA commenced a study to investigate the effectiveness of ventilation.  *Id*.  In July 2007 FEMA adopted a more proactive approach by

---

[23]/      *See also United States Fid. & Guar. Co. v. United States*, 837 F.2d 116, 122-23 (3d Cir. 1988) (determination of how to accomplish safety objective is discretionary because it requires the setting of priorities in light of the risks and resources available to address the problem); *Allen,* 816 F.2d at 1424 (same); *Loughlin v. United States*, 286 F. Supp.2d 1, 28-29 (D.D.C. 2003), *aff'd,* 393 F.3d 155 (D.C. Cir. 2004) (decision regarding what action to take when confronted with elevated arsenic reading susceptible to policy considerations); *Western Greenhouses v. United States*, 878 F. Supp. 917, 927-28 (N.D. Tex. 1995) (decisions regarding nature, scope and investigation, monitoring and remediation of contamination involve a plethora of issues and persons making those decisions are engaged in making public policy); *United States v. Nicolet, Inc.*, 1987 WL 8199 *4 (E.D. Pa. Mar 19, 1987) (decision on selection of remedy protected).

creating a dedicated formaldehyde call center, offered to move any occupant who had concerns about formaldehyde into a motel/hotel until other more permanent housing became available, halted all sales of trailers, and engaged ATSDR to test occupied units, and conduct a health assessment based upon the results of that testing.  Ex. 18, 7/19/07, Statement Paulison at 000007-08; Ex. 24, 7/20/07, FEMA Release No. FNF-07-028 at 000191; Ex. 25, 7/20/07, FEMA Release No. HQ-07-143 at 00193-94.

In consideration of ATSDR's findings issued in February 2008, FEMA gives relocation priority to disaster victims who may be more susceptible to formaldehyde, have supplemented its efforts to encourage occupants to vent their units and seek medical care if they have concerns, and continued its ongoing efforts to move disaster victims as quickly as possible from EHUs into more permanent housing.  FEMA's past and ongoing responses to formaldehyde were inherently fraught with policy considerations – considerations articulated by Congress in the legislation enabling FEMA to act in the face of a national disaster and preventing those decisions from being subject to judicial second-guessing.

**III.    The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Contract Claims.**

Plaintiffs' claims in Counts 1 and 3 must be dismissed because, first, they are based upon express or implied contracts with the United States, and the FTCA does not waive sovereign immunity for contract claims; and, second, because this Court does not have jurisdiction over Plaintiffs' contract claims against the United States.  *See* Little Tucker Act, 28 U.S.C. §1346(a)(2); Tucker Act, 28 U.S.C. §1491(a).

Plaintiffs through Count 1 assert implied or express contract claims for alleged breach of warranty and guarantee arising out of Plaintiffs' implied or express lease of EHUs from FEMA.

*See* Complt. ¶¶99-108.  The Court lacks subject matter jurisdiction over any such contract claim because Plaintiffs seek damages in excess of $10,000.  28 U.S.C. §§1346(a)(2), 1491(a). Plaintiffs through Count 3 assert that FEMA's failed to "perform its contractual obligations," and "breeched the contract of sale" because it sold to Plaintiffs defective EHUs.  *See* Complt. ¶¶119-131.  The Court lacks subject matter jurisdiction over this contract claim because the Contract Disputes Act (CDA), 41 U.S.C. §§601-13, divests federal district courts of jurisdiction over any claims arising out of the sale of government property.  *See* 41 U.S.C. §§602(a)(4), 609(a)(1); 28 U.S.C. §1346(a)(2).  Moreover, even if the Court had jurisdiction over such contract claims, dismissal is required because Plaintiffs failed to comply with the requirements of the CDA and submit a claim to the contract officer prior to filing suit, *see* 41 U.S.C. §605(a), and the evidence shows that neither the Pujol nor Thomas Family purchased a trailer.[24]/

