UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER                     MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION            SECTION "N-4"
                                        JUDGE ENGELHARDT
                                        MAG. JUDGE ROBY


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


DEFENDANT UNITED STATES OF AMERICA'S EXHIBITS
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FTCA AND
CONTRACT CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION




U.S. EXHIBIT NO. 5



*Office of Inspector General*

**U.S. Department of Homeland Security**

March 31, 2006

Preface

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the Homeland Security Act of 2002 (*Public Law 107-296*) by amendment to the Inspector General Act of 1978. This is one of a series of audit, inspection, and special reports prepared by our office as part of our oversight responsibilities to promote economy, effectiveness, and efficiency within the department.

This report assesses the Federal Emergency Management Agency's (FEMA) performance as it conducted its disaster management responsibilities in response to Hurricane Katrina. We examined whether the laws, regulations, policies, procedures, plans, guidelines, and resources were adequate and operational, and whether FEMA's organizational structure enhanced or hindered its emergency management capabilities.

The recommendations herein have been developed to the best knowledge available to our office, and have been discussed in draft with those responsible for implementation. It is our hope that this report will result in more effective, efficient, and economical operations. We express our appreciation to all who contributed to the preparation of this report.

Richard L. Skinner
Inspector General

# Table of Contents

**Executive Summary** .................................................................................................................1

**Background** ...............................................................................................................................4

    Hurricane Katrina's Devastation.................................................................................4
    Preparing for the Storm................................................................................................5
    Initial Response.............................................................................................................6
    Initial Recovery...........................................................................................................13
    Framework for Federal Disaster Response .............................................................13

**Results of Review** ..................................................................................................................18

**Difficulty Adapting to New Response Plans**.................................................................18

    States Had Varied Success Implementing Incident Command System Structures and
    Establishing Unified Command.................................................................................19
    FEMA and DHS Were Adjusting to the National Response Plan ..........................23
    Need to Solidify Role of ESF-5, Emergency Management.....................................31
    ESF-6, FEMA's Coordination Efforts with Other Governmental and
    Nongovernmental Partners........................................................................................34
    New Capabilities and Improved Coordination Necessary for ESF-9 ....................52
    ESF-15 Structure and State Coordination Need Improvement...............................56
    National Guard and Active Duty Troops Provide Valuable Support but
    Improved Coordination with FEMA Is Needed.......................................................62

**FEMA Provided Record Levels of Support but Delivery Structure
Needs Improvement** ..............................................................................................................65

    Visibility and Improvements to Resource Ordering and Delivery Process Required ..................66
    Unreliable Disaster Communications During the Initial Response ........................77
    FEMA Does Not Have Staff or Plans Adequate to Meet Its Human Capital Needs during
    Catastrophic Disasters................................................................................................81
    Individual Assistance..................................................................................................87
    FEMA's Efforts to Augment Staff and Call Center Capacity ...............................87
    Housing Area Command Concept .............................................................................94
    Delivery of FEMA's Individuals and Households Program....................................97
    Delivery of FEMA's Public Assistance Program ................................................106

# Table of Contents

## FEMA Needs to Improve Readiness .......................................................................109

FEMA's Organization and Capacity to Respond to Disasters.................................110
Grant Program Changes Contributed to Weakened Relationship with States...........112
Organizational Staffing Requires Better Management .........................................118
Despite Expanded Training Delivery, Some FEMA Training Needs Are Unmet.......120
FEMA Planning Efforts Were Incomplete and Insufficient ..................................123
Long-term Deterioration in FEMA's Exercise Program .......................................128
FEMA Should Strengthen Remediation Measures for "Lessons Learned"................132

## Future Considerations.....................................................................................134

Working Toward All-Hazards Preparedness .......................................................135
Developing DHS Culture in Carrying Out Emergency Management Responsibilities...140
Stafford Act Authorities Are Sufficient, Long-term Recovery Issues Need to be Addressed ....143

## Management Comments and OIG Analysis....................................................145

## Appendices

Appendix A:    Hurricane Katrina Timeline..........................................................146
Appendix B:    FEMA's Individual Assistance Programs .......................................149
Appendix C:    FEMA's Public Assistance Program and Eligible Work ...................156
Appendix D:    The National Incident Management System ....................................159
Appendix E:    The National Response Plan.........................................................163
Appendix F:    Comparison of PFO and FCO Duties Under the National Response Plan.........165
Appendix G:    National Voluntary Organizations Active in Disaster........................166
Appendix H:    FEMA Consolidated Shelter Report...............................................168
Appendix I:    Disaster Recovery Centers:  Location Map .....................................170
Appendix J:    Disaster Recovery Centers:  Hours of Operation .............................171
Appendix K:    Agencies Receiving Mission Assignments ......................................173
Appendix L:    Mission Assignment Descriptions..................................................174
Appendix M:    Call Center Staff Compared to Number of Calls .............................178
Appendix N:    Average Length of Disaster Victim Calls .......................................179
Appendix O:    FEMA Referrals to Other Assistance Providers................................180
Appendix P:    DHS Organizational Charts..........................................................181
Appendix Q:    FEMA Ten-Year Timeline............................................................183
Appendix R:    Purpose, Scope, and Methodology ................................................185
Appendix S:    Recommendations .....................................................................187
Appendix T:    Management Response to Draft Report ...........................................193

A Performance Review of FEMA's Disaster Management Activities
In Response to Hurricane Katrina

# Table of Contents

Appendix U:  Major Contributors to This Report ................................................................. 209
Appendix V:  Report Distribution ....................................................................................... 210

## Abbreviations

| | |
|---|---|
| ADD | Automated Deployment Database |
| CORE | Cadre of On-Call Response Employees |
| DAE | Disaster Assistance Employee |
| DHS | Department of Homeland Security |
| EMAC | Emergency Management Assistance Compact |
| EMPG | Emergency Management Performance Grants |
| EOC | Emergency Operations Center |
| EP&R | Emergency Preparedness and Response |
| ESF | Emergency Support Function |
| FCO | Federal Coordinating Officer |
| FEMA | Federal Emergency Management Agency |
| FY | Fiscal Year |
| HSOC | Homeland Security Operations Center |
| HUD | Department of Housing and Urban Development |
| ICS | Incident Command System |
| IHP | Individuals and Households Program |
| IIMG | Interagency Incident Management Group |
| JFO | Joint Field Office |
| MERS | Mobile Emergency Response Support |
| MRE | Meal Ready-to-Eat |
| NDMS | National Disaster Medical System |
| NEMB-CAP | National Emergency Management Baseline Capabilities Assurance Program |
| NPSC | National Processing Service Center |
| NRCC | National Response Coordination Center |
| NIMS | National Incident Management System |
| NRP | National Response Plan |
| ODP | Office of Domestic Preparedness |
| OIG | Office of Inspector General |
| PFO | Principal Federal Official |
| RAMP | Remedial Action Management Program |
| RRCC | Regional Response Coordination Center |
| SBA | Small Business Administration |
| US&R | Urban Search and Rescue |
| VOAD | Voluntary Organizations Active in Disaster |

# OIG

*Department of Homeland Security*
*Office of Inspector General*

## Executive Summary

The federal government, in particular the Federal Emergency Management Agency (FEMA), received widespread criticism for a slow and ineffective response to Hurricane Katrina. Much of the criticism is warranted. Hurricane Katrina's high winds and storm surge caused devastating loss of life and substantial property damage in Mississippi and in Louisiana. In the city of New Orleans several breaches of the levee system compounded losses. The hurricane caused significant damage in Alabama also. Although FEMA and other agencies deployed emergency responders and resources in advance of the storm and supported state efforts to evacuate people and conduct other final preparations, most were overwhelmed the first week after landfall.

We conducted a review of FEMA's activities in response to Hurricane Katrina, which details FEMA's responsibilities for three of the four major phases of disaster management – preparedness, response, and recovery – during the first five weeks of the federal response. In addition, we evaluated FEMA's preparedness and readiness efforts over the past ten years to determine its organizational capability and posture prior to Hurricane Katrina.

