UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | |
|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION | MDL NO. 1873<br><br>SECTION "N-4"<br>JUDGE ENGELHARDT<br>MAG. JUDGE ROBY |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEFENDANT UNITED STATES OF AMERICA'S EXHIBITS
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FTCA AND
CONTRACT CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION

U.S. EXHIBIT NO. 9

HUD-000001



49 FR 31996-01                                                                                        Page 1
49 FR 31996-01, 1984 WL 106759 (F.R.)
(Cite as: 49 FR 31996)

RULES and REGULATIONS
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
Office of the Assistant Secretary for Housing--Federal Housing Commissioner
24 CFR Part 3280
[Docket No. R-84-1068; FR 1637]
Manufactured Home Construction and Safety Standards
Thursday, August 9, 1984

*31996 AGENCY: Office of the Assistant Secretary for Housing--Federal Housing Commissioner, HUD.

ACTION: Final rule.

SUMMARY: HUD is revising its Manufactured Home Construction and Safety Standards to improve the safety and quality of manufactured homes. Standards limiting permissible amounts of formaldehyde emissions from plywood and particleboard are being added. Standards relating to fire safety are being revised.

EFFECTIVE DATE: October 29, 1984.

FOR FURTHER INFORMATION CONTACT: Richard A. Mendlen, Manufactured Housing Standards Division, Office of Manufactured Housing and Regulatory Functions, Room 9154, Department of Housing and Urban Development, 451 Seventh Street, S.W., Washington, D.C. 20410. Telephone (202) 755-5798. (This is not a toll-free number.)

SUPPLEMENTARY INFORMATION:

I. Background

A. General

The National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. 5401-5427 (Act), authorizes the Secretary of Housing and Urban Development (Secretary) to establish and amend the Manufactured Home Construction and Safety Standards, 24 CFR Part 3280 (Standards). The stated purposes of the Act are "to reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from manufactured home accidents and to improve the quality and durability of manufactured homes." Changes to the fire safety standards and the addition of standards on formaldehyde emissions from

HUD-000002

49 FR 31996-01                                                                                              Page 2
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

particleboard and plywood are being adopted in accordance with these purposes. In accordance with the Act, these rules will take effect 180 days from the date of this publication. 42 U.S.C. 5403(c).

B. *Advance Notices of Proposed Rulemaking*

The Department published an Advance Notice of Proposed Rulemaking (ANPR) on June 7, 1979, soliciting comment concerning revision of the Standards (44 FR 32711). Generally, the industry responded that cost effectiveness and clarity of objectives should be the Department's primary concerns in evaluating the need for change in the safety and durability areas cited in the ANPR. Consumers and associated groups expressed the view that manufactured homes lacked the qualities necessary to make the homes as durable and safe as they desire.

Another ANPR, directed solely at the issue of formaldehyde emissions in manufactured homes, was published on August 28, 1981. That ANPR solicited comment on 21 different aspects of formaldehyde outgassing, including adverse health effects, test methods, and the economic impact of regulation. Comments were submitted by individual consumers and consumer organizations, manufactured home builders, wood product producers, trade associations, government agencies, universities, and the chemical industry. The major issues raised in the comments included the need for a formaldehyde standard and whether a standard should regulate the amount of formaldehyde in the total home environment or the amount emitted from the major sources of formaldehyde in the home. Other issues addressed in the comments included the adverse health effects associated with exposure to formaldehyde, sensitization, test methods, regulatory alternatives, and warning notices.

C. *Proposed Rule*

On August 16, 1983, the Department published a proposed rule revising all Subparts of the Standards (48 FR 37136). The comment period was held open until 30 days after a Cost Impact Analysis was made available for public inspection. On March 9, 1984, a Notice of the availability of the Coast Impact Analysis was published (49 FR 8946). Accordingly, the comment period closed on April 9, 1984. The Department received 253 comments, many of them quite extensive. To expedite the implementation of those standards which would have the greatest effect on public health and safety, the Department determined that the regulations concerning fire safety and formaldehyde should be separated from the other proposed revisions and published for effect as soon as possible. The comments on the fire safety and formaldehyde standards are discussed below. The Department is continuing its review of the remaining comments and will take appropriate action on the other proposed standards when the analysis of the comments is complete.

