inventions, proprietary rights, approvals and ratings to the extent assignable, and including but not limited to those listed on Schedule 1.2A(vii) attached hereto (collectively, the "Intellectual Property");

    (viii)  **Information Technology.** All computer software licenses, software documentation, back-up tapes of data and software, all personal computers, file servers, telecommunication software and hardware, information technology fire protection equipment, security software and systems, as set forth on Schedule 1.2A(viii).

    (ix)  **Prepaid Items and Deposits.** Except as described in Section 1.1A(iii) and 1.1B(iv), all prepaid items and deposits relating to the Business useful to Purchasers including, without limitation, those described on Schedule 1.2A(ix) attached hereto and all rental deposits under the Leases and utilities deposits (the "Prepaid Items and Deposits");

    (x)  **Business Records.** All lists of dealers, suppliers and customers served by Industries and SunRay, all records of accounts receivable and payable, all personnel records, written policies and procedures, and all other business records of Industries and SunRay related to the operation of the Business (the "Business Records"), provided, however, that Industries and SunRay shall have reasonable access (with assistance of Purchaser's employees) to such Business Records subsequent to Closing for accounting and income tax return purposes, and with respect to litigation and administration of Excluded Assets and Excluded Liabilities; and

    (xi)  **Miscellaneous.** All telephone numbers, post office boxes, website addresses, e-mail addresses, licenses and all governmental approvals and permits to the extent assignable and all other miscellaneous tangible and intangible rights, claims and assets.

  **B.**  **Assets of Enterprises:**

That certain real property, presently enclosed by fencing, and consisting of approximately 59 acres, more or less, and all building(s) thereon, and that certain parcel of real property proximal to the Industries plants, both as specifically described in Schedule 1.2B (collectively, the "Real Estate").

  1.3  **Assumed Liabilities.** Purchasers shall at the Closing, assume, and hold Industries and SunRay harmless from, only the following unpaid liabilities and obligations of Industries and SunRay (collectively, the "Assumed Liabilities"):

    A.  The unpaid liabilities included in the Seller's statement of assets to be sold and liabilities to be assumed dated as of the Closing Date(the "Closing Balance Sheet"), but only to the extent included therein; and

    B.  the Leases and Contracts; and

    C.  the open purchase orders and sales orders ("Open Orders") outstanding as of the close of business on the last business day immediately preceding the Closing

Date and executed in the ordinary course of business by Seller, a true and complete list of which Open Orders shall be supplied to Purchaser by Seller prior to Closing.

1.4     **Liabilities Not Assumed.** Other than the Assumed Liabilities, Purchasers shall not accept, assume, become or be liable for or subject to any liability, indebtedness, obligation or responsibility of Sellers or of any other person or entity in any way related to the ownership or operation, or both, of the Purchased Assets or the Business prior to the Closing Date, whether said liability, indebtedness, obligation or responsibility arises before or after the Closing. Without limiting the interpretation of this Section 1.4, Purchasers shall not assume any liability for income taxes of Sellers related to the within transaction, for retiree benefits or for franchise taxes, excise taxes, federal income taxes and state income taxes first due during or attributable to periods prior to Closing. It is expressly agreed, without limiting the effect of the preceding sentence, that Purchasers shall not be obligated to assume or become liable for, without Purchasers' express written consent, any of Sellers' liabilities, debts or commitments of any kind whatsoever, known or unknown, fixed or contingent, or, without limitation, liabilities for federal, state, local or foreign income or revenue or sales taxes on account of any transactions of Sellers, including the consummation of this Agreement, liabilities which relate to any product liability or warranty claim with respect to products sold by Industries or SunRay or sold after the Closing Date but produced prior to the Closing Date (notwithstanding the Purchasers' Limited Litigation Indemnity of Industries and SunRay pursuant to Section XIV), any obligation or liability (including, but not limited to, any audits, tax returns, or reports) for or arising out of any pension, profit sharing, retirement, health, life or other benefit plan, including, but not limited to, those listed on Schedule 3.20, sponsored by any Seller or the Business, or for any costs or expenses of the Sellers incurred in connection with or resulting from the transactions contemplated by this Agreement except to the extent contemplated by Section 15.5.

## Section II
## PURCHASE PRICE

2.1     **Purchase Price.** The Purchase Price for the Purchased Assets shall be Seventeen Million Six Hundred Thousand Dollars ($17,600,000) plus the assumption of the Assumed Liabilities, less the amount of the Sellers' expenses in connection with this Agreement pursuant to Sections VI, 9.6, 10.9 and 15.5 (collectively, the "Sellers' Transaction Expenses").

2.2     **Payment of Purchase Price**

    A.     **Assumption and Payment of Certain Liabilities.** At the Closing as part payment of the purchase price for the Purchased Assets, Purchaser shall assume and agree to pay, and hold Seller harmless from, the Assumed Liabilities. The following Assumed Liabilities will be paid and satisfied effective as of the Closing:

        (i)     that certain obligation to Maxine Giles in the amount of $241,151.00, net of $43,689.23 and any other amounts owed by Mrs. Giles to the Sellers; and

        (ii)    that certain obligation to Dorothy Neely in the amount of $416,152, net of $75,500 and any other amounts owed by Mrs. Neely to the Sellers.

    B.    **Cash.** Fifteen Million, Eight Hundred Forty Thousand Dollars ($15,840,000) of the Purchase Price, less the amount of Sellers' Transaction Expenses, shall be paid in cash. Seven Hundred Fifty Thousand Dollars ($750,000), plus an amount equal to the receivables, if any, owed to Industries at the close of the tenth business day before the Closing Date under those certain contracts listed and identified as items 1, 2 and 3 on Schedule 1.2A(vi) (the "FEMA Receivable"), shall be deposited into an escrow account (the "Escrow Account") established pursuant to an escrow agreement in the form attached hereto (the "Escrow Agreement"). The balance of the cash portion of the Purchase Price shall be paid by the Purchasers in cash at the Closing by bank wire transfer to the Sellers, allocated among the Sellers and/or their respective beneficial owners in such amounts as the Sellers shall direct by written instruction delivered to the Purchasers prior to the Closing Date.

    C.    **Shares.** The remaining One Million Seven Hundred Sixty Thousand Dollars ($1,760,000) of the Purchase Price shall be paid by the delivery of that amount in value of unregistered shares of the common stock, $.01 par value of Southern Energy Homes, Inc. (the "Shares"). The Shares shall be subject to the agreement set forth in Section 8.2. For the purpose of computing the number of Shares issuable to the Sellers, the Shares will be valued at the last reported sale price on the earlier to occur of (i) the tenth business day prior to the Closing Date (ii) or February 15, 2006. The Sellers have directed that all of the Shares shall be allocated and distributed to Alan C. Neely. All such Shares shall be subject to the agreements set forth in Section VIII of this Agreement.

2.3    **Allocation of Purchase Price.** The Purchase Price shall be apportioned among the properties, assets, contracts, and business being sold by Sellers to Purchasers as set out in Schedule 2.3.

2.4    **FEMA Receivable Settlement.** Within ten (10) business days after the 180th day following the Closing Date, the following actions shall occur:

    A.    Any portion of the FEMA Receivable that has not then been received by the Purchasers shall be paid from the Escrow Account to the Purchasers; and

    B.    All the Purchasers' right, title and interest in and to any such uncollected portion of the FEMA Receivable shall be assigned and conveyed to the Sellers.

