UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | |
|---|---|
| IN RE: FEMA TRAILER<br>FORMALDEHYDE<br>PRODUCT LIABILITY LITIGATION | MDL NO. 1873<br><br>SECTION "N-4"<br>JUDGE ENGELHARDT<br>MAG. JUDGE ROBY |

**THIS DOCUMENT IS RELATED TO ALL CASES**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**THE UNITED STATES' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' STEERING COMMITTEE'S MOTION TO COMPEL**

**INTRODUCTION**

Pursuant to Pretrial Order No. 7 ("PTO 7"), the United States hereby files this supplemental Memorandum in Opposition to the Motion of Plaintiffs' Steering Committee ("PSC") to Compel the Federal Emergency Management Agency ("FEMA") to produce personal contact information for non-party disaster aid recipients who were issued temporary emergency housing units ("EHUs" or "units") after Hurricanes Katrina and Rita. ("PSC Mot.") [Dkt. No. 119].

The Court should deny the portion of PSC's Motion that remains under submission because: 1) the Government's communications made to EHU occupants were not made by a party to this litigation; 2) those communications were properly made pursuant to programmatic public health and housing concerns; 3) PSC and its Expert misread and misinterpret those communications; and 4) PSC's Motion is not supported by the law or facts of this case. Thus, to grant PSC's Motion would be to assume far too much – that absent, putative class members are all injured; that the public health and housing communications FEMA and the Centers for

Disease Control ("CDC") have made somehow have hid the existence of this well-publicized litigation from them; that they wish to be represented by PSC; and that it is the Court's role to assist PSC in engaging them as direct clients. Because the facts and law do not support these assumptions, the remainder of PSC's Motion must be denied.

## BACKGROUND

On April 1, 2008, PSC filed its Motion to Compel, pursuant to Fed. R. Civ. P. 23, 45, and 37. On April 18, the Court heard oral argument on the Motion, which was denied in part without prejudice on April 22, 2008. *See* Pretrial Order No. 5 ("PTO 5") ¶ 5 ("The motion is denied to the extent that the Court will not order the Government to provide a Third Party Administrator with a list of all individuals who have resided in FEMA trailers so that a notice may be sent out to them."). The Court reserved the question of whether a subset of such persons should receive notice of the litigation, if that "would be fair" after review of communications the Government had already made to such persons. *Id.* On May 2, 2008, the United States produced those communications to the Court and Counsel, pursuant to PTO 5 ("PTO 5 Production" or "the Government's production").

On May 9, 2008, the Court heard oral argument on those communications and ordered further briefing on the narrow issue of whether notice of the litigation should be given to a subset of EHU recipients who may have been prejudiced with respect to their litigation rights by anything contained in the Government's production. *See* PTO 7 ¶¶ 1-2 ("Plaintiffs shall provide . . . an itemized response" to the Government's production and "shall give a proposed response thereto" and "the Government shall [respond] to Plaintiffs' response and proposal."). On May 19, 2008, PSC responded to certain communications contained within the Government's

production, but, in lieu of giving a tailored proposal pursuant to PTO 7, PSC "reurg[ed] its motion to compel, so that the FEMA list of putative class members can be furnished to the Court and a Court-Appointed Notice Administrator, and an appropriate Rule 23(d) notice sent to these individuals prior to the Court's decision on class certification." Supplemental Memorandum of PSC in Support of Motion to Compel [Dkt. No. 228] ("PSC Supp. Memo.") at 12. This issue has already been decided.[1] Therefore, the United States hereby responds to the portion of PSC's Motion that remains under submission, *i.e.*, arguments made with respect to the Government's production, pursuant to PTO 7.

## ARGUMENT

I. **The Communications Contained Within The Government's Production Were Not Made By A Party To This Litigation.**

As an initial matter, the United States notes that it was not a party to this litigation during most of the communications contained within the PTO 5 Production. *See* PTO 5 Production, Table of Contents (Tabs 38 through 42 post-date March 18, 2008, when the Administrative Master Complaint ("Master Compl.") added the United States as a Defendant).[2] Moreover, CDC, the public health agency that developed many of the communications at issue, is not a

---

[1] Nevertheless, the United States briefly responds to recent arguments made through PSC's Supplemental Memorandum, *infra*, at Section IV.

