**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

IN RE: FEMA TRAILER                                MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION                       SECTION "N-4"

                                                   JUDGE ENGELHARDT
                                                   MAG. JUDGE ROBY

THIS DOCUMENT IS RELATED TO ALL CASES

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT UNITED STATES**
**OF AMERICA'S MOTION TO DISMISS PLAINTIFFS' FTCA AND**
**CONTRACT CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION**

*May it please the Court:*

**LEGAL STANDARD OF REVIEW**

The defendant United States of America (United States and/or Government), invoking

"discretionary function"immunity, moves for dismissal of plaintiffs' claims as set forth in the

Amended Master Complaint (AMC) for lack of subject matter jurisdiction under Fed. R. Civ. P.

12(b)(1) or, alternatively, under Rule 56(c).  The claims at issue seek damages resulting from the

-1-

United States' alleged negligent acts in providing and maintaining temporary housing units[1] which claims are asserted under the Federal Tort Claims Act (FTCA) 28 U.S.C. §1346.

The AMC sets forth a number of facts which plaintiffs believe support their claims that the challenged actions, inactions and/or decisions of the United States are not immunized under the "discretionary function" exception contained in 28 U.S.C. §2680(a) raised by the United States in its motion. The United States' position is that none of the alleged tortious acts alleged by plaintiffs are subject to judicial review because they all fall within the discretionary function exception. Yet the United States' memorandum in support of its motion, and 37 exhibits attached thereto, is nothing short of a full scale attack on the merits of the plaintiffs' claims, including the threshold jurisdictional question, in support of which the United States has produced affidavit testimony as well as documentary evidence directed to the facts underlying the plaintiffs' claims.

Under the extant Fifth Circuit jurisprudence, plaintiffs suggest that this Court must assume jurisdiction in this matter, should deny the United States' motion to dismiss, and proceed to consider the Governments' summary judgment motion. For the reasons discussed below, the plaintiffs maintain the United States' Rule 56(c) motion is premature as discovery has only begun and the plaintiffs will require discovery directed to allegations made in its motion and supporting affidavits.

The Fifth Circuit maintains that with respect to Rule 12(b)(1) motions:

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1). Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera-Montenegro*

---

[1]     For simplicity, the plaintiffs also will use the United States' acronym of "EHU" which stands for "emergency housing unit".

*v. United States,* 74 F.3d 657, 659 (5th Cir.1996).

.....................

> In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute. *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.1981). Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief. *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th Cir.1998).

*Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001).

When the defendant's jurisdictional attack also assails the very existence of the plaintiffs' claims under the FTCA, there are mixed questions of jurisdiction over and the merits of the claims.

Under these circumstances:

> [W]here issues of fact are central both to subject matter jurisdiction and the claim on the merits...the trial court must assume jurisdiction and proceed to the merits. In circumstances where 'the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court ... is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case' under either Rule 12(b)(6) or Rule 56. *Williamson v. Tucker,* 645 F.2d 404, 415 (5th Cir.1981); see also *Daigle v. Opelousas Health Care, Inc.,* 774 F.2d 1344, 1347 (5th Cir.1985).

*Montez v. Department of Navy,* 392 F.3d 147, 150 (5th Cir. 2004). *See also In re Katrina Canal Breaches Consolidated Litigation,* 471 F.Supp.2d 684, 688 (E.D.La. 2007).

As the Fifth Circuit has stated in *Williamson v. Tucker,* 645 F.2d 404, 415 (5th Cir.1981)*,*

> [N]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits. This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) ... or Rule 56 ... both of which place greater restrictions on the district court's discretion.

Hence, the general rule in this Circuit is that, where a jurisdictional attack is intertwined with a

challenge to the merits of an FTCA claim, resolution of the jurisdictional issue pursuant to a 12(b)(1) motion is improper. *Montez*, 392 F.3d at 150. This Court, upon determining that the United States' challenge to subject matter jurisdiction is indirectly a challenge to the existence of plaintiffs' federal cause of action, accordingly should find that jurisdiction exists and decide the matter at hand under Rule 56. *See In re Katrina Canal Breaches Consolidated Litigation*, 471 F.Supp.2d 684, 688 -690.

The standard of review for summary judgment requires that the motion may only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett, Texas,* 247 F.3d 206, 210 (5th Cir.), (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c))), *cert. denied,* 122 S.Ct. 210 (2001). Facts are material if they might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All facts and inferences must be viewed in the light most favorable to the nonmoving party. *Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 568 (5th Cir. 2003). *United States v. Corpus,* 491 F.3d 205, 209 (5th Cir.2007).

Finally, "'[t]he moving party bears the burden of showing ... that there is an absence of evidence to support the nonmoving party's case.' If the moving party meets this burden, 'the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.' 'A dispute over a material fact is genuine if the evidence is such that a jury reasonably could return a verdict for the nonmoving party.' 'The substantive law determines which facts are material.'" *Centanni v. U.S.,* 2004 WL 385057, 1 (E.D.La. 2004) (quoting *Kee v. City of Rowlett, Texas,* 247 F.3d 206).

Nonetheless,

> When deciding a motion for summary judgment, the Court must avoid a 'trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts' are tasks for the trier-of-fact. *Anderson,* 477 U.S. at 255. To that end, the Court must resolve disputes over material facts in the non-movant's favor. 'The party opposing a motion for summary judgment, with evidence competent under Rule 56, is to be believed.' *Leonard v. Dixie Well Service & Supply, Inc.,* 828 F .2d 291, 294 (5th Cir.1987).

*In re Katrina Canal Breaches Consolidated Litigation*, 2008 WL 1989672, 12 (E.D.La. 2008).

## ARGUMENT

**1.    The Discretionary Function exception to the Federal Tort Claims Act and the Stafford Act.**

The FTCA provides a remedy to individuals where the acts of the Government cause harm

under the appropriate circumstances. As explained in *United States v. S.A. Empresa de Viacao Aera*

*Rio Grandense (Varig Airlines),* 467 U.S. 797 (1984):

> The Federal Tort Claims Act, 28 U.S.C. § 1346(b), authorizes suits against the United States for damages
>
> > 'for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'
>
> The Act further provides that the United States shall be liable with respect to tort claims 'in the same manner and to the same extent as a private individual under like circumstances.' [28 U.S.C.] § 2674.

*Id.*, 467 U.S. at 807-808.

The limited waiver of immunity under the FTCA "serves to enhance government accountability,

eliminate the need for private bills seeking individual relief, and allocate loss across the federal

taxpaying public." *Bear Medicine v. U.S. ex rel. Secretary of Dept. of Interior*, 241 F.3d 1208, 1213

(9ᵗʰ Cir. 2001).

Congress did not waive the sovereign immunity of the United States in all respects. There

are in fact there are two distinct exceptions to the waiver of sovereign immunity found in the FTCA.

*Lively v. United State*s, 870 F.2d 296 (5th Cir.1989):

> The 'due care' exception which immunizes the Government from suit with respect
> to claims based on the execution of a statute or regulation and requires 'for its
> application that the actor have exercised due care. The 'discretionary function
> exception' excepts 'claims based on the performance of a discretionary function and
> has no such requirement with respect to the exercise of due care.' In fact, the statute
> specifically dictates that the immunity attaches regardless of whether the discretion
> is abused.

*In re Katrina Canal Breaches Consolidated Litigation*, 471 F.Supp.2d 684, 697 (E.D.La. Feb 02,
2007) (citing *Lively,* 870 F.2d at 296-297, and *Buchanan v. United States,* 915 F.2d 969 (5ᵗʰ
Cir.1990).

In this case, the United States also avers that the"Nonliability" provision found at 42 U.S.C.

§5148 of the Stafford Act[2] precludes all claims arising from its disaster relief actions because these

actions all are discretionary in nature.  This provision, however, adopts the discretionary function

language of 28 U.S.C. §2680(a), and is subject to the same determination whether a particular act

or decision at the basis of a claim was indeed entitled to the  "discretionary function" immunity as

construed by Supreme Court jurisprudence. *See Watson v. Federal Emergency Management Agency,*

2006 WL 5249703, 3 (S.D.Tex. 2006), and *McWaters v. Federal Emergency Management Agency*,

436 F.Supp.2d 802, 812 -813 (E.D.La. 2006) (The district court held that FEMA was not immune

---

[2]        Robert T. Stafford Disaster and Relief Act, 42 U.S.C. §5121, *et. seq.*

from judicial review for mandatory acts or possible constitutional violations). As noted by one federal district judge, "This Court has found only a handful of cases discussing the discretionary function exception under the Stafford Act, and these cases have consistently used the 'discretionary function' exception analysis as set out in *Berkovitz*." See *United Power Association v. FEMA*, 2000 WL 33339635 1, 2 (D.N.D. Sept.13, 2000); see also *Dureiko v. United States*, 209 F.3d 1345 (Fed.Cir.2000); *Graham v. FEMA*, 149 F.3d 997 (9th Cir.1998); *Rosas v. Brock*, 826 F.2d 1004 (11th Cir.1987); *Torres v. Government of the United States*, 979 F.Supp. 1054 (D.Vi.1997); *Lockett v. FEMA*, 836 F.Supp. 847 (S.D.Fla.1993). *See also McWaters v. Federal Emergency Management Agency*, 408 F. Supp. 2d 221 (E.D. La. 2005) (held FEMA breached a mandatory statutory requirement by miscommunicating the protocol for receiving temporary housing assistance by causing some applicants to believe that an SBA loan application was a necessary prerequisite.)

A.    *The Discretionary Function Analysis*.

The plaintiffs are asserting negligence claims against the United States, through the Federal Emergency Management Agency (FEMA), for harm inflicted and damages sustained in connection with the Government's provision of direct housing assistance in response to Hurricanes Katrina and Rita. The plaintiffs named in the AMC are Louisiana residents who seek relief under the provisions §1346(b)(1) on behalf of a putative class of plaintiffs who resided in four states: Louisiana, Mississippi, Alabama and Texas. The named plaintiffs' claims sound in Louisiana tort-based law.[3]

Application of the discretionary function exception involves a two-part analysis. *See United*

---

[3]    Resident plaintiffs from the other three states involved in this litigation had not yet exhausted the requirements under the Federal Tort Claims Procedure, 28 U.S.C. 2671, *et seq.*, at the time the AMC was filed.

*States v. Gaubert*, 499 U.S. 315, 324-25, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Berkovitz v. U.S.*, 486 U.S. 531, 536-538, 108 S.Ct. 1954, 1958 - 1959 (1988).  Under the analysis:

> Courts are to ask first whether the challenged action was a discretionary one-i.e., whether it  was governed by a mandatory statute, policy, or regulation. If the action is not discretionary, it cannot be shielded under the discretionary function exception. Second, courts ask whether the challenged action is of the type Congress meant to protect-i.e., whether the action involves a decision susceptible to social, economic, or political policy analysis. *O'Toole v. United States,* 295 F.3d 1029, 1033-34 (9th Cir.2002) (summarizing *Gaubert/Berkovitz* test).  It is the government's burden to demonstrate the applicability of the discretionary function exception. *Bear Medicine v. United States ex rel. Sec'y of the Dep't of the Interior*, 241 F.3d 1208, 1213 (9th Cir.2001).

*Whisnant v. U.S.*, 400 F.3d 1177, 1180 -1181 (9th Cir. 2005).[4]

Relevant portions of the Supreme Court's discussions of the two-part analysis in *Berkovitz* and *Gaubert* are worth reproducing here, as often the summaries gloss over what plaintiffs believe are important qualifiers of the analysis.  In *Berkovitz*, the Court stated:

> In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice. See *Dalehite v. United States,* 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953) (stating that the exception protects 'the discretion of the executive or the administrator to act according to one's judgment of the best course'). Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect...
>
> Moreover, assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield.... The exception, properly construed, therefore

---

[4]     The Fifth Circuit has held in a case applying immunity under the *Feres* doctrine that the Government bears the burden of proving that the doctrine applies.  *Kelly v. Panama Canal Com'n,* 26 F.3d 597 (5th Cir.1994).

protects only governmental actions and decisions based on considerations of public policy....In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment.

*Id.* at, 486 U.S. 531, 536-537, 108 S.Ct. 1954, 1958 - 1959.

Under the second prong of the discretionary function analysis, the focus of the inquiry is on the whether or not the challenged conduct was susceptible to policy analysis:

> [E]ven 'assuming the challenged conduct involves an element of judgment, *a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield.'*
>
> [I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.
>
> *Not all agencies issue comprehensive regulations, however. Some establish policy on a case-by-case basis, whether through adjudicatory proceedings or through administration of agency programs.* Others promulgate regulations on some topics, but not on others. *In addition, an agency may rely on internal guidelines rather than on published regulations....*
>
> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.

*U.S. v. Gaubert*, 499 U.S. 315, 324-325, 111 S.Ct. 1267, 1274 - 1275 (1991), (citations omitted, emphasis added).

