STATEMENT OF RICHARD L. SKINNER

INSPECTOR GENERAL

U.S. DEPARTMENT OF HOMELAND SECURITY

BEFORE THE

COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

UNITED STATES SENATE

FEBRUARY 13, 2006



Good morning Madam Chairman and Members of the Committee.

Thank you for the opportunity to be here today to discuss our ongoing and future audit and investigative efforts. I would like to focus my remarks on two important areas, sheltering initiatives and contract management.

However, before I begin my testimony, there are four groups I want to be sure are recognized. First, there have been many negative stories in the media about FEMA. It's not a secret that there are issues that need to be addressed. However, given all the negative press, the FEMA employees on-the-ground are working extraordinarily long hours, living away from their families for weeks at a time, and are not being recognized for their genuine commitment and hard work. Despite their heavy workload, FEMA employees have been very cooperative with my office. I understand from some of them that if they're recognized in the public as FEMA employees, they often are spat on and booed. This is unfortunate. Most are hard working federal employees trying to make a difference. To them, it's not just a job, but a way to serve their fellow citizens in a time of need.

Second, I want to take this time to recognize the support and assistance of the Department of Homeland Security (DHS). Both Secretary Chertoff and Deputy Secretary Jackson have made every effort to ensure that my office has access to whatever information we may need and deem important. The Secretary and Deputy Secretary have formally requested that we provide management counsel about how best to work through the issues of procurement, financial controls, and related matters that will help ensure DHS components are the best stewards of taxpayer dollars.

Third, I would like to recognize the efforts of the President's Council on Integrity and Efficiency (PCIE), and the Government Accountability Office (GAO), for their collective efforts to ensure that disaster relief funds are being spent wisely. Hundreds of auditors and investigators are now working, and will continue to work aggressively, in a coordinated manner to oversee the Federal Government's Gulf Coast Hurricane response and recovery efforts. I am extremely proud to be part of the PCIE community.

Finally, I would like to recognize the efforts of the Department of Justice (DOJ) in supporting the Inspectors General investigative activities. Their cooperation and support is unprecedented, and the success that we have had to date combatting Hurricane Katrina fraud can be tied directly to their fraud task force initiatives.

Thank you for allowing me to digress, I want to make sure that all the hardworking federal employees and agencies get the recognition they so rightly deserve.

## **OVERVIEW OF OIG HURRICANE KATRINA OVERSIGHT**

Hurricane Katrina devastated the Gulf Coast regions of Louisiana, Mississippi, and Alabama. Katrina was the third most intense hurricane to hit the United States in history, and the sixth strongest hurricane ever recorded in the Atlantic basin. Katrina's damage

2

alone was significant; however, followed by Hurricane Rita, the damage remains uncalculated.

As you well know, in the wake of Katrina, Congress responded quickly with funds for immediate relief efforts, and the long process of recovery began. To date, emergency appropriations totaling about $85 billion have been made available for the recovery effort, of which $36.6 billion went to FEMA. Of the $36.6 billion added to the Disaster Relief Fund, $22 billion has been obligated for contracts, grants, and other disaster related activities.

Although FEMA is responsible for coordinating response and recovery efforts, the enormous effort required to restore the Gulf Coast necessitated the combined and collaborative efforts of many federal, state, and local government entities. Estimates of the cost to recover from the storm and rebuild the affected areas are as high as $200 billion. With this much damage, money, and number of agencies involved, the necessity for oversight is unprecedented.

Recognizing the need to protect taxpayers' dollars, the Office of Management and Budget in early September 2005 mandated that the federal agencies involved in the disaster response and recovery efforts develop a stewardship plan. The plan sets the framework for mitigating risks associated with crisis procurement, managing the broad scope of oversight work, and overseeing contracts awarded. On the heels of the Office of Management and Budget/Department of Homeland Security plan, the Federal Office of Inspectors General (OIGs) involved in oversight of disaster relief efforts developed an audit hurricane coordination model. The model outlined which OIGs would focus on what recovery activities and during which phase of the recovery. By December 2005, the federal OIGs published the first <u>Compendium of Hurricane Oversight Plans</u> for single- and multiple-agency management reviews, audits, and investigations. To date, the OIGs have completed 15 reviews, initiated more than 121, and plan at least 50 more within the next six months. This does not take into account the thousands of man hours expended by the OIGs to provide oversight, counsel, and technical advisory services to their respective program managers involved in hurricane relief activities.

On September 8, 2005, the U.S. Attorney General established the Hurricane Katrina Fraud Task Force to deter, investigate, and prosecute disaster-related federal crimes. The task force is led by the Department of Justice, Criminal Division, and is based in Louisiana. The task force includes federal, state, and local law enforcement agencies.

