STENOGRAPHIC MINUTES
Unrevised and Unedited
Not for Quotation or
Duplication

# HEARING ON FEMA'S TOXIC TRAILERS

Thursday, July 19, 2007

House of Representatives,

Committee on Oversight and Government

Reform,

Washington, D.C.

"This is a preliminary transcript of a Committee Hearing. It has
not yet been subject to a review process to ensure that the statements
within are appropriately attributed to the witness or member of
Congress who made them, to determine whether there are any
inconsistencies between the statements within and what was actually
said at the proceeding, or to make any other corrections to ensure the
accuracy of the record."

## Committee Hearings

of the

## U.S. HOUSE OF REPRESENTATIVES



**OFFICE OF THE CLERK**
**Office of Official Reporters**

HGO200.000

1 | Court Reporting Services, Inc.

2 | HGO200000


3 | HEARING ON FEMA'S TOXIC TRAILERS

4 | Thursday, July 19, 2007

5 | House of Representatives,

6 | Committee on Oversight and Government

7 | Reform,

8 | Washington, D.C.



9 |       The committee met, pursuant to call, at 10:00 a.m. in

10 | room 2154, Rayburn House Office Building, the Honorable Henry

11 | A. Waxman [chairman of the committee] presiding.

12 |       Present: Representatives Waxman, Towns, Maloney,

13 | Cummings, Davis of Illinois, Clay, Watson, Yarmuth, Braley,

14 | Norton, Cooper, Hodes, Murphy, Sarbanes, Welch, Davis of

15 | Virginia, Souder, Platts, Issa, Westmoreland, Foxx, Sali, and

16 | Jordan.

17 |       Also Present: Representatives Melancon, Jindal, and

18 | Taylor.

19 |       Staff Present: Phil Schiliro, Chief of Staff;  Phil

20 | Barnett, Staff Director and Chief Counsel; Kristin Amerling,

21  General Counsel; Karen Lightfoot, Communications Director and

22  Senior Policy Advisor; Greg Dotson, Chief Environmental

23  Counsel; Erik Jones, Counsel; Earley Green, Chief Clerk;

24  Teresa Coufal, Deputy Clerk; Caren Auchman, Press Assistant;

25  Zhongrui ''JR'' Deng, Chief Information Officer; Leneal

26  Scott, Information Systems Manager; Kerry Gutknecht, Staff

27  Assistant; Will Ragland, Staff Assistant; David Marin,

28  Minority Staff Director; Larry Halloran, Minority Deputy

29  Staff Director; Jennifer Safavian, Minority Chief Counsel for

30  Oversight and Investigations; Keith Ausbrook, Minority

31  General Counsel; Ellen Brown, Minority Legislative Director

32  and Senior Policy Counsel; Steve Castor, Minority Counsel;

33  John Cuaderes, Minority Senior Investigator and Policy

34  Advisor; Patrick Lyden, Minority Parliamentarian and Member

35  Services Coordinator; Brian McNicoll, Minority Communications

36  Director; Benjamin Chance, Minority Clerk; and Ali Ahmad,

37  Minority Staff Assistant and Online Communications

38  Coordinator.

39    Chairman WAXMAN. The meeting of the Committee will

40  please come to order.

41    Today we begin two days of hearings on the Federal

42  Emergency Management Agency.  These hearings are part of a

43  series of hearings in this Committee on how to make

44  Government effective again.

45    In the 1990s, FEMA was a model Government agency, but,

46  as Hurricane Katrina showed, cronyism, under-funding, and

47  lack of leadership turned FEMA into the most ridiculed agency

48  in the Government.

49    In these hearings we will ask whether FEMA has learned

50  the lessons of Hurricane Katrina and restored its capacity to

51  protect the public in disasters.  Today we are going to look

52  at a narrow but telling subject: FEMA trailers that exposed

53  our citizens to dangerous levels of formaldehyde.  Then in

54  two weeks we will look at the broader topic of FEMA's

55  preparedness for the next disaster.

56    I want to commend our colleague, Ranking Member Tom

57  Davis, for asking for the preparedness hearing and for his

58  bipartisan approach to these issues.

59    Americans were repulsed by the indifference and

60  incompetence of FEMA displayed after Hurricane Katrina.

61  Incredibly, FEMA has adopted the same attitude in addressing

62  reports of high levels of formaldehyde in FEMA trailers.  The

63  nearly 5,000 pages of documents we have reviewed expose an

64  official policy of premeditated ignorance.  Senior FEMA

65  officials in Washington didn't want to know what they already

66  knew, because they didn't want the moral and legal

67  responsibility to do what they knew had to be done, so they

68  did their best not to know.  It is sickening, and the exact

69  opposite of what Government should be.

