```
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF LOUISIANA
    ************************************************************
 3

 4  IN RE:  FEMA TRAILER
    FORMALDEHYDE PRODUCTS            Docket No. MDL-1873(N)
 5  LIABILITY LITIGATION            New Orleans, Louisiana
                                    Monday, April 21, 2008
 6
    ************************************************************
 7

 8                 TRANSCRIPT OF MOTION PROCEEDINGS
         HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
 9                 UNITED STATES DISTRICT JUDGE

10

11  APPEARANCES:

12  FOR THE PLAINTIFF
    STEERING COMMITTEE:           GAINSBURGH BENJAMIN DAVID
13                                MEUNIER AND WARSHAUER
                                  BY:  GERALD E. MEUNIER, ESQ.
14                                     JUSTIN I. WOODS, ESQ.
                                  2800 Energy Centre
15                                1100 Poydras Street, Suite 2800
                                  New Orleans, LA 70163
16

17
    FOR THE DEFENDANTS'
18  LIAISON COUNSEL:              DUPLASS ZWAIN BOURGEOIS MORTON
                                  PFISTER & WEINSTOCK
19                                BY:  ANDREW D. WEINSTOCK, ESQ.
                                       JOE GLASS, ESQ.
20                                Three Lakeway Center
                                  3838 N. Causeway Boulevard, Suite 2900
21                                Metairie, LA 70002

22
    FOR THE GOVERNMENT:           UNITED STATES DEPARTMENT OF JUSTICE
23  (BY TELEPHONE)                BY:  HENRY T. MILLER, ESQ.
                                       MICHELLE G. BOYLE, ESQ.
24                                     Civil Division - Torts Branch
                                  P.O. Box 340, Ben Franklin Station
25                                Washington, D.C. 20004
```

1

2    Official Court Reporter:          Karen A. Ibos, CCR, RPR, CRR
                                       500 Poydras Street, Room HB-406
3                                      New Orleans, Louisiana 70130
                                       (504) 589-7776
4

5

6         Proceedings recorded by mechanical stenography, transcript
     produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(MONDAY, APRIL 21, 2008)

(MOTION PROCEEDINGS)


1    THE COURT:  Let's do a roll call.

2    MR. MILLER:  This is Henry Miller.  I think your secretary

3    called Janice Jones, and when she didn't answer we don't know if we

4    can hang up but Janice Jones' line is still open and going into her

5    voice mail.

6    THE COURT:  I am quite certain we can shut that off

7    because we have Karen, the court reporter is back with us in the

8    conference room where we met on Friday, so for the sake of recording

9    we'll have a transcript of all of this anyway.

10   MR. MILLER:  Your Honor, I am in a different office.  It's

11   her voice mail, Janice Jones' interoffice that apparently picked up.

12   THE COURT:  Okay.  Well, it will probably go on well

13   beyond our discussions here.  Who else do we have on, Henry and who?

14   MR. MILLER:  Michelle Boyle is with me.

15   MS. BOYLE:  Good morning, your Honor.

16   MR. MEUNIER:  Jerry Meunier and Justin Woods for

17   plaintiff.

18   MR. WEINSTOCK:  Andrew Weinstock and Joe Glass.

19   THE COURT:  We will give you a progress report here.  The

20   first group of protesters have showed up and staked out the

21   territory next to Mother's restaurant, which was pretty wise on

1   their part.  I am happy to report that they are the trade unionist

2   group who are complaining about jobs going across boards.  So we'll

3   try to give you an update as the day goes on.  But it is as we

4   expected it would be, and it's only just beginning.

5         MR. WOODS:  They complain the debris sandwiches are too

6   heavy in grease.

7         THE COURT:  I don't know if I've ever heard that

8   complaint.

9         MR. MEUNIER:  Coronary artery manufacturers.

10        THE COURT:  I spent the weekend going through the issues

11   we talked about, and as I told you, it's an important issue and it's

12   an important juncture in the case.  And there are a lot of competing

13   arguments, all of which are pretty good ones, pretty legitimate

14   argument.  I don't think there is anything here that we can just

15   toss off to the side as being not significant of a concern.  I do

16   have some follow-up questions for you, though, in the course of

17   thinking about it over the weekend and talking to Jennifer and

18   Amanda about it.  Some things that didn't come up during our

19   discussion.

20        First of all, this list, what we refer to as the "List"

21   with a capital "L", is that something that is exactly that in either

22   electronic or written form?  In other words, are we talking about an

23   actual list or are we talking about a group of names that we think

24   are discernible in the grand scheme of things?  Henry or Michelle,

25   do you all know that?

1          MR. MILLER:  Your Honor, the answer is, no, I don't know

2    if there is just a single database or list.  In fact, there's bound

3    to be four separate databases at least because FEMA keeps the

4    information on a state-by-state basis.  As to lists, no, I don't

5    know, your Honor, one way or the other.

6          THE COURT:  I take it, Jerry, Justin, you all have no way

7    of knowing that at this point?

8          MR. MEUNIER:  We do not, we just assume that the data is

9    there in whatever form it exists.

10         THE COURT:  But it's not as simple as simply pulling a

11   diskette out of somebody's desk or some vault somewhere and plugging

12   it in and printing up mailing labels.

13         MR. MILLER:  I don't think that it would be that easy.  I

14   wish it was.

15         THE COURT:  Not that it would be difficult, it's not that

16   easy.  There is no "list" per se, and I use the word list in quotes,

17   there is no "list" per se, it rather is stored information that

18   might be in more than one source.  But that's helpful to know.

19          In terms of what FEMA has already sent -- and again, I am

20   talking about only mailings that pertain to this formaldehyde

21   issue -- we would like to get from, we meaning me, would like to get

22   a copy of everything referencing the formaldehyde level issue sent

23   to anyone on the "list" in whole or in part.  If we refer to the

24   list as a whole, we recognize that that may be apportioned out by

25   state or by manufacturer or however, is that something we can get

```
 1    our hands on fairly quickly?  And I just need one copy of each thing
 2    that was sent out.
 3            MR. MILLER:  You want a copy of everything that was sent
 4    out to the occupants relating to formaldehyde?
 5            THE COURT:  Correct.
 6            MR. MILLER:  And that would start with probably the
 7    brochure back in July of 2006 I think.
 8            THE COURT:  Well, perhaps.
 9            MR. MEUNIER:  Judge, can I ask a classification, which
10    might help as we discuss this point.  Are we including not just FEMA
11    communication but CDC?  Because I know the Officer for Disease
12    Control had some communication was well.
13            THE COURT:  I think that it would be appropriate to
14    include that -- what I would like to do is be able to look at what
15    has been sent to these people, or a portion of this list, people who
16    are on the list or a portion of the people on the list, a portion of
17    the list, I would like to see what information they have already
18    received from the government.
19            MR. MILLER:  I understand, your Honor.  We can put that
20    together.  Obviously I don't know how long it will take.  We have to
21    talk to FEMA, but obviously we will provide you with whatever has
22    been issued out to anybody in a trailer relating to formaldehyde.
23            THE COURT:  Relating to formaldehyde, exactly.  I hope
24    that's a definition that is usable.  If there is a dispute or a
25    question as to whether something is or is not relevant to
```

1  formaldehyde, then I would suggest including it in what you can get

2  me.  You can either e-mail it to me or fax it to me, whichever way

3  is convenient.  I assume there was a series of notices of some sort

4  that were sent, including those that were sent in the last six to

5  eight months relative to CDC testing and FEMA's plans to relocate

6  people as a result of that testing.

7          MR. MILLER:  Whatever it is, your Honor, we will get it

8  together and give it to you.  Some of it may have been sent to

9  people whose units were just tested, others may be sent to all

10  people, I don't know.  And we will put it together and organize it

11  appropriately so you can identify it.

12          THE COURT:  That's a material distinction that we don't

13  get to just yet because you may have people who lived in trailers or

14  units and vacated those units before July of '06 which would have

15  been almost, well, it would have been 11 months after at least

16  Katrina, perhaps maybe nine months or actually ten months after

17  Rita; but at any rate, you may have notices that were sent

18  specifically to those still residing in units at the time of the

19  mailing but not mailed to others who previously lived in units.  Is

20  that a fair statement?

21          MR. MILLER:  Your Honor, I think the way -- there is only

22  notices that would have been sent to anyone who probably was still

23  occupying the unit and who identified, whoever that was, give you

24  the notice, say these notices were provided to anybody who was in

25  the unit at these times when this was sent out.  People when

1    vacated, obviously they probably wouldn't have gotten it.

2         THE COURT:  I think that's a distinction if it can be made

3    who the intended recipients are by that general categorization with

4    each notice can be provided to me, that will be very helpful.

