```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2     ***********************************************************

 3
       IN RE:  FEMA TRAILER
 4     FORMALDEHYDE PRODUCTS              Docket No. MDL-1873(N)
       LIABILITY LITIGATION              New Orleans, Louisiana
 5                                       Friday, May 9, 2008

 6     ***********************************************************

 7
             TRANSCRIPT OF STATUS CONFERENCE AND MOTION PROCEEDINGS
 8           HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                      UNITED STATES DISTRICT JUDGE
 9


10     APPEARANCES:

11
       FOR THE PLAINTIFF
12     STEERING COMMITTEE:              GAINSBURGH BENJAMIN DAVID
                                        MEUNIER AND WARSHAUER
13                                      BY:  GERALD E. MEUNIER, ESQ.
                                             JUSTIN I. WOODS, ESQ.
14                                      2800 Energy Centre
                                        1100 Poydras Street, Suite 2800
15                                      New Orleans, LA 70163

16


17     FOR THE DEFENDANTS'
       LIAISON COUNSEL:                 DUPLASS ZWAIN BOURGEOIS MORTON
18                                      PFISTER & WEINSTOCK
                                        BY:  ANDREW D. WEINSTOCK, ESQ.
19                                           JOE GLASS, ESQ.
                                        Three Lakeway Center
20                                      3838 N. Causeway Boulevard, Suite 2900
                                        Metairie, LA 70002

21


22     FOR THE GOVERNMENT:              UNITED STATES DEPARTMENT OF JUSTICE
                                        BY:  MICHELLE G. BOYLE, ESQ.
23                                           Civil Division - Torts Branch
                                        P.O. Box 340, Ben Franklin Station
24                                      Washington, D.C. 20004

25
```

1

2

3    Official Court Reporter:          Karen A. Ibos, CCR, RPR, CRR
                                       500 Poydras Street, Room HB-406
4                                      New Orleans, Louisiana 70130
                                       (504) 589-7776
5

6

7         Proceedings recorded by mechanical stenography, transcript
     produced by computer.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                    (FRIDAY, MAY 9, 2008)

 3          (STATUS CONFERENCE AND MOTION PROCEEDINGS)

 4

 5          THE COURT:  You may be seated.  I have met with your

 6    prospective committee members earlier this morning, and I would also

 7    report to the group generally that we have had several issues come

 8    up since the last time we were here, and those issues are best

 9    reflected I think in the orders that the court has entered since the

10    last time you were here.  I believe that -- well, you should also

11    have a copy of the Joint Report No. 3, which was filed in connection

12    with today's meeting and our status conference here.  You should

13    have since we met on March the 20th, you should have access to a

14    time and expense submission, which is Record Document No. 115;

15    Pretrial Order No. 3, which the court entered on April the 9th, it's

16    Record Document 123; Pretrial Order No. 4, which is record Document

17    No. 130, that was entered in this case on April the 21st, and

18    Pretrial Order No. 5, Document No. 134 entered on April 22nd; and,

19    let's see, Pretrial Order No. 6, which is Document No. 135, entered

20    on April the 22nd.

