**EXHIBIT 4**

ASSET PURCHASE AGREEMENT

OF

GILES INDUSTRIES OF TAZEWELL, INCORPORATED
R.O. GILES ENTERPRISES, INC.

SALE TO

GILES ACQUISITION CORP.

AND OF

SUNRAY RV, LLC

SALE TO

SUNRAY ACQUISITION, LLC

******

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is made and entered into as of the 3rd day of March, 2006, by and among Giles Industries of Tazewell, Incorporated, a Tennessee corporation ("Industries"), SunRay RV, LLC, a Tennessee limited liability company ("SunRay"), and R.O. Giles Enterprises, Inc., a Tennessee corporation ("Enterprises") (Industries, SunRay and Enterprises collectively, the "Sellers" and individually, a "Seller); and Giles Acquisition Corp., an Alabama corporation ("Giles Acquisition Corp."), and SunRay Acquisition, LLC, an Alabama limited liability company ("SunRay Acquisition, LLC") (Giles Acquisition Corp. and SunRay Acquisition, LLC, collectively, the "Purchasers" and individually a "Purchaser"); and Southern Energy Homes, Inc., a Delaware corporation (the "Company"), relating to the purchase of the business and assets of Sellers. Alan C. Neely, who is the sole member of SunRay, the President of Industries and SunRay, and a holder of beneficial interest in Industries and Enterprises, is made a party to this Agreement solely for the purpose of Section 3.30 and Section VIII, and, in his capacity as Sellers Agent, solely for the purpose of Section VII.

### RECITALS:

A.  Industries owns and operates a business that manufactures and sells manufactured housing units at two facilities located in New Tazewell, Tennessee, doing business as "Giles Industries" (the "Industries Business"), SunRay owns and operates a business that manufactures and sells towable travel trailers at a facility located in New Tazewell, Tennessee, doing business as "SunRay RV" (the "SunRay Business") (the Industries Business and the SunRay Business collectively, the "Business"), and Enterprises owns certain real property used in the Industries Business.

B.  Each of Industries, SunRay and Enterprises is affiliated with the other by virtue of controlling, being controlled by or under common control with, the others. The individual beneficial owners of the respective Sellers are all members of the same family.

C.  Giles Acquisition Corp. is a wholly-owned subsidiary of the Company, and SunRay Acquisition, LLC is a wholly-owned subsidiary of Giles Acquisition Corp.

D.  Industries and SunRay desire to sell and the Purchasers desire to purchase the Business and all of the properties, assets, trade names, contracts, rights and other things of value owned by Industries and SunRay and used in the Business, and Enterprises desires to sell, and the Purchasers desire to purchase, the real estate upon which the Industries Business is located, subject to certain of their respective current liabilities and certain other stated obligations of the Sellers, all on the terms and conditions hereinafter set forth.

E.  The parties have agreed upon the terms and conditions of such sale and purchase and are setting out their agreement herein.

NOW, THEREFORE, in consideration of the premises, the covenants, promises and agreements hereinafter contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1

**Section I**

**SALE AND PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES**

    1.1    **Sale and Purchase of Assets.**  On the terms and conditions set forth herein, the respective Sellers hereby agree to transfer, sell, convey and assign to Purchasers, free and clear of all liens and encumbrances (except those securing the Assumed Liabilities), and Purchasers agree to purchase from Sellers, the assets of Sellers of every kind and description used in the operation of the Business, wherever located, (collectively, the "Purchased Assets") including, without limitation, the assets hereinafter specifically described; provided, however, that the Purchased Assets shall not include the following (the "Excluded Assets"):

    A.    **All Sellers.**  The following assets of each of the Sellers:

        (i)    company charter, articles and other organizational documents, minute books and membership ownership record books, qualifications to conduct business as a foreign corporation or company, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates, and other documents relating to the organization, maintenance, and existence of the Sellers as legal entities, all income tax returns and work papers directly relating to income tax returns, and any of the rights of the Sellers under this Agreement;

        (ii)    Sellers' bank account(s) established for the purpose of receiving the proceeds of this sale, and which will contain less than $100.00 immediately prior to the Closing;

        (iii)    prepaid excise and/or franchise taxes, to the extent attributable to periods after the Closing;

        (iv)    insurance policies and the right to proceeds thereunder (except as provided in Section 9.6 and except proceeds paid for property damage that is unrepaired at the Closing);

        (v)    employee benefit plans, arrangements and agreements; and

        (vi)    leases of personal property leased by the Sellers and used in the operation of the Business that are not assignable according to the terms of such leases, as listed on Schedule 1.1A(vi).

    B.    **Industries.**  The following assets of Industries:

        (i)    certificates of deposits listed on Schedule 1.1B(i) in the aggregate principal amount of $3,550,000;

        (ii)    Charles Schwab Account in the amount of $402,864.41, as of January 31, 2006, and as it may be adjusted prior to the Closing;

        (iii)    life insurance policies listed on Schedule 1.1B(iii) having approximately $1,296,200 in aggregate cash surrender value;

        (iv)    the specific prepaid items listed on Schedule 1.1B(iv); and

████████those certain real properties known and identified on Industries' financial statements as the "Countryside Subdivision" and "Land" and having a current value on Industries' balance sheet dated as of December 31, 2005 of approximately $210,096 and $55,100, respectively, and more particularly described on Schedule 1.1B(v)(v).

