E.     not sell or voluntarily dispose of any of the Purchased Assets, except in the ordinary course of business, nor engage in any merger or consolidation involving Seller;

F.     not incur any accounts payable with respect to the operation of the Business except in the ordinary course of business;

G.     not grant any increase in pay or perquisites to employees nor increase any salary, commission, bonus or management fee or other benefits to any employee except in the ordinary course of business, nor institute or amend in any material manner any bonus or pension or profit-sharing plan or program;

H.     not enter into any contract or commitment or engage in any transaction which is not in the ordinary course of business and consistent with past practice, nor permit any change in the character of the Seller's Business;

I.     use its best efforts to prevent the occurrence of any event that would result in any of its representations and warranties contained in this Agreement not being true and correct;

J.     use its best efforts to keep its Business intact and preserve its relationship with suppliers, dealers, customers and others with whom Seller has business relations;

K.     not remove any inventory or equipment from the Real Estate, except in the ordinary course of business; and

L.     not pay or declare any distributions to stockholders or members as such after December 31, 2005, other than those disclosed on Schedule 3.7.

    5.3    **Consents of Purchaser.** No consent, recommendation or advice given by Purchaser to Seller pursuant to this Section V regarding the conduct of the Business pending the Closing shall constitute an understanding, commitment, representation or undertaking of Purchaser or give rise to any obligation or liability of Purchaser or constitute a waiver of any warranty, representation, covenant or agreement contained herein, except as may be expressly set forth in writing and signed by the parties hereto.

### Section VI
### REAL ESTATE TITLE REPORT AND SURVEY

    6.1    Schedule 1.2B attached hereto is a legal description of the Real Estate. Seller shall furnish to Purchaser a standard form title insurance report indicating good title to the Real Estate in Seller free and clear of all liens and encumbrances other than those set forth on Schedule 1.2B, subject only to taxes and assessments, both general and special, which are a lien, but are not yet due and payable, zoning ordinances, limitations, reservations, easements and restrictions that do not materially adversely affect use of the Real Estate for operation of the Business.

    6.2    Seller has caused a survey of the Real Estate that meets the requirements of an ALTA/ASCM survey to be delivered to Purchaser. Such survey locates all of the improvements thereon, sets out all easements and encroachments and certifies that none of the Real Estate lies within a flood hazard area.

6.3   The cost of the title insurance report and insurance policy; real property appraisal and survey, shall be divided equally between the Sellers and Purchasers, and in the event the transactions contemplated by this Agreement are closed, the Sellers' portion shall reduce the cash portion of the Purchase Price.

## Section VII
## SELLERS AGENT

7.1   **Agent Authorized to Act for All Sellers.** Upon the execution of this Agreement, each of the Sellers shall be deemed to have irrevocably constituted and appointed Alan C. Neely (hereinafter sometimes referred to as the "Sellers Agent"), as the agent of each of them to act from and after the date hereof in accordance with the instructions of the Sellers to do such things and execute such documents that may be necessary, convenient or appropriate to facilitate the consummation of the transactions contemplated by this Agreement. Sellers hereby authorize and direct Sellers Agent to (i) receive payments under or pursuant to this Agreement and to disburse such payments to the Sellers and others, as contemplated by this Agreement; and (ii) receive and forward notices and communications pursuant to this Agreement. Following the Closing, Purchasers and the Company will deal directly with Sellers Agent on all matters concerning the Sellers and arising under or in connection with this Agreement, and will not be obligated to, and will not, notify, contact or otherwise communicate with the Sellers, or any of them, with respect to any such matter, specifically including but not limited to any matter for which indemnification or contribution to Purchasers from Sellers arising out of a claimed breach of a representation, warranty or covenant. In addition, Sellers Agent is hereby authorized to act on behalf of the Sellers in all matters, including, without limitation, with respect to negotiations of and consent to the determination of Purchase Price adjustments and to indemnification claims asserted by the Purchasers and regardless of whether paid in whole or in part from the Escrow Account. Any action taken by Sellers Agent pursuant to and in accordance with this Section VII shall be absolutely and irrevocably binding on each Seller as if such Seller had personally taken such action (or executed and delivered such document) or made such decision or determination in its own capacity. The Sellers Agent, acting in his capacity as such, shall have only the rights, power and authority granted in this Section VII. Notwithstanding any other provision of this Agreement, (x) with respect to those matters expressly covered by this Section VII, each of the Sellers hereby irrevocably relinquishes such Seller's right to act independently and other than through the Sellers Agent and (y) no Seller shall have any right by virtue or by availing of any provision in this Agreement, any such rights being irrevocably and exclusively delegated to the Sellers Agent who, acting in accordance with the terms hereof, shall be the sole party entitled to avail himself of the provisions of this Agreement.

7.2   **Purchasers' Reliance.** The Purchasers and the Company shall be fully protected in dealing with the Sellers Agent under this Agreement and may rely upon the authority of the Sellers Agent to act as the agent of all of the Sellers in accordance with the grant of authority to the Sellers Agent under this Section VII. Any payment by a Purchaser that is required to be paid to the Sellers under this Agreement may be paid to the Sellers Agent in his capacity as such and shall be considered a payment by the Purchaser to the Sellers. The appointment of the Sellers Agent is coupled with an interest and shall be irrevocable except upon the written agreement of all of the Sellers.

7.3   **Successor.** If there is a vacancy at any time in the position of Sellers Agent for any reason, or if Mr. Neely is unable or unwilling to serve in the position, the Sellers shall select a successor to fill such vacancy.

