UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

In Re: FEMA TRAILER                                     MDL NO. 07-1873
        FORMALDEHYDE PRODUCTS
        LIABILITY LITIGATION
                                                        SECTION "N"  (4)

THIS DOCUMENT RELATES TO
ALL CASES

## ORDER AND REASONS

Before the Court is the Defendant United States of America's Motion to Dismiss Plaintiffs'

FTCA and Contract Claims for Lack of Subject Matter Jurisdiction (Rec. Doc. 196).  After hearing

oral argument[1] from counsel on July 23, 2008, and after reviewing the Complaint, the memoranda

of the parties, and the applicable law, the Court rules as set forth herein.

I.      **INTRODUCTION**

First, the undersigned notes that the motion presently before the Court addresses only the

threshold inquiry of whether Plaintiffs' claims against the government should be dismissed at this

early juncture in these proceedings.  In other words, the issue before the Court is merely whether

Plaintiffs can state a legally sufficient and valid claim cognizable under the law, given statutory and

jurisprudential authority affording the government immunity from suit in some instances.  This

Court's decision in no way suggests or is meant to suggest any finding of liability against any party.

---

[1]      References to the "transcript" herein pertain to the July 23, 2008 oral argument.

All remaining claims are, of course, subject to discovery and, ultimately, trial on the merits.

## II.     <u>BACKGROUND</u>

On August 27, 2005, in anticipation of the approaching massive Category 4 hurricane named "Katrina," a federal emergency declaration was issued for Louisiana, which authorized the Federal Emergency Management Agency ("FEMA") to begin pre-positioning commodities and emergency management personnel.  (Ex. 5 to Rec. Doc. 196, FEMA09-000119). The very next day, the same federal emergency declarations were issued for Mississippi and Alabama. (*Id.*)

On August 29, 2005, Hurricane Katrina made landfall.  (Ex. 5 to Rec. Doc. 196, FEMA09-000118).  This storm has since been described as the most destructive natural disaster in United States history, surpassing the Chicago Fire of 1871, the San Francisco Earthquake and Fire of 1906, and Hurricane Andrew in 1992.   (Ex. 1 to Rec. Doc. 196, WH-000013).  Hurricane Katrina's destructive winds were accompanied by a 27-foot storm surge,[2] which impacted nearly 93,000 square miles from Mobile, Alabama, to New Orleans, Louisiana.  (Ex. 1 to Rec. Doc. 196, WH-00009, WH-000013-000014).  Additionally, the New Orleans area experienced levee failures at the 17th Street Canal, the London Avenue Canal, and the Industrial Canal, which together flooded approximately 80 percent of the city and its surrounding areas. (Ex. 1 to Rec. Doc. 196, WH-000014).   Over 1,320 people died in this disaster, and an estimated 300,000 homes were left uninhabitable, leaving hundreds of thousands homeless.  (Ex. 5 to Rec. Doc. 196, FEMA09-000118; Ex. 1 to Rec. Doc. 196, WH-000015).   The very same day Hurricane

---

[2]        The extraordinary storm surge overtopped levees in several areas, most notably along the Mississippi River-Gulf Outlet ("MR GO"), causing several feet of water to flood the entirety of St. Bernard Parish and parts of Plaquemines Parish.

Katrina made landfall, President George W. Bush, under the authority of the Robert T. Stafford

Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5206, ("the Stafford Act"),

declared the states of Louisiana, Mississippi, and Alabama "major disasters" and, thus,

authorized FEMA to respond to those disasters. (Ex. 3 to Rec. Doc. 196).

Less than one month later, on September 24, 2005, Hurricane Rita made landfall along

the Texas-Louisiana border.  (Ex. 2 to Rec. Doc. 196, LARR-0003).  Rita brought with it a 20-

foot storm surge, which greatly impacted more than 85,500 square miles in Texas and Louisiana.

(Ex. 2 to Rec. Doc. 196, LARR-00003, LARR-00011). Hurricane Rita is said to have been the

third most expensive natural disaster in our nation's history.  (Ex. 2 to Rec. Doc. 196, LARR-

00003). Rita left an estimated 23,000 homes in Texas and Louisiana uninhabitable.  (Ex. 2 to

Rec. Doc. 196, LARR-000012). In response, President Bush declared both Texas and Louisiana

"major disasters" under the Stafford Act. (Ex. 6 to Rec. Doc. 196).

FEMA immediately began attempting to find emergency housing for the hundreds of

thousands of people who were left homeless or displaced as a result of these storms.  One

Individual Assistance ("IA") program that FEMA administers to aid disaster victims is the

Individual and Household Assistance Program ("IHP").  This particular program, which provides

housing assistance, is the primary mechanism to assist individuals and households in their

recovery from damages caused by a disaster. (Ex. 5 to Rec. Doc. 196, FEMA09-000127,

FEMA09-000264). IHP assistance includes (1) financial aid to repair and/or replace property lost

or destroyed; (2) rental assistance to renters and homeowners whose homes are uninhabitable;

and (3) direct assistance such as emergency housing units ("EHUs")[3] when housing resources are

---

[3]     As discussed in more detail hereinafter, EHUs were to consist primarily of: (1) travel trailers; (2) park model trailers; and (3) manufactured housing, i.e., mobile homes.

3

not available within an affected area . (Ex. 5 to Rec. Doc. 196, FEMA09-000263; Ex. 8 to Rec. Doc. 196, ¶4).

Even before Hurricane Katrina made landfall, FEMA's Housing Area Command began planning to address potential shortfalls in shelter and housing. (Ex. 5 to Rec. Doc. 196, FEMA09-000209).  In response to Hurricane Katrina, FEMA promptly procured approximately 20,000 existing EHUs and made plans to purchase another 100,000 EHUs.  (*Id.*)  FEMA claims it initially planned for disaster victims to find shelter in  hotels, motels, cruise ships, shelters, tents, and with friends and relatives immediately following Hurricane Katrina.  (Ex. 5 to Rec. Doc. 196, FEMA09-000154). Then, FEMA planned to transfer the disaster victims to EHUs. Finally, FEMA planned to transition disaster victims to apartments, etc., to address longer-term housing needs.  (*Id*).

Kevin Souza, the Acting Deputy Director of the Individual Assistance Division of FEMA during the rebuilding of the Gulf Coast Region following Hurricanes Katrina and Rita until May 2008, has explained that "the massive damage to housing stock" in the area "created an urgent and immediate need for an unprecedented number of EHUs." (Ex. 8 to Rec. Doc. 196, ¶6). These EHUs were to consist primarily of: (1) travel trailers; (2) park model trailers; and (3) manufactured housing, i.e., mobile homes.  Mobile homes are relatively large and are designed to be used as permanent housing.  Their manufacture is regulated by the United States Department of Housing and Urban Development ("HUD").  (Rec. Doc. 109, ¶¶18-20).[4]  Travel

---

[4]     HUD requires manufacturers of mobile homes to use special plywood and particle board in the construction of mobile homes. Specifically, the applicable regulation provides that:

> All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed . . . 0.2 parts per million . . . [and] . . . 0.3 ppm [respectively].

4

trailers and park model trailers, on the other hand, are smaller than their mobile home

counterparts and are designed to provide temporary living quarters to individuals.  (*Id.*) Both

travel trailers and park model trailers are exempt from HUD construction standards, including

those relating to acceptable formaldehyde levels.[5]  (*Id.*)

FEMA claims that, initially, it intended to rely primarily on mobile homes wherein

disaster victims could be re-located to mobile home cities set up throughout the affected areas.

(Ex. 8 to Rec. Doc. 196, ¶6).  However, state and local officials apparently objected to this plan,

asserting that disaster victims should be placed in, or as close as possible to, their devastated

communities to encourage and promote rebuilding and recovery efforts. (*Id.*). In an attempt to

satisfy these objections, FEMA made the decision to rely primarily upon travel trailers and park

---

24 CFR §3280.308(a)(1) & (2). HUD requires that manufacturers use these materials to target an indoor ambient formaldehyde air quality level of 0.4 ppm or 400 ppb. (See Ex. 9 to 196, HUD-000007 to HUD-000013). HUD also requires that:

> (a) Each manufactured home shall have a Health Notice on formaldehyde emissions prominently displayed in a temporary manner in the kitchen (i.e., countertop or exposed cabinet face) . . .

> (b) The Notice shall be legible and typed using letters at least 1/4 inch in size. The title shall be typed using letters at least 3/4 inch in size.

> (c) The Notice shall not be removed by any party until the entire sales transaction has been completed. . . .

24 CFR §3280.309 (a-c).

[5]     This particular HUD regulation provides, in pertinent part:

> (g) Recreational vehicles. Recreational vehicles are not subject to this part, part 3280, or part 3282. A recreational vehicle is a vehicle which is:

>> (1) Built on a single chassis;
>> (2) 400 Square feet or less . . .;
>> (3) Self-propelled or permanently towable by a light duty truck;
>> (4) **Designed primarily not for use as a permanent dwelling but as temporary living quarters** . . . .

24 CFR §3282.8(g) (emphasis added).

models which, unlike mobile homes, could be placed in, or in close proximity to, the devastated communities. (*Id.*).

## III.   CONTENTIONS RAISED IN THE PENDING MOTION

In this multi-district litigation ("the MDL"), referred to as "In Re: FEMA Trailer Formldehyde Products Liability Litigation," certain named plaintiffs have filed suit against the United States through FEMA and several Defendant manufacturers, claiming that they either lived or resided along the Gulf Coast of the United States in travel trailers, park models, and manufactured homes provided to them by FEMA after Hurricanes Katrina and Rita made landfall in August and September of 2005, respectively.   Plaintiffs claim to have been exposed to purportedly high levels of formaldehyde contained in these EHUs, and to have suffered damages as a result.

In the present motion to dismiss, FEMA seeks dismissal from this lawsuit, claiming immunity from suit.  Plaintiffs, on the other hand, argue that FEMA is not immune from suit and, indeed, erred (1) in its initial selection of travel trailers, park model trailers, and mobile homes as EHUs for hurricane disaster victims; (2) in its actual physical provision of the EHUs for use by Plaintiffs; and (3) in its response to concerns and complaints of formaldehyde exposure in the EHUs after they were placed in use.

