**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: FEMA TRAILER FORMALDEHYDE              MDL No. 1873
PRODUCTS LIABILITY LITIGATION

                                             SECTION N(4)

                                             JUDGE ENGELHARDT

THIS DOCUMENT IS RELATED TO:
*Aldridge, et al. v. Gulf Stream Coach, Inc., et al.*   MAGISTRATE ROBY
*No. 07-9228*


*************************************************************************

**MEMORANDUM IN SUPPORT OF MOTION**
**TO FILE FIRST SUPPLEMENTAL AND AMENDING**
**COMPLAINT IN THE UNDERLYING ACTION**

**MAY IT PLEASE THE COURT:**

   **I.   Proposed Amendment**

       Since the filing of the original underlying Complaint (the "Original Complaint"), counsel

for Plaintiffs have received information which, in the interest of judicial economy and justice,

requires the addition of seven additional defendants from those named in the underlying action

and the assertion of causes of action specific to these newly added defendants.   These new

defendants are the following: (1) the United States of America (hereinafter the "Federal

Government" or "FEMA" interchangeably); (2) Fluor Enterprises, Inc. ("Fluor"); (3) Bechtel

Corporation ("Bechtel"); (4) Shaw Group ("Shaw"); (5) CH2M Hill ("CH2M") (collectively

with Fluor, Bechtel and Shaw the "No-Bid Defendants"); (6) North American Catastrophe

Services, Inc. ("NACS"); and (7) Morgan Building & Spa Manufacturing Company, Inc. ("Morgan") (collectively with NACS the "Procurement Defendants") (collectively with all newly added defendants the "New Defendants").

Because of the enormity of this undertaking and despite diligent investigation by Plaintiffs' counsel, only recently has a complete picture begin to form of the full spectrum of culpability for the injuries suffered by the Plaintiffs due to the defective nature of the temporary housing units employed to house victims of hurricanes Katrina and Rita. While the underlying Original Complaint focuses solely upon the manufacturers, it is now apparent that the New Defendants each played a significant role in the selection and conversion of predominantly travel trailers from recreational vehicles to fixed housing units intended for extended occupancy. The actions and inactions of the New Defendants significantly contributed to and/or exacerbated the exposure to hazardous levels of formaldehyde in the temporary housing units.

The Federal Government was responsible for implementing the emergency housing mandates of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act"). FEMA tasked the Procurement Defendants with identifying, selecting and procuring temporary housing units to house the victims of hurricanes Katrina and Rita. The Procurement Defendants knowingly selected and procured units which were neither intended for nor suited for extended habitation (i.e., travel trailers). The Procurement Defendants' willful selection of inadequate temporary housing units directly impacted the occupants' exposure to formaldehyde. Following the procurement of the temporary housing units, FEMA tasked the No-Bid Defendants with the implementation of temporary housing assistance under the Stafford Act. This involved, amongst other things, the hauling, installing, converting the units from mobile recreational vehicles to stationary residential units, managing,

maintaining and refurbishing the units.   This installation and conversion of the units fundamentally modified and changed the use of the unit from their use intended by the various manufacturers as a recreational vehicle into residential dwellings intended by FEMA for extended occupancy up to and possibly exceeding eighteen months.  By contract, the No-Bid Defendants were obligated not only to act in the best interests of FEMA, but also to advise FEMA as to the implementation of temporary housing units under the Stafford Act and to comply and adhere to all manufacturer warning and instructions.  The No-Bid Defendants did none of these things and by modifying and converting the units to be used in a very different capacity than which they were designed, the No-Bid Defendants contributed to and exacerbated the exposure to hazardous levels of formaldehyde experienced by the occupants of the temporary housing units.   Finally, shortly after victims of hurricanes Katrina and Rita were put into temporary housing units, concerns over formaldehyde content in the units begin to arise.  Rather than effectively and proactively resolve the problem, FEMA, lacking any clear policy rationale for doing so, suppressed and covered up their knowledge of formaldehyde in the temporary housing units.  The actions and inactions of the Federal Government, once it became aware of the risk of exposure to hazardous levels of formaldehyde in the temporary housing units, created a situation where tens of thousands of people, including many thousands of children, were exposed to hazardous levels of formaldehyde for years longer that they would have been had FEMA acted in the best interests of the victims rather than focusing on how to limit its liability to lawsuits.  The Procurement Defendants, the No-Bid Defendants and the Federal Government all contributed to and exacerbated the exposure to hazardous levels of formaldehyde experienced by the victims of hurricanes Katrina and Rita.  As such, and as further articulated below, they are all proper defendants and should be brought in to this litigation.

**A.      The United State of America**

Quite simply put, FEMA became aware of the problem with formaldehyde at a very early date in the process of providing temporary housing following the aftermath of hurricanes Katrina and Rita.  Once it became aware of the formaldehyde in the temporary housing units, FEMA refused to take appropriate remedial action and prolonged the hazardous exposure to formaldehyde suffered by the occupants of the units for considerable periods of time.  While there is some discussion as to whether FEMA had this information in October, 2005 or March 2006, it was FEMA's actions and inactions following the receipt of this information are where the problem lies.[1]  This Court is already well versed in the support for the assertions raised in the First Supplemental and Amending Complaint attached hereto.  For reference the Plaintiffs simply refer this Court to its well researched and articulated Order and Reasons denying in part the United State of America's Motion to Dismiss the Master Complaint on October 3, 2008 in the *In re: FEMA Trailer Formaldehyde Products Liability Litigation*, MDL No. 07-1873, Document 717.

