**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

| | |
|---|---|
| IN RE:  FEMA TRAILER | MDL NO. 1873 |
| FORMALDEHYDE | |
| PRODUCT LIABILITY LITIGATION | SECTION "N-4" |
| | |
| | JUDGE ENGELHARDT |
| | MAG. JUDGE ROBY |

**THIS DOCUMENT IS RELATED TO ALL CASES**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

**MAY IT PLEASE THE COURT:**

Named Plaintiffs, individually and on behalf of all persons similarly-situated, through the Plaintiffs' Steering Committee ["PSC"] respectfully submit this Memorandum in Support of its Motion for Class Certification.

I.     **STATEMENT OF THE CASE:**

    A.  **INTRODUCTION**

After the landfalls of Hurricanes Katrina and Rita the homes of hundreds of thousands of citizens of the United States who resided along the Gulf Coast were rendered uninhabitable, leaving these citizens homeless. The United States of America, through the Federal Emergency Management Agency (FEMA), undertook to provide emergency housing units (EHU's) to these citizens.

FEMA contracted with the Manufacturing Defendants to purchase thousands of such EHU's. Many were purchased directly off the lots of some of the Manufacturing Defendants. FEMA purchased over 34,000 EHU's off the lot and over 106,000 were purchased from manufacturers pursuant to FEMA's specifications. In addition, the Manufacturing Defendants expedited the production of many of the EHU's, using substandard materials and/or employing irregular practices during the manufacturing process. Plaintiffs submit that the housing units, both those which were manufactured prior to the hurricanes and those later manufactured did not conform to any Government-imposed regulations or standards which address formaldehyde levels in the design and/or construction of housing units. The result of these actions was an abnormally high level of formaldehyde in the EHU's. Consequently, Plaintiffs were exposed to hazardous level of formaldehyde while residing in units intended to replace their damaged or destroyed homes. This health crisis was exacerbated when the United States, through FEMA, chose not to respond to citizen complaints and concerns about formaldehyde in the emergency housing units because of a governmental focus on potential liability instead of public health.

At this stage in the MDL, the key issue before the Court is procedural in nature: Should this litigation be managed as a class action in order to efficiently adjudicate and resolve common issues on the merits, or should the parties be relegated to a mass joinder model which may prove more costly, more time-consuming and less susceptible to the MDL resolution of disputed common issues?

To certify this matter as a class action, the Court must find that plaintiffs have satisfied each of the requirements of Rule 23(a) and, in addition, the requirements of Rule 23(b)(3). Plaintiffs respectfully submit that they have satisfied these requirements of numerosity, commonality, typicality, and adequacy under Rule 23(a), as well as the requirements of

predominance and superiority under Rule 23(b)(3). This case therefore should be managed as a class action and proceed to a common issues trial, thereby avoiding the delays and costs of multiple suits with varying results, particularly in the event of post-MDL remand.

In the event that this Court elects not to certify a class based on all individuals who resided in EHU's in the four states after Hurricanes Katrina and Rita, then the plaintiffs urge the court to certify a class based upon the future medical services that are desperately needed by all plaintiffs, especially children. The Court, under Rule 23(c)(4), has the authority to certify an action with respect to a particular issue, severing it from the whole class seeking certification. *Castano v. American Tobacco Co.*, 84 F.3d 784, 739 (5th Cir. 1996). While plaintiffs submit that the entire class meets the burdens imposed by Rule 23, the subclass proposed for the recovery of future medical services may be separately certified, if the Court so desires, because this subclass independently satisfies the certification criteria of Rule 23.

### B. **PROCEDURAL HISTORY**

In response to their exposure to formaldehyde, numerous Named Plaintiffs filed class actions which have been consolidated before this Honorable Court. On March 18, 2008 the Named Plaintiffs filed an Administrative Master Complaint consolidating the various claims raised in the pending class actions. The Administrative Master Complaint sets forth causes of action enumerated in Counts I through IX, and seeks damages and other relief for the injuries identified. On August 1, 2008 the Administrative Master Complaint was dismissed by the Court as to certain Newly Added Defendants, based on a failure to specify claims against these entities on the part of named class representatives. Plaintiffs then filed a Motions for Leave to file a Second Supplemental and Amended Complaint in the underlying *Pujol* matter (Rec. Doc 656)

and a Second Supplemental and Amended Master Complaint (Rec. Doc. 657) to correct (or address to the fullest extent possible) this "standing" issue. Plaintiffs' Motions to Amend were granted by the Court on October 6, 2008 (Rec. Doc. 720).

### C. CLASS AND SUBCLASS DEFINITIONS

Application of Rule 23 to the present claims supports certifying the following subclasses:

#### a. Louisiana Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the state of Louisiana after Hurricanes Katrina and/or Rita, and who sustained damages recoverable under Louisiana law as a result of exposure to formaldehyde in these units.

#### b. Texas Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the state of Texas after Hurricanes Katrina and/or Rita, and who sustained damages recoverable under Texas law as a result of exposure to formaldehyde in these units.

#### c. Mississippi Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the state of Mississippi after Hurricanes Katrina and/or Rita, and who sustained damages recoverable under Mississippi law as a result of exposure to formaldehyde in these units.

#### d. Alabama Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the state of Alabama after Hurricanes Katrina and/or Rita, and who sustained damages recoverable under Alabama law as a result of exposure to formaldehyde in these units.

#### e. Future Medical Services Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the states of Louisiana, Texas, Mississippi, and/or Alabama after Hurricanes Katrina and/or Rita, and who are found eligible to participate in a medical services program designed to monitor the physical condition(s) of each such individual for the purpose of ascertaining and responding to diseases caused by, contributed to, or exacerbated by the individual's exposure to formaldehyde while residing in any of the aforementioned units.

**f. Economic Loss Subclass:**

All individuals to whom FEMA provided an emergency housing unit within the states of Louisiana, Texas, Mississippi, and Alabama after Hurricanes Katrina and Rita and who sustained economic loss recoverable under each state's law as a result of being provided housing not fit for its ordinary purpose.

The above class and subclass definitions are appropriately specific, allowing the parties and the Court to ensure that the claims of all individuals included in the definitions can and will be asserted and prosecuted through a single, manageable proceeding. These definitions also give potential claimants sufficient information to discern whether they are in the class and a given subclass, enabling them to decide whether to opt out of the same. Those who choose to remain class members will be bound under principles of *res judicata* as to any and all decisions in the class proceeding regarding common, class-wide issues.

Proposed class definitions should be "precise, objective, and presently ascertainable."[1] They should not depend on subjective criteria or on the merits of the case, or require extensive

---

[1] Manual for Complex Litigation, Fourth § 21.222 (2005).

factual inquiry to determine inclusion in the class.[2] By the use of objective criteria, the above definitions also avoid problems of "circular" definitions, i.e., those which depend on the outcome of the litigation before class membership can be ascertained."[3] The definitions proposed herein do not "require the court to engage in an impermissible consideration of the merits of the claims in connection with its class certification determination."[4]

## II.     THE REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 23:

In applying Rule 23 this Court need not, and should not, evaluate the merits of the case. The question is whether the certification criteria of Rule 23 are satisfied, a question as to which the Court has substantial discretion. *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001). In addressing this question, the Court may consider materials beyond the pleadings, relevant facts, basis of the claims of the parties, and applicable substantive law. *See Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

As noted, <u>supra</u>, a class of plaintiffs seeking certification must satisfy four threshold prerequisites: (1) numerosity (that the class is so numerous that joinder of all members is impracticable; (2) commonality (that there are questions of law or fact common to the class); (3) typicality (that the claims of the representative parties are typical of the claims or defenses of the class); and (4) adequacy (that the representative parties will fairly and adequately protect the interests of the class). *See* Fed. R. Civ. P. 23(a); *see also Amchem Products, Inc. Windsor, supra*, 521 U.S. at 613 (1997). In addition to satisfying Rule 23(a)'s prerequisites, a class proposed under Rule 23(b), such as the one proposed herein, must meet certain additional requirements. Specifically, pursuant to Rule 23(b)(3), Plaintiffs must show that:

---

[2] Herbert B. Newberg, Newberg on Class Actions §6:14 at 614-615 (4th ed. 2002).
[3] *Id.*
[4] *Id.*

[q]uestions of law or fact common to the members of the class <u>predominate</u> over any questions affecting only individual members, and that a class action is <u>superior</u> to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3) [emphasis added].

