UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION | * * * * * | MDL NO. 07-01873 SECTION "N-4" JUDGE ENGELHARDT |
| This Document Relates to: All Cases | * * | MAG. JUDGE ROBY |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AMERICAN HOMESTAR DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR RULE 12(b)(6) MOTION TO DISMISS (PRE-EMPTION)

**MAY IT PLEASE THE COURT:**

American Homestar Corporation and Oak Creek Homes, LP ("American Homestar Defendants"), respectfully submit this Memorandum in Support of their Rule 12(b)(6) Motion to Dismiss. Plaintiffs' Amended Administrative Master Complaint fails to state a claim upon which relief can be granted. The American Homestar Defendants move to dismiss the Amended Administrative Master Complaint on the grounds that the National Manufactured Housing Construction and Safety Standards Act (the Act) pre-empts plaintiffs' state statutory and common law tort claims against the American Homestar Defendants that manufactured homes sold to FEMA as "manufactured home[s]," as defined in the Act and rules adopted pursuant to that Act.

1

**Procedural History and Factual Background**

Neither Defendant American Homestar Corporation nor Defendant Oak Creek Homes, LP was named in and served with any of the underlying suits that were transferred to MDL Docket No. 1873. American Homestar Corporation and Oak Creek Homes, LP were named in and served with the Administrative Master Complaint.[1] The American Homestar Defendants joined in the Manufacturing Defendants' Motion to Dismiss (Rec. Doc. 210) and were dismissed in this Court's August 1, 2008 Order and Reasons (Rec. Doc. 604), without prejudice to the right of the existing plaintiffs in the AMC to "match" each plaintiff to the defendant that manufactured the Emergency Housing Unit ("EHU") occupied by that plaintiff. The Court granted plaintiffs leave to amend and plaintiffs filed the Second Supplemental and Amended Complaint. While the Amended Administrative Master Complaint ("Amended AMC") attempted to "match" each existing plaintiff with a named defendant alleged to have manufactured the plaintiff's EHU, as required by the Court's Order and Reasons, it also improperly added 140 plaintiffs.

Defendant American Homestar, through its Oak Creek Homes, LP subsidiary, manufactured and sold one hundred twenty-five (125) "manufactured homes" directly to FEMA after Hurricanes Katrina and Rita and arranged for the delivery of them to a FEMA staging area in Hope, AR.[2] Each of these 125 homes is a "manufactured home" as defined in the National

---

[1] Oak Creek Homes, Inc. was also named in the Administrative Master Complaint. Oak Creek Homes, Inc. has been dissolved and its assets transferred to Oak Creek Homes, LP.

[2] After examining documents provided by FEMA, the American Homestar Defendants believe that at least eighty-five (85) of these 125 manufactured homes have never been occupied; sixty-four (64) of these unoccupied manufactured homes are located in Hope, AR and twenty-one (21) are located in Fredericksburg, Maryland. The location and occupants, if any, of approximately forty (40) of these manufactured homes is unknown.

Manufactured Housing Construction and Safety Standards Act[3] (the Act) and rules established by the Department of Housing and Urban Development ("the Department" or "HUD") pursuant thereto.[4] Each was constructed in accordance with the Manufactured Home Construction and Safety Standards[5] established by HUD, including the formaldehyde standard.[6]

Oak Creek Homes, LP also manufactured 250 smaller "park model" manufactured homes, under a subcontract with Silver Creek Homes, which sold these manufactured homes to FEMA. Oak Creek arranged for delivery of these manufactured homes to a FEMA staging area in Baton Rouge, LA.[7] Each of these 250 park model manufactured homes were also constructed in accordance with the Manufactured Home Construction and Safety Standards established by HUD.[8] The 250 park model manufactured homes sold to FEMA by Silver Creek Homes are simply smaller than the 125 other manufactured homes manufactured and sold by Oak Creek

---

[3] Pub. L. 93-383, Title VI, 88 Stat. 701 (Aug. 22, 1974), codified at 42 U. S. C. §§ 5401 *et seq.* "Manufactured home" is defined at 42 U. S. C. §5402(6) as follows: "'Manufactured home' means a structure, transportable in one or more sections, which, in the traveling mode, is eight body feet or more in width or forty body feet or more in length, or, when erected on site, is three hundred twenty or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air condition, and electrical systems contained therein; except that such term shall include any structure which meets all the requirements of this paragraph except the size requirements and with respect to which the manufacturer voluntarily files a certification required by the Secretary and complies with the standards established under this chapter; and except that such term shall not include any self-propelled recreational vehicle."

