UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | |
| | * | JUDGE: ENGELHARDT |
| This Document Relates to:   All Cases | * | |
| | * | |
| | * | MAG: CHASEZ |

**MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE
EXPERT TESTIMONY OF PATRICIA M. WILLIAMS, PH.D., DABT**

**MAY IT PLEASE THE COURT:**

The Manufacturing Defendants respectfully submit the following Memorandum in Support of their Motion *in Limine* to Exclude Expert Testimony of Patricia M. Williams, Ph.D., DABT.

I.

**Patricia M. Williams, Ph.D, DABT's Opinions**

Plaintiffs in this matter seek the certification of classes and/or sub-classes effectively defined as all individuals who resided for any length of time in emergency housing units provided by the Federal Emergency Management Agency (FEMA) following Hurricanes Katrina and/or Rita in Louisiana, Texas, Mississippi and Alabama, who sustained damages as a result of exposure to formaldehyde in the units.  *See* Doc. 764-2, Plaintiffs' Memorandum in Support of Motion for Class Certification, p. 4.  In an effort to support their request for class certification, plaintiffs intend to offer the opinions and testimony of Patricia M. Williams, Ph.D. *Id.* at pp. 22, 25-27.  Plaintiffs' intended purpose for Patricia Williams, Ph.D.'s opinions and testimony is to establish Federal Rule of Civil Procedure 23's class certification requirements of commonality

and typicality of claimants.  Id. *See* also Exhibit 1, Affidavit/Report of Patricia Williams, Ph.D., at p. 34.  Plaintiffs purport to satisfy these criteria by way of Patricia Williams Ph.D.'s opinions that the claimants all sustained "damage" due to formaldehyde exposure.  *See* Exhibit 2, Deposition of Patricia Williams, Ph.D., at pp. 102, 125-126, 231-236.  Furthermore, plaintiffs assert that, due to claimants suffering such "damages" a future medical services program is required for treatment of the claimants.  *See* Doc. 764-2, Plaintiffs' Memorandum in Support of Motion for Class Certification, pp. 4-5, 19, 22-34.  *See also* Exhibit 2, Deposition of Patricia Williams, Ph.D., at pp. 125-126, 131, 133.

Distilled to their core, Patricia Williams, Ph.D.'s opinions boil down to her opinion that anybody in the presence of formaldehyde, at any level, sustains damage at the very molecular or cellular level though symptoms, disease or injury may never appear.  *See* Exhibit 2, Deposition of Patricia Williams, Ph.D., at pp. 102, 125, 134, 231-236.  *See also* Doc. 764-2, Plaintiffs' Memorandum in Support of Class Certification, at p. 26.  From this opinion, Patricia Williams, Ph.D. concludes that commonality and typicality exist among the claimants.  *See* Exhibit 1, Affidavit/Report of Patricia Williams, Ph.D., at p. 34.

Patricia Williams, Ph.D.'s opinions and testimony should be excluded under Federal Rule of Evidence 702 (and its interpretative jurisprudence) as Patricia Williams, Ph.D. lacks the qualification necessary to render such opinions, the opinions are fundamentally unreliable and the opinions are not premised upon any recognized scientific methodology.

II.

**Admissibility of Expert Opinions**

A.    Patricia Williams, Ph.D. Lacks Requisite Qualification

The qualification of a witness as an expert, separate and apart from the witness' opinion, is a determination that is a discreet, independent and important requirement in considering the admissibility of an expert's testimony.  *See* U.S. v. Frazier, 387 F.3d 1244 (11th Cir. 2004).  This analysis, as well as that pertaining to the reliability of an expert's opinion, is especially sensitive in cases "where the plaintiff claims that exposure to a toxic substance caused his injury, [because a] jury may blindly accept an expert's opinion that conforms with their underlying fears of toxic substances without carefully understanding or examining the basis for that opinion".  *See* O'Conner The Commonwealth Edison Co., 807 F.Supp. 1376, 1391(C.D.Ill. 1992).  *See also* Whiting v. Boston Edison Co., 891 F.Supp. 12, 24 (D. Mass. 1995) (excluding proffered medical expert's opinion based on lack of knowledge and experience in analyzing causation of injury by radiation).  Indeed, it has been held that a toxicologist is not qualified to offer an expert opinion regarding a chemical's ability to cause alleged damages where the toxicologist is not a licensed medical doctor and lacks experience in the study of exposures to the subject chemical.  *See* Wintz by and through Wintz v. Northrop Corp. 110 F.3d 508, 514 (7th Cir. 1997) (excluding expert's opinion based upon lack of qualification where the proffered toxicologist was not a physician and, despite acquiring generalized knowledge of the chemical at issue [bromide], the expert did not have experience in analyzing causation of injury by way of exposure to the chemical).

