UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | ) | MDL NO. 1873 |
| FORMALDEHYDE | ) | |
| PRODUCT LIABILITY LITIGATION | ) | |
| | ) | SECTION: N(4) |
| | ) | |
| | ) | JUDGE: ENGELHARDT |
| | ) | MAG: ROBY |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## AFFIDAVIT OF  PATRICIA  M. WILLIAMS, PH.D. DABT

STATE OF LOUISIANA
PARISH OF ORLEANS

Before me, the undersigned notary on this day personally appeared Patricia M. Williams,

Ph.D. DABT, a person whose identity is known to me.  After I administered the oath to her, upon her oath she stated as follows:

   All statements contained herein are  true and correct and based upon my personal knowledge, education, and experience and I am a person of full age of majority, competent to execute this affidavit.

### Section 1.0 – Expert Witness Qualifications

**1.1** My qualifications as expert witness include the following:

**Board certification:  Diplomate of the American Board of Toxicology
Tulane University, School of Medicine, Department of Anatomy, Ph.D., 1983.
    Major:  Anatomy Minor: Biochemistry
Louisiana State University in Baton Rouge; M.S. in Microbiology, 1975
Louisiana State University in Baton Rouge; B.S. in Medical Technology, 1966
Clinical Laboratory Scientist-Generalist, Louisiana License Number: G00023
Laboratory Director – CLIA Certification 19D0898394  (1993-2005)**

   I am board-certified in Toxicology and a Diplomate of the American Board of Toxicology.  I am a tenured Associate Professor and currently serve as Coordinator for Toxicology Research Laboratories of the Pontchartrain Institute for Environmental

1

Sciences, University of New Orleans. In that capacity, I am also responsible for teaching courses in Toxicology to Graduate and Undergraduate students.

I served for ten years as the Director of the Occupational Toxicology Outreach Program of the Department of Medicine of the LSU Medical Center in Shreveport. In that capacity, I surveyed or evaluated over 17,000 workers or community members with occupational or environmental toxic exposures for adverse health effects of such exposures. I was a tenured Associate Professor of Medicine of the Department of Medicine of LSU Medical School in Shreveport. Additionally, I served as the Laboratory Director of an in-house research laboratory for Medical Surveillance for adverse health effects of chemical exposure. In this capacity, I was responsible for identifying the laboratory parameters that are clinical indicators of environmental and occupational toxic exposure and for the interpretation of the laboratory parameters to the attending physicians. I am licensed by the State of Louisiana and certified by the American Society for Clinical Pathologists and meet the requirements of federal law, specifically, the Clinical Laboratory Improvement Act, to serve as the Laboratory Director. I have been certified and have had work experience in the performance and interpretation of clinical laboratory procedures for over thirty-nine years. My work experience includes serving as Department Head of Medical Technology at LSU Medical Center for seven years. In that capacity, I was responsible for the development, organization, administration, review, revision, and direction of the educational program to train students at the baccalaureate and masters levels in the performance and the interpretation of clinical laboratory procedures in the areas of hematology, immunology, immunohematology, microbiology, parasitology, urinalysis, clinical chemistry, toxicology, phlebotomy, and management. In that capacity, I also designed and taught courses in the various areas of clinical pathology to cytotechnology students, pathology residents, and maxillo-facial surgery dental residents, as well as medical students. I also developed an in-house departmental clinical practicum, which was nationally accredited, in the performance and interpretation of laboratory procedures. This clinical practicum substituted for six months of the required hospital training program in the various areas of clinical pathology for the baccalaureate students.

By virtue of my doctoral degree in Anatomy, I have extensive training and teaching in the areas of gross anatomy, medical histology, embryology, neuroscience, and cell biology. I have a minor in biochemistry at the doctoral level with doctoral research in the areas of hematology, specifically megakaryocytopoiesis, thrombopoiesis, and erythropoiesis, and the stem cell compartment. Also, I have graduate credit in epidemiology from Tufts University New England Epidemiology Institute. I have performed health profiles and epidemiologic studies in communities to identify the evolution of disease in association with chemical exposure through the study of clinical symptoms, diagnosed diseases, lifestyle and behavior factors. I have taught in numerous HASMET (hazardous materials) conferences, workshops, and seminars for union workers and industrial corporations. I have assisted numerous physicians in the understanding of the etiology of occupational and environmental diseases and provided Continuing Medical Education for physicians and Continuing Education programs for Industrial Hygienists. I conducted disease prevention programs for workplace,

2

communities, homes, and schools including prevention of prostate cancer, inhalant abuse, fetal alcohol syndrome, alcohol toxicity, and abuse of drugs and alcohol.

I lectured to second year medical students on the "Environmental Etiology of Disease", which includes: recognizing the adverse health patterns commonly observed in chemically associated diseases, the multifactorial nature of disease, effects of chemical interactions in a mixture, dose-response, and the cellular effects of DNA reactive carcinogens.

