**Westlaw Delivery Summary Report for WEINSTOCK,ANDREW 2432290**

Date/Time of Request:              Monday, November 10, 2008 10:38 Central
Client Identifier:                 ADW
Database:                          DCT
Citation Text:                     Not Reported in F.Supp.2d
Lines:                             1041
Documents:                         1
Images:                            0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

Page 1

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Patricia A. WILLS, Plaintiff,
v.
AMERADA HESS CORP., et al., Defendants.
No. 98 CIV. 7126(RPP).

Jan. 31, 2002.

Kenneth Heller, Esq., New York, Counsel for
Plaintiff.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP,
Newark, NJ, By Robert J. Kelly, Esq., Hill, Betts &
Nash LLP, New York, Counsel for Defendants.

OPINION AND ORDER

PATTERSON, D.J.

**\*1** Defendants Amerada Hess Corporation,
Spentonbush/Red Star Companies, Inc., Sheridan
Transportation Corp., and Hygrade Operators, Inc.
move in limine to exclude the testimony and opin-
ions of Plaintiff's expert, Jesse H. Bidanset pursuant
to Rule 702 of the Federal Rules of Evidence, and
move for an order pursuant to Rule 56 of the Feder-
al Rules of Civil Procedure ("Fed. R. Civ.P.") for
summary judgment dismissing any and all claims
against Defendants with prejudice. Plaintiff moves
in limine to impose the Pennsylvania Rule. For the
reasons that follow, Defendant's motion in limine to
exclude Plaintiff's expert opinion is granted; De-
fendants' motion for summary judgment is granted
subject to a condition described herein; and
Plaintiff's motion in limine to impose the
Pennsylvania Rule is denied.

BACKGROUND

*I. Procedural History*

On October 8, 1998 Patricia A. Wills filed a com-

plaint on behalf of her late husband Ricky Lee
Wills individually and as a class action against De-
fendants for wrongful death under the Jones Act, 46
U.S.C. § 688(a) as a result of exposure to toxic
chemicals while working on Defendants' vessels.

On December 23, 1998 a pretrial conference was
held and the Court ordered that discovery would be
completed by August 31, 1999 and trial held on
September 21, 1999.

On May 19, 1999, by memo endorsement, the Court
ordered Plaintiff to respond to Defendants' interrog-
atory seeking the identity of Plaintiff's expert wit-
nesses and Plaintiff's grounds for maintaining the
action as a class action.

On October 14, 1999, upon being advised that
Plaintiff had not complied with the Court's order of
May 19, 1999, the Court ordered Plaintiff to dis-
close the names of all expert witnesses expected to
be called at trial and otherwise comply with Rule
26(a)(2)(A)(B) and (C) by November 1, 1999. At
the hearing held on November 4, 1999, on
Plaintiff's motion to compel discovery including all
Defendants cargo manifests, engineering plans and
drawings for all vessels, cargo, piping, cargo pump-
ing equipment, as well as discovery about the docks
and dock equipment at which Defendants' vessels
docked for a ten year period. Defendants stated that
they had produced all documents in their possession
responsive to the Request for Production, except
medical records of the putative class members, and
agreed to provide authorizations for inspection and
copying of the designs of vessels in the custody of
the New York Shipping Association and for equip-
ment in the custody of manufacturers. Defendants
were also required to provide the names and last
known addresses for those former employees who
were shipmates of the Decedent and agreed to make
their present such employees available for depos-
ition. Defendants were ordered to search for some
additional documents among their tax records and
to make additional searches for some documents.

Not Reported in F.Supp.2d                                                                                              Page 2
Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

The parties were ordered to submit additional briefs on the availability or privacy of the medical records pertaining to putative class members. Plaintiff was ordered to provide an expert medical report within two weeks showing that Plaintiff had grounds for concluding that Decedent's squamous cell cancer had been caused by his exposure to petroleum products while employed by the Defendants.

*2 On or about November 19, 1999, Plaintiff produced a four page report of Jesse H. Bidanset, Ph.D., a forensic toxicologist, dated November 16, 1999, concluding that Decedent's exposure to Amerada Hess petroleum products caused him to contract squamous cell cancer. In that report, Mr. Bidanset, who admits his articles have not been peer-reviewed, relied on very limited medical literature which neither provided supporting epidemiological data for his conclusion nor specific facts which correspond to the facts relating to Decedent's employment history. Mr. Bidanset's conclusion was that the Decedent's exposure to Amerada Hess petroleum products containing carcinogenic hydrocarbons "must have been significant." (Bidanset Report at 4.) This first report did not show any basis for that conclusion nor did it explicate the manner of the Decedent's exposure to those hydrocarbons.

By letter dated December 2, 1999, Defendants moved for a protective order precluding Plaintiff from conducting depositions of Amerada Hess employees and seeking answers to interrogatories and document production until Defendants had deposed Mr. Bidanset and the Court had assessed the evidentiary reliability of his opinion.

On December 6, 1999, the Court ordered discovery stayed pending resolution of the Defendants' motion to preclude Dr. Bidanset's testimony.

By letter dated December 14, 1999, Defendants moved to compel Plaintiff to respond properly to Defendants' November 22, 1999 Notice to Produce requesting documents pertaining to Mr. Bidanset's opinion.

By letter dated December 17, 1999, Plaintiff opposed Defendants' motion for a protective order and moved to compel Defendants to provide disclosure of outstanding discovery requests, charging that Defendants have (a) engaged in spoliation of evidence, (b) failed to comply with the Court's disclosure orders of November 4, 1999, and (c) otherwise failed to respond to Plaintiff's discovery requests and misled the Court.[FN1] On December 28, 1999 Defendants responded to Plaintiff's letter of December 17, 1999 and by letters of January 3 and January 6, 2000, Plaintiff made arguments in reply.

> FN1. Plaintiff's accusation of spoliation of evidence was not supported by any direct or circumstantial evidence or hearsay.

On January 14, 2000, the Court ordered the Defendants to comply with the discovery ordered by the Court on November 4, 1999 and to provide Plaintiff with Defendants' records of the exposure monitoring of Decedent and medical surveillance records of Decedent conducted pursuant to Coast Guard or OSHA regulations, and any other medical records pertaining to the Decedent in its possession by January 18, 2000. The Court also decided that the December 6, 1999 order staying Plaintiff's discovery would remain in effect until Defendants had deposed Plaintiff's expert, Jesse H. Bidanset, and the Court had assessed whether his opinion as to the cause of Decedent's squamous cell cancer was sufficiently scientifically reliable to be allowed into evidence under *Daubert v Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).[FN2]

> FN2. The Plaintiff's remaining discovery requested had raised questions as to whether Plaintiff was engaging in a fishing expedition to harass the Defendants into a settlement or in order to conduct an epidemiological survey to develop a theory of causation for Decedent's death for which Plaintiff had no reason to believe there was scientific support for when this action was initiated.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                        Page 3
Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

**\*3** On April 28, 2000, Dr. Bidanset wrote a twenty-nine page letter report to Plaintiff's counsel ("Second Report"). The Second Report was provided to Defendants and Dr. Bidanset was deposed on August 16, 2000. On January 2, 2001 Defendants filed a motion in limine to exclude Dr. Bidanset's testimony and a motion for summary judgment dismissing Plaintiffs' claims. At a conference on January 9, 2001 requested by Plaintiff, Plaintiff was ordered to file responsive papers by February 9, 2001. The date for response was reset to February 26, 2001. On February 20, 2001, Plaintiff filed a motion in limine pursuant to general maritime law to impose the Pennsylvania Rule as well as papers in opposition to Defendants' motions, which included expert opinions from Dr. Alferd Neugut and Mr. Paul Haas.

