UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER          *          MDL NO. 1873
        FORMALDEHYDE         *
        PRODUCTS LIABILITY   *
        LITIGATION           *
                             *          JUDGE: ENGELHARDT
This Document Relates to:   All Cases   *
                             *
                             *
                             *          MAG: CHASEZ

## MEMORANDUM IN SUPPORT OF JOINT MANUFACTURING DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. KENNETH PARIS

**MAY IT PLEASE THE COURT:**

Manufacturing Defendants hereby respectfully submit the following Memorandum in Support of their joint Motion to Exclude the Testimony of Dr. Kenneth Paris.

## I.      Introduction

As part of their efforts to seek class certification, Plaintiffs argue that all children who resided in the EHUs are at increased risk of developing allergies and asthma, and, as a result, this Court should fashion relief in the form of a program that would diagnose and then treat the children.  *See* Memorandum in Support of Plaintiffs' Motion for Class Certification, Rec. Doc. 764-2, at p. 33.  Underpinning this claim is the tacit assertion that exposure to airborne formaldehyde causes asthma in children.  There is no study in any of the world's medical literature that reaches this conclusion.[1]  Nonetheless, in a vain attempt to have this Court construct the children's program, Plaintiffs have proffered Dr. Kenneth Paris as an expert witness, who ultimately opines that "high levels of formaldehyde exposure in children living in emergency housing units increases the risk of developing allergic disease and asthma."  Affidavit

---

[1]    In fact, there is likewise no generally accepted medical literature supporting a claim that airborne formaldehyde exposure causes asthma in adults.  *See* Affidavit of H. James Wedner, attached hereto as Exhibit "A," at ¶¶ 25-30.

of Dr. Kenneth Paris, attached hereto as Exhibit "B," at 4. To support this contention, Dr. Paris relies on the 2007 National Asthma Education and Prevent Program Asthma Guidelines (the "NAEPP") and the three studies cited therein. These three studies -- which are observational studies -- themselves conclude merely that formaldehyde exposure in children <u>might</u> increase the risk of asthma in children. Indeed, when asked on direct examination by Plaintiffs' counsel what health effects formaldehyde exposure has on children, Dr. Paris testified that it merely increases the risk of asthma:

> Q.   What adverse health effects do you believe the children suffered as a result of that exposure?

> A.   So exposure to formaldehyde put them at increased risk for development of allergy and for asthma symptoms.

Deposition of Dr. Kenneth Paris, taken on September 19, 2008, attached hereto as Exhibit "C," at 140:7-11. Moreover, Dr. Paris readily admitted, as he must, that risk does *not* equal causation. *Id.* at 33:25-34:1.

Dr. Paris' reliance on the studies cited within the NAEPP -- which themselves are insufficient to prove Plaintiffs' claim -- does not pass gatekeeper muster under the evidentiary requirements of *Daubert* and its progeny. Because Dr. Paris' *ipse dixit* conclusion has no actual support in medical literature or independent testing, this motion seeks the exclusion of his opinions, opinions that assume their conclusion rather than apply the scientific method of hypothesis generation and testing, and substitute anecdotal observational studies reflecting suppositional causal explanations for epidemiologic proof.

## II.     Argument and Citation of Authority

**A.     The Law Excludes Unsupported Expert Opinions**

Pursuant to Rule 104 of the Federal Rules of Evidence, a district court shall determine

preliminary questions regarding the admissibility of evidence.  Rule 702 specifically governs the

admission of expert testimony and provides that it may only be admitted if it is both relevant and

reliable.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  In addition, Rule 702:

> establishes a standard of evidentiary reliability.  [citation omitted]
> It requires a valid . . . connection to the pertinent inquiry as a
> precondition to admissibility [citation omitted].  And where such
> testimony's factual basis, data, principles, methods, or their
> application are called sufficiently into question, . . . the trial judge
> must determine whether the testimony has a reliable basis in the
> knowledge and experience of [the relevant] discipline.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at

590, 592) (punctuation altered).

Under *Daubert*, the district court must make a "preliminary assessment of whether the

reasoning or methodology underlying" the proposed expert testimony "is scientifically valid *and*

of whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert*,

509 U.S. at 592-93 (emphasis added).  As the Court observed in *Daubert*, "scientific validity for

one purpose is not necessarily scientific validity for other, unrelated purposes."  509 U.S. at 591.

