UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER<br>    FORMALDEHYDE PRODUCTS<br>    LIABILITY LITIGATION | MDL NO. 1873 |
| | SECTION: N (4) |
| THIS DOCUMENT RELATES TO<br>ALL CASES | JUDGE: ENGELHARDT<br>MAG: CHASEZ |

## MANUFACTURING DEFENDANTS'
## <u>MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION</u>

# TABLE OF CONTENTS

INDEX OF EXHIBITS ........................................................................................ 6

I.       INTRODUCTION AND SUMMARY .......................................................... 10

II.      FACTS ........................................................................................................ 13

         A.       Variability of the Class – Plaintiffs and Their FEMA Provided EHUs. ............... 14

                  1.       Variability Among Individuals in the Putative Class. ............................ 14

                  2.       Variability Among FEMA EHUs Provided to the Putative Class. ........... 26

         B.       Medical Background and Overview of Controlling Standards ............................ 29

                  1.       Medical Background ................................................................... 29

                           a.       Formaldehyde – Chemical Properties and Background ............... 29

                           b.       Formaldehyde – Irritant Properties ................................. 30

                           c.       Formaldehyde – The Meaning of Exposure Levels ..................... 33

                                    i.       History of the Formaldehyde Issue ................................ 33

                                    ii.      HUD Product and Ambient Air Regulation ..................... 34

                           d.       Federal Government Formaldehyde Regulation ......................... 36

                           e.       Formaldehyde – Non-Injurious Exposure ................................. 36

                           f.       Formaldehyde – Sensitization/Asthma ......................... 38

                           g.       Formaldehyde – Cancer ......................................... 39

III.     BURDEN OF PROOF AND STANDARD OF REVIEW ................................. 40

IV.      STANDING ................................................................................................ 41

V.       CLASS DEFINITION .................................................................................. 45

VI.      RULE 23(B)(3) PREDOMINANCE AND SUPERIORITY ............................. 47

         A.       Plaintiffs Cannot Show Predominance ................................................. 47

                  1.       The Predominance Standard under Rule 23(b)(3). ............................... 47

                  2.       Individual Issues Predominate ..................................................... 48

3.    Variability of the Putative Class – the Plaintiffs and their FEMA provided EHUs .......................................................................... 51

    a.    Plaintiff variability ....................................................... 51

    b.    FEMA EHUs Variability ............................................... 52

4.    Law of Predominance as it Relates to Claims of The Putative Class ..................................................................................... 54

5.    Plaintiffs Have Not Conducted the Choice of Law Analysis Necessary to Demonstrate Predominance in a Multi-State Class Action ................................................................................... 59

    a.    The Fifth Circuit Has Routinely Denied Class Certification in Multi-State Cases Where the Plaintiffs Fail to Sufficiently Analyze Choice of Law Issues ................................. 60

    b.    Choice of Law Issues Related to Medical Monitoring and Economic Loss Subclasses ........................................... 61

    c.    Choice of Law Issues Related to State-Specific Subclasses ......... 62

B.    Plaintiffs Cannot Show Superiority ........................................................ 63

1.    The Superiority Standard Under Rule 23(b)(3). ....................................... 63

2.    Certification Would Require Series of Mini-Trial Making Class Treatment Undesirable ............................................................................. 64

3.    A Manageable Trial in This Case is Not Possible .................................... 65

4.    The Seventh Amendment Poses Obstacles to Manageability ................... 67

VII.    RULE 23(A) REQUIREMENTS ................................................................ 69

A.    Plaintiffs Have Not Carried Their Burden of Showing Numerosity .................... 69

B.    Plaintiffs Have Not Carried Their Burden of Showing Commonality ................ 70

C.    Plaintiffs Have Not Carried Their Burden of Showing Typicality ..................... 72

1.    The Class Representatives' Causes of Action Vary by State. .................. 72

2.    Plaintiffs' Designated Class Representatives Fail to Demonstrate Typicality in Terms of Their Claimed Injuries. ....................................... 73

D.    Plaintiffs Have Not Carried Their Burden of Showing Adequacy ..................... 78

VIII.   FUTURE MEDICAL SERVICES (MEDICAL MONITORING) SUBCLASS .............. 82

    A.   Issues Presented by the Future Medical Services Subclass. ................................. 82

    B.   What Does the Definition of the Future Medical Services Subclass Mean? ........ 83

    C.   How Do Plaintiffs' Experts Describe the Medical Services Program? ................ 86

    D.   Plaintiffs' Future Medical Services Subclass Definition Is Legally
       Insufficient. ...................................................................................................... 90

    E.   Plaintiffs as a Group Don't Meet the "Manifest Physical Injury"
       Requirement for Medical Monitoring .................................................................. 91

    F.   Even if Cellular Damage Is an "Injury," Individual Issues of Exposure and
       Risk Predominate and Prevent Certification of a Future Medical Services
       Subclass ............................................................................................................. 96

    G.   Plaintiffs Cannot Prove That the Program They Request Is any Different
       from the Regime of an Annual Physical; Nor Can They Prove That the
       Program Is Supported by any Scientific Authority. ........................................... 101

    H.   In Sum, the Future Medical Services Subclass Should Not Be Certified. ........... 107

IX.   ECONOMIC LOSS SUBCLASS ...................................................................... 108

    A.   The Proposed Economic Loss Subclass Lacks Standing to Assert Claims
       against the Manufacturing Defendants. .............................................................. 108

    B.   The Proposed Economic Loss Subclass Fails to Meet Rule 23(b)(3)'s
       Predominance Requirement. ............................................................................... 111

        1.   Under Louisiana, Mississippi, and Texas Law, a Determination
           Must be Made for Each and Every Subclass Member as to Whether
           the Subclass Member was a Purchaser of His or Her Emergency
           Housing Unit. ........................................................................................ 111

           a.   Louisiana Law ........................................................................... 112

           b.   Mississippi Law ......................................................................... 112

           c.   Texas Law .................................................................................. 113

        2.   Where Alabama Law Applies, the Court Must Determine if Each
           Plaintiff was a Purchaser and if Privity of Contract Exists between
           the Plaintiff and the Manufacturing Defendant. ..................................... 115

    C.   The Sale and Privity Requirements Defeat Predominance for the Proposed
       Economic Loss Subclass .................................................................................... 116

X.    CONCLUSION.............................................................................................................. 117

# INDEX OF EXHIBITS

## INDEX TO DISC NUMBER 1

Exhibit A:  Plaintiff Profiles

| | |
|---|---|
| Ex A-01 | Acker, Letecheia o/b/o Smith, Dakyre |
| Ex A-02 | Adams, John I. |
| Ex A-03 | Alfonso, Stephen A. |
| Ex A-04 | Alfred, Courtney o/b/o Thomas, Christopher |
| Ex A-05 | Anderson, Sandra |
| Ex A-06 | Ayala, Marcelio |
| Ex A-07 | Baker, Shane o/b/o Baker, Shane |
| Ex A-08 | Walker, Toinette o/b/o Ballet, Edward, IV |
| Ex A-09 | Walker, Toinette o/b/o Ballet, Derell |
| Ex A-10 | Walker, Toinette o/b/o Ballet, Egypt |
| Ex A-11 | Battie, Kendra o/b/o Battie, D'Asia |
| Ex A-12 | Beasley, Jocelyn o/b/o Beasley, Heavenly A. |
| Ex A-13 | Benoit, Pamela o/b/o Benoit, Christopher |
| Ex A-14 | Bergens, Thomas A. |
| Ex A-15 | Beverly, Marcie |
| Ex A-16 | Bradford, Portia |
| Ex A-17 | Bradford, Randy J. |
| Ex A-18 | Bridges, Juanita X. |
| Ex A-19 | Bright, Rose L. |
| Ex A-20 | Brown, Trina |
| Ex A-21 | Culler, Jerome A. |
| Ex A-22 | Culler, Jerome A. o/b/o Joan R. Culler (deceased) |
| Ex A-23 | Darby, Brian Sr. o/b/o Darby, Brian Jr. |
| Ex A-24 | Daunoy, Peter III |
| Ex A-25 | Davis, Corey |
| Ex A-26 | Davis, Dione o/b/o Guesnon, Trinity |
| Ex A-27 | Davis, Linda |
| Ex A-28 | Dedeaux, Jaqueline |
| Ex A-29 | Delone, Donovan |
| Ex A-30 | Dillon, Barbara A. |
| Ex A-31 | Dominguez, Barry P. |
| Ex A-32 | Dubuclet, Elisha o/b/o Dubuclet, Timia |
| Ex A-33 | Esposito, Nicole |
| Ex A-34 | Evans, Percy |
| Ex A-35 | Flowers, Ella |
| Ex A-36 | Foley, Lillian A. |
| Ex A-37 | Foley, Lillian A. o/b/o Foley, Samuel |
| Ex A-38 | Fontenot, Shontay o/b/o Fontenot, Hailey |
| Ex A-39 | Fontenot, Shontay o/b/o Fontenot, Jonathon Jr. |
| Ex A-40 | Fontenot, Shontay o/b/o Fontenot, Justin |
| Ex A-41 | Frank, Simone |

| | |
|---|---|
| Ex A-42 | Gardner, Renay M. |
| Ex A-43 | Gordon, Shelia |
| Ex A-44 | Green, Trichonda |
| Ex A-45 | Griffin, Rommel E. |
| Ex A-46 | Gumm, Crystal L. |
| Ex A-47 | Hargrove, Damian J. o/b/o Hargrove, Damian J. Jr. |
| Ex A-48 | Hargrove, Leroy Jr. |
| Ex A-49 | Harris, Mary |
| Ex A-50 | Heechung, Hazel |
| Ex A-51 | Hill, Douglas III |
| Ex A-52 | Howard, Thelma H. |
| Ex A-53 | Jack, Joseph Jr. |
| Ex A-54 | Jordan, Constance o/b/o Jordan, Bronica |
| Ex A-55 | Keyes, Sylvia J. |
| Ex A-56 | LeBeau, Carrie |
| Ex A-57 | Lightell, Lakesha o/b/o Lightell, Donovan |
| Ex A-58 | Lightell, Lakesha o/b/o Lightell, Jazlyn N. |
| Ex A-59 | London, LaTonya o/b/o London, Edbony |
| Ex A-60 | London, LaTonya o/b/o Madison, Darrell |
| Ex A-61 | London, LaTonya o/b/o Madison, Darren |
| Ex A-62 | London, LaTonya o/b/o Madison, Derrell |
| Ex A-63 | Magee, Keena o/b/o Wilson, Kierra |
| Ex A-64 | Maldonado-West, Linda |
| Ex A-65 | McCray, Adrina N. |
| Ex A-66 | McCray, Adrina N. o/b/o Wood, Kody |
| Ex A-67 | McGallion, Amaris |
| Ex A-68 | Miller, Brittney |
| Ex A-69 | Mitchell, Natley |
| Ex A-70 | Moreland, Glenda |
| Ex A-71 | Myers, Centra |
| Ex A-72 | Parker, Maria o/b/o Ardoin, Tyler |
| Ex A-73 | Posey, George |
| Ex A-74 | Pujol, Stephanie G. |
| Ex A-75 | Ray, Craig Sr. |
| Ex A-76 | Robertson, Penny M. o/b/o Robertson, Mercedez |
| Ex A-77 | Robertson, Penny M. |
| Ex A-78 | Robinson, Rayfield Jr. |
| Ex A-79 | Semien, Sandra o/b/o Semien, Danielle |
| Ex A-80 | Semien, David Jr. |
| Ex A-81 | Semien, David W. Sr. |
| Ex A-82 | Sinclair, Shirley A. |
| Ex A-83 | Smith, Sheila o/b/o Tracy, Michael C. |
| Ex A-84 | Solis, Margarita |
| Ex A-85 | Stephens, Cherish |
| Ex A-86 | Sylve, Libby o/b/o Sylve, Hailey N. |
| Ex A-87 | Sylve, Libby |

Ex A-88       Thomas, Betty
Ex A-89       Trollinger, Sherry, mother with power of attorney,
              o/b/o Michael Davis
Ex A-90       Vason, Kendra S. o/b/o Battle, Tyrone
Ex A-91       White, Betty o/b/o McConnel, Erin
Ex A-92       White, Johnny
Ex A-93       Williams, Enna
Ex A-94       Williams, Faye
Ex A-95       Williams, Joanette o/b/o Williams, George L.
Ex A-96       Williby, Alvin, Sr. o/b/o Williby, Sandra (deceased)

**INDEX TO DISC NUMBER 2**

Ex B          Dr. Philip Cole Affidavit
Ex C          Dr. Brooks Emory Affidavit
Ex D          Thomas Fribley Affidavit
Ex E-1        Dr. Michael Ginevan Affidavit
Ex E-2        Dr. Michael Ginevan Deposition Excerpts
Ex F          Dr. Robert Golden Affidavit
Ex G          Dr. William Waddell Affidavit
Ex H          Dr. James Wedner Affidavit
Ex I          Michael Zieman Affidavit

**INDEX TO DISC NUMBER 3**

Ex J          Mary DeVany Deposition Excerpts
Ex K-1        Dr. Paul Hewett Affidavit Excerpts
Ex K-2        Dr. Paul Hewett Deposition Excerpts
Ex L          Marco Kaltofen Deposition Excerpts
Ex M          Dr. Gerald McGwin Deposition Excerpts
Ex N          Stephen Mullet Deposition Excerpts
Ex O          Dr. Kenneth Paris Deposition Excerpts
Ex P          Dr. Judd Shellito Deposition Excerpts
Ex Q          Dr. Stephen Smulski Deposition Excerpts
Ex R-1        Dr. William Stein Affidavit Excerpts
Ex R-2        Dr. William Stein Deposition Excerpts
Ex S-1        Dr. Patricia Williams Affidavit Excerpts
Ex S-2        Dr. Patricia Williams Deposition Excerpts

**INDEX TO DISC NUMBER 4**

Ex T          Final Report on Formaldehyde Levels in FEMA Supplied Trailers, ParkModels, &
              Mobile Homes, July, 2008 ("CDC Final Report")
Ex U          Lang, et al., Formaldehyde and Chemosensory Irritation in Humans: A Controlled
              Human Exposure Study, 50(1) Reg. Toxicol. Pharmacol. 23, 23 –36 (2008)
Ex V          FEMA Trailer Study Data Set for Individual Units ("CDC Data Set")
Ex W          CDC Health Consultation, February, 2007

Ex X        McGregor, D., et al., Formaldehyde and Glutaraldehyde and Nasal Sinotoxicity: Case Study Within the Context of the 2006 IPCS Human Framework for the Analysis of Cancer Model of Action for Humans.  Crit. Rev. Toxicol. 36 (10): 821-35

Ex Y        Marsh, G. et. al., Mis-specified and Non-Robust Mortality Risk Models for Nasophayngeal Cancer in the National Cancer Institute Formaldehyde Worker Cohort Study, Reg. Toxicol. Pharmacol., 47:59-67, 2007

Ex Z        Devany EHU test result dataset

Ex AA       D'Amico EHU test result dataset; and,

Ex BB       Non-formaldehyde Related Symptoms per Dr. Golden Analysis.

## INDEX TO DISC NUMBER 5

Ex CC       Fleetwood Travel Trailer Mirror Warning Label

Ex DD       Fleetwood Travel Trailer Manual Warning

Ex EE       HUD Important Health Notice

Ex FF       30(b)(6) Deposition of Fleetwood Enterprises, Inc. by William Farish taken taken July 16, 2008, pp. 109: 16-24-110: 1-8

Ex GG       Forest River Travel Trailer Manual Warning

Ex HH       30(b)(6) Deposition of Forest River by Doug Gaeddert taken August 6, 2008, pp. 103-106

Ex II       Plaintiffs' Position Paper on Elements of Class Certification dated May 15, 2008

## I.    INTRODUCTION AND SUMMARY

Before the Court are product liability cases in which the Plaintiffs allege that they are suffering from personal injuries because they were allegedly exposed to a chemical composed of carbon and water.  In short compass, this MDL is about a lot of different people who claim that a lot of different companies, who made a lot of different products, exposed them to a lot of different levels of formaldehyde, and, as a result, they developed a lot of different symptoms. This is not an MDL proceeding that can be certified as a class action.

Cutting through the trappings of "multi-district litigation," cutting through the rhetoric of Plaintiffs' brief, and laying bare the issue before this Court, the question is an individual one.  It is as individual as the Plaintiffs' class representatives who stand before this Court; it is as individual as the 64 Manufacturing Defendants who stand prepared to defend the multitude of claims brought against each of them.  The question which cannot be answered summarily – but must be answered individually – is whether and to what extent any individual who resided in a FEMA supplied emergency housing unit ("EHU") suffers from any purported health effect from the formaldehyde containing wood products contained in their FEMA supplied housing and whether any individual manufacturer produced a unit that was defective within the meaning of the laws here at issue.  This Court has itself stated the conundrum faced by the trier of fact much more eloquently: "Ultimately, the battle royale in this case will be fought over causation on an individual basis."[1]

Plaintiffs' Motion for Class Certification and Memorandum filed in support,[2] ring hollow.  This is scarcely odd because Plaintiffs must show that "...questions of law or fact

---

[1]    *In Re: American Commercial Lines, LLC*, Nos. 00-252, 00-2967, 00-3147, 202 WL 1066743 at *14 (E.D. La. May 28, 2002) ("*In re American Commercial Lines*").

[2]    Memorandum in Support of Plaintiffs' Motion for Class Certification ("Plaintiffs' Memorandum"), Rec. doc. 764-2.

common to class members predominate over any questions affecting only individual members, and that a class action is superior to the other available methods for fairly and efficiently adjudicating the controversy."[3]

Plaintiffs' entire argument is founded on the flawed premise that they have satisfied the requirements of Rule 23(a) and the requirements of Rule 23(b)(3) and therefore the case should be managed as a class action, proceeding to a common issues trial and avoiding the delays, costs, and varying results of a post-MDL remand.[4]  Recognizing, as they must, the fingernail hold they have at the chance of class certification, in their next breath they make a blatant appeal to emotion by claiming that, at the very least, the Court should certify a class based upon the future medical services that they speculate may be needed at some unspecified future date by putative class members who lived in EHUs when they were children.[5]

Plaintiffs' very position paper filed in May belies the substance of their present argument: "While there are obviously many and varying circumstances attaching to the exposure and effects to the occupants of the trailers and mobile homes involved in these claims, it seems likely that the distinctions may be without significant difference."[6]  But it is this Court's arrow that has truly found the mark:

> Each Plaintiff will have different relevant facts that may or may not afford him/her such a claim ....  As for each Plaintiff involved in this litigation, the evidence will undoubtedly differ, just as the individual claims will differ.  For instance, some Plaintiffs will not have suffered any symptoms from the alleged formaldehyde exposure.  Furthermore, those who do claim to have suffered side effects will surely differ as to which side effects and as to what extent those side effects manifested.  Some Plaintiffs may have

---

[3]      FED. R. CIV. P. 23(b)(3).
[4]      Plaintiffs' Memorandum, pp. 2-3 of 40.
[5]      Plaintiffs' Memorandum, p.3 of 40.
[6]      Plaintiffs' position paper on elements of class certification, dated May 15, 2008 at p.1.

complained about the alleged formaldehyde exposure while still in the EHUs; others, will not have complained or voiced any concerns until after relocating from their EHUs.[7]

Perhaps the Fifth Circuit in *Castano v. American Tobacco Co.*,[8] summed it up best in denying class certification in a toxic tort case: "We find it difficult to fathom how common issues could predominate in this case [where][9]... class members were exposed to nicotine through different products, for different amounts of time, and over different time periods."[10] Formaldehyde class actions have been denied for the very same reasons. After noting that the thrust of Plaintiff' lawsuit was that formaldehyde creates an environment that prevents ordinary use of the manufactured home, the trial court held: "Perhaps the most important factor militating against class certification is the absence of common facts as to causation. Any claim that the mere presence of formaldehyde supports liability defies reality."[11]

As this Court is well aware, class certification has been denied in a case in this very district with far more commonalities than exist in this case. In the *In re Vioxx* MDL cases involving a single pill, one defendant, and a known dosage, the court found: "The plaintiffs' claims in this case that Vioxx proximately caused their injuries ... are highly individualized and inappropriate for class wide adjudication."[12] Here, there were 140,000 houses, not a single pill; 64 Defendants, not one defendant; and instead of a known dosage, varying dosages for every Plaintiff.

---

[7] October 3, 2008 Order and Reasons, Rec. Doc. 717 at pp. 42-43.

[8] *Castano*.

[9] Lengthy citation to *Georgine* omitted. *Georgine v. Amchem Prods.*, 83 F.3d 610 (3rd Cir. 1996).

[10] *Castano*, 84 F.3d at 742 n. 15.

[11] *Brummett, et al. v. Skyline Corp.*, No. C-81-0103-L(B) 1985 U.S. Dist. in LEXIS 19264, at *25-6.

[12] *In re Vioxx Products Liability Litigation*, 239 F.R.D. 450, 461 (E.D. La. 11/22/2006) ("*In re Vioxx 2006*").

Indeed, these are individual product liability toxic tort cases, not cases ripe for class certification.  For all of the reasons that will be shown below, Plaintiffs' Motion for Class Certification should be denied.

## II.    FACTS

The parties have spent the last several months engaged in intensive discovery limited to the issues entailed in the class certification requirements.  Many of class representatives have been deposed to the extent they have made themselves available for deposition.[13]  The parties have also exchanged expert reports dealing with class certification issues.  The Manufacturing Defendants have taken the depositions of almost all of the Plaintiffs' experts, and the Plaintiffs have taken a deposition of one of the Manufacturing Defendants' experts.

This fact section will summarize the results of that discovery, first demonstrating the multitude of differences among the putative class representatives themselves and then demonstrating the the variability among the Defendant Manufacturers' dozens of different Emergency Housing Units ("EHUs").  These differences directly affect formaldehyde levels in the EHUs and the concomitant potential for irritation or any other effects related to formaldehyde exposure.

Last, in order to understand the significance of these differences, discovery concerning the medical characteristics of formaldehyde-related irritation and alleged associated injury/disease will be summarized, followed by an overview of controlling standards. Formaldehyde is an essential ingredient in all cells in the human body, without which human life could not exist.  Elimination of formaldehyde is not the goal.  Formaldehyde, like many other substances, varies in its effects depending upon its "dose" or concentration.  Therefore, an

---

[13]    A number of depositions of the class representatives have been cancelled or postponed by Plaintiffs.  Some are still in process.

understanding of the properties of formaldehyde and applicable standards will help the Court to place in proper context the class certification issues present in this case.

**A.      Variability of the Class – Plaintiffs and Their FEMA Provided EHUs.**

1.      Variability Among Individuals in the Putative Class.

The record in this case demonstrates the vast variability that the Court and Plaintiffs predicted among the putative class.  Plaintiffs only inaccurately predicted that the distinctions would be "without significant difference."  In fact, the variation among class members makes all the difference here.

In an effort to show that "claims asserted by the class representative are typical of other class member claims,"[14] Plaintiffs discussed only four class representatives, Davis, Robinson, Baker and Beasley.  Rather than showing typicality or shared claims, Plaintiffs' discussion of these four individuals explains the extreme variability among putative class members here. While all four indicate they experienced eye irritation, watery eyes and breathing problems,[15] the similarity among them ends there.  Davis and Robinson were adults, Baker was a toddler and Beasley was an infant when they occupied their units.  Davis and Robinson lived in their units for two years while Baker and Beasley lived in their units for seven to eight months.  Each of the four claim other symptoms, some of which overlap, some which do not – Davis:  headaches, dizziness, coughing, frequent nosebleeds, vomiting; Robinson:  stomach pain, vomiting,

---

[14]      Plaintiffs' Memorandum, p. 14 of 40.
[15]      In describing these three "common" symptoms, the four class representatives describe them quite differently:  Davis:  "shortness of breath, irritation of eyes"; Robinson: "watery eyes, breathing problems"; Baker:  "breathing difficulties"; Beasley "troubled breathing."  Plaintiffs' Memorandum, pp. 14-15 of 40.

diarrhea;  Baker:  skin rashes, abdominal pain, nausea, vomiting;  Beasley:  ear infections, stomach problems, upper respiratory infection.[16]

Information obtained by the Manufacturing Defendants in class discovery in this case shows additional, significant variations between the four class representatives discussed by Plaintiffs.  Davis's Plaintiff Fact Sheet indicates that he did not live in his unit for two years, he lived there for only 13 months.  He spent 14 hours a day in the trailer.[17]  He claims his symptoms started almost as soon as he moved into the trailer and continue today, despite his not occupying the unit for seven months.[18]  Robinson claims to have experienced asthma attacks which he has not had since childhood.[19]  Shane Baker's parents are both smokers.[20]  Heavenly Beasley resided in the EHU about 24 hours a day while her mother Joycelyn resided in the unit about 10 hours a day.[21]  Yet, Joycelyn and her husband claim to have suffered headaches, burning eyes and rashes – symptoms which Heavenly did not experience.[22]

Other examples of the variability among Plaintiffs' identified class representatives, such as lifestyle patterns, claimed symptoms, medical, employment and social histories, are provided in the Plaintiff Profiles prepared by the Manufacturing Defendants for each class representative, citing to Plaintiff Fact Sheet responses and/or deposition testimony, and are discussed further in this memorandum.[23]  To highlight a few here, Sylvia Keyes occupied a Fleetwood travel trailer.

---

[16]     Plaintiffs' Memorandum in Support of Motion for Class Certification, Rec. Doc. 764-2, pp. 14-15.

[17]     Ex. A-25, Plaintiff Profile C. Davis, PFS at 9.

[18]     Ex. A-25, Plaintiff Profile C. Davis, PFS at 4.

[19]     Ex. A-78, Plaintiff Profile R. Robinson, PFS at 3-4.

[20]     Ex. A-7, Plaintiff Profile Baker, PFS at 12.

[21]     Ex. A-12, Plaintiff Profile Beasley, Dep. at 29:9-19, 30:20-25, 31:1-16.

[22]     Ex. A-12, Plaintiff Profile Beasley, Dep. at 58:21-25, 59:1-19.

[23]     Exs. A-1 - A-96, Plaintiff Profiles.  The information available on each class representative at the time of filing this memorandum varies.  Some class representatives have not

She claims symptoms of shortness of breath, breathing problems, wheezing, eye irritation, tightness of chest.[24]  Yet, Keyes lived in a mobile home, in which she had problems with mold and mildew, for 20 years before occupying the Fleetwood unit, and she returned to that mobile home upon vacating the Fleetwood unit.[25]  Before Katrina, Keyes underwent surgery for a knife stab wound to her chest.[26]  Between 2003 and 2007 – during the time she lived in the Fleetwood unit, she worked inside ships as a painter, in close proximity to insulators, pipefitters, sandblasters, and welders, in admittedly "very dusty" conditions.[27]  Jerome and Joan Culler lived in a Gulf Stream unit.  Jerome lived there for 27 months, Joan for 10 months.[28]  The Cullers experienced very different symptoms:  Jerome, abdominal pain, diarrhea and dizziness,[29] Joan, pneumonia, pulmonary edema, seizures, and low blood pressure.[30]  Joan is deceased.  Jerome has a claim here for wrongful death.[31]  Peter Daunoy occupied a Clayton Homes travel trailer.  Daunoy lists 23 acute symptoms he claims to have had while occupying the EHU.[32]  He claims that his occupancy aggravated his pre-existing fibromyalgia (a chronic condition characterized by widespread pain in muscles).[33]  Daunoy is currently a smoker and has smoked five cigars per day for 35 years.[34]  Sheila Smith lived in three separate EHU units – a Coachman travel trailer for nine months; a Homes of Merit mobile home for 14 months; and a Waverlee mobile home for

---

yet been deposed.  Limited medical and employment information has been obtained for some class representatives, but not for others.

