UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER         MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION    SECTION "N-5"

JUDGE ENGELHARDT
MAG. JUDGE CHASEZ

THIS DOCUMENT IS RELATED TO ALL CASES

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE
EXPERT TESTIMONY OF PATRICIA M. WILLIAMS, PH.D., DABT

**MAY IT PLEASE THE COURT:**

Plaintiffs respectfully submit the following in response to the Manufacturing Defendants' Motion *In Limine* to Exclude Expert Testimony of Patricia M. Williams, Ph.D., DABT.

I.

Defendants seek to exclude, at the class certification stage of this litigation, the expert testimony of Dr. Patricia M. Williams. First and foremost, this class certification inquiry does not require an in-depth evaluation of Dr. William's qualifications and reliability. Furthermore, Dr. Williams is more than qualified to render the opinions she has offered, the science on which she relies is sound, and her opinions are entirely reliable.

1

## II.
## EXPERT ADMISSIBILITY AT RULE 23 HEARING

It is axiomatic that the class certification determination must be conducted independently of the substantive merits of the litigation. Oscar Private Equity Investments v. Allegiance Telecom, Inc., 487 F.3d 261, 268 (5th Cir. 2007). Within the Rule 23 inquiry, the district court may certainly look past the pleadings to gain an understanding of the claims, defenses, and facts relevant to the case. Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996). Rule 23 hearings, however, should not devolve into a mini-trial of the merits of the class claims. Unger v. Amedisys, Inc., 401 F.3d 316, 320-21 (5th Cir. 2005). To this end, the court should exercise its considerable discretion to limit the extent of the certification hearing. *See* In re IPO Securities Litigation, 471 F.3d 24, 41 (2nd Cir. 2006).

The Eastern District of Louisiana adopts a sensible approach of limiting expert examination at the Rule 23 hearing to issues of reliability and relevance to the particular class certification element for which the testimony is offered. The Honorable Carl Barbier has noted that "[a] full review under *Daubert* is not suitable to class certification proceedings." Ancar v. Murphy Oil, U.S.A., Inc., 2007 WL 3270763, *1. For purposes of the *Ancar* case, his limited review consisted of reviewing the expert's opinion for flaws that would render it inadmissible as a matter of law, insuring that the methodology showed some hallmarks of reliability and confirming that the witness was qualified. Id. at *2. He further limited his review to only those opinions that were relevant to one of the requirements of class certification under Rule 23. *See* Id.

The Honorable Stanwood Duval's approach is similar. He also rejects the idea of a full *Daubert* examination at the class certification stage. *See* In re Katrina Canal Breaches Consol. Litigation, 2007 WL 3245438, *12. Although his review is "vigorous," it is limited to verifying

the existence of hallmarks of reliability, focusing specifically on the probative value to the elements of class certification. Id.  He requires only that the expert is sufficiently trustworthy to assist the Court in determining whether the class action should or should not be certified. *See* Id.

Dr. Williams will present opinions relevant to commonality, numerosity and typicality. Her experience and credentials as presented to the Court certainly justify allowing her testimony as an aid to the class certification determination. *See* In re Katrina Canal Breaches Consol. Litigation, at 2007 WL 3245438, *12.

## III.
## DR. WILLIAMS IS QUALIFIED

Under either a full or limited *Daubert* review, Dr. Williams's qualifications are not only sufficient Under Fed. R. Evid. 702, but also extremely impressive.  She holds a Masters Degree in microbiology from Louisiana State University, and a Ph.D. in anatomy with a doctoral minor in biochemistry from Tulane Medical Center. *See* Williams's CV, p.1.  She is board certified by the American Board of Toxicology[1] and licensed by the State of Louisiana as a Clinical Laboratory Scientist and Laboratory Director. *See* Williams's CV, p.1.  She currently serves as a tenured Associate Professor and Coordinator for Toxicology Research Laboratories of the Pontchartrain Institute for Environmental Sciences at the University of New Orleans., where she also teaches graduate and undergraduate classes in toxicology. *See* Williams's CV, p.1; Williams Affidavit, pp.1-2.  She has lectured to second-year medical students on the "Environmental Etiology of Disease," and has served as Principal Investigator for medical surveillance research projects funded by the State of Louisiana. *See* Williams Affidavit, p. 3. Her experience also includes performing health profiles and epidemiologic studies to identify the

