1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

 3
      IN RE:   FEMA TRAILER
 4    FORMALDEHYDE PRODUCTS                 Docket No. MDL-1873(N)
      LIABILITY LITIGATION                  New Orleans, Louisiana
 5                                          Tuesday, December 2, 2008

 6    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

 7
                TRANSCRIPT OF MOTION TO CERTIFY CLASS PROCEEDINGS
 8               HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                         UNITED STATES DISTRICT JUDGE
 9

10
      APPEARANCES:
11
      FOR THE PLAINTIFF
12    STEERING COMMITTEE:          GAINSBURGH BENJAMIN DAVID
                                   MEUNIER AND WARSHAUER
13                                 BY:   GERALD E. MEUNIER, ESQ.
                                         JUSTIN I. WOODS, ESQ.
14                                 2800 Energy Centre
                                   1100 Poydras Street, Suite 2800
15                                 New Orleans, LA 70163

16
                                   LAW OFFICES OF FRANK J. D'AMICO, JR.
17                                 BY:   FRANK J. D'AMICO, JR., ESQ.
                                   622 Baronne Street
18                                 New Orleans, LA 70113

19
                                   REICH & BINSTOCK
20                                 BY:   DENNIS REICH, ESQ.
                                   4265 San Felipe, Suite 1000
21                                 Houston, TX 77027

22

23                                 NEXSEN PRUET JACOBS POLLARD & ROBINSON
                                   BY:   PAUL A. DOMINICK, ESQ.
24                                 P. O. Box 486
                                   Charleston, SC 29402
25
```

```
 1   BY MR. WEINSTOCK:

 2   Q.   On page 17 of your report, did you not report to us that the

 3   relative risk for the highest category of peak exposure above 4 ppm

 4   or above 4,000 ppb was 2.46 for all leukemia and 3.46 for myeloid

 5   leukemia?

 6   A.   That came from IARC, yes.  I reported -- that's from IARC 2004,

 7   I didn't go to the individual, I was doing a compilation of IRAC's

 8   information.

 9   Q.   So if I'm understanding correctly, you've cited the Hauptmann

10   reports but you have not reviewed the Hauptmann reports?

11   A.   IARC cited the Hauptmann report.

12   Q.   You've cited part of the IARC report --

13   A.   Correct.

14   Q.   -- of Hauptmann in your report, but you have not reviewed the

15   individual Hauptmann paper?

16   A.   I've read it, but my -- in this particular report this was

17   giving a compilation of IRAC's presentation of Hauptmann's

18   articles.

19   Q.   Just so I am clear so I understand, the relative risk that you

20   found that you pulled from IARC was for those in the exposure group

21   with peak exposures above 4,000 ppb, is that correct, for leukemia

22   and myeloid leukemia?

23   A.   I would have to go back and look at these.  I was just

24   reporting from IARC to show their evidence that they used to

25   classify this as a Group 1 carcinogen.  I wasn't reevaluating
```

```
 1    IARC's evaluation.

 2    Q.   If you would turn to page 17 of your report, which is P-24.

 3    A.   I have it.

 4    Q.   Okay.  Did you not state the relative risk for a highest

 5    category of peak exposure above 4 ppb -- I'm sorry, 4 ppm was 2.46

 6    for all leukemia and 3.46 for myeloid leukemia?

 7    A.   That's correct.

 8    Q.   Okay.

 9    A.   That is from IARC 2004.  Not my language, their language.

10    Q.   Do you reject their language?

11    A.   No.  It's in my report.

12    Q.   Okay.  There we go.  Next sentence.  "Based on eight cases, a

13    significant excess mortality from nasopharyngeal cancer was

14    observed among formaldehyde-exposed workers in comparison with the

15    national population (standard mortality ratio 2.10; 95 percent

16    confidence interval, 1.05 - 4.21)."  Correct?

17    A.   That is what IARC says.

18    Q.   But there is a footnote to that page, is there not?

19    A.   Well, not in IARC.  IARC basically was giving positive findings

20    that they used in making their Group 1 carcinogen classification.

21    Q.   So you're not aware, or until this moment and until you read my

22    brief, you were not aware that the exact confidence interval we're

23    talking about actually goes below 1.0?

