UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER<br>         FORMALDEHYDE PRODUCTS<br>         LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO<br>ALL CASES | MDL NO. 1873<br><br>SECTION: N (4)<br><br>JUDGE: ENGELHARDT<br>MAG: CHASEZ |

**MANUFACTURING DEFENDANTS' POST-HEARING
MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION**

This memorandum will address arguments, testimony, and evidence submitted after original memoranda were filed. While there have been many changes, Plaintiffs have not improved their position on class certification.

**Plaintiffs' new children's subclass**. Plaintiffs' children's subclass is far narrower than their originally proposed "Future Medical Services Subclass." It now reads:

> Any child who lived in a travel trailer which exceeded the ATSDR minimum risk levels for the correspondent period in which they resided in the trailer, and who manifested any symptom of formaldehyde exposure during the time in which they resided in the trailers.

(Emphasis added). Plaintiffs no longer seek medical monitoring. (Ex. 1, p. 167.) This subclass is now limited to children. Manufactured housing defendants are not included. It sets a specific (but disputed) level of formaldehyde. It eliminates children who had no symptoms while living in a travel trailer.

*Standing*. Very few class representatives meet these limitations. Only nine travel trailer manufacturers have class representatives who even arguably fit within this subclass:

1

Gulfstream,[1] Monaco,[2] Thor,[3] Jayco,[4] TL Industries,[5] Fleetwood,[6] Forest River,[7] Americorp,[8] and KZRV.[9] All other manufacturers should be dismissed as to this subclass.

*Class Definition*. The new definition requires a determination of the level of formaldehyde in every trailer before a plaintiff qualifies for class membership. Determining any particular level is an individualized issue that would require a mini-trial for each trailer. Further, since individuals vary in their sensitivity to formaldehyde, there is no uniform level that can be applied classwide. The new definition is likewise vague in its failure to specify what symptoms can be caused by formaldehyde exposure, a subject of significant debate even among plaintiffs experts. For instance, Dr. Williams testified that diarrhea was such a symptom. (Ex. A, p. 104, l. 4.) The definitional phrase "any symptom of formaldehyde exposure" is overbroad and does not target the focus of the proposed asthma treatment program. These difficulties prevent class membership from being "presently ascertainable."

*Predominance*. This Court correctly recognized that plaintiffs are "leapfrogging" liability issues. Plaintiffs cannot use Rule 23 to alter the requirements of state substantive law.[10] No plaintiff is entitled to treatment funded by any defendant unless he proves that 1) the particular defendant's product was "<u>defective</u>"; and 2) that the defect <u>caused</u> his injury. These are individual questions that destroy predominance.

<u>Defect</u>: While establishing that a trailer exceeded the ATSDR MRL does not mean that anyone was injured, even if it did, the level of formaldehyde can only be determined on a trailer-

---

[1] Shane Baker #7, Brian Darby, Jr. #23, Damien Hargove, Jr. #47.
[2] Edward Ballet #8, Derell Ballet #9, Mercedes Robertson #76.
[3] Edward Ballet #8, Derell Ballet #9.
[4] D'Asia Battie #11, Heavenly Beasley #12.
[5] Brian Darby, Jr. #23.
[6] Timia Dubuclet, # 32.
[7] Erin McConnel #91.
[8] Danielle Simien #79.
[9] Kody Wood #66.
[10] *Cimino v. Raymark Industries, Inc*., 151 F.3d 297, 311 (5th Cir. 1998).

by-trailer basis which would result in mini-trials to consider all factors that influence formaldehyde levels. Increases in formaldehyde levels caused by factors unrelated to the trailer itself would have to be identified and separated, *e.g.*, tobacco smoke contains "huge amounts" of formaldehyde. (Ex. 1, p. 135, ll.13-15.)  <u>Causation</u>:  The mere fact that a plaintiff complained of laryngitis, eye irritation, cough, chest tightness, wheezing, headache, nausea, vomiting, diarrhea, skin rash, asthma-like symptoms and/or serious lung damage while living in a travel trailer does not establish that any of those symptoms were caused by formaldehyde at any level. These symptoms are common ones seen in any population, particularly inner city populations, and have multiple causes other than formaldehyde. (Ex. 1, p. 122-23.)  In order to conclude that formaldehyde caused a symptom, the patient must be examined by a doctor to verify the symptom, the exposure level must be determined, and other causes must be eliminated. (Ex. 1, p. 123.)  A trial for each individual is required to establish causation of that person's injury.

