UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  FEMA TRAILER<br>        FORMALDEHYDE PRODUCTS<br>        LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO<br>ALL CASES | MDL NO. 1873<br><br>SECTION:  N (4)<br><br>JUDGE: ENGELHARDT<br>MAG: CHASEZ |

**EXHIBIT 1 TO**
**MANUFACTURING DEFENDANTS' POST-HEARING**
**MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION**

**<u>CLASS CERTIFICATION HEARING TRANSCRIPT EXCERPTS</u>**

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2   *********************************************************************

 3
     IN RE:  FEMA TRAILER
 4   FORMALDEHYDE PRODUCTS              Docket No. MDL-1873(N)
     LIABILITY LITIGATION              New Orleans, Louisiana
 5                                     Tuesday, December 2, 2008

 6   *********************************************************************

 7
              TRANSCRIPT OF MOTION TO CERTIFY CLASS PROCEEDINGS
 8           HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                     UNITED STATES DISTRICT JUDGE
 9

10
     APPEARANCES:
11
     FOR THE PLAINTIFF
12   STEERING COMMITTEE:          GAINSBURGH BENJAMIN DAVID
                                  MEUNIER AND WARSHAUER
13                                BY:  GERALD E. MEUNIER, ESQ.
                                       JUSTIN I. WOODS, ESQ.
14                                2800 Energy Centre
                                  1100 Poydras Street, Suite 2800
15                                New Orleans, LA 70163

16
                                  LAW OFFICES OF FRANK J. D'AMICO, JR.
17                                BY:  FRANK J. D'AMICO, JR., ESQ.
                                  622 Baronne Street
18                                New Orleans, LA 70113

19
                                  REICH & BINSTOCK
20                                BY:  DENNIS REICH, ESQ.
                                  4265 San Felipe, Suite 1000
21                                Houston, TX 77027

22
                                  NEXSEN PRUET JACOBS POLLARD & ROBINSON
23                                BY:  PAUL A. DOMINICK, ESQ.
                                  P. O. Box 486
24                                Charleston, SC 29402

25
```

```
 1   FOR THE DEFENDANTS'
     LIAISON COUNSEL:            DUPLASS ZWAIN BOURGEOIS MORTON
 2                               PFISTER & WEINSTOCK
                                 BY:  ANDREW D. WEINSTOCK, ESQ.
 3                                    JOSEPH G. GLASS, ESQ.
                                 Three Lakeway Center
 4                               3838 N. Causeway Boulevard, Suite 2900
                                 Metairie, LA 70002
 5

 6
     FOR THE GOVERNMENT:         UNITED STATES DEPARTMENT OF JUSTICE
 7                               BY:  HENRY T. MILLER, ESQ.
                                      MICHELLE G. BOYLE, ESQ.
 8                                    ADAM M. DINNELL, ESQ.
                                 Civil Division - Torts Branch
 9                               P.O. Box 340, Ben Franklin Station
                                 Washington, D.C. 20004
10

11

12   FOR FLEETWOOD ENTERPRISES,
     INC. AND FLEETWOOD CANADA,
13   LTD.:                       NELSON, MULLINS, RILEY & SCARBOROUGH
                                 BY:  RICHARD K. HINES, V, ESQ.
14                               201 17th St., NW
                                 Suite 1700
15                               Atlanta, GA 30363

16

17

18   Official Court Reporter:    Karen A. Ibos, CCR, RPR, CRR
                                 500 Poydras Street, Room HB-406
19                               New Orleans, Louisiana 70130
                                 (504) 589-7776
20

