UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | |
|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION | MDL NO. 1873<br><br>SECTION "N-5"<br><br>JUDGE ENGELHARDT<br>MAG. JUDGE CHASEZ |

THIS DOCUMENT IS RELATED TO ALL CASES

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

PLAINTIFFS' CLASS CERTIFICATION
POST-HEARING BRIEF

MAY IT PLEASE THE COURT:

I.      **Medical Treatment Subclass**

Plaintiffs now have shown that a medical treatment subclass for formaldehyde-exposed children would be viable pursuant to Rule 23, and that the common issues presented by the claims of this subclass can and should be resolved through a workable Trial Plan. Plaintiffs submit that such a subclass offers the Court not only a vehicle for adjudication that is far superior to the mass joinder model, but also a mechanism to adequately address the health needs of these children.

The proposed subclass will include, by definition: Any minor on whose behalf administrative FTCA remedies have been exhausted, who lived in a travel trailer which exceeded the ATSDR minimum risk level for the correspondent period of residence in the trailer,[1] and who

---

[1] The ATSDR levels in question are categorized as follows: Acute = 40 ppb for 0-14 days; Intermediate = 30 ppb for 15-364 days; Chronic = 8 ppb for 365+ days. Virtually every trailer

manifested any symptom of formaldehyde exposure during the residency period. This definition is specified in three important ways: (1) the proposed subclass relates only to minors, because they generally are acknowledged by the scientific community to be a population which is particularly vulnerable and susceptible to injury from formaldehyde exposure above ATSDR Minimum Risk Levels; (2) the proposed subclass is compromised only of the minor residents of <u>travel trailers</u>, which units are not regulated by HUD in regard to formaldehyde emission or ambient air quality; and (3) the subclass is only available to children who can show they experienced symptoms related to formaldehyde exposure which were manifest in temporal relationship to the period of residency.

Not only is the proposed subclass defined to be readily ascertainable, it also offers a procedural vehicle which is superior to any alternative to address through litigation what has become an increasingly apparent urgency, *to-wit*: the immediate need for proper diagnosis and treatment of the respiratory problems affecting these exposed children.[2] The evidence has established that: (1) the mechanism of injury sustained by the children at issue is **the same** for each child who exhibits symptoms of formaldehyde exposure; (2) not only is there a common

---

tested in this case had formaldehyde levels above the ATSDR minimum risk levels during the time of occupancy. As stated by Defendants' Expert Dr. Golden, the average travel trailer level was 97 ppb in the winter two and a half years after they were first occupied. Defendants' expert Michael Zieman has stated in a memorandum attached to the bench book at Exhibit P58, that the Rule of Thumb is a doubling of formaldehyde off-gassing for every 12 degree increase in temperature. **Hence, if the CDC testing found levels of about 100 ppb at 50 degrees, those same trailers would be roughly 800 ppb at 86 degrees**.

[2]This need is illustrated by the Congressional testimony given by the various doctors and medical experts, the plaintiffs' medical experts, the CDC report, and the Children's Health Fund Report, all included in the Court's bench book. Dr. Chris DeRosa testified of warning ATSDR of a "pending public health catastrophe." The CHF Report calls these children "among the most medically needy child populations in the United States."

mechanism of injury, but there also is a common threshold of exposure and alleged injury (the ATSDR MRL's); (3) while study of these children has already been proposed by CDC and other groups, study alone is not enough, because these **children need treatment now**; (4) since this subclass does not present claims for monetary damages but rather access to medical diagnosis and treatment, it can be much more effectively administered through one proceeding and a Court-appointed administrator[3]; (5) because of the urgency of the medical needs of these children, and the negative effects of delay in their gaining through individualized litigation a remedy to treat their formaldehyde-caused medical conditions, the subclass procedure will avoid the risk of these claims becoming more acute over time; (6) there is no need for individualized jury trials to determine eligibility for participants to the fund[4]; (7) the establishment of a medical intervention fund would serve to ensure that the affected children would have access to the health care they need; and (8) because the fund sought to be established will be available for diagnosis and treatment of only temporally-manifest symptoms of formaldehyde exposure, it is not easily susceptible to confusion or abuse.

Just as litigating the issue of medical intervention and treatment for children is

---

[3] It is important to note that the medical intervention and treatment fund sought to be established through the subclass proceeding would replace the subclass members' individual claims for future medical expenses.

