```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2   ************************************************************

 3
     IN RE:   FEMA TRAILER
 4   FORMALDEHYDE PRODUCTS                Docket No. MDL-1873(N)
     LIABILITY LITIGATION                 New Orleans, Louisiana
 5                                        Tuesday, December 2, 2008

 6   ************************************************************

 7
              TRANSCRIPT OF MOTION TO CERTIFY CLASS PROCEEDINGS
 8            HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                       UNITED STATES DISTRICT JUDGE
 9


10
     APPEARANCES:
11
     FOR THE PLAINTIFF
12   STEERING COMMITTEE:            GAINSBURGH BENJAMIN DAVID
                                    MEUNIER AND WARSHAUER
13                                  BY:  GERALD E. MEUNIER, ESQ.
                                         JUSTIN I. WOODS, ESQ.
14                                  2800 Energy Centre
                                    1100 Poydras Street, Suite 2800
15                                  New Orleans, LA 70163

16
                                    LAW OFFICES OF FRANK J. D'AMICO, JR.
17                                  BY:  FRANK J. D'AMICO, JR., ESQ.
                                    622 Baronne Street
18                                  New Orleans, LA 70113

19
                                    REICH & BINSTOCK
20                                  BY:  DENNIS REICH, ESQ.
                                    4265 San Felipe, Suite 1000
21                                  Houston, TX 77027

22

23                                  NEXSEN PRUET JACOBS POLLARD & ROBINSON
                                    BY:  PAUL A. DOMINICK, ESQ.
24                                  P. O. Box 486
                                    Charleston, SC 29402
25
```

BY MR. WEINSTOCK:

Q. On page 17 of your report, did you not report to us that the relative risk for the highest category of peak exposure above 4 ppm or above 4,000 ppb was 2.46 for all leukemia and 3.46 for myeloid leukemia?

A. That came from IARC, yes. I reported -- that's from IARC 2004, I didn't go to the individual, I was doing a compilation of IRAC's information.

Q. So if I'm understanding correctly, you've cited the Hauptmann reports but you have not reviewed the Hauptmann reports?

A. IARC cited the Hauptmann report.

Q. You've cited part of the IARC report --

A. Correct.

Q. -- of Hauptmann in your report, but you have not reviewed the individual Hauptmann paper?

A. I've read it, but my -- in this particular report this was giving a compilation of IRAC's presentation of Hauptmann's articles.

Q. Just so I am clear so I understand, the relative risk that you found that you pulled from IARC was for those in the exposure group with peak exposures above 4,000 ppb, is that correct, for leukemia and myeloid leukemia?

A. I would have to go back and look at these. I was just reporting from IARC to show their evidence that they used to classify this as a Group 1 carcinogen. I wasn't reevaluating

1  IARC's evaluation.
2  Q.  If you would turn to page 17 of your report, which is P-24.
3  A.  I have it.
4  Q.  Okay.  Did you not state the relative risk for a highest
5  category of peak exposure above 4 ppb -- I'm sorry, 4 ppm was 2.46
6  for all leukemia and 3.46 for myeloid leukemia?
7  A.  That's correct.
8  Q.  Okay.
9  A.  That is from IARC 2004.  Not my language, their language.
10 Q.  Do you reject their language?
11 A.  No.  It's in my report.
12 Q.  Okay.  There we go.  Next sentence.  "Based on eight cases, a
13 significant excess mortality from nasopharyngeal cancer was
14 observed among formaldehyde-exposed workers in comparison with the
15 national population (standard mortality ratio 2.10; 95 percent
16 confidence interval, 1.05 - 4.21)."  Correct?
17 A.  That is what IARC says.
18 Q.  But there is a footnote to that page, is there not?
19 A.  Well, not in IARC.  IARC basically was giving positive findings
20 that they used in making their Group 1 carcinogen classification.
21 Q.  So you're not aware, or until this moment and until you read my
22 brief, you were not aware that the exact confidence interval we're
23 talking about actually goes below 1.0?
24 A.  You're saying IARC made an error?  I am not aware that IARC has
25 made an error.

