**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

IN RE:    **FEMA TRAILER**
           **FORMALDEHYDE**
           **PRODUCTS LIABILITY LITIGATION**

**MDL NO. 1873**

**SECTION "N-5"**

**JUDGE ENGELHARDT**
**MAG. JUDGE CHASEZ**

**THIS DOCUMENT IS RELATED TO ALL CASES**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# Amended Pre-Trial Order

# for

# Class Certification

December 17, 2008

*Signed original on*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION**

| | |
|---|---|
| **IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION** | **MDL NO. 1873** |
| | **SECTION "N-5"** |
| | **JUDGE ENGELHARDT MAG. CHASEZ** |

**THIS DOCUMENT IS RELATED TO ALL CASES**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## PRE-TRIAL ORDER

**NOW INTO COURT**, through undersigned counsel comes Plaintiffs' Liaison

Counsel ("PLC"), Manufacturing Defendants' Liaison Counsel ("MDLC") and

Government Counsel ("GC"), who respectfully submit this Pre-Trial Order in advance of

the Class Certification Hearing currently scheduled for December 2, 2008.

**1.**    **DATE/TIME OF PRE-TRIAL CONFERENCE**

A Pre-Trial Conference is scheduled to be held before the Honorable Kurt D.

Engelhardt, United States District Judge, Section N of the United States District Court in

and for the Eastern District of Louisiana on Tuesday, December 2, 2008, at 8:30 a.m.

prior to the Hearing on Plaintiffs' Motion for Class Certification.

**2.**    **APPEARANCES OF COUNSEL**

**FOR PLAINTIFFS:**
Gerald Meunier, Esq. (9471), Co-Liaison Council

- 1 -

Justin Woods, Esq. (24713) Co-Liaison Council
Anthony G. Buzbee, Esq. (TX 24001820)
Raul Bencomo, Esq. (2932)
Frank D'Amico, Esq. (17519)
Matthew Moreland, Esq. (24567)
Linda Nelson, Esq. (9938)
Ronnie Penton, Esq. (10462)

**FOR MANUFACTURING DEFENDANTS:**
    1.  Andrew Weinstock
        Joe Glass
        **DUPLASS, ZWAIN, BOURGEOIS,**
        **PFISTER & WEINSTOCK**
        3838 North Causeway Blvd, Ste. 2900
        Metairie, La 70002

    2.  Timothy D. Scandurro
        Dewey M. Scandurro
        **SCANDURRO & LAYRISSON**
        607 St. Charles Avenue
        New Orleans, LA 70130
        **Counsel for Defendant, Gulf Stream Coach, Inc. and Fairmont**
        **Homes, Inc.**

    3.  Lyon H. Garrison
        Randall C. Mulcahy
        Darrin L. Forte
        **GARRISON, YOUNT, LORMAND,**
        **FORTE, MULCAHY, L.L.C.**
        909 Poydras Street, Suite 1800
        New Orleans, LA 70112
        **Counsel for Defendant, TL Industries, Inc., Recreation by Design,**
        **LLC, Frontier RV, Inc. and Play'Mor Trailers, Inc.**

    4.  Jerry L. Saporito
        **LEAKE & ANDERSSON, L.L.P.**
        1100 Poydras Street, Suite 1700
        New Orleans, LA 70163-1701

    5.  Richard K. Hines, V
        Rebecca Phalen
        **Nelson Mullins Riley & Scarborough, LLP**
        201 17th Street NW, Suite 1700
        Atlanta, GA 30363

**Counsel for Fleetwood Enterprises, Inc., Fleetwood Canada, Ltd. and Fleetwood Homes of North Carolina, Inc.**

6.  John Stewart Tharp
    David Bienvenu
    **TAYLOR, PORTER, BROOKS & PHILLIPS, LLP**
    451 Florida Street, 8th Floor
    Baton Rouge, LA 70801
    **Counsel for Defendant, Coachmen Industries, Inc., Viking Recreational Vehicle, Coachmen Recreational Vehicle Company, LLC, and Coachmen Recreational Vehicle Company of Georgia, LLC**

7.  Ernest P. Gieger, Jr.
    Jason D. Bone
    **GIEGER, LABORDE & LAPEROUSE, LLC**
    701 Poydras Street, Suite 4800
    New Orleans, LA 70139
    **Counsel for Defendant, Forest River, Inc., Palomino RV and Vanguard Industry of Michigan**

8.  Ryan Johnson
    James Percy
    **JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, LLP**
    Four United Plaza
    8555 United Plaza Boulevard
    Baton Rouge, LA  70809

9.  Madeleine Fischer
    James Percy
    **JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, LLP**
    201 St. Charles Avenue
    New Orleans, LA 70170
    **Counsel for Defendants, Dutchmen, Pilgrim International, Inc., Thor Industries, Inc., Thor California, CrossRoads (DS Corp.) Keystone Industries, Inc., Keystone RV Company and KZRV, LP Co-counsel to Monaco and Monaco Coach**

10. Thomas L. Cougill
    Jeffrey P. Fultz
    Willingham Fultz & Cougill LLP
    Niels Esperson Bldg.
    808 Travis, Ste. 1608
    Houston, Tx. 77002

**Counsel for Starcraft RV, Inc., Jayco Enterprises, Inc. and Jayco, Inc.**

11. Ben Mayeaux
    Greg Koury
    Cliffe Laborde
    Laborde & Neuner
    1001 W. Pinhook Rd., Ste. 200
    Lafayette, LA 70503
    **Counsel for Defendant, Horton Homes, Inc.**

12. Tom W. Thagard, III
    Josh Baker
    Ted Hosp
    Ed Sledge
    Lee Bains
    Maynard Cooper & Gale PC
    1901 Sixth Ave. North
    2400 AmSouth/Harbert Plaza
    Birmingham, Al 35203-2618
    **Counsel for Defendants, CMH Manufacturing, Inc.**
    **Southern Energy Homes, Inc., Giles Industries, Inc.**
    **SunRay Investments, LLC, and Palm Harbor Homes, Inc.**

13. Jim Carroll
    Fowler, Rodriguez
    400 Poydras St., 30th flr.
    New Orleans, Louisiana 70130
    **Counsel for Defendants, CMH Manufacturing, Inc.**
    **Southern Energy Homes, Inc., Giles Industries, Inc.**
    **SunRay Investments, LLC, and Palm Harbor Homes, Inc.**

14. Tom Mondrala, CPCU
    Regional General Adjuster
    GAB Robins
    One Oak Hill Center, Suite 201
    Westmont, IL 60559

15. Walter Jamison
    Nan Landry
    Daigle Jamison & Rayburn
    303 West Vermillion, Ste. 210
    Lafayette, LA 70501
    **Counsel for Defendant, Silver Creek, and Alliance Homes dba**
    **Adrian Homes**

16. Jonathan H. Waller, Esq.
    Waller Law Office, P.C.
    The Park Building
    2140 11th Avenue South
    Suite 222
    Birmingham, AL 35205
    **Counsel for Defendant, Monaco**

17. Mike Hays
    Monaco Coach Corporation
    Senior Counsel
    606 Nelson's Parkway, P.O. Box 465
    Wakarusa, Indiana 46573

18. Lamont P. Domingue
    Voorhies & Labbé
    P.O. Box 3527
    Lafayette, LA  70502-3527
    **Counsel for Defendants, Champion Home Builders Co., Homes of
    Merit, Inc., Redman Homes, individually and f/k/a Dutch Housing,
    Inc., Cavalier Home Builders, LLC, Liberty Homes, Inc., Waverlee
    Homes, Inc., River Birch Homes, Inc., and Patriot Manufacturing,
    Inc. (in bankruptcy) and Patriot Homes of Texas, L.P. (in
    bankruptcy)**

19. David Kelly
    BREAZEALE, SACHSE & WILSON, L.L.P.
    301 Main Street, 23rd Floor [70801]
    Post Office Box 3197
    Baton Rouge, LA  70821
    **Counsel for Defendant, Indiana Building Systems, LLC
    d/b/a Holly Park**

20. Evan Plauche
    David Bach
    **HAILEY, MCNAMARA, HALL
    LARMANN & PAPALE, L.L.P.**
    One Galleria Blvd, Ste. 1400
    Metairie, LA 70011-8288
    **Counsel for American Homestar Corporation, Oak Creek Homes,
    LP and Oak Creek Homes, Inc.**

21. Thomas C. "Chris" Pennebaker
    Nielsen Law Firm, LLC
    3838 North Causeway Blvd., Ste. 2850
    Metairie, LA 70002

**Counsel for Scot Bilt Homes, Inc.**

22. Terry Knister
**Gordon, Arata, McCollum, Duplantis & Eagan, L.L.P,**
201 St. Charles Ave., 40th Floor
New Orleans, LA 70170
**Counsel for Scot Bilt Homes, Inc.**

23. Isaac Ryan
**DEUTSCH, KERRIGAN & STILES**
755 Magazine St
New Orleans, LA 70130
**Counsel for Tom Stinett Holiday RV Center, Inc.**

24. Larry Feldman
Robert Sheesley
**McGlinchey Stafford, PLLC**
601 Poydras Street, 12th Floor
New Orleans, LA 70130
**Counsel for Layton & Skyline Corporation**

25. Bob Kerrigan
Josh Keller
755 Magazine St.
New Orleans, LA 70130
**Counsel for Destiny Industries and Birch Homes**

## COUNSEL FOR GOVERNMENT:

1.   United States Department of Justice

  Henry T. Miller
  Adam Dinnell
  Michelle Boyle
  U.S. Department of Justice, Civil Division
  Torts Branch, Environmental Torts Section
  1331 Pennsylvania Avenue, NW, Room 8203N
  Washington, DC 20004

2.   FEMA

  Jordan Fried
  Janice William Jones
  Federal Emergency Management Agency
  500 C Street SW

Washington, D.C. 20472

3.   **DESCRIPTION OF THE PARTIES**

**PLAINTIFFS:**

Plaintiffs have proposed that the class be defined as:

All individuals who resided for any length of time in FEMA-provided housing units within the states of Louisiana, Mississippi, Alabama, and Texas after hurricanes Katrina and Rita.

Plaintiffs further proposed that, with regard to their claims arising under the products liability statutes and/or tort liability and/or other state statutes of the four states included in the class definition, and asserted specifically against the Federal Government and the Manufacturing Defendants, there be four sub-classes established, each comprised of individuals within the states of (1) Louisiana, (2) Mississippi, (3) Alabama, and (4) Texas,  who resided for any length of time in FEMA-provided housing units after hurricanes Katrina and Rita, and who have been damaged as a result of the Federal Government's and/or the Manufacturing Defendants' design, manufacture, marketing, and distribution of defective FEMA-provided housing units, and/or these defendants' failure to warn plaintiffs of the housing units' defect(s) and dangers associated therewith, either prior to their occupancy or following the awareness or possible dangers to formaldehyde exposure in the subject units and/or these defendants' violations of any state-based causes of action.

Plaintiffs have proposed that this Court certify the following subclasses:

- 7 -

a.     Louisiana Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the state of Louisiana after hurricanes Katrina and/or Rita, and who sustained damages recoverable under Louisiana law as a result of exposure to formaldehyde in these units.

b.     Texas Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the state of Texas after hurricanes Katrina and/or Rita, and who sustained damages recoverable under Texas Law as a result of exposure to formaldehyde in these units.

c.     Mississippi Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the state of Mississippi after hurricanes Katrina and/or Rita, and who sustained damages recoverable under Mississippi law as a result of exposure to formaldehyde in these units.

d.     Alabama Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the state of Alabama after hurricanes Katrina and/or Rita, and who sustained damages recoverable under Alabama law as a result of exposure to formaldehyde in these units.

e.    Future Medical Services Subclass:

All individuals who resided for any length of time in emergency housing units provided by FEMA within the states of Louisiana, Texas, Mississippi, and/or Alabama after hurricanes Katrina and/or Rita, and who are found eligible to participate in a medical services program designed to evaluate the physical condition(s) of each such individual for the purpose of ascertaining and responding to diseases caused by, contributed to, or exacerbated by the individual's exposure to formaldehyde while residing in any of the aforementioned units.

Further, Plaintiffs specifically request that this Court certify the following subclass with regard to children:

Any child who lived in a travel trailer which exceeded the ATSDR minimum risk levels for the correspondent period[1] in which they resided in the emergency housing unit, and who manifested any symptom of formaldehyde exposure during that period.

f.    Economic Loss Subclass:

All individuals to whom FEMA provided emergency housing units within the states of Louisiana, Texas, Mississippi, and Alabama after hurricanes Katrina and/or Rita and who sustained economic loss recoverable under each states' law as a result of being provided housing not fit for its ordinary purpose.

**MANUFACTURING DEFENDANTS:**

The Manufacturing Defendants are a group of entities that manufacture travel

---

[1] Acute = 40 ppb for 0-14 days, Intermediate = 30 ppb for 15-364 days, Chronic = 8 ppb for 365+ days.

trailers, park models, and manufactured housing for distribution throughout the United

States.  FEMA purchased emergency housing units manufactured by these Defendants

to provide as temporary housing to the FEMA aid recipients following hurricanes Katrina

and Rita.

Patriot Manufacturing, Inc., and Patriot Homes of Texas, L.P., filed bankruptcy,

which is still pending. See Doc. 746.

Pilgrim International, Inc., filed bankruptcy in the Northern District of Indiana, Suit

No. 08-33256.  The Pilgrim bankruptcy is still pending.

**UNITED STATE OF AMERICA:**

United States of America

4.      **JURISDICTION**

**PLAINTIFFS:**

The court has subject matter over the United States of America and FEMA

pursuant to 28 U.S.C. §§ 1346 and 2671, *et seq.*  Certain Manufacturing Defendants

named herein are subject to the *in personam* jurisdiction of this Court because they do

substantial business in the state of Louisiana and within this federal district, and at all

times relevant hereto engaged in commerce both in this federal district and in the State

of Louisiana.  The remaining Manufacturing Defendants do substantial business in the

states of Mississippi, and/or Alabama, and/or Texas, and at all times relevant hereto

engaged in the commerce in federal districts in those states, which on remand from this

MDL the courts in those districts would have *in personam* jurisdiction over these defendants.

Plaintiffs allege that they individually have suffered damages in an amount in excess of $75,000.00 exclusive of interest and court costs.  There is subject matter jurisdiction due to ample diversity pursuant to the terms of the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2).  This court has subject matter jurisdiction pursuant to the previous provisions of 28 U.S.C. § 1332(d)(2) because this is a class action in which there is at least minimal diversity and the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a large portion of the negligent and wrongful actions of the defendants occurred in the Eastern District of Louisiana.  Venue is also proper in this district as to the United States of America and FEMA since individual plaintiffs reside in this district and the acts and/or omissions as to certain of the plaintiffs occurred in this district.  Venue is also proper in this district under the provisions of 28 U.S.C. § 1407, this Court having been determined the appropriate transferee Court pursuant to the order of the United States Judicial Panel on Multidistrict Litigation, entered October 24, 2007.

## MANUFACTURING DEFENDANTS:

### A.  Jurisdictional Issues

    1.    CAFA

a.     This Court has jurisdiction of this case under 28 U.S.C. §1332, as amended by the Class Action Fairness Act of 2005 ("CAFA").  CAFA's intent "is to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications" (S. Rep. 109-14, at 35) and "its provisions should be read broadly, with a strong preference that interstate class actions should be heard in federal court if properly removed by any defendant" (S. Rep. 109-14, p. 43), considering that such class actions usually have "significant implications for interstate commerce and national policy" (S. Rep. 109-14, p. 27).

(Plaintiffs do not agree that standing is a contested issue in that the Court has ruled on standing in this matter.)

2.     Diversity Jurisdiction

a.     The District Court possesses subject matter jurisdiction under 28 U.S.C. §§ 1332 and 1441 in that all plaintiffs and all defendants are citizens of different states and the amount in controversy is in excess of $75,000, exclusive of interest and costs.  Venue is proper in the United States District Court for the Eastern District of Louisiana under 28 U.S.C. § 1391 in that the events giving rise to the cause of action occurred in this district.

**B.  Amount in Controversy Issues**

The parties stipulate that the amount in controversy is sufficient to satisfy all federal jurisdictional requirements.

**UNITED STATES OF AMERICA:**

A.  Jurisdictional Issues

    1.  CAFA

        a.  It is the United States' position that CAFA does not constitute a waiver of the United States' sovereign immunity and does not authorize the Court to exercise subject matter jurisdiction and award damages for alleged personal injury or property damages.

    2.  Diversity Jurisdiction

        a.  It is the United States' position that 28 U.S.C. §§ 1332 and 1441 do not constitute waivers of the United States' sovereign immunity and does not authorize the Court to exercise subject matter jurisdiction and award damages for alleged personal injury or property damages.

    3.  FTCA

        a.  The United States asserts that under  Court lacks subject matter jurisdiction over the 19 plaintiffs and any other person who files suit against the United States because any such claims are barred by the: (1) the discretionary function exception, 28 U.S.C. 2680(a), and (2) misrepresentation exception, 28 U.S.C. 2680(h).

    b.    The United States asserts that the Court lacks subject matter jurisdiction over putative FTCA class claimants because those persons have failed to exhaust their FTCA administrative remedies.

B.    Amount in Controversy Issues

The United States does not so stipulate.  The FTCA is only potential basis for Court to exercise subject matter jurisdiction over Plaintiffs claims against the United States and for the reasons set forth in previous section the Court lacks subject matter jurisdiction over any such claims.

