|  | o/b/o Egypt Ballet (By PFS) | Representative |
|---|---|---|
| 23. | Edward Ballett, III and/or Toinette Walker o/b/o Edward Ballet, IV (By PFS) | Fact/Class Representative |
| 24. | Kendra Battie o/b/o D'Asia Battie (By PFS) | Fact/Class Representative |
| 25. | Joycelyn Beasley o/b/o Heavenly A. Beasley (By PFS) | Fact/Class Representative |
| 26. | Pamela Benoit o/b/o Christopher Benoit (By PFS) | Fact/Class Representative |
| 27. | Thomas A. Bergens (By PFS) | Fact/Class Representative |
| 28. | Marcie Beverly (By PFS) | Fact/Class Representative |
| 29. | Portia Bradford (By PFS) | Fact/Class Representative |
| 30. | Randy J. Bradford (By PFS) | Fact/Class Representative |
| 31. | Juanita Bridges (By PFS) | Fact/Class Representative |
| 32. | Rose L. Bright  (By PFS) | Fact/Class Representative |
| 33. | Trina Brown  (By PFS) | Fact/Class Representative |
| 34. | Jerome A. Culler  (By PFS) | Fact/Class Representative |
| 35. | Jerome A. Culler o/b/o Joan R. Culler (deceased) (By PFS) | Fact/Class Representative |

| 36. | Brian Darby, Sr. o/b/o Brian Darby, Jr. (By PFS) | Fact/Class Representative |
| 37. | Peter Daunoy, III (By PFS) | Fact/Class Representative |
| 38. | Corey Davis (By PFS) | Fact/Class Representative |
| 39. | Dione Davis o/b/o Trinity Guesnon (By PFS) | Fact/Class Representative |
| 40. | Linda Davis  (By PFS) | Fact/Class Representative |
| 41. | Jacqueline Dedeaux (By PFS) | Fact/Class Representative |
| 42. | Donovan Delone  (By PFS) | Fact/Class Representative |
| 43. | Barbara A. Dillon  (By PFS) | Fact/Class Representative |
| 44. | Barry P. Dominguez  (By PFS) | Fact/Class Representative |
| 45. | Elisha Dubuclet o/b/o Timia Dubuclet (By PFS) | Fact/Class Representative |
| 46. | Nicole Esposito | Fact/Class Representative |
| 47. | Percy Evans  (By PFS) | Fact/Class Representative |
| 48. | Ella Flowers  (By PFS) | Fact/Class Representative |
| 49. | Lillian A. Foley  (By PFS) | Fact/Class Representative |

| | | |
|---|---|---|
| 50. | Lillian A. Foley o/b/o Samuel Foley (By PFS) | Fact/Class Representative |
| 51. | Shontay Fontenot o/b/o Hailey Fontenot (By PFS) | Fact/Class Representative |
| 52. | Shontay Fontenot o/b/o Jonathan Fontenot (By PFS) | Fact/Class Representative |
| 53. | Shontay Fontenot o/b/o Justin Fontenot, Jr. (By PFS) | Fact/Class Representative |
| 54. | Simone Frank  (By PFS) | Fact/Class Representative |
| 55. | Renay Marie Gardner  (By PFS) | Fact/Class Representative |
| 56. | Shelia Gordon  (By PFS) | Fact/Class Representative |
| 57. | Trichonda Green  (By PFS) | Fact/Class Representative |
| 58. | Rommel E. Griffin (By PFS) | Fact/Class Representative |
| 59. | Crystal W. Gumm  (By PFS) | Fact/Class Representative |
| 60. | Damian J. Hargrove o/b/o Damian J. Hargrove, Jr.  (By PFS) | Fact/Class Representative |
| 61. | Leroy Hargrove, Jr.  (By PFS) | Fact/Class Representative |
| 62. | Mary Harris  (By PFS) | Fact/Class Representative |
| 63. | Hazel K. Heechung  (By PFS) | Fact/Class Representative |

| | | |
|---|---|---|
| 64. | Douglas Hill, III  (By PFS) | Fact/Class Representative |
| 65. | Thelma H. Howard  (By PFS) | Fact/Class Representative |
| 66. | Joseph C. Jack, Jr.  (By PFS) | Fact/Class Representative |
| 67. | Constance Jordan o/b/o Brunica Jordan (By PFS) | Fact/Class Representative |
| 68. | Sylvia J. Keyes  (By PFS) | Fact/Class Representative |
| 69. | Carrie LeBeau  (By PFS) | Fact/Class Representative |
| 70. | Lakeesha N. Lightell o/b/o Donovan Lightell (By PFS) | Fact/Class Representative |
| 71. | Lakeesha N. Lightell o/b/o Jazlyn N. Lightell  (By PFS) | Fact/Class Representative |
| 72. | Latonya London o/b/o Darrell Madison (By PFS) | Fact/Class Representative |
| 73. | Latonya London o/b/o Darren Madison (By PFS) | Fact/Class Representative |
| 74. | Latonya London o/b/o Derell Madison (By PFS) | Fact/Class Representative |
| 75. | Latonya London o/b/o Edbony London (By PFS) | Fact/Class Representative |
| 76. | Keena Magee o/b/o Kierra Wilson (By PFS) | Fact/Class Representative |
| 77. | Linda Maldonado-West  (By PFS) | Fact/Class Representative |

| | | |
|---|---|---|
| 78. | Adrina N. McCray (By PFS) | Fact/Class Representative |
| 79. | Adrina N. McCray o/b/o Kody Wood (By PFS) | Fact/Class Representative |
| 80. | Amaris McGallion  (By PFS) | Fact/Class Representative |
| 81. | Brittney Miller  (By PFS) | Fact/Class Representative |
| 82. | Natley Mitchell  (By PFS) | Fact/Class Representative |
| 83. | Glenda Moreland  (By PFS) | Fact/Class Representative |
| 84. | Centra Myers  (By PFS) | Fact/Class Representative |
| 85. | Maria Parker o/b/o Tyler Ardoin (By PFS) | Fact/Class Representative |
| 86. | George Posey  (By PFS) | Fact/Class Representative |
| 87. | Stephanie G. Pujol  (By PFS) | Fact/Class Representative |
| 88. | Craig Ray, Sr.  (By PFS) | Fact/Class Representative |
| 89. | Penny M. Robertson  (By PFS) | Fact/Class Representative |
| 90. | Penny M. Robertson o/b/o Mercedes Robertson  (By PFS) | Fact/Class Representative |
| 91. | Rayfield Robinson, Jr.  (By PFS) | Fact/Class Representative |

| | | |
|---|---|---|
| 92. | David Semien, Jr. (By PFS) | Fact/Class Representative |
| 93. | David W. Semien, Sr.  (By PFS) | Fact/Class Representative |
| 94. | Sandra Semien o/b/o Danielle Semien (By PFS) | Fact/Class Representative |
| 95. | Shirley A. Sinclair  (By PFS) | Fact/Class Representative |
| 96. | Shelia Smith o/b/o Michael C. Tracy (By PFS) | Fact/Class Representative |
| 97. | Margarita Solis-Ayala  (By PFS) | Fact/Class Representative |
| 98. | Cherish Stephens  (By PFS) | Fact/Class Representative |
| 99. | Libby L. Sylve  (By PFS) | Fact/Class Representative |
| 100. | Libby Sylve o/b/o Hailey N. Sylve (By PFS) | Fact/Class Representative |
| 101. | Betty Thomas  (By PFS) | Fact/Class Representative |
| 102. | Sherry Trollinger o/b/o Michael Davis (By PFS) | Fact/Class Representative |
| 103. | Kendra S. Vason o/b/o Tyrone Battle (By PFS) | Fact/Class Representative |
| 104. | Betty White and/or Neatoya Bush o/b/o Erin McConnell  (By PFS) | Fact/Class Representative |
| 105. | Johnny White  (By PFS) | Fact/Class |

Representative

106.   Enna Williams  (By PFS)                          Fact/Class
                                                        Representative

107.   Faye Williams  (By PFS)                          Fact/Class
                                                        Representative

108.   Joanette Williams                                Fact/Class
       o/b/o George L. Williams  (By PFS)               Representative

109.   Alvin Williby                                    Fact/Class
       o/b/o Sandra Williby (deceased) (By PFS)         Representative

**MANUFACTURING DEFENDANTS:**

This witness list was filed in compliance with prior Court Orders, and the

Manufacturing Defendants have exchanged the reports of their expert witnesses in

compliance with those prior orders.  The Manufacturing Defendants reserve the right to

call the following witnesses at the December 2, 2008 Class Certification hearing:

A.     H. James Wedner, M.D.              (Live)
       660 South Euclid
       Campus Box 8122
       St. Louis, Missouri 63110

       1.     Dr. Wedner may testify regarding the immunologic effects of

formaldehyde on the human body. Specifically, he will address whether the

inhalation of airborne formaldehyde can cause the type of immunologic

reactions often associated with formaldehyde exposure, as well as

formaldehyde's capacity to act as an allergen or to affect lung function.

B.     Robert Golden, Ph.D.              (Live)
       9808 Clogett Farm Drive
       Potomac, MD 20854

       1.     Dr. Golden's may testify regarding the health effects of the

inhalation of airborne formaldehyde. In short, he will testify as to what health effects the inhalation of airborne formaldehyde can and cannot cause at various levels and by various types of populations.

| | | |
|---|---|---|
| C. | Dr. Philip Cole | (By Affidavit) |
| D. | Dr. Brooks Emory | (By Affidavit) |
| E. | Thomas Fribley | (By Affidavit) |
| F. | Dr. Michael Ginevan | (By Affidavit) |
| G. | Dr. William Waddell | (By Affidavit) |
| H. | Michael Zieman | (By Affidavit) |

**UNITED STATES OF AMERICA:**

The United States will not call any witnesses, but will cross-examine Dr. Williams, and reserves the right to cross-examine any witness called by the Manufacturing Defendants.

14. **JURY OR NON JURY STATUS**

    A.    **The class certification issue will be tried by the Court. Thus, this is a non-jury determination.**

    B.    **Proposed Findings of Fact**

**PLAINTIFFS' PROPOSED FINDINGS OF FACT:**

1. The class of persons that the Named Plaintiffs and Putative Class Representatives seek to represent encompasses thousands of individuals.

2. The class of persons that the Named Plaintiffs and Putative Class Representatives seek to represent is geographically dispersed among the states of Louisiana, Alabama, Texas, and Mississippi.

3. The named plaintiffs and the putative class representatives have an interest in the prosecution of this litigation.

4. Plaintiffs were exposed to dangerous levels of formaldehyde in the units;

5. Certain plaintiffs now suffer a significantly increased risk of contracting a serious latent disease, associated with formaldehyde exposure;

6. Certain plaintiffs' risk of contracting such a disease is greater than (a) the risk of contracting the same disease had there been no exposure, and (b) the chances of members of the public at large of developing the disease;

7. A medical procedure exists that makes the early detection of any such disease possible; and

8. There is a demonstrated clinical value in the early detection and diagnosis of any such disease.

**MANUFACTURING DEFENDANTS' PROPOSED FINDINGS OF FACT:**

a. Background Facts

   i. In the aftermath of Hurricanes Katrina and Rita in August and September of 2005, the homes of hundreds of thousands of Gulf Coast residents were rendered uninhabitable.

   ii. Many of these residents needed emergency housing.

   iii. Through the Federal Emergency Management Agency, the

federal government undertook to provide emergency

housing units (EHUs) to these residents.

iv.    In an attempt to acquire sufficient housing to meet the need

of these residents, FEMA contracted with several entities to

purchase thousands of EHUs.

v.    FEMA acquired EHUs in various ways – it purchased some

directly from manufacturers of travel trailers and

manufactured housing, and others from suppliers and

vendors throughout the United States.

vi.    Consequently, the units were not homogenous. They

differed in size, type, specification, feature, design, and

construction.

vii.    Included in these units were various products that may have

contained the substance known as formaldehyde.

viii.    Over time, residents who occupied these EHUs began to file

suit in courts across the country alleging damages as a

result of their inhalation of the formaldehyde emitted within

the EHUs.

ix.    Eventually, 27 state and federal toxic tort suits involving

formaldehyde in EHUs were consolidated in a Multi-District

Litigation in the United States District Court for the Eastern

District of Louisiana. These 27 suits encompass

approximately 17,000 named plaintiffs.

x.      The suit is brought against 75 defendants who manufactured the various EHUs (the "Manufacturing Defendants") as well as the United States through FEMA.

xi.     In this litigation, Plaintiffs seek recovery for alleged physical and mental pain and suffering, physical impairments and disability, medical expenses, loss of earnings capacity, loss of enjoyment and quality of life, loss of consortium, travel expenses, out-of-pocket expenses, attorney's fees, and the loss of use and/or opportunity to use safe and adequate shelter allegedly resulting from the purported exposure to formaldehyde.

xii.    On October 24, 2008, the many Plaintiffs filed a Motion for Class Certification seeking to have this Court certify the Plaintiffs as a class.

xiii.   On November 14, 2008, the Manufacturing Defendants filed their opposition to Plaintiff's Motion for Class Certification.

xiv.    On December 2, 2008, this Court heard oral argument on the issue of whether Plaintiffs are entitled to class certification.

b.      Formaldehyde

i.      Formaldehyde is a chemical composed of carbon and water. Its chemical formula is $CH_2O$.

ii.     It is a normal constituent of the cells of most life forms,

including human beings.  Life cannot exist without formaldehyde because it is a key component for the biological use of one-carbon units; these one-carbon compounds are the building blocks of more complex compounds in both animals and plants.  Formaldehyde is present in the blood of all human beings, and is a measurable constituent of human breath.  And just as formaldehyde is present in every living cell in the human body, so also is formaldehyde naturally present in foods including meats, fish, dairy products, fruits, vegetables, and bread.  Formaldehyde is ubiquitous in the air in nature, in urban areas and in indoor environments.  *See* Ex. D-227, Dr. Waddell Aff., paras. 5-6, 10; Ex. D-221, Dr. Cole Aff. at 3; Ex. D-228, Dr. Wedner Aff., para. 7; and Ex. D-226, Dr. Golden Aff., para. 6; Ex. D-242, Dr. Williams Deposition, pp. 67-68; Ex. D-241, Dr. Williams Aff., sec. 3.0.

iii.   Formaldehyde does not accumulate in the environment or in the human body.  In fact, the body's ability to break down formaldehyde is so efficient that even when people are exposed to airborne formaldehyde at levels far higher than were experienced in the FEMA EHUs, no increase in normally occurring blood levels can be detected.  *See* Ex. D-226, Dr. Golden Aff., para. 6.

iv.   Since formaldehyde was first synthesized in the late 19th Century, it has become one of the most widely used commercial agents in the world.  It is a common chemical feedstock and has many applications in dozens of industries. No recent enumeration of the total number of persons who have, or have had, occupational exposure to formaldehyde is available.  However, the number is enormous as evidenced by data indicating that in the European Union in the early 1990s, there were about one million persons employed in industries that produced or used formaldehyde. *See* Ex. D-221, Dr. Cole at 3-4.

v.   Because of the wide use of $CH_2O$, its well known irritant properties, and the exposure of humans to this chemical, there is a large body of investigative work examining the effects of $CH_2O$ on humans as well as a number of animal models.  *See* Ex. D-228, Dr. Wedner Aff., para. 3.

vi.   In general, studies have demonstrated that $CH_2O$ is a remarkably safe compound at the concentrations to which we are usually exposed and to which the FEMA occupants were exposed.  *See* Ex. D-228, Dr. Wedner Aff., para. 3.

vii.   When humans are exposed to increasing concentrations of $CH_2O$, a variety of irritant symptoms can occur which are dependent upon the ambient concentration of formaldehyde.

