(c)   Jayco, Inc. did not design, manufacture or supply any travel trailers pursuant to a direct request from FEMA or a FEMA contractor.

(d)   Jayco, Inc. travel trailers eventually supplied by FEMA to victims of hurricanes Katrina or Rita were not subject to different design or production methods or standards.

(e)   Jayco, Inc. travel trailers eventually supplied by FEMA to victims of hurricanes Katrina or Rita were not constructed of component parts different than any other similar travel trailer being manufactured at the time.

(f)   In Plaintiffs' Second Supplemental and Amended Complaint filed in *Pujol v. The United States of America*, No. 08-3217, the name "Jayco, Inc." was substituted for name "Jayco Enterprises, Inc." Doc. 721, p.1. However, neither Jayco Enterprises, Inc. nor Jayco, Inc. is named in any underlying Complaint in the *Pujol v. The United States of America,* No. 08-3217 matter. See the Class Action Complaint filed May 9, 2008 and the First Supplemental and Amended Complaint, Doc. 378.

(g)     The two proposed Plaintiff class representatives spent varying amounts of time in the EHU's.

- Heavenly Beasley: approximately twenty-four hours per day.   *Plaintiff Fact Sheet*, p. 9.

- D'Asia Battie: approximately 12-16 hours per day.  *Plaintiff Fact Sheet*, p. 9.

(h)     The two proposed Plaintiff class representatives for Jayco had varying lifestyles and reported symptoms.

- Heavenly Beasley lived in the EHU while an infant, until age two and one-half years.  *Plaintiff Fact Sheet* at p. 6, 9.

- D'Asia Battie lived in the EHU from approximately age ten to twelve years and attended school during the normal school year, visited relatives and spent the night at relatives living in other EHU's.  *Deposition of Kendra Battie* at Page 35, Lines 21-25; Page 36, Lines 1-

16, 18-25; Page 37, Lines 1-22; Page 38, Lines 1-25.

- Symptoms suffered by Heavenly Beasley include diagnoses in December 2006 of bronchitis and upper respiratory infection. *Deposition of Joycelyn Beasley*, Page 51, Lines 1-19. Symptoms suffered by Heavenly Beasley also included diarrhea and stomach problems. *Id.* at Page 51, Lines 1-14; Page 57, Lines 16-20.

- Symptoms reported on behalf of D'Asia Battie, which started approximately three months after moving into the travel trailer, included nasal congestion, headaches, stomach aches, nausea, dizziness, loss of appetite and diarrhea. *Deposition of Kendra Battie O/B/O D'Asia Battie,* Page 58, Lines 21-25; Page 59, Lines 1-14; Page 60, Lines 16-25.

- The symptoms claimed on behalf of D'Asia Battie and Heavenly Beasley

vary from the symptoms of parents and siblings who were also occupants of the same EHU's. *Deposition of Kendra Battie*, Page 62, Lines 21-25; Page 63, Lines 1-6; Page 65, Lines 4-18; Page 66, Lines 7-19; Page 68, Lines 4-25; Page 69, Lines 106. *Deposition of Joycelyn Beasley*, Page 58, Lines 21-25; Page 59, Lines 1-19.

- The EHU occupied by D'Asia Battie had only the bathroom vent open approximately two times per week. *Deposition of Kendra Battie.* at Page 45, Lines 18-25. The windows in the travel trailer were not opened by the Batties. *Id.* at Page 46, Lines 1-13.

- The EHU occupied by Heavenly Beasley was equipped with three vents that were kept open at all times and the windows were opened during the day. *Id.* at Page 37, Lines 14-25; Page 38, Lines 1-10.

x.      Jayco Enterprises, Inc.

(a)     Jayco Enterprises, Inc. has never designed, manufactured or sold travel trailers, manufactured homes or park models to or for FEMA or any other person or entity.  Jayco Enterprises, Inc. is a transportation company only.

(b)     In Plaintiffs' Second Supplemental and Amended Complaint filed in *Pujol v. The United States of America*, No. 08-3217, the name "Jayco, Inc." was substituted for name "Jayco Enterprises, Inc."  Doc. 721, p.1.  However, neither Jayco Enterprises, Inc. nor Jayco, Inc. is named in any underlying Complaint in the *Pujol v. The United States of America,* No. 08-3217 matter.  See the Class Action Complaint filed May 9, 2008 and the First Supplemental and Amended Complaint, Doc. 378.

xi.     Starcraft RV, Inc.

(a)     There is one proposed Plaintiff class representatives who is alleged to have lived in EHUs manufactured by Starcraft RV, Inc.  This individual resided in travel trailer only, as opposed to a manufactured home or park

model.  See the *Plaintiff Fact Sheet* for
Thomas Anthony Bergens.  This plaintiff is a
Louisiana resident who lived in the EHU in
Louisiana.  *Id.*  No proposed Plaintiff class
representatives from Texas, Mississippi or
Alabama are alleged to have lived in an EHU
manufactured by Starcraft RV, Inc.

(b)     Starcraft RV, Inc. did not have any contracts
with FEMA or its contractors for the design,
production or sale of travel trailers in response
to hurricanes Katrina or Rita.

(c)     Starcraft RV, Inc. did not design, manufacture
or supply any travel trailers pursuant to a direct
request from FEMA or a FEMA contractor.

(d)     Starcraft RV, Inc. travel trailers eventually
supplied by FEMA to victims of hurricanes
Katrina or Rita were not subject to different
design or production methods or standards.

(e)     Starcraft RV, Inc. travel trailers eventually
supplied by FEMA to victims of hurricanes
Katrina or Rita were not constructed of
component parts different than any other

similar model of travel trailer being

manufactured at the time.

(f)     The proposed Plaintiff class representative

spent approximately twelve hours per day in

the EHU for a period of approximately one

year.  *Plaintiff Fact Sheet*, p. 9.

(g)     Thomas Bergens has worked as an

automotive/diesel mechanic from 1970 to

present, which has led to exposure to a variety

of toxic substances.  *Id.* at p. 6.

(h)     Mr. Bergens' oral deposition was scheduled for

September 30, 2008, pursuant to the

agreement of counsel.  However, his

deposition was cancelled by Plaintiffs' counsel

on September 29, 2008 and he has not been

re-offered for deposition.  *See Notice of*

*Deposition and email from counsel dated*

*September 29, 2008, attached to Plaintiff*

*Profile in Defendants' Opposition to Class*

*Certification.*

xii.     Recreation By Design, LLC

(a)    There is not a purported class representative for each proposed subclass for Recreation By Design, LLC (RBD)

(b)    Plaintiffs have only identified one proposed class representative for RBD, namely Johnny White.  Johnny White lived in a travel trailer, not a manufactured home.  Further, Johnny White is a Louisiana plaintiff.  There are no Alabama, Mississippi or Texas class representatives for RBD.  Therefore, as to RBD, there is no legally sufficient class representative for any proposed Alabama, Mississippi or Texas subclass.  Also, as Johnny White lived in a travel trailer, there are no legally sufficient class representatives for any proposed manufactured housing subclass as to RBD.

(c)    All travel trailers manufactured by RBD were sold to dealers; RBD did not sell travel trailers directly to FEMA in response to hurricanes Katrina and Rita.

(d)    There is only one class representative for RBD, Johnny White.  Johnny White only lived in one

RBD travel trailer.  Therefore, no comparison
can be made between differences among
various units manufactured by RBD.

(e)     There is only one class representative for RBD,
Johnny White.  Therefore, no comparison can
be made regarding preexisting conditions,
medical histories, employment histories and
lifestyles, between class representatives who
lived in a RBD manufactured travel trailer.

xiii.     TL Industries, Inc.

(a)     There is not a purported class representative
for each proposed subclass for TL Industries,
Inc. (TL)

(b)     Plaintiffs have only identified one proposed
class representative for TL, namely Brian
Darby Sr. o/b/o Brian Darby Jr.  Brian Darby Jr.
lived in a travel trailer, not a manufactured
home.  Further, Brian Darby Jr. is a Louisiana
plaintiff.  There are no Alabama, Mississippi or
Texas class representatives for TL.  Therefore,
as to TL, there is no legally sufficient class
representative for any proposed Alabama,
Mississippi or Texas subclass.  Also, as Brian

Darby Jr. lived in a travel trailer, there are no legally sufficient class representatives for any proposed manufactured housing subclass as to TL.

(c)    All travel trailers manufactured by TL were sold to dealers; TL did not sell travel trailers directly to FEMA in response to hurricanes Katrina and Rita.

(d)    There is only one class representative for TL, Brian Darby Sr. o/b/o Brian Darby Jr. Brian Darby Jr. only lived in one TL travel trailer. Therefore, no comparison can be made between differences among various units manufactured by TL.

(e)    There is only one class representative for TL, Brian Darby Sr. o/b/o Brian Darby Jr. Therefore, no comparison can be made regarding preexisting conditions, medical histories, employment histories and lifestyles, between class representatives who lived in a TL manufactured travel trailer.

xiv.    Frontier RV, Inc.

(a)    There is not a purported class representative for each proposed subclass for Frontier RV, Inc. (Frontier)

(b)    Plaintiffs have only identified one proposed class representative for Frontier, namely Glenda Moreland. Glenda Moreland lived in a travel trailer, not a manufactured home. Further, Glenda Moreland is a Louisiana plaintiff.  There is no Alabama, Mississippi or Texas class representatives for Frontier. Therefore, as to Frontier, there is no legally sufficient class representative for any proposed Alabama, Mississippi or Texas subclass.  Also, as Glenda Moreland lived in a travel trailer, there are no legally sufficient class representatives for any proposed manufactured housing subclass as to Frontier.

(c)    All travel trailers manufactured by Frontier were sold directly to dealers; Frontier did not sell travel trailers directly to FEMA in response to hurricanes Katrina and Rita.

(d)    There is only one class representative for Frontier, Glenda Moreland. Glenda Moreland

only lived in one Frontier travel trailer. Therefore, no comparison can be made between differences among units manufactured by Frontier.

(e) There is only one class representative for Frontier, Glenda Moreland. Therefore no comparison can be made regarding preexisting conditions, medical histories, employment histories and lifestyles, between class representatives who lived in a Frontier manufactured travel trailer.

xv. CMH Manufacturing, Inc.

(a) CMH Manufacturing, Inc. ("CMH") sold only manufactured homes in the aftermaths of Hurricanes Katrina and Rita.

(b) CMH has approximately 858 manufactured homes that potentially could have been lived in by putative class members. This number represents the total number of manufactured homes provided to FEMA less the number of new and/or unused manufactured homes as provided in a list obtained from the

government. *See* August 13, 2008 Letter to Magistrate Roby.

(c)    CMH has no class representative matched with it in Texas, Alabama, or Mississippi (i.e., no putative class representative resided in a CMH manufactured home within these states), and thus there is no proposed class representative for the majority of the subclasses proposed by plaintiffs. *See generally* Class Representatives listed in Rec. Doc. 666-2, matched with specific manufacturers in the Second Supplemental and Amended AMC (Rec. Doc. 722), and Plaintiff Facts Sheets for Linda Davis, Joseph Jack, Jr., and Crystal Gumm. *See also* Rec. Doc. 902, at pp. 42-44.

(d)    All CMH manufactured homes provided to FEMA came with formaldehyde warnings. (24 CFR 3280.309)

(e)    All CMH manufactured homes were manufactured in accordance with U.S. Department of Housing and Urban Development ("HUD") standards. (24 CFR 3280.308)

(f)     The CMH manufactured homes, amongst other things, vary dramatically in size, configuration, material, and type of ventilation system when compared to other manufacturers' housing units. Zieman Affid., ¶¶ 14-17  For example, the CMH ventilation system is an integral part of the furnace/HVAC system and exchanges indoor air with outdoor air every time the furnace or air conditioning system is in use. Alternatively, some manufacturers utilize whole house ventilation systems that exchange air by a manually activated ventilation fan that is not an integral part of the furnace.  Housing units that have different whole house ventilation systems will have different air changes rates that in turn will yield different ambient formaldehyde levels. Zieman Affid., ¶¶ 16-17.

(g)     In addition, any given CMH manufactured home differs significantly from other manufacturers' housing units, and among CMH units from model to model and plant to plant with regards to formaldehyde levels.  These differences are based upon types, qualities,

age, and storage of construction materials (all of which differ from supplier to supplier), home design and construction methods, workmanship and quality of construction, types and quantities of furniture and drapery, whether residents added or installed their own formaldehyde-emitting materials, time and condition of housing unit storage, transportation of the housing unit from the plant to the ultimate occupant, installation of the housing unit, geographic placement of a given housing unit, the number and size of air condition units, the use of windows and doors, the type of ducting and insulation, specific usage of the housing unit, and varying occupant lifestyles. *See generally* Zieman Affid.

(h)     CMH's purported class representatives, Linda Davis ("Davis"), Joseph Jack, Jr. ("Jack"), and Crystal Gumm ("Gumm"), complain of varying symptoms as a result of residing in their CMH manufactured home, suffered from varying pre-existing medical conditions prior to living in

their CMH manufactured home, lived in their CMH manufactured home for varying amounts of time, and occupied their CMH manufactured home in different manner. In addition, CMH's purported class representatives complain of varying symptoms, suffered from varying pre-existing medical conditions, lived in their housing units provided by FEMA for varying amounts of time, and occupied their housing units provided by FEMA in different manners as compared to the class as a whole. *See generally* Plaintiff Fact Sheets for Davis, Jack, and Gumm.

(i)     Davis, Jack and Gumm would have each been exposed to vastly different levels of formaldehyde than other persons who resided in CMH homes and than other class members who lived in the homes of other manufacturers. *See generally* Zieman Affid.

(j)     At least one of CMH's purported class representatives, Davis, lived in a travel trailer manufactured by a different manufacturer prior

to moving into a CMH manufactured home.
*See* Plaintiff Fact Sheet for Davis, at p. 27

(k)   Two of CMH's purported class representatives,
Jack and Gumm, have yet to be deposed
despite CMH's attempts to depose them.

