UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER * | | MDL NO. 1873 |
|     FORMALDEHYDE * | | |
|     PRODUCTS LIABILITY * | | |
|     LITIGATION * | | SECTION:  N(4) |
| * | | |
| This Document Relates to:  ALL CASES * | | JUDGE: ENGELHARDT |
| * | | MAG: ROBY |

*****************************************************************************

### MEMORANDUM IN SUPPORT OF MANUFACTURING DEFENDANT'S JOINT MOTION TO ADOPT PROPOSED CASE ADMINSTRATION ORDER

**MAY IT PLEASE THE COURT:**  Though this Court has previously instituted certain pretrial procedures for the effective administration of this case, the Manufacturing Defendants respectfully submit that the parties require a Case Administration Order that will establish pre-trial procedures, direct the course and scope of discovery, expedite the process of selecting appropriate plaintiffs for trial, and schedule those trials as soon as possible.

In the Court's December 29 order denying class certification, the Court recognized that "factual variations as to each plaintiff . . . spawn individual issues relating to injury and causation" requiring an "examination of individual evidence."  Rec. Doc 1014 at (p. 17).  The Court further recognized that "a determination of fault as to one defendant will not answer the question as to any other defendant."  (p. 12).  In order to give effect to the mandates of the Court's order, the Manufacturing Defendants propose that a Case Management system be put in place that balances the need for efficient case administration against the Court's recognition that each case should be considered on an individual basis.  The Manufacturing Defendants hereby propose the entry of a Case Management Order which: (1)  Establishes pre-trial procedures, including the requirement for plaintiffs to submit expert affidavits and to continue to submit fact

1

sheets in accordance with PTO No. 2.; (2) directs each plaintiff to amend his pleadings in order to identify only those defendants implicated by the individual claims of each Plaintiff; and (3) mandates trial procedures requiring cases to be grouped into two separate pools (chronic injury versus nuisance claims) and that each case be tried on an individualized basis, one plaintiff, one defendant at a time.

## I. Pre-Trial Procedures

### A. Enforce PTO No. 2 and require an expert affidavit.

In this action, with the Court's leadership, the parties have instituted procedures allowing for efficient case administration. Among the procedures set forth in Pretrial Order No. 2 [Rec. Doc. No. 87] is the requirement that the plaintiffs submit completed fact sheets, and to date the plaintiffs have submitted well over five thousand fact sheets. The Manufacturing Defendants propose that the parties build on this system that is already in place with a Case Administration Order that recognizes and enforces the fact sheet requirements and that additionally requires expert affidavits. The plaintiffs should continue to submit certified fact sheets, along with signed medical authorizations. The Manufacturing Defendants can continue to use the procedure set forth in PTO No. 2 to ask the plaintiffs to cure material deficiencies in the fact sheets and may continue to seek case dismissals for individual plaintiffs' failure to cure the material deficiencies.

Additionally, this Court should continue to employ case management tools that will assist in balancing the burdens imposed by toxic tort litigation involving multiple plaintiffs and defendants. Instructive to this case is the case management order entered in the *Lore v. Lone Pine Corp.*, No. L 33606-85, (N.J. Super. Ct. Law Div. 1986), a case involving numerous plaintiffs claiming personal injury and property damage allegedly caused by pollution from the

Lone Pine landfill.[1] The New Jersey Superior Court required each plaintiff to provide specific information regarding their claim for personal injury, including reports of treating physicians and medical or other experts supporting each individual plaintiff's claim of injury and causation by substances from Lone Pine Landfill.

The plaintiffs were given four months to provide this information, which, as the court observed, was simply "basic facts plaintiffs must furnish in order to support their claims of injury and property damage." Ultimately, the plaintiffs were unable to comply with the court's order (thus demonstrating they could not establish a *prima facie* case) and their claims were dismissed.

