UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION | : | MDL NO. 2:07-MD-1873 |
| | : | SECTION "N" (5) |
| THIS DOCUMENT IS RELATED TO: | : | JUDGE ENGELHARDT |
| *All Cases* | : | MAGISTRATE JUDGE CHASEZ |

---

# MEMORANDUM IN SUPPORT OF
# RULE 12(b)(6) MOTION TO DISMISS
# BASED ON FEDERAL PREEMPTION
# FILED BY THE
# MANUFACTURED HOUSING DEFENDANTS

Respectfully submitted:

**VOORHIES & LABBÉ**
(A Professional Law Corporation)

_____
Lamont P. Domingue - #20787
Post Office Box 3527
700 St. John Street
Lafayette, Louisiana 70502-3527
Telephone: (337) 232-9700
ATTORNEYS FOR Cavalier Home Builders, LLC., Cavalier Homes, Inc., Champion Homebuilders Co., Homes of Merit, Inc., Liberty Homes, Inc., Redman Homes, Inc. (for itself and in its capacity as the acquiring entity by merger of the corporation formerly known as Dutch Housing, Inc.), River Birch Homes, Inc., ScotBilt Homes, Inc. and Waverlee Homes, Inc.

MAY IT PLEASE THE COURT:

## I.      NATURE OF THE CASE

This Multi-District Litigation is the consolidation of multiple toxic tort suits in which thousands of plaintiffs claim to have inhabited emergency housing units ("EHUs") provided by the Federal Emergency Management Agency ("FEMA") in the aftermath of Hurricanes Katrina and Rita. Plaintiffs seek recovery for alleged personal injury damages (under the laws of the states of Louisiana, Mississippi, Texas and Alabama) resulting from exposure to formaldehyde while occupying EHUs. Plaintiffs have sued the manufacturers of the EHUs, the United States Government and, in some instances, government contractors who prepared, delivered and setup the EHUs.

FEMA purchased various types of EHUs for use as emergency housing following Hurricanes Katrina and Rita. This motion to dismiss is filed on behalf of the Manufactured Housing Defendants[1] and applies ONLY to the plaintiffs' claims against the manufacturers of manufactured homes, sometimes called "mobile homes."

The manufactured housing industry has been heavily regulated by federal law since 1974. The Manufactured Housing Construction and Safety Standards Act (the "Manufactured Housing Act" or the "Act"), 42 U.S.C. § 5401, et seq., and the standards and regulations promulgated by the U.S. Department of Housing and Urban Development ("HUD") pursuant to the Act, 24 C.F.R. § 3280 and § 3282 (the "HUD Code"), embody a comprehensive federal statutory and regulatory scheme balancing

---

[1] The Manufactured Housing Defendants joining in this motion are listed on Exhibit A, attached hereto.

the conflicting congressional interests of safety, affordability and national uniformity in the construction of manufactured homes.

Specifically, pursuant to its authority under the Manufactured Housing Act, HUD has issued comprehensive standards addressing formaldehyde emissions in manufactured homes. 24 C.F.R. §3280.308-309, and § 3280.406. Those standards require home manufacturers to purchase only certain types of pre-tested and certified lumber, which meets HUD's strict standards for formaldehyde emissions, 24 C.F.R. §3280.308, and require a very specific warning be given in each manufactured home and homeowner's manual, 24 C.F.R. § 3280.309.  In issuing these standards, HUD made their preemptive effect clear:

> **It is HUD's intention that these standards preempt State and local formaldehyde standards in accordance with the Act (42 U.S.C. 5403(d)).**

49 Fed. Reg. at 31997.

In their complaints[2], Plaintiffs attempt to have all manufactured homes used as EHUs declared defective simply because they were constructed with plywood and

---

[2] The complaints filed against the manufactured housing defendants are: *Pujol, et al, v. The United States of America, et al,* Case No. 08-3217 (the "Pujol Complaint"); *Laney, et al, v. The United States of America, et al,* Case No. 08-4636; *Bauer, et al, v. Liberty Homes, Inc., et al,* Case No. 08-5031; *Johnson, et al, v. United States of America, et al,* Case No. 08-3602; and *Babin, et al v. Cavalier Home Builders, L.L.C., et al,* Case No. 08-4629. The manufactured housing defendants are also named in the Administrative Master Complaint (AMC) (Doc. 109) filed directly into MDL No. 1873. Except for paragraph numbers and differences not germane to this motion, the *Pujol, Laney,* and *Bauer* complaints, and the AMC, are identical. For purposes of this motion, the *Johnson* and *Babin* complaints have even less specific factual allegations than the other complaints and the arguments herein therefore apply with even greater force. All of the complaints allege claims against both manufactured housing defendants and other manufacturing defendants without any distinction between the claims against the different defendants. Due to the identical nature of the substantive allegations in the various complaints, citations in this memorandum to Plaintiffs' specific allegations are to the *Pujol* Complaint.

particle board that contained formaldehyde.[3] Indeed, Plaintiffs directly attack the federal regulations in their complaints, alleging that even if Defendants complied with them, such "safety standards, regulations, or requirements are or were inadequate to protect the public from unreasonable risk of injury or damage caused by the housing units[.]"[4] Plaintiffs seek further to hold Defendants liable under some unspecified "ambient air standard" for formaldehyde, something HUD has expressly rejected.[5] In short, Plaintiffs seek simultaneously to invent a non-uniform, *ad hoc* formaldehyde emission standard and then to impose it retrospectively against the Defendants to create liability rejected by Congress and HUD. Plaintiffs state common law standards are fundamentally *different* from those found in the HUD Code and are preempted.

Interestingly, Plaintiffs' counsel, in oral argument responding to FEMA's motion to dismiss, actually argued that FEMA breached its obligation to provide safe and habitable housing by failing to require the other manufacturers not regulated by HUD, to construct their EHUs *in accordance with* the HUD formaldehyde regulations applicable

---

[3] *E.g.* Pujol Complaint, at ¶¶ 130-131.

[4] Pujol Complaint, at ¶¶ 187(c). Plaintiffs' allegations actually constitute a camouflaged *Chevron* attack on the HUD Code, since the Plaintiffs are seeking to have this Court hold that HUD's standards are unreasonable, and thus due no deference under law. *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-2783, 81 L.Ed.2d 694, 703-704 (U.S. 1984). A similar challenge has been rejected by at least one other court. *State of New Mexico v. U.S. Dep't. of HUD*, 1987 U.S. App.Lexis 15519 (10th Cir. 1987) (rejecting New Mexico's challenge to HUD's formaldehyde standards for manufactured homes).

[5] The HUD Code requires manufacturers to purchase wood products that are pre-tested and certified pursuant to HUD Code standards, which adopt certain generally accepted ASTM standards. 24 C.F.R. § 3280.308 and .406. The wood products industry and the manufactured home industry have complied with these standards for over 20 years. Plaintiffs would have this Court ignore these settled rules and formulate a standard of care rejected by HUD, which would require home manufacturers to test the ambient air in all homes after their manufacture. HUD's rejection of an ambient air standard is found at 49 Fed. Reg., p. 31997.

4

to manufactured homes.[6]  Plaintiffs' counsel further stated:

> MR. MEUNIER: … For over 20 years, Judge, the government has been aware of the risk of formaldehyde exposure in manufacturing of mobile homes. **And the CFR itself specifies safe, maximum formaldehyde emissions from the plywood and particle board used in both manufactured and mobile homes**.

