**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:      FEMA TRAILER | * | **MDL NO. 1873** |
| **FORMALDEHYDE PRODUCTS** | * | **SECTION: N** |
| **LIABILTY LITIGATION** | * | **MAGISTRATE: 5** |
| | * | |
| **THIS DOCUMENT RELATES TO:** | * | **JUDGE ENGLEHARDT** |
| | * | **MAGISTRATE CHASEZ** |
| *Joseph M. Pujol, et al. v. Pilgrim* | * | |
| *International, et al.* | * | |
| No.    2007-5709 | * | **JURY DEMANDED** |

**********************************************************************************

<u>**SECOND AMENDED COMPLAINT FOR DAMAGES**</u>

NOW INTO COURT, through undersigned counsel, comes LaRay Maurice Carey ("Plaintiff"), and respectfully represents as follows:

### I.   <u>PARTIES</u>

1.     LaRay Maurice Carey, a person of the full age of majority and domiciled in the Parish of Orleans, State of Louisiana.

2.     Defendant Keystone RV Company, Inc. ("Keystone") is, upon information and belief, an entity incorporated in the State of Delaware which conducts business in the State of Louisiana, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Louisiana.

3.     The Defendant United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the "Federal Government," "Government" and/or "FEMA".

4.     Shaw Environmental, Inc. ("Shaw"), a Louisiana corporation, received a No-Bid contract from the Federal Emergency Management Agency ("FEMA") and was tasked with, amongst

other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to persons displaced by hurricanes Katrina and/or Rita.

## II.  JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§1346 and 2671, *et seq.*

6.      Plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

7.      Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendant(s) with citizenship other than that of plaintiff(s), because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

9.      Keystone is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

10.     Shaw is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

11.     Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, as the emergency housing unit was provided to the Plaintiff in this district, and his injuries were sustained in this district.

### III.  FACTS AND GENERAL ALLEGATIONS

12.     Plaintiff residing or living the travel trailer (hereinafter referred to as "housing unit") in the State of Louisiana was provided this housing unit by FEMA after the landfall of Hurricane Katrina in August of 2005.

13.     The housing unit at issue is a "travel trailers which is wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet.  It is designed to provide temporary living quarters and is generally considered a vehicle, regulated by state transportation authorities rather than housing authorities.  *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

14.     Plaintiff's residence was rendered unhabitable following Hurricane Katrina, leaving him homeless and in need of housing assistance.

15.     FEMA contracted with the Keystone to purchase the housing unit for provision to the Plaintiff as temporary housing.

16.     On information and belief, Keystone expedited production of this housing unit, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing unit occupied by Plaintiff containing higher than normal levels of formaldehyde.

17.     On information and belief, Plaintiff's housing unit deviated from Government specifications pertaining to the safety of the unit as a residence.

18.     Plaintiff submits that the housing unit did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing unit pertinent to formaldehyde levels.

19.     Plaintiff submits that the housing unit contained dangerous levels of formaldehyde due to Keystone's use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing unit as a temporary residences for at least 18 months, but that Keystone failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

20.     Plaintiff submits that Keystone ignored, or concealed and/or condoned the concealment of, the fact that the housing unit contained dangerous levels of formaldehyde due to Keystone's use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing unit as a temporary residences for at least 18 months, all in order to sell Keystone's products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

21.     Plaintiff spent significant time in the FEMA-provided housing unit manufactured by Keystone and provided to the Plaintiff by the Federal Government.  As a result, the Plaintiff unwittingly was exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing unit.

22.    Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units.  Pursuant to federal law, the defendants are required to display a "Health Notice" in manufactured homes concerning exposure to formaldehyde which reads:

### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde.  Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure.  Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk.  Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air.  Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer.  Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels.  When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels.  Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

23.    According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA").  Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of

exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

24.     Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects.  In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to 1 ppm.  In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

25.     HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions.  By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...".  *See* 24 C.F.R. §3280.308.

