UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | MDL No. 1873 |
| | SECTION N(5) |
| | JUDGE ENGELHARDT |
| THIS DOCUMENT IS RELATED TO: | |
| *Aldridge, et al. v. Gulf Stream Coach, Inc., et al.* No. 07-9228 | MAGISTRATE CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
FILED BY SHAW ENVIRONMENTAL, INC.
AND CH2M HILL CONSTRUCTORS, INC.**

**NOW INTO COURT**, through undersigned counsel, come plaintiffs in *Aldridge, et al. v. Gulf Stream Coach, Inc., et al.*, No. 07-9228 (E.D. La.) ("plaintiffs"), who respectfully offer this Opposition to the Motion to Dismiss filed by Defendants Shaw Environmental, Inc. ("Shaw") and CH2M Hill Constructors, Inc. ("CH2M HILL", collectively with Shaw hereinafter the "No-Bid Defendants"). The arguments put forth by the No-Bid Defendants fall into three specific categories: (1) Article III Standing; (2) Prescription; and (3) the Louisiana Products Liability Act. Plaintiffs assert, and will show, that arguments raised by the No-Bid Defendants are not persuasive and must fail.

1

In essence, the No-Bid Defendants argue that the *Aldridge* plaintiffs have no standing because there was no specific matching information linking individual plaintiffs to the No-Bid Defendants at the time plaintiffs filed the First Supplemental and Amending Complaint in *Aldridge*.[1] As will be more fully outlined, the lack of matches was due to the fact that there was no matching information in the possession of the plaintiffs at the time of filing. The plaintiffs now have filed the Second Supplemental and Amending Complaint in *Aldridge*[2] with the available matching information, and have sent discovery to the No-Bid Defendants in an effort to obtain the remaining matching information. As such, plaintiffs aver that any lack of standing argument is moot.

In addition to the standing argument, the No-Bid Defendants make the completely unfounded and unsupportable assertion that the plaintiffs in *Aldridge* had imputed knowledge to trigger the running of prescriptive periods based upon earlier-filed cases, specifically, *Hilliard, et al. v. United States of America, et al.*, No. 06-2576 (E.D. La.)[3]. This argument not only ignores what this Court previously has acknowledged in the context of class certification, i.e., that this case gives rise to individual fact patterns for individual plaintiffs, but it also fails to take into account that the *Aldridge* plaintiffs continued to reside in trailers and suffer exposure to formaldehyde even after *Hilliard* was filed. Further, the No-Bid Defendants themselves make claims regarding the joint tortfeasors in this matter which actually support the *Aldridge* plaintiffs' position that their action against the No-Bid Defendants is timely and not prescribed.

Finally, the No-Bid Defendants argue that they are not manufacturers under the Louisiana Products Liability Act ("LPLA"), and thus do not fall within the ambit of the LPLA. In

---

[1] The First Supplemental and Amending Complaint in *Aldridge* was filed on or about January 21, 2009.
[2] The Second Supplemental and Amending Complaint is MDL Document No. 1346.
[3] The *Hilliard* case was filed on May 18, 2006.

articulating this argument, the movants attempt to minimize the effect and scope of their actions relating to the Emergency Housing Units ("EHUs"), and fail to acknowledge that under the theory of liability urged by the plaintiff, they were in fact the constructors and manufacturers of the final product used by the plaintiffs. The movants also engaged in the restoration and/or refurbishment of EHUs and significantly modified them, rendering them "manufacturers" under the LPLA. Thus, the movants' arguments do not meet the standards necessary for a Rule 12(b) dismissal on this basis.

### I.     Applicable Legal Standards

The No-Bid Defendants seek dismissal of this action pursuant to both Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *See Ramming v. United States*, 281 F.3d 158 161 (5th Cir. 2001); *see also Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977). This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice. *Id.* The court's dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction. *Id.*

In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute. *See Williamson v. Tucker* 645 F.2d 404, 413 (5th Cir. 1981). Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief. *See Home Builders Ass'n of Miss., Inc. v. City of Madison, MS*, 143 F.3d 1006, 1010 (5th Cir. 1998).

