Westlaw.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

Page 1

C

Brigham Young University Law Review
2003

Articles

*185 ADVISORY JURIES AND THEIR USE AND MISUSE IN FEDERAL TORT CLAIMS ACT CASES

Matthew L. Zabel [FNa1]

Copyright (c) 2003 Brigham Young University Law Review; Matthew L. Zabel

I. Introduction — 186

II. The Federal Tort Claims Act and the Use of Advisory Juries — 189

A. The FTCA and Its Prohibition of Jury TrialsA.The FTCA and its Prohibition of Jury Trials — 189

B. Advisory Juries in Historical Perspective — 193

III. Advisory Juries, the FTCA, and Congressional Intent — 196

A. The Statutory Language Requires District Courts to Decide FTCA Cases Without the Assistance of a Jury of Any Kind. — 197

B. The Use of Advisory Juries in FTCA Cases Is Inconsistent with Congress's Intent in Prohibiting Jury Trials Against the United States — 204

IV. Practical Considerations and Systemic Costs of Using Advisory Juries in FTCA Cases — 207

A. The Additional Time and Ex- — 208

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



2003 BYULR 185
2003 B.Y.U. L. Rev. 185

Page 2

pense of Advisory Juries

    B. The Advisory Jury's Influence     213
on the Presentations Made at Trial

    C. The Systemic Costs of Advis-     215
ory Juries

    D. The Use of Advisory Juries in     219
High-Profile Cases

    V. Conclusion     224

## *186 I. Introduction

On April 19, 1993, after the Federal Bureau of Investigation's fifty-one day standoff with David Koresh and his Branch Davidian followers, millions of Americans watched in horror on live television as flames engulfed the Davidians' four-story wooden compound near Waco, Texas. The fire left nearly eighty men, women, and children dead, thus constituting "the deadliest law-enforcement incident in U.S. history" [FN1] and indelibly searing the Waco tragedy onto the national psyche.

In the aftermath of the events at Waco, Branch Davidian survivors and family members of those who died in the fire filed a $675 million civil wrongful-death lawsuit against the United States, [FN2] setting the stage for what many came to see as the ultimate showdown between the Branch Davidians and the federal government. [FN3] The lawsuit, which was brought against the United States pursuant to the Federal Tort Claims Act ("FTCA" or "the Act"), [FN4] alleged that negligent and intentional acts by federal law enforcement agents caused or contributed to the Branch Davidians' deaths. [FN5] After a highly-publicized, four-week trial during the summer *187 of 2000, the United States prevailed on all issues, and the federal district court placed sole responsibility for the deaths at Waco on David Koresh. [FN6]

What few outside the proceedings realize, however, is the extent to which a single decision by the trial judge--to impanel an advisory jury--fundamentally changed the trial and risked further fueling the controversy about the Waco tragedy.

When a person sues the United States in tort under the FTCA, the Act requires that the case be tried by a federal district court judge, rather than a jury. [FN7] However, just three weeks before trial, the judge in the Waco litigation, who otherwise would have served as the sole fact-finder, "[h]aving considered the importance of the issues involved in this case," ordered that an advisory jury be impaneled to issue a verdict. [FN8]

Notwithstanding the judge's understandable desire for advice from a panel of citizen-jurors in the highly-charged Waco litigation, the use of an advisory jury violated both the letter and intent of the FTCA's prohibition of jury trials. [FN9] Furthermore, the presence of the advisory jury fundamentally changed the presentations made by the parties at trial, increased the length, expense, and complexity of the proceeding, and unnecessarily injected the potential for contradictory *188 verdicts by the judge and advisory jury into what was already a highly controversial case.

By impaneling an advisory jury, however, the trial judge in the Waco case was following an ongoing trend in which

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

federal district court judges impanel "advisory juries" to assist them in deciding FTCA cases against the United States. [FN10] In electing to use such advisory panels, these courts cite a Federal Rule of Civil Procedure that ostensibly grants them the discretion to do so. [FN11] When an advisory jury is used, the trial judge still must make the final decision on the United States' liability under the FTCA, but does so only after receiving the advisory jury's verdict. [FN12]

Although advisory juries have been used or discussed in approximately forty published FTCA cases since the passage of the Act in 1946, [FN13] "[j]udges rarely have explained why they have chosen to call, or not to call, an advisory jury." [FN14] Likewise, neither the available decisions nor any known articles or studies evaluate the propriety, desirability, or impact of using advisory juries in FTCA cases.

This Article attempts to fill that void. Part II briefly relates the historical and legislative background of the FTCA before discussing *189 the requirement that cases brought pursuant to the FTCA be tried to a judge rather than a jury. Part III then explains how both the applicable statutory language and congressional intent preclude the use of advisory juries in FTCA cases. Part IV discusses the practical complications and systemic costs inherent in impaneling and using an advisory jury. The Article concludes by arguing that advisory juries, while understandably appealing to federal judges, are contrary to the letter and intent of the FTCA and often create more problems than they solve.

## II. The Federal Tort Claims Act and the Use of Advisory Juries

We are confident that district judges, sitting without a jury as required by 28 U.S.C. § 2402, will be able to dispose of [FTCA] complaints intelligently . . . . [FN15]

Since its passage in 1946, the Federal Tort Claims Act has served as an important jurisprudential fixture in the federal courts. With very limited exceptions, all tort suits against the United States must be brought pursuant to the FTCA and its limitations. [FN16] As a foundation for understanding the interplay between advisory juries and the Act, subpart A supplies a brief history of the FTCA and its prohibition of jury trials in favor of bench trials. Subpart B then examines the historical use of advisory juries, particularly in FTCA cases against the United States.

A. The FTCA and Its Prohibition of Jury TrialsA.The FTCA and its Prohibition of Jury Trials

As sovereign, the United States is immune from tort suits brought by its citizens. [FN17] Absent a statutory waiver of that immunity, a person injured by the negligence of a federal government employee cannot sue the United States in tort to recover damages. [FN18] *190 Historically, such a victim was without a judicial remedy, and the victim's only relief was to petition Congress for redress through the cumbersome and uncertain process of a private bill. [FN19]

Congress eventually became overwhelmed with the difficulty of attempting to address the increasing numbers of private bills for relief. [FN20] Beginning in 1887, Congress repeatedly considered legislation to develop a tort remedy against the United States for persons injured by the negligence of federal government employees but never successfully passed a general tort claims statute. [FN21] Over the following decades, similar attempts at enacting a general federal tort claims statute failed. [FN22]

The impetus for legislative change finally occurred on the morning of July 28, 1945, when a United States Army bomber airplane was accidentally flown into the Empire State Building, killing and seriously injuring a number of people in the building and *191 on the streets below. [FN23] Because no statutory mechanism existed to allow suit against the federal government, however, the victims of this accident were left essentially without a remedy. Congress, placed in an untenable public-relations position, responded by passing the Federal Tort Claims Act, which became law on August 2,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185                                                                                      Page 4
2003 B.Y.U. L. Rev. 185

1946. [FN24]

The FTCA was thus a response to the perceived unfairness of failing to allow tort suits against the federal govern-ment, as well as a solution to the burden of responding to private bills for relief requiring individual congressional con-sideration. [FN25] The Act is a limited waiver of sovereign immunity, [FN26] making the federal government liable for certain torts of federal employees acting within the scope of their employment to the same extent as a private party under analogous circumstances. [FN27] Actions under the FTCA cover a broad range of subject matter areas, including medical malpractice at government hospitals, [FN28] accidents at national parks and other *192 federally-owned properties, [FN29] malicious prosecution claims based on the actions of federal prosecutors, [FN30] and a host of other factual situ-ations.

Congress qualified the FTCA's waiver of the United States' sovereign immunity, however, by including a number of limitations to suit against the United States. For instance, before an FTCA suit may be filed in federal court, its pro-ponent must first file an administrative claim with the federal agency employing the allegedly negligent employee. [FN31] The FTCA also precludes tort suits based on policy-based discretionary decisions, [FN32] suits for intentional torts, [FN33] or suits regarding actions taken in a foreign country. [FN34] Furthermore, a plaintiff in an FTCA suit against the government may not recover punitive damages or pre-judgment interest. [FN35] Because the above limita-tions are part of the United States' waiver of its sovereign immunity, they define the jurisdiction of a court to entertain an FTCA suit. [FN36]

An additional limitation imposed by Congress under the FTCA requires that trials against the United States be con-ducted by a court sitting without a jury. [FN37] Therefore, when a plaintiff sues the United *193 States in tort pursuant to the FTCA, the trial must be heard by a federal district court judge, rather than a jury. [FN38]

Plaintiffs in FTCA cases are not entitled to a jury trial because "[i]t has long been settled that the Seventh Amend-ment right to trial by jury does not apply in actions against the Federal Government." [FN39] Indeed, sovereign im-munity provides that in actions against the United States, because the government is presumptively immune from suit, the Seventh Amendment right to a jury trial never existed. [FN40]

Accordingly, "[s]ince there is no generally applicable jury trial right that attaches when the United States consents to suit, the accepted principles of sovereign immunity require that a jury trial right be clearly provided in the legislation cre-ating the cause of action." [FN41] In the case of the FTCA, Congress chose not to provide for the right to a jury trial and even affirmatively denied the use of juries to determine the United States' tort liability. [FN42] Notwithstanding this clear prohibition by Congress, however, courts have increasingly chosen to impanel advisory juries in FTCA cases.

B. Advisory Juries in Historical Perspective

Advisory juries are not a new phenomenon and are not unique to FTCA cases. Historically, courts of equity in the United States could *194 summon advisory juries to assist them in deciding cases. [FN43] However, such verdicts were non-binding, and the court could disregard them or adopt their verdicts only in part. [FN44] In 1937, this historical power of trial court judges was incorporated into the Federal Rules of Civil Procedure as Rule 39(c). [FN45] The rule provides that "[i]n all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury . . . ." [FN46]

Since the enactment of the Federal Tort Claims Act in 1946, courts in approximately forty published decisions have addressed the issue of advisory juries in FTCA cases. [FN47] Despite an initial resistance to the use of advisory juries,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

courts have increasingly held that judges have the discretion to impanel an advisory jury pursuant to Federal Rule of Civil Procedure 39(c), notwithstanding the FTCA's prohibition of jury trials. [FN48]

In the first published cases to address the availability of advisory juries in FTCA cases, courts generally found that the FTCA's prohibition of juries also encompassed advisory juries. [FN49] In declining to impanel an advisory jury, these courts found the FTCA's language *195 prohibiting jury trials to be dispositive and viewed an advisory jury as being of little use to the court in making its independent decision. [FN50]

Proponents of advisory juries have since fared much better. Indeed, the vast majority of courts to address the issue have reasoned that they have the discretion to impanel an advisory jury. [FN51] Opinions by other courts have similarly indicated that an advisory jury was available or actually used, without analyzing the propriety of doing so. [FN52] However, none of the opinions allowing advisory juries has *196 satisfactorily addressed the statutory and congressional intent barriers to the use of such advisory panels, which is a shortcoming that deserves closer examination.

### III. Advisory Juries, the FTCA, and Congressional Intent

The responsibility for decisions under the Federal Tort Claims Act rests upon the court, and if the court accepts a jury's advisory verdict which is contrary to the court's own conclusion, then obviously the court has abdicated, and the jury, not the court, is the trier of fact. [FN53]

In prohibiting jury trials in cases against the government under the FTCA, Congress was explicit: "[A]ny action against the United States under [the FTCA] shall be tried by the court without a jury . . . ." [FN54] However, many federal district court judges have elected to use advisory juries because, in their view, an "advisory jury" is not the same as a "jury" for purposes of the FTCA. [FN55]

To better understand the FTCA's prohibition of jury trials, this Part examines the relationship among advisory juries, the FTCA, and the congressional intent underlying the Act. Subpart A argues that the use of advisory juries in FTCA cases is inconsistent with both the letter and spirit of the statutory mandate requiring district court judges to decide FTCA cases without a jury. Subpart B then argues that Congress intended for courts to decide FTCA cases on their own, without being influenced by the participation of any jury, whether it be a regular jury or an advisory jury.

*197 A. The Statutory Language Requires District Courts to Decide FTCA Cases Without the Assistance of a Jury of Any Kind.

Because the FTCA provides that cases against the United States "shall be tried by the court without a jury," [FN56] it is beyond debate that the ultimate decision must be made by the court, rather than a jury. [FN57] However, several courts have held that Federal Rule of Civil Procedure 39(c) [FN58] gives them the discretion to use an "advisory" jury, as opposed to a "regular" jury. [FN59] A closer examination reveals that Rule 39(c) does not so easily resolve the advisory jury issue.

