UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER　　　　　　　　　MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION　　　　SECTION "N-5"
　　　　　　　　　　　　　　　　　　JUDGE ENGELHARDT
　　　　　　　　　　　　　　　　　　MAG. JUDGE CHASEZ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEFENDANT UNITED STATES OF AMERICA'S MOTION
TO DISMISS PLAINTIFFS' REMAINING FTCA CLAIMS
FOR LACK OF SUBJECT MATTER JURISDICTION

U.S. EXHIBIT NO. 23

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * * | CIVIL ACTION 2:07-MD-1873 <br><br> JUDGE ENGLEHARDT -DIV. N <br><br> MAG. JUDGE CHASEZ - MAG. 5 |

***********************************************************************

## DECLARATION OF STEPHEN C. MILLER

I, Stephen C. Miller state and declare as follows:

1. I am employed by the Federal Emergency Management Agency (FEMA), a component agency of the Department of Homeland Security (DHS), as a Logistic Management Specialist Supervisor. One of my duties includes the position of Contracting Officer Technical Representative. During the response to hurricanes Katrina and Rita I served as the Inventory Supervisor, FEMA HQ Logistics Emergency Housing Unit. As the Inventory Supervisor I was responsible for directing the movement of all temporary Emergency Housing Units (EHUs) from the original point of procurement to the physical site where the units would be received by FEMA.

2. In response to Hurricane Katrina and Rita, FEMA purchased temporary emergency housing units ("EHUs") from recreational vehicle dealerships, intermediaries, and Gulf Stream Coach, Inc. Gulf Stream Coach, Inc., was the only manufacturer of EHUs which FEMA contracted with to purchase EHUs, and it supplied in excess of one-third of the total

EHUs purchased by FEMA.

3. My first involvement in responding to concerns about formaldehyde in EHUs issued to Hurricane Katrina and Rita disaster victims was in mid-March 2006. In mid-March 2006, I was notified that a newspaper article had reported that a travel trailer occupant had expressed concerns that his unit contained excessive levels of formaldehyde. In response to this occupant's concern, FEMA took a proactive approach swapped out the occupant's unit for an older refurbished unit that we believed by virtue of its prior successful use and age was less likely to contain formaldehyde.

4. As part of FEMA's response to the complaint, I also contacted Mr. Dan Shea, President, Gulf Stream Coach, Inc. The unit at issue had been manufactured for FEMA by Gulf Stream Coach, Inc. FEMA did not have in-house expertise to address this matter, and given ongoing disaster response activities, FEMA had neither the manpower or expertise to test and determine whether there were problems with the unit.

5. On or about March 17, 2006, Mr. Shea informed me by email that Gulf Stream Coach, Inc., uses low formaldehyde emitting materials in all of its Cavalier model travel trailers which it had supplied to FEMA, where possible they use materials that meets the HUD specifications of low formaldehyde emissions for manufactured housing, and that Gulf Stream Coach, Inc., is one of the leaders in reducing formaldehyde emission in recreational vehicles.

6. On March 21, 2006, I asked Mr. Shea in emails whether there is any additional information or assistance that Gulf Stream Coach, Inc., can provide and whether Gulf Stream Coach, Inc.'s field staff has the capability to put this formaldehyde issue to bed. In response, Mr.

Shea agreed to send a person to test.

7. On or about March 24, 2006, Scott Pullin, a Gulf Stream Coach, Inc., employee commenced testing for formaldehyde in EHUs. Those test results were not shared with FEMA, and neither Mr. Pullin, nor any other Gulf Stream Coach, Inc., employee or representative, ever told me that the units they were inspecting and/or testing contained levels of formaldehyde that may require FEMA to take actions to protect the occupants health and safety.

8. Between April and June 2006, if FEMA received a complaint from an EHU occupant about formaldehyde, our responses included encouraging the occupant to vent and air out the unit, swapping out the unit of concern with an older refurbished unit that we believed because of its age and past use was likely to have lower formaldehyde levels than new units, and temporarily moving some people into hotels or reimbursing them for costs associated with hotels.

9. In June 2006, the decision was made by FEMA in response to the complaints it had received and because of concerns that formaldehyde issue may extend beyond the handful of complaints that FEMA had received, that a programmatic response was required. Accordingly, the decision was made that if an occupant complained to FEMA about formaldehyde or indicated that they had symptoms that may result from formaldehyde exposure, the occupant would be advised to air out and vent the unit in accordance with manufacturers recommendations, and if that did not resolve the occupants concern, swap out the unit with an older refurbished unit. Given that there was little, if any available local alternate housing, absent moving the person out of the area, this was the only practical response action available.

10. To implement this program, I arranged to have FEMA identify older refurbished

Page 3 of 4



units that satisfied these parameters and have those units issued when a request for such a unit was submitted.

11. In addition, a formaldehyde brochure was prepared and in July 2006 distributed to occupants of EHUs. To ensure that all occupants received a copy, FEMA issued the brochures to its maintenance contractors with instructions to leave a copy of the brochure at each EHU.

12. On or about July/August 2006, the United States Environmental Protection Agency ("EPA") and Agency for Toxic Substances and Disease Registry ("ATSDR") agreed to test EHUs for formaldehyde. I was responsible for providing a testing site and locating the new unused EHUs for testing. A portion of the Baton Rouge Staging Area was set aside as a test area. Initially we had hoped to be able to commence testing at the end of August, however, extending electrical power to the test area took longer then expected, and as a result testing did not commence until mid-September 2006. EPA was responsible for conducting that testing, and I provided them with logistic support upon request.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this ____ day of _____.

_____
STEPHEN C. MILLER
Logistic Management Specialist Supervisor
DHS / FEMA
Washington, D.C.

RECEIVED
2009 MAY 15  A 10: 33
ENV. TORTS BR
CIVIL DIVISION