UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER             MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION     SECTION "N-5"
                                 JUDGE ENGELHARDT
                                 MAG. JUDGE CHASEZ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEFENDANT UNITED STATES OF AMERICA'S MOTION
TO DISMISS PLAINTIFFS' REMAINING FTCA CLAIMS
FOR LACK OF SUBJECT MATTER JURISDICTION

U.S. EXHIBIT NO. 25

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

- - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: | ) | MDL NUMBER 1873 |
| FEMA TRAILER FORMALDEHYDE | ) | SECTION "N" (4) |
| PRODUCTS LIABILITY LITIGATION | ) | JUDGE ENGELHARDT |

- - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF BECHTEL NATIONAL, INC.

30(B)(6) DEPONENT JACK HUME

THURSDAY, AUGUST 21, 2008

BEHMKE REPORTING & VIDEO SERVICES

BY: CHRISTINE L. JORDAN, CSR NO. 12262, RPR, CCRR

160 SPEAR STREET, SUITE 300

SAN FRANCISCO, CALIFORNIA 94105

(415) 597-5600

Page 2

Videotaped deposition of BECHTEL NATIONAL, INC., BY DEPONENT JACK HUME, taken on behalf of PLAINTIFF'S STEERING COMMITTEE, at Three Embarcadero Center, 28th Floor, San Francisco, California, commencing at 8:58 A.M., THURSDAY, AUGUST 21, 2008, before Christine L. Jordan, Certified Shorthand Reporter No. 12262, pursuant to Federal Rule 30(b)(6) Notice of Deposition of Bechtel National, Inc.

Page 3

APPEARANCES OF COUNSEL:
FOR PLAINTIFF'S STEERING COMMITTEE:
  LAW OFFICES OF RONNIE G. PENTON
  BY: RONNIE G. PENTON, ATTORNEY AT LAW
  209 Hoppen Place
  Bogalusa, Louisiana 70427
  Telephone: (985) 732-5651

FOR PLAINTIFF'S STEERING COMMITTEE:
  LAMBERT & NELSON, A PROFESSIONAL LAW CORPORATION
  BY: HUGH PALMER LAMBERT, ATTORNEY AT LAW
  701 Magazine Street
  New Orleans, Louisiana 70130
  Telephone: (504) 581-1750

FOR PLAINTIFF'S STEERING COMMITTEE (telephonically):
  BECNEL LAW FIRM, LLC
  BY: DANIEL BECNEL, ATTORNEY AT LAW
  P.O. Drawer H
  106 W. Seventh Street
  Reserve, Louisiana 70084
  Telephone: (985) 536-1186

Page 4

APPEARANCES OF COUNSEL (CONTINUED):
FOR PLAINTIFF'S STEERING COMMITTEE (telephonically):
  BENCOMO & ASSOCIATES
  BY: RAUL R. BENCOMO, ATTORNEY AT LAW
  639 Loyola Avenue, Suite 2110
  New Orleans, Louisiana 70113
  Telephone: (504) 529-2929

FOR DEFENDANT UNITED STATES OF AMERICA:
  UNITED STATES DEPARTMENT OF JUSTICE
  CIVIL DIVISION
  BY: HENRY T. MILLER, SENIOR TRIAL COUNSEL
  1331 Pennsylvania Avenue, N.W.
  Room 8006-S
  Washington, DC 20004
  Telephone: (202) 616-4223

FOR BECHTEL INTERNATIONAL, INC. and THE WITNESS:
  FRILOT, LLC
  BY: JOHN J. HAINKEL, III, ATTORNEY AT LAW
  1100 Poydras Street, Suite 3600
  New Orleans, Louisiana 70163
  Telephone: (504) 599-8021

Page 5

APPEARANCES OF COUNSEL (CONTINUED):
FOR DEFENDANT FOREST RIVER:
  GIEGER, LABORDE & LAPEROUSE, LLC
  BY: JASON D. BONE, ATTORNEY AT LAW
  One Shell Square, 48th Floor
  701 Poydras Street
  New Orleans, Louisiana 70139-4800
  Telephone: (504) 654-1325

