UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER  MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION  SECTION "N-5"
JUDGE ENGELHARDT
MAG. JUDGE CHASEZ

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEFENDANT UNITED STATES OF AMERICA'S MOTION
TO DISMISS PLAINTIFFS' REMAINING FTCA CLAIMS
FOR LACK OF SUBJECT MATTER JURISDICTION

U.S. EXHIBIT NO. 34

```
0001
  1              UNITED STATES DISTRICT COURT
  2              EASTERN DISTRICT OF LOUISIANA
  3      ------------------------ X
  4    IN RE:                    ) MDL NO. 1873
  5       FEMA TRAILER           ) SECTION "N" (4)
  6       FORMALDEHYDE PRODUCTS  ) JUDGE ENGELHARDT
  7       LIABILITY LITIGATION,  ) Pages 1 - 305
  8      ------------------------ X
  9                          Monday, August 11, 2008
 10                              Chantilly, Virginia
 11            CONFIDENTIAL DISCOVERY MATERIAL
 12      30(b)(6) Videotaped Deposition of:
 13            KENNETH J. MELCHIORRE, P.E., PMP,
 14      called for oral examination by counsel for the
 15      Plaintiffs, pursuant to notice, at CH2M Hill,
 16      15010 Conference Center Drive, Suite 200,
 17      Chantilly, Virginia, before Deborah Larson
 18      Hommer, of Capital Reporting Company, a Notary
 19      Public in and for the Commonwealth of
 20      Virginia, beginning at 9:07 a.m., when were
 21      present on behalf of the respective parties:
 22
0002
  1                  A P P E A R A N C E S
  2    On Behalf of Plaintiffs' Steering Committee
  3    Law Offices of Ronnie G. Penton
  4          209 Hoppen Place
  5          Bogalusa, Louisiana   70427
  6          (504) 732-5651
  7          rgp@rgplaw.com
  8    BY:   Ronnie G. Penton, Esquire
  9
 10    Lambert & Nelson, P.C.
 11          701 Magazine Street
 12          New Orleans, Louisiana   70130
 13          (504) 581-1750
 14          law@lambertandnelson.com
 15    BY:   Hugh Palmer Lambert, Esquire
 16
 17    Bencomo & Associates
 18          639 Loyola Avenue, Suite 2110
 19          New Orleans, Louisiana   70113
 20          (504) 529-2929
 21          ben_law@bellsouth.net
 22    BY:   Raul R. Bencomo, Esquire (via phone)
0003
  1    On Behalf of CH2M Hill
  2    Law Offices of Baker, Donelson, Bearman,
  3    Caldwell, & Berkowitz, P.C.
  4          3 Sanctuary Boulevard
  5          Suite 201
  6          Mandeville, Louisiana   70471
  7          (985) 819-8416
  8          gbarrios@bakerdonelson.com
  9    BY:   Gerardo R. Barrios, Esquire
 10
```

```
11      On Behalf of Redman Homes, Inc., et al.
12      Voorhies & Labbe, PLC
13           700 St. John Street
14           4th Floor
15           Lafayette, Louisiana   70502
16           (337) 232-9700
17           lpd@volalaw.com
18      BY:  Lamont P. Domingue, Esquire
19
20
21
22
0004
 1      On Behalf Of the United States
 2      U.S. Department of Justice, Civil Division
 3           1331 Pennsylvania Avenue, N.W.
