UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER                    MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION           SECTION "N-5"
                                       JUDGE ENGELHARDT
                                       MAG. JUDGE CHASEZ


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


DEFENDANT UNITED STATES OF AMERICA'S MOTION
TO DISMISS PLAINTIFFS' REMAINING FTCA CLAIMS
FOR LACK OF SUBJECT MATTER JURISDICTION


U.S. EXHIBIT NO. 1

<pre>
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2   ******************************************************************

 3

     IN RE:  FEMA TRAILER
 4   FORMALDEHYDE PRODUCTS              Docket No. MDL-1873(N)
     LIABILITY LITIGATION              New Orleans, Louisiana
 5                                     Tuesday, December 2, 2008

 6   ******************************************************************

 7

              TRANSCRIPT OF MOTION TO CERTIFY CLASS PROCEEDINGS
 8           HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                    UNITED STATES DISTRICT JUDGE

 9


10

     APPEARANCES:
11

     FOR THE PLAINTIFF
12   STEERING COMMITTEE:               GAINSBURGH BENJAMIN DAVID
                                       MEUNIER AND WARSHAUER
13                                     BY:  GERALD E. MEUNIER, ESQ.
                                            JUSTIN I. WOODS, ESQ.
14                                     2800 Energy Centre
                                       1100 Poydras Street, Suite 2800
15                                     New Orleans, LA 70163

16
                                       LAW OFFICES OF FRANK J. D'AMICO, JR.
17                                     BY:  FRANK J. D'AMICO, JR., ESQ.
                                       622 Baronne Street
18                                     New Orleans, LA 70113

19
                                       REICH & BINSTOCK
20                                     BY:  DENNIS REICH, ESQ.
                                       4265 San Felipe, Suite 1000
21                                     Houston, TX 77027

22

23                                     NEXSEN PRUET JACOBS POLLARD & ROBINSON
                                       BY:  PAUL A. DOMINICK, ESQ.
24                                     P. O. Box 486
                                       Charleston, SC 29402

25
</pre>

```
 1   FOR THE DEFENDANTS'
     LIAISON COUNSEL:              DUPLASS ZWAIN BOURGEOIS MORTON
 2                                 PFISTER & WEINSTOCK
                                   BY:   ANDREW D. WEINSTOCK, ESQ.
 3                                       JOSEPH G. GLASS, ESQ.
                                   Three Lakeway Center
 4                                 3838 N. Causeway Boulevard, Suite 2900
                                   Metairie, LA 70002
 5

 6
     FOR THE GOVERNMENT:           UNITED STATES DEPARTMENT OF JUSTICE
 7                                 BY:   HENRY T. MILLER, ESQ.
                                         MICHELLE G. BOYLE, ESQ.
 8                                       ADAM M. DINNELL, ESQ.
                                   Civil Division - Torts Branch
 9                                 P.O. Box 340, Ben Franklin Station
                                   Washington, D.C. 20004
10

11

12   FOR FLEETWOOD ENTERPRISES,
     INC. AND FLEETWOOD CANADA,
13   LTD.:                         NELSON, MULLINS, RILEY & SCARBOROUGH
                                   BY:   RICHARD K. HINES, V, ESQ.
14                                 201 17th St., NW
                                   Suite 1700
15                                 Atlanta, GA 30363

16

17

18   Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR
                                   500 Poydras Street, Room HB-406
19                                 New Orleans, Louisiana 70130
                                   (504) 589-7776
20

21

22      Proceedings recorded by mechanical stenography, transcript
     produced by computer.
23

24

25
```

3

1

I N D E X

2

WITNESSES FOR PLAINTIFF:                                    PAGE/LINE:

3

PATRICIA M. WILLIAMS, Ph.D.

4

    Voir Dire Examination by Mr. D'Amico          12/25
5   Traverse Examination by Mr. Weinstock         21/19
    Direct Examination by Mr. D'Amico             24/7
6   Cross-Examination by Mr. Weinstock            62/16
    Cross-Examination by Mr. Dinnell              100/23
7   Redirect Examination by Mr. D'Amico           114/5

8

9

WITNESSES FOR DEFENDANTS:

10

H. JAMES WEDNER, M.D.

11

    Voir Dire Examination by Mr. Hines            117/1
    Traverse Examination by Mr. Reich             120/4
12  Direct Examination by Mr. Hines               120/25
    Cross-Examination by Mr. Reich                130/4

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                 (TUESDAY, DECEMBER 2, 2008)

 3                 (MOTION TO CERTIFY CLASS)

 4

 5              THE COURT:  Good morning.  As you were.  All right.  We

 6      have today the hearing for class certification in the FEMA Trailer

 7      Formaldehyde Products Liability Litigation, MDL No. 1873.

 8              Counsel, are you prepared to proceed?

 9              MR. MEUNIER:  For plaintiffs we are, your Honor.

10              MR. WEINSTOCK:  Defendants are as well, your Honor.

11              MR. MILLER:  The government as well, your Honor.

12              THE COURT:  Let's go ahead and make our appearances then

13      of those of you who are going to have an active participatory role

14      in this hearing.  Mr. Meunier.

