UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER            MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION   SECTION "N-5"
                               JUDGE ENGELHARDT
                               MAG. JUDGE CHASEZ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEFENDANT UNITED STATES OF AMERICA'S MOTION
TO DISMISS PLAINTIFFS' REMAINING FTCA CLAIMS
FOR LACK OF SUBJECT MATTER JURISDICTION

U.S. EXHIBIT NO. 36

```
0001
 1          UNITED STATES DISTRICT COURT
 2          EASTERN DISTRICT OF LOUISIANA
 3
 4   IN RE:  FEMA TRAILER        MDL NO. 1873
 5   FORMALDEHYDE PRODUCTS       SECTION N(4)
 6   LIABILITY LITIGATION        JUDGE ENGELHARDT
 7
 8                  *   *   *
 9
10           VIDEOTAPED DEPOSITION OF MICHAEL
11   BONNER PH.D., 2703 OAK GROVE ROAD,
12   HATTIESBURG, MISSISSIPPI 39402, TAKEN AT THE
13   OFFICES OF BRYAN NELSON, P.A., 6524 HIGHWAY
14   98 WEST, HATTIESBURG, MISSISSIPPI 39402, ON
15   THE 19TH DAY OF AUGUST, 2008.
16
17
18   REPORTED BY:
19       PAT KENNEDY QUINTINI, CCR
         PROFESSIONAL SHORTHAND REPORTERS
20       (504)529-5255
21   VIDEOGRAPHER:
22       MICHAEL BERGERON
         PROFESSIONAL SHORTHAND REPORTERS
23       (504)529-5255
24
25
0002
 1   APPEARANCES:
 2       LAMBERT & NELSON
         (BY:  HUGH P. LAMBERT, ESQ.)
 3       (BY:  LINDA J. NELSON, ESQ.)
         701 MAGAZINE STREET
 4       NEW ORLEANS, LOUISIANA  70130
         (PRESENT VIA TELEPHONE)
 5
            (ATTORNEYS FOR THE PLAINTIFFS)
 6
         LAW OFFICES OF RONNIE G. PENTON
 7       (BY:  RONNIE G. PENTON, ESQ.)
         209 HOPPEN PLACE
 8       BOGALUSA, LOUISIANA  70427
 9          (ATTORNEYS FOR THE PLAINTIFFS)
10       SWEET & ASSOCIATES
         (BY:  WILLIAM E. GRUBBS, ESQ.)
11       158 EAST PASCAGOULA
         JACKSON, MISSISSIPPI  39201
12
            (ATTORNEYS FOR THE PLAINTIFFS)
13
         NEXSEN PRUET, LLC
14       (BY:  DENNIS J. LYNCH, ESQUIRE)
         1230 MAIN STREET, SUITE 700
15       COLUMBIA, SOUTH CAROLINA  29201
         (PRESENT VIA TELEPHONE)
16
```

```
              (ATTORNEYS FOR THE PLAINTIFFS)
17
         DAIGLE, JAMISON & RAYBURN
18         (BY: WALTER K. JAMISON III, ESQUIRE)
         303 WEST VERMILION STREET
19       SUITE 210
         LAFAYETTE, LOUISIANA   70502
20         (PRESENT VIA TELEPHONE)
21           (ATTORNEYS FOR DEFENDANTS
                 SILVER CREEK)
22
23
24
25
0003
 1  APPEARANCES CONTINUED:
 2       SCANDURRO & LAYRISSON, L.L.C.
         (BY:  DEWEY M. SCANDURRO, ESQUIRE)
 3       607 ST. CHARLES AVENUE
         NEW ORLEANS, LOUISIANA   70130
 4
           (ATTORNEYS FOR DEFENDANT GULF STREAM
 5            COACH, INC.)
 6
         U.S. DEPARTMENT OF JUSTICE
 7       CIVIL DIVISION, TORTS BRANCH
         (BY:  ADAM BAIN, ESQUIRE)
 8       POST OFFICE BOX 340
         BENJAMIN FRANKLIN STATION
 9       WASHINGTON, D.C.   20044
10         (ATTORNEYS FOR DEFENDANT UNITED
               STATES OF AMERICA)
11
         FOWLER RODRIGUEZ VALDES-FAULI
12       (BY: STEPHANIE D. SKINNER, ESQUIRE)
         400 POYDRAS STREET
13       30TH FLOOR
         NEW ORLEANS, LOUISIANA   70130
14       (PRESENT VIA TELEPHONE)
15         (ATTORNEYS FOR DEFENDANTS
               CMH MANUFACTURING, SOUTHERN
16             ENERGY HOMES, INC., PALM HARBOR
               MANUFACTURING, LP, PALM
17             HARBOR ALBERMARLE, AND GILES
               INDUSTRIES, INC.)
