UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION

MDL NO. 1873

SECTION "N-5"
JUDGE ENGELHARDT
MAG. JUDGE CHASEZ

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEFENDANT UNITED STATES OF AMERICA'S MOTION
TO DISMISS PLAINTIFFS' REMAINING FTCA CLAIMS
FOR LACK OF SUBJECT MATTER JURISDICTION

U.S. EXHIBIT NO. 40

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: FEMA TRAILER | * | CIVIL ACTION 2:07-MD-1873 |
| FORMALDEHYDE PRODUCTS | | |
| LIABILITY LITIGATION | * | JUDGE ENGLEHARDT –DIV.  N |
| | * | MAG. JUDGE CHASEZ – MAG. 5 |

**********************************************************************************

### DECLARATION OF JOSEPH D. LITTLE

I, Joseph D. Little state and declare as follows:

1.      I am currently employed as an Emergency Coordinator, National Institute

for Occupational Safety and Health ("NIOSH"), Centers for Disease Control and

Prevention in Atlanta, Georgia.  Between June 2006 and December 2007, I was employed

as an Emergency Response Coordinator for the Centers for Disease Control and

Prevention ("CDC")/Agency for Toxic Substances and Disease Registry ("ATSDR"),

Division of Toxicology, Emergency Response Program.  I am a Registered

Environmental Health Specialist (REH/RS) and received in 1989 from Tulane University,

School of Public Health and Tropical Medicine, a Master of Science in Public Health

(MSPH) Degree with a concentration in Environmental Toxicology.  As part of my duties

and responsibilities with ATSDR, I have provided numerous emergency consultations

concerning hazardous materials release and cleanup events and served as an ATSDR on-

call Emergency Toxicologist for a period of 17 years (1990 – 2007).  In addition, I also

provided emergency response support at the FEMA Regional Operations Center during

Hurricanes Frances, Jeanne and Charlie (2004); and at the CDC Emergency Operations

Center during Hurricane Katrina (2005), and Hurricanes Gustav and Ike (2008).  I also

served as a Duty Officer in the CDC Emergency Operations Center and assisted with

coordinating emergency response activities in response to SARS, Monkey Pox, W. Nile
Virus, and Influenza Responses (2003-2004).

      2.      During Hurricane Katrina response activities, the Centers for Disease
Control and Prevention, National Center for Environmental Health, Office of Terrorism
Preparedness and Emergency Response ("OTPER") was the lead CDC Office responsible
for coordinating emergency response activities.  Scott Wright, and I, both CDC/ATSDR
Emergency Response Coordinators, were assigned to the CDC Emergency Operations
Center, in response to Hurricane Katrina, to provide emergency technical assistance
concerning the evaluation of environmental sampling data, and for this purpose, worked
intermittently from the Fall through Winter of 2005.  The National Center for
Environmental Health, Office of Terrorism Preparedness and Emergency Response
(OTPER) was the lead CDC Office responsible for coordinating the CDC response and
technical assistance to Hurricanes Katrina and Rita.  Mr. Wright and I were assigned to
work with OTPER, which is standard procedure when the CDC Emergency Operations
Center is activated, and during that time, our work was reviewed and supervised by Dr.
Michael Allred, Team Lead, Emergency Response Program, Division of Toxicology,
ATSDR.  The following year (2006) Dr. Michael Allred became the Deputy Director,
OTPER, and Dr. Mark Keim, became the acting Director, OTPER.

      3.      On June 19, 2006, I participated in a "heads-up" conference call with Sam
Coleman, United States Environmental Protection Agency ("EPA"), Rick Preston,
Federal Emergency Management Agency ("FEMA") Office of General Counsel ("OGC")
and other FEMA, EPA, CDC and ATSDR officials regarding FEMA's potential request
for assistance investigating concerns about formaldehyde in temporary emergency

housing units ("EHU").  FEMA indicated that it needed to investigate this issue because

of an accusation by Sierra Club that an elderly man had died in his trailer due to

formaldehyde,  a growing public concern about formaldehyde in EHUs resulting from

tests conducted by Sierra Club (no results were provided), and concerns resulting from a

lawsuit that had been filed against FEMA.

      4.     During the heads-up call on June 19, 2006, EPA representatives and  Scott

Wright expressed numerous concerns to FEMA regarding the difficulties associated with

sampling for formaldehyde and interpreting the data, due to the large number of other

formaldehyde sources from other products in the home and individual lifestyle.  These

concerns were expressed again by myself during the July 10, 2006 conversation with

EPA, and also during the July 13, 2006 conference call with FEMA, EPA, CDC, and

ATSDR representatives.  Concerns were relayed to FEMA regarding potential serious

problems in interpreting any data due to the pervasiveness of formaldehyde in all homes

and buildings, the absence of any baseline comparison, and the potential enormity of a

broadly defined sampling project.  FEMA representatives noted our concerns, but insisted

that testing was necessary and were insistent that EPA and ATSDR move forward with

the project.

