**Lila F. Laux, PhD**
Human Factors Consulting
417 Leyden St.
Denver, CO 80220
(303) 388 4659

May 11, 2009

Re: FEMA Litigation

# 1  Background

My name is Lila Laux, Ph.D. I live in Denver, Colorado. I have a doctorate in Industrial Psychology with a specialization in Human Factors Engineering from Rice University in Houston, Texas and a Master of Science degree in Applied Psychology from the University of Louisiana Lafayette. I was on the staff and faculty in the Department of Community Medicine at Baylor College of Medicine from 1981-1994, where I did human factors research. A great deal of my work at Baylor was related to analyzing patient behavior in the presence of risks. I remain an adjunct faculty member at Baylor. I was also on the faculty and research staff in the Department of Psychology at Rice University from 1986-1994, where I taught Human Factors courses and carried out independent research. This research, and other research performed in the Human Factors laboratory at Rice, examined the characteristics of user populations, how people identify and respond to hazards, and how to effectively communicate risk information.

In 1994, I left academia and went to work as a Human Factors Engineer for a large telecommunications company in Denver, CO. I left that position in 2001 to work for a firm that provides human factors research and consultative services to the military, government, public service organizations, and private business, where I am a Principal Engineer. I continue to teach and consult in the area of human factors and hazard communication. Twice annually I teach a class on hazard communication for industry in the Department of Engineering Professional Development at the University of Wisconsin, Madison. Over the last 15 years, hundreds of manufacturers and distributors have attended this course, which informs manufacturers and distributors regarding the identification of hazards to purchasers and users of their products and how to adequately warn and instruct these consumers and users to make good decisions and take appropriate action. I have also taught in the Human Factors short course for professionals at the University of Michigan Ann Arbor. I have authored a number of publications and presentations related to:
- effective hazard communication (getting the appropriate information into the awareness of people who could be exposed to the hazard),
- the problems associated with effectively communicating hazard and risk information to diverse populations, and
- analyzing behavior in the presence of risks.

These papers and presentations are listed in my C.V., which is attached. I have also written chapters included in four human factors books that are used for teaching and to guide research.

I earned my doctorate at Rice University in Houston, Texas where Human Factors Engineering was offered as a specialty of Industrial/Organizational Psychology. In my doctoral research I

1

studied how people perceive information why they make perceptual and judgment errors, especially when they must respond quickly. Other research I performed while on the faculty at Rice involved studies to discover how people evaluate risk and what motivates people to comply with warning information. While at Rice I performed funded basic research and research funded by industry to answer specific questions. For instance, a major car manufacturer funded me to do research to discover why operators of vehicles continued to experience serious injuries when jump starting their batteries or changing tires. Another manufacturer funded research to determine why users of high pressure washing equipment were suffering severe cutting and injection injuries when using their equipment.

As a human factors psychologist my day-to-day job is to apply the principles of psychology and human factors engineering to the design of systems and devices that people use. Currently, the majority of my time is spent working with Lockheed Martin Space Systems on the design of the Orion spacecraft, the planned replacement for the space shuttle.

I also consult with private companies regarding the development and evaluation of their warning systems. In addition, I spend a small portion of my time assisting lawyers and parties in litigation such as this. In my human factors analysis of the toxic exposure that is the basis of this lawsuit, I applied essentially the same analytical methods and procedures that I have used in providing Human Engineering services to our Country's military, nuclear power, and aerospace industries. Those methods are basic to the science of Human Engineering/Cognitive Engineering.

## 2  Human Factors Engineering

The discipline of human factors matured during the Second World War, when industrial and experimental psychologists were brought in to work on the new and more complex systems and processes developed for the military. The design of many of these systems was causing the humans in the systems to make serious and deadly errors such as attacking friendly targets, flying into mountainsides, or activating the wrong controls when flying a plane, which caused the pilot to be ejected. By applying human factors design principles regarding the design and placement of information displays/controls and warning information, these systems were redeveloped to significantly reduce the likelihood of human error. Human factors psychologists or engineering psychologists understand how humans are affected by information such as warning information. Human factors engineers also understand the process by which people sense and gather information and make decisions, especially in the presence of hazards.

