**Affidavit of Gary Bunzer**

**Re:  Age et al.  v. Gulf Stream Coach, Inc. et al.**

**State of Washington**
**County of King**

BEFORE ME, the undersigned notary, appeared personally on this the ___*15TH*___ day of May, 2009:

**GARY BUNZER**

Who, after being duly sworn by me, did depose and say that the information contained in the attached report is true and accurate to the best of his knowledge.

Thus, signed and sworn on this the ___*15TH*___ day of May, 2009.

---

Gary Bunzer
2801 – 1st Avenue, #308
Seattle, WA 98121

Notary Public Signature

Sierra D. Griffith
Notary Public Name

Notary Public
State of Washington
SIERRA D GRIFFITH
My Appointment Expires Feb 18, 2011

___N/A___
Notary Number

___Feb. 18 2011___
Commission Expires

ALX-EXP-12-000001

# Bunzer Consulting, Inc.

PO Box 19562
Seattle, WA 98109
619.507.1510
gbunzer@hotmail.com
www.rvdoctor.com

**EXPERT OPINION REGARDING THE SET-UP, MAINTENANCE
AND REPAIR OF RECREATION VEHICHLES (RVs)**

**Gary Bunzer
May 15, 2009**

## INTRODUCTION and DECLARATIONS:

1. My name is Gary Bunzer and I have been retained by counsel for the plaintiffs in Re: *Alexander and Cooper v. Gulf Stream et al, Docket No. 09-2892,* FEMA Trailer Formaldehyde Products Liability Litigation specifically in regards to the normal and expected methods of set-up, preventive maintenance and consequential repairs of a recreation vehicle (RV).

2. I have not been asked to evaluate the conduct, material procurement methods, construction practices or procedures of any RV manufacturer in regard to the design or manufacture of any RV. I do not consider myself an expert in RV production, therefore, I have no opinion regarding such matters. Clearly, my expertise is in the area of "after-the-sale" set-up, use, preventive maintenance and repair of RVs.

3. I have been actively involved within the aftermarket service segment of the RV Industry for over forty years. Prior to focusing solely on RVs, I had six years experience working as a mobile home repair technician; building, setting up, repairing and maintaining mobile homes along the Gulf Coast of Bradenton/Sarasota, Florida as well as in San Diego County, California.

4. Since 1973 I have served the RV Industry as an RV service technician, shop foreman, service manager, columnist, technical editor, book author, educator, television producer and host, consultant and training specialist. I have been writing The RV Doctor Column for various RV publications and newspapers since the fall of 1976. The RV Doctor Column, which features questions from RVers seeking technical advice regarding set-up, maintenance and repair of RVs, has been published somewhere every month for thirty-three consecutive years.

5. I have created and produced training videos and DVDs for the RV enthusiast as well as for the professional RV service technician. I work closely with RVIA in developing and updating the textbooks and DVDs used by educational facilities, RV dealers and service shops nationwide. I have been an advocate for industry certification of all RV service technicians and have assisted in the development of the RVIA/RVDA sponsored Certification Exam. The titles of the training videos and DVDs I have written and produced are:

    i.    Cleaning and Servicing the RV Absorption Refrigerator
    ii.   Testing the Battery Systems – The Basics
    iii.  Roof Air Conditioner Evacuation and Charging Procedures
    iv.   RV Generator Tune-up/Set-up Procedures
    v.    Cleaning and Servicing the RV Furnace

ALX-EXP-12-000002

vi.   Plastic Welding Techniques
vii.  Storing and Using Your Recreational Vehicle
viii. RV Preventive Maintenance Procedures

6. Since January 2004 I have been Adjunct Professor at Northampton Community College (NCC) in Bethlehem, PA. I created the curriculum materials and currently administer and teach thirteen different courses for the on-line RV Technician Training Program. The courses I teach are:

   i.    Introduction to RV Service
   ii.   Pre Delivery Inspections
   iii.  RV Towing Systems
   iv.   RV Electrical Systems
   v.    RV Generators
   vi.   LP Systems
   vii.  RV Water Heaters
   viii. RV Ranges & Cooktops
   ix.   RV Absorption Refrigeration
   x.    RV Heating Systems
   xi.   RV Air Conditioning
   xii.  RV Plumbing Systems
   xiii. RV Preventive Maintenance

   Courses are presented three per semester; three semesters per calendar year. The program is designed to teach students how to troubleshoot, set-up, repair and maintain RVs and related components. Even though the college awards the Special Diploma, RV Service Technician, for successful completion of all thirteen courses, NCC does not "certify" them as RV technicians. Only RVIA/RVDA has the authority to certify; NCC simply prepares the student for certification.

