UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

In Re: FEMA TRAILER                              MDL NO. 07-1873
        FORMALDEHYDE PRODUCTS
        LIABILITY LITIGATION
                                              SECTION "N" (5)

THIS DOCUMENT RELATES TO
ALL CASES

## ORDER AND REASONS

Before the Court is the Manufacturing Housing Defendants' Joint Rule 12(b)(6) Motion to

Dismiss Based on Federal Preemption (Rec. Doc. 1192). After reviewing the complaints, the

memoranda of the parties, and the applicable law, the Court rules as set forth herein.

## I.      BACKGROUND

In this multi-district litigation ("the MDL"), referred to as "In Re: FEMA Trailer

Formldehyde Products Liability Litigation," Plaintiffs are individuals who resided in emergency

housing units ("EHUs")[1] provided by the Federal Emergency Management Agency ("FEMA")

after Hurricanes Katrina and Rita. Plaintiffs claim to have been exposed to purportedly high

levels of formaldehyde contained in these EHUs, and to have suffered damages as a result of

these unsafe levels of formaldehyde and/or the absence of adequate warnings about the same.[2]

Plaintiffs have sued the manufacturers of these EHUs, the United States Government, and in

some cases, the government contractors who delivered and set up these EHUs.

The instant motion to dismiss is filed by the manufacturers of these particular mobile

---

[1]      These EHUs consisted of travel trailers, park models, or manufactured homes (also, referred to as "mobile homes").

[2]      Plaintiffs seek recovery for these alleged injuries under the state laws of Louisiana, Mississippi, Texas, and Alabama.

homes; travel trailers and park models are not at issue.[3]  The Defendants-movants note that the construction of these mobile homes is governed and regulated by the Manufactured Home Construction and Safety Standards Act, 42 U.S.C. § 5401 *et seq.*, ("the MHA") and the standards and regulations promulgated by the United States Department of Housing and Urban Development ("HUD"), pursuant to 24 C.F.R. § 3280 and § 3282 ("the HUD Code")[4]. Accordingly, the Movants assert that the federal statutes and regulation in the MHA and the HUD Code explicitly and impliedly preempt Plaintiffs' claims against them in accordance with the Supremacy Clause of Article VI, Section 2 of the United States Constitution.  Plaintiffs, on the other hand, contend that the MHA neither expressly nor implicitly preempts their state tort law-based claims against the Movants.

## II.    DISCUSSION

### A.    Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), a court accepts all well-pleaded

---

[3]    See Exhibit A to Rec. Doc. 1192-2 for a complete listing of these defendants. Also, See Rec. Doc. 1408. Further, the complaints filed against the manufacturers of mobile homes are filed in the following member cases: 08-3217, 08-4636, 08-5031, 08-3602, 08-4629.  These manufactured housing defendants are also named in the Amended Master Complaint (Rec. Doc. 109). In the complaints filed against the manufacturers of mobile homes, Plaintiffs allege that the EHUs were defective because they were constructed with plywood and particle board that contained formaldehyde. (Member case 08-3217, Rec. Doc. 1-2, ¶¶ 130-131).  Plaintiffs allege that even though Defendants complied with the federal regulations that governed formaldehyde in manufactured homes, such "safety standards, regulations or requirements are or were inadequate to protect the public from unreasonable risks of injury or damage caused by the housing units..." (Member case 08-3217, Rec. Doc. 1-2, ¶ 187(c)). The Complaint alleges that while federal standards do exist to regulate the formaldehyde content in some building materials, no federal standard exists to regulate the formaldehyde standard in "indoor air quality."  (Member case 08-3217, Rec. Doc. 1, ¶ 32). It should be noted that the complaints do not differentiate between claims against manufacturers of travel trailer and park models and claims against manufacturers of mobile homes. However, this is an important distinction because as this Court explained in its October 3, 2008 Order and Reasons (Rec. Doc. 717), the manufacture of mobile homes is regulated by HUD while the manufacture of travel trailer and park models is exempt from HUD construction standards, including those relating to formaldehyde content.

[4]    It is important to note that these regulations only govern mobile homes, and not the construction of travel trailers and park models.

facts as true and draws all reasonable inferences in favor of the plaintiff. *Baker v. Putnal*, 75

F.3d 190, 196 (5th Cir. 1996). To avoid dismissal, however, the plaintiff must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007); *In re Katrina Canal Breaches Litig*.,

495 F.3d 191, 205 (5th Cir. 2007). "Factual allegations must be enough to raise a right to relief

above the speculative level on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)." *Twombly*, 127 S .Ct. at 1965 (quotation marks, citations, and footnote

omitted).

### B.    Applicable Regulations in MHA and HUD Code

The United States Code states the purposes of the MHA:

> (1) to protect the quality, durability, safety, and affordability of manufactured homes;
>
> (2) to facilitate the availability of affordable manufactured homes and to increase homeownership for all Americans;
>
> (3) to provide for the establishment of practical, uniform, and, to the extent possible, performance-based Federal construction standards for manufactured homes;
>
> (4) to encourage innovative and cost-effective construction techniques for manufactured homes;
>
> (5) to protect residents of manufactured homes with respect to personal injuries and the amount of insurance costs and property damages in manufactured housing, consistent with the other purposes of this section;
>
> (6) to establish a balanced consensus process for the development, revision, and interpretation of Federal construction and safety standards for manufactured homes and related regulations for the enforcement of such standards;
>
> (7) to ensure uniform and effective enforcement of Federal construction and safety standards for manufactured homes; and

> (8) to ensure that the public interest in, and need for, affordable
> manufactured housing is duly considered in all determinations relating to
> the Federal standards and their enforcement.

42 U.S.C. § 5401(b).  To accomplish these objectives, the MHA grants the Secretary of HUD

authority to establish appropriate Federal construction and safety standards for manufactured

homes. 42 U.S.C.A. § 5403(a).  According to the MHA, these standards[5] shall be "performance-

based" and "reasonable and practical", and must also meet "high standards of protection." *Id*.

