UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | ^ | MDL NO. 1873 |
| FORMALDEHYDE PRODUCTS | ^ | |
| LIABILITY LITIGATION | ^ | SECTION "N" (5) |
| | ^ | |
| | ^ | JUDGE ENGELHARDT |
| | ^ | MAGISTRATE CHASEZ |
| | ^ | |

THIS DOCUMENT IS RELATED TO

*Charlie Age, et al. v. Gulf Stream Coach
Inc., et al*, Docket No. 09-2892;
Alana Alexander, individually and on behalf of
Christopher Cooper

## AFFIDAVIT OF MARY C. DEVANY

STATE OF WASHINGTON
COUNTY OF CLARK

BEFORE ME, the undersigned authority, on this day, personally appeared:

Mary C. DeVany, MS, CSP, CHMM

Who, first being sworn, upon her oath deposed and stated that the information
contained in the attached report, is true and accurate to the best of her knowledge.

Mary C. DeVany, MS, CSP, CHMM

Sworn to and subscribed
before me this ___ day of May, 2009.

NOTARY PUBLIC

My commission expires _____

NOTARY PUBLIC
KACEY L. SOLKI
STATE OF WASHINGTON
My Commission Expires Dec. 15, 20__

ALX-EXP-16-000001

EXHIBIT D

# Overview of the Formaldehyde Exposure to Christopher Cooper and Alana Alexander in Their FEMA-Issued Gulfstream Cavalier:

## A Review of the Formaldehyde Exposure Standards; Toxicological Effects; Airborne Formaldehyde Sampling and Methodology; Air Sampling Results; Case Findings and Conclusions

*Mary C. DeVany,*

**Mary C. DeVany, MS, CSP, CHMM**
Digitally signed by:
Mary C. DeVany, MS, CSP, CHMM
**May 19, 2009**

**DeVany Industrial Consultants**
**14507 NW 19th Ave.**
**Vancouver, Washington 98685 USA**
**(360) 546-0999**
mdevany@earthlink.net

# I.  INTRODUCTION

ALX-EXP-16-000002

## A. Professional Credentials

1. I am a Certified Safety Professional (CSP) in Comprehensive Practice and a Certified Hazardous Materials Manager at the Master Level (CHMM). I hold an M.S. from Loyola University of Chicago in biology – areas of concentration: biochemistry and human physiology. I have completed numerous post-graduate courses in chemical toxicology, occupational and community environmental safety and health, chemical exposure assessment, indoor air quality, air contaminant sampling methodology, statistical analysis, risk assessment, and methods of exposure recognition, evaluation and control.

2. Currently I am the president of the community and occupational environmental health and safety firm of DeVany Industrial Consultants, which I founded twenty-three years ago. This company provides consulting services to the public and private sectors, including exposure assessments, technical training, written compliance programs, site hazard evaluations, and exposure elimination/control in the areas of community and occupational health, safety, and environmental affairs. A copy of my résumé, fee schedule, and lists of my recent expert testimony and publication highlights are attached.

## B. Overview of This Report and Study

1. Counsel for the Plaintiff have retained me to evaluate the facts of this case and determine if the plaintiffs were overexposed to formaldehyde in their FEMA-Issued Gulfstream Cavalier travel trailer, and if so, if that exposure resulted in adverse health effects.

   Specifically, I have been asked to do the following:

   a. Survey current formaldehyde exposure limits and explain their basis, application, and limitations;

   b. Survey and review the adverse health effects from formaldehyde exposure, and explain these effects;

   c. Develop the sampling methodology and measurement strategy for determining formaldehyde contamination in the trailer FEMA issued to the Alexander family;

   d. Review the collected sampling data, analyze the sampling results, and interpret the findings in this and other Gulfstream Cavalier trailers;

   e. Assist in determining the extent to which the adverse health effects experienced by Ms Alana Alexander and Christopher Cooper are

attributable to formaldehyde exposures from their travel trailer;

    f.  Review the related FEMA and Gulfstream Cavalier documents for disclosures and warnings about the presence of formaldehyde and its adverse effects, and their efforts to mitigate these exposures, and

    g.  Relate my conclusions and recommendations, including the limitations of the study.

2.  The remainder of this report, in addition to the description in # 1 above, gives an overview of the information relied upon to develop my opinions, the reasons and bases for them, and an overview of the resources, documents, technical research and references considered in forming these opinions.

# II. BACKGROUND OVERVIEW ON FORMALDEYDE; SURVEY OF CURRENT FORMALDEHYDE EXPOSURE LIMITS AND THE BASIS, APPLICATION, AND LIMITATIONS OF THESE STANDARDS

## A.  Formaldehyde: Definition and Uses

1. Formaldehyde is a colorless, flammable, acrid, pungent-smelling gas often mixed with water at ~ 37% to make a liquid formaldehyde solution (formalin).  It is an important industrial chemical used to manufacture building materials and to produce many commercial, industrial and household products.

Formaldehyde is commonly used as an industrial fungicide, germicide, and disinfectant, and as a preservative in mortuaries, in medical applications for tissue preservation, and to preserve biological specimens.

It is also a common material used in the manufacture of pressed wood products such as particleboard, plywood, plywood paneling, and medium-density fiberboard; the manufacture of urea-formaldehyde and phenol-formaldehyde resins, melamine and polyacetal resins; as a component of many glues and adhesives; is the durable permanent press treatment for fabrics and textiles; and in paper product coatings, molded plastic products, decorative laminates, and certain insulation materials.  It is found in construction components, carpet adhesives, and panels.

2. **Baking Off** – During manufacturing, the manufacturers of travel trailers, mobile homes and other THU's commonly use these pressed wood products such as particleboard, plywood, and fiberboard which contain formaldehyde.  These are used in

the sub-floors, cabinetry and furniture. In addition, some formaldehyde-containing upholstery, fabrics and carpeting are also used in the manufacturing processes of these THU's. Countertops, carpeting and the above-listed wood products are also commonly installed using formaldehyde-based glues and adhesives.

In order to cure and harden these formaldehyde-containing adhesives and materials, many manufacturers place these parts into kilns, especially the pressed wood products. As the process of heat-setting and hardening takes place in the kilns, the formaldehyde in the glues, resins and adhesives is given off.

During production, these kilns are set at temperatures between 120°-150°F for 24-72 hours. The components are put into these kilns to rapidly cure and "set" the chemicals, and to "bake-off" the gases, notably formaldehyde, that they emit as they cure. The emitted formaldehyde gas is vented away during this baking off/curing process. Much of the formaldehyde in the component parts is emitted during this rapid curing from the heat treatment process.

After leaving the kilns, the parts are assembled into the final trailers/campers/mobile homes/etc. Without this bake-off process, the formaldehyde-containing resins, glues and adhesives cure *very* slowly – and as a result formaldehyde gas can be given off for years.

## B.   Formaldehyde Standards – Application Overview

Many standards exist – because they are developed to protect different segments of the population and to protect these populations for varying durations of exposures. In general, the longer the duration, the lower the exposure level must be to avoid adverse effects. Also, the healthier the target population, the higher the allowable level can be.

Since standards set to protect the adult working population at work are designed for only 40 hours per week of exposure and a healthier segment of the population, higher levels can be tolerated.

Standards set by the military, representing a selected very healthy population screened to exclude any medically compromised soldiers/sailors, are allowed to be even higher.

On the other hand, standards set to protect the general population in a residential setting must be lower, not only to safeguard the more vulnerable segments of the population but to protect them during extended, residential-type exposure durations. These standards, by necessity, must be the most restrictive.

## C.  Specific Standards

**1.  OSHA** (Occupational Safety and Health Administration), U.S. Department of Labor:

After extensive rulemaking more than 20 years ago, OSHA issued a then-comprehensive

regulation covering occupational exposure to formaldehyde, 29 CFR 1910.1048. This rule reduced the permissible exposure limits (PELs) to 0.75 ppm (0.75 part formaldehyde per million parts of air) as an 8-hour time-weighted average ($TWA_8$), and a short-term exposure limit (STEL) of 2 ppm for a 15-minute time period.

In addition, an "Action level" of only 0.5 ppm was established. This means that if an employer finds formaldehyde levels of 0.5 ppm or more as a time-weighted average, action must be taken to ensure protection for employees. These include posting formaldehyde exposure warning signs, restricting entry into those exposure areas, conducting specially-designed training for workers, and evaluating personal protective equipment worn by workers when doing job tasks that involve potential formaldehyde exposures among other "worker protection action" items.

OSHA recognizes formaldehyde as a potential occupational carcinogen and regulates formaldehyde for its irritating, sensitizing and toxic effects. The rule was based on a wide range of evidence including animal bioassays and epidemiological evidence. This rule is designed to protect most workers, *but not those already sensitized or with pre-existing medical conditions*, from cancer and other harmful health effects. This standard also does not protect workers from discomfort and transient irritation from formaldehyde.

OSHA's standard was promulgated with the understanding that *workers will only be exposed for 8 hours/day and no more than 40 hours/week*, and that the time outside these 40 hours will have no formaldehyde exposures (called *exposure recovery time*). Note that the adult population able to work a 40-hour workweek is, as a group, much healthier and able to endure exposures that the elderly, the very young, and the medically compromised cannot.

