Lila F. Laux
May 29, 2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER            *        MDL NO. 1873
       FORMALDEHYDE            *
       PRODUCTS LIABILITY      *        SECTION: N(5)
       LITIGATION              *
                               *
Charlie Age, et al., v.        *
Gulf Stream Coach Inc, et al.  *
Docket No. 09-2892             *

VIDEOTAPE ORAL DEPOSITION OF
LILA F. LAUX, Ph.D.
May 29, 2009

        VIDEOTAPE ORAL DEPOSITION OF LILA F. LAUX,
Ph.D., produced as a witness at the instance of Gulf
Stream Coach, Inc., and duly sworn, was taken in the
above-styled and numbered cause on the 5th of May, 2009,
from 12:14 p.m. to 7:37 p.m., before Carla D. Capritta,
RPR, in and for the State of Colorado, reported by
machine shorthand, at the conference room of Embassy
Suites-Denver Airport, 7001 Yampa Street, Denver,
Colorado  80249, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

Lila F. Laux
May 29, 2009

1   societies?

2       A.    Those are the ones that, yeah, are fairly

3   current, right.

4       Q.    Your employment history, you were a teacher

5   from 1961 to 1968; is that correct?

6       A.    Yes.

7       Q.    Okay.  Then you went to Germany for about ten

8   years?

9       A.    I think it was eight.

10      Q.    Okay.  And then, thereafter, you went to

11  academic -- different adademic postings where you were

12  doing research; is that accurate?

13      A.    Not quite.  I then went to the University of

14  Southwest Louisiana and was working on my master's.  And

15  during that time, I was also teaching and working in the

16  counseling center, that's true.

17           And then from there, I went to Rice, where I

18  started working on my Ph.D.  And then my second year

19  there, I was hired by Baylor College of Medicine to be

20  on the staff of the community medicine program, and then

21  later became part of the faculty there.

22      Q.    That was in 1985 when you became a member of

23  the faculty?

24      A.    No.  I became a member of the faculty much

25  earlier than that, but I can't remember exactly what

Lila F. Laux
May 29, 2009

1  year.

2          Q.    And you held that post until when?

3          A.    Until I moved away from Houston, which, I

4  think, was 1994.  And I still am an adjunct there, at

5  least I was the last time I checked.  I probably need to

6  check it and see if my -- if it's still active.

7          Q.    While in the univer- -- while at Baylor

8  College of Medicine, were you in or around the students

9  when they were in classes and things like that?

10          A.    Medical students?

11          Q.    Yes.

12          A.    To some extent, yes.  But mostly I was doing

13  research in the community medicine centers.

14          Q.    When you moved to Colorado, it's my

15  understanding, you started working for US West

16  Technologies and then Qwest.

17          A.    Yes, um-hmm.

18          Q.    And what position did you told with them?

19          A.    I was probably a lead human factors engineer.

20          Q.    Okay.  What does a lead human factors engineer

21  do?

22          A.    Well, a lead human factors engineer apply --

23  applies the knowledge that human factors psychologists

24  have, to the design of systems.  So as a human factors

25  psychologist, I was trained to understand how people's

Lila F. Laux
May 29, 2009

Page 24

1    A.   I hope so.

2    Q.   Did you discuss with your husband any --

3    anything about this particular case?

4    A.   No.

5    Q.   Okay.  In your past history, did you ever

6    actually design an owner's manual for a product?

7    A.   No.  I -- we did some, you know, work with

8    General Motors, as you're probably aware, where we made

9    some suggestions, which were later followed, about the

10   owner's manual for vehicles.  But, no, I never designed,

11   outright, an owner's manual.

12   Q.   You were part of a team that was working with

13   General Motors?

14   A.   Yes, I was the lead, um-hmm.

15   Q.   And would those -- or was the end product from

16   your team ultimately put into commercial use by General

17   Motors?

18   A.   Well, yes and no.  And the reason I say that

19   is that we ultimately wrote a manual for General Motors

20   to follow when they designed their user manuals and

21   their warnings and labels for their vehicles, which they

22   then did use to help them design the warnings and so

23   forth that they put into their vehicles.

