Lila F. Laux
May 29, 2009

Page 158

1      A.    No.

2      Q.    Okay.  Do you know how often she used

3   that tra- -- or the heater?

4      A.    No.

5      Q.    Okay.  Do you know if there are any

6   recommendations or warnings regarding using electric

7   heaters in the trailer?

8      A.    Recommendations by Gulf Stream, you mean?

9      Q.    Yes, ma'am.

10      A.    Or FEMA?

11      Q.    Either one.

12      A.    I might have seen something.  I don't really

13   recall.

14      Q.    Do you know what she cooked in the travel

15   trailer?

16      A.    Food.

17      Q.    What kind of food?

18      A.    I have no idea.

19      Q.    Does it matter in regard -- in regards of the

20   off-gassing of formaldehyde?

21      A.    It might.  But I don't think that the Gulf

22   Stream said:  Well, let's see.  If she's making red

23   beans and rice, we better warn her about this; but if

24   she's making shrimp gumbo, we better warn her about

25   that.

Lila F. Laux
May 29, 2009

1     Q.    Did she maintain the travel trailer?

2     A.    She tried to.

3     Q.    What did she do to maintain the travel

4     trailer?

5     A.    She cleaned it; and when she saw mold on it,

6     she washed it off with Clorox water; and things like

7     that.

8     Q.    How often did she clean it?

9     A.    Oh, gosh, I have no idea.  As often as it

10    needed it, I'm assuming.

11    Q.    Okay.  Did she have pets in the trailer?

12    A.    I don't know.  I didn't think so.  She didn't

13    mention them.

14    Q.    Did you specifically ask?

15    A.    No, I didn't.

16    Q.    Did she have plants in the trailer?

17    A.    I don't know.

18    Q.    Do you know if she maintained the different

19    components of the trailer according to the maintenance

20    schedule in the owner's manual?

21    A.    Well, I know she called the people who were

22    supposed to be doing the maintenance and had some

23    trouble with that, so I kind of doubt that the

24    maintenance took place on the schedule that it was

25    supposed to take place.

Lila F. Laux
May 29, 2009

1    A.   Haven't seen those studies.

2    Q.   Okay.  The next opinion is No. 6:  Not

3  informed that even low levels of formaldehyde exposure,

4  if chronic, could cause serious health problems in

5  children, adults with respiratory problems, and/or who

6  were sensitive to formaldehyde.

7         Same question:  The medical support, when

8  you're -- you're talking about low levels, what level

9  are you -- you referring to?

10   A.   Well, let's just go with .05 or even .03,

11  which are some of the ones that have been recommended,

12  or .003.

13   Q.   Parts per million?

14   A.   Yes.

15   Q.   I'm sorry.  You said .3 as well, or did you

16  say point --

17   A.   .03.

18   Q.   Okay.  And then you said .003?

19   A.   Right.

20   Q.   And when you say chronic, is there any

21  particular time that you classify as chronic?

22   A.   Well, chronic means over time, of course.  So,

23  you know, it depends on how you want to define it.  But

24  I would say people who are living in trailers are

25  chronically exposed.  They're exposed for a long --

Lila F. Laux
May 29, 2009

Page 180

1    well, you know, 24 hours a day, potentially.  And

2    they're living there, so they're exposed for days on

3    end.

4            I mean, I don't know of any definition in the

5    medical literature that defines chronic as beginning at

6    day seven and ends at -- you know, if it's day six, it's

7    not chronic.

8        Q.   Okay.  So applying the numbers that you did,

9    that you just gave me, so Ms. Alexander was not informed

10   that even at low levels, which could be .05 parts per

11   million or .03 parts per million or even .003 parts per

12   million of formaldehyde exposure, if chronic, could

13   cause serious health problems in children, adults with

14   respiratory problems, and/or who are sensitive to

15   formaldehyde.  That would also be accurate?

16       A.   Are you asking me -- what are you asking me?

17       Q.   What I'm asking you is, if I substitute in any

18   of the three standards -- or, I'm sorry, numbers for the

19   exposure level, instead of just saying low level, would

20   it still be an accurate statement?

21       A.   Well, you're probably right, but that wouldn't

22   be what I would tell her.  Because she doesn't know how

23   to assess whether it's .05 or .003 or anything like

24   that.  I mean, you wouldn't inform her of those levels.

