UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
|     FORMALDEHYDE | * | |
|     PRODUCTS LIABILITY | * | |
|     LITIGATION | * | SECTION: N(5) |
| | * | |
| This Document Relates to: *Lyndon T. Wright. v.* | * | JUDGE: ENGELHARDT |
| *Forest River, Inc., et al*, Docket No. 09-2977 | * | |
| | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF MOTION FOR PROTECTIVE ORDER
REGARDING RETESTING OF PLAINTIFF'S TEMPORARY HOUSING UNIT**

**MAY IT PLEASE THE COURT:**

In support of their Motion for Protective Order, defendants Forest River, Inc. ("Forest River") and Shaw Environmental, Inc. ("Shaw") respectfully submit this memorandum of points and authorities. Forest River and Shaw adopt and incorporate Gulf Stream's motion for protective order and its memorandum of law in support (Rec. Doc. 1373), as well as Fleetwood Enterprises, Inc.'s related motion and memorandum of law in support (Rec. Doc. 1396), and offer the following analysis specific to Forest River and Shaw.

### I. BACKGROUND

As the Court is aware, PSC and Forest River reached an agreement nominating Lyndon Wright as the first Forest River trial plaintiff. This determination was based on several factors, including the fact that Mr. Wright's unit had been professionally tested by PSC and that the test

results were provided, thus alleviating the need for further testing. On April 6, 2009, the Court rendered Pre-Trial Order No. 34, in which it confirmed Wright as Forest River's first trial plaintiff. (Rec. Doc. No. 1299).

On June 9, 2009, plaintiff's counsel submitted an Inspection and Testing Protocol seeking to conduct additional air sampling and destructive testing of Wright's unit, which is currently located at a FEMA storage site in Melville, Louisiana. *See* Inspection and Testing Protocol, attached as Exhibit "A." The following is a brief summary of the proposed testing:

1. The trailer is to be hauled, by unspecified means, to an unidentified location for testing and disassembly.
2. The trailer is to be sealed for a minimum of 72 hours prior to the commencement of any testing.
3. Active and passive indoor air monitoring will be conducted after sealing the unit and without the HVAC system in operation. Only after the PSC conducts its sampling under these fabricated conditions will the unit's air conditioning system be activated.
4. Indoor and outdoor humidity monitoring will be performed. Thermographic surveys, inspection of electrical components, collection of mold samples, ventilation testing and an environmental walk-through and general survey will also be completed.
5. A materials audit of the interior and exterior components of the trailer is to be completed throughout the inspection period. This audit will include destructive testing.
6. PSC intends, again by unspecified means, to jack the unit and place it on blocks, before testing the units air exchange rate, with additional "ventilation testing" both with and without the HVAC operating.

*See* Exhibit "A."

The testing PSC proposes is a costly, time consuming, and ultimately irrelevant inquiry which is intended to undermine PSC's own prior test results. Although ostensibly designed to obtain a variety of data, the proposed testing protocol, spanning four days with a vast array of experts, still fails to address the key question in the case: the ambient concentration of air-borne formaldehyde in the unit at the time of the plaintiff's occupancy.[1] However, just as with the Gulf Stream and Fleetwood units, plaintiff already has a formaldehyde level obtained while the unit was tested at plaintiff's residence in New Orleans. In short, PSC has already tested this unit, and this latest protocol is duplicative and will only serve to confuse the jury at trial. Forest River and Shaw respectfully object to the entirety of the repetitious, untimely, and unnecessary testing of this unit and request that this Court issue a protective order barring any and all such examination. In the alternative, should the Court allow additional testing to be permitted, movants ask that this Court to limit it in the manner described in Section II (B) of this Memorandum.

## II. LAW AND ARGUMENT

### A. THE ENTIRETY OF THE PROPOSED TESTING MUST BE PROHIBITED FOR REASONS OUTLINED IN THE COURT'S PRIOR ORDERS

Forest River and Shaw seek protection under Federal Rule of Civil Procedure 26(c)(1), which protects parties from "annoyance, embarrassment, oppression, or undue burden or expense" in the discovery process. A protective order may issue only upon a showing of good cause. *Thomas Doe v. Stegall*, 653 F.3d 180 (5th Cir. 1981). "Good cause" exists when justice

---

[1] The humidity level testing, thermographic surveys, inspection of electrical components, collection of mold samples, and ventilation testing are little more than corollary tested likely offered to explain the air sampling results to be obtained by Scott and Kaltofen.

3

requires the protection of "a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id.* (quoting Fed.R.Civ.P. 26(c)).

A brief review of this Court's Order and Reasons barring retesting of the Gulf Stream and Fleetwood units is instructive, as movants echo many of the same concerns raised by those parties. In particular, the Court identified two concerns, one practical and the other theoretical, weighing against the retesting of the bellwether units.

First, on a practical level, plaintiff's desire to retest should have been raised long ago. As the Court correctly pointed out that in its prior Order, during the ongoing discussions involving testing, not once did plaintiffs ever express a need for an additional round of air sampling, nor did they suggest that their experts' protocol required different types of testing. *See* Rec. Doc. 1547. Since **June of 2008**, both plaintiffs and defendants have spent considerable time, effort, and client resources to agree to a protocol for testing of occupied units and to complete testing of those units. This Court has participated heavily in the process and expended its own time and resources in monitoring the progress of testing and setting deadlines. *See* Rec. Docs 123, 130, 328, 399, 862, 1011, 1022, referenced in the Court's Order and Reasons, Rec. Doc. 1493. Pre-Trial Order No. 3 required that "all testing of housing units" was to be completed by September 2, 2008. *See* Rec. Doc. 123. If plaintiffs desired to conduct the more expansive testing proposed here, plaintiffs could and should have made such a representation to the Court and defendants at some point during the year long testing process. Had movants known that additional testing would occur, they would have not wasted considerable resources shadowing plaintiffs' experts and conducting their own testing.

Furthermore, the proposed testing protocol serves as yet another example of plaintiff's refusal to consider the position of the other parties in this litigation. The protocol presents an

overly simplistic picture: plaintiff will test over the course of four days in early July, with plenty of time to produce expert reports by the July 22 deadline. By pushing for retesting in early July, though, plaintiff assumes that neither Shaw, FEMA, nor Forest River may need to conduct their own testing as a result of this late request. Should plaintiff be allowed to perform this testing, the defendants will need their own period of time to test, as they undoubtedly will be compelled to perform their own air sampling, ventilation testing, and destructive testing. Also, several of plaintiff's proposed tests -- primarily those involving jacking, ventilation, and destructive testing -- force defendants to test before or concurrently with plaintiff's experts, as all three methodologies will irrevocably alter the unit.[2] As a result, Forest River and Shaw suggest that the necessary serial testing, i.e., plaintiff followed by defendants, may take weeks, not days, to complete. With plaintiff's July 22nd expert report deadline fast approaching, scheduling this testing is difficult, if not impossible, and would require defendants to rush and assemble additional testing protocols and their own experts in short order. This hurried time frame is unworkable and overly burdensome to the defendants.[3]

---

[2] The movants note that jacking does not, if done properly, inevitably alter the unit. Plaintiff's silence on just how he proposes to jack up the unit, however, raises suspicions that plaintiff may try to jack the unit in a way that could damage it; if successful, plaintiff's efforts will indeed alter the unit.

[3] Forest River and Shaw question plaintiff's delay in waiting until June 9, 2009 to provide this testing protocol for the first time. As a preliminary matter, it should be noted that Pre-Trial Order No. 26, which discusses the procedures for destructive/component part testing, has been in place since January 6, 2009. *See* Rec. Doc. 1022.

Moreover, counsel for Forest River has asked for information regarding Wright's revised testing protocol since **April 14, 2009.** *See* Exhibit "B," various emails between J. Bone and J. Woods. PSC's only response was that, "When you receive and review the testing protocol, it should become clear as to what testing is to be done."

On April 23, 2009, PSC even admitted that it would use the same testing protocol for the Forest River unit as it did for the Gulf Stream unit. *See* Exhibit "C," email from J. Woods to A. Weinstock and H. Miller, dated April 23, 2009, noting that PSC "anticipate[s] using [the protocol for the Alexander unit] with each additional bellwether unit." Counsel for Forest River requested the protocol again in early May, and plaintiff's counsel confirmed that he would

The logistical problems and delays with this latest round of testing are reason enough to prohibit the testing. Yet, in its Order for the Gulf Stream and Fleetwood testing, this Court identified other theoretical concerns which should preclude testing. Although movants concede that some of these points may be more properly considered in a Motion in Limine, their discussion here is warranted nevertheless.[4]

Just as with the Gulf Stream and Fleetwood units, the PSC has already completed professional testing of the Wright unit. On September 30, 2008, months after testing protocols had been developed and agreed upon by all parties, PSC notified the manufacturing defendants of their intent to test Lyndon Wright's unit on October 2, 2008. *See* email correspondence from R. Mezzic, paralegal at Lambert & Nelson, to counsel for manufacturing defendants, dated September 30, 2008, attached as Exhibit "E." The testing conducted on Wright's occupied unit was conducted not by Wright himself via a passive badge monitoring system, but by the Scott Group, a professional "team" of experts retained by PSC and at Lyndon Wright's home site in New Orleans. Adhering to the 24 hour "occupied unit" testing protocol, the Scott Group found a total of 0.048 ppm of formaldehyde in the unit. *See* Errata Sheet of Wright's Plaintiff Fact Sheet, attached as Exhibit "F," and WD Scott Group, Inc. test results, Exhibit "G."[5]

---

provide it soon thereafter. *See* Exhibit "D," email from A. Ahlquist to J. Bone, dated May 1, 2009.

Despite Forest River's repeated requests for a protocol, plaintiff chose to delay for months and produce it in mid June, only six weeks before his expert report deadline. The hardships caused by this delay, which was caused solely by PSC, could have been avoided, and the Motion for Protective Order could have been resolved months ago.

[4] If the Court ultimately has no intention of allowing the test results to be admitted into evidence, the testing is unnecessary, irrelevant, and overly burdensome *per se* and should be barred by the instant Protective Order.

[5] The testing was conducted using the "Occupied Housing" protocols established by the parties. The Court noted that, for the Fleetwood bellwether unit, the previous testing at the plaintiffs' residence would "provide the best information as to what these plaintiffs were subject to while occupying the EHU in question." *See* Rec. Doc. 1493.

This result, obtained at the actual site of plaintiff's post-Katrina residence and verified through his own Plaintiff Fact Sheet, provides a formaldehyde level under the conditions existing at his home site. *See* Exhibit "F." Plaintiff now seeks to distort that straightforward result by retesting the unit in a FEMA storage area under conditions that in no way resemble those experienced by plaintiff. The protocol then compounds that problem even further. For instance, plaintiff proposes to seal the unit for 72 hours prior to obtaining an air sample. *See* Exhibit "A." Movants question how, on a common sense level, this sealing of the unit in the middle of the summer will provide any more accurate or reliable numbers than those obtained from prior testing at the actual site of plaintiff's trailer in New Orleans. As the Court succinctly put it, "Gauging the levels of formaldehyde in this unit is not a 'moving target.' To get even more results from testing long after these bellwether plaintiffs vacated the EHU serves only to create confusion as to the relevant time period, as well as the ultimate issue to be decided." Rec. Doc. 1547.

Second, this Court recognized in its prior Order that Plaintiffs could "offer no reason" as to why plaintiffs require additional testing of the unit, including air sampling, an environmental walkthrough study, measurements of the trailer, a material audit, and ventilation testing. *See* Rec. Doc. 1547. Plaintiffs have not alleged that their prior testing was improper or flawed.[6] In fact, they have retained William Scott, whose company originally tested the Wright unit, to participate in this latest round. Defendants can only assume that plaintiff's willingness to use Scott for a second time is a testament to PSC's faith in his expertise and ability to furnish

---

[6] In excluding Plaintiff's additional testing, the Court noted that, "Plaintiffs have already conducted testing of the [Gulf Stream] EHU at issue in this motion, and, furthermore, Plaintiffs' own expert has validated the results of that test." *See* Rec. Doc. 1547. The same is true for the Fleetwood unit, which was tested while the bellwether plaintiffs resided in the unit. *See* Rec. Doc. 1493.

7

accurate test results. Since the commencement of this litigation, plaintiff cannot point to any change in circumstances, from the identity of his experts to the availability of the trailers, which necessitates retesting.

Moreover, plaintiff can offer no justification for destructive testing, as it is irrelevant and extraneous given the prior air sampling results. Plaintiff claims exposure to air-borne formaldehyde, not direct exposure via skin or ingestion to formaldehyde contained in the carpets or wood products within the unit.[7] Destructive testing is merely a back door means of submitting additional levels of formaldehyde exposure to the jury. Plaintiff's prior air sampling provided the relevant results, and any results from destructive testing have little, if any, probative value.

Forest River and Shaw would add one more point relating to the "big picture" that should weigh against plaintiff's protocol. Defendants agreed to try these bellwether candidates based on the information contained in the Plaintiff Fact Sheets ("PFS"), including, *inter alia*, the results of any testing for formaldehyde levels. Indeed, prior to the selection of bellwether candidates, PSC would only agree to produce plaintiffs for deposition if questioning would be limited to the information in the PFS and any deficiencies contained therein.[8] Plaintiff now seeks to go outside

---

[7] *See* Wright's *Complaint for Damages*, Paragraph 98, alleging exposure to "formaldehyde fumes" in the Forest River unit.

[8] *See* email from F. D'Amico to J. Bone, dated 3/16/09, attached as Exhibit "H," wherein Mr. D'Amico limited the areas of inquiry for the deposition of potential bellwether candidates Jonathan Ijoko and Lyndon Wright. Mr. D'Amico stated, "Further, to illuminate my understanding, it is also going to be stipulated by and between the parties and made part of the record that the PSC has agreed to producing these depositions primarily on the condition that the depositions will be used as a tool for the limited purpose of curing PFS deficiencies. **Further, it is agreed to and understood between the parties that this in no way is intended to obviate the court's protocol for selection of trial plaintiffs, ie: by use of the Plaintiff Fact Sheets.** Therefore with regard to the plaintiffs, …, please specify in advance of the depositions what PFS deficiencies you will be inquiring into. Obviously deposition questions not calculated to cure these deficiencies will be subject to PSC objection." (emphasis added).

the bounds of the PFS by not only proposing new types of testing but also by adding new formaldehyde levels for the jury to consider.

However, the protocol does more than contravene the agreement of the parties. It creates scheduling difficulties, as defendants are now forced to hurry and complete their own testing prior to plaintiff's own. It also frustrates the Court's efforts to provide a streamlined approach to the pre-trial process and complicates, rather than simplifies, the issues common to this MDL.[9]

The original premise of the bellwether trials was simple: try cases with plaintiffs who had known symptoms and known formaldehyde levels to obtain meaningful results.[10] PSC's protocol abandons this approach by adding new levels of scheduling difficulties and scientific complexity where they need not exist. Should the Court allow retesting for Wright's case, a dangerous precedent would be set for future trials, and the fundamental principles multi-district litigation, codified at 28 U.S.C. § 1407, would be undermined. Rather than promote the "coordinated or consolidated pretrial proceedings" and "just and efficient" approach envisioned by the statute, the Court will be mired in confusion. If all plaintiffs are allowed to retest, the effort made in the last twelve months to test occupied units will have been futile. The parties will be forced unnecessarily to rush to retest, or at the very least monitor the other party's testing efforts, for each of these plaintiffs. More resources would be wasted to conduct testing which was, or could have been, completed by plaintiffs' experts months ago, and the intent of the MDL – to efficiently coordinate these cases – will be stymied. As a result, remanding these cases for

---

[9] If this protocol is allowed to go forward for Lyndon Wright, will all other plaintiffs be able to pursue testing for additional formaldehyde levels and conduct ventilation and other destructive testing? If so, this new data will create a new cycle of PFS submissions and arguably create more, not fewer, points of scientific and legal debate in the MDL as a whole.

[10] Even though Keystone has no formaldehyde level from prior testing, the future testing will still produce a single number for use at trial, such that all the bellwether candidates will be in the same position.

9

trial to the district courts would be delayed. This delay, duplication, and unnecessary expense are precisely the types of excesses that Rule 26, as well as 28 U.S.C. § 1407, are intended to prevent.

### B.   IN THE ALTERNATIVE, SHOULD TESTING GO FORWARD, THE PROTOCOL MUST BE ALTERED

Should the Court allow additional examination to be permitted, Forest River and Shaw respectfully submit that the investigation should be limited to photographing, videotaping, and measuring the dimensions of the unit, as this examination has not been completed to date and does not raise the same objections and burdens as does the testing contemplated by plaintiff's proposed protocol.

Additionally, if any other contemplated testing is permitted by the Court, movants respectfully suggest that they are entitled to and would request plaintiff's protocol be modified to the extent necessary to allow defendants complete and unfettered access to the Wright unit to perform comparative studies relating to any testing performed. In its current form, plaintiff's protocol does not allow the defendants or their representatives to monitor the testing performed or to perform their own examination. Section "xxx," for example, states that the "number of people entering into the Trailer for the initial indoor quality testing should be limited to only those experts or consultants qualified to perform these tests." *See* Exhibit A, p. 3.[11] This language is vague and should be revised to allow both defense counsel and their experts to be present during plaintiff's testing and to perform their own contemporaneous examination.

---

[11] Pursuant to Pre-Trial Order No. 26, defendants must also be provided access to the unit during any destructive and component part testing performed by plaintiff. *See* Rec. Doc. 1022. Each party shall also be entitled to have two representatives or observers present at each incident of testing and may video-tape and/or otherwise document the testing process. *Id.* Plaintiff's protocol does not expressly provide any language to this effect.

Movants also request that no mold testing of any kind be permitted. Mold has not been properly alleged in this case, so the results of any mold testing would by definition be irrelevant to the issues actually present in the case.[12] In any event, mold testing at this point, after the trailer at issue has sat in a field for months, could not possibly yield any useful data.

The proposed testing protocol does not describe the tools or methods to be used in connection with "jacking" the trailer. If jacking is permitted, the PSC should be required to describe exactly what it intends to do in that regard, so that the defendants can check the protocol and ensure that the tools and methods reasonably simulate the tools and methods actually used in the field. The plaintiff should not be permitted simply to jack up one corner at a time, or to jack them up too quickly, in the hopes that these procedures might damage the frame.

Further, the defendants should be permitted access to the unit to perform their own testing at appropriate intervals following plaintiff's examination. For instance, after plaintiffs have completed air sampling, should same be permitted by the Court, the defendants should be allowed to perform their own air sampling pursuant to their experts' respective protocol prior to any further testing envisioned by PSC, including but not limited to any destructive testing.[13] It is only in this manner that defendants can ensure that their test results have not been compromised by the activities of the PSC and their experts' testing. Given this, the defendants would anticipate that no less than a week of additional time would be needed to perform the necessary testing and evaluation of this unit. Accordingly, to the extent any additional testing of the

---

[12] Mr. Wright has proposed to amend his *Complaint* in order to make mold-related allegations, but Shaw has objected. Shaw submits that this is a case about formaldehyde, not mold, and that efforts to twist the underlying factual predicate for this case into something else, only six months before trial and in the midst of other bellwethers, should not be permitted.

[13] The Court has already ruled that all ambient air testing of a unit is to be completed to the satisfaction of all parties prior to the commencement of any component part/destructive testing. *See* Exhibit "I," email from A. Ballay to H. Miller, dated May 4, 2009, wherein the Court confirmed Mr. Miller's third point of clarification.

11

Wright unit is permitted, plaintiff's proposed protocol must be revised to accommodate the defendants' access to the unit and to incorporate sufficient time delays to allow defendants' experts to perform sufficient follow up analysis before evidence is altered or destroyed.

### III.   CONCLUSION

**WHEREFORE,** considering the foregoing, Forest River and Shaw respectfully request that this Honorable Court issue an Order preventing the PSC, Wright and/or his representatives from testing the THU allegedly occupied by Lyndon Wright. As the unit has already been professionally tested by plaintiff's experts, any redundant testing would constitute an unnecessary waste of the defendants' resources and undermine the purpose of the prior testing of these units. In the alternative, Forest River and Shaw request that the protocol be limited, as set forth above, and modified to allow defendants to complete their own testing and monitor any testing by plaintiffs.

        Respectfully submitted,

        /s/ Jason D. Bone
        ERNEST P. GIEGER, JR. (La. State Bar No. 6154)
        JASON D. BONE (La. State Bar No.28315)
        GIEGER, LABORDE & LAPEROUSE, L.L.C.
        One Shell Square
        701 Poydras Street, Suite 4800
        New Orleans, Louisiana  70139-4800
        Telephone:  (504) 561-0400
        Facsimile:  (504) 561-1011
        *ATTORNEYS FOR FOREST RIVER, INC.*

-and-

/s/ M. David Kurtz
M. DAVID KURTZ (#23821)
KAREN K. WHITFIELD (#19350)
CATHERINE N. THIGPEN (#30001)
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000
*ATTORNEYS FOR SHAW ENVIRONMENTAL, INC.*

# CERTIFICATE

I hereby certify that on the 18th day of June, 2009, a copy of the foregoing Notice of Hearing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

/s/ Jason D. Bone

JASON D. BONE