# In The Matter Of:

*FEMA Trailer Formaldehyde Products Liability Litigation*

*Elizabeth Ganiere*
*June 1, 2009*

Original File ELIZABETH GANIERE.txt
Min-U-Script® with Word Index



PLAINTIFF'S EXHIBIT C

**Page 9**

1  Q So you believe -- was it Scott Pullin who sent out
2    some of these --
3  A Yes.
4  Q -- documents, these litigation holds?
5  A Yes, he did.
6  Q Have those been produced?
7  A I don't know if they have been requested or
8    produced.
9  Q Okay. But you believe that there are non-lawyer
10   documents, for instance, from Scott Pullin, who is
11   vice president of --
12 A He was directed by Ken Brinker to do that --
13 Q Right.
14 A -- but yes.
15 Q So those would exist somewhere.
16 A Somewhere they do exist, yes.
17 Q Because I've noticed a real -- you'll probably
18   disagree with me, but -- even though you're not a
19   disagreeable person.
20 A Thank you.
21 Q There's a real lack of documents, for instance,
22   surrounding this so-called policy of using only LFE
23   materials. Was a search done for those types of
24   documents?
25 A Oh, yes.

**Page 10**

1  Q And there are none.
2  A You're quite correct. With exception of there are
3    POs with signature lines from the purchasing
4    agents. They had them actually come up on the POs
5    as a part of their ordering of certain part orders
6    from wood product manufacturers.
7  Q Another, what I think is a, you know -- sometimes
8    when I'm in a lawsuit, I kind of get a red flag
9    goes up when I see a real lack of documents in
10   various areas. And one of the areas that I saw,
11   maybe you can help me with, is correspondence
12   either to or from Adorn, for instance, regarding
13   formaldehyde and the use of LFE wood products.
14     I know for a fact that one of the other
15   manufacturers has produced in this case a document,
16   correspondence from Adorn, that's not even
17   specifically addressed to that competitor, but is
18   just to Dear Valued Customer.
19     Can you explain to me why that document wasn't
20   produced from Gulf Stream?
21 A Probably because we don't have it. Honestly, I'm
22   astounded at how thorough they were before I
23   arrived of the documents that they produced for the
24   subpoena from DHS and then continuing with
25   Congress. I mean, I'm stunned and amazed at how

**Page 11**

1    many documents that they were able to create up and
2    to and continuing through the e-mails that were
3    produced without such electronic requests being
4    made.
5      So, I mean, I beg to differ that -- there
6    probably doesn't exist a document like that, that
7    we have come across anyways. I mean, I can tell
8    you that. I have not gone through every single
9    purchase order and invoice, because there were just
10   thousands upon thousands and thousands of
11   documents. I mean, I have boxes and boxes all
12   over.
13     So I personally, I've gone through a lot of
14   them, probably at least half, but I have not gone
15   through every single solitary paper.
16 Q Okay. But I just want to be specific.
17   Communications either to or from Adorn in the last
18   five years, have you searched for those?
19 A Oh, certainly. Yes.
20 Q And you've come up with nothing other than what's
21   been produced.
22 A Right. Right.
23 Q And so if other defendants in this case have
24   produced, in fact, correspondence with Adorn, your
25   response to that would be, look, we just don't have

**Page 12**

1    that.
2  A We've looked for it, we've asked for the documents,
3    and various employees that had those particular
4    duties and responsibilities, but of course, you
5    know, as you know as a lawyer, discovery is
6    continuing, and upon discovery of such additional
7    information, we'll provide that.
8  Q And have you learned the identity of certain
9    individuals you might want to go to now and ask for
10   documents over the course of these last couple of
11   depositions?
12 A Probably the best person for these types of
13   documents that you're asking about for Adorn, that
14   would be Jeff Zumbrun. And I don't even know if he
15   has a particular file for Adorn or not. I don't
16   know if he has that particular file for that
17   vendor.
18 Q Have you asked him?
19 A Oh, yes, yes.
20 Q Okay. So, I mean, whether --
21 A But I will ask him again. And of course, you know,
22   you can ask and ask and ask the same person, and
23   all of a sudden they find it in some rogue drawer
24   that they haven't opened in quite some time. So
25   I'll continue to ask him. I've been making notes

**Page 13**

1   throughout the deposition, so...
2   Q So some of these individuals whom we've identified,
3       you may, in fact, go to them and make sure that
4       they've collected and searched for documents that
5       may be relevant.
6   A Yes.
7   Q Okay. Specifically, Jeff --
8   A Yes.
9   Q -- Zumbrun. Is that his name?
10  A Yes. Yes. I will ask him specifically.
11  Q I also -- I can take it you disagree. I think that
12      there is a very -- there's very few e-mails
13      relative to the amount of e-mails I see in other
14      litigation. Have you specifically asked the three
15      brothers, the Shea brothers, as well as other
16      members of management for e-mails, nonprivileged
17      e-mails, relating to formaldehyde or their wood
18      products?
19  A Yes. Matter of fact, I've searched their
20      computers. And most of their computers store the
21      e-mails on their computers because there's a no
22      delete. So I've personally searched their
23      computers, so...
24          And we've had a preservation company preserve
25      the data.

**Page 14**

1   Q So you had a company come in to preserve electronic
2       data?
3   A Yes.
4   Q Okay.
5   A Which I believe counsel has notified you about.
6   Q Yeah, probably so. I just don't listen very well.
7   A Okay. It's no -- it's no new news.
8   Q Specifically I didn't see any documents -- you
9       know, you heard Dan talk about he just so happened
10      to see this REG product in the factory, 75 I think
11      he said. Did you search for any documents
12      surrounding that discovery? It's surprising to me
13      there's not one piece of paper.
14  A About the discovery of REG?
15  Q Yeah. The fact that he learned that you guys were
16      using REG.
17  A No, from what I understand, you know, after
18      learning, my starting at Gulf Stream, is that was
19      something all verbal. There wasn't really any
20      e-mail or other communication surrounding that
21      other than verbal communication. There's no
22      documentation for that.
23  Q Let's switch gears, because it sounds like, I mean,
24      that this is going to be ongoing; you're going to
25      continue to search for documents.

**Page 15**

1   A Oh, of course.
2   Q Okay. And you're probably going to spend some time
3       asking some of these identified witnesses about
4       documents. And I'll just work through your outside
5       counsel on that.
6   A That's fine.
7   Q Let's talk about the insurance policies. Are these
8       claims made policies that are in effect for Gulf
9       Stream?
10  A No, they're occurrence.
11  Q Occurrence. Explain what that means.
12  A Occurrence is when there's a claim that --
13          MR. WEINSTOCK: I'm going to let her answer
14      these, not being -- her not being an insurance
15      expert, I assure you our carriers will not feel
16      bound by any opinions she gives you on the
17      coverage.
18          MR. BUZBEE: I completely understand.
19  Q Just help me understand.
20  A Okay.
21  Q Have you produced -- and he tells me it's been
22      produced repeatedly.
23  A We have produced them, yes. And I've produced them
24      to him repeatedly.
25  Q You've produced every insurance document that could

**Page 16**

1       even be arguably applicable.
2   A I believe we have.
3   Q And what about these insurance policies that cover
4       the years 2004 and 2005 and 2006; I think you
5       produced all three.
6   A Yes, we did.
7   Q I may know more about it.
8   A Even up to and including 2007, 2008.
9   Q Good.
10  A Oh, yes.
11  Q There is a self-insured retention.
12  A Yes.
13  Q Has that been expended? Has that been burned up
14      or --
15  A Actually, that's not really a question I can really
16      answer because that determination is still being
17      made because of how the claims are coming in.
18  Q Yes.
19  A So that's something that's ongoing and so I really
20      can't answer that.
21  Q I'm really curious about it, for obvious reasons,
22      so...
23  A Well, obviously, but I really -- there's some
24      discussions that will be ongoing with our insurance
25      company, so I really can't answer that in any way