### A.    Applicable Law.

The FTCA only waives sovereign immunity for tort claims; sovereign immunity for

---

[24]/    Moreover, even if Plaintiffs' Count 1 and 3 claims that FEMA owed an implied and/or express contractual warranty and/or guarantee to provide EHUs safe and free of defect (which it did not) could be construed as a tort claim (which it clearly cannot), those claims would be barred by the FTCA's discretionary function exception, for the reasons explained in Section II, *supra* at 23-43.  Furthermore, the FTCA does not waive sovereign immunity for claims based upon any alleged implied and/or express warranty or guarantee that the EHUs were safe, habitable, and free of all defects because it would impermissibly impose tort liability based upon a no-fault or strict liability theory.  *See Laird*, 406 U.S. at 802-03; *Lively*, 870 F.2d at 300; *Davis*, 2003 WL 30421 *2.  Likewise, the FTCA does not authorize imposition of liability for injury or economic lose resulting from the Government's negligent or wrongful misrepresentation or failure to disclose a hidden defect.  *See* 28 U.S.C. §2680(h); *see also See McNeily v. United States*, 6 F.3d 343, 347 (5th Cir. 1993); *Williamson v. U.S. Dept. of Agriculture*, 815 F.2d 368, 377 (5th Cir. 1987); *Brewer v. HUD*, 508 F. Supp. 72, 75-76 (S.D. Ohio 1980) (claims based upon failure to disclose that the house was unfit for habitation because of structural defects barred by the misrepresentation exception).

claims founded upon express or implied contracts with the United States is waived by the Tucker Act, 28 U.S.C §§1346(a)(2), 1491(a) and Contract Disputes Act (CDA), 41 U.S.C. §§601-13, and not by the FTCA. *See Rothe Dev. Corp. v. DoD*, 194 F.3d 622, 624 (5th Cir. 1999); *Davis v. United States*, 961 F.2d 53, 56 (5th Cir. 1991); *Dardar v. Potter*, 2004 WL 422008 *11 (E.D. La., March 4, 2004), *aff'd*, 108 Fed. Appx. 931 (5th Cir. 2004) ("jurisdiction over contractual claims governed by the CDA does not lie in the district court"). The FTCA, Tucker Act, and CDA's respective waivers of sovereign immunity are mutually exclusive. *See Awad v. United States*, 2001 WL 741638 *3 (N.D. Miss. Apr. 27, 2001).

Moreover, a claimant cannot avoid the jurisdictional bar of the Tucker Act or CDA by alleging that the cause of action is a tort, when the dispute arises out of a contract. *See Dardar*, 2004 WL 422008 *11. Where a claimant asserts tort claims in connection with a government contract, the court, as a matter of federal law, must determine whether the action is cognizable under the FTCA or whether it is a claim that must be brought under the Tucker Act or CDA. *See Blanchard v. St. Paul Fire*, 341 F.2d 351, 357 (5th Cir. 1965); *Woodbury v. United States*, 313 F.2d 291, 295 (9th Cir. 1963). This is because to allow a party to bring a contract claim under the FTCA, merely by characterizing its as a tort, would: (1) impermissibly allow a claimant to circumvent Congress' decision to restrict the district court's jurisdiction over contract claims, *see* 28 U.S.C. §§1346(a)(2), 1491(a); 41 U.S.C. §§602(a)(4), 609(a)(1); (2) violate the requirement that federal government contracts are governed by federal law, not state tort law,[25]/; (3) allow a

---

[25]/      Claims involving government contracts are governed by federal contract law. *See* 28 U.S.C. §1491(a); *Blanchard*, 341 F.2d at 358; *Woodbury*, 313 F.2d at 295. FTCA claims are governed by the law of the state where the negligent act occurred. 28 U.S.C. §§1346(b), 2671.

party to avoid the specific terms and conditions of the contract; and (4) contravene Congressional intent that the CDA provide a comprehensive system for resolving contract claims arising out of the sale of government property.  *See Wright v. USPS*, 29 F.3d 1426, 1428 (9th Cir.1994); *Reily Elec. Supply Co. Inc. v. Hight's Enters., Inc.*, 1998 WL 209457 *2 (E.D. La. Apr. 28, 1998).  *See also* S. Rep. No. 1118, 95th Cong., 2d Sess. 4, *reprinted in,* 1978 U.S.C.C.A.N. 5235, 5238.

In determining whether a claim is based in tort or contract, the court is not bound by a plaintiffs' characterizations of claims in the complaint.  *See City Nat'l Bank v. United States*, 907 F.2d 536, 546 (5th Cir. 1990); *Awad*, 2001 WL 741638 *3.  Instead, the court must examine the essence of the claims to determine whether or not they arise out of the failure to perform a contractual obligation.  *See City Nat'l Bank*, 907 F.2d at 546 (claim for gross negligence under FTCA dismissed because it arose out of government's failure to act in accordance with loan participation agreement); *Blanchard*, 341 F.2d at 357-58 (dismissing negligence claim founded on alleged failure to perform contractual obligation); *Awad*, 2001 WL 741638 *3 (dismissing FTCA claim based upon alleged failure to fulfill contractual obligation).

Moreover, the Fifth Circuit has consistently held that claims founded upon an alleged failure to perform contractual obligations are not tort claims that support subject matter jurisdiction under the FTCA; this is so even when the plaintiff alleges claims for torts such as misrepresentation, conversion, negligence, or bad faith breach of contract.  *See Davis v. United States*, 961 F.2d at 55-56; *Blanchard*, 341 F.2d at 357.  In other words, if the purported tort claims are based on the breach of a duty created by an implied or express contract, the claims are deemed to be based on a contract action, not a tort action, and fall outside the FTCA's waiver of sovereign immunity.  *See Davis*, 961 F.2d at 56; *City Nat'l Bank*, 907 F.2d at 546; *Awad*, 2001

WL 741638 *3.  In such situations, the Tucker Act provides the appropriate waiver of sovereign

immunity.  *See, e.g.*, *Awad*, 2001 WL 741638 *3.  In short, where the claims require the court "to

construe the government's promises, and to determine if they were carried out, the Tucker Act,

and not the FTCA, provides jurisdiction."  *Id.*

### B.    The Court Lacks Subject Matter Jurisdiction Over Count 1 Contract Claims.

Plaintiffs, through Count 1, seek to recover damages in excess of $10,000 for the alleged

personal injuries resulting from FEMA's alleged breach of warranty and guarantee arising out of

its express or implied lease and/or contract of EHUs.  Complt. ¶¶99-105.  Plaintiffs' Count 1

claims are based upon FEMA's alleged failure to perform contractual obligations – its implied

and/or express warranty and contractual guarantee that the EHUs it provided are free of defect.

Complt. ¶¶99-105.  These claims fall outside the FTCA's waiver of sovereign immunity.  *See*

*Davis*, 961 F.2d at 56; *City Nat'l Bank*, 907 F.2d at 546.  Instead, the Tucker Act provides the

appropriate waiver of sovereign immunity.  *See, e.g.*, *Awad*, 2001 WL 741638 *3.

The Court must dismiss Plaintiffs' Count 1 Tucker Act claims for lack of jurisdiction.

The Tucker Act, vests jurisdiction in the federal district courts over any "claim against the United

States, not exceeding $10,000 in amount founded . . . upon . . . any express or implied contract

with the United States."  28 U.S.C. §1346(a)(2).[26]/  *See also Wilkerson v. United States*, 67 F.3d

112, 118 (5th Cir. 1995).  For claims that exceed $10,000, the Tucker Act grants exclusive

---

[26]/      It is well-established that the Tucker Act does not authorize suits against the United
States based on contracts implied in law.  *See Hercules, Inc. v. United States*, 516 U.S. 417, 423-
24 (1996).  Thus, to the extent Plaintiffs allege claims based on a contract implied in law, such
claims are barred, notwithstanding the other jurisdictional requirements of the Tucker Act.

jurisdiction to the United States Court of Federal Claims.  28 U.S.C.§1491(a); *Amoco Prod. Co. v. Hodel*, 815 F.2d 352, 358 (5th Cir. 1987).  In the instant case, Plaintiffs seek in excess of $10,000 in damages.  *See* Ex. 31, Adm. Claims.  Accordingly, the Court lacks subject matter jurisdiction over Count 1.[27]/

### C.   The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Count 3 Contract Claims.

 In Count 3 of the Complaint seeks damages associated with the purchase of EHUs. Complt. ¶¶119-31.  Specifically, Plaintiffs assert that FEMA (1) sold EHUs to plaintiffs and putative class members, *id.* ¶121; (2) was aware that the EHUs were defective and failed to disclose that defect, *id.* ¶122-28; and (3) in failing to disclose the defect, breached the contract of sale and failed to perform its contractual obligations. *id.* ¶¶130-131.  Plaintiffs seek to recover, in part, the purchase price, interest, expenses occasioned by the sale, and attorneys fees.  *Id.*  ¶129.

 As previously noted, *supra* at46-48, it is well-established that where claims are based on an alleged breach of contract, whether the breach is the result of negligence or wrongful conduct, the claims are based on a contact action and not a tort action.  In the instant case, simple review of the Plaintiffs' claims shows that they are expressly based on the government's alleged breach of contract – sale of defective EHUs and associated economic damages.  *See* Complt. ¶¶122-28. As such, Plaintiffs' Count 3 claims are contract claims that fall outside the FTCA's waiver of sovereign immunity.  *See Davis*, 961 F.2d at 56.

---

[27]/     The proper remedy is dismissal of Plaintiffs' contract claims, not transfer thereof to the Court of Federal Claims.  Even assuming all jurisdictional requirements were met, 28 U.S.C. §1500 divests the Court of Federal Claims of jurisdiction over any action pending in a district court based on the same set of operative facts.  *See* WRIGHT & MILLER, 17 FED. PRAC. & PROC. JURIS. 3d §4101; *Keene v. United States*, 508 U.S. 200, 202, 205-07, 210-14 (1993).

Furthermore, the Court lacks jurisdiction over any contract claims arising from the purchase of government property. The CDA applies to any "express or implied contract . . . entered into by an executive agency for . . . the disposal of personal property." 41 U.S.C. §602(a)(4). All claims involving a contract covered by the CDA must be submitted to a contracting officer for a decision. *See* 41 U.S.C. §605(a); *see also Bethlehem Steel v. Avondale Shipyards*, 951 F.2d 92, 93 (5th Cir. 1992); *Trevino v. General Dynamics*, 865 F.2d 1474, 1489 (5th Cir. 1989). Contractors may appeal the contracting officer's decision to an agency board, *see* 41 U.S.C. §§606, 607, or bring an action in the United States Court of Federal Claims. *See* 41 U.S.C. §609; *see also Trevino*, 865 F.2d at 1489; *Reily Elec. Supply Co.*, 1998 WL 209457 *2. The CDA divests federal district courts of jurisdiction over all express or implied contracts arising out of the disposal of government property. *See* 41 U.S.C. §§602(a)(4), 609(a)(1); 28 U.S.C. 1346(a)(2); *see also Hayes v. USPS,* 859 F.2d 354, 356 (5th Cir. 1988); *Jackson v. USPS*, 799 F.2d 1018, 1022 (5th Cir. 1986).

In sum, the Court must dismiss Plaintiffs' Count 3 contract claim for three reasons. First, the CDA divests district courts of jurisdiction over any such contract claims. Second, Plaintiffs have not filed the required administrative claims with the Contract Officer prior to filing suit. Third, even if this Court had jurisdiction, summary judgment and dismissal is required because none of the Plaintiffs purchased a trailer from the government: The Pujol Family asserted no administrative claim for damage or injury resulting from the purchase of an EHU, *see* Ex. 29, Adm. Claim at 000022-34; and although Mr. Thomas notified FEMA that he was interested in purchasing his trailer, FEMA told him that the unit was not for sale, and so no purchase by Mr. Thomas was every made. Ex. 31, Thomas Doc. at 000196, 234.

**CONCLUSION**

For all the reasons set forth herein, the Court should grant the United States' motion and dismiss Plaintiffs' claims for lack of subject matter jurisdiction.  Alternatively, the Court should grant summary judgment to the United States on all claims.

Dated: May 18, 2008.                    Respectfully Submitted,

                                        GREGORY S. KATSAS
                                        Assistant Attorney General, Civil Division

                                        C. FREDERICK BECKNER III
                                        Deputy Assistant Attorney General, Civil Division

                                        J. PATRICK GLYNN
                                        Director, Torts Branch, Civil Division

                                        MICHELLE BOYLE
                                        Trial Attorney

                                        *//S// Henry T. Miller*
                                        HENRY T. MILLER (D.C. Bar No. 411885)
                                        Senior Trial Counsel
                                        United States Department of Justice
                                        Civil Division – Torts Branch
                                        P.O. Box 340, Ben Franklin Station
                                        Washington, D.C. 20004
                                        Telephone No:  (202) 616-4223
                                        E-mail:  Henry.Miller@USDOJ.Gov

                                        Attorneys for the United States of America

OF COUNSEL:

JORDAN FRIED
Associate Chief Counsel
JANICE WILLIAM-JONES
Trial Attorney
FEMA/DHS
Department of Homeland Security
Washington, D.C. 20472

**Defendant United States of America's**
**Memo. In Support of Motion to Dismiss**                    51

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2008, the foregoing Memorandum, and accompanying Motion, Declaration, and Exhibits were filed via the U.S. District Court's CM/ECF electronic filing system a copy thereof was served upon Liaison Counsel.

*//S// Henry T. Miller*
HENRY T. MILLER (D.C. Bar No. 411885)