Under the authorities of the *Robert T. Stafford Disaster Relief and Emergency Assistance Act* (the Stafford Act)[1] and the National Response Plan (NRP), FEMA provides disaster assistance to individuals and communities and coordinates emergency support functions for emergency management; mass care, housing, and human services; urban search and rescue; long-term recovery; and external affairs. We reviewed whether FEMA's authorities, plans and procedures, organizational structure, and resources were adequate and effective. Appendix R summarizes the scope and methodology of this review.

Within the past two years, the Department of Homeland Security (DHS) published two watershed planning documents – the National Incident Management System (NIMS) and the NRP – that restructure how federal,

---

[1] P.L. No. 93-288 (1974)(codified as amended at 42 U.S.C. §§5121–5206 and other scattered sections)

state, and local government agencies and emergency responders conduct disaster preparation, response, and recovery activities. Changes needed to implement both documents, however, were still underway when Hurricane Katrina made landfall. FEMA's initial response was significantly impeded by the adjustments it was making in implementing its responsibilities under the NRP.

The response demonstrated some positive features of the incident command structure under NIMS, which FEMA and state staff led in Mississippi and Alabama. It also highlighted severe deficiencies and multiple areas where FEMA and DHS headquarters must make adjustments to the NRP, such as the use of incident designations, the role of the Principal Federal Official (PFO), and the responsibilities of emergency support function coordinators.

When compared to other disasters, FEMA provided record levels of support to Hurricane Katrina victims, states, and emergency responders. However, a lack of visibility in the resource ordering process, difficulty deploying sufficient numbers of trained personnel, unreliable communication systems, and insufficient management controls for some assistance programs demonstrate a need for improved response support capabilities and more effective delivery mechanisms for assistance.

FEMA's efforts to support state emergency management and to prepare for federal response and recovery in natural disasters were insufficient for an event of Hurricane Katrina's magnitude. Difficulties experienced during the response directly correlate with weaknesses in FEMA's grant programs, staffing, training, catastrophic planning, and remediation of issues identified during previous disasters and exercises. As FEMA's role in administering grants and conducting exercises for natural hazards preparedness has diminished, new mechanisms are needed to enhance capability and sustain its relationships with states and first responders.

Finally, the integration of FEMA, all hazards preparedness, and disaster response and recovery capabilities within DHS requires additional attention. After the terrorist attacks of September 11, 2001, DHS' prevention and preparedness for terrorism have overshadowed that for natural hazards, both in perception and in application. Although an "all-hazards" approach can address preparedness needs common to both man-made and natural events, DHS must ensure that all four phases of emergency management – preparedness, response, recovery, and mitigation – are managed throughout the department on an all-hazards basis. Coordination and consultation among

DHS components and with the states is essential to guide, advise, develop, and monitor all-hazards capability and responder effectiveness.

We make 38 recommendations to the Director of FEMA, Under Secretary for Preparedness, Assistant Secretary of Public Affairs, and Director of the Office of Operations Coordination.  We are recommending that DHS headquarters and FEMA establish measurable expectations of FEMA's response; provide the necessary financial, technical, and staff support to meet them; and assess FEMA's readiness.  In addition, we make recommendations aimed at clarifying how DHS headquarters, FEMA, and other DHS components will implement aspects of the NRP, and address improvements to FEMA's infrastructure for resource ordering and tracking; personnel deployment; disaster communications; and disaster application handling.  To improve disaster preparedness, we are recommending that FEMA complete catastrophic, surge, and workforce plans; add training; strengthen its remedial action program; and, build relationships with the states in concert with the Preparedness Directorate and DHS Public Affairs.  Finally, we are recommending several modifications to how FEMA manages disaster assistance, including testing programs before their use and housing displaced persons.

# Background

## Hurricane Katrina's Devastation

After first making landfall in Florida as a Category 1 hurricane on August 25, 2005, Hurricane Katrina crossed the Gulf of Mexico and grew in intensity before making a second landfall in Louisiana as a strong Category 3 hurricane on August 29, 2005.[2]  As the storm passed and assistance started moving into the area, New Orleans' levee system sustained several breaches, failed, and submerged much of the city under water, exacerbating what was already a major disaster.

While FEMA and other federal, state, and local entities pre-staged commodities and personnel in and around the region to respond to Hurricane Katrina, the magnitude of the storm and its catastrophic effects completely overwhelmed FEMA's disaster response system and resources, and those of state and local governments.  In addition, differences in disaster response and emergency management capabilities across states resulted in varied levels of response success.

Hurricane Katrina left damage in catastrophic proportions along the Gulf Coast in Louisiana, Mississippi, and Alabama.  The hardest hit communities lost all infrastructure:  electricity; water and sewer; roads and bridges; communication systems including telephone lines, cell phone towers, radio capabilities, and many satellite antennae; and, in some instances, basic governmental operations including law enforcement.  Many local first responders were also victims.

Hurricane Katrina caused 1,326 deaths – 1,096 in Louisiana, 228 in Mississippi, and 2 in Alabama.[3]  More than 700,000 people were displaced

---

[2] The Saffir-Simpson Hurricane Scale classifies hurricanes by wind intensity in order to predict the damage and flooding the storm will likely cause upon landfall.  A Category 3 hurricane has sustained winds of 111–130 miles per hour and a predicted storm surge of 9–12 feet, causing flooding and some structural damage.  A Category 4 hurricane has sustained winds of 131–155 miles per hour and a predicted storm surge of 13–18 feet.  The most intense hurricane, Category 5, has sustained winds over 156 miles per hour and a predicted storm surge over 19 feet.  A Category 5 hurricane can cause complete roof failure, building failure, utility loss, and major flooding damage.  Initial reports indicated that Hurricane Katrina made landfall as a Category 4 storm, particularly due to the level of damage left by the storm; however, on December 20, 2005, the National Hurricane Center reported that aircraft data showed Hurricane Katrina actually made landfall in Louisiana as a high-end Category 3 hurricane.

[3] Data from www.firstgov.gov, Frequently Asked Questions – Hurricane Katrina's effects, accessed January 30, 2006.

from the Gulf Coast region as a result of Hurricane Katrina. More than 273,000 people were displaced and evacuated to shelters. An estimated 300,000 homes were destroyed, or received major or minor damage in Louisiana, Mississippi, and Alabama. In Mississippi alone, 780 homes and 413 mobile homes were reported destroyed; 6,482 homes and 808 mobile homes sustained major damage; and 42,444 homes and 18,243 mobile homes had minor damage as of September 17, 2005.[4] Major disaster declarations covered over 90,000 square miles of the affected Gulf Coast area.

## Preparing for the Storm

The National Hurricane Center tracked Hurricane Katrina as it gained intensity and crossed the Gulf of Mexico, and issued multiple dire warnings regarding its severity. By 5:00 PM eastern daylight time on August 26, 2005, the National Hurricane Center predicted that Hurricane Katrina's track had shifted and was headed for southeast Louisiana and New Orleans, where landfall was expected as a Category 4 storm. Eleven members of FEMA's Hurricane Liaison Team were at the National Hurricane Center in Miami, Florida, to monitor the storm and storm advisories by August 27, 2005.[5] In addition, federal emergency declarations were issued for Louisiana on August 27, 2005, and for Mississippi and Alabama on August 28, 2005, authorizing FEMA to begin pre-positioning commodities and emergency management personnel.

Even before the storm shifted, FEMA activated its National Response Coordination Center (NRCC) in Washington, DC, and Regional Response Coordination Centers (RRCC) in Atlanta, Georgia, and Denton, Texas.[6] They tracked the storm and began preparations to coordinate the response. State emergency management officials in Alabama, Mississippi, and Louisiana also activated their Emergency Operations Centers (EOC) and began preparing for a second landfall. In addition, the NRCC, RRCCs, and state EOCs activated all 15 Emergency Support Functions (ESFs) plus the Defense Coordinating Officer (a military liaison) specified in the NRP.

---

[4] Mississippi Defense Coordinating Element Situation Report 17, September 17, 2005. These totals do not include numbers from two of the hardest hit counties in Mississippi.
[5] See Appendix A for a timeline of Hurricane Katrina's storm track and key decisions and events of the response.
[6] For a discussion of FEMA's headquarters and regional structure, see the FEMA's Organization and Capacity to Respond to Disasters section of this report.

FEMA deployed its Emergency Response Team-National to Louisiana's EOC in Baton Rouge, and Emergency Response Teams-Advanced to the state EOCs in Jackson, Mississippi, and Clanton, Alabama. FEMA Emergency Response Teams began coordinating with the states to preposition both commodities and personnel in the area to respond as soon as storm conditions subsided and it was safe for responders to enter the affected area. In addition, FEMA activated and pre-positioned multiple response teams to locations near the forecasted affected areas. It pre-staged three Urban Search and Rescue (US&R) task forces in Louisiana and two in Mississippi. Mobile emergency operations vehicles and Mobile Emergency Response Support (MERS) personnel, who are capable of providing communications equipment and other support, were deployed and pre-staged near each state's EOC. In addition, many National Disaster Medical System (NDMS) teams, including Disaster Medical Assistance Teams, Disaster Mortuary Operational Response Teams, and Veterinary Medical Assistance Teams were activated and pre-staged in the region for deployment as soon as conditions permitted.

FEMA activated federal operational staging areas and mobilization centers to accept delivery of commodities and dispense them to local distribution points within the affected areas. Quantities of ice, water, meals ready-to-eat (MREs), and other commodities were pre-staged at Meridian Naval Air Station in Mississippi; Maxwell Air Force Base and Craig Field in Alabama; and Camp Beauregard, Barksdale Air Force Base, and the New Orleans Superdome in Louisiana, in addition to staging areas in Florida, Georgia, and Texas. Also, the three affected states identified pre-staged commodities, particularly ice, left over from the Hurricane Dennis response.[7]

## Initial Response

As soon as conditions permitted, life saving and life sustaining efforts began, and Rapid Needs Assessment teams assessed damage in the affected areas. In many areas, roads and bridges were destroyed, making air or water the only means available to reach stranded victims, conduct initial damage assessments, and get emergency management response personnel into the area.

The communications infrastructure – phone lines, cell phone towers, and radio and satellite antennae – was destroyed in many areas. This significantly

---

[7] Hurricane Dennis was declared a major disaster in Alabama on July 10, 2005.

impacted the ability of emergency responders to get situational and operational information to state or federal personnel outside the affected areas. It took days to establish an accurate picture of the disaster's magnitude and devastation.

FEMA's national US&R task forces, the U.S. Coast Guard, National Guard troops, active duty federal troops, and state and local first responders performed search and rescue missions, and rescued an estimated 50,000 victims. U.S. Coast Guard personnel conducted over 30,000 rescues during the first week after landfall – more rescues than it performed in all of 2004.

NDMS activated and deployed over 80 teams to support response efforts. Medical Needs Assessment Teams from FEMA Regions IV and VI were deployed to assess medical needs in the affected area. Over 50 Disaster Medical Assistance Teams were deployed. All 11 Disaster Mortuary Operational Response Teams plus 2 Disaster Portable Mortuary Units deployed to assist in body recovery and identification operations. Three National Medical Response Teams, five Veterinary Medical Assistance Teams, and three International Medical Surgical Response Teams were activated also. In addition, four Management Support Teams provided logistical, managerial, and operational support for NDMS teams in the affected area. NDMS also supported search and rescue operations by evacuating over 2,500 people with special needs.

In addition, FEMA began moving pre-staged trucks of water, ice, and MREs from federal operational staging areas into the disaster area and to various points of distribution. Additional commodities were ordered for daily delivery; however, it took time to establish an operational delivery system to supply adequate quantities of commodities to support victims and first responders. Also, FEMA personnel and state and local responders expressed confusion and frustration because FEMA's logistics system lacks an asset visibility program. As a result, FEMA personnel and state and local responders did not know what type or quantity of commodities was on the way or even when resources would arrive.

## Alabama

FEMA's Emergency Response Team-Advanced was on the ground and operating at the EOC in Clanton, Alabama by August 26, 2005. In Alabama, FEMA had the benefit of existing pre-positioned assets, commodities, and an operational Joint Field Office (JFO) because of Hurricane Dennis, which

struck Alabama earlier in the summer. As a result, FEMA was able to mobilize operations quickly at the JFO in response to Hurricane Katrina.

Alabama's two most southern counties were the hardest hit and sustained major damage. Communications infrastructure was destroyed and officials in these counties experienced difficulty communicating their needs to the JFO for the first two days after landfall. The state sent a communications vehicle, and FEMA sent a MERS unit to the area to provide communications support and other response assistance.

FEMA and state officials told us the response went well in Alabama. Both conducted joint integrated action planning to coordinate and manage Alabama's response efforts. In addition, Alabama was able to release its Defense Coordinating Officer on August 31, 2005, because Department of Defense support was not needed in Alabama. This allowed additional Department of Defense resources to shift into Mississippi.

### Mississippi

Mississippi's six southern most counties were left with catastrophic damage. Winds and storm surge from Hurricane Katrina destroyed basic infrastructure along approximately 26 miles of Mississippi's coast from Biloxi to Waveland. Neighborhoods, schools, and business districts in the three coastal counties were destroyed as well.



1) Debris pile in Waveland, MS, 10/14/05; 2) Temporary school structure
established in Waveland, MS, 10/14/05; 3) Neighborhood street and
debris in Waveland, MS, 10/14/05; 4) Neighborhood street and debris in
Gulfport, MS, 10/14/05

FEMA's Federal Coordinating Officer (FCO) and Mississippi's State
Coordinating Officer immediately established joint integrated operations.
FEMA and state or local counterparts integrated, worked side-by-side, and
addressed issues as they occurred. Pre-existing relationships, established by
federal, state, and local entities during the response to Hurricane Dennis and
preparedness exercises, facilitated the integration of Hurricane Katrina
response personnel.

FEMA, state, and local emergency management responders operated jointly at
an interim operating facility in Biloxi, which later became the Area Field
Office, and at the JFO in Jackson. FEMA established branches and divisions
within its Operations Section. Division supervisors were empowered to act
and, in conjunction with local counterparts, determined needs for their
division. Those needs were reported to the branch director, who determined
what the branch could meet, and then unmet needs were forwarded to the
Operations Section Chief at the JFO. Needs that could not be filled by the
JFO were mission assigned or contracted to other federal agencies.

FEMA and state officials expressed frustration with the rate and quantity of
commodities delivered to Mississippi as well as with the lack of asset

visibility for the logistics process. Officials indicated they had ordered water, ice, and MREs in quantities far greater than what was delivered, yet when they attempted to determine where additional quantities were in the process, they were told the commodities were "in the pipeline." According to FEMA field officials, on average, Mississippi received less than 50 percent of the commodities it requested between August 27, 2005, and September 5, 2005. While FEMA should address asset visibility, a number of factors outside of FEMA's control affect its ability to deliver requested commodities, including the reasonableness of field requests, supplier inventories, and the availability of transportation resources. Even so, the effectiveness of a response is dependent upon the ability to anticipate and address potential shortfalls through adequate contingency planning.

The communications infrastructure was destroyed in areas of Mississippi. FEMA deployed a MERS detachment to the Gulfport area, containing satellite equipment and a satellite link, to establish communications and provide support. We were told that without MERS, there would have been no communications in the area. FEMA officials said it took about three days after landfall to fully grasp the magnitude of the destruction.

### Louisiana

Hurricane Katrina's winds and storm surge caused severe damage in a number of Louisiana parishes; however, the majority of the damage in the city of New Orleans was a result of several breaches in the city's levee system after landfall. Because of the breaches much of the city was submerged, and dewatering efforts placed Louisiana's response and recovery behind Mississippi.



1) Damaged house in Plaquemines parish in Louisiana, 10/23/05; 2) New Orleans, LA – Lower Ninth Ward, 10/24/05; 3) Damaged house in New Orleans, LA, 10/24/05; 4) Neighborhood street and debris in New Orleans' Lower Ninth Ward, 10/24/05

The Superdome in New Orleans was designated as a shelter of last resort. Louisiana state officials told us that its use as a shelter was intended only for citizens who had special needs and were medically unable to evacuate the city prior to Katrina's landfall. After the levees breached, additional victims began appearing at the Superdome, the Convention Center, and other locations around the city.

Prior to landfall, FEMA pre-staged five trucks of water and two trucks of MREs at the Superdome. In addition, we were told, a few trucks of commodities were delivered to the Superdome after landfall. However, the unexpected large number of evacuees arriving at the Superdome and other locations within the city was not anticipated nor adequately planned for by state and local authorities. The limited commodities quickly became depleted, people with special needs were not addressed, various stages of civil unrest ensued, and FEMA responders pulled out of the Superdome until order and security could be restored.

Under mission assignments from FEMA, the Departments of Defense and Transportation provided support for the evacuation of victims from New Orleans. Over four days beginning August 31, 2005, more than 22,000

evacuees were transported from the Superdome, the Convention Center, and other locations in the city to shelters in Texas and other states.

FEMA officials experienced difficulty establishing joint, integrated operations with Louisiana's emergency management personnel. Limited space at Louisiana's EOC prevented some FEMA and state personnel from co-locating, and FEMA established an interim operating facility at a separate location where most FEMA personnel operated until the JFO was established. FEMA's FCO and Louisiana's State Coordinating Officer did not establish joint operational objectives and priorities until September 11, 2005. In addition, Louisiana's limited number of trained emergency managers impacted the integration of FEMA with state and local counterparts.

New Orleans: A Uniquely Vulnerable City

Because the greater New Orleans metropolitan area sits in the tidal lowlands of Lake Pontchartrain and is generally bordered on its southern side by the Mississippi River, its near sea level elevation makes it uniquely susceptible to flooding. Levees and floodwalls built around the city were expected to greatly reduce the threat of flooding from hurricane-induced storm surges, waves, and rainfalls. However, the levees kept natural silt deposits from the Mississippi River from replenishing the delta, causing Louisiana's coastal wetlands to wash away and the city of New Orleans to sink even deeper, which when combined with rising sea levels, increased the region's vulnerability to flooding.

New Orleans' location also creates unique evacuation issues. For example, only two main highways provide evacuation routes inland and out of the New Orleans area; one route leads through Mississippi. Should both Mississippi and Louisiana need to evacuate simultaneously, significant congestion problems would occur, and shelters in Mississippi would become overwhelmed in trying to care for evacuees from two states. While Louisiana and Mississippi had an agreement in place to convert all traffic lanes to a northbound direction on specified evacuation routes, the plan's effectiveness was dependent on Louisiana beginning to evacuate a day before Mississippi. Both states began evacuating on the same day prior to Hurricane Katrina's landfall.

## Initial Recovery

FEMA's primary programs to assist individuals and states recover from the effects of a disaster are the Individual and Public Assistance programs.

For Hurricane Katrina, an individual or household could receive a maximum of $26,200 of Individual and Household Program (IHP) assistance from FEMA. IHP has two major components: housing assistance and other needs assistance.[8] Housing assistance is 100 percent federally funded and administered and provides assistance for temporary rental lodging, home repairs, and home replacement. Other needs assistance is a cost-shared partnership between FEMA and the states. It assists with the reimbursement of medical and dental costs, funeral and burial costs, transportation, and personal property items. As of September 30, 2005, FEMA had received 1,557,937 registrations for IHP assistance from residents of the three affected states. It made 1,380,564 applicant referrals for assistance under the housing assistance component and awarded $2,401,735,486. It also made 784,887 referrals under the other needs assistance component and awarded $68,793,970.

FEMA's Public Assistance program provides supplemental federal disaster grants for the repair, replacement, or restoration of disaster-damaged, publicly owned facilities and the facilities of certain private non-profit organizations.[9] The program reimburses eligible emergency related activities such as debris removal and emergency protective measures. As of October 1, 2005, FEMA had received a total of 430 projects and obligated more than $962 million to the three affected states.

## Framework for Federal Disaster Response

The terrorist attacks of September 11, 2001, resulted in substantial changes to how the federal government prepares for, responds to, and recovers from natural disasters. The *Homeland Security Act of 2002*[10] created DHS and realigned FEMA, previously independent, as part of the department within the

---

[8] See Appendix B for a description of FEMA's Individual Assistance Programs.
[9] See Appendix C for a description of FEMA's Public Assistance Program and eligible work under the program.
[10] P.L. 107-296 (November 25, 2002).

Emergency Preparedness and Response Directorate.[11] FEMA gained some capabilities, such as the NDMS from the Department of Health and Human Services, but did not retain others, such as the administration of selected preparedness grants. Further, the *Homeland Security Act* and Homeland Security Presidential Directive-5, "Management of Domestic Incidents," called for a new, unified, all-hazards framework and plan for responding to terrorism, natural disasters, special events, and emergencies.

As required by Homeland Security Presidential Directive-5, DHS developed NIMS as a framework to help emergency managers and responders from different jurisdictions and disciplines work together more effectively during disasters and emergencies. To the extent possible, disasters are managed locally; as most responses do not exceed the capabilities of the local government. However, some incidents require multiple jurisdictions or levels of government to provide an adequate response. To aid cooperation, the NIMS standardizes the concepts and processes for incident command and management, resource management, training and certification, and communications. Appendix D provides greater detail on the command and management aspects of NIMS, including Incident Command Structure. DHS published NIMS on March 1, 2004. Jurisdictions are required to comply fully with its guidelines by September 30, 2006, in order to remain eligible for DHS preparedness grants.

DHS designed the NRP to fit the NIMS framework and to synthesize previous federal plans including those for natural hazards, biological and radiological hazards, and terrorist events.[12] The NRP addresses events such as Hurricane Katrina – events that involve multiple geographic areas; cause casualties and displace persons; disrupt critical infrastructure and essential public services;

---

[11] A DHS reorganization that took effect after Hurricane Katrina eliminated the Emergency Preparedness & Response Directorate, organizationally placing FEMA directly under the DHS Secretary. The reorganization created a DHS Preparedness Directorate distinct from FEMA, which absorbed some of FEMA's Preparedness Division. These and other organizational changes were planned as part of the Second Stage Review. The review examined elements of DHS in order to recommend ways to better manage risk in terms of threat, vulnerability, and consequence; prioritize policies and operational missions according to this risk-based approach; and establish a series of preventive and protective steps that would increase security at multiple levels. The results of the review were announced on July 13, 2005, and were reflected in the *Department of Homeland Security Appropriations Act, 2006*, P.L. No. 109-90 (October 18, 2005). FEMA's Preparedness Division remained intact at the time of Hurricane Katrina, and is therefore referred to as such in this report.

[12] The NRP superseded the Initial National Response Plan, the Federal Response Plan, the Domestic Terrorism Concept of Operations Plan, and the Federal Radiological Emergency Response Plan on April 14, 2005. The NRP outlines the authorities and responsibilities for coordinating domestic incident management based on 70 statutes, regulations, executive orders, and presidential directives.

Disaster Welfare Information

The intent of the Disaster Welfare Information concept of operations for ESF-6 is to collect and provide information on individuals who live in an affected disaster area to family members and friends outside of the disaster area. The Red Cross, in collaboration with Microsoft Corporation, established the Family Links Website to provide this service. It includes records from the previous Red Cross Family Links website and many other websites. Family Links attempts to provide the most current and accurate information available. However, due to the relocation and movement of Hurricane Katrina evacuees, location information on the website was not always complete, current, or correct. Evacuees were able to provide information on their location, and concerned family members and friends could search the list of those already registered. This website was available online for evacuee searches through February 28, 2006. As of September 25, 2005, 276,439 evacuees had reported their status and 28,237 concerned family members and friends had registered on line. In addition, calls were made to the Red Cross' 1-877-LOVED1s number concerning the status of 167,682 names.

**FEMA's Efforts to Identify and Establish Housing Resources**

FEMA's overall housing strategy for Hurricane Katrina was to use shelters, hotels, motels, cruise ships, tents, applicants staying with friends and relatives, tarping of roofs so applicants could remain in place where possible, and other available housing resources to address immediate housing needs of disaster victims. It would then transition victims to travel trailers and mobile homes, and finally to apartments to address longer-term housing needs. Some components of FEMA's housing strategy were not well planned or coordinated, while other components to address and support the housing needs of displaced disaster victims were not as effective or efficient as FEMA had anticipated.

Because of Hurricane Katrina's devastation, FEMA made immediate housing decisions. For example, on August 31, 2005, it procured 20,000 manufactured housing units, for approximately $1 billion, to address anticipated housing needs and planned to purchase over 100,000 units. It also purchased 30 mobile Disaster Recovery Centers to compliment its existing inventory and 30 office trailers for use in implementing Individual Assistance field operations. By September 4, 2005, FEMA continued to assess available housing resources such as hotels, properties owned by federal agencies, and vacant lots at mobile home parks as well as the potential use of recently closed nursing homes and

commercial cruise ships as options for temporary housing resources. The Individual Assistance Technical Assistance Contactors were en route to Mississippi and two cruise ships, with a capacity to hold 5,200 passengers, were to arrive the following day in Galveston, Texas for use as interim housing for the elderly, persons with special needs, and families with small children who were in shelters.

By September 5, 2005, FEMA's Individual Assistance management cell had developed a strategy to address the immediate needs of disaster victims that included: deploying teams to register evacuees, activating expedited assistance, facilitating relocation of evacuees, using alternative means to verify program eligibility, and establishing a gradual transition to its standard operating procedures and program implementation once immediate needs had been addressed. By September 7, 2005, the U.S. Department of Agriculture was working with the private sector to identify privately owned rental resources nationwide that could be used to house displaced victims. In addition, the department made 3,000 vacant housing units in the affected region available and 30,000 housing units available nationwide. FEMA and the department also coordinated with faith-based organizations to match displaced residents with those housing resources. FEMA officials expressed to us the integral role the Department of Agriculture played in identifying and providing housing resources to displaced victims.

The Corporation for National and Community Service and FEMA worked to develop a plan for the most effective use of national service resources in assisting disaster victims. Also, FEMA made requests of the Corporation for National and Community Service to help augment its Disaster Recovery Centers staff by providing casework, outreach, and other administrative services throughout the impacted area.

### Travel Trailers and Mobile Homes

By September 6, 2005, FEMA's primary ESF-6 issues in Louisiana were to stabilize shelter operations and food distribution; in Mississippi it was supporting shelters and the relocation of evacuees as well as identifying emergency group sites for travel trailers; and in Alabama it was coordinating the installation of travel trailers on individual private sites and developing group sites. FEMA's Housing Area Command stated it had identified sufficient sites to address the housing needs of displaced Alabama residents and would redirect resources to address the more affected states of Mississippi and Louisiana. In all states, 3,500 manufactured homes and 5,200 travel

trailers, in various stages of production, were purchased from dealer lots. FEMA also began moving approximately 5,000 units from its inventory to staging areas, had 60,000 travel trailers being produced at the rate of approximately 120 per day, and awarded a contract for 1,500 modular structures.

By September 10, 2005, staff at FEMA registration call centers began recording information for mobile and travel trailer pre-placement interviews. The first family to be placed in a travel trailer occurred 12 days after the disaster was declared. By September 12, 2005, construction started on a 500-unit travel trailer site in Louisiana with an accelerated occupancy schedule of one week. Within the three affected states, there were 903 travel trailers occupied by September 15, 2005; an additional 1,306 (both travel trailers and mobile homes) were ready for occupancy; and 4,798 were positioned in various staging areas. The following day, only 910 units were occupied: 491 in Louisiana; 107 in Mississippi; and 312 in Alabama.

In Louisiana, the Housing Area Command was working to have 2,405 housing units ready for occupancy by the week of September 17, 2005, and an additional 3,408 units ready the following week. Construction began on a site in Baton Rouge on September 19, 2005, to place 580 travel trailers. The anticipated completion date for this project was September 29, 2005. As of October 1, 2005, only 4,128 units were occupied: 667 in Louisiana, 2,929 in Mississippi, and 532 in Alabama; and, an additional 5,446 units were ready for occupancy. FEMA, in working with its contractors, experienced difficulty in identifying acceptable sites to place units and was slow in identifying applicants to occupy units.[33] For example, several sites initially identified by FEMA in Louisiana to place multiple units were not well coordinated with local officials, and local officials determined placement was not acceptable. Also, in several states there were issues with leasing existing parks. FEMA can pay only for minimum improvements and some parks required major renovations before being considered suitable for unit placement.

<u>Cruise Ships</u>

In Alabama, FEMA's use of a cruise ship was primarily focused on housing evacuees from Mississippi who were 65 years and older and in good health, single parents with children, and homeless individuals living in adverse

---

[33] The DHS OIG Office of Gulf Coast Hurricane Oversight is conducting ongoing work regarding housing issues.

conditions.[34] By September 5, 2005, the ship had a lower than anticipated occupancy rate. The lower rate may have been caused by the availability of shelters and tents in the area. Evacuees could commute more easily to work and were closer to their damaged homes by residing in these facilities rather than on the ship, as living on the ship meant a 45-minute commute for some. By September 19, 2005, FEMA was working to move more displaced persons on to the ship. In addition, it had been trying to move the ship from Mobile, Alabama to Pascagoula, Mississippi, as this would place the evacuees closer to home and work, but FEMA received resistance from Mobile's port director because a docking fee would be lost should the ship move. As of September 30, 2005, the number of Mississippi residents aboard the cruise ship was 1,111, although the ship was capable of accommodating 1,848 passengers. The ship moved to Pascagoula, Mississippi on October 29, 2005.

On September 10, 2005, two cruise ships arrived in New Orleans, Louisiana, to provide housing to disaster victims, with a primary focus to house disaster victims and first responders or personnel essential to the recovery effort. On September 12, 2005, FEMA met with New Orleans and parish officials regarding the use of the ships for evacuees but the most critical need expressed to FEMA was to house essential city personnel, such as police and firefighters. Boarding began that day. The two ships provided immediate housing for essential emergency workers, created a base camp from which to operate, and also housed disaster victims. An additional 262 boarded on September 15, 2005, and pre-registration for an additional 866 began, bringing the total cruise ship occupants registered to approximately 3,366, with 1,430 on board. By September 18, 2005, a third cruise ship was in the New Orleans area and the total boarded population was 2,105. By October 1, 2005, 4,658 passengers were on all four ships in New Orleans and Chalmette, Louisiana, and Mobile, Alabama.

During the first 30 days after the disaster, all four ships were only about 35 percent occupied. At that occupancy rate, the cost to FEMA was approximately $3,363 per week, per evacuee, which was about three times higher than the existing per diem rate for federal government workers for the area. As of October 31, 2005, however, the occupancy increased significantly. In New Orleans, one ship with a capacity of 2,634 passengers had 2,118 on board (80 percent occupied); another ship with the same

---

[34] DHS OIG Office of Audits conducted an initial review of the decision to use cruise ships to provide housing for victims and first responders. DHS OIG, Memorandum to AIG for Hurricane Katrina Oversight, *Hurricane Katrina Cruise Ships*, November 4, 2005.

capacity had 2,374 passengers (90 percent occupied); and the additional ship
with a capacity of 1,020 had 862 passengers (85 percent occupied). The last
of the four ships, with a capacity of 1,848 had 1,367 passengers (74 percent
occupied).

The use of high occupancy ships as an alternative resource to provide housing
for disaster victims and personnel essential to the response and recovery effort
was effective, but not necessarily efficient. For example, in Alabama, because
other immediate housing resources were available in the affected area and
provided evacuees with better accessibility to their work and damaged
residences, the initial efficiency of the ships as an alternative housing resource
was diminished. Future planning for the use of this resource should be
focused more on accommodating the needs of disaster victims and should take
into account other available housing resources to avoid potential duplication.

**Recommendation #5:** We recommend that the Director of the Federal
Emergency Management Agency develop alternative housing resource plans
that include a review of all identified resources within an affected area,
determine whether potential duplication exists, and efficiently deliver services
that are accommodating to the disaster victim.

## Coordination with Voluntary Organizations

Voluntary organizations are FEMA's partners in the provision of many mass
care services for ESF-6, such as feeding and the bulk distribution of items to
victims of disaster, and offer assistance that FEMA is unable to provide. For
example, by September 23, 2005, both the Red Cross and the Salvation Army
had provided over 16 million meals, 12 million snacks, established over 780
fixed feeding sites, and used over 520 mobile feeding units in response to
Hurricane Katrina.[35] In addition, over 158,000 clean up kits and 287,000
comforts kits had been distributed.[36]

FEMA worked with the Department of Agriculture and ESF-6 to keep
sufficient food supplied to shelters. In Louisiana, a mass feeding coordination
group was established that included: ESF-11, FEMA, VOAD, the Red Cross,
the Salvation Army, the Southern Baptist Convention, and the state. The
group reviewed and updated resources, parish feeding needs, and meal
capacity for hurricane victims and evacuees. By September 30, 2005, six

---

[35] ESF-6, data as of September 23, 2005.
[36] ESF-6, data as of September 26, 2005.

November 16, 2005, FEMA had made over four million referrals to other assistance providers.[90]

## Housing Area Command Concept

The introduction of a contractor, and lessons learned from the 2004 hurricane season, led to a concept of operations to more effectively coordinate and manage housing operations. A Housing Area Command concept was established in 2005 to respond to large-scale disasters where housing needs were significant and spread over multiple states. The Housing Area Command would coordinate and oversee housing solutions throughout the affected area where several JFOs had been established. However, the Housing Area Command would not be an operational element as the housing operation functions remain within the JFO.[91] The Technical Assistance Contractor would be involved in staffing housing operations and implementing housing solutions such as emergency group shelters, manufactured housing, travel trailers, and modular construction.

In response to the Hurricane Dennis disasters declared on July 10, 2005, FEMA used a Technical Assistance Contractor to implement its direct housing assistance mission for the first time. The contractor would be responsible for mobile home and travel trailer site assessment, transportation, installation, and group site coordination. However, Hurricane Dennis' predicted devastation was not realized and the contractor did not become fully operational.

On August 22, 2005, a disaster was declared in Wyoming as a result of damages sustained from a tornado. This event provided FEMA with an opportunity to implement contractor support in a controlled disaster environment, as the needs and damage were specific and defined within a determined geographic area. For example, 278 individuals had applied for disaster assistance, approximately $413,689 in assistance was approved, and 52 families were housed in mobile homes as of October 17, 2005.

One week after the Wyoming declaration, Hurricane Katrina made landfall. Because a contractor was already engaged, FEMA was able to mobilize it and make preparations for direct housing needs in the Gulf Coast region. Prior to Hurricane Katrina, however, FEMA had only used a Technical Assistance

---

[90] See Appendix O for FEMA's referrals to other assistance providers.
[91] Housing Area Command, draft Concept of Operations Plan, July 29, 2005.

Contractor once, and its tasking for the provision of direct housing assistance was minimal.

## Initial Implementation Lacked Coordination with Oversight and Operational Elements

Prior to landfall, FEMA's Housing Area Command was activated and began planning contingencies for potential shortfalls in sheltering and housing. FEMA activated four technical assistance contactors to support its temporary housing mission, procured 20,000 manufactured housing units, and planned to purchase over 100,000 units. All contractors reported directly to the Housing Area Command. Eighteen days after landfall, only 910 units were occupied by disaster victims, 1,306 additional units were ready for occupancy, and 4,798 additional units were positioned in various staging areas. As of October 1, 2005, 4,128 units were occupied: 667 in Louisiana, 2,929 in Mississippi, and 532 in Alabama.

FEMA field and headquarters staff told us the use of the Technical Assistance Contractors provides FEMA with new resources to enhance its housing mission and the use of contractors should continue in response to future disasters. FEMA staff also told us they experienced great difficulty in obtaining information on the contractors' progress to establish direct housing resources. Significant communication impediments resulted from having all technical assistance contactors report only to and obtain tasking only from the Housing Area Command, without appropriate coordination and input from field operational elements, such as the JFOs.

A week before landfall, FEMA was in the process of conducting briefings and soliciting proposals from contractors to perform its direct housing mission. However, FEMA had not adequately defined the roles, responsibilities, expectation for deliverables, or performance measures for contractors. In response to Hurricane Katrina, the Housing Area Command awarded several contracts; however the terms, conditions, and deliverables of the contracts were unknown and not appropriately coordinated with FEMA personnel responsible for contract oversight. For example, FEMA officials said the Housing Area Command tasked the Technical Assistance Contractors without the knowledge of the Contracting Officer's Technical Representative or the JFO, creating a tasking for work without proper documentation.

A lack of coordination and communication also existed between the Housing Area Command and operational elements in all affected areas. Some FEMA

## FEMA's Individual Assistance Programs

FEMA may provide financial assistance and, if necessary, direct services to eligible individuals and households who, as a direct result of a major disaster, have necessary expenses and serious needs and are unable to meet such expenses or needs through other means.[137]  FEMA is authorized to administer four distinct Individual Assistance programs in response to disasters declared by the President:  (1) Individuals and Households; (2) Crisis Counseling; (3) Unemployment Assistance; and, (4) Legal Services.

### Individuals and Households Program

The Individuals and Households Program is FEMA's primary mechanism to assist individuals and households recover from damages or losses sustained as a direct result of a disaster, when losses are not covered by insurance and property has been damaged or destroyed.  Applicants must meet specific eligibility criteria to qualify for assistance, and the program is designed to assist only with critical expenses that cannot be covered by other means, such as loans from the SBA.  It does not cover all losses from damage to homes, personal property, and household items that result from a disaster and is not intended to restore damaged property to its condition before a disaster.

For Hurricane Katrina, an individual or household could receive a maximum of $26,200 of IHP assistance, with repair and replacement assistance capped at $5,200 and $10,500 respectively.[138]  Rental assistance was provided to renters whose homes were uninhabitable due to the disaster and to homeowners until more permanent repairs could be made to their primary residence.  The combination of all forms of IHP financial assistance cannot exceed the maximum grant of $26,200.

When housing resources are not available within an affected area to accommodate the needs of disaster victims, FEMA is authorized to provide direct federal assistance, such as mobile homes and travel trailers, for up to 18 months following a declared major disaster.  Using lessons learned from previous disasters, FEMA developed a concept of operations and procurement strategy in August 2004 to address direct housing needs associated with multiple disasters.  The strategy would allow FEMA to:  (1) establish a temporary housing surge capacity of 2,500 units; (2) establish primary

---

[137] 42 U.S.C. §5174 and 44 CFR Part 206, Subparts D and F.
[138] The maximum grant amount is adjusted annually to reflect changes in the Consumer Price Index.  See 69 FR 61515 (October 19, 2004).

contractors for installation, maintenance, site inspection of units, and deactivation; (3) develop uniform procurement specifications for temporary housing units; (4) develop a statement of work for refurbishing and deploying units in storage; (5) establish staffing requirements to support field and storage operations; and, (6) support shelter operations.

While supporting 2004 disasters, FEMA began to establish additional capability and capacity in its housing unit inventory, and formalized the use of Technical Assistance Contractors.[139] As of May 2005, FEMA's existing housing inventory was approximately 4,832 mobile homes and travel trailer units.[140]

As of November 16, 2005, FEMA had received 1,680,516 registrations for IHP assistance from residents of the three affected states, determined that 984,432 (or 59 percent) were eligible, and approved approximately $3.5 billion in assistance.[141] IHP has two major components: Housing Assistance and Other Needs Assistance. Housing Assistance is 100 percent federally funded and administered and provides assistance for temporary rental assistance, home repairs, and home replacement. Other Needs Assistance is a cost-shared partnership between FEMA and the states.[142] As part of this partnership, FEMA and the states engage in annual coordination efforts to determine how Other Needs Assistance will be administered for the coming year. States may choose to administer the component or to have FEMA administer it. For Hurricane Katrina, all three states elected to have FEMA administer the program; however, each retained influence over the program by determining which household items were eligible for reimbursement.

Contract inspectors, under FEMA's Inspections Services Branch, verify personal and real property losses and damages of individuals and households while FEMA personnel verify reported disaster-related deaths as well as medical and dental needs for the IHP. Inspectors visit homes of applicants to verify disaster-related damages to real and personal property. Findings are uploaded into FEMA's processing system, the National Emergency Management Information System, which in most disasters automatically determines eligibility in over 90 percent of cases. FEMA caseworkers process all cases that cannot be processed automatically to determine eligibility for IHP.

---

[139] Approximately 20,000 temporary housing units were assigned to the field to support FEMA's Disaster Housing Operations mission in 2004.
[140] FEMA Direct Housing 2005 Pre-Hurricane Season Briefing, May 26, 2005.
[141] FEMA Data Status Report as of November 16, 2005.
[142] Under the other needs assistance component of the IHP, a state must provide a 25 percent match.

Appendix B
FEMA's Individual Assistance Programs

## Crisis Counseling

FEMA provides financial assistance for professional counseling services to relieve mental health problems caused or aggravated by a disaster or its aftermath. Under the Crisis Counseling Assistance and Training Program (Crisis Counseling Program), FEMA provides assistance to states through the Immediate Services Program and Regular Services Program. The Immediate Services Program affords funding for screening or diagnostic techniques that can be applied to meet mental health needs immediately following the disaster. The duration of the Immediate Services Program is 60 days from the declaration date, with a potential extension of 30 days or more. The Regular Services Program generally expands upon the existing Immediate Services Program to identify and reach impacted populations more effectively. The Regular Services Program funds up to nine months of services from the date of the award notice, with potential extensions of up to three months, contingent upon the ongoing need. For catastrophic disasters, the Regular Services Program often is extended beyond three months.

The Crisis Counseling Program is intended to supplement – not supplant – a state's mental health program. The program is 100 percent FEMA-funded. The Center for Mental Health Services under the U.S. Department of Health and Human Services consults with state officials and helps ensure that appropriate services are provided. Historically, only states receiving a disaster declaration were eligible to receive funding for the Crisis Counseling Program. Recognizing the special needs resulting from Hurricane Katrina and the unprecedented relocation of disaster victims, FEMA, in consultation with the Center for Mental Health Services, allowed states to apply for funding without a disaster declaration; funding was provided through the existing declarations. FEMA monitored applicant registrations from all states and when a threshold of 150 was exceeded, FEMA coordinated with the Center for Mental Health Services and contacted each State Emergency Management Agency and State Mental Health Authority to invite applications for the Immediate Services Program. As of November 17, 2005, 35 states and the District of Columbia had met the threshold. The Immediate Services Program was initiated for 33 states and the District of Columbia; FEMA approved $24,423,729 to fund the program.[143]

---

[143] FEMA Recovery Division, November 17, 2005. Two states decided not to initiate the Immediate Services Program because needs were met through existing resources.

Appendix B
FEMA's Individual Assistance Programs

## Disaster Unemployment Assistance

The Stafford Act authorizes FEMA to provide assistance to any unemployed individual whose employment or self-employment was interrupted as a direct result of a declared disaster and who is not eligible for regular state Unemployment Insurance or other supplemental income. The Disaster Unemployment Assistance program provides financial assistance until applicants resume work or their customary employment, traditionally up to 26 weeks. Disaster Unemployment Assistance was not designed as an income replacement program. The amount of assistance is authorized by a state's regular unemployment program. Through a delegation of authority by FEMA, the U.S. Department of Labor oversees and coordinates the program. The program is 100 percent FEMA-funded and administered by state agencies responsible for providing unemployment services and insurance.

Eligible applicants received at least the minimum benefit rate, estimated at $86 per week in Mississippi, $89 per week in Alabama, and $98 per week in Louisiana at the time of Hurricane Katrina.[144] Applicants qualifying for the maximum amount could receive $210, $220, or $258 per week respectively. Gaps may exist between an applicant's day-to-day living expenses and Disaster Unemployment Assistance benefit amounts, which could be considerably less than the weekly pay of most. As of September 30, 2005, approximately 67,769 claims were received in all three affected states and 66,806 claims (98.6 percent) were approved, totaling $18,982,565.[145]

| Hurricane Katrina Disaster Unemployment Assistance as of 09/30/05 | | | |
|---|---|---|---|
| State | DUA Claims | DUA Eligible | First Payments | Amount Compensated |
| Louisiana | 55,950 | 55,950 | 55,950 | $15,121,129 |
| Mississippi | 10,285 | 10,238 | 8,409 | $3,788,968 |
| Alabama | 1,534 | 618 | 333 | $72,468 |
| Total | 67,769 | 66,806 | 64,692 | $18,982,565 |

After Hurricanes Charley, Frances, Ivan, and Jeanne struck Florida during the 2004 hurricane season, approximately 14,761 claims were received during a comparable period and 12,698 claims (86 percent) were approved, totaling $2,489,619.

---

[144] The minimum Disaster Unemployment Assistance benefit amount is based on 50 percent of the average weekly benefit amount for regular unemployment insurance within a state. For Hurricane Katrina, the initial minimum amount was based upon the average of total unemployment benefits from 04/01/04 to 03/31/05 within each state.
[145] U.S. Department of Labor, data as of September 30, 2005.

Appendix B
FEMA's Individual Assistance Programs

| Disaster Unemployment Assistance for 2004 Hurricanes[146] | | | |
|---|---|---|---|
| Hurricane | DUA Claims | DUA Eligible | First Payments | Amount Compensated |
| Charley | 3,283 | 3,244 | 1,770 | $779,529 |
| Frances | 6,888 | 5,984 | 2,946 | $1,197,349 |
| Ivan | 2,811 | 2,654 | 1,242 | $352,292 |
| Jeanne | 1,779 | 816 | 342 | $160,449 |
| Total | 14,761 | 12,698 | 6,300 | $2,489,619 |

The higher than average approval rate in the Hurricane Katrina affected states may have occurred as a result of the Department of Labor's decision to extend the 21-day filing period for applicants to provide supporting documentation to 90 days. Due to the widespread evacuation and limited access to appropriate documentation, many workers would likely be unable to present documentation within 21 days. As of November 17, 2005, FEMA had obligated the following funds to three affected states for Disaster Unemployment Assistance: Louisiana – $94,402,248; Mississippi – $28,400,000; and Alabama – $1,150,000.

## Legal Services

FEMA is authorized by the Stafford Act to provide legal services to help low-income victims with issues such as landlord and tenant relationships, employment, immigration, and insurance provisions. Assistance is also available to address issues with credit and bankruptcy, will validity, trusts and estates, real property, and powers of attorney. The Disaster Legal Services program was implemented for Hurricane Katrina with eligibility criteria used in previous disasters. Attorneys work *pro bono* and FEMA reimburses eligible administrative costs through the Young Lawyers Division of the American Bar Association. FEMA believes the program is cost effective because the work is *pro bono* and many lawyers, firms, and organizations donate legal services outside FEMA programs. Within the affected areas, the program was implemented as intended. As of November 23, 2005, legal services assistance totaled $21,400.[147]

## Coordination with Voluntary Organizations

FEMA is authorized by the Stafford Act to coordinate the activities of voluntary organizations to the extent that they "agree to cooperate under this advice or direction." Under ESF-6, FEMA exercised its lead responsibility in

---

[146] U.S. Department of Labor, Hurricane Charley data as of September 30, 2004; Hurricane Frances data as of October 31, 2004; Hurricane Ivan data as of October 31, 2004; and, Hurricane Jeanne data as of November 30, 2004.
[147] FEMA Recovery Division, November 23, 2005.

Appendix B
FEMA's Individual Assistance Programs

an environment of consensus that allowed the Voluntary Organizations Active
in Disaster to carry out their missions in a coordinated manner. VOADs
typically provide immediate emergency assistance to victims while FEMA
addresses shorter and longer-term recovery needs. Near the end of the
recovery phase, VOADs address victims' unmet needs.

FEMA is required by the Stafford Act to ensure that benefits are not
duplicated among disaster programs, insurance benefits, or any other types of
disaster assistance. FEMA traditionally has not considered the assistance of
voluntary organizations to be duplicative of its assistance programs. For
example, the Red Cross provides food and water to affected communities
through fixed feeding sites and emergency response vehicles that canvass
neighborhoods with hot meals, water, and snacks. These programs are
separate from any assistance provided by FEMA and other government
agencies.

### Small Business Administration Loans Address More Permanent Needs

While disaster assistance is available through FEMA's IHP, most federal
disaster assistance is provided through loans from SBA, which must be repaid.
IHP applicants may be required to first seek assistance from SBA before being
considered for certain types of IHP assistance.

SBA reviews the income-to-debt ratio of those who apply to determine
whether applicants are eligible for loans. Based on this information, SBA
determines whether the applicant has the resources to repay the loan.
Applicants who cannot afford a loan or do not qualify will be referred back to
FEMA to determine eligibility for IHP grant assistance.

Under SBA's Disaster Loan Program, homeowners may apply for real
property loans of up to $200,000 to repair or restore a primary residence
damaged in a declared disaster area to its pre-disaster condition, but may not
use the funds to upgrade homes or make additions. The loan amount depends
on the cost of repairing or replacing the home, less any insurance settlements
or grants. Any proceeds from insurance coverage on the property or home
would be deducted from the total damage to the property to determine the
eligible loan amount.

In addition, renters and homeowners may borrow up to $40,000 in personal
property loans to repair or replace clothing, furniture, cars, or appliances
damaged or destroyed in the disaster. For applicants unable to obtain credit
elsewhere the interest rate does not exceed four percent. For those who can

Appendix B
FEMA's Individual Assistance Programs

obtain credit elsewhere, the interest rate is no more than eight percent.  The
SBA offers terms of up to 30 years for repayment, which are determined on a
case-by-case basis.  For Hurricane Katrina, SBA provided the following data
on loan applications for homeowners and renters.

| SBA Disaster Loan Information by State through of 09/30/05 | | | | |
| --- | --- | --- | --- | --- |
| State | Cumulative FEMA Referrals to SBA | Applications Received by SBA | Applications Approved by SBA | Amount Approved by SBA |
| Mississippi | 290,286 | 10,089 | 95 | $7,661,700 |
| Alabama | 57,876 | 1,791 | 43 | $1,497,100 |
| Louisiana | 636,050 | 17,195 | 136 | $5,336,100 |

By September 30, 2005, SBA had approved 274 applications for $14,494,900
in Mississippi, Alabama, and Louisiana; and, by November 23, 2005, had
approved 8,979 applications for $633,146,300 within the affected states.

## FEMA's Public Assistance Program

FEMA's Public Assistance program provides supplemental federal disaster grants for the repair, replacement, reconstruction, or restoration of disaster-damaged, publicly owned facilities and the facilities of certain private non-profit organizations, and for the reimbursement of eligible emergency related activities such as debris removal and emergency protective measures.[148]  The federal share of assistance is at least 75 percent of the eligible cost.  The state determines how the non-federal share (up to 25 percent) is split among applicants; eligible applicants are state agencies, local governments, certain private non-profit organizations, and federally recognized Indian tribes or tribal organizations.[149]

To be eligible for assistance, the work must be required as the result of the disaster, be located within the designated disaster area, and be the legal responsibility of an eligible applicant.  Eligible work is categorized as either "emergency work" or "permanent work."  Emergency work is defined as work that must be done immediately to save lives and protect improved property and public health and safety, or to avert or lessen the threat of a major disaster.[150]

### Emergency Work

Category A:  Debris Removal
Clearance of trees and woody debris; building wreckage; sand, mud, silt, and gravel; vehicles; and other disaster-related material deposited on public and, in very limited cases, private property

Category B:  Emergency Protective Measures
Measures taken before, during, and after a disaster to save lives, protect public health and safety, and to protect improved public and private property

---

[148] Stafford Act, P.L. 93-288, as amended, Sections 403, 406, 407, 418, and 419.
[149] Certain eligible private non-profit organization facilities must be open to the public and perform essential services of a governmental nature.
[150] 44 CFR §206.201(b)

Appendix C
FEMA's Public Assistance Program and Eligible Work

## Permanent Work

Category C: Roads and Bridges
Repair of roads, bridges, and associated features, such as shoulders, ditches, culverts, lighting and signs

Category D: Water Control Facilities
Repair of irrigation systems, drainage channels, and pumping facilities. Repair of levees, dams, and flood control channels fall under Category D, but the eligibility of these facilities is restricted (Permanent repair of Flood Control Works is the responsibility of the U.S. Army Corps of Engineers and the Natural Resources Conservation Service)

Category E: Buildings and Equipment
Repair or replacement of buildings, including their contents and systems; heavy equipment; and vehicles

Category F: Utilities
Repair of water treatment and delivery systems; power generation facilities and distribution lines; and sewage collection and treatment facilities

Category G: Parks, Recreational Facilities, and Other Items
Repair and restoration of parks, playgrounds, pools, cemeteries, and beaches. Also, this category is used for any work or facility that cannot be characterized adequately by Categories A-F

The state serves as the grant administrator for all funds provided under the program and also is considered the grantee, which then provides funds to subgrantees, such as local governments.[151] Small projects, estimated to be less than $51,000, are funded based on an approved project cost estimate. Large projects, estimated to be $51,000 or more, are funded based upon the actual cost of the project. The state or grantee may provide advances or progress payments to subgrantees on large projects as work is completed.

The President's pre-landfall emergency declarations in Louisiana, Mississippi, and Alabama authorized federal funds under the Public Assistance program for debris removal and emergency protective measures (Categories A and B) at 75 percent. Major disaster declarations in all three states on

---

[151]Federally recognized tribes and tribal organizations may also be their own grantee if approved by FEMA.

Appendix C
FEMA's Public Assistance Program and Eligible Work

---

August 29, 2005, authorized FEMA to provide Public Assistance for debris removal and emergency protective measures at 100 percent federal share for a period of up to 72 hours.  However, the President amended the cost sharing arrangements two days later and authorized funding for debris removal and emergency protective measures at 100 percent of total eligible costs for a 60-day period, retroactive to August 29, 2005.  The vast majority of work requested by the affected states as of October 1, 2005, was for emergency protective measures and debris removal.  As of October 1, 2005, FEMA had received a total of 430 projects and obligated more than $962 million.