D. *The National Manufactured Home Advisory Council*

The Act provides for a National Manufactured Home Advisory Council comprised of 24 members divided equally among the industry, government agencies, and consumer

49 FR 31996-01                                                                    Page 3
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

groups. The Act directs the Secretary to consult with the Advisory Council, to the extent feasible, before establishing, amending, or revoking any Standard (42 U.S.C. 5404).

In September 1983, the Council was convened to review the proposed revisions which had been published in August. Subcommittees of the Council met in workshop sessions for three days and then presented reports which were voted upon by the full Council. Several changes were made to the rule based upon the Council's recommendations. Copies of the Advisory Council Subcommittee reports are part of the Department's rulemaking record and are available for public inspection.

II. Formaldehyde Regulation

A. *General*

The Department has concluded that a Federal Standard designed to limit formaldehyde emissions in manufactured homes should be adopted. The formaldehyde rule is a product standard which limits the level of formaldehyde emitted from particleboard floor decking and cabinetry and from interior plywood installed in manufactured homes. The rule requires that formaldehyde emissions not exceed 0.2 parts per million (ppm) from plywood and 0.3 ppm from particleboard as measured by a specified air chamber test. Generally, manufactured home manufacturers must use only particleboard and plywood that comply with these emission standards and are certified as meeting the standards.

B. *Regulatory Alternatives*

There were a substantial number of comments concerning whether the HUD formaldehyde standard should limit formaldehyde emissions from specific products installed in the home (product standard) or the overall amount of formaldehyde in the home environment (ambient standard). In choosing a product standard, the Department considered effectiveness, quality control, and ease of enforcement.

*31997 1. Ambient Standard

Many commenters, especially State agencies, endorsed the use of an ambient standard that would limit the level of formaldehyde in the home despite variations in temperature, humidity, ventilation, and living habits. These sources stated that an ambient standard would ensure the maintenance of a safe level of formaldehyde in the home by limiting outgassing from all sources of formaldehyde used in the home's construction. Some of the commenters expressed concern that a product standard would protect home manufacturers from claims regarding homes that have high levels of formaldehyde but that are built with products certified as meeting a product standard. Other commenters indicated that a product standard would unfairly single out the wood products industry, which is not responsible for the ultimate construction of the home.

HUD-000004

49 FR 31996-01                                                                   Page 4
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

According to some of these commenters, an ambient standard would not be difficult to enforce. They stated that there are ambient test methods available which are accurate and inexpensive. One such method cited was a formaldehyde dosimeter used by several States and Canada. Proper ambient test procedures, stated these sources, can eliminate homeowner contribution and compensate for differences in temperature and humidity. Some suggested that, to enforce the standard, ambient testing could be done on prototype or randomly selected homes.

Of those commenters urging the adoption of an ambient standard, levels from 0.1 ppm to 0.4 ppm were suggested. Many commenters indicated that a 0.4 ppm standard could be met using currently available technology. Some sources recommended that a 0.4 ppm standard be adopted now and that lower levels be designated to take effect over the next few years, thus gradually phasing in a 0.1 ppm standard. Others argued that, to protect the health of manufactured home occupants, no greater than a 0.1 ppm standard should be adopted. (Health effects associated with formaldehyde exposure are discussed below.)

Finally, several commenters suggested that an ambient standard could be used in conjunction with a product standard. These commenters stated that an end result specification is necessary as a cross-check to any product standard.

2. Product Standard

Many commenters, especially those from the manufactured home industry, endorsed the use of a product standard. These commenters cited the unreliability of ambient measurements because of differences in temperature, humidity, ventilation, and lifestyle of the home occupants. Consumers, they said, could bring other formaldehyde contributors into the home over which the manufacturer has no control. Several of these sources also cited the Department's research study conducted by Clayton Environmental Consultants, the National Particleboard Association, and the Hardwood Plywood Manufacturers Association ("Evaluation of the Relationship Between Formaldehyde Emissions From Particleboard Mobile Home Decking and Hardwood Plywood Wall Paneling in Experimental Mobile Homes" (March 1982)). This study determined that a wood product standard can effectively reduce the amount of formaldehyde in the home environment. Finally, these commenters also stated that ambient test methods are more costly and less reliable than test methods.

3. Selection of a Product Standard

The Department has decided to adopt product standards. The Clayton study cited above establishes that a product standard can be effective and that product test values reasonably correlate to formaldehyde levels in homes. Products can be tested easily under standardized conditions, which will avoid the problem of compensating for variations in home temperature and humidity levels. Also, a product standard has the advantage of allowing for early detection of a potential formaldehyde problem. Unlike the violation of an ambient standard, which can be

HUD-000005

49 FR 31996-01                                                                                          Page 5
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

established only after a manufactured home has been completely assembled, violation of a wood product standard can be discovered before the wood is shipped by its supplier or installed in a home. Therefore, based on its effectiveness, the availability of reliable test methods, and the potential to prevent formaldehyde problems before the homes are sold, the Department has concluded that a product standard is appropriate.

The standards will cover particleboard and plywood, two of the major emitters of formaldehyde in manufactured homes. HUD's objective in implementing these standards is to reduce the level of formaldehyde within the home environment. It is HUD's intention that these standards preempt State and local formaldehyde standards in accordance with the Act (42 U.S.C. 5403(d)).

*C. The Adopted Product Standards (§ 3280.309(a))*

The formaldehyde standards will limit emissions from plywood and particleboard produced with resins or surface finishes containing formaldehyde. The standards do not apply to wood products that cannot be characterized as plywood or particleboard, most notably medium density fiberboard (MDF). Rulemaking is being initiated to determine the extent to which MDF and similar products contribute to formaldehyde levels in manufactured homes and how these products should be regulated, if at all.

1. Plywood Standard

The proposed rule would have prohibited the use of plywood that emits more than 0.2 ppm formaldehyde when tested in a large air chamber in manufactured homes. A significant number of commenters from the wood products industry urged that the permissible limit be raised from 0.2 to 0.25 ppm. These commenters said that 0.25 ppm reflects current technology and provides a sufficiently wide margin to meet the Department's anticipated ambient result. (See Targeted Ambient Level, below.) Further, they said that a 0.2 ppm standard is too restrictive because it would require too much costly retesting under the testing protocol proposed. Several of these commenters stated that an appropriate means of changing the proposed plywood standard to 0.25 ppm and of regulating formaldehyde in general would be to incorporate by reference the Hardwood Plywood Manufacturers Association's voluntary standard.

Other representatives from both the wood products and manufactured home industries supported the 0.2 ppm level and said that it is being met at this time. A major manufacturer of manufactured homes stated that it was certain, based on information obtained from its wood product suppliers, that the proposed level was being achieved. One commenter stated that plywood that emits at only 0.15 ppm formaldehyde is being produced.

A number of consumers and academic sources stated that it was imperative that the plywood standard be lowered. These commenters expressed the opinion that the in-

49 FR 31996-01                                                                                           Page 6
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

dustry could produce plywood that would emit at levels below 0.2 ppm and stated that a lower standard is necessary to protect the health of manufactured home occupants.

The Department has decided to adopt a 0.2 ppm plywood standard. The 0.2 ppm standard is reasonable, can be met *31998 consistently in production, and gives a margin for error in achieving the 0.4 ppm targeted ambient level in the home. The Department does not have adequate information or data upon which to base a decision to lower the plywood standard below 0.2 ppm. The proposed testing procedures have been revised to avoid the high cost of retesting that may be necessary to meet the 0.2 ppm standard. (See Testing Requirements, below.)

2. Particleboard Standard

The proposed rule would have prohibited the use of particleboard in manufactured homes that emits more than 0.3 ppm formaldehyde when tested in a large air chamber. Virtually all of the industry representatives who commented on the particleboard standard approved the 0.3 ppm level. Generally, these commenters stated that the technology to consistently produce particleboard that meets this standard is currently available. Recently, the National Particleboard Association (NPA) adopted a voluntary standard of 0.3 ppm. According to the NPA, major producers of particleboard already comply with the 0.3 ppm standard.

The response from consumers and several other sources on the particleboard standard was much like the response to the plywood standard. Basically, these commenters objected to the 0.3 ppm level as being too high. Some consumers and representatives from the wood products industry stated that the industry could produce lower-emitting particleboard at this time. A few consumers felt that urea-formaldehyde-based particleboard was so significant an emitter that it should be banned from use in manufactured homes.

The Department has decided to adopt a 0.3 ppm particleboard standard. This level was endorsed by the Advisory Council when it met in September 1983. Further, this standard can consistently be met in the production of particleboard. Finally, the Department does not have sufficient verifiable information or data to justify lowering the particleboard standard below this level.

3. Phenol-Formaldehyde Resin Exemption

The proposed formaldehyde standard would have covered all particleboard and plywood which contain formaldehyde.

Most of the plywood and particleboard used in manufactured homes is produced with urea-formaldehyde resins. Manufacturers of phenol-formaldehyde-based wood products, which are used in some manufactured homes, objected to the application of the standard to their materials. They submitted information demonstrating that phenol-formaldehyde resin is much more stable than the urea-based resins and

HUD-000007

49 FR 31996-01                                                                                         Page 7
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

that products made with phenol-based resins emit formaldehyde at a much lower rate. The phenol-based products emit such small quantities of formaldehyde that the standards for both plywood and particleboard are met easily. Thus, requiring that these products be tested and certified is not necessary.

Therefore, the Department has decided to exempt products that are formulated exclusively with phenol-formaldehyde resins and surface finishes from the testing and certification provision of the rule.

4. Medium Density Fiberboard (MDF)

The proposed rule did not specifically mention medium density fiberboard or any other formaldehyde-based wood product except plywood and particleboard.

There was some confusion expressed in the comments as to precisely which wood products were to be covered by the proposed rule. One manufacturer of wood products stated that the terms "plywood" and "particleboard" are generic and include medium density fiberboard and other wood products. Other industry sources simply questioned the coverage of the rule and requested clarification. Still other commenters assumed that MDF was not covered and recommended that HUD initiate rulemaking on this product.

The proposed rule would have covered all forms of plywood and particleboard including waferboard, flakeboard, and chipboard. MDF is a product which is not generally accepted by the industry as either plywood or particleboard. Since the publication of the proposed rule, the Department has learned that MDF is used in manufactured homes, particularly in cabinetry, and that it is a high emitter of formaldehyde unless properly sealed. When used unsealed in a manufactured home, MDF could be a major contributor to the home's overall formaldehyde level. Therefore, the Department is preparing an Advance Notice of Proposed Rulemaking (ANPR) on MDF and any other formaldehyde-emitting wood products which are used in manufactured homes and which were not covered by the proposed rule. The ANPR will solicit comment on the identity of such products, the extent to which they emit formaldehyde, and how they could be regulated.

*D. Targeted Ambient Level*

The Department has concluded that an indoor ambient formaldehyde level of 0.4 ppm provides reasonable protection to manufactured home occupants. The Department has determined that the plywood and particleboard standards will result in indoor ambient formaldehyde levels of not greater than 0.4 ppm when: (1) The indoor temperature does not exceed 77 F; (2) the indoor relative humidity level does not exceed 50%; (3) the home's ventilation rate is at least 0.5 air change per hour (ACH); and (4) there are no other major emitters of formaldehyde, such as MDF, installed in the home.

1. Home Conditions

49 FR 31996-01 Page 8
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

There was a considerable amount of disagreement in the comments concerning how often the 0.4 ppm level would be exceeded in the home. Many commenters stated that, given the conditions which must exist to achieve a 0.4 ppm ambient level, it is likely that homes constructed with plywood and particleboard that meet the standard will, at times, exceed 0.4 ppm. Some of these commenters said that the 0.4 ppm target would be exceeded quite often, especially in the summer months. One source expressed the opinion that, even if the stated environmental conditions are met, the ambient level in the home will be 0.5 ppm. Still other commenters said that the proposed product standards leave an adequate margin to achieve 0.4 ppm in the home, even if there are other sources of formaldehyde present or if the air exchange rate is less than 0.5 ACH.

(a) Temperature and humidity conditions. There was general agreement in the comments that increases in temperature and humidity increase formaldehyde emission rates. This was of particular concern to commenters from the southern States. They stated that 77 F and 50% relative humidity are exceeded often in their States. A major consumer organization reported that these temperature and humidity conditions would be exceeded most often in States with the highest manufactured home populations, citing Florida, Texas, and California specifically. One State claimed that the Department was ignoring its statutory mandate by not considering the geographical location of the regulated homes in developing the formaldehyde rule. (See 42 U.S.C. 5403(f)(3).)

The Department realizes that the selected temperature and humidity conditions will not be met in all homes at all times. These conditions are *31999 reasonable, however, and do reflect typical living conditions. The Department does not have sufficient data at this time to substantiate that there is a particular problem in the southern part of the country. Once the formaldehyde rule takes effect, the Department will monitor homes and evaluate complaints to determine whether there is a greater problem in the South and to assess the effectiveness of the standards generally. Further, the health notice which must be posted in all manufactured homes specifically warns purchasers about the effects of heat and humidity on formaldehyde emissions. (See Air Quality Notice, below.)

(b) Ventilation. Other commenters concentrated more on the 0.5 ACH condition. The comments demonstrated that, while not as significant as temperature and humidity, reduced air changes also raise the level of formaldehyde in the home. According to some sources, the 0.4 ppm level will not be achieved unless ventilation also is controlled. These commenters stated that the average air exchange rate in manufactured homes is 0.3 ACH with the heating/cooling system operating. One source said that in the spring and fall, when no such system is used, air changes can fall to 0.1 and 0.2 ACH.

The Department does not have adequate information about the effect of ventilation on air quality to require mandatory air change requirements. However, HUD does recognize that, generally, better ventilation results in reduced formaldehyde

49 FR 31996-01                                                                Page 9
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

levels. Therefore, the Department has decided to require that a ventilation improvement option be offered with each manufactured home. (See Ventilation and Other Options, below.)

(c) Other sources of formaldehyde. There was some concern expressed in the comments about the introduction of sources of formaldehyde other than plywood and particleboard into the home by either the manufacturer or purchaser. One commenter said that other formaldehyde contributors typically raise the indoor level to over 0.7 ppm. Another commenter stated that the formaldehyde-emitting products brought into the home by the occupants are not a significant problem. This source relied on a widely recognized theory that the highest emitter present in the home is the most significant determinant of the home's overall formaldehyde level and concluded that it is usually the manufacturer who installs the highest formaldehyde emitters in the home.

A related concern expressed in the comments is that the installation of unusually large amounts of plywood and particleboard in the home could cause the ambient response to be higher than 0.4 ppm. According to these sources, by increasing the loading rates of these products in the home, a manufacturer can push the home's formaldehyde level beyond 0.4 ppm but still be in compliance with the HUD standard. One commenter suggested that, to address this problem, the Department regulate the loading rate of plywood and particleboard in manufactured homes.

The Department believes that the product standards of 0.2 ppm and 0.3 ppm for plywood and particleboard, respectively, will themselves, under test conditions, result in emissions of sufficiently less than 0.4 ppm to allow for a certain amount of formaldehyde contribution from other sources. Therefore, even if carpets, drapes, or furniture which contain formaldehyde are installed in the home, the Department believes that the 0.4 ppm target will not be exceeded if the requisite temperature, humidity, and ventilation conditions exist. However, the Department realizes that levels higher than 0.4 ppm will result when other major emitters of formaldehyde that are not covered by the rule, such as MDF, are used in the home. For this reason, HUD is initiating rulemaking to identify these products and to determine how they should be regulated. (See Medium Density Fiberboard, above.) Further, the Department believes that the loading rates of particleboard and plywood do not typically vary enough to affect formaldehyde levels significantly. Again, the margin for error allowed by the product standards is sufficient to permit loading rates greater than usual.

2. Health Effects

There was considerable disagreement in the comments regarding the adequacy of 0.4 ppm to protect manufactured home occupants from discomfort and from acute and chronic health effects. Some commenters stated generally that this level is too high to protect home occupants' health. Others said that there is ample medical and scientific evidence to support the 0.4 ppm level. Several commented that the

49 FR 31996-01  
49 FR 31996-01, 1984 WL 106759 (F.R.)  
**(Cite as: 49 FR 31996)**

Page 10

target 0.4 ppm level is obsolete, pointing out that the Department's product standards do not reduce levels below those voluntarily achieved by the industry.

HUD believes that the product standards will result in a 0.4 ppm indoor level under the specified conditions and that this level, given economic considerations, is reasonable. The Department realizes that this targeted level will not be achieved at all times. However, the currently available medical and scientific evidence does not adequately establish the effect on health benefits of a level below 0.4 ppm. In any event, it is not possible to implement a formaldehyde standard that will protect the entire population.

(a) Acute health effects and threshold levels. The extent, intensity, and duration of symptoms caused by exposure to formaldehyde vary, depending on the individual and the level of formaldehyde in the home. Common complaints include eye, nose, and throat irritation, persistent cough, skin irritation, nausea, headache, dizziness, and respiratory distress. The symptoms usually diminish or disappear when the individual leaves the home.

Several commenters stated that the 0.4 ppm target ambient level is too high to protect the majority of manufactured home occupants from odor and irritation. Consumers wrote letters relating their personal experiences with formaldehyde, in some cases attaching letters from physicians and results of tests measuring the levels of formaldehyde in their homes. These letters chronicled the occurrence of acute symptoms at levels as low as 0.15 ppm. A comment from one State agency reported that the agency receives many complaints from people in homes where formaldehyde levels were measured between 0.1 ppm and 0.4 ppm. Another State agency submitted the results of a study it funded that preliminarily analyzed acute symptomatology and found no association with formaldehyde concentrations in indoor air.

Other commenters submitted evidence showing varying degrees of functional disturbance and response to low levels of formaldehyde. Several commenters stated that 20% of the population will experience slight irritation at levels from 0.05 ppm to 0.5 ppm. A major industry trade association said that the irritation threshold is between 0.8 ppm to 1.2 ppm and that the general population will not experience adverse effects from exposure to 0.5 ppm formaldehyde.

The Department has concluded that there is insufficient medical and scientific evidence to substantiate more than minimal health benefits when formaldehyde levels are reduced below 0.4 ppm. Studies of human exposure to formaldehyde still do not conclusively establish whether there is a level of formaldehyde that will not cause acute symptoms. Therefore, HUD continues to rely on the Committee on Toxicology's conclusion that there is no population threshold for the irritant effect of formaldehyde in humans (Report, Committee on Toxicology, National Academy of Sciences, Formaldehyde--*32000 An Assessment of Its Health Effects, NTIS Doc. No. ADA-08785g, April 1980).

49 FR 31996-01                                                                          Page 11
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

(b) Sensitization and Susceptible Groups. Exposure to formaldehyde gas causes sensitization in certain individuals. Sensitized persons exhibit allergic reactions when exposed to formaldehyde. Also, certain groups are more susceptible to the acute irritant effects of formaldehyde than the general population. These include persons with a history of allergies or respiratory diseases, elderly persons, and children, especially infants.

Commenters disagreed strongly as to whether formaldehyde gas is a sensitizer and, if so, how many people were likely to become sensitized. One commenter stated that sensitization can occur in 1-5% of the population; another maintained that there is little evidence that exposure to formaldehyde produces any pulmonary sensitization reaction. A few consumers submitted histories of their own or their families' sensitization, including confirmation from their doctors.

Virtually all commenters agreed, however, that certain populations seem to be particularly susceptible to formaldehyde's irritant effects. Several commenters emphasized that the groups that are most sensitive to formaldehyde are those who are most likely to stay in the home for extended periods of time, such as the elderly, the infirm, and infants. One source said that a 0.4 ppm ambient air level will expose these persons to a cumulative formaldehyde exposure in excess of the National Institute for Occupational Safety and Health's recommended occupational exposure of 1.0 ppm per 40-week. Another commenter said that a State has estimated that nearly two million high-risk, particularly susceptible persons now live in manufactured homes.

The Department realizes that there are people who will react adversely to extremely low levels of formaldehyde and who are unusually sensitive to formaldehyde's irritant effects. The Committee on Aldehydes of the National Academy of Sciences stated that 10-12% of the population may have some degree of airway hyperactivity which will result in a more severe response to the effects of formaldehyde exposure. (Formaldehyde and Other Aldehydes, Committee on Aldehydes, Board on Toxicology and Environmental Health Hazards, Assembly of Life Sciences, National Research Council, 1981.) To alert those people who may be sensitive to formaldehyde, the Department is requiring that a health notice be posted in every manufactured home and placed in each home's consumer manual. (See Air Quality Notice, below.)

(c) Chronic health effects and carcinogenicity. Respiratory illnesses reported to be caused by chronic formaldehyde exposure include difficulty in breathing and other asthma-like symptoms, persistent cough, and chest congestion. Further, statistically significant incidences of nasal cancer (squamous cell carcinoma) occured in rats exposed to 15.0 ppm formaldehyde gas (Final Report: A Chronic Inhalation of Toxicology Study on Rats and Mice Exposed to Formaldehyde, CIIT/Batelle Laboratories, 1981).

In terms of chronic health effects, the comments primarily focused on the carci-

49 FR 31996-01                                                                Page 12
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

nogenic risk posed by exposure to formaldehyde. Generally, the Commenters were divided into those who believe that formaldehyde should be presumed to be a human carcinogen and those who maintain that there are sufficient human epidemiological and animal studies to conclude that formaldehyde presents a cancer risk to humans. A State Attorney General criticized the Department for failing to take a position on this issue, citing a report from the Congressional Office of Technology Assessment which concluded that, in the absence of epidemiological data concerning a substance's effect on humans, bioassays on carcinogenicity in animals should be used to identify potential human carcinogens.

Among those commenters who presumed that formaldehyde is a human carcinogen, there was disagreement regarding the extent of the risk presented by exposure to a level of 0.4 ppm. Some commenters said that, using the highest level of exposure in the CIIT study, 15.0 ppm, and applying a safety factor of 100, there is a significant level of risk at 0.15 ppm. These commenters asserted that this method of calculation is conservative because, when no threshold is known, a 1000-fold or greater safety factor often is used. This conclusion was used as a basis for recommending that the appropriate ambient formaldehyde level is no more than 0.1 ppm. Other commenters said that the animal and human studies performed to date establish that the cancer risk at 0.4 ppm formaldehyde is virtually nonexistent. A large compilation of studies and reports was submitted by the Formaldehyde Institute showing that there is no basis, at this time, for treating formaldehyde as a human carcinogen.

On May 23, 1984, the Environmental Protection Agency designated formaldehyde for expedited regulatory action under section 4(f) of the Toxic Substances Control Act (TSCA) (49 FR 21870). In the publication, EPA stated that there may be a reasonable basis to conclude that formaldehyde presents a significant risk of widespread harm to humans from cancer. The EPA determined that there are animal data on formaldehyde that can be used to assess the human cancer risk. One of the exposure categories to which the section 4(f) decision applies is the exposure associated with residence in manufactured homes.

In addition, the Executive Office of the President, Office of Science and Technology Policy, issued a draft document containing guidelines to be used by regulatory agencies in assessing cancer risks from chemicals (49 FR 21594) (May 22, 1984). The Department has reviewed these guidelines and will evaluate them further when the final report is issued.

The Department will monitor the EPA's regulatory progress closely. In its May 23rd publication, the EPA clearly stated that its decision does not mean that the agency believes that formaldehyde presents short-term emergency risks. Further, the EPA stated that "information available to the Agency does not indicate that people should substantially change their habits if they are being exposed to some level of formaldehyde." Therefore, the Department does not believe it would be appropriate to change the formaldehyde product standards in response to the section

49 FR 31996-01  Page 13
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

4(f) designation. The Department will reevaluate the formaldehyde standards when the EPA reaches a final regulatory decision and may change the standards if the basis for EPA's findings show that these standards are not adequate to protect the health of manufactured home occupants.

Because the scientific community has not resolved the human carcinogenic issue, HUD has not taken a position as to whether formaldehyde causes cancer in humans. (See the discussion of this issue in the proposed rule (48 FR 37136, 37138).)

*E. Ventilation and Other Options (§ 3280.710(g))*

The Department received many comments which suggested methods by which formaldehyde levels could be reduced. Some suggested methods of reducing the amount of formaldehyde emitted from the wood products so that the product standards could be met or bettered. These methods included using sealants, such as varnishes, paints, sealers, and liquid fire-retarding saturants; coating systems, including water-based finishing coats; scavengers, *32001 such as wax, ammonia, and other chemicals; low mole resin (low formaldehyde-to-urea ratio); pretreatment of particles; and covers or veneers.

Other commenters suggested ways to reduce the overall formaldehyde level in the home. These methods included substituting other products for urea-formaldehyde-based particleboard and plywood, venting wall and floor cavities, specifying a maximum loading ratio for particleboard and plywood, and installing vapor barriers.

The Department has limited information on most of the methods of reducing formaldehyde levels suggested in the comments. The commenters did not provide and the Department does not have sufficient data on the cost or effectiveness of any methods to mandate the use of any one in particular. The Department will seek further comment on methods of reducing formaldehyde levels in the home in the ANPR which is being prepared. (See Medium Density Fiberboard, above.) A significant number of comments recommended ventilation as an effective means of reducing indoor formaldehyde levels. Many of these were comments which generally stated that better ventilation will lead to improved air quality. Other commenters expressed opinions on specific methods of ventilating the home. One source stated that the addition of outside air will provide a modest reduction in short-term formaldehyde levels but that there is a more significant impact on long-term levels.

The Department agrees that, generally, improved ventilation reduces the amount of formaldehyde in the home. Therefore, the Department is requiring that manufacturers offer a ventilation improvement option with each home. The fresh air inlet which was proposed to be installed in the heating system will be one of the acceptable options which a manufacturer may offer. As alternatives to the fresh air inlet, a manufacturer may offer a passive, mechanical, or a combination of

49 FR 31996-01                                                                                    Page 14
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

mechanical and passive ventilation system. The ventilation system offered must
improve the ventilation in the manufacturered home's occupied living space. A
device which is designed to vent the ceiling cavity alone, for example, is not ac-
ceptable.

A ventilation improvement sheet must be given to every purchaser before a sales
agreement is signed. The information sheet will contain a description of the
available ventilation option(s) and, for mechanical systems, the ventilation capa-
city expressed in air changes per hour or cubic feet per minute.

*F. Testing Requirements (§§ 3280.308(b) and 3280.406)*

The testing requirements contained in the proposed rule generated a lot of com-
ment, particularly from industry sources. The proposed rule set forth a detailed
scheme for certifying wood products and for production testing using a specified
desiccator test and frequent air chamber retesting to maintain the certification.

1. Test Method

There was general support in the comments for the use of the large air chamber
test. Commenters agreed that the air chamber test can provide an excellent pre-
diction of actual formaldehyde levels in manufactured homes. Several commenters
did say, however, that testing wood under controlled conditions has little prac-
tical application to emissions in homes.

2. Certification Testing

Most commenters agreed that certification is appropriate and that the large air
chamber test is a reasonable test method upon which to rely. Certification will
take place on a plant-by-plant basis. Since the rule no longer specifies that
exceeding a desiccator test value will trigger an air chamber test, the certifica-
tion process does not mandate the performance of a desiccator test. Production
testing methods are to be determined by the certifying agency. (See Production
Testing, below.) However, air chamber testing must be conducted on a quarterly
basis, rather than semiannually as proposed.

Some commenters recommended that HUD incorporate by reference the air chamber
test developed by the Hardwood Plywood Manufacturers Association and the National
Particleboard Association, FTM-2-1983. These commenters stated that the industry
test includes provisions for prehandling of boards, background formaldehyde
levels, and sample spacing, and therefore is more complete than the proposed
test. They also preferred the industry's selection of a seven-day precondition-
ing period, in lieu of the two-day period proposed, and the 75 F plus or minus
2 chamber temperature as opposed to the 77 F plus or minus 2 proposed by HUD.

Other commenters addressed the conditions in the chamber selected by the Depart-
ment. Ventilation rate, temperature, and humidity were all criticized in the