2.5    **Additional Payment to Sellers.** Of the funds then remaining in the Escrow Account after the FEMA Receivable has been settled as set forth in Section 2.4 above, all funds in excess of $750,000 shall promptly be paid and distributed to the Sellers, and the remaining $750,000 shall continue subject to the terms of the Escrow Agreement until termination thereof.

### Section III
### REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchasers to enter into this Agreement and to consummate the transactions contemplated hereby, each Seller, and, as to Section 3.30, Alan C. Neely, separately and severally, and not jointly, hereby represents and warrants to Purchasers that each of the following representations and warranties set out in this Section III is true and correct in all material respects to the best of its knowledge and belief, and acknowledges that each of said representations and warranties has been relied upon by

6

Purchasers and is material to the Company's and the Purchasers' decision to enter into this Agreement and to consummate the transaction contemplated herein.

3.1     **Company Existence and Power.** Each of Industries and Enterprises is a corporation, and SunRay is a limited liability company, duly organized under the laws of the State of Tennessee, validly existing, and in good standing under the laws of the State of Tennessee; has the power to own, operate, and lease its properties as presently owned, operated, and leased and to carry on its business as now being conducted; is duly qualified to conduct business and is in good standing in each jurisdiction in which a failure to qualify would have a material adverse effect on the Business where such qualification is necessary under the applicable laws of such jurisdiction; and has the requisite power and authority to enter into and perform its obligations under this Agreement in accordance with its terms.

3.2     **Authority Relative to Agreement.** The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein have been duly and effectively authorized by all necessary company action, including approval by Industries' and Enterprises' shareholders and SunRay's Members. This Agreement, upon execution by the Seller, will constitute the legal, valid and binding obligation of Seller in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, or other laws affecting creditors' rights generally, and except as may be limited by general principles of equity.

3.3     **Effect of Agreement.** Except as set forth on Schedule 3.3 hereof, the execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated herein do not require the consent, waiver, approval, license or authorization of any person or public authorities and do not violate, in any respect, any provision of law applicable to Seller; do not conflict with or result in any breach of Seller's articles or bylaws, or articles of organization or operating agreement, or with or without the giving of notice and/or the passage of time, any mortgage, deed of trust, license, lease, indenture or other agreement or other instrument, or any order, judgment, or any other restriction of any kind or character, to which Seller is a party or any of Seller's property may be bound; do not give to others any right to terminate, or result in any termination of, any such instrument; do not result in termination of any provisions of any such instrument; and do not result in the creation of any lien, charge or encumbrance upon any of the property of Seller.

3.4     **Ownership of Seller.** There are no outstanding subscriptions, options, warrants, rights, convertible securities, or other agreements or commitments obligating Seller to issue additional shares of stock or membership interest. The names and addresses of each of the stockholders or members, the social security numbers or tax identification number of each such stockholder or member to whom Shares will be issued, and the ownership interest of Seller owned by each stockholder or member are as shown on Schedule 3.4.

3.5     **Operation of Business.** The Seller has substantially complied with all laws, statutes, ordinances, rules, regulations and orders of all governmental entities applicable to the operations of its business, including, without limiting the generality of the foregoing, Title VII of the Civil Rights of 1954, as amended ("Title VII"), the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), the Equal Pay Act of 1963, as amended ("EPA"), the National Labor Relations Act of 1935, as amended ("NLRA"), the Federal Employee Retirement Income Security Act, as amended ("ERISA"), the Immigration Act, the Federal Occupation Safety Health Act ("OSHA"), the Fair Labor Standards Act ("FSLA"), the Americans With Disabilities Act ("ADA"), the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), or applicable statutes, regulations, orders and restrictions relating to employment standards and controls. Except as disclosed on Schedule 3.5, no notice has been issued and to Seller's best knowledge and belief, no investigation or review is pending or threatened by any governmental entity

with respect to (i) any alleged violation by the Seller of any law, ordinance, rule, regulations, order, policy or guideline of any governmental entity, or (ii) any alleged failure to have all permits, certificates, licenses, approval and other authorizations required in connection with the operation of the Business.

3.6     **Financial Statements.** Sellers' Balance Sheet and operating statement as of the fiscal year ending December 31, 2005 are set out in Schedule 3.6. The Balance Sheet fairly presents the financial condition of the Sellers as of December 31, 2005 and the earnings statement for the period ending December 31, 2005, fairly presents the results of the operations of the Business of Sellers for the calendar year ending December 31, 2005. The said financial statements have been prepared on a modified cash basis and do not contain any untrue statements of material fact or omit to state any material fact necessary in order to make the statements contained in this paragraph or therein not misleading.

3.7     **Material Changes.** Since December 31, 2005, except as disclosed on Schedule 3.7 attached hereto, there has not been:

    A.     any material adverse change in the condition, financial or otherwise, of the Business of Seller (other than changes in the ordinary course of business, none of which has been materially adverse and which are not in the aggregate materially adverse);

    B.     damage, destruction or loss, whether or not covered by insurance, materially adversely affecting the Purchased Assets or the Business;

    C.     any increase in the compensation payable or to become payable by the Seller to any of its employees or agents employed in connection with the operation of the Business, or in any bonus payment or arrangement made to or with any thereof, or any material change in the terms of an employee benefit plan through amendment or otherwise;

    D.     any labor dispute with respect to or affecting the Business that would have a materially adverse effect upon the Business;

    E.     any distributions to stockholders or members paid or declared by Seller;

    F.     any merger or consolidation involving Seller, or any issuance or other transfer of membership interests or capital stock of Seller or of any options or warrants in respect thereof;

    G.     any disposition of the assets of Seller other than in the ordinary course of business; or

    H.     any change to accounting policies and procedures.

3.8     **Leases.** Seller has previously delivered to Purchaser true and correct copies of the Leases together with all amendments and notices relating thereto and which Leases are listed on Schedule 1.2A(v). The Leases listed on Schedule 1.2A(v) constitute all of the personal property leases to which Seller is a party as Lessor or Lessee. Such Leases remain in full force and effect, all rents and additional rents currently due on such Leases have been paid. No waivers, indulgences or postponements of Seller's obligations thereunder have been granted by any lessor, or of any lessor's obligations by Seller. There exists no event or occurrence, condition or act which, with the giving of notice, the lapse of time or the happening of any further event or condition would become a material default by Seller (or to the best of

Seller's knowledge, by any lessor) under such Leases. To the best knowledge and belief of Seller, provided that the lessor's consent, if necessary, is obtained, the consummation of the transactions contemplated herein in accordance with the terms hereof will not constitute a material default under any Lease.

3.9   **Title to Purchased Assets.** Seller has (or, with respect to Inventory delivered after the date hereof, will have on the effective date of the sale) possession (except for outside processing, if any) or control of the Purchased Assets, and Seller has or, at the time of Closing, will have good and marketable title to all of the Purchased Assets subject to no mortgage, pledge, lien, conditional sales agreement, encumbrance, security interest, charge, or claim, including without limitation any federal, state or municipal tax claim or lien against any of the Purchased Assets.

3.10   **Tools and Inventory Owned by Third Parties.** Set forth on Schedule 3.10 is a true and correct list of all tools, equipment, components, materials, inventory, and any other personal property in the Seller's possession and used in the Business owned by third parties (except as may be subject to Leases listed in Schedule 1.2A(v)), or subject to third parties' rights, including, by way of example but without limiting the generality of the foregoing, tools or equipment owned and provided by materials suppliers for the Seller's use in connection with such materials, or inventory or other goods held on approval, on sale or return, or under consignment or other arrangement providing for Seller's use or possession but not ownership.

3.11   **Condition of Equipment.** The Property and Plant and the Equipment that is presently being used in the operation of the Business has been inspected by Purchasers and Purchasers purchase such Equipment "as is, where is" without representation or warranty for merchantability or fitness for particular purpose.

3.12   **Contracts and Commitments.** Sellers have previously delivered to Purchaser true and correct copies of all of the Contracts, which constitute all of the material outstanding contracts, agreements, commitments or understandings (written or oral) to which Seller is a party relating to the operation of the Business and which Contracts are listed on Schedule 1.2A(vi). Neither Seller nor, any other party to any Contract or Open Order, is in material default under the terms of any Contract or Open Order other than as described in Schedule 3.12. Seller is not subject to nor a party to any mortgage, lien, lease, agreement, contract, instrument, order, judgment or decree or any other restriction of any kind or character which would hinder the continued operation of the Business by Purchasers after the Closing on substantially the same basis as theretofore operated, except those liens securing the Assumed Liabilities.

3.13   **All Assets.** The Purchased Assets together with the Real Estate constitute all the material properties of any nature with which Seller has conducted the Business for the twelve month period prior to the Closing Date, subject to sale of inventory and additions and deletions of other assets in the ordinary course of business. Industries represents and warrants that the Real Estate is all of the real estate occupied by Industries and used in its Business.

3.14   **Insurance.** Set forth on Schedule 3.14 attached hereto is a true and correct schedule of all policies of insurance on which Seller is named as an insured party, and said schedule includes the name of the insurer, the nature of the insurance coverage and the policy limits. The policies listed upon Schedule 3.14 are in full force and effect and all applicable premiums thereon have been paid in full through the dates indicated thereon. Such insurance is believed by Seller to be adequate in amount of coverage and risks insured against. Seller will continue to maintain the insurance coverage afforded by the policies listed on Schedule 3.14 in full force and effect up to and including the Closing Date.

3.15   **Judgments and Decrees.**  Seller is not subject to any order, judgment or decree which would prevent the consummation of any of the transactions contemplated hereunder or compliance by Seller with the terms, conditions and provisions hereof.

3.16   **Litigation and Administrative Proceedings.**  Except as set forth on Schedule 3.15 attached hereto, there are no actions, suits, or proceedings which have been served on Seller or, threatened against, at law or in equity, by or before any federal, state or municipal court or any other governmental department, commission, board, bureau, agency or instrumentality, or any arbitration or mediation forum. Seller is not subject to any liability by reason of a violation of any order, rule, or regulation of any federal, state, municipal or other governmental agency, department, commission, bureau, board or instrumentality to which Seller is subject. The language of this Section 3.16 shall apply, without limitation, to any and all actions or causes of action related directly or indirectly to the operations within the Real Estate.

3.17   **No Adverse Change.**  To the best knowledge and belief of Seller, there exists no event, condition or other circumstance that immediately, or with a lapse of time, will materially adversely affect the Business as conducted by Seller. Except as set forth on Schedule 3.17, Seller has no knowledge of any pending changes in governmental laws or regulations that would materially and adversely affect Seller's Business.

3.18   **Name, Trademarks and Trade Names, Licenses, Etc.**  To the best knowledge and belief of Seller, Seller owns or has adequate licenses or other rights to use its name and all trademarks, service marks, trade names, licenses, laboratory ratings and approvals, copyrights, patents, proprietary information, and designs either used in, or necessary for, the conduct of its Business; and all trademarks, service marks, trade names, licenses, laboratory ratings and approvals, copyrights, designs owned by or under license to Seller together with all pertinent information related thereto, including filing, registration and expiration dates, serial numbers, record owners and licenses and their essential terms are listed on Schedule 1.2A(vii) attached hereto. Seller has not interfered with, infringed upon, misappropriated, or otherwise come into conflict with any intellectual property rights of third parties, and has never received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that Seller must license or refrain from using any intellectual property rights of any third party). To Seller's best knowledge and belief, no third party has interfered with, infringed upon, misappropriated, or otherwise come into conflict with any intellectual property rights of Seller.

3.19   **Employment Agreements.**  Except as set forth in Schedule 3.19 hereto, Seller has no written union contracts, employment contracts, consulting agreements, indemnification agreements, severance agreements or any other binding agreements relating to the employment of any of its employees. Seller is not a party to any agency, consulting or other agreement with respect to consultants or agents, except as described on Schedule 3.19. Seller has performed the obligations required to be performed by it under, and has complied with the provisions of, all agreements set forth on such Schedule 3.19, and all such agreements are in full force and effect and constitute the valid and legally binding obligations of the parties thereto. Except as set forth in the instruments referred to in said Schedule 3.19 and except as may be required by applicable law, upon termination of the employment of any of said employees, neither Seller nor Purchaser will by reason of anything done prior to the Closing hereunder be liable to any of said employees for so-called severance pay or any other payments.

3.20   **Employee Benefit Plans.**  Schedule 3.20 contains a true and complete list of all employee benefit arrangements currently in effect covering employees of Seller. Other than as disclosed on Schedule 3.20 hereto, at no time prior to the date hereof has there been (and at no time from and after the date hereof through the Closing will there be) any pension, retirement, disability, medical, dental or other health plan, life insurance or other death benefit plan, profit sharing, deferred compensation, bonus

or other incentive plan, vacation benefit plan, severance plan, or other employee benefit plan or arrangement, including, without limitation, any pension plan ("Pension Plan") as defined in Section 3.2 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and any welfare plan ("Welfare Plan") as defined in Section 3(1) of ERISA, whether or not any of the foregoing is funded, and whether written or oral, (a) to which Seller is or was a party, or (b) with respect to which Seller has made any payments or contributions or may otherwise have any liability (including any such plan or arrangement formerly maintained by the Seller). No reportable Event (as described in Section 4043(b) of ERISA) has occurred with respect to any Pension Plan or Welfare Plan, and no event has occurred that would impose any liability on Seller or any Related Company (as defined in Section 414(c) of the Internal Revenue Code of 1986, as amended (the "Code")) under ERISA. Each Pension Plan and Welfare Plan is in material compliance, and has been administered materially in accordance with the applicable provisions of the Code and ERISA. Seller has made all payments due to be made to any Pension Plan or Welfare Plan.

3.21  Salaries, Wage Rates. Schedule 3.21, which schedule contains a true and accurate list of all salaried employees and their salary rates, a list of the rates of compensation for hourly employees in the Business and amounts paid on account of any incentive programs, a list of all bonuses paid or earned, and all expenses reimbursed to or paid on behalf of employees for and during the twelve month period prior to the Closing Date. Schedule 3.21 also lists all non-employees who have since December 31, 2005, performed services for the Seller as independent contractors, other than persons rendering legal or independent accounting services, and to whom the Seller has issued a Form 1099. Seller has properly treated all of such persons as independent contractors for purposes of federal employment taxes and income tax withholding in accordance with the Code.

3.22  **Ordinary Course of Business.** Other than as specifically disclosed to Purchaser hereunder, since December 31, 2005, Seller has conducted its business solely in the usual and ordinary manner and has refrained from any transaction not in the ordinary course of business.

3.23  **Accounts Receivable.** All outstanding Accounts Receivable to be purchased are bona fide, arose in the ordinary course of business, and, are collectible in full (less any reserve for bad debts) within 180 days of Closing. Except as set forth in Schedule 3.23, none of such Accounts Receivable are subject to any claim of off-set, recoupment, or counterclaim and Seller has no knowledge of any facts or circumstances giving rise to any such claims against it. No Account Receivable is contingent upon the performance of Seller of any obligation or contract. No person has any lien on the Accounts Receivable or any part thereof except those liens securing the Assumed Liabilities and except as set out in Schedule 3.25, and no agreement for deduction or discount has been made with respect to any such Accounts Receivable, other than in the ordinary course of business as disclosed on Schedule 3.23. The representations and warranties contained in this Section 3.23 do not apply to the FEMA Receivable.

3.24  **Books and Records.** Except as set forth on Schedule 3.24, Seller has maintained its books of account on a modified cash basis, consistently applied.

3.25  **Indebtedness.** Schedule 3.25 is a list of Seller's indebtedness including as to each indebtedness, the creditor's name and address, the principal balance and accrued interest as of a recent date together with a statement of the collateral securing each indebtedness. Seller has furnished to the Purchaser copies of all loan documents including capitalized personal property leases evidencing Seller's indebtedness.

3.26  **Preparation of Schedules.** The Seller's Schedules attached hereto have been prepared by Seller. The statements contained herein, in the Seller's Schedules, are true and correct in all material respects, and the Schedules do not omit any fact necessary to make the statements contained therein not

11

misleading in any material respect. The statements and information contained in the Schedules shall be deemed to constitute representations and warranties of Seller under this Agreement to the same extent as if herein set forth in full.

    3.27    **Hazardous Materials.** Except as disclosed on Schedule 3.27(a), Seller has not used or installed any Hazardous Material (as hereinafter defined) on, from, or in the Real Estate. Seller has not violated any applicable Environmental Laws (as hereinafter defined) relating to or affecting the Real Estate; all of Seller's properties are currently in compliance with all Environmental Laws, and there are no facts or circumstances currently existing upon or under such properties, or relating to such properties, which may violate any applicable Environmental Laws, and the Seller has not been served with any action, suit, investigation or proceeding against Seller, or the Real Estate seeking to enforce any right or remedy under any of the Environmental Laws. Seller has obtained all licenses, permits and/or other governmental or regulatory actions necessary to comply with Environmental Laws (the "Permits") and Seller is in full compliance with the terms and provisions of the Permits; and there has been no Release (as hereinafter defined) of any Hazardous Materials on or from the Real Estate; As used in this Agreement: (i) "Hazardous Material" or "Hazardous Materials" means and includes petroleum products, flammable explosives, radioactive materials, asbestos or any material containing asbestos, polychlorinated biphenyls, and/or any hazardous, toxic or dangerous waste, substance, chemical or material defined as such, or as a Hazardous Substance or any similar term, by, in or for the purposes of the Environmental Laws, including, without limitation section 101(14) of CERCLA (hereinafter defined); (ii) "Release" shall have the meaning given such term, or any similar term, in the Environmental Laws, including, without limitation, Section 101(22) of CERCLA; and (iii) "Environmental Law" or "Environmental Laws" shall mean any "Super Fund" or "Super Lien" law, or any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree, regulating, relating to or imposing liability or standards of conduct concerning any Hazardous Materials as may now be in effect, including, without limitation, the following, and all regulations promulgated thereunder or in connection therewith: the Super Fund Amendments and Reauthorization Act of 1986 ("SARA"); the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"); the Clean Air Act ("CAA"); the Clean Water Act ("CWA"); the Toxic Substances Control Act ("TSCA"); the Solid Waste Disposal Act ("SWDA"), as amended by the Resource Conservation and Recovery Act ("RCRA"); the Hazardous Waste Management System; and the Occupational Safety and Health Act of 1970 ("OSHA").

    3.28    **Inventory.** All items of inventory included in the Purchased Assets included in the Balance Sheet have been valued on a modified cash basis, using a first-in, first-out method, and fairly and accurately represent the inventory.

    3.29    **Sensitive Payments.** None of Seller or, to the best of Seller's knowledge after due inquiry, any officer, director, employee, agent or other representative of Seller or any person acting on their behalf, has made, directly or indirectly, any bribes, kickbacks, illegal political contributions with corporate funds, payments from corporate funds not recorded on the books and records of the payor, payments from corporate funds that were intentionally recorded falsely on the books and records of the payor, payments from corporate funds to governmental officials in their individual capacities or illegal payments from corporate funds to obtain or retain business either within the United States or abroad.

    3.30    **Investment Representations.** The Sellers and Alan C. Neely have informed the Purchasers and the Company that all the Company Shares to be issued in partial payment of the Purchase Price will be allocated and/or distributed to Mr. Neely. Mr. Neely accordingly hereby acknowledges his understanding that the Company Shares to be issued in partial payment of the Purchase Price will not have been registered, nor is registration contemplated, under the Securities Act of 1933, as amended (the "Securities Act") or under the securities laws of any state, but are being offered pursuant to exemptions

from the registration requirements of federal and state securities laws, based in part upon Mr. Neely's representations contained in this Agreement. Mr. Neely hereby represents and warrant as follows:

A. **Seller Bears Economic Risk.** Mr. Neely, either alone or with his representatives and advisors, has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company so that he is capable of evaluating the merits and risks of an investment in the Company and has the capacity to protect his own interests. Mr. Neely must bear the economic risk of this investment indefinitely unless the Shares are registered pursuant to the Securities Act, or an exemption from registration is available. Mr. Neely understands that the Company has no present intention of registering the Shares or any shares of its common stock. He also understands that there is no assurance that any exemption from registration under the Securities Act will be available and that, even if available, such exemption may not allow him to transfer all or any portion of the Shares under the circumstances, in the amounts or at the times he might propose.

B. **Acquisition for Own Account.** Mr. Neely is acquiring the Shares for his own account for investment only, and not with a view toward distribution.

C. **Accredited Investor.** Mr. Neely represents that he is an accredited investor within the meaning of Section 501(a)(5) and/or (6) of Regulation D under the Securities Act.

D. **Company Information.** Mr. Neely has been provided copies of the Company's Annual Reports to Shareholders for each of the fiscal years ended January 3, 2003, January 2, 2004 and December 31, 2004, its Quarterly Reports to Shareholders for each of the first three quarters of the fiscal years ending January 2, 2004, December 31, 2004 and December 30, 2005, the Company's proxy materials for its annual meetings of shareholders held in 2003, 2004 and 2005 (collectively, the "Company Information"), and such other information, if any, as he or his representatives have requested concerning the Company. He acknowledges that he (and his representatives, or other advisors, if any) has had the opportunity to ask questions of and receive satisfactory answers from the Company and its management concerning the Company, the Company Information and the Shares.

E. **Rule 144.** Mr. Neely acknowledges and agrees that the Shares must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. He has been advised or is aware of the provisions of Rule 144 promulgated under the Securities Act, which permits limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including, among other things: the availability of certain current public information about the Company, the resale occurring not less than one year (or two years as to certain persons) after a party has purchased and paid for the security to be sold, the sale being through an unsolicited "broker's transaction" or in transactions directly with a market maker (as said term is defined under the Securities Exchange Act of 1934, as amended) and the number of shares being sold during any three-month period not exceeding specified limitations.

3.31    **Survival.** The representations and warranties of Seller set forth in this Agreement shall be continuous and shall survive the Closing and delivery of the Purchased Assets for a period of four (4) years.

## Section IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to the Sellers to enter into this Agreement and to consummate the transactions contemplated hereby, each of the Purchasers and the Company hereby represent and warrant to Sellers each of the following representations and warranties and acknowledges that each of said representations and warranties has been relied upon by Sellers and is material to Sellers' decision to enter into this Agreement and to consummate the transaction contemplated herein:

4.1    **Corporate Existence and Power.** Giles Acquisition Corp. is a corporation and SunRay Acquisition, LLC is a limited liability company, each duly organized and validly existing, and each will be in good standing under the laws of the State of Alabama upon the timely filing of its initial Alabama Business Privilege Tax Return and Annual Report; the Purchaser and the Company each has the corporate power to own, operate, and lease its properties as presently owned, operated, and leased and to carry on its business as now being conducted; is duly qualified to do business and is in good standing in each jurisdiction in which a failure to qualify would have material adverse effect on the conduct of its business or ownership of its property where such qualification is necessary under the applicable laws of such jurisdiction; and has the requisite corporate power and authority to enter into and perform its obligations under this Agreement in accordance with its terms.

4.2    **Authority Relative to Agreement.** The execution, delivery, and performance of this Agreement by Purchaser, the Guaranty of Purchasers' obligations hereunder by the Company, and the consummation by Purchaser of the transactions contemplated hereby, have been duly and effectively authorized by all necessary corporate action, including approval of the board of directors of Purchaser and the board of directors of the Company. This Agreement, upon execution by Purchasers and Sellers, and the Guaranty of Purchaser's obligations by the Company will constitute the legal, valid and binding obligation of Purchaser and the Company, respectively, except as may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors rights generally and except as may be limited by general principles of equity.

4.3    **Effect of Agreement.** The execution, delivery and performance of this Agreement by Purchaser and the Guaranty of the Company, and the consummation by Purchaser of the transactions contemplated herein do not violate, in any respect, any provision of law applicable to Purchaser or the Company; do not conflict with or result in any breach of Purchaser's or the Company's articles of incorporation or by-laws, or articles of organization or operating agreement, or with or without the giving of notice and/or the passage of time, any mortgage, deed of trust, license, lease, indenture or other agreement or other instrument, or any order, judgment, or any other restriction of any kind or character, to which Purchaser or the Company is a party or by which Purchaser or the Company or any of Purchaser's or the Company's property may be bound; do not give to others any right to terminate, or result in any termination of, any such instrument; do not result in termination of any provisions of such instrument; and do not result in the creation of any lien, charge or encumbrance upon any of the property of Purchaser.

4.4    **Purchaser's Knowledge.** Purchaser has no knowledge of any fact, occurrence, event or condition that would make any representations or warranties of any Seller untrue in any material respect. Until the Closing Date, Purchaser will immediately advise Sellers in writing of any fact or occurrence or any pending or threatened occurrence of which it obtains knowledge which, if existing and known at any

time prior to the Closing Date, would make any representation or warranty of a Seller untrue in any material respect.

4.5 **Material Information, Etc.** No representation or warranty made herein by Purchasers and the Company, and no statement made by Purchasers and the Company contained in the Company Information and any document, schedule, certificate or other instrument furnished or to be furnished to Sellers by Purchasers and the Company in connection with the transactions contemplated by this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state any material facts necessary in order to make any statement of fact contained herein or therein not misleading.

4.6 **Survival.** The representations and warranties of Purchaser set forth in this Agreement shall be continuous, and shall survive the Closing for a period of four (4) years, except on to Section 4.5, which shall survive three (3) years.

## Section V
## CONDUCT OF BUSINESS PENDING CLOSING

From and after the date hereof until the Closing:

5.1 **Full Access and Investigation.** Purchaser and its authorized representatives shall have full access during normal business hours to all properties, books, records, contracts and documents of Seller, and Seller shall furnish or cause to be furnished (including through its employees as selected by Seller, authorized representatives and independent providers of professional services) to Purchaser and its authorized representatives all information with respect to the affairs and Business of Seller as Purchaser may reasonably request. Purchaser shall have no right under this Agreement to contact any supplier, dealer or customer of Seller without the express written permission of Seller.

5.2 **Continue Business in Regular Course.** Seller shall carry on the Business diligently and substantially in the same manner as it is currently being conducted and shall not make or institute any material change in its method of purchase, sale, lease, management, marketing, accounting, or operations without the prior written consent of Purchaser. Unless otherwise consented to in writing by Purchaser, Seller shall:

    A. maintain all of the Purchased Assets presently being used in the operation of the Business in good operating condition and repair subject to normal operation;

    B. maintain insurance upon the Purchased Assets in amounts comparable to that in effect on the date hereof;

    C. preserve its present business organization intact, refrain from firing or terminating any of its present officers or employees, except in the ordinary course of business;

    D. maintain its books, accounts and records in the usual, regular and ordinary manner, on a basis consistent with prior years, endeavor to comply with all laws applicable to it and to the conduct of the Business, and perform all of its obligations without default;

E.     not sell or voluntarily dispose of any of the Purchased Assets, except in the ordinary course of business, nor engage in any merger or consolidation involving Seller;

F.     not incur any accounts payable with respect to the operation of the Business except in the ordinary course of business;

G.     not grant any increase in pay or perquisites to employees nor increase any salary, commission, bonus or management fee or other benefits to any employee except in the ordinary course of business, nor institute or amend in any material manner any bonus or pension or profit-sharing plan or program;

H.     not enter into any contract or commitment or engage in any transaction which is not in the ordinary course of business and consistent with past practice, nor permit any change in the character of the Seller's Business;

I.     use its best efforts to prevent the occurrence of any event that would result in any of its representations and warranties contained in this Agreement not being true and correct;

J.     use its best efforts to keep its Business intact and preserve its relationship with suppliers, dealers, customers and others with whom Seller has business relations;

K.     not remove any inventory or equipment from the Real Estate, except in the ordinary course of business; and

L.     not pay or declare any distributions to stockholders or members as such after December 31, 2005, other than those disclosed on Schedule 3.7.

    5.3   **Consents of Purchaser.** No consent, recommendation or advice given by Purchaser to Seller pursuant to this Section V regarding the conduct of the Business pending the Closing shall constitute an understanding, commitment, representation or undertaking of Purchaser or give rise to any obligation or liability of Purchaser or constitute a waiver of any warranty, representation, covenant or agreement contained herein, except as may be expressly set forth in writing and signed by the parties hereto.

## Section VI
## REAL ESTATE TITLE REPORT AND SURVEY

    6.1   Schedule 1.2B attached hereto is a legal description of the Real Estate. Seller shall furnish to Purchaser a standard form title insurance report indicating good title to the Real Estate in Seller free and clear of all liens and encumbrances other than those set forth on Schedule 1.2B, subject only to taxes and assessments, both general and special, which are a lien, but are not yet due and payable, zoning ordinances, limitations, reservations, easements and restrictions that do not materially adversely affect use of the Real Estate for operation of the Business.

    6.2   Seller has caused a survey of the Real Estate that meets the requirements of an ALTA/ASCM survey to be delivered to Purchaser. Such survey locates all of the improvements thereon, sets out all easements and encroachments and certifies that none of the Real Estate lies within a flood hazard area.

6.3    The cost of the title insurance report and insurance policy, real property appraisal and survey, shall be divided equally between the Sellers and Purchasers, and in the event the transactions contemplated by this Agreement are closed, the Sellers' portion shall reduce the cash portion of the Purchase Price.

### Section VII
### SELLERS AGENT

7.1    **Agent Authorized to Act for All Sellers.** Upon the execution of this Agreement, each of the Sellers shall be deemed to have irrevocably constituted and appointed Alan C. Neely (hereinafter sometimes referred to as the "Sellers Agent"), as the agent of each of them to act from and after the date hereof in accordance with the instructions of the Sellers to do such things and execute such documents that may be necessary, convenient or appropriate to facilitate the consummation of the transactions contemplated by this Agreement. Sellers hereby authorize and direct Sellers Agent to (i) receive payments under or pursuant to this Agreement and to disburse such payments to the Sellers and others, as contemplated by this Agreement; and (ii) receive and forward notices and communications pursuant to this Agreement. Following the Closing, Purchasers and the Company will deal directly with Sellers Agent on all matters concerning the Sellers and arising under or in connection with this Agreement, and will not be obligated to, and will not, notify, contact or otherwise communicate with the Sellers, or any of them, with respect to any such matter, specifically including but not limited to any matter for which indemnification or contribution to Purchasers from Sellers arising out of a claimed breach of a representation, warranty or covenant. In addition, Sellers Agent is hereby authorized to act on behalf of the Sellers in all matters, including, without limitation, with respect to negotiations of and consent to the determination of Purchase Price adjustments and to indemnification claims asserted by the Purchasers and regardless of whether paid in whole or in part from the Escrow Account. Any action taken by Sellers Agent pursuant to and in accordance with this Section VII shall be absolutely and irrevocably binding on each Seller as if such Seller had personally taken such action (or executed and delivered such document) or made such decision or determination in its own capacity. The Sellers Agent, acting in his capacity as such, shall have only the rights, power and authority granted in this Section VII. Notwithstanding any other provision of this Agreement, (x) with respect to those matters expressly covered by this Section VII, each of the Sellers hereby irrevocably relinquishes such Seller's right to act independently and other than through the Sellers Agent and (y) no Seller shall have any right by virtue or by availing of any provision in this Agreement, any such rights being irrevocably and exclusively delegated to the Sellers Agent who, acting in accordance with the terms hereof, shall be the sole party entitled to avail himself of the provisions of this Agreement.

7.2    **Purchasers' Reliance.** The Purchasers and the Company shall be fully protected in dealing with the Sellers Agent under this Agreement and may rely upon the authority of the Sellers Agent to act as the agent of all of the Sellers in accordance with the grant of authority to the Sellers Agent under this Section VII. Any payment by a Purchaser that is required to be paid to the Sellers under this Agreement may be paid to the Sellers Agent in his capacity as such and shall be considered a payment by the Purchaser to the Sellers. The appointment of the Sellers Agent is coupled with an interest and shall be irrevocable except upon the written agreement of all of the Sellers.

7.3    **Successor.** If there is a vacancy at any time in the position of Sellers Agent for any reason, or if Mr. Neely is unable or unwilling to serve in the position, the Sellers shall select a successor to fill such vacancy.

7.4     **Acknowledgment and Acceptance.** The Sellers Agent acknowledges that he has carefully read and understands this Agreement, hereby accepts such appointment and designation, and represents that he will act in his capacity as Sellers Agent in strict compliance with and conformance to the provisions of this Section VII.

7.5     **Actions of the Sellers Agent.** The Sellers Agent shall not be liable to the Purchasers or to the Sellers for any error of judgment, or any act done or step taken or omitted by him in good faith or for any mistake in fact or law, or for anything which he may do or refrain from doing in connection with this Agreement, except for his own bad faith or willful misconduct. The Sellers Agent may seek the advice of legal counsel in the event of any dispute or question as to the construction of any of the provisions of this Agreement or its duties hereunder, and he shall incur no liability to the Purchasers or the Sellers and shall be fully protected with respect to any action taken, omitted or suffered by him in good faith in accordance with the opinion of such counsel.

7.6     **Expenses.** Sellers will reimburse Sellers Agent for all reasonable expenses incurred by the Sellers Agent in connection with the performance of his duties hereunder. The Sellers Agent may from time to time submit invoices to the Sellers covering such expenses, which expenses shall be paid promptly by the Sellers.

7.7     **Agent's Obligations.** Notwithstanding anything to the contrary hereunder and for the avoidance of doubt, the parties hereby acknowledge and agree that duties and responsibilities of the Sellers Agent under this Agreement shall be limited to those of an agent of the Sellers as set forth in this Section VII, and that the Sellers Agent shall only act as the agent of the Sellers and shall have no liability to the Purchasers with respect to any liability or obligation of the Sellers under this Agreement or the related transactions, it being further acknowledged and agreed that this Section 7.7 is not intended to limit liability or affect obligations that Alan C. Neely may owe as an officer, director, manager, owner or holder of any beneficial interest in any Seller under this Agreement.

## Section VIII
## AGREEMENTS REGARDING THE SHARES

8.1     **The Employee-Owned Shares.** As provided in Sections 10.10 and 11.6, it is a condition of the transaction contemplated hereby that Alan C. Neely be employed by the Purchaser, and as provided in Section 2.2C, that Mr. Neely be the ultimate beneficial owner of the Shares to be issued and delivered as part of the Purchase Price. The parties have made the following additional agreements concerning the Shares:

    A.     **Put Option.** The Shares shall be subject to Mr. Neely's right to require that the Company repurchase the Shares (the "Put Option"). The Put Option shall be exercisable during the period beginning two (2) years after the Closing Date and ending ninety (90) days thereafter, at a price equal to one hundred ten percent (110%) of the last reported sale price of the Company's shares on the tenth business day prior to the Closing Date.

    B.     **Call Option.** The Shares shall also be subject to the Company's right to require that Mr. Neely sell his Shares back to the Company (the "Call Option") at the then current fair market value in the event that Mr. Neely's employment is terminated under certain conditions.

    C.  **Option Agreement.** The Company and Mr. Neely shall enter into the Option Agreement set forth in Exhibit 8.1C, evidencing Mr. Neely's Put Option and the Company's Call Option.

  8.2  **Company's Right of First Offer.** If any Seller or distributee of a Seller, including Mr. Neely, holding Shares desires to transfer any or all of the Shares owned or held by such person, such holder (a "Selling Holder") shall deliver written notice (an "Offer Notice"), of such intention to transfer (an "Offer") to the Company. The Offer Notice shall identify the number of Shares subject to the Offer (the "Offered Shares"), the price per Share at which a sale is proposed to be made (the "Offer Price") (which Offer Price may be, but is not required to be, stated as an "at the market" price), and all other material terms and conditions of the proposed transfer. Each Seller agrees that such Seller will not enter into any discussions or negotiations with any person concerning a transfer except in full compliance with the provisions hereof.

    A.  The receipt of an Offer Notice by the Company shall constitute an Offer by the Selling Holder to sell to the Company the Offered Shares at the Offer Price and on all other material terms and conditions as the proposed transfer. For a period of 10 days after receipt of the Offer Notice, the Company shall have the right, but not the obligation, to accept such Offer as to all but not less than all the Offered Shares by giving a written notice of acceptance (which shall be deemed irrevocable) (an "Acceptance Notice") to the Selling Holder prior to the expiration of such 10-day period and, if such Offer is so accepted within such 10-day period, such Offer shall be irrevocable. Failure to deliver the Acceptance Notice before the expiration of such 10-day period shall be deemed a rejection of such Offer. The tender by the Company of an Acceptance Notice to the Selling Holder shall constitute an agreement by the Company to purchase, and by the Selling Holder to sell to the Company, the Offered Shares at the Offer Price and, except as otherwise provided for in this Section A, on the terms and conditions set forth in the Offer Notice. In the instance of an "at the market" price, the price shall be determined as of the last reported sale on the day prior to the date of the Acceptance Notice.

    B.  If the Offer Notice is accepted as to the Offered Shares within the 10-day period, the Company shall purchase, and pay the Offer Price in cash for, such Shares within a 20-day period after its delivery of an Acceptance.

    C.  Upon the rejection or waiver of the Offer by the Company in accordance with Section 8.2A or the failure of the Company to consummate the purchase of the Offered Shares within the time period prescribed by Section 8.2B, the Selling Holder shall have the right to sell the Offered Shares to the third party on terms and conditions not more favorable to the Selling Holder than those set forth in the Offer Notice, subject to compliance with federal and state securities laws as set forth in Section 3.30. If any Offered Shares are not sold pursuant to the provisions of this Section 8.2 prior to the expiration of ninety (90) after rejection or waiver of the Offer by the Company, such Offered Shares shall become subject once again to the provisions and restrictions of this Section 8.2.

    D.  If and to the extent any action required by this Section 8.2 to be taken within a specified period of time cannot be taken within such time period because of trading blackouts or other requirements necessary to assure compliance with securities laws, then the applicable time period shall be tolled for such amount of

time as necessary under the circumstances, and extended for an additional five (5) days thereafter.

## Section IX
## FURTHER COVENANTS OF PURCHASERS AND SELLERS

9.1    **Right of Access and Furnishing Information.** Each Seller shall give Purchasers or their duly appointed representatives (i) full access during normal business hours to the Purchased Assets and all Sellers' Business Records, including, but not limited to, customer lists, credit information, inventory sales and purchasing information and documentation relating to computer software, and Seller shall furnish such other information as Purchaser may from time to time reasonably request; (ii) authority to perform such reasonable inspections or tests on the Real Property, the Property and Plant and Equipment and the inventory as they shall deem appropriate to ensure that the Real Property is in compliance with all federal, state and local laws and regulations applicable thereto and in good condition and repair (ordinary wear and tear excepted), that the Property and Plant and Equipment is in good operating condition and repair and that the inventory is merchantable; provided that the performance of such inspections and tests does not unreasonably interfere with the operation of the Business; provided further that Seller shall deliver to Purchaser copies of all environmental reports that Seller has performed or had performed with respect to the Real Property or that Seller has in its possession, if any, and Purchaser shall deliver to Seller copies of environmental reports that Purchaser has performed with respect to the Real Property before the Closing; (iii) authority to perform such tests with respect to the accounting records of Seller, and the working papers of Seller's accountants with respect to the financial statements, as are deemed necessary by Purchaser or Purchaser's Accountants in order to ensure that the financial statements set out in Schedule 3.6 are complete and correct in all material respects and fairly present the financial position of Seller and the results of its operation; and (iv) authority to consult with Seller's officers and employees concerning the Purchased Assets and the Business. Sellers acknowledge that any inspections or tests performed by Purchasers shall neither diminish nor negate the warranties and representations made by Sellers to Purchasers in this Agreement. Purchaser may disclose any such information obtained concerning Sellers, the Purchased Assets or the Business to Purchasers' principal financing institution and other advisers of Purchasers to the extent Purchasers deem such disclosure necessary or desirable to enable such financiers and advisers to advise Purchasers concerning the Purchased Assets or the Business.

9.2    **Consents and Best Efforts.** As soon as practicable, Purchasers and Sellers, as applicable, will commence all other reasonable action required hereunder to obtain all applicable permits, licenses, consents, approvals and agreements of, and to give all notices and make all filings with, any third parties as may be necessary to authorize, approve or permit the full and complete sale, conveyance, assignment or transfer of the Purchased Assets by a date early enough to allow the transactions contemplated hereunder to be consummated by the Closing Date. Sellers shall apply for or obtain, at Sellers' expense, (i) any and all consents to transfer material permits or licenses or (ii) any and all new permits or licenses required for continued operation of the Business.

9.3    **Tax Filing.** Purchasers and Sellers agree that the purchase and sale provided for herein constitute an "applicable asset acquisition" within the meaning of § 1060 of the Code. Accordingly, the parties agree to report the transaction on Form 8594, and for any other required purpose, in a consistent manner.

9.4    **Corporate Existence.** After the closing, Industries and Enterprises shall each maintain its respective corporate existence as a corporation, and SunRay shall maintain its existence as a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Tennessee until five (5) years after the Closing Date; provided that if on such fifth anniversary date, a

Purchaser has duly notified a Seller of a claim for indemnification pursuant to Section 13.1, Seller shall maintain its corporate existence as hereinabove required until Purchaser's claim for indemnification shall have been finally determined and Seller shall have reimbursed Purchaser for the full amount of the indemnified liability, loss, claim, damage or expense.

     9.5    **Name Change.** Industries and SunRay each agrees to change its name within thirty (30) days after the Closing Date to a name approved by the Purchaser, and not to use its present corporate name, or one confusingly similar thereto, in conducting any business activity after Closing.

     9.6    **Liability Insurance.** Until December 31, 2009, Industries shall maintain policies of general liability and product liability insurance in amounts of not less than $1,000,000 for injury to or death of one person, for damage to property or as a result of one occurrence, and not less than $2,000,000 for an annual aggregate for such injury, death or damage, and issued by such insurance companies as shall be reasonably acceptable to Purchasers, covering the operations of the Industries Business prior to the closing, which policy shall name Purchasers as additional named insureds. The Sellers shall pay one-half the cost of this insurance coverage, up to a maximum of $125,000, and the Sellers' portion shall reduce the cash portion of the Purchase Price. The remainder of the cost will be borne by the Purchasers.

     9.7    **Retention of Books and Records.** Each Seller shall retain for a period of five (5) years after the Closing Date, all of its books and records (including such records as may be stored in computer databases) relating to the Purchased Assets or the Business and not delivered to Purchasers at the Closing. During such period, Sellers will make such books and records available to Purchasers at Purchasers' cost and expense, for purposes of reasonable and legitimate inspection and copying. In the event a Purchaser requires the original of any document in the possession of a Seller, such Seller shall provide the same, if available, subject to Seller's right to inspect and copy the same. Sellers will have the right to destroy such books and records at any time after the end of the aforesaid period; provided, however, that Sellers shall give written notice to Purchasers prior to the time Sellers intend to destroy such books and records so that if a Purchaser wishes to take possession of all or some designated part of such books and records it may, at its expense, do so.

     9.8    **Fulfillment of Conditions.** Between the date hereof and the Closing Date, Purchasers and Sellers shall take any and all action on their respective parts necessary or appropriate to cause all of the conditions precedent set forth in Section X, Section XI and Section XII to be fulfilled.

     9.9    **Post-Closing Tax Distribution Payment.** Following the Closing, Purchasers will pay to the shareholders of Industries an amount equal to their 2006 tax liability (the "Industries Tax Distribution Payment"). The Industries Tax Distribution Payment to will be made as soon as practicable after the allocation of the Purchase Price has been completed in accordance with Section 2.3, and Industries' 2006 tax calculation through the Effective Date (as defined in Section 12.1) has been prepared and agreed to by both parties. The Industries Tax Distribution Payment will consist of the 2006 tax liability calculated through the Effective Date plus a $33,350 management fee owed by Industries to its shareholders for January and February 2006. Purchasers will also pay to Alan C. Neely, as the sole member of SunRay, an amount equal to his 2006 tax distribution (the "SunRay Tax Distribution Payment"). The SunRay Tax Distribution Payment will be made as soon as practicable after SunRay's 2005 tax return has been prepared and SunRay's 2006 tax calculation through the Effective Date has been prepared and agreed to by both parties. The SunRay Tax Distribution Payment will consist of the tax liability for 2005, and for January and February 2006.

...
...
...

## Section X
## CONDITIONS TO OBLIGATIONS OF PURCHASERS

Each and every obligation of Purchasers under this Agreement to be performed on or prior to the Closing Date shall be subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions:

10.1  **Representations and Warranties True at Closing.** The representations and warranties made by Sellers in or pursuant to this Agreement or given on behalf of any Seller hereunder shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date.

10.2  **Due Diligence Review.** Purchasers shall have Sellers' full cooperation in conducting a due diligence review of Sellers. Sellers shall have reasonably provided Purchaser and Purchasers' agents full and complete access to the property, books and records of Sellers and allowed Purchasers and Purchasers' agents to contact employees' accountants and personnel as selected by Sellers. The obligation of Purchasers to proceed with the transaction contemplated herein is expressly contingent upon the completion of such due diligence review and the Business and Purchased Assets being found to be satisfactory to Purchasers in Purchasers' sole discretion.

10.3  **Obligations Performed.** Each Seller shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

10.4  **Consents.** Each Seller shall have obtained and delivered to Purchasers written consents of all persons or entities whose consent is required to consummate the transactions contemplated herein and all of such consents shall remain in full force and effect at and as of the Closing.

10.5  **Delivery of Closing Documents.** Each Seller shall have delivered to Purchasers each of the closing documents listed and set forth in Section 12.2 hereof together with any additional documents Purchasers may reasonably request to effect the transactions contemplated herein.

10.6  **No Litigation or Government Investigations.** As of the Closing Date there shall be no litigation, including without limitation any litigation brought by any creditor of a Seller, or government investigation pending, in which an injunction is or may be sought against the transactions contemplated hereby or in which relief is sought against a Seller relating to this Agreement and the transactions described herein.

10.7  **No Investigations of Seller or Business.** As of the Closing Date there shall be no pending investigation by any municipal, state or federal government agency or regulatory body with respect to the Purchased Assets or the Business.

10.8  **No Material Change.** At the Closing, the Business and the Purchased Assets shall not have been materially and adversely affected as the result of fire, water, explosion, flood, act of God, accident or other casualty, material labor controversy, or any action by the United States or any other governmental authority, whether or not covered by insurance. Further, as of the Closing Date, and since December 31, 2005, Seller shall not have suffered any material adverse change in condition, financial or otherwise, of the Business.

10.9  **Environmental Conditions.** The Seller shall have corrected, to the extent requested by the Purchaser, any hazardous material condition at the Real Estate that is recommended to be corrected in

22

an environmental report (phase I, and phase II, if indicated) that is prepared by an engineer acceptable to both Sellers and Purchasers. One-half the cost of such engineering services and one-half the cost of such correction expenditures shall be liabilities of Seller and shall reduce the Purchase Price. In the event that Purchaser requests a correction of any hazardous material condition at the Real Estate that exceeds $13,500 and that Seller deems excessive and desires not to undertake, Seller may give written notice to Purchaser of its refusal to make the Correction and if the Purchaser does not retract or modify its request to Seller for Correction in a manner satisfactory to Seller in its sole discretion, in writing according to the method of notice as provided in Section 15.1 hereof, within five (5) business days after receipt of the notice from Seller, this Agreement shall thereon terminate, be null and void and each party shall be responsible for the costs that they may have incurred.

10.10 **Option, Employment and Non-competition Agreements.** Industries' and SunRay's president, Alan C. Neely, shall have entered into the Option Agreement (Exhibit 8.1C), the form of employment agreement attached as Exhibit 10.10A, and including the Restricted Stock Award Agreement provided for therein (the "Employment Agreement"), and a non-competition agreement in the form attached as Exhibit 10.10B (the "Neely Non-competition Agreement"). In addition, each of the respective Sellers' other shareholders and members who is an individual, and each of the individual beneficial owners or interest holders of each such shareholder or member that is an entity, shall have entered into a Non-competition Agreement in the form attached as Exhibit 10.10C (the "Shareholder Non-competition Agreements").

### Section XI
### CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of the Sellers to consummate the transaction contemplated herein shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

11.1 **Representations and Warranties True at Closing.** The representations and warranties made by Purchasers and the Company in this Agreement shall be true and correct on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date.

11.2 **Obligations Performed.** Each Purchaser shall have performed and complied with all of its obligations under this Agreement that are to be performed or complied with by it prior to or at the Closing.

11.3 **Delivery of Closing Documents.** Each Purchaser shall have delivered to Sellers each of the closing documents and instruments listed in Section 12.3 hereof together with any additional documents Sellers may reasonably request to effect the transactions contemplated herein.

11.4 **No Notices.** Sellers shall not have received any notices from Purchasers pursuant to the provision of Section 4.4 above.

11.5 **Consideration.** Sellers shall have received the cash portion of the Purchase Price in good funds via wire transfer and the Company shall have issued the Shares in accordance with Section 2.2.

11.6 **Option, Employment and Non-competition Agreements.** The Company shall have executed and entered into the Option Agreement, the Employment Agreement (and Restricted Stock Award Agreement provided for therein), the Neely Non-Competition Agreement and the Shareholder Non-competition Agreements.

23