[2] Between May 18, 2006 and February 28, 2007, the United States was a party to *Hillard v. United States, et. al.*, Civ. Action No. 06-2576 (E.D. La.). However, the United States was dismissed from that case for lack of jurisdiction under the Stafford Act's discretionary function provision, 42 U.S.C. § 5148. *Hillard*, Order at 1, 5 (Feb. 28, 2007) (Lemmon, J.). The United States maintains its position that this Court lacks jurisdiction to decide Plaintiffs' claims brought against it, in part, because of the discretionary function exceptions to the Stafford Act, and to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a). *See* Defendant United States of America's Memorandum in Support of Its Motion to Dismiss Plaintiffs' FTCA and Contract Claims for Lack of Subject Matter Jurisdiction [Dkt. No. 196-3] at 19-38.

3

named or prospective Defendant in this litigation.  *See* Master Compl. ¶ 8(a) (naming "the United States of America through [FEMA]" as a Defendant).  Even now, the United States, through Administrative Claims filed with FEMA, is only a Defendant with respect to *eight Plaintiffs*, who already are represented by PSC.  *See* Master Compl. at 3.

It is well-established that "a prospective defendant is free to communicate with potential class members" in "the ordinary course of business."  ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 15:11 (4th ed. 2002) (Prelitigation communications by party opposing class).  It is obvious from the Government's production that FEMA and CDC's communications with EHU occupants were made in the ordinary course of business, pursuant to programmatic public health and housing considerations.  *See*, *e.g.*, Tab 11 (CDC testing is being done "to learn more about the amount of formaldehyde" in trailers and to "help FEMA help residents with housing options"); Tab 28 at CDC-15 ("CDC is testing the air in trailers and mobile homes to learn how much formaldehyde may be in the air in them.  Results from these tests will also help FEMA help residents with housing options.").  Therefore, PSC's argument that the United States, as an "adverse party," contacted putative class members lacks merit, because the communications at issue were not made by a party to the litigation, and pertained to public health and housing initiatives, not to the litigation.  *See* PSC Supp. Memo. at 6.[3]

---

[3] But, even if the communications related to the litigation or were made in an attempt to settle a claim, which they clearly were not, that still would be proper under applicable law.  *See* NEWBURG ON CLASS ACTIONS § 15:11 at 51.

## II. The Government's Communications With EHU Occupants Properly Were Made Pursuant to Programmatic Public Health And Housing Considerations.

Remarkably, PSC complains about the Government's actions taken with respect to health and safety concerns, on the one hand, but argues that the Government has not done enough to respond to those same concerns, on the other. *See* PSC Supp. Memo. at 5-12; Master Compl. ¶ 61. Thus, according to PSC, the Government should not allow a possible problem to go unaddressed, however, the Government should not address it, because in doing so the Government necessarily must communicate with EHU occupants. The United States hereby responds to that argument and submits that, *even if* it had been a party with respect to all named and unnamed persons in this litigation, none of its actions or communications were improper.

It is not uncommon that a group of people who have purchased a particular product, or, as here, applied for or received a particular government benefit, choose to sue the government based on facts related to that benefit. *See*, *e.g.*, *Taylor v. St. Clair*, 685 F.2d 982, *reh'g denied*, 692 F.2d 757 (5th Cir. 1982) (summary judgment for private and government defendants in class action on behalf of Medicaid recipients); *Alexander v. Robinson*, 756 F.2d 1153 (5th Cir. 1985) (summary judgment for government defendants in class action on behalf of food stamp recipients). Likewise, it is natural that the Government would possess contact information for those individuals in order to provide benefits. Normally, the Government may continue to communicate with them, even if they are named or potential class members, for the purpose of providing the benefit, without court oversight. *See generally* NEWBURG ON CLASS ACTIONS § 15:14 (Precertification communications by party opposing class); *Rankin v. Board of Educ.*, 174 F.R.D. 695 (D. Kan. 1997).

But, even where courts have inspected communications made between a defendant and

named or potential class members, such communications have been held to be proper, where they did not abuse those persons' litigation rights. Professor Newberg has commented on precisely this situation, in describing the case of *Rankin v. Board of Education*, where recipients of certain speech-language services sued the school board for the alleged failure to properly provide those services, which were ongoing. Thus, he noted, even with respect to *named plaintiffs*:

> [T]he court believed that an exception to [the anti-contact rule] should apply when necessary for the maintenance of services which were presently being provided to the plaintiffs, or in which the plaintiffs were currently enrolled. *It would be very difficult, if not impossible, for the defendants to continue to provide services if all communications had to be made through counsel*. NEWBURG ON CLASS ACTIONS § 15:14 at 56 (emphasis added).

With respect to *prospective class members*, ongoing, or even corrective or ameliorative communications made by a governmental defendant are likewise proper in the context of the program being administered. Thus, in *Rankin*, the court found that a letter sent by the governmental defendant to benefit recipients, that contained an apology and an offer to provide supplemental services, was proper in the circumstances:

> [T]he court found that plaintiffs failed to [show] that the May 27, 1997 letter was an abusive action that required protection from the court; the court did not find that a letter of apology and an offer to provide needed services, *even if they are a subject of this litigation*, was an abusive practice requiring the protection of the court. The letter made no reference to the litigation and [did] not even attempt to seek to discourage or prevent the recipients of the letter from participating in the lawsuit. Any prospective member of the class could choose to take advantage of defendants' offer and still choose to participate in this action should the class be certified. NEWBURG ON CLASS ACTIONS § 15:14 at 56 (emphasis added).

In this case, PSC does not even allege that the communications it complains of refer or relate to the litigation – specifically, whether a potential class member should sue or not sue. On the contrary, PSC complains the documents "do not mention" the litigation. *See* PSC Supp.

Memo. at 6.[4]  The reason for this is obvious – the communications simply were not about the litigation, but rather were programmatic, public health and housing communications made pursuant to the Government's discretionary authority under the Stafford Act, 42 U.S.C. § 5148. *See*, *e.g.*, Tab 6 (due to formaldehyde concerns FEMA staff "will complete our best effort to assist in helping concerned persons with Referrals to appropriate Agencies"); Tab 7 ("As part of our continuing strategy to address health issues related to the FEMA MH/TT units, FEMA will be assisting concerned persons with relocating to a hotel until more suitable housing can be located.").  Thus, the facts and law clearly show the Government has appropriately communicated with EHU occupants, "*even though such communications may necessarily implicate the subject matter of the litigation.*"  *See* NEWBERG ON CLASS ACTIONS § 15:14 at 56, *citing Rankin*, 174 F.R.D. 695 (emphasis added).

### III.    PSC's Reading And Interpretation Of The Contents Of The Government's Production Is Inaccurate.

In any event, it appears that PSC and its Expert have misread or misunderstood the contents of the Government's production, and the United States hereby explains those contents.

### A.  PSC's Expert Misreads The Text Of The Documents At Issue.

PSC complains that the Government provided EHU occupants with false or misleading information with respect to their health, through information contained in Tabs 1 and 24.  *See* PSC Memo. at 5-8 & PSC Exh. 1 at 2-3, §§ D & E.  PSC's Expert mistakenly asserts that Tab 1 does not: 1) state that formaldehyde levels in traditional homes are lower than those of EHUs;

---

[4] PSC does, however, appear to speculate that certain information relating to health and housing, contained in the communications, may have led EHU occupants not to sue.  For the reasons stated *infra* at III, this speculation has no basis in fact.

2) state that "exposure to formaldehyde can *cause*" the stated health effects; 3) mention certain harmful effects on children; and 4) state "that skin rashes and dermatitis" can result from formaldehyde exposure.  PSC Exh. 1 at 2-3, §§ C & E.  In fact, Tab 1 states: 1) that "travel trailers . . . are more likely to contain higher levels of formaldehyde" than traditional homes; 2) that people who suspect formaldehyde problems should work with a doctor "to see if formaldehyde is *causing* their symptoms;" and 3-4) that "*[c]hildren* and the elderly" and people with "*skin* . . . conditions . . . are potentially more susceptible to the effects of formaldehyde." FEMA09-387 (emphasis added); *see also* Tabs 5, 10 (same).

      Likewise, PSC's Expert's complaints with respect to Tab 24, the script that CDC personnel used to communicate test results to EHU occupants, lack merit.  *See* PSC Exh. 1 at 3 § E.  As an initial matter, the United States notes that PSC complained, prior to the CDC testing, about this very issue.  Therefore, the Government voluntarily agreed to provide PSC with its testing protocol and the opportunity to observe a demonstration of the testing.  *See* Joint Motion for Protective Order Concerning FEMA Testing of Housing Units [Dkt. No. 50].  Thus, PSC had ample notice of and insight into CDC's testing and methodology, and had the opportunity to be present if and when any of its clients were contacted.  At that time, PSC did not file a motion to prohibit the Government from contacting EHU occupants, presumably, because the transparency of the operation did not cause PSC sufficient concern to do so.  PSC should not now have a second bite at this apple under the guise of class notice.

      Moreover, the scientific accuracy of the communications of CDC, a non-party, public health agency, is not relevant to this dispute.  Rather, what is relevant is whether any of the contents of the Government's production interfered with the legal rights of any EHU occupants,

and PSC fails to explain how this could have occurred. In any event, PSC and its Expert have misunderstood the text of CDC's communications, which the United States explains below.

PSC and its Expert appear to argue: 1) that CDC's description of formaldehyde concentrations in EHUs relative to the average home in the United States caused prejudice to study participants; 2) that CDC told participants that the smell, rather than the concentration, of formaldehyde, was significant; and 3) that CDC's information conveyed with respect to cancer caused prejudice to participants. With respect to item (1) above, CDC informed residents whether their EHUs' formaldehyde concentrations were high, intermediate, or low, relative to the average home in the United States. *See*, *e.g.*, Tab 24 at 147-48. CDC informed residents with a "high" concentration that the level was "higher than the average home in America" and that "relocating [was] important." *See id.* CDC informed residents with an "intermediate" concentration that the level was "approximately the same or slightly higher than most homes in America" and added that there was "benefit to reducing" formaldehyde while awaiting permanent housing. *Id.* at 147. CDC informed residents with "low" concentrations that the level was "the same or lower . . . than the average home in America" but still advised them "to take steps to reduce formaldehyde exposure." *Id.*[5]

While PSC's Expert may ultimately testify as to what constitutes "average" in her opinion, that is irrelevant to the issue of whether CDC, a non-party public health agency, has interfered with the study participants' legal rights – which it clearly has not. Moreover, CDC

---

[5] CDC's determination of what constituted "average" could have been based on a number of sources. *See*, *e.g.*, Exh. 1, FORMALDEHYDE EXPOSURE IN HOMES: A REFERENCE FOR STATE OFFICIALS TO USE IN DECISION-MAKING, FEMA09-394-95 (describing studies and findings regarding average levels), 398-99 (References).

advised residents in the "high" and "intermediate" categories to move. Tab 24 at CDC-147-48. FEMA and CDC repeated this information in their efforts to publicize CDC's findings and conduct further operations pursuant to programmatic public health and housing considerations. *See* Tabs 24, 25, 29, 30, 31, 34, 36, 37, and 42.[6] PSC fails to identify how CDC's communications were prejudicial to legal rights, or how a resident could have misinterpreted advice to move as a signal that nothing was wrong with his or her EHU.

With respect to item (2) above, PSC's Expert simply misreads the text of Tab 24. In fact, it explains to participants with high concentrations that they may be at risk, *even if* they can no longer smell formaldehyde, *i.e.*, if they are used to its smell. Tab 24 at CDC-147 (formaldehyde "level" and "measurement" put participants into "<u>high</u> exposure range" even if they no longer noticed the smell because they were "around it daily," and relocating them was "important"). With respect to number (3) above, Tab 24 specifically states, "the lower the exposure level and shorter the duration of exposure, the less chance of getting cancer." *Id.* PSC has failed to show how this statement, which they agree with, can be construed as an attempt to minimize any particular health-related risk, much less interfere with a person's legal rights. *See* PSC Mot. at 8 & PSC Exh. 1 at 3 §§ D & E. *See also* Memo. in Support of Motion to Compel [Dkt. No. 119-1] at 14 (alternative housing arrangements "clearly" relate to mitigation of damages).[7]

---

[6] Because PSC has singled out Tab 42, *see* PSC Supp. Memo. at 9 n.3, the United States addresses it here. The fact that there are no regulatory requirements for indoor air quality in residences is already conceded by PSC. *See* Compl. ¶ 37. Therefore, PSC's concern in this regard is inapposite.

[7] PSC's Expert also complains that one page of a document's title does not match its contents. *See* PSC Exh. 1 at 1 § A (arguing Tab 29, CDC-117 contains the title "health effects" but does not describe health effects in detail). It is clear from prior and subsequent documents that health effects were well-publicized by the Government. In any event, this particular

10

## B. PSC's Interpretation Of The Government's Production Is Not Supported By Fact.

PSC's remaining arguments appear to be the following: 1) that information that formaldehyde levels and effects "decrease or disappear" over time is prejudicial to EHU occupants; 2) that information that formaldehyde may cause symptoms similar to those of the "common cold" is similarly prejudicial; 3) that CDC improperly classified formaldehyde concentrations into three levels – low, medium, and high; and 4) that FEMA and CDC improperly made themselves available to answer questions from concerned occupants, to refer them to doctors (for medical needs) or lawyers (for legal needs), and to move them out of their EHUs upon request. *See* PSC Supp. Memo. at 9-11. PSC's concerns with respect to Item (3) are addressed *supra*, at Section III. The United States hereby addresses PSC's remaining arguments.

Item (1) above is based on Tab 1, which explains certain illnesses that could result from formaldehyde exposure, suggests mitigation techniques (such as opening windows), directs concerned persons to call a doctor, and states that formaldehyde decreases or disappears over time. FEMA09-387. PSC fails to articulate how this information is factually incorrect or would somehow lead a person to not wish to sue the Government if he or she was injured. Moreover, PSC and its Experts believe that formaldehyde dissipates over time, as evidenced by their testing protocol, which calls for all doors and windows to be closed prior to and during testing.

With respect to item (2), while some of the documents PSC complains of mention symptoms of the common cold or flu, they also mention "cancer," *see*, *e.g.*, Tab 5 at FEMA09-

---

complaint relates to an oral presentation, which may have included other health-related information. The United States has included such slide presentations because of the Court's instruction to be over-inclusive in producing information pursuant to PTO 5.

388, "difficulty breathing," *see*, *e.g.*, Tab 28 at CDC-10, and "lung diseases such as asthma," *see*, *e.g.*, Tab 33 at FEMA09-385.  Moreover, they advise EHU occupants regarding mitigation techniques and to see a doctor if they are experiencing any symptoms.  *See* Tab 10 at CDC-152-53; Tab 33, FEMA09-385; Tab 37 at CDC-109; Tab 42, FEMA10-376.  This makes sense in the circumstances – obviously, not every person who is exposed would have symptoms of a common cold, or would have cancer.  Moreover, the Government's communications informed people who may otherwise have assumed that they had a cold, that in fact they may have been exposed to formaldehyde, and to see a doctor for an accurate, individualized diagnosis.  Again, PSC fails to show how the mention of a range of illnesses, mitigation techniques (which PSC agrees with), and the suggestion to call a doctor, caused any prejudice to the legal rights of EHU occupants.

With respect to item (4) above, PSC appears to complain that FEMA and CDC have established procedures, including the use of telephone scripts, to respond to EHU occupants' health and housing concerns.  PSC Supp. Memo. at 10-11.  As an initial matter, any telephone scripts were used, if at all, in response to occupants' phone calls made *to the Government*, and it is unclear whether PSC is contesting those.  *See* PSC Supp. Memo. at 11 (PSC does not oppose efforts of agencies to assist "trailer residents, specifically those who, on their own initiative, contact the agencies with questions or concerns about formaldehyde exposure").

In any event, the Government's production transparently shows that FEMA and CDC's telephone scripts do not relate to the litigation or to legal rights, but rather to programmatic public health and housing issues.  *See* Tabs 2, 3, 4, 6, 28, 38, 41.  Indeed, the only legal advice that may have been given was to contact a lawyer with legal questions, which comports with any legal ethics rule, *i.e.*, the anti-contact rule, even assuming it applied.  *See*, *e.g.*, Louisiana Rule of

12

Professional Conduct ("LRPC") 4.2, 4.3;[8] Tab 28 at CDC-13. Moreover, although PSC complains that the Government is the "source" of information conveyed during these calls, PSC fails to proffer what other entity, besides FEMA, would be the "source" for information regarding free, post-disaster housing assistance to qualified persons. *See* PSC Supp. Memo. at 10. Finally, FEMA specifically referred all health-related questions to CDC or told concerned persons to contact a doctor, because "FEMA does not have medical expertise." *See*, *e.g.*, Tab 2 at FEMA09-409; Tab 3 at FEMA09-403.

PSC also appears to complain about the contents of Tabs 12, 13, 21, and 23. *See* PSC Memo. at 10. However, these were publicly posted notices. *See* PTO 5 Production, Table of Contents. Therefore, even assuming PSC could show some type of prejudice to occupants resulting from these notices, their remedy would be to publicly post advertisements for their services, not to enlist the Court in performing a targeted solicitation.[9] Likewise, PSC complains

---

[8] The anti-contact rule only applies to lawyers engaged in a representation. *See* LRPC 4.2, 4.3 ("In representing a client, a lawyer shall not communicate about the subject of the representation with . . . a person the lawyer knows to be represented by another lawyer in the matter" or "state or imply [to an unrepresented person] that the lawyer is disinterested" and "shall not give legal advice to an unrepresented person, other than the advice to secure counsel."). In this case, for the reasons stated *supra*, at Sections I-II, the communications PSC complains of were not made by lawyers and did not pertain to a legal representation, but rather were made by program staff pursuant to public health and housing initiatives. *See*, *e.g.*, Tabs 6-7, 39-41 (Memos. to staff responsible for addressing formaldehyde and other housing concerns).

PSC and its Expert's "ethical" accusations are inapposite. *See* PSC Memo. at 6-7 & PSC Exh. 1 at 3-4 § E. *First*, they appear to refer to medical, as opposed to legal ethics, which would form the basis for any curative notice to absent, potential class members. *Second*, they accuse a non-party public health agency, CDC, of failing to disclose a conflict of interest in the litigation. This concern is unfounded for the reasons discussed *supra*, at Sections I-II.

[9] Indeed, there is no reason why PSC cannot post a notice, or even issue a targeted solicitation, on its own initiative. *See*, *e.g.*, LRPC 7.3(b)(iii) (lawyers may issue a "targeted solicitation" that does "not resemble a legal pleading, notice, contract or other legal document

of Tabs 14, 19, and 20, which are radio scripts. *See* PTO 5 Production, Table of Contents. PSC presumably can purchase air time on various radio stations in order to advertise their services, even assuming the messages were prejudicial, which they clearly were not. Indeed, it appears PSC has already conducted an effective advertising campaign, since it already represents more people than have ever complained to FEMA about formaldehyde concerns. *See* PSC Memo. at 6; United States' Opposition to PSC Mot. [Dkt. No. 124] at 16.

### IV. The Notice Provisions Of Rule 23 Are Designed To Protect Absent Class Members From PSC, Not From The Government.

PSC's request for pre-certification class notice has already been denied. PTO 5 ¶ 5. Nevertheless, the United States briefly addresses this issue to the extent PSC has done so in its Supplemental Memorandum. Whether and when to issue notice to absent class members under Rule 23, depends on whether or not a step in the litigation has affected their substantive rights. *See Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1309 (4th Cir. 1978); *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1110 (5th Cir. 1978), *aff'd*, 932 F.2d 965 (5th Cir. 1991), *cert. denied*, 502 U.S. 861 (1991); *Sanft v. Winnebago Indus., Inc.*, 216 F.R.D. 453 (N.D. Iowa 2003). Normally, that "step" is the grant of class certification, but may also be a settlement offer or, in rare cases, the denial of class certification. *See* Fed. R. Civ. P. 23(c), (e); Advisory Committee Notes at 128-129; *Sanft*, 216 F.R.D. at 460 (special circumstances required notice to absent class members that the statute of limitations began to run again after denial of class certification).

Notably, PSC has failed to cite, in two briefs and two oral arguments, a single case to support its request for pre-certification notice in the absence of a certification determination or

---

and [is] not . . . delivered via registered mail, certified mail or other restricted form of delivery," and contains the word "ADVERTISING" in two places on each page). LRPC 7.3(b)(iii).

settlement offer. The reason for this is clear – Rule 23's notice provisions are designed to protect absent class members from being bound by the named plaintiffs' representation. In other words, Rule 23 notice protects absent persons *from PSC*, not from the Government or any defendant. *See*, *e.g.*, Rule 23 Advisory Committee Notes at 128-129. Nothing contained in PSC's supplemental argument, *see* PSC Supp. Memo. at 2-5, changes this well-established rule. Finally, the fact that PSC has not proposed a new remedy pursuant to PTO 7, but instead has reurged its original request, underscores the fact that PSC primarily is concerned with engaging new clients, rather than redressing any improper communications the Government has made. *Compare* PTO 7 ¶ 1 ("Plaintiffs . . . shall give a proposed response" to certain documents) *with* PSC Supp. Memo. at 12 ("PSC respectfully reurges its motion to compel, so that the FEMA list of putative class members can be furnished . . . .").

**CONCLUSION**

For the foregoing reasons, the remainder of PSC's Motion should be denied.

Dated: May 23, 2008                                    Respectfully submitted,

                                                       GREGORY S. KATSAS
                                                       Assistant Attorney General, Civil Division

                                                       C. FREDERICK BECKNER, III
                                                       Deputy Assistant Attorney General, Civil Division

                                                       J. PATRICK GLYNN
                                                       Director, Torts Branch, Civil Division

                                                       HENRY T. MILLER
                                                       Senior Trial Counsel

                                                              //S//
                                                       _____
                                                       MICHELLE G. BOYLE (Va. Bar. No. 73710)
                                                       Trial Attorney
                                                       United States Department of Justice
                                                       Civil Division – Torts Branch
                                                       P.O. Box 340, Ben Franklin Station
                                                       Washington, D.C. 20004
                                                       Telephone No: (202) 616-4447
                                                       E-mail: Michelle.Boyle@usdoj.gov

                                                       Attorneys for the United States of America

OF COUNSEL:

JORDAN FRIED
Associate Chief Counsel
JANICE WILLIAMS-JONES
Trial Attorney
Office of Chief Counsel
FEMA DHS
500 C Street, SW
Washington, D.C. 20472

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2008, the foregoing Memorandum, and accompanying Exhibit, were filed via the U.S. District Court's CM/ECF electronic filing system and a copy thereof was served upon Liaison Counsel.

                                                             _____//S//_____

                                                Michelle G. Boyle (Va. Bar No. 73710)