Only where the discretionary act was grounded in social, economic, or political policy, or is the product of a permissible exercise in policy judgment, does the discretionary function exception immunize the public entity (or employee) from suit; otherwise the suit may go forward. *Commerce and Industry Ins. Co. v. Grinnell Corp*, 280 F.3d 566, 572 (5th Cir. 2002). This position, however, "does **not** mean that 'if Government activity involves conduct that is rooted in policy, the

discretionary function exception bars a cause of action based on that conduct unless the Government employee violated a mandatory regulation that restricts his discretion or judgment' as noted by the Fifth Circuit in *Lively,* 870 F.2d at 299." *In re Katrina Canal Breaches Consolidated Litigation*, 471 F.Supp.2d at 698. The exception is not so circumscribed. The mere association of a decision with regulatory concerns is not enough; exempt decisions are only those "fraught with ... public policy considerations." *Sami v. United States,* 617 F.2d 755, 767 (D.C.Cir.1979). The mere presence of choice-even if that choice involves whether money should be spent-does not trigger the exception. *Cope v. Scott,* 45 F.3d 445, 449 (C.A.D.C. 1995).

Finally, the Supreme Court in *Berkovitz* discussed one other analysis under the discretionary function exception. If the plaintiff's claim is that the Government made a determination in compliance with regulatory standards, but that determination was incorrect, the "question of the applicability of the discretionary function exception requires a somewhat different analysis. *See In re Katrina Canal Breaches Consolidated Litigation*, 471 F.Supp.2d at 698. The issue before the Court in *Berkovitz* involved plaintiff's claim that National Institutes of Health's Division of Biological Standards incorrectly determined that an oral polio vaccine complied with regulatory standards. The Supreme Court stated:

> In that event, the question turns on whether the manner and method of determining compliance with the safety standards at issue involve agency judgment of the kind protected by the discretionary function exception. Petitioners contend that the determination involves the application of objective scientific standards. .. whereas the Government asserts that the determination incorporates considerable 'policy judgment.' In making these assertions, the parties have framed the issue appropriately; application of the discretionary function exception to the claim that the determination of compliance was incorrect hinges on whether the agency official making that determination permissibly exercised policy choice.

*Berkovitz*, 486 U.S. at 544-545.

-10-

If this Court finds that the United States has satisfied its burden of establishing it had discretion with respect to the claims asserted by the plaintiffs, for the plaintiffs' complaint to survive its motion to dismiss they must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. *Gaubert*, 499 U.S. 315, 325, 111 S.Ct. 1267, 1275. As discussed below, plaintiffs believe that they have satisfied their burden based upon the present record. Obviously, discovery will be necessary to completely develop for the record the regulatory environment within which FEMA conducted its direct aid program in response to Hurricanes Katrina and Rita. Under the applicable Rule 12(b)(1)/Rule 56 analysis, the Court may consider evidence beyond the pleadings at this time; but plaintiffs should be permitted to present evidence which support their allegations and rebut the United States' assertions that their conduct is immune under the exception. *Cf. Loughlin v. U.S.*, 286 F.Supp.2d 1 (D.D.C. 2003) (the Court denied the government's motions to dismiss in part, but specifically reserved judgment on the discretionary function argument, allowing the claimants an opportunity to conduct discovery regarding the existence of rules, regulations, or directives that might bear on whether the exception applied). Plaintiffs submit that there are particular areas where discovery is necessary in order to fairly analyze the issues at hand, including the self-serving and in some instances unsupported statements in the affidavits attached to the Government's motion, to the effect that discretionary choices and policy considerations are at the basis of the conduct challenged by plaintiffs. The Court should refuse to grant summary judgment, or defer its ruling to permit appropriate discovery. *See* 10B Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE, CIV. 3RD §§ 2740, 2741.

**B.**      ***Application of the Discretionary Function Analysis***

The Government asserts that the FTCA applies only to Count 2 of the AMC; however, Count 1, regarding the Government's breach of its duties in its role as owner/lessor of the EHU's is a tort-based claim and may be pursued under the FTCA.  Counts 1 and 3 will be discussed in more detail below.

1.      *The known relevant federal statutes, regulations, and/or enunciated policies regarding "direct housing" assistance under the Stafford Act.*

Under the first part of the discretionary function analysis, the  question is whether the challenged conduct was a matter of choice.  In the instant case this requires careful consideration of the regulatory scheme within which the United States acted at all times pertinent.  If the relevant federal statutes, regulations, or policy directives prescribe a course of action for a Government employee to follow, the employee has no rightful option but to adhere to the directive.  There is no discretion under this scenario and the exception does not apply.  Beyond this, even

> [w]here the agency's course of conduct is not mandated by statute or regulation, an FTCA plaintiff still can prevail under the second part of the analysis, which examines whether the government actions at issue 'are of the nature and quality that Congress intended to shield from tort liability.' Government actions involving the exercise of judgment or choice are exempted from suit under the FTCA only if they are 'susceptible to policy analysis,', and involve a 'decision[ ] grounded in social, economic, and political policy.'.

*O'Toole v. U.S.,* 295 F.3d 1029, 1033 (9th Cir.2002), (citations omitted).

It is important to scrutinize these two-fold requirements of choice and policy for objective support.  The inquiry into the nature of a decision "is not meant to open the door to ex post rationalizations by the Government in an attempt to invoke the discretionary function shield....the Government'[s] ...burden of proving the discretionary function exception...is not done by mere subjective statements. There must be reasonable support in the record for a court to find, without

-12-

imposing its own conjecture, that a decision was policy-based or susceptible to policy analysis." *Bear Medicine,* 241 F. 3rd at 1216.

What is presently known about the regulatory framework for the challenged conduct in this case is far from extensive. The Government, through FEMA, apparently develops much of its policy and guidelines internally, for example, through periodic reviews. *See* United State's Motion Exhibit 5 at 00010, Department of Homeland Security (DHS), March 31, 2006 report assessing FEMA's performance in response to Hurricane Katrina. The stated purpose of the report at defense Motion Ex. 5 is to examine "whether the laws, regulations, policies, procedures, plans, guidelines, and resources were adequate." In the report, at 000117, DHS states it makes 38 recommendations to the Director of FEMA which include "several modifications as to how FEMA manages disaster assistance, including testing programs before their use and housing displaced persons." Further at 000263 of Exhibit 5, there is reference to a direct housing "operations and procurement strategy" developed *prior to* Hurricane Katrina which addressed in part the development of uniform procurement specifications for temporary housing units. Finally at 000115 the report references that disaster assistance in this case was provided under the authorities of the Stafford Act and the "National Response Plan" (NRP) and to some degree the "National Incident Management System" (NIMS). The latter two documents are apparently not publicly available in their pre-Katrina versions, making discovery of these documents necessary in order to fully address the applicable regulatory and policy background.

With respect to FEMA's responsibilities under the Stafford Act regarding the provision of temporary housing, this is what the record does reflect:

1. FEMA was established in 1979 to provide a single point of accountability for the Federal

Government's disaster response. AMC ¶ 41.

2. The mission of FEMA as set forth in the Stafford Act is to assist the efforts of the states "in expediting the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of areas devastated by disasters." 42 U.S.C. § 5121(a)(2). AMC ¶ 42.

3. The Stafford Act authorizes federal aid to individuals and households and provides that the President may provide temporary housing assistance to individuals and households "who are displaced from their pre-disaster primary residences or whose pre-disaster primary residences are rendered uninhabitable ... as a result of damage caused by a major disaster." 42 U.S.C.A. § 5174(b)(1). AMC ¶ 43.

4. The Stafford Act provides that in connection with housing assistance, both financial and direct, "The President shall determine appropriate types of housing assistance to be provided ...to [eligible] individuals and households ... based on considerations of cost effectiveness, convenience to the individuals and households, and such other factors as the President may consider appropriate." 42 U.S.C. §5174(b)(2)(A), 44 C.F.R. §§ 206.110(a),(c), 206.117.

5. Under the federal regulations implementing the Stafford Act, a "displaced applicant" is one "whose primary residence is *uninhabitable*, inaccessible, made unavailable by the landlord...or *not functional* as a direct result of the disaster and has no other housing available in the area." The term "functional" is defined as "an item or home capable of being used for its intended purpose." The term "uninhabitable" is defined as meaning the "dwelling is not safe, sanitary or fit to occupy." 44 C.F.R. 206.11. AMC ¶ 44.

6. The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred

to as Section 408 assistance.  AMC ¶ 45.

7. Under the Individual and Household Program (IHP) of the Stafford Act (§ 408 and 44 C.F.R. §
206.110, *et. seq.*) housing assistance includes rental assistance or, where housing resources are not
available, direct assistance in the form of EHU's when a renter or homeowner's primary residence
"are uninhabitable."  United States' Motion Exhibit 8, Souza Affidavit at ¶ 4.[5]

8. FEMA's IHP "assures that people whose homes are damaged by disaster have a safe place to
live."[6]

9. Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide
"direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly
to individuals or households who, because of a lack of available housing resources, would be unable
to make use of the alternative "financial assistance"  provided under subparagraph (c)(1)(A).  *See
also* 44 C.F.R. § 206.117(b)(ii). AMC  ¶ 46.

10. According to FEMA, the agency only provides temporary housing units when all other housing
resources are unavailable, and are only used as a last resort to provide "safe, secure, and sanitary"
housing for eligible disaster victims, but acknowledges that the EHU's at issue were never designed

---

[5]        Note that when a victim is determined "eligible" for housing assistance under
§206.113(a)(8), the regulations pertaining to housing assistance at §206.117 references "alternate
housing resources" and "manufactured housing" or "recreational vehicles"*only* in connection
with the financial assistance component, while under the "direct assistance" provision
§206.117(b)(D)(ii) merely states FEMA may provide "temporary housing units" which term is
not defined.

[6]        Plaintiffs' Exhibit 1, Statement of Harvey E. Johnson, Jr., Acting Deputy
Administrator and Chief Operating Officer, Federal Emergency Management Agency,
Department of Homeland Security, before the Subcommittee on Disaster Recovery and
Subcommittee on State, Local, and Private Sector Preparedness and Integration, Homeland
Security and Governmental Affairs Committee, United States Senate, March 4, 2008, at 3.

for long-term occupation.  Plaintiffs' Exhibit 1, Statement of Harvey E. Johnson, Jr., at 5.  AMC ¶ 47.

11. Temporary housing is available for an 18-month period beginning on the date of the declaration of the major disaster by the President, after which the Federal Government may charge fair market rent for each temporary housing unit provided. 42 U.S.C.A. § 5174 (c)(1) (B)(ii)(iii).  *See also* 44 C.F.R. § 206.117(b)(ii)(F). AMC ¶ 48.

12. The Federal Government has been aware for over twenty years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith.[7]

13. Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes).  HUD has far stricter exposure limits for residential formaldehyde emissions.  By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle

---

[7]     *See* Plaintiffs' Exhibit 2, Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 5 and 8. AMC  ¶ 53.

board materials shall not emit formaldehyde in excess of 0.3 ppm...".  See 24 C.F.R. §3280.308.

AMC  ¶ 33, 36.  Pursuant to federal law, manufacturers of mobile homes are required to display a

"Health Notice" about exposure to formaldehyde in mobile homes. See 24 C.F.R. §3280.309. AMC

¶ 33.  *See also* United States' Memorandum at 5.

14. FEMA acknowledges the manufacture of mobile homes are regulated by the Department of

Housing and Urban Development (HUD), which imposes product standards for formaldehyde

emissions in connection with plywood and particle board, which standards were implemented in

1984. United States' Memorandum at 5 and Motion Exhibit 9. See also AMC  ¶ 18.

15. Of the housing units at issue, mobile homes are designed to be used as permanent homes and are

defined and regulated by the U.S. Department of Housing and Urban Development ("HUD").[8]

16. FEMA acknowledges that travel trailers and park model trailers were at all times material hereto

exempted from HUD manufacturing regulations and, under the regulations are "designed primarily

not for use as a permanent dwelling but as temporary living quarters for *recreational, camping,*

*travel, or seasonal use.*"  United States' Memorandum at 6.  *See also* 24 C.F.R. § 3282.8(g),

emphasis added, and AMC at ¶ 18-20.

17. Because travel trailers and park model trailers were exempted from HUD manufacturing

regulations they did not come equipped with the formaldehyde- specific warning present in mobile

homes, which FEMA knew.

18. FEMA's initial plan in response to Hurricane Katrina was to provide direct assistance in the form

of mobile homes located in "mobile home cities". United States' Motion Ex. 8, Souza Affidavit at

---

[8]      *See* Plaintiffs' Exhibit 3, Center for Disease Control and Prevention, INTERIM
FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS,
AND MOBILE HOMES, Feb. 29, 2008.  AMC ¶ 18.

¶ 6.

19. FEMA asserts that it changed its initial plan to rely instead primarily on travel trailers at the alleged insistence of state and local officials.  United States' Motion Ex. 8, Souza Affidavit at ¶ 6.

20. Yet, the Inspector General of the Department of Homeland Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, stated that FEMA regulations actually prohibit using mobile homes in flood plains, including much of Louisiana and Mississippi.  *See* Plaintiffs' Exhibit 4, Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, at 7.

21. FEMA suggests that a "successful" history of use of travel trailers justified the selection of trailers for use as EHU's; however, FEMA also has acknowledged that trailers in the past have been used in smaller-scale disasters, where the duration of occupancy typically did not extend beyond 18 months.  Plaintiffs' Exhibit 1, Statement of Harvey E. Johnson, Jr., at 5.

22. FEMA purchased over 34,000 EHU's (includes all three varieties, mobile homes, travel trailers and park models) "off the lot" and over 106,000 were purchased from manufacturers pursuant to FEMA "specifications".  United States' Memorandum at 7.

23. According to DHS Inspector General Richard Skinner, DHS is reviewing the "entire process for accountability of the trailers from initial orders, the receipt be FEMA, to final delivery to an evacuee".  Plaintiffs' Ex.4 at 9.

24. FEMA admits its specifications relating to the purchase of EHU's did not address formaldehyde.  United States' Memorandum at 7.

25. While FEMA asserts that the definitions under 42 C.F.R. § 206.111 pertain to eligibility and do

not impose mandatory requirements regarding the selection of EHU's, it nonetheless repeatedly asserts in its memorandum that FEMA relied upon the manufacturers and vendors to provide a "safe," "habitable" and "functional" product (EHU). United States' Memorandum at 7-8, 32-33, and Motion Ex. 10, McCreary Affidavit at ¶ 10, and Ex. 11, Miller Affidavit at ¶ 4.

26. FEMA did not conduct any initial testing for formaldehyde in units it purchased and prior to distribution, relying instead upon the manufacturers and vendors to provide a "safe," "habitable" and "functional" product. United States' Memorandum at 7-8, and Motion Ex. 10, McCreary Affidavit at ¶ 11-12, and Ex. 11, Miller Affidavit at ¶ 4.

The United States also has provided testimonial evidence through affidavits attached to its Motion that FEMA's mission in connection with the direct assistance program was to ensure that hurricane victims were provided with safe and habitable housing. These affidavits expressly confirm that, in fact, FEMA in this case undertook to provide safe and habitable housing. The Souza affidavit[9] states that the agency relied on vendors and manufacturers to provide "safe habitable housing units...." and the agency believed that these EHUs "would provide safe and habitable" housing. The McCreary affidavit[10] states that FEMA "relied exclusively upon the vendors' and manufacturers' expertise and experience...to construct and provide FEMA with new units...that would provide disaster victims with a safe, habitable place to live...." McCreary says that the agency relied on vendors and manufacturers "to ensure that the units received by FEMA and...provided to disaster victims were safe and habitable."[11]

---

[9]    United States' Motion Ex. 8 at ¶7.

[10]    United States' Motion Ex. 10 at ¶10.

[11]    *Id.* ¶11.

Indeed, the Government argues that, consistent with the belief that it was "purchasing a safe, habitable and functional unit, FEMA did not test the EHUs to determine formaldehyde levels."[12] McCreary says that, if such testing were required, the vendor/manufacturer "should have conducted and completed" such testing before transfer of the units.[13]  Interestingly, however, in both the mobile home contract[14] and in the travel trailer contract[15], the Government expressly reserved "the right to inspect or test any supplies...tendered for acceptance."   Moreover, prior to taking custody of delivered EHUs, FEMA representatives did "walk through" inspections. These did not include air quality testing because, again, FEMA "relied upon the vendor and manufacturer, their expertise with construction and manufacture of EHUs to provide EHUs that were safe and habitable..." and therefore the agency did not test for "defects such as formaldehyde."[16]  At the same time, FEMA kept a technical inspector at the Gulf Stream Manufacturing site, and this individual did inspect approximately 1 out of 5 units as they came off the production line; he again relied on the manufacturer to "ensure that the units were 'safe and habitable' and did not inspect for 'hidden problems....'"[17]

All of this is consistent with the fact that it was part of the mission and mandate of FEMA to undertake to provide safe and habitable housing.  Whether it sought to accomplish this mission

---

[12]     United States' Memorandum at p. 8.

[13]     United States' Motion Ex. 10 at ¶12.

[14]     United States' Motion Ex. 10-B at 000225 (p. 11).

[15]     United States' Motion Ex.10-C at 000318 (p. 10).

[16]     United States' Motion Ex. 11 at  ¶4.

[17]     United State's Motion Ex. 11 at ¶5.

by its own action or by reliance on another entity is a question which goes to the merits and discovery phases of this litigation. For present purposes, it suffices to note that FEMA at times herein acted consistent with a *mandate* to give meaningful housing assistance to disaster victims, which necessarily entails safe and habitable housing.   As stated by FEMA Administrator David Paulison on July 19, 2007, "FEMA [is] committed to ensuring that victims of disaster have a safe and healthy place to live during the recovery period."[18]

Regulations promulgated pursuant to FEMA's authority under the Stafford Act have the force and effect of law as long as they are reasonably related to the administrative enforcement of the Act and do not contravene statutory provisions. *State of Kan. ex rel. Hayden v. U.S.*, 751 F. Supp. 1495 (D. Kan. 1990), judgment summarily aff'd, 953 F.2d 1392 (10th Cir. 1992).   The testimony of a government witness may establish whether policy mandates the challenged conduct and thereby removes the conduct from the discretionary function exception. *Ashford v. U.S.,* 511 F.3d 501, 505 (5th Cir. 2007).   Applying the regulations pertaining to the eligibility of a disaster victim for housing assistance, Judge Stanwood Duval has held that once a disaster victim has been determined eligible for housing assistance, the Stafford Act creates an entitlement to housing assistance which reaches the level of a property interest constitutionally protected under the Due Process Clause. *McWaters v. Federal Emergency Management Agency*, 436 F. Supp. 2d 802 (E.D. La. 2006).[19]

Even if FEMA had a choice as to the *type* of housing it provided, it did not have a true choice

---

[18]      United State's Motion Ex. 18  at 00008.

[19]      Indeed, in *McWaters* the Court noted that despite the use of the word "may" in of 42 U.S.C. § 5174(b)(1), "testimony taken at the preliminary injunction hearing revealed that it is FEMA's own interpretation of its governing regulations and FEMA policy that ... once an applicant is deemed eligible for [housing] assistance, assistance of some sort *will be* provided." *Id.* at 818.

when it came to whether or not to provide *safe* housing. Discretionary choice as to type operated within a larger mandate of safety.  The sworn testimony and congressional statements of FEMA officials establish what should be self-evident, namely that undertaking to help disaster victims with housing necessarily means putting them in safe housing.  Every FEMA employee whose conduct will be at issue herein was obliged to act in a manner consistent with this mandatory  provision of safe and habitable housing.

> **2.     *Was the Government's selection of EHU's subject to mandatory regulations or policy.***

The plaintiffs in this case challenge, in part, the United States' conduct at the point after the eligibility determination has been made and FEMA has elected to provide direct assistance in the form of "purchased or leased housing units".  44 C.F.R. §206.117(b)(D)(ii).  The United States takes the position the selection of EHU's, which included travel trailers and park models, under the direct assistance program was discretionary, *i.e.*: FEMA had a choice regarding the selection process under the first prong of the analysis.  FEMA argues that the policy regime as outlined above does not, as set forth in *Berkovitz*, prescribe a course of action for an employee to follow.[20]  On the present record, however, no such conclusion can, or should, be drawn.  The degree of conduct specificity pursuant to a mission to provide safe housing, will depend upon whether there existed unpublished

---

[20]     The United States' reliance on *Buchanan v. U.S.,* 915 F.2d 969, 971 (5th Cir.1990), a case involving American prisoners who were held hostage by rioting Cuban nationals detained in prison pending review of their immigration status and who brought suit against the Government under the Federal Tort Claims Act, is misplaced.  There the Fifth Circuit, applying both the due care and discretionary function analysis, concluded that the prison officials acts were discretionary because the conduct at issue occurred during a prison riot, something the cited statute governing the Bureau of Prisons did not address.  There was no determination under the facts of that case whether the language under the subject statute did establish a mandatory and specific course of conduct outside the realm of prison uprisings.

directives, guidelines or policy statements addressing the selection of temporary housing units in order to (a) determine if they prescribed safety and habitability issues and conduct and/or (b) further define the policy underpinnings of the Stafford Act, the NRP, NIMS and any other applicable plan or program influencing the provision of EHU's as safe and habitable housing for hurricane victims. Whether or not a mandatory course of conduct was established by FEMA's internal policies and procedures ultimately can be determined only through further discovery, *e.g.:* deposition testimony regarding FEMA policy statements or guidelines, or agency interpretation. *Cf. Gadd By and Through Gadd v. U.S.,* 971 F.Supp. 502, 508 (D.Utah 1997), and cases cited therein (agency's administrative interpretation of its own regulations deserves deference unless it is plainly erroneous or inconsistent with the regulation.).

It already is known that FEMA has, since the hurricanes, adopted the HUD formaldehyde emissions regulations for travel trailer purchase specifications.[21]  This new policy is not published in the federal regulations.  Indeed, plaintiffs would not have been apprised of such a change of policy, limiting FEMA's options in selecting or requisitioning EHU's, without the congressional investigations which ensued when the formaldehyde crisis became public.  The agency mission of safe housing assistance, which applies to these new emission standards, almost assuredly existed at the time of Hurricane Katrina.  Plaintiffs are entitled to explore this area through discovery.

FEMA's initial intent was to utilize mobile homes in mobile home cities in response to the hurricanes, and mobile homes are supposed to be built to comply with the above-referenced HUD regulations and come with warnings.  The Government claims that it changed its plan to rely on mobile home cities and agreed to rely primarily on travel trailers in response to state and local

---

[21]         *See* Plaintiffs' Ex. 2, Statement of R. David Paulison, at 8.

officials objections to the original plan.  The Government's position is posited in terms of a public policy basis for the decision to use the travel trailers and park models instead.  However, as set forth above, there is evidence to suggest that the real reason for the plan's change was FEMA's own regulations regarding the placement of mobile homes.  Plaintiffs do not know what other policies may have been applicable to this decision or what internal guidelines may have existed regarding the selection process.  And, given the known potential for dangerous levels of  formaldehyde even in mobile homes, and the Government's knowledge that travel trailers and park models might pose an even greater danger since these were not subject to the HUD product standards,  the plaintiffs should be allowed to explore the asserted policy basis for FEMA's decision to change its plan.  As will be discussed more fully below, where a known health hazard inheres in a plan implemented by the governmental entity, particularly where the Government is also in the role of a property owner, any discretion regarding how to carry out responsibility to maintain safe and healthy premises is quite limited, and the discretionary function exception simply cannot shield the government from FTCA liability for its negligent conduct.  In this case, even if the local and state authorities preferred the travel trailer option, the Government may not have had discretion to entertain that option either under a "safe housing" mandatory standard.  Alternatively, the consequence of incorrectly applying FEMA standards or policies regarding the selection of EHU's and/or maintaining safety, represents not a legally protected choice, but the kind of judgment which is not supported by a permissible policy exercise.  *See Berkovitz*, 486 U.S. at 544-545.

Applying the second prong of the discretionary function analysis, the United States has failed to articulate a policy basis for its decision to contract the construction of the EHU's without addressing formaldehyde product and emission standards, and entrusting the obligation to provide

-24-

safe and habitable housing, including apparently low formaldehyde emissions standards, to the manufacturing defendants.  The Government argues that in the name of conserving its resources it chose to rely on the vendors and manufacturers to provide  "safe and habitable" EHU's, and elected not to make testing for ambient levels of formaldehyde part of its initial inspection and purchase process.  FEMA also asserts that no regulations required it to conduct such testing, although it claims the vendor/manufacturer should have done so before selling the unit to FEMA.[22]  But the United States knew that the travel trailers and park models in question were not going to be manufactured according to the same product standards established by HUD for mobile homes and knew that citizens it was obliged to help would be living in these EHU's as semi-permanent residences.  The United States also knew that the trailers and park models would not come with the formaldehyde warnings which are required in mobile homes, yet did nothing to address these issues in the specifications given to the manufactures.

The Government had pre-existing knowledge that formaldehyde presents serious health concerns at relatively low, chronic exposure levels.  In the face of a specific known or knowable health hazard contained in housing which is intended to be provided to secure safe and habitable temporary housing, "economics" or "insufficient government resources alone do not a discretionary function make".  *Duke v. Department of Agriculture,* 131 F.3d 1407, 1411-1412 (10th Cir. 1997) (quoting *Domme v. United States*, 61 F.3d 787, 793 (10th Cir.1995)).  As expressed in  *O'Toole v. U.S.* 295 F.3d at1037, and substituting "landowner" for owner/lessor:

> The danger that the discretionary function exception will swallow the FTCA is especially great where the government takes on the role of a private landowner. *Cf. Gotha v. United States,* 115 F.3d 176, 179 (3d Cir.1997) ("[I]f the word

---

[22]        *See* United States' Motion Ex. 10, (McCreary Affidavit)  ¶10-12.

'discretionary' is given a broad construction, it could almost completely nullify the goal of the [FTCA]."). Every slip and fall, every failure to warn, every inspection and maintenance decision can be couched in terms of policy choices based on allocation of limited resources. As we have noted before in the discretionary function exception context, "[b]udgetary constraints underlie virtually all governmental activity." Were we to view inadequate funding alone as sufficient to garner the protection of the discretionary function exception, we would read the rule too narrowly and the exception too broadly. Instead, in order to effectuate Congress's intent to compensate individuals harmed by government negligence, the FTCA, as a remedial statute, should be construed liberally, and its exceptions should be read narrowly.

(Some citations omitted).

This case is distinguishable from those cited by the Government in support of its contention that discretion exists because it housing assistance policy (as FEMA recites it) is too broad to mandate a specific course of action.  This argument addresses both the selection of EHU's and the Government's response to the safety issues raised during distribution and after EHU's were distributed.  As plaintiffs already have pointed out, there is a strong justification for allowance of discovery concerning FEMA policy related to the housing selection process as well as the response to the formaldehyde crisis.  Moreover, with regard to the latter category of conduct, the cases relied upon by the United States do not support its position that discretionary function immunity applies herein.

Many of the cases cited by the Government essentially stand for the proposition that broad or general policy mandates do not eliminate discretion.  However, under part two of the analysis, the cases which have applied discretionary function immunity generally have involved readily identifiable public policy decisions. *See, e.g.*, *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1537-38 (10th Cir.1992) (decision on how to contain environmental contaminants while protecting public health involved essence of policy choices protected by discretionary function exception); *Varig Airlines,*

*supra,* (where actions based on Federal Aviation Administration's comprehensive aircraft certification scheme, which incorporated private industry in the implementation of its policies, were protected under the FTCA). Several cases cited by defendant involve unexpected events not covered under <u>any</u> general policy, for instance, prison riots[23] or multiple fires[24].

Another category of cases where discretionary function has been held to apply involved either a national forest, wilderness area, or national park, all situations in which general dangers existed and a deliberate decision was made not to warn against or eliminate such dangers based upon the express policy of preserving an area in its pristine condition to protect the wilderness experience of the visitors.[25]   Examples include *Kiehn v. United States*, 984 F.2d 1100, 1105 (decision not to place warning signs on unstable rock formations at petroglyph site was part of policy to protect natural scenery); *Johnson v. United States Dep't of Interior*, 949 F.2d 332, 338 (10th Cir.1991) (Park Service decision not to post warnings concerning dangers of mountain climbing in Grand Tetons was based on policy of leaving experience as wilderness); *Zumwalt v. United States*, 928 F.2d 951, 953 (10th Cir.1991) (decision to warn of danger of caves in Pinnacles National Monument in pamphlet but not to erect warning signs was part of policy to maintain trail in wilderness state). Several similar cases are cited by the United States in its memorandum, for instance *Elder v. U.S.* 312 F.3d 1172 (10th Cir. 2002); *Autery v. U.S. ,*992 F.2d 1523 (11th Cir.1993); *Blackburn v. United States*, 100 F.3d 1426 (9th

---

[23]     Buchanan v. United States, *supra,* and *Garza v. U.S.*, 161 Fed.Appx. 341, 2005 WL 3478009 (5th Cir. 2005)

[24]     *See Miller v. United States,* 163 F.3d 591, 597 (9th Cir.1998), (held that the Forest Service's decisions regarding how to fight a fire in a multiple fire situation were protected by the discretionary function exception where various standards and procedures did not address the multiple fire situation).

[25]     *See Duke v. Department of Agriculture,* 131 F. 3d at 1410-1412.

Cir.1996); and, *Gadd By and Through Gadd v. U.S., supra*.

But the Tenth Circuit in *Duke* drew a distinction between these cases and decisions (or nondecisions) involving choice which were not within the discretionary function exemption. In the latter cases a specific hazard exists, distinct from the multitude of hazards that might exist in the former line of cases. *See, e.g., Boyd v. United States*, 881 F.2d 895, 898 (10th Cir.1989) (Army Corp of Engineers' "failure to warn swimmers of dangerous conditions in a popular swimming area does not implicate any social, economic, or political policy judgments with which the discretionary function exception is properly concerned"); *Smith v. United States*, 546 F.2d 872, 876-77 (10th Cir.1976) (failure to warn of the hazards of thermal pool in national park); *Gotha v. United States*, 115 F.3d 176, 181-182 (3d Cir.1997) (failure to provide safeguards on a footpath on a Navy underwater tracking range); *Cope v. Scott,* 45 F.3d 445, 451-452 (D.C.Cir.1995) (failure to post adequate warning signs on road maintained by the National Park Service).  *See also Oberson v. U.S. Dept. of Agriculture, Forest Service,* 514 F.3d 989, 998 (9th Cir. 2008) (Forest Service knew of specific hazard on snowmobile trail through its own investigation, but failure to post a warning or remedy the hazard was shown not to be the product of a policy choice).  In each of these specific-hazard cases the court could not perceive in the record before it any significant social, economic or political policy in the action or inaction that allegedly contributed to the injury giving rise to the lawsuit.

This case is analogous since the Government has not identified a significant social, economic or political policy as the basis for its (1) delay in response to the formaldehyde concern, or (2) design and implementation of a response (biased testing and issuance of misleading brochures and a flawed Health Consultation).  These responses were not based upon disinterested, scientific input but, rather,

were purposefully designed to reach a result that would tend to shield the Government from liability. Indeed, the Government in this case states that there are no regulations which require FEMA to consider formaldehyde in EHU's or specify what actions FEMA must take in response to health and safety concerns.[26]  Under these circumstances, the likelihood that the Government's response to the formaldehyde crisis was grounded in policy is remote:

> [I]f the regulations [do] not address and offer guidance about the kind of decision that is in issue, it would be less likely that that kind of decision could be said to promote or 'be based on the purposes that the regulatory regime seeks to accomplish.' It follows that courts should demand a clearer showing that a challenged act or decision is the kind that would turn on consideration of 'social, economic, and political policy' when the official's act or decision is not addressed in the pertinent regulatory setting

*Hughes v. U.S.,* 116 F.Supp.2d 1145, 1154 (N.D.Cal. 2000) (Quoting *Gaubert,* 499 U.S. at 325, n. 7, 111 S.Ct. 1267).

Regarding the United States' argument that it is immune for the torts of independent contractors ("manufacturers" here) under the independent contractor exception[27], plaintiffs aver that the crux of their claims against the Government lies with the Government's actions and omissions, and are not based upon "negligent supervision" of the vendors and manufacturers, although plaintiffs have averred negligence of the Government in the administration of the procurement contracts for the EHU's.  Plaintiffs' claims, in part, focus more upon the Government's either non-discretionary, or discretionary but not exempt, conduct in determining to use the EHU's at issue without addressing the control of formaldehyde in their manufacture through contract specifications.  The scenario plaintiffs describe and complain of is one in which the Government had superior knowledge of the

---

[26]     United States' Memorandum at 32-33.

[27]     *See* United States' Memorandum at 29-30, and cases cited therein.

intended use of the EHU's and was aware of the fact that formaldehyde has been regulated at least with respect to manufactured and mobile homes, but these regulations had not been applied to travel trailers and park models. The Government ignored the formaldehyde emissions issue despite this knowledge, and purchased or contracted for the manufacture of housing to be used at minimum for 18 months without incorporating any formaldehyde standards for use in manufacture (as it now does) or requiring the type of warnings which come with mobile homes. For the Government to argue on one hand it was not required to (or had discretion not to) address formaldehyde in specifications with its contractors, yet blame the manufacturers for selling it EHU's which have not been manufactured to minimize or remove formaldehyde emitting components, is akin to allowing the Government to immunize itself under the independent contractor exception. Where the focus is the Government's conduct or misconduct, the independent contractor exception does not apply, since otherwise "employment of an independent contractor insulates the United States from liability for its own employees' independent acts of negligence." *Aretz v. U.S.,* 604 F.2d 417, 427 (5th Cir.1979) (citing *Logue v. United States*, 412 U.S. 521, 532-33, 93 S.Ct. 2215).

Under the Stafford Act the Government goes to great lengths to ensure that an applicant qualifies for disaster housing assistance under the Act. FEMA, in part, must determine that, as a result of the disaster, the applicant's primary residence is "uninhabitable, " meaning "not safe, sanitary or fit to occupy," and/or "not functional," meaning the residence is not "capable of being used for its intended purpose." Surely, once the Government determines an applicant's house is "uninhabitable" as a predicate for assistance, it has no "discretion" to provide the qualified applicant with a house that also is uninhabitable. The United States and its representatives, in attached affidavits, repeatedly assert that FEMA has a mandate to provide "safe, secure, and sanitary"

housing for eligible disaster victims.  Discovery is necessary to establish what, if any, guidelines or policies were in place to ensure that eligible victims with a constitutionally protected right to receive *some* appropriate housing assistance, did not receive simply another uninhabitable house.  The Government was aware of the HUD regulations, in existence for over 20 years, regarding formaldehyde and the product standards applicable to mobile homes, which included a warning; it knew that mobile homes were designed to be used as permanent housing; and, it admits to knowing that travel trailers and park models were not subject to formaldehyde regulations and were not intended to be used as a permanent dwellings but as temporary living quarters for *recreational, camping, travel, or seasonal use.*  This knowledge must be considered in regard to FEMA's policies and procedures for the selection of EHU's in the context of its congressional mandate.   It is knowledge which either informed or required the selection of EHU's which did not emit dangerous levels of formaldehyde, or served as the policy basis for selecting EHU's.  Under either scenario, FEMA's decisions in this case to act contrary to what it knew, amount to a violation of an acknowledged "safe and habitable" housing mandate, and fall  outside of the discretionary function exception.[28]

In sum, FEMA cannot on the one hand acknowledge it had a mandate to  provide "safe, secure, and sanitary" housing for eligible disaster victims, but on the other hand claim that this policy does not apply to its selection of EHU's because the obligation for providing safe, habitable housing

---

[28]     *See Hillard v. U.S.*, 2007 WL 647292 (E.D.La. 2007), where, in opposition to a dismissal motion based on discretionary function brought by the Government, plaintiffs argued that "once the Government exercised its discretion to provide temporary housing to the plaintiffs, it did not have the discretion to provide trailers which were safe and uninhabitable." *Id.* at 3. Judge Lemmon then noted "These allegations are outside the Stafford Act.  The only allegations of acts that implicate the Stafford Act are acts committed to agency discretion by law...." *Id.*

fell upon vendors and manufacturers exclusively.  If FEMA sought to accomplish its mandate negligently through reliance on other entities, its liability should be addressed on the merits of the case.  Either "safe and habitable" housing assistance policies and guidelines existed which mandated a certain course in connection with the selection of EHU's which would have excluded outright the use of travel trailers and/or mobile homes not manufactured in accordance with HUD regulations, or, failing that, such policies and guidelines limited any claimed exercise of discretion regarding the selection of EHU's for which the Government seeks immunity.

### 3.   *FEMA's response to the formaldehyde problem.*

Plaintiffs' make allegations concerning the United States' negligent conduct and negligent delay or failure to act appropriately when put on notice that dangerous levels of formaldehyde were present in the EHU's it had distributed.  *See* AMC ¶¶ 53-82.

The United States claims that it had discretion to decide whether to continue to use the EHU's even after it became aware that formaldehyde gas was present in the EHU's (and particularly travel trailers and park models); that because there were no mandatory regulations or policies which required FEMA to conduct testing or the manner in which that testing was performed, FEMA's decision to study whether ventilation was an effective to remedy the presence of formaldehyde was discretionary and susceptible to policy analysis; that it's decision to use .3 parts per million (ppm) as its "level of concern" against which all of FEMA's response testing was measured for effectiveness complied with scientific standards; and, because FEMA published only certain recommendations in an Agency for Toxic Substances and Disease Registry (ATSDR) toxicological profile and Environmental Protection Agency (EPA) basic informational pamphlet (opening a

window and/or using a fan[29]), that these recommendations also comported with objective, scientific standards.[30]  FEMA also asserts that its delay in initiating a response, including testing of the units, was reasonable and discretionary.  It says this even though the Occupational Safety & Health Administration (OSHA), at the request of two FEMA contractors (Individual Assistance/Technical Assistance Contractors or "IA/TACs"), had been testing units in one staging area as early as October of 2005[31].  But it was not until September of 2006 when FEMA finally had the EPA test new unused trailers and the ATSDR assess the results of those tests.  This exercise produced the now discredited February 2007 "Health Consultation".[32]  FEMA also suggests that during the testing and analysis which led to the original Health Consultation that it was the ATSDR which was "focused" on the ventilation technique, rather than an assessment of long term effects of formaldehyde concentrations in trailers or potential health concerns related to exposure.[33]

Plaintiffs dispute the Government's arguments and asserted facts.  Plaintiffs have identified, through the allegations contained in the AMC, arguments herein and exhibits attached, substantive material facts which contradict the Government's assertions.  Plaintiffs also aver that the

---

[29]     Of course, FEMA elected not to adopt or recommend several other of the recommendations proposed by EPA during the selection process, such as: using "exterior grade" pressed wood production its specifications (these do not contain the formaldehyde producing "urea" resins) or *asking* about the formaldehyde content of pressed wood and building materials before you buy them.  United States' Motion Ex 34 at 3-4.

[30]     *See* United States' Motion Exs. 16 (ATSDR toxicological profile at 000025); 34 (EPA, Formaldehyde Basic Info at 3-4); and, 15 (2/1/07 "Health Consultation" at 000010).  See also the FEMA brochure at United States' Motion Ex.22.

[31]     *See* United States' Memorandum at 10 and Motion Ex. 17.

[32]     *See* United States' Memorandum at 13 and exhibits cited therein.

[33]     United States' Memorandum at 13-14.

Government's response to the formaldehyde disaster was not protected by the discretionary function exception.

The Government itself unnecessarily created the problems which then led to its ineffective response in this case. FEMA was aware that formaldehyde in these EHU's was a potential issue, and it was incumbent upon FEMA to act to protect the public, in fulfillment of its congressional mandate to provide to  provide "safe, secure, and sanitary" housing, using methods based on *objective* scientific principles. *Cf. Lively v. U.S.*, 870 F.2d 296, 299(5th Cir. 1989) ("Where the Government does not create a danger... the Government is exempt from liability under the discretionary function exception."). The United States posits several arguments, all couched in terms of the discretionary function analysis, regarding how and why its design and implementation of testing and warning protocols are immune. What the Government does not address are the plaintiffs assertions in the AMC (and these are  based only upon what has been *published*) that the Government's response in this case was tainted by its interference with and manipulation of the applicable science related to its response plan and implementation of same,  and its intentional obfuscation of data, all to the detriment of hurricane victims, and that much of this conduct was orchestrated by FEMA's Office of General Counsel. For these reasons and reasons discussed below, the United States' conduct in response to the formaldehyde safety issue is not immune from suit under the FTCA or the Stafford Act, because this conduct is not based upon permissible public policy.

The analysis of the Government's response to the formaldehyde issue focuses on the second prong of the discretionary function analysis; however, because the issue involved public safety or protection from a well known, researched and specific hazard, formaldehyde, the end result is not much different than if there had been specific mandatory regulations governing FEMA's response.

This is so because "matters of scientific and professional judgment-particularly judgments concerning safety-are rarely considered to be susceptible to social, economic, or political policy." *Whisnant*, 400 F.3d at 1181.[34]  Actions based on technical or scientific standards "are not the kind of judgments meant to be protected from liability by the discretionary function exception because those actions do not involve a weighing of policy considerations."  *Bear Medicine*, 241 F. 3rd at 1214. Because there were objective, scientific standards in place regarding recommended levels of formaldehyde exposure for the non-working population, which essentially rendered continued use of the travel trailers and park models unfeasible, FEMA had no discretion to ignore those standards. FEMA nonetheless did so and, based upon manipulated science, implemented a flawed program dealing only with individuals who knew enough to complain (they might get another EHU) and later issuing partial warnings, leaving out crucial information concerning acute and chronic health effects, and including only partial remedial measures skewed to conserve "resources," and all of this born out of FEMA's desire to avoid legal liability and negative publicity.  For those reasons alone FEMA's conduct cannot be said to have been based upon legitimate policy considerations in this case.  Additionally, its response is not exempt under the discretionary function exception because, as the Ninth Circuit emphasized in *Whisnant*,  "The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not.... [S]afety measures, once undertaken, cannot be shortchanged in the name of policy." *Id.* at 1182 (quoting *Bear Medicine* 241 F.3d at 1216-17). The United States "cannot claim that both the decision to take safety

---

[34]     The *Whisnant* case involved negligence of the United States in failing to properly maintain and then remediate toxic mold in a commissary it operated.  The Court held that the Government was not shielded by the discretionary function exception, "because removing an obvious health hazard is a matter of safety and not policy." *Id.* at 1183.

measures and the negligent implementation of those measures are protected policy decisions. This argument would essentially allow the Government to 'administratively immunize itself from tort liability under applicable state law as a matter of 'policy.'" *Bear Medicine*, 241 F. 3rd at 1215 (quoting *McGarry v. United States,* 549 F.2d 587, 591 (9th Cir.1976)).

FEMA cannot claim not to have known or to have been on notice of OSHA's initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005. The testing was done at the request of two FEMA contractors and therefore the United States should be charged with notice, even though the Government claims not to have obtained the testing results until March of 2006. The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels.[35] In March 2006, FEMA's Bronson Brown directed in an e-mail that staff be instructed, prior to entering trailers, to allow for a period of "off-gassing" before workers safely entered trailers. *See* United States' Motion Ex.19, at 000090. This led to air testing later that month due to concerns for "potential employee exposure to formaldehyde." *See* United States' Motion Ex. 20 at 000164.

Plaintiffs have alleged, with supporting evidence, that the Government delayed its response to the public health hazard of formaldehyde emissions in the EHU's because of concerns over legal liability. While the United States denies learning of the October 2005 testing until March of 2006,

---

[35]     *See* AMC at ¶ 55, and  Plaintiffs' Exhibit 6, Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007. *See also* United States' Motion Exs. 17 and 19.

which plaintiffs dispute, it also learned of the Sierra Club's testing in April of 2006 and was receiving complaints related to formaldehyde from hurricane victims. Yet, all the while FEMA continued to furnish these dangerous EHU's to the unsuspecting hurricane victims.[36]

The Government defends its initial policy of addressing complaints on a "case-by-case basis" by reference to the alleged  small number of complaints, "absence of residential air quality formaldehyde standards," and the "risk that testing [EHU's] in the absence of any residential air standards would not provide a programmatic solution". However, Administrator Paulison expressed being "troubled" that some FEMA employees hadn't reacted "with the speed and sensitivity I expect" to resident concerns, and then he made this statement: "FEMA's first priority is the health and welfare of disaster victims we serve. Anything less is totally unacceptable.... He pledged to "hold sacred this...commitment."[37]

Contrary to the Government's assertions, with mounting evidence of the existence of dangerous levels of formaldehyde present in the housing units and complaints about formaldehyde starting to become public, the Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem. As stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, *the clock is ticking on our duty to respond to them*." Another email repeats these concerns, reading

---

[36]     *See* AMC at ¶ 56 and Plaintiffs' Ex. 4, Statement of Richard L. Skinner, at 8, only 75,000 travel trailers had been distributed as of this February 13, 2006 statement.

[37]     United States' Motion Ex. 25 at 000194.

"OGC has advised that we do not do testing, *which would imply FEMA's ownership of the issue*."[38] Plaintiffs aver that, even as plaintiffs and their families were being placed at risk in unsafe temporary housing, the United States had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the Manufacturing Defendants concerning formaldehyde levels in the housing units and how best to deal with the publicity fall-out as the media reports of same increased. *See* AMC at ¶ 62. Evidence of communications among the defendants exists by way of emails emanating from the FEMA Office of General Counsel (OGC).  For example, in June 16, 2006 the same email which states "OGC has advised that we do not do testing," goes on to state: "Gulfstream is working closely with FEMA to resolve the formaldehyde problem in smaller travel trailer (Cavalier) units."  A later email reflects relief of the FEMA OGC  at the "good news" that "one of the major manufacturers of national housing units (Gulfstream I think)...wanted to get with External Affairs so they could get on the same page...we may get the benefit of the manufacturer's 'science' and 'public relations' approaches."[39]

It bears reiterating here that FEMA *knew or should have known* that formaldehyde was likely to be present in the EHU's it dispatched to hurricane victims.  FEMA artfully defends its failure to timely and adequately respond by asserting that there was an absence of "residential" formaldehyde air standards.  However FEMA cannot dispute that there were in fact several existing formaldehyde

---

[38]     See Plaintiffs' Exhibit 5, ("Supplemental A") emails, and Plaintiffs' Exhibit 6, ("Supplemental B") emails.  *See also* AMC at ¶ 61.

[39]     *See* Plaintiffs' Exhibit 7, U.S. House of Representatives, Committee on Oversight and Government Reform, FEMA'S TRAVEL TRAILERS: LITIGATION CONSIDERATIONS V. HEALTH AND SAFETY CONSIDERATIONS, AND THE WINNER IS?, July 19, 2007, emails.  *See also* AMC at ¶ 63.

standards which data establish levels of exposure designed to protect people and which inform appropriate long-term, residential exposure levels.

Many standards exist because they are developed to protect different populations and to protect these populations for varying durations of exposures. In general, the longer the duration, the lower the exposure level can be to avoid adverse effects. Moreover, standards designed to protect the adult working population at work, based on only 40 hours per week of exposure and a healthier population, can allow levels higher than what is suitable for residential environments.  Standards set by the military, representing a selected very healthy population screened to exclude any medically compromised soldiers/sailors, can allow levels even higher.[40]  OSHA reduced the permissible exposure limits (PELs) to 0.75 ppm as an 8-hour timeweighted average (TWA) and a short-term exposure limit (STEL) of 2 ppm for a 15 minute time period, recognizing that formaldehyde is not only a potential occupational carcinogen, but should be regulated for its irritating, sensitizing and toxic effects.  This standard was promulgated with the understanding that *workers will only be exposed for 8 hours/day and no more than 40 hours/week,* and that the time outside these 40 hours will have no formaldehyde exposures (*exposure recovery time*). Note that the adult population able to work a 40-hour work week is, as a group, much healthier and able to endure exposures that the elderly, the very young, and the medically compromised cannot.[41]

The HUD product standards for formaldehyde emissions, previously outlined, were

---

[40]     *See* Plaintiffs' Exhibit 8, *The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued to Hurricane Disaster Victims, and Recommended Action Items*, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007 at 2.

[41]     Plaintiffs' Ex. 8 at *id.*.

developed to protect the general public from health effects of exposures to formaldehyde in their living quarters. These levels, mixed in the general air of the manufactured home, will normally keep emissions below 0.01 ppm even in areas such as the kitchen.  As set forth in the AMC at ¶ 37, the ATSDR has established inhalation minimal risk levels (MRL) as follows: Acute: 0.04 ppm (1-14 days of exposure), Intermediate duration: 0.03 ppm (>14-364 days of exposure), and Chronic duration: 0.008 ppm (365 or more days of exposure).  These MRL's are based upon respiratory effects in humans. The MRL is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse non-cancer health effects over a specified duration of exposure. TCEQ (The Texas Commission on Environmental Quality) has issued Effects Screening Levels (ESL's) as chemical-specific air concentrations set to protect human health and welfare. Short-term ESL's are based on data concerning acute health effects, the potential for odors to be a nuisance, and effects on vegetation, while long-term ESL's are based on data concerning chronic health and vegetation effects. ESL's are as follows: Short-Term (1 hour): 0.012 ppm, Long-Term (1 year): 0.0012 ppm.  NIOSH (National Institute of Occupational Safety and Health), U.S. Dept. of Health and Human Services, Center for Disease Control and Prevention (CDC), develops Recommended Exposure levels designed to protect all workers. These are: 10-hour TWA (with 14 hours of non exposure recovery time): 0.016 ppm, Ceiling Level: 0.1 ppm, and IDLH (Immediately Dangerous to Life and Health): 20 ppm.  ACGIH (American Conference of Governmental Industrial Hygienists) has established a workplace Threshold Limit Value (TLV) for a 15 minute time weighted average in the workplace 4 times per 8-hour shift with 16 hours recovery time: 0.3 ppm.  WHO (World Health Organization) and Health Canada have standards designed to protect against cancer – the threshold exposure level at which there is a negligible risk of upper respiratory tract cancer in

humans due to cytotoxic (cellular) damage to the nasal mucosa. These standards are for short-term exposures only, with subsequent zero (negligible) levels of exposure for recovery: WHO: 30-minute average: 0.08 ppm (0.1 mg/m3), and Health Canada: Residential Indoor Air Quality Guidelines, 1-hr exposure limit: 0.1 ppm and 8-hour exposure limit: 0.04 ppm.  The Council Subcommittee on Emergency and Continuous Exposure Guidance Levels for Selected Submarine Contaminants are standards are set for sailors screened for physical fitness, living on submarines. As can be seen from these values, and revising standards to account for current research and health effects knowledge, these levels are proposed to be even lower than those for the American workforce: Current level for 1-hour exposure: 3 ppm; proposed: 0.4 ppm, Current level 24-hour exposure: 1 ppm; proposed: 0.1 ppm.  *See* Plaintiffs' Ex. 8 at 3-4.  Finally, the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) recommends that indoor formaldehyde concentrations inside the home be no greater than 0.1 ppm. Arnold W. Reitze & Sheryl-Lynn Carof, *THE LEGAL CONTROL OF INDOOR AIR POLLUTION ,*25 B.C. Envtl. Aff. L. Rev. 247, 315 -316 (1998).

Against this background, the Government asserts the "level of concern" used was (1) discretionary because there is "no standard for formaldehyde air quality in EHU's or residential structures"; and, (2) it complied with "objective scientific standards" because it is below the HUD "target ambient" standard of .4 ppm.[42]   The studies behind the implementation of this standard were conducted in the 1980's.  And  the Government, through the ATSDR,  acknowledges in its updated and revised Health Consultation, published in October 2007 after criticisms of the original version published in February 2007, that studies since the issuance of the 1985 HUD formaldehyde product

---

[42]        *See* United States' Motion Ex. 9.

standards reflect significantly lower average levels of formaldehyde with "outlier" levels at .4ppm.[43] Since 1985, the EPA, which then stated that formaldehyde presented a significant risk of cancer in humans, now classifies formaldehyde as a probable human carcinogen.[44]   FEMA's adoption of .3 ppm as its level of concern, based upon which it fashioned its testing and couched its warnings, was not based upon good science.   It was the product of manufactured science and used in order to minimize the Government's legal problems rather than protect the public.   Plaintiffs' allegations are based upon the testimony of several experts and one Government employee, and should suffice to create material factual issues regarding whether the United States' response is exempt under the discretionary function exception.

Plaintiffs have alleged the Government's design and ultimate implementation of its response plan, which included the unoccupied trailer testing by EPA and analysis of that data by the ATSDR, was influenced by mounting pressure from the public and Congress regarding formaldehyde emissions.   FEMA's response however was not designed to objectively, scientifically assess the health and safety issues associated with formaldehyde.   Rather, FEMA and FEMA's attorneys embarked upon a course of action designed to understate the severity of these concerns.   Plaintiffs aver that FEMA participated in an inter-agency meeting with the EPA and the CDC in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher, and warning against the "the advisability of testing at all" concerned that the data would have

---

[43]      See United States' Motion Ex. 23, at 00009.

[44]      See United States' Motion Ex. 9 at 000012, and Ex. 23 at 000013.

to be released to the public and that the media would characterize the findings in the worst possible light.[45]  FEMA and EPA senior leadership decided to test ventilation methods on unoccupied trailers in September and October of 2006, which completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were of questionable value for determining a policy to protect trailer residents.[46]  FEMA further manipulated the governmental testing by circumventing normal channels within the  ATSDR, and involving instead little known office in the Office for Preparedness, Terrorism and Emergency Response (OPTER)  to analyze the testing data.[47]  FEMA explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review.  FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units.[48]  FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006.  The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not

---

[45]     *See* Plaintiffs' Exhibit 10, and AMC at ¶ 64.

[46]     AMC at ¶ 65-66.

[47]     Plaintiffs' Exhibit 9, Statement of Christopher T. De Rosa, M.S., Ph. D., Assistant Director for Toxicology and Risk Assessment National Center for Environmental Health/Agency for Toxic Substances and Disease Registry Centers for Disease Control and Prevention U. S. Department of Health and Human Service, to the Subcommittee on Investigations and Oversight Committee on Science and Technology United States House of Representatives Hearing on "Toxic Trailers: Have the Centers for Disease Control Failed to Protect the Public?"  April 1, 2008, at 4, 6-7.

[48]     AMC at ¶ 68.

use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit.[49] Yet even applying this "level of concern," the average sampling results still were higher.[50]   Indeed, in testimony before Congress, industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating  "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw… I think it was a complete violation of our professional code of ethics."[51]

After the publication of the Original Health Consultation in February of 2007, the then Director of the Division of Toxicology and Environmental Medicine, Chris De Rosa, M.D.[52], the office specifically by-passed within the ATSDR during the EPA sampling review process, immediately wrote to FEMA general counsel and Dr. Frumkin of the ATSDR advising that the Health Consultation was "incomplete and misleading" because formaldehyde is classified as "reasonably anticipated to be a human carcinogen" and there is "no recognized 'safe level' of exposure."[53] Dr. Christopher T. De Rosa currently serves as the Assistant Director for Toxicology and Risk Analysis at the National Center for Environmental Health/Agency for Toxic Substances

---

[49]     *See* Plaintiffs' Ex. 9 at 5-7.

[50]     *See* Plaintiffs' Ex. 8 at 7, and AMC at ¶ 69.

[51]     *See* AMC at ¶ 70;  Plaintiffs' Exhibit 13, the  Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 (the full hearing transcript, not reproduced here is *available at* http://oversight.house.gov/documents/20071114164004.pdf); and, Plaintiffs' Ex. 8 at 7.

[52]     Plaintiffs' Ex. 9 at 2.

[53]      *See* AMC at ¶ 71, Plaintiffs' Ex. 9 at 5-7.

and Disease Registry, Centers for Disease Control and Prevention.  Dr. DeRosa has testified that the

mission of ATSDR is "to serve the public by using the best science, taking responsive public health

actions, and providing trusted health information to prevent harmful exposures and disease related

to toxic substances."  He testified that the "Health Consultation," was developed  to fulfill the

Comprehensive Emergency Response, Compensation and Liability Act (CERCLA) public health

mandates as a formal response to what may be *time sensitive issues*.[54]

Dr. DeRosa has testified that while ATSDR was engaged in ongoing verbal and written

evaluations and discussions for a wide range of information on behalf of EPA and FEMA, which

included the evaluation of formaldehyde levels in the air of unoccupied FEMA trailers, in contrast

to a Health Consultation, such evaluations are more informal, usually verbal, periodic discussions

of available data.  He testified that initial discussions regarding sampling protocols and data

collection of formaldehyde in trailers used by the EPA began in late June of 2006.[55] Dr. DeRosa

testified that when his superior, Dr. Howard Frumkin, realized in December 2006 that Dr. DeRosa's

office was evaluating the September 2006 air samples from FEMA trailers, Dr. DeRosa's office was

cut out of the evaluation process.  Dr. DeRosa stated that it was at the specific direction of FEMA's

attorney that the evaluation of EPA's data not be performed by his office, which normally would

have conducted the evaluation, but go instead through OPTER, with direct oversight by Dr. Frumkin

and Dr. Thomas Sinks.[56]  According to Dr. DeRosa, unbeknownst to him, the initial Health

Consultation was forwarded to FEMA on February 1, 2007.  When Dr. DeRosa saw the published

---

[54]        Plaintiffs' Ex.9 at 3.

[55]        *Id.* at 3-4.

[56]        *Id.* at 4, 6-7.

version he immediately contacted Dr. Frumkin's office relaying his concerns that the report failed to address longer term health effects, including that fact that formaldehyde is a carcinogen.  Dr. DeRosa testified that it was FEMA's legal counsel who, as early as the Spring of 2006, first suggested that in evaluating "safe levels of exposure" that the ATSDR restrict its evaluation to short term exposures, to which Dr. DeRosa objected because failure to address long term health effects could be misleading.[57]   After the publication of the original Health Consultation, Dr. DeRosa repeatedly cautioned Dr. Frumkin and others against FEMA's request for "safe" exposure levels for formaldehyde, there being none in his opinion; recommended using the ATSDR's short, intermediate and long term exposure values[58] in assessing the hazards posed by FEMA trailers; and requested that the Government initiate health interventions to interdict exposures and mitigate health effects, and issue warnings to the residents regarding all health effects, including the potential reproductive, developmental and carcinogenic effects of formaldehyde exposure.[59]

Dr. Mary DeVany concurred that the level of concern adopted by FEMA was arbitrary and inconsistent with the published ATSDR long term exposure limit of .008 ppm, which should have been used.[60]   Joining Drs. DeRosa and DeVany are Dr. Heidi Sinclair[61] and  Dr. Meryl Karol, the

---

[57]     *Id.* at 6.

[58]     *See* AMC at ¶ 37.

[59]     *Id.* at 5-7.

[60]     Plaintiffs' Ex. 8 at 7.

[61]     Plaintiffs' Exhibit 12, Testimony of Heidi Sinclair MD, MPH, FAAP Medical Director, Baton Rouge Children's Health Project, Assistant Professor, Department of Pediatrics Louisiana State University Health Sciences Center, to U.S. House of Representatives Committee on Science and Technology Subcommittee on Investigations and Oversight, April 1, 2008.  Dr. Sinclair adopts the ATSDR long-term exposure level of .008 ppm.

latter testifying that the February 2007 Health Consultation's published .3 ppm level of concern was misleading.[62]  He testified that the Government's representation that this level would not adversely affect non-sensitive individuals was contrary to published reports which provide evidence that 0.3 ppm is not a protective concentration even for the general population, and  certainly would not be protective for the more susceptible persons.[63]  Dr. Karol cites to many of the studies  and levels discussed above and specifically addresses a 1997 expert panel review which concluded that maintaining a formaldehyde concentration below 0.1 ppm in the indoor environment where exposures might occur 24 hour/day might avoid acute effects such as irritation in virtually all persons.[64]

In summary, plaintiffs believe that they have established sufficient grounds for this Court to deny the United States' motions to dismiss and summary judgment.  While additional discovery  is needed, plaintiffs have nonetheless identified legitimate grounds upon which to dispute the Government's assertions that all acts, from selection to the EHU's through its flawed response to the formaldehyde health crises, are subject to the discretionary function exception.  Plaintiffs have alleged facts, supported by evidence, to refute the Government's position.  Discovery is necessary concerning the entire FEMA regulatory and internal policy regime in order to determine, (1) what different acts might have been required, or mandated by the "safe and habitable" housing policy or,

---

[62]    Plaintiffs' Exhibit 11,Testimony of Dr. Meryl H. Karol, Professor Emerita, University of Pittsburgh, Pittsburgh, Pennsylvania, Before the U.S. House Committee on Science and Technology Subcommittee on Investigations and Oversight Hearing on "Toxic Trailers: Have the Centers for Disease Control Failed to Protect Public Health?," April 1, 2008.

[63]    *Id.* at 3.

[64]    *Id.* at 5.

alternatively, (2) if discretion was indeed granted regarding a particular act, whether the exercise of that discretion served the underlying policy aims, or (3) whether FEMA, in the application of scientific or regulatory standards, erred and its error was not the product of a permissibly exercised policy choice.

As the Fifth Circuit observed in *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1484 (5th Cir. 1989), "Courts have found it 'unnecessary-and indeed impossible-to define with precision every contour of the discretionary function exception.'" This case presents particular challenges for the plaintiffs and the Court to determine the details of the relevant policy regime in order that a fair determination may ultimately be made concerning the Untied States' position that it should be released from this matter because its conduct has been immunized.  With many thousands of plaintiffs' claiming to have been seriously injured as a result of residing in the EHU's at issue, it is incumbent upon the Court to allow relevant discovery to proceed to completely develop the record concerning the Government's discretionary function defense.

**2.      Plaintiffs Claims asserted in Count 1 of the AMC**.

The plaintiffs' claims under Count 1 of the AMC are not contract-based claims.  These are tort-based claims sounding in general negligence and thus are cognizable under the FTCA and not under the Tucker Act, 28 U.S.C. §1491 or Little Tucker Act, 28 U.S.C. §1346(a)(2).  The Tucker Act is a jurisdictional statute that also waives the federal government's sovereign immunity for monetary claims "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." By its terms,

> [T]he Tucker Act excludes cases 'sounding in tort;' instead, the Federal Tort Claims
> Act subsequently enacted in 1946 waived sovereign immunity for suits in District

Court seeking money damages for tortious wrongs by the federal government.)
Trial court jurisdiction over 'Big' Tucker Act claims against the United States is
assigned by § 1491(a)(2) of title 28 of the United States Code to the Court of Federal
Claims.  District Courts retain concurrent jurisdiction over Tucker Act claims for
$10,000 or less under § 1346 of title 28, which is commonly known as the 'Little'
Tucker Act.  The Big Tucker Act and the Little Tucker Act differ only in terms of the
designated forum.

Gregory C. Sisk *THE TAPESTRY UNRAVELS: STATUTORY WAIVERS OF SOVEREIGN
IMMUNITY AND MONEY CLAIMS AGAINST THE UNITED STATES,* 71 Geo. Wash. L. Rev. 602,
611 (2003).

While it is true that plaintiffs generally and *alternatively* aver to "terms of a lease agreement,"

at ¶100 of the AMC, it is clear from the allegations under Count 1 that plaintiffs are addressing the

Government's status, through FEMA, as a "lessor" under Louisiana law, as well as owner/custodian

of the EHU's, whose responsibilities and concomitant liabilities for personal injuries visited upon

the plaintiffs by the defective condition of the presence of formaldehyde all spring from Louisiana

tort law and obligations imposed by law.  As such, the plaintiffs claims may only be brought under

the FTCA and are specifically excluded under the Tucker Act.

The FTCA and the Tucker Act's respective waivers of sovereign immunity are

non-overlapping, " The FTCA only waives sovereign immunity for tort claims; sovereign immunity

for claims founded upon express or implied contracts with the United States is waived by the Tucker

Act, and not by the FTCA." *Awad v. U.S.*, 2001 WL 741638, 2 (N.D.Miss. 2001) (citing *Rothe Dev.

Corp. v. United States Dep't of Def.,* 194 F.3d 622, 624 (5th Cir.1999); *Davis v. United States,* 961

F.2d 53, 56 (5th Cir.1991)). In order for a claim to implicate the Tucker Act, it must be based upon

or arise out of a contract, and "the court must examine the essence of the plaintiff's claims to

determine whether or not the claims arise out of the failure to perform a contractual obligation."

*Awad* at 3, (citing *City Nat. Bank v. U.S.,* 907 F.2d 536, 546 (5th Cir. 1990); *Blanchard v. St. Paul*

*Fire and Marine Ins. Co.*, 341 F.2d 351, 357-58 (5th Cir.1965)).

Plaintiffs referenced the varying form agreements or leases in Count 1 to emphasize the Government's role as owner/lessor of the EHU's at issue.   However, the obligations referenced in Count 1 all arise under the law of the State of Louisiana and specifically the negligence-based tort law underlying Louisiana Civil Code Articles 2317, 2317.1 and 2696[65].  The implied warranty of La.Civ.Code Art. 2696 arises by operation of law in every contract of lease.  *Walnut Equipment Leasing Co., Inc. v. Moreno,* 26,004 , 8 (La.App. 2 Cir. 1994); 643 So.2d 327, 332; and, *Ford New Holland Credit Co. v. McManus*, 36,567 , 3-4 (La.App. 2 Cir. 12/11/02); 833 So.2d 1130, 1133 (statutory warranty applies to lease of both moveables and immovables).

First, to be clear, there was no uniform "agreement" between FEMA and the plaintiffs as evidenced by Plaintiffs' Exhibits 14, an agreement executed by a Louisiana putative class member purporting *not* to be a lease agreement, and 15, an agreement executed by a Mississippi putative class member couched in terms of a "lease".   Second, the agreement does not serve as the basis for plaintiffs' claims against the Government for damages arising from exposure to formaldehyde. Plaintiffs are not seeking to enforce any specific provision of these agreements.   In any event these agreements were contracts of adhesion, because the plaintiffs were required to sign such documents in order to obtain the EHU. The terms were not negotiable.   Contracts of adhesion are usually

---

[65]      To the extent that La. C.C. Art. 2696 may have retained elements of strict liability under that State's tort law, plaintiffs are specifically not seeking application strict liability in connection with their claims against the United States.  *See Barnes v. Riverwood Apartments Partnership,* 38-495, 38,331 (La.App. 2 Cir. 4/7/04); 870 So.2d 490, 494 (The 1996 enactment of 2317.1 added a notice or knowledge component to 2317, effectively changing liability in this particular area from strict liability to negligence. However, there is jurisprudence suggesting that prior Article 2695 (now C.C. Arts. 2696, 2697 (2004)) was not similarly revised to remove its strict liability cause of action, citing *Driscoll v. Provenzano,* 01-1115 (La.6/1/01), 793 So.2d 201, J. Calogero, concurring.).

contained in standard forms, such as are found in this case.  *See* Saul Litvinoff, *Consent Revisited: Offer Acceptance Option Right of First Refusal and Contracts of Adhesion in the Revision of the Louisiana Law of Obligations*, 47 La.L.Rev. 699, 758 (1987).

Under Louisiana law, valid contract formation must have the following four elements: (1) the parties had the capacity to contract; (2) the parties freely gave their mutual consent to the contract; (3) the parties had cause or reason for obligating themselves; and (4) the contract has a lawful purpose.[66] A court may invalidate a contract under Louisiana law on grounds when a contract is unconscionable.  *Almon v. Higbee Co.,* 2008 WL 79956, 2 (E.D.La. 2008) (citations omitted).  In this case, the agreements were no different than the lease at issue in *Gonzalez v. Hidalgo County, Texas,* 489 F.2d 1043, 1050 (5th Cir. 1973), which was executed by a migrant worker, and held to be "a contract of adhesion where form leases were offered to tenants on an 'accept this or get nothing basis' which tenants were compelled to sign without any real freedom of contract."  In addition there was no "consideration" given in connection with any lease agreement, as the direct housing was a form of Individual Housing Assistance, mandated by the Stafford Act, and owed to  eligible applicants who have a constitutionally protected right to some form of housing assistance.  See *McWaters*, 436 F. Supp. 2d at 818.

The basis of plaintiffs claims under Count 1 is negligence as expressed in La. C.C. Arts. 2317 and 2317.1:

We are responsible, not only for the damage occasioned by our own act, but for that

---

[66]      The Federal Court of Claims has held that to establish a contract under the Tucker Act, the claimant must prove (i) lack of ambiguity in offer and acceptance, (ii) mutuality of intent to contract, (iii) sufficient conduct by a government representative having actual authority to bind the government in contract, and (iv) consideration.  14 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice  & Procedure, Juris*.3d § 3657

which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.

LSA-C.C. Art. 2317

The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

LSA-C.C. Art. 2317.1

Article 2317.1 can be broken down into five elements of proof. The plaintiff must make a prima facie showing that: (1) the defendant was the owner or custodian of the thing; (2) the plaintiff's damage was occasioned by some ruin, vice, or defect in the thing; (3) the defendant knew, or in the exercise of reasonable care, should have known of the ruin, vice or defect; (4) "the damage could have been prevented by the exercise of reasonable care"; and (5) the defendant failed to exercise reasonable care. Joseph E. Lee, III, *A RETURN TO NEGLIGENCE OR SOMETHING MORE? PROVING KNOWLEDGE IN "STRICT LIABILITY" CASES IN LOUISIANA UNDER CIVIL CODE ARTICLE 2317.1,* 59 La. L. Rev. 1225, 1227 (1999).  Plaintiffs have alleged these five elements under Count 1.

In addition to their negligence claims against the United States as owner of the EHU's, any obligations owed to plaintiffs in FEMA's capacity as lessor would have been implied in law; therefore, and to the extent that the law of negligence applies to these legally implied obligations, the FTCA, rather than the Tucker Act provides jurisdiction.  As the Government acknowledges, the Tucker Act extends only to contracts either expressed or implied in fact, and not to claims on

-52-

contracts implied in law. *Hercules Inc. v. U.S.*, 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47

(1996). Congress surrendered the Government's sovereign immunity under the Tucker act on claims

based upon contracts which are expressed or implied in fact only. *Blanchard v. St. Paul Fire &

Marine Ins. Co.*, 341 F.2d at 357-358. The distinction between "implied in fact" and "implied in

law," and the consequent limitation, has been established as follows:

> An agreement implied in fact is 'founded upon a meeting of minds, which, although
> not embodied in an express contract, is inferred, as a fact, from conduct of the parties
> showing, in the light of the surrounding circumstances, their tacit understanding.'
> By contrast, an agreement implied in law is a 'fiction of law' where 'a promise is
> imputed to perform a legal duty...'

*Hercules*, 516 U.S. at 423-424.[67]

The United States suggests plaintiffs have dressed up a contract claim as a tort. This is not

so. Even if the "agreements" between FEMA and plaintiffs were of significance, "where a 'breach

of contract, if any, [is] a mere background for the tort' [Tucker Act] jurisdiction is similarly lacking.

*Salter v. U.S.,* 880 F.Supp. 1524, 1531-1532 (M.D.Ala.1995)(citing *Woodbury v. United States*, 313

F.2d 291, 296-297 (9th Cir. 1963)). Indeed, similar to the plaintiff in the *Salter* case, the plaintiffs

here assert claims primarily for personal injuries arising from tortious conduct of the United States

in issuing dangerous EHU's, and then failing to timely and adequately remove the dangerous

condition, formaldehyde, from the EHU's, or remove the plaintiffs from continued exposure to

formaldehyde in the EHU's. The lease or varying "agreements" are only referenced in Count 1 to

establish that under Louisiana law the Government had obligations to the plaintiffs as owner and as

---

[67]     *See also* 14 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal
Practice & Procedure, Juris.*3d § 3657 (Reference in the statute to actions on "implied
contracts" encompasses only contracts that are implied in fact; actions against the government on
contracts that are implied in law or quasi contracts are outside the district court's Tucker Act
jurisdiction.).

lessor of the subject EHU's.  *See Salter*, 880 F. Supp. at 1532-1533.

Finally, the plaintiffs' claims under Count 1 are not exempted under the FTCA's "misrepresentation" exception.  *See* 28 U.S.C. §2680(h).[68]  "'[T]he essence of an action for misrepresentation is the communication of misinformation *on which the recipient relies.*'...Where there is no detrimental reliance on an alleged miscommunication, no claim for misrepresentation is made."  *Saraw Partnership v. U.S.,* 67 F.3d 567, 571 (5th Cir. 1995) (quoting  *Block v. Neal,* 460 U.S. 289, 296, 103 S.Ct. 1089, 1093, 75 L.Ed.2d 67 (1983) (emphasis added); and, citing *Ware v. United States,* 626 F.2d 1278, 1283 (5th Cir.1980)).  It is only where "the underlying governmental conduct 'essential' to the plaintiff's claim can be fairly read to 'arise out of' conduct that would establish an excepted cause of action." [under §2680(h)]...  Thus... a court must 'look to the essential act that spawned the damages' to determine whether the misrepresentation exception bars the claim."  *Metropolitan Life Ins. Co. v. Atkins,* 225 F.3d 510, 512 (5th Cir. 2000).

The plaintiffs' causes of action arise principally from the Government's negligent conduct in selecting and distributing dangerously defective EHU's, failing timely to remove EHU's from plaintiffs or *vice versa*, and failure to warn the plaintiffs of the dangerous conditions posed by emissions of formaldehyde in the EHU's.  The facts of this case simply do not support the "misrepresentation" exception to the FTCA.

**3.      Plaintiffs Claims asserted in Count 3 of the AMC**.

It would appear that claims by those putative class members who have purchased EHU's

---

[68]      *See* United States' Memorandum at n. 24.

from the Government, specifically the Department of Homeland Security[69], and who are seeking to rescind those contracts of sale, fall within the scope of the Contracts Disputes Act (CDA), and specifically 41 U.S.C. § 602(a)(4).  Plaintiffs will not oppose dismissal without prejudice in order to allow those putative class members who are seeking rescission of those sales to proceed with the pursuit of their claims pursuant to the provisions of the CDA.

## CONCLUSION

For all of the reasons set forth herein, the Court should find subject matter jurisdiction exists, deny the United States' Rule 12(b)(1) motion, and deny or defer ruling upon the Rule 56(c) motion with regard to Counts 1 and 2, in order that discovery relevant to the issues addressed in the motion may be conducted.

Respectfully submitted,

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:   s/Gerald E. Meunier
      GERALD E. MEUNIER, #9471
      **PLAINTIFFS' CO-LIAISON COUNSEL**
      Gainsburgh, Benjamin, David, Meunier &
      Warshauer, L.L.C.
      2800 Energy Centre, 1100 Poydras Street
      New Orleans, Louisiana 70163
      Telephone:    504/522-2304
      Facsimile:    504/528-9973
      gmeunier@gainsben.com

---

[69]    The DHS is an executive department as defined in section 101 of Title 5. 41 U.S.C.A. § 602 (2).

s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:     504/522-2304
Facsimile:     504/528-9973
jwoods@gainsben.com


**COURT-APPOINTED PLAINTIFFS'
STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
RONNIE PENTON, #10462


## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2008, I electronically filed the foregoing with the Clerk of

Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of

record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the

notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF

participants.

s/Gerald E. Meunier
GERALD E. MEUNIER, #9471

## TABLE OF CONTENTS

LEGAL STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    1.    The Discretionary Function exception to the Federal Tort Claims Act and the Stafford Act... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.    *The Discretionary Function Analysis.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.    *Application of the Discretionary Function Analysis.* . . . . . . . . . . . . . . . 12

            1.    ***The known relevant federal statutes, regulations, and/or enunciated policies regarding "direct housing" assistance under the Stafford Act.*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            2.    *Was the Government's selection of EHU's subject to mandatory regulations or policy.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            3.    *FEMA's response to the formaldehyde problem...* . . . . . . . . . . . . 32

    2.    Plaintiffs Claims asserted in Count 1 of the AMC. . . . . . . . . . . . . . . . . . . . . 48

    3.    Plaintiffs Claims asserted in Count 3 of the AMC.. . . . . . . . . . . . . . . . . . . . . 54

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -i-

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -ii-

## **TABLE OF AUTHORITIES**

**CASES**

*In re Katrina Canal Breaches Consolidated Litigation.. . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6, 10

*McWaters v. Federal Emergency Management Agency, . . . . . . . . . . . . . . . . . . . . . . . . 7, 21, 51

Almon v. Higbee Co., 2008 WL 79956 (E.D.La. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). . . . . . 4, 5

Aretz v. U.S., 604 F.2d 417 (5th Cir.1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Armstrong v. Am. Home Shield Corp., 333 F.3d 566 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . 4

Ashford v. U.S., 511 F.3d 501 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Autery v. U.S. ,992 F.2d 1523 (11th Cir.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Awad v. U.S., 2001 WL 741638 (N.D.Miss. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Barnes v. Riverwood Apartments Partnership, 38,331 (La.App. 2 Cir.); 870 So.2d 490 . . . . . . 50

Bear Medicine v. U.S. ex rel. Secretary of Dept. of Interior, 241 F.3d 1208 (9th  Cir. 2001). . 6, 8,
                                                                                              13, 35, 36

Berkovitz v. U.S., 486 U.S. 531, 108 S.Ct. 1954 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Blackburn v. United States, 100 F.3d 1426 (9th Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Blanchard v. St. Paul Fire and Marine Ins. Co., 341 F.2d 351 (5th  Cir.1965). . . . . . . . . . . 49, 53

Boyd v. United States, 881 F.2d 895 (10th Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Buchanan v. United States, 915 F.2d 969 (5th  Cir.1990). . . . . . . . . . . . . . . . . . . . . . . . 6, 22, 27

Centanni v. U.S., 2004 WL 385057 (E.D.La. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Cf.  Loughlin v. U.S., 286 F.Supp.2d 1 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Cf. Gadd By and Through Gadd v. U.S., 971 F.Supp. 502 (D.Utah 1997). . . . . . . . . . . . . . 23, 28

Cf. Gotha v. United States, 115 F.3d 176, 179 (3d Cir.1997) .. . . . . . . . . . . . . . . . . . . . . . . . . 26

*Commerce and Industry Ins. Co. v. Grinnell Corp*, 280 F.3d 566 (5th Cir. 2002). . . . . . . . . . . . . . 9

*Cope v. Scott,* 45 F.3d 445 (C.A.D.C. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 28

*Daigle v. Shell Oil Co.*, 972 F.2d 1527 (10th Cir.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Dalehite v. United States,* 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953) . . . . . . . . . 8

*Davis v. United States,* 961 F.2d 53 (5th Cir.1991)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Domme v. United States*, 61 F.3d 787, 793 (10th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Driscoll v. Provenzano*, 01-1115 (La.6/1/01), 793 So.2d 201). . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Duke v. Department of Agriculture,* 131 F. 3d 1410. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Duke v. Department of Agriculture,* 131 F.3d 1407 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . 25, 28

*Dureiko v. United States*, 209 F.3d 1345 (Fed.Cir.2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Elder v. U.S.* 312 F.3d 1172 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ford New Holland Credit Co. v. McManus*, 36,567 (La.App. 2 Cir. 12/11/02); 833 So.2d 1130
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Garza v. U.S.*, 161 Fed.Appx. 341, 2005 WL 3478009 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . 27

*Gonzalez v. Hidalgo County, Texas,* 489 F.2d 1043 (5th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . 51

*Gotha v. United States,* 115 F.3d 176 (3d Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Graham v. FEMA*, 149 F.3d 997 (9th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hercules Inc. v. U.S.*, 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47  (1996). . . . . . . . . . . . . . . 53

*Hillard v. U.S.*, 2007 WL 647292 (E.D.La. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Hughes v. U.S.,* 116 F.Supp.2d 1145 (N.D.Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Katrina Canal Breaches Consolidated Litigation,* 471 F.Supp.2d 684 (E.D.La. 2007). . . . . 3

*Johnson v. United States Dep't of Interior*, 949 F.2d 332 (10th Cir.1991) . . . . . . . . . . . . . . . . . 27

*Kee v. City of Rowlett, Texas,* 247 F.3d 206 (5th Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Kelly v. Panama Canal Com'n,* 26 F.3d 597 (5th Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kiehn v. United States*, 984 F.2d 1100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Leonard v. Dixie Well Service & Supply, Inc.,* 828 F .2d 291, 294 (5th Cir.1987). . . . . . . . . . . . 5

*Lively v. United State*s, 870 F.2d 296 (5th Cir.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 34

*Lockett v. FEMA*, 836 F.Supp. 847 (S.D.Fla.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*McWaters v. Federal Emergency Management Agency*, 436 F.Supp.2d 802 (E.D.La. 2006) . . . 6, 21

*Metropolitan Life Ins. Co. v. Atkins,* 225 F.3d 510 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . 54

*Miller v. United States,* 163 F.3d 591 (9th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Montez v. Department of Navy,* 392 F.3d 147 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*O'Toole v. U.S.,* 295 F.3d 1029 (9th Cir.2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25

*Oberson v. U.S. Dept. of Agriculture, Forest Service,* 514 F.3d 989 (9th Cir. 2008) . . . . . . . . . 28

*Ramming v. U.S.*, 281 F.3d 158 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Rosas v. Brock*, 826 F.2d 1004 (11th Cir.1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Rothe Dev. Corp. v. United States Dep't of Def.,* 194 F.3d 622, 624 (5th  Cir.1999). . . . . . . . . . 49

*Salter v. U.S.,* 880 F.Supp. 1524. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

*Sami v. United States,* 617 F.2d 755 (D.C.Cir.1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Saraw Partnership v. U.S.,* 67 F.3d 567 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Smith v. United States*, 546 F.2d 872 (10th Cir.1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*State of Kan. ex rel. Hayden v. U.S.*, 751 F. Supp. 1495 (D. Kan. 1990). . . . . . . . . . . . . . . . . . 21

*Torres v. Government of the United States*, 979 F.Supp. 1054 (D.Vi.1997). . . . . . . . . . . . . . . . . 7

*Trevino v. General Dynamics Corp*., 865 F.2d 1474 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . 48

*United Power Association v. FEMA*, 2000 WL 33339635 (D.N.D. Sept.13, 2000). . . . . . . . . . . . 7

*United States v. Corpus,* 491 F.3d 205 (5th Cir.2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). . . . . . . 8, 9, 11

*United States v. S.A. Empresa de Viacao Aera Rio Grandense (Varig Airlines),* 467 U.S. 797 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 27

*Walnut Equipment Leasing Co., Inc. v. Moreno,* 26,004 (La.App. 2 Cir. 1994); 643 So.2d 327 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Watson v. Federal Emergency Management Agency,* 2006 WL 5249703 (S.D.Tex. 2006). . . . . 6

*Whisnant v. U.S.*, 400 F.3d 1177 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 35

*Zumwalt v. United States*, 928 F.2d 951(10th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Almon v. Higbee Co.,* 2008 WL 79956 (E.D.La. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). . . . . . 4, 5

*Aretz v. U.S.,* 604 F.2d 417 (5th Cir.1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . 4

*Ashford v. U.S.,* 511 F.3d 501 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Autery v. U.S. ,*992 F.2d 1523 (11th Cir.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Awad v. U.S.*, 2001 WL 741638 (N.D.Miss. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Barnes v. Riverwood Apartments Partnership,* 38,331 (La.App. 2 Cir.); 870 So.2d 490 . . . . . . 50

*Bear Medicine v. U.S. ex rel. Secretary of Dept. of Interior*,

      241 F.3d 1208 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 13, 35, 36

*Berkovitz v. U.S.*, 486 U.S. 531, 108 S.Ct. 1954 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Blackburn v. United States*, 100 F.3d 1426 (9th Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Blanchard v. St. Paul Fire and Marine Ins. Co.*, 341 F.2d 351 (5th Cir.1965). . . . . . . . . . . . 49, 53

*Boyd v. United States*, 881 F.2d 895 (10th Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Buchanan v. United States,* 915 F.2d 969 (5th Cir.1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 22, 27

*Centanni v. U.S.,* 2004 WL 385057 (E.D.La. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Cf. Loughlin v. U.S.,* 286 F.Supp.2d 1 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cf. Gadd By and Through Gadd v. U.S.,* 971 F.Supp. 502 (D.Utah 1997). . . . . . . . . . . . . . 23, 28

*Cf. Gotha v. United States,* 115 F.3d 176, 179 (3d Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . 26

*Commerce and Industry Ins. Co. v. Grinnell Corp,* 280 F.3d 566 (5th Cir. 2002). . . . . . . . . . . . . 9

*Cope v. Scott,* 45 F.3d 445 (C.A.D.C. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 28

*Daigle v. Shell Oil Co.,* 972 F.2d 1527 (10th Cir.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Dalehite v. United States,* 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953) . . . . . . . . . 8

*Davis v. United States,* 961 F.2d 53 (5th Cir.1991)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Domme v. United States,* 61 F.3d 787, 793 (10th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Driscoll v. Provenzano,* 01-1115 (La.6/1/01), 793 So.2d 201). . . . . . . . . . . . . . . . . . . . . . . . . 50

*Duke v. Department of Agriculture,* 131 F. 3d 1410. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Duke v. Department of Agriculture,* 131 F.3d 1407 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . 25, 28

*Dureiko v. United States,* 209 F.3d 1345 (Fed.Cir.2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Elder v. U.S.* 312 F.3d 1172 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ford New Holland Credit Co. v. McManus,*

      36,567 (La.App. 2 Cir. 12/11/02); 833 So.2d 1130. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Garza v. U.S.,* 161 Fed.Appx. 341, 2005 WL 3478009 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . 27

*Gonzalez v. Hidalgo County, Texas,* 489 F.2d 1043 (5th Cir. 1973). . . . . . . . . . . . . . . . . . . . . 51

*Gotha v. United States,* 115 F.3d 176 (3d Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Graham v. FEMA,* 149 F.3d 997 (9th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hercules Inc. v. U.S.*, 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). . . . . . . . . . . . . . . 53

*Hillard v. U.S.*, 2007 WL 647292 (E.D.La. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Hughes v. U.S.,* 116 F.Supp.2d 1145 (N.D.Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Katrina Canal Breaches Consolidated Litigation,*

    471 F.Supp.2d 684 (E.D.La. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 6, 10

*Johnson v. United States Dep't of Interior*, 949 F.2d 332 (10th Cir.1991) . . . . . . . . . . . . . . . . . 27

*Kee v. City of Rowlett, Texas,* 247 F.3d 206 (5th Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Kelly v. Panama Canal Com'n,* 26 F.3d 597 (5th Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kiehn v. United States*, 984 F.2d 1100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Leonard v. Dixie Well Service & Supply, Inc.,* 828 F .2d 291, 294 (5th Cir.1987). . . . . . . . . . . . 5

*Lively v. United State*s, 870 F.2d 296 (5th Cir.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 34

*Lockett v. FEMA*, 836 F.Supp. 847 (S.D.Fla.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*McWaters v. Federal Emergency Management Agency*,

    436 F.Supp.2d 802 (E.D.La. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 21, 51

*Metropolitan Life Ins. Co. v. Atkins,* 225 F.3d 510 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . 54

*Miller v. United States,* 163 F.3d 591 (9th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Montez v. Department of Navy,* 392 F.3d 147 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*O'Toole v. U.S.,* 295 F.3d 1029 (9th Cir.2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25

*Oberson v. U.S. Dept. of Agriculture, Forest Service,* 514 F.3d 989 (9th Cir. 2008) . . . . . . . . . 28

*Ramming v. U.S.*, 281 F.3d 158 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Rosas v. Brock,* 826 F.2d 1004 (11th Cir.1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Rothe Dev. Corp. v. United States Dep't of Def.,* 194 F.3d 622, 624 (5th Cir.1999). . . . . . . . . . 49

*Salter v. U.S.,* 880 F.Supp. 1524. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

*Sami v. United States,* 617 F.2d 755 (D.C.Cir.1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Saraw Partnership v. U.S.,* 67 F.3d 567 (5th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Smith v. United States*, 546 F.2d 872 (10th Cir.1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*State of Kan. ex rel. Hayden v. U.S.*, 751 F. Supp. 1495 (D. Kan. 1990). . . . . . . . . . . . . . . . . 21

*Trevino v. General Dynamics Corp.*, 865 F.2d 1474 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . 48

*Torres v. Government of the United States*, 979 F.Supp. 1054 (D.Vi.1997). . . . . . . . . . . . . . . . . 7

*United Power Association v. FEMA*, 2000 WL 33339635 (D.N.D. Sept.13, 2000). . . . . . . . . . . 7

*United States v. Corpus,* 491 F.3d 205 (5th Cir.2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). . . . . . . 8, 9, 11

*United States v. S.A. Empresa de Viacao Aera Rio Grandese (Varig Airlines),* 467 U.S. 797 (1984)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 27

*Walnut Equipment Leasing Co., Inc. v. Moreno,* 26,004 (La.App. 2 Cir. 1994); 643 So.2d 327
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Watson v. Federal Emergency Management Agency,* 2006 WL 5249703 (S.D.Tex. 2006). . . . . . 6

*Whisnant v. U.S.*, 400 F.3d 1177 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 35

*Zumwalt v. United States*, 928 F.2d 951(10th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## FEDERAL RULES

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 11, 55

Fed. R. Civ. P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

## FEDERAL STATUTES

28 U.S.C. 2671. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

28 U.S.C. § 1346(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. § 1491(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

28 U.S.C. § 2674 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. §1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. §1346(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

28 U.S.C. §1346(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 U.S.C. §1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

28 U.S.C. §2680(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

28 U.S.C. §2680(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

41 U.S.C. § 602(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

41 U.S.C.A. § 602 (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

42 U.S.C. § 5121(a)(2) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 5174(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. §5121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. §5148 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. §5174(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C.A. § 5174 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C.A. § 5174 (c)(1) (B)(ii)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 U.S.C.A. § 5174(b)(1) (Supp. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11, 55

## FEDERAL REGULATIONS

24 C.F.R. § 3282.8(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

24 C.F.R. §3280.308 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

24 C.F.R. §3280.309. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 C.F.R. § 206.111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

44 C.F.R. 206.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

44 C.F.R. § 206.110. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

44 C.F.R. § 206.113(a)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

44 C.F.R. § 206.117. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

44 C.F.R. § 206.117(b)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

44 C.F.R. § 206.117(b)(ii)(F). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

44 C.F.R. §206.117(b)(D)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22

44 C.F.R. §§ 206.110(a),(c), 206.117. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## STATE STATUTES

La. C.C. Art. 2317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

La. C.C. Art. 2317.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

La. C.C. Art. 2696. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

La. C.C. Art, 2695 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

La.Civ.Code Art. 2696. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Louisiana Civil Code Articles 2317, 2317.1 and 2696. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## OTHER AUTHORITIES

10B Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE,

Cɪᴠ. 3ʀᴅ § 2740, §2741 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

14 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice  & Procedure, Juris.*3d § 3657 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 53

47 La.L.Rev. 699, 758 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

59 La. L. Rev. 1225, 1227 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Federal Practice & Procedure, Juris.*3d § 3657 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Gregory C. Sisk *THE TAPESTRY UNRAVELS: STATUTORY WAIVERS OF SOVEREIGN IMMUNITY AND MONEY CLAIMS AGAINST THE UNITED STATES,* 71 Geo. Wash. L. Rev. 602, 611 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Joseph E. Lee, III, *A RETURN TO NEGLIGENCE OR SOMETHING MORE? PROVING KNOWLEDGE IN "STRICT LIABILITY" CASES IN LOUISIANA UNDER CIVIL CODE ARTICLE 2317.1,* 59 La. L. Rev. 1225, 1227 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Saul Litvinoff, *Consent Revisited: Offer Acceptance Option Right of First Refusal and Contracts of Adhesion in the Revision of the Louisiana Law of Obligations*, 47 La.L.Rev. 699, 758 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51