In October 2005, the PCIE and the Executive Council on Integrity and Efficiency (ECIE) developed an investigation coordination model to address how case referrals, and investigations would be coordinated and managed by the litany of law enforcement agencies involved in the prevention and detection of fraud in disaster assistance programs.

Additionally, the Hurricane Relief Fraud Hotline was created on October 4, 2005, to support all federal agencies involved in the recovery. The Department of Defense Office

3

of Inspector General serves as the operator of the Hotline on behalf of all OIGs. The Hotline, which has reported 11,102 calls through the end of January 2006, functions as a channel for tracking incoming complaints and allegations of wrongdoing.

In the first 90 days after Katrina swept the Gulf Coast area, more than 4,700 contracts were awarded, valued at more than $8.1 billion, mostly for emergency response and the initial stages of recovery. Usually, disaster response periods last roughly 72 hours. In this case, the initial response to help the millions affected by the hurricanes lasted approximately three months. Also unique to this disaster is the breadth of states to which victims were evacuated. FEMA reports that currently 42 states plus the District of Columbia are housing victims of Katrina. At one point, evacuees were reported in all 50 states. This phenomenon, in itself, has increased the opportunity for fraud, waste, and abuse.

As the emergency response phase diminishes, individual and household assistance is growing. Likewise, public assistance grants have increased dramatically over the past several months as the arduous task of rebuilding the Gulf Coast's infrastructure begins in earnest.

Fortunately, the OIG community is well poised to address the need for oversight of the Federal Government's disaster response and recovery programs and operations. Prior to Hurricane Katrina, the PCIE established a Homeland Security Roundtable, based on their collective experience after the 9/11 attacks. The roundtable is a natural focal point around which hurricane recovery oversight can revolve. And, as Chair of the PCIE's Homeland Security Roundtable, I have been tasked with coordinating its activities. Needless to say, Hurricane Katrina oversight has been my number one priority for the past five months, and it will continue to be so for months and years to come. In addition to the OIGs involved in disaster response and recovery, I have invited the DOJ Katrina Fraud Task Force, GAO, and staffers from both Senate and House oversight committees to participate—since we all have one mission in common, to ensure that disaster relief funds are spent wisely.

In addition, I have created a separate Special Inspector General for Gulf Coast Recovery within my office. The Special IG provides:

- Independent audits and investigations of disaster relief operations
- Independent and objective leadership and coordination of, and recommendations on, policies designed to promote economy, efficiency, and effectiveness in the administration of disaster programs and operations, and prevent and detect fraud, waste, and abuse.
- An independent and objective means of keeping the Congress, the Secretary of Homeland Security, and all other federal departments and agencies involved in disaster relief fully and currently informed about problems and deficiencies relating to the administration of disaster relief programs and operations, and the necessity for and progress of corrective action.

This allows us to stay current on all disaster relief operations, and provide on-the-spot advice on internal controls and precedent setting decisions.

Although FEMA has cooperated with our efforts and is in the process of implementing procedures to identify and reduce waste, fraud, and abuse, it has yet to implement a number of DHS/OIG recommendations, which, in our opinion, could have mitigated many of the problems they are experiencing today. In May 2005, we provided FEMA with a report entitled, "FEMA's Individuals and Households Program in Miami-Dade County, Florida, for Hurricane Frances." In the report, we identified the need for better development and implementation of policies, procedures, and guidelines in the granting of awards to individuals and households for hurricane relief. Unfortunately, FEMA had not implemented those controls when Katrina struck. The lack of basic internal controls is contributing partially to the fraud, abuse, and waste we are currently seeing.

We have initiated a number of reviews as part of our stewardship role for the Department's Hurricane Katrina relief efforts.  Our plan of action to ensure the appropriate use of FEMA funds can be summarized as follows:

- <u>Assigned Audit and Investigation Teams to Joint Field Offices (JFOs).</u>  We deployed audit and investigative teams to each of the JFOs in Alabama, Mississippi, Louisiana, Texas, and Florida to provide technical assistance to FEMA, State, and local officials.  The auditors are providing advice on various matters to FEMA, state, and local officials and perform proactive procedures related to the internal activities of the JFOs to ensure the appropriate control and use of FEMA funds.  The investigators are coordinating with the respective federal, state, and local law enforcement agencies and prosecutors as part of their "fraud awareness" initiatives and initiated a series of investigations of allegations received through the Katrina "Hotline," and other sources.

- <u>Assigned Team to FEMA Emergency Operations Center.</u> We assigned a team to the FEMA EOC to monitor disaster relief operations and provide consulting services and advice, as requested, on the precedent setting decisions that relate to the "welter of issues" confronting FEMA as it attempts to carry out its emergency response and recovery responsibilities.

- <u>Participate in Applicant Briefings and Kickoff Meetings.</u>  The auditors are assisting program officials during applicants' briefings and also participate in any follow-up meetings with selected applicants and inform potential applicants of FEMA's documentation requirements.

- <u>Provide Upfront Technical Advice on Grant Recipient Accounting Systems and Procedures.</u>  During meetings with applicants, our auditors are offering to visit their place of business to review their accounting systems and subgrant administration policies, procedures, and practices.  The auditors are making site visits to state and local offices, as well as others who qualify for disaster assistance, to evaluate their systems and subgrant management controls to account

5

>     for FEMA funds and identify weaknesses early in the process that need to be corrected.
>
> - <u>Review Major Contracts.</u>  Our auditors are reviewing all major FEMA contracts, including those awarded by our federal partners working under Mission Assignments and grant recipients to ensure that appropriate federal acquisition regulations are being adhered to, and expenditures are necessary and reasonable.
>
> - <u>Review Property Management.</u>  Our auditors are determining whether FEMA property management practices provide sufficient safeguards against pilferage and loss, particularly property acquired for use under mission assignments.
>
> - <u>Review Supporting Documentation for Public Assistance Projects.</u>  The auditors are also closely monitoring FEMA's approval of Public Assistance projects.  We are initiating audits of selected projects in their early implementation stages to ensure compliance with federal laws and FEMA regulations, and before funds can be misspent.
>
> - <u>Review FEMA's Disaster Management Programs in Response to Hurricane Katrina.</u> We plan to issue, within the next couple of months, an inspection of the overall adequacy of FEMA's emergency management program, i.e., how well FEMA carried out its disaster management responsibilities in response to Hurricane Katrina.

We are also conducting performance reviews of the individual household assistance program, FEMA's sheltering initiatives, and its management of mission assignments.

The above lays out just a few of our immediate plans to address the overwhelming need for oversight and stewardship. Today, I want to share with you some of the issues that we are currently raising through our on-going reviews and audits of FEMA's disaster response and recovery efforts.   Many of the issues I will discuss are directly attributable to poorly managed programs, the lack or circumvention of basic internal controls, the absence of consistent and authoritative guidance, communication breakdowns, and ineffective information systems.  We plan to issue reports on these issues in the near future.

## **OVERSIGHT OF SHELTERING INITIATIVES**

This is the largest disaster that FEMA has had to respond to in its history. However, it does not mitigate the need for controls to be in place to prevent duplication of benefits and to manage the overall assistance being provided to victims of the disaster.

We are conducting a performance review of the sheltering initiatives to ensure that controls are in place and fraud and mismanagement are minimized. We are working closely with other OIGs through the PCIE that have temporary housing programs, such as the Department of Housing and Urban Development.

6

To coordinate the sheltering initiatives, FEMA established a Housing Area Command (HAC) that was set up in the Baton Rouge JFO to meet the needs of evacuees. The initial purchases for manufactured and modular homes and travel trailers were authorized by the HAC. While it appears the HAC overreacted to the overwhelming number of evacuees needing temporary housing, we are still evaluating the initial decisions made to determine the number and types of transitional housing needed, as well as the controls in place to ensure accountability of the transitional housing units purchased.

In addition to manufactured and modular homes and travel trailers, evacuees with immediate housing needs were placed in shelters, including hotels/motels and apartments, that were dispersed throughout the country. FEMA is working to transition all eligible evacuees into its Section 408 Direct Housing assistance program by March 1, 2006. However, there are a number of issues that we are finding that need to be addressed to ensure that the transition is done in an economic, efficient, and effective manner.

**Manufactured Housing**

It appears that FEMA may have over purchased manufactured homes and modular homes in excess of housing needs. FEMA is now paying to store and maintain them at various sites throughout the country. It is unclear how the decision was made; however, we determined that FEMA purchased 24,967 manufactured homes at a cost of $857.8 million and 1,295 modular homes at a cost of $40 million.

FEMA regulations prohibit using mobile homes in flood plains; therefore, the manufactured homes and modular homes cannot be used where most needed, i.e., in parts of Louisiana and Mississippi. Currently, the only use for modular homes has been to house emergency personnel, 50 in Alabama and 50 in Mississippi, and there is consideration to use some to store supplies at some of FEMA's locations, e.g., the furniture for the modular homes. To date, FEMA has identified the need for 2,600 manufactured homes in Louisiana and 2,000 in Mississippi. FEMA officials have also advised us that they plan to make some of these homes available for victims of the fire declarations in Texas and Oklahoma and for use in the areas that are not in flood plains. They also advised that with hurricane season close at hand, they might use some of the manufactured housing stock in other areas of the country. While there currently is no plan to sell any of the homes, FEMA officials advised that they plan to establish a staff of 22 sales personnel to work out of the Cumberland, Maryland, Distribution/Logistics Center in case the homes cannot be utilized. Needless to say, should FEMA opt to sell the surplus homes, they will be unable to recoup their investment since many of the homes are being poorly maintained and others have had built-in TVs, microwave ovens, and dishwashers removed because FEMA did not want some evacuees to get a manufactured home with a television or microwave while others did not receive the same amenity.

At one Emergency Housing Site in Hope, Arkansas, there are 10,777 manufactured homes, costing approximately $301.7 million, sitting on runways and in open fields. Since they are not properly stored, the homes are sinking in the mud and their frames are

7

bending from sitting on trailers with no support. FEMA is now in the process of installing jacks under the manufactured homes to help steady the frames. As of January 2006, none of the manufactured homes stored at Hope, Arkansas, have been moved out to house evacuees.

The problem is exacerbated because FEMA cannot use any manufactured homes greater than 14 feet wide or 60 feet long, of which they currently have approximately 2,360 in stock, because they do not meet current FEMA specifications. FEMA is considering declaring these homes as surplus and transferring them to the General Services Administration (GSA) for donation to other federal agencies that may have a need.

**Travel Trailers**

FEMA purchased 114,341 travel trailers at a cost of $1.7 billion. Approximately 75,000 are being used by evacuees and another 21,000 travel trailers are available for delivery to disaster victims. The remainder are being transported to sites or undergoing preparations for use. FEMA officials recently authorized the purchase of 4,000 more trailers.

We are currently reviewing the entire process for accountability of the trailers from the initial orders, the receipt by FEMA, to final delivery to an evacuee. We have reviewed various reports all with a different set of numbers as to what has been ordered, received, and occupied. These discrepancies suggest that FEMA and its contractors do not have sufficient controls or systems in place to account for the trailers and their ultimate disposition.

We are also concerned with contractors who are taking parts from damaged trailers that were not fully mission capable to bring other trailers into mission capable status. We found 36 cannibalized trailers in Mississippi and were told by FEMA officials that the total number is actually 51. Trailers that were not fully mission capable were missing batteries, propane tanks, or other small parts. At the beginning of the disaster, parts were not readily available, thus the contractor felt it was necessary to cannibalize non-mission capable trailers to meet the needs of the applicants. According to FEMA officials, trailers with missing parts were not reported nor were the trailers that were not mission capable. Both of these categories remain in FEMA inventory as usable trailers. Much of the damage to the trailers that were cannibalized appeared to be structural in nature, consistent with damage that would occur while in transit. Damage incurred during transit should be covered by, and filed with, the transporter's insurance company. Also, trailers received with missing parts or not fully mission capable should have been reported to the manufacturer and repaired under the manufacturer's warranty. The decision to cannibalize damaged trailers that most likely would have been covered under the manufacturer's warranty, or would be the responsibility of the transporter, unnecessarily increases FEMA's overall cost of travel trailers.

**Inspection and Acceptance Processes**

We observed the delivery and acceptance of travel trailers and mobile homes without any formal inspection procedures. Absent a thorough inspection prior to acceptance, FEMA could take possession of defective or non-compliant inventory. Given the high cost of individual units, comprehensive inspections are needed before acceptance.

**Trailer Specifications**

FEMA purchased over 27,000 travel trailers "off the lot" from over 300 local firms who had a variety of travel trailers in inventory. We reviewed a number of these contracts and noted that the contracts identified the model type and the Vehicle Identification Number for each individual trailer. However, the contracts that did not specify minimum specifications requirements, making it possible that some trailers did not meet FEMA's requirements or had significant deficiencies. Because minimum specifications were not included in the "off the lot" contracts, FEMA may have difficulty requiring contractors to repair defects in delivered trailers. We noted that when buying directly from manufacturers, FEMA included in the contract, extensive specification requirements to protect the interests of the Government.

**Apartments**

Under the Public Assistance program, FEMA has utilized the option of leasing apartments for evacuees. There are over 43,000 apartment leases in approximately 32 states to house evacuees with the majority of those in Texas. Some cities in Texas established 12-month lease agreements to house evacuees. However, evacuees were placed in these apartments before FEMA determined their eligibility for disaster assistance. FEMA is now planning to determine whether those in apartments are eligible for disaster assistance.

If a household is eligible for direct assistance, FEMA will refer the applicant to its contractor who will enter into an agreement with the landlord/lessor to pay the rental amount on a month-to-month basis up to the Fair Market Rent (FMR) published by HUD. A household may rent a unit that exceeds FMR; however, unless approved by FEMA, the applicant will be responsible for the difference in the rental amount. FEMA's contractor will not be responsible for the performance of the lease agreement and will not be liable or responsible for the household's behavior or conduct in tenancy. The contractor will continue the direct assistance payments until FEMA notifies the contractor to discontinue or until the applicant is no longer residing in the unit.  The above procedures hold true for all apartment leases with the exception of those located in the City of Houston. FEMA has a separate contract with Houston to provide apartments for evacuees.

**Other Transitional Housing**

FEMA obtained a no cost lease to use facilities at the Starship facility in Anniston, AL, at the former Fort McClellan Army base for a period of two years on August 31, 2005. The

9

facility is owned and operated by the Joint Powers Authority—a non-profit organization. It is co-located with FEMA's Nobel Training Center. In return for the no cost lease, FEMA was required to refurbish the facility in order to make it a suitable housing site for approximately 1,000 evacuees.  FEMA spent an estimated $7.9 million in disaster relief funds to refurbish the facility as it was in poor condition after having been mothballed for over six years with mechanical systems and building interiors in poor condition.  Most metal surfaces were reportedly corroded and non-metallic surfaces were covered with a black mold. The renovated buildings were adjacent to a firing range that required expensive fencing to minimize risk from unexploded ordinance.  Additionally, the contractor performing the work renovated a boiler plant, gymnasium, clinic, resource center, and welcome center.

The Starship facility received the first evacuee on September 15, 2005, but was shutdown by FEMA less than two months later on October 25, 2005, as the number of projected evacuees never materialized and facility-operating costs were too high.  The Starship facility averaged less than ten evacuees per day during the short time that it was open for business.  The contractor performing the work did not receive a formal statement of work until October 25, 2005; the same day the facility was shutdown by FEMA. Between September 15, 2005-October 25, 2005, daily occupancy at the Starship facility ranged between four and 19 evacuees.  At the maximum occupancy level, this equates to $416,000 per evacuee.  We understand that FEMA terminated the lease and returned the improved property to the Joint Powers Authority.

**Individual Assistance**

We are currently conducting a performance review of the Individuals and Households Program (IHP), and are also working closely with other OIGs through the PCIE, that have individual assistance programs, e.g., Department of Health and Human Services (HHS) and the Small Business Administration. We are working to identify weaknesses in the controls of the application process from receipt, review, and award to ensure only those individuals eligible for FEMA assistance receive it. Because of the varying types of assistance including rental assistance, home repairs, hotels/motels, apartment leases, and travel trailers, we are reviewing the potential for duplication of benefits or fraud.

## **CONTRACT MANAGEMENT ACTIVITIES**

As government agencies rushed to meet requirements in the immediate aftermath of Katrina, they used expedited contracting methods as authorized under Federal Acquisition Regulations. The media has already reported many cases in which procurement personnel authorized contractors to begin work without a definitive statement of work, often on a sole-source basis with no attempt to independently estimate costs.  While we have found many instances where contractors performed their work efficiently and in good faith, we have also found instances where there were problems. In some cases, the Government will have little legal recourse to recoup payments to contractors for payments under questionable contracts.

DHS has reported awarding over $5 billion in contracts to date and other agencies have reported a total of over $4.2 billion in awards. We are implementing a proactive and aggressive audit oversight program of contracting activities. Our objectives are to determine the extent: (1) federal acquisition regulations are being adhered to, (2) effective contracting practices are being used on these procurements, and (3) the expenditures are necessary and reasonable. Auditors are currently reviewing the award and administration of major contracts, especially those awarded in the first two weeks. Particular emphasis is being placed on cost-reimbursement, time and materials, no-bid, and limited competition contracts.

As a community, the OIGs have committed to providing effective contract oversight and have established a Hurricane Katrina Contract Audit Task Force to coordinate those efforts. This group includes auditors from DHS, GAO, the Departments of Defense (including the service audit agencies from Army and Navy), HUD, HHS, the Department of Energy, GSA, and the Environmental Protection Agency.

One of the objectives of the Contract Audit Task Force is to provide consistent contract oversight across all government agencies involved in Katrina. To this end, contract audit experts from the community are currently evaluating the risks presented by large dollar contracts awarded without competition or definitive requirements and identifying contracts that require more detailed review or investigation. As we perform these reviews, we will identify situations where the government agencies can save federal funds by amending or terminating questionable contracts.  In other cases, OIGs or the Defense Contract Audit Agency (DCAA) will be performing detailed cost incurred audits to identify questionable costs that the Government should not reimburse to the contractor. The OIGs will be issuing reports as soon as problems and issues are identified so that corrective actions can be taken immediately.

As a specific example of how the OIG community is cooperating on contract oversight, I point to our work on the use of cruise ships to house Katrina evacuees. FEMA tasked the Military Sealift Command within the Department of Navy to contract cruise ships to provide housing and other services for evacuees displaced by Hurricane Katrina. My office is working with auditors from the Naval Audit Service to provide a thorough review of both the programmatic and contracting aspects of the program. Auditors from DHS OIG have determined that FEMA's initial decision to lease cruise ships was reasonable under the urgent circumstances following Hurricane Katrina. Our auditors determined that the use of cruise ships may have been economical in a high cost area such as New Orleans so long as occupancy remains high, but are not economical in low cost areas such as Alabama and Mississippi.  We found the cruise ship average occupancy rate to be 80%, however, the cruise ships require a 95% occupancy rate to be cost effective compared to per diem.

At the same time, the Naval Audit Service is reviewing contracts awarded by the Military Sealift Command under a FEMA Mission Assignment to determine the reasonableness of

11

the contract terms and the resulting costs. We anticipate completing both reviews and issuing final reports in the near future.

My office is also working with Army Audit Agency to review Corps of Engineers contracts for debris removal and other emergency response activities in the Gulf Coast states. While Army Audit is doing the actual contracting reviews, DHS auditors are sharing tips, information and concerns on debris removal activities and oversight. Most of the DHS auditors working on Katrina oversight have extensive experience with disaster response and are conversant on the inherent risks in debris removal operations. In addition to our work with related OIGs, my office is conducting an extensive program of reviews and audits on DHS and FEMA awarded contracts.

**Technical Assistance Contractors**

FEMA contracted with four major engineering firms to provide technical assistance to the Individual Assistance Program.  The Individual Assistance Program provides, among other support, housing assistance to Katrina evacuees, which may include temporary housing in travel trailers, modular homes, and mobile homes.  The four technical assistance contactors' work scope includes: supporting staging areas for housing units (travel trailers and mobile homes), installation of housing units, maintenance and upkeep, site inspections and preparations, site restoration, group site design, group site construction, site assessments, property and facility management, as well as housing unit deactivation and rehabilitation. While one contract had been awarded in response to a previous hurricane, the other three contracts were awarded as letter contracts. FEMA's procurement activities were consistent with the Federal Acquisition Regulations and can be justified under the critical need for expedited action resulting from Hurricane Katrina.

FEMA is using pre-award authorization notifications with ceilings on pre-contract costs to initiate contractor work to meet urgent requirements in advance of a negotiated contract or task order. FEMA had been incrementally increasing the allowable cost ceiling on the pre-award authorization notifications every two weeks.  FEMA has reported 88 active verbal authorizations that have been issued and has authorized these four contractors to spend $281.6 million in pre-contract costs. However, the current process may not be the most optimal approach to controlling costs as use of pre-award cost authorizations have no impact on the control of total costs for the effort.   My office therefore recommended that FEMA negotiate a not-to-exceed ceiling within a brief period (i.e., two - three weeks) after issuance of new and existing verbal authorizations and letter task orders.   In addition, we recommended that FEMA develop binding spending schedules against the not-to-exceed ceiling to limit the government's liability in the event of a change in the government's requirements.

FEMA has recently reported to us that the four technical assistance contractors have incurred costs over $8.2 million for 133 site assessments that were ultimately rejected for reasons such as: the owner withdrew from negotiations, lack of need, parish rejected the site location, etc.  While the costs for most of these sites involved minimal expenditures, some sites were significantly more expensive ($300,000 - $600,000).  We will be

12

reviewing these more expensive sites to determine whether the incurred costs were reasonable.

**Hotel Invoices**

FEMA's Individual Assistance Program also provides for temporary housing for disaster victims in hotels until such time as the victims can be transferred to longer term housing programs such as apartments, travel trailers and mobile homes. Immediately after Hurricane Katrina, the American Red Cross provided hotel rooms for evacuees until October 24, 2005. The American Red Cross was awarded a contract on October 20, 2005 for $250 million to provide housing and pharmaceutical assistance to eligible evacuees for the period from August 29 to October 24, 2005. Subsequent to October 24, 2005, FEMA assumed responsibility for providing hotel rooms for Katrina evacuees and awarded a task order under a GSA contract. Under this task order, the contractor, was to be paid a flat rate of $2.48 per night per room. The actual lodging costs were to be paid separately.

Among these charges, 773 rooms were over $150 per night with a total cost of $147,935 or a $191 per night average. Over 15,000 rooms were over $100 per night. In some instances, the room rates were excessive compared to the contract's estimated cost, but were consistent with the hotel's published price. For example, the contractor paid a hotel in New York City its published rate of $438.00 per night. Another facility in Panama City, Florida, charged between $330 and $375 per night for beachfront condominiums. A hotel in downtown Chicago charged up to $399 per night. As late as December 2005, FEMA was still paying relatively high prices – up to $364 per night at a hotel in San Diego, CA and as high as $339 per night in New Orleans, LA. We understand that FEMA discontinued allowing evacuees to stay at expensive hotels and put limits on the amount it would pay for a hotel room.

In other instances, we found hotel charges that appeared to be excessive compared to the published room rates for the hotel, however, we do not have sufficient data to determine whether it was because the charges were for a family that required more than one room or there were excessive charges to the Government. We are auditing the individual hotels charges from both the American Red Cross and FEMA's contractor to ensure that the hotel charges to FEMA were not in excess of the hotel's published room rates.

We have recommended that FEMA require that the contractor continue to obtain appropriate credits to hotel billings where room charges were higher than published room rates plus applicable taxes. We have requested that GSA modify the contract to provide incentives for meeting contract cost estimates and/or penalties for failing to meet contract cost estimates. Finally, we recommended that FEMA work with its contractor and the American Red Cross to revise the process for selecting hotels to prevent excessive per night room charges.

**Invoice Payments**

A routine part of the contracting process is the review and approval of contractor invoices by FEMA procurement and program management personnel. We are pleased to note that we are aware of several instances where FEMA procurement and program personnel have identified and withheld portions of invoices received from contractors due to questioned charges. Examples of these questioned charges include: unreasonable charges for holiday pay, billings for individuals who apparently did no work on the contract, and invoice reductions because of the poor quality of supervisory services received. FEMA, DCAA, and our office will continue to review all invoices to ensure their reasonableness prior to payment.

On one contract for base camp support, we have reported invoice payments of $4.9 million for work that was performed before the effective date of the contract. In addition, mathematical errors in the invoices indicated over $2 million in overcharges. Finally, even though the contract was a firm fixed price contract, the contractor billed FEMA on a time and materials plus a fixed per diem rate producing additional overcharges. On another firm fixed price contract for base camp support, we identified $353,030 in invoice overpayments where the contractor was billing FEMA on a cost-reimbursement basis plus a fixed per diem rate. In this instance, the contractor was directed to invoice in this manner because of incorrect invoicing instructions in the contract. In addition, recent media reports have commented on a Federal investigation of a $5 million award to a contractor that received payment in full before services were rendered. Subsequently, the contractor is reported to have failed to complete the work under the contract.

**Purchase Cards**

In addition to reviewing the award and administration of major contracts, we are participating in a joint review with the GAO in monitoring purchase card transactions through the use of data mining techniques. Data mining involves subjecting purchase card transactions to an automated review to identify more easily questionable transactions. For example, purchase card transactions with certain types of businesses, such as casinos, are considered to be more likely to involve fraudulent or wasteful purchases. In addition, we are reviewing these purchases to ensure that purchasers are following federal acquisition regulations and guidelines to ensure that expenditures are necessary and reasonable. Data mining techniques will provide continuous oversight of purchase card transactions to identify spending anomalies for further review. Ultimately, we expect that contractors will be tasked to fulfill many of the post Katrina requirements. One of the major challenges facing the OIG community is to build and maintain an inventory of contracts awarded outside DHS for Katrina response and recovery efforts. When FEMA issues mission assignments to other agencies, they expect that agency to handle the contracting; FEMA receives no information on the actual contract arrangements. Therefore, OIG or program personnel at DOD, HHS, HUD and other agencies will be responsible for auditing the contracts awarded under each mission assignment. This can be relatively easy for mission assignments awarded to the Corps of Engineers, but money sent to the Department of Defense can move through many

14

different organizations before a contract is awarded and is proving more difficult to monitor funds accountability.

**Staffing Issues**

We are also concerned about FEMA's capacity to oversee contractor performance. Contracting officer technical representatives serve a critical role in verifying that delivered products and services meet contract requirements and reviewing contractors' invoices to ensure that contractors are only paid the amount that they are actually due. Therefore, we will be reviewing the availability of qualified contracting officer technical representatives to administer the awards effectively.

### DHS OVERSIGHT

Although there are a number of issues where we have concerns, it is worth noting that DHS has already undertaken several initiatives to address our concerns and improve its disaster operations. The following efforts complement and are supported by a broader series of efforts at DHS and within the federal government to strengthen internal financial controls and implement oversight measures that minimize waste, fraud and abuse.

- Established a Katrina Internal Controls and Procurement Oversight Board to ensure proper controls are in place to manage the response and recovery efforts. Participants include officials from the DHS Management Directorate, DHS General Counsel, DHS Inspector General, and FEMA. Weekly meetings are held to review key issues and coordinate on oversight matters.

- Increased oversight over FEMA contracts, including reviews of on-going contracts awarded during Katrina to validate that requirements still exist and to ensure appropriate expenditure of funds.

- Initiated a comprehensive program to randomly test for improper payments across all programs and activities that are believed to be susceptible to improper payments according to the Improper Payments Information Act of 2002.

- Established the Gulf Region Acquisition Center along with plans to hire an additional 60 contracting officers or contracting officer technical representatives to strengthen procurement within FEMA.

- Entered into a memorandum of understanding with the Defense Contract Audit Agency to provide independent contract audit support for the four individual assistance Technical Assistance Contractors.

- Completed a review of internal control processes for disaster relief programs, including financial and systems controls.

15

We believe that the above actions are a step in the right direction and demonstrate the commitment of DHS management to address both program and management deficiencies. We will continue to collaborate with the Department to ensure that these and other improvements are implemented.

## **HURRICANE KATRINA FRAUD TASK FORCE**

We are participating in the Hurricane Katrina Fraud Task Force that was established on September 8, 2005, by the United States Attorney General. The Task Force is charged with deterring, detecting, and prosecuting unscrupulous individuals who try to take advantage of the Hurricane Katrina and Hurricane Rita disasters. It has mobilized to bring prosecutions as quickly as possible to send a strong message of deterrence. By casting a broad net and using the investigative assets of federal law enforcement agencies, federal Inspectors General, and state and local law enforcement – together with the prosecution resources of the 94 United States Attorneys' Offices – the Task Force is positioned to act quickly and aggressively to bring to justice to those who would further victimize the victims of these natural disasters.

The principal types of fraud on which the Task Force is now concentrating include:

- Fraudulent Charities: Cases in which individuals falsely hold themselves out as agents of a legitimate charity, or create a "charity" that is in fact a sham;

- Identity Theft: Cases in which the identities of innocent victims are "stolen" and assumed by criminals who convert the funds of, or otherwise defraud, the victims;

- Government-Benefit Fraud: Cases in which individuals file false applications seeking benefits to which they are not entitled;

- Government-Contract and Procurement Fraud and Public Corruption: Cases in which individuals and companies engage in fraud and public corruption relating to federal funds provided for the repair and restoration of infrastructure, businesses, and government agencies in the affected region; and

- Insurance Fraud: Cases in which false or inflated insurance claims are filed.

In the five months since the Task Force was established, United States Attorneys' Offices and a variety of investigative agencies, including the FBI, the Postal Inspection Service, the Secret Service, other IGs and my office, have pursued a significant number of prosecutions stemming from Hurricanes Katrina and Rita. The statistics are impressive. As January 2006, in our office alone, we have opened 340 cases, made 68 arrests, indicted 98 individuals, and obtained 15 convictions. The prosecutions span Federal districts from Oregon to Florida and many places in between. This large number of arrests, indictments, and prosecutions, brought in such a short period, exemplifies the Task Force's effectiveness in fighting fraud.

You can be sure there are many more arrests and indictments to come in the months ahead. It also appears to have had a notable preventive impact on potential fraud. Due to our efforts, along with the highly publicized work of the U.S. Attorney's office, approximately 2,484 individuals have returned checks to FEMA for a total of $6.3 million dollars.

### OPERATING the "Hurricane Relief Fraud" HOTLINE

While each of the OIGs has its own HOTLINE for receiving allegations of fraud, waste, and abuse, the community has also established a single Hurricane Relief Fraud HOTLINE and is widely publicizing this number. The DOD OIG operates the HOTLINE on behalf of the entire OIG community. Furthermore, I personally recorded public service announcements to inform the Gulf Coast residents about the Hotline and urged those with knowledge of fraud to come forward. Additionally, FEMA has referred over 500 suspicious activities by individuals related to assistance. We are pursuing these referrals aggressively along with the U.S. Attorney's office.

### REPORTING OIG PROGRESS AND RESULTS

Each OIG will be reporting their progress to me, and my office, in turn, will prepare consolidated status reports, which will be posted regularly on our website. Each OIG will also be issuing individual reports as weaknesses or problem areas needing attention are identified. These reports are intended to inform management of potential problems and provide recommendations for corrective and preventative actions quickly.

### CONCLUSION

Hurricane Katrina has been a catastrophic event beyond anything in recent experience. We will debate its lessons and calculate its total monetary and economic impact for many years to come. Our oversight efforts are focused on prevention of fraud, waste, and abuse in the expenditure of Katrina related funds, but we also hope to provide lessons for future disasters.

My office is currently evaluating how well FEMA carried out its disaster management responsibilities in response to Hurricane Katrina. This will encompass preparedness, response, and recovery, as well as certain emergency management support functions, such as financial management, public affairs, and congressional affairs. We plan to issue our report on this subject no later than April 1, 2006.

I believe that, collectively, the Inspectors General are uniquely qualified and positioned to provide the most timely and effective oversight of Hurricane Relief activities in the Gulf Coast region. Working together, with the support of the DOJ Hurricane Katrina

Fraud Task Force, the OIG community will ensure that taxpayers' dollars are managed and used wisely, and that the affected communities and people receive the full benefit of the funds to be spent on response and recovery.

The bottom line is, notwithstanding the overwhelming affects of Hurricanes Katrina, Rita and Wilma, it does not mitigate our fiduciary obligations as stewards of public dollars.

-------------------------------------------------------------------------------------------------------

Mr. Chairman, that concludes my prepared statement. I would be happy to answer any questions you or the members may have.

# # #