70      My staff has prepared a briefing memo for Members that

71  describes in detail what we learned from our review of the

72  FEMA documents, and I ask unanimous consent to include the

73  memo and the documents it cites in the hearing record.

74  Without objection, that will be the order.

75      The FEMA documents depict a battle between FEMA field

76  staff, who recognized right away that formaldehyde was a

77  serious problem, and FEMA headquarters, particularly FEMA's

78  lawyers, who wanted to pretend it didn't exist.

79      In March, 2006, news articles reported high levels of

80  formaldehyde in FEMA trailers.  FEMA field staff urged

81  immediate action, saying, ''This needs to be fixed today.  We

82  need to take a proactive approach.''  And there is

83  ''immediate need for a plan of action.

84      But when the issue reached FEMA lawyers, they blocked

85  testing of occupied trailers.  One FEMA attorney explained,

86  ''Do not initiate any testing until we give the okay.  Once

87  you get results, the clock is running on our duty to respond

88  to them.''

89      Another FEMA official wrote, ''The Office of General

90  Counsel has advised we do not do testing, because it would

91  imply FEMA's ownership of this issue.''

92      Early in the process, through the perseverance of a

93  pregnant mother with a four month old child, FEMA did test

94  one occupied trailer.  The results showed that their trailer

95  had formaldehyde levels 75 times higher than the maximum

96  workplace exposure levels recommended by the National

97  Institute for Occupational Safety and Health.  Well, the

98  mother evacuated the trailer.  FEMA then stopped testing

99  other trailers, and top officials issued a statement that

100  said, ''FEMA and industry experts have evaluated the small

101  number of cases where owners with formaldehyde have been

102  reported, and we are confident there is no ongoing risk.''

103  That is where they stood after they stopped testing the

104  trailers.

105      In early July, 2006, FEMA officials worked with EPA and

106  the Center for Disease Control to develop a testing protocol

107  for unoccupied trailers that would ''determine formaldehyde

108  concentrations emanating from the trailer under living

109  conditions.''  EPA officials advised FEMA that, ''The levels

110  we find under testing may well be more than 100 times higher

111  than the health base level.''

112      After receiving this report, FEMA responded by changing

113  the testing protocols.  Instead of simulating actual living

114  conditions, which would show high levels of formaldehyde,

115  FEMA directed that the trailers be tested with their windows

116  open, their ventilation fans running, and their air

117  conditioning units operating 24 hours a day.  A leading

118  treatise on diagnosing indoor air quality calls testing

119  formaldehyde under these conditions meaningless.

120      FEMA repeatedly received complaints from occupants about

121  high formaldehyde levels, including at least two complaints

122  involving the death of occupants, but the Agency brushed the

123  complaints aside.

124      Although 100,000 families have lived in FEMA trailers

125  and manufactured homes, yet the leadership of FEMA refused to

126  take even the most basic steps to protect them from toxic

127  formaldehyde fumes.  Think about it.  Families, thousands of

128  families who faced the tragedy of Katrina, lost everything,

129  had their lives turned upside down, then got another hit from

130  the Federal Government when they were put in trailers that

131  had high toxic levels of formaldehyde.

132      Yesterday, FEMA finally admitted it made a mistake.  It

133  announced it would begin a program to test occupied trailers

134  for dangerous levels of formaldehyde.  This is exactly what

135  FEMA's field staff urged over a year ago, but it took this

136  hearing and the prospect that Director Paulison would face

137  tough questions to stir FEMA to act yesterday.

138      FEMA exists to serve the public, but it acts as though

139  protecting Director Paulison from embarrassment is more

140  important than protecting the health of the victims of

141  Hurricane Katrina.

142      It is impossible to read these FEMA documents and not be

143  infuriated.  Americans don't mind paying their taxes if they

144  get a Government that works, but when that bargain is broken

145  and tax dollars are squandered and health jeopardized,

146  frustration rises and trust in Government erodes.

147      At our last hearing we had Surgeon Generals before us,

148  particularly Surgeon General Carmona, and I said that good

149  oversight serves two purposes: it should expose Government

150  malfeasance and point the way toward reform.  These are my

151  goals again today.

152      I know the documents we are releasing and the testimony

153  we will hear will reveal mistakes and misjudgments.  We need

154  to learn from them to identify what needs to be fixed to

155  protect the health of thousands of families still living in

156  FEMA trailers almost two years after Hurricane Katrina, and

157  we should do everything we can to make sure that this

158  disgraceful conduct never happens again.

159      [Prepared statement of Chairman Waxman and referenced

160  information follow:]


161  ********** INSERT **********

162        Chairman WAXMAN. I want to recognize Ranking Member Tom

163   Davis for his opening statement, and then we will proceed

164   with the hearing.

165        Mr. DAVIS OF VIRGINIA. Well, thank you, Mr. Chairman.

166        Let me commend Chairman Waxman for agreeing to hold a

167   hearing later this month on disaster preparedness, as well.

168   We wrote the chairman requesting the hearing, and we

169   appreciate his agreeing to examine where FEMA and DHS stand

170   as we approach the active part of 2007 hurricane season,

171   August and September.  A hearing on that important topic

172   confirms our shared interest in conducting important

173   oversight.  We are both eager to learn whether, in today's

174   post-Katrina environment, we are better prepared for natural

175   or man-made disasters than we were two years ago.

176        Sadly, thousands of displaced residents still occupy

177   Government property, temporary housing in the Gulf Coast

178   region.  Today we are here to discuss the issue of unsafe

179   levels of formaldehyde in FEMA trailers.

180        The Select Committee to Investigate the Preparation for

181   and Response to Hurricane Katrina, which I chaired, entitled

182   our final report A Failure of Initiative, because leadership

183   at all levels failed to get the information they needed and

184   failed to act decisively to meet the crisis.  Among those

185   failures was the inability of FEMA to provide timely,

186   short-term shelter and adequate long-term housing to those

187 | displaced by the catastrophe.

188 |     As part of the Federal Government's response to
189 | Hurricanes Katrina and Rita, FEMA acquired thousands of
190 | manufactured houses, recreational travel trailers, and larger
191 | trailers for use by the victims on the Gulf Coast.  These
192 | temporary homes contained walls, cabinetry, and other
193 | components made of particle board and plywood.  The glue or
194 | coating used in manufacturing or treating particle board or
195 | plywood often contained formaldehyde, a common chemical used
196 | in many industrial and commercial settings.

197 |     A naturally occurring chemical, formaldehyde is also a
198 | byproduct of cigarette smoke.  When inhaled in large doses,
199 | it can cause extreme discomfort and illness.

200 |     Over a year ago FEMA began fielding complaints about
201 | noxious odors emanating from some of the occupied trailers.
202 | At that time I wrote Secretary Chertoff asking about the
203 | extent of the problem.  We received assurances the issues
204 | were limited to a small number of units and it was under
205 | control.

206 |     In August, 2006, FEMA communicated to the Committee in
207 | no uncertain terms the health and safety of inhabitants was
208 | driving the Agency's response to the formaldehyde complaints.
209 | The Committee was told FEMA had partnered with leading
210 | Government experts, both at the EPA and the CDC, to develop a
211 | robust testing program and incident response system.

212    It now seems that what FEMA told the Committee was not

213 completely correct.  Apparently, the problem of unsafe

214 formaldehyde levels in FEMA trailers is more widespread than

215 initially acknowledged, and FEMA's reaction to the problem

216 was deliberately stunted to bolster the Agency's litigation

217 position.

218    New information recently provided to the Committee shows

219 these statements mischaracterized the scope and purpose of

220 FEMA's actual response to the formaldehyde reports.  Recently

221 discovered documents make it appear FEMA's concerns were

222 legal liability and public relations, not human health and

223 safety. Decisions about assistance to Gulf Coast residents

224 seem to have been driven by the desire to limit litigation,

225 even if that meant limiting genuine testing and risk

226 mitigation efforts, as well.

227    One internal e-mail from June, 2006, reported the

228 Agency's Office of General Counsel ''has advised that we do

229 not do testing'' because this would ''imply FEMA's ownership

230 of this issue.''

231    Another attorney advised, ''Do not initiate any testing

232 until we give the okay.  While I agree we should conduct

233 testing, we should not do so until we are fully prepared to

234 respond to the results.  Once you get results, and should

235 they indicate some problem, the clock is running on our duty

236 to respond to them.''

237   This information is deeply troubling.  FEMA was not

238   forthright with Congressional investigators.  It took nearly

239   a year and a threat of subpoenas for FEMA to produce all the

240   documents the Committee requested.  After seeing the

241   documents, it is pretty clear why FEMA tried to hide them

242   behind dubious claims of confidentiality and privilege.

243   The information in these documents contradicts what we

244   were told all along.  Holding them back only highlighted

245   their damning significance.  Beyond the litigation-centric

246   process, we have to be concerned about substantive problems.

247   The causes and effects of excessive formaldehyde fumes in

248   housing product purchased by the Federal Government has still

249   not been addressed.

250   Katrina had many hard lessons to teach.  One of them was

251   the Federal Government's primary response agency has to be

252   proactive, nimble, and trusted as the honest broker between

253   Washington and those at need at the State and local levels.

254   Reading these documents, I am not persuaded FEMA is that

255   agency yet.  The noxious gas in those trailers should have

256   energized FEMA to admit the problem and solve it, not hide it

257   behind a fog of risk-averse lawyering.

258   FEMA's toxic response to these formaldehyde fumes should

259   energize us to demand accountability and push for the reforms

260   that will clear the air and improve the Nation's emergency

261   response capabilities.

HGO200.000                                                PAGE      12

262 |     Thank you.

263 |        [Prepared statement of Mr. Davis of Virginia follows:]


264 | ********** INSERT **********

265        Chairman WAXMAN. Thank you very much, Mr. Davis.

266        Let me ask unanimous consent that Representatives

267   Melancon, Jindal, and Taylor be permitted to join us at our

268   hearing today, even though they are not members of the

269   Committee.  Without objection, we welcome them to our

270   hearing.

271        I want to welcome our first panel.  We are going to hear

272   from Mr. Paulison after this first panel.  We are pleased to

273   have these witnesses who are willing to travel to Washington,

274   D.C., to share their experiences with FEMA's trailers with

275   this Committee.  I realize these experiences have not been

276   pleasant ones, and I thank you all for being here.

277        On this first panel we have Dr. Scott Needle.  Dr.

278   Needle is a Pediatrician.  He obtained his medical degree

279   from Johns Hopkins University in Baltimore, and until June

280   2007 Dr. Needle had been a Pediatrician in Bay St. Louis,

281   Mississippi.

282        Mary DeVany is an expert in the fields of industrial

283   hygiene and occupational safety.  She has an M.S. in

284   biochemistry from Loyola University in Chicago, and she is a

285   Certified Safety Professional in Comprehensive Practices,

286   Certified Hazardous Materials Manager, and is qualified as an

287   Instructor for OSHA compliance.

288        Mr. Paul Stewart was an occupant of a FEMA trailer from

289   December 2005 through March 2006.  In March 2006 Mr. Stewart

290 | was the first FEMA trailer occupant to discuss formaldehyde

291 | levels publicly.

292 |     Lindsay Huckabee and her family have been FEMA mobile

293 | home occupants since December, 2005.  She continues to reside

294 | in a trailer along with her husband and five children.

295 |     James Harris, Jr., is a practicing minister and a small

296 | businessman.  He and his family have been living in a FEMA

297 | trailer since April of 2006.

298 |     We want to welcome each of you to our hearing today.

299 |     It is the practice of this Committee that all witnesses

300 | that testify take an oath, and I would like to ask you if you

301 | would stand and raise your right hand.

302 |     [Witnesses sworn.]

303 |     Chairman WAXMAN. The record will indicate that each of

304 | the witnesses answered in the affirmative.

305 |     We are delighted to have you here.  If you submitted a

306 | statement to us, that statement will be made part of the

307 | record in full.  I am going to have a clock on for five

308 | minutes, and I would like to ask, if you could, to try to

309 | keep to the five minutes.  If you run a little over, that is

310 | no problem.  There is a little clock there you can see that

311 | is green, and it will turn orange when there is a minute

312 | left, and red when the five minutes are up, so you might take

313 | a glance over at it at some point during your comments.

314 |     Dr. Needle, why don't we start with you?

422       Chairman WAXMAN. Thank you very much, Dr. Needle.

423       Ms. DeVany, we are pleased to have you.

424   STATEMENT OF MARY DE VANY


425       Ms. DEVANY. Good morning.  My name is Mary DeVany, and I

426   am a scientist specializing in industrial hygiene, the

427   recognition and control of occupational and environmental

428   health, and safety concerns.

429       I would like to thank Congressman Waxman, Congressman

430   Davis, and the other Congressional representatives that

431   decided to hold this hearing and attend today.

432       I also wish to thank my husband, who is a Wesley

433   Lifebrook, a certified industrial hygienist who returned just

434   five months ago from active duty in Iraq.  If it were not for

435   his research, knowledge, and support, I could not have been

436   here today.

437       I want to share some information to help you take

438   action, because we Americans have the ability to give our

439   disaster victims safe and secure housing, free from known

440   hazards that every American wants and deserves.

441       As you know, formaldehyde is a component in

442   manufacturing of particle board, press board, fiber board,

443   paneling grooves, counter tops, and other materials,

444   including some adhesives used to lay carpeting.  Since these

445  materials are so common, everyone is exposed, to some degree.

446   However, when the exposure gets elevated, we experience

447  symptoms including headache, dizziness, nausea, loss of sense

448  of smell, and fatigue.  Respiratory system irritation, nose

449  bleeds, sinus infection, throat irritation, coughing, and

450  chest congestion occur, as well.  Eye and skin itching,

451  burning, and skin eruptions occur.

452       Formaldehyde also makes many pre-existing medical

453  conditions worse, including asthma, allergies that affect the

454  sinuses, chronic bronchitis, emphysema, skin diseases such as

455  eczema, and migraine headaches.

456       Over the long term, we know that formaldehyde can cause

457  changes to certain cells in the immune system.  Skin and

458  respiratory sensitization can also occur in some people,

459  making them have serious health effects with even very low

460  exposures.  And changes in nasal and nasal pharyngeal cells

461  occur that can develop into cancer.

462       According to the National Cancer Institute, it may also

463  cause brain cancer and possibly leukemia.

464       Regarding exposure limits, the scientific community

465  recommends limits based on two main groups: adults in the

466  workplace and the population at large.  Agencies such as

467  OSHA, NIOSH, and the military base their limits on the

468  average adult worker not sensitized to formaldehyde and--and

469  this is critical--people who are exposed for an average of

470   only eight to ten hours per day, forty hours per week, with

471   the rest of the hours each day and week away from the

472   exposure source, so these levels can be set much higher

473   because the away-from-the-exposure-source recovery time

474   assists those people and their bodies in recovering from

475   their exposures.

476        Levels set by agencies such as the EPA, the

477   ATSDR--Agency for Toxic Substances and Disease Registry--and

478   many State agencies, as well as the World Health

479   Organization, set exposure standards aimed to protect nearly

480   all of our most vulnerable citizens, including the elderly,

481   infants, and people that are medically compromised.

482   Workplace and military standards do not protect this at-risk

483   segment of our population.

484        Because of concern for the health of individuals living

485   in these trailers, over a year ago the Sierra Club began

486   sampling trailers in Mississippi.  Within a couple of months

487   after being informed of the high levels, FEMA had sampling

488   conducted by the EPA.  The Sierra Club sampled 69 trailers,

489   the EPA tested 96.  The results were similar: nearly all of

490   the trailers sampled had formaldehyde levels at least three

491   times the proposed level for healthy, physically fit sailors

492   exposed to formaldehyde on a submarine for only 90 days.

493   That population group even excludes medically unfit soldiers.

494        One of the responses FEMA just implemented was to adopt,

495 for new travel trailers, below-hub particle board and

496 powdered emissions regulations that only apply to mobile

497 homes.  By closing this loophole, FEMA is showing commitment

498 to the health of the inhabitants of these brand new trailers.

499 However, approximately 86,000 people are still living in the

500 old travel trailers, and, according to the sample results,

501 most of these trailers have unacceptably high levels of

502 formaldehyde.

503         So what can you do?  Manufacturers can substitute

504 soy-based adhesives for formaldehyde-based ones.  We can give

505 people who are sick different trailers or other temporary

506 housing.  We can educate trailer occupants on formaldehyde

507 health effects and give them options for relocating.  We can

508 ensure that people without symptoms are removed from

509 hazardous exposures by testing all existing trailers before

510 they develop the symptoms.  And we must require manufacturers

511 to cure an off-gas formaldehyde at the manufacturing level.

512         In addition, we should test the formaldehyde level in

513 each trailer prior to acceptance and delivery of new

514 trailers. We should not sell or donate empty, vacated

515 trailers that have elevated formaldehyde levels to Native

516 Americans or others before ensuring that the levels are safe.

517  There are routine procedures to cure formaldehyde in empty

518 trailers that should be implemented.

519         In conclusion, the elevated exposures to this toxic,

520 | irritating, and cancer-causing gas in FEMA-issued travel
521 | trailers has developed into a major public health concern.
522 | Now that we have recognized the problem, Americans need to
523 | take prompt, effective action to help these disaster victims
524 | and safeguard their health.  We have the tools.  We now need
525 | Congress to take decisive action.  We owe this to our fellow
526 | Americans who have been victimized again through no fault of
527 | their own.
528 |      I am ready for questions.  Thank you.
529 |      [Prepared statement of Ms. DeVany follows:]

530 | ********** INSERT **********

2453  do testing, which resulted in the end in results coming back

2454  showing that there were dangerous levels above those

2455  recommended by scientific experts.

2456       Ms. DeVany, I wanted to point that question to you,

2457  because I know you were involved in coming up with the

2458  protocols that the Sierra Club used, and would ask you just

2459  to talk a little bit about the advice that you gave them and

2460  how you believe those tests went.

2461       Ms. DEVANY. I did advise the Sierra Club on methods for

2462  testing, and, just in general, when we design protocols for

2463  doing air sampling, we want to catch actual real values.  I

2464  think this goes back to what the chairman said, what Mr.

2465  Davis said, that not only was FEMA trying to cover up, but

2466  they engaged other Federal agencies in their cover-up.  They

2467  had the EPA design sampling protocols that were, as an

2468  industrial hygienist, bizarre.  Why would we take empty

2469  trailers, open them and ventilate them twenty-four hours a

2470  day three weeks straight and then decide that is how we are

2471  going to figure out the formaldehyde levels?

2472       Then, in addition to having the EPA design, like I said,

2473  bizarre protocols, they got two scientists from the

2474  ATSDR--the Agency for Toxic Substances Registry--and, instead

2475  of using their own standard of .03 parts per million, these

2476  scientists changed their level that is so high and causes

2477  such physiological damage that it actually, at that level,

2478  the .3 parts per million, causes the bronchi to constrict

2479  enough that it restricts airway enough to cause wheezing,

2480  asthma, and an emergency situation.

2481      That level is the one they chose.  Instead of using the

2482  safe exposure level, the ATSDR chose a level of concern.  And

2483  then they analyzed EPA's results using that skewed baseline.

2484      Mr. MURPHY. Ms. DeVany--and I see Dr. Needle shaking his

2485  head, as well--do you have any opinion as to why they chose

2486  that level, despite a number of sources of literature

2487  suggesting a much more reasonable standard?

2488      Ms. DEVANY. All I can say, in my professional opinion,

2489  is that they did this in order to minimize the actual extent

2490  of the problems in these trailers.  I have no other

2491  conclusion I can draw as a scientist analyzing this.  And I

2492  have done this all my life.  I can't believe it was done.  I

2493  think it was complete violation of our professional code of

2494  ethics.

2495      Mr. MURPHY. Do you have faith in the results of the

2496  Sierra Club trials, given your input into how those were

2497  conducted?

2498      Ms. DEVANY. There were some problems there, too.  I

2499  mean, in an ideal situation I would have recorded what the

2500  ambient temperatures were, the range during that time, what

2501  the humidity levels were, if anyone smoked inside the trailer

2502  or not.  But, by and large, they were realistic samples of

2503  what people were being exposed to.  They didn't artificially

2504  try to elevate them by putting the samples inside cabinets

2505  and closing the door.  They were pretty realistic, I believe.

2506       Mr. MURPHY. Mr. Stewart, you had some experience in the

2507  Sierra Club trials, as well.  What was your experience with

2508  those trials?

2509       Mr. STEWART. In my circumstance, in particular, if the

2510  test showed anything it was that the test was actually on the

2511  low end, because my test was done, as she just stated, not

2512  under perfect conditions.  My windows were open, the exhaust

2513  fan was on, and there was an air purifier, an industrial one,

2514  working at the time I did the test.  So even at the .22, that

2515  was a low ball figure from that standpoint.

2516       And then I did walk around and put these in other

2517  campers, and I can say that I don't think there were any in

2518  the middle of the summer in Mississippi that didn't have the

2519  air conditioning on and trying to keep the place cool.  So

2520  from a humidity standpoint and a temperature standpoint, I

2521  think they were relatively common throughout the campers.

2522       I did just want to say one thing, if I could.

2523       Mr. MURPHY. My time is up.

2524       Mr. STEWART. Mr. Sarbanes, I just wanted to say one

2525  thing.  I think that an organization can be uncaring and

2526  incompetent at the same time.  I don't think they are

2527  mutually exclusive.  When you call FEMA and, one, they don't