5         MR. MEUNIER:  Your Honor, Jerry Meunier, if I could ask

6    one more clarification.  I know that some written material was

7    actually handed out at some of these FEMA trailer parks as opposed

8    to being put in the mail, and could I ask for clarification on

9    whether the court is going to request all written information

10   regarding formaldehyde both mailed and issued by hand?

11        THE COURT:  Disseminated whichever way, that's correct.

12        MR. MILLER:  We are supposed to identify and produce any

13   information that was released or disseminated by the government to

14   trailer occupants relating to formaldehyde.

15        THE COURT:  Right.

16        MR. MILLER:  It's ATSDR, whether FEMA's got and has it, we

17   will give it to the judge.

18        THE COURT:  If it was handed out at a trailer location, I

19   think FEMA had some meetings here in this area, it was handed out.

20   If it was publicly disseminated regardless of the means, mail or by

21   hand or whatever, I would like to have the chance to review that

22   material.  And to the extent possible, designate to whom it was

23   directed, whether it was directed to anyone who appeared at the

24   meeting or whether it was directed by mail to only those who resided

25   in units at the time it was mailed, that would be useful to know.

1    That's the first thing.

2         The second thing with regard to the class action issue

3    that came up, we spent sometime talking about how and why we would

4    handle class action in a particular order on our timeline of events,

5    and at that time it became clear that:  (a) the court would

6    necessarily have to rule on a class action certification issue at

7    some juncture; and (b) the defendants, as well as the government,

8    were contending that it would be inappropriate to send any notice to

9    anyone -- I say any notice, the notice that the plaintiffs

10   prepared -- to anyone prior to such certification resolution and

11   that their position was that we should do the class cert hearing

12   sooner rather than later.

13        Jerry, you mentioned, gee, that's going to have to make us

14   do some discovery on class cert.  What would that discovery include?

15   I'll be honest with you when I think about it, and I am obviously

16   not dealing with your end of the case in particular, but when I

17   think about it it seems like most of the class cert issues we

18   initially get into are either not at issue in this case or are

19   easily discernible.

20        MR. MEUNIER:  Well, your Honor, we're going to have to, I

21   think, unpack the issue of commonality if we're going to tee up

22   class cert sooner rather than later.  And by that I think numerosity

23   speaks for itself.

24        THE COURT:  Right.

25        MR. MEUNIER:  I think typicality is just a matter of us

1   naming, if necessary, by amendment to the master complaint

2   appropriate reps from each state.  Commonality to me is the key and

3   often most disputed element of class cert, and I think it would

4   behoove the plaintiffs to propose, and I think we've done this in

5   the master complaint, but what we consider to be common issues; and

6   then the defendants will have to propose what they consider to be

7   individual issues.  And there may be some discovery needed into the

8   extent to which, for example, levels of formaldehyde have across the

9   board implications that don't require us to go case by case to

10  determine injury.

11          So I know I am not being as specific as the court would

12  like me to be at the moment, but I am trying to, I guess,

13  communicate that if we are going to focus on that, we the plaintiffs

14  are going to be obligated to at least make sure that we have a

15  sufficient record for you to make this decision in an appropriate

16  way.  And I can tell you from experience that commonality is going

17  to be the controversy, and I don't know that we can just do that in

18  theory as opposed to having some record made about what facts tend

19  to support the identification of our list of common issues and what

20  facts tend to support the defendants' expected argument that there's

21  too much individuality to certify a class.

22          THE COURT:  Well, but in terms -- I agree with your

23  analysis of the issues, I think most of them are readily apparent

24  such as numerosity, obviously the competency of counsel to represent

25  and handle a class action, and so on.  So commonality is really

1    where the issue is going to be decided.

2            What discovery would you need from the other side, either

3    the government or from the manufacturer defendants that would have a

4    bearing on commonality?

5            MR. MEUNIER:  Well, for example, what kinds of symptoms

6    are associated with the levels that are typically found in these

7    trailers?  Is there some way if we were going to handle it as a

8    class to serve up questions to a jury in a common issues trial that

9    certain ranges of PPM exposure will or will not lead to certain

10   types of symptoms.  And are those symptoms found in a sufficient

11   number of plaintiffs so that the response, the dose response to

12   formaldehyde in these trailers is an issue that's common and that

13   predominates over individual medical idiosyncrasies.

14           I think we have to get into some of the science of

15   formaldehyde, we might have to have some experts testify about that;

16   we're going to have to put on some evidence about testing results

17   from these trailers.  As the court knows, the plaintiffs have been

18   testing trailers and the defendants are undertaking a protocol to

19   test trailers, FEMA's got of course their own set of test results

20   from CDC, so we will have to get all of those test results looked at

21   and see if we can all reach some understanding about what the levels

22   have been.  To the extent we agree on test results or don't agree on

23   test results, that goes to commonality.

24           So I think some discovery needs to be conducted into test

25   results, the medical implications of those results, and then I also

1    think some, perhaps, study of the symptomatology reported by

2    plaintiffs to see to the extent to which that pattern of symptoms

3    responds scientifically to what level.

4              THE COURT:  Let me ask it a different way then.  That

5    being the case, you suggest in your proposal regarding proceeding on

6    a mass joinder basis that a class certification hearing could be

7    conducted as early as November 19th, 2008, along with the motion to

8    certify being filed on September 26, 2008.  What can be done to move

9    those dates forward?  And I am thinking of moving those dates to

10   perhaps in July.  Is that doable or are you suggesting by describing

11   that discovery -- because a lot of this information is going to be

12   in your hands already.

13             MR. MEUNIER:  Right.  It will be, Judge.  I don't, you

14   know, as I sit here I doubt seriously that the plaintiffs can come

15   up with the kind of record that I think we need on commonality by

16   July.  We represent, as you know, to date, a number of class members

17   already.  But I don't know where we stand on test results, we have

18   the whole issue of the statistical extrapolation, which I think also

19   ties into this, to what extent are we going to have an evidentiary

20   basis to take certain levels in a sample testing group and extend

21   those out.  I think that has to be teed up.

22              So we have to get our model, our statistical model in

23   shape.  We're beginning the process of the fact sheets, which is the

24   assembly of claims data, but we're not going to be there by July in

25   terms of getting a comprehensive data set on our claims.

1        THE COURT:  But you feel certain that you can be there by

2   September 26th enough to file a motion, is that correct, based on

3   your submission here?

4        MR. MEUNIER:  Yes.

5        THE COURT:  Okay.  And that is the type of stuff that you

6   would need, for instance, your statistical sample, that is the type

7   of stuff you're going to need to try the cases anyway?

8        MR. MEUNIER:  Yes.

9        THE COURT:  We're not superimposing additional work for

10  the class cert hearing.

11        MR. MEUNIER:  We're not, but as you said, the statistical

12  model is needed for both purposes.

13        MR. WEINSTOCK:  Judge, we certainly on the defense side,

14  one thing I was prepared to tell the court this morning, I can

15  absolutely live with the November 19th date and we appreciate that

16  that's moving this towards what I'm asking for, an early resolution

17  of the class issue.

18        MR. MEUNIER:  Well, this is -- ultimately the issue before

19  the court at this point is mailing notices to people under whichever

20  procedural device we choose, whether it's a Rule 23 or Rule 26 or

21  however you want to consider it.  So what I am trying to do is to

22  figure out where we can, the soonest we can broach this class

23  certification issue -- because one of two things is going to be

24  true, either the court will certify a class in which case there will

25  be notification, and the defendants' complaint was, well, then there

1    will be two notifications, a prehearing notification and then a post

2    hearing notification.  Or the court does not certify a class, in

3    which case we're going to go the mass joinder route.  And in that

4    circumstance, perhaps there is a notice to be sent anyway.

5         THE COURT:  But by all accounts, we're going to do the

6    class certification hearing.  I haven't heard anybody say, Judge, if

7    we do the notice we're not going to have the class cert hearing.

8         MR. MEUNIER:  No, your Honor.  This is Jerry, and we've

9    always felt that what the defendants need is legitimate, namely

10   closure on American Pipe.  And frankly we need that.

11        THE COURT:  Oh, I know.

12        MR. MEUNIER:  We're going to try to figure out how many

13   claims we're dealing with this in the MDL while we have this unique

14   opportunity, we need to have -- we need to move toward closure on

15   that which requires that the time began to run should you decide not

16   to certify a class.  So we don't want to postpone that indefinitely,

17   but we're trying to hit that sweet spot between doing it when we

18   have a sufficient record and getting underway with claims gathering

19   ahead of time and that's -- that was the purpose of how I laid out

20   those calendar dates.

21        THE COURT:  Let me stop here for a second.  Henry, Jan

22   Jones, is she needed?  Does she need to be on this conference

23   because she called in?

24        MR. MILLER:  No, we're okay.  We can inform her what's

25   going on.  I can't commit to anything without her.

1          THE COURT:  Okay.

2          MR. MILLER:  All we're doing is producing the documents, I

3     will just need to get in touch with FEMA to find out how long it

4     will be on that.

5          THE COURT:  I just wanted you to know she is on the other

6     line.

7          MR. MILLER:  Okay.

8          THE COURT:  Getting back to our discussion though, if we

9     can't do it in July, can we not move this class cert hearing up?  I

10    mean, and I hear your clients saying, look, as long as a class cert

11    is there -- we didn't think it would be there once the master

12    complaint is filed -- but now that it's there we can't do anything

13    until that's decided except our expert testimony, that's kind of

14    where I hear you coming from on this.

15         MR. WOODS:  Judge, my belief is we could move it up, but

16    I'm only half of the equation.  I will tell you that I learned

17    Friday that -- maybe it impacts this, maybe it doesn't -- July 15th

18    we're not getting 20,000 fact sheets, we're getting 700 fact sheets,

19    which was not my understanding and maybe it was the court's, I don't

20    know.  But obviously the more information we have the easier it is

21    to digest class certification and go forward from there.

22         MR. MEUNIER:  And, Judge, this is Jerry, Andy and I spoke

23    about this after we left your chambers the other day and we've

24    always understood Pretrial Order No. 2, I think the language does

25    support this indication that it implies the July 16th deadline for

1    plaintiff fact sheets is set forth in PTO No. 2 applies to all

2    plaintiffs named in actions that are pending in the MDL.  And that

3    is a group of, as Andy said, I guess about 700 named plaintiffs.

4    Andy felt that the intent of it was to get a PPF produced, a PPF

5    produced for all of the plaintiffs we have identified as being

6    represented in this case, which is a much larger number.

7             THE COURT:  Well, the more the better.  Is it not possible

8    to get all of the PPF's that are done?

9             MR. MEUNIER:  It's a mechanical problem.  What we're doing

10   right now, just so the court knows and counsel knows, we are

11   interviewing and hiring contract labor to staff a central location.

12   We've come to the conclusion that we don't want to leave the

13   execution of these plaintiff fact sheets to a scattered, remote

14   operation where we mail them off to people and they come back

15   through the mail or they don't come back through the mail.  We're

16   trying to set up a central location where clients can come in and we

17   can have the data inputted electronically and the fact sheets done

18   that way on a rolling basis.  So every day we're taking steps to

19   find a place that we can lease and to put people in that place.

20             And then, you know, we're going to do it by lawyer group;

21   in other words, the D'Amico people will come, the Gainsburgh people

22   another day, and et cetera.  But we're not at a point today where we

23   can start that process, we're working on it.  But I think it would

24   be very difficult by mid July to have all, you know, 17,000 people

25   done by then.  I just don't see that happening.

```
 1          THE COURT:  Will you have more than just the named
 2   plaintiff 700?
 3          MR. MEUNIER:  I hope so, but I hate to make a commitment
 4   to the court that I can't keep.
 5          THE COURT:  I am just saying the more the better.  If
 6   we've got -- I mean, I understand if you can't get whatever 18 or
 7   20,000 people done by July the 16th or whatever the date is, but we
 8   can do more than 700 I would think.
 9          MR. MEUNIER:  And, your Honor, we probably can.  But I
10   mean that was the whole point, too, of the fact sheet and tolling
11   agreement was that once people -- the way people got protected
12   against the statute of limitations was signing the tolling
13   agreement, And the way they got that benefit was by doing the fact
14   sheet.  So as we identified claimants through the fact sheet process
15   they sign a tolling agreement and we put them over in the column
16   where they can be treated on a mass joinder basis.
17          THE COURT:  Right.
18          MR. MEUNIER:  So we have this concept that we would do it
19   on a rolling basis, I figured we could do our 17 or 18,000 in
20   roughly a three month period.  So I agree with the court and with
21   Andy, the sooner we get started the better.  Like I say, we're
22   trying to get our operation up and going but it's now early -- late
23   April.  Even if we had the office up and running early May, May,
24   June, July, we'll get as many done as we can is all I can say,
25   Judge.
```

```
 1          THE COURT:  All right.  Well, the order does say each
 2    plaintiff named in an action.
 3          MR. MEUNIER:  Yes.  Right now that's only about 700
 4    people.
 5          THE COURT:  So I think that Jerry and Justin's
 6    interpretation of the order, page eight of the order, Section C is
 7    correct.  But it doesn't in any way suggest that we should not be
 8    producing these things sooner rather than later.  So I understand
 9    what you want, Andy, and I am with you, but strictly by the wording
10    of the order that's what they're obligated to do.  I would like to
11    see it many more, as many as possible.
12          MR. WEINSTOCK:  Right, Judge.  I was just saying that it
13    was obviously a disconnect.  I am saying any order, by not doing it
14    by the 15th --
15          THE COURT:  Right.
16          MR. WEINSTOCK:  It kind of dovetails into so many more
17    issues, so the more the better.  The commonality is the issue, we'll
18    know a lot more about what's common and what's not.  10,000 fact
19    sheets instead of 700.
20           I know, and I've raised, we want to test as many trailers
21    as we can identify.  The government wants to start destroying them
22    this fall, the more I have, the more I can test, the more
23    information I have.  So I am not suggesting they're violating the
24    order by reading it this way, but I hope there is a happy medium
25    between seven and 20,000.
```

1      THE COURT:  Why can't we -- tell me again why this is an

2 impediment to moving class cert up from a November date, being filed

3 in late September and being heard in November, moving that up a

4 month or two or three?

5      MR. WEINSTOCK:  I don't think it is, your Honor, if we can

6 see something -- we don't need every single fact sheet certainly to

7 make that happen.  But if we can see eight or 10,000 that we can

8 digest, that will be fantastic and we should be able to move the

9 hearing up a month.

10      I agree with you and I appreciate what you've been saying

11 and Jerry's been saying, we need a merit determination of class

12 certification, and obviously the sooner the better.  So I am

13 certainly not going to sit here and push that in 2009 or if we can

14 move it up a month that's fine by me.

15      THE COURT:  As a result of the hearing on Friday and my

16 consideration of it over the weekend, it's occurred to me -- it

17 should be apparent to you now that it has occurred to me that unlike

18 our initial feeling that we could put class cert on the back end, it

19 probably needs to be disposed of on the front end, and I think we

20 were all hoping to do it the other way, but we are where we are, and

21 with regard to any kind of tolling or any type of mass joinder, we

22 simply can't do it absent the court's ruling on class cert.  So I

23 think we need to pick up mantle and get that done.

24      The reason this has come up now because of the issue of

25 mailing notices to people and how and under what procedural vehicle

1   will those notices be mailed if they are going to be mailed, so

2   that's why we're getting into this now.  If it's got to be decided

3   it's got to be decided and that's what I'm here to do.

4           I would like to go ahead and tee up the class cert

5   hearing.  I really would rather not wait until November on the one

6   hand.  On the other hand if you all tell me that it's impossible to

7   do in July, then maybe we can pick sometime between July and

8   November to get class certification disposed of.

9           Clearly if a class is certified notice is going to go out

10  to the people who are potential class members, and that list, such

11  as it is, is in the exclusive possession of the government.  So what

12  do you all think, does anybody disagree with the idea of getting

13  class certification out of the way, contrary to what our initial

14  thoughts were in handling this?

15          MR. MILLER:  Your Honor, this is Henry Miller.  The

16  government's position on -- I stated this earlier in chamber

17  conferences -- class cert has always been class certification had

18  been teed up as early as possible, and when I first noted that we

19  were not a party and hadn't been served.  And the government's

20  position hasn't changed on that.

21          THE COURT:  All right.

22          MR. MEUNIER:  Your Honor, I need to mention one other

23  factor in all of this is that we don't have all of the defendants

24  yet in the case.

25          THE COURT:  Right.  Right, but we will.  What's the answer

1     date we gave them?  It's coming up.

2          MR. WEINSTOCK:  May 18th, the 12(b) date, but they'll be

3     there.

4          THE COURT:  And I thought about that.  We can encounter

5     all of our Rule 12(b) motions, all of the motion practice that's

6     going to be filed later this summer and probably will be set for

7     hearing well into the fall, if not even after the first of the year,

8     all of that can occur simultaneously to class certification.  So as

9     well as the preparation of expert reports, selection of potential

10    bellwether trials, all of that can occur separate and apart from

11    this class cert hearing.  I am not suggesting that we drop what

12    we're doing and turn our attention to class certification.  Now it's

13    going to be a little bit more work intensive, that's why we have the

14    committees and whatever subcommittees you've been able to establish

15    to try to handle this.

16          MR. MEUNIER:  Your Honor, I wonder whether class cert

17    ought to be addressed before 12(b) motion practice concludes.  The

18    12(b) motion practice is going to help shape the nature and extent

19    of some of the common legal issues.  In other words, we're going to

20    propose that there are X numbers of common legal issues and some of

21    those issues may rise or fall with your decision on 12(b) motions.

22    So I would hate to be addressing commonality under Rule 23 at a

23    moment in time when it's still not clear what the course is doing on

24    the 12(b) motion practice.

25          THE COURT:  You're saying if you don't have certain claims

1    that would impact the appropriateness of the use of the class

2    vehicle?

3              MR. MEUNIER:  Correct.  Suppose I convince you that we

4    have ten common issues but three are the subject of a 12(b) motion.

5    I don't know how the court is going to go about deciding Rule 23

6    commonality if you haven't decided yet how many of the common legal

7    issues exist.  So I just think logically we ought to set this

8    calendar situation up so that we can be somewhat confident we'll be

9    through the 12(b) phase of the case before we submit a decision on

10   class cert to you.

11             THE COURT:  Well, if class cert is in any way dependent on

12   the existence of those claims, can't the court go ahead and either

13   make that assumption that the claims are there or, in fact, handle

14   them simultaneously such that, I mean, if you tell me this class

15   rises and falls on these particular groups of claims or that the

16   other side says, well, Judge, if you take that claim out, if we're

17   successful then they really don't have a class, I mean, can't that

18   all go into the mix?  I mean, it shouldn't affect your scheduling if

19   the court determines that a 12(b)(6) determination impacts class

20   certification.

21             I guess what I'm saying is we don't necessarily have to

22   telescope out on our timeline these issues, we can consider the

23   implications of them while those motions are pending and, in fact,

24   reverse the order of our rulings on those motions if we have to.  In

25   other words, I can rule on 12(b)(6) and then rule on class cert or I

1    can rule on class cert making assumptions on 12(b)(6)s or I can rule

2    on class cert because the 12(b)(6)s don't in any way impact that

3    decision.

4         MR. MEUNIER:  I think there are options to the court, I am

5    just pointing it out.

6         THE COURT:  Yes.

7         MR. MEUNIER:  Let's take medical monitoring.  I know that

8    the -- I would assume that the defendants are going to in motion

9    practice raise the question whether medical monitoring as a tort

10   remedy is or is not available under any or all of the four state

11   laws at issue.

12        MR. WEINSTOCK:  You're correct.

13        MR. MEUNIER:  And there will be a different analysis per

14   state.  Well, medical monitoring relief is by nature a class wide

15   remedy and would be assertable in my view as a common legal issue.

16   So if in deciding whether it is or is not to be weighed as common

17   issue, the court will be taking into the question whether or not it

18   exists as a matter of law under the state laws in question.  So I

19   just think there are some overlap there.

20        And my thought was that we would have the 12(b), you know,

21   and the whole point of the master complaint as you know was to tee

22   up a vehicle to dispose of legal issues that were common.

23        THE COURT:  Right.  But the complication though, as Andy

24   has pointed out, is the class, the assertion of a class in the

25   master complaint.  I don't have a problem with it, I am not

1    surprised you do it, but the defendants have, that has given them

2    cause to hesitate and the net effect of that is to keep open any

3    type of tolling agreement that -- actually kind of obviates the need

4    for tolling agreements if everyone is going to be considered

5    potential class members.  So it's raised, that issue, sooner than I

6    think we had all wanted to get to it, and so it's there and I don't

7    mind getting to it.  I agree with what you're saying, we could

8    happily march off to encounter all of the 12(b)(6) motion practice

9    and all of the other motions and rule on that, but the problem is

10   that we have this class assertion that also needs to be tended to in

11   the context of this notification issue.

12        MR. MEUNIER:  Well, your Honor, it does need to be tended

13   to, and again, I cite the Vioxx case with the proposition that you

14   can actually postpone it if you want until after you've even done

15   bellwether trials.  I am sensitive to the need to interrupt or end

16   the suspension effect of American Pipe, I am just again trying to

17   suggest that moving it up, you know, does cause there to be activity

18   in the case addressed to class cert when we're also trying to get up

19   and running on some other important things.  I don't want the wheels

20   to come off here.

21        THE COURT:  Well, it does.

22        MR. MEUNIER:  If I could suggest a way for your Honor's

23   need to get to it and Andy and Henry's need to get to it, but at the

24   same time I just don't know that the November date is -- I thought I

25   heard Andy say earlier that he could live with it, I don't know that

1    that is --

2              THE COURT:  He did.

3              MR. MEUNIER:  I don't know that that's problematic for the

4    court if we know we're going to do it in November and we do the

5    notification and we get an August identification of how many more

6    claims we actually have to process through the fact sheet and

7    tolling agreement approach, we'll have a lot to do and we'll have

8    the 12(b) motion stuff to do.  I don't know why that's problematic.

9              THE COURT:  Okay.  All right.  Let me ask Henry and

10   Michelle, are there any plans that you're aware of, is it

11   contemplated that any future mailings will be made by FEMA or CDC or

12   someone on their behalf to anyone on this list or any subgroup of

13   people on that list as we sit here today?  Do we know if there are

14   going to be any other written communications made?

15             MR. MILLER:  The answer is, your Honor, I do not -- we do

16   not in the torts branch, we don't involve ourselves with the

17   perspective actions that are related to health and safety.  We don't

18   figure it's our -- we're not the appropriate person to be

19   interjecting litigation issues into what the government should be

20   doing to protect health and safety.  So it's not something I've kept

21   up with or am aware of.  I obviously can inquire of FEMA to that.

22   FEMA is trying to move the people out of the trailers as quickly as

23   possible and maybe contacting some for those purposes I'm sure.  But

24   that's all been done through contractors anyway.

25             So the answer is, the quick answer is, no, I don't know,

1   and I would need to check with FEMA.

2         THE COURT:  Jerry and Justin, can you all take this

3   notification that you've prepared as a proposal, it's about three or

4   four pages long, can that not be distilled down into a single

5   paragraph perhaps that says, that discloses the existence of the MDL

6   by docket number or however you want to identify it and further

7   states that, you would have to play with the wording here, but

8   further states, it provides the web site, which we are going to have

9   online here at the court, and contains your address as liaison

10  counsel, a mailing address, not with your names, but simply as

11  liaison counsel, a paragraph that could be included in any future

12  FEMA or CDC mailings, can you all distill this down to a single

13  paragraph?

14        MR. MEUNIER:  Your Honor, we will certainly try.  You have

15  probably already discerned that I have a hard time saying things in

16  just a paragraph.  And I'll take credit for being the author of that

17  proposed notice, and I think I mentioned this, there are experts out

18  there, you have to pay for this service, but there are experts out

19  there who know how to take lawyer words and convert them into words

20  that the average person can understand.  And I will certainly do my

21  best to work with these people and try to get it condensed as much

22  as possible out.

23        MR. MILLER:  Your Honor, if I can speak, what I gather

24  you're contemplating is requiring FEMA to include in any future

25  notice the litigation information regarding the litigation and the

1    ongoing litigation and the ability of the persons to join in this

2    litigation.  And that's going to put me in a very awkward situation

3    because it's going to basically result in me having to make

4    suggestions or legal advice on how FEMA should proceed with issuing

5    notices that relate to health and safety matters because it

6    implicates the litigation.  And I think that's problematic.  If

7    notice is going to go out, that notice should be separate and apart

8    from any safety or other information that is issued to these

9    persons.  Leave the safety and health information that FEMA is

10   issuing to this litigation, I think, it's just -- well, I know it's

11   inappropriate.

12         THE COURT:  Okay.  Well, if that's the case then surely

13   FEMA or CDC or anyone else acting on behalf of the government, if a

14   notice is mailed to any group of people perhaps that's where that,

15   those, the identities of those recipients or intended recipients

16   could be provided to a third party administrator who can then send a

17   notice such as the type that I am talking about and that Jerry's

18   talking about, I am talking about prospectively.  Because I don't

19   know, and maybe you don't know as we sit here, FEMA may not even be

20   mailing things to people who moved out of trailers some 18 months

21   ago.  The list of people that are being mailed to today and

22   hereafter could be a very limited universe.  But nonetheless, those

23   people are getting mailings or will be getting mailings.

24         So if that's the case, and I am coming full circle here to

25   my first set of questions when we started this conference, if people

1    are getting information, they should get information, maybe not in

2    the form that's drafted here in this 23(d) notice, but just

3    disclosure information as to the existence of the MDL and a way to

4    access information for the MDL at this juncture.

5         And if I understand you, your position, and I am not

6    insensitive to it, but the other way would be that every time FEMA

7    does a mailing, plaintiffs counsel and defense counsel will be able

8    to see it and then they can make a determination whether they want

9    to send a preapproved notice that everybody will see that will go

10   out in connection with FEMA's notice, and it will be done at

11   plaintiffs' expense by a third party administrator.  Plaintiffs will

12   not be provided with names and addresses to whom that notice has

13   been sent.

14        In that context, that's why I am asking to see what people

15   have already been sent.  And if it is something that is so fact

16   neutral or advice neutral that doesn't warrant a follow-up mailing,

17   then so be it.  But if it is something that arguably could be

18   considered advisory in terms of exercising rights, then perhaps

19   that's worthy of a follow-up.  Again, not with necessarily the

20   notice that plaintiffs have prepared here, but something that

21   discloses the existence of the MDL and a way to get further

22   information on the MDL.  Because I know at least some of the notices

23   that FEMA has sent out or CDC has sent out says, here is what we

24   know about this and they speak in general terms and then they say we

25   will be having some type of meeting or something in your area and

1    inviting people to attend to obtain information.  It's

2    informational.  And if we're going to provide information, we need

3    to provide information that is balanced -- well, to quote the

4    popular phrase, fair and balanced.

5         So there's got to be a way to do this.  And I am not

6    suggesting that your prior notices that were sent out were not fair

7    and balanced, but I haven't seen those yet in order to determine

8    whether a follow-up in the form of some MDL notification is

9    necessary.  I am not signing on to the idea of, hey, give us the

10   list of everybody whoever applied for a FEMA trailer or lived in a

11   FEMA trailer and we're going to send out this notice to all of those

12   people.

13        MR. MILLER:  From what I can gather, your Honor, what the

14   court is indicating is that it's not the Privacy Act rights or Rule

15   23 that concerns the court, but it's rather the fact that FEMA or

16   CDC or government entities are currently in contact with persons who

17   are residing in trailers or perhaps had resided in trailers and

18   conveying to them information regarding formaldehyde; and further,

19   that the information may justify the plaintiffs or even the

20   manufacturers issuing their own notice to rebut anything that is in

21   the FEMA notices to these persons by virtue of the fact that these

22   persons are putative class claimants.

23        THE COURT:  Well, I will substitute, you use the word

24   rebut, I would use the word supplement.

25        MR. MILLER:  Okay.

1           THE COURT:  Well, I think it makes a difference.  I think

2      it makes a difference.  Because the information that FEMA is and CDC

3      is providing to an individual may be entirely correct and

4      appropriate.  I recognize their obligation to take that action and

5      we're not suggesting, I don't think anybody is suggesting that FEMA

6      or CDC up to this point has failed to give adequate notice in this

7      last, these last few months.  Their allegations that they failed,

8      they were aware of things and failed to give notice at the time they

9      were making trailers available, housing units available.  But I

10     don't think anybody is saying, hey, look, you know, you knew about

11     this in December or January, this past December or January and you

12     just sat on it.  I think that there have been press conferences held

13     and mailings that have been made that have been a follow-up to what

14     has been discerned by CDC in the last six or eight months.

15          MR. MILLER:  I understand that, your Honor.

16          THE COURT:  But, Henry, I think --

17          MR. MILLER:  I guess what I'm trying to understand the

18     vehicle by which the court would then order this notice is through

19     what, Rule 23 -- I don't think it contemplates Rule 23 or the court

20     order exception to the Privacy Act.

21          MR. MEUNIER:  I don't understand that comment, your Honor,

22     I think the whole thing is predicated on Rule 23 and the court order

23     exemption of the Privacy Act.  I haven't heard anything that you

24     said that disqualifies any such notice legally.

25          THE COURT:  I don't see -- right now we're dealing with

1   Rule 23, we are dealing with Rule 23, we've got the other rules that

2   have been cited here, but I think it's ultimately a discretionary

3   function of the court under whichever procedural vehicle we've

4   argued on Friday.  I think ultimately the court can look at notices

5   that are sent and make a determination whether if plaintiffs or

6   defendants at their own expense would like to follow-up with a

7   notice that everybody sees beforehand that's informational, I think

8   that we should be able to do that.  Both prospectively and looking

9   back at what has been sent.

10          MR. MILLER:  My only point is, and I would emphasize what

11  Michelle had argued on Friday, is that the notice is for purposes of

12  if there's been substantive rights affected by some court action or

13  some action that's gone on that has affected the putative class

14  members rights, that's what that contemplates, and in this case

15  there is no such thing.  In fact, what the plaintiffs are trying to

16  do is issue this notice prior to teeing up class action or prior to

17  having any substantive rights of any putative claimant affected.

18  It's basically issuing notice that would effectively sign these

19  people up.

20          THE COURT:  No, they're not going to issue a notice until:

21  (a) a notice is sent in the future to a group of people and that

22  notice is one that in the court's discretion or court's opinion, I

23  should say, would be worthy of some type of notification from

24  plaintiffs' counsel or a notice has previously been sent that in the

25  court's opinion is worthy of being provided information, further

1   information from plaintiffs' counsel or defense counsel for that

2   matter.

3           So, no, it's not an attempt to sign up or contact people

4   for the sake of signing them up, it would be hinged upon solely the

5   information, whatever has been provided to people already or in the

6   future by the government.  And it may well be that once we look at

7   what the government has submitted we determine that there is no need

8   for any type of follow-up communication from plaintiffs' counsel or

9   defense counsel.

10          MR. MILLER:  And so, I gather is what the court is saying

11  that if any of the documents that FEMA distributed to the trailer

12  residents in the past or may distribute in the future substantively

13  affected the putative class members' rights, the court would allow

14  the defendant manufacturers or the plaintiffs to issue a

15  supplemental notice to those persons.

16          THE COURT:  That's right.  I am not sure -- yeah, that's

17  generally correct.  That's generally correct.  When you say affects

18  their substantive rights, at this point in time I think a person can

19  make decisions better with more information.

20          MR. MILLER:  And I don't disagree -- I agree more

21  information is always better.  But in the context of a class, the

22  general way that one distributes that information if you don't have

23  these lists, and the Privacy Act is supposed to be considered

24  separate, is you issue the notification through publications,

25  advertisement and other ways.  And that's considered effective to

1    provide the information to the persons.  And nothing at all prevents

2    the plaintiffs or the manufacturing defends in this case from

3    issuing that notice to do that in this case.

4         THE COURT:  You're talking about publicly any type of

5    public advisements; is that correct?

6         MR. MILLER:  Correct.  Or if they want to go around to

7    anybody else or any individuals that are around there.  I guess I'm

8    concerned is, the fact of the matter is this list exists or lists,

9    we talked about this list, but there is obviously a discernible

10   number of persons who resided in FEMA trailers.  But the fact of the

11   matter is is that if that list didn't exist, you would consider

12   notification through publications or other means to be sufficient.

13        THE COURT:  But, Henry, not only does the list exist it's

14   being used to disseminate information --

15        MR. MILLER:  Well, your Honor --

16        THE COURT:  -- by the government.

17        MR. MILLER:  To my knowledge, and I say this just from

18   what I'm understanding, there have been three things that have been

19   disseminated to the actual residents.

20        THE COURT:  Okay.

21        MR. MILLER:  And that is the brochure that was issued in

22   June of 2006.

23        THE COURT:  Right.

24        MR. MILLER:  And a second brochure that was issued in the

25   summer of 2007 and the CDC fact sheet that was issued on or about

1    January or February 2008.

2           THE COURT:  Okay.

3           MR. MILLER:  In addition, there was direct communication

4    with the 500 plus persons that CDC's units, whose units were tested.

5    That's my understanding of the direct communications.

6           Now, there may have been other publications, there may

7    have been meetings that resulted as a result of the CDC's testing

8    that I am not aware of, but that's what I'm aware of now.  I state

9    with a caveat it's not something I've investigated or attempted to

10   assert beforehand so there may very well be other things out there.

11          THE COURT:  All I am suggesting at this point in time is

12   that -- and we're going to have to talk about how quickly we can get

13   this -- I would like to see, and I'm sure counsel would like to see,

14   they're probably already familiar with it, I would like to see what

15   has been sent "to the list" or portion of the list, up to this

16   point.  And you've identified three so far, perhaps there's a couple

17   more, perhaps there aren't, but you've identified at least three

18   things that were sent out to people by the government.  I may look

19   at those and say, you know, these are purely innocuous from this

20   litigation point of view, and really are not worthy of any type of

21   follow-up by plaintiffs' counsel or defense counsel, in which case

22   motion to compel would be denied.

23          MR. MILLER:  But, your Honor, until last month we were not

24   a defendant in the litigation.

25          THE COURT:  I understand that.

1        And then with regard to any future mailings that are going

2   to be made, I think it will be incumbent upon the government to

3   provide that notification to the court, either prior to mailing it

4   or while it is being mailed at which time the court can determine

5   whether there's a need for those people to receive something else to

6   supplement it.

7        MR. MILLER:  So in essence the court could enjoin the

8   United States from issuing any future notices without first passing

9   it by the court for its review.

10       THE COURT:  I am not enjoining anything.  I told you the

11  option would be either to submit it to the court prior or go ahead

12  and mail it and give me a copy of it.

13       MR. MILLER:  Okay.

14       THE COURT:  You all decide, I mean, we don't even know if

15  there's going to be a subsequent notification process.

16       MR. WEINSTOCK:  I don't know one way or the other, your

17  Honor.  I am just trying to figure out and understand the boundaries

18  of what the court is intending to impose upon the government.

19       THE COURT:  Right now the only thing I am imposing on the

20  government is providing me with a copy of everything that has been

21  mailed to these people, a single copy of whatever item has been

22  mailed to the list or any subset of the list and a description of

23  that subset, if, in fact, it was not mailed to everybody.  That's

24  all I'm asking for at this point.

25       MR. MILLER:  Okay.

```
1          THE COURT:  And in the future to be provided with a copy
2    of it either prior to it being sent or if the government -- I don't
3    think there is any trick to giving it to me beforehand, you can give
4    it to me when it's sent.  Because the court's consideration of what
5    plaintiffs seek in this case is going to be based upon what
6    information is being given to these people and whether there is a
7    need for them to receive anything additionally about this MDL and
8    their ability to participate in it.
9          MR. MILLER:  And I understand, your Honor.  From a
10   practical or logistic standpoint, it sounds relatively simple.  I
11   don't think it's presently as easy as everyone envisions because
12   there are a lot of government entities out there, ATSDR, CDC, FEMA,
13   and basically now they're all going to have to report to me and
14   provide me with copies of everything, anything that goes out to any
15   trailer occupant for review so that I can comply with this request
16   or order.
17         THE COURT:  I am not talking about a letter to an
18   individual trailer occupant.  I am talking about something on the
19   order of a notice that is sent out, we're not going to quantify
20   here, something that would be sent out to a group of people, that's
21   not addressed -- if you're sending somebody a letter saying, "Dear
22   Ms. Smith, we have received your request that the trailer be
23   removed.  Please be advised that we are going to remove it on or
24   before X date."  I don't need that.
25         MR. MILLER:  No, I understand that, your Honor.  What
```

1   you're looking for, though, is anything that is sent out to any

2   current occupant that would have anything to do with formaldehyde,

3   and so anything that is sent out by FEMA, CDC, ATSDR, HUD or any

4   other government entity needs to go through me.

5          THE COURT:  Yes.

6          MR. MILLER:  Before it goes out.

7          THE COURT:  Right, that's correct.  We're talking about

8   three things that have gone out in the past.

9          MR. MILLER:  That I know of, your Honor.

10          MR. MEUNIER:  Your Honor, I think you mentioned more than

11   three, I think there was the June '06 brochure, the summer '07

12   brochure, the CDC fact sheet of December '08 and then contact with

13   the 500 folks whose trailers were tested by CDC.

14          THE COURT:  I am talking about information that is

15   disseminated to groups of people, big groups; small groups, I don't

16   know that, but it would be information that is disseminated to

17   groups of people, not individualized letters to people regarding

18   FEMA business.

19          MR. MILLER:  Your Honor, I guess it puts me in an awkward

20   situation because as a tort lawyer, what I would end up doing is

21   advising not to send out any further notices.

22          THE COURT:  No.

23          MR. MILLER:  Obviously there are other people that will

24   make that ultimate decision.

25          THE COURT:  You keep wanting me to say that so you can go

1   to the Court of Appeals, Henry, and I have never said that.  I am
2   not saying it now.
3           MR. MILLER:  I don't want to go to the Court of Appeals,
4   your Honor.
5           THE COURT:  Then stop putting words in my mouth.  That's
6   about the third time you've done it today.  I have never said that.
7   I am not enjoining you from doing anything or the government from
8   doing anything.  I have never said don't send people notices.  Ever.
9           MR. MILLER:  And what I said, your Honor, and I want to
10  make this clear, you're putting me a position, not the court, that
11  the legal advice that I would advise is for them not to send such
12  notices.  It's not the court is enjoining, it's not, I understand
13  that very clearly.  If the court -- if I stated it otherwise I
14  apologize.  But I want to make it very clear that it puts me as the
15  torts lawyer in the position of providing advice to the government.
16          THE COURT:  You're going to have to do that anyway.  Look,
17  the government is in the position that it's in because of all that
18  has occurred up to this date.  I am not going to forgive you the
19  position that you're in, I don't think that you have an easy job, I
20  don't think Jerry and Justin or Andy has an easy job either.  We're
21  in the position we're in.  Notices have been sent, we know that.
22  Notices may be sent in the future, we don't know that but perhaps
23  they will be.  This isn't a question of telling people not to do
24  things, it's a question of being able to level the playing field
25  such that people can receive information.

1        We're in the position we're in.  I am in the position of
2   having a class cert hearing before the end of the year when we all
3   envisioned this would be a mass joinder case, but that's what we're
4   going to do.  It's not easier than the other way, but it's what
5   we're going to do.
6        So we're talking about whose rear end's going to get stuck
7   out and shot at, we're all kind of exposed on this.  But we're going
8   to do it and do it the way that is the most suitable for the parties
9   and for the court.  And I recognize the government is a party, I
10  hear you.  But at some point we're all going to have to bite the
11  bullet and do this.
12       If they mail -- I want to see the ones they've mailed out, and
13  if they mail out in the future informational mailings then I need to
14  get a copy of it.  Just add me to the mailing list.  I don't need
15  the letter to Ms. Smith telling her when the trailer is going to be
16  picked up, I don't need internal information regarding FEMA at this
17  point or formaldehyde testing.  I need a general informational
18  mailer that is sent out to people who are potential class members or
19  already litigants in this case.  That's all I'm asking for.
20       And I am not agreeing with plaintiffs that the entirety of
21  the list be provided to a third party administrator and that a
22  mailing is going out to all of them.  I am expressly stating that I
23  am not granting the motion to the extent that it seeks that.
24       I mean, it's nuanced, I know, and it may be a little bit
25  more work intensive.  I don't think it is, but that's where we are.

1  You're right, you all were not a party before, so how would you

2  know, I mean, you do what you think is right.  And I don't think

3  anybody is complaining at this point that the government should not

4  have mailed out notices, and nobody, certainly not I, am contending

5  that future notices are not warranted and should not be made.

6      I mean the government has -- there is a discretionary function

7  that you guys argue all the time, it comes into play here.  I mean,

8  if you all decide that actions need to be taken and information

9  needs to be provided, by all means go ahead and provide it.  I am

10 just asking for a copy of it so that counsel can see it and we can

11 determine whether any additional information needs to be provided

12 that would impact the status of the parties in this case or the

13 claims in this case.  Anybody?

14         MR. MEUNIER:  We understand, Judge.  This is Jerry.

15         THE COURT:  Henry.

16         MR. MILLER:  I understand, your Honor.

17         THE COURT:  So the task before us right now is, No. 1,

18 we're going to have the class certification hearing.  And as much as

19 I hate to extend it into the fall, both sides are telling me this is

20 doable, so let's put our motion to continue pens away because we're

21 going to have it as set forth in this notice or this plaintiffs'

22 proposal.  And that hearing, the motion will be filed by September

23 26th, the opposition will be -- we're going to issue an order that

24 copies right off this submission here and the hearing will be held

25 no later than November 19th, 2008.

1       It would be my hope that that hearing could be done either

2   by submission or simply by oral argument.  I don't envision this as

3   being something where we have to call so many witnesses, but I won't

4   hold you to that if you decide on the plaintiffs' side or on the

5   defendants' side that that's not the way you want to go.  I would

6   suggest that most of the issues in this case are things that could

7   be resolved on paper such that the court can take it as submitted.

8   All right.  That's No. 1.

9       No. 2:  What is it, the 21st here.  Why don't we say by

10  May 2nd, which is a Friday, the government can provide to counsel

11  and to me a single copy of every item that has been distributed to

12  the "list" or any subset of people on the list.  We know that there

13  are three items, perhaps there are more.  I really don't think

14  there's going to be a lot more than that.  And as best as you all

15  can, on the government's side, a general description of those who

16  got it; i.e. everyone who lived in a FEMA trailer as of this date

17  was intended to be a recipient of this notice.  We don't know

18  whether they actually got it or not.  Or everyone whoever lived in a

19  FEMA trailer after August 29th, 2005 got this notice or was intended

20  to get this notice.  Just some general descriptions such as that.

21  Or everyone who lives in a FEMA trailer in the State of Louisiana as

22  of this date got this notice or was intended to get this notice.

23  Some general descriptions such as that.

24      The court will review those, and if there is a need for

25  further action, we will reconvene because then we would have to

1    discuss what that further notification would be and I would submit

2    to you, at this time, as I've already suggested, that there be

3    something, not to knock your work, Jerry, it's very comprehensive,

4    but something that is even more compact than that.  And also that if

5    the government determines that any further general notifications

6    need to be provided in the future, that the court simply be provided

7    with it.  Either prior to mailing or at the time of mailing, along

8    with a general description of the persons to whom it is intended.  I

9    guess the general rule is keep doing what you're doing, just copy me

10   on it and copy the attorneys on it.

11           MR. MILLER:  Understood, your Honor.

12           THE COURT:  If I could put it in a nutshell, that would be

13   the upshot of what I am ordering.

14           MR. WEINSTOCK:  Judge, can I ask a question, not about an

15   order but about a plan of action?

16           THE COURT:  All right.

17           MR. WEINSTOCK:  Can we get some indication from the

18   plaintiffs, and I am not asking for any kind of hard and fast

19   deadline, but some kind of indication of when they think they can

20   give us some kind of volume of fact sheets?  And I am not asking for

21   that information today, they still have to obtain their contractor

22   and I need to report back to my group and we're ready to get a

23   section as soon as possible, maybe on May 2nd on what kind of

24   timetable they think they can meet.  One thing I told Jerry from Day

25   1, I was in complete agreement, we will not have some kind of hard

1    deadline and start filing motions the day afterwards to dismiss

2    claims, that's not what I'm saying, I am just trying to see how much

3    material we can get and how quickly.

4         THE COURT:  Let me see if I understand, January 16th

5    date -- and Jerry has pointed out that on, according to my order on

6    page eight of Pretrial Order No. 2 that that would include the named

7    plaintiffs and he has also told us that he and Justin are going to

8    try to get many more than that, and it's in their interest to try to

9    get all of those to you as soon as possible, including before July

10   16th if possible.  Is that not on the deadlines?

11        MR. MEUNIER:  July 16, your Honor, is the deadline for

12   named plaintiffs and we're going endeavor to get as many more as we

13   can.  And I think what I hear Andy is asking for is a more specific

14   prognostication by understanding of May 2nd of how many we expect

15   realistically to have done by July 16 and we can certainly do that.

16        THE COURT:  All right.  Go.  We are going to put that in

17   the order, too.

18         Now, with regard to discovery, Jerry, you're the only one,

19   as a matter of fact Andy had even said at the hearing on Friday that

20   there would not be a need for a lot of discovery from the

21   defendants.  Jerry, you had mentioned the need for discovery

22   regarding class certification.

23        MR. MEUNIER:  Yes, sir.  And I don't know, I can't

24   remember now if in the mass joinder proposal I set forth a deadline

25   on any discovery for class cert but I would suggest that we have

```
 1    such a deadline.  And I think I did put something in there about

 2    stipulations, I think a lot of it can be stipulated.

 3                THE COURT:  I agree.

 4                MR. MEUNIER:  So I would suggest that in the court's order

 5    as it deals with class cert we have a deadline for both fact and

 6    expert discovery and we also have a deadline by which the parties

 7    are to submit the maximum joint stipulations that it can.

 8                THE COURT:  All right.  Any suggestions from anyone as to

 9    what that date could be in order for us to meet this hearing

10    deadline?

11                MR. MEUNIER:  Judge, I wish I had it in front of me.  Did

12    I submit a proposal for stipulations?

13                THE COURT:  October 31st I think is the date you had.

14                MR. MEUNIER:  Okay.  Normally I would think we would want

15    to conclude discovery well enough in advance of that date to know

16    what we can and cannot stipulate to.  So I would think that maybe a

17    September deadline for class cert related discovery would be

18    appropriate.

19                THE COURT:  Well, how about we make it the date that we're

20    looking at for our trailer testing deadline, which would be the

21    Tuesday after Labor Day?

22                MR. MEUNIER:  Okay.

23                THE COURT:  I don't see where -- I mean, I realize this is

24    a lot of information to organize and put into a presentable form,

25    but I don't see where there is going to be a lot of discovery, we're
```

1  not talking about a lot of depositions of people on the defendant

2  side that you're going to need.  Most of the information relative to

3  this commonality is going to be information that the plaintiffs

4  would have and possess and perhaps can be shared with the

5  defendants.

6       MR. MEUNIER:  I would agree, Judge.  And I understand from

7  my standpoint I am going to have a group of plaintiff lawyers now

8  who are going to be asked to live with an approach on class cert

9  that establishes a good faith effort in this record for you to make

10  a decision on, and I just don't want that group of lawyers to feel

11  like they haven't been given the opportunity to do whatever they

12  think needs doing.  And I really do think on commonality, which is

13  the issue, from a factual standpoint it has to do with a profile of

14  the claims.  And I would think, again, if we get up and running on

15  this fact sheet with the known group we'll get a long way toward

16  that.  And then just on an expert level, it's having our experts

17  disclose in an appropriate report what they feel to be true and we

18  have across the board conclusions about formaldehyde and have the

19  defendant experts respond.  And maybe a couple of expert

20  depositions.

21       So I don't want to leave the court with the idea that I am

22  talking -- looking at thousands or hundreds or dozens of

23  depositions, I just want to make sure that we give enough time for

24  us to sort out exactly what we need to do.

25       THE COURT:  Andy, are you in agreement with what Jerry has

1    just said?

2           MR. WEINSTOCK:  I am.  I think both of you all hit the

3    nail on the head.  I think most of the discovery comes from the

4    commonality amongst the plaintiffs and that's something in their

5    control, but more expert than fact.  Jerry probably does need to get

6    some discovery, and if he does so do we.  I am just wondering maybe

7    mid September makes a little more sense because I know how summer

8    schedules tend to work out, if we can do September 15th, I think it

9    can all be done.  I don't know if anybody else agrees with that.

10          THE COURT:  Tuesday after Labor Day, that only gives you

11   an extra few days.

12          MR. WEINSTOCK:  I know, Judge, it just seems like my

13   experience is everybody seems to go on vacation right before their

14   kids go back to school in August.

15          THE COURT:  Not me.

16          MR. WEINSTOCK:  And making things, calendaring things.

17          THE COURT:  Let's leave it the day after Labor Day.

18          MR. WEINSTOCK:  Summer vacation is set for the end of

19   July, I'm good.

20          THE COURT:  And, look, we've got a lot of people that can

21   work on this.

22          MR. WEINSTOCK:  True.

23          THE COURT:  You have your committees and subcommittees

24   that are working on all of this, so you're going to have to

25   designate some people that are going to pick up the mantle on this.

1   Now, can we not by next, the 2nd, May 2nd also decide --

2 when you look at the factors for class action under Rule 23, and you

3 can pick whatever case you want from the Fifth Circuit, really any

4 of the federal courts because they're all following the same, and

5 the jurisprudence is all the same, can we not go through that and

6 decide all of the areas that are not going to be at issue in this

7 hearing?  For instance, numerosity I would think and competency of

8 counsel to represent a class, I would hope we could get those off

9 the table.  That would leave those other factors such as obviously

10 the biggest, commonality, suitability of class reps, that is going

11 to be a battle ground.

12   And I am not asking you to tell me now whether you think

13 it is or it isn't, but can't we in the next week or two decide which

14 of the elements of class cert are actually going to be litigated and

15 which we can toss off to the side as either being satisfied, I mean,

16 obviously plaintiffs are going to say they're all satisfied, but can

17 we not remove some of those from the playing field?

18   MR. WEINSTOCK:  I think we can, your Honor.  I can't even

19 envision an argument I can make on numerosity or on competency of

20 counsel.  Commonality certainly and suitability is just something we

21 would have to take a look at.  I would have to relook, I know they

22 listed out quite a few plaintiffs and it would seem some should be

23 suitable.

24   MR. MEUNIER:  Your Honor, this is Jerry, we may not have

25 named yet in the master complaint -- I am just talking about now in

1    terms of citizenship because we have four states, and, you know, I

2    may need an opportunity to amend and bring in by name some trailer

3    residents from each of the four states so at least that part is

4    covered insofar as typicality is concerned.  But I do think that May

5    2nd we can in conversations and among counsel get back, after that

6    get back to the court on what truly will be at issue and what won't

7    be in the certification.

8              THE COURT:  Let me ask Henry and Michelle, based upon what

9    we have just talked about with regard to this class cert hearing and

10   what needs to be done leading up to it between now and then, do you

11   all have any problems, suggestions, difficulties with what we've

12   said?

13             MR. MILLER:  I don't have any problem, your Honor.  I

14   would just, in fact, I think obviously the competency of counsel is

15   not something that needs to be argued here, Justin and Jerry have

16   clearly shown themselves to be very competent.  The numerosity can

17   be an FTCA because we only have eight claimants at this point who

18   have filed suit, your Honor.

19             THE COURT:  Okay.

20             MR. MILLER:  So from the FTCA point of view it may be the

21   other ones obviously we would agree with whatever position probably

22   that Andy took.  We will discuss it with him but we will probably be

23   aligned with him on that.

24             THE COURT:  What I would like you to do then, that's fair

25   enough, by May 2nd just go ahead and submit to me, you can do it

1   either in a joint letter form or a memorandum or something like

2   that, just give me a statement that you all can all agree to as to

3   the elements that the court will be expected to try or hear come

4   November and the elements, and those will be the elements that you

5   all will pursue with whatever discovery is necessary to accomplish

6   that.

7           MR. MEUNIER:  That's fine, Judge.

8           THE COURT:  All right.

9           MR. MILLER:  Yes, sir.

10          THE COURT:  Okay.  We did say May 2nd that Henry could

11   give us the information on the mailings?

12          MR. MILLER:  Yes, your Honor, we have May 2nd down.

13          THE COURT:  Okay.  Good.

14           So the record is going to reflect in conclusion that the

15   motion to compel is denied in part and submitted in part; denied to

16   the extent that plaintiffs seek to use a third party administrator

17   to contact each and every person on the list such as it has been

18   described in the motion.  It is submitted in part and subject to

19   further order pending the submissions from the government, and at

20   that point we'll take a look at those and it may well be that it

21   becomes denied in whole or it may well be that the court issues an

22   order in response to those submissions.

23          MR. MEUNIER:  All right, Judge.

24          THE COURT:  If the court does, it would be limited to

25   responding to a particular dissimenation made by the government and

1    to those to whom that dissimenation has been made.  And of course to

2    the extent it's been denied, it's denied without prejudice pending

3    class certification resolution.  So in other words, we may be at

4    this same juncture, hopefully with a lot less complicated issues if

5    the court decides to cert a class of some sort, then the so-called

6    list becomes relevant once again at that level.

7              So to the extent it's denied, it's denied without

8    prejudice for future reference.  All right?

9              MR. MEUNIER:  All right, Judge.

10             MR. MILLER:  Your Honor, if I could just bring two things

11   up because we had this discussion on Friday and it wasn't on the

12   record.

13             THE COURT:  Okay.

14             MR. MILLER:  Just wanted to make clear two things.  First

15   of all, there was the plaintiffs' request to test the additional 300

16   units, the unoccupied, unused units.  And we had discussions and it

17   was agreed that what plaintiffs would do would be identify those

18   units, we try to segregate them and they complete testing by May

19   30th.  And I just wanted to make sure it's very clear for the record

20   that the United States is of the position and believes very clearly

21   that the plaintiffs failed to show good cause for the amendment to

22   the court's scheduling order to add those units.  And

23   notwithstanding that, we will accommodate them to the best of our

24   ability to get those units available so they can test them.

25             The second thing was the court's -- the plaintiffs also

1    filed a motion requesting relief from the April 21st deadline and we

2    had discussion about that off the record.  And again, it's the

3    government's position that the plaintiffs failed to establish good

4    cause to have that extension, especially as to the 2,200 trailers

5    that Andy and the defense manufacturers are going to identify today

6    to us that are going to be segregated and pulled out.

7            THE COURT:  Okay.

8            MR. MILLER:  Your Honor, the reason I do this is the

9    plaintiffs have continuously indicated they stated they are going to

10   work toward the September 2nd deadline, but they've never indicated

11   that they will, in fact, comply with it and have indicated that

12   continuously that they've extended the deadlines that have been

13   provided or the agreements that the agreed deadlines have been

14   provided, and so I think it's necessary to establish a record just

15   to make sure that the government can preserve that September 2nd

16   deadline.

17           THE COURT:  I hear you and consider the record made.  And

18   I am sensitive to the deadline that we set in September for the

19   government to commence the destruction of the units, so I appreciate

20   you putting that on the record.  Does anybody care to respond to

21   that at all?

22           MR. MEUNIER:  Judge, just to the extent that it's implied

23   that the plaintiffs are not serious about your September 2nd

24   deadline, I want to correct that impression, we're very serious

25   about complying with that.

1            Second, to the extent that it's implied that we are

2    repeatedly seeking extensions without just cause that may be the

3    government's view.  But every time we have asked for help on those

4    deadlines and it's had to do with one thing and one thing only is

5    the deficiency of available data which is beyond our control.

6            THE COURT:  Okay.

7            MR. MEUNIER:  That's all I want to state.

8            THE COURT:  I understand that and to be fair when we

9    discussed it Friday, plaintiffs' counsel had indicated that the

10   additional time it sought in the near future would not jeopardize

11   the date that the court had set in September for FEMA to begin

12   destruction.

13           MR. MILLER:  Your Honor, I have one question, no comment.

14   That is today, we're going to today?

15           MR. WEINSTOCK:  Is the list of 2,200 we've been able to

16   match up.  My only question is, does the court want a copy of that

17   as well?

18           THE COURT:  Why not.

19           MR. WEINSTOCK:  You got it.  I can't say why not either.

20           THE COURT:  Okay.  Send it on over.

21           MR. WEINSTOCK:  You got it.

22           THE COURT:  Not that I plan on attending any of the

23   testing procedures, but we might as well.  I'd like to go ahead and

24   have it.

25           Okay.  Anything else?

1    MR. WEINSTOCK:  No, I have to get down to Mother's and

2    join the protesters.

3    MR. MEUNIER:  I'll see you there, Andy.

4    THE COURT:  I don't know if they're there, I understand

5    Jackson Square is hosting a large contingent that will be making

6    their way back over here later in the day when the presidents are

7    here.  So there's no telling.

8    MR. MEUNIER:  At least the protesters will eat well.

9    THE COURT:  Well, as I have told our chief here, any time

10   they adopt the tactic of blocking the exit from the government

11   building known as the courthouse at five o'clock, they take their

12   lives in their hands.  When we had that Iraq war started they were

13   trying to block the garage for employees to leave at five o'clock,

14   and, well, that resolved itself pretty quickly.

15   MR. MEUNIER:  I bet it did.

16   MR. WEINSTOCK:  I'm sure the torts branch had some cases

17   about that.

18   MR. MILLER:  Don't some of your employees carry handguns?

19   THE COURT:  All right.  Well, good, look.  Keep me in the

20   loop here in terms of if we need to get back on the phone, let's get

21   back to the phone.  These are tough issues and they're important

22   issues.  And like I said, we need to just come to grips with this

23   and just get it done.  It's a lot of stuff but we need to get it

24   done in order to get to the meat of the matter, which I am anxious

25   to get to.  And I think I told you all that when we first met.

1     MR. MEUNIER:  Thank you, Judge.  We appreciate your

2  working and timeliness on these things, they are tough issues.

3     MR. MILLER:  This is Henry Miller and Michelle Boyle,

4  thank you very much, we appreciate it.

5     MR. WEINSTOCK:  Thank you, your Honor.

6     MR. MEUNIER:  Thank you.

7     MR. WEINSTOCK:  Thank you, bye.

8     (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

9

10                    * * * * * *

11

12                 REPORTER'S CERTIFICATE

13

14     I, Karen A. Ibos, CCR, Official Court Reporter, United States

15  District Court, Eastern District of Louisiana, do hereby certify

16  that the foregoing is a true and correct transcript, to the best of

17  my ability and understanding, from the record of the proceedings in

18  the above-entitled and numbered matter.

19

20

21                    ___/s/ Karen A. Ibos___

22                 Karen A. Ibos, CCR, RPR, CRR

23                 Official Court Reporter

24

25