21          In addition, it's my understanding that we now have a

22    total of 21 actions which are part of the MDL as we sit here today,

23    and I would also at this point in terms of announcements advise you

24    that the web site, which you can access from this court's web site

25    if you go down the left side where it says MDL cases, there is now a
```

1   link to information pertaining to this MDL, and we'll try to keep

2   that updated.  And so you might want to check that out.  As soon as

3   we can get things on there, we will.  And of course, hopefully by

4   the time we get it on there you will have already heard from liaison

5   counsel whatever substantive information comes from the court.

6          Before we get into the joint report from liaison counsel,

7   I think one of the most important things we've done between our last

8   meeting and today was to have a hearing with regard to the provision

9   of the list of unit occupants from the government to an independent

10  third party who could distribute a notice, the contents of which

11  haven't been decided but have been discussed.  And the court

12  currently has that motion under submission, and you can see this

13  reflected in one of these pretrial orders that I've just referenced.

14         I have sought from the government and have now received a

15  binder full of all of the notices that were distributed to mobile

16  home or trailer occupants.  And I have also gotten from the

17  government the statement of the intended recipients of those

18  notices.  I have been through them, I have asked liaison counsel to

19  also go through them in hopes that they can maybe share their

20  thoughts with regard to those.  Those will form the basis after we

21  review those as to whether or not there is a need for any follow-up

22  notification to occupants, whether they're claimants in this case or

23  not.  We're going to go through those and decide, obviously if a

24  submission that's been distributed to a group of people would

25  warrant some type of response prepared by plaintiffs' counsel and

1   approved by the court, that would be distributed to those who

2   received the first notice.  Some of these were distributed to all

3   recipients of temporary housing.

4          So in pointing that out, I am not suggesting that there

5   will be any further notice, but if there is a notice it will be

6   geared toward those who received a particular notice from the

7   government.

8          All right.  Having said that, that issue is under

9   advisement and the court will consider any remarks today regarding

10  that and will also continue to make a review of the documents that

11  the government has provided.

12         Now, let's get to the joint report.  Counsel, would one of

13  you all like to begin.

14         MR. WEINSTOCK:  Your Honor, at this point in time, I'm

15  sorry, Andy Weinstock, defense liaison counsel.  There are 21 total

16  cases, they are all currently vested in the MDL, none are awaiting

17  transfer.  There is a total of 857 plaintiffs that have been named

18  in the actions who we are calling the named plaintiffs for the time

19  being.  And I don't want to speak for Michelle, but I believe there

20  are about 4,000 claimants who have filed administrative claim forms

21  against the government pertaining to the FEMA formaldehyde

22  litigation.

23         MS. BOYLE:  That's correct.

24         THE COURT:  Okay.

25         MR. MEUNIER:  May it please the court, Jerry Meunier for

1   the plaintiffs.  What we would simply like to note for the record,

2   Judge, is that we will be speaking with government counsel about a

3   system whereby as to the 4,000 to date Form 95 claims that are

4   apparently received, denial letters are issued only in the case of a

5   plaintiff who is named in an action already.  The importance of that

6   being that the denial letter in other cases triggers the time

7   running to file a lawsuit and we don't want to swamp the court, and

8   I don't think any party wants to swamp the court with unnecessary

9   lawsuits being filed against the government.

10          And secondly, we will talk to the government counsel about

11  working out a system where the claimants in this group of 4,000 who

12  have lawyers receive from the government confirmation of the receipt

13  of the form in each and every one of those cases so that we keep a

14  running inventory of claims where we are the representatives and we

15  know that the Form 95 has been received by the government.  We hope

16  to report to the court on those discussions.

17          THE COURT:  And those notices, let me suggest or ask,

18  those notices would be provided not only to the claimant in the

19  event of a denial but also to liaison counsel and the individual

20  counsel I would think, or do we know how that's -- is that subject

21  to further discussion?

22          MR. MEUNIER:  I think, Judge, to date the denial letters

23  simply go to the claimant, is that correct, Frank?

24          MR. D'AMICO:  Judge, what I had suggested to the federal

25  government, in addition to the posting of the 4,000 plaintiffs, they

1     also post who denial letters went out to because the process right

2     now is for them to mail it to the claimant and if I didn't sign my

3     name on the bottom, it goes to a claimant that's three sheets to the

4     wind, we don't know where they are and how do we get notice.

5         So she is going to check, Michelle is going to check with

6     the DOJ and see how they can accomplish that.  But our request was

7     that they post it on some central filing site so we get notice of

8     who got the denial letter.

9        THE COURT:  The goal here, as I understand it, is to make

10    certain that the notice is provided to someone or is available to

11    someone other than the claimant himself or herself in the sense that

12    that person may no longer reside at a certain address or may not

13    receive the notice.  So that information would be available to

14    counsel and also to liaison counsel in this case, and for that

15    matter, if it's on a web site then anybody who cares to check it; is

16    that correct, Michelle?

17        MS. BOYLE:  Yes, your Honor.  I understand the concerns

18    and I will bring them back to DOJ and FEMA for the possible solution

19    conferring with the plaintiffs liaison counsel.

20        THE COURT:  Okay.  Good.  All right, Mr. Meunier.

21        MR. MEUNIER:  Your Honor, on the item two on the joint

22    report, which is the status of defendants named in the master

23    complaint, we do report that a number of entities named in the

24    master complaint turn out to be non-manufacturers, which at this

25    point plaintiffs do not feel that there was a sufficient factual

1   basis through discovery to allege fault, and so we will voluntarily

2   dismissing those entity basis for claims we will seek on.  But there

3   are a total of I think nine or so entities, several of which we've

4   already voluntarily dismissed and we're working to do that.

5        And then that will leave the group of defendants presently

6   named as FEMA and the known manufacturers.  And we also spoke to the

7   court about perhaps further down the road getting to a point where

8   we can identify on a market share basis which of the named

9   manufacturers have the greatest share.

10       THE COURT:  And let me expand on that, perhaps.  When we

11  met this morning with the committee members, it became clear that

12  certain manufacturers may have supplied a relatively few number of

13  units to FEMA for the purpose of distribution as temporary housing,

14  and, moreover, out of those units an even smaller group were

15  actually used by individuals and then out of that an even smaller

16  group were individuals who seek to file a claim here in this case,

17  or any claim at all for that matter.  Those folks, if they feel as

18  though they would like to have their particular claimants on their

19  particular unit s considered separately in order to save on

20  attorney's fees or testing or whatever, I would strongly

21  encourage -- I think that will not only streamline the case for the

22  rest of the participants who have a great volume in terms of units

23  in circulation, but will also save a fees and costs for that

24  particular defendant if they want to talk directly to liaison

25  counsel.  And I would ask them to certainly advise Mr. Weinstock and

1    his committee that that's the route they would like to go.

2         I don't know if I am being as articulate about it as you

3    all were when we met with the committees.  Does everybody understand

4    what I am talking about, those particular defendant manufacturers

5    who have relatively few units in circulation perhaps can be spared

6    the burden of not only following along with our meetings here, but

7    the testing, the cost of testing as well as having to review the

8    volumes of paper that will certainly be generated in the next few

9    months in this case.  If they would like to go that route, then they

10   should certainly feel free to do that, advise Mr. Weinstock of that

11   and we can handle it in that fashion.  The court would encourage it

12   and would do whatever it takes to facilitate the early exit from

13   this case of those manufacturers.

14        Now, some of them will most likely want to stay in, I

15   would think, for the balance of the Rule 12 practice, the motion

16   practice.  But again, it's to those particular manufacturers.  But

17   it would be helpful to perhaps them and to the others who are in for

18   the long haul if they were to be considered separately.  Okay.  Next

19        MR. MEUNIER:  Item 3, Judge, reports on the filing of a

20   new Eastern District of Louisiana action in this MDL, filing will

21   take place today.  And the purpose of this is to serve as a complete

22   underlying action with respect to newly named plaintiffs and newly

23   named defendants in the master complaint.  And the purpose of this

24   is that at the conclusion of an MDL, as we all know, there could

25   conceivably without resolution be a need to remand the cases or to

1    then to proceed to litigate cases that here in the Eastern District.

2    So it's important that after the master complaint serves its

3    function there is an underlying case, either to be remanded

4    elsewhere or treated here.  So we have to compare the underlying

5    cases all allegations, all defendants, all plaintiffs.  And to the

6    extent that we added parties in the master complaint, we are now

7    addressing and solving that issue.

8            We also talked in chambers in our report that to address

9    the concern whether each named plaintiff in the underlying action

10   being filed today matches to each of the named defendants or matches

11   to at least one of the named defendants in that case, we will

12   undertake a search to determine and verify that.  And if it turns

13   out that a named plaintiff in the underlying action was in a trailer

14   manufactured by an entity not named in the underlying action, we may

15   seek leave to amend just to have that match, again, for purposes of

16   the underlying case treatment.

17           THE COURT:  Okay.  And let me also make it clear that that

18   pleading that is being filed today will warrant no response from the

19   defendants at this time, and perhaps no response at all depending on

20   the course of the litigation.  And it would reserve all rights to

21   the defendants with the exception of the motion practice that is

22   pertinent to all claims which we're going to get into later this

23   summer.

24           Also at the time that those cases are sent back, in the

25   event that they are sent back, of course certain, almost all, if not

1    a single defendant, with the rest of the defendants would be

2    dismissed from that action so that we match up a particular claimant

3    with a particular unit.  Mr. Weinstock

4         MR. WEINSTOCK:  Your Honor, this actually kind of brings

5    in something I probably should have brought up sooner, but I just

6    want to make sure what I am telling the defendants about the 12(b)

7    practice is accurate.  What I've been telling them is there will be

8    one -- the existing defendants are working on a joint 12(b) motion

9    in response to the master amending complaint an all of the issues

10   that are common to all defendants in the master amending complaint.

11   We are going to circulate it to the new defendants as well and ask

12   either they join in it or I'm sure many of them will just file

13   something saying we adopt it.  That's one.

14        Two, if there is any defendant that has some idiosyncratic

15   in the master amended complaint, they are to file their own

16   idiosyncratic brief on that issue.

17        And then three, on the 21 under laying complain ts, each

18   defendant is to file their own or file what they consider to be

19   idiosyncratic 12(b) defenses that they want to preserve at such time

20   as the MDL might end and those cases would be transferred back to

21   their transferor courts, those were not waived.  That's what I've

22   been telling them, I hope I am telling them the right thing.

23        THE COURT:  I believe that accurately states what we

24   discussed at the conference a couple of weeks ago.  Mr. Meunier and

25   Mr. Woods.

1    MR. MEUNIER:  As long as I clarify and confirm that the

2 court's attention and the litigants attention will be on the 12(b)

3 practice addressed to common issues and that the plaintiffs will not

4 at this moment have to expect to argue a 12(b) motion that is unique

5 to an underlying case, that we can address later.

6    MR. WEINSTOCK:  Right, the underlying cases are all going

7 to be extent they're unique it's preserved, but there may be

8 idiosyncratic to a specific defendant in the master amended

9 complaint that they would raise now.

10    THE COURT:  Yes, I would like to get those filed, as you

11 suggests sort of in a cursory fashion, those unique 12(b) defenses.

12 For the purpose of making the decision and evaluating whether any of

13 them might be applicable to more, not that I don't trust you, but it

14 may well be that something that you think is unique at this time

15 somebody else chimes in and says, hey, we would like to take that

16 position, too, and then all of a sudden we have an issue that can be

17 dealt with as part of the MDL, which I think is everybody's

18 preference.  So we would like to go ahead and get those defenses on

19 record.  And if they are unique, then, yeah, I don't think the

20 purpose of us here is to try to get into each and everyone on a per

21 plaintiff or per manufacturer basis.  At least not at this juncture.

22 Okay.  Mr. Meunier.

23    MR. MEUNIER:  Your Honor, Item 4 in the joint report deals

24 with written discovery.  On May 1st, plaintiffs and defendants

25 propounded -- I should plaintiffs and manufacturing defendants

1    propounded to one another pursuant to the court's Pretrial Order

2    No. 2 a master set of interrogatories and requests for production.

3    Responses will be due on July the 1st.  We have discussed with

4    counsel for the manufacturers arrangements needed for the production

5    of certain information that's in electronic format.

6         We did raise in chambers and raise now plaintiffs' concern

7    that the written interrogatories and request for production that are

8    addressed essentially to 857 named plaintiffs at this moment not

9    focus so much on claim specific discovery for those 857 plaintiffs,

10   given the fact that we have a plaintiff fact sheet coming and our

11   understanding was that the basic claims specific discovery, at least

12   initially, would proceed through the fact sheet.  To the extent the

13   written interrogatories and request for production from the

14   defendants are contention based or common issue oriented, we

15   certainly will make full responses.  Our plan is to speak with

16   defendant liaison and see if we can't come to some understanding

17   about that issue.

18        THE COURT:  Okay.

19        MR. WEINSTOCK:  That's correct, your Honor.  We've agreed

20   to confer on that and the clarification to the court and to the

21   plaintiffs since the meeting in chambers, I have spoken with some of

22   our group and really the goal here was to try to make these class

23   orient as opposed to making life miserable for 857 individuals that

24   have stepped forward.  We will try to make sure that it achieves the

25   former goal, not the latter goal.

1           THE COURT:  Okay.  With regard to the plaintiff fact

2    sheets, one thing that we have been discussing is the need to try to

3    get those filled out and returned as promptly as possible.  Those of

4    you who have plaintiff fact sheets, have plaintiffs that need to

5    fill out plaintiff fact sheets, please don't wait for a central

6    location to be established to start having your clients working on

7    those.

8           I realize it's not a process of having somebody come in

9    and meeting with them for 15 minutes and having them fill out the

10   sheet and it being perfect, so please give them their homework to

11   get those done.  We will need those, and the sooner you can get them

12   to liaison counsel, the better.  So please work on those.  I think

13   the goal that we were trying to meet with regard to the plaintiff

14   fact sheets was July the 16th and we still would like to meet that

15   goal as much as possible.  We do understand that there will be

16   others who perhaps join this litigation post July the 16th, but in

17   the meantime, we do those 857 people who are identified and should

18   be able to be reached to fill out these plaintiff fact sheets

19   completely and fully.  Mr. Meunier.

20          MR. MEUNIER:  And, your Honor, on plaintiff fact sheets,

21   which is Item 5 in the report, we do, the plaintiffs do intend to

22   have a staffed centralized location operative by the 1st of June, at

23   which we will begin the formal inputting of the data in the fact

24   sheets that the court suggests.  Certainly preparation and entry of

25   fact sheets is taking place now, particularly as to the named

1    plaintiffs.  That will be the input process.

2          And then our plan, Judge, thereafter is to have a rolling

3    basis production.  Obviously this is not going to be done in one

4    fell swoop, but on a monthly basis we will furnish data and the

5    defendants therefore be up-to-date on the plaintiffs on the data of

6    claims, as reflected in the fact sheets.

7          THE COURT:  Okay.  Testing.  Let's go ahead and talk about

8    testing.  And that is another issue that we have spent a lot of time

9    on since the last time we conferred with all of you, so Mr. Woods if

10   you would like to bring us up to date on that.

11         MR. WOODS:  Justin Woods for the plaintiffs.  Your Honor,

12   we have a May 30th deadline in place for the unoccupied/never before

13   used category of trailers.  The plaintiffs intend full well to make

14   that May 30th deadline, except for the units that we have identified

15   for testing that are at the Hope, Arkansas site after being informed

16   by counsel for FEMA that those units are inaccessible because of the

17   weather situation and the situation of the field in which they are

18   stored on.

19         Besides that, the plaintiffs, the PSC has certain concerns

20   about certain units at these sites; for example, on May 2nd, a PSC

21   member, Matt Moreland took some photographs of some units at the

22   Baton Rouge site, which I provided to the court earlier during the

23   conference.  And it illustrates that there are some units with doors

24   that are open, which allows for ventilation which is in

25   contradiction to the plaintiffs' testing protocol, in that there are

1   units that were previously occupied and are missing windows.  We

2   hope that we will work with the government to either, if those units

3   are to be tested or that we've identified those units to be tested,

4   that we will be allowed access to similar make and model units.

5           Another concern that was --

6           THE COURT:  Before we move on from that.  My understanding

7   from Ms. Boyle, and I think her cocounsel is actually working on

8   that with you, that the government was going to cooperate to make

9   substitute units available, recognizing the problem that you've just

10  highlighted that the government would take appropriate steps to

11  remedy that.  Is that correct, Ms. Boyle?

12          MS. BOYLE:  That's correct, your Honor.

13          THE COURT:  Go ahead, Mr. Woods.

14          MR. WOODS:  Another concern that was raised when we began

15  testing of these unoccupied, never before units was that there was a

16  protocol in place for FEMA personnel that the units would be

17  ventilated for a period of 37 minutes and that a special fan would

18  be needed to sit in the doorway of each unit prior to anyone being

19  allowed access.  Today we are not certain how many units that we

20  have tested actually underwent that sort of preparation before we

21  were allowed access.  After conversations with Jan Jones, the FEMA

22  attorney, she has assured us that that will not be the situation in

23  any testing going forth from this date.

24          THE COURT:  Okay.  Yes, Ms. Boyle.

25          MS. BOYLE:  Just briefly on the OSHA issue.  I conferred

1    with plaintiffs liaison counsel about this on Wednesday and I was

2    told that their understanding as of that time was that the OSHA

3    testing, there was a brief window of time where that may have

4    affected their testing but that it was curtailed in time for them to

5    proceed without any further problems.  But certainly, you're welcome

6    to confer with us to confirm that understanding next week.

7              THE COURT:  Okay.

8              MS. BOYLE:  Thank you, your Honor.

9              THE COURT:  Thanks.

10             MR. WOODS:  And I believe, your Honor, that's the report

11   that the PSC has, complete report that we have as far as testing as

12   of this date.  We are, however, continuing testing of units that

13   have been occupied.  We have delivered to defense counsel, defense

14   liaison counsel a list of the units that we have tested thus far

15   that have either been located at private residences or on trailer

16   sites.

17             THE COURT:  All right.  Mr. Weinstock.

18             MR. WEINSTOCK:  Your Honor, we are testing as quickly as

19   possible.  Because of the nature of the two different test

20   protocols, plaintiffs' protocol calls for no ventilation of the unit

21   and ours calls for ventilation, and even the fact that if we had

22   tested ahead of them even if we didn't have ventilation the fact

23   that we'd open the door and go in it would upset the protocol they

24   have in mind.  Therefore, we have to wait until they complete their

25   testing unit by unit to get our testing done.  We are -- our plan is

1   to follow behind them and we're streaming toward the May 30th

2   deadline.  There are some concerns we have that weather might impact

3   it because the windows need to be closed, those units cannot be

4   aired out.  We'll cross that bridge when we get to it, and if we

5   need more time we will ask the court, but we will not ask the court

6   until we know we need more time and we have a specific reason why we

7   need more time.  That's where we stand on the existing defendants.

8          For the new defendants, I have been in communication with

9   a number of them, many of them are getting their ducks in a row to

10  try to get testing lined up so they can do what they need to do.

11  They are in an unfortunate situation that a lot of the new

12  defendants are manufactured housing defendants.  A significant

13  percentage of the never used units that are being tested before May

14  30th are manufactured housing units.  But I have tried to make them

15  understand that the court might be more receptive to an extension of

16  time if they were taking certain steps toward completing the testing

17  as opposed to just saying this is not enough time, can I have more

18  time.

19         So I am in communication with them on those issues and I

20  will continue to be in communication with them, and encourage them

21  that they need to get this done ASAP, hopefully by May 30th.

22         THE COURT:  I am particularly concerned that they get into

23  a position where they need units that have not yet been identified

24  and pulled by the government.  I mean, if we have to restart this

25  process -- we've been working well together I think in terms of

advising FEMA of which units we need to test and where they're located and having FEMA make those available.  If we have somebody who is going to pipe up at a later date and say that's all well and good but now I need these units, you know, we need to know that sooner rather than later.  So please advise them of that that they should really, the train is leaving the station now and they need to know that the process is in motion to get units pulled so that they can be tested.

        The other thing that we have talked about for the issue of those of you who are here, I think the order reflects that we have talked about and I intend to enforce the deadline for all testing of any units the day after Labor Day.  The government has insisted, and I think rightfully so, that they cannot keep units stored during the pendency of this litigation or for even an extended period of time.  One of the primary factors, aside from just the physical location of these units, is taxpayer dollars.  It's costly to keep these units available.

        Now, having said that, they are not going to be destroyed overnight that particular day.  But by the same token, the government has got to have the opportunity to start destroying units, hope free starting with the units that have been tested and no one is interested in anymore.  But nonetheless I would like to see accomplish all testing of all units between now and Labor Day.  I think that's very doable based upon what plaintiff is planing to do.  As far as the defendants are concerned, that should give you

1   the opportunity to identify any and all units that you want to test.

2   You have indicated that you would like to test all of the units of

3   the named plaintiffs at this point, all of the claimants at this

4   point; is that correct, Mr. Weinstock?

5          MR. WEINSTOCK:  All of the units that we can identify have

6   been lived in by a plaintiff on any of the spreadsheets, not just

7   the 857 named plaintiffs.

8          THE COURT:  Correct.  Let's work toward that end,

9   recognizing of course and this has come up before, but recognizing

10  of course that we may have folks joining this litigation at a later

11  date.  If it's after Labor Day, we're going to go with the

12  statistical analysis and it won't be a defense later on that, gee, a

13  particular unit was destroyed and we didn't know we had to test, nor

14  were the plaintiffs -- that's going to be the rule is we're going to

15  get to a point where the government is going to be allowed to

16  dispose of these units and that's not going to impact the course of

17  this litigation because all of the testing should have been done by

18  that time.

19          I just can't have these units being stored at taxpayer

20  expense for an indefinite period of time.  If anybody wants to

21  provide a storage place at their expense, either on the plaintiffs'

22  side or the defendant's side, you know, feel free to do that.  But

23  at some point the government's going to be relieved of its

24  obligation to hold these units at a particular location and make

25  them available.  And I'm suggesting quite strongly at this point

1   that that date is going to be around the Labor Day date that the

2   court has already set.

3           MR. WEINSTOCK:  Your Honor, I understand everything you

4   said and I've understood that as long as you've been saying it.  The

5   one thing I've always held the caveat back for is, to the extent we

6   learn about a unit that was occupied by a plaintiff, whether it's by

7   way of fact sheet on June 16th, whether it's by way of fact sheet on

8   August 15th or even October 15th, and that unit is still has not

9   been destroyed -- because the government will freely admit they

10  cannot destroy 150,000 units in one week -- we would still like the

11  right to test those units, even if it's after September 2nd.

12          THE COURT:  Let me be clear.  My order is not that all

13  testing shall cease on that date, my order rather is directed to the

14  ability of the government to begin destruction of units and

15  relieving them of their obligation to maintain and store units.

16  Sure, if we're in December of 2008 or even beyond and there is a

17  particular unit that is available and can be tested, then by all

18  means make arrangements to test it.  What I am saying is that after

19  that Labor Day date, if a unit is no longer available because the

20  government has destroyed it, that's not going enure to the benefit

21  of anyone to say, well, now I want to test that unit but it's not

22  there anymore, so there won't be a spoliation argument that will be

23  made at that point because now is the time to do it between now and

24  that date.

25              You can test as long as you can get the government to

1   identify and produce those units, where they can be found.  As long

2   as the government has them and is willing to do that.

3           MR. WEINSTOCK:  And if I can back up to one more thing you

4   said a few minutes ago.  Part of my message to the new defendants

5   should be even if they don't have an expert ready to test, they

6   should start immediately identifying which units they want to test.

7           THE COURT:  Absolutely, absolutely.

8           MR. WEINSTOCK:  And then the last thing, Justin mentioned

9   was we are talking to them, we would like to be able to test units

10  that are currently being occupied by plaintiffs that they have

11  tested and we will continue our efforts with them.

12          THE COURT:  That should be easy enough, that really is

13  just between you all but that should be easy enough.

14          MR. WOODS:  Just one concern, your Honor, just to bring to

15  the court's attention is that the defendants' testing protocol for

16  occupied units requires basically a 24 hour access that their

17  apparatus needs to be set up in the unit, in the middle of the unit,

18  and we will still have claimants living in those units so those are

19  some logistical concerns that we will need to work out with the

20  defendants.

21          THE COURT:  I understand that.  If you're a claimant in

22  this case, they have a right to test the unit; and the claimant for

23  whatever inconvenience that might warrant, I would think the

24  claimant would be willing to cooperate and endure whatever it is,

25  within reason, that the defendants would like to do by way of

```
 1    testing.  So if it's an inconvenient situation, then so be it.

 2    Frankly, we haven't gotten crosswise yet with any of the, and I

 3    don't think we will, with any of the local governments that are now

 4    demanding that these units be removed.  So to the extent that

 5    they're in the community now and they're actually occupied, we need

 6    to get them tested now.  Even if it's inconvenient to the occupant,

 7    we need to get them tested now because once they get hauled off,

 8    they're going to go into this general body of stored units where

 9    they're going to have to be pulled again.

10          So let's try to get it done.  Like I said, if you're a

11    claimant in this case it's not unreasonable that you would have to

12    have your unit subject to testing, even if it's inconvenient.

13          MR. WOODS:  Okay.  Your Honor.  Thank you.

14          I believe that's it for testing.  The next item is the

15    confidentiality order.

16          THE COURT:  Right.

17          MR. WOODS:  Item No. 7.  The PSC and the defendants have

18    been working towards confecting a confidentiality order.  We

19    neglected to include FEMA, the United States in the negotiations of

20    that order.  However, the government has now received the proposed

21    order, and I believe that we will be able to confect some sort of

22    agreement and present it to the court within a two week period.  I

23    hope anyway.

24          THE COURT:  Ms. Boyle, is that correct, I understand you

25    just got a copy of the order to review?
```

1        MS. BOYLE:  Yes, that's our goal, your Honor.  We will

2   work with the parties, the private parties towards that time frame.

3        THE COURT:  Okay.  And I would like to have, if at all

4   possible, a single confidentiality order as opposed to two competing

5   orders, one that's for plaintiffs and defendants, and one that

6   includes in the loop the government.  I would like to have a single

7   order whether it's this one that the government can either sign on

8   to as is or can be modified so that we're all operating under the

9   same provisions.  Let's not make it more complicated than it needs

10  to be.

11       So as soon as possible, Ms. Boyle, if you can advise

12  counsel and the court of any problems with the existing order, we'll

13  go from there.  But we would like to try to achieve a single

14  document.

15       MS. BOYLE:  Yes, your Honor.

16       THE COURT:  Mr. Meunier.

17       MR. MEUNIER:  Judge, I think the final item on the joint

18  report deals with class certification.  Just to report in Pretrial

19  Order No. 6 the court did set forth a schedule for the discovery and

20  completion of class certification issue development with a view

21  toward having that issue under Rule 23 presented to the court in

22  November of this year.  And there was a September 2nd cutoff for

23  discovery dealing with class certification issues.  We're aware that

24  that though this is not true merits discovery still, the discovery

25  on class certification will take us into some specific claims

1    information for proposed class reps, it will take us into the idea

2    of impact, formaldehyde levels in certain trailers, I suspect it

3    will also take us into this whole question of market share that we

4    talked about before.

5         So it will open some doors to important issues and they

6    have to be developed quickly and efficiently.  We, therefore, have

7    established in our group a class certification subcommittee, the

8    sole responsibility of which will be to communicate with the

9    defendant group, set up the needed depositions and get the needed

10   written discovery in place as quickly as possible.

11        Your court appointed plaintiff attorney group is equal to

12   the task, it's going to be a busy summer, we're going to have

13   testing, we're going to have plaintiff fact sheets and class cert

14   discovery, but we don't like to ventilate trailer, we do ventilate

15   among ourselves and back stage e-mails as the court may know, but we

16   are up to the task and we're ready to do what we need to do.

17        THE COURT:  All right.  Mr. Weinstock.  Thank you,

18   Mr. Meunier.

19        MR. WEINSTOCK:  Yes, your Honor, on the last point we will

20   put together a group of our own and get with their group to work out

21   the logistics of getting cert ready for this fall.

22        THE COURT:  My hope is that within the next week a

23   comprehensive plan for class cert discovery can be established, and

24   obviously we can be flexible in terms of what all needs to be done.

25   As certain portions of that discovery are complete, it may give rise

1   to other inquiries that are necessary.  But I would like to have a

2   set, not only a set of ground rules but perhaps even a schedule of

3   what is going to be needed on each side -- and that's inclusive, of

4   course, of the government -- of what is going to be needed on each

5   of the sides of the case in order to have the class cert hearing and

6   a game plan for getting all of that done within the time frame that

7   the order suggests.

8          I am considering at that point to go ahead and turn that

9   to Magistrate Roby and let her make certain that that process is

10  followed and allow you to bring disputes to her.  My intent is that

11  discovery disputes, not only in that fashion, but really in general

12  are handled in a more rapid fire manner as opposed to simply sending

13  the discovery out, having the time delay, follow-up with a motion to

14  compel, have that noticed for hearing under the local rules, an

15  opposition, perhaps a reply, I think we're going to get bogged down

16  if we have to do it that way, so I will, once I get that plan from

17  you, I will try to meet with her.  But submit that to me and I will

18  try to meet with her, and that's the direction we go with it, we can

19  go ahead and get her plugged into what it is you all intend to do.

20         But I would rather have it -- if you have a discovery

21  dispute, in other words, I am suggesting that you immediately call

22  me for the time being but perhaps her and let her resolve it

23  posthaste as opposed to going through the normal motion practice

24  procedure that the local rules envision.

25         MR. WEINSTOCK:  Your Honor, my experience has been lawyers

1    work best with deadlines.  Would you like to set a deadline, perhaps

2    next Friday or the following Monday, to give you a schedule of

3    briefing?

4            THE COURT:  I would like it by next Friday, if you would,

5    go ahead and designate your committee and let these folks interface,

6    and make it as comprehensive as it can be, both in terms of what's

7    going to happen on a certain date and what it is you're actually

8    going to need.  And like I said, if you have to do it in waves

9    because you don't really know, you may get some information from

10   your opponent that warrants further inquiry or perhaps points in a

11   different direction or in another direction, then you can do that in

12   your second wave of discovery.  However you want to set up tiers or,

13   we just need to know what all needs to be done and how it's going to

14   get done who is going to do it and within what time frame.

15           Yes, by next Friday if you all can give us that, that

16   would be terrific.

17           MR. WEINSTOCK:  Thank you, your Honor.

18           MR. MEUNIER:  That will obviously involve the

19   manufacturers and FEMA?

20           THE COURT:  That's correct.

21           MR. MEUNIER:  Judge, we are ready to make some comments on

22   the record about the communication.

23           THE COURT:  Okay.

24           MR. MEUNIER:  Have you scheduled the next status

25   conference?

1    THE COURT:  Let's go ahead and finish that and finish that

2  before we get comments with regard to the FEMA distributions, unless

3  anybody has anything else they would like to raise?  The floor is

4  open for further discussion.  Yes, sir.

5    MR. SCHMIDT:  Douglas Schmidt.  As far as the testing of

6  the trailer goes, let's say you pick up a client after the testing

7  is over and his trailer is destroyed.  How does he prove that his

8  trailer had a certain level, is that going to in the statistical

9  sample deal?

10    THE COURT:  That's my intent.  I think on the plaintiff's

11  side is that and the way I envision it is by allowing the government

12  to dispose of the units, that there is going to be a statistical

13  sampling, a track record that's already been established.  That's a

14  good question, that is something that's come up before and I

15  understand the concern, but, yes.

16    A plaintiff, if someone who joins this litigation whose

17  unit has not been tested is not precluded by that fact alone that

18  that unit is no longer available.

19    MR. SCHMIDT:  And one other question.  I know this is an

20  obvious question, but I just want to hear the answer.  They're doing

21  testing in 2008.  It's obvious these trailer s came out 2005, 2006

22  during the summers, they have much more, as far as my research goes,

23  formaldehyde in them.  So how are we going to adjust back to the

24  three years that they had before of the level.  Because you might go

25  to trailer now and it might be the same level, it might have been

1    five times the level in 2005, 2006.

2            THE COURT:  Well, the issue, and I'll allow counsel to

3    address it, but as I understand it, the issue of what I would call

4    degradation of the levels is something that is certainly going to

5    be, I would think, to an almost exclusively the extent of expert

6    testimony.

7            MR. SCHMIDT:  Okay.

8            THE COURT:  Mr. Meunier and Mr. Weinstock perhaps can

9    address that.  But that's got to be, I would think, a critical

10   function of an expert analysis.

11           MR. MEUNIER:  Yes, Judge, it will be.  It will be a

12   question ultimately answered by our experts.  But what we already

13   know is this, the mere number, the level on a given day under given

14   conditions is not the end of the story.  It's a piece, an important

15   piece in the puzzle of what the exposure was in that situation.

16   Obviously though you have to go back to some extent and reconstruct

17   earlier temperature, humidity conditions, you have to look at

18   ventilation issues, you have to look at how the passage of time

19   effects off-gassing, and our experts are aware of that.

20            So I don't think anyone in this case is saying, look, when

21   you get a test level, that's the end of the story and there's no

22   question that's exactly what the level of exposure was every day at

23   every moment for that plaintiff.

24           MR. WEINSTOCK:  Your Honor, actually I'm much more

25   interested in his first point.  And I understand what this court has

1    said and we've been on step all along, what happens when you sign

2    somebody up in October of 2008 and their trailer has already been

3    destroyed.  We can't go back in the H.G. Wells time machine and get

4    test results.  But if you sign them up in June of 2008 or February

5    2008 and you haven't produced a spreadsheet so that FEMA can give us

6    a new search on the FRRATS list and that unit gets destroyed, that's

7    evidentiary against us and they had the ability to prevent that from

8    happening and to give us the opportunity to test and we will not be

9    so sympathetic.

10          THE COURT:  WELL, that's an important point because my

11   comment does presuppose that that person is unknown such that the

12   unit could not possibly have been identified and tested at a later

13   date when perhaps the government has already disposed of the unit.

14   And I think that's an important point.  If someone is a claimant in

15   this case and their unit is there, we know that the units have not

16   been destroyed right now, it's important that that person's name,

17   identity be disclosed immediately so that that, if there is an

18   intent by the defendants to test that unit they would so have the

19   opportunity.

20          So nobody can sit, I don't think anybody can sit and lay

21   in the gap on this thing and then show up later and say, well, now,

22   you know, I was in the case back in June and you didn't test my unit

23   because you didn't know about me.

24          MR. SCHMIDT:  Your Honor, let's say I've named one client

25   but I have a lot more clients than I've not named at this point.  If

1    I submit plaintiff fact sheets or if I've submitted I-95 forms to

2    the government, would that satisfy the requirement?  Because if I

3    come in now and name all of my plaintiffs, I have a certain deadline

4    to get all of the discovery in a certain limited time, which is

5    fine.  But my question is, what notification do they need, is the

6    I-95 notification enough?

7            THE COURT:  Mr. Meunier?  I am not sure that it has to be

8    in any particular form unless the plaintiffs liaison counsel and the

9    committee has established a procedure.  As far as I'm concerned

10   though, I'm only concerned about disclosure.  As far as the form

11   whether it's on a spreadsheet or which spreadsheet it comes off of

12   doesn't matter to me, it may matter to them.  Mr. Meunier, do you

13   want to address that?

14           MR. MEUNIER:  We have put out a call to all known

15   plaintiff counsel already saying, look, if you have clients that are

16   currently in a trailer, so that we have the opportunity to test that

17   trailer you need to let us know that.  That takes care of the

18   problem of someone whose trailer is picked up tomorrow and say,

19   oops, I didn't get to test it.  We do the best we can on that.  We

20   are relying on plaintiff attorneys to tell us I have these clients

21   in these trailers, they currently occupy them, we go test them, Andy

22   wants to test them as well, we tell Andy.

23            There is a larger group at risk here and that's the group

24   who have already moved out of their trailers and FEMA's got custody

25   of the trailer.  And as the court knows, we as a court appointed

group of counsel have decided we cannot and should not undertake to

test every single trailer in the FEMA inventory that once upon a

time was occupied by a plaintiff.  So we are doing our statistical

sample which we believe through expert testimony will be able to

cover all bases.

And I think the defendants have told us, manufacturers

that they would transfer prefer to make the approach of testing

every single one of these plaintiffs.  The plaintiff lawyers need to

know on the one hand if you have clients who previously occupied a

trailer, it was picked up, you never tested it, it's now in FEMA's

inventory that when the day comes to litigate that case, what this

group of court appointed lawyers is going to be presenting on your

behalf will be, unless you fall into the statistical testing group,

an extrapolated result from a sample.  What the defendants hope to

be able to produce at that moment is an actual test result.  If they

can manage to test every trailer.

THE COURT:  Right.

MR. MEUNIER:  One other thing to say, Judge.  We have

given the defendants and FEMA a list of I think it's 17 some odd

thousand plaintiffs who are represented by our organized group of

counsel.  That list does not include perhaps significant numbers of

claimants represented by others.  I think frankly it behooves

plaintiff lawyers to work through us to give us your listed names so

that we can include that in whatever discussions we're having on

this issue.

1        MR. SCHMIDT:  Your Honor, I would like, I have this

2    available.  I can give them a computer printout of all of my

3    plaintiffs, all of the VIN numbers and all of the manufacturers of

4    my clients.  It's just that I have not put them into the -- I've

5    named one so I am in the proceeding, but I have thousands more and I

6    just haven't put them in yet because I wanted to see where it was

7    going, whether I wanted to go to state court or whether I go in

8    federal court.  And that's why I was here, and I'm going to meet

9    with Mr. Meunier about making a final decision on it.

10        THE COURT:  Well, the point, you can see the competing,

11    there's a dichotomy here in the approach to the case.  There is a

12    dichotomy in the approach to the case.  The defendants seek to

13    override the plaintiffs statistical sample, which the plaintiffs

14    believe will be convincing.  The defendants could seek to override

15    that by saying, well, the statistics are fine but I have an actual

16    test of your unit, Mr. Plaintiff.

17        MR. SCHMIDT:  I understand their position, your Honor.

18        THE COURT:  So that is also overlaid on top of the need to

19    dispose of these units and the relative costs of preserving them

20    during the interim of the case.  So I am going to tell you, and I am

21    going to suggest strongly to plaintiffs counsel who are here that if

22    you have a list of people, such as you're talking about, especially

23    if they're matched up with manufacturer and VIN number, you're going

24    to be faced with this argument that, well, you knew that you were

25    going to be a claimant way back in May when you were sitting in

1    Judge Engelhardt's courtroom and we would have tested your unit but

2    you didn't speak up.

3            MR. SCHMIDT:  I understand.

4            THE COURT:  What I'm talking about a claim is not going to

5    be precluded if someone that's out there has no attorney right now,

6    maybe doesn't even know that they want to file a claim.

7            MR. SCHMIDT:  That would be the ones that would go into a

8    class action notice?

9            THE COURT:  Correct.  Or if in the event there no class,

10   is there is a mass joinder mechanism, those people who join this

11   case at a later date are not going to be precluded by the fact that

12   the court has allowed the government to dispose of units after Labor

13   Day and their unit is one of the ones that the government has

14   disposed of.

15           MR. SCHMIDT:  I will produce to Mr. Meunier a list, and

16   also what I will do is I will make every one of my clients fill out

17   a plaintiff fact sheet.

18           THE COURT:  That would be great.  I think that gets us

19   much further along the road in many, many respects, including the

20   all important aspect of the case, which is both the plaintiffs'

21   testing as well as the defendant's desire to individually test.

22           MR. SCHMIDT:  Your Honor, I just didn't want to get caught

23   up in the deadline of July 1st.  I have thousands of clients and I

24   didn't want to mail them now and get my fact sheets and then I have

25   the pressure on me of getting it all in on time.  Even though I have

1    a big staff that is going to do it, so that's why I named one but I

2    will go through everything else.

3            THE COURT:  For purpose of testing I think if you can get

4    not so much the fact sheets at this point but the names and the VIN

5    numbers.

6            MR. SCHMIDT:  I will have that next week, your Honor.

7            THE COURT:  If you can get that then that's great.  The

8    fact sheets, we are going to continue to work on those and hopefully

9    get those in.

10           MR. SCHMIDT:  Thank you for giving me the opportunity to

11   make an appearance.

12           THE COURT:  Thank you.

13           MR. WEINSTOCK:  Your Honor, I would not just, not just

14   Mr. Schmidt, I appreciate what he just said, to the extent any

15   plaintiff lawyer has clients out there and they can follow the

16   Bencomo model as giving as much information as possible so we can

17   get a more accurate hit on the FRRATS list so we can get more units,

18   that would be helpful.

19           THE COURT:  Right.  It's no secret and it hasn't been a

20   secret that the defendants intend to go and test every single unit

21   that a claim is being made on in this case, as I understand it, and

22   the only way they're going to know that, obviously, is if someone

23   steps forward and gives the information.  Mr. Woods.

24           MR. WOODS:  Yes, your Honor, just to follow-up what

25   Mr. Weinstock just said.  We have made a call to all plaintiff

1    counsel, all known plaintiff counsel to continue to provide us with

2    lists of their clients, even if they don't have the information such

3    as VIN number and they then on a rolling basis turn that list over

4    to FEMA for its search through their FRRATS database and identify

5    those units in that manner.

6             THE COURT:   Okay.   But I guess the point, too, is that

7    what you're looking for -- I understand to match up I understand

8    with manufacturer.   But what you all are looking for to test is

9    different than what the defendants are looking for to test.   So as

10   long as we know who all is involved, the name of plaintiffs and if

11   possible the manufacturer and the VIN, then the defendants can go

12   ahead and test until their heart's content.   And whatever the

13   results are they'll have.

14             We're ultimately going to get the point, I think it's

15   clear, where people will be joining this litigation either as class

16   members or as part of a mass joinder, and if they're doing this

17   after Labor Day, there is a very real chance that their unit is no

18   longer available for testing.   And at that point they're going to be

19   able to take advantage of the plaintiffs' work with regard to the

20   statistical analysis and will have to go to trial with that

21   information in that fashion.

22             Okay.   Anybody else, while the floor is open, on any other

23   issue that was covered here today before we get into these notices?

24             Before we move on, let's pick the date for our next

25   conference.   How does everyone look on, how do you all look on June

1    the 20th or 27th, any preference out of those two?  Are Fridays

2    better for everybody, are Fridays good?

3            MS. BOYLE:  Yes, your Honor.

4            THE COURT:  Okay.  I had a few of you from out of town

5    suggest that Fridays are perfect, so we'll keep them on Friday.

6            MR. MEUNIER:  A committee meeting with you followed by --

7            THE COURT:  Yes, same procedure we will have an earlier

8    committee meeting that morning and then a meeting here for all of

9    us.  Any preference?

10           MR. MORELAND:  You said the 20th or 27th, your Honor?

11   Because on a few of our calendars the 27th would be better.  Sorry,

12   we just didn't hear which one you chose.

13           THE COURT:  Any consensus here, 20th or 27th?

14           MR. MEUNIER:  I think you just ought to pick one, Judge.

15   I wouldn't open this up to discussion of the floor.

16           THE COURT:  All right.  Why don't we -- is there anything

17   that you all think warrants something on the calendar more than

18   other?

19           MR. MEUNIER:  Judge, I am now getting a consensus, at

20   least from plaintiffs, that it would be better to have it to the

21   20th, not the 27th.

22           THE COURT:  20th, okay.  Am I getting a contrary consensus

23   from this table?

24           MR. WEINSTOCK:  No, your Honor.

25           THE COURT:  Let's take the 20th because quite honestly

1    that looks like the better on my calendar as well.  So let's make it

2    Friday, June the 20th, we'll meet again.

3            Now, with regard to the notices that the government has

4    sent out to occupants or distributed informationally.  Mr. Meunier,

5    did you want to address that?

6            MR. MEUNIER:  Yes, your Honor.

7            THE COURT:  We will follow the same times, nine o'clock

8    and ten o'clock.

9            MR. MEUNIER:  May it please the court, by way of

10   background, the plaintiffs filed in this case a motion to enforce a

11   subpoena to FEMA to produce a list of all individuals who have

12   resided in a FEMA provided emergency housing unit after Hurricane

13   Rita or Katrina.  That motion was heard by the court in chambers,

14   and the court then denied in part by concluding that it would not at

15   this time order the production of the list.  FEMA has raised Privacy

16   Act concerns about the information.  We've suggested that the

17   information could be given to a joint -- I'm sorry, to a court

18   appointed notice administrator, and that only in the event that a

19   plaintiff responded by indicating that he or she was interested in

20   presenting a claim in this litigation, would we, counsel ever know

21   the identity of that person.

22           The court also ordered in connection with this motion that

23   for purposes of its further consideration of our request that the

24   list be produced for the notice, FEMA and the government provide all

25   written material reflecting communications with actual trailer or

1    housing unit resident and the government dealing with the

2    formaldehyde levels or formaldehyde exposure in these units.

3         We for the plaintiffs have now reviewed this material,

4    and, your Honor, we respectfully submit that it just confirms that

5    there is a strong justification for the PSC to have an opportunity

6    through the notice administrator to inform these putative class

7    members of the litigation and of the need to take certain action

8    steps if there is a wish to participate in litigation.

9         Judge, this class action litigation is based on allegedly

10   harmful exposure to formaldehyde, that's the gravamen of the case.

11   And these documents confirm that the very defendant which admits

12   that it exclusively owns and possesses identities for each and every

13   member of the putative class, is regularly and frequently

14   communicating with these class members about the fact of

15   formaldehyde exposure, about the implications of formaldehyde

16   exposure, and about the appropriate steps to take about formaldehyde

17   exposure, even as it claims that the plaintiffs' counsel in this

18   case have no right through a notice administrator to communicate

19   with these individuals, there is something in our view that is very

20   wrong with this picture, legally, factually and equitably.

21        I've got 42 categories of documents furnished by the

22   government, very helpful index, and I am referring to the title

23   designations when I talk about 1 through 42.

24        Let me just briefly mention a handful to illustrate my

25   point.  No. 1, title number one contains communication to class

members from FEMA that over time formaldehyde goes away.  And its
effects, "decrease or disappear."  Now that may be true from the
government's standpoint, it may not be true.  And certainly
plaintiffs are entitled to know what our experts think about the
long-term effects of formaldehyde exposure should they decide to
participate in litigation.

Title No. 2, like many other titles, is one where there is
an express invitation to the class member to follow-up with the
federal government, with the CDC if they have any questions about
health problems.  And we are not impugning the integrity of the CDC,
we think the CDC is an excellent organization but it's the federal
government.  And that's one view about the health and medical issues
involved in this.  It's the view as it happens of an adverse party.

Title 5 identifies symptoms of formaldehyde exposure and
compares them to those associated with "the common cold".  And then
acknowledges that there can be more serious health problems such as
a "small but increased risk of cancer".  I don't know what people
are supposed to make of that.  On the one hand you're told it's
something like a common cold symptom and then on the hand you're
told, oh, by the way there can be an increased risk of cancer.  I
think it's confusing to people.

Title 8 gives very specific scripted plan responses that
the government gives to people who ask about the health risks of
formaldehyde, and I won't go through them.  But I mean there is a
very carefully scripted set of questions and answers, you know, if

1    you have any kind of specific concern, you're engaged in a dialogue

2    with the government and you get their response.

3           Item 10, Title 10 is interesting.  The question posed is,

4    how do I know if I've been exposed to formaldehyde?  The answer from

5    CDC, well, the symptoms would be like those caused by other things,

6    such as mold and smoking and could be due to flu or allergy.  So

7    here I am asking about how do I know if it's formaldehyde, and the

8    government's response is, well, you have to think about mold, you

9    have to think about smoking, you have to think about allergies.  I

10   don't say that's an untruthful response, but it's not a when there

11   are particularly when potential legal claims are involved.

12          Item 14 is a public service announcement, and it says, "If

13   you've heard that the air quality in the FEMA trailer is making you

14   sick, you know what you have to do, open the windows, don't smoke,

15   et cetera, and then call us, CDC for more information.  Well, there

16   is one other thing you can do and that's you could contact a lawyer.

17          Now, let me say here, very well publicized case, we don't

18   deny that there agency been a lot on the air, there's been a lot of

19   publicity about this case.  And we could leave it to the market, we

20   could say you plaintiff lawyers have First Amendment commercial free

21   speech, you go advertise and then public service announcements can

22   run on the other side.  What's troubling to us here is that you have

23   a known discrete group, there is no guesswork, these are the

24   putative class members.  FEMA knows them by name and FEMA has an

25   outreach system of direct communication with each and every one of

those very individuals, and that makes this different.  They have

concrete one-on-one communication with putative class members and

defendant taking place here and overhear to suggest that, well,

through the marketplace let's hope these people fine their way to a

lawyer.

Now, and again, the notice that we're talking about, and

the court has seen the language we propose, is meant to be very

neutral, simply telling people, there is a case, there is MDL

litigation, there is a fact sheet.  If you're interested, and we are

not saying you have a claim or should have a claim, but if you're

interested, here is what you should do and it puts them in touch

with the fact sheet process.

I just think it's, to use a well worn phrase these days,

fair imbalance to allow us to have this opportunity.  I could go on,

Judge.

Let me just flip to one more, and that's Item 24.  And the

court is aware of this one because this one is actually attached to

our motion.  This is a guide notifying putative class members whose

trailers have been tested were told by FEMA, CDC has tested over 500

trailers so presumably this is a letter that goes to roughly 500

putative class members.  Now, what the government does in this

letter is say we're going to divide this into three areas of risk:

Low, intermediate and high.  And you know what, that may be a

perfectly logical way to do it, but we are not going to sit here as

plaintiffs' counsel and say we stipulate that each and every one of

1    those levels discerned according to how many parts per billion are

2    in existence is one that we agree with, or that our experts agree

3    with.

4            And yet the plaintiffs are now being told by a defendant

5    we're going to not only tell you about the test results, but guess

6    what we're going to interpret the results, we're going to assess the

7    risk and we're the government.  CDC even says in here our mission is

8    public health.  Now, again, we don't mean to impugn the integrity of

9    the CDC but I think this is critically important information.

10           So this is where we think we are.  We think the PLC has a

11   court appointed responsibility to protect the interest of absent

12   class members as long as a class action is pending, and we think

13   that for as long as this class action has been pending, it turns out

14   that absent class members, thousands of absent class members

15   individually have been hearing from the defendant United States,

16   FEMA, or another federal agency CDC, about what this defendant

17   believes to be true regarding formaldehyde levels in these units and

18   the health risks associated with exposure.

19           It's not our contention that each and every thing that has

20   been communicated is false, but how can there be any question but

21   that the government has a clear interest in not portraying this as a

22   significant crisis, which has put the health of thousands of

23   families, including children, at risk.  And you know there's already

24   been some furor in Congress about certain members of the federal

25   government wanting to say more than FEMA has been willing to say

1    about health risks.  And how can there be any question but that the

2    government has a clear interest in these residents being not advised

3    by their own attorneys about what there is to know about

4    formaldehyde exposure.  We don't expect the government to wear that

5    hat, that's not their job, but we wear that hat.  And it's just not

6    fair for the communication to be so one sided.

7         You know, if the liability insurer of a defendant driver

8    were having regular communication with my client after it was known

9    that I was involved as counsel, anyone would call that improper.

10        THE COURT:  Not to cut you off, Mr. Meunier, because we

11   did, for those of you who have not seen or I am not suggesting that

12   you have to go and get the transcript or review it, we did have some

13   extensive oral argument on this very issue prior to the presentation

14   of these notices, so I don't want to rehash that.

15        MR. MEUNIER:  I'll conclude, Judge.  I'll just say this

16   that I think legally, factually, ethically, and under the express

17   discretionary notice authority of Rule 23, we respectfully reurge

18   our request that you order FEMA to produce this list so that the

19   notice can be sent.  In the alternative, and only in the

20   alternative, we would like to discuss with the court appropriate

21   guidelines or restrictions that should be placed on further

22   government communication with putative class members.

23        THE COURT:  Okay.  I appreciate that.  Let me do this.

24   Let me get Mr. Weinstock's reaction to these documents, then

25   Ms. Boyle I'll allow you to respond.  But again, we spent -- and we

1   I mean in particular Mr. Miller was present from the government,

2   however, Ms. Boyle had the laboring oar on this issue, Mr. Meunier,

3   and Mr. Weinstock argued this extensively and we did make a record

4   of it a few weeks ago.  So I don't really -- I understand the

5   conceptual arguments and the particular provisions of law.  What I

6   am interested in now is just getting your reaction to these

7   particular notices that have been produced by the government that

8   have been distributed, and I'll let Ms. Boyle respond to whatever

9   comments are made, if she chooses to do so.  Go ahead,

10  Mr. Weinstock.

11       MR. WEINSTOCK:  Your Honor, I'm glad you raised that

12  because I'm looking back as to what I thought we were trying to do,

13  which was look at these notices to see if there were inaccuracies in

14  them that needed to be corrected, that's what I thought the initial

15  goal was.  And I appreciate everything Mr. Meunier said in his

16  opinion he would rather not it be phrased this way.  Quite frankly

17  in my opinion, there are things I think FEMA was ridiculously overly

18  conservative of.  But without having an evidentiary hearing and a

19  finding by this court that this level is a problem, this level is

20  not, you can't just jump out and say this may be inaccurate, call

21  the plaintiff lawyer.

22          And that's what I'm hearing they're asking and it just

23  doesn't make any sense, especially in light of the simple logistics

24  of this case.  There are 17,000 plaintiffs on spreadsheets of which

25  there are going to be able to handle approximately 800 a month.  I

1     think the goal of this is to sign up a few thousand or many

2     thousands more that they're not going to -- they can't get the

3     relief facts for almost two years and they're going to sign up

4     another two years' worth, I think that's the goal of doing this at

5     this time.  And I don't think saying something is factually

6     inaccurate needs to be corrected coming from the court long before

7     we get to the issue of whether it truly is factually inaccurate.  I

8     think that's putting the cart before the horse, so to speak.

9          THE COURT:  Well, when I heard the arguments for the first

10    time a few weeks ago, we had those arguments on a Friday and we

11    reconvened by telephone I believe on a Monday, at which time I made

12    the request not only for the notices that were sent but also for as

13    the index provides the information regarding the recipients, and my

14    exercise in receiving this is to go through each of the notices that

15    were sent for a particular concern regarding information provided.

16         I have also said -- the reason I asked for that is because

17    the government, I agree with Mr. Meunier in the sense that the

18    government has been communicating with these people about this very

19    issue, putting aside the substance of what these documents tell us

20    are contained in the notices.  But the other thing, the other thing

21    is that there may be particular notices that went to certain people.

22    Not all notices went to all occupants.  And so I want to do it with

23    regard to particular ones.

24         Now, Mr. Meunier did highlight by numbers some of these

25    submissions, so that's the way that I was viewing these documents as

1    well.  But I have also refused to order simply by the fact that the

2    government had sent out a notice to a person living in temporary

3    housing that, therefore, there is going to be a notice from this

4    court mailed out to every single person.  I think I have ruled on

5    that issue.

6         I will consider sending a notice out to a particular group

7    of individuals or the entirety if something in these documents

8    suggests that that would be appropriate based upon an individual

9    provision of a document.  And I think Mr. Meunier has highlighted

10   that.  So, yeah, your understanding of what we're doing here is

11   correct.  Go ahead.

12        MR. WEINSTOCK:  And then you kind of preceded my second

13   point, which is, for example, I think some of the ones Mr. Meunier

14   had a lot of comments about are these phone scripts of how you

15   respond.  And I'm sure there is a list of 100 or 200 people.  So if

16   the court feels those people may have gotten something or wasn't

17   communicated that way, that wouldn't require a notice to 300,000

18   people if there was only 100 people that actually made that phone

19   call and went through that script.  Which I think --

20        THE COURT:  Likewise, if someone attended, we would know,

21   I would think, who attended the St. Maria Goretti meeting, I don't

22   know if there was a sign-in sheet there like we do here, but we

23   would know perhaps who all was that at meeting if they received

24   something that warranted a response.  So, yes, that's the fashion

25   that we would proceed in.

1      MR. WEINSTOCK:  And then really the last point, your

2  Honor, is, and I understand his comments about FEMA being a

3  defendant, a defendant being in direct communication, and that you

4  could look at it that way, and he certainly does.  But this isn't

5  really a case of P v. D and there being a V in the middle, this is

6  much more of a triangle and FEMA is a different wing to the

7  triangle.  I mean, we are all defendants but Henry Miller truly

8  believes he will not be a party to these proceedings come sometime

9  soon and we will be the ones left with their response to FEMA's

10  notice that we have nothing to do with.

11      THE COURT:  Well, the other competing factor, not to take

12  words out of Ms. Boyle's mouth, but actually this was raised at the

13  hearing was that the government having possession of information

14  regarding possible or potential harmful circumstances has an

15  obligation to disseminate information as long as it is, Mr. Meunier

16  used the term fair imbalance, as long as it is informational so that

17  people can act upon that information, I mean it's almost a

18  mitigation type of argument or motive that requires some action on

19  behalf of the government.

20      So I am trying to balance that and the only way I can do

21  that is to look at the actual submissions that were made or

22  disseminated to these groups of people.

23      MR. WEINSTOCK:  And really, the first point being the most

24  significant, I mean, for example, Mr. Meunier points out something

25  about cancer.  There is a big dispute over a lot of these health

1   effects, whether they're related or not related and at what levels.

2   It will be very difficult for this court to see that that needs to

3   be corrected until you've heard evidence on all of it by smarter

4   people than me.  Thank you, your Honor.

5           THE COURT:  Okay.  Thank you, Ms. Boyle would you like to

6   respond briefly?

7           MS. BOYLE:  Yes.

8           THE COURT:  I don't know whether, while she is approaching

9   the podium, I don't know whether either of you have asked for the

10  transcript of what we covered on the record on this issue

11  previously, but for the benefit of the group, there is, forgive me

12  if I've mentioned this, but there is a transcript of that and I

13  would think that your liaison counsel can make that available if you

14  choose to plow through the arguments that have already been made.

15  Go ahead, Ms. Boyle.

16          MS. BOYLE:  Thank you, your Honor.  I will try to stick to

17  the narrow issue that is before the court today, which is to address

18  the contents of these notices.  But because Mr. Meunier highlighted

19  some of the legal arguments from before, I would just like to

20  emphasize in general that the legal standard for class notice under

21  Rule 23 is simply whether or not a potential plaintiffs' right to

22  sue and/or knowledge of their substantive rights has been affected

23  by a certain step in the litigation.  In this litigation plaintiffs

24  have chosen on their own initiative to bring a class action, which

25  by definition until a class is denied, already includes all of the

1   people who have received all of these notices.  Irrespective of what

2   the notices contain.

3        If the court -- personally I have reviewed the notices, I

4   have not seen any red flags, and I will get to the contents in just

5   one moment.  But if the court did find that any of the

6   communications somehow would lead a person to believe they should

7   not sue, for example, the remedy for that under Rule 23 is for in

8   the event a class is denied then perhaps issue a notice to that

9   subset of people that the class was denied so that they know that

10  they need to pursue their own rights on their own.

11       And this is an exception to the general rule that notice

12  should only be issued if a class is granted.  But one particular

13  case that stands for the proposition to issue notice out of this

14  fairness principle if a class is denied, is just a simple district

15  court case, and its citation is 216 F.R.D. 453, Sanft v. Winnebago

16  Industries, this was not cited in our brief.  But there was a

17  special circumstance in that case after the class denial where the

18  court found special facts in that case warranted notice after the

19  denial because of various issues, including the timing of the denial

20  and the types of information that those people were somehow led to

21  believe that they were in the class and all of a sudden they were

22  not.

23       And second, the government requests that the issue, that

24  the narrow issue that we're addressing today, I will do my best to

25  address it on a factual level, but the government also asked that

1  this issue be briefed where the plaintiff liaison counsel identifies

2  with particularity the problems that they see in the notices and the

3  legal standard by which they're requesting this relief.  Because the

4  government still maintains that this is not proper relief under Rule

5  23, nor under subpoena discovery rules.  And so we are confused as

6  to the legal basis for the request and have no choice but to simply

7  view it as a request for advertising at this point of the

8  litigation.

9          Having said that, I will try to clarify on a factual

10  level.  With respect to some of the notices that plaintiffs liaison

11  has identified, or with respect to all of them, I would just like to

12  echo Mr. Weinstock's comment that there is a dichotomy between the

13  contents of the notice with respect to merits issues of the case or

14  even mitigation of damages, such as who was in the trailer at any

15  given time and when did they move out, or how many people received

16  the notice with respect to the facts contained in the notice.  What

17  are the problems that formaldehyde causes.

18          I submit to you it's my understanding that the government

19  attempted to take a very proactive approach to encouraging people to

20  seek the advice of a doctor.  You'll see that the script, for

21  example, in No. 2 and many of the notices, No. 8 is a script,

22  No. 10, for example, and I think Nos. 1, 5 and 14 are the letters

23  that Mr. Meunier identified, all say if you're experiencing health

24  problems, call a doctor.  And as you noted, your Honor, this is a

25  responsibility of the CDC with respect to its public health mission.

1        With respect to how accurate the facts are, again I submit

2   I think the government was trying to be overly informative.  I

3   personally don't know how accurate all of the facts are, and I think

4   that the court would need an evidentiary hearing if the contents of

5   the notice is what the court is interested in learning.  And I agree

6   with Mr. Weinstock's position in that regard.

7        With respect to No. 8, which is a script, one of the

8   prepared responses is to call a lawyer if you would like to pursue

9   your legal rights.  So again, I don't think that the government, I

10  can direct your Honor to the page if you would like.

11       THE COURT:  I have it, I tagged it.  It's in 28 as well.

12       MS. BOYLE:  Okay.  So again, I don't believe that the

13  agencies had in mind a concept of how many people would be suing or

14  not suing.  I think that they were advising people consult with a

15  doctor, consult with a lawyer.  I personally on a factual level just

16  don't see a cause for concern.

17       Outside of the context of Rule 23, the government is

18  certainly happy to follow-up with supplemental information in your

19  Honor would like to review that, you know, for your own comfort

20  level.

21       But with respect to Rule 23 class notice and with respect

22  to discovery, the government submits that this issue needs some

23  further briefing from plaintiffs liaison counsel and some

24  alternative legal basis for the relief, because, as I said, at this

25  point the only legal operation of this, of what this request is, in

1    my opinion, is just simply an advertisement at this point.

2          And finally, with respect to the contents.  I believe

3    Mr. Meunier may have issues with the characterization of low,

4    medium, high, again that's an evidentiary issue.  This certainly, it

5    was an informational letter.  I don't believe it was intended for

6    the plaintiffs' counsel to make any stipulation as they seem to be

7    arguing with respect to the contents of any of these.

8          And so if the court has no further questions, the position

9    of the government is this requires further briefing, if anything.

10   Thank you, your Honor.

11         THE COURT:  All right.  Thank you.  I think that what we

12   should do, and to be fair to counsel in this case, I think I had

13   advised through Amanda, I want to say on Wednesday of this week,

14   that I would hope that you all had been through these documents, and

15   I am not sure that when I asked that these documents be submitted to

16   the court that I expected that you all would be able to go through

17   each one and highlight the particularities of concerns on each one,

18   it begins with the plaintiffs who, of course, are initiating this

19   process in seeking this notification procedure.

20         So to be fair, I would agree with Ms. Boyle that perhaps

21   maybe some further opportunity for plaintiffs now that they possess

22   these notifications and the designated pools of individuals who are

23   recipients to go through and identify for the court item by item,

24   and much of this material is very repetitive, it's very thematic in

25   terms of here is what we know about formaldehyde, so many of these

1   notices, as a matter of fact several of them appear to be identical,

2   although they were sent out on different dates.  What I would like

3   you to do is perhaps go through and tell me by item number, by

4   docket number, I should say tab number, which ones and what specific

5   provisions you believe would warrant something in some additional

6   information or an additional mailing to those who receive that.

7        And I'd like to get that from you by, what's today, the

8   9th, by the 19th, Monday the 19th.  It doesn't need to be -- all I

9   need it to be is, Judge, if you look under tab one it says blankety

10  blank, and here is why we think that's not an appropriate statement

11  or it's a statement that warrants additional information.  So that's

12  all I need to get from you.  And like I said, that's going to be --

13  if you find something in there that meets that criteria that you

14  think warrants a response, you're going to see that maybe in five

15  other items under these tabs so you need not reproduce it.  Just say

16  they said it in tab one, they said it in tab five and six, and they

17  said it also in tabs 27 through 40 or whatever, however many times

18  they said it.  Tell me why you think that needs a response.

19       If there's going to be a response, keep in mind, too, that

20  I would hope that it would be specifically and narrowly tailored if

21  we are going to send something to these people.  In suggesting that,

22  I am not indicating that I am convinced that we are going to send

23  something to these people.

24       There are two items that do have instructions about

25  seeking the advice of an attorney.  Now, both of those come in the

1   form of a proposed set of answers to a caller who calls some type of

2   hotline or phone number.  So that's not on the generally

3   disseminated information.

4           But at any rate, what I would like you to do is go through

5   these, tell me which ones warrant a response.  And I'll tell you

6   there's nothing specifically contained in any of these documents,

7   such that I've read it, that stands out as being just a horrendously

8   prejudicial statement, something that warrants an immediate response

9   from counsel.  But I am going to give you the chance, because I do

10  think that there are some things in here informationally that

11  perhaps arguably could warrant further information.

12          And all of this is cognizant of the fact that depending on

13  what happens with the class cert hearing there will be a renewed

14  need to broach this issue with regard to notification, notification

15  that you thought you were in a class but the court has declined to

16  certify a class, notification that we have a class action, you are a

17  potential member and you need to opt in or opt out and so.  Those

18  issues can be handled in the context of those rulings.  What we're

19  talking about right now is the need to send information sooner

20  rather than later to a group of individuals based upon something

21  that the government has already sent to these people.

22          So, Mr. Meunier, you were going say something.

23          MR. MEUNIER:  I just want to clarify, Judge, that in the

24  following up briefing the court doesn't need any further legal

25  argument?

1          THE COURT:  No, I understand the legal argument.

2          MR. MEUNIER:  It's more factual.

3          THE COURT:  Right.

4          MR. MEUNIER:  Ms. Boyle did mention a new case I would

5    like to maybe read it and comment briefly on it if I may.  But

6    otherwise we understand this is a factual, you know, here is what we

7    see in the language and here is what we think is needed.

8          THE COURT:  Right, that's where I am on this.  We've

9    covered the broader arguments and the privacy concerns, and I

10   understand all of that and all of that comes into play in any

11   consideration, those are general arguments that I think come into

12   play in any determination hearing, there are so many competing

13   factors at this point.  Mr. Weinstock.

14         MR. WEINSTOCK:  I was just going to ask can the government

15   and the defendants have a week to respond?

16         THE COURT:  Yes.  If we get that by the 19th, the

17   government and the defenses respond by, well, that next day the 27th

18   would be Tuesday, since Monday is a federal holiday you can have

19   until Tuesday the 27th to respond to what the plaintiffs want.  And

20   in the mean time I'll go through these again myself.  We've

21   highlighted portions of them, I've got tabs on certain portions of

22   them.  And we'll take your material and go through them again and

23   come to a conclusion as to if any additional information is going to

24   be provided, to whom it is going to be provided, and what that

25   additional information or notice would be inclusive of.

1          Originally we had a submission that I think plaintiffs had

2     prepared that is a little more general and broad, and might

3     ultimately be appropriate at a later juncture, depending on what

4     happens with the class cert, but we'll put that aside for now and

5     talk about what's in these documents.

6          MR. MEUNIER:  Judge, to what extent are these documents in

7     the record or will be in the record?  In other words, should I plan

8     to attach just the ones I am speaking to or are you going to put the

9     government's production in the record?

10          THE COURT:  I don't think there is any reason, none of

11    these are subject to any type of -- they've been distributed

12    generally, so unless there is some internal document that's a

13    question sheet or something like that that was for internal use

14    only, and, Ms. Boyle, you can tell us whether there is or is not.

15    Right now why don't we refer to them since you have them and

16    defendants have them and I have them now, why don't we just refer to

17    them by tab number.  And if necessary, we'll go ahead and put those

18    in the record once the court makes a ruling based on a particular

19    notice, we'll make that notice part of the record.

20          MR. MEUNIER:  Okay.  Thank you, Judge.

21          THE COURT:  Fair enough?

22          MS. BOYLE:  Yes.

23          THE COURT:  And let me know if there's one that can't go

24    in the record for whatever reason, it's a prepared scenario for a

25    person answering the phone.  But I think all of this is pretty

1    general information in one form or another.

2         MS. BOYLE:  I believe that's correct, your Honor.  But I

3    will use the time between now and the responsive deadline to double

4    check and investigate if there are any that fall into that category.

5         THE COURT:  Okay.  Good.  All right.  Anybody have

6    anything else that we need to cover at this point as a group?  If

7    not, then we will adjourn and I thank all of you for attending and

8    appreciate your continued work on this.

9         (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

10

11                        * * * * * *

12

13

14                   REPORTER'S CERTIFICATE

15

16       I, Karen A. Ibos, CCR, Official Court Reporter, United States

17    District Court, Eastern District of Louisiana, do hereby certify

18    that the foregoing is a true and correct transcript, to the best of

19    my ability and understanding, from the record of the proceedings in

20    the above-entitled and numbered matter.

21

22

23                        ___/s/ Karen A. Ibos___

24                        Karen A. Ibos, CCR, RPR, CRR

25                        Official Court Reporter