1.2    **Purchased Assets.**  Purchased Assets shall include, without limitation, the following assets owned by the respective Sellers and used in the Business as of the Closing Date (as defined in Section 12.1):

A.    **Assets of Industries and SunRay:**

(i)    **Cash.**  Except as described in Section 1.1B(i), all of the remaining cash and cash equivalents of Industries and SunRay at the Closing Date, including, without limitation, such amounts deposited in any bank account or petty cash fund of Industries and SunRay, and including the transfer of Industries' and SunRay's bank accounts;

(ii)    **Inventory.**  All of the inventory of Industries and SunRay in respect of the Business at the Closing Date, including raw materials, work-in-process, finished goods and inventory;

(iii)    **Accounts Receivable.**  All of the accounts receivable and other receivables of Industries and SunRay at the Closing Date (the "Accounts Receivable");

(iv)    **Fixed Property, Plant and Equipment.**  All buildings, structures, improvements and fixtures located thereon, including all electrical, mechanical, plumbing and other building systems, fire protection, security and surveillance systems, telecommunications, computer, wiring, and cable installations; utility installations, water distribution systems, and landscaping (the "Property and Plant"), and all machinery and equipment, tooling, vehicles, software, computers, supplies, desks, chairs, tables, furniture, fixtures and all other personal property of Industries and SunRay used in the operation of the Business, including but not limited to those items listed on Schedule 1.2A(iv) (the "Equipment");

(v)    **Leases.**  Except as described in Section 1.1A(vi), the assignment of Industries and SunRay in and to the leases of the personal property leased by Industries and SunRay, respectively, and used in the operation of the Business, including but not limited to those leases listed on Schedule 1.2A(v) attached hereto (the "Leases");

(vi)    **Contracts.**  All of Industries' and SunRay's right, title and interest in and to all contracts and agreements relating to the Business, limited however, to those Contracts listed on Schedule 1.2A(vi) attached hereto (the "Contracts");

(vii)    **Intellectual Property.**  Industries' and SunRay's company name and all of their respective patents, trademarks, service marks and trade names,

3

inventions, proprietary rights, approvals and ratings to the extent assignable, and including but not limited to those listed on Schedule 1.2A(vii) attached hereto (collectively, the "Intellectual Property");

(viii)  **Information Technology.**  All computer software licenses, software documentation, back-up tapes of data and software, all personal computers, file servers, telecommunication software and hardware, information technology fire protection equipment, security software and systems, as set forth on Schedule 1.2A(viii).

(ix)  **Prepaid Items and Deposits.**  Except as described in Section 1.1A(iii) and 1.1B(iv), all prepaid items and deposits relating to the Business useful to Purchasers including, without limitation, those described on Schedule 1.2A(ix) attached hereto and all rental deposits under the Leases and utilities deposits (the "Prepaid Items and Deposits");

(x)  **Business Records.**  All lists of dealers, suppliers and customers served by Industries and SunRay, all records of accounts receivable and payable, all personnel records, written policies and procedures, and all other business records of Industries and SunRay related to the operation of the Business (the "Business Records"), provided, however, that Industries and SunRay shall have reasonable access (with assistance of Purchaser's employees) to such Business Records subsequent to Closing for accounting and income tax return purposes, and with respect to litigation and administration of Excluded Assets and Excluded Liabilities; and

(xi)  **Miscellaneous.**  All telephone numbers, post office boxes, website addresses, e-mail addresses, licenses and all governmental approvals and permits to the extent assignable and all other miscellaneous tangible and intangible rights, claims and assets.

B.  **Assets of Enterprises:**

That certain real property, presently enclosed by fencing, and consisting of approximately 59 acres, more or less, and all building(s) thereon, and that certain parcel of real property proximal to the Industries plants, both as specifically described in Schedule 1.2B (collectively, the "Real Estate").

1.3  **Assumed Liabilities.** Purchasers shall at the Closing, assume, and hold Industries and SunRay harmless from, only the following unpaid liabilities and obligations of Industries and SunRay (collectively, the "Assumed Liabilities"):

A.  The unpaid liabilities included in the Seller's statement of assets to be sold and liabilities to be assumed dated as of the Closing Date(the "Closing Balance Sheet"), but only to the extent included therein; and

B.  the Leases and Contracts; and

C.  the open purchase orders and sales orders ("Open Orders") outstanding as of the close of business on the last business day immediately preceding the Closing

4

Date and executed in the ordinary course of business by Seller, a true and complete list of which Open Orders shall be supplied to Purchaser by Seller prior to Closing.

1.4 **Liabilities Not Assumed.** Other than the Assumed Liabilities, Purchasers shall not accept, assume, become or be liable for or subject to any liability, indebtedness, obligation or responsibility of Sellers or of any other person or entity in any way related to the ownership or operation, or both, of the Purchased Assets or the Business prior to the Closing Date, whether said liability, indebtedness, obligation or responsibility arises before or after the Closing. Without limiting the interpretation of this Section 1.4, Purchasers shall not assume any liability for income taxes of Sellers related to the within transaction, for retiree benefits or for franchise taxes, excise taxes, federal income taxes and state income taxes first due during or attributable to periods prior to Closing. It is expressly agreed, without limiting the effect of the preceding sentence, that Purchasers shall not be obligated to assume or become liable for, without Purchasers' express written consent, any of Sellers' liabilities, debts or commitments of any kind whatsoever, known or unknown, fixed or contingent, or, without limitation, liabilities for federal, state, local or foreign income or revenue or sales taxes on account of any transactions of Sellers, including the consummation of this Agreement, liabilities which relate to any product liability or warranty claim with respect to products sold by Industries or SunRay or sold after the Closing Date but produced prior to the Closing Date (notwithstanding the Purchasers' Limited Litigation Indemnity of Industries and SunRay pursuant to Section XIV), any obligation or liability (including, but not limited to, any audits, tax returns, or reports) for or arising out of any pension, profit sharing, retirement, health, life or other benefit plan, including, but not limited to, those listed on Schedule 3.20, sponsored by any Seller or the Business, or for any costs or expenses of the Sellers incurred in connection with or resulting from the transactions contemplated by this Agreement except to the extent contemplated by Section 15.5.

## Section II
## PURCHASE PRICE

2.1 **Purchase Price.** The Purchase Price for the Purchased Assets shall be Seventeen Million Six Hundred Thousand Dollars ($17,600,000) plus the assumption of the Assumed Liabilities, less the amount of the Sellers' expenses in connection with this Agreement pursuant to Sections VI, 9.6, 10.9 and 15.5 (collectively, the "Sellers' Transaction Expenses").

2.2 **Payment of Purchase Price**

A. **Assumption and Payment of Certain Liabilities.** At the Closing as part payment of the purchase price for the Purchased Assets, Purchaser shall assume and agree to pay, and hold Seller harmless from, the Assumed Liabilities. The following Assumed Liabilities will be paid and satisfied effective as of the Closing:

(i) that certain obligation to Maxine Giles in the amount of $241,151.00, net of $43,689.23 and any other amounts owed by Mrs. Giles to the Sellers; and

(ii) that certain obligation to Dorothy Neely in the amount of $416,152, net of $75,500 and any other amounts owed by Mrs. Neely to the Sellers.

5

B.   **Cash.**  Fifteen Million, Eight Hundred Forty Thousand Dollars ($15,840,000) of the Purchase Price, less the amount of Sellers' Transaction Expenses, shall be paid in cash. Seven Hundred Fifty Thousand Dollars ($750,000), plus an amount equal to the receivables, if any, owed to Industries at the close of the tenth business day before the Closing Date under those certain contracts listed and identified as items 1, 2 and 3 on Schedule 1.2A(vi) (the "FEMA Receivable"), shall be deposited into an escrow account (the "Escrow Account") established pursuant to an escrow agreement in the form attached hereto (the "Escrow Agreement). The balance of the cash portion of the Purchase Price shall be paid by the Purchasers in cash at the Closing by bank wire transfer to the Sellers, allocated among the Sellers and/or their respective beneficial owners in such amounts as the Sellers shall direct by written instruction delivered to the Purchasers prior to the Closing Date.

C.   **Shares.**  The remaining One Million Seven Hundred Sixty Thousand Dollars ($1,760,000) of the Purchase Price shall be paid by the delivery of that amount in value of unregistered shares of the common stock, $.01 par value of Southern Energy Homes, Inc. (the "Shares"). The Shares shall be subject to the agreement set forth in Section 8.2. For the purpose of computing the number of Shares issuable to the Sellers, the Shares will be valued at the last reported sale price on the earlier to occur of (i) the tenth business day prior to the Closing Date (ii) or February 15, 2006. The Sellers have directed that all of the Shares shall be allocated and distributed to Alan C. Neely. All such Shares shall be subject to the agreements set forth in Section VIII of this Agreement.

2.3   **Allocation of Purchase Price.**  The Purchase Price shall be apportioned among the properties, assets, contracts, and business being sold by Sellers to Purchasers as set out in Schedule 2.3.

2.4   **FEMA Receivable Settlement.**  Within ten (10) business days after the 180th day following the Closing Date, the following actions shall occur:

A.   Any portion of the FEMA Receivable that has not then been received by the Purchasers shall be paid from the Escrow Account to the Purchasers; and

B.   All the Purchasers' right, title and interest in and to any such uncollected portion of the FEMA Receivable shall be assigned and conveyed to the Sellers.

2.5   **Additional Payment to Sellers.**  Of the funds then remaining in the Escrow Account after the FEMA Receivable has been settled as set forth in Section 2.4 above, all funds in excess of $750,000 shall promptly be paid and distributed to the Sellers, and the remaining $750,000 shall continue subject to the terms of the Escrow Agreement until termination thereof.

## Section III
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchasers to enter into this Agreement and to consummate the transactions contemplated hereby, each Seller, and, as to Section 3.30, Alan C. Neely, separately and severally, and not jointly, hereby represents and warrants to Purchasers that each of the following representations and warranties set out in this Section III is true and correct in all material respects to the best of its knowledge and belief, and acknowledges that each of said representations and warranties has been relied upon by

Purchasers and is material to the Company's and the Purchasers' decision to enter into this Agreement and to consummate the transaction contemplated herein.

3.1     **Company Existence and Power.** Each of Industries and Enterprises is a corporation, and SunRay is a limited liability company, duly organized under the laws of the State of Tennessee, validly existing, and in good standing under the laws of the State of Tennessee; has the power to own, operate, and lease its properties as presently owned, operated, and leased and to carry on its business as now being conducted; is duly qualified to conduct business and is in good standing in each jurisdiction in which a failure to qualify would have a material adverse effect on the Business where such qualification is necessary under the applicable laws of such jurisdiction; and has the requisite power and authority to enter into and perform its obligations under this Agreement in accordance with its terms.

3.2     **Authority Relative to Agreement.** The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein have been duly and effectively authorized by all necessary company action, including approval by Industries' and Enterprises' shareholders and SunRay's Members. This Agreement, upon execution by the Seller, will constitute the legal, valid and binding obligation of Seller in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, or other laws affecting creditors' rights generally, and except as may be limited by general principles of equity.

3.3     **Effect of Agreement.** Except as set forth on Schedule 3.3 hereof, the execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated herein do not require the consent, waiver, approval, license or authorization of any person or public authorities and do not violate, in any respect, any provision of law applicable to Seller; do not conflict with or result in any breach of Seller's articles or bylaws, or articles of organization or operating agreement, or with or without the giving of notice and/or the passage of time, any mortgage, deed of trust, license, lease, indenture or other agreement or other instrument, or any order, judgment, or any other restriction of any kind or character, to which Seller is a party or any of Seller's property may be bound; do not give to others any right to terminate, or result in any termination of, any such instrument; do not result in termination of any provisions of any such instrument; and do not result in the creation of any lien, charge or encumbrance upon any of the property of Seller.

3.4     **Ownership of Seller.** There are no outstanding subscriptions, options, warrants, rights, convertible securities, or other agreements or commitments obligating Seller to issue additional shares of stock or membership interest. The names and addresses of each of the stockholders or members, the social security numbers or tax identification number of each such stockholder or member to whom Shares will be issued, and the ownership interest of Seller owned by each stockholder or member are as shown on Schedule 3.4.

3.5     **Operation of Business.** The Seller has substantially complied with all laws, statutes, ordinances, rules, regulations and orders of all governmental entities applicable to the operations of its business, including, without limiting the generality of the foregoing, Title VII of the Civil Rights of 1954, as amended ("Title VII"), the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), the Equal Pay Act of 1963, as amended ("EPA"), the National Labor Relations Act of 1935, as amended ("NLRA"), the Federal Employee Retirement Income Security Act, as amended ("ERISA"), the Immigration Act, the Federal Occupation Safety Health Act ("OSHA"), the Fair Labor Standards Act ("FSLA"), the Americans With Disabilities Act ("ADA"), the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), or applicable statutes, regulations, orders and restrictions relating to employment standards and controls. Except as disclosed on Schedule 3.5, no notice has been issued and to Seller's best knowledge and belief, no investigation or review is pending or threatened by any governmental entity

7

with respect to (i) any alleged violation by the Seller of any law, ordinance, rule, regulations, order, policy or guideline of any governmental entity, or (ii) any alleged failure to have all permits, certificates, licenses, approval and other authorizations required in connection with the operation of the Business.

3.6     **Financial Statements.**  Sellers' Balance Sheet and operating statement as of the fiscal year ending December 31, 2005 are set out in Schedule 3.6. The Balance Sheet fairly presents the financial condition of the Sellers as of December 31, 2005 and the earnings statement for the period ending December 31, 2005, fairly presents the results of the operations of the Business of Sellers for the calendar year ending December 31, 2005. The said financial statements have been prepared on a modified cash basis and do not contain any untrue statements of material fact or omit to state any material fact necessary in order to make the statements contained in this paragraph or therein not misleading.

3.7     **Material Changes.**  Since December 31, 2005, except as disclosed on Schedule 3.7 attached hereto, there has not been:

> A.     any material adverse change in the condition, financial or otherwise, of the Business of Seller (other than changes in the ordinary course of business, none of which has been materially adverse and which are not in the aggregate materially adverse);
>
> B.     damage, destruction or loss, whether or not covered by insurance, materially adversely affecting the Purchased Assets or the Business;
>
> C.     any increase in the compensation payable or to become payable by the Seller to any of its employees or agents employed in connection with the operation of the Business, or in any bonus payment or arrangement made to or with any thereof, or any material change in the terms of an employee benefit plan through amendment or otherwise;
>
> D.     any labor dispute with respect to or affecting the Business that would have a materially adverse effect upon the Business;
>
> E.     any distributions to stockholders or members paid or declared by Seller;
>
> F.     any merger or consolidation involving Seller, or any issuance or other transfer of membership interests or capital stock of Seller or of any options or warrants in respect thereof;
>
> G.     any disposition of the assets of Seller other than in the ordinary course of business; or
>
> H.     any change to accounting policies and procedures.

3.8     **Leases.**  Seller has previously delivered to Purchaser true and correct copies of the Leases together with all amendments and notices relating thereto and which Leases are listed on Schedule 1.2A(v). The Leases listed on Schedule 1.2A(v) constitute all of the personal property leases to which Seller is a party as Lessor or Lessee. Such Leases remain in full force and effect, all rents and additional rents currently due on such Leases have been paid. No waivers, indulgences or postponements of Seller's obligations thereunder have been granted by any lessor, or of any lessor's obligations by Seller. There exists no event or occurrence, condition or act which, with the giving of notice, the lapse of time or the happening of any further event or condition would become a material default by Seller (or to the best of

8.

Seller's knowledge, by any lessor) under such Leases. To the best knowledge and belief of Seller, provided that the lessor's consent, if necessary, is obtained, the consummation of the transactions contemplated herein in accordance with the terms hereof will not constitute a material default under any Lease.

3.9     **Title to Purchased Assets.** Seller has (or, with respect to Inventory delivered after the date hereof, will have on the effective date of the sale) possession (except for outside processing, if any) or control of the Purchased Assets, and Seller has or, at the time of Closing, will have good and marketable title to all of the Purchased Assets subject to no mortgage, pledge, lien, conditional sales agreement, encumbrance, security interest, charge, or claim, including without limitation any federal, state or municipal tax claim or lien against any of the Purchased Assets.

3.10     **Tools and Inventory Owned by Third Parties.** Set forth on Schedule 3.10 is a true and correct list of all tools, equipment, components, materials, inventory, and any other personal property in the Seller's possession and used in the Business owned by third parties (except as may be subject to Leases listed in Schedule 1.2A(v)), or subject to third parties' rights, including, by way of example but without limiting the generality of the foregoing, tools or equipment owned and provided by materials suppliers for the Seller's use in connection with such materials, or inventory or other goods held on approval, on sale or return, or under consignment or other arrangement providing for Seller's use or possession but not ownership.

3.11     **Condition of Equipment.** The Property and Plant and the Equipment that is presently being used in the operation of the Business has been inspected by Purchasers and Purchasers purchase such Equipment "as is, where is" without representation or warranty for merchantability or fitness for particular purpose.

3.12     **Contracts and Commitments.** Sellers have previously delivered to Purchaser true and correct copies of all of the Contracts, which constitute all of the material outstanding contracts, agreements, commitments or understandings (written or oral) to which Seller is a party relating to the operation of the Business and which Contracts are listed on Schedule 1.2A(vi). Neither Seller nor, any other party to any Contract or Open Order, is in material default under the terms of any Contract or Open Order other than as described in Schedule 3.12. Seller is not subject to nor a party to any mortgage, lien, lease, agreement, contract, instrument, order, judgment or decree or any other restriction of any kind or character which would hinder the continued operation of the Business by Purchasers after the Closing on substantially the same basis as theretofore operated, except those liens securing the Assumed Liabilities.

3.13     **All Assets.** The Purchased Assets together with the Real Estate constitute all the material properties of any nature with which Seller has conducted the Business for the twelve month period prior to the Closing Date, subject to sale of inventory and additions and deletions of other assets in the ordinary course of business. Industries represents and warrants that the Real Estate is all of the real estate occupied by Industries and used in its Business.

3.14     **Insurance.** Set forth on Schedule 3.14 attached hereto is a true and correct schedule of all policies of insurance on which Seller is named as an insured party, and said schedule includes the name of the insurer, the nature of the insurance coverage and the policy limits. The policies listed upon Schedule 3.14 are in full force and effect and all applicable premiums thereon have been paid in full through the dates indicated thereon. Such insurance is believed by Seller to be adequate in amount of coverage and risks insured against. Seller will continue to maintain the insurance coverage afforded by the policies listed on Schedule 3.14 in full force and effect up to and including the Closing Date.

9

3.15 **Judgments and Decrees.** Seller is not subject to any order, judgment or decree which would prevent the consummation of any of the transactions contemplated hereunder or compliance by Seller with the terms, conditions and provisions hereof.

3.16 **Litigation and Administrative Proceedings.** Except as set forth on Schedule 3.15 attached hereto, there are no actions, suits, or proceedings which have been served on Seller or, threatened against, at law or in equity, by or before any federal, state or municipal court or any other governmental department, commission, board, bureau, agency or instrumentality, or any arbitration or mediation forum. Seller is not subject to any liability by reason of a violation of any order, rule, or regulation of any federal, state, municipal or other governmental agency, department, commission, bureau, board or instrumentality to which Seller is subject. The language of this Section 3.16 shall apply, without limitation, to any and all actions or causes of action related directly or indirectly to the operations within the Real Estate.

3.17 **No Adverse Change.** To the best knowledge and belief of Seller, there exists no event, condition or other circumstance that immediately, or with a lapse of time, will materially adversely affect the Business as conducted by Seller. Except as set forth on Schedule 3.17, Seller has no knowledge of any pending changes in governmental laws or regulations that would materially and adversely affect Seller's Business.

3.18 **Name, Trademarks and Trade Names, Licenses, Etc.** To the best knowledge and belief of Seller, Seller owns or has adequate licenses or other rights to use its name and all trademarks, service marks, trade names, licenses, laboratory ratings and approvals, copyrights, patents, proprietary information, and designs either used in, or necessary for, the conduct of its Business; and all trademarks, service marks, trade names, licenses, laboratory ratings and approvals, copyrights, designs owned by or under license to Seller together with all pertinent information related thereto, including filing, registration and expiration dates, serial numbers, record owners and licenses and their essential terms are listed on Schedule 1.2A(vii) attached hereto. Seller has not interfered with, infringed upon, misappropriated, or otherwise come into conflict with any intellectual property rights of third parties, and has never received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that Seller must license or refrain from using any intellectual property rights of any third party). To Seller's best knowledge and belief, no third party has interfered with, infringed upon, misappropriated, or otherwise come into conflict with any intellectual property rights of Seller.

3.19 **Employment Agreements.** Except as set forth in Schedule 3.19 hereto, Seller has no written union contracts, employment contracts, consulting agreements, indemnification agreements, severance agreements or any other binding agreements relating to the employment of any of its employees. Seller is not a party to any agency, consulting or other agreement with respect to consultants or agents, except as described on Schedule 3.19. Seller has performed the obligations required to be performed by it under, and has complied with the provisions of, all agreements set forth on such Schedule 3.19, and all such agreements are in full force and effect and constitute the valid and legally binding obligations of the parties thereto. Except as set forth in the instruments referred to in said Schedule 3.19 and except as may be required by applicable law, upon termination of the employment of any of said employees, neither Seller nor Purchaser will by reason of anything done prior to the Closing hereunder be liable to any of said employees for so-called severance pay or any other payments.

3.20 **Employee Benefit Plans.** Schedule 3.20 contains a true and complete list of all employee benefit arrangements currently in effect covering employees of Seller. Other than as disclosed on Schedule 3.20 hereto, at no time prior to the date hereof has there been (and at no time from and after the date hereof through the Closing will there be) any pension, retirement, disability, medical, dental or other health plan, life insurance or other death benefit plan, profit sharing, deferred compensation, bonus

10

or other incentive plan, vacation benefit plan, severance plan, or other employee benefit plan or arrangement, including, without limitation, any pension plan ("Pension Plan") as defined in Section 3.2 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and any welfare plan ("Welfare Plan") as defined in Section 3(1) of ERISA, whether or not any of the foregoing is funded, and whether written or oral, (a) to which Seller is or was a party, or (b) with respect to which Seller has made any payments or contributions or may otherwise have any liability (including any such plan or arrangement formerly maintained by the Seller). No reportable Event (as described in Section 4043(b) of ERISA) has occurred with respect to any Pension Plan or Welfare Plan, and no event has occurred that would impose any liability on Seller or any Related Company (as defined in Section 414(c) of the Internal Revenue Code of 1986, as amended (the "Code")) under ERISA. Each Pension Plan and Welfare Plan is in material compliance, and has been administered materially in accordance with the applicable provisions of the Code and ERISA. Seller has made all payments due to be made to any Pension Plan or Welfare Plan.

3.21   **Salaries, Wage Rates.** Schedule 3.21, which schedule contains a true and accurate list of all salaried employees and their salary rates, a list of the rates of compensation for hourly employees in the Business and amounts paid on account of any incentive programs, a list of all bonuses paid or earned, and all expenses reimbursed to or paid on behalf of employees for and during the twelve month period prior to the Closing Date. Schedule 3.21 also lists all non-employees who have since December 31, 2005, performed services for the Seller as independent contractors, other than persons rendering legal or independent accounting services, and to whom the Seller has issued a Form 1099. Seller has properly treated all of such persons as independent contractors for purposes of federal employment taxes and income tax withholding in accordance with the Code.

3.22   **Ordinary Course of Business.**   Other than as specifically disclosed to Purchaser hereunder, since December 31, 2005, Seller has conducted its business solely in the usual and ordinary manner and has refrained from any transaction not in the ordinary course of business.

3.23   **Accounts Receivable.** All outstanding Accounts Receivable to be purchased are bona fide, arose in the ordinary course of business, and, are collectible in full (less any reserve for bad debts) within 180 days of Closing. Except as set forth in Schedule 3.23, none of such Accounts Receivable are subject to any claim of off-set, recoupment, or counterclaim and Seller has no knowledge of any facts or circumstances giving rise to any such claims against it. No Account Receivable is contingent upon the performance of Seller of any obligation or contract. No person has any lien on the Accounts Receivable or any part thereof except those liens securing the Assumed Liabilities and except as set out in Schedule 3.25, and no agreement for deduction or discount has been made with respect to any such Accounts Receivable, other than in the ordinary course of business as disclosed on Schedule 3.23. The representations and warranties contained in this Section 3.23 do not apply to the FEMA Receivable.

3.24   **Books and Records.**   Except as set forth on Schedule 3.24, Seller has maintained its books of account on a modified cash basis, consistently applied.

3.25   **Indebtedness.** Schedule 3.25 is a list of Seller's indebtedness including as to each indebtedness, the creditor's name and address, the principal balance and accrued interest as of a recent date together with a statement of the collateral securing each indebtedness. Seller has furnished to the Purchaser copies of all loan documents including capitalized personal property leases evidencing Seller's indebtedness.

3.26   **Preparation of Schedules.** The Seller's Schedules attached hereto have been prepared by Seller. The statements contained herein, in the Seller's Schedules, are true and correct in all material respects, and the Schedules do not omit any fact necessary to make the statements contained therein not

11

misleading in any material respect. The statements and information contained in the Schedules shall be deemed to constitute representations and warranties of Seller under this Agreement to the same extent as if herein set forth in full.

3.27  **Hazardous Materials.**  Except as disclosed on Schedule 3.27(a), Seller has not used or installed any Hazardous Material (as hereinafter defined) on, from, or in the Real Estate. Seller has not violated any applicable Environmental Laws (as hereinafter defined) relating to or affecting the Real Estate; all of Seller's properties are currently in compliance with all Environmental Laws, and there are no facts or circumstances currently existing upon or under such properties, or relating to such properties, which may violate any applicable Environmental Laws, and the Seller has not been served with any action, suit, investigation or proceeding against Seller, or the Real Estate seeking to enforce any right or remedy under any of the Environmental Laws. Seller has obtained all licenses, permits and/or other governmental or regulatory actions necessary to comply with Environmental Laws (the "Permits") and Seller is in full compliance with the terms and provisions of the Permits; and there has been no Release (as hereinafter defined) of any Hazardous Materials on or from the Real Estate; As used in this Agreement: (i) "Hazardous Material" or "Hazardous Materials" means and includes petroleum products, flammable explosives, radioactive materials, asbestos or any material containing asbestos, polychlorinated biphenyls, and/or any hazardous, toxic or dangerous waste, substance, chemical or material defined as such, or as a Hazardous Substance or any similar term, by, in or for the purposes of the Environmental Laws, including, without limitation section 101(14) of CERCLA (hereinafter defined); (ii) "Release" shall have the meaning given such term, or any similar term, in the Environmental Laws, including, without limitation, Section 101(22) of CERCLA; and (iii) "Environmental Law" or "Environmental Laws" shall mean any "Super Fund" or "Super Lien" law, or any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree, regulating, relating to or imposing liability or standards of conduct concerning any Hazardous Materials as may now be in effect, including, without limitation, the following, and all regulations promulgated thereunder or in connection therewith: the Super Fund Amendments and Reauthorization Act of 1986 ("SARA"); the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"); the Clean Air Act ("CAA"); the Clean Water Act ("CWA"); the Toxic Substances Control Act ("TSCA"); the Solid Waste Disposal Act ("SWDA"), as amended by the Resource Conservation and Recovery Act ("RCRA"); the Hazardous Waste Management System; and the Occupational Safety and Health Act of 1970 ("OSHA").

3.28  **Inventory.**  All items of inventory included in the Purchased Assets included in the Balance Sheet have been valued on a modified cash basis, using a first-in, first-out method, and fairly and accurately represent the inventory.

3.29  **Sensitive Payments.**  None of Seller or, to the best of Seller's knowledge after due inquiry, any officer, director, employee, agent or other representative of Seller or any person acting on their behalf, has made, directly or indirectly, any bribes, kickbacks, illegal political contributions with corporate funds, payments from corporate funds not recorded on the books and records of the payor, payments from corporate funds that were intentionally recorded falsely on the books and records of the payor, payments from corporate funds to governmental officials in their individual capacities or illegal payments from corporate funds to obtain or retain business either within the United States or abroad.

3.30  **Investment Representations.**  The Sellers and Alan C. Neely have informed the Purchasers and the Company that all the Company Shares to be issued in partial payment of the Purchase Price will be allocated and/or distributed to Mr. Neely. Mr. Neely accordingly hereby acknowledges his understanding that the Company Shares to be issued in partial payment of the Purchase Price will not have been registered, nor is registration contemplated, under the Securities Act of 1933, as amended (the "Securities Act") or under the securities laws of any state, but are being offered pursuant to exemptions

12

from the registration requirements of federal and state securities laws, based in part upon Mr. Neely's representations contained in this Agreement. Mr. Neely hereby represents and warrant as follows:

A.   **Seller Bears Economic Risk.** Mr. Neely, either alone or with his representatives and advisors, has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company so that he is capable of evaluating the merits and risks of an investment in the Company and has the capacity to protect his own interests. Mr. Neely must bear the economic risk of this investment indefinitely unless the Shares are registered pursuant to the Securities Act, or an exemption from registration is available. Mr. Neely understands that the Company has no present intention of registering the Shares or any shares of its common stock. He also understands that there is no assurance that any exemption from registration under the Securities Act will be available and that, even if available, such exemption may not allow him to transfer all or any portion of the Shares under the circumstances, in the amounts or at the times he might propose.

B.   **Acquisition for Own Account.** Mr. Neely is acquiring the Shares for his own account for investment only, and not with a view toward distribution.

C.   **Accredited Investor.** Mr. Neely represents that he is an accredited investor within the meaning of Section 501(a)(5) and/or (6) of Regulation D under the Securities Act.

D.   **Company Information.** Mr. Neely has been provided copies of the Company's Annual Reports to Shareholders for each of the fiscal years ended January 3, 2003, January 2, 2004 and December 31, 2004, its Quarterly Reports to Shareholders for each of the first three quarters of the fiscal years ending January 2, 2004, December 31, 2004 and December 30, 2005, the Company's proxy materials for its annual meetings of shareholders held in 2003, 2004 and 2005 (collectively, the "Company Information"), and such other information, if any, as he or his representatives have requested concerning the Company. He acknowledges that he (and his representatives, or other advisors, if any) has had the opportunity to ask questions of and receive satisfactory answers from the Company and its management concerning the Company, the Company Information and the Shares.

E.   **Rule 144.** Mr. Neely acknowledges and agrees that the Shares must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. He has been advised or is aware of the provisions of Rule 144 promulgated under the Securities Act, which permits limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including, among other things: the availability of certain current public information about the Company, the resale occurring not less than one year (or two years as to certain persons) after a party has purchased and paid for the security to be sold, the sale being through an unsolicited "broker's transaction" or in transactions directly with a market maker (as said term is defined under the Securities Exchange Act of 1934, as amended) and the number of shares being sold during any three-month period not exceeding specified limitations.

13

3.31    **Survival.** The representations and warranties of Seller set forth in this Agreement shall be continuous and shall survive the Closing and delivery of the Purchased Assets for a period of four (4) years.

## Section IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to the Sellers to enter into this Agreement and to consummate the transactions contemplated hereby, each of the Purchasers and the Company hereby represent and warrant to Sellers each of the following representations and warranties and acknowledges that each of said representations and warranties has been relied upon by Sellers and is material to Sellers' decision to enter into this Agreement and to consummate the transaction contemplated herein:

4.1    **Corporate Existence and Power.** Giles Acquisition Corp. is a corporation and SunRay Acquisition, LLC is a limited liability company, each duly organized and validly existing, and each will be in good standing under the laws of the State of Alabama upon the timely filing of its initial Alabama Business Privilege Tax Return and Annual Report; the Purchaser and the Company each has the corporate power to own, operate, and lease its properties as presently owned, operated, and leased and to carry on its business as now being conducted; is duly qualified to do business and is in good standing in each jurisdiction in which a failure to qualify would have material adverse effect on the conduct of its business or ownership of its property where such qualification is necessary under the applicable laws of such jurisdiction; and has the requisite corporate power and authority to enter into and perform its obligations under this Agreement in accordance with its terms.

4.2    **Authority Relative to Agreement.** The execution, delivery, and performance of this Agreement by Purchaser, the Guaranty of Purchasers' obligations hereunder by the Company, and the consummation by Purchaser of the transactions contemplated hereby, have been duly and effectively authorized by all necessary corporate action, including approval of the board of directors of Purchaser and the board of directors of the Company. This Agreement, upon execution by Purchasers and Sellers, and the Guaranty of Purchaser's obligations by the Company will constitute the legal, valid and binding obligation of Purchaser and the Company, respectively, except as may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors rights generally and except as may be limited by general principles of equity.

4.3    **Effect of Agreement.** The execution, delivery and performance of this Agreement by Purchaser and the Guaranty of the Company, and the consummation by Purchaser of the transactions contemplated herein do not violate, in any respect, any provision of law applicable to Purchaser or the Company; do not conflict with or result in any breach of Purchaser's or the Company's articles of incorporation or by-laws, or articles of organization or operating agreement, or with or without the giving of notice and/or the passage of time, any mortgage, deed of trust, license, lease, indenture or other agreement or other instrument, or any order, judgment, or any other restriction of any kind or character, to which Purchaser or the Company is a party or by which Purchaser or the Company or any of Purchaser's or the Company's property may be bound; do not give to others any right to terminate, or result in any termination of, any such instrument; do not result in termination of any provisions of such instrument; and do not result in the creation of any lien, charge or encumbrance upon any of the property of Purchaser.

4.4    **Purchaser's Knowledge.** Purchaser has no knowledge of any fact, occurrence, event or condition that would make any representations or warranties of any Seller untrue in any material respect. Until the Closing Date, Purchaser will immediately advise Sellers in writing of any fact or occurrence or any pending or threatened occurrence of which it obtains knowledge which, if existing and known at any

14

time prior to the Closing Date, would make any representation or warranty of a Seller untrue in any material respect.

4.5    **Material Information, Etc.**  No representation or warranty made herein by Purchasers and the Company, and no statement made by Purchasers and the Company contained in the Company Information and any document, schedule, certificate or other instrument furnished or to be furnished to Sellers by Purchasers and the Company in connection with the transactions contemplated by this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state any material facts necessary in order to make any statement of fact contained herein or therein not misleading.

4.6    **Survival.**  The representations and warranties of Purchaser set forth in this Agreement shall be continuous, and shall survive the Closing for a period of four (4) years, except on to Section 4.5, which shall survive three (3) years.

Section V
CONDUCT OF BUSINESS PENDING CLOSING

From and after the date hereof until the Closing:

5.1    **Full Access and Investigation.**  Purchaser and its authorized representatives shall have full access during normal business hours to all properties, books, records, contracts and documents of Seller, and Seller shall furnish or cause to be furnished (including through its employees as selected by Seller, authorized representatives and independent providers of professional services) to Purchaser and its authorized representatives all information with respect to the affairs and Business of Seller as Purchaser may reasonably request.  Purchaser shall have no right under this Agreement to contact any supplier, dealer or customer of Seller without the express written permission of Seller.

5.2    **Continue Business in Regular Course.**  Seller shall carry on the Business diligently and substantially in the same manner as it is currently being conducted and shall not make or institute any material change in its method of purchase, sale, lease, management, marketing, accounting, or operations without the prior written consent of Purchaser.  Unless otherwise consented to in writing by Purchaser, Seller shall:

A.    maintain all of the Purchased Assets presently being used in the operation of the Business in good operating condition and repair subject to normal operation;

B.    maintain insurance upon the Purchased Assets in amounts comparable to that in effect on the date hereof;

C.    preserve its present business organization intact, refrain from firing or terminating any of its present officers or employees, except in the ordinary course of business;

D.    maintain its books, accounts and records in the usual, regular and ordinary manner, on a basis consistent with prior years, endeavor to comply with all laws applicable to it and to the conduct of the Business, and perform all of its obligations without default;

15