7.4 **Acknowledgment and Acceptance.** The Sellers Agent acknowledges that he has carefully read and understands this Agreement, hereby accepts such appointment and designation, and represents that he will act in his capacity as Sellers Agent in strict compliance with and conformance to the provisions of this Section VII.

7.5 **Actions of the Sellers Agent.** The Sellers Agent shall not be liable to the Purchasers or to the Sellers for any error of judgment, or any act done or step taken or omitted by him in good faith or for any mistake in fact or law, or for anything which he may do or refrain from doing in connection with this Agreement, except for his own bad faith or willful misconduct. The Sellers Agent may seek the advice of legal counsel in the event of any dispute or question as to the construction of any of the provisions of this Agreement or its duties hereunder, and he shall incur no liability to the Purchasers or the Sellers and shall be fully protected with respect to any action taken, omitted or suffered by him in good faith in accordance with the opinion of such counsel.

7.6 **Expenses.** Sellers will reimburse Sellers Agent for all reasonable expenses incurred by the Sellers Agent in connection with the performance of his duties hereunder. The Sellers Agent may from time to time submit invoices to the Sellers covering such expenses, which expenses shall be paid promptly by the Sellers.

7.7 **Agent's Obligations.** Notwithstanding anything to the contrary hereunder and for the avoidance of doubt, the parties hereby acknowledge and agree that duties and responsibilities of the Sellers Agent under this Agreement shall be limited to those of an agent of the Sellers as set forth in this Section VII, and that the Sellers Agent shall only act as the agent of the Sellers and shall have no liability to the Purchasers with respect to any liability or obligation of the Sellers under this Agreement or the related transactions, it being further acknowledged and agreed that this Section 7.7 is not intended to limit liability or affect obligations that Alan C. Neely may owe as an officer, director, manager, owner or holder of any beneficial interest in any Seller under this Agreement.

## Section VIII
## AGREEMENTS REGARDING THE SHARES

8.1 **The Employee-Owned Shares.** As provided in Sections 10.10 and 11.6, it is a condition of the transaction contemplated hereby that Alan C. Neely be employed by the Purchaser, and as provided in Section 2.2C, that Mr. Neely be the ultimate beneficial owner of the Shares to be issued and delivered as part of the Purchase Price. The parties have made the following additional agreements concerning the Shares:

    A. **Put Option.** The Shares shall be subject to Mr. Neely's right to require that the Company repurchase the Shares (the "Put Option"). The Put Option shall be exercisable during the period beginning two (2) years after the Closing Date and ending ninety (90) days thereafter, at a price equal to one hundred ten percent (110%) of the last reported sale price of the Company's shares on the tenth business day prior to the Closing Date.

    B. **Call Option.** The Shares shall also be subject to the Company's right to require that Mr. Neely sell his Shares back to the Company (the "Call Option") at the then current fair market value in the event that Mr. Neely's employment is terminated under certain conditions.

18

C. **Option Agreement.** The Company and Mr. Neely shall enter into the Option Agreement set forth in Exhibit 8.1C, evidencing Mr. Neely's Put Option and the Company's Call Option.

8.2 **Company's Right of First Offer.** If any Seller or distributee of a Seller, including Mr. Neely, holding Shares desires to transfer any or all of the Shares owned or held by such person, such holder (a "Selling Holder") shall deliver written notice (an "Offer Notice"), of such intention to transfer (an "Offer") to the Company. The Offer Notice shall identify the number of Shares subject to the Offer (the "Offered Shares"), the price per Share at which a sale is proposed to be made (the "Offer Price") (which Offer Price may be, but is not required to be, stated as an "at the market" price), and all other material terms and conditions of the proposed transfer. Each Seller agrees that such Seller will not enter into any discussions or negotiations with any person concerning a transfer except in full compliance with the provisions hereof.

A. The receipt of an Offer Notice by the Company shall constitute an Offer by the Selling Holder to sell to the Company the Offered Shares at the Offer Price and on all other material terms and conditions as the proposed transfer. For a period of 10 days after receipt of the Offer Notice, the Company shall have the right, but not the obligation, to accept such Offer as to all but not less than all the Offered Shares by giving a written notice of acceptance (which shall be deemed irrevocable) (an "Acceptance Notice") to the Selling Holder prior to the expiration of such 10-day period and, if such Offer is so accepted within such 10-day period, such Offer shall be irrevocable. Failure to deliver the Acceptance Notice before the expiration of such 10-day period shall be deemed a rejection of such Offer. The tender by the Company of an Acceptance Notice to the Selling Holder shall constitute an agreement by the Company to purchase, and by the Selling Holder to sell to the Company, the Offered Shares at the Offer Price and, except as otherwise provided for in this Section A, on the terms and conditions set forth in the Offer Notice. In the instance of an "at the market" price, the price shall be determined as of the last reported sale on the day prior to the date of the Acceptance Notice.

B. If the Offer Notice is accepted as to the Offered Shares within the 10-day period, the Company shall purchase, and pay the Offer Price in cash for, such Shares within a 20-day period after its delivery of an Acceptance.

C. Upon the rejection or waiver of the Offer by the Company in accordance with Section 8.2A or the failure of the Company to consummate the purchase of the Offered Shares within the time period prescribed by Section 8.2B, the Selling Holder shall have the right to sell the Offered Shares to the third party on terms and conditions not more favorable to the Selling Holder than those set forth in the Offer Notice, subject to compliance with federal and state securities laws as set forth in Section 3.30. If any Offered Shares are not sold pursuant to the provisions of this Section 8.2 prior to the expiration of ninety (90) after rejection or waiver of the Offer by the Company, such Offered Shares shall become subject once again to the provisions and restrictions of this Section 8.2.

D. If and to the extent any action required by this Section 8.2 to be taken within a specified period of time cannot be taken within such time period because of trading blackouts or other requirements necessary to assure compliance with securities laws, then the applicable time period shall be tolled for such amount of

19

time as necessary under the circumstances, and extended for an additional five (5) days thereafter.

## Section IX
## FURTHER COVENANTS OF PURCHASERS AND SELLERS

9.1  **Right of Access and Furnishing Information.** Each Seller shall give Purchasers or their duly appointed representatives (i) full access during normal business hours to the Purchased Assets and all Sellers' Business Records, including, but not limited to, customer lists, credit information, inventory sales and purchasing information and documentation relating to computer software, and Seller shall furnish such other information as Purchaser may from time to time reasonably request; (ii) authority to perform such reasonable inspections or tests on the Real Property, the Property and Plant and Equipment and the inventory as they shall deem appropriate to ensure that the Real Property is in compliance with all federal, state and local laws and regulations applicable thereto and in good condition and repair (ordinary wear and tear excepted); that the Property and Plant and Equipment is in good operating condition and repair and that the inventory is merchantable; provided that the performance of such inspections and tests does not unreasonably interfere with the operation of the Business; provided further that Seller shall deliver to Purchaser copies of all environmental reports that Seller has performed or had performed with respect to the Real Property or that Seller has in its possession, if any, and Purchaser shall deliver to Seller copies of environmental reports that Purchaser has performed with respect to the Real Property before the Closing; (iii) authority to perform such tests with respect to the accounting records of Seller, and the working papers of Seller's accountants with respect to the financial statements, as are deemed necessary by Purchaser or Purchaser's Accountants in order to ensure that the financial statements set out in Schedule 3.6 are complete and correct in all material respects and fairly present the financial position of Seller and the results of its operation; and (iv) authority to consult with Seller's officers and employees concerning the Purchased Assets and the Business. Sellers acknowledge that any inspections or tests performed by Purchasers shall neither diminish nor negate the warranties and representations made by Sellers to Purchasers in this Agreement. Purchaser may disclose any such information obtained concerning Sellers, the Purchased Assets or the Business to Purchasers' principal financing institution and other advisers of Purchasers to the extent Purchasers deem such disclosure necessary or desirable to enable such financiers and advisers to advise Purchasers concerning the Purchased Assets or the Business.

9.2  **Consents and Best Efforts.** As soon as practicable, Purchasers and Sellers, as applicable, will commence all other reasonable action required hereunder to obtain all applicable permits, licenses, consents, approvals and agreements of, and to give all notices and make all filings with, any third parties as may be necessary to authorize, approve or permit the full and complete sale, conveyance, assignment or transfer of the Purchased Assets by a date early enough to allow the transactions contemplated hereunder to be consummated by the Closing Date. Sellers shall apply for or obtain, at Sellers' expense, (i) any and all consents to transfer material permits or licenses or (ii) any and all new permits or licenses required for continued operation of the Business.

9.3  **Tax Filing.** Purchasers and Sellers agree that the purchase and sale provided for herein constitute an "applicable asset acquisition" within the meaning of § 1060 of the Code. Accordingly, the parties agree to report the transaction on Form 8594, and for any other required purpose, in a consistent manner.

9.4  **Corporate Existence.** After the closing, Industries and Enterprises shall each maintain its respective corporate existence as a corporation, and SunRay shall maintain its existence as a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Tennessee until five (5) years after the Closing Date; provided that if on such fifth anniversary date, a

20

Purchaser has duly notified a Seller of a claim for indemnification pursuant to Section 13.1, Seller shall maintain its corporate existence as hereinabove required until Purchaser's claim for indemnification shall have been finally determined and Seller shall have reimbursed Purchaser for the full amount of the indemnified liability, loss, claim, damage or expense.

9.5     **Name Change.** Industries and SunRay each agrees to change its name within thirty (30) days after the Closing Date to a name approved by the Purchaser, and not to use its present corporate name, or one confusingly similar thereto, in conducting any business activity after Closing.

9.6     **Liability Insurance.** Until December 31, 2009, Industries shall maintain policies of general liability and product liability insurance in amounts of not less than $1,000,000 for injury to or death of one person, for damage to property or as a result of one occurrence, and not less than $2,000,000 for an annual aggregate for such injury, death or damage, and issued by such insurance companies as shall be reasonably acceptable to Purchasers, covering the operations of the Industries Business prior to the closing, which policy shall name Purchasers as additional named insureds. The Sellers shall pay one-half the cost of this insurance coverage, up to a maximum of $125,000, and the Sellers' portion shall reduce the cash portion of the Purchase Price. The remainder of the cost will be borne by the Purchasers.

9.7     **Retention of Books and Records.** Each Seller shall retain for a period of five (5) years after the Closing Date, all of its books and records (including such records as may be stored in computer databases) relating to the Purchased Assets or the Business and not delivered to Purchasers at the Closing. During such period, Sellers will make such books and records available to Purchasers at Purchasers' cost and expense, for purposes of reasonable and legitimate inspection and copying. In the event a Purchaser requires the original of any document in the possession of a Seller, such Seller shall provide the same, if available, subject to Seller's right to inspect and copy the same. Sellers will have the right to destroy such books and records at any time after the end of the aforesaid period; provided, however, that Sellers shall give written notice to Purchasers prior to the time Sellers intend to destroy such books and records so that if a Purchaser wishes to take possession of all or some designated part of such books and records it may, at its expense, do so.

9.8     **Fulfillment of Conditions.** Between the date hereof and the Closing Date, Purchasers and Sellers shall take any and all action on their respective parts necessary or appropriate to cause all of the conditions precedent set forth in Section X, Section XI and Section XII to be fulfilled.

9.9     **Post-Closing Tax Distribution Payment.** Following the Closing, Purchasers will pay to the shareholders of Industries an amount equal to their 2006 tax liability (the "Industries Tax Distribution Payment"). The Industries Tax Distribution Payment to will be made as soon as practicable after the allocation of the Purchase Price has been completed in accordance with Section 2.3, and Industries' 2006 tax calculation through the Effective Date (as defined in Section 12.1) has been prepared and agreed to by both parties. The Industries Tax Distribution Payment will consist of the 2006 tax liability calculated through the Effective Date plus a $33,350 management fee owed by Industries to its shareholders for January and February 2006. Purchasers will also pay to Alan C. Neely, as the sole member of SunRay, an amount equal to his 2006 tax distribution (the "SunRay Tax Distribution Payment"). The SunRay Tax Distribution Payment will be made as soon as practicable after SunRay's 2005 tax return has been prepared and SunRay's 2006 tax calculation through the Effective Date has been prepared and agreed to by both parties. The SunRay Tax Distribution Payment will consist of the tax liability for 2005, and for January and February 2006.

21

## Section X
## CONDITIONS TO OBLIGATIONS OF PURCHASERS

Each and every obligation of Purchasers under this Agreement to be performed on or prior to the Closing Date shall be subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions:

10.1     **Representations and Warranties True at Closing.** The representations and warranties made by Sellers in or pursuant to this Agreement or given on behalf of any Seller hereunder shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date.

10.2     **Due Diligence Review.** Purchasers shall have Sellers' full cooperation in conducting a due diligence review of Sellers. Sellers shall have reasonably provided Purchaser and Purchasers' agents full and complete access to the property, books and records of Sellers and allowed Purchasers and Purchasers' agents to contact employees' accountants and personnel as selected by Sellers. The obligation of Purchasers to proceed with the transaction contemplated herein is expressly contingent upon the completion of such due diligence review and the Business and Purchased Assets being found to be satisfactory to Purchasers in Purchasers' sole discretion.

10.3     **Obligations Performed.** Each Seller shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

10.4     **Consents.** Each Seller shall have obtained and delivered to Purchasers written consents of all persons or entities whose consent is required to consummate the transactions contemplated herein and all of such consents shall remain in full force and effect at and as of the Closing.

10.5     **Delivery of Closing Documents.** Each Seller shall have delivered to Purchasers each of the closing documents listed and set forth in Section 12.2 hereof together with any additional documents Purchasers may reasonably request to effect the transactions contemplated herein.

10.6     **No Litigation or Government Investigations.** As of the Closing Date there shall be no litigation, including without limitation any litigation brought by any creditor of a Seller, or government investigation pending, in which an injunction is or may be sought against the transactions contemplated hereby or in which relief is sought against a Seller relating to this Agreement and the transactions described herein.

10.7     **No Investigations of Seller or Business.** As of the Closing Date there shall be no pending investigation by any municipal, state or federal government agency or regulatory body with respect to the Purchased Assets or the Business.

10.8     **No Material Change.** At the Closing, the Business and the Purchased Assets shall not have been materially and adversely affected as the result of fire, water, explosion, flood, act of God, accident or other casualty, material labor controversy, or any action by the United States or any other governmental authority, whether or not covered by insurance. Further, as of the Closing Date, and since December 31, 2005, Seller shall not have suffered any material adverse change in condition, financial or otherwise, of the Business.

10.9     **Environmental Conditions.** The Seller shall have corrected, to the extent requested by the Purchaser, any hazardous material condition at the Real Estate that is recommended to be corrected in

22

an environmental report (phase I, and phase II, if indicated) that is prepared by an engineer acceptable to both Sellers and Purchasers. One-half the cost of such engineering services and one-half the cost of such correction expenditures shall be liabilities of Seller and shall reduce the Purchase Price. In the event that Purchaser requests a correction of any hazardous material condition at the Real Estate that exceeds $13,500 and that Seller deems excessive and desires not to undertake, Seller may give written notice to Purchaser of its refusal to make the Correction and if the Purchaser does not retract or modify its request to Seller for Correction in a manner satisfactory to Seller in its sole discretion, in writing according to the method of notice as provided in Section 15.1 hereof, within five (5) business days after receipt of the notice from Seller, this Agreement shall thereon terminate, be null and void and each party shall be responsible for the costs that they may have incurred.

10.10 **Option, Employment and Non-competition Agreements.** Industries' and SunRay's president, Alan C. Neely, shall have entered into the Option Agreement (Exhibit 8.1C), the form of employment agreement attached as Exhibit 10.10A, and including the Restricted Stock Award Agreement provided for therein (the "Employment Agreement"), and a non-competition agreement in the form attached as Exhibit 10.10B (the "Neely Non-competition Agreement"). In addition, each of the respective Sellers' other shareholders and members who is an individual, and each of the individual beneficial owners or interest holders of each such shareholder or member that is an entity, shall have entered into a Non-competition Agreement in the form attached as Exhibit 10.10C (the "Shareholder Non-competition Agreements").

## Section XI
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of the Sellers to consummate the transaction contemplated herein shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

11.1 **Representations and Warranties True at Closing.** The representations and warranties made by Purchasers and the Company in this Agreement shall be true and correct on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date.

11.2 **Obligations Performed.** Each Purchaser shall have performed and complied with all of its obligations under this Agreement that are to be performed or complied with by it prior to or at the Closing.

11.3 **Delivery of Closing Documents.** Each Purchaser shall have delivered to Sellers each of the closing documents and instruments listed in Section 12.3 hereof together with any additional documents Sellers may reasonably request to effect the transactions contemplated herein.

11.4 **No Notices.** Sellers shall not have received any notices from Purchasers pursuant to the provision of Section 4.4 above.

11.5 **Consideration.** Sellers shall have received the cash portion of the Purchase Price in good funds via wire transfer and the Company shall have issued the Shares in accordance with Section 2.2.

11.6 **Option, Employment and Non-competition Agreements.** The Company shall have executed and entered into the Option Agreement, the Employment Agreement (and Restricted Stock Award Agreement provided for therein), the Neely Non-Competition Agreement and the Shareholder Non-competition Agreements.

23

11.7  **Company Board Nomination.** The Company shall have agreed to nominate Alan C. Neely for election to its Board of Directors for so long as Mr. Neely is employed under the Employment Agreement, subject to the Board of Directors' fiduciary obligations under Delaware law and duties and responsibilities under applicable securities laws and exchange listing requirements.

## Section XII
## THE CLOSING

12.1  **Time and Date.** Subject to the terms and conditions set forth herein, the closing of the transactions contemplated hereby (the "Closing") shall take place, effective as of March 3, 2006 (the "Effective Date"), by overnight delivery and facsimile and/or email transmission of documents and instruments such date as may be agreed upon by them, but in no event later than March 20, 2006. unless extended by written agreement of the parties (the "Closing Date").

12.2  **Deliveries by Sellers at Closing.** At the Closing, the Sellers shall deliver or cause to be delivered to the respective Purchasers the following executed instruments and agreements:

    A.  **Bills of Sale.** Bills of Sale transferring to Purchasers all of Sellers' right, title and interest in and to the respective Purchased Assets;

    B.  **Assignment and Assumption Agreements.** Assignment and Assumption Agreements assigning to Purchasers all of Sellers' respective right, title and interest in and to the duties and obligations arising from and after the Closing Date under the Contracts, the Leases and the Open Orders;

    C.  **Consents.** Written consents in the form and substance satisfactory to Purchasers of each person or entity whose consent is required to consummate the transactions contemplated herein;

    D.  **Certificates of Incumbency.** A certificate of incumbency evidencing the authority of each of the individuals executing on behalf of the respective Sellers this Agreement and any documents of transfer or any other nature in connection therewith;

    E.  **Authorizing Resolutions.** Resolutions of the stockholders of Industries, the directors of Enterprises, certified by an officer thereof, and joint written consent of the sole member and governor of SunRay, authorizing this Agreement and the transactions contemplated herein;

    F.  **Certificates of Sellers.** A certificate of each Seller's officer or member dated the Closing Date certifying (i) the fulfillment of the conditions specified in Article VIII hereof, and (ii) that all warranties and representations of such Seller contained in this Agreement are true and correct at and as of the Closing Date as though such warranties and representations were made at and as of such time;

    G.  **Escrow Agreement.** The Escrow Agreement executed by the Sellers.

    H.  **Employment Agreement; Non-competition Agreements and Option Agreement.** The Employment Agreement, Neely Non-competition Agreement and Option Agreement executed and delivered by Alan C. Neely, and the Shareholder Non-competition Agreements executed and delivered by each of the

24

shareholders or members of the respective Sellers who are individuals and by the individuals holding or owning the beneficial interests in each of the shareholders or members of the Sellers that are entities.

I.  **Additional Documents.** All such further instruments and documents as Purchasers may reasonably request for the more effective conveyance, assignment or transfer to the Purchasers of any of the Purchased Assets; and

J.  **Opinion of Counsel.** An opinion of legal counsel for the Sellers dated the Closing Date, in form and substance reasonably acceptable to the Purchaser.

12.3  **Deliveries by Purchasers at Closing.** At the Closing Purchasers will execute and deliver to Sellers the following:

A.  **Payment to Sellers.** Payment by wire transfer of the cash portion of the Purchase Price less the amount to be paid to the Escrow Account;

B.  **Payment to Escrow Agent.** Payment by wire transfer of the amount to be paid to the Escrow Account;

C.  **Issuance of Shares.** Issuance of the Shares in payment of the remaining portion of the Purchase Price in accordance with Section 2.2C;

D.  **Employment Agreement, Non-competition Agreements and Option Agreement.** The Employment Agreement, Neely Non-competition Agreement and Shareholder Non-competition Agreements, and Option Agreement executed and delivered on behalf of the Purchasers;

E.  **Escrow Agreement.** The Escrow Agreement executed by the Purchasers and the Escrow Agent;

F.  **Certificate of Incumbency.** A Certificate of Incumbency evidencing the authority of each of the individuals executing on behalf of Purchasers this Agreement and any documents of transfer or other nature in connection therewith;

G.  **Certificate of Resolutions of Board.** Resolutions of the Board of Directors of Purchasers, certified by the Secretary of Purchasers, authorizing this Agreement and the transactions contemplated herein, and resolutions of the Board of Directors of the Company, certified by the Secretary of the Company, authorizing the Guaranty of Purchaser's obligations hereunder by the Company;

H.  **Purchaser's Certificate.** A certificate of each Purchaser's authorized officer dated the Closing Date certifying that (i) the conditions specified in Section XI hereof have been fulfilled and (ii) all representations and warranties of such Purchaser contained herein are true and correct at and as of the Closing Date as though such warranties and representations were made at and as of such time;

I.  **Opinion of Purchaser's Counsel.** An opinion of legal counsel for Purchaser and the Company dated the Closing Date in form and substance reasonably acceptable to the Seller.

## Section XIII
## INDEMNIFICATION

13.1   **Indemnification.** Each Seller hereby agrees to indemnify and hold the Purchasers, the Company and their respective directors, officers, employees and agents (other than Alan C. Neely, who will be an employee of the Purchasers following the Closing), and their respective successors and assigns (all of such indemnified companies and individuals are collectively referred to hereafter as the "Indemnified Party") harmless from the following:

   A.   **Misrepresentation, Nonfulfillment of Agreement.** Any liability, loss, cost, expense, damage, claim or deficiency resulting from any misrepresentation set forth herein or in any Schedule hereto, any breach of any warranty set forth herein or any breach, nonfulfillment of or failure to perform any covenant, duty or obligation set forth herein on the part of the Seller;

   B.   **Inaccuracies in Closing Documents.** Any inaccuracy in, breach of or misrepresentation in any certificate or other document required to be delivered hereunder at the Closing by the Seller in accordance with any provision of this Agreement;

   C.   **Taxes.** Any claim against or liability of the Seller for delinquent or unpaid taxes of any kind or nature, including, without limitation, withholding taxes, and any related interest, penalty or fine, whether to the federal or any state or local government, agency or instrumentality, attributable to taxable periods ending on or before the Closing Date, except to the extent such taxes have been reserved against in the Closing Balance Sheet;

   D.   **Contingent Liabilities.** Any claim or liability arising out of a transaction or event occurring prior to the Closing Date, including a claim or liability arising out of or from a transaction or event occurring after the Closing Date with respect to products manufactured prior to the Closing Date, that is not reserved against or included as a liability on the Closing Balance Sheet; provided, however, that product warranty service in the ordinary course of business that does not involve litigation (including arbitration, mediation, or administrative or other adversarial proceedings) does not constitute a claim or liability subject to this Section 13.1D;

   E.   **Attending Costs and Expenses.** All liabilities, claims, actions, suits, proceedings, demands, assessments, judgments and costs incident to and reasonably incurred by the Indemnified Party on account of any of the foregoing, including, without limitation, reasonable attorney's fees and other expenses of investigation or litigation (including all arbitration, mediation, or administrative or other adversarial proceedings)

13.2   **Limits of Indemnification.** The liability under Section 13.1 hereof:

   A.   shall not arise unless the Indemnified Party suffers a Covered Breach. A "Covered Breach" means either:

      (i)   a single indemnifiable course of conduct, related set of circumstances, occurrence or event, by or as a result of which the damages suffered by Indemnified Party arising therefrom exceed Ten Thousand and 00/100

26

Dollars ($10,000.00), but is not subject to the Limited Litigation Indemnity, in which event the Seller shall be liable for the entire amount of such Covered Breach; or

(ii) a matter to which the Limited Litigation Indemnity under Section XIV applies, if the Purchasers' indemnity amount thereunder has been exceeded, in which event the Seller shall be liable for the excess of the Covered Breach over the Limited Litigation Indemnity amount.

B. shall in all events be limited to an amount equal to $15,840,000 minus Sellers' Transaction Expenses.

13.3 **Claims Against Escrow.** Any claim that an Indemnified Party may have against a Seller under this Agreement shall be made against the Escrow Account pursuant to the terms and conditions of this Agreement and the Escrow Agreement, and the Sellers shall be jointly and severally liable to the extent of the Escrow Account. To the extent that the amount of the Covered Breaches exceed the amount in the Escrow Account, the claim shall be made against the respective Seller.

13.4 **Method of Asserting Claims Against Seller.** All claims for indemnification under this Section XIII made by an Indemnified Party shall be asserted and resolved as follows:

A. In the event that any claim or demand for which a Seller would be liable hereunder is asserted against or sought to be collected from an Indemnified Party by a third party, the Indemnified Party shall promptly notify the Seller of such claim or demand, specifying the nature of such claim or demand and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim or demand) (the "Claim Notice"). For the purpose of this Section 13.4 "Notice Period" shall mean twenty (20) calendar days from the delivery of the Claim Notice (the "Notice Period"), except that in the event the Claim Notice relates to the institution of litigation or arbitration proceedings, the Notice Period shall extend until ten (10) calendar days prior to the due date, including any extension thereof, of a responsive pleading by the Indemnified Party. As to any Claim Notice, the Seller shall have the right to request an extension of the Notice Period in order to conduct an investigation of the Claim Notice in cooperation with the Indemnified Party, and such an extension request shall not be unreasonably refused. Within the Notice Period the Seller shall notify the Indemnified Party:

(i) whether or not the Seller disputes liability to the third party or to the Indemnified Party hereunder with respect to such claim or demand, and

(ii) whether or not Seller desires, at its sole cost and expense, to defend the Indemnified Party against such claim or demand. In the event that the Seller notifies the Indemnified Party within the Notice Period that the Seller desires to defend against such claim or demand, except as hereinafter provided, the Seller shall have the right to defend the Indemnified Party by appropriate proceedings, which proceedings shall be promptly settled or prosecuted by them to a final conclusion in such a manner as to avoid any risk of the Indemnified Party becoming subject to liability for any other matter. If the Indemnified Party desires to participate in, but not control, any such defense or settlement, it may do

27

so at its sole cost and expense. If the Seller elects not to defend the Indemnified Party against such claim or demand, whether by not giving timely notice as provided above or otherwise, then the amount of any such claim or demand, or, if the same be contested by the Seller or by the Indemnified Party (but the Indemnified Party shall have no obligation to contest any such claim or demand), then that portion thereof as to which such defense is unsuccessful shall be conclusively deemed to be a liability of the Seller hereunder; provided, however, that the Indemnified Party is otherwise entitled to indemnification with respect to such claim or demand under Section 13.1 hereof.

B. In the event the Indemnified Party should have a claim hereunder which does not involve a claim or demand being asserted against or sought to be collected from it by a third party, the Indemnified Party shall promptly send a Claim Notice with respect to such claim to the Seller. If the Seller does not notify the Indemnified Party within a twenty (20) day Notice Period that the Seller disputes such claim, it shall be conclusively deemed a liability of the Seller hereunder.

C. Nothing herein shall be deemed to prevent the Indemnified Party from making a claim hereunder for potential or contingent claims or demands provided the Claim Notice is made within the warranty survival period set out in Section 3.31 and sets forth the specific basis for any such potential or contingent claim or demand, to the extent then feasible and the Indemnified Party has reasonable grounds to believe that such a claim or demand may be made.

13.5 **Payment of Claims.** In the event that a Seller is required to make any payment under this Section XIII, the Seller shall direct the Escrow Agent to make such payment from the Escrow Fund within ten (10) days after the determination of such amount. If the amount in the Escrow Fund is insufficient to pay the claim in full, the Seller shall pay such excess amount within ten (10) days after such determination.

13.6 **Indemnified Claims by Purchaser.** Purchaser does hereby indemnify and agree to hold the Sellers, their respective officers, stockholders, members, managers, employees and agents, and their respective successors and assigns harmless from the following:

A. **Misrepresentation, Nonfulfillment of Agreement.** Any liability, loss, cost, expense, damage, claim or deficiency resulting from any misrepresentation set forth herein, breach of any warranty set forth herein or any breach, nonfulfillment of, or failure to perform any covenant, duty or obligation set forth herein on the part of Purchasers;

B. **Liabilities of Purchasers.** Any liability, loss, cost, damage or expense arising in connection with or resulting from the operation of the Business on or after the Closing Date, including without limitation, tax and environmental liability;

C. **Inaccuracies in Closing Documents.** Any inaccuracy in, breach of or misrepresentation in any certificate or other document required to be delivered hereunder at the Closing by Purchasers in accordance with any provision of this Agreement.

28

      D.      **Attending Costs and Expenses.** All liabilities, claims, actions, suits, proceedings, demands, assessments, judgments and costs incident to and reasonably incurred on account of any of the foregoing, including, without limitation, reasonable attorney's fees and other expenses of investigation or litigation (including all arbitration, mediation, or administrative or other adversarial proceedings); and

      13.7    **Method of Asserting Claim Against Purchaser.** All claims for indemnification under this Section XIII made against a Purchaser shall be asserted and resolved in the manner set out for asserting and resolving claims made against the Seller under Section 13.4 hereof, except any reference in Section 13.4 to Seller shall mean Purchasers and any reference to an Indemnified Party shall mean Seller. In the event that Purchaser is required to make any payment under this Section XIII, Purchaser shall pay the indemnitee entitled thereto such amount within ten (10) days after the determination of such amount in immediately available funds.

      13.8    **Exclusivity.** This Section XIII shall be the sole and exclusive remedy of the parties and their respective directors, officers, agents, successors and assigns for any breach of any representation and warranty or any nonfulfillment of any covenant contained in this Agreement or for any other matter in respect of which indemnification may be sought under Section XIII.

### Section XIV
### LIMITED LITIGATION INDEMNITY FOR INDUSTRIES AND SUNRAY

Purchasers hereby agree that they will indemnify Industries and SunRay from and against, all liabilities, claims, actions, suits, proceedings, demands, assessments, judgments, expense, damage, claim or deficiency, and costs incident to and reasonably incurred on account of any of the foregoing, including, without limitation, reasonable attorney's fees and other expenses of investigation or litigation (including all arbitration, mediation, or administrative or other adversarial proceedings), arising out of or related to product liability or warranty claims, including administrative action by the United States Department of Housing and Urban Development, arising on or after the Closing Date with respect to products sold by Industries or SunRay, or sold after the Closing Date but produced prior to the Closing Date, to the extent of a cumulative annual aggregate of One Hundred Thousand Dollars ($100,000) per year for each of the four years following the Closing Date. All claims for indemnification under this Section XIV against a Purchaser shall be asserted and resolved in the manner set out for asserting and resolving claims made against the Seller under Section 13.4 hereof, *except* that the provisions of Section 13.4A(ii) shall not apply, it being the intent and understanding of the parties that the Purchasers shall have complete and absolute control of the defense of any proceeding to which this Limited Litigation Indemnity shall apply. The parties expressly acknowledge their agreement that the matters listed on Schedule 3.16 are the sole responsibility of the Sellers and are not subject to this Limited Litigation Indemnity.

### Section XV
### MISCELLANEOUS

      15.1    **Notices.** All communications or notices required or permitted by this Agreement shall be in writing and shall be deemed to have been given at the earlier of the date when actually delivered to the officer of a corporate party designated below by personal delivery or facsimile transmission or the fifth day following the date deposited in the United States mail, certified or registered mail, postage prepaid, return receipt requested, and addressed as follows, unless and until any of such parties notifies the others in accordance with this Section 15.1 of a change of address:

If to the Company:        Southern Energy Homes, Inc.
                          Attention: Keith O. Holdbrooks
                                  President and Chief Executive Officer
                          144 Corporate Way
                          P. O. Box 390
                          Addison, Alabama 35540
                          Fax (256) 747-7586

with a copy (which shall not constitute notice) to:
                          Dan E. Batchelor, Esq.
                          Executive Vice President and General Counsel
                          Southern Energy Homes, Inc.
                          3284 Morgan Drive
                          Birmingham, Alabama 35243
                          Fax (205) 823-6001

with additional copy (which shall not constitute notice) to:
                          Carolyn L. Duncan
                          Cabaniss, Johnston, Gardner, Dumas & O'Neal LLP
                          2001 Park Place North, Suite 700
                          Birmingham, Alabama 35203

If to any Seller:         Alan C. Neely
                          405 South Broad Street
                          New Tazewell, Tennessee 37825
                          Fax (423) 626-6919

with a copy (which shall not constitute notice) to:
                          Ivan J. Schell, Esq.
                          Reed Weitkamp Schell & Vice PLLC
                          500 West Jefferson Street, Suite 2400
                          Louisville, Kentucky 40202
                          Fax (502) 562-2200

15.2    **Binding Agreement; Assignment.**  This Agreement and the right of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

15.3    **Entire Agreement.**  This Agreement, the Employment Contract, the Option Agreement, the Non-competition Agreement, the Escrow Agreement and the Schedules and Exhibits attached hereto, and the documents delivered pursuant hereto, constitute the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and revoke any prior agreement or understanding relating to the subject matter of this Agreement. Any amendment or modification to this Agreement must be in writing, signed by all parties.

15.4    **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. A signature on any counterpart may be a facsimile or an electronically transmitted signature, and such signature shall have the same force and effect as an original signature.

15.5    **Expenses.**  Whether or not the transactions contemplated hereby are consummated, the parties hereto will each pay their own attorneys' and accountants' fees, expenses and disbursements in connection with the negotiation and preparation of this Agreement and Schedules and all other costs and expenses incurred in performing and complying with all conditions to be performed under this Agreement; provided, however, that in the event the transactions contemplated hereby are consummated, the aggregate expenses paid by Industries and SunRay will not exceed $115,000. The cost of the items listed on Schedule 15.5 (which also includes the expenses provided for in Section VI, 9.6 and 10.9) will be divided equally between the Sellers and the Purchasers, subject to the cap on Sellers' expenses under Section 9.6, and to the extent paid by the Sellers will reduce the cash portion of the Purchase Price.

15.6    **Confidentiality.**  If, for any reason, the transactions contemplated by this Agreement are not consummated, any confidential information obtained by any party hereto from any other party shall not be disclosed or used by any such party, other than as required by applicable laws or regulations or in connection with any litigation arising under this Agreement, and each party shall return to the other all documents and written information obtained from such other party as such other party or its counsel may request in writing.

15.7    **Further Assurances.**  Upon reasonable request from time to time the parties hereto will execute and deliver such further instruments as are necessary or appropriate to the consummation of the transactions contemplated hereby.

15.8    **Construction.**  Within this Agreement, the singular shall include the plural and the plural shall include the singular, and any gender shall include the other genders, all as the meaning in the context of this Agreement shall require.

15.9    **Incorporation.**  All Schedules and Exhibits attached to this Agreement are by this reference incorporated herein and made an essential part hereof.

15.10   **Cooperation.**  The parties hereto will cooperate fully with each other and their respective counsel and accountants in connection with all steps to be taken as part of their obligations under this Agreement.

15.11   **Captions.**  The captions used in this Agreement are inserted for convenience only and shall not constitute a part hereof.

15.12   **Governing Law.**  This Agreement shall be governed and regulated and the rights and liabilities of all parties hereto shall be construed pursuant to the laws of the State of Tennessee, without regard to principles of conflicts of laws, except with respect to matters of law concerning the internal corporate affairs of any corporate entity which is a party to or the subject of this Agreement, and as to those matters the law of the jurisdiction under which the respective entity derives its powers shall govern.

IN WITNESS WHEREOF, the undersigned parties have entered into and executed this Agreement under seal to be effective as of the day and year first above written.

Sellers:

**GILES INDUSTRIES OF TAZEWELL, INCORPORATED**
a Tennessee corporation

By: _____/s/ Alan C. Neely_____ (Seal)
Alan C. Neely
Its President and Authorized Seller's Agent

**R.O. GILES ENTERPRISES, INC.**
a Tennessee corporation

By: _____/s/ Alan C. Neely_____ (Seal)
Alan C. Neely
Its Authorized Seller's Agent

**SUNRAY RV, LLC**
a Tennessee limited liability company

By: _____/s/ Alan C. Neely_____ (Seal)
Alan C. Neely
Its Sole Member and Governor


Purchasers:

**GILES ACQUISITION CORP.**
an Alabama corporation

By: _____ (Seal)
Keith O. Holdbrooks
Its President

**SUNRAY ACQUISITION, LLC**
an Alabama limited liability company

By: _____ (Seal)
Keith O. Holdbrooks
Its President

_____/s/ Alan C. Neely_____
Alan C. Neely

32

IN WITNESS WHEREOF, the undersigned parties have entered into and executed this Agreement under seal to be effective as of the day and year first above written.

Sellers:

**GILES INDUSTRIES OF TAZEWELL, INCORPORATED**
a Tennessee corporation

By:_____ (Seal)
      Alan C. Neely
      Its President and Authorized Seller's Agent

**R.O. GILES ENTERPRISES, INC.**
a Tennessee corporation

By:_____ (Seal)
      Alan C. Neely
      Its Authorized Seller's Agent

**SUNRAY RV, LLC**
a Tennessee limited liability company

By:_____ (Seal)
      Alan C. Neely
      Its Sole Member and Governor


Purchasers:

**GILES ACQUISITION CORP.**
an Alabama corporation

By:_____ (Seal)
      Keith O. Holdbrooks
      Its President

**SUNRAY ACQUISITION, LLC**
an Alabama limited liability company

By:_____ (Seal)
      Keith O. Holdbrooks
      Its President


_____
Alan C. Neely

32