## IV.   LAW AND ANALYSIS

### A.   Legal Standard

FEMA's motion is brought under both Rule 12(b)(1) of the Federal Rules of Civil Procedure and, alternatively, under Rule 56 of the Federal Rules of Civil Procedure.  Thus, the Court must first determine whether this suit should be dismissed as a matter of law because the

Court lacks subject matter jurisdiction over these claims, as FEMA contends.  The burden of

proof for a Rule 12(b)(1) motion is on the party asserting jurisdiction. *Ramming v. United States*,

281 F.3d 158 (5th Cir. 2001). As the United States Court of Appeals for the Fifth Circuit has

stated:

> When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12
> motions, the court should consider the Rule 12(b)(1) jurisdictional attack
> before addressing any attack on the merits. *Hitt v. City of Pasadena*, 561
> F.2d 606, 608 (5th Cir.1977) (per curiam). This requirement prevents a
> court without jurisdiction from prematurely dismissing a case with
> prejudice. *Id.* The court's dismissal of a plaintiff's case because the
> plaintiff [sic] lacks subject matter jurisdiction is not a determination of the
> merits and does not prevent the plaintiff from pursuing a claim in a court
> that does have proper jurisdiction. *Id.*

*Ramming*, 281 F.3d at 161.

The  Fifth Circuit explained in *Montez v. Department of the Navy*, 392 F.3d 147 (5th Cir.

2004), that generally "the district court can resolve factual disputes in determining jurisdiction

pursuant to a Rule 12(b)(1) motion for dismissal." *Id*. at 148. However, where the dispute is

determinative of both the federal jurisdiction question and the underlying federal cause of action,

and thus are interdependent, a district court might err where it resolves the disputed factual issue

in favor of the government. The *Montez* case arose in the context of the Federal Tort Claims Act

("FTCA").  The Fifth Circuit explained:

> In general, where subject matter jurisdiction is being challenged, the trial
> court is free to weigh the evidence and resolve factual disputes in order to
> satisfy itself that it has the power to hear the case. See *Land v. Dollar*, 330
> U.S. 731, 735 & n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). "A court may
> base its disposition of a motion to dismiss for lack of subject matter
> jurisdiction on (1) the complaint alone; (2) the complaint supplemented by
> undisputed facts; or (3) the complaint supplemented by undisputed facts
> plus the court's resolution of disputed facts." [*Robinson v. TCI/US West
> Communications Inc.*, 117 F.3d 900, 904 (5th Cir. 1997)]. In short, no

7

presumptive truthfulness attaches to the plaintiff's allegations, and the
court can decide disputed issues of material fact in order to determine
whether or not it has jurisdiction to hear the case.

However, where issues of fact are central both to subject matter
jurisdiction and the claim on the merits, we have held that the trial court
must assume jurisdiction and proceed to the merits. In circumstances
where "the defendant's challenge to the court's jurisdiction is also a
challenge to the existence of a federal cause of action, the proper course of
action for the district court . . . is to find that jurisdiction exists and deal
with the objection as a direct attack on the merits of the plaintiff's case"
under either Rule 12(b)(6) or Rule 56. *Williamson v. Tucker*, 645 F.2d
404, 415 (5th Cir. 1981); see also *Daigle v. Opelousas Health Care, Inc.*,
774 F.2d 1344, 1347 (5th Cir. 1985).

As we stated in *Williamson*,

[N]o purpose is served by indirectly arguing the merits in the context of
federal jurisdiction. Judicial economy is best promoted when the existence
of a federal right is directly reached and, where no claim is found to exist,
the case is dismissed on the merits. This refusal to treat indirect attacks on
the merits as Rule 12(b)(1) motions provides, moreover, a greater level of
protection to the plaintiff who in truth is facing a challenge to the validity
of his claim: the defendant is forced to proceed under Rule 12(b)(6) . . . or
Rule 56 . . . both of which place greater restrictions on the district court's
discretion.

645 F.2d at 415. Therefore, we follow our general rule in holding that a
jurisdictional attack intertwined with the merits of an FTCA claim should
be treated like any other intertwined attack, thereby making resolution of
the jurisdictional issue on a 12(b)(1) motion improper.

*Montez*, 392 F.3d at 149 -150.

Thus, as Judge Duval determined in *In Re Katrina Canal Breaches*,  471 F. Supp.2d 684

(E.D. La. 2007), and under other Fifth Circuit jurisprudence, this Court must determine whether

FEMA's challenge to the Court's jurisdiction is also a challenge to the existence of a federal

cause of action. If so, then the proper course of action for the Court is to find that jurisdiction

exists and deal with the subject motion as a Rule 12(b)(6) or Rule 56 motion. Here, Plaintiffs

8

maintain this Court should determine that FEMA's challenge to subject matter jurisdiction is indirectly a challenge to the existence of their federal cause of action, which they claim should cause the Court to conclude that jurisdiction exists and decide the matter in terms of Rule 56 of the Federal Rules of Civil Procedure. (See Rec. Doc. 348, p. 4).  After reviewing the allegations of Counts 1, 2 and 3 of Plaintiffs' Administrative Master Complaint ("AMC")(Rec. Doc. 109), the parties' memoranda, and the applicable law, this Court finds that the arguments raised by FEMA do, indeed, call into question whether a cause of action exists.  Thus, the Court will consider all the evidence presented and will decide this motion under Rule 56 of the Federal Rules of Civil Procedure.

### B.    Analysis

The United States as a sovereign "is immune from suit save as it consents to be sued," and without such consent, a district court lacks subject matter jurisdiction over claims against it. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).  In other words, the United States may not be sued without its consent under the doctrine of sovereign immunity. See *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). However, the FTCA provides that "the United States shall be liable, respecting the provision of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances. . .." 28 U.S.C. § 2674. Thus, based on this waiver, Plaintiffs have sued FEMA contending that it acted negligently in selecting and providing EHUs to Plaintiffs and in responding to complaints and concerns of formaldehyde in these EHUs.

FEMA, in the instant motion, has moved to dismiss Counts 1, 2, and 3 of the AMC (Rec. Doc. 109), maintaining that the FTCA did not waive sovereign immunity for the alleged

wrongdoings claimed by Plaintiffs.

1.    **COUNT 1 of the AMC**

In Count 1, Plaintiffs raise claims under Louisiana Civil Code Articles 2317, 2317.1 and 2696, asserting implied or express contract claims for FEMA's alleged breach of warranty and guarantee arising out of Plaintiffs' implied or express lease of EHUs from FEMA.  (Rec. Doc. 109, ¶¶ 99-108).  FEMA argues that Plaintiffs' claims in Count 1 must be dismissed because they are based upon express or implied contracts with the United States, and the FTCA does not waive sovereign immunity for contract claims.  *Davis v. United States*, 961 F.2d 53, 56 (5th Cir. 1991).

Plaintiffs assert that their claims are not contract-based claims, but instead, are tort-based claims sounding in general negligence, which are cognizable under the FTCA, and not under the Tucker Act, 28 U.S.C. §1491 or the Little Tucker Act, 28 U.S.C. §1346(a)(2).  The Court will address Plaintiffs' claims (1) under La. C. C. Art. 2696, and (2) under La. C. C. Arts. 2317 and 2317.1.  As for Plaintiffs' claims under La. C. C. Art. 2696, Plaintiffs do not challenge FEMA's argument that this Court lacks jurisdiction over these claims.  Plaintiffs' counsel confirmed this during oral argument on July 23, 2008.  (Transcript, p. 35).  Thus, these claims are hereby dismissed.

As for Plaintiffs' claims under Louisiana Civil Code articles 2317 and 2317.1,[6] FEMA concedes that these claims sound in negligence and are not barred by the Tucker Act. Nevertheless, FEMA argues that dismissal of these claims is required because they fall within the discretionary function exception for the same reason that the other tort claims are barred (see

---

[6]    These claims specifically deal with acts of others and acts of things in custody.

discussion of Count 2 of the AMC, *infra*).  Because this Court finds that the discretionary

function exception may not apply to all Plaintiffs' claims regarding FEMA's insufficient

response to complaints and concerns of formaldehyde in EHUs (for the reasons explained

hereinafter), Plaintiffs' claims under Louisiana Civil Code articles 2317 and 2317.1 as to that

particular theory of recovery remain intact and shall not be dismissed on this motion.  However,

as for Plaintiffs' other claims regarding the selection and provision of EHUs, to which this Court

found that the discretionary function exception does apply (for the reasons explained

hereinafter), Plaintiffs' claims under Louisiana Civil Code articles 2317 and 2317.1 are

dismissed as to those theories only.

### 2.    COUNT 2 of the AMC

Count 2 of the AMC is asserted under Louisiana Civil Code article 2316 and challenges

FEMA's decisions regarding the use and provision of travel trailers, park model trailers, and

mobile homes as temporary emergency housing for Hurricanes Katrina and Rita disaster victims,

and it challenges FEMA's actions in response to complaints and concerns about occupants'

potential exposure to formaldehyde in EHUs.  FEMA claims that the discretionary function

exceptions to the FTCA and the Stafford Act bar Plaintiffs' FTCA claims and require the

dismissal of Count 2 of the AMC.

The Stafford Act provides that the government "shall not be liable" for any claim based

on a federal agency's or employee's "exercise or performance of or the failure to exercise or

perform a discretionary function or duty." 42 U.S.C. § 5148.  Congress enacted the Stafford Act

in recognition of the fact that "disasters often cause loss of life, human suffering, loss of income,

and property loss and damage" and "often disrupt the normal functioning of governments and

communities, and adversely affect individuals and families with great severity." 42 U.S.C.

§5121. The Stafford Act is "designed to assist the efforts of . . . affected States in expediting the

rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of

devastated areas." *Id*.  Thus, FEMA avers that the "non-liability" provision found at 42 U.S.C.

§5148 of the Stafford Act precludes all claims arising from its disaster relief actions because

these actions were all discretionary in nature.  This particular provision adopts the discretionary

function language of the FTCA's 28 U.S.C. §2680(a), and is subject to the same determination of

whether a particular act or decision at the basis of a claim was indeed entitled to the

"discretionary function" immunity as construed by Supreme Court jurisprudence. See *Watson v.*

*Federal Emergency Management Agency,* 2006 WL 5249703, 3 (S.D.Tex. 2006).  As one federal

Court noted, "[t]his Court has found only a handful of cases discussing the discretionary function

exception under the Stafford Act, and these cases have consistently used the 'discretionary

function' exception analysis as set out in [*Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct.

1954, 100 L.Ed.2d 531 (1988)]." See *United Power Association v. FEMA*, 2000 WL 33339635

1, 2 (D.N.D. Sept.13, 2000).  Thus, this Court's analysis of the discretionary function exception

is the same under both the Stafford Act and the FTCA.

The discretionary function exception is set forth in the FTCA and limits FEMA's waiver

of sovereign immunity under the Act by providing that the waiver will not apply to:

> [a]ny claim based upon an act or omission of an employee of the
> Government, exercising due care, in the execution of a statute or
> regulation, whether or not such statute or regulation be valid, or based
> upon the exercise or performance or the failure to exercise or perform a
> discretionary function or duty on the part of a federal agency or an
> employee of the Government, whether or not the discretion involved be
> abused.

28 U.S.C. § 2680(a).  The exception covers only acts that "'involv[e] an element of judgment or choice.' " *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (citing *Berkovitz*, 486 U.S. at 536).  Thus, "'it is the nature of the conduct, rather than the status of the actor,' that governs whether the exception applies."  *Id*. (citing *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984), *reh'g denied*, 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (1984); see also *Baldassaro v. United States*, 64 F.3d 206 (5th Cir. 1995).  The purpose of the exception is to "'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " *Gaubert*, 499 U.S. at 323 (citing *Varig Airlines*, 467 U.S. at 814).  Therefore, the exception "'protects only governmental actions and decisions based on considerations of public policy.' " *Gaubert*, 499 U.S. at 323; *Berkovitz*, 486 U.S. at 536-537.  The Fifth Circuit has specifically noted the following regarding section 2680(a):

> This subsection contains two clauses beginning with "based upon" and separated by the disjunctive "or." These clauses set forth two separate exceptions to the FTCA. The first clause, exempting actions mandated by statute or regulation, applies only if the actor has exercised due care. The second clause, exempting actions based on a discretionary function, contains no due care requirement.

*Buchanan v. United States*, 915 F.2d 969, 970-71 (5th Cir. 1990)(internal citations omitted).

The Supreme Court has held that "when established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.  The *Gaubert* Court concluded that, in light of this presumption, to survive a motion to dismiss based on the discretionary function exception a

complaint "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Id.* at 324-25. The Court noted that, in determining whether the discretionary function exception bars a suit against the government, the focus of the inquiry is on the nature of the action taken and on whether that action is susceptible to policy analysis. *Id.*

The *Berkovitz* determination requires a two-step process. First, a court must determine whether the action is "a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice." *Id.*, citing *Dalehite v. United States*, 346 U.S. 15, 34, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The Supreme Court continued:

> Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

*Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. Thus, "if an employee violates a mandatory regulation 'there will be no shelter from liability because there is no room for choice.'" *Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935 (E.D. La. March 10, 1998) (citing *Gaubert*, 499 U.S. at 324).

However, the discretionary function exception does not protect all actions that involve an element of choice. The second inquiry is whether that judgment or choice is based on considerations of public policy. "The discretionary function exception insulates the

14

Government from liability if the action challenged in the case involves the permissible exercise

of policy judgment." *Berkovitz*, 486 U.S. at 537.  Justice Scalia's concurring opinion in *Gaubert*

is instructive with regard to the proper application of this standard:

> The so-called discretionary function exception to the [FTCA] does not
> protect all governmental activities involving an element of choice.
> *Berkovitz v. United States*, 486 U.S. 531, 536-537, 108 S.Ct. 1954,
> 1958-1959, 100 L.Ed.2d 531 (1988). The choice must be "grounded in
> social, economic, [or] political policy," *United States v. Varig Airlines*,
> 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984), or, more
> briefly, must represent a "policy judgment," *Berkovitz*, supra, 486 U.S., at
> 537, 108 S.Ct., at 1959. Unfortunately, lower courts have had difficulty in
> applying this test.

499 U.S. at 335.  Continuing, Justice Scalia explained:

> In my view a choice is shielded from liability by the discretionary function
> exception if the choice is, under the particular circumstances, one that
> ought to be informed by considerations of social, economic, or political
> policy and is made by an officer whose official responsibilities include
> assessment of those considerations.

*Id*.

Thus, applying the *Berkovitz* test to this case, the Court shall address these two inquiries

as they relate to the challenged governmental actions, as identified in the AMC and also as

identified by Plaintiffs at the July 23, 2008 oral argument: (1) FEMA's selection of the EHUs;

(2) FEMA's provision of the EHUs to hurricane victims; and (3) FEMA's response to reports of

formaldehyde exposure in these EHUs.  (Rec. Doc. 109; Transcript, p. 20).

### a.      FEMA's Initial Selection of the EHUs

As previously explained herein, the EHUs selected for use by FEMA consisted primarily

of: (1) travel trailers; (2) park model trailers; and (3) manufactured housing, i.e., mobile homes.

Mobile homes are relatively large, are designed to be used as permanent housing, and are

15

regulated by HUD.  Travel trailers and park model trailers, on the other hand, are smaller than

mobile homes, are designed to provide temporary living quarters to individuals, and are exempt

from HUD construction standards, including those relative to acceptable formaldehyde levels.

### (1) Was there a statute, regulation, or policy that specifically prescribed the course of action for FEMA to follow?

Whereas Plaintiffs claim there was such a specific procedure in place that prescribed

FEMA's course of action in this instance, FEMA disagrees.  Specifically, Plaintiffs argue that

every EHU selected by FEMA (whether it was a mobile home, a park model, or a travel trailer)

was intended by FEMA to serve as housing, and potentially, *long-term* housing.  Plaintiffs

argue that FEMA had a federal policy mandate to provide EHUs that were safe and habitable.

In support of this assertion, Plaintiffs note that the Declaration of FEMA's Kevin Souza states

that FEMA relied on vendors and manufacturers to provide "safe habitable housing units. . .."

and that FEMA believed that these EHUs "would provide safe and habitable" housing. (Exhibit

8 to Rec. Doc. 196, ¶7).  Further, the Declaration of Bryan McCreary[7] states that FEMA "relied

exclusively upon the vendors' and manufacturers' expertise and experience. . .to construct and

provide FEMA with new units. . .that would provide disaster victims with a safe, habitable

place to live. . .." (Exhibit 10 to Rec. Doc. 196, ¶10).  Plaintiffs also note that FEMA

Administrator David Paulison has explained that "FEMA [is] committed to ensuring that

victims of disaster have a safe and healthy place to live during the recovery period." (Ex. 18 to

Rec. Doc. 196 at 00008).

---

[7]     McCreary is the Chief of the NETC and Regional Support Section, Acquisition Operations Branch, Office of Acquisition Management, FEMA, a component of the Department of Homeland Security ("DHS"). (Ex. 10 to Rec. Doc. 196, ¶1).

Essentially, Plaintiffs claim that, even if FEMA had a choice as to the *type* of housing it was to provide in response to the devastation caused by Hurricane Katrina, it did not have a true choice when it came to whether or not to provide *safe* housing.  In other words, Plaintiffs maintain that FEMA had a discretionary choice as to *type* of housing, but all the while operated within a larger mandate of *safety*.

Explaining this position, Plaintiffs note that under the federal regulations that implement the Stafford Act, a "displaced applicant" is one "whose primary residence is uninhabitable. . .." The term "uninhabitable is defined as a "dwelling. . . not safe, sanitary, or fit to occupy."  44 C.F.R. § 206.11.  Plaintiffs further reference the following public statement by Harvey E. Johnson, FEMA's Acting Deputy Administrator and Chief Operating Officer:

> FEMA only provides temporary disaster housing units when all other housing resources, including rental units, are unavailable.  The assistance is only used as a last resort to provide safe, secure, and sanitary housing for eligible disaster victims.

(Ex. 1 to Rec. Doc. 348, p. 5).  Plaintiffs specifically assert that FEMA's definition of "uninhabitable" and the public statement by Johnson imposed a mandatory and specific requirement upon FEMA to ensure that disaster victims were not exposed to formaldehyde. (See Rec. Doc. 109, ¶¶44-66, 81).  FEMA, on the other hand, contends that neither the term "uninhabitable" nor Johnson's statement imposes a mandatory and specific requirement for its course of action, but rather, demonstrates that FEMA must use discretion in responding to the disaster housing crisis.

This Court agrees with FEMA that neither the term "uninhabitable" nor Johnson's statement mandates, by way of extrapolation, a *specific* course of conduct in terms of responding to a massive, sudden housing crisis like the one experienced after Hurricanes

Katrina and Rita.  Indeed, the applicable statutory and regulatory provisions explicitly instruct

that the "appropriate types of housing assistance" shall be "based upon considerations of cost-

effectiveness, convenience to the individuals and households, and such other factors as the

President may consider appropriate." 42 U.S.C. §5174(b)(2)(A); 42 CFR §206.110(c).  Here,

there existed no mandatory and specific statute, regulation, or policy that specified exactly what

course FEMA should take in selecting alternative housing for disaster victims.

In rejecting Plaintiff's argument that FEMA's definition of "uninhabitable," along with

the public statement by Johnson, imposed a mandatory and specific requirement upon FEMA to

ensure that disaster victims were not exposed to formaldehyde, this Court finds instructive *Duke*

*v. Dept. of Agriculture*, 131 F.3d 1407 (10th Cir. 1997).  In *Duke*, a camper, who was injured in

a national forest when a boulder rolled down a hillside and crushed his tent, sued the

government under the FTCA.  The government argued the discretionary function exception to

the FTCA's waiver of sovereign immunity.  Applying the *Berkovitz* test, the Tenth Circuit

determined that a national forest manual, which required the national forest to post signs to

"safely guide, regulate, warn or advise the public. . . ," was not specific enough to eliminate the

forest service employees' choice regarding how to act in particular circumstances. *Id.* at 1410.

Similarly, here, although the ultimate goal was obviously to provide safe temporary housing,

there existed no statute or regulation that instructed FEMA to take certain action in the selection

of EHUs for disaster victims.

FEMA's conduct in initially selecting the EHUs in the emergency setting following

Hurricane Katrina clearly involved an element of judgment: no federal statute, regulation, or

policy existed which prescribed a specific course of action in the face of such unprecedented

disaster.  However, even though the Court finds that there was no specific procedure in place that prescribed FEMA's course of action in the selection of EHUs, the Court still must consider whether FEMA's discretionary decision to select those EHUs is susceptible to policy analysis.

### (2) Were FEMA's actions susceptible to policy judgment?

Plaintiffs submit that, in selecting park models and travel trailers for disaster assistance housing purposes, FEMA should have incorporated the same government formaldehyde standards for use in those units as are required for mobile homes.  Plaintiffs submit that this would have guarded against the potentially harmful formaldehyde levels in the EHUs that allegedly made them unfit for long-term, semi-permanent use by hurricane victims.

As FEMA points out, the Stafford Act and applicable regulations explicitly invest it with discretion and require it to base its decision  "upon considerations of cost-effectiveness, convenience to the individuals and households, and such other factors as the President may consider appropriate." 42 U.S.C. §5174(b)(2)(A); 42 CFR §206.110(c). Pertinent to this inquiry, FEMA claims to have made its decision to use trailers after consulting with state and local officials who expressly wanted temporary emergency housing that would place as many disaster victims as possible in, or as close as possible to, their devastated communities to promote and encourage recovery and rebuilding efforts.  (Exhibit 8 to Rec. Doc. 196, ¶¶6-7).

The Court notes that, in the days and weeks after Katrina (and again after Rita), FEMA was compelled to act immediately to meet the urgent, massive demand for temporary housing. FEMA spent over $2.5 billion dollars to purchase over 140,000 new EHUs from recreation vehicle dealers and trailer manufacturers. (Ex. 10 to Rec. Doc. 196, ¶4). To respond to this urgent housing crisis, FEMA sought from vendors and manufacturers temporary emergency

housing for disaster victims who had no housing at all, some with very few possessions, in the most dire of circumstances.  To meet this urgent and immediate goal, FEMA contracted for and purchased units that were: (1) new and under warranty; (2) furnished; (3) contained basic amenities; and (4) met certain size requirements. (Ex. 10 to Rec. Doc. 196, ¶¶5-6, 8, 10). Admittedly, the contracts FEMA issued did not contain specifications relating to formaldehyde. (Ex. 8 to Rec. Doc. 196, ¶6; Ex. 10 to Rec. Doc. 196, ¶¶6-10).  Further, these units were needed immediately; FEMA's walk-through inspections of these units were conducted primarily to ensure that the units it received were new, contained basic contracted-for amenities, and had not been damaged during shipment to the staging site. (Ex. 10 to Rec. Doc. 196, ¶11; Ex. 11 to Rec. Doc. 196, ¶¶3-5; Ex. 11-A to Rec. Doc. 196, FEMA09-000073-000074).

This Court recognizes that, during this time frame, the emergency nature of FEMA's mission to provide housing to disaster victims quickly required reliance on the vendors and manufacturers.  Consistent with that approach, the contracts it issued did not contain new specifications relating to formaldehyde.[8]  Furthermore, the Court recognizes that at the time FEMA made its decision in the selection of the EHUs for use by hurricane victims, it was unknown and undeterminable how long any individual was going to reside in such temporary housing, given the unprecedented nature of this disaster and resulting vast destruction and damage.  Moreover, this housing assistance was meant to be *temporary*; it was never intended to be *permanent* housing for hurricane victims.  In other words, these travel trailers and park

---

[8]   Surely, had FEMA insisted on imposing new formaldehyde standards that had never before been imposed on travel trailers and park models, it would have been severely criticized for staring at hundreds of thousands of homeless people while brand new, empty housing units sat waiting to be occupied - but for a new FEMA technical requirement.

models were not intended to be used as domiciles on a permanent basis.[9]

Considering the foregoing, FEMA's judgment regarding the selection of the EHUs in this case appears to have been based on considerations of public policy.  Specifically, in the emergency setting following Hurricanes Katrina and Rita, FEMA acted as quickly as possible to address and provide for the desperate need for temporary housing for all those individuals left homeless, without shelter, and without other basic every-day necessities.  In responding to this enormous housing crisis, FEMA used its discretion and promptly made a policy decision to procure EHUs without first taking the time to develop new EHU specifications and without first promulgating and issuing ambient indoor air quality standards for formaldehyde. Taking into account the urgency of the situation following what has been called the most destructive natural disaster in our nation's history, as well as the desires of local and state officials to quickly house citizens in their communities, this Court declines to partake in "judicial second-guessing" of FEMA's discretionary decision to use these means of temporary housing to shelter hurricane victims.  *See Gaubert*, 499 U.S. at 323; *Varig*, 467 U.S. at 814; *Guile*, 422 F.3d at 229; *Baldassaro*, 64 F.3d at 208.[10]  Thus, at least in regards to FEMA's initial selection of these EHUs for use by Plaintiffs and other hurricane victims, the Court finds that the discretionary function exceptions to both the Stafford Act and the FTCA shield FEMA from liability.

---

[9]     The Court further notes that mobile homes, which are subject to HUD regulations, are expected to be manufactured and provided in conformity with those specific regulations regarding formaldehyde.  To the extent that any such mobile homes at issue in this litigation violated government formaldehyde level standards, that liability would belong to the manufacturer alone, and not to FEMA, which had the right to expect that all such mobile homes provided would have been manufactured in compliance with the existing HUD standards.  (See Transcript, pp. 35-36).  Thus, Plaintiffs' claims against FEMA as they relate to mobile homes are dismissed.  The Court further notes that, hereinafter, when it refers to EHUs, it is referring only to travel trailers and park models.

[10]     Although not perfect, the use of temporary housing units provided shelter for the hurricane victims and, by returning at least some citizens to the affected areas, arguably furthered recovery and crime prevention in those areas.

b.        **FEMA's Provision of the EHUs to Hurricane Victims**

Beyond selecting these EHUs, FEMA provided them to Plaintiffs by making

arrangements in the field and by contracting with certain companies to deliver the EHUs, set

them up, and make them available and ready for residential use.  At the July 23, 2008 hearing

on this matter, Plaintiffs referenced and introduced the 2006 Fleetwood manual for the Pioneer

travel trailers. (Transcript, p. 31).  Plaintiffs noted that the manual states that the trailer is not

designed to be used as permanent housing. The same manual also cautions that the stabilizer

jacks should not be used to level the trailer, lift the weight of the trailer, or raise the tires off the

ground. In that hearing, Plaintiffs also referenced that same warning in another manual by

Pilgrim Recreational Vehicles. Plaintiffs's counsel noted that the trailer occupants were not the

individuals who jacked up the trailers improperly against manufacturer specifications. Instead,

Plaintiffs contend that FEMA was responsible for making those arrangements with the

companies it hired to deliver and install the EHUs.

Plaintiffs submit that many of the EHUs, particularly the travel trailers, were set up off

of their wheels improperly.  This, Plaintiffs contend, exposed and opened up certain spaces

containing allegedly unhealthy formaldehyde emissions from glued wood products that

normally would be sealed.

(1)        **Was there a statute, regulation, or policy that**
                 **specifically prescribed the course of action for the Govt**
                 **to follow?**

The Court has been presented with no evidence of a specific statute, regulation, or

policy giving specific direction as to how FEMA should supervise contractors or ensure that

they follow directions in owners' manuals regarding the set-up and installation of EHUs.

22

Further, a decision to hire a contractor as well as the choice of contractor is a discretionary decision. *Guile v. United States*, 422 F.3d 221, 231 (5th Cir. 2005), citing *Williams v. United States*, 50 F.3d 299, 310 (4th Cir.1995).

**(2)      Were FEMA's actions susceptible to policy judgment?**

To the extent that Plaintiffs claim that one or more government employees were involved in making arrangements for the contractors to follow in the field regarding the delivery and set-up of the EHUs, the Court considers this to be a discretionary function involving the balancing of considerations, including that of responding to a major housing crisis promptly. See *Gaubert*, 111 S.Ct. at 1273 (act is non-discretionary if a " 'federal statute, regulation or policy specifically prescribes a course of action for an employee to follow' "). As the Eighth Circuit reasoned in *Kirchmann v. United States*:

> By enacting the discretionary function exception to the waiver of sovereign immunity for the tort liability of the government, however, Congress precluded "judicial 'second-guessing' of . . . [certain] administrative decisions" by the government. . . . In doing so, Congress accepted the possibility that government agencies would have to take "certain calculated risks" in assessing "the degree of confidence that might reasonably be placed in a given [contractor]."  . . . That acceptance presumably included the realization that some persons might be injured consequent to those assessments and that those persons would not be compensated for those injuries. . . . It is not within our power to "determine the wisdom," . . . of that decision by Congress.

8 F.3d 1273, 1278 (8th Cir. 1993) (internal citations omitted).  Thus, the Court concludes that FEMA's action or inactions regarding the provision and installation of the EHUs are protected under the discretionary function exception to the FTCA and the Stafford Act.

**c.      <u>FEMA's Response to Reports of Formaldehyde Exposure in EHUs</u>**

Plaintiffs claim that FEMA negligently acted and/or failed to act appropriately when put

23

on notice[11] that allegedly dangerous levels of formaldehyde were present in the EHUs it had

distributed to hurricane victims. (Rec. Doc. 109, ¶¶ 53-82).  Whereas FEMA asserts that its

response to formaldehyde in the EHUs was protected by the discretionary function exception,

Plaintiffs aver that FEMA's response was not protected.

### (1)     Was there a statute, regulation, or policy that specifically prescribed the course of action for the Govt to follow?

In considering this question, the Court finds relevant certain *general* policy

pronouncements, located in the Code of Federal Regulations, that existed before Hurricanes

Katrina and Rita and governed, in less detail, the scope of FEMA's policies regarding the

provision of housing assistance.  Notably, the regulations provide that "FEMA shall determine

the appropriate type of housing assistance to be provided . . . based on considerations of cost-

effectiveness, convenience . . . and availability of the types of assistance." 44 CFR

§§206.110(a), (c), 206.117. FEMA is explicitly authorized to "provide . . . direct assistance . . .

to respond to the disaster-related housing needs . . . ." 44 CFR §206.117(a). Such direct

assistance may consist of providing "purchased or leased temporary housing units directly to

individuals or households who lack available housing resources." *See* 44 CFR

§206.117(b)(ii)(A). The regulations further provide that an individual is eligible for housing

assistance if their primary residence is "uninhabitable."   See 44 CFR §206.113(a)(8).   The

term "uninhabitable" is defined as a dwelling that is "not safe, sanitary, or fit to occupy."  44

---

[11]         In their first claim [the allegedly negligent selection of EHUs (see section a., *supra*)] of course, Plaintiffs contended that FEMA should have been aware *initially* that the travel trailers and park models might have contained unhealthy levels of formaldehyde because of the HUD regulations governing mobile home construction. The Court rejects that argument for the previously stated reasons.

CFR §206.111.

Despite these *general* policy pronouncements, the Court has been presented with no evidence of a *specific* statute, regulation, or policy giving precise direction as to how FEMA should respond to concerns and complaints of formaldehyde in EHUs.  Notwithstanding the absence of a specific procedure prescribing FEMA's course of action in response to complaints and knowledge of formaldehyde in EHUs, the Court still must consider whether FEMA's discretionary decisions made in response to formaldehyde complaints were susceptible to policy analysis within the broad boundaries of the general policy set by FEMA.

(2)     **Were FEMA's actions susceptible to policy judgment?**

(i)     **Relevant Jurisprudence**

In evaluating the submitted facts relative to this question, the Court finds guidance in *Indian Towing Co. v. United States*, 350 U.S 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), and in the subsequent Supreme Court decision in *Berkovitz* that has interpreted it. While the discretionary function exception was not at issue in *Indian Towing*, that case has often  been used in the analysis of discretionary function exception cases by the Supreme Court. See *In Re Katrina Canal Breaches Consolidated Litigation*, 471 F. Supp. 2d at 699.  Indeed, in the *Berkovitz* case, the Supreme Court explained the *Indian Towing* decision and holding as follows:

> The plaintiff in that case sued the Government for failing to maintain a lighthouse in good working order. The Court stated that the initial decision to undertake and maintain lighthouse service was a discretionary judgment. . . . The court held, however, that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA. . . . The latter course of conduct did not involve any permissible exercise of policy judgment.

486 U.S. at 538, n. 3.  The Supreme Court in *Indian Towing* had further elaborated:

> [T]he Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light . . ., it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in it duty and damage was thereby caused to petitioners, the Untied States is liable under the [FTCA].

*Indian Towing*, 350 U.S. at 69.  The *Indian Towing* Court also noted the following, which is applicable here:

> Of course, when dealing with a statute subjecting the Government to liability for potentially great sums of money, this Court must not promote profligacy by careless construction. Neither should it as a self-constituted guardian of the Treasury import immunity back into a statute designed to limit it.

*Id.*  Thus, the Supreme Court in *Indian Towing* ultimately concluded that if the Coast Guard failed in its duty to maintain the lighthouse, causing damage to plaintiffs, then the government was liable under the FTCA.

Plaintiffs rely on *Whisnant v. United States*, 400 F.3d 1177 (9ᵗʰ Cir. 2005),[12] to argue

---

[12]    In *Whisnant*, an employee of a government contractor brought an action under the FTCA against the United States, seeking to recover for alleged negligence in defendant's operation of a commissary on a naval base.  Specifically, the plaintiff claimed to have come into contact with toxic mold that had accumulated in the meat department of the commissary where he worked.  The government tried to assert that the discretionary function applied, mooting the waiver in the FTCA.  In concluding that the discretionary function exception did not apply, the *Whisnant* Court reasoned:

> Like the government's duties to maintain its roads in safe condition [*ARA Leisure Servs. v. United States,* 831 F.2d 193, 195 (9th Cir.1987)], to ensure the use of suitable materials in its building projects [*Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1027-28, 1031 (9th Cir.1989)], and to monitor the safety of its logging sites [*Bear Medicine v. United States ex rel. Sec'y of the Dep't of the Interior,* 241 F.3d 1208, 1212, 1214, 1217 (9th Cir.2001)], the government's duty to maintain its grocery store as a safe and healthy environment for employees and customers [in *Whisnant*] is not a policy choice of the type the discretionary function exception shields. Cleaning up mold involves professional and scientific judgment, not decisions of social, economic, or political policy. "***Indeed, the crux of our holdings on this issue is that a failure to adhere to accepted professional standards is not susceptible to a policy analysis.***" *Bear Medicine,* 241 F.3d at 1217 (internal quotation marks omitted); see also *In re Glacier Bay,* 71 F.3d 1447, 1453 (9th Cir.1995) ("Decisions involving the application of objective

26

that FEMA's alleged failure to adhere to accepted professional standards is not susceptible to a policy analysis.  The Ninth Circuit explained in the *Whisnant* decision that "matters of scientific and professional judgment - particularly judgments concerning safety - are rarely considered to be susceptible to social, economic, or political policy."  *Whisnant*, 400 F.3d at 1181.

### (ii)  Contentions of FEMA as to Count 2

FEMA claims that its discretionary response to formaldehyde complaints, as well as health and safety concerns resulting from trailer occupants' potential exposure to formaldehyde in EHUs, is susceptible to policy analysis.  FEMA argues that its decisions required it to weigh and balance the most effective means to provide basic shelter for hundreds of thousands of displaced hurricane victims, along with competing potential health and safety risks associated with formaldehyde in EHUs.  Specifically, FEMA maintains that it had to weigh the significance of reports of formaldehyde fumes in trailers,  with the substantial cost incurred to purchase those trailers and the extremely limited availability of alternative emergency housing.

### (iii)  Timeline of Relevant Facts/Events

The Occupational Safety and Health Administration ("OSHA")'s initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi that was

---

scientific standards are not insulated by the discretionary function exception because they do not involve the weighing of economic, political and social policy." (quoting *Kennewick*, 880 F.2d at 1030) (alterations omitted)). Because removing an obvious health hazard is a matter of safety and not policy, the government's alleged failure to control the accumulation of toxic mold in the Bangor commissary cannot be protected under the discretionary function exception.

400 F.3d at 1183.

conducted in October 2005 *was done at the request of two FEMA contractors*.[13]   Even if FEMA

did learn of these test results for the first time, as FEMA now suggests, in mid-March 2006, it is

undisputed that  FEMA allowed some hurricane victims to remain in these trailers for some

time thereafter without any notification or warning.[14] Despite the fact that the test results

revealed that the levels detected in most trailers exceeded the Agency for Toxic Substances and

Disease Registry's ("ATSDR")  minimum risk levels associated with exposures up to and

exceeding 14 days, most levels also exceeded the Environmental Protection Agency ("EPA")-

recognized level at which acute health effects can manifest, and several exceeded the OSHA

workplace maximum levels.  (Ex. 6 to Rec. Doc. 348).  In analyzing whether FEMA's response

to formaldehyde complaints and concerns was susceptible to policy analysis, the Court

considers the following detailed summary of the events that recounts FEMA's purported

learning of the results of OSHA's initial formaldehyde air sampling and the events that

followed.

It was (by FEMA's admission) as early as March 2006 that FEMA purportedly received

the first reported concerns of formaldehyde fumes by a Gulf Coast trailer occupant. (Ex. 8 to

Rec. Doc. 196, ¶10).  Coincidentally, also in March 2006, apparently out of concern for

government employees, FEMA's Bronson Brown directed in an e-mail that FEMA staff

---

[13]        By way of background, in October 2005, OSHA, at the request of two Individual
Assistance/Technical Assistance Contractors ("IA/TACs") hired by FEMA, began conducting formaldehyde testing
at the IA/TAC facilities. (Rec. Doc. 196, p. 10).  FEMA's Office of Occupational Safety and Health ("OSH") claims
to have first learned about the trailer occupant's complaint and about OSHA's October 2005 testing at the IA/TAC
facilities in mid-March 2006. (Rec. Doc. 196, p. 11).

[14]        To the extent that Plaintiffs can demonstrate that FEMA was *supplying* the same or similar type of
EHUs containing unsafe formaldehyde emissions *after* the date ultimately proven for FEMA to have been on notice
of this problem and despite such knowledge, the analysis is the same, and the discretionary function exception may
not apply.

personnel entering trailers be instructed to allow for a period of "off-gassing." (Ex.19 to Rec. Doc. 196, FEMA09-000090).  Thereafter, on March 18, 2006, a local news report discussed formaldehyde levels in a FEMA trailer. (Ex. 19 to 196, FEMA09-000086).  The very next day, the trailer occupant who first reported concerns of formaldehyde had his EHU replaced. (Ex. 8 to Rec. Doc. 196, ¶10).

Air testing later that month was conducted due to concerns of "potential *employee* exposure to formaldehyde."  (Ex. 20 to Rec. Doc. 196, FEMA10-000164)(emphasis added).  On March 28-29, 2006, FEMA conducted testing on new and refurbished unoccupied travel trailers in Purvis, Mississippi. (Ex. 28 to 196, FEMA10-000196).  In late-March 2006, OSHA again conducted occupational testing. (Ex. 20 to Rec. Doc. 196, FEMA10-000163).  In April 2006, it became public that the Sierra Club had tested trailers and detected formaldehyde above 0.1 ppm in most of the tested units. (Rec. Doc. 196, p. 11).  On April 11, 2006, an email was sent to FEMA staff acknowledging unsafe "well above OSHA standards" formaldehyde levels.  The tester who conducted the test admittedly developed "eye-watering."  (Ex. 7 to Rec. Doc. 349, p. 5 of 6).

Despite the initial awareness of a potential health hazard, on April 18, 2006, a FEMA field attorney wrote to FEMA's general counsel's office expressing the following concern regarding FEMA's inaction on the issue:

> I got a visit from our External Affairs folks, who want to know which of the available formaldehyde test protocols FEMA has decided to utilize. ***GULP! I don't think FEMA has decided how to deal with the formaldehyde issue, and certainly not the testing issue.***

(Ex. 7 to Rec. Doc. 349, p. 2 of 6) (emphasis added).  On May 16, 2006, an attorney with FEMA's Office of General Counsel ("OGC") in Biloxi stated:

29

Incidentally, I happened to go over to see a Sergeant in the Army National Guard the other day on other FEMA business and he happened to mention that he has had a trailer for 5 or 6 months now and he has had a problems [sic] with smell, sore throats, burning eyes, he says he airs out the trailer every day but it only helps for a little while and then it is worse than ever. Seems like after a few weeks of airing the problem should be gone*. **I am not expert** [sic] **but it doesn't sound right.  He knows its formaldehyde***; This guy served in Iraq and says he's lived in worse and doesn't want to look a gift horse in the mouth.  But seems a shame he has to live under these conditions.

(Ex. 7 to Rec. Doc. 349, p. 5 of 6) (emphasis added).  Also on that same day, an email was sent by an individual in FEMA Logistics Management to agency lawyers urging them not to overreact to the formaldehyde issue:

We are continuing to work the contracting issues for the testing.  CNN has done another story and trying to revive this so we're working diligently to sort all this out to make testing a reality.  *I have some concerns about overreacting to the formaldehyde issue.  Seems like every time we really start focusing on issues such as this they get BIGGER*!

(Ex. 7 to Rec. Doc. 349, p. 6 of 6, emphasis added).  Instead of responding to the concerns regarding formaldehyde, on May 18, 2006, a individual in FEMA Logistics Management was still speculating why these concerns over formaldehyde have arisen:

I just can't understand why out of 15,000 trailers we had in Florida during the 04/05 response/recovery that we didn't have one complaint about formaldehyde.  It's really strange that in Louisiana they don't have a single one either, and that no one complained until the press got this from this one guy in Mississippi, now we have a number of complaints in MS. Really strange.

(Ex. 7 to Rec. Doc. 349, p. 6 of 6).

Finally, on June 14, 2006, FEMA's Kevin Souza broached the issues of FEMA-initiated federal testing, and of warning trailer occupants of the potential harmful side effects of formaldehyde in EHUs:

30

>Has the Agency conducted our own testing of the units?  If not, we need to do so ASAP and put this issue to rest or remove people from harm. I don't want to rely on non-fed testing.  We also need an information campaign on what we are doing about the potential issue and our eventual findings to include temporary and permanent remedies.

(Ex. 5 to Rec. Doc. 348).  However, the very next day, Souza's prudent suggestion (which seems to have been grounded on legitimate "policy" considerations) was rejected by a FEMA trial attorney:

>Do not initiate any testing until we give the OK.  While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results.  Once you get results and should they indicate some problem, the clock is running on our duty to respond to them.

(Ex. 5 to Rec. Doc. 348; Ex. 7 to Rec. Doc. 348, p. 2 of 6).  This is perhaps the most clear example presently before the Court of a legitimate "policy" consideration or suggestion by a FEMA employee with such discretionary authority being overridden and rejected by a lawyer in the name of strategizing against anticipated liability claims (i.e., fulfilling FEMA's "duty to respond").

By mid-June of 2006, FEMA had received several complaints about formaldehyde from trailer occupants in Louisiana and Mississippi. (Ex. 8 to Rec. Doc. 196, ¶13).  On June 16, 2006, Peggy Phillips[15] wrote in an email that FEMA's OGC yet again "has advised that we do not do testing, which would imply FEMA's ownership of this issue."  (Ex. 21 to Rec. Doc. 196, p. 2 of  3).

Despite this reluctance about responding to the growing formaldehyde concerns, on June 19, 2006, the first conference call was held to discuss concerns about formaldehyde in EHUs;

---

[15]     Phillips is identified as a Logistical Management Specialist in Exhibit 21 to Rec. Doc. 196. Although the Court is unsure as to which specific government agency she is linked, it is clear that she was involved in discussions regarding the formaldehyde issue.

representatives from the Centers for Disease Control and Prevention ("CDC"), ATSDR, EPA, and FEMA participated in the call.  (Ex. 23 to Rec. Doc. 196, p. 7 of  24).  Thereafter, in July 2006, FEMA commenced distribution of a formaldehyde brochure to trailer occupants instructing them, if they had concerns, to ventilate their units and to seek medical advice, if necessary.  (Ex. 8 to Rec. Doc. 196, ¶14).  Also in July 2006, FEMA requested that ATSDR evaluate formaldehyde air sampling data collected by the EPA in 96 unoccupied trailers.  (Ex. 23 to Rec. Doc. 196, p. 5 of  24).

In September 2006, FEMA commenced a study to determine the effectiveness of ventilation. (Ex. 8 to Rec. Doc. 196, ¶14).  On September 18, 2006, the EPA, at FEMA's request, began testing unoccupied, stored trailers to determine baselines and recommendations for action. (Ex. 28 to Rec. Doc. 196, p. 3 of 4).  On October 5, 2006,  FEMA's OGC admitted that formaldehyde testing was undertaken because FEMA was sued, referring to *Hillard v. United States, et. al.*, Civil Action No. 06-2576 (E.D. La.), filed on May 18, 2006.  (Ex. 7 to Rec. Doc. 349, p. 3 of 6).  On October 10, 2006, the EPA completed the sampling of 96 new, unused trailers. (Ex. 23 to Rec. Doc. 196, p. 5 of  24).

In February of 2007, the ATSDR issued its Consultation Report, wherein it reported that:

> The purpose of the ATSDR consultation is to provide FEMA a clearer understanding of the issues associated with formaldehyde in temporary housing units. *The consultation is not intended to establish FEMA's future policy concerning temporary housing units.* The conclusions derived from the sampling of the 96 trailers are for those trailers only, and are not necessarily applicable to all other trailers due to numerous variables for which the appropriate data and information are not available.

(Ex. 15 to Rec. Doc. 196, ATSDR_FEMA-00002)(emphasis added).  On April 26, 2007, FEMA

released a Fact Sheet entitled "Providing Continued Assistance for Gulf Coast Hurricane

Victims." (Ex. 4 to Rec. Doc. 196).  Despite the continued and unresolved concerns regarding

formaldehyde, that fact sheet provided, in pertinent part: "Beginning immediately, FEMA will

allow residents of its mobile homes and travel trailers to purchase their dwellings at a fair and

equitable price."  (*Id.* at p. 2 of 4).

By July 2007, FEMA had received over 200 formaldehyde complaints. (Ex. 24 to Rec.

Doc. 196, FEMA10-000191).  According to FEMA, trailer occupants were being advised to

ventilate their units; however, only a small percentage of those occupants requested that their

unit be replaced with a different older unit. (Ex. 24 to Rec. Doc. 196, FEMA10-000191).

Besides suggesting ventilation and offering replacement EHUs, FEMA established a dedicated

formaldehyde call center to answer questions and to assist in relocating occupants not satisfied

with their EHUs. FEMA also prepared a "Formaldehyde Fact Sheet," which was distributed to

EHU occupants, and engaged ATSDR to conduct testing of occupied units, as well as to

conduct a public health assessment from data generated from that testing. Lastly, FEMA

updated its travel trailer specifications to require manufacturers, in the future, to use the same

low emission materials that HUD required for use in mobile homes.  (Rec. Doc. 196, pp. 14-15).

On July 19, 2007, the United States House of Representatives, Committee on Oversight

and Government Reform, conducted a hearing on "FEMA's Toxic Trailers." (Ex. 13 to Rec.

Doc. 348).  At the hearing, FEMA Administrator David Paulison appeared and stated: "FEMA

and the entire Department of Homeland Security are committed to ensuring that victims of

disasters have a safe and healthy place to live during the recovery period." (Ex. 2 to Rec. Doc.

348, p. 8 of 9).  Mary DeVany, an industrial hygienist,[16] also testified at this hearing.  (Ex. 8 to

348).  Also on that day, the U.S. House of Representatives issued a report entitled, "FEMA's

Travel Trailers: Litigation Considerations v. Health and Safety Considerations, And the winner

is?" (Ex. 7 to Rec. Doc. 348).

On July 20, 2007, FEMA issued a release on "Formaldehyde and Travel Trailers."  (Ex.

24 to Rec. Doc. 196).  Also, FEMA issued a Statement by Administrator Paulison entitled

"Important Information for FEMA Housing Occupants."  (Ex. 25 to Rec. Doc. 196). The very

next day, FEMA set up call centers for EHU occupants living on group and/or commercial or

private sites who had concerns or questions about formaldehyde.  (Ex. 28 to Rec. Doc. 196).

It was not until July 24, 2007 that FEMA actually suspended the sales of EHUs to trailer

occupants.  (Ex. 36 to Rec. Doc. 196, p. 9 of 12).  A few days later, on July 31, 2007, FEMA

issued an Interim Direction, which suspended the use of travel trailers and park models.  (Ex. 36

to Rec. Doc. 196, p. 6 of  12).  By November 2007, the formaldehyde hotline had received

approximately 4,000 calls.  (Rec. Doc. 196, p. 15).

On November 7, 2007, CBS produced a story entitled "FEMA Protecting Itself, Not

Evacuees." (Ex. 28 to Rec. Doc. 196).  The very next day, FEMA issued a release entitled

"Myths and Facts: Travel Trailers." (Ex. 28 to Rec. Doc. 196).  Between December 2007 and

February 2008, several tests were conducted and several reports were issued.  (Rec. Doc. 196, p.

---

[16]     DeVany does not appear to be a government employee.  She explains that she has been an industrial hygienist for 30 years.  She has owned and operated an international occupational safety, health, and environmental consulting company for over 20 years.  DeVany has served on the OR Governor's Steering Committee for Occupational Safety and Health and the WA Governor's Accident Prevention Committee (chair, appointed by the governor).  She has chaired national committees on Emerging (Hazards) Issues, Confined Spaces, and Social Concerns, and has served on the national Global Sweatshops Task Force and the international Joint Industrial Hygiene Ethics Committee.  Her pro bono work includes being the Workplace Technical Advisor to the Sierra Club, which she admits is how she became involved in this particular issue.

15; Ex. 29 to Rec. Doc. 196, p. 3 of 4).  On February 14, 2008, FEMA and CDC issued a Joint

Press Release regarding the results of formaldehyde level tests. (Ex. 29 to Rec. Doc. 196, p. 2 of

4).  This release included the preliminary test results and outlined certain steps to take to

provide for the safety and well being of  EHU occupants.  (Ex. 36 to Rec. Doc. 196, p. 10 of

12).  Also on that same day, FEMA expanded its formaldehyde hotline hours to be available

twenty-four hours per day, seven days per week, in anticipation of increased public interest due

to the announcement of the preliminary test results from CDC.  (*Id.*)

        In February and March of 2008, CDC hosted availability sessions in several

communities in Louisiana and Mississippi wherein representatives from FEMA were present to

discuss housing options with attendees. (Ex. 30 to Rec. Doc. 196, FEMA08-000012).  Between

November 2007 and April 2008, the formaldehyde hotline had received approximately 6,000

calls. (Rec. Doc. 196, p. 15).  On April 1, 2008, several individuals, including Dr. Christopher

De Rosa, Dr. Merol H. Karol, and Dr. Heidi Sinclair, testified before the Subcommittee on

Investigations and Oversight, Committee on Science and Technology, U.S. House of

Representatives. (Ex. 9 to Rec. Doc. 348).[17]

        During this subcommittee hearing, Dr. De Rosa explained the various efforts he made to

---

[17]        Dr. Karol, Professor Emerita, University of Pittsburgh, testified regarding whether CDC failed to
protect public health with toxic trailers. (Ex. 11 to Rec. Doc. 348).  Further, Sinclair, MD, Medical Director, Baton
Rouge Children's Health Project, Asst. Professor, Department of Pediatrics, LHUHSC, testified regarding concerns
of formaldehyde in FEMA-issued EHUs. (Ex. 12 to Rec. Doc. 348).  Dr. De Rosa has worked with the federal
government for 28 years.  He is currently the Assistant Director for Toxicology and Risk Assessment, National
Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control
and Prevention, U.S. Department of Health and Human Services. (Ex. 9 to Rec. Doc. 348).  The Court notes that De
Rosa previously held the title of Director, Division of Toxicology and Environmental Medicine, Agency for Toxic
Substances and Disease Registry (ATSDR), from 1991 to 2007.  According to De Rosa, he was removed from this
position after 16 years of superior performance and after having met or exceeded 95% of all of his division's
performance objectives for the past three years.  De Rosa asserts that his removal from his previous position was
closely followed by his "attempt to speak the truth to the authorities" regarding the formaldehyde issue.  (Ex. 9 to
Rec. Doc. 348, pp. 2, 9-11 of 11).

convey his concerns about formaldehyde in EHUs to the government, especially for individuals who occupied the EHUs on a long-term basis:

> I repeatedly cautioned Dr. Frumkin and other senior staff regarding the formaldehyde issue in FEMA trailers.  For example, on June 1, 2007, I wrote to Dr. Frumkin outlining my concerns in response to a request from FEMA to identify "safe levels of formaldehyde exposure".  I cautioned that since formaldehyde is a carcinogen, it is a matter of U.S. Federal Government science policy, that there is technically no "safe level" of exposure.  I wrote that the Department of Health and Human Services had classified formaldehyde as "reasonably anticipated to be a human carcinogen".  I also wrote that in 1995, the World Health Organization's (WHO), International Agency for Research on Carcinogens (IARC) had classified formaldehyde as "probably carcinogenic to humans" while EPA had determined that formaldehyde is a "probable human carcinogen."

************

> Finally, I wrote that to my knowledge this was the third time that we had been approached by FEMA requesting that we provide health guidance on safe levels of exposure to formaldehyde and that we restrict our evaluation to short term exposures.

************

> I indicated that FEMA had neglected to address the longer term exposures and indicated that failure to address longer term effects could be misleading.

************

> Most importantly, I pointed to the primal need to alert trailer residents regarding all health hazards.

************

> I stressed the importance of alerting the trailer residents to the potential reproductive, developmental and carcinogenic effects of formaldehyde exposure.

> The only response I received was that such matters should not be discussed in emails since they might be "misinterpreted."

36

(Ex. 9 to Rec. Doc. 348, p. 5-7 of 11).

### (iv)     Analysis of Count 2

Despite the Court's conclusion that there existed no specific statute, regulation, or policy giving direction as to how FEMA should respond to complaints and concerns of formaldehyde in EHUs, there certainly were general policies in place, before Hurricanes Katrina and Rita that, on this evidence, seem to preclude and/or prohibit FEMA's initial response (or lack thereof) to the complaints and concerns of formaldehyde.  For instance as discussed briefly earlier, under federal regulations implementing the Stafford Act, a "displaced applicant" is one "whose primary residence is uninhabitable, inaccessible, made unavailable by the landlord . . . or not functional as a direct result of the disaster and has no other housing available in the area." The term "functional" is defined as "an item or home capable of being used for its intended purpose." The term "uninhabitable" is defined as meaning the "dwelling is not safe, sanitary or fit to occupy." 44 C.F.R. 206.11.  Under the IHP of the Stafford Act, housing assistance includes rental assistance or, where housing resources are not available, direct assistance in the form of EHU's when a renter or homeowner's primary residence "are uninhabitable." 44 C.F.R. § 206.110, *et. seq*.

Post-storm, FEMA officials made other general policy pronouncements.  According to FEMA, it only provides temporary housing units when all other housing resources are unavailable, and the units are only used as a last resort to provide "safe, secure, and sanitary" housing for eligible disaster victims. (Ex. 36 to Rec. Doc. 196, FEMA09-000337). Kevin Souza of FEMA stated that the agency relied on vendors and manufacturers to provide "safe habitable housing units. . . ." and that FEMA believed that these EHUs "would provide safe and

habitable" housing. (Exhibit 8 to Rec. Doc. 196, ¶7).  Further, Bryan McCreary of FEMA stated

that the agency  "relied exclusively upon the vendors' and manufacturers' expertise and

experience. . .to construct and provide FEMA with new units. . .that would provide disaster

victims with a safe, habitable place to live. . . ." (Exhibit 10 to Rec. Doc. 196, ¶10).  FEMA

Administrator David Paulison has explained that "FEMA [is] committed to ensuring that

victims of disaster have a safe and healthy place to live during the recovery period." (Ex. 18 to

Rec. Doc. 196 at 00008).

　　　　According to the above policy pronouncements, displaced residents whose residences

were left uninhabitable due to the hurricanes should have been provided alternative housing that

was habitable (i.e., safe).  However, there is evidence that shows that the alternative housing

supplied by FEMA to disaster victims may have actually been unsafe or uninhabitable based on

allegedly high levels of formaldehyde emissions contained therein.  After responding to the

initial massive housing crisis by providing displaced residents with EHUs, FEMA allegedly

first became aware of formaldehyde concerns in mid-March 2006 (and perhaps earlier, if further

discovery so supports).  Yet, instead of immediately responding to these concerns in an effort to

comply with the existing policy pronouncements touting safe alternative housing, the evidence

reveals that FEMA officials attempted, at least during some identifiable time period, to avoid

litigation by essentially "sticking their heads in the sand."  Indeed, the evidence shows that

FEMA initially ignored the potential formaldehyde problem and neglected to conduct testing in

fear that such testing would "imply FEMA's ownership of the issue."  (Ex. 21 to Rec. Doc. 196,

p. 2 of  3).  Such conduct is not grounded in considerations of public policy, and cannot be

analyzed as such, as it clearly falls outside the long-standing FEMA policies that exist relative

to emergency housing.

As mentioned above, while FEMA was apparently concerned about the well-being of government employees (Ex.19 to Rec. Doc. 196, FEMA09-000090; Ex. 20 to Rec. Doc. 196, FEMA10-000164), there is at least some evidence that FEMA delayed its response to the concerns and complaints about the potentially harmful formaldehyde emissions in EHUs because of concerns of legal liability.  As stated in emails from the FEMA OGC in June 2006, "[d]o not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results." (Ex. 5 to 348). Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue."  (Ex. 5 to Rec. Doc. 348; Ex. 6 to Rec. Doc. 348).  During such time, it seems Plaintiffs can assert at least a colorable claim against FEMA, which arguably was not acting based on considerations of public policy.  Instead, it seems, based on this evidence, to have been acting on concerns of potential litigation, liability exposure, and self-interest, well outside the policy parameters that had been previously established.

While FEMA claims to have decided to respond initially to the few complaints regarding formaldehyde on a case-by-case basis, even Administrator Paulison expressed being "troubled" that some FEMA employees had not reacted "with the speed and sensitivity I expect" to resident concerns.  He then stated, "FEMA's first priority is the health and welfare of disaster victims we serve. Anything less is totally unacceptable . . . " He pledged to "hold sacred this . . . commitment."  (Ex. 25 to Rec. Doc. 196, FEMA10-000194).  In addition, Plaintiffs cited to testimony by industrial hygienist DeVany, who believed that the government

attempted to minimize the actual extent of the problems associated with formaldehyde in EHUs. (Exhibit 13 to Rec. Doc. 348, p. 22 of 23; Ex. 8 to Rec. Doc. 348, p. 7 of 9).

Here, like in the *Indian Towing* case, the government undertook in its discretion to provide a service (i.e., the supply of safe, habitable alternative housing to disaster victims). Its decision to, at least for a time, ignore potential health concerns associated with this alternative housing, however, did not involve any permissible exercise of policy judgment. As the Ninth Circuit stated in *Whisnant*, "matters of scientific and professional judgment - particularly judgments concerning safety - are rarely considered to be susceptible to social, economic, or political policy."[18] 400 F.3d at 1181.

Although there are many cases analyzing the second prong of the *Berkovitz* test relating to the discretionary function exception, and courts have, admittedly, gone back and forth on what is/is not considered to be susceptible to policy judgment, this Court concludes that, in this case, FEMA's duty to quickly and adequately respond to concerns and complaints of formaldehyde was not a policy choice of the type that the discretionary function exception shields. When an agency is faced with a matter of public safety, donning the litigation battle

---

[18]     While the Court finds this analysis somewhat applicable to the issue regarding FEMA's *response* to formaldehyde concerns, the Court notes that *Whisnant* is not helpful in analyzing FEMA's discretionary decision regarding the *initial selection* of the EHUs used to house disaster victims. In *Whisnant*, the government was not faced with an urgent situation like this one wherein it had to immediately respond to an enormous crisis. Instead, *Whisnant* dealt with the issue of a government employee's contact with toxic mold that had accumulated over a period of time in the meat department of the commissary where the employee worked. The emergency nature of the Katrina/Rita housing crisis (along with FEMA's decision to go along with the suggestion of local authorities to house disaster victims in travel trailers and park models that could be set up close to their damaged homes to facilitate rebuilding efforts) makes FEMA's decision regarding the initial selection of EHUs susceptible to policy analysis.

However, after responding to the initial housing crisis by selecting and providing EHUs to disaster victims, FEMA, at least for some period of time after it acquired knowledge of potential health concerns regarding formaldehyde in these EHUs, seems to have chosen to ignore the problem - in fear that responding to the problem would imply its "ownership" of the issue. It is in this context, only, that this Court finds the *Whisnant* holding applicable.

armor should not be confused with weighing policy considerations and responding reasonably

and promptly in such a way that can be considered to be "susceptible to policy analysis."  The

evidence unfortunately reveals that FEMA may have - at least for some time after it claims it

acquired knowledge of the potential formaldehyde issue (i.e, March 2006 through June of 2006)

- placed strategic litigation concerns over and above an appropriate discretionary response to

the potential harmful effects of formaldehyde in EHUs.

The evidence also reveals that the initial instructions to ignore the potential problem and

to not initiate testing right away primarily came from FEMA's OGC[19] - not from individuals

charged with the discretion to respond to formaldehyde concerns.  See *Gaubert*, 499 U.S. at 335

(Scalia, J., concurring).  FEMA's response to formaldehyde concerns involved decisions of

professional and scientific judgment; it did not involve decisions of social, economic, or

political policy.  Also, the Court notes that FEMA cannot excuse its alleged failure to properly

respond to complaints of formaldehyde in EHUs solely on the grounds of inadequate

government resources.  See *Duke v. Dept. of Agriculture*, 131 F.3d 1407 (10th Cir. 1997)

("insufficient government resources alone do not a discretionary function make").  Here, like in

*Duke*, a specific, known and knowable hazard existed (i.e., the likelihood of formaldehyde in

travel trailers and park models, which were not subject to the HUD product standards and which

were being used as semi-permanent residences). FEMA, once it had adequate notice of a

potential hazard, has not shown how failing to test these trailers for formaldehyde levels,

failing to warn occupants (while warning its own employees) of potentially dangerous

---

[19]     While the Court recognizes the critical and routine role of counsel in formulating policies for
federal agencies, such does not appear to be the case here, based on the submissions to the Court.  A review of these
papers suggests that counsel directed the (non)response, effectively vetoing Souza's stated plan of June 14, 2006.
(See Ex. 5 to Rec. Doc. 348).

formaldehyde levels, or failing to immediately remove occupants from these EHUs implicated political, social, or economic decisions of the sort that the discretionary function exception was designed to protect.

Accordingly, on the showing made at this juncture, and solely for purposes of deciding this motion, the Court finds that genuine issue of material fact exist.  There may be actionable conduct committed by FEMA for a window of time starting no later than March 2006 until some time thereafter (when FEMA's actions begin to fall within the discretionary function exception).  Further discovery is needed to determine whether FEMA's conduct during that time period truly amounts to "acts grounded in policy," or instead, simply strategizing by attorneys in anticipation of litigation. If the latter applies, as evidenced on the showing offered, then the window of time that such conduct occurred can be established by further discovery as to its start and end.

Moreover, even if such a window of time can be established, each plaintiff will have different relevant facts that may or may not afford him/her such a claim.  Some plaintiffs may not have a claim against FEMA in this litigation if they were neither supplied nor did they occupy such a travel trailer of park model after the starting date of such time period.  As for each plaintiff involved in this litigation, the evidence will undoubtedly differ, just as the individual claims will differ.  For instance, some plaintiffs will not have suffered any symptoms from the alleged formaldehyde exposure.  Furthermore, those who do claim to have suffered side effects will surely differ as to which side effects each suffered and as to what extent those side effects manifested.  Some plaintiffs may have complained about the alleged formaldehyde exposure while still in their EHUs; others will not have complained or voiced any concerns

until after relocating from their EHUs.  The evidence will also differ as to when FEMA selected

an EHU for each plaintiff, when each plaintiff moved in to that EHU, and when each plaintiff

moved out of that EHU.[20]  Thus, whether and to what extent FEMA knew of the alleged

formaldehyde concerns when these events occurred will likely need to be considered on a case-

by case basis.  In any event, it is clear that, at some point, FEMA became aware that the EHUs

that had been distributed, and those that were still being distributed, to disaster victims

contained potentially unsafe levels of formaldehyde.  It may also be established that, at some

point in time thereafter, FEMA's conduct conformed to policy considerations such that it would

fall into the discretionary function exception as to any given plaintiff.

### (v)      Summation as to Count 2

First, as for the *initial selection* of EHUs, this Court concludes that there existed no

mandatory and specific statute, regulation, or policy that prescribed exactly what course FEMA

should take in selecting alternative housing for disaster victims.  However, based on (1) the

emergency nature of FEMA's mission to provide housing to disaster victims quickly; (2) the

assertion that when FEMA made its decision in the selection of the EHUs for use by hurricane

victims, it was, at that time, unknown and undeterminable how long any individual was going to

reside in such temporary housing; and (3) FEMA's decision to follow the suggestion of local

leaders and place disaster victims in EHUs that could be placed nearest to their devastated

communities to facilitate rebuilding efforts; the Court concludes that FEMA's judgment

regarding the selection of the EHUs in this case was based on considerations of public policy.

Thus, the discretionary function exception shields FEMA from suit in this regard.

---

[20]      As previously indicated, on at least one occasion, FEMA promptly provided another EHU
(presumably formaldehyde-free) to a complainant.

Also, because mobile homes, which are subject to HUD regulations, are expected to be manufactured and provided in conformity with those specific regulations regarding formaldehyde, any potential claims Plaintiffs may have relative to them will likely lie against the manufacturers - not FEMA.  Thus, Plaintiffs' claims against FEMA as they relate to mobile homes are dismissed.

Second, as for the *provision* of EHUs, the Court finds that there has been no evidence of a specific statute, regulation, or policy giving precise direction as to how FEMA should supervise contractors, or ensure that they follow directions in owners' manuals regarding the set-up and installation of EHUs.  Further, case law indicates that decisions to hire a contractor, as well as the choice of contractors, are policy-based discretionary decisions. *Guile*, 422 F.3d at 231 (citing *Williams*, 50 F.3d at 310).  To the extent that Plaintiffs claim that one or more government employees were involved in making arrangements for the contractors to follow in the field regarding the delivery and set-up of the EHUs, the Court considers this to be a discretionary function involving the balancing of considerations, including that of responding to a major housing crisis promptly. Therefore, the Court finds that FEMA's action or inactions regarding the provision and installation of EHUs are protected under the discretionary function exception to the FTCA and the Stafford Act.

Third, as for FEMA's *response* to complaints and concerns of formaldehyde in EHUs, while the Court finds that there existed no specific statute, regulation, or policy giving direction as to how FEMA should respond to such concerns, the Court notes that there were general policies in place that existed long before Hurricanes Katrina and Rita that seem to preclude FEMA's initial response (or lack thereof) to the complaints and concerns of formaldehyde.

There were also other general policy pronouncements that were made by FEMA officials, post-storms, including the assertion by FEMA Administrator David Paulison that "FEMA [is] committed to ensuring that victims of disaster have a safe and healthy place to live during the recovery period." (Ex. 18 to Rec. Doc. 196 at 00008).

While FEMA allegedly first became aware of formaldehyde concerns in mid-March of 2006 (and perhaps earlier, if further discovery so supports), the evidence reveals that FEMA attempted, at least during some identifiable time period, to avoid responsibility by ignoring the potential formaldehyde problem and neglecting to warn, or to conduct testing in fear that such testing would "imply FEMA's ownership of the issue."  (Ex. 21 to Rec. Doc. 196, p. 2 of  3). The Court concludes that such conduct is not grounded in considerations of public policy, and cannot be analyzed as such, as it clearly falls outside the long-standing FEMA policies existing with regard to emergency housing.  Litigation strategizing initiated by government counsel in an attempt to quash the legitimate execution of policy by government officials holding policy-making authority should not be confused with weighing policy considerations within the parameters established.  Thus, on the showing made in the instant motion, the Court finds that genuine issues of material fact exist which preclude summary judgment on FEMA's behalf. Thus, FEMA's motion is denied and Plaintiffs may proceed with discovery as to their claims against FEMA on this issue.

The Court specifically notes that there may be actionable conduct committed by FEMA for a window of time starting no later than March 2006 until some time thereafter (when FEMA's actions begin to fall within the discretionary function exception).  Further discovery may reveal whether FEMA's conduct during that time period truly amounts to "acts grounded

in policy," or simply insouciance at the direction of counsel in anticipation of litigation. The

Court also notes that as for each plaintiff involved in this litigation, the evidence will

undoubtedly differ, just as the individual claims will differ.  In other words, each plaintiff will

likely have different relevant facts that may or may not afford him/her such a claim.

     **3.**     **COUNT 3 of the AMC**

Plaintiffs, through Count 3, assert that FEMA failed to "perform its contractual

obligations," and "breached the contract of sale" because it sold defective EHUs to Plaintiffs.

(Rec. Doc. 109., ¶¶119- 131). FEMA argues that the Court lacks subject matter jurisdiction over

this contract claim because the Contracts Disputes Act ("CDA") divests federal district courts

of jurisdiction over any claims arising out of the sale of government property, pursuant to 41

U.S.C. §§602(a)(4), 609(a)(1); 28 U.S.C. §1346(a)(2).  Plaintiffs concede that claims by those

putative class members who have purchased EHUs from FEMA (specifically, the DHS), and

who are seeking to rescind those contracts of sale, fall within the scope of the CDA, and

specifically 41 U.S.C. § 602(a)(4).  Plaintiffs' counsel further conceded this during oral

argument on July 23, 2008.  (Transcript, pp. 37-38). Thus, this Court dismisses these claims

without prejudice in order to allow those putative class members who are seeking rescission of

those sales to proceed with the pursuit of their claims pursuant to the provisions of the CDA.

**V.**     <u>**CONCLUSION**</u>

Count 1 specifically deals with Plaintiffs's claims arising under Louisiana Civil Code

Articles 2317, 2317.1 and 2696.  Because Plaintiffs do not challenge FEMA's argument that

this Court lacks jurisdiction over their claims brought under La. Civil Code article 2696, those

claims are hereby dismissed.   As for Plaintiffs' claims under Louisiana Civil Code articles

2317 and 2317.1, because this Court finds that the discretionary function exception does not apply to Plaintiffs' claims regarding FEMA's allegedly insufficient response to complaints and concerns of formaldehyde in EHUs, Plaintiffs' claims under Louisiana Civil Code articles 2317 and 2317.1 as to that particular theory of recovery remain intact and shall not be dismissed. However, as for Plaintiffs' other claims regarding the selection and provision of EHUs, to which this Court found that the discretionary function exception does apply, the Court rules that the motion is granted to the extent that Plaintiffs' claims under Louisiana Civil Code articles 2317 and 2317.1 are dismissed as to those theories only.

Next, as for Count 2, the Court finds that the discretionary function exception applies to shield FEMA from liability as to Plaintiffs' claims relating to the selection of and provision of EHUs.  However, because the Court concludes that the discretionary function exception does not apply to Plaintiffs' claims regarding FEMA's alleged negligent conduct in responding to complaints and concerns of formaldehyde in EHUs,  the Court rules that the motion is denied to the extent that these claims remain intact and are not dismissed.

Count 3 relates to Plaintiffs' claims regarding FEMA's failure to perform certain contractual obligations.  Plaintiffs concede that claims by putative class members, who have purchased EHUs from FEMA and who are seeking to rescind those contracts of sale, fall within the scope of the CDA.  Thus,  the Court rules that the motion is granted to the extent that these claims are dismissed without prejudice in order to allow those putative class members who are seeking rescission of those sales to proceed with the pursuit of their claims pursuant to the provisions of the CDA.

Considering the foregoing, **IT IS ORDERED** that the Defendant United States of

America's Motion to Dismiss Plaintiffs' FTCA and Contract Claims for Lack of Subject Matter

Jurisdiction (Rec. Doc. 196) is **GRANTED IN PART and DENIED IN PART**, as stated

above.

New Orleans, Louisiana, this 3rd day of October, 2008.

**KURT D. ENGELHARDT**
**UNITED STATES DISTRICT JUDGE**

48