**1.   Vested Property Rights Under the Stafford Act**

Plaintiffs make additional allegations against the Federal Government and FEMA for breach of vested property rights in disaster housing assistance under the Stafford Act.  Plaintiffs also make additional assertions against the manufacturing defendants that their hazardous products breached implied warranties pursuant to the provision of temporary housing units under the Stafford Act.

---

[1] Further, FEMA, as an agency of the Federal Government certainly had significant information at its disposal regarding the adverse health effects attributable to formaldehyde and the dangers that the occupants of the temporary housing units would face when exposed to hazardous levels of formaldehyde.

The Stafford Act, at 42 U.S.C. §5174(c)(1) states in pertinent part:

**(A)     Financial assistance**
**(i)**      In general.  The President may provide financial assistance to individuals or households to rent alternate housing accommodations, existing rental units, manufactured housing, recreational vehicles, or other readily fabricated dwellings.

**(ii)**     Amount.  The amount of assistance under clause (i) shall be based upon the fair market rent for the accommodation provided plus the cost of any transportation, utility hookups, or unit installation not provided directly by the President.

**(B)     Direct assistance**
**(i)**      In general.  The President may provide temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of lack of available housing resources, would be unable to make use of the assistance provided under subparagraph (A).

Not only were the occupants of the temporary housing units injured by the hazardous levels of formaldehyde, they had a vested property interest in temporary housing assistance under the Stafford Act.  Because FEMA failed to provide safe, suitable and sanitary temporary housing units, where occupants could have been provided with rental assistance in the alternative (but were not), their vested interest in housing assistance and their right to due process was violated.   Support for this contention is found in *McWaters, et al. v. Federal Emergency Management Agency, et al.*, 436 F.Supp.2d 802 (E.D. LA 2006), which states in pertinent part:

[W]hether the Stafford Act creates a constitutionally protected entitlement to disaster assistance, the Court must determine whether, under current regulations, hurricane disaster victims meeting the statutory qualifications for assistance are indeed automatically entitled to receive it.  If so, as in *Goldberg*, eligible persons would have a constitutionally protected property interest in assistance.

****

FEMA's discretion in providing assistance under the Stafford Act is tempered in many important ways.  Firstly, by FEMA's own admission, the agency has *no* discretion regarding provision of Temporary Housing Assistance to eligible persons and families…Additionally, while the ultimate resources allocated to FEMA from the Federal Government and Congress may be finite in monetary amount, it provision of those resources *must* be done so equitably under the law and in accordance with regulations designed to "insur[e] that the distribution of

supplies, the processing of applications, and other relief and assistance activities shall be accomplished in an equitable and impartial manner…Indeed, based on statute and testimony provided by FEMA's own representatives, a person or family is deemed eligible for temporary housing assistance solely on the basis of being a person or member of a household who is "displaced from their predisaster primary residence[ ] or whose predisaster primary residence[ ] are rendered uninhabitable as a result of damage caused by a major disaster.

****

Accordingly, the Court finds that under the Constitution, by virtue of the automatic, non-discretionary nature of FEMA's provision of assistance as found in both practice and the Stafford Act and its implementing regulations, persons who qualify as eligible do have a constitutionally protected property interest in receipt of housing assistance.

*Id.*, at 816-818. (internal citations omitted).

Because FEMA did not provide equitable relief between those who received rental assistance and those put into hazardous environments, particularly once FEMA became aware of the hazardous nature of the temporary housing units and failed to provide alternative temporary housing assistance under their Stafford Act mandate, the occupants of the hazardous temporary housing units had their constitutionally protected right to equitable assistance violated.  Further, this is an easily calculable number that can be consistently applied to all member of the class.  In *McWaters*, the court approved the "fair market rent figure" used by FEMA of $786.00 per month.  *Id.*, at 827.

### a.      Property Damage Claims against the Manufacturers

Plaintiffs assert property damage claims based upon breaches of implied warranties and redhibitory defects. See, Master Complaint at 55, 56, 66 and 73.  The Fifth Circuit squarely addressed whether such claims were appropriate for class certification in *McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545 (5th Cir. 2003).  The *McManus* case involved breach of warranty claims by motor home purchasers under Texas law alleging the misrepresentation of the towing capacity of the motor homes *Id.* at 547.  Although the Fifth Circuit reversed certification of the

6

misrepresentation, fraud and express warranty claims, the Court upheld certification of the claim for breach of implied warranty of merchantability. *Id.* at 548. The plaintiffs' theory in *McManus* was that the motor homes were not "fit for the ordinary purposes for which such goods are used." *Id.* at 551. Under Texas law, plaintiffs had the burden of proving the goods were defective at the time they left the manufacturer's or seller's possession. *Id.* at 552. The Court emphasized that this was a contract action (as opposed to tort) where plaintiffs were seeking the difference between the actual value of the motor home and the value as warranted. *Id.*

> Here, the damages sought by the [McManuses] are not rooted in the alleged defect of the product as such, but in the fact that they did not receive the benefit of their bargain." *Coghlan v. Wellcraft Marine Corp.,* 240 F.3d 449, 455 n. 4 (5th Cir. 2001). Thus, whether or not any member of the class actually suffered any *physical* injury is immaterial. Likewise, it is immaterial whether or not the class members even intended to use their motor homes for towing because all a jury need determine is that the motor homes were defective with respect to a motor home's "*ordinary* purpose." TEX. BUS. $ COM.CODE ANN. § 2.314 (emphasis added).

*Id.*

As in McManus, the FEMA trailers at issue are defective with respect to their "ordinary purpose", and, thus, plaintiffs did not receive the benefit of their bargain. See, *McManus* at 551-552. The FEMA trailers were not fit for residential use, but only for recreational use. In fact, the FEMA trailers may not have been fit for recreational use, but that is not an issue in this case.

It is important to note that each state has implied warranty legal theories available to Plaintiffs in this suit. See, Code of Ala. § 7-2-314 and 7-2-315; Louisiana Civil Code Article 2520, et seq.; Miss. Code Ann. § 75-2-314 and 75-2-315 (Miss. 1976); and Texas Business and Commercial Code § 2.314 and 2.315.

**B.**      **The No-Bid Defendants**

In order to implement the temporary housing mandate of the Stafford Act, FEMA, through a series of no-bid Contracts, engaged Fluor, Bechtel, Shaw and CH2M.  Upon information and belief, the four No-Bid Defendants formed the entire universe of FEMA contracts for implementation of the temporary housing mandate under the Stafford Act, and every Plaintiff or putative Plaintiff had their temporary housing unit installed, converted or maintained by one of the No-Bid Defendants.

The contracts between FEMA and the No-Bid Defendants, while containing some differences as to numbers of units and underlying geographic areas of operation, were virtually identical in how the No-Bid Defendants were tasked with handling temporary housing, from hauling and installing the units through management and refurbishment.[2]  Each of the respective contracts contained identical Performance Work Statement attachments which defined the mission of the No-Bid Defendants in their implementation of FEMA's temporary housing mandate under the Stafford Act (the "Scope of Work").[3]  Further, each scope of work contained fifteen identical exhibits which developed and described the activities outlines in the Scope of Work.

The fifteen exhibits attached to the Scope of Work in the respective contracts were:

1. History of Disasters
2. Work Plan

---

[2] The contracts are attached hereto as follows: Fluor is attached hereto as Exhibit "A"; Bechtel is attached hereto as Exhibit "B"; Shaw is attached hereto as Exhibit "C", and; CH2M is attached hereto as Exhibit "D".

[3] See the various scope of work documents incorporated as Attachment "A" to each of the respective contracts.

3.  Preliminary Land or Property Identification and Usage Assessment
4.  Site Inspection
5.  Staging Operations Support
6.  Manufactured Home – Installation Specifications
**7.  Travel Trailer Installation**
8.  Park Model – Installation Specification
9.  Unit Make Ready Only
**10. Maintenance – Temporary Housing Units**
11. Deactivation Task
12.  Group Site Design
13. Site Maintenance
14. Disaster Recovery Center Support
15. Technical Support

This section will briefly discuss the following in support of the allegations raised in the Amended Complaint: (1) the Scope of Work itself; (2) Travel Trailer installation; and (3) Maintenance of the Temporary Housing Units.  It is predominantly through these that the No-Bid Defendants failed in their duties to FEMA and the occupants of the Temporary Housing Units, and contributed to and exacerbated the exposures suffered by those same occupants to hazardous levels of formaldehyde.

### 1.  Scope of Work

Through the Scope of Work documents and the Exhibits attached thereto, the duties and obligations of the No-Bid Defendants under their respective contracts clearly defined and conveyed.  The Scope of Work clearly states that the No-Bid Defendants were tasked with providing support to FEMA under the Stafford Act.[4]  There is clearly an implied imperative that the No-Bid Defendants have familiarity with the terms, conditions, mandates and authorities of the Stafford Act in connection with their assistance to FEMA in its implementation.  This includes the temporary housing assistance mandate.  As such, the No-Bid Defendants had

---

[4] See sections 2.1.1 and 2.1.2 of the respective Scope of Work Documents.

knowledge that the term "temporary housing" under the Stafford Act meant a period up to, if not greater than, 18 months.[5]

Not only were the contractors tasked with competently carrying out the directives of FEMA, pursuant to the relevant statutory authorities (including but not limited to the Stafford Act), it is reiterated throughout the Scope of Work that the No-Bid Defendants are to "act in the best interest of FEMA."[6]   This was to be accomplished through clear communications and coordination with FEMA.   This included meeting with FEMA representative to plan and coordinate implementation activities and for the No-Bid Defendants to "become familiar and adjusted to FEMA requirements, methods, policies and plans."[7]   Further, under the Scope of Work section 2.5.2: "The contractor develop a work plan specific to temporary disaster housing that will identify the various factors which could impact the temporary disaster housing mission…"   This created an affirmative duty for the No-Bid Defendants to identify and address with FEMA any problems or risks associated with the implementation of disaster assistance through the use of inadequate temporary housing units – specifically travel trailers.  The No-Bid Defendants completely failed to address the inadequacy of the temporary housing units with FEMA.

Not only were the No-Bid Defendants tasked with communicating with FEMA regarding any potential problems with implementation, they were also tasked with communicating with the manufacturers of the temporary housing units regarding implementation.   Under section 2.9.1, the installation of the temporary housing units, the Scope of Work states:

---

[5] See, 42 U.S.C.A §5174.

[6] See Scope of Word sections 2.1 and 2.2 generally, and 2.2.2.1 specifically.

[7]  See Scope of Work, 2.5.1.

The Contractor shall transport and install mobile/temporary structures to be **ready to occupy in a safe and sanitary condition**…NOTE: The Exhibits that are provided are an example of installation requirements, **manufacturer recommendations should be followed whenever possible…** (emphasis added).

Section 2.9.2 discusses Coder Adherence as well as manufacturer specifications and recommendations:

The contractor is responsible for adherence to applicable local, state, and federal building regulations and laws…**The *contractor* shall be responsible for meeting manufacturer recommended installation specifications.** (emphasis added).[8]

Despite these clear instructions in their contracts with FEMA, the No-Bid Defendants failed to consult with the manufacturer regarding the installation of travel trailers as temporary housing units, not to mention whether that use was proper in the first place.  Not only did the No-Bid Defendants fail to discuss the use of the travel trailers as temporary housing units with the various manufacturers, they entirely failed to even review the owners' manuals of the various units which would have shown that the manufacturers universally warned that travel trailers were designed as recreational vehicles and were not intended for long-term habitation.  In fact several, including Forest River, Inc., warned that use of the travel trailer for long-term habitation would void the warranty.[9]  Further, the many of the various owners' manuals warn against lifting the unit up so its wheel base is off the ground, which is exactly what the No-Bid Defendants did when the installed the units and as will be further described in the following paragraphs.  Finally,

---

[8] It is interesting and important to note that pursuant to Section 2.9.2 of the Scope of Work, and Exhibits 6,7 and 8 attached thereto (the Installation instructions for Mobile Homes, Travel Trailers and Park Models), the No-Bid Defendants are clearly tasked with adhering to federal building regulations and codes.  Both Exhibit 6 and Exhibit 8 contain a Section 2.1 entitled "Codes, Regulations and Standards".  Under this section and emphasized, it states: "Precedent for applying codes and regulations are HUD and Federal requirements first, State and local second, manufacturers third, and NCSBCS/ANSI A 225.1, last."  Exhibit 7, Travel Trailer Installation, contains no such section or other language discussing regulatory residential requirements as travel trailers are not regulated as residences, **rather they are recreational vehicles.**  This is interesting and important because the travel trailers were utilized in the **exact same manner as manufactured housing and park models**.  The travel trailers were converted by the No-Bid Defendants from their intended design as recreational vehicles into long-term temporary housing units.

[9] Select Pages of Forest River, Inc.'s Owner's Manual are attached as Exhibit E.

many of the owners' manuals contained warnings that the various travel trailers contained urea-formaldehyde.  The No-Bid Defendants did not consult with the manufacturers in determining how to implement the FEMA contacts.  Nor did they consult or discuss with FEMA regarding the problems and warning associated with using travel trailers as temporary housing units.

### 2.  Travel Trailer Installation

Exhibit 7 of the respective Scope of Work documents contains the instructions for travel trailer installation.  This includes specific instruction for how to install the units onto concrete blocks or piers.[10]  This "blocking" involves lifting the units so that their weight is off of the wheel base.  Pursuant to the instructions under 2.1.2 of Exhibit 7, the travel trailer is lifted so that the weight is off of the wheel base and the frame is placed on a minimum of six concrete piers.  There are no instructions regarding returning weight distribution to the wheel base.  These instructions directly conflict with the manufacturer warnings that the units not be lifted off of the wheel base.  The No-Bid Defendants had a duty to comply with manufacturer specifications, instructions and warnings, and they also had a duty to consult with or discuss with FEMA any issues relating to the implementation of the temporary housing assistance under the Stafford Act.  The No-Bid Defendants did neither.  These failures, when coupled with the blocking of the units, created increased injury for the occupants of the temporary housing units.

The reason the manufacturers warned against the lifting the travel trailer off of its wheel base is fairly simple.  The travel trailer is designed as a recreational vehicle intended to be transportable and towable by cars and trucks on the road.  In effect, the travel trailer is a mobile alternative to a tent or hotel.  Because it is designed to be towed on the road, its frame was constructed to rest on the wheel base.  When it is lifted off of the wheel base, upon information

---

[10] Exhibits 6 and 8 also discuss "blocking" of mobile homes/manufactured housing, and park models respectively.

and belief, the frame is subjected to stresses which cause flexing and bending of the frame and walls.  Numerous problems result from this flexing and bending, including cracks which allow increased moisture intrusion, spaces for increased formaldehyde gas flow into the interior of the units, separation of the cabinetry and fixtures from the walls, warping of the frame so that the doors jam and the windows don't open correctly, amongst others.  In effect and actuality, the installation of the recreational vehicle travel trailers onto permanent concrete piers, with the wheelbase off of the ground, fundamentally altered the intended use for which the travel trailers were designed.  Instead of being recreational vehicles to be used intermittently for short period, which was the intent of the various manufacturers, the travel trailers became something different – an installed residence intended for occupancy under the Stafford Act of a period up to and possibly exceeding 18 months.  This converted use came with no residential occupancy protections through regulation or law, because travel trailers are listed as recreational vehicles and are not regulated by HUD or other housing agencies.  When the problems warned against by the manufacturers began to foreseeably occur with the use of the converted travel trailers, neither FEMA nor the No-Bid Defendants did anything about it.  These failures include but are not limited to adequately warning the occupants of the temporary housing units or moving them to safe, sanitary and habitable alternative housing.

It is also very important to note that both FEMA and the No-Bid Contractor knew or should have known about the problems of frame flexing and bending caused by lifting the travel trailers off of their wheel bases and installing them on concrete piers.  In Exhibit 11 to the respective Scope of Work documents, instructions for de-installation are given.  When closely examining the wording of the instructions, it is clear that both FEMA and the No-Bid Defendants were cognizant of frame flexing and bending creating damage to the frame and shell caused by

installation on concrete blocks.  Exhibit 11, Deactivation Task, page 3 of 17 reads in pertinent part:

> Inspect axel assemblies, springs, spring hangers, and equalizers, for missing parts **or cracked welds.**  Repair and/or replace as necessary.
>
> Inspect drawbar for **significant bends** that could affect transportability, **and ensure that all welds are free of cracks.**  Repair as required.
>
> ****
>
> Remove pier blocking or stabilizer jacks.  **Care should be taken to avoid excess sinking of the unit when it is lowered.**  During the lowering process, the unit drawbar shall be blocked in such a manner as to prevent the weight of the unit from resting on the screw jack.

(emphasis added).[11]

Not only did the installation of the travel trailers onto concrete blocks create flexing and warping of the frame and shell of the travel trailers, the No-Bid Defendants **were told to look for cracks and breaks attributable to that warping and flexing.**  Further, when presented with evidence of flexing and bending of the frame, the No-Bid Defendants did not consult with FEMA regarding alternative options, they were simply told to "repair the cracks".  The blocking of the travel trailers by the No-Bid Defendants created and exacerbated the exposure to formaldehyde experienced by the unit occupants.

### 3.   Maintenance/Refurbishment of the Temporary Housing Units

Under their contracts with FEMA, the No-Bid Defendants were tasked with maintenance of the temporary housing units.  This maintenance included refurbishment and reconditioning of the units for future use, sometimes immediate re-occupancy.  Section 2.10.1 of the Scope of Work, "Cleaning, Sanitation, & Reconditioning", states:

---

[11] It should be noted that there is no cautionary language regarding weld cracking or unit sinking in Exhibit 7, Travel Trailer Installation.

The contractor shall provide adequate personnel to clean and sanitize structures as required by FEMA to re-occupy the unit.  Contractor shall provide structural or other refurbishment as required by FEMA.  **"refurbishment" means restoration of structure to "like new" condition (reasonable wear and tear excepted) and shall include but not be limited to replacement of broken or faulty equipment, systems contained within or on the structure (i.e., carpet, trim, etc.).**  (emphasis added).

Exhibit 10 to the Scope of Work more clearly outlines the duties and obligations of the No-Bid Defendants for maintenance and refurbishment work.  The travel trailer and manufactured housing maintenance specifications are tasked generally under section 6.1 of Exhibit 10, page 7 of 15, and is described as: "The contractor will do maintenance necessary to maintain the temporary housing units in a safe, working, and livable, condition."  (emphasis in original).  This mandate should be coupled with the general requirement on the first page of the exhibit at subsection j) that the No-Bid Defendant is to: "[i]nform FEMA of any trends associated with the upkeep and maintenance of the unit…"  The No-Bid Defendants failed to maintain the units in a safe and livable condition when they knew or should have known of the elevated levels of formaldehyde.  Further, upon information and belief, the No-Bid Defendants took no action and failed to notify FEMA that there was a trend that the temporary housing units contained elevated levels of formaldehyde when they knew or should have known the occupants were being exposed to same.  Sections 6.6.5 and 6.6.6 of exhibit 10 delineate duties associated with refurbishment of the manufactured housing and the travel trailers respectively.

This refurbishment along with the conversion of the travel trailers from their intended design as recreational vehicles to installed residential housing units, both done by the No-Bid Defendants, creates liability by the No-Bid Defendants as manufacturers under products liability language of Louisiana, Mississippi, Alabama and Texas, as is alleged in the Amended Complaint.  The No-Bid Defendants fundamentally changed the intended use of the travel trailer

into something it was not designed to be used for – long-term habitation and occupancy.  The actions and inactions of the No-Bid Defendants contributed to and exacerbated the formaldehyde exposure of the occupants of the temporary housing units.

      C.    **The Procurement Defendants**

The Amended Complaint seeks to bring in a third group of defendants, the Procurement Defendants – NACS and Morgan.   Following hurricanes Katrina and Rita, the Federal Government contacted, contracted with and tasked the Procurement Defendants with identifying, selecting and procuring the temporary housing units to meet FEMA's disaster assistance mandate under the Stafford Act.  There was an initial contact email sent to NACS and Morgan separately explaining that FEMA needed 35,000 initial travel trailers and attaching a four page trailer specification list dated August 12, 2004.[12]   Upon information and belief, NACS and Morgan were the two Procurement Defendants tasked with purchase of all temporary housing units on behalf of FEMA.  The rationale for bringing in the Procurement Defendants is a simple one – knowing that FEMA was in need of temporary housing units in response to hurricanes Katrina and Rita, and knowing that the manufacturers' intended use of travel trailers was as recreational vehicles, the Procurement Defendants were a proximate cause of the disaster victims exposure to formaldehyde because the Procurement Defendants elected to purchase units which were not designed for nor adequate to be used as temporary housing units.

It must also be mentioned that the Procurement Defendants had knowledge well before hurricanes Katrina and Rita that FEMA was examining travel trailers as potential disaster

---

[12] The Morgan email and specifications are attached hereto as Exhibit "F"; the NACS email and specifications, with additional cover letter are attached hereto as Exhibit "G".

housing units.[13]   Not only did the Procurement Defendants have advanced knowledge that

FEMA was looking at travel trailers for use in disaster assistance, but at least NACS had direct

input in the design of an alternative, safer model prior to the hurricanes.   At the 30(b)(6) class

certification deposition in the master action of this matter, NACS's representative discussed its

involvement in designing a safer alternative at page 79, line 6 through page 81, line 19:[14]

> Q:      Have you ever been contacted or asked to contribute your thoughts,
> comments or expertise in designing a travel trailer, a park model or a mobile
> home?
>
> A:      Yes, sir.
>
> Q:      Tell me what those circumstances are…Go ahead.
>
> A:      In – I believe it was in 2003, Eric Tolbert moved up from the State
> Director of North Carolina Emergency management into the FEMA organization
> as the Director – I Can't remember if Eric was either the director of response or
> director of recovery.  Bur Eric had been through Hurricane Floyd and knew the
> housing mission and knew the intricacies and problems with it, and took it very
> personally on the housing mission.  I knew Eric quite well through the National
> Emergency Management Association, which I'm a member, and so Eric asked me
> to assist him designing a park model.  At that time, FEMA had not used park
> models.  And so I called Jim Foltz with Forest River, and Jim and I met Eric
> Tolbert and his staff at a park model development in a small – Spotsylvania – I
> think near Spotsylvania, Virginia.  And what Eric did was get on board the park
> model and, you know, for the mother, he wanted a washer/dryer hook-up, you
> know how he wanted it laid out.  **He wanted to use C.O.T.S., Commercial off-
> the-shelf materials, not materials for the recreational vehicle industry.**  That
> if something broke you could go to Home Depot.  And so Jim took that
> information back with him and designed specifications and a floor plan, which
> was then submitted to FEMA, to Eric's office, and they, you know, they put their
> stamp of approval, although, you know, they weren't in the process of ordering
> anything.  But it was like, "Eric, is this what you are talking about?"  And Jim had
> put together the specifications and the floor plan.  **And so we actually took that
> particular unit and put it on the GSA schedule, which would allow the**

---

[13] See the handwritten fax cover sheet from NACS to Forest River dated July 1, 2004 and attached hereto as Exhibit
"H".  The handwritten notes state in pertinent part:  **"This is a new direction FEMA is going and as such we hope
to build great quantities of these units…We do not currently offer any non-slide models in the size range 32-35
feet.  Forest River does not build one, can we overcome this?"**

[14] The cover and selected pages are attached hereto as Exhibit "I".

> **Government the capability to access it easier in the time of disaster, because the GSA is a recognized method of procurement for the Federal Government.**
>
> **Q.     All right.  Did any of those models become part of any of the orders or contracts that your company dealt with?**
>
> **A:     Never.  It never was used.**

(emphasis added).

As of 2003, per the above sworn testimony, FEMA and the Procurement Defendants, at least NACS, were cognizant of alternatives to travel trailers and had gone so far as to design an alternative with commercial grade parts, rather than recreational vehicle grade parts.  Despite the time, effort and expense undertaken by FEMA, Forest River and NACS, there was never any attempt to utilize these safer units specifically designed for disaster response.  Rather, FEMA reverted to travel trailer requests and the Procurement Defendants, knowing there was an alternative unit specifically designed for disaster housing under the Stafford Act, simply purchased approximately 140,000 travel trailers between them.

The decision to select, identify and procure travel trailers instead of more suitable units for temporary housing assistance under the Stafford Act is the primary reason that occupants were exposed to hazardous levels of formaldehyde.  Had the Procurement Defendants chosen more suitable units, the displaced victims of hurricanes Katrina and Rita would not have been exposed to dangerous levels of formaldehyde.

## II. Argument

The Amended Complaint is necessary for judicial efficiency and economy, and the New Defendants all share some responsibility for the exposure to hazardous levels of formaldehyde experienced by the Plaintiffs as a whole while occupying the temporary housing units.  The Federal Government, once it became aware of the problem with formaldehyde, failed to warn the

occupants or to take appropriate actions to protect them.   Rather, the Federal Government's primary focus was on the avoidance of liability and an interest to protect itself from litigation, as shown and discussed in this Court's Order and Reasons of October 3, 2008 in the Master Action. The No-Bid Defendants were tasked with the implementation of the direct assistance under the Stafford Act.   This included installation, maintenance and refurbishment of the temporary housing units.   The No-Bid Defendants failed to: (1) consult with the manufacturers of the units regarding the advisability of putting the units on blocks with the weight off of their wheel base; (2) consult with FEMA regarding the advisability of using travel trailers as temporary housing units; (3) failed to warn the occupants of the trailers about the danger of formaldehyde; and (4) failed to identify or take any action regarding the dangerous levels of formaldehyde in the temporary housing units.   This, coupled with the fact that the No-Bid Defendants actively converted the travel trailers from mobile recreational vehicles into stationary residences intended for long-term occupancy which fundamentally changed the intended purpose of the units from that which they were designed for, creates liability for the No-Bid Defendants.   Finally, the Procurement Defendants, having knowledge of safer alternative units designed specifically for disaster housing, chose instead to purchase travel trailer in enormous quantities.   Without that decision by the Procurement Defendants, there would not have been an opportunity for the formaldehyde exposure experienced by the occupants of the temporary housing units

A.  **Amending the Complaint**

The amendment of an underlying complaint is envisioned and allowable by Rule 15 of the Federal Rules of Civil Procedure.   FRCP Rule 15(a)(2) states that a party may amend its pleading with the court's leave and that the court should "freely give leave when justice so

requires." Further FRCP Rule 15(c) which deals with the relation back of amendments states in

pertinent part:

> **(1)**       ***When an Amendment Relates Back.***  An amendment to a pleading relates
> back to the date of the original pleading when:
>
> ****
>
>> **(B)**       the amendment asserts a claim or defense that arose out of the
>> conduct, transaction or occurrence set out – or attempted to be set out – in
>> the original pleading; or
>>
>> **(C)**       the amendment changes the party or the naming of the party
>> against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if,
>> within the period provided by Rule 4(m) for serving the summons and
>> complaint, the party brought in by the amendment:
>>
>> **(i)**   received such notice of the action that it will not be prejudiced in
>> defending on the merits; and
>>
>> **(ii)** knew or should have known that the action would have been brought
>> against it, but for a mistake concerning the proper party's identity.

Pursuant to FRCP Rule 15(c), this honorable Court should allow the amendment of the

Original Complaint for four reasons: (1) at the time of filing, the Plaintiffs did not know of the

involvement of the New Defendants (other than FEMA); (2) the causes of action against the new

defendants, all stemming from formaldehyde exposure in the temporary housing units provided

to victims of hurricanes Katrina and Rita, have been discovered through document production

and deposition testimony, all of which only recently came into the possession of the Plaintiffs;

(3) every single one of the New Defendants has been deposed in this matter and provided some

document production which indicate possible liability to the Plaintiffs arising out of the events

and occurrences alleged in the Original Complaint and which gave the New Defendants ample

indication they may be brought in and made defendants to this action; and (4) this action has not

entered the merits phase of litigation and, as such, there is no prejudice to any of the New

Defendants in their ability to defend against the assertions and allegations in the Amended

Complaint.  Further, the United States is already a named party to the Master Class Complaint based upon a separate underlying complaint, and the undersigned simply wanted to correct the failure to include them in their particular Original Complaint.

Pursuant to the Rule 15, this Court should freely give leave to amend as justice so requires.  Further, the relation back aspects of Rule 15 should apply to the New Defendants.

B.  **The Federal Government**

The analysis as to why the Federal Government and FEMA are named and bear some liability in this action was clearly articulated by this Court in its October 3, 2008 Order and Reasons.  Plaintiffs would refer the Court to its own writings in support of their claims against the Federal Government.  Plaintiffs would raise one point of focus, however, that is particularly determinative regarding the failures and inactions of the Federal Government, once it knew of the hazardous levels of formaldehyde in the temporary housing units.  The *Indian Towing Co. v. United States*, 350 U.S. 61 (1955) case and its subsequent interpretation in *Berkowitz v. United States*, 486 U.S. 531 (1988), provide solid guidance as to FEMA's liability for its failure to address the problem of hazardous levels of formaldehyde once it knew of it.  The *Berkowitz* court, discussing *Indian Towing*, stated:

> The plaintiff in that case sued the Government for failing to maintain a lighthouse in good working order.  The Court stated that the initial decision to undertake and maintain lighthouse service was a discretionary judgment…The Court held, however, that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA…The latter course of conduct did not involve any permissible exercise of policy judgment.

*Id.,* at 538.

The *Indian Towing* Court, in reaching the conclusion that the if the Government's failure to maintain a lighthouse damaged the plaintiffs it would be liable under the Federal Tort Claims Act, stated:

> [T]he Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light…, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the [FTCA].

350 U.S., at 69.

The argument against FEMA is twofold: (1) it failed to take appropriate remedial action once it became aware of the hazardous conditions in the temporary housing units, and (2) through its failure to take remedial action, FEMA violated the constitutional right to equitably distributed temporary housing assistance under the Stafford Act.

## C.  Adding the Product Liability Causes of Action vs. No-Bid Defendants

The four states which were most seriously affected by hurricanes Katrina and Rita have product liability statutes which apply broadly to the No-Bid Defendants as manufacturers/sellers. Briefly they are: (1) Louisiana Revised Statute 9:2800.53; (2) Mississippi Code Annotated §11-1-63; (3) Code of Alabama §6-5-521; and (4) Vernon's Texas State Code Annotated, Texas Civil Practice and Remedies Code 82.001, et seq.

The No-Bid Defendants fundamentally changed the design and intended use of the travel trailers when they installed them and converted them from recreational vehicles to residential temporary housing units. They were further tasked with refurbishment of the units for future use

in a "like-new" condition.   Because of these two reasons, the No-Bid Defendants were manufacturers under the various statutes and are liable under theories of product liability.

D.  **Negligence of All Parties.**

The concept of negligence is pervasive throughout the sequence of events which led to the hurricane victims being exposed to hazardous levels of formaldehyde.  The manufacturers designed recreational vehicles and knowing that they were to be used for extended occupancy, a purpose outside the intended use of the vehicles, they sold the travel trailer units for significant profit.  The Procurement Defendants were contracted by FEMA to identify, select and purchase enormous numbers of temporary housing units to house disaster victims.  The Procurement Defendants, knowing that there were safer and better suited alternative designs, selected and purchased travel trailers which were unsafe and not intended for long-term habitation.  The No-Bid Defendants failed to consult with FEMA or the manufacturers regarding the use of the travel trailers for housing the disaster victims.  Further, they failed to consult with the manufacturers regarding the installation and implementation of their contracts relating to the temporary housing units.  FEMA became aware of problems with hazardous levels of formaldehyde at an early stage in the disaster housing program, and failed to take appropriate action to resolve the problem, in some cases waiting years to do anything to help the occupants.  All of the above negligent actions or inactions contributed to and exacerbated the exposure to hazardous levels of formaldehyde experienced by the Plaintiffs.

**III.  Conclusion**

The Amended Complaint is necessary for judicial efficiency and economy, and the New Defendants all share some responsibility for the exposure to hazardous levels of formaldehyde

experienced by the Plaintiffs as a whole while occupying the temporary housing units.  The Federal Government, once it became aware of the problem with formaldehyde, failed to warn the occupants or to take appropriate actions to protect them.  Instead, FEMA's primary focus was on the avoidance of liability and an interest to protect itself from litigation, as shown and discussed in this Court's Order and Reasons of October 3, 2008 in the Master Action.  Additionally, once FEMA became aware of the problem, their failure to take affirmative action violated the vested property rights of the disaster victims to equitable temporary housing assistance.  The No-Bid Defendants were tasked with the implementation of the direct assistance under the Stafford Act, but failed to: (1) consult with the manufacturers of the units regarding the advisability of putting the units on blocks with the weight off of their wheel base; (2) consult with FEMA regarding the advisability of using travel trailers as temporary housing units; (3) failed to warn the occupants of the trailers about the danger of formaldehyde; and (4) failed to identify or take any action regarding the dangerous levels of formaldehyde in the temporary housing units.  This, coupled with the fact that the No-Bid Defendants actively converted the travel trailers from mobile recreational vehicles into stationary residences intended for long-term occupancy which fundamentally changed the intended purpose of the units from that which they were designed for, creates liability for the No-Bid Defendants.  Finally, the Procurement Defendants, having knowledge of safer alternative units designed specifically for disaster housing, chose instead to purchase travel trailer in enormous quantities.  Without that decision by the Procurement Defendants, there would not have been an opportunity for the formaldehyde exposure experienced by the occupants of the temporary housing units.  These injuries were experienced throughout the class, and Plaintiffs humbly request that this honorable Court grant their Motion for Leave to Amend and admit the attached Amended Complaint.

Respectfully Submitted,


By:    /s/ Frank J. D'Amico, Jr
         Frank J. D'Amico, Jr. (#17519)
         **Frank J. D'Amico, Jr., APLC**
         622 Baronne Street
         New Orleans, Louisiana 70113
         Telephone:   (504) 525-7272
         Facsimile:   (504) 525-9522

         **Counsel for Plaintiffs and member of
         Court Appointed Plaintiffs' Steering
         Committee in the Master Action**


## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record were served with copies via the electronic filing system in the Eastern District of Louisiana this 23 day of October, 2008.  I further certify that any counsel of record not subscribing to the electronic filing system in the Eastern District of Louisiana were noticed via United States Mail, postage pre-paid, this 23 day of October, 2008.


         /s/ Frank J. D'Amico, Jr.
         FRANK J. D'AMICO, JR. (#17519)