## A.  Rule 23(a): Numerosity, Commonality, Typicality, and Adequacy

### a.  *Numerosity*

To establish numerosity, Plaintiffs must provide some evidence or a reasonable estimate of the number of purported class members. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001). Although a specific minimum number of members in a proposed class is not controlling in determining whether joinder in impracticable, it has been noted that any class consisting of more than forty members does "raise a presumption that joinder is impracticable." *See Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999). Moreover, when class size reaches substantial proportions (as here), the impracticability-of-joinder requirement may be seen as satisfied by sheer numbers alone. Newberg, §3.05 at 3-26 (3rd ed. 1992).

### b.  *Commonality*

A common question of law or fact is one that, when answered as to one class member, "will affect all or a significant number of the putative class members." *James v. City of Dallas, supra*, at 570; *See also Lightbourn v. City of El Paso, supra*. The Fifth Circuit has noted that "the threshold of commonality is not high." *Bertulli v. Independent Ass'n of Continental Pilots*, 242 F.2d 468 (5th Cir. 1986) (citing *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468 (5th Cir. 1986)). The fact that some of the plaintiffs may have different claims, or have claims that require individualized analysis, will not defeat commonality. *Forbush v. J.C.Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993). The commonality requirement is satisfied if the named plaintiffs share with the proposed class at least one question of law or fact.  *See James v. City of Dallas, supra*, at

570; *See also Mullen*, 186 F.3d at 625 [stating that commonality "ordinarily is considered in connection with the Rule 23(b)(3) predominance inquiry because the court can usually find at least one issue that can be said to be common under the liberal wording of Rule 23(a)(2)"].

### c. *Typicality*

Typicality does not require a complete identity of claims within the proposed class, but simply that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3) (West 2005). The test is not considered demanding as it is satisfied when the claims of the named and unnamed plaintiffs share a common source and rest upon the same legal and remedial theories. *See Mullen v. Treasure Chest Casino, supra,* 186 F.3d at 625 (5th Cir. 1999). The focus on the similarity of claims is more important than the relative strength of the claims on their merits. *See Lightbourn*, 118 F.3d 421, 426 (5th Cir. 1997). Generally, when it is alleged that the same conduct was directed at or affected both the named plaintiffs and the class sought to be represented, the typicality requirement is met irrespective of varying fact patterns which may underlie individual claims. *See* Newberg. §313 at 3-77 (3rd ed.). Hence, if the claims arise from a similar court of conduct and share the same legal theory, factual differences will not defeat typicality. *See Mullen*, 186 F.3d at 625 (typicality is satisfied when plaintiff-employees asserted the same theories of liability, despite defendants' argument that each class member's allegedly resulting "respiratory illness" may differ).

### d. *Adequacy of Representation*

The adequacy requirement applies to both the class representatives and their respective counsel. *See Jenkins v. Raymark, Indus., Inc., supra*. The requirement exists because a final judgment in a class action is binding on all class members, and accordingly mandates that class

representative interests be aligned with, and not antagonistic to, unnamed class members. *See Mullen v. Treasure Chest Casino*, *supra*, at 625-626. A sufficient alignment exists when "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class." *In re: Corrugated Container Antitrust Litigation*, 643 F.2d 195, 208 (5th Cir. 1981). Differences between the named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts of interest between the named plaintiffs and class members. *See Mullen v. Treasure Chest Casino*, *supra*, at 626. It has been observed that the adequacy of representation requirement "tends to merge" with the commonality and typicality requirements, to the extent all such criteria "serve as guideposts for determining whether the maintenance of a class action is economical and whether the named plaintiffs and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem Products, Inc. v. Windsor*, *supra*, 521 U.S. at 626 n. 20.

### B. <u>Rule 23(b)(3): Predominance and Superiority</u>

Rule 23(b)(3) requires determinations (1) whether common issues predominate, and (2) whether a class action is a superior method to resolve the controversy. Taken together, these two requirements ensure that a proposed class has "sufficient unity, so that absent class members can fairly be bound by decisions of the class representatives." *See id.*, U.S. at 615. Determining whether common issues predominate and whether the class action is a superior procedural vehicle entails an understanding of the relevant claims, defenses, facts, and substantive law presented in the case. *See Berger, supra*, at 483.

#### a. *Predominance*

In order to "predominate," common issues must constitute a significant part of the individual cases. *See Jenkins v. Raymark Industries, Inc.*, *supra*, at 472. The purpose of the predominance requirement is to ensure that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor, supra*, 521 U.S. at 623. The standard "does not require that all issues be common to all parties," but rather mandates that "resolution of the common questions affect all or a substantial number of the class members." *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992). Thus, for example, individual questions on issues such as damages which do not predominate over common issues will not prevent certification. 7A Wright, Miller, & Kane, Federal Practice and Procedure, § 1780 at 576-77 (2nd ed. 1986).

**b.** *Superiority*

With respect to the superiority inquiry, Rule 23(b)(3) identifies for consideration four factors which are meant to be illustrative, not exhaustive: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class. Fed R. Civ. P. 23(b)(3)(A)-(D); Newberg, §4.28 (4th ed.).

The "interest" factor requires more than the desire of certain individuals to have their own separate lawsuits. Rather, such an interest exists where the individual has "special issues which require separate litigation," as, for example, an issue of reliance in a case of misrepresentation.  7A Wright, Miller, & Kane, Federal Practice and Procedure, § 1780. Presumably, this factor pertains to the interests of more or all class members, rather than the

interests of a few individual members; for when a small segment of class members has a strong interest in individual litigation, that interest may be served by opting out. *See* Newberg, §4.29 (4th ed.). Furthermore, the Advisory Committee notes with Rule 23 direct the court to ascertain whether any stated "interests" may be theoretic rather than practical. *See id.*

The second factor suggests that the court consider "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." Fed. R. Civ. P. 23(b)(3)(B). This serves the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits. Ordinarily, a class action will be superior to repetitive individual suits. Newberg, §4.30 (4th ed.).

The third consideration suggests that the court assess "the desirability or undesirability of concentrating the litigation of the claims in a particular forum." Fed. R. Civ. P. 23(b)(3)(C). The inquiry is whether the forum chosen for the class action represents an appropriate place to settle the controversy, given the location of the interested parties, the availability of witnesses and evidence, and the condition of the court's calendar. In the class action context, the desirability of concentrating claims in a particular forum is relevant only when other class action litigation has already been commenced elsewhere. *See* Newberg, §4.31 (4th ed.).

The fourth factor, manageability, addresses the "difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P.23(b)(3)(D). Such management difficulties are appropriately considered when comparing the class action device to other methods of adjudicating the controversy, and it is only when such difficulties make a class action less fair and efficient than some other method, such as individual interventions or consolidation, that a class action is improper. Newberg, §4.32 (4th ed.).

III.   **ANALYSIS**

A.   **Rule 23(a):**

a.   *Numerosity*

In the instant case, numerosity is easily established. The class of persons that the Named Plaintiffs and Putative Class Representatives seek to represent encompasses thousands of individuals. Federal courts have certified classes of far fewer putative class members than exist herein, including classes of members as few as 13, 17, and 18. *See Arkansas Education Ass'n v. Bd. of Education of Portland Arkansas School District*, 446 F.2d 763 (8th Cir. 1971); *Cypress v. Newport News General & Nonsectarian Hospital Ass'n*, 375 F.2d 648 (4th Cir. 1967); *Dole Electronics, Inc. v. RCL Electronics, Inc.*, 53 F.R.D. 531 (D.N.H. 1971).

Specific numbers aside, the practical difficulty of joining and managing all of the proposed class member claims in this case as individual, consolidated claims, is obvious. The plaintiffs have been and continue to be geographically dispersed as a result of Hurricanes Katrina and Rita. *See Mullen v. Treasure Chest Casino*, *supra*, at 625 (affirming the district court's finding of numerosity where the court reasonably inferred from the nature of the plaintiffs' employment that class members would be geographically dispersed).

Hence, given both the number of putative class members involved herein and the impracticability of a mass joinder of claimants who are geographically dispersed, the numerosity prerequisite of Rule 23 is satisfied.

b.   *Commonality*

All of the claims herein proceed from one of two hurricane disasters, and the resulting displacement and relocation of citizens which resulted in formaldehyde exposure. The questions why and how this occurred, what chemical and at what levels was present, and who were

exposed, all are common questions. Defendants' conduct or fault in the failure to exercise reasonable care to prevent the exposure of formaldehyde to the plaintiffs is a central and common issue. The scientific nature and behavior of formaldehyde likewise are common issues of fact. These issues, and others discussed *infra* in regard to the "predominance" requirement, are managed most effectively and uniformly in a class action which applies to and binds all claimants. *See* 7A Wright, Miller, & Kane, *Federal Practice and Procedure*, § 1763 at 227 (2d ed. 1986) (noting the partial redundancy of Rule 23(a)(2)'s commonality requirement, given that the analysis is essential to Rule 23(b)(3)'s predominance requirement).

### c.  *Typicality*

The third prerequisite, typicality, also is clearly established in the case at bar. As stated, typicality focuses less on the relative strength of the named plaintiffs' and the putative class members' cases than on the similarity of the legal and remedial theories between and among their claims and those of the class. *See Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). This is because one of the purposes of the typicality requirement is to ensure that the class representative's interest is aligned with those of the represented group and that in pursuing his or her own claims, the named plaintiff also will advance the interests of the class members." *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996). In making this determination, courts consider the elements of the cause of action that the class representatives must prove in order to establish the defendant's liability; if these elements are substantially similar to those needed to be proven by other class members, the representative's claims are deemed typical. *See* Newberg, §3:15, 359-60, and cases cited therein.

Named plaintiffs, herein, individually and on behalf of the putative class, are asserting various legal theories of liability directed at the Manufacturing Defendants' design, manufacture,

and distribution of products (housing units) which were unreasonably dangerous in normal and/or foreseeable misuse. These defendants failed to warn plaintiffs of the unreasonably dangerous nature of their products, and failed to ensure that their products were suitable for their intended use (long-term residence). The named class representatives specifically have pled the following causes of action against the Manufacturing Defendants: (1) liability under the Louisiana Products Liability Act for the negligent design, manufacture, and distribution of their products; (2) strict liability under the Mississippi Code Annotated § 11-1-63 for the negligent design, manufacture, and distribution of their products; (3) liability under Alabama's Extended Manufacturer's Doctrine for the negligent design, manufacture, and distribution of their products; (3) liability under Texas law for the negligent design, manufacture, and distribution of their products; (4) liability for their failure to warn; (5) liability for their breach of express or implied warranty and/or failure to conform to other express factual representations on which the plaintiffs justifiably relied. As to each of these causes of action, the claims asserted by the class representatives are typical of other class member claims under these theories of liability.

As an example, Corey Davis, a class representative, asserts claims arising from his nearly two-year residency in an EHU.[5] Mr. Davis suffered shortness of breath, irritation of the eyes, headaches, dizziness and coughing.[6] He also suffered nosebleeds every other night and vomiting once or twice a week.[7] Mr. Rayfield Robinson, a class representative, suffered during his twenty-five month residency in an EHU burning, watery eyes, breathing problems, vomiting problems and pains in his stomach.[8] Mr. Robinson continues to suffer vomiting, watery eyes, and diarrhea

---

[5] *See* Deposition of Corey Davis generally, attached hereto as Exhibit A.
[6] *See* Exhibit A, p.20:19-23.
[7] *See* Exhibit A, pp.57:6-58:14; p. 59:14-16.
[8] *See* Deposition of Rayfield Robinson, p. 31:18-23 attached hereto as Exhibit B.

today despite having evacuated the EHU nearly seven months ago.[9] Shane Lee Baker, a minor who resided in an EHU for seven months, asserts claims based upon his suffering of irritation of nasal membranes, nausea, vomiting, skin rashes, abdominal pain, and breathing difficulty.[10] Heavenly Beasley, a minor who resided in an EHU from October 2005 to April 2008, asserts claims of troubled breathing, ear infections, and stomach problems.[11] Heavenly has been diagnosed with and continues to be treated for bronchitis and upper respiratory infection.[12] The claims asserted by Corey Davis, Rayfield Robinson, Shane Lee Baker, and Heavenly Beasley, are typical and representative of the claims asserted by the class as a whole.

The named class representatives have, on behalf of the putative class, also asserted the following causes of action against the United States/FEMA: (1) liability under Louisiana Civil Code Articles 2316; and; (2) liability under 2317. These claims all arise out of the governmental defendant's improper response to disclosures that the housing units furnished to plaintiffs were found to have unsafe levels of formaldehyde, claims which were discussed by the Court in its Order and Reasons filed October 3, 1008 (Rec. Doc. 717). The class representatives' claims are typical of class claims in this regard, because class members were improperly allowed to remain in units known to be unsafe, without proper warnings from FEMA prior to exposure.

In this case, the representatives' claims thus arise from the exact same course of conduct and share the same legal theory as do claims of the putative class. The class representatives carry no burden of proof unique to their liability cases, and will continue to advance the interests of all the class members.

---

[9] *See* Exhibit B, p.36:1-15.
[10] *See* Deposition of Shane Baker o/b/o Shane Lee Baker, p. 89:11; p. 90:8, 19-24; p. 90:25-91:2; p.98:16-23, attached hereto as Exhibit C.
[11] *See* Deposition of Joycelyn C. Beasley o/b/o Heavenly Beasley, p. 47:2-6; p. 57:19-20, attached hereto as Exhibit D.
[12] *See* Exhibit D, p. 51:7-9; 52:15-17.

### d. *Adequacy of Representation*

The final Rule 23(a) prerequisite to a class action, adequacy of representation, requires that the interests of the named plaintiffs be aligned with the putative class members to ensure that the class representatives have an incentive to pursue and protect the claims of the absent class members. *See Amchem Products, Inc. v. Windsor*, 117 S.Ct. 2231, 2251, n. 20 (1997). Two factors now predominantly recognized as the basic guidelines for the Rule 23(a)(4) prerequisite are (1) absence of conflict and (2) assurance of vigorous prosecution. *See* Newberg, § 3:22, at 409.

The interests of the plaintiff representatives do not conflict in any manner with the interests of the members of the class they seek to represent, as all seek similar relief. All are persons injured as a result of their exposure to formaldehyde from housing units made by the Manufacturing Defendants and provided by the Federal Government, and all present claims for personal injury and property damage. Moreover, the class representatives named herein have a strong interest in prosecuting this action. They will diligently prosecute this action on behalf of themselves and all other persons similarly-situated.

Regarding the adequacy of counsel requirement, this Court has appointed the Plaintiffs' Steering Committee (PSC) to coordinate the representation of all plaintiffs in this matter.  The PSC, and plaintiffs' counsel working with the PSC, include experienced attorneys who have pursued, and will continue to pursue, the interests of all potential claimants. These efforts to date include preparing appropriate pleadings, motion practice, propounding and responding to discovery, retaining experts, conducting extensive testing of units, evaluating the claims presented herein, conducting a formal and extensive written claims process, interacting with the defendants to insure the protection and preservation of evidence, court appearances, and

extensive legal research into the claims and defenses presented herein. The PSC consists of counsel who regularly engage in major complex litigation and have had extensive experience in class action suits involving complex litigation similar in size, scope and complexity to the present case.

### B.  Rule 23(b)(3)

#### a.  *Predominance*

The common issues of fact and law herein predominate over individual issues such as causation and quantum. Plaintiffs plead the same legal and remedial theories under their respective subclass' state law with respect to the Defendants' conduct. This assures class-wide proof and resolution of all significant, common elements of compensatory damage recovery, save for individual causation.

A list of the most significant class-wide issues of fact and law in this matter would include the following:

- Louisiana Subclass
  - Whether the Manufacturing Defendants designed and made housing units which emitted dangerous levels of formaldehyde;
  - Whether the Manufacturing Defendants' units were unreasonably dangerous in normal use and/or reasonably anticipated misuse;
  - Whether the Manufacturing Defendants failed to conform to the express warranties made regarding the fitness of their respective products;
  - Whether the Manufacturing Defendants failed to properly test the housing units to properly evaluate the level of emissions of formaldehyde;

- o Whether the Manufacturing Defendants failed to warn the plaintiffs of the unreasonably dangerous nature of the housing units or of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde;

- ▪ <u>Texas Subclass</u>

  - o All issues enumerated above, as if fully repeated herein;

  - o Whether the Manufacturing Defendants breached their duty to plaintiffs in failing to act reasonably in the design, marketing, distribution and sale of the housing units;

  - o Whether the Manufacturing Defendants failed to properly inspect the housing units;

  - o Whether the Manufacturing Defendants failed to sufficiently test the effects and/or the risks of formaldehyde fumes on the plaintiffs;

- ▪ <u>Mississippi Subclass</u>

  - o All issues enumerated above, as if fully repeated herein;

  - o Whether the Manufacturing Defendants knew or should have known that their products were defective;

  - o Whether the defective and unreasonably dangerous condition of the product proximately caused the damages and injuries sustained by plaintiffs;

  - o Whether the Manufacturing Defendants properly selected and installed their respective products' component parts;

- o Whether an alternative design would have to a reasonable probability prevented the toxic exposure of the plaintiffs;

- ▪ <u>Alabama Subclass</u>

  - o All issues enumerated above, as if fully repeated herein.

- ▪ <u>Future Medical Services Subclass</u>

  - o Whether certain plaintiffs were significantly exposed to a formaldehyde, a hazardous substance;

  - o Whether certain plaintiffs now suffer a significantly increased risk of contracting a serious latent disease, associated with formaldehyde exposure;

  - o Whether certain plaintiffs' risk of contracting such a disease is greater than (a) the risk of contracting the same disease had there been no exposure, and (b) the chances of members of the public at large of developing the disease;

  - o Whether a medical procedure exists that makes the early detection of any such diseases possible;

  - o Whether the future medical services regime for such detection is different from medical services recommended in the absence of exposure;

  - o Whether there is some demonstrated clinical value in the early detection and diagnosis of any such diseases.

- ▪ <u>Economic Loss Subclass as to Manufacturing Defendants</u>

  - o Whether the emergency housing units are defective with respect to their ordinary purpose;

- o Whether the emergency housing units were defective at the time they left the manufacturer's possession;

- o Whether the failure to provide safe housing for the use of plaintiffs violated the implied warranties of the Manufacturing Defendants;

- ▪ <u>Economic Loss Subclass as to the Federal Government</u>

  - o Whether FEMA failed to provide safe and habitable emergency housing units;

  - o Whether FEMA's failure to provide safe and habitable emergency housing units violated the plaintiffs' property interest.

In the prosecution of claims by each of these subclasses, the following common issues exist in regard to the defendant United States/FEMA.

- • Whether the Federal Government knew or should have known at some point in time that the housing units at issue herein produced excessive formaldehyde emissions, which posed a health risk to plaintiffs;

- • Whether the Federal Government was negligence in failing to ensure that the housing units purchased and provided to the plaintiffs were habitable, functional, and suitable for their intended use;

- • Whether the Federal Government , on first becoming aware of legitimate concerns regarding formaldehyde exposure in the housing units at issue, should have (a) ceased and desisted in furnishing additional units to plaintiffs, and (b) issued appropriate and effective health warnings to those already residing in these units.

All of the common questions listed above constitute a "significant part" of each individual case, and form the common predicate for each claimant's proof of individual harm and recovery. Class action management of these issues thus will assure fairness and uniformity. Conversely, individual proceedings as to these issues would invite inconsistent results, not to mention unnecessary repetition and the waste of judicial and litigant resources.

### b. *Superiority*

The "superiority" factors to be considered under Rule 23(b)(3) also weigh in favor of class certification. First, there is no known or foreseeable "interest" on behalf of a significant number of class members to individually prosecute their claims. Second, all cases filed with respect to this case have been filed in Louisiana or neighboring states and have been consolidated before this Court, eliminating the need to consider both the extent and nature of the litigation already commenced and the desirability of concentrating Plaintiffs' claims in this forum. Finally, any "management" difficulties that this Court should encounter in the handling of this litigation as a class action will be minimal. The class and subclasses are easily discernible, and common issues of law and fact predominate with respect to this common disaster.

In regards to the future medical services subclass, it is especially clear that a class action is the superior procedure. Because of the potentially large number of *de minimis* claims, a class would allow access to the courts for plaintiffs who otherwise might not be able to litigate due to the relative size of their claims when compare with the expense of litigation. *Scott v. American Tobacco Co.*, 725 So.2d 10, 14 (La. App. 4 Cir. 1998). Without a class action, plaintiffs could not bring an action designed to monitor the medical conditions of each subclass member for the purpose of ascertaining and responding to diseases caused by, contributed to, or exacerbated by

the exposure of formaldehyde. Future medical services are necessary to facilitate early detection and possibly successful treatment of a disease caused by formaldehyde exposure. For this reason, addition discussion of this proposed subclass is in order:

### C.  <u>Future Medical Services Subclass</u>

A future medical services subclass encompassing individuals, or at a minimum all children, who were exposed to formaldehyde while residing in an EHU in Louisiana, Texas, Mississippi, and Alabama provided by FEMA after Hurricanes Katrina and Rita is essential in order to monitor and treat the injuries that have resulted as a result of said exposure. Damages in form of future medical services are allowable under the state laws of Louisiana, Texas, Mississippi, and Alabama. Louisiana's Civil Code Article 2315 provides the basic liability for acts causing damages and sets forth the basis for establishing a claim for future medical services. It states in pertinent part that "[d]amages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease." *La. Civ. Code Ann. Art. 2315(B).* The United States District Court for the Eastern District has refused to dismiss claims for medical monitoring, a similar but distinct remedy than what is being sought in the case at bar, where the plaintiffs alleged actual injuries. *Hillard v. United States of America, et al.*, 2007 WL 647292, 5 (E.D.La. 2007). Accordingly, where a manifest injury can be identified, damages for future monitoring or services is recoverable. Here, as will be shown, a manifest injury is apparent in the putative class members in the form of a cellular and molecular damage.

The courts in Mississippi  have also incorporated a similar standard of "manifest injury" when determining whether future services are an allowable damage. In a certified question to the Mississippi Supreme Court from the Untied States Court of Appeals for the Fifth Circuit, the

Court was asked whether Mississippi law allows a medical monitoring cause of action for exposure to a harmful substance without proving current physical injuries from that exposure. *Paz v. Brush Engineered Materials, Inc.*, 949 So.2d 1 (Miss. 2007). The Court stated that "it would be contrary to current Mississippi law to recognize a claim for medical monitoring without proof of current physical or emotional injury form the exposure. *Id.* at 6. While the mere possibility of a future injury alone, without physical or emotional injury, is insufficient to support a tort claim, where there has been a physical injury future damages, be it monitoring or services, are recoverable.

Similarly, Alabama law permits damages in the form of medical monitoring in cases arising from exposure to hazardous contamination and pollution when there is proof of a manifest physical injury or illness. *Hinton v. Monsanto Co.*, 813 So.2d 827, 831-829 (Ala. 2001). In *Griffin v. Unocal Corp. et al,* 2008 WL 204446 at 2 (Ala. 2008), the Court defined "manifest present injury" as a injury or illness that has evidenced itself such that it is apparent, even if only to a physician. *Id.* at 773. An injury or illness may manifest even though the plaintiff is not actually aware of the injury. *Id.* at 774. Thus, just as in Louisiana and Mississippi, a claim for damages arising from a future event such as monitoring or services is cognizable if an injury can be objectively evidenced.

While no Texas statutes or cases specifically affirm or deny a cause of action or claim for future medical services or surveillance, it may be inferred that it is an available claim based upon the mention of claims for medical monitoring in several cases. The Court of Appeals of Texas mentioned medical monitoring in *Barras v. Monsanto Co.*, 831 S.W. 859, 862 (14th Dist. 1992). In *Barras*, the plaintiffs alleged Monsanto's dumping of toxic waste resulted in the need for future medical monitoring. *Id.* However, the appellate court affirmed the trial court's decision

that Monsanto was not liable and thus damages were not an issue. *Id.* at 868. Therefore, the issue of availability for claims such as medical surveillance or services was not addressed.

The United States District Court for the Eastern District of Texas mentioned medical monitoring in *Greene v. Mobil Oil Corp. et al.* 188 F.R.D. 430 (E.D. Tex. 1999). In *Greene* the original plaintiff filed a wrongful death claim that was amended to add 1,260 additional plaintiffs requesting medical monitoring. *Id.* at 431. Again, the issue of availability for claims such as medical monitoring or services was never reached because the court dismissed all but the original plaintiff without prejudice to file separate suits specifying their individual damages. *Id.* at 432.

The state law of Louisiana, Mississippi, and Alabama are clear. If an injury is present and identifiable, then the future medical services and surveillance of those injuries are recoverable. While Texas law has not yet addressed this issue specifically, the availability of such damages may be inferred. In the case at bar, each plaintiff was exposed to formaldehyde as a result of residency in an EHU provided after Hurricanes Katrina and Rita. Scientific experts such as Dr. Judd Shellito, Dr. Ken Paris, and Dr. Patricia Williams have identified an apparent, manifest injury to the plaintiffs, especially children. Therefore, a future medical services subclass should be certified to set up and maintain a program by which the plaintiffs' injuries may be treated.

When examining the medical effects of exposure to formaldehyde to residents of the EHU's, it is necessary to examine the following: (1) medical effects of formaldehyde exposure to the general population; (2) medical effects of formaldehyde exposure to susceptible populations, particularly children; and (3) whether there is available intervention, treatment and management

which can positively reduce the quality of life impact that the adverse health effects related to formaldehyde exposure can cause.[13]

### a.   Health Effects of Formaldehyde Exposure to the General Population

Formaldehyde is a toxic gas and irritant which causes a number of physiological responses.  Further, it is a known human carcinogen according to the International Agency for Researching Cancer (IARC) and its 2004 monograph on formaldehyde.[14]  While the most visible effects of formaldehyde exposure are eye, nose, throat and lung irritation, it is extremely important to note that formaldehyde exposure causes damage on a molecular/cellular level which is not readily apparent.[15]

Formaldehyde is a respiratory irritant, which means it is the inhaled vapor which irritates the cells lining the nose, throat and bronchi resulting in acute symptoms of nasal discharge, nose bleeds, sore throat, watery eyes, hoarseness and cough.[16]  Further, formaldehyde has been shown to cause the creation of IGE molecules as anti-bodies.  These IGE molecules are connected to histamine cells, and when they come into contact with formaldehyde, the histamine is released, causing the various symptoms discussed above, respiratory difficulty, broncho-constriction and asthma, a number of other negative health effects.[17]  Dr. Judd Shellito, Head of Pulmonology at LSU Health Sciences Center and Lowenstein Professor of Medicine, discusses formaldehyde in the body as transient: symptoms of exposure diminish or disappear when an average healthy

---

[13] This section references the expert reports prepared by the medical experts retained by the Plaintiffs in this matter.  Specifically, the Affidavit of toxicologist Patricia Williams, Ph.D is attached as Exhibit E, the Affidavit of pulmonologist/immunologist Judd Shellito, M.D. is attached as Exhibit F, and the Affidavit of pediatric allergist/immunologist Ken Paris, M.D. is attached hereto as Exhibit G.

[14] IARC found that formaldehyde can cause nasopharyngeal cancer.

[15] *See* Deposition of Patricia Williams, Ph.D., DABT, pp. 123:13-124:13, attached hereto as Exhibit H.

[16] See Exhibit F, p.2.

[17] See Exhibit E, p.15.

adult is removed from the exposure; and, specifically, detectable levels of formaldehyde in the blood tend to disappear quickly.[18]   However, Dr. Patricia Williams, a Board Certified Toxicologist with an advanced degree in Anatomy, explained in her deposition that in fact 35-39% of formaldehyde, once absorbed into the blood stream, actually remains in the tissues, organs and cells, bonding with molecules and cells and causing discrete, tangible damage.[19]

This molecular and cellular damage caused by formaldehyde exposure was discussed at length during Dr. Williams deposition.  The damage is due in large part to formaldehyde's properties as an electrophile, i.e., it is a molecule with a deficiency of electrons and which aggressively attacks or bonds with other molecules to acquire them.  Formaldehyde therefore creates protein-to-protein crosslinks, DNA-protein crosslinks, and/or it incorporates into larger molecules, destroying the integrity of these molecules.[20]   These crosslinks can cause significant, tangible injury.  Formaldehyde crosslinks can cause a number of things to happen: (1) Linkage to DNA can mutate the DNA itself, and either destroy the cell or create a mutant cell, replicating DNA sequence in a way which may lead to tumors and cancer; (2) linkage can initiate what is known as apoptosis, basically the "self-destruct" sequence in a cell which causes cell loss; (3) the loss of such cells in specialized tissue (i.e. organs, glands, etc.) can decrease or destroy normal function.[21]  Dr. Williams cited several studies which found and illustrated the metaplasia (normal tissue in an abnormal place) and dysplasia (abnormal tissue) caused by exposure to

---

[18] Id.

[19] *See* Exhibit H, pp. 72:14 – 74:8.  Dr. Williams testified at deposition that 93% of inhaled formaldehyde is absorbed into the nasal passage, of this absorbed formaldehyde, 40% is eliminated through $CO_2$ expiration from the lungs, 17% is excreted as formic acid in urine, 5% is eliminated as formic acid in feces, and 35-39% remains in the tissue.

[20] *Id*.  See also Exhibit E, p. 9-10.

[21] *Id*.

formaldehyde in humans and animals.[22]  These changes and damage will cause the nose, throat and lungs to begin sloughing dead cells, rather than to function normally.

In addition to the health effects caused by formaldehyde on the molecular/cellular level and as a respiratory irritant, formaldehyde has been shown to be a sensitizer causing allergic reactions and is linked with asthma.  As a sensitizer, formaldehyde can stimulate the immune system to develop a reaction to the chemical.[23]  Not only can sensitization to formaldehyde itself occur, but formaldehyde can cause sensitization to other allergens which are present at the time of exposure to the formaldehyde (i.e., dust mites, mold, etc.).  Once sensitized, a person remains so for long periods of time, if not permanently, and sensitization can lead to various reactions such as contact dermatitis, asthma-like symptoms, swelling, etc.  For those sensitized, their quality of life is significantly impacted.

---

[22] See Exhibit E, p. 12.  See also, Boysen, et al. *Nasal mucosa in workers exposed to formaldehyde: a pilot study.*  British Journal of Industrial Medicine. (1990).  (Performed biopsies in the middle turbinate of the nasal cavity.  Of the 28 workers tested 9 had hyperplastic nasal mucosa and three had dysplasia.  Loss of cilia occurred as changes from the normal epithelium evolved to metaplasia as well as keratinizing stratified squamous epithelium was described. ); Holstrom et al, *Histological Changes in the Nasal Mucosa in Rats after Long-term Exposure to Formaldehyde and Wood Dust*. (1989). (Found similar results in his human study as to the others presented in the rat study.  In addition to the squamous cell metaplasia, the study found one squamous cell carcinoma with keratinizing layers.  Four other rats exhibited keratinizing stratified squamous epithelium in metaplastic tissue.   In addition in the rat study there were findings of pulmonary emphysema.); Holstrom et al, *Histological changes in the Nasal Mucosa in Persons Occupationally Exposed to formaldehyde Alone and in combination with Wood Dust.* (1989) (Studied a group of workers in a chemical plant that produced formaldehyde.  Exposures began at 40 ppb.  A statistically significant increase of  istological changes from normal tissue was observed.  These changes included loss of cilia, goblet cell hyperplasia, metaplasia and dysplasia replacing the normal pseudostratified ciliated columnar epithelium in nasal biopsy specimens of 70 workers.)  Dr. Williams testified that, as illustrated by these studies, formaldehyde can and will change the cell lining of the nasal mucosa, bronchi and alveoli from sensitive tissues with protective cilia, into something that closely resembles the dead skin found on the bottom of a foot.
[23] See Exhibit F, p.2.  See also, Exhibit E, p. 14-16.

Dr. Shellito gives a three-factor analysis in examining formaldehyde exposure and adverse health effects: (1) the intensity of the exposure; (2) the duration of the exposure; and (3) the susceptibility of the individual in question.[24]  Briefly addressing factors two and three, it is generally accepted that many, if not most, of the occupants of the EHU's were in those units for period in excess of one year, and in some cases longer than three years.  As such, there is no doubt that the plaintiffs have been exposed to formaldehyde for sufficient duration to pose a potent health hazard.[25]  For the general population, there is a range of exposure which will produce a physiological response.  (Children will be addressed separately).  It is important to understand, however, that physiological response is equated with symptomatology rather than injury.  As discussed above, much of the injury occurs on the cellular/molecular level.  The plaintiffs who were exposed to the elevated levels of formaldehyde all suffered similar if not identical injury on the cellular/molecular level; only the severity of the damage differs. This apparent physiological response, while an injury and damage in itself, occurs separate from and in addition to the cellular/molecular damage discussed above.

In examining the intensity of exposure aspect of Dr. Shellito's analysis, it is important to have a base understanding of the level of formaldehyde exposure that the occupants of the EHU's received.  The July 2008 CDC report on formaldehyde levels in the 519 EHU's tested found an average level of 77 part per billion (ppb), with the travel trailers tested showing a geometric mean of 81 parts per billion.[26]  It is also important to note that the CDC testing was conducted in the colder, drier winter months, and that the report clearly states that the warmer-weather exposure levels experienced by the occupants of the temporary housing units was most

---

[24] See Exhibit F, p. 2.
[25] See Exhibit F, p. 3.
[26] See Exhibit E, p. 19-20.

likely (significantly) higher.  Further, the study stated that off-gassing of formaldehyde occurred at higher levels in newer units, and that occupants were probably exposed to higher levels than the testing indicated in that regard as well.[27]

The ATSDR (Agency for Toxic Substances and Disease Registry) is the branch of the CDC tasked by the Federal Government with developing reports made available to the public on various toxic substances and their health effects.  The ATSDR report on formaldehyde is a 1999 report and is over 450 pages long.  Contained in that report are Minimal Risk Levels ("MRLs") for acute, intermediate and chronic exposure levels to formaldehyde.  An MRL is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse non-cancer health effects over a specified duration of exposure.[28]   The MRL's for inhaled formaldehyde exposure levels are 40 ppb for acute (1-14 days), 30 ppb for intermediate (15-364 days), and 8 ppb for chronic (365+ days).[29]  These levels are all significantly lower than the geometric mean of 81 ppb found in the travel trailers by the CDC study.[30] [31]   It is also important to understand that the odor threshold of formaldehyde has been reported at 50 ppb, a level significantly above the recommended MRLs.[32]  This means that injury and damage will already have occurred by the time a person smells the gas.  Not only were the Plaintiffs exposed to hazardous levels of formaldehyde, levels which injured them and caused damage, but they

---

[27] Id.
[28] See, Exhibit E, p. 10-12
[29] Id.
[30] It is also important to note that the ATSDR Report is focused on healthy adult populations, and does not examine children's susceptibility to formaldehyde exposure.
[31] Further note that the World Health Organization (WHO) guideline for short term formaldehyde exposure is 100 ppb for 30 minutes, and the California Office of Environmental Health Hazard Assessment guideline for office exposure is 23 ppb.  The National Institute of Occupational Health Science recommends a time weighted average of 16 ppb with a 15 minute ceiling limit of 100 ppb.  See, Exhibit F, p. 3.
[32] See, Exhibit F, p. 2.

experienced this exposure as residents of these units  with no real way to remove themselves permanently from the toxic environment.  Dr. Shellito opined that the occupants of the EHU's were exposed to levels of formaldehyde that exceeded acceptable levels according to the ATSDR.

### b. *Formaldehyde and Children*

While the exposure to hazardous levels of formaldehyde injured all occupants, it is the children who were most severely affected.[33] [34]  Many thousands of children have reported asthma or other respiratory problems associated with or resulting from living in the EHU's. Importantly, it is also the children who can most readily be helped, as will be discussed later. The ATSDR considers children to categorically be a susceptible and highly sensitive population. Its recommended exposure limits may not be relevant for the pediatric population.[35] Physiologically, children are more vulnerable to formaldehyde and may have increased severity of symptoms.[36]

Quite simply stated, children are more susceptible because of their undergoing, continual development and physiological growth.  Their airways are smaller in diameter and any broncho-constriction or other inflammation will be more acutely felt by children than by adults.  As such, children have increased respiratory rates and cardiac output.  Infants and children breathe more air per kilogram of body weight, but with less developed lungs.  Further, children eat and drink

---

[33] See Exhibit G, generally and Exhibit G, p. 21-23.
[34] It is also important to note that children are not the only sensitive population, the elderly and persons with suppressed immune systems and immune-response are also susceptible.  See, Exhibit E, p. 23-24.
[35] See, Exhibit G, p. 3.
[36] Id.

substantially more per kilogram body weight than do adults.[37]   In addition, infants also have immature blood-brain barriers, blood-testis barriers and livers.[38]   These all predispose children who are exposed to formaldehyde to greater concentrations than adults.  Further, small children who are teething (aged ~ 6 – 18 months) have significant additional drool and moisture production and an increased tendency to mouth or chew on anything in reach.  This further exacerbates the effects of formaldehyde exposure.[39]

Formaldehyde has been linked with increased risk for the development of asthma in children by the National Asthma Education and Prevention Program in its 2007 guidelines.[40] There are very few studies which examine reactions of children to formaldehyde exposure, either in a home setting or elsewhere.[41]   This is for good reason – our society does not knowingly expose children to hazardous and toxic substances simply to study them.[42]   However, those studies which have been conducted have found significant correlation with allergy, allergic disease, respiratory symptoms, and asthma and sensitization amongst children exposed to formaldehyde.[43]   Dr. Kenneth Paris, MD, M.P.H., Pediatric Allergy/Immunology, opined in his Affidavit that the levels of formaldehyde which the children were exposed to in the EHU's increased the risk of developing allergic disease and asthma.[44]

---

[37] Formaldehyde is not just an inhaled toxicant.  Formaldehyde is extremely water soluble, so the increased drinking and eating for their weight leads to increased exposure for children.  See Exhibit E, p. 23.

[38] Exhibit E, p. 22.

[39] Id., at p. 23.

[40] See, Exhibit G, p. 4.

[41] Id.

[42] As such, this population of children represents the best target population for study of the effects of formaldehyde exposure on children, and a five-year study was recommended by the CDC in its report on formaldehyde levels in the temporary housing units.

[43] See, Exhibit G, p. 4.

[44] Id.

In addition to the problems of asthma and sensitization, formaldehyde exposure causes in children an increased risk for chronic or long-lasting injury at a molecular/cellular level. Children's lungs and immuno-response system are not fully developed; any damage sustained during this development can be irreversible and affect quality-of-life issues permanently. Damage at the cellular level can create abnormal development and lead to life-long problems with asthma and other health conditions.

Based upon the CDC report, several environmental factors could have exacerbated the children's adverse health responses to formaldehyde.  One in five EHU's were reported to have mold.  This creates sensitization issues, and also indicates the presence of poor ventilation, increased moisture and levels of relative humidity, all of which are triggers for allergy, allergic response or asthma.

### c.   Medical Diagnosis, Treatment, Intervention and Management

Fortunately for those who have developed asthma or respiratory problems as a result of their exposure to formaldehyde, diagnoses, treatment and management are achievable and can greatly improve an individual's quality of life.  This is particularly true of children.  This section, while applicable to the population as a whole, will be focused on children and managing the adverse health effects of formaldehyde exposure.

While asthma can never be "cured", it can be effectively managed through medication, education and informed lifestyle choices.  Medication can be used to relieve both symptoms of acute respiratory distress as well as to decrease overall morbidity and severity of exacerbations. As Dr. Paris opines in his Affidavit:

> Diagnosis of asthma is the first step.  Once a child is identified as having symptoms of asthma, further treatment and management according to the NHLBI [National Heart Lung and Blood Institute] guidelines should begin.  It is generally accepted that treatment of asthma with medication, implementation of

environmental control measures, and consistent medical evaluation results in improved outcomes in patients.  Treatment with medications may include daily inhaler regimens and oral medications.  Environmental control measures include removal of substances known to cause symptoms.  Frequent clinic visits for patients with asthma are recommended in order to adjust medications and monitor lung function.  In order to successfully treat children, it is imperative that medical care is available and accessible.  We can improve outcomes in children with asthma if these children are treated according to the NHLBI/NAEPP guidelines.[45]

Dr. Paris then goes on to state:

Conversely, failure to diagnose, treat and manage asthma in children can lead to significant adverse health effects.  Children with uncontrolled or untreated asthma have an increased risk of hospitalization, decreased quality of life, and decreased school attendance.  As a group, children from the states affected by hurricanes Katrina and Rita are from a high risk population that suffers from lack of resources – this further complicates their care and makes proper diagnosis and treatment important.[46]

It should be pointed out that in 1999, in *U.S. Public Interest, et al. v. Bayou Steel Corp.*, Docket No. 2:96-cv-00432 (EDLA 1999), Judge Lemmon, with the support of both Plaintiffs and Defendants, entered a consent decree for an Asthma Education and Management Program in St. John Parish, which was implemented with great success and applauded by all parties to the litigation.  The Education and Management program instructed both at-risk children suffering from debilitating asthma and medical professionals in how to educate and treat children with asthma.  The program led to a significant and permanent improvement in the quality of life for the children suffering from asthma.[47]  This program certainly could be duplicated, or at least used as a template, to craft a similar diagnosis, intervention, treatment and management program for children adversely effected by the hazardous levels of formaldehyde in the EHU's.

Finally, it should be noted that the majority of these children have no health insurance; their families use the emergency rooms of hospitals as their primary care treatment. It is not

---

[45] See, Exhibit G, p. 4-5.
[46] Id.
[47] *See*, Exhibit E, p. 30.

likely these children will benefit from repeated visits following any diagnosis of formaldehyde-related problems. They will lack the necessary resources to effectively manage these problems, and the cost of this void in medical service will be borne in large part by the Federal Government, through Medicaid, rather than by those who created and/or contributed to the hazardous exposure in the first place. Admittedly, this observation touches on the merits of this litigation; but it is not irrelevant to the Court's determination whether Rule 23 offers an appropriate opportunity to address the future medical service needs of the children in the plaintiffs class in a procedurally superior way; i.e., though consideration of an effective medical intervention, diagnosis, treatment and management program which can be evaluated.

### D.  Economic Loss Subclass as to Manufacturing Defendants

Plaintiffs seek economic loss damages based upon breaches of implied warranties and redhibitory defects. *See* Administrative Master Complaint at p. 55, 56, 66, and 73. The Fifth Circuit squarely addressed whether such claims were appropriate for class certification in *McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545 (5th Cir. 2003). In *Fleetwood* the facts involved breach of warranty claims by motor home purchasers under Texas law alleging the misrepresentation of the towing capacity of the motor homes. *Id.* at 547. Although the Fifth Circuit reversed certification of the misrepresentation, fraud, and express warranty claims, the Court upheld certification of the claim for breach of implied warranty of merchantability. *Id.* at 548. The plaintiffs' theory in *Fleetwood* was that the motor homes were not "fit for the ordinary purposes of which such goods are used." *Id. at 551*. Under Texas law, plaintiffs had the burden of proving the goods were defective at the time they left the manufacturer's or seller's possession. *Id.* at 552. The Court emphasized that this was a contract action (as opposed to tort)

where plaintiffs were seeking the difference between the actual value of the motor home and the

value as warranted. *Id.*

> Here, the damages sought by the [McManuses] are not
> rooted in the alleged defect of the product as such, but in the fact
> that they did not receive the benefit of their bargain." *Coghlin v.
> Wellcraft Marine Corp.*, 240 F.3d 449, 455 n. 4 (5th Cir. 2001).
> Thus, whether or not any member of the class actually suffered any
> physical injury is immaterial. Likewise, it is immaterial whether or
> not the class members even intended to use their motor homes for
> towing because all a jury need determine is that the motor homes
> were defective with respect to a motor homes' "*ordinary* purpose."
> TEX. BUS. & COM. CODE ANN §2.314 (emphasis added).

*Id.* As in Fleetwood, the EHU's at issue are defective with respect to their "ordinary

purpose". Representatives of Manufacturing Defendants have acknowledged their implied

warranty of merchantability. Doug Gaeddert testified on behalf of Forest River Corp.:

> Q: And when you complete building a unit and you put it out on
> the market, whether you're giving it to your vendors for sale to the
> public or providing NASC, what you're presenting is that this is a
> safe, habitable product; is that right?"
>
> A: Yes.
>
> Q: And the people who buy those units from your vendors or
> NASC can rely upon that. Is that right?
>
> A: Yes. [48]

Additionally, James Shea testified on behalf of Gulf Stream:

> Q: As the chairman of this company, would you agree that the
> Government – at least your understanding was the Government
> expected you to provide a safe product?
>
> A: Yes. We were concerned with safety and took measures to
> provide a safe product, and those included additional testing and so
> forth. [49]

---

[48] *See* 30(B)(6) Deposition Testimony of Doug Gaeddert on behalf of Forest River, pp. 157:15 –
158:3, attached hereto as Exhibit I.

Here the Manufacturing Defendants represented their products, the EHU's, as fit for their ordinary purpose. Plaintiffs contend that the Manufacturing Defendants violated this implied warranty. Therefore, plaintiffs did not receive the benefit of their bargain. *See Fleetwood*, at 551-552.  The EHU's were not fit for residential use, but only for recreational use, if that.

Common issues predominate in property damage/breach of warranty subclass for the following reasons:

- Each state has implied warranty legal theories available to plaintiffs. Code of Ala. §§7-2-314 and 7-2-315; Louisiana Civil Code Article 2520, et seq.; Miss. Code Ann. §§75-2-314 and 74-2-315 (Miss. 1976); and Texas Business and Commercial Code §§2.314 and 2.315.

- Plaintiffs should have been provided alternative housing that was habitable (i.e., safe). *See* Order and Reasons filed October 3, 2008 at page 38 (Rec. Doc. 717). The failure to provide safe housing for the use of plaintiffs would violate implied warranties of the Manufacturing Defendants. "Safe housing" is not an issue that varies from state-to-state or person-to-person.

- A determination of whether EHU's meet the requirement of "safe housing" does not involve issues such as illness, complaints by plaintiffs, and/or FEMA's knowledge or actions.

Damages can be easily determined on a class wide basis for such claims. Louisiana jurisprudence has indicated that the monthly rental value of a defective mobile home court,

---

[49] *See* 30(B)(6) Deposition Testimony of James Shea on behalf of Gulf Steam, p. 44:11 – 44:17, attached hereto as Exhibit J.

without proper evidence, support damages in a case such as this. In *Chenniliaro v. Kaufman & Broad Homes Systems of Louisiana*, 636 So.2d 246 (La. App. 1 Cir. 1994), the defendants argued that they were entitled to a credit equal to the monthly rent on a comparable mobile home for the time in which the plaintiffs lived in a defective mobile home. The Court rejected the defendants' argument because no evidence was presented of the monthly rental value of the mobile home that possessed the defect at issue. *Chenniliaro* provides support for the proposition that an appropriate measure of damages in this case would be monthly rental value of a safe and habitable trailer. In setting rental assistance payments, FEMA determined $786.00 per month was the average national fair market rent. This was the basis for FEMA's payments to qualified homeowners and renters whose housing was destroyed.

Where EHU's were provided, the homeowner or renters were ineligible for this financial assistance. Therefore, damages would be a simple mathematical calculation of $786.00, multiplied by the number of months each plaintiff inhabited an EHU. In this regard, individual damages would not defeat class certification, because they would be susceptible to a formulaic determination.

### E. Economic Loss Subclass as to FEMA

In one of the *McWaters* opinions, the Eastern District found that hurricane victims had a property interest in FEMA assistance that was created by the Stafford Act and protected by the Due Process Clause of the U.S. Constitution. *McWaters, et al. v. Federal Emergency Management Agency, et al.*, 436 F. Supp.2d 802 (E.D. La. 2006). The District Court noted as follows:

> Pursuant to statute and the applicable regulations, for purposes of this opinion, assistance means, *inter alia,* "Temporary Housing Assistance" and "Continued Rental Assistance." Pursuant to statute, Temporary Housing Assistance includes both financial

> assistance, such as rental assistance (or, in some cases, "continued rental assistance") and/or direct assistance, <u>such as trailers or other temporary housing units</u>.  See 42 U.S.C.  § 5174(c); 44 C.F.R. § 206.117(b)(1)(i) and (ii).

*Id.* at 816. (*Emphasis added.*)  In the case before this Court, the property rights of the putative Plaintiff class were denied when FEMA failed to provide safe and habitable trailers or other emergency housing units." *Id.*

Two weeks after the issuance of the above *McWaters* opinion, the District Court granted the *McWaters* Plaintiffs' motion for class certification. *McWaters, et al., v. Federal Emergency Management Agency, et al.*  The class included victims of Hurricane Katrina in Louisiana, Mississippi and Alabama.  *Id.*  at 163.  Although the plaintiff class sought only injunctive relief, the District Court specifically found the class requirements of Rule 23(a) to be satisfied.  *Id.*  at 162.  Because injunctive relief was sought, the class was certified under 23(b)(2).  *Id.*

Again, damages can be easily determined for claims such as this on a class wide basis. The *McWaters* Court approved FEMA's use of $786.00 per month as a "fair market rent figure" for the majority of the victims.  *McWaters*, 463 F.Supp.2d at 827.  Where EHU's were provided, the homeowner or renters were ineligible for this financial assistance.  *See*, FEMA Individual and Households Program.  Consequently, damages would be a simple mathematical calculation of $786.00 times the time period each Plaintiff inhabited the EHU's.

## IV.   <u>CONCLUSION</u>

It is tempting for Plaintiffs in any dispute over class certification to emphasize the anticipated case for defendant's fault and the recovery of damages, just as a defendant might wish to promote its likely succession in the trial of questionable claims. But Rule 23 is concerned with management, not merit. It provides a unique vehicle for the fair and efficient disposition of

common issues, regardless of outcome, and it safeguards the resources of the judicial system in litigation where thousands of claims arise from a catastrophic event.

This case satisfies the prerequisites of Rule 23(a) and the criteria of Rule 23(b)(3). Plaintiffs accordingly ask the Court to certify the matter as a class action.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:      s/Gerald E. Meunier
         GERALD E. MEUNIER, #9471
         **PLAINTIFFS' CO-LIAISON COUNSEL**
         Gainsburgh, Benjamin, David, Meunier &
         Warshauer, L.L.C.
         2800 Energy Centre, 1100 Poydras Street
         New Orleans, Louisiana  70163
         Telephone:    504/522-2304
         Facsimile:     504/528-9973
         gmeunier@gainsben.com

         s/Justin I. Woods
         JUSTIN I. WOODS, #24713
         **PLAINTIFFS' CO-LIAISON COUNSEL**
         Gainsburgh, Benjamin, David, Meunier &
         Warshauer, L.L.C.
         2800 Energy Centre, 1100 Poydras Street
         New Orleans, Louisiana  70163
         Telephone:    504/522-2304
         Facsimile:     504/528-9973
         jwoods@gainsben.com

         **COURT-APPOINTED PLAINTIFFS'
         STEERING COMMITTEE**
         ANTHONY BUZBEE, TEXAS #24001820
         RAUL BENCOMO, #2932
         FRANK D'AMICO, JR., #17519

MATT MORELAND, #24567
LINDA NELSON, #9938
RONNIE PENTON, #10462

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2008, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all

counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing

document and the notice of electronic filing by first-call mail to all counsel of record who are

non-CM/ECF participants.


s/Gerald E. Meunier
GERALD E. MEUNIER, #9471