[4] Manufactured Home is defined at 24 C. F. R. §3280.2.

[5] Manufactured Home Construction and Safety Standards, 24 C. F. R. part 3280.

[6] See attached **Exhibit "MZ-1,"** a copy of the Affidavit of Charlie Boyer.

[7] The location and occupants of these 250 park model manufactured homes are generally unknown. The amended Administrative Master Complaint does match three newly added plaintiffs to Oak Creek Homes, LP, but does not state the location of these manufactured homes. Four of the units tested by CDC in December 2007-January 2008 were Oak Creek park model manufactured homes, but the identity of the occupants is unknown.

[8] See attached **Exhibit "MZ-1,"** a copy of the Affidavit of Charlie Boyer.

3

Homes to FEMA,[9] yet still meet the minimum size (and other) requirements for a manufactured home, including the formaldehyde standard.[10]

## Argument and Citation of Authority

**Plaintiffs' Claims Against a Manufacturer of a Manufactured Home are Pre-empted by the National Manufactured Housing Construction and Safety Standards Act (NMHCSSA).**

### A. The NMHCSSA pre-emption provision.

The National Manufactured Housing Construction and Safety Standards Act (the Act), as amended, 42 U. S. C. §5403(d), provides:

> 5403. Construction and safety standards.
> \* \* \*
> (d) **Supremacy of Federal standards**
> **Whenever a Federal** manufactured home **construction and safety standard** established under this chapter **is in effect, no State** or political subdivision of a State **shall have any authority** either **to establish**, or to continue in effect, with respect to any manufactured home covered, **any standard regarding the construction or safety applicable to the same aspect of performance** of such manufactured home **which is not identical to the Federal** manufactured home **construction and safety standard. Federal pre-emption** under this subsection shall be **broadly and liberally construed** to ensure that **disparate State** or local **requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry** as established by this chapter.[11] Subject to section 5404 of this title, there is reserved to each State the right to establish standards for the stabilizing and support systems of manufactured homes sited within that State, and for the foundations on which manufactured homes sited within that State are installed, and the right to enforce compliance with such standards, except that such standards shall be consistent with the purposes of this chapter and shall be consistent with the design of the manufacturer.

[Emphasis supplied.]

The Act also contains a "saving" clause, 42 U. S. C. §5409(c), which provides:

---

[9] The 125 manufactured homes were 14'x60' (840 sq. ft.) and the 250 park model manufactured homes were approximately 400 sq. ft. (11'8"x34'10"). A manufactured home's minimum dimensions are 320 sq. ft. (8'x40').

[10] See attached **Exhibit "MZ-1,"** a copy of the Affidavit of Charlie Boyer.

[11] This sentence and the next sentence, were added by Pub. L. 106—569, Title VI, 114 Stat. 2997-3013 (Dec. 27, 2000). See §604(2), 114 Stat. 3006.

4

5409. Prohibited acts; exemptions
* * *
(c) Compliance with any Federal manufactured home construction or safety standard issued under this chapter does not exempt any person from liability under common law.

## B. Federal Pre-emption.

As the U. S. Supreme Court has noted:

> Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. Thus, since our decision in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427, 4. L. Ed. 579 (1819), it has been settled that state law that conflicts with federal law is "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L. Ed. 2d 576 (1981). Consideration of issues arising under the Supremacy clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purposes of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447 (19497). Accordingly, "'[t]he purpose of Congress is the ultimate touchstone'" of pre-emption analysis. *Malone v. White Motor Corp.*, 435 U. S. 497, 504, 98 S. Ct. 1185, 1189, 55 L. Ed. 2d 443 (1978) ...

*Cipollone v. Liggett Group, Inc.*, 505 U. S. 504, 516, 112 S. Ct. 2608, 2617, 120 L. Ed. 2d 407 (1992).

When faced with express pre-emption provisions similar to that in the Act, 42 U. S. C. §5403(d), the Court has made it clear that state common law or statutory tort actions that conflict with federal law may be pre-empted. *See, e. g., Cipollone*, 505 U. S. at 521 ("The phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law") and *Bates v. Dow AgroSciences LLC*, 544 U.S. 431, 443, 125 S. Ct. 1788, 1798, 161 L. Ed. 2d 687 (2005) ("the term 'requirements' ... reaches beyond positive enactments such as statutes and regulations to embrace common law duties").

The presence of the "saving" clause in the Act, 42 U. S. C. §5409(c), does not change the result of the pre-emption analysis. The U. S. Supreme Court, in considering the express pre-

5

emption provision and the "saving" clause in the National Traffic and Motor Vehicle Safety Act of 1966, which were virtually identical to the express pre-emption provision and saving clause in the Act,[12] concluded:

> Nothing in the language of the saving clause suggests an intent to save state-law tort actions that conflict with federal regulations. The words "compliance" and "does not exempt" ... sound as if they simply bar a special kind of defense, namely a defense that compliance with a federal standard automatically exempts a defendant from state law, whether the Federal government meant that standard to be an absolute requirement or only a minimum one. *See Restatement (Third) of Torts: Products Liability* §4(b), Comment *e* (1997) (distinguishing between state-law compliance defense and a federal claim of pre-emption).
> ...
> And we conclude that the saving clause foresees—it does not foreclose—the possibility that a federal safety standard will pre-empt a state common-law tort action with which it conflicts.

*Geier v. American Honda Motor Company, Inc.*, 529 U.S. 861, 869-870, 20 S. Ct. 1913, 919, 46 L. Ed. 2d 914 (2000). The Fifth Circuit, in a recent decision involving the same act and the same rule at issue in *Geier*, omitted most of the pre-emption analysis and simply addressed whether the state common law tort claim actually conflicted with the Federal rule and was thus pre-empted by federal law. *Carden v. General Motors Corp.*, 509 F. 3d 227, 230 (5 Cir. 2007). The

---

[12] *Compare* 15 U.S.C. §1392(d) ("*Whenever a Federal* motor vehicle safety *standard established under this* sub*chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any* motor vehicle or item of motor vehicle equipment, *any* safety *standard applicable to the same aspect of performance of such* vehicle or item of equipment *which is not identical to the federal standard.*") with 42 U. S. C. §5403(d) ("*Whenever a Federal* manufactured home construction and safety *standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any* manufactured home covered, *any standard* regarding the construction or safety *applicable to the same aspect of performance of such* manufactured home *which is not identical to the Federal* manufactured home construction and safety *standard.* ).

Congress, whose purpose is the "ultimate touchstone" of pre-emption analysis, recently strengthened the Act's express pre-emption provision with the addition of the following sentence: "Federal pre-emption under this subsection shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this chapter." Pub. L. 106—569, Title VI, 114 Stat. 2997-3013 (Dec. 27, 2000). See §604(2), 114 Stat. 3006.

*Compare* 15 U. S. C. §1397(k) ("*compliance with*" a federal safety standard "*does not exempt any person from any liability under common law*") with 42 U. S. C. §5409(c) ("*compliance with* any Federal manufactured home construction or safety standard issued under this chapter *does not exempt any person from any liability under common law.*"

6

Tenth Circuit, in considering the pre-emption provision and the "saving" clause of the Act, after an extended explication of the *Geier* pre-emption analysis, also considered whether the products liability action under Oklahoma law actually conflicted with 24 C.F.R. §3280.208(a). *Choate v. Champion Home Builders Company*, 222 F. 3d 788 (10 Cir. 2000).

Thus, this Court must consider whether any or all of the state statutory and common law claims against the American Homestar Defendants conflicts with the formaldehyde standard.

### C. The Formaldehyde Standard.

Among the Manufactured Home Construction and Safety Standards established by HUD is the formaldehyde standard.[13] This formaldehyde standard is a product standard which limits the level of formaldehyde emitted from particleboard floor decking and cabinetry and from interior plywood installed in manufactured homes. The standard requires that formaldehyde emissions not exceed 0.2 parts per million (ppm) from plywood and 0.3 ppm from particleboard as measured by a specified air chamber test. Generally, manufactured home manufacturers must use only particleboard and plywood that comply with these emission standards and are certified as meeting the standards. 49 Fed. Reg. 31,996 (August 9, 1984).

The Department considered adoption of an "ambient standard." Commenters suggested ambient standard levels from 0.1 to 0.4 ppm. (100 to 400 ppb). However, the Department decided to adopt the "product standards" for plywood and particleboard. 49 Fed. Reg. 31,996-7. Although the Department did not adopt an ambient standard, it did use an indoor ambient formaldehyde level of 0.4 ppm (400 ppb) as a targeted ambient level to be achieved by compliance with its product standards. The Department concluded that there was insufficient

---

[13] *See*, 24 C. F. R. §3280.308 (formaldehyde emission controls for certain wood products), §3280.309 (health notice on formaldehyde emissions), §3280.406 (air chamber test method for certification and qualification of formaldehyde emission levels) and §3280.710(g) (ventilation and other options), as promulgated at 49 Fed. Reg. 31,966-32,013 (August 9, 1984) (the formaldehyde standard).

7

medical and scientific evidence to substantiate more than minimal health benefits when formaldehyde levels are reduced below 0.4 ppm and that an indoor ambient formaldehyde level of 0.4 ppm provides reasonable protection to manufactured home occupants. 49 Fed. Reg. 31,998. The Department concluded that the plywood and particleboard standards would result in indoor ambient formaldehyde levels of not greater than 0.4 ppm when (1) the indoor temperature does not exceed 77° F.; (2) the indoor relative humidity level does not exceed 50%; (3) the home's ventilation rate is at least 0.5 air change per hour (ACH); and (4) there are no other major emitters of formaldehyde in the home. 49 Fed. Reg. 31,998.

The Department also established a standard that required a health notice regarding formaldehyde emissions (24 C. F. R. §3280.309) and a standard that required each manufacture to provide a "ventilation improvement option," including providing each prospective purchaser with a "ventilation improvement sheet" that contains a description of the available ventilation option and, for mechanical systems, the ventilation capacity expressed in air changes per hour or cubic feet per minute (24 C. F. R. §3280.710(g)).

HUD specifically stated:

> It is HUD's intention that **these standards preempt State and local formaldehyde standards** in accordance with the Act (42 U.S.C. 5403(d)). [Emphasis supplied.]

49 Fed. Reg. 31,997 (mid. col.).

### D.   The Amended Administrative Master Complaint.

Part VII of the Amended Administrative Master Complaint contains six counts against the manufacturing defendants and a prayer for compensatory damages (all 4 states), the costs of medical monitoring (all 4 states), and punitive damages (under the laws of Mississippi, Alabama and Texas). Count 4 alleges a cause of action against the manufacturers under the Louisiana

Products Liability Act. Count 5 alleges a cause of action for strict products liability under Miss. Code Ann. 11-1-63. Count 6 alleges a cause of action under the Alabama Extended Manufacturer's Liability Doctrine, Code of Ala. 6-5-521. Counts 7 through 9 each alleges a cause of action under Texas law. That is, Count 7 alleges a cause of action against manufacturers under Texas products liability law. Count 8 alleges a cause of action against manufacturers for negligence under Texas law. Count 9 alleges a cause of action against manufacturers for breach of implied warranty under Texas law.

None of these counts specifically applies to manufactured homes and must be read to exclude manufactured homes because the Act pre-empts these state statutory and common law tort actions. That is, because HUD has established a construction and safety standard for manufactured homes regarding formaldehyde, the Act pre-empts plaintiffs' statutory or common law suits regarding that aspect of performance of the manufactured homes. Federal pre-emption under 42 U. S. C. §5403(d) must be broadly and liberally construed to ensure that disparate state or local requirements or standards do not affect the uniformity and comprehensiveness of the formaldehyde standard nor the Federal superintendence of the manufactured housing industry.

**WHEREFORE,** the American Homestar Defendants respectfully request that the Court grant their Motion to Dismiss and dismiss plaintiffs' claims against the American Homestar Defendants which manufactured only manufactured homes. The National Manufactured Housing Construction and Safety Standards Act (NMHCSSA) pre-empts these state statutory and common law tort actions which conflict with the uniformity and comprehensiveness of the HUD formaldehyde standard and with the Federal superintendence of the manufactured housing industry.

Respectfully Submitted,

<u>s/ W. Evan Plauché</u>
**W. EVAN PLAUCHÉ**
Bar No.: #21027
**JOHN T. CULOTTA**
Bar No. #17272
**DAVID C. BACH**
Bar No.: #28484
Counsel for Defendants,
**American Homestar Corporation and Oak Creek Homes, LP**
**HAILEY, McNAMARA, HALL, LARMANN & PAPALE, L.L.P.**
One Galleria Boulevard, Suite 1400
P. O. Box 8288
Metairie, Louisiana 70011-8288
Telephone: (504) 836-6500
Fax: (504) 836-6565
E-Mail: eplauche@hmhlp.com
dbach@hmhlp.com
jculotta@hmhlp.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on **October 31, 2008,** I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

<u>s/ W. Evan Plauché</u>