Courts have routinely refused to admit a proffered expert's testimony where the proffered expert, even despite a generalized or professed knowledge of issues arguably relevant to the

subject matter, nevertheless lacked experience with the specific nature of the claims being litigated. *See e.g.* Kassim v. City of Schenectady, 415 F.3d 246 (2nd Cir. 2005) (lack of knowledge of Arabic translation); Adams v. Teck Cominco  Alaska, Inc., 399 F.Supp.2d 1031 (D. Alaska 2005) (expert lacked experience with total dissolved solids technology at issue); Morales v. E.D. Etnyre & Co., 382 F.Supp.2d 1252 (D.N.M. 2005) (lack of experience in distribution, sales and marketing practices); In Re: Rezulin Products Liability Litigation, 309 F.Supp.2d 531 (S.D.N.Y. 2004) (expert's opinion not based on qualification or experience but on subjective views of ethical standards at issue); Lippe v. Bairnco Corp., 288 B.R. 678 (S.D.N.Y. 2003) (expert's opinion on business valuation excluded where expert had never performed a business valuation); Montefiore Medical Center v. American Protection Ins. Co., 2003 WL 2110 8232 (S.D.N.Y. 2003) (expert lacked specific experience with building deterioration issues despite generalized expertise in field of construction) (attached hereto as Exhibit 3); and Teska v. Potlatch Corp., 184 F.Supp.2d 913 (D.Minn. 2002) (lack of current knowledge and experience with respect to crane operation).

In the present case, Patricia Williams, Ph.D. is not qualified to render expert opinions regarding the claimants' alleged exposure to formaldehyde and resultant damages therefrom. Patricia Williams, Ph.D. is a toxicologist. *See* Exhibit 1, Affidavit/Report of Patricia Williams, Ph.D., at p. 1.  She has recently been precluded from offering medical opinions in Ballard v. Bunge North America, Inc., 2008 WL 2185385, *3 (E.D. La. 5/22/08) (Barbie, J.)(rejecting Patricia Williams, Ph.D.'s opinion and granting defendants' Motion for Summary Judgment, stating that, "no other expert has made any diagnosis of occupational asthma, and no other expert has linked medical conditions to any inhalation of phosphine gas.") (attached hereto as Exhibit 4).  She is not a medical doctor, nor is she an epidemiologist or oncologist.  *See* Exhibit 2,

Deposition of Patricia Williams, at pp. 45-46. Her doctoral degree is an anatomy. <u>Id.</u> at p. 181. Prior to her retention in this case, Patricia Williams, Ph.D. has never rendered any opinions pertaining to formaldehyde exposure. *See* Exhibit 2, Deposition of Patricia Williams, at pp. 30-31. In addition, she has never authored any publications regarding health effects of formaldehyde exposure. <u>Id.</u> at 32. Her "extensive experience" with formaldehyde is that, as an "anatomist," she has used formaldehyde in the past. <u>Id.</u> at p. 30. Moreover, nowhere in her 34-page Affidavit does Patricia Williams, Ph.D. recite any experience pertaining to the evaluation of health effects due to formaldehyde exposure. *See* Exhibit 1, Affidavit/Report of Patricia Williams (*in toto*). All that Patricia Williams, Ph.D. has done to "qualify" herself as an expert in this case is review some published literature discussing formaldehyde and, from that, proclaim generalized theories of damage and causation. This exercise falls far short of that required to establish the qualification of Patricia Williams, Ph.D. as an expert under Federal Rule of Evidence 702 sufficient to allow the admissibility of her opinions and testimony in this case.

B.  <u>Trial Court's Gate-keeping Role Regarding Opinions of Patricia Williams, Ph.D.</u>

Federal Rule of Evidence 702 provides:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Fed. R. Evid. 702.

In considering the admissibility of expert opinion and testimony, the trial judge must act as a gate-keeper to determine whether the expert's reasoning and methodology underlying the testimony is scientifically valid and whether that reasoning and methodology has been properly

applied to the present case.  *See* Daubert v. Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 593-595 (1993).  The general considerations guiding this role are: (a) whether the theory or technique can or has been tested; (b) whether the theory or technique has been subjected to peer review or publication; (c) the known or potential rate of error; (d) the existence and maintenance of standards and controls; and (e) whether the theory or technique is generally accepted by those who work in the field of expertise at issue.  Id. *See also* Moore v. Ashland Chemical, Inc., 151 F.3rd 269, 275-276 (5th Cir. 1998) (*en banc*).  The focus of the trial judge is to determine whether the testimony and opinions are not only relevant, but reliable.  *See* Daubert, 509 U.S. at p. 589.

In addition to the guiding principles set forth in Daubert, other factors relevant to the consideration of whether an expert's testimony and opinions are sufficiently reliable so as to allow their admission are as follows: (1) whether the expert is proposing to testify about matters growing naturally and directly out of the expert's research conducted independent of the litigation or whether the expert has developed the opinion expressly for the purpose of testifying in the litigation; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as she would be in her regular professional work outside of her paid litigation consulting; and (5) whether the field of expertise claimed by the expert is known to reach reliable results consistent with the type of opinion the expert is giving.  *See e.g.* Kumho  Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999); General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997); Moore v. Ashland Chemical, Inc., 151 F.3d 269 (5th Cir. 1998) (*en banc)*; Sheehan v. Daily Racing Form, Inc., 104 F. 3d 940, 942 (7th Cir. 1997); Daubert v. Merrill Dow Pharmaceuticals, Inc. 43 F.3d 1311, 1317 (9th Cir. 1995) (Daubert II); and Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994).

Ensuring the reliability of an expert's opinion is appropriate at the class certification stage.  *See* In Re: Katrina Canal Breaches Consolidated Litigation, 05-4182, 2007 WL 3245438, *3-8 (E.D.La. 11/1/07) (Duval, J.) (attached hereto as Exhibit 5).  The question has arisen as to what extent the Daubert analysis should be performed in the context of class certification – i.e., a full Daubert review versus a more limited Daubert review.  While several Eastern District decisions have applied limited Daubert review, relying on the Second Circuit's opinion in In Re: Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124 (2d Cir. 1999), the Second Circuit has since reversed its holding on this issue in In Re: Initial Public Offering Securities Litigation, 471 F.3rd 24, 42 (2nd Cir. 2006) (applying full Daubert review in the context of class certification).  It has also been recognized and held that:

> "While the class certification determination is certainly important to the litigants, this court is especially cognizant of its duty to protect absent class members' rights.  Certification without adequate review of the parties' experts may substantially impair or foreclose the rights of absent class members if later review results in exclusion of the parties' experts. Given the high percentage of class actions which settle as a result of class certification, failure to conduct a *Daubert* analysis might invite plaintiffs to seek class status for settlement purposes, and essentially amounts to a "delegation of judicial power to the plaintiffs, who can obtain class certification just by hiring a competent expert…The *Daubert* analysis is especially necessary in this suit, where the plaintiffs assert a medical monitoring cause of action and rely on their experts' opinions to prove both the merits of their case as well as the appropriateness of class certification…This court has broad discretion when considering class certification; the district court 'is free to consider matters developed through…discovery, as well as other matters [the district court] considers appropriate for making its Rule 23 findings.'  *Gariety,* 368 F.3d at 368. Neither the Federal Rules of Evidence nor the Rules of Civil Procedure prohibit use of *Daubert* at the class certification stage and Rule 23 does not specifically provide for, require, or prohibit specific proceedings.  In the interest of fairness and efficiency, prior to considering the expert opinions proffered by the plaintiffs to prove commonality and cohesiveness, the court concludes that the opinions offered by the plaintiffs' experts must be reliable and relevant under the principles established in *Daubert*."  West v. Prudential Sec., 282 F.3d 935, 938 (7th Cir. 2002).

Defendants submit that a full <u>Daubert</u> review is appropriate and reflects the majority rule of other circuits.  *See* Dwight J. Davis, Karen R. Kowalski & Brandon P. Ansley, <u>Expert Opinion in Class Certifications:  Second Circuit Revisits, Disavows In Re Visa Check and Joins Majority Rule</u>, 74 DEF. COUNSEL. J. 253 (2007).   However, the core concept of ensuring reliability is at the heart of either a full or "limited" <u>Daubert</u> review.

Even under a "limited" <u>Daubert</u> review, in the context of class certification, the court must first determine whether the plaintiffs' expert testimony supporting class certification is reliable.  *See* Exhibit 4, at *8.  Under such a review, the court's review of the expert's opinion is to be limited to the opinion's reliability and relevance to the requirements under Federal Rule of Civil Procedure 23.  *See* <u>Ancar v. Murphy Oil U.S.A., Inc.</u>, 2007 WL 3270763, *2 (E.D. La. 11/2/07) (Barbier, J.) (attached hereto as Exhibit 6).  At this stage, the court should review the expert's opinion to ensure that it contains no flaws that would render it inadmissible as a matter of law:  the methodology must show some hallmarks of reliability, whether through peer review or use of generally-accepted standards or methods; the expert must be qualified; and the opinion must have probative value for the issues of class certification.  <u>Id.</u> (citations omitted).

The opinions and testimony of Patricia Williams, Ph.D. fail to exhibit such hallmarks of reliability and, as such, should not be admitted at the class certification hearing or otherwise in support of plaintiffs' Motion for Class Certification.  The following opinions, comprising the overwhelming crux of Patricia Williams, Ph.D.'s testimony, should be excluded as unreliable under the tenets of Federal Rule of Evidence 702 and <u>Daubert</u>, even in a class-certification context: (1) that all persons in the presence of formaldehyde, regardless of concentration, suffered damage; (2) that claimants require a future medical services program; and (3) that claimants satisfy commonality and typicality requirements for class certification.

III.

**All Claimants Suffered Damage – Unreliable**

A.    Unacceptable Definition of "Damage"

Patricia William, Ph.D. concludes that all persons in the presence of formaldehyde, regardless of concentration, sustained damage.  *See* Exhibit 2, Deposition of Patricia Williams, at pp. 102, 125, 134, 136, 231-236.  To wit, she offers the following testimony:

> A. …so that anyone that is in the presence or in the exposure medium and is in contact will have damage…
>
> * * *
>
> Q.       …you said that everyone that has inhaled formaldehyde has some damage?
>
> A.       Correct, at the cellular level.  I'm a toxicologist and I'm talking about the cellular and molecular result of formaldehyde…
>
> * * *
>
> A.       You may not see symptoms…
>
> * * *
>
> Q.       …at any concentration levels, in your opinion, it will cause some damage…
>
> A.       Right…
>
> * * *
>
> A.       …it's at the very molecular level…
>
> * * *
>
> A.       …we know that there is no threshold on a molecular level…

*See* Exhibit 2, Deposition of Patricia Williams, at pp. 102, 134, 231-236.

In addition, she is of the opinion that she cannot estimate a concentration guaranteed not to produce negative reactions in the general population.  *See* Exhibit 1, Affidavit/Report of Patricia Williams, at pp. 14.

This line of reasoning and opinion-making has been tried before and considered unacceptable.  In <u>Dumontier v. Schlumberger Technology Corp.</u>, 543 F. 3rd 567, 570 (9th Cir. 2008), the court held:

> We next consider whether the term "bodily injury" in the Act includes subcellular damage.  Plaintiffs argue that the slightest exposure to radiation damages cells by denaturing proteins and modifying DNA.  This, they argue, qualifies as bodily injury under the Act.  But not every alteration of the body is an injury.  Thinking causes synapses to fire and the brain to experience tiny electric shocks; fear stimulates the production of chemicals associated with the fight-or-flight response.  All life is change, but all change is not injurious.  Adopting plaintiffs' interpretation of bodily injury would render the term surplusage, as every exposure to radiation would perforce cause injury.

The court went on to explain that "this damage does not establish that there is or will be pain or interference with bodily functions and thus isn't an injury within the meaning of the Act."  Id. at 571.  *See also* Parker v. Wellman, 230 Fed. Appx. 878, 882-883 (11th Cir. 2007) (holding that subclinical injury does not constitute actionable "damage");  Ranier v. Union Carbide Corp., 402 F.3d 608, 618-622 (6th Cir. 2005); Schweitzer v. Consol. Rail Corp., 758 F.2d 936, 942 (34rd Cir. 1985);  Laswell v. Brown, 683 F.2d 261, 269 (8th Cir. 1982); and Eagle-Picher Indus, Inc. v. Liberty Auto Ins. Co., 682 F.2d 12, 19-20 (1st Cir. 1982).

As such, this opinion of "damage" at the "very molecular level" as stated by Patricia Williams, Ph.D. fails to establish even general causation of injury in relation to formaldehyde exposure.

B.    Linear Non-Threshold Models are Unacceptable

Patricia Williams, Ph.D.'s opinion that such damage takes place, regardless of exposure concentration, is nothing more than a linear non-threshold model as she states:

> A.    Because it is well above where we know we have adverse health effects.  Formaldehyde is a DNA-reactive carcinogen, and when you theoretically consider the DNA-reactive carcinogens, we know that there is no threshold on a molecular level...*See* Exhibit 2, Deposition of Patricia Williams, at p. 223.

This methodology has been soundly rejected.  In rejecting opinions based on such a model as that presented by Patricia Williams, Ph.D., it has been held that it "**fails all of the**

**Daubert reliability factors**." *See* <u>Whiting v. Boston Edison Co.</u>, 891 F.Supp. 12, 25 (D.Mass. 1995). (emphasis added). Therein, plaintiff's experts espoused opinions that low dose exposure to radiation could trigger events leading to the development of acute lymphocytic leukemia (ALL) and the court, in excluding such opinions, held as follows:

> I find that the opinion…that low doses of nuclear radiation…can cause ALL is not based on scientific knowledge, but is grounded on speculation shaped by result-oriented biases. The linear non-threshold model cannot be falsified nor can it be validated. To the extent it has been subjected to peer review and publication, it has been rejected by the overwhelming majority of the scientific community. It has no known or potential rate of error. It is merely an hypothesis. In sum, it has no capacity to be of assistance to a jury in resolving the ultimate issues in this case. <u>Id</u>.

Other courts have also precluded such opinions based upon this model providing that opinions based upon it are "flatly rejected as mere hypothesis." *See e.g.* <u>Parker v. Mobil Oil Corp.</u>, 793 N.Y.S. 2d 434, 438 (2d Dep't 2005); <u>Willis v. Amerada Hess Corp.</u>, 2002 WL 140542, *14 (S.D.N.Y. 2002) (attached hereto as Exhibit 7); and <u>Sutera v. Perrier Group</u>, 986 F.Supp. 655, 666 (D.Mass. 1997).

As such, the very model by which Patricia Williams, Ph.D. forms her opinions has been flatly rejected, thereby invalidating her entire opinion.

C.     <u>Misuse of Studies is Unacceptable</u>

In addition to the model utilized by Patricia Williams, Ph.D. having been soundly rejected in both the scientific and legal communities, Patricia Williams, Ph.D. also improperly relies upon and/or mis-cites pertinent studies which she contends confirm her opinions.

First, a short background on the proper use of epidemiological papers by various courts is set forth here. The U.S. Court of Appeals for the Fifth Circuit has recognized the value of epidemiological studies in cases such as this. *See* <u>Brock v. Merrell Dow Pharmaceuticals, Inc.</u>,

874 F.2d 307, 311 (5th Cir. 1989).  "Epidemiology attempts to define a relationship between a disease and a factor suspected of causing it."  Id.  To define that relationship, an epidemiologist examines the general population, comparing the frequency of the disease among those people exposed to the factor to those not exposed.  Id.  The epidemiologist then uses statistical methods and reasoning to draw a biological inference between the factor and the disease's etiology.  Id.[1]

One difficulty with epidemiologic studies is that often several factors can cause the same disease.  Id.[2]  Studies incorporate the possibility of these other factors by using a "confidence interval."  Id. at 312.  The confidence interval is a common sense mechanism upon which statisticians rely to confirm their findings and to lend persuasive power within their profession. Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349, 1353 n.1 (6th Cir. 1992).  It has two components: a percentage and an interval.  Id.  The percentage is often set at 95 percent.  Id. The interval represents a range of possible values at high and low ends of a scale of "relative risk."  Id.  At a 95 percent interval, the relative risk value will be between the high and low ends of the confidence interval 95 percent of the time.  Id.

That, of course, begs the question of how to define "relative risk."  The relative risk is a number that describes the increased or decreased incidence of the disease in question in the population exposed to the factor as compared to the control population not exposed to the factor. See Brock, (supra) 874 F.2d at 312.  A relative risk of 1.0 means that the incidence of disease in the two groups was the same.  Id.  A relative risk greater than 1.0 means that there was a higher incidence of disease in the group exposed to the factor.  Id.

---

[1]   See A. Lilienfeld & D. Lilienfeld, Foundations of Epidemiology 3 (2d Ed. 1980).

[2]   Indeed, Patricia Williams, Ph.D. admits that each of the symptoms reported by claimants can be caused by something other than formaldehyde.  See Exhibit 2, Deposition of Patricia Williams, at pp. 101-102.

Just because an epidemiological study concludes that a relative risk is greater than 1.0, it does not establish that the factor caused the disease. Id. If the confidence interval is so great that it includes the number 1.0, then the study will be said to show no statistically significant association between the factor and the disease. Id. So, if a study concluded that the relative risk for a disease was 1.30, but the confidence interval was from 0.95 to 1.82, then no statistically significant conclusions could be drawn from this study because the relative risk, when adjusted by the confidence interval, includes 1.0. Id.

To further demonstrate what is wrong with Patricia Williams, Ph.D.'s opinions based on epidemiology papers, the Manufacturing Defendants' refer to the PSC's expert epidemiologist, Dr. Gerald McGwin, who has given two opinions regarding the issue of association (or lack thereof) between cancer and formaldehyde. Dr. McGwin opined that the only cancer he could link to formaldehyde was nasal pharyngeal. *See* Exhibit 8, Deposition of Gerald McGwin, at p. 45. No other cancer has a statistically significant association. Dr. McGwin also conceded that an association between formaldehyde and nasal pharyngeal cancer is only seen with peak exposures above 4,000 ppb of formaldehyde. Id. at pp. 115-116. Dr. McGwin further conceded that 4,000 ppb peak exposure is not relevant to this case. As such, neither did Patricia Williams Ph.D.'s single molecule theory/non-threshold linear model. Id. at p. 124.

Patricia Williams, Ph.D. has chosen to misreport some of those same studies cited by Dr. McGwin. In her report she states:

> "Formaldehyde is carcinogenic to humans (Group 1) as classified by the International Agency for Research on Cancer. There is sufficient evidence in humans for the carcinogenicity of formaldehyde. There is sufficient evidence in experimental animals for the carcinogenicity of formaldehyde. (IARC, 2004)."[3]

---

[3]     Although she cites generally to IARC, 2004, she fails to cite to specific pages of the nearly 300 printed pages of text. The Summary of Data Reported and Evaluation, §5, IARC Monographs Volume 88, pp. 273-280, specifically concludes that there is sufficient epidemiological evidence only that formaldehyde causes naspopharyngeal cancer in humans. IARC Monographs Volume 88, p. 274 (2004). There is strong,

> *See* Exhibit 1, Affidavit/Report of Patricia Williams, Ph.D., at p. 16 (Sec. 5.2, Cancer)

To support this opinion she cites the Hauptmann 2003 and 2004 (attached hereto as Exhibit 9); Stellman 1998 (attached hereto as Exhibit 10); and Ott 1989 papers (attached hereto as Exhibit 11). While Patricia Williams, Ph.D. acknowledges that the Hauptmann papers only see an association with leukemia at peak exposure above 4,000 ppb, she leaves that out of her analysis of nasal pharyngeal cancer and formaldehyde exposure.[4]

In citing the Stellman paper, Patricia Williams, Ph.D. chooses to select the relative risk of formaldehyde in conjunction with wood dust (a suspected carcinogen). <u>Id</u>. She conveniently ignores[5] the column which evaluated **formaldehyde only** and found the corresponding SMR for:

|  |  |
|---|---|
| Lymphohematopoietic | 1.22 (range 0.84 - 1.77) |
| Leukemia | .96 (range 0.54 - 1.71) *See* Exhibit 10, Stellman 1998 (Table V). |

As discussed above, once the confidence interval includes a sub - 1.0 figure, it loses all statistical significance.

---

but not sufficient evidence for a causal association between leukemia and occupational exposure to formaldehyde. IARC Monographs Volume 88, p. 276 (2004). On the basis of data available at the time, the Working Group was unable to identify a mechanism for the induction of acute myeloid leukemia. IARC Monographs, Volume 88, p. 280. As to "animal carcinogenicity data" via inhalation, the summary states that "several studies…showed evidence of carcinogenicity, particularly the induction of squamous-cell carcinomas of the nasal cavities. A similar study in hamsters showed no evidence of crinogenicity, and one study in mice showed no effect." IARC Monographs Volume 88, p. 278 (2004). However, in humans, there was little evidence of an association with squamous-cell carcinoma of the nasal cavity. IARC Monographs Volume 88, p. 275 (2004).

[4] She devotes 2 paragraphs (7 sentences) to the summary of the Hauptmann papers. However, these paragraphs are not her analysis. They are nearly verbatim excerpts from the IARC Monograph. Compare her selective excerpts with IARC Monographs Volume 88, §2.1.1(a) The National Cancer Institute (NCI) Cohort, pp. 94-104. Since her report in this regard is merely a selective quotation of the IARC Monograph, it is of no assistance to the Court.

[5] She also ignores the Working Group note that this study should be given little weight in the evaluation because of the small number of formaldehyde-exposed workers and the limitation in the subjective exposure assessment for formaldehyde. IARC Monographs Volume 88, p. 110 (2004).

Finally, Patricia Williams, Ph.D. cites the Ott 1989 paper, which is a study of occupation hazards from chemical combinations, not from isolated chemicals such as formaldehyde. Perhaps this is why Ott concluded his opinions on non-Hodgkins lymphoma by stating, "However, the confounding of chemical exposures precluded attributing this finding to a specific agent." *See* Exhibit 11, Ott 1989, at p. 641. Indeed, the only specific reference to formaldehyde that appears in Ott's paper is in Table III as one of 21 different chemicals to which the workers were exposed.[6]

Following Dr. Williams' assertions that concentrations of formaldehyde as low as 0.1mM induce genetic damage and inhibit DNA repair in bronchial cells, she provides inappropriate opinions based on animal studies. Her report, at 16, states:

> Inhalation of formaldehyde has been shown to induce the formation of DNA-protein cross links in nasal tissue from rats and monkeys…[7]

Extrapolating these theories to humans has been rejected by the PSC's expert oncologist Dr. Stein who testified:

> Q.    Same is true, you can't necessarily extrapolate animal study results to humans?
>
> A.    No, you can't extrapolate animal studies to humans. They give you an idea where to head. They give you an idea -- I mean, if you have something that is a known carcinogen in an animal, then you have a reason to suspect that it may be a known carcinogen to humans. But it doesn't give you concrete evidence of that. And because something is not a carcinogen in an animal doesn't mean it is not a carcinogen in humans. Because animals and humans are different biological systems.

Exhibit 12, Deposition of Dr. Williams Stein, III, M.D., at p. 192.

Stein further testified:

---

[6]    The IARC Working Group noted that confidence intervals were not provided and could not be calculated because the number of exposed controls was not given. IARC Monographs Volume 88 p. 112 (2004).

[7]    She provides only a non-specific reference to IARC (2004). This statement is of no assistance to the court.

Q.     What is the **biological mechanism** by which exposure to formaldehyde would cause nasopharyngeal cancer?

A.     **I don't have a clue**.

Q.     How would it cause cancer?

A.     I don't know.  Ask me how -- what causes breast cancer and why? Methylation has been implicated for years.  I don't have a clue.  Neither does anybody else.  If we knew why, we would know what to do about it. Formaldehyde is a desiccant.  It takes the water out of tissue.  Whether or not that causes problems with DNA or causes problems with those cells -- apparently, one of the papers I read said that the only way you get cancer is if there was significant tissue damage from the formaldehyde, a drying effect, and there had to be significant problem for one hypothesis. **But whether or not that is true, I don't know.  I don't think anybody knows**.

*Id.* at p. 153.

Apparently, Dr. Williams disagrees.

The purported reliance by experts upon animal and/or epidemiological studies in attempting to show validation for their opinions has been the subject of great scrutiny, particularly since <u>Daubert</u>.  The United States Supreme Court has cautioned, in no uncertain terms, that trial courts be wary of experts attempting to do exactly what Patricia Williams, Ph.D. has done here – improperly proclaiming validation based upon report studies.

In <u>General Electric Co. v. Joiner</u>, 522 U.S. 136 (1997), the Court upheld the trial court's exclusion of plaintiff's experts based upon the experts' misuse of animal and epidemiological studies.  Therein, plaintiff's experts proffered opinions that plaintiff's development of small-cell lung cancer was due to his exposure to PCB's while working as an electrician.  <u>Id.</u> at at pp. 139-140.  Plaintiff's experts offered the opinion that because plaintiff was exposed to PCB's, which were alleged to be capable of promoting cancer, this exposure was responsible for plaintiff's condition.  <u>Id.</u> at p. 140.  The trial court found, in ruling on defendant's Motion for Summary

Judgment that the plaintiff's experts had failed to show that there was a link between PCB's and small-cell lung cancer and that there opinions failed to rise above "subjective belief or unsupported speculation." Id.  The opinions were therefore ruled inadmissible. Id.

Instructive to the case at hand, the Court analyzed the improper reliance upon and misuse by the plaintiffs' experts of four epidemiological studies that plaintiffs' experts claimed supported the opinion that plaintiffs' exposure to PCB's lead to his cancerous condition. All four studies relied upon did show increases in lung cancer deaths above expectations in the population studied. Id. at pp. 145-146. This notwithstanding, an analysis of the studies relied upon demonstrated that they could not support the experts' conclusions that plaintiffs' exposure to the PCB's caused his condition. Id.  The authors of the first study concluded that "there were apparently no grounds for associating" the lung cancer deaths to exposures to PCB's in the plant studied. Id. at p. 145.  As such, the authors "were unwilling to say that PCB exposure had caused cancer among the workers that they examined." Id.  In the second study, while noting that the incidents of lung cancer deaths among the workers studied was higher than would ordinarily be expected, the increase was not statistically significant and the authors "did not suggest a link between the increase in lung cancer deaths and exposure to PCB's ." Id.  The third study made no mention of PCB's and, moreover, was expressly limited to the type of mineral oil involved in the study. Id. at p. 146.  The fourth study, despite showing a statistically significant increase in lung cancer deaths in the population studied, also demonstrated that the subjects of the study had been exposed to numerous potential carcinogens including toxic rice oil that they had ingested. Id.

The Court in confirming the District Court's rejection of the proffered opinions, held that:

> Trained experts commonly extrapolate from existing data.  But nothing in either Daubert or the Federal Rules of Evidence requires a District

Court to admit opinion evidence that is connected to existing date only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

Id. at p. 146.[8],[9]

D.      Conclusion on "Damage" Opinions

Based on the above, Patricia Williams, Ph.D.'s opinions regarding class-wide suffering of damages to support class certification are based upon unacceptable definitions of "damage", unaccepted model and unaccepted use of scientific studies.  As such, these opinions should be excluded.

IV.

**Claimants Require a Future Medical Services Program – Unreliable**

Patricia Williams, Ph.D. is also of the opinion that the individuals allegedly exposed to formaldehyde are required to be placed in a future medical services program.  *See* Exhibit 2, Deposition of Patricia Williams, Ph.D., at p. 126.  *See also*, Doc. 764-2, Plaintiffs' Memorandum in Support of Motion for Class Certification, at pp. 22-25, 32-34.

---

[8]     The Court also considered the trial court's rejection of plaintiff's experts reliance upon animal studies that plaintiffs contended validated the experts' opinions.  Id. at pp. 144-145.  The animal studies relied upon by plaintiffs' experts held the Court, could not sufficiently support the opinions proffered because they were so dissimilar to the facts of the present litigation.  Id.  For example, the animal studies involved infant mice with massive doses of PCB's injected into them and no study demonstrated that adult mice developed small cell lung cancer after being exposed to PCB's.  Id. at p. 144.  In contrast, plaintiff was an adult human being whose alleged exposures were to far less concentrations and by entirely different mediums.  Id.

[9]     Justice Breyer, in his concurrence to the Court's opinion, highlighted the importance of the trial court's role in ensuring reliable expert testimony in the context of toxic tort cases.  Id. at p. 146.

Justice Breyer stated:

        "The plaintiff in today's case says that a chemical substance caused, or promoted his lung cancer.  His concern, at that of others, about the causes of cancer is understandable for cancer kills over one in five Americans…yet modern life, including good health as well as economic well being, depends upon the use of artificial or manufactured substances, such as chemicals.  And it may, therefore, prove particularly important to see that Judges fulfill their Daubert gate-keeping function, so that they help assure that the powerful engine of tort liability, which can generated strong financial incentives to reduce, or to eliminate production, points toward the right substances and does not destroy the wrong ones."  Id.

Patricia Williams, Ph.D. admitted in her deposition that she would defer to medical doctors regarding diagnosis and treatment.  *See* Exhibit 2, Deposition of Patricia Williams, Ph.D., at pp. 48-49.  In addition, Patricia Williams, Ph.D. admitted in her deposition that she would defer to medical doctors as to the determination of what tests should be performed as part of an intervention program as well as what treatment should be performed in any type of medical intervention program.  Id., at pp, 131,133.  Interestingly, plaintiffs characterize the future medical services program as "treatment" required by the prospective class members.  *See* Doc. 764-2, Plaintiffs' Memorandum in Support of Motion for Class Certification, at pp. 32-34.  As such, the opinion that a future medical services program is required cannot be given by Patricia Williams, Ph.D. as she has admitted that she is not qualified to render such an opinion.  *See also* Parker v. Wellman (supra), 230 Fed. Appx. at 882-883 (rejecting plaintiffs' request for a medical monitoring class based on theory of subcellular damage model).

V.

**Commonality and Typicality are Established – Unreliable**

Patricia Williams, Ph.D. is of the opinion that the plaintiffs satisfy the requirements for class certification of commonality and typicality.  *See* Exhibit 1, Affidavit/Report of Patricia Williams, Ph.D., at p. 34.  The basis for her opinion in this regard is her review of 1,516 Fact Sheets submitted by prospective plaintiffs.  *See* Exhibit 1, Affidavit/Report of Patricia Williams, Ph.D., at pp. 24-29.  From these self-reported symptoms on the Fact Sheets, Patricia Williams, Ph.D. is of the opinion that the symptoms reported by the claimants are both common across them as well as typical of exposure to formaldehyde.

Under the Federal Rules of Evidence, a court may not exclude otherwise admissible evidence simply because that evidence touches upon an ultimate issue to be decided by the fact

finder. FED. R. EVID. 702(a) (2008). This rule applies with equal force to expert witnesses. <u>See</u> <u>U.S. v. Beaumont</u>, 972 F.2d 553, 565 (5th Cir. 1992) ("Moreover, we note Federal Rule of Evidence 704 provides that expert testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.") However, the rule "does not open the door to all opinions." <u>Owen v. Kerr-McGee Corp.</u>, 698 F.2d 236, 240 (5th Cir. 1983). The rule is not intended to allow a witness to give **legal** conclusions. *Id*. In this case, Dr. Williams has violated established Fifth Circuit jurisprudence by offering a legal conclusion as to commonality and typicality.

Furthermore, even if she were entitled to offer such opinions, her methodology for doing so was flawed.  First, Dr. Williams admitted that there was no control group of individuals to whom the Plaintiff Fact Sheets were handed to which comparisons could be made to validate her opinion.  *See* Exhibit 2, Deposition of Patricia Williams, Ph.D., at p. 148.  In addition, Patricia Williams, Ph.D. admitted that her analysis was not an epidemiological study.  <u>Id.</u>  In fact, Patricia Williams, Ph.D. testified that she would not do an epidemiological study because "you've always got problems with it."  <u>Id.</u>, at pp. 148, 153 and 175.  In addition, Patricia Williams, Ph.D. admitted that her analysis was not even a toxicological study, was not a scientific study and was purely an exercise in "enumeration in measurement."  <u>Id.</u>, at pp. 175, 178-179.  Finally, Patricia Williams, Ph.D. admitted that her "survey" methodology was not submitted to any of her peers for review and acceptance.  <u>Id.</u>, at p. 179.

In addition to the foregoing, Patricia Williams, Ph.D.'s own reported opinions set forth in her Affidavit belittle her opinions as to commonality and typicality.  At several places in her opinion, Patricia Williams, Ph.D. comments that "there are large individual differences and responses to formaldehyde exposure in the normal population and between hyper-reactive and

sensitized people" as well as the statement that "there is considerable variability in responses of humans to xenobiotics."  *See* Exhibit 1, Affidavit/Report of Patricia Williams, Ph.D., at pp. 9, 14, 21, 22.  Moreover, as cited previously, Patricia Williams, Ph.D. admitted that every symptom reported could be caused by something other than formaldehyde – rendering her opinions of no assistance.  *See* Exhibit 2, Deposition of Patricia Williams, Ph.D., at pp. 101-102.

Perhaps the problems with Patricia Williams, Ph.D.'s opinions are that she is focused on the legal basis for her theories rather than the scientific basis and on numerous occasions she explained that her opinions were offered to bring the case within the Federal Judiciary Guidelines, for example:

> A.    And in Federal Court, the **Federal Judiciary Guidelines**, what they're looking for is a measure of exposure or if you have biological indicators or if you have some way to directly test or an air modeler.

> \* \* \*

> A.    So exposure, generally when you have a, quote, "measure of exposure" according to the **Federal Judiciary Guidelines**, it's a measure of what's in the air.  Or if you're talking about a soil case, what's in the soil.  Or if you're talking about water, what's in the water.  That's exposure.  What's the concentration in the medium that you may come into contact with.  All right?

\* \* \*

> Q.    Okay.  Just become someone experienced a symptom while they were living in a trailer doesn't mean that it was caused by formaldehyde, does it?

> A.    Well, that's the purpose for doing a cross-sectional analysis.  Certainly this is not a specific causation report.  What it is is to see, first of all -- you know, the first thing you want to ask before you even go forward with litigation when you got a population is what do they have, what have they experienced, what are they exhibiting in the way of symptoms or disease that can be temporally associated with their known exposures.  Now, if you don't have symptoms -- I mean, the **guidelines or the law** requires that you show you have a population of people with exposure and that you have common symptoms observed, numerous common

symptoms observed that are typical of what is documented in the scientific literature and known to be caused by formaldehyde.  So that is what this is.

* * *

A.    …You're going into another type of method.  You're doing an epidemiological study, and that takes a great deal, no matter how carefully you try to put that together, you've always got problems with it, so I did not do that.

Q.    Okay.

A.    It was not necessary under the **Federal Judicial Center requirements** for a  class certification.

* * *

Q.    …You have referred several times to the Federal Judicial Center criteria.  Are you referring to the Reference Manual on Scientific Evidence?

A.    I am.

Q.    The information and correlation of information that is in your report, I believe you stated that is not an epidemiological study; is that correct?

A.    That is correct.

Q.    And is it a toxicological study?

A.    This is strictly an enumeration in measurement.  No, it is not a toxicological study, per se.

Q.    Thank you.  Thank you.  Have you conducted a scientific study of any kind?

A.    This is a general causation report, which is based upon scientific studies in the general literature that document according to the **Federal Judiciary Guidelines** mandated that we show general causation, that the compounding question, formaldehyde, can cause these adverse health effects.[10]

---

[10]    These collective responses and testimony may be the most candid admission by a proffered expert that the opinions and methodology were developed solely for the purpose of testifying – an approach expressly cautioned against.  *See* <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 43 F.3d 1311, 1317 (9th Cir. 1995) (<u>Daubert II</u>).

*See* Exhibit 2, Deposition of Patricia Williams, Ph.D., at pp. 81, 86, 104, 153-154, 174-175.

VI.

### **Conclusion**

Based upon the foregoing, Manufacturing Defendants' request that this Court enter an Order precluding Patricia Williams, Ph.D. from offering any and all of the foregoing opinions and/or testimony in support of Plaintiffs' Motion for Class Certification.

Respectfully submitted,

**DUPLASS, ZWAIN, BOURGEOIS, PFISTER, & WEINSTOCK**

s/Andrew D. Weinstock

_____

**ANDREW D. WEINSTOCK #18495**
**JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700
Fax: (504) 837-3119
andreww@duplass.com
jglass@duplass.com
***DEFENSE LIASON COUNSEL***

<u>**C E R T I F I C A T E**</u>

I hereby certify that a copy of the foregoing has this date been serves on all

counsel of record in this proceeding by:

( )   Hand Delivery                    ( )   Prepaid U.S. Mail

( )   Facsimile                        ( )   Federal Express

(X)   CM/ECF

New Orleans, Louisiana this 10th day of November, 2008.


                              s/Andrew D. Weinstock
                    _____
                    ANDREW D. WEINSTOCK #18495
                         andreww@duplass.com

24