I was commissioned to conduct a health assessment and medical surveillance using laboratory procedures of the people of Grand Bois who reside next to a Non-hazardous oilfield waste site that received shipments of Benzene-contaminated wastes that were ordered removed from an out-of- state facility because of the toxic nature of the wastes. The preliminary results of this study resulted in announcement of funding provided from the Department of Health and Hospitals budget by the then Governor of Louisiana, Mike Foster, for an additional medical surveillance research project of which I was designated the Principal Investigator. Internal Review Board approval from the LSU Medical Center in Shreveport was granted for the conduct of both research studies. Soon thereafter, the Louisiana Legislature granted an additional funding amount of $100,000 in the 1998 Legislative Session for additional medical surveillance of the adults and children of Grand Bois for the 1998-1999 fiscal year. This study was not related to litigation and was an independent research project. The results of this study are located in all of the State Libraries throughout Louisiana. It consists of two volumes: Volume 1 consists of a "Retrospective Study of Health Effects of the Grand Bois Community" utilizing a health survey for data collection. Volume 2 consists of a one year medical surveillance project with the performance of clinical laboratory procedures that would serve as indicators of developing disease or indicators of abnormalities of concern with the potential for future disease development. As laboratory director under Federal Law, specifically the Clinical Laboratory Improvement Amendments Subpart A Section 493, I was responsible for ensuring that my consultation was available to the laboratory clients for the interpretation of the test results reported concerning specific patient conditions. (pg. 7176, Federal Register, vol 57, No. 40, Friday, February 28, 1992)

I have performed health profiles and epidemiologic studies in communities to identify the evolution of disease in association with chemical exposure through the study of clinical symptoms, diagnosed diseases, lifestyle and behavior factors. In the Combustion litigation of Livingston Parish in Louisiana, I served as the expert witness for a population of 10,000 who had exposures to benzene and other toxic chemicals. Leukemias and Neuroblastomas were prominent among the adverse consequences of chemical exposure. Another case of 4,000 individuals, in the Thompson Hayward Case in Orleans Parish of Louisiana, involved pesticide exposure. I examined the reproductive health outcomes from chemical exposure, which included spontaneous abortions, stillbirths, live births with short survival time, and children with birth defects and mothers with multiple children with birth defects. In the Lincoln Creosote case in Bossier Parish of Louisiana, I examined a population exposed to Benzene, creosote, Pentachlorophenol, Toluene, Styrene, and other toxic compounds. Leukemias, reproductive cancers, and

3

birth defects were prominent among the adverse consequences of the toxic exposure in the Lincoln Creosote case.  Two Worker Compensation cases and one toxic tort suit, each with single person complainants/plaintiffs, in which I served as Expert Witness or Consultant involved benzene-related hematologic malignancies.

I have conducted doctoral research on stem cell precursors for erythrocytic and megakaryocytic cell lineages.  My doctoral research included characterization of megakaryocytopoiesis under the hormonal influence of thrombopoietin and the development of an in vitro assay for thrombopoietin.  This was a study of stem cell precursors of the megakaryocytic cell line that differentiates into the mature cells that produce blood platelets.  Further doctoral research included the immunocytochemical localization of erythropoietin receptors on the cell surface of early erythrocytic precursors at the ultrastructural level.  For this research, I received the Arceneaux Memorial ward in Recognition of Outstanding Student Research in Electron Microscopy in May of 1981.  I have conducted funded research by the American Heart Association on the development of an assay for thrombopoietin and an additional grant for the characterization of megakaryocytopoiesis.  I conducted funded research from the American Cancer Society on an immunocytochemical characterization of skin biopsies in the diagnosis of human acute Graft-versus-Host Disease in Leukemia.  The American Heart Association further funded my research for the Isolation and Characterization of 4N and 8N Megakaryocytes. I served as a consultant to Karel A. Dicke, M.D., chief oncologist and Director of the Bone Marrow Transplantation Unit at M.D. Anderson Hospital for electron microscopic evaluation of in vitro chemotherapeutic treatment for autologous bone marrow transplantation therapeutic techniques.  I have written, developed, and taught numerous courses and lectures in Hematology and Immunology to students at the associate, baccalaureate, and masters levels, as well as, medical students, pathology residents, and maxillo-facial surgery residents.  I am qualified by both State and Federal Law to perform and interpret clinical laboratory procedures in the areas of hematology and immunology.  I am further qualified by Federal Law (CLIA-Clinical Laboratory Improvement Act) to serve as a Laboratory Director for all levels of complexity in the interpretation of laboratory procedures, which include hematology and immunology.  I served as the Laboratory Director of an in-house medical surveillance laboratory for ten years and have interpreted hematological parameters in a population of residents exposed to benzene and other toxic substances.  I have also served as principal investigator in a project to screen for Lupus Erythrematosus, an autoimmune disease of the hematologic/immunologic systems of the body.

In the area of Forensic Drug Testing, I have served as an expert witness and consultant on collection of specimens, chain of custody, and drug-testing in the workplace to numerous clients, including the Department of Education, School Boards, Unions, Medical Care Corporations, municipalities, the State of Louisiana, and private entities, and served as consultant to a collection company for collection of forensic urine and blood specimens and, in that capacity, designed and oversaw the administration of chain of custody and collection procedures.  Furthermore, I have served as expert witness in drug-testing litigation in State Court, Workman's Compensation and Unemployment compensation hearings, and arbitration hearings.  I have served as expert witness in

numerous legislative committees on the subject of drug-testing and minimal guidelines for collection and testing of forensic specimens. I drafted the bill for Louisiana Act 1036 of the 1990 Legislative Session establishing minimal guidelines for collection of forensic specimens and drug-testing in the State of Louisiana. Additionally, I drafted Act 396 of the 1993 Legislative Session for Mandatory Licensure of Clinical Laboratory Personnel and Certification of Phlebotomists in the State of Louisiana. I was the expert witness testifying for both bills at the request of Senators and Representatives, the Commissioner of Administration, the AFL-CIO, and the Louisiana State Society for Medical Technology during the course of passage into Law by the Louisiana Legislature.

By virtue of my educational, research, and work experience, I am qualified to identify and interpret patterns of development of disease in association with toxic exposure and to determine the etiology/causation of environmental and occupational diseases. I am qualified to conduct community health assessments and interpret the etiology/causation of environmental diseases and birth defects. I am qualified to identify and interpret patterns of adverse reproductive outcomes, including fetal birth defects and embryonal tumors, in association with toxic exposure. I am qualified to review the scientific and medical literature, and medical and laboratory data associated with occupational and environmental exposures and to interpret said data as to the etiology/causation. I am qualified to perform and interpret medical surveillance utilizing laboratory procedures as to the development and causation of environmental and occupational diseases. I am qualified to interpret the causation of hematological diseases as related to environmental and occupational exposures.

Additionally, I am qualified to interpret the role of contributing factors in the development of cancer and birth defects. I have qualified as an expert in anatomy, hematology, toxicology, medical surveillance utilizing laboratory procedures, neuroanatomy, and performance and interpretation of health assessments of environmentally exposed communities. Additionally, in the areas of forensic drug testing, I am qualified to review and interpret medical and laboratory data, including the phlebotomy, chain of custody, and accessioning techniques utilized in the collection of medical and forensic drug specimens.

## 1.2  Methodology

Methodology for the formation of an opinion on General Causation of adverse health effects from toxic exposure included the following scientifically accepted investigative techniques listed below for evaluation and causation of occupational and environmental diseases. This methodology is published in the **Reference Manual for Scientific Evidence** of the **Federal Judiciary Center**.

Although the purpose of this preliminary report is not to prove specific causation, the same methodology was used as a reference to evaluate the self-reported clinical symptoms and diseases and provide a community profile of symptoms/diseases to determine the commonality, numerosity, and typicality of the reported acute/chronic health effects in association with the documented toxic contaminants in their

environment. Methodology for the formation of a General Causation opinion on adverse health effects from toxic exposure to formaldehyde included the following scientifically accepted investigative techniques for evaluation of General Causation of occupational and environmental diseases and a review of the following documents:

1. A review of the scientific literature on formaldehyde including but not limited to publications concerning the following: mechanism of action of formaldehyde at the anatomical, histological, and cellular levels; epidemiology; clinical studies; *in vitro* studies, including mutagenicity; and animal experimentation.
2. United States Government documents concerning formaldehyde exposure levels of the residents in FEMA trailers post-Hurricane Katrina.
3. An analysis of the self-reported symptoms and diseases of the plaintiffs (Plaintiff Fact Sheets) to determine if there are numerous and common symptoms in the plaintiff population that are temporally related to formaldehyde exposures in the FEMA trailers and that are known to be caused by formaldehyde as published in the body of scientific literature.
4. The potential for a completed exposure pathway consisting of the five elements required by the EPA in investigation of superfund sites as published by Joseph LaDou, 1997: a source of contamination, an environmental medium, a point of exposure, route(s) of exposure, and a receptor person or population has been evaluated for the plaintiff's exposures.
5. Chemical causation was evaluated using the published Points for Consideration in Causal Reasoning as published by Kenneth Rothman, PhD, based on and including the proposals of Bradford Hill in 1965.
6. Chemical causation was evaluated using the published diagnostic and investigative methods of Janette D. Sherman, M.D which are based on the Bradford Hill Causal Considerations.
7. The causal criterion for temporality (as first proposed by Bradford Hill in 1965) exists for the self-reported abnormal health effects experienced by the plaintiffs as listed on the Plaintiff Fact Sheets.
8. Biologic plausibility as defined by Bradford Hill MD and Kenneth Rothman, PhD, exists for the chemical exposure and the mechanism of development of the adverse health effects reported by the plaintiffs.
9. Methods for causal reasoning in determining General and Specific Causation: in accordance with the Reference Manual on Scientific Evidence 2nd edition: Reference Guides on toxicology, epidemiology, and medical testimony: external causation.
10. Database of 1,516 plaintiff fact sheets.
11. Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes, Centers for Disease Control and Prevention and Prevention, July 2, 2008
12. Press Release, CDC July 2, 2008; 1 pm EST
13. Fact Sheet: Final Report on formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes, Centers for Disease Control and Prevention; FEMA

14. Fact Sheet: Lawrence Berkeley National Laboratories Study of Unoccupied Trailers,

Centers for Disease Control and Prevention; FEMA

15. CDC Media Relations: February 14, 2008; CDC and FEMA Discuss Preliminary Test Results from Trailers and Mobile Homes in Louisiana and Mississippi.

16. Interim Findings on formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes, Centers for Disease Control and Prevention, February 29, 2008.

17. Interim Report: VOC and Aldehyde Emissions in Four FEMA Temporary Housing Units, Indoor Environment Department Lawrence Berkeley National Laboratory, May 8, 2008

18. Interim Staff Analysis: Formaldehyde and FEMA Trailers, July 2008

19. US House of Representatives, Committee on Science and Technology Subcommittee on Investigations and Oversight: Response to concerns of Formaldehyde in FEMA Travel Trailers, April 1, 2008

20. OSHA Formaldehyde Standard 1910.1048 including Appendix C

**Specifically the following considerations are included in rendering an opinion of General Causation:**

Considerations of the following are made for General Causation of Disease or other Adverse Health Effects when reviewing the scientific literature and the toxic exposures of the community:

Strength of the Association of disease and exposure
- The higher the relative risk, the stronger the association and the lower the probability that the effect is due to chance.

Consistency- Is there consistency-repeated observation of an association in different populations?

Dose-response or biological gradients–Are there dose-response relationships or evidence of biological gradients (duration of employment; years since last employment, etc.)? Are there exposure measures that are applicable to the exposures of the individual?

Temporal –Is there a temporal relationship of disease to exposure?

Biologic Plausibility –Is the association biologically plausible?

Coherence-an association does not conflict with the natural history and biology of the disease

Experimental evidence

Other considerations include the following:

- Are there occupational or environmental exposures specific to the community that are known to cause (general causation from scientific evidence discussed above) the diseases/symptoms/cancers/reproductive health effects that are reported by the members of the community?

- Is there scientific evidence in the literature to support these exposures and the disease causation? What is the strength of the association of the exposures and the disease causation in the scientific literature?

- Is there consistency, that is, repeated observation of an association in different populations with the same toxic exposures in the scientific literature?
- Is there a biological gradient or dose-response in the scientific literature that is applicable to the observed adverse health effects that are reported by the members of the community?
- What is the temporal association of the individual's occupational or environmental exposures to the disease diagnosis?  Did the exposures occur before the disease diagnosis?  What is the time period of the first exposure to the disease diagnosis?
- Is there biologic plausibility for the disease causation from occupational or environmental exposures?
- Is there coherence for the association of the environmental exposures and the disease causation?
- Is there any experimental evidence to support or dispute the role of the exposures and the disease causation?
- Is there an increase in specific diseases in a population  with common exposures?
- Is there a clustering of the same diseases or related diseases in the applicable  population?
- Are there unusual or uncommon diseases in the applicable population?
- Was the appearance of diseases or symptoms temporally associated with a change of environment?
- Are there completed exposure pathways?
- What is the source of contamination?
- What is the environmental medium? (air, water, soil, other?)
- What are the points of exposure?
- What are the routes of exposure?

## Section 2.0  Formaldehyde

Formaldehyde ($CH_2O$) is a flammable, colorless and readily polymerized gas at ambient temperatures.  Formaldehyde is readily soluble in water, alcohols, and other polar solvents, but has a low degree of solubility in non-polar fluids.  Air is the most relevant compartment in the formaldehyde cycle. (WHO, 1989)

There are several indoor environmental sources that can result in human exposure to formaldehyde, including cigarettes and tobacco products and smoke, furniture containing formaldehyde-based resins, building materials containing urea-formaldehyde resins, adhesives containing formaldehyde used for plastic surfaces and parquet, carpets, paints, disinfectants, gas cookers, and open fireplaces. (WHO, 1989)

## Section 3.0  Toxicokinetics of Formaldehyde

Formaldehyde has a pungent odor detected at low concentrations, and its vapor and solutions are known skin and eye irritants in human beings.  Formaldehyde is readily absorbed in the respiratory and gastrointestinal tracts.  Dermal absorption of formaldehyde appears to be very slight.  The common effects of formaldehyde exposure are various symptoms caused by irritation of the mucosa in the eyes and upper airways. In the non-industrial indoor environment, sensory reactions are typical effects, but there are large individual differences in the normal population and between hyperreactive and sensitized people.  (WHO, 1989)

In humans, as well as in other animals, formaldehyde is an essential metabolic intermediate in all cells.  It is produced endogenously from serine, glycine, methionine, and choline and is generated in the demethylation of nitrogen-, oxygen-, and S-methyl compounds.  It is an essential intermediate in the biosynthesis of purines, thymidine and certain amino acids.  The endogenous concentration of formaldehyde determined in the blood of human subjects not exposed to formaldehyde was $2.61 \pm 0.14$ µg/g blood.  This concentration represents the total concentration of both free and reversibly bound endogenous formaldehyde in the blood.  The concentration of formaldehyde measured in the blood of six human volunteers immediately after exposure by inhalation to 1.9 ppm [2.3 mg/m3] for 40 minutes was $2.77 \pm 0.28$ µg/g blood which did not differ from the pre-exposure concentration due to metabolically formed formaldehyde.  The absence of an increase is due to the fact that formaldehyde reacts rapidly at the site of contact and is swiftly metabolized by human erythrocytes which contain formaldehyde dehydrogenase and aldehyde dehydrogenase.  The half-time of formaldehyde in rat plasma after intravenous administration is reported to be approximately 1 minute.  The blood concentrations of formaldehyde immediately after a single exposure of rats to 14.4 ppm were indistinguishable from those before exposure.  (IARC, 2004)

The absorption of inhaled gases takes place mainly in the lungs.  However, before a gas reaches the lungs, it passes through the nose, with its turbinates, which increase the surface area.  Because the mucosa of the nose is covered by a film of fluid, gas molecules can be retained  by the nose and not reach the lungs if they are very water soluble or react with cell surface components.  In this regard, the nose acts as a "scrubber" for water-soluble gases and highly reactive gases, partially protecting the lungs from potentially injurious insults.  (Casarett & Doull's, 2001)   Formaldehyde is water soluble and exerts its initial mechanistic toxicity on the nasal mucosa.  The structure of the nose gives rise to complex airflow patterns, which have been correlated with the location of formaldehyde-induced nasal lesions in animal studies.  (IARC, 2004)

Formaldehyde is used as a fixative in vitro because of its mechanistic properties of forming DNA-protein cross-links.  In the nasal mucosa upon formaldehyde deposition, such DNA-protein cross-links are formed. Contact of formaldehyde with any mucosal or epithelial surface will result in DNA-protein cross-links upon contact.  Thus the eyes, nose, and skin are vulnerable to formaldehyde contact with subsequent symptomology of the irritant properties and potential for DNA-protein crosslinks.  Toxicity of

9

formaldehyde exposure is most likely to occur at sites that are near the portal of entry. Airborne formaldehyde irritates the eyes, nose, and throat in healthy humans. (IARC, 2004)

Sustained or high concentrations of formaldehyde may reach the pulmonary alveoli and diffuse through cell membranes in the pulmonary absorption of gases. DNA-protein cross-links in blood leukocytes have been used as a marker for exposure to formaldehyde in workers with chronic exposure. Formaldehyde is allergenic in nature and can result in allergic contact dermatitis and provocation of asthma attacks and increased respiratory symptoms in sensitized individuals. (IARC, 2004)

Formaldehyde is thought to act via sensory nerve fibers that signal through the trigeminal nerve to reflexsively induce bronchoconstriction through the vagus nerve. In guines pigs, a 1 hour exposure to about 0.3 ppm of formaldehyde induces an increase in airflow resistance accompanied by a lesser decrease in compliance. Respiratory frequency and minute volume also decreased, but these changes do not become statistically significant until >10 ppm. The introduction of formaldehyde through a tracheal cannula to bypass nasal scrubbing greatly augments the irritant response, indicating that deep lung irritant receptors can also be activated by this vapor. (Casarett & Doull's, 2001)

Formaldehyde can interact with water-soluble salts during inhalation and produce irritancy beyond that expected for the gas alone. When it was inhaled simultaneously with submicron sodium chloride aerosol, irritancy was augmented in proportion to the aerosol concentration, but this potentiation cannot be accounted for by a simple "carrier" effect of the aerosol. It appeared that the aerosol reacted with the formaldehyde to produce a product of a chemical transformation –perhaps methylene hydroxide. In addition to interactions with water-soluble particles, formaldehyde has been shown to interact with carbon-based particles to augment bacterial infectivity in a murine model. In this case, the potentiation appears to correlate with the surface carrying capacity of the inhaled particle. (Casarett & Doull's, 2001)

## Section 4.0  Acute Symptoms caused by Formaldehyde Exposure and Associated Exposure  Concentrations

According to the Agency for Toxic Substances and Disease Registry (ATSDR, July1999), the respiratory tract, especially the upper respiratory tract, is a critical target of the toxicity of airborne formaldehyde.  In the 1999 Toxicological Profile on Formaldehyde, ATSDR reports on acute controlled-exposure human studies, studies of humans exposed acutely or repeatedly under occupational or residential conditions, and on studies of animals exposed by inhalation for acute, intermediate, and chronic durations.

The toxicological profiles published by ATSDR include an examination, summary and interpretation of available toxicological information and epidemiologic evaluations

of a hazardous substance.  Minimal risk Levels (MRLs) are derived when reliable and sufficient data exist to identify the target organ(s) of effect or the most sensitive health effect(s) for a specific duration for a given route of exposure.  An MRL is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse noncancer health effects over a specified duration of exposure.  MRLs are based on noncancer health effects only and are not based on a consideration of cancer effects.  (ATSDR, 1999)

MRLs are derived for acute (1-14 days), intermediate (15-364 days), and chronic (365 days and longer) durations and for the oral and inhalation routes of exposure.  MRLs are generally based on the most sensitive chemical-induced end point considered to be of relevance to humans.  Serious health effects (such as irreparable damage to the liver or kidneys, or birth defects) are not used as a basis for establishing MRLs.  Most MRLs contain a degree of uncertainty because of the lack of precise toxicological information on the people who might be most sensitive to the effects of hazardous substances.  These sensitive populations include infants, elderly, nutritionally or immunologically compromised individuals.  ATSDR uses a conservative or protective approach to address this uncertainty consistent with the public health principle of prevention.  Proposed MRLs undergo a rigorous review process:  Health Effects/MRL Workgroup reviews within the Division of Toxicology, expert panel peer reviews, and agency wide MRL Workgroup reviews, with participation from other federal agencies and comments from the public.  (ATSDR, 1999)

The acute inhalation MRL (1-14 days) for humans is 0.040 ppm (40 ppb).  Nasal washings were performed in two groups, an occupationally exposed test group with skin hypersensitivity to formaldehyde and an unexposed control group.  Both groups were non-smokers.  Both groups were given placebo inhalation periods and both groups were without effects on nasal wash cellular contents or symptom scores.  Both groups were then exposed to a two hour exposure of 0.4 ppm formaldehyde with subsequent evaluations conducted at 4 and 18 hours after completion of the 2-hour exposure periods.  In both groups, placebo inhalation periods were without effects on nasal wash cellular contents or symptom score.  During exposure to 0.4 ppm formaldehyde, both groups showed statistically significantly increased symptoms which included sneezing, rhinorrhea, mucosal edema, and itching eyes in both groups.  Symptom scores remained elevated for 18 hours after the original two hour exposure.  Following formaldehyde exposure in both groups, nasal washings revealed that eosinophil counts were elevated for the duration of the post-exposure evaluation and albumin levels increased briefly (10 minutes).  No change in basophils numbers was noted.  The authors concluded that the symptoms observed were the result of a non-specific, non-allergic process in response to low-level formaldehyde vapor exposure.  Eosinophils may have protective properties by neutralizing histamine.  However, no increase in basophil counts were noted.  Eosinophils may also have damaging properties by liberating mediators that damage epithelial surfaces.  (ATSDR, 1999)

The intermediate inhalation MRL (15-364 days) for humans is 0.03 ppm (30 ppb).  Cyanomolgus monkeys were exposed to varying concentrations of formaldehyde from

0.19 ± 0.02, 0.98 ± 0.08 to 2.95 ± 0.18 ppm for 22 hours per day, 7 days per week for 26 weeks. Monkeys in the 2.95 ppm group exhibited increasing hoarseness, nasal congestion and nasal discharge, especially during the last 13 weeks of the study. While some nasal symptoms were noted in the lower dose groups, they were observed to be inconsistent and were not substantiated histologically. A statistically significant increased incidence of squamous metaplasia and hyperplasia of the nasal epithelium was clearly observed in the 2.95 ppm group, but no significant increase was found in the lower dose groups. In determining the intermediate MRL, the exposure concentration was not adjusted to a continuous exposure basis based on evidence that concentration is more important than the product of concentration and duration of exposure in determining the severity of formaldehyde-induced epithelial damage in the upper respiratory tract. (ATSDR, 1999)

The chronic inhalation MRL (365 days and longer) for humans is 0.008 ppm (8 ppb). The chosen study (Holmstrom et al, 1989) examined histological changes in nasal tissue specimens from a group of 70 workers in a chemical plant that produced formaldehyde and formaldehyde resins for impregnation of paper, a group of 100 furniture factory workers working with particle board and glue components, and a non-exposed, control group of 36 office workers in the same village as the furniture factories. Estimates of personal breathing zone air concentrations ranged from 0.04 to 0.4 ppm for the chemical workers, from 0.16 to 0.4 ppm for the furniture workers, and from 0.07 to 0.13 ppm in the late summer for the office workers, with a year round medial of 0.07 ppm. The mean histological score for the chemical workers was statistically different from the control score. These histological changes consisted of loss of cilia, goblet cell hyperplasia, cuboidal and squamous cell metaplasia replacing columnar epithelium. The exposure concentration was not adjusted to a continuous exposure basis based on evidence that concentration is more important than the product of concentration and duration of exposure in determining the severity of formaldehyde-induced epithelial damage in the upper respiratory tract. (ATSDR, 1999)

The Minimal Risk Level for chronic oral ingestion (365 days and longer) of formaldehyde is 0.2 ppm (200 ppb) in humans. The Til et al, 1989 study was chosen by ATSDR for development of the chronic oral MRL. Animals were exposed to formaldehyde in their drinking water for 2 years. In high dose animals (82mg/kg/day), histopathological examination revealed gastric changes including papillary epithelial hyperplasia accompanied by hyperkeratosis and focal ulceration in the forestomach, and focal chronic atrophic gastritis, occasionally accompanied by ulceration and/or glandular hyperplasia in the glandular stomach. Histopathological examinations of the kidneys showed that the incidence and degree of renal papillary necrosis increased in week 105 in high-dose animals. (ATSDR, 1999)

The odor threshold for 50% of the people exposed to formaldehyde is between 0.06 mg/m$^3$ (0.049 ppm; 49 ppb) and 1.2 mg/m$^3$ (0.98 ppm). The eye irritation threshold is between 0.01 mg/m$^3$ (0.008 ppm; 8 ppb) and 1.9 mg/m$^3$ (1.55 ppm), and for throat irritation is between 0.1 mg/m$^3$ (0.081 ppm; 81 ppb) and 3.1 mg/m$^3$ 2.52 ppm. (Patty's Toxicology, 2001) The conversion factor: mg/m$^3$ = 1.23 x ppm (IARC 2004)

Formaldehyde exposure provokes pharyngeal irritation in occupational and environmental settings. Laryngitis has also been reported as a reaction of exposure to formaldehyde.  Chronic exposure to formaldehyde was related to episodes of aphonia and pharyngeal irritation (laryngeal mucosa and vocal cords were swollen) that disappeared when occupants were away from work.  (Patty's Toxicology, 2001)

In acute toxicity studies, human subjects experienced eye irritation at 0.5 ppm in an experimental chamber.  Irritating effects in the upper respiratory tract begin at 0.1 ppm and become more common at 0.2 ppm.  Symptoms in the lower airways such as cough, chest tightness, and wheeze are observed at higher levels (>0.5 ppm).  Exposures to 2-3 ppm cause acute nose, throat, and eye irritation. (Patty's Toxicology, 2001)

Headache, nausea, vomiting, and diarrhea have been reported by people exposed to concentrations that range from 0.02 to 4.15 ppm in residential environments. Neurobehavioral effects, such as headache, dizziness, nausea, memory loss, and sleeping problems were also observed among histology technicians exposed to concentrations from 0.2 to 1.9 ppm. (Patty's Toxicology, 2001)

Prolonged exposure to low concentrations of the vapor can result in irritation of the eyes and inflammation of the eyelids, and sensitive persons might develop an allergic skin rash.  At levels of 25-50 ppm, tissue damage may occur, but recovery tends to be rapid and complete after removal from exposure.  Levels of 10 ppm cause lacrimation and can be tolerated for only a few minutes.  Cases of bronchial asthma have been reported as a result of occupational exposure to formaldehyde.  (Patty's Toxicology, 2001)

Values for inhalation levels as published in Sittig (1991) are as follows:  Irritation of the nose and throat can occur after an exposure of 0.25 ppm to 0.45 ppm.  Levels between 0.4 ppm and 0.8 ppm can give rise to coughing and wheezing, tightness of the chest and shortness of breath.  Sudden exposures to concentrations of 4 ppm may lead to irritation of lung and throat severe enough to give rise to bronchitis and laryngitis.  Breathing may be impaired at levels above 10 ppm and serious lung damage may occur at 50 ppm. Exposure to airborne levels of formaldehyde of 0.4 ppm have brought on tearing and irritation. (Sittig, 1991)

The World Health Organization reports that the individual odor detection thresholds cover a wide concentration range.  For a group of 50 observers, Berglund et al (1987) showed that the 50-percentile detection threshold for formaldehyde odor was 145 ppb, the 10-percentile threshold was 20 ppb, and the 90-percentile threshold was 500 ppb. (WHO, 1989)  The difference between odor and irritation concentration may be noticeable, but there is no evidence that there is a threshold at which odor is superseded by irritation.  However, for most inhaled odorous compounds, the trigeminal nerve has a higher threshold than the olfactory nerve (Montcrieff, 1955).  When the formaldehyde concentration is increased and affects both the eyes and the nostrils, sensory irritation is

first experienced in the eyes, then the odor is perceived, and finally nasal irritation occurs. (WHO, 1989)

It has been shown that sensory irritation is the earliest human reaction to formaldehyde, both in exposure studies and from complaints about indoor environments. Since differences in individual reactions to formaldehyde are large in both the normal population and in hyperreactive and sensitized persons, it is difficult to estimate a concentration guaranteed not to produce negative reactions in the general population. (WHO, 1989)

## Section 5.0  Chronic Health Effects caused by Formaldehyde Exposure

### 5.1  Respiratory Tract Sensitization

Formaldehyde is a low-molecular weight compound that is extremely soluble in water and haptenates human proteins easily.  Occupational exposure to formaldehyde has been associated with the occurrence of asthma, although it has been difficult to demonstrate antibodies to formaldehyde in the affected individuals.  (Casarett & Doull's, 2001)

Nordman, et al., (1985) gave a total of 230 patients, who suffered from "asthma like" respiratory symptoms, a bronchial provocation test with formaldehyde.  On the basis of the medical and occupational histories of the patients, the specific bronchial provocation test and other test results, 12 cases were considered to be caused by specific sensitization to formaldehyde.  (WHO, 1989)

Burge, et al., (1985) reported tests on 15 formaldehyde-exposed workers with symptoms suggesting occupation-related asthma.  Bronchial provocation tests with a mean formaldehyde concentration of 4.8 mg/m$^3$ (3.9 ppm)  [no range given] showed 3 subjects with delayed bronchiospasm and 6 with an immediate reduction in forced expiratory volume in one second (FEV1).  (WHO, 1989)

Eight cases of occupational asthma (3 smokers, 5 non-smokers) were reported among 28 members of the nursing staff at a haemodialysis unit where formalin was used to sterilize the artificial kidney machine (Hendrick and Lane, 1977).  In 2 out of 5 subjects with histories of recurrent attacks of wheezing, inhalation provocation tests led to asthmatic attacks similar to those at work.  (WHO, 1989)

Hendrick, et al., (1982) reinvestigated the nurses of the haemodialysis unit.  One nurse had not worked with formaldehyde since 1976 and had had no further symptoms.  Her 1981 test (15 minute exposure to 7.2 mg/m3 [5.85 ppm] formaldehyde did not provoke any asthmatic response.  The other nurse had continued to work with formaldehyde, though under much improved conditions, and had continued to suffer mild intermittent attacks of asthma.  Her test (5-minute exposure to 3.6 mg/m3 [2.93 ppm] formaldehyde) provoked a late asthmatic reaction similar to the one observed in 1975.  (WHO, 1989)

Rumchev, et al., (2002) examined formaldehyde exposure in relation to asthma among young children (between 6 months and 3 years old) in a population-based control study carried out in Perth, Western Australia, between 1997-1999. An association between exposure to formaldehyde and asthma in young children has been suggested. The study found seasonal differences in formaldehyde levels in the children's bedrooms and living rooms with significantly greater formaldehyde exposure during the summer period for the case and control subjects. The generalized estimating equation model showed that children exposed to formaldehyde levels of $\geq 60$ µg/m3 (49 ppb) are at increased risk of having asthma. The results suggest that domestic exposure to formaldehyde increases the risk of childhood asthma.

Krzyzanowski, et al., (1990) studied the relation of chronic respiratory symptoms and pulmonary function to formaldehyde in homes of a sample of 298 children (6-15 years of age) and 613 adults. Significantly greater prevalence rates of asthma and chronic bronchitis were found in children from houses with HCHO levels 60-120 ppb than in those less exposed, especially in children also exposed to environmental tobacco smoke. In children, levels of peak expiratory flow rates (PEFR) decreased linearly with formaldehyde exposure, with the estimated decrease due to 60 ppb of formaldehyde equivalent 22% of PEFR level in nonexposed children. The effects in asthmatic children exposed to formaldehyde below 50 ppb were greater than in healthy ones. The effects in adults were less evident; decrements in PEFR due to formaldehyde over 40 ppb were seen only in the morning, and mainly in smokers.

Casset, et al., 2006, studied domestic exposure to low concentrations of formaldehyde and the effect on respiratory health. Potentiation of the response to allergens has been observed in animals and children. This effect has also been found on respiratory symptoms, with a 39% increase in the risk of asthma for a domiciliary exposure of more than 60 µg/m3 (49 ppb). In a study with asthmatics sensitized to house dust mite, the response to allergen provocation was increased following a 30 minute exposure to 100 µg/m3 (81 ppb) of formaldehyde. The data show that mild exposure to formaldehyde in the home is sufficient to provoke sensitization and also an aggravation of symptoms in patients with allergic asthma.

Wantke, et al., 1996, studied sixty-two eight-year-old children attending three forms at a primary school. Children initially attended school in a frame construction with particleboard used extensively as paneling and later were transferred to a brick building for schooling. Indoor formaldehyde concentrations were measured in classrooms. In the frame construction with paneling, formaldehyde levels were 0.075 ppm and 0.069 ppm. Assessment of specific IgE to formaldehyde was done in all children. Assessment of specific IgE to formaldehyde was done in all children. Children were transferred to a brick building and 3 months later specific IgE to formaldehyde in pupils showing initially elevated radioallergosorbent test (RAST) values reassessed. In all children symptoms were evaluated by questionnaire before and 3 months after changing school. RAST classes of $\geq 2$ were found in three children, two of them attending the classroom with 0.075 ppm formaldehyde. Elevated RAST classes of $\geq 1.3$ were found in another 21 pupils. Thirty-eight pupils as well as 19 control children showed RAST classes in the

normal range of $\leq 1.2$. Headache, nose bleeding, rhinitis, fatigue, cough, dry nasal mucosa and burning eyes were found in the affected children. There was a good correlation between symptoms and the formaldehyde concentrations in the classrooms. However, elevated IgE levels to formaldehyde did not correlate with symptoms. Formaldehyde concentrations in the brick building school were 0.029 ppm , 0.023 ppm, and 0.026 ppm. After transfer to the brick school, specific IgE to formaldehyde decreased significantly (P < 0.002) as did the incidence of symptoms. The authors conclude that gaseous formaldehyde, besides its irritant action, leads to IgE-mediated sensitization. As children are more sensitive to toxic substances than adults, threshold levels for indoor formaldehyde should be reduced for children.

## 5.2 Cancer

Formaldehyde is carcinogenic to humans (Group 1) as classified by the International Agency for Research on Cancer, 2004. There is sufficient evidence in humans for the carcinogenicity of formaldehyde. There is sufficient evidence in experimental animals for the carcinogenicity of formaldehyde. (IARC, 2004)

Formaldehyde demonstrates positive effects in large number of in-vitro tests for genotoxicity, including bacterial mutation, DNA strand breaks, chromosomal aberrations and sister chromatid exchange. Studies in humans showed inconsistent results with regard to cytogenetic changes (micronuclei, chromosomal aberrations and sister chromatid exchange). The frequency of DNA-protein cross-links was found to be significantly higher in peripheral lymphocytes from exposed workers. (IARC, 2004)

Formaldehyde also induces genetic damage at concentrations as low as 0.1 mM and inhibits DNA repair in bronchial cells. Inhalation of formaldehyde has been shown to induce the formation of DNA-protein cross-links in nasal tissue from rats and monkeys, including decreased extractability of DNA from proteins, labeling studies and isolation of DNA by HPLC. The formation of DNA-protein cross-links is a non-linear function of formaldehyde concentration, described by an initial linear component with a shallow slope and a second linear component with a steeper slope that follows a significant decrease in survival of the cells and depletion of GSH. (IARC, 2004)

## 5.21  Studies of Cancer in industrial workers (IARC, 2004)

Hauptmann (2003, 2004) updated studies of the National Cancer Institute cohort of over 25,000 workers employed in facilities that manufactured formaldehyde, formaldehyde resins, molding compounds, molding plastic products, photographic films, and plywood. He followed the cohort through to 1994 with a comprehensive evaluation of historical levels of exposure to formaldehyde and of other potentially confounding exposures. (IARC, 2004)

A statistically significant exposure-response relationship was observed between peak exposure to formaldehyde and all lymphatic and haematopoietic neoplasms ($p$ trend = 0.002) in the Poisson regression analysis. This relationship was largely due to strong