On February 26, 2001, the Court granted Defendants' application to preclude the opinions of Dr. Alfred I. Neugut and Mr. Paul Haas, two proposed expert witnesses, because Plaintiff had failed to provide timely disclosure of their identity and expert reports as was ordered by the Court in November 1999 and as is required by Fed.R.Civ.P. 26. Plaintiff submitted three letters, dated February 27, March 5, and March 9, 2001, requesting the Court to reconsider its order. On March 27, 2001, the Court denied Plaintiff's request for reconsideration with prejudice.

*II. Facts*

Plaintiff asserts Decedent, Ricky Lee Wills, was employed as a seaman by the Defendants from approximately 1986 until August 1995. In Dr. Bidanset's report, in the section entitled "Medical History of Ricky Wills," he stated:

The decedent's medical history relative to his cancer began in December 1995, when his chief complaint was pain along the right mandible with pain in his nose and throat. On or about December 18, 1995, the diagnosis of squamous cell carcinoma of the right mandible and neck area was

rendered. On January 5, 1996, surgery, including a right radical neck and right side mandibular reconstruction was performed. The operative report, dated January 5, 1996, provided a diagnosis of squamous cell carcinoma retromolar trigone (true alveolar ridge mandible). The surgical pathology report indicated that 18 of 24 lymph nodes were positive for tumor. Approximately one week later, Mr. Wills developed pneumonia as a complication. A January 26, 1996, operative report indicated a diagnosis of "necrotic cutaneous Kapel portion of the right fibula free mandibular reconstruction (introral). More specifically, the carcinoma is described as C3 and 2AM squamous cell carcinoma of the right alveolar ridge/ right premolar trigone. On June 6, 1996, Mr. Wills was seen at Tuomey Regional Medical Center in Sumter, South Carolina, where his cancer was evaluated as having progressed to the right neck. He subsequently underwent two cycles of chemotherapy, to be followed by radiation treatment. He developed lower back pain and was found to have several metastatic sites, which included the rib cage and subcutaneous tissues. In July 1996, the decedent presented with chest and lower back pains. At this point, his diagnosis was recurrent carcinoma of the head and neck with jugular nodal recurrences with metastases to the rib cage. Discharged on August 5, 1996, Mr. Wills prognosis was very bleak despite chemotherapy and radiation. An August 27, 1996, admission to Tuomey Regional Medical Center found Mr. Wills with pain in the upper lumbar area, radiating to the left lower extremity. By September 1996, his squamous cell carcinoma was metastatic to the abdomen and bone. Bone marrow also appeared to be involved as he was neutropenic and thrombocytopenic. He was scheduled to transfer to hospice on October 2, 1996, but succumbed to this multiple cancer site disease before that transfer was accomplished.

**\*4** (Id. at 6.) Dr. W. Duffy, Jr., radiation oncologist, noted in a consultation report of 5/20/96 that "[t]he patient has smoked 2 packs per day since age 16.

Not Reported in F.Supp.2d                                                                      Page 4
Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

He has drank alcohol, mainly beer, heavily in the past."(Def.'s Ex. H.)

### III. Dr. Bidanset's Background

Dr. Bidanset was not Decedent's treating physician.[FN3] Dr. Bidanset is a forensic toxicologist with a B.S. in chemistry and a graduate degree in organic chemistry, who took no courses on toxicology, but worked for 17 years as senior chemist, then toxicologist one, and then chief toxicologist, until 1979 in the Nassau Country Medical Examiners Office. He taught toxicology at St. John's University as a tenured professor for 14 years until 1997. He has been a conract consulting forensic toxicologist with the Rockland County Office of the Medical Examiner since 1974. Dr. Bidanset admitted in his deposition that he has published no peer reviewed articles involving cancer causation except for a segment of a subsection of a chapter that dealt with carcinogenic chemicals and lung cancer. *The Federal Judicial Center: Reference Manual on Scientific Evidence,* "Reference Guide on Toxicology," ("Reference Manual") at 418 states, "Publication of articles in peer-reviewed journals indicates an expertise in toxicology. The number of articles, their topics, and whether the individual is the principal author are important factors in determining the expertise of a toxicologist."Only 1 to 2 percent of the cases that came to the medical examiner's office where he worked dealt with cancer. (Bidanset Dep. at 52-3.) In the last ten years, as a private consultant, he estimates he has dealt with issues of cancer causation in about five or six asbestos cases and three or four solvent cases. (*Id.* at 54.)Dr. Bidanset has evaluated and submitted written reports on approximately forty cases each year. (Defs.' Ex. B.)

> **FN3.** Although Decedent's treating physician would be within the power of the Plaintiff to produce, Plaintiff is not relying on evidence from a treating physician or on any autopsy report linking Decedent's squamous cell carcinoma to any chemical

exposure that may have occurred while he was working aboard Defendants' vessels.

### IV. Dr. Bidanset's First Report

In his first four-page report, dated November 16, 1999, after assessing the nature of the Decedent's employment background and medical history relative to his cancer, Dr. Bidanset engaged in a general review of non-occupational cancer risks. He then stated "[p] resently evidence suggests that cancers arise from a single abnormally transformed cell" and then wrote "[t] he concept of a threshold or no effect level of exposure to carcinogens is controversial. Since a carcinogen can initiate a change in the subject cell, there is really no safe exposure. There is however strong evidence that a dose-response relationship exists for carcinogens."(Defs.' Ex. B.) He noted that benzene has been grouped by the IARC as a chemical in which occupational exposure has been causally related to human cancer and diesel engine exhaust has been listed as a probable occupational carcinogen. In this first report he relied on three studies. One found an association between PAHs and esophageal cancer, with a relative risk of 1.9, although he doesn't specify what the method of exposure was or how that conclusion was drawn; another reported that "tobacco and alcohol were the major risk factors for squamous cell carcinoma of the neck and head"; and the third found that squamous cell carcinomas of the skin occurred in mice exposed to naphtha, Jet A, JP-4 and crude oils. (Defs.' Ex. B.) He then concluded, "Considering Mr. Wills' age at the time of his death, his exposure to these carcinogenic hydrocarbons must have been significant. According to discussion concerning dose-response relationships, the aggressiveness of Mr. Wills' cancer would lead one to conclude that he was intensely exposed to these carcinogenic hydrocarbons."(*Id.*)[FN4]

> **FN4.** During his deposition Dr. Bidanset admits that this statement is based on speculation. (Bidanset Dep. at 99.)

### V. Dr. Bidanset's Second Report

**\*5** In the Second Report (Defs.' Ex. C), Dr. Bidanset first reviewed Medical Surveillance reports for Mr. Wills for 1992, 1993 and 1994 during which Wills had a satisfactory Fit Test Report for an air purifying respirator and had responded that he could breath through a respirator during his working activities. (*Id.* at 3.) Dr. Bidanset relied on an affidavit of Mr. Miller to make determinations of Mr. Wills' working conditions, since Mr. Miller had worked with Mr. Wills intermittently on board the Hygrade 22 for about five months in 1995. Miller states that he was aware of and complained of gases, vapors and fumes which permeated both living and work spaces and, apparently, came from spaces between the vapor recovery and from the vessel, that respirators were not serviced, and that members of the crew were not instructed on their use and that he and other members of the crew, including Mr. Wills, experienced dizziness, tremors, headaches, nausea, blurred vision, stomach aches, problems urinating. (*Id.* at 4.)

The Report next reviewed the affidavit of Richard Rodi who "commented that the leaks described by Mr. Miller were indicative of a poorly maintained barge and its systems," which, Dr. Bidanset stated, would account for the signs and symptoms described by Mr. Miller. Based on Mr. Rodi's affidavit that two diesel engines were used in operations of these barges, Dr. Bidanset states that "[r]ecognizing that the exact exposure to the diesel exhaust is dependent on the operation of the engine, movement of the vessel, wind and weather conditions, and a number of other variables, one could state with reasonable certainty that crew members were continuously exposed to some level of diesel exhaust."(*Id.* at 5.)

The Report next reviewed the connection between cigarette smoking and squamous cell carcinoma, noting that cigarette smoking is the most frequently reported cause of squamous cell carcinoma and that a medical history of Mr. Wills obtained by Envirocare Healthy Services on June 19, 1993, indicated Mr. Wills had a smoking history of two packs a day

for twenty years. Dr. Bidanset then states, without citing any source, that the usual appearance of squamous cell carcinoma from cigarette smoking takes "decades" to develop. After noting that the hydrocarbons in cigarette smoke are the very same chemicals to which Mr. Wills was exposed in his employment, Dr. Bidanset states that the "latency for the development of cancers as a result of cigarette smoking *should be considered* in determining the role played by cigarette smoking versus occupational exposure to carcinogenic hydrocarbons" and that "the occurrence of the squamous cell carcinoma in Mr. Wills' case is sufficiently early in his life that one *must consider* an alternate cause, or at least an interactive process with known carcinogens in petroleum hydrocarbon products."(*Id.* at 6.)(emphasis added)

The Report next reviewed benzene exposure reports conducted by Clayton Environmental Consultants pertaining to the Defendant's vessels during the years 1992 through 1995. It states that the 1992 and 1993 reports involved vessels on which the Decedent may not have served and was not on board at the time of sampling but that the 1994 and 1995 sampling data involved vessels on which the Decedent served. It also states that neither the air monitoring data or daily logs gave an indication of the cargo of the vessel. (*Id.* at 6.) He then notes that Mr. Wills' log of days worked and positions held shows that Wills served on the ST114 from June 1 to June 7, 1994, and that a test of the vessel on July 31, 1994 with a result of 6.5 p.p.m. benzene over 5.8 hours, and that Mr. Wills served on the Hygrade 22 in 1995, but not on the testing dates provided, and that on July 1995, a sample from the Hygrade 22 revealed 6.3 p.p.m. benzene over 3.3 hours. Dr. Bidanset acknowledges in the Report that, "He was unable to match any of the exposure monitoring data with the vessels at the exact time Mr. Wills was on board (*id.* at 6), but concludes that, because Coast Guard Regulation 46 C.F.R. 197.540(a)(1) states that, "The environment samples and personal air monitoring must be conducted so as to determine the representative personal exposure of all per-

sons engaged in each particular operation involving benzene," that "the data can be used to establish that unsafe working conditions existed where accepted standards for benzene exposure were exceeded."(*Id.* at 7.)[FN5]

> FN5. The Regulation quoted does not state that the exposure monitoring data is representative of personal exposure on dates other than the dates monitored.

**\*6** The Report next reviews only the benzene exposure reports which exceeded Occupational Safety and Health standards, i.e., permissible exposure limits ("PEL") 1 part per million ("PPM") and short-term exposure limit ("STEL") 5 p.p.m. for 15 minutes. He notes that other hydrocarbons, including polycyclic aromatic hydrocarbons were never evaluated and that diesel exhaust components, recently emphasized in government reports as carcinogens were apparently not sampled. (*Id.* at 7.) The 24 reports reviewed involved 12 different occasions during the four-year period. (*Id.* at 7-11.)

The Report next reviewed articles in Environmental Health Perspectives, 104:1165-1171 (1996) and 104:1159-1163 (1996), involving the carcinogenicity of benzene and its metabolites, particularly as regards its propensity to cause leukemia. (*Id.* at 12.)

The Report next reviewed the Material Safety Data Sheets ("MSDS") (*id.* at 13-17) provided by the defendants and reaches the following conclusions:

> # 4 Residual Fuel Oil is classified by the International Agency for Research on Cancer (IARC) as a Group B substance, i.e., there is sufficient evidence for carcinogenicity in experimental animals but inadequate evidence in humans.

> Cat Cracked Slurry Oil (reported to contain 1.5% polycyclic aromatic compounds (PACS) and polynuclear aromatic compounds (PNAS) and has been classified by IARC as Group 1 carcinogen; by the National Toxicology Program (NTP) as a carcinogen; and by American Conference of

Government Industrial Hygienists (ACGIH) as an A-1 carcinogen, but OSHA found no evidence of carcinogenicity from PNAs.

Fuel Oil # 6 has been classified as a Group B carcinogen by IARC. The American Petroleum Institute states similar products produce skin cancer in experimental animals but has not determine significance of human exposure to Fuel Oil # 6.

Marine Diesel Fuel is not expected to be a cancer hazard under normal conditions of use, but IARC has classified whole diesel exhaust as Group 2A, i.e., probably carcinogenic. National Institute of Occupational Safety and Health (NIOSH) classifies diesel exhaust as a potential cause of lung cancer (Tumorigin).

Gasoline, Premium Unleaded, Unleaded Plus, and Regular Unleaded contain benzene is concentrations of .1% to 4.9%, which is recognized as causing anemia and other blood disorders, including leukemia, after repeated and prolonged exposure. IARC lists gasoline and gasoline exhaust in Group B as sufficient evidence for carcinogenicity in experimental animals, but inadequate evidence in humans. Benzene is listed as carcinogenic in humans by IARC, NTP, OSHA and ACGIH.

Kerosene, Jet Fuel A/A1 and # 1 Diesel are classified by OSHA, IARC and NTP as non-carcinogenic, although similar products produce skin cancer and skin tumors in laboratory animals after repeated application without washing or removal.

# 2 Diesel, the MSTS states, "Longtime exposure to vapors has caused cancer in some laboratory animals."No mention of diesel exhaust.

**\*7** # 2 Fuel Oil exhaust particulates is classified by IARC as Group 2A, i.e., probably carcinogenic in humans.

The Report then discusses polycyclic aromatic carbons ("PAHs") in exhaust gas and studies which

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:07-md-01873-KDE-MBN   Document 860-9   Filed 11/10/08   Page 8 of 18

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

concluded that there was a clear carcinogenic effect of inhaled PAHs containing exhaust gas in rats and mice; a study of engine room conditions showing no exposure to PAHs in air samples, but some in skin exposure; and another study, using epidemiological evidence, found that there was a substantial increased risk of lung, skin and bladder cancer in occupations involving heavy exposure to PAHs. (*Id.* at 18-19.)[FN6]

FN6. Barge operations are not mentioned.

Turning to Diesel Exhaust Emissions, the Report first states that epidemiological studies of trainmen, truck and bus drivers' exposure can be distinguished as those populations undergo less exposure than barge operators. It then reviews those studies that found (1) epidemiological evidence diesel exhaust containing PAHs was "suggestive of a carcinogenic effect", or was "a probable human carcinogen"; and (2) that rats exposed to automotive diesel exhaust demonstrated increased prevalence of lung tumors and squamous cellcarcinoma. (*Id.* at 19-21.)

Turning to gasoline and gasoline exhaust emissions, the Report cites (1) a study of refinery workers which did not suggest a kidney or liver cancer risk in humans, and (2) a study of gasoline exhaust painted on the skin of mice induced squamous cell carcinomas and papillomas and a study finding that PAHs of three or more rings implanted in the lungs of rats caused lung cancer. (*Id.* at 22.)

Turning to animal studies of hydrocarbons and benzene, the Report (at 23-25) points out that leukemia is the most widely accepted cancer associated with benzene exposure, but that (1) a study of rats who ingested 500 mg/kg of benzene in olive oil once daily, four to five days per week for 104 weeks, developed squamous cell carcinomas in the oral cavity; (2) that mice exposed to 1200 ppm. benzene vapor for six hours a day, five days per week for ten weeks developed an instance of squamous cell carcinoma (of unknown origin); and (3) that rats and mice receiving three oral doses of benzene (50,100 and 200 mg/kg) in corn oil caused increased incid-

ence of zymbalgland carcinomas and squamous cell papillomas and carcinomas.

Based on this review of the evidentiary material and authorities, Dr. Bidanset opined that Wills' exposures to known carcinogens from the cargoes carried or combustion emissions "was a factor in the development of Mr. Wills' squamous cell carcinoma of the head and neck."(*Id.* at 29.)

*VI. Dr. Bidanset's Testimony*

Dr. Bidanset's testimony did not rely on any documents or studies not included in his reports, but clarifies that his theory that Mr. Will's death was caused by the conditions of his employment is based on the oncogene or no-threshold theory, not a dose-response determination. He admits he did not quantify Mr. Wills' exposure to benzene or PAHs.

*8 Q: Have you computed any dosage for benzene for Mr. Wills?

A: No.

...

Q: Have you quantified Mr. Will's exposure to PAHs?

A: I don't think I can....

(Bidanset Dep. at 76, 72.) He explains, "[f]or most toxic events, there is a relationship, a dose-response relationship, between the amount of material that's absorbed into the body and the intensity of the event. In some instances that is not necessarily the case. There are certain toxic events that do not demonstrate a dose-response relationship."(Bidanset Dep. 59-60.) "There is no threshold value for carcinogenic activity and you do not need to have a dose-response relationship associated with low level exposures."(*Id.* at 63). When asked for a definition of the oncogene theory that he is using, Dr. Bidanset replied,
One of the short term assays for carcinogenicity

involves the exposure of cell culture to measured amounts of a carcinogen and then the observation of changes in activity that are associated with mutation in the genes. This test is referred to as the Ames test, and has been used widely to evaluate chemicals and drugs for potential carcinogenic and mutagenic activity. Ames originally designed the test to measure genetic changes, gene mutations, but the ability to use that assay and to determine the carcinogenic activity of a compound is widely accepted at this point. For cancers whose origin involves the mutation of the genes, then the oncogene theory would apply. There are other kinds of cancers which do not obey the oncogene theory, that is, they involve a different mechanism by which the cancer is developed.

...

Q: Am I correct in understanding that one of the features of the oncogene theory is that a solitary exposure would be sufficient to initiate the cell transformation that leads to the cancer?

A: That's true.

(*Id.* at 66-7; 68.)

As to whether Mr. Wills cancer, squamous cell carcinoma, obeys this theory, the following exchange is illustrative:

Q: Does squamous cell carcinoma obey the oncogene theory?

A: I believe it does.

Q: What is the basis for your opinion?

A: Because the basis-the basis of the opinion is that the transformed cell is the initiation of tumor activity. And the squamous cell carcinoma is one that obeys that oncogene theory.

Q: How do you know that?

A: Just basically, my background experience and

reading. I couldn't point you to a specific reference.

Q: Can you name any cancer that does not obey the oncogene theory?

A: I can't think of any at the moment.

Q: Do you hold the opinion that squamous cell carcinoma obeys the oncogene theory to a reasonable degree of scientific certainty?

A: Yes, that's my opinion.

(*Id.* at 67-8.)He also admits that he can only use benzene, not the other chemicals he discusses, under the oncogene theory.

Q: And is your opinion that Mr. Will's squamous cell carcinoma was caused by his exposure to benzene [and] polycyclic aromatic hydrocarbons based upon the oncogene theory of carcinogenicity?

**\*9** A: Because you've included benzene in the picture, I would say yes, benzene very definitely has been associated with the modification of the gene structure. The polycyclic aromatic compounds, I'm not sure. I don't know that they would apply to the oncogene theory or not.

(*Id.* at 70-71.)

## DISCUSSION

### I. Defendants Motion in Limine

Defendants argue that Dr. Bidanset's opinions do not meet the standard for the admission of scientific expert testimony under Fed.R.Evid. 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993); that Dr. Bidanset has arrived at his conclusions in a manner that fails to comport with the recognized methodology for determining causation in toxic tort matters; that Dr. Bidanset's failures a) to quantify Decedent's exposure to benzene and polycyclic aromatic compounds ("PAHs"), b) to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

identify any relevant studies finding an increased risk of squamous cell carcinoma of the head and neck as a result of exposure to such substances, and c) to exclude all other potential causes of the illness including Decedent's documented smoking and drinking illustrate that his opinion is not scientifically valid and is unreliable. (Defs.' Mot. in Limine at 1.)

Plaintiff's responsive argument concerning the admissibility of Dr. Bidanset's testimony and opinion centers around the low level of burden of proof given to Jones Act plaintiffs and the claim that discovery is incomplete. However, as the Ninth Circuit stated in Claar v. Burlington N. R.R. Co., 29 F.3d 499, 503 (9th Cir.1994), "[t]he standard of causation under FELA and the standards for admission of expert testimony under the Federal Rules of Evidence are distinct issues and do not affect one another."FN7 The court went on to say,

> FN7. Standards of proof are the same under the Jones Act and FELA. In re Hechinger, 890 F.2d 202, 208 (9th Cir.1989), cert denied, 498 U.S. 848 (1990).

[i]t is true that under FELA the quantum of evidence sufficient to present a jury question of causation is less than it is in a common law tort action.... This does not mean, however, that FELA plaintiffs need make no showing of causation. Nor does it mean that in FELA cases courts must allow expert testimony that in other contexts would be inadmissible.... FELA plaintiffs still must demonstrate some causal connection between a defendant's negligence and their injuries.
Id. The inquiry of the Court as to whether Dr. Bidanset's reports and testimony are admissible under Rule 702 of the Federal Rules of Evidence and Daubert remains the same regardless of the level of the burden of proof. In every case, to be admissible, an expert's opinion must be based on scientifically reliable methods subject to the requirements of Rule 702 of the Federal Rules of

Evidence and Daubert.

Plaintiff filed a Surreply Brief on March 13, 2001 that was not authorized under the Federal Rules of Civil Procedure and was not authorized by the Court. The Surreply Brief states in a conclusory manner that Dr. Bidanset's findings are supported by scientific research proving that benzene contributes no matter how slight to squamous cell carcinoma but does not demonstrate any basis for that statement other than Dr. Bidanset's oncogene (no-threshold) theory.FN8 Plaintiff's Surreply Brief characterizes Dr. Bidanset's testimony as concluding that "the combined exposure to benzene, PAHs, and diesel exhaust fumes aboard Defendants' vessels ... were a possible contributing cause of decedent's squamous cell carcinoma."(Surreply at 6.) Possibilities are not a substitute for demonstrating a scientifically acceptable basis for concluding that the cancer was caused by that exposure.

> FN8. Plaintiff's claim that the dose-response relationship between benzene and squamous cell carcinoma of the skin of mice does not demonstrate a cause of internal squamous cell carcinoma of the jaw and neck in humans and there is no epidemiological study cited by Bidanset to show causation of that cancer.

II. Analysis of Dr. Bidanset's Opinion

A. Dr. Bidanset's First Report

*10 The paucity of support for his opinion in his First Report demonstrates that Dr. Bidanset was ready to form a conclusion first, without any basis, and then try to justify it. He appears to be claiming that he is using the dose-response theory to conclude Decedent was "intensely exposed to these carcinogenic hydrocarbons" and yet he makes no attempt to quantify Decedent's level of exposure, the essential step in using the dose-response theory. (Defs' Ex. B.) The Ninth Circuit has noted that, "... scientists whose conviction about the ultimate conclusion of their research is so firm that they are

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method." *Claar v. Burlington N. R.R. Co.,* 29 F.3d 499, 503 (9th Cir.1994). In his deposition, when questioned about his first report, he admits that his statement "the aggressiveness of Mr. Wills cancer would lead me to conclude that he was intensively exposed to these carcinogenic hydrocarbons"(*id.*) was based on speculation.

> Q: Can you point me to any studies that correlate aggressiveness of cancer with intensity and exposure to toxic substances?
>
> A: I'm not prepared to do that today. My thoughts at the time that I prepared that particular opinion were that from the time of diagnosis to the time of his death that the cancer progressed quite rapidly, metastasized and ultimately took his life. It would have been my-and it is my opinion which that's a sign of aggressiveness and relates to hydrocarbon exposure, but I can't point you to any study that would document that.

(Bidanset Dep. 99.) As for the three studies cited in the First Report, none relate Decedent's type of cancer to any of the particular substances to which he may have been exposed. One, in fact, reports "tobacco and alcohol were the major risk factors for squamous cell carcinoma of the neck and head."Dr. Bidanset, however, appears to rely on the statement in that study that "occupational exposures play a minor, though definite, role in the development of head and neck cancers."(Defs.' Ex. B.) None of these studies support his conclusion in that Report that "Mr. Wills' occupational exposure to various petroleum products was the most probable cause of his squamous cell carcinoma."(*Id.*) Dr. Bidanset's willingness to draw such a conclusion without a scientific basis in his first report is troubling.

*B. Second Report*

In his Second Report, dated April 28, 2000, Dr. Bidanset concludes that Mr. Wills was exposed to benzene, PAHs and diesel exhaust emissions from cargo carried on the vessels on which the Decedent worked as a master, and that "these exposures, to known carcinogens from the products or combustion emissions was a factor in the development of Mr. Wills' squamous cell carcinoma of the head and neck."(Defs.' Ex. C at 29.) This second report does not provide any basis to reach this conclusion other than the fact that Mr. Wills worked on various vessels of the Defendants during the period 1986 to 1993; that those vessels operated with diesel engines and carried petroleums, some of which included carcinogens; and that on twelve occasions during the period 1992-1995, some of the Defendants' vessels had benzene emissions that exceeded OSHA standards. Dr. Bidanset cites no evidence that Mr. Wills was on those vessels on those dates or during those occasions, although he reviewed all the logs of Decedent's voyages and all the emission reports which were conducted by a third party.

**\*11** The *Reference Manual* advises,

> An opinion on causation should be premised on three preliminary assessments. First, the expert should analyze whether the disease can be related to chemical exposure by a biologically plausible theory. Second, the expert should examine if the plaintiff was exposed to the chemical in a manner that can lead to absorption into the body. Third, the expert should offer an opinion as to whether the dose tot which plaintiff was exposed is sufficient to cause the disease.

*Reference Manual* at 419.

Turning to the second and third factors in the *Reference Manual* first, it states in regards to the second factor, "Evidence of exposure is essential in determining the effects of harmful substances."*Reference Manual* at 424. In Dr. Bidanset's report he notes, "During the collection, there could have been excursions well above the average and certainly above the acceptable standard."(Defs.' Ex. C at 11.)

Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

This possibility is far from a fact to be used in sci-entifically sound reasoning. Dr. Bidanset acknow-ledges that he was "unable to match any of the ex-posure data, which indicated excursions above the acceptable standard for benzene, with Mr. Wills' presence on board the vessels at the time of test-ing."(*Id.* at 25.)

Also, at least one court has found it inappropriate to use OSHA standards to determine causation of a disease. *Sutera v. Perrier Group of America, Inc.,* 986 F.Supp. 655, 664 (D.Mass.1997);* ("... a regu-latory standard, rather than being a measure of causation, is a public health exposure level that an agency determines pursuant to statutory standards set by Congress.").

Dr. Bidanset relies on the affidavit of Mr. Miller, another seaman, to support his conclusion as to the extent and manner of the Decedent's exposure. Dr. Bidanset equated Decedent's exposure to Mr. Miller's even though they only worked together in-termittently for five months and had different occu-pations. He equated Miller's habits in using protect-ive equipment and washing to those of Decedent without any justification. Although Mr. Miller can smell, there is no evidence that he has the expertise to determine the toxicity of fumes. At his depos-ition, Dr. Bidanset did not identify the grounds for Mr. Miller's conclusory allegation that his exposure was harmful.

> Q: Do you have any reason to think that Mr. Miller had any qualification to offer an opinion as to what odor was harmful and toxic as opposed to those that are non-harmful and non-toxic?

> A: I don't know what Mr. Miller's qualifica-tions were. He simply became aware of these odors and-my recall is that he had a whole set of symptoms that he described as a result of that ex-posure. So whether he was a toxicologist or med-ical professional, he experienced harmful and toxic effects from it. He related those to the odors that he was experiencing. I don't think it neces-sarily requires a professional expertise.

(Bidanset Dep. at 103.) Mr. Miller has initiated his own lawsuit in New York Supreme Court against Defendants for being exposed to harmful toxic odors, but not for developing cancer or squamous cellcarcinoma. Studies offered by the Plaintiff in-dicate that placement on a boat can be very signi-ficant in the various levels of possible exposures. One states "[c]aptains experience almost no chem-ical exposure."(Pl.'s Ex. 11 at 186.)

**\*12** As for the third factor, exposure to a sufficient dose to cause the disease, the *Reference Manual* notes, "The certainty of the expert's opinion de-pends on the strength of the research data demon-strating a relationship between exposure and the disease at the dose in question and the absences of other disease-causing factors (also known as con-founding factors)."*Reference Manual* at 423. In the section of Dr. Bidanset's Second Report entitled "Animal Studies Relative to Benzene's Carcinogen-ic Potential," he writes, "the most widely accepted cancer associated with benzene exposure in humans is leukemia. Some recently published animal stud-ies strongly suggest that benzene may produce can-cer at other target sites."(Defs.' Ex. C at 24.) Dr. Bidanset appears to be stating that he is not even sure whether benzene is capable of causing De-cedent's cancer. He cites a 1982 study by Maltoni which shows that 5% of male rats and 10% of fe-male fats developed squamous cell carcinoma of the oral cavity after ingesting 500mg/kg of benzene in olive oil once daily, 4-5 days per week, for 104 weeks. He also cites a 1989 study by Huff and col-leagues at the National Institute of Environmental Health that indicates a correlation of oral ingestion of benzene and squamous cell carcinoma in rats who received three oral doses of benzene (50, 100, and 200 mg/kg) in corn oil. However, there is no evidence that Decedent orally ingested benzene or that he ingested 500 mg a day for 104 weeks, nor do these studies support Dr. Bidanset's conclusion that one exposure to benzene is sufficient to devel-op squamous cell carcinoma. Dr. Bidanset cites a 1988 Synder study that involved inhalation of ben-zene. However, in that study mice were exposed to

1,200 ppm of benzene vapor for 6 hours per day, 5 days per week for 10 weeks. They found 14 tumors in the treated group, with one instance of squamous cell carcinoma of unknown origin. The dose involved in that study was a huge dose, and Dr. Bidanset has not shown that there is any reason to believe that Decedent was exposed to anywhere near that dose. Not only does no study support a conclusion of dose-response causation, none of the studies cited by Dr. Bidanset support his conclusion based on the oncogene theory that one exposure to benzene would have been capable of causing Decedent's cancer.

In eliminating other possible causes, Dr. Bidanset noted in his first report a reference to an article in which "the authors reported that tobacco and alcohol were the major risk factors for squamous cell carcinoma of the neck and head."(Defs.Ex. B.) In his second report he stated, "[t]his reviewer recognizes that cigarette smoking is the most frequently reported cause of squamous cell carcinoma and also that Mr. Wills smoked 1-2 packs per day for twenty years."(Defs.' Ex. C at 5.) Although he calculated this as 20-40 pack years, he then rejected cigarette smoking as a possible basis for Mr. Wills' cancer saying, "[t]he usual appearance of the squamous cell carcinoma from cigarette smoking requires decades to develop, usually appearing in the form of lung cancer rather than mandibular, head and neck cancer."(Id.) However, the article that he, himself, has cited in his first report cites tobacco and alcohol as the major risk factor for squamous cell carcinoma of the neck and head and the latency period for squamous cell carcinoma Dr. Bidanset is using for Mr. Wills' occupational exposure to benzene and PAHs in the employ of Defendants is eight years and Dr. Bidanset is satisfied that eight years is enough. He can point to no studies as a basis for that view. Instead, he admits that there are no human studies that support that conclusion because there are no human studies on benzene and PAHs and that the animal studies are not determinative. (Bidanset Dep. at 113.) He does not even try to exclude Decedent's history of alcohol consump-

tion, a major risk factor of squamous cell carcinoma of the head and neck, even though he notes that a doctor's report in 1994 stated that Decedent had slightly elevated liver function and should follow up with a private physician and avoid alcohol. (Defs.' Ex. C at 3.) Decedent's doctor, in a report dated April 20, 1996 stated, "[h]e has drank alcohol, mainly beer, heavily in the past."(Defs.' Ex. H.)

*C. Dr. Bidanset's Oncogene Theory*

**\*13** For the examination of the first factor in the *Reference Manual* of whether the disease can be related to chemical exposure by a biologically plausible theory, it is useful to examine the *Daubert* factors. The Supreme Court stated a court should assess whether the "reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."*Daubert* at 592-3.That assessment includes the following: (1) whether it can be and has been tested; (2) whether it has been subject to peer review and publication; (3) for a scientific technique, the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) general acceptance. *Id.* at 593-5.The Court noted, "[w]idespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community,' may properly be viewed with skepticism."*Id.* at 594 (quoting *United States v. Downing,* 753 F.2d 1224, 1238 (3rd Cir.1985) (internal citation omitted).) The Supreme Court emphasized, however "[m]any factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test."*Id.* at 593.

Although the criteria listed in *Daubert* are not supposed to be exhaustive or definitive, they provide a convenient starting point for analyzing the opinion of Dr. Bidanset. Dr. Bidanset's conclusion that Mr. Wills' cancer was caused from an exposure, no mat-

Not Reported in F.Supp.2d                                                                    Page 13
Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

ter what the level, to toxic chemicals, namely ben-
zene and PAHs is not expressly addressed in his re-
ports, only in his deposition. When asked for the
basis of his opinion, Dr. Bidanset says "Just basic-
ally my background experience and reading. I
couldn't point you to a specific reference."(Bidanset
Dep. at 67.) Because Dr. Bidanset's theory that De-
cedent's illness, squamous cell carcinoma, obeys
the oncogene theory merely relies on his back-
ground experience and reading, there is no evidence
it has been tested. Thus, it fails the first *Daubert*
factor. Nor has Dr. Bidanset given any indication it
has been subject to peer review publication, failing
the second *Daubert* factor. Dr. Bidanset himself has
not written any publications in this area and admits
the oncogene theory itself is controversial.
(Bidanset Dep. at 62-3.) The third *Daubert* factor is
the known or potential error rate of the expert's the-
ory. Nowhere in his Reports or testimony does Dr.
Bidanset provide a known or potential error rate for
the oncogene theory.

The fourth *Daubert* factor is general acceptance in
the scientific community. Courts should pay partic-
ularly close attention to experts who depart from
generally accepted scientific methodologies. *Allen
v. Pennsylvania Engineering Corp.,* 102 F.3d 194,
197 n. 4 (5th Cir.1996). As the Seventh Circuit
noted in *Braun v. Lorillard Inc.,* 84 F.3d 230, 235
(7th Cir.1996), *cert. denied,* 519 U.S. 992 (1996),
"A judge or jury is not equipped to evaluate sci-
entific innovations. If, therefore an expert proposes
to depart from the generally accepted methodology
of his field and embark upon a sea of scientific un-
certainty, the court may appropriately insist that he
ground his departure in demonstrable and scrupu-
lous adherence to the scientist's creed of meticulous
and objective inquiry."

**\*14** Dr. Bidanet admits that the "generally accep-
ted" theory is the dose-response relationship and
that the oncogene theory that he is using is contro-
versial. "The classical thinking is that if a dose-
response relation doesn't exist, that you haven't
proven a cause and effect. What I'm saying is that

there is an ongoing controversy with that opin-
ion."(Bidanset Dep. at 62.) As the court in *Mancuso
v. Consolidated Edison Co. of NY,* 56 F.Supp.2d
391, 399 (S.D.N.Y.1999) pointed out, the generally
accepted methodology for determining whether a
person's illness was caused by a specific toxin, as
prescribed by the World Health Organization and
the National Acadamy of Sciences, and recommen-
ded by the *Reference Manual,* is a three-step pro-
cess:

> First, the level of exposure of plaintiff to the tox-
> in in question must be determined; second, from
> a review of the scientific literature, it must be es-
> tablished that the toxin is capable of producing
> plaintiff's illness-called "general causation"-and
> the dose/response relationship between the toxin
> and the illness-that is, the level of exposure
> which will produce such an illness-must be ascer-
> tained; and third, "specific causation" must be es-
> tablished by demonstrating the probability that
> the toxin caused this particular plaintiff's illness,
> which involves weighing the possibility of other
> causes of the illness-a so-called "differential dia-
> gnosis."

Dr. Bidanset admitted during his deposition that he
did not quantify Plaintiff's level of exposure to ben-
zene or PAHs. (Bidanset Dep. at 72, 76.) He admits
there are no epidemiologic studies finding an in-
creased risk of squamous cell carcinomas in hu-
mans as a result of exposure to either benzene or
PAHs. (*Id.* at 75.)As to whether the particular tox-
ins Mr. Wills may have been exposed to are capable
of producing Mr. Will's particular illness, he relies
on animal studies that he himself states are not al-
ways reliable and none relate to Mr. Wills particu-
lar illness. (*Id.* at 45-46.)As for "differential dia-
gnosis," he admits that smoking and drinking are
the largest risk factors for squamous cell carcinoma
of the neck and head, yet decides that the latency
period of twenty years as a smoker is not enough,
while concluding, without any basis, that an eight
year latency period is enough under the oncogene
theory. (*Id .* at 112-113.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Other courts have similarly rejected expert opinions that are based on the "no-threshold" model as exemplified by Dr. Bidanset's assertion that "[t]here is no threshold value for carcinogenic activity, and you do not need to have a dose-response relationship associated with low level exposures."(Bidanset Dep. at 63.) As one court explained in excluding the plaintiffs' experts using the same no threshold theory, "[t]he linear non-threshold model cannot be falsified, nor can it be validated. To the extent that it has been subjected to peer review and publication, it has been rejected by the overwhelming majority of the scientific community. It has no known or potential rate of error. It is merely an hypothesis." *Whiting v. Boston Edison Co.,* 891 F.Supp. 12, 25 (D.Mass.1995)."In layman's terms, the model assumes that if a lot of something is bad for you, a little of the same thing, while perhaps not equally bad, must be so in some degree. The model rejects the idea that there might be a threshold at which the neutral or benign effects of a substance become toxic." *Id.* at 23. *Sutera v. Perrier Group of America Inc.,* 986 F.Supp. 655, 666 (D.Mass.1997) ("Accordingly, although there is evidence that one camp of scientists ... believes that a non-linear model is appropriate basis for predicting the risks of low-level exposures to benzene, there is no scientific evidence that the linear no-safe threshold analysis is an acceptable scientific technique used by experts in determining causation in an individual instance.").

**\*15** As recognized by the *Reference Manual,*"For agents that produce effects other than through mutations, it is assumed that there is some level that is incapable of causing harm.... Theoretically, any exposure at all to mutagens may increase the risk of cancer, although the risk may be very slight and not achieve medical probability."*Reference Manual* at 426. Dr. Bidanset has simply provided no information relating to Decedent's exposure to a level of toxins that would cause harm in humans. Without this essential information, a scientifically reliable opinion cannot be formed. See, e.g., *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 781 (10th Cir.1999)

("[g]uesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case"); *Wright v. Willamette Industries, Inc.,* 91 F.3d 1105, 1107-8 (8th Cir.1996).

Dr. Bidanset admitted during his deposition that benzene can be found in "smoke from fires, from wood products, from synthetics such as PVC and also from natural fires" as well as fruits, fish, dairy products, ambient environment and answered "correct" to the question "would you agree that pursuant to the oncogene theory, exposure in any of those settings or any of those substances could trigger the single molecular transformation that could lead to a carcinogenic process?"(Bidanset Dep. at 94-5.) He also replied yes to the question, "If I understand you correctly, then, pursuant to the oncogene theory while you don't apply a dose-response relationship, you have concluded that the occupational on board exposure was more likely the cause because there was more of an exposure to hydrocarbons."(*Id.* at 97.)

Dr. Bidanset's theory would lead to an impossible link of causation. If one exposure is sufficient for causation, there would be no way to determine which exposure caused a particular cancer since we are exposed to carcinogens to some degree in the ambient environment on a daily basis.

In the Second report, Dr. Bidanset opines that Mr. Wills' exposure to PAHs was a factor in his development of squamous cell carcinoma. However, in his deposition he says he is not sure that PAHs obey the oncogene theory that he is using for Decedent's possible exposure to benzene. (Bidanset Dep. at 71.) He also admits that without quantifying Decedent's exposure he cannot opine as to a causal relationship based upon dose response. (*Id.*) Therefore, Dr. Bidanset admits that he draws a conclusion as to PAHs being a factor in Decedent's illness without any basis whatsoever. He similarly asserts that Decedent's encounters with diesel exhaust emission were a factor in his illness without offering any basis for his conclusion.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

Plaintiff's expert is using a controversial theory that some toxins do not follow the dose-response relationship, but that any amount of exposure causes cancer. Even though benzene and PAHs have been shown to cause some types of cancer, it is too difficult a leap to allow testimony that says any amount of exposure to these toxins caused squamous cell carcinoma of the head and neck in the Decedent. Dr. Bidanset admits that he "believes" squamous cell carcinoma obeys the oncogene theory even though he can point to no scientific basis for this belief, just his background experience and reading. He also says he cannot use this theory for the possible exposure to PAHs, but still asserts that this possible exposure was a factor, but offers no scientific basis for that conclusion. Although Plaintiff tries to argue that she would use the accepted dose-response relationship if she had more discovery, that is not relevant to the issue of whether the conclusion that Plaintiff's expert has drawn is scientifically reliable under *Daubert.*The opinion of Dr. Bidanset that any exposure Mr. Wills may have had to benzene and PAHs can cause squamous cell carcinoma of the head and neck is merely a hypothesis. It is not grounded in reliable scientific methods, but only Dr. Bidanset's presumptions. It fails all of the Daubert factors. Therefore, Defendant's motion in limine to exclude the testimony and opinions of Plaintiff's expert, Jesse H. Bidanset is granted.

### III. Pennsylvania Rule

**\*16** Plaintiff's reliance on *The Pennsylvania,* 86 U.S. 125 (1873) is misplaced. As Plaintiff states *The Pennsylvania* did involve claims of liability by the owners of two ships involved in a collision and held that where a ship was in violation of a navigation rule intended to prevent collisions "the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."(Pl.'s Brief in Supp. of Mot. in Limine at 3.)

Plaintiff goes on to argue that the Supreme Court in *Kernan v. American Dredging Co.,* 355 U.S. 426 (1958) applied *The Pennsylvania* to a case where a fire on a tug which killed a seaman was caused by an open flame kerosene lamp carried on a scow in statutory violation. (Pl.'s Brief in Supp. of Mot. in Limine at 4.) Plaintiff is incorrect. The Supreme Court's holding in *Kernan* was that in the absence of any showing of negligence the Jones Act permits recovery for the death of a seaman *resulting from* a violation of a statutory duty. *Id.* at 431 (emphasis added).*Kernan* does not cite *The Pennsylvania* or in any way rely on it. Instead, the Supreme Court relied on the FELA and Jones Act standard of the employer's liability for damages when injury is caused, in whole or in part, by the employer's fault. *Id.* at 432.

*In Re Seaboard Shipping Corp.,* 449 F.2d 132 (2d Cir.1971), which is also relied on by Plaintiff, was an action between a barge owner and a tug owner each charging negligence by the other. At issue were the damages paid in settlement of claims on behalf of two seaman on the barge who had drowned during a storm. The legal basis for the claim for the death of the seamen was not at issue. Accordingly, the reliance of the *Seaboard* court on *The Pennsylvania* does not support reliance on *The Pennsylvania* in a wrongful death claim, the situation in this case.

*Jones v. Spentonbush-Red Star,* 155 F.3d 587 (2d Cir.1998) was an action for a seaman's injury on board a ship. It did not apply the Pennsylvania Rule. It rejected the plaintiff's claim that the Pennsylvania Rule should be applied because defendant's violation of OSHA regulations were not violations of Coast Guard regulations or maritime statutes. *Id.* at 595.However, *Jones* does not constitute a holding that the Pennsylvania Rule is applicable here.[FN9]

> FN9. Its parenthetical articulation of the *Seaboard* decision is misleading.

*Wilkins v. American Export Isbrandtsen Lines,*

*Inc.,* 446 F.2d 480 (2d Cir.1971) is a case more similar to this one. There, the decedent, Chief Officer of the ship, was required to put in overtime hours in the performance of his duties in violation of 46 U.S.C. §§ 235 and 673 and shortly thereafter died of an acute heart attack. The trial judge rejected the decedent's widow claim as in *The Pennsylvania* that the burden was on the shipowner to prove that its statutory violation not only did not, but could not have contributed to the decedent's death. Plaintiff also relied on *Kernan.* The court point out that *Kernan* did not go so far as to hold that a causal connection was presumed to exist between the statutory violation and the alleged injury (*id.* at 484 n. 8) and cited *Nolan v. Greene,* 383 F.2d 814, 817 (6th Cir.1967) holding that for the burden to shift "there *must be a causal connection* between the breach of the statutory duty and the death of the seaman ."(emphasis added.) After considering *The Pennsylvania,* the court determined it should not be extended "beyond the chosen area of ship collisions to embrace Jones Act cases." *Wilkins* at 486.

**\*17** Based on this decision, *The Pennsylvania* is not applicable here. Under *Kernan* and *Wilkins,* Plaintiff must show evidence of a causal connection between Defendants' alleged violation of Coast Guard regulations and the Plaintiff's injury. Plaintiff has failed to present admissible evidence of causation. Accordingly, her motion in limine is denied.

*IV. Summary Judgment*

To survive Defendants' motion for summary judgment, Plaintiff was required to offer admissible expert testimony showing that exposure to chemicals in the workplace caused Decedent's squamous cell carcinoma and death. As no admissible testimony of causation of Decedent's squamous cell carcinoma by Plaintiff has been offered, summary judgment is granted subject to Plaintiff's right within twenty days to submit an affidavit stating what further discovery it seeks and specifically why each

such category of discovery would lead the Court to a different conclusion on causation.

Review of Dr. Neugut's affidavit reveals that his opinion has not reached a conclusion based on the dose-response theory of causation. He also does not say what theory of causality he is using. His conclusion is "it is my belief, within a reasonable degree of medical probability, that the occupational exposures that Ricky Wills had as an employee at Amerada Hess raised the risk and was a cause and / or contributing factor to his developing squamous cell carcinoma of the oral cavity. While I recognize that he was, in fact, a heavy cigarette smoker and moderate alcohol user as well, ... this would not preclude the impact of his occupational exposures."(Pl.'s Ex. 9 at 12.) Not only does Dr. Neugut seem unwilling to assert causation to a reasonable degree of medical certainty, he bases his opinion on Mark Miller's inexpert assertion that fumes encountered on the ship were toxic, and he fails to establish the Decedent's exposure or the dose. Even if Dr. Neugut's testimony and Dr. Haas' testimony, which did not deal with the issue of causation, had been admitted, summary judgment would still be properly granted.

As for Plaintiff's claim of maintenance and cure, to be eligible "a seaman must be 'in the service of the ship' at the time of the illness or injury" *Nelson v. Research Corp. of University of Hawaii,* 805 F.Supp. 837, 853 (D. Hawaii 1992) or "where the illness has not manifested itself until after a seaman has left the ship, the seaman must be able to offer convincing proof of causal connection between the alleged injury and his service on the ship." *Id.* (citing *Brahms v. Moore-McCormack Lines, Inc.,* 133 F.Supp. 283, 286 (S.D.N.Y.1955)). As the illness did not manifest itself during the Decedent's employment nor has a convincing proof of causal connection been made between his injury and that employment, Plaintiff's claims for maintenance and cure are also dismissed.

CONCLUSION

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

For the foregoing reasons, Defendants' motion in limine to exclude the testimony and opinions of Plaintiff's expert is granted; Defendants' motion for summary judgment is granted subject to the right of the Plaintiff within twenty days from the date of this decision to file an affidavit showing what additional discovery it seeks and specifically why each such category of discovery might lead the Court to a different conclusion on the issue of causation. Defendants will have twenty days to respond if an affidavit is filed; Plaintiff's motion in limine to impose the Pennsylvania Rule is denied.

**\*18** IT IS SO ORDERED.

S.D.N.Y.,2002.
Wills v. Amerada Hess Corp.
Not Reported in F.Supp.2d, 2002 WL 140542 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.