Applying *Kumho* and *Daubert*, expert testimony may be admitted into evidence if:  (1)

the expert is qualified to testify competently regarding the matters he intends to address; (2) the

methodology by which the expert reaches his conclusions is sufficiently reliable as determined

by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through

the application of scientific, technical, or specialized expertise, to understand the evidence or to

determine a fact in issue.  *See, e.g., City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548,

562 (11th Cir. 1998).  An expert's testimony will only be admissible if all three of these factors are satisfied.  *Id.*

Under *Daubert*, even the most distinguished scientist must adhere to the rigors of the scientific method.  Indeed, although any expert may ultimately be proven to be correct, until he can establish a sufficient scientific basis, his conclusions remain no more than an "intuitive, clinical hunch."  *Leather v. Pfizer, Inc.*, 233 F.R.D. 687, 695 (N.D. Ga. 2006).  Whether further experimentation can remedy the shortcomings in an expert's testimony is not for the court to predict.  The trial court must deal with the evidence it has before it.

An expert's bare opinion will not suffice.  *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).  Likewise, "an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."  *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996), *cert. denied*, 519 U.S. 819 (1996).  An expert opinion that is connected to existing data only by the *ipse dixit* of the expert should not be admitted.  *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

## B.      These Evidentiary Standards Apply To The Class Certification Stage

Ensuring the reliability of an expert's opinion is appropriate at the class certification stage.  *See In Re: Katrina Canal Breaches Consolidated Litigation*, 05-4182, 2007 WL 3245438, *3-8 (E.D.La. 11/1/07) (Duval, J.) (attached hereto as exhibit "D").  The question has arisen as to what extent the *Daubert* analysis should be performed in the context of class certification, i.e., a full *Daubert* review versus some form of a limited *Daubert* review.  While several Eastern District of Louisiana decisions have applied a limited *Daubert* review, relying on the old Second Circuit opinion of *In re Visa Check/MasterMoney Antitrust Litig*., 280 F.3d 124 (2d Cir. 1999), the Second Circuit has now reversed its holding on this issue.  *In Re: Initial Public Offering*

*Securities Litig.*, 471 F.3d 24, 42 (2nd Cir. 2006) (applying full *Daubert* review in the context of class certification).

The Western District of West Virginia has recently explained why a full *Daubert* review is necessary:

> While the class certification determination is certainly important to the litigants, this court is especially cognizant of its duty to protect absent class members' rights. Certification without adequate review of the parties' experts may substantially impair or foreclose the rights of absent class members if later review results in exclusion of the parties' experts. Given the high percentage of class actions which settle as a result of class certification, failure to conduct a *Daubert* analysis might invite plaintiffs to seek class status for settlement purposes, and essentially amounts to a "delegation of judicial power to the plaintiffs, who can obtain class certification just by hiring a competent expert."

*Rhodes v. E.I. du Pont de Nemours and Co*., No. 6:06-CV-00530, 2008 WL 2400944, *36 (S.D. W. Va. June 11, 2008) (quoting *West v. Prudential Sec.*, 282 F.3d 935, 938 (7th Cir. 2002)) (attached hereto as Exhibit "E").

Defendants submit that a full *Daubert* review is appropriate and reflects the majority rule of other circuits. *See* Dwight J. Davis, Karen R. Kowalski & Brandon P. Ansley, *Expert Opinion in Class Certifications:  Second Circuit Revisits, Disavows In Re Visa Check and Joins Majority Rule*, 74 DEF. COUNSEL. J. 253 (2007).  However, the core concept of ensuring reliability remains at the heart of either a full or "limited" *Daubert* review.

**C.     In Toxic Tort Cases, The Reliability Prong Of *Daubert* Must Include Questions Of Causation**

In the context of toxic tort cases, "scientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden . . . ."  *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996).  Therefore, the reliability prong of *Daubert* must include the questions

of causation.  Where the general causal effect of a particular toxin is not in doubt, the court need

only engage in a *Daubert* analysis of the testimony as it relates to the specific harm to the

individual plaintiff.  However, where, as in this case, there is no medical/scientific consensus as

to the general causative effect of the particular substance, here formaldehyde, the trial court's

*Daubert* analysis must include the general question of whether the chemical can cause the harm

the plaintiff alleges.  *See, e.g., Sutherland v. Matrixx Initiatives, Inc.*, No. 04-AR-0129-M, 2006

U.S. Dist. LEXIS 96652 (N.D. Ala. Nov. 7, 2006) (attached hereto as Exhibit "F").[2]

"General causation is concerned with whether an agent increases the incidence of disease

in a group and not whether the agent caused any individual's disease."  Michael D. Green et al.,

*Reference Guide on Epidemiology*, in Reference Manual on Scientific Evidence 392 (Federal

Judicial Center, 2d ed. 2000).  To put it another way, general causation is a predicate for

establishing a specific harm.  The most conclusive type of evidence of causation is

epidemiologic evidence.  *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 311 (5th

Cir. 1989) (holding that plaintiffs' failure to present statistically significant epidemiological

proof that Bendectin causes limb reduction defects to be fatal to their case); *Siharath v. Sandoz

Pharms. Corp.*, 131 F. Supp. 2d 1347, 1356 (N.D. Ga. 2001) (noting that epidemiological

evidence provides "the primary generally accepted methodology" for demonstrating a causal

relation between a chemical compound and a disease).

In epidemiological terms, the difference in risk of getting a disease is the "relative risk."

The relative risk is a number which describes the increased or decreased incidence of the disease

---

[2]    An example of general causation versus specific causation that this Court will be confronted with can be found in the following example:  Assume twins live in an EHU and both complain of runny noses.  From a general causation standpoint, both a virus and formaldehyde exposure (if the concentration is sufficient) can cause runny noses.  Therefore from a specific causation standpoint, the medical history, the family history, and records of a treating doctor must be analyzed in order to diagnose the specific cause of the runny nose in each twin.

in question in the population exposed to the factor as compared to the control population not exposed to the factor.  A relative risk of 1.0 means that the incidence of disease in the two groups were the same.  A relative risk greater than 1.0 means that there were more incidences of disease in the group exposed to the factor.  Just because an epidemiological study concludes that a relative risk is greater than 1.0 does not establish that the factor caused the disease.  Separately, even if the calculated relative risk is greater than 2, if the statistical confidence interval is such that it includes the number 1.0, then the study will be said to show no statistically significant association between the factor and the disease.  The confidence interval attempts to express mathematically the magnitude of possible error.  *Brock*, 874 F.2d at 312.[3]

The threshold for concluding that an agent more likely than not caused a disease is a relative risk of greater than 2.0.  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 n.16 (11th Cir. 1999) (citing Federal Judicial Center, *Reference Manual on Scientific Evidence* 168-69 (1994)).  Only risks *greater than* 2.0 permit an inference that a plaintiff's disease was more likely than not caused by the suspected agent.  *Id.* (emphasis added).[4]

In another toxic tort case, the Middle District of Louisiana explained that where a disease develops in the general population -- that is, it develops in those who have been exposed to the chemical in question and in those who have not been exposed to the chemical – a controlled study is required to determine if the disease claimed by the plaintiff is more common in people who have been exposed to the chemical than those who have not.  *Chamber v. Exxon Corp.*, 81 F. Supp. 2d 661, 664 (M.D. La. 2000).  Epidemiological studies are necessary to determine the cause and effect relationship between an agent, in this case exposure to formaldehyde and

---

[3]   The simple point is, if the mathematical error is too great, no study can show an effective relative risk.

[4]   It is critical to note that the studies relied on by Dr. Paris -- to the extent these studies report relative risks/odd ratios for formaldehyde exposure and asthma --  do not report relative risks greater than two.

asthma. *Id.*; *Brock*, 874 F.2d at 315 (finding that theories of toxic causation "unconfirmed by epidemiological proof cannot form the basis for causation in a court of law").

Dr. Paris has no data by which he can calculate a relative risk.  Because Dr. Paris' theories of asthma causation and formaldehyde exposure are wholly unconfirmed by epidemiological proof, his opinion that children are at increased risk of developing asthma in this case are unreliable, irrelevant, and unhelpful.

**D.**     **Dr. Paris Mischaracterizes The Very Studies He Relies On And Lacks Any Scientific Foundation For His Opinions**

> Q.     But risk doesn't equal causation, does it?
>
> A.     It's not the same, no.

Ex. C, Dr. Kenneth Paris Deposition at 33:25-34:1.

Dr. Paris received a degree in Public Health before attending the Louisiana State University School of Medicine, from which he graduated in 2000.  He just completed his allergy and immunology fellowship in 2006.[5]  He now cares for pediatric patients in the area of asthma, allergic diseases, and immune disorders.  Ex. B, Dr. Paris Aff. at 1, 7-8.  In his affidavit submitted in support of Plaintiffs' Motion for Class Certification, Dr. Paris concludes that "high levels of formaldehyde exposure in children living in emergency housing units increases the risk of developing allergic disease and asthma." *Id.* at 4.  He offers virtually no testimony regarding the relative risk of formaldehyde exposure, and certainly does not testify that the relative risk is greater than 2.0.

Dr. Paris concedes that there is "a lack of literature describing immediate or long term effects of formaldehyde exposure on the developing respiratory system of children." *Id.* However, although there are no studies that show airborne formaldehyde exposure can even

---

[5]     He apparently is board certified although his Expert Affidavit prepared for this proceeding in August 2008 attaches a CV that indicates he became board certified (prospectively) in October 2008.

cause asthma in adults -- and several studies which say it does not -- Dr. Paris stands on the
assumption of these non-existent studies and somehow extrapolates that "[p]hysiologically,
children are more vulnerable since smaller airways (bronchi) in children <u>may</u> result in more
severe symptoms than in adults." *Id.* (emphasis added).

   The equivocations made by Dr. Paris in his affidavit are further highlighted throughout
his deposition testimony.  When asked whether it has been proven that formaldehyde increases
the risk of allergic sensitization in children, Dr. Paris admitted that it is only a "speculation" that
has been *suggested*:

> Q. The speculation that formaldehyde may increase the risk of allergic
> sensitization in children remains unproven?
>
> A. The **speculation** has been **suggested** in multiple papers.
>
> Q. Right.
>
> A. As well as recommendations from various medical groups.  So in order to
> prove that, we would need to perform experimental studies which to my
> knowledge are not done.  **So, no, they have not been proven**, but – no.
>
> Q. It has not been proven?
>
> A. It has – we have not done the studies yet to prove those nor will we be
> able to perform those studies.  There are no – it's not – we cannot perform
> experimental studies on children with formaldehyde.  So the very nature of
> that question I can't answer.
>
> . . .
>
> Q. In other words there are a lot of suggestions in the world literature.  But at
> this point as we sit here September 19, 2008 it hasn't been proven in the
> world's literature?
>
> A. The experimental study where children have been exposed to
> formaldehyde and their response in terms of allergy or asthma, that study
> has not been done, no.

Ex. C, Dr. Paris Dep. at 36:15-37:10; 70:10-17 (emphasis added).

Furthermore, Dr. Paris concedes that exposure to formaldehyde has only been *implicated*

as a *potential* risk factor for asthma <u>and</u> that there is an important medical distinction between a

known risk factor and a potential risk factor:

> A.    . . . formaldehyde would be a potentiator of that development for allergy, which is the concept which is proposed and which is the central idea of why the [NHLBI] has made the statement that – I don't want to get the statement wrong, but formaldehyde – "formaldehyde and volatile organic compounds have been implicated as potential risk factors for asthma and wheezing."
>
> Q.    Right.  And that's all they say.  The choice of words is absolutely specific. Has been implicated –
>
> A.    Uh-huh.
>
> Q.    -- and what's the next word?
>
> A.    As potential risk factors.
>
> Q.    As potential.  It doesn't say as a known risk factor.  It says potential risk factor.  There's a terrific medical distinction between known and potential.
>
> A.    Right.

Ex. C, Paris Dep. at 65:16-66:9.  It is important to note that the NAEPP itself goes on to

explain this bullet point statement quoted by Dr. Paris in his report and in the deposition

colloquy set forth above.[6]  Indeed, the explanation found on page 176 actually clarifies the

context of the NAEPP's statement: -- which explanation Dr. Paris ignores in both his affidavit

and during his deposition -- as follows:

> "Formaldehyde and VOCs – which can arise from sources such as new linoleum flooring, synthetic carpeting, particle board, wall coverings, furniture, and recent painting – have been implicated as potential risk factors for ***the onset of*** asthma and wheezing (Garrett, et al. 1999; Jaakkola, et al. 2004; Rumchev, et al. 2004).

---

[6]    So that the Court can compare the bullet point statement (pp. 165-66) with the more detailed paragraph discussion (p. 176) from the NAEPP, the relevant portions are attached hereto as Exhibit "G" and Exhibit "H," respectively.

> Clinicians should advise patients to be aware of the potential
> irritating effects of newly installed furnishing and finishes."

National Asthma Education and Prevention Program. Expert Panel Report 3:  Guidelines for the

Diagnosis and Management of Asthma.  Full report 2007 at p. 176 (emphasis added).[7]  The

authors of the Panel Report limit the application of their findings consistent with the principles of

good science.  They simply say that clinicians (to whom the NAEPP Report is directed), should

"be aware of the potential irritating effects" of formaldehyde containing products.  The Report

does not say:  "Be aware of the irritating effects of newly installed furnishings and finishes;" or

"Beware: these products cause asthma."  Dr. Paris expands the application of the NAEPP

paragraph, and the studies cited therein, beyond good science.  This illustrates Dr. Paris' lack of

scientific rigor in that he draws unauthorized conclusions from limited data -- conclusions the

authors of the study do not make.  In these papers, what the authors are saying is that

formaldehyde is just an example of a potential irritant.  They are in no way saying that it is a

cause of asthma.

And to further belie his own conclusion, Dr. Paris admits that risk does <u>not</u> equal

causation:

Q.      But risk doesn't equal causation, does it?

A.      It's not the same, no.

Ex. C, Paris Dep. at 33:25-34:1.  Courts have consistently found that expert testimony based on

speculative, non-verifiable, and unsubstantiated theories such as the one propounded by Dr. Paris

warrants exclusion.  *See Wright v. Case Corp.*, Civ.A.1:03CV1618-JEC, 2006 WL 278384, *4-5

(N.D. Ga. Feb. 1, 2006) (attached hereto as Exhibit "I"); *Dale v. General Motors Corp.*, 109

---

[7]     It is interesting to note that the bullet point response and the NAEPP paragraph, here quoted in its entirety, are
the only two references in the 417 page NAEPP Panel Report the Manufacturing Defendants have found to
formaldehyde and asthma.

F. Supp. 2d 1376, 1381 (N.D. Ga. 1990).  So, too, here should Dr. Paris' speculative testimony

be excluded.

**E.      There Is No Evidence That Formaldehyde Causes Asthma In Children And Anecdotal Observations Based Largely On Temporality Are Not A Reliable Substitute**

Dr. Paris himself testified that there are no epidemiological or other studies that show

formaldehyde can cause asthma in children.  Ex. C, Dr. Paris Dep. at 36:15-37:10; 70:10-17.

The studies he nonetheless relies on in advocating his opinion do not support him in this quest.

These observational studies conclude merely that "the observation that exposure to formaldehyde

very early in childhood is associated with asthma **suggests the possibility** that irritants in indoor

air **might be involved** in the initiation phase of asthma";[8] "[l]ow level exposure to indoor

formaldehyde **may** increase the risk of allergic sensitization to common aeroallergens in

children";[9] and "[c]onsistent with our hypothesis, the risks of current asthma and wheezing and

allergic diseases were related to installation of materials with potential chemical emissions."[10]

(emphases added).

Temporal connections between exposure to chemicals and an onset of symptoms,

standing alone, are entitled to little weight in determining causation.  *McClain v. Metabolife Int'l,*

*Inc.*, 401 F.3d 1233 (11th Cir. 2005); *Hilton v. Matrixx Initiatives, Inc.*, No. 4-04CV-519-Y, 2007

U.S. Dist. LEXIS 73264, at *8-9 (N.D. Tex. Feb. 20, 2007) (attached hereto as Exhibit "J").

Drawing a conclusion from temporal relationships "leads to the blunder of the *post hoc ergo*

---

[8]     Rumchev K., Spickett J., Bulsara M., et al. Domestic exposure to formaldehyde significantly increases the risk of asthma in young children.  Eur. Respir. J. 2002; 20:407, attached hereto as Exhibit "K."

[9]     Garrett M.H., Hooper M.A., Hopper B.M., Rayment P.R., Abramson M.J. Increased risk of allergy in children due to formaldehyde exposure in homes.  Allergy 1999; 54(4):330, attached hereto as Exhibit "L."

[10]    Jaakkola J.J., Parise H., Kislitsin V., Lebedeva N.I., Spengler J.D.  Asthma, wheezing, and allergies in Russian schoolchildren in relation to new surface matierals in the home.  Am. J. Public Health 2004; 94(4):561, attached hereto as Exhibit "M."

*propter hoc* fallacy." *Metabolife*, 401 F.3d at 1243.  The *post hoc ergo propter hoc* fallacy

assumes causality from temporal sequence.  It literally means "after this, because of this."

Black's Law Dictionary 1186 (7th ed. 1999).

Highlighting the problem of identifying a causative relationship based solely on temporal

association, Dr. Paris explains in his affidavit that "[i]n children, it is best to think of 'asthma' as

a clinical syndrome that may have different causes."  *Id.* at 2.  Dr. Paris then notes that high

levels of moisture, mold, and dust mites -- *known* irritating factors -- were present in the FEMA

trailers.  *Id.* at 3.  Rather than allow that these *known* irritants could be the cause of any asthmatic

response in children who resided in FEMA trailers, Dr. Paris chooses to postulate that

formaldehyde, whose association with asthma is speculative at best, is the cause of any such

asthmatic response.  Speculation, conjecture, or inferences that cannot be supported by sound

scientific principles should not be admitted because "[t]he courtroom is not the place for

scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Rider v.*

*Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) (citations omitted).

**F.     A Reliable Dose-Response Analysis Is Required For The Admission Of Disease
        Causation Opinions.**

The notion of dose-response is fundamental to scientific toxicology.  "Virtually every

element or compound . . . is toxic above a certain level or dose."  Bert Black and Patrick Lee,

Expert Evidence:  A Practitioner's Guide to law, Science, and the FJC Manual, 124 (West

Group, 1991).  The dose-response relationship is a "relationship in which a change in amount,

intensity, or duration of exposure to an agent is associated with a change -- either an increase or

decrease -- in risk of disease."  Green, *supra*, at 392.

If an expert offers no evidence related to the dose-response relationship, there is an

insurmountable methodology problem.  David L. Eaton*, Toxicology in Litigation*, 12 J.L. &

Pol'y 5, 15 (2003).  Where there is a methodology problem, there is a reliability problem.  And where there is a reliability problem, there is a *Daubert* problem.  *Id.*

When specifically asked about his opinions regarding the dose-response relationship with respect to formaldehyde, Dr. Paris offered essentially no opinion:

> Q.    You do not have an opinion on what dose of formaldehyde is needed to result in whether it be allergic or asthmatic symptoms; is that right?
>
> A.    Well, I think the studies that I reviewed actually saw a significant risk with levels that were found in existing homes in the areas where these studies occurred.  These were observational studies.  So it appears from these studies that the ambient what was measured in these children's homes were sufficient to create differences in the risk or the presence -- or portion of people who developed allergy or asthma, and also the severity of the respiratory symptoms which were present in those children.  So there -- these were children in residential ambient levels.

Ex. C, Paris Dep. at 115:25-116:15.  This conclusion, the product of thoroughly unconvincing reasoning, rests at the heart of Dr. Paris's testimony.  To establish toxicity under *Daubert*, more conclusive evidence is required.  Anecdotal hearsay cannot fill the gap left by the absence of the kinds of clinical and epidemiological proof required by *Daubert*.  His lack of testimony about any specific dose-response relationship combined with his vague testimony about significant individual variations leaves a muddle of ambiguity that undermines his opinions and renders them inadmissible.

### III.    Conclusion

Ultimately, Dr. Paris fails to show either that his opinions are based upon reliable sources and data or that his methodology comports with that criteria listed in *Daubert* or with those standard otherwise utilized by experts in the field of toxicology.  The opinions of Dr. Paris are not based on reliable scientific methodology, are not relevant to causation and would not assist a trier of fact.  Accordingly, Dr. Paris' proffered opinion, *i.e.,* that the exposure of the children

residing in the EHUs to airborne formaldehyde increases their risk of developing allergic disease and asthma, should be excluded under *Daubert* and its progeny.

Respectfully submitted,

**DUPLASS, ZWAIN, BOURGEOIS, PFISTER, & WEINSTOCK**

s/Andrew D. Weinstock
_____
**ANDREW D. WEINSTOCK #18495**
**JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700
Fax: (504) 837-3119
andreww@duplass.com
jglass@duplass.com
*DEFENSE LIASON COUNSEL*

## C E R T I F I C A T E

I hereby certify that a copy of the foregoing has this date been serves on all counsel of record in this proceeding by:

( )   Hand Delivery                    ( )   Prepaid U.S. Mail

( )   Facsimile                        ( )   Federal Express

(X)   CM/ECF

New Orleans, Louisiana this 10th day of November, 2008.

s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com