[24]     Ex. A-55, Plaintiff Profile Keyes, PFS at 3-4.
[25]     *Id.*, Dep. at 10:16-20, 13:10-12, 70:21 – 71:4.
[26]     *Id.*, Dep. at 31:1-21.
[27]     *Id.*, Dep. at 25:6-27, 43:20-25, 53:24; 54:9-16.
[28]     Ex. A-21, Plaintiff Profile Culler, PFS at 9 and Ex. A-22, Plaintiff Profile Culler O/B/O Joan Culler, PFS at 9.
[29]     Ex. A-21, Plaintiff Profile Culler, PFS at 3-4.
[30]     Ex. A-22, Plaintiff Profile Culler O/B/O Joan Culler, PFS at 3-4.
[31]     Ex. A-21, Plaintiff Profile Culler, PFS at 8.
[32]     Ex. A-24, Plaintiff Profile Daunoy, PFS at 3-4.
[33]     *Id.*, PFS at 5.
[34]     *Id.*, PFS at 12.

over 13 months.  She continues to reside in the Waveerlee unit.[35]  She lived in a mobile home

with wood paneling for 15 to 16 years before Hurricane Katrina, as well as other mobile homes

before that.[36]  In addition, Smith claims exposure to "mold" that made her "sick" while living in

her own mobile home, following Hurricane Katrina and before moving into a EHU provided by

FEMA.[37]  Clearly the many differences among these class representatives demonstrate the

substantial variability that can be expected in any larger group of putative class members here.

One significant way in which all putative class members and their claims vary is that the

formaldehyde levels in their units are vastly different.  Since formaldehyde level equates to dose,

and dose is critical to a determination of any link between a formaldehyde exposure and a

purported health effect,[38] this variation is critical to the question of class certification.  The

CDC's test results, and test results from incomplete datasets provided to the Manufacturing

Defendants by Plaintiffs show this variation clearly.[39]  The difference between low and high test

results in datasets provided by Plaintiffs is a factor of over 100.[40]  A Plaintiffs' dataset of about

220 occupied units showed formaldehyde levels ranging from 0.007 to 0.98 ppm[41], while

another Plaintiffs' dataset of some 60 occupied units, ranged from 0.009 ppm to 0.96 ppm.[42]

Test results provided by Plaintiffs to their expert Paul Hewett, on 976 apparently unoccupied

---

[35]     Ex. A-83, Plaintiff Profile Smith, Dep. at 18:19 – 21:9; 8-9, 27, 30.
[36]     *Id.*, Dep. at 64:6 – 67:17, 67:25 – 68:12.
[37]     Ex. 83, Plaintiff Profile Smith, Dep. at 67:25 – 68:12.
[38]     Ex. P, Dr. Shellito Dep. at 25:13-22.
[39]     Ex. V, CDC Data Set. Ex. J, DeVany EHU test result dataset; Ex. AA, D'Amico EHU test result dataset.
[40]     Ex. Z, DeVany EHU test result dataset.  By way of example, this test dataset which provides formaldehyde concentrations ranging from 0.007 ppm to 0.98 ppm is a factor of 140 times different from the lowest to the highest test result.  One calculates this by dividing 0.98 by 0.007 = 140.  A number of EHUs tested by PSC had no detectable concentration of formaldehyde at all.  Ex. K-2, Dr. Hewett Dep. at 82:4-14.
[41]     *Id.*
[42]     Ex. AA Frank D'Amico Results.xls

units, ranged from zero to 0.5 ppm, or greater.[43]  In the CDC's survey of 519 EHUs,

formaldehyde concentrations ranged from .003 ppm to .59 ppm.[44]

Plaintiffs attempt to present a predominance argument in this case by suggesting that

there is an average formaldehyde exposure level common to all occupants of EHUs which

somehow explains an alleged predominance of certain symptoms self-reported by plaintiffs.[45]

This argument is flawed in several respects.  As the testing data on EHUs clearly demonstrates,

each unit tested to date has a certain level of formaldehyde.[46]  With the exception of a handful of

plaintiffs, individuals lived in but one EHU.  Taking an "average" of the widely ranging

formaldehyde levels to determine some sort of standard exposure for plaintiffs is improper.

Unlike in a workplace environment where industrial hygienists may test for chemical exposures

at various places within a specific work area and average those exposures to provide an

estimated level of exposure for workers moving about in that work area in a given day, EHU

occupants are not moving from unit to unit throughout the day, rather they live in one unit.

Averaging formaldehyde levels in hundreds, or thousands, of EHUs as a method for describing

formaldehyde exposures that class members would have in common is a statistically and

scientifically inaccurate method.  It provides no useful information about the actual

formaldehyde exposure of any plaintiff because the only relevant formaldehyde concentration for

---

[43]     Ex. K-2, Dr. Hewett Dep. at 37; Ex. K-1, Dr. Hewett Aff. at 4, Figures 1 and 3. Figure 1 at page 4 of Dr. Hewett's Affidavit is particularly interesting in that it plots the test results of 976 units, thereby demonstrating graphically the huge variability among the units.

[44]     Ex. V, CDC Data Set.

[45]     Ex. K-1, Dr. Hewett Aff. at 10.

[46]     Ex. K-2, Dr. Hewett Dep. 82:4-14.  A number of EHUs tested showed no detectable level of formaldehyde.

any one plaintiff is the level in his or her own unit.[47]  The Manufacturing Defendants' statistical

expert Dr. Ginevan puts this in proper perspective:

> My first observation is that Hewett's analysis is based on a fundamentally incorrect definition of the problem to be solved.  He is focused on obtaining arithmetic mean (AM) values for different groups of trailers.... Certainly, the AM is well established as a basis for assessing human exposure.  The rationale is that as a person moves around a workplace or an area contaminated by hazardous waste they average their environment.  Thus their exposure is proportional to the arithmetic mean contamination level in the workplace or contaminated area.  Unfortunately, in the case of the trailers, exposure takes place within a single trailer.  That is, a given person lives in a given trailer and his exposure is determined by conditions in that trailer.[48]

Plaintiffs' experts agree with Dr. Ginevan.  Dr. Hewett observes:

> Q      The calculation of the mean exposure does not tell you, does it, what the particular reading or exposure is in a particular trailer at any particular given time; isn't that correct?
>
> A      That is correct.  Unless, of course, for that particular day and that particular time, that particular trailer, the exposure actually is right at the mean.
>
> Q      But in order to know that, as you just stated it, you'd have to test in that trailer at that time on that day, correct?
>
> A.      Yes.  Yes.[49]

Plaintiffs' expert Dr. Smulski observes:

> Q.      Right.  So that the only way that you could ever determine what any individual was ever exposed to is to measure that particular individual unit to see what the level was at the snapshot that that level is being taken
>
> A.      I would agree.  If you want to know what happened to this trailer, you need to measure inside this trailer. If you want to know

---

[47]      Ex. E-2, Dr. Ginevan Dep. at 119:21-22, 120:1-11.

[48]      Ex. E-1, Dr. Ginevan Aff. at 4, See also Ex. E-2, Dr. Ginevan Dep. at 119:21-22, 120:1-11.

[49]      Ex. K-2, Dr. Hewett Dep. at 77:4 – 16.

what happened in that trailer, you need to measure inside that trailer.[50]

Several of Plaintiffs' experts go further and observe that one or even two test results from a given unit are unlikely to provide accurate information about the average formaldehyde levels that might have been experienced by occupants because conditions in the units are so variable.[51]

Plaintiffs' testing expert Marco Kaltofen noted that "there are expected variables that are going to affect the formaldehyde concentrations in a specific unit.  That is what invalidates looking at one test just once for forming some kind of exposure or some statement about formaldehyde other than that snapshot."[52]  The fact that the test data for formaldehyde levels in the EHUs range so widely is yet another example of plaintiff variability which makes certification of the class inappropriate in this case.

The test data differences are driven by numerous variables among the EHUs themselves, including weather conditions such as wind, humidity and temperature, unit orientation, and unit age.[53]  There are demonstrated manufacturer to manufacturer, model to model differences, and unit to unit differences, even where two units are produced by the same manufacturer.[54]  There are also numerous plaintiff lifestyle variables that likely explain the range of test results we see.  A review of the Plaintiff Profile sheets shows that the occupants of each unit lived differently and in way that could impact the formaldehyde levels in the unit or explain their reported

---

[50]     Ex. Q, Dr. Smulski Dep. at 174:2-17.
[51]     Ex. K-2, Dr. Hewett Dep. at 100:3-6, 22 – 25; 101:1-3, 10-21.  "There's variability [in the test results] due to the sampling and analytical method....No sampling and analytical system gets it exactly right....There's going to be variability due to the underlying mechanisms that give rise to exposure,...air conditioning use, temperature, humidity, type of trailer could be a factor, type of manufacturer can be a factor...pets relieving themselves on the carpet...cooking...anything that can generate perhaps formaldehyde itself or influence the exchange – rates of exchange with outside air."
[52]     Ex. L, Kaltofen Dep. at 67:11-23.
[53]     Ex. K-2, Dr. Hewett Dep. at 100:3-6, 21-25; 101:1-3, 10-21.
[54]     Ex. K-2, Dr. Hewett Dep. at 46:16-18, 47:7-18, 48:19-25.

symptoms.  For example, some occupants smoked in their units.[55]  Some opened the windows and used the vents,[56] some did not.[57]  Some had problems with their air conditioning.[58]  Some had mold problems.[59]  Plaintiffs' industrial hygienist expert Mary DeVany described these lifestyle issues as "confounding factors".  Her testing group maintained field data sheets on the tested units noting tobacco use, pets, cleaning materials, chemical compounds, water damage and mold found because these are "items that can cause adverse health effects similar to the acute effects" that various occupants were reporting.[60]  Plaintiffs' expert Dr. Williams agrees that such "confounding factors" impact the formaldehyde levels to which an occupant was exposed.[61]

When Dr. Williams was asked if the formaldehyde exposures of two individuals living in the same unit would differ, she responded, "Yes, two people could have different amounts that are coming in their body..."[62]  Dr. Shellito went even further in agreeing to the extreme variability of formaldehyde effects on a given individual, noting:

> Q      Two twins living at a temporary housing unit, one has the preexisting condition that you've talked about, the other doesn't. Their reaction will be different to the formaldehyde?
>
> A      It will be dictated by – yes, and –
>
> Q      And we'd have to know their histories to know which one had the preexisting condition?
>
> A      Correct.  Correct.

---

[55]      Ex. A-49, Plaintiff Profile Harris, Dep. at 90:20-25; Ex. A-5, Plaintiff Profile Harris, PFS at 12. Ex. S-1, Dr. Williams Aff. at 25, of 1516 plaintiffs whose Fact Sheets Dr. Williams reviewed, 157 reported smoking in their EHUs.

[56]      Ex. A-12, Plaintiff Profiles Beasley, Dep. at 37:14-25, 38:1-10.

[57]      Ex. A-11, Plaintiff Profile Battie, Dep. at 45:18-25, 46:1-13.

[58]      *Id*., Battie, Dep. at 43:19-25, 44:1-6.

[59]      Ex. S-1, Dr. Williams Aff. at 25,  of 1516 plaintiffs whose Fact Sheets Dr. Williams reviewed, 183 reported having mold in their EHUs.

[60]      Ex. J, DeVany Dep. at 129:18-25, 130:1-2.

[61]      Ex. S-2, Dr. Williams Dep. at 77:12-25, 78:1-25.

[62]      Ex. S-2, Dr. Williams Dep. at 78:19-21.

Q        So we'd have to evaluate them each individually?

A        Correct.[63]

As has been discussed above in profiling eight class representatives (Davis, Robinson, Baker, Beasley, Keyes, Culler, Daunoy and Smith), there is a wide range of symptoms reported by the putative class members.  Dr. Patricia Williams performed a "survey" of sorts on self-reported symptoms from a group of 1516 individuals who filled out Plaintiff Fact Sheets.[64]  Dr. Williams counted positive responses by the 1516 individuals to 47 symptoms which she concluded could be formaldehyde related symptoms, and applied percentages to the reporting on those symptoms (*i.e.*, 64.2 % reported tearing of eyes).[65]  Obviously this "survey" is not a scientific study of any kind and would never meet basic *Daubert* requirements of peer review, testability,  rate of error or scientific acceptance.  Dr. Williams did not have information about the medical or social histories of any of the 1516 respondents in her survey.[66]  She had no information on other environmental exposures or medical conditions experienced by any of the 1516 responders.[67]  She did not know when, in the course of residing in a EHU, any of the 1516 individuals developed the symptoms they listed, or whether the symptom was developed in an environment other than inside the EHU itself.[68]  Dr. Williams agrees that the 47 symptoms she

---

[63]        Ex. P, Dr. Shellito Dep. at 53:5-16.

[64]        The Manufacturing Defendants have filed a Motion to Exclude Dr. Williams on the grounds that she is not qualified to render the opinions expressed here, and that her testimony does not meet *Daubert* standards.  This discussion of the survey she performed is submitted in an abundance of caution, in the event the Court does not exclude her testimony altogether.

It should also be noted that although Dr. Williams reviewed these 1516 Fact Sheets and executed her Affidavit referencing her review of those materials on August 21, 2008.  Despite requests for this material, the Manufacturing Defendants still have only 876 Fact Sheets not 1516.

[65]        Ex. S-2, Dr. Williams Dep. at 160:2-4.

[66]        Ex. S-2, Dr. Williams Dep. at 150:25, 151:1-5.  "I never met any of the people .... I don't even know what their names are."

[67]        Ex. S-2, Dr. Williams Dep. at 158: 2-15.

[68]        Ex. S-2, Dr. Williams Dep. at 149:13-25, 150:1-4.

surveyed are "non-specific symptoms for the most part that you may see with other toxicants or with other conditions,"[69] each of which can be caused by things other than formaldehyde.[70]  She did not consider background rates in the general population for the 47 symptoms she surveyed.[71]  Dr. Williams agrees that her survey was not an epidemiological study, that she had no control group to which she could compare the responses of the 1516 individuals.  Her work was a "cross sectional survey of a population to ascertain a profile, a picture, a snapshot."[72]  Plaintiffs' expert Dr. Shellito testified that to determine if any symptom reported by a EHU occupant was related to formaldehyde in that unit would require a complete medical evaluation of the individual.[73]  Of interest also are the close to 100 additional symptoms/medical conditions (in addition to the 47 symptoms in the "survey") that the 1516 respondents included, many of the symptoms/conditions being listed by more than one respondent.[74]  These additional symptoms/conditions range from kidney stones to hysterectomy to diabetes to bleeding ulcer to Sickle Cell Anemia.[75]  Dr. Williams recognizes that many of these reported symptoms and medical conditions are not caused by formaldehyde,[76] however, she made no attempt to determine the extent to which any of these conditions could be the cause of all or any of 47

---

[69]     Ex. S-2, Dr. Williams Dep. at 154:21-23; Ex. P, Dr. Shellito Dep. at 33:5-11.  In addition, Plaintiffs' expert Dr. Shellito testified that there are thousands of known respiratory irritants that can explain such non-specific symptoms.

[70]     Ex. S-2, Dr. Williams Dep. at 102:20-24.

[71]     Ex. S-2, Dr. Williams Dep. at 156: 10-23.

[72]     Ex. S-2, Dr. Williams Dep. at 148:7-17, 151:9-25.

[73]     Ex. P, Dr. Shellito Dep. at 39:19-25, 40:8-16, 44:15-25.

[74]     Ex. S-2, Dr. Williams Dep., Ex. 6, Chart A at 1 to 57.

[75]     Ex. S-2, Dr. Williams Dep. at 140:22-25, 141:1-8, and Ex. 6 to deposition, Chart A at 3, 5, 6, 15.

[76]     Ex. P, Dr. Shellito Dep. at 158:2-25, 159:1-25.  Plaintiffs' expert Dr. Shellito also agreed that numbers of symptoms reported by EHU occupants were not related to formaldehyde exposure in the EHU including loss of consciousness, seizure, blood in urine, kidney problems, miscarriage, abnormal lab tests.

symptoms that the 1516 individuals listed which Dr. Williams finds could be formaldehyde related.

This wide variability in levels of formaldehyde in EHUs and the wide variability in reported symptoms by EHU occupants are highly significant to the issue of class certification because formaldehyde concentration levels in individual EHUs drives the determination of whether any putative class member has experienced any health effect as a result of his or her occupation of a EHU.  As Plaintiffs' expert Dr. Shellito points out, the dose of formaldehyde to which an individual is exposed is critical to a determination of whether any symptom/condition he or she is experiencing is related.

> Q        And the concentration is important to understand the dose an individual might sustain –
>
> A        Correct.
>
> Q        – might receive?
>
> A        Correct.
>
> Q        Is – in your opinion, is formaldehyde and health effects from formaldehyde dose-response related?
>
> A        Yes, they are.[77]

Dr. Shellito notes that the amount of time spent in a unit would impact whether a person exhibited symptoms related to formaldehyde as would a determination whether the individual had a particular sensitivity to formaldehyde.[78]  Dr. Williams agreed that different people have different reactions to different levels of formaldehyde.[79]  In creating her survey of 1516

---

[77]     Ex. P, Dr. Shellito Dep. at 25:13-22.
[78]     Ex. P, Dr. Shellito Dep. at 100:7 -11, 17-22, 102:8-15.
[79]     Ex. S-2, Dr. Williams Dep. at 90:19-22.

occupants' symptoms, Dr. Williams had no information about the formaldehyde levels, if any, to which any of the 1516 respondents were exposed.[80]  Plaintiffs' expert Dr. Stein observed:

> A.      Would you also agree, Doctor, based upon your research, that the reaction to the irritant effects of formaldehyde can vary from person to person?
>
> A.      Yes, ma'am, they can.
>
> Q.      And even if you have two people who have the exact same exposure, their reactions can vary.  Isn't that correct?
>
> A.      That's correct.
>
> Q.      So, the reaction is to – the reaction of any person to formaldehyde is to some extent dependent upon the individual's specific characteristics, correct?
>
> A.      Yes.  I think I said that in my report.  But yes.  It is – it is dependent upon duration of exposure, level of exposure and individual characteristics.  Not everybody is the same.[81]

Dr. Shellito and Dr. Paris testified that the only way to make an analysis of whether a person was experiencing symptoms or medical conditions related to formaldehyde exposure in a EHU would be to make an individual evaluation of that person and that person's environment.[82] Dr. Stein agrees.  "And the bad problem is ... we have a population of 100,000 plus people, and we don't know how much exposure each one of them had.  We don't know the time duration they had that exposure.  We don't know their individual health characteristics, and we have never had a population before that we have subjected to this type of exposure to what everybody considers to be a carcinogen to see what happens to them.  *We plain don't know*."[83]

---

[80]     Ex. S-2, Dr. Williams Dep. at 99:9-13.

[81]     Ex. R-2, Dr. Stein Dep. at 77:15-25, 78:1-7.

[82]     Ex. P, Dr. Shellito Dep. at 166: 12-18, Ex. O, Dr. Paris Dep. at 31:18-24, 32:1-5, 38:14-24.

[83]     Ex. R-2, Dr. Stein Dep. at 106:7-18 (emphasis added).

The vast variability in plaintiffs, their lifestyles, the units they lived in, their employment, medical and personal histories, make certification of this matter as a class inappropriate.

2.      Variability Among FEMA EHUs Provided to the Putative Class.

As discovery in this case has demonstrated, ambient formaldehyde levels vary greatly manufacturer to manufacturer, home to home, and even hour to hour within the same home. Manufactured housing units, park models and travel trailers alike have significant design, manufacture and production differences that make them heterogeneous.[84]  These units vary dramatically in size, configuration, and ventilation system; some were built strictly to HUD construction standards, some were not; some contain formaldehyde health notices and warnings; some did not.  The factors contributing to this substantial variation in formaldehyde levels include types, quantities, age, and storage conditions of construction materials[85], home design and construction methods,[86] length of trailer, number of axles, and frame strength,[87] workmanship and quality of construction,[88] types and quantities of furniture and drapery,[89]

---

[84]      Ex. I, Zieman Aff., ¶¶ 11-12; Ex. Q, Smulski Dep. at 51-52, 58.

[85]      The formaldehyde levels of construction materials differ significantly manufacturer to manufacturer, supplier to supplier, and even batch to batch.  Ex. I, Zieman Affid., ¶ 14.  There are "hundreds, if not thousands" of different composite wood product manufacturers, and these products, as well as their different finishes, off-gas formaldehyde at different rates, creating different formaldehyde levels.  Ex. Q, Dr. Smulski Dep. at 51-52, 58; Ex. D Fribley Aff. at ¶4, Ex. N, Mullet Dep. 34:5-9, 137:12-21.

[86]      The type of ventilation system in manufactured housing units affects air exchange and the level of formaldehyde.  The CMH ventilation system is an integral part of the furnace/HVAC system and exchanges indoor air with outdoor air every time the furnace or air conditioning system is in use.  Alternatively, some manufacturers utilize whole house ventilation systems that exchange air by a manually activated ventilation fan which is not an integral part of the furnace.  There are a number of design variations among manufacturers within these two types of systems.  Ex. I, Zieman Aff., ¶ 16-20.  *Id*., ¶¶ 18-20.

[87]      Ex. N, Mullet Dep. at 106:16-19, 170:2-5, 140:15-15, 141:1-10.

[88]      This varies not only manufacturer to manufacturer, but also from plant to plant among the same manufacturer, and from worker to worker at the same plant.  For example, in sealing duct joints, the workmanship involved in the application of sealant materials affects duct leakage which in turn affects air change rates and ambient formaldehyde levels for each particular home.  Ex. I, Zieman Aff., ¶ 21.

whether residents added or installed their own formaldehyde-emitting materials, such as furniture, carpets, drapery or fabrics,[90] time and condition of home storage,[91] transportation of the home from the plant to the ultimate occupant[92],installation of the home[93], geographic placement of a given home [94], the number and size of air conditioning units,[95] the type of ducting and insulation, [96]usage of the home and occupant lifestyles.[97]  The variations occur not only among manufacturers but also among units of the same type built by the same manufacturer.

---

[89]     *Id.* at ¶ 22.

[90]     *Id.* at ¶ 23.

[91]     The greater the time that passes between construction and occupancy, the lower the ambient formaldehyde level in a given unit.  Ex. I, Zieman Affid., ¶ 24.  Plaintiffs' expert testified that different manufacturers have different distribution methods for their products, and that differing times to reach end-users would "affect the concentration of formaldehyde" inside travel trailers as well.  Ex. Q, Dr. Smulski Dep. at 71.  The "newness" of a home has a "significant effect" on the formaldehyde level inside it.  *Id.* at 155.

[92]     Examples of possible damage during transportation include punctures of the bottom board and racking of the structure affecting envelope sealing.  These issues can directly affect a home's air change rate which in turn affects the ambient formaldehyde level.  Ex. I, Zieman Aff., ¶ 25.

[93]     For instance, the presence or lack of skirting around the home affects a given home's air change rate and in turn, the ambient formaldehyde level.  Ex. I, Zieman Aff., ¶ 26.

[94]     Location can involve differing temperature, humidity, and prevailing wind conditions.  Temperature and humidity affect formaldehyde offgassing rates, and wind conditions affect air change rates all of which affect ambient formaldehyde levels.  Ex. I, Zieman Aff., ¶ 27; *see also* Ex. Q, Dr. Smulski Dep. at 86-87 (stating that the formaldehyde increases at an "exponential rate" as the temperature increases, and that formaldehyde also increases as humidity increases).  Ambient formaldehyde levels will differ depending on a particular home's solar exposure and orientation of the home to the sun.  If a home is shaded by trees, its ambient formaldehyde level will be reduced due to a slower temperature rise curve for formaldehyde-emitting construction materials in the roof and walls.  Further, whether a home is located in an urban or rural setting creates differences.  Formaldehyde is naturally present, to some extent, in the normal environment and in general, is found in higher concentrations in areas where smog is present and where there are large numbers of automobiles and/or factories.  These variations establish the background baseline ambient formaldehyde level which in turn affects the indoor ambient level.  Ex. I, Zieman Aff., ¶ 27-29.

[95]     Ex. N, Mullet Dep. at 60:15-20.

[96]     Ex. I, Zieman Aff. at ¶18, Ex. D Fribley Aff. at ¶7, Ex. Q, Dr. Smulski Dep. at 171:8-17, Ex. N, Mullet Dep. at 60:9-14.

[97]     Ex. Q, Dr. Smulski Dep. at 72-73; Ex. I, Zieman Aff., ¶ 30.  The number of occupants living in a unit can affect the ambient formaldehyde level because humans produce

Each of these manufacturing variables, in turn, determines whether and to what extent an individual plaintiff was exposed to formaldehyde while in his own travel trailer.[98]  Additionally, variables external to the manufacturing processes of the respective manufacturers also distinguish each plaintiff.  The external variables include:  the length of time each respective plaintiff spent in each respective travel trailer;[99] the number of people who spent time in each respective travel trailer;[100] the manner in which the respective travel trailers were installed at each location;[101] the geographic location (topography) and weather conditions (temperature and humidity) where each respective travel trailer was place;[102] the air exchange rate of each respective travel trailer (use of windows and doors);[103] the length of the travel trailers;[104] the

---

moisture increasing the humidity level within the structure which affects formaldehyde off-gassing.  The frequency of showers and baths also affects humidity as does the.  Individualized use of bathroom exhaust fans.  The amount and frequency of cooking  and the individualized use of kitchen exhaust ventilation fans affect air change rates and the humidity level .  Ex. I, Zieman Aff., ¶ 30.  Occupants' preferences for thermostat settings for the HVAC system, and window opening, affect temperature and humidity.  How often occupants enter and exit the home affects air change rates.  Any formaldehyde producing activities by the occupants such as smoking would directly raise ambient formaldehyde levels.  Attention to maintenance issues can significantly affect ambient formaldehyde levels.  For example, the condition of the HVAC filter indirectly affects duct leakage and system run time which in turn affects air change rates and thus, ambient formaldehyde levels.  Also a badly maintained HVAC system may not be able to reach the thermostat set point on hot humid days, thus increasing the temperature which in turn raises the ambient formaldehyde level.  *Id.,* ¶¶ 31-32.

[98]    *See* Ex. I, Zieman Aff. at ¶¶ 16-22; Ex. D, Fribley Aff. at ¶ 13; and Ex. Q, Dr. Smulski Dep. at 155:11-14.

[99]    Ex. N, Mullet Dep. at 77:14-22.

[100]    Ex. I, Zieman Aff. at ¶ 30; Ex. Q, Dr. Smulski Dep. at 105:1-3, 150:13-20; and Ex. N, Mullet Dep. at 116-17:22-1.

[101]    Ex. I, Zieman Aff. at ¶ 26; Ex. D, Fribley Aff. at ¶ 10; and Ex. Q, Dr. Smulski Dep. at 110-11:25-10.

[102]    Ex. I, Zieman Aff. at ¶ 27; Ex. Q, Dr. Smulski Dep. at 83:11-20; 86-87:8-16, 171:8-17; and Ex. N, Mullet Dep. at 116-17:13-4, 124:6-9.

[103]    Ex. I, Zieman Aff. at ¶ 16; Ex. Q, Dr. Smulski Dep. at 86-87:8-16 and Ex. N, Mullet Dep. at 77:4-13.

[104]    Ex. N, Mullet Dep. at 106:16-19, 140-41:15-10.

location and number of axles on the units;[105] frame strength,[106] the number and size of air

conditioning units;[107] the type of ducting system,[108] the type of insulation in the travel trailers;[109]

the component parts used to manufacture the travel trailers;[110] the type and number of composite

wood products used in the manufacture the travel trailers;[111] and the type and manner in which

the travel trailers are sealed (air exchange rates).[112]

Because of the type and number of variant factors found in the EHUs, formaldehyde

levels clearly vary substantially unit to unit.  As Plaintiffs' own expert on travel trailer design

testified, as a result of these factors determining formaldehyde exposure for Plaintiffs will

require an "individual, that is, person-by-person, trailer-by-trailer" approach.[113]

**B.     Medical Background and Overview of Controlling Standards**

      1.     Medical Background

            a.     Formaldehyde – Chemical Properties and Background

Formaldehyde is a chemical composed of carbon and water.  Its chemical formula is

$CH_2O$.  It is a normal constituent of the cells of most life forms, including human beings.  Life

cannot exist without formaldehyde because it is a key component for the biological use of one

carbon units; these one carbon compounds are the building blocks of more complex compounds

---

105      Ex. N, Mullet Dep. at 107:2-5, 140-41:15-10.
106      Ex. N, Mullet Dep. at 107:14-19, 140-41:15-10.
107      Ex. N, Mullet Dep. at 60:15-20.
108      Ex. I, Zieman Aff. at ¶18; Ex. D, Fribley Aff. at ¶ 7; Ex. Q, Dr. Smulski Dep. at 171:8-17; and Ex. N, Mullet Dep. at 60:9-14.
109      Ex. D, Fribley Aff. at ¶ 7; and Ex. N, Mullet Dep. at 60-61:24-1.
110      Ex. D, Fribley Aff. at ¶ 4; and Ex. N, Mullet Dep. at 34:5-9, 137:12-21.
111      Ex. I, Zieman Affidavit at ¶¶ 14 and 22-23; Ex. D, Fribley Affidavit at ¶ 4; Ex. Q, Dr. Smulski Dep. at 55:11-19, 70:16-25, 98:13-21; and Ex. N, Mullet Dep. at 61:2-12, 203:15-19.
112      Ex. I, Zieman Affidavit at ¶ 19; Ex. D, Fribley Affidavit at ¶ 6; and Ex. N, Mullet Dep. at 75:13-18.
113      Ex. Q, Dr. Smulski Dep. at 122.

in both animals and plants.[114]  Formaldehyde is present in the blood of all human beings,[115] and is a measurable constituent of human breath.[116]  And just as formaldehyde is present in every living cell in the human body, so also is formaldehyde naturally present in foods including meats, fish, dairy products, fruits, vegetables, and bread.[117]  Formaldehyde does not accumulate in the environment or in the human body.  In fact, the body's ability to break down formaldehyde is so efficient that even when people are exposed to airborne formaldehyde at levels far higher than were experienced in the FEMA EHUs, no increase in normally occurring blood levels can be detected.[118]

Since formaldehyde was first synthesized in the late 19th Century, it has become one of the most widely used commercial agents in the world.  It is a common chemical feedstock and has many applications in dozens of industries.  No recent enumeration of the total number of persons who have, or have had, occupational exposure to formaldehyde is available.  However, the number is enormous as evidenced by data indicating that in the European Union in the early 1990s, there were about one million persons employed in industries that produced or used formaldehyde.[119]

b.      Formaldehyde – Irritant Properties

Because of the wide use of $CH_2O$, its well known irritant properties, and the exposure of humans to this chemical, there is a large body of investigative work examining the effects of $CH_2O$ on humans as well as a number of animal models.  In general, these studies have demonstrated that $CH_2O$ is a remarkably safe compound at the concentrations to which we are

---

[114]    Ex. G, Dr. Waddell Aff., ¶¶ 5-6; Ex. B, Dr. Cole Aff. at 3.
[115]    Ex. H, Dr. Wedner Aff., ¶ 7.
[116]    Ex. F, Dr. Golden Aff., ¶ 6.
[117]    Ex. G, Dr. Waddell Aff., ¶ 10.
[118]    Ex. F, Dr. Golden Aff., ¶ 6.
[119]    Ex. B, Dr. Cole Aff. at 3-4.

usually exposed and to which the FEMA occupants were exposed.  However, as the 15th Century physician Paracelsus pointed out:  "All things are poisons, there is none that is not; it is dose that separates a poison from a cure."[120]

When humans are exposed to increasing concentrations of $CH_2O$, a variety of irritant symptoms can occur which are dependent upon the ambient concentration of formaldehyde. Formaldehyde has a very characteristic pungent odor which can be detected by most individuals well before irritation occurs.  The concentration at which the odor is detected varies from individual to individual, and the average individual can detect $CH_2O$ at about 0.5-1 part per million ("ppm") (500-1000 parts per billion ("ppb")).[121]  Irritation from formaldehyde is transient, and toxicologists do not consider it an adverse health effect, certainly not a disease or injury.[122]  The medical and scientific literature demonstrate that formaldehyde does not cause any injury at levels below sustained exposure at approximately 4 ppm – which is approximately fifty-two times higher than the average exposure level seen in the Centers for Disease Control ("CDC") study of the 519 EHUs.[123]  It is important to remember that concentrations of 0.5-1 ppm trigger the olfactory apparatus in the nose, *i.e.*, smell.  An individual may enter a room with a low level of $CH_2O$ and detect its characteristic odor, but if that person remains in the room, the odor will eventually no longer be detected.  This process is called "adaptation" and grew out of the ability of vertebrates to both find food and avoid enemies through their sense of smell.  While the formaldehyde is still present, the individual has "gated it out," and the olfactory system is

---

[120]     Ex. H, Dr. Wedner Aff., ¶ 3.
[121]     Ex. H, Dr. Wedner Aff., ¶ 4.
[122]     Ex. G, Dr. Waddell Aff., ¶ 19.
[123]     As discussed more fully below, the 2008 CDC Final Report on its study of 519 EHUs revealed a mean airborne formaldehyde exposure level of 0.077 ppm.  Ex. T, Final Report on Formaldehyde Levels in FEMA-Supplied Trailers, Park Models, and Mobile Homes July 2, 2008 ("CDC Final Report").

now ready for further odor detection, physiologically unhampered by the conflicting odor of formaldehyde.[124]

At sufficient concentrations, exposure to formaldehyde vapor produces symptoms of sensory irritation, *i.e.*, irritation of the eyes, nose, and throat, with eye irritation generally accepted as the most sensitive endpoint.[125]  In the most recent controlled human exposure study of sensory irritation in volunteers exposed to formaldehyde at known concentrations, the authors concluded that:

> [T]he results of the present study indicated eye irritation as the most sensitive parameter.  Minimal objective eye irritation was observed at levels 0.5 ppm with peaks of 1 ppm ....  It was concluded that the no-observed-effect level for subjective and objective eye irritation due to formaldehyde exposure was 0.5 ppm in case of a constant exposure levels and 0.3 ppm with peaks of 0.6 ppm in case of short-term peak exposures.[126]

Putting aside the question of odor perception (shown above to be in the range of 0.5-1 ppm), and putting the conclusions of this 2008 study in a different way, the volunteer subjects of the study exhibited a threshold level of irritation at 0.5 ppm but no effect at all at 0.3 ppm.  In the context of the EHUs studied by the CDC study, only one unit out of the total 519 exceeded the threshold irritation level of 0.5 ppm.  498 of the EHUs in the CDC study were measured at levels less than the no-effect level of 0.3 ppm.  Thus, according to the 2008 volunteer study results, virtually no objective symptoms of sensory irritation to the EHU occupants would be expected at the formaldehyde levels found by the CDC study.[127]  Indeed, it is difficult to reliably determine whether formaldehyde actually causes sensory irritation at levels below about 1 ppm.  This is

---

[124]    Ex. H, Dr. Wedner Aff., ¶¶ 4, 5.
[125]    Ex. F, Dr. Golden Aff., ¶ 8.
[126]    Ex. F, Dr. Golden Aff., ¶ 16 and Ex. U, I. Lang, et al., *Formaldehyde and Chemosensory Irritation in Humans: A Controlled Human Exposure Study*, 50(1) Reg. Toxicol. Pharmacol. 23, 23 -36 (2008) (referenced in Dr. Golden's affidavit).
[127]    Ex. F, Dr. Golden Aff., ¶ 19.

because in many controlled studies in which some people are intentionally exposed to air with formaldehyde levels below 1 ppm and some are exposed to clean air, 20 to 30 per cent of those exposed to clean air will report responses of sensory irritation (*i.e.*, false positives).[128]

> c.    Formaldehyde – The Meaning of Exposure Levels[129]

Plaintiffs' discussion of the purported medical effects of exposure to airborne formaldehyde[130] implies that mere exposure to formaldehyde – regardless of the level of exposure – necessarily means that all of the plaintiffs have suffered injury.  This section will address the medical facts and will demonstrate the fallacy of Plaintiffs' assertions.

> i.    History of the Formaldehyde Issue

Following the Arab oil embargo in 1973, the federal government, through the Department of Housing and Urban Development ("HUD"), determined that it would regulate the manufactured housing industry in order to require more energy efficient manufactured housing. This was accomplished through HUD regulations issued in 1975 that required energy efficiency in the construction of manufactured housing.[131]  Implementation of these regulations significantly reduced the indoor air exchange rates within mobile homes.  In the late 1970s, industry attention was brought to bear on a limited number of formaldehyde odor complaints from residents of manufactured housing which had resulted from the reduced ventilation.

---

[128]    Ex. F, Dr. Golden Aff., ¶ 18

[129]    Plaintiffs' discussion of exposure levels in the context of Minimum Risk Levels ("MRLs") at 29 of Plaintiffs' Memorandum misses the mark.  MRLs are a creation of the Agency for Toxic Substances and Disease Registry ("ATSDR").  They serve no regulatory function.  As defined by the ATSDR, "[t]hese substance-specific estimates, which are *intended to serve as screening* levels, are used by ATSDR health assessors to identify contaminants and potential health effects that may be on concern at hazardous waste sites.  It is important to note that *MRLs are not intended to define clean-up or action levels for ATSDR or other agencies.… Exposure to a level above the MRL does not mean that adverse health effects will occur*" (Emphasis added).  Ex. F, Dr. Golden Aff., ¶ 20.

[130]    Plaintiffs' Memorandum, pp. 25 -34 of 40.

[131]    24 C.F.R. § 3280.1 *et seq.*

Recognizing the irritant properties of formaldehyde vapor, the chemical producers of formaldehyde and the wood products industry worked together and developed wood products (particleboard and hardwood plywood) with reduced formaldehyde emission rates.

ii.     HUD Product and Ambient Air Regulation

At the same time that resin producers and the wood products industry were reducing formaldehyde emissions in their products, HUD, in 1984, issued specific regulations for manufactured housing that mandated that plywood formaldehyde emission rates be limited to 0.2 ppm and particleboard rates be limited to 0.3 ppm with a targeted indoor ambient air level of formaldehyde of 0.4 ppm for mobile homes.[132]  The HUD indoor air target level for formaldehyde of 0.4 ppm for mobile homes is the only federal regulatory pronouncement for the indoor air of a residential dwelling.  This level reflected that, "[t]he Department has concluded that an indoor ambient formaldehyde level of 0.4 ppm provides reasonable protection to manufactured home occupants."[133]  The HUD indoor air target of 0.4 ppm continues in full force and effect today.  The levels reported in the EHUs overall – geometric mean exposure of 0.077 ppm – fall far below 0.4 ppm.[134]

These HUD regulations – which became effective February 11, 1985 – were not limited to product standards for wood products containing formaldehyde.  They also mandated the inclusion of an "Important Health Notice" that would be prominently displayed in a temporary manner in the kitchen (*i.e.*, countertop or exposed cabinet face) of all manufactured housing.

---

[132]     24 C.F.R. 3280.308; 49 Fed. Reg. 31998-99.
[133]     *Id.*
[134]     Ex. T, CDC Final Report; Ex. V, FEMA Trailer Study Data Set for Individual Units ("CDC Data Set").

The "Important Health Notice" requirement remains in full force today.[135]  The notice provides in part:

### IMPORTANT HEALTH NOTICE

> Some of the building materials used in this home emit formaldehyde.  Eye, nose, and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk.  Research is continuing on the possible long-term health effects of exposure to formaldehyde.[136]

All manufactured-housing units that are the subject matter of this litigation contained HUD compliant wood products and the HUD required formaldehyde health notice when they left the hands of the manufactured housing defendants.[137]

On the other hand, the practices of the travel-trailer defendants who are not subject to this regulation varied.  Some of the travel-trailer defendants provided a health notice/warning concerning formaldehyde; some did not.[138]  At least one travel-trailer manufacturer provided formaldehyde warnings both by placing them on the bathroom mirror and by including them in the owner's manual.[139]  Another manufacturer provided a warning in its manual that was located in each EHU.[140]

---

[135]   24 C.F.R. § 3280.309.

[136]   The remainder of the health notice discusses supplemental ventilation, the control of temperature and humidity by air conditioning, and directs the occupants who have any questions regarding the health effects of formaldehyde to consult their doctor or local health department.  The C.F.R. regulation further mandates the size of the notice, requires that the notice be posted until the entire sales transaction has been completed and also mandates that a notice also be included in the consumer's homeowner's manual.

[137]   Federal preemption issues arising from these HUD regulations are beyond the scope of the present motion.

[138]   Ex. D, Fribley Aff., ¶ 8.

[139]   Ex. FF, Farish Dep. at 109;16-24, 110:1-8.

[140]   Ex. HH, Gaeddert Dep. at 103: 3-25; 104-05; 106: 1-3.  The manual page is attached as Ex. DD.

d.      Federal Government Formaldehyde Regulation

Other than the HUD target level of 0.4 ppm, the only regulatory indoor ambient air standard for formaldehyde is the OSHA standard.  OSHA establishes an "Action Level" for formaldehyde of 0.5 ppm with the permissible exposure level ("PEL") time-weighted average ("TWA") of 0.75 ppm with the stipulation that "... no employee is exposed to an airborne concentration of formaldehyde which exceeds 0.75 parts formaldehyde per million of air (0.75 ppm) as an eight hour TWA."[141]

Following Hurricane Katrina on February 1, 2007, the federal government, through the CDC and its subsidiary Agency for Toxic Substances and Disease Registry ("ATSDR"), issued on February 1, 2007 its first Health Consultation.[142]  This health consultation pronounced that 0.3 ppm exposure to formaldehyde is "below the level of concern for sensitive individuals."[143]  Put another way, the CDC represented that exposures below 0.3 ppm presented no level of concern for adverse health effects to individuals.  This 0.3 level is of concentration is approximately four times greater than the mean level of formaldehyde found in the 519 tested CDC units.  Plaintiffs fail to address any of these levels in their brief.

e.      Formaldehyde – Non-Injurious Exposure

As part of their argument,[144] Plaintiffs launch an obfuscated discussion of molecular and cellular damage which they claim might potentiate the development of cancer.[145]  Putting aside

---

[141]      Ex. F, Dr. Golden Aff., ¶ 20.
[142]      *See* Ex. W, CDC Health Consultation, February 2007.
[143]      *Id.* at 2.
[144]      Plaintiffs' Memorandum, pp. 26-27 of 40.
[145]      This "molecular damage" discussion is offered through the Ph.D. testimony of Patricia Williams and her opinions are presently the subject of the Manufacturing Defendants' Motion in Limine to Exclude Expert Testimony of Patricia M. Williams ("Motion to Exclude Dr. Williams"), Rec. doc. 860 (filed November 10, 2008).  At page 26 of Plaintiffs' Memorandum, Plaintiffs state – as though this were permanent injury – that formaldehyde therefore creates protein-to-protein crosslinks, DNA-protein crosslinks, and/or it incorporates into larger

the weak and highly controversial association of formaldehyde as a carcinogen in the first place,

cell injury (cytotoxicity) follows the well established principle that there is a dose response

relationship.  That is, only certain doses can cause cellular injury following sufficient

exposure.[146]  Cytotoxicity and any potential medical sequale do not – and cannot – occur at the

levels found in the FEMA EHUs.  Formaldehyde doses must be sufficient to damage and kill

cells (*i.e.*, cytotoxicity) before this can result in cellular proliferation (growth).[147]  In this

connection, a 2006 publication, critically analyzing voluminous prior data according to EPA's

risk assessment guidelines,[148] concluded that there was an increase in tumor incidence in animal

studies at sustained formaldehyde concentrations for two years equal to and greater than 6 ppm.

The same publication observed that exposure concentrations of 2 ppm and lower induced no

malignant nasal tumors.[149]  There is no evidence in this case that a single exposure to anyone

---

molecules destroying the integrity of these molecules.  Plaintiffs fail to state that their own
expert, Dr. Harry Milman, produced the abstract of an article by Liu entitled *Studies on
Formation and Repair of Formaldehyde-Damaged DNA by Detection of DNA-Protein Crosslinks
and DNA Breaks,* Front Biosci. 2006 (11) 991-7 in which study it was shown that although
sufficient levels of formaldehyde may indeed induce DNA-protein crosslinks (DPC), DPC could
be significantly repaired after eighteen hours and DNA breakages could be repaired completely
within 90 minutes.  Thus, DNA crosslinks, if any, could be nothing more than a transitory effect,
quickly repaired.

[146]   Ex. F, Dr. Golden Aff., ¶ 21.

[147]   *Id.*

[148]   Ex. F, Dr. Golden Aff., ¶ 21.

[149]   Ex. X, McGregor, D., et al., *Formaldehyde and Glutaraldehyde and Nasal
Cytotoxicity: Case Study Within the Context of the 2006 IPCS Human Framework for the
Analysis of Cancer Model of Action for Humans.*  Crit. Rev. Toxicol. 36 (10): 821-35 as cited in
Ex. F, Dr. Golden Aff., ¶ 21.  The cytotoxic levels discussed in McGregor of greater than 2 ppm
appear consistent with the human studies of Boysen and Holstrom reported in Footnote 22 of
Plaintiffs' memorandum.  A detailed analysis of those articles is beyond the scope of this brief
but is here noted in passing.  It is also interesting to note that the primary study relied on by
IARC in concluding that formaldehyde can cause nasopharyngeal cancer is similarly supportive
of this view.  Hauptmann, M. *et al.*, *Mortality from Solid Cancers Among Workers in
Formaldehyde Industries*, Am. J. Epidemiol. 2004; 159:1117-11130.  Although the Hauptmann
report is heavily criticized in the medical literature, the modest excess of deaths reported in that
study only occurred at exposures greater than 4 ppm.

ever reached a level even approaching 2 ppm (sustained over time) – much less 6 ppm, the lowest level at which cellular damage might be expected.

From all of the studies addressing sub-clinical, cellular/cytotoxic insult, the data clearly show that tumors do not occur unless a threshold dose of formaldehyde has been exceeded, and this threshold dose is clearly well in excess of 2 ppm.[150]  The critical take home message from this comprehensive evaluation of the data is that the claim of no threshold, or "no safe level," for formaldehyde exposure is demonstrably incorrect and not supported by any empirical data.[151]

        f.         Formaldehyde – Sensitization/Asthma

Plaintiffs also abstractly pronounce that as a sensitizer, formaldehyde can stimulate the immune system to develop a reaction to the chemical.[152]  What Plaintiffs fail to state is that while it is well-established that formaldehyde in an aqueous solution (formalin) is a recognized immunogen and can cause contact dermatitis in some people, gaseous formaldehyde, the state of formaldehyde at issue here, is not a recognized immunogen.[153]  Notably, the Plaintiffs do not provide any citation to scientific studies demonstrating that exposure to formaldehyde vapor alone is capable of inducing sensitization.

Regarding exposure of small children to formaldehyde in the home setting, recent studies cited by Plaintiffs in their brief have only "suggested" that such ambient exposure "might"

---

[150]    Based on this scientific evidence it is known with certainty that rats exposed to formaldehyde at 2 ppm do not develop nasal tumors.  Since Plaintiffs raise the specter that one molecule of formaldehyde is capable, under the right conditions, of causing cancer, it seems appropriate to contrast a dose of one molecule with the scientifically certain dose of molecules that does not cause cancer in rats.  It is relatively straightforward to calculate that 2 ppm (*i.e.*, 2.5 mg/m3) of formaldehyde contains approximately 5,000,000,000,000,000 ($5 \times 10^{18}$) molecules of formaldehyde.  It is striking that none of the $5 \times 10^{18}$ molecules of formaldehyde to which rats exposed at 2 ppm for two years breathed into their noses managed to find the "right conditions" to initiate the cancer process.

[151]    Ex. F, Dr. Golden Aff., ¶ 21.

[152]    Plaintiffs' Memorandum, p. 27 of 40.

[153]    Ex. H, Dr. Wedner Aff., *passim*.

increase the risk of triggering the onset of a wheezing or asthma episode.  Critically, those studies do *not* find that formaldehyde caused asthma.[154]  Indeed, in these studies, the effect of formaldehyde was minimal and was not statistically significant.  At most, these studies show that $CH_2O$ might have an irritating effect on the airways.[155]

Indeed, the very study principally relied upon by Plaintiffs' Dr. Kenneth Paris, the National Asthma Education and Prevention Program Expert Panel Report, states:

> Formaldehyde and VOCs – which can arise from sources such as new linoleum flooring, synthetic carpeting, particleboard, wall coverings, furniture, and recent painting – have been *implicated* as *potential* risk factors for *the onset of asthma and wheezing.* Clinicians should advise patients to be aware of the *potential irritating effects* of newly installed furnishings and finishes.[156]

In short, the latest medical literature on the subject only suggests that formaldehyde is an irritant that *might* trigger a wheezing or asthmatic episode.  Medical science has not concluded that airborne formaldehyde *will* trigger such episodes or, critically, that it causes asthma.  Correspondingly, once a child – or adult – is removed from the potential irritant (formaldehyde), his previous exposure to the potential irritant has no adverse health effect.

> g.      Formaldehyde – Cancer

Plaintiffs note that formaldehyde "... is a known human carcinogen according to the International Agency for Research on Cancer (IARC) and its 2004 monograph on

---

[154]      With respect to Plaintiffs' representations that gaseous formaldehyde causes asthma, the Manufacturing Defendants refer the Court to the Manufacturing Defendants' Motion to Exclude the Testimony of Dr. Kenneth Paris, Rec. doc. 863 (filed November 10, 2008) ("Motion to Exclude Dr. Paris").

[155]      Ex. H, Dr. Wedner Aff., ¶ 14.  In a paper heavily relied upon by Plaintiffs' Dr. Paris, Garrett, *et al.* conclude: "Low-level exposure to indoor formaldehyde may increase the risk of allergic sensitization to common aeroallergens in children."  Garrett, *et al.*, Increased Risk of Allergy in Children Due to Formaldehyde Exposure in Homes [erratum appears in Allergy 1999 December: 54(12):1327] Allergy.  54(4):330-7, 1999.  As demonstrated in the Motion to Exclude Dr. Paris, a suspected pathogen that might only slightly increase the risk of disease is not legally cognizable.

[156]      Emphasis added, internal citations omitted.

formaldehyde."[157]  IARC, a subsidiary of The World Health Organization, is the only agency in

the world presently known to have found formaldehyde to be a known human carcinogen –

indeed a carcinogen for only one very rare human cancer, *i.e.,* nasopharyngeal cancer, and which

finding is based entirely on occupational exposures, not residential exposures.  No U.S.

regulatory agency has found formaldehyde to be a known human carcinogen.  Because it is

unnecessary at this class certification stage to address the merits of the IARC position, suffice it

to say that medical researchers evaluating the basis of the IARC conclusion have themselves

concluded that the IARC finding is misplaced and no longer supportable by current data.[158]

### III.   BURDEN OF PROOF AND STANDARD OF REVIEW

The party seeking certification bears the burden of establishing each of Rule 23's

requirements.[159]  Each subclass must independently meet all of the requirements of Rule 23.[160]

District courts must conduct a rigorous analysis of the Rule 23 prerequisites before

certifying a class.[161]  When legal and factual merits issues overlap the class certification

requirements, the Fifth Circuit *requires* that this court fully resolve the issues at the class

---

[157]   Plaintiffs' Memorandum, p. 25 of 40.

[158]   Ex. B, Dr. Cole Aff., at 8-11.  The very occupational exposure study principally relied on by IARC finds an SMR for nasopharyngeal cancer to be a most problematic 210, a finding that is not statistically significant – this with exposures greater than 4 ppm (4000 ppb). Indeed, reviewers of the study have concluded that of the 10 plants studied, all of the excess deaths were reported at one plant and their excesses may have arisen by chance, and if not by chance, then the cause of the excess was likely employment in metal industries in the vicinity of the plant.  *Id.*.  Ex. Y, Marsh, G. et al., *Mis-specified and non-robust mortality risk models for nasopharyngeal cancer in the National Cancer Institute formaldehyde worker cohort study,* Regul Toxicol Pharmacol, 47:59-67, 2007.

[159]   *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613-14 (1997); *Gene and Gene LLC v. Biopay LLC,* 541 F.3d 318, 325 (5th Cir. 2008) ("*Gene and Gene*"); *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 737-38 (5th Cir. 2003) ("*O'Sullivan*").

[160]   FED. R. CIV. P. 23(b)(5); *Johnson v. American Credit Co. of Georgia,* 581 F.2d 526, 532 (5th Cir. 1978); *Recinos-Recinos v. Express Forestry, Inc.,* 233 F.R.D. 472 (E.D. La. 2006).

[161]   *Gene and Gene,* 541 F.3d at 325; *O'Sullivan,* 319 F.3d at 738.

certification stage.[162]  District courts must resolve disputes relevant to each Rule 23 requirement, and the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue.[163]

## IV.    STANDING

In *Rivera v. Wyeth-Ayerst Laboratories*,[164] the Fifth Circuit held that standing is an inherent prerequisite to class certification.  Standing must be decided first, because it determines the court's fundamental power to even hear the case.[165]  In *Rivera*, the Fifth Circuit held that the district court committed error by not demanding a showing of standing before it certified the class.[166]

There are three irreducible constitutional minimum elements of standing:  1) the plaintiff must have suffered an injury in fact; 2) there must be a causal connection between the injury and the complained-of conduct of the defendant; 3) it must be likely that the injury will be redressed by a favorable decision.  Plaintiffs bear the burden of establishing each of these elements.[167]

In this case, assuming for the moment that plaintiffs could demonstrate the first and third elements, it is impossible for them to demonstrate the second element as to every state subclass for every defendant.  This is so because many of the EHU manufacturers do not have a class representative for each of the four states.  Out of the approximately 60 manufacturing defendants

---

[162]     *Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007), *cert. denied*, ___ U.S. ____, 128 S.Ct. 1120, 169 L. Ed. 2d 957 (2008), and *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 267 (5th Cir. 2007) ("*Oscar Private Equity*") ("We cannot ignore the *in terrorem* power of certification, continuing to abide the practice of withholding until 'trial' a merit inquiry central to the certification decision, and failing to insist upon a greater showing.").

[163]     *Oscar Private Equity*, 487 F.3d at 268.

[164]     283 F.3d 315, 319 (5th Cir. 2002) ("*Rivera*").

[165]     *Id.*

[166]     *Id.*

[167]     *Id.* at 318.

that have been named, plaintiffs do not begin to have a class representative for each defendant in every state.  Their most successful effort was in Louisiana – and even there at least fifteen defendants have no class representative identified.  For a potential Alabama subclass, there are 39 defendants that have not been matched to any class representative; in Texas, 38 defendants; and in Mississippi, 27 defendants.  Specifically, the following table shows the names of the manufacturers who have no class representative occupying a trailer in the state indicated:

| STATE | NO CLASS REPRESENTATIVE FOR THESE MANUFACTURERS |
|---|---|
| Alabama | 1. Cavalier Home Builders, L.L.C.<br>2. Champion Home Builders Co.<br>3. CMH<br>4. Coachmen Recreational Vehicle Company of Georgia, L.L.C.<br>5. Coachmen Recreational Vehicle Company, L.L.C.<br>6. Destiny Industries, LLC<br>7. DS Corporation (d/b/a CrossRoads RV)<br>8. Dutchmen Manufacturing, Inc.<br>9. Fleetwood (no class representative for MH)<br>10. Frontier RV, Inc.<br>11. Giles<br>12. Gulf Stream Coach, Inc.<br>13. Homes of Merit, Inc.<br>14. Horton Homes<br>15. Jayco, Inc.<br>16. Keystone RV Company<br>17. KZ RV, LP<br>18. Layton Homes Corporation<br>19. Liberty Homes, Inc.<br>20. Monaco Coach Corporation<br>21. Oak Creek Homes, LP<br>22. Palm Harbor Homes<br>23. Patriot Manufacturing, Inc. and Patriot Homes of Texas, L.P.<br>24. Pilgrim International, Inc.<br>25. Recreation By Design, LLC<br>26. Redman Homes, Inc., individually and f/k/a Dutch Housing, Inc.<br>27. River Birch Homes, Inc.<br>28. R-Vision, Inc.<br>29. ScotBilt Homes, Inc.<br>30. Silver Creek Homes, Inc. (neither MH nor TT)<br>31. Skyline Corporation (neither MH nor TT)<br>32. Southern Energy Homes |

| STATE | NO CLASS REPRESENTATIVE FOR THESE MANUFACTURERS |
| --- | --- |
| | 33. Starcraft RV, Inc.<br>34. Sunray<br>35. Thor California<br>36. TL Industries, Inc.<br>37. Vanguard Industries<br>38. Viking Recreational Vehicle Company, L.L.C.<br>39. Waverlee Homes, Inc. |
| Louisiana | 1.  Cavalier Home Builders, L.L.C.<br>2.  Champion Home Builders Co.<br>3.  Coachmen Recreational Vehicle Company of Georgia, L.L.C.<br>4.  Destiny Industries, LLC<br>5.  Fleetwood (no class representative for MH)<br>6.  Homes of Merit, Inc.<br>7.  Liberty Homes, Inc.<br>8.  Palm Harbor Homes<br>9.  River Birch Homes, Inc.<br>10. R-Vision, Inc.<br>11. ScotBilt Homes, Inc.<br>12. Silver Creek Homes, Inc. (no class representative for TT)<br>13. Skyline Corporation (no class representative for MH)<br>14. Viking Recreational Vehicle Company L.L.C.<br>15. Waverlee Homes, Inc. |
| Mississippi | 1.  Cavalier Home Builders, L.L.C.<br>2.  Champion Home Builders Co.<br>3.  CMH<br>4.  Coachmen Recreational Vehicle Company of Georgia, L.L.C.<br>5.  Coachmen Recreational Vehicle Company, L.L.C.<br>6.  DS Corporation (d/b/a CrossRoads RV)<br>7.  Fleetwood (neither TT nor MH)<br>8.  Frontier RV, Inc.<br>9.  Giles<br>10. Horton Homes<br>11. Jayco, Inc.<br>12. KZ RV, LP<br>13. Layton Homes Corporation<br>14. Monaco Coach Corporation<br>15. Oak Creek Homes, LP<br>16. Patriot Manufacturing, Inc. and Patriot Homes of Texas, L.P.<br>17. Pilgrim International, Inc.<br>18. Recreation By Design, LLC<br>19. R-Vision, Inc.<br>20. Silver Creek Homes, Inc. (neither TT nor MH)<br>21. Skyline Corporation (neither TT nor MH)<br>22. Southern Energy Homes |

| STATE | NO CLASS REPRESENTATIVE FOR THESE MANUFACTURERS |
|---|---|
| | 23. Starcraft RV, Inc. |
| | 24. SunRay |
| | 25. TL Industries, Inc. |
| | 26. Vanguard Industries |
| | 27. Viking Recreational Vehicle Company L.L.C. |
| Texas | 1.  Cavalier Home Builders, L.L.C. |
| | 2.  Champion Home Builders Co. |
| | 3.  CMH |
| | 4.  Coachmen Recreational Vehicle Company of Georgia, L.L.C. |
| | 5.  Coachmen Recreational Vehicle Company, L.L.C. |
| | 6.  Destiny Industries, LLC |
| | 7.  DS Corporation (d/b/a CrossRoads RV) |
| | 8.  Fleetwood (neither TT or MH) |
| | 9.  Forest River (neither TT nor MH) |
| | 10. Frontier RV, Inc. |
| | 11. Giles |
| | 12. Homes of Merit, Inc. |
| | 13. Horton Homes |
| | 14. Jayco, Inc. |
| | 15. Keystone RV Company |
| | 16. KZ RV, LP |
| | 17. Layton Homes Corporation |
| | 18. Liberty Homes, Inc. |
| | 19. Monaco Coach Corporation |
| | 20. Oak Creek Homes, LP |
| | 21. Palm Harbor Homes |
| | 22. Patriot Manufacturing, Inc. and Patriot Homes of Texas, L.P. |
| | 23. Pilgrim International, Inc. |
| | 24. Recreation By Design, LLC |
| | 25. Redman Homes, Inc., individually and f/k/a Dutch Housing, Inc. |
| | 26. River Birch Homes, Inc. |
| | 27. R-Vision, Inc. |
| | 28. ScotBilt Homes, Inc. |
| | 29. Silver Creek Homes, Inc. (neither TT nor MH) |
| | 30. Skyline Corporation (neither TT nor MH) |
| | 31. Southern Energy Homes |
| | 32. Starcraft RV, Inc. |
| | 33. SunRay |
| | 34. Thor California |
| | 35. TL Industries, Inc. |
| | 36. Vanguard Industries |
| | 37. Viking Recreational Vehicle Company L.L.C. |
| | 38. Waverlee Homes, Inc. |

Clearly, for example, because no class representative occupied a Fleetwood manufactured housing unit or travel trailer in Mississippi, the class representatives who lived in other manufacturers' EHUs in Mississippi have no standing to sue Fleetwood for the Mississippi subclass.  Fleetwood cannot possibly have caused an injury to any class representative in Mississippi because none lived in a Fleetwood EHU.  Thus, the second element of standing – the potential for a causal connection – is missing as to Fleetwood for the Mississippi subclass and Fleetwood should be dismissed from that subclass.

The Manufacturing Defendants ask that this Court determine the standing issue as a prerequisite to class certification and dismiss all of the manufacturers listed in the table above from their respective state subclasses.

## V.      CLASS DEFINITION

The Fifth Circuit recently held:  "The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23."[168]

Plaintiffs now define four of their subclasses as:

> All individuals who resided for any length of time in emergency housing units provided by FEMA within [applicable state] after Hurricanes Katrina and/or Rita, and who sustained damages recoverable under [applicable state law] as a result of exposure to formaldehyde in these units.[169]

Because the definition is limited to individuals who sustained damages recoverable under state law due to formaldehyde exposure, ascertaining class membership in Plaintiffs' proposed class requires an individualized inquiry, with a mini-trial necessary for each proposed class

---

[168]     *John v. Nat'l Security Fire & Casualty Co.,* 501 F. 3d 443, 445 (5th Cir. 2007); *see also DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (citations omitted) ("It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.").

[169]     Plaintiffs' Memorandum, p. 4 of 40.

member to make the causation/damages determination.  When a class definition requires a mini-trial or administrative burden to determine each person's class membership, class certification should be denied.[170]

The factual background of the class representatives' cases reflect this individualized inquiry necessary for causation and damages.  For example, one class representative, Sylvia Keyes, claims chest pain as a result of formaldehyde exposure.  Yet she was stabbed in the chest prior to Katrina.[171]  Was Keyes damaged "as a result of exposure to formaldehyde" or for some other reason?  Another class representative, Nicole Esposito, claims abdominal pain and nausea as a result of formaldehyde exposure, but was pregnant at the time.[172]  Was Esposito's problem caused by formaldehyde or by her pregnancy?  Yet another class representative, Amaris McGallion, claims skin irritations, rashes and drying/scaling of the skin due to formaldehyde exposure, yet he also suffers from psoriasis.[173]  The cause of McGallon's skin problems would be an area of obvious dispute.  In each of these cases, it is impossible to determine whether the person is a member of the class without resolving an individual medical issue in a mini-trial.

---

[170]    *See, e.g., Middleton v. Arledge*, No. CIV.A. 3:06-CV-303WH, 2008 WL 906525, *9-10 (S.D. Miss. Mar. 31, 2008) (class certification denied in part because of the administrative burden created by a factual and legal review of each purported class member's claims to determine class membership); *In re Vioxx Prods. Liab. Litig.*, No. MDL 1657, 2008 WL 4681368, *10 (E.D. La. Oct. 21, 2008) (Fallon, J.) ("*In re Vioxx 2008*"); *Perez v. Metabolife Intern., Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003) ("[a] court should deny class certification where the ... number of individualized determinations required to determine class membership becomes too administratively difficult."); *Fisher v. CIBA Specialty Chems. Corp.*, 238 F.R.D. 273, 301 (S.D. Ala. 2006) ("[a] court should deny class certification … where the number of individualized determinations required to determine class membership becomes too administratively difficult") (citations omitted); *Crosby v. Social Sec. Admin.*, 796 F. 2d 576, 580 (1st Cir. 1986) (certification improper because class members were "impossible to identify prior to individualized fact-finding and litigation").

[171]    Ex. A-55, Plaintiff Profile Keyes, Dep. at 30:23 – 31:21.

[172]    Ex. A-33, Plaintiff Profile Esposito, PFS at 3, 12.

[173]    Ex. A-67, Plaintiff Profile McGallion, PFS at 3-4.

The necessity of a highly individualized inquiry and mini-trial to determine class membership makes the state subclass definitions inadequate as a matter of law.[174]

## VI.     RULE 23(B)(3) PREDOMINANCE AND SUPERIORITY

### A.     Plaintiffs Cannot Show Predominance

1.       The Predominance Standard under Rule 23(b)(3).

Plaintiffs are seeking damages for alleged personal injuries for the four state subclasses. The very nature of a personal injury case is that it is *personal* – the alleged injuries and causation issues vary from person to person.  Any member of the proposed class is a poor representative of any other member, because the individualized issues overwhelm any reason for class certification that Plaintiffs have proffered.  Plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members,

---

[174]      Further, Plaintiffs' proposed class definition conditions class membership on a conclusion on the merits – whether a purported class member sustained damages under applicable state law as a result of exposure to formaldehyde.  It is hornbook law that a class definition must not require an inquiry into the merits to determine class membership.  2 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 6:14 (4th ed. 2008) ("Definitions, particularly under (b)(3), should avoid criteria ... that depend on the merits (e.g., persons who where discriminated against).  Such definitions frustrate efforts to identify class members, contravene the policy against considering the merits of a claim in deciding whether to certify a class, and create potential problems of manageability."); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.222 (2004) ("The order defining the class should avoid ... terms that depend on resolution of the merits.").  Plaintiffs themselves recognize this basic tenet of class action law.  Plaintiffs' Memorandum, pps. 5-6 of 40 ("Proposed class definitions should be 'precise, objective, and presently ascertainable.'  They should not depend on subjective criteria or on the merits of the case, or require extensive factual inquiry to determine inclusion in the class.").  Such a definition defeats class certification.  *See e.g., Barasich v. Shell Pipeline Co*., No. 05-4180, 2008 U.S. Dist. LEXIS 47474 at *10 n. 4 (E.D. La. 2008) (rejecting a "fail-safe" class definition of all commercial oystermen whose oyster leases were contaminated by oil as a result of the negligence of the defendant); *In re Vioxx 2008*, at *10 (denying class certification where proposed class definition required an individualized inquiry into the merits); *Jones v. Nat'l Security Fire & Casualty Co.,* No. 06-1407, 2006 WL 3228409, *4 (W.D. La. Nov. 3, 2006), *aff'd*, 501 F.3d 443 (5th Cir. 2007) (same).

and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[175]

Rule 23(b)(3) presents two primary issues: predominance and superiority.  The text of the Rule presupposes that there are "questions of law or fact common to the members of the class." Yet the mere existence of common issues does not mean that class certification is appropriate. The predominance test is "far more demanding" than the commonality test.[176]  "To predominate, common issues must form a significant part of individual cases."[177]

This Circuit has recognized that the certification of mass tort litigation is disfavored.[178] Historically, other courts have also noted that there are "inherent obstacles to personal injury class actions."[179]  "Particularly in products liability actions individual issues may outnumber common issues.  No single happening or accident occurs to cause similar types of physical harm or property damage.  No one set of operative facts establishes liability.  No single proximate cause applies equally to each potential class member and each defendant."[180]  "These factual differences translate into significant legal differences."[181]

### 2.     Individual Issues Predominate

As a proposed class, the Plaintiffs seek recovery from all manufacturers of any "FEMA-provided housing unit" – despite the fact that each plaintiff could only reside in one

---

[175]     FED. R. CIV. P. 23(b)(3).

[176]     *Unger v. Amedisys Inc.,* 401 F.3d 316, 320 (5th Cir.2005), citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623-24, 117 S.Ct. 2231, 2249-50, 138 L.Ed.2d 689 (1997).

[177]     *In re Vioxx 2006*, 239 F.R.D. at 460, citing *Mullen v. Treasure* Chest *Casino, LLC,* 186 F.3d 620, 626 (5th Cir.1999).

[178]     *Castano*, 84 F.3d at 746.

[179]     *In re Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982) (citing cases).

[180]     *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 628 (3rd Cir. 1996), *aff'd sub nom*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) (quoting *A.J. Robins Co., Inc. v. Abed*, 459 U.S. 1171 (1983)).

[181]     *Id.* at 627.

manufacturer's housing unit at a time.  No manufacturer can be held liable for a product it did not manufacture.  Additionally, the record in this case clearly demonstrates that significant differences exist in these units, manufacturer to manufacturer and even unit to unit, manufactured by the same company.  Those differences include specifications for the unit, quantity of any materials containing formaldehyde, quantity of formaldehyde in those materials, suppliers used, distribution of products, manufacturing processes.[182]

In the *In re Vioxx* MDL handled by Judge Fallon of this Court, even with a *single* product from a *single* drug-maker, manufactured under controlled laboratory conditions, with a known prescribed dosage for each plaintiff, and with alleged damages essentially limited to heart attack and stroke, the issues among proposed class members were so distinct that Judge Fallon denied class certification.[183]

This case presents a far worse candidate than *In re Vioxx* for certification, with hundreds of models of trailers, produced by 64 different manufacturers,[184] with orders-of-magnitude variation in the CDC-reported ambient air levels even within a single manufacturer's units and even among units tested by Plaintiffs,[185] and many variations within individual manufacturers in the composition of their trailers.  As Plaintiffs' wood-products expert Dr. Stephen Smulski admitted, "[C]ommonsense tells me that each manufacturer produces a different product by a

---

[182]    Ex. I, Zieman Aff., at ¶¶ 16 -30; Ex. D, Fribley Aff. at ¶¶ 7, 13; Ex. N, Mullet Dep. at 75:13-18.

[183]    *In re Vioxx 2006*, 239 F.R.D. at 463.

[184]    Different manufacturers have different models with different wood products with different finishes and different formaldehyde levels bought from different suppliers.  Ex. Q, Dr. Smulski Dep. at 50:15-18, 51:6-25, 52:8-12, 55:11-19, 58:15-25, 59:1-9, 70:20-25, 71:1-20, 72:8-10, 95:8-11, 98:7-21; Ex. N, Mullet Dep. at 34:5-9, 60:9 – 61:8, 137:12-21, 203:9-24.

[185]    Ex. E-2, Dr. Ginevan Dep. at 49:19 – 50:2, "[T]here is a very large amount of variability among trailers, I mean, in orders of magnitude.  So we know that the formaldehyde levels across trailers certainly vary a lot."  "[H]e's got a very, very large range of measured concentrations, and it's not honest – I don't honestly, you know, think that – estimating a mean, estimating an average is just – it doesn't make variability go away.  That's the real problem."

different method using different workers in different plants, different raw materials, different models, different brands, et cetera."[186]  Those issues are multiplied when the Court considers the laundry list of almost 50 allegedly formaldehyde related symptoms, each and every one of which can be caused by things other than formaldehyde.[187]  Each person is different, reacts differently to formaldehyde, and must be examined separately to determine what symptoms, if any, result from exposure to formaldehyde versus one of the many other potential causes.[188]  The lack of predominant common legal and factual issues is further made evident by the fact that the formaldehyde that allegedly renders the trailers "unreasonably dangerous" is ubiquitous in the air in nature,[189] in urban areas and in indoor environments; is produced in large quantities by the human body as a natural and necessary part of human metabolism,[190] and is also found in countless consumer products such as shampoo, toothpaste, cleaning products, carpet, and permanent-press clothing; and is a byproduct of combustion, ranging from fireplaces to smoking to stovetop cooking.  The Fifth Circuit explained its ubiquity:

> Formaldehyde is a colorless gas composed of carbon, hydrogen and oxygen.  It is present in every cell in the human body and in the atmosphere.  Formaldehyde has been in widespread commercial use for almost a century … according to the industry,

---

[186]  Ex. Q, Dr. Smulski Dep. at 70:20-25.

[187]  This is acknowledged by Plaintiffs' experts.  Ex. S-2, Dr. Williams Dep. at 102:20-24; 154:21-23; Ex. R-2, Dr. Stein Dep. at 78:18-23.

[188]  Ex. P, Dr. Shellito Dep. at 33:5-11.  Plaintiffs' expert Dr. Shellito testified that there are thousands of known respiratory irritants that can explain such non-specific symptoms. *See also* Ex. R-2, Dr. Stein Dep. at 74:6 – 80:16, 183:13 – 185:7; Ex. S-2, Dr. Williams Dep. at 90:7-22, 167:3-20.

[189]  Ex. S-2, Dr. Williams Dep. 67:3 – 68:23.

[190]  Ex. S-1, Dr. Williams Aff. at Section 3.0.  According to Dr. Williams, human blood normally has approximately 2-3 micrograms of formaldehyde per gram of blood, equivalent to 2-3 parts per million or 2000-3000 parts per billion.  Ex. S-2, Dr. Williams Dep. at 76:14-22.  Inhalation of formaldehyde does not raise the natural blood level of formaldehyde.  *Id.* at 75:20 – 76:9; Ex. S-1, Dr. Williams Aff. at Section 3.0.  Formaldehyde molecules in ambient air are identical to the formaldehyde molecules produced by the human body, with the same allegedly toxic properties.  Ex. S-2, Dr. Williams Dep. at 286:4 – 289:25.

> formaldehyde is a component of products aggregating 8% of this country's Gross National Product ....  Such products as shampoo, toothpaste, cosmetics, and paper towels also contain formaldehyde.[191]

There are no common issues as to the Plaintiffs themselves – each one has allegedly suffered an individual physical injury.  Judge Fallon recently opined, "The United States Court of Appeals for the Fifth Circuit has recently stated that certification is inappropriate where each plaintiff's claim 'will be highly individualized with respect to proximate causation, including individual issues of exposure, susceptibility to illness, and types of physical injuries.'"[192]  As the court noted, "one set of operative facts would not establish liability and … the end result would be a series of individual mini-trials which the predominance requirement is intended to prevent."[193]  The Plaintiffs' claims in this case that Vioxx proximately caused their injuries are no different; they are highly individualized and inappropriate for classwide adjudication."[194]

3.      Variability of the Putative Class – the Plaintiffs and their FEMA provided EHUs.

a.      Plaintiff variability

The record in this case demonstrates significant variability among Plaintiffs which impact whether, and the extent to which, any plaintiff was exposed to formaldehyde; and whether, and the extent to which, any plaintiff experienced health effects as a result of formaldehyde exposure.  These variations have been discussed in detail *supra*, at pages 14 to 26.

To summarize, individual plaintiffs vary by age, gender, personal and family medical history, school, work and social environments, and personal lifestyle patterns such as keeping pets, smoking, and cooking patterns.  Plaintiffs' potential formaldehyde exposure and any health

---

[191]      *Gulf South Insulation v. U.S. Consumer Products Safety Commission*, 701 F.2d 1137, 1140 (5th Cir. 1983).

[192]      *Steering Committee*, 461 F.3d at 602.

[193]      *Id.* at 602.

[194]      *In re Vioxx 2006*, at 461.

effects allegedly related thereto vary by which EHU the plaintiff lived in; the type of unit, the manufacturer of the unit, how the unit was set up, and where the unit was set up.  There is also great variability in the amount of time each plaintiff occupied his or her EHU and the number of hours per day, and which hours a day, he or she spent inside the EHU, dependent on each individual's work, school, and other activities.  There is great variability in each plaintiff's habits with regard to use of heating, air conditioning, and window or door use.[195]

Equally important in this action is each plaintiff's exposure to environmental factors including exposure to sources of formaldehyde unrelated to the EHUs, exposure to irritants or pathogens such as air pollution, pesticides, pet dander, cleaning agents, mold, bacteria and viruses, any of which could explain all or some of the physical symptoms and medical conditions claimed by the Plaintiffs.  The Plaintiffs have varying employment, school and other activity histories which may well explain their complaints.  Many Plaintiffs are current and/or past smokers, or lived in units with smokers.[196]

The personal injury claims among the Plaintiffs vary greatly.  These range from alleged present injury to fear of future injury, from chronic disease to irritation, from new injury to exacerbation of a preexisting condition, from physical injury to emotional distress, from particularized sensitivity claims by children to miscarriages to brain tumors.  Many Plaintiffs are also seeking purely economic damages in the form of medical expenses, lost wages, and under a theory of entitlement to lost housing subsidy.[197]

b.  FEMA EHUs Variability

The EHUs provided by FEMA varied in manufacturer, make, and model as has been discussed in detail *supra*, at pages 26 through 29.  The variability of travel trailers, affecting the

---

[195]     *See generally* Exs. A-1 – A-94, Plaintiff Profiles.
[196]     *Id.*
[197]     *Id.*

formaldehyde levels and consequently Plaintiffs' degree of exposure to and health effects from such exposure, overwhelm any claim of predominant factual or legal issues.  These factors include both factors internal to the manufacturing process and factors external to the manufacturing process.  In both instances, the factors determine the level of formaldehyde exposure experienced by each individual Plaintiff.  In turn, the level of formaldehyde exposure is a primary factor in determining whether a Plaintiff has been harmed.  Distilled to its core, the individual issues presented predominate any claim of common issues.

There were significant differences in the design, manufacture and production of these units – manufacturer to manufacturer and even unit to unit, among models produced by the same manufacturer.  This variability makes every plaintiff's exposure to formaldehyde unique and defeats class certification here.[198]  These differences include types, quantities, age, and storage conditions of construction materials,[199] home design and construction methods,[200] workmanship and quality of construction,[201] types and quantities of furniture and drapery,[202] whether residents added or installed their own formaldehyde-emitting materials, such as furniture, carpets, drapery or fabrics,[203] time and condition of home storage,[204] transportation of the home from the plant to the ultimate occupant,[205] installation of the home,[206] geographic placement of a given home,[207]

---

[198]     Ex. I, Zieman Aff., at ¶¶ 11-12; Ex. Q, Dr. Smulski Dep. at 51:6 – 52:12, 58:15-25.

[199]     *Id.* at ¶¶ 14-15; Ex. D, Fribley Aff., at ¶ 13; Ex. Q, Dr. Smulski Dep. at 51:6 – 52:12, 58:15-25.

[200]     Ex. I, Zieman Aff. at ¶ 16-20, ¶¶ 18-20.

[201]     *Id.* at ¶ 21.

[202]     *Id.* at ¶ 22.

[203]     *Id.* at ¶ 23.

[204]     *Id.* at ¶ 24; Ex. Q, Dr. Smulski Dep. at 71, 155.

[205]     Ex. I, Zieman Aff., at ¶ 25.

[206]     *Id.*  at ¶ 26.

[207]     *Id.* at ¶¶ 27- 29; *see also* Ex. Q, Dr. Smulski Dep. at 86-87.

usage of the home and occupant lifestyles.[208]  Because of the type and number of variant factors

found in the EHUs, formaldehyde levels clearly vary substantially unit to unit, affecting any

potential health effects in the occupants.  As a result, determining formaldehyde exposure for

individual Plaintiffs will require an "individual, that is, person-by-person, trailer-by-trailer"

approach.[209]

       4.      Law of Predominance as it Relates to Claims of The Putative Class.

       "The predominance requirement of Rule 23(b)(3), though redolent of the commonality

requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes

are sufficiently cohesive to warrant adjudication by representation.'"[210]

       Courts have previously refused to certify a class action alleging formaldehyde exposure

in mobile homes because the case presented issues that "will inevitably involve numerous

individualized factual inquiries."[211]  In *Brummett v. Skyline Corp.*, the district court recognized

that there are numerous environmental factors that affect the amount of formaldehyde gas

released into the air.[212]  Moreover, the health effects of formaldehyde will vary depending on the

individual characteristics of a particular mobile home.[213]  The court rejected the Plaintiffs'

contention that "the mere presence of formaldehyde supports liability" as defying reality.[214]  The

court found that "individual questions concerning causation would nullify the usefulness of a

---

[208]    Ex. Q, Dr. Smulski Dep. at 72-73; Ex. I, Zieman Aff., at ¶¶ 30-32.

[209]    Ex. Q, Dr. Smulski Dep. at 122.

[210]    *Gene and Gene*, 541 F.3d at 326 (citations omitted); *Unger v. Amedisys Inc.,* 401 F.3d 316, 320 (5th Cir.2005); *In re Vioxx 2006*, 239 F.R.D. at 460-61.

[211]    *Brummett v. Skyline Corp.*, No. C 81-0103-L(B), 1985 U.S. Dist. LEXIS 19264, at *25 (W.D. Ky. June 3, 1985) (denying certification in a purported formaldehyde mobile home class action even where claims were limited to property damages); *see also Pearl v. Allied Corp.*, 102 F.R.D. 921 (E.D. Pa. 1984) (denying class certification in mobile home formaldehyde case); *Kuhn v. Skyline Corp.*, No. 83-0942, 1984 WL 62775, *7 (M.D. Pa. Aug. 3, 1984) (same).

[212]    1985 U.S. Dist. LEXIS 19264, at *25.

[213]    *Id.*

[214]    *Id.*

class action" and that the common questions do not predominate, precluding class certification.[215]

The Fifth Circuit has used this reasoning in denying other personal injury class actions. In *Steering Committee v. Exxon Mobil Corp.*[216], the Court affirmed the denial of a class action arising out of a fire at the defendant's facility.[217] The Plaintiffs argued that issues relating to the defendant's liability relating to the single incident at the plant predominated over individual issues of causation and damages.[218] But, the Fifth Circuit noted that "each individual plaintiff suffered different alleged periods and magnitudes of exposure and suffered different alleged symptoms as a result."[219] The district court concluded that "one set of operative facts would not establish liability and that the end result would be a series of individual mini-trials which the predominance requirement is intended to prevent."[220] Moreover, the damages for each Plaintiff had to be determined subjectively and not on a class-wide basis.[221] The district court did not abuse its discretion in denying class certification.[222] Critically, this case is not a single-disaster mass tort, but rather a complex product liability action where the factual and legal issues differ from individual to individual.[223]

In the Vioxx cases, Judge Fallon explained that the substantial issues of specific causation overwhelmed any issues of general causation, stating that the proposed trial of

---

[215]    *Id.* *26-27.

[216]    *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006) ("*Steering Committee*").

[217]    *Id.* at 605.

[218]    *Id.* at 602.

[219]    *Id.*

[220]    *Id.*

[221]    *Id.*

[222]    *Id.* at 604.

[223]    *Cf. In re Phenylpropanolamine (ppa) Prods. Liab. Litig.*, 211 F.R.D. 435, 440 (D. Wash. 2002) (distinguishing a "typical" mass tort from a *pharmaceutical* product liability action in which individual questions exist).

common issues "does not…eliminate the highly individualized inquiry of whether Vioxx specifically caused the injury alleged by each plaintiff in light of his or her medical history, family history, other risk factors, and use of the drug."[224]

Judge Fallon cited a commentator in explaining that "Resolution of general causation is unlikely to affect the course of this litigation.":

> "Mass trials on the issue of "general" causation create substantial savings only when plaintiffs lose because this leads immediately to the dismissal of large numbers of mass tort claims, as the Bendectin case illustrates. Rarely, however, will a mass trial lead to the prompt entry of judgment in favor of a large group of plaintiffs against one or more defendants because even if the first jury finds, for example, that the defendant's product could have caused the plaintiff's injury, individual trials will still be necessary to determine specific causation, whether any affirmative defenses are available to the defendant, and the extent of the plaintiff's damages. Little or no time and expense will be saved in these individual trials by virtue of the preceding mass trial on general causation."[225]

Judge Fallon distinguished mass-accident cases – even there, certification is only occasionally appropriate – and concluded that "The number, uniqueness, singularity, and complexity of the factual scenarios surrounding each case swamp any predominating issues."[226]

This same reasoning has been applied in property damage and insurance coverage cases arising out of Hurricanes Katrina and Rita.  In *Henry*, the Plaintiffs brought class action allegations against one defendant insurer for using a software package that undervalued claims of property damage resulting from the hurricanes.[227]  The district court granted the defendant's

---

[224]     *In re Vioxx 2006*, 239 F.R.D. at 462.
[225]     *In re Vioxx 2006*, 239 F.R.D. at 462 (citation omitted).
[226]     *Id.*, at 462-63.
[227]     *Henry v. Allstate Ins. Co.*, No. 07-1738, 2007 WL 2287817, at *1 (E.D.La. Aug. 8, 2007).

motion to strike[228] the class allegations, finding that predominance could not be shown.  Citing

other district court cases, the Court held that:

> [P]roving a questionable pattern and practice of undervaluing
> claims will require an intensive review of the individual facts of
> each member's damage claim, including the nature and extent of
> damage, the timing and adjustment of each class member's claim,
> how much each class member was paid for his claim and for what
> damage, and whether that amount was sufficient and timely.  On
> the face of the pleading, it is clear that those individualized and
> highly personal issues pertaining to each class member patently
> overwhelm any arguably common issues, rendering the claims
> inappropriate for class treatment.[229]

The predominance requirement "is the test of cohesion, and it is demanding.  To

predominate, common issues must form a significant part of individual issues."[230]

The Fifth Circuit analyzed similar issues with respect to cigarettes, holding in the

*Castano* case:

> We find it difficult to fathom how common issues could
> predominate in this case when variations in state law are
> thoroughly considered ....  The Castano *class* suffers from many of
> the difficulties that the *Georgine* [*Georgine v. Amchem Prods.*, 83
> F.3d 610 (3d Cir.1996)] court found dispositive. The class
> members were exposed to nicotine through different products, for
> different amounts of time, and over different time periods. Each
> class member's knowledge about the effects of smoking differs,
> and each plaintiff began smoking for different reasons. Each of
> these factual differences impacts the application of legal rules such
> as causation, reliance, comparative fault, and other affirmative
> defenses..[231]

---

[228]     The ruling appears to have been made on a motion to strike, without an actual
class certification hearing, suggesting that proof of predominance of common issues could not be
made under any fact pattern suggested by the *Henry* Plaintiffs.

[229]     *Id.* at *4 (citing *Pollet v. Travelers Prop. Cas. Ins. Co.*, 2001 WL 1471724 (E.D.
La. Nov. 16, 2001)).

[230]     *Id.* *3.

[231]     *Castano*, 84 F.3d at 743.

Like Vioxx, and like cigarette actions that were not certified despite having one common issue (harmfulness of cigarettes),[232] this case should not be certified.  It is critical for this Court to understand that there is a huge medical threshold issue in these consolidated cases, i.e., whether under any circumstances of exposure alleged in these cases, formaldehyde could even be the "cause" of any alleged injury.  If class certification was inappropriate in personal injury actions when there was only one defendant and one incident and in property damage cases in which there was one defendant and multiple properties, class certification must be rejected in this case.  Here we have multiple diverse defendants, multiple diverse products, multiple claimed injuries potentially caused by multiple diverse sources, wildly varying exposures, personal, medical, employment and social histories, and alleged reactions.  Individual trials will be required to determine whether each plaintiff is entitled to recover from one of the many defendants for one of their various products.  No common issue predominates and class certification is inappropriate.

Finally, Plaintiffs have brought claims under the laws of four different states—Louisiana, Alabama, Mississippi, and Texas.  This Court will also need to address the differences in state laws in analyzing certification.[233]  Variations in state law impact whether there are common issues of fact or law that predominate among the class members.[234]  The chances of Plaintiffs showing predominance of common issues further diminishes in light of the multiplication of issues to be determined by application of the laws of at least four states.

---

[232]     *See also Georgine*, 83 F.3d at 627.

[233]     *See In re Vioxx 2006*, 239 F.R.D. at 458 (conducting choice of law analysis to determine which state's law applies in analyzing hurdles to certification).

[234]     *Cole v. GMC*, 484 F.3d 717, 724 (5th Cir. 2007) (reversing district court's grant of class certification because of significant variations in state law and the individualized legal and factual issues they present).

5.      Plaintiffs Have Not Conducted the Choice of Law Analysis Necessary to
        Demonstrate Predominance in a Multi-State Class Action

In a multi-state class action, the Court must analyze how choice of law questions impact

Rule 23's requirements *before* certifying a class.  This is critical because differences in states'

laws "may swamp any common issues and defeat predominance."[235]  Quite simply, the Court

must "know which law it will apply before it makes its predominance determination."[236]  The

choice of law question is also important to determine whether the class action remedy is superior

to individual claims brought by plaintiffs.[237]

In diversity cases, the Court uses the choice of law rules of the forum state.[238]  The

analysis is more complicated in multi-district litigation.  There, the MDL court must apply the

"law of the transferor form, that is the law of the state in which the underlying action was filed,

including the transferor forum's choice of law rules."[239]  The transferor forum state is the one in

which the action was initially filed before it was transferred to the MDL court.[240]

The Court cannot make its decision about class certification in a vacuum.  Plaintiffs have

the burden to show predominance, along with the other requirements under Rule 23.  They *must*

also provide the Court with "an extensive analysis of state law variations to reveal whether these

---

[235]    *Castano*, 84 F.3d at 741.

[236]    *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 313 (5th Cir. 2000), *citing Castano*,
84 F.3d at 741.

[237]    *See Castano*, 84 F.3d at 741.

[238]    *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[239]    *In re Vioxx 2008*, citing *Ferens v. John Deere Co.*, 494 U.S. 516, 524 (1990).  *See
also In re Guidant Corporation Implantable Defibrillators Prods. Liab. Litig.*, 489 F. Supp. 2d
932 (1989); *see also* ANNOTATED MANUAL FOR COMPLEX LITIGATION (FOURTH) §9.18 (David
Herr ed., 2008) ("In diversity cases, the court will apply the law of the transferor forum, by
application of its choice-of-law rules.").

[240]    *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 140 (E.D. La. 2002) ("*In re
Propulsid*").  As Judge Fallon noted in *Propulsid*, the filing of a Master Complaint does not
affect the choice of law analysis because it is simply a procedural device, and the Court must
"look to the specific action brought before the Court for class certification."  *Id.* at 142.

pose 'insuperable obstacles to certification.'"[241]   As the D.C. Circuit observed, the question of which law applies is not an "academic" inquiry and the Court cannot accept assertions of the class action proponents that there are no differences at issue.[242]

Instead, the Court must require that plaintiffs meet their burden and carry out the choice of law analysis fully.  The Plaintiffs' class certification brief does not analyze the present choice of law issues or attempt to explain how they relate to predominance, superiority or any of the other Rule 23 requirements.  Thus, the Plaintiffs have failed to meet their burden to show the elements of class certification are met.

          a.        The Fifth Circuit Has Routinely Denied Class Certification in Multi-State Cases Where the Plaintiffs Fail to Sufficiently Analyze Choice of Law Issues.

On a number of occasions, the Fifth Circuit has refused to certify multi-state class actions where the plaintiffs have failed to analyze the differences in states' laws and explain the impact on Rule 23's requirements.  Some of those cases include the following:

- *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882-83 (5th Cir. 1973) (affirming the district court's denial of certification of a nationwide class asserting, inter alia, common law claims and explaining that, "the geographical dispersion of the alleged representations would bring into issue various state common law standards.  With no single law governing the entire class, common issues of law cannot be shown to warrant Rule 23 treatment.").

- *Castano v. American Tobacco Co.*, 84 F.3d 734, 740-41 (5th Cir. 1996) (reversing district court's certification of a nationwide class action asserting common law claims because the district court "failed to consider how variations in state law affect predominance and superiority" and explaining that, "[i]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance....  Accordingly, a district court must consider how variations in state law affect predominance and superiority.").

---

[241]    *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986), *cert. denied*, 482 U.S. 915(1987).

[242]    *Id.* at. 1016-17 ("Appellees see the 'which law' matter as academic.  They say no variations in state warranty laws relevant to this case exist.  A court cannot accept such an assertion on faith.  Appellees, as class action proponents, must show that it is accurate." (Internal quotations and footnotes omitted)).

- *Spence v. Glock*, *Ges. m.b.H.*, 227 F.3d 308, 309-10 (5th Cir. 2000) (reversing district court's certification of a nationwide class action alleging common law claims "[b]ecause the district court erred in its choice of law analysis, and thus abused its discretion on the issue of predominance under Rule 23(b)(3).").

- *Stirman v. Exxon Corp.*, 280 F.3d 554, 558, 564 (5th Cir. 2002) (reversing the district court's certification of a multi-state class action alleging common law claims and explaining that "[h]ere the district court did consider variations in state law, and found them to not prevent class certification.  However, this analysis did not take into account significant variations in state law that defeat predominance.").

- *Cole v. General Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (reversing district court's certification of nationwide class action asserting common law claims and stating that "[w]e have recognized in a class action governed by the laws of multiple states, such as this one, 'variations in state law may swamp any common issues and defeat predominance.'" (citation omitted)).

In each of these cases, the Fifth Circuit focused its decision, in part, on the plaintiffs' failure to meet their burden under Rule 23.  Consequently, this Court  must require that Plaintiffs fully analyze the choice of law questions and demonstrate how they comport with Rule 23.  If plaintiffs fail to do so, the Court should deny certification.

         b.     Choice of Law Issues Related to Medical Monitoring and Economic Loss Subclasses

Plaintiffs' medical monitoring and economic loss subclasses purport to include residents of at least four states – Texas, Louisiana, Alabama, and Mississippi.[243]  To determine what law applies to those claims, the Court must examine the choice of law rules in each of the four states. The Plaintiffs' burden, which they have not met, is to demonstrate how the choice of analysis works under those states' laws and that common issues of law will predominate over individualized issues.

Similarly, as to the medical monitoring claims, the Plaintiffs must first analyze each state's choice of law rule to determine whether the law of that state or another state will apply to the claims.  Then, Plaintiffs have the burden of explaining whether any individual variations in

---

[243]    *See* Plaintiffs' Memorandum, p. 5 of 40.

the laws are workable or whether they would "swamp common issues of law and fact."[244]  Here, Plaintiffs have not made any attempt to do so.  Similarly, for their economic loss subclass, Plaintiffs have failed to analyze the individual states' laws and establish the predominance factor under Rule 23.

Plaintiffs may argue that Louisiana's choice of law rules (as the forum in which the MDL is pending) applies to their economic loss and medical monitoring subclasses because they filed a Master Complaint in the MDL.  Judge Fallon rejected this approach in the *Propulsid* litigation and noted that the Court must look at the "specific action" brought before the Court for class certification, and should not use the Master Complaint for purposes of analyzing which choice of law rules should apply.[245]  Applying that principle, this Court cannot rely simply on Louisiana's choice of law principles, but instead, must analyze the question – at least as for the economic loss and medical monitoring subclasses – on a state-by-state basis.

c.      Choice of Law Issues Related to State-Specific Subclasses

Plaintiffs have also proposed four state specific subclasses.[246]  Presumably, Plaintiffs contend that for each subclass, the substantive law of that state (including choice of law provisions) apply.  Plaintiffs have not explained the choice of law analysis or how the subclasses would fit within the Rule 23 requirements.

Given the Plaintiffs' burden, the court cannot "rely on assurances of counsel that any problems with predominance or superiority can be overcome."[247]  In addition, Plaintiffs cannot simply offer up a generic description of subclasses without describing in detail their trial plan. This is because, as the Fourth Circuit has noted, the "use of subclasses to consider different state

---

[244]     *Castano*, 84 F.3d at 741.
[245]     *In re Propulsid*, 208 F.R.D. at 142.
[246]     Plaintiffs' Memorandum, p. 5 of 40.
[247]     *Castano*, 84 F.3d at 742, *citing Windam v. American Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1977).

laws will pose management difficulties and reduce the judicial efficiency sought to be achieved through certification." [248]  Plaintiffs have not demonstrated how their subclasses will overcome these difficulties, and without the proper showing, the Court should find that class certification of the proposed subclasses is not appropriate.

**B.    Plaintiffs Cannot Show Superiority**

1.    The Superiority Standard Under Rule 23(b)(3).

Rule 23(b)(3) requires that a district court find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  The "superiority" analysis includes four factors: (A) the class members' interests in individually controlling the prosecution of separate actions; (B) the extent and nature of litigation concerning the controversy already begun by class members; (C) the desirability or undesirability of concentrating the litigation in the particular forum; and (D) the likely difficulties in managing a class action.[249]

Judge Fallon summarily disposed of any notion that the class action format was superior in *Vioxx*, simply stating "In this case, the difficulties in class management overwhelm any efficiencies that could be secured through classwide adjudication.  Indeed, 'the predominance of individual issues relating to the Plaintiffs' claims for compensatory and punitive damages detracts from the superiority of the class action device in resolving these claims.'[250]

The predominance of individual issues detracts from the superiority of the class action device in this case.  Indeed, litigating an individual case should be relatively simple since it could be narrowly focused on a specific model, specific manufacturer, specific exposure, and unique

---

[248]    *Central Wesleyan College V. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir. 1993).
[249]    Fed. R. Civ. P. 23(b)(3); *In re Vioxx 2006*, 239 F.R.D. at 463.
[250]    *Steering Committee*, 461 F.3d at 604-05; *see Allison*, 151 F.3d at 419; *Castano*, 84 F.3d at 745; *In re Vioxx 2006*, 239 F.R.D. at 463.

problems of the plaintiff.[251]  A court may also use case management tools—uniquely available in this MDL forum—to streamline and manage the litigation.[252]  This case should be managed with other tools, which will allow the full development of the individual issues while conserving judicial resources.

2.      Certification Would Require Series of Mini-Trials Making Class Treatment Undesirable.

Certification under Rule 23(b)(1) does not apply to actions seeking compensatory damages; rather, it applies to actions seeking injunctive or declaratory relief.[253]  "Underlying is the concern that if compensatory damage actions can be certified under Rule 23(b)(1)(A), then all actions could be certified under the section, thereby making the other sub-sections of Rule 23 meaningless, particularly Rule 23(b)(3)."[254]  This action is a mass tort claim in which Plaintiffs are seeking compensatory and punitive damages as well as the establishment of a medical monitoring fund.  Determination of specific causation and damages for any plaintiff would require a trial specific to only that plaintiff.  In addition, the question of specific causation must be answered for determination of the class definition, as discussed at *supra* pages 45 through 47, as well as for a determination of any recovery by any plaintiff under the purported "Future Medical Services Subclass."  None of these determinations can be made simply by trying the claims of the class representatives.

---

[251]      *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996).

[252]      *Steering Committee*, 461 F.3d at 604-05 (noting with approval the district court's use of consolidated summary judgments and Lone Pine orders in efficiently managing the litigation).

[253]      *See, e.g.*, *In re Dennis Greenman Sec. Litig.*, 829 F.2d 1539, 1545 (11th Cir. 1987).

[254]      *Id.*

3.      A Manageable Trial in This Case is Not Possible

In determining whether Plaintiffs' proposed class can be certified, the Fifth Circuit

requires this Court to consider, as part of its analysis of the Rule 23(b)(3) superiority requirement

and/or predominance requirement, "how a trial on the alleged causes of action would be tried."[255]

At least three times, the Fifth Circuit has reversed certification of a class action based on the trial

court's failure to consider how the class action would be tried.[256]   The class action Plaintiffs

propose cannot be manageably tried.

In *Robinson v. Texas Automobile Dealers Association,* an antitrust case involving over a

thousand defendants, the Fifth Circuit noted:

> [T]he district court failed to consider the complications of the
> plaintiffs' and defendants' presentations at trial. . . . [A]s the court
> acknowledges, 'each Defendant has the absolute right to
> individually defend itself . . . .  [E]ach of the several hundred
> defendants likely will want to offer a witness or two to refute any
> evidence offered in support of the plaintiffs' position.
>
> Simultaneously, however, the parties have an interest in ensuring
> that the jurors will have a reasonable chance of remembering
> which party presented which evidence.  The sheer number of
> individual defendants and the incentive to offer individual defenses
> create the possibility of jurors' having to base their determinations
> on evidence offered throughout a long proceeding.[257]

The Fifth Circuit went on to admonish a certify now, "figure-it-out-as-we-go-along approach" to

trying such a complicated case.[258]

The case at hand has similar and equally significant obstacles to a manageable trial.  The

number of class representatives has been a constantly moving target, but currently hovers around

---

[255]    387 F.3d 416, 426 (5th Cir. 2004) ("*Robinson*"); *Gene and Gene*, 541 F.3d at 326.
[256]    *See e.g., Robinson, supra; Castano; Gene and Gene.*
[257]    387 F.3d at 425-26.
[258]    *Id.* at 426.

96,[259] with each of them expected to testify and offer their own evidence.  While the number of

Manufacturing Defendants similarly has been a moving target, the latest number is 64 different

Manufacturing Defendants.[260]  Each of those Manufacturing Defendants absolutely has the right

to defend itself, and will offer its own witnesses to refute Plaintiffs' claims against them.  This is

particularly true in light of the fact that ambient formaldehyde levels vary so much manufacturer

to manufacturer.[261]  Further, the Manufacturing Defendants come from two entirely separate

industries – the manufactured home industry and the travel trailer industry, each with their own

individual issues to be considered in this case.[262]

As in *Robinson*, *supra*, in this case there is a significant likelihood of juror confusion as

to which party presented which evidence.  A juror may attribute damaging evidence as to one

manufacturer against another manufacturer, or evidence as to one industry against a

manufacturer in an entirely different industry.  This likelihood is particularly troublesome in light

of the fact that the testing results from manufacturer to manufacturer have varied substantially in

this case.[263]

---

[259]    For purposes of consistency within this memorandum, the number 96 will be used.  However, it should be understood that the actual number may be somewhat less in light of the dismissal by the Court of at least one defendant and the unofficial withdrawal by plaintiffs of at least two putative class representatives.

[260]    *See* Second Am. Compl.

[261]    Ex. I, Zieman Affid., ¶¶ 11, 14-22.

[262]    For example, HUD regulates the manufactured home industry, and more specifically, certain issues pertaining to formaldehyde levels in manufactured homes, but does not regulate the travel trailer industry at all.

[263]    *See* Ex. K-1, Dr. Hewett Aff. at 12-19.  A manageable trial of this case as a class action simply is not possible.  Plaintiffs do not offer the Court any suggested means of how to try this incredibly complex case.  The party seeking certification bears the burden of proving the Rule 23 elements.  *See Castano*, 84 F.3d at 740.  As consideration of "how a trial on the alleged causes of action would be tried" is part of the predominance/superiority prong under Fifth Circuit law, Plaintiffs here should offer the Court a viable method of trying this case.  While the Fifth Circuit, in *Feder v. Electronic Data Systems Corp.*, 429 F.3d 125, 139-40 (5th Cir. 2005), rejected Defendant's argument that the class certification should be reversed based on plaintiff's

Another problem with superiority, and specifically a problem with managing this action, is the fact that federal law will govern several Plaintiffs' claims while state law will govern the others.  In this case, the Court has already recognized that HUD's standards govern the manufacture of mobile homes, while travel trailers and park models are exempt from HUD construction standards.[264]  The Court will face serious difficulty in managing a case in which it must interpret federal law standards for several Plaintiffs (e.g., Marcie Beverly, Marcelio Ayala, Maragrita Solis, and Sheila Smith) and state law for several others (e.g., Darrell Madison, Hazel Heechung, Kierra Wilson, and Constance Jordan).  This is yet another reason why the class action model is far from superior in this case.

4.      The Seventh Amendment Poses Obstacles to Manageability

The Seventh Amendment also presents significant obstacles to the manageability of a class action here.[265]  In *State of Alabama v. Blue Bird Body Co., Inc*., [266] the Fifth Circuit recognized the limitations that arise in the handling of a class action because of the Seventh Amendment "right of a litigant to have only one jury pass on a common issue of fact."  In *Blue Bird*, the district court had certified an antitrust case as a nationwide class action and had bifurcated the issues of liability and damages so that one jury would decide the liability issues

---

failure to submit a trial plan, the Fifth Circuit so ruled on the basis that there were only three defendants in the *Feder* case, and thus the case did not present the trial challenges posed by *Robinson, supra*.  The case at hand does pose the challenges presented in *Robinson*.  All Plaintiffs here offer is a conclusory statement that any "management" difficulties will be "minimal."  Plaintiffs' Memorandum, p. 21 of 40.  "Given the [P]laintiffs' burden, a court cannot rely on assurances of counsel that any problems with…superiority can be overcome."  *Castano,* 84 F.3d at 742 (citations omitted).

[264]      Rec. Doc. 717, p. 4.
[265]      The Seventh Amendment provides in relevant part as follows:  "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States."
[266]      573 F.2d 309, 318 (5th Cir. 1978) ("*Blue Bird*").

and subsequent juries would decide damages issues for class members.[267]   The former Fifth Circuit reversed the nationwide class certification order and explained that bifurcation under Rule 42(b) is appropriate only when "the court preserves inviolate the right of trial by jury as declared by the Seventh Amendment ...."[268]   To preserve the parties' Seventh Amendment right, the issue to be tried separately "must be so distinct and separable from the others that a trial of it alone may be had without injustice.... Such a rule is dictated for the very practical reason that if separate juries are allowed to pass on issues involving overlapping legal and factual questions the verdicts rendered by each jury could be inconsistent."[269]

   The Fifth Circuit has cautioned that the use of bifurcation to make a class action manageable could cause Seventh Amendment violations at least two other times since *Blue Bird*. In *Castano v. American Tobacco Co.,*[270] the Fifth Circuit reversed a multi-state class certification of smokers against the cigarette companies.  As to the Seventh Amendment, the Fifth Circuit stated:

> Another factor weighing heavily in favor of individual trials is the risk that in order to make this class action manageable, the court will be forced to bifurcate issues in violation of the Seventh Amendment.  This class action is permeated with individual issues, such as proximate causation, comparative negligence, reliance, and compensatory damages.  In order to manage so many individual issues, the district court proposed to empanel a class jury to adjudicate common issues.  A second jury, or a number of 'second' juries, will pass on the individual issues, either on a case-by-case basis or through group trials of individual plaintiffs.  The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues.[271]

---

[267]   *Blue Bird*, 573 F.2d at 320.
[268]   *Id*. at 318.
[269]   *Id*. (citation omitted).
[270]   84 F.3d 734, 750-51 (5th Cir. 1996).
[271]   *Id.*

Again, in *Allison v. Citgo Petroleum Corp.,*[272] the Fifth Circuit, in affirming a district court's refusal to certify a race discrimination class action, noted: "In order to manage the case, the district court faced the likelihood of bifurcated proceedings before multiple juries. The result in turn increased the probability that successive juries would pass on issues decided by prior ones, introducing potential Seventh Amendment problems and further decreasing the superiority of the class action device."

## VII.    RULE 23(A) REQUIREMENTS

### A.    Plaintiffs Have Not Carried Their Burden of Showing Numerosity

Each subclass must independently meet all of the requirements of Rule 23.[273]  Because the Plaintiffs have defined their proposed subclasses so broadly (i.e. all persons who lived in FEMA provided housing – regardless of manufacturer), the subclasses would initially appear to be sufficiently numerous to meet the standards of Rule 23.  But, as explained throughout this brief, such broadly defined subclasses are fraught with significant problems of commonality, typicality, adequacy, predominance and superiority.  In addition, most Plaintiffs will have resided in only one travel trailer manufactured by only one manufacturer.  Even under the most expansive reading of Plaintiffs' allegations, a typical class member would therefore be entitled to an award against only one manufacturer.  Thus, putative class members do not have standing to bring claims against all defendant manufacturers, despite the breadth of the defined subclasses.

For this reason, even though the Court does not bear the burden of constructing subclasses, the Court can certainly recognize that, at the very least, the Plaintiffs should have proposed a subclass for each manufacturer.  The Court implicitly recognized this issue when it

---

[272]    151 F.3d 402, 419-20 (5th Cir. 1998).

[273]    FED. R. CIV. P. 23(b)(5); *Johnson v. American Credit Co. of Georgia,* 581 F.2d 526, 532 (5th Cir. 1978); *Recinos-Recinos v. Express Forestry, Inc.,* 233 F.R.D. 472 (E.D. La. 2006).

ruled that a manufacturer defendant will not "be in the 'class action' case if the class is certified" if there is no class representative matched to that manufacturer.[274]  Similarly, where the Plaintiffs have not and cannot demonstrate that there is a sufficiently numerous group of persons with arguable claims against a particular manufacturer, then that manufacturer defendant should not "be in the class action."

Plaintiffs should be made to demonstrate that a subclass of putative class members as to each manufacturer is sufficiently numerous under Rule 23.  This they have not done and, for that reason, certification should be denied.

**B.      Plaintiffs Have Not Carried Their Burden of Showing Commonality.**

The Federal Rules of Civil Procedure allow for the class action procedure only if there are questions of law or fact common to the class.[275]  The test for commonality is not demanding – it is met "when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."[276]

Even though commonality under Rule 23(a)(2) is not a difficult burden to satisfy, because of the multiple defendants in this case it is not present here.  This is not a case of a single product, and plaintiffs cannot transform the dozens of EHU manufacturers here into a monolithic single defendant.  Every defendant manufacturer here has at least one unique product (some have more than one).  There is no commonality, because the Plaintiffs lived in different EHUs or "products."

---

[274]  Order and Reasons, September 24, 2008, Rec. Doc. 706.
[275]  FED. R. CIV. P. 23(a)(2) (2008).
[276]  *Lightbourn v. City of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997).

Plaintiffs' Memorandum cites several supposedly "common" issues,[277] but those issues are in fact not common at all:

- The question of "what chemical and at what levels was present."[278]  This issue is an individual question that must be answered for each EHU.  Even in two EHUs side by side and of the same model and manufacturer, the chemicals present (*i.e.* possible presence of formaldehyde and other potential chemical sources of irritation) will be different depending upon the habits of the residents.  The levels cannot be determined class-wide and many EHUs have levels that are acceptable according to any standard, including those suggested by Plaintiffs.

- The question of "who [was] exposed."[279]  This question on its face is an individual issue, not common to all class members.  Further, exposure alone is not a true issue in this case.  All human beings are exposed to ambient formaldehyde and have naturally-occurring formaldehyde in every cell of their bodies.  The issue is the level of each person's exposure, and whether the level is hazardous.  This can only be determined individually.

- The question of "Defendants' conduct or fault in the failure to exercise reasonable care."[280]  If there were a single product and a single defendant this might be a common issue.  This is not the case, however.  There are dozens of defendants with different products.  Answering this question for one defendant will not answer the question as to any other defendant.  Plaintiffs have not devised their subclasses according to defendant.  Each subclass includes *all* defendants and all of their different products.  Therefore, there is no common question of this nature in any of the subclasses that plaintiffs' have proposed.

- The question of "[t]he scientific nature and behavior of formaldehyde."[281]  Not even this issue is truly a common issue to this class.  This is because the basic scientific nature of formaldehyde in general is well-established.  The issue for each plaintiff will be keyed to proving a specific level of formaldehyde in his unit and proving the effect of that formaldehyde *on him* (not on someone else).

Because Plaintiffs complain about many different products manufactured by different defendants, Plaintiffs cannot meet even the lax commonality standard.

---

[277]     Plaintiffs' Memorandum, pp. 12-13 of 40.
[278]     *Id.*, p. 12 of 40.
[279]     *Id.*, pp. 12-13 of 40.
[280]     *Id.*, p. 13 of 40.
[281]     *Id.*, p. 13 of 40.

**C.      Plaintiffs Have Not Carried Their Burden of Showing Typicality**

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  The typicality requirement of Rule 23 focuses on the similarities between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.[282]  In determining typicality, the court must consider "whether the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members."[283]  In other words, to satisfy the typicality requirement, a class representative must "possess the same interest and suffer the same injury as class members."[284]

1.      The Class Representatives' Causes of Action Vary by State.

The class representatives' claims are not typical with regard to either (1) their theories of liability or (2) the injuries claimed.  First, as to the applicable legal framework, Plaintiffs' Memorandum asserts five theories of liability as "typical" of other class members.  In their fifth cause of action, plaintiffs assert that class members in all four states will be able to pursue damages for "liability for [manufacturers'] breach of express or implied warranty and/or failure to conform to other express factual representation on which the plaintiffs justifiably relied."[285]

This statement is incorrect, as varying state laws governing manufacturers' liability preclude a finding of typicality.  For instance, Louisiana plaintiffs can only recover in a manner consistent with the Louisiana Products Liability Act.[286]  The LPLA excludes recovery for a

---

[282]      *See James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001); *In re American Commercial Lines*, 2002 WL 1066743 at *8-9.

[283]      *In re Baycol Products Litigation*, 218 F.R.D. 197, 205 (D. Minn. 2003) ("*In re Baycol*").

[284]      *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982) "*General Telephone*").

[285]      Plaintiffs' Memorandum, p. 14 of 40.

[286]      LA. REV. STAT. § 9:2800.52.

breach of implied warranty.[287]  On the other hand, Texas law provides for such recovery.[288]  As a result, class members in Louisiana cannot obtain the same result as those in Texas.

As illustrated by the example above, the relevant products liability laws of Texas, Mississippi, Louisiana and Alabama are not uniform, and typicality therefore does not exist with respect to the class members' legal theories.[289]

>2.      Plaintiffs' Designated Class Representatives Fail to Demonstrate Typicality in Terms of Their Claimed Injuries.

Perhaps more significantly, plaintiffs fail to demonstrate typicality in terms of class injuries.  Plaintiffs' brief mentions only four of the ninety-two class representatives and intimates that these individuals' skin, stomach and respiratory problems are somehow representative of the class as a whole.[290]  While the four individuals identify approximately twenty symptoms which they relate to formaldehyde exposure, the remaining 92 class representatives claim a myriad of other symptoms and conditions, such as unconsciousness, convulsions, nephritis, and hypothermia, the vast majority of which have never been linked to exposure to formaldehyde.[291]  Moreover, the plaintiff fact sheet designates a total of 47 alleged formaldehyde symptoms, more than twice the number of symptoms listed by the four class representatives in plaintiffs' brief.  Indeed, the plaintiff fact sheet lists ailments ranging from low blood pressure to asthma,

---

[287]      *See Jefferson v. Lead Indus. Ass'n*, 106 F.3d 1245, 1251 (5th Cir. 1997) (noting that, under the LPLA, breach of implied warranty is not available as a theory of recovery for personal injury).

[288]      *See Sipes v. General Motors Corp.*, 946 S.W.2d 143, 158 (Tex. App. 1997) (describing plaintiff's ability to recover under an implied warranty of merchantability).

[289]      *See Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) ("Given the differences among the state laws, it cannot be said that [the class representatives'] claims are 'typical' of the class…"); *In re Vioxx 2006*, 239 F.R.D. at 459-460 (noting that the "applicability of multiple substantive laws also precludes a finding of typicality").

[290]      Plaintiffs' Memorandum, p. 14-15 of 40.

[291]      *See* Ex. BB, Spreadsheet of symptoms/conditions reported by class representatives which Dr. Robert Golden shows are not associated with formaldehyde exposure, Ex. F., Dr. Golden Aff. at 19-21, 25-29.

miscarriage, stillbirth, laryngitis and pneumonia.[292]  Thus, the plaintiffs' claim that the symptoms of class representatives Davis, Robinson, Baker and Beasley are typical or "representative of the claims asserted by the class as a whole" is without merit.[293]  Neither these four individuals' alleged injuries, nor any of the remaining class representatives identified here, are typical of the larger universe of plaintiffs they purport to represent.[294]

Furthermore, typicality is "not satisfied where plaintiffs' claims and defenses will be dominated by individual evidence."[295]  Here, plaintiffs seek certification of a class purportedly consisting of hundreds of thousands of individuals, each with diverse medical histories, symptoms, exposures and claimed damages.  Accordingly, any meaningful evaluation of liability and damages will necessarily turn on a highly individualized inquiry into the idiosyncrasies of the individual claimant, necessarily undermining typicality.

Instructive is the case of *Kuhn v. Skyline Corp.*, 1984 WL 62775 (M.D. Pa. 1984).  In *Kuhn*, the court dealt specifically with formaldehyde exposure in mobile homes.  In denying class certification, the *Kuhn* Court found "a plethora of ... individual factors which would have to

---

[292]     *See* Ex. F, Dr. Golden Aff. at 19-20 and Exs. A-1 – A-96, Plaintiff Profiles.

[293]     Plaintiffs' Memorandum, p. 15 of 40.

[294]     Given the fact that plaintiffs have decided to create subclasses based on occupancy in a particular state, each class will have plaintiffs with various symptoms and formaldehyde exposure levels.  Plaintiffs' failure to create subclasses that survive a typicality analysis is a fatal flaw, yet neither defendants nor the court must undertake the duty to define the class properly.  *See Steering Committee* (noting that, since the parties moving for class certification have full opportunity to present to the district court proposals for their preferred form of class treatment, the district court is under no obligation to *sua sponte* consider other variations not proposed by any party); *see also United States Parole Commission v. Geraghty*, 445 U.S. 338, 408, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) ("[I]t is not the District Court that is to bear the burden of constructing subclasses.  That burden is upon the [party proposing certification] and it is he who is required to submit proposals to the court.").

[295]     *Welch v. Atlas Roofing Corp.*, 2007 WL 3245444 at *3-4 (E.D. La. Nov. 2, 2007) (citing *Martin v. Home Depot U.S.A. Inc.*, 225 F.R.D. 198, 201 (W.D. Tex. 2004)).

be considered in assessing economic harm and liability."[296]  Included in the Court's analysis

were, "the type and extent of ventilation in use in the home, the outside environment, the layout

and room size of the unit, ... the condition and age of the home."[297]

Similarly, in *Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198 (W.D Tex. 2004), the

court noted that exposure to toxins from treated wood products failed to meet typicality

requirements.  Although the case dealt with the same general body of products, the court noted

that "material product variations exist – including varying types of products, varying uses, and

varying sources of, and causes of, alleged failures…" sufficient to preclude certification.[298]  Due

to these variances, the court found there was "no single accident or event that caused all of

Plaintiffs' injuries."[299]  In other words, "[a]ny resolution of plaintiffs' claim of a health risk from

[contaminated materials] will require a great deal of site-specific and user-specific inquiries."[300]

---

[296]     *Kuhn*, 1984 WL 62775 at *4.  The court further outlined the individual
considerations involving formaldehyde exposure which were influential in its denial of class
certification as follows:

> Plaintiff's case is even weaker and the individual factors more
> numerous where the Personal Injury Class ... is concerned.  Some
> of the factors which would affect decisions regarding liability or
> damages or both are:  the individual's age, his or her general heath
> and particular susceptibility to formaldehyde offgassing, the degree
> of the individuals' exposure to formaldehyde from a myriad of
> other common sources ..., the amount of time each party spent in a
> [mobile home], and the individual's exposure to other agents
> which can cause the same or similar symptoms.

*Kuhn*, 1984 WL 62775 at *5.

[297]     *Id.  See also Sanders v. Tailored Chemical Corp*., 570 F. Supp. 1543 (D.C. Pa.
1983) (denying class certification to plaintiffs allegedly exposed to urea formaldehyde insulation
due to varying factual issues, such the conduct of intermediary installers).

[298]     *Martin*, 225 F.R.D. at 201.

[299]     *Id*. at 202.

[300]     *Id*. at 202-03.  *See also Castano*, 84 F.3d at 742 n. 15 (decertifying class in part
due to finding that different levels of nicotine exposure through different products, for different
amounts of time, and over different time periods, impact causation, reliance, comparative fault,

In multidistrict litigation involving the pain reliever Vioxx, Judge Fallon denied class certification and noted that, although the claims involve common theories of negligence, strict liability, and failure to warn, they also involve individual issues such as injury, causation, and comparative fault.[301]   As a result, Judge Fallon concluded that the "class representatives' claims are not typical of the class given these factual variations."[302]

Judge Davis's analysis in the *Baycol* MDL, which involved clams of injury due to the ingestion of a single cholesterol-reducing medication, underscored the problems associated with class certification in the context of plaintiffs with varying levels of exposure:

> [T]he underlying facts and circumstances of this case do not make the proposed personal injury class amenable to class certification. This case involves a vast number of persons who took different dosages of Baycol, at different times, and possibly took Baycol concomitantly with other prescription drugs.[303]

In *Steering Committee v. Exxon Mobil Corp.*,[304] the Fifth Circuit affirmed the district court's denial of class certification where plaintiffs were exposed to smoke from a chemical fire. The court underscored the fact that "each individual plaintiff suffered different alleged periods and magnitudes of exposure and suffered different alleged symptoms as a result."[305]   As such, the case called for an "individual, not class-wide, remedy."[306]

---

and other affirmative defenses); *In re Baycol*, 218 F.R.D. at 206 (noting that, in finding a lack of typicality, "limitations exist when the claimed injury is tied to a complex course of conduct engaged in by the defendants over a long period of time, as opposed to a single act to which all class members were exposed to equally"); *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 420 (E.D. La. 1997) (expressing reservations regarding typicality based on, among other things, the fact that all of the products at issue in that case did not exhibit problems).

[301]   *See In re Vioxx 2006*, 239 F.R.D. at 459-60.
[302]   *Id.*
[303]   *In re Baycol*, 218 F.R.D. at 205-06.
[304]   461 F.3d 598, 602-03 (5th Cir. 2006).
[305]   *Steering Committee,* 461 F.3d at 602-03.
[306]   *Id.*

The same considerations espoused by these learned jurists are equally applicable to the instant litigation.  Any examination of plaintiffs' claims and alleged injuries will be dominated by individual evidence which cannot meet the requirements of typicality.  As the attached summaries relating to each of the 96 designated representatives highlight, each presents his or her own discrete medical history, symptomology, and environmental exposures.[307]

For instance, class representatives resided in emergency housing units of varying configurations, manufactured by distinct entities, for discrete amounts of time, from months to years.  Some representatives' units were modified after purchase, others were replaced *in toto*.  Indeed, one purported class representative lived in multiple units and complained of differing symptoms in each.[308]

Pre-existing medical conditions, ranging from allergies to asthma, significantly impact those class representatives' causation analysis.  Confounding sources such as cigarette use, whether before or during the time of occupancy in the trailer, also muddle any causation analysis for class members.[309]  Occupational or environmental exposure to formaldehyde and other chemicals creates similar problems.  Additionally, some plaintiffs complained of exposure to mold while residing in FEMA trailers, while others had been exposed to mold and suffered breathing problems prior to moving into the emergency housing units.

Plaintiffs' interactions with FEMA also vary widely.  Some representatives complained to FEMA on numerous occasions and had significant contact with FEMA officials to discuss issues with their units. Others voiced no complaints whatsoever.  Likewise, some plaintiffs submitted a request to purchase the unit in which they resided; others did not.  Indeed, some

---

[307]   *See* Exs. A-1 – A-96, Plaintiff Profiles.
[308]   Ex. A-15, Plaintiff Profile Beverly, Dep. at 94:11-19.
[309]   *Id*., Dep. at 75:3-4, 77:14-23.

were even offered the opportunity to relocate even after complaints specifically regarding formaldehyde but chose not to.[310]

This multitude of variables creates an endless matrix of considerations in each individual's case.  Given this complex web of individual factors, plaintiffs have failed to demonstrate that their designated cohort of representatives is typical of the overall putative class. As the purported class representatives will not "possess the same interest and suffer the same injury as class members," certification must fail.[311]

**D.     Plaintiffs Have Not Carried Their Burden of Showing Adequacy**

Another requirement for class certification is adequacy.  Certification is possible only if the representative parties will fairly and adequately protect the interests of the class.[312]  The adequacy requirement directs the court to determine "the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees."[313]  "[C]lass representatives [must] possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation."[314]  The inquiry into adequacy is geared toward revealing conflicts,[315] and ensuring that the representatives have an ample stake in the outcome of the litigation.[316]

Applying that law to these Plaintiffs, the putative class representatives do not adequately represent the interests of the class members.  First, several putative representatives have expressed an unwillingness to take an active role in the litigation.  Some have failed to appear at

---

[310]     Ex. A-50, Plaintiff Profile Heechung, Dep. at 97:23 – 98:11.
[311]     *See General Telephone*, 457 U.S. at 156.
[312]     FED. R. CIV. P. 23(a)(4) (2008).
[313]     *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982), *as quoted in Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) ("*Berger*").
[314]     *Berger* at 482-83.
[315]     *Id.* at 479-80.
[316]     *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 605 (E.D. La. 2006).

their noticed class depositions.[317]  Others believe that, as representatives, they have no responsibility to the class members.[318]  Still others have no concept of how many members there are and have delegated the task of informing potential members about the litigation to their attorneys.[319]  Some have even flatly stated that they do not want to be a representative.[320]  These examples show a group that is generally uninformed, uninterested, and lackadaisical when it comes to participating in this case and protecting the interests of absent class members.

Additionally, the jurisprudence shows that the varying nature of members' claims can act as a bar to adequacy.  When the claims of members raise significantly different factual and legal issues, representatives are hard-pressed to fulfill the adequacy requirement.[321]  "[The] amalgamation of factually and legally different plaintiffs creates problematic conflicts of interest, which thwart fulfillment of the typicality and adequacy of representation requirements of Rule 23(a)."[322]  In *Amchem Products, Inc. v. Windsor*, the Supreme Court affirmed the decertification of a class established for settlement purposes and noted the difficulty in adequately representing members with divergent issues.[323]  The case involved asbestos exposure, and the Court noted a huge difference in the interests of the members who already suffered from an asbestos-related illness and those who only suffered from exposure.[324]  Those with exposure-only issues negotiated settlements that ensured funds to cover injuries that could occur in the future, as well

---

[317]     *See* Ex. A-90, Plaintiff Profile Vason; Ex. A-54, Plaintiff Profile Jordan; Ex. A-65, Plaintiff Profile McCray; Ex. A-66, Plaintiff Profile Wood.

[318]     *See* Ex. A-47, Plaintiff Profile D. Hargrove, Dep. at 84:11-15; Ex. A-26, Plaintiff Profile D. Davis, Dep. at 49:2-6; Ex. A-3, Plaintiff Profile Alfonso, Dep. at 79:20-25.

[319]     Ex. A-16, Plaintiff Profile P. Bradford, Dep. at 71:15-17, 78:19-24; Ex. A-17, Plaintiff Profile R. Bradford, Dep. at 44:19-23.

[320]     *See e.g.* Ex. A-73, Plaintiff Profile Posey, Dep. at 45:23-46:6.

[321]     *See Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 618 (3rd Cir. 1996).

[322]     *Id.*

[323]     521 U.S. 591, 610-11 (1997).

[324]     *Id.* at 610.

as negotiating to utilize advancements in treatment and guard against inflation.[325]  The injured parties, however, were not concerned with future treatment, but instead negotiated for higher current amounts to cover their illnesses.[326]  Because those interests were not aligned, the representatives could not adequately represent both the injured and exposed members.[327]  Similarly in the present case, there is a conflict between the interests of those who claim a current injury and those whose damages are tied to the potential development of disease in the future.

Further, because adequacy is closely tied to typicality, and the representatives do not have claims typical of class members' claims, the representatives cannot adequately represent the members.[328]  In *In re Vioxx 2006*, the Eastern District said, "the adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members."[329]  In that case, the myriad factual and legal differences that prevented representatives from fulfilling typicality requirement likewise prevented them from fulfilling the adequacy requirement.[330]  Here, the putative representatives' claims are not typical of the members' claims, as discussed above.  None of the four class representatives cited by the Plaintiffs in support of their typicality argument (Davis, Robinson, Baker and Beasley) have symptoms that are truly typical of the members.  Even the other putative representatives claim different symptoms – such as unconsciousness, convulsions, nephritis, and hypothermia, most of which are not linked to

---

[325]     *Id*. at 610-11.
[326]     *Id*. at 611.
[327]     *Id*. at 626.
[328]     *See supra*, VII.C.
[329]     *In re Vioxx 2006*, 239 F.R.D. at 460.
[330]     *See id*.

formaldehyde inhalation – than the four cited by Plaintiffs.[331]  Just as in *In re Vioxx 2006*, the differences between the representatives' claims and the members' claims are fatal to the typicality *and* adequacy factors.[332]

The fact that some representatives have claimed symptoms completely unrelated to formaldehyde render them inadequate representatives for members who claim a formaldehyde-*related* illness.[333]  While inhalation exposure to formaldehyde can cause symptoms such as nose and throat irritation, nausea, coughing, and eye irritation,[334] there is no evidence, that links formaldehyde inhalation to pneumonia, upper respiratory tract infections, dizziness, diarrhea, unconsciousness, convulsions, seizures or low blood pressure.[335]  Yet, several class representatives have stated that they suffer from the very symptoms that have no link to formaldehyde inhalation.  John Adams has complained of diarrhea and dizziness.[336]  Shirley Sinclair has alleged seizures.[337]  Clearly, several representatives complain of symptoms that have never been related to formaldehyde inhalation, and thus they cannot adequately represent members with symptoms that are actually related to formaldehyde – symptoms quite unlike their own.

Finally, adequacy can be undermined when class counsel uses the class action vehicle to pursue its own goals.  "Class action lawsuits are intended to serve as a vehicle for capable, committed advocates to pursue the goals of the class members through counsel, *not for capable,*

---

[331]    *See* Ex. F, Dr. Golden Aff., ¶¶ 34-35, 40.
[332]    239 F.R.D. at 460.
[333]    *See* Ex. F, Dr. Golden Aff., ¶ 42.
[334]    *Id*. ¶¶ 32—33.
[335]    *Id*. ¶¶ 34-35, 40.
[336]    Ex. A-2, Plaintiff Profile Adams, PFS at 3-4.
[337]    Ex. A-82, Plaintiff Profile Sinclair, PFS at 3-4.

*committed counsel to pursue their own goals through those class members.*"[338]   The instant case is littered with examples of representatives who, while well intentioned, have shown themselves to be incapable and uncommitted representatives.  Several times, they have admitted that they have deferred crucial duties and decisions to their attorneys.[339]  In turn, counsel have delayed informing certain Plaintiffs that they must act as representatives, in one instance until the day of the representative's deposition.[340]  While class counsel has sought to achieve its own goals, the actual representatives have been left by the wayside.  Thus, those representatives are unable to represent adequately the interests of the members.

## VIII.   FUTURE MEDICAL SERVICES (MEDICAL MONITORING) SUBCLASS

### A.   Issues Presented by the Future Medical Services Subclass.

Plaintiffs contend that even if their claims cannot be certified for *all* FEMA trailer residents, at minimum the Court should certify a "Future Medical Services Subclass."  The Court must decide three issues to determine whether this subclass can be certified:

(1)   A prerequisite to medical monitoring is a manifest physical injury caused by formaldehyde.  Plaintiffs' toxicologist, Dr. Williams, testified that formaldehyde molecules in the body bond with other molecules causing molecular and cellular changes.  Do these changes constitute a manifest physical injury?

If the answer to this question is No, the Court need go no further – Plaintiffs do not have a single common injury caused by formaldehyde and this subclass is not suitable for class certification.

If the answer is Yes, the court must consider a second issue:

---

[338]     *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 484 (5th Cir. 2001) (emphasis added).

[339]     *See* Ex. A-16, Plaintiff Profile P. Bradford, Dep. at 71:15-17, 78:19-24; Ex. A-17, Plaintiff Profile R. Bradford, Dep. at 44:19-23; Ex. A-78, Plaintiff Profile Robinson, Dep. at 74:6-10, 84:15-18.

[340]     Ex. A-48, Plaintiff Profile L. Hargrove, Dep. at 133:13-15; Ex. A-3, Plaintiff Profile Alfonso, Dep. at 83:24-84:10.

(2)     To be entitled to medical monitoring, Plaintiffs must prove significant exposure and significantly increased risk of contracting a latent disease caused by formaldehyde.  Plaintiffs' individual exposures vary and Plaintiffs' experts cannot quantify the increase in risk (if any) to a particular plaintiff.  Can the elements of exposure and risk for the class be proven by trial of the class representatives' cases?

If the answer to this question is No, the Court need go no further – exposure and risk are

individual issues decided on specific causation grounds.  Exposure and risk cannot be tried

representatively and this subclass does not meet the predominance and superiority requirements.

If the answer is Yes, the Court must consider a third and final issue:

(3)     Medical monitoring is appropriate when an accurate screening test exists that can detect disease in its latent phase and the disease is more successfully treated when screen-detected.  The monitoring regime must be different from medical services that would be recommended for the non-exposed population.  The monitoring program recommended by Plaintiffs' experts is an annual examination by a personal physician.  Can this regime satisfy the legal requirements for a court-monitored medical monitoring program?

The answer to this question can only be No.  Because the program proposed by Plaintiffs does

not satisfy the essential legal elements of medical monitoring, the unifying factor by which class

treatment would be practicable and workable for this subclass does not exist.  The Future

Medical Services Subclass should not be certified.

**B.      What Does the Definition of the Future Medical Services Subclass Mean?**

Plaintiffs propose a subclass with the following definition:

**<u>Future Medical Services Subclass</u>**

All individuals who resided for any length of time in emergency housing units provided by FEMA within the states of Louisiana, Texas, Mississippi, and/or Alabama after Hurricanes Katrina and/or Rita, and who are found eligible to participate in a medical services program designed to monitor the physical condition(s) of each such individual for the purpose of ascertaining and responding to diseases caused by, contributed to, or

exacerbated by the individual's exposure to formaldehyde while
residing in any of the aforementioned units.

Stripping this definition bare and translating it into plain English, members of this subclass would be periodically checked by a doctor[341] to find out if they have[342] a disease caused by formaldehyde, and if they do, they would be treated.[343]  Although Plaintiffs now tout this "future medical services program" as novel and distinct from medical monitoring,[344] it is in fact the same medical monitoring they sought in their Administrative Master Complaint[345] with the added component of treatment if the monitoring detects disease.

Monitoring and treatment should not be confused.  The difference between the two is conspicuously apparent when viewed in the context of an individual case.  Consider the hypothetical case of trailer resident John Doe versus trailer manufacturer Acme Trailer Company.  If John Doe alleges that he has a manifest physical injury or disease caused by an excessive level of formaldehyde in an Acme trailer, John states a cause of action against Acme. If John can prove all the elements of his case under applicable state law in a trial, he will recover all medical expenses for the treatment of his injury or disease including the projected cost of future treatment.  John probably does not need or want monitoring.  He already has an injury or disease.  He needs treatment.  The burden is always on John Doe, however, to prove that he has been injured, that the injury was caused by formaldehyde, and that the presence of formaldehyde in his Acme trailer qualifies as a defect under applicable state law.

---

[341]     "Periodically checked by a doctor" = "monitor the physical condition of."
[342]     "Find out if they have" = "for the purpose of ascertaining … diseases."
[343]     "Treated" = "for the purpose of … responding to diseases."
[344]     Plaintiffs argue that medical monitoring is "a similar but distinct remedy than what is being sought in the case at bar."  Plaintiffs' Memorandum, p. 22 of 40.
[345]     Administrative Master Complaint, Rec. doc. 109, p. 48 of 78, ¶ 91 ("medical monitoring for all class members under a court-supervised medical monitoring fund").

If John Doe *does* ask for monitoring in addition to treatment, he still bears the burden of proving the original injury, causation, and defect.  But by adding a monitoring claim, he *increases* his trial burdens.  Now, he must *also* prove all the elements of a medical monitoring claim under applicable state law.  At minimum, he must demonstrate by a preponderance of the evidence that 1) the level of exposure to formaldehyde in the Acme trailer was significant; 2) the exposure significantly increased his risk of contracting a serious disease in the future – a disease that is different from the one he has now and a disease that has a latency period; 3) a medical test or procedure exists that makes early detection of the future disease possible; 4) the medical test or procedure is different from his normal regular checkups that he would  get if he hadn't been exposed to formaldehyde.

But what if John Doe does not succeed in his attempt to prove all of the elements in the first part of his case?  What if John Doe cannot prove that he has a current manifest injury or disease?  Or what if he cannot prove that the injury or disease he has was caused by formaldehyde?  In his individual case, he plainly would not be entitled to medical monitoring. But if the Court were to certify Plaintiffs' "Future Medical Services Subclass," the outcome would be different.  If John participates in the subclass, he receives the monitoring part of the program regardless of the fact that he has no current injury or disease and regardless of the fact that the odds are that he will never suffer from a formaldehyde-caused injury or disease in the future.  He will be monitored, but probably will never be treated.  John, as a subclass member, is relieved of the burden he bore in his individual suit.  He doesn't have to prove that he has a current manifest injury or disease.  Instead, Acme now shoulders the burden of paying for a program to regularly check John to "ascertain" if he develops an injury or disease in the future. Plaintiffs' ingenious definition of the "Future Medical Services Subclass" would allow for

monitoring without treatment and without injury.  Plaintiffs cannot use class action procedure to void state law requirements or shift burdens of proof that would apply if the case were filed individually.[346]

**C.     How Do Plaintiffs' Experts Describe the Medical Services Program?**

The medical services program referred to in the subclass definition has been explained by different Plaintiffs' experts.  Only one of Plaintiffs' experts, Dr. William Stein, addressed the medical services program in any detail in his affidavit.  Dr. Stein, an internist and oncologist, recommended a bifurcated program:

> 1)     <u>Short term health effects</u>.  Individuals who have suffered acute health effects (respiratory complaints and rashes) should be followed for five years.  They should be seen by a physician when they have symptoms, when they have a known re-exposure, or at a frequency determined by their individual physician.

> 2)     <u>Long term health effects</u>.  All individuals, whether or not they have symptoms, should be followed for twenty years or for life.  They should be seen once a year for a routine history and physical examination.  No particular medical tests are required by the program, but medical tests may be ordered at the physician's discretion.  Individuals and their physicians should be educated about the risks and potential consequences of formaldehyde exposure.  These recommendations are emphasized for children.[347]

Dr. Stein elaborated on this proposed program in his deposition.  There he explained that for short term health effects, the only people who need to be followed five years are those who have acute symptoms.[348]  Those people should simply be seen by their personal physician, not a

---

[346]     Rule 23 "does not alter the required elements which must be found to impose liability and fix damages (or the burden of proof thereon) or the identity of the substantive law … which determines such elements."  *Cimino v. Raymark Industries, Inc.*, 151 F.3d 297, 312 (5th Cir. 1998)

[347]     Ex. R-1, Dr. Stein Aff. at 7-9 (Opinions 5 & 6 with basis for each).

[348]     Ex. R-2, Dr. Stein Dep. at 83:1-6.

specialist.[349]  The five year time period for this monitoring is an arbitrary number.[350]  Whether

someone should be monitored at all for short term health effects can only be determined on an

individual basis.[351]

Dr. Stein recommended monitoring for long term health effects, regardless of whether an

individual had acute symptoms.  But his recommendation was simply a yearly visit to a personal

physician for a history and physical exam.[352]  This is the same thing he would recommend in the

absence of exposure:  "Well, you know, I think people ought to be examined yearly anyway."[353]

The only difference is that he believes the doctors and patients should be told about their

formaldehyde exposure and the risks that the exposure entails.[354]  Dr. Stein emphasized that he is

not recommending expensive medical screening in his proposed program:

> I don't think it is cost effective, time effective, anything effective
> to do big-time screening on these people on an ongoing basis.  In
> other words, you can't justify doing CAT scans on 100,000 people,
> at $2,000 a pop, every year for 20 years.  No. 1, it isn't going to
> affect the outcome of the disease, in all likelihood, at least not for
> the majority of them.
>
> No. 2, we are not going to find that many cases.  It is going to be
> hard to know if that many cases that we do find are – if a particular
> case we find is or is not affected by formaldehyde.[355]

In fact, Dr. Stein is not convinced that medical screening for specific diseases is beneficial at all

except in the case of breast cancer, colon cancer, and possibly prostate cancer.[356]

---

349      *Id.* at 84:8-20.
350      *Id.* at 85:1 – 87:1.
351      *Id.* at 84:21-25.
352      *Id.* at 111:18-24.
353      *Id.* at 166:6-11.  *See also id.* at 102:6-17.
354      *Id.* at 166:13-19.
355      *Id.* at 91:24 – 95:13.
356      *Id.* at 112:22 – 113:25.  It should be noted that none of these cancers are in any
way linked to formaldehyde exposure. Ex. B, Dr. Cole Aff., *passim*.

As for the emphasis on monitoring for children that Dr. Stein discussed in his affidavit, he explained that he was simply recommending that children be seen yearly by their individual pediatrician. "I think they should all be seen yearly by their doctors anyway."[357]  There is no special medical test or procedure that he recommends for these children.[358]  Further, he stated that his recommendations for monitoring of children are based on his personal feelings and his academic curiosity, not scientific evidence:

> Now, my personal feeling about this is that an evaluation should be done of this entire population of children.  And that we should know how much exposure they had to formaldehyde.
>
> But I can't sit here in good faith and tell you that we should – that this is a necessary thing other than for my academic curiosity.  I mean, I don't know and cannot point to anything in the literature which says that there is this type of adverse effect on these children and that they should be monitored and they should go to special education or anything of that nature because I don't know that.[359]

Although Dr. Stein was the Plaintiffs' expert who directly addressed a monitoring program in his affidavit and who gave extensive deposition testimony on that subject, he is not mentioned in Plaintiffs' Memorandum.  Nor is the program that he proposed discussed.  Instead, the only program discussed by Plaintiffs in their memorandum is a program focused on treating and educating children who *already have* asthma.[360]  Plaintiffs cite the testimony of Dr. Kenneth Paris, a pediatrician who specializes in the treatment of children with asthma.  Dr. Paris recommends diagnosis and treatment of children who have asthma, hardly a controversial position.[361]  Plaintiffs also cite an Asthma Education and Management Program implemented in

---

[357]    *Id.* at 116:2-3.
[358]    *Id.* at 118:1-22.
[359]    *Id.* at 119:15 – 120:4.
[360]    Plaintiffs' Memorandum, pp. 32-33 of 40.
[361]    *Id.*

connection with a settlement in the *Bayou Steel* case. Again, this program was focused on children who were *already suffering from* asthma.[362]

It is not clear how the program discussed in Plaintiffs' memorandum relates to the medical monitoring program requested in the Master Administrative Complaint. Even more obscure is how the program discussed in Plaintiffs' memorandum relates to the program proposed in the subclass definition. The program in the subclass definition is:

> [A] medical services program designed to monitor the physical condition(s) of each such individual for the purpose of ascertaining and responding to diseases caused by, contributed to, or exacerbated by the individual's exposure to formaldehyde while residing in any of the aforementioned units.

Yet, the program discussed in Plaintiffs' memorandum and discussed in the depositions of Drs. Paris and Williams is far narrower and would only apply to children who have asthma. And, even if the children already have asthma, the vehicle of a subclass cannot be used as an excuse to skip the Plaintiffs' required proof that any particular class member's asthma was caused or exacerbated by formaldehyde exposure,[363] which in turn had to have been due to a defect in a trailer. Thus, there appears to be no advantage to using a subclass for this program instead of individual treatment and management of children diagnosed with asthma.

None of Plaintiffs experts cite any scientific authority for a medical monitoring program of any sort for any of the alleged effects of formaldehyde exposure.

---

[362]    *Id.*, p. 33 of 40.

[363]    As discussed, *supra* at Section II.B.1.f, the Manufacturing Defendants at all times vigorously contest the notion that formaldehyde causes or exacerbates allergic disease and asthma. This is also discussed at length in the Motion to Exclude Dr. Paris. However, even if the Court were to accept the Plaintiffs' concept of general causation, over the Manufacturing Defendants' objection, they would still have to prove in each and every case, the issue of specific causation. That is, they would not only have to prove that formaldehyde *can* cause or exacerbate asthma, but they would also have to prove that each class member's asthma or allergic disease was caused or exacerbated by formaldehyde and not some other common cause.

**D.      Plaintiffs' Future Medical Services Subclass Definition Is Legally Insufficient.**

Each subclass must independently meet all of the requirements of Rule 23.[364]  This

includes the requirement of an adequate class definition.[365]

The Future Medical Services Subclass does not pass muster because, in order to be a

member of the subclass, a person must be "found eligible to participate in a medical services

program."  This in turn requires individualized factual inquiries to determine whether a person is

even a member of the subclass.  Furthermore, it is not even clear at this point what those factual

inquiries would be, because Plaintiffs' experts cannot agree on the purpose and scope of the

proposed program.  The definition fails because it is not precise, objective, nor presently

ascertainable.[366]  As aptly stated in another medical monitoring case where a class definition was

found to be fatally vague:  "As formulated, there is no objective means for the Court, or indeed

even potential claimants, to discern who qualifies.  Plaintiffs have failed to explain what criteria

would be used to identify those 'who will require medical detection services' without an

individual assessment of every person who thinks that he or she qualifies."[367]

---

[364]      FED. R. CIV. P. 23(b)(5); *Johnson v. American Credit Co. of Georgia*, 581 F.2d
526, 532 (5th Cir. 1978); *Recinos-Recinos v. Express Forestry, Inc.*, 233 F.R.D. 472 (E.D. La.
2006).

[365]      *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 662 (S.D. Ala. 2005).

[366]      *Id.* and cases cited therein.

[367]      *Snow v. Atofina Chemicals, Inc.*, No. 01-72648, 2006 WL 1008002, *8 (E.D.
Mich. Mar. 31, 2006) ("*Snow*").  *See also In re Fosamax Products Liability Litigation*, 248
F.R.D. 389 (S.D.N.Y. 2008) ("*In re Fosamax*"); *Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 660
(M.D. Fla. 2001), *aff'd*, 400 F.3d 1286 (11th Cir. 2005), *cert. denied*, 546 U.S. 935 (2005) and
*Lockheed Martin Corp. v. Superior Court*, 63 P.3d 913, 1109 (Cal. 2003) – all medical
monitoring cases where definitions were found insufficient.

**E.      Plaintiffs as a Group Don't Meet the "Manifest Physical Injury" Requirement for Medical Monitoring**

Each of the four states at issue require that a plaintiff have a "manifest physical injury" before he may claim medical monitoring for development of a future disease.[368]  Plaintiffs admit that they must climb this legal hurdle but contend that all class members have suffered a manifest physical injury in the form of "cellular and molecular" damage.[369]

Only Plaintiffs' expert Dr. Patricia Williams espoused the theory that cellular and molecular changes involving formaldehyde constitute manifest physical injury.  Dr. Williams' is not qualified to give an opinion on this subject.  Further, her testimony is unreliable and irrelevant under *Daubert* standards.  Problems with her qualifications and scientific methodology are fully addressed in Manufacturing Defendants' motion to exclude her testimony.[370]  Here, Manufacturing Defendants will limit this discussion to what Dr. Williams testified to in her deposition and whether, even by her own statements, a manifest physical injury exists in every member of the class.

Dr. Williams admits that "In humans, as well as in other animals, formaldehyde is *an essential metabolic intermediate in all cells.*"[371]  That is, formaldehyde occurs naturally in all human cells and is essential to life.  This coincides with opinions of the Manufacturing Defendants' experts.  "Formaldehyde is ubiquitous in nature; it is present in all living things ….  Life cannot exist without formaldehyde because it is the key ingredient for the transfer of the

---

[368]      Louisiana:  La. Civ. Code art. 2315(B) ("manifest physical or mental injury or disease"); Alabama:  *Hinton ex rel. Hinton v. Monsanto Co.*, 813 So. 2d 827 (Ala. 2001) ("manifest physical injury or illness"); Mississippi:  *Paz v. Brush Engineered Materials, Inc.*, 949 So. 2d 1 (Miss. 2007) ("identifiable injury, either physical or emotional"); Texas:  *Norwood v. Raytheon Co.*, 414 F. Supp. 2d 659 (W.D. Tex. June 17, 2006) ("present physical injury") (federal district court predicting outcome under Texas law).

[369]      Plaintiffs' Memorandum, p. 22 of 40.

[370]      Motion to Exclude Dr. Williams.

[371]      Plaintiffs' Memorandum, *Plaintiffs'* Ex. E, Dr. Williams Aff. at 9.

one-carbon units; carbon compounds are the backbone structures of compounds in both animals and plants."[372]

Dr. Williams conceded in her deposition that the formaldehyde molecules that a person may inhale from external sources such as those that may be emitted from components of a travel trailer are no different from the formaldehyde molecules that exist naturally in the human body.[373] Furthermore, the properties of the formaldehyde molecule to combine with other molecules and insert itself into cells are no different for inhaled formaldehyde than for naturally occurring formaldehyde.[374]

Since metabolism is by definition the buildup and breakdown of molecules for use by the body,[375] and since formaldehyde is essential for human metabolism, this propensity of the formaldehyde molecule that Dr. Williams describes as causing "damage" is the same quality of the formaldehyde molecule that sustains human life. It is simply the combination of formaldehyde molecules with other molecules.

This process that occurs naturally in the body at all times was described by Dr. Williams in the following hyperbolic terms:

> If that one molecule in its reactive electrophile form [its normal form[376]] comes in contact with any part of a cell, it's going to combine and it's going to cause damage.
>
> *Now, observable damage? You know, no.* Not unless that observable damage becomes later on a clone of mutant cells, it has

---

[372]    Ex. G, Dr. Waddell Aff. at 3, ¶ 6. *See also* Ex. F, Dr. Golden Aff. at 4-5, ¶ 6; Ex. B , Dr. Cole Aff. at 3.

[373]    Ex. S-2, Dr. Williams Dep. at 286:4 – 287:6.

[374]    Ex. S-2, Dr. Williams Dep. at 287:7 – 288:1.

[375]    Metabolism is "The sum of chemical changes that occur within the tissues of an organism consisting of anabolism (BIOSYNTHESIS) and catabolism; the buildup and breakdown of molecules for utilization by the body." Medical Dictionary Online, http://www.online-medical-dictionary.org/omd.asp?q=metabolism.

[376]    According to Dr. Williams formaldehyde is "a reactive electrophile." Ex. S-2, Dr. Williams Dep. at 235:3-4.

> become a cancer.  So that it's not an observable.  *It's at the very molecular level*.  That's the nature of an electrophile.[377]

This cellular/molecular level non-observable "damage" as described by Dr. Williams fails to qualify as manifest physical injury under the legal standards applicable in Louisiana, Alabama, Mississippi and Texas.  It is not a legally cognizable "physical injury"; further, it is not "manifest" "identifiable" or – in the words of Dr. Williams – "observable."

In *In re Rezulin Products Liability Litigation*,[378] Judge Kaplan concluded that subcellular mitochondrial damage allegedly caused by the drug Rezulin was not a manifest physical injury under either Texas or Louisiana law.[379]

Not every physical change is an injury.  The Ninth Circuit in *Dumontier v. Schlumberger Technology Corp.*, recently explained this in rejecting a claim that subcellular damage caused by the slightest exposure to radiation constituted "bodily injury" within the meaning of the Price-Anderson Act:

> We next consider whether the term "bodily injury" in the Act includes subcellular damage.  Plaintiffs argue that the slightest exposure to radiation damages cells by denaturing proteins and modifying DNA.  This, they argue, qualifies as bodily injury under the Act.  But not every alteration of the body is an injury.  Thinking causes synapses to fire and the brain to experience tiny electric shocks; fear stimulates the production of chemicals associated with the fight-or-flight response.  All life is change, but all change is not injurious.  Adopting Plaintiffs' interpretation of bodily injury would render the term surplusage, as every exposure to radiation would perforce cause injury.

And:

> Plaintiffs presented evidence that radiation always " damage[s] the DNA or other important cellular components."  But this damage does not establish that there is or will be pain or interference with

---

[377] Ex. S-2, Dr. Williams Dep. at 236:8-18 (emphasis added).
[378] 361 F. Supp. 2d 268 (S.D.N.Y. 2005).
[379] *In re Rezulin*, 361 F. Supp. 2d at 273-76 (Texas) and 277-79 (Louisiana).

bodily functions, and thus isn't an injury within the meaning of the Act.[380]

Other courts have come to similar conclusions.  The Sixth Circuit in *Rainer v. Union Carbide Corp.*,[381] also found that subcellular damage to DNA and chromosomes caused by exposure to spent uranium fuel was not a "bodily injury" under the Price-Anderson Act.  The Sixth Circuit reached this conclusion despite expert testimony that the physical injuries sustained by the DNA were analogous to a knife wound cutting tissue.  The Sixth Circuit held that whether chromosome damage constitutes a "present physical injury" is *a legal question, not a factual one*.  Analyzing and applying Kentucky case law, the Sixth Circuit cited several important considerations supporting its legal determination that chromosome damage was *not* a present physical injury.

The Sixth Circuit first referred to Kentucky courts' stated concerns about opening floodgates of litigation, were such physical changes held to constitute physical injury.  "Accepting the Plaintiffs' claim would … throw open the possibility of litigation by any person experiencing even the most benign subcellular damage.  Based upon the average American's exposure to chemically processed foods, toxic fumes, genetically modified fruits and vegetables, mercury-laden fish, and hormonally treated chicken and beef, this might encompass a very large percentage of the total population."[382]

The Sixth Circuit also noted that Kentucky courts have stated that subcellular damage that is merely predictive of future disease is not a present physical injury.  "Although the Plaintiffs contend that they have real and concrete physical injuries, the evidence shows that their

---

[380]     *Dumontier v. Schlumberger Technology Corp.*, 543 F.3d 567, 571 (9th Cir. 2008).
[381]     402 F.3d 608 (6th Cir. 2005), *cert. denied*, 546 U.S. 978 (2005).
[382]     402 F.3d at 621.

DNA damage is harmful only insofar as it is predictive of future disease ….. The claims of the Plaintiffs here are likewise premature."[383]

In *Parker v. Wellman*,[384] the Eleventh Circuit considered whether the presence of elevated levels of toxin metabolites in children's blood as a result of beryllium exposure constituted a current physical injury and decided that it did not. The Court held that subclinical, cellular damage did not constitute physical injury *as a matter of law*. The subclinical, cellular damage had not resulted in "an identifiable physical disease, illness, or impairing symptoms."[385] Under Georgia law, "an allegation of subclinical damage does not satisfy [the] requirement of an actual 'disease' or 'impairment,' even if it is a predictor of future disease."[386]

As discussed in these cases, even accepting Dr. Williams testimony that there has been "contact damage" to cells caused by formaldehyde, the requirement of a manifest physical injury is not met. Not only is the purported damage unobservable (and therefore not manifest or identifiable), but it also causes no current pain, interference with bodily function, disease, illness or impairing symptoms. Whether subcellular damage is a manifest physical injury under these circumstances is a question of law that should be decided by the Court as it was in each of the cases discussed above. Manufacturing Defendants submit that the "damage" described by Dr. Williams is *not* a manifest physical injury and therefore the prerequisite for medical monitoring under the laws of each of the four states cannot be met class-wide.

Such a holding does not prevent any particular class member from demonstrating that he has a manifest physical injury. Rather, the question of whether any individual has such an injury can only be answered by examining the facts and circumstances pertaining to each person. This

---

[383]   *Id.* at 622.
[384]   230 Fed. Appx. 878 (11th Cir. Apr. 18, 2007).
[385]   *Id*. at 882.
[386]   *Id*. at 883.

is an individual inquiry that cannot be answered by trying this case in the form of a class action. Given that every person's case must be individually tried as to whether they have sustained an injury and whether the injury was caused by formaldehyde, class certification for a "Future Medical Services Subclass" is inappropriate.

**F.    Even if Cellular Damage Is an "Injury," Individual Issues of Exposure and Risk Predominate and Prevent Certification of a Future Medical Services Subclass.**

Plaintiffs claim that common issues predominate over individual ones in their Future Medical Services Subclass.  Yet at least two of the issues they cite in their memorandum as common issues are in fact individual issues.  They are:

º    Whether *certain Plaintiffs* were *significantly exposed* to a [sic] formaldehyde, a hazardous substance;

º    Whether *certain Plaintiffs* now suffer a significantly *increased risk* of contracting a serious latent disease, associated with formaldehyde exposure.[387]

The use by Plaintiffs of the phrase "certain Plaintiffs" in describing these supposedly common issues is telling.  Which plaintiffs are they?  How do we pick the plaintiffs who were significantly exposed?  How do we pick the plaintiffs who have an increased risk, presuming for the moment that such an increased risk even exists?  These questions cannot be determined on a class wide basis.  They must be determined by looking at each individual plaintiff's circumstances.

The amount of exposure to formaldehyde for any individual must be uniquely determined by looking at the a number of different factors as discussed above.  These variations can substantially affect levels of formaldehyde to which an individual is exposed.  For example, smoking a single cigarette in a room of approximately 1000 cubic feet (10' x 10' x 10') will raise

---

[387]    Plaintiffs' Memorandum, p. 19 of 40 (emphasis added).

the formaldehyde level in the room by 210 ppb in the space of an hour.[388]  This level of

formaldehyde is far above the Minimum Risk Levels cited by Plaintiffs in their memorandum,[389]

has nothing to do with any source of formaldehyde from the trailer itself, and can only be

determined by individual inquiry.  Even within a single trailer, different family members will

have different exposures according to their own personal habits, including for example, use of

household products and cosmetics[390] as well as many other factors.[391]  Assuming that an

exposure level can be accurately determined for a particular class representative does not help to

determine the exposure of any other class member.  Thus, the so-called "common question" of

significant exposure, is not common at all.[392]

Likewise, the question of whether a class member sustained a significantly increased risk

of a serious latent disease associated with formaldehyde exposure is not a common question

because it cannot be determined without individual inquiry.  Take, for purposes of illustration,

the risk of contracting nasopharyngeal cancer, a disease that Plaintiffs claim is a risk of

formaldehyde exposure.  The risk in the general American population of contracting

---

[388]     Ex. G, Dr. Waddell Aff. at 5, ¶ 13.  (Converting ppm to ppb and cubic meters to cubic feet.)

[389]     Plaintiffs cite the Minimum Risk Levels from the Agency for Toxic Substances and Disease Registry as 40 ppb for acute exposure, 30 ppb for intermediate exposure and 8 ppb for chronic exposure.  As shown in footnote 129, *supra*, the use of numbers generated for MRL purposes is meaningless to practitioners and is simply a creation of the ATSDR for their own purposes.

[390]     Ex. Q, Dr. Smulski Dep. at 73:3-7.

[391]     *Id.* at 121:20 – 122:12.

[392]     Similar concerns led Louisiana's state Fifth Circuit to affirm denial of a medical monitoring class for workers exposed to asbestos at Avondale Shipyard.  The Court concluded it was impossible to determine whether any employee sustained a "significant exposure" without a detailed individual examination of the individual's particular circumstances.  The Court stated that its ruling was made not only under Louisiana's class action rules, but also under Rule 23. *Bourgeois v. A.P. Green Industries, Inc.*, 2006-0087 (La.App. 5 Cir. 7/28/06), 939 So. 2d 478, 492-93, *writ denied*, 2006-2159 (La. 12/8/06), 943 So. 2d 1095.

nasopharyngeal cancer is .5 males per 100,000 and .2 females per 100,000 annually.[393]

Assuming the risk is increased at all by exposure to formaldehyde while living in a trailer, the

risk is still very small.[394]  As Plaintiffs' oncologist, Dr. Stein, testified, no one really knows what

the increase in risk is:

> But to tell you the truth, we really – we have a lot of suppositions,
> but the problem we have with this and with formaldehyde is that
> the numbers are so small, while we assume that there is some
> causative agent or there is some increased risk because of it, these
> things are very hard to determine.  That is why there is all the
> debate about this.[395]

Determining an *individual's* risk is keyed to individual factors of level of exposure,

duration of exposure, and other individual characteristics such as whether the person has other

risk factors for contracting nasopharyngeal cancer.[396]  Thus, an individual's risk cannot be

determined on a class-wide basis.[397]

---

[393]   Ex. M, Dr. McGwin Dep. at 163:2-21; Ex. R-2, Dr. Stein Dep. at 97:6-21.

[394]   Ex. R-2, Dr. Stein Dep. at 98:17 - 99:1 ("But I will tell you that whatever, the incidence is low, and the incremental increase in incidence is going to be a small number.  But whether or not that increases the incidences by 50 percent or 100 percent, it is still a small number.  So if you accept your numbers and go from .5 cases – 0.05 cases per hundred thousand and have a 100 percent increase, it is still only .1 per hundred thousand.").

[395]   *Id.* at 99:25 – 100:8.  Similarly Dr. Philip Cole states, "There is no way to estimate the amount of excess NPC or of leukemia that might occur among the occupants of the EHUs from any formaldehyde exposure.  That is so because any such excesses are entirely hypothetical, very low, and so imprecise as to defy quantification."  Ex. B, Dr. Cole Aff. at 13.

[396]   Ex. R-2, Dr. Stein Dep. at 100:14-25.  Other risk factors include certain viral illnesses and certain carcinogens.  *Id.* at 99:22-25

[397]   *See In re Fosamax*, 248 F.R.D. at 399-400 ("A plaintiff cannot prevail by proving that, in general, Fosamax could cause a significant increase in the risk of ONJ in some users…. A court could not decide whether any class member's ingestion of Fosamax caused him or her to suffer a significant increase in the risk of ONJ without considering … individual factors.") and *Barnes v. American Tobacco Co.*, 161 F.3d 127, 145 (3rd Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999) ("[P]laintiffs cannot prove causation by merely showing that smoking cigarettes causes cancer and other diseases" but "must demonstrate that defendants' [acts] caused each individual plaintiff to have a significantly increased risk of contracting serious latent diseases thereby demonstrating the need for medical monitoring.").

Nor, for that matter, is it apparent from Plaintiffs' expert's testimony that a *significant* increase in risk (a requirement for medical monitoring) can be demonstrated, even if general causation is assumed.  In the context of a claim for increased risk of developing future asbestos-related cancer, the Louisiana Supreme Court in the *Bonnette* case said:

> It is abundantly clear that none of the experts could conclude that any of the Plaintiffs had suffered any "significant" exposure to asbestos fibers.  Furthermore, the experts admittedly could not quantify the degree of exposure that Plaintiffs experienced, if in fact they were exposed.  The trial court therefore correctly determined that Plaintiffs' exposure to asbestos fibers in addition to those found in ambient air, was "slight," and that any increased risk of contracting an asbestos-related health condition was also "slight."  Under the circumstances, Plaintiffs have failed to prove they are entitled to compensatory damages for an increased risk of developing an asbestos-related disease.[398]

Similarly here, Plaintiffs' are unable to demonstrate significantly increased risk of contracting a serious latent disease due to formaldehyde exposure, because their experts have testified that the risk is very small and they are unable to quantify the increase in risk, if any.  This absence of proof of an essential requirement for medical monitoring precludes a subclass targeted at monitoring.

In 2005, in *In re St. Jude Medical, Inc.*,[399] the Eighth Circuit Court of Appeal summarized the status of medical monitoring class actions nationwide as follows:

> Proposed medical monitoring classes suffer from cohesion difficulties, and numerous courts across the country have denied certification of such classes.  *See, e.g., Ball v. Union Carbide Corp.*, 385 F.3d 713, 727-28 (6th Cir. 2004); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195-96, *amended*, 273 F.3d 1266 (9th Cir. 2001); *Barnes*, 161 F.3d at 143-46; *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995).  Quoting the Third Circuit, the Supreme Court in *Windsor* listed some of the individual variations precluding class certification:  "[Exposure-only Plaintiffs] will also incur different medical expenses because

---

[398]   *Bonnette v. Conoco, Inc.*, 2001-2767 (La. 1/28/03), 837 So. 2d 1219, 1233.
[399]   425 F.3d 1116 (8th Cir. 2005).

their monitoring and treatment will depend on singular
circumstances and individual medical histories."   521 U.S. at 624,
117 S.Ct. 2231 (quoting *Georgine*, 83 F.3d at 626).[400]

In *In re St. Jude Medical, Inc.*, the Eighth Circuit reversed the trial court's certification of a

medical monitoring class of approximately 11,000 recipients of an artificial heart valve that had

been recalled.  The cases specifically listed in the Eighth Circuit opinion were merely

representative of a growing trend across the country.  Since that time there have been many

others.[401]

The great weight of cases nationwide now refuse certification of medical monitoring

classes because individual questions involved in monitoring predominate over common

questions.  "No matter how you cut it, cube it, or slice it, Plaintiffs cannot overcome the

problems with individual issues of law and fact, which eclipse any possible common questions or

cohesion among their claims."[402]  The same concerns prevent certification of the Future Medical

Services Subclass here.  Plaintiffs cannot try their claims without extensive examination of

exposure levels and risk for every individual in the class.

---

[400]    *Id.* at 1122.

[401]    *See, e.g.*, *In re St. Jude Medical, Inc.*, 522 F.3d 836 (8th Cir. 2008) (same case
considered under Rule 23(b)(3)); *In re Fosamax*; *Sanders v. Johnson & Johnson, Inc.*, No. CIV>
03-2663, 2006 WL 1541033 (D.N.J. June 2, 2006) (use of medical product Intergel); *Meyer ex
rel. Coplin v. Fluor Corp.*, No. ED 86616, 2006 WL 996540 (Mo. App. April 18, 2006) (lead
and chemical exposure from smelter); *Snow* (chemical exposure from single explosion at
defendant's chemical plant); *Wyeth, Inc. v. Gottlieb*, No. 3D05-491, 2006 WL 335602 (Fla. Dist.
Ct. App. Feb. 15, 2006) (use of drug Prempro); *In re Prempro*, 230 F.R.D. 555 (E.D. Ark. 2005)
("*In re Prempro*") (use of drug Prempro).

[402]    *In re Prempro*, 230 F.R.D. at 573.  *See also In re Fosamax*, 248 F.R.D. at 401
("[A]lmost every element of a medical monitoring claim under the laws of … Louisiana would
present case-specific questions that are central to whether class members [are] entitled to
recovery in this case.  These individualized questions clearly predominate over any common
questions in the case.").

G.     **Plaintiffs Cannot Prove That the Program They Request Is any Different from the Regime of an Annual Physical; Nor Can They Prove That the Program Is Supported by any Scientific Authority.**

Another prerequisite for a medical monitoring program in those states where the remedy is recognized is that the monitoring regime be different from that which would be recommended in the absence of exposure.[403]  Dr. Stein's program of an annual checkup with a complete history and physical examination is, by his own admission, no different from that generally recommended for all people (regardless of age) in the absence of formaldehyde exposure.[404]

The asthma program recommended by Dr. Williams is not a program to detect a serious latent disease.  Instead, it is a program designed to educate and treat children who have already been diagnosed with asthma.  In order to participate in such a program, each child would have to individually show that he has asthma already, that the asthma was caused by formaldehyde exposure in a trailer, and that the trailer was defective.  (Plaintiffs cannot – and do not – cite to a single medical reference that concludes that formaldehyde causes asthma.  All they can do is cite to three articles that have "suggested" that ambient formaldehyde exposure "might" increase the

---

[403]        In *Bourgeois v. A.P. Green Industries, Inc.*, 1997-3188 (La. 7/8/98), 716 So. 2d 355, the Louisiana Supreme Court laid out the requirements for medical monitoring in the absence of manifest physical injury, which included the requirement that "the prescribed monitoring regime is different from that normally recommended in the absence of exposure." The following year, the Louisiana Legislature amended article 2315 of the Louisiana Civil Code to add the requirement of a manifest physical injury.  Because the other three states here have never recognized medical monitoring in the absence of manifest physical injury, those three states have never set forth in detail the requirements for medical monitoring beyond that of an existing injury.  Nonetheless, it is only logical under basic principles of tort law that if a person's normal medical regime is not changed due to an exposure, there is no legitimate reason to shift costs which would have been incurred even without exposure to the defendant.  *See also In re Prempro*, 230 F.R.D. at 571 (denying nationwide medical monitoring class action, court described a "key element[] generally required by states recognizing medical monitoring relief" as being that "as monitoring procedure exists that makes early detection of disease possible, and that this procedure is different from the health monitoring normally recommended in the absence of exposure.").

[404]        *See* discussion *supra* at pp. 88-89.

risk of triggering the onset of a wheezing or asthma episode.[405])  Nine percent of the general population has asthma.[406]  Furthermore, there are numerous common triggers of asthma found in the EHUs, including among others, dust mite, pet dander, mold, and cockroach.[407]  Discerning those cases caused or exacerbated by formaldehyde (if any) will be no easy task and will require extensive examination of individual circumstances and medical history.

If a child could carry those individual legal burdens of proof, he would be eligible to participate in Dr. Williams' program.  But there has been no demonstration that any such child would be better served by participating in a mass program as opposed to receiving individualized treatment by an allergist of his own choosing.  Put another way, "There is an insufficient basis to believe that all class members would prefer the proposed monitoring program to one designed with their own particular circumstances in mind."[408]

The program Dr. Williams has spoken of is a program of her own devising, created by her in connection with a settlement in another case.  Dr. Williams, a toxicologist, has in no way demonstrated that her program has been approved by the scientific community or for that matter by any other medical authority.  Nor is it apparent why a toxicologist would be qualified to design an education and treatment program for asthma.  Dr. Williams' attempts to give medical testimony have been rejected in the past,[409] and she should not be allowed to do so here by the back door of testifying to a "medical services" program.

---

[405]    For a further discussion see the Motion in Limine to Exclude Dr. Paris, as well as the Medical Background section *Formaldehyde – Sensitization/Asthma* at Section B.1.f, *supra*.

[406]    Ex. O, Dr. Paris Dep. at 120:3-7.

[407]    *Id.* at 38:3-10.

[408]    *In re Fosamax*, 248 F.R.D. at 402.

[409]    *Ballard v. Bunge North America, Inc.*, No. CIV.A. 07-343, 2008 WL 2185385, *3 (E.D. La. May 22, 2008).

While Plaintiffs experts were unable to cite to any guiding principles for designing a monitoring program,[410] generally accepted guidelines do exist in the scientific community. These are described in the affidavit of Dr. Philip Cole who is both a medical doctor and an epidemiologist.  Dr. Cole explains:

> The major concepts in cancer screening were developed nearly 30 years ago (4, 24) and have remained essentially unchanged ever since (24, 25).  The most important issues are:  1) Screening may be appropriate for a cancer that is *relatively common in its preclinical, or latent, phase* among the people for whom screening is intended.  2) The cancer must be *more successfully* treated when it is screen-detected than when it is symptom-diagnosed.  3) There must be available a screening test that is known to be both highly *sensitive* (nearly always detects latent disease) and highly *specific* (does not produce a false positive result in the absence of disease).[411]

(These criteria are also attested to by Dr. James Wedner, Manufacturing Defendants' allergist and immunologist.[412])  Dr. Cole goes on to explain that screening for nasopharyngeal cancer and for leukemia meets none of these criteria.  "Thus, in terms of principles, NPC and leukemia are not diseases for which there is a rational basis for screening."[413]

Dr. Brooks Emory, Manufacturing Defendants' pulmonologist and internist who has testified before on the subject of medical monitoring, also states that monitoring as a result of formaldehyde exposure is not appropriate.  He cites 1) the lack of evidence of any disease related to formaldehyde exposure at the levels said to be present in the trailers; 2) the lack of monitoring or screening tests for diseases claimed to be related to formaldehyde exposure; 3) and the fact that normal periodic health checkups are recommended in the absence of exposure.

---

[410]   Ex. R-2, Dr. Stein Dep. at 24:13 – 25:3.
[411]   Ex. B, Dr. Cole Aff. at 13.
[412]   Ex. H, Dr. Wedner Aff. at 12, ¶ 31.
[413]   Ex. B, Dr. Cole Aff. at 13.

Dr. Wedner, Manufacturing Defendants' expert allergist and immunologist, states that medical screening for asthma is inappropriate for comparable reasons:

> There is currently no specific test that will with precision demonstrate the early appearance of any atopic disease before it becomes readily obvious to the patient's physician or health care provider. For asthma, for example, there are tests that are applied after one becomes symptomatic and which are used to confirm the diagnosis: but, none that can be used for the early detection of this disease. More importantly, there is no evidence in the world's literature that if there were such a test that it would lead to a treatment which if instituted would improve health care outcomes, one of the important hallmarks of a monitoring program.[414]

Indeed, while medical monitoring has intuitive appeal – after all, wouldn't we all be better off with more medical testing "just in case"? – it in fact can be harmful and should be used with caution only in circumstances that meet standard criteria and where it is merited. Thus, Plaintiffs' expert pulmonologist Dr. Shellito testified that he had conveyed "words of caution" to Plaintiffs' counsel in this case. Those "words of caution":

> – centered around a medical monitoring aspect of this case. And referring to my words of caution, my words of caution would be that medical monitoring for any adverse health effect due to exposure – due to a toxic exposure should be carefully thought out and well justified.[415]

Dr. Shellito's concerns are echoed by several of the Manufacturing Defendants' experts, including Dr. Cole and Dr. Wedner. Dr. Cole stated that:

> There are few topics in medicine and public health that generate more misunderstanding than does screening. This misunderstanding reflects the fact that screening has great intuitive appeal. It seems to be a simple, obvious and effective approach to cancer control. In reality, cancer screening is a complex practice that is expensive, potentially dangerous and with few exceptions produces little or no benefit. The limitations of screening are well

---

[414]   Ex. H, Dr. Wedner Aff. at 12, ¶ 33.
[415]   Ex. P, Dr. Shellito Dep. at 20:7-13.

recognized and understood by those who have studied and written about it (4, 24, 25).[416]

And further:

> The second edition of a standard textbook, *Cancer Epidemiology and Prevention*, includes a chapter entitled "Fundamental Issues in Screening for Cancer" (29). It was written by Dr. Anthony Miller, a former Director of the National Cancer Institute of Canada and of the Canadian Cancer Society. Dr. Miller cautions that, for a screening test to be acceptable it must be safe. He also indicates that, "*It cannot necessarily be assumed that a screening program for cancer will benefit the population to which it is applied. Not only do ethics demand that only programs with proven effectiveness be widely disseminated, it is also necessary to ensure that the program is continually monitored to confirm that effectiveness is maintained.*"

> The perception that a screening test and program can be ineffective and harmful may appear surprising. But, as just one example of these kinds of difficulties, consider the long-standing concerns over screening for prostate cancer. First, there is little evidence that prostate cancer screening (usually based on a blood test for prostate-specific antigen) actually lowers prostate cancer mortality among men who have been screened. In addition, men who test positive may be subjected to major surgery – surgery with a significant probability of producing serious side effects.

> Dr. Miller's positions, which I fully endorse, exemplify the accepted professional views that cancer screening can be both ineffective and even harmful.[417]

Dr. Wedner agreed that medical monitoring which is not well thought out can be harmful:

> Simply testing for diseases that do not meet these criteria represents "testing for the sake of testing" and is not only inappropriate but may lead to adverse health outcomes by suggesting a disease when none exists or by early diagnosis of a disease for which there is no cure, i.e. the patient has to endure the disease longer. It is for this reason that wholesale monitoring of any population should be done with great thought.[418]

---

[416]   Ex. B, Dr. Cole Aff. at 12.
[417]   *Id*. at 15.
[418]   Ex. H, Dr. Wedner Aff. at 12, ¶ 31.

A perfect example of a diagnostic test that can be harmful is demonstrated in the testimony of Dr. Kenneth Paris, Plaintiffs' pediatric allergist.  The only screening test that Dr. Paris could think of to detect asthma in a child before a child exhibits symptoms was a Methacholine challenge – a test that is actually designed to rule out asthma.[419]  However, he admitted that he would not order a Methacholine challenge on a child who had lived in a FEMA trailer but had no symptoms.[420]  There are very serious dangers involved in a Methacholine challenge including the danger of death.[421]  Dr. Paris wants evaluation and treatment of children who have obvious symptoms such as wheezing and bronchoconstriction, not screening tests.  Dr. Paris testified that medical screening will not help these patients.[422]

Plaintiffs have not pointed to any scientific authority supporting either of the programs their experts have suggested.[423]  Dr. Stein candidly admitted that he knew of no medical organizations that recommend screening for nasopharyngeal cancer or leukemia.[424]  Dr. Williams' program applies only to children who already have asthma.[425]  It is not a screening program and she cites no authority for it other than her own opinion.

Under similar circumstances, Judge Fallon denied class certification of a medical monitoring program for users of the drug Propulsid:

---

[419]    Ex. O, Dr. Paris Dep. at 82:14 – 83:6.
[420]    *Id.* at 97:13-24; 99:10-16.
[421]    *Id.* at 97:25 – 98:5 and 98:23 – 99:2.  *See also* Ex. C, Dr. Emory Aff. at 4 ("The use of methacholine testing is not a safe test for use in a medical monitoring setting.").
[422]    Ex. O, Dr. Paris Dep. at 73:23 – 74:5.
[423]    Dr. Cole specifically states that the American Cancer Society, the U.S. National Cancer Institute, and the United States Preventive Services Task Force, three public health agencies that from time-to-time have published updated guidelines for screening for various forms of cancer, have not recommended screening for nasopharyngeal cancer or leukemia.  Ex. B, Dr. Cole Aff. at 14.
[424]    Ex. R-2, Dr. Stein Dep. at 112:22 – 113:4.
[425]    Ex. S-2, Dr. Williams Dep. at 121:25 – 122:9.

> This raises the issue of the role of the courts in such an instance. Stated succinctly, the question is whether the courts should lead the scientific community in an area of medical science.[426]

With only Plaintiffs' experts suggesting these programs, this Court should refuse to order a class-wide medical monitoring, education or treatment program and leave the development of medical programs for a more cautious case by case approach supported by scientific authority and focused on the particular factual circumstances of individual Plaintiffs.

**H.      In Sum, the Future Medical Services Subclass Should Not Be Certified.**

The Future Medical Services Subclass does not meet Rule 23 requirements and should not be certified.  Each state requires a manifest physical injury before a person is entitled to medical monitoring.  The alleged cellular/molecular damage caused by formaldehyde molecules does not qualify as a manifest physical injury.  Thus, in order to satisfy the manifest physical injury requirement, each individual must be examined.  Each individual must prove his injury and that the injury was caused by formaldehyde which in turn resulted from a "defective" trailer.  These determinations must be made on an individual basis and cannot be made class-wide by a trial of only the class representatives' cases.  Other requirements of medical monitoring also require individual determinations, especially ascertaining whether a person has had a "significant" level of exposure to formaldehyde from a trailer, and whether a person's risk of contracting a serious latent disease has been significantly increased.  Finally, it is apparent that the monitoring program recommended by Dr. Stein is no different from the normal regime of annual checkups that all people should follow.  Neither that program nor Dr. Williams' "medical intervention" program are supported by scientific authority keyed to formaldehyde exposure. Because Plaintiffs have not demonstrated, even by their own expert testimony, that they could

---

[426]      *In re Propulsid Products Liability Litigation*, 208 F.R.D. 133, 147 (E.D. La. 2002).  To the same effect *see In re Fosamax*, 248 F.R.D. at 403 and *In re Baycol Products Litigation*, 218 F.R.D. 197, 212 (D. Minn. Sept. 17, 2003).

ever satisfy the legal requirements of medical monitoring on a class-wide basis, the Future

Medical Services Subclass cannot serve as the "glue" by which the putative class members'

claims could coalesce into a cohesive class action.

## IX.    ECONOMIC LOSS SUBCLASS

Plaintiffs seek certification of an economic loss subclass comprised of "All individuals to

whom FEMA provided an emergency housing unit within the states of Louisiana, Texas,

Mississippi, and Alabama after Hurricanes Katrina and Rita and who sustained economic loss

recoverable under each state's law as a result of being provided housing not fit for its ordinary

purpose."[427]  For the following reasons, this Court should deny Plaintiffs' request to certify this

proposed economic loss subclass.

**A.    The Proposed Economic Loss Subclass Lacks Standing to Assert Claims against the Manufacturing Defendants.**

Standing is a threshold issue that "determines the court's fundamental power to hear the

suit."[428]  As explained by the United States Supreme Court in *Lujan v. Defenders of Wildlife*,[429]

at an "irreducible constitutional minimum," a plaintiff must establish the following three

elements in order to have standing:  First, the plaintiff must show that she has suffered an injury

in fact.  This injury must be an invasion of a legally protected interest which is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical.[430]  Second, the

plaintiffs must establish "a causal connection between the injury and the conduct complained

of."[431]  Finally, it must be likely that the injury "will be redressed by a favorable decision."[432]

The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these

---

[427]    Plaintiffs' Memorandum, p. 5 of 40.
[428]    *Rivera.*
[429]    504 U.S. 555, 560 (1992).
[430]    *Lujan*, 504 U.S. at 560.
[431]    *Id.*
[432]    *Id.*

elements; and failure to establish any one of the elements deprives the federal courts of jurisdiction to hear the suit.[433]

In this case, Plaintiffs have failed to establish that the proposed economic subclass members suffered an injury in fact.  Plaintiffs do not articulate what economic injury was suffered by the proposed class members.  Instead, Plaintiffs merely conclude that "they did not receive the benefit of their bargain."[434]  But what bargain?  Plaintiffs do not argue that the proposed subclass members entered into any agreement with any of Manufacturing Defendants. Plaintiffs do not argue that the economic loss subclass members actually purchased emergency housing units.

Plaintiffs attempt to rely on the United States Court of Appeal, Fifth Circuit's decision in *McManus v. Fleetwood Enterprises, Inc.*[435] in order to support their argument that Plaintiffs did not receive the benefit of their bargain.[436]  In *Fleetwood*, the Court of Appeal did affirm the certification of a class of plaintiffs who alleged that they suffered economic damages as a result of the manufacturer's alleged breach of an implied warranty.[437]  However, the class members in *Fleetwood* were all *purchasers* of the motor homes at issue in that case.[438]  In contrast, the proposed economic loss subclass in this case is not limited to actual purchasers of emergency housing units but extends to "*[a]ll* individuals to whom FEMA *provided* an emergency housing unit."[439]

---

[433]   *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83 (1998).

[434]   Plaintiffs' Memorandum, p. 36 of 40.

[435]   320 F.3d 545 (5th Cir. 2003).

[436]   Plaintiffs' Memorandum, p. 36 of 40.

[437]   *Fleetwood*, 320 F.3d at 551-52.

[438]   *Id.* at 546.

[439]   Plaintiffs' Memorandum,, p. 5 of 40. (emphasis added).

Also, merely claiming that Plaintiffs did not receive the benefit of some bargain is not sufficient to establish that Plaintiffs suffered an injury in fact.  In order to have standing, Plaintiffs must establish that they suffered an actual economic injury.  The injury must be concrete and particularized, not conjectural or hypothetical.[440]  An example of an actual economic injury would be where the purchaser of a defective product seeks the difference between the value of the product as warranted and the actual value of the product.  Plaintiffs make no such claim for an actual economic injury.

Instead of explaining what economic injury was suffered by Plaintiffs, Plaintiffs focus on trying to determine what a measure of damages in this case might be.[441]  Plaintiffs argue that their damages could be measured by the "monthly rental value of a safe habitable trailer."[442]  Such arguments, though, do not establish that Plaintiffs actually suffered any economic injury.

In *Rivera v. Wyeth-Ayerst Laboratories*, the United States Court of Appeals, Fifth Circuit, reversed the district court's certification of a class action where the plaintiffs, purchasers of an allegedly defective drug, argued that they were entitled to economic damages based on breach of implied warranty but failed to articulate what economic injury was actually suffered by the proposed class members.[443]  The Court stated, "The plaintiffs never define [their] 'economic injury,' but, instead, spend most of their brief listing helpful suggestions on how a court could calculate damages.  These arguments are relevant (if at all) to redressability, not injury.  Merely asking for money does not establish an injury in fact."[444]  The same is true with Plaintiffs' proposed economic damages subclass.  Plaintiffs have suggested what an appropriate award of

---

[440]     *Lujan*, 504 U.S. at 560.

[441]     *See* Plaintiffs' Memorandum, pp. 36-37 of 40.

[442]     *Id*. at 37.

[443]     *Rivera*.

[444]     *Rivera*, 283 F.3d at 319.

damages would be but have failed to articulate what economic injury, if any, was actually suffered by the proposed class members. As a result, Plaintiffs have failed to establish that the proposed economic subclass members have standing to bring suit against the Manufacturing Defendants. Therefore, this Court should deny Plaintiffs' request to certify an economic loss subclass.

**B.     The Proposed Economic Loss Subclass Fails to Meet Rule 23(b)(3)'s Predominance Requirement.**

Rule 23(b)(3) requires that "the questions of law or fact common to the class members predominate over any questions affecting only individual members…." Plaintiffs bear the burden to establish that the predominance requirement is met.[445] Plaintiffs' proposed economic loss subclass fails to satisfy Rule 23(b)(3)'s predominance requirement because, as explained below, the Court's determination of these claims cannot be made using class-wide proof but, instead, requires an examination of facts particular to each and every proposed class member.

1.     Under Louisiana, Mississippi, and Texas Law, a Determination Must be Made for Each and Every Subclass Member as to Whether the Subclass Member was a Purchaser of His or Her Emergency Housing Unit.

Plaintiffs argue that the Manufacturing Defendants are liable for economic damage suffered by Plaintiffs based on the theories of implied warranty and redhibitory defects.[446] Under the law of Louisiana, Mississippi, Texas, and Alabama, however, such claims are barred unless the plaintiff actually purchased the emergency housing unit in question.

---

[445]     *See, e.g., Spence v. Glock, Inc.*, 227 F.3d 308, 310 (5th Cir. 2000).
[446]     *See* Plaintiffs' Memorandum, p. 34 of 40.

a.      Louisiana Law

Under Louisiana law, a claim for economic loss arising from an alleged breach of implied warranty is governed by Louisiana's redhibition regime.[447]  The very nature of an action in redhibition is the avoidance of a *sale*, without which there can be no claim in redhibition.[448]  A sale is defined by the Civil Code as a "contract whereby a person transfers ownership of a thing to another for a price in money."[449]  The thing itself, the price and the consent of all parties to the transaction are necessary requirements for perfection of a sale.[450]  Where an actual sale exists, the seller warrants the buyer against redhibitiory defects in the thing sold.[451]  Thus, the primary threshold requirement of Louisiana redhibition law is the necessity for a *valid sale* in order to seek a redhibition remedy.[452]

b.      Mississippi Law

Mississippi's sales law, which is based on Article 2 of the Uniform Commercial Code, addresses claims for breach of an implied warranty.[453]  Under Article 2 of the Uniform Commercial Code and similar statutes, a party can only assert a warranty claim based on a sale of goods, not some other type of transaction.  As a leading UCC expert recognized, "warranties

---

[447]     *See* MARAIST & GALLIGAN, LOUISIANA TORT LAW, § 15.06, at 15-12, 15-13 (2d ed. 2004); *see also DeAtley v. Victoria's Secret Catalogue*, 876 So. 2d 112 (La. App. 4 Cir. 2004).

[448]     LA. CIV. CODE art. 2520; *Duhon v. Three Friends Homebuilders Corp.*, 396 So. 2d 559 (La. App. 3 Cir. 1981).

[449]     LA. CIV. CODE art. 2439.

[450]     *Id.*

[451]     LA. CIV. CODE art. 2520.

[452]     *See Martin v. Rome*, 486 So. 2d 213, 215 (La. App. 1 Cir. 1986) (finding that Louisiana's laws of redhibition apply only to a contract of sale and not to other contracts such as contracts to install or to provide services).

[453]     *See* MISS. CODE ANN. §§ 75-2-314 (implied warranty of merchantability) and 75-2-315 (implied warranty of fitness for particular purpose).

arise under Article 2 only when there is a sale.  Although Article 2 applies to 'transactions in goods,' its warranty sections specifically require a 'contract for their sale.'"[454]

This "sale" requirement applies to claims for breach of implied warranty under Mississippi law.  The Mississippi Supreme Court has recognized the sale requirement, finding that a contract of sale is a fundamental component for a breach of implied warranty claim under Mississippi law.[455]

Mississippi law limits the situations in which a non-purchaser may bring a claim for breach of implied warranty.  Mississippi Code § 75-2-314 provides, in pertinent part:

> A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty.

Thus, under Mississippi law, only the buyer of a product, the buyer's family, and, in some circumstances, guests in the buyer's home can bring a claim for breach of implied warranty against the product's manufacturer.

c.      Texas Law

Like Mississippi, Texas has adopted specific provisions of the UCC's sale law relating to implied warranties.[456]  The language used in each of these sections makes it clear that an implied warranty arises out of a sale transaction, not some other form of transaction.[457]

---

[454]      3 ANDERSON ON THE UNIFORM COMMERCIAL CODE, §2-314.39, 285 (3d ed. 2002).

[455]      *Royal Lincoln-Mercury Sales, Inc. v. Wallace*, 415 So. 2d 1024, 1028 (Miss. 1982) ("We conclude, in the absence of any evidence that Ford either sold or contracted to sell the vehicle to the plaintiff, that no remedy of revocation was available  to the plaintiff under the terms of §75-2-314 against Ford as a 'seller.'").  *See also* WHITE & SUMMERS, UNIFORM COMMERCIAL CODE, 511 (4th ed. 1995).

[456]      *See* TEX. BUS. & COM. CODE ANN. §§ 2.314 (implied warranty of merchantability) and 2.315 (implied warranty of fitness for particular purpose).

Yet, unlike Mississippi, the Texas Business and Commercial Code intentionally left undecided the question of whether someone other than a purchaser may maintain a claim for breach of implied warranty.  Texas Business and Commercial Code § 2.318 provides:

> This chapter does not provide whether anyone other than a buyer may take advantage of an express or implied warranty of quality made to the buyer or whether the buyer or anyone entitled to take advantage of a warranty made to the buyer may sue a third party other than the immediate seller for deficiencies in the quality of the goods.  These matters are left to the courts for their determination.

Courts applying Texas law have addressed the instances in which a non-purchaser may bring a claim for breach of implied warranty.  These courts draw a distinction between a claim for personal injuries and a claim for economic loss.  A non-purchaser may bring a claim for personal injuries arising out of a breach of implied warranty.[458]  But a non-purchaser may not bring a claim for economic damages based on an implied warranty.  For example, in *Keith v. Stoelting, Inc.*, the United States Court of Appeals, Fifth Circuit, held that, under Texas law, a "non-purchasing" plaintiff could not maintain a breach of implied warranty claim for economic damages against the manufacturer of the product causing the alleged damage.[459]  Also, in *Hou-Tex, Inc. v. Landmark Graphics*, the Court held that a customer of the purchaser of a product could not maintain a breach of implied warranty claim for economic damages against the manufacturer of the product where the customer never actually purchased the product in question.[460]  The Courts in both *Keith* and *Hou-Tex* noted that there are no Texas cases that have

---

[457]     *See* TEX BUS. & COM CODE ANN. §§ 2.314 (providing that an implied warranty arises from "contract of sale") and 2.315 (providing that an implied warranty arises where a "buyer" is relying on the judgment of a "seller").

[458]     *Garcia v. Texas Instruments, Inc.*, 610 S.W.2d 456, 463-466 (Tex. 1980).

[459]     *Keith v. Stoelting, Inc.*, 915 F.2d 996, 999 (5th Cir. 1990) ("*Keith*").

[460]     *Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 108-109 (Tex. App. 2000) ("*Hou-Tex*").

allowed a non-purchasing plaintiff to maintain a claim for economic damages against a manufacturer based on the theory of breach of implied warranty.[461]

> 2.    Where Alabama Law Applies, the Court Must Determine if Each Plaintiff was a Purchaser and if Privity of Contract Exists between the Plaintiff and the Manufacturing Defendant.

Alabama's sales law is also based on Article 2 of the Uniform Commercial Code.  In Alabama, like the other states, a party can only assert a breach of warranty claim based on a sale of a product, not some other type of transaction.[462]

Alabama's sales law also addresses the instances in which a non-purchaser may bring a claim for breach of an implied warranty.  Alabama Code § 7-2-318 provides, in pertinent part: "A sellers' warranty, whether express or implied, extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty."

Alabama Code § 7-2-318, however, applies only to claims for personal injuries.  When claims for property damage or economic damage are at issue, a plaintiff claiming a breach of implied warranty must show that privity of contract exists between the plaintiff and the manufacturer.

The Alabama Supreme Court has consistently held that privity of contract must exist for a purchaser to be entitled to bring a breach of implied warranty claim for economic damages against a manufacturer.  In *State Farm Fire & Cas. Co. v. J.B. Plastics, Inc.*, the Court held that "[w]hile Alabama's version of U.C.C. §2-318 has abolished the privity requirements in actions involving injuries to natural persons, the privity requirements still remain[ ] in cases of strictly

---

[461]      *Keith*, 915 F.2d at 999; and *Hou-Tex*, 26 S.W.3d at 109.

[462]      *See* ALA. CODE § 7-2-106 (A "'contract for sale' includes both a present sale of goods and a contract to sell goods at a future time.  A 'sale' consists of the passing of title from the seller to the buyer for a price.").

economic injury."[463]  Based on this requirement of privity, the Court upheld the dismissal of the plaintiff's breach of implied warranty claim against the manufacturer of the product that caused the plaintiff's economic injury where the plaintiff purchased the product from a hardware store and not directly from the manufacturer.  Similarly, in *Wellcraft Marine v. Zarzour*, the Alabama Supreme Court held that "[t]here is no right of action on an implied warranty theory against a manufacturer for property damage without privity of contract."[464]  Thus, when a plaintiff asserts a claim for economic loss arising out of an alleged breach of implied warranty, Alabama law requires that the plaintiff (1) be a purchaser of the product and (2) that privity of contract exists between the purchaser and the defendant.

**C.     The Sale and Privity Requirements Defeat Predominance for the Proposed Economic Loss Subclass.**

As shown above, only subclass members who actually purchased emergency housing units will have a viable claim against the Manufacturing Defendants.  Furthermore, where Alabama law applies, an emergency housing unit purchaser will only be able to maintain a breach of implied warranty claim against a Manufacturing Defendant if privity of contract exists between the purchaser and the Manufacturing Defendant.  In this case, Plaintiffs have made no attempt to limit the proposed economic damage subclass to actual purchasers of emergency housing units.  Instead, Plaintiffs propose that the class be comprised of "[a]ll individuals to whom FEMA provided an emergency housing unit."[465]

As a result, this Court's determination of the claims of the economic loss subclass will turn on facts that are particular to each class member.  This Court must determine whether each subclass member purchased an emergency housing unit.  The Court must also determine which

---

[463]     *State Farm Fire & Cas. Co. v. J.B. Plastics, Inc.*, 505 So. 2d 1223, 1227 (Ala. 1987); *see also Rampey v. Novartis*, 867 So. 2d 1079, 1087 (Ala. 2003).
[464]     *Wellcraft Marine v. Zarzour*,  577 So. 2d 414, 419 (Ala. 1990).
[465]     Plaintiffs' Memorandum, p. 5 of 40.

state's law applies to each subclass member that purchased an emergency housing unit; and where that state's law requires privity of contract, the Court must determine whether the purchaser was in privity of contract with a Manufacturing Defendant. These issues cannot be resolved by class-wide proof but must be examined for each and every proposed class member. Therefore, Plaintiffs cannot meet their burden to establish that Rule 23(b)(3)'s predominance requirement is satisfied, and this Court should deny certification of the economic loss subclass.

## X.    CONCLUSION

The class plaintiffs seek is a jumbled amalgam of different plaintiffs, asserting different injuries and different claims, under the laws of different states, against different defendants who manufactured different products. Neither the class claims nor any of the proposed six subclass claims can be tried representatively. Because the claims of each putative class member are dependent on so many individual factors, each person's claim must be tried individually.

Individual issues overwhelmingly predominate, and this lack of cohesiveness makes individual trials, not class treatment, the superior method for managing these cases. This is true not only for the state law subclasses, but also for the Future Medical Services Subclass and the Economic Loss Subclass.

While lack of predominance and lack of superiority may be the most obvious deficiencies in terms of the class action requirements, even the most basic elements of numerosity, commonality, typicality and adequacy are not met. The class definition itself is inherently and incurably deficient. And finally, plaintiffs do not have standing to sue many of the manufacturers in the state subclasses due to the complete absence of any representative living in those manufacturers' EHUs.

The Manufacturing Defendants urge this Court to flatly deny class certification altogether. Although Plaintiffs may cling to the hope that their Future Medical Services Subclass

can be salvaged, in reality that subclass presents not only all of the deficiencies inherent in the state subclasses, but additional problems due to the legal prerequisites for medical monitoring. These legal prerequisites simply add to the individual determinations that must be made for each putative subclass member.  Therefore, the reasons for denying class certification of the Future Medical Services Subclass are even more numerous than for other subclasses.

Alternatively, were the Court to certify any of the state subclasses, due to the standing issues, the Manufacturing Defendants ask that this Court dismiss all defendants from state subclasses as to which there is no class representative matched to a particular defendant. However, if the Court denies class certification as the Manufacturing Defendants urge, the cases will proceed individually with each plaintiff asserting a claim against only the manufacturer of the unit he inhabited.  In this event, the standing question will no longer be an issue.

Class certification is inappropriate for this MDL.  Plaintiffs' Motion for Class Certification should be denied.

Respectfully submitted,

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER & WEINSTOCK**

s/Andrew D. Weinstock

_____

**ANDREW D. WEINSTOCK #18495
JOSEPH G. GLASS #25397**
3838 N. Causeway Blvd., Suite 2900
Metairie, LA 70002
(504) 832-3700
**DEFENSE LIAISON COUNSEL**

# C E R T I F I C A T E

I hereby certify that on the 14th day of November, 2008, a copy of the foregoing Manufacturing Defendants' Memorandum In Opposition To Class Certification was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

s/Andrew D. Weinstock

**ANDREW D. WEINSTOCK #18495**
andreww@duplass.com