---

[1] The American Board of Toxicology is the premier certifying body in general toxicology.  The certification is based on competency, and involves a three-day exam.  There are only approximately 2,000 board certified toxicologists world-wide. *See* Williams depo., pp. 33-35.

evolution of disease in association with chemical exposure. *See* Williams Affidavit, p. 3. Other courts have found her to be "clearly and indisputably well-qualified." *See* Opinion from the Northern District of Mississippi, July 23, 2007, attached as Exhibit A, p. 10.

Dr. Williams is particularly qualified as to the testimony she has provided. Her opinions derive in part from a database of 1,516 Plaintiff Fact Sheets that recorded dates of residence in FEMA trailers and symptoms reported by each plaintiff. *See* Williams Affidavit, p. 25. The existence and concentration range of formaldehyde in the FEMA trailers was available from the direct analysis of air concentrations in a sample population of trailers performed by the Center for Disease Control and Prevention (CDC), which published its Final Report on July 2, 2008. *See* Williams Affidavit, p. 25; Williams depo, p. 66. Dr. Williams conducted an extensive review of the scientific literature, which she has summarized in her affidavit. *See* Williams Affidavit, pp. 8-24. Her references include such venerated sources as the World Health Organization (WHO), International Agency for Research on Cancer (IARC), Cassarett & Doull's, the Agency for Toxic Substances and Disease Registry (ATSDR), and Patty's Toxicology. *See* Williams Affidavit, pp. 8-24. Her testimony obviates that her education, research, and work experience qualify her to identify and interpret patterns of disease development in association with toxic exposures to determine the etiology of environmental diseases using the tools, data, and resources she used as the basis of her expert testimony for this class certification hearing. *See* Williams Affidavit, p. 5.

Defendants' challenge to Dr. Williams's qualification fails because they miscast her opinions. Defendants misrepresent Dr. Williams's testimony as seeking to establish medical causation.[2] *See* Motion *In Limine*, p. 3. Medical causation, however, is neither the purpose nor the thrust of her testimony. As she states numerous times in her Affidavit and deposition, her opinions relate only to general causation. *See* Williams Affidavit, p. 5; Williams depo, p. 104.

---

[2] Dr. Williams herself states that she does not diagnose patients. *See* Williams depo, p. 44.

She, in fact, specifies that "the purpose of this preliminary report is *not* to prove specific causation." *See* Williams Affidavit, p. 5; *see also* Williams depo, p. 119. Thus, Defendants' cited cases concerning physicians lack any relevance to Dr. Williams's testimony.

Defendants also attempt to challenge Dr. Williams's qualifications to offer her opinions on the basis that she has had no previous experience with formaldehyde. *See* Motion *In Limine*, p. 4. Her relevant experience is with the *methodology* involved in performing health profiles to identify the evolution of disease in association with chemical exposure. *See* Williams Affidavit, p. 5. The methodology can then be applied to whatever chemical is at issue. This would be analogous to a differential diagnosis that includes a diseases or condition the physician has never before encountered, or a scientist applying the scientific method in testing a novel hypothesis.

Defendants spuriously contradict Dr. Williams's sworn testimony that she had not been excluded in *Ballard*. *See* Williams depo, p. 51. *Ballard* was a summary judgment case in which one plaintiff claimed that she had contracted numerous pulmonary and respiratory problems as result of exposure to phosphine gas fumigant in her workplace. Ballard v. Bunge North America, Inc., 2008 WL 2185385, *1. In deciding the summary judgment, the court clearly considered, and even summarized some of Dr. Williams's testimony. Id. at *3. The court then assumed that Dr. Williams's testimony was sufficient to prove general causation, the issue to which she has testified in this litigation. Id. The *Ballard* summary judgment was based on specific causation, an issue addressed not by Dr. Williams, but by a physician witness in the case. Id. at *4.

Dr. Williams is unquestionably qualified by knowledge, skill, experience, training, and education to offer the testimony she presents in this case. *See* Fed. R. Evid. 702. As she has repeatedly testified, her opinions offered for the class certification hearing deal with general

causation. Defendants' claim that she is not qualified to establish specific causation is simply irrelevant.

## IV.
## DR. WILLIAMS TESTIMONY IS RELIABLE

A.   Dr. Williams's testimony demonstrates the hallmarks of reliability enumerated in *Daubert* and its progeny.

Under *Daubert* and its progeny, within either a full or limited review, Dr. Williams's methodology is reliable, bearing numerous hallmarks of reliability. *See* Ancar v. Murphy Oil, U.S.A., Inc., 2007 WL 3270763, *2; In re Katrina Canal Breaches Consol. Litigation, 2007 WL 3245438, *12. Dr Williams based her methodology on that proposed in the Reference Manual for Scientific Evidence of the Federal Judiciary Center. *See* Williams Affidavit, p. 5. Her technique, therefore, is not only generally accepted by federal courts nation-wide as well as by experts in her field, but has also been tested, published, and peer reviewed. These indicia of reliability are sufficient to satisfy the standards set forth in both *Daubert* and *Ancar. See* Daubert v. Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 593-95 (1993); Ancar v. Murphy Oil, U.S.Al., Inc., 2007 WL 3270763, *2.

Dr. Williams's opinions have developed naturally and directly from her previous research and projects. *See* Kumho Tire Co., Ltd. V. Carmichael, 526 U.S. 137, 150-51 (1999). She has previously conducted government-funded health assessments and medical surveillance projects related to toxic exposures. *See* Williams Affidavit, p. 3. She has served as project administrator for a court-established medical intervention program for asthma sufferers, which included a camp for children suffering from asthma, an adult asthma education program, and an asthma education and management program for pulmonary care clinics. *See* Williams Affidavit,

6

p. 30.  She will use this experience as a guide in designing a program for the affected FEMA trailer children if so request ed by the Court.  *See* Williams Affidavit, p. 31.

Dr. Williams opinions are consistent with the research on which she relies.  *See* General Electric Co. v. Joiner,  522 U.S. 136, 146 (1997).  Her opinion that the plaintiffs have numerous symptoms in common is self-evident from the results of the compilation of self-reported symptoms in the Plaintiff Fact Sheets she reviewed.  *See* Williams Affidavit, pp. 25-29, 34; Williams depo, pp. 92-101.  She documents the symptoms of various concentration ranges of formaldehyde exposure found in the medical literature, which include, but are not limited to, laryngitis, eye irritation, cough, chest tightness, wheezing, headache , nausea, vomiting, diarrhea, skin rash, asthma-like symptoms, and serious lung damage.  *See* Williams Affidavit, pp. 12-14, 34.  Her opinion that the symptoms listed by the plaintiffs are consistent with those documented in the scientific literature stems from a reasonable comparison of the two.  *See* Williams Affidavit, pp. 12-13, 25-29, 34.  Her opinion that the plaintiffs had the potential for extensive toxic exposure in their residences is based the air testing done by the CDC, published in 2008.  *See* Williams Affidavit, pp. 19-20, 25, 34; Williams depo, p. 66.  She extensively reviewed the medical literature to articulate the exposure pathways for formaldehyde, thus supporting her opinion that completed exposure pathways existed.  *See* Williams Affidavit, pp. 9-10, 20, 28, 34.  Her conclusion as to temporality is based on the design of the questions in the Plaintiff Fact Sheets, which provided a snapshot in time of the symptoms reported during the time of the plaintiffs' exposures.  *See* Williams Affidavit, p 34; Williams depo, pp. 100-103, 115.  Her conclusion as to cancer is logical when the CDC's reported levels of formaldehyde in the FEMA trailers is considered in relation to IARC's classification of formaldehyde as a Group 1 Human Carcinogen.  *See* Williams Affidavit, p. 34; Williams depo, p. 243.

Dr. Williams's testimony demonstrates that her conclusions are based on sound scientific principles. Her methodology displays virtually all the hallmarks of reliability noted in the relevant case law. Defendants' arguments to the contrary are without merit.

B.  Defendants fail to challenge the opinions Dr. Williams presented.

Defendants disingenuously mislead the Court as to what constitutes Dr. Williams's opinions. Dr. Williams clearly lists the opinions she is offering on page 34 of her Affidavit as follows:

- The plaintiffs have numerous symptoms and/or asthma and/or allergies that are common to the plaintiff population and typical of the scientifically documented adverse health effects caused by formaldehyde.

- The plaintiffs have the potential for extensive toxic exposure as a result of their exposure to formaldehyde in their residential environment.

- There are completed exposure pathways that are capable of producing toxic exposures to formaldehyde with resultant adverse health effects in the plaintiff population.

- The adverse health effects reported by the plaintiffs are consistent with those documented in the scientific literature to result from exposures to formaldehyde.

- The appearance of symptoms and/or asthma and/or allergies are temporally associated with the contaminated residential environment of the plaintiff population as listed on the plaintiff fact sheet.

- Given the IARC classification of formaldehyde as a Group 1 Human Carcinogen and the scientifically documented literature demonstrating the strength of association of formaldehyde and cancer, along with the documented measures of formaldehyde exposure-the plaintiffs have legitimate fear of cancer.

*See* Williams Affidavit, p. 34.

Rather than challenging those opinions, which by virtue of their intrinsic reliability are impervious to challenge, Defendants have chosen to battle "opinions" of their own invention. Even if their arguments were persuasive, which they are not, the opinions challenged are not the ones proffered by Dr. Williams.

C.   Defendants' fail to attack Dr. Williams's reliability as to molecular damage.

As a threshold issue, it should be noted that Defendants' arguments as to "sub-clinical" injury are simply irrelevant to this class certification proceeding. To the extent that the term "sub-clinical" implies a lack of manifested symptoms, the term is not applicable to the proposed subclass of children. The subclass is defined as follows:

> Any child who lived in a travel trailer which exceeded the ATSDR minimum risk levels for the correspondent period[3] (FN) in which they resided in the trailer, and **who manifested any symptom** of formaldehyde exposure during the time they resided in the trailer.

The class definition itself requires a manifestation of symptoms. Anyone with only "sub-clinical" damages will therefore be excluded from the subclass.

Defendants attack Dr. Williams's statements concerning the inevitability of damage caused by formaldehyde. *See* Motion *In Limine,* pp. 8-10. Dr. Williams is a toxicologist. *See* Williams's CV, p.1; Williams depo, p. 134. As such, she looks at damage not only as observable symptoms, but also as the damage occurring at the molecular and cellular levels. *See* Williams Affidavit, p. 4, Williams depo, p. 134. Her job as a scientist is to illuminate the biochemical mechanism involved in producing the observable symptoms. *See* Williams depo, p. 134.

To aid in the understanding of the scientific foundation of her opinions, Dr. Williams admirably explained the well-documented body of science concerning the mechanism of

---

[3] FN: Accute = 40 ppb for 0-14 days, Intermediate = 30 ppb for 15-364 days, Chronic = 8 ppb for 365+ days.

formaldehyde damage. *See* Williams depo, p. 232-33. The mechanism of formaldehyde damage begins with the chemical structure of the formaldehyde molecule itself. *See* Williams depo, p. 125. The formaldehyde molecule is a reactive electrophile, meaning that its structure is deficient in electrons, and thus has a positive electrical charge. *See* Williams depo, pp. 73, 134, 232, 252-53. The molecule, therefore, seeks to attach to negatively charged molecules, much like a magnet, to cure its electron deficiency. *See* Williams depo, p. 253. The attachment of the formaldehyde changes the molecule to which it attaches. *See* Williams depo, p. 253. When molecules in a cell are changed, the cell itself is changed and damaged. *See* Williams depo, p. 134. The damage at the cellular level can be seen using microscopes to view biopsies in humans and tissue samples in animals. *See* Williams depo, p. 135.

The injury caused by the cellular change depends partially on the dose, and partially on the type of cell that was damaged. For instance, a change in a DNA molecule can result in a mutant gene. *See* Williams depo, p. 232. If the dose of the toxicant is low, only a few DNA molecules will be changed, and it is likely that the body's defense mechanisms will be able to repair the damage, particularly in healthy adults, with a net result of no observable disease. *See* Williams depo, pp.76, 232, 256. If the dose is high or the exposure prolonged, more cells will be damaged, the likelihood of repair will be lower, and the ultimate result will be a tumor, malignancy, damaged tissue, apoptosis, metaplasia, and dysplasia. *See* Williams depo, pp. 118, 125, 127, 163, 213, 253, 256, 264. Because formaldehyde is a gas, it will contact and have a similar effect on the cells of the skin and the respiratory system, resulting in observable damage of a type unique to those organs. *See* Williams depo, pp. 118, 121, 263, 272-73.

Formaldehyde damage on the cellular level is particularly dangerous in children. Compared to adults, children have greater lung-surface area to body weight ratios. *See* ATSDR

Medical Management Guidelines for Formaldehyde, attached as Exhibit B, p. 2. Because of their short stature and their mouthing habits, their exposure to formaldehyde on the ground, where levels of formaldehyde are highest, will be greater for children than for adults. *See* Williams depo, p. 232, ATSDR Medical Management Guidelines for Formaldehyde, attached as Exhibit B, p. 2. Inhalation levels will also be more significant because children inhale more air per body weight than do adults. *See* Williams depo, p. 120, 278. Children are also more vulnerable to toxicants absorbed through the skin because of their larger surface area to body weight ratio. *See* ATSDR Medical Management Guidelines for Formaldehyde, attached as Exhibit B, p. 2.

The immaturity of a child's developing lungs increases his vulnerability to toxic electrophile molecules. *See* Williams depo, p. 91. Damage to the developing lungs can result in improper lung development. *See* Williams depo, p. 121. At the cellular level, damage to the bronchioles results in higher rates and increased severity of upper respiratory infections. *See* Williams depo, p. 121. Early exposure to formaldehyde can sensitize children to other allergens, resulting in life-long allergic reactions to substances other than formaldehyde. *See* Williams depo, p. 269, 275. Studies have confirmed the association between formaldehyde and asthma in children. *See* Williams depo, pp. 270-74.[4]

---

[4] The diagrams attached as Exhibit D are illustrative of the common mechanism of injury that occur to formaldehyde exposed populations, particularly children. The diagrams depict the mechanism in which formaldehyde causes bronchial constriction, metaplasia (cellular re-arrangements in which the wrong type of tissue forms in the wrong place), dysplasia (abnormal tissue), hyperplasia (excess production of goblet cells), and loss of cilia. To better assist the Court as it reviews the attached diagrams, a brief description of each is as follows:

D-1:  A diagram of the Trigeminal and Vagus nerves which are responsible for causing bronchoconstriction when exposed to respiratory irritants such as formaldehyde.
D-2, D-3 and D-4:  These are images of Stratified Squamouos Epithelium, with tough outer surface keratin layers. This tough outer layer is typical of external skin (e.g., thumb, palm of hand, heel of foot, etc.).
D-5:  This is a diagram of the normal anatomy of a lung.
D-6:  This diagram shows the normal anatomy of the Trachea and Bronchi which are the airways bringing external air into the lung. The Diagram also shows where the epithelium are located in the airways.

Nowhere in the Motion *In Limine* do the Defendants attack the science or the methodology of Dr. Williams's explanation of the molecular underpinnings of observable disease or symptoms. Unless Defendants can dispute that cellular damage is the scientific precursor of observable injury, which they have not even attempted, their arguments do not touch the issue of the reliability of Dr. Williams's testimony.

D.  Defendants fail to support their self-selected argument on cellular damage.

Defendants incorrectly assert that case law establishes the proposition that cellular damage is unacceptable. *See* Motion *In Limine,* p. 9. They reach this erroneous conclusion only by taking language out of context and using cases that have no relevance to the class certification issue. Unlike the case at bar, *Doumontier*, which the Defendants quote at length, interprets language of the Price-Anderson Act, which creates a private cause of action for injury arising out of a nuclear explosion or incident. *See* Dumontier v. Schlumberger Technology Corp., 543 F.3d 567, 569 (9th Cir. 2008). The Act specifically prohibits recovery without a showing of "bodily

---

D-7, D-8, D-9 and D-10:   This series of Diagrams and Images show illustrations of normal tissue lining the Trachea and Bronchi in the Respiratory Tract. They illustrate the ciliated cells. Cilia are the tiny hair-like fingers which are the conveyors of mucus and aid in expelling toxins and other undesirable elements out of the Respiratory Tract. The descriptive notes on each image are also helpful.

D-11:  This is an image of abnormal tissue epithelium following formaldehyde exposure. This image comes from the study which the ATSDR relied upon in determining the Chronic Minimum Risk Level of 8 ppb. This image, amongst other things, shows the loss of cilia. This in turn diminishes the ability of the Respiratory Tract to remove toxins.

D-12 and D-13:  These images are taken from the *Boysen, et al.* study in the British Journal of Industrial Medicine. D-12 shows normal psuedostratified epithelium with ciliated cells. The two images on D-13, however, show changes as a result of formaldehyde exposure in the ciliated cells into those more similar to the external skin cells exemplified in D-2, D-3 and D-4. The formaldehyde exposure has basically converted the sensitive lining of the Respiratory Tract into something more akin to the heel of a person's foot.

D-14, D-15, D-16, D-17:  These diagrams are illustrative of the tiny alveolar sacks which are where the diffusions of gasses in and out of the blood occur. These alveoli are extremely susceptible to damage from formaldehyde and abnormal development can greatly impact the lung's gas exchange capacity.

D-18:  This image illustrates how the alveoli surround a bronchiole airway, and there is also good illustration of the cilia in the healthy bronchiole.

D-19:  The image in D-19 illustrates emphasematous changes to a respiratory bronchiole and surrounding alveoli. Notice the obvious lack of differentiation amongst the alveoli and the loss of cilia in the bronchiole.

D-20:  This is comparison imagery of the difference between a newborn's lungs and a twelve-year old girl's lungs, with obvious developmental changes that occur in that 12 year period.

injury, sickness, disease, or death." Id. at 570.  The defendants' own quotation, had they read it carefully, would have informed them that the interpretation dealt only with "an injury ***within the meaning of the Act.***" Id. *emphasis added*; Motion *In Limine,* p. 10.  The case has nothing to offer on the reliability of the scientific evidence of molecular damage or any other subject considered by Dr. Williams.

None of the other cases to which Defendants cite support a finding of scientific unreliability.  *Parker* interpreted Georgia law, which requires evidence of "actual disease, pain or impairment of some kind." See Parker v. Wellman, 230 Fed. Appx. 878, 882 (11th Cir. 2007). *Ranier*, again interpreting state law, represented the Sixth Circuit's "best prediction" of how the Supreme Court of Kentucky would defined "bodily injury," an unsettled question in the jurisdiction.  See Ranier v. Union Carbide Corp., 402 F.3d 608, 618 (6th Cir. 2005).  In *Eagle-Picher Industries, Inc.,* the issue was the construction of language of an insurance policy. See Eagle-Picher Industries, Inc. v. Liberty Mut. Inc. Co., 682 F.2d 12, 19-20 (1st Cir. 1982).  In both *Schweitzer* and *Laswell,* the issues were whether a injury on a cellular level was sufficient to maintain a cause of action. See Schweitzer v. Consol. Rail Corp., 758 F.2d 936, 942 (3rd Cir. 1985);  Laswell v. Brown, 683 F.2d 261, 269 (8th Cir. 1982).  That inquiry, however, is not within the scope of this class certification proceeding and was not raised by the opinions Dr. Williams herself has listed.  See Oscar Private Equity Investments, 487 F.3d at 268; Williams Affidavit, p. 34.  Certainly, the cases Defendants cite fail to raise an issue as to the scientific reliability of Dr. Williams's opinions.

E.      Defendants fail to support their self-selected argument on Linear Non-threshold Models

Again, Defendants' cited case law fails to support their argument.  Every one of the cases cited by Defendants dealt with causation of a specific disease in a specific individual.  The

13

problems with the testimony in the cases ranged from total lack of quantification of exposure to lack of a differential diagnosis. Dr. Williams's, however, has made it clear that she is not testifying as to specific causation. *See* Williams Affidavit, p. 5; Williams depo, p. 119. Her quote included in Defendants' motion that "when you theoretically consider the DNA-reactive carcinogens, we know there is no threshold on a ***molecular level…***" was directed at cellular damage, not a specific disease. *See* Motion *In Limine*, p. 10, *emphasis added*; Williams depo, pp. 231-36. None of the cases rejected Dr. Williams's explanation that every completed exposure results in some damage at a molecular level. Nor did Defendants challenge the scientific underpinnings of the statement. Defendants arguments, therefore, fail to cast doubt on the reliability of Dr. Williams's opinions.

F.    Dr. Williams appropriately used the scientific studies she cites.

Once again, Defendants challenge issues neither raised by Dr. Williams's testimony or relevant to the litigation. They first criticize her statement that the IARC Monograph classifies formaldehyde as a Group 1 carcinogen. *See* Motion *In Limine*, p. 13. Her statement, however, is not only accurate, but also almost a direct quote from the Monograph itself. *See* IARC Monograph on the Evaluation of Carcinogenic Risks to humans, Volume 88, p. 280, attached as Exhibit C. The carcinogenicity of formaldehyde is not merely Dr. Williams's opinion, but is the conclusion of the prestigious International Association for Research on Cancer, whose publication is a recognized resource relied on by scientists and health care professionals world-wide.

Defendants next accuse Dr. Williams of improperly relying on, or mis-citing epidemiological studies, but discuss only three (3) of the thirteen (13) cases she cites. Dr. Williams discussed the studies at issue, but drew no conclusions from them. She used the studies

merely to flesh out the science of formaldehyde toxicity. *See* Williams Affidavit, p. 17. Although cancer is not a central issue in this litigation, no discussion of formaldehyde would be complete without a discussion of its cancer-causing propensities. Further, it has been established that the Court need not undertake an extensive *Daubert* analysis when the toxicity of the substance at issue is generally recognized. *See* McClain v. Metabolife Intern., Inc., 401 F.3d 1233, 1239 (11th Cir. 2005).

Defendants' discussion of *Joiner* totally misses the point of Dr Williams's testimony. The issue in *Joiner*, unlike that in this certification proceeding, was specific causation of a disease in a particular individual. *See* General Electric Co. v. Joiner, 522 U.S. 136, 139-40 (1997). Dr. Williams has stated emphatically that she is not testifying as to specific causation. *See* Williams depo, pp. 104, 119. Her use of studies was merely illustrative and did not form the basis of her opinions. Since her one opinion concerning cancer is founded on the IARC's evaluation and classification, once again, Defendants have failed to cast doubt on the reliability of Dr. Williams's testimony. *See* Williams Affidavit, p. 34.

G.  Dr. Williams's testimony concerning an asthma program is not only reliable, but derived from her real-life personal experience.

Defendants either misunderstood or miscast Dr. Williams's testimony as to an asthma program. Obviously, Dr. Williams is not a physician, and therefore has offered no opinions on the medical diagnosis and treatment of the children exposed to formaldehyde. *See* Williams depo, pp. 48-49, 131, 133. Her expertise, however, allows her to assist the Court in understanding the benefits of an intervention program for children, like those in our proposed subclass, with asthma symptoms and other respiratory conditions.

Because children are affected more severely by formaldehyde exposure than are adults, they can benefit more from an interventional program. *See* Williams depo, pp. 121, 129-132, 276-277, 279.  Dr. Williams has served as project administrator for one such program, which resulted in dramatic improvement in the children's quality of life. *See* Williams Affidavit, p. 30. One part of the program was a camp for the affected children.  *See* Williams depo, p. 276.  The goal of the camp experience was to teach the children how to manage their conditions. *See* Williams depo, pp. 129-32, 276-77.  They were educated about their conditions, the proper use of their medications, and how to identify their own personal triggers.  *See* Williams depo, pp. 276-77.  By the end of the camp session, children who had previously been unable to withstand physical exertion were, for the first time, taking swimming lessons, playing football, and going hiking. *See* Williams depo, pp. 132,  277.   Certainly, Dr. Williams expertise and experience with children similar to those in the proposed subclass will prove to be a valuable resource in the litigation.

## IV.
## DR. WILLIAMS TESTIMONY IS ADMISSIBLE ON THE ISSUES OF COMMONALITY AND TYPICALITY

In their argument as to commonality and typicality, Defendants continue their attempts to dispute the fact that the opinions listed by Dr. Williams are her only opinions. *See* Motion *In Limine*, p. 19.  Nowhere does she opine that the class certification requirements of commonality and typicality are satisfied. *See* Williams Affidavit, p. 34.  She simply offers her opinions for consideration by the Court in making its legal determination of whether this class action should be certified.  *See* Williams Affidavit, p. 34.

Since Dr. Williams never intended to prove specific causation, and was able to prove general causation from her extensive review of the scientific literature, her approach to

evaluating the data was entirely reasonable and appropriate. Using a database of the information from 1,516 Plaintiff Fact Sheets, she organized the symptoms listed into a usable format. *See* Williams Affidavit pp. 25-29. The information then provides a cross-sectional profile of the symptoms suffered by the plaintiffs at the time each filled out his Plaintiff Fact Sheet. *See* Williams depo, p. 100. Dr. Williams's cross-sectional approach to symptoms mirrors exactly the CDC's cross-sectional approach to concentrations of formaldehyde. *See* Williams depo, p. 100. Both provide information as it existed at a certain time, virtual snapshots or profiles of the conditions at the specific time. *See* Williams depo, p. 100.

Certainly, all of the plaintiffs do not manifest identical symptoms. This fact is to be expected, as individuals vary in their response to toxic substances, as well as to almost everything else. *See* Williams depo, p. 102; Williams Affidavit, p. 9, 21. All of the class members do, however, exhibit symptoms that can be associated or exacerbated by formaldehyde exposure. *See* Williams Affidavit, p. 29. Thus, the fact that the symptoms may vary from individual to individual does not negate the fact that each individual suffered the same molecular/cellular damage via the same mechanism of injury.

## V.
## CONCLUSION

Dr. Patricia Williams presents credentials surpassing mere adequacy. As a toxicologist, anatomist, and biochemist, she is more than qualified to evaluate the scientific literature of formaldehyde toxicity. The methodology she employed in reaching her opinions scrupulously applies the tenants of the scientific method as applied by the numerous generally-accepted sources she relied upon. Her conclusions are both rational and reasonable. Her experience in working with affected children insures her value to the litigation. Defendants have failed to raise

even one valid challenge to the reliability of her testimony or her methodology.  Defendants' Motion *In Limine* to Exclude Expert Testimony of Patricia M. Williams, PhD, DABT, should therefore by denied.

        Respectfully submitted,

**FORMALDEHYDE TRAILER
PRODUCTS LIABILITY LITIGATION**

BY:   /s/ Gerald E. Meunier
        GERALD E. MEUNIER (Bar No. 9471)
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warchauer, L.L.C.
        2800 Energy Centre, 1100 Poydras Street
        New Orleans, LA 70163
        Telephone:   (504)  522-2304
        Facsimile:   (504)  528-9973
        gmeunier@gainsben.com

        /s/ Justin I. Woods
        JUSTIN I. WOODS (Bar No. 24713)
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warchauer, L.L.C.
        2800 Energy Centre, 1100 Poydras Street
        New Orleans, LA 70163
        Telephone:   (504)  522-2304
        Facsimile:   (504)  528-9973
        jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS'
STEERING COMMITTEE**
        Anthony Buzbee (Texas Bar No. 24001820)
        Raul Bencomo  (Bar No. 2932)
        Frank J. D'Amico, Jr. (Bar No. 17519)
        Matt Moreland  (Bar No. 24567)
        Linda Nelson  (Bar No. 9938)
        Ronnie Penton  (Bar No. 10462)

**CERTIFICATE OF SERCIVE**

      I hereby certify that on November 24, 2008, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I Further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to all counsel of record who are non-CM/ECF participants.

                                              /s/ Gerald E. Meunier
                                              GERALD E. MEUNIER (Bar No. 9471)