24    A.   You're saying IARC made an error?  I am not aware that IARC has

25    made an error.
```

1    Q.   If we can turn to the Stellman study.   Did you cite portions of

2    the Stellman study in your opinion?

3    A.   IARC has included in their monographs the lymphohematopoietic

4    SMR of 3.44 and the leukemia of SMR of 5.79 with confidence levels

5    for both exposures to formaldehyde and wood dust.

6    Q.   There was a column next to the exposure just to formaldehyde;

7    is that correct?

8    A.   Excuse me?

9    Q.   There was -- you cited the column with formaldehyde plus wood

10   dust, correct?

11   A.   I did, right.

12   Q.   There was a column right next to it -- keep going, it's

13   there -- there was a column right next to it with formaldehyde

14   exposure only, correct?

15   A.   No.   I cited IARC, I am not citing that column or that study.

16   That's the Stellman study itself.   I cited IARC.   And only for

17   illustrative purposes to show that they had voluminous information

18   to review and consider all aspects of all of these articles in

19   rendering their Group 1 carcinogen classification.

20   Q.   On page 34, are you telling us that your opinion that the

21   plaintiffs have a reasonable fear of cancer is solely because of

22   what IARC said?   You've reviewed no other papers, you've drawn no

23   other conclusions from these papers, and you're not familiar with

24   these papers, is that what you're telling this court?

25   A.   No, it's not what I'm telling this court.   I am telling this

 1   doesn't mean that I haven't looked at the others.

 2   Q.   Am I correct that you consider negative studies to be

 3   meaningless?

 4   A.   IARC makes a statement in the front of their -- negative epi

 5   studies cannot prove the no.  You cannot take a negative result,

 6   that's a cardinal rule of epidemiology, and prove that something

 7   isn't.  You can't prove a negative.  And that is standard.  So that

 8   is correct.  You cannot make that conclusion.

 9   Q.   And I don't -- I am not concerned about IARC's methodology, I

10   am concerned about Dr. Williams' methodology.

11   A.   My methodology is the same as the methodology in

12   epidemiologies.  You can't prove the no, you can only say we have

13   not found results because of the nature of epidemiology.  If you do

14   say that negative result proves that you are giving

15   epidemiologically incorrect information.

16            MR. WEINSTOCK:  Your Honor, may I approach?

17            THE COURT:  Yes.

18            MR. D'AMICO:  What page are you going to?

19            MR. WEINSTOCK:  I don't know.  If we can go to page 132.

20   BY MR. WEINSTOCK:

21   Q.   This is your answer, "That is the cardinal rule of

22   epidemiology, all I look for were epidemiological studies and I

23   look for those that would prove an association."

24   A.   Well that's correct.  That's just what I told you.  If you're

25   looking for epidemiology, you've got to find positive studies.  You

1   can't -- the negative cannot prove the no.  So that is an absolute

2   correct statement.

3   Q.  If we can continue.  Next slide.  Same page.  "I chose were

4   articles that would prove and showed an association.  Since

5   epidemiology is by design, negative studies are meaningless."

6   A.  Correct.

7   Q.  "They do not mean there is no association.  They strictly mean

8   they did not show no association."

9   A.  That is absolutely correct in what I said.

10  Q.  And that is -- I just want to make sure that is your

11  methodology as we stand here today?

12  A.  That is the nature of epidemiology, sir.  You cannot prove the

13  no.  You can only -- you must look for positive associations.  That

14  is expressed in epidemiology texts, that is expressed in the

15  beginning of IARC --

16  Q.  I just want your methodology.

17  A.  That's not just my methodology, that is the methodology of the

18  state of science.

19  Q.  So if we had three studies and two showed an association and

20  one showed no association, the one, as you said with no

21  association, is meaningless; correct?

22  A.  Correct.  And IARC also says if you see an abundance of

23  negative epi studies but you have one with a positive association,

24  then you have to look at that positive association.

25  Q.  And that's your opinion.  So if we had --

1   A.   That's not just my opinion.

2   Q.   If we had ten studies and one was positive and nine showed no

3   association, you would opine, got to go with the positive, the

4   negative is meaningless.  Correct?

5   A.   Correct.  And the thalidomide debacle were children were born

6   without limbs there were a lot of negative studies.

7           MR. WEINSTOCK:  Objection, your Honor.  I got an answer to

8   my question.  Can I get the next one out?

9           THE COURT:  Yes, let's just stick with the question,

10  ma'am.  There will be an opportunity for redirect it counsel

11  chooses, but let's not get argumentative, either one of you, let's

12  not get argumentative.  Stick with the question.  Answer the

13  question and move on to the next one.

14  BY MR. WEINSTOCK:

15  Q.   And if we had a million studies and one showed an association,

16  999,999 showed no association, because they're meaningless, you

17  discount all of that and you just go with the one, correct?  Is

18  that what you just said?

19  A.   You would have to recognize the one.  It's the design of the

20  epi studies.  If you could do a million studies trying to locate

21  the etiologic vector of AIDS in a million bottles of blood to prove

22  that it was transmitted through the blood, and they would all be

23  negative because you have to find that person with AIDS that has

24  the virus in the blood.  That is absolutely correct.

25  Q.   Another Bradford Hill, what did you call them, points of