Plaintiffs' proposed trial plan, revealed for the first time at the class certification hearing, does nothing to ameliorate these problems. Indeed, there are gaping holes in the trial plan which has no stage devoted to proof of either the level of formaldehyde in any particular trailer or causation of a particular plaintiff's "injury" by formaldehyde. Plaintiffs cannot create predominance by "leapfrogging," "climbing over," or simply ignoring necessary individualized determinations.

Plaintiffs' first trial phase appears designed to disguise the fact that it is inappropriate to include multiple defendants in a class-wide trial when each individual plaintiff can only assert a claim against the manufacturer of the trailer in which he lived. Instead of admitting the necessity of trying cases separately against each defendant, Plaintiffs say they will conduct a "serial" trial "one at a time" against each manufacturer defendant to determine fault and liability on a

statewide basis. There are approximately 64 individual defendants (the number changes, depending upon dismissals and amendments). Even assuming that 55 of these defendants are dismissed for lack of standing, that leaves nine defendants to be subjected to separate trials in just the first trial phase. Phase one should be renamed as phases one through nine (or even, according to plaintiffs, phases one through 64).

Moreover, even a single manufacturer's "fault and liability" cannot be determined on anything other than an individual basis, trailer-by-trailer and person by person. Taking as an example the law of Louisiana (because plaintiffs have failed to submit the required analysis of this subclass under the law of all four states), there is no "liability" on the part of a defendant absent a confluence of all three elements of a tort: fault, causation, and damages. To establish liability, a plaintiff must prove that defendant's fault caused *him* some legally compensable damage. And a defendant is only liable for that damage caused by its own fault.[11] Thus, each of these supposedly individual "defendant" trials, must actually prove that the particular defendant caused some legally compensable damage to a particular plaintiff further multiplying the number of individual determinations. Even were the children's subclass further subclassed by defendant, proof that a particular manufacturer's trailer caused damage to one specific plaintiff, does not constitute proof that the same manufacturer caused damage to any other plaintiff, including plaintiffs who may have inhabited the very same trailer. As this Court has wisely stated,

> Assuming arguendo that certification would grace the individual trials with some measure of judicial efficiency not otherwise realized, the problems of proof unique to each class member's case predicate to a finding of liability under Louisiana law will likely consume more judicial resources than certification will save, particularly considering the commonplace symptomotology allegedly experienced together, with the plethora of individual-specific factors which figure into the determination of causation and damages *i.e.*, the "significant" part of each case. Defendants' conduct, while common, is but a minor part of each potential class member's case. Suffice it to say, under the circumstances presented, the net

---

[11] *Hall v. Brookshire Bros., Ltd.*, 2002-2404 (La. 6/27/03), 848 So.2d 559, 567.

result is more likely a waste of judicial resources.  Ultimately, the battle royale in this case will be fought over causation on an individual basis.[12]

*Superiority*.  A significant element of superiority is manageability.  In this case plaintiffs have offered a trial plan as proof of how this case would be tried.[13]

The trial plan does not include required elements of liability.  Phase one requires numerous individual trials as to each defendant, even by plaintiffs' reckoning; by Manufacturing Defendants' reckoning every individual plaintiff must be tried separately because liability cannot be assessed class-wide.  Even if an ATSDR level is demonstrated in a particular trailer, this does not constitute proof that anyone has been injured.  Fault that causes no injury is irrelevant.[14]

Phase four puts the cart before the horse by allowing the Court and the jury to determine in retrospect "qualification criteria for individual Class Members."  This is a roundabout way of saying that the class will be defined at the end of the case.  But, Plaintiffs must submit a credible and adequate class definition *before* a class is certified, as a prerequisite to class certification.

Phase four also includes the improper suggestion that the Court and the jury may "allocate" the cost of a fund "among liable Defendants".  Yet plaintiffs have not explained how the law of any of the four states involved allows imposition of the costs of medical treatment on any defendant other than upon proof that that particular defendant caused the injury of a particular plaintiff.  Thus, allocation of fund costs is a false "common" issue.

Importantly, Plaintiffs have not demonstrated that the imposition of a single class-wide remedy is a superior method of medical treatment for any child who might actually be able to prove an individual injury caused by formaldehyde in a travel trailer.  Indeed, the treatment program that Plaintiffs advocate would be a waste of money and a highly inefficient way to treat

---

[12] *In re American Commercial Lines*, LLC, 2002 WL 1066743, *14 (E.D.La. May 28, 2002) (Engelhardt, J.).
[13] *Feder v. Electronic Data Systems Corp.*, 429 F.3d 125, 139 (5th Cir. 2005).
[14] *Cf. Lewis v. Timco, Inc.*, 716 F.2d 1425, 1431 (5th Cir. 1983).

individual cases. As Dr. James Wedner testified in his study of inner city populations, "there was no [single] factor but … for every child there was something that was different for that child that made them have asthma more than somebody else." (Ex. 1, p. 128.) The only intervention that has a chance of success is one designed towards each individual child. (*Id.*)

Plaintiffs have complained that individual trials risk inconsistent results. But this is the very nature of the case. Each individual's case is different. It would be unfair to impose a uniform result on all defendants for every case – every expert has acknowledged that individuals react differently to the same levels of formaldehyde.

*Rule 23(a) requirements*. Plaintiffs' narrowed subclass definition exacerbates problems with typicality and adequacy. Most of the 96 original class representatives are now atypical. Adults are not typical. People who live in manufactured homes are not typical. And those who cannot prove ATSDR MRLs are not typical. Even as to children living in travel trailers, individual issues are raised as to typicality and adequacy by the handful of remaining class representatives who might meet a few of the threshold requirements. For example, Shane Baker lived in a trailer where three adults were smokers. (Defendant Manufacturers' original opposition memorandum, Ex. A-7.) Derell and Edward Ballet lived in a trailer that was tainted with mold and mildew. (*Id.*, Exs. A-8 and A-9.) Heavenly Beasley's father was a smoker. (*Id.*, Ex. A-12.) Timia Dubuclet had skin allergies and eczema prior to moving into the trailer and had severe mildew and rodent/bug problems in her trailer that were treated using various sprays. (*Id.*, Ex. A-32.) Damien Hargrove was born with asthma and eczema, long before he moved into a trailer. (*Id.*, Ex. A-47.) Kody Wood's legal representative, Adrina McCray, has not appeared for a deposition. Therefore, Defendants have been unable to determine any facts about Kody Wood and by the same token, Plaintiffs have not carried their burden of proving typicality or

adequacy of Kody Wood.  (*Id.*, Ex. A-66.)  Mercedez Robertson's parents smoke and have smoked around her for her entire life.  (*Id.*, Ex. A-76.)  It rained inside Danielle Simien's trailer. (*Id.*, Ex. A-79.)  In short, many individual differences exist as to the class representatives who meet the definitional qualifications of age and residence in a travel trailer.  None of these representatives were discussed in Plaintiffs' initial memorandum.  Without some explanation, Plaintiffs have not carried their burden of proving typicality or adequacy, neither of which are presumed.

*Dr. Williams's Testimony*.  Dr. Williams significantly limited the opinions expressed in her deposition.  She no longer expresses any opinions as to cancer.  (Ex. 1, pp. 71-72.)  She also expresses no opinions on individual causation, recognizing that there are large individual differences in the normal population ranging from hypersensitive to not sensitive.  (Ex. 1, p. 63.) Dr. Williams also agrees that there are multiple sources of formaldehyde not inherent in travel trailers such as tobacco smoke, disinfectants, and gas cookers.  (Ex. 1, p. 64.)

Dr. Williams opined that formaldehyde can cause or exacerbate childhood asthma, but in reaching that opinion relied only on positive studies and ignored negative ones.[15]  She violated an essential principle of the scientific method:  "testability."  As explained in *Daubert*,

> "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified;  indeed, this methodology is what distinguishes science from other fields of human inquiry."  Green 645.  See also C. Hempel, Philosophy of Natural Science 49 (1966)  ("[T]he statements constituting a scientific explanation must be capable of empirical test");  K. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability").[16]

---

[15] Compare with testimony of the qualified allergist Dr. Wedner who opined formaldehyde does not cause or aggravate asthma and who reads entire articles in order to "tease the paper apart."  (Ex. 1 at 123-25; 136-37.)

[16] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S.Ct. 2786, 2796-97 (1993).

7

Reliance upon studies conducted by others is not, per se, an improper methodology. However, the expert must conduct a thorough and systematic review of *all* significant studies on the subject, not "cherry pick" only those which lend support to his opinion.

> [G]ood scientific technique or methodology generally accepted by scientists does not permit scientists to selectively choose only those studies which support an hypothesis and to ignore the rest in attempting to arrive at a conclusion. It appears almost without question based on the testimony of the various experts that this is the type of exercise that scientists generally do not engage in.[17]

In addition to reviewing studies in a "systematic" manner, the very essence of scientific method requires that the expert research first and conclude later.

The hypothesis *Daubert* refers to is the null hypothesis. The null hypothesis in epidemiological studies "postulates that there is no association between specific exposure and a particular outcome . . . The goal of an epidemiological study is to determine whether one can reject the null hypothesis and conclude that there is in fact an association between the exposure and the outcome."[18] Experts who proceed in the opposite fashion by assuming a connection between an agent and a disease and setting out to support that connection defy basic scientific method.[19]

Dr. Williams, a toxicologist who fancies herself an expert in epidemiology despite the lack of a degree or prior qualification in federal court as such, violated a cardinal rule of epidemiology when she testified that she only considered studies that demonstrated a positive

---

[17] *Lofgren v. Motorola*, 1998 WL 299925 (Ariz. Super. 6/1/98) at *20 (applying *Daubert*). *See also Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 665 (M.D. La. 2000), *aff'd*, 247 F.3d 240 (5th Cir. 2001).

[18] *Wade-Greaux Whitehall Laboratories, Inc.*, 874 F. Supp. 1441, 1451 (D. Virgin Islands 1994).

[19] "Scientists, including epidemiologists, generally began an empirical study with a hypothesis that they seek to disprove, called the null hypothesis. The null hypothesis states that there is no true association between an agent and a disease." Reference Manual on Scientific Evidence ("RMSE") at 356. *See also Chambers, supra* at 665 (experts who started by assuming that benzene induced chronic myelogenous leukemia did not use sound scientific methodology); *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 783 (experts who reached conclusions before studying scientific literature turned scientific analysis on its head); *Castellow v. Chevron USA*, 97 F.Supp.2d 780, 786 (S.D. Tex. 2000) (experts who "worked backward" from conclusions to seek out medical and scientific support could not "withstand *Daubert* scrutiny" and were "not due any credence in a court of law"); *Black v. Rhone-Poulenc, Inc.*, 19 F.Supp.2d 592, 598 (S.D.W. Va. 1998) (expert who did not proceed from the null hypothesis – "the very starting point for testability" – "violated 'the prime objective' for scientific research"); *Lofgren*, *supra* at *18 ("Reaching their opinions first and then doing research to support them suggests that the plaintiffs' experts' opinions are 'result oriented' rather than the result of good scientific technique or methodology.")

8

association between formaldehyde exposure and childhood asthma. According to the Reference Manual on Scientific Evidence (2d ed.):

> The need to replicate research findings permeates most fields of science. In epidemiology, research findings often are replicated in different populations. Consistency in these findings is an important factor in making a judgment about causation. Different studies that examine the same exposure–disease relationship generally should yield similar results. While inconsistent results do not rule out a causal nexus, any inconsistencies signal a need to explore whether different results can be reconciled with causality.

*Id.* at 377-78. Dr. Williams, conversely, stated she only relied upon studies that were positive and ignored myriad negative studies. Ironically, when testifying on direct examination, Dr. Williams acknowledged that "in accordance with the Reference Manual on Scientific Evidence … you want to see multiple studies finding the same thing." (Ex. 1, p. 43.) Her methodology is fatally flawed.

*Dr. Paris's Supplemental Affidavit.* Dr. Paris's supplemental affidavit offers new opinions but cites no scientific support for those opinions. For example, Dr. Paris states that, despite the lack of studies, it is "logical" that children exposed to formaldehyde may develop asthma. He does not explain how studies that demonstrate that formaldehyde does *not* cause asthma in adults can be extrapolated to demonstrate that formaldehyde *does* cause asthma in children. Such testimony does not meet *Daubert* standards and proves nothing.

Dr. Paris's supplemental affidavit also contradicts Dr. Williams' testimony concerning IgE. Dr. Paris, like Dr. Wedner and Dr. Shellito (all allergists), acknowledges that humans can produce formaldehyde-specific IgE,[20] but the presence of this molecule is not clinically relevant because it does not correlate with symptoms.

*Children's Health "Study"*. Plaintiffs cite this "study" (which in fact is not a scientific

---

[20] Dr. Wedner actually testified that nobody makes antibodies to airborne formaldehyde itself, but the body can produce IgE to a formaldehyde-protein adduct that has not been correlated to symptoms, thus making the presence of IgE in persons exposed to formaldehyde wholly irrelevant to the formaldehyde exposure. (Ex. 1, pp. 132-34.)

9

study at all) for the proposition that there is a "health crisis that's been created and who is going to pay for it" and "the defendants who are responsible for causing the damage in the first place [should] pay for it." (Ex. 1, p. 150.) Yet, the Children's Health Fund Paper cites a variety of health problems suffered by the post–Katrina pediatric population that have no connection even hypothetically to formaldehyde. These include nutritional, educational, developmental and mental health issues. In fact, the word "formaldehyde" occurs only twice in this 17-page paper.

The incidence of verified physician-diagnosed asthma in children living in travel trailers cited in this paper is 11%, no different than the level that would normally be expected in an inner city impoverished population. (Ex. 1, p. 128.) Once again, Plaintiffs appeal to passion rather than reason. Plaintiffs imply, without any sound basis, that if only the trailers had been formaldehyde-free, these children would have none of the problems inventoried in the Children's Health Paper. Aside from lacking a scientific foundation, this proposition defies common sense.

**Economic loss subclass**. In their argument plaintiffs once again propose a subclass of people they claim are entitled to recover rental assistance. As explained in the Manufacturing Defendants' original opposition, there is no theory upon which any plaintiff, who paid nothing for their trailers, sustained any economic loss attributable to any action of the Manufacturing Defendants. There is no constitutional entitlement to rental assistance.[21] Further, had Plaintiffs received rental assistance, they would have been required to expend that money on obtaining alternative housing arrangements. They would not have been permitted to use that money for any other purpose.

Plaintiffs have cited no cases in support of their theory that non-purchasers are entitled to economic loss damages from manufacturers due to dissatisfaction with a product.

---

[21] *Ridgely v. Federal Emergency Management Agency*, 512 F.3d 727 (5th Cir. 2008).

Respectfully submitted,

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER & WEINSTOCK**

s/Andrew D. Weinstock
_____
**ANDREW D. WEINSTOCK #18495
JOSEPH G. GLASS #25397**
3838 N. Causeway Blvd., Suite 2900
Metairie, LA 70002
(504) 832-3700
**DEFENSE LIAISON COUNSEL**

## C E R T I F I C A T E

I hereby certify that on the 10th day of December, 2008, a copy of the foregoing Manufacturing Defendants' Memorandum In Opposition To Class Certification was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

s/Andrew D. Weinstock
_____
**ANDREW D. WEINSTOCK #18495**
andreww@duplass.com

11