21

22     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
23

24

25
```

1
                        I N D E X
2
WITNESSES FOR PLAINTIFF:                    PAGE/LINE:
3
PATRICIA M. WILLIAMS, Ph.D.
4
   Voir Dire Examination by Mr. D'Amico         12/25
5  Traverse Examination by Mr. Weinstock        21/19
   Direct Examination by Mr. D'Amico            24/7
6  Cross-Examination by Mr. Weinstock           62/16
   Cross-Examination by Mr. Dinnell            100/23
7  Redirect Examination by Mr. D'Amico         114/5

8

9  WITNESSES FOR DEFENDANTS:

10 H. JAMES WEDNER, M.D.

11   Voir Dire Examination by Mr. Hines         117/1
     Traverse Examination by Mr. Reich          120/4
12   Direct Examination by Mr. Hines           120/25
     Cross-Examination by Mr. Reich             130/4
13

14

15

16

17

18

19

20

21

22

23

24

25

1    the nasal mucosa in persons occupationally exposed, what levels did

2    the exposures begin at?

3    A.   Forty ppb.  And these are biopsy, if I didn't make that clear,

4    it's on the slide, these they actually took biopsies of the

5    workers' nasal mucosa.

6    Q.   Was there a statistically significant increase of histological

7    changes from normal tissue that was observed in these workers?

8    A.   Basically they were looking at -- there was a statistically

9    significant increase of histological changes.

10   Q.   Yes, okay.  I think another slide is coming up?

11   A.   Next slide.  This is the next article.  There are three human

12   articles, and this is Edling, Occupational exposure to formaldehyde

13   and histopathological changes in the nasal mucosa.  As a

14   toxicologist and in accordance with the Reference Manual on

15   Scientific Evidence of the Federal Judiciary Center, you want to

16   see multiple studies finding the same thing, and so I've included

17   three human studies.

18        Here on the left is the nasal respiratory epithelium

19   cylindric cells with cilia, normal, from the article by Edling and

20   also given at my deposition.  And here you see again a metaplasia,

21   you have the wrong type of tissue in the place.

22        And when you have the -- even though at this point it's

23   still a normal tissue, but you can't -- it cannot do the function,

24   it's damaged, it cannot do the function of protecting the lower

25   lung of getting allergens and dust and particle and toxin out of

1    A.  Yes.

2    Q.  Okay.  I would first like to start by asking you a few

3    questions regarding class.

4           MR. WEINSTOCK:  Your Honor, we do have a slide show but

5    it's really not a slide show, it's just blown up portions of her

6    report and testimony, if necessary.  It's not anything no one has

7    seen before, with the exception of some impeachment that may or may

8    not come up.

9           THE COURT:  Okay.

10          MR. D'AMICO:  Objection.  Is that a question?  That seems

11   like argument.

12          THE COURT:  No, I think it was --

13          MR. WEINSTOCK:  I think it was a statement to the court as

14   to what we're doing.

15          THE COURT:  -- stating to me what his intentions were with

16   regard to the examination, so I'll overrule it.  Go ahead.

17   BY MR. WEINSTOCK:

18   Q.  Would you agree with the following statement:  There are large

19   individual differences in the normal population and between

20   hypersensitive and sensitized people?

21   A.  Yes.  It's a bell shaped curve.  Any type of response is going

22   to have individual differences.  You have on one end the

23   hypersensitive, on the other end the not sensitive.

24   Q.  So the answer is you would agree with that statement?

25   A.  I would agree with that statement.

1   Q.  In fact, you wrote that statement in your report, correct?

2   A.  That is correct.  That's a toxicological fact.

3   Q.  Would you also agree with this statement:  There are several

4   indoor environmental sources that can result in human exposure to

5   formaldehyde, including cigarettes and tobacco products and smoke,

6   furniture containing formaldehyde resins, adhesives containing

7   formaldehyde used for plastic surfaces and parkay, carpets, paints,

8   disinfectants, gas cookers and open fireplaces.  Would you agree

9   with that statement, Doctor?

10  A.  Yes.

11  Q.  And, in fact, you wrote that statement as well in your report,

12  did you not?

13  A.  That is correct.

14  Q.  In the opposition to your Daubert challenge, on page 8 the

15  plaintiffs state:  "Defendants," which I guess means me and others,

16  "disingenuously mislead the court as to what constitute

17  Dr. Williams' opinions.  Dr. Williams clearly lists the opinions

18  she is offering on page 34 of her affidavit as follows:"

19       Is that correct, are the opinions you're giving this court

20  on page 34 of your affidavit?

21  A.  They are.  And also the general -- and also if you look with

22  the general causation is inherent to it and that's earlier than

23  page 34.  I have like -- I think it's page 5 through 8, somewhere

24  in there, if you just wait a minute, with the general causation

25  methodology.  And of course there is a general causation opinion

1  Q.  I am saying that in the Hauptmann paper the exact confidence

2  interval was reported below .1 at the bottom level.

3  A.  I really did not use it in the capacity of criticizing

4  Hauptmann.  I used it in the capacity of showing which studies,

5  which confidence intervals IARC used to render this a Group 1

6  carcinogen.  I did not render an opinion other than the fact that

7  IARC has classified it as a Group 1 carcinogen and I concur and

8  that's it.

9  Q.  You concurred without reviewing the study?

10  A.  I concur with IARC's elaborate monograph and their

11  considerations, yes, I do concur.

12  Q.  I guess my question then would be, other than handing the judge

13  the IARC study, you're not making any expert evaluation of that

14  study; is that right?

15       MR. D'AMICO:  Objection to the classification as the IARC

16  study, it's not a study.

17       THE COURT:  Go ahead and rephrase it.

18  BY MR. WEINSTOCK:

19  Q.  Other than handing the judge what IARC did with formaldehyde,

20  you offer nothing but to -- you offer no expertise on what's

21  written in there because you haven't looked at the underlying data?

22  A.  No.  I looked -- IARC has 803 references in its monograph.

23  They have an advisory committee that is a worldwide representation

24  of advisory committee.  I am not making any specific causation

25  here, I am not making any opinions at all on cancer other than to

1    say that IARC has presented, studied ad nauseum all of the data,

2    with its flaws or missing or whatever it is they have looked at,

3    and they have given, rendered it a Group 1 carcinogen.

4         I am not doing any specific causation.  I have not

5    rendered any opinions on cancer.  If I were, then I would be going

6    beyond what IARC and looking at individual articles.

7    Q.  Are you aware of any travel trailer in which the levels were

8    found to be 4,000 ppb?

9    A.  I am not, no.

10   Q.  But nevertheless, the portion of IARC you selected to represent

11   to the court involved the relative risk for peak exposures above

12   4,000 ppb, that's the portion you lifted from IARC and gave to the

13   court; is that correct?

14   A.  There are many, many studies on cancer that I put in this from

15   IARC.  And as I said, my -- I am not interested in rendering

16   opinions on cancer at this time.

17   Q.  And these nasopharyngeal, the eight deaths actually turned out

18   to be seven, are you aware of that, that one of them was

19   reclassified?

20   A.  I have not.  I have not gone into the specific articles

21   concerning cancer because my testimony is not involving that.  My

22   testimony is only involving that I concur with IARC's extensive

23   review of all of the literature.  And literature will have always

24   some considerations that weaknesses, strengths, that's literature.

25   That's science.

1   BY MR. HINES:

2   Q.  Dr. Wedner, would you introduce yourself to the court.  Tell

3   the court where you live and where you work and what your position

4   is.

5   A.  My name is H. James Wedner, M.D.  I am from St. Louis,

6   Missouri.  I am professor of medicine and chief of the Division of

7   Allergy and Clinical Immunology in the Department of Medicine at

8   Washington University School of Medicine.  I am the Training

9   Program Director for Allergy and Clinical Immunology of the

10  Training Program in Allergy and Immunology at Washington University

11  School of Medicine.  I am the director of the Asthma and Allergy

12  Center of Washington University, and I am the chair of one of the

13  IRB's, which is the human experimentation committee, for the

14  Washington University School of Medicine in Washington University

15  combined human experimentation consortium.

16  Q.  And can you tell the court, the particular group, the human

17  experimentation program you work on just very quickly what that

18  entails?

19  A.  Well, every university has to have an IRB and we have one of

20  the largest in the country.  We have four what are called new

21  protocols IRB's and six review protocols.  So every human

22  experimentation protocol that is done at Washington University or

23  the School of Medicine has to be presented to one of the four new

24  protocol IRB's.  And they present the plan, it has to be

25  scientifically sound, the consent form has to come to us, we have

1  to approve it, and you can't do any research unless we approve it.

2  Q.  With respect to the clinical program that you're involved in

3  and that you are the chief of, you evaluate and treat patients who

4  complain from time to time of exposure to various indoor air

5  pollutants, including formaldehyde, and have you had occasion to

6  treat such or related such people?

7  A.  Yes.  Our program, like all allergy programs, sees both adults

8  and children.  My youngest patient is currently two, my oldest

9  patient is currently 102.

10        MR. HINES:  Your Honor, I don't want to go through his

11  entire CV, it's part of Exhibit D-228, but just very quickly.

12  BY MR. HINES:

13  Q.  You were educated in both undergraduate and medical school at

14  Cornell, you interned at Barnes which is Barnes Hospital at

15  Washington University, St. Louis.  And if we could just put that in

16  context, where does in the great hierarchy of medical schools,

17  where does Washington University in St. Louis School of Medicine

18  sit?

19  A.  According to U.S. News and World Report, we're currently third.

20  Q.  And who is ahead of you?

21  A.  Harvard and Penn.

22  Q.  I take it you're board certified and members of appropriate

23  organizations?

24  A.  Actually, because when I started doing this a long, long time

25  ago I did only research, I am not board certified.  But I have a

1   certificate from the people who certify that you have to be board

2   certified to train others, that that's okay.  So I never took the

3   boards.

4           But I belong to all of the other groups and I am a fellow

5   of the American Academy of Allergy, Asthma and Immunology.

6   Q.  And you serve on the editorial and peer review boards of

7   various peer review journals?

8   A.  I have, yes.

9   Q.  And, in fact, you have authored a series of studies, and I just

10  want very briefly for you address the inner city asthma program

11  that you were involved with and the study just very briefly.

12  A.  Back in 1990, the National Institutes of Allergy and Infectious

13  Diseases set up the first of a series of inner city asthma

14  programs.  The first one was called the National Cooperative Inner

15  City Asthma Study, or NCICAS, which was designed to ferret out what

16  we initially thought would be the cause of the significant rise in

17  asthma within the inner city.  And there were seven sites chosen,

18  of which Washington University was one, and I was the principle

19  investigator of that.

20          MR. HINES:  Your Honor, at this time it would like to

21  offer Dr. Wedner as an expert in the field of immunology and

22  allergy.

23          THE COURT:  Any objection?  Any desire to question this

24  witness?

25          MR. REICH:  If I may voir dire the witness briefly, your

1    Honor?

2                THE COURT:  Sure.

3                          TRAVERSE EXAMINATION

4    BY MR. REICH:

5    Q.  Dr. Wedner, you are not a pediatric immunologist, are you?

6    A.  I see patients both adult and pediatrics, yes.

7    Q.  Is there a specialty for pediatric immunology and allergy?

8    A.  No.  You have to be, show competency in both.  In order to be

9    board certified or to have a certificate as I do, you have to be

10   competent in both.  If you start off being trained as an internist,

11   then 20 percent of your training in allergy and immunology has to

12   be with children; if you start off as a pediatrician, then

13   20 percent has to be in adults.

14   Q.  What percentage of the patient population that you would have

15   occasion to see clinically would constitute pediatric patients?

16   A.  At the asthma center, approximately right now about 30 percent

17   of all of my patients are under the age of 12.  At our other

18   clinical setting, about 15 percent are under the age of 12.

19   Q.  Have you had an opportunity to evaluate clinically any of the

20   children living in the FEMA trailers?

21   A.  I have not.

22                MR. REICH:  I have no further questions at this time.

23                THE COURT:  All right.  Thank you.

24                          DIRECT EXAMINATION

25   BY MR. HINES:

1    Q.  I note in your affidavit that because of the wide --

2            THE COURT:  Let me ask before you proceed.  Is there an

3    objection that the court should consider to this witness's, this

4    witness being admitted as an expert in the field of immunology and

5    allergy, which I think is what he is being offered as?

6            MR. REICH:  No, your Honor.

7            THE COURT:  All right.  Thank you.  Go ahead.

8            MR. HINES:  Thank you, your Honor.

9            THE COURT:  The court will so accept him and will go ahead

10   and proceed with the opinion.

11           MR. HINES:  Thank you, your Honor.

12                           DIRECT EXAMINATION

13   BY MR. HINES:

14   Q.  Dr. Wedner, I noticed in your affidavit you say that because of

15   the wide use of formaldehyde that there is a large body of medical

16   literature investigating the alleged health effects of

17   formaldehyde?

18   A.  That's correct.

19   Q.  My question is this, did all of that literature start

20   post-Katrina?

21   A.  Oh, no.  The interest in formaldehyde started probably back in

22   1975 actually the first papers.

23   Q.  And when did you, Dr. Wedner, first review the literature on

24   formaldehyde?

25   A.  It was starting in late 1981 and then into 1982.

1   Q.  And tell the court, if you would, the scope of the literature

2   that you, in fact, reviewed.

3   A.  I reviewed what was the world's literature at that time.

4   Q.  And since 1981-82 when you first became involved with the

5   literature on formaldehyde, have you maintained that interest over

6   the years?

7   A.  I have.

8   Q.  And with respect to the irritant and alleged allergic

9   properties of formaldehyde, has the state-of-the-art of the medical

10  literature changed significantly since 1981, 1982?

11  A.  The state-of-the-art has progressed only in the sense that

12  there are more papers showing basically the same thing.

13  Q.  In Dr. Williams' report and as we heard this morning, she has

14  listed a panoply of symptoms that she says is common to virtually

15  all of the putative plaintiffs in this case.  Among those are

16  laryngitis, eye irritation, cough, chest tightness, wheezing,

17  headache, nausea, vomiting, diarrhea, skin rash, asthma-like

18  symptoms, and serious lung damage.

19        My question is this, do things other than formaldehyde

20  cause these symptoms?

21  A.  Oh, of course.

22  Q.  And even without any exposure to formaldehyde, would you expect

23  to see these symptoms occurring in this population?

24  A.  In any population, and in particular any inner city population

25  like the ones that we continue to study now, these would be a

1    common series of symptoms that we would see.

2    Q.  From the standpoint of the clinician, what would the clinician

3    have to do in order to diagnosis whether or not a particular

4    symptom is related to alleged formaldehyde exposure?

5    A.  Well, there are a number of things you would have to do.  First

6    of all, you would have to verify the symptom, you would have to

7    make sure that the patient actually had what was alleged to be.

8    You can't just accept that.  Second of all, you would have to

9    verify exposure.  And third of all, you would have to eliminate

10   other common things in the individual's environment which could

11   cause the same symptoms.

12          For example, if you lived in an environment that was very

13   dusty, if you lived in a bad outside environment where there was

14   high levels of ozone or particulates, in the inner city there are

15   cockroaches, there is rat allergen, there is mouse allergen, there

16   are people who are in close quarters so you could have a high level

17   of upper respiratory infections.  All of those would have to be

18   eliminated before you could focus on a single, whether it's a

19   single allergen or a single irritant or any single factor, be that

20   formaldehyde or any other.

21   Q.  Let me change the subject for just a moment.  One of the big

22   questions confronting this court is whether or not formaldehyde

23   causes asthma and/or whether formaldehyde aggravates preexisting

24   asthma in an otherwise atopic individual, especially children.  My

25   question to you is this, sir:  Does formaldehyde cause asthma or

1   aggravate asthma symptoms in an otherwise atopic individual?

2   A.  Let's break it into two questions.  One is, is formaldehyde in

3   and of itself able to cause asthma?  And the answer is there is no

4   compelling evidence that asthma -- that formaldehyde causes asthma.

5   First of all, there is no good mechanism by which it should be able

6   to cause asthma.

7          And second of all, the studies are very unconvincing that

8   at any significant ambient concentration it does cause individuals,

9   and this includes children, to have asthma.  So that's point one.

10         The second is, does it cause individuals who have asthma

11  to wheeze more, and that is no also.  And it's been shown in two

12  ways:  In adults, what people have done, and that's been done

13  starting way back in the early 80s and onward, is they've taken

14  individuals who have diagnosed asthma, put them in chambers and

15  literally exposed them to medium to high concentrations, we're

16  talking 3 ppm, of formaldehyde and they don't wheeze.  And this

17  included individuals who thought they had formaldehyde induced

18  asthma.  And when they masked the odor of the formaldehyde, it

19  didn't make them wheeze.

20         So as far as we know, formaldehyde is not a cause or an

21  exacerbater of asthma.

22  Q.  Once you have asthma, by the way, I heard something from

23  Dr. Williams this morning, once you have asthma, do you

24  automatically have asthma for life?

25  A.  Actually you don't.  If you develop -- there are several

1    classes of people who wheeze, and this is very important for

2    children because we have what are called early wheezers, and these

3    are the children who wheeze before the second year of life.  And

4    early wheezers generally fall into two classes, some of the early

5    wheezers, indeed most of them, actually stop wheezing.  And whether

6    or not they truly have asthma or not is something open to question.

7    But they lose their wheezing and they're actually normal, usually

8    for the rest of their life or at least as far as they have now been

9    study which is out to 18 years.

10        Some of those early wheezers and then the younger group

11   from two on will then begin to start to wheeze, and those would be

12   called childhood asthmatics.  And if you do appropriate studies,

13   you can show they have asthma.  Of those individuals, about half of

14   them will lose their asthma somewhere around puberty, between the

15   ages of 10 and 14, and they will literally lose their sensitivity

16   to methacholine or histamine, they will not show any asthma

17   symptoms.

18        Now, unfortunately of that group some of them will

19   re-acquire their asthma later in life between the ages of 25 and

20   40, but there is a group who developed asthma as a child and then

21   lose it and they never have asthma again.

22        THE COURT:  Counsel, you've used the time that was

23   allotted.  We will allow you to go into the half hour for closing

24   argument if you choose to do so.  We'll also allow the plaintiffs

25   that as well.  The plaintiffs have about 14 minutes left of their

1    examination time.  So you can proceed with that caveat.

2             MR. HINES:  Thank you, your Honor, we will be very brief.

3    BY MR. HINES:

4    Q.  Another big question that is confronting this court is whether

5    formaldehyde can sensitize adults, and not only adults but

6    especially children, and whether or not that sensitization could

7    trigger other allergic reactions as opposed to just an allergic

8    reaction to formaldehyde itself.  Do you have an opinion as to

9    whether or not formaldehyde can act as such a pathogen?

10   A.  Okay.  If we talk about sensitization, very briefly there are

11   four kinds of sensitization:  One involves T cells and that was the

12   kind that you just heard about where somebody can't wear eye shadow

13   and that has nothing to do with asthma.  That's a skin reaction,

14   it's called a type four reaction.  And we see it all the time, it's

15   very, very common.  About 30 percent of everybody will have a patch

16   test positive to formaldehyde.  Everybody in this room.

17            Sensitization in the IgE sense making you allergic can be

18   shown in one very interesting situation where formaldehyde touches

19   blood, you can develop IgE, and that was shown way back in 1981 --

20   actually the first paper was in '78.  But those individuals who had

21   IgE, there is no correlation between the IgE and whether or not

22   they're symptomatic.  So the IgE is basically inconsequential.

23            And that's also been shown in two studies in children

24   where they developed really low levels, RASS scores about 1.3,

25   which is very low, to formal proteins and there was no correlation

1    between the IgE and the symptoms.  So it's not a good sensitizer.

2    In most people it's not a sensitizer at all, but it doesn't cause

3    disease.

4    Q.  Thank you.  My last subject is this, your Honor, as we move

5    briefly through.  You described earlier your work in the inner

6    city.  You have been heavily involved in inner city work with

7    children.  There will be a slide presented in closing by the

8    plaintiffs that if children have symptoms, they deserve treatment.

9    In fact, the plaintiffs have asked this court for a children's

10   subclass where the court would intervene on behalf of the children.

11           Would such a subclass based on your experience with

12   children, based on what you know about allergy and immunology,

13   would such a program be efficacious for those children?

14   A.  Probably not.  The problem with asthma, particularly asthma in

15   a group --

16           MR. REICH:  Objection, your Honor, it's beyond the scope

17   of his expertise, no foundation.

18           THE COURT:  Do you want to respond to the objection?

19   BY MR. HINES:

20   Q.  Let's go back to your foundation.  Can you tell the court the

21   work you've had with children and the funding you've had to work

22   with children and with asthmatics and what you've seen from those

23   studies and compare and contrast that with what's being asked in

24   this case.

25   A.  Okay.  The initial National Cooperative Inner City Asthma Study

1   was a large study, as a matter of fact at the time it was the

2   largest asthma study of children that had been done.  And remember

3   that the incidence of asthma in the inner city currently is running

4   between 12 to 14 percent.

5   Q.  Let me interrupt.  So when we saw this morning that the Legacy

6   of Shame article by the Children's Health Fund reported that the

7   children in New Orleans and Baton Rouge that have been studied, in

8   fact, had 11 percent.  Would that be what you would expect to find?

9   A.  Absolutely.  Within statistical error that was probably exactly

10  what I would have expected from that kind of a population.

11         So the question was, here you have the inner city at let's

12  say 11 percent and you had suburbia at 7 to 8 percent.  Why?  And

13  that was the idea of this study.  So it was a two-part study:  The

14  first was we naively said, okay.  There must be a factor and so we

15  did a huge study in seven cities to find the factor that caused

16  inner city asthma to be so high.  What we learned was there was no

17  factor but that for every child there was something that was

18  different for that child that made them have asthma more than

19  somebody else.

20         We then designed an intervention which was the first

21  intervention that actually statistically worked that had ever been

22  done on children.  And that was an intervention designed toward

23  each child.  And remember, the number one cause of an increase in

24  asthma in the inner city is psychological.  We all thought it would

25  be mites and it wasn't mites; we all thought it would be

1    cockroaches and it wasn't cockroaches.  The number one was

2    psychosocial.

3         So our intervention used social workers and it was

4    designed to, first of all, find out what's wrong and then fix it.

5    If you don't have a doctor, we got you a doctor.  If you had

6    problems at school, we fixed the problems at school.  We looked at

7    your environment and we fixed that, if possible.  We gave you bed

8    covers.  If you had a cat we got the cat out of the house if

9    possible.  We did one of everything but it was designed for every

10   single child.

11        If you do the same thing to every child in any cohort,

12   there have been study after study after study before NCICAS that

13   showed that doesn't work.  So that's the first thing.

14        The second thing is you can't focus on one factor.  You

15   can't say we're going to select a group of children based on a

16   single questionnaire filled out by a parent, which all they, all

17   they do is check a couple of boxes, you're not selecting the right

18   cohort.  If you want to do a study and you want to do it right for

19   the children in this area, you have to pick them all.  You can't

20   just say, okay.  If your parent checked off the right box, you get

21   to be in a study; and if you parent forgot to check off a box, you

22   can't be in the study, you can't get the intervention, that's just

23   not right.

24        MR. HINES:  Thank you, your Honor.  Thank you that's all

25   we have.

1          THE COURT:  Thank you.  Y'all have 23 minutes left.

2          MR. REICH:  Thank you.

3                        CROSS-EXAMINATION

4    BY MR. REICH:

5    Q.  Dr. Wedner, you understand that you are at the class

6    certification stage of this case?

7    A.  Yes.

8    Q.  And you certainly recognize that there may be other experts in

9    your field who have different opinions as you may have regarding

10   whether formaldehyde is a risk factor for asthma?

11   A.  There may be, sure.

12   Q.  In fact, the American Academy of Pediatricians recognizes

13   asthma as a risk factor, correct?

14   A.  They list it as a potential --

15   Q.  Formaldehyde as a risk factor for asthma --

16   A.  No, they list it as a potential risk factor.

17   Q.  And potential simply means that there is an opportunity for

18   asthma to be induced from formaldehyde exposure into some people

19   who experience exposure, correct?

20   A.  No.  It means there is a possibility that it might cause asthma

21   but we don't know.

22   Q.  Doesn't it, in fact, mean that a linkage has been shown in the

23   scientific literature that formaldehyde can induce asthma but that

24   there may be genetic and environmental factors that will determine

25   the extent of the outcome?

```
 1   A.  Well, you're testifying, not me.  That's not what I believe it
 2   to be.
 3           But what it says it's potentially a cause of asthma, I
 4   think what they mean is we don't know.  There is some literature
 5   that suggests an association but that association is not proven.
 6   Q.  And in 2007, recently, the National Heart, Lung and Blood
 7   Institute and the National Asthma Education and Prevention Program
 8   determined that formaldehyde is a risk factor for asthma, correct?
 9   A.  No.  They said exactly the same thing as the Academy of
10   Pediatrics, they said it's a potential risk factor.
11   Q.  And that was based upon the review of medical literature
12   demonstrating that persons exposed to formaldehyde are at increased
13   risk for developing asthma?
14   A.  Not necessarily.
15   Q.  All right.  Now, I noticed that you prepared an affidavit and
16   your affidavit referenced a number of studies, including adult
17   studies and a few children studies.  But for some reason the Wantke
18   study, which was displayed to the court earlier, was absent.  Were
19   you familiar with that study?
20   A.  Yes, I was.  I am not sure why it's not there, but.
21   Q.  And in the Wantke study, if I may place it on the ELMO.
22           THE WITNESS:  Can I get a copy of that?
23           THE COURT:  Do you have a copy of that for the witness?
24           THE WITNESS:  It's almost impossible to read it from here.
25           THE COURT:  It sure is.
```

1          MR. REICH:  I have a copy, I should.

2          THE WITNESS:  Thanks.

3   BY MR. REICH:

4   Q.  In this study, school children were evaluated who were exposed

5   to particle board containing formaldehyde; is that correct?

6   A.  Yes.

7   Q.  In one particular school.  And there were three different

8   measurements taken and those measurements were in the ppb 43, 69

9   and 75; is that correct?

10  A.  That's correct.

11  Q.  And approximately 40 percent of the children who were exposed

12  at those levels at the particle board formaldehyde containing

13  school room developed formaldehyde specific IgE antibodies,

14  correct?

15  A.  Well, they developed a low level RAST tighter, yes.  Not

16  formaldehyde, formyl.  So the way you do this is you take

17  formaldehyde and you couple it to a protein.  Nobody makes

18  antibodies to formaldehyde, it's too small.  So this is a hapten

19  protein conjugate and the antibody is actually made against the

20  hapten protein conjugate.  So the way they do the RAST is they hook

21  the formaldehyde to a protein and then hook the protein up to the

22  solid phase.

23      So to call these actual formaldehyde antibodies is

24  scientifically incorrect, it's actually an anti-formyl IgE.

25  Q.  The study indicates, and in fact concludes, that 40 percent of

1   the exposed children developed formaldehyde specific antibodies, is

2   that the language in the study?

3   A.   That's their language, but that's incorrect.

4   Q.   You disagree with the characterization of that language?

5   A.   Correct.

6   Q.   And the same children who were relocated to another school and

7   placed in school rooms that did not have the particle board

8   containing formaldehyde but had exposure levels nonetheless in the

9   low 20 ppb range or so, did not develop these IGE-mediated

10  antibodies, true?

11  A.   Say that again, the ones who were transferred?

12  Q.   Yes.

13  A.   No.   The ones that were transferred just had a lowering of

14  their IgE levels.

15  Q.   Not the control group.   But when the children were then put

16  into another environment without the particle board --

17  A.   Correct.

18  Q.   -- they did not have the IgE-mediated antibodies, correct?

19  A.   No, they just went down.

20  Q.   And they went down significantly according to the report, true?

21  A.   Well, statistically significant.

22  Q.   Yes, there was a statistical significant decrease in

23  formaldehyde specific antibodies, according to the paper that you

24  have before you, the Wantke study, correct?

25  A.   Correct.

1    Q.  And the Wantke study was a peer-reviewed publication, true?

2    A.  Right.  The problem with the study is, as I pointed out before,

3    is there was no correlation between the level of IgE antibody and

4    symptoms, as they say here.  However, elevated IgE to formaldehyde

5    did not correlate with symptoms, so it was irrelevant.

6           It's like if you're allergic to something and it's not

7    there, that's irrelevant.  If something's there and you're not

8    allergic to it, that's irrelevant.  So they had antibodies at very

9    low level, a RAST score of 1.7 is almost irrelevant.  If you had a

10   RAST score of 1.7 to something, you probably wouldn't be very sick.

11   Nonetheless, it didn't correlate with your symptoms, so we would

12   conclude as a clinician that's not significant to you.  If you came

13   to me and said I think I'm allergic to something and your IgE level

14   didn't correlate with your symptoms, we would go look for something

15   else.

16           MR. REICH:  Objection as non-responsive, your Honor, I

17   didn't have a question pending.  But I'll move on.

18   BY MR. REICH:

19   Q.  There have been other studies, some of which you have cited in

20   your report, such as Krzyzanowski and Rumchev.  And those were

21   studies that looked at children as well, correct?

22   A.  Yes.

23   Q.  And in the Krzyzanowski study, at levels of formaldehyde

24   approximately 60 ppb there was a significantly elevated level of

25   asthma in those children who received such exposure.  True?

1    A.  As they presented the data.  But there's a problem -- you

2    can --

3    Q.  Is that true, that's all I'm asking?

4    A.  That's true -- show me the paper so I can make sure I'm looking

5    at the same paper.

6    Q.  All right.  I'll show it to you.

7    A.  Let me trade you papers.

8    Q.  And if you look at the summary, you will see in the first

9    paragraph, and I'll read to you, "significantly greater prevalence

10   rates of asthma and chronic bronchitis were found in children from

11   houses with formaldehyde levels 60 to 120 ppb than in those less

12   exposed, especially in children also exposed to environmental

13   tobacco smoke."  Now environmental tobacco smoke, of course, will

14   contain formaldehyde, correct?

15   A.  Huge amounts, yes.

16   Q.  And in addition to the diagnosis of bronchitis and asthma by

17   physicians in that population of children that was exposed, wasn't

18   there also a decrement in a type of lung function study known as

19   PEFR, pulmonary expiratory flow rate, correct?

20   A.  Correct.

21   Q.  And you're familiar with PEFR studies?

22   A.  Yes.

23   Q.  The twenty-two percent decrement in this case between the

24   exposed and the unexposed children was considered to be

25   statistically significant, true?

1    A.  Well, interestingly there was also --

2    Q.  Can you answer that question?

3            THE COURT:  Let's answer the question.

4            THE WITNESS:  Yes, correct.

5    BY MR. REICH:

6    Q.  And, in fact, in your affidavit you indicated that with regard

7    to the children's study, there was no statistically significant

8    findings.  Your statement in your affidavit turned out to be

9    absolutely incorrect.  True?

10   A.  Not true.  I mean, it's easy to read an abstract from the front

11   of a paper and say that's what it says, but then you have to read

12   the paper.  You have to go through and look at the data.

13           And in point of fact there are some problems with this

14   paper.  If you do work with kids, you have to look at where they're

15   exposed and what it all means.  So if you look at, for example, the

16   bedroom, particularly the subject's bedroom, which is where you

17   spend, if you think about it, about a third of your life.  So the

18   most important room for a child is their bedroom.  And as a matter

19   of fact, the second iteration of the asthma study showed that if

20   you clean up a child's bedroom and forget about the rest of the

21   house, that's very important.

22           So it showed, for example, in table three, that that's one

23   area that there was no statistically significant correlation,

24   particularly with bronchitis.

25           So if you tease the paper apart rather than just reading

1   the abstract, which is a nice abstract I will admit, but if you

2   look at the data and you look, for example, at this decrease in

3   peak expiratory flow rate, the morning peak expiratory flow rate

4   went down in non-asthmatics as well as asthmatics.  So it didn't

5   have anything to do with asthma, it had to do with just breathing.

6          So you have to tease apart the paper, and I did not

7   falsify in my affidavit, I simply read the paper and not the

8   abstract.

9   Q.  Bronchitis and asthma are significant concerns to children,

10  correct?

11  A.  Of course.

12  Q.  And a 22 percent decrement in peak expiratory flow rate is a

13  significant measurement, is it not?

14  A.  If you're looking at it in terms of why it went down.  But if

15  you're saying it's an asthma response and the non-asthmatic kids

16  went down the same as the asthmatic kids, then it has nothing to do

17  with asthma.

18  Q.  Let's talk about one other study, the Rumchev study, which is

19  in the bench book, Plaintiffs' Exhibit No. 36.  You're familiar

20  with the Rumchev study, correct?

21  A.  Yes.

22  Q.  And would you like a copy of it?

23  A.  Sure.  I may have it but it's easier for you to give it to me.

24  Q.  Sure.  Rumchev made a determination that asthma levels increase

25  based upon respiratory questionnaires, as well as pinprick testing

1    at levels of 60 micrograms per cubic meter and greater.  60

2    micrograms would be approximately 48 or 49 ppb, correct?

3    A.  Right.

4    Q.  Now, let's just go to some of his findings.  Take a look at

5    figure three, please, of the Rumchev study.  Figure three shows

6    95 percent confidence levels and it correlates odds ratios with

7    formaldehyde levels.  And you see the horizontal line where the

8    odds ratio is one, if you go above one that means you have a

9    statistical excess, correct, at the 95 percent level, true?

10   A.  Yes.

11   Q.  So when you're at 50 to 59 micrograms per cubic meter and 50

12   would be approximately 40 ppb, true?

13   A.  50 would be approximately 40.

14   Q.  Okay.  And 60 would be about 48 or 49 ppb.  You have a

15   statistically significant correlation there between formaldehyde

16   levels and development of asthma in children that were studied in

17   the Rumchev study, true?

18   A.  Well, the answer to that is yes and no.  If you look at the

19   paper carefully, you'll see -- leave it up.  If you analyze the

20   data you'll see that the first two points are actually from 10 to

21   29, they're 20; and the next one is from 30 to 49, which is 20; and

22   the next one is from 50 to 59, which is only 10.  And the reason

23   they did that is because if you did it 50 to 69, you would have

24   actually eliminated all but about two kids.  That point would have

25   been statistically insignificant and then the two children that

```
 1   would have been in the next point would have also been

 2   statistically insignificant.

 3          So they log-linear transformed the data to make it fit

 4   statistically.  It's a statistical trick to make statistical data.

 5   You can do almost anything with statistics.  And so that's really

 6   pushing your data.

 7          The interesting thing was that was the only thing that

 8   changed.  So if you have to log-linear transform your data and then

 9   change the intervals to make the data look good, I am not real

10   sure.

11          And the other thing is, in response to a reader's question

12   in a later issue of the journal, basically Dr. Rumchev said he

13   really hadn't proven that formaldehyde was a cause of asthma.

14   Q.  Now, have you had occasion --

15          THE COURT:  Counsel, you're a minute or two into your

16   closing.  Go ahead.

17   BY MR. REICH:

18   Q.  As part of your work in this case, did you have occasion to

19   read the 1999 publication ATSDR toxicological profile for

20   formaldehyde?

21   A.  Yes.

22   Q.  And are you aware that the ATSDR tox profile states that Wantke

23   and Krzyzanowski studies demonstrate that children respond much

24   more sensitively to formaldehyde than adults?

25   A.  Yes.
```

```
 1  Q.  And would you agree with that?

 2  A.  No.

 3            MR. REICH:  I have no further questions, your Honor.

 4            THE COURT:  All right.  Thank you.  Any redirect?

 5            MR. HINES:  No, your Honor.

 6            THE COURT:  Anything from the government?

 7            MR. MILLER:  No, your Honor.

 8            THE COURT:  All right.  Thank you.  Doctor, you can step

 9  down.

10            MR. MEUNIER:  Your Honor, can we confirm the amount of

11  argument time remaining per side?

12            THE COURT:  I have 27 minutes on the plaintiff side and 23

13  minutes on the defendants side.  Would you like to reserve some for

14  rebuttal?

15            MR. MEUNIER:  We may want to reserve some of our 27 for

16  rebuttal.  Why don't we say 20 on our initial argument and seven

17  for rebuttal.  And we will actually have two attorneys taking part

18  in the 20-minute segment, Paul Dominick and Frank D'Amico.

19  Mr. Dominick will go first.

20            THE COURT:  And with regard on the defendants side,

21  Mr. Weinstock and Mr. Miller or Mr. Dinnell, how do you all want to

22  handle your time left?

23            MR. WEINSTOCK:  I believe Ms. Boyle is going to make an

24  argument for the government approximately five minutes and I'll

25  take the rest.
```

1        MR. D'AMICO:  It does, it does.  The point about our

2   subclass though, your Honor, is whether it caused or exacerbated a

3   preexisting asthmatic condition or respiratory condition is of no

4   moment.  The fact is, if a child with a preexisting asthma moved

5   into a trailer and their preexisting asthma was exacerbated, as the

6   Child Health Study showed us, they need treatment.  They lost many

7   of their doctors, they moved out.  Most of the public assisted

8   medical treatment centers, such as Charity, are no longer in

9   existence, they're lost to medical care.

10       THE COURT:  So you're speaking of this subclass for

11   children solely as a function of damages?

12       MR. D'AMICO:  No, as an interventional fund so that they

13   can get treatment.  The difference is we're not going to make a

14   damage award.  We're not concerning ourselves with, what is the

15   value of that child's claim.  What we're concerned about is the

16   health crisis that's been created and who is going to pay for it.

17       Do the already overtaxed Medicare and Medicaid systems

18   pay?  I recently read an article where the state Medicaid system is

19   facing a $450 million shortfall.  The health study has called on

20   the governor to provide assistance to these children.  We believe

21   it is more equitable and more reasonable to ask the defendants who

22   are responsible for causing the damage in the first place to pay

23   for it.

24       THE COURT:  Yeah, but you see that's -- you're kind of

25   leapfrogging the liability issue by stating that there should be,

 1   class very easily to only include those persons who have satisfied

 2   the administrative requirements, filed their Form 95s and exhausted

 3   all administrative remedies before they could qualify, so those

 4   arguments are nonsensical.

 5        And as Judge Duval has already pointed out, there is a due

 6   process requirement because there is a property right that vest

 7   wants you're determined to be entitled.  The McWaters case we find

 8   compelling.

 9        Now, the class deposition as my counsel has said, class

10   includes all found by the court following appropriate notification

11   to have filed Form 95 claims; and two, evidences intent to proceed

12   with the litigation as a class member.

13        I would like the court now to look at the definition for

14   the proposed subclass for the medical intervention and treatment

15   fund.  I think what the defendants are doing is confusing the

16   issues of cancer and a medical monitoring fund with what we're

17   proposing, which is not a medical monitoring fund at all.  It is a

18   fund to be created for any child who lived in a travel trailer

19   which exceeded the ATSDR minimum risk levels for the correspondent

20   period in which they resided in the trailer.  That means they have

21   to have exhibited a manifest injury while living in the trailer --

22   during the time they resided there.  And we would have to show that

23   the levels they were exposed to exceeded those as promulgated by

24   the ATSDR.

25        If we don't prove it, we don't recover.  That's what the