[4] *See Scott, et al v. American Tobacco Co.*, 949 So.2d 1266, 1285 (La. App. 4 Cir. 2007). This case, citing federal case law when discussing the smoking cessation fund sought by plaintiffs, stated: "None of the cases cited by the defendants [citations omitted] hold that there must be an individualized series of jury trials to determine whether each class member is eligible to participate in a court-supervised smoking cessation program. To the contrary, courts that have addressed this issue in other jurisdictions have held that such "individualized" elibility should be made administratively, not by a jury. *See Petitio v. A. H. Robbins, Co.*, 750 So.2d 103, 107 (Fl. Dist.Ct.App. 1999); *Day v. NLO*, 851 F.Supp. 869, 885-87 (S.D. Ohio, 1994)."

procedurally facilitated by Rule 23, there are difficulties inherent in proceeding on a mass-joinder basis: (1) the numerous and predominating common issues regarding entitlement to future medical care may not be similarly-resolved for each child; (2) recovery by these children through a mass-joinder vehicle will entail individual recovery by legal custodians, and will not necessarily ensure proper and necessary medical treatment for the minors who were exposed; (3) because there are many thousands of children who have suffered injury from formaldehyde exposure, individual adjudications will place a severe strain on judicial resources and cause these children to wait far too long to get effective medical treatment; and (4) the pressing medical needs for many, if not most, of these children will have to be addressed through emergency medical services over the period during which individualized adjudication occurs, which does not foster effective, specialized respiratory treatment for a class-wide expose, and which further places undue strain on increasingly-overburdened and under-funded State Medicaid and Federal Medicare systems.

Plaintiffs presented a Trial Plan at the December 2, 2008 hearing which is attached hereto as Exhibit A.  As merits discovery proceeds, the Court, or even defendants, may modify and improve upon the attached proposal in order to make it even more workable.  Like any case management tool, the Plan remains subject to the Court's equitable authority to address the claims of the proposed subclass members in the most efficient manner possible.

As outlined in the Trial Plan, the liability phase of this litigation will proceed serially, through the already-designated class representatives as trial plaintiffs presenting evidence against

each manufacturing defendant in turn, and FEMA, on a state-by-state basis.[5] Plaintiffs propose to begin with Gulf Stream and Fleetwood and proceed through the list of manufacturers.[6] The jury would determine issues specific to Alabama, Mississippi, Texas and Louisiana law separately, and apply a determination of fault percentage to be applied in each state. Following the statewide liability phase, the general medical causation phase would look at the modes of formaldehyde exposure and mechanism of injury. Through a well-structured verdict form and the determinations made by the jury, assuming liability is established, the Court then can allow input from appropriate experts as needed to fashion the programmatic remedy sought by this subclass. The questions to be resolved on class-wide basis in this phase would include: (1) the qualification criteria for the individual class members to participate in the fund; (2) the format and cost of the treatment remedy; (3) the fault-based allocation of that cost among defendants; and (5) the prospective management of the fund.

---

[5] From the designated proposed class representatives, those that would be suitable as sub-class representatives would be: 1) Angela Sullivan on behalf of her minor child, Brenden Sullivan; Brenden resided in a Gulf Stream THU from February, 2006 through August, 2008 and filed a SF95 on February 6, 2008; 2) Dione Davis on behalf of her minor child, Trinity Guesnon; Trinity resided in a Gulf Stream THU from June, 2007 through September, 2007 and filed a SF95 on April 18, 2008; 3)Veronda Barnes on behalf of her minor child, Jasmine Barnes; Jasmine resided in a Pilgrim THU from October, 2007 until December 1, 2007 and filed a SF95 on May 30, 2008; 4) Betty White on behalf of her minor child, Erin McConnel; Erin resided in a Forest River THU from October 18, 2005 through October 8, 2007 and filed a SF95 on February 25, 2008.

[6] Defendants may raise a defense of comparative fault, as they may claim that the plaintiffs failed to take mitigating actions to reduce their exposure. Plaintiffs contend that comparative fault is not appropriate for a number of reasons: (1) the exposed children did not have a practical ability to mitigate; (2) the proposed methods of mitigating exposure are not practical in the Gulf South; and (3) even if every child followed every instruction or recommendation to reduce exposure, they would have still been exposed to levels of formaldehyde significantly higher than the ATSDR MRLs.

Class counsel understand that litigating this remedy under Rule 23 will have impact on the claims of class members, because it effectively would replace individualized claims for future medical expenses with a pre-funded, programmatic remedy. Counsel further understand that, should the liability phase of trial result in a defense verdict, there likewise would be no recovery by any class members for future medical costs associated with children who were exposed. Counsel have concluded, however, that the events of this case necessitate both rapid adjudication and effective treatment for children and families who now face a continuing health crisis.

## II.  Discussion and Clarification for Dr. Patricia Williams' Expert Opinions and Testimony

The opinions and testimony of Patricia Williams, Ph.D., DABT, are based upon widely-accepted research findings and recommendations of the worldwide scientific community, including the World Health Organization, the International Agency for the Research of Cancer, the U.S. ATSDR, the U.S. EPA and NIOSH. This sufficient to satisfy any Rule 702 or *Daubert* "general causation" challenge by defendants. Defendant may disagree with Dr. Williams, and/or with the scientific principles she endorses; but any such disagreement should be addressed on the merits.

Dr. Williams' testimony established that there is a valid and supportable model of a common mechanism of injury at the cellular level which applies to the claims at hand, a mechanism which entails the formation of damaging cross-links between inhaled/ingested formaldehyde and the cells, DNA, and molecules with which contact is made. The common injury thus sustained by the children at the cellular and molecular level manifests itself through

the various symptoms listed in the Plaintiffs' Fact Sheet.[7] These symptoms reflect observable damage to the respiratory tract, as supported by the ATSDR's determination of chronic exposure Minimum Risk Levels.[8] As Dr. Williams testified, damage results whenever inhaled/ingested formaldehyde molecules react and form cross-links. In determining the MRL of 8 ppb, the ATSDR relied upon the Holmstrom, et al report *Histological Changes in the Nasal Mucosa in Persons Occupationally Exposed to Formaldehyde Alone and in Combination with Wood Dust* (Exhibit P31). The agency then determined that damage would be observable in some susceptible individuals, including children, at 8 ppb for chronic exposures greater than 365 days.

Defendants' experts cite two studies (by Kushch and by Moser) to refute the ATSDR MRLs, studies which discuss formaldehyde concentrations in exhaled breath. Both studies, however, are based upon the volume-to-volume ratio of "parts per billion **volume**" or "ppb**V**," and not the mass-to-volume ratio used to determine formaldehyde levels in a gas referred to as "parts per billion" or "ppb." The EPA's On-line Tools for Site Assessment Calculation, in discussing Indoor Air Unit Conversion, states:

> In evaluating indoor air concentrations of carcinogenic or toxic compounds, some confusion exists over various units in use...The confusion arises in converting from mass-per-volume to parts-per-number volume units. This confusion arises because parts-per-

---

[7]Defendant manufacturers spent a significant amount of time at the hearing challenging Dr. Williams' opinions on formaldehyde as a carcinogen. Repeatedly, Dr. Williams explained she was not testifying about cancer, and that the ATSDR Minimum Risk Levels discussed only related to **non-cancer** health effects. The proposed treatment subclass is not a "medical monitoring" subclass and is not related to cancer. Should the manufacturing defendants continue to raise such issues, this will only serve to confuse the record as to what plaintiffs actually are asking this Court to certify.

[8]Dr. Williams stresses that the ATSDR Minimum Risk Levels are most appropriate for children as they can be applied generally and do not specifically apply to occupational exposure.

> billion-volume used in gas measurements is based on volume-to-volume ratio and is not the same as parts-per-billion used in aqueous measurements that is based on a mass-per-mass ratio...It is important to remember that [micrograms-per-liter] in gas systems IS NOT equal to [ppbV], nor is [mg/L] in gas systems equal to [pp**V**].[9]

Defendants' attempt to equate ppb**V** with ppb is thus misleading at best and is scientifically invalid. In fact, defendants have offered no support for their challenges to the key assertions made by the plaintiffs, and supported by Dr. Williams and the plaintiffs' pediatric specialist, Kenneth Parish, M.D., MPH, *to-wit*: that children are a particularly susceptible population who have suffered a common exposure and mechanism of formaldehyde-related injury known to require medical intervention and care.

## III. Opinions of Dr. James Wedner, Defendants' Expert

The defendant manufacturers called one expert witness at the certification hearing, James Wedner, M.D. Defendants ostensible purpose to discredit a well-established mainstream body of science recognizing that formaldehyde can cause asthma. But Dr. Wedner is not a pediatric specialist, lacks certification by the American Board of Allergy and Immunology, and offered opinions that deviate significantly from published and well-established precepts which are in the record. Specifically, he refused to recognize the well-settled principle that children are more sensitive than adults to the effects of formaldehyde exposure, and further testified that he disputes the ATSDR's determination that children are more sensitive than adults to the effects of formaldehyde. (ATSDR Medical Management Guidelines, Doc. No. 924-3, attached hereto as

---

[9]The EPA Indoor Air Unit Conversion is attached as Exhibit "B." Further, the actual equation for the Conversion is extremely complex and is listed, along with a number of other conversion equations, on p. 4 of the Exhibit.

Exhibit C). Dr. Wedner even refused to accept the findings of three peer-reviewed studies demonstrating that children who are exposed to low levels of formaldehyde (40 ppb to 120 ppb) can sustain significant lung function debilitation as well as asthma. (Wantke, P80; Krzyzanowski, P81; and Rumchev, P36). Yet he offered the Court no published or peer-reviewed no foundation for his contrary opinions, and provided no methodological underpinnings or literature to support his criticism of the causal relationship between formaldehyde exposure and the induction of asthma in children.

In the final analysis, there are merits issues, but it suffices for present purposes to simply note that defendants' expert on the justification for a medical treatment subclass has chosen to ignore the research and published findings of entities such as the American Academy of Pediatricians, the National Heart Lung Blood Institute/National Asthma Education Prevention Program, the World Health Organization and the ATSDR, all of which determined that formaldehyde exposure does represent a risk factor for asthma in children. Since Dr. Wedner's testimony is contrary to peer-reviewed studies involving the effects of formaldehyde on children, it should be accorded little weight by the Court in regard to what presently is a case management decision whether a subclass should be certified.

### IV. Jurisprudential Authority and Analogous Programmatic Remedies

Under Rule 23 of the Federal Rules of Civil Procedure, this Court is vested with the power to select and certify a subgroup of class members from the greater body of putative class members for the purpose of litigating a particular issue, and specifically for the purpose of determining the availability of an inherently subclass-wide remedy for medical intervention for children who resided in FEMA-provided temporary housing units. Fed.R.Civ.P. 23(c)(4);

Fed.R.Civ.P. 23(c)(5).  *See e.g., Cent. Wesleyan Coll. V.W.R. Grace & Co.*, 6 F.3d 177, 184 (4th Cir. 1993) (class certified for eight common issues); *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472-73 (5th Cir. 1986) (class action to adjudicate "state of the art" defense); *Weathers v. Peters Realty Corp.*, 499 F.2d 1197 (6th Cir. 1974) (class for injunctive relief).  The question before the Court is whether case precedent, and the present record, support the exercise of such authority.

Federal courts have acknowledged the appropriateness of certifying a class to address claims for the establishment of a medical treatment program.  In *In re Diet Drugs Products Liability Litigation*, 1999 WL 673066 (E.D.Pa. 1999), the Court certified a class for future medical care and observation to determine if numerous former users of diet drug combinations had sustained injury so as to justify such services.  In *Diet Drugs*, as in the case at bar, the programmatic remedy sought was recommended not only by the plaintiffs' expert, but also other medical professionals and associations which issued parallel recommendations, noting the potential serious public health implications of Fen/Phen exposure.  In the case at bar, it likewise is true that plaintiffs' expert Dr. Patricia Williams is not the only medical professional endorsing the need for a programmatic remedy to afford class-wide medical treatment for children exposed to formaldehyde in these trailers.  The Children's Health Fund also has made strong recommendations for immediate medical care for such children (P78).  Just as in *Diet Drugs*, therefore, a litigation expert has received independent support for such a programmatic remedy, support in the scientific and medical community among those who are not retained experts in this litigation.

The Rule 23 certification of programmatic remedies also has been approved in the

Eastern District of Louisiana. In *U.S. Public Interests v. Bayou Steel Corp.*, 1999 WL 675203 (E.D.La. 1999), Judge Lemmon created a subclass to fund the educational and intervention projects relating to asthma in children.[10]

## V. Economic Loss Subclass as to FEMA

The economic loss subclass proposed by plaintiffs meets all the requirements of Rule 23; and the objections made by FEMA can be addressed through a proper definition of the proposed subclass and delineation of the issues to be tried. The subclass population would be:

> "All heads of household who have exhausted their administrative FTCA remedies and resided in FEMA EHU's from the date FEMA should have warned occupants of potentially dangerous formaldehyde levels and taken other appropriate measures through the date FEMA's actions would fall within the discretionary function exception."

Based on a liability finding that the potential danger of formaldehyde exposure was accompanied by a failure to respond on FEMA's part, the triable issues would be as follows:

1. Whether the EHU's provided by FEMA were habitable (i.e., safe). (This establishes causation of economic loss).

2. On what date did FEMA know, or should have known, of the potential hazard?

3. On what date did FEMA take appropriate action as a result of the potential

---

[10] It also is true that Judge Fallon, in *In re Propulsid Products Liability Litigation*, 208 F.R.D. 133 (E.D.La. 2002), considered the certification of class for a program of medical monitoring or a group study of all former Propulsid users, but, relying on the decision in *Diet Drugs*, found that there was no secondary recommendation for the program. *See id.* at 147 ["In the present case there is an absence of recommendations from the medical community regarding the need for a medical monitoring program or a clinical study"]. But the proposed subclass at issue is directly analogous to the one certified in *Diet Drugs*, and clearly distinguishable from the one proposed in *Propulsid*. Here, Dr. Williams is <u>not</u> alone in her recommendation for the creation of a programmatic remedy. The Children's Health Fund, independent of this litigation, has issued a parallel recommendation.

hazard?

Between the dates determined in resolving issues (2) and (3) above, the economic subclass then would be entitled to damages from FEMA, the calculation of which damages would be formulaic.

The Government's reliance on *John v. National Security Fire and Casualty Company*, 2007 WL 148735 (W.D.La.) is misplaced. In that case, there was an issue as to the market prices for materials and supplies. Here, FEMA itself has established the monthly sum available for financial assistance to displaced residents. Although the proposed subclass can assert a property interest in the EHU's, *see McWaters, et al v. Federal Emergency Management Agency*, et al, 436 F.Supp.2d 802 (E.D. La. 2006), the claim against FEMA in this case is based not upon damage to the property itself, but upon economic losses suffered by the subclass members because they were not warned of the potential dangers by FEMA, continued to reside in FEMA-provided unsafe housing, and thereby forfeited the right to receive financial assistance from FEMA under the Stafford Act.

Whether residents of each of the four states at issue have identical causes of action for such economic loss against FEMA under the FTCA is a legal issue not before the Court at this time. Still, a glaring example of the defendants' improper analysis of the issue of privity appears in their brief's discussion of Mississippi law. Contrary to the assertion that privity is required, Mississippi has a statute that specifically states privity is <u>not</u> required in an economic loss, breach of warranty case. <u>Mississippi Code Annotated</u> §11-7-20 (1976, as amended). In any event, plaintiffs submit that the formulaic nature and commonality of their economic loss theory of recovery predominate over any potential variances in state law.

### VI. Plaintiffs' Response to FEMA's Objections to Plaintiffs' Exhibits

In the interest of clarity and brevity, plaintiffs attach hereto as Exhibit D a chart of the exhibits grouped by the type of objection lodged by FEMA and provide therein plaintiffs' response to each such objection.

### VII. Conclusion

Given the time constraints applicable to the class certification hearing, as well as the page limitations which govern this post-hearing brief, plaintiffs have sought to focus on two subclasses which warrant certification on the basis of Rule 23:

The first of these would address a class-wide health crisis affecting exposed children, a crisis now acknowledged by independent scientists; and it would allow the Court to utilize the flexible procedures of Rule 23 to adjudicate and resolve the merits of plaintiffs' claims that this crisis gives rise to a legal remedy for future medical care which is both common to the families of all such children and which can be implemented on a programmatic basis. Participation will be determinable pursuant to a subclass-wide determination of those children who developed symptoms during their exposure to specified levels of formaldehyde in FEMA-issued travel trailers. The second subclass likewise would take advantage of the procedure Rule 23 adjudication to achieve resolution on the merits of a formulaic and discrete economic loss claim that can, and should be, addressed on a uniform, subclass-wide basis as to FEMA.

In both instances, the alternative to class certification is a veritable model of inefficiency, if not inequity. In any series of mass-joinder trials conducted either in this MDL forum or, on remand in other district courts, there will be guaranteed delays, inordinate costs, and potentially inconsistent fact-finding in regard to claims which have far more in common than they are

different, and which, by nature, invite programmatic and/or formulaic handling on the merits.

Plaintiffs respectfully submit that their Motion to Certify should be granted.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION**

BY:   s/Gerald E. Meunier
GERALD E. MEUNIER, #9471
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:   504/528-9973
gmeunier@gainsben.com

s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:   504/528-9973
jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS' STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, JR., #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
RONNIE PENTON, #10462

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 10, 2008, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

                                        s/Gerald E. Meunier
                                        GERALD E. MEUNIER, #9471