1   Q.  If we can turn to the Stellman study.  Did you cite portions of
2   the Stellman study in your opinion?
3   A.  IARC has included in their monographs the lymphohematopoietic
4   SMR of 3.44 and the leukemia of SMR of 5.79 with confidence levels
5   for both exposures to formaldehyde and wood dust.
6   Q.  There was a column next to the exposure just to formaldehyde;
7   is that correct?
8   A.  Excuse me?
9   Q.  There was -- you cited the column with formaldehyde plus wood
10  dust, correct?
11  A.  I did, right.
12  Q.  There was a column right next to it -- keep going, it's
13  there -- there was a column right next to it with formaldehyde
14  exposure only, correct?
15  A.  No.  I cited IARC, I am not citing that column or that study.
16  That's the Stellman study itself.  I cited IARC.  And only for
17  illustrative purposes to show that they had voluminous information
18  to review and consider all aspects of all of these articles in
19  rendering their Group 1 carcinogen classification.
20  Q.  On page 34, are you telling us that your opinion that the
21  plaintiffs have a reasonable fear of cancer is solely because of
22  what IARC said?  You've reviewed no other papers, you've drawn no
23  other conclusions from these papers, and you're not familiar with
24  these papers, is that what you're telling this court?
25  A.  No, it's not what I'm telling this court.  I am telling this

1  doesn't mean that I haven't looked at the others.
2  Q.  Am I correct that you consider negative studies to be
3  meaningless?
4  A.  IARC makes a statement in the front of their -- negative epi
5  studies cannot prove the no.  You cannot take a negative result,
6  that's a cardinal rule of epidemiology, and prove that something
7  isn't.  You can't prove a negative.  And that is standard.  So that
8  is correct.  You cannot make that conclusion.
9  Q.  And I don't -- I am not concerned about IARC's methodology, I
10  am concerned about Dr. Williams' methodology.
11  A.  My methodology is the same as the methodology in
12  epidemiologies.  You can't prove the no, you can only say we have
13  not found results because of the nature of epidemiology.  If you do
14  say that negative result proves that you are giving
15  epidemiologically incorrect information.
16          MR. WEINSTOCK:  Your Honor, may I approach?
17          THE COURT:  Yes.
18          MR. D'AMICO:  What page are you going to?
19          MR. WEINSTOCK:  I don't know.  If we can go to page 132.
20  BY MR. WEINSTOCK:
21  Q.  This is your answer, "That is the cardinal rule of
22  epidemiology, all I look for were epidemiological studies and I
23  look for those that would prove an association."
24  A.  Well that's correct.  That's just what I told you.  If you're
25  looking for epidemiology, you've got to find positive studies.  You

1  can't -- the negative cannot prove the no.  So that is an absolute
2  correct statement.
3  Q.  If we can continue. Next slide.  Same page.  "I chose were
4  articles that would prove and showed an association.  Since
5  epidemiology is by design, negative studies are meaningless."
6  A.  Correct.
7  Q.  "They do not mean there is no association.  They strictly mean
8  they did not show no association."
9  A.  That is absolutely correct in what I said.
10 Q.  And that is -- I just want to make sure that is your
11 methodology as we stand here today?
12 A.  That is the nature of epidemiology, sir.  You cannot prove the
13 no.  You can only -- you must look for positive associations.  That
14 is expressed in epidemiology texts, that is expressed in the
15 beginning of IARC --
16 Q.  I just want your methodology.
17 A.  That's not just my methodology, that is the methodology of the
18 state of science.
19 Q.  So if we had three studies and two showed an association and
20 one showed no association, the one, as you said with no
21 association, is meaningless; correct?
22 A.  Correct.  And IARC also says if you see an abundance of
23 negative epi studies but you have one with a positive association,
24 then you have to look at that positive association.
25 Q.  And that's your opinion.  So if we had --

1  A.  That's not just my opinion.
2  Q.  If we had ten studies and one was positive and nine showed no
3  association, you would opine, got to go with the positive, the
4  negative is meaningless.  Correct?
5  A.  Correct.  And the thalidomide debacle were children were born
6  without limbs there were a lot of negative studies.
7           MR. WEINSTOCK:  Objection, your Honor.  I got an answer to
8  my question.  Can I get the next one out?
9           THE COURT:  Yes, let's just stick with the question,
10 ma'am.  There will be an opportunity for redirect it counsel
11 chooses, but let's not get argumentative, either one of you, let's
12 not get argumentative.  Stick with the question.  Answer the
13 question and move on to the next one.
14 BY MR. WEINSTOCK:
15 Q.  And if we had a million studies and one showed an association,
16 999,999 showed no association, because they're meaningless, you
17 discount all of that and you just go with the one, correct?  Is
18 that what you just said?
19 A.  You would have to recognize the one.  It's the design of the
20 epi studies.  If you could do a million studies trying to locate
21 the etiologic vector of AIDS in a million bottles of blood to prove
22 that it was transmitted through the blood, and they would all be
23 negative because you have to find that person with AIDS that has
24 the virus in the blood.  That is absolutely correct.
25 Q.  Another Bradford Hill, what did you call them, points of

**WORLD HEALTH ORGANIZATION**
**INTERNATIONAL AGENCY FOR RESEARCH ON CANCER**



# *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans*

## VOLUME 88

## Formaldehyde, 2-Butoxyethanol and 1-*tert*-Butoxypropan-2-ol



LYON, FRANCE
2006

risk after cessation of or reduction in exposure in individuals or in whole populations also supports a causal interpretation of the findings.

Although a carcinogen may act upon more than one target, the specificity of an association (an increased occurrence of cancer at one anatomical site or of one morphological type) adds plausibility to a causal relationship, particularly when excess cancer occurrence is limited to one morphological type within the same organ.

Although rarely available, results from randomized trials showing different rates among exposed and unexposed individuals provide particularly strong evidence for causality.

When several epidemiological studies show little or no indication of an association between an exposure and cancer, the judgement may be made that, in the aggregate, they show evidence of lack of carcinogenicity. Such a judgement requires first of all that the studies giving rise to it meet, to a sufficient degree, the standards of design and analysis described above. Specifically, the possibility that bias, confounding or misclassification of exposure or outcome could explain the observed results should be considered and excluded with reasonable certainty. In addition, all studies that are judged to be methodologically sound should be consistent with a relative risk of unity for any observed level of exposure and, when considered together, should provide a pooled estimate of relative risk which is at or near unity and has a narrow confidence interval, due to sufficient population size. Moreover, no individual study nor the pooled results of all the studies should show any consistent tendency for the relative risk of cancer to increase with increasing level of exposure. It is important to note that evidence of lack of carcinogenicity obtained in this way from several epidemiological studies can apply only to the type(s) of cancer studied and to dose levels and intervals between first exposure and observation of disease that are the same as or less than those observed in all the studies. Experience with human cancer indicates that, in some cases, the period from first exposure to the development of clinical cancer is seldom less than 20 years; studies with latent periods substantially shorter than 30 years cannot provide evidence for lack of carcinogenicity.

## 9. STUDIES OF CANCER IN EXPERIMENTAL ANIMALS

All known human carcinogens that have been studied adequately in experimental animals have produced positive results in one or more animal species (Wilbourn *et al.*, 1986; Tomatis *et al.*, 1989). For several agents (aflatoxins, 4-aminobiphenyl, azathioprine, betel quid with tobacco, bischloromethyl ether and chloromethyl methyl ether (technical grade), chlorambucil, chlornaphazine, ciclosporin, coal-tar pitches, coal-tars, combined oral contraceptives, cyclophosphamide, diethylstilboestrol, melphalan, 8-methoxypsoralen plus ultraviolet A radiation, mustard gas, myleran, 2-naphthylamine, nonsteroidal estrogens, estrogen replacement therapy/steroidal estrogens, solar radiation, thiotepa and vinyl chloride), carcinogenicity in experimental animals was established or highly suspected before epidemiological studies confirmed their carcinogenicity in humans (Vainio *et al.*, 1995). Although this association cannot establish that all agents

It is recognized that the criteria for these evaluations, described below, cannot encompass all of the factors that may be relevant to an evaluation of carcinogenicity. In considering all of the relevant scientific data, the Working Group may assign the agent, mixture or exposure circumstance to a higher or lower category than a strict interpretation of these criteria would indicate.

### (a) Degrees of evidence for carcinogenicity in humans and in experimental animals and supporting evidence

These categories refer only to the strength of the evidence that an exposure is carcinogenic and not to the extent of its carcinogenic activity (potency) nor to the mechanisms involved. A classification may change as new information becomes available.

An evaluation of degree of evidence, whether for a single agent or a mixture, is limited to the materials tested, as defined physically, chemically or biologically. When the agents evaluated are considered by the Working Group to be sufficiently closely related, they may be grouped together for the purpose of a single evaluation of degree of evidence.

#### (i) Carcinogenicity in humans

The applicability of an evaluation of the carcinogenicity of a mixture, process, occupation or industry on the basis of evidence from epidemiological studies depends on the variability over time and place of the mixtures, processes, occupations and industries. The Working Group seeks to identify the specific exposure, process or activity which is considered most likely to be responsible for any excess risk. The evaluation is focused as narrowly as the available data on exposure and other aspects permit.

The evidence relevant to carcinogenicity from studies in humans is classified into one of the following categories:

*Sufficient evidence of carcinogenicity*: The Working Group considers that a causal relationship has been established between exposure to the agent, mixture or exposure circumstance and human cancer. That is, a positive relationship has been observed between the exposure and cancer in studies in which chance, bias and confounding could be ruled out with reasonable confidence.

*Limited evidence of carcinogenicity*: A positive association has been observed between exposure to the agent, mixture or exposure circumstance and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence.

*Inadequate evidence of carcinogenicity*: The available studies are of insufficient quality, consistency or statistical power to permit a conclusion regarding the presence or absence of a causal association between exposure and cancer, or no data on cancer in humans are available.

*Evidence suggesting lack of carcinogenicity*: There are several adequate studies covering the full range of levels of exposure that human beings are known to encounter, which are mutually consistent in not showing a positive association between exposure to

aldehyde
of these
review
nists and
oducers,
workers
us IARC
dings, the
er carci-

ome into
ncluding
opharyn-
n cancer,

dies of
year of
ers who
orking,
s have
updated

studies,
e 1966
dehyde
oulded
plant).

Marsh
eather

Table 16. Cohort studies of industrial workers exposed to formaldehyde

| Reference, location, years of study | Cohort description Type of analysis (cohort size) | Exposure assessment | Organ site (ICD code)[a] | No. of cases/deaths | SMR (95% CI) | Comments |
|---|---|---|---|---|---|---|
| Coggon et al. (2003), United Kingdom, 1941–2000 (update of Acheson et al., 1984a; Gardner et al., 1993) | Chemical factories that used or produced formaldehyde Standardized mortality (14 014 men) | Level of exposure (background, low, moderate, high); among highly exposed, time period and duration of exposure | All cancers | 1511 deaths | 1.10 (1.04–1.16) | 2.0 expected |
| | | | Nasopharynx | 1 death | NR | Two additional cases identified from registry that could not be used in the analysis |
| | | | Nose and nasal sinuses | 2 deaths | 0.87 (0.11–3.14) | |
| | | | Lymphohaematopoietic | NR | NR | Increased risk among highly exposed (1.58; 95% CI, 1.40–1.78); inverse trend with duration of exposure |
| | | | Leukaemia | 31 deaths | 0.91 (0.47–1.59) | |
| | | | Mouth (ICD-9, 143–145) | 6 deaths | 1.28 (0.47–2.78) | |
| | | | Lung | 594 deaths | 1.22 (1.12–1.32) | |
| | | | Brain and central nervous system | 30 deaths | 0.85 (0.57–1.21) | |
| Hauptmann et al. (2003, 2004), USA, 1966–94 (update of Blair et al., 1986, 1987) | Manufacturer of formaldehyde, formaldehyde resins, moulding compounds, moulded plastic products, photographic films and plywood Standardized mortality (25 619 workers; 22 493 men, 3126 women) | Duration; quantitative estimates of cumulative, average and highest peak exposure | All cancers | 1723 deaths | 0.90 (0.86–0.95) | 15-year lag for solid cancers; 2-year lag for lymphohaematopoietic cancers The authors noted that the exact CI is 0.91–4.14; statistically significant trend with highest peak exposure; weaker trends observed with duration of, cumulative and average exposures |
| | | | Nasopharynx | 8 deaths | 2.10 (1.05–4.21) | |
| | | | Nose and nasal sinuses | 3 deaths | 1.19 (0.38–3.68) | Statistically significant trend with peak exposure, particularly for myeloid leukaemia; weaker trend with average exposure; no trend with duration of or cumulative exposure |
| | | | Lymphohaematopoietic | 161 deaths | 0.80 (0.59–0.94) | |
| | | | Leukaemia | 65 deaths | 0.85 (0.67–1.09) | |
| | | | Buccal cavity | 49 deaths | 1.01 (0.77–1.34) | |
| | | | Lung | 641 deaths | 0.97 (0.90–1.05) | |
| | | | Brain and central nervous system | 43 deaths | 0.92 (0.68–1.23) | |

Table 16 (contd)

| Reference, location, years of study | Cohort description Type of analysis (cohort size) | Exposure assessment | Organ site (ICD code)[a] | No. of cases/ deaths | SMR (95% CI) | Comments |
|---|---|---|---|---|---|---|
| Chiazze et al. (1997), USA, 1951–91 | Fibreglass manufacturing plant workers Standardized mortality and nested case–control (4631 men and women) | Cumulative exposure | All cancers | 96 deaths | 0.94 (0.77–1.15)[b] | Analysis restricted to 2933 white men |
| | | | Nasopharynx | NR | NR | |
| | | | Nasal cavity | NR | NR | |
| | | | Lymphohaematopoietic | 5 deaths | 0.46 (0.15–1.08) | |
| | | | Leukaemia | 1 death | 0.24 (0.006–1.36) | |
| | | | Buccal cavity/pharynx | 2 deaths | 0.70 (0.08–2.52) | |
| | | | Lung | 47 deaths | 1.26 (0.93–1.68) | Excess risk for lung cancer reduced when local rates were used (SMR, 1.17; 95% CI, 0.86–1.55); positive trend in case–control study with cumulative exposure to formaldehyde among smokers |
| | | | Brain and nervous system | 6 deaths | 1.48 (0.54–3.23) | |
| Stellman et al. (1998), USA, 1982–88 | Workers in the American Cancer Society CPS-II study employed in wood-related occupations or who reported exposure to wood dust Retrospective cohort mortality (45 399 men, of whom 387 reported exposure to formaldehyde) | Dichotomous (yes/no) with and without employment in a wood occupation | All cancers | 367 deaths | 0.98 (0.86–1.12) | |
| | | | Formaldehyde alone | 14 deaths | 1.61 (0.95–2.72) | |
| | | | Formaldehyde + wood | NR | NR | |
| | | | Nasopharynx | NR | NR | |
| | | | Nasal cavity | | | |
| | | | Lymphohaematopoietic | 28 deaths | 1.22 (0.84–1.77) | |
| | | | Formaldehyde alone | 3 deaths | 3.44 (1.11–10.68) | |
| | | | Formaldehyde + wood | | | |
| | | | Leukaemia | 12 deaths | 0.96 (0.54–1.71) | |
| | | | Formaldehyde alone | 2 deaths | 5.79 (1.44–23.25) | |
| | | | Formaldehyde + wood | NR | NR | |
| | | | Buccal cavity/pharynx | | | |
| | | | Lung | 104 deaths | 0.93 (0.73–1.18) | |
| | | | Formaldehyde alone | 7 deaths | 2.63 (1.25–5.51) | |
| | | | Formaldehyde + wood | NR | NR | |
| | | | Brain (ICD-9, 191) | | | |




WORLD HEALTH ORGANIZATION
INTERNATIONAL AGENCY FOR RESEARCH ON CANCER

GREEN COLLEGE, OXFORD

# INTERPRETATION OF NEGATIVE EPIDEMIOLOGICAL EVIDENCE FOR CARCINOGENICITY

Proceedings of a Symposium held in Oxford, 4–6 July 1983

EDITORS

N.J. WALD & R. DOLL

IARC Scientific Publications No. 65

INTERNATIONAL AGENCY FOR RESEARCH ON CANCER
LYON
1985

of the exposure experienced.... Negative human evidence may mean very little, unless it relates to prolonged and heavy exposure. If, however, it does and is consistent in a variety of studies (correlation studies over time, cohort studies of exposed individuals, and case-control studies of affected patients), whereas the laboratory evidence is limited in scope to, for instance, a particular type of tumour in a few species, negative human evidence may justify the conclusion that for practical purposes the agent need not be treated as a human carcinogen. In practice it is, of course, not usual for such perfect negative evidence to be available, but even less conclusive negative human evidence may help determine priorities between different lines of action.'

*Combination of data*

To this I should like to add, for the purpose of this Symposium, only three comments. First, I should have thought that the statement that human evidence is always relevant and can never be dispensed with, if available, was non-controversial, were it not that the Occupational Safety and Health Administration (1980) in the USA sought to lay down criteria for the admissibility of evidence that tended to show the lack of an effect. These criteria were that the data should refer to groups of subjects who had had at least 20 years' exposure, had been followed for at least 30 years, and were numerous enough for a 50% increase in the predicted type of cancer to be statistically significant. Such data would certainly carry substantial weight, but the exclusion of all other data would be unwise. A laboratory investigator can be advised to use so many animals, to test so many species, to treat at so many levels of dose, and to observe for a minimum length of time, as all these conditions are under his personal control—subject only to the constraints of finance and the availability of personnel. It is, however, unproductive to lay down similarly rigid rules for the epidemiologist, as experiments cannot be repeated and the conditions of the experiment are not under the epidemiologist's control. In practice, we can seek to overcome the deficiencies of one set of data only by combining it with sets from other sources, and any set that would be capable of showing a positive effect is worth considering. Indeed, it *must* be considered, if one is to avoid the trap described by Gaffey (personal communication), in which a positive effect is accepted because it appears in one set of data at the 1 in 20 level of significance, while 19 similar sets are exluded because they fail to satisfy more stringent requirements for the submission of negative results.

From what we know of the induction of cancer, it would be reasonable to require all sets of data to be set out in such a way as to show separately the results of observations made more than 10 years after first exposure, irrespective of whether this showed positive or negative results; but it would be unwise to exclude automatically even the first 10 years' data. In some circumstances, these could be crucial; as, for example, when examining the safety of an immunosuppressive drug that might replace azathioprine in the treatment of patients receiving renal transplants. The only safe rule is to consider the totality of the evidence, making sure, however, that it is set out in such a way that conclusions can be drawn about the presence or absence



# OCCUPATIONAL EPIDEMIOLOGY

## 2nd Edition

### Richard R. Monson



the interpretation of a large rate ratio. Even though in repeated studies a rate ratio may vary from 10 to 12 to 20, an association between exposure and disease is clearly present. (The only caveat in such a situation is that the association be based on reasonably large numbers. As indicated in Chapter 4, if the number of exposed persons with disease is less than 5, any interpretation attached to the association must be extremely conservative). It is generally accepted that if some confounding factor exists that accounts totally for such a strong association, its detection should be relatively simple.

By contrast, the size of a rate ratio has little to do with the possibility that an association could be due to selection bias or observation bias. Either of these forms of bias can lead in data to a total misrepresentation of the underlying association between exposure and disease. Only through examination of the methods used in the selection of study participants and the collection of data can a judgment be made as to the likelihood of these forms of bias.

## III. INTERPRETATION OF DATA WITH NO ASSOCIATION BETWEEN EXPOSURE AND DISEASE

### A. Random Misclassification

Suppose that some exposure leads to some disease with a rate ratio of 5.0. If 100 exposed persons and 100 nonexposed persons are followed until the disease occurs, the data in the top third of Table 5.2 may result.

Suppose that some of the exposed persons were incorrectly classified as being nonexposed. The data in the middle third of Table 5.2 were the result. The rate ratio of 2.9 is less than the true rate ratio of 5.0, but still is greater than 1.0.

Suppose that there was no relation whatsoever between true exposure and classified exposure, so that a truly exposed person was equally likely to be called exposed or not exposed. The data in the bottom third of Table 5.2 might result. The rate ratio of 1.0 reflects the complete intermingling of exposed and nonexposed persons.

In a cohort study (or in an experiment) random misclassification results when there is imprecision in classifying someone as exposed or not exposed. The misclassification is random because it occurs with equal probability in diseased or nondiseased persons. In a case-control study, random misclassification results when there is imprecision in classifying someone as diseased or not diseased. The misclassification occurs with equal probability in exposed and nonexposed persons.

Random misclassification can only lead to a dampening of the rate ratio. A rate ratio greater than 1.0 is lessened while one less than 1.0 is raised. With complete random misclassification, the rate ratio is 1.0.

Consider the study of asbestos and lung cancer. Some of the persons in a cohort study said not to be exposed will in fact have had some asbestos exposure. The two groups are not "exposed and not exposed", but "heavily exposed and not so heavily exposed". Unless the random misclassification is extreme, a difference in exposure exists between the two groups. In the measurement of lung cancer in a case-control study, some persons called nondiseased will in fact have lung cancer. There simply would be an underestimation in the measure of the association between asbestos and lung cancer.

There may also an error in a cohort study in the classification of disease. If this occurs equally among exposed and nonexposed groups, the rate ratio is not altered. (If this error has the potential to occur more in one group, observation bias will result.) In a case-control study, random error in the classification of exposure will not alter the ratio of exposure between case and control groups. However, in either type of study, the odds ratio will be dampened by this form of random misclassification.

Therefore, if an association between an exposure and a disease is found to be 1.0, random misclassification must be considered. If an association between an exposure and a disease