5.    **<u>MOTIONS PENDING</u>**

    **PLAINTIFFS:**

Currently, the following motions are pending before this Honorable Court:

| DOCUMENT NO. | PLEADING | FILED BY |
|---|---|---|
| 756 | Motion to Dismiss Second Supplemental and Amended Master Complaint | Liberty Homes, Inc., Waverlee Homes, Inc. and Redman Homes, Inc. |
| 758 | Motion for Leave to File First Supplemental and Amending Complaint | *Aldridge* case |
| 860 | Motion *in Limine* to Exclude Expert Testimony of Dr. Patricia Williams | Manufacturing Defendants |
| 863 | Motion to Exclude the Testimony of Dr. Kenneth Paris **(The defendants have agreed to withdraw this motion, but have not formally done so).** | Manufacturing Defendants |
| 764 | Motion for Class Certification | PSC |

| 908 | Motion to Alter Judgment regarding Patricia Burr | PSC |
|-----|--------------------------------------------------|-----|
| 909 | Motion for Reconsideration regarding Penny Robertson | PSC |
| 882 | Motion to Dismiss Second Supplemental and Amended Master Complaint | Champion Home Builders and Homes of Merit, Inc. |

## MANUFACTURING DEFENDANTS:

### A.   Motion *in Limine* to Exclude Expert Testimony of Patricia M. Williams, Ph.D., DABT

The Manufacturing Defendants contend that Patricia Williams, Ph.D.'s opinions

and testimony should be excluded under Federal Rule of Evidence 702 (and its

interpretative jurisprudence) as Patricia Williams, Ph.D. lacks the qualification

necessary to render her opinions that anybody in the presence of formaldehyde, at any

level, sustains damage at the very molecular or cellular level though symptoms, disease

or injury may never appear.  Moreover, the opinions are fundamentally unreliable and

the opinions are not premised upon any recognized scientific methodology.

### B.   Manufacturing Defendants' Motion to Strike Non-compliant Class Representatives

The Manufacturing Defendants contend that several proposed Class

Representatives have failed to comply with the Orders issued by the Court. The

Manufacturing Defendants now move to strike as class representatives those

individuals who did not timely provide completed Plaintiff Fact Sheets.  Further, on

November 4, 2008, the Court ordered that the depositions of newly added Defendants'

Putative Class Representatives "will take place on or before November 13, 2008". (Rec. Doc. 830).  Therefore, the Manufacturing Defendants move to strike as class representatives those Plaintiffs who failed to appear for their scheduled depositions, and whose depositions were not rescheduled prior to November 13, 2008.

**UNITED STATES OF AMERICA:**

United States hereby joins and concurs in motion filed by Manufacturing Defendants.

6.   **BRIEF SUMMARY OF MATERIAL FACTS**

**PLAINTIFFS:**

After the landfalls of hurricanes Katrina and Rita, the homes of hundreds of thousands of citizens of the United States who resided along the Gulf Coast were rendered uninhabitable, leaving these citizens homeless.  The United States of America, through the Federal Emergency Management Agency (FEMA), undertook to provide emergency housing units (EHU's) to these citizens.

FEMA contracted with the Manufacturing Defendants to purchase thousands of such EHU's.  Many were purchased directly off the lots of some of the vendors of the Manufacturing Defendants.  FEMA purchased over 34,000 EHU's off the lot and over 106,000 were purchased from manufacturers directly pursuant to FEMA's specifications.  In addition, the Manufacturing Defendants expedited the production of many of the EHU's, using substandard materials and/or employing irregular practices

during the manufacturing process.  Plaintiffs submit that the housing units, both those

which were manufactured prior to the subject hurricanes and those later manufactured

did not conform to any Government-imposed regulations or standards which address

formaldehyde levels in the design and/or construction of housing units.  The result of

these actions was an abnormally high level of formaldehyde in the EHU's.

Consequently, Plaintiffs were exposed to hazardous levels of formaldehyde while

residing in units intended to replace their damaged or destroyed homes.  This health

crisis was exacerbated when the United States, through FEMA, chose not to respond to

citizen complaints and concerns about formaldehyde in the emergency housing units

because of a governmental focus on potential liability instead of public health.

At this stage in the MDL, the key issue before the Court is procedural in nature:

Should this litigation be managed as a class action in order to efficiently adjudicate and

resolve common issues on the merits, or should the parties be relegated to a mass

joinder model which may prove more costly, more time-consuming and less susceptible

to the MDL resolution of disputed common issues?

To certify this matter as a class action, the Court must find the plaintiffs have

satisfied each of the requirements of Rule 23(a) and, in addition, the requirements of

Rule 23(b)(3).  Plaintiffs respectfully submit that they have satisfied these requirements

of numerosity, commonality, typicality, and adequacy under Rule 23(a), as well as the

requirements of predominance and superiority under Rule 23(b)(3).  This case therefore

should be managed as a class action and proceed to a common issues trial, thereby

avoiding the delays and costs of multiple suits with varying results, particularly in the event of post MDL remand.

In the event that this Court elects not to certify a class based on all individuals who resided in EHU's in the four states after hurricanes Katrina and Rita, then the plaintiffs urge the Court to certify a class based upon the future medical services that are desperately needed by all plaintiffs, especially children. The Court, under Rule 23(c)(4), has the authority to certify an action with respect to a particular issue, severing it from the whole class seeking certification. *Castano v. American Tobacco Co.*, 84 F.3d 784, 739 (5th Cir. 1996). While plaintiffs submit the entire class meets the burden imposed by Rule 23, the subclass proposed for the recovery of future medical services may be separately certified, if the Court so desires, because this subclass independently satisfies the certification criteria of Rule 23.

**MANUFACTURING DEFENDANTS:**

The Manufacturing Defendants submit that the facts material to the Court's Class Certification determination concern the myriad variables applicable to the class representatives and the manufacturers' products. Regarding the class representatives, the material facts include variability among class representatives' frequency, duration and extent of alleged exposure; claimed symptomology; medical, employment and social histories; and interaction with FEMA regarding formaldehyde related concerns.

Regarding the Manufacturing Defendants' respective products, manufactured housing units, park models and travel trailers alike have significant design, manufacture

and production differences that are material to the Court's determination.  These units

vary dramatically in size, configuration, and ventilation system; some were built strictly

to HUD construction standards, some were not; some contain formaldehyde health

notices and warnings; some did not.   The factors contributing to this substantial

variation in formaldehyde levels include type, quantity, age, and storage conditions of

construction materials; home design and construction methods; unit size, number of

axles, and frame strength; workmanship and quality of construction; types and

quantities of furniture and drapery; whether residents added or installed their own

formaldehyde-emitting materials, such as furniture, carpets, drapery or fabrics; time and

condition of the unit prior to occupancy; the number and size of air conditioning units,

the type of ducting and insulation.  The variations occur not only among manufacturers

but also among units of the same type built by the same manufacturer.  Each of these

manufacturing variables, in turn, determines whether and to what extent an individual

plaintiff may have been exposed to formaldehyde while occupying any given EHU.

Additionally, variables external to the manufacturing processes of the respective

manufacturers also distinguish each plaintiff.  The external variables include:  the length

of time each respective plaintiff spent in each respective travel trailer; the number of

people who spent time in each respective travel trailer; the manner in which the

respective travel trailers were installed at each location; the geographic location

(topography) and weather conditions (temperature and humidity) where each respective

travel trailer was place; and the air exchange rate of each respective travel trailer (use

of windows and doors).

**UNITED STATES OF AMERICA:**

1.    On March 18, 2008, Plaintiffs filed the AMC, which incorporated and superseded all previously filed actions that had been consolidated in this Multidistrict Litigation ("MDL"), including those filed as putative class actions.  Administrative Master Complaint ("AMC") [Dkt. No. 109] ¶ 5.

2.    The AMC specifically asserts that certain named persons, the Pujol and Thomas families, are entitled to damages under the FTCA for personal injury resulting from exposure to formaldehyde in EHUs provided by FEMA.  The AMC requests that the Court certify a Fed. R. Civ. P. 23 class action against the United States. AMC ¶¶7(a), 93-95.

3.    The AMC alleges that only the members of the Pujol and Thomas families have actually "exhausted the requirements" of the FTCA and its administrative process.  *Id.* at ¶ 7.

4.    On May 9, 2008, a Complaint was filed in *Pujol v. United States*, No. 08-3217 [Dkt. No. 1].  This Complaint, filed after the AMC, constitutes the underlying substantive lawsuit that is the initial basis for the claims against the United States set forth in the AMC.

5.    Since the filing of the *Pujol* Complaint, the United States has been made a defendant in two other lawsuits filed and consolidated in this MDL action.  *See Johnson v. United States*, No. 08-3602 and *Huckabee v. Fleetwood Enters.*, No. 08-4095.  The eleven named plaintiffs in these actions, like the eight named plaintiffs in *Pujol*, (a total of nineteen persons) seek money damages from the

United States for personal injuries allegedly caused by exposure to formaldehyde in EHUs supplied by FEMA.[1]

6.  On August 22, 2008, Plaintiffs identified proposed class representatives. *See* Notice of Proposed Class Representatives [Dkt. No. 666].  Mrs. Stephanie Pujol is the only proposed class representative who has filed suit against the United States. *Id.*

7.  From approximately November 2005 to December 2006, the Pujol family occupied a FEMA-provided travel trailer in Metairie, Louisiana.  Ex. 1, Pujol Individual Assistance ("IA") File Excerpts at FEMA86-117, 213, 236.  In approximately December 2006, the Pujol family moved from the trailer into an apartment, for which they received rental assistance from FEMA. *Id.* at 213, 226-227.

8.  The Pujol family vacated the travel trailer because Mrs. Pujol's parents, the owners of the land where the trailer had been placed, wanted the trailer removed from their property; Mr. and Mrs. Pujol suffered from numerous medical conditions and the trailer did not readily accommodate their medical equipment; and Mrs. Pujol found "more permanent . . . and more comfortable housing." *Id.* at 127, 135, 202, 209, 218, 239; Ex. 3, Depo. Pujol at 67:16-22.

9.  In the spring and summer of 2007, the Pujol family, after having vacated the trailer, suggested to FEMA, in conjunction with their request for rental assistance,

---

[1] In addition, the United States has been named or may be made a defendant in two additional underlying lawsuits that have been consolidated in this MDL. *See Laney v. United States*, No. 08-4630, Complaint [Dkt. No. 1]; *Aldridge v. Gulf Stream*, No. 07-9228, Motion for Leave to File First Supplemental and Amending Complaint [Dkt. No. 758].  To date, the United States has not been served with the Complaint in either of these actions.

that some of the family members may have been injured as a result of exposure to formaldehyde during the family's occupancy of the trailer.  *Id.* at 170-171, 227-228.

10.  On or about September 10, 2007, FEMA received administrative tort claims submitted by Plaintiffs Mr. and Mrs. Pujol, as well as their two children (through Mr. Pujol).  Ex. 2, Pujol Adm. Claims at FEMA-23-39.  The Pujols allege that they have suffered the following personal injuries as a result of living in the trailer: sinus, respiratory, and other injuries; arthritic and pneumonia-like symptoms; headaches, nausea, emotional injuries, respiratory tract infections, worsening of sleep apnea, worsening of hepatitis C, chest pains, fatigue, shortness of breath, increased blood glucose, ear infections, "worsened ADHD and ODD symptoms," cough, nausea, vomiting, and future injuries.  *Id.* at 23-36.

11.  Prior to Hurricane Katrina, and continuing to the present time, Mrs. Pujol has suffered from, among other things, hypothyroidism, hepatitis C, orthopedic problems, and repeated respiratory tract infections, and takes over 12 prescription medications.  *See* Ex. 3, Depo. Pujol at 73:14-88:25.

12.  Mrs. Pujol seeks $1 million in damages.  Mr. Pujol seeks $100,000, as well as $750,000 on behalf of each of his two minor children.  Ex. 2 at 23, 27, 31, 36.

13.  None of the Pujol claimants asserts an FTCA property damage claim.  *Id.*

14.  In or about February, 2006, FEMA issued the Thomas family a travel trailer in Kenner, Louisiana.  Ex. 4, Thomas IA File Excerpts at FEMA-229-36.

15.  In the spring or summer of 2007, Mr. Thomas notified FEMA that he was interested in purchasing the trailer.  *Id.* at 196, 234, 237.

16.     In September 2007, FEMA notified Mr. Thomas that the unit was not available for purchase; and, later that same month, the Thomas family vacated the unit. *Id.* at 196, 234, 237.

17.     Available evidence indicates that the Thomas family did not complain to FEMA about odors or formaldehyde in the trailer. *Id.* at 223-237.

18.     On or about September 10, 2007, FEMA received administrative tort claims submitted by Plaintiffs Sean and Phuong Thomas, on behalf of themselves and their two minor children. Ex. 5, Thomas Adm. Claims at FEMA-42-57.  The Thomas claimants allege the following personal injuries as a result of living in the trailer: sinus, respiratory, and other injuries; arthritic and pneumonia-like symptoms, headaches, nausea, emotional injuries; injuries to the eyes and throat, nausea, vomiting, coughing, headache, joint stiffness, and future injuries. *Id.* at 42-54.

19.     Each member of the Thomas family seeks $150,000 in personal injury damages. *Id.* at 42, 46, 50, 54.

20.     None of the Thomas claimants asserts a property damage claim. *Id.*

21.     On or about October 10, 2005, FEMA issued the Huckabee family a travel trailer in Kiln, Mississippi.  Ex. 6, Huckabee IA File Excerpts at FEMA114-50.

22.     In January 2006, FEMA issued the Huckabee family a mobile home at the same address where the trailer had been installed. *Id.* at 26-27, 50.  Between July 2006 and October 2006, the Huckabee family contacted FEMA and expressed an interest in purchasing their EHU. *Id.* at 61-63.

23.     In or about May 2007, the Huckabee family complained to FEMA regarding formaldehyde and mold in their mobile home unit.  *Id.* at 51-52, 64-65.

24.     In or about May 2007, FEMA in response to the Huckabee's complaint took the following actions: FEMA offered to relocate the family to a different mobile home in a commercial park, which the Huckabees refused; FEMA sent persons to inspect the mobile home and advise the Huckabee family regarding ventilation and cleaning techniques; and FEMA commenced action to provide the Huckabees with alternative housing.  *Id.* at 52-54.

25.     On or about June 20, 2007, at the Huckabees' request, FEMA placed a different mobile home at the same address where the previous trailer and mobile home had been placed.  *Id.* at 53.

26.     In or about April 2008, the Huckabee family complained about formaldehyde in the replacement mobile home, and FEMA moved them to a hotel.  *Id.* at 58.

27.     From April 2008 to July 2008, FEMA provided the Huckabee family with hotel rooms and meals, and assisted them in attempting to locate an apartment that would accept FEMA rental assistance payments.  *Id.* at 51-58, 76-80.

28.     In July of 2008, the Huckabees vacated the hotel and moved into a housing unit provided by the Mississippi Emergency Management Agency.  *Id.* at 79-80.

29.     FEMA received the Huckabees' administrative tort claims after December 2007. Ex. 7, Huckabee Adm. Claims at FEMA-931-37.  The Huckabees claim they suffered personal injuries as a result of exposure to formaldehyde and mold while residing in the EHUs, including respiratory ailments, pain and suffering, and psychological injuries.  *Id.*

30.   Each member of the Huckabee family seeks $250,000 in damages for personal injury damages. *Id.* None of the Huckabees asserts a property damage claim. *Id.*

31.   FEMA purchased in excess of 140,000 EHUs to provide emergency housing for victims of Hurricanes Katrina and Rita. Ex. 8, FEMA Press Release No. HQ-08-002b (Feb. 12, 2008) at FEMA10-209.

32.   The United States Department of Housing and Urban Development's ("HUD") indoor air target level for formaldehyde in manufactured housing, mobile homes, is 0.4 parts per million (ppm) or 400 parts per billion (ppb). 49 F.R. 31,996, 31,997-98 (Aug. 9, 1984). This standard describes the target indoor air formaldehyde level resulting from the manufacture of mobile homes using certain low-formaldehyde emissions materials. *Id.* at 31,996, 24 C.F.R. § 3280.308(a).

33.   Fleetwood Enterprises, Inc. ("Fleetwood") constructed over 13,000 EHUs that were purchased by FEMA to provide emergency housing for disaster victims following Hurricanes Katrina and Rita. Ex. 9, Letter to Hon. Karen Wells Roby from Joseph Glass at 2 (Aug. 13, 2008). Since the 1980s, Fleetwood has maintained a policy of voluntarily constructing all of its EHUs, including those used to respond to Hurricanes Katrina and Rita, with HUD-compliant low-formaldehyde emissions materials – the same materials that makers of manufactured housing (mobile homes) are required to use. Ex. 10, Fleetwood's Responses to Plaintiffs' First Interrogatories, Response No. 16.

34.   Gulfstream Coach, Inc. ("Gulfstream") manufactured approximately 50,000 EHUs that FEMA purchased to provide emergency housing for victims of Hurricanes

Katrina and Rita.  Ex. 9 at 2.  Gulfstream has had in place a "long-standing" policy to use HUD-compliant low-formaldehyde emissions materials in the construction of all EHUs.  Ex. 11, Statement of Jim Shea, Chairman, Gulf Stream Coach, Inc., Before the House Committee on Oversight and Government Reform (July 9, 2008) at 8.

35.    In December 2007 and January 2008, the Centers for Disease Control ("CDC") tested 519 EHUs that FEMA had issued to Hurricane Katrina/Rita disaster victims.  Ex. 12, Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes (July 2, 2008) at iii.  Formaldehyde levels in the 519 units that were tested ranged from 3 to 590 ppb.  *Id.* at 10.  Of those, only 5% contained formaldehyde levels in excess of 300 ppb.  *Id.* at 23, Table 2.

36.    Plaintiffs have tested numerous EHUs as a part of this litigation.  One of Plaintiffs' experts, Mr. Kaltofen, reports that the median concentration level of formaldehyde in the tested units is .14 ppm (140 ppb), and that test results have ranged from no detection of formaldehyde to 4 ppm (4000 ppb).  Ex. 13, Kaltofen Expert Report at PL-218; Ex. 14, Depo. Kaltofen at 92:24-25.

37.    Another Plaintiffs' experts, Dr. Hewett, reports that of the 976 tested units of different manufacturers, only one manufacturer's mean formaldehyde concentration level exceeded the HUD indoor air target level for mobile homes of 400 ppb.  Ex. 15, Hewett Expert Report at 12-13, Table 8; Ex. 16, Depo. Hewett at 152:21-153:6.

7.    **UNCONTESTED MATERIAL FACTS**

A.     On August 29, 2005, Hurricane Katrina made landfall.  (Rec. Doc. 717, p. 2);

B.     On September 24, 2005, Hurricane Rita made landfall near the Texas-Louisiana border.  (Rec. Doc. 717, p. 2);

C.     Approximately 17,000 individuals are currently represented by counsel and allege that they have been injured as a result of living in temporary housing units that were issued by FEMA.

D.     Approximately 1,100 individuals have filed suit against Manufacturing Defendants and allege that they have been injured as a result of living in temporary housing units that were issued by FEMA.

E.     Nineteen individuals have filed suit against the United States and allege that they have been injured as a result of living in temporary housing units that were issued by FEMA.

F.     Approximately 12,000 individuals have submitted claims to FEMA that appear to stem from living in temporary housing units that were issued by FEMA.

8.    **CONTESTED ISSUES OF FACT**

**PLAINTIFFS:**

1.    The provision of temporary housing to plaintiffs entailed a duty on the part of the Federal Government to insure that such housing was safe for habitation. Unfortunately, the housing provided was and is unsafe, and presents a clear and present danger to the health and well-being of the plaintiffs and their families.

2.   The Manufacturing Defendants rushed through production many of the housing units, using substandard materials and/or employing irregular practices during the manufacturing process that resulted in the housing units containing high levels of formaldehyde.

3.   The housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, were neither constructed nor designed in accordance with reasonably precise Government specifications.

4.   The housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units as pertains to formaldehyde levels.

5.   Plaintiffs submit that the housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde.

6.   Manufacturing Defendants ignored or deliberately and fraudulently concealed and/or condoned the concealment, and/or conspired with, advised, encouraged, or aided others and/or each other to conceal that the housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde.

7.   All of the putative class representatives have spent significant time in the FEMA-provided housing units manufactured by one or more of the named Manufacturing Defendants and provided to plaintiffs by the Federal Government.

As a result, plaintiffs unwittingly have been exposed to dangerously high concentrations of the formaldehyde that is emitted from products used in the manufacture of the subject housing units.

8.   The Federal Government provided housing to the plaintiffs that contained formaldehyde capable of emitting levels that are dangerously unhealthy.

9.   FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units.

10.  The Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11; 2005 and as late as Jan. 17, 2006.

11.  The Federal Government continued to supply the defective and dangerous housing units to the plaintiffs even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value.

12.  The Federal Government continued to supply the defective and dangerous housing units to the plaintiffs even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units.

13.  FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units supplied in the wake of

- 29 -

the hurricanes in order to avoid legal liability for injuries to plaintiffs herein as a result of their exposure to formaldehyde.

14.   The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

15.   Of the housing units at issue, "mobile homes" are wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet.

16.   Of the housing units at issue, "travel trailers" are wheel-mounted and no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet.

17.   Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area).

18.   The homes of many citizens of the United States who resided along the Gulf Coast were rendered uninhabitable leaving these citizens homeless.

19.   FEMA contracted to purchase thousands of the temporary housing units (THUs), primarily travel trailers, for provision to the plaintiffs as temporary housing.

20.   Formaldehyde is found in construction materials such as particleboard, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the THUs.

21.   According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for

Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA").

22.    Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace.

23.    HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes).  HUD has far stricter exposure limits for residential formaldehyde emissions.

24.    FEMA was established in 1979 to provide a single point of accountability for the Federal Government's disaster response.

25.    The mission of FEMA as set forth in the Robert T. Stafford Disaster Relief Act ("Stafford Act") is to assist the efforts of the states "in expediting the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of areas devastated by disasters." 42 U.S.C. § 5121(a)(2) (2006).

26.    The Stafford Act authorizes federal aid to individuals and households and provides that the President may provide temporary housing assistance to individuals and households "who are displaced from their pre-disaster primary residences or whose pre-disaster primary residences are rendered uninhabitable ... as a result of damage caused by a major disaster." 42 U.S.C.A. § 5174(b)(1) (Supp. 2007).

27.    Under the federal regulations implementing the Stafford Act, a "displaced applicant" is one "whose primary residence is *uninhabitable*, inaccessible, made unavailable by the landlord...or *not functional* as a direct result of the disaster and

has no other housing available in the area."  The term "functional" is defined as "an item or home capable of being used for its intended purpose."  The term "uninhabitable" is defined as meaning the "dwelling is not safe, sanitary or fit to occupy."  44 C.F.R. 206.11

28.   Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance"  provided under subparagraph (c)(1)(A).  *See also* 44 C.F.R. § 206.117(b)(ii).

29.   According to FEMA, the agency only provides temporary housing units when all other housing resources are unavailable, and are only used as a last resort to provide "safe, secure, and sanitary" housing for eligible disaster victims, but acknowledges that these units were never designed for long-term occupation. (Statement of Harvey E. Johnson, Jr., Acting Deputy Administrator and Chief Operating Officer, Federal Emergency Management Agency, Department of Homeland Security, before the Subcommittee on Disaster Recovery and Subcommittee on State, Local, and Private Sector Preparedness and Integration, Homeland Security and Governmental Affairs Committee, United States Senate, March 4, 2008, at 5.)

30.   In response to Hurricanes Katrina and Rita, FEMA provided approximately143,000 THUs.

31.   The CDC conducted testing of THUs in the fall of 2007.  The CDC testing

revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartment

32.    The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions.

33.    As a result of this round of testing, the Federal Government implemented a

program that essentially entails removing the remaining residents from the
subject housing units and placing them into other, safe, forms of housing.

34.    The objective for the certification of a sub-class comprised of children affected by
exposure to formaldehyde is to create a specific intervention and treatment
program to address the injury caused by exposure to formaldehyde in these
children, to ensure that they receive the medical attention that this exposure
requires, which is at the same time self-regulating and narrowly tailored to only
address the medical needs of these children that result from that formaldehyde
exposure.

35.    Children are acknowledged to be a particularly susceptible population to
formaldehyde exposure.  This is because children are still developing
physiologically and damage at a developmental stage can have long-lasting if not
permanent effects.  Formaldehyde has been linked with asthma, respiratory
disease, and other pulmonary and respiratory problems.  The type of injury
sustained by these children is universal in mechanism, but the symptoms
resulting from this injury may differ from child to child.  Mechanistically, the
formaldehyde cross-links with cells, proteins, DNA and macromolecules, causing
cell death, cell mutation, tissue loss, abnormal development, and other problems.
These injuries are universal to children exposed to elevated levels of
formaldehyde and, as such, there is uniformity within the sub-class as to
mechanism of injury.  Further, the average formaldehyde level tested in the 2007
CDC study of 519 travel trailers (~82 ppb for the travel trailers), conducted in the
cooler, dryer winter months, was over ten times the Minimal Risk Level for

chronic exposure (8 ppb), almost three times the level of intermediate exposure (30 ppb), and over twice the level of acute exposure (40 ppb).  This, coupled with the duration of habitation placing the vast majority of children in the chronic exposure range and the fact that there is no scientifically accepted actual minimum risk level for children, is supportive of a class certification for children.

36.    Some of the common symptoms of injury that have manifested in these children include but are not limited to asthma, allergic disease, and sensitization to formaldehyde and other substances.  These health problems can be chronic and life-long, and seriously impact the quality of life of the individual children.  However, these respiratory problems are manageable given proper diagnosis and treatment, coupled with management education, all from qualified medical personnel.  Improper diagnosis, treatment or management will lead to increased burden on the medical system and a significant decrease in the quality of life for these children and their families.  A large portion of these children do not have health insurance and any treatment for respiratory problems, without this program, will be through the emergency room and not with a qualified pediatrician.  Without the proposed program, the cost of medical care will continue to be borne the State and Federal Governments through the Medicaid and Medicare programs – programs that are already overburdened.  The establishment of a medical intervention and treatment program will ensure that the cost of treatment will be borne by those who caused the injury in the first place.  Additionally, by setting up a program, administered as a specialized fund, rather than simply giving the parents or guardians of the children money to treat

the children's medical conditions, the danger of misuse of the funds will be minimized. Further, the fund would be self-regulating and free of misuse, because it would only apply to children who seek medical attention for conditions directly attributable to formaldehyde exposure, and who can show that they had some manifestation of symptoms relating to formaldehyde exposure when they resided in a travel trailer.

37.   There has been significant success and precedent for such programs. There is a National Vaccine Injury Compensation Program that has been tremendously successful and provides a recourse for individuals injured by vaccination. This program is also supported and subscribed to by the medical community itself. The Louisiana Fourth Circuit Court of Appeal, in *Scott v. American Tobacco Co., Inc.*, 949 So.2d 1266 (La.App. 4 Cir. 2007), the court found that a Smoking Cessation program was an appropriate remedy for those who were addicted to nicotine to give them appropriate medical assistance in managing that addiction. There is even precedent for such medical intervention programs in the Eastern District of Louisiana. In a July 8, 1999 consent judgment, Judge Lemmon in *U.S. Public Interest, et al. v. Bayou Steel*, 96-cv-0432, ordered that payment be made to an Asthma Education and Intervention Program. This program was tremendously successful and dramatically improved the quality of life for the children engaged in the program. The architect and administrator of that program was Patricia M. Williams, Ph.D.

38.   If a sub-class of children is not certified and they are forced to proceed individually, there is likelihood that there will be inconsistent recovery and that the

medical needs of these children suffering with life-changing medical problems as a result of formaldehyde exposure will not have access to the medical attention they need.  Judicial economy will suffer and there is a strong likelihood that identical issues will be decided differently for the various children and will result in a lack of equitable treatment and resolution of the various children.

**MANUFACTURING DEFENDANTS:**

1. The presence of formaldehyde in the units;

2. The level of formaldehyde in each unit at any given time;

3. The health effects of formaldehyde exposure;

4. Whether the symptoms claimed by each putative class representative can be caused by airborne formaldehyde;

5. Duration of time each putative class representative lived in a FEMA EHU;

6. Hours spent in the EHU per day by each putative class member;

7. Whether each unit was built to HUD construction standards;

8. Whether each unit included health notices;

9. Usage of the home and occupant lifestyles;

10. The number of people who spent time in each respective travel trailer;

11. Whether the respective EHUs were damaged during installation at each location; and

12. The type and number of composite wood products used in the manufacture the travel trailers.

**UNITED STATES OF AMERICA:**

United States adopts reference Manufacturing Defendants' Contested Statement of Fact.

9.    **CONTESTED ISSUES OF LAW**

**PLAINTIFFS:**

1.    Whether the proposed class is so numerous that joinder of all members is impracticable.

2.    Whether there are questions of law and fact common to the class which predominate over any questions affecting only individual members.

3.    Whether the claims of the proposed class representatives are typical of the class.

4.    Whether the representative parties will fairly and adequately protect the interests of the class and the court appointed Plaintiffs' Steering Committee will adequately represent the interests of all potential claimants.

5.    Whether a class action is superior to other available methods for the fair and efficient adjudication of this matter.

6.    Whether class members' claims are so common that they should be allowed to have adjudicated, the following issues of law:

Louisiana Subclass:

a.    Whether the Manufacturing Defendants designed and made

housing units that emitted dangerous levels of formaldehyde;

b.   Whether the Manufacturing Defendants' units were unreasonably

dangerous in normal use and/or reasonably anticipated misuse;

c.   Whether the Manufacturing Defendants failed to conform to the

express warranties made regarding the fitness of their respective

products;

d.   Whether the Manufacturing Defendants failed to sufficiently test the

housing units to properly evaluate the level of emissions of

formaldehyde; and

e.   Whether the Manufacturing Defendants failed to warn the plaintiffs

of the unreasonably dangerous nature of the housing units or of the

presence of excessive levels of formaldehyde emissions and the

hazards associated therewith.

Texas Subclass:

a.   All issues enumerated above, as if fully repeated herein;

b.   Whether the Manufacturing Defendants breached their duty to

plaintiffs in failing to act reasonably in the design, marketing,

distribution and sale of the housing units;

c.   Whether the Manufacturing Defendants failed to properly inspect

the housing units; and

    d.    Whether the Manufacturing Defendants failed to sufficiently test the effect and/or risks of formaldehyde emissions on the plaintiffs.

Mississippi Subclass:

a.    All issues enumerated above, as if fully repeated herein;

b.    Whether the Manufacturing Defendants knew or should have known that their products were defective;

c.    Whether the defective and unreasonably dangerous condition of the product proximately caused the damage and injuries sustained by plaintiffs;

d.    Whether the Manufacturing Defendants properly selected and installed their respective products' component parts; and

e.    Whether an alternative design would have to a reasonable probability prevented the toxic exposure of the plaintiffs.

Alabama Subclass:

a.    All issues enumerated above, as if fully repeated herein.

Future Medical Services Subclass:

a.    Whether certain plaintiffs were significantly exposed to formaldehyde, a hazardous substance;

b.    Whether certain plaintiffs now suffer a significantly increased risk of contracting a serious latent disease, associated with formaldehyde exposure;

c.    Whether certain plaintiffs' risk of contracting such a disease is greater than: (a) the risk of contracting the same disease had there been no exposure, and (b) the chances of members of the public at large of developing the disease;

d.    Whether a medical procedure exists that makes the early detection of any diseases possible;

e.    Whether the future medical services regime for such detection is different from medical services recommended in the absence of exposure; and

f.    Whether there is some demonstrated clinical value in the early detection and diagnosis of any such diseases.

Economic Loss Subclass as to Manufacturing Defendants

g.    Whether the emergency housing units are defective with respect to their ordinary purpose;

h.    Whether the emergency housing units were defective at the time they left the manufacturers' possession; and

i.    Whether the failure to provide safe housing for the use of plaintiffs violated the implied warranties of the Manufacturing Defendants.

Economic Loss Subclass as to the Federal Government

j.    Whether FEMA failed to provide safe and habitable emergency housing units; and

k.   Whether FEMA's failure to provide safe and habitable emergency housing units violated the plaintiffs' property interest.

7.   In the prosecution of claims by each of these subclasses, the following common issues exist in regard to the defendant United States/FEMA.

a.   Whether the Federal Government knew or should have known at some point in time that the housing units at issue herein produced excessive formaldehyde emissions, which posed a health risk to plaintiffs;

b.   Whether the Federal Government was negligent in failing to ensure that the housing units purchased and provided to the plaintiffs were habitable, functional, and suitable for their intended use; and

c.   Whether the Federal Government, on first becoming aware of legitimate concerns regarding formaldehyde exposure in the housing units at issue, should have: (a) ceased and desisted in furnishing additional units to plaintiffs, and (b) issued appropriate and effective health warnings to those already residing in these units.

8.   Whether each state has implied warranty legal theories available to plaintiffs.  Code of Ala. §§ 7-2-314 and 7-2-315; Louisiana Civil Code

Article 2520, et seq.; Miss. Code Ann. §§ 75-2-314 and 74-2-315 (Miss. 1976); and Texas Business and Commercial Code §§ 22.314 and 2.315.

9.    Whether plaintiffs should have been provided alternative housing that was habitable (i.e. safe).  Whether the failure to provide safe housing for the use of plaintiffs would violate implied warranties of the Manufacturing Defendants.  "Safe housing" is not an issue that caries from state-to-state or person-to-person.

10.    Whether EHUs meet the requirement of "safe housing" and whether this involves issues such as illness, complaints by plaintiffs, and/or FEMA's knowledge or actions.

**MANUFACTURING DEFENDANTS:**

1.    Defendants contest whether Plaintiffs have standing to sue;

2.    Whether there exists an ascertainable class of persons to be represented by the proposed class representatives;

3.    Whether this action is maintainable as a class action, specifically:

i.    whether the class is so numerous that joinder of all members is impracticable;

ii.    whether the claims or defenses of the representative parties are typical of the claims or defenses of the class;

iii.    whether the representative parties will fairly and adequately protect the interests of the class;

iv.    whether there are questions of law or fact common to class

- 43 -

members;

v.      whether any common questions predominate over any

questions affecting only individual members;

vi.     whether a class action is superior to other available methods

for fairly and efficiently adjudicating the controversy;

4.      Whether Plaintiffs are entitled to a medical monitoring subclass;

5.      Whether Plaintiffs are entitled to an economic loss subclass.

6.      Whether there is a causal-relationship between the medical

complaints of each respective plaintiff and that plaintiff's alleged

exposure to formaldehyde.

**UNITED STATES OF AMERICA:**

1.      Whether the Court has subject matter jurisdiction over the 19

plaintiffs who have commenced an action and filed suit under the

FTCA seeking money damages for alleged personal injuries.

2.      Whether the Court has subject matter jurisdiction over putative

class claimants FTCA claims.

3.      Whether the Court has subject matter jurisdiction over any FTCA

claims for economic loss associated with damage or injury to a

temporary emergency housing unit.

4.      United States incorporates by reference Manufacturing Defendants'

Contested Issues of Law

**10.    <u>LIST OF EXHIBITS</u>**

The parties reserve their right to object at the time of any merits proceeding, to the admissibility of any exhibit accepted into the record for the Class Certification Hearing.

| EXHIBIT ID | EXHIBIT DESCRIPTION | BATES RANGE | STATUS |
|---|---|---|---|
| **Plaintiffs' Exhibits**<br><br>P1 | Majority Staff Report Subcommittee on Investigations & Oversight - Committee on Science & Technology U.S. House of Representatives, September 2008, "Toxic Trailers – Toxic Lethargy: How the Centers for Disease Control and Prevention Has Failed to Protect the Public Health" | PSC002070 - PSC002112 | FEMA Obj: FRE 802 |
| P2 | CDC Summary and Interim Report: VOC and Aldehyde Emissions in Four FEMA Temporary Housing Units – Indoor Environment Department, Lawrence Berkeley National Laboratory, 8 May, 2008 | PSC002113 - PSC002166 | FEMA Obj: FRE 802 |
| P3 | U.S. Department of Health and Human Services and CDC Presentation Titled "Formaldehyde Levels in Occupied FEMA-supplied Temporary Housing Units (THUs) in LA and MS, Winter 2007-2008" | PSC002167 - PSC002181 | FEMA Obj: FRE 802 |
| P4 | CDC Interim Findings on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes – February 29, 2008 | PSC002182- PSC002202 | FEMA Obj: FRE 802 |
| P5 | CDC Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes – July 2, 2008 | PSC002203 - PSC002263 | |
| P6 | Agency for Toxic Substances and Disease Registry (ATSDR) "Health Consultation, Formaldehyde Sampling at FEMA Temporary Housing Units, Baton Rouge, Louisiana, February 1, 2007" | PSC002264 - PSC002277 | |

| | | | |
|---|---|---|---|
| P7 | ATSDR October 2007 "An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers Baton Rouge, Louisiana, September-October 2006" | PSC002278 - PSC002318 | |
| P8 | Testimony of Heidi Sinclair MD, MPH, FAAP before the U.S. House of Representatives Committee on Science and Technology, Subcommittee on Investigations and Oversight – April 1, 2008 | PSC002319 - PSC002325 | FEMA Obj: FRE 802 |
| P9 | Testimony of Christopher T. De Rosa, M.S., Ph.D. before the U.S. House of Representatives Committee on Science and Technology, Subcommittee on Investigations and Oversight – April 1, 2008 | PSC002326 - PSC002336 | FEMA Obj: FRE 802 |
| P10 | Testimony of Dr. Meryl H. Karol before the U.S. House Committee on Science and Technology, Subcommittee on Investigations and Oversight – April 1, 2008 | PSC002337 - PSC002344 | FEMA Obj: FRE 802 |
| P11 | Testimony of Scott Needle, MD, FAAP before the U.S. House of Representatives Committee on Oversight and Government Reform – July 19, 2007 | PSC002345 - PSC002349 | FEMA Obj: FRE 802 |
| P12 | "Important Information for Travel Trailer Occupants" FEMA brochure | PSC002350 - PSC002351 | |
| P13 | Affidavits and Curricula Vitae of Dave P. Barnes, Jr. and Dr. Lee E. Branscome | PSC002352 - PSC002385 | |
| P14 | Affidavit and Curriculum Vitae of Mary C. DeVany | PSC002386 - PSC002418 | |
| P15 | Affidavit and Curriculum Vitae of Dr. Paul Hewett | PSC002419 - PSC002446 | |
| P16 | Affidavit and Curriculum Vitae of Marco Kaltofen | PSC002447 - PSC002466 | |
| P17 | Affidavit and Curriculum Vitae of Dr. Gerald McGwin, Jr. | PSC002467 - PSC002511 | |
| P18 | Affidavit and Curriculum Vitae of Dr. Harry A. Milman | PSC002512 - PSC002540 | |

| P19 | Affidavit and Curriculum Vitae of Stephen Mullet | PSC002541 - PSC002555 | |
|---|---|---|---|
| P20 | Original and Supplemental Affidavits and Curriculum Vitae of Dr. Kenneth Paris | PSC002556 - PSC002571 | 1) FEMA Obj: Fed. R. Civ. P 26 and FRE 802 2) MDLC Obj to Supplem ental Affidavit Timelines s |
| P21 | Affidavit and Curriculum Vitae of Dr. Judd E. Shellito | PSC002572 - PSC002612 | |
| P22 | Affidavit and Curriculum Vitae of Dr. Stephen Smulksi | PSC002613 - PSC002629 | |
| P23 | Affidavit and Curriculum Vitae of Dr. William Stein, III | PSC002630 - PSC002648 | |
| P24 | Affidavit and Curriculum Vitae of Dr. Patricia M. Williams | PSC002649 - PSC002682 | |
| P25 | Deposition Transcript of Dr. Michael E. Ginevan | PSC002683 - PSC002751 | |
| P26 | "*Formaldehyde Indoors*" by Dr. Stephen Smulski, April 1987, Progressive Builder, 12(4):9-11. | PSC002752 - PSC002754 | FEMA Obj: FRE 802 |
| P27 | Asthma Project Report, February 28, 2001, Patricia M. Williams, Ph.D. and Results of Preliminary Asthma Education and Management Program | PSC002755 - PSC002844 | FEMA Obj: FRE 802 |
| P28 | Boyson, M. "*Nasal mucosa in workers exposed to formaldehyde: a pilot study.*" Br J of Ind Med 47:116-121, 1990. | PSC002845 - PSC002853 | FEMA Obj: FRE 802 |
| P29 | Edling, C. "*Occupational exposure to formaldehyde and histopathological changes in nasal mucosa.*" Br J of Ind Med 45:761-765, 1988. | PSC002854 - PSC002865 | FEMA Obj: FRE 802 |
| P30 | Holmstrom, M. "*Histological Changes in the Nasal Mucosa in Rats after Long-term Exposure to Formaldehyde and Wood Dust.*" Acta Otolaryngol (Stockh) 108:274-283, 1989. | PSC002866 - PSC002881 | FEMA Obj: FRE 802 |

| P31 | Holmstrom, M. "*Histological Changes in the Nasal Mucosa in Persons Occupationally Exposed to Formaldehyde Alone and in Combination with Wood Dust.*" Acta Otolaryngol (Stockh) 107: 120-129, 1989. | PSC002882 - PSC002893 | FEMA Obj: FRE 802 |
|---|---|---|---|
| P32 | Castro-Rodriguez, JA. "*A Clinical Index to Define Risk of Asthma in Young Children with Recurrent Wheezing.*" Am J Respir Crit Care Med 2000;162(4 Pt 1):1403-06. | PSC002894 - PSC002897 | FEMA Obj: FRE 802 |
| P33 | Garrett, MH.  "*Increased risk of allergy in children due to formaldehyde exposure in homes.*" Allergy 1999;54(4):330-7. | PSC002898 - PSC002905 | FEMA Obj: FRE 802 |
| P34 | Jaakkola JJ. "*Asthma, Wheezing, and Allergies in Russian Schoolchildren in Relation to New Surface Materials in the Home.*" Am J Public Health 2004;94(4):560-2. | PSC002906 - PSC002908 | FEMA Obj: FRE 802 |
| P35 | Platts-Mills, TA. "*Indoor allergens and asthma: Report of the Third International Workshop.*" J Allergy Clin Immunol 1997;100(6 Pt 1):S2-S24. | PSC002909 - PSC002931 | FEMA Obj: FRE 802 |
| P36 | Rumchev, K. "*Domestic exposure to formaldehyde significantly increases the risk of asthma in young children.*" Eur Respir J 2002;20:403-8. | PSC002932 - PSC002937 | FEMA Obj: FRE 802 |
| P37 | Letter from Bennie G. Thompson, Chairman of the U.S. House of Representatives Committee on Homeland Security, dated November 19, 2007, to R. David Paulison and Paulison's response, dated December 11, 2007 | PSC002938 - PSC002942 | FEMA Obj: FRE 802 to Mr. Thompson's letter |

| P38 | NHLB/National Asthma Education and Prevention Program – "Section 3, The Four Components of Asthma Management;" "The Strong Association Between Sensitization To Allergens and Asthma: A Summary of the Evidence;" "Indoor/Outdoor Air Pollution Irritants;" "Assessment Questions For Environmental And Other Factors That Can Make Asthma Worse" and " Section 4, Managing Asthma Long Term in Children 0-4 Years of Age and 5-11 Years of Age" | PSC002943 - PSC003012 | FEMA Obj: FRE 802 |
| --- | --- | --- | --- |
| P39 | Statement on National Vaccine Injury Compensation Program by Thomas E. Balbier, Jr., Director, National Vaccine Injury Compensation Program, U.S. Dept. of Health and Human Services, before the Committee on Government Reform, September 28, 1999 | PSC003013 - PSC003016 | FEMA Obj: FRE 802 |
| P40 | *Public Interest v. Bayou Steele*, 1999 WL 675203, July 8, 1999, CA# 96-0432, pleadings from the USDC EdLA (J. Lemmon), including the Consent Order and supporting documentation for the Asthma Intervention Program | PSC003017 - PSC003048 | FEMA Obj: FRE 802 |
| P41 | FEMA Model Travel Trailer Procurement Specifications Dated: July 14, 2005 | PSC003049 - PSC003057 | |
| P42 | Declaration of Kevin Souza | PSC003058 - PSC003065 | FEMA Obj: Completeness. Entire declaration should be offered not just selected pages. |

| P43 | Excerpt of Deposition Testimony of James Shea on behalf of Gulf Stream Coach | PSC003066 - PSC003067 | |
| P44 | BlueLinx Corporation Material Safety Data Sheet for Urea-Formaldehyde Bonded Wood Products | PSC003068 - PSC003078 | |
| P45 | Georgia-Pacific Material Safety Data Sheet for Urea-Formaldehyde Bonded Wood Products | PSC003079 - PSC003091 | |
| P46 | "FEMA Storage Site Duties/Responsibilities" | PSC003092 - PSC003094 | FEMA Obj: FRE 802, 901 |
| P47 | "FEMA Trailer User's Guide Version 5" -Copyrighted By CH2M Hill, Inc., 4/6/06 | PSC003095 - PSC003096 | |
| P48 | Letter from Joseph G. Glass, Esq. to Magistrate Roby, Gerald E. Meunier and Henry T. Miller with Manufactures' Market Shares, August 13, 2008 | PSC003097 - PSC003100 | |
| P49 | Pictures of THUs taken by Plaintiffs' Expert Marco Kaltofen, PE | PSC003101 - PSC003121 | FEMA Obj: FRE 802, 901 |
| P50 | Fleetwood Enterprises, Inc. Travel Trailers Owners Manual  excerpts | PSC003122 - PSC003134 | FEMA Obj: FRE 802, 901 |
| P51 | Gulf Stream Coach, Inc. Travel Trailers and Fifth Wheels Owner's Manual excerpts | PSC003135 - PSC003136 | FEMA Obj: FRE 802, 901 |
| P52 | Forest River Recreational Vehicle Owner's Manual – Travel Trailers & Fifth Wheels excerpts | PSC003137 - PSC003144 | FEMA Obj: FRE 802, 901 |
| P53 | Pilgrim and Open Road Recreational Vehicles Owners Manual excerpts | PSC003145 - PSC003146 | FEMA Obj: FRE 802, 901 |
| P54 | 24 C.F.R. § 3280.309, Health Notice on formaldehyde emissions | PSC003147 | |
| P55 | ATSDR Formaldehyde Regulations and Advisories | PSC003148 - PSC003157 | FEMA Obj: FRE 802, 901 |
| P56 | ATSDR Formaldehyde Minimal Risk Levels and Worksheets – Appendix A | PSC003158 - PSC003172 | FEMA Obj: FRE 802, 901 |

| P57 | U.S. Department of Housing and Urban Development Rules and Regulations regarding Formaldehyde, 49 FR 31996 | PSC003173 - PSC003186 | |
| P58 | Email from Manufacturing Defendants' Expert, Michael Zieman, July 9, 2004 | PSC003187 | FEMA Obj: FRE 802, 901 |
| P59 | Statement of Harvey E. Johnson, Jr., Acting Deputy Administrator and Chief Operating Officer for FEMA before the U.S. Senate Subcommittee on Disaster Recovery and Subcommittee on State, Local, and Private Sector Preparedness and Integration, March 4, 2008 | PSC003188 - PSC003198 | |
| P60 | Statement of R. David Paulison, FEMA  Administrator, before the U.S. House of Representatives Committee on Oversight and Government Reform, July 19, 2007 | PSC003199 - PSC003207 | |
| P61 | "Formaldehyde Exposure in Homes: A Reference for State Officials to Use in Decision-Making" published in March 2008 by the DHHS, CDC, DHS, FEMA and the EPA | PSC003208 - PSC003213 | |
| P62 | U.S. EPA "Indoor Air Quality" Basic Information for Formaldehyde – Last updated November 14, 2007 | PSC003214 - PSC003217 | |
| P63 | "Formaldehyde Levels in FEMA-Supplied Trailers - Early Findings from the Centers for Disease Control and Prevention" | PSC003218 - PSC003219 | FEMA Obj: 802 |
| P64 | THU Testing Protocol prepared by Mary DeVany et al. | PSC003220 - PSC003348 | FEMA Obj: FRE 802, 901 |
| P65 | Formaldehyde Testing Database prepared by the PSC | PSC003349 - PSC003393 | FEMA Obj: FRE 802, 901 |
| P66 | PSC Formaldehyde Testing Database Summary Graph | PSC003394 | FEMA Obj: FRE 802, 901 |
| P67 | April 25, 2008 letter from FEMA to a THU occupant | PSC003397 - PSC003399 | |

| P68 | Formaldehyde Test results from Bonner Analytical Testing Company prepared for CH2M Hill, Inc., April 6, 2006 | PSC003400 - PSC003406 | |
| P69 | Summary of Test Results conducted by Weston Solutions, Inc. for the U.S. EPA | PSC003407 - PSC003409 | |
| P70 | Air Toxics Ltd. Laboratory Narrative for samples submitted by Weston Solutions | PSC003410 - PSC003415 | |
| P71 | FEMA test results for formaldehyde testing at FEMA THU staging areas during November 2005, December 2005 and January 2006 | PSC003416 - PSC003420 | FEMA Obj: FRE 802, 901 |
| P72 | FEMA Memorandum from May 31, 2006 regarding Formaldehyde Air Sampling at the THU staging area in Purvis, Mississippi | PSC003421 - PSC003438 | |
| P73 | Email correspondence between FEMA and Government staff | PSC003439 - PSC003447 | FEMA Obj: FRE 802, 901 |
| P74 | Alphabetical List of Class Representatives with their THU move in and out dates prepared by the PSC | PSC003448 - PSC003450 | FEMA Obj: FRE 802, 901 |
| P75 | Spreadsheets of Symptoms: 1) Total Report of All Symptoms; 2) Report of Symptoms of Individuals With Neither Mold Nor Mildew Reported in Their THU and No Fumigation of Their THU; 3) Report of Symptoms of Individuals Who Did Not Smoke Inside Their THU and 4) Report of Symptoms of Individuals who Did Not Report Mold or Mildew, Did Not Smoke Inside, Did Not Have Their THU Fumigated and Did Not Have Service or Maintenance Repairs | PSC003451 - PSC003663 | FEMA Obj: 802, 901 |
| P76 | Plaintiff Fact Sheets (hereafter "PFS"), Form 95s and other documentation for the below listed Class Representatives: | PSC – no bates number | FEMA Obj: Errata Sheets for PFS: Completeness |

| P76-1 | Letecheia Acker o/b/o Dakyre Smith | PSC003664 - PSC003685 | FEMA Obj: Complete ness – Errata Sheets for PFS Omitted and/or Not Authentic ated/Sign ed by Claimant |
|---|---|---|---|
| P76-2 | John J. Adams | PSC003686 - PSC003706 | |
| P76-3 | Stephen A. Alfonso | PSC003707 - PSC003728 | |
| P76-4 | Courtney Alfred o/b/o Christopher Thomas | PSC003729 - PSC003750 | |
| P76-5 | Sandra Anderson | PSC003751 - PSC003780 | |
| P76-6 | Marcilio Ayala | PSC003781 - PSC003805 | |
| P76-7 | Shane Baker o/b/o Shane Lee Baker | PSC003806 – PSC003827 | |
| P76-8 | Edward Ballet, III and/or Toinette Walker o/b/o Derell Ballet | PSC003828 – PSC003849 | |
| P76-9 | Edward Ballet, III  and/or Toinette Walker o/b/o Edward Ballet IV | PSC003850 – PSC003870 | |
| P76-10 | Edward Ballet, III and/or Toinette Walker o/b/o Egypt Ballet | PSC003871 – PSC003892 | |
| P76-11 | Kendra Battie o/b/o D'Asia Battie | PSC003893 – PSC003911 | |
| P76-12 | Joycelyn Beasley o/b/o Heavenly A. Beasley | PSC003912 – PSC003936 | |
| P76-13 | Pamela Benoit o/b/o Christopher Benoit | PSC003937 – PSC003957 | |
| P76-14 | Thomas A. Bergens | PSC003958 – PSC003979 | |
| P76-15 | Marcie Beverly | PSC003980 – PSC004003 | |

| | | | |
|---|---|---|---|
| P76-16 | Portia Bradford | PSC004004 – PSC004027 | |
| P76-17 | Randy J. Bradford | PSC004028 – PSC004051 | |
| P76-18 | Juanita Bridges | PSC004052 – PSC004072 | |
| P76-19 | Rose L. Bright | PSC004073 – PSC004097 | |
| P76-20 | Trina Brown | PSC004098 – PSC004121 | |
| P76-21 | Jerome A. Culler | PSC004122 – PSC004145 | |
| P76-22 | Jerome A. Culler o/b/o Joan R. Culler (deceased) | PSC004146 – PSC004170 | |
| P76-23 | Brian Darby, Sr. o/b/o Brian Darby, Jr. | PSC00 4171– PSC004196 | |
| P76-24 | Peter Daunoy, III | PSC004197 – PSC004217 | |
| P76-25 | Corey Davis | PSC004218 – PSC004241 | |
| P76-26 | Dione Davis o/b/o Trinity Guesnon | PSC004242 – PSC004266 | |
| P76-27 | Linda Davis | PSC004267 – PSC004294 | |
| P76-28 | Jaqueline Dedeaux | PSC00 4295– PSC004315 | |
| P76-29 | Donovan Delone | PSC004316 – PSC004336 | |
| P76-30 | Barbara A. Dillon | PSC004337 – PSC004360 | |

| P76-31 | Barry P. Dominguez | PSC004361 – PSC004385 | |
| P76-32 | Elisha Dubuclet o/b/o Timia Dubuclet | PSC004386 – PSC004407 | |
| P76-33 | Nicole Esposito | PSC004408 – PSC004432 | |
| P76-34 | Percy Evans | PSC004433 – PSC004457 | |
| P76-35 | Ella Flowers | PSC004458 – PSC004479 | |
| P76-36 | Lillian A. Foley | PSC004480 – PSC004500 | |
| P76-37 | Lillian A. Foley o/b/o Samuel Foley | PSC004501 – PSC004521 | |
| P76-38 | Shontay Fontenot o/b/o Hailey Fontenot | PSC004522 – PSC004542 | |
| P76-39 | Shontay Fontenot o/b/o Jonathan Fontenot, Jr. | PSC004543 – PSC004563 | |
| P76-40 | Shontay Fontenot o/b/o Justin Fontenot | PSC004564 – PSC004584 | |
| P76-41 | Simone Frank | PSC004585 – PSC004605 | |
| P76-42 | Renay Marie Gardner | PSC004606 – PSC004627 | |
| P76-43 | Shelia Gordon | PSC004628– PSC004650 | |
| P76-44 | Trichonda Green | PSC004651 – PSC004674 | |
| P76-45 | Rommel E. Griffin | PSC004675 – PSC004695 | |

| P76-46 | Crystal W. Gumm | PSC004696 – PSC004719 | |
| P76-47 | Damian J. Hargrove o/b/o Damian J. Hargrove, Jr. | PSC004720– PSC004741 | |
| P76-48 | Leroy Hargrove, Jr. | PSC004742 – PSC004763 | |
| P76-49 | Mary Harris | PSC004764 – PSC004784 | |
| P76-50 | Hazel K. Heechung | PSC004785 – PSC004807 | |
| P76-51 | Douglas Hill, III | PSC004808 – PSC004828 | |
| P76-52 | Thelma H. Howard | PSC004829 – PSC004853 | |
| P76-53 | Joseph C. Jack, Jr. | PSC004854 – PSC004876 | |
| P76-54 | Constance Jordan o/b/o Brunica Jordan | PSC004877 – PSC004904 | |
| P76-55 | Sylvia J. Keyes | PSC004905 – PSC004925 | |
| P76-56 | Carrie LeBeau | PSC004926 – PSC004949 | |
| P76-57 | Lakeesha N. Lightell o/b/o Donovan Lightell | PSC004950– PSC004970 | |
| P76-58 | Lakeesha  N. Lightell o/b/o Jazlyn N. Lightell | PSC004971– PSC004992 | |
| P76-59 | Latonya London o/b/o Darrell Madison | PSC004993 – PSC005016 | |
| P76-60 | Latonya London o/b/o Darren Madison | PSC005017 – PSC005041 | |

| P76-61 | Latonya London o/b/o Derrell Madison | PSC005042 – PSC005066 | |
| P76-62 | Latonya London o/b/o Edbony London | PSC005067 – PSC005091 | |
| P76-63 | Keena Magee o/b/o Kierra Wilson | PSC005092 – PSC005117 | |
| P76-64 | Linda Maldonado-West | PSC005118 – PSC005149 | |
| P76-65 | Adrina N. McCray | PSC005150 – PSC005170 | |
| P76-66 | Adrina N. McCray o/b/o Kody Wood | PSC005171 – PSC005195 | |
| P76-67 | Amaris McGallion | PSC005196 – PSC005219 | |
| P76-68 | Brittney Miller | PSC005220 – PSC005237 PSC006027 – PSC006032 | |
| P76-69 | Natley Mitchell | PSC005238 – PSC005268 | |
| P76-70 | Glenda Moreland | PSC005269 – PSC005290 | |
| P76-71 | Centra Myers | PSC005291 – PSC005318 | |
| P76-72 | Maria Parker o/b/o Tyler Ardoin | PSC005319 – PSC005343 | |
| P76-73 | George Posey | PSC005344 – PSC005365 | |
| P76-74 | Stephanie G. Pujol | PSC005366 – PSC005387 | |
| P76-75 | Craig Ray, Sr. | PSC005388 – PSC005411 | |

| | | |
|---|---|---|
| P76-76 | Penny M. Robertson | PSC005412 – PSC005435 |
| P76-77 | Penny M Robertson o/b/o Mercedes Robertson | PSC005436 – PSC005459 |
| P76-78 | Rayfield Robinson, Jr. | PSC005460 – PSC005480 |
| P76-79 | David Semien, Jr | PSC005481 – PSC005503 |
| P76-80 | David W. Semien, Sr. | PSC005504 – PSC005527 |
| P76-81 | Sandra Semien o/b/o Danielle Semien | PSC005528 – PSC005573 |
| P76-82 | Shirley A. Sinclair | PSC005574 – PSC005594 |
| P76-83 | Shelia Smith o/b/o Michael C. Tracy | PSC005595 – PSC005625 |
| P76-84 | Margarita Solis-Ayala | PSC005626 – PSC005650 |
| P76-85 | Cherish Stephens | PSC005651 – PSC005674 |
| P76-86 | Libby L. Sylve | PSC005675 – PSC005696 |
| P76-87 | Libby Sylve o/b/o Hailey N. Sylve | PSC005697 – PSC005718 |
| P76-88 | Betty Thomas | PSC005719 – PSC005739 |
| P76-89 | Sherry Trollinger o/b/o Michael Davis | PSC005740 – PSC005786 |
| P76-90 | Kendra S. Vason o/b/o Tyrone Battle | PSC005787 – PSC005810 |

| | | | |
|---|---|---|---|
| P76-91 | Betty White and/or Neatoya Bush o/b/o Erin McConnell | PSC005811 – PSC005854 | |
| P76-92 | Johnny White | PSC005855 – PSC005878 | |
| P76-93 | Enna Williams | PSC005879 – PSC005899 | |
| P76-94 | Faye Williams | PSC005900 – PSC005917 | |
| P76-95 | Joanette Williams o/b/o George L. Williams | PSC005918 – PSC005935 | |
| P76-96 | Alvin Williby, Sr. o/b/o Sandra Williby (deceased) | PSC005936 – PSC005960 | |
| P77 | Deposition Transcript of Dr. Kenneth Paris | PSC005961 – PSC006026 | FEMA Obj: FRE 802 |
| P78 | *"Legacy of Shame: The On-Going Public Health Disaster of Children Struggling in Post-Katrina Louisiana."* Children's Health Fund & Columbia Univ. Mailman School of Public Health, Nov. 4, 2008 | PSC006033 – PSC006052 | FEMA Obj: FRE 802 Exhibit Admitted by Court |
| P79 | *"Children from FEMA trailer park battle serious health problems"* USA Today 11/24/08 | PSC006053 – PSC006054 | FEMA Obj: FRE 802 Exhibit denied by Court |
| P80 | Wantke, F, *"Exposure to gaseous formaldehyde induces IgE-mediated sensitization to formaldehyde in school-children"* Clinical and Experimental Allergy, 1996, Vol. 26, pages 276-280 | PSC006055 – PSC006059 | |
| P81 | Krzyzanowski, Michal, *"Chronic Respiratory Effects of Indoor Formaldehyde Exposure"* Environmental Research 52, 117-125 (1990) | PSC006060 – PSC006068 | |
| P82 – P83 | Intentionally left blank | | |

| Government's Exhibit G84 | ATSDR, Toxicological Profile for Formaldehyde (July 1999) | ATSDR-00001-0000468 | |
|---|---|---|---|
| G85 | ATSDR, Minimum Risk Levels (MRL) For Hazardous Substances | ATSDR_MRL-00001-000010 | |
| G86 | HUD, Manufactured Home Construction and Safety Standards – Final Rule (August 9, 1984) 24 CFR Part 3280, 49 FR 31996-01, 1984 WL 106759 (F.R) | HUD-000001-000048 | |
| G87 | CDC/FEMA, Formaldehyde Exposure in Homes: A Reference for State Officials to Use in Decision-Making (March 2008) | CDC-000269-000274 | |
| G88 | CDC, Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes (July 2, 2008) | CDC-000208-000268 | |
| G89 | EPA, An Introduction to Indoor Air Quality (October 9, 2008) | EPA-000001-000004 | |
| G90 | U.S. Consumer Product Safety Commission, An Update On Formaldehyde (1997 Revision) | CPSC-000001-000012 | |
| G91 | FEMA, Important Information For Travel Trailer Occupants (Summer 2006) | FEMA08-000013-000014 | |
| G92 | Fleetwood, Pioneer 2006 Owners Manual | FLEET30b6-000001-000103 | |
| G93 | Affidavit of Marco Kaltofen | PL-000214-233 | |
| G94 | Pujol Individual assistance file excerpts | FEMA86-000001; -000114-000135; -000168-000171; -000197-000249 | |
| G95 | Pujol administrative claims | FEMA-00023-00039 | |
| G96 | Stephanie Pujol deposition transcript excerpts | 1-8; 65-88 | |
| G97 | Thomas individual assistance file excerpts | FEMA-00161; -00195-00196; -00224-00237 | |
| G98 | Thomas administrative claims | FEMA-00042-00057 | |

| G99 | Huckabee individual assistance file excerpts | FEMA114-000001; -000026-000027; -000050-000079 | |
| G100 | Huckabee administrative claims | FEMA-000931-000937 | |
| G101 | FEMA press release (No. HQ-08-002b) | FEMA10-000209-000211 | |
| G102 | Letter to Hon. Karen Wells Roby from Joseph Glass | DLC-000001 to DLC-00004 | |
| G103 | Fleetwood's Responses to Plaintiffs' First Interrogatories, Response No. 16 | 1; 12-14; 16-17 | |
| G104 | Statement of Jim Shea, Chairman, Gulf Stream Coach Inc., Before the House Committee on Oversight and Government Reform (July 9, 2008) | GS-000002 to GS-000016 | |
| G105 | Marco Kaltofen deposition transcript excerpts | 1-8; 89-96 | |
| G106 | Paul Hewett expert report | 1-21; 1-6 | |
| G107 | Paul Hewett deposition transcript excerpts | 1-8; 149-156 | |
| G108 | Harry Milman deposition transcript excerpts | 1-8; 73-76; 177-180; 189-192 | |
| G109 | Leroy Hargrove deposition transcript excerpts | 1-7; 27-28 | |
| G110 | Eric Smith deposition transcript excerpts | 1-8; 113-116 | |
| G111 | Stephen Alfonso deposition transcript excerpts | 1-7; 113-116 | |
| G112 | Sylvia Keyes deposition transcript excerpts | 1-8; 65-68 | |
| G113 | Corey Davis deposition transcript excerpts | 1-8; 149-156 | |
| G114 | Damian Hargrove deposition transcript excerpts | 1-8; 121-124 | |
| G115 | Douglas Hill individual assistance file excerpts | FEMA76-000001; -000073-000079 | |
| G116 | Rayfield Robertson individual assistance file excerpts | FEMA29-000001; -000110-000115 | |
| G117 | Juanita Bridges deposition transcript excerpts | 1-8; 129-136 | |
| G118 – G123 | Intentionally left blank | | |

| | | | |
|---|---|---|---|
| **Manufacturer Defendants' Exhibits** <br><br> D-124 | Plaintiff Profile and Deposition Excerpts of Letecheia Acker o/b/o Dakyre Smith | D-CLASS-124 0001-0004 | |
| D-125 | Plaintiff Profile and Deposition Excerpts of John I. Adams | D-CLASS-125 0001 | |
| D-126 | Plaintiff Profile and Deposition Excerpts of Stephen A. Alfonso | D-CLASS-126 0001-0020 | |
| D-127 | Cured Plaintiff Fact Sheet of Courtney Alfred o/b/o Christopher Thomas | D-CLASS-127 0001-0025 | |
| D-128 | Plaintiff Fact Sheet of Frank Alfred | D-CLASS-128 0001-0025 | |
| D-129 | Plaintiff Profile and Deposition Excerpts of Sandra Anderson | D-CLASS-129 0001-0004 | |
| D-130 | Plaintiff Profile and FEMA Disaster File Excerpts of Marcelio Ayala | D-CLASS-130 0001-0006 | |
| D-131 | Plaintiff Profile and Deposition Excerpts of Shane Bake, o/b/o Shane Baker | D-CLASS-131 0001-0005 | |
| D-132 | Plaintiff Profile and Deposition Excerpts of Toinette Walker o/b/o Edward Ballet | D-CLASS-132 0001-0008 | |
| D-133 | Plaintiff Profile and Deposition Excerpts of Toinette Walker o/b/o Derell Ballet | D-CLASS-133 0001-0008 | |
| D-134 | Plaintiff Profile and Deposition Excerpts of Toinette Walker o/b/o Egypt Ballet | D-CLASS-134 0001-0008 | |
| D-135 | Plaintiff Profile and Deposition Excerpts of Kendra Battie o/b/o D'Asia Battie | D-CLASS-135 0001-0021 | |
| D-136 | Plaintiff Profile and Deposition Excerpts of Jocelyn Beasley o/b/o Heavenly A. Beasley | D-CLASS-136 0001-0018 | |
| D-137 | Plaintiff Profile and Deposition Excerpts of Pamela Benoit o/b/o Christopher Benoit | D-CLASS-137 0001-0026 | |
| D-138 | Plaintiff Profile and Notice of Deposition Cancellation of Thomas A. Bergens | D-CLASS-138 0001-0008 | |
| D-139 | Plaintiff Profile and Deposition Excerpts of Marcia Beverly | D-CLASS-139 0001-0015 | |

| | | | |
|---|---|---|---|
| D-140 | Plaintiff Profile and Deposition Excerpts of  Portia Bradford | D-CLASS-140 0001-0012 | |
| D-141 | Plaintiff Profile and Deposition Excerpts of Randy J. Bradford | D-CLASS-141 0001-0016 | |
| D-142 | Plaintiff Profile and Deposition Excerpts of Juanita X. Bridges | D-CLASS-142 0001-0005 | |
| D-143 | Plaintiff Profile and Deposition Excerpts of  Rose L. Bright | D-CLASS-143 0001-0006 | |
| D-144 | Plaintiff Profile of  Trina Brown | D-CLASS-144 0001 | |
| D-145 | Plaintiff Profile and Deposition Excerpts of  Jerome A. Culler | D-CLASS-145 0001-0015 | |
| D-146 | Plaintiff Profile and Deposition Excerpts of Jerome A. Culler o/b/o Joan R. Culler (deceased) | D-CLASS-146 0001-0015 | |
| D-147 | Plaintiff Profile and Deposition Excerpts of  Brian Darby Sr. o/b/o Brian Darby, Jr. | D-CLASS-147 0001-0005 | |
| D-148 | Plaintiff Profile, FEMA Disaster File Excerpts and Skyline Invoice of Peter Daunoy, III | D-CLASS-148 0001-0008 | |
| D-149 | Plaintiff Profile and Deposition Excerpts of  Corey Davis | D-CLASS-149 0001-0011 | |
| D-150 | Plaintiff Profile and Deposition Excerpts of Dione Davis o/b/o Trinity Guesnon | D-CLASS-150 0001-0015 | |
| D-151 | Plaintiff Profile and Deposition Excerpts of Linda Davis | D-CLASS-151 0001-0032 | |
| D-152 | Plaintiff Profile and Deposition Excerpts of Jaqueline Dedeaux | D-CLASS-152 0001-0027 | |
| D-153 | Plaintiff Profile and Deposition Excerpts of Donovan Delone | D-CLASS-153 0001 | |
| D-154 | Plaintiff Profile, Deposition Excerpts and FEMA Disaster File Excerpts of Barbara A. Dillon | D-CLASS-154 0001-0018 | |
| D-155 | Plaintiff Profile and Deposition Excerpts of Barry P. Dominguez | D-CLASS-155 0001-0007 | |
| D-156 | Plaintiff Profile and Deposition Excerpts of Elisha Dubluclet o/b/o Timia Dubuclet | D-CLASS-156 0001-0011 | |
| D-157 | Plaintiff Profile and Deposition Excerpts of  Esposito, Nicole | D-CLASS-157 0001-0026 | |
| D-158 | Plaintiff Profile and Deposition Excerpts of  Percy Evans | D-CLASS-158 0001-0029 | |
| D-159 | Plaintiff Profile and Deposition Excerpts of Ella Flowers | D-CLASS-159 0001-0063 | |

| D-160 | Plaintiff Profile of Lillian A. Foley | D-CLASS-160 0001 | |
| D-161 | Plaintiff Profile of Lillian A. Foley o/b/o Samuel Foley | D-CLASS-161 0001 | |
| D-162 | Plaintiff Profile of Shontay Fontenot o/b/o Hailey Fontenot | D-CLASS-162 0001-0002 | |
| D-163 | Plaintiff Profile of Shontay Fontenot o/b/o Jonathon Fontenot, Jr. | D-CLASS-163 0001-0002 | |
| D-164 | Plaintiff Profile of Shontay Fontenot o/b/o Justin Fontenot | D-CLASS-164 0001-0002 | |
| D-165 | Plaintiff Profile of Simone Frank | D-CLASS-165 0001 | |
| D-166 | Plaintiff Profile and Deposition Excerpts of Renay M. Gardner | D-CLASS-166 0001-0006 | |
| D-167 | Plaintiff Profile and Deposition Excerpts of Sheila Gordon | D-CLASS-167 0001-0019 | |
| D-168 | Plaintiff Profile and Deposition Excerpts of  Trichonda Green | D-CLASS-168 0001-0012 | |
| D-169 | Plaintiff Profile and Skyline Invoice of  Rommel E. Griffin | D-CLASS-169 0001-0002 | |
| D-170 | Plaintiff Profile of Crystal L. Gumm | D-CLASS-170 0001 | |
| D-171 | Plaintiff Profile and Deposition Excerpts of Damian J. Hargrove o/b/o Damian J. Hargrove, Jr. | D-CLASS-171 0001-0016 | |
| D-172 | Plaintiff Profile and Deposition Excerpts of Leroy L. Hargrove | D-CLASS-172 0001-0010 | |
| D-173 | Plaintiff Profile and Deposition Excerpts of  Mary Harris | D-CLASS-173 0001-0013 | |
| D-174 | Plaintiff Profile and Deposition Excerpts of  Hazel Heechung | D-CLASS-174 0001-0021 | |
| D-175 | Plaintiff Profile, Deposition Excerpts and FEMA Disaster File Excerpts of Douglas  Hill, III | D-CLASS-175 0001-0019 | |
| D-176 | Plaintiff Profile of Thelma H. Howard | D-CLASS-176 0001 | |
| D-177 | Plaintiff Profile of Joseph Jack, Jr. | D-CLASS-177 0001 | |
| D-178 | Plaintiff Profile and Deposition Excerpts of Constance Jordan o/b/o Bronica Jordan | D-CLASS-178 0001-0004 | |
| D-179 | Plaintiff Profile and Deposition Excerpts of Sylvia J. Keyes | D-CLASS-179 0001-0004 | |
| D-180 | Plaintiff Profile and Deposition Excerpts of Carrie LeBeau | D-CLASS-180 0001-0005 | |

| D-181 | Plaintiff Profile of Lakesha Lightell o/b/o Donovan Lightell | D-CLASS-181 0001 | |
| D-182 | Plaintiff Profile and Deposition Excerpts of Lakesha Lightell o/b/o Jazlyn N. Lightell | D-CLASS-182 0001 | |
| D-183 | Plaintiff Profile of LaTonya London o/b/o Edbony London | D-CLASS-183 0001-0025 | |
| D-184 | Plaintiff Profile of LaTonya London o/b/o Darrell Madison | D-CLASS-184 0001-0025 | |
| D-185 | Plaintiff Profile of LaTonya London o/b/o Darren Madison | D-CLASS-185 0001-0025 | |
| D-186 | Plaintiff Profile of LaTonya London o/b/o Derrell Madison | D-CLASS-186 0001-0025 | |
| D-187 | Plaintiff Profile of Keena Magee o/b/o Kierra Wilson | D-CLASS-187 0001-0021 | |
| D-188 | Plaintiff Profile of  Linda West-Maldonado | D-CLASS-188 0001-0027 | |
| D-189 | Plaintiff Profile of Adrina N. McCray. | D-CLASS-189 0001-0007 | |
| D-190 | Plaintiff Profile of Adrina N. McCray o/b/o Kody Wood | D-CLASS-190 0001 | |
| D-191 | Plaintiff Profile and Deposition Excerpts of Amaris McGallion | D-CLASS-191 0001 | |
| D-192 | Plaintiff Profile, Deposition Excerpts and FEMA Disaster File Excerpts of Brittney Miller | D-CLASS-192 0001-0012 | |
| D-193 | Plaintiff Profile of Natley Mitchell | D-CLASS-193 0001 | |
| D-194 | Plaintiff Profile o Glenda Moreland | D-CLASS-194 0001 | |
| D-195 | Plaintiff Profile of Centra Myers | D-CLASS-195 0001 | |
| D-196 | Plaintiff Profile of Maria Parker o/b/o Tyler Ardoin | D-CLASS-196 0001-0003 | |
| D-197 | Plaintiff Profile and Deposition Excerpts of George Posey | D-CLASS-197 0001-0021 | |
| D-198 | Plaintiff Profile and Deposition Excerpts of Stephanie G. Pujol | D-CLASS-198 0001-0008 | |
| D-199 | Plaintiff Profile and Deposition Excerpts of  Craig Ray Sr. | D-CLASS-199 0001 | |
| D-200 | Plaintiff Profile of Penny M. Robertson o/b/o Mercedez Robertson | D-CLASS-200 0001 | |
| D-201 | Plaintiff Profile of  Penny M. Robertson | D-CLASS-201 0001 | |

| D-202 | Plaintiff Profile and Deposition Excerpts of Rayfield Robinson, Jr. | D-CLASS-202 0001-0015 | |
| D-203 | Plaintiff Profile of Sandra Semien o/b/o Semien, Danielle | D-CLASS-203 0001 | |
| D-204 | Plaintiff Profile of David Semien, Jr. | D-CLASS-204 0001 | |
| D-205 | Plaintiff Profile of David W. Semien, Sr. | D-CLASS-205 0001 | |
| D-206 | Plaintiff Profile and FEMA Disaster File Excerpts of Shirley A. Sinclair | D-CLASS-206 0001-0009 | |
| D-207 | Plaintiff Profile and Deposition Excerpts of Sheila Smith o/b/o Michael C. Tracy | D-CLASS-207 0001-0045 | |
| D-208 | Plaintiff Profile of Margarita Solis | D-CLASS-208 0001 | |
| D-209 | Plaintiff Profile of Cherish Stephens | D-CLASS-209 0001-0007 | |
| D-210 | Plaintiff Profile of Libby Sylve o/b/o Hailey N. Sylve | D-CLASS-210 0001 | |
| D-211 | Plaintiff Profile of Libby Sylve | D-CLASS-211 0001 | |
| D-212 | Plaintiff Profile and Deposition Excerpts of Betty Thomas | D-CLASS-212 0001 | |
| D-213 | Plaintiff Profile of Sherry Trollinger, mother with power of attorney, o/b/o Michael Davis | D-CLASS-213 0001-0007 | |
| D-214 | Plaintiff Profile and FEMA Disaster File Excerpts of Kendra S. Vason o/b/o Tyrone Battle | D-CLASS-214 0001-0010 | |
| D-215 | Plaintiff Profile of Betty White, o/b/o Erin McConnel | D-CLASS-215 0001 | |
| D-216 | Plaintiff Profile of Johnny White | D-CLASS-216 0001 | |
| D-217 | Plaintiff Profile of Emma Williams | D-CLASS-217 0001 | |
| D-218 | Plaintiff Profile of Faye Williams | D-CLASS-218 0001 | |
| D-219 | Plaintiff Profile of Joanette Williams o/b/o George L. Williams | D-CLASS-219 0001 | |
| D-220 | Plaintiff Profile and Deposition Excerpts of Alvin Williby, Sr. o/b/o Sandra Williby, (deceased) | D-CLASS-220 0001-0010 | |
| D-221 | Dr. Philip Cole Affidavit | D-CLASS-221 0001-0033 | |
| D-222 | Dr. Brooks Emory Affidavit | D-CLASS-222 0001-0010 | |

| D-223 | Thomas Fribley Affidavit | D-CLASS-223 0001-0015 | |
| D-224 | Dr. Michael Ginevan Affidavit | D-CLASS-224 0001-0027 | |
| D-225 | Dr. Michael Ginevan Deposition Excerpts | D-CLASS-225 0001-0009 | |
| D-226 | Dr. Robert Golden Affidavit | D-CLASS-226 0001-0051 | |
| D-227 | Dr. William Waddell Affidavit | D-CLASS-227 0001-0030 | |
| D-228 | Dr. James Wedner Affidavit | D-CLASS-228 0001-0027 | |
| D-229 | Michael Zieman Affidavit | D-CLASS-229 0001-0020 | |
| D-230 | Mary DeVany Deposition Excerpts | D-CLASS-230 0001-0006 | |
| D-231 | Dr. Paul Hewett Affidavit Excerpts | D-CLASS-231 0001-0011 | |
| D-232 | Dr. Paul Hewett Deposition Excerpts | D-CLASS-232 0001-0013 | |
| D-233 | Marco Kaltofen Deposition Excerpts | D-CLASS-233 0001-0006 | |
| D-234 | Dr. Gerald McGwin Deposition Excerpts | D-CLASS-234 0001-0006 | |
| D-235 | Stephen Mullet Deposition Excerpts | D-CLASS-235 0001-0022 | |
| D-236 | Dr. Kenneth Paris Deposition Excerpts | D-CLASS-236 0001-0019 | |
| D-237 | Dr. Judd Shellito Deposition Excerpts | D-CLASS-237 0001-0017 | |
| D-238 | Dr. Stephen Smulski Deposition Excerpts | D-CLASS-238 0001-0034 | |
| D-239 | Dr. William Stein Affidavit Excerpts | D-CLASS-239 0001-0004 | |
| D-240 | Dr. William Stein Deposition Excerpts | D-CLASS-240 0001-0041 | |
| D-241 | Dr. Patricia Williams Affidavit Excerpts | D-CLASS-241 0001-0004 | |
| D-242 | Dr. Patricia Williams Deposition Excerpts | D-CLASS-242 0001-0091 | |
| D-243 | Edling C.  Hellquist H., Odkvist L. *Occupational Exposure to Formaldehyde and Histopathological Changes in the Nasal Mucosa,* Br J Ind Med 1988; 45: 761 – 765 | D-CLASS-243 0001-0012 | |

| D-244 | Boysen M. Zadig B. Digernes V, Abeler V, Reith A. *Nasal mucosa in workers exposed to formaldehyde: a pilot study.* Br J Ind Med 1990; 47:116 – 121 | D-CLASS-244 0001-0009 | |
|---|---|---|---|
| D-245 | Holmstrom M, Wilhelmsson B, Hellquist J. *Histological Changes in the Nasal Mucosa in Rats after Long-Term Exposure to Formaldehyde and Wood Dust.* Acta Otolaryngol (Stockh) 1989; 108:274-283 | D-CLASS-245 0001-0016 | |
| D-246 | Holmstrom M, Wilhelmsson B, Hellquist H., Rosen G. *Histological Changes in the Nasal Mucosa in Persons Occupationally Exposed to Formaldehyde Alone and in Combination with Wood Dust.* Acta Otolaruyngol (Stockh) 1989; 107;120-129 | D-CLASS-246 0001-0012 | |
| D-247 | International Programme on Chemical Safety, Environmental Health Criteria (EHC 89, 1989), "Formaldehyde" pgs. 1 – 171 | D-CLASS-247 0001-0223 | |
| D-248 | *Lymphatic and Hematopoietic Tissue Cancer in a Chemical Manufacturing Environment*, M. Gerald Ott, Ph.D., et al, American Journal of Industrial Medicine 16:631-643 (1989) | D-CLASS-248 0001-0013 | |
| D-249 | *Cancer Mortality and Wood Dust Exposure Among Participants in the American Cancer Society Cancer Prevention Study-II (CPS-II)*, Steven D. Stellman, Ph.D., MPH, et al, American Journal of Industrial Medicine 34:229-237 (1989 | D-CLASS-249 0001-0009 | |
| D-250 | *Mortality from Solid Cancers among Workers in Formaldehyde Industries*, Michael Hauptmann, et al, American Journal of Epidemiology 159:1117-1130 (2004) | D-CLASS-250 0001-0014 | |

| D-251 | *Mortality From Lymphohematopoietic Malignancies Among Workers in Formaldehyde Industries*, Michael Hauptmann, et al, Journal of National Cancer Institute Vol. 95, No. 21 (11/5/03) | D-CLASS-251 0001-0009 | |
| D-252 | Final Report on Formaldehyde Levels in FEMA Supplied Trailers, Park Models & Mobile Homes, July, 2008 ("CDC Final Report") | D-CLASS-252 0001-0061 | |
| D-253 | Lang, et al, Formaldehyde and *Chemosensory Irritation in Humans: A Controlled Human Exposure Study,* 50(1) Reg. Toxicol. Pharmacol. 23, 23 – 36 (2008) | D-CLASS-253 0001-0014 | |
| D-254 | FEMA Trailer Study Data Set for Individual Units ("CDC Data Set") | D-CLASS-254 0001-0016 | |
| D-255 | CDC Health Consultation, February, 2007 | D-CLASS-255 0001-0014 | |
| D-256 | McGregor, D., et al., *Formaldehyde and Glutaraldehyde and Nasal Sinotoxicity: Case Study Within the Context of the 2006 IPCS Human Framework for the Analysis of Cancer Model of Action for Humans.* Crit. Rev. Toxicol. 36 (10): 821-35 | D-CLASS-256 0001-0015 | |
| D-257 | Marsh, G., et al., *Mis-specified and No-Robust Mortality Risk Models for Nasophayngeal Cancer in the National Cancer Institute Formaldehyde Worker Cohort Study,* Reg. Toxicol. Pharmacol. 47:59-67, 2007 | D-CLASS-257 0001-0009 | |
| D-258 | Devany EHU test result dataset | D-CLASS-258 0001-0006 | |
| D-259 | D'Amico EHU test result dataset | D-CLASS-259 0001-0002 | |
| D-260 | Non-formaldehyde Related Symptoms per Dr. Golden Analysis. | D-CLASS-260 0001 | |
| D-261 | Fleetwood Travel Trailer Mirror Warning Label | D-CLASS-261 0001 | |
| D-262 | Fleetwood Travel Trailer Manual Warning | D-CLASS-262 0001-0002 | |
| D-263 | HUD Important Health Notice | D-CLASS-263 0001 | |

| D-264 | 30(b)(6) Deposition of Fleetwood Enterprises, Inc. by William Farish taken July 16, 2008, pp. 109: 16-24-110: 1-8 | D-CLASS-264 0001-0190 | |
| D-265 | Forest River Travel Trailer Manual Warning | D-CLASS-265 0001-0002 | |
| D-266 | 30(b)(6) Deposition of Forest River by Doug Gaeddert taken August 6, 2008, pp. 103-106 | D-CLASS-266 0001-0005 | |
| D-267 | Plaintiffs' Position Paper on Elements of Class Certification dated May 15, 2008 | D-CLASS-267 0001-0006 | |
| D-268 | 30(b)(6) Deposition of Gulf Stream Coach, Inc. by Philip Sarvari taken July 24, 2008, pp. 28, 30-31, 47-48 and James Shea taken July 24, 2008, pp. 26-27, 29-30, 46-47 | D-CLASS-268 0001-0023 | |
| D-269 | Gulf Stream Coach, Inc. Travel Trailer Chart (Gulf Doc 0003121-3122) | D-CLASS-269 0001-0002 | |
| D-270 | Affidavit of Thomas P. Holland, Jr., Vice President and Chief Financial Officer of ScotBilt Homes, Inc. | D-CLASS-270 0001-0002 | |
| D-271 | ScotBilt's Objections and Responses to Plaintiffs' First Master Set of Discovery (Interrogatories and Requests for Production of Documents) to All Non-Governmental Defendants | D-CLASS-271 0001-0038 | |
| D-272 | Subcontract between Alliance Homes, Inc. and ScotBilt Homes, Inc. | D-CLASS-272 0001-0003 | |
| D-273 | Home Owner's Manual of ScotBilt Homes, Inc. | D-CLASS-273 0001-0033 | |
| D-274 | Excerpts of Cavalier Home Builders, L.L.C. Class Certification Discovery Responses | D-CLASS-274 0001-0008 | |
| D-275 | Excerpts of Redman Homes, Inc., Class Certification Discovery Reponses | D-CLASS-275 0001-0008 | |
| D-276 | Excerpts of Liberty Homes, Inc. and Waverlee Homes, Inc. Class Certification Discovery Responses | D-CLASS-276 0001-0008 | |

| D-277 | Chart Requested by and submitted to Magistrate Judge Karen Roby regarding Number of EHUs Supplied by Defendants and Used by FEMA | D-CLASS-277 0001-0004 | |
| D-278 | Communications and Supporting Documents regarding the Absence of Class Representatives for Cavalier Home Builders, L.L.C. | D-CLASS-278 0001-0039 | |
| D-279 | Excerpts of River Birch Homes, Inc., Class Certification Discovery Responses. | D-CLASS-279 0001-0008 | |
| D-280 | Deposition Excerpts of Ella Flowers | D-CLASS-280- 0001-0048 | |

## 11.   DEPOSITIONS TO BE INTRODUCED AT TRIAL

### A. List of all Deposition Testimony to be Offered at Certification Hearing

**PLAINTIFFS:**

1.   Plaintiffs will introduce the deposition of Manufacturing Defendants' expert, Michael Ginevan, at the hearing.

2.   Plaintiffs will introduce the entire deposition transcript of Dr. Kenneth Paris.

**MANUFACTURING DEFENDANTS:**

1.   Deposition of Jocelyn Beasley, at 29:9-19, 30:20-25, 31:1-16, 37:14-25, 38:1-10, 58:21-25, 59:1-19.

2.   Deposition of Sylvia Keyes, at 10:16-20, 13:10-12, 25:6-27, 30:23 – 31:21, 31:1-21, 43:20-25, 53:24; 54:9-16, 70:21 – 71:4.

3.   Deposition of Sheila Smith, at 18:19 – 21:9, 64:6 – 67:17, 67:25 – 68:12.

4.   Deposition of Mary Harris, at 90:20-25.

5.      Deposition of Kendra Battie, at 43:19-25, 44:1-6, 45:18-25, 46:1-13.

6.      Deposition of Pamela Benoit o/b/o Christopher Benoit, at 8:13-21, 20:9-11, 32:6-11, 38:5-40:7, 41:9-42:10, 44:25-45:16, 46:13-20, 49:9-12, 50:4-15, 51:17-52:7, 53:7-55:23, 57:16-59:6, 60:21-25, and 62:7-20.

7.      Deposition of Marcie Beverly, at 75:3-4, 77:14-23, 94:11-19.

8.      Deposition of Hazel Heechung, at 97:23 – 98:11.

9.      Deposition of Dione Davis, at 49:2-6.

10.    Deposition of Steven Alfonso, at 79:20-25; 83:24-84:10.

11.    Deposition of Portia Bradford, at 71:15-17, 78:19-24.

12.    Deposition of Randy Bradford, at 44:19-23.

13.    Deposition of George Posey, at 45:23-46:6.

14.    Deposition of Rayfield Robinson, at 74:6-10, 84:15-18.

15.    Deposition of Leroy Hargrove, at 133:13-15.

16.    Deposition of Michael Ginevan, at 49:19 – 50:2, 77:4 – 16, 119:21-22, 120:1-11.

17.    Deposition of Gerald McGwin, at 163:2-21.

18.    Deposition of Marco Kaltofen, at 67:11-23.

19.    Deposition of Mary DeVany, at 129:18-25, 130:1-2.

20.    Deposition of Kenneth Paris, at 31:18-24, 32:1-5, 38:3-10, 38:14-24, 73:23 – 74:5, 82:14 – 83:6, 97:13-24, 97:25 – 98:5, 98:23 – 99:2, 99:10-16, 120:3-7.

21.    Deposition of Judd E. Shellito, at 20:7-13, 25:13-22, 33:5-11, 39:19-

25, 40:8-16, 44:15-25, 53:5-16, 100:7 -11, 17-22, 102:8-15, 158:2-25, 159:1-25, 166: 12-18.

22.  Deposition of Paul Hewett, at 37, 46:16-18, 47:7-18, 48:19-25, 82:4-14, 100:3-6, 22 – 25, 101:1-3, 10-21.

23.  Deposition of William Stein, at 24:13 – 25:3, 74:6 – 80:16, 77:15-25, 78:1-7, 78:18-23, 83:1-6, 84:8-20, 84:21-25, 85:1 – 87:1, 91:24 – 95:13, 97:6-21, 98:17 - 99:1, 99:22-25, 99:25 – 100:8, 100:14-25, 102:6-17, 106:7-18, 111:18-24, 112:22 – 113:25, 116:2-3, 118:1-22, 119:15 – 120:4, 166:6-11, 166:13-19, 183:13 – 185:7.

24.  Deposition of Stephen Mullet, at 34:5-9, 60:9-14, 60:9 – 61:8, 60:15-20, 61:2-12, 75:13-18, 77:4-13, 77:14-22, 106:16-19, 107:2-5, 107:14-19, 116-17:22-1, 116-17:13-4, 124:6-9, 137:12-21, 140-41:15-10, 170:2-5, 203:15-19, 203:9-24.

25.  Deposition of Stephen Smulski, at 3:11-20, 50:15-18, 51:6 – 52:12, 55:11-19, 58:15-25, 59:1-9, 70:16-25, 70:20-25, 71:1-20, 72:8-10, 73:3-7, 86-87:8-16, 95:8-11, 98:7-21, 98:13-21, 105:1-3, 110-11:25-10, 121:20 – 122:12, 150:13-20, 155:11-14, 171:8-17, 174:2-17.

26.  Deposition of Patricia Williams, at 67:3 – 68:23, 75:20 – 76:9, 76:14-22, 76:14-22, 77:12-25, 78:1-25, 90:7-22, 90:19-22, 99:9-13, 102:20-24, 121:25 – 122:9, 140:22-25, 141:1-8, 148:7-17, 149:13-25, 150:1-4, 150:25, 151:1-5, 151:9-25, 154:21-23, 156: 10-23, 158: 2-15, 160:2-4, 167:3-20, 235:3-4, 236:8-18, 286:4 – 289:25.

27.  Deposition of Fleetwood Enterprises through William Farish, at

109;16-24, 110:1-8.

28.    Deposition of Forest River through Doug Gaeddert, at 103: 3-25, 104-05,106: 1-3.

**UNITED STATES OF AMERICA:**

29.    Deposition of Stephanie Pujol at 1-8; 65-88.

30.    Deposition of Marco Kaltofen 1-8; 89-96 .

31.    Deposition of Paul Hewitt at 1-8; 149-156.

32.    Deposition of Harry Milman at 1-8; 73-76; 177-180; 189-192.

33.    Deposition of Leroy Hargrove at 1-7; 27-28.

34.    Deposition of Eric Smit at 1-8; 113-116.

35.    Deposition of Stephen Alfonso at1-7; 113-116.

36.    Deposition of Sylvia Keyes at  1-8; 65-68.

37.    Deposition of Corey Davis at 1-8; 149-156.

38.    Deposition of Damian Hargrove at1-8; 121-124.

39.    Deposition of Juniata Bridges at 1-8; 129-136.

**B.  The Effect of Deposition Testimony**

**PLAINTIFFS:**

The deposition of Defendants' expert, Michael Ginevan, Ph.D., will show:

a.  100% of Dr. Ginevan's expert testimony has been on behalf of corporations and other entities defending suits of toxic exposure. Deposition, p. 41:8-14;

b.  Dr. Ginevan has no challenge or criticism of the statement by the CDC scientists that smoking was not significantly associated with increased formaldehyde levels. Deposition, p. 85:7-13;

    c.  Dr. Ginevan does not hold himself out as expert on "safe levels" of exposure to formaldehyde, p. 93:2-11;

    d.  Dr. Ginevan would defer to other experts on the question of whether a plaintiff has been harmed by exposure to formaldehyde, p. 93:12-16;

    e.  There is no specific parts per million or parts per billion level of formaldehyde exposure that separates "safe" levels of formaldehyde from "dangerous" level of formaldehyde exposure, p. 95:2-10;

    f.  Dr. Ginevan has not done an independent analysis of the data related to the formaldehyde exposure levels collected thus far, p. 119; 5-9; and

    g.  Plaintiffs can prove the level of exposure of formaldehyde through a sampling study, p. 146:13-17.

## MANUFACTURING DEFENDANTS:

The following deposition testimonies of the individual Plaintiffs, corporate representatives and Plaintiffs' experts demonstrate the variability among the individuals in the putative class and establish the inappropriateness of a class action for this litigation.

    a.  Deposition of Stephen A. Alfonso

        i.  Alfonso believes that, as representatives, he has no responsibility to the class members. See Ex D-126, Dep. at 79:20-25.

        ii.  Plaintiff's counsel had delayed informing Alfonso that he must act as representatives until the day of his deposition. See Ex D-126, Dep. at 83:24-84:10.

    b.  Deposition of Kendra Battie o/b/o D'Asia Battie

        i.  Battie did not open the windows and used the vents. See Ex D-135, Dep. at 45:18-25, 46:1-13.

    ii.     Battie had problems with her air conditioning.  See Ex D-135,
Dep. at 43:19-25, 44:1-6.

  c.  Deposition of Jocelyn Beasley o/b/o Heavenly A. Beasley

      i.     Heavenly Beasley resided in the EHU almost 24 hours a day while her mother Joycelyn resided in the unit only 10 hours a day.  See Ex D-136, Dep. at 29:9-19, 30:20-25, 31:1-16.

      ii.     Joycelyn and her husband claim to have suffered with headaches, burning eyes and rashes – symptoms which Heavenly did not experience.  See Ex D-136, Dep. at 58:21-25, 59:1-19.

      iii.    Beasley opened the windows and used the vents. See Ex D-136, Dep. at 37:14-25, 38:1-10.

  d.  Deposition of Marcie Beverly

      i.     Beverly lived in multiple units and complained of differing symptoms in each.  See Ex D-139, Dep. at 94:11-19.

      ii.     Pre-existing medical conditions, ranging from allergies to asthma, significantly impact those class representatives' causation analysis.  Confounding sources such as cigarette use, whether before or during the time of occupancy in the trailer, also muddle any causation analysis for class members.  See Ex D-139, Dep. at 75:3-4, 77:14-23.

  e.  Deposition of Portia Bradford

i.    Portia Bradford has no concept of how many members are in the proposed class and she delegated the task of informing potential members about the litigation to her attorneys. See Ex D-140, Dep. at 71:15-17, 78:19-24.

ii.    The instant case is littered with examples of representatives who, while well intentioned, have shown themselves to be incapable and uncommitted representatives. Portia Bradford has admitted that she has deferred crucial duties and decisions to their attorneys. See Ex D-140, Dep. at 71:15-17, 78:19-24.

f.   Deposition of Randy J. Bradford

Randy Bradford has no concept of how many members are in the proposed class and has delegated the task of informing potential members about the litigation to his attorneys. See Ex D-141, Dep. at 44:19-23.

i.    The instant case is littered with examples of representatives who, while well intentioned, have shown themselves to be incapable and uncommitted representatives. Randy Bradford has admitted that he has deferred crucial duties and decisions to his attorneys. See Ex D-141, Dep. at 44:19-23.

g.   Deposition of Dione Davis o/b/o Trinity Guesnon

i.    Davis believes that, as a representatives, she has no

responsibility to the class members.  See Ex D-150, Dep. at 49:2-6.

h.  Deposition of Damian J. Hargrove o/b/o Damian J. Hargrove, Jr.

   i.  Damian Hargrove believes that, as a representatives, he has no responsibility to the class members.  See Ex D-171, Dep. at 84:11-15.

i.  Deposition of Leroy Hargrove, Jr.

   i.  Plaintiff's counsel had delayed informing Leroy Hargrove that he must act as representative until the day of his deposition. See Ex D-172, Dep. at 133:13-15.

j.  Deposition of Mary Harris

      Harris smoked in her units.  See Ex D-173, Dep. at 90:20

k.  Deposition of Hazel Heechung

   i.  Heechung was offered the opportunity to relocate even after complaints specifically regarding formaldehyde but chose not to. See Ex D-174, Dep. at 97:23 – 98:11.

l.  Deposition of Sylvia J. Keyes

   i.  Keyes lived in a mobile home, in which she had problems with mold and mildew, for 20 years before occupying the Fleetwood unit, and she returned to that mobile home upon vacating the Fleetwood unit.  See Ex D-179, Dep. at 10:16-20, 13:10-12, 70:21 – 71:4.

   ii.  Between 2003 and 2007 – during the time she lived in the

Fleetwood unit, Keyes worked inside ships as a painter, in close proximity to insulators, pipefitters, sandblasters, and welders, in admittedly "very dusty" conditions. See Ex D-179, Dep. at 25:6-27, 43:20-25, 53:24; 54:9-16.

    iii.    Sylvia Keyes claims chest pain as a result of formaldehyde exposure. Yet she was stabbed in the chest prior to Katrina. See Ex D-179, Dep. at 30:23 – 31:21.

m.    Deposition of George Posey

    i.    Posey testified that he does not want to be a representative. See Ex D-197, Dep. at 45:23-46:6.

n.    Deposition of Rayfield Robinson, Jr.

    i.    Robinson admitted that he has deferred crucial duties and decisions to his attorneys. See Ex D-202, Dep. at 74:6-10, 84:15-18.

o.    Deposition of Sheila Smith o/b/o Michael C. Tracy

    i.    Sheila Smith lived in three separate EHU units – a Coachman travel trailer for nine months; a Homes of Merit mobile home for 14 months; and a Waverlee mobile home for over 13 months. She continues to reside in the Waverlee unit. See Ex D-207, Dep. at 18:19 – 21:9; 8-9, 27, 30.

    ii.    She lived in a mobile home with wood paneling for 15 to 16 years before Hurricane Katrina, as well as other mobile

homes before that.  See Ex D-207, Dep. at 64:6 – 67:17, 67:25 – 68:12.

iii.    Smith claims exposure to "mold" that made her "sick" while living in her own mobile home, following Hurricane Katrina and before moving into a EHU provided by FEMA.  See Ex D-207, Dep. at 67:25 – 68:12.

p.    Deposition of Mary DeVany

i.    Lifestyle issues are "confounding factors".  Her testing group maintained field data sheets on the tested units noting tobacco use, pets, cleaning materials, chemical compounds, water damage and mold found because these are "items that can cause adverse health effects similar to the acute effects" that various occupants were reporting.  See Ex D-230, Dep. at 129:18-25, 130:1-2.

q.    Deposition of Dr. Paul Hewett

i.    The difference between low and high test results in datasets provided by Plaintiffs is a factor of over 100.  See Ex D-231, Dep. at 82:4-14.

ii.    Test results provided by Plaintiffs to their expert Paul Hewett, on 976 apparently unoccupied units, ranged from zero to 0.5 ppm, or greater.  See Ex D-231, Dep. at 37.

iii.    As the testing data on EHUs clearly demonstrates, each unit tested to date has a certain level of formaldehyde.  See Ex

D-231, Dep. 82:4-14.

iv.   The calculation of the mean exposure does not tell you what the particular reading or exposure is in a particular trailer at any particular given time.  See Ex D-231, Dep. at 77:4 – 16.

v.   The test data differences are driven by numerous variables among the EHUs themselves, including weather conditions such as wind, humidity and temperature, unit orientation, and unit age.  See Ex D-231, Dep. at 100:3-6, 21-25; 101:1-3, 10-21.

vi.   There are demonstrated manufacturer to manufacturer, model to model differences, and unit to unit differences, even where two units are produced by the same manufacturer.  See Ex D-231, Dep. at 46:16-18, 47:7-18, 48:19-25.

r.   Deposition of Dr. Gerald McGwin

i.   The risk in the general American population of contracting nasopharyngeal cancer is .5 males per 100,000 and .2 females per 100,000 annually.  See Ex D-234, Dep. at 163:2-21.

s.   Deposition of Stephen Mullet

i.   The factors contributing to this substantial variation in formaldehyde levels include types, quantities, age, and storage conditions of construction materials, home design

and construction methods, length of trailer, number of axles, and frame strength, workmanship and quality of construction, types and quantities of furniture and drapery, whether residents added or installed their own formaldehyde-emitting materials, such as furniture, carpets, drapery or fabrics, time and condition of home storage, transportation of the home from the plant to the ultimate occupant and geographic placement of a given home, the number and size of air conditioning units and the type of ducting and insulation.  See Ex D-235, Dep. 34:5-9, 137:12-21, 106:16-19, 170:2-5, 140:15-15, 141:1-10, 60:15-20 and 60:9-14.

ii.  Variables external to the manufacturing processes of the respective manufacturers also distinguish each plaintiff.  The external variables include:  the length of time each respective plaintiff spent in each respective travel trailer; the number of people who spent time in each respective travel trailer; the manner in which the respective travel trailers were installed at each location; the geographic location (topography) and weather conditions (temperature and humidity) where each respective travel trailer was place; and the air exchange rate of each respective travel trailer (use of windows and doors).  See Ex D-235, Dep. at 77:14-22, 116-

17:22-1, 116-17:13-4, 124:6-9, 77:4-13, 106:16-19, 140-41:15-10, 107:2-5, 140-41:15-10, 107:14-19, 140-41:15-10, 60:15-20, 60:9-14, 60-61:24-1, 34:5-9, 137:12-21, 61:2-12, 203:15-19, and 75:13-18.

iii.    Significant differences exist in these units, manufacturer to manufacturer and even unit to unit, manufactured by the same company. Those differences include specifications for the unit, quantity of any materials containing formaldehyde, quantity of formaldehyde in those materials, suppliers used, distribution of products, manufacturing processes. See Ex D-235, Dep. at 75:13-18.

t.    Deposition of Dr. Kenneth Paris

i.    The only way to make an analysis of whether a person was experiencing symptoms or medical conditions related to formaldehyde exposure in a EHU would be to make an individual evaluation of that person and that person's environment. See Ex D-236, Dep. at 31:18-24, 32:1-5, 38:14-24.

ii.    Nine percent of the general population has asthma. See Ex D-236, Dep. at 120:3-7.

iii.    There are numerous common triggers of asthma found in the EHUs, including among others, dust mite, pet dander, mold, and cockroach. See Ex D-236, Dep. at 38:3-10.

iv.    The only screening test that Dr. Paris could think of to detect asthma in a child before a child exhibits symptoms was a Methacholine challenge – a test that is actually designed to rule out asthma.  See Ex D-236, Dep. at 82:14 – 83:6.

v.    Dr. Paris admitted that he would not order a Methacholine challenge on a child who had lived in a FEMA trailer but had no symptoms.  See Ex D-236, Dep. at 97:13-24; 99:10-16.

vi.    There are very serious dangers involved in a Methacholine challenge including the danger of death.  See Ex D-236, Dep. at 97:25 – 98:5 and 98:23 – 99:2.

vii.    Dr. Paris testified that medical screening will not help these patients.  See Ex D-236, Dep. at 73:23 – 74:5.

u.    Deposition of Dr. Judd Shellito

i.    Since formaldehyde level equates to dose, and dose is critical to a determination of any link between a formaldehyde exposure and a purported health effect, this variation is critical to the question of class certification.  See Ex D-237, Dep. at 25:13-22.

ii.    Dr. Shellito testified that to determine if any symptom reported by a EHU occupant was related to formaldehyde in that unit would require a complete medical evaluation of the individual.  See Ex D-237, Dep. at 39:19-25, 40:8-16, 44:15-25.

iii.   The dose of formaldehyde to which an individual is exposed is critical to a determination of whether any symptom/condition he or she is experiencing is related to that exposure. See Ex D-237, Dep. at 25:13-22.

iv.   The amount of time spent in a unit would impact whether a person exhibited symptoms related to formaldehyde as would a determination whether the individual had a particular sensitivity to formaldehyde. See Ex D-237, Dep. at 100:7 – 11, 17-22, 102:8-15.

v.    The only way to make an analysis of whether a person was experiencing symptoms or medical conditions related to formaldehyde exposure in a EHU would be to make an individual evaluation of that person and that person's environment. See Ex D-237, Dep. at 166: 12-18.

vi.   Each person is different, reacts differently to formaldehyde, and must be examined separately to determine what symptoms, if any, result from exposure to formaldehyde versus one of the many other potential causes. See Ex D-237, Dep. at 33:5-11.

vii.   Dr. Shellito testified that he had conveyed "words of caution" to Plaintiffs' counsel in this case. Those "words of caution": – centered on a medical monitoring aspect of this case. His words of caution would be that medical monitoring for

any adverse health effect due to a toxic exposure should be carefully thought out and well justified.  See Ex D-237, Dep. at 20:7-13.

    v.    Deposition of Dr. Stephen Smulski

        i.    The only way that you could ever determine what any individual was ever exposed to is to measure that particular individual unit to see what the level was at the snapshot that that level is being taken.  See Ex D-238, Dep. at 174:2-17.

        ii.    Ambient formaldehyde levels vary greatly manufacturer to manufacturer, home to home, and even hour to hour within the same home.  Manufactured housing units, park models and travel trailers alike have significant design, manufacture and production differences that make them heterogeneous. See Ex D-238, Dep. at 51-52, 58.

        iii.    The factors contributing to this substantial variation in formaldehyde levels include types, quantities, age, and storage conditions of construction materials, home design and construction methods, length of trailer, number of axles, and frame strength, workmanship and quality of construction, types and quantities of furniture and drapery, whether residents added or installed their own formaldehyde-emitting materials, such as furniture, carpets, drapery or fabrics, time and condition of home storage,

- 86 -

transportation of the home from the plant to the ultimate

occupant, installation of the home, geographic placement of

a given home, the number and size of air conditioning units,

the type of ducting and insulation, usage of the home and

occupant lifestyles.  See Ex D-238, Dep. at 51-52, 58, 71,

86-87, 171:8-17 and 72-73.

iv.   The variations occur not only among manufacturers but also

among units of the same type built by the same

manufacturer.  Each of these manufacturing variables, in

turn, determines whether and to what extent an individual

plaintiff was exposed to formaldehyde while in his own travel

trailer.  See Ex D-238, Dep. at 155:11-14.

v.    Additionally, variables external to the manufacturing

processes of the respective manufacturers also distinguish

each plaintiff.  The external variables include:  the length of

time each respective plaintiff spent in each respective travel

trailer; the number of people who spent time in each

respective travel trailer; the manner in which the respective

travel trailers were installed at each location; the geographic

location (topography) and weather conditions (temperature

and humidity) where each respective travel trailer was place;

and the air exchange rate of each respective travel trailer

(use of windows and doors).  See Ex D-238, Dep. at 105:1-

3, 150:13-20, 110-11:25-10, 83:11-20; 86-87:8-16, 171:8-17, 86-87:8-16, 171:8-17, 55:11-19, 70:16-25, 98:13-21.

vi.   The factors determining formaldehyde exposure for Plaintiffs will require an "individual, that is, person-by-person, trailer-by-trailer" approach.  See Ex D-238, Dep. at 122.

vii.   Commonsense tells us that each manufacturer produces a different product by a different method using different workers in different plants, different raw materials, different models, different brands, et cetera.  See Ex D-238, Dep. At 70:20-25

viii.   Variability in units include types, quantities, age, and storage conditions of construction materials, home design and construction methods, workmanship and quality of construction, types and quantities of furniture and drapery, whether residents added or installed their own formaldehyde-emitting materials, such as furniture, carpets, drapery or fabrics, time and condition of home storage, transportation of the home from the plant to the ultimate occupant, geographic placement of a given home, usage of the home and occupant lifestyles.  See Ex D-238, Dep. at 51:6 – 52:12, 58:15-25, 71, 155, 86-87, and 72-73.

ix.   Because of the type and number of variant factors found in the EHUs, formaldehyde levels clearly vary substantially unit

to unit, affecting any potential health effects in the occupants. As a result, determining formaldehyde exposure for individual Plaintiffs will require an "individual, that is, person-by-person, trailer-by-trailer" approach. See Ex D-238, Dep. at 122.

    x.    Even within a single trailer, different family members will have different exposures according to their own personal habits, including for example, use of household products and cosmetics as well as many other factors. See Ex D-238, Dep. at 73:3-7, 121:20 – 122:12.

    w.    Deposition of Dr. William Stein

    i.    The reaction to the irritant effects of formaldehyde can vary from person to person. Two people who have the exact same exposure can have reactions that vary. The reaction of any person to formaldehyde is to some extent dependent upon the individual's specific characteristics. It is dependent upon duration of exposure, level of exposure and individual characteristics. Not everybody is the same. See Ex D-240, Dep. at 77:15-25, 78:1-7.

    ii.    For the EHU residents, there is a population of 100,000 plus people, and he doesn't know how much exposure each one of them had. He doesn't know the time duration they had that exposure. He doesn't know their individual health

characteristics, and he has never had a population before that has been subjected to this type of exposure, to see what happens to them. See Ex D-240, Dep. at 106:7-18 (emphasis added).

iii. The Plaintiffs' attorneys' laundry list of almost 50 allegedly formaldehyde related symptoms, each and every one of which can be caused by things other than formaldehyde. See Ex D-240, Dep. at 78:18-23.

iv. Each person is different, reacts differently to formaldehyde, and must be examined separately to determine what symptoms, if any, result from exposure to formaldehyde versus one of the many other potential causes. See Ex D-240, Dep. at 74:6 – 80:16, 183:13 – 185:7.

v. For short term health effects, the only people who need to be followed five years are those who have acute symptoms. See Ex D-240, Dep. at 83:1-6.

vi. The risk in the general American population of contracting nasopharyngeal cancer is .5 males per 100,000 and .2 females per 100,000 annually. See Ex D-240, Dep. at 97:6-21.

vii. Assuming the risk is increased at all by exposure to formaldehyde while living in a trailer, the risk is still very small. See Ex D-240, Dep. at 98:17 - 99:1.

viii.    The problem we have with formaldehyde is that the numbers
(NPC) are so small, while we assume that there is some
causative agent or there is some increased risk because of
it, these things are very hard to determine.  That is why there
is all the debate about this.  See Ex D-240, Dep. at 99:25 –
100:8.

ix.    Determining an *individual's* risk is keyed to individual factors
of level of exposure, duration of exposure, and other
individual characteristics such as whether the person has
other risk factors for contracting nasopharyngeal cancer.
See Ex D-240, Dep. at 100:14-25.

x.    Dr. Stein candidly admitted that he knew of no medical
organizations that recommend screening for nasopharyngeal
cancer or leukemia.  See Ex D-240, Dep. at 112:22 – 113:4.

x.    Deposition of Patricia Williams

i.    Confounding factors impact the formaldehyde levels to which
an occupant was exposed.  See Ex D-242, Dep. at 77:12-25,
78:1-25.

ii.    The formaldehyde exposures of two individuals living in the
same unit could have different amounts that are coming in
their body..."  See Ex D-242, Dep. at 78:19-21.

iii.    Dr. Williams' "survey" is not a scientific study of any kind and
would never meet basic *Daubert* requirements of peer

review, testability, rate of error or scientific acceptance.  Dr.
Williams did not have information about the medical or social
histories of any of the 1516 respondents in her survey.  See
Ex D-242, Dep. at 150:25, 151:1-5.

iv.    Dr. Williams had no information on other environmental
exposures or medical conditions experienced by any of the
1516 responders.  See Ex D-242, Dep. at 158: 2-15.

v.    Dr. Williams did not know when, in the course of residing in a
EHU, any of the 1516 individuals developed the symptoms
they listed, or whether the symptom was developed in an
environment other than inside the EHU itself.  See Ex D-242,
Dep. at 149:13-25, 150:1-4.

vi.    Dr. Williams agrees that the 47 symptoms she surveyed are
"non-specific symptoms for the most part that you may see
with other toxicants or with other conditions," each of which
can be caused by things other than formaldehyde.  See Ex
D-242, Dep. at 154:21-23 and 102:20-24.

vii.    Dr. Williams did not consider background rates in the
general population for the 47 symptoms she surveyed.  See
Ex D-242, Dep. at 156: 10-23.

viii.    Dr. Williams agrees that her survey was not an
epidemiological study that she had no control group to
which she could compare the responses of the 1516

individuals.  Her work was a "cross sectional survey of a population to ascertain a profile, a picture, a snapshot."  See Ex D-242, Dep. at 148:7-17, 151:9-25.

ix.     Close to 100 additional symptoms/medical conditions that even the Plaintiffs do not relate to formaldehyde exposure (in addition to the 47 symptoms in the "survey") that the 1516 respondents included.  Many of the symptoms/conditions listed are claimed by more than one respondent.  See Ex D-242, Dep., Chart A at 1 to 57.

x.      These additional symptoms/conditions range from kidney stones to hysterectomy to diabetes to bleeding ulcer to Sickle Cell Anemia.  See Ex D-242, Dep. at 140:22-25, 141:1-8.

xi.     Dr. Williams agreed that different people have different reactions to different levels of formaldehyde.  See Ex D-242, Dep. at 90:19-22.

xii.    In creating her survey of 1516 occupants' symptoms, Dr. Williams had no information about the formaldehyde levels, if any, to which any of the 1516 respondents were exposed. See Ex D-242, Dep. at 99:9-13.

xiii.   The Plaintiff attorneys' laundry list of almost 50 allegedly formaldehyde related symptoms, each and every one of which can be caused by things other than formaldehyde.

See Ex D-242, Dep. at 102:20-24; 154:21-23.

xiv.  Each person is different, reacts differently to formaldehyde, and must be examined separately to determine what symptoms, if any, result from exposure to formaldehyde versus one of the many other potential causes.  See Ex D-242, Dep. at 90:7-22, 167:3-20.

xv.  Formaldehyde is ubiquitous in the air in nature, in urban areas and in indoor environments; is produced in large quantities by the human body as a natural and necessary part of human metabolism, and is also found in countless consumer products such as shampoo, toothpaste, cleaning products, carpet, and permanent-press clothing; and is a byproduct of combustion, ranging from fireplaces to smoking to stovetop cooking.  See Ex D-242, Dep. 67:3 – 68:23, 76:14-22 and 286:4 – 289:25.

xvi.  Formaldehyde molecules that a person may inhale from external sources such as those that may be emitted from components of a travel trailer are no different from the formaldehyde molecules that exist naturally in the human body.  See Ex D-242, Dep. at 286:4 – 287:6.

xvii.  The properties of the formaldehyde molecule to combine with other molecules and insert itself into cells are no different for inhaled formaldehyde than for naturally

occurring formaldehyde.  See Ex D-242, Dep. at 287:7 –

288:1.

xviii.    Dr. Williams' asthma education program applies only to

children who already have asthma.  See Ex D-242, Dep. at

121:25 – 122:9.

xix.    Dr. Williams recognizes that many of these reported

symptoms and medical conditions are not caused by

formaldehyde, however, she made no attempt to determine

the extent to which any of these conditions could be the

cause of all or any of 47 symptoms that the 1516 individuals

listed which Dr. Williams finds could be formaldehyde

related.  See Ex D-242, Dep. at 158:2-25, 159:1-25.

y.    Deposition of William Farish o/b/o Fleetwood Enterprises, Inc.

i.    Farish testified that his travel-trailer manufacturer provided

formaldehyde warnings both by placing them on the

bathroom mirror and by including them in the owner's

manual.  See Ex D-264, Dep. at 109;16-24, 110:1-8.

z.    Deposition of Doug Gaeddert o/b/o Forest River

i.    Gaeddert testified that his travel trailer manufacturer

provided a warning in its manual that was located in his unit.

See Ex D-266, Dep. at 103: 3-25; 104-05; 106: 1-3.

## UNITED STATES OF AMERICA:

A.    Deposition of Stephanie Pujol at 1-8; 65-88.

Witness never complained to FEMA about formaldehyde or if did FEMA took action in response to complaint. Witness vacated EHU for reasons unrelated to formaldehyde.

B.    Deposition of Marco Kaltofen 1-8; 89-96 .

Testing of EHU shows median concentration of 0.14 ppm formaldehyde and the results of the individual units tested range from no detect to 4.5 ppm formaldehyde.

C.    Deposition of Paul Hewitt at 1-8; 149-156.

Testing of EHU shows concentration of formaldehyde in units varies from unit and that almost all units contain concentration levels below 300 ppb.

D.    Deposition of Harry Milman at 1-8; 73-76; 177-80; 189-92.

Determination and setting of a action level for formaldehyde by a governmental agency requires weighing an balancing economic, social and health and safety policy considerations.

E.    Deposition of Leroy Hargrove at 1-7; 27-28.

Witness never complained to FEMA about formaldehyde or if did FEMA took action in response to complaint.

F.    Deposition of Eric Smit at 1-8; 113-116.

Witness never complained to FEMA about

formaldehyde or if did FEMA took action in response

to complaint.

G.    Deposition of Stephen Alfonso at1-7; 113-116.

Witness never complained to FEMA about

formaldehyde or if did FEMA took action in response

to complaint.

H.    Deposition of Sylvia Keyes at  1-8; 65-68.

Witness never complained to FEMA about

formaldehyde or if did FEMA took action in response

to complaint.

**12.    LIST OF CHARTS, GRAPHS, AND MODELS**

**PLAINTIFFS:**

Plaintiffs intend to introduce the following:

1.    Graphic of Cumulative Distribution of Formaldehyde by Trailer Number.

2.    Graphics/Powerpoint  to be utilized during the testimony of Dr. Patricia

Williams and during remarks of counsel.

3.    Spreadsheets of Symptoms:

a.  Total Report of All Symptoms;

b.  Report of Symptoms of Individuals With Neither Mold Nor Mildew

Reported in Their THU and No Fumigation of Their THU;

    c.  Report of Symptoms of Individuals Who Did Not Smoke Inside Their THU; and

    d.  Report of Symptoms of Individuals Who Did Not Report Mold or Mildew, Did Not Smoke Inside, Did Not Have Their THU Fumigated and Did Not Have Service or Maintenance Repairs.

4.    Alphabetical list of Class Representatives with their "move in and out" dates prepared by the PSC.

**MANUFACTURING DEFENDANTS:**

The Manufacturing Defendants will not utilize any demonstrative aids at the class certification hearing other than utilizing the Court's AV system for receiving exhibits.

**UNITED STATES OF AMERICA:**

The United States will not utilize any demonstrative aids at the class certification Hearing.

**13.**    <u>**LIST OF WITNESSES**</u>

**PLAINTIFFS:**

| | | |
|---|---|---|
| 1. | Dr. Patricia M. Williams  (Live) | Expert |
| 2. | David P. Barnes, Jr.  (By Affidavit) | Expert |
| 3. | Dr. Lee Branscome  (By Affidavit) | Expert |
| 4. | Mary C. DeVany, M.S.  (By Affidavit) | Expert |
| 5. | Dr. Paul Hewett  (By Affidavit) | Expert |
| 6. | Marco Kaltofen, P.E.  (By Affidavit) | Expert |

| 7. | Dr. Gerald McGwin, Jr.  (By Affidavit) | Expert |
| 8. | Dr. Harry A. Milman  (By Affidavit) | Expert |
| 9. | Stephen Mullet  (By Affidavit) | Expert |
| 10. | Dr. Kenneth Paris<br>(By Affidavit and Supplemental Affidavit) | Expert |
| 11. | Dr. Judd Shellito  (By Affidavit) | Expert |
| 12. | Dr. Stephen Smulski  (By Affidavit) | Expert |
| 13. | Dr. William Stein, III  (By Affidavit) | Expert |
| 14. | Letecheia Acker o/b/o Dakyre Smith<br>(By Plaintiff Fact Sheet ("PFS")) | Fact/Class Representative |
| 15. | John J. Adams (By PFS) | Fact/Class Representative |
| 16. | Stephen Alfonso (By PFS) | Fact/Class Representative |
| 17. | Courtney Alfred o/b/o Christopher Thomas<br>(By PFS) | Fact/Class Representative |
| 18. | Sandra Anderson (By PFS) | Fact/Class Representative |
| 19. | Marcilio Ayala (By PFS) | Fact/Class Representative |
| 20. | Shane Baker o/b/o Shane Lee Baker<br>(By PFS) | Fact/Class Representative |
| 21. | Edward Ballet, III and/or Toinette Walker<br>o/b/o Derell Ballet (By PFS) | Fact/Class Representative |
| 22. | Edward Ballet, III and/or Toinette Walker | Fact/Class |