*See* Ex. D-228, Dr. Wedner Aff., para. 4.

viii. Formaldehyde has a very characteristic pungent odor which can be detected by most individuals well before irritation occurs.  The concentration at which the odor is detected varies from individual to individual, and the average individual can detect $CH_2O$ at about 0.5-1 part per million ("ppm") (500-1000 parts per billion ("ppb")). *See* Ex. D-228, Dr. Wedner Aff., para. 4.

ix. Irritation from formaldehyde is transient, and toxicologists do not consider it an adverse health effect, certainly not a disease or injury.  *See* Ex. D-227, Dr. Waddell Aff., para. 19.

x. The medical and scientific literature demonstrate that formaldehyde does not cause any injury at levels below sustained exposure at approximately 4 ppm – which is approximately fifty-two times higher than the average exposure level seen in the Centers for Disease Control ("CDC") study of the 519 EHUs.  *See* Ex. D-252, 2008 CDC Final Report on Formaldehyde Levels in FEMA-Supplied Trailers, Park Models, and Mobile Homes July 2, 2008 ("CDC Final Report").

xi. The 2008 CDC's Final Report on Formaldehyde Levels in FEMA-Supplied Trailers, Park Models, and Mobile Homes July 2, 2008 ("CDC Final Report") on its study of 519 EHUs

revealed a mean airborne formaldehyde exposure level of 0.077 ppm. *See* Ex. D-252, 2008 CDC Final Report.

xii.   At sufficient concentrations, exposure to formaldehyde vapor produces symptoms of sensory irritation, *i.e.*, irritation of the eyes, nose, and throat, with eye irritation generally accepted as the most sensitive endpoint. *See* Ex. D-226, Dr. Golden Aff., para. 8.

xiii.   In the most recent controlled human exposure study of volunteers exposed to formaldehyde, the authors concluded that: "[T]he results of the present study indicated eye irritation as the most sensitive parameter. Minimal objective eye irritation was observed at levels 0.5 ppm with peaks of 1 ppm .... It was concluded that the no-observed-effect level for subjective and objective eye irritation due to formaldehyde exposure was 0.5 ppm in case of a constant exposure levels and 0.3 ppm with peaks of 0.6 ppm in case of short-term peak exposures." *See* Ex. D-226, Dr. Golden Aff., para. 16.

xiv.   The volunteer subjects of the study above exhibited a threshold level of irritation at 0.5 ppm but no effect at all at 0.3 ppm. In the context of the EHUs studied by the CDC study, only one unit out of the total 519 exceeded the threshold irritation level of 0.5 ppm. 498 of the EHUs in the

CDC study were measured at levels less than the no-effect level of 0.3 ppm.  Thus, according to the 2008 volunteer study results, virtually no objective symptoms of sensory irritation to the EHU occupants would be expected at the formaldehyde levels found by the CDC study. *See* Ex. D-226, Dr. Golden Aff., para. 19.

xv.     Plaintiffs' discussion of exposure levels in the context of Minimum Risk Levels ("MRLs") in Plaintiffs' Memorandum in Support of Motion for Class Certification (Doc. 764-2, p. 29) misses the mark.  MRLs are a creation of the Agency for Toxic Substances and Disease Registry ("ATSDR").  They serve no regulatory function.  As defined by the ATSDR, "[t]hese substance-specific estimates, which are intended to serve as screening levels, are used by ATSDR health assessors to identify contaminants and potential health effects that may be on concern at hazardous waste sites.  It is important to note that MRLs are not intended to define clean-up or action levels for ATSDR or other agencies....  Exposure to a level above the MRL does not mean that adverse health effects will occur"  *See* Ex. D-226, Dr. Golden Aff., para. 20.

c.  Formaldehyde in Manufactured Housing

i.      In order to require more energy efficient manufactured

housing,  HUD regulations issued in 1975 required energy

efficiency in the construction of manufactured housing.

Implementation of these regulations significantly reduced the

indoor air exchange rates within mobile homes.  *See* 24

C.F.R. § 3280.1 *et seq.*

ii.      In the late 1970s, industry attention was brought to bear on a

limited number of formaldehyde odor complaints from

residents of manufactured housing that had resulted from

the reduced ventilation.  Recognizing the irritant properties of

formaldehyde vapor, the chemical producers of

formaldehyde and the wood products industry worked

together and developed wood products (particleboard and

hardwood plywood) with reduced formaldehyde emission

rates.

iii.     At the same time that resin producers and the wood

products industry were reducing formaldehyde emissions in

their products, HUD, in 1984, issued specific regulations for

manufactured housing that mandated that plywood

formaldehyde emission rates be limited to 0.2 ppm and

particleboard rates be limited to 0.3 ppm with a targeted

indoor ambient air level of formaldehyde of 0.4 ppm for

mobile homes.  The HUD indoor air target level for

formaldehyde of 0.4 ppm for mobile homes is the only

federal regulatory pronouncement for the indoor air of a residential dwelling. *See e.g.* 24 C.F.R. 3280.308; 49 Fed. Reg. 31998-99.

iv.   This level reflected that, "[t]he Department has concluded that an indoor ambient formaldehyde level of 0.4 ppm provides reasonable protection to manufactured home occupants." The HUD indoor air target of 0.4 ppm continues in full force and effect today. *See* Ex. D-252, CDC Final Report.

v.   Other than the HUD target level of 0.4 ppm, the only regulatory indoor ambient air standard for formaldehyde is the OSHA standard. OSHA establishes an "Action Level" for formaldehyde of 0.5 ppm with the permissible exposure level ("PEL") time-weighted average ("TWA") of 0.75 ppm with the stipulation that "... no employee is exposed to an airborne concentration of formaldehyde that exceeds 0.75 parts formaldehyde per million of air (0.75 ppm) as an eight hour TWA. *See* Ex. D-226, Dr. Golden Aff., para. 20.

vi.   The levels reported in the EHUs overall – geometric mean exposure of 0.077 ppm – fall far below 0.4 ppm. *See* Ex. D-252, CDC Final Report; Ex. D-254, FEMA Trailer Study Data Set for Individual Units ("CDC Data Set").

vii.   These HUD regulations – which became effective February

11, 1985 – were not limited to product standards for wood products containing formaldehyde. They also mandated the inclusion of an "Important Health Notice" that would be prominently displayed in a temporary manner in the kitchen (*i.e.*, countertop or exposed cabinet face) of all manufactured housing. The "Important Health Notice" requirement remains in full force today. *See* 24 C.F.R. § 3280.309. The notice provides in part:

IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose, and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term health effects of exposure to formaldehyde.

All manufactured-housing units that are the subject

matter of this litigation contained HUD compliant wood products and the HUD required formaldehyde health notice when they left the hands of the manufactured housing defendants.

viii. On the other hand, the practices of the travel-trailer defendants who are not subject to this regulation varied. Some of the travel-trailer defendants provided a health notice/warning concerning formaldehyde; some did not. At least one travel-trailer manufacturer provided formaldehyde warnings both by placing them on the bathroom mirror and by including them in the owner's manual.  Another manufacturer provided a warning in its manual that was located in each EHU.  *See e.g.* Ex. D-223, Fribley Aff., para. 8; Ex. D-264, Farish Deposition, pp. 109-110; Ex. D-266, Gaeddert Deposition, pp. 103-106.

ix. Following Hurricane Katrina on February 1, 2007, the federal government, through the CDC and its subsidiary Agency for Toxic Substances and Disease Registry ("ATSDR"), issued on February 1, 2007 its first Health Consultation.  This health consultation pronounced that 0.3 ppm exposure to formaldehyde is "below the level of concern for sensitive individuals."  Put another way, the CDC represented that exposures below 0.3 ppm presented no level of concern for

- 119 -

adverse health effects to individuals.  *See* Ex. D-255, CDC Health Consultation, February 2007.

    x.    This 0.3 ppm level of concentration is approximately four times greater than the mean level of formaldehyde found in the 519 tested CDC units.

d.  Plaintiffs' proposed class

    i.    The court rejects plaintiffs' proposed injury or damage definition as insufficient factually and legally.

e.  Injury - Cytotoxicity

    i.    Cell injury (cytotoxicity) follows the well established principle that there is a dose-response relationship.  That is, only certain doses can cause cellular injury following sufficient exposure.  Formaldehyde doses must be sufficient to damage and kill cells (*i.e.*, cytotoxicity) before this can result in cellular proliferation (growth).  In this connection, a 2006 publication, critically analyzing voluminous prior data according to EPA's risk assessment guidelines, concluded that there was an increase in tumor incidence in animal studies at sustained formaldehyde concentrations for two years equal to and greater than 6 ppm.  *See* Ex. D-226, Dr. Golden Aff., para. 21.  Exposure concentrations of 2 ppm and lower induced no malignant  nasal tumors.

    ii.    The studies addressing sub-clinical, cellular/cytotoxic insult

and the data show that tumors do not occur unless a threshold dose of formaldehyde has been exceeded, and this threshold dose is well in excess of 2 ppm. The claim of no threshold, or "no safe level," for formaldehyde exposure is demonstrably incorrect and not supported by any empirical data. *See* Ex. D-226, Dr. Golden Aff., para. 21.

iii.   There is no evidence in this case that a single exposure to anyone ever reached a level even approaching 2 ppm (sustained over time) – much less 6 ppm, the lowest level at which cellular damage might be expected. As such, cytotoxicity and any potential medical sequelae do not – and cannot – occur at the levels found in the FEMA EHUs.

f.   Injury - Sensitization/asthma

i.   Gaseous formaldehyde, the state of formaldehyde at issue here, is not a recognized immunogen. Plaintiffs do not provide any citation to scientific studies demonstrating that exposure to formaldehyde vapor alone is capable of inducing sensitization. *See* Ex. D-228, Dr. Wedner Aff., *passim*.

ii.   Regarding the exposure of small children to formaldehyde in the home setting, recent studies cited by Plaintiffs in their brief have only "suggested" that such ambient exposure "might" increase the risk of triggering the onset of a wheezing or asthma episode. Critically, those studies do *not*

find that formaldehyde caused asthma. *See* Ex. D-228, Dr. Wedner Aff., para. 14. Indeed, in the studies reviewed the effect of formaldehyde was minimal and was not statistically significant. At most, these studies show that $CH_2O$ might have an irritating effect on the airways.

iii.   In short, the latest medical literature on the subject only suggests that formaldehyde is an irritant that *might* trigger a wheezing or asthmatic episode. Medical science has not concluded that airborne formaldehyde *will* trigger such episodes or, critically, that it causes asthma.

g.   Injury - Cancer

i.   The International Agency for Research on Cancer (IARC), a subsidiary of The World Health Organization, is the only agency in the world presently known to have found formaldehyde to be a known human carcinogen – indeed a carcinogen for only one very rare human cancer, *i.e.,* nasopharyngeal cancer, and which finding is based entirely on occupational exposures, not residential exposures. *See* Ex. D-221, Dr. Cole Aff. at 8-11.

ii.   No U.S. regulatory agency has found formaldehyde to be a known human carcinogen. It is unnecessary at this class certification stage to address the merits of the IARC position, suffice it to say that medical researchers evaluating the basis

of the IARC conclusion have themselves concluded that the IARC finding is misplaced and no longer supportable by current data. *See* Ex. D-221, Dr. Cole Aff. at 8-11.

h. Exposure and Dose Assessment

   i.   Formaldehyde varies in its effects depending upon its dose or concentration.  *See* Ex. D-237, Dr. Shellito Deposition, p. 25.

   ii.   Determination of dose is critical to a determination of any alleged link between formaldehyde exposure and a purported health effect. *See* Ex. D-237, Dr. Shellito Deposition,   p. 25.

   iii.   Dose can not be determined without an accurate and reliable assessment of exposure.  *See* Ex. D-232, Dr. Hewett Deposition, pp. 77, 100-101; Ex. D-238, Dr. Smulski Deposition, p. 174.

   iv.   Conditions of living and individual plaintiff lifestyles as well as factors including wind, humidity, temperature, ventilation, unit age, unit orientation and materials utilized in the different forms of mobile homes and trailer units comprising the EHUs at issue vary greatly and affect possible formaldehyde levels within the EHU.  *See* Ex. D-232, Dr. Hewett Deposition, pp. 46-48, 100-101.

   v.   The test data available for the EHUs that were tested yield

varying ranges of formaldehyde levels.

vi.    Utilizing an averaging of formaldehyde levels across numerous EHUs as a means of describing formaldehyde exposure by a particular class member from that class member's EHU is statistically and scientifically unsound. *See* Ex. D-232, Dr. Hewett Deposition, pp. 77, 100-101; Ex. D-238, Dr. Smulski Deposition, p. 174.

i.  Symptomology

i.    Symptoms consistent with formaldehyde exposure are also consistent with causation by other factors not including formaldehyde exposure.  *See* Ex. D-230, DeVany Deposition, pp. 129-130; Ex. D-242, Dr. Williams Deposition, pp. 102.

ii.    The 47 symptoms surveyed as reported by purported class members on the Plaintiff Fact Sheets are non-specific symptoms that may be seen with other toxicants or other conditions, each of which can be caused by things other than formaldehyde, including other toxicants, environmental exposures beyond the EHU, pre-existing medical conditions or other illness. *See* Ex. D-242, Dr. Williams Deposition, pp. 102, 154; Ex. D-240, Dr. Stein Deposition, p. 74-80, 183-185; Ex. D-237, Dr. Shellito, p. 33.

iii.    Thousands of known respiratory irritants exist that can

explain these non-specific symptoms. *See* Ex. D-237, Dr. Shellito Deposition, p. 33; Ex. D-240, Dr. Stein Deposition, pp. 74-80, 183-185; Ex. D-242, Dr. Williams Deposition, pp. 90, 167.

iv.    Purported additional symptoms reported by alleged class members as due to formaldehyde exposure in their EHU total close to approximately 100 different additional symptoms or conditions (i.e. kidney stones, hysterectomy, bleeding ulcers, Sickle Cell Anemia), many or all of which are not associated with formaldehyde exposure. *See* Ex. D-237, Dr. Shellito Deposition, pp. 158-159.

v.    To determine whether any symptom reported by an EHU occupant was related to formaldehyde in that unit requires a complete individual medical evaluation and evaluation of the individual's environment. *See* Ex. D-242, Dr. Williams Deposition, p. 53; Ex. D-237, Dr. Shellito Deposition, pp. 39-40, 44, 166; Ex. D-236, Dr. Paris Deposition, pp. 31-32, 38.

vi.    Different people have different reactions to different levels of formaldehyde. *See* Ex. D-242, Dr. Williams Deposition, p. 90.

vii.    Time spent in an EHU, level of exposure to formaldehyde as well as individual sensitivity or individual characteristics would impact whether a person exhibited symptoms related

to formaldehyde exposure.  *See* Ex. D-237, Dr. Shellito

Deposition, pp. 100-102; Ex. D-240, Dr. Stein Deposition,

pp. 77-78.

viii.   For the overwhelming majority of the 100,000 plus putative

class members, there is no information known regarding

their exposure levels (if any), duration of exposures and

individual health characteristics.  *See* Ex. D-240, Dr. Stein

Deposition, p. 106.

j.   Individual Plaintiff/Representative

**Adams, John J.**

i.   John J. Adams is proposed as a class representative

for Lakeside Parkway Homes ("Lakeside"). See Ex.

D-125.

ii.   John J. Adams lived in a Lakeside travel trailer.  The

travel trailer was located in Louisiana. *Id.*

iii.   John J. Adams reports suffering from symptoms

including posttraumatic stress disorder he developed

while living in a FEMA unit. *Id.*

iv.   John J. Adams has a medical history of smoking,

asthma and depression.  These are pre-existing

conditions that the plaintiffs do not attribute to

formaldehyde exposure. *Id.*

**Alfonso, Stephen**

i.      Stephen Alfonso is a putative class representative for

Fleetwood, in the proposed Louisiana subclass.

Ex. D-126; Plaintiff Fact Sheet, p. 8.

ii.     Mr. Alfonso alleges to have lived in a travel trailer

manufactured by Fleetwood. *Id.*

iii.    The travel trailer was purportedly located in Louisiana.

*Id.* at 9.

iv.     Mr. Alfonso was 64 years old at the time he lived in

the unit. *Id.* at 11.

v.      Mr. Alfonso allegedly lived in the unit for

approximately ten months. *Id.* at 9.

vi.     He claims to have spent approximately 12-16 hours

per day in the unit. *Id.*

vii.    He smoked cigarettes, up to two packs per day, for

approximately thirty years. Ex. D-126; Deposition of

Stephen Alfonso, taken September 16, 2008, at 61:3-

13; 67:21-23.

viii.   He claims the following symptoms: irritation to eyes,

burning of eyes, tearing of eyes, irritation to nasal

membranes, burning of nasal membranes, bleeding of

nasal membranes, irritation or itching of skin, burning

of skin, rashes on skin, drying or scaling of skin,

scaling or itching of eyelids, irritation or swelling of

eyelids or eye area, tingling or swelling of lips or face area, headaches, nausea, vomiting, difficulty in breathing, wheezing, shortness of breath, persistent cough, throat irritation, upper respiratory tract infections, worsening of allergies that he had previous to living in FEMA trailer, dizziness, unconsciousness. Ex. D-126; Plaintiff Fact Sheet, pp. 3-4.

ix.     He had numerous pre-existing medical conditions related to his presently claimed symptoms, including extreme allergies, facial swelling, rashes, bronchitis, acute sinusitis, trouble breathing and sore throat. Ex. D-126; Deposition of Stephen Alfonso, pp. 58:20-59:1; 51:8-54:23; 54:24-55:21.

x.      He did not realize he was a class representative until the morning of his deposition. *Id.* at 83:24-84:10.

xi.     Despite learning that he is a class representative, he testified that "it is not [his] concern who the other people are." *Id.* at 79:20-25.

xii.    He is not familiar with the most fundamental pleadings in this case. *Id.* at 74:21-75:3; 76:25-77:6.

xiii.   He has no knowledge of the defendants named in this action, no knowledge of the other class

representatives or the putative members he purports

to represent, or even an idea as to how many putative

members there may be. *Id.* at 82:15-18;

80:7-14; 75:5-76:11; 77:9-21; 79:16-19.

xiv.    He complains of several symptoms that have never

been associated with formaldehyde exposure,

including vomiting, dizziness, and unconsciousness.

*See* Ex. D-126; Plaintiff Fact Sheet, pp. 3-4; Affidavit

of Dr. Golden, p. 25.

**Anderson, Sandra**

i.      Sandra Anderson is a putative class representative

for Gulf Stream Coach, Inc. Ex. D-129.

ii.     Ms. Anderson lived in a travel trailer manufactured by

Gulf Stream. *Id.*

iii.    The travel trailer was located in Mississippi. *Id.*

iv.     She reports residing in the trailer unit for three

months, spending about 13 hours per day in the trailer

unit.  *See* Ex. D-129; Plaintiff Fact Sheet, pp. 4, 8–9

and App. 2.

v.      She reports an onset of the reported symptoms about

two days after moving into the trailer.  *Id.*

at 4, 9. Her symptoms included irritation, burning, and

tearing of her eyes, irritation, burning, and bleeding to

her nasal membranes, irritation or itching of skin, burning of skin, rashes on skin, drying or scaling of skin, irritation or swelling or eyelids or eye area, tingling or swelling of lips or face, headaches, nausea, vomiting, bloody vomiting, abdominal pain, difficulty in breathing, wheezing, shortness of breath, persistent cough, tightness of chest, throat irritation, upper respiratory tract infections, allergies for the first time in her life, dizziness, abnormal liver enzymes, sleep apnea, heavy breathing, loosening of teeth, bad circulation in feet swelling in feet, muscle pain, low back pain, hair falling out, nasal congestion, stuffiness of nose that has not gotten better and has worsened, and abnormal laboratory tests on her blood.

vi.   Prior to living in the trailer, Ms. Anderson admits that she suffered from a pre-existing condition or conditions, but these are unknown. Ex. D-129; Plaintiff Fact Sheet, pp. 4-5.

vii.   Several of her symptoms, including abdominal pain, upper respiratory tract infections, dizziness, abnormal liver enzymes, low back pain, and allergies for first time in life, are inconsistent with known effects of exposure to formaldehyde at the levels alleged by

plaintiffs. Ex. D-129; Plaintiff Fact Sheet, pp. 3-4; Affidavit of Dr. Golden, pp. 23-28; Affidavit of Dr. Wedner, pp. 12-13.

viii.    She is a current smoker and has smoked one (1) pack of cigarettes per day for the past fifteen years. Ex. D-129; Deposition of Sandra Anderson, taken on October 14, 2008, at 99:9-17.

ix.    She does not know how many people are in the class. *Id.* at p. 89.

x.    She believes her attorneys are responsible for sending notices to the members. *Id.* at 114.

**Ayala, Marcilio**

i.    Marcilio Ayala is a putative class representative for Silver Creek Homes, Inc.

ii.    He and his wife, Maragrita Solis-Ayala who is also a putative class representative, lived in two different FEMA units, the details of which are broken down below.

iii.    He lived in the first unit which was located in Louisiana from November of 2006 through May of 2007; however, he has provided no information as to the manufacturer of that unit.

iv.      He indicates that the first unit was a mobile home with dimensions of 480 square feet and measured 40X12. His reason for leaving was "FEMA told us to leave."

v.      He spent 24 hours per day in the unit.

vi.      He lived in the second unit which was also located in Louisiana from May of 2007 to April of 2008. That unit was manufactured by Silver Creek Homes, Inc.

vii.      Although she indicated that this unit was a travel trailer, it was, in fact, a park model as Silver Creek Homes, Inc. manufactured <u>no travel trailers</u>. His reason for leaving was again "FEMA told us to leave."

viii.      He spent 22 hours per day in the unit.

ix.      His understanding of the illness or disease he has developed or may develop is "formaldehyde exposure."

x.      He reports that his symptoms began in September of 2007. Those symptoms included irritation to eyes, burning of eyes, tearing of eyes, irritation to nasal membranes (inside of nose), burning of nasal membranes (inside of nose), bleeding of nasal membranes (inside of nose), irritation or itching of skin, burning of skin, rashes on skin, drying or scaling of skin, scaling or itching of eyelids, irritation or

swelling of eyelids or eye area, headaches, nausea, vomiting, bloody vomiting, abdominal pain, diarrhea, difficulty in breathing, wheezing, shortness of breath, persistent cough, tightness of the chest, bronchitis, throat irritation, hoarseness, laryngitis, pneumonia, upper  respiratory tract infections, pulmonary edema, asthma attacks for the first time in his life, allergies for the first time in his life, allergic contact dermatitis, dizziness, unconsciousness, convulsions or seizures, blood in urine, abnormal liver enzymes, nephritis (inflammation of kidneys), hypothermia (low body temperature), abnormal laboratory tests on blood, abnormal laboratory tests on urine, body aches, high blood pressure.

xi.  He indicates his use of a FEMA trailer has <u>NOT</u> worsened a condition he already had in the past.

xii.  He reports that he was treated in 2005 at University Hospital in New Orleans in 2008 for chest pains; in 2007 at Ochsner Hospital in New Orleans for coughing, fever, dizziness, headaches; and in 2008 at Charity Hospital in New Orleans for high blood pressure and chest pain.

xiii.   The staff doctor at Ochsner Hospital in New Orleans told him that his alleged illness, disease, or injury is related to living in a FEMA trailer or mobile home.

xiv.   He had an MRI in April of 2008 at University Hospital due to problems breathing and a chest x-ray in July of 2008 due to a fall.

xv.   He was 57 years old at the time he began residing in the first FEMA unit.

xvi.   He was born in Puerto Rico and is Spanish speaking.

xvii.   He reports his weight prior to living in the FEMA as 220 pounds and his current weight is 190 pounds. He is 5'10" in height.

xviii.   He is not making a claim for lost wages.

### Baker, Shane L.A.

i.   Shane L. A. Baker is a putative class representative for Gulf Stream Coach, Inc. Ex. D-131.

ii.   Mr. Baker lived in a travel trailer manufactured by Gulf Stream. *Id.*

iii.   The travel trailer was located in Louisiana. *Id.*

iv.   Mr. Baker was two to three years old at the time he lived in the travel trailer. Ex. D-131; Plaintiff Fact Sheet, p. 6.

v.   He lived in the trailer unit for six months, spending about 22-24 hours per day in the trailer unit. *See* Ex.

- 134 -

D-131; Plaintiff Fact Sheet, pp. 4, 8–9 and App. 2.

vi.    His symptoms included irritation, burning, and bleeding to her nasal membranes, rashes on skin, drying or scaling of skin, nausea, vomiting, abdominal pain, diarrhea, difficulty in breathing, wheezing, shortness of breath, persistent cough, tightness of chest, throat irritation, hoarseness and ear infections.

vii.   Several of his symptoms, including abdominal pain and diarrhea, are inconsistent with known effects of exposure to formaldehyde at the levels alleged by plaintiffs. Ex. D-131; Plaintiff Fact Sheet, pp. 3-4; Affidavit of Dr. Golden, pp. 23-28.

viii.  His parents both smoke. Ex. D-131; Deposition of Shane Baker, taken October 10, 2008, at 44, 45, 183.

ix.    It is reported that he still suffers every symptom. *Id.* at 91.

x.     Mr. Baker is represented in this case by his father, Shane Baker. Ex. D-131.

xi.    The representing Shane Baker has no idea how many persons are in the potential class.  *See* Ex. D-131; Deposition of Shane Baker, 10/10/08, pp. 102-103.

xii.   When asked about the duties of a class representative, Mr. Baker asked examining counsel to

- 135 -

"explain it to me…" *Id.* p. 107.

xiii. He learned his son was being offered as a class

representative just one week before the deposition.

*Id.* p. 108.

xiv. He is unaware of any rulings, amendments or

deadlines in the litigation. *Id.* pp. 114-115.

**Ballet, Derell**

i. Derell Ballet, an 8 year old minor, is proposed as a

class representative for Monaco Coach Corporation

("Monaco"). Ex. D-133.

ii. Derell Ballet is being represented in this litigation by

his mother, Toinette Walker. *Id.*

iii. Derell Ballet lived in a travel trailer from January,

2006 through January, 2008.  The travel trailed was

located in Louisiana. *Id.*

iv. Derell Ballet reports suffering from symptoms

including eye irritation, skin rashes and nausea he

developed while living in a FEMA unit. *Id.*

v. No health care provider has advised Derell Ballet that

his symptoms are linked to formaldehyde exposure.

vi. Neither Derell Ballet nor Toinette Walker have

attended any hearings, nor do they know what

motions have been filed, or know what rulings have

issued. *Id.*

vii.    Neither Derell Ballet nor Toinette Walker have met with any experts, reviewed any expert reports, reviewed discovery responses, or conducted any research regarding the lawsuit, FEMA, or formaldehyde. *Id.*

**Ballet, Egypt**

i.    Egypt Ballet, a 7 year old minor, is proposed as a class representative for Monaco Coach Corporation ("Monaco"). Ex. D-134.

ii.    Egypt Ballet is being represented in this litigation by her mother, Toinette Walker. *Id.*

iii.    Egypt Ballet lived in a Monaco travel trailer from January, 2006 through January, 2008.  The travel trailed was located in Louisiana. *Id.*

iv.    Egypt Ballet reports suffering from symptoms including eye irritation, headaches and nausea she developed while living in a FEMA unit. *Id.*

v.    No health care provider has advised Egypt Ballet that her symptoms are linked to formaldehyde exposure.

vi.    Neither Egypt Ballet nor Toinette Walker have attended any hearings, nor do they know what motions have been filed, or know what ruling have

- 137 -

issued. *Id.*

vii.     Neither Egypt Ballet nor Toinette Walker have met

with any experts, reviewed any expert reports,

reviewed discovery responses, or conducted any

research regarding the lawsuit, FEMA, or

formaldehyde. *Id.*

**Ballet, IV, Edward**

i.     Edward Ballet, IV, a 17-year-old minor, is proposed as

a class representative for Thor California ("Thor"). Ex.

D-132.

ii.     Edward Ballet, IV is being represented in this litigation

by his stepmother, Toinette Walker. *Id.*

iii.     Edward Ballet, IV lived in a travel trailer from March,

2006 through January, 2008.  The travel trailed was

located in Louisiana. Ex. *Id.*

iv.     Edward Ballet, IV was 16 years old when he lived in

the travel trailer. Ex. *Id.*

v.     Edward Ballet, IV reports suffering from symptoms

including eye irritation, headaches and nausea he

developed while living in a FEMA unit. Ex. *Id.*

vi.     No health care provider has advised Edward Ballet, IV

that his symptoms are linked to formaldehyde

exposure. *Id.*

vii.    Neither Edward Ballet, IV nor Toinette Walker have attended any hearings, nor do they know what motions have been filed, or know what ruling have issued. *Id.*

viii.   Neither Edward Ballet, IV nor Toinette Walker have met with any experts, reviewed any expert reports, reviewed discovery responses, or conducted any research regarding the lawsuit, FEMA, or formaldehyde. *Id.*

### Battie, D'Asia rep by Kendra Battie

i.      D'Asia Battie, a minor, is a putative class representative for Jayco, Inc. Ex. D-135.

ii.     D'Asia Battie lived in a travel trailer manufactured by Jayco, Inc. Ex. D-135; *Plaintiff Fact Sheet* p. 8.

iii.    The travel trailer was located in the State of Louisiana. *Id.* at p. 9.

iv.     D'Asia Battie was approximately ten to twelve years of age while living in the travel trailer.  *Id.* at p. 6, 9.

v.      D'Asia Battie lived in the travel trailer for two and one-half years, spending approximately sixteen hours per day in the travel trailer during the school year.  Ex. D-135; *Deposition of Kendra Battie* at Page 35, Lines 21-25; Page 36, Lines 1-16.

- 139 -

vi.   D'Asia Battie visited relatives in different FEMA-supplied travel trailers on an almost daily basis, sometimes spending the night with those relatives. *Id.* at Page 36, Lines 18-25; Page 37, Lines 1-22; Page 38, Lines 1-25.

vii.   Symptoms reported on behalf of D'Asia Battie, which started approximately three months after moving into the travel trailer, included nasal congestion, headaches, stomach aches, nausea, dizziness, loss of appetite and diarrhea.  *Id.* at Page 58, Lines 21-25; Page 59, Lines 1-14; Page 60, Lines 16-25.

viii.   Three of the symptoms claimed on behalf of D'Asia Battie, stomach problems, dizziness and diarrhea are inconsistent with known effects of formaldehyde exposure at the levels alleged by Plaintiffs.  *Affidavit of Dr. Robert Golden*, p. 25-26; Ex. D-135, *Plaintiff Fact Sheet*, p. 3.

ix.   Other family members who occupied the travel trailer reported suffering different symptoms than those claimed on behalf of D'Asia Battie.  Ex. D-135; *Deposition of Kendra Battie*, Page 62, Lines 21-25; Page 63, Lines 1-6; Page 65, Lines 4-18; Page 66, Lines 7-19; Page 68, Lines 4-25; Page 69, Lines 106.

x.    The vent in the travel trailer was opened approximately two times per week.  *Id*. at Page 45, Lines 18-25.

xi.    The windows in the travel trailer were not opened by the Batties.  *Id*. at Page 46, Lines 1-13.

### Beasley, Heavenly rep by Joycelyn C. Beasley

i.    Heavenly Beasley, a minor, is a putative class representative for Jayco, Inc. Ex. D-136.

ii.    Heavenly Beasley lived in a travel trailer manufactured by Jayco, Inc. Ex. D-136; *Plaintiff Fact Sheet*, p. 8.

iii.    The travel trailer was located in the State of Louisiana.  *Id*. at p. 9.

iv.    Heavenly Beasley was approximately five months to two and one-half years of age while living in the travel trailer.  *Id*. at p. 6, 9.

v.    Heavenly Beasley lived in the travel trailer for two and one-half years, spending approximately twenty-four hours per day in the travel trailer.  *Id*. at p. 9.

vi.    Symptoms suffered by Heavenly Beasley, include diagnoses in December 2006 of bronchitis and upper respiratory infection.  Ex. D-136; *Deposition of Joycelyn Beasley*, Page 51, Lines 1-19.

vii.    Symptoms suffered by Heavenly Beasley also included diarrhea and stomach problems. *Id.* at Page 51, Lines 1-14; Page 57, Lines 16-20.

viii.    Three of the symptoms reported by Heavenly Beasley, diarrhea, stomach problems and upper respiratory infection are inconsistent with known effects of exposure to formaldehyde at the levels alleged by Plaintiffs. *Affidavit of Dr. Robert Golden*, p. 24-26.

ix.    Heavenly Beasley denies living in the travel trailer worsened any condition that she had in the past. Ex. D-136; *Plaintiff Fact Sheet*, p. 4.

x.    The parents of Heavenly Beasley, the only other occupants of the trailer, complained of symptoms that are different than Heavenly Beasley's symptoms. Ex. D-136; *Deposition of Joycelyn Beasley*, Page 58, Lines 21-25; Page 59, Lines 1-19.

xi.    The travel trailer was equipped with three vents that were kept open at all times and the windows were opened during the day. *Id.* at Page 37, Lines 14-25; Page 38, Lines 1-10.

**Benoit, Christopher:**

i.  Christopher Benoit, a thirteen-year-old minor, is proposed as a class representative. Ex. D-137.

ii.  He is being represented in this litigation by his mother, Pamela Benoit. *Id.*

iii.  Pamela Benoit has not been appointed as the administrator or tutor for Christopher Benoit.

iv.  Christopher Benoit lived in a Horton Homes, Inc. manufactured housing unit from February 2006 through August 2007. *Id.*

v.  During this time, the Horton Homes unit was situated in the State of Louisiana. *Id.*

vi.  Christopher Benoit was in the Horton Homes unit for approximately eight hours per day on average. *Id.*

vii.  Christopher Benoit claims sinus infections and nose bleeds as the symptoms he developed while living in a FEMA unit. *Id.*

viii.  No health care provider has advised Christopher Benoit (or his parents), that his symptoms are linked to formaldehyde exposure. *Id.*

ix.  Christopher Benoit is not asserting a claim for mental or emotional damages. *Id.*

x.  Christopher Benoit has a medical history of ADHD/hyperactivity and is being treated with the

medication Adderall.  This is a pre-existing condition that the plaintiffs do not attribute to formaldehyde exposure.  *Id.*

xi. Christopher Benoit is wholly unaware of this lawsuit or his proposed participation as a class representative. *Id.*

xii. Neither Christopher nor Pamela Benoit have reviewed or assisted with the drafting of any of the pleadings filed with the Court. *Id.*

xiii. Neither Christopher nor Pamela Benoit knows any other prospective class members.  *Id.*

xiv. Neither Christopher nor Pamela Benoit has communicated with any other prospective class member. *Id.*

xv. Neither Christopher nor Pamela Benoit know any other person that lived in a Horton Homes unit provided by FEMA. *Id.*

xvi. Neither Christopher nor Pamela Benoit have attended any hearings, know what motions have been filed, or know what ruling have issued. *Id.*

xvii. Neither Christopher nor Pamela Benoit have met with any experts, reviewed any expert reports, reviewed

discovery responses, or conducted any research regarding the lawsuit, FEMA, or formaldehyde. *Id.*

xviii.   Pamela Benoit has made no effort whatsoever to educate herself or Christopher Benoit regarding the status of the lawsuit or the claims against the defendants. *Id.*

## Beverly, Marcie – Forest River, Inc.

i.   Marcie Beverly is a putative class representative for Forest River, Inc.  *See* Ex. D-139; Plaintiff Fact Sheet, p. 8.

ii.   Ms. Beverly claims she lived in a travel trailer manufactured by Forest River, Inc. *Id.* at 8.

iii.   The travel trailer was located in Louisiana.  *Id.* at 9.

iv.   Ms. Beverly was fifty-five years old at the time she lived in the travel trailer.  *Id.* at 8.

v.   She claims she lived in the Forest River trailer for approximately six months, spending about 22 hours inside the trailer per day.  *Id.* at 8-9.

vi.   She reports suffering from symptoms immediately upon moving into the trailer. Those symptoms include: irritation to the eyes, burning and tearing of the eyes, irritation or itching of skin, bleeding, burning, and irritation of nasal membranes, skin rashes, burning

skin, scaling or itching of eyelids, irritation or swelling

of eyelids or eye area, headaches, nausea, diarrhea,

difficulty in breathing, wheezing, allergies for the first

time in her life, shortness of breath, throat irritation,

tightness of the chest, upper respiratory tract

infections, and persistent cough.  *Id.* at 3-4.

vii.   She complains of symptoms that have never been

associated with formaldehyde exposure, including

diarrhea.  *Id.*; Affidavit of Dr. Golden, p. 25.

viii.   Prior to living in the travel trailer, Ms. Beverly was

exposed to mold in her apartment.  *See* Ex. D-139;

Deposition of Marcie Beverly, taken October 14,

2008, 92: 5-17.

ix.   Ms. Beverly smoked cigarettes, up to eight per day,

inside the units and has smoked since she was

nineteen years old.  *Id.* at 75:3-4; 77:14-23

x.   She filed suit against Conoco for alleged exposure to

chemicals in Westlake, Louisiana, in 2005.  *Id.* at 28:

13-25; 29:1-25.

xi.   Following Hurricane Rita, she claims that she lived in

two units, a Forest River travel trailer and an Adrian

Home mobile home.  *See* Ex. D-139; *Plaintiff* Fact

Sheet, pp. 8, 27.

xii.   She is not familiar with the most fundamental deadlines in this case. *See* Ex. D-139; *Deposition* of Marcie Beverly, taken October 14, 2008, 61: 1-5.

xiii.  She stated that she will not notify the class member about developments in the suit, but instead will rely upon her lawyers to do so. *Id.* at 63: 4-19.  She is also not prepared to pay the costs to notify other class members of developments in litigation.  *Id.* at 63: 13-19.

xiv.   She has never met with any other named plaintiffs in the suit and does not know how many class members are in the suit.  *Id.* at 47: 19-24; 48: 4-5; 64: 22-24.

**Beverly, Marcie – Alliance Homes, Inc. d/k/a Adrian Homes**

i.     Marcie Beverly is a putative class representative for Alliance Homes, Inc., d/b/a Adrian Homes. She lived in two different FEMA units, the details of which are broken down below.

ii.    She lived in the first unit which was located in Louisiana from July of 2006 through January of 2007, which was a travel trailer manufactured by Forest River.  Her reason for leaving was "Moved into larger trailer."

iii.   She spent 22 hours per day in the unit.

iv.    She reported smoking an average of 10 cigarettes per day for 35 years, and she did smoke inside the unit

v.    She lived in the second unit which was also located in Louisiana from January of 2007 to May of 2008, which was a mobile home manufactured by Adrian Homes.  Her reason for leaving was "Trailer was moved."She spent 22 hours per day in the unit.

vi.    Her understanding of the illness or disease she has developed or may develop is "formaldehyde exposure which may cause cancer."

vii.    She reports that her symptoms began in August of 2006.  Those symptoms included irritation to eyes, burning of eyes, tearing of eyes, irritation to nasal membranes (inside of nose), burning of nasal membranes (inside of nose), bleeding of nasal membranes (inside of nose), irritation or itching of skin, burning of skin, rashes on skin, scaling or itching of eyelids, irritation or swelling of eyelids or eye area, headaches, nausea, diarrhea, difficulty in breathing, wheezing, shortness of breath, persistent cough, tightness of the chest, throat irritation, upper respiratory tract infections, allergies for the first time in her life, sleeplessness and constant fatigue.

viii. She is also claiming depression as a result of residing in a FEMA trailer or mobile home.  However, she has a history of being treated for depression in 2000, at which time she was prescribed Paxil for 4-6 months.

ix. She indicates her use of a FEMA trailer has NOT worsened a condition she already had in the past.

x. She reports that she has been treated from 2006 to present for breathing problems.

xi. No healthcare professional has told her that her alleged illness, disease, or injury is related to living in a FEMA trailer or mobile home.

xii. She had a chest x-ray in 2008 at Memorial Hospital due to breathing problems, and had an MRI in 2008 and CT Scan in 2007-2008 due to a back injury.

xiii. She was 55 years old at the time she began residing in the first FEMA unit.

xiv. She is not making a claim for lost wages.

xv. She has a pending lawsuit for claims regarding a chemical release at Conoco Westlake, Louisiana on September 17, 2005.

**Bradford, Portia**

i. Portia Bradford is a putative class representative for Gulf Stream Coach, Inc. Ex. D-140.

ii.      Mrs. Bradford lived in a travel trailer manufactured by Gulf Stream. *Id.*

iii.     The travel trailer was located in Louisiana. *Id.*

iv.     She reports residing in the trailer unit for 15 months, spending about 20 hours per day in the trailer unit. Ex. D-140; PFS 4, 9.

v.      She reports an onset of the reported symptoms immediately upon moving into the trailer. *Id.* Her symptoms included irritation, burning, and tearing of her eyes, irritation and burning to her nasal membranes, irritation or itching of skin, burning of skin, rashes on skin, drying or scaling of skin, scaling or itching of eyelids, headaches, abdominal pain, diarrhea, allergies for the first time in her life, low blood pressure, dizziness, and allergic contact dermatitis.

vi.     Prior to living in the trailer, Mrs. Bradford suffered from vertigo and headaches. Ex. D-140; PFS 4-5.

vii.    Several of her symptoms, including dizziness, abdominal pain, diarrhea and low blood pressure, are inconsistent with known effects of exposure to formaldehyde at the levels alleged by plaintiffs. Ex. D-140; Plaintiff Fact Sheet, pp. 3-4; Deposition of Portia

- 150 -

Bradford, taken October 16, 2008, at 44, 58-60;

Affidavit of Dr. Golden, pp. 23-28.

viii.    She has no idea how many plaintiffs are in the

litigation. Ex. D-140; Deposition of Portia Bradford,

10/16/08, p. 71.

ix.    She has delegated her duties as a class

representative to her attorneys. *Id.* pp. 78-79.

x.    She does not know where the lawsuit has been filed.

*Id.* p. 85.

xi.    She is not aware of rulings or orders or deadlines in

place. *Id.* pp. 106-107.

**Bradford, Randy**

i.    Randy Bradford is a putative class representative for

Gulf Stream Coach, Inc. Ex. D-141.

ii.    Mr. Bradford lived in a travel trailer manufactured by

Gulf Stream. *Id.*

iii.    The travel trailer was located in Louisiana. *Id.*

iv.    He reports residing in the trailer unit for 15 months,

spending about 17 hours per day in the trailer unit.

Ex. D-141; PFS 4, 9.

vi.    He reports an onset of the reported symptoms

immediately upon moving into the trailer. *Id.* His

symptoms included irritation, burning, and tearing of

his eyes, irritation and bleeding to his nasal membranes, scaling or itching of eyelids, irritation or swelling of eyelids or eye areas, tingling or swelling of lips or face, headaches, nausea, diarrhea, difficulty in breathing, wheezing, shortness of breath, tightness of the chest, bronchitis, throat irritation, upper respiratory tract infections, asthma attacks that are recurrence of childhood asthma, allergies for first time in his life, worsening of allergies he had prior to living in FEMA trailer, dizziness, and unconsciousness.

vii.   Prior to living in the trailer, Mr. Bradford suffered from asthma. Ex. D-141; Plaintiff Fact Sheet, p. 4. Deposition of Randy Bradford, taken October 16, 2008, at 54.

viii.   Several of his symptoms, including dizziness, unconsciousness, diarrhea and upper respiratory tract infections, are inconsistent with known effects of exposure to formaldehyde at the levels alleged by plaintiffs. Ex. D-141; Plaintiff Fact Sheet, pp. 3-4; Deposition of Randy Bradford, taken October 16, 2008, at 126-128; Affidavit of Dr. Golden, pp. 23-28.

ix.    He reported that he "doesn't know anything about the case yet." Ex. D-141; Deposition of Randy Bradford, 10/16/08, p. 32.

x.    He first learned he was a class representative two (2) days prior to his deposition. *Id.* p. 36, 38.

xi.    He has not reviewed any pleadings in the litigation, has done nothing to push the litigation forward, has not notified or spoken with any persons he is representing and has not reviewed any documents in the litigation except his own fact sheet and records. *Id.* p. 37.

xii.    He is unaware of a class certification hearing being set. *Id.* p. 42.

xiii.    He is unaware of what defendants were sued and why. *Id.* pp. 32-34, 39.

xiv.    He has essentially "delegated all responsibility for this case to his attorney." *Id.* p. 44.

**Bridges, Juanita G.**

i.    Juanita G. Bridges is proposed as a class representative for Dutchmen Manufacturing, Inc. ("Dutchmen"). Ex. D-142.

ii.     Ms. Bridges lived in a Dutchmen travel trailer from December 2005 through the present. The travel trailer is located in Mississippi. *Id.*

iii.     Ms. Bridges was 65 years old when moved into the Dutchmen travel trailer. *Id.*

iv.     Ms. Bridges stays in the travel trailer for approximately 20 hours per day on average. *Id.*

v.     Ms. Bridges is suffering from symptoms including nausea, vomiting, and dizziness she developed while living in a FEMA unit. *Id.*

vi.     No health care provider has advised Ms. Bridges that her symptoms are linked to formaldehyde exposure. *Id.*

vii.     Ms. Bridges has a medical history of skin rashes and high blood pressure. These are pre-existing conditions that the plaintiffs do not attribute to formaldehyde exposure. *Id.*

viii.     Ms. Bridges is not familiar with the allegations of the complaint and does not know whom she has sued. *Id.*

ix.     Ms. Bridges does not know any other prospective class members. *Id.*

x.     Ms. Bridges did not review the lawsuit filed on her behalf. *Id.*

**Bright, Rose Lee**

    i.     Rose Lee Bright is proposed as a class representative for Dutchmen Manufacturing, Inc. ("Dutchmen"). Ex. D-143.

    ii.    Ms. Bright lived in a Dutchmen travel trailer from September 2006 through November 2007.  The travel trailer was located in Louisiana.  *Id.*

    iii.   Ms. Bright was 55 years old when she lived in the Dutchmen travel trailer.  *Id.*

    iv.   Ms. Bright was in the travel trailer for approximately twenty-four hours per day, on average.  *Id.*

    v.    Ms. Bright reports suffering from symptoms including abdominal pain, vomiting, dizziness, and diarrhea she developed while living in a FEMA unit. *Id.*

    vi.   No health care provider has advised Ms. Bright that her symptoms are linked to formaldehyde exposure. *Id.*

    vii.   Ms. Bright has a medical history of high blood pressure, Chronic Obstructive Pulmonary Disease (COPD) and asthma.  These are pre-existing conditions that plaintiffs do not attribute to formaldehyde exposure. *Id.*

viii.    Ms. Bright was a heavy smoker, having smoked as
many as 20 cigarettes per day for 32 years. *Id.*

ix.    Ms. Bright failed to appear for her properly noticed
deposition on September 19, 2008.  *Id.*

x.    Ms. Bright failed to appear for her properly noticed
deposition on October 17, 2008.  *Id.*

**Culler, Joan**

i.    Joan Culler is a putative class representative for Gulf
Stream Coach, Inc. Ex. D-146.

ii.    Ms. Culler lived in a travel trailer manufactured by
Gulf Stream. *Id.*

iii.    The travel trailer was located in Louisiana. *Id.*

iv.    Ms. Culler resided in the trailer unit for 10 months,
spending about 12 hours per day in the trailer unit.
Ex. D-146; Plaintiff Fact Sheet, p. 9.

v.    Ms. Culler resided "on and off" at other locations
during the time in which she resided in the trailer unit.
Ex. D-146; Plaintiff Fact Sheet of Jerome Culler o/b/o
Joan Culler, p. 10.

vi.    Ms. Culler experienced the onset of identified
symptoms within two to three weeks of moving into
the trailer unit. Ex. D-146; Deposition of Jerome
Culler, taken August 6, 2008, at 25. These symptoms

included irritation, burning, and tearing of his eyes, irritation, burning, and bleeding to his nasal membranes, irritation or itching of skin, burning of skin, rashes on skin, drying or scaling of skin, scaling or itching of eyelids, irritation or swelling or eyelids or eye area, tingling or swelling of lips or face, headaches, nausea, vomiting, bloody vomiting, abdominal pain, diarrhea, difficulty in breathing, wheezing, shortness of breath, persistent cough, tightness of chest, bronchitis, throat irritation, hoarseness, laryngitis, pneumonia, upper respiratory tract infection, pulmonary edema, dizziness, unconsciousness, convulsions or seizures, blood in urine, nephritis, low blood pressure, hypothermia, abnormal laboratory tests of her blood, and abnormal laboratory tests of her urine.

vii.    Prior to living in the trailer, Ms. Culler suffered from headaches and diabetes. Ex. D-146; PFS at 4-5; Deposition of Jerome Culler, taken August 6, 2008, at 181.

viii.   Several of her symptoms, including abdominal pain, diarrhea, dizziness, upper respiratory tract infection, pneumonia, pulmonary edema, unconsciousness,

seizures or convulsions, nephritis and low blood pressure, are inconsistent with known effects of exposure to formaldehyde at the levels alleged by plaintiffs. Ex. D-146; Plaintiff Fact Sheet of Jerome Culler o/b/o Joan Culler, pp. 3-4; Deposition of Jerome Culler, taken August 6, 2008, at 16, 28; Affidavit of Dr. Golden, pp. 23-28.

ix.    Jerome Culler is asserting a wrongful death claim on behalf of Ms. Culler and is representing her for class purposes. Ex. D-146; Plaintiff Fact Sheet, pp. 2, 8; Deposition of Jerome Culler, taken August 6, 2008, at 41.

x.    Mr. Culler did not see the lawsuit before it was filed. Ex. D-146; Deposition of Jerome Culler, taken August 6, 2008, at 36.

xi.    He has not spoken with any other plaintiffs. *Id.* at 43.

xii.    He states that the allegations in the Complaint are based on what he saw in the news media. *Id.* at 43-49.

## Culler, Jerome

i.    Jerome Culler is a putative class representative for Gulf Stream Coach, Inc. Ex. D-145.

ii.     Mr. Culler lived in a travel trailer manufactured by Gulf
        Stream. *Id.*

iii.    The travel trailer was located in Louisiana. *Id.*

iv.     Mr. Culler resided in the trailer unit for 27 months,
        spending about 20 hours per day in the trailer unit.
        Ex. D-145; Plaintiff Fact Sheet, p. 9.

v.      He reports that the onset of identified symptoms was
        within two to three weeks of moving into the trailer
        unit. Ex. D-145; Deposition of Jerome Culler, taken
        August 6, 2008, at 25. These symptoms included
        irritation, burning, and tearing of his eyes, irritation,
        burning, and bleeding to his nasal membranes,
        irritation or itching of skin, burning of skin, rashes on
        skin, drying or scaling of skin, scaling or itching of
        eyelids, irritation or swelling or eyelids or eye area,
        tingling or swelling of lips or face, headaches, nausea,
        bloody vomiting, abdominal pain, diarrhea, difficulty in
        breathing, wheezing, shortness of breath, persistent
        cough, tightness of chest, throat irritation,
        hoarseness, dizziness, and allergic contact dermatitis.

vi.     Prior to living in the trailer, Mr. Culler suffered from
        hypertension and diabetes. Ex. D-145; PFS at 4-5;

Deposition of Jerome Culler, taken August 6, 2008, at 180.

    vii.    Several of his symptoms, including abdominal pain, diarrhea, and dizziness, are inconsistent with known effects of exposure to formaldehyde at the levels alleged by plaintiffs. Ex. D-145; Plaintiff Fact Sheet, pp. 3-4; Deposition of Jerome Culler, taken August 6, 2008, at 16, 28; Affidavit of Dr. Golden, pp. 23-28.

    viii.    Mr. Culler is a past user of tobacco products. He smoked one-half pack of cigarettes per day from 1980 to 1986. Ex. D-145; PFS 11-12.

    ix.    He did not see the lawsuit before it was filed.  Ex. D-145; Deposition of Jerome Culler, 8/6/08, p. 36.

    x.    He has not spoken with any other plaintiffs. *Id.* p. 43.

    xi.    He states that the allegations in the Complaint are based on what he saw in the news media. *Id.* pp. 43-49.

### Darby, Brian, Jr. rep by Brian Darby, Sr.

    i.    Brian Darby, Jr., is a putative class representative for TL Industries, Inc. Ex. D-147.

    ii.    The travel trailer was located in Louisiana. *See* Ex. D-147; Plaintiff Fact Sheet, pg. 9.

iii.    Darby was twelve to thirteen years old at the time he lived in the travel trailer. *See* Ex. D-147; Plaintiff Fact Sheet, pp. 6, 9.

iv.    Darby lived in the trailer for two years, spending 12 hours inside the trailer per day. *See* Ex. D-147; Plaintiff Fact Sheet, pg. 9.

v.    He reports suffering from symptoms immediately upon moving into the trailer.  Those symptoms included irritation to the eyes, burning of the eyes, irritation or itching of skin, skin rashes, scaling or itching of eyelids, headaches, nausea, difficulty in breathing, wheezing, worsening of allergies, allergic contact dermatitis, dizziness, and persistent cough. *See* Ex. D-147; Plaintiff Fact Sheet, pgs. 3-4.

vi.    Two of Darbys' reported symptoms, dizziness and worsening of the allergies, are inconsistent with know effects of exposure to formaldehyde at the levels alleged by plaintiffs. *See* Ex. D-147; Affidavit of Dr. Golden, pgs. 25-28.

vii.    Prior to living in the travel trailer, Darby suffered from allergies, skin rashes, and skin irritation. *See* Ex. D-147; Plaintiff Fact Sheet, pgs. 4 and 13.

**Daunoy, Peter, III:**

i.     Peter Daunoy III is a putative class representative for Layton Homes Corporation. Ex. D-148.

ii.    Mr. Daunoy lived in a travel trailer manufactured by Layton Homes Corporation. *Id.*

iii.   The travel trailer was located in Louisiana. *Id.*

iv.    The travel trailer was manufactured in January 2006.

v.     The travel trailer was <u>not</u> manufactured for sale to FEMA <u>or</u> any FEMA contractors. *Id.*

vi.    Mr. Daunoy lived in the trailer for twenty-seven (27) months, spending twenty (20) to twenty-four (24) hours per day inside the trailer. *Id.*

vii.   Four (4) of Mr. Daunoy's reported symptoms, including abdominal pain, vomiting, dizziness, and diarrhea, are inconsistent with known effects of exposure to formaldehyde at the levels alleged by plaintiffs. *Id.*

viii.  Mr. Daunoy contacted FEMA about being provided a handicapped travel trailer to accommodate his fibromyalgia in January 2007. *Id.*

ix.    Mr. Daunoy contacted FEMA about relocating the travel trailer because of neighborhood conditions in 2006. *Id.*

x.    Mr. Daunoy is a smoker and has smoked five (5) cigars per day for thirty-five (35) years. *Id.*

xi.    Prior to living in the travel trailer, Mr. Daunoy suffered from fibromyalgia. *Id.*

**Davis, Corey**

i.    Corey Davis is a putative class representative for Gulf Stream Coach, Inc. Ex. D-149.

ii.    Mr. Davis lived in a travel trailer manufactured by Gulf Stream. *Id.*

iii.    The travel trailer was located in Louisiana. *Id.*

iv.    Mr. Davis resided in the trailer unit for 13 months, spending about 14 hours per day in the trailer unit. Ex. D-149; Plaintiff Fact Sheet, p. 9.

v.    He reports that the onset of identified symptoms almost as soon as he moved into the trailer unit. Ex. D-149; Plaintiff Fact Sheet, p. 4. These symptoms included irritation, burning, and tearing of his eyes, irritation, burning, and bleeding to his nasal membranes, irritation or itching of skin, drying or scaling of skin, scaling or itching of eyelids, headaches, nausea, vomiting, abdominal pain, diarrhea, difficulty in breathing, wheezing, shortness

of breath, persistent cough, tightness of chest, throat irritation, hoarseness, and dizziness.

vi.   Several of his symptoms, including dizziness and diarrhea, are inconsistent with known effects of exposure to formaldehyde at the levels alleged by plaintiffs. Ex. D-149; Plaintiff Fact Sheet, pp. 3-4; Deposition of Corey Davis, taken October 10, 2008, at 55-56, 60; Affidavit of Dr. Golden, pp. 23-28.

vii.   He has no idea of the claims of other class members. Ex. D-149; Deposition of Corey Davis, taken October 8, 2008, at 87.

viii.   He does not know who the defendants are in the litigation. *Id.* at 88.

ix.   He does not know who the defendants are in this case. *Id.* at 89.

x.   He does not know where the lawsuit is pending. *Id.*

xi.   He has not taken an active role informing the other claimants and is relying on the attorneys to do so. *Id.* at 91-92.

xii.   He is not aware of any deadlines or reviewed any orders issued by the court. *Id.* at 93.

**Davis, Linda**

i.      Linda Davis ("Davis") is a putative class representative for CMH Manufacturing, Inc. Ex. D-151.

ii.      Davis lived in a CMH Manufacturing, Inc. manufactured home. *Id.*

iii.      Davis's manufactured home was located in Louisiana. *Id.*

iv.      Davis was approximately twenty-seven (27) to twenty-eight (28) years old at the time she lived in the manufactured home. *Id.*

v.      Davis lived in the manufactured home for approximately twenty-one (21) months, spending approximately sixteen (16) hours in the manufactured home per day. *Id.*

vi.      Prior to living in the manufactured home, Davis lived in a travel trailer provided by FEMA manufactured by someone other than CMH Manufacturing, Inc. for approximately seven (7) months. *Id.*

vii.      Davis reports suffering from symptoms immediately upon moving into the housing units provided by FEMA, including headaches, nausea, vomiting,

abdominal pain, and abnormal laboratory tests on urine. *Id.*

viii.   One of Davis's symptoms, vomiting, is inconsistent with known effect of exposure to formaldehyde at the levels alleged by plaintiffs. *Id.*

ix.   Prior to living the housing units provided by FEMA, Davis was diagnosed with epilepsy. *Id.*

x.   Davis has not been to see the doctor or any other physician regarding her symptoms. *Id.*

xi.   Davis was pregnant while living in the manufactured home, giving birth in September of 2007. *Id.*

xii.   Davis smokes cigarettes, two (2) per day, for the last five (5) to six (6) years.  Davis also lived with someone who smoked cigarettes, fifteen (15) per day, sometimes doing so while inside the housing units provided by FEMA. *Id.*

xiii.   Davis did not know she was a class representative until two (2) weeks before her deposition (November 5, 2008), had not seen reviewed any of the pleadings in the lawsuit, and has not had any communications with any class members or putative class members regarding the litigation. *Id.*

xiv. The level of formaldehyde to which this putative class representative would have been exposed is vastly different than other putative class representatives and can only be determined by individualized inquiry. *Id.*

**Davis, Michael rep by Sherry Trollinger, as next of friend**

i. Mr. Davis is a putative class representative for Fleetwood, in the proposed Louisiana subclass. Ex. D-213; Plaintiff Fact Sheet at 8.

ii. Mr. Davis allegedly lived in a travel trailer manufactured by Fleetwood for approximately 20 months. *Id.* at 8-9.

iii. The travel trailer was purportedly located in Louisiana. *Id.* at 9.

iv. The Plaintiff Fact Sheet is incomplete because Sherry Trollinger has failed to provide legally sufficient verification that she is either the legal continuing tutor or court-appointed representative of the mentally incapacitated major, Michael Davis. *Id.* at 2-3.

v. Furthermore, if Michael Davis has been interdicted, Plaintiff has failed to provide legally sufficient verification of the interdiction and curatorship. In addition, no medical provider will supply information on Michael Davis based on his status as a major

- 167 -

without verification of Sherry Trollinger's tutorship or curatorship.  *See* email correspondence from Plaintiffs' Steering Committee, attached as Ex. A-89 to Mfr'g Defs.' Opp'n to Class Certification.

vi.  Plaintiffs' Steering Committee has informed counsel that they are withdrawing her as a class representative.

### Dedeaux, Jacqueline

i.  Jacqueline Dedeaux is identified in the pleadings as a putative class representative for Redman Homes, Inc. Ex. D-152.

ii.  Ms. Dedeaux states in her most recent Plaintiff Fact Sheet that she does not know who manufactured her EHU because she is waiting on her disaster file. *Id.*

iii.  Ms. Dedeaux believes she lived in a Redman EHU because she saw the name Redman on literature in the EHU. *Id.*

iv.  Ms. Dedeaux lived in the EHU for 12 months (from September 2006 to August 2007). *Id.*

v.  Ms. Dedeaux was 41 years old when she moved into the EHU. *Id.*

vi.  The EHU Ms. Dedeaux occupied was located in Mississippi. *Id.*

vii.  Ms. Dedeaux did not experience any symptoms until three (3) months after moving into the EHU. *Id.*

viii.  Three (3) months after moving into the EHU, Ms. Dedeaux claims she experienced the following symptoms: irritation, burning and tearing of the eyes, itching and irritation of the eyelids, headaches, difficulty breathing, wheezing, shortness of breath, persistent cough, bronchitis, hoarseness, upper respiratory tract infections, and allergies for the first time in her life. *Id.*

ix.  Ms. Dedeaux was a smoker for seven (7) years before moving into the EHU, smoking an average of 10 cigarettes per day (according to her signed Plaintiff Fact Sheet) or 1 pack per week (according to her deposition), which she stopped in February 2006, seven (7) months before moving into the EHU. *Id.*

x.  The circumstances of Ms. Dedeaux's occupancy of the EHU, her smoking and her alleged symptoms while living in the EHU are unique, individualized and dissimilar from other putative class members. *Id.*

**Dillon, Barbara**

    i.    Barbara Dillon is a putative class representative for Fleetwood, in the proposed Mississippi subclass.  Ex. D-154; Plaintiff Fact Sheet, pp. 8-9.

    ii.    Ms. Dillon alleges to have lived in a travel trailer manufactured by Fleetwood.  *Id.* at 8.

    iii.    The travel trailer was purportedly located in Mississippi.  *Id.* at 9.

    iv.    Ms. Dillon was 54 years old at the time she lived in the unit.  *Id.* at 6.

    v.    Ms. Dillon allegedly lived in the Fleetwood unit for approximately seven months.  *Id.* at 9.

    vi.    She claims to have spent approximately 20 hours per day in the unit.  *Id.*

    vii.    She claims the following symptoms:  irritation to eyes, burning of eyes, tearing of eyes, irritation to nasal membranes, burning of nasal membranes, bleeding of nasal membranes, irritation or itching of skin, burning of skin, rashes on skin, drying or scaling of skin, scaling or itching of eyelids, irritation or swelling of eyelids or eye area, headaches, nausea, abdominal pain, diarrhea, difficulty in breathing, wheezing, shortness of breath, persistent cough, tightness of the

chest, bronchitis, throat irritation, hoarseness, laryngitis, upper respiratory tract infections, asthma attacks that are recurrence of childhood asthma, worsening of allergies that she had previous to living in a FEMA trailer, allergic contact dermatitis, dizziness, nephritis, and abnormal laboratory tests on blood, and sleep problems. *Id.* at 3-4.

viii.     She has pre-existing medical conditions related to her presently claimed symptoms. *See* Ex. D-154; Deposition of Barbara Dillon, taken on October 7, 2008, 46:19-22, 61:2-12.

ix.     She has unique pre-existing conditions, including sleep apnea, back pain, gastrointestinal reflux disorder and bladder problems. *Id.* at 47:3-14.

x.     She believes her temporary housing unit had mold. *Id.* at 173:5-20.

xi.     She has not spoken to any other class representatives. *Id.* at 80:12-21.

xii.     She believes she represents class members from Louisiana, although she admitted that she only lived in EHU's located in Mississippi. *Id.* at 87:25-88:6.

xiii.     She was provided two different temporary housing units by FEMA. She claims Fleetwood manufactured

both units; however, her FEMA file indicates one unit was manufactured by Fleetwood and the other unit was manufactured by Thor. *Id.* at 36:14-25; 39:7-40:18; FEMA 33-000186 – 000187.

xiv.    She moved out of her Thor unit because she needed a handicapped accessible unit. Ex. D-154; Dillon Deposition at 41:21-25.

xv.    She moved out of her Fleetwood EHU (the second EHU she moved into) because the electrical system in the unit was insufficient to run an oxygen system required for treatment of her preexisting sleep apnea condition. *Id.* at 67:21-25, 68:1-4.

xvi.    In addition to living in various temporary housing units provided by FEMA, she lived in a manufactured mobile home post-Katrina. *Id.* at 29:18-30:12.

xvii.    She complained of certain symptoms that have never been connected with formaldehyde exposure, particularly with inhaled exposure as alleged here, including abdominal pain, dizziness, diarrhea, nephritis, abnormal blood tests. Ex. D-154; Plaintiff Fact Sheet, p. 3-4; Affidavit of Dr. Golden, pp. 25-26.

**Dominguez, Barry**

    i.    Barry Dominguez is proposed as a class representative for DS Corporation, d/b/a CrossRoads RV ("CrossRoads"). Ex. D-155.

    ii.    Mr. Dominguez lived in a CrossRoads travel trailer. He did not identify in his Plaintiff Fact Sheet the dates on which he lived in the CrossRoads travel trailer. It was located in Louisiana. *Id.*

    iii.    Mr. Dominguez did not complete many of the sections of his Plaintiff Fact Sheet. He used the answer "unknown at this time" seventy-four times on his Ex. D-155; Plaintiff Fact Sheet.

    iv.    Mr. Dominguez reports suffering from symptoms including dizziness he developed when living in a FEMA unit. Ex. D-155.

    v.    No health care provider has advised Mr. Dominguez his symptoms are linked to formaldehyde exposure. *Id.*

    vi.    Mr. Dominguez cancelled his deposition that was noticed for October 16, 2008 and plaintiffs have not rescheduled the deposition. *Id.*

**Dubuclet, Timia**

i.      Timia Dubuclet is a putative class representative for
        Fleetwood, in the proposed Louisiana subclass. Ex.
        D-156; Plaintiff Fact Sheet at 8.

ii.     She allegedly lived in a Fleetwood travel trailer. *Id.*

iii.    The travel trailer was purportedly located in Louisiana.
        *Id.* at 9.

iv.     Ms. Timia Dubuclet was 8 years old at the time she
        lived in the unit. *Id.* at 6, 9.

v.      She allegedly lived in the unit approximately 15
        months. *Id.* at 9.

vi.     She claims to have spent approximately 16 to 20
        hours in the EHU per day. *Id.* at 9.

vii.    She had skin allergies and eczema prior to moving
        into the EHU. Ex. D-156; Deposition of Elisha
        Dubuclet o/b/o Timia Dubuclet, taken September 17,
        2008, at 15:17-16:3.

viii.   She reports the following symptoms:
        irritation/burning/tearing eyes,
        irritation/burning/bleeding nose, irritation or itching of
        skin, rashes on skin, dry or scaling of skin, scaling or
        itching of eyelids, irritation/swelling of eyelids,
        tingling/swelling lips or face, difficulty in breathing,

wheezing, persistent cough, throat irritation, and worsening of allergies. Ex. D-156; Plaintiff Fact Sheet at 3-4.

ix.   She had severe mildew and rodent/bug problems in her EHU that were treated using various sprays. Ex. D-156; Deposition of Elisha Dubuclet o/b/o Timia Dubuclet, taken September 17, 2008, at 38:14-40:18.

x.   Elisha Dubuclet has no knowledge of the other class representatives or the putative members she purports to represent on behalf of Timia Dubuclet. *Id.* at 61:3-8.

**Esposito, Nicole**

i.   She is a putative class representative for Fleetwood, in the proposed Louisiana subclass. Ex. D-157; Plaintiff Fact Sheet at 8.

ii.   Ms. Esposito allegedly lived in a travel trailer manufactured by Fleetwood for approximately 17 months. *Id.* at 8-9.

iii.   The travel trailer was purportedly located in Louisiana. *Id.* at 9.

iv.   She had her children tested for "formaldehyde" and attributes her symptoms to their test results. She is not making a claim on behalf of her children. Ex. D-157; Deposition of Nicole Esposito, taken October 17,

2008, at 75:21-76:20; 77:20 – 78:12; 78:22-23; 86:2-10; 117: 9-24; Second Supplemental and Amending Complaint and all underlying Complaints.

v.  Ms. Esposito has pre-existing medical conditions related to the symptoms she attributes to living in a temporary housing unit, including a persistent cough, dizziness, bronchitis and headaches.  Ex. D-157; Deposition of Nicole Esposito, taken October 17, 2008, 53:5-11; 53:17-54:3; 54:6-14; 54:21-55:1.

vi.  She sought to purchase her temporary housing unit from FEMA.  *Id.* at 71:19-72:2; FEMA 34-000027.

vii.  She had pre-existing medical conditions related to the symptoms she attributes to living in a temporary housing unit, including a persistent cough, dizziness, bronchitis and headaches.  Ex. D-157; Deposition of Nicole Esposito, taken October 17, 2008, 53:5-11; 53:17-54:3; 54:6-14; 54:21-55:1.

viii.  She is making a claim for mental and/or emotional damages, but was diagnosed with depression prior to residing in a temporary housing unit.  *Id.* at 55:10-56:1.

ix.  The symptoms she attributes to living in a temporary housing unit did not surface until weeks after moving

into the trailer. *Id.* at 26:6-27:1; 29:23-30:1; 30:7-13; 30:17-20; 30:25-31:3; 32:16-18; 33:17-19.

x.  She claims to continue to suffer from symptoms she attributes to residing in the temporary housing unit, which are also pre-existing, even though she vacated the unit over a year ago. *Id.* at 9:9-16; 122:15-123:6.

xi.  She complained of mold in her temporary housing unit. *Id.* at 69:25-70:4; 70:22-71:11; FEMA 34-000027.

xii.  She has not been present in any Court hearings. Ex. D-157; Deposition of Nicole Esposito, taken October 17, 2008, at 84:57-7.

xiii.  She is not aware of any upcoming dates for Court appearances. *Id.* at 84:11-13.

xiv.  She has not contacted any other class member. *Id.* at 84:14-17; 86:14-22.

xv.  She is unfamiliar with the pleadings. *Id.* at 85:12-

**Evans, Percy**

i.  Percy Evans is a putative class representative for Homes of Merit, Inc., and Liberty Homes, Inc. Ex. D-158.

ii.  Mr. Evans lived in two EHUs – a Homes of Merit manufactured home for 13-14 months (from July 2006

to October 2007) and a Liberty manufactured home for 9-10 months (from October 2007 to July, 2008). *Id.*

iii.    The EHUs Mr. Evans occupied were located in Mississippi. *Id.*

iv.    Mr. Evans was 79 years old when he moved into the first EHU. *Id.*

v.    Mr. Evans owned and lived in a manufactured home for many years before Hurricane Katrina. *Id.*

vi.    Mr. Evans suffered from preexisting high blood pressure due to lack of exercise and had defibrillator implanted for congestive heart failure in April 2008. *Id.*

vii.    Mr. Evans did not experience any symptoms while living in the first EHU (the Homes of Merit manufactured home), but claims that the following symptoms began after he move into the second EHU (the Liberty manufactured home): skin irritation and rashes, irritation of the eye area, difficulty breathing, wheezing, shortness of breath, chest tightness, throat irritation, hoarseness and congestive heart failure. *Id.*

viii.    The circumstances of Mr. Evans' long-term occupancy of a manufactured home before Hurricane Katrina, his occupancy of a Homes of Merit and a Liberty EHU, his preexisting conditions and his

alleged symptoms while living in the second (Liberty)

EHU, but not the first (Homes of Merit), are unique,

individualized and dissimilar from other putative class

members. *See id.*

### Flowers, Ella E.

i.      Ella E. Flowers  ("Flowers") is a putative class

representative for ScotBilt Homes, Inc. Inc.

ii.     Flowers lived in a ScotBilt Homes, Inc. manufactured

home provided by FEMA at no cost to her.

(deposition of Plaintiff, pp. 168, lines 8-18).  She

identified the manufacturer in part based upon the

owners' manual that she has in her possession.

(deposition of Plaintiff, p. 25, lines 18-25 through p.

26, line 8).

iii.    Flowers' manufactured home was located in

Mississippi.  Ms. Flowers never lived in Texas,

Louisiana or Alabama.  (deposition of Plaintiff, p. 92,

lines 10-25)

iv.     Flowers was born in 1965 and was approximately 42

(forty-two) years old at the time she lived was

provided the FEMA manufactured home in question.

(Deposition of Plaintiff, page 8, lines 5-7).

v.      Flowers lived in the ScotBilt home provided to her by
        FEMA beginning in March of 2007.  (Deposition of
        Plaintiff, p. 110, lines 12-15).  During that time, she
        spent approximately forty hours in the trailer during
        the week on Mondays through Fridays, and sixteen
        hours total on Saturdays and Sundays in the
        manufactured home. (deposition of Plaintiff, p.147,
        line 20 through p. 148, line 17.)  After receiving the
        ScotBilt home, she contacted FEMA about purchasing
        the ScotBilt home.  (deposition of Plaintiff, p. 110,
        lines 16-21).

vi.     Prior to living in the ScotBilt manufactured home and
        before Hurricane Katrina struck, Flowers lived in a
        different manufactured home that she owned – a
        1970 New Moon mob mobile home, which she lived in
        for six or seven years prior to Hurricane Katrina
        striking and after Hurricane Katrina struck.
        (Deposition of Plaintiff, p. 12, lines 9-25; p. 13, lines 1-
        5).

vii.    Flowers listed that the symptoms of which she
        complains began to manifest or were made worse if
        they were pre-existing conditions (such as her
        allergies) in December of 2005, but she did not

- 180 -

receive her ScotBilt manufactured home until March of 2007.  (Plaintiffs' Fact Sheet, page 4, question 5; deposition of Plaintiff, p. 52, lines 9-25).

viii.    Flowers complains of various symptoms including irritation to eyes; tearing of eyes; irritation to nasal membranes; burning of nasal membranes; irritation or itching of skin;  headaches;  nausea; diarrhea; difficulty in breathing;  wheezing;  shortness of breath; persistent cough;  tightness of the chest; hoarseness; worsening of allergies that existed prior to living in the trailer and dizziness.  (See Plaintiff's fact sheet, pages 3 and 4). Ms. Flowers testified that she knew she had some of these problems for two to two and a half years. (Deposition of Plaintiff, pps. 38 through 42).

ix.    Two of Flowers' symptoms, worsening of allergies and dizziness, is inconsistent with known effect of exposure to formaldehyde at the levels alleged by plaintiffs.  .  Flowers also testified that she began getting the rash in 2006, prior to receiving her ScotBilt home in March of 2007.  (deposition of Plaintiff, p. 154, line 19 through p. 155, line 12).

x.    No doctor has advised Flowers that her problems are related to living in a FEMA provided manufactured

- 181 -

housing unit.  (Plaintiffs' Fact Sheet, page 14, part "D").

xi.   The ScotBilt manufactured home in question was not purchased by Flowers.

xii.   Flowers has been employed thirteen years as a custodian, primarily in the county school system, and works with chemicals.  (deposition of Plaintiff, p. 68, lines 9-15).

xiii.   No doctor has treated Flowers for mental and/or emotional issues but she is claiming such damages. (deposition of Plaintiff, p. 45, lines 23-25;  p. 46, lines 1-3).  Ms. Flowers also testified that her emotional and mental issues are caused by things other than living in a FEMA provided housing unit.  (deposition of Plaintiff, p. 53, lines 8-25;  p. 54, lines 1 -10).

xiv.   Flowers is making a claim for medical expenses, but listed that the amount claimed is "unknown at this time" on her fact sheet and she has no receipts. (deposition of Plaintiff, page 54, lines 11-18).

xv.    Flowers is not making a lost wages claim.  (Plaintiffs' Fact Sheet, page 7, question "3")

xvi.   Flowers testified that she never called ScotBilt and complained about the home.  (deposition of Plaintiff,

p. 59, lines 17-19).  She testified that she did not call
FEMA and complain about formaldehyde in her FEMA
provided home at issue.  (deposition of Plaintiff, p. 59,
lines 20-25).

xvii.   Flowers first learned that she would be serving as a
class representative in September of          2008.
(deposition of Plaintiff, p., 62, lines 3-19).

xviii.  Flowers had never read any of the lawsuits at issue
prior to her deposition on November 12, 2008.
(deposition of Plaintiff, p. 62, lines 20-25 through p.
67, line 24).  Ms.

xix.    Flowers could not describe the members of the
purported class she represented;  could not provide
the names of any of the putative class members;
could not describe the nature of the claims of the
putative class members she represented; and could
not describe her duties as a class representative.
(deposition of plaintiff, p. 69, lines 22-25, through p.
72, line 5).  Flowers also testified that she did not
know the size of the class of the individuals she was
representing – it could be "100 or 100,000".
(deposition of Plaintiff, p. 91, line 25, through p. 92,
line 7).  She made no efforts to determine the size of

the class, who would be the members of the class, and was relying upon her lawyers.  (deposition of Plaintiff, p. 96, lines 24-25, through p. 97, lines 1-12).

xx.　　Flowers testified that she believed that since she was serving as a class representative, she should get something extra than the other members of the class that she was representing.  (deposition of plaintiff, p. 73, line 25 through p. 74, line 14).

xxi.　　Flowers did not know what HUD is or what the HUD code is, and did not know what the allowable levels of formaldehyde were for manufactured housing under the HUD code, and had no information concerning the effects of being around formaldehyde.  (deposition of Plaintiff, p. 76, lines 4-20).

xxii.　　Flowers did not know how many lawsuits there are involved in this proceeding or how many defendants are involved.  (deposition of Plaintiff, p 77, lines 2 through 16).

xxiii.　　Flowers did not know who the attorneys were that are involved for the Plaintiffs in this case and had not spoken to any of them.  (deposition of Plaintiff, p. 80, lines 17-25 through p. 81, lines 1-20).

xxiv.   Flowers was unaware that potentially she might have

to pay costs associated with this litigation.  (deposition

of Plaintiff, p. 87, lines 9 through 21)

xxv.    Flowers did not know what a class action lawsuit was,

and thought that the lawsuits were brought on behalf

of herself, her husband and her child.  (deposition of

Plaintiff, p. 91, lines 10-24).

xxvi.   Flowers did not know what a breach of warranty claim

was as is being advanced in this litigation, and had no

input into the nature of the claims being advanced in

the lawsuit – she was relying upon the lawyers.

(deposition of Plaintiff, p. 99, lines 7 through 20).

Flowers also did not know what a claim for exemplary

damages was and could not describe the nature of

the claim for exemplary damages.  (deposition of

Plaintiff, p. 130, line 7 through p. 131, line 17).

xxvii.  FEMA offered to move Flowers out of the ScotBilt

home in March of 2008 and into a different housing

location, but Flowers refused the offer to move and

stayed in the ScotBilt home.  (deposition of Plaintiff, p.

114, line 21 through p.  118, line 9).

xxviii. Flowers did not have any information regarding the

amount of damages being claimed by any other

potential class member, and had no idea of any way to get any information about the amount damages per class member without talking to them individually. (deposition of Plaintiff, p. 124, lines 3-18).

xxix.   Flowers did not know of any specific tasks that she had to perform as a class representative, and did not believe that she had a duty to look out for the interests of other individuals involved in the lawsuit. (deposition of plaintiff, p. 127, line 6 through p. 128, line 12).

xxx.   Ms. Flowers does not know what it means for a class action lawsuit to get certified, does not know what the process is for a class action lawsuit to be certified, does not know if she has any responsibilities during the class certification process, and has turned over the handling of this lawsuit to her lawyers.  (deposition of Plaintiff, p. 129, line 7 through p. 130, line 4).

xxxi.   Flowers did not know what any of the deadlines are in the case, did not know if the judge made any rulings in the case, did not know if any hearings had occurred, and was doing nothing to check on the status of the case, but was relying upon the lawyers

to tell her.  (deposition of Plaintiff, p. 132, line 22 through p. 133, line 15).

xxxii.  Flowers had no plans on how to contact potential members of the class and advise them, and no idea of the costs associated with such notice, but was relying upon her lawyers to handle these issues. (deposition of Plaintiff, p. 136, line 14 through p. 137, line 5).

xxxiii.  Flowers FEMA provided unit had air conditioning and heating which she used, and sometimes opened the doors and windows to ventilate the unit. (deposition of plaintiff, pages 148-149).

**Foley, Lillian A.**

i.  Lillian Foley is a putative class representative of Heartland RV & Fabrique Par.  *See* Ex. D-160; Plaintiff Fact Sheet, p. 8.

ii.  Lillian Foley claims she lived in a travel trailer manufactured by Heartland RV & Fabrique Par.  *Id.*

iii.  The travel trailer was located in Louisiana.  *Id.*

iv.  She reports suffering from symptoms immediately upon moving into the trailer. Those symptoms include: irritation to the eyes, burning and tearing of the eyes, irritation or itching of skin, burning of the skin, rashes

on skin, drying or scaling of skin, headaches, nausea, vomiting, abdominal pain, diarrhea, difficulty in breathing, wheezing, allergies for the first time in her life, shortness of breath, throat irritation, bronchitis, recurring asthma attacks, worsened allergies, dizziness, tightness of the chest, upper respiratory tract infections, and persistent cough. *Id.* at 3-4.

v. Some of the symptoms she complains of—vomiting and dizziness—have never been associated with formaldehyde exposure. *Id.* at 3; Affidavit of Dr. Golden, p. 25.

vi. She is not making a lost wages claim. *Id.* at 7.

vii. She has a pre-existing medical condition of asthma. *Id.* at p. 4.

viii. She is not making a lost wages claim. *Id.* at p. 7.

ix. She has smoked 10 cigarettes per day for 15 years. *Id.* at pp. 11-12.

**Foley, Samuel rep by Lillian A. Foley**

i. Samuel Foley is a putative class representative of Heartland RV & Fabrique Par. *See* Ex. D-161; Plaintiff Fact Sheet, p. 8.

ii. Samuel Foley claims he lived in a travel trailer manufactured by Heartland RV & Fabrique Par. *Id.*

iii.   The travel trailer was located in Louisiana.  *Id.* at 9.

iv.   He reports suffering from symptoms immediately upon moving into the trailer. Those symptoms include: irritation to the eyes, burning and tearing of the eyes, scaling or itching of eyelids, irritation or swelling of eyelids or eye area, headaches, nausea, vomiting, abdominal pain, diarrhea, difficulty in breathing, wheezing, allergies for the first time in her life, shortness of breath, tightness of the chest, and persistent cough.  *Id.* at 3.

v.   Some of the symptoms he complains of—vomiting and dizziness—have never been associated with formaldehyde exposure.  *Id.* at 3; Affidavit of Dr. Golden, p. 25.

vi.   He is not making a lost wages claim.  *Id.* at 7.

vii.   He lives with his mother who has smoked 10 cigarettes per day for 15 years.  *Id.* at p.12.

## Fontenot, Hailey rep by Shontay Fontenot

i.   Shontay Fontenot o/b/o Hailey Fontenot ("Fontenot") is a putative class representative for Giles Industries, Inc. Ex. D-162.

ii.   Fontenot lived in a Giles Industries, Inc. manufactured home. *Id.*

iii.   Fontenot's manufactured home was located in Louisiana. *Id.*

iv.   Fontenot was approximately three (3) to four (4) years old at the time she lived in the manufactured home.

v.   Fontenot lived in the manufactured home for approximately fourteen (14) months, spending approximately fourteen (14) hours in the manufactured home per day. *Id.*

vi.   Prior to living in the manufactured home, Fontenot lived "off and on" in a travel trailer provided by FEMA that was manufactured by a defendant other than CMH Manufacturing, Inc. for approximately seven (7) months. *Id.*

vii.   Prior to living in the manufacture home, Fontenot lived "off and on" in a home that had a severe mold problem as a result of damages sustained from Hurricane Rita.  Fontenot was exposed to this mold for approximately seven (7) months. *Id.*

viii.   Fontenot reports suffering from symptoms immediately upon moving into the housing units provided by FEMA, including irritation, burning, and tearing of the eyes, irritation or itching of the skin, rashes on the skin, drying or scaling of the skin,

headaches, nausea, difficulty in breathing, wheezing, shortness of breath, bronchitis, throat irritation, upper respiratory tract infections, and worsening of allergies. *Id.*

ix. One of Fontenot's symptoms, worsening of allergies, is inconsistent with known effect of exposure to formaldehyde at the levels alleged by plaintiffs. *Id.*

x. Prior to living in the housing units provided by FEMA, Fontenot suffered from several pre-existing medical conditions related to her presently claimed symptoms including allergies, upper respiratory infections, rashes, and ear infections. *Id.*

xi. Shontay Fontenot did not know she was acting as a class representative on behalf of her children until approximately two (2) weeks before her deposition (November 10, 2008), is not familiar with the most fundamental pleadings, has not had any communications with any class members or putative class members regarding the litigation, and is not aware of the differences between a class representative and other plaintiffs as she believes that all plaintiffs may be class representatives. *Id.*

xii.  The level of formaldehyde to which this putative class representative would have been exposed is vastly different than other putative class representatives and can only be determined by individualized inquiry. *Id.*

**Fontenot, Justin rep by Shontay Fontenot**

i.  Shontay Fontenot o/b/o Hailey Fontenot ("Fontenot") is a putative class representative for Giles Industries, Inc. Ex. D-164.

ii.  Fontenot lived in a Giles Industries, Inc. manufactured home. *Id.*

iii.  Fontenot's manufactured home was located in Louisiana. *Id.*

iv.  Fontenot was approximately four (4) to five (5) years old at the time he lived in the manufactured home. *Id.*

v.  Fontenot lived in the manufactured home for approximately fourteen (14) months, spending approximately sixteen (16) hours in the manufactured home per day. *Id.*

vi.  Prior to living in the manufactured home, Fontenot lived "off and on" in a travel trailer provided by FEMA that was manufactured by a defendant other than CMH Manufacturing, Inc. for approximately seven (7) months. *Id.*

vii. Prior to living in the manufacture home, Fontenot lived "off and on" in a home that had a severe mold problem as a result of damages sustained from Hurricane Rita.  Fontenot was exposed to this mold for approximately seven (7) months. *Id.*

viii. Fontenot reports suffering from symptoms immediately upon moving into the housing units provided by FEMA, including irritation, burning, and tearing of the eyes, irritation or itching of the skin, rashes on the skin, drying or scaling of the skin, headaches, difficulty in breathing, wheezing, shortness of breath, bronchitis, throat irritation, upper respiratory tract infections, and worsening of allergies. *Id.*

ix. One of Fontenot's symptoms, worsening of allergies, is inconsistent with known effect of exposure to formaldehyde at the levels alleged by plaintiffs. *Id.*

x. Prior to living in the housing units provided by FEMA, Fontenot suffered from several pre-existing medical conditions related to his presently claimed symptoms including allergies, asthmatic type symptoms, wheezing, and ear infections. *Id.*

xi.  Prior to living in the housing units provided by FEMA,
Fontenot was diagnosed with eczema. *Id.*

xii.  Shontay Fontenot did not know she was acting as a
class representative on behalf of her children until
approximately two (2) weeks before her deposition
(November 10, 2008), is not familiar with the most
fundamental pleadings, has not had any
communications with any class members or putative
class members regarding the litigation, and is not
aware of the differences between a class
representative and other plaintiffs as she believes that
all plaintiffs may be class representatives. *Id.*

xiii.  The level of formaldehyde to which this putative class
representative would have been exposed is vastly
different than other putative class representatives and
can only be determined by individualized inquiry. *Id.*

**Fontenot, Jr., Jonathan rep by Shontay Fontenot**

i.  Shontay Fontenot o/b/o Jonathan Fontenot, Jr.
("Fontenot") is a putative class representative for
Giles Industries, Inc. Ex. D-163.

ii.  Fontenot lived in a Giles Industries, Inc. manufactured
home. *Id.*

iii.  Fontenot's manufactured home was located in Louisiana. *Id.*

iv.  Fontenot was approximately five (5) to six (6) years old at the time he lived in the manufactured home. *Id.*

v.  Fontenot lived in the manufactured home for approximately fourteen (14) months, spending approximately sixteen (16) hours in the manufactured home per day. *Id.*

vi.  Prior to living in the manufactured home, Fontenot lived "off and on" in a travel trailer provided by FEMA that was manufactured by a defendant other than CMH Manufacturing, Inc. for approximately seven (7) months. *Id.*

vii.  Prior to living in the manufacture home, Fontenot lived "off and on" in a home that had a severe mold problem as a result of damages sustained from Hurricane Rita.  Fontenot was exposed to this mold for approximately seven (7) months. *Id.*

viii.  Fontenot reports suffering from symptoms immediately upon moving into the housing units provided by FEMA, including irritation, burning, and tearing of the eyes, bleeding of nasal membranes, irritation or itching of the skin, rashes on the skin,

drying or scaling of the skin, difficulty in breathing, wheezing, shortness of breath, persistent cough, bronchitis, throat irritation, pneumonia, upper respiratory tract infections, and worsening of allergies. *Id.*

ix.    One of Fontenot's symptoms, worsening of allergies, is inconsistent with known effect of exposure to formaldehyde at the levels alleged by plaintiffs. *Id.*

x.    Prior to living in the housing units provided by FEMA, Fontenot suffered from several pre-existing medical conditions related to his presently claimed symptoms including allergies, upper respiratory infections, rashes, and pneumonia. *Id.*

xi.    Prior to living in the housing units provided by FEMA, Fontenot was diagnosed with asthma. *Id.*

xii.    Prior to living in the housing units provided by FEMA, Fontenot was diagnosed with eczema. *Id.*

xiii.    Fontenot was born premature with a birth weigh of 2 lbs. and 13 oz., with a six (6) week stay in neonatal intensive care unit. *Id.*

xiv.    Shontay Fontenot did not know she was acting as a class representative on behalf of her children until approximately two (2) weeks before her deposition

(November 10, 2008), is not familiar with the most fundamental pleadings, has not had any communications with any class members or putative class members regarding the litigation, and is not aware of the differences between a class representative and other plaintiffs as she believes that all plaintiffs may be class representatives. *Id.*

xv.   The level of formaldehyde to which this putative class representative would have been exposed is vastly different than other putative class representatives and can only be determined by individualized inquiry. *Id.*

**Gardner, Renay**

i.   Renay Gardner is proposed as a class representative for Pilgrim International, Inc. ("Pilgrim"). Ex. D-166.

ii.   Renay Gardner lived in a travel trailer from June, 2006 through January, 2007.  The travel trailer was located in Louisiana. *Id.*

iii.   Renay Gardner was 35 years old when she lived in a Pilgrim travel trailer. *Id.*

iv.   Renay Gardner reports suffering from symptoms including eye irritation, throat irritation and upper respiratory tract infections she developed while living in a FEMA unit. *Id.*

- 197 -

v.    No health care provider has advised Renay Gardner

that her symptoms are linked to formaldehyde

exposure. *Id.*

vi.    Renay Gardner has not reviewed or assisted with the

drafting of any of the pleadings filed with the Court. *Id.*

vii.    Renay Gardner has not attended any hearings, does

not know what motions have been filed, and does not

know what rulings have issued. *Id.*

viii.    Renay Gardner has not met with any experts,

reviewed any expert reports, reviewed discovery

responses, or conducted any research regarding the

lawsuit, FEMA, or formaldehyde. *Id.*

**Gordon, Sheila**

i.    She is a putative class representative for Fleetwood,

in the proposed Louisiana subclass. Ex. D-167;

Plaintiff Fact Sheet at 8.

ii.    She allegedly lived in a Fleetwood travel trailer. *Id.*

iii.    The travel trailer was purportedly located in Louisiana.

*Id.* at 9.

iv.    She allegedly lived in the unit approximately 2 years,

3 months. *Id.* at 9.

v.    She claims to have spent approximately 16 to 20

hours in the EHU per day. *Id.* at 9.

vi.    Her EHU was fumigated for spiders and ants. *Id.* at 10.

vii.    She reports the following symptoms: headaches, dizziness, nausea, stillbirth, nose irritation/burning, irritation/itching of skin, rashes/drying/scaling of skin, scaling/itching of eyelids, shortness of breath, vomiting, persistent cough, and throat irritation. *Id.* at 3-4.

viii.    She did not begin to experience symptoms until she had lived in the EHU for a year. Ex. D-167; Deposition of Shelia Gordon, taken October 14, 2008, at 26:13-18.

ix.    She claims nausea and vomiting as symptoms, but states that they did not occur until she became pregnant. *Id.* at 28:19-29:9.

x.    She had pre-existing allergies for which she was prescribed an inhaled spray shortly before moving into the EHU. *Id.* at 30:24-31:13.

xi.    She experienced a stillbirth while living in the EHU. *Id.* at 10:4-7.

xii.    She was diagnosed with a persistent cough, which she claims still persists today, before moving into the EHU. *Id.* at 36:9-12.