(l)   Two of CMH's purported class representatives,
Jack and Gumm, have totally deficient Plaintiff
Fact Sheets ("PFS") and have yet to cure the
PFS despite CMH's requests that they do so.
*See generally* Plaintiff Fact Sheets for Jack
and Gumm, and ERRATA Sheet for Gumm.

xvi.   Southern Energy Homes, Inc.

(a)   Southern Energy Homes, Inc. ("Southern
Energy") sold only manufactured homes in the
aftermaths of Hurricanes Katrina and Rita.

(b)   Southern Energy has approximately 529
manufactured homes that potentially could
have been lived in by putative class members.
This number represents the total number of
manufactured homes provided to FEMA less
the number of new and/or unused
manufactured homes as provided in a list

obtained from the government. *See* August 13, 2008 Letter to Magistrate Roby.

(c) Southern Energy has no class representative matched with it in Texas, Alabama, or Mississippi (i.e., no putative class representative resided in a Southern Energy manufactured home within these states), and thus there is no proposed class representative for the majority of the subclasses proposed by plaintiffs. *See generally* Class Representatives listed in Rec. Doc. 666-2, matched with specific manufacturer in the Second Supplemental and Amended AMC (Rec. Doc. 722), and Plaintiff Facts Sheet for Amaris McGallion. *See also* Rec. Doc. 902, at pp. 42-44.

(d) All Southern Energy manufactured homes provided to FEMA came with formaldehyde warnings.

(e) All Southern Energy manufactured homes were manufactured in accordance with U.S. Department of Housing and Urban Development ("HUD") standards.

(f)     The Southern Energy manufactured homes,
amongst other things, vary dramatically in size,
configuration, material, and type of ventilation
system when compared to other
manufacturers' housing units. Zieman Affid., ¶¶
14-17.

(g)     In addition, any given Southern Energy
manufactured home differs significantly from
other manufacturers' housing units, and among
Southern Energy units from model to model
and plant to plant with regards to formaldehyde
levels.  These differences are based upon
types, qualities, age, and storage of
construction materials (all of which differ from
supplier to supplier), home design and
construction methods, workmanship and
quality of construction, types and quantities of
furniture and drapery, whether residents added
or installed their own formaldehyde-emitting
materials, time and condition of housing unit
storage, transportation of the housing unit from
the plant to the ultimate occupant, installation
of the housing unit, geographic placement of a

given housing unit, the number and size of air condition units, the use of windows and doors, the type of ducting and insulation, specific usage of the housing unit, and varying occupant lifestyles. *See generally* Zieman Affid.

(h)  Southern Energy's purported class representative, Amaris McGallion ("McGallion"), complains of varying symptoms, suffered from varying pre-existing medical conditions, lived in her housing unit for varying amounts of time, and occupied her housing unit in a different manner as compared to the class as a whole. *See generally* Plaintiff Fact Sheet for McGallion.

(i)  Southern Energy's purported class representative, McGallion, lived in a travel trailer manufactured by a different manufacturer and lived in a house with a severe mold problem prior to moving into a Southern Energy manufactured home. *See* Plaintiff Fact Sheet for McGallion, at p. 27 and Deposition of McGallion.

(j)     McGallion would have been exposed to vastly

different levels of formaldehyde than other

persons who resided in Southern Energy

homes and than other class members who

lived in the homes of other manufacturers. *See*

*generally* Zieman Affid.

xvii.   Palm Harbor Homes, Inc.

(a)     Palm Harbor Homes, Inc. ("Palm Harbor") sold

only manufactured homes in the aftermaths of

Hurricanes Katrina and Rita.

(b)     Palm Harbor has approximately 287

manufactured homes that potentially could

have been lived in by putative class members.

This number represents the total number of

manufactured homes provided to FEMA less

the number of new and/or unused

manufactured homes as provided in a list

obtained from the government. *See* August 13,

2008 Letter to Magistrate Roby.

(c)     Palm Harbor has no class representative

matched with it in Texas, Alabama, or

Louisiana (i.e., no putative class representative

resided in a Palm Harbor manufactured home

within these states), and thus there is no proposed class representative for the majority of the subclasses proposed by plaintiffs. *See generally* Class Representatives listed in Rec. Doc. 666-2, matched with specific manufacturer in the Second Supplemental and Amended AMC (Rec. Doc. 722), and Plaintiff Facts Sheet for Linda Maldonado-West. *See also* Rec. Doc. 902, at pp. 42-44.

(d)    All Palm Harbor manufactured homes provided to FEMA came with formaldehyde warnings.

(e)    All Palm Harbor manufactured homes were manufactured in accordance with U.S. Department of Housing and Urban Development ("HUD") standards.

(f)    The Palm Harbor manufactured homes, amongst other things, vary dramatically in size, configuration, material, and type of ventilation system when compared to other manufacturers' housing units. Zieman Affid., ¶¶ 14-17.

(g)     In addition, any given Palm Harbor

manufactured home differs significantly from

other manufacturers' housing units, and among

Palm Harbor units from model to model and

plant to plant with regards to formaldehyde

levels.  These differences are based upon

types, qualities, age, and storage of

construction materials (all of which differ from

supplier to supplier), home design and

construction methods, workmanship and

quality of construction, types and quantities of

furniture and drapery, whether residents added

or installed their own formaldehyde-emitting

materials, time and condition of housing unit

storage, transportation of the housing unit from

the plant to the ultimate occupant, installation

of the housing unit, geographic placement of a

given housing unit, the number and size of air

condition units, the use of windows and doors,

the type of ducting and insulation, specific

usage of the housing unit, and varying

occupant lifestyles. *See generally* Zieman

Affid.

(h)    Palm Harbor's purported class representative, Linda Maldonado-West ("West"), complains of varying symptoms, suffered from varying pre-existing medical conditions, lived in her housing unit for varying amounts of time, and occupied her housing unit in a different manner as compared to the class as a whole. *See generally* Plaintiff Fact Sheet for West.

(i)    Palm Harbor's purported class representatives, West, lived in three (3) different travel trailers manufactured by different manufacturers -- one of which has a severe mold problem -- prior to moving into a Palm Harbor manufactured home. *See* Plaintiff Fact Sheet for West, at pp. 8-9, 27, 30-31, 33-34.

(j)    West would have been exposed to vastly different levels of formaldehyde than other persons who resided in Palm Harbor homes and than other class members who lived in the homes of other manufacturers. *See generally* Zieman Affid.

xviii.   Giles Industries, Inc.

(a)     Giles Industries, Inc. ("Giles") sold only manufactured homes in the aftermaths of Hurricanes Katrina and Rita.

(b)     Giles has approximately 259 manufactured homes that potentially could have been lived in by putative class members.  This number represents the total number of manufactured homes provided to FEMA less the number of new and/or unused manufactured homes as provided in a list obtained from the government. *See* August 13, 2008 Letter to Magistrate Roby.

(c)     Giles has no class representative matched to it in Texas, Alabama, or Mississippi (i.e., no putative class representative resided in a Palm Harbor manufactured home within these states), and thus there is no proposed class representative for the majority of the subclasses proposed by plaintiffs. *See generally* Class Representatives listed in Rec. Doc. 666-2, matched with specific manufacturer in the Second Supplemental and Amended AMC (Rec. Doc. 722), and Plaintiff

Facts Sheet for Fontenots. *See also* Rec. Doc. 902, at pp. 42-44.

(d)  All Giles manufactured homes provided to FEMA came with formaldehyde warnings.

(e)  All Giles manufactured homes were manufactured in accordance with U.S. Department of Housing and Urban Development ("HUD") standards.

(f)  The Giles manufactured homes, amongst other things, vary dramatically in size, configuration, material, and type of ventilation system when compared to other manufacturers' housing units. Zieman Affid., ¶¶ 14-17.

(g)  In addition, any given Giles manufactured home differs significantly from other manufacturers' housing units, and among Giles units from model to model and plant to plant with regards to formaldehyde levels.  These differences are based upon types, qualities, age, and storage of construction materials (all of which differ from supplier to supplier), home design and construction methods, workmanship and quality of construction, types

and quantities of furniture and drapery,
whether residents added or installed their own
formaldehyde-emitting materials, time and
condition of housing unit storage,
transportation of the housing unit from the plant
to the ultimate occupant, installation of the
housing unit, geographic placement of a given
housing unit, the number and size of air
condition units, the use of windows and doors,
the type of ducting and insulation, specific
usage of the housing unit, and varying
occupant lifestyles. *See generally* Zieman
Affid.

(h)     Giles's purported class representatives,
Shontay Fontenot o/b/o Hailey Fontenot,
Shontay Fontenot o/b/o of Justin Fontenot, and
Shontay Fontenot o/b/o Jonathan Fontenot, Jr,
complain of varying symptoms as a result of
residing in a Giles manufactured home,
suffered from varying pre-existing medical
conditions prior to residing in their Giles
manufactured home, lived in their Giles
manufactured home for varying amounts of

time, and lived in their Giles manufactured home in different manners. In addition, Giles's purported class representatives complain of varying symptoms, suffered from varying pre-existing medical conditions, lived in their housing units provided by FEMA for varying amounts of time, and occupied their housing units provided by FEMA in different manners as compared to the class as a whole.

(i)   Giles's purported class representatives, Shontay Fontenot o/b/o Hailey Fontenot, Shontay Fontenot o/b/o of Justin Fontenot, and Shontay Fontenot o/b/o Jonathan Fontenot, Jr, lived "off and on" in a travel trailer manufactured by a different manufacturer as well as a house with a mold problem prior to moving into a Giles manufactured home. *See generally* Plaintiff Fact Sheet for Fontenots and Deposition of Shontay Fontenot, 37:6-38:8, 40:5-58:21.

(j)   These individuals would have each been exposed to vastly different levels of formaldehyde than other persons who resided

in Giles homes and than other class members
who lived in the homes of other manufacturers.
*See generally* Zieman Affid.

xix.   SunRay Investments, LLC

(a)   SunRay Investments, LLC ("SunRay") sold
only travel trailers in the aftermaths of
Hurricanes Katrina and Rita.

(b)   SunRay has approximately 67 travel trailers
that potentially could have been lived in by
putative class members.  This number
represents the total number of travel trailers
provided to FEMA less the number of new
and/or unused travel trailers as provided in a
list obtained from the government.  As  a result,
it is highly unlikely that plaintiffs could meet the
numerosity requirement for class certification.
*See* August 13, 2008 Letter to Magistrate
Roby.

(c)   SunRay has no class representative matched
with it in Texas, Alabama, or Mississippi (i.e.,
no putative class representative resided in a
Palm Harbor manufactured home within these
states), and thus there is no proposed class

representative for the majority of the subclasses proposed by plaintiffs. *See generally* Class Representatives listed in Rec. Doc. 666-2, matched with specific manufacturer in the Second Supplemental and Amended AMC (Rec. Doc. 722), and Plaintiff Facts Sheet for Mary Harris. *See also* Rec. Doc. 902, at pp. 42-44.

(d)   All SunRay travel trailers provided to FEMA came with formaldehyde warnings.

(e)   The SunRay travel trailers, amongst other things, vary dramatically in size, configuration, material, and type of ventilation system when compared to other manufacturers' housing units. Zieman Affid., ¶¶ 14-17.

(f)   In addition, any given SunRay manufactured home differs significantly from other manufacturers' housing units, and among SunRay units from model to model and plant to plant with regards to formaldehyde levels. These differences are based upon types, qualities, age, and storage of construction materials (all of which differ from supplier to

supplier), home design and construction methods, workmanship and quality of construction, types and quantities of furniture and drapery, whether residents added or installed their own formaldehyde-emitting materials, time and condition of housing unit storage, transportation of the housing unit from the plant to the ultimate occupant, installation of the housing unit, geographic placement of a given housing unit, the number and size of air condition units, the use of windows and doors, the type of ducting and insulation, specific usage of the housing unit, and varying occupant lifestyles. *See generally* Zieman Affid.

(g)    SunRay's purported class representative, Mary Harris, complains of varying symptoms, suffered from varying pre-existing medical conditions, lived in her housing unit for varying amounts of time, and occupied her housing unit in a different manner as compared to the class as a whole. *See generally* Plaintiff Fact Sheet for Harris.

(h)  Harris would have been exposed to vastly different levels of formaldehyde than other persons who resided in SunRay homes and than other class members who lived in the homes of other manufacturers. *See generally* Zieman Affid.

xx.  ScotBilt Homes, Inc.

(a)  ScotBilt Homes, Inc. ("ScotBilt") sold only manufactured homes through a subcontract with Alliance Homes, Inc. d/b/a Adrian Homes in the aftermaths of Hurricanes Katrina and Rita. (Answers of ScotBilt Homes to Plaintiffs' discovery, Request for Production No. 2 and Answer to Interrogatory No. 2;  copy of the contract between ScotBilt and Alliance;  Affidavit of Tom Holland**)**

(b)  ScotBilt has a universe of 275 manufactured homes at issue, of which it appears that at least approximately 100  were never used by FEMA as per the FEMA FRAATS lists, leaving approximately 175 units that could  have been occupied by potential class members, and this number was based upon the number of new

and/or unused manufactured homes as provided

in a list obtained from the government. (Affidavit of

Tom Holland; Answers of ScotBilt Homes to

Plaintiffs' discovery, answer to Interrogatory No. 1

and Response to Request for Production No. 1;

see also Third Party Demand of ScotBilt Homes,

Docket Entry #333)

(c) ScotBilt has no class representative in Texas,

Alabama, or Louisiana (i.e., no one resided in a

ScotBilt manufactured home that is a named class

representative Plaintiff), and thus there is no

proposed class representative for the majority of

the subclasses proposed by plaintiffs.  (See

Plaintiffs' list of putative class members, docket

entry #666 and Docket Entry 722;  deposition

testimony of Ella Flowers, page 92, lines 10-25).

(d) All ScotBilt  manufactured homes provided to

FEMA came with formaldehyde warnings as

mandated by the HUD Code governing

manufactured housing, whereas other

manufacturers' of different types of emergency

housing at issue housing units did not.  (See the

copy of the generic formaldehyde warning

- 332 -

submitted by defendants as an exhibit;  affidavit of

Tom Holland).  Even if such warnings were not

provided, which is denied, as the HUD Code

mandated formaldehyde warning is codified and

promulgated by HUD in the Code of Federal

Regulations at 24 C.F.R. §3280.308, all persons

are charged with knowledge of the terms and

provisions of the HUD Code formaldehyde

warnings under *Federal Crop Ins. Corp. v. Merrill,*

332 U.S. 380 (1947). (Answers of ScotBilt Homes

to Plaintiffs' discovery, Interrogatory no. 13).

Plaintiff Ella Flowers had a copy of the ScotBilt

owner's manual that she used to identify the

manufacturer of her home.  (deposition of Plaintiff,

p. p. 25, lines 18-25 through p. 26, line 8).  The

ScotBilt Owners Manual also contains the

Formaldehyde warnings as mandated by the HUD

Code.  (See the copy of the ScotBilt Homes

Owners' Manual, page  HO-21; affidavit of Tom

Holland)

(e) All ScotBilt manufactured homes were

manufactured in accordance with U.S. Department

of Housing and Urban Development ("HUD")

standards whereas other manufacturers' of emergency housing units were not because the HUD Code did not apply to their products. (Answers of ScotBilt Homes to Plaintiffs' discovery, Interrogatory no. 13;  affidavit of Tom Holland)

(f) The ScotBilt manufactured homes, amongst other things, vary dramatically in size, configuration, material, and type of ventilation system when compared to other manufacturers' housing units. Some manufacturers utilize whole house ventilation systems that exchange air by a manually activated ventilation fan that is not an integral part of the furnace.  Housing units which have different whole house ventilation systems will have different air changes rates which in turn will yield different ambient formaldehyde levels. (Zieman Affidavit in general and paragraphs 16- 17;  Affidavit of Tom Holland).

(g) ScotBilt Homes' purported class representative, Ella Flowers, complains of varying symptoms as a result of residing in a ScotBilt manufactured home, suffered from varying pre-existing medical

conditions prior to living in a ScotBilt Home, lived
in another manufactured housing unit immediately
prior to Hurricane Katrina striking, stated that her
symptoms started to manifest in December of
2005 but did not receive her ScotBilt unit until
March of 2007, and lived in a CMH manufactured
home for varying amounts of time. Several of the
symptoms (including dizziness),  (see in general
the proposed findings of fact for Ella Flowers and
her fact sheet;  See also in general the affidavit of
Robert Golden).

(h) In addition, any given ScotBilt manufactured home
differs significantly from other manufacturers'
housing units, and among ScotBilt units from
individual unit to individual unit with regards to
formaldehyde levels.  These differences are based
upon types, qualities, age, and storage of
construction materials (all of which differ from
supplier to supplier), home design and
construction methods, workmanship and quality of
construction, types and quantities of furniture and
drapery, whether residents added or installed their
own formaldehyde-emitting materials, time and

condition of housing unit storage, transportation of

the housing unit from the plant to the ultimate

occupant, installation of the housing unit,

geographic placement of a given housing unit, the

number and size of air condition units, the use of

windows and doors, the type of ducting and

insulation, specific usage of the housing unit, and

varying occupant lifestyles. (*See generally* Zieman

Affidavit).

xxi.     Many of the EHU manufacturers do not have a class

representative for each of the four states in which

Plaintiffs seek class or sub-class certification

(Alabama, Louisiana, Mississippi and Texas).

xxii.    Redman Homes, Inc., individually and f/k/a Dutch
Housing, Inc.

(i)  Redman Homes, Inc. acquired Dutch Housing,

Inc. (hereinafter collectively referred to as

"Redman"), in May 2008. See Docs. 620 and 685,

in which Redman discloses it acquired Dutch

Housing, Inc. by merger.

(j)  Redman manufactured only manufactured homes

that were sold to FEMA for use as EHUs in the

aftermaths of Hurricanes Katrina and Rita. See

Exhibit D-275, Redman Class Certification

Discovery Responses.

(k) Redman has approximately 367 manufactured

homes which potentially could have been lived in

by putative class members. This number

represents the total number of manufactured

homes provided to FEMA less the number of new

and/or unused manufactured homes as provided

in a list obtained from the government. See Exhibit

D-277, Chart Requested by and Supplied to

Magistrate Judge Karen Wells Roby.

(l) Redman has no class representative matched with

it in Texas or Alabama (i.e., no putative class

representative resided in a Redman manufactured

home within these states), and thus there is no

proposed class representative for the majority of

the subclasses proposed by plaintiffs. See Class

Representatives Identified by Plaintiffs at Doc.

666; See Second Amended and Supplemental

Administrative Master Complaint at Doc. 722

alleging a connection between the named plaintiffs

to specific manufacturing defendants, inclusive of

the putative class representatives; and See the

Plaintiff Fact Sheets identifying the locations in which the putative class representatives resided in EHUs; all of which show there is no putative class representative connected who claims to have lived in a Redman EHU in the states of Texas or Alabama.

(m) All Redman manufactured homes provided to FEMA contained formaldehyde warnings. See Exhibit D-275, Redman Class Certification Discovery Responses; 24 C.F.R. 3280.309, HUD Formaldehyde Warning Regulation.

(n) All Redman manufactured homes were manufactured in accordance with U.S. Department of Housing and Urban Development ("HUD") regulations, including the formaldehyde emission regulations. See, Exhibit D-275, Redman Class Certification Discovery Responses; 24 C.F.R. 3280.308, HUD Formaldehyde Emission Control Regulation; 49 Fed. Reg. 31996, rejecting ambient level emission controls, but concluding the enacted regulations would achieve a "Targeted Ambient Level" of .4 ppm; Affidavit of Paul Hewitt, at Section 7, Tables, at Table 1, demonstrating

ambient formaldehyde levels in Redman manufactured homes were less than .4 ppm.

(o) All manufactured homes vary dramatically in size, configuration, material, and type of ventilation system. Zieman Affid., ¶¶ 14-17  For example, some manufacturer ventilation systems are an integral part of the furnace/HVAC system and exchange indoor air with outdoor air every time the furnace or air conditioning system is in use. Alternatively, some manufacturers utilize whole house ventilation systems that exchange air by a manually activated ventilation fan which is not an integral part of the furnace.  Housing units which have different whole house ventilation systems will have different air changes rates which in turn will yield different ambient formaldehyde levels. Zieman Affid., ¶¶ 16-17.

(p) In addition, any given Redman manufactured home differs significantly from other manufacturers' housing units, and among Redman units from model to model and plant to plant with regards to formaldehyde levels.  These differences are based upon types, qualities, age, and storage

of construction materials (all of which differ from supplier to supplier), home design and construction methods, workmanship and quality of construction, types and quantities of furniture and drapery, whether residents added or installed their own formaldehyde-emitting materials, time and condition of housing unit storage, transportation of the housing unit from the plant to the ultimate occupant, installation of the housing unit, geographic placement of a given housing unit, the number and size of air condition units, the use of windows and doors, the type of ducting and insulation, specific usage of the housing unit, and varying occupant lifestyles. *See generally* Zieman Affid.

(q) Redman's putative class representatives, Betty Thomas, Courtney Alfred o/b/o Christopher Thomas and Jacqueline Dedeaux, have not provided adequate proof that they resided in a Redman manufactured home, ranged in age from two (2) months to 40-plus years when they lived in their EHUs, complain of varying symptoms as a result of residing in their EHUs, suffered from

varying medical conditions before, during and after living in their EHUs, lived in their EHUs for varying amounts of time, and occupied their EHUs in a different manner. See Findings of Fact and Plaintiff Fact Sheets for Betty Thomas, Courtney Alfred o/b/o Christopher Thomas and Jacqueline Dedeaux. In addition, Redman's purported class representatives complain of varying symptoms, suffered from varying pre-existing medical conditions, lived in their housing units provided by FEMA for varying amounts of time, and occupied their housing units provided by FEMA in different manners as compared to the class as a whole. Id.

(r) Betty Thomas, Courtney Alfred o/b/o Christopher Thomas and Jacqueline Dedeaux would have each been exposed to vastly different levels of formaldehyde than other persons who resided in Redman homes and than other class members who lived in the homes of other manufacturers. See Affidavit of Paul Hewitt, at Section 7, Tables, at Table 1.

xxiii.    Cavalier Home Builders, L.L.C.

(a) There is no class representative for Cavalier
Home Builders, L.L.C. (Cavalier). See Class
Representatives Identified by Plaintiffs at Doc.
666, identifying Joanette Williams o/b/o George
Williams and Rose Lee Bright as putative class
representatives; See Exhibit D-278,
Communications and Documents Regarding the
Absence of Class Representatives for Cavalier
(Letter and attachments of September 30, 2008 to
PSC re: Joanette Williams did not occupy a
Cavalier EHU; See Email of November 11, 2008,
from PSC confirming Joanette Williams did not
occupy a Cavalier EHU; Email of November 14,
2008 from PSC alleging Rose Lee Bright lived in a
Cavalier EHU; Email and excerpts of disaster file
attached thereto of November 14, 2008, to the
PSC regarding Rose Lee Bright did not occupy a
Cavalier EHU; Plaintiff Fact Sheet of Rose Lee
Bright).

(b) Cavalier manufactured and delivered only
manufactured homes to FEMA for use as EHUs in
the aftermath of Hurricanes Katrina and Rita. See
Doc. 617-3.

(c) All Cavalier manufactured homes provided to FEMA contained formaldehyde warnings. See Exhibit D-274, Cavalier Class Certification Discovery Responses; 24 C.F.R. 3280.309, HUD Formaldehyde Warning Regulation.

(d) All Cavalier manufactured homes were manufactured in accordance with U.S. Department of Housing and Urban Development ("HUD") standards. See, Exhibit D-274, Cavalier Class Certification Discovery Responses; 24 C.F.R. 3280.308, HUD Formaldehyde Emission Control Regulation; 49 Fed. Reg. 31996, rejecting ambient level emission controls, but concluding the enacted regulations would achieve a "Targeted Ambient Level" of .4 ppm.

(e) All manufactured homes vary dramatically in size, configuration, material, and type of ventilation system. Zieman Affid., ¶¶ 14-17  For example, some manufacturer ventilation systems are an integral part of the furnace/HVAC system and exchange indoor air with outdoor air every time the furnace or air conditioning system is in use. Alternatively, some manufacturers utilize whole

house ventilation systems that exchange air by a manually activated ventilation fan which is not an integral part of the furnace.  Housing units which have different whole house ventilation systems will have different air changes rates which in turn will yield different ambient formaldehyde levels.  Zieman Affid., ¶¶ 16-17.

(f)  In addition, any given Cavalier manufactured home differs significantly from other manufacturers' housing units, and among Liberty units from model to model and plant to plant with regards to formaldehyde levels.  These differences are based upon types, qualities, age, and storage of construction materials (all of which differ from supplier to supplier), home design and construction methods, workmanship and quality of construction, types and quantities of furniture and drapery, whether residents added or installed their own formaldehyde-emitting materials, time and condition of housing unit storage, transportation of the housing unit from the plant to the ultimate occupant, installation of the housing unit, geographic placement of a given housing unit, the

- 344 -

number and size of air condition units, the use of
windows and doors, the type of ducting and
insulation, specific usage of the housing unit, and
varying occupant lifestyles. *See generally* Zieman
Affid.

xxiv.   Liberty Homes, Inc.

(a) Liberty Homes, Inc. ("Liberty") sold only
manufactured homes to FEMA in the aftermaths of
Hurricanes Katrina and Rita. See Exhibit D-276,
Liberty and Waverlee Class Certification Discovery
Responses.

(b) Liberty has approximately 423 manufactured
homes that potentially could have been lived in by
putative class members. This number represents
the total number of manufactured homes provided
to FEMA less the number of new and/or unused
manufactured homes as provided in a list obtained
from the government. See Exhibit D-277, Chart
Requested by and Supplied to Magistrate Judge
Karen Wells Roby.

(c) Liberty has no class representative matched with it
in Texas, Alabama, or Louisiana (i.e., no putative
class representative resided in a Liberty

manufactured home within these states), and thus there is no proposed class representative for the majority of the subclasses proposed by plaintiffs. (See Class Representatives Identified by Plaintiffs at Doc. 666; See Second Amended and Supplemental Administrative Master Complaint at Doc. 722 alleging a connection between the named plaintiffs to specific manufacturing defendants, inclusive of the putative class representatives; and See the Plaintiff Fact Sheets identifying the locations in which the putative class representatives resided in EHUs at Exhibits P-76; all of which show there is no putative class representative connected who claims to have lived in a Liberty EHU in the states of Texas, Alabama or Louisiana.

(d) All Liberty manufactured homes provided to FEMA contained formaldehyde warnings. See Exhibit D-276, Liberty and Waverlee Class Certification Discovery Responses; 24 C.F.R. 3280.309, HUD Formaldehyde Warning Regulation.

(e) All Liberty manufactured homes were manufactured in accordance with U.S. Department

of Housing and Urban Development ("HUD")
standards. See, Exhibit D-276, Liberty and
Waverlee Class Certification Discovery
Responses; 24 C.F.R. 3280.308, HUD
Formaldehyde Emission Control Regulation; 49
Fed. Reg. 31996, rejecting ambient level emission
controls, but concluding the enacted regulations
would achieve a "Targeted Ambient Level" of .4
ppm; Affidavit of Paul Hewitt, at Section 7, Tables,
at Table 1, demonstrating ambient formaldehyde
levels in Liberty manufactured homes were less
than .4 ppm.

(f) All manufactured homes vary dramatically in size,
configuration, material, and type of ventilation
system. Zieman Affid., ¶¶ 14-17  For example,
some manufacturer ventilation systems are an
integral part of the furnace/HVAC system and
exchange indoor air with outdoor air every time the
furnace or air conditioning system is in use.
Alternatively, some manufacturers utilize whole
house ventilation systems that exchange air by a
manually activated ventilation fan which is not an
integral part of the furnace.  Housing units which

have different whole house ventilation systems will have different air changes rates which in turn will yield different ambient formaldehyde levels. Zieman Affid., ¶¶ 16-17.

(g) In addition, any given Liberty manufactured home differs significantly from other manufacturers' housing units, and among Liberty units from model to model and plant to plant with regards to formaldehyde levels.  These differences are based upon types, qualities, age, and storage of construction materials (all of which differ from supplier to supplier), home design and construction methods, workmanship and quality of construction, types and quantities of furniture and drapery, whether residents added or installed their own formaldehyde-emitting materials, time and condition of housing unit storage, transportation of the housing unit from the plant to the ultimate occupant, installation of the housing unit, geographic placement of a given housing unit, the number and size of air condition units, the use of windows and doors, the type of ducting and insulation, specific usage of the housing unit, and

- 348 -

varying occupant lifestyles. *See generally* Zieman Affid.

(h) Liberty's purported class representative, Percy Evans, lived in a manufactured home for many years before Hurricane Katrina, complains of varying symptoms, suffered from varying pre-existing medical conditions, lived in his housing unit for varying amounts of time, and occupied his housing unit in a different manner as compared to the class as a whole. See Findings of Fact for Percy Evans.

(i) Liberty's purported class representative, Evans, lived in a different EHU, a manufactured home constructed by Homes of Merit, Inc., before moving into the Liberty manufactured home. See Findings of Fact for Percy Evans.

(j) Evans would have been exposed to vastly different levels of formaldehyde than other persons who resided in Liberty homes and than other class members who lived in the homes of other manufacturers. See Affidavit of Paul Hewitt, at Section 7, Tables, at Table 1.

xxv.   Waverlee Homes, Inc.

(a) Waverlee Homes, Inc. ("Waverlee") sold only manufactured homes to FEMA in the aftermaths of Hurricanes Katrina and Rita. See Exhibit D-276, Liberty and Waverlee Class Certification Discovery Responses.

(b) Waverlee has approximately 393 manufactured homes which potentially could have been lived in by putative class members.  This number represents the total number of manufactured homes provided to FEMA less the number of new and/or unused manufactured homes as provided in a list obtained from the government. See Exhibit D-277, Chart Requested by and Supplied to Magistrate Judge Karen Wells Roby.

(c) Waverlee has no class representative matched with it in Texas, Alabama, or Louisiana (i.e., no putative class representative resided in a Liberty manufactured home within these states), and thus there is no proposed class representative for the majority of the subclasses proposed by plaintiffs. See Class Representatives Identified by Plaintiffs at Doc. 666; See Second Amended and Supplemental Administrative Master Complaint at

Doc. 722 alleging a connection between the named plaintiffs to specific manufacturing defendants, inclusive of the putative class representatives; and See the Plaintiff Fact Sheets identifying the locations in which the putative class representatives resided in EHUs at Exhibits P-76; all of which show there is no putative class representative connected who claims to have lived in a Waverlee EHU in the states of Texas, Alabama or Louisiana.

(d) All Waverlee manufactured homes provided to FEMA contained formaldehyde warnings. See Exhibit D-276, Liberty and Waverlee Class Certification Discovery Responses; 24 C.F.R. 3280.309, HUD Formaldehyde Warning Regulation.

(e) All Waverlee manufactured homes were manufactured in accordance with U.S. Department of Housing and Urban Development ("HUD") standards. See, Exhibit D-276, Liberty and Waverlee Class Certification Discovery Responses; 24 C.F.R. 3280.308, HUD Formaldehyde Emission Control Regulation; 49

Fed. Reg. 31996, rejecting ambient level emission controls, but concluding the enacted regulations would achieve a "Targeted Ambient Level" of .4 ppm; See Affidavit of Paul Hewitt, at Section 7, Tables, at Table 1, demonstrating ambient formaldehyde levels in Waverlee manufactured homes were less than .4 ppm.

(f)   All manufactured homes vary dramatically in size, configuration, material, and type of ventilation system. Zieman Affid., ¶¶ 14-17. For example, some manufacturer ventilation systems are an integral part of the furnace/HVAC system and exchange indoor air with outdoor air every time the furnace or air conditioning system is in use. Alternatively, some manufacturers utilize whole house ventilation systems that exchange air by a manually activated ventilation fan which is not an integral part of the furnace. Housing units which have different whole house ventilation systems will have different air changes rates which in turn will yield different ambient formaldehyde levels. Zieman Affid., ¶¶ 16-17.

(g)   In addition, any given Waverlee manufactured home differs significantly from other manufacturers' housing units, and among Liberty units from model to model and plant to plant with regards to formaldehyde levels.  These differences are based upon types, qualities, age, and storage of construction materials (all of which differ from supplier to supplier), home design and construction methods, workmanship and quality of construction, types and quantities of furniture and drapery, whether residents added or installed their own formaldehyde-emitting materials, time and condition of housing unit storage, transportation of the housing unit from the plant to the ultimate occupant, installation of the housing unit, geographic placement of a given housing unit, the number and size of air condition units, the use of windows and doors, the type of ducting and insulation, specific usage of the housing unit, and varying occupant lifestyles. *See generally* Zieman Affid.

(h)   Waverlee's purported class representative, Sheila Smith o/b/o Michael Tracy, was a heavy smoker

for 50 years before moving into his housing unit, complains of varying symptoms, suffered from varying and serious pre-existing medical conditions, lived in his housing unit for varying amounts of time, and occupied his housing unit in a different manner as compared to the class as a whole. See Findings of Fact for Sheila Smith o/b/o Michael Tracy.

(i) Waverlee's purported class representative, Sheila Smith o/b/o Michael Tracy, lived in a different EHU, a manufactured home constructed by Homes of Merit, Inc., before moving into the Waverlee manufactured home. See Findings of Fact for Sheila Smith o/b/o Michael Tracy

(j) Tracy would have been exposed to vastly different levels of formaldehyde than other persons who resided in Waverlee homes and than other class members who lived in the homes of other manufacturers. See Affidavit of Paul Hewitt, at Section 7, Tables, at Table 1.

xxvi.   Champion Home Builders Co.

(a) Champion Home Builders Co. ("Champion") sold only manufactured homes to FEMA in the aftermaths of Hurricanes Katrina and Rita.

(b) There is no class representative for Champion Home Builders Co. See Class Representatives Identified by Plaintiffs at Doc. 666; See Second Amended and Supplemental Administrative Master Complaint at Doc. 722 alleging a connection between the named plaintiffs to specific manufacturing defendants, inclusive of the putative class representatives; and See the Plaintiff Fact Sheets identifying the locations in which the putative class representatives resided in EHUs at Exhibits P-76; all of which show there is no putative class representative who claims to have lived in a Champion EHU.

(c) All Champion manufactured homes provided to FEMA contained formaldehyde warnings. (See 24 C.F.R. 3280.309, HUD Formaldehyde Warning Regulation.)

(d) All Champion manufactured homes were manufactured in accordance with U.S. Department of Housing and Urban Development ("HUD")

standards. (See, 24 C.F.R. 3280.308, HUD

Formaldehyde Emission Control Regulation; 49

Fed. Reg. 31996, rejecting ambient level emission

controls, but concluding the enacted regulations

would achieve a "Targeted Ambient Level" of .4

ppm; Affidavit of Paul Hewitt, at Section 7, Tables,

at Table 1, demonstrating ambient formaldehyde

levels in Champion manufactured homes were

less than .4 ppm.

(e) All manufactured homes vary dramatically in size,

configuration, material, and type of ventilation

system. Zieman Affid., ¶¶ 14-17  For example,

some manufacturer ventilation systems are an

integral part of the furnace/HVAC system and

exchange indoor air with outdoor air every time the

furnace or air conditioning system is in use.

Alternatively, some manufacturers utilize whole

house ventilation systems that exchange air by a

manually activated ventilation fan which is not an

integral part of the furnace.  Housing units which

have different whole house ventilation systems will

have different air changes rates which in turn will

yield different ambient formaldehyde levels.
Zieman Affid., ¶¶ 16-17.

(f) In addition, any given Champion manufactured
home differs significantly from other
manufacturers' housing units, and among Liberty
units from model to model and plant to plant with
regards to formaldehyde levels.  These differences
are based upon types, qualities, age, and storage
of construction materials (all of which differ from
supplier to supplier), home design and
construction methods, workmanship and quality of
construction, types and quantities of furniture and
drapery, whether residents added or installed their
own formaldehyde-emitting materials, time and
condition of housing unit storage, transportation of
the housing unit from the plant to the ultimate
occupant, installation of the housing unit,
geographic placement of a given housing unit, the
number and size of air condition units, the use of
windows and doors, the type of ducting and
insulation, specific usage of the housing unit, and
varying occupant lifestyles. *See generally* Zieman
Affid.

(g) Occupants of particular Champion home would
have been exposed to vastly different levels of
formaldehyde than those who occupied other
Champion homes or homes manufactured by
other defendants. See Affidavit of Paul Hewitt, at
Section 7, Tables, at Table 1.

xxvii.   Homes of Merit, Inc.

(a) Homes of Merit, Inc. sold only manufactured
homes to FEMA in the aftermaths of Hurricanes
Katrina and Rita.

(b) There is no class representative for Homes of
Merit, Inc., in Texas, Alabama or Louisiana. See
Class Representatives Identified by Plaintiffs at
Doc. 666; See Second Amended and
Supplemental Administrative Master Complaint at
Doc. 722 alleging a connection between the
named plaintiffs to specific manufacturing
defendants, inclusive of the putative class
representatives; and See the Plaintiff Fact Sheets
identifying the locations in which the putative class
representatives resided in EHUs at Exhibits P-76;
all of which show there is no putative class
representative who claims to have lived in a

Champion EHU in the states of Texas, Alabama or Louisiana.

(c) All Homes of Merit manufactured homes provided to FEMA contained formaldehyde warnings. See 24 C.F.R. 3280.309, HUD Formaldehyde Warning Regulation.

(d) All Homes of Merit manufactured homes were manufactured in accordance with U.S. Department of Housing and Urban Development ("HUD") standards. See, 24 C.F.R. 3280.308, HUD Formaldehyde Emission Control Regulation; 49 Fed. Reg. 31996, rejecting ambient level emission controls, but concluding the enacted regulations would achieve a "Targeted Ambient Level" of .4 ppm; Affidavit of Paul Hewitt, at Section 7, Tables, at Table 1, demonstrating ambient formaldehyde levels in manufactured homes were less than .4 ppm.

(h) All manufactured homes vary dramatically in size, configuration, material, and type of ventilation system. Zieman Affid., ¶¶ 14-17  For example, some manufacturer ventilation systems are an integral part of the furnace/HVAC system and

exchange indoor air with outdoor air every time the furnace or air conditioning system is in use. Alternatively, some manufacturers utilize whole house ventilation systems that exchange air by a manually activated ventilation fan which is not an integral part of the furnace.  Housing units which have different whole house ventilation systems will have different air changes rates which in turn will yield different ambient formaldehyde levels. Zieman Affid., ¶¶ 16-17.

(i) In addition, any given Homes of Merit manufactured home differs significantly from other manufacturers' housing units, and among Liberty units from model to model and plant to plant with regards to formaldehyde levels.  These differences are based upon types, qualities, age, and storage of construction materials (all of which differ from supplier to supplier), home design and construction methods, workmanship and quality of construction, types and quantities of furniture and drapery, whether residents added or installed their own formaldehyde-emitting materials, time and condition of housing unit storage, transportation of

the housing unit from the plant to the ultimate

occupant, installation of the housing unit,

geographic placement of a given housing unit, the

number and size of air condition units, the use of

windows and doors, the type of ducting and

insulation, specific usage of the housing unit, and

varying occupant lifestyles. *See generally* Zieman

Affid.

(j)  The Homes of Merit purported class

representative, Percy Evans, lived in a

manufactured home for many years before

Hurricane Katrina, complains of varying

symptoms, suffered from varying pre-existing

medical conditions, lived in his housing unit for

varying amounts of time, and occupied his housing

unit in a different manner as compared to the class

as a whole. See Findings of Fact for Percy Evans.

(k)  The Homes of Merit purported class

representative, Evans, lived in a different EHU, a

manufactured home constructed by Liberty

Homes, Inc., after leaving his Homes of Merit

EHU, and states that he did not suffer any

symptoms while living his Homes of Merit EHU. See Findings of Fact for Percy Evans.

(l)  Evans would have been exposed to vastly different levels of formaldehyde than other persons who resided in Homes of Merit homes and than other class members who lived in the homes of other manufacturers. See Affidavit of Paul Hewitt, at Section 7, Tables, at Table 1.

(m) The Homes of Merit purported class representative, Sheila Smith o/b/o Michael Tracy, was a heavy smoker for 50 years before moving into his housing unit, complains of varying symptoms, suffered from varying and serious pre-existing medical conditions, lived in his housing unit for varying amounts of time, and occupied his housing unit in a different manner as compared to the class as a whole. See Findings of Fact for Sheila Smith o/b/o Michael Tracy.

(n)  The Homes of Merit purported class representative, Sheila Smith o/b/o Michael Tracy, lived in a different EHU, a manufactured home constructed by Waverlee, after moving out of the

Homes of Merit manufactured home. See Findings
of Fact for Sheila Smith o/b/o Michael Tracy.

(o) Tracy would have been exposed to vastly different
levels of formaldehyde than other persons who
resided in Homes of Merit homes and than other
class members who lived in the homes of other
manufacturers. See Affidavit of Paul Hewitt, at
Section 7, Tables, at Table 1.

xxviii. River Birch Homes, Inc.

(a) River Birch Homes, Inc. ("River Birch") sold only
manufactured homes to FEMA in the aftermaths of
Hurricanes Katrina and Rita. See Exhibit D-279,
Excerpts of River Birch  Class Certification
Discovery Responses.

(b) River Birch has approximately 526 manufactured
homes that potentially could have been lived in by
putative class members. This number represents
the total number of manufactured homes provided
to FEMA less the number of new and/or unused
manufactured homes as provided in a list obtained
from the government. See Exhibit D-277, Chart
Requested by and Supplied to Magistrate Judge
Karen Wells Roby.

(c) River Birch has no class representative matched with it in Texas, Alabama, or Louisiana (i.e., no putative class representative resided in a Liberty manufactured home within these states), and thus there is no proposed class representative for the majority of the subclasses proposed by plaintiffs. See Class Representatives Identified by Plaintiffs at Doc. 666; See Second Amended and Supplemental Administrative Master Complaint at Doc. 722 alleging a connection between the named plaintiffs to specific manufacturing defendants, inclusive of the putative class representatives; and See the Plaintiff Fact Sheets identifying the locations in which the putative class representatives resided in EHUs at Exhibits P-76; all of which show there is no putative class representative connected who claims to have lived in a River Birch EHU in the states of Texas, Alabama or Louisiana.

(d) All River Birch manufactured homes provided to FEMA contained formaldehyde warnings. See Exhibit D-279, Excerpts of River Birch Class Certification Discovery Responses; 24 C.F.R.

3280.309, HUD Formaldehyde Warning Regulation.

(e) All River Birch manufactured homes were manufactured in accordance with U.S. Department of Housing and Urban Development ("HUD") standards. See, Exhibit D-279, Excerpts of River Birch Class Certification Discovery Responses; 24 C.F.R. 3280.308, HUD Formaldehyde Emission Control Regulation; 49 Fed. Reg. 31996, rejecting ambient level emission controls, but concluding the enacted regulations would achieve a "Targeted Ambient Level" of .4 ppm; See Affidavit of Paul Hewitt, at Section 7, Tables, at Table 1, demonstrating ambient formaldehyde levels in River Birch manufactured homes were less than .4 ppm.

(f) All manufactured homes vary dramatically in size, configuration, material, and type of ventilation system. Zieman Affid., ¶¶ 14-17. For example, some manufacturer ventilation systems are an integral part of the furnace/HVAC system and exchange indoor air with outdoor air every time the furnace or air conditioning system is in use.

Alternatively, some manufacturers utilize whole
house ventilation systems that exchange air by a
manually activated ventilation fan which is not an
integral part of the furnace.  Housing units which
have different whole house ventilation systems will
have different air changes rates which in turn will
yield different ambient formaldehyde levels.
Zieman Affid., ¶¶ 16-17.

(g) In addition, any given River Birch manufactured
home differs significantly from other
manufacturers' housing units, and among Liberty
units from model to model and plant to plant with
regards to formaldehyde levels.  These differences
are based upon types, qualities, age, and storage
of construction materials (all of which differ from
supplier to supplier), home design and
construction methods, workmanship and quality of
construction, types and quantities of furniture and
drapery, whether residents added or installed their
own formaldehyde-emitting materials, time and
condition of housing unit storage, transportation of
the housing unit from the plant to the ultimate
occupant, installation of the housing unit,

geographic placement of a given housing unit, the number and size of air condition units, the use of windows and doors, the type of ducting and insulation, specific usage of the housing unit, and varying occupant lifestyles. *See generally* Zieman Affid.

(h) River Birch's purported class representative, Sandra Anderson, has smoked one (1) pack of cigarettes a day for 13 years, complains of varying symptoms, lived in her housing units for varying amounts of time, and occupied her housing unit in a different manner as compared to the class as a whole. See Findings of Fact for Sandra Anderson.

(i) River Birch's purported class representative, Sandra Anderson, lived in a different EHU, a travel trailer manufactured by Gulf Stream, before moving into the River Birch manufactured home. See Findings of Fact for Sandra Anderson.

(j) Anderson would have been exposed to vastly different levels of formaldehyde than other persons who resided in River Birch homes and than other class members who lived in the homes

of other manufacturers. See Affidavit of Paul

Hewitt, at Section 7, Tables, at Table 1.

xxviiii.         The following demonstrates the names of manufacturers who have no

class representative occupying an EHU in the state indicated ("TT" denotes Travel

Trailer and "MH" denotes Mobile Home):

| State | No class representative for these manufacturers |
|-------|--------------------------------------------------|
| Alabama | 1. Cavalier Home Builders, L.L.C.<br>2. Champion Home Builders Co.<br>3. CMH<br>4. Coachmen Recreational Vehicle Company of Georgia, L.L.C.<br>5. Coachmen Recreational Vehicle Company, L.L.C.<br>6. Destiny Industries, LLC<br>7. DS Corporation (d/b/a CrossRoads RV)<br>8. Dutchmen Manufacturing, Inc.<br>9. Fleetwood (no class representative for MH)<br>10. Frontier RV, Inc.<br>11. Giles<br>12. Gulf Stream Coach, Inc.<br>13. Homes of Merit, Inc.<br>14. Horton Homes<br>15. Jayco, Inc.<br>16. Keystone RV Company<br>17. KZ RV, LP<br>18. Layton Homes Corporation<br>19. Liberty Homes, Inc.<br>20. Monaco Coach Corporation<br>21. Oak Creek Homes, LP<br>22. Palm Harbor Homes<br>23. Patriot Manufacturing, Inc. and Patriot Homes of Texas, L.P.<br>24. Pilgrim International, Inc.<br>25. Recreation By Design, LLC<br>26. Redman Homes, Inc., individually and f/k/a Dutch Housing, Inc.<br>27. River Birch Homes, Inc.<br>28. R-Vision, Inc.<br>29. ScotBilt Homes, Inc.<br>30. Silver Creek Homes, Inc. (neither MH nor TT)<br>31. Skyline Corporation (neither MH nor TT)<br>32. Southern Energy Homes |

| State | No class representative for these manufacturers |
|-------|--------------------------------------------------|
|  | 33. Starcraft RV, Inc.<br>34. Sunray<br>35. Thor California<br>36. TL Industries, Inc.<br>37. Vanguard Industries<br>38. Viking Recreational Vehicle Company, L.L.C.<br>39. Waverlee Homes, Inc. |
| Louisiana | 1. Cavalier Home Builders, L.L.C.<br>2. Champion Home Builders Co.<br>3. Coachmen Recreational Vehicle Company of Georgia, L.L.C.<br>4. Destiny Industries, LLC<br>5. Fleetwood (no class representative for MH)<br>6. Homes of Merit, Inc.<br>7. Liberty Homes, Inc.<br>8. Palm Harbor Homes<br>9. River Birch Homes, Inc.<br>10. R-Vision, Inc.<br>11. ScotBilt Homes, Inc.<br>12. Silver Creek Homes, Inc. (no class representative for TT)<br>13. Skyline Corporation (no class representative for MH)<br>14. Viking Recreational Vehicle Company L.L.C.<br>15. Waverlee Homes, Inc. |
| Mississippi | 1. Cavalier Home Builders, L.L.C.<br>2. Champion Home Builders Co.<br>3. CMH<br>4. Coachmen Recreational Vehicle Company of Georgia, L.L.C.<br>5. Coachmen Recreational Vehicle Company, L.L.C.<br>6. DS Corporation (d/b/a CrossRoads RV)<br>7. Fleetwood (neither TT nor MH)<br>8. Frontier RV, Inc.<br>9. Giles<br>10. Horton Homes<br>11. Jayco, Inc.<br>12. KZ RV, LP<br>13. Layton Homes Corporation<br>14. Monaco Coach Corporation<br>15. Oak Creek Homes, LP<br>16. Patriot Manufacturing, Inc. and Patriot Homes of Texas, L.P.<br>17. Pilgrim International, Inc.<br>18. Recreation By Design, LLC<br>19. R-Vision, Inc.<br>20. Silver Creek Homes, Inc. (neither TT nor MH) |

| State | No class representative for these manufacturers |
|-------|------------------------------------------------|
| | 21. Skyline Corporation (neither TT nor MH) <br> 22. Southern Energy Homes <br> 23. Starcraft RV, Inc. <br> 24. SunRay <br> 25. TL Industries, Inc. <br> 26. Vanguard Industries <br> 27. Viking Recreational Vehicle Company L.L.C. |
| Texas | 1. Cavalier Home Builders, L.L.C. <br> 2. Champion Home Builders Co. <br> 3. CMH <br> 4. Coachmen Recreational Vehicle Company of Georgia, L.L.C. <br> 5. Coachmen Recreational Vehicle Company, L.L.C. <br> 6. Destiny Industries, LLC <br> 7. DS Corporation (d/b/a CrossRoads RV) <br> 8. Fleetwood (neither TT or MH) <br> 9. Forest River (neither TT nor MH) <br> 10. Frontier RV, Inc. <br> 11. Giles <br> 12. Homes of Merit, Inc. <br> 13. Horton Homes <br> 14. Jayco, Inc. <br> 15. Keystone RV Company <br> 16. KZ RV, LP <br> 17. Layton Homes Corporation <br> 18. Liberty Homes, Inc. <br> 19. Monaco Coach Corporation <br> 20. Oak Creek Homes, LP <br> 21. Palm Harbor Homes <br> 22. Patriot Manufacturing, Inc. and Patriot Homes of Texas, L.P. <br> 23. Pilgrim International, Inc. <br> 24. Recreation By Design, LLC <br> 25. Redman Homes, Inc., individually and f/k/a Dutch Housing, Inc. <br> 26. River Birch Homes, Inc. <br> 27. R-Vision, Inc. <br> 28. ScotBilt Homes, Inc. <br> 29. Silver Creek Homes, Inc. (neither TT nor MH) <br> 30. Skyline Corporation (neither TT nor MH) <br> 31. Southern Energy Homes <br> 32. Starcraft RV, Inc. <br> 33. SunRay <br> 34. Thor California <br> 35. TL Industries, Inc. |

| State | No class representative for these manufacturers |
|-------|--------------------------------------------------|
|       | 36. Vanguard Industries<br>37. Viking Recreational Vehicle Company L.L.C.<br>38. Waverlee Homes, Inc. |

    I.      Future medical seizures

        i.      Plaintiffs propose a subclass with the following definition:

**Future Medical Services Subclass**

All individuals who resided for any length of time in emergency housing units provided by FEMA within the states of Louisiana, Texas, Mississippi, and/or Alabama after Hurricanes Katrina and/or Rita, and who are found eligible to participate in a medical services program designed to monitor the physical condition(s) of each such individual for the purpose of ascertaining and responding to diseases caused by, contributed to, or exacerbated by the individual's exposure to formaldehyde while residing in any of the aforementioned units.

        ii.      Plaintiffs do not have a single common injury or damage caused by formaldehyde, plaintiffs can not try the issues of exposure and risk on a representative basis and the proposed monitoring regime is not different than

            medical services that would be recommended for a non-exposed population – i.e. the recommended monitoring is essentially nothing more than an annual examination by a personal physician.

    iii.    None of Plaintiffs experts cite any scientific authority for a medical monitoring program of any sort for any of the alleged effects of formaldehyde exposure.

m.    Economic loss

    i.    Plaintiffs propose certification of an economic loss subclass comprised of "All individuals to whom FEMA provided an emergency housing unit within the states of Louisiana, Texas, Mississippi, and Alabama after Hurricanes Katrina and Rita and who sustained economic loss recoverable under each state's law as a result of being provided housing not fit for its ordinary purpose."

    ii.    Plaintiffs have failed to identify what bargain they were deprived the benefit

of or that they suffered economic injury

in fact.

    iii.    Plaintiffs have failed to prove that any

plaintiff was a purchaser of the EHU in

question or that he/she received his/her

EHU by way of a sales transaction.

**United States Government's Proposed Findings of Fact**

The United States for purposes of the Class Certification Hearing incorporates and adopts by reference the Manufacturing Defendants' Proposed Findings of Fact.

The United States further asserts that:

1. On March 18, 2008, Plaintiffs filed the AMC, which incorporated and superseded all previously filed actions that had been consolidated in this Multidistrict Litigation ("MDL"), including those filed as putative class actions. Administrative Master Complaint ("AMC") [Dkt. No. 109] 5.

2. The AMC specifically asserts that certain named persons, the Pujol and Thomas families, are entitled to damages under the FTCA for personal injury resulting from exposure to formaldehyde in EHUs provided by FEMA. The AMC requests that the Court certify a Fed. R. Civ. P. 23 class action against the United States. AMC 7(a), 93-95.

3. The AMC alleges that only the members of the Pujol and Thomas families have actually "exhausted the requirements" of the FTCA and its administrative process. Id. at 7.

4. On May 9, 2008, a Complaint was filed in Pujol v. United States, No. 08-3217 [Dkt. No. 1]. This Complaint, filed after the AMC, constitutes the underlying substantive lawsuit that is the initial basis for the claims against the United States set forth in the AMC.

5. Since the filing of the Pujol Complaint, the United States has been made a defendant in two other lawsuits filed and consolidated in this MDL action. See Johnson v. United States, No. 08-3602 and Huckabee v. Fleetwood Enters., No. 08-4095. The eleven named plaintiffs in these actions, like the eight named plaintiffs in Pujol, (a total of nineteen persons) seek money damages from the United States for personal injuries allegedly caused by exposure to formaldehyde in EHUs supplied by FEMA.

6. On August 22, 2008, Plaintiffs identified proposed class representatives. See Notice of Proposed Class Representatives [Dkt. No. 666]. Mrs. Stephanie Pujol is the only proposed class representative who has filed suit against the United States. Id.

7. From approximately November 2005 to December 2006, the Pujol family occupied a FEMA-provided travel trailer in Metairie, Louisiana. Ex. 1, Pujol Individual Assistance ("IA") File Excerpts at FEMA86-117, 213, 236. In approximately December 2006, the Pujol family moved from the trailer into an

apartment, for which they received rental assistance from FEMA.  Id. at 213, 226-227.

8.  The Pujol family vacated the travel trailer because Mrs. Pujol's parents, the owners of the land where the trailer had been placed, wanted the trailer removed from their property; Mr. and Mrs. Pujol suffered from numerous medical conditions and the trailer did not readily accommodate their medical equipment; and Mrs. Pujol found "more permanent . . . and more comfortable housing."  Id. at 127, 135, 202, 209, 218, 239; Ex. 3, Depo. Pujol at 67:16-22.

9.  In the spring and summer of 2007, the Pujol family, after having vacated the trailer, suggested to FEMA, in conjunction with their request for rental assistance, that some of the family members may have been injured as a result of exposure to formaldehyde during the family's occupancy of the trailer.  Id. at 170-171, 227-228.

10. On or about September 10, 2007, FEMA received administrative tort claims submitted by Plaintiffs Mr. and Mrs. Pujol, as well as their two children (through Mr. Pujol).  Ex. 2, Pujol Adm. Claims at FEMA-23-39.  The Pujols allege that they have suffered the following personal injuries as a result of living in the trailer: sinus, respiratory, and other injuries; arthritic and pneumonia-like symptoms; headaches, nausea, emotional injuries; respiratory tract infections, worsening of sleep apnea, worsening of hepatitis C, chest pains, fatigue, shortness of breath, increased blood glucose, ear infections, "worsened ADHD and ODD symptoms," cough, nausea, vomiting, and future injuries.  Id. at 23-36.

11. Prior to Hurricane Katrina, and continuing to the present time, Mrs. Pujol has suffered from, among other things, hypothyroidism, hepatitis C, orthopedic problems, and repeated respiratory tract infections, and takes over 12 prescription medications.  See Ex. 3, Depo. Pujol at 73:14-88:25.

12. Mrs. Pujol seeks $1 million in damages.  Mr. Pujol seeks $100,000, as well as $750,000 on behalf of each of his two minor children.  Ex. 2 at 23, 27, 31, 36.

13. None of the Pujol claimants asserts an FTCA property damage claim.  Id.

14. In or about February, 2006, FEMA issued the Thomas family a travel trailer in Kenner, Louisiana.  Ex. 4, Thomas IA File Excerpts at FEMA-229-36.

15. In the spring or summer of 2007, Mr. Thomas notified FEMA that he was interested in purchasing the trailer.  Id. at 196, 234, 237.

16. In September 2007, FEMA notified Mr. Thomas that the unit was not available for purchase; and, later that same month, the Thomas family vacated the unit. Id. at 196, 234, 237.

17. Available evidence indicates that the Thomas family did not complain to FEMA about odors or formaldehyde in the trailer.  Id. at 223-237.

18. On or about September 10, 2007, FEMA received administrative tort claims submitted by Plaintiffs Sean and Phuong Thomas, on behalf of themselves and their two minor children.  Ex. 5, Thomas Adm. Claims at FEMA-42-57. The Thomas claimants allege the following personal injuries as a result of living in the trailer: sinus, respiratory, and other injuries; arthritic and pneumonia-like symptoms, headaches, nausea, emotional injuries; injuries to

the eyes and throat, nausea, vomiting, coughing, headache, joint stiffness, and future injuries.  Id. at 42-54.

19. Each member of the Thomas family seeks $150,000 in personal injury damages.  Id. at 42, 46, 50, 54.

20. None of the Thomas claimants asserts a property damage claim.  Id.

21. On or about October 10, 2005, FEMA issued the Huckabee family a travel trailer in Kiln, Mississippi.  Ex. 6, Huckabee IA File Excerpts at FEMA114-50.

22. In January 2006, FEMA issued the Huckabee family a mobile home at the same address where the trailer had been installed.  Id. at 26-27, 50.  Between July 2006 and October 2006, the Huckabee family contacted FEMA and expressed an interest in purchasing their EHU. Id. at 61-63.

23. In or about May 2007, the Huckabee family complained to FEMA regarding formaldehyde and mold in their mobile home unit.  Id. at 51-52, 64-65.

24. In or about May 2007, FEMA in response to the Huckabee's complaint took the following actions: FEMA offered to relocate the family to a different mobile home in a commercial park, which the Huckabees refused; FEMA sent persons to inspect the mobile home and advise the Huckabee family regarding ventilation and cleaning techniques; and FEMA commenced action to provide the Huckabees with alternative housing.  Id. at 52-54.

25. On or about June 20, 2007, at the Huckabees' request, FEMA placed a different mobile home at the same address where the previous trailer and mobile home had been placed.  Id. at 53.

26. In or about April 2008, the Huckabee family complained about formaldehyde in the replacement mobile home, and FEMA moved them to a hotel. Id. at 58.

27. From April 2008 to July 2008, FEMA provided the Huckabee family with hotel rooms and meals, and assisted them in attempting to locate an apartment that would accept FEMA rental assistance payments. Id. at 51-58, 76-80.

28. In July of 2008, the Huckabees vacated the hotel and moved into a housing unit provided by the Mississippi Emergency Management Agency. Id. at 79-80.

29. FEMA received the Huckabees' administrative tort claims after December 2007. Ex. 7, Huckabee Adm. Claims at FEMA-931-37. The Huckabees claim they suffered personal injuries as a result of exposure to formaldehyde and mold while residing in the EHUs, including respiratory ailments, pain and suffering, and psychological injuries. Id.

30. Each member of the Huckabee family seeks $250,000 in damages for personal injury damages. Id. None of the Huckabees asserts a property damage claim. Id.

31. FEMA purchased in excess of 140,000 EHUs to provide emergency housing for victims of Hurricanes Katrina and Rita. Ex. 8, FEMA Press Release No. HQ-08-002b (Feb. 12, 2008) at FEMA10-209.

32. The United States Department of Housing and Urban Development's ("HUD") indoor air target level for formaldehyde in manufactured housing, mobile homes, is 0.4 parts per million (ppm) or 400 parts per billion (ppb). 49 F.R. 31,996, 31,997-98 (Aug. 9, 1984). This standard describes the target indoor

air formaldehyde level resulting from the manufacture of mobile homes using certain low-formaldehyde emissions materials.  Id. at 31,996, 24 C.F.R. § 3280.308(a).

33. Fleetwood Enterprises, Inc. ("Fleetwood") constructed over 13,000 EHUs that were purchased by FEMA to provide emergency housing for disaster victims following Hurricanes Katrina and Rita.  Ex. 9, Letter to Hon. Karen Wells Roby from Joseph Glass at 2 (Aug. 13, 2008).  Since the 1980s, Fleetwood has maintained a policy of voluntarily constructing all of its EHUs, including those used to respond to Hurricanes Katrina and Rita, with HUD-compliant low-formaldehyde emissions materials - the same materials that makers of manufactured housing (mobile homes) are required to use.  Ex. 10, Fleetwood's Responses to Plaintiffs' First Interrogatories, Response No. 16.

34. Gulfstream Coach, Inc. ("Gulfstream") manufactured approximately 50,000 EHUs that FEMA purchased to provide emergency housing for victims of Hurricanes Katrina and Rita.  Ex. 9 at 2.  Gulfstream has had in place a "long-standing" policy to use HUD-compliant low-formaldehyde emissions materials in the construction of all EHUs.  Ex. 11, Statement of Jim Shea, Chairman, Gulf Stream Coach, Inc., Before the House Committee on Oversight and Government Reform (July 9, 2008) at 8.

35. In December 2007 and January 2008, the Centers for Disease Control ("CDC") tested 519 EHUs that FEMA had issued to Hurricane Katrina/Rita disaster victims.  Ex. 12, Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes (July 2, 2008) at iii.

Formaldehyde levels in the 519 units that were tested ranged from 3 to 590 ppb. Id. at 10. Of those, only 5% contained formaldehyde levels in excess of 300 ppb. Id. at 23, Table 2.

36. Plaintiffs have tested numerous EHUs as a part of this litigation. One of Plaintiffs' experts, Mr. Kaltofen, reports that the median concentration level of formaldehyde in the tested units is .14 ppm (140 ppb), and that test results have ranged from no detection of formaldehyde to 4 ppm (4000 ppb). Ex. 13, Kaltofen Expert Report at PL-218; Ex. 14, Depo. Kaltofen at 92:24-25.

37. Another Plaintiffs' experts, Dr. Hewett, reports that of the 976 tested units of different manufacturers, only one manufacturer's mean formaldehyde concentration level exceeded the HUD indoor air target level for mobile homes of 400 ppb. Ex. 15, Hewett Expert Report at 12-13, Table 8; Ex. 16, Depo. Hewett at 152:21-153:6.

C.    **Proposed Conclusions of Law**

    1.  **Plaintiffs' Proposed Conclusions of Law**

        i.    The class of persons that the Named Plaintiffs and the Putative Class Representatives seek to represent is so numerous that joinder of all members is impracticable.

        ii.   Given both the number of putative class members involved herein and the geographical disbursement, mass joinder is impracticable.

iii. Manufacturing Defendants' conduct or fault in the failure to exercise reasonable care to prevent the exposure of formaldehyde to the plaintiffs is a central and common issue.

iv. The scientific nature and behavior of formaldehyde are common issues of fact.

v. FEMA's failure to provide safe and habitable emergency housing once it became aware of legitimate concerns regarding formaldehyde in the housing units is a central and common issue.

vi. Named plaintiffs, individually and on behalf of the putative class, are asserting legal theories of liability typical of the claims of the putative class as a whole. These claims include: the Manufacturing Defendants' design, manufacture, and distribution of products.

vii. As the named plaintiffs are asserting claims based upon the theories of liability, Manufacturing Defendants' design, manufacture, and distribution of products, the plaintiffs' claims thus arise from the exact same course of conduct.

viii. The interest of putative class representatives do not conflict in any manner with the interests of the members they seek to represent, as all seek similar relief.

ix.   The class representatives carry no burden of proof unique to their liability cases, and will continue to advance the interests of all the class members.

x.   The class representatives have a strong interest in prosecuting this action. They will diligently prosecute this action on behalf of themselves and the putative class members.

xi.   The common issues of fact and law predominate over individual issues such as causation and quantum.

xii.   The class action mechanism is superior to that of a mass joinder or other multiple plaintiff litigation structures.

xiii.   A future medical services subclass encompassing individuals, or at a minimum all children, who were exposed to formaldehyde while residing in an EHU in Louisiana, Texas, Mississippi, and Alabama provided by FEMA after Hurricane Katrina and Rita is essential in order to monitor and treat the injuries that have resulted as a result of exposure.

xiv.   Damages in the form of future medical services are allowable under the state laws of Louisiana, Texas, Mississippi, and Alabama.

xv.   An economic loss subclass for class members seeking economic loss damages based on the theory of breaches of

implied warranties and redhibitory defects is allowable under

the state laws of Louisiana, Texas, Mississippi and Alabama

as to the Manufacturing Defendants.

xvi.   An economic loss subclass for class members seeking

economic loss damages based on the theory that FEMA

denied the property rights of class members by failing to

provide safe and habitable trailer or other emergency

housing units is allowable.

2.   **Manufacturing Defendants' Proposed Conclusions of Law**

i.   Plaintiffs bear the burden of establishing each of the

elements of standing as a prerequisite to class certification

determination.  *Rivera v. Wyeth-Ayerst Laboratories,* 283

F.3d 315, 318 (5th Cir. 2002) ("*Rivera*").  There are three

irreducible constitutional minimum elements of standing:  1)

the plaintiff must have suffered an injury in fact; 2) there

must be a causal connection between the injury and the

complained-of conduct of the defendant; 3) it must be likely

that the injury will be redressed by a favorable decision.  *Id.*

ii.   Because many of the EHU manufacturers do not have a

class representative for each of the four states offered as a

subclass, the second element of standing – the potential for

a causal connection – is missing as to these EHU

defendants.  Thus, these EHU manufacturers must be

dismissed from the subclasses wherein they do not have a class representative.

iii.   The party seeking certification bears the burden of establishing each of Rule 23's requirements. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997); *Gene and Gene LLC v. Biopay LLC,* 541 F.3d 318, 325 (5th Cir. 2008) ("*Gene and Gene*"); *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737-38 (5th Cir. 2003) ("*O'Sullivan*").

iv.   Each subclass must independently meet all of the requirements of Rule 23.  FED. R. CIV. P. 23(b)(5); *Johnson v. American Credit Co. of Georgia*, 581 F.2d 526, 532 (5th Cir. 1978); *Recinos-Recinos v. Express Forestry, Inc.*, 233 F.R.D. 472 (E.D. La. 2006).

v.   District courts must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class. *Gene and Gene*, 541 F.3d at 325; *O'Sullivan*, 319 F.3d at 738.

vi.   When legal and factual merits issues overlap the class certification requirements, the Fifth Circuit *requires* that this court fully resolve the issues at the class certification stage. *Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007), *cert. denied*, ___ U.S. ____, 128 S.Ct. 1120, 169 L. Ed. 2d 957

(2008), and *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 267 (5th Cir. 2007) ("*Oscar Private Equity*").

vii.    District courts must resolve disputes relevant to each Rule 23 requirement, and the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue. *Oscar Private Equity*, 487 F.3d at 268.

viii.   The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23. *John v. Nat'l Security Fire & Casualty Co.,* 501 F. 3d 443, 445 (5th Cir. 2007); *see also DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (citations omitted).

ix.     Because the Plaintiffs' proposed class definition is limited to individuals who sustained damages recoverable under four different states' respective laws due to formaldehyde exposure, ascertaining class membership in Plaintiffs' proposed class requires an individualized inquiry, with a mini-trial necessary for each proposed class member to make the causation/damages determination.  Thus, Plaintiffs do not meet the necessary prerequisites for class certification.

x.    In determining whether certification as a class is warranted in a particular case, the Court must first look at Rule 23(a) of the Federal Rules of Civil Procedure, and the Plaintiffs must prove that: (1) the class is so *numerous* that joinder of all members is impracticable, (2) there are *questions of law or fact common* to the class, (3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class, and (4) the representative parties will *fairly and adequately protect* the interests of the class. These four requirements are often referred to as numerosity, commonality, typicality, and adequacy of representation. *Rose v. Tennessee Gas Transmission Co.*, 2006 WL 1581358, *1-2, 05-3102 (E.D. La. 5/17/06)(citations omitted).

xi.    "Once a plaintiff satisfies all four requirements set out in Rule 23(a), the plaintiff must demonstrate that the proposed class satisfies one of the subdivisions of Rule 23(a) in order to obtain class certification. *See generally* Rule 23(b). In meeting this burden, a plaintiff must prove either: (1) that if separate actions are maintained, inconsistent adjudications will result or non-parties' interests will be substantially impaired; (2) that final injunctive or declaratory relief is appropriate as to the class as a whole; or (3) that questions

of law or fact common to the class members predominate over any individual claims, and that a class action is superior to other methods of adjudication. *See* Rule 23(b)(1)-(3). If the court is satisfied that the plaintiff meets all four requirements of Rule 23(a) and any one of the aforementioned requirements of Rule 23(b), then the court will grant the plaintiffs' motion for class certification." *Rose*, 2006 WL 1581358, *2.

xii.   A plaintiff must show that "the class is so numerous that joinder of all members is impracticable." Federal R. Civ. P. 23(a)(1).  In determining whether a proposed class of plaintiffs meets the numerosity requirement, a court will first consider the size of the class in question; however, a court will also consider factors such as the ease with which the class members may be identified, the nature of the action, and the size of each plaintiff's claim in making its determination.  *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624-25 (5th Cir. 1999).

xiii.   Plaintiffs are required to demonstrate that a subclass of putative class members as to each manufacturer is sufficiently numerous under Rule 23.  This they have not done and, for that reason, certification is denied.

xiv.    The Federal Rules of Civil Procedure allow for the class

action procedure only if there are questions of law or fact

common to the class.  Federal R. Civ. P. 23(a)(2).

xv.    Even though commonality under Rule 23(a)(2) is not a

difficult burden to satisfy, because of the multiple defendants

in this case it is not present here.  Even in two EHUs side by

side and of the same model and manufacturer, the

chemicals present (*i.e.* possible presence of formaldehyde

and other potential chemical sources of irritation) will be

different depending upon the habits of the residents.  The

levels cannot be determined class-wide and many EHUs

have levels that are acceptable according to any standard,

including those suggested by Plaintiffs.  Thus, the presence

of chemicals and the amount in each EHU is not susceptible

to a common determination.

xvi.    Formaldehyde exposure alone is not a true common issue in

this case.  All human beings are exposed to ambient

formaldehyde and have naturally occurring formaldehyde in

every cell of their bodies.  The issue is the level of each

person's exposure, and whether the level is hazardous,

which can only be answered on an individual basis. Thus,

the level of each person's exposure and whether the level is

hazardous, is not susceptible to a common determination.

xvii.   There are dozens of defendants with different products.

Answering whether an individual defendant's conduct

constitutes fault in the failure to exercise reasonable care will

not answer the question as to any other defendant.  Plaintiffs

have not devised their subclasses according to defendant.

Each subclass includes *all* defendants and all of their

different products.  Thus, there is no common question of

this nature in any of the subclasses that Plaintiffs have

proposed.

xviii.  Rule 23(a)(3) requires that the "claims or defenses of the

representative parties are typical of the claims or defenses of

the class." Federal R. Civ. P. 23(a)(3). The typicality

requirement of Rule 23 focuses on the similarities between

the named plaintiffs' legal and remedial theories and the

theories of those whom they purport to represent. *See*

*James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001); *In*

*re American Commercial Lines*, 2002 WL 1066743 at *8-9.

In determining typicality, the court must consider "whether

the representative's interests will be aligned with those of the

represented group, and in pursuing his own claims, the

named plaintiff will also advance the interests of the class

members."  *In re Baycol Products Litigation*, 218 F.R.D. 197,

205 (D. Minn. 2003) ("*In re Baycol*"). In other words, to

satisfy the typicality requirement, a class representative must "possess the same interest and suffer the same injury as class members." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982) "*General Telephone*").

xix.    The relevant products liability laws of Texas, Mississippi, Louisiana and Alabama are not uniform, and typicality therefore does not exist with respect to the class members' legal theories.

xx.    Plaintiffs fail to demonstrate typicality in terms of class injuries.  Plaintiffs seek certification of a class purportedly consisting of hundreds of thousands of individuals, each with diverse medical histories, symptoms, exposures and claimed damages.  Accordingly, any meaningful evaluation of liability and damages will necessarily turn on a highly individualized inquiry into the idiosyncrasies of the individual claimant, necessarily undermining typicality.

xxi.    Certification is possible only if the representative parties will fairly and adequately protect the interests of the class. Federal R. Civ. P. 23(a)(3).  The adequacy requirement directs the court to determine "the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir.

1982), *as quoted in Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) ("*Berger*"). "[C]lass representatives [must] possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Berger*, 257 F.3d at 482-83. The inquiry into adequacy is geared toward revealing conflicts, and ensuring that the representatives have an ample stake in the outcome of the litigation. *Berger*, 257 F.3d at 479-80; *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 605 (E.D. La. 2006).

xxii. Plaintiffs have failed to promote class representatives who will fairly and adequately represent the proposed class. Several putative representatives have expressed an unwillingness to take an active role in the litigation. Some have failed to appear at their noticed class depositions. Others believe that, as representatives, they have no responsibility to the class members. Still others have no concept of how many members there are and have delegated the task of informing potential members about the litigation to their attorneys. Some have even flatly stated that they do not want to be a representative.

xxiii. Plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting

only individual members, and that a class action is superior
to other available methods for fairly and efficiently
adjudicating the controversy." Federal R. Civ. P. 23(b)(3).
The predominance test is "far more demanding" than the
commonality test.  *Unger v. Amedisys Inc.,* 401 F.3d 316,
320 (5th Cir.2005), citing *Amchem Prods., Inc. v. Windsor,*
521 U.S. 591, 623-24, 117 S.Ct. 2231, 2249-50, 138 L.Ed.2d
689 (1997).  "To predominate, common issues must form a
significant part of individual cases."  *In re Vioxx 2006*, 239
F.R.D. at 460, citing *Mullen v. Treasure Chest Casino, LLC,*
186 F.3d 620, 626 (5th Cir.1999).

xxiv.   Individual plaintiffs vary by age, gender, personal and family
medical history, school, work and social environments, and
personal lifestyle patterns such as keeping pets, smoking,
and cooking patterns.  Plaintiffs' potential formaldehyde
exposure and any health effects allegedly related thereto
vary by which EHU the plaintiff lived in; the type of unit, the
manufacturer of the unit, how the unit was set up, and where
the unit was set up.  There is also great variability in the
amount of time each plaintiff occupied his or her EHU and
the number of hours per day, and which hours a day, he or
she spent inside the EHU, dependent on each individual's
work, school, and other activities.  There is great variability in

each plaintiff's habits with regard to use of heating, air conditioning, and window or door use. Thus, questions of law or fact affecting only individual members predominate over any questions common to class members, and class certification is precluded.

xxv. Each plaintiff's exposure to environmental factors including exposure to sources of formaldehyde unrelated to the EHUs, exposure to irritants or pathogens such as air pollution, pesticides, pet dander, cleaning agents, mold, bacteria and viruses, any of which could explain all or some of the physical symptoms and medical conditions claimed by the Plaintiffs. The Plaintiffs have varying employment, school and other activity histories which may well explain their complaints. Many Plaintiffs are current and/or past smokers, or lived in units with smokers. Thus, questions of law or fact affecting only individual members predominate over any questions common to class members, and class certification is precluded.

xxvi. The personal injury claims among the Plaintiffs vary greatly. These range from alleged present injury to fear of future injury, from chronic disease to irritation, from new injury to exacerbation of a preexisting condition, from physical injury to emotional distress, from particularized sensitivity claims

by children to miscarriages to brain tumors.  Many Plaintiffs are also seeking purely economic damages in the form of medical expenses, lost wages, and under a theory of entitlement to lost housing subsidy.  Thus, questions of law or fact affecting only individual members predominate over any questions common to class members, and class certification is precluded.

xxvii.  There were significant differences in the design, manufacture and production of these units – manufacturer to manufacturer and even unit to unit, among models produced by the same manufacturer.  This variability makes every plaintiff's exposure to formaldehyde unique and defeats class certification here.  These differences include types, quantities, age, and storage conditions of construction materials, home design and construction methods, workmanship and quality of construction, types and quantities of furniture and drapery, whether residents added or installed their own formaldehyde-emitting materials, such as furniture, carpets, drapery or fabrics, time and condition of home storage, transportation of the home from the plant to the ultimate occupant, installation of the home, geographic placement of a given home, usage of the home and occupant lifestyles.  Thus, questions of law or fact affecting

only individual members predominate over any questions common to class members, and class certification is precluded.

xxviii.  Plaintiffs have the burden to show predominance, along with the other requirements under Rule 23.  They *must* also provide the Court with "an extensive analysis of state law variations to reveal whether these pose 'insuperable obstacles to certification.'" *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986), *cert. denied*, 482 U.S. 915(1987). The Plaintiffs' class certification brief does not analyze the present choice of law issues among the four States proposed as subclasses or attempt to explain how they relate to predominance, superiority or any of the other Rule 23 requirements.  Likewise, the Plaintiffs' class certification brief does not analyze the present choice of law issues among the proposed economic loss and medical monitoring subclasses or attempt to explain how they relate to predominance, superiority or any of the other Rule 23 requirements.  Thus, the Plaintiffs have failed to meet their burden to show the elements of class certification are met.

xxviii.  Rule 23(b)(3) requires that a district court find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Federal R. Civ. P.

23(b)(3).  The "superiority" analysis includes four factors: (A) the class members' interests in individually controlling the prosecution of separate actions; (B) the extent and nature of litigation concerning the controversy already begun by class members; (C) the desirability or undesirability of concentrating the litigation in the particular forum; and (D) the likely difficulties in managing a class action.  Thus, questions of law or fact affecting only individual members predominate over any questions common to class members, and class certification is precluded. Federal R. Civ. P. 23(b)(3); *In re Vioxx 2006*, 239 F.R.D. at 463.  This action is a mass tort claim in which Plaintiffs are seeking compensatory and punitive damages as well as the establishment of a medical monitoring fund.  Determination of specific causation and damages for any plaintiff would require a trial specific to only that plaintiff.  Thus, a class action is not superior to other available methods for fairly and efficiently adjudicating the controversy.

xxix.  In determining whether Plaintiffs' proposed class can be certified, the Fifth Circuit requires this Court to consider, as part of its analysis of the Rule 23(b)(3) superiority requirement and/or predominance requirement, "how a trial on the alleged causes of action would be tried." 387 F.3d

416, 426 (5th Cir. 2004) ("*Robinson*"); *Gene and Gene*, 541 F.3d at 326. The case at hand has similar and equally significant obstacles to a manageable trial. The number of class representatives is currently 96, with each of them expected to testify and offer their own evidence. There are 64 Manufacturing Defendants. Each of those Manufacturing Defendants absolutely has the right to defend itself, and will offer its own witnesses to refute Plaintiffs' claims against them. Ambient formaldehyde levels vary significantly from manufacturer to manufacturer and EHU to EHU. Further, the Manufacturing Defendants come from two entirely separate industries – the manufactured home industry and the travel trailer industry, each with their own individual issues to be considered in this case.

xxx.    The Future Medical Services Subclass does not meet the class action prerequisites because, in order to be a member of the subclass, a person must be "found eligible to participate in a medical services program." This in turn requires individualized factual inquiries to determine whether a person is even a member of the subclass. Furthermore, it is not even clear at this point what those factual inquiries would be, because Plaintiffs' experts cannot agree on the purpose and scope of the proposed program. The definition

fails because it is not precise, objective, nor presently ascertainable.

xxxi.   Plaintiffs have failed to establish that the proposed economic subclass members suffered an injury in fact.  Plaintiffs do not articulate what economic injury was suffered by the proposed class members.

xxxii.  Plaintiffs' proposed economic loss subclass fails to satisfy Rule 23(b)(3)'s predominance requirement because the Court's determination of these claims cannot be made using class-wide proof but, instead, requires an examination of facts particular to each and every proposed class member. Only subclass members who actually purchased emergency housing units may have a potentially viable claim against the Manufacturing Defendants.

**3.    United States Government's Proposed Conclusions of Law**

i.     The United States incorporates by reference for purposes of the Class Action status hearing the Manufacturing Defendants' Proposed Conclusions of Law.  The United States further asserts the following proposed Conclusions of Law.

ii.    The Court lacks subject matter jurisdiction over the 19 Plaintiffs who have filed FTCA claims against the United

States because those claims are barred by the discretionary function and misrepresentation exceptions to the FTCA waiver of sovereign immunity.

iii.     The Court lacks subject matter jurisdiction over all putative class claimants FTCA claims because Plaintiffs have failed to demonstrate that each of the unidentified putative class claimants have exhausted the FTCA administrative claims process.

iv.     The Court lacks subject matter jurisdiction over all putative class claimants FTCA claims because Plaintiffs have failed to demonstrate that each of the unidentified putative class claimants submitted a timely and legally sufficient administrative claim to FEMA.

v.     A court may only certify a class action where it possesses jurisdiction over the putative class claimants claims.  *See, e.g., Amchem Prods., Inc., et al. v. Windsor, et al.,* 521 U.S. 591, 613 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b)").

vi.     Federal Rule of Civil Procedure 23 does not "extend . . . the jurisdiction of the district courts."  Fed. R. Civ. P. 82.  *See*

also *Lindsay, et al. v. Gov't Emp'ees Ins. Co.*, 448 F.3d 416, 420 (D.C. Cir. 2006) ("Because subject matter jurisdiction is a prerequisite to class certification, it is properly reviewed in a Rule 23(f) interlocutory appeal."); *Olden, et al. v. LaFarge Corp.*, 383 F.3d 495, 498 (6th Cir. 2004) (same); *cf. Gene and Gene LLC v. Biopay LLC*, 541 F.3d 318, 323-34 (5th Cir. 2008) (court may decide subject matter jurisdiction during Rule 23(f) interlocutory appeal); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-95 (1998) (jurisdiction is a "threshold" inquiry).

vii.   As sovereign, the United States may not be sued without its consent - it is the existence of this consent that defines the scope of the Court's jurisdiction. *See United States v. Mitchell,* 445 U.S. 535, 538 (1980); *United States v. Testan*, 424 U.S. 392, 399 (1976); *United States v. Sherwood*, 312 U.S. 584, 586 (1941).

viii.  The consent of the United States to be sued cannot be implied, but must be unequivocally expressed. *See United States v. Idaho*, 508 U.S. 1, 6 (1993); *Guile v. United States*, 422 F.3d 221, 229 (5th Cir. 2005).

ix.    The Federal Tort Claims Act, 28 U.S.C. §§1346(b)(1), 2671-80, constitutes a limited wavier of sovereign immunity, and must be strictly construed in favor of the United States. *See*

*Idaho*, 508 U.S. at 7; *United States v. Orleans*, 425 U.S. 807, 813 (1976); Atorie Air, Inc. v. FAA, 942 F.2d 954, 958 (5th Cir. 1991); *Paul v. Igyarto*, 2002 WL 1610962 at *1 (E.D. La. July 18, 2002) (Engelhardt, J.).

x.      Plaintiffs bear the burden of establishing that the Court has subject matter jurisdiction and that their claims satisfy all the jurisdictional requirements of the FTCA's limited waiver.  See Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001); *Dowl v. Tulane Univ. Hosp.*, 2005 WL 2060921 at *2 (E.D. La. Aug. 22, 2005) (Engelhardt, J.) (plaintiff must show that court has subject matter jurisdiction over FTCA claim).

xi.     An FTCA claimant must exhaust his or her administrative remedies before the appropriate federal agency before a court may hear his or her tort claim, and until a person has exhausted the administrative claims process, FEMA, not a court, retains jurisdiction to adjudicate, compromise, and settle that person's claims arising from alleged formaldehyde exposure in an EHU.  *See* 28 U.S.C. §§1346(b)(1), 2672, 2675(a), 2677; *Gregory v. Mitchell*, 634 F.2d 199, 203-04 (5th Cir. 1981) (the administrative exhaustion requirement is jurisdictional in nature and cannot be waived); Price v. United States, 69 F.3d 46, 54 (5th Cir. 1995); *Molinar v. United States*, 515 F.2d 246, 249 (5th Cir. 1975) (adherence

to the statutory procedure for making a claim against the sovereign is a jurisdictional prerequisite of the government's waiver of its immunity); *Plyler v. United States*, 900 F.2d 41, 42 (4th Cir. 1990); *Ahmed v. United States*, 30 F.3d 514, 516 (4th Cir. 1994).

xii.   Congress specifically enacted and established the administrative tort claim process as a part of the FTCA to: (1) reduce the burden placed on federal courts by facilitating settlement of FTCA claims at the administrative level; (2) decrease the government's cost of processing tort claims; and (3) promote fair and equitable treatment of claimants. H. Rep. No. 1532, 89th Cong., 2d Sess. 6 (1966); S. Rep. No. 1327, 89th Cong., 2d Sess. 11, reprinted in 1966 U.S. Code Cong. & Ad. News 2515, 2524.  *See generally Tucker v. United States Postal Serv.*, 676 F.2d 954, 958-59 (3d Cir. 1982); *Dondero v. United States*, 775 F. Supp. 144, 147 (D. Del. 1991).

xiii.   Even when strict compliance with the administrative process may be futile, this requirement must be satisfied before a court may exercise jurisdiction over a tort claim, whether the claimant is known or unknown.  *See Indus. Constr. Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 967 (10th Cir. 1994) (bringing an administrative claim is a jurisdictional

prerequisite to suit, imposed by Congress, which the courts

have no power to waive; the assertion that the administrative

claim process is futile does not excuse this jurisdictional

requirement); Manko v. United States, 830 F.2d 831, 840

(8th Cir. 1987) (the administrative claim process contains no

exception for futility - for a court to carve out such an

exception would disrupt the administrative claim procedure

created by Congress).

xiv.    A court lacks jurisdiction over all putative FTCA class

claimants, including any persons who may have filed legally

sufficient administrative claims with FEMA and whose claims

have been pending with FEMA for more than six-months,

until any such claimant files suit and commences an action

in district court and divests FEMA of its jurisdiction and

authority to adjudicate and administratively resolve the claim.

See 28 U.S.C §§1346(b)(1), 2401, 2672, 2675(a), 2677,

2678; 28 C.F.R. §§14.2(c),14.9(a)-(b). ,

xv.     Consistent with the Court's October 3, 2008, Order and

Reasons, whether this Court has jurisdiction over any of the

putative FTCA class members claims that have not already

been barred will hinge on whether each individual's claims

fall outside the FTCA's discretionary function exception.  As

outlined in the Court's ruling, this will necessarily require an

individualized inquiry, thereby defeating the purpose of potentially managing this case as a class action. *See* Order and Reasons at 42-43 [Dkt. No. 717].  Whether an individual's tort claim against the United States will be allowed to proceed or will be barred by the discretionary function exception will vary among all putative class members because each individual claimant must show that his or her claim is based on conduct that is not protected from suit by the exception.  Such a determination will be based on "different relevant facts that may or may not afford him/her such a claim." *Id.* at 42 ("As for each plaintiff involved in this litigation, the evidence will undoubtedly differ, just as the individual claims will differ.").  Pursuant to the Court's ruling, for each EHU resident, facts will vary as to whether FEMA had reason to believe that the particular EHU in question contained dangerous levels of formaldehyde and as to whether FEMA's response to that concern was susceptible to economic, political, social, or safety policy analysis. *Id.* at 44-46.

xvi.    The FTCA only waives liability for [C]ivil actions on claims against the United States, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission . . . of the government.

28 U.S.C. §1346(b).

xvii.    Under the FTCA, the law of the state where the alleged act or omission occurred is applied to determine whether a plaintiff has set forth a cause of action in negligence, and how damages for loss of property or personal injury should be measured. 28 U.S.C. §§1346(b), 2674.

xviii.    As to Mrs. Pujol, the lone proposed class representative that has filed suit against the United States, the alleged negligent acts on the part of the United States appear to have occurred in Louisiana. *See* AMC 7(a) [Dkt. 109]; Ex. 1 at 117, 213, 236. Accordingly, if the Court reaches the merits of her claim, it will have to look to Louisiana tort law to measure the damages that Mrs. Pujol may recover. *See Guillory v. United States*, 699 F.2d 781, 784 (5th Cir. 1983); *Southern Pacific Transp. Co. v. United States*, 471 F. Supp. 1186, 1189 (E.D. Cal. 1979).

xix.    As to the Thomas family the alleged negligent acts appear to have occurred in Louisiana and as such their claims are governed by applicable Louisiana tort law. See Ex. 4 at 234.

xx.    As to the Huckabee family's FTCA claims the alleged negligent acts appear to have occurred in Mississippi an as such their claims are governed by applicable Mississippi tort law. See Ex. 6 at 51.1

xxi.   Under applicable Louisiana tort law, to the extent that any putative class members has suffered a compensable personal injury, the Court will need to determine on a person-by-person basis whether the putative class member suffered any recoverable economic loss, such as lost income. *See generally Jaques v. Moses*, 737 So.2d 64, 69 (La. App. 1999) (to show lost income, a "plaintiff must prove by a preponderance of the evidence that he suffered a loss of earning capacity."). Similarly, to recover medical expenses under applicable Louisiana tort law each claimant must present individual evidence of both past medical expenses, and, as to any award of future medical expenses, and offer medical testimony regarding the "projected specific expenses" that the claimant will incur. *See Smith v. Louisiana Farm Bureau Cas. Ins. Co.*, 603 So.2d 199, 204 (La. App. 1992). *See also Pitts v. Bailes*, 551 So.2d 1363, 1377 (La. App. 1989).

xxii.   The determination of any economic loss claims based on damage to property will also have to be resolved on a person-by-person basis. Based on a review of the administrative tort claims filed by the Pujol, Thomas, and Huckabee families, the Court lacks subject matter jurisdiction over any property damage claims as to these persons

because they specifically chose only to make an administrative claim for personal injury, not property damage. Exs. 2, 5, 7. *See Kokaras v. United States*, 980 F.2d 20, 22-23 (1st Cir. 1992) (holding that where claimant only administratively asserted claims for property damage, court lacked jurisdiction over any personal injury claims).

xxiii.  Further, even if some members of the putative subclass submitted administrative claims asserting property damage and exhausted their administrative claims, a person cannot recover for property damage unless that person can demonstrate that he or she possessed a proprietary interest in the property at issue - in this case, the person's EHU. *See Harp v. Pine Bluff Sand and Gravel Co.*, 750 So.2d 226, 229-230 (La. App. 1999) (ruling that claimant failed to show the requisite amount of proprietary interest in the damaged property to be entitled to recover economic damages); *see also Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1023 (5th Cir. 1985) (economic loss resulting from physical damage to property in which claimant has no proprietary interest is "a pragmatic limitation imposed by the Court upon the tort doctrine of foreseeability").

xxiv.  Neither the Stafford Act, or its accompanying regulations governing the Individual Assistance housing program, even

for persons who qualify for housing assistance, create an

entitlement to temporary emergency housing assistance.

*See Ridgely v. FEMA*, 512 F.3d 727, 634-45 (5th Cir. 2008).

xxv.   Under the FTCA's private analogous liability provision, 28

U.S.C. §1346(b)(1), the only potential proprietary interest an

FTCA claimant may claim to possess or have possessed in

EHUs is the interest an occupant may have in using an

emergency shelter that is owned and voluntarily provided by

a private good Samaritan.  *See generally Ridgely*, 512 F.3d

at 736 (holding that neither the Stafford Act, nor applicable

regulations, compel FEMA to provide assistance, even upon

a disaster victim's showing of eligibility).

xxvi.   Under applicable Louisiana tort law, economic loss for

damage to any alleged interest that plaintiffs may have

possessed in an EHU - assuming such an interest exists -

will require an individualized inquiry that is not suitable for

class determination.  Under Louisiana tort law, to recover

economic damages for loss of use, a claimant must show

that the property interest that they possessed was damaged,

i.e., the claimant's actual use of the property was impaired.

*See Skansi v. Signal Petroleum*, 375 So.2d 965, 967 (La.

App. 1979); *Landry v. Pierre Part Natural Gas Co.*, Inc., 413

So.2d 621, 622-23 (La. App. 1982)

15.   **LIABILITY ISSUE**

The matter before this Honorable Court is a Motion to Certify a Class.  It does not

involve issues of liability.

16.   **MATTERS WHICH MIGHT EXPEDITE TRIAL**

17.   **TRIAL SETTING**

The class certification hearing will be conducted on December 2, 2008,

commencing at 8:30 a.m. (CT).  The hearing will last a maximum of four hours.

Plaintiffs will be allotted two hours for all argument, examination of witnesses and cross-

examination of witnesses.  The manufacturing defendants and the United States

Government will share two hours for all argument, examination of witnesses and cross-

examination of witnesses.

18.   **FORMULATION OF PRE-TRIAL ORDER**

This pre-certification hearing order has been formulated after conference

of counsel.  Reasonable opportunity has been afforded counsel for corrections, or

additions, prior to signing.  Hereafter, this order will control the course of the certification

hearing and may not be amended.

19.   **POSSIBILITY OF SETTLEMENT**

Manufacturing Defendants submit that there is no possibility of settlement in

advance of a class certification determination.

**UNITED STATES OF AMERICA:**

United States submits that at this stage of the litigation there is no possibility of

settlement.

New Orleans, Louisiana this *19th* day of *December*, 2008.

_____
Honorable Judge Kurt D. Engelhardt
UNITED STATES DISTRICT JUDGE

SUBMITTED BY PLAINTIFFS' STEERING COMMITTEE:

*Justin Woods* by *Linda Nelson with permission*
Gerald Meunier, Esq. (9471)
Justin Woods, Esq. (24713)
Linda Nelson, Esq. (9938)
Matthew Moreland, Esq. (24567)
Raul Bencomo, Esq. (2932)
Frank D'Amico, Jr., Esq. (17519)
Anthony G. Buzbee, Esq. (TX 24001820)
Ronnie Penton, Esq. (10462)

SUBMITTED BY MANUFACTURING DEFENDANTS:

_____

Andrew Weinstock, Esq. (18495)
Jerry Saporito, Esq. (11717)
Ernest P. Gieger, Jr., Esq. (06154)
John Stewart Tharp, Esq. (24230)
James C. Percy, Esq. (10413)
Richard K. Hines, V., Esq. (GA 356300)
Timothy D. Scandurro, Esq. (18424)


SUBMITTED BY UNITED STATES OF AMERICA:

_____  12/16/08

Henry Miller, Esq. (DC 411885)
Michelle Boyle, Esq.  (VA 73710)
Adam Dinnell, Esq. (TX 24055405)