The Fifth Circuit, recognizing the value of this type of case management order, has required plaintiffs to establish certain elements of their claims through expert affidavits. In *Acuna v. Brown & Root*, 200 F.3d 335 (5th Cir. 2000), two personal injury actions involving 1,600 total plaintiffs were consolidated on appeal. In each case, plaintiffs brought suit in state court against various defendants alleging personal injuries and property damages arising from the defendants' uranium mining and processing activities. The cases were removed to the federal district court for the Western District of Texas where they were treated as related cases. First in *Acuna* and then in *Garcia* (the second case), the court issued pre-discovery scheduling orders that required the plaintiffs to submit expert affidavits to establish their claims. The affidavits had to specify for each plaintiff the facts surrounding each plaintiff's exposure and the scientific and medical basis for the expert's opinions.[2]

---

[1] As this Court may recall, the Manufacturing Defendants previously filed a Motion for Entry of a Lone Pine Order (Doc. No. 52).

[2] The court specifically stated that the plaintiffs had to provide affidavits specifying: a) the injuries or illnesses suffered by the plaintiff that were caused by the alleged uranium exposure; b) the materials or substance causing the injury; c) the facility thought to be their source; d) the dates, circumstances and means of exposure to the injurious materials; and e) the scientific and medical basis for the expert's opinions.

3

In reviewing the court's action, the Fifth Circuit noted that *Lone Pine* orders are designed to handle the complex issues and potential burdens on defendants and the court in mass tort litigation, and they are issued in the federal courts under the wide discretion afforded district judges over the management of discovery under Federal Rule of Civil Procedure 16. *Id.* at 340. The Fifth Circuit found that it was within the court's discretion to take steps to manage the complex and potentially burdensome discovery that the cases would require and that the scheduling orders essentially required the type of information that the plaintiffs should have had before filing their claims. *Id.* "Each plaintiff should have had at least some information regarding the nature of his injuries, the circumstances under which he could have been exposed to harmful substances, and the basis for believing that the named defendants were responsible for his injuries." *Id.; see also Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 604 (5th Cir. 2006); *In Re 2000 ExxonMobil Release Litigation*, Master Docket No. 00-MD-1-C-1 (M.D. La 2003)(requiring expert affidavits on causation and factual basis of exposure).

In the instant case, requiring an expert affidavit and continuing to enforce PTO No. 2 is particularly appropriate because the plaintiffs have alleged in their complaints nothing more than non-specific allegations of formaldehyde emissions[3] and a litany of alleged personal injuries. The order will allow the Court to determine the facts underlying the most critical issues of the case--the circumstances surrounding each plaintiff's alleged exposure to formaldehyde <u>and</u> the alleged causation between defendants' alleged emission of formaldehyde and each plaintiff's alleged injuries. Furthermore, by separating the meritorious claims from those in which a plaintiff merely alleged she was exposed to unidentified levels of formaldehyde, the order can

---

[3] For example, in *Hillard*, the plaintiffs simply refer to "exposure to unlawful and harmful levels of formaldehyde while residing in FEMA Housing." *Hillard* Compl. ¶ 2. Although referring generally to regulations referencing formaldehyde level, *see id.* at ¶¶ 11-12, no allegations specify the level of formaldehyde to which plaintiffs have allegedly been exposed.

4

eliminate the frivolous claims and save enormous litigation costs and judicial resources.

As this Court has recognized, the fact sheet requirements and expert opinions are critical because of the nature of formaldehyde. The plaintiffs' own testifying medical expert, Dr. Judd Shellito, has testified that when a plaintiff vacates her EHU, any non-cancerous effects that she experienced – including nosebleeds, nasal discharge, watery eyes, and hoarseness – should dissipate, and the plaintiff should return to baseline. *See* Deposition of Judd Shellito, taken on Sept. 15, 2008, p. 116-17, 119.[4] Dr. Shellito also testified that, as it pertained to non-cancerous effects, there would be no delayed onset of symptoms after leaving the EHU. *Id*. at 125. The information the plaintiffs provide pursuant to the proposed Case Management Order will allow the parties to determine: (1) which plaintiffs, if any, have been diagnosed with cancer due to formaldehyde exposure; (2) which plaintiffs suffered from irritant effects that abated once the plaintiff left the EHU; (3) which plaintiffs are still suffering from symptomatology allegedly related to formaldehyde exposure despite removal from the Emergency Housing Unit ("EHU"); and (4) which plaintiffs had an onset of symptomatology allegedly related to formaldehyde exposure after leaving the units.

Accordingly, if the information on a given plaintiff establishes that: (1) plaintiff has no symptomatology allegedly related to formaldehyde exposure that persisted after plaintiff vacated the EHU; (2) plaintiff experienced delayed onset of symptomatology after leaving the EHU; or (3) plaintiff returned to baseline – in other words, if the plaintiff suffers from no demonstrable injury due to formaldehyde exposure – the Court should move these claims onto a "nuisance" docket.

Finally, the burden on the plaintiffs to continue to comply with PTO No. 2 and to provide the expert affidavit is minimal. Much of the information that would be required from plaintiffs

---

[4] Attached hereto as Exhibit "A."

5

under such an order has been required of them all along under PTO No. 2 and is nothing more than the information plaintiffs are required to assert under modern pleading rules in advance of filing suit. Fed. R. Civ. P. 11(b)(3); *see also Bell Atlantic Corp. v. Twombly*, No. 05-1126, 127 S.Ct. 1955, 1965 (U.S. 2007) (holding that under Federal Rule of Civil Procedure 8, a plaintiff is obligated to provide more than labels and conclusions, and "a formulaic recitation of the elements of a cause of action will not do"). Requiring the plaintiffs to submit an expert affidavit should not be burdensome—particularly when balanced against the efficiency obtained from this procedure. The Case Management Order would ensure that plaintiffs support their claims with expert testimony (something the Manufacturing Defendants expect each plaintiff would do in any event) and to submit this information early in the case and in affidavit form rather than live testimony. An affidavit should be far more efficient and less costly than live testimony and should be easy for plaintiffs already complaining of physical injuries to obtain from their treating physicians.

Therefore, the Manufacturing Defendants request that PTO No. 2 continue to be in effect and that each plaintiff provide an affidavit from an expert that: 1) states that the specific level of formaldehyde in each plaintiff's EHU was sufficient to cause the plaintiff's alleged injuries and 2) sets forth the methodology used by the expert and the factual basis for the expert's conclusions that the plaintiff is suffering from a formaldehyde-caused injury or disease.

### B.     Amending the pleadings.

The parties should also narrow each plaintiff's lawsuit to the actual defendant or defendants that allegedly caused the plaintiff's injuries. *See In Re Welding Fume Prods. Liab. Litig.*1:03-CV-17000 (MDL No. 1535), Rec. Doc. 1724, at 2-4. By identifying the specific defendant in whose trailer the plaintiff resided, each plaintiff could then dismiss without

6

prejudice the defendants who were not and could not be liable for the plaintiff's alleged injuries. This will expedite the litigation by simplifying and clarifying each plaintiff's claim. Also, because the dismissal would be without prejudice, the plaintiff could re-institute her claim against a dismissed defendant if she later found that another defendant could be liable for her injuries.

      **C.    Deadline to submit completed fact sheets and affidavits.**

Finally, this Court should establish a final deadline for the plaintiffs to submit their completed fact sheets and affidavits. The Manufacturing Defendants suggest that the Court require plaintiffs to serve their submissions within 120 days after the entry of this order. This deadline would be in lieu of the fact sheet submission deadline currently set forth under the Court's December 19, 2008 Order [Rec. Doc. No. 1006] which presently requires fact sheets to be filed within thirty days of transfer or filing of the complaint.

**II.    Case-specific discovery**

With these pretrial procedures in place, the Court can then address the scope of case-specific discovery. In the welding fume case cited in the previous section, the court decided that it would identify a batch of 100 cases in which counsel for plaintiffs would work quickly to obtain medical authorizations. *Id.* at 12. This would allow counsel for defendants to obtain plaintiff's medical records. *Id.* Additionally, the Court identified 15 of those 100 cases in which full-blown case-specific discovery would begin. *Id.* The 15 chosen included a broad variety of diagnoses, plaintiffs' attorneys, and applicable states' law. *Id.* The Court then stated that, 90 days after commencement of the full-blown discovery, it would hold a status conference to assess the progress and decide when a new group within the 100 cases could commence all-encompassing discovery. *Id.*

Here, the Court should follow a similar plan. The Court should choose its initial 100 plaintiffs from the pool of claimants who have sufficient fact sheets and expert affidavits, if there are enough to meet that quota. To best achieve fairness, the Court should make its own determination based on briefing from both parties establishing which hundred would best represent the various issues involved in this case (e.g., manufacturers, exposures, different states' laws, etc.). Some of those selected by the Court may have already produced medical authorizations, so the process of obtaining those plaintiffs' medical records could commence immediately.

Once the Court has selected the 100 cases, the Court would then choose 15 cases to enter full-blown discovery. After 120 days of all-encompassing discovery in those cases, the court should then hold a status conference to assess the progress of the discovery and select a new set of 15 cases to enter the full discovery phase. Most importantly, at that conference the Court would select which of the first 15 cases it deems ready for trial and would schedule those trials.

Finally, in order to avoid a situation in which multiple trial continuations are granted, the Court should order counsel for the 100 selected plaintiffs to scan each plaintiff's medical records to determine whether those records reveal any issues suggesting that a trial of the case might be unwarranted. *See In Re Welding Fume Products Liability Litigation*, 1:03-CV-17000 (MDL No. 1535), Rec. Doc. 1888. Counsel must then compare those findings to the medical history provided in the fact sheets to ensure the two match. *Id*. at 2. Then, counsel should carefully interview his client in order to make a final determination as to whether the trial is warranted. *Id*. at 3. After the determination is made, plaintiff's counsel must send notice to defense counsel stating that in good faith the plaintiff's counsel believes trial is warranted, or that the case should

be dismissed. *Id*. This notice must occur within 75 days of the scheduling conference at which the court scheduled the trials. *Id*.

### III. Trial Procedures

The final requirement that the Manufacturing Defendants suggest be included in a Case Administration Order is a set of procedures governing the manner and order by which this Court will try the plaintiffs' cases. As more fully set forth below, the Manufacturing Defendants propose that the plaintiffs' cases be divided into two separate pools (one for plaintiffs who have been diagnosed with a chronic injury or disease and the other for nuisance claims) and that each case be tried on an individual basis.

#### A. Two Pools

The Manufacturing Defendants believe that this Court should divide into two classes the cases plaintiffs have chosen for trial according to the foregoing pre-trial and discovery procedures. The Court should separate those plaintiffs who allege a diagnosed medical injury or illness due to their exposure to formaldehyde from those who make a nuisance claim limited to allegations of irritant/ transient response that occurred only while the plaintiffs resided in the EHU. The "chronic" group would include plaintiffs who allege that formaldehyde exposure caused them to suffer a long term injury or disease that has persisted since they vacated the EHU. The plaintiffs in that group would need fact sheets and expert affidavits to show a specific diagnosis which establishes a causal relationship between the diagnosis and formaldehyde exposure.

The "nuisance" group would include plaintiffs who allege irritant, transient responses to formaldehyde that abated once they vacated their EHU. The plaintiffs in this group would essentially allege that the exposure to formaldehyde caused them to suffer a transient, irritant

9

effect that dissipated after they moved out of the EHU. They would need evidence that the irritant response they claim was caused by formaldehyde exposure and factual information to support their damage claims.

By separating the claims in this manner, the Court would engender efficiency by allowing the parties to classify similar claims together. This was the approach taken by Judge Duval in *In re Katrina Canal Breaches Consolidated Litigation*, in which the Court separated the claims into mini-proceedings (e.g., levee, barge, etc.). See Civ. Action No. 05-4182 "K". The Manufacturing Defendants believe the same type of grouping would be helpful here, as well.

### B.     Individual Trials

Though the Manufacturing Defendants propose two pools of plaintiffs, the Defendants submit that the only proper way to try the claims of each plaintiff, regardless of the pool they are in, is through an individual trial.

As this Court recognized in the class certification decision, "each Plaintiff is unique" and Plaintiff's' claims are "individualized with respect to causation and will include individual issues of exposure, susceptibility to illness, and types of physical injuries." Rec. Doc. 1014 at (pp. 25-26). This Court has further recognized that "a determination of fault as to one defendant will not answer the question as to any other defendant." Rec. Doc. 1014 at (p. 12). Accordingly, separate trials are warranted.

Both general constitutional principles and federal jurisprudence demand separate trials. According to the United States Supreme Court, "[a] fundamental requirement of due process is the 'opportunity to be heard' . . . at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see Martin v. Wilks*, 490 U.S. 755, 762 (1989); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429 (1982). The Fifth Circuit recently reiterated that its

"adversity toward group resolution [of asbestos cases] sounds in our concern that no one be deprived the right to a full and fair opportunity to litigate their claims." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 443 (5th Cir. 2001). Despite the press to resolve claims quickly, courts should "refuse to tolerate deviation from fundamental principles of due process simply because asbestos cases threaten to swamp the resources" of courts. *Id.* The federal rules of procedure recognize these concerns by authorizing courts to order a separate trial of one party's claims for purposes of convenience, to avoid prejudice, or to expedite and economize the case. FED. R. CIV. P. 42(b). *See also Malcolm v. National Gypsum Co.*, 995 F. 2d 346, 350 (2nd Cir. 1993) ("The systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiffs' – and defendant's – cause not be lost in the shadow of a towering mass litigation")*; Cain v. Armstrong World Industries*, 785 F. Supp. 1448, 1455 (S.D. Ala. 1992) ("it is evidence . . . that . . . the joint trial of such a large number of differing cases both confused and prejudiced the jury.")

While an omnibus trial for all plaintiffs and defendants may have some intuitive appeal for the plaintiffs and, perhaps, for this court, the United States Supreme Court has made it clear:

> [The] Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause, in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.

*Stanley v. Illinois*. 405 U.S. 645, 656 (1972) (footnote omitted).

Finally, to avoid the possibility of a single plaintiff either dismissing, settling, or losing his or her case on summary judgment (thereby preventing a scheduled trial date), the Court should stack ten (10) cases for trial on a single date. If the plaintiff listed first resolves his or her

claim on or prior to the scheduled trial date, the Court should immediately move to the next listed plaintiff. This procedure should be employed until a case is tried to conclusion or all ten listed plaintiffs' respective cases are dismissed or resolved.

Based on the foregoing, the Manufacturing Defendants believe that the prejudice resulting from the trial of the claim of more than one plaintiff is too great to proceed with anything other than individual trials.

>Respectfully submitted,
>
>**DUPLASS, ZWAIN, BOURGEOIS,
>PFISTER & WEINSTOCK**
>
>s/Andrew D. Weinstock
>_____
>**ANDREW D. WEINSTOCK #18495
>JOSEPH G. GLASS #25397**
>3838 N. Causeway Blvd., Suite 2900
>Metairie, LA 70002
>(504) 832-3700
>*Defense Liaison Counsel*

## C E R T I F I C A T E

I hereby certify that on the 9th day of January, 2009 a copy of the foregoing Memorandum in Support of Motion to Adopt Proposed Case Administrative Order was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

>s/Andrew D. Weinstock
>_____
>ANDREW D. WEINSTOCK #18495
>andreww@duplass.com