Transcript of July 23, 2008, at p. 25, lines 15 – 20 (emphasis added).

This Court, in recognizing this admission from Plaintiffs' counsel, summed up the only possible liability for the manufactured housing defendants in a nutshell:

> The Court further notes that mobile homes, which are subject to HUD regulations, are expected to be manufactured and provided in conformity with those specific regulations regarding formaldehyde. To the extent that any such mobile homes at issue in this litigation violated government formaldehyde level standards, that liability would belong to the manufacturer alone … (See Transcript, pp. 35-36).

Order and Reasons of October 3, 2008 (Doc. 717), at page 21, footnote 9.

Defendants agree completely with this Court's view of liability: a manufactured home defendant may be held liable only for injuries to a plaintiff caused by a home manufactured in *violation* of the HUD Code. This type of attack could take two forms: (1) an allegation that the wood products purchased by manufacturers failed to meet the product certification standards promulgated by HUD (§ 3280.308 and -.406) and caused injury; or (2) an allegation that the home manufacturers failed to issue the required warnings, in the proper way (§ 3280.309), thereby causing injury.

Plaintiffs, however, are urging much more. Plaintiffs attack the federal standards themselves as insufficient, and have further asserted claims against Defendants using

---

[6] See Transcript of July 23, 2008, pp. 20-38, Oral Argument of Mr. Gerald E. Meunier, on behalf of the Plaintiffs' Steering Committee.

non-federal standards that are materially *different* from the HUD regulations.   This is precisely the type of attack foreclosed by the preemption doctrine, as applied via the Supremacy Clause of the United States Constitution.

## II.     STANDARD OF REVIEW

This is a 12(b)(6) motion to dismiss based on the federal preemption doctrine. To survive a 12(b)(6) motion, each plaintiff's allegations must state more than conclusory allegations.   *Kapps v. Torch Offshore, Inc.,* 379 F.3d 207, 210 (5th Cir. 2004).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 1464-65, 167 L.Ed.2d 929 (2006) (citations omitted). "Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk v. Schneider,* 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis the Court's).   Hence, "… conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez-Montes v. Allied Pilots Assn.,* 987 F.2d 278, 284 (5th Cir. 1993).

The need for more than labels, conclusions and a formulaic recitation of the

6

elements of a cause of action is particularly significant in this type of multi-district, mass tort litigation:

> "As the Supreme Court recently reaffirmed, 'a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)). Such concerns are particularly apt in a multidistrict litigation like this one, involving hundreds of cases, thousands of plaintiffs, and millions of dollars -- the cost of the discovery on the horizon is substantial and the potential for abuse is great. For this reason, courts have repeatedly held that "the price of entry, *even to discovery*, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome." *DM Research[v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999)] (first emphasis added). To permit otherwise -- that is, to allow 'plaintiffs to plead first and discover later' -- would be 'costly for both courts and defendants . . . and might ultimately encourage meritless suits in terrorem.' *Cracker Barrel Old Country Store, Inc. v. Cincinnati Ins. Co.*, __F. Supp. 2d __, 2008 U.S. Dist. LEXIS 105788, 2008 WL 5396480, at *3 (M.D. Tenn. Aug. 28, 2008)."

*In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation,* 2009 U.S. dist. LEXIS 9236, at 6-7 (Dist. Minn. Feb. 5, 2009).

In sum, the Plaintiffs' complaints must allege specific, non-preempted allegations directed against the manufactured home defendants in order to survive a challenge under Rule 12(b)(6). As demonstrated below, Plaintiffs have failed in this regard, and their Complaints should be dismissed.

## III.   THE MANUFACTURED HOUSING ACT AND THE HUD CODE

In this preemption analysis, three bodies of federal law and regulation are significant:  (1) the Manufactured Housing Act, and (2) - the HUD Code, generally, and (3) HUD's formaldehyde regulations.  These laws demonstrate that Plaintiffs' claims are

contrary to, and thus preempted by, controlling federal standards.

## A. The Manufactured Housing Act.

The Manufactured Housing Act establishes a pervasive statutory and regulatory scheme governing the manufactured housing industry. Congress, in passing the Act, clearly sought to balance its safety purpose with its purpose of providing affordable homes for all Americans.   The Act specifically labels "affordable" as one of the Congressional findings ("Congress finds that . . . manufactured homes provide a significant resource for affordable homeownership and rental housing accessible to all Americans").  Further, while "safety" clearly is one of the "purposes" of the Act, so too are "affordability" and "uniformity." [7]  Indeed, the Act specifically states that the "need for affordable housing" be considered at all times in making determinations regarding the

---

[7] The Manufactured Housing Act lists the following "purposes:"

    (1)  to protect the quality, durability, safety, and **affordability** of manufactured homes;

    (2)  to facilitate the availability of **affordable** manufactured homes and to increase homeownership for all Americans;

    (3)  to provide for the establishment of practical, **uniform**, and, to the extent possible, performance-based Federal construction standards for manufactured homes;

    (4)  to encourage innovative and cost-effective construction techniques for manufactured homes;

    (5)  to protect residents of manufactured homes with respect to personal injuries and the amount of insurance costs and property damages in manufactured housing, **consistent with the other purposes of this section**;

    (6)  to establish a **balanced** consensus process for the development, revision, and interpretation of Federal construction and safety standards for manufactured homes and related regulations for the enforcement of such standards;

    (7)  to ensure **uniform** and effective enforcement of Federal construction and safety standards for manufactured homes; and

    (8)  to ensure that the public interest in, and need for, **affordable** manufactured housing is duly considered in all determinations relating to the Federal standards and their enforcement.

42 U.S.C. § 5401(b) (emphasis added).

8

safety standards and their enforcement. *See also Scurlock v. City of Lynn Haven, Fla,* 858 F. 2d 1521, 1524 (11th Cir. 1988) ("while consumer protection represents the primary goal of the [Manufactured Housing Act], complete safety is not to be obtained at all expense:   in promulgating regulations, HUD must 'consider the effect of [the standards] on the cost of [mobile] home[s] to the public'").

Section 5403 entrusts the administration of the Manufactured Housing Act to the HUD Secretary and *requires*[8] HUD to establish "appropriate Federal manufactured home construction and safety standards, each of which ... shall be reasonable and practical [and] meet high standards of protection *consistent with the purposes* of [the Act][.] " 42 U.S.C. § 5403(a)(1)(A)(i)-(ii) (emphasis added). Section 5403 further establishes an extensive process for the promulgation, revision and enforcement of manufactured housing construction and safety standards, 42 U.S.C. § 5403(a)-(c), and requires that the standards be evaluated for revision every two (2) years. 42 U.S.C. § 5403(a)(4).

The Manufactured Housing Act also sets forth an express preemption clause that must be "broadly and liberally construed," specifically stating in relevant part:

> **d)   Supremacy of Federal standards.** Whenever a Federal
> manufactured home construction and safety standard established under

---

[8] Section 5403(a)(1) states:   "The [HUD] Secretary *shall* establish, by order, appropriate Federal manufactured home construction and safety standards . . . . "   The United States Supreme Court has stated that such a Congressional *mandate* to an administrator to promulgate rules and regulations is evidence that Congress intended implicit preemption.  *See Sprietsma v. Mercury Marine,* 537 U.S. 51, 69, 123 S. Ct. 518, 529 (2002) (discussing the case of *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S. Ct. 988 (1978), in which the Court held that the Ports and Waterways Safety Act ("PWSA") implicitly preempted state law, and noting in particular that Congress in the PWSA "*required* the Secretary [of Transportation] to issue 'such rules and regulations as may be necessary" regarding the safety and operation of covered vehicles.).

this title is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard. Federal preemption under this subsection shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this title.

42 U.S.C. § 5403(d).

The Act's comprehensive governance of the manufactured housing industry is further illustrated by Congress' instruction to the Secretary to "conduct research, testing, development, and training necessary to carry out the purposes of [the Act][,]" 42 U.S.C. § 5407(a), and to "advise, assist, and cooperate with other federal agencies and with State and other interested public and private agencies, in the planning and development of - - (1) manufactured home construction and safety standards; and (2) methods for testing and inspecting to determine compliance[.]" 42 U.S.C. § 5408. The Act prohibits and penalizes, both civilly and criminally, commerce involving manufactured homes that does not comply with the standards or fail to comply with other various statutory and regulatory requirements, 42 U.S.C. §§ 5409-12, and establishes an extensive investigation and enforcement scheme. 42 U.S.C. §§ 5413-15, 5422.

The Manufactured Housing Act also contains what is commonly referred to as a "saving clause." The saving clause states, "[c]ompliance with any Federal manufactured home construction or safety standard issued under this title does not exempt any person from any liability under common law." 42 U.S.C. § 5409(c). As discussed in

10

more detail in section V(D), infra, this saving clause does not protect Plaintiffs' claims from preemption.

The Act also sets forth a clear statement of Congress' intent regarding the authority of courts presiding over state-law claims like the ones before this Court:

> Nothing in this title shall prevent any State agency or court from asserting jurisdiction under State law over any manufactured home construction or safety issue with respect to which no Federal manufactured home construction and safety standard has been established ...[.] (Emphasis added.)

Section 5422 (a).

Thus, Congressional intent demonstrates that local standards may not be applied to homes regulated by HUD because the HUD Code is designed to be uniform and comprehensive. To the extent Plaintiffs urge liability on some non-federal standard not identical to the HUD Code, their claims are preempted and should be dismissed.

## B. The HUD Code.

Pursuant to the congressional mandate for HUD to establish construction and safety standards for manufactured homes that are consistent with the purposes of the Act, HUD, in 1975, promulgated such standards. 24 C.F.R. § 3280. The procedural and enforcement regulations promulgated in 1976 are set forth in Section 3282.[9] These

---

[9] The federal manufactured housing program requires manufacturers to participate in an extensive system of design approvals and in-plant inspections to ensure that homes being produced will conform to the federal standards. 24 C.F.R. § 3282.201 et seq. Each manufacturer must contract with a HUD-approved independent third-party agency ("Design Approval Primary Inspection Agency" or "DAPIA") to review and approve the manufacturer's design for conformance to the standards. *Id.* Each manufacturer must also contract with a HUD-approved independent third-party agency ("Production Inspection Primary Inspection Agency" or "IPIA") to inspect homes in the plant during construction to ensure that homes are

11

two sections of Title 24 are commonly referred to as the "HUD Code."

Under the HUD Code, virtually every aspect of manufactured housing construction is regulated by HUD. Indeed, consistent with the express preemption clause found in the Act, the HUD Code has its own express preemption provision:

§ 3282.11 Preemption and reciprocity.

(a) **No State manufactured home standard regarding manufactured home construction and safety which covers aspects of the manufactured home governed by the Federal standards shall be established or continue in effect with respect to manufactured homes subject to the Federal standards and these regulations unless it is identical to the Federal standards.**

*               *               *

(c) . . . **These regulations establish the exclusive system for enforcement of the Federal standards. No State may establish or keep in effect through a building code enforcement system or otherwise, procedures or requirements which constitute systems for enforcement of the Federal standards or of identical State standards which are outside the system established in these regulations or which go beyond this system to require remedial actions which are not required by the Act and these regulations. . . . .**

(d) **No State or locality may establish or enforce any rule or regulation or take any action that stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The test of whether a State rule or action is valid or must give way is whether the State rule can be enforced or the action taken without impairing the Federal superintendence of the manufactured home industry as established by the Act**.

24 C.F.R. § 3282.11 (emphasis added.).  The HUD Code has no "saving clause."

**C.      The HUD Code's Formaldehyde Regulations.**

In August 1981, HUD published an Advance Notice of Proposed Rulemaking

---

constructed in accordance with the federal standards. *Id.*

(ANPR) "solicit[ing] comment on 21 different aspects of formaldehyde outgassing, including adverse health effects, test methods, and the economic impact of regulation." 49 Fed. Reg. 31996.

Three years later, in August 1984, after significant evaluation and commentary from "individual consumers, consumer organizations, manufactured home builders, wood product producers, trade associations, government agencies, universities, and the chemical industry[,]" id., HUD promulgated a sweeping set of four balanced standards to control formaldehyde emissions in manufactured homes: (1) the "product standard" for plywood, § 3280.308; (2) the "product standard" for particle board, § 3280.308; (3) the "warning standard," § 3280.309, and (4) the "testing standards." § 3280.406. These regulations govern the manufacturers of products containing formaldehyde used in the construction of manufactured homes, the testing laboratories that certify those products as compliant with the HUD regulations, and the home manufacturers. 24 C.F.R. § 3280.308-309 and §3280.406.

### 1. The Product Standards.

The "product standards" that control formaldehyde emissions in plywood and particle board used in the construction of manufactured homes are the heart of this comprehensive federal scheme. 49 Fed. Reg. at 31997; 24 C.F.R. § 3280.308.

The product standards prohibit formaldehyde emissions greater than .2 ppm from plywood, and .3 ppm from particle board. § 3280.308. HUD concluded that the product standards would result in indoor ambient formaldehyde levels of not greater than 0.4 ppm, which it determined "provides reasonable protection to manufactured home

occupants." 49 Fed. Reg. at 31998. "There was considerable disagreement in the comments regarding the adequacy of 0.4 ppm to protect manufactured home occupants[,]"[10] as well as regarding the plywood formaldehyde emission rate of .2 ppm and particle board formaldehyde emission rate of .3 ppm. HUD responded, "HUD believes that the product standards will result in 0.4 ppm indoor level under specified conditions and that this level, given economic considerations, is reasonable...[and] medical and scientific evidence does not adequately establish the effect on health benefits of a level below 0.4 ppm." Id. at 31997-999. Further, HUD determined that the cost of a manufactured home would be higher by several hundred dollars if standards were set to achieve an indoor ambient air level lower than 0.4 ppm. 49 Fed. Reg. 31,996, 32002-003 (1984). By its adoption of these product standards and rejection of lower product standards, HUD preempted more stringent product standards that might be imposed through state and local laws.

In adopting the product standards, HUD specifically rejected an ambient air standard – one of the standards sought by Plaintiffs in this case -- for the finished manufactured home product. 49 Fed. Reg. at 31997. After weighing and considering the benefits of *both* standards, as well as a combination product-ambient air standard, HUD declared, "... based on its effectiveness, the availability of reliable test methods, and the potential to prevent formaldehyde problems before the homes are sold, the Department has concluded that a product standard is appropriate." *Id.*

_____

[10] "A number of consumers and academic sources stated that it was imperative that the plywood [and particle board] standard[s] be lowered." Id. at 31997.

HUD also considered disagreements over anticipated living conditions and their possible effect on the standards. Many commentators believed the standards should be geographically sensitive to accommodate regional variations in temperature and humidity. *Id.* at 31998-31999. Other commentators believed additional standards were necessary to account for other formaldehyde contributors that might be used in construction or placed in the home by occupants. *Id.* at 31999. HUD rejected both proposals, finding that the anticipated temperature and humidity conditions, regardless of regional variations, were "reasonable … and reflect typical living conditions[,]" and that "even if carpets, drapes or furniture which contain formaldehyde are installed in the home … the 0.4 ppm target will not be exceeded[.]" *Id.* Thus, the HUD formaldehyde standards also preempt state and local laws used to impose liability based regional variations in temperature and humidity or on the installation of other formaldehyde contributors in a manufactured home.[11]

The State of New Mexico challenged HUD's formaldehyde regulations, making many of the same arguments Plaintiffs make in this case (e.g., attacking the 0.4 ppm target level and the effect of higher temperatures and humidity on it). A federal circuit court rejected that attack, with its opinion tracking the lengthy and deliberative rulemaking process HUD undertook, as set forth above. *State of New Mexico v. U.S.*

---

[11] Ventilation in manufactured homes was also considered by HUD in evaluating the anticipated air exchange rates. In fact, HUD's original formaldehyde regulations included a standard requiring manufacturers to offer additional ventilation options. 49 Fed. Reg. at 31999; see also, repealed Section 3280.710(g) quoted at 49 Fed. Reg. at 32012-13. However, increased factory-provided ventilation ceased to be a concern and was rendered obsolete when HUD converted the ventilation "options" in repealed Section 3280.710(g) to mandatory "requirements" in the 1993 amendments to Section 3280.103(b)-(c). 58 Fed. Reg. 54975, 55003-55004.

*Dep't. of HUD,* 1987 U.S. App.Lexis 15519 (10th Cir. 1987).

### 2. The Warning Standard.

Because the product standard would not entirely eliminate formaldehyde in manufactured homes, HUD also promulgated a third standard – a regulation mandating that a specifically worded formaldehyde warning be posted in each manufactured home and in the homeowner's manual, 24 C.F.R. § 3280.309.

When HUD first proposed regulating formaldehyde in manufactured homes, it "solicited comment on whether a warning alerting the public to possible problems associated with formaldehyde should be posted in manufactured homes[,]" and "the idea received overall support by all commentators." 49 Fed. Reg. at 32002.   The commentators agreed that the formaldehyde notices should be "prominently displayed, list the health effects associated with formaldehyde exposure, identify particularly susceptible populations and reference a source for further information." Id. Information in the notice about ventilation and formaldehyde having caused cancer in laboratory animals was also proposed and considered.

A consumer interest group, the Consumer Federation of America (CFA), and industry association, the Manufactured Housing Institute (MHI), led the way and jointly developed a notice that was endorsed by several commentators. Id.  HUD requires the warning be posted in the kitchen and homeowner's manual, and that it inform purchasers that manufactured homes contain products that emit formaldehyde, describe the most common acute symptoms caused by formaldehyde exposure, identify groups who are particularly susceptible to formaldehyde exposure, describe the benefits of

16

additional ventilation and refers to physicians and local health departments as sources for additional information. *Id.*[12]

The manufactured housing defendants cannot vary the terms, posting or size of this warning and, as a result, any state or local laws requiring formaldehyde warnings not identical to that mandated by HUD are preempted.

### 3. The Testing Standard.

The fourth standard is a regulation establishing the testing procedures to be employed by plywood and particle board manufacturers and testing laboratories before certifying that their products comply with HUD's product standard. 24 C.F.R. § 3280.406. HUD's formaldehyde testing and certification regulations require the plywood and particle board manufacturers to test their products to assure compliance with the product standards before certifying them for use in manufactured housing. The manufactured housing defendants are thereafter required to use only plywood and particle board "stamped or labeled so as to identify the product manufacturer, date of production and/or lot number, and the testing laboratory certifying compliance with" the product and testing standards. 24 C.F.R. § 3280.308(c).

HUD's testing and certification standards that assure that plywood and particle board certified for use in manufactured homes meet the product standards, are set forth in § 3280.308(b)-(d) and § 3280.406.[13] Detailed standards controlling everything from

---

[12] The current HUD formaldehyde notice, as amended in 1989 and 1993, is attached as Exhibit C.

[13] 24 C.F.R. §§ 3280.308 and 3280.406 are attached hereto as Exhibit B.

how the product is stored after manufacture and before preconditioning for testing, to what is required to retest and certify plywood and particle board that failed an initial test, to quality control of both the product manufacturers' and the testing laboratories are included in HUD's product testing and certification regulations "to assure that the [product] panels meet the Standard[.]" Id.; see also § 3280.308(b)-(d).

*   *   *

HUD adopted the formaldehyde standards "to reduce … personal injuries[,] … deaths[,] … insurance costs and property damage resulting from manufactured home accidents and to improve the quality and durability of manufactured homes[,]" in accordance with its congressional mandate. 49 Fed. Reg. at 31996.

When it announced this comprehensive federal scheme governing formaldehyde in manufactured homes, HUD also declared its intentions concerning the preemptive effect of the regulations:

> **It is HUD's intention that these standards preempt State and local formaldehyde standards in accordance with the Act (42 U.S.C. 5403(d)).**

49 Fed. Reg. at 31997.

## IV. <u>PLAINTIFFS' CLAIMS</u>

Plaintiffs' claims have a number of deficiencies. <u>First</u>, Plaintiffs make conclusory "group" claims against ALL the manufacturing defendants throughout their complaint, without distinction between the claims against the manufactured home defendants and the other manufacturing defendants, notwithstanding Plaintiffs' acknowledgment that

18

they need to be "treat[ed] separately[.]"[14] Plaintiffs more specifically allege "that there existed **no Governmental specifications** addressed to the design/manufacture/construction and/or warnings relative to formaldehyde levels in the housing units." (Emphasis added.)[15] Plaintiffs' failure to distinguish between the manufactured home defendants, who are governed by HUD, and the other manufacturing defendants, who are not, renders their group complaint little more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action" or "legal conclusions masquerading as factual conclusions" that cannot save Plaintiffs' claims from preemption.[16]

Second, Plaintiffs allege claims based on standards that conflict with the formaldehyde standards set forth in the HUD Code.   Plaintiffs allege that the manufacturing defendants are liable for the mere presence of formaldehyde in wood products used in the construction of EHUs, an allegation clearly conflicting with the formaldehyde regulations in the HUD Code.[17] Plaintiffs further seek Defendants' liability for their failure to comply with an ambient air standard, which HUD specifically rejected.

Third, Plaintiffs attack the sufficiency of the HUD Code itself. Plaintiffs allege that the manufacturing defendants are liable under Texas law even if they complied with any

---

[14] See, Transcript, supra., fn. 6, at p. 35.

[15] Pujol Complaint, at ¶ 23.

[16] This type of unclarified, general, conclusory and alternative pleading is the type of pleading tactic that is owed no deference by this Court. *Old Time Enterprises, Inc. v. International Coffee Corporation*, 862 F.2d 1213, 1219 (5th Cir. 1989).

[17] Pujol Complaint, at ¶¶ 130-131.

19

applicable regulations because the "… safety standards, regulations or requirements are or were inadequate to protect the public from unreasonable risks of injury or damage caused by the housing units[.]"[18] This attack on federal standards under Texas law is precisely what federal preemption prohibits.

Any claim attacking the sufficiency of existing standards or imposing a standard different from that in the HUD Code cannot survive a preemption attack. Indeed, the *only* claim Plaintiffs can make is for an injury proximately caused by a violation of the HUD Code (e.g., plaintiffs were injured because Defendants used uncertified or wrongly certified wood, or that Defendants did not comply with the warning requirement in the HUD Code). Any other claim should be dismissed.[19]

## V. ARGUMENT

Plaintiffs' claims alleging anything other than a violation of the HUD Code are preempted by the Manufactured Housing Act and the HUD Code. This argument is divided into four sections. First, an overview of federal preemption law is given. The second section addresses how Plaintiffs' claims alleging anything other than a violation of the HUD Code are preempted under the doctrine of conflict preemption. The third section explains how this preemption conclusion is further supported by the express preemption clauses in both the Act and the HUD formaldehyde regulations. Lastly, the

---

[18] *Id.*, at ¶ 187(c).

[19] No complaint filed by any plaintiff against any manufactured housing defendant alleges any fact or cause of action materially different from than those alleged in the Pujol Complaint. Thus, all of the complaints filed against the manufactured housing defendants are plagued with the same flaws and failures that plague the Pujol Complaint.

fourth section establishes that the Act's saving clause does not "save" Plaintiffs' claims from preemption.

## A. An Overview of Federal Preemption Law.

The preemption doctrine is based on the Supremacy Clause of Article VI of the U.S. Constitution, and provides that federal legislation enacted pursuant to Congress' constitutionally delegated authority can nullify conflicting state or local actions. U.S. Const. Art. VI, § 2. Federal administrative regulations have the same preemptive effect as federal statutes. *Fidelity Fed. Savings & Loan Assoc. v. de la Cuesta,* 458 U.S. 141, 153-54 (1982).

Important to this case in which state common law claims are alleged, federal preemption displaces not only state statutory and administrative laws, but also judicial decisions based on tort law. *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 247 (1959). Federal courts have held on a number of occasions that state law tort claims have been preempted by federal law. *See e.g., Geier v. Am. Honda Motor Co., Inc.,* 529 U.S. 861, 120 S. Ct. 1913 (2000) (holding that state tort law claims were preempted by National Traffic and Motor Vehicle Safety Act); *Witty v. Delta Airlines, Inc.,* 366 F. 3d 380, 383-85 (5th Cir. 2004) (holding that state law tort claims were preempted by the Airline Deregulation Act); *Frank v. Delta Airlines, Inc.,* 314 F. 3d 195, 203 (5th Cir. 2002) (holding that state law tort claims were preempted by the Omnibus Transportation Employee Testing Act and FAA regulations); *Gomez v. St. Jude Medical Daig Div., Inc.,* 442 F. 3d 919, 930-933 (5th Cir. 2006) (holding that all state law tort claims were preempted by the Medical Device Amendments to the Food, Drug &

Cosmetics Act, with the exception of a manufacturing defect claim to the extent the plaintiff alleged the device was defectively manufactured because it did not comply with the FDA-approved specifications); *Gallup v. Omaha Property & Casualty Ins. Co.,* 434 F. 3d 341, 344-345 (5th Cir. 2005) (holding that National Flood Insurance Act authorized FEMA to promulgate regulation to preempt state law claims made against Write Your Own insurance providers under the National Flood Insurance Program).

Preemption ultimately turns on congressional intent. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 120 L. Ed. 2d 407, 112 S. Ct. 2608 (1992). Federal law may preempt state or local law in any of three ways:  (1) expressly ("express preemption"); (2) impliedly where Congress occupies an entire field of regulation ("field preemption"); and (3) impliedly where a local law conflicts with federal law ("conflict preemption"). *Michigan Canners and Freezers Assoc., Inc. v. Agricultural Marketing and Bargaining Bd,* 467 U.S. 461, 470 (1984).

Express preemption occurs "when Congress has made its intent known through explicit statutory language[.]" *English v. General Electric, Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Express preemptive language may also be found in a statute's legislative history and in regulations promulgated pursuant to law. *Howard v. Uniroyal, Inc.,* 719 F. 2d 1552, 1556 (11th Cir. 1983).

Field preemption occurs where Congress legislates a field so completely that it is clear Congress intended the federal government to have exclusive jurisdiction in that field. *See Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947).

Conflict preemption can occur in two different scenarios:  (1) when compliance

22

with both federal and state law is impossible; *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-143 (1963), or (2) when the state law conflicts with the federal law and stands as an obstacle to the achievement of federal purposes and objectives as set out in the statutes or regulations. *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941) ("*Hines*"); *see also, Witty v. Delta Air Lines, Inc.,* 366 F.2d 380, 384 (5th Cir. 2004). This latter form of conflict preemption is sometimes called "obstacle preemption."

As set forth in more detail below, Plaintiffs' claims alleging anything other than a violation of the HUD Code are preempted by the Manufactured Housing Act and the HUD Code under the doctrines of conflict "obstacle" preemption and express preemption.

**B.    Plaintiffs' Claims Are Preempted by Conflict Preemption.**

Plaintiffs' claims assert standards that conflict with the federal standards established by HUD.    These conflicts create an obstacle to the achievement of Congress's purposes and objectives in the Manufactured Housing Act.

The Manufactured Housing Act and HUD Code provide a comprehensive and pervasive scheme of federal regulation of formaldehyde emissions. Congress, in establishing the Manufactured Housing Act, stated its objectives were *both* safety and maintaining affordable homes. The latter was so important that Congress *mandated* that HUD balance these two purposes *in every safety standard* created. 42 U.S.C. § 5401(b)(8) (listing as a purpose: "to ensure that the public interest in, and need for, affordable manufactured housing is duly considered in all determinations relating to the Federal standards and their enforcement"); § 5403(e)(4) (mandating that HUD, in

23

establishing every standard, "consider the probable effect of such standard on the cost of the manufactured home to the public").

Congress *required* HUD to promulgate these construction and safety standards[20] for manufactured homes with affordability of those homes to be a consideration in *all determinations* of such standards.  42 U.S.C. § 5401(b)(8); § 5403(a)(1); *see also* fn. 7, *supra*.

Pursuant to that congressional mandate, HUD promulgated formaldehyde regulations after a long, deliberative process engaging in the Congressionally-directed balancing test. Plaintiffs' complaint seeks to throw out that Congressional-mandated balancing test altogether. Plaintiffs challenge the sufficiency of the HUD standards.[21] They assert an ambient air standard, which HUD has flatly rejected in favor of the existing product standard. They seek Manufactured Housing Defendants' liability for the mere presence of formaldehyde in the manufactured homes, when HUD clearly has accepted a level of .4 ppm as part of the product standards, and rejected anything lower as interfering with the "affordable homes" purpose of the Manufactured Housing Act. *Id.* HUD even specifically noted, in *rejecting* any indoor air standard of less than .4 ppm,

---

[20] This *requirement* indicated Congress's intent to have HUD, an agency with extensive knowledge and expertise in this area, be the one performing that balance test.  *See Witty,* 366 F. 3d 380, 384 (5th Cir. 2004) (in holding that plaintiffs' state law claims were barred by obstacle preemption, the Fifth Circuit noted that the "FAA not only authorizes *but affirmatively directs* the Administrator of the Federal Aviation Administration to promulgate air safety standards); *see also* fn. 8, *supra*.

[21] To the extent Plaintiffs wish to challenge HUD's formaldehyde regulations, binding United States Supreme Court precedent mandates that considerable deference be given to HUD regarding the regulations at issue in this case and HUD's interpretation of them.  *See Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-2783, 81 L.Ed.2d 694, 703-704 (U.S. 1984).

that such standard would raise the cost of manufactured homes by "several hundred dollars." *State of New Mexico v. U.S. Dep't. of HUD,* 1987 U.S. App.Lexis 15519, at p. 10, citing 49 Fed. Reg. 31,996, 32,002-003.

Plaintiffs' claims thus directly interfere with, and indeed threaten, the Act's purpose of providing safe, *yet affordable* homes. When Plaintiffs seek to impose standards that are *different* from those mandated by the federal standards, with serious disregard for the "affordability" purpose of the Act, an "obstacle to the accomplishments and objectives" of the Manufactured Housing Act and the HUD Code arises. *See Witty,* 366 F.2d at 384-85 (holding state law tort claims preempted by Airline Deregulation Act under conflict preemption because the state standards they sought to impose would interfere with federal objectives of a "delicate balance between safety and efficiency"); *Neill v. State Farm Fire & Casualty Ins. Co.,* 159 F. Supp. 2d 770, 776 (E.D. Pa. 2000) (holding that plaintiffs' state common law claims against a flood insurer were preempted by the National Flood Insurance Act ("NFIA")), for allowing state law to apply "would undermine the ability of the government to ensure adequate provision of affordable flood insurance" and thus would stand as an "obstacle to the accomplishment and objectives" of the NFIA).

The *Witty* case demonstrates this point. In *Witty,* a passenger sued an airline, alleging that he developed a blood clot condition while on a flight, and that the airline was negligent in failing to warn him about it. The Fifth Circuit, in holding that the claims were preempted under obstacle preemption, noted: (1) the comprehensive scheme of federal regulation of the airlines; (2) that the FAA "not only authorizes but affirmatively

directs the Administrator" to promulgate air safety standards and regulations; (3) pursuant to that mandate, the Administrator had issued several standards regarding warnings to passengers; (4) that the FAA "requires a delicate balance between safety and efficiency;" and that the "interdependence of these factors" requires "a uniform and exclusive system" of regulation; (5) that claims that additional warnings beyond those required by the Administrator thus "conflict with the federal regulations" and are preempted, and (6) that the saving clause in the FAA did not "save" plaintiffs' claims under conflict preemption.  366 F.2d  at 383-85.

This case is just like *Witty*.  We, too, have a comprehensive scheme of federal regulation of formaldehyde emissions.  The Manufactured Housing Act not only authorizes, but affirmatively requires HUD to issue safety regulations, but requires a delicate balance between safety and affordability.  Plaintiffs' state law claims, based on standards different from those in the federal regulations, and indeed already rejected by HUD, conflict with the HUD regulations and are preempted. The Act's saving clause does not "save" Plaintiffs' claims from preemption. And, just as the Fifth Circuit concluded in *Witty* that the only claim the plaintiff there could make is one "based on a violation of federally mandated warnings," Plaintiffs here can only make claims based on *violations* of the HUD formaldehyde standards.

The United States Supreme Court, in ruling for preemption of state law tort claims under a different statute, explained the danger in allowing a *jury* to set a conflicting standard without regard to the balance test that Congress delegated to the administrative agency:

26

> State tort law that requires a manufacturer's catheters to be safer, but hence less effective, than the model the FDA has approved disrupts the federal scheme no less than state regulatory law to the same effect. Indeed, one would think that tort law, applied by juries under a negligence or strict liability standard, is less deserving of preservation.  A state statute, or a regulation adopted by a state agency, could at least be expected to apply a cost-benefit analysis similar to that applied by the experts at the FDA:  How many more lives will be saved by a device which, along with its greater effectiveness, brings a greater risk of harm? A jury, on the other hand, sees only the cost of a more dangerous design, and is not concerned with its benefits; the patients who reaped those benefits are not represented in court.

*Riegel v. Medtronic, Inc.,* 128 S. Ct. 999, 1008 (2008) (holding that plaintiff's common law claims of negligence, strict liability and implied warranty against manufacturer were preempted by federal law).

This case is no different.  A jury will only see the safety issue of formaldehyde and will not be concerned with the affordability purpose that Congress found so important, it required it to be considered by HUD in *all* safety standard considerations. 42 U.S.C. § 5401(b)(8).

When HUD, after due consideration of the purposes of the Manufactured Housing Act, establishes standards in accordance with its Congressional mandate, state laws that impose different standards "disturb and conflict with the balance embodied in that considered federal agency determination" and are preempted. *California v. Federal Energy Regulatory Commission*, 495 U.S. 490, 506, 110 S.Ct. 2024, 2034, 109 L.Ed.2d 474 (1990).[22]

---------------

[22] In *California v. Federal Energy Regulatory Commission*, a California regulation attempting to impose stricter minimum flow requirements on a hydroelectric project than those required by the Federal Energy Regulatory Commission were preempted.

The formaldehyde regulations issued by HUD have been tested with regard to their preemptive effect. In *Woolridge v. Redman Homes, Inc.*, 792 F. Supp. 1469 (N.D. Tex. 1991), the plaintiffs alleged personal injury claims based on exposure to formaldehyde gas. *Id.* at 1470. The issue before the court was whether removal of the case to federal court, based on the preemptive effect of the HUD Code, was appropriate. *Id.* Plaintiffs claimed that their mobile home was defectively designed, and that the home manufacturer failed to provide an adequate warning concerning the dangers of formaldehyde. *Id.* The plaintiff asserted state law claims under Texas law. *Id.* Texas law specifically adopted the HUD Code formaldehyde regulations as a standard of care. *Id.* at 1471. The court held that "[i]n determining whether the Defendants breached their duty to warn of formaldehyde dangers or violated the construction guidelines (whether fraudulently or negligently), federal standards apply." *Id.* The court ultimately remanded the case because plaintiffs urged only state law theories of recovery. However, the court found that the plaintiffs' claims were not preempted by federal law because the standard of care urged by the plaintiffs was identical to the HUD Code standards.[23] *Id.*

---

[23] This finding is not unique; a number of courts have permitted state law formaldehyde claims to be maintained against mobile home companies, but only where such claims were based on the violation of federal law. *Shorter v. Champion Home Builders Co.*, 776 F. Supp. 333 (N.D. Ohio)(court held that plaintiff who purchased a mobile home could pursue state law claims based on HUD's formaldehyde standards involving particleboard, plywood and formaldehyde warnings); *Hall v. Fairmont Homes, Inc.*, 664 N.E.2d 546, 556 (Ohio App. Ct. 1995)(plaintiffs' formaldehyde claims are not preempted to the extent they premise relief on violations of the HUD Code); *Liberty Homes, Inc. v. Dep't of Industry, Labor & Human Relations*, 374 N.W.2d 142, 153-56 (Wis. Ct. App. 1985)(federal law preempts conflicting state law-based formaldehyde standard).

This case demonstrates our point exactly. Plaintiffs are within their rights to allege state law causes of action for personal injuries arising from formaldehyde exposure, BUT only to the extent that liability is predicated on a home manufacturer's failure to comply with HUD Code standards. The Manufactured Housing Defendants are not claiming that Plaintiffs' state law claims are barred by the HUD Code completely. Instead, these defendants maintain that Plaintiffs' claims are due to be dismissed to the extent their state law claims are predicated on a standard of care that is different in any respect to the product and warning standards in the HUD Code. For this reason, this Court should dismiss Plaintiffs' complaints against the manufactured home defendants because the complaints allege claims preempted by federal law.

## C. The Express Preemption Clauses in Both the Act and the Regulations Further Support a Finding of Both Conflict and Express Preemption.

The Manufactured Housing Act also expressly preempts Plaintiffs' claims, "broadly and liberally," to the extent they are based on state laws and standards "not identical" to the Act and the HUD Code. 42 U.S.C. § 5403(d). The United States Supreme Court in *Geier* held that a virtually identical express preemption clause supported a holding of conflict preemption. 529 U.S. at 869-74, 120 S.Ct. 1919-1923. However, unlike the Manufactured Housing Act's express preemption clause, the express preemption clause in *Geier* did not require that it be "broadly and liberally construed." The absence of this requirement in *Geier* was addressed by the Court, who then described the impact of a broad and liberal express preemption clause, stating, "**it would pre-empt all nonidentical state standards established in tort actions covering the same aspect of performance as an applicable federal standard**[.]"529

29

U.S. at 869, 120 S.Ct. at 1918. (Emphasis added.)

The federal statutory and regulatory scheme governing preemption of formaldehyde claims in the manufactured housing arena is unique. Congress' express preemption statute declares that state standards that are not identical to the Act and HUD's regulations are broadly and liberally preempted, notwithstanding the Act's saving clause. HUD's express preemption regulation also declares all state standards not identical to HUD's standards are preempted. HUD also expressly preempted state formaldehyde standards "in accordance with the Act (42 U.S.C. 5403(d)" when it issued its formaldehyde standards. No other federal statutory and regulatory scheme has expressly preempted state standards not identical to the federal standards so pervasively.

Congress amended the Manufactured Housing Act's express preemption clause in 2000[24] to provide that preemption "shall **be broadly and liberally construed** to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards[.]" 42 U.S.C. § 5403(d) (emphasis added); 68 Fed. Reg. 42327, 42328 (2003). By the amendment, Congress intended to provide explicit statutory support for HUD's express preemption clause in 24 C.F.R. 3282.11 that also preempts nonidentical state standards. 68 Fed. Reg. at 42328. The amendment of the Act's express preemption clause was also intended by Congress to "clarify the scope of federal preemption to ensure that disparate state or local

---

[24] See, the American Homeownership and Economic Opportunity Act of 2000, enacting the Manufactured Housing Improvement Act of 2000, Pub.L. 106-569, Title VI, § 604, Dec. 27, 2000, 114 Stat. 2999.

requirements do not affect the uniformity and comprehensive nature of the federal standards"[25] and, in combination with other amendments to the Act, "put HUD back in charge of setting standards[,]"[26] which Congress believed to be "critical for the economy to improve the quality and affordability of such housing in the context of maintaining consumer protection and safety."[27]

When considered against this backdrop, there simply cannot be a more clear statement of preemptive intent than that expressed by Congress in the Act, by HUD in the regulations and, more particularly, by HUD when it announced the formaldehyde regulations:

> **It is HUD's intention that these standards preempt State and local formaldehyde standards in accordance with the Act (42 U.S.C. 5403(d)).**

49 Fed. Reg. at 31997.

The United States Supreme Court has stated that when an administrator declares a preemptive intent, if that administrator has been given discretion by Congress in promulgating the regulations at issue, then the preemption "judgment[] [is] subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily." *Fidelity,* 458 U.S. at 153-54, 102 S. Ct. at 3022-23; *see also Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 701, 104 S. Ct. 2694, 2701 (1984) (holding that federal regulations preempted state law against broadcasting of

---

[25] 146 Cong. Rec. H11960, H11987 (Dec. 27, 2000) (Rep. Leach).

[26] 146 Cong. Rec. at H11992 (Rep. Lafalce).

[27] 146 Cong. Rec. at H11985 (Rep. Leach).

31

advertisements for alcoholic beverages, where FCC explicitly preempted the area, and the FCC's determination was a "reasonable accommodation of conflicting policies" within its domain).

> Specifically,

> If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.

*Id.* HUD"s declared preemption is not arbitrary and did not exceed authority. Indeed, it mirrored the preemption provision in the Act itself, and represented a "reasonable accommodation" of the conflicting policies of safety, affordability, and uniformity in the Act.[28]

In *Geier*, unlike in this case, the DOT's regulations did not contain a preemption clause. The DOT, however, filed an amicus brief in that case, stating that such a tort suit would stand as an obstacle to the accomplishment and objectives in the act at issue in that case. 529 U.S. at 883, 120 S. Ct. at 1926. The United States Supreme Court gave that interpretation "some weight" in ruling for conflict preemption, in light of the fact that Congress had delegated to the DOT the authority to implement the statute, the subject matter was technical, the agency had a thorough understanding of its own

---

[28] The Manufacturing Housing Defendants are aware of the Supreme Court's recent decision in *Wyeth v. Levine,* 2009 WL 529172 (U.S. 2009) ("*Wyeth*"), where the Supreme Court held that the FDA's proclamation of preemption over drug labeling did not preempt state law. *Id.* at *10-12. *Significantly,* however, that case is very distinguishable because the federal statute at issue *did not* have an express preemption provision. *Id.* at 10 ("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express preemption provision at some point during the FDCA's 70-year history").

regulation and its objectives and was uniquely qualified to comprehend the likely impact of state requirements. *Id.* In so holding, the Court rejected the dissent's requirement for a "formal agency statement of preemptive intent." *Id.* at 884, 120 S. Ct. at 1927.

This case has all that *Geier* had, and more. There *is* here what was missing in *Geier* (and what the dissent in *Geier* demanded) – a formal agency statement of preemptive intent. And, there *is* here, the requirement that this Court broadly and liberally construes preemption, which Geier says preempts "all nonidentical state standards established in tort actions."

Given Congress and HUD's clear expression of the preemptive intent of HUD's formaldehyde regulations, the "saving clause" does have the same impact here that it did in *Geier*. Instead, the saving clause serves to clarify the important, yet limited role served by state law:  HUD's regulatory role of establishing the uniform standards are enforced (in part) by state remedial schemes under which individual purchasers of homes may sue for damages arising from *violations* of the HUD Code. *Gatlin v. Countryside Industries, Inc.*, 564 F. Supp. 1490, 1493 (N.D. Tex. 1983) ("The federal regulations issued under authority of the [Manufactured Housing] Act establish the contours of the states' remedial, as distinguished from regulatory, jurisdiction"). Stated differently, HUD regulates the building Code itself, whereas, state laws provide the legal mechanism for pursuing violations of the HUD Code.  One reason state law serves this limited role is that the HUD Code does not itself set forth an express or implied federal cause of action for HUD Cod violations. *Id.* at 1495; *Richard v. Fleetwood Enterprises, Inc.*, 4 F. Supp.2d 650, 653-55 (E.D. Tex.1998).

33

Thus, in addition to conflict preemption, Congress and HUD's intent concerning the preemptive effect of the formaldehyde standards strongly support a finding of express preemption of any claim based on any standard other than a violation of HUD's formaldehyde standards.

**D.    The Act's Saving Clause Does Not Save Plaintiffs' Claims From Being Preempted Under Conflict Preemption.**

The Act's "saving clause" does not protect Plaintiffs' claims from preemption. See *Geier,* 529 U.S. at 869, 120 S.Ct. at 1919.  Both the statutory preemption clause and the "saving clause" in *Geier* were nearly identical to those in the Manufactured Housing Act, except that the preemption clause did not require that it be "broadly and liberally construed[.]"  In holding that conflict preemption applied notwithstanding the saving clause, the Court in *Geier* stated:  "Nothing in the language of the saving clause suggests an intent to save state-law tort actions that conflict with federal regulations." *Geier*, 529 U.S. at 869, 120 S. Ct. at 1919; *see also Witty,* 366 F. 3d at 383 n. 4 (Recognizing this holding in *Geier* and similarly concluding that a saving clause in the FAA "does not foreclose us from concluding that state claims are preempted under recognized implied preemption principles").

The *Geier* court further stated:  "this Court has repeatedly 'declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'"  *Id.* at 870, 120 S. Ct. at 1919 (citations omitted).  And the Court concluded:  "the saving clause foresees – it does not foreclose – the possibility that a federal safety standard will pre-empt a state common-law tort action with which it conflicts."  *Id.*

34

The same analysis applies in this case, only with greater force. Plaintiffs' claims conflict with HUD's formaldehyde regulations, and pose an obstacle to the accomplishments of Congress's objectives in the Act. Thus, Plaintiffs' claims are not "saved" by the Act's saving clause.

## CONCLUSION

As demonstrated above, Plaintiffs' complaints against the manufactured housing defendants should be dismissed because the plaintiffs allege state law theories of recovery predicated on standards of care that are *different than* HUD Code standards. Plaintiffs' allegations go much further than that, however. Plaintiffs assert claims that are *contrary to* the statutorily-mandated balancing analysis employed by HUD, when it adopted formaldehyde standards specifically for HUD Code homes. Plaintiffs would have this Court blithely ignore twenty-five years of settled and time-tested regulations, which correctly balanced the need for safety against home costs and the need for code uniformity, and apply new standards of care that ignore the purposes of the Act and HUD's reasonable interpretation thereof. Indeed, Plaintiffs intend to impose an ambient air standard that runs counter to the product standards developed by HUD. They also seek to attack the efficacy of the warnings specifically mandated by the HUD Code. This Court should not entertain such allegations because they are preempted by federal law.

Accordingly, this Court should dismiss Plaintiffs' complaints against the manufactured housing defendants, pursuant to Federal Rule of Civil Procedure 12(b)(6). We anticipate that the plaintiffs will attempt to amend their pleadings, in the event they

are confronted with a full dismissal of their claims. Should the Court permit amendments to the complaints, Defendants urge the Court to require Plaintiffs to make defendant specific, non-preempted allegations of HUD Code violations. The Manufactured Housing Defendants should not be held to account for standards of care applicable to other products, or invented by Plaintiffs to create liability where none would otherwise lie.

Respectfully submitted:
**VOORHIES & LABBÉ**
(A Professional Law Corporation)


*/s/ Lamont P. Domingue*
Lamont P. Domingue - #20787
700 St. John Street, 5th Floor
Post Office Box 3527
Lafayette, Louisiana 70502-3527
Telephone: (337) 232-9700
Fax: (337) 235-4943
ATTORNEYS FOR Cavalier Home Builders, LLC., Cavalier Homes, Inc., Champion Home Builders, Co., Homes of Merit, Inc., Liberty Homes, Inc., Redman Homes, Inc., (for itself and in its capacity as the acquiring entity by merger of the corporation formerly known as Dutch Housing, Inc.), River Birch Homes, Inc., ScotBilt Homes, Inc. and Waverlee Homes, Inc.
E-Mail: LPD@volalaw.com

/s/ Thomas W. Thaggard, III
Thomas W. Thaggard, III
One of the Attorneys for CMH Manufacturing, Inc., Giles Family Holdings, Inc., and Southern Energy Homes, Inc.

**OF COUNSEL:**

Lorrie L. Hargrove
Edward A. "Ted" Hosp
Edward S. Sledge, IV
**MAYNARD, COOPER & GALE, P.C.**
2400 Regions/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2616
Telephone:  205-254-1000
FAX:  205-254-1999

-and-

James K. Carroll (#3898), T.A.
Stephanie D. Skinner (#21100)
Kati Cox Weaver (#30878)
**FOWLER RODRIGUEZ VALDES-FAULI**
400 Poydras Street, 30th Floor
New Orleans, Louisiana 70130
Telephone:  504-523-2600
FAX:  504-523-2705

/s/ Ben L. Mayeaux
Ben L. Mayeaux (#19042)
One of the attorneys for Horton Homes, Inc.

**OF COUNSEL:**

Gregory A. Koury (#26364)
LABORDE AND NEUNER
1001 West Pinhook Suite 200
Lafayette, Louisiana 70503
Telephone: 337-237-7000
FAX: 337-233-9450

/s/ W. Evan Plauché
W. Evan Plauché, #21027
One of the attorneys for American Homestar
Corporation and Oak Creek Homes, LP

**OF COUNSEL:**

John T. Culotta, #17272
David C. Bach, #28484
HAILEY, McNAMARA, HALL,
LARMANN & PAPALE, LLP
One Galleria Boulevard, Suite 1400
Post Office Box 8288
Metairie, Louisiana 70011-8288
Telephone: 504-836-6500
FAX: 504-836-6565

/s/ Walter K. Jamison, III
Walter K. Jamison, III, #07229
Attorney for Alliance Homes, Inc., d/b/a Adrian
Homes and Silver Creek Homes, Inc.
Attorney at Law
KRAFT, GATZ, LANE, BENJAMIN, LLC
600 Jefferson Street, Suite 410
Lafayette, Louisiana 70501
Telephone: 337-706-1818
FAX: 337-706-1828

/s/ Eric L. Lindstrom
Erick L. Lindstrom
Texas State Bar No. 12385200
One of the Attorneys for Palm Harbor Albermarle, LLC, Palm Harbor Homes, Inc., Palm Harbor Manufacturing, LP

**OF COUNSEL:**

Michael J. Craddock, Trial Attorney
Texas State Bar No. 04970300
CRADDOCK DAVIS & KRAUSE LLP
3100 Monticello Avenue, Suite 550
Dallas, Texas  75205-3466
214/750-3550
214/750-3551 (FAX)

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of March, 2009, a copy of the Manufacturing Housing Defendants' Memorandum in Support of Rule 12(b)(6) Motion to Dismiss Based on Federal Preemption was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent by operation of the court's electronic filing system. I also certify that I have mailed by United States Postal Service this filing to the following non-CM/ECF participants:

Jeffery N. Luthi
One Columbus Circle, NE
Federal Judiciary Bldg., Room G-255
Washington, DC 20002.

*/s/ Lamont P. Domingue*
Lamont P. Domingue - #20787
Post Office Box 3527
700 St. John Street
Lafayette, Louisiana 70502-3527
Telephone: (337) 232-9700
ATTORNEYS FOR Cavalier Home Builders, LLC., Cavalier Homes, Inc., Champion Home Builders, Co., Homes of Merit, Inc., Liberty Homes, Inc., Redman Homes, Inc., (for itself and in its capacity as the acquiring entity by merger of the corporation formerly known as Dutch Housing, Inc.), River Birch Homes, Inc., ScotBilt Homes, Inc. and Waverlee Homes, Inc.
E-Mail: LPD@volalaw.com

---

392583

40