26.     Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|--------|----------|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

27.    Keystone knew or should have known of the health hazards inherent in the product it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

28.    FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act").   The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may

provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

29.     In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Shaw with No-Bid contracts, eventually amounting to at least 830 million dollars.  The Federal Government also relied on Shaw's expertise and knowledge to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.  *See* Department of Homeland Security, Office of Inspector General, Hurricane Katrina Temporary Housing Technical Assistance Contracts, August 2008 at http://www.dhs.gov/xoig/assets /mgmtrpts/OIG_08-88_Aug08.pdf.

30.      Shaw was tasked with the transportation, installation, site identification and preparation of location, preparation of infrastructure to handle the unit, inspection of the temporary housing unit, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the unit.

31.     Under the terms of its contracts, Shaw was obligated to adhere to all warnings and instructions relating to the temporary housing unit as provided and indicated by the manufacturer.  Further, under its No-Bid contracts with FEMA, Shaw was obligated to advise and instruct FEMA regarding the implementation of those contracts.  Shaw failed to properly fulfill either of these tasks.

32.     Shaw contracted with FEMA to pick-up and transport the temporary housing unit from a FEMA-controlled staging area and deliver it to the area which Shaw was tasked with operating.

8

This new area included the individual location and address where Shaw assigned that temporary housing unit and, further, would have obligations to manage and maintain it.

33.     To accomplish its contractual obligations with FEMA, in addition to the use of subsidiary companies, Shaw entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under its individual contracts with FEMA.

34.     Shaw was tasked under its contracts with FEMA to identify and prepare the infrastructure for the location.  This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc.  Shaw knew or should have known that these preparations were for long-term occupancy of the temporary housing unit.

35.     Once the temporary housing unit occupied by the Plaintiff was transported and delivered to the location, Shaw had the responsibility for installing that temporary housing unit.  Shaw installed the temporary housing unit by "blocking" the unit.  "Blocking" means raising the Plaintiff's unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

36.     By "blocking" Plaintiff's temporary housing unit, Shaw created stress and flexing on the frame of the unit because it was not designed to be lifted off of the wheel base.  In fact, upon information and belief, the manufacturer of the temporary housing unit warned in the owners' manuals provided with the unit, that unit should not be jacked so that the its weight is no longer supported by its wheels.

37.     The stress and flexing on the temporary housing unit's frame caused by Shaw's "blocking" it with weight off of its wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

38.     The FEMA provided temporary housing unit occupied by the Plaintiff was a travel trailer.  Travel trailers are, by definition, mobile.  They are designed for and intended for periodic,

recreational use and not for long-term habitation.  By installing the travel trailers on concrete blocks for extended occupancy, Shaw knowingly and intentionally modified the design and the actual use of this unit occupied by the Plaintiff by converting it into a temporary housing unit to be used as a residence for long term occupancy, exceeding 18 months.

39.     Shaw failed to consult with Keystone with regard to the installation, warnings, warranty issues or advisability of using the travel trailer for long term residence and occupation.  Shaw took actions which voided the manufacturer's warranties and directly created or contributed to unsafe and hazardous living conditions in the temporary housing unit.

40.     Once Shaw had completed the transportation, delivery and installation of the temporary housing unit occupied by the Plaintiff, Shaw was tasked with inspecting the unit to ensure that it was safe and habitable, prior to occupancy by the Plaintiff.  Upon information and belief, Shaw failed to adequately inspect the temporary housing units occupied by the Plaintiff to ensure that the unit was safe and suitable for its intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita.  This failure to properly inspect the unit for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by the Plaintiffs.

41.     In addition to transportation, site identification, installation and inspection, the temporary housing units occupied by the Plaintiff that was provided in response to Hurricane Katrina was also managed, maintained and repaired by Shaw, or its various subcontractors over whom it maintained direct oversight and responsibility.  Upon information and belief, Shaw failed to adequately manage, maintain and repair the temporary housing unit which enabled and contributed to the unsafe and hazardous conditions that led to Plaintiff's adverse health effects.

42.     Upon information and belief, Shaw failed to undertake appropriate action in response to numerous complaints made by the Plaintiff-occupant of the temporary housing unit concerning various adverse health effects caused by exposure to elevated levels of formaldehyde.

43.     Following the Plaintiff's occupancy of the temporary housing unit, Shaw was tasked with its de-installation.  Upon discovering the deteriorated condition of the temporary housing unit at the time of de-installation and removal, Shaw failed to identify the unsuitability of the temporary housing units for long-term occupancy.

44.     In addition to de-installation of the temporary housing unit, Shaw was tasked with refurbishment and restoration of the temporary housing unit for use, either in direct response to hurricanes Katrina and Rita or for other use in the future.  By restoring and refurbishing this temporary housing unit, Shaw warranted that the unit was fit for its intended use, long term occupancy in response to disaster related displacement.  By restoring and refurbishing this temporary housing unit, Shaw created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing unit.  Further, in upon information and belief, following the restoration and refurbishment, the temporary housing unit was immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, who were then directly exposed to hazardous levels of formaldehyde.

45.     Shaw, at every stage of its involvement, failed to warn the Plaintiff-occupant of the temporary housing unit of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but not limited to the possible onset of adult asthma in the Plaintiff.

11

46.     Through its actions and omissions, Shaw created and perpetuated a situation wherein the occupant of the temporary housing unit was exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Shaw negligently failed to adhere to the manufacturer's instructions and warnings related to: (1) the manufacturer's intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing unit; and (3) the warning that the temporary housing unit contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

47.     Shaw failed to warn the occupant of temporary housing unit of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing unit.

48.     By restoring and refurbishing the trailer for future habitation, Shaw improperly and negligently warranted that the unit was fit for the intended use of long-term occupancy.

49.     Finally, despite these failures, Shaw approximately $830 million dollars in contracts from FEMA and the United States government, at the expense of the health of the Plaintiff-occupant of the temporary housing unit who simply had nowhere else to go and who was relying on FEMA and its contractors to keep him safe in the aftermath of the greatest natural disaster in the history of the United States.

50.     The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith.  *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and

Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

51.     Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including this housing unit, and specifically was aware of the published dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

52.     In fact, the Federal Government was conducting initial formaldehyde air sampling of the housing units substantially similar to the Plaintiff's at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels.  *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007.

53.     Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in the housing unit scheduled for delivery to the Plaintiff, the Inspector General of the Department of Homeland Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 trailers had been delivered, including the one occupied by the Plaintiff.  *See* Statement of Richard L.

Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

54.     The Federal Government also continued to supply the defective and dangerous housing unit to the Plaintiffs after March of 2006 .

55.     The Federal Government continued to supply the defective and dangerous housing unit to the Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

56.     The Federal Government continued to supply the defective and dangerous housing unit to the Plaintiff even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied housing units substantially similar to the Plaintiff's at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value.    Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http://oversight.house.gov/documents/20070719113015.pdf)    and    D (*available at* http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

57.     The Federal Government continued to supply the defective and dangerous housing unit to the Plaintiff even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, *supra*, and Exhibits E (*available at* http://oversight.house.gov/documents/20070719113322.pdf), I (*available at*

http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at*
http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

58.     While complaints of formaldehyde exposure continued to be reported to the Federal
Government and evidence supporting the existence of dangerous levels of formaldehyde present
in the housing unit was uncovered, the Federal Government intentionally avoided undertaking
any comprehensive testing of its own because it wanted to avoid liability for the problem, as
stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not
initiate any testing until we give the OK. While I agree that we should conduct testing, we should
not do so until we are fully prepared to respond to the results. Once you get results and should
they indicate some problem, the clock is ticking on our duty to respond to them." Another email
repeats these concerns, reading "OGC has advised that we do not do testing, which would imply
FEMA's ownership of the issue."  Union of Concerned Scientists, *supra*, and Supplemental A
(various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and
Supplemental B (various emails *available at* http://oversight.house.gov/
documents/20070809120940.pdf) attached thereto.

59.     Plaintiff avers that, even as he was being placed at risk in unsafe temporary housing, the
Federal Government had reviewed the results of all earlier testing and complaints of
formaldehyde associated with substantially similar housing units and was actively conferring
with the manufacturer concerning formaldehyde exposure in the housing units and how best to
deal with the publicity fall-out as the media reports of same increased.

60.     FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease
Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised
FEMA that the "health base level" for formaldehyde might be much lower than previously

expected, with anticipated levels being more than 100 times higher.  The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light.   Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at* http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

61.     FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers.  This testing methodology completely failed to simulate the living conditions of a trailer resident, including the Plaintiff, so results, which would not be released for another seven to eight months,  were useless for determining a policy to protect trailer residents, including the Plaintiff.  This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana.  Union of Concerned Scientists, and Exhibit R attached thereto, *supra*.  *See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available at* http://www.atsdr.cdc.gov/HAC/pha/ fema_housing_formaldehyde/formaldehyde_report_0507.pdf.

62.     This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales in which residents, such as the Plaintiff, lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.   Union of Concerned Scientists, *supra*.

63.     FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units substantially similar to the one occupied by the Plaintiff supplied in the wake of the hurricanes in order to avoid legal liability for injuries to the Plaintiff

as a result of his exposure to formaldehyde.  FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006.  *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

64.     FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review.  FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units.  *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

65.     FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006.  The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit.  Yet even applying this "level of concern," the average sampling results still were higher.  *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM

FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents/20070719102502.pdf.

66.     In testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw… I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/20071114164004.pdf.

67.     On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

68.     Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation"did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at*

http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

69.     The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiff's exposure to dangerous levels of formaldehyde in the housing unit and causing him serious injuries.

70.     It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units.  *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC'S RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

71.     The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park

model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments.  *Id.* at 4.

72.     The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions.  *Id.* at 5-6, 11.

73.     As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing.  The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

74.     With regard to the Plaintiff, the Federal Government's actions in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy.  Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

75.     Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing unit it provided to the Plaintiff.

## COUNT 1:

## CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT

76.     At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to the Plaintiff.

77.     The Federal Government was obligated to promptly warn the Plaintiff of any defects in the housing unit which could cause harm and of which the Federal Government was aware.

78.     The Federal Government, after becoming aware of the potential for such harm, violated this duty to the Plaintiff, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

79.     As a direct and proximate result of the acts and/or omissions of the Federal Government, as well as its violations of state and federal law, the Plaintiff has suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

80.     Further, since the Plaintiff is within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, Plaintiff specifically pleads the application of the doctrine of negligence *per se.*

81.     The Federal Government was negligent and at fault in the following non-exclusive particulars:

a.     In failing to warn the Plaintiff of the unreasonably dangerous nature of the housing unit which he occupied;

b.     In failing to promptly remedy the dangerous nature of the housing unit, on becoming aware of the formaldehyde dangers associated with the unit;

c.     In failing to timely implement adequate safety measures and procedures to address the defects in Plaintiff's housing unit, on becoming aware of the formaldehyde danger associated with the unit; and

d.     Such other actions of negligence and fault as will be shown at the trial of this matter.

## COUNT 2:

## CAUSE OF ACTION AGAINST KEYSTONE UNDER LOUISIANA PRODUCTS LIABILITY ACT

97.    Keystone is a manufacturer of the housing unit occupied by the Plaintiff, which unit constitutes products under the Louisiana Products Liability Act [LPLA].

98.    Plaintiff's exposure to formaldehyde fumes from Keystone's products and equipment resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration in the condition in which Keystone sold this housing unit.

99.    The design of the housing unit, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to the Plaintiff.

100.   Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to the Plaintiff.

101.   Keystone's products, equipment and supplies used by the Plaintiff were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left Keystone's control.  Plaintiff was an intended and foreseeable user of the alleged defective products and damages and Plaintiff's losses reasonably could have been anticipated by Keystone.

102.   The defects in Keystone's housing unit are the result of and/or include, but are not limited to, the following:

  i.   In failing to design its respective products so as not to emit dangerous levels of formaldehyde;

  ii.   In providing a housing unit which, by virtue of its design and/or manufacture and/or composition, was unreasonably dangerous under reasonably anticipated use;

  iii.   In providing housing units which, by virtue of a lack of an adequate warnings, was unreasonably dangerous under reasonably anticipated use;

  iv.   In providing a housing unit which did not conform to the express warranties made by the Starcraft regarding its fitness for use as reasonably anticipated;

23

v.      In manufacturing, testing, marketing, distributing, licensing and selling of an unreasonably dangerous housing unit;

vi.     In failing to properly test the housing unit to property evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

vii.    In failing to warn the Plaintiff of the unreasonably dangerous nature of the housing unit occupied by him, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit;

viii.   In failing to ensure that the housing unit it manufactured and provided to the Plaintiff was suitable for its intended use;

ix.     In failing to adhere to any and all express warranties of fitness and safety for the housing unit it manufactured and provided;

x.      In manufacturing and providing a housing unit which were unduly dangerous due to its emissions of formaldehyde; and

xi.     Such other indicia of fault under the LPLA  as will be shown at the trial of this matter.

## COUNT 3:

## SHAW'S LIABILITY UNDER THE LOUISIANA PRODUCTS LIABILITY ACT

103.   Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

104.   Shaw qualifies as a manufacturer under the Louisiana Products Liability Act ("LPLA"), as it performed work pursuant to its contracts with FEMA which altered the character, design, construction, and/or quality of the product and the housing unit constitutes products under the LPLA.

105.   The increased exposure to formaldehyde fumes from the alteration of the temporary housing unit by Shaw resulted from the normal, foreseeable, and intended use of the products and equipment.

106.   The installation and alteration of the temporary housing unit, the modifications to the manufacturer's designs, and "blocking" the unit off its wheel base, altered the product which increased the effects of the product's defect and posed an unreasonable risk of harm to the Plaintiff.

107.   Plaintiff was an intended and foreseeable user of the alleged defective products, and damages and losses to the Plaintiff reasonably could have been anticipated by Shaw.

108.   Shaw, by installing the temporary housing unit on concrete blocks for extended occupancy and, further, by installing residential appliances and heating and air conditioning units, knowingly and intentionally modified the design and the actual use of the unit.

109.   The defects in Shaw's product are the result of and/or include, but are not limited to the following:

   a.   In creating stress and flexing on the unit's frame by lifting significant weight from its wheel base, which distorted the travel trailer's shell allowing for increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell;

   b.   In providing temporary housing units to the Plaintiff which, by virtue of its composition, refurbishment, reconditioning, and/or construction was unreasonably dangerous under reasonably anticipated use;

   c.   In providing a temporary housing unit to the Plaintiff which, lacking adequate warnings, was unreasonably dangerous under reasonably anticipated use;

   d.   In failing to warn the Plaintiff of the unreasonably dangerous nature of the travel trailer converted to a temporary housing unit for its intended use by FEMA (i.e., as long-term housing) or of the presence of excessive levels of emissions of formaldehyde;

   e.   In failure to ensure that the temporary housing unit it installed, refurbished, and reconditioned was suitable for its intended use, (i.e., as long-term housing);

   f.   In failing to adhere to any and all of the manufacturer's warnings against jacking the unit with weight off its wheel base;

   g.   In failing to follow the manufacturer's instructions for the installation and intended use of the temporary housing unit;

   h.   In providing a housing unit which was unduly dangerous due to its emissions of formaldehyde; and

i.    Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

## COUNT 4:
## NEGLIGENCE OF SHAW UNDER LOUISIANA LAW

110.    Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

111.    At all relevant times Shaw was tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused the Plaintiff's injuries.

112.    Shaw owed a duty to the Plaintiff to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore a safe temporary housing unit that did not emit hazardous levels of formaldehyde.

113.    Shaw knew or should have known when it provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing unit to the Plaintiff (thereby modifying and converting the mobile unit into a residential installations) the Plaintiff's actual and intended use of the temporary housing unit, and that the temporary housing units would be used in the manner that the Plaintiff used the temporary housing unit (i.e., as long-term housing).

114.    Shaw breached its duty to the Plaintiff by failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing unit; specifically by:

a.    Failing to sufficiently warn the Plaintiff of the inherently dangerous properties or the foreseeable conditions of the temporary housing unit when used for long-term occupancy; and

b.    Failing to adhere to the manufacturer's warnings against jacking the temporary housing unit off its wheel base by "blocking" the unit.

115.     Shaw's actions were the proximate cause of the Plaintiff's increased exposure to formaldehyde.

116.     Shaw contributed to and exacerbated the adverse health impacts upon the Plaintiff.


## IV.     COMPENSATORY DAMAGES

127.     In addition to and by way of summarizing the compensatory damages prayed for herein, Plaintiff avers that the Defendants, the United States of America through FEMA , Keystone, and Shaw, are individually and/or jointly responsible for all damages which the Plaintiff has suffered and continues to suffer as a consequence of Defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and  loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.


## V.     REQUEST FOR JURY TRIAL

Plaintiff is entitled to and demands a trial by jury.


## VI.     PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that Keystone, Shaw, and the Federal Government be served with a copy of this Complaint, and that, after due proceedings are conducted:

1.  there be a judgment herein in favor of the Plaintiff and against Defendants for all compensatory damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2.  there be specially included in the judgment in the Plaintiff's favor, provisions for the following damages and relief as found applicable and supported by the evidence:

      a.     past and future physical injuries;

      b.     past and future mental and physical pain and suffering;

      c.     past and future physical impairments and disability;

      d.     past and future reasonable and necessary medical expenses;

      e.     past and future loss of earning capacity;

      f.     past and future loss of enjoyment and quality of life;

      g.     loss of consortium and/or society;

      h.     compensable out-of-pocket expenses related to defendants' wrongdoing;

      i.     costs of court; and

3.  all other general, equitable, and further relief as the Court may deem just and

proper.


Respectfully Submitted,


__/s/ Hugh P. Lambert_____
Hugh P. Lambert (LA Bar Number 7933)
Linda J. Nelson (LA Bar Number 9938)
Lambert & Nelson, P.L.C.
701 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 581-1750
Facsimile: (504) 529-2931


**PLEASE SERVE:**

1.  Keystone RV Company, Inc.
    **Through its registered agent for service:**
    David G. Thomas
    2642 Hackberry Drive
    Goshen, IN 46526

2.  The United States of America
    **Through**
    U.S. Attorney's Office, Eastern District of Louisiana
    500 Poydras Street
    Room B210
    New Orleans, Louisiana 70130
    *And through*
    Attorney General of the United States
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530-0001
    *And through*
    Federal Emergency Management Agency
    Office of the Director, Office of the General Counsel
    500 C Street, NW
    Washington, DC 20472

3.      Shaw Environmental, Inc.
        **Through its registered agent for service:**
        CT Corporation System
        5615 Corporate Blvd., Ste 400B
        Baton Rouge, LA 70808

<u>**CERTIFICATE OF SERVICE**</u>

  **I HEREBY CERTIFY** that the above and foregoing pleadings were served on all

counsel of record through electronic notification pursuant to the electronic filing in the United

States District Court for the Eastern District of Louisiana this 2nd day of March, 2009.

      *__/s/ Hugh P. Lambert_____*
      HUGH P. LAMBERT, ESQ. (#7933)
      LINDA J. NELSON, ESQ. (#9938)