Rule 12(b)(6) motions challenge the complaint for an alleged failure to state a legally cognizable claim. *Ramming*, 281 F.3d at 161. The court addressing such motions must accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *See Ferrer v. Chevron Corp.*, 484 F.3d 776, 781 (5th Cir. 2007); *see also Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464 476 (5th Cir. 2004).

**II.     Standing**

The assertion made by the No-Bid Defendants that the *Aldridge* plaintiffs have no standing against them due to the lack of matching information pled in the First Supplemental and Amending Complaint, is premised upon an incorrect assumption of facts and, further, has been made moot by the plaintiffs' filing of their Second Supplemental and Amending Complaint containing all established matches.

The No-Bid Defendants state that, based upon data provided by the United States in February 2008, plaintiffs had access to and should have provided all matching information at the time *Aldridge* was filed on January 21, 2009. This argument is not reasonable, particularly since No-Bid Defendants acknowledge that the actual matching information between occupants of EHUs and their No-Bid Contractor/Defendant was not provided until, at the earliest, January 31, 2009…**after the *Aldridge* First Supplemental and Amending Complaint was filed.**

At the time the matching database produced by the United States was actually received by undersigned counsel, on or about February 13, 2009, matching efforts were undertaken to match the *Aldridge* plaintiffs to the No-Bid Contractors.[4] The database produced by the United States of America allowed for slightly over half of the *Aldridge* plaintiffs to be matched to No-

---

[4] It is important to recall that the *Aldridge* First Supplemental and Amending Complaint named four No-Bid Defendants: (1) The Shaw Group; (2) CH2M Hill, Inc.; (3) Bechtel Corporation, Inc.; and (4) Fluor Enterprises, Inc.

Bid Contractors/Defendants. The remaining named plaintiffs remain unmatched for several reasons, including but not limited to: (1) lack of a FEMA Identification Number in their possession; (2) lack of EHU VIN number; and/or (3) typographical errors within the database which did not allow for matching. As such, a number of matches will only be available through discovery upon the No-Bid Contractors themselves.[5]

Additionally, upon a review of the documents, it became apparent that Bechtel Corporation (while also a misnamed Defendant) did not perform any service in Louisiana or the Eastern District of Louisiana related to this litigation, and as such, on or about March 10, 2009, the undersigned filed a Voluntary Motion to Dismiss Bechtel Corporation (Document No. 1153).

Though discussions with counsel for the No-Bid Contractors, it also became apparent that Shaw Group and CH2M Hill, Inc. had been misnamed in the *Aldridge* pleadings, and that the proper parties were actually Shaw Environmental, Inc. and CH2M Hill Constructors, Inc. As such, the undersigned filed a consent Motion to Substitute Parties on or about March 25, 2009 (Document No. 1210).

Once the correct parties were identified and brought into the suit, plaintiffs anticipated completing the matching of the named plaintiffs through the discovery process, and amending the underlying action one time, with a completed matching list of all named plaintiffs to their respective No-Bid Contractor. However, because of the No-Bid Defendants filing their Motion to Dismiss, including a lack of standing argument in their assertions, the *Aldridge* plaintiffs filed their Motion for Leave to File the Second Supplemental and Amending Complaint providing whatever matches are known at this point, and with the intention to supplement more fully when

---

[5] This discovery was propounded upon Fluor Enterprises, Inc. ("Fluor") in February, 2009, and pursuant to Fluor's request, an extension in time to respond has been granted. As such no responses have been received from Fluor. Further, discovery seeking this information from Shaw and CH2M Hill has been recently submitted to the No-Bid Defendants.

the remaining information becomes known.  This Motion for Leave to file was made without objection by any No-Bid Contractor/Defendant.  These efforts, as well as the good faith efforts by plaintiffs to obtain this information and to move the litigation forward, should effectively moot the standing arguments asserted by the No-Bid Defendants.

Finally, the suggestion by the No-Bid Defendants that allowing the claims against the No-Bid Contractors/Defendants to move forward will be unfair or unduly burdensome based upon any current trial schedule must fail, as there are no *Aldridge* plaintiffs involved in the first flight of bellwether trials set in this MDL.

### III. Prescription

The No-Bid Defendants' entire argument relating to prescription is inextricably and incorrectly tied to the May 2006 filing of *Hilliard*.  They assert, that on its face, *Aldridge* is prescribed because it was filed over a year after the *Hilliard* suit was filed. But movants provide no support, because there is none, for the proposition that knowledge of the individual *Aldridge* plaintiffs regarding their claims in this litigation may be inferred from *Hilliard*. All points raised by the No-Bid Defendants in their brief flow from this flawed premise; and once this argument is refuted, some of the No-Bid Defendants' own arguments **support** the right to amend *Aldridge* under the doctrine of prescription interruption through the filing of plaintiffs' claims against joint tortfeasors.

### a. There is no imputation of knowledge from *Hilliard*, nor does *Hilliard* control

Movants' contention that the May 2006 filing date of *Hilliard* somehow is dispositive, or even relevant, as to *Aldridge* plaintiffs is untenable.  As this Honorable Court has reasoned in denying class certification, each claim in this case is individual, and comprised of an individual and unique set of facts.  Accordingly, what each Aldridge plaintiff knew about formaldehyde

6

exposure or the possibility of a legal action, and when this knowledge occurred, are questions answerable not on a categorical or class-wide basis, but only case by case.

There are two statements made by the No-Bid Defendants in their Motion to Dismiss which articulate and illustrate the absurdity of their position. The first, on pages 6 and 7, states:

> This case is part of a multi-district litigation involving residents displaced by hurricanes Katrina and Rita who were allegedly exposed to dangerous levels of formaldehyde while living in EHUs. The first of these consolidated cases, *Hilliard*, was filed on May 18, 2006. <u>Even though the general public most likely became aware of the presence of formaldehyde in the FEMA trailers months **before** the *Hilliard* case was filed, any potential claimants (including those who have appeared as plaintiffs in this lawsuit) **should have been aware of their claims against the [No-Bid Defendants] by this date**…</u>

(emphasis added).[6] The next paragraph at page 7, states: "Here it is clear on the face of the plaintiffs' Complaint that the alleged injury causing event was or should have been discovered, **at the latest, on May 18, 2006.**" (emphasis added).

Yet, where is the needed <u>factual</u> demonstration, beyond rank speculation, that the *Hilliard* filing date represents such an "awareness trigger" for the public at large, much less the *Aldridge* plaintiffs in particular? The truth is there was little, if any, general or public knowledge of formaldehyde exposure as early as May 2006. In fact, as has been shown through various pleadings to this point in the MDL, there was no published warning distributed generally to the occupants of the EHUs by FEMA until much later than May 2006.[7]

Nor is Fifth Circuit jurisprudence supportive of the "imputed knowledge" theory urged by the No-Bid Defendants. In *Bourdais v. New Orleans City*, 485 F.3d 294 (5th Cir. 2007), the

---

[6] While this litigation certainly has been converted into multi-district litigation, the transfer order from the Judicial Panel on Multidistrict Litigation was not entered until October 24, 2007, and the Plaintiffs' Steering Committee was not created until December 2007. As such, an argument that the *Aldridge* Plaintiffs had any imputed knowledge of *Hilliard* because these cases both fall into the MDL is not supportable.

[7] In fact, the Plaintiffs' Steering Committee would argue that such warnings were not generally distributed until as late as the summer of 2007. In this regard, the Court is referred to the material previously put into the record as evidence of FEMA's prior communications with trailer occupants.

7

Court considered the issue of notice in a case brought under 42 U.S.C. § 1983 based on discriminatory hiring practice, and specifically addressed the issue of earlier-filed suits as a basis for notice to later or prospective claimants. It upheld the District Court's finding that the limited knowledge conferred upon plaintiffs by an earlier-filed civil rights action was insufficient to alert them to their own claims, and that the prescriptive period as to the latter therefore did not begin to run from the earlier suit's filing date.

The movants' position would oblige this Court to conclude that <u>every</u> occupant of the approximately 144,000 EHUs automatically and immediately knew or should have known that they had suffered injury and had justiciable claims against any manufacturer, FEMA or any other defendant, because one group of attorneys for one group of plaintiffs filed suit in May 2006. But this Court has rejected plaintiffs' assertions of Rule 23 commonality and typicality, specifically because there are so many individualized aspects unique to each plaintiff's claims.  In the December 29, 2009 Order and Reasons denying class certification, when discussing the allegations against FEMA, this Court also stated, on page 45: "Plaintiffs' interactions with FEMA also vary greatly on an individual basis."  Continuing this line of explanation into a footnote, the Court cited its October 3, 2008 Order and Reasons regarding FEMA's Motion to Dismiss, and held:

> …each plaintiff will have different relevant facts that may or may not afford him/her such a claim…As for each plaintiff involved in this litigation, the evidence will undoubtedly differ, just as the individual claims will differ.  For instance, some plaintiffs will not have suffered any symptoms from the alleged formaldehyde exposure.  Furthermore, those who do claim to have suffered side effects will surely differ as to which side effects each suffered and as to what extent those side effects manifested.  Some plaintiffs may have complained about the alleged formaldehyde exposure while still in their EHUs; others will not have complained or voiced any concerns until after relocating from their EHUs.  The evidence will also differ as to when FEMA selected an EHU for each plaintiff, when each plaintiff moved in to that EHU, and when each plaintiff moved out of

8

that EHU…**Thus, whether an to what extent FEMA knew of the alleged formaldehyde concerns when these events occurred will likely need to be considered on a case by case basis.**

Order and Reasons of 10/3/08, at p. 42-43 (Doc. No. 717) (emphasis added).

If FEMA did not even know in individual cases what formaldehyde exposures and health effects were being experienced by trailer occupants, it simply cannot be expected that every unsophisticated trailer occupant would become sufficiently aware of a potential legal claim of exposure purely and simply though the filing of a lawsuit by unrelated individuals.[8]

### b. Continuing Torts

Plaintiffs, in addition to refuting the linking of *Hilliard* and *Aldridge* for any prescriptive calculations, argue that the doctrine of continuing tort applies to many, if not all, of the *Aldridge* plaintiffs. The doctrine was well-articulated in *Scott v. American Tobacco, Co.*, 949 So.2d 1266, 1280 (La.App. 4 Cir. 2007), where the Louisiana Fourth Circuit Court of Appeal was examining the suppression and distortion of information by American Tobacco, Co., and, citing the earlier decision of *Wilson v. Hartzman*,[9] held:

> [T]he continuing and repeated wrongful acts are to be regarded as a single wrong which gives rise to and is cognizable in a single action, rather than a series of successive actions. Therefore, the date for commencing the accrual of prescription of an action based on the single wrong is the date of the last wrongful exposure, and the single action may be filed within the prescriptive period reckoning from the cessation of the continuing wrongful acts.
>
> *Id.* at 207 (citations omitted). The Court also recognized the distinction between the discovery rule and the continuing tort doctrine:

---

[8] Indeed, if the No-Bid Defendants would take the position that *Hilliard* has some precedential impact on *Aldridge*, the reasonable date would seem to be the date the MDL was assigned, October 24, 2007. Since *Aldridge* was filed in November 2007, there is no prescription issue relating to *Hilliard*.

[9] 373 So.2d 204 (La.App. 4 Cir. 1979).

9

> ... while prescription as a general rule begins to run from the date of commission of the tort, in those cases in which the damages are not immediately apparent, it has often been held that prescription begins to run from the time a reasonable person under similar circumstances would have become aware of both the tort and the damages. See Stone, Louisiana Civil Law Treatise Tort Doctrine § 120 (1977).
>
> Another exception to commencement of prescription on the date of the tort is the situation in which the tortious conduct that is the operating cause of the damages is a continuing act, giving rise to successive damages from day to day. In such a case prescription does not commence to run until the continuing cause of the damages is abated.

*Id*. at 206.

Based upon information provided in their Plaintiff Fact Sheets, 42 of the 141 named plaintiffs in *Aldridge* were still living in their trailers at the time suit was filed. Further, according to the *Aldridge* Plaintiff Fact Sheets, at least 13 of the plaintiffs experienced or became aware of injury less than a year prior to the November 2007 filing of *Aldridge*.[10] These numbers clearly illustrate how any connection with *Hilliard* is fictitious as far as prescriptive calculations are concerned, and any argument to the contrary must fail.

### c. Joint Tortfeasors

The *Aldridge* plaintiffs assert claims against the No-Bid Defendants as joint tortfeasors and it is axiomatic that filing against one joint tortfeasor interrupts prescription against all joint tortfeasors. The No-Bid Defendants adhere to the notion that the *Hilliard* filing is determinative. When that foundational pillar of their argument is removed, their remaining argument as to joint tortfeasors **actually supports the position taken by the *Aldridge* plaintiffs.** As such, and without the support of the position that the *Hilliard* filing is controlling, the No-Bid Defendants' argument must fail.

---

[10] This number is likely higher, as some Plaintiffs are unaware or could not recall when they first became aware of the formaldehyde exposure.

The pertinent Louisiana Civil Code Article on the interruption of prescription, Article 1799, provides that "the interruption of prescription against one solidary obligor is effective against all solidary obligors and their heirs." Louisiana Civil Code Article 2324 further states that: "[i]nterruption of prescription against one joint tortfeasor is effective against all joint tortfeasors." These notions are reiterated in. Civ. Code. Article 3503, which states: "[W]hen prescription is interrupted against a solidary obligor the interruption is effective against all solidary obligors and their successors."

In fact, the arguments asserted by the No-Bid Defendants, when *Hilliard* is removed from consideration,[11] support the position that the No-Bid Defendants are joint torfeasors under *Aldridge*. Interestingly, the No-Bid Defendants provide a useful chart which supports the contention that in *Aldridge* prescription was interrupted as to un-named tortfeasors by the filing of suit against a named defendant.[12] The chart below appears in the No-Bid Defendants' Motion to Dismiss, and by simply inserting *Aldridge* in place of *Hilliard*, the very argument that the No-Bid Defendants make in reference to the chart, would suggest that prescription for named plaintiffs against non-named Defendants has been interrupted pursuant to La. Civ. Code art. 2324:

|  | **Named** Defendant in *Hilliard* | **Not a Named** Defendants in *Hilliard* |
|---|---|---|
| **Named** Plaintiff in *Hilliard* | Prescription interrupted by Filing of suit. *See* LA. Code Civ. Proc. Art. 3462. | Prescription interrupted by Joint tortfeasor doctrine. *See* La. Civ. Code art. 2324. |
| **Not a Named** Plaintiff in *Hilliard*, but Member of Putative Class | Prescription suspended as to putative class members. *See* La. Code Civ. Proc. Art. 596. | No effect on prescription. |

---

[11] The argument made by the No-Bid Defendants on page 12 of their Motion to Dismiss, that "only the named plaintiffs in *Hilliard* can avail themselves of the joint tortfeasor doctrine" under Article 2324, is nonsensical for the reasons previously articulated.

[12] *See* No-Bid Defendants' Motion to Dismiss, page 13.

The filing of *Aldridge* was not prescribed. As such, under the joint torfeasor doctrine, and as articulated and supported by the No-Bid Defendants' own argument, any claims against joint tortfeasors by *Aldridge* plaintiffs are not prescribed under La. Civ. Code art. 2324. There need be no further discussion on this point, as this Motion to Dismiss is directed solely at the *Aldridge* filing and the plaintiffs contained therein. Because of the reasons articulated herein, there is not a viable argument against the *Aldridge* plaintiffs that their claims have prescribed, and the Motion to Dismiss by the No-Bid Defendants must fail.

### IV.     The Movants' Status as Manufacturers under the LPLA

The movant's motion to dismiss for failure to assert a claim under the Louisiana Products Liability Act (hereinafter, "LPLA") must be denied as the plaintiffs have factually alleged, above mere speculation, that the movants qualify as "manufacturers", rendering them subject to strict liability under the LPLA.

The LPLA establishes the exclusive theories of manufacturer liability for damage caused by their products. La. Rev. Stat. 9:2800.52. The threshold test of liability under the LPLA is whether the defendant is a "manufacturer." *See Loper v. National Union Fire Ins., Co.*, 2001 WL 210367, *2 (E.D.La. 2001). LPLA defines a "manufacturer" as: "A person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, **constructing**, designing, remanufacturing, **reconditioning** or **refurbishing** a product." La. Rev. Stat. 9:2800.53(1) (emphasis added). A manufacturer of a product, for purposes of products liability, includes not only the original manufacturer, but also any entity that substantially modifies or materially alters the product after

its original manufacture through the use of different components or methods of assembly. *See Marshall v. Beno Truck Equipment, Inc.*, 481 So.2d 1022, 1031 (La. App. 1 Cir. 1985). Thus a corporation or other entity may be cast in product liability for modifications that engender injury-causing defects. *Id. See also Spillers v. Montgomery Ward & Co., Inc.*, 294 So.2d 803 (La. 1974). Here, the movants have engaged in multiple actions which bring them within the purview of the LPLA. First, the movants have "constructed" the final defective product used by the plaintiffs; second, they engaged in the restoration and/or refurbishment of the units; and finally, their actions have significantly modified and materially altered the trailers.

The actions of the movants render them subject to liability as manufacturers under the LPLA as they "constructed" the final product used by the plaintiffs. The LPLA plainly includes in its definition of a manufacturer a person or entity that engages in the "construction" of a product. La. Rev. Stat. 9:2800.53(1). While "construct" is not defined in the LPLA, *Black's Law Dictionary*, sixth edition, defines construct as follows: "To build; erect; put together; **make ready for use; to adjust and join materials, or parts of, so as to form a permanent whole**; to put together constituent parts of something in their proper place and order." The plaintiffs alleged in their First Supplemental and Amending Complaint that the movants prepared each trailer for long-term occupancy by installing residential appliances, heating and air conditioning units, plumbing, and electricity. *See* Plaintiffs' First Supplemental and Amending Complaint, ¶56. The movants transferred the travel trailers to concrete piers, "blocking" the trailers off of their wheels. *See id.* at ¶54. The movants also engaged in activity to winterize the units by protecting pipes from freezing and wrapping the units to prevent the entrance of cold air. Ultimately, the movants, in their mission to ready these trailers for occupancy, constructed a long-term residency unit using the mobile trailers (designed as vehicles) as merely a component

13

part. It was the movants who <u>constructed</u>, and therefore manufactured, the residential product that was used by the plaintiffs.

Similarly, in *Coulon v. Wal-mart*, 734 So.2d 916 (La. App. 1 Cir. 1999), Wal-mart was held to be a manufacturer under the LPLA where they engaged in the "assembly" of a bicycle unit, which proved to be defective. Relying upon the "construction" definition as set out in *Black's Law Dictionary*, the court concluded that the term "manufacturing a product" indirectly referred to assembling a product. *See Coulon*, at 919. Thus, one who assembles a product is "properly deemed a manufacturer of the assembled product under the LPLA." *Id.* "Accordingly, this entity would be liable under the LPLA as a manufacturer for any defects that are created in the assembly process." *Id*. The same definition of manufacturer applies here. The movants' actions as they relate to the EHUs was an "assembly" of trailers, concrete blocks, and other materials to construct an end product suitable for long-term occupancy. Without question, the movant's actions in preparing and making the trailers occupancy-ready qualify as "constructing" the EHUs as they would be used by the plaintiffs. Thus, the movants qualify as manufacturers under the language of the LPLA.

Second, the plaintiffs clearly and plainly alleged in the complaint that the movants, in addition to constructing the final product, engaged in the restoration and refurbishment of the EHUs. *See* Plaintiffs' First Supplemental and Amending Complaint, ¶56. The language of the LPLA distinctly identifies restoration and refurbishment as actions giving rise to manufacturer status. The movants, however, seek to minimize their actions by referring to their actions as the "installation" of the EHUs. Yet, as the presence of the plaintiffs' allegations of refurbishment are clear and undisputed, the plaintiffs' complaint unmistakably states a legal cognizable claim against the movants under the LPLA.

Finally, the movants' actions and modifications to the EHUs, undertaken in their mission to construct the occupancy-ready units, substantially modified and materially altered the units, qualifying them as manufacturers under the LPLA. In the "jacking up" of the units, the movants converted and transformed the travel trailers, which are mobile by definition, into stationary residential housing. The addition of residential appliances, plumbing, electricity, and other utilities substantially altered and converted mobile, temporary-residence trailers into more permanent, or semi-permanent, housing, intended for long-term occupancy by displaced citizens who had lost their homes. Since this transformation materially altered the very nature and intended purpose of the trailers, it is conduct which renders the movants manufacturers under the LPLA.

Movants rely solly on *Slaid v. Evergreen Indemnity, Ltd.*, 745 So.2d 793 (La. App. 2 Cir. 1999) for the proposition that the mere "installation" of the EHUs does not support their alleged "manufacturer" status. However, *Slaid* is easily distinguished from the case at bar. In *Slaid* the plaintiffs were seeking to impose manufacturer liability upon a bank that had authorized the replacement of a single window in a mobile housing unit. The court found that such a minimal repair was "merely cosmetic" and did not give rise to an alteration of the unit. *Id.* at 799. The actions taken by the bank to simply replace a window are hardly comparable to those at issue here, and the role of the movants in their preparation and construction of occupancy-ready units far exceeds "cosmetic" changes. The movants converted mobile travel trailers into stationary housing units through the installation of utilities and appliances, and by "blocking" the unit. Structurally, the mobile trailer was significantly altered once it was "jacked up" or blocked in this way. From a "travel" trailer on wheels (assigned a <u>vehicle</u> identification number) it was converted to a supposed residence. The actions taken by the movants went far and beyond the

mere replacement of a window, as in *Slaid.* Therefore, the movants' reliance upon the court's holding in *Slaid* is misplaced, as the facts of that case are fundamentally distinguishable.

While the movants wish to characterize (and minimize) their actions as "installers" of the EHUs, therefore, to do so would ignore the scope and consequences of their actions. They engaged in systemic and substantial modifications of each EHU. These defendants "constructed" the residential product ultimately used by the plaintiffs. There can be little doubt that such actions qualify them as "manufacturers" under the LPLA.

## V.     Conclusion

For the reasons articulated herein, the three elements of the No-Bid Defendants' Motion to Dismiss (standing, prescription and LPLA), must fail, and the Motion to Dismiss should be denied.  Plaintiffs did not have specific matching information at the time the First Supplemental and Amending Complaint was filed, but they have since filed their Second Supplemental and Amending Complaint containing what matching information currently in their possession and have taken additional affirmative steps to obtain the remaining information.  These actions either moot the lack of standing argument, or render any final decision on same premature at this time.

There is no support for the No-Bid Defendants' argument that there is imputed knowledge to the *Aldridge* plaintiffs with the filing of *Hilliard* in May 2006.  Each claim herein is distinct and individual, as has been articulated by this Court in several opinions, including for purposes of prescription.  Further, under the doctrine of continuing tort and the No-Bid Defendants' own argument relating to joint tortfeasors, there is no legitimate argument to be made by No-Bid Defendants relating to the prescription of *Aldridge* plaintiffs.  As such, the No-Bid Defendants' Motion to Dismiss for prescription must fail.

Finally, the movants' argument for dismissal of claims brought under the LPLA also fail as the LPLA makes it abundantly clear that an entity which engages in the construction, restoration, and/or refurbishment of a product or which substantially modifies a product, is a "manufacturer." Here, the movants did all of the above, assuring their legal status as manufacturers under the LPLA.

WHEREFORE, *Aldridge* plaintiffs respectfully pray that this honorable Court deny the Motion to Dismiss brought by No-Bid Defendants, Shaw Environmental, Inc. and CH2M Hill Constructors, Inc.

Respectfully submitted,

__/s/ Frank J. D'Amico, Jr._____
FRANK J. D'AMICO, JR. (Bar No. 17519)
**FRANK J. D'AMICO, JR., APLC**
622 Baronne Street
New Orleans, LA 70113
Telephone:   (504) 525-7272
Fax:              (504) 525-9522

*Counsel for James H. Aldridge, et al. and member of the PSC*

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the above and foregoing pleadings were served on all counsel of record through electronic notification pursuant to the electronic filing in the United States District Court for the Eastern District of Louisiana this ____ day of April, 2009.

                          /s/ Frank J. D'Amico, Jr.
                          **FRANK J. D'AMICO, JR.**