As a threshold matter, the attempted use of Rule 39(c) in an FTCA case conflicts with other provisions of law. For example, although not addressed in any published opinions relating to advisory juries, the use of Rule 39(c) to impanel an advisory jury in an FTCA case arguably abridges and modifies the United States' substantive right to have its tort liability tried to a court without a jury in violation of the Rules Enabling Act. [FN60] In addition, the FTCA's prohibition of jury trials is a jurisdictional limitation. [FN61] As a result, the attempted use of Rule 39(c) to impanel an advisory jury in an FTCA case violates Federal Rule of Civil Procedure 82, which provides that the Federal Rules of Civil Procedure

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

"shall not be construed to extend . . . the jurisdiction of the United States district courts." [FN62]

Beyond these non-FTCA obstacles, the use of advisory juries is even more problematic for reasons directly relating to the FTCA itself. For example, courts that impanel advisory juries usually advance one or more of several related explanations of why they are not violating the FTCA's prohibition of jury trials. They primarily *198 emphasize that the court alone will make the final decision, not the advisory jury, and that the court is free "to accept or reject, in whole or in part, the verdicts of the advisory jury as they relate to the government." [FN63] These courts further contend that "[a]n advisory jury is an optional aid to an independent court, not the factfinder or decision-maker. . . . An advisory verdict has no force, other than persuasive, on the court, which remains the sole and final decision-maker." [FN64]

On their face, these justifications seem logical. If the court, rather than the advisory jury, makes the final decision, there has been no direct violation of the FTCA's prohibition of jury trials. Upon deeper consideration, however, the proffered justifications are unsatisfactory for several reasons, all of which relate to the issue of independence in judicial decision making.

First, from a strict textual approach focused on preserving the court's independence, the judge would be required to forego any input from any another fact-finder, which in this case would be the advisory jury. In other words, if a court were to solicit and receive an advisory jury verdict, the court would essentially negate its independence in deciding the case. Therefore, under this view, an advisory jury could have no role in a truly independent judicial decision.

Some courts have recognized the above challenge that an advisory jury poses to genuinely independent decision making. For example, in In re Air Crash Disaster, [FN65] the court was charged with resolving the contribution claims among the United States and two private co-defendants after the plaintiffs in the airplane accident case had already reached a settlement. [FN66] The question arose whether the jury already impaneled for the private defendants should also serve as *199 an advisory jury as to the claims against the United States under the FTCA. [FN67]

Recognizing that "the Court, not the jury, must determine the liability of the United States under the F.T.C.A.," the judge rejected the invitation to use an advisory jury: "If the advisory jury's opinion were consistent with mine, it would not be very useful. On the other hand, if the advisory jury's verdict differed from mine, I would have difficulty giving effect to it." [FN68] Therefore, although the private parties were entitled to a jury trial on the issues between them, the FTCA case was tried to the court without the jury serving in an advisory capacity.

Similarly, in Wright v. United States, [FN69] because a jury was already present to hear the case against private third-party defendants, the plaintiffs requested that it be used as an advisory jury as to the FTCA claims against the United States. While recognizing that it arguably had the discretion to impanel an advisory jury, the court declined to do so for the inherently logical reason that "if the verdict were consistent with my views, it would be of no assistance, and were it contrary, I would not know what effect to give it." [FN70] Thus, as these courts recognized, to be genuinely faithful to the FTCA's prohibition of jury trials, a court that had chosen to impanel an advisory jury would then be statutorily required to ignore it. [FN71]

*200 A second view of the role of advisory juries would be to allow an advisory jury to participate in the judicial decision, but, allegedly, only in a way that does not violate the FTCA's prohibition of jury trials. This construction is used in most cases that allow advisory juries. Under this interpretation, the advisory jury "has no force, other than persuasive, on the court, which remains the sole and final decision-maker." [FN72] Rather, the advisory jury verdict is viewed as merely one piece of information to be considered by the court in arriving at its independent decision. [FN73]

This construction of the role of advisory juries is problematic on several levels. If a court allows itself to be swayed

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

even in part by an advisory jury's decision, the court has allowed a "jury," albeit an advisory one, to participate in deciding the United States' liability under the FTCA. Moreover, if the court considers the advisory jury verdict as a piece of evidence or data in deciding the case, the United States has been denied the opportunity to cross-examine that piece of evidence to test its reliability. [FN74]

On this point, a court using an advisory jury would be quick to point out that, because the jury serves only in an advisory role, the court is "free to ignore any or all of the jury's findings." [FN75] Courts are *201 undeniably free to do so. In fact, a fair reading of the FTCA requires them to ignore the advisory jury's verdict if it conflicts with that of the court. However, justifying the use of an advisory jury on the basis that a court is free to disregard its verdict elevates form over both reality and practice.

First, an advisory jury almost certainly will have some persuasive effect on the court's decision. [FN76] Even the courts that have used advisory juries concede that the advisory jury verdict is "taken into consideration" [FN77] and has a "persuasive" effect on the court's decision. [FN78] Therefore, even if the advisory jury has merely influenced or persuaded the court in its decision, the use of an advisory jury has compromised the spirit of the FTCA's prohibition of jury trials:

> While advisory juries are now fairly common, it is far from clear how they can be useful if § 2402 [the FTCA's prohibition of jury trials] is to be respected. If the judge allows himself to be influenced by the jury, a result contrary to § 2402 would appear to obtain. [FN79]

Of potentially more significance is the idea that, even if the court considers the advisory jury verdict merely as an additional piece of information, the verdict nevertheless has the potential of changing the outcome of the case. This concern was recognized and addressed in Wright, [FN80] in which the court declined an invitation to impanel an advisory jury:

> It may be that the court could use an advisory verdict if the advisory verdict were to be treated as evidence and weighed with the other evidence before a decision were reached. Perhaps in such a case there is no abdication of the court's responsibility, but it is not entirely clear. If, absent a jury verdict, the court would have reached a contrary conclusion, who has really decided the case? [FN81] *202 This question is particularly important in close cases in which the outcome could legitimately go either way. In those instances, the concern is whether the district court judge will have the requisite inclination and fortitude to reject an advisory jury verdict in favor of the court's independent decision, particularly when no one other than the judge would be aware of the judge/jury dissonance. [FN82] That the advisory jury need not have been impaneled in the first instance makes the judge's quandary in such situations even more regrettable.

Whatever the actual decision-making process, the perception of litigants and the public is often that the court will likely follow the advisory jury's verdict. For instance, in the Waco/Branch Davidian trial, after the advisory jury had returned its verdict, but before the judge had issued his decision, the lead plaintiffs' attorney conceded that "I understand the judge has his decision to make and the jury is advisory, but I think from a practical matter, we would recognize that there will be no judgment against the government . . . . I wouldn't be foolish enough to suggest otherwise." [FN83]

The public's view that a judge will side with an advisory jury is not unfounded. Having gone to the trouble of impaneling an *203 advisory jury, a judge is unlikely to then completely ignore the jury's verdict:

> Because an advisory jury trial is tried formally before the bench, the judge is free to disregard the advisory jury's findings. In practice, however, a judge who believes it worthwhile to empanel such a jury will likely find it worthwhile to listen to what that jury has to say. [FN84]

In any event, a district court's inclination to share some of the decision-making responsibility with an advisory jury is

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

understandable. Despite their life tenure, federal district court judges are sometimes called upon to make extraordinarily controversial, or at least very difficult, decisions regarding the federal government's interaction with private citizens in FTCA cases. The Waco/Branch Davidian trial, which involved allegations that the federal government had intentionally or negligently killed eighty of its citizens, is only one example. [FN85] It should not be surprising, therefore, that judges might seek to share responsibility for a difficult decision with a panel of citizen-jurors.

However, to be faithful to the FTCA's requirement that such cases "be tried by the court without a jury," a district court must resist the temptation to use an advisory jury. At best, an advisory jury requires the creation and use of a judicial fiction that the judge is not really using the advisory jury verdict in a manner inconsistent with the FTCA's prohibition of the use of juries. At worst, by using an advisory jury to effectively decide an FTCA case, a federal court "would be abdicating to a large degree the responsibility placed upon [it] by Congress when it passed the [FTCA]." [FN86] Either way, it is clear that the FTCA's statutory prohibition of jury trials does not allow a court to use an advisory jury.

*204 B. The Use of Advisory Juries in FTCA Cases Is Inconsistent with Congress's Intent in Prohibiting Jury Trials Against the United States

Apart from conflicting with the FTCA's statutory language, the use of an advisory jury also clashes with Congress's intent that a court sit without a jury when hearing FTCA actions against the United States. This incompatibility with congressional intent is evident from both the jurisdictional nature of the FTCA's prohibition on jury trials and the available evidence in the legislative history.

When the United States has waived its sovereign immunity from suit, as it did with the FTCA, the "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." [FN87] Therefore, when interpreting statutes such as the FTCA that waive the sovereign immunity of the United States, courts should be careful to construe them in a manner that gives effect to congressional intent. [FN88]

The available legislative history is revealing. One of the reasons for passing the FTCA was the pre-existing lack of uniformity in considering private congressional bills for relief: "Under the existing practice, there is lacking uniformity of action from one Congress to another. Discrimination among applicants for relief thereby *205 results." [FN89] By requiring all litigants to adhere to the same set of statutory provisions, [FN90] including the requirement of non-jury bench trials, [FN91] the FTCA imposed a template of uniformity on tort claims against the government. Whether one agrees or disagrees with Congress's preference for bench trials, the standard is at least the same for all plaintiffs. [FN92] The selective use of advisory juries in some cases and not others needlessly works against this uniformity by introducing an element of inequality into the system.

Even more significantly, the legislative history demonstrates that Congress chose bench trials over jury trials because it recognized that juries would have difficulty viewing the United States as a defendant without being influenced by the fact that it has a deeper pocket than any other defendant: [FN93]

There are advantages in trial before the court without a jury . . . . [I]nasmuch as the Government is the defendant and the money comes out of the Treasury, the juries will decide cases with their hearts rather than their heads, just as they do when an insurance company is the defendant, so the awards in jury trials would probably be much larger, in view of the sympathy the jurors might have, than they would be in trials before the court. If these cases are to be tried by the Federal Courts, they should be court trials rather than jury trials, in my opinion. [FN94] *206 Subsequent illustration of this concern appears in the legislative history underlying a 1954 amendment to the statute prohibiting jury trials in FTCA cases. This amendment exempted certain tax cases against the United States

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

from the non-jury rule. [FN95] In explaining the legislation, the House of Representatives Committee Report noted that the "primary objection to granting jury trials in suits against the United States is that juries, in considering possible sums to be awarded the plaintiff, might tend to be overly generous because of the virtually unlimited ability of the Government to pay the verdict." [FN96]

This concern about excessive jury verdicts seems inherently logical, and remains equally valid today. For example, in Lehman v. Nakshian, [FN97] which involved the availability of jury trials in cases under the Age Discrimination in Employment Act, the Supreme Court illuminated Congress's purpose in opting for bench trials in cases in which the United States is the defendant. The Court first observed that "[w]hen Congress has waived the sovereign immunity of the United States, it has almost always conditioned that waiver upon a plaintiff's relinquishing any claim to a jury trial." [FN98] The Court then noted that "[i]t is not difficult to appreciate Congress' [sic] reluctance to provide for jury trials against the United States." [FN99] As an example, the Court explained that in permitting a narrow *207 exception allowing jury trials in tax refund cases, "Congress expressed its concern that juries 'might tend to be overly generous because of the virtually unlimited ability of the Government to pay the verdict.'" [FN100] This concern is heightened in tort cases against the government, which frequently involve personal injury or death allegedly caused by governmental negligence. [FN101]

By enacting the FTCA, Congress sought to provide a uniform, fair system for adjudicating tort claims against the United States. However, the use of advisory juries undermines that congressional intent, both by disrupting the otherwise uniform requirement of bench trials and by permitting jurors to pass judgment on the ultimate deep pocket of the federal government. As such, advisory juries have no rightful place in the FTCA statutory scheme envisioned by Congress.

### IV. Practical Considerations and Systemic Costs of Using Advisory Juries in FTCA Cases

It seems to me that calling an advisory jury in a Federal Tort Claims case creates more problems than it solves . . . . [FN102]

An advisory jury may seem innocuous and even appealing to a trial judge. The judge may view the impaneling of an advisory jury as an opportunity to gain valuable insight into a case at no cost to the judge, who may accept or reject the advisory jury's verdict at will. As is so often the case, however, appearances can be deceiving. Experience has shown that advisory juries require additional outlays of time and procedural steps, such as voir dire, opening statements, jury instructions, and the like, that are unnecessary or greatly reduced when the court hears an FTCA case without a jury, whether advisory or not.

*208 In an effort to assist federal district courts and practicing attorneys, this Part examines the practical considerations and consequences of using an advisory jury, at times using the Waco/Branch Davidian civil trial [FN103] as an illustrative example. Subpart A discusses the additional time, expense, and procedures required in impaneling and presenting a case to an advisory jury. Subpart B then examines the influence of an advisory jury on the presentations made at trial. Subpart C argues that the use of advisory juries generates systemic costs with regard to citizens' participation as jurors and their perceptions of jury service. Finally, subpart D considers the heightened risks and potential benefits of using advisory juries in high-profile cases.

### A. The Additional Time and Expense of Advisory Juries

Despite their intended use as an aid to district court judges, advisory juries typically present the court with additional challenges that significantly decrease the court's efficiency. For instance, jury trials take significantly longer than bench trials, up to twice as long. [FN104]

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

In part because they are longer, jury trials are also significantly more expensive than bench trials. [FN105] The increased length of jury *209 trials also increases attorneys' fees and expenses for the parties and creates longer delays for other litigants waiting for access to the courts. Although efficiency is only one of many goals in adjudicating disputes in the federal courts, [FN106] the additional time and expense of advisory jury trials on already-crowded court dockets is significant. [FN107]

In contrast to a jury trial, a bench trial can be a remarkably more efficient means of conducting a trial. First, because it does not involve the logistical complications associated with multiple citizen-jurors, a bench trial can be scheduled in and around the court's other business. Once it begins, a judge can recess a bench trial for days, weeks, or more while attending to other pressing court business. [FN108] With a jury trial, in contrast, a court generally must dedicate a continuous block of time for completion of the entire trial [FN109] due to jurors' schedules and concerns about jurors' retention of evidence already presented.

Likewise, in a bench trial a judge can employ several tools to expedite and streamline the presentation of evidence. For example, *210 opening statements and closing arguments are often significantly reduced in time, submitted in written form, or eliminated altogether in a bench trial. With an advisory jury, opening statements and closing arguments are usually necessary to introduce and summarize the evidence for the jurors. Also, the selection of an advisory jury is usually accomplished through voir dire and direct and peremptory challenges, which are not necessary in a bench trial. [FN110]

In civil bench trials, a considerable amount of testimony typically is introduced through deposition transcripts rather than by live testimony, thus saving trial time. With an advisory jury, however, litigants are likely to reevaluate this approach. Because it is customarily thought to be more persuasive to a jury to present witnesses live at trial rather than through written deposition testimony, litigants may choose to call more of their witnesses to testify live, thus extending the length of trials. [FN111]

Due to the perceived importance of preventing an advisory jury from hearing prejudicial hearsay or other improper evidence, the presence of an advisory jury may also increase the number of evidentiary objections by counsel and the resulting need for rulings by the trial judge. [FN112] In contrast, evidentiary rulings in bench trials *211 are usually less frequent and contentious because counsel can assume that the trial judge will consider the proffered evidence only for its appropriate evidentiary value. [FN113]

The presence of a jury--even an advisory one--also requires the parties to submit proposed jury instructions and verdict forms. The judge must then consider these proposals, often after a hearing where counsel argue the merits of competing instructions. In a bench trial, proposed instructions and verdict forms are unnecessary because the court simply decides the case by entering findings of fact and conclusions of law. [FN114] By using an advisory jury, therefore, the court introduces an additional, and often contentious, procedure into what would otherwise be a relatively straightforward bench trial. [FN115]

*212 The Waco/Branch Davidian case provides a concrete example of several of the foregoing considerations. The district court judge assigned to hear the case was already intimately familiar with the complicated facts of the case, having presided over the criminal trial involving the death of four ATF agents as well as several other lawsuits arising from the incidents at Waco. [FN116] Accordingly, both the Davidian plaintiffs and the United States were able to prepare for trial knowing that the judge was already very familiar with the facts of the case. The parties were thus able to focus and streamline their presentation of evidence accordingly.

The district court's decision to impanel an advisory jury, which came three weeks before trial was to begin, changed

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

this assumption. The conversion from a bench trial to a jury trial forced the litigants to consider the use of additional witnesses, evidence, and exhibits to explain the case to the advisory jurors, who, unlike the judge, were relatively unfamiliar with the evidence. [FN117]

Other steps were also necessary. After the panel of prospective jurors was assembled, the judge and the attorneys conducted voir dire and the attorneys made direct and peremptory challenges. Once the advisory jury was selected and impaneled, both parties made opening statements. During the course of the trial, portions of twenty-three depositions were read aloud in open court or played in videotaped format, both of which consumed considerable trial time. [FN118]

**\*213** As the conclusion of the trial approached, the litigants submitted extensive proposed jury instructions, and the court held a hearing outside the presence of the jury to settle on which instructions and verdict forms were to be used. After the parties rested their cases, lawyers for both sides presented lengthy closing arguments to summarize the evidence for the jurors, and the court then read aloud the instructions to the jury. All of these steps, which would have been eliminated or reduced in a bench trial, extended the length of the trial.

Although the Waco/Branch Davidian trial was unusual in certain respects, these preceding inefficiencies are likely present to varying degrees in more typical advisory jury trials. In this time of overloaded court dockets, the conservation and wise expenditure of judicial resources are valid concerns, and courts can ill afford the "waste of the additional time and money which is inherent to a jury trial." [FN119] In fact, several courts have declined to use advisory juries based on the additional time and expense inherent in trying a case to a jury. [FN120] Although these inefficiencies and their related complications may not be dispositive in a court's decision whether to use an advisory jury, they do counsel against the use of advisory juries.

B. The Advisory Jury's Influence on the Presentations Made at Trial

Although an advisory jury may initially appear to be a passive, benign presence in the courtroom because the court, not the jury, makes the ultimate decision regarding the United States' liability under the FTCA, [FN121] any jury--even an advisory one--is a materially **\*214** different audience than a federal district court judge. [FN122] Simply put, lawyers present a different case at trial when an advisory jury is present. [FN123]

In the Waco/Branch Davidian trial, for instance, a lawyer who was involved in prior litigation relating to the 1993 Waco standoff opined that the court's decision to use an advisory jury would require last-minute changes in trial strategy: "Any time you have a case, if you're trying it to a court, you're going to do it a certain way, and if you're trying it to jurors, you have to use [a] different approach." [FN124]

Not all of the differences between a judge-only trial and the use of an advisory jury are benign. One concern in the Waco trial was that the advisory jury would be susceptible to arguments based more on emotion than the evidence. [FN125] For example, one of the government attorneys reportedly recognized the persuasive appeal the case could have for an advisory jury, in large part, "because so many children had died in the fire." [FN126] Even before the trial, a lawyer **\*215** familiar with the proceedings and participants stated that the presence of the advisory jury could help the Davidians' lawyers, because they "will play the violin right from the very beginning" and "will wave the bloody shirts on all the kids." [FN127]

This prediction proved to be accurate. At trial, the lead plaintiffs' attorney focused his opening statement and much of his case on the children who died in the fire, frequently referring to a videotape and a board of photographs displaying their young faces. [FN128] Likewise, "[m]uch of the plaintiffs' closing argument appealed to jurors' emotions," as the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

plaintiffs' attorneys "described sect members as peaceful church people; . . . showed photographs of three babies who died; and . . . read aloud part of the Declaration of Independence." [FN129] It is unlikely that a similar approach would have been used if the trial would have been presented only to the district court judge, who had been described as a "no-nonsense" judge and a "tough jurist with a precise legal mind." [FN130]

Reasonable persons can disagree on whether presentations designed for a judge or those designed for a jury are preferable and what criteria should be used in evaluating them. [FN131] However, because the presence of an advisory jury will alter the presentations made by the litigants at trial, it will change the nature of the proceedings. Therefore, an advisory jury is not an inconsequential presence in the courtroom that does not affect the course of the trial. Instead, it presents a substantive influence on the proceedings that weighs against impaneling an advisory jury.

C. The Systemic Costs of Advisory Juries

Trial by jury in the United States is an important and valued right and responsibility, as illustrated by its inclusion in the Seventh *216 Amendment to the United States Constitution. [FN132] Although the jury system has been sharply criticized on a variety of grounds, [FN133] Americans overwhelmingly support the participation of citizens in deciding cases as jurors. [FN134] As such, our society views citizen involvement on juries as an interest worth preserving. [FN135]

It is thus worthwhile to examine the effect advisory juries may have on the jury system, particularly because an advisory jury is not mandated by the Constitution or by statute, but instead is a discretionary device the court may use in reaching its decision. Little, if any, relevant statistical research or literature exists regarding the impact of advisory juries on the jury system. However, the use of advisory juries raises several concerns, including juror apathy, juror disillusionment, and a decreased appreciation of the importance of jury service.

One concern is that jurors' advisory status might negatively affect their commitment to their fact-finding task. Knowing that their verdict is not binding, some jurors may undervalue their responsibilities and may choose not to pay close attention to the evidence presented at trial. They also may fail to deliberate vigorously, instead quickly reaching any kind of consensus, knowing *217 that the court can and will make the final decision regardless of the jury's verdict.

At least one commentator has recognized the potentially detrimental impact their "advisory" status may have on advisory jurors:

[T]he Federal Tort Claims Act does not permit a jury in an action brought against the government. When such an action is joined with a claim against another defendant to which a jury is available, it may be desirable to request that the jury also sit as an advisory jury as to the claim against the United States so that the jury will not perceive that it is deciding only half the case or that its verdict is not important. [FN136] This concern for jurors' sense of purpose is heightened in the context of a straight FTCA case. In that situation, the advisory jurors are not merely "deciding only half the case," they are essentially deciding none of the case. Presumably, this would even further decrease their perceived sense of importance to the proceeding and ultimate resolution of the case.

Of course, this concern assumes that the jurors realize they are serving only in a non-binding advisory capacity and that the court must make its own independent decision notwithstanding their verdict. [FN137] In some cases, however, the judge may decide not to inform the jurors of their advisory status until after they have returned a verdict. [FN138] Even where the court does inform the jurors of their advisory status, the timing and thoroughness of the explanation may shape the attitudes of the jurors and the diligence of their efforts.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The judge in the Waco/Branch Davidian trial apparently was concerned about this issue. In ordering that a jury be impaneled and in supervising the selection of the jury, the court did not disclose that the jurors would be serving in an advisory capacity. Moreover, *218 the court simultaneously entered a sealed order "clarify[ing] that the jury is being empaneled as an advisory jury" and strictly prohibited the attorneys in the case from making any reference to the jury "as an advisory jury." [FN139] This attempt to suppress the advisory nature of the jury suggests that the court was concerned that the jurors' knowledge of their advisory status would adversely affect the quality of their service.

Finally, there may be a related systemic cost--in terms of the public's perception of jury service--inherent in using advisory jurors. Presumably, it is desirable for citizens to have a positive view of their civic duty to occasionally serve as jurors. Yet many who are called for jury duty view it as a burden to avoid, citing professional or family responsibilities that would hinder or preclude jury service, or simply do not show up at all. [FN140]

The use of advisory juries, as opposed to regular juries, could exacerbate this perception. Advisory jurors may respond negatively when told they are being asked to take time away from their jobs and families to serve as jurors-- sometimes in a protracted trial--but that their verdict is non-binding. [FN141] Alternatively, if the jurors are not informed of their advisory status until after the trial, that late-delivered information may have an adverse impact on their impression of the jury system.

These undesirable byproducts of advisory juries illustrate the social cost of requiring citizens to serve as jurors when the judge is under a statutory obligation not to be unduly influenced by their *219 advisory verdict. [FN142] Likewise, the use of citizens as advisory jurors, as opposed to regular jurors, may have a diluting effect on the public's perception of the importance and desirability of jury service. Considering that an advisory jury is an optional aid not required by the Constitution or any statute, the systemic costs generated by advisory juries counsel against their use in FTCA cases.

D. The Use of Advisory Juries in High-Profile Cases

When the issues in an FTCA case are highly publicized or politicized, an advisory jury may be especially attractive to a federal district court judge. Faced with making the decision on his or her own, the judge may seek to share some of the perceived responsibility for the decision with an advisory jury consisting of members of the community.

However, the decision to use an advisory jury is a roll of the dice by the judge. If the advisory jury returns a verdict consistent with the court's independent judgment, both the judge and the public have arguably benefited from the decision. The judge has been vindicated by the collective judgment of a cross-section of the community. [FN143] The public, in turn, has benefited from participation in the trial through its representative jurors, and a jury verdict in such cases likely will be more acceptable to the public than a decision by a single federal judge. [FN144] Although the law is clear that the federal judge, not the advisory jury, must make the final decision on the United States' liability, an advisory jury verdict admittedly can lend a *220 degree of credibility to the judge's decision in an otherwise controversial case. [FN145]

On the other hand, if the advisory jury's verdict conflicts with the judge's view of the evidence, the judge is in an extremely precarious situation. To agree with a jury verdict that does not reflect his views would be a complete abdication of his statutory obligation to independently decide an FTCA case. The other option--of seemingly reversing an advisory jury verdict-- is equally unappealing. In doing so, the court may create even more controversy about the case than if he or she had just made the decision in the first instance without the assistance of an advisory jury.

In a highly publicized or particularly controversial case, the stakes of this gamble are especially high. The Waco/

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Branch Davidian civil trial provides a compelling illustration because of the intense public interest in the events at Waco, which was fueled in part by extensive governmental investigations, [FN146] the activities of various conspiracy *221 and anti-government groups dedicated to the Davidian cause, [FN147] and the controversial allegations made by the plaintiffs. [FN148] And if the events at Waco were not sufficiently tragic in themselves, they were subsequently viewed in the shadow of the Oklahoma City bombing, which was committed on the second anniversary of the Waco fire in retaliation for what Timothy McVeigh viewed as the injustice at Waco. [FN149]

As the Waco/Branch Davidian trial approached, neither the plaintiffs nor the United States requested an advisory jury. [FN150] Nonetheless, the district court judge assigned to hear the case, "[h]aving considered the importance of the issues involved in this *222 case," ordered that an advisory jury be impaneled to issue a verdict. [FN151] Despite the United States' opposition to the procedure, the court went ahead with the advisory jury as planned. [FN152]

We can only speculate as to the trial judge's motivations for deciding to use an advisory jury. Most obvious was the gravity of the charges made against the government, namely, that the federal government had intentionally or negligently caused the deaths of approximately eighty of its citizens. Moreover, in large part because he had presided over the criminal trial and conviction of several Branch Davidians, the district court judge was viewed by some as being biased against the Branch Davidians, [FN153] who had previously attempted to have the judge recused from the civil case on that basis. [FN154]

Whatever the court's motivations, once the decision was made to impanel an advisory jury, the general sentiment was that the resolution of the case would be more widely accepted because of the jury's participation. [FN155] For example, one commentator noted that "the move [to impanel an advisory jury] distributes the responsibility for the verdict. And should the jury's recommendation go against the Davidians, it would help bury conspiracy theories deeper than would a ruling from a lone federal judge." [FN156] The plaintiffs' attorneys agreed that the participation of an advisory jury would "ensure greater public acceptance of any verdict." [FN157]

*223 After considering four weeks of testimony and evidence, it took the advisory jury less than an hour of deliberation to return a unanimous verdict in favor of the United States on all issues. [FN158] Approximately two months later, the district court judge filed a written opinion absolving the United States of liability and concluding that "[t]he entire tragedy . . . can be laid at the feet of this one individual [David Koresh]." [FN159]

Therefore, the ironic outcome of the Waco/Branch Davidian trial was that the United States, which opposed the judge's use of the advisory jury, actually benefited greatly from its use. The advisory jury verdict arguably had a far greater influence on public opinion than a written decision by a single federal judge. Even the lead plaintiffs' attorney viewed the verdict as being conclusive: "I think the vast majority of the American people will take this [the advisory jury verdict] as the final word." [FN160] In a certain sense, therefore, the advisory jury in the Waco/Branch Davidian trial served a valuable purpose by providing at least the perception of public participation in laying this controversial incident to rest.

However, it is interesting to contemplate the consequences if things would have worked out differently. If the advisory jury verdict had gone against the United States, the judge would have been in an extremely difficult situation. [FN161] A court decision contrary to that of the advisory jury-- notwithstanding the court's statutory obligation *224 to make an independent decision--likely would have been viewed as reversing the judgment of the advisory jury.

It is not difficult to imagine the fallout if the judge would have found it necessary to reject an advisory jury verdict in favor of the Branch Davidians and rule for the United States. Notwithstanding the structural and functional independence of the federal judiciary, a certain segment of the public would have viewed a decision by the trial judge to disregard an

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

advisory jury verdict against the United States as yet another continuation of the alleged federal conspiracy against the Branch Davidians. Rather than providing closure to the Branch Davidian incident, such a decision by the judge likely would have further stoked the fires of the Waco controversy. [FN162]

In sum, the decision by a federal district judge to use an advisory jury in a high-profile FTCA case is fraught with risk. With luck, an advisory jury verdict can lend additional credibility and public acceptance to a judge's decision, as was the fortunate outcome in the Waco/Branch Davidian trial. Without such luck, however, an advisory jury verdict can exacerbate the controversy that induced the judge to impanel a jury in the first instance.

Of course, the risk/benefit analysis must be made by individual judges in individual cases. However, the much wiser course is for courts to honor the FTCA's statutory mandate by deciding even high-profile cases on their own without the assistance of an advisory jury, thus avoiding the potential for inconsistent decisions by judge and jury.

## V. Conclusion

Federal district court judges are understandably drawn to advisory juries. The use of an advisory jury allows a judge to sound out the public's opinion on the case and to share some of the responsibility for deciding the case. And as long as the court explicitly professes to make an independent, final decision as to the United States' liability under the FTCA, the court can argue that it is not violating the FTCA's statutory proscription of jury trials.

*225 The use of an advisory jury does, however, violate the letter and spirit of the FTCA's prohibition of jury trials, which does not contemplate the input of a jury of any kind. An advisory jury likewise requires meaningful outlays of time and resources by the court, the parties, and the jurors themselves. And because of the advisory, non-binding nature of their verdicts, advisory juries may unnecessarily impose undesirable systemic strains on the jury system.

Congress expressly charged federal district courts with the responsibility of deciding FTCA cases without a jury. Notwithstanding the use of a judicial fiction suggesting otherwise, a court cannot use an advisory jury and still remain faithful to the FTCA's statutory proscription of jury trials. Considering the unnecessary costs and complications generated by advisory juries, courts are best served by adhering to the FTCA's text by simply deciding FTCA cases on their own, without the assistance of a jury of any kind.

[FNa1]. Trial Attorney, United States Department of Justice, 1997-2002; Adjunct Professor, George Mason University School of Law. The author was a member of the United States trial team in the Waco/Branch Davidian civil litigation and trial. The opinions expressed in this Article are the author's alone and not those of the United States Department of Justice.

[FN1]. Lee Hancock, Davidian Battle Goes to Court: U.S., Sect Will Offer Accounts of Standoff, Dallas Morning News, June 18, 2000, at 41A; see also Dave Harmon, Seven Years Later, Waco Questions Linger, Austin Am.-Statesman, May 28, 2000, at A1. At least twenty of the Branch Davidians died of gunshot wounds that were self-inflicted or inflicted by other Davidians. See Andrade v. United States, 116 F. Supp. 2d 778, 784 (W.D. Tex. 2000).

[FN2]. Although referred to herein as a single lawsuit, the Waco/Branch Davidian civil litigation began as ten different lawsuits that were subsequently consolidated. See Andrade v. Chojnacki, 65 F. Supp. 2d 431, 447 n.10 (W.D. Tex. 1999).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

[FN3]. See Ross E. Milloy, Jury Finds for U.S. in Deaths at Waco, N.Y. Times, July 15, 2000, at A1 ("The lawsuit itself represent[ed] a six-year legal struggle that ultimately became a highly publicized test of the government's credibility."); Esther M. Bauer, Jury Clears U.S. Agents in Deaths at Waco, Wash. Post, July 15, 2000, at A1 (The "trial was the most thorough exploration to date of the government's controversial actions against the Branch Davidians."); Lee Hancock, No-Nonsense Style Defines Waco Judge, Dallas Morning News, Oct. 25, 1999, at 1A [hereinafter Hancock, No-Nonsense Style] (quoting trial judge as describing the Waco litigation as "unprecedented in subject matter, scope and public attention"); Hancock, supra note 1 (describing interests at stake for both parties in the lawsuit); Mark England, Stakes High in Davidian Proceedings, Waco Trib.-Herald, June 18, 2000, at 1A (also describing interests at stake for both parties in the lawsuit).

[FN4]. 28 U.S.C. §§1346(b), 2671-2680 (1994 & Supp. V 1999).

[FN5]. Specifically, the plaintiffs alleged (1) "[t]hat Alcohol, Tobacco, and Firearms [("ATF")] agents used excessive force in the initial raid to serve search and arrest warrants on Feb. 28, 1993," which resulted in a gunfight in which four agents and approximately six Davidians were killed; (2) that FBI agents used converted tanks beyond the limits of the operations plan approved by the Attorney General; (3) that FBI agents caused or contributed to the fire that destroyed the Davidians' compound on April 19, 1993; and (4) that the FBI failed to have firefighting equipment on hand to fight the fire. See Terry Ganey, Lawsuit by Branch Davidians Comes to Trial, St. Louis Post-Dispatch, June 18, 2000, at A1. The plaintiffs also alleged that FBI agents fired on the compound before and during the fire. The court later considered and dismissed this claim. See Andrade, 116 F. Supp. 2d at 783.

[FN6]. See Andrade, 116 F. Supp. 2d at 785 n.2 (concluding that "[t]he entire tragedy... can be laid at the feet of this one individual [David Koresh]"). The advisory jury verdict in favor of the United States that preceded the district court's written ruling was named one of the "top defense wins of 2000" by the National Law Journal. See Margaret Cronin Fisk, The Best Defense, Nat'l L.J., Mar. 19, 2001, at A1.

[FN7]. 28 U.S.C. §2402 (1994 & Supp. V 1999) (providing that suits brought pursuant to the FTCA "shall be tried by the court without a jury").

[FN8]. Andrade v. United States, Civ. No. W-96-CA-139 (and consolidated actions), Docket No. 643, at 2 (W.D. Tex. May 26, 2000) (order to impanel advisory jury); Lee Hancock, Jury to Decide Suit on Branch Davidian Deaths, Dallas Morning News, May 27, 2000, at 31A; Ganey, supra note 5; see also Paul Duggan, More Upset Than Interested, Waco Awaits Replay in Court: As Branch Davidian Case Nears Trial, City Distances Itself, Wash. Post, June 9, 2000, at A3 (stating that the judge "surprised attorneys on both sides recently when he announced he would impanel a jury to hear the lawsuit").

[FN9]. 28 U.S.C. §2402 (1994).

[FN10]. See, e.g., Hamm v. Nasatka Barriers Inc., 166 F.R.D. 1, 3 (D.D.C. 1996); Birnbaum v. United States, 436 F. Supp. 967, 988 (E.D.N.Y. 1977), aff'd as modified, 588 F.2d 319 (2d Cir. 1978).

[FN11]. See Fed. R. Civ. P. 39(c) ("In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury....").

[FN12]. See Hamm, 166 F.R.D. at 3 ("An advisory verdict has no force, other than persuasive, on the court, which remains the sole and final decision-maker.").

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN13]. This figure was obtained through multiple searches of electronic databases and supplemented by cross-referencing other published materials, such as cases, articles, and treatises. The obvious and inherent limitation of such a figure is that it omits advisory jury cases that do not generate published opinions. Likewise, even in cases that result in published opinions, the advisory jury issue may have been insufficiently significant or contested by the parties to warrant mention in the written opinion. Rather, in such cases, the court may have resolved the advisory jury issue through a pretrial ruling not subsequently incorporated into the final opinion on the merits. Such a scenario occurred in the Waco/ Branch Davidian litigation.

That advisory juries have been used in significantly more cases than those resulting in published opinions has been confirmed by conversations between the author and other Department of Justice attorneys who have tried FTCA advisory jury cases that did not result in published opinions. Given these limitations, the extent of the use of advisory juries may be a fertile subject for further survey and statistical research.

[FN14]. 9 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure §2335, at 210 (2d ed. 1994).

[FN15]. United States v. Muniz, 374 U.S. 150, 163 (1963) (involving prisoners' FTCA actions based on negligence of government employees).

[FN16]. SeeJeffrey Axelrad, The Federal Tort Claims Act: Taking Uncle Sam to Court, The Brief, Winter 1993, at 19.

[FN17]. See Lehman v. Nakshian, 453 U.S. 156, 160 (1981); FDIC v. Meyer, 510 U.S. 471, 475 (1994).

[FN18]. See Lehman, 453 U.S. at 160 (discussing the waiver of sovereign immunity found in the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621-634 (1976 & Supp. III)); Meyer, 510 U.S. at 475 (discussing the Federal Savings and Loan Insurance Corporation's statutory waiver of sovereign immunity).

[FN19]. As indicated in Glasspool v. United States, 190 F. Supp. 804, 805 n.2 (D. Del. 1961), the first private act of Congress in payment of a tort claim against the United States was the Act of April 13, 1792, 6 Stat. 8.

[FN20]. See 1 Lester S. Jayson & Robert C. Longstreth, Handling Federal Tort Claims: Administrative and Judicial Remedies §2.02, at 2-6 (2001). In fact, as early as 1832, John Quincy Adams complained that private matters of this sort were consuming an inordinate amount of Congress's time and that Congress was ill-suited for handling such private claims. Id. (citing Hearings on H.R. 5373 and H.R. 6463 Before the House Comm. on the Judiciary, 77th Cong. 49 (1942)); see also id. §2.08, at 2-48 to 2-49 ("So great was the volume of private relief measures introduced in Congress to provide damages to these claimants that it was said to be a physical impossibility for the Committees on Claims to examine the merits of each."); id. §2.08, at 2-49 n.8 (quoting 67 Cong. Rec. 4756 (1926) (statement of Sen. Means)) ("It is a physical impossibility for us to give the consideration which Senators here are all requesting every day to numerous bills embodying small claims; we cannot do it, and there ought to be some means to provide for such matters."); H.R. Rep. No. 667, 69th Cong., 1st Sess. (1926), at 1; 74 Cong. Rec. 6868 (1931); 75 Cong. Rec. 13,824 (1932) (statement of Sen. Howell); 86 Cong. Rec. 12,018 (1940) (statement of Rep. Celler) (all discussing overwhelming number of bills involving small private claims and the need for a solution); 92 Cong. Rec. 10,049 (1946) (statement of Rep. Dirksen) (describing the burden on Congress of considering private bills for relief); 92 Cong. Rec. 10,092 (1946) (statement of Rep. Scrivner) ("[A]lmost half the bills introduced in this House are private bills.").

[FN21]. See1 Jayson & Longstreth, supra note 20, §§2.07, 2.09-.10 (chronicling prior legislative efforts to enact general tort claims act); 92 Cong. Rec. 10,049 (1946) (statement of Rep. Dirksen) (describing previous efforts to enact tort claims act).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

Page 18

[FN22]. See 1 Jayson & Longstreth, supra note 20, §§2.07-.10; Comment, The Federal Tort Claims Act, 56 Yale L.J. 534, 535 & n.10 (1947) (documenting previous legislative attempts to enact general tort claims law).

[FN23]. See1 Jayson & Longstreth, supra note 20, §2.01, at 2-3.

[FN24]. See id. §2.10, at 2-66; Legislative Reorganization Act of 1946, Pub. L. No. 79-601, 60 Stat. 812, 842 (1946).

[FN25]. See Axelrad, supra note 16, at 19; 1 Jayson & Longstreth, supra note 20, §3.01, at 3-3; Glasspool v. United States, 190 F. Supp. 804, 805 (D. Del. 1961) (citing as bases for passage of the FTCA "the justice of the right to make a claim against the Government for injuries caused by the negligence of a Governmental agent" and "the onerous and unsatisfactory action of Congress by private bills for relief").

[FN26]. Justice Holmes once explained the concept of sovereign immunity as follows:
  Some doubts have been expressed as to the source of the immunity of a sovereign power from suit without its own permission, but the answer has been public property since before the days of Hobbes. A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.
Kawananakoa v. Polyblank, 205 U.S. 349, 353 (1907) (internal citation omitted).

[FN27]. 28 U.S.C. §§1346(b), 2671-2680 (1994 & Supp. V 1999) (giving district courts exclusive jurisdiction over certain suits against the United States if a private person would be liable under "the law of the place where the act or omission occurred"); United States v. Orleans, 425 U.S. 807, 813 (1976). The constitutional basis for enacting the FTCA is found in Article I, Section 8 of the United States Constitution, which gives Congress the authority "to pay the debts... of the United States." See 1 Jayson & Longstreth, supra note 20, §2.14, at 2-78 (citing United States v. Sherwood, 312 U.S. 584, 587 (1941); Williams v. United States, 289 U.S. 553, 569, 579-81 (1933); Ex parte Bakelite Corp., 279 U.S. 438, 452 (1929)).

[FN28]. See, e.g., Bueno v. United States, 64 F. Supp. 2d 627 (W.D. Tex. 1999) (involving the alleged failure of army and air force physicians to diagnose decedent's heart condition).

[FN29]. See, e.g., Whalen v. United States, 29 F. Supp. 2d 1093 (D.S.D. 1998) (involving the alleged failure of the National Park Service to prevent teenager from falling from cliff to his death at Badlands National Park).

[FN30]. See, e.g., Torres-Dueno v. United States, 165 F. Supp. 2d 71 (D.P.R. 2001) (involving allegations of malicious prosecution and excessive display of force in arrest based on United States Attorney's unsuccessful conspiracy prosecu- tion).

[FN31]. See28 U.S.C. §2675.

[FN32]. See id. §2680(a). This exception, which is known as the "discretionary function exception" to the FTCA, precludes the imposition of liability against the United States for any claim that is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused." Id.

[FN33]. See id. §2680(h). This limitation is further subject to an "exception to the exception," commonly known as the "law enforcement proviso," which allows suits for certain torts when committed by federal "investigative or law enforcement officers." Id.

[FN34]. See id. §2680(k).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN35]. See id. §2674.

[FN36]. See Lehman v. Nakshian, 453 U.S. 156, 160 (1981) ("[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'") (quoting United States v. Testan, 424 U.S. 392, 399 (1976) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941))).

[FN37]. 28 U.S.C. §2402 (1994 & Supp. V 1999) specifically provides that "any action against the United States under [the FTCA] shall be tried by the court without a jury."

[FN38]. See, e.g., Lehman, 453 U.S. at 161 (citing 28 U.S.C. §2402) (stating that "in tort actions against the United States,... trials shall be to the court without a jury").

[FN39]. Id. at 160.

[FN40]. Id. at 162 n.9; see also Comment, supra note 22, at 554 n.128 (explaining that the constitutionality of the FTCA's proscription of jury trials "is not open to question, for, having the power to retain complete immunity, the Government is free to relax it on terms"). But see Roger W. Kirst, Jury Trial and the Federal Tort Claims Act: Time to Recognize the Seventh Amendment Right, 58 Tex. L. Rev. 549 (1980) (arguing that the Seventh Amendment guarantees a right to a jury trial in FTCA actions against the United States).

[FN41]. Lehman, 453 U.S. at 162 n.9. In Glasspool v. United States, 190 F. Supp. 804 (D. Del. 1961), the District of Delaware pointed out that
[j]urisdiction of a District Court as to tort claims against the United States did not exist prior to the passage of the Federal Tort Claims Act. Under that Act the jurisdiction is limited to a trial by the Court without a jury. The District Court has no authority or jurisdiction to empanel a jury for such causes.
Id.at 806.

[FN42]. See 28 U.S.C. §2402; Lehman, 453 U.S. at 161 (citing 28 U.S.C. §2402) (internal citations omitted) ("[I]n tort actions against the United States,... trials shall be to the court without a jury."); Glasspool, 190 F. Supp. at 807 ("The Federal Tort Claims Act... not only does not provide for a jury trial but absolutely forbids it.").

[FN43]. See 9 Wright & Miller, supra note 14, §2335; see also 8 James Wm. Moore et al., Moore's Federal Practice P 39.40[1] (3d ed. 1997) ("The court, on motion or on its own initiative, may try any issue with an advisory jury. The power of a court to summon a jury to act in an advisory capacity is traceable to the Chancery Court. The chancellor in equity had the power to use an advisory jury to assist in deciding cases. This authority is now incorporated into Rule 39(c)."). The lineage of the advisory jury actually extends as far back as the fourteenth-century reign of Edward III. See Richard E. Guggenheim, A Note on the Advisory Jury in Federal Courts, 8 Fed. B. Ass'n J. 200, 200 (1947). At that time, a court of equity "'could not summon a jury, but issues of fact in these proceedings were sent for trial before the King's Bench', for the purpose of enlightening the conscience of the chancellor." Id. (quoting J. Pomeroy's Equity Jurisprudence §32 (4th ed. 1918)); see also Note, Practice and Potential of the Advisory Jury, 100 Harv. L. Rev. 1363, 1364 (1987).

[FN44]. Kohn v. McNulta, 147 U.S. 238, 240 (1893) ("But such verdict is not binding upon the judgment of the court. It is advisory simply, and the court may disregard it entirely, or adopt it either partially or in toto.") (citations omitted).

[FN45]. Fed. R. Civ. P. 39 advisory committee's note. But see 9Wright & Miller, supra note 14, §2331 (dating Rule 39's adoption as 1938).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN46]. Fed. R. Civ. P. 39(c).

[FN47]. As explained previously in note 13 supra, this figure undoubtedly understates the number of FTCA cases in which advisory juries have been used.

[FN48]. See2 Jayson & Longstreth, supra note 20, §16.08[2], at 16-55 (noting that the authorities on advisory juries "are relatively few and somewhat in conflict, but most take the view that an advisory jury is not improper").

[FN49]. See, e.g., Honeycutt v. United States, 19 F.R.D. 229, 230-31 (W.D. La. 1956) (holding that "Congress made this [bench-trial] provision mandatory, not permissive, and intended that no jury of any kind be used in [FTCA] cases").

[FN50]. See Vincoy v. United States, No. CIV. 97-296JC/LFGACE, 1998 WL 1668877, at *3 (D.N.M. Dec. 28, 1998) (declining use of advisory jury because it "does not lessen [the] responsibility for deciding the Federal Tort Claims Act issues"); In re Air Crash Disaster, 619 F. Supp. 13, 17 (E.D. Mich. 1984) (declining to exercise discretion to use an advisory jury because "the use of advisory juries in F.T.C.A. cases creates more problems than it solves"); Texasgulf Inc. v. Colt Elecs. Co., 615 F. Supp. 648, 659 (S.D.N.Y. 1984) (rejecting requested use of advisory jury because if it agrees with the court, its opinion "is of little use," and if it disagrees with the court, "it would be impossible to give effect to it"); Latz v. Gallagher, 562 F. Supp. 690, 693 (W.D. Mich. 1983) (finding an advisory jury unwarranted based upon a strict construction of the particular federal statutes at issue); Wright v. United States, 80 F.R.D. 478, 479-80 (D. Mont. 1978) (exercising discretion not to impanel advisory jury because "if the verdict were consistent with [the judge's] views, it would be of no assistance, and were it contrary, [the judge] would not know what effect to give it").

[FN51]. See, e.g., Coffland v. United States, 57 F.R.D. 209, 210 (N.D.W. Va. 1972); Poston v. United States, 262 F. Supp. 22, 23-24 (D. Haw. 1966), aff'd on other grounds, 396 F.2d 103 (9th Cir. 1968); see also Lerdahl v. Magill, Nos. Civ. A. 90-2306-L, 90-2307-L, 1992 WL 40694, at *1 (D. Kan. Feb. 25, 1992) ("The Court has power to utilize such an advisory jury in Federal Tort Claims Act cases and exercises its discretion to do so pursuant to Fed.R.Civ.P. 39(c).").

[FN52]. See, e.g., Presley v. U.S. Postal Service, 317 F.3d 167 (2d Cir. 2003); Newmann v. United States, 938 F.2d 1258, 1259 (11th Cir. 1991); Allgeier v. United States, 909 F.2d 869, 875 (6th Cir. 1990); Wooten v. United States, 825 F.2d 1039, 1043 (6th Cir. 1987); Serra v. Pichardo, 786 F.2d 237, 239 (6th Cir. 1986); In re N-500L Cases, 691 F.2d 15, 18 n.3 (1st Cir. 1982); Stratis v. E. Air Lines, Inc., 682 F.2d 406, 408 (2d Cir. 1982); Black v. United States, 421 F.2d 255, 256 (10th Cir. 1970); Am. Airlines, Inc. v. United States, 418 F.2d 180, 183 (5th Cir. 1969); Garcia v. United States, 896 F. Supp. 467, 475 n.9 (E.D. Pa. 1995); Palischak v. Allied Signal Aerospace Co., 893 F. Supp. 341, 352 (D.N.J. 1995); Robinson v. Alaska Prop. & Inv., Inc., 878 F. Supp. 1318, 1323 (D. Alaska 1995); Santa Fe Pac. Realty Corp. v. United States, 780 F. Supp. 687, 697 (E.D. Cal. 1991); Allen v. United States, 588 F. Supp. 247, 258 n.2 (D. Utah 1984), rev'd on other grounds, 816 F.2d 1417 (10th Cir. 1987); In re "Agent Orange" Prod. Liab. Litig., 580 F. Supp. 1242, 1256 (E.D.N.Y. 1984); Georges v. Hennessey, 545 F. Supp. 1264, 1265 (E.D.N.Y. 1982); Picariello v. Fenton, 491 F. Supp. 1026, 1027 (M.D. Pa. 1980); Lentz v. Freeman Assocs. Caribbean, Inc., 441 F. Supp. 892, 896 (D.V.I. 1977); Allegheny Airlines, Inc. v. United States, 420 F. Supp. 1339, 1341 (S.D. Ind. 1976); Moloney v. United States, 354 F. Supp. 480, 481 (S.D.N.Y. 1972); Moyer v. United States, 306 F. Supp. 390, 391, 397 (S.D. Fla. 1969); Moyer v. United States, 302 F. Supp. 1235, 1236 (S.D. Fla. 1969), rev'd on other grounds, 481 F.2d 585 (5th Cir. 1973); Schetter v. Hous. Auth. of Erie, 132 F. Supp. 149, 154 (W.D. Pa. 1955); see also Cox v. United States, 815 F.2d 76 (Table, 1987 WL 36441, at *3) (6th Cir. Feb. 24, 1987); Stingley v. Raskey, No. A95-0242 CV (HRH), 1995 WL 696591, at *7 (D. Alaska Nov. 20, 1995).

[FN53]. Wright v. United States, 80 F.R.D. 478, 480 (D. Mont. 1978); see also Honeycutt v. United States, 19 F.R.D. 229, 231 (W.D. La. 1956) (concluding that impaneling an advisory jury "would be abdicating to a large degree the re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

sponsibility placed upon [the court] by Congress when it passed the Act").

[FN54]. 28 U.S.C. §2402 (1994 & Supp. V 1999).

[FN55]. See, e.g., Hamm v. Nasatka Barriers Inc., 166 F.R.D. 1, 2 (D.D.C. 1996). The court in Hamm found that an advisory jury would be "both helpful and appropriate," pointing out that "[i]t is wholly within the Court's discretion whether to accept or reject, in whole or in part, the verdicts of the advisory jury as they relate to the government, and '[t]he responsibility for the ultimate decision never shifts from the shoulders of the judge.'" Id. at 3 (quoting Poston, 262 F. Supp. at 24).

[FN56]. 28 U.S.C. §2402.

[FN57]. See, e.g., Lehman v. Nakshian, 453 U.S. 156, 161 (1981) ("[I]n tort actions against the United States,... trials shall be to the court without a jury.") (citing 28 U.S.C. §2402); Glasspool v. United States, 190 F. Supp. 804, 807 (D. Del. 1961) ("The Federal Tort Claims Act... not only does not provide for a jury trial but absolutely forbids it.").

[FN58]. Fed. R. Civ. P. 39(c) ("In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury....").

[FN59]. See, e.g., Hamm, 166 F.R.D. at 2-3.

[FN60]. 28 U.S.C. §2072(b) (1994) (providing that the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right"); Glasspool, 190 F. Supp. at 807 (stating that under the FTCA, the "jurisdiction is limited to a trial by the Court without a jury").

[FN61]. See infra note 87 and accompanying text.

[FN62]. Fed. R. Civ. P. 82.

[FN63]. Hamm, 166 F.R.D. at 3; see also Poston v. United States, 262 F. Supp. 22, 24 (D. Haw. 1966) ("[T]he responsibility for the ultimate decision as to liability of the United States never shifts from the shoulders of the judge, just as though the advice of the jury were not sought."), aff'd on other grounds, 396 F.2d 103 (9th Cir. 1968) (citing (Am.) Lumbermens Mut. Cas. Co. of Ill. v. Timms & Howard, Inc., 108 F.2d 497 (2d Cir. 1939)); Lee Hancock, Davidians' Attorney Vents Anger at Judge: Appeal Now Planned in Wrongful Death Suit, Dallas Morning News, Sept. 13, 2000, at 25A (quoting Waco district court judge who cautioned attorneys that "if you don't think I've got the guts to disregard this jury verdict, you're wrong").

[FN64]. Hamm, 166 F.R.D. at 3.

[FN65]. 619 F. Supp. 13 (E.D. Mich. 1984).

[FN66]. See id. at 14-15.

[FN67]. See id. at 16-17.

[FN68]. Id. at 17; see also Texasgulf Inc. v. Colt Elecs. Co., 615 F. Supp. 648, 659-60 (S.D.N.Y. 1984) (rejecting requested use of advisory jury).

[FN69]. 80 F.R.D. 478, 479 (D. Mont. 1978).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN70]. Id. at 479-80. The court also reiterated that the "responsibility for decisions under the Federal Tort Claims Act rests upon the court" and expressed the view that "calling an advisory jury in a Federal Tort Claims case creates more problems than it solves." Id. at 480.

[FN71]. Gragg v. City of Omaha, 812 F. Supp. 991 (D. Neb. 1993), is a case where the court chose to use an advisory jury and then disregarded that jury's verdict. Id. at 993. In Gragg, which involved a wrongful-death suit against an off-duty police officer, only the first of the plaintiffs' two theories of recovery was entitled to be heard by a jury. Id. at 991-92. The court nevertheless used the jury in an advisory capacity on the second issue, which was to be decided by the court. Id. at 992. Although the jury returned a verdict in favor of the plaintiffs on the second issue, the court recognized its duty to make an independent decision on the merits: "While I believe a reasonable jury could reach the same conclusion this jury came to in finding [the defendant] negligent, as the fact finder I disagree with the jury's verdict, and, accordingly, I find in favor of the defendants." Id. at 993. The independence demonstrated by the court is commendable; however, it begs the question of why the court initially elected to use an advisory jury when it knew it would have to disregard the advisory jury's verdict.

[FN72]. Hamm v. Nasatka Barriers Inc., 166 F.R.D. 1, 3 (D.D.C. 1996).

[FN73]. SeeBirnbaum v. United States, 436 F. Supp. 967, 988 (E.D.N.Y. 1977) ("The verdict of such an advisory panel is only part of the data taken into consideration in arriving at the court's independent conclusion."), aff'd as modified, 588 F.2d 319 (2d Cir. 1978); Hamm, 166 F.R.D. at 3 ("[A]n advisory verdict might well be a useful additional source of information for the Court.").

[FN74]. See 5 John Henry Wigmore, Evidence in Trials at Common Law §1367, at 32 (James H. Chadbourn ed., rev. ed. 1974) (describing cross-examination as "the greatest legal engine ever invented for the discovery of truth"). When a court considers an advisory jury verdict as a piece of evidence, the government has been precluded from testing whether it is founded on a valid basis or whether it is the product of prejudice, misunderstanding, or even means as arbitrary as the flip of a coin. See Lawrence M. Friedman, Some Notes on the Civil Jury in Historical Perspective, 48 DePaul L. Rev. 201, 209 (1998) (stating that although juries are "not supposed to toss a coin or decide cases on the basis of prejudice or sympathy, there is absolutely nothing to prevent the jury from doing any or all of these things").

[FN75]. Hamm, 166 F.R.D. at 3. The district court judge in the Waco trial expressed similar sentiments. See Lee Hancock, Jurors Side with U.S. in Waco Siege, Dallas Morning News, July 15, 2000, at 1A (quoting judge as saying "A jury makes a decision. The jury advises the court. I can take its advice or I can reject it. I consider their verdict to the extent that I want to."); Milloy, supra note 3 (quoting district court judge as reminding lawyers involved that "It's important for everyone to understand that [the advisory jury's] decision is in no way binding. I intend to consider the advice of the jury, but by law I cannot be bound by it.").

[FN76]. See, e.g., Michelle Mittelstadt, Jury's Findings Reverberate Across Capital, Country, Dallas Morning News, July 15, 2000, at 21A ("While the jurors' recommendation isn't binding, the judge is expected to take it into account in crafting his verdict.").

[FN77]. Birnbaum, 436 F. Supp. at 988.

[FN78]. Hamm, 166 F.R.D. at 3; see also id. ("[A]n advisory verdict might well be a useful additional source of information for the Court.").

[FN79]. 2 Jayson & Longstreth, supra note 20, §16.08[2], at 12-56 to 12-58.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN80]. Wright v. United States, 80 F.R.D. 478 (D. Mont. 1978).

[FN81]. Id. at 480 (footnote omitted).

[FN82]. Posing these concerns in no way suggests that courts are insincere when expressing their decision-making inde-pendence and willingness to disregard an advisory jury verdict that conflicts with their own view of the case. For in-stance, in the known FTCA cases in which an advisory jury was actually used, judges have sometimes altered or reversed the advisory jury verdict. See, e.g., Newmann v. United States, 938 F.2d 1258, 1259 (11th Cir. 1991) (noting that "[a]n advisory jury returned a verdict for the United States, but the trial court rejected that verdict"); Gallardo v. United States, 697 F. Supp. 1243, 1245 (E.D.N.Y. 1988) (rejecting advisory jury verdict in favor of the United States); Moloney v. United States, 354 F. Supp. 480, 483 (S.D.N.Y. 1972) (agreeing with advisory jury's finding of defendant negligence but nevertheless holding that contributory negligence barred plaintiff's recovery); Moyer v. United States, 306 F. Supp. 390, 397 (S.D. Fla. 1969).

   However, a court's natural inclination to conform its judgment to that of a jury is evident in Moyer, where the district court noted that its decision in favor of the United States "may be regrettable because it not only goes contrary to the findings of [an advisory] jury (which, however, I feel was largely the result of sympathy) but, also, deprives plaintiff and her children of a substantial recovery." 306 F. Supp. at 397.

[FN83]. Tommy Witherspoon, Jury: Feds Not Liable, Waco Trib.-Herald, July 15, 2000, at 1A. Other commentators sim-ilarly expressed confidence that the judge would follow the advisory jury's verdict. See Ganey, supra note 5 (stating that "[t]he jury will consider whether the government is liable for damages; [the judge] could overrule its findings but prob-ably won't be inclined to do so"); William H. Freivogel, Advisory Jury Rejects Davidians' Wrongful Death Lawsuit, St. Louis Post-Dispatch, July 15, 2000, at 15 (stating that "both sides expect [the judge] to agree with the jury"); Milloy, supra note 3 (noting that "[l]awyers involved in the case today said they could not recall an instance in which a judge overruled a jury's advisory finding").

[FN84]. Note, supra note 43, at 1365. It is interesting to note that a study evaluating decision making by judges and juries in 4000 civil trials determined that the judge and jury would have come to the same conclusion on liability seventy-eight percent of the time, and would have come to different conclusions twenty-two percent of the time. See Harry Kalven, Jr. & Hans Zeisel, The American Jury 63-64 (1966); Harry Kalven, Jr., The Dignity of the Civil Jury, 50 Va. L. Rev. 1055, 1065 (1964) (reporting the rate of judge/jury agreement as seventy-nine percent in personal injury cases); see also Valer-ie P. Hans & Neil Vidmar, Judging the Jury 117 (1986). Even in cases where both the judge and the jury would have found for the plaintiffs, the study revealed that the jury awards were, on average, twenty percent higher than those of the judge. See Kalven, supra, at 1065.

[FN85]. Andrade v. United States, 116 F. Supp. 2d 778 (W.D. Tex. 2000).

[FN86]. Honeycutt v. United States, 19 F.R.D. 229, 231 (W.D. La. 1956).

[FN87]. Lehman v. Nakshian, 453 U.S. 156, 161 (1981) (quoting Soriano v. United States, 352 U.S. 270, 276 (1957)); see Koehler v. United States, 153 F.3d 263, 265 (5th Cir. 1998) ("[N]o suit may be maintained against the United States unless the suit is brought in exact compliance with the terms of a statute under which the sovereign has consented to be sued.").

   Significantly, the prohibition of jury trials in FTCA cases is a jurisdictional limitation; indeed, Congress in-cluded this limitation in the section that defined the FTCA's jurisdictional grant. Legislative Reorganization Act of 1946, ch. 753, 60 Stat. 812, 843-44 (1946) ("Subject to the provisions of this title, the United States district court for the dis-trict wherein the plaintiff is resident or wherein the act or omission occurred,... sitting without a jury, shall have exclus-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ive jurisdiction to hear, determine, and render judgment on any claim against the United States."). As originally codified, the FTCA (which was Title IV of the Legislative Reorganization Act) appeared at 28 U.S.C. §§921-946. The 1948 code revision resulted in the separation and scattering of the FTCA's provisions among different parts of the judicial code. See 1 Jayson & Longstreth, supra note 20, § 2.13, at 2-72 to 2-73. This recodification of the FTCA, however, effected no substantive change in the law. SeeFinley v. United States, 490 U.S. 545, 554 (1989).

[FN88]. SeeSmith v. United States, 507 U.S. 197, 203 (1993) (quoting United States v. Kubrick, 444 U.S. 111, 117-18 (1979)) (Courts "should not take it upon [themselves] to extend the waiver [of sovereign immunity] beyond that which Congress intended... [nor] should [courts] assume the authority to narrow the waiver that Congress intended.").

[FN89]. H.R. Rep. No. 69-667, at 3 (1926), quoted in 1 Jayson & Longstreth, supra note 20, §2.08, at 2-50.

[FN90]. See, e.g., supra notes 31-38 and accompanying text.

[FN91]. 28 U.S.C. § 2402 (1994 & Supp. V 1999) (providing that "any action against the United States under [the FTCA] shall be tried by the court without a jury").

[FN92]. Indeed, in certain cases, such as when the plaintiff or his theory of recovery is politically or socially unpopular, it might be preferable for the United States as a litigant to have its liability determined by a jury, rather than the court. However, Congress expressly chose the uniform standard of having the United States' liability under the FTCA determined by federal judges, rather than juries, regardless of whether a judge or jury would benefit the United States or a plaintiff in a particular case.

[FN93]. Members of Congress who opposed general tort legislation "feared that the Government would be made the victim of ambulance chasing, exaggerated or fraudulent claims, and emotionalism in verdicts." 1 Jayson & Longstreth, supra note 20, § 2.08, at 2-51; see also id. ("If you throw down the bars [precluding tort suits against the government] you might make the sovereign, which in this country is the people, liable not only for hundreds of millions but billions of dollars, which might threaten the life of the sovereign and the very existence of the Government.") (quoting 69 Cong. Rec. 2191 (1928) (statement of Rep. Ramseyer)).

[FN94]. 92 Cong. Rec. 10,092 (1946) (statement of Rep. Scrivner); see also S. Rep. No. 79-1400, at 32 (1946) ("The trial will be without a jury as is now the case in suits under the Tucker Act."). Also, in assessing the newly enacted Federal Tort Claims Act the same year of its passage in 1946, a commentator noted that "one reason, probably the most cogent, for not permitting juries in suits under [Acts allowing suit against the government], was to prevent the United States from being overtaxed and mulcted by the sentiment of a jury which might give exorbitant verdicts far beyond the claimant's just dessert." Irvin M. Gottlieb, The Federal Tort Claims Act--A Statutory Interpretation, 35 Geo. L.J. 1, 17-18 n.53 (1946) (citing Hearings Before Subcomm. No. 1 of the House Comm. on the Judiciary, 76th Cong. 20 (1940); 92 Cong. Rec. 10,143 (1946)).
     The concern that jurors might not be overly sympathetic to the plight of the federal government was present in the Waco/Branch Davidian litigation. For example, one of the United States' trial attorneys noted that facing an advisory jury was a daunting task because of "the large amount of negative publicity the government had received over the years" relating to the events at Waco and "because so many children had died in the fire." Fisk, supra note 6.

[FN95]. Pub. L. No. 83-559, 68 Stat. 589, 674 (codified as amended at 28 U.S.C. §§346(a), 2402 (1994 & Supp. V 1999)). In making this exception, it was recognized that it would be "the first time jury trials would be permitted in suits against the Government." 1954 U.S.C.C.A.N. 2716, 2718.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN96]. 1954 U.S.C.C.A.N. 2716, 2718.

[FN97]. 453 U.S. 156 (1981).

[FN98]. Id. at 161.

[FN99]. Id. at 161 n.8.

[FN100]. Id. (quoting H.R. Rep. No. 83-659, at 3 (1953)); see also Matthews v. CTI Container Transp. Int'l, Inc., 871 F.2d 270, 279 (2d Cir. 1989) (noting that "suits against the United States, 'are sui generis,' and while they are allowed by statute in some instances, e.g. under the... Federal Tort Claims Act,... the sovereign... is not subjected to the 'great vicissitudes of jury trial'") (quoting Ruggiero v. Compania Peruana De Vapores, 639 F.2d 872, 881 (2d Cir. 1981)); Ruggiero, 639 F.2d at 880 ("Surely one reason why the United States has coupled its waiver of sovereign immunity in certain types of cases with a refusal to submit itself to jury trial was the fear that juries might draw too heavily on a deep pocket.").

[FN101]. See, e.g., supra notes 28-29.

[FN102]. Wright v. United States, 80 F.R.D. 478, 480 (D. Mont. 1978).

[FN103]. SeeAndrade v. United States, 116 F. Supp. 2d 778 (W.D. Tex. 2000).

[FN104]. See Kalven, supra note 84, at 1059-60 & n.12 (estimating that jury trials are one-and-a-half times as long as bench trials); Richard A. Posner, An Economic Approach to the Law of Evidence, 51 Stan. L. Rev. 1477, 1491 (1999) (citing Richard A. Posner, The Federal Courts: Challenge and Reform 193 n.1 (1996)) (suggesting that in federal courts, "civil jury trials are on average more than twice as long as civil bench (that is, judge) trials"); see also Peter W. Culley, In Defense of Civil Juries, 35 Me. L. Rev. 17, 26-27 (1983) ("No one would seriously dispute that a jury trial can be time-consuming when compared to a bench trial" and that trial by jury has been advocated "in spite of its being a relatively expensive and time-consuming method of dispute resolution."); Patrick E. Longan, The Case for Jury Fees in Federal Civil Litigation, 74 Or. L. Rev. 909, 930 (1995) (noting that "jury trials inherently take longer than nonjury trials").

    As early as 1946, a congressman debating the passage of the FTCA argued that "[t]here are advantages in trial before the court without a jury, namely, that the cases can be much more expeditiously handled than they can in the case of a jury trial." 92 Cong. Rec. 10,092 (1946) (statement of Rep. Scrivner); see also William H. Levit et al., Expediting Voir Dire: An Empirical Study, 44 S. Cal. L. Rev. 916, 920 (1971) ("Jury trials are lengthier and more expensive than court trials.").

[FN105]. See Developments in the Law: The Civil Jury, 110 Harv. L. Rev. 1408, 1424 (1997) ("The claim that jury trials are more expensive than bench trials is perhaps the only truism in the debates surrounding the civil jury."); James S. Kakalik & Abby Eisenshtat Robyn, Costs of the Civil Justice System: Court Expenditures for Processing Tort Cases xviii, xix (RAND Institute for Civil Justice 1982) (quantifying higher government expenditures for jury trials than for non-jury bench trials).

    Jury trials generate costs relating to juror fees, meals, transportation, security, and court personnel to administer and supervise jury panels. Jurors and their employers also bear significant costs, considering the modest $40 daily juror attendance fee, 28 U.S.C. §1871(b)(1) (1994), and employers' loss of work while their employees are serving as jurors. See Longan, supra note 104, at 928-29; William R. Pabst, Jr. & G. Thomas Munsterman, The Economic Hardship of Jury Duty, 58 Judicature 494, 496-98 (1975) (describing economic costs to employees and employers of jury service). Beyond monetary costs, jurors' personal lives are often disrupted by their service. Longan, supra note 104, at 929; Pabst & Munsterman, supra, at 496; Developments in the Law, supra, at 1425.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN106]. For example, Federal Rule of Civil Procedure 1 states that the federal rules should be "construed and administered to secure the just, speedy, and inexpensive determination of every action."

[FN107]. See O'Donnell v. Watson Bros. Transp. Co., 183 F. Supp. 577, 581 (N.D. Ill. 1960) (warning that "[c]ourt congestion is a critical problem which strikes at the heart of the administration of justice"); Note, supra note 43, at 1368-69 (noting that the "problem of case backlog in federal courts is serious enough that even a modest increase in trial time is potentially significant"). Jury trials, because their results are less predictable than bench trials, may also discourage pretrial settlement of cases, thus exacerbating court congestion. See George L. Priest, Justifying the Civil Jury, in Verdict: Assessing the Civil Jury System 103, 131-32 (Robert E. Litan ed. 1993).

[FN108]. See John Zebrowski, Judge or Jury: The Judge's Perspective, Litig., Fall 1994, at 28, 31 (describing relative ease of scheduling non-jury bench trials).

[FN109]. See id. (describing difficulties of scheduling jury trials); AM Int'l v. Eastman Kodak Co., 648 F. Supp. 506, 509 (N.D. Ill. 1986) (stating that "a bench trial is easier to schedule and may be spread over a longer period while a jury trial requires a block of continuous time").

[FN110]. See Zebrowski, supra note 108, at 31-32; Longan, supra note 104, at 929-30; O'Donnell, 183 F. Supp. at 583 (outlining the various additional procedures required by jury trials); Robert J. MacCoun & Tom R. Tyler, The Basis of Citizens' Perceptions of the Criminal Jury, 12 Law & Hum. Behav. 333, 335 (1988) (underscoring that "jury trials involve a number of time-consuming features not associated with a bench trial, including the voir dire process, pre- and mid-trial conferences regarding the admissibility of evidence, and the judge's charge to the jury"). Also, the presentation of expert and other testimony is often more streamlined in a bench trial, in part due to "the expanded freedom of judges to question either counsel or the witnesses." See Zebrowski, supra note 108, at 32 (noting that in non-jury trials the "presentation of expert testimony is often easier, shorter, and perhaps cheaper than in a jury trial").

[FN111]. Whatever the amount of testimony submitted by written deposition, the process of doing so is different in bench trials and jury trials. In a bench trial, the presentation of deposition testimony can be accomplished by excerpting and submitting the relevant portions to the court in written form. Once submitted, the transcripts can be reviewed by the court at a convenient time and place--often in chambers--thus saving trial time. A jury trial, in contrast, usually requires the comparatively time-consuming practice of having the lawyers read aloud the deposition transcripts in open court, or playing the deposition videotapes for the jury, both of which consume considerable trial time.
       With an advisory jury, there is also a need to carefully screen such deposition transcripts for hearsay and other objections to unreliable evidence that the court, as the trier of fact, would not credit but might influence the jury.

[FN112]. In a typical jury trial, jury instructions are frequently the subject of appellate challenge and review. In an advisory jury trial, in contrast, since the jury is acting in only a non-binding "advisory" capacity, an otherwise reversible error in the jury instructions would not justify reversal on appeal. See Ashland v. Ling-Temco-Vought, Inc., 711 F.2d 1431, 1438 (9th Cir. 1983) (stating that "there can be no review of supposed errors relating to rulings before and instructions to the advisory jury") (quoting 9 Wright & Miller, supra note 14, §2335); Poston v. United States, 262 F. Supp. 22, 24 (D. Haw. 1966) (stating that "specifications of error relating to rulings on evidence before an advisory jury and instructions to that jury need not be considered on appeal, because the function of that jury is to assist the judge"), aff'd on other grounds, 396 F.2d 103 (9th Cir. 1968).
       Therefore, while a judge must typically be very cautious in instructing a regular jury, he or she may instruct an advisory jury in any conceivable way-- or even fail to instruct the jury at all--and still avoid reversal on appeal. See Note, supra note 43, at 1365 (stating that the "invisibility of the advisory jury on appeal allows the trial judge to be informal,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

experimental, or even sloppy with the advisory jury without risk of reversible error"); see also Moore et al., supra note 43, P 39.43, at 39-92. Of course, inadequate or inappropriate jury instructions may reduce the value of the advisory verdict by increasing the chances that it is based on invalid or improper grounds.

[FN113]. Even if the frequency of objections does not increase, the resolution of evidentiary objections in a jury trial is usually more cumbersome and time-consuming. See Longan, supra note 104, at 930 (noting that "[e]videntiary disputes are also likely to take more time in a jury trial" than in a non-jury trial). Objections in a jury trial often require the lawyers to assemble at the bench to discuss the issue with the judge outside the hearing of the jury. Extended discussions of evidentiary issues are even more time-consuming, as they require the temporary removal of the jury from the courtroom. These procedures are in contrast to the comparatively efficient discussion and resolution of evidentiary issues as they arise in a bench trial.

[FN114]. See Fed. R. Civ. P. 52(a). With an advisory jury, the parties' obligation to develop and submit proposed jury instructions and verdict forms is typically in addition to, rather than in lieu of, the need to submit proposed findings of fact and conclusions of law. Because the district court is still required by Federal Rule of Civil Procedure 52(a) to enter findings of fact and conclusions of law, courts often request or require the parties to submit proposed findings and conclu- sions.

[FN115]. It should be noted that "many judges report that bench trials require far more concentration and effort on the part of the trial judge." Paula L. Hannaford et al., How Judges View Civil Juries, 48 DePaul L. Rev. 247, 250 (1998) (describing burdens of trial judge in handling the various aspects of a trial). Of concern here is whether judges can avoid the reduced attentiveness inherent in presiding over a jury trial when they choose to use an advisory jury. If not, this may cause a subtle shift of the fact-finding task in advisory jury trials from the district court to the advisory jury that would violate the FTCA's prohibition of jury trials.

[FN116]. See United States v. Branch, 91 F.3d 699 (5th Cir. 1996); Hancock, No-Nonsense Style, supra note 3.

[FN117]. See Mark England, Davidian Jury May Not Have Last Word, Waco Trib.-Herald, June 4, 2000, at 1A (quoting government attorney as saying "I think we will have to present some more information [at trial] because the judge has a great deal of information about this case that the jury, presumably, won't have"). An attorney familiar with the Waco proceedings similarly noted that "one of the big factors is that [the judge] has been living with this thing since it happened, so there's a lot of background information that you wouldn't have to put on for [the judge], but you would have to put on with a jury." Hancock, supra note 8.
     Even in a more typical case, the district court will often be familiar with the basic facts and issues in the case through motions to dismiss, summary judgment motions, or other pre-trial filings by the parties.

[FN118]. See Hancock, supra note 75.

[FN119]. Hildebrand v. Bd. of Trs., 607 F.2d 705, 710 (6th Cir. 1979).

[FN120]. See Dewey Elecs. Corp. v. Montage, Inc., 117 F.R.D. 73, 75 (M.D. Pa. 1987) (declining use of advisory jury in non-FTCA case because "a jury trial's requirements of openings, summations and jury instructions would be replaced by a trial brief in a bench trial, with a concomitant saving of judicial resources"); Skoldberg v. Villani, 601 F. Supp. 981, 982 (S.D.N.Y. 1985) (declining to use advisory jury in part because of "the additional time and expense involved in presenting this case to a jury"); Pan Am. Corp. v. Delta Air Lines, Inc., 1994 WL 174318, at *4 (S.D.N.Y. May 3, 1994). But see Note, supra note 43 at 1368-69 (citing "the modest impact of the advisory jury on trial length," but also noting that the "problem of case backlog in federal courts is serious enough that even a modest increase in trial time is poten-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tially significant").

[FN121]. 28 U.S.C. § 2402 (1994 & Supp. V 1999).

[FN122]. The courts that have used advisory juries in FTCA cases have not discussed or analyzed what effect the jury's presence might have had on the proceedings or whether it is a positive or negative influence.

[FN123]. As one court put it, "[a]ny good trial lawyer will testify that there are significant tactical differences in presenting and arguing a case to a jury as opposed to a judge." Hildebrand, 607 F.2d at 710; see also Pradier v. Elespuru, 641 F.2d 808, 811 (9th Cir. 1981) (noting that "[t]here are frequently significant tactical differences in presenting a case to a court, as opposed to a jury").
        One might argue that, because the judge--and not the advisory jury--makes the final decision, the presence of an advisory jury should not affect the presentations made at trial. This would seem to ignore the reality of the situation. By impaneling the advisory jury, the judge has demonstrated his or her interest in receiving the jury's advice. Accordingly, attorneys will attempt to persuade the jury, which in turn may influence the judge. Indeed, it would arguably be a very questionable trial strategy to ignore the advisory jury and focus solely on a presentation designed to persuade the court.

[FN124]. Hancock, supra note 8 (quoting attorney who litigated earlier case relating to 1993 Waco standoff); see also AM Int'l v. Eastman Kodak Co., 648 F. Supp. 506, 509 (N.D. Ill. 1986) (denying plaintiff's late request for jury trial because the defendant had "spent the previous six years preparing for a bench trial," and to require the defendant "to prepare for a jury trial at this late date would impose a substantial burden on [the defendant]").

[FN125]. See, e.g., Developments in the Law, supra note 105, at 1424-25 (contending that "[j]uries... create an outlet for 'demaguoery within the American legal system,' encouraging trial lawyers to be overly flamboyant and to subordinate substance to style") (quoting Paul D. Carrington, The Seventh Amendment: Some Bicentennial Reflections, 1990 U. Chi. Legal F. 33, 39-41); Moyer v. United States, 306 F. Supp. 390, 397 (S.D. Fla. 1969) (noting, in setting aside advisory jury's verdict, that the verdict "was largely the result of sympathy").

[FN126]. Fisk, supra note 6.

[FN127]. Ganey, supra note 5. Before the trial, the Davidians' attorneys thought that the participation of the advisory jury would improve their chances. See Hancock, supra note 8.

[FN128]. See Mark England, Davidian Lawyers Focus on Children, Waco Trib.-Herald, June 21, 2000, at 1A; Lee Hancock, Lawyers Debate Who's at Fault in Waco Case: Children, Koresh in Spotlight as Testimony Opens, Dallas Morning News, June 21, 2000, at 1A.

[FN129]. Jennifer Autrey & Barry Shlachter, Jury Clears U.S. Agents at Waco, Fort Worth Star-Telegram, July 15, 2000, at 1A.

[FN130]. Hancock, No-Nonsense Style, supra note 3.

[FN131]. See, e.g., Culley, supra note 104, at 30 (arguing that "[b]ench trials tend to encourage sloppy presentations," while jury trials produce better advocacy).

[FN132]. See, e.g., The Federalist No. 83 (Alexander Hamilton) (noting that the Framers, "if they agree in nothing else, concur at least in the value they set upon the trial by jury").

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

[FN133]. See, e.g., Stephen Daniels & Joanne Martin, Civil Juries and the Politics of Reform 1-15 (1995) (summarizing criticisms of civil jury system); Kalven, supra note 84, at 1055-56 (noting that "virtually since its inception it has been embroiled in controversy, attracting at once the most extravagant praise and the harshest criticism").

[FN134]. See Priest, supra note 107, at 104, 127 (noting the "widespread support for the civil jury" and "the extraordinary public endorsement of the civil jury"); Powers v. Ohio, 499 U.S. 400, 406 (1991) (stating that the "opportunity for ordinary citizens to participate in the administration of justice has long been recognized as one of the principal justifications for retaining the jury system").

[FN135]. Powers, 499 U.S. at 406. Alexis de Tocqueville viewed American juries as a "gratuitous public school" that permitted citizen-jurors to become "practically acquainted with the laws," and that the "political good sense" of Americans was due to the "long use that they have made of the jury in civil cases." See Friedman, supra note 74, at 203 (quoting Alexis de Tocqueville, Democracy in America 284-85 (Phillips Bradley ed., 1946)); see also Jeffrey Abramson, We, the Jury: The Jury System and the Ideal of Democracy 252 (1994) (stating that "[j]ury duty falls upon millions of Americans each year, making the jury system the most widespread example of participatory democracy in the United States today"); Kalven, supra note 84, at 1062 (noting that "the jury provides an important civic experience for the citizen"); Culley, supra note 104, at 29 (describing the jury as "an instrument of participatory democracy").

[FN136]. Moore et al., supra note 43, -P 39.41, at 39-87 (emphasis added) (footnote omitted).

[FN137]. The published cases generally do not indicate whether the jurors were informed of their advisory status.

[FN138]. See, e.g., Gragg v. City of Omaha, 812 F. Supp. 991, 991-92 (D. Neb. 1993) (indicating, in non-FTCA case, that court "did not inform the jury that it was acting in an advisory capacity"). Admittedly, not informing juries would satisfy the concern that jurors would be less attentive and committed to their responsibilities if they were aware of their advisory status from the outset.

[FN139]. Andrade v. United States, Civ. No. W-96-CA-139 (and consolidated actions), Docket No. 644, at 1-2 (W.D. Tex. May 26, 2000) (order to impanel advisory jury). Nevertheless, the media promptly discovered and explained that, because of the FTCA's prohibition on jury trials, the jury would be serving in an advisory capacity. See England, supra note 117 (reporting that "[w]hile there will be a jury in the June 19 trial on the wrongful-death lawsuit filed by surviving Branch Davidians against the federal government, [the judge] won't have to follow its verdict"). It is unknown whether the jurors became aware of their advisory status through these media reports.

[FN140]. See Stephen J. Adler, The Jury: Trial and Error in the American Courtroom 219-20 (1994) (describing efforts to avoid jury service and noting that the "national no-show rate is about 55 percent"); Zebrowski, supra note 108, at 31 (noting that "[j]urors and their employers are becoming increasingly less tolerant of the demands of jury service").

[FN141]. See Shari Seidman Diamond, What Jurors Think: Expectations and Reactions of Citizens Who Serve as Jurors, in Verdict: Assessing the Civil Jury System, supra note 107, at 282, 286 (reporting that "one of the primary dissatisfactions voiced by jurors is that their time has been wasted").

[FN142]. This social cost may also be present in situations where a judge enters a judgment as a matter of law reversing a jury verdict. See Fed. R. Civ. P. 50(b) (providing that a court may enter judgment as a matter of law notwithstanding a jury verdict). However, in the Rule 50(b) situation, the court's decision to reverse an unsustainable jury verdict is a necessary evil. In the advisory jury situation, on the other hand, the court's statutory obligation to make an independent decision in the case requires the court to essentially disregard an advisory jury's verdict from the outset.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN143]. See Note, supra note 43, at 1376 (stating that, like a typical jury, "the advisory jury increases the legitimacy of the administration of law through the participation of the people who live under that law").

[FN144]. See Hannaford et al., supra note 115, at 251 (noting that the "allocation of decision making between the judge and [regular] jury injects 'community values' into the judicial process while shielding the judge from criticism for unpopular decisions and insulating the whole justice system from allegations of elitism, judicial bias, and political influence"); Note, supra note 43, at 1374 (stating that "the involvement of people from the broader community gives content to an imprecise and subjective legal standard and legitimizes the decision of the lone judge").

[FN145]. In trials involving highly controversial public events such as Waco, trying the case with an advisory jury may also confer a public benefit by making the trial more open. For example, jury trial strategy may often persuade the litigants to have their side's witnesses testify in open court, rather than through the submission and private viewing of deposition excerpts by a federal judge. See supra notes 117, 123-24 and accompanying text. The same may be true of the formal introduction and explanation of key documentary and physical evidence. See supra notes 117, 123-24 and accompanying text.

[FN146]. In 1995, Congress conducted extensive televised hearings on the events at Waco. See Activities of Federal Law Enforcement Agencies Toward the Branch Davidians: Joint Hearings Before the Subcomm. on Crime of the House Comm. on the Judiciary and the Subcomm. on Nat'l Sec., Int'l Affairs, and Crim. Just. of the House Comm. on Gov't Reform and Oversight, 104th Cong. (1995); H.R. Rep. No. 104-749 (1996); see also Events Surrounding the Branch Davidian Cult Standoff in Waco, Texas, Hearing Before the House Comm. on the Judiciary, 103d Cong. (1993); H.R. Rep. No. 106-1037 (2000).
      Extensive investigations were also conducted by the Department of Justice. See Richard Scruggs et al., U.S. Dep't of Justice, Report on the Events at Waco, Texas, February 28 to April 19, 1993 (1993); Edward S.G. Dennis, Jr., U.S. Dep't of Justice, Report to the Deputy Attorney General: Evaluation of the Handling of the Branch Davidian Stand-Off in Waco, Texas by the U.S. Department of Justice and the Federal. Bureau of Investigation (1993). The Department of the Treasury also conducted an investigation. See Dep't of the Treasury, Report on the Bureau of Alcohol, Tobacco, and Firearms Investigation of Vernon Wayne Howell Also Known as David Koresh (1993).
      In 1999, the Attorney General appointed a Special Counsel to examine the events at Waco. See John C. Danforth, Special Counsel, Interim Report to the Deputy Attorney General Concerning the 1993 Confrontation at the Mt. Carmel Complex, Waco, Texas (2000); John C. Danforth, Special Counsel, Final Report to the Deputy Attorney General Concerning the 1993 Confrontation at the Mt. Carmel Complex, Waco, Texas (2000) [hereinafter OSC Final Report].

[FN147]. The Branch Davidian cause has been promoted through books, documentary films, and internet sites. See, e.g., David Thibodeau & Leon Whiteson, A Place Called Waco: A Survivor's Story (1999); Dick J. Reavis, The Ashes of Waco: An Investigation (1995); Armageddon in Waco (Stuart A. Wright ed., 1996); Carol Moore, The Davidian Massacre (1995); Waco: The Rules of Engagement (Fifth Estate Productions 1997); Waco: A New Revelation (MGA Films, Inc. 1999); Stephen D. O'Leary, Waco Fire Continues to Burn on the Web, Online Journalism Rev. (Oct. 13, 2000), at http://ojr.org/ojr/ethics/1017962869.php;       Waco       Holocaust       Electronic       Museum,       at       http://www.public-action.com/SkyWriter/WacoMuseum/ (last updated August 19, 2001); The Davidian Massacre Pages, at http://www.carolmoore.net/waco (last visited Feb. 8, 2003).
      It has been said that "[v]irtually every right-wing antigovernment group points back to Waco as the moment that Washington waged war on its own people." Daniel Klaidman & Michael Isikoff, A Fire That Won't Die, Newsweek, Sept. 20, 1999, at 24; see also Ben Macintyre, Waco Cult Puts FBI in Dock Over Siege Deaths, Times (London), June 20, 2000, at 18 (noting that the "Waco siege has become a defining moment in US cultural history, the source of countless conspiracies and the trigger for further violence").

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN148]. For the specific allegations made by the plaintiffs, see supra note 5. See also Duggan, supra note 8 (noting that "[t]o a lot of people-- particularly those who inhabit an Internet realm where tales of sinister government conspiracies abound--'Waco' has become a shorthand term for a mass murder and coverup orchestrated by secret enemies of freedom in Washington").

[FN149]. SeeUnited States v. McVeigh, 153 F.3d 1166, 1177 (10th Cir. 1998) (stating that McVeigh and his accomplice Terry Nichols "had decided to take some type of positive offensive action against the federal government in response to the government's siege of the Branch Davidians in Waco, Texas, in 1993"); see also United States v. Fortier, 180 F.3d 1217, 1220 (10th Cir. 1999).

[FN150]. Interestingly, after the trial judge decided to impanel an advisory jury, the lead plaintiffs' attorney stated before trial that the plaintiffs "were very happy at having a jury" and that "it was wise for [the judge] to bring in a jury." England, supra note 117; see also Hancock, supra note 8 (quoting lead plaintiffs' attorney's approval of advisory jury). After losing at trial, however, this same attorney condemned the judge's decision to impanel the advisory jury as "a ruse to provide the judge with cover for a controversial decision." Lee Hancock, Ruling Ends Suit Over Waco Siege, Dallas Morning News, Sept. 21, 2000, at 1A [hereinafter Hancock, Ruling Ends Suit].

[FN151]. Andrade v. United States, Civ. No. W-96-CA-139 (and consolidated actions), Docket No. 643, at 2 (W.D. Tex. May 26, 2000) (order to impanel advisory jury); Hancock, supra note 8; Ganey, supra note 5.

[FN152]. See Lee Hancock, Judge to Decide if Agents Fired in Siege, Dallas Morning News, June 13, 2000, at 19A (stating that the judge "rejected a secret government bid, filed... under court seal, to reconsider the decision to bring a jury into the case").

[FN153]. See, e.g., Richard Leiby, Trial Set in Suit Over Davidians' Fiery End, Wash. Post, July 14, 1999, at A3 (citing allegation by Branch Davidians that trial judge was prejudiced against them).

[FN154]. See Hancock, supra note 8 (reporting that lead plaintiffs' attorney "went all the way to the U.S. Supreme Court in a failed bid to have the judge removed from the civil case because of potential bias").

[FN155]. See England, supra note 117 (quoting law professor as opining that "whatever the decision, it will be more widely accepted if there is a jury").

[FN156]. Ganey, supra note 5.

[FN157]. Hancock, supra note 8; see also Duggan, supra note 8 (quoting lead plaintiffs' attorney as stating "[g]iven the circumstances, I think [the judge] recognizes that a jury verdict will be perceived as more fair by the American people than a verdict by a judge who gets his paycheck from the U.S. government").

[FN158]. See Hancock, Ruling Ends Suit, supra note 150 (stating that "jurors returned a verdict for the government in less than three hours, and court personnel later said their actual deliberations took less than an hour"); see also Jim Yardley, Government Cleared in Deaths at Waco, N.Y. Times, Sept. 21, 2000, at A27 (stating that advisory jurors "deliberated for less than two hours").

[FN159]. Andrade v. United States, 116 F. Supp. 2d 778, 785 n.2 (W.D. Tex. 2000). The Office of Special Counsel's investigation--which involved interviews of 1001 witnesses, the review of over 2.3 million pages of documents, and the examination of thousands of pounds of physical evidence-- similarly concluded that "[r]esponsibility for the tragedy of Waco rests with certain of the Branch Davidians and their leader, Vernon Howell, also known as David Koresh." OSC

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2003 BYULR 185
2003 B.Y.U. L. Rev. 185

Final Report, supra note 146, at 4-5.

[FN160]. Hancock, supra note 75.

[FN161]. Before the conclusion of the trial, the court "noted he might be in 'one hell' of a position with his decision to impanel an advisory jury for a type of civil case normally decided by a judge alone." Hancock, supra note 63. However, the judge was reported as telling lawyers in chambers early in the trial that "if you don't think I've got the guts to disregard this jury verdict, you're wrong." Id. Of course, this presumes that the district court judge arrived at his decision absolving the United States of liability through an independent consideration of the evidence presented at trial.

[FN162]. Indeed, it has been noted that the trial judge's ruling, which was consistent with the advisory jury's verdict, "most definitely will not put an end to the Internet-fueled excesses of the conspiratorial community." Editorial, Waco: The Government Didn't Do It, Star Trib. (Minneapolis), Sept. 24, 2000, at 36A.
2003 B.Y.U. L. Rev. 185

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.