FOR DEFENDANTS PILGRIM INTERNATIONAL, MONACO COACH CORPORATION, R-VISION, INC., DUTCHMEN MANUFACTURING, KZ RV, LP, KEYSTONE RV COMPANY, THOR CALIFORNIA, DS CORPORATION D/B/A CROSS ROADS RV (telephonically):
  JONES WALKER WAECHTER POITEVENT CARRERE & DENEGRE LLP
  BY: JEFFREY S. EVANS, ATTORNEY AT LAW
  8555 United Plaza Boulevard
  Baton Rouge, Louisiana 70809-7000
  Telephone: (225) 248-2058

FOR DEFENDANT GULF STREAM COACH, INC. (telephonically):
  DUPLASS, ZWAIN, BOURGEOIS, PFISTER & WEINSTOCK
  BY: RYAN M. MALONE, ATTORNEY AT LAW
  3838 North Causeway Boulevard, Suite 2900
  Metairie, Louisiana 70002
  Telephone: (504) 832-3700

Page 102

1   Q. Uh-huh.
2   A. Yeah, I'd say generally, yes.
3   Q. Okay. Did you ever or do you recall -- and of
4   course the records are going to -- once we get them and
5   look at them, we'll be able to see what was recorded in
6   the maintenance records.
7       Would those maintenance records include
8   complaints like, for example, of leaking doors or
9   windows and stuff like that?
10  A. Yes.
11  Q. Hard to close or open --
12  A. Stuck.
13  Q. -- doors or windows?
14      Stuck, right.
15      Did you ever attribute any of the stuck
16  doors or windows to distortion of the shell of the
17  travel trailer?
18  A. Not that I'm aware of.
19  Q. Okay. You're unaware of an issue regarding
20  lifting the weight of the wheels of the tra- -- the
21  weight off of the wheels of the travel trailer creating a
22  shell distortion which could cause binding of doors or
23  windows? You're unaware of that?
24  A. I am unaware of that.
25  Q. Unaware, correct?

Page 103

1   A. Correct.
2   Q. Okay. Do you recall any complaints with regard
3   to leaking of travel trailers?
4   A. Leaking?
5   Q. Water leaks from rain outside, environmental.
6       Let me make sure the question is clear
7   because you're struggling with it, and I don't want
8   you to.
9   A. No, I'm trying to think.
10  Q. Oh, okay. Maybe it's -- maybe it's a good
11  question, and you just took a while to --
12  MR. HAINKEL: Do you remember any complaints
13  about water leaking inside the trailers?
14  BY MR. LAMBERT:
15  Q. Yeah, you know --
16  A. Yeah.
17  Q. -- from rain?
18  A. And I do recall one.
19  Q. Okay. Do you recall, other than the person that
20  you told us about, the employee that you told us about
21  that complained about the smell, do you recall any other
22  complaints other than his one?
23  MR. HAINKEL: I'm going to object to the form of
24  the question. I don't think he characterized it that
25  way.

Page 104

1   BY MR. LAMBERT:
2   Q. Do you know what that means?
3   MR. HAINKEL: Go ahead. You can answer.
4   BY MR. LAMBERT:
5   Q. Just means he objects. You can answer the
6   question.
7   A. What he said is he doesn't think you said
8   what I said --
9   Q. Right.
10  A. -- earlier.
11  Q. That's what he said, but I think I did.
12  A. There were -- there were calls received by
13  the call center relative to smells.
14  Q. Okay. And so those calls came from more than
15  just the one person that you identified as an employee of
16  Bechtel, correct?
17  A. Oh, yeah. He didn't make a call.
18  Q. Oh, he just talked to you?
19  A. Yeah.
20  Q. Now, we -- we heard from a fella yesterday who
21  has done testing of travel trailers for formaldehyde in
22  the Mississippi area who was ready, willing, and able to
23  do that and apparently had the qualifications to do so.
24      Did FEMA ever discuss with you that there
25  was someone who had already tested trailers and --

Page 105

1   when they asked you if you'd do it?
2   MR. BONE: Object to the narrative.
3   THE WITNESS: Not that I'm aware of.
4   BY MR. LAMBERT:
5   Q. Okay. Is it your testimony that Bechtel doesn't
6   have the capacity to test for formaldehyde inside travel
7   trailers?
8   A. I don't think I said that.
9   Q. You said it wasn't part of your --
10  A. Scope of work.
11  Q. -- scope of work?
12  A. Correct.
13  Q. Well, the government could change the scope of
14  work, correct?
15  A. They could have.
16  Q. Okay. So they could have said: Okay, we want
17  you, Bechtel, to do this work. And so since you don't
18  have a scope of work order that covers testing inside,
19  here's a new one.
20  MR. MILLER: Objection --
21  BY MR. LAMBERT:
22  Q. Right?
23  MR. MILLER: -- foundation, speculation.
24  THE WITNESS: They could have, yes.
25

Page 106

1  BY MR. LAMBERT:
2     Q. Right. And you, Bechtel, meaning you're
3  speaking for the corporation, clearly have the capability
4  to do that testing for formaldehyde --
5     MR. MILLER: Objection --
6  BY MR. LAMBERT:
7     Q. -- or any other gas, correct?
8     MR. MILLER: -- foundation.
9     THE WITNESS: We have air monitoring
10 capabilities, yes.
11 BY MR. LAMBERT:
12    Q. Okay. Do you know if the complaints that are
13 recorded in the maintenance records from occupants of
14 travel trailers were ever addressed, to your knowledge,
15 by anyone other than Bechtel? Because you said Bechtel
16 didn't do it.
17    A. The direction we had from FEMA -- because
18 we're dancing around "the smells"; we're talking
19 about formaldehyde -- is they gave us a script that
20 we read to the occupant to establish that it was a
21 formaldehyde-related call, and then we turned those
22 over to FEMA for their direct handling.
23    Q. Okay. And what was the script?
24    A. I don't recall what it was.
25    Q. Well, give me the best recollection you have.

Page 107

1  Was it one page?
2     A. Yeah. It was like three bullets.
3     Q. Three bullet points?
4     A. Three, four bullets. Yeah.
5     Q. Okay. And it would ask questions that were
6  designed apparently to determine whether or not it was a
7  formaldehyde-related smell?
8     A. Yes, I think so.
9     Q. Okay.
10       (Reporter clarifies.)
11    THE WITNESS: Yes, I think so.
12 BY MR. LAMBERT:
13    Q. And how many of those calls do you think that --
14 well, first of all, when did your contract end with FEMA?
15 So when is the end of the maintenance records that would
16 have included these kind of calls?
17    A. July of '06.
18    Q. July of '06?
19    A. Right off the top of my head, for
20 maintenance.
21    Q. Okay. Now we're sitting here in '08 right now,
22 August. So two years later, right?
23    A. (Nodding head.)
24    Q. You got to say it out loud.
25    A. Yes.

Page 108

1     Q. Okay. And so obviously -- who is doing this
2  maintenance work -- who -- scratch that.
3        Who took over in July of '06 the maintenance
4  function that Bechtel had?
5     MR. MILLER: Objection; foundation.
6     THE WITNESS: Ten contractors under direct
7  contract to FEMA.
8  BY MR. LAMBERT:
9     Q. They were your subs?
10    A. No.
11    Q. Okay. Who are those ten contractors?
12    A. I don't remember.
13    Q. Is there a list of them someplace?
14    A. No, because their -- didn't have anything to
15 do with us. We handed off maintenance to them, and
16 they took it --
17    Q. Okay.
18    A. -- working directly for FEMA.
19    Q. Did you ever have any discussions with any of
20 those ten contractors, meaning a contact person with any
21 of them?
22    A. Yes. We had to transition our work to them.
23    Q. Okay.
24    A. So we had contacts with all of them.
25    Q. All right. And were there records of those

Page 109

1  contacts?
2     A. Meeting minutes --
3     Q. All right.
4     A. -- were produced by FEMA, and we have
5  records of -- we had to turn our information over to
6  them --
7     Q. Okay.
8     A. -- individually. So we have transmittals of
9  that transfer of information.
10    Q. All right. Did they get a -- did they get a
11 copy of the database that you told us about, the
12 maintenance database?
13    A. I don't remember.
14    Q. All right.
15    A. They did not get it from us.
16    Q. All right.
17    A. They might have gotten it from FEMA.
18    Q. All right. The storm was obviously in August of
19 '05. So Bechtel's total involvement was just shy of a
20 year?
21    A. Physically on the ground in Mississippi was
22 just slightly over a year because we did our final
23 demobilization mid-September, 2006.
24    Q. All right. At that point in time, can you give
25 me your best estimate of how many formaldehyde-related

Page 110

1  complaints Bechtel was aware of?
2  A. It was 95, 96, something like that.
3  Q. Are you aware of any communication by FEMA
4  wherein a notification was given to the people in the
5  database that you told us about where you could identify
6  the individual who lived in a trailer, a particular
7  trailer, and where their location was, to -- to provide
8  them with any sort of opportunity to answer those bullet
9  points that FEMA had provided to you to determine if
10 there was a formaldehyde issue in their unit?
11     MR. MILLER: Objection.
12     MR. LAMBERT: Let me do the question again.
13     MR. HAINKEL: Yeah.
14     MR. LAMBERT: Okay. Start again.
15     THE WITNESS: I think I know what you said, but
16 give it another shot.
17     MR. LAMBERT: I think I do too, but let's see if
18 I can make it clear on the record.
19 BY MR. LAMBERT:
20 Q. There's a database that's got everybody's name
21 in it and the trailer they live in, right?
22 A. Yes, there is.
23 Q. Okay. Did FEMA ever ask Bechtel to notify those
24 individuals of this issue of formaldehyde and possibly by
25 sending them those -- that one-page bullet point thing

Page 111

1  that said --
2  A. No.
3  Q. -- are you -- they didn't.
4     So there -- there was a one-way street going
5  on here. In other words, if the person complained
6  and there was an attempt to determine if there was a
7  formaldehyde in their unit but there was no attempt,
8  that you're aware of, to go in the other direction
9  where the occupants were actually asked whether or
10 not they were experiencing issues with formaldehyde?
11     MR. HAINKEL: Let me -- wait. I'm going to
12 object to the form of the question because --
13     MR. LAMBERT: That's fine.
14     MR. HAINKEL: -- I don't think that's at all what
15 the testimony was. I think he knows what you're
16 trying to get to.
17     MR. MILLER: Compound, vague.
18     MR. HAINKEL: I don't under- -- I don't
19 understand the question.
20 BY MR. LAMBERT:
21 Q. I do. Do you?
22 A. Restate it.
23 Q. It's a two-way street as far as information. In
24 other words, in one direction the occupant says: I'm
25 smelling something.

Page 112

1     And then FEMA says: Answer these questions.
2  And if it's -- if you answer the bullet points right,
3  then it's a FEMA -- then it's a formaldehyde-related
4  issue.
5     And you know of about 100 of those, 90 or
6  something, right? So far I'm right?
7  A. So far you're right.
8  Q. Okay.
9     Now, since there is a smell issue related to
10 formaldehyde, at least with 95 people within this
11 year, was -- my question was: Are you aware of any
12 request from the other direction, meaning FEMA
13 saying: All y'all people that live in these
14 temporary housing units, have you experienced any of
15 these symptoms?
16 A. I am aware of that.
17 Q. Okay. They did ask?
18 A. It was on TV.
19 Q. Oh. The TV assumes that a person that lived in
20 the trailer watched the TV and saw that.
21 A. Yeah.
22 Q. My question is: The database that you have
23 identifies the individuals that live in the -- in the
24 trailer, correct --
25 A. That's correct.

Page 113

1  Q. -- in the temporary housing unit by that point.
2     Are you aware of any attempt to notify those
3  individuals through that database?
4  A. No, I'm not.
5  Q. Okay.
6     MR. LAMBERT: We can go ahead and change it now.
7  We're going to change the tape.
8     THE VIDEOGRAPHER: This marks the end of DVD
9  Number 1 in the deposition of Bechtel National,
10 Inc.'s 30(b)(6) deponent, Jack Hume.
11     We're going off the record. The time is
12 11:07.
13     (Off the record.)
14     THE VIDEOGRAPHER: We're back on the record.
15 Here marks the beginning of DVD Number 2 in the
16 deposition of Jack Hume. The time is 11:10.
17     Please begin.
18     MR. LAMBERT: Mr. Hume, thank you very much. I'm
19 going to pass you to the next questioner and hope
20 that we all make our flight. Thank you.
21     MR. BONE: I need a microphone.
22     MR. HAINKEL: Why don't -- can you switch places
23 with him?
24     MR. BONE: Is that all right? Yeah.
25     MR. HAINKEL: I think that would be easier for

Page 138

1   A. Yes, at least the vast majority. There was
2 some came out of Selma, but we just went to Purvis
3 for the most part.
4   Q. And that's what I was getting at. Were you
5 aware that there were other FEMA facilities where FEMA
6 stored temporary housing units that contractors such as
7 yourself or CH2M HILL or Fluor or Shaw was picking up
8 from?
9   A. I was aware that there were, but I was only
10 aware of the Selma yard and the Purvis yard by name.
11   Q. And those were the only two yards that Bechtel
12 was picking up from?
13   A. Yes. With the -- with almost all of them
14 from Purvis, though.
15   Q. There's been some testimony offered by other
16 witnesses in this case that indicated that the
17 manufacturers would put the owner's manuals and
18 associated documents with the units inside the unit when
19 it was transferred by FEMA, to FEMA, that FEMA would
20 leave those documents in the units.
21   What actions would Bechtel take if such
22 documents were in the unit at the time it received
23 it, such as owner's manuals, any other documents that
24 the manufacturers may have provided with the unit?
25   A. I don't know that answer firsthand.

Page 139

1   Q. Do you have any reason to believe that Bechtel
2 would have removed any of those documents from the unit
3 prior to tra- -- handing the units over to the occupants?
4   A. No reason to believe we would have.
5   Q. Mr. Lambert asked you some questions about the
6 give and take of information on formaldehyde and how you
7 may have received some complaints -- approximately 94, 95
8 I think complaints you indicated -- on your call in line,
9 maintenance call in line. And you indicated that there
10 was some information that was distributed on the
11 television relating to formaldehyde?
12   A. Yes.
13   Q. What is your recollection of that, sir?
14   A. My recollection of that, since I was in an
15 RV in Pass Christian at the time, was that there was
16 a toll-free number that people were told to call and
17 that it was -- it was on the news quite regularly for
18 a period of time.
19   Q. Do you recall what time period this was?
20   A. Spring.
21   Q. And by that do you mean spring 2006?
22   A. Spring 2006, yes.
23   Q. And as you sit here today, your best
24 recollection is between August 29th, when you started
25 this contract, and when your contract ended in about

Page 140

1 July -- actually, ended around September 2006, you
2 received approximately 94, 95 complaints about odors that
3 were attributed to formaldehyde?
4   A. And I think the actual count is 96.
5   Q. Ninety-six.
6   Were you aware that in Ju- --
7   A. That was 96 out of over 207,000, just for
8 point of reference.
9   Q. Where do you get the 207,000 number from?
10   A. From the call log.
11   Q. So the call log has a total of 207,000 call-ins?
12   A. Correct.
13   Q. And only 96 of those related to formaldehyde?
14   A. Correct.
15   Q. What was the major complaint that was fielded by
16 the call log?
17   A. I don't know what the major complaint was.
18   Q. Okay. What were the major complaints that were
19 received, generally?
20   A. Inoperable air conditioning, refrigerator
21 stopped, blocked toilets.
22   Q. Were you aware that in approximately July 2006,
23 August 2006 time frame, FEMA issued a pamphlet to all
24 occupants of travel trailers relating to formaldehyde?
25   A. No, I wasn't aware of that.

Page 141

1   Q. Were you aware that some of the manufacturers'
2 owner's manuals provided instructions that if
3 formaldehyde odors were smelled or identified, that the
4 action to take was to ventilate the unit?
5   A. I had understood that that was a
6 recommendation. I didn't know it was in the
7 manufacturers' manuals.
8   Q. And I don't say it was in all the manufacturers'
9 manuals. I just know it was one, sir.
10   A. Okay.
11   Q. It may have been in more; I just don't know.
12   Sir, finally, that ends my substantive
13 questioning. I would ask you -- pursuant to the
14 Federal Rules of Civil Procedure, I request that you
15 read and sign the deposition. The court reporter
16 will transcribe it. That transcript will be provided
17 to your counsel. You'll have 30 days upon receipt to
18 read, review, and make any changes you believe
19 necessary or appropriate to make sure that your
20 testimony is truthful and accurate.
21   However, I admonish you that if you make any
22 changes that are substantive in nature, the United
23 States reserves the right to ask you questions about
24 those changes, why those changes were made, either if
25 you're redeposed at a later date or should you