 4           Room 8220-N
 5           Washington, D.C.   20004
 6           (202) 616-4223
 7           henry.miller@usdoj.gov
 8      BY:  Henry Miller, Esquire
 9
10      On Behalf of Jayco Enterprises, Inc. and
11      Starcraft RV, Inc.
12      Willingham, Fultz & Cougill, LLP
13           Niels Esperson Building
14           808 Travis
15           Suite 1608
16           Houston, Texas   77002
17           (713) 333-7600
18           tomc@willingham-law.com
19      BY:  Thomas L. Cougill, Esquire (via phone)
20
21
22
0005
 1      On Behalf of Defense Liaison Counsel's Office
 2      Duplass, Zwain, Bourgeois, Pfister & Weinstock
 3           3838 N. Causeway Boulevard
 4           Suite 2900
 5           Metairie, Louisiana   70002
 6           (504) 832-3700
 7           pwatson@duplass.com
 8      BY:  Philip Watson, Esquire (via phone)
 9
10      On Behalf of American Homestar Corporation and
11      Oak Creek Homes, LP
12      Hailey, McNamara, Hail, Larman & Papale
13           10725 Perkins Road
14           2nd Floor
15           Baton Rouge, Louisiana 70810
16           (225) 766-5567
17           DavidBach@HaileyMcNamara.com
18      BY:  David Bach, Esquire (via phone)
19
20
21
```


```
22
0006
 1     On Behalf of Fleetwood
 2     Leake & Andersson, LLP
 3            1100 Poydras Street
 4            Suite 1700
 5            New Orleans, Louisiana  70163-1701
 6            (504) 585-7500
 7            Regan@LeakeAndersson.com
 8     BY:    Robbie Egan, Esquire (via phone)
 9
10     On Behalf of Forest River, Inc.
11     Gieger, Laborde & Laperouse, LLC
12            One Shell Square
13            Suite 4800
14            New Orleans, Louisiana  70139
15            (504) 561-0400
16            Jbone@glllaw.com
17     BY:    Jason D. Bone, Esquire
18
19
20
21
22
0007
 1     On Behalf of Silver Creek Homes
 2     Daigle, Jamison & Rayburn, LLP
 3            303 W. Vermilion
 4            Suite 210
 5            Lafayette, Louisiana 70502
 6            (337) 234-7000
 7            wkjamison@djrlawfirm.com
 8     BY:    W.K. Jay Jamison, Esquire (via phone)
 9
10     On Behalf of CMH Mfg., Inc., Southern Energy
11     Homes, Inc., Palm Harbor Homes, Inc., Giles
12     Family Holdings, Inc., SunRay Investments,
13     Inc.
14     Maynard, Cooper & Gale, P.C.
15            1901 Sixth Avenue North
16            Suite 2400
17            Birmingham, Alabama   35203
18            (205) 254-1091
19            tthagard@maynardcooper.com
20     BY:    Thomas W. Thagard III, Esquire
21                                    (via phone)
22
0008
 1     On Behalf of Morgan Building & Spas, Inc. and
 2     Morgan Building Systems, Inc.
 3     McGlinchey Stafford, PLLC
 4            301 Main Street
 5            14th Floor
 6            Baton Rouge, Louisiana   70802
 7            (225) 382-3693
 8            astout@mcglinchey.com
 9     BY:    Amanda S. Stout, Esquire (via phone)
```

```
10    **without waiver of defenses/objections
11    related to outstanding motions to dismiss and
12    court's order granting Morgan's motion to
13    dismiss or lack of subject matter jurisdiction
14
15    Also Present:
16         Dan Holmstock, Videographer
17
18
19
20
21
22
0009
```

## CONTENTS

| | EXAMINATION OF MELCHIORRE BY | PAGE |
|---|---|---|
| 3 | Mr. Penton | 21 |
| 4 | Mr. Lambert | 152 |
| 5 | Mr. Barrios | 243 |
| 6 | Mr. Dominigue | 245 |
| 7 | Mr. Miller | 275 |
| 8 | Mr. Dominigue | 295 |

| | MELCHIORRE DEPOSITION EXHIBITS: | PAGE |
|---|---|---|
| 12 | 1A - Notice of deposition | 13 |
| 13 | 1B - Letter dated 7/14 | 13 |
| 14 | 1C - Document signed by Michael Bonner | |
| 15 | dated 4/6/06 | 157 |

```
0010
 1              P R O C E E D I N G S
 2              MR. PENTON:  This is the 30(b)(6)
 3    deposition of CH2M Hill in Chantilly,
 4    Virginia.
 5              There was an underlying notice that
 6    was served as a subpoena back in June pursuant
 7    to the Court's orders.  Subsequent to that,
 8    there were meetings held between the no-bid
 9    contractors.  And there is an agreement that
10    for -- at least for this first 30(b)(6)
11    deposition, that we will proceed pursuant to a
12    description of the topics as well as the scope
13    of this deposition and a July 14 letter of
14    Jerry Barrios.
15              Specifically, CH2M Hill agreed to
16    produce FEMA contract documents as well as
17    associated task orders, modifications,
18    third-party subcontracts related to emergency
19    THUs, including hauling, delivery,
20    installation, setup and maintenance of
```

```
15        Q.   What is OMI?
16        A.   OMI is legal entity of CH2M Hill.
17   They do operations and maintenance activities
18   predominantly on commercial or state
19   municipalities.
20        Q.   And were they involved in the
21   contract with FEMA?
22        A.   I am not sure what you mean by
0155
 1   "involved."
 2        Q.   Well, did they do work on these
 3   travel trailers?
 4        A.   They provided some labor, some
 5   oversight labor, not work.
 6        Q.   Okay.
 7        A.   Now, when you say "work," we
 8   physically didn't do, really, the work.  The
 9   work was done by subcontractors.
10        Q.   I understand.  But oversight
11   labor --
12        A.   Yes.
13        Q.   -- would be someone who
14   supervised --
15        A.   Right.
16        Q.   -- a subcontractor, correct?
17        A.   Yes.
18        Q.   And I take it that part of the
19   reason why CH2M Hill received payment as a
20   contractor was for their expertise in
21   oversight?
22             MR. MILLER:  Objection.  Vague.
0156
 1             THE WITNESS:  We were --
 2             MR. BARRIOS:  Wait until he's
 3   finished with the objection.
 4             MR. MILLER:  Assumes facts not in
 5   evidence.
 6             MR. BARRIOS:  Go ahead.  I'm sorry.
 7             MR. LAMBERT:  Go ahead.
 8             MR. MILLER:  I am done.
 9             MR. BARRIOS:  Okay.  Objection.
10             BY MR. LAMBERT:
11        Q.   Go ahead and answer.
12        A.   We were paid to -- in the
13   performance of our contract.
14        Q.   And part of that work was
15   oversight?
16        A.   Yes.
17        Q.   Now, I want to just step through
18   this Bonner analysis testing, hopefully
19   quickly, and find out exactly how it worked.
20   First of all, you said before that this was
21   pursuant to a task order.
22        A.   No.  I clarified that.
0157
 1        Q.   Okay.  Well, let me do this --
 2        A.   Sure.
```

```
 3          Q.    -- so that the record is clear.
 4     This FEMA Waxman 3867 is a number that we have
 5     on this document.  It's a three-page document
 6     signed by Michael S. Bonner dated April 6,
 7     2006.  And the -- and just for clarity, I
 8     think we will go ahead and attach a copy of it
 9     as Exhibit C.
10              MR. BARRIOS:  Do you intend to put
11     the complete copy that we produced to you?
12              MR. LAMBERT:  I only have these
13     three pages.
14              MR. BARRIOS:  Well, just by
15     chance...
16              MR. LAMBERT:  You have the whole
17     thing.
18              (Deposition Exhibit No. 1C was
19     marked for identification.)
20              BY MR. LAMBERT:
21          Q.    All right.  Was this done pursuant
22     to some provision in the contract?
0158
 1          A.    Not that I am aware of.  Explain
 2     what you mean by "some provision in the
 3     contract."  Are you saying that we were given
 4     a written request to do this or -- I am not
 5     sure I understand the question.
 6          Q.    Well, first of all, payments were
 7     made for work performed by CH2M Hill --
 8          A.    Yes.
 9          Q.    -- from the government to CH2M
10     Hill.
11          A.    Right.
12          Q.    And those payments all went into
13     some account under the contract that had to do
14     with travel trailers, correct?
15          A.    Correct.
16          Q.    Was the payment for the Bonner
17     Analysis [sic] Testing Company work paid for
18     by that same account?
19          A.    Yes.
20          Q.    Okay.  Now, in the general
21     descriptions of work to be performed that you
22     have been asked a bunch of questions about
0159
 1     maintenance functions and providing safe and
 2     habitable structures -- is that general
 3     provision one that would give you the right to
 4     charge for this particular work?
 5          A.    In my mind, no.
 6          Q.    In your mind, what was the --
 7          A.    In my --
 8          Q.    Let me finish the question.
 9              We didn't do this because we don't
10     want to take up a bunch of time --
11          A.    Sure.
12          Q.    -- but it helps if we wait for each
13     other.  The court reporter has an easier time.
```

```
14          A.   It's okay with me.
15          Q.   And now you're going to give me
16    your own personal opinion or your position as
17    a spokesman for CH2M?
18          A.   I am going to give you my position
19    as how I interpret the contract.
20          Q.   You meaning the company?
21          A.   Under CH -- yes.
22          Q.   Okay.  Go ahead.  How do you
0160
 1    interpret?
 2          A.   It's not in the statement of work.
 3          Q.   All right.  So how is it that --
 4    what was billed through the contract?
 5          A.   Because we performed that at the
 6    request of FEMA.
 7          Q.   All right.
 8          A.   And we had to be paid for it.
 9          Q.   All right.  Now, did the people
10    involved call FEMA, meaning in this particular
11    case, the family?
12          A.   I don't know the answer to that.
13    It may say that in there, but I can't remember
14    what it says.
15               MR. BARRIOS:  Just for the record,
16    the witness is going to be looking at Bates
17    stamp number CH2M-FEMA-006404 through 6412.
18               Is that going to be attached as an
19    exhibit?
20               MR. LAMBERT:  Yes, we can do that.
21               BY MR. LAMBERT:
22          Q.   Now, before you go through all
0161
 1    that, if you would, please --
 2          A.   Sure.
 3          Q.   -- I want your recollection, before
 4    you read the document, of how this occurred?
 5          A.   How this occurred?
 6          Q.   Yes.
 7          A.   I found out about it on a call.
 8          Q.   Okay.
 9          A.   We have operational calls.  At the
10    time, it might have been every day.
11          Q.   Okay.
12          A.   And everybody goes around the room
13    and gives an update, and I overheard somebody
14    say about taking a test.  And I said, what
15    test?  And they said, we took an analytical
16    test at the request of FEMA for formaldehyde.
17               I said, first -- you know, I'm kind
18    of paraphrasing here because I don't recall
19    exactly what was said.  But the bottom line
20    was I wasn't aware that we did the test.  I
21    immediately put a halt to the test and asked
22    for a copy of the test.
0162
 1          Q.   Okay.  Now, let's back up on that
```

```
 2     just for a second.
 3        A.   Sure.
 4        Q.   Is there a record of the date of
 5     this phone call that you're telling me about?
 6        A.   I don't know the answer to that.
 7        Q.   All right.  Who would know that?
 8        A.   I don't think anybody would know
 9     it.  I don't believe we kept minutes that
10     would say exactly that.  I could certainly
11     look, but I don't know.
12        Q.   All right.  I would like for you to
13     look and provide your counsel with whatever
14     records there are of that meeting.
15        A.   Okay.
16        Q.   The telephone meeting.
17             Can you tell me your best
18     recollection of who was on the phone call?
19     And start with the people present.  I take it
20     it was from this office?
21        A.   Some of them.
22        Q.   Well, start with the people that
0163
 1     were in the room with you from this CH2M Hill
 2     office yourself.
 3        A.   All I can speak -- without going
 4     back and seeing if I have a record -- is
 5     myself from the office.
 6        Q.   All right.  Who else do you recall
 7     was on the phone?
 8        A.   I believe Brian Rabe was on the
 9     telephone.
10        Q.   Okay.  And that's because he is the
11     fellow that is mentioned?
12        A.   Yes.
13        Q.   And where is Brian Rabe -- and how
14     do you spell his last name?
15        A.   R-a-b-e.
16        Q.   All right.  And where is Brian Rabe
17     located?
18        A.   Korea.
19        Q.   In Korea?
20        A.   Yes.
21        Q.   Okay.  And what entity is he part
22     of?
0164
 1        A.   CCI.
 2        Q.   Okay.  And tell me how he gets
 3     involved in this.
 4        A.   Well, he was the deputy program
 5     manager in Mississippi.  And my recollection
 6     is he was asked to do this by the government.
 7        Q.   Now, he is the deputy program
 8     manager?
 9        A.   For Mississippi.
10        Q.   For Mississippi, and he is in
11     Korea?
12        A.   Yes.  This contract is over.
```

```
13    Remember, it's over a long time ago.
14         Q.   Okay.  But at the time, he was in
15    Mississippi?
16         A.   Yes, sir.
17         Q.   Okay.
18         A.   Yes.
19         Q.   All right.  And -- all right.  Do
20    you know whether or not that particular
21    request was as a result of a complaint by the
22    family made to this hotline, the 24/7 hotline?
0165
 1         A.   Do not know.
 2              MR. MILLER:  Objection.
 3    Foundation.
 4              BY MR. LAMBERT:
 5         Q.   Was there a 24/7 hotline available
 6    to the individuals in the FEMA trailers in
 7    Mississippi?
 8         A.   From what I recall, yes.
 9         Q.   Okay.  Part of the tasks outlined
10    in some of these documents was to record if
11    there were any recurring issues.  Do you
12    recall that?
13         A.   I recall reading something like --
14    about warranty issues.
15         Q.   Okay.  I think it's warranty and
16    recurring --
17         A.   I think it's under warranty.
18              MR. BARRIOS:  If you want to show
19    him the document, that would be better.
20              BY MR. LAMBERT:
21         Q.   Do you remember whether or not --
22    before you had this telephone call about the
0166
 1    testing, do you remember whether or not there
 2    had been complaints of smells by occupants of
 3    the trailers reported?
 4         A.   I have no idea.  I don't recall
 5    anything like that.
 6         Q.   Okay.  Would that be in those
 7    maintenance records that would be on the CD?
 8              MR. BARRIOS:  Objection to form.
 9              BY MR. LAMBERT:
10         Q.   Go ahead and answer it.
11         A.   Possibly.  I don't know the answer
12    to that.
13         Q.   Okay.  And what I am talking about
14    is -- and we have talked about this before --
15    the CD-ROM in Microsoft Word or Excel that
16    would record maintenance complaints, it would
17    be -- if there were a record of maintenance
18    complaints reported to this 24/7 toll-free
19    number having to do with air quality issues,
20    that's probably where it would be?
21              MR. BARRIOS:  Objection.
22              BY MR. LAMBERT:
0167
```

```
 1          Q.    Correct?
 2                MR. BARRIOS:  You can answer.
 3                THE WITNESS:  If somebody called --
 4     I don't know if it would be an air quality
 5     issue.  Somebody might have called up with a
 6     complaint.  Now, I am not going to define air
 7     quality --
 8                BY MR. LAMBERT:
 9          Q.    Whether you want to do air
10     quality --
11          A.    Okay.
12          Q.    If somebody said --
13          A.    If there was a complaint --
14          Q.    -- my eyes are watering, you
15     know --
16          A.    That would probably be on there,
17     yes.
18          Q.    Okay.  And that would probably be
19     on that CD-ROM?
20          A.    I would guess it would be.  I don't
21     know for sure.
22                MR. BARRIOS:  You're just asking
0168
 1     him to speculate as to whether, if there were
 2     one, whether that's where it would be.  That's
 3     what you're asking him.
 4                MR. LAMBERT:  Those are your words.
 5     That's an objection -- I take it.  It's noted.
 6                BY MR. LAMBERT:
 7          Q.    Do you know of any other location
 8     other than that maintenance record CD-ROM,
 9     where it would be --
10          A.    No, sir.
11          Q.    -- "it" being the complaint about
12     my eyes are watering, I am sneezing, throat
13     irritation, whatever?
14                MR. BARRIOS:  Objection.  Assumes
15     facts not in evidence.
16                BY MR. LAMBERT:
17          Q.    Go ahead and answer.
18                MR. MILLER:  Objection -- I would
19     like to throw one in as well.  Assumes facts
20     not in evidence.
21                BY MR. LAMBERT:
22          Q.    Okay.  Go ahead.
0169
 1          A.    I'm not aware of another place.  I
 2     mean, certainly it could be somewhere.
 3          Q.    Okay.
 4          A.    It could be in a -- you know,
 5     scratch paper, e-mail.  I don't know.
 6          Q.    All right.  Highest likely would be
 7     in that maintenance record?
 8          A.    I would have to assume that, if
 9     somebody called in a complaint.
10          Q.    Okay.  Now, you've read this
11     exhibit which we have marked as Exhibit No. C.
```

```
12     I think your counsel has supplied us with a
13     different copy than I have, and I assume it's
14     the same.
15          A.    I read it a while ago.
16          Q.    Okay.  Do you remember in the
17     telephone discussion anyone telling you that
18     the Sistrunks -- and that's who these people
19     are -- complained that they experienced
20     symptoms described as burning of eyes and
21     feeling sick and that -- do you remember that?
22          A.    No, sir, I don't.
0170
 1          Q.    Do you remember that one of the
 2     reasons given for the testing was that they
 3     had visited a doctor and that the doctor
 4     suggested that they may have been exposed to
 5     formaldehyde?
 6          A.    I don't remember.
 7          Q.    Do you remember the word
 8     "formaldehyde" in connection with the
 9     discussion on the phone that you told us
10     about?
11          A.    I don't remember that, but I can
12     actually assume that if I asked for the
13     analytical report.  I don't know, though.  I
14     mean, that was two years ago -- over two years
15     ago.
16          Q.    All right.  Do you remember why you
17     ordered them to stop doing any testing?
18          A.    Because we do not do analytical
19     services in our statement of work.  Another
20     example would be biohazards.  We don't do that
21     either.  When somebody cuts themselves and
22     there is blood everywhere, we don't do that.
0171
 1     It's not in our statement of work.
 2          Q.    Okay.  Well, nobody cut themselves
 3     here.  These people were just --
 4          A.    I am just trying to give you an
 5     example.
 6          Q.    Okay.  Don't interrupt me and I
 7     won't interrupt you.
 8          A.    All right, sir.
 9          Q.    All right.  Nobody cut themselves
10     here.  We're talking about people just
11     breathing in the normal use of their travel
12     trailer, or their temporary housing unit,
13     whatever you want to call it.
14                What steps did you take to
15     determine the cause of the problems described
16     by these individuals?
17          A.    As far as this analytical goes?  We
18     were requested a service from FEMA, and we
19     provided the results to FEMA.
20          Q.    Okay.  I understand.
21          A.    Okay.
22          Q.    But you said you stopped any
```

```
12      I think your counsel has supplied us with a
13      different copy than I have, and I assume it's
14      the same.
15           A.   I read it a while ago.
16           Q.   Okay.  Do you remember in the
17      telephone discussion anyone telling you that
18      the Sistrunks -- and that's who these people
19      are -- complained that they experienced
20      symptoms described as burning of eyes and
21      feeling sick and that -- do you remember that?
22           A.   No, sir, I don't.
0170
 1           Q.   Do you remember that one of the
 2      reasons given for the testing was that they
 3      had visited a doctor and that the doctor
 4      suggested that they may have been exposed to
 5      formaldehyde?
 6           A.   I don't remember.
 7           Q.   Do you remember the word
 8      "formaldehyde" in connection with the
 9      discussion on the phone that you told us
10      about?
11           A.   I don't remember that, but I can
12      actually assume that if I asked for the
13      analytical report.  I don't know, though.  I
14      mean, that was two years ago -- over two years
15      ago.
16           Q.   All right.  Do you remember why you
17      ordered them to stop doing any testing?
18           A.   Because we do not do analytical
19      services in our statement of work.  Another
20      example would be biohazards.  We don't do that
21      either.  When somebody cuts themselves and
22      there is blood everywhere, we don't do that.
0171
 1      It's not in our statement of work.
 2           Q.   Okay.  Well, nobody cut themselves
 3      here.  These people were just --
 4           A.   I am just trying to give you an
 5      example.
 6           Q.   Okay.  Don't interrupt me and I
 7      won't interrupt you.
 8           A.   All right, sir.
 9           Q.   All right.  Nobody cut themselves
10      here.  We're talking about people just
11      breathing in the normal use of their travel
12      trailer, or their temporary housing unit,
13      whatever you want to call it.
14                What steps did you take to
15      determine the cause of the problems described
16      by these individuals?
17           A.   As far as this analytical goes?  We
18      were requested a service from FEMA, and we
19      provided the results to FEMA.
20           Q.   Okay.  I understand.
21           A.   Okay.
22           Q.   But you said you stopped any
```

```
0172
 1     further testing.
 2          A.    I provided the results to FEMA.  Or
 3     I didn't.  My folks did.
 4          Q.    But then you stopped -- you told --
 5     on the same phone call you told them not to do
 6     any more testing.
 7          A.    That's right.
 8          Q.    Okay.  What did you suggest be done
 9     to determine the problems that were reported
10     by these individuals living in the unit?
11               MR. MILLER:  Objection.  Assumes
12     facts not in evidence.
13               MR. BARRIOS:  He beat me.
14               BY MR. LAMBERT:
15          Q.    Go ahead and answer.
16          A.    Reported it to FEMA.
17          Q.    Okay.  That's all?
18          A.    The COTR, yes.
19          Q.    I'm sorry?
20          A.    The COTR.
21          Q.    What's COTR?
22          A.    Contracting officer's technical
0173
 1     representative.
 2          Q.    Okay.  Now, did you tell them that
 3     you all had the capability of doing
 4     environmental sort of testing?
 5          A.    I didn't tell them that.
 6          Q.    Okay.
 7          A.    And let's be clear too.  We did not
 8     do that test.  I want to make sure that we
 9     understand.  That says Bonner Analytical.
10     CH2M Hill did not do that test.
11          Q.    CH2M Hill is capable of doing that
12     test.
13          A.    I don't know the answer to -- I'm
14     not aware that we have a laboratory.
15          Q.    Okay.  Now, you have a master's
16     degree in environmental engineering from Penn
17     State?
18          A.    Correct.
19          Q.    You don't know whether or not --
20     and you're under oath.  Do you understand
21     that?
22          A.    Yes.
0174
 1          Q.    Okay.  Just so you understand, the
 2     same penalties for perjury apply to testimony
 3     given in this deposition as if you were
 4     sitting in a courtroom.  Do you understand
 5     that?
 6          A.    Yes, sir.
 7          Q.    Okay.  Now, you do not know whether
 8     or not CH2M Hill has the ability to perform an
 9     air test that would disclose the presence of
10     formaldehyde?
```