15              MR. MEUNIER:  For the PSC, Jerry Meunier.

16              MR. D'AMICO:  On behalf of the PSC, Frank D'Amico, Jr.

17              THE COURT:  Good morning.

18              MR. WOODS:  On behalf of the PSC, Justin Woods.

19              THE COURT:  Good morning.

20              MR. WEINSTOCK:  For the manufacturing defendants, Andy

21      Weinstock.

22              MR. HINES:  For the manufacturing defendants, Richard

23      Hines.

24              MR. MILLER:  On behalf of the United States, your Honor,

25      Henry Miller, Adam Dinnell, and Michelle Boyle.
```

1          MR. MEUNIER:  Dr. Patricia Williams.

2          THE COURT:  Dr. Williams, if you would come up here,

3   ma'am.  Please remain standing until you take the oath.

4          Before we start, last call for cell phones.  Anybody that

5   has cell phones, black berries, pagers, whatever else they've

6   invented since I instituted my rule, would you please turn those in

7   to my secretary Susan.  Even turned off I appreciate it if you

8   would not have those in the courtroom.

9          Those of you who can't see that need to see this, this is

10  just for attorneys, if you would like to sit in the jury box,

11  you're free to do so.  It may be if you're sitting on this side it

12  may be hard to see the screen.  Maybe you've already seen the slide

13  show or whatever, PowerPoint.

14         THE DEPUTY CLERK:  Please raise your right hand.

15   (WHEREUPON, PATRICIA M. WILLIAMS, Ph.D., WAS SWORN IN AND

16  TESTIFIED AS FOLLOWS:)

17         THE DEPUTY CLERK:  Thank you.  You may be seated.

18         THE WITNESS:  There was one more thing I needed.

19         THE DEPUTY CLERK:  Okay.  Please state your name and give

20  correct spelling for the record.

21         THE WITNESS:  Patricia M. Williams, P-A-T-R-I-C-I-A,

22  middle initial M, Williams, W-I-L-L-I-A-M-S.

23         THE COURT:  Go ahead.

24                          VOIR DIRE EXAMINATION

25  BY MR. D'AMICO:

1  Q.  Good morning, your Honor, Frank D'Amico, Jr. on behalf of the

2  Plaintiffs Steering Committee.

3      Dr. Williams, would you please state your name for the

4  record.

5  A.  Patricia M. Williams, Ph.D., DABT.

6  Q.  And, Dr. Williams, in connection with your testimony, did you

7  provide the court with an up-to-date and current copy of your

8  curriculum vitae?

9  A.  Yes, I did.

10      MR. D'AMICO:  And that curriculum vitae, your Honor, has

11  already been attached and made a part of the record, so we won't go

12  into all of her publications and all of her extensive background.

13  But for the benefit of the court because there is a Daubert

14  challenge, I would like to go over a few of her background

15  credentials.

16      THE COURT:  Sure.

17  BY MR. D'AMICO:

18  Q.  Dr. Williams, would you please give us a brief recitation of

19  your education and training, and mention anything specific to that

20  which might be of particular interest to this case.

21  A.  Well, I am board certified in toxicology by the American Board

22  of Toxicology, which is actually certifies internationally, there

23  are about 2,000 of us worldwide with that certification.  It

24  requires passage of a three half day board exam with

25  credentialing -- first, before we can take it we have to be judged

1    as to whether we have practiced toxicology for a period of time.

2    And then you're allowed to take the board.

3           I completed all three parts successfully on the first try,

4    there is usually about a 50 percent passage rate on it.  From then

5    you must maintain continuing education on an annual basis and

6    recertify in another five years, every five years.  You may not use

7    the term DABT, Diplomate of the American Board of Toxicology,

8    unless you do.  It's a competency exam in toxicology.

9           That -- my credentials since I think it was 2006, November

10   of 2006.  I have a Bachelor of Science in medical technology and I

11   am licensed by the State of Louisiana and qualified, also board

12   certified for the interpretation -- performance and interpretation

13   of all complexity testing, including high complexity testing of

14   laboratory procedures.

15          And in addition because of my doctorate level and my

16   experience and that board certification, I am qualified under

17   federal law, the CLIA, Clinical Laboratory Improvement Act, to be a

18   laboratory director.  And have had a medical surveillance

19   laboratory for -- laboratory procedures for environmental and

20   occupational exposure to analyze clinical warning signs.  That's my

21   bachelorette degree.

22          I also have a masters in microbiology, and in that

23   microbial physiology and biochemistry as part of that.  I began

24   working with formaldehyde at that time as my master's level because

25   I did electron microscopy, so I formed the cross-links and tissues

1    with the formaldehyde to be able to look at the structures, cell

2    structures and cytostructures.

3            I have a doctorate in anatomy from Tulane in the

4    Department of Anatomy, specifically my minor is biochemistry.  I

5    did work on erythropoiesis and megakaryocytopoiesis, and again used

6    formaldehyde and other aldehydes in fixation of tissues,

7    visualization of cell receptors and ultra structure of the cell as

8    well as, of course, cadavers we have formaldehyde fixative in

9    there.

10           My doctorate, of course, I did animal and human research,

11   including dose responses and analysis of those particular kinds.

12   I've also done immunocytochemistry.

13           Post doctorally I continued to have graduate training in

14   epidemiology from Tufts Medical Center, and then, of course,

15   continued with some continuing education at the New England

16   Epidemiology Center.  I think that was at the University of

17   Michigan.  I also did some -- I do a lot of continuing education in

18   toxicology, University of Kansas Medical Center, Dr. Clawson who

19   wrote the book on toxicology has a course, and then every year I go

20   to cytotoxicology meetings.

21           I also in my academic career started out at LSU Medical

22   Center, and, of course, worked my way up and became a department

23   head in medical technology for seven years.  And that was a

24   statewide position in which I organized and implemented the

25   teaching programs and all of the aspects of medical technology,

1    immunology, hematology, clinical chemistry, paracytology,

2    microbiology, urinalysis, the works.

3          Then I went on to become the director of the occupational

4    toxicology outreach program as an associate professor, tenured

5    associate professor of medicine with LSU Medical Center in

6    Shreveport.  And there I ran a statewide program for prevention of

7    disease from chemical exposure.

8          My main responsibility was to be, to provide information

9    to physicians who are unfortunately are not trained in recognition

10   and the other etiology, the occupational environmental etiology of

11   disease.  So I taught second year medical students and worked

12   closely with my fellow peers in the Department of Medicine, as well

13   as community physicians throughout the state.  They would call me

14   and ask me if I would do the environmental histories on their

15   patients when they could find no other reason why they were not

16   responding to treatment.

17         So I did that from 1995 to 2005.  I was also a codirector

18   of the Center of Excellence for Clinical and Forensic Toxicology

19   which is really pulls together things outside of occupational and

20   environmental medicine such as drug testing, forensic type work.

21         In 2005 I moved to the University of New Orleans --

22   actually, while I was in Shreveport I implemented an asthma

23   education and intervention program.  I had received funding as I

24   proposed a settlement in a case by Judge Mary Ann Lemmon's court,

25   and it was accepted as a win-win from both sides; so then I

1    inherited the job to implement it, and I was the principle

2    investigator.  So I implemented that, you know, at St. John Parish

3    for adults and children.

4           And then it was so successful I brought all of the

5    computer programs that we developed for the intervention and the

6    education program to the pulmonary care clinic in Shreveport with

7    my colleagues.  And I maintained through my budget asthma educated

8    to implement that.

9           From there I moved to the University of New Orleans and

10   became the coordinator for toxicology research laboratories and I'm

11   an associate professor in the Pontchartrain Institute for

12   Environmental Sciences.  There I teach three courses in toxicology:

13   Toxicology in Human Health, Ecotoxicology, and be teaching a new

14   one, the Toxicology of Coastal Marine Microorganisms, because they

15   do a lot of the coastal erosion work.

16   Q.  Doctor, have you ever performed health profiles and

17   epidemiologic studies in workers to identify the evolution of

18   disease in association with chemical exposures?

19   A.  Yes.  I've surveyed over 17,000, and stopped counting after

20   that, workers throughout the state with surveys similar to symptom

21   surveys that we used on the plaintiff fact sheet to identify.  And

22   I worked with both industry, as well as labor, on hazardous

23   materials committees to help them identify through the symptoms hot

24   spots in their workplace that needed to be addressed.

25   Q.  Doctor, have these survey questionnaires ever been used in

1    court?

2    A.   No.   I would not allow that.   That was strictly for the benefit

3    of both industry and labor, and I was often called in by industry

4    itself to help them with it.

5    Q.   Okay.   Let me make sure I understand you.   These survey

6    questionnaires, have they ever been used in court?

7    A.   Oh, now, I have other surveys.

8    Q.   Yes.

9    A.   I have the environmental history surveys.

10   Q.   That's what I'm talking about.

11   A.   You asked about the workers.   The workers, that I would not

12   allow to be used in court, that was kept very confidential, only

13   industry or management or the workers' unions would know that.

14           But I have also an environmental health survey that was

15   developed and certainly was peer reviewed by, approved by and used

16   in a community study, Grand Bois, for research, which was a

17   two-year study followed up one year of the epi study and using that

18   research, that environmental health survey, and then a medical

19   surveillance with laboratory procedures for a year.   That same

20   survey I used with the physicians, as I mentioned, to do an

21   environmental history.

22           But it also has been accepted in two federal courts, one

23   in U.S. District Court as a causation tool, one in U.S. District,

24   Northern Mississippi, I think Eastern District, Columbus,

25   Mississippi; and the other in Texarkana Division, I think that's

1  Northern Texas -- no, Eastern Texas -- Texarkana division of the

2  U.S. District Court.  Both have acknowledged the, that particular

3  health survey as an absolute acceptable and really praised it, I

4  think, in their orders as being very good.

5  Q.  Have you ever been qualified as an expert to testify in federal

6  court before?

7  A.  Yes.

8  Q.  Can you tell us how many times?

9  A.  Twice.

10  Q.  Have you ever been excluded from testifying in your area of

11  expertise in any courts?

12  A.  No.

13  Q.  And have you ever been qualified by the courts as an expert in

14  the areas of expertise as you've recited them to the court?

15  A.  Wait.  Would you repeat that?

16  Q.  Which areas of expertise have you been qualified in?

17  A.  Oh, the areas of expertise, toxicology, anatomy, hematology,

18  epidemiology, interpretation of laboratory procedures, causation,

19  etiology, specific and general causation, and many other things.

20        THE COURT:  That was on both occasions, twice that you've

21  been qualified in federal court you were offered in all of those

22  areas --

23        THE WITNESS:  In Texarkana --

24        THE COURT:  Wait.  Let me finish.

25        THE WITNESS:  Oh, okay.

1          THE COURT:  You were offered on the areas that you just

2    recited and were accepted in all of those areas on both occasions

3    in federal court?

4          THE WITNESS:  In federal court, toxicology and -- yes,

5    interpretation of the etiology of disease and specific and general

6    causation in the Mississippi case, yes.

7          In the Texarkana, it was a strange little case, and that

8    was, if I remember correctly, I wasn't board certified at that time

9    so it was really for the etiology of disease and specific and

10   general causation.

11         THE COURT:  Okay.

12   BY MR. D'AMICO:

13   Q.   As a causation expert, have you qualified in various courts of

14   law specifically in the areas of toxicology?

15   A.   Yes.

16   Q.   Anatomy?

17   A.   Yes.

18   Q.   Epidemiology?

19   A.   Yes.

20   Q.   Hematology?

21   A.   Yes.

22   Q.   Neuroanatomy?

23   A.   Yes.

24   Q.   Medical surveillance using laboratory procedures?

25   A.   Yes.

1   Q.   Performance and interpretation of health assessments?

2   A.   Yes.

3   Q.   Causation of diseases in communities and individuals

4   environmentally exposed to toxic chemicals?

5   A.   Yes.

6           MR. D'AMICO:  Your Honor, in connection with the proffer,

7   I'd like to tender the witness as an expert in toxicology, anatomy,

8   epidemiology, hematology, neuroanatomy, medical surveillance using

9   medical procedures, performance and interpretation of health

10  assessments, and causation of diseases in communities in

11  individuals environmentally exposed to toxic chemicals.

12          THE COURT:  Counsel, would you prefer to go ahead and voir

13  dire this witness now on the area of expertise?

14          MR. WEINSTOCK:  Yes, because it's going to be about five

15  questions, your Honor, so I just assume handle expertise very

16  quickly.

17          THE COURT:  Okay.  All right.

18                        TRAVERSE EXAMINATION

19  BY MR. WEINSTOCK:

20  Q.   Were you qualified as an expert in epidemiology in federal

21  court?

22  A.   No, no.  That was -- that was in relation to the surveys in a

23  state court.

24  Q.   And then I believe you said or counsel said that in Mississippi

25  you were qualified to testify as to specific and general causation?

1   bell shaped curve at 400 ppb.  You still have irritation to the

2   eyes, tearing of the eyes at 400 ppb is the lowest, irritation to

3   the eyes 8 ppb, headaches 20 ppb, nausea/vomiting 20 ppb,

4   difficulty -- let's see.  Diarrhea, 20 ppb, wheezing, shortness of

5   breath, persistent cough, tightness of the chest, all 400 ppb;

6   bronchitis four -- throat irritation, 81 ppb, laryngitis -- not

7   laryngitis.  Dizziness, 200 ppb; those are in my report as the

8   lowest end on that Gaussian or bell shaped curve.  So you're really

9   ignoring the susceptible population when you make that

10  determination.  And since you said it concerns money, economics and

11  politics, but really more economics I think than anything.

12  Q.  And the government decided that .4 ppm would be that standard,

13  right?

14  A.  For their purposes.

15  Q.  And that standard is still in effect to this day, correct?

16  A.  As far as I know it is.

17  Q.  And I just quickly want to take a moment to talk about

18  responses to formaldehyde concerns, okay.  We're going to look at

19  G-91.

20  A.  I don't have a 91.

21          MR. DINNELL:  May I approach, your Honor?

22          THE COURT:  Yes, go ahead and give it to her.

23          THE WITNESS:  Oh, you mean another exhibit.

24          MR. DINNELL:  Got it?

25          THE WITNESS:  Yes.

1    BY MR. DINNELL:

2    Q.  G-91 is a document titled Important Information for Travel

3    Trailer Occupants, correct?

4    A.  Correct -- well, let me see if that's the same, yeah.

5    Q.  The cover page --

6    A.  Yeah, I saw it.

7    Q.  Have you seen this document before?

8    A.  No.

9    Q.  Were you aware that the government had issued this brochure to

10   residents of travel trailers?

11   A.  No.

12   Q.  Now, I want you to turn to that page that actually has the text

13   on it, and on the far right side there is a paragraph titled "What

14   can I do to reduce my exposure to formaldehyde in my travel

15   trailer."  Do you see that?

16   A.  Yes.

17   Q.  In that section FEMA made four recommendations as the how to

18   reduce formaldehyde in a travel trailer.  Do you see those?

19   A.  Yes.

20   Q.  The first method was increase ventilation, correct?

21   A.  Yes.

22   Q.  The second method, keep indoor temperatures moderate; do you

23   see that?

24   A.  Yes.

25   Q.  Third method, lower the humidity.  And then fourth method, do

1    not smoke inside, correct?

2    A.  Right.

3    Q.  And specifically, that first one, increase ventilation states,

4    "You can reduce your exposure to formaldehyde by bringing more

5    outdoor air into your home.  Open windows and doors whenever

6    possible."  Is that right?

7    A.  That's what it says.

8    Q.  Right.  Now, you would agree that increased ventilation inside

9    a residence can effect the levels of formaldehyde, correct?

10   A.  Increasing the ventilation can reduce them.

11   Q.  Now, we talked earlier about the ATSDR toxicological profile,

12   correct?

13   A.  Correct.

14   Q.  And you said that it's voluminous, comprehensive -- the leading

15   information center for information about center substances,

16   correct?

17   A.  Well, it's a leading document for -- that really, it relates to

18   communities, but I mean, it's a leading scientific document, but

19   they often try to word things in the beginning for lay community

20   people.

21   Q.  I want to take a look at that, that's G-84, and this is the

22   ATSDR toxicological profile.

23            MR. DINNELL:  May I approach, your Honor?

24   BY MR. DINNELL:

25   Q.  And you've identified this ATSDR toxicological profile as one

1   of the documents that you reviewed in your work on this case; is

2   that right?

3   A.   That's right.

4   Q.   You've read it cover to cover?

5   A.   This is -- oh, wait here it is.  Okay.  Yeah.

6   Q.   Got it?

7   A.   Yes, I found it.

8   Q.   And you've read the profile cover to cover during your work on

9   this case?

10  A.   I have read the profile.  It has some areas that are redundant,

11  so if I am hitting another redundant area I may not read that

12  exact --

13  Q.   But you've cited to this document in your work?

14  A.   Yes, I have covered it extensively.

15  Q.   And the toxicological profile is issued by the ATSDR like you

16  talked about earlier, right?

17  A.   Yes.

18  Q.   It's a government agency and is a peer-reviewed document; is

19  that right?

20  A.   Oh, yes.

21  Q.   Now I want to direct your attention to the portion of the

22  toxicological profile that discusses how to reduce or respond to

23  formaldehyde concerns.  It's page ATSDR-25.

24  A.   That's page 25 up there?

25  Q.   And that's page 25 is the coded page number, ATSDR 25.

1   A.  At the bottom (INDICATING)?

2   Q.  That's right.

3           MR. D'AMICO:  Page six at the top.

4           MR. DINNELL:  Right.

5           THE WITNESS:  Okay.  Got it.

6   BY MR. DINNELL:

7   Q.  Now, in the second paragraph on this page, the ATSDR reports,

8   "Formaldehyde is usually found in the air."  And then it states,

9   "Opening windows or using a fan to bring in fresh air is the

10  easiest way to lower formaldehyde levels in the home and reduce the

11  risk of exposure to your family."  Correct?

12  A.  That is what it says.

13  Q.  And you'd agree with the ATSDR that in indoor environments

14  opening windows or using a fan can successfully lower formaldehyde

15  levels?

16  A.  In the air.  It says in the air.  It doesn't address the

17  formaldehyde that has dissolved on the, in the water of the

18  pacifier or the baby's bottle or that has been absorbed into the

19  carpet and is -- you know, it doesn't address that.  It's talking

20  about this is the way we get it out when it's in the air.  It's not

21  addressing some of the major areas that I think concern the need

22  for the children.

23  Q.  But ventilation can help get formaldehyde out of the air,

24  right?

25  A.  In the air, if it's in the air, yes.

1   Q.  And ventilation is what was recommended in the FEMA brochure

2   that we put up on the board earlier, right?

3   A.  It's a band-aid approach.  It can certainly, you know, allow

4   air to circulate to the extent that it can -- I mean, my impression

5   of these trailers they don't have these French doors that you can

6   hold wide open.  So it's limited for air to be able to flow through

7   that.  I've seen little windows, correct me if I'm wrong, and they

8   have a better ventilation.  But some ventilation, I wouldn't be too

9   optimistic how much.

10  Q.  And ventilation is an approach recommended by the ATSDR?

11  A.  Well --

12  Q.  You just read it.

13  A.  It's a statement that if it's in the air and you get fresh air

14  in you're going to reduce it, and it's talking about that component

15  that's in the air, but it's not addressing, as I said, the concerns

16  that I have with drooling babies and pacifiers and baby bottles

17  that would be dissolved in the water that they're having their own

18  ambient environment.

19  Q.  Let's look at one more document here, we're going to go to

20  G-89, it's an EPA document titled An Introduction to Indoor Air

21  Quality.

22  A.  In here (INDICATING)?

23          MR. DINNELL:  I'll bring it up to you.  May I approach,

24  your Honor?

25          THE COURT:  Yes.

1    BY MR. DINNELL:

2    Q.  Do you have G-89 in front of you?

3    A.  Yes.

4    Q.  And that's an EPA document titled An introduction to indoor air

5    quality, correct?

6    A.  Yes.

7    Q.  You've seen this document before?

8    A.  No, I have not seen this before.

9    Q.  But you're familiar with using EPA materials on indoor air

10   quality?

11   A.  Yes, I do.

12   Q.  And they're a reputable source for any kind of indoor air

13   contaminant issue; is that fair?

14   A.  They give reputable information, yes.

15   Q.  Did you see the paragraph titled Steps to Reduce Exposure?

16   A.  On what page?

17   Q.  That's on page EPA-3, I'm sorry.

18   A.  All right.

19   Q.  Now, the EPA lists three steps to reduce exposure to

20   formaldehyde.  Do you see that?

21   A.  Yes.

22   Q.  The first one is use exterior grade pressed wood products.  Do

23   you see that?

24   A.  Right.

25   Q.  I want you to focus on the second and third steps to reduce

1   exposure to formaldehyde.  "(2) use air conditioning and

2   dehumidifiers to maintain moderate temperature and reduce humidity

3   levels."  Did I read that right?

4   A.  Correct.

5   Q.  And you see three, "increase ventilation, particularly after

6   bringing new sources of formaldehyde into the home."  Is that

7   right?

8   A.  That's correct.

9   Q.  So the EPA has also suggested ventilation as the means to

10  reduce formaldehyde levels, right?

11  A.  Correct.

12  Q.  And ventilation, again, was the same thing suggested in the

13  FEMA brochure that we talked about earlier?

14  A.  Correct.

15  Q.  Now, let's look at one last document.  We're going to go to

16  G-92.  All right.  Doctor, G-92 the front page says Fleetwood

17  Pioneer, correct?

18  A.  Yes.

19  Q.  And down below it says FEMA owner's manual near the bottom of

20  the page.  Do you see that?

21  A.  Yes.

22  Q.  Now, you see the coded page numbers down at the bottom, Fleet

23  30(b)(6) and then the number?

24  A.  Yes.

25  Q.  We're going to go to No. 11.  You've got it?

1   A.   Yes.

2   Q.   Page is entitled Important Notices, right?  Do you see that?

3   A.   The yellow highlighted portions, is that what you're asking me

4   to read?

5   Q.   Right.  We're going to focus on these first two warnings here.

6   And all three of these warnings are similar, so let's just look at

7   Warning No. 1 for right now.  It reads:  "This product is

8   manufactured with urea-formaldehyde resin.  Formaldehyde vapor may

9   in some people cause headaches, eye, nose and throat irritation and

10  aggravation of allergies and respiratory problems such as asthma.

11  Proper ventilation should reduce the risk of such problems."  Is

12  that right?

13  A.   You read it correctly, yes.

14  Q.   Now, do you have any idea how many residents chose to vent

15  their units in this case?

16  A.   No, I have no knowledge of that.

17  Q.   And you said earlier that venting can affect the levels of

18  formaldehyde present in a housing unit or indoor airspace; is that

19  right?

20  A.   If there is true ventilation, yes.

21  Q.   And ventilation is one of the methods suggested by the ATSDR

22  and the EPA to reduce formaldehyde levels; is that right?

23  A.   As a transient solution to reducing transient time periods of

24  ventilation of formaldehyde levels, how long can you keep your

25  windows open with a small child, I don't know.

1   Q.  But, yes --

2   A.  Ventilation is effective at that period in time that you're

3   ventilating reducing the levels in the air.

4   Q.  So ventilation is a means of effectively reducing formaldehyde

5   levels; is that right?

6   A.  Some of it, not all of it.

7         MR. DINNELL:  No further questions.

8         THE COURT:  All right.  Thank you.  All right.  You all

9   have about 11 minutes, on the defendant's side, to present two

10  witnesses if you want to re-evaluate that.

11        MR. WEINSTOCK:  Your Honor, we're only presenting one

12  witness.  And I have no trouble, if it's all right with you, if

13  they take time from what would be our closing argument.

14        THE COURT:  Okay.

15        MR. MEUNIER:  Well, that bares -- Judge, we have

16  17 minutes left, as I appreciate it.

17        THE COURT:  That's about right, yeah.

18        MR. MEUNIER:  And if I understand the rules, we can now

19  redirect and use some of that 17, or we can save that --

20        THE COURT:  You can redirect with this witness or you can

21  save it for --

22        MR. MEUNIER:  Or save it for cross.  So I guess I needed

23  to know if the defendants are truly going to put on a witness and

24  I'm hearing that they are.

25        MR. WEINSTOCK:  Yes.  Sorry.  Yes.

1   Q.  He's got a suggested leukemia case that's in this MDL, correct?

2   A.  I don't know.  I really don't know.

3   Q.  Have you discussed Mr. Geathreaux with him?

4   A.  No, I don't discuss -- I haven't at this point discussed it.  I

5   think he has a couple of people, but I am not quite sure.

6   Q.  And you have consulted with your son in the past on cases,

7   correct?

8   A.  Oh, I always, you know, if -- I can't serve as his expert

9   witness, but I will serve as his consultant when appropriate.

10  Q.  So if he is a member of the plaintiffs group, you could not

11  consult as one of their experts, is that what you're saying?

12  A.  I am not his consultant at this time.

13          MR. WEINSTOCK:  That's all I have.  Thank you.

14          THE COURT:  All right.  Thank you, Mr. Weinstock.  Any

15  follow-up -- I see Mr. Miller.  Did you have anything?

16          MR. MILLER:  The government has some questions, please.

17          THE COURT:  Certainly.

18          MR. D'AMICO:  I keep forgetting about the government in

19  this case.

20          MR. DINNELL:  Your Honor, Adam Dinnell for defendant

21  United States.

22                          CROSS-EXAMINATION

23  BY MR. DINNELL:

24  Q.  And, Dr. Williams, I want to talk with you briefly about

25  manufactured housing units.  All right.  You understand that by

1    manufactured housing units I'm talking about mobile home units?

2    A.  Well, I know there are different distinctions between the

3    difference, if you'll let me pull my --

4    Q.  Right.  You understand that manufactured housing units are

5    regulated by the Department of Housing and Urban Department, HUD?

6    A.  Yes.

7    Q.  Isn't it true that in regulating mobile homes, HUD has issued a

8    targeted indoor ambient formaldehyde level?

9    A.  Yes.

10   Q.  And this has come up in the past in your deposition, right?

11   A.  Yes.

12   Q.  You've seen that HUD target level, correct?

13   A.  Yes.

14   Q.  And you know that it's .4 ppm?

15   A.  Yes.

16   Q.  .4 ppm is 400 ppb, right?

17   A.  Yes.

18   Q.  I want you to take a look at what's been submitted as

19   Government Exhibit 86, we're going to put this up on the board.

20   This is the first page of G-86, HUD-1 is the document.  And this is

21   a citation to the Federal Register and this is HUD regulation on

22   manufactured housing titled Rules and Regulations, Department of

23   Housing and Urban Development.  Can you see the first page there?

24   A.  I really can't read it.  But as long as -- I'm sure somebody

25   will let me know if you're not reading it right.  Go ahead.

```
1              THE COURT:  Do you have a copy you want to let her see?

2              MR. DINNELL:  Sure.

3              MR. D'AMICO:  Can we have a copy of it, too, Judge?

4              THE COURT:  No, it should be in the exhibit book.  It's

5    No. 86 in the book.

6    BY MR. DINNELL:

7    Q.  Doctor, do you see the first page there of G-86?

8    A.  Yes.

9    Q.  Do you see the paragraph titled Summary?

10   A.  Yes.

11   Q.  Now it says that, "HUD is revising its manufactured home

12   construction and safety standards to improve the safety and quality

13   of manufactured homes."  Did I read that correctly?

14   A.  Yes.

15   Q.  And then it says, "Standards limiting permissible amounts of

16   formaldehyde emissions from plywood and particle board are being

17   added."  Correct?

18   A.  Yes.

19   Q.  Now I want you to turn to page, HUD-7 of G-86.

20   A.  Page seven?

21   Q.  Right.  You got it?

22   A.  Yes.

23   Q.  Okay.  Do you see down at the bottom there's a paragraph titled

24   (D) Targeted Ambient Level?

25   A.  Yes.
```

1   Q.  That paragraph reads, "The Department has concluded that an

2   indoor ambient formaldehyde level of .4 ppm provides reasonable

3   protection to manufactured home occupants.  The Department has

4   determined that the plywood and particle board standards will

5   result in indoor ambient formaldehyde levels of not greater than .4

6   ppm," and then it goes on.  Do you see that section?

7   A.  Yes.

8   Q.  And again, .4 ppm is 400 ppb when you convert it, right?

9   A.  Correct.

10  Q.  Now, let's look at HUD-10.  Do you have HUD-10 up?

11  A.  Yes.

12  Q.  I am in the last paragraph, and it states, "The Department,"

13  meaning HUD, "has concluded that there is insufficient medical and

14  scientific evidence to substantiate more than minimal health

15  benefits when formaldehyde levels are reduced below .4 ppm."  Do

16  you see that?

17  A.  Yes.

18  Q.  Now, when the government sets values like this, they have to

19  take into consideration both health, safety, but also political

20  factors and economic factors; is that right?

21  A.  That is right.

22  Q.  And you disagree with the HUD standard?

23  A.  I sure do.

24  Q.  Okay.  And why is that?

25  A.  Well, because you are certainly ignoring the people on that

1    bell shaped curve at 400 ppb.  You still have irritation to the

2    eyes, tearing of the eyes at 400 ppb is the lowest, irritation to

3    the eyes 8 ppb, headaches 20 ppb, nausea/vomiting 20 ppb,

4    difficulty -- let's see.  Diarrhea, 20 ppb, wheezing, shortness of

5    breath, persistent cough, tightness of the chest, all 400 ppb;

6    bronchitis four -- throat irritation, 81 ppb, laryngitis -- not

7    laryngitis.  Dizziness, 200 ppb; those are in my report as the

8    lowest end on that Gaussian or bell shaped curve.  So you're really

9    ignoring the susceptible population when you make that

10   determination.  And since you said it concerns money, economics and

11   politics, but really more economics I think than anything.

12   Q.  And the government decided that .4 ppm would be that standard,

13   right?

14   A.  For their purposes.

15   Q.  And that standard is still in effect to this day, correct?

16   A.  As far as I know it is.

17   Q.  And I just quickly want to take a moment to talk about

18   responses to formaldehyde concerns, okay.  We're going to look at

19   G-91.

20   A.  I don't have a 91.

21            MR. DINNELL:  May I approach, your Honor?

22            THE COURT:  Yes, go ahead and give it to her.

23            THE WITNESS:  Oh, you mean another exhibit.

24            MR. DINNELL:  Got it?

25            THE WITNESS:  Yes.