18
         JONES, WALKER, WAECHTER, POITEVENT,
19         CARRERE & DENEGRE
         (BY: MADELEINE FISCHER, ESQUIRE)
20       8555 UNITED PLAZA BOULEVARD
         BATON ROUGE, LOUISIANA   70809
21         (PRESENT VIA TELEPHONE)
22         (ATTORNEYS FOR DEFENDANTS PILGRIM,
               KEYSTONE, MONACO, R-VISION, THOR
23             CALIFORNIA, KZRV, DS/
               CROSSROADS AND DUTCHMEN)
24
```

```
25
0004
 1   APPEARANCES CONTINUED:
 2        LEAKE & ANDERSSON
          (BY:  JERRY L. SAPORITO, ESQUIRE)
 3        1700 ENERGY CENTRE
          1100 POYDRAS STREET
 4        NEW ORLEANS, LOUISIANA  70163
          (PRESENT VIA TELEPHONE)
 5
            (ATTORNEYS FOR DEFENDANTS
 6             FLEETWOOD ENTERPRISES, INC.,
               ET AL.)
 7
          NIELSEN LAW FIRM
 8        (BY:  JASON M. VERDIGETS, ESQUIRE)
          3838 NORTH CAUSEWAY BOULEVARD
 9        SUITE 2850
          METAIRIE, LOUISIANA  70002
10         (PRESENT VIA TELEPHONE)
11          (ATTORNEYS FOR DEFENDANTS
               SCOTBILT HOMES, INC.)
12
          GARRISON, YOUNT, LORMAND, FORTE &
13          MULCAHY
          (BY: KELLY M. MORTON, ESQUIRE)
14        909 POYDRAS STREET
          SUITE  1800
15        NEW ORLEANS, LOUISIANA  70112
          (PRESENT VIA TELEPHONE)
16
            (ATTORNEYS FOR DEFENDANTS
17             RECREATION BY DESIGN, LLC,
               TL INDUSTRIES, INC., AND FRONTIER
18             HOMES, INC.)
19        TAYLOR, PORTER, BROOKS & PHILLIPS
          (BY: JOHN STEWART THARP, ESQUIRE)
20        8TH FLOOR - CHASE TOWER SOUTH
          451 FLORIDA STREET
21        BATON ROUGE, LOUISIANA  70801
22          (ATTORNEYS FOR DEFENDANTS
               COACHMEN INDUSTRIES)
23
24
25
0005
 1   APPEARANCES CONTINUED:
 2        VOORHIES & LABBE'
          (BY:  LAMONT P. DOMINGUE, ESQUIRE)
 3        700 ST. JOHN STREET
          LAFAYETTE, LOUISIANA  70502
 4        (PRESENT VIA TELEPHONE)
 5           (ATTORNEYS FOR DEFENDANTS CAVALIER
                HOME, WAVERLEE HOMES, REDMAN HOMES,
 6              DUTCH HOUSING, PATRIOT HOMES AND
                RIVER BIRCH)
 7
```

```
 1  professional life, there was a significant
 2  amount of formaldehyde released in that
 3  trailer as evidenced by my eyes burning and
 4  my experience with having been around
 5  formaldehyde. And knowing how the industry
 6  utilizes urea formaldehyde resins, I have to
 7  believe that there were elevated levels of
 8  formaldehyde in that trailer on that day.
 9  Whether they were 1.2 parts per million, ten
10  parts per million or .1 parts per million, I
11  can't say that.
12  EXAMINATION BY MR. PENTON:
13       Q.   Dr. Bonner, I'm Ronnie Penton.  I
14  only have a couple of questions. Maybe I
15  didn't hear it accurately, but after you
16  were hired and CH2M Hill chose the
17  methodology of this test, did you testify
18  that you never heard from them verbally once
19  you sent them the report?
20       A.   To the best of my knowledge, after
21  I gave them my report, we didn't have any
22  other discussions.
23       Q.   And the same would go for FEMA.
24  We asked you about FEMA also.
25       A.   Sure, sure.
0045
 1       Q.   In other words, to your knowledge
 2  and your best memory, no one from the
 3  government nor from CH2M Hill after they got
 4  this report ever contacted you to have a
 5  follow-up conference to understand anything
 6  about the substance of your report?
 7       A.   That may have happened. I do not
 8  recollect that. I recollect that I had the
 9  conversation with this gentleman and I
10  offered our services to test all the
11  trailers in south Mississippi because we are
12  in the testing business and I do not
13  recollect anything beyond that.
14       Q.   You don't recall them telling you
15  to stop testing, you can't test any more;
16  you just don't remember ever having contact
17  with anyone after you submitted your test
18  results?
19       A.   I don't remember talking to them
20  any after they got these results. We did
21  not discuss any additional testing, to the
22  best of my knowledge.
23       MR. PENTON:
24            Okay. We are going to tender at
25  this time.
0046
 1  EXAMINATION BY MR. THARP:
 2       Q.   Dr. Bonner, my name is Stewart
 3  Tharp. I represent the Coachmen entities in
 4  this matter. I think we have been
 5  proceeding along fairly well here, but I
```

```
 6    just want to make sure that if you don't
 7    understand what I'm asking, please ask me to
 8    rephrase the question and I will. If you
 9    answer my question, I'm going to understand
10    that you heard it correctly and gave your
11    best answer.
12         A.   Sure.
13         Q.   Did I understand you to say that
14    this colorimetric tube testing procedure was
15    or was not approved by OSHA and NIOSH?
16         A.   It is not an OSHA-approved
17    technique.
18         Q.   What is your -- what is your
19    technique of choice when you test for
20    formaldehyde?
21         A.   There are a couple of hydrazine
22    derivative procedures and I'm going to go on
23    my memory. But I think the OSHA procedure
24    uses a dinitrophenol hydrazine derivation.
25    It's a very effective protocol. It allows
0047
 1    you to isolate formaldehyde from the other
 2    aldehydes. Of course, in FEMA trailers the
 3    aldehyde is typically going to be
 4    formaldehyde. The other aldehydes are not
 5    present. But it's a very selective
 6    technique. I can't recall the method code
 7    for that, but I can get it for you.
 8         Q.   During your conversations with
 9    Ms. Sistrunk did you ask her any questions
10    about their living habits or
11    characteristics?
12         A.   You know, I'm certain that I did.
13    I don't recall any specifics other than the
14    things that I have said previously.
15         Q.   So you don't recall how long on a
16    given day she may or may not have been
17    living in the trailer?
18         A.   You know, I know that I -- I'm
19    sure I asked that because I -- typically
20    when I do indoor air quality type work,
21    those are the questions that I ask. But
22    again, this is two-year-old information and
23    the answers to those questions would more
24    than likely be on the audio portion of my
25    photographs. And I haven't located those
0048
 1    yet, but I'm looking for them.
 2         Q.   It's your recollection there was a
 3    house next door that she was living at at
 4    that time?
 5         A.   I believe there was a small wood
 6    frame house as I faced the trailer to the
 7    left of it, I think.
 8         Q.   It's your recollection she was
 9    living there at the time of the test?
10         A.   I believe that she had come out of
```

```
11   that house that morning when I came up to do
12   the test.  There was nobody in the trailer
13   when I got there and there wasn't anybody in
14   the trailer when I came back that evening.
15        Q.   Do you recall whether we are
16   dealing with smokers or not?
17        A.   I don't know.
18        Q.   The locations that you placed
19   these tubes, and I see them in your report,
20   can you be a little more specific?  Did you
21   place these tubes on any surface or was
22   there some kind of stand that you provided?
23        A.   The tubes are the type that you --
24   there are two types of tubes we use in this
25   type testing.  One is a tube that we attach
0049
 1   to a pump where you break both ends of the
 2   tube off.  These tubes are passive tubes, so
 3   you break the top off the tube.  I stood the
 4   tubes up vertically.  I believe there was
 5   something on the right-hand side of their
 6   nightstand where I was able to prop the
 7   thing up vertically.  I think the -- I
 8   believe that I taped the tubes to the bunk
 9   bed.  In each case the tubes would have been
10   put up in a vertical position.
11        Q.   So on the side of the bunk bed,
12   not necessarily underneath?
13        A.   It was not underneath the bunkbed.
14   There was a post, as I remember, and I
15   attached it to the post.
16        Q.   So you were attaching the tubes on
17   surfaces that were already present in the
18   trailer?
19        A.   Yes.
20        Q.   You weren't providing any kind of
21   apparatus for them to sit on?
22        A.   No, no.
23        Q.   Were most of these surfaces wood
24   surfaces?
25        A.   Certainly inside the cabinet where
0050
 1   we got the 2.4, that would have been all
 2   wood surface.  I believe that the -- in the
 3   master bedroom the nightstand would have
 4   been a wooden surface, yeah.  I'm trying to
 5   remember the kitchen.  I can't remember the
 6   kitchen location.
 7        Q.   Do you recall, and you may have
 8   already testified, as to whether the cabinet
 9   was open or closed when you placed the tube
10   inside?
11        A.   Seems to me that I closed that
12   cabinet.  I was looking for a worst-case
13   scenario for the inside of that cabinet.
14        Q.   Explain why you had the air
15   conditioner turned off during the testing.
```

```
16        A.   Oh, we were certainly looking for
17   a worst-case scenario and had the air
18   handler been on, the temperature inside the
19   FEMA trailer would have stayed at whatever
20   thermostatic setting you have, around
21   72 degrees probably for most people.  And we
22   would have expected the formaldehyde
23   concentrations to be lower if the AC had
24   been left on.
25        Q.   So you weren't necessarily trying
0051
 1   to replicate this lady's living conditions?
 2        A.   No.  But I will say that obviously
 3   with all of the FEMA trailers on the coast,
 4   there would be people that would leave at
 5   7:00 going to work and turn the heat and air
 6   off.  And then when they came home in the
 7   afternoon, they would turn the heat and the
 8   air on.  And then there would be people that
 9   would leave the air on all day if they had
10   people living in trailer.  So what I wanted
11   to do was replicate a worst-case scenario.
12        Q.   Did you ask her what her typical
13   habits were regarding air conditioning?
14        A.   I don't recall that I did that.  I
15   don't recall that I did that.  And I will
16   tell you this, the fact that the
17   temperature, outside temperature that day
18   didn't get above 80 degrees would be an
19   indication that we really didn't get the
20   worst-case scenario.  If it had been a hot
21   95-degree August day, we would expect those
22   numbers to be much higher than that, I would
23   think.
24        Q.   Assuming the air conditioning was
25   not on?
0052
 1        A.   Certainly.
 2        Q.   And I don't recall if you said
 3   whether it was on at the time.  Did you turn
 4   it off, was it on when you got there?  Had
 5   it been conditioned?
 6        A.   I do not remember, but the
 7   temperature -- it was cool in the trailer,
 8   around 70 degrees when I got there.
 9        Q.   Did you take the temperature?
10        A.   If I had actually taken the
11   temperature, it would have been documented
12   that way.  I used the 80-degree temperature
13   having gotten that information from the
14   weather source that day.  But I did not
15   monitor temperature in there, no, sir.
16        Q.   The inside readings, where did you
17   get those from?  The thermostat?
18        A.   No.  I believe I said --
19        Q.   Did you not measure inside?
20        A.   I did not measure.  I just -- I
```

```
15        Q.   I mean, I'm appreciating you
16   saying that there was a gradual increase,
17   but you are not able to say when it became
18   detectable or when that increase started?
19        A.   This was a time weighted test, an
20   average over 8.35 hours.  So it could only
21   have been -- if we tried to take the average
22   out of it and say:  Well, the formaldehyde
23   didn't occur until 15 minutes before I got
24   there, then we would be looking at some
25   massive concentrations of formaldehyde in
0062
 1   the air at that point in time.  And science
 2   would tell you that that concentration
 3   increased with time over the course of the
 4   day and at some point in time late that
 5   afternoon if, indeed, these colorimetric
 6   tubes were accurate, and I suspect that they
 7   were, you would have expected that
 8   formaldehyde concentration to be higher than
 9   one part per million at 1900 hours when I
10   got back.  And my uncalibrated eyes told me
11   that there was an issue with formaldehyde
12   when I went back in the trailer.
13        Q.   And at no point in time you
14   checked the thermostat -- well, I will
15   rephrase it.  Did you check it when you came
16   back into the trailer?
17        A.   No.
18        MR. THARP:
19             I don't think I have any other
20   questions.
21   EXAMINATION BY MR. BAIN:
22        Q.   Dr. Bonner, I think I have just a
23   few questions.  I'm Adam Bain for the United
24   States.  I just want to go over the
25   chronology a little bit.  You arrived at the
0063
 1   trailer in the morning sometime before
 2   10:00, right?
 3        A.   That would be correct, sir.
 4        Q.   And you set up your tubes and
 5   checked them approximately 45 minutes after
 6   they had been set up; is that right?
 7        A.   Yes.
 8        Q.   And at that point you didn't see
 9   any indication of formaldehyde exposure; is
10   that right?
11        A.   Say that again, sir.
12        Q.   You didn't see any indication of
13   formaldehyde at that time?
14        A.   At 45 minutes, no, sir.
15        Q.   And given how you know these
16   instruments work and given your subsequent
17   experience with the tubes, you would have
18   expected to see some indication if there had
19   been formaldehyde present?
```

```
20        A.   If formaldehyde had been present
21   at a concentration above the detection limit
22   of the tube you would have expected to see
23   that.
24        Q.   Now, do you know whether there
25   were any windows in the unit?
0064
 1        A.   There were windows and -- but the
 2   windows were closed and the door was closed
 3   when I started the test.
 4        Q.   And you then checked the tubes
 5   about two hours later; is that right?
 6        A.   Yes, sir.
 7        Q.   During the time between the first
 8   check of the tubes and the subsequent check,
 9   what were you doing?
10        A.   I think I was working on a report
11   in my truck and my truck was parked next to
12   the trailer.
13        Q.   As far as you know, during the
14   interim between your first check of the
15   tubes and your second check of the tubes,
16   did anybody go in or out of the trailer?
17        A.   No, sir.
18        Q.   And was the air conditioner on or
19   off during that time?
20        A.   The air conditioner was off.
21        Q.   And you left, then, I think you
22   testified, and went back to your office, is
23   that right, for a while?
24        A.   I went back to my office sometime
25   after noontime.
0065
 1        Q.   And before you left, did you give
 2   any instructions to Ms. Sistrunk about
 3   whether or not she could go into the
 4   trailer?
 5        A.   I believe that I did.  I'm certain
 6   that I told her to leave the trailer as it
 7   was until I came back and did, completed my
 8   test.
 9        Q.   Besides Ms. Sistrunk, was there
10   anyone else that you interacted with while
11   you were there?
12        A.   I believe Ms. Sistrunk was the
13   only person I interacted with.
14        Q.   And can you describe what the
15   condition of the trailer was when you went
16   back there at 1900 hours with respect to the
17   windows and the air conditioning unit?
18        A.   The windows would have been closed
19   and the air condition would still have been
20   off and the door would have been closed.
21        Q.   And was there any indication to
22   you that anyone had been in or out of the
23   trailer since you left?
24        A.   There was no indication to me that
```

```
 25   anyone had been in or out.
0066
  1        Q.   And had the windows been open and
  2   the air conditioning been on during that
  3   time, what would you have expected with
  4   respect to the formaldehyde levels that you
  5   would have seen as compared to what you did
  6   see?
  7        A.   If the air conditioner had been on
  8   and/or the fan for the air conditioner have
  9   been on and the windows had been open, I
 10   would have expected the concentration to be
 11   lower than what we saw here.
 12        MR. BAIN:
 13             I don't think I have any other
 14   questions.  Thank you.
 15   EXAMINATION BY MR. SCANDURRO:
 16        Q.   Doctor, a few questions for you.
 17   Are you a certified industrial hygienist?
 18        A.   I am not a certified industrial
 19   hygienist.
 20        Q.   Was anyone else with you when you
 21   did this testing?
 22        A.   No one was with me.
 23        Q.   Do you have certified industrial
 24   hygienists on your staff?
 25        A.   No, sir.  For the record, I have
0067
  1   been doing industrial hygiene work since
  2   1971, and though I am not a certified
  3   industrial hygienist, I have quite a bit of
  4   experience in that field.
  5        Q.   When you arrived at the Sistrunks'
  6   trailer, was it completely closed up, doors
  7   and windows closed?
  8        A.   It was.
  9        Q.   Earlier you mentioned the use of
 10   urea formaldehyde by what you described as
 11   the building industry.  Can you be more
 12   specific about what industry you are
 13   referring to?
 14        A.   I cannot tell you everyone in the
 15   industry that uses urea formaldehyde resins,
 16   but urea formaldehyde resins are used in a
 17   number of wood products to hold them
 18   together to act as the binder.  Various
 19   particle board type products utilized urea
 20   formaldehyde resin, and I can't tell you all
 21   the others.
 22        Q.   So when you use the term industry
 23   or building industry, you are including the
 24   wood products industry; people who make
 25   plywood and particle board?
0068
  1        A.   People who use the urea
  2   formaldehyde resins, yes, sir.
  3        Q.   Do you know whether the travel
```