      5.     Bi-monthly (every two weeks) conference calls were held for purposes of

implementing the testing project.  Although FEMA wanted EPA to test new and occupied

units, a consensus was reached that the initial testing should be confined to new,

unoccupied units because: (1) this would provide a baseline formaldehyde level and

allow us to determine the effectiveness of various ventilation practices in reducing

formaldehyde in the units; and (2) testing occupied units would not allow us to determine

if there was a formaldehyde problem with the units or the effectiveness of ventilation, because of the large number of other potential sources of the formaldehyde and the effect of individual lifestyle choices on formaldehyde levels.

6.      In July or early August 2006, EPA prepared and circulated a draft test protocol. Scott Wright, myself, and FEMA officials were given an opportunity to provide comments. After EPA finalized the protocol, FEMA created a facility to test units in Baton Rouge, Louisiana. Ninety-six (96) new, never occupied EHUs from eight different manufacturers (12 trailers from each of the eight manufacturer) were installed at that test facility, and in mid-September, EPA commenced collection of samples from the units. Sampling was completed on October 7, 2006, and in late November, EPA completed its laboratory data quality assurance/quality control review.

7.      On December 6, 2006, ATSDR received the EPA data from Rick Preston, FEMA OGC. Mr. Preston requested that we review the data and provide a written report analysing the results of these tests and provide any conclusions or recommendations that can be derived from them. Mr. Preston also requested that the information and ATSDR's analysis be kept confidential.

8.      Scott Wright and I were the ATSDR officials responsible for analysing and interpreting the EPA test results and preparing the short turn-around Health Consultation Report. A draft of that report was completed on or about December 22, 2006. After the Holiday break, during the first week of January 2007, the draft report was submitted to Dr. Keim, who then assigned the review to Dr. Allred. Neither Dr. Allred nor Dr. Keim substantively modified the draft report. Dr. Allred took the draft report to the ATSDR Office of the Director (Dr. Frumkin and Dr. Sinks) for review and

Case 2:07-md-01873-KDE-MBN   Document 1545-44   Filed 05/18/09   Page 6 of 7

approval. An executive summary and a few minor modifications were requested by Dr. Frumkin and Dr. Sinks. These corrections were relayed to myself and Scott Wright through Dr. Allred. Over the month of January 2007, a total of four drafts were provided to Dr. Frumkin and Dr. Sinks through Dr. Allred for review, and the final document was approved for release on February 1, 2007.

9.      The Health Consultation Report identified 0.3 ppm of formaldehyde in air as a comparison point or "level of concern"; a level that had been associated with an allergic reaction and subsequent constriction of the bronchi in previously formaldehyde sensitized individuals. We further found that EPA's testing showed that the ventilation method of opening windows reduced formaldehyde levels in the EHUs to below 0.3 ppm after four days of the windows being continuously open, while the ventilation method of running the air conditioning did not.

10.     In selecting 0.3 ppm formaldehyde in air as a comparison point or level of concern, Mr. Wright and I were aware that ATSDR had issued Minimal Risk Levels ("MRLs") for formaldehyde and that the formaldehyde MRLs were substantially lower than 0.3 ppm. We concluded that the ATSDR Acute and Intermediate MRLs were not appropriate for use as a comparison point or level of concern because they were based upon actual effect levels that were higher than 0.3 ppm that were then adjusted downward by safety factors ranging from 9 to 30. The ATSDR Acute and Intermediate MRLs were also not used because they were both below levels typically found in newer conventional homes and offices throughout the United States. The ATSDR Chronic MRL was not used because it was based on an average exposure time frame of approximately 10 years (range 1-36 years); and also because it was below background levels at the test site, and

below background levels found in most urban areas throughout the United States.
ATSDR advises that MRLs are not intended to be used as regulatory action levels.

11.    The decision to use the 0.3 ppm formaldehyde in air as a comparison point
was based on the fact that it was the lowest actual human effect level, not modified by
safety factors, found in the peer reviewed literature from ATSDR and the National
Library of Medicine's Hazardous Substances Data Bank, referenced during the
approximate two-week time frame (December 6-22, 2006) to write the emergency
consultation.  The 0.3 ppm level is based upon an allergic reaction in individuals
previously sensitized to formaldehyde.  The 0.3 ppm comparison point is below the odor
threshold for formaldehyde which ranges from 0.5 - 1.0 ppm, and below the level that
produces irritation of the eyes, nose, and throat of 0.4 ppm.  The 0.3 ppm level would be
a sufficient comparison point for the evaluation of formaldehyde air levels in the 96 test
trailers.

12.    FEMA OGC participated in the bi-monthly conference calls.  However,
FEMA OGC was not an active participant in those bi-monthly calls, and did not issue
instructions limiting or impose any restrictions on EPA's testing for formaldehyde in
EHUs or ATSDR's interpretation and analysis of the EPA test results.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing
is true and correct.  Executed on this _12_ day of _May_, _2009_

_Joseph D. Little_
CDR. JOSEPH D. LITTLE
Emergency Coordinator
CDC/NIOSH
Atlanta, GA