In an example described above where the crew of a navy vessel attacked a friendly airplane, the decision to attack was made based on incomplete information under time pressure. As a result of a human factors decision-centered design analysis of this accident, the displays that present information to the crew were redesigned, as were the decision rules for selecting to fire a missile. In our work for General Motors, we analyzed the effect of information on hazard understanding and behavioral intentions. We found that when consumers were not clearly informed about hazards, many of them could not articulate appropriate behaviors in the presence of those hazards.

2

The specialization of Human Engineering is focused on creating and maintaining a safe and efficient environment for the people in that environment and assuring that people can safely and effectively interact with any hazards in that environment. Human Factors engineers are trained to identify hazards that require that human exposure be prevented through guards, redesign, warnings, or other protective measures. Hazards such as toxic emissions from materials in the environment require warning against hazardous exposure to protect the person(s) at risk, because breathing in environments with high levels of formaldehyde in the air may have immediate and serious consequence or a delayed effect associated with exposure to long-term lower, but still hazardous, levels of the toxic substance. Because of human limitations in risk perception and evaluation in the presence of such exposure, it is critical to provide both warnings about the hazard and instructions for appropriate actions.

The unique expertise of people trained as Human Factors psychologists is their in-depth understanding of human behavior and the factors that influence, or shape, human behavior. We are concerned with how people learn about hazards in their environment, and how information shapes their motivation and safety behavior.

Human Factors specialists are not civil engineers, chemists, or physicians. We rely on information these specialists produce, and work with them to design and/or evaluate systems that include humans as one element of the system. Human factors engineers are involved in the design and evaluation of essentially all military equipment and systems and in the design of all American manned spacecraft. Human factors professionals are part of the design team for nuclear power plants, automobiles, road systems, and manufacturing systems. Human factors engineers have a critical role in the design of any system where humans are exposed to hazards. Human Factors specialists integrate understanding of human behavior and decision-making with knowledge of hazards to develop appropriate solutions that assure safe practices.

Information about hazards and how to warn about them may be gathered from a number of sources, including American National Standards Institute (ANSI) Standards, National Safety Council publications such as the Accident Prevention Manual for Business and Industry, Military Standards (e.g., MIL STD 1472 Human Engineering), NASA standards such as the Man-Systems Integration Standards (NASA-STD-3000, 1995 Revision), safety-related journals and manuals, OSHA and NIOSH publications, publications such as the Human Engineering Guide to Equipment Design (McGraw-Hill, 1972), the Department of Transportation, publications of industry groups such as the American Association of Railroads and the Chemical Manufacturers' Association, and public health materials.

Human Factors encompasses both research and application concerning the performance of humans when they interact with systems of all sizes. The goal of human factors research is to understand how human capabilities, knowledge, and experience affect human behavior. Fifty years of research have provided many rules and guidelines that can be applied to the evaluation of warnings. The focus of a human factors analysis is the human in the context of interacting with the things in their environment. The analysis and conclusions reached by human factors engineers go well beyond "common sense"; they represent more than fifty years of scientific and

3

ALX-EXP-40-000003

technical research and experimentation that have resulted in better understanding of why and when warnings are needed and how to provide more effective warnings.

The study of human decision-making and error is a major component of the field of human factors engineering[1,2,3]. The field researches why people make what in retrospect can be identified as a decision error,[4] based on understanding human capabilities, experience, and behavior and how these interact with the design of warnings and instructions.[5,6] Humans make many decisions that have unfortunate outcomes, but unless they are provided with adequate information in warnings and instructions they are unable to detect when a decision exposes them to a hazard.[7]

**Background information regarding formaldehyde**
- Formaldehyde is a colorless gas that is detectable even at very low levels by its odor, although people who are exposed to the gas over an extended time period rapidly be come habituated to the odor of low levels of formaldehyde and no longer detect the odor.
- Formaldehyde gas is produced when substances such as Medium Density Fiberboard and other composite materials such a plywood and particle board that include formaldehyde in their manufacture are exposed to the air. Fabrics and carpets made with formaldehyde also off-gas formaldehyde into the atmosphere.
- Formaldehyde is recognized by federal and international agencies as toxic at levels that are present inside many mobile homes and travel trailers (for example, current 8 hour OSHA allowable for formaldehyde is 0.75 ppm for healthy adults working only 40 hours/week). Studies dating back to the 1980s documented adverse health effects for people living in trailers who were exposed to even lower levels. Formaldehyde exposure to those living in trailers like the Gulf Steam Cavalier provided to Ms Alexander is potentially 24 hours per day, seven days per week.
- Formaldehyde levels such as those present in many travel trailers are more harmful to children than adults.
- Formaldehyde levels such as those present in many travel trailers are more harmful to people who are sensitive to formaldehyde, especially children with respiratory conditions such as asthma.
- Chronic exposure to formaldehyde fumes is hazardous, even at levels that are considered safe for short-term or workplace exposures.
- The small interior volume and the large surface area of formaldehyde off-gassing products in the interior of trailers like the Gulf Stream Cavalier allow the concentration of formaldehyde fumes in mobile homes and travel trailers.

---

[1] Meister, David (1989). *Conceptual aspects of human factors.* Johns Hopkins University Press: Baltimore & London.
[2] Wickens, C. (1992). *Engineering psychology and human performance.* HarperCollins Publishers.
[3] Sanders, M. & McCormick, E. (1987). *Human factors in engineering and design.* McGraw Hill: NY.
[4] Seamster, T., Redding, R., & Kaempf, G. (2000). A skill based cognitive task analysis framework. In Shraagin, Chipman & Shalin (Eds.). *Cognitive task analysis.* Earlbaum Ass.: Mahwah, NJ.
[5] Norman, D. A. (1983). Design rules based on analysis of human error. *Communications of the ACM*, 26: 254-258.
[6] Wickens, C. (1987). Information processing, decision-making, and cognition. In G. Salvendy, Ed. *Handbook of human factors.* Wiley & Sons: NY.
[7] Endsley, M. & Garland, D. Eds. (2000). *Situation awareness analysis and measurement.* Lawrence Earlbaum:Mahwah, NJ.

4

- Heat and humidity such as are routinely experienced on the Gulf Coast, increase the rate of formaldehyde off-gassing, as does the presence of mold, which also thrives in heat and humidity.

**Exposure to Formaldehyde by Plaintiff**

Hurricane Katrina struck the Gulf Coast on August 29, 2005, displacing many residents of the area like plaintiffs Ms Alana Alexander and her son Christopher Cooper. According to Ms Alexander, after Hurricane Katrina severely damaged her home and left it uninhabitable, she went to Florida to live with relatives. In May 2006 she was provided with the Cavalier travel trailer manufactured by Gulf Stream on 12/13/2004. Ms Alexander made the decision to return to New Orleans and allowed the trailer to be moved to family property in New Orleans. She moved into the Gulf Stream Cavalier with her son in May of 2006 and lived there until late December of 2007. During that time, her son experienced increasing respiratory problems and was treated in the ER for asthma, which had worsened after they took up residence in the Gulf Stream Cavalier.

# 3   Materials reviewed

I reviewed the following materials you provided related to Chris Cooper's formaldehyde exposure:

CD with photos of the Alexander Cavalier travel trailer taken 4/17/2009: DSC07738 DSC08086HSFE04-Q-8000 FEMA Model Travel Trailer Procurement Specification Dated: August 12, 2004
FEMA Model Travel Trailer Procurement Specification Dated: July 14, 2005
GULF STREAM COACH, INC. and FEMA Bates GULF0002223-4
GULF STREAM COACH, INC LIMITED WARRANTY Bates GULF0002231
Letter to David Paulson, 10/10/05 Bates GULF0003008-9
Letter to Janice Uthe Bates GULF0002279
Letter to David Porter Bates GULF0002506-7
Letter to Rick Preston Bates GULF0002342, 4-5
Letter to Patrick Edward Preston, Feb. 1, 2007 –cover for ATSDR Health Consultation
Letter to whom it may concern Bates GULF0003201
Letter to Deidre Lee Bates Gulf Stream Statement Bates GULF0003180-2
Letter to Deidre Lee Bates Gulf Stream Statement Bates GULF0003176
Gulf Stream Statement Bates GULF0003202
Gulf Stream Statement Bates GULF00032023
Gulf Stream Statement Bates GULF0003204
Gulf Stream Statement Bates GULF0003218
Gulf Stream Meets Proposed CARB Formaldehyde Emission Levels Bates GULF0003205
9mm Plywood vs 3/8" MDF Bates GULF00003054
Phone logs Bates GULF0002503-5, GULF0002497-9, GULF0003059, GULF0003057, GULF0003061, GULF00023251-2, GULF0002495-6, GULF0002349-50, GULF0002501-2, GULF0002500

5

ALX-EXP-40-000005

Suburban Manufacturing Company *(11-1-03). Installation and operational manual direct vent gas water heater* provided to Ms Alexander (also provided in French)
Medical records of Christopher Cooper – Dr Janet Barnes
Emails: Bates GULF0002831, GULF0003057, GULF0002838-41, GULF0002832-3, GULF0002537-8, GULF0002532, GULF0002494, GULF0002834-5, GULF 0002354, GULF0002326-7, GULF0003178
Schematic Bates GULF0000753, GULF0000755, GULF0000758
GULF STREAM COACH component list Bates GULF0000038-49
Norbord letter to Fairmont Homes Bates GULF0003037
Affidavit of Marco Kaltofen, PE 8/20/08 Bates Kaltofen 1
Affidavit of Steven Smulski, PhD 8/20/08 Bates Smulski 2
Affidavit of Patricia M. Williams, PhD DABT 8/21/08 Bates Exhibit E
Weyerhaeuser (2004). MSDS Medium density Fiberboard Bates GULF0002283
Weyerhaeuser (2004). MSDS Medium density Fiberboard Bates GULF0002330
Weyerhaeuser (2005). MSDS Structurwood RES Bates GULF 0002328
Gulf Stream (no date). Travel Trailers and Fifth Wheels Owner's Manual
Gulf Stream (no date). Travel Trailers and Fifth Wheels Owner's Manual given to Ms. Alexander when she acquired the travel trailer
Owner's manual for Pilgrim and open Road Recreational Vehicles Cover and P. 9
Owner's manual for Pilgrim and open Road Recreational Vehicles
Fleetwood Driven to Explore Pioneer 2006 Owner's Manual
Plaintiff Fact Sheet signed Alana Alexander
Plaintiff fact sheet Christopher Cooper represented by Alana Alexander
ANSI 208.1 (1999). Particle Board
ANSI 208.2 (1994). Medium density Fiberboard.
W. D. Scott Group, Inc. Gulf Stream Cavalier FEMA ID 1041407 File # 3070 05/11/09

In addition, I reviewed the following materials:
Persons authorized to set up manufactured homes.
www.ncdoi.com/OSFM/ManufacturedBuilding/Documents/Regulations/5-14.pdf
Pert, Virginia (2003). Indoor Air Quality in Florida: Formaldehyde. University of Florida IFAS Extension
EPA Technology Transfer Network Air Toxics Web Site Formaldehyde. Hazard Summary-Created in April 1992; Revised in January 2000
EPA Integrated Risk Information System Formaldehyde.
http://www.epa.gov/iris/subst/0419.htm
SEFA Formaldehyde Emissions and Particleboard Core Products.
*www.sefalabs.com/i4a/pages/index.cfm?pageID=3394*
National Safety Council (no date). Formaldehyde. NSC.org
CDC Summary of Lawrence Berkeley National Laboratory Final VOC Report Dec. 10, 2008
Case 2:07-md-01873-KDE-ALC Document 1305 FEMA TRAILER MDL NO. 07-1873 FORMALDEHYDE PRODUCTS

6

ALX-EXP-40-000006

ATSDR (2007). An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers Baton Rouge, Louisiana, September-October, 2006

Hamburger, Tom & Miller, Alan C. (2007). Formaldehyde Labeled a Carcinogen. Los Angeles Times, June 16

NIOSH International Chemical Safety Cards (2004) ICSC: 0275

NIOSH The Registry of Toxic Effects of Chemical Substances Formaldehyde. http://www.cdc.gov/niosh/rtecs/lp882f48.html

NIOSH *Pocket Guide to Chemical Hazards* June 1994 US Dept of Health and Human Services

Health Canada www.hc-sc.gc.ca (2006). Residential Indoor Air Quality Guideline: Formaldehyde

Industrial Strength Woodworking (2008). Industry News Study Says Plywood, Particleboard Responsible for FEMA Trailers' Toxicity. ISW Online

CFR 24 Volume 5 Sec. 3280.309 MANUFACTURED HOME CONSTRUCTION AND SAFETY STANDARDS Health Notice on formaldehyde emissions.

CFR 24 Volume 5 Sec. 3280.309 MANUFACTURED HOME CONSTRUCTION AND SAFETY STANDARDS Subpart J--Transportation

LIABILITY LITIGATION US Dept of Health and Human Services (1999). Toxicological profile for formaldehyde. Agency for Toxic Substances and Disease Registry Division of Toxicology/Toxicology Information Branch

OSHA (2005). 2005 Gulf-Coast Hurricane Response OSHA Gas and Vapor Monitoring. Data. DOL. http://www.osha.gov/katrina/lisareports/gandv_combined.html

Richie, Ingrid & Lehnen, Robert (1987). Formaldehyde-related health complaints of residents living in mobile and conventional homes. Am J Public Health, 77, pp 323-328.

Dally, Kay, Hanrahan, Lawrence, Woodbury, Mary Ann & Kanarek, Marty (1981). Formaldehyde exposure in nonoccupational environments. *Archives of Environmental Health*, 36(6).

Aerias Air Quality Sciences IAQ Resouce Center (no date). Formaldehyde in the Indoor Environment. *www.aerias.org/DesktopModules/ArticleDetail.aspx?articleId=40 - 64k*

Substance profiles (no date). *REPORT ON CARCINOGENS, ELEVENTH EDITION* Formaldehyde (Gas) CAS No. 50-00-0

24 CFR § 3280.309 Health Notice on formaldehyde emissions. 49 FR 32012, Aug. 9, 1984, as amended at 54 FR 46049, Nov. 1, 1989; 58 FR 55007, Oct. 25, 1993

24 CFR § 3282.207 Manufactured home consumer manual requirements. 61 FR 10860, Mar. 15, 1996

Majority Staff Report, Subcommittee on investigations and Oversight, Committee on Science & Technology, US House of Representatives (Sept. 2008). Toxic Trailers – Toxic Lethargy: How the Centers for Disease Control and Prevention has failed to protect the public health.

Consumer Product Safety Commission (1997 Revision). An Update on Formaldehyde. CPSC Document #725

*NIOSH (1981). Current Intelligence Bulletin 34 Formaldehyde: Evidence of Carcinogenicity*

ALX-EXP-40-000007

*NIOSH Pocket Guide to Chemical Hazards* NIOSH  Publication 2005-149
U.S. CONSUMER PRODUCT SAFETY COMMISSION (1997).  An update on formaldehyde.  CPSC: Washington, DC 20207
AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY ATSDR (no date).  Formaldehyde CAS #50-00-0
Investigators from CIIT Centers for Health Research (2004).  Replacing Conservative Assumptions with Knowledge: Formaldehyde's State-of-the-Art Cancer Risk Assessment  LRI Perspectives
US EPA (no date).  An Introduction to Indoor Air Quality Formaldehyde.  *www.epa.gov/iaq/formalde.html*
Hsu, Spencer S. (2007).  FEMA Knew of Toxic Gas in Trailers.  Washington Post page A01
NIOSH <u>Immediately Dangerous To Life or Health Concentrations (IDLHs)</u> IDLH (1996).  Documentation Formaldehyde
FEMA (2007).  Formaldehyde and Travel Trailers FNF-07-028
Environmental Health (2008).  Formaldehyde Exposure in Homes: A Reference for State Officials to Use in Decision-making.  08_118152B
Liteplo, R.G. Beauchamp, R. Meek, M.E. & Chénier, R. (2002).  Formaldehyde. World Health Organization
Federal Register /Vol. 72, No. 206 /Thursday, October 25, 2007 /Notices Agency for Toxic Substances and Disease Registry [ATSDR–235] Proposed Substances To Be Evaluated for Set 22 Toxicological Profiles
Environmental Health (2008).  What You Should Know about Formaldehyde in Mobile Homes
CDC (2008).  Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes
CDC (2008).  Fact Sheet: Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes
Global Health and Safety Initiative (2008).  Formaldehyde Found in Building Materials.  Healthy Building Network, Kaiser Permanente
OSHA (2002).  OSHA Fact Sheet What is Formaldehyde.  US Dept of Labor
California Department of Health Services (2003).  Formaldehyde HAZARD EVALUATION SYSTEM & INFORMATION SERVICE
FEMA (no date).  Important Information for Travel Trailer Occupants

# 4  Opinions

Based on the materials I have reviewed and my training and experience, I have the following opinions regarding Chris Cooper's exposure to formaldehyde in the Gulf Stream Cavalier travel trailer:
1. Ms Alexander's decision to accept and live in the Gulf Stream Cavalier was a reasonable decision given the information she was provided.  Her use of the trailer was a reasonably anticipated use of the trailer by Gulf Stream.

8

2. Ms Alexander reasonably relied on Gulf Stream, the manufacturer of the Cavalier travel trailer that she was provided, to warn her if there were conditions which could create a hazard for herself and her children.
3. Although the paneling and other formaldehyde containing materials from which her trailer was built gave off fumes that she could detect, Ms Alexander was not informed that if she could smell the fumes there was a possibility that she and her son were being exposed to unacceptable levels of toxic chemicals.
4. Ms Alexander was not informed that high ambient temperatures and high humidity as well as the presence of mold would increase the rate at which formaldehyde would off-gas from the materials in the interior of the travel trailer.
5. Ms Alexander was not informed that exposure to the fumes she could smell could cause serious, potentially life-threatening and long-term health problems for those who breathed the fumes, especially to children and in particular children with asthma and other respiratory problems.
6. Ms Alexander was not informed that even low levels of formaldehyde exposure, if chronic, could cause serious health problems in children and adults with respiratory problems and/or who were sensitive to formaldehyde.
7. Gulf Stream knew or should have known that the Cavalier travel trailer they manufactured could reasonably be expected to create elevated levels of formaldehyde gas in the interior of the trailer.
8. Gulf Stream knew or should have known that after Katrina, people would be living in travel trailers provided to them by FEMA for extended periods.
9. Gulf Stream knew, or should have known, that the high heat and high humidity that would be experienced in Gulf Coast Louisiana and Mississippi would increase the rate at which formaldehyde was off-gassed into the trailer, thus increasing the concentration of formaldehyde in the interior atmosphere. Gulf Stream also knew that long term stays in the travel trailer would increase the humidity in the trailer.
10. Gulf Stream knew or should have known that people living in the Cavalier Travel trailer would not be aware of the hazard associated with the formaldehyde fumes unless they were alerted and informed.
11. Gulf Stream knew or should have known that people living in a Cavalier travel trailer would not be able to accurately determine whether or not they were being exposed to hazardous levels of formaldehyde.
12. Gulf Stream knew or should have known that water damage to the trailer could increase the level of formaldehyde that would be emitted into the atmosphere, and that water damage would be more likely if the trailer were improperly handled during transport to the site where it was placed or by improper stabilizing of the trailer.
13. Gulf Stream knew or should have known that in the enclosed small volume of the Gulf Stream Cavalier, the formaldehyde fumes could be concentrated. They knew, or should have known, that carrying out the recommendations from Gulf Stream for ventilation would not guarantee that the concentration was reduced to a safe level for long-term residence.
14. Gulf Stream knew or should have known that the ventilation in the travel trailer required use of the air conditioning for extended periods with appropriate venting.
15. Gulf Stream knew or should have known that most Katrina victims would not know that they needed to ventilate their trailers to evacuate formaldehyde gases and would not be

9

able to determine when levels were safe. Asking residents to remain outside or not to be inside the trailer for days would impose a severe hardship on many residents.
16. The warnings and instructions that were provided by Gulf Stream to the occupants of the Cavalier travel trailer failed to alert Ms Alexander to the hazard Gulf Stream could reasonably expect she would be exposed to upon moving into the travel trailer.
17. Gulf Stream had a duty to alert and provide adequate warning to travel trailer users about the hazards associated with formaldehyde off-gassing. They knowingly failed to provide this information to people who would be using their trailers. Failure to provide adequate warnings and instructions was unconscionable and showed a disregard for the health of the people who used their travel trailers after Katrina.
18. At a minimum, Gulf Stream should have provided warnings and instructions such as those in Title 24 CFR § 3280.309 Health Notice on formaldehyde emissions. [49 FR 32012, Aug. 9, 1984, as amended at 54 FR 46049, Nov. 1, 1989; 58 FR 55007, Oct. 25, 1993] shown below. This information was known prior to August 1984.


**§ 3280.309 Health Notice on formaldehyde emissions**
(a) Each manufactured home shall have a Health Notice on formaldehyde emissions prominently displayed in a temporary manner in the kitchen (i.e., countertop or exposed cabinet face). The Notice shall read as follows:

IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose, and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system. If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

(b) The Notice shall be legible and typed using letters at least 1/4 inch in size. The title shall be typed using letters at least 3/4 inch in size.

10

ALX-EXP-40-000010

(c) The Notice shall not be removed by any party until the entire sales transaction has been completed (refer to part 3282—Manufactured Home Procedural and Enforcement Regulations for provisions regarding a sales transaction).
(d) A copy of the Notice shall be included in the Consumer Manual (refer to part 3283—Manufactured Home Consumer Manual Requirements). [49 FR 32012, Aug. 9, 1984, as amended at 54 FR 46049, Nov. 1, 1989; 58 FR 55007, Oct. 25, 1993].

19. Gulf Stream should have provided a Consumer Manual that warned and instructed people who would be residing in the travel trailer about the formaldehyde off-gassing and its potential to create a health hazard. This manual should also have detailed the methods for lowering formaldehyde levels in the trailer.
20. The lack of appropriate information on the trailer rendered the trailer unreasonably dangerous for its occupants.
21. Ms Alexander's decision to move into the Cavalier travel trailer was the result of inadequate warnings and information regarding the hazard of formaldehyde and its dangers, especially the danger to children and people with respiratory problems such as asthma. As soon as she learned about the hazards associated with formaldehyde off-gassing in the trailer, she moved her family out. If adequate information had been provided with the trailer, Chris Cooper would not have been exposed to the elevated levels of formaldehyde in the Cavalier travel trailer.
22. If Ms Alexander had been adequately warned about the hazards associated with formaldehyde off-gassing, especially to children and people with asthma, Ms Alexander would not have moved into the Cavalier travel trailer. She had the option to remain in Florida with her relatives or to live with relatives in New Orleans until she could find satisfactory housing, and would not have intentionally placed her children at risk. Ms Alexander knew that her son had asthma, and if she had been adequately warned and informed she would have made the decision to prevent him from being exposed to formaldehyde, which she would have realized would put him at risk for severe health problems.

If I receive more information, I may revise or add to my opinions. If you have any questions, please call me at 303 971 1053 (8-4 Mountain time) or at 303 388 4659 any other time.

*Lila F Laux*

Lila F. Laux, PhD

11

ALX-EXP-40-000011

# Affidavit of Lila F. Laux, Ph.D.
Re: Age et al. v. Gulf Stream Coach, Inc. et al.

STATE OF COLORADO
COUNTY OF DENVER

BEFORE ME, the undersigned authority personally came before me an appeared:

LILA F. LAUX, PhD

Who, after being duly sworn by me, did depose and say that she is in all ways competent to make this affidavit and that the information contained in the attached report is true and accurate to the best of her knowledge.

*Lila F. Laux*
LILA F. LAUX, PhD

Sworn and subscribed
Before me, this 16th day
of May, 2009.

*Roselia Hernandez*    # N/A
Notary Public

My commission expires   10-08-2012