7. I am the author of the RV Owner's Handbook, published by Woodall Publishing (2009). Written generically, it covers all the maintenance requirements for RVs regardless of type or size. It teaches RV owners how systems operate, how to perform most annual maintenance procedures, how to winterize and de-winterize the RV and how to troubleshoot and repair complaints common to all RVs.

8. I regularly create and present informational RV owner seminars for RV shows, gatherings, and events. The RV Doctor Seminars are a popular feature at major consumer RV Shows around the country. A sampling of topics presented at recent RV shows include:

   i.    Winterizing Your RV
   ii.   The Spring Shakedown
   iii.  The Top Ten Maintenance Tips Every RVer Should Know
   iv.   Spare Parts/Key Questions
   v.    RV Tires – Care and Safety
   vi.   Exterior Care for Your RV – The How's and Why's
   vii.  Optimizing the RV Battery Systems
   viii. RV Appliance Maintenance

ALX-EXP-12-000003

9. I have developed custom programs of study for various RV dealerships and service centers by assessing the technical qualifications of the current staff and developing a point-specific curriculum based on the needs requirements of that shop. I then present the training at the dealership, around their shop hours, so that the shop loses no revenue during the training evolution.

10. I understand that RV set-up procedures, usage, troubleshooting, repair and specific preventive maintenance procedures are applicable to all types of RVs; towable and motorized, regardless of type, length or design. It is common knowledge that all RVs require periodic maintenance to the exterior, each major system and appropriate components within each major system. Oftentimes RV manufacturers will publish a prescribed maintenance schedule for their brand and type of RV.

11. I am aware that many component manufacturers (product suppliers) have a prescribed set of maintenance procedures for their product(s) used in or on the RV. They too recommend regular maintenance in order to obtain optimum use of their product(s).

12. It is within the realm of RV set-up procedures, usage, preventive maintenance and repair of the RV that I prepare this report.

I) **TOPICS OF DISCUSSION – Overview:**

This report will discuss and address:
1. Set-up and jacking procedures
2. Types of maintenance required
3. Preventive maintenance inspections and procedures
4. Common RV repairs
5. Inspection of FEMA trailer, VIN: **1NL1GTR2551021783** FEMA ID #: **1041407**
6. Conclusions

II) **SET-UP AND JACKING PROCEDURES:**

1. Rarely are RVs permanently set in place. By design and definition, an RV is a vehicle that combines transportation and temporary living quarters for travel, recreation and camping. My experience with jacking techniques and permanent set-up procedures involves my years working as a mobile home repair technician.

2. My experience has shown that special care must be taken when jacking and maneuvering a modular unit like a mobile home, park model trailer or RV. Movements must be made in small increments until the proper vertical height is achieved for that particular installation.

3. When jacking a rigid structure like a mobile home, park model trailer or RV, it is vital that a minimum of two hydraulic jacks be employed, regardless of any minimal length of the unit. All jacks must work in concert, lifting one complete side of the unit at the same time to avoid unwanted wracking or stressing of the main frame members and outriggers.

ALX-EXP-12-000004

4. A series of stacked cribbing timbers must be utilized at the four corners of the structure as well as in-between, when necessary, to safely raise the unit in small increments to the final, desired height. The unit must be temporarily lowered onto the stacked cribbing timbers periodically to reset the jacks and to check the safety of the procedure up to that point. A proper jacking procedure may take several instances of raising, then lowering the unit onto the cribbing timbers until the unit reaches a point slightly above the desired height.

5. Once the unit is at the correct height, the trailer must be slowly lowered evenly onto pre-set piers, joists or other types of foundational support, one side at a time. After a proper jacking procedure, the final leveling of the unit is achieved by placing shims where necessary to satisfactorily obtain the degree of levelness required and to ensure that all piers are snug and each pier supports its share of the weight of the unit.

6. It has been my experience that the key to a proper jacking procedure is to raise each side independently of the other and to lift one entire side the same distance at the same time. Raising only a single corner, for instance, will undoubtedly cause an unnatural wracking or twisting of the frame. Unnatural wracking and twisting of the frame, however briefly, has the propensity to dislodge structural members within the wall, floor and roof of the unit, and will likely distort or loosen paneling, cabinetry or other accoutrements inside the unit as well. In cases of severe wracking, water lines, LP tubing and drain piping and their associated fittings may be displaced or even breached, causing leakages.

7. Wracking and twisting of the frame of the unit can also deform door jambs and restrict or bind window and door operation.

8. Another result of unnatural wracking of the frame of a mobile home, park model trailer or RV is the compromising of the integrity of the sealants on the roof, around the windows, doors and storage compartments as well as at the edges and seams of the unit. Any break in the sealant is an open door to moisture intrusion.

9. If one becomes aware during a pre or post delivery inspection or vehicle set-up that a specific formaldehyde odor exists, it is necessary to perform the industry-accepted method of fumigating the RV until the odor diminishes or is eliminated completely. The procedure involves the use of aqueous ammonia, more commonly known as ammonium hydroxide. The ammonia itself, while it will help minimize the odor of formaldehyde, contains strong irritants that may affect the eyes, nose, and throat during the process. Therefore, appropriate fumigation steps must be followed. These appropriate fumigation steps are:

   i. Remove all plants, fish, animals, foodstuffs, etc., from the RV and empty all the drawers. Remove bedding, clothing and all cooking utensils.
   ii. Remove all drawers completely and open all cabinets and closet doors. The ammonia must be allowed to evaporate into every area of the RV.
   iii. Disconnect the unit from AC power, but leave the battery connected. Turn the LP off at the container(s).
   iv. Drain the fresh water tank.

ALX-EXP-12-000005

v.     Turn the furnace thermostat to the maximum setting so the furnace fan runs continuously (there will be no heat since the LP container valves are closed). The circulating air will aid in moving the ammonia vapor into all areas of the RV. Make sure all furnace ducts remain fully open.

vi.    Pour one-half gallon of the ammonia into two wide, but shallow plastic bowls. Be sure to wear the appropriate eye protection and gloves. Place the bowls on a flattened plastic garbage bag in each of the two largest areas of the unit.

vii.   Close all the exterior windows, doors and roof vents tightly.

viii.  Allow the ammonia to stand and evaporate naturally for a minimum of twenty-four hours; then open all the windows, doors and roof vents to rid the coach of any residual ammonia smell. If possible, run the air conditioner.

ix.    The remaining liquid in the plastic bowls, now comprised mostly of water, can be safely poured down the sewer drain.

x.     Refill the fresh water tank, reinstall all the drawers and stow the RV contents.

xi.    It may be necessary to daily vent the coach for a week or so to completely rid the RV of any residual ammonia odor.

## III) TYPES OF MAINTENANCE REQUIRED:

1. Virtually every RV requires periodic preventive maintenance in order to avoid or minimize the necessity of crisis repairs. Some preventive maintenance tasks, where applicable, include, but are not limited to:

   i.    Inspecting and sealing roof components, seams, edges, joints; all appurtenances.

   ii.   Inspecting and sealing windows, doors, storage bay compartments; anything attached to the side walls of the RV.

   iii.  Measuring the LP pressure, testing the RV for gas leaks and cleaning and servicing the LP-burning appliances.

   iv.   Cleaning the filters in the air conditioning system.

   v.    Flushing and sanitizing (chlorinating) the fresh water distribution system.

   vi.   Cleaning and treating the holding tanks and lubrication of termination valves.

   vii.  Cleaning and flushing P-traps in the waste system.

   viii. Performing routine battery maintenance.

   ix.   Testing the incoming AC voltage for the correct polarity.

   x.    Testing the Ground Fault Circuit Interrupter (GFCI).

   xi.   Washing and protecting the roofing material and exterior portions of the RV.

2. Most preventive maintenance practices are employed on an annual basis, but more frequently in certain cases. Geographical areas experiencing extreme heat or cold, extreme high or low humidity, frequent rainfall, abundant snow accumulation or other extremes of weather or exposure may mandate more frequent inspections and subsequent repairs.

## IV) PREVENTIVE MAINTENANCE INSPECTIONS AND PROCEDURES:

1. It is my opinion, when performed regularly, preventive maintenance practices can reduce or eliminate the need of crisis repairs and extend the useful life of the RV. It is also my opinion that water intrusion is the predominant destructive enemy of any RV. Therefore, it is vital that regular and very detailed inspections be performed on the exterior surfaces of the RV. Roof,

Page **5** of **14**

ALX-EXP-12-000006

sidewalls, end walls and underbelly inspections, performed at regular intervals are crucial to the structural integrity, usability and weather-proofing of any RV.

2. Any evidence of water intrusion should be rectified immediately to minimize structural damage, deterioration and the proliferation of mold. It is my understanding from others that water intrusion also exasperates the off-gassing of formaldehyde components common in building materials used in RV construction.

3. The steps to perform a complete exterior inspection of any RV include, but are not limited to:

   i.    Look closely at all roof seams, edges, moldings, awning rails, drip rails, etc.
   ii.   Check the tightness of all mounting screws around sewer vents, roof vents and refrigerator exhaust vents and trim pieces.
   iii.  Look for loosened, flaking or deteriorated sealants and coatings anywhere on the exterior of the unit.
   iv.   Look for cracks in sealants, open seams or lifting sealants around all roof components.
   v.    Search for tears or cuts in synthetic roofing materials.
   vi.   Check for soft spots or low spots in the roof decking.
   vii.  Check for damage to the exterior skin on all sides, front and rear of the unit.
   viii. Look for gaps around plumbing drain lines, LP gas tubing or electrical conductors where they pass through the floor of the unit.
   ix.   Check for dried or chipped butyl tape or peeling silicone sealants around all doors, windows and storage compartments.
   x.    Inspect and ensure the integrity of appliance intake and exhaust vents.
   xi.   Look for any voids or gaps in self-leveling sealants employed on the roof.
   xii.  Check the roof-top air conditioner(s) for proper mounting. This includes checking the gasket between the air conditioner and the roof surface.
   xiii. Look for rusted or oxidized components on the frame, axles and running gear.
   xiv.  Inspect for evidence of animal infestation or habitation (mice, wasp nests, etc.).
   xv.   Test the function and operation of all doors and windows.

4. It is important to know which composite materials are used on that particular RV. No single sealant is compatible for use with all the different materials found on the RV. The correct sealant, designed for that material, must be utilized. Some of the various composite materials common to RVs include:

   i.    Rubber
   ii.   Ethylene Propylene Diene Monomer (EPDM) rubber roofing
   iii.  Thermoplastic polyolefin (TPO) synthetic roofing
   iv.   Fiberglass®
   v.    Filon®
   vi.   Plastic (ABS)
   vii.  Vinyl
   viii. Steel
   ix.   Aluminum
   x.    Fiberglass reinforced plastics (FRP)

ALX-EXP-12-000007

5. The integrity of the LP gas system is also crucial and a safety concern. LP pressure regulators need periodic adjustments to ensure the delivery line pressure remains at 11.0 water column inches. The DOT cylinders or ASME tanks require periodic inspections and in the case of DOT cylinders, periodic recertification. The entire RV should be leak tested at least annually to ensure no LP leaks are present.  (Specific RVIA-approved LP leak testing and pressure setting procedures can be provided upon request).

6. In addition, each LP-burning appliance requires annual cleaning and servicing. With a few exceptions, RVs are equipped with four LP-burning appliances; refrigerator, water heater, range and furnace. The major steps to perform an appliance clean and service procedure include:

    i.    Disassembly and cleaning of all orifices and burner assemblies.
    ii.   Cleaning of associated components and enclosures.
    iii.  Flushing out the water heater and replenishing the air gap.
    iv.   Checking the condition of the anode rod in the water heater (Suburban only).
    v.    Vacuuming and cleaning of all ducts and distribution systems.
    vi.   Cleaning and preserving electronic board contacts.
    vii.  Cleaning and brightening electrode assemblies.
    viii. Cleaning or adjusting thermostats.
    ix.   Test firing to ensure proper operation.

7. All air conditioners are equipped with a return air filter. It is paramount to the successful operation of the air conditioner that the filter be cleaned periodically. This is usually accomplished by simply washing and drying the filtering element.

8. Flushing and chlorinating the fresh water piping system is an annual process performed to ensure the water quality maintain its freshness. The RVIA-approved procedure to chlorinate the fresh water system is available and can be provided upon request.

9. Cleaning and flushing sink P-traps is self-explanatory, yet still a process that needs periodic attention.

10. Period battery maintenance involves regular inspections and specific measurements to ensure battery life is maximized. Evidence of neglect includes corroded or oxidized terminals and connections at the battery posts, low electrolyte levels in each cell and dirt accumulation on the battery top. Charge rates from the converter/charger must be measured to preclude overcharging the battery. Chronic overcharging reduces the overall usable lifespan of the battery and creates an off-gassing of hydrogen that can be hazardous. Battery maintenance procedures may include, but are not limited to:

    i.    Inspecting the battery case, looking for bulges, cracks or leakage of electrolyte.
    ii.   Cleaning the battery case using a mixture of water and baking soda.
    iii.  Cleaning and brightening the battery posts.
    iv.   Cleaning all terminals, ring connectors and conductors attached to each post.
    v.    Checking the integrity of the frame ground connection.
    vi.   Filling each cell with distilled water to the appropriate level.
    vii.  Fully charging the battery.
    viii. Performing an open circuit battery voltage test.

ALX-EXP-12-000008

        ix.      Measuring the specific gravity of all cells.

        x.      Measuring the charge rate from the converter/charger.

11. Prior to connecting the RV to any 120-volt AC power source it is necessary to test the polarity of the incoming voltage. Additionally, after the unit is plugged into AC service, the polarity should, once again, be checked at all the receptacles inside and outside the RV. A common, plug-in circuit analyzer is used to check the polarity. Additionally, it is recommended to measure the incoming voltage prior to connecting to any power source. Extremely high or low AC voltage is damaging to certain components in the RV.

12. Every RV is equipped with a Ground Fault Circuit Interrupter (GFCI) which protects the user from AC circuits and receptacles located near a source of water, i.e., the lavatory, galley sink and exterior receptacles. Typically a GFCI test function is an integral component on a lavatory duplex receptacle; in other cases, the GFCI test function is located on a circuit breaker in the panelboard distribution box. The GFCI should be tested monthly.

13. Washing the exterior periodically will reveal any areas of concern and determine if proactive repair steps need to be taken. Once cleaned, exterior surfaces can be inspected closely for discrepancies. Faults or flaws in sealants cannot be properly determined by inspecting a dirty RV. Some materials such as synthetic roofing may require specific cleaners and protectants. Additionally, it is advised to polish and wax the complete exterior regularly, using the appropriate methodology for the particular type of exterior materials used on that RV.

## V) COMMON RV REPAIRS:

1. As a result of performing periodic preventive maintenance inspections and tasks, it is often the case to take a proactive course of action to rectify any discrepancies located as a result of the detailed inspections. Immediate attention is required in the event water intrusion has been located. Common repairs to RVs may include, but are not limited to:

        i.      Resealing of seams, edges, joints and components such as wall seams, vents, skylights and air conditioners located on the roof of the unit.

        ii.      Repairing/sealing tears or cuts in synthetic roofing materials.

        iii.      Resealing gutter moldings (J rails), awning rails and extruded trim pieces located at corners where the roof joins the side walls and the front and rear caps.

        iv.      Caulking or resealing deteriorated sealants around marker lamps, tail lamp assemblies, entry doors, escape hatches, windows and compartment doors.

        v.      Sealing voids or openings around drain pipes, electrical conductors and LP gas tubing that passes through the floor into the living areas.

        vi.      Repairing cuts, tears and holes located in the exterior skin of the unit.

        vii.      Scraping rust and repainting frame rails, outriggers, A-frame (including LP containers) and hitch and axle components.

        viii.      LP regulator adjustment or replacement.

        ix.      Locating and eliminating LP leaks.

        x.      Replacing faulty components in the LP-burning appliances, including the sacrificial anode rod in the water heater (Suburban only).

        xi.      Cleaning or replacing of air conditioner filters.

ALX-EXP-12-000009

xii.   Cleaning and brightening all battery terminals, connections and conductor terminations.
xiii.  Replenishing battery electrolyte to the appropriate level.

2. Aftermarket products abound to safely and appropriately facilitate all the repairs indicated above.

3. In the case of permanently installed mobile homes, park model trailers or RVs, it is advisable to tighten all weight bearing piers or support members, and to check all tie down attachment points often.

## VI) INSPECTION OF FEMA TRAILER, VIN: 1NL1GTR2551021783, FEMA ID #: 1041407:

1. On May 6 and May 7, 2009, in the company of counsel and other experts, I inspected the above trailer at the FEMA storage lot in Lottie, Louisiana. I was present during the entire allotted inspection time from 4:00 PM to 7:30 PM on Wednesday, the 6th and for a few additional hours on Thursday, the 7th. I was also able to interview the plaintiff via telephone on both days.

2. The overall condition of the trailer was deteriorated and in dire need of repair, if even feasible. We were not allowed to perform any destructive tests so all my determinations are made solely on the visual inspections I performed.

3. Starting at the roof, I immediately noticed wide gaps and cracks in the sealants at all the seams and joints where the front aluminum panel overlapped the synthetic roofing material [photos 7988 & 7990].[1] Large gaps and open seams were present where trim moldings ran upward along the corners and over and onto the roof [photos 024 & 7820].

4. Just behind the front seam, the roof deck underlayment was deteriorated to the point that it would be unsafe to gain access to the roof. The roof was soft enough that pressing down with my hand, while standing on a ladder, was enough to flex the roof approximately three inches. It was obvious water intrusion had damaged that section of roofing beyond repair; it is my opinion replacement would be the only cure.

5. All moldings at the corners of the unit had been separated enough to break the integrity of the sealants, resulting in an open conduit for rain and moisture to enter the roof [photos 018 & 7756]. Once in the roof cavity, water can travel anywhere as gravity propels it downward.

6. The sealants around sewer vent caps were also raised up above the surface of the roofing material [photo 021]. Rain water had free access around the plastic vent pipe below the caps. From my vantage point on the ladder, it was undeterminable if the roof had sunk or if the sealant had risen up; either way, a large gap resulted.

7. The 14-inch exhaust vent in the lavatory also showed signs of deterioration with open cracks in the sealant and holes in the plastic cover [photo 017].

---

[1] All referenced photos saved to disk. See Appendix I for filenames.

ALX-EXP-12-000010

8. Deteriorated sealant was also observed around the city water connection on the side of the RV [photo 027], and also around most windows and above the entry door. Many windows exhibited signs of rubber gasket shrinkage which also can lead to water intrusion [photo 7793].

9. The condition of the water heater appeared beyond repair with rusted and deteriorated components evidenced. The anode rod, which also serves as the drain plug, had been removed and appeared original and to be in need of replacement [photo 8036].

10. The sealant around the furnace intake and exhaust assembly showed signs of compromise [photo 8052].

11. The exterior 120-volt AC receptacle was broken and missing the mounting plate and weather-proof cover [photo 015]. As a precaution we applied black electrician's tape around all the metal components, including the ground conductor in the Romex cable.

12. All frame and axle components were severely rusted and oxidized to the point of needing repair or replacement [photos 8009 & 7871]. The black iron piping of the LP gas manifold, also secured to the frame, was severely rusted as well.

13. The underbelly was intact with only one small section of the vapor/moisture barrier loosened on the road side, near the front of the RV [photo 7851]. However, the front section of the underbelly showed signs of water retention to the point that when pushed up, water poured out of the small open section at the left front side. Water or soaked insulation could be felt at most of the sections of the underbelly [photo 1044]. Again, because we could not perform any destructive testing, no water was visibly evident except at the front section.

14. I viewed copious amounts of duct tape wrapped around an ABS drain pipe where it passed through the floor [photo 1047]. I also noticed a type of expandable foam sealant around some electrical conductors and drain pipes that passed through the floor [photo 014], as well as steel wool positioned around LP copper tubing wherever it passed through the floor [photo 1045].

15. Inside the RV, in the front bedroom, I noticed a seam between two sections of paneling had opened up due to the popping out of one of the adjacent panels [photos 7936, 7940, 7942 & 7943]. During my discussion with the plaintiff, it was made known to me that during the first week in the trailer, she told a FEMA representative that the popped out panels in the bedroom were present the day she moved into the trailer. She was instructed by the FEMA representative, at that time, to simply apply duct tape to secure the panels back in place.

16. I located a second paneling seam in the lavatory that had also opened up due to one of the adjacent panels popping out of position [photo 1002]. According to the plaintiff she did not notice this seam opening until a few months after she moved into the trailer. These two sections of interior paneling, (bedroom and lavatory), were the only two seams between any two panels that ran from floor to ceiling unabated and in one piece; meaning that neither of these two seams was interrupted by a window cutout, a cabinet installation

**Page 10 of 14**

or a partition wall. All the other interior paneling seams were held secure by a window, the entry door, a partition wall, a cabinet, a bunk bed or the dinette section.

17. A tear in the synthetic roofing material near the edge molding was evident [photo 7812].

18. After inspecting the shoreline cable and turning off all the circuit breakers in the panelboard distribution box, the unit was connected to a portable generator. I then turned on the main 30-amp breaker, the 20-amp breaker for the roof air conditioner and the 15-amp breaker which controlled the converter that powered the wall thermostat. The air conditioner was then turned on and the unit began cooling the RV. Due to the humidity level there was an abundance of condensation run-off from the air conditioner. The condensation dripped over the sides of the RV at numerous locations; a normal occurrence of no concern if the various sealants were not so deteriorated.

19. Overall, the condition would be considered deplorable and certainly not livable, as mold was found in many locations inside the RV [photo 7954]. It was obvious water intrusion had damaged major sections of the RV and remained pooled in the floor sections. Clearly the roof sustained major structural damage as did the flooring and certain interior panels. It was not possible to determine if the side wall structural members sustained any damage because of the inability to perform destructive testing or inspections.

## VII) CONCLUSIONS:

1. At first glance it would be difficult to determine the time-line concerning the deterioration of the sealants which ultimately allowed water intrusion and structural damage within the ceiling and flooring. However, I believe the presence of the two popped out interior panels provides the answer. Because the panels were popped out of position the first day the plaintiffs moved in, it is my opinion that the RV was improperly jacked up during the initial set-up at 4415 Dale Street, New Orleans, LA 70126. The position of the panels is consistent with the effects of improper jacking, whereby the entire structure was twisted unnaturally. Additionally, the RV sat vacant and closed up on-site for almost a month prior to the plaintiffs' return from Jacksonville, FL. During this time, it is conceivable that rain water and moisture began entering the RV unimpeded.

2. It is inconceivable to believe the panels were popped out prior to leaving the factory since the transporting company and the receiving agent from FEMA should have noted the damage upon delivery of the RV to the FEMA storage lot in Florida. However, no available document indicates such damage. In fact, the available documents indicate that no such damage was incurred. Therefore, it is most likely that the panels popped out due to an improper jacking procedure taking place when the trailer was installed in the front yard of the plaintiffs' former home in New Orleans.

3. It is my opinion that improper jacking of the RV during the initial set-up in New Orleans caused unnatural wracking and twisting of the structure that resulted in the interior panels popping out of their location.

4. Additionally, it is my opinion that improper jacking of the RV during initial set-up in New Orleans caused the roof sealant to split, opening up the seam at the front of the RV. This is

ALX-EXP-12-000012

further evidenced by the manifestation of a water leak emanating from the front bedroom ceiling lamp within a few weeks after the plaintiff moved in.

5.  A service call was made and the plaintiff was told it would probably leak again, which it did some weeks later. A second service call was made, but by then, enough water had evidently entered the unit and the damage continued. As stated earlier, to repair the popped out interior panels, the plaintiff was told to use duct tape. It is my opinion that duct tape is not the normal or expected method of repair for such damage.

6.  It is my opinion that, even though periodic inspections were performed on the exterior of the RV during the time the plaintiffs lived in the RV, it is doubtful any restorative repairs were performed on the roof seam in question. I saw no evidence of an aftermarket sealant having been applied to the seam.

7.  I did see evidence of silicone sealant that was applied at the corners of roof and down each side of the vertical extruded trim molding, but I was unable to determine if the silicone was factory applied or applied during an attempt to repair the water leak after set-up.

8.  Destructive inspection may determine if multiple layers of the correct type of sealant were applied to the roof seam in question, but we were unable to alter or cause further damage to the RV. It is my opinion that the sealant on the roof currently visible is the factory-applied sealant. It is consistent in appearance with the sealant located at other components on the roof.

9.  It is my opinion that periodic maintenance, similar to what is considered normal and necessary was not performed on the water heater as evidenced by the severely deteriorated condition of the anode rod. The sacrificial anode rod should be replaced annually or when it has deteriorated to about 25% its normal size.

10. It is also doubtful that an LP leak test, a regulator lock-up test or an operating pressure test was ever performed on the LP system after the RV was set-up in New Orleans. No documentation of such tests being performed was reviewed by me. All the random inspections were performed when the plaintiff was at work so it is further doubtful that the furnace was ever cleaned and serviced since access to the interior would be necessary.

11. During the time of occupancy in December of 2006, the furnace failed to heat. The fan would run, but no heat was produced. A performance complaint was filed by the plaintiff and a service technician inspected the furnace and determined a part needed to be ordered. The part was never replaced and the furnace was never repaired. After numerous phone calls, the plaintiff gave up and purchased a portable electric heater. In my opinion this was neither professional nor appropriate customer service.

12. Fearing infestation of mice and/or other unwanted guests, the plaintiff herself attempted to patch voids and gaps around plumbing components, electrical conductors and copper tubing where each passed through the floor. This should have been located and rectified during a professional, preventive maintenance inspection. It is my opinion that, due to the

ALX-EXP-12-000013

above observations, the completeness and competence of either the inspectors and/or the service technicians was either lacking or disingenuous.

13. My conclusion is that improper jacking of the RV during the initial set-up in New Orleans caused the initial breach of the sealants on the roof and the popped out interior panels, creating increased formaldehyde exposure levels. Further, the lack of adequate inspections and preventive maintenance practices resulted in the rapid intrusion of moisture and water and the proliferation of damage that ultimately occurred, which also increased formaldehyde exposure levels.

14. In summary, the company that set up the trailer was negligent in its jacking procedures, which proximately caused the breach of the sealants of the roof and the popping out of the interior panels, resulting in an increase in formaldehyde exposure. The company responsible for the maintenance of this trailer negligently performed its required maintenance of this trailer, which resulted in the rapid intrusion of moisture and water, proximately causing an increase in formaldehyde exposure.

I reserve the right to submit amendments to this report if deemed necessary.

Respectfully Submitted,

Gary Bunzer
2801 – 1st Ave., #308
Seattle, WA 98121

ALX-EXP-12-000014

**Appendix I**

List of photo filenames referenced in the Bunzer Report and submitted on disk with the report. Note: photos were taken by at least three different cameras.

Photo Filenames
014
015
017
018
021
024
027
1002
1004
7756
7793
7812
7820
7851
7939
7940
7942
7943
7954
7988
7990
8009
8036
8056
1044
1045
1047

ALX-EXP-12-000015