The MHA also requires that the mobile home construction and safety standards established by

the Secretary of HUD include:

> preemptive energy conservation standards ... [which] shall be
> cost-effective energy conservation performance standards designed to
> ensure the lowest total of construction and operating costs ... [and] shall
> take into consideration the design and factory construction techniques of
> manufactured homes and shall provide for alternative practices that result
> in net estimated energy consumption equal to or less than the specified
> standards.

42 U.S.C. § 5403(g).

    Specific to preemption, the MHA provides:

> Whenever a Federal manufactured home construction and safety standard
> established under this chapter is in effect, no State or political subdivision
> of a State shall have any authority either to establish, or to continue in
> effect, with respect to any manufactured home covered, any standard
> regarding the construction *or safety* applicable to the same aspect of
> performance of such manufactured home *which is not identical to the
> Federal manufactured home construction and safety standard*.

42 U.S.C.A. § 5403(d) (emphasis added).  This provision further states:

> Federal preemption under this subsection shall be broadly and liberally
> construed *to ensure that disparate State or local requirements or
> standards do not affect the uniformity and comprehensiveness of the*

---

[5]  These standards, established by the HUD Secretary, are published at 24 C.F.R. §§ 3280.1 *et seq*.

*standards promulgated under this section* nor the Federal superintendence of the manufactured housing industry as established by this chapter. Subject to section 5404 of this title, there is reserved to each State the right to establish standards for the stabilizing and support systems of manufactured homes sited within that State, and for the foundations on which manufactured homes sited within that State are installed, and the right to enforce compliance with such standards, except that such standards shall be consistent with the purposes of this chapter and shall be consistent with the design of the manufacturer.

*Id.* (emphasis added). The HUD Code sets out the preemptive reach of § 5403(d) of the MHA.

The regulation states, in pertinent part:

(a) No State manufactured home standard regarding manufactured home construction and safety which covers aspects of the manufactured home governed by the Federal standards shall be established or continue in effect with respect to manufactured homes subject to the Federal standards and these regulations unless it is identical to the Federal standards.

...

(c) States may participate in the enforcement of the Federal standards enforcement program under these regulations either as SAAs or PIAs or both. These regulations establish the exclusive system for enforcement of the Federal standards. No State may establish or keep in effect through a building code enforcement system or otherwise, procedures or requirements which constitute systems for enforcement of the Federal standards or of identical State standards which are outside the system established in these regulations or which go beyond this system to require remedial actions which are not required by the Act and these regulations. A State may establish or continue in force consumer protections, such as warranty or warranty performance requirements, which respond to individual consumer complaints and so do not constitute systems of enforcement of the Federal standards, regardless of whether the State qualifies as an SAA or PIA.

(d) No State or locality may establish or enforce any rule or regulation or take any action that stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The test of whether a State rule or action is valid or must give way is whether the State rule can be enforced or the action taken without impairing the Federal superintendence of the manufactured home industry as established by the Act.

5

24 C.F.R. § 3282.11. Further, when HUD announced the formaldehyde regulations, it explained, "[i]t is HUD's intention that these standards preempt State and local formaldehyde standards in accordance with the Act (42 U.S.C. 5403(d))." 49 Fed. Reg. at 31997.

The MHA also contains a "savings clause" which states that "[c]ompliance with any Federal manufactured home construction or safety standard ... does not exempt any person from any liability under common law."[6] 42 U.S.C. § 5409(c). Additionally, the MHA contains a provision that sets forth state court jurisdiction under state law:

> Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any manufactured home construction or safety issue *with respect to which no Federal manufactured home construction and safety standard has been established* pursuant to the provisions of section 5403 of this title.

42 U.S.C. § 5422(a) (emphasis added).

Several regulations within the HUD Code govern the construction of manufactured homes. Section 3280.303 sets forth "general requirements" for construction of the body and frame of mobile homes. That section states that "[a]ll construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing. . ." 24 C.F.R. § 3280.303(b).

Pursuant to the MHA, HUD established the Manufactured Home Construction and Safety Standards ("MHCSS"), 24 C.F.R § 3208 *et seq.*, which govern the standards for formaldehyde emissions from materials used in manufactured homes. This regulation provides:

> (a) Formaldehyde emission levels. All plywood and particleboard

---

[6] As the district court concluded in *Guidroz, Jr. v. Champion Enterprises, Inc.*, (W.D. La. 05-1148, Rec. Doc. 30), this Court, too, finds that while the savings clause refers to "common law", it is clear that it is meant to include state actions brought under state statutory law, including for example, the LPLA and the Louisiana Civil Code.

materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes:

> (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm) as measured by the air chamber test method specified in § 3280.406.

> (2) Particleboard materials shall not emit formaldehyde in excess of 0.3 ppm as measured by the air chamber test specified in § 3280.406.

24 C.F.R. § 3280.308(a). This regulation expressly and specifically dictates the maximum level of formaldehyde gas that component products in mobile homes can emit.[7] The regulations also specify that a health notice on formaldehyde emissions shall be temporarily displayed in the kitchen of each manufactured home. 24 C.F.R. § 3280.309.[8]

---

[7] The record shows that when HUD adopted the product standard it specifically considered and rejected the ambient air standard that plaintiffs are seeking to advance as the standard of care. In the early 1980s, HUD published an Advance Notice of Proposed Rulemaking asking for comments on 21 different aspects of formaldehyde outgassing. HUD's August 1984 report sets forth the rulemaking process that led to its formaldehyde regulations. See 49 Fed.Reg. 31996-01 *et seq.* (August 9, 1984). Before adopting its product formaldehyde standard, HUD received comment from "individual consumers and consumer organizations, manufactured home builders, wood product producers, trade associations, government agencies, universities, and the chemical industry." *Id.* The major issue was "whether a standard should regulate the amount of formaldehyde in the total home environment [i.e., the ambient air standard] or the amount emitted from the major sources of formaldehyde in the home [i.e, the product standard]." *Id.*

At the end of the lengthy process, which is described in detail in HUD's August 1984 report, HUD adopted (effective October 29, 1984) the formaldehyde product standard that is at issue in the present litigation. 49 Fed.Reg. at 31996. The product standard seeks to minimize the amount of formaldehyde in manufactured housing by limiting the emissions from its plywood and particle board components. To be clear, HUD expressly considered and rejected an ambient air standard, which would measure the formaldehyde level in the air of the finished home. In doing so, HUD reasoned that the formaldehyde level in the air of the finished home will vary with the temperature, humidity, ventilation, and living habits of the homeowner. HUD essentially concluded that the product standard would be more effective and easier to enforce. According to its report, the component wood products of a mobile home are easy to test under standardized conditions, which avoids the difficulty of "compensating for variations in home temperature and humidity levels." The product standard also permits detection of a potential formaldehyde problem before the home has already been constructed. "Therefore, based on its effectiveness, the availability of reliable test methods, and the potential to prevent formaldehyde problems before the homes are sold, [HUD] concluded that a product standard is appropriate." 49 Fed.Reg. at 31997.

[8] This regulation provides as follows:

> (a)    Each manufactured home shall have a Health Notice on formaldehyde

## C.    Preemption

Preemption ultimately turns on congressional intent. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Preemption may be express or

---

emissions prominently displayed in a temporary manner in the kitchen (i.e., countertop or exposed cabinet face). The Notice shall read as follows:

> Important Health Notice
>
> Some of the building materials used in this home emit formaldehyde. Eye, nose, and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.
>
> Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.
>
> High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.
>
> If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

(b) The Notice shall be legible and typed using letters at least 1/4 inch in size. The title shall be typed using letters at least 3/4 inch in size.

(c) The Notice shall not be removed by any party until the entire sales transaction has been completed (refer to Part 3282--Manufactured Home Procedural and Enforcement Regulations for provisions regarding a sales transaction).

(d) A copy of the Notice shall be included in the Consumer Manual (refer to part 3283--Manufactured Home Consumer Manual Requirements).

implied. *Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). First, the state law is preempted if such preemption is explicitly contemplated by the federal statute in question. *English v. General Electric Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). There are two types of implied preemption: field preemption and conflict preemption. Field preemption exists when a federal law was intended to "occupy the field", that is, if the statute or law regulates an area of policy over which Congress intended the federal government to have exclusive control. *Id.* Conflict preemption exists when federal law conflicts with a state law such that it is impossible to comply with both at once or such that the state law conflicts with the goals of the federal statute. *Id.*

### D.    Analysis

#### 1.    Express Preemption

Express preemption exists when Congress makes "its intent known through explicit statutory language." *English*, 496 U.S. at 79. In *Geier v. American Honda Motor Co.*, 529 U.S. 861, 868 (2000), when considering a similar preemption and savings clause in the National Traffic and Motor Vehicle Safety Act ("NTMVSA"), the Supreme Court reasoned that the savings clause "assumes that there are some significant number of common-law liability cases to save."

As several courts have previously noted, the MHA does not *explicitly* preempt state causes of action. *Choate v. Champion Home Builders Company,* 222 F.3d 788, 793, 794 (10th Cir. 2000); *Whittington v. Patriot Homes, Inc.*, 2008 WL 1736824, * 5 (W.D. La. Apr. 11, 2008). *Perry v. Fleetwood Enterprises, Inc.*, 2007 WL 2893410, *5 (M.D. Ala. Sept. 28, 2007); *Richard v. Fleetwood Enterprises, Inc.*, 4 F. Supp.2d 650, 657 (E.D. Tex. 1998). In fact, section 5409©

provides that compliance with any Federal manufactured home construction or safety standard does not exempt any person from any liability under common law.  Although the MHA includes an express preemption clause, the presence of the savings clause makes it clear that the congressional intent behind the Act was not to explicitly preclude common law suits.

## 2.        Implied Preemption

This Court next considers whether Plaintiffs' claims are impliedly preempted. The existence of an express preemption provision (such as the one in the MHA) does not, by itself, prevent a Court from undertaking an implied preemption analysis. See *Choate*, 222 F.3d at 794, citing *Geier*, 120 S.Ct. at 1919.  The presence of a saving clause such as the one in the MHA also does not, by itself, foreclose an implied preemption analysis. *Id.*, citing *Geier*, 120 S.Ct. at 1919 (stating that "the saving clause (like the express pre-emption provision) does *not* bar the ordinary working of conflict pre-emption principles") (emphasis supplied). The *Geier* Court explained, when reviewing the identical saving clause in the NTMVSA:

> Nothing in the language of the saving clause suggests an intent to save state-law tort actions that conflict with federal regulations. The words "[c]ompliance" and "does not exempt" sound as if they simply bar a special kind of defense, namely, a defense that compliance with a federal standard automatically exempts a defendant from state law, whether the Federal Government meant that standard to be an absolute requirement or only a minimum one.... Nor does our interpretation conflict with the purpose of the saving provision, say by rendering it ineffectual. As we have previously explained, the saving provision still makes clear that the express pre-emption provision does not of its own force pre-empt common-law tort actions. And it thereby preserves those actions that seek to establish greater safety than the minimum safety achieved by a federal regulation intended to provide a floor.

*Geier*, 120 S.Ct. at 1919 (citations omitted).

Implied preemption exists in two circumstances: (1) when state law regulates conduct in

a field Congress intended the Federal Government to occupy exclusively (also referred to as "field preemption"), or (2) when state law actually conflicts with federal law (also referred to as "conflict preemption"). *Choate*, 222 F.3d at 795, citing *English*, 496 U.S. at 79.

### a.    Field Preemption

Field preemption exists when Congress legislates a field so completely that it is clear that Congress intended for the federal government to have exclusive jurisdiction over that field. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947). The presence of a savings clause suggests that the legislature did not intend to occupy the field. *Perry*, 2007 WL 2893410 at *5. As the district court reasoned in *Richard*:

> ...there is no clear or manifest congressional intent for the federal regulation of the safety and sale of manufactured housing to completely occupy the field. Because the fields of products liability and negligence are traditionally occupied by state law, the congressional intent that federal law occupy the entire fields must be clear or manifest. In the Manufactured Housing Act, the only manifestation of congressional intent regarding conflicts with state law is that the standards in the Act are supreme over any standard that state law may impose.

4 F. Supp.2d at 657 (citations omitted). Further, in *Choate*, the Tenth Circuit agreed that the MHA does not support an assertion that Congress intended to occupy the field of the construction and safety of manufactured homes exclusively. 222 F.3d at 795; see also *Perry*, 2007 WL 2893410 at *5-6. Here, like the cases noted herein, this Court finds that the presence of the savings clause in the MHA suggests that Congress did not intend to occupy the field.

### b.    Conflict Preemption

Conflict preemption exists in two scenarios: (1) when compliance with both a state and federal law is impossible, and/or (2) when the state law conflicts with the federal law such that it stands as an obstacle to the achievement of the federal law's purposes and objectives (also

referred to as "obstacle preemption"). *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 384 (5th Cir. 2004). The Fifth Circuit, in *O'Hara v. General Motors Corporation*, when faced with a similar express preemption provision and savings clause found in the Federal Motor Vehicle Safety Standard, noted that, "[t]he express preemption clause and the savings clause 'read together, reflect a neutral policy, not a specially favorable or unfavorable policy, toward the application of ordinary conflict pre-emption principles.' 508 F.3d 753, 759 (5th Cir. 2007) (citing *Geier*, 529 U.S.870-71).

Here, the Movants contend that Plaintiffs' claims assert standards that conflict with the federal standards established by HUD in such a way as to create an obstacle to the achievement of Congress's objective in the MHA. The Movants contend that Plaintiffs cannot successfully argue that compliance with the HUD product standard is not enough to save the Manufactured Housing Defendants from liability under state tort law. They assert that the ambient air standard used to measure the level of formaldehyde (which was specifically rejected by HUD) conflicts with the product standard (which was specifically adopted by HUD). The Manufactured Housing Defendants assert that the conflict between the HUD product standard and the rejected ambient air standard creates an obstacle to the achievement of Congress' purposes including the need for uniformity and the need to balance safety concerns with affordability concerns.

Plaintiffs, on the other hand, contend that allowing their claims to proceed would actually be consistent with the stated purposes of the MHA, including the purpose of "protect[ing] residents of manufactured housing with respect to personal injuries and the amount of insurance costs and property damages in manufactured housing. . ." 42 U.S.C. § 5401.

Plaintiffs argue that the state law claims pursued by the plaintiffs in this case clearly would operate to increase safety and reduce the number of personal injuries resulting from manufactured homes. The prosecution of such claims, according to Plaintiffs, would not impair the policy or substance of the Manufactured Housing Act, but instead would be consistent with the stated purpose of the Act to enhance and protect the safety of mobile home occupants.

Plaintiffs also assert that the MHA does not conflict with Plaintiffs' state law product liability claims because it provides only *minimum* federal standards for the manufacturers, and is therefore, not incompatible with more rigid standards advanced under state tort law theories. In other words, Plaintiffs argue that the Manufacturing Defendants may be held accountable in tort for failing to provide *greater* safety protection than the alleged *minimum* standard required under the HUD regulations. Moreover, Plaintiffs note that the only standards at issue in this case which are mandatory are those that limit formaldehyde emission in plywood and particleboard used in manufactured homes. Plaintiffs further note that there is currently no mandatory ambient air standard that has been established federally. In this regard, Plaintiffs argue that there is no incompatibility between a manufacturer's compliance with minimum particleboard and plywood emissions, and the same manufacturer's ability to avoid potential liability for unsafe ambient air in the unit. In other words, they assert that federal regulatory requirements for certain components of the EHU are not incompatible with independent tort law standards for product liability which depend upon the ambient levels of formaldehyde as the reference for the alleged defect. Still further, Plaintiffs assert that whether the ambient air level during occupancy constitutes the proof of defect for the end user remains the ultimate determinant of the manufacturer's tort liability and compliance with the HUD's standard on plywood/particleboard

emissions should be treated as only one piece of evidence going toward the issue of design defect, as it was treated in *Shorter v. Champion Home Builders Co.*, 776 F. Supp. 333, 338 (N.D. Ohio 1991).

The Manufactured Housing Defendants respond that the HUD's product-based standard for formaldehyde regulation in mobile homes would be completely displaced if Plaintiffs prevail in advocating an ambient air standard under state law. They note that juries in 50 states would be free to impose their own judgment on what is safe, economical, and proper for the mobile home industry. Then, the Movants claim that "a 50-state chaotic patchwork of rules would emerge to the detriment of an entire industry." (Rec. Doc. 1333, p. 3).

This Court finds that the preemption clause in § 5409(d) (which states that no state may establish, or to continue in effect, any mobile home standard regarding construction or safety which is not identical to the Federal mobile home construction and safety standard), the savings clause in § 5409(c) (which states that compliance with any Federal mobile home construction or safety standard does not exempt any person from any liability under common law), and the provision in § 5422(a) (which states that state agencies and courts can act on safety issues that have not been addressed by federal law) all can, indeed, be properly reconciled, when read and analyzed consistently with the rest of the MHA.

The decision in *Macmillan v. Redman Homes, Inc.*,818 S.W.2d 87 (Tex. Ct. App. 1991), although not controlling authority, is directly on point, and for that reason this Court finds it especially helpful in analyzing the instant matter. In *Macmillan*, the plaintiffs attempted to litigate the level of formaldehyde emissions in the ambient air of a mobile home, as opposed to using the component parts standard adopted and addressed in the HUD Code. The Texas state

court dismissed Plaintiffs' action against the manufacturing defendants, finding that federal law preempts claims for damages allegedly caused by excessive formaldehyde in the ambient air. In making this determination, the state court referenced 49 Fed. Reg.31, 996 *et seq.*, which explains the lengthy process and analysis that resulted in HUD accepting the component parts standard and specifically rejecting the ambient air standard, such as the one the plaintiffs were attempting to assert. The *Macmillan* Court noted that in relation to formaldehyde levels, HUD "consciously chose to adopt a product standard instead of an ambient air standard." 818 S.W.2d at 92.

The plaintiffs in *Macmillan* argued that despite the MHA's preemption language, its savings clause permits states to entertain common-law suits and establish additional formaldehyde standards by judicial decision. The *Macmillan* plaintiffs interpreted the saving clause at § 5409(c) to mean that courts can impose liability for levels of formaldehyde in the air that juries consider too high, even though the manufacturing defendant had complied with HUD's component product standards.

The *Macmillan* Court determined that, when reading § 5409(c) in conjunction with § 5422(a), it seems clear that state courts can litigate safety issues that are not covered by federal standards, and that compliance with federal law does not shield a defendant from such suits concerning matters not covered by federal law. These two provisions clarify the extent to which the MHA implicitly preempts state law. In other words, § 5422(a) means that state courts can enforce state law in areas that Congress and HUD did not reach (i.e, areas other than formaldehyde and fire safety), and in such suits, under § 5409(c), mere compliance with whatever standards do exist does not exempt a defendant from liability. The *Macmillan* Court explained:

[Sections 5409(c) and 5422(a)] eliminate any suggestion that federal regulation of *certain aspects* of safety in manufactured housing (such as formaldehyde and fire safety) preempts and occupies the *entire field* of liability involving manufactured housing. They represent Congress's way of saying that when it entered the field of manufactured home safety *partially*, it did not mean to preempt the field *entirely*. In the absence of § 5409(c), a defendant in compliance with federal formaldehyde or fire standards could argue that federal law occupies the safety field and therefore implicitly preempts the states' authority to litigate other kinds of safety issues (such as electrical wiring or strength of the structure). This is essentially what the Supreme Court meant in an interstate commerce case, when it said, "Without this [savings] provision ... 'it might have been claimed that, Congress having entered the field, the *whole subject* of liability of carrier to shippers in interstate commerce had been withdrawn from the jurisdiction of the state courts....' " *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 328, 101 S.Ct. 1124, 1135-36, 67 L.Ed.2d 258 (1981) (*emphasis added*) (quoting *Pennsylvania Ry. Co. v. Puritan Coal Mining Co.*, 237 U.S. 121, 130, 35 S.Ct. 484, 487, 59 L.Ed. 867 (1915)).

Plaintiffs would have us hold that § 5409(c) authorizes common-law liability when there is a federal standard and the defendant has complied with it, and that § 5422(a) authorizes liability under state law where there is no standard at all. In other words, in two different parts of the statute, Congress said there is potential state-law liability on matters covered and on matters not covered. That would be a strange way of drafting when Congress could have said simply that states can litigate safety issues regardless of the presence or absence of a federal standard. We cannot accept that construction of the statute and attribute such clumsy drafting to Congress. In our view the two provisions complement each other. Section 5422(a) means that state courts can enforce state law in areas that Congress and HUD did not reach, and in such suits, under § 5409(c) mere compliance with whatever standards exist does not exempt a defendant from liability.

818 S.W.2d at 93 (emphasis supplied). This Court agrees with this analysis.

If Plaintiffs in the instant case are allowed to go forward with their state product liability claims raising the ambient air standard, then Defendants in the mobile home industry would essentially be required to deviate (in ways variable from state to state) from those federal standards so carefully and thoroughly crafted by HUD. The MHA clearly states that if states

want to regulate safety matters that federal law *already covers* (like formaldehyde emissions), those regulations must be "identical." 42 U.S.C. § 5403(d). As the *Macmillan* Court determined, it was neither Congress' nor HUD's intention to allow states to affect the manufacturing of mobile homes so drastically by setting standards through their courts that would be totally different from the federal standards.[9] Thus, this Court concludes that federal law preempts Plaintiffs' state law products liability claims alleging an excessive level of formaldehyde in the air of the mobile home.

The decision in *Geier v. American Honda Motor Co.*, *supra*, also supports a finding of preemption. In *Geier*, the plaintiffs claimed that their 1987 Honda Accord should have been equipped with an airbag. However, the version of the Federal Motor Vehicle Safety Standards promulgated by the DOT provided manufacturers with a range of choices among different passive restraint systems - one of those choices was an airbag. The plaintiffs contended that the manufacturer should have chosen the airbag over the other choices offered under the federal standards. After considering the effect of the nearly identical preemption and savings clause provisions in the NTMVSA, the Supreme Court determined that allowing the plaintiffs to go forward with such a claim would effectively eliminate the other choices offered under the federal

---

[9]    The Supreme Court has previously observed, relative to the Employee Retirement Income Security Act of 1974 ("ERISA"):

> Particularly disruptive is the potential for conflict in substantive law. It is
> foreseeable that state courts, exercising their common law powers, might
> develop different substantive standards applicable to the same employer conduct,
> requiring the tailoring of plans and employer conduct to the peculiarities of the
> law of each jurisdiction. Such an outcome is fundamentally at odds with the goal
> of uniformity that Congress sought to implement.

*Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142, 111 S.Ct. 478, 484, 112 L.Ed.2d 474, 486 (1990). The same potential for conflict in substantive law exists in the instant case in relation to the uniformity of standards in the manufactured housing industry.

standards. Thus, the Court determined that the rule of state common law sought by the plaintiffs would have stood "as an obstacle to the accomplishment and execution of" the important identified federal objectives of having a variety and mix of passive restraint devices, and promoting a gradual passive restraint phase-in. 120 S.Ct. at 1925. Similarly, in this case, allowing Plaintiffs to advance the ambient air standard (even though it was considered and rejected by HUD, which instead adopted the product standard) would serve as an obstacle to the MHA's objectives of achieving a balance between uniformity, safety, and affordability.[10]

To be clear, this Court has considered all the cases cited by Plaintiffs (and some that were not cited) in support of their position against preemption but has determined that they are either inapplicable or not helpful to the instant case for the following reasons. For instance, this Court does not find the case of *Shorter v. Champion Home Builders Co.*, 776 F. Supp. 333 (N.D. Ohio) persuasive. In *Shorter*, the court held that the MHA does not preempt most tort claims regarding mobile housing. The *Shorter* court reasoned that § 5403(d) and § 5409(c), although initially appearing contradictory, when read together establish that the MHA preempts state law standards, but does not preempt most state law claims. The court added that nothing in the legislative history suggests that a state law claim alleging high levels of formaldehyde in the particleboard flooring of a mobile home would frustrate the intent of Congress in reducing personal injuries in mobile homes. Specifically, the *Shorter* court explained that Defendants' compliance with the MHA standard would simply "be treated as one piece of evidence going

---

[10]        There are other cases in which courts have determined that state law claims that would eliminate a choice given under the federal regulations are impliedly preempted. See *Murphy v. Southern Energy Hones, Inc.*, 2008 WL 652902 (M.D. Ala. Mar. 6, 2008); *Perry v. Fleetwood Enterprises, Inc.*, 2007 WL 2893410 (M.D. Ala. Sept. 28, 2007); *Guidroz v. Champion Enterprises, Inc.*, W.D. La. 05-1148, Rec. Doc. 30. The Court notes that the same reasoning it applied in the *Geier* decision was applied in these cases as well.

toward the issue of design defect." *Id.* at 338.

Finding the *Macmillan* decision persuasive, this Court simply cannot follow the *Shorter* analysis for the very reasons set forth in *Macmillan*. First, the *Shorter* decision essentially allowed the plaintiffs to go forward with their state law claims against the defendants despite the defendants' alleged compliance with federal formaldehyde regulations. Neither Congress nor HUD intended to allow states to affect the manufacturing of mobile homes so drastically by setting standards through their courts that would require more than the federal standards. This would essentially require each mobile home manufacturer to tailor its industry, state-by-state, in an attempt to comply with the peculiarities of each state's law, as then interpreted by each particular state's judiciary. This outcome is clearly at odds with the goal of uniformity that Congress sought in the MHA. It is important to remain mindful that this goal was clearly stated and clarified several years after the *Shorter* decision was rendered.

Indeed, in December 2000, the American Homeownership and Economic Opportunity Act of 2000 amended 42 U.S.C.A. § 5403(d) to include the following provision, "Federal preemption under this subsection shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this chapter." William B. Johnson, Annotation, *Pre-emptive Effect of Construction and Safety Standards of National Manufactured Housing Construction and Safety Standards Act of 1974*, 172 A.L.R. Fed. 349 (2001). For all of these reasons, this Court does not find the *Shorter* decision persuasive authority in this matter.

The case of *Choate v. Champion Home Builders Company*, 222 F.3d 788 (10th Cir. 2000),

also relied on by Plaintiffs, is inapplicable to the instant matter.  In *Choate*, the Tenth Circuit determined that the plaintiffs' action against the defendants for their failure to install a smoke detector with a battery-powered back-up in a manufactured home was not preempted. The court reasoned that, according to the MHA, the applicable standard only requires "[a]t least" one smoke detector that is hard wired to the general electrical circuit). 222 F.3d at 795, quoting 24 C.F.R. § 3280.208(a), (d).  The Tenth Circuit determined that the provision in the MHA expressly established only a "minimum rather than a maximum standard, and a state standard requiring a battery-operated backup is not in any way contrary to HUD's superintendence of a federal standard calling for 'at least' one hard-wired smoke detector." 222 F.3d at 795.  There, the hard-wired smoke detector minimum standard, imposed under the MHA, remained undisturbed by the state's additional battery back-up requirement.

*Choate* is distinguishable from the instant situation.  In *Choate*, the regulation required "at least" one hardwired smoke detector, expressly stating a minimum and thus implying that state standards could require more.  Here, the formaldehyde regulations contain no such language.  In fact, it was unmistakably  apparent that HUD went through great lengths looking for the most appropriate method of measuring formaldehyde emissions while still striving to achieve the purposes of the MHA.  It considered and rejected the ambient air standard in favor of the component parts measurement standard.  In doing so, HUD found that using the ambient air standard to measure the formaldehyde level in the air of a mobile home would be inappropriate as the level of formaldehyde in the air of a manufactured home varies with the temperature, humidity, ventilation, and living habits of the homeowner.  Conversely, in accepting the formaldehyde product standard, HUD determined that it would be more effective and easier to

enforce. Plaintiffs now seek to hold the Manufacturing Defendants accountable to a wholly different standard than the one adopted by HUD.  Allowing them to do so would go against the uniformity objectives of the MHA and would directly violate section 5403(d) of the Act.

The decision in *Sprietsma v. Mercury Marine*, 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002), is also inapplicable to the instant matter.  In *Sprietsma*, the surviving spouse of a boat passenger who was killed after falling from a boat and being struck by the propeller blades of the outboard engine filed suit against the engine designer, alleging that the engine should have been equipped with a propeller guard. The trial court granted the motor manufacturer's motion to dismiss, and the intermediate appellate court affirmed on the ground that the action was expressly pre-empted by the Federal Boat Safety Act of 1971, 46 U.S.C. §§ 4301-4311 ("FBSA")[11]. The Illinois Supreme Court, relying on the *Geier* decision, rejected the appellate court's express preemption rationale, but affirmed on implied preemption grounds.  The United States Supreme Court was tasked with deciding  whether a state common law tort action seeking damages from the manufacturer of an outboard motor is preempted either by the enactment of the FBSA, or by the decision of the Coast Guard in 1990 not to promulgate a regulation requiring propeller guards on motorboats.

In its decision, the Supreme Court found that the FBSA did not occupy the field of safety regulation of recreational boats as to foreclose state common-law remedies.  Further, the Supreme Court rejected the manufacturer's reliance on the Coast Guard's decision not to adopt a regulation requiring propeller guards on motorboats. It reasoned:

It is quite wrong to view that decision as the functional equivalent of a

---

[11]     The FBSA included similar preemption and savings clause provisions as are found in the MHA.

> regulation prohibiting all States and their political subdivisions from adopting such a regulation. The decision in 1990 to accept the subcommittee's recommendation to "take no regulatory action," . . . left the law applicable to propeller guards exactly the same as it had been before the subcommittee began its investigation. Of course, *if a state common-law claim directly conflicted with a federal regulation promulgated under the Act, or if it were impossible to comply with any such regulation without incurring liability under state common law, pre-emption would occur.* This, however, is not such a case.

537 U.S. at 527 (emphasis added). Here, however, this Court determines that Plaintiffs' state law claims *do* directly conflict with the federal regulations promulgated under the MHA, as they seek to enforce an entirely different standard for measuring the legally permissible amounts of formaldehyde in mobile homes.

The Fifth Circuit's decision in *O'Hara v. General Motors Corporation*, 508 F.3d 753 (5th Cir. 2007), also does not support Plaintiffs' argument against preemption. In *O'Hara*, the parents of a minor who had been injured in a vehicular rollover accident alleged product liability claims regarding the vehicle's side windows, claiming that they should have had advanced glazing. The vehicle manufacturer claimed preemption based on safety standards for glass set by the Department of Transportation ("DOT"). The Fifth Circuit concluded that the standards, which approved glass both with and without glazing in side windows, were minimum standards and thus found that the plaintiffs' claims were not preempted.

As the Manufacturing Defendants correctly point out, *O'Hara* is not a case wherein "the administrative agency specifically considered two standards, and expressly rejected the one advocated by the plaintiffs in favor of another, as is the case here." (Rec. Doc. 1333, n.11). For this reason, this Court does not find that *O'Hara* supports Plaintiffs' argument against preemption.

Furthermore, it is worth noting that the Plaintiffs *sub judice* contend that the

Manufactured Home Defendants should have adhered to the ambient air standard, which *differs*

from the HUD-accepted component products standard.  Thus, cases that present situations where

the plaintiffs are not arguing that the defendants should have adhered to a standard higher than or

different from what the MHA imposes are inapplicable.  See, *Redman Homes, Inc. v. Ivy*, 920

S.W.2d 664, 666 (Tex. 1996) ("[b]y its own terms, section 5403(d) preempts only state

construction or safety standards that differ from the federal law).  To be clear, any of Plaintiffs'

state law claims that advance non-compliance with federal formaldehyde regulations (to the

extent that such claims exist) are considered to be parallel claims, are not preempted and, thus,

are not dismissed.  See *Riegel v. Medtronic, Inc.*, 128 S.Ct 999, 1011 (2008); *Whittington*, 2008

WL 1736824 at *5; *Richard*, 4 F. Supp.2d at 657.  As the Ohio state court concluded in *Hall v.

Fairmont Homes, Inc.*, 664 N.E.2d 546, 556 (Ohio Ct. App. 1995), this Court determines that

such state law claims "would serve to merely enforce the federal regulations, would not be

disruptive of the federal scheme, and would further the purpose of the Act of reducing personal

injuries."  *Id*. at 556.  After all, because the HUD Code does not itself set forth a federal cause of

action for violations of the HUD Code[12], it is incumbent upon the state law to fulfill this limited

role.

Last, as for Plaintiffs' inadequacy of warning claims, the Movants assert that Plaintiffs

cannot claim that they are liable under state law for inadequacy of warning when those warnings

complied with federal law under the HUD Code.  Plaintiffs, on the other hand, note that HUD

requires that the manufacturer post a warning in each manufactured home informing the

---

[12]        See *Richard*, 4 F. Supp.2d at 653-54.

occupant of health risks associated with formaldehyde emissions. 24 C.F.R. § 3280.309(a). However, Plaintiffs argue that the adequacy of such required warnings can be adjudicated under state law, even if the manufacturer satisfied the federal requirement that there be a warning of some specific type.  In Plaintiffs' Opposition to the instant motion, they imply that they are challenging, under state law, the adequacy of federally-mandated warnings about formaldehyde in mobile homes.  (See Rec. Doc. 1304, p. 14).  In other words, Plaintiffs allege that it is possible to comply with the federal requirement that a warning be provided and also satisfy state product liability requirements for adequate product warnings.  Thus, they contend that no conflict exists.

This Court concludes that any such claims, relating to inadequate warnings of exposure to purportedly high levels of formaldehyde contained in EHUs, that require more than the federal standards, should be and are hereby dismissed[13].  This Court finds the decision in *Liberty Homes, Inc. v. Department of Industry, Labor and Human Relations,* 374 N.W.2d 142, 155 (Wis. Ct. App. 1985) persuasive.  In *Liberty Homes*, the Wisconsin Administrative Code included the following requirement regarding a mobile home label:

> All mobile homes offered for retail sale in this state on or after the
> effective date of this rule shall have affixed to the front door or pre-sale

---

[13]     The same preemption provisions that are referenced in Section II(B) of this opinion apply to the formaldehyde emissions notice/warning requirement.  The formaldehyde emissions provision (24 C.F.R. § 3280.308) and the health notice on formaldehyde emissions provision  (24 C.F.R. § 3280.309) are contained within the "Body and Frame Construction Requirements" subpart under Part 3280 of the HUD Code entitled "Manufactured Home Construction and Safety Standards."  As noted earlier, 24 C.F.R. § 3282.11 relates to preemption and provides, "No State manufactured home standard regarding manufactured home construction and safety which covers aspects of the manufactured home governed by the Federal standards shall be established or continue in effect with respect to manufactured homes subject to the Federal standards and these regulations unless it is *identical* to the Federal standards." 24 C.F.R. § 3282.11(emphasis added).  Thus, federal preemption relative to the HUD-required health notice on formaldehyde emissions provision  shall also be "broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this chapter."  42 U.S.C.A. § 5403(d).

warning label which shall be obtained from the department and which
shall read as follows:

WARNING

Formaldehyde concentrations in this mobile home are regulated by the
Wisconsin Department of Industry, Labor and Human Relations. Product
safety information, approved by the department about the effects of
formaldehyde and the department's regulation of formaldehyde shall be
provided to the purchaser prior to the sale of this home. This label shall
not be removed by the mobile home manufacturer or any person offering
this mobile home for retail sale in Wisconsin.

*Id.* at 144. This warning differed from the HUD-required warning present in 24 C.F.R. §

3280.309(a). Wisconsin's Department of Industry, Labor and Human Relations argued that the

formaldehyde warning required by state code was not preempted by the warning HUD required.

However, the Wisconsin appellate court disagreed, finding that the federal warning was part of

the federal standard, which specifically preempts nonidentical state construction and safety

standards in 42 U.S.C. 5403(d). Thus, they determined that the state formaldehyde warning

requirement was preempted. This Court agrees with this analysis and concludes that Plaintiffs'

claims advancing a state warning requirement that differs from the HUD-warning requirement

are preempted and, thus, are dismissed.

Further, and similarly, in *Witty*, *supra*, the plaintiff, a passenger on a commercial airline

brought suit against the airline after allegedly developing Deep Vein Thrombosis ("DVT") while

on board a flight from Louisiana to Connecticut. Among other things, the plaintiff claimed that

the airline was negligent for failing to warn passengers about the risks of developing DVT

during flight. The *Witty* Court concluded that conflict preemption principles were applicable

because a comprehensive scheme of federal regulation existed, and the imposition of state

standards would conflict with federal law and interfere with federal objectives. The Fifth

Circuit's analysis was based on its recognition that there are numerous federal regulations affecting warnings and instructions[14] that must be given to airline passengers. Based on these regulations, the Court determined:

> [F]ederal regulatory requirements for passenger safety warnings and instructions are exclusive and preempt all state standards and requirements. Congress enacted a pervasive regulatory scheme covering air safety concerns that includes regulation of the warnings and instructions that must be given airline passengers. The Supreme Court has observed that the FAA "requires a delicate balance between safety and efficiency, and the protection of persons on the ground.... The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled."
>
> *Allowing courts and juries to decide under state law that warnings should be given in addition to those required by the Federal Aviation Administration would necessarily conflict with the federal regulations.* In this case, the conflict is more than theoretical, since Witty claims that a DVT warning should have been given, while federal regulations do not require such a warning. And any warning that passengers should not stay in their seats, but should instead move about to prevent DVT, would necessarily conflict with any federal determination that, all things considered, passengers are safer in their seats. We note that, due to turbulence concerns, the Federal Aviation Administration recommends on its Internet site that passengers wear their seat belts at all times....
>
> Moreover, warnings by their nature conflict, in the sense that the import of one warning is diluted by additional warnings that might be imposed under state law....

366 F.3d at 385 (internal citations omitted, emphasis added). Specifically, the Court follows the rationale set forth in *Witty*'s holding:

> . . . at a minimum, any such claim must be based on a violation of federally mandated warnings. In this case, federal regulations do not require warnings to passengers about the risks of DVT or methods for preventing this condition. Delta therefore cannot be held liable for failing

---

[14] These includes, for example, regulations requiring "no smoking" placards, "fasten seat belt" signs, and specific oral briefings that must be provided on each flight.

to provide warnings or instructions to Witty.

*Id.* Based on the *Liberty Homes* and *Witty* case, this Court finds that such state law failure-to-warn/inadequate warning claims, which require more than the HUD regulations, would present an obstacle to the MHA and to the HUD Code. In contrast, any state law claims alleging violations of the federal warning requirement are not preempted. See *Woolridge v. Redman Homes, Inc.*, 792 F. Supp. 1469, 1471 (N.D. Tex. 1991).

## III. CONCLUSION

Considering the foregoing, **IT IS ORDERED** that the **Manufacturing Housing Defendants' Joint Rule 12(b)(6) Motion to Dismiss Based on Federal Preemption (Rec. Doc. 1192)** is **GRANTED** only to the extent that any of Plaintiffs' state law claims which advance a standard of care that is different from (i.e., not identical to) the formaldehyde regulations in the HUD Code and the formaldehyde warning standard specifically set forth in 24 C.F.R. § 3280.309(a) are dismissed. To be clear, Plaintiffs' other state law claims, particularly those that may involve violations of the HUD Code, remain viable and are not hereby dismissed.

New Orleans, Louisiana, this 29th day of May, 2009.

**KURT D. ENGELHARDT**
**UNITED STATES DISTRICT JUDGE**

27