Again, this standard only allows 40 hours of exposure at this level. If shifts longer than 8 hours are worked, calculations must be performed that reduce the permissible exposure limit. For example, for 12-hour work shifts, not only is the exposure time four hours longer but the recovery time is four hours less.

Accordingly, the permissible exposure limit for 12-hour shift workers is only 0.375 ppm. The action level is also proportionately lower. For those working 16-hour shifts, the permissible exposure limit is only 0.125 ppm. *This only holds true for 40 hours of exposure during any given work week. Extrapolating to 24 hours of exposure the level would be only 0.0625 for a total work week of 40 hours.*

In addition, care must be taken not to apply these standards to the segments of the working population that are chemically sensitized to formaldehyde or to those that have pre-existing medical conditions, such as asthma, that may be exacerbated by formaldehyde exposures.

Note that other countries have established workplace exposure standards as well. For example, The Japan Society for Occupational Health has a workplace Occupational Exposure Limit (OEL 8-hour time weighted average, 40 hour workweek) of 0.1 ppm.

ALX-EXP-16-000006

However they also state that, "Exposure above OEL-M (mean) should be avoided even where duration is short or work intensity is light."

**2. ACGIH** (American Conference of Governmental Industrial Hygienists):

Workplace Threshold Limit Value (TLV) for a never-to-be-exceeded ceiling exposure level in the workplace: 0.3 ppm.

This level is designed to protect most but not all members of the full-time adult working population but not the general public. The ACGIH is an independent body of scientists that reviews the research studies on various airborne contaminants and other workplace stressors, publishes documentations of their reviews, and makes recommendations for workplace Threshold Limit Values based upon consensus of their findings and conclusions.

**3. NIOSH** (National Institute of Occupational Safety and Health), U.S. Department of Health and Human Services, Center for Disease Control and Prevention (CDC):

NIOSH develops Recommended Exposure Levels designed to protect workers, but not the general public. These standards are:
10-hour Time Weighted Average ($TWA_{10}$) with 14 hours of non-exposure recovery time): 0.016 ppm
Ceiling Level (never to be exceeded, even for a moment): 0.1 ppm
IDLH (Immediately Dangerous to Life and Health): 20 ppm

**4. ATSDR** (Agency for Toxic Substances and Disease Registry), U.S. Department of Health and Human Services, Center for Disease Control and Prevention (CDC):

The ATSDR has established inhalation minimal risk levels (MRL's) designed to protect the general population, including its more vulnerable segments such as children, the elderly, and the medically compromised. These levels are not limited to a routine 40-hour work week exposure, such as OSHA, ACGIH and NIOSH have. Rather, the ATSDR standards are set for extended daily exposures that could exist under normal housing conditions. Their adopted recommended maximum levels are as follows:
**Acute** MRL: 0.04 ppm (1-14 days of exposure)
**Intermediate duration** MRL: 0.03 ppm (>14-364 days of exposure)
**Chronic duration** MRL: 0.008 ppm (365 or more days of exposure)

This agency, also a branch of the CDC as is NIOSH (above), has set these MRL's based upon the respiratory effects in humans. These exposure limits are designed to protect the general population at large. "*The MRL is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse non-cancer health effects over a specified duration of exposure.*"

**5. Council Subcommittee on Emergency and Continuous Exposure Guidance Levels for Selected Submarine Contaminants:**

These standards are set for sailors screened for excellent physical fitness that will be stationed on submarines for a limited duration.

As can be seen from the values below, including the standards under revision established to account for current research and health effects knowledge, these levels are proposed to be even lower than those for the American workforce:

Current level for 1-hour exposure: 3 ppm; proposed: 0.4 ppm
Current level 24-hour exposure: 1 ppm; proposed: 0.1 ppm.
These levels are not designed to protect any vulnerable segment of the population.

6. **TCEQ** (The Texas Commission on Environmental Quality):

The Effects Screening Levels (ESL's) of 2003 are chemical-specific air concentrations set to protect human health and welfare. Short-term ESL's are based on data concerning acute health effects, the potential for odors to be a nuisance, and for effects on vegetation, while long-term ESL's are based on data concerning chronic health and vegetation effects. ESL's are as follows:

Short-Term ESL (1 hour): 0.012 ppm
Long-Term ESL (1 year): 0.0012 ppm

7. **California Environmental Protection Agency;** Office of Environmental Health Hazard Assessment:

Exposure levels are to be as low as possible, assuming levels below the local background are not achievable. Recommended Exposure Limits (REL):

Acute REL --> 0.076 ppm for one hour
Intermediate REL --> 0.027 ppm for eight hours
These levels are set to protect the population at large for exposures up to 8 hours with exposures at background levels afterwards.

8. **HUD** (Housing and Urban Development)**:**

For more than 20 years HUD has regulated the production of manufactured homes to reduce the associated hazards to future occupants. Included are regulations limiting formaldehyde emissions in plywood materials to no more than 0.2 ppm and in particleboard materials to no more than 0.3 ppm. The production facility must also establish procedures to identify potential increases in formaldehyde emissions from other sources and have an independent testing laboratory observe or conduct the emissions testing.

These standards were developed to protect the general public from health effects of exposures to formaldehyde in their living quarters. These levels, mixed in the general air

of the manufactured home, will normally keep emissions below 0.01 ppm even in areas such as the kitchen.

HUD also monitors state plans and third party inspection agencies to ensure their oversight is adequate and is authorized to take administrative action against them for violations.

9. **FEMA** (Federal Emergency Management Agency) **Established Standards for Temporary Housing Units**

Temporary housing units purchased by FEMA after August, 2008 (constructed for the 2008 hurricane season) and for the duration of the three-year contract need to have formaldehyde levels below 0.016 ppm.  The contract is good for up to 1400 mobile homes and 1900 park homes.

10. **WHO** (World Health Organization), and **Health Canada**:

These organizations have standards designed to protect the general population against cancer – the threshold exposure level at which there is a negligible risk of upper respiratory tract cancer in humans due to cytotoxic (cellular) damage to the nasal mucosa. These standards are for short-term exposures only, with subsequent zero (negligible) levels of exposure for recovery:

**WHO:** 30-minute average:  0.08 ppm (0.1 mg/m$^3$)

**Health Canada:**  Residential Indoor Air Quality Guidelines:
1-hr exposure limit:  0.1 ppm and 8-hour exposure limit: 0.04 ppm

**Refer to <u>Appendix A: Published Levels of Concern for Formaldehyde</u> for a summary of these exposure standards.**

# III.  AN OVERVIEW OF THE ADVERSE HEALTH EFFECTS FROM FORMALDEHYDE EXPOSURE

## A.  Overview and Introduction

Formaldehyde causes many acute health effects because of its ability to cause extreme irritation to the mucous membranes, skin, and other potentially exposed tissues.  When formaldehyde gas comes into contact with water or moisture, including that found in the human respiratory tract or on the surface of the skin, it can produce formalin, the basic component of embalming fluid, and formic acid.

ALX-EXP-16-000009

The airborne concentration at which the average person can detect formaldehyde by smell, the Odor Threshold, is 0.83 ppm, with a range of 0.05 to 1.0 ppm.  As a result, at levels widely recognized to cause adverse health effects, most people are unable to detect it in the air.

NOTE that what follows only highlights some of the acute and chronic health effects of formaldehyde exposures.

## B.  Acute (short-term) Health Effects

### 1. Skin and Eye Effects
Because of its highly irritating properties and its reaction with water, formaldehyde causes watering, stinging, redness, and/or burning of the eyes.  It can also cause intense irritation, itching, dermatitis, and burning of the skin, especially when there is high relative humidity in the air or if perspiration is present on the skin.  These symptoms have been demonstrated to result when formaldehyde is present in the air at levels of 0.1 ppm.  Pre-existing dermatitis, skin rashes, eczema, acne, and other skin disorders can be severely aggravated by very low levels of formaldehyde.  Higher levels can result in skin ulcerations and blackening of exposed tissue, especially the fingers.

### 2. Respiratory System Effects
Overexposure to formaldehyde can cause acute irritation and inflammation of the respiratory system, from the nares (nostrils) to the lungs.  Symptoms include sore throat, coughing, mucous membrane irritation, runny and bloody noses, sinus irritation, respiratory irritation, wheezing, and chest congestion.  The symptoms of sinus irritation, sore throat, coughing, nasal irritation and tissue inflammation can cause individuals to be much more susceptible to colds and other respiratory diseases caused by microbial exposures.  These infections can progress to severe sinus congestion and sinusitis, asthmatic changes in the airways, laryngitis, bronchitis, and pneumonia if exposures are not abated.

### 3. Neurological Effects
Acute central nervous system symptoms of overexposure to formaldehyde include headache, dizziness, nausea, and fatigue.  Other symptoms include weakness and lethargy.

### 4. At Risk Populations
The very young (children, infants), the elderly, those with compromised immune systems, people with chronic skin diseases, and those with respiratory and other chronic diseases, such as asthma, chronic bronchitis, and emphysema, are much more susceptible to the effects of formaldehyde.  These individuals experience adverse symptoms at much lower concentrations than those that would affect the general/workplace population of normal, healthy adults.

## C.  Intermediate and Chronic Exposure Health Effects

**1. Sensitization**

Sensitization results from tissue changes, includes changes in nasal and skin cells, that make the susceptible individual more sensitive to the irritating effects of formaldehyde. These people experience adverse health effects at concentrations that others would not react to. In addition, some individuals can develop allergic sensitivity skin and/or respiratory system reactions, and be much more susceptible to the effects of other airborne contaminants including airborne chemical irritants, molds, other airborne allergens and chemicals. Sensitized individuals are also more susceptible to carcinomas of the nasopharynx. Skin sensitization results in allergy-induced skin rashes and dermatitis.

**2. Tissue and Systemic Changes**

Formaldehyde exposure can induce changes in cells in human tissue, including permanent changes to the respiratory system and the skin. Susceptible individuals, especially those with respiratory diseases, also can develop immune system changes as a result of formaldehyde exposures.

Reproductive effects and metabolic changes also result from formaldehyde exposures. Some of these changes can resolve when the exposure is removed but others are permanent. Hepatotoxicity (toxic effects to the liver) has been demonstrated in animal studies after only 6 months of formaldehyde exposure at 3 ppm. Formation of benign polyps in the airways has also been observed.

**3. Cancer-Causing Potential**

Although the short-term health effects of formaldehyde exposure are well known, less is known about its potential long-term health effects. Nearly 30 years ago, in 1980, laboratory studies showed that exposure to formaldehyde could cause nasal cancer in rats. This finding raised the question of whether formaldehyde exposure could also cause cancer in humans.

In 1987, the U.S. Environmental Protection Agency (EPA) classified formaldehyde as a probable human carcinogen under conditions of unusually high or prolonged exposure. Since that time, some studies of industrial workers have suggested that formaldehyde exposure is associated with nasal cancer, nasopharyngeal cancer, and possibly with leukemia. In 1995, the International Agency for Research on Cancer (IARC) concluded that formaldehyde is a probable human carcinogen.

Following a re-evaluation of the new and existing data, in June of 2004 the IARC reclassified formaldehyde as a known human carcinogen.

**4. Other Effects**

Formaldehyde has been demonstrated to be mutagenic in a variety of test systems. Other research done recently points to potential links of formaldehyde to brain cancer, adverse reproductive effects, birth defects, and Lou Gehrig's disease. Formaldehyde has also been reported to cause menstrual disorders and secondary sterility in women. In fact, formaldehyde is so well known for its ability to induce cross-linking of DNA-associated proteins, that it is widely accepted in cellular and molecular biology as a classic research

method to produce this effect reliably and effectively.

# IV. SAMPLING METHODOLOGY FOR DETERMINING FORMALDEHYDE CONTAMINATION IN THE GULFSTREAM CAVALIER ISSUED BY FEMA WITH FEMA ID # 1041407 AND SAMPLING RESULTS

In order to determine if the adverse health effects being experienced by Ms Alexander and her son, Christopher Cooper, have been caused by excessive levels of formaldehyde in her FEMA-Issued Gulfstream Cavalier, formaldehyde levels needed to be scientifically measured.

## A. Sampling Protocol

*Formaldehyde Sampling: Active and Passive Sampling Protocols -- Procedures for Evaluating Formaldehyde Levels in FEMA Temporary Housing Units* was developed to result in sample collection procedures that would reliably yield results representative of the true exposures that occupants experienced when living in FEMA-issued THU(s). Significant data were collected and in various locations of the Cavalier to ensure that the sampling results represent with a reliable degree of accuracy the approximate true exposure levels.

Active sampling involves the use of a small pump that draws a known volume of surrounding air through the appropriate medium. Each specific medium is made of a filter or other material designed to capture or react with the specific contaminant. By calibrating the exact pump flow in liters/minute, and noting the time the pump is in operation, the air volume in liters can be calculated. Once the medium is analyzed in the laboratory and the exact quantity of the contaminant (in this case, formaldehyde) is determined, its concentration in the air can be calculated.

The active sampling methods for airborne formaldehyde measurements only allow a small amount of air volume to be pulled through the specific medium. Because of this, active samples cannot be taken continuously for many hours or days like passive samples can. As a result, formaldehyde active sampling methods typically sample the air for only 15-60 minutes.

Passive sampling uses a small badge (dosimeter), typically about the size of a large coin. This dosimeter contains a treated medium that collects the airborne contaminant with passive air movement. The total time the dosimeter is exposed to air, and the exact quantity of formaldehyde found on the medium, are used to calculate the total airborne concentration.

Active and passive sampling was conducted in this THU. Results were compared and no significant differences were found between the two classifications of methods.

Vapors and gases such as formaldehyde are usually reported by volume – in parts per million parts of air (ppm). NIOSH and OSHA have approved several methods for active sampling and several

ALX-EXP-16-000012

badges for passive sampling. The *Protocol* explains these methods in detail.

These sampling data were used in good faith to evaluate the formaldehyde concentrations the Alexander family experienced while living in this Gulfstream Cavalier trailer.

## B. Sampling Location: Various Areas/Rooms and Various Heights

The sample location and the sample height can introduce variables. For representative sampling, it is most desirable to attempt to locate the collection sample as close to the breathing zone height of the resident as possible. It was determined that the area where the Alexanders were every day, (6-8 hours or more), was lying down in bed.

As a result, height and location were determined to be the bedside table/nightstand. Placing the sampler there gives a very close approximation of the air the residents are breathing for extended period of time each day. However, during waking hours, the kitchen and bathroom are very common living areas with significant occupancy times. Therefore, samples were taken in these rooms as well, away from cooking odors, and during periods when very high humidity (such as taking a shower or doing dishes) did not occur.

## C. Sampling Results

Initial monitoring was conducted approximately a month after the Alexander family moved out of the trailer, on January 28, 2008. During the sampling, the trailer was closed, without the ventilation system running. The passive monitor was placed on the nightstand by the bed. Formaldehyde results = 0.05 ppm.

Repeat monitoring was done on May 6, 2009. Active and passive sampling was conducted. Note that although the trailer was closed, without the ventilation system running, the ambient temperatures were warmer. Results of the five samples are shown in the table below.

Master bedroom nightstand =      0.110 ppm (active sampling)
Master bedroom nightstand  =     0.074 ppm (passive sampling)
Master bedroom at window  =      0.059 ppm (passive sampling)
Bathroom =                       0.099 ppm (passive sampling)
Kitchen cabinet under the sink = 0.068 ppm (passive sampling)

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

# V. SUMMARY OF THE CASE FACTS:
# THE HISTORY OF THE FORMALDEHYDE EXPOSURE TO THE

# ALEXANDER FAMILY AND A DESCRIPTION OF PERTINENT FACTS FROM THE CASE DOCUMENTS AND RELATED FILES

## A. Brief History of Where Alana Alexander and Her Son, Christopher Cooper Have Lived Following Hurricane Katrina, As Well As a Summary of Their Medical Conditions and Treatment

Ms Alana Alexander and her young child, Christopher, were left homeless after Hurricane Katrina. From their home city of New Orleans, they were bussed to Arkansas and stayed there one day, then they went to Houston and lived there one week, then they travelled to Jacksonville and lived in an apartment for several months, and finally moved into the home of Alana's brother where they lived until late May of 2006. It was at this time that they obtained a FEMA-issued travel trailer and moved to New Orleans.

They were given a 28-foot Cavalier travel trailer manufactured by Gulf Stream Coach, Inc. This trailer was made December 13, 2004, and issued the Gulf Stream Serial Number: 57-5-T-CVDH-21783 and the VIN (Vehicle Identification Number): 1NL1GTR2551021783. FEMA's Identification Number for this trailer is 1041407.

The Alexander family lived in this trailer for approximately nineteen months, and then moved from it into the home of Alana's sister in late December of 2007.

Ms Alexander graduated from high school, worked in various fields for a few years, and then attended college for a couple of years. She was working as a teacher's aide when Katrina hit. Christopher Cooper, Alana's son, was born in December of 1996 and was only 8 years old then. He had been diagnosed with asthma as a toddler and Elaina's modest income allowed her son to get medical assistance through Medicaid. He was taking decongestant medication as well as using an emergency inhaler on occasion to control his symptoms when the hurricane hit.

Although his medications were lost along with their household possessions, the symptoms were mild enough that it wasn't until he had moved to Jacksonville before refills were sought for the medications to treat his breathing disorders. However, when the family moved back to New Orleans and began living in the FEMA-issued trailer, his symptoms returned shortly thereafter. In addition, Alana Alexander began experiencing nasal and throat irritation as well as frequent headaches, and Erica Alexander, Christopher's older sister, experienced nosebleeds within weeks.

Not long after they moved into the Cavalier, Christopher began showing worsening symptoms of difficulty breathing, shortness of breath, sinus infections and rhinitis, tearing, itchy eyes, and nasal congestion. That summer (2006) he needed to use his rescue inhaler more frequently because he began having asthma attacks more often. Over time, his skin erupted with an allergic dermatitis.

By the fall of 2007, Christopher, now 10 years old, was experiencing asthma attacks every several days (once or twice per week) and relying on his recue inhaler. His health continued to deteriorate.

ALX-EXP-16-000014

Alana's headaches also continued along with her nasal and throat irritation.

Christopher was later treated in Children's Hospital as well as by Primary Healthcare Associates for his breathing difficulties and skin condition.  He had bouts of eye inflammation which had to be treated with prescription medication.  Between 2006-2008 Christopher was prescribed Clarinex for his sinuses, an Albuterol inhaler, Prednisone to control inflammation, Pulmicort and Flovent (inhalers), Singular for his allergy symptoms, Elocon ointment for his dermatitis, and Patenol eye drops.

The writer found no evidence in any the information reviewed that Ms Alexander had any knowledge prior to December of 2007 of possible formaldehyde contamination in her trailer.  The evidence shows that she became aware of this potential hazardous condition around this time and within the month she moved out of the Cavalier and in with her sister in New Orleans.  She and Christopher remain there as of this writing.

Christopher's symptoms have become less and less severe since moving out of the trailer. However, according to his physician Dr. Janet Duncan Barnes, he will not achieve a full recovery. She states, "…The exposure to formaldehyde in the FEMA trailer, within a reasonable degree of medical probability, will cause permanent epithelial damage, with subsequent acute exacerbations of Asthma, recurrent rhinosinusitis, and chronic atopic dermatitis for the rest of his life."

## B. Documentation and Summary of the Discovery of the Presence of Formaldehyde in FEMA-Issued Trailers, Formaldehyde Concentrations Found, and Subsequent Actions

### 1. When FEMA became aware of the potential formaldehyde contamination and subsequent action taken in the first 9 months after the hurricanes

After the hurricanes, FEMA began receiving temporary housing units to house the newly homeless.  Workers began setting up these units for residents, including unwrapping cabinetry, unpackaging furniture, setting up bed frames and mattresses, connecting utilities, and the like.  Right away after these activities began, in early October of 2005, workers for FEMA began experiencing severe respiratory irritation, headaches, and itchy skin and eyes when doing this set up of the trailers for occupancy.

Complaints were made to OSHA, and OSHA health compliance officers came to Purvis, Kiln, Bay St. Louis, Pass Christian, Gulfport, Waveland, and Ocean Springs.  They sampled many workers and work areas in these temporary housing units.  More than 175 samples were taken, with OSHA going onto FEMA sites as early as October 11, 2005 to conduct this sampling.

Formaldehyde exposures were significant; many were more than the 0.75 OSHA Permissible Exposure Limit set for healthy adult workers.  When overexposures are found, OSHA is mandated to notify the employer and ensure that follow up measures are implemented to protect workers.  In addition, OSHA health compliance officers would have had to state their

business for being on every FEMA site.  Because of this, FEMA must have been aware in
the fall of 2005 of excessive formaldehyde levels in these temporary housing units being set
up for the hurricane disaster victims.  Their own workers were getting sick.

However, although FEMA was aware in the fall of 2005, there is no evidence that FEMA
took any action to warn or notify the people moving into these trailers.  There is no evidence
that FEMA took steps to identify, evaluate, and eliminate or at least control to an acceptable
degree, formaldehyde exposures to the incoming residents of these trailers.

No evidence could be found that FEMA initiated testing prior to accepting additional TT's
(travel trailers), or that they rejected TT's because of contamination, including mold and
other potential irritants.

In addition, *no evidence could be found that Gulfstream took steps* to comply with the HUD
standards that are mandated for mobile homes or to even initiate formaldehyde screening of
its completed travel trailers, although they were aware that these trailers would be occupied
much longer than a couple of weeks for recreational purposes.  Prudent practice would have
been to at least screen the finished units for formaldehyde since their occupancy according to
FEMA would be for extended periods, in many cases for more than a year.

Excess formaldehyde levels were found by The Sierra Club, the non-profit volunteer
environmental organization.  The Sierra Club started investigating complaints by residents
within *weeks* of initial notification and began sampling trailers for formaldehyde shortly
thereafter.  Sampling continued into the spring of 2006.  Nearly all results showed
formaldehyde concentrations in excess of the 0.008 ppm limit recommended by the CDC's
Agency for Toxic Substances and Disease Registry.

FEMA knew of the wide-spread formaldehyde contamination before May of 2006, yet
never investigated the issue or communicated the potential to incoming residents.

2.  **Summary of additional sampling**

CDC Testing – Excess formaldehyde emissions were found in the study done by the CDC.
Results of 519 units sampled showed an average of seven times the maximum ATSDR
recommended exposure level for durations of more than one year, even though the tests were
done two years after the TT's were manufactured and most of the testing was done in January
of 2008 on unheated units.

Ernest Orlando Lawrence Berkeley National Laboratory Study – Excess formaldehyde levels
were found in the temporary housing units tested by the Ernest Orlando Lawrence Berkeley
National Laboratory in their trailer sampling study.  In addition, elevated alpha-pinene (the
main component of turpentine), acetic acid and phenol were also found.  Since these three
chemicals also cause serious respiratory, eye and skin irritation, the effects of the high levels
of formaldehyde are made even worse by their presence.

DeVany Industrial Consultants Evaluation – Sampling of more than 5000 FEMA-owned
temporary housing units was conducted by DeVany Industrial Consultants and supervised by

the writer.  More than 250 of these were Gulf Stream Cavaliers.

Of these, not one was below the ATSDR level of 0.008 ppm for exposures greater than 365 days.  In fact, the mean concentration of 1.56 ppm was 195 times the ATSDR level of 0.008 ppm and twice the highest legally allowable 8-hour exposure level in the United States, established nearly 20 years ago for healthy adult workers and for exposures of no more than 8 hours per 24-hour period and no more than 40 hours per week.

Only 6 of the Gulfstream Cavaliers were below ATSDR's recommended short term (up to 14 days) level of 0.04; and only 2 were below ATSDR's intermediate term (between 15-364 days) level of 0.03 ppm.  11 were below 0.05, and 14 of the 253 were below 0.1 ppm.  The Cavalier issued to the Alexanders following 19 months of use tested at 0.05 ppm in the middle of the winter, 6.25 times the recommended limit for occupancies of more than one year.  In warmer temperatures, the Cavalier issued to the Alexanders was tested in May, 2009, in the same location as the previous test at a level of 0.074 ppm, 9.25 times the recommended limit for occupancies of more than one year.

It must be noted that most of these samples had to be taken during the summertime.  This was because FEMA restricted access to the travel trailers on their sites to between May 15th and August 29 of 2008.  Only one week before this, notice was given that the sampling was to be allowed to continue – in order to finish the sampling of other manufacturers' travel trailers not yet located.

## C. FEMA's Response to the Potential Formaldehyde Contamination

Although FEMA was aware of the formaldehyde contamination in the late fall of 2005, and although many records exist of individuals complaining to FEMA about bad odors/chemical smells in their TT's., FEMA did not conducted sampling or prepare warnings of the potential danger for the trailer occupants.

In fact, one FEMA official advised FEMA staff on June 16, 2006, *against* investigating the complaints.  She stated that this recommendation was based upon the advice from the OGC (Office of the General Counsel).  This states, "Further, OGC has advised that we do not do testing, which would imply FEMA's ownership of this issue."  Accordingly, although records show much internal correspondence regarding formaldehyde contamination in the TUH's, almost no action was taken to identify the problem, notify the occupants, and control the exposures.

By the summer of 2007, forced by Congressional intervention and public pressure, FEMA acknowledged that it needed to take steps to address this issue.  It wasn't until six months later, in December of 2006, that through the CDC, FEMA began testing their THU's to assess formaldehyde contamination.  Notices were issued to occupants and the general public about the potential contamination, how to identify symptoms of overexposures, and steps to take to reduce personal exposure levels.  FEMA also reassessed how and to whom they offered alternative housing.  The agency developed priority lists to expedite relocating those occupants whose health was most at greatest risk.  The agency identified the elderly, children,

and those with pre-existing medical conditions that could be exacerbated by even low levels of formaldehyde.

In an effort to eliminate formaldehyde exposures long-term, FEMA developed additional standards for purchasing new THU's. These standards resulted in two critical changes in the RFP's (Requisitions for Procurement/Purchase) issued for the fall of 2008 hurricane season: Testing of every THU before it leaves the factory site to verify that indoor airborne formaldehyde is below 0.016 ppm, and implementing new manufacturing specifications to increase ventilation rates and overall air exchanges in newly purchased THU's.

Unfortunately, FEMA failed to take action and to warn about the potential for serious health effects until *after* the Alexander family moved into their trailer. When Ms Alexander signed for delivery of her Gulfstream Cavalier, no mention was made of any potential hazard from the indoor air. She did not become aware of the problem until very late in 2006 and moved her family within the month.

## D. Some factors known to increase formaldehyde off-gassing: increased ambient temperature and humidity

As stated indirectly in the previous paragraph, it has been well researched and documented that an increase in ambient temperature causes an increase in formaldehyde off-gassing. Increasing relative humidity is also widely accepted as causing increasing formaldehyde off-gassing. This can create higher formaldehyde levels than would be found in cooler, drier climates.

New Orleans is well known for being hot and humid. However, with their limited income, air conditioning was a luxury the Alexanders would not allow themselves, except during very high temperatures conditions.

Air conditioning (A/C) can take approximately five to seven times the electricity that heating does, and as a result of the cost, the writer found many people were in the same situation as the Alexanders. When DeVany Industrial Consultants spent weeks doing formaldehyde sampling in occupied travel trailers in the New Orleans area during September and October of 2007, most of the residents told the writer that they simply could not afford A/C unless it got over 90° F. Even then, many people only used it when cooking or to cool off a bit so they could sleep. Still others told us they could not afford it at all.

The relatively high temperature and humidity levels found along the Gulf coast in the summertime, as shown when the data from the above-described studies are analyzed, cause increased formaldehyde emissions from the construction materials in these travel trailers. The Alexanders moved into their Gulfstream Cavalier in late May of 2006. Christopher was 9 years old and to this point his health had been slowly and steadily improving as he got older.

Evidence demonstrates that exposure to the formaldehyde levels found in their travel trailer that summer caused serious, chronic irritation and burns to Christopher's eyes and respiratory

system.  With increased perspiration, skin irritation also becomes an issue.  Alana also began having symptoms, including respiratory irritation and headaches.  In addition, concern for the health and welfare of her son more likely than not caused her significant, on-going stress.

Cooler Temperatures, Lower Humidity – Conversely, when temperatures decrease in the winter months, the formaldehyde off-gassing also decreases, resulting in lower formaldehyde levels.  As a case in point, the test results of the CDC study conducted by Bureau Veritas on unoccupied, unheated THU's from the end of December through January of 2008, were analyzed.  The mean concentration of the 136 Gulfstream Cavaliers samples was 0.150 ppm.

If we allow that confounding factors are roughly equal in both studies, this is a significant variation due to the range of temperature and humidity levels.  However, this concentration is nearly 20 times the long-term ATSDR level of 0.008 ppm, and it is double the mean (0.077 ppm) for all of the trailers manufacturers sampled in this government-sponsored study.

## E. Indoor Air Volume to Wood Surface Area

The first paragraph of the *Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units – Final Report,* 2008, by the Ernest Orlando Lawrence Berkeley National Laboratory, states the following:

> THU's and the associated whole trailer emissions factors were found to be higher, sometimes much higher, than what is typically found in residential environments.  The difference between these THUs and other housing appears to be the very high composite wood surface area relative to room volume and the low ventilation rates in terms of low area- specific fresh air flow rates relative to internal surface area in the THU's.

This excerpt explains the underlying reasons why travel trailers have such a high formaldehyde level when compared to mobile homes and conventional homes.  When comparisons are made, the internal air volume or inside air space of travel trailers relative to the amount of wood surfaces is very low.

Relatively the same amount of cabinetry, closets, tables, bed stands, and other wood-based materials are gathered into a much smaller, more compact unit.  Even if HUD standards were met for these composite wood materials, they are off-gassing into a much smaller space than that found in mobile and conventional homes.  Therefore, given the same rate of off-gassing, the smaller the air space, the more concentrated the formaldehyde will be.

In addition, the much larger mobile homes and conventional homes also have much more indoor air to dilute the concentration of the formaldehyde gas than TT's do.  They also, in general have greater air turn over or a faster rate of air exchanges than travel trailers do.  Air exchanges dilute the concentration of formaldehyde with fresh air.  So travel trailers not only have a greater amount of formaldehyde emissions per cubic foot of indoor air, the air turn-over is much less.  These factors combine to cause travel trailers to have formaldehyde concentrations that significantly exceed those found in both mobile homes and conventional homes.

## F.  Unoccupied vs Occupied Trailers

Without people going in and out, with doors, windows and vents closed, and with the HVAC (heating, ventilating and air conditioning) system turned off, little fresh air enters the inside of a travel trailer. Travel trailers that are sealed up cause air to become stagnant and tend to accumulate formaldehyde.  When THU's are closed up for extended amounts of time, formaldehyde levels can increase because the vapors off-gas and have nowhere to go.

Conversely, when people are living inside, people open doors and go in and out.  The HVAC system is used.  Windows and vents may be opened from time to time.  Fans may be used to circulate air around the inside.  All of this air movement significantly impacts indoor air quality because fresh air is allowed to enter.  Therefore, as a result, unoccupied units can have higher concentrations of formaldehyde than occupied ones.

## G.  Since Formaldehyde Off-Gassing Decreases over Time, How Are Approximations Made As to the Indoor Air Concentration of Formaldehyde over the Range of the Travel Trailer's Use?

Phenol-formaldehyde containing resins, glues and adhesives are very commonly used in the manufacturer of fiberboard, plywood and particle board.  As these resins, glues and adhesives set and cure, formaldehyde is given off.  Because of this, newly made materials emit the highest quantity of formaldehyde and at the highest emission rates.  That is because as the materials age, the formaldehyde concentration becomes lower and lower.  This results in lower and lower emissions rates and the total quantities of formaldehyde off-gassed.

Stated another way, the rate of off-gassing decreases over time and so does the amount of formaldehyde emitted.  Many attempts have been made to approximate this emission rate and total quantity – formulas and extrapolations for determining these values have been submitted by a number of sources.  Mathematical regression analysis and logarithm functions are usually used to get the "best fit" curve or line through the data.  From these formulas and curves, we can approximate, for example, what the total quantity of airborne formaldehyde will be in a given travel trailer two years after manufacturer if the level was tested at 4 months and the measured level was "X".  Another use for the calculations: if a unit has a level of 0.67 ppm on the date of manufacturer, what will the indoor concentration be after one year?  Two years?  Three years?...

Variables such as ventilation, humidity, temperature, total indoor air volume, the quantity of formaldehyde in the resin/glue/adhesive in the materials, the ratio of the total indoor air volume to wood products surface area, occupancy times, and the manufacturing process itself are just some of the factors/variables to consider.

Accordingly, for the purposes of this report, several methods have been used to approximate

ALX-EXP-16-000020

the formaldehyde concentration in the indoor air of the Alexander's trailer when they first moved in.  These estimations are conservatively based upon the 0.05 ppm concentration measured in January of 2008, or approximately 37 months after its manufacturer in December of 2004.  Note that assumptions have to be made regarding the constancy of the variables listed above, as well as others, but these apply to all of the methodologies submitted as follows.

1.  In his article, "Decay of the Decrease of Formaldehyde Concentrations or Emissions over Time and UF-bonded Wood Panel Products," from December of 2005, William Groah states that "Controlled studies in unoccupied homes, while limited, suggest a reduction of 25-40% in formaldehyde concentration during the firsts 4-8 weeks, and a half life of 18-25 months." He quotes a study done for the EPA by Versar (1986) whose exposure model for predicting formaldehyde concentration is as follows:

$$Y = 0.504e^{-0.00065x}$$

where  x = formaldehyde concentration in ppm and x = home age in days

This study reported that "the correlation coefficient ® for the equation is 0.59 and the $R^2$ value is 0.35, implying that home age determines approximately 35% of the home formaldehyde level, while all other factors determine the other 65% of its variability.

2.  Zinn, Cline, and Lehmann (June, 1990) published their article, "Long-term Study of Formaldehyde Emission Decay from Particle Board," *Forest Products Journal*, and stated, "The overall ¾ and ½ lives were 38 and 216 days, respectively.  The rate at which emission levels decrease is not constant, but decreases with time.  Generally, formaldehyde emission levels decrease linearly with respect to the natural log of time."

Their exposure model for predicting formaldehyde emission data is as follows:

$$HCHO = F + G \, X \, ln(t)$$

where  HCHO  = formaldehyde emission level (ppm) and ln(t) = natural log of time in days

3.  In the CDC report (July 2, 2008), "Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes," they report parameter estimates that can be used to calculate predicted formaldehyde levels.

*The natural log of*          $= 0.012 + Mfgr + T(0.052) + 45(RH) + (vent) + M$
*formaldehyde concentration*

where  x = formaldehyde concentration of the specific manufacturer
T = temperature (Fahrenheit)

RH = % relative humidity
Vent = ventilation factor
M = mold in a concentration of one square foot or more than

4. In the *Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units – Final Report,* 2008, by the Ernest Orlando Lawrence Berkeley National Laboratory, cites a study (Oak Ridge National Laboratory) (Matthews, 1995) showing it takes 7.5 years for the formaldehyde concentration to drop to a concentration of 10 ppb.

5. Lastly, our data from the analysis of Gulfstream Cavaliers correcting for date of manufacturer was used to derive approximate concentrations using a best fit linear regression curve.

Summary: Derived concentrations at 17 months after manufacturer, which represent the approximate date when the Alexander family moved into the TT, were calculated using each of the five above-summarized methods. The concentration ranged from 1.6 ppm to 0.1 ppm.

## H. Induction of IgE-Mediated Sensitization to Formaldehyde

Research shows that exposure to gaseous formaldehyde could be linked to the induction of IgE-mediated sensitization to formaldehyde in primary school children, at levels of only 0.075 ppm and 0.069 ppm. These levels are nearly identical to those levels measured in the empty Alexander trailer nearly a year and a half *after* they moved out.

The levels in the Alexander trailer, derived using several different methodologies (see above) designed to approximate formaldehyde concentrations when they first moved in and at the date of manufacturer, were significantly higher than those in this study. In addition, rhinitis, cough, burning eyes, nose bleeding, headache, fatigue and dry nasal mucosa were found in the affected children. Of interest is the fact that the IgE levels did not correlate with the symptoms. In other words, immune system changes were occurring in some of the children without any outward symptoms of irritation. More than 60 children participated in the study.

Dr. Barnes, Christopher Cooper's physician, has diagnosed IgE immune system changes in him.

# VI. DISCUSSION OF FINDINGS AND OBSERVATIONS

## A. Medical Conditions

Christopher's medical profile parallels what would be anticipated by a review of the many formaldehyde exposure studies that have been conducted during the past several decades. The respiratory, skin and eye ailments would all be exacerbated by his chronic exposure to formaldehyde. In addition, the IG$_E$-mediated response in primary school children of Christopher's age, referenced above, is also consistent with Dr. Barnes' diagnosis.

Alana's physical symptoms were less debilitating than Christopher's, as would be anticipated in an otherwise healthy adult with no pre-existing respiratory, eye, or skin disorders. Her symptoms are consistent with and typical of those found in many studies conducted in the range of the exposure levels found in the Cavalier. In addition, the financial burden caused by a sick child, and the difficulty in finding sick child care so she could work, more likely than not contributed to emotional stress that could weigh on her in the workplace.

For nearly twenty years Industrial Hygienists have recognized the contribution that family stress makes to workplace productivity. Well-documented studies demonstrate improved worker health and lower accident rates by reducing family pressures. As an example, it is widely acknowledged in the fields of occupational safety and industrial hygiene that absenteeism and accident rates decrease, and productivity increases, when work-site child care programs are available.

## B. Defective Design

Because the interior air volume relative to the surface area of wood products is so low in travel trailers, formaldehyde gas can build up to high levels. The interior design, construction practices, and low ventilation rates inherent to the Gulfstream Cavalier demonstrate basic design defects in this travel trailer, which renders it unreasonably dangerous in design. Furthermore, travel trailers emitting formaldehyde at levels at or below 0.016 ppm exist now. These trailers use safer alternative designs and material choices that existed years before December, 2004, when the Alexander trailer was manufacturer by Gulfstream. Trailers emitting formaldehyde at levels at or below 0.016 ppm would have prevented Christopher Cooper's damages. Further, the gravity of his damages outweighs any burden on Gulfsteam in adopting such alternative designs.

## C. FEMA's Lack of Action

Before the Alexanders entered their trailer in May of 2006, FEMA was well aware that the units contained potentially hazardous levels of formaldehyde, yet there is no evidence that any notice of this was given to the Alexander family. Indeed, although FEMA had an on-going, well-documented telephone history with Ms Alexander, no record of even a verbal warning or notification exists in the phone logs.

Once they became cognizant of the issue, FEMA should have taken swift action to give appropriate warnings to the Alexanders about the potentially hazardous condition. Then, without delay, steps should have been taken to evaluate the formaldehyde levels. Once

identified, FEMA should have acted to eliminate the condition, attempt to control it, or at least provide immediate alternative housing to those at high risk, such as Christopher.

No evidence was found that Ms Alexander was notified by FEMA about the potentially hazardous levels of formaldehyde that were present in her trailer or advised of the adverse health effects that could occur as a result of formaldehyde gas exposure. Had she been made aware, she could have taken steps to protect her son and herself. Indeed, Ms Alexander moved her family out of the trailer within a month after the learned about the formaldehyde issue.

## D. Gulfstream's Lack of Action

No evidence could be found that Gulfstream took steps to align their practices with the spirit of the law by complying with the HUD standards that are mandated for semi-permanent to permanent housing. HUD regulates formaldehyde emissions of wood products contained in mobile homes; however, nothing could be found in the case documents demonstrating that Gulfstream even considered initiating formaldehyde screening of its completed travel trailers, although it was well-publicized that these trailers would be occupied much longer than a couple of weeks for recreational purposes.

Prudent practice would have been to at least screen the finished units for formaldehyde. This is especially true since, according to FEMA, their occupancy would be for an extended period, in many cases for more than a year. This testing could have been done with minimal effort and very low cost. Furthermore, Gulfstream failed to warn Ms Alexander of the consequences of the formaldehyde in her trailer.

# VII. CONCLUSIONS

It is a matter of record that the Plaintiffs did not move into their Gulfstream Cavalier until the end of May, 2006. FEMA knew of the risk of formaldehyde exposures before this time. Unfortunately, FEMA did not take reasonable steps to warn these trailer occupants. Had the agency done so, the Alexander family could have sought medical counsel prior to moving into this trailer. They would have been able to make an informed decision had they know about the serious health risks involved. Because they had no knowledge of this condition, their health was severely impacted, and Christopher's health may be permanently impaired.

FEMA demonstrated negligence in failing to warn of the hazards associated with occupying this trailer.

Gulfstream has been one of the largest manufacturers in the U.S. of portable housing. For many years they have had to comply with the HUD limits for formaldehyde emissions from wood products in their mobile homes. Although the thousands of travel trailers provided to FEMA would

be occupied for extended periods of time as living quarters for individuals and families, no effort was made to ensure that the emissions were reduced accordingly.  Gulfstream showed negligence in not testing or taking other prudent measures to ensure that formaldehyde concentrations were on par with those required by law for prolonged housing.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I reserve the right to modify or change the opinions in this report if additional information is made known to me.

# APPENDIX A:  BIBLIOGRAPHY – DOCUMENTS AND RESOURCES REVIEWED AND RELIED UPON IN THE PREPARATION OF THIS REPORT

ACGIH. Documentation of Threshold Limit Values and Biological Exposure Indices; Formaldehyde - Suspected Human Carcinogen. 2001.

Alexander, A., March 24, 2009, Federal Emergency Management Agency Contact Report, FEMA 137-000075, from

April 11, 2008, Release number: HQ-08-056, New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels In Mobile Homes And Park Models, from http://www.fema.gov/newsrelease.fema?id=43180

Arts, J.H., Muijser, H., Kuper, C.F., (2008). Setting an Indoor Air Exposure Limit for Formaldehyde: Factors of Concern, *Regulatory Toxicology and Pharmacology, 52,* 189-194

ASTM International. (2002), *Standard Test Methods for Determining Formaldehyde Concentrations in Air and Emission Rates from Wood Products using a Large Chamber* (ASTM Designation: E1333-96 [Reapproved 2002]), West Conshohocken, PA

Bullock, W.H. and Ignacio, J.S.: (editors): A Strategy for Assessing and Managing Occupational Exposures, Third Edition. Fairfax, VA: American Industrial Hygiene Association (2006).

Barnes, J. MD., Clinic Forms Progress Notes, from Christopher Cooper, December 18, 1996

California Environmental Protection Agency Air Resources Board. Indoor Air Quality Guideline - Formaldehyde in the Home. August, 2004.
    http://www.arb.ca.gov/research/indoor/formaldgl08-04.pdf

California Environmental Protection Agency Air Resources Board. Proposed Airborne Toxic Control Measure To Reduce Formaldehyde Emissions From Composite Wood Products. Sacramento. March 2007.

Caby, S., Pierce, R.J., (2009) Quantitative chromatin immunoprecipitation (Q-ChIP) applied to Schistosoma mansoni, Mol Biochem Parasitol, 166(1), 77-80.

Centers for Disease Control and Prevention. (2008). *Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes*. Retrieved from http://www.cdc.gov/nceh/ehhe/trailerstudy/pdfs/FEMAFinalReport.pdf

Children's Hospital (2009), Medical Records for Christopher Cooper, New Orleans, La.

DeVany, Mary C., MS, CSP, CHMM. Chemical Toxicology, with Emphasis on the Reproductive System. DeVany Industrial Consultants. Washington Industrial Safety and Health Administration annual meeting; Vancouver, Washington.

DeVany, Mary C., MS, CSP, CHMM. Summary of Formaldehyde Health Effects and Exposures in FEMA Travel Trailers. Statement for Press Conference, DeVany Industrial Consultants. Vancouver, Washington. May 2007.

DeVany, Mary C., MS, CSP, CHMM. The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued to Hurricane Disaster Victims, and Recommended Action Items.  Testimony before the Committee on Oversight and Government Reform, U.S. House of Representatives; Washington D.C., 19 July 2007.

Duncan, J. MD, Narrative Report for Chris Cooper, May 15, 2009

Ernest Orlando Lawrence Berkeley National Laboratory, Environmental Energy Technologies Division, (2008), *Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units – Final Report*, Richmond, CA.: Maddalena. R. Russell, M. Sullivan, D. Apte, M.

Federal Emergency Management Agency (2007). *Fact Sheet: Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes*,

ALX-EXP-16-000026

Washington DC.: U.S. Government Printing Office

Federal Emergency Management Agency (2007). *Formaldehyde and Travel Trailers*. Washington DC.: U.S. Government Printing Office. Retrieved from FEMA Government Web site: http://www.fema.gov/news/newsrelease.fema?id=36730

Federal Emergency Management Agency (2006). *FEMA Job Hazard Analysis, Trailer In-Bound Inspection (New Trailer)*, Washington DC.: U.S. Government Printing Office

Federal Emergency Management Agency (2009). *FEMA Temporary Housing Program Ending for Families of Hurricanes Katrina and Rita*. Washington DC. Release Number: FNF-09-009. Retrieved from FEMA Government Web site: http://www.fema.gov/news/newsrelease.fema?id=47936

Formaldehyde Sampling: Active and Passive Sampling Protocols -- Procedures for Evaluating Formaldehyde Levels in FEMA Temporary Housing Units. DeVany Industrial Consultants; Vancouver, Washington, March, 2008.

Gulf Stream Coach Inc. (1999). *American Sealants, Inc, Product:502 Silicone Sealant, Material Safety Data Sheet*. (GULF0002403). Nappanee, IN.

Gulf Stream Coach Inc. (2004). *HI TEC, Silicone Elastomar, Material Safety Data Sheet*. (GULF0002428). Nappanee, IN.

Gulf Stream Coach Inc. (2004). *Weyerhaeuser, Medium-Density Fiberboard, Material Safety Data Sheet*. (GULF0002283). Nappanee, IN.

Gulf Stream Coach Inc. (2005). *Weyerhaeuser, Structurwood RES, Material Safety Data Sheet*. (GULF0002328). Nappanee, IN.

Gillette, Becky, "Testimony to House Comm. on Oversight and Government Reform", U.S. House of Representatives, 19 July 07.

Hardwood Plywood and Veneer Association and the Kitchen Cabinet Manufacturers Association. (2005). *Decay or the Decrease in Formaldehyde Concentrations or Emissions over Time and UF-boned Wood Panel Products*. Reston, VA: Groah, W.

Health Canada. Residential Indoor Air Quality Guideline - Formaldehyde. April 2006. http://www.hc-sc.gc.ca/ewh-semt/alt_formats/hecs-sesc/pdf/pubs/air/formaldehyde-eng.pdf

Hewett, P. (2009). Analysis of the Gulf Stream Coach Inc. Formaldehyde Exposure Dataset: Technical Report, *Exposure Assessment Solutions Inc.*, May 15, 2009

Hewett, P.: Mean Testing: II. Comparison of Several Alternative Procedures. Applied Occupational and Environmental Hygiene 12:347-355 (1997).

ALX-EXP-16-000027

Hewett, Paul: Industrial Hygiene Exposure Assessment - Data Analysis and Interpretation, in Handbook of Chemical Health and Safety. Alaimo, R.J. (editor); American Chemical Society; Oxford University Press (2001).

Hughes, Vernon (Atmospheric Modeling and Support Section Planning and Technical Support Division). California Environmental Protection Agency. Air Quality Modeling of Emissions From Composite Wood Products. Sacramento. June 2006.

International Agency for Research on Cancer. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Overall Evaluations of Carcinogenicity to Humans. Lyon, France. April 2008.  http://monographs.iarc.fr/ENG/Classification/crthgr01.php

International Agency for Research on Cancer. Press Release: IARC Monographs  Programme Finds Cancer Hazards Associated With Shiftwork, Painting And Firefighting. Lyon, France. May 2007.   http://www.iarc.fr/en/Media-Centre/IARC-Press-Releases/Recent-Releases/IARC-Monographs-Programme-finds-cancer-hazards-associated-with-shiftwork-painting-and-firefighting

Koplan, Jeffrey P., DM, MPH (Administrator) U.S. Department of Health and Human Services Public Health Service Agency for Toxic Substances and Disease Registry. Toxicological Profile for Formaldehyde. Chapter 7. July 1999. http://www.atsdr.cdc.gov/toxprofiles/tp111.pdf

Li LinYing, Delao Andrew, Tasat Webster, Fitz Gibbon Mike. Emission Inventory Branch Planning and Technical Support Division, ARB. Estimation of Formaldehyde Emissions from Composite Wood Products.

Madison Roberta E, Broughton Alan, Thrasher Jack D. Immunologic Biomarkers  Associated with an Acute Exposure to Exothermic Byproducts of a Ureaformaldehyde Spill. Environmental Health Perspectives, Vol. 94, pp. 219-223. 1991.

Mathews, T.G. (1985).  Modeling and Testing of Formaldehyde Emission Characteristics of Pressed-Wood Product: Report XVIII to the U.S. Consumer Product Safety Commission, Oak Ridge National Laboratory, Oak Ridge, TN. ORNL/TM-9867.

National Archives and Records Administration. 24 CFR § 3280.308 - Formaldehyde Emission Controls for Certain Wood Products. August 1984. http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?type=simple;c=ecfr;cc=ecfr;sid=da536441af330244bf717531615c8c39;region=DIV1;q1=Formaldehyde%20emission%20controls%20for%20certain%20wood%20products;rgn=div8;view=text;idno=24;node=24%3A5.1.3.1.1.4.13.10

National Archives and Records Administration. 24 CFR § 3280.309 - Health Notice on Formaldehyde Emissions. October 1993. http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?type=simple;c=ecfr;cc=ecfr;sid=da536441af330244bf717531615c8c39;region=DIV1;q1=Health%20Notice%20on%20Formaldehyde%20emissions;rgn=div8;view=text;idno=24;node=24%3A5.1.3.1.1.4.13.11

ALX-EXP-16-000028

National Cancer Institute. Factsheet - Formaldehyde and Cancer: Questions and Answers. July 2004. http://www.cancer.gov/cancertopics/factsheet/Risk/formaldehyde

National Center for Environmental Health, Division of Environmental Hazards and Health Effects. (2007). *Evaluation of Formaldehyde Levels in Occupied Federal Emergency Management Agency-Owned Temporary Housing Units.* Washington D.C.:U.S. Government Printing Office.

National Institute for Occupational Safety and Health. NIOSH Pocket Guide to Chemical Hazards. September 2005. http://www.cdc.gov/niosh/npg/npgd0293.html

National Institute for Occupational Safety and Health. NIOSH Safety and Health Topic: Formaldehyde. August 2008. http://www.cdc.gov/niosh/topics/formaldehyde/

Nelson, L., Formaldehyde Plaintiff Database, *All Plaintiff THU Formaldehyde Sampling Data.* May 15, 2009.

Omae, K. (2008), Recommendation of Occupational Exposure Limits (2008-2009), *Journal of Occupational Health*, 50, 426-443.

S. Daniels, personal communication, Post Katrina Timeline, May 16, 2009, 12:39 PM

Scott, W. (2009). Alexander Formaldehyde Exposure Report: Expert Report, *W.D. Scott Group Inc.*, May 15, 2009

Sharon E Jacob, MD, Tace Steele. Avoiding Formaldehyde Allergic Reactions in Children. U. Miami. Pediatric Annals 36:1. January 2007.

Standard Interpretations, United States Department of Labor. 03/13/1998 - OSHA  Rulemaking on Formaldehyde Exposure Limits. 13 March 98. http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATION S&p_id=22543

State of California Air Resources Board. Resolution 07-14. April 2007.

State of California Air Resources Board. Resolution 07-14 Attachment A: Proposed Regulation Order: Airborne Toxic Control Measure to Reduce Formaldehyde Emissions from Composite Wood Products (sections 93120 to 93120.12, title 17, California Code of Regulations), as set forth in Appendix A to the Initial Statement of Reasons, released March 9, 2007. April 2007.

State of California Air Resources Board. Resolution 07-14 Attachment B: Staff's  Suggested Modifications to the Original Proposal (Distributed at the Board hearing on April 26, 2007). April 2007.

State of California Air Resources Board. Supplemental Analysis Supporting the Test for

Demonstrating Equivalence between Primary and Secondary Methods for Measuring Formaldehyde Emissions from Composite Wood Products. January 2008.

Technical Report 07-03 - Industrial Hygiene Exposure Assessment - Data Analysis and Interpretation. Exposure Assessment Solutions, Inc. available at www.oesh.com

Texas Department of State Health Services.  Texas Administrative Code, Title 25, Part 1, Chapter 297, Subchapter A. May 2007.  http://www.dshs.state.tx.us/iaq/rules.shtm

Thrasher, Jack D. Ph.D. Broughton, Allan M.D., Ph.D. Micevich, Paul Ph.D. Antibodies and Immune Profiles of Individuals Occupationally Exposed to Formaldehyde: Six Case Reports. American Journal of Industrial Medicine, Vol 14, pp. 479-88.  1988.

Thrasher Jack D, Ph.D. Embryo Toxicity and Teratogenicity of Formaldehyde (FA). Alto, New Mexico.

Thrasher Jack D, Ph.D. et al. Evidence for Formaldehyde Antibodies and Altered Cellular Immunity in Subjects Exposed to Formaldehyde in Mobile Homes.  Archives of Environmental Health, Vol. 42, pp. 347-350. 1987.

Thrasher, Jack D. The Immediate and Long-Term Effects of Formaldehyde. Comments Toxicology 1988, Vol. 3, No. 2, pp. 135-153. 1988.

Thrasher Jack D, Ph.D. et al. Immune Activation and Autoantibodies in Humans with Long-Term Inhalation. Archives of Environmental Health, Vol. 45, pp. 217-223. 1990.

U.S. Department Of Health And Human Services Public Health Service Agency for Toxic Substances and Disease Registry. An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers-Baton Rouge, Louisiana, September-October, 2006. Atlanta, Georgia. October 2007. http://www.atsdr.cdc.gov/substances/formaldehyde/pdfs/revised_formaldehyde_report_1007.pdf

U.S. Department Of Health And Human Services Agency for Toxic Substances and Disease Registry. Minimal Risk Levels (MRLs) for Hazardous Substances. November 2007. http://www.atsdr.cdc.gov/mrls/index.html

U.S. Department of Health, Education, and Welfare, Public Health Service, Center for Disease Control, National Institute of Occupational Safety and Health. Criteria for a Recommended Standard.... Occupational Exposure to Formaldehyde. Washington DC, December 1976.

U.S. Department of Labor Occupational Safety and Health Administration. OSHA Formaldehyde Standards. Washington DC. May 2008. http://www.osha.gov/SLTC/formaldehyde/standards.html

U.S. District Court Eastern District of Louisiana New Orleans Division. (2009). Complaint for

ALX-EXP-16-000030

*Damages.* Docket No. 09-2892, Section: NMAG.5, Charlie Age versus Gulf Stream Coach, Inc., Flour Enterprises, Inc., and the United States of America through the Federal Emergency Management Agency, This case relates to MDL NO. 07-1873.

U.S. District Court Eastern District of Louisiana New Orleans Division. (2008). Orders and Reasons. MDL NO. 1873, Section: N(4), Judge: Engelhardt. FEMA Trailer Formaldehyde Product Liability Litigation.

U.S. District Court Eastern District of Louisiana New Orleans Division. (2009). *Plaintiff Fact Sheet.* Alana M. Alexander. MDL NO. 1873, Section: N(4), Judge: Engelhardt. FEMA Trailer Formaldehyde Product Liability Litigation

U.S. District Court Eastern District of Louisiana New Orleans Division. (2009). *Plaintiff Fact Sheet.* Christopher J. Cooper. MDL NO. 1873, Section: N(4), Judge: Engelhardt. FEMA Trailer Formaldehyde Product Liability Litigation

U.S. District Court Eastern District of Louisiana New Orleans Division. (2008). *Stipulated Protective Order.* MDL NO. 1873, Section: N(4), Judge: Engelhardt. FEMA Trailer Formaldehyde Product Liability Litigation.

U.S. District Court Eastern District of Louisiana New Orleans Division. (2007). *U.S. House of Representatives Committee on Oversight and Government Reform July 19, 2007 Hearing.* MDL NO. 1873, Section: N (5), Judge: Engelhardt. FEMA Trailer Formaldehyde Products Liability Litigation.

U.S. District Court Eastern District of Louisiana New Orleans Division. (2008). *U.S. House of Representatives Committee on Science and Technology , Subcommittee on Investigations & Oversight, April 01, 2008 Hearing.* MDL NO. 1873, Section: N (5), Judge: Engelhardt. FEMA Trailer Formaldehyde Products Liability Litigation.

U.S. District Court Eastern District of Louisiana New Orleans Division. (2008). *U.S. House of Representatives Committee on Oversight and Government Reform July 09, 2008 Hearing.* MDL NO. 1873, Section: N (5), Judge: Engelhardt. FEMA Trailer Formaldehyde Products Liability Litigation.

U.S. Environmental Protection Agency - Indoor Air Quality. Basic Information - Formaldehyde. November 2007. http://www.epa.gov/iaq/formalde.html

U.S. Environmental Protection Agency - Integrated Risk Information System. Formaldehyde (CASRN 50-00-0). January 2008.  http://www.epa.gov/iris/subst/0419.htm

Wantke, F., Demmer, C.M., Tappler, P., et al (1996). Exposure to Gaseous Formaldehyde Induces IgE-Mediated Sensitization to Formaldehyde in School Children, *Clinical & Experimental Allergy, Vol 26, No. 3*, 276-280(5)

Weisskopf, Marc.  Formaldehyde Exposure Increases Risk of Lou Gehrig's Disease, Harvard

ALX-EXP-16-000031

School of Public Health Studies, April 18th, 2008.

World Health Organization. <u>Air Quality Guidelines for Europe</u>. Second Edition. Copenhagen. 2000. <u>http://www.euro.who.int/document/e71922.pdf</u>

World Health Organization. Air Quality Guidelines for Europe. Second Edition.  Chapter 5.8 – formaldehyde. Copenhagen. 2001 http://www.euro.who.int/document/aiq/5_8formaldehyde.pdf

Zinn, T., Cline, D., Lehmann, W.F., (1990). Long-term Study of Formaldehyde Emission Decay from Particleboard,  *Forest Products Journal, 40, No. 6*, 15-18

# APPENDIX B:  Published Levels of Concern for Formaldehyde

NOTE:  **Outdoor air contains** 0.00012 ppm – 0.00039 ppm formaldehyde

US Department of Labor (US DOL)
Occupational Safety & Health Administration (OSHA)
Permissible Exposure Limit: **(WORKPLACE)**
TWA --> **0.75 ppm**
Short Term Exposure Limit (15 minutes) --> **2 ppm**
Action Level--> **0.50 ppm**

US Department of Health & Human Services (US DHHS)
Centers for Disease Control & Prevention (CDC)
National Institute for Occupational Safety & Health (NIOSH)
Recommended Exposure Limits: **(WORKPLACE)**
Time Weighted Average up to 10-hour work day/40-hour work week (TWA) --> **0.016 ppm**
Ceiling [15-minute] --> **0.1 ppm**
Immediately Dangerous to Life and Health (IDLH) levels --> **20 ppm**

American Conference of Governmental Industrial Hygienists (ACGIH)
Threshold Limit Value - Ceiling Exposure Limit (TLV-CEILING) (1998) **(WORKPLACE)**

Never to be exceeded, even for a moment, in the workplace --> **0.3 ppm**

The Japan Society for Occupational Health, Occupational Exposure Limit: **(WORKPLACE)**
TWA --> **0.1 ppm**

US Department of Health & Human Services
Centers for Disease Control & Prevention (CDC)
Agency for Toxic Substances & Disease Registry (ATSDR)
Minimal Risk Levels (MRL) **(PUBLIC)**
Acute MRL --> **0.04 ppm**
Intermediate duration MRL --> **0.03 ppm**
Chronic duration MRL --> **0.008 ppm**

Federal Emergency Management Agency (FEMA)
Airborne concentration for inside new mobile homes and park homes (for a 3-year contract duration
that began in the summer of 2008)
Measured airborne level --> **0.016 ppm**

California Environmental Protection Agency
Office of Environmental Health Hazard Assessment **(PUBLIC)**
As low as possible assuming you can not achieve levels below background or:
Recommended exposure limits (REL)
Acute REL --> 76 ppb for one hour (**0.076 ppm**)
Intermediate REL --> 27 ppb for eight hours (**0.027 ppm**)

Health Canada
Residential Indoor Air Quality Guidelines **(PUBLIC)**
One hour exposure limit --> 100 ppb (**0.1 ppm**)
Eight hour exposure limit --> 40 ppb (**0.04 ppm**)

World Health Organization
2000, Air Quality Guidelines for Europe, 2nd Edition **(PUBLIC)**
Air Quality Guideline Value, 30 minute average --> 0.1 mg/m3 (**0.08 ppm** at 1 Atmosphere, 25
degrees C) (NOTE: 25º C = 77º F)

**Exposure Limits Ranked from Highest to Lowest:**

| Name | Concentration | Source/Agency | Exposure Duration | Intended Population |
|------|---------------|---------------|-------------------|---------------------|
| IDLH | 20 ppm | NIOSH | Anytime | Occupational |
| STEL-PEL | 2 ppm | OSHA | 15 minutes | Occupational |
| TWA-PEL | 0.75 ppm | OSHA | 8 hours | Occupational |
| Action Level | 0.50 ppm | OSHA | 8 hours | Occupational |
| TWA-PEL | 0.375 ppm | OSHA | 12 hours | Occupational |
| TLV-CEILING | 0.3 ppm | ACGIH | Never to be | Occupational |

| | | | exceeded | |
|---|---|---|---|---|
| Ceiling-REL | 0.1 ppm | NIOSH | 15 min | Occupational |
| OEL-M | 0.1 ppm | JOSH | 8 hours | Occupational |
| REL | 0.1 ppm | Health Canada | Up to 1 hour | Public |
| AQGV | 0.08 ppm | WHO | 30 min | Public |
| Acute REL | 0.076 ppm | Cal EPA | 1 hr | Public |
| REL | 0.04 ppm | Health Canada | Up to 8 hours | Public |
| Acute MRL | 0.04 ppm | ATSDR | 0-14 days | Public |
| Intermed. MRL | 0.03 ppm | ATSDR | >14 days < 1 year | Public |
| Intermed. REL | 0.027 ppm | Cal EPA | 8 hr | Public |
| TWA-REL | 0.016 ppm | NIOSH | 8/10 hrs | Occupational |
| Chronic MRL | 0.008 ppm | ATSDR | 1 year or longer | Public |

ppm = parts per million
IDLH = Immediately Dangerous to Life and Health
STEL = Short Term Exposure Limit
PEL = Permissible Exposure Limit
TWA = Time Weighted Average
TWA-CEILING = Exposure limit never to be exceeded, even momentarily
REL = Recommended Exposure Limit
ELGV = Exposure Limit Guideline Value
AQGV = Air Quality Guideline Value
MRL = Minimal Risk Level
OEL-M = Mean Occupational Exposure Limit
JSOH = Japan Society for Occupational Health
NIOSH = National Institute for Occupational Health and Safety (Federal Agency)
OSHA = Occupational Safety & Health Administration (Federal Agency)
ACGIH = American Conference of Governmental Industrial Hygienists (Professional Association)
WHO = World Health Organization (Coordinating International Health Authority of the United
Nations System)
Cal EPA = California Environmental Protection Agency
ATSDR = Agency for Toxic Substances & Disease Registry

ALX-EXP-16-000034