24   Q.   So it was a manual on how to write a manual?

25   A.   Exactly.

Lila F. Laux
May 29, 2009

1    Q.    Okay.

2    A.    Oh, and not just how to write a manual, but

3 how to develop warnings and how to figure out what

4 warnings you needed to have and how to test your

5 warnings and . . .

6    Q.    Have you ever written a warning that's been

7 put into commercial use?

8    A.    You mean on a product?

9    Q.    On a product line?

10    A.    I don't do that because I don't think that's

11 appropriate.

12    Q.    Why don't you think it's important?

13    A.    I didn't say I didn't think it was important.

14 I said --

15    Q.    I'm sorry.

16    A.    -- "I don't think it's appropriate."

17    Q.    Appropriate, I apologize.

18    A.    I don't think it's appropriate because when

19 companies come to me and ask me to develop warnings,

20 what I tell them is:  I will help you develop your

21 warnings, because the warnings have to belong to you.

22 They can't be my warnings.  They have to be your

23 warnings.  You have to believe in them.  You have to

24 accept them.  You have to be responsible for them,

25 and -- and make sure that they stay updated and that you

Lila F. Laux
May 29, 2009

1   whatever the findings are.

2          So if an outside expert comes in and says,

3   "Here's your warning," then the person who's going to

4   the manufacturer, or whatever, is not going to feel

5   connected to that warning and to the users who have to

6   get information from that warning.

7          Q.   So as new information's developed, it's

8   important for the company to go back and -- and act on

9   that information?

10         A.   Absolutely.

11         Q.   Okay.  Does that mean that the preceding

12  warning, if they act on it, was inadequate?

13         A.   Not if they included everything that they knew

14  and understood at the time and should have reasonably

15  been expected to know and understand.  Because sometimes

16  we do get new information that we were not aware of or

17  couldn't have been aware of earlier.  I guess that's the

18  most important consideration.

19         Q.   In past litigation have you actually drafted

20  prototypes of warnings?

21         A.   I have when I've been asked to do so.

22         Q.   Have you ever designed a warning specifically

23  for a travel trailer product?

24         A.   No, I haven't.

25         Q.   Okay.  Manufactured homes, have you ever

Lila F. Laux
May 29, 2009

1    drafted a warning for a manufactured home?

2         A.    I think I may have drafted a warning for a

3    stove in a FEMA trailer.

4         Q.    Do you remember the case that they hired?

5         A.    Well, it's -- no, I don't.  And I'm going to

6    give a deposition in it, in a couple of weeks, but I

7    don't remember the style.

8         Q.    Do you remember the manufacturer of the

9    trailer?

10        A.    No, I don't.

11        Q.    Is that case in Louisiana?

12        A.    I believe so.

13        Q.    Which attorney are you --

14        A.    His name is Michael Breden, I think.  Or Batt,

15   B-a-t-t, is his name.  I think the person that I've

16   dealt with the most is Michael Breden, and I'm not sure

17   he's an attorney.

18        Q.    Where does Michael Batt have his office?

19        A.    I don't know that it's Michael Batt.  I don't

20   know his first name, Mr. Batt.  I think they're in New

21   Orleans.

22        Q.    Have you ever consulted with a travel trailer

23   manufacturer?

24        A.    No.

25        Q.    Have you ever consulted with the manufacturer

Lila F. Laux
May 29, 2009

1   specifically about travel trailers when I ask you about

2   travel trailers.

3        A.   Right.

4             MR. PINEDO:   Objection to form.

5        A.   I understood that.   And that's why I tried to

6   clarify that.

7        Q.   (By Mr. Glass)   I appreciate that.   Have you

8   tested the effectiveness of any warnings that are

9   contained in travel trailers?

10       A.   No.

11       Q.   Have you tested the effectiveness of any

12  information that's provided in any travel trailer

13  manufacturers owner's manual?

14       A.   No.

15       Q.   There are a number of agencies that may touch

16  on some of the issues that we're going to go into here

17  today.   I think that you may have done either some

18  reports or presentations to one of those, the American

19  Society of Testing Materials.   Have you done some

20  publications or some reports for them?

21       A.   I did a paper for them, which was supposed to

22  be published, but they actually never published it.

23  It's the -- the paper and the presentation we provided

24  to them.   We did go to the conference and present the

25  paper, but the proceedings never did get published.

Lila F. Laux
May 29, 2009

Page 45

1    together after I wrote the report.

2        Q.   I don't want you to do it today, and

3    especially not during this deposition, given the time

4    constraints, but I would ask that -- I will attach all

5    the disks to this deposition, and I'm assuming that,

6    since you generally do look at your transcripts and sign

7    them, if at that time you would go through and -- and

8    confirm that everything that you're looking at is

9    something that you looked at when you drafted the

10   report.

11       A.   What's listed in my report is what I looked

12   at.  That much we can be sure of.

13       Q.   Okay.

14       A.   So if it isn't listed in my report, I haven't

15   seen it prior to my report.

16       Q.   Okay.  That helps me out tremendously.

17   Plaintiff fact sheets, subfolder there.  There are two

18   PDF files, one for Alana Alexander and one for

19   Christopher Cooper.

20            And then the last folder is labeled "Testing,"

21   and it contains two PDFs, I believe, as well.  Yes, it

22   does.  One's labeled May 18th, 2009, and one is labeled

23   May 6, hyphen, 7, '09 which, I assume -- which, I know,

24   are testing results that were done on those days.

25            You looked at those before the drafting of

Lila F. Laux
May 29, 2009

Page 79

1    Q.    Okay.  Do you have to rely on other areas of

2    expertise when formulating your opinions in the human

3    factors arena?

4    A.    I do typically rely on medical doctors,

5    chemists, physicists.  In fact, in all this work I'm

6    doing with NASA, I'm having to rely heavily on the

7    astronauts, who have been in space themselves, to tell

8    me what kinds of problems they had in interacting with

9    the interface.

10         So, sure, I look for any source of expertise

11   to help me identify what the issues should be.

12   Q.    Okay.  Are your opinions regarding the human

13   factors analysis only as good as the information that

14   you're provided by these other experts?

15   A.    No.  I have expertise independent of those

16   other experts.  Certainly if those other experts provide

17   me with egregiously wrong information and say, you know,

18   that formaldehyde is going to kill you in one second or

19   formaldehyde is never going to hurt you, for instance,

20   then, yes, that could, if I relied on a single source of

21   information.  That's why I try to get multiple sources

22   of information.

23   Q.    If you are provided inaccurate information by

24   an expert, in an area that you don't claim expertise,

25   are your opinions necessarily inaccurate?

Lila F. Laux
May 29, 2009

Page 80

1      A.    Well, I guess it would depend on what the

2   opinion is and who I -- how I based -- what -- what what

3   credence I gave to that or what weight I gave to that

4   expert's opinion.

5      Q.    Okay.  I'm kind of jumping ahead a little bit

6   here, because I don't think I've still understood

7   exactly what your normal procedure is in evaluation, but

8   I think this is important enough to continue along.

9           In -- for instance, in this case, are you

10  professing any expertise in toxicology?

11     A.    No.

12     Q.    Are you relying on toxicologists' reports for

13  information as to whether formaldehyde constitutes a

14  hazard in this case?

15     A.    Well, I'm relying on reports from CDC and

16  other agent -- government agencies, yes.

17     Q.    Okay.  Do you rely -- or do you have any

18  expertise in civil engineering?

19     A.    No.

20     Q.    So are you able to offer any specific opinions

21  as to the design of travel trailers or alternative

22  designs that are available?

23     A.    No.

24     Q.    Okay.  Do you have any expertise in chemistry?

25     A.    Well, I did teach high school chemistry at one

Lila F. Laux
May 29, 2009

Page 81

1   point in my life.

2       Q.   Are you offering yourself as an expert in

3   chemistry in this case?

4       A.   No.

5       Q.   I --

6       A.   You know that I'm offering myself as a human

7   factors engineer.

8       Q.   I understand that, ma'am.  But I -- I'm still

9   going to ask you these questions.

10      A.   All right.

11      Q.   Okay?  Are you an expert in the area of

12  industrial hygiene?

13      A.   No.

14      Q.   Okay.  Are you relying on industrial hygienist

15  report in this case?

16      A.   There may have been someone from ACHIG or

17  whatever.  But, you know, basically I was relying on

18  information that's available from CDC and the other

19  federal agencies and other entities that are expert in

20  chemistry and who have written MSDSs and other forms of

21  data.

22      Q.   Are you an expert in emergency relief

23  response?

24      A.   No.

25      Q.   Okay.  Are you an expert in disaster relief

Lila F. Laux
May 29, 2009

Page 83

1      A.    Only to the extent that I believe that I know

2   that the manufacturers have a duty to warn people when

3   they know about hazards that their products are going to

4   expose them to.  I don't consider that expertise in

5   legal duties.

6      Q.    And, in fact, have you called those -- I think

7   you've called them various things over the years, maybe

8   decency standards or human factors standards.  Is that

9   accurate?

10     A.    I don't know that I've ever called them a

11  decency standard.

12     Q.    Okay.

13     A.    That sounds completely new to me.  But I may

14  have -- I may have -- I don't know that I've ever called

15  them human factors standards either.

16     Q.    Okay.

17     A.    But certainly that's the human factors

18  perspective, that we want to inform people if they're

19  going to be exposed to a hazard.

20     Q.    And I think you've already said that you're

21  not an expert in the area of travel trailer manufacture.

22     A.    Definitely not.

23     Q.    Okay.  Have you ever taken courses in travel

24  trailer design or engineering?

25     A.    Are there such courses?

Lila F. Laux
May 29, 2009

Page 84

1    Q.   I'm asking you if you've ever taken any.

2    A.   No.

3    Q.   Okay.  Have you ever taken any courses in -- I

4  mean, excuse me, have you had any training or

5  investigation regarding component parts of a travel

6  trailer?

7    A.   No.

8    Q.   Performed any investigation in the process of

9  manufacturing a travel trailer?

10   A.   Beyond what I read in the documents that were

11  provided to me, I have no other -- have not done any

12  other research in the manufacture of travel trailers.

13   Q.   Have you inspected any travel trailer plants?

14   A.   No.

15   Q.   Wood product manufacturers plants?

16   A.   No.

17   Q.   Have you ever designed warnings for a travel

18  trailer?

19   A.   No.

20   Q.   An owner's manual for a travel trailer?

21   A.   No.

22   Q.   Okay.  Let's go back to talk a little bit

23  about the process that you go through.  You -- you

24  mentioned that you do what I called information

25  gathering.  Then you went into the hazard pattern

Lila F. Laux
May 29, 2009

1    Q.   And once, okay, you get to the point, after

2    those steps, where you feel like there's something else

3    that needs to be done to communicate the alleged hazard,

4    where -- where do you fall in on that process?

5    What's -- is there something else that you need to do

6    or --

7    A.   Well, then I look at sources of information

8    that are out there that might provide that information,

9    and try to identify ways in which that information could

10   be provided to the people who need it.

11        And that's when I opine about the need for

12   warnings and the content of those warnings and how the

13   warnings should be presented.  And what I expect the

14   response of the warnee -- if you want to call it that,

15   the person who's being warned -- to be if the warning is

16   adequate.

17   Q.   In that third step, where you're talking about

18   the -- whether it affected the behavior and their

19   understanding of the warnings, do you, as part of your

20   methodology, test the adequacy of any alternate proposal

21   or alternative proposal of warnings or information

22   communicated to the end-user?

23   A.   Do you mean, do I go out and find a group of

24   people who are representative of the people who should

25   have been receiving this information and present them

Lila F. Laux
May 29, 2009

1    with a prototype warning and try to determine whether my

2    prototype warning is adequate or not?

3         Q.   Yes.

4         A.   I have done that.  I haven't done it in this

5    case.  In some cases, I have done it.

6         Q.   Okay.  Is that relevant to your normal

7    evaluation when you're retained in a case, to test

8    whether there is some alternative system that would have

9    effectively communicated whatever information was

10   lacking?

11        A.   That would be ideal, but it doesn't typically

12   happen, no.

13        Q.   Okay.  So it's not part of your normal --

14        A.   I wouldn't say it's part of my normal or not

15   normal.  I mean, it -- when I have a chance to do it, I

16   do appreciate doing it.  But I don't always get the

17   chance to do it.

18             And I do have other ways of evaluating any

19   potential warning.  You know, I teach a class in the

20   University of Wisconsin on how to evaluate warnings, and

21   I provide a checklist for them to use in determining

22   whether their warnings that they're proposing are

23   adequate.  So I can -- I do use that kind of evaluation

24   of proposed warnings when I have them.

25        Q.   In this particular case when you were

Lila F. Laux
May 29, 2009

Page 90

1    retained, did you follow your normal procedure in

2    evaluating the system and the information?

3          A.    I did, yes, follow my normal procedure, that's

4    correct.

5          Q.    You performed the information gathering

6    process, and then subsequently identified whether there

7    was a potential hazard with the -- the situation that

8    you were evaluating?

9          A.    I did.

10         Q.    Okay.  Did you conclude that there was a

11   hazard?

12         A.    I did.

13         Q.    And what is that hazard?

14         A.    The hazard is the chronic exposure to

15   formaldehyde or even short-term exposure to formaldehyde

16   can be a hazard under certain circumstances.

17         Q.    And what is the basis of that opinion?

18         A.    Well, you can look at all the documents in the

19   file that, you know, I looked at from CDC and other

20   agencies, as well as the OSHA, I think -- no, NIOSH

21   chemical handbook.  I mean, there are all kinds of

22   sources of information that tell you what the exposure

23   levels are that are safe.

24         Q.    Is there a medical -- or a consensus in the

25   medical community that there is a hazard, as you've

Lila F. Laux
May 29, 2009

1    described, from chronic or short-term exposure to

2    formaldehyde?

3        A.    Yes.

4        Q.    There's a medical consensus?

5        A.    I believe there is a medical consensus that

6    there is a hazard associated with exposure to

7    formaldehyde, both short-term and chronic, if at certain

8    levels.

9        Q.    Okay.  What are those certain levels?

10       A.    Well, there isn't consensus about what the

11   levels are for chronic exposure.  They range from .05 to

12   .1 parts per million.  But for OSHA, for instance, I

13   think it's .75 parts per million for a 40-hour PEL.

14   Which means that for a healthy adult, working for

15   40 hours, their exposure could be as high as .75 parts

16   per million.

17       Q.    Have you seen any studies or heard of any

18   studies, performed by other people in the medical

19   community, that totally disagree with the levels that

20   you're talking about as constituting a health hazard?

21       A.    I haven't seen any medical articles that

22   totally disagree, you're right.  There are other values

23   that are presented in some other materials.  I'm looking

24   at the ones that are in various standards.  Like OSHA,

25   and for manufactured homes and things like that, there

Lila F. Laux
May 29, 2009

Page 129

1          A.    There was a gas -- a propane stove, I believe.

2          Q.    Was there a heater?

3          A.    There was a heater, but it didn't work.  She

4     used an electrical heater, is my understanding.

5          Q.    An electrical heater in time the -- inside of

6     the trailer?

7          A.    Yes, one that she plugged in.  That's my

8     understanding.

9          Q.    Do you know if there was an ionizer used by

10    Chris Alexander while he was in the travel trailer?

11         A.    You mean a nebulizer?

12         Q.    Any kind of -- you know, like a Sonic Breeze

13    from Sharper Image or any of the ionizers that -- that

14    cleanse the air.

15         A.    Not that I know of.

16         Q.    Okay.  So just like you can't tell what

17    concentration of formaldehyde is in this room because

18    you don't know what the ventilation is, you don't know

19    what the off-gassing is, you -- you can't tell what the

20    concentration, though, is in any of these travel

21    trailers without determining that, correct?

22         A.    No.  But there -- I saw data that indicated

23    that they have been -- it had been assessed.  As I said,

24    you know, I'm making this assumption.  If I'm wrong,

25    that there was no off-gassing in these travel trailers

Lila F. Laux
May 29, 2009

Page 130

1    or that the level of off-gassing was insignificant, then

2    so be it.

3        Q.   Okay.  That's -- that's a really interesting

4    point.  So you've come to the conclusion that this is a

5    hazard, based upon the information that was provided to

6    you by some additional experts, and what you've

7    reviewed.  But as you've just indicated, if, through

8    these proceedings, it's determined that the level that

9    existed in this specific unit wasn't a hazard, then your

10   opinions are wrong?

11           MR. PINEDO:  Objection, form.

12       A.   It would be irrelevant if there's -- if it

13   turns out that there was no formaldehyde exposure that

14   caused Chris Cooper to develop additional symptoms or

15   that posed any threat to anybody in these -- in any of

16   these travel trailers, then my opinion would be

17   irrelevant.

18       Q.   (By Mr. Glass)  Well, I want you to focus just

19   on the specific trailer at issue here, which is the unit

20   that was used by Ms. Alexander and her son Chris.  If

21   it's determined that the level of formaldehyde that was

22   in this trailer is such that it didn't constitute a

23   hazard, then, as you said, your opinions regarding

24   warning irrelevant.  Is that accurate?

25       A.   I suppose that if you -- I mean, the weight of

Lila F. Laux
May 29, 2009

1    the evidence, he was ill, his doctors believe that it

2    was caused by formaldehyde exposure.  So, you know, I

3    have a logical reason for making that assumption.

4         Q.   Okay.

5         A.   It's not like I plucked it out of thin air.

6         Q.   I -- I -- I'm just making sure I'm

7    understanding what the source of your opinion is.  And

8    as you've just said, it's based upon what her doctors --

9    what Chris Cooper's doctors, such as Janet Barnes and

10   Ms. -- or Dr. Panchenko and the others, have said.  Is

11   that accurate?

12        A.   Well, that's accurate that his asthma was

13   exacerbated by exposure to formaldehyde, correct.

14        Q.   But if it is established, as I said, that

15   it's -- that the levels that were existing in this

16   trailer did not constitute a hazard, then the opinions

17   regarding whether this -- where a warning should

18   accompany this trailer, this particular trailer, are not

19   relevant to this case?

20        A.   Well, I don't think that makes any sense,

21   because this trailer was not manufactured for Alana

22   Alexander.  So I'm talking about travel trailers that

23   were produced by Gulf Stream and what they told the

24   people out there who were going to be using their

25   trailer.

Lila F. Laux
May 29, 2009

Page 154

1    that.

2        Q.    Okay.  Well, when we get to it, then the --

3    the first time, then you can explain it to me at that

4    point.

5        A.    All righty.

6        Q.    And you just used another variable.  You said

7    the extended period of time.  What do you consider

8    extended periods of time?

9        A.    Well, I consider any -- anything living in

10   a -- in a trailer -- and it's not just going camping,

11   but living in a trailer -- represents that you are in

12   there for an extended period of time.

13       Q.    Living --

14       A.    Does that mean more than a week, more than two

15   weeks?  Probably.

16       Q.    More than two weeks is an extended period of

17   time?

18       A.    Depending on the exposure you get.  These

19   things are -- you know, you've got the -- if you have

20   control in one variable, like the length of time, you

21   have to consider all the other variables that go into

22   play when you make that decision.

23       Q.    First opinion, contained on Page 8:

24   Ms. Alexander's decision to accept and live in the Gulf

25   Stream Cavalier was a reasonable decision given the

Lila F. Laux
May 29, 2009

Page 155

1    information she was provided.

2            What information was she provided?

3        A.    Not much.

4        Q.    Okay.  Well, that -- that's not specific

5    enough for me.  Can you tell me what information?

6        A.    She was told that she was going to get a FEMA

7    trailer.

8        Q.    Were there any warnings contained on the

9    product?

10       A.    Yes.

11       Q.    Okay.  What warnings?

12       A.    Well, I think there was a warning about

13   propane, and there were probably others.  I don't recall

14   them all, but I know that there were some other warnings

15   or alerts.  But I just don't remember what they are at

16   this moment.

17       Q.    What information was provided to Ms. Alexander

18   in the owner's manual?

19       A.    Do you want me to get it out and read it?

20   Because otherwise, I mean, there's a lot of information

21   in that owner's manual.  I have no idea what you're

22   asking me.

23       Q.    What I'm asking you is, your opinion is that

24   their decision to live in the trailer, Ms. Alexander's

25   decision to live in the trailer, is based on information

Lila F. Laux
May 29, 2009

Page 156

1    provided.  And I'm just trying to determine what

2    information you were referring to.  Does that include

3    the information in the owner's manual?

4         A.   I don't think so.  She'd already made the

5    decision to accept and live in the trailer probably

6    before she saw the owner's manual.

7         Q.   That's all -- that's all I'm trying to

8    determine, ma'am.

9              Your next portion of that opinion is:  Her use

10   of the trailer was a reasonably anticipated use of the

11   trailer by Gulf Stream.

12             Okay.  How did she use the trailer?

13        A.   She lived in it.

14        Q.   Okay.  How long did she live in it?

15        A.   Well, you just told me she lived in it almost

16   19 months.

17        Q.   Did she use the air conditioner?

18        A.   Some.

19        Q.   When you say "some," what do you mean, "some"?

20        A.   Well, she didn't run it 24 hours a day, 7 days

21   a week, 12 months in the year, no.

22        Q.   She told you that?

23        A.   Yes.

24        Q.   What temperature did she set the air

25   conditioner at?

Lila F. Laux
May 29, 2009

Page 157

1      A.    I don't know.

2      Q.    Did she use the ceiling vents?

3      A.    I believe so, but I can't swear to that.

4      Q.    Did she use the humidifier?

5      A.    I don't -- you mean a dehumidifier?

6      Q.    A dehumidifier.

7      A.    I believe she might have, but I can't swear to

8   that either.

9      Q.    How many people stayed in the travel trailer?

10      A.    She and her two children.

11      Q.    Did anybody else stay in the trailer at any

12   time?

13      A.    I have no idea.  Over 18 months, I imagine

14   someone else did, but I don't know who it was.

15      Q.    How many people -- what was the most number of

16   people that ever resided in the trailer at one time?

17      A.    I have no idea.

18      Q.    Did she cook in the trailer?

19      A.    I believe she did.

20      Q.    You said she used an electric trailer,

21   correct -- I mean, excuse me, an electric heater inside

22   the trailer?

23      A.    That's what I understood.

24      Q.    Okay.  Do you know how much Btus that heater

25   put out?