25       Q.   I understand.  What I'm -- what I'm just

Lila F. Laux
May 29, 2009

1    trying to understand is, you've suggested that Gulf

2    Stream Coach should have provided certain information to

3    her, and I'm -- I want to make sure that if there is a

4    product out there, at a chronic level of exposure, which

5    you've defined as low levels which could include .05,

6    .03 or .003, that there's some obligation to convey that

7    information.  And I'm assuming that wouldn't be just for

8    travel trailers; that would be for anything.

9              MR. PINEDO:  Objection, form.

10   A.    Well --

11   Q.    (By Mr. Glass)  Is that accurate?

12   A.    No, it's not accurate.

13   Q.    Okay.

14   A.    Because you have to take the other things into

15   consideration; that she -- it's a small space; that

16   you're exposed for long periods of time.  So there --

17   you know, and if there are other conditions in the

18   environment.

19              So there may be times when you and I are

20   exposed to low levels, but we don't live in them; we

21   aren't enclosed in them, like in a closet, where we're

22   breathing them 24 hours a day.  So this travel trailer

23   circumstance creates a very different situation.

24   Q.    Ma'am, I'm -- I'm using the exact language,

25   and I under -- let me finish before you -- you jump in.

Lila F. Laux
May 29, 2009

Page 182

1          "Ms Alexander was not informed that even low

2     levels of formaldehyde exposure, if chronic," so that's

3     part of the statement, "could cause serious [and]

4     health" -- "serious health problems in children and

5     adults with respiratory problems and/or who are

6     sensitive to formaldehyde."

7          My question to you is, if -- is that statement

8     true to other types of products; that if there is

9     chronic exposure to low levels, as defined by .05, .03

10    or .003, that the person manufacturing the product

11    creating that exposure should provide some warning

12    information?

13       A.   Should provide some information, that's right.

14       Q.   Okay.  That's all I wanted to make sure.  Your

15    next opinion, No. 7:  Gulf Stream knew or should have

16    known that the Cavalier travel trailer they manufactured

17    could reasonably be expected to create elevated levels

18    of formaldehyde gas in the interior of the trailer.

19          You know I'm going to ask the question.

20    What's an elevated level?

21       A.   Well, a level greater than .05, let's say.

22       Q.   Okay.

23       A.   Or whatever level has been established by

24    health professionals to be a hazard to someone who has

25    asthma, who is elderly, you know, who has other

Lila F. Laux
May 29, 2009

1        MR. PINEDO:  Can we take a break?

2        MR. GLASS:  Sure.

3        THE VIDEOGRAPHER:  We are going off the

4   record.  The time is 16:12:08.

5            (Recess taken from 4:12 p.m. to 4:25 p.m.)

6        THE VIDEOGRAPHER:  We are back on the record.

7   The time is 16:25:03.

8        Q.   (By Mr. Glass)  Before we get started back up,

9   I want to -- I'm going to lose track of the things that

10  I've requested here, and I may have some additional

11  things I want to request.  You're telling me, on any

12  request for documentation that -- that I brought up, I

13  need to shoot that to Chris, and then we'll work on

14  getting that?

15       A.   That's my understanding, that that's the

16  appropriate way to do things.

17       Q.   Okay.  Things -- just to make sure it's on the

18  record and keeping track --

19       MR. GLASS:  And if you want to take note of

20  it, Chris, because it'll be coming as soon as I can get

21  it to you.

22       Q.   (By Mr. Glass)  -- I would like to see the

23  article that you wrote on the MSDS that you provided to

24  the ATS.

25       A.   If I can get it.

Lila F. Laux
May 29, 2009

1     Q.    I understand.  The course material that you

2   use up at University of Wisconsin, Madison.

3     A.    Which year?  I've been doing it for 15 years,

4   so there's 30.

5     Q.    Your most recent --

6     A.    Okay.

7     Q.    -- course material.  The -- see, I've already

8   forgotten some of it.

9     A.    I'll have to check with them to make sure,

10  because it's copyrighted by them, but I don't think

11  there'll be any problem.

12    Q.    Well, if you need me to do it in the form of

13  subpoenas, so we can avoid any copyright issues, I'll do

14  that, but --

15    A.    I don't think that'll be necessary, but if so,

16  I'll let you know.

17    Q.    And then I think you mentioned that you

18  drafted a prototype warning for a travel trailer, and I

19  understand it involved the stove for --

20    A.    It was for the stove.  I think I did.  I know

21  I wrote a report, and I think I used it.

22    Q.    Well, I would -- if you've written a warning

23  specific for that, I would like to see that as well.

24          Gosh, there was something else too.  It'll

25  come back to me.  Oh, I know, it was -- it'll be the

Lila F. Laux
May 29, 2009

1    source materials for some of the medical opinions that I

2    was asking you about.

3            MR. PINEDO:  If you could be specific on that,

4    which medical opinions?

5            MR. GLASS:  I -- I will -- I will point it out

6    specifically to you.  But she indicated, I believe, that

7    she didn't know, off the top of her head, but she could

8    go back and look and see where they came from.  And I'll

9    tell you exactly which opinions.

10           MR. PINEDO:  Okay.

11           MR. DINNELL:  I'll just jump in quickly.

12   There was a checklist that you referenced earlier, that

13   you used to assess warnings.  A copy of that

14   checklist --

15           THE DEPONENT:  Okay.

16           MR. DINNELL:  -- is something that we want.

17           THE DEPONENT:  Sure.

18           MR. GLASS:  Checklist.  Okay.  I will pass

19   that warning -- I mean, that list to you, first, so you

20   can look at it, Adam.

21           MR. DINNELL:  Great.

22       Q.  (By Mr. Glass)  All right.  I think we left

23   off on No. 14 -- no, 13:  Gulf Stream knew or should

24   have known that the enclosed small volume of the Gulf

25   Stream Cavalier, the formaldehyde fumes would be

Lila F. Laux
May 29, 2009

1    outside of education and experience.  You could expose

2    them to the hazard and say, you know, "Put your hand on

3    there," and when they felt that they were burned, they

4    would understand that they shouldn't put their hand on

5    there.

6         Q.    Is there -- okay.  But can information be

7    conveyed to -- to a group of people, about a hazard,

8    through the media?

9         A.    Yes.

10        Q.    In fact, you've actually testified that

11   that's -- a public service campaign is one way that you

12   can actually inform people about situations, correct?

13        A.    Sure, but that's a warning.

14        Q.    Okay.  What was the media coverage regarding

15   formaldehyde and in travel trailers, say, in early 2006?

16        A.    I don't know.

17        Q.    How about the summer of 2006?

18        A.    I don't know.  I can't be sure that

19   Ms. Alexander ever heard anything or saw anything on TV

20   about this.  I have no idea whether she did or not.  I

21   don't even know if it was put out there.

22        Q.    And following Hurricane Katrina, did you see

23   any news coverage that talked about potential

24   formaldehyde in travel trailers in the Gulf Coast?

25        A.    No, I didn't.

Lila F. Laux
May 29, 2009

1      Q.    You never saw a single news story on it?

2      A.    No, I didn't.

3      Q.    Did you do any kind of research regarding

4   the media outlets in the Gulf Coast region, regarding

5   reporting on formaldehyde in travel trailers?

6      A.    I saw some that came along in 2006 and 2007; I

7   saw something on MSNBC; things like that, that were sort

8   of people pieces, you know, where they were talking

9   about this -- this elderly lady and her husband who were

10  exposed to things like that.

11          I didn't see any -- I didn't see anything from

12  the manufacturer saying:  Pay attention, we've

13  discovered that there is a -- you know, a problem with

14  formaldehyde in these trailers.  Here are the steps you

15  need to take.

16     Q.    Did you see anything, within your document

17  review, regarding communications between the

18  manufacturer and FEMA concerning the new reports that

19  were coming out following Hurricane Katrina?

20     A.    I did see something.  I don't know too much --

21  I don't recall too much what I saw, though.

22     Q.    Did you see any information coming from FEMA,

23  at any point, regarding potential formaldehyde exposure

24  in the trailers?

25     A.    There was quite a bit of information from

Lila F. Laux
May 29, 2009

1    FEMA.  Are you asking me if I saw anything that was

2    broadcast to the public?

3         Q.   Yes.

4         A.   No, I didn't.

5         Q.   Do you know if any specific documentation was

6    provided to every single aid recipient regarding

7    formaldehyde?

8         A.   I didn't see anything that told me that at the

9    time Mrs. Alex -- Ms. Alexander moved into her trailer,

10   that they were providing this information to every

11   single person who was moving into a FEMA trailer.  No, I

12   did not see that.

13        Q.   Hypothetically speaking, as someone who was

14   living in New Orleans following Hurricane Katrina, if I

15   tell that you there wasn't a day that went by where this

16   wasn't discussed by the summer of 2006, does that make

17   any difference as to whether the information was

18   conveyed to the aid recipients, the people living in the

19   travel trailers?

20        A.   Well --

21             MR. PINEDO:  Objection, form.

22        A.   -- who discussed it?  I'd have to know who

23   discussed it.  You said it was being discussed, but were

24   the right people discussing it?  Was it being

25   communicated to the people in the trailers?  And, if so,

Lila F. Laux
May 29, 2009

Page 208

1    had a duty to warn anyone who moved into this, or any of

2    the other trailers that they were producing, that there

3    was a likelihood that, because of the way the trailer

4    was constructed, they might be being exposed to levels

5    of formaldehyde that were high enough to cause them

6    injury and they needed to check it out.

7         Q.   And, of course, that presupposes that there's

8    a determination that the levels of formaldehyde that can

9    be present in these trailers reaches a level that would

10   be considered unreasonably dangerous under the Louisiana

11   law?

12        A.   Over an -- over an extended period of time.  I

13   mean, that --

14        Q.   I understand.

15        A.   -- this is the issue that we're talking about

16   here.

17        Q.   I understand.

18        A.   I know that there are standards that -- that

19   reduce the exposure limits, based on the amount of time

20   you're exposed.  And we know that if you're going to be

21   exposed over a year, the limits are very low.

22             So there's no one warning that you can put on

23   there that says there is a hazardous or there isn't a

24   hazardous.  You have to say:  You need to consider,

25   you're living in here, here -- here's the issue.  You

Lila F. Laux
May 29, 2009

Page 209

1    need to consider what's going on.  You need to find out

2    what it is.  You need to find out if you're sensitive to

3    it, all these issues.  So you need to be alerted, you

4    need to be informed and warned.

5         Q.   Okay.  And ultimately it comes down to the

6    concentration and the circumstances that are being

7    presented to you.  In this particular case, you're

8    saying long-term residents inside these trailers had

9    chronic exposure, they needed to be warned?

10        A.   I think they did.  And, I mean --

11        Q.   Okay.

12        A.   -- you know, even if you find out that today

13   the levels are very low, we can't know what the levels

14   were at the time she moved in.  But we can assume that

15   the levels were higher at that point than they are

16   today.

17        Q.   Okay.  I'll dispute that.  But, I mean, I

18   really want the source of where you can point to --

19        A.   Well, I -- I will --

20        Q.   -- some statistical analysis.

21        A.   -- certainly get you that.

22        Q.   But that being the case, there are other

23   products where people live, including manufactured

24   homes, correct?  And then the next opinion talks about

25   what's required from HUD to be included information when

Lila F. Laux
May 29, 2009

Page 210

1    people are purchasing and using a manufactured house,

2    correct?

3         A.   That's correct.

4         Q.   Is this an adequate warning?

5         A.   Well, no, I wouldn't consider it adequate.

6    But that's why I say, as a minimum, I think, in Mrs. --

7    Ms. Alexander's case, this would have done the trick.

8    Would I consider this adequate for every user of these

9    trailers?  No.

10        Q.   Well, you -- you like to talk about every

11   trailer and what Gulf Stream, as a manufacturer, should

12   have provided.  So you're saying, at a minimum, this

13   should have been provided to her.  Is that setting the

14   bar for, this is adequate?

15        A.   No.

16        Q.   Okay.  So even including this information,

17   exactly as you've opined in opinion No. 8 of your report

18   on Page 10, carrying over to Page 11, this is not --

19        A.   Oh, it's 18, not 8.

20        Q.   Oh, I'm sorry, 18.

21        A.   You got me confused there.

22        Q.   I'm sorry, 18.  This is on Pages 10 and 11.

23        A.   Right.

24        Q.   That, in your opinion, is not an adequate

25   warning?

Lila F. Laux
May 29, 2009

Page 211

1      A.    Not for the general public that can be

2   expected to be living in these trailers.  I think it

3   would have been adequate for Ms. Alexander.  But would I

4   advise that a manufacturer of travel trailers, who were

5   putting information into these trailers, would use just

6   that?  No, I wouldn't.

7      Q.    Okay.  But if Ms. Alexander was provided this

8   warning that you've laid out in 18, that would have been

9   sufficient for her to make a decision and make -- and

10  modify her behavior to potentially move out of this

11  trailer?

12     A.    I think so.  Although, you know, it's

13  important health notice, I think, since she had a child

14  that she knew had asthma.  And if it had been displayed,

15  I mean, it's supposed to be big print, a quarter of an

16  inch size.  And an important health notice is

17  three-quarters of an inch in size, and it has to be on

18  the kitchen cabinets where you can't miss it.

19     Q.    In a temporary manner, so it's not meant to be

20  permanently affixed.

21     A.    Well, no, of course it's not permanently

22  affixed.  It's there so that when you move it, you see

23  it.

24     Q.    So if it's established that Mrs. --

25  Ms. Alexander received this notice within a month of

Lila F. Laux
May 29, 2009

Page 212

1    moving into the trailer and she still didn't move out,

2    then your opinions regarding the adequacy of this

3    warning would be entirely inaccurate; is that correct?

4        A.    So you're saying she received this within a

5    month of moving in and --

6        Q.    Yes, ma'am.

7        A.    She did?  Well, if she did, then this is

8    inadequate.

9        Q.    Okay.  So if it was adequate before -- boy, I

10   love that.

11       A.    I didn't say it was adequate.  I said "at a

12   minimum."

13       Q.    Okay.  You said it was adequate for her.

14       A.    No, I didn't.

15       Q.    We'll go back and we'll get that on the

16   record.  That's great.  I love that, okay.

17       A.    But this is definitely not an adequate

18   warning.

19       Q.    Okay.  But you said it was adequate for

20   Ms. Alexander.

21       A.    I said it would have been adequate for her, if

22   she'd read it, yes, then it would.

23       Q.    And you just said that if it's shown that she

24   has that, then it was inadequate.

25       A.    It was inadequate for her, obviously.

Lila F. Laux
May 29, 2009

Page 213

1       Q.    Good.  I really appreciate that.

2       A.    It clearly didn't inform her what she needed

3   to know.

4       Q.    Can you reverse engineer any warning to

5   prevent or to allegedly address any hazard or incident

6   that occurred in the past?

7       A.    I don't know what you mean.

8       Q.    Okay.  Well, you just did it.  You just said

9   that, well, it's not adequate for her if she didn't

10  abide by it, so --

11      A.    No, I didn't say that.  I said if she didn't

12  understand it, if it didn't get through to her.  I mean,

13  giving it to her is one thing; knowing that she read it

14  and understood it is another thing.

15      Q.    Your testimony will stand for itself.  I don't

16  think I want to beat on this anymore.

17            You -- you -- you indicated, at the beginning

18  of this, before you laid out the HUD standard, that this

19  information was known prior to August 1984; is that

20  accurate?

21      A.    That is accurate.

22      Q.    Okay.  In 1984 we could have known what the

23  1993 amendment or the 1989 amendment was providing in

24  this -- this warning?

25      A.    You're saying, because this has been amended,

Lila F. Laux
May 29, 2009

Page 226

1    asthma.

2         Q.   Well, all those factors that you just

3    mentioned, they all the apply equally to the travel

4    trailers, correct?

5         A.   Sure.

6         Q.   Sure.

7         A.   But the travel trailer is small and the -- and

8    the fumes tend to get concentrated in there because they

9    don't have anyplace to go.

10        Q.   But that's -- again, that's my point.  It --

11   it -- you have -- it doesn't matter if you're talking

12   about a big building or a little building, the level of

13   formaldehyde is the level of formaldehyde.

14        A.   Well, that's true.  But, you know, if doors

15   are open and ventila- -- air comes in and out, you might

16   take it at one moment and the concentration might be X,

17   and five minutes later it might be very different;

18   whereas, in the travel trailer, I think the -- the

19   concentration is likely to be more stable.

20        Q.   What is the background level of formaldehyde

21   in some of the larger cities in the United States?

22        A.   It's pretty high, but I don't know what it is.

23        Q.   Would you -- would you consider that people

24   living in those cities are chronically exposed to those

25   levels?

Lila F. Laux
May 29, 2009

1    A.   Yes.

2    Q.   As its background?

3    A.   Yes.

4    Q.   Should those cities warn people that they

5  shouldn't live there?

6    A.   Well, maybe they should warn people that they

7  should take some kind of precautions.  Look at the

8  incidence of asthma and how it's going up.  I mean, we

9  know that it's part of the pollution in -- in city

10  environments.  And we know, from hospitals, that there's

11  a lot more people coming in with respiratory problems.

12    Q.   Let me show you what we've been talking about,

13  on some -- some level, for a little while here.  Did you

14  see what I will mark as Laux 8, a document that has a

15  FEMA stamp on it and it's Bates labeled FEMA 09, hyphen,

16  00386 and 87?

17    A.   I did see it.

18    Q.   Okay.

19    A.   In fact, I have it in my file.

20    MR. PENOT:  What is this?  This is Laux what?

21    MR. GLASS:  8.

22    Q.   (By Mr. Glass)  Okay.  You've said this is in

23  your file?

24    A.   Um-hmm.

25    Q.   And this is actually referenced in your --

Lila F. Laux
May 29, 2009

Page 228

1   port -- report, is it not?

2       A.   Yes, it is.

3       Q.   Okay.  Does this information convey adequately

4   the information that -- that you would consider

5   appropriate for Ms. Alexander to make a decision on

6   whether to stay in the trailer?

7       A.    Well, it wouldn't be the way I would do it, if

8   I were trying to warn someone about the presence of

9   formaldehyde.

10           It certainly is some information, but it

11  doesn't -- you know, it doesn't ever say "warning,"

12  even, or it doesn't even try to attract your attention.

13  It doesn't say how you should maintain the humidity at

14  40 to 50 percent.  It doesn't say how you should keep

15  the indoor temperatures monitored.  I mean, it -- and it

16  says, you know, it might affect you, and what -- and

17  what -- that's way down in the text.

18           These are -- these are not the sorts of things

19  that I would do to create a warning.

20      Q.   Okay.  So to answer my question, then, you

21  would not consider this to be adequate, an adequate

22  means of conveying the information that you feel

23  Ms. Alexander should have received?

24      A.   Nope, I don't think so.  When she moved into

25  that trailer, she needed something a lot more straight-

Lila F. Laux
May 29, 2009

Page 229

1   forward than this.

2        Q.    Okay.  Do you know when she -- if she received

3   this?

4        A.    I don't think she did.  I mean, I didn't --

5   she didn't tell me that she did, and I didn't see any

6   evidence that she did.

7        Q.    Do you know when FEMA distributed this?

8        A.    No.  I couldn't find out.

9        Q.    Okay.  Do you know if it was provided to all

10  of the recipients of FEMA trailers following Hurricane

11  Katrina?

12       A.    Not to my knowledge, it wasn't.

13       Q.    Okay.  Did you see where FEMA provided any

14  information beyond what we've marked as Laux 8?

15       A.    I did see something that talked about how to

16  turn the air conditioning on and ventilate your trailer

17  and things like that.  I have that, actually, in my file

18  as well, the one you're marking now.

19       Q.    I will mark this as Laux 9.  I don't have a --

20  oh, I do.  I apologize.  It's FEMA09, hyphen, 000388.

21  Do you know if the people that were provided trailers

22  after Katrina were provided with this document?

23       A.    Some may have been, but I don't believe

24  Ms. Alexander was.  I -- she certainly didn't say that

25  she had, and I didn't see any evidence that she had.

Lila F. Laux
May 29, 2009

Page 234

1     Q.   Have  you done any studies to -- to establish

2   that everyone understands that?

3     A.   Well, I probably shouldn't have said

4   "everyone."  I'm sure not all children understand it.

5   And there are probably elderly people who don't read the

6   newspaper or watch TV or read magazines or listen to the

7   radio, who may not understand it.

8         But I think the vast majority of Americans,

9   especially those who might smoke, have learned it.  Kids

10   are learning in it school.  Doctors' offices have

11   pamphlets.  Pediatricians tell their patients don't

12   smoke around your children.  I mean . . .

13     Q.   You have not been asked, in this litigation,

14   to craft what you feel would be an appropriate warning

15   to accompany these travel trailers?

16     A.   No, I haven't.

17     Q.   Is it your opinion that a warning could be

18   crafted such that this product could be put -- or this

19   product can be used in everyday life?

20     A.   Well, I think it's going to depend.  Each --

21   each trailer, the -- the people who live there are going

22   to have to determine whether they can get the

23   formaldehyde levels down to an acceptable level that

24   they're willing to accept.

25         And it's going to depend on the length of

Lila F. Laux
May 29, 2009

Page 241

1    there?

2         A.    Yes.

3         Q.    That she would have remembered that she got

4    this and that she would have told you that she got it,

5    right?

6         A.    That's my assumption.

7         Q.    All right.  Same for Laux No. 9.  You didn't

8    know, at the time that you spoke to her, that FEMA had

9    circulated Laux No. 9, or did you, to Gulf Coast

10   residents?

11        A.    No, I didn't.  And to be honest, I went to the

12   FEMA site and everywhere else, trying to find the dates

13   that these were published and what they did with them,

14   and there wasn't anything that told me.  Those were

15   there, but it didn't tell me anything about how they

16   were admini- -- distributed or when they were

17   distributed or anything like that.

18        Q.    So -- so once again, you -- of course, if you

19   didn't know it was circulated, you probably didn't ask

20   her if she had received it, expressly, correct?

21        A.    Well, I knew that these were circulated.  I

22   just didn't know if they'd been circulated at the time

23   when she moved into her trailer.

24        Q.    Okay.  So, but you did not specifically ask

25   her:  Did you, Ms. Alexander, get Laux No. 9?

Lila F. Laux
May 29, 2009

Page 242

1    A.    No, I didn't.

2    Q.    Okay.  So when you say she didn't get it,

3    again, you're assuming that she -- she would have

4    remembered and she would have had told you?

5    A.    Well, since I --

6    Q.    -- correct?

7    A.    -- specifically asked her what she received

8    when she moved into the trailer, which maybe is not the

9    appropriate question, because if these things were

10   circulated later, you know, I don't -- I didn't ask her:

11   Did you at some time other time get materials from Gulf

12   Stream?

13   Q.    Okay.  Or from FEMA?

14   A.    Or from FEMA.

15   Q.    You testified -- well, instead of me trying to

16   repeat what you said, let me just ask you if this

17   accurate:  That when -- it's your belief or your

18   understanding that when Ms. Alexander moved into the

19   trailer, she had a crack in the paneling, she talked to

20   FEMA, and they told her to tape it up.  Is that your

21   understanding?

22   A.    Well, it wasn't a crack in the paneling.  It

23   was where, evidently, two panels butt up against each

24   other and they were -- one of them had come kind of, I

25   guess you'd say, loose.

Lila F. Laux
May 29, 2009

Page 244

1   are assuming the truth of them, correct?

2        A.   There's no way I can know, other than being

3   told.

4        Q.   Right, okay.  But you've never looked at the

5   trailer yourself?

6        A.   No.  I've seen many pictures of it, but I've

7   never been into it, you're right.

8        Q.   And the pictures you saw were pictures that

9   were provided for you by your counsel, correct?  I

10  mean --

11       A.   Well, he's not my counsel, but --

12       Q.   Excuse me.  It's been a -- it's been a long

13  couple of days.  I apologize.  By the counsel who

14  retained you?

15       A.   That's correct.

16       Q.   And those pictures, are you aware of the date

17  of those pictures?

18       A.   4-17-2009.

19       Q.   Okay.  So they were -- they were made just

20  April of this year?

21       A.   Right.

22       Q.   Correct.  And more than a year, about a year

23  and a half, almost a year and a half, year and four

24  months, after the -- Ms. Alexander and Chris Cooper

25  moved out of the trailer, correct?

Lila F. Laux
May 29, 2009

1   however long.

2      Q.   Were you retained by the plaintiffs in the

3   Alexander/Cooper case?

4      A.   Yes, I was.

5      Q.   And what were you asked to do in that case?

6      A.   I was asked to evaluate the warnings and other

7   kinds of hazard information that were provided by Gulf

8   Stream to Ms. Alexander.

9      Q.   Did you review any materials related to that

10   case?

11      A.   Yes, a lot of materials.

12      Q.   Could you briefly tell us what kinds of

13   materials, what types of materials, you reviewed with

14   regard to the Alexander/Cooper case?

15      A.   Well, I was particularly concerned to know

16   what was known about the hazards associated with

17   formaldehyde, so the -- a lot of the research I did was

18   tracking down what's known about the hazards associated

19   with formaldehyde.

20        Then I was also interested in determining what

21   was known about the levels of formaldehyde in travel

22   trailers and other small, enclosed spaces, so I spent

23   some time tracking that down.

24        And then I was interested in knowing what

25   exactly -- what information exactly was provided to

Lila F. Laux
May 29, 2009

Page 298

1    Ms. Alexander, and so that was a part of what I looked

2    at in the materials that were provided to me by you.

3         Q.   And you understand that I am one of the

4    attorneys representing Chris Cooper and Alana Alexander

5    in this case?

6         A.   Yes, I do know that.

7         Q.   And you -- did you prepare a report in this

8    case?

9         A.   Yes.  I have it in front of me.

10        Q.   And what is the exhibit number on that report?

11        A.   No. 2.

12        Q.   And does that set forth your opinions in this

13   case?

14        A.   Yes, it does.

15        Q.   Well, one of the things you mentioned that you

16   reviewed are the hazards associated with formaldehyde.

17   Did you do some research on that?

18        A.   Well, I researched the literature to determine

19   whether there were -- whether it was known that there

20   were hazards or potential hazards associated with

21   exposure to formaldehyde and what the cost, the dose

22   response levels, would be.  In other words, at what

23   level does it begin to be hazardous and -- and -- and

24   what exposures are hazardous?

25        Q.   And then this aspect of reviewing the hazards

Lila F. Laux
May 29, 2009

1    associated with formaldehyde, is that the same kind of

2    steps that you would take, or you instruct your students

3    to take in courses with regard to hazard communication,

4    to be able to quantify what hazard there is?

5        A.    Well, yes.  The first things you have to know

6    is, you have to identify whether there is a hazard or

7    not.  And the only way you can be sure of that is to

8    look at all the research literature that's out there,

9    to -- I mean, sometimes you can tell from the design.

10   If it's a stamping machine and there's no -- nothing to

11   guard the person's hands against the stamper, well, you

12   can pretty much predict, because we know from history,

13   that people will accidentally get their hands in there.

14   So you can see that hazard.

15            But in other instances, like off-gassing, you

16   have to go to the scientific literature and see what's

17   been discovered and what's known about the product and

18   what's been discovered through experiences, good and

19   bad, about people being exposed to formaldehyde or any

20   other chemical.

21            So as far as chemicals are concerned, there's

22   a vast literature associated with understanding the

23   hazards to people and trying to figure out what the

24   hazards are and what levels of exposure create a hazard.

25        Q.    The step of reviewing the scientific

Lila F. Laux
May 29, 2009

Page 311

1    about what had been established, that Alana Alexander

2    received, are you aware that the president and CEO of

3    Gulf Stream, Jim Shea, testified under oath that Gulf

4    Stream never provided any warning information on

5    formaldehyde to the occupants of the travel trailers?

6         A.   I haven't seen that testimony, but you've told

7    me that.

8         Q.   Let's take a look at your report here.  Does

9    it set forth your opinions?

10        A.   Yes, it does.

11        Q.   And in addition to the scientific articles and

12   medical articles that you reviewed, did you review any

13   medical records for Chris Cooper?

14        A.   I did review what they had, not everything

15   that was -- had -- not all of his records were

16   available, because of Katrina, but I reviewed all the

17   records that were available.

18        Q.   Now, what do you mean, "not all of his records

19   were available," due to Katrina?

20        A.   I think some of the -- based on what I recall,

21   and I guess I could be wrong, some of his records had

22   been destroyed.

23        Q.   Did you also ask Alana Alexander, Chris

24   Cooper's mother, about Chris Cooper's medical condition

25   before, after, and during living in the trailer?

Lila F. Laux
May 29, 2009

Page 312

1      A.   Well, I didn't ask her about after, but I did

2   ask her about before and during, and she said that, you

3   know, he had asthma, she knew that; but that when they

4   were living in the trailer, it did get progressively

5   worse.

6      Q.   Did you see anything in the medical records

7   that would indicate something similar for Chris Cooper,

8   that while he was living there, there was a change in

9   his conditions related to asthma?

10      A.   I did see, in the medical records and then

11   also in the reports of the physicians, that he had had

12   to use the inhaler more frequently, that he had more

13   events, and that he also had actually been hospitalized

14   for an asthma attack during that time.

15      Q.   "During that time" would be the time that he

16   was living in the travel trailer?

17      A.   Yes.

18      Q.   And did it appear to you that his asthma was

19   exacerbated in the term that he was living in the travel

20   trailer?

21      A.   Well, I wouldn't make that conclusion, but the

22   doctors who reviewed his records did make that

23   conclusion, so I accept that, yes.

24      Q.   Do you have any opinion as to whether an

25   exacerbation of asthma is consistent with what you read

Lila F. Laux
May 29, 2009

Page 313

1    in the medical records with regard to people with

2    preexisting asthma being exposed to formaldehyde?

3        A.    Yes.  I think that's fairly frequently in

4    the -- in the -- in the materials that I read about

5    formaldehyde, from the medical field, that people who

6    are exposed to it do experience worse asthma.

7        Q.    And at least the medical records you saw from

8    Chris Cooper, were they consistent with that?

9        A.    Well, he did get worse as he lived in the

10   trailer, so, yes, that is consistent.

11       Q.    When we look at your report on Pages 5, 6, 7,

12   and 8, do they set forth the various materials that you

13   have reviewed?

14       A.    Yes.  There are some things, in addition to

15   that, that I've reviewed since then.

16       Q.    And those materials, did they include various

17   standards for formaldehyde?

18       A.    Yes, they did.

19       Q.    And what is your understanding of the

20   standards with regard to formaldehyde?

21       A.    Well, my understanding is that there are a

22   variety of standards, depending on the length of

23   exposure and who you are and where you're getting

24   exposed.  So, you know, there are all kinds of standards

25   for exposure to formaldehyde.