Laux Lila F - Vol I.txt

0001
1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2                NEW ORLEANS DIVISION
3   IN RE: FEMA TRAILER        *      MDL NO. 1873
            FORMALDEHYDE        *
4           PRODUCTS LIABILITY  *      SECTION: N(5)
            LITIGATION          *
5                               *
    Charlie Age, et al., v.     *
6   Gulf Stream Coach Inc, et al. *
    Docket No. 09-2892          *
7
8            VIDEOTAPE ORAL DEPOSITION OF
                LILA F. LAUX, Ph.D.
9                  May 29, 2009
10
11          VIDEOTAPE ORAL DEPOSITION OF LILA F. LAUX,
    Ph.D., produced as a witness at the instance of Gulf
12  Stream Coach, Inc., and duly sworn, was taken in the
    above-styled and numbered cause on the 5th of May, 2009,
13  from 12:14 p.m. to 7:37 p.m., before Carla D. Capritta,
    RPR, in and for the State of Colorado, reported by
14  machine shorthand, at the conference room of Embassy
    Suites-Denver Airport, 7001 Yampa Street, Denver,
15  Colorado  80249, pursuant to the Federal Rules of Civil
    Procedure and the provisions stated on the record or
16  attached hereto.
17
18
19
20
21
22
23
24
25
0002
1                    A P P E A R A N C E S
2   FOR GULF STREAM, INC.:
        JOSEPH G. GLASS, ESQ.
3       Duplass Zwain Bourgeois Pfister & Weinstock
        3838 N. Causeway Boulevard
4       29th Floor
        Metairie, Louisiana  70002
5
    FOR FLUOR ENTERPRISES, INC.:
6       CHARLES R. PENOT, ESQ.
        Middleberg Riddle & Gianna
7       717 North Harwood
        Suite 6850
8       Dallas, Texas  75201
9   FOR U.S. DEPARTMENT OF JUSTICE:
        ADAM M. DINNELL, ESQ.
10      Environmental Torts Section
        Ben Franklin Station
11      P.O. Box 340
        Washington, D.C. 20044
12
    FOR FOREST RIVER, INC.:
13      JASON D. BONE, ESQ.
        Gieger, Laborde & Laperouse, L.L.C.
14      701 Poydras Street

Page 1

Laux Lila F - Vol I.txt

```
15          48th Floor
            New Orleans, Louisiana  70139
16
17    FOR KEYSTONE RV:
            JAMES C. PERCY
18          Jones Waechter Poitevent Carrere & Denegre
            8555 United Plaza Boulevard
19          5th Floor
            Baton Rouge, Louisiana  70809
20
      FOR RECREATION BY DESIGN, LLC; TL INDUSTRIES, INC.;
21    FRONTIER RV, INC.; and PLAY'MOR TRAILERS, INC.
      (Appearing Telephonically)
22          RANDALL C. MULCAHY, ESQ.
            Garrison, Yount, Forte & Mulcahy, L.L.C.
23          909 Poydras Street
            Suite 1800
24          New Orleans, LA 70112
25
0003
1                A P P E A R A N C E S (Continued)
2     FOR HEARTLAND RECREATIONAL VEHICLES, L.L.C.:
      (Appearing Telephonically)
3           LORI A. DAIGLE, ESQ.
            BRENT MAGGIO, ESQ.
4           Allen & Gooch, A Law Corporation
            One Lakeway
5           3900 N. Causeway Blvd
            Suite 1450
6           Metairie LA 70002
7     FOR JAYCO, INC. and STARCRAFT RV, INC.:
      (Appearing Telephonically)
8           THOMAS L. COUGILL, ESQ.
            Willingham, Fultz & Cougill
9           Niels Esperson Building
            808 Travis, Suite 1608
10          Houston, Texas 77002
11
12    FOR PLAINTIFFS:
            CHRIS PINEDO, ESQ.
13          4550 Jericho
            Corpus Christi, Texas  78413
14
15
16    ALSO PRESENT:
17          Paula Wolff, Videographer
18
19
20
21
22
23
24
25
0004
```

```
1                          INDEX
2     Appearances...................................... 2, 3
3     Stipulations..................................... 329
4
5     LILA F. LAUX
            Examination by Mr. Glass.................. 6, 250
6           Examination by Mr. Penot..................... 234
            Examination by Mr. Dinnell................... 253
```

Laux Lila F  - Vol  I.txt

```
 7          Examination by Mr. Pinedo....................  285
            Examination by Mr. Percy.....................  331
 8
 9   Signature and Changes.............................  329
10   Reporter's Certificate............................  330
11
12                          EXHIBITS
13   NO.  DESCRIPTION                                    PAGE
14   1  Amended Notice of Video-Tape Deposition.........    7
15   2  Lila F. Laux, Ph.D., Expert Witness Report......    8
16   3  Lila F. Laux, Ph.D., Curriculum Vitae...........    8
17   4  Lila F. Laux, Ph.D., Curriculum Vitae...........   11
18   5  Lila F. Laux, Ph.D., Reliance Files on CDs......   46
19   6  Lila F. Laux, Ph.D. Case List...................   58
20   7  Lila F. Laux, Ph.D. Invoice.....................   67
21   8  "Important Information for Travel Trailer
        Occupants"...................................... 279
22
     9  "Important Formaldehyde Information for
23      FEMA Housing Occupants"......................... 284
24
25
```

```
0005
 1                  P R O C E E D I N G S
 2             THE VIDEOGRAPHER:  We are on the record.  The
 3   time is 12:14:12.  This is the videotape deposition of
 4   Lila F. Laux, Ph.D., in the matter of Charlie Age,
 5   et al., versus Gulf Stream Coach Incorporated, in the
 6   United States District Court, Eastern District of
 7   Louisiana, New Orleans Division, Docket No. 09-2892.
 8             The deposition is being held at the Embassy
 9   Suite, 7001 Yampa Street, Denver, Colorado 80249, on
10   May 29th, 2009.  My name is Paula Wolff, and I am the
11   videographer.  I am present on behalf of Stratos Legal.
12   The court reporter is Carla Capritta, also present on
13   behalf of Stratos Legal.
14             Counsel will now state their appearance and
15   firm affiliation for the record.
16             MR. PINEDO:  Chris Pinedo on behalf of the
17   plaintiffs.
18             MR. GLASS:  Joe Glass on behalf of Gulf Stream
19   Coach.
20             MR. DINNELL:  Adam Dinnell for Defendant
21   United States.
22             (Mr. Percy entered the room.)
23             MR. PENOT:  Charles Penot for Defendant Fluor
24   Enterprises, Inc.
25             MR. PERCY:  Jim Percy on behalf of
0006
 1   Keystone RV.
 2             MR. BONE:  Jason Bone on behalf of Forest
 3   River Incorporated.
 4             THE VIDEOGRAPHER:  Will the court reporter
 5   please swear in the witness.
 6                    LILA F. LAUX, Ph.D.,
 7      having been first duly sworn, testified as follows:
 8                        EXAMINATION
 9   BY MR. GLASS:
10        Q.   Good afternoon, Doctor.  I introduced myself
11   earlier.  My name is Joe Glass, and I represent Gulf
12   Stream Coach in this litigation.  We're under pretty
13   severe time constraints.  I know we have to go through a
14   lot of stuff, so I'm not going to waste a lot of time on
```

Page 3

Laux Lila F - Vol I.txt

15  the preliminaries.
16          But I would remind you that if you don't
17  understand a question that I ask, go ahead and ask me to
18  rephrase it; or let me know that, and I'll try and do my
19  best to clear up whatever confusion there is.
20          If you need to take a break, let me know that,
21  and we'll try and accommodate you.
22          And, most importantly, please let me finish
23  asking my question first, before you begin your answer.
24  And I'll do the best I can to accommodate you in the
25  same way, let you completely finish your response before
0007
1   going on to the next question.
2       A.   Fine.
3       Q.   Is there any reason why you feel your
4   testimony here today would be impaired?  You're -- do
5   you have any medications or anything that would conflict
6   with your testimony today?
7       A.   No.
8       Q.   Okay.  Well, then, let's will get right to it.
9   Would you please identify yourself for the record, and
10  your business address.
11      A.   I'm Lila Laux, and my business address for my
12  consulting is 417 Leyden Street, Denver, Colorado 80220.
13      Q.   Thank you, ma'am.  I'm going to start with,
14  since we have a bunch of people on the phone and people
15  will be reading this later, I want to get some of the
16  exhibits marked so we can get through that later on.
17  I'm going to hand you what I've marked as Laux 1 and ask
18  you if you've seen that document before.
19      A.   Yes.  This is the Amended Notice of Videotaped
20  Deposition.
21      Q.   And attached to that amended notice is an
22  Exhibit A, that we requested certain documents; is that
23  accurate?
24      A.   Yes, it is.
25      Q.   Okay.  Hang on to that, and we'll come back to
0008
1   that later.  The next document I would like to mark --
2       A.   Excuse me.
3       Q.   That's all right.  If you need any water or
4   anything, I think you have a full glass, but we'll --
5   we'll get you --
6       A.   It's allergy season around here now.
7       Q.   I'm going to hand you another document, that's
8   dated May 11th, and it has your information at the top.
9   I believe -- have you seen that document before?
10      A.   Yes.  I believe I did create that document.
11      Q.   And what is that document?
12      A.   That's my report in this matter.
13      Q.   All right.  We'll mark that as Laux 2.
14      A.   Can I borrow your clip?
15      Q.   Absolutely.  Next document I'd like you to
16  look at also has your name at the top.  Do you recognize
17  that document?
18      A.   I do.
19      Q.   And what --
20      A.   That's my CV.  But I don't believe it's a
21  complete version of it, because not all of the
22  publications that I sent you are listed on here.
23      Q.   Okay.  How many pages do you have, ma'am?
24      A.   I have seven.
25      Q.   Okay.  I have one with eight pages that'll
                        Page 4

Laux Lila F  - Vol  I.txt

0009
1   work.  How about that?  Does that one look better?
2        A.    Let's see.  That one looks like a very old
3   one.  I don't know if this is the most current one, the
4   one I sent him, or not.  There shouldn't be any major
5   differences.  There would probably be some additional
6   publications, but beyond that -- this looks like an old
7   version.  I don't know.
8        Q.    Okay.
9        A.    Oh, yes, it says August 2007.
10       Q.    And that was the question.  While you have
11  that in front of you, why don't we talk about the CV.
12  This was the one that was provided to us with your
13  report, the one dated August 2007.
14       A.    Can I see that one?
15       Q.    Certainly.  They have Bates label --
16       A.    Yes.
17       Q.    -- numbers at the bottom, correct?
18       A.    They do.  And they look the same.  I know that
19  I haven't -- I forgot to update the footer.
20       Q.    Yeah.
21       A.    So the 2007 is not really the problem.  It's
22  just that I don't think that all of the -- and -- yeah,
23  there's nothing wrong with it.  It's just probably
24  doesn't have every single publication.
25       Q.    The page -- the last page of the eight that I
0010
1   have, runs about half of the page and ends with a 1993
2   article by Cynthia Willis and yourself; is that correct?
3        A.    That's correct.
4        Q.    And you say there should be more publications
5   on there?
6        A.    Let me get you an updated copy, just to be
7   sure that we have the most recent copy.  Because I
8   printed this out yesterday, I believe.
9             Here we go.  See, that still says August 2007,
10  but it's -- oh, yeah, and these are the additional
11  publications that were not on the -- any of the CVs I
12  sent you.  I don't list them anymore, because they're
13  old and they're usually not relevant.  But you can see,
14  there are a few more publications on this one than there
15  were on that one you just had.
16       Q.    You just handed me what -- are you
17  representing to me that these same -- these first eight
18  pages are identical to what we've marked as Laux 3 --
19       A.    No.
20       Q.    -- and that there's two --
21       A.    No, no.
22       Q.    -- three --
23       A.    No, no.  That's not true.
24       Q.    Okay.
25       A.    The first -- the first four pages should be
0011
1   the same.  The only thing that's going to be different
2   is, there may be one or two additional publications.  I
3   just put one on there this week, that just came out last
4   year, that we did for the Army.  There won't be any
5   major differences.
6             And the other difference is that I added the
7   list of old publications from Baylor that I no longer
8   list on my CV.  That's the difference.
9        Q.    I will attach as Exhibit 4, Laux Exhibit 4,
10  the CV that you just handed to me.

Page 5

Laux Lila F  - Vol  I.txt
```
11        A.   Okay.  Sorry about that.
12        Q.   That's all right.  It's perfectly acceptable.
13   Just let me know that's going on.  The packet that you
14   just withdrew this from, what material is that?  Is that
15   your file in this matter?
16        A.   That's part of my file in this matter.
17        Q.   Okay.  Are those the documents that will be
18   responsive to the -- the Exhibit A that was attached to
19   the subpoena?
20        A.   I believe so.  I know I sent you -- or I put
21   together a disk that had all of the things on it.  There
22   may be things in here that Mr. Pinedo sent me, which
23   would also be listed on my report, but which are not on
24   that CD-ROM that I sent you.
25        Q.   All right.  We'll get to that in a moment.
0012
1    I -- I want to try and work through some of your
2    background here on the CV very quickly, if we can.  It's
3    my understanding that you obtained your -- well, it's
4    contained on your educational background here, that you
5    have your bachelor of arts from Rice University; is that
6    correct?
7         A.   Yes, it is.
8         Q.   And was your major English?
9         A.   English and biology.  I did a teaching
10   certification in biology and general science.
11        Q.   What year did you receive that degree?
12        A.   1961.
13        Q.   Thereafter you obtained a master of science
14   degree from the University of Southwest Louisiana?
15        A.   In Lafayette, I sure did.
16        Q.   Okay.
17        A.   It's now called the University of Louisiana or
18   Louisiana State University at Lafayette, I think.
19        Q.   Okay.  And I actually just wrote on Exhibit 3.
20   I'll re-mark it before we attach it.
21             Okay.  And then you received your master's of
22   science degree; is that correct?
23        A.   Yes, at USL, as it was then.
24        Q.   And I believe you just said that.  And then
25   your doctorate, correct?
0013
1         A.   Yes, I got a doctorate at Rice.
2         Q.   And what specialty or area did you receive
3    your doctorate in?
4         A.   Industrial psychology is my field, and human
5    factors engineering is my subspecialty.
6         Q.   Do you hold any licenses?
7         A.   No.
8         Q.   Okay.  Do you -- are you not a licensed
9    psychologist?
10        A.   No.
11        Q.   In the entire time that you've been consulting
12   and doing work in the area of industrial psychology or
13   human factors engineering, have you received any kind of
14   awards?
15        A.   No.
16        Q.   Okay.  Any citations from any organization or
17   anything like that?
18        A.   Not that I can think of, right offhand.
19        Q.   Okay.  You --
20        A.   I mean, I was the president of the local
21   chapter, and I've held offices in the national
```
Page 6

Laux Lila F  - Vol  I.txt

22  organization and things like that, but I don't consider
23  those awards.
24       Q.   Are those the professional affiliations you
25  talked about, that are human factors and ergonomic
0014
1  societies?
2       A.   Those are the ones that, yeah, are fairly
3  current, right.
4       Q.   Your employment history, you were a teacher
5  from 1961 to 1968; is that correct?
6       A.   Yes.
7       Q.   Okay.  Then you went to Germany for about ten
8  years?
9       A.   I think it was eight.
10      Q.   Okay.  And then, thereafter, you went to
11  academic -- different adademic postings where you were
12  doing research; is that accurate?
13      A.   Not quite.  I then went to the University of
14  Southwest Louisiana and was working on my master's.  And
15  during that time, I was also teaching and working in the
16  counseling center, that's true.
17           And then from there, I went to Rice, where I
18  started working on my Ph.D.  And then my second year
19  there, I was hired by Baylor College of Medicine to be
20  on the staff of the community medicine program, and then
21  later became part of the faculty there.
22      Q.   That was in 1985 when you became a member of
23  the faculty?
24      A.   No.  I became a member of the faculty much
25  earlier than that, but I can't remember exactly what
0015
1  year.
2       Q.   And you held that post until when?
3       A.   Until I moved away from Houston, which, I
4  think, was 1994.  And I still am an adjunct there, at
5  least I was the last time I checked.  I probably need to
6  check it and see if my -- if it's still active.
7       Q.   While in the univer- -- while at Baylor
8  College of Medicine, were you in or around the students
9  when they were in classes and things like that?
10      A.   Medical students?
11      Q.   Yes.
12      A.   To some extent, yes.  But mostly I was doing
13  research in the community medicine centers.
14      Q.   When you moved to Colorado, it's my
15  understanding, you started working for US West
16  Technologies and then Qwest.
17      A.   Yes, um-hmm.
18      Q.   And what position did you told with them?
19      A.   I was probably a lead human factors engineer.
20      Q.   Okay.  What does a lead human factors engineer
21  do?
22      A.   Well, a lead human factors engineer apply --
23  applies the knowledge that human factors psychologists
24  have, to the design of systems.  So as a human factors
25  psychologist, I was trained to understand how people's
0016
1  capabilities and limitations affect their ability to do
2  different kinds of activities, including work; so how
3  would you design a system that's going to optimize the
4  strengths that humans have and minimize effects of the
5  weaknesses that humans have.
6       Q.   That sounds like it's pretty broad and all-
                          Page 7

Laux Lila F  - Vol  I.txt
7  encompassing.  We're not talking about specifically just
8  products when you're talking about a system, correct?
9          A.   Well, depends on how you define a product.
10 When I was working at US West and Qwest, what I was
11 working on in those instances was typically devices that
12 either the people would use to provide you with phone
13 service or that they would use to go out on the poles
14 and troubleshoot or in their trucks and troubleshoot.
15          So it was mostly looking at how to design
16 either a computer system or some kind of device for a
17 human being to use to perform work.
18          Q.   And the system that when you're talking about
19 human factors analysis, does the system include, for
20 instance, services as well as products?
21          A.   Well, it depends on how you would define
22 "services."  I mean, if we're talking about services
23 like providing you with a interface for a -- for e-mail,
24 it would.
25          Q.   What about for, say, you -- well, you've
0017
1  talked about hospitals, to go into a hospital.  Can
2  human factors analysis take into account how doctors and
3  patients interact, and all that kind of stuff, as well?
4          A.   Oh, we did a lot of that while I was on the
5  faculty at Baylor.  But we also looked at things like,
6  how do you design permission -- you know, when you ask
7  someone to give informed consent for some procedure, how
8  do you design that.  So there were a variety of things,
9  anytime there's a human involved and there needs to be a
10 transfer of information.
11          Q.   So that would include even interactions
12 between two people in society?
13          A.   Well, it would depend on whether there was a
14 need for that information to be transferred.  So, for
15 instance, if I'm looking at how you would inform someone
16 who maybe can't read, then possibly verbal communi-
17 cations would come into play.
18          Q.   Okay.  You also, I guess, toward the end of
19 your time with Qwest, started Human Factors Consulting.
20 Is that correct?
21          A.   Well, actually, no.  I'd been doing Human
22 Factors Consulting since 1986.  During the time that I
23 was still at Rice and on the faculty there and part of
24 the human engineering lab, I did a lot of consulting at
25 that time.
0018
1          Q.   And that's -- the focus of the work at Human
2  Factors Consulting is what?
3          A.   Well, I work with attorneys, obviously, but I
4  also work with industries if they're interested in
5  testing.  For instance, sometimes I do -- I set up
6  testing for their warnings and instructions.  Or if
7  they're just interested in having me come in and
8  evaluate their warnings or other materials that they're
9  going to provide, I do that.
10          I may consult with them on the design of a
11 product.  For instance, sometimes in medical devices,
12 they will call.  And I have been called, in several
13 instances, to help evaluate a medical device to see if
14 it's something that a human being could reasonably be
15 expected to use safely and appropriately.
16          Q.   In the last ten years, what percentage of your
17 time has been spent on litigation matters, versus going
                              Page 8

Laux Lila F  - Vol  I.txt
18  in and doing something with industry, like you just
19  described?
20      A.   Well, you know that I also work for a
21  company --
22      Q.   Yes, ma'am.
23      A.   -- that provides consulting.  And so I work
24  pretty much full time right now.  I've been working, for
25  the last two years, with Lockheed Martin on the design
0019
1  of a new spacecraft that will replace the Shuttle.  So
2  that takes up the vast majority of my time.  And I
3  guess, maybe even, on average, eight to ten hours --
4  well, that's probably too much -- five to six hours a
5  week, in addition, I spend on things that I would call
6  Human Factors Consulting.  But it's never spread out
7  like that.
8      Q.   My question was more along the lines of, in
9  Human Factors Consulting, which is the name of your
10  company --
11      A.   Right.
12      Q.   -- how much of the time -- how much work for
13  just that company is on litigation versus helping out
14  industry on -- in the areas that you described?
15      A.   Probably, these days, about 90 to 95 percent
16  of what I do is for Human Factors Consulting, because I
17  don't really have time to do much else.
18      Q.   So 90 percent of the work through Human
19  Factors Consulting, the company, is probably on
20  litigation?
21      A.   Probably.
22      Q.   Of that 90 percent, how is that divided
23  between plaintiff work versus defense work?
24      A.   Well, in the last four or five years, for
25  sure, it's been entirely plaintiffs.
0020
1      Q.   When's the last time you represented -- or,
2  excuse me, when's the last time you assisted a defendant
3  in litigation?
4      A.   I don't really recall.  Most of the times when
5  I was asked to do that, it was by a third party, like an
6  insurance company or something like that.  So I don't
7  really recall when I was last asked by a defense
8  attorney.
9      Q.   Would it have been in the 2000s?
10      A.   I don't know.
11      Q.   And you also currently work, as you described
12  for us, at Micro Analysis & Design; is that correct?
13      A.   No.  It's now called Alion Science &
14  Technology, as you see on the CV.  I have put Micro
15  Analysis & Design in there because that's what it was
16  when I went to work for them.  But we've been -- it's a
17  small company, and we were bought by a large defense
18  contracting firm on the East Coast, which is Alion.
19      Q.   And you started to describe for us, and I
20  don't want to get into a whole lot of detail, but with
21  that company, you were working primarily with military
22  or governmental agencies, like NASA, for designing
23  systems for whatever those needs might be?
24      A.   True.  Although, you know, when you think
25  about the spacecraft, it's -- it's pretty specifically
0021
1  what we're doing.  We're looking at, you know, how to
2  design the spacecraft so that these astronauts can
                            Page 9

Laux Lila F  - Vol  I.txt

```
 3   safely go back and forth to the ISS, to the moon, and
 4   eventually on to Mars.
 5       Q.    I don't want to ask too many questions about
 6   your husband, but I want to ask a few, based on his past
 7   history.  Are you still married to John Peter?
 8       A.    Last I knew.
 9       Q.    Okay.  Just making sure.  I didn't want to
10   presume something that may not be the case.  He worked
11   for Dow Chemical, correct?
12       A.    He did.
13       Q.    Okay.  He was geochemist?
14       A.    He is a geochemist, yes.
15       Q.    He is a geochemist, okay.  And while he was
16   working for Dow Chemical, did he have the opportunity to
17   work with different types of toxic chemicals and things
18   of that nature?
19       A.    Well, I don't know, but I would assume.
20       Q.    Okay.  It's not something that you've
21   discussed with him?
22       A.    No.
23       Q.    Okay.  Did he ever bring home any kind of
24   MSDSs or anything like that?
25       A.    No, he didn't.
0022
 1       Q.    Thereafter he went to -- it's my
 2   understanding, he became VP of exploration at some
 3   smaller companies, DeKalb being one.  Is that correct?
 4       A.    What?
 5       Q.    DeKalb.  Did I pronounce that --
 6       A.    Oh, DeKalb, uh-huh.
 7       Q.    Okay.  Same question.  At any time did he
 8   discuss different types of substances he might be
 9   exposed to at work?
10       A.    At that point he was never going out on rigs
11   anymore.  I mean, that -- going out on the rigs was, you
12   know, something that happened in his early days.
13       Q.    Okay.  Again, he didn't bring home any kind of
14   MSDSs or ask you anything about them?
15       A.    No.
16       Q.    The last information I have about his work is
17   that he was at the Department of Health for the State of
18   Colorado and retired in 2001.  Is that accurate?
19       A.    That's -- I think 2001's probably right, yeah.
20       Q.    Okay.  He was a geochemist -- or that was
21   his position with the Department of Health?
22       A.    You know, I don't know.  I have no idea what
23   he -- what they called him.
24       Q.    Did -- did he supervise a hazardous waste
25   division for the Department of Health?
0023
 1       A.    I don't know that he supervised, but he
 2   certainly worked in the hazardous waste area.  He -- he
 3   did go out and evaluate sites, you know, where garbage
 4   is dumped and stuff like that.  And he did do some work
 5   with hazardous waste, you're right, he did.  I'd
 6   forgotten about that.
 7       Q.    Was he -- are you able to tell me what his job
 8   duties were in regards to the hazardous waste division?
 9       A.    Well, he would be called to go out and do an
10   evaluation and write a report, and then to make
11   recommendations.
12       Q.    Recommen- --
13       A.    But, you know, I don't know.  I don't really
```

Page 10

Laux Lila F - Vol I.txt

14   know very detailed work, what he did.
15        Q.    Did you ever consult with him or assist him in
16   drafting anything to do with the hazardous waste sites?
17        A.    No.
18        Q.    Did he ever discuss with you anything about
19   the hazardous waste sites, the different types of
20   substances that might be involved?
21        A.    No.
22        Q.    Okay.  And no MSDSs were ever brought home to
23   be talked about over the dinner table?
24        A.    No.
25        Q.    Do you have more exciting stuff to talk about?
0024
1         A.    I hope so.
2         Q.    Did you discuss with your husband any --
3    anything about this particular case?
4         A.    No.
5         Q.    Okay.  In your past history, did you ever
6    actually design an owner's manual for a product?
7         A.    No.  I -- we did some, you know, work with
8    General Motors, as you're probably aware, where we made
9    some suggestions, which were later followed, about the
10   owner's manual for vehicles.  But, no, I never designed,
11   outright, an owner's manual.
12        Q.    You were part of a team that was working with
13   General Motors?
14        A.    Yes, I was the lead, um-hmm.
15        Q.    And would those -- or was the end product from
16   your team ultimately put into commercial use by General
17   Motors?
18        A.    Well, yes and no.  And the reason I say that
19   is that we ultimately wrote a manual for General Motors
20   to follow when they designed their user manuals and
21   their warnings and labels for their vehicles, which they
22   then did use to help them design the warnings and so
23   forth that they put into their vehicles.
24        Q.    So it was a manual on how to write a manual?
25        A.    Exactly.
0025
1         Q.    Okay.
2         A.    Oh, and not just how to write a manual, but
3    how to develop warnings and how to figure out what
4    warnings you needed to have and how to test your
5    warnings and . . .
6         Q.    Have you ever written a warning that's been
7    put into commercial use?
8         A.    You mean on a product?
9         Q.    On a product line?
10        A.    I don't do that because I don't think that's
11   appropriate.
12        Q.    Why don't you think it's important?
13        A.    I didn't say I didn't think it was important.
14   I said --
15        Q.    I'm sorry.
16        A.    -- "I don't think it's appropriate."
17        Q.    Appropriate, I apologize.
18        A.    I don't think it's appropriate because when
19   companies come to me and ask me to develop warnings,
20   what I tell them is:  I will help you develop your
21   warnings, because the warnings have to belong to you.
22   They can't be my warnings.  They have to be your
23   warnings.  You have to believe in them.  You have to
24   accept them.  You have to be responsible for them,
                              Page 11

Laux Lila F  - Vol  I.txt

25   and -- and make sure that they stay updated and that you
0026
 1   do everything you need to do.  So I will help you, but I
 2   won't write your warning.
 3        Q.   You should take ownership, you're talking
 4   about psychological ownership of it?
 5        A.   That's a good piece of it, yes.
 6        Q.   Okay.  And is there any particular reason why,
 7   once the -- the warning is drafted, it has to be drafted
 8   by the company, versus some outside consultant?
 9        A.   Well, that's not necessarily true.  The
10   company can hire an outside consultant to assist them,
11   particularly with the graphical aspects of it, for
12   instance; and picking the materials that the warning --
13   if it's a warning label, picking the materials that the
14   warning label would be made out of, because that's a
15   very important part of the whole process.
16             So they might have outside consultants who
17   would help them, but they have to psychologically, as
18   you said, own that warning.  That warning, they have to
19   believe in that warning.  They have to -- they know
20   their product.  And so they're the ones who have to be
21   constantly vigilant to make sure that if new information
22   is available to them, that they take that into account
23   and maybe redraft their warnings.  They have to be the
24   ones who are willing to test the warnings and accept
25   the -- accept the findings and do something about
0027
 1   whatever the findings are.
 2             So if an outside expert comes in and says,
 3   "Here's your warning," then the person who's going to
 4   the manufacturer, or whatever, is not going to feel
 5   connected to that warning and to the users who have to
 6   get information from that warning.
 7        Q.   So as new information's developed, it's
 8   important for the company to go back and -- and act on
 9   that information?
10        A.   Absolutely.
11        Q.   Okay.  Does that mean that the preceding
12   warning, if they act on it, was inadequate?
13        A.   Not if they included everything that they knew
14   and understood at the time and should have reasonably
15   been expected to know and understand.  Because sometimes
16   we do get new information that we were not aware of or
17   couldn't have been aware of earlier.  I guess that's the
18   most important consideration.
19        Q.   In past litigation have you actually drafted
20   prototypes of warnings?
21        A.   I have when I've been asked to do so.
22        Q.   Have you ever designed a warning specifically
23   for a travel trailer product?
24        A.   No, I haven't.
25        Q.   Okay.  Manufactured homes, have you ever
0028
 1   drafted a warning for a manufactured home?
 2        A.   I think I may have drafted a warning for a
 3   stove in a FEMA trailer.
 4        Q.   Do you remember the case that they hired?
 5        A.   Well, it's -- no, I don't.  And I'm going to
 6   give a deposition in it, in a couple of weeks, but I
 7   don't remember the style.
 8        Q.   Do you remember the manufacturer of the
 9   trailer?

Laux Lila F - Vol I.txt

10    A.   No, I don't.
11    Q.   Is that case in Louisiana?
12    A.   I believe so.
13    Q.   Which attorney are you --
14    A.   His name is Michael Breden, I think.  Or Batt,
15 B-a-t-t, is his name.  I think the person that I've
16 dealt with the most is Michael Breden, and I'm not sure
17 he's an attorney.
18    Q.   Where does Michael Batt have his office?
19    A.    I don't know that it's Michael Batt.  I don't
20 know his first name, Mr. Batt.  I think they're in New
21 Orleans.
22    Q.   Have you ever consulted with a travel trailer
23 manufacturer?
24    A.   No.
25    Q.   Have you ever consulted with the manufacturer
0029
1 of a home manufacturer?
2    A.   No.
3    Q.   Have you ever done any kind of research into
4 the types of warnings that should be in travel trailers?
5    A.   Beyond normal research into how to do warnings
6 and so forth and specifically for travel trailers?
7    Q.   Correct.
8    A.   Only in the instance of this --
9    Q.   This case?
10    A.   -- stove.
11    Q.   Okay, the stove.  But preceding this case with
12 the stove, had you done any kind of studies on the types
13 of warnings that should be in travel trailers?
14    A.   Well, I guess I really don't understand your
15 question.  I mean, the types of warnings that should be
16 in travel trailers are the types of warnings that should
17 be anywhere.  When there's a hazard, there should be a
18 warning, so -- have I tried to identify the hazards in
19 travel trailers specifically?  No, I haven't.
20    Q.   Okay.  And you did a good job of getting to
21 where I want.  I think it's implicit in my question
22 that I'm getting towards travel trailers.
23         I understand that, in your opinion, that
24 there's warnings and hazards all around us, and there
25 should be warnings of those hazards.  But I'm speaking
0030
1 specifically about travel trailers when I ask you about
2 travel trailers.
3    A.   Right.
4    MR. PINEDO:  Objection to form.
5    A.   I understood that.  And that's why I tried to
6 clarify that.
7    Q.   (By Mr. Glass)  I appreciate that.  Have you
8 tested the effectiveness of any warnings that are
9 contained in travel trailers?
10    A.   No.
11    Q.   Have you tested the effectiveness of any
12 information that's provided in any travel trailer
13 manufacturers owner's manual?
14    A.   No.
15    Q.   There are a number of agencies that may touch
16 on some of the issues that we're going to go into here
17 today.  I think that you may have done either some
18 reports or presentations to one of those, the American
19 Society of Testing Materials.  Have you done some
20 publications or some reports for them?

Page 13

Laux Lila F  - Vol  I.txt

```
21        A.   I did a paper for them, which was supposed to
22   be published, but they actually never published it.
23   It's the -- the paper and the presentation we provided
24   to them.  We did go to the conference and present the
25   paper, but the proceedings never did get published.
0031
 1        Q.   What was the topic of that paper?
 2        A.   That had to do with MSDSs, using MSDSs to warn
 3   end-users.
 4        Q.   Is that listed in what we've marked as Laux 4?
 5        A.   Certainly should be.  Yeah, here it is, on
 6   Page 5, the third one:  "Communicating with the worker
 7   through the MSDS," Haz Com II:  "Material Safety Data
 8   Sheets Are a Communication Tool."
 9        Q.   Do you have a copy of that article?
10        A.   Maybe, somewhere.
11        Q.   Okay.
12        A.   I could probably get you a copy by getting in
13   touch with my colleague, Kenneth Laughery, who is
14   retired, but I think I could track him down.
15        Q.   Okay.  I would ask if you could find that for
16   me.  I would greatly appreciate it.
17        A.   If you would send me -- send Mr. Pinedo a
18   request, and he will get it to me; otherwise, I won't
19   remember it.
20        Q.   I will do that.  Have you ever been on a
21   committee for the American National Standards Institute?
22        A.   No, I haven't.
23        Q.   That's ANSI, correct?
24        A.   Correct.
25        Q.   Have you chaired any committees, drafting
0032
 1   committees, done anything with anybody at ANSI,
 2   regarding warnings?
 3        A.   Well, I've worked quite a bit with people who
 4   are on that committee, like Mike Wogalter and -- oh, I
 5   can't remember -- Ned Silver, different people.  But,
 6   no, I have not done any direct work for ANSI.
 7        Q.   Well, you worked -- did these individuals that
 8   you just identified contact you to provide some kind of
 9   input on any standard that was being drafted?
10        A.   I can't remember what Mike -- I know Mike was
11   writing a book, Mike Wogalter was writing a book, on
12   warnings, and he asked me to provide a chapter, which I
13   don't do, but interfaced with him several times about
14   that.
15        Q.   What's Mike's last name?
16        A.   Wogalter.  He's at UN -- NC State, North
17   Carolina State, on the faculty there.  W-o-g-a-l-t-e-r,
18   just like it sounds.
19        Q.   Wow, amazingly, I spelled it correctly.  How
20   about ISO?  Have you ever been a consult -- did anybody
21   consult with you to draft anything for ISO?
22        A.   Yes.  I worked on -- with -- oh, I can't think
23   of his name right now, who was drafting standards for
24   the design of systems for the elderly, which was going
25   to be in an ISO standard.
0033
 1        Q.   Was that actually put in place?
 2        A.   Well, the standard has certainly been put in
 3   place, yes.
 4        Q.   When did you work with this individual at ISO?
 5        A.   Oh, it's probably been five years or so.
```

Page 14

Laux Lila F  - Vol I.txt
```
 6        Q.    Did you look at the standard to see if any
 7   information that you provided was actually incorporated
 8   into that standard?
 9        A.    Well, I believe some was; probably nothing
10   that I said word for word, but sure.  You know, I was
11   considered at that time, and probably still am
12   considered an expert in the geron- -- gerontological
13   human factors.
14        Q.    Were you actually an official member of a
15   drafting committee for ISO?
16        A.    No.
17        Q.    Okay.  ISO -- I'm sorry, an advisory committee
18   for ISO?
19        A.    I don't think I was official, no.
20        Q.    I'm going to ask you about some other
21   agencies, and I'll try and run through them very
22   quickly.  Have you had any involvement with EPA?
23        A.    No.
24        Q.    Okay.  You've never been on a chair or
25   committee or -- or provided any consultation with the
0034
 1   EPA?
 2        A.    No.
 3        Q.    Okay.  Would the same be true for OSHA?
 4        A.    Yes.
 5        Q.    You have not had any --
 6        A.    Nothing formal, no.
 7        Q.    -- consultation?  Okay.  You just -- you
 8   hesitated.  Why are you hesitating on that question?
 9        A.    Well, at conferences and things, I have
10   interacted with folks from OSHA and we've discussed
11   various things.  But, you know, I wouldn't ever call
12   that any official capacity with OSHA.
13        Q.    The things that you consulted with, with these
14   representatives from OSHA, did it involve any kind of
15   exposure levels to substances or anything like that?
16        A.    I'm trying to remember.  These sorts of things
17   take place at the human factors conferences, you know,
18   where people from OSHA and other places come and give
19   presentations, and I'm there giving a presentation, and
20   we interact.  And beyond what we talked about in the
21   MSDS paper, I don't think so.
22        Q.    Have you had any input on actual policy
23   decisions through OSHA?
24        A.    No.
25        Q.    Okay.  For NIOSH, have you had any input on
0035
 1   any policy decisions for -- decisions for NIOSH?
 2        A.    I don't think so.  Maybe with the lifting
 3   standard that came out, there was stuff that I did, you
 4   know, through the Human Factors Society.  But I don't
 5   think it would be considered official, no.
 6        Q.    So you weren't on a committee or --
 7        A.    No.
 8        Q.    -- you weren't consulted in a -- in a
 9   official capacity --
10        A.    No.
11        Q.    -- with NIOSH?
12        A.    Not an official capacity, no.
13        Q.    What about Chemical Manufacturers Association,
14   have you done any work with them?
15        A.    No.
16        Q.    Have you ever consulted with them?
```
                              Page 15

Laux Lila F  - Vol  I.txt

```
17          A.   No.
18          Q.   HUD, have you ever consulted with HUD?
19          A.   No.
20          Q.   Have you ever had any input on any kind of
21     standards or regulations that may have been promulgated
22     through HUD?
23          A.   Nope.
24          Q.   FEMA, have you ever done any work with FEMA?
25          A.   Nope.
0036
 1          Q.   Have you ever been consulted by FEMA?
 2          A.   No, I don't think so.
 3          Q.   Have you had any input on anything that has
 4     been promulgated by FEMA?
 5          A.   No.
 6          Q.   National Particleboard Association, have you
 7     had anything to do with them?
 8          A.   No.
 9          Q.   Ever consulted with them?
10          A.   No.
11          Q.   Ever talked to them about their warnings or
12     products?
13          A.   No.
14          Q.   Composite Panel Association, have you ever
15     talked to them?
16          A.   No.
17          Q.   Have you ever been consulted by anybody that
18     was associated with Composite Panel Association?
19          A.   Not if they -- not that I know that they represented
20     themselves that way, no.
21          Q.   Have you ever had the opportunity, in your
22     working history, to work with Consumer Products Safety
23     Commission?
24          A.   Hmm, yes, but I can't remember exactly why.  I
25     remember going to D.C. and meeting with them.
0037
 1          Q.   At their request?  Or I guess I should say its
 2     request.
 3          A.   It's been so long, it was while I was still at
 4     Rice, I don't even remember what the issue was.  I might
 5     think of it in a minute.  I can't think of it right now.
 6          Q.   Is it your general recollection that it had to
 7     do with some kind of product that the CPSC was looking
 8     at?
 9          A.   I think it probably did have to do with ground
10     fault circuit interruptors, but I don't think it was
11     that narrow.
12          Q.   When you say you -- it was while you were at
13     Rice, what time frame are you thinking this was?
14          A.   Well, I was at Rice, on the faculty, from '86
15     through '94.
16          Q.   Do you remember who you spoke with at the
17     CPSC?
18          A.   No.  It was a woman, but I don't remember her
19     name.  You're asking me to do memory recall that I'm not
20     capable of.
21          Q.   Was the situation where you were offering some
22     guidance on how there should be some warnings associated
23     with GFIs?
24          A.   Well, there were warnings associated with
25     GFIs, and I think the issue was that the warning didn't
0038
 1     seem to be doing the trick.  And so we were doing, while
```

Page 16

Laux Lila F  - Vol  I.txt

2   I was still at Rice, a lot of research on warnings and
3   hazards associated with consumer products.  And I think
4   that at that time, I was in Washington, and I met with
5   them about some of that work.  And, you know, I just
6   don't have a very clear memory of it.
7        Q.    Well, thinking back on something you said a
8   little while ago, you've done work for GM, and you
9   provided a manual that offered guidance on how to draft
10  manuals and warnings.  In your history of litigation
11  work, have you ever been critical of any GM manuals?
12       A.    Probably.
13       Q.    Have you ever been critical of any GM
14  warnings?
15       A.    Probably.  I can't tell you specifically, but
16  it's more than likely.
17       Q.    Have you ever been consulted or done any work
18  with ATSDR?
19       A.    No.
20       Q.    Have you had any input on any publications or
21  standards that have been set forth by the AT -- ATSDR?
22       A.    No.
23       Q.    The American Conference of Governmental
24  Industrial Hygienists, have you ever been consulted by
25  them?
0039
1        A.    No.
2        Q.    Have you ever had any input on any standards
3   that they have published?
4        A.    No.
5        Q.    How about Recreational Vehicle Industry
6   Association, have you ever been consulted with them?
7        A.    No, I haven't.
8        Q.    Formaldehyde Council, Inc., have you ever
9   worked with them?
10       A.    No, I haven't.
11       Q.    World Health Organization?
12       A.    No.
13       Q.    You haven't had any opportunity to consult
14  with them?
15       A.    No, I haven't consulted with them.  When I was
16  at Baylor, the chairman of our department was part of
17  the World Health Organization team that did some work,
18  but I -- I wouldn't say I was involved with it.
19       Q.    So you have not had any input into any
20  standards that they might have set forth at any time?
21       A.    No.
22       Q.    Any other industry groups that might touch on
23  the topics that we're here to discuss today that you
24  might have consulted with?
25       A.    I don't recall any.
0040
1        Q.    Okay.  Let's go back to Exhibit 1, which is
2   the notice of deposition with Exhibit A attached.  If I
3   can find it.
4        A.    I have Exhibit 1 here, but you have your own
5   copy, I'm assuming.
6        Q.    Yeah, I'm going to go along and look at it
7   with you.  You said you brought some documentation.  I
8   want to go through and make sure that I have everything
9   that you've relied on.  And I'll do that as I get
10  through Exhibit A, I'm sure.
11       A.    Well, you know everything I've relied on,
12  because it was in my report.  I listed it.  There may be
Page 17

Laux Lila F  - Vol  I.txt
13  one thing that wasn't in my report, that I forgot to put
14  in, that I actually looked at, and that was an ATSDR
15  report.
16       Q.   Okay.   Here's -- here's what I'm going to do,
17  because I don't have a huge amount of time and I have to
18  get into your report at some -- at some point.   I have a
19  disk that has -- that was provided to us.   Actually,
20  I -- I have three disks with me; two that contain
21  photographs of the trailer and then also Alana
22  Alexander's current residence, and then one contained
23  files that were called reliance files.
24       I have the disk that has the reliance files in
25  my computer right now.   And it has several subfolders,
0041
1  one containing articles, and there are a list of
2  articles that is too extensive for me to spell out right
3  here; documents produced by Gulf Stream, and they are
4  all, for the most part, I believe, Bates numbered;
5  another folder, IA Disaster File, which contains three
6  PDF documents.
7       A.   What is that?
8       Q.   This is the disk of reliance files.
9       A.   I know, but what was the name of that folder?
10       Q.   IA File, IA Disaster File.
11       A.   I don't know what that is.
12       Q.   And the subfolders, you know, the PDF
13  documents were Alana Alexander Disaster File.   495 is
14  the second one, and inspection checklist was the third
15  PDF tile.   You don't recall seeing them?
16       A.   I'd have to look at them to tell you whether
17  I've seen that or not.   I don't remember the checklist
18  for sure.
19       Q.   Okay.
20       A.   But that may be something that she did provide
21  to me as part of the manual that I got that she had had.
22       Q.   When you're saying "she," you're talking about
23  Alana Alexander?
24       A.   Yes, I am.
25       Q.   The next subfolder is "Medicals," and it
0042
1  contains one PDF file, Janet Barnes' medical records
2  from Weinstock.
3       There's a -- next folder is "Other Expert
4  Reports," contains three PDF files; final class cert,
5  expert report Kaltofen; final class cert, expert report
6  Smulski; and final class cert, report Williams.
7       A.   Yes.
8       Q.   Are those the only expert reports that you
9  have reviewed?
10       A.   No.   But they were the only ones I had
11  reviewed at the time I wrote my report.
12       Q.   Okay.   We'll get to what additional work
13  you've done before you --
14       A.   Right.   But I wanted to answer your question
15  accurately.
16       Q.   I -- I appreciate it.   Okay.   So as of the
17  date of your report, November 11th, 2009, the only
18  expert reports you had reviewed were Kaltofen, Williams,
19  and Smulski?
20       A.   I believe so.
21       Q.   Okay.   And those were the reports from the
22  class certification, correct?   That's what they are
23  labeled?

Page 18

Laux Lila F  - Vol  I.txt

24        A.   If that's what they're labeled, then that's
25   what they were.
0043
1         Q.   You did not see the reports that were
2    submitted this month, correct?
3         A.   I have seen them, but I didn't -- hadn't seen
4    them at that point.
5         Q.   As of the time of drafting your report?
6         A.   That's correct.
7         Q.   All of my questions, going forward, until I
8    tell you otherwise, will be up to the date of your
9    report, just so that we don't have the same confusion.
10        A.   Well, right, except that if somebody goes in
11   and just looks in someplace and doesn't know that you've
12   said that --
13        Q.   Okay.  Rather than waste time on it, we'll
14   just keep going the way we are.
15             Other reliance materials, there are eight
16   sub- -- PDF files in that subfolder.  Looks like ANSI
17   MDF, which, I'm assuming, is medium density fiberboard.
18        A.   Yes.
19        Q.   ANSI PBD; ATSDR Facts; FEMA Instructions; HC
20   transmittal letter; HUD stamp; introduction and general
21   information; and office of assistant secretary of
22   housing, HUD.  Those are the -- the captioned files.
23        A.   Well, I'm sure I sent those to Mr. Pinedo, so
24   I must have had them.
25        Q.   Okay.  The next folder is owner's manuals, and
0044
1    there are one, two, three -- 16 PDF files for various
2    manufacturers owner's manuals, if I counted correctly.
3    Did you review all those owner's manuals before you
4    drafted your report?
5         A.   If I sent those to him -- I don't remember
6    that many owner's manuals, but if I sent 'em to him,
7    then I must have reviewed them.
8         Q.   Let me try and short-circuit what I'm -- and I
9    have two -- two folders that I need to go into again.
10   But what I'm doing, and I'll represent to you that I
11   have found documents on the disk that were not listed
12   out on your report.  And I'm trying to determine, at the
13   time you wrote report -- your report, did you review
14   everything in the reliance materials as well as
15   everything listed on your report?
16        A.   I don't know.
17        Q.   Okay.
18        A.   To be honest.
19        Q.   We'd have to go through each document to
20   determine that?
21        A.   Well, this all happened so quickly that I --
22   and I had to create this disk to send to Mr. Pinedo so
23   quickly, that I'm not sure, a hundred percent sure, that
24   everything on that disk is stuff that I had reviewed
25   before I wrote my report, because I did put the disk
0045
1    together after I wrote the report.
2         Q.   I don't want you to do it today, and
3    especially not during this deposition, given the time
4    constraints, but I would ask that -- I will attach all
5    the disks to this deposition, and I'm assuming that,
6    since you generally do look at your transcripts and sign
7    them, if at that time you would go through and -- and
8    confirm that everything that you're looking at is

Laux Lila F  - Vol  I.txt

```
 9   something that you looked at when you drafted the
10   report.
11        A.   What's listed in my report is what I looked
12   at.  That much we can be sure of.
13        Q.   Okay.
14        A.   So if it isn't listed in my report, I haven't
15   seen it prior to my report.
16        Q.   Okay.  That helps me out tremendously.
17   Plaintiff fact sheets, subfolder there.  There are two
18   PDF files, one for Alana Alexander and one for
19   Christopher Cooper.
20             And then the last folder is labeled "Testing,"
21   and it contains two PDFs, I believe, as well.  Yes, it
22   does.  One's labeled May 18th, 2009, and one is labeled
23   May 6, hyphen, 7, '09 which, I assume -- which, I know,
24   are testing results that were done on those days.
25             You looked at those before the drafting of
0046
 1   your report?
 2        A.   I believe so.  I know --
 3        Q.   Okay.
 4        A.   -- I had seen -- yes, I'm pretty sure.
 5             MR. PINEDO:  Just so the record's clear, the
 6   one May 18, that was after she had finished her report.
 7             MR. GLASS:  Okay, correct.
 8             MR. PINEDO:  That was sent to her, as it was a
 9   correction of the previous one.
10             THE DEPONENT:  I had seen the previous one,
11   that's correct.
12        Q.   (By Mr. Glass)  Okay.  And I'm going to move
13   to attach these three disks globo.  I think we're on
14   No. 5, Laux 5.
15        A.   Okay.  Do you still want me to go through 'em?
16   Because I've told you that what's listed on my report is
17   what I looked at --
18        Q.   No, ma'am.
19        A.   -- prior to writing the report.
20        Q.   I don't need you to go through and tell me
21   that.  I can -- I can do it just as easily later on.
22   But I do want to ask you a question.  The -- do you
23   recall what -- what additional documents you looked at
24   after the drafting of your report?
25        A.   Well, anything that's on those disks that
0047
 1   you -- that is not listed in the report, plus some
 2   materials that I brought with me.
 3        Q.   Can you tell me what materials you brought
 4   with you?
 5        A.   Well, let's see.  These were materials that
 6   Mr. Pinedo provided to me; the first supplemental and
 7   amended complaint, the stipulated protective order.
 8             MR. PINEDO:  If I could just, quick, for the
 9   record, she has the original, which she signed,
10   stipulated protective order.
11             THE DEPONENT:  Right.
12             MR. PINEDO:  So --
13        A.   And this, which should have been on there, and
14   I don't know if I got it onto the disk or not, is
15   called -- it's from the Committee on the -- U.S. House
16   of Representatives Committee on Science and Technology.
17   It's attached report entitled "Toxic Trailers."  And
18   that -- the date on that is September 22nd, 2008.  And I
19   would be glad, if I haven't provided it to you on that
```
                         Page 20

Laux Lila F  - Vol  I.txt
20  disk, I will be glad to provide it to you.
21      Q.   (By Mr. Glass)  Okay.
22      A.   So then I have these additional, Affidavit of
23  William D. Scott; this inspection report prepared by
24  Legrange Consulting; this report from Dr. Thomas Mayor
25  M-a-y-o-r.  Now, these things, I'm pretty sure, were
0048
1  provided to me by Mr. Pinedo, and I'm sure that I listed
2  them.  There's the affidavit of Marcus Kaltofen,
3  Smulski, Patricia Williams.  And all these things should
4  be listed.
5      Q.   You're flipping through, right now, several
6  Gulf Stream documents that are Bates labeled with the
7  Gulf Stream number at the bottom --
8      A.   Yes.
9      Q.   -- right?
10      A.   And they should be listed on my report.
11      Q.   I noticed that several of the items listed on
12  the disk, that had Bates labels with the Gulf prefix,
13  were not included in the items in your report.  Were
14  those provided to you later?
15      A.   Possibly.  But I also have this stack of
16  documents that I wrote:  Not relevant to me.  So it's
17  possible that he put them on there because he sent them
18  to me but I didn't consider them relevant to my report.
19      Q.   And you're looking at -- well, it has a sheet
20  that says "Dealer Purchases" on the top?
21      A.   Well, that's one of the things, but there are
22  other things in here too.  There's inadvertently copied
23  Card 4 of 4.  So there are just materials in here that I
24  didn't think -- 2005 -- that I didn't think were
25  relevant.
0049
1           A lot of them were duplicates, to be honest.
2  A lot of the documents that were sent to me, I had.  In
3  the stack of documents, there were sometimes two or even
4  three copies of the same thing, but they had different
5  Bates numbers.  Go figure.
6           So that's what's in here, but then I -- are --
7  am I reading off to you the things I've seen since I
8  wrote my report?
9      Q.   Yes.  Tell me what additional you've seen
10  since your report.
11      A.   Okay.
12           MR. PINEDO:  If I could, Ms. -- Dr. Laux, you
13  referenced this report, which you e-mailed to me this
14  morning.
15      A.   Right.  That's the one I was just talking
16  about that's from the committee, the U.S. House of
17  Representatives Committee on Science and Technology.  If
18  I don't have that referenced in my -- this toxic
19  trailers, toxic lethargy.  I should have had it
20  referenced in my report.  If I didn't --
21      Q.   You read that?
22      A.   -- it was an oversight in my -- on my part.
23  Yes, I did.
24      Q.   I'm sorry.  I didn't mean to interrupt.
25      A.   I did read it before I wrote my report.  And
0050
1  for some reason, it didn't get into the folder, and I
2  found it yesterday on MY desktop.  And my computer has
3  been completely messed up.  It's gone down twice, it's
4  crashed twice, in the last month, so -- okay, here's
                          Page 21

Laux Lila F - Vol I.txt

5    some more stuff.
6         Q.   Hold it.  Before we start, are those things
7    you've actually reviewed since you received them?
8         A.   Yes.
9         Q.   Okay.  So you've read all of these?
10        A.   Yes.
11        Q.   Okay.
12        A.   All right.  Affidavit of Alec -- Alexis
13   Mallette.  "Formaldehyde Exposure and Asthma in
14   Children, a Systemic Review," by Gerald McGwin,
15   M-c-G-w-i-n.  And here's an affidavit of his, and his
16   CV.
17             "Structural Condition Assessment for FEMA
18   Travel Trailer, Laudy, Louisiana," prepared for First
19   General Services of the South, by Charles David Moore,
20   M-o-o-r-e.
21             A report on Christopher Cooper from National
22   Jewish Health by --
23        Q.   Dr. Panchenco?
24        A.   I'm trying to find it.  I'm pretty sure it is.
25   Yes, Karen Pacheco.
0051
1             "Investigation of FEMA Travel Trailer,"
2    prepared by Irvin L. Ritter, psychological examination
3    performed by Edward Hayley Shwery, S-h-w-e-r-y.
4         Q.   That's S-c-h-w-r-e-y.
5         A.   No, not --
6         Q.   No?
7         A.   Not on the letterhead.
8         Q.   Okay.  Sorry.
9         A.   Affidavit of Steven Smulski, Affidavit of
10   Patricia Williams; those are, I think, the same thing I
11   had earlier.
12             Designation of expert witnesses.  From the
13   desk of Janet Barnes.  A narrative report of Chris
14   Cooper's, called "Formaldehyde Exposure."  Affidavit of
15   Gary Bunser.
16             Weather conditions in Punta Gorda, Florida and
17   New Orleans, Louisiana, for the trailer occupied by the
18   Alexander family.  Branscone, B-r-a-n-s-c-o-n-e.
19             Mary -- affidavit of Mary Deveney.  Affidavit
20   of Paul Hewett.  This is a report by Regan Johnson of
21   C4 Animation.  Again, the affidavit of Marcus Kaltofen.
22   The affidavit of James R. Kornberg, M.D.,
23   K-o-r-n-b-e-r-g.
24        Q.   In the affidavits that you just reviewed
25   there, of Smulski, Kaltofen, and Williams are duplicates
0052
1    of earlier ones?
2         A.   I believe.
3         Q.   Okay.  And you've read all these?
4         A.   Yes.
5         Q.   Okay.
6         A.   I can't say I've read every single word of
7    every one of those, but I've reviewed them to the extent
8    to determine whether they had information that was
9    useful to me, in them.
10        Q.   Did you see any of the defendants' expert
11   affidavits from the class certification?
12        A.   If I didn't read it off to you and I haven't
13   listed it in my report and it isn't on those disks, I
14   haven't seen it.
15        Q.   Okay.  Did you want to see anything from the

Laux Lila F  - Vol  I.txt

16  defense side?
17       A.   I certainly would like to see it, yes.
18       Q.   Was it something you asked for before you
19  drafted your report?
20       A.   No.  I didn't have a chance to.  This went
21  very quickly.
22       Q.   Are your opinions in your May 11, 2009,
23  report valid, in light of the fact that there was other
24  information you wanted but didn't have?
25       A.   I believe they are valid, although I do have
0053
1   the caveat, on the end of my report, if you looked at
2   it, that said, if I learned of new information, I could
3   change my opinions.
4        Q.   What was the expert deadline for opinion --
5   deadline for reports on the plaintiffs' side in this
6   case, do you know?
7        A.   I think I -- it had to be -- I had to have it
8   in by the 15th, but I'm not sure what the deadline was
9   for them.
10            Can I have one of those watermelon ones?  I'm
11  kind of dry.
12       Q.   Certainly.  Do you need more water?
13       A.   No, I'm fine with the water.  I just wanted to
14  get something to wet my whistle.
15       Q.   Okay.  Are there any other documents that you
16  felt like you wanted to see before you drafted your
17  report, but were not provided an opportunity to see?
18            MR. PINEDO:  Objection, form.
19       A.   As you said, I didn't ask for those other
20  documents.
21       Q.   (By Mr. Glass)  Okay.
22       A.   So whatever I asked for, I received.
23       Q.   Other than the defense reports -- or, excuse
24  me, the affidavits from the class certification hearing,
25  are there any other documents that you feel like you --
0054
1   would be beneficial to your evaluation and your
2   conclusions in this report?
3            MR. PINEDO:  Objection, form.
4        A.   Not that I can think of.  Sorry.
5        Q.   (By Mr. Glass)  That's all right.  I'm going
6   to ask you to answer anyway, no matter that he's making
7   objections.
8        A.   Oh, I know.  But I feel sorry for the court
9   reporter, who's trying to take down everything
10  simultaneously.
11       Q.   Let's talk, very quickly, if we can, about
12  Exhibit A, and just make sure that if they aren't here,
13  that they don't exist, the documents that have been
14  requested.
15            The first request is for a list of any and all
16  objects including, travel trailer homes that are the
17  subject of this litigation, exemplar homes or component
18  part -- components, parts and items related thereto
19  which you have inspected, viewed, photographed, tested
20  or analyzed in connection with this litigation.
21            Did you look at any travel trailers?
22       A.   Nope.
23       Q.   Do -- is there a list of documents that needs
24  to be produced to us that would be responsive to this?
25       A.   I don't believe so.
0055

Page 23

Laux Lila F  - Vol  I.txt
```
 1        Q.   Okay.  As far as No. 2, on the testing data,
 2   test documents, test papers, et cetera, do you have any
 3   that haven't been identified, to this point?
 4        A.   Well, this says "memoranda or other
 5   writings . . . by you," so I'm assuming that all of that
 6   refers to things that I created.  And since I didn't
 7   create anything but the report, and since you've seen
 8   everything I've seen --
 9        Q.   That's what I'm asking you.  Is there anything
10   outside of -- that would be responsive to this, outside
11   of what you've already discussed?
12        A.   I don't think so.  But as I said, you know,
13   it's not exactly clear to me what it's asking for.  But
14   given my reading of it, that I would say no.
15        Q.   Well, later on I'll get into what you've done,
16   as far as your methodology, in reaching your opinions.
17   And if -- my reading of this would be there -- if there
18   are any documents that would be responsive to whatever
19   evaluation, tests, research that you've created, such as
20   notes, memoranda, anything like that, that would be
21   responsive.
22        A.   All right.
23        Q.   Are there any such documents?
24        A.   No.
25        Q.   "All photographs and videotapes viewed . . .
0056
 1   or taken by you in this case."  Did you take any
 2   photographs?
 3        A.   No.  I have this big -- which you've seen, I'm
 4   sure.
 5        Q.   Correct.  And I've attached that as Laux 5.
 6             Copies of all statements, written or recorded,
 7   that you've examined in connection with this case.
 8   You've given me the reports that you reviewed.  Did you
 9   review any statements by anybody in this case?
10        A.   Not that I know of.  Well, maybe those things
11   by Mrs. Alexander.
12        Q.   The plaintiff fact sheets?
13        A.   Um-hmm, those are statements, I guess, in my
14   mind.
15        Q.   Did you review any testimony that has been
16   given by anybody in this case, through either
17   depositions or congressional hearings, anything of that
18   nature?
19        A.   Unless it's listed in my list of materials,
20   no.  One of those things is a congressional hearing, I
21   think.  The AA -- well, one of them.  I can't remember
22   which one.
23        Q.   No. 5 is:  Any published standards from any
24   governmental body or agency or recognized authority used
25   or referenced by you in formulating your opinions.
0057
 1             We'll get into some of those opinions, but I
 2   know you referenced the HUD standard.  Anything
 3   else that -- or also an OSHA standard, I believe, you
 4   referenced.  Any other standards that you referenced?
 5        A.   I think there might be an ANSI standard in
 6   there.
 7        Q.   Okay.  ANSI 535?
 8        A.   I don't recall.
 9        Q.   Okay.  Anything else, off the top of your
10   head, that you can recall that you referenced?
11        A.   Again, if it didn't -- if it isn't referenced
```
Page 24

Laux Lila F  - Vol  I.txt

12  in the report, I probably didn't look at it.  So we can
13  look on there and see what's in there, but -- and if
14  it's referenced in the report, you should have a copy of
15  it.
16      Q.   The next three items, 6, 7, and 8, deal with
17  speeches, copies of published articles, and a list of
18  all your articles and seminar materials.
19          You provided us -- and I know it's not a
20  complete list, but you provided us -- or is it a
21  complete list?
22      A.   It is complete.  I added that section of
23  publications that I had done, that I had taken off my
24  CV, but it's there.
25      Q.   Okay.  No. 9 is a list of all cases in which
0058
1   you've provided to the court or counsel an expert
2   disclosure.  Is that something that you've also provided
3   to us?
4       A.   I provided you the list that I keep for
5   testifying in federal court, which has the last four
6   years, which is all I have.
7       Q.   Okay.
8       A.   If you don't have it, I have a copy of it
9   somewhere.
10      Q.   I have it.
11      A.   Oh, okay.
12      Q.   And I want to attach it as an exhibit.  That's
13  what I was looking for.  I'll attach it as Laux 6.
14      A.   Actually, there's one correction.
15      Q.   Well, we'll get to that.  Let me get this out
16  to all counsel.  That's the one you can look at.
17          MR. GLASS:  I don't have enough for everybody,
18  sorry.
19      Q.   (By Mr. Glass)  Okay.  You're looking at what
20  has been marked as Laux 6.  Is that your list of current
21  publications that's required under the Federal Rules?
22      A.   There are no publications on there.
23      Q.   I'm sorry, list of prior testimonies.
24  Apologize, ma'am.
25      A.   Yes, it is.
0059
1       Q.   You said there's one correction?
2       A.   There is.  Mr. Pinedo reminded me that that
3   one actually took place in 2008.  I didn't get paid till
4   2009, but it actually took place in 2008.
5       Q.   Okay.
6       A.   So I have a corrected one here.  This one.
7       Q.   Okay.  If I simply scratch through, on
8   Exhibit 6, the case that's next to Mr. Pinedo's name and
9   change that to 2009, that would be entirely accurate?
10      A.   Should be.
11      Q.   You know what?  I'll just mark the one you
12  gave me as 6.  How about that?
13      A.   Makes more sense to me.  It's also neater.
14  This one has a funny margin.
15      Q.   Okay.  Looking at the list that I've now
16  marked Laux 6, I see, toward the -- the bottom, that you
17  gave a deposition for -- well, you were retained by
18  Linda Thomas in a case that involved chlorinated
19  hydrocarbons?
20      A.   Yes, that's correct.
21      Q.   Pesticides?  Where was that case pending?
22      A.   I don't know.  I don't pay too much attention
                        Page 25

                         Laux Lila F  - Vol  I.txt
23    to that.  I went to Houston to give my deposition, but I
24    don't know where the case was pending.
25         Q.    What was the nature of the claim?
0060
 1         A.    I think it was also a class action suit, with
 2    volatile organic compound exposure.  But beyond that, I
 3    can't tell you too much else about it.
 4         Q.    Were you retained to offer an opinion as to
 5    whether there was an appropriate warning contained in
 6    tip of the VOC itself?
 7         A.    Yes.
 8         Q.    Okay.  Was that the result of bulk sales to an
 9    intermediary, or was it for end-user exposure?
10         A.    Both.  It was -- had to do with a plant in
11    Mission, Texas, that was producing pesticides, as I
12    recall.  And so it had an element from the providers of
13    the raw materials that -- they really were not raw
14    materials, but the materials that would be mixed into
15    these pesticides, and then the manufacturer of the
16    pesticides and the sale and the use of the pesticides.
17         Q.    Okay.  Is that case still ongoing?
18         A.    I heard from Mr. Reich that it's been stayed,
19    but I guess it's still ongoing.
20         Q.    Were your opinions accepted in -- in that
21    matter, or do you know if they've been even challenged?
22         A.    As far as I know, they haven't been
23    challenged.
24         Q.    Okay.  Were you offering opinions on MSDSs in
25    that case?
0061
 1         A.    Yes.
 2         Q.    Okay.  Did it also -- did your testimony
 3    encompass warnings themselves, on a barrel or something
 4    along those lines?
 5         A.    Yes.
 6         Q.    All right.  And I presume that you found that
 7    they were not sufficient.
 8         A.    I did.
 9              MR. PINEDO: Objection, form.
10         Q.    (By Mr. Glass)  Okay.  Did you find that those
11    were adequate?
12         A.    No, I did not.
13         Q.    When I say "those," I'm referring to whatever
14    warnings or information was provided to the -- the
15    people involved in the distribution of that chemical.
16         A.    Well, it was a big issue about the workers in
17    the plant, that assembled or put together these
18    pesticides for sale.  And the big -- that was the
19    biggest issue, were they adequately warned about the
20    hazards associated with these various products that were
21    being put together to create these pesticides.
22         Q.    Sorry, I was distracted for a second.  Are
23    there any other cases listed on Laux 6 that you recall
24    were specifically dealing with hazardous substances or
25    your evaluation of warnings with a substance?
0062
 1              MR. PINEDO: Objection, form.
 2         A.    You know, I don't know.  Oh, yeah -- well, no
 3    that -- there are several medications; drugs, I guess
 4    you could call it.  And then there's the PBA products
 5    liability litigation, which is also a drug.  So I don't
 6    know specifically how to answer your question.
 7         Q.    (By Mr. Glass)  Okay.  Well, for example, the
                              Page 26

Laux Lila F - Vol I.txt

```
 8  Osborne v. Powder River Coal, LLC, did that involve
 9  alleged exposure to a substance?
10       A.   No.
11       Q.   How about the case against C&C Car Wash, was
12  that an allegation that they were exposed to some kind
13  of chemical or substance at the car wash?
14       A.   No.
15       Q.   Okay.  That's the kind of question that I'm
16  asking.  Do you recall any of these cases that might
17  have involved alleged exposure to a substance?
18       A.   Not like that, no.
19       Q.   Okay.
20       A.   As I said, a lot -- a number of them are
21  pharmaceuticals, which are --
22       Q.   Okay.  Ingested.
23       A.   -- substances --
24       Q.   Right.  I understand.
25       A.   -- that might be ingested or put on your body
0063
 1  or . . .
 2       Q.   Okay.  How many cases have you been retained
 3  in to offer opinions regarding the adequacy of a
 4  warning?
 5       A.   Ever?
 6       Q.   Yes.
 7       A.   Well, I started doing this in 1986.  So what's
 8  that, 14 years -- 24 years?  Probably somewhere between
 9  3 and 400.
10       Q.   In those 3 to 400 cases where you were
11  retained to evaluate warnings --
12       A.   Well, actually I have to take that back.  I've
13  been retained that many times, but probably somewhat
14  more than half of them had to do with warnings.  The
15  rest of them had to do with product design.
16       Q.   Okay.  Of the approximately half of the cases
17  that you identified or the number of cases you
18  identified where you were retained to evaluate warnings,
19  have you ever opined that a warning is adequate or was
20  adequate?
21       A.   Yes.
22       Q.   Okay.  Can you give me the instance where that
23  occurred or when that occurred?
24       A.   That occurred sometime ago in -- in a case in
25  Brownsville, Texas, but I can't really remember much
0064
 1  about the details.  It's probably been 15 years.
 2       Q.   You don't remember the warning at issue?
 3       A.   No.  The product was a chemical that would
 4  protect shrimp when they were harvested, you know, put
 5  into the -- the container on the boat, and they put some
 6  chemical on them that protects them from decomposition.
 7       Q.   Just so I don't get these mixed up, I want to
 8  make sure which Laux 6 is the accurate one.
 9       A.   The accurate one is that one, not this one.
10       Q.   All right.  Well, let's put that in front of
11  you and put this one away.
12       A.   Okay.
13       Q.   Put all these away.  Other than this one
14  instance 15 years ago, in Brownsville, do you recall any
15  other instance where you felt like a warning was
16  adequate?
17       A.   Well, it depends on what you're asking me.  I
18  mean, in cases where I've testified, typically, no.  But
```

Laux Lila F  - Vol  I.txt
19  in the other cases, where I've been asked for an
20  opinion -- so, say, I've been contacted by a plaintiff's
21  attorney -- and I've said, "Well, it seems to me the
22  warning is okay," then, of course, I haven't testified,
23  so . . .
24       Q.   So if I understand your testimony correctly,
25  other than this one time, you've never testified that a
0065
1  warning is adequate.  And would that have been the 200
2  number that you were talking about?
3       A.   Well, I don't know that I've given testimony
4  in all those cases.
5       Q.   Okay.  Can you give me an idea of how many
6  times you told an attorney that consulted with you that
7  a warning was adequate?
8       A.   Maybe 10 or 15.
9       Q.   Do you recall any of those products?
10       A.   No, I don't.
11       Q.   Do you remember the last time you told an
12  attorney that consulted with you that a product -- a
13  warning was adequate?
14       A.   It's been a pretty good long time.  Probably
15  more than five years, for sure.
16       Q.   No. 10 deals with copies of your reports.
17  We've got an agreement that your drafts are not
18  required, so don't worry about that.
19       A.   I don't have any, anyway.
20       Q.   Are the copies of any reports -- the only
21  report you have is the May 11th report?
22       A.   That's right.  And I don't keep drafts, so you
23  got it.
24       MR. DINNELL:  Joe, I'll just object quickly,
25  for the record, that we didn't agree to no drafts.
0066
1       MR. GLASS:  Okay.  I apologize.
2       MR. DINNELL:  No problem.
3       MR. GLASS:  I misstated that.
4       MR. PENOT:  Yeah, I join in that.  I did not
5  agree to no drafts.
6       MR. GLASS:  Okay.
7       THE DEPONENT:  It's moot anyway, since I don't
8  have any drafts.
9       MR. GLASS:  That shows you what I know about
10  what's going on with these agreements.  Apologize about
11  that.
12       MR. PENOT:  It's hard to know.
13       MR. GLASS:  Maybe I'm just reflecting back to
14  the class cert.
15       Q.   (By Mr. Glass)  No. 11 is:  Any memoranda,
16  notes, graphs, charts, illustration, or plans prepared
17  by you in connection with this matter.  Are there any?
18       A.   There aren't any.  There might be a notation
19  or something on some document, but I doubt it.  I don't
20  typically do that.
21       Q.   Okay.  No. 12:  Would the government
22  publications you've examined, you've provided --
23  everything that you have, you provided to us?
24       A.   I did.
25       Q.   Okay.  I think we were running out of -- how
0067
1  are we doing on tape?
2       THE DEPONENT:  While you're at it.
3       THE VIDEOGRAPHER:  Two minutes.
Page 28

Laux Lila F  - Vol  I.txt
```
 4            MR. GLASS:  It sounds like we're getting
 5   pretty close to the end of the tape, anyway.  Do you
 6   want to take a quick break?
 7            MR. PINEDO:  Are we considering this
 8   "Committee on Science and Technology" a government
 9   publication?
10            MR. GLASS:  Well, she's already described it.
11            MR. PINEDO:  Okay.
12            MR. GLASS:  So I think it's included already.
13            MR. PINEDO:  Okay.
14            MR. GLASS:  Okay.  We'll take a quick break,
15   off the record.
16            THE VIDEOGRAPHER:  We are going off the
17   record.  The time is 13:25:01 p.m.
18            (Recess taken from 1:25 p.m. to 1:35 p.m.)
19            THE VIDEOGRAPHER:  We are on the record.  The
20   time is 13:35:58.  This marks the beginning of Tape
21   No. 2 in the deposition of Lila F. Laux, Ph.D.
22        Q.  (By Mr. Glass)  Okay.  Ma'am, where we left
23   off was 13 on the Exhibit A.  You have -- or you've been
24   asked to provide records regarding the time spent in
25   connection with this case.  Have you done that?
0068
 1        A.   Well, I found that one.  There are two more
 2   bills that I can't find.  As I said, my computer has
 3   crashed twice in the last month.
 4        Q.   Okay.
 5        A.   Mr. Pinedo will have copies of them because I
 6   sent him the bills.  One was for a hundred and fifty
 7   dollars, and one was for $200.
 8        Q.   Okay.  I'm going to mark this as Laux 7.  And
 9   what you've given me is something with your name at the
10   top of it and a bill for, it looks like, 1300 -- I mean,
11   excuse me, $3,100.  Is that accurate?
12        A.   For 31 hours of work for prep- -- in the
13   preparation of a report, that's correct.
14        Q.   So you still charge a hundred dollars an hour?
15        A.   I do.
16        Q.   Okay.  Any other charges that are generally
17   associated with your consultation?
18        A.   Any expenses I incur, such as FedExing and so
19   forth.  And those, I have those receipts here somewhere,
20   if you're interested in them.
21        Q.   At the bottom of this page that's been marked
22   as Laux 7, there is a No. 12.  Does that have any
23   significance?
24        A.   No.
25        Q.   Okay.  It's not Page 12 of a bunch of other
0069
 1   stuff?
 2        A.   No.
 3        Q.   Okay.  If we could get copies of the other
 4   invoices, I'd appreciate it.
 5            And that's the sum total of the amount of time
 6   it took you to perform the review of all the documents
 7   you've identified for us?
 8        A.   No.  Remember, there are many documents that I
 9   had not seen prior to writing my report.
10        Q.   How much --
11        A.   Reviewing all the documents that are listed on
12   my report.
13        Q.   Okay.  So that the 31 hours was for your
14   review and drafting of the report, is just review of
```
Page 29

Laux Lila F  - Vol  I.txt

15  documents prior to drafting the report?
16       A.   Review and generation of the report.
17       Q.   Okay.  Since that time, how much time have you
18  put into reviewing documents that have been provided to
19  you?
20       A.   Probably five more hours.
21       Q.   You read a lot faster than I do.
22       A.   I read pretty fast.
23       Q.   Okay.  No. 14, you've already identified the
24  experts' reports that you have reviewed, correct?
25       A.   Right.
0070
1        Q.   Okay.  Looks like 15 is also information that
2   you provided to us already.
3        A.   I have.
4        Q.   No. 16:  A copy of any correspondence
5   exchanged between you and the plaintiff or
6   representatives of plaintiffs.
7        A.   That should all be in here.  That's just
8   letters, I think there are just a couple of cover
9   letters from Mr. Pinedo, and my FedEx and UPS.
10       Q.   Can you --
11       A.   You know, when I sent him the report and --
12       Q.   The cover letter that you're referencing is
13  from April 30th, 2009, "Just enclosing materials related
14  to the above-referenced matter," which is FEMA
15  litigation; is that accurate?
16       A.   Right.
17       Q.   Do you remember what specifically was
18  contained in that cover?
19       A.   Everything that I have except those reports
20  and everything that had a Bates number.
21       Q.   All right.
22       A.   So anything that's in my report that has a
23  Bates number was in there.
24       Q.   The next few items are things that you've
25  already provided to us.
0071
1             No. 22:  Any material that you have provided
2   to plaintiffs' attorney regarding your opinions.  Do we
3   have copies of everything?
4        A.   That's just the report.
5        Q.   Okay.  All of that, but you've also provided
6   any materials that you've referenced that were outside
7   of what he provided to you, correct?
8        A.   I sent them to him so that he could put them
9   on a disk and provide them to you.  You're right, I did.
10       Q.   You've provided every single piece of
11  information that you received regarding the plaintiffs
12  in this case, Ms. Alexander and her son?
13       A.   Everything that I received from Mr. Pinedo,
14  yes.
15       Q.   Okay.
16       A.   And I didn't get any information about her or
17  her son from any other source.
18       Q.   No. 24:  Any and all copies of medical,
19  scientific, or technical studies, journals, articles, or
20  reports regarding symptoms of physical or mental
21  conditions which are allegedly associated with exposure
22  to formaldehyde, which you've reviewed in formulating
23  your opinions.
24             So that everything that you've provided to
25  your -- to the attorney that hired you and that was
Page 30

Laux Lila F - Vol I.txt

0072
1    provided to us on disk?
2        A.   Yes.
3        Q.   Okay.  The same for No. 25 --
4        A.   Plus that one more thing that we just --
5        Q.   Plus the one that we -- we've talked about and
6    identified?
7        A.   Right.
8        Q.   Okay.  No. 25 is similar in that it requests
9    all the medical and scientific and technical studies,
10   et cetera, that relate to indoor air quality of the
11   temporary housing units.
12             Have you provided everything that you
13   reviewed?
14       A.   I have.
15       Q.   Same question, No. 26, for documents that you
16   reviewed regarding indoor air quality for site-built
17   houses or homes.
18       A.   Yes.  There may be one or two of that nature
19   in that list of documents I gave you.
20       Q.   Okay.  And you've also provided us all the
21   documentation that deals with testing or statistical
22   sampling of any temporary housing unit?
23       A.   Well, there's one folder that evidently he
24   separated out as testing, but there were other reports
25   of testing by various agencies, and they're all in
0073
1    there.
2        Q.   Okay.  Then I'm going to skip over the next
3    few.  And the last one is:  Your entire file with regard
4    to this case, whether kept in hard copy, computer form,
5    which would include all notes, reports, correspondence,
6    protocols, standards, regulations.
7             You've provided all that to us?
8        A.   Everything I had.
9        Q.   Okay.  We're done with that.
10       A.   Let me put this back together before it gets
11   all mixed up here.  Do we have a paperclip or something
12   we could put on this?
13       Q.   Overkill, but it'll work.
14       A.   Yep.
15       Q.   Okay.  Next question is, when you are retained
16   to act as -- well, first off, what were you retained to
17   do?
18       A.   I was retained to evaluate the warnings and
19   hazard information that were provided by Gulf Stream to
20   Mrs. Alexander.
21       Q.   When were you first contacted?
22       A.   April something.  Let's see, what was that
23   letter?
24       Q.   April of this year?
25       A.   Yes.
0074
1        Q.   Okay.  Did you review anything in preparation
2    for this deposition?
3        A.   Not really, no -- well, actually, what I did
4    was, I went back through the list of documents I had and
5    looked to see if I knew pretty much what was innate to
6    the documents.  But as far as reviewing -- and I did
7    review some of those -- because I hadn't had all of
8    those reports prior to writing my report, I reviewed
9    those reports that I hadn't already seen.
10       Q.   Okay.  Do you have Laux 4 in front of you?  I
                        Page 31

Laux Lila F  - Vol  I.txt
11  just want -- before I put this away, I want to make sure
12  that this is not a duplicate.
13          A.    Nope, I don't have Laux 4.
14          Q.    Okay.
15          A.    What is Laux 4?
16          Q.    That's your CV.
17          A.    It is, okay.  All right.
18          Q.    Okay.  What's your normal procedure when
19  you're retained to evaluate information and warnings in
20  a circumstance such as this?
21          A.    Well, the first thing --
22          MR. PINEDO:  Objection to form.
23          A.    First thing I do is try to figure out what
24  happened, you know, to -- because a lot of times, you
25  get a lot of information, but it doesn't really tell you
0075
1   what the events or the sequence of events was.  So
2   generally I look at the material that the attorney sends
3   me.  And I ask him for specific kinds of information;
4   and if they have it, they send it.
5           And that usually has to do with what the
6   product was or the situation was; how the exposure
7   occurred; how we know that there was an exposure; what
8   the consequences were; what the warnings were; what
9   information was known about the product and the hazard,
10  when was it known, who knew it; whether a hazard pattern
11  analysis had been done by the manufacturer or the person
12  who developed the product; how they approached the
13  development of warnings and instructions, if that's
14  known.  All that kind of information.
15          Q.    (By Mr. Glass)  And so one of the first things
16  that you do is gather the universe of information that's
17  currently available.  You try and get documentation and
18  all the things you talked about, the hazard pattern
19  analysis, what warnings were there, all the -- all the
20  factual background?
21          A.    I try to find out what happened and what was
22  known about the -- darn it.  I lost the little doohickey
23  off there.  I'm just all tangled up in this thing.
24          I try to get background on the -- the -- let's
25  see -- how this all happened to occur.  In other words,
0076
1   usually someone doesn't get injured by a product just
2   suddenly, out of the blue.  There's usually something
3   that goes on before either the manufacturer attempted to
4   identify the hazards or tried to write warnings and
5   instructions or made some decision that they didn't need
6   warnings and instructions; you know, all this kind of
7   background information.
8           Q.    Well, do you presume, when you're first
9   contacted by someone, that there actually was a
10  compensable injury?
11          A.    No.
12          Q.    Okay.
13          A.    That's why I want to get all the background
14  information, so I can find out what really happened.
15          Q.    Okay.  Well, I'm going to call that first step
16  information gathering.  Is that --
17          A.    Well, fine.
18          Q.    Is that acceptable to you?
19          A.    Sure.
20          Q.    Okay.  After you gather information, what's
21  the next step in your process?

Page 32

Laux Lila F - Vol I.txt

22    A.    Well, the next step is going to be figuring
23 out what information that I have is relevant to
24 understanding the adequacy of the warnings and
25 instructions and how those warnings and instructions
0077
1 relate to the event that's the focus of the lawsuit.
2    Q.    All right.  So in the information gathering
3 process, you're trying to identify whether there was, in
4 fact, a hazard?
5    A.    Well, one of the things I would want to see is
6 whether there was a hazard pattern analysis.  And if
7 there wasn't, I would be looking for data out there that
8 indicated that there was indeed a hazard and that it
9 was -- had been identified as a hazard, was a recognized
10 hazard.
11    Q.    Okay.  You've mentioned hazard pattern
12 analysis a couple times.  Would you describe for me what
13 you consider hazard pattern analysis?
14    A.    A hazard pattern analysis is done when you
15 have a product and you want to determine -- you need to
16 do a comprehensive evaluation of the way that people
17 might use your product and the ways that the use of the
18 product might actually lead to some kind of injury or --
19 or damage to the environment.
20        So you're looking at, you know -- well, let's
21 go to, for instance, with the car owner's manuals.
22 We're looking at:  What did General Motors think about
23 when they wrote this manual?  How did they identify what
24 things they needed to warn about?
25        Well, they did a -- a hazard pattern analysis
0078
1 or a failure -- failure effects and -- failure modes and
2 effects analysis.  Those are the kinds of things that
3 are done where you look at how interaction with your
4 product could, let's say, go wrong; how interaction with
5 your product could result in  an injury or harm to a
6 person or to the environment.
7    Q.    Okay.  And you've mentioned in your report, in
8 the background at the very beginning, that your area of
9 expertise is in human factors analysis, correct?
10    A.    Well, no, I don't think I said it was in human
11 factors analysis.
12    Q.    Okay.  What would you classify your expertise
13 in?
14    A.    I'm a human factors psychologist, human
15 factors engineer.
16    Q.    Okay.  As a human factors psychologist or a
17 human factors engineer, does your expertise allow you to
18 opine on the design of the products?
19    A.    Yes.  It's wherever there is a human interface
20 to the product, yes.
21    Q.    Okay.
22    A.    That's exactly what human engineers do.
23    Q.    Are you -- do you have an expertise in
24 designing travel trailers, for instance?
25    A.    No.
0079
1    Q.    Okay.  Do you have to rely on other areas of
2 expertise when formulating your opinions in the human
3 factors arena?
4    A.    I do typically rely on medical doctors,
5 chemists, physicists.  In fact, in all this work I'm
6 doing with NASA, I'm having to rely heavily on the
                              Page 33

Laux Lila F  - Vol  I.txt

```
 7  astronauts, who have been in space themselves, to tell
 8  me what kinds of problems they had in interacting with
 9  the interface.
10          So, sure, I look for any source of expertise
11  to help me identify what the issues should be.
12      Q.   Okay.  Are your opinions regarding the human
13  factors analysis only as good as the information that
14  you're provided by these other experts?
15      A.   No.  I have expertise independent of those
16  other experts.  Certainly if those other experts provide
17  me with egregiously wrong information and say, you know,
18  that formaldehyde is going to kill you in one second or
19  formaldehyde is never going to hurt you, for instance,
20  then, yes, that could, if I relied on a single source of
21  information.  That's why I try to get multiple sources
22  of information.
23      Q.   If you are provided inaccurate information by
24  an expert, in an area that you don't claim expertise,
25  are your opinions necessarily inaccurate?
0080
 1      A.   Well, I guess it would depend on what the
 2  opinion is and who I -- how I based -- what -- what what
 3  credence I gave to that or what weight I gave to that
 4  expert's opinion.
 5      Q.   Okay.  I'm kind of jumping ahead a little bit
 6  here, because I don't think I've still understood
 7  exactly what your normal procedure is in evaluation, but
 8  I think this is important enough to continue along.
 9          In -- for instance, in this case, are you
10  professing any expertise in toxicology?
11      A.   No.
12      Q.   Are you relying on toxicologists' reports for
13  information as to whether formaldehyde constitutes a
14  hazard in this case?
15      A.   Well, I'm relying on reports from CDC and
16  other agent -- government agencies, yes.
17      Q.   Okay.  Do you rely -- or do you have any
18  expertise in civil engineering?
19      A.   No.
20      Q.   So are you able to offer any specific opinions
21  as to the design of travel trailers or alternative
22  designs that are available?
23      A.   No.
24      Q.   Okay.  Do you have any expertise in chemistry?
25      A.   Well, I did teach high school chemistry at one
0081
 1  point in my life.
 2      Q.   Are you offering yourself as an expert in
 3  chemistry in this case?
 4      A.   No.
 5      Q.   I --
 6      A.   You know that I'm offering myself as a human
 7  factors engineer.
 8      Q.   I understand that, ma'am.  But I -- I'm still
 9  going to ask you these questions.
10      A.   All right.
11      Q.   Okay?  Are you an expert in the area of
12  industrial hygiene?
13      A.   No.
14      Q.   Okay.  Are you relying on industrial hygienist
15  report in this case?
16      A.   There may have been someone from ACHIG or
17  whatever.  But, you know, basically I was relying on
```
Page 34

Laux Lila F  - Vol  I.txt

18  information that's available from CDC and the other
19  federal agencies and other entities that are expert in
20  chemistry and who have written MSDSs and other forms of
21  data.
22        Q.    Are you an expert in emergency relief
23  response?
24        A.    No.
25        Q.    Okay.   Are you an expert in disaster relief
0082
 1  response?
 2        A.    No.
 3        Q.    Are you an expert in epidemiology?
 4        A.    Well, although I have some expertise in that
 5  area, I don't hold myself out as an expert in that area.
 6        Q.    Are you relying on epidemiologists in this
 7  case to provide information that's part of your
 8  underlying -- or underlie your own opinions?
 9        A.    Well, I'm relying on government data and other
10  forms of data from entities that I believe understand
11  the hazards associated with formaldehyde.  If those
12  happen to be industrial hygienists or whatever it was
13  you asked me about, I suppose then the answer would be
14  yes.  Otherwise, I don't know.
15        Q.    Are you an expert in regulations that may
16  apply in this case?
17        A.    No.
18        Q.    So you don't have an expertise in OSHA
19  regulations?
20        A.    I know quite a bit about them, but I don't
21  hold myself out as an expert, no.
22        Q.    Okay.  Have you ever held yourself out as an
23  expert on legal duties?
24        A.    No.
25        Q.    Okay.  Are you an expert in legal duties?
0083
 1        A.    Only to the extent that I believe that I know
 2  that the manufacturers have a duty to warn people when
 3  they know about hazards that their products are going to
 4  expose them to.  I don't consider that expertise in
 5  legal duties.
 6        Q.    And, in fact, have you called those -- I think
 7  you've called them various things over the years, maybe
 8  decency standards or human factors standards.  Is that
 9  accurate?
10        A.    I don't know that I've ever called them a
11  decency standard.
12        Q.    Okay.
13        A.    That sounds completely new to me.  But I may
14  have -- I may have -- I don't know that I've ever called
15  them human factors standards either.
16        Q.    Okay.
17        A.    But certainly that's the human factors
18  perspective, that we want to inform people if they're
19  going to be exposed to a hazard.
20        Q.    And I think you've already said that you're
21  not an expert in the area of travel trailer manufacture.
22        A.    Definitely not.
23        Q.    Okay.  Have you ever taken courses in travel
24  trailer design or engineering?
25        A.    Are there such courses?
0084
 1        Q.    I'm asking you if you've ever taken any.
 2        A.    No.

Page 35

Laux Lila F - Vol I.txt

3  Q.   Okay.  Have you ever taken any courses in -- I
4  mean, excuse me, have you had any training or
5  investigation regarding component parts of a travel
6  trailer?
7  A.   No.
8  Q.   Performed any investigation in the process of
9  manufacturing a travel trailer?
10  A.   Beyond what I read in the documents that were
11  provided to me, I have no other -- have not done any
12  other research in the manufacture of travel trailers.
13  Q.   Have you inspected any travel trailer plants?
14  A.   No.
15  Q.   Wood product manufacturers plants?
16  A.   No.
17  Q.   Have you ever designed warnings for a travel
18  trailer?
19  A.   No.
20  Q.   An owner's manual for a travel trailer?
21  A.   No.
22  Q.   Okay.  Let's go back to talk a little bit
23  about the process that you go through.  You -- you
24  mentioned that you do what I called information
25  gathering.  Then you went into the hazard pattern
0085
1  analysis, which, I presume, would also be part of the
2  information gathering process, to determine if that was
3  done by the manufacturer.
4  What's the next step, after you've gathered
5  all of this information and you're doing your review?
6  A.   Well, in this case, you know, I'm going to be
7  doing sort of a truncated or focused analysis of this
8  particular hazards, because that's what this case is
9  about.  So I'm not looking at every hazard that's
10  associated with travel trailers, like I would if I were,
11  you know, working with a travel trailer manufacturer and
12  trying to develop a manual or information for the user
13  in this case.
14  The analysis is focused entirely on this
15  particular issue of whether or not there is a hazard
16  associated with formaldehyde and whether or not the
17  information was provided to the people who needed it.
18  Q.   Okay.  The first part of that analysis, if I
19  understood you correctly, was to determine whether
20  formaldehyde is, in fact, a hazard.
21  A.   That's correct.
22  Q.   Okay.  And once you've analyzed that, assume
23  that you've come to the conclusion that formaldehyde is
24  a hazard.  What's the next step in the process?
25  A.   Well, I wouldn't say that formaldehyde is a
0086
1  hazard.  I would say that formaldehyde can present a
2  hazard to people who are exposed to it at certain
3  levels.
4  Q.   Okay.
5  A.   And my next -- the next thing I would do is
6  then to start looking at what the manufacturer provided
7  to the people who were going to use the product, in
8  analyzing whether that information that the manufacturer
9  provided to the people who would be exposed to the
10  formaldehyde met my standards and human factors
11  standards of adequacy in terms of the hazard
12  communication.
13  Q.   Okay.  There's a lot in there, sorry.

Page 36

Laux Lila F  - Vol  I.txt
```
14       A.   I'm a very wordy person, sorry.
15       Q.   No.  It's just, there is a lot of different
16  directions I could go from here.  The -- okay, you've --
17  you've now identified the potential for a hazard.  So
18  assume that for me.  And you looked at what was provided
19  by the manufacturer.
20            If you conclude at that point that there's no
21  hazard -- or, excuse me, that whatever they provide is
22  adequate, you wouldn't be here, I presume.
23       A.   That's right.
24       Q.   Okay.  And if you --
25       A.   Well, I mean, I would like to be here to say
0087
 1  that.
 2       Q.   Sure.
 3       A.   But I doubt I would be allowed to.
 4       Q.   The other alternative is that you conclude
 5  that there was some inadequacy.  What do you do at that
 6  point in your normal procedure?
 7       A.   Well, there's something that happens before
 8  that.
 9       Q.   Okay.
10       A.   Then I have to say, okay, well, did that --
11  did the lack of information affect the behavior of the
12  injured party in this case, Ms. Alexander and her
13  children?  And so then I gather information on
14  Ms. Alexander and other typical or foreseeable users.
15            That's a very important part of designing a
16  warning and designing information for people, is:  who
17  do you think is going to be exposed to this hazard?
18  what do they know, and what do they need to know, and
19  how do we get that information to them?
20            So there's two parts to it.  First of all,
21  is -- well, actually three.  Is there a hazard?
22  Secondly, is someone being exposed to the hazard?  And
23  third, do they understand the hazard; and, if not, what
24  could you expect to -- what would you need to provide
25  them to make them understand how -- what was happening?
0088
 1       Q.   And once, okay, you get to the point, after
 2  those steps, where you feel like there's something else
 3  that needs to be done to communicate the alleged hazard,
 4  where -- where do you fall in on that process?
 5  What's -- is there something else that you need to do
 6  or --
 7       A.   Well, then I look at sources of information
 8  that are out there that might provide that information,
 9  and try to identify ways in which that information could
10  be provided to the people who need it.
11            And that's when I opine about the need for
12  warnings and the content of those warnings and how the
13  warnings should be presented.  And what I expect the
14  response of the warnee -- if you want to call it that,
15  the person who's being warned -- to be if the warning is
16  adequate.
17       Q.   In that third step, where you're talking about
18  the -- whether it affected the behavior and their
19  understanding of the warnings, do you, as part of your
20  methodology, test the adequacy of any alternate proposal
21  or alternative proposal of warnings or information
22  communicated to the end-user?
23       A.   Do you mean, do I go out and find a group of
24  people who are representative of the people who should
```
Page 37

Laux Lila F  - Vol  I.txt
25   have been receiving this information and present them
0089
1    with a prototype warning and try to determine whether my
2    prototype warning is adequate or not?
3         Q.   Yes.
4         A.   I have done that.  I haven't done it in this
5    case.  In some cases, I have done it.
6         Q.   Okay.  Is that relevant to your normal
7    evaluation when you're retained in a case, to test
8    whether there is some alternative system that would have
9    effectively communicated whatever information was
10   lacking?
11        A.   That would be ideal, but it doesn't typically
12   happen, no.
13        Q.   Okay.  So it's not part of your normal --
14        A.   I wouldn't say it's part of my normal or not
15   normal.  I mean, it -- when I have a chance to do it, I
16   do appreciate doing it.  But I don't always get the
17   chance to do it.
18             And I do have other ways of evaluating any
19   potential warning.  You know, I teach a class in the
20   University of Wisconsin on how to evaluate warnings, and
21   I provide a checklist for them to use in determining
22   whether their warnings that they're proposing are
23   adequate.  So I can -- I do use that kind of evaluation
24   of proposed warnings when I have them.
25        Q.   In this particular case when you were
0090
1    retained, did you follow your normal procedure in
2    evaluating the system and the information?
3         A.   I did, yes, follow my normal procedure, that's
4    correct.
5         Q.   You performed the information gathering
6    process, and then subsequently identified whether there
7    was a potential hazard with the -- the situation that
8    you were evaluating?
9         A.   I did.
10        Q.   Okay.  Did you conclude that there was a
11   hazard?
12        A.   I did.
13        Q.   And what is that hazard?
14        A.   The hazard is the chronic exposure to
15   formaldehyde or even short-term exposure to formaldehyde
16   can be a hazard under certain circumstances.
17        Q.   And what is the basis of that opinion?
18        A.   Well, you can look at all the documents in the
19   file that, you know, I looked at from CDC and other
20   agencies, as well as the OSHA, I think -- no, NIOSH
21   chemical handbook.  I mean, there are all kinds of
22   sources of information that tell you what the exposure
23   levels are that are safe.
24        Q.   Is there a medical -- or a consensus in the
25   medical community that there is a hazard, as you've
0091
1    described, from chronic or short-term exposure to
2    formaldehyde?
3         A.   Yes.
4         Q.   There's a medical consensus?
5         A.   I believe there is a medical consensus that
6    there is a hazard associated with exposure to
7    formaldehyde, both short-term and chronic, if at certain
8    levels.
9         Q.   Okay.  What are those certain levels?
                                Page 38

Laux Lila F  - Vol I.txt
10      A.   Well, there isn't consensus about what the
11  levels are for chronic exposure.  They range from .05 to
12  .1 parts per million.  But for OSHA, for instance, I
13  think it's .75 parts per million for a 40-hour PEL.
14  Which means that for a healthy adult, working for
15  40 hours, their exposure could be as high as .75 parts
16  per million.
17      Q.   Have you seen any studies or heard of any
18  studies, performed by other people in the medical
19  community, that totally disagree with the levels that
20  you're talking about as constituting a health hazard?
21      A.   I haven't seen any medical articles that
22  totally disagree, you're right.  There are other values
23  that are presented in some other materials.  I'm looking
24  at the ones that are in various standards.  Like OSHA,
25  and for manufactured homes and things like that, there
0092
1   are standards that have been established.
2       Q.   Okay.
3       A.   Whether there's conjecture about those or not,
4   I -- you know, I'm not going to get into any argument
5   about whether there's conjecture about them or not.
6   They are the standards.
7       Q.   Are those standards sufficient for your
8   purposes, if those standards are not breached, that this
9   would not constitute a hazard to the occupants of the
10  travel trailers?
11      A.   Well, when you say "those standards," it would
12  depend on which standards you're talking about and who
13  the population would be.  As I said, for the OSHA
14  standard, that's targeted toward healthy adults in the
15  workforce, who would be working, who would not be
16  children and who would not be elderly, and who would be
17  working 40 hours a week.
18           So you can't assume that the population of
19  people who are going to be living in these travel
20  trailers are healthy adults, who are only going to be
21  exposed for 40 hours a week.  So that standard is not
22  going to be appropriate for a travel trailer.
23           A travel trailer is going to be potentially a
24  24-7 exposure.  And based on the different standards
25  I've seen or recommendations from various health
0093
1   organizations and CDC, the level would be much lower
2   than that.
3       Q.   We'll get into those specific opinions when we
4   get down to the opinion section of your report.  But in
5   the meantime, it's -- it's your testimony that there is
6   a medical community -- there's a consensus in the
7   medical community that exposures at, say, even .05 parts
8   per million, chronic, is a health hazard.
9       A.   I don't believe I said that.
10      Q.   Okay.  Can you tell me where I was wrong on
11  what I just said?
12      A.   I never said there was a consensus in the
13  medical community.
14      Q.   Okay.
15      A.   I said that there are standards that call that
16  out.  That's not the same thing as saying there's a
17  consensus in the medical community.
18      Q.   Do any of the standards that you just
19  identified for me, are they specifically regulated for
20  travel trailers?
                         Page 39

Laux Lila F  - Vol  I.txt

```
21        A.    No.  As far as I can tell, there is no
22  standard for travel trailers.
23        Q.    Are there any standards for site-built homes?
24        A.    I believe there are.
25        Q.    Okay.  What standards are those?
0094
 1        A.    You know, I can't recall them, right off the
 2  top of my head.  My assumption in this case is, you
 3  know, after reading the materials, is that there is a
 4  hazard that residents of these travel trailers need to
 5  be informed about.
 6        Q.    Okay.  Well, let's -- let's start working on
 7  some general opinions, then.  When is a warning
 8  required, under your standards?
 9        A.    Under my standards, a warning is required when
10  there is an exposure to a hazard produced by any
11  product, that the user would not be logically expected
12  to know about.
13        Q.    Any hazard?
14        A.    Any hazard that's going to cause harm to them
15  or significant harm to the environment, and it's
16  something that they're likely to be exposed to and that
17  they wouldn't be expected to know about.
18        Q.    Okay.  Now you've thrown in a qualifier that
19  they're likely to be exposed to.  Can't -- isn't it true
20  that any product or any substance can be a hazard or is
21  a hazard?  Not just can be, is?
22        A.    No.
23        Q.    No?
24        A.    No.  Not under normal conditions of use, no.
25        Q.    Okay.  Well, you've just testified that if
0095
 1  there's a likelihood of harm from the product, then
 2  every product can cause you harm.
 3        A.    Well, sure, you can drop a sewing machine on
 4  your foot.  You can sit on a pair of scissors when
 5  they're open and cut your butt.  But those are not the
 6  kinds of things that we logically talk about, and you
 7  know that.
 8        Q.    Well, you've also testified in the past that
 9  you can use a bottle of water to hit somebody over the
10  head too, right?
11        A.    You can.  Or you can drink five bottles of
12  water and poison yourself with too much water.  But, you
13  know, those are not likely to happen.  And most people
14  know that those things -- that it's hazardous to hit
15  somebody over the head with a bottle of water.
16        A.    Well, you're -- you're offering opinions, and
17  you have many times in the past, that a manufacturer of
18  a product is not responsible, and you like to use words
19  "callous" and "reckless," for not including a warning.
20              But I'm trying to get a bright-line rule as to
21  what your standards are when a manufacturer makes this
22  decision as to when a product requires a warning when
23  everything constitutes a hazard.
24              MR. PINEDO:  Objection, sidebar.  Objection to
25  form.
0096
 1        A.    And I also think you misspoke.  I think you
 2  said that I said they were not responsible, when I have
 3  said they are.
 4        Q.    (By Mr. Glass)  Okay.
 5        A.    So you want to know when I said that --
```

Page 40

Laux Lila F - Vol I.txt

```
 6      Q.    Well --
 7      A.    -- a manufacturer should provide a warning?
 8      Q.    Let me -- let me try and refine it a little
 9  bit.  Because you used, in your -- your response, if I'm
10  remembering correctly, that it's -- there was a
11  probability element in that response.  Is that accurate?
12      A.    Well, I'm -- here's what I'm assuming:  That
13  no product is going to be put on the market with a
14  serious hazard, if we are 100 percent sure that everyone
15  who uses that product is going to be injured.  So that's
16  an assumption I'm making, yes.
17            So then there is a probability.  So we have
18  certain controls in our society, which would prevent
19  that kind of product, typically, from being offered for
20  sale to the public.
21            So given that, what I'm -- what I'm saying to
22  you is that, when you are a manufacturer of a product
23  that's going to be used by many, many people and you
24  know that the -- there's a hazard associated with the
25  use of your product, and you know that therefore many
0097
 1  people are being exposed to that hazard, and you know
 2  that there's a probability that some of those people who
 3  are exposed to the hazard will be injured, you have a
 4  duty to warn; unless that hazard is something like
 5  hitting them over the head with a bottle full of water.
 6      Q.    Okay.  Again, in your response, you said some
 7  of the people, percentage.  What prejudice is a
 8  manufacturer -- what constitutes a percentage that
 9  requires a manufacturer to warn?
10      A.    The percentage is based on the significance of
11  the hazard, how serious the hazard is.
12      Q.    Okay.
13      A.    If the hazard is pretty minor, they might get
14  a bruise or they might break the container and spill
15  something on themselves that was warm but not hot, then
16  maybe they don't need to warn.
17            So, but if the hazard create -- is created to
18  the point where whoever is exposed to the hazard is
19  significantly injured, blinded, maimed, killed, suffers
20  chemical exposures to their lungs, that, you know,
21  impair their breathing, any of those, then even a low
22  rate of exposure becomes critical.
23            That's why the probability and the
24  consequences have to both be considered in the decision
25  about when to warn and what to warn.
0098
 1      Q.    Well, and that's -- that's the problem I'm
 2  having.  If there's a product that everybody in the
 3  world uses, uses hypothetical, that everyone uses in the
 4  entire world, on a daily basis.  And there's one person
 5  in -- in the world who has an adverse reaction to that
 6  product, one person out of everybody in the world; and
 7  that adverse reaction, to that person, is deadly.  Is
 8  the manufacturer obligated to warn for that one person?
 9      A.    Well, that's a totally unrealistic --
10      Q.    It's my hypothetical.  I'm asking.
11      A.    Yeah, but it's a totally unrealistic
12  hypothetical.
13      Q.    Okay.
14      A.    I mean, there is no such thing that you could
15  have 280,000,000 people exposed to a hazard, one person
16  would be -- would experience the deadly consequences of
```

Page 41

```
17    the hazard.
18         Q.     Fine.  As unrealistic as it is, does that
19    manufacturer have a duty to warn and convey that
20    information?
21         A.     Once the accident has happened, the
22    manufacturer has a duty to evaluate:  What's the
23    probability that that would happen again, or was this
24    really a flukey thing that's not going to happen again?
25    But they certainly need to pay attention and look to see
0099
1     if, in fact, something about their product, that they
2     were not aware of, actually resulted in this death.
3          Q.     Well, but, ma'am, isn't it true that, if the
4     accident were to happen as I've described it and one
5     person died, they know there's a possibility that
6     somebody could die from it?
7          A.     Well, but the issue is:  What were the
8     circumstances around the accident?  I mean, did the
9     person do it intentionally?  That's always a
10    possibility.  Was this person in some way different from
11    all the other 280,000,000 people who used the product?
12    That's a possibility.  Not very likely, but it's
13    certainly as likely as your hypothetical.
14         Q.     Well, ma'am, isn't every person in the world
15    unique?
16         A.     No.
17         Q.     You don't think we're all unique?
18         A.     No, not in many ways.
19         Q.     We can have common symptoms, but we're all
20    unique.
21         A.     No, we're not.  We're very similar.
22         Q.     Okay.  All right.  Assume for me that -- the
23    same hypothetical and that there's a hundred percent
24    response to whatever the product is that could
25    potentially cause harm.  Clearly that would be a
0100
1     situation where it's a situation that society wouldn't
2     allow that product to get out, correct?
3          A.     More than likely.
4          Q.     Okay.
5          A.     Unless there was some overriding enormous
6     value to the product, I can't imagine any circumstances
7     in which that product would be marketed.
8          Q.     I think we're going in circles here.  I'm just
9     going to try and ask this as a very direct question and
10    see if I can get a direct answer.
11         A.     Well, usually when attorneys say that to me,
12    that means they want me to answer what they want me to
13    answer.
14         Q.     No, I want -- I want to know your answer is,
15    because I think you were led.  But the -- the situation
16    is, there is, in society, an acceptable amount of risk
17    that's associated with products that don't require --
18    where there wouldn't require a warning.  Is that
19    accurate or inaccurate?
20         A.     It depends on the product.
21         Q.     Okay.
22         A.     For sure, we accept the risk of a knife, and
23    we don't typically warn about knives.
24         Q.     And it can harm people?
25         A.     Sure.
0101
1          Q.     There's a hazard associated with knives,
```

Page 42

Laux Lila F  - Vol  I.txt

2  correct?
3      A.    Absolutely.
4      Q.    So is it your opinion that there is a warning
5  required in every circumstance where there's a hazard --
6  where there's a hazard?
7      A.    I think I've already explained to you that
8  that is not the case.  I have not said that.
9      Q.    Okay.
10     A.    And I have explained to you when I do think
11 that a warning is required.
12     Q.    In the entire time that you've been associated
13 with litigation, have your opinions ever been rejected
14 by a court?
15     A.    I don't know what you mean by "rejected," but
16 I know that the appeals court in Louisiana once reversed
17 a case based on my having testified.
18     Q.    A state court?
19     A.    I don't know.
20     Q.    Okay.  Do you remember the product, so I could
21 go look that up?
22     A.    The product was an outboard engine.
23     Q.    And what did you opine in that case?
24     A.    Well, there was no cover on this engine, and
25 there was a flywheel in there, which, when the person --
0102
1  well, actually there had been a cover, but he took it
2  off to try and jump-start the engine; and wound up, I
3  think, if I recall, being seriously injured by the
4  flywheel.
5      Q.    In that case, the -- the Appellate Court for
6  the Third Circuit of Louisiana actually concluded that
7  your -- you were not qualified to offer opinions
8  regarding the design of the outboard motor; is that
9  correct?
10     A.    I don't know if it was the appellate court.  I
11 don't know if it was the Third Circuit of Louisiana.
12 And I don't know what -- on what grounds they rejected
13 my opinion.
14     Q.    Did you offer opinions that the design was
15 improper for that motor?
16     A.    I didn't -- I offered opinions that the --
17 yes, that they should not have been able to take the
18 cover off while the flywheel was still moving.
19     Q.    Did you offer any opinions regarding the
20 warnings in that case?
21     A.    Yes.
22     Q.    Okay.  Were they accepted by the appellate
23 court?
24     A.    I don't know.
25     Q.    Okay.  Any other circumstances where your
0103
1  opinions were not accepted by a court?
2          MR. PINEDO:  Objection, form.
3      A.    I'm not sure.  Not that I recall, not that I
4  specifically know of, no.
5      Q.    (By Mr. Glass)  Okay.  Do you ever remember
6  being disqualified as an expert in a case?
7      A.    No.
8      Q.    Are you saying it hasn't happened?
9      A.    No.  I'm saying you asked me if I remembered
10 it.
11     Q.    Okay.  That's why I'm --
12     A.    And I'm saying, no, I don't remember that
                        Page 43

Laux Lila F  - Vol  I.txt

13   that's ever happened.
14        Q.   Okay.  And I'm trying to be more precise.  Has
15   it ever happened?
16        A.   I don't know.
17        Q.   Okay.
18        A.   If I don't remember it, how could I know?
19        Q.   Is it -- it's a situation where it just didn't
20   mean that much to you, if it happened, and you just
21   don't remember it?
22        A.   No.  The --
23        MR. DINNELL:  Objection, form.
24        A.   The situation would be that I probably wasn't
25   informed of it, if it happened.
0104
1        Q.   (By Mr. Glass)  Okay.  Awhile ago you were
2   talking about standards, and you mentioned not only your
3   own standards but human factors standards.  And I -- I
4   apologize, I think I may have jumped to another question
5   when you started answering what your standards are.
6   What are your standards for conveyance of warnings?
7        A.   My standards are that the manufacturers who
8   develop a product need to be sure that they have
9   identified all the hazards to the users of their
10  products, and that they have done the appropriate
11  analysis to develop the warnings that are necessary to
12  protect those users.
13       Q.   Okay.  And what are human factors standards?
14       A.   Well, human -- those are pretty much human
15  factors standards.  If you look in the human factor
16  literature relating to warnings, you know, there are a
17  lot of standards on color and size; print size, in like
18  the ANSI Z.35 and Z.535 and others that are like that.
19            But human factors people have done a lot of
20  research on what's the best color, what's the best
21  signal word; how do you best place the warnings to make
22  sure that people see them; how do you evaluate your
23  use -- your potential user audience to determine what
24  kind of language you should use for them; how do you
25  best motivate the people who are going to be exposed to
0105
1   the hazard?  Those are all human factors guidelines for
2   how to go about developing an adequate warning.
3        Q.   If you meet regulatory guidelines, is that
4   sufficient to -- to meet your obligation or burdens that
5   you've just described under human factors guidelines?
6        A.   Not usually.
7        Q.   Okay.  So if a product labeling is a hundred
8   percent compliant with whatever federal regulatory
9   obligation may be imposed, that's not necessarily
10  adequate, in your mind?
11       A.   Well, let's think about medications, drugs,
12  that are regulated by the FDA.  They specifically say
13  you must comply with their warnings.  But if you
14  identify an additional hazard, you can put that
15  warning -- you can put that on your product label and
16  get in touch with them and talk to them about it.
17            So you see where I'm coming from.  All these
18  regulatory agencies have given you their best bet at the
19  base line, the absolute minimum.  But they, most of
20  them, have not said you cannot add additional
21  information when you know that there is a hazard that's
22  not being warned about.
23       Q.   You say "most of them."  What's the basis of
                              Page 44

24    that opinion?
25        A.    Well, I don't know about all of them, so I
0106
1    can't say all of them.  But the ones that I've
2    been in -- had anything to do with would certainly agree
3    that if you knew of a hazard that you hadn't warned
4    about, that you should either warn and let them know or
5    get in touch with them so that they could help you
6    rewrite your warnings.
7        Q.    Can you warn against every possible harm or
8    hazard?
9        A.    You don't need to warn against every possible
10   harm or hazard.  That's what I -- why I'm talking about
11   a hazard pattern analysis in evaluating whether or not
12   the -- what's the likelihood that someone's going to be
13   exposed, what's the likelihood that the hazard will
14   occur.  All these things need to be considered.  And did
15   I ever say it was easy?  No.
16        Q.    Well, if -- if a person is not -- if there's
17   not a high probability that a number of people will have
18   a response to a substance, is a manufacturer negligent
19   for not warning of that substance?
20        A.    It depends on the consequences of the
21   exposure.  I've told you several times now that it's not
22   just the likelihood of exposure or the likelihood of the
23   response.  It's also a function of the significance of
24   that response.
25        Q.    Okay.  And if -- if that response is generally
0107
1    in the scientific community found to be insignificant or
2    transitory, would -- in your opinion as a human factors
3    engineer, would that mean that the manufacturer needs to
4    provide a warning?
5        A.    We're going round and round about this.  So
6    you're asking me here:  I'm a manufacturer, I'm
7    producing a product.  I know that it's going to cause
8    some injury, but it's slight, in my opinion.  Do I have
9    a duty to warn?
10        Q.    No, not that it will.  That it's -- as you've
11   already described, that any product can possibly cause
12   something.
13        A.    Well, okay.  But then a significant number of
14   people that I know of, in the population, who are going
15   to use this, could likely experience some kind of
16   negative consequence.
17        Q.    Oh, boy.  All right.  Let's see if we can
18   start over with this thing.  You know, maybe we'll have
19   to just wait until we get to your specific opinions,
20   because doing it in the abstract I don't think is going
21   to work with you.
22        A.    I'm not very abstract, you're right.
23        Q.    Okay.
24        A.    I need some more water.  That's pretty
25   concrete.
0108
1        Q.    I'll help you with that.  I can handle that.
2             MR. PINEDO:  I'll object to the previous
3    sidebar, before the water discussion.
4             MR. GLASS:  No problem.
5        Q.    (By Mr. Glass)  All right.  What safety
6    standards are there regarding warnings?
7        A.    I don't understand what you're asking me.
8        Q.    Okay.  Are there any guidelines that are

Laux Lila F  - Vol  I.txt

9   offered to manufacturers to look at regarding how
10  warnings can be presented to the users of their
11  products?
12      A.    Oh, sure.  ANSI Z.535 is a big one, and it's
13  been around since the '70s.
14      Q.    All right.  And as far as ANSI Z.535, what
15  does it provide regarding types of -- or how you can
16  communicate warnings?
17      A.    Well, that's basically what it does provide,
18  is how to present the warning.  It doesn't really tell
19  you how to identify the warning.  It tells you how to
20  present the warning.
21      Q.    And -- and what were the general ways that
22  ANSI 535 tells you to do that?
23      A.    Well, ANSI Z.535 is a -- an on-product or on-
24  environment or on-thing, kind of warning.  It doesn't
25  deal with auditory warnings or olfactory warnings or
0109
1   tactile warnings or any other kinds of warnings except
2   strictly visual warnings.
3           And it describes how you would decide the --
4   how you should go about deciding whether to use danger,
5   warning, caution, or just information.  It tells you how
6   to decide what the background for your signal word --
7   those are called signal words; danger, warning, caution,
8   information.  How to decide whether you need to have the
9   exclamation point the alerting signal; how large the
10  print should be; where you should place the warning, in
11  terms of the -- the eye point or viewpoint of the
12  potential user; how to arrange and decide what fonts and
13  sizes you should use; all that kind of stuff.
14      Q.    Okay.  I --
15      A.    Whether to use white-on-black or black-on-
16  white.
17      Q.    As far as the information that you're supposed
18  to convey, obviously the first thing would be the hazard
19  that is -- you have to identify the hazard?
20      A.    Well, yes, when you get to that point, once
21  you --
22      Q.    Sure.  And then also, what -- what are some
23  other substantive information that should be conveyed
24  according to ANSI Z.535?
25      A.    You need to tell the user what the hazards is;
0110
1   how they're -- what they should do to prevent exposure,
2   and which includes how the exposure occurs; and what the
3   consequences of the exposure can be.
4       Q.    All right.  Do you agree that an adequate --
5   or a warning can be adequate even if people are still
6   being injured by it?
7       A.    Well, let's see.
8       Q.    I'm sorry.  Let me -- I'll rephrase that.
9   That didn't make any sense.  I apologize.  If -- would
10  you agree that a warning can still be adequate even if
11  people are being injured by a product that contains that
12  warning?
13      A.    Can -- can someone still be injured by a
14  product that has an adequate warning?  Is that what
15  you're asking me?
16      Q.    No.  I -- I'm saying it a different way, so
17  I'd rather have it the way I said it.  But the mere fact
18  that an accident occurred doesn't mean that a warning's
19  inadequate, correct?

Page 46

Laux Lila F  - Vol  I.txt

20      A.    Correct.
21      Q.    Okay.  Or somebody got hurt using a product
22  doesn't mean that that -- that the product was deficient
23  because it did not have a warning?
24      A.    Not necessarily, no.
25      Q.    Can you eliminate every hazard that can occur,
0111
1  in any circumstance, at any time?
2       A.    Are you talking about for a specific product
3  or --
4       Q.    Yep.
5       A.    -- are you talking about in general?
6       Q.    Yes, ma'am.
7       A.    You didn't limit that to a product.
8       Q.    Okay.  For a product.
9       A.    For a product, is it --
10      Q.    Yes.
11      A.    -- possible to eliminate --
12      Q.    Yes.
13      A.    Well, knives and scissors wouldn't be very
14  useful, would they?
15      Q.    No, they would not.  The evidentiary basis for
16  your opinions in this case, did you speak to
17  Ms. Alexander?
18      A.    I did.
19      Q.    Okay.  How long did you speak with
20  Ms. Alexander?
21      A.    Maybe 15 or 20 minutes.
22      Q.    Okay.  And what kind of things did you discuss
23  with Ms. Alexander?
24      A.    Well, I asked her about her son's asthma and
25  if she knew that he had asthma, and she described that
0112
1  she did.
2            And I asked her what -- you know, if she had
3  realized -- if she had seen the warning that said that,
4  you know, there was a potential for harm to -- from
5  formaldehyde for people with asthma, and how would
6  her -- what would her reaction have been.
7            And I asked her if she had alternative things
8  she could have done, instead of moving to the FEMA
9  trailer.
10      Q.    Okay.  Did you talk to her about factual
11  things such as, you know, whether she read the owner's
12  manual?
13      A.    Yes.
14      Q.    And what did she say?
15      A.    She said she had read the owner's manual.
16      Q.    She read it before she moved in?
17      A.    I believe so.  I'm not positive, now that you
18  asked me that.  But she had read it, I know.
19      Q.    So you just don't know when she read it?
20      A.    I don't.
21      Q.    Could it have been after she became a
22  bellwether plaintiff in this case?
23      A.    No.  She indicated to me that she had read it
24  quite early on when she had moved into the trailer,
25  because it gave her instructions about some of the
0113
1  things she needed to know about.
2       Q.    Did you talk to Christopher Cooper?
3       A.    No.
4       Q.    Did you speak directly to any of the
                          Page 47

Laux Lila F - Vol I.txt

```
 5      plaintiffs' experts?
 6          A.   No.
 7          Q.   Okay.
 8               MR. PINEDO:  Do you think we could take a
 9      quick break?
10               MR. GLASS:  Sure.
11               MR. PINEDO:  Okay.
12               THE VIDEOGRAPHER:  We are going off the
13      record.  The time is 14:26:21.
14               (Recess taken from 2:26 p.m. to 2:28 p.m.)
15               THE VIDEOGRAPHER:  We are back on the record.
16      The time is 14:28:33.
17          Q.   (By Mr. Glass)  Okay.  Ma'am, if you would
18      please pull out your report.
19          A.   Okay.
20          Q.   I want you ask you some questions, and
21      specifically I'm going to -- since I haven't even gotten
22      to your opinions yet, let's start on Page 4 and skip
23      some of this other stuff.
24          A.   All right.
25          Q.   Okay.  On Page 4 you have some background
0114
 1      information regarding formaldehyde?
 2          A.   Yes.
 3          Q.   Okay.  The first bullet point, where you're
 4      talking about the basic information about formaldehyde,
 5      where'd you pull this information from?
 6          A.   Well, from all the documentation that's cited
 7      in my list of materials that I reviewed about
 8      formaldehyde.
 9          Q.   Okay.  I'm more concerned about the second
10      half of that statement:  although people who are exposed
11      to the gas over an extended period of time rapidly
12      become habituated to the odor of low levels of
13      formaldehyde and no longer detect the odor.
14               Is that just something that you're relying on
15      from some of the other experts, or is that something
16      you've cited to a specific source?
17          A.   Probably both.  I don't remember the specific
18      source.  But that's a psychological phenomenon that's
19      well known, called habituation.
20          Q.   The third bullet point talks about OSHA
21      allowable limits of .75 parts per million for healthy
22      adults working 40 hours a week, correct?
23          A.   Right.
24          Q.   And then the second sentence there reads,
25      "Studies dating back to the 1980s documented adverse
0115
 1      health effects for people living in trailers who were
 2      exposed to even lower levels."
 3               That statement, did that come -- which studies
 4      were you referring to?
 5          A.   I'd have to get out my materials and look for
 6      them, but it's in there.  And that -- for instance, that
 7      warning that I said, you know, comes from the CFR, was
 8      from the early '80s.
 9          Q.   The HUD warning?
10          A.   Yes.
11          Q.   We'll get to that.  So you --
12          A.   So, you know, clearly it was known by HUD by
13      that time.
14          Q.   Do you know what the underlying data for those
15      studies was evaluated?
```

Page 48

Laux Lila F - Vol I.txt

16     A.   Not offhand.  I'm sure I must have seen that
17  in the -- in the reports.  Probably a lot of it had to
18  do with mouse exposure and --
19     Q.   Were they -- were those studies based on the
20  same component parts that are being utilized in the
21  manufacture of travel trailers today?
22     A.   I don't know anything about those component
23  parts.  I know that there was exposure to formaldehyde.
24  I don't know about the component parts that were used,
25  though.
0116
1      Q.   Well, the problem I'm having is, this says the
2   studies dating back to the 1980s documented adverse
3   health effects for people living in travel trailers who
4   were exposed to even at lower levels.  What are those
5   lower levels?
6      A.   Lower levels than .75 parts per million.
7      Q.   Okay.  So your benchmark there is .75 parts
8   per million?
9      A.   Well, that's what it said in this -- it's what
10  this sentence says.
11     Q.   Well, it's two sentences, and I want to make
12  sure that they're related to each other, which I did not
13  understand in the first reading.
14     A.   All right.
15     Q.   So it's your understanding that there are
16  studies, dating back to the 1980s, that document adverse
17  health effects for people living in travel trailers, who
18  were exposed to levels --
19     A.   I didn't say travel trailers.  You notice
20  that.
21     Q.   I'm sorry.  -- trailers, who were exposed to
22  even lower levels than .75 parts per million?
23     A.   That's correct.
24     Q.   Okay.  And you don't remember what those
25  studies are?
0117
1      A.   No.  We can go through the materials that
2   I've --
3      Q.   No.
4      A.   -- provided to you, if you want me to, and I
5   can point them out.
6      Q.   I don't have time to do that, unfortunately.
7   We're very limited in what we can do.
8      A.   Well, you are limited.  I'm not.  I can stay
9   as long as you want.
10     Q.   Okay.  Well, in that case I may direct that to
11  your attorneys and ask for the source of that
12  information.
13          Is it your opinion -- I'm going to kind of
14  jump forward from the '80s.  Is it your opinion that
15  there's a consensus in the medical community, at the
16  time that the Alexander travel trailer was sold -- and
17  I'm going to represent to you, that was 2004 -- that the
18  levels of formaldehyde in travel trailers constituted a
19  health hazard?
20     A.   Consensus by whom?
21     Q.   I said the medical community.
22     A.   Oh, you did?
23     Q.   Yes.
24     A.   I didn't hear.
25     Q.   Yes.
0118

Page 49

Laux Lila F - Vol I.txt
```
 1      A.    Sorry.  I don't know that the medical
 2 community ever considered it.
 3      Q.    Okay.
 4      A.    Specifically with regard to travel trailers.
 5      Q.    So is it accurate to say that you don't know
 6 whether there was a consensus?  I'm trying to be
 7 specific.  You didn't answer my question.
 8      A.    I have seen no evidence that the medical
 9 community specifically targeted the formaldehyde levels
10 in travel trailers.
11      Q.    I'll ask the same question regarding the
12 scientific community.  Is there -- was there a consensus
13 at the time -- or in the scientific community, at the
14 time that the Alexander travel trailer was sold, in
15 2004, that the levels of formaldehyde in travel trailers
16 constituted a health hazard?
17      A.    Well, the question you're asking me doesn't
18 really have an answer, because nobody was saying --
19 looking specifically at travel trailers.  The people who
20 were establishing safe levels of formaldehyde were
21 talking about safe levels of exposure, period.  They
22 weren't saying safe levels of exposure in travel
23 trailers, safe exposure in workplaces, safe -- you know,
24 like this.  People were looking to see if there was a
25 hazard associated with exposure to formaldehyde.
0119
 1      Q.    So it doesn't matter where the person might
 2 have been exposed.  As you said, it could have been at
 3 work, it could have been outside, it could have been in
 4 their -- a regular site-built home; it wasn't specific
 5 to a travel trailer.  Is that understood?
 6      A.    What wasn't?
 7      Q.    The fact that people -- as you've said, that
 8 nobody -- you don't know of anybody who was looking
 9 specifically at exposure in travel trailers.
10      A.    I don't know of -- I didn't see any studies
11 where -- very early, in 2000, let's say, where anybody
12 was going out and saying, well, let's look at the
13 formaldehyde levels in travel trailers.
14            For one thing, as it was pointed out in some
15 of the literature, at that point, before they were being
16 used by FEMA, it wasn't expected that people would be
17 living for extended periods of time in these trailers.
18      Q.    Okay.  You know, that -- that actually leads
19 to the next point in that, that -- or the next sentence
20 in that bullet point:  Formaldehyde exposure to those
21 living in trailers like the Gulf Stream Cavalier
22 provided to Ms. Alexander is potentially 24 hours per
23 day, 7 days per week.
24      A.    That's correct.
25      Q.    And you -- you've mentioned that, earlier in
0120
 1 your testimony.  Are we being exposed to formaldehyde
 2 right now?
 3      A.    Yes.
 4      Q.    Okay.  Are -- are people exposed to
 5 formaldehyde 24 hours a day, 7 days a week, regardless
 6 of where they were?
 7      A.    Sure.  You're manufacturing some of it in your
 8 own body.
 9      Q.    Correct.  You're breathing it in right now,
10 aren't you, ma'am?
11      A.    Probably.
```
                              Page 50

Laux Lila F  - Vol I.txt

12      Q.   Okay.  It's -- and as far as you know, it's
13  also part of permanent press in your clothes; is that
14  accurate?
15      A.   Could be.
16      Q.   Okay.  Is it part of the food that you eat?
17      A.   Can be.
18      Q.   Okay.  Is it -- is there formaldehyde being
19  emitted from the wood products in this room?
20      A.   I hope not, but it's possible.
21      Q.   You haven't seen any -- in all the literature
22  that you read in preparation of your report and since,
23  you haven't seen anything that suggests that
24  formaldehyde is being emitted from wood products?
25      A.   Sure.
0121
1       Q.   Okay.  And you don't think that the wood
2   products in this room are included in those?
3       A.   I said it's possible.
4       Q.   Okay.  But you also said that you hope not.
5       A.   Well, I do hope not.  Sometimes when they get
6   really quite old, they don't give off nearly as much
7   formaldehyde.  So maybe it's not giving off enough to be
8   of interest or certainly not enough to be of concern.
9       Q.   Where did you obtain the information that
10  formaldehyde, over time -- emissions of formaldehyde
11  diminish over time?
12      A.   Well, it's in every article I read about the
13  emission of formaldehyde from particleboard and MDF and
14  all that.  Or MFD?  No, MF -- MDF.
15      Q.   So the second sentence in Bullet Point 3, that
16  formaldehyde exposure to those living in travel trailers
17  like the Gulf Stream provided Ms. Alexander is
18  potentially 24 hours a day, 7 days a week, did -- does
19  that assist anybody in -- it's just common sense that
20  they're already -- that people are exposed to
21  formaldehyde 24 hours a day, correct?
22      A.   You certainly are making a funny conclusion if
23  you think that what I'm talking about there is normal,
24  everyday kinds of formaldehyde exposure.  It's pretty
25  clear that what I'm talking about is the kind of
0122
1   elevated formaldehyde exposure that they're talking
2   about in these travel trailers.
3            You know, yes, we are all being exposed to
4   formaldehyde every day.  Are we being exposed to
5   elevated levels?  I hope not.
6       Q.   Okay.  You've used elevated exposure and
7   elevated levels twice -- well, several times in this
8   deposition.  What is elevated?
9       A.   Well, certainly it's elevated against what I
10  would consider the normal background level of
11  formaldehyde; which is very low, in most instances.
12      Q.   Okay.  And what is background levels of
13  formaldehyde?
14      A.   Well, typically they might be as low as 1 part
15  per billion or lower than that.
16      Q.   Have you seen --
17      A.   But it depends upon the environment you're in,
18  of course, and whether you smoke.
19      Q.   Okay.  What -- what about smoking involves
20  formaldehyde?
21      A.   Well, smoking releases formaldehyde into the
22  environment, so people who are smokers are being exposed
                          Page 51

Laux Lila F  - Vol  I.txt

```
23  to more formaldehyde.
24       Q.    Are you still a smoker?
25       A.    No.
0123
 1       Q.    Okay.  When did you quit?
 2       A.    This time a year ago.
 3       Q.    Okay.  Are there warnings contained on
 4  cigarette packages?
 5       A.    Yes, there are.
 6       Q.    But you still choose to smoke?
 7       A.    They were effective, though.  Eventually I did
 8  quit because of those warnings.
 9       Q.    Well, you said "this time."  You quit and then
10  you started again?
11       A.     I have quit more than once and then started
12  again, that's right.  Smoking is an addiction.  It's not
13  like other kinds of habits that people have.
14       Q.    How many parts per million of formaldehyde is
15  contained in cigarette smoke by volume?
16       A.    I don't know.
17       Q.    Okay.  Would it surprise you if it was as much
18  as 40 parts per million?
19       A.    No, it wouldn't surprise me.  I don't know
20  that it's correct, but it wouldn't surprise me.
21       Q.    And the exposures that -- at the levels you
22  talked about, you talked about even .05 parts per
23  million, correct?
24       A.    Yes, I have.
25       Q.    Okay.
0124
 1       A.    Because that's chronic exposure.
 2       Q.    According to whom?
 3       A.    According to whom what?
 4       Q.    You said "that's chronic exposure," .05.
 5  Where did you get that information?
 6       A.    I didn't -- I said that that's the limit that
 7  some agencies put on chronic exposure as being safe.
 8       Q.    Okay.  Can you tell me which agencies?
 9       A.    Not right offhand.  I could -- ATSDR, maybe,
10  or, I don't know, CDC.  I'd have to go back and look and
11  see.
12       Q.    Have you seen any studies that suggest that
13  the background level in cities is even higher than that?
14       A.    Not higher than that.  But I've seen the
15  studies that there are cities that have a higher
16  background level of formaldehyde.
17       Q.    Have you seen any studies that suggest that
18  site built homes have levels that exceed .050?
19       A.    I haven't seen those studies.  I wouldn't
20  argue with you, if you tell me they exist.
21       Q.    So, and again, I'm not trying to make a funny,
22  but if -- I don't want you to assume anything, but I'll
23  ask it this way:  People are exposed to formaldehyde
24  24 hours a day, 7 days a week; is that accurate?
25       A.    To some level, yes.
0125
 1       Q.    Okay.
 2       A.    But adding -- adding additional formaldehyde
 3  to their environment is not a good thing.
 4       Q.    What is the basis of that opinion?
 5       A.    Because it raises the level of their exposure.
 6  And I think that we can all be in agreement that the
 7  higher the exposure, the greater the risk.
```

Page 52

Laux Lila F - Vol I.txt

8      Q.   Okay.  I understand what you propose.  The
9  next bullet point talks about small volume, large
10 surface area of Gulf Stream Coach and travel trailers
11 allows for a concentration of formaldehyde.  Is that
12 accurate?
13     A.   Is that the next bullet?
14     Q.   Or maybe it's not the next one.  Hold on.  Let
15 me see which one I was looking at.
16     A.   I think it's the last bullet on that page.
17     Q.   Okay.  Before I go to that, then, I need to
18 ask you a few more questions.
19          "Formaldehyde levels such as those present in
20 many travel trailers are more harmful to children than
21 adults."  Is that something that is within your
22 expertise, to make that diagnostic conclusion?  Or is
23 that something you're relying on medical experts for?
24     A.   I don't know that that's a diagnostic
25 conclusion.  That's a -- information that's provided in
0126
1  all kinds of publications.  It just says that children
2  are more sensitive to exposure of formaldehyde than
3  adults.
4      Q.   Okay.
5      A.   In fact, it's in -- in that warning that I
6  cite in here.
7      Q.   HUD, okay.  All right.  Now let's go to the
8  last bullet point on that page:  "small interior volume
9  and the large surface area of formaldehyde off-gassing
10 products in the interior of trailers like the Gulf
11 Stream Cavalier allow [for] the concentration of
12 formaldehyde fumes in mobile homes and travel trailers."
13          Where -- where did you obtain this
14 information?
15     A.   I probably got it through logic, after reading
16 all the information that I read, but then it was
17 subsequently confirmed by one of the expert reports.
18     Q.   Have you personally gone and examined what the
19 interior volume of a trailer -- travel trailer is, and
20 the surface area of the interior products that off-gas
21 formaldehyde, if any?
22     A.   No.
23     Q.   When you say allow for concentration,
24 concentration at what level?
25     A.   Well, concentration just means concentration.
0127
1  It just means that the fumes become more concentrated.
2  It doesn't say what level.  It just says that they
3  become more concentrated.  That's in all the literature
4  that's provided about how to reduce the level of
5  formaldehyde in your travel trailer, et cetera,
6  et cetera.
7      Q.   Is it also true that the amount of surface
8  area of wood in here allows for the concentration of
9  formaldehyde in this room?
10     A.   Now, that didn't make any sense to me.  What
11 are you asking me?
12     Q.   I'm asking you, if there's formaldehyde -- if
13 there are formaldehyde sources in this room, such as the
14 wood product behind you, the wood table in front of you,
15 the wood credenza, are -- is that creating a
16 concentration of formaldehyde in this room?
17     A.   Depends on the ventilation --
18     Q.   Okay.

Page 53

Laux Lila F  - Vol  I.txt

19      A.    -- to some extent, and the off-gassing.  And I
20  don't have any idea what the off-gassing levels are, and
21  I don't have any idea what the ventilation is.  Is that
22  a possibility?  Yes.  Maybe we should move outdoors.
23      Q.    Because I don't -- the doors aren't open here.
24  It doesn't seem like the vents are working.
25      A.    There are a couple vents up there.
0128
1       Q.    Okay.  How many vents are in the Gulf Stream
2   travel trailer that was used by the Alexanders?
3       A.    A couple that I know of.
4       Q.    How many --
5       A.    I'm not sure how many.
6       Q.    How many windows?
7       A.    Well, I think there might be three.
8       Q.    Okay.  And how many doors?
9       A.    To my knowledge, only one, but there might be
10  another one.
11      Q.    Okay.  What types of ventilation systems
12  accompany the travel trailer?
13      A.    Well, there was an air conditioner, if that's
14  what you're asking me.  Otherwise, I'm not sure whether
15  there was a fan on that -- you know, an exhaust fan on
16  there.
17      Q.    Was there a dehumidifier in this trailer?
18      A.    I don't know.
19      Q.    Okay.  Was a there a humidifier in the
20  trailer.
21      A.    I don't know that either.  I don't know if
22  there was a dehumidifier, and I don't know if there was
23  humidifier.
24      Q.    Was there an open source of flame in this
25  travel trailer?
0129
1       A.    There was a gas -- a propane stove, I believe.
2       Q.    Was there a heater?
3       A.    There was a heater, but it didn't work.  She
4   used an electrical heater, is my understanding.
5       Q.    An electrical heater in time the -- inside of
6   the trailer?
7       A.    Yes, one that she plugged in.  That's my
8   understanding.
9       Q.    Do you know if there was an ionizer used by
10  Chris Alexander while he was in the travel trailer?
11      A.    You mean a nebulizer?
12      Q.    Any kind of -- you know, like a Sonic Breeze
13  from Sharper Image or any of the ionizers that -- that
14  cleanse the air.
15      A.    Not that I know of.
16      Q.    Okay.  So just like you can't tell what
17  concentration of formaldehyde is in this room because
18  you don't know what the ventilation is, you don't know
19  what the off-gassing is, you -- you can't tell what the
20  concentration, though, is in any of these travel
21  trailers without determining that, correct?
22      A.    No.  But there -- I saw data that indicated
23  that they have been -- it had been assessed.  As I said,
24  you know, I'm making this assumption.  If I'm wrong,
25  that there was no off-gassing in these travel trailers
0130
1   or that the level of off-gassing was insignificant, then
2   so be it.
3       Q.    Okay.  That's -- that's a really interesting
Page 54

Laux Lila F  - Vol  I.txt

4    point.  So you've come to the conclusion that this is a
5    hazard, based upon the information that was provided to
6    you by some additional experts, and what you've
7    reviewed.  But as you've just indicated, if, through
8    these proceedings, it's determined that the level that
9    existed in this specific unit wasn't a hazard, then your
10   opinions are wrong?
11         MR. PINEDO:  Objection, form.
12         A.   It would be irrelevant if there's -- if it
13   turns out that there was no formaldehyde exposure that
14   caused Chris Cooper to develop additional symptoms or
15   that posed any threat to anybody in these -- in any of
16   these travel trailers, then my opinion would be
17   irrelevant.
18         Q.   (By Mr. Glass)  Well, I want you to focus just
19   on the specific trailer at issue here, which is the unit
20   that was used by Ms. Alexander and her son Chris.  If
21   it's determined that the level of formaldehyde that was
22   in this trailer is such that it didn't constitute a
23   hazard, then, as you said, your opinions regarding
24   warning irrelevant.  Is that accurate?
25         A.   I suppose that if you -- I mean, the weight of
0131
1    the evidence, he was ill, his doctors believe that it
2    was caused by formaldehyde exposure.  So, you know, I
3    have a logical reason for making that assumption.
4         Q.   Okay.
5         A.   It's not like I plucked it out of thin air.
6         Q.   I -- I -- I'm just making sure I'm
7    understanding what the source of your opinion is.  And
8    as you've just said, it's based upon what her doctors --
9    what Chris Cooper's doctors, such as Janet Barnes and
10   Ms. -- or Dr. Panchenko and the others, have said.  Is
11   that accurate?
12         A.   Well, that's accurate that his asthma was
13   exacerbated by exposure to formaldehyde, correct.
14         Q.   But if it is established, as I said, that
15   it's -- that the levels that were existing in this
16   trailer did not constitute a hazard, then the opinions
17   regarding whether this -- whether a warning should
18   accompany this trailer, this particular trailer, are not
19   relevant to this case?
20         A.   Well, I don't think that makes any sense,
21   because this trailer was not manufactured for Alana
22   Alexander.  So I'm talking about travel trailers that
23   were produced by Gulf Stream and what they told the
24   people out there who were going to be using their
25   trailer.
0132
1         Sure, she happens to be the person that we're
2    talking about in this case.  But the manufacturer has a
3    duty to warn all the people who are going to be using
4    this trailer.
5         Q.   Okay.
6         A.   Any of these trailers.
7         Q.   So in this particular case, hypothetical, in
8    this particular case, testing -- and I'm not
9    representing this is accurate; I'm saying this is a
10   hypothetical -- testing comes out that this is below, as
11   you pointed out, OSHA .075, parts per million?
12        A.   Well, that wouldn't be relevant to me at all.
13        Q.   Okay.  That's not what --
14        A.   Because that's for the workplace, for a

Page 55

Laux Lila F - Vol I.txt

```
15  healthy adult, for 40 hours a week.
16      Q.    Perfect, okay.  Now we go to, I think you've
17  also cited .050 from some other source, that I can't
18  recall at this particular point.  If the testing is
19  below .050, is it your testimony that that doesn't
20  matter because maybe some other trailer had a higher
21  level and they should have warned Alana and Chris, even
22  though their trailer didn't have a level that you
23  consider bad?
24            MR. PINEDO:  Objection, form.
25      A.    I don't know where to start with this.  So
0133
 1  you're asking me if, today, they tested it and found out
 2  the level was .05, and that was concluded not to be
 3  causing his asthma, would I still believe that they
 4  needed to be warned?
 5            And my answer would be yes, because we have to
 6  extrapolate backwards from that .05.  We can look at
 7  other trailers and look at the -- that are similar or
 8  exactly the same and determine what the level was at the
 9  time they moved in, or extrapolate to get some number
10  similar to that.  We can look at the doctor's opinions
11  that the formaldehyde was what exacerbated.
12            So I don't know what you're asking me,
13  honestly.  If you're saying, if it's proven that there
14  was no hazard from formaldehyde in this trailer -- is
15  that what you're asking me?
16      Q.    (By Mr. Glass)  Yes.
17      A.    Okay.  If it's proven that formaldehyde was
18  not a hazard in this trailer, ever, during the entire
19  time they lived there, and it did not have anything to
20  do with his asthma, would I still believe that my
21  suggestion about warnings was required?
22            Yes, because they couldn't guarantee that it
23  was going to be those two people in this trailer.
24  Everybody who moved into this trailer needs that
25  information, that this trailer get -- gives off
0134
 1  formaldehyde; that formaldehyde has been found by
 2  government agencies to cause these symptoms; and if
 3  you're elderly or a child or you have a history of
 4  asthma, you need to pay attention and -- and seeing if
 5  it's going to be causing you a problem.
 6      Q.    You're saying the HUD standard says that it's
 7  been proven to cause these things?
 8      A.    It says here, it's been reported --
 9      Q.    This it may cause.
10      A.    -- that elderly persons and young children, as
11  well as anyone with a history of asthma, allergies, or
12  lung problems, may be at greater risk.
13      Q.    May be, correct?
14      A.    Well, sure.  You're going take -- you're going
15  to take your asthmatic kid in there and it says, "If you
16  bring your asthmatic child in here, your child may be at
17  risk"?  You're going to say, "Oh, well, 'maybe,' that
18  doesn't count.  I don't think I'll pay any attention to
19  that."
20      Q.    This is pointing out to the fact that you had
21  said it does, and now it really says may.  But be that
22  as it may, we'll get to that opinion when we get down to
23  the opinions.
24            MR. PINEDO:  Objection, sidebar.
25      A.    And this is in '84, don't forget.  We know a
```

Page 56

Laux Lila F - Vol I.txt

0135
1   lot more than we knew in '84.  There's a lot of more
2   recent data that indicate that, yes, there is a hazard.
3   I mean, it's been put on the IARC, the cancer risk list.
4   It's -- we know that it's a hazard.  So you can't come
5   and tell me to assume that -- that there was no hazard.
6   There is hazard.
7           Q.    (By Mr. Glass)  Okay.  Is -- can you cite to
8   me any U.S. agency that has established that
9   formaldehyde is a known carcinogen?
10          A.    I don't know.  I'd have to go out and look at
11  all the different agencies that are out there.  I know
12  that CDC lists  -- lists it as a probability.  I'm not
13  sure that it's listed as a known.  I'm pretty sure the
14  IARC does list it as a known.
15          Q.    And is that -- is that a U.S. agency?
16          A.    No.  It's an international agency.
17          Q.    All right.  I don't know where to start with
18  that whole dialogue either, to paraphrase what you said.
19  Where do you have information to support your statement
20  that -- oh, man, I just drew a blank on what you had
21  said.  I'm sorry.  I was right in the middle of your --
22  your response.
23          A.    You can have her read it back.
24                MR. GLASS:  Can -- can you read it back?
25                MR. PINEDO:  I'm going to object to the form
0136
1   of the question.
2                 MR. GLASS:  I haven't finished it yet.  She
3   had a very long response.
4                 (Discussion held off the record.)
5                 MR. GLASS:  Read the last answer.
6                 THE VIDEOGRAPHER:  All right.  This ends the
7   Tape No. 2 in the deposition of Lila Laux.  The time is
8   14:53:49.
9                 (Recess taken from 2:53 p.m. to 3:08 p.m.)
10                THE VIDEOGRAPHER:  This is marks the beginning
11  of Tape No. 3 in the deposition of Lila Laux.  The time
12  is 15:08:19.
13          Q.    (By Mr. Glass)  Okay.  We took a break while
14  we were trying to find the question that I -- I could
15  not recall.  And we did.
16                You -- you had mentioned, in the middle of one
17  of your answers, that you could extrapolate back from
18  whatever reading that you were evaluating, and, I guess,
19  do some kind of analysis as to what levels were at
20  different times.  Did I understand that correctly?
21          A.    Well, there's going to be an off-gassing
22  curve.  And, of course, it's not going to be exact, but
23  you can estimate, to some degree of assuredness, that --
24  you know, what the earlier levels of off-gassing were,
25  giving the current levels.  But, of course, it's all
0137
1   going to depend a lot, too, on how the trailer was used
2   and what the temperatures were, what the humid -- how
3   the humidity was, what the condition in the trailer was,
4   all kinds of things.
5                 But I think you can pretty much assume that,
6   if the level is at point whatever now, at a year earlier
7   it was probably at some point higher than that.
8           Q.    What's the basis for that opinion?
9           A.    Well, everything I've read in all these
10  different articles.

Page 57

Laux Lila F  - Vol  I.txt

11    Q.    And I apologize, but that doesn't help me very
12   much, when you say "everything I've read in all these
13   articles."
14    A.    Well, it's in numerous documents that I have
15   provided to you, that the rate of off-gassing is higher
16   in the first eight months and then gradually begins to
17   taper off, and after a time it becomes lower and lower.
18    Q.    First eight months from when, what point?
19    A.    Probably from the time of manufacture.
20    Q.    When was the --
21    A.    But again, that's going to depend on what's
22   going on with the trailer during that time.
23    Q.    What -- what factors are relevant to what's
24   going on with the trailer at that time?
25    A.    How much it's ventilated, so the temperatures
0138
1   it's exposed to; the humidity, relative humidity, that
2   it's being exposed to; the condition of the -- how much
3   the trailer is airtight.  Things like that.
4    Q.    The ventilation of the trailer affects the
5   rate of off-gassing from the wood in the interior?
6    A.    More than likely.  I mean, given my experience
7   with chemistry, if you take -- if you've got two
8   different concentrations of a gas, the gas is going to
9   move toward the area of low concentration.  So if you
10   have a -- if you have a condition where it's being
11   ventilated, then the gas is going to move into that
12   space more rapidly than it would otherwise.
13    Q.    When was the trailer, used by Ms. Alexander
14   and her son, manufactured?
15    A.    Oh, sometime in 2004.  I have it in my report,
16   but I'm not -- I can't recall the exact date right
17   offhand.
18    Q.    When did they move into the trailer?
19    A.    They moved in about a year and a half later, I
20   think.  It was built in -- okay, yep, she moved in about
21   18 months after it was constructed.
22    Q.    And it's your understanding that formaldehyde
23   emissions from wood products decreases over time?
24    A.    Under some circumstances, sure.  Well, they
25   actually they are high initially, and then they
0139
1   gradually begin to decrease, yes.
2    Q.    You're saying they're high.  What benchmark
3   are you using for high?
4    A.    Well, I don't have a benchmark for high.  But
5   they are at their highest, let's put it that way.  And
6   that, that's known, that they're -- that when it's first
7   constructed, they're giving off their highest rate of
8   off-gassing of formaldehyde and other things that
9   they're off-gassing.
10    Q.    You also mentioned, in that long answer, that
11   you were talking about 1984 for the HUD standard.  And
12   that, you know, obviously, at least from your
13   perspective, that means that things have been known
14   since 1984.  Has the manufacturer of wood products
15   changed in the more than 20 years since 1984?
16    A.    For sure.
17    Q.    Is the amount of formaldehyde that is emitted
18   from wood products the same as what you would expect was
19   emitted in 1984?
20    A.    It would depend on the product and the
21   manufacturer.  I can't make any kind of blanket
Page 58

Laux Lila F  - Vol  I.txt

22  statement about that.
23          Q.   Do you think there has been advances, or do
24  you have any understanding as to whether there have been
25  any advances, in the manufacture of wood products such
0140
1   that formaldehyde is emitted at much lower levels than
2   might have been studied in 1984?
3          A.   Yes.
4          Q.   You expect that?
5          A.   Do I expect what?
6          Q.   Is it -- is it your understanding that that's
7   the case, or you just don't know?
8          A.   I told you that I understand that is the case.
9          Q.   Okay.
10         A.   There are products available that off-gas at a
11  much lower rate, than were available in 1984.  Although
12  I'm -- they probably were available, they weren't used
13  in 1984 as much as they are used today.
14         Q.   What products were used in manufacture of the
15  Alexander travel trailer?
16         A.   Well, all of these different paneling
17  components and carpets and drapes and --
18         Q.   What types of wood components?
19         A.   I'm not positive which ones were used.
20         Q.   Were those --
21         A.   I could -- I could get the spec out and look
22  at it and see, but --
23         Q.   But did you look at that before you drafted
24  your report?
25         A.   I did.
0141
1          Q.   Was this -- or this trailer that was used by
2   the Alexander plaintiffs, Mrs. Alexander and her son,
3   Chris Cooper, manufactured using LSB?
4          A.   I don't know.
5          Q.   Was it manufactured using MDF?
6          A.   I don't know.
7          Q.   Was it --
8          A.   I mean, I can look it up and see.  I'm not
9   going to be able to tell you right now.  You can ask me
10  all you want.  I'm not going to know.
11         Q.   Was it manufactured with LFE?
12         A.   Again, how many times do I have to tell you,
13  I'm not going to be able to tell you.
14         Q.   I'm just verifying what information you have
15  to base your opinions on.  Do you know at what rates
16  formaldehyde is off-gassed from any of those products
17  that I just mentioned?
18         A.   Not those specific products.  I know that they
19  are -- that Gulf Stream requested in their specs that it
20  be -- I think in their specs, or maybe it was just from
21  the providers -- that it would off-gas at an acceptable
22  rate to them, which was like .3 parts per million.
23         Q.   And you're saying "acceptable rate to them."
24  Is there a standard that any of the composite wood
25  product manufacturers have adopted in the manufacture of
0142
1   their products, regarding the off-gassing of
2   formaldehyde?
3          A.   I don't know if there's a standard, but that
4   seems to be the standard they use.  I mean, I don't know
5   that there is a government standard or a -- or an
6   industry standard, but that was the standard that seemed
                            Page 59

Laux Lila F  - Vol  I.txt

 7  to have been used at that time.
 8       Q.   Okay.  Isn't the type of product that
 9  comprises the trailer, the type of wood product that
10  comprises the trailer used by the plaintiffs, important
11  in determining whether the amount of formaldehyde
12  off-gassed constitutes a hazard?
13       A.   Are you asking me whether I -- because I said
14  I don't know exactly at this moment what products were
15  used, I shouldn't be forming an opinion about whether it
16  was off-gassing?  I don't think that that's even
17  relevant.
18            I've told you I assumed that these products
19  are off-gassing, and I've read what those products were,
20  and I've read what the -- that the level of off-gassing
21  was .3.  I've read the analyses not only from -- that
22  was done on this trailer but on the other trailers, and
23  I know that the concentration of formaldehyde in these
24  trailers was often quite high.
25       Q.   Okay.  I don't think that was remotely the
0143
 1  question.  I ask that you just rephrase and answer
 2  the -- I'll ask it again.
 3            Is it important to know what type of wood
 4  product was used in the Alexander trailer to determine
 5  the levels of formaldehyde that are off-gassed from that
 6  product, if any, when you -- when you try to determine
 7  whether it constituted a hazard to the people who lived
 8  in it.
 9            MR. PINEDO:   Objection, sidebar; objection,
10  form.
11       A.   I don't know what you're asking me.  If you're
12  asking me, is it important for me to know what products
13  were used and how much they off-gassed, in formulating
14  my opinion that there was a -- a hazard associated with
15  formaldehyde off-gassing to the people who lived in
16  these trailers, the only thing I can tell you is that I
17  did know, I have seen those data, and I understand that
18  the levels of formaldehyde in this trailer and the other
19  trailers were certainly way above detectable, and that
20  everyone who examined Christopher Cooper agrees that he
21  was exposed to formaldehyde and that that exacerbated
22  his asthma.
23            So beyond that, I don't know what else to tell
24  you.
25       Q.   (By Mr. Glass)  Everyone who examined him
0144
 1  agreed with that?
 2       A.   Everyone that I read who --
 3       Q.   Okay.
 4       A.   -- the reports said that, you know, his asthma
 5  was -- and generally it's agreed that asthma is
 6  exacerbated.  It even says so --
 7       Q.   I just want to --
 8       A.   -- in this health notice.
 9       Q.   I just want to make sure that you -- that your
10  opinion is that everyone who's examined him, that you've
11  read, has opined that.  And I understand that you've
12  answered that question, but again you haven't answered
13  the question that I've asked.
14            Is it important to know what products are
15  comprising the travel trailer now when you're trying to
16  determine the levels of formaldehyde that are being
17  off-gassed?

Page 60

Laux Lila F - Vol  I.txt
```
18            MR. PINEDO:  Objection, form.
19       A.   I don't think I can answer that question as
20  you've asked it.  Doesn't make any sense to me.  Do I
21  need to know every single product that was in there and
22  how much it off-gassed in order for me to determine
23  whether the off-gassing reached levels that were
24  hazardous?  I don't think so.  Do I know what the
25  products were?  I read the list of materials that were
0145
1   used.
2        Q.   (By Mr. Glass) Ma'am, I haven't asked you in
3   relation to your opinions espoused in your -- in
4   your opinion --
5        A.   Oh.
6        Q.   -- opinion.  I'm asking if it's --
7        A.   Oh, you're not asking about me.  You're asking
8   in general.
9        Q.   Is it important to know what products are in
10  the trailer?  Yes, ma'am.
11       A.   For who?  Important for who?
12       Q.   To -- to determine --
13       A.   I thought you meant me.
14       Q.   Ma'am, is it important to know the type of
15  product, wood product, in the trailer to determine the
16  levels of formaldehyde that were being emitted by those
17  products?
18       A.   Is it important for whom to know?
19       Q.   For anybody who's offering opinion that
20  there's a hazard in this trailer.
21       A.   Okay.  So now you are referring to me, right?
22       Q.   Okay.  Fine, yes, ma'am.
23       A.   Okay.  Is it important for me to know what
24  products were used in the -- in the construction of this
25  trailer, in order to me to opine that there was an
0146
1   elevated level of formaldehyde in -- or that there was a
2   level at least that was hazardous to Chris Cooper?  I
3   don't think so.
4        Q.   No?
5        A.   Do I know?  I do know.  I read those things.
6        Q.   Okay.  You also have another bullet point --
7   go back to the bullet points -- Page 5, Page 5, top of
8   Page 5, "Heat and humidity such as are routinely
9   experienced on the Gulf Coast, increase the rate of
10  formaldehyde off-gassing, as does the presence of mold,
11  which also thrives in the heat and humidity."
12            Where did you obtain the information that the
13  presence of mold increases the rate of formaldehyde
14  off-gassing?
15       A.   I'm not sure specifically, but I might have a
16  copy of something that relates to that.  If not, I'll
17  have to go back to my literature and search it out.
18  Here's a document, I think, "To control mold."  So it's
19  telling you about what you should know about
20  formaldehyde in mobile homes.  It's a document put out
21  by CDC, FEMA, the U.S. Department of Homeland Security
22  and two other agencies that I can't recall, environment
23  health.
24       Q.   Okay.  And that document that you just
25  referenced suggests that the presence of mold increases
0147
1   the off-gassing of formaldehyde?
2        A.   I'm not sure this is the one, but I think so.
```
Page 61

Laux Lila F  - Vol  I.txt

3    But there were others.  I remember reading it more than
4    once.
5         Q.    Okay.  Maybe it's -- may I see the document
6    you're referring to?
7         A.    Um-hmm.
8              (Document tendered to Mr. Glass.)
9         A.    And I know I've read it in some other treatise
10   besides that, but I did notice that when I started to
11   print these things off before I decided not to kill so
12   many trees.
13        Q.    Okay.  I don't dispute that there was also a
14   discussion about controlling mold in this article, but I
15   do not recall seeing, anywhere in here, that it suggests
16   that formaldehyde levels are increased by mold.  This is
17   talking about air quality, in addition to mold.  Is --
18   am I --
19        A.    Well, it says "What You Should Know About
20   Formaldehyde in Mobile Homes."  That's the name of the
21   article.  But I'm sure that I saw this in other
22   treatises, as I mentioned.  And I can go back and find
23   it, if you want me to.
24        Q.    Okay.  Well, the only way I can assess the
25   reliability of what you're telling me in any of these
0148
1    opinions is by your being able to cite to me where you
2    get the information.  So -- and so I may have to ask
3    you that, since we don't have the time for you to dig
4    through all your documentation to find it here.
5              Okay.  Now we're going to go to the next part
6    of Page 5 on your report, where it's talking about the
7    background -- or, I mean, exposure to formaldehyde by
8    plaintiffs.  When you talked to Mrs. Alexander, did you
9    receive any information about what types of living
10   quarters she was in, in Florida?
11        A.    No.
12        Q.    How about was it -- was it a stick-built or --
13   or a site-built home, or was it a manufactured house or
14   a travel trailer?
15        A.    Well, I just think I didn't -- told you, I
16   didn't get any information, right?
17        Q.    Okay.  Was -- how many people were living in
18   that house?
19        A.    I have no idea.
20        Q.    Do you know if there were any other sources of
21   formaldehyde in that house?
22        A.    I don't.
23        Q.    Did you receive information from anybody else
24   regarding any of the -- of that type of information?
25        A.    It was totally irrelevant to me.
0149
1         Q.    Okay.
2         A.    I wouldn't have even asked for that type of
3    information.
4         Q.    That -- that information is not relevant to
5    any of your opinions?
6         A.    No.
7         Q.    Not a single one that's contained in your
8    report?
9         A.    Well, if you can point one out to me, maybe.
10   I don't know.
11        Q.    Well, then how --
12        A.    I don't think so.
13        Q.    I think you just testified that it wasn't, so
                        Page 62

Laux Lila F - Vol I.txt
```
14   we'll get to some of the opinions in a few minutes.
15          The next point in that subsection of exposure
16   to formaldehyde is that Gulf Stream Coach Inc. -- or
17   there was a Gulf Stream Coach Inc. travel trailer
18   manufactured in 2004 and that the plaintiff lived in it
19   until May of 2006; is that correct?
20      A.   No.
21      Q.   I'm sorry.  I --
22      A.   I didn't say that at all.
23      Q.   I apologize.  It was manufactured in 2004.
24   And then they lived it from May of 2006 until
25   December 2007.
0150
1       A.   That's correct.
2       Q.   Okay.  So they lived in the trailer
3    approximately 19 months?
4       A.   I guess.
5       Q.   Okay.  And that was information from
6    Ms. Alexander?
7       A.   Yes.  But I think it must have been in the
8    plaintiff fact sheet too.  I mean, I saw it somewhere
9    else, but I'm sure I verified it with her.
10      Q.   The end of that paragraph talks about her son
11   experiencing increased respiratory problems and being
12   treated for asthma in the emergency room, and her
13   statement that it -- I guess the asthma had worsened
14   after they took up residence in the Gulf Stream
15   Cavalier.  Where did you receive that information from?
16      A.   From Ms. Alexander and from the medical
17   records.
18      Q.   When was the first time that you saw any
19   mention of asthma potentially worsening while she was in
20   the trailer -- while Chris Cooper was in the trailer in
21   any of the medical records?
22      A.   Well, I don't think it said worsening, but the
23   fact that was in the ER and even hospitalized during
24   that period made it a logical assumption, to me, that he
25   was getting worse.
0151
1       Q.   Are there other reasons why asthma can worsen?
2       A.   Sure.
3       Q.   Do people have different reactions as weather
4    changes?
5       A.   Well, yeah, over a year they might go up and
6    down, based on the pollen and so forth in the air, sure.
7       Q.   Are you qualified to diagnose the cause of
8    Mr. Cooper's symptoms or alleged symptoms?
9       A.   I'm qualified to read the medical reports and
10   conclude that they said that it was related to
11   formaldehyde.
12      Q.   So you can -- you're qualified to read another
13   expert's report and repeat what's said in that?
14      A.   No, that's not what I said at all.  I'm
15   qualified to read a medical report and conclude that, if
16   the -- if the medical personnel believed that a
17   condition is exacerbated by the presence of a chemical
18   like formaldehyde, that I am entitled to rely on that.
19      Q.   We've talked about a bunch of different
20   standards.  I just want to make sure, before we get into
21   your opinions, I know exactly what we're dealing with.
22   What, in your opinion, is an excessive -- well, at what
23   point is there an excessive level of formaldehyde?
24      A.   Well, it depends on which standard you're
```
Page 63

Laux Lila F  - Vol  I.txt

25    looking at, but certainly any level that's detectable
0152
1    that you're going to be exposed to over time.  I mean,
2    if you can smell it, then probably you're being exposed
3    at a level that's too high.  And that's -- you know,
4    that's even what it says in here.
5              Do I -- can I set a specific number and say,
6    okay, .05 or .03, which are some of the ones that are in
7    the standards, or even .008, which are in some of the
8    standards?  I'm not going to say that I believe that any
9    one of those is the correct standard or the only
10   standard.  But it's clear that there are limits to the
11   amount of exposure you should have.
12        Q.   I understand that.  And many of your opinions
13   talk about excessive levels, and so I need to
14   understand, to understand your opinions, what you mean
15   by excessive levels.
16        A.   Well, I mean, levels that are higher than .05,
17   for sure -- for sure, parts per million.  But if I
18   looked at other standards, I might assume that other
19   levels are excessive.
20             And what we know is that it depends on you, as
21   an individual, what's excessive.  But we know that
22   people who are asthmatic or elderly or young children
23   are more sensitive and should be exposed at even lower
24   levels than those standards.
25        Q.   That's an important point.  So when you say at
0153
1    least .050, you're talking about healthy adults at that
2    level?
3         A.   I'm talking about healthy people and, most
4    likely, adults.  But if you look at the statement, it
5    says, you know, the children, the elderly, people with
6    asthma, you have to consider.
7              And -- and when you're producing thousands of
8    these travel trailers, you have to assume that some of
9    the people who are going to be living in them are
10   children; are adults, elderly adults; are asthmatics;
11   and do have other conditions.  So you have to be sure
12   that you alert them to the presence of formaldehyde even
13   at extremely low levels.
14        Q.   Okay.  So I just -- I got to make sure I
15   understand what your definition of excessive is.  And am
16   I correct in understanding that .05 parts per million is
17   an excessive level for adults, healthy adults, in your
18   opinion, when you say excessive?
19        A.   If they're going to be exposed over an
20   extended period of time, I think that's a level that is
21   of concern, partic- -- if we've been talking about
22   healthy adults, maybe not.  We don't know.
23        Q.   Okay.  I didn't draft the report, so I need to
24   understand what you mean by it.
25        A.   Well, I don't think I ever said anything like
0154
1    that.
2         Q.   Okay.  Well, when we get to it, then the --
3    the first time, then you can explain it to me at that
4    point.
5         A.   All righty.
6         Q.   And you just used another variable.  You said
7    the extended period of time.  What do you consider
8    extended periods of time?
9         A.   Well, I consider any -- anything living in
                          Page 64

Laux Lila F - Vol I.txt

10   a -- in a trailer -- and it's not just going camping,
11   but living in a trailer -- represents that you are in
12   there for an extended period of time.
13        Q.   Living --
14        A.   Does that mean more than a week, more than two
15   weeks?  Probably.
16        Q.   More than two weeks is an extended period of
17   time?
18        A.   Depending on the exposure you get.  These
19   things are -- you know, you've got the -- if you have
20   control in one variable, like the length of time, you
21   have to consider all the other variables that go into
22   play when you make that decision.
23        Q.   First opinion, contained on Page 8:
24   Ms. Alexander's decision to accept and live in the Gulf
25   Stream Cavalier was a reasonable decision given the
0155
1    information she was provided.
2         What information was she provided?
3         A.   Not much.
4         Q.   Okay.  Well, that -- that's not specific
5    enough for me.  Can you tell me what information?
6         A.   She was told that she was going to get a FEMA
7    trailer.
8         Q.   Were there any warnings contained on the
9    product?
10        A.   Yes.
11        Q.   Okay.  What warnings?
12        A.   Well, I think there was a warning about
13   propane, and there were probably others.  I don't recall
14   them all, but I know that there were some other warnings
15   or alerts.  But I just don't remember what they are at
16   this moment.
17        Q.   What information was provided to Ms. Alexander
18   in the owner's manual?
19        A.   Do you want me to get it out and read it?
20   Because otherwise, I mean, there's a lot of information
21   in that owner's manual.  I have no idea what you're
22   asking me.
23        Q.   What I'm asking you is, your opinion is that
24   their decision to live in the trailer, Ms. Alexander's
25   decision to live in the trailer, is based on information
0156
1    provided.  And I'm just trying to determine what
2    information you were referring to.  Does that include
3    the information in the owner's manual?
4         A.   I don't think so.  She'd already made the
5    decision to accept and live in the trailer probably
6    before she saw the owner's manual.
7         Q.   That's all -- that's all I'm trying to
8    determine, ma'am.
9         Your next portion of that opinion is:  Her use
10   of the trailer was a reasonably anticipated use of the
11   trailer by Gulf Stream.
12        Okay.  How did she use the trailer?
13        A.   She lived in it.
14        Q.   Okay.  How long did she live in it?
15        A.   Well, you just told me she lived in it almost
16   19 months.
17        Q.   Did she use the air conditioner?
18        A.   Some.
19        Q.   When you say "some," what do you mean, "some"?
20        A.   Well, she didn't run it 24 hours a day, 7 days

Page 65

Laux Lila F - Vol  I.txt

```
21   a week, 12 months in the year, no.
22        Q.   She told you that?
23        A.   Yes.
24        Q.   What temperature did she set the air
25   conditioner at?
0157
 1        A.   I don't know.
 2        Q.   Did she use the ceiling vents?
 3        A.   I believe so, but I can't swear to that.
 4        Q.   Did she use the humidifier?
 5        A.   I don't -- you mean a dehumidifier?
 6        Q.   A dehumidifier.
 7        A.   I believe she might have, but I can't swear to
 8   that either.
 9        Q.   How many people stayed in the travel trailer?
10        A.   She and her two children.
11        Q.   Did anybody else stay in the trailer at any
12   time?
13        A.   I have no idea.  Over 18 months, I imagine
14   someone else did, but I don't know who it was.
15        Q.   How many people -- what was the most number of
16   people that ever resided in the trailer at one time?
17        A.   I have no idea.
18        Q.   Did she cook in the trailer?
19        A.   I believe she did.
20        Q.   You said she used an electric trailer,
21   correct -- I mean, excuse me, an electric heater inside
22   the trailer?
23        A.   That's what I understood.
24        Q.   Okay.  Do you know how much Btus that heater
25   put out?
0158
 1        A.   No.
 2        Q.   Okay.  Do you know how often she used
 3   that tra- -- or the heater?
 4        A.   No.
 5        Q.   Okay.  Do you know if there are any
 6   recommendations or warnings regarding using electric
 7   heaters in the trailer?
 8        A.   Recommendations by Gulf Stream, you mean?
 9        Q.   Yes, ma'am.
10        A.   Or FEMA?
11        Q.   Either one.
12        A.   I might have seen something.  I don't really
13   recall.
14        Q.   Do you know what she cooked in the travel
15   trailer?
16        A.   Food.
17        Q.   What kind of food?
18        A.   I have no idea.
19        Q.   Does it matter in regard -- in regards of the
20   off-gassing of formaldehyde?
21        A.   It might.  But I don't think that the Gulf
22   Stream said:  Well, let's see.  If she's making red
23   beans and rice, we better warn her about this; but if
24   she's making shrimp gumbo, we better warn her about
25   that.
0159
 1        Q.   Did she maintain the travel trailer?
 2        A.   She tried to.
 3        Q.   What did she do to maintain the travel
 4   trailer?
 5        A.   She cleaned it; and when she saw mold on it,
```

Page 66

Laux Lila F - Vol I.txt

```
 6    she washed it off with Clorox water; and things like
 7    that.
 8         Q.   How often did she clean it?
 9         A.   Oh, gosh, I have no idea.  As often as it
10    needed it, I'm assuming.
11         Q.   Okay.  Did she have pets in the trailer?
12         A.   I don't know.  I didn't think so.  She didn't
13    mention them.
14         Q.   Did you specifically ask?
15         A.   No, I didn't.
16         Q.   Did she have plants in the trailer?
17         A.   I don't know.
18         Q.   Do you know if she maintained the different
19    components of the trailer according to the maintenance
20    schedule in the owner's manual?
21         A.   Well, I know she called the people who were
22    supposed to be doing the maintenance and had some
23    trouble with that, so I kind of doubt that the
24    maintenance took place on the schedule that it was
25    supposed to take place.
0160
 1         Q.   Are there any obligations on the owners to
 2    maintain their living environment?
 3         A.   Depends on what you mean by "maintain."
 4         Q.   Well, you've read -- you've read the owner's
 5    manual.  Are there any suggestions that the owner is
 6    supposed to do certain things on a periodic basis?
 7         A.   I'm sure there are things that they're
 8    expected to do periodically.
 9         Q.   Did Mrs. Alexander do those things?
10         A.   I don't know.
11         Q.   Okay.  Without all of that information, how
12    are you able to opine that it was reasonable, a
13    reasonably anticipated use?
14         A.   Well, I think that the fact that she moved in
15    there with her children and lived there is a reasonably
16    anticipated use.
17         Q.   Okay.  Do you know if she, for instance, let
18    water accumulate on the floor?
19         A.   I don't know that she let water accumulate on
20    the floor.  I think she did have some leaks.
21         Q.   But yet, not having all this information, it's
22    your opinion that it was a reasonably anticipated use?
23         A.   Living in the trailer with her children was an
24    anticipated use, yes.
25         Q.   Okay.  The next opinion you have is that
0161
 1    Ms. Alexander relied on Gulf Stream to warn of any
 2    conditions that could create a hazard.
 3         A.   Um-hmm.
 4         Q.   Okay.  Any hazard?
 5         A.   Any hazard that was for -- that she would be
 6    exposed to and her children would be exposed to, that
 7    she wouldn't be aware of normally, sure.
 8         Q.   Okay.  And not to beat a dead horse, but it's
 9    in every single one of your opinions, the hazard -- a
10    hazard is the potential to cause harm, correct?
11         A.   A hazard is a condition which has potential to
12    cause harm, yes.
13         Q.   Okay.  And you can't warn against every
14    potential harm, can you, a product manufacturer?
15         A.   Oh, we could have a long discussion, at this
16    point, which, I'm sure, you don't want, about which
```

Page 67

Laux Lila F  - Vol  I.txt
17  hazards should be warned about.  And I think we've
18  discussed that, to some extent.  And, of course, I've
19  said, you know, you can't -- you shouldn't even try to
20  warn them about things like don't start a fire on the
21  floor of the trailer or don't run into the trailer with
22  a car and turn it over.  I mean, those are the kinds of
23  things that we certainly wouldn't expect to warn about.
24          The things we want to warn about are the
25  things that we can logically assume she might be exposed
0162
1  to, that she wouldn't necessarily understand that she
2  was being exposed to the hazard; that there was a
3  reasonable probability that if she was exposed, she
4  could suffer some negative consequences; and that there
5  were things she could do about it, which she needed to
6  know about.
7          Q.   Okay.  I think your next opinion talks about,
8  "Although the paneling and other formaldehyde containing
9  materials from which the trailer was built gave off
10  fumes that she could detect, Ms Alexander was not
11  informed that if she could smell the fumes there was a
12  possibility that she and her son were being exposed to
13  unacceptable levels of toxic chemicals."
14          What's the source of that information?  Is
15  that from some medical report you read or --
16          A.   What information are you asking me about?  I
17  don't get it.
18          Q.   Okay.  The -- the fact that you have made the
19  opinion that if she is smelling something, that is an
20  unacceptable level of toxic chemicals.
21          A.   It says there was a possibility that she --
22          Q.   Okay.
23          A.   -- and her son were being exposed to
24  unacceptable levels of toxic chemicals.
25          Q.   What is the source of that information?
0163
1          A.   I don't think I understand the question.
2  She -- I said she wasn't informed that if she could
3  smell the fumes, there was a possibility that she and
4  her son were being exposed to unacceptable levels of
5  toxic chemicals.  That's my statement.
6          Q.   Okay.  And I'm trying to determine the basis
7  of your -- your making that statement.
8          A.   That she should have been alerted to the fact
9  that if she smelled an -- a smell in the trailer, that
10  she might be being exposed to unacceptable levels of
11  toxic chemicals?
12          Q.   No.  The fact that because you can smell
13  something means that you might be being exposed to an
14  unacceptable level of toxic chemicals.
15          A.   Well, it -- you know, we know that the -- they
16  knew that the -- the paneling and these other components
17  of the trailer could and were probably giving off
18  formaldehyde, and they knew that formaldehyde has an
19  odor, and it's a very pungent odor.  And the likelihood
20  that she was smelling formaldehyde was real.
21          Yes, there could have been other smells that
22  she was smelling.  The sewer might have been open or
23  something like that.  But she detected something that
24  stung her eyes and that was, pretty obviously, a
25  chemical substance.  And there was nothing in there that
0164
1  warned her that if she smelled something like that, she
Page 68

Laux Lila F  - Vol  I.txt

```
 2  should check it out.
 3          Q.    You think that's something that a normal
 4  person needs to be told:  If they -- they feel some --
 5  if they're smelling something and, you're saying,
 6  they're having physical symptoms of it, they should
 7  check it out?
 8          A.    Absolutely.
 9          Q.    Okay.
10          A.    I mean, if I move into a trailer and I'm
11  smelling -- I -- how many time -- oh, you never have
12  but, I've gone into many fabric stores that made my eyes
13  sting.  There's formaldehyde in those fabrics.  But she
14  wasn't aware that the formaldehyde, even if it was
15  present, could harm her.
16          Q.    You just made a very interesting point.  So
17  you walk into a place of business where you've been --
18  where you've been exposed to something where you could
19  smell it, and it caused a physical reaction to you.  Was
20  there a duty to warn on -- on the part of that business
21  operator?
22          A.    Absolutely.
23          Q.    Okay.  If there's -- if you walk into -- or if
24  you get into a new car and you smell a new-car smell,
25  are you being exposed to a hazardous level or
0165
 1  unacceptable level of chemicals?
 2          A.    You'd like to hope that that was controlled so
 3  that the answer's no.  If you are being exposed, you
 4  should certainly be warned about it.
 5          Q.    Can there come a point where warnings -- I'm
 6  going to, for lack of a better, word call it warnings
 7  overload for people.
 8          A.    Oh, that's an old saw, sure.  And let's not --
 9  let's not warn anybody about anything, because if we
10  give them too many warnings, they won't pay attention,
11  right?  That's what you're asking me, right?
12          Q.    No.  What I'm you asking is, if you give too
13  many warnings for unlikely situations, do people stop --
14  stop heeding warnings altogether?
15          A.    No.  There's a whole lot of circumstances
16  around that.  If you give a lot of warnings which the
17  user perceives as being totally egregious or irrelevant
18  or unimportant or unlikely, then, yes.  And you gave ten
19  warnings, and they all said things like don't drop this
20  on your foot; don't fold this up on your finger; this is
21  sharp, it might cut you, when it's a knife.  Then, sure,
22  people are not going to pay any attention to those
23  warnings.  But that's not the issue here.
24          Q.    Are there any studies that establish that
25  detection levels are well below expected irritant
0166
 1  levels, when you're talking about formaldehyde?
 2          A.    I think there are detection levels that are
 3  below irritant levels.
 4          Q.    Have you read any of -- I apologize.  I think
 5  you already told me you haven't looked at any of the
 6  plaintiffs' experts -- I mean, defense expert reports.
 7  What are detectable levels of formaldehyde?
 8          A.    Well, one part billion, for sure, but --
 9          Q.    One part per billion?
10          A.    Yes.
11          Q.    That's a detectable level?
12          A.    That's what I understand.
```
                        Page 69

13    Q.    Okay.
14    A.    At least detectable by some people.  That
15  doesn't mean that every single one of us -- for
16  instance, people who smoke might not detect it, but it
17  is a detectable level.
18         MR. PINEDO:  Excuse me, Mr. Glass.  Are there
19  any defense expert reports in the Alexander/Cooper case?
20         MR. GLASS:  Class certification, but not in
21  the Cooper case.  But I'm just asking if you got any --
22  if she got any class certification.
23         MR. PINEDO:  Okay.  I just want to be clear,
24  this is not in the Alexander/Cooper case.
25         MR. GLASS:  They'll be coming.
0167
1          MR. PINEDO:  And they will be supplied to her
2  when they come forth.
3          MR. GLASS:  No problem.
4     Q.    (By Mr. Glass)  The next opinion, No. 4:
5  Ms. Alexander was not informed that high ambient
6  temperatures and high humidity as well as the presence
7  of mold would increase the rate at which formaldehyde
8  would off-gas from the materials in the interior of the
9  travel trailer.
10         I think I've already asked you where you got
11  the information that the presence of mold increases the
12  rate of formaldehyde off-gassing.  And right now you
13  can't specifically cite something, other than the CDC,
14  but you'll look for that for me?
15    A.    If you send Mr. Pinedo a request and he gives
16  me a request, I'll look for it.
17    Q.    Back on No. 3 just very briefly, "unacceptable
18  levels of toxic chemicals."  Again, are you able to tell
19  me what an unacceptable level is?
20    A.    Well, again, you know, I gave you a bottom
21  line, and I gave you a --
22    Q.    .050?
23    A.    Yeah, that's one.  But again, as I said,
24  it's -- a lot of it is going to depend on the condition
25  of the people who are being exposed to it, and that
0168
1  comes -- you know, that's very clear from all the
2  literature, that a child with asthma is going to need to
3  be exposed to a much lower level than an adult, a
4  healthy adult, during the working day.
5          I mean, these levels, that's -- I -- I'm --
6  I -- there are many different levels that have been
7  specified as being acceptable; but none of them, that I
8  know of, that into account, except maybe the .0087, or
9  the lowest one I think I saw, would be likely to
10  accommodate every single person in the expected user
11  population; children, elderly, people with asthma,
12  people with other respiratory problems.
13         So the issue is going to be, if you have any
14  of those conditions, you need to check it out and see
15  whether you're being exposed to something that's going
16  to be harmful to you.
17    Q.    So if I understand you correctly, then, in
18  fact, is it accurate to say that to provide an adequate
19  warning for a travel trailer product, that would be
20  required under your analysis for any product that would
21  result in exposure exceeding .008 parts per million?
22    A.    I don't think I said that.
23    Q.    Well, I'm -- that's what I'm trying to
                        Page 70

Laux Lila F  - Vol  I.txt
24   confirm.  I think you just said that -- okay, let me let
25   me step back.  You said .05 was one level that you have
0169
 1   indicated is what you believe you've read as a level for
 2   healthy adults.  And then you said, but you have to take
 3   into account for people who are most susceptible,
 4   including kids with asthma.  Is that accurate?
 5        A.   Sure you do.
 6        Q.   Okay.
 7        A.   I mean, you know that kids with asthma is part
 8   of the expected user population for these trailers.
 9        Q.   And then you read one standard that may meet
10   that requirement is .008?
11        A.   Meet what standard?
12        Q.   That would be a level that is below where you
13   might expect a response from a sensitive or -- a
14   sensitive person or a person with a respiratory problem
15   like asthma.
16        A.   Well, I think they'd be much less likely have
17   a response than at -- than at a higher level.  But I
18   think the issue is not so much those levels, as the fact
19   that you need to tell people, who are being exposed,
20   that they are being exposed to some level, however low,
21   and that there are certain segments of the population
22   who are particularly sensitive and that they need to
23   check that out.
24        Q.   And that's what I am trying to get to, ma'am.
25   So any product that would expose a sensitive individual
0170
 1   or a child with asthma to a level of formaldehyde at a
 2   level that you've described as excessive, should warn of
 3   that -- that situation or that --
 4        A.   If they're going to be living in that
 5   situation for extended periods of time, yes.
 6        Q.   Okay.
 7        A.   That doesn't mean that I think every home or
 8   every store needs to have a warning if people come in
 9   and out.  But if you're going to be living in there and
10   being exposed to it as much as all the time, yes, you
11   need to know that.
12        Q.   Okay.  So potentially in a site-built home, if
13   a person is living in their house and they're exposed to
14   levels even below the .050 standard, those houses should
15   have a warning that people with asthma or respiratory
16   problems should evaluate whether they need to live in
17   the home, because they are sensitive to potential
18   formaldehyde exposure?
19        A.   Well --
20        MR. PINEDO:  Objection, form.
21        A.   Does every home?  I mean, if -- if there is no
22   alternative and the home has to give off those levels
23   and there's no way to deal with it, then I guess we
24   don't -- you know, we're kind of at an impasse.  But
25   most homes have ventilation systems, they have large
0171
 1   spaces, the air volume is much bigger, the air volume
 2   turns over faster.  So there are lots of other
 3   mitigating factors.
 4        Would I want to know if a new house I was
 5   buying had products that off-gas from formaldehyde?  I
 6   sure would.
 7        Q.   (By Mr. Glass)  You -- you just mentioned that
 8   there are all kinds of factors in a site-built home,
                              Page 71

Laux Lila F - Vol I.txt

9  such as volume, ventilation, everything else.  That's
10  all -- that all goes into the level or concentration of
11  formaldehyde in a home, correct?
12       A.   Well, let's say that, for instance, in the
13  kitchen, where there's cabinets that were made out of
14  particleboard, you might have a higher exposure than you
15  would in the bedroom.
16           But if I had a house and I knew that the
17  kitchen cabinets were built with particleboard that were
18  off-gassing formaldehyde and I had a child with asthma,
19  I would definitely want to know that.
20       Q.   And a response- -- in your opinion, a
21  responsible manufacturer would be required to warn of
22  that, for those types of products, in the site-built
23  home?
24       A.   If the -- in the -- if the cabinets are giving
25  off detectable amounts of formaldehyde into the
0172
1  environment, then I think that it would -- I would want
2  to know that.
3       Q.   Okay.  You talk about high ambient
4  temperature.  And I'm again on No. 4.  That high ambient
5  temperatures and high humidity increase the rate at
6  which formaldehyde off-gasses.  Temperature inside or
7  outside of the travel trailer?
8       A.   Well, specifically into -- inside, but the
9  inside temperature is going to be reflect -- a
10  reflection of the exterior temperature.
11       Q.   You've lived in Louisiana for some period of
12  time?
13       A.   Yes, I have.
14       Q.   Do people in Louisiana use trail -- or live in
15  conditions without air conditioning, when an air
16  conditioner's available to them, during hot summer
17  months?
18       A.   Sometimes they do; if they can't afford the
19  electricity, yes.
20       Q.   Okay.  Is there any indication that anybody
21  who was provided a travel trailer following the
22  Hurricane Katrina catastrophe was not able to get
23  electricity?
24       A.   Oh, I didn't say that, did I?  I said that
25  some people felt they couldn't afford it.  And, yes, I
0173
1  did read some reports where people felt that they
2  couldn't afford the electricity to run the air
3  conditioners.  And they didn't feel like they could be
4  out of their houses for several days while the air
5  conditioners clean -- cleared out the formaldehyde.
6       Q.   Was aid provided to the travel trailer
7  recipients, where they're electricity bills or utility
8  bills were also paid?
9       A.   Some.
10       Q.   Okay.  How about the Alexanders?
11       A.   I don't know.
12       Q.   Same question for humidity.  Is it humidity
13  inside the trailer or humidity outside the trailer?
14       A.   Well, they're dependent on each other, but
15  certainly we're -- I'm talking about humidity -- both,
16  actually, in this case, because since there were cracks
17  in the paneling in the wall, the exterior humidity
18  was -- and -- and in the roof, the exterior humidity was
19  having an influence on the -- what was behind the walls,

Page 72

Laux Lila F  - Vol  I.txt
20  but which was probably being released into the interior
21  of the trailer.
22       Q.   Where do you -- what's the source of your
23  opinions that potentially the crack -- there -- first
24  off, that there were cracks from the trailer, and that
25  that resulted in a higher humidity in the interior of
0174
1   the travel trailer?
2        A.   Well, there's evidence that there were cracks
3   in the trailer -- or not -- I wouldn't say cracks,
4   exactly -- that the paneling had come loose and there
5   were gaps when she moved in, essentially.  And she spoke
6   to FEMA, and they told her to tape it up with duct tape,
7   I think she said.
8        And so, you know, if it's humid outside and
9   there's holes, which there evidently were also in the --
10  I wouldn't say holes, but there were -- it wasn't
11  airtight, so the humid air from outside was getting into
12  the trailer.
13       Q.   Okay.  Does that increase the interior vent --
14  air exchange rate?  Are you saying that the air is
15  coming in from outside?
16       A.   Probably not.
17       Q.   And what -- where do you base that conclusion
18  on, when you say "probably not"?
19       A.   Well, because the -- what's coming in through
20  these cracks is going to just be fumes from the -- you
21  know, moisture from the interior.  But it's not going to
22  be a wind.  There's not going to be any movement of air.
23  It's just going to be through osmosis that it's coming
24  in.
25       Q.   Okay.  Is there a point where wood products
0175
1   reach a saturation level, for lack of a better word, to
2   where additional temperature will not result in any
3   additional increase in off-gassing of formaldehyde?
4        A.   I don't know.
5        Q.   Is there a point where increases in humidity
6   will no longer result in higher levels of formaldehyde
7   being off-gassed, if that is indeed the case?
8        A.   Well, humidity can't go above a hundred
9   percent, so I guess we could say a hundred percent is
10  pretty much the limit.
11       Q.   Is there a point below that where any
12  additional increases will not result in additional
13  off-gassing of formaldehyde from any higher rate than a
14  baseline?
15       A.   I don't know.
16       Q.   Okay.  No. 5:  Ms. Alexander was not informed
17  that exposure to fumes she could smell could cause
18  serious, potentially life-threatening and long-term
19  health problems for those who breathed the fumes,
20  specially the children and, in particular, children with
21  asthma and other respiratory problems.
22       Okay.  Do you have medical support for the
23  position that -- that there are long-term life-
24  threatening health problems from exposure to
25  formaldehyde at the levels that were seen in the
0176
1   Alexander trailer?
2        A.   Well, if you notice, I said that it could
3   cause those things.  And that's because, in the medical
4   literature, there is a relationship between inhalation
Page 73

Laux Lila F - Vol I.txt

5   of formaldehyde fumes and those conditions that I
6   mentioned in there.
7           Q.   I understand the way it's phrased, and I asked
8   you a more direct question, that if you know if there's
9   any support, medical support, that exposure to
10  formaldehyde levels at .050 would result in long-term
11  life-threatening conditions, as opined in No. 5 of your
12  report.
13          A.   Yes.  There's evidence that says in particular
14  to children with asthma.  I mean, we can go back again
15  to that statement that was put out by HUD.  I mean, and
16  that's based on some research, right?  They're saying
17  that there's the young -- elder persons and young
18  children as well as anyone with a history of asthma,
19  allergies, or lung problems is at greater risk.  And
20  that there is research continuing on the possible long-
21  term effects.
22          And I think that, you know, subsequent
23  research has indicated that when people do get exposed
24  and suffer these consequences, they don't always recover
25  back to the level where they were before, even when
0177
1   they're removed from the source of the formaldehyde.
2           Q.   Are there medical opinions to the contrary,
3   that levels at -- seen as have been tested in this
4   trailer or even using your standard of .050 --
5           A.   That's not my standard.  That's just a
6   number --
7           Q.   Okay.
8           A.   -- that is one of the standards that is
9   provided in the literature.
10          Q.   Okay.  I'll start over.  And have you seen
11  any studies that would indicate that exposures
12  to formaldehyde at levels at or below .050 parts per
13  million do not -- there's no medical causation to
14  indicate that even in individuals with respiratory
15  problems and asthma would suffer any kind of aggravation
16  of that -- those symptoms?
17          A.   I don't see how you could do that study unless
18  you exposed them for extended periods of time.  I mean,
19  you could do some kind of a case-controlled study, I
20  suppose.  But you can't do that exact exposure study, so
21  I don't see how I could have seen -- seen any literature
22  like that.
23          Q.   Okay.  All you have to say is no.  That's
24  fine.
25          A.   Well --
0178
1           Q.   But you can explain it too.  That's fine.
2           A.   But the question is not a sensible question.
3   That's why I'm explaining it.
4           Q.   Have you seen any studies where there was a
5   case control study with zero parts per million and what
6   the results of those studies were?
7           A.   So a case-controlled study comparing zero
8   parts per million to what?
9           Q.   To the self-reporting complaints that people
10  would have at various levels.
11          A.   So you're asking me if I've seen a study
12  where -- where there is no formaldehyde in the
13  environment, and people reported that they had some
14  conditions like asthma and things like that, right?
15          Q.   whether they had --

Page 74

Laux Lila F - Vol I.txt

```
16        A.    And whether the rate of those reports --
17        Q.    (By Mr. Glass)  Self -- let me -- let me
18   clarify a little bit.  Not asthma, but it's other types
19   of responses, like eye irritation, nose irritation,
20   throat irritation.
21        A.    So you're asking me if there's been a study,
22   with zero exposure, and they measured eye irritation and
23   throat irritation, and those rates were no different
24   than rates of exposure of higher levels of formaldehyde?
25        Q.    Yes, ma'am.
0179
1         A.    Haven't seen those studies.
2         Q.    Okay.  The next opinion is No. 6:  Not
3    informed that even low levels of formaldehyde exposure,
4    if chronic, could cause serious health problems in
5    children, adults with respiratory problems, and/or who
6    were sensitive to formaldehyde.
7               Same question:  The medical support, when
8    you're -- you're talking about low levels, what level
9    are you -- you referring to?
10        A.    Well, let's just go with .05 or even .03,
11   which are some of the ones that have been recommended,
12   or .003.
13        Q.    Parts per million?
14        A.    Yes.
15        Q.    I'm sorry.  You said .3 as well, or did you
16   say point --
17        A.    .03.
18        Q.    Okay.  And then you said .003?
19        A.    Right.
20        Q.    And when you say chronic, is there any
21   particular time that you classify as chronic?
22        A.    Well, chronic means over time, of course.  So,
23   you know, it depends on how you want to define it.  But
24   I would say people who are living in trailers are
25   chronically exposed.  They're exposed for a long --
0180
1    well, you know, 24 hours a day, potentially.  And
2    they're living there, so they're exposed for days on
3    end.
4               I mean, I don't know of any definition in the
5    medical literature that defines chronic as beginning at
6    day seven and ends at -- you know, if it's day six, it's
7    not chronic.
8         Q.    Okay.  So applying the numbers that you did,
9    that you just gave me, so Ms. Alexander was not informed
10   that even at low levels, which could be .05 parts per
11   million or .03 parts per million or even .003 parts per
12   million of formaldehyde exposure, if chronic, could
13   cause serious health problems in children, adults with
14   respiratory problems, and/or who are sensitive to
15   formaldehyde.  That would also be accurate?
16        A.    Are you asking me -- what are you asking me?
17        Q.    What I'm asking you is, if I substitute in any
18   of the three standards -- or, I'm sorry, numbers for the
19   exposure level, instead of just saying low level, would
20   it still be an accurate statement?
21        A.    Well, you're probably right, but that wouldn't
22   be what I would tell her.  Because she doesn't know how
23   to assess whether it's .05 or .003 or anything like
24   that.  I mean, you wouldn't inform her of those levels.
25        Q.    I understand.  What I'm -- what I'm just
0181
```

Page 75

Laux Lila F  - Vol  I.txt

1  trying to understand is, you've suggested that Gulf
2  Stream Coach should have provided certain information to
3  her, and I'm -- I want to make sure that if there is a
4  product out there, at a chronic level of exposure, which
5  you've defined as low levels which could include .05,
6  .03 or .003, that there's some obligation to convey that
7  information.  And I'm assuming that wouldn't be just for
8  travel trailers; that would be for anything.
9           MR. PINEDO:  Objection, form.
10      A.   Well --
11      Q.   (By Mr. Glass)  Is that accurate?
12      A.   No, it's not accurate.
13      Q.   Okay.
14      A.   Because you have to take the other things into
15  consideration; that she -- it's a small space; that
16  you're exposed for long periods of time.  So there --
17  you know, and if there are other conditions in the
18  environment.
19           So there may be times when you and I are
20  exposed to low levels, but we don't live in them; we
21  aren't enclosed in them, like in a closet, where we're
22  breathing them 24 hours a day.  So this travel trailer
23  circumstance creates a very different situation.
24      Q.   Ma'am, I'm -- I'm using the exact language,
25  and I under -- let me finish before you -- you jump in.
0182
1           "Ms Alexander was not informed that even low
2  levels of formaldehyde exposure, if chronic," so that's
3  part of the statement, "could cause serious [and]
4  health" -- "serious health problems in children and
5  adults with respiratory problems and/or who are
6  sensitive to formaldehyde."
7           My question to you is, if -- is that statement
8  true to other types of products; that if there is
9  chronic exposure to low levels, as defined by .05, .03
10  or .003, that the person manufacturing the product
11  creating that exposure should provide some warning
12  information?
13      A.   Should provide some information, that's right.
14      Q.   Okay.  That's all I wanted to make sure.  Your
15  next opinion, No. 7:  Gulf Stream knew or should have
16  known that the Cavalier travel trailer they manufactured
17  could reasonably be expected to create elevated levels
18  of formaldehyde gas in the interior of the trailer.
19           You know I'm going to ask the question.
20  What's an elevated level?
21      A.   Well, a level greater than .05, let's say.
22      Q.   Okay.
23      A.   Or whatever level has been established by
24  health professionals to be a hazard to someone who has
25  asthma, who is elderly, you know, who has other
0183
1  conditions, which they could certainly have lung
2  problems, which they could certainly anticipate would be
3  part of the population of people --
4      Q.   Okay.
5      A.   -- who would be moving into this trailer, this
6  FEMA trailer.
7      Q.   Okay.
8      A.   In these circumstances.
9      Q.   Okay.  Your next opinion:  Gulf Stream knew or
10  should have known that after Katrina people would be
11  living in travel trailers provided to them by FEMA for

12  extended periods.
13          What's an extended period?
14      A.  Well, more than a month, for sure.  And I
15  think they were expecting people to live in the trailers
16  for at least a year.
17      Q.  Okay.  Do you -- or have you done any research
18  as to how long Gulf Stream has been supplying trailers
19  to FEMA for use in disasters throughout the country?
20      A.  Ten years, I think they said, or maybe 17.  I
21  can't remember.  I saw a letter from Gulf Stream or a
22  blurb from Gulf Stream, talking about how long they had
23  been providing these travel trailers.
24      Q.  Have you seen any studies regarding how long
25  people typically stay in a trailer following a natural
0184
1   disaster in the United States?
2       A.  No.  But I don't know that it would be
3   relevant anyway.  Most natural disasters don't have the
4   magnitude that Katrina brought to bear on the Gulf
5   Coast.
6       Q.  That was going to be one of my questions.  Has
7   there ever been a disaster of the magnitude experienced
8   in the Gulf Coast in the history of the United States?
9       A.  Well, I guess it would depend how you define
10  disaster, but it certainly was a big disaster.
11      Q.  Do you have any information as to how long was
12  the average length of stay for any aid recipient of a
13  FEMA travel trailer, in any disaster where a travel
14  trailer was provided, prior to Hurricane Katrina?
15      A.  I think I remember something like six or eight
16  months, but that's just off the top of my head.
17      Q.  That's -- you -- you read someplace that the
18  average length of stay in a trailer, following a
19  disaster, was six to eight moments?
20      A.  I think I remember something like that, when
21  we were talking about the -- the tornado up in Windsor
22  here.  I can't remember, though, for sure.
23      Q.  Do you know where you recall reading that?
24      A.  No.
25      Q.  Okay.  Next opinion, No. 9:  Gulf Stream knew
0185
1   or should have known that the high heat and high
2   humidity that would be experienced in the Gulf Coast,
3   Louisiana, and Mississippi would increase the rate which
4   formaldehyde -- at which formaldehyde was off-gassed in
5   the trailer, thus increasing the concentration of
6   formaldehyde in the interior atmosphere.  Gulf Stream
7   also knew that long-term stays in the travel trailer
8   would increase humidity in the travel trailer.
9           The -- what was the -- or what is the increase
10  in rate in off-gassing based on temperature and
11  humidity?  Is it a linear curve or is there a study out
12  there someplace that tells you what that is?
13      A.  There are curves, but I don't know what they
14  are, in my head, no.  And, of course, it's going to
15  depend on the age of the product.  I mean, there are
16  just so many variables.
17      Q.  And again, you don't know, at least off the
18  top of your head, that there's a saturation point
19  regarding temperature and humidity that, at which,
20  further increases do not increase the levels of
21  off-gassing, if that occurs?
22      A.  No, I don't know.

Laux Lila F  - Vol  I.txt
23        Q.   The next opinion, No. 10:  Gulf Stream knew or
24   should have known that people living in a Cavalier
25   travel trailer would not be aware of the hazard
0186
1    associated with formaldehyde fumes unless they were
2    alerted and informed.
3              I know exactly where this is probably going to
4    lead, but isn't that kind of a self-serving statement
5    in -- in that people don't know something unless they're
6    taught it at some point or informed of it at some point?
7         A.   Right.
8         Q.   I mean, that's -- that -- that's true for
9    anything; isn't that true?  I mean --
10        A.   But that's not the consideration here.  You're
11   not trying to teach people about the whole world.
12   You're trying to teach them about the circumstances in
13   this trailer.
14             And it's an unusual circumstance, something
15   that they're not going to pick up through daily life or
16   experience.  And it's something they're not -- you
17   can't -- you don't expect them to just know.
18        Q.   And when you refer to the hazard associated
19   with formaldehyde fumes, what specific hazard, again,
20   are you referring to?
21        A.   I'm referring to the health hazard.
22        Q.   The health hazard for sensitive individuals
23   above a certain level?
24        A.   Well, that health hazard and also the --
25   ultimately the hazard about the nasal cancer, and things
0187
1    like that, above a certain level or, you know, repeated
2    exposures.  I haven't talked about that at all, but it's
3    certainly in the literature, that there is a
4    relationship between exposure to formaldehyde and
5    cancer.
6         Q.   In humans?
7         A.   Yes.
8         Q.   Okay.  And what literature are you -- to which
9    are you referring?
10        A.   Well, IARC has some literature on it.  But
11   there's other studies out there, that are included in my
12   list of materials, as you'll see.  And as I said, I
13   haven't referred to that because it isn't particularly
14   relevant to this case, but it is a hazard associated
15   with some levels of exposure to formaldehyde.
16        Q.   Is it your understanding that there has been a
17   conclusive medical study, somewhere, that has
18   definitively reached the conclusion that nasopharyngeal
19   cancers are associated with formaldehyde exposure?
20             MR. PINEDO:  Objection, form.
21        A.   Well, associated with, yeah.  I don't think we
22   have definitely got a causal.
23        Q.   (By Mr. Glass)  Okay.
24        A.   But we definitely have association with.
25        Q.   Have you read studies that conclude the exact
0188
1    opposite?
2         A.   No, I haven't.  And, you know, I -- I searched
3    the literature on my own.  I didn't rely on Mr. Pinedo
4    to provide me with that literature.  And I didn't see
5    any -- anything that indicated that there was strong
6    evidence that it did not, that there was no association.
7              Can I have some more water, please?
                              Page 78

```
 8        Q.   Oh, absolutely.
 9        A.   That's good, thanks.
10        Q.   There you go.  I think we're just about out.
11   We are out.
12        A.   There's another pitcher, on the other end of
13   the table.
14        Q.   We'll confiscate that shortly.
15        A.   Oh, look at them.  Aren't they nice?  They're
16   giving us their water.
17             MR. PENOT:  Not too nice.  I took some first.
18             THE DEPONENT:  And you're the one -- no,
19   he's -- who was the one that was taking all the
20   watermelon candies?  Was that you?  No, that was him.
21             MR. DINNELL:  No, that -- don't blame me.
22             MR. PENOT:  It's that old fella in the flannel
23   suit.
24             MR. PINEDO:  The defendants are just pointing
25   the finger at each other.
0189
 1             THE DEPONENT:  That's right, they are.
 2        Q.   (By Mr. Glass)  Your Opinion No. 11:  Gulf
 3   Stream knew or should have known that people living in a
 4   Cavalier travel trailer would not be able to accurately
 5   determine whether or not they were being exposed to
 6   hazardous levels of formaldehyde.
 7             Just one question there.  Again, hazardous
 8   level is -- is the level where a sensitive person would
 9   experience a problem?
10        A.   That might be one definition of a hazardous
11   level.  It's certainly hazardous for that person.  But
12   there are levels that are hazardous to people who are
13   not sensitive, as well.
14        Q.   Okay.  No. 12:  Gulf Stream knew or should
15   have known that water damage to the trailer could
16   increase the level of formaldehyde that would be
17   admitted into the atmosphere, and that water damage was
18   more likely if the trailer were improperly handled
19   during transport to the site where it's placed or by
20   improper stabilizing of the trailer.
21             What is the source of that information, ma'am?
22        A.   Oh, I don't know.  It's in the literature that
23   I provided.  Oh, probably -- I don't recall where, but I
24   know that it was in there; that, you know, it -- well,
25   first of all, we know that if it's -- I read several
0190
 1   installation manuals -- that if it's improperly
 2   installed, it can break some of the seals, you might
 3   call them, or cause small openings in the -- in the
 4   exterior of the trailer.  And once those are open, then
 5   you have leaks into the -- into the trailer, into the
 6   insulation in the walls, and directly into the trailer.
 7             She actually had a leak into the trailer.  And
 8   so if -- you know, if the trailer is improperly handled
 9   during mounting of it and transport of it, then these
10   fissures, or whatever you want to call 'em, could
11   result, which would result in water getting into the
12   insulation and into the trailer, causing dampness and
13   mold.
14        Q.   And -- and I think I already know the answer
15   to this question, but "increase the level of
16   formaldehyde," you're not talking about a specific
17   level, you're just saying more, correct?
18        A.   Yes.
```

Page 79

19      Q.    Okay.
20      A.    It makes it possible for more formaldehyde to
21  be emitted from the materials that the -- the travel
22  trailer is composed of.
23      Q.    And if I -- if I'm reading this correctly, is
24  it my -- or is my understanding correct that your -- you
25  have a criticism of Gulf Stream Coach for not warning of
0191
1   a situation where somebody improperly handled or misused
2   the product?
3       A.    Well, I think they should certainly have made
4   it clear that the trailer had to be handled in a way
5   that would not result in those -- what do we want to
6   call them? -- so that the exterior of the trailer is no
7   longer totally sealed; so that no water can enter into
8   the -- can get into the insulation and in between the
9   walls, can leak into the trailer.
10      Q.    So was I accurate that, yes, Gulf Stream
11  should have conveyed some information, if they did not,
12  regarding, make sure you properly handle this -- this
13  unit?
14      A.    Yeah, although I wouldn't say it that way.
15      Q.    Okay.
16      A.    But, yes.
17      Q.    And -- and that would include information
18  online, so what we talked about with ANSI Z.535, such as
19  if you improperly handle this, this can happen, and --
20      A.    Well, I would have to look into that situation
21  and see how that occurs, how the information is
22  transferred to the installers and what the installers
23  know, before I could answer that question.  And I
24  haven't done that.  I wasn't asked to do that.
25      Q.    Okay.  Okay, 14.  Oh, I guess I'm skipping 13.
0192
1           MR. PINEDO:  Can we take a break?
2           MR. GLASS:  Sure.
3           THE VIDEOGRAPHER:  We are going off the
4   record.  The time is 16:12:08.
5           (Recess taken from 4:12 p.m. to 4:25 p.m.)
6           THE VIDEOGRAPHER:  We are back on the record.
7   The time is 16:25:03.
8       Q.    (By Mr. Glass)  Before we get started back up,
9   I want to -- I'm going to lose track of the things that
10  I've requested here, and I may have some additional
11  things I want to request.  You're telling me, on any
12  request for documentation that -- that I brought up, I
13  need to shoot that to Chris, and then we'll work on
14  getting that?
15      A.    That's my understanding, that that's the
16  appropriate way to do things.
17      Q.    Okay.  Things -- just to make sure it's on the
18  record and keeping track --
19          MR. GLASS:  And if you want to take note of
20  it, Chris, because it'll be coming as soon as I can get
21  it to you.
22      Q.    (By Mr. Glass)  -- I would like to see the
23  article that you wrote on the MSDS that you provided to
24  the ATS.
25      A.    If I can get it.
0193
1       Q.    I understand.  The course material that you
2   use up at University of Wisconsin, Madison.
3       A.    Which year?  I've been doing it for 15 years,
                        Page 80

Laux Lila F  - Vol  I.txt

```
 4   so there's 30.
 5        Q.    Your most recent --
 6        A.    Okay.
 7        Q.    -- course material.  The -- see, I've already
 8   forgotten some of it.
 9        A.    I'll have to check with them to make sure,
10   because it's copyrighted by them, but I don't think
11   there'll be any problem.
12        Q.    Well, if you need me to do it in the form of
13   subpoenas, so we can avoid any copyright issues, I'll do
14   that, but --
15        A.    I don't think that'll be necessary, but if so,
16   I'll let you know.
17        Q.    And then I think you mentioned that you
18   drafted a prototype warning for a travel trailer, and I
19   understand it involved the stove for --
20        A.    It was for the stove.  I think I did.  I know
21   I wrote a report, and I think I used it.
22        Q.    Well, I would -- if you've written a warning
23   specific for that, I would like to see that as well.
24              Gosh, there was something else too.  It'll
25   come back to me.  Oh, I know, it was -- it'll be the
0194
 1   source materials for some of the medical opinions that I
 2   was asking you about.
 3              MR. PINEDO:  If you could be specific on that,
 4   which medical opinions?
 5              MR. GLASS:  I -- I will -- I will point it out
 6   specifically to you.  But she indicated, I believe, that
 7   she didn't know, off the top of her head, but she could
 8   go back and look and see where they came from.  And I'll
 9   tell you exactly which opinions.
10              MR. PINEDO:  Okay.
11              MR. DINNELL:  I'll just jump in quickly.
12   There was a checklist that you referenced earlier, that
13   you used to assess warnings.  A copy of that
14   checklist --
15              THE DEPONENT:  Okay.
16              MR. DINNELL:  -- is something that we want.
17              THE DEPONENT:  Sure.
18              MR. GLASS:  Checklist.  Okay.  I will pass
19   that warning -- I mean, that list to you, first, so you
20   can look at it, Adam.
21              MR. DINNELL:  Great.
22        Q.    (By Mr. Glass)  All right.  I think we left
23   off on No. 14 -- no, 13:  Gulf Stream knew or should
24   have known that the enclosed small volume of the Gulf
25   Stream Cavalier, the formaldehyde fumes would be
0195
 1   concentrated.
 2        A.    "Could be."
 3        Q.    "Could be," sorry.  "They knew, or should have
 4   known, that carrying out the recommendations from Gulf
 5   Stream for ventilation would not guarantee that the
 6   concentration was reduced to a safe level for long-term
 7   residence."
 8              I'm assuming that the long-term is again that
 9   same number that's used before, definitely a month or
10   two.
11        A.    This is for people who are living in the
12   trailers, rather than camping or going on vacation.
13        Q.    Okay.  And what ventilation recommendations
14   were provided by Gulf Stream?
```

Page 81

Laux Lila F  - Vol  I.txt
15      A.    They talked about opening all the windows and
16  turning on the air conditioner.  And I don't remember
17  what they all were, at this moment.
18      Q.    Do you know how compliant Ms. Alexander and
19  her son were with the recommendations from Gulf Stream?
20      A.    Well, I know they didn't do that every two
21  days, which is -- you know, it indicates that if you do
22  that, it may take up to two days to get the levels down.
23  So beyond that, I don't really know how often they did
24  it, no.
25      Q.    No. 14:  Gulf Stream knew or should have known
0196
1  that the ventilation in the travel trailer required use
2  of the air conditioning for extended periods with
3  appropriate venting.
4              What is the source of that opinion?
5      A.    Oh, it's probably something I read in the Gulf
6  Stream material and also in the other sources about
7  ventilating.  Probably the FEMA recommendations.
8      Q.    And you have a general idea that
9  Mrs. Cooper -- or Ms. Cooper used the air conditioner in
10  the unit?
11              MR. PINEDO:  Let's refer to her as
12  Ms. Alexander.
13              MR. GLASS:  I'm sorry.  I mixed up Chris and
14  Ms. Alexander.
15      A.    Well, I know that she used it some.  I don't
16  know that she used it on a continuous basis, no.
17      Q.    (By Mr. Glass)  No. 15:  Gulf Stream knew or
18  should have known that most Katrina victims would not
19  know that they needed to ventilate their trailers to
20  evacuate formaldehyde gases and would not be able to
21  determine when levels were safe.  Asking residents to
22  remain outside or not to be inside the trailer for days
23  would impose a severe hardship on many residents.
24              Did you conduct any kind of study to determine
25  what the Katrina victims knew and understood?
0197
1      A.    Well, I have a pretty good understanding of
2  their level of knowledge, and I can certainly compare it
3  to my own level of knowledge, and I have a Ph.D.  And I
4  know that a lot of the victims who were in the Katrina
5  trailers were -- not only didn't have Ph.D.s, lots of
6  them didn't have even college educations or possibly
7  even high school educations.
8              So I think it's -- unless they had gone in and
9  done an analysis that showed that their -- that the
10  people who were living in these trailers were
11  sophisticated and would have that kind of knowledge,
12  they would have to assume they didn't have that kind of
13  knowledge.
14      Q.    No. 16:  The warnings and instructions that
15  were provided by Gulf Stream to the occupants of the
16  Cavalier travel trailer failed to alert Ms. Alexander to
17  the hazard Gulf Stream could reasonably expect she'd be
18  exposed to upon moving into the travel trailer.
19              What is the hazard to -- of which Gulf Stream
20  failed to warn?
21      A.    Well, I think we've been talking all day about
22  formaldehyde exposure.
23      Q.    And if I understood the earlier testimony, I
24  think we've established that that hazard is any level
25  that could potentially elicit health problems in a
Page 82

Laux Lila F - Vol I.txt

0198
1    sensitive individual?
2         A.    I don't think I ever said that specifically,
3    no.  That certainly would be a level that is a hazard,
4    but I think the hazard she needed to be aware of was
5    that there was formaldehyde being off-gassed and that
6    she needed to be -- she needed to be aware that if she
7    was an elderly person or a child or someone with asthma,
8    that that needed to be checked out; that there was a
9    potential for harm to them.
10        Q.    And the purpose is to provide the information
11   to -- to the person receiving that information or -- or
12   that warning, correct, so they can make a decision on
13   the modification of their behavior?
14        A.    You're asking me if the purpose of a warning
15   is to inform people so that they can modify their
16   behavior?
17        Q.    Correct.
18        A.    In the presence of a hazard, I'd have to say
19   yes.
20        Q.    Okay.
21        A.    Excuse me.
22        Q.    And to make the -- you all right?
23        A.    I am.  I must have swallowed some of that
24   oatmeal the wrong way.
25        Q.    Okay.
0199
1         A.    Sorry.
2         Q.    People don't always comply with warnings,
3    correct?
4         A.    No, that's correct.
5         Q.    So behavior is not always modified by a
6    warning; is that accurate?
7         A.    But without a warning, the behavior can't be
8    modified, right?
9         Q.    Okay.  What warnings and instructions were
10   provided with the Gulf Stream trailer in regards to
11   formaldehyde?
12        A.    None.
13        Q.    Did you perform any kind of analysis to
14   determine whether Ms. Alexander, if provided with the
15   type of information you've described here today, would
16   have acted differently?
17        A.    Are you done?
18        Q.    Yes, ma'am.
19        A.    I -- when I spoke with her, I asked her what
20   she would have done, and she said she would have moved
21   in with their family or she would have stayed in
22   Florida.
23              But, you know, as I've tried to point out
24   several times, these warnings are not just for
25   Ms. Alexander.  We have to assume that any reasonable
0200
1    person, when faced with exposure to a hazard, will take
2    the appropriate steps if we tell them what they are.
3         Q.    Based upon their perception of the perceived
4    risk, correct?
5         A.    They had to understand that there -- that
6    there's a risk, yes.
7         Q.    Well, not just that there's a risk, but their
8    perception of whether that risk is applicable to them,
9    correct?
10        A.    Yes.  They have to understand that the risk
                          Page 83

Laux Lila F  - Vol  I.txt
```
11  is -- the hazard is something that, if they are exposed
12  to it, it does cause a risk to them, that's right.
13       Q.   And you've actually referred to some of that
14  analysis, I believe, as a cost of compliance.
15       A.   There is a cost of compliance.  That's not
16  what I'm talking about here.
17       Q.   Okay.
18       A.   But there definitely is a cost of compliance.
19       Q.   What's the cost of compliance?
20       A.   Well, for instance, if you tell someone that
21  they have to keep the temperature in the trailer at
22  55 degrees or else they'll be exposed to hazardous
23  substances, and they don't have anyplace else to go,
24  then they may choose to remain and be exposed because
25  they can't get the -- get it down to 55 degrees and they
0201
 1  don't have anyplace else to go.
 2            So if you tell someone that they can buy a car
 3  that, they can guarantee, will not cause them to be
 4  injured in a collision, but it's going to cost them a
 5  hundred and fifty thousand dollars, they may decide that
 6  they're willing to take the risk that all of us take
 7  every day when we get on the highway, that the car that
 8  they're in is safe enough.
 9            So the cost compliance is, you know, a
10  function of what's perceived as necessary to do, whether
11  or not it's reasonable and possible to do and whether
12  the potential for the hazard is great enough that it's
13  worth taking that trouble, spending that money,
14  expending that energy, doing whatever that is that's
15  required.
16       Q.   Is a warning the only means to communicate the
17  potential hazard of a product or a situation?
18       A.   Well, you know, if our schools did a better
19  job, we might be able to do it through the schools
20  somewhat.  But, you know, for a -- for a situation that
21  isn't in your everyday life, that you are not taught
22  about, that you don't experience every day, then a
23  warning is probably the best way to get the information
24  to you.
25            I don't know of any other way to do it,
0202
 1  outside of education and experience.  You could expose
 2  them to the hazard and say, you know, "Put your hand on
 3  there," and when they felt that they were burned, they
 4  would understand that they shouldn't put their hand on
 5  there.
 6       Q.   Is there -- okay.  But can information be
 7  conveyed to -- to a group of people, about a hazard,
 8  through the media?
 9       A.   Yes.
10       Q.   In fact, you've actually testified that
11  that's -- a public service campaign is one way that you
12  can actually inform people about situations, correct?
13       A.   Sure, but that's a warning.
14       Q.   Okay.  What was the media coverage regarding
15  formaldehyde and in travel trailers, say, in early 2006?
16       A.   I don't know.
17       Q.   How about the summer of 2006?
18       A.   I don't know.  I can't be sure that
19  Ms. Alexander ever heard anything or saw anything on TV
20  about this.  I have no idea whether she did or not.  I
21  don't even know if it was put out there.
```
Page 84

Laux Lila F  - Vol  I.txt

22        Q.    And following Hurricane Katrina, did you see
23   any news coverage that talked about potential
24   formaldehyde in travel trailers in the Gulf Coast?
25        A.    No, I didn't.
0203
1         Q.    You never saw a single news story on it?
2         A.    No, I didn't.
3         Q.    Did you do any kind of research regarding
4    the media outlets in the Gulf Coast region, regarding
5    reporting on formaldehyde in travel trailers?
6         A.    I saw some that came along in 2006 and 2007; I
7    saw something on MSNBC; things like that, that were sort
8    of people pieces, you know, where they were talking
9    about this -- this elderly lady and her husband who were
10   exposed to things like that.
11              I didn't see any -- I didn't see anything from
12   the manufacturer saying:  Pay attention, we've
13   discovered that there is a -- you know, a problem with
14   formaldehyde in these trailers.  Here are the steps you
15   need to take.
16        Q.    Did you see anything, within your document
17   review, regarding communications between the
18   manufacturer and FEMA concerning the new reports that
19   were coming out following Hurricane Katrina?
20        A.    I did see something.  I don't know too much --
21   I don't recall too much what I saw, though.
22        Q.    Did you see any information coming from FEMA,
23   at any point, regarding potential formaldehyde exposure
24   in the trailers?
25        A.    There was quite a bit of information from
0204
1    FEMA.  Are you asking me if I saw anything that was
2    broadcast to the public?
3         Q.    Yes.
4         A.    No, I didn't.
5         Q.    Do you know if any specific documentation was
6    provided to every single aid recipient regarding
7    formaldehyde?
8         A.    I didn't see anything that told me that at the
9    time Mrs. Alex -- Ms. Alexander moved into her trailer,
10   that they were providing this information to every
11   single person who was moving into a FEMA trailer.  No, I
12   did not see that.
13        Q.    Hypothetically speaking, as someone who was
14   living in New Orleans following Hurricane Katrina, if I
15   tell that you there wasn't a day that went by where this
16   wasn't discussed by the summer of 2006, does that make
17   any difference as to whether the information was
18   conveyed to the aid recipients, the people living in the
19   travel trailers?
20        A.    Well --
21              MR. PINEDO:  Objection, form.
22        A.    -- who discussed it?  I'd have to know who
23   discussed it.  You said it was being discussed, but were
24   the right people discussing it?  Was it being
25   communicated to the people in the trailers?  And, if so,
0205
1    what were they being told and what options were they
2    being given?  I didn't see anything that indicated that
3    those things were happening.
4         Q.    (By Mr. Glass)  We'll get to those in a
5    second.
6              MR. GLASS:  Okay.  We're going to take a quick
                              Page 85

Laux Lila F - Vol I.txt

```
 7    break, to let him switch the tape -- or let her switch
 8    the tape.
 9                THE VIDEOGRAPHER:  This ends Tape No. 3 in the
10    deposition of Lila Laux.  The time is 16:39:44.
11                (Recess taken from 4:39 p.m. to 4:42 p.m.)
12                THE VIDEOGRAPHER:  This marks the beginning of
13    Tape No. 4 in the deposition of Lila Laux.  The time is
14    16:42:53.
15          Q.   (By Mr. Glass)  Okay.  I like this next one.
16    17 is my favorite:  Gulf Stream had a duty to alert and
17    provide adequate warning to travel trailer users about
18    the hazards associated with formaldehyde off-gassing.
19    They knowingly failed to provide this information to
20    people who would be using their trailers.  Failure to
21    provide adequate warnings and instructions was
22    unconscionable and it showed a disregard for the health
23    of the people who used the travel trailer after Katrina.
24          Okay.
25                THE DEPONENT:  Oh, thanks.
0206
 1          Q.   (By Mr. Glass)  The -- what's the source of
 2    your conclusions that their failure to provide an
 3    adequate warning was unconscionable?
 4          A.   It's my -- my conclusion.
 5          Q.   And again, if it's determined that the levels
 6    of formaldehyde in -- in the trailer at issue do not
 7    constitute a health hazard, then this -- this opinion
 8    would have to follow, I would assume.
 9          A.   No, because -- just because it isn't in that
10    trailer, doesn't mean that they're -- you know, unless
11    you can show me that every trailer didn't have those
12    levels, then I would have to say they still have a duty
13    to warn.
14          Q.   Well, we're here --
15          A.   To travel trailer users.
16          Q.   We are -- we're dealing with one particular
17    trailer in this lawsuit that was going to trial
18    September 14, and that's the Alexander trailer.  And if
19    it is established that the levels of formaldehyde in the
20    Alexander trailer do not constitute an unreasonably
21    dangerous condition, then does your opinion that Gulf
22    Stream acted with -- showed a disregard and acted
23    unconscionably have to fall?
24          A.   No, because I think that if you can show me
25    that all of them were -- didn't have it -- but, you
0207
 1    know, I -- this -- what I'm they couldn't know that this
 2    one trailer might be safe, if -- if you're going to
 3    prove that it was safe.  So that doesn't relieve them of
 4    the duty to put that warning in there, that this --
 5    there are formaldehyde off-gassing materials in this
 6    trailer; there might be a hazard to you, particularly if
 7    you have asthma or if you're child; you, need to be --
 8    particularly if you can smell it, you need to be
 9    checking this out.
10          Q.   So even if, in this case involving
11    Ms. Alexander and Mr. Cooper, it is established that the
12    level of formaldehyde in this product was not to a level
13    where it constituted an unreasonably dangerous
14    condition, for whatever reason, your opinion is still
15    that Gulf Stream Coach had an obligation to provide a
16    warning that they could have been harmed; is that
17    accurate?
```

18    A.    Gulf Stream had a duty to say:  We built this
19  small travel trailer with a very small interior volume,
20  with a lot of products that off-gas formaldehyde.  And
21  so you may be a person who's sensitive to that, and
22  particularly if you can detect formaldehyde, if you can
23  detect an aroma, you need to check this out.
24         Now, this doesn't say that they had a duty to
25  warn Ms. Alexander; but, of course, they did.  But they
0208
1   had a duty to warn anyone who moved into this, or any of
2   the other trailers that they were producing, that there
3   was a likelihood that, because of the way the trailer
4   was constructed, they might be being exposed to levels
5   of formaldehyde that were high enough to cause them
6   injury and they needed to check it out.
7     Q.    And, of course, that presupposes that there's
8   a determination that the levels of formaldehyde that can
9   be present in these trailers reaches a level that would
10  be considered unreasonably dangerous under the Louisiana
11  law?
12    A.    Over an -- over an extended period of time.  I
13  mean, that --
14    Q.    I understand.
15    A.    -- this is the issue that we're talking about
16  here.
17    Q.    I understand.
18    A.    I know that there are standards that -- that
19  reduce the exposure limits, based on the amount of time
20  you're exposed.  And we know that if you're going to be
21  exposed over a year, the limits are very low.
22         So there's no one warning that you can put on
23  there that says there is a hazardous or there isn't a
24  hazardous.  You have to say:  You need to consider,
25  you're living in here, here -- here's the issue.  You
0209
1   need to consider what's going on.  You need to find out
2   what it is.  You need to find out if you're sensitive to
3   it, all these issues.  So you need to be alerted, you
4   need to be informed and warned.
5     Q.    Okay.  And ultimately it comes down to the
6   concentration and the circumstances that are being
7   presented to you.  In this particular case, you're
8   saying long-term residents inside these trailers had
9   chronic exposure, they needed to be warned?
10    A.    I think they did.  And, I mean --
11    Q.    Okay.
12    A.    -- you know, even if you find out that today
13  the levels are very low, we can't know what the levels
14  were at the time she moved in.  But we can assume that
15  the levels were higher at that point than they are
16  today.
17    Q.    Okay.  I'll dispute that.  But, I mean, I
18  really want the source of where you can point to --
19    A.    Well, I -- I will --
20    Q.    -- some statistical analysis.
21    A.    -- certainly get you that.
22    Q.    But that being the case, there are other
23  products where people live, including manufactured
24  homes, correct?  And then the next opinion talks about
25  what's required from HUD to be included information when
0210
1   people are purchasing and using a manufactured house,
2   correct?

3    A.    That's correct.
4    Q.    Is this an adequate warning?
5    A.    Well, no, I wouldn't consider it adequate.
6  But that's why I say, as a minimum, I think, in Mrs. --
7  Ms. Alexander's case, this would have done the trick.
8  Would I consider this adequate for every user of these
9  trailers?  No.
10   Q.    Well, you -- you like to talk about every
11 trailer and what Gulf Stream, as a manufacturer, should
12 have provided.  So you're saying, at a minimum, this
13 should have been provided to her.  Is that setting the
14 bar for, this is adequate?
15   A.    No.
16   Q.    Okay.  So even including this information,
17 exactly as you've opined in opinion No. 8 of your report
18 on Page 10, carrying over to Page 11, this is not --
19   A.    Oh, it's 18, not 8.
20   Q.    Oh, I'm sorry, 18.
21   A.    You got me confused there.
22   Q.    I'm sorry, 18.  This is on Pages 10 and 11.
23   A.    Right.
24   Q.    That, in your opinion, is not an adequate
25 warning?
0211
1    A.    Not for the general public that can be
2  expected to be living in these trailers.  I think it
3  would have been adequate for Ms. Alexander.  But would I
4  advise that a manufacturer of travel trailers, who were
5  putting information into these trailers, would use just
6  that?  No, I wouldn't.
7    Q.    Okay.  But if Ms. Alexander was provided this
8  warning that you've laid out in 18, that would have been
9  sufficient for her to make a decision and make -- and
10 modify her behavior to potentially move out of this
11 trailer?
12   A.    I think so.  Although, you know, it's
13 important health notice, I think, since she had a child
14 that she knew had asthma.  And if it had been displayed,
15 I mean, it's supposed to be big print, a quarter of an
16 inch size.  And an important health notice is
17 three-quarters of an inch in size, and it has to be on
18 the kitchen cabinets where you can't miss it.
19   Q.    In a temporary manner, so it's not meant to be
20 permanently affixed.
21   A.    Well, no, of course it's not permanently
22 affixed.  It's there so that when you move it, you see
23 it.
24   Q.    So if it's established that Mrs. --
25 Ms. Alexander received this notice within a month of
0212
1  moving into the trailer and she still didn't move out,
2  then your opinions regarding the adequacy of this
3  warning would be entirely inaccurate; is that correct?
4    A.    So you're saying she received this within a
5  month of moving in and --
6    Q.    Yes, ma'am.
7    A.    She did?  Well, if she did, then this is
8  inadequate.
9    Q.    Okay.  So if it was adequate before -- boy, I
10 love that.
11   A.    I didn't say it was adequate.  I said "at a
12 minimum."
13   Q.    Okay.  You said it was adequate for her.

Laux Lila F  - Vol  I.txt

14      A.   No, I didn't.
15      Q.   We'll go back and we'll get that on the
16 record.  That's great.  I love that, okay.
17      A.   But this is definitely not an adequate
18 warning.
19      Q.   Okay.  But you said it was adequate for
20 Ms. Alexander.
21      A.   I said it would have been adequate for her, if
22 she'd read it, yes, then it would.
23      Q.   And you just said that if it's shown that she
24 has that, then it was inadequate.
25      A.   It was inadequate for her, obviously.
0213
1      Q.   Good.  I really appreciate that.
2      A.   It clearly didn't inform her what she needed
3 to know.
4      Q.   Can you reverse engineer any warning to
5 prevent or to allegedly address any hazard or incident
6 that occurred in the past?
7      A.   I don't know what you mean.
8      Q.   Okay.  Well, you just did it.  You just said
9 that, well, it's not adequate for her if she didn't
10 abide by it, so --
11      A.   No, I didn't say that.  I said if she didn't
12 understand it, if it didn't get through to her.  I mean,
13 giving it to her is one thing; knowing that she read it
14 and understood it is another thing.
15      Q.   Your testimony will stand for itself.  I don't
16 think I want to beat on this anymore.
17           You -- you -- you indicated, at the beginning
18 of this, before you laid out the HUD standard, that this
19 information was known prior to August 1984; is that
20 accurate?
21      A.   That is accurate.
22      Q.   Okay.  In 1984 we could have known what the
23 1993 amendment or the 1989 amendment was providing in
24 this -- this warning?
25      A.   You're saying, because this has been amended,
0214
1 we can't know exactly what it said in '84?
2      Q.   Yes, ma'am.
3      A.   You're right.
4      Q.   Okay.
5      A.   I think it did say that, though.
6      Q.   You -- you don't know if there ever was any
7 amendment in 1984 -- excuse me, 1989?
8      A.   I think they added additional information, but
9 I don't know exactly what.
10      Q.   Okay.  In --
11      A.   You're right.
12      Q.   In 1993, do you know what information was
13 added?
14      A.   No.
15      Q.   Okay.  But are -- is it your opinion that
16 everything that's listed here was known prior to
17 August 1984?
18      A.   No.  But I think those first -- that first
19 paragraph was known then.
20      Q.   Okay.  And this -- this warning actually
21 indicates that, may cause the types of symptoms in that
22 first paragraph, correct?
23      A.   It says that it's been associated with these
24 things.

Page 89

Laux Lila F  - Vol  I.txt
```
25        Q.   Okay.  "Elderly persons and young children, as
0215
 1  well as anyone with a history of asthma, [allergy], or
 2  lungs problems may be at greater risk"?
 3        A.   Greater risk.  But it says, "Eye, nose ,and
 4  throat, irritation, headache, nausea, and a variety of
 5  asthma-like symptoms, including shortness of breath,
 6  have been reported as a result of formaldehyde
 7  exposure."
 8        Q.   Okay. -- And do you know -- well, we've already
 9  talked about the state of the product at the time this
10  was first drafted in 1984, so I don't need to go back
11  into that.
12             This also talks about the use of air
13  conditioning systems, if available, in wherever this is
14  being posted, correct?
15        A.   Right.
16        Q.   Is that an error?
17        A.   It says an air -- air conditioning system can
18  be used to control --
19        Q.   Sure.
20        A.   -- indoor temperature levels.
21        Q.   Right.  And this is something that's regulated
22  by HUD to be provided with manufactured housing,
23  correct?
24        A.   Yes, it is.
25        Q.   Okay.  And -- and if somebody is complying
0216
 1  with that regulation, in your opinion, it's still
 2  inadequate?
 3        A.   I think it's probably not going to be adequate
 4  for the entire population of people who are going to be
 5  exposed to FEMA trailers, for sure.
 6        Q.   How would you -- have you sat down to figure
 7  out what needs to be corrected in this, if it's not
 8  adequate?
 9        A.   Well, I think it needs to say:  Warning, that
10  there's products that were used to construct this
11  trailer that have formaldehyde, and they give off
12  formaldehyde fumes.  And if you have any symptoms of
13  asthma or allergies, burning eyes, so forth, you need to
14  check and see what the levels of formaldehyde in your
15  trailer are.
16        Q.   19:  Gulf Stream should have provided a
17  consumer manual that warned and instructed people who
18  would be residing in the travel trailer about
19  formaldehyde off-gassing and its potential to create a
20  health hazard.  The manual should have also detailed the
21  methods for lowering formaldehyde levels in the trailer.
22             We're talking about the same -- the same
23  hazard, that it's just whatever level with the potential
24  to cause problems in somebody who's sensitive?
25        A.   Right.
0217
 1        Q.   When you talk about chronic exposure, where
 2  you're going to live?
 3        A.   Yep, exactly.
 4        Q.   No. 20:  The lack of appropriate information
 5  on the trailer rendered the trailer unreasonably
 6  dangerous for its occupants.
 7             This a -- a statement that goes to the general
 8  population, rather than the Alexanders, or to both?
 9        A.   Well, I think it goes -- they are part of the
                           Page 90
```

```
10  general population, so --
11     Q.    Okay.
12     A.    -- clearly, I believe it goes to both.
13     Q.    But if, again, it's established that the
14  levels in this particular trailer, for whatever reason,
15  don't constitute an unreasonably dangerous condition in
16  the trailer --
17     A.    And never did?
18     Q.    -- and never did, your opinion remains,
19  nonetheless, that the lack of information rendered all
20  of these trailers unreasonably dangerous because that
21  trailer could have gone to somebody else who did have a
22  problem for it?
23     A.    No, not because of that.  Because if it's
24  dangerous to somebody else, it would be dangerous to
25  him.  No, my opinion is that, you know, these trailers
0218
1   are made with products that off-gas formaldehyde, so you
2   need to tell people that.
3      Q.    21:  Ms. Alexander's decision to move into the
4   Cavalier travel trailer was the result of inadequate
5   warnings and information regarding the hazard of
6   formaldehyde and its dangers, especially the danger to
7   children and people with respiratory problems such as
8   asthma.  As soon as she learned about the hazards
9   associated with formaldehyde off-gassing in the trailer,
10  she moved her family out.
11            What is your understanding as to when she
12  first learned of the hazards allegedly associated with
13  formaldehyde off-gassing?
14     A.    Sometime in the early weeks of December, she
15  learned about it.
16     Q.    Talking about December 2007?
17     A.    The same year she moved out.  So I'll have to
18  check and make sure.
19     Q.    I'll represent to you that it was
20  December 2007.
21     A.    Okay.
22     Q.    Okay.
23     A.    Yep, December 2007.
24     Q.    Okay.  So it's -- based on that opinion, is it
25  safe to me to assume that it's your opinion, if she had
0219
1   been provided information such as the HUD warning, which
2   you previously testified about, she would have moved out
3   at that time?
4      A.    Or might not have moved in.  I mean, I think,
5   if she had known, before she moved into this trailer or
6   when she first began to move into the trailer, that --
7   that formaldehyde was off-gassing and that it could be a
8   hazard to her child, who had asthma, she would have made
9   other arrangements for living conditions.
10            She was in Florida.  She didn't have to come
11  back.  And she had family members there in New Orleans
12  that she could live with until she found an adequate
13  place to live.  So I think she would have said, "Well,
14  hey, I can't move into that trailer with my son, who has
15  asthma, because it might put him at risk."
16     Q.    How -- how can we validate that a provision of
17  a different type of warning, such as the HUD warning,
18  would have conclusively caused her behavior to be
19  modified?
20     A.    Well, she told me that.  And, of course,
```

Laux Lila F  - Vol  I.txt

21  that's in retrospect.  But we have to assume that a -- a
22  reasonably safe, you know, person, who has reasonable
23  concerns for the safety of their children, would respond
24  appropriately when they get warning information that
25  reflects on a hazard to their child.
0220
1        Q.    If there was intense media coverage within a
2  month of Ms. Alexander moving into this travel trailer,
3  suggesting that -- the very information you're talking
4  about, that there may be a problem with formaldehyde
5  levels, that it may result in health problems with
6  people that have sensitivities, children with asthma,
7  and Ms. Alexander didn't move out, does that change your
8  opinion at all?
9        MR. PINEDO:  Objection, form.
10        A.    If you can tell me that she saw those on TV
11  and on the radio and understood what they meant to her,
12  well, then I would say, you know, she didn't respond.
13  But I can't -- I just don't believe that she actually
14  saw, heard, understood that she was exposing her child
15  to a hazard.
16        Q.    (By Mr. Dinnell)  What did he she tell you she
17  learned when she moved out of the trailer?
18        A.    She told me that someone else told her that
19  she heard that there were high formaldehyde levels in
20  the trailer and that it was making people sick.  And
21  she -- she then found out that it affected people with
22  asthma, and so they found another place to live.
23        Q.    Do you know how the HUD standard was
24  developed, the one you referred to in Opinion 18?
25        A.    No.
0221
1        Q.    Okay.  Opinion 22, appears to be similar to
2  21, that if she had been adequately -- in -- in that, if
3  she had been adequately warned about the alleged -- you
4  say hazards, but the alleged hazards associated with
5  formaldehyde off-gassing, especially to children and
6  people with asthma, she would not have moved into the
7  Cavalier travel trailer.  She -- and that's where you
8  talk about the options, where she could have stayed in
9  Florida --
10        A.    Right.
11        Q.    -- or lived with relatives in New Orleans till
12  she could find satisfactory housing, correct?
13        A.    Correct.
14        Q.    And she would not have intentionally placed
15  her children at risk?
16        A.    Correct.
17        Q.    If -- is it your testimony that Ms. Alexander
18  now understands that certain levels of formaldehyde can
19  pose potential health risks to kids with asthma?
20        A.    Well, I don't know that I think she
21  understands that.  I think she understands that there
22  was a formaldehyde level in that trailer that she
23  believes was associated with the increased risk of --
24  the increased incidence and severity of the asthma
25  attacks -- excuse me -- her child had.
0222
1        I don't believe that she's out there, looking
2  in every building, to see if there's formaldehyde being
3  off-gassed.
4        Q.    Do you know if she's checked in her own home,
5  what the -- the background level of formaldehyde is?
                           Page 92

Laux Lila F  - Vol  I.txt

```
 6      A.   I doubt she has.
 7      Q.   Okay.
 8      A.   I don't know how she would, for one thing.
 9      Q.   If there's established that there are levels
10 of formaldehyde that exceed .003 that you talked about
11 before, parts per million, and she's exposing her child
12 to that now, in the house where she currently lives, is
13 that something she should be warned about?
14      A.   If the -- I don't know that -- you know, what
15 the level is that would be a hazard.  But if -- if he's
16 being exposed chronically to levels of formaldehyde that
17 have been recognized as being associated with damage,
18 harm, then she should be warned about it.
19      Q.   Okay.  Well, but that's what this whole
20 lawsuit is really about, ma'am, and that's the --
21 whether the levels of formaldehyde that are off-gassed
22 in these trailers constitutes harm.
23           And my question to you is, if Chris Cooper is
24 currently being exposed to levels of formaldehyde
25 comparable to what he was exposed to or could have been
0223
 1 exposed to in these trailers, in his current home,
 2 should he -- should he have some kind of warning from
 3 either the landlord or whoever built the house?
 4      A.   If --
 5      MR. PINEDO:  Objection, form.
 6      A.   If he's he being exposed to levels that are
 7 harmful to him, he should be warned, yes.
 8      Q.   (By Mr. Glass)  Okay.  What about when he's at
 9 school, if the background levels at school are
10 comparable to what may be found in a travel trailer or
11 what could be found in a travel trailer, should he be
12 warned about that?
13      A.   Well, remember that he won't be in school
14 24-7, so the level of exposure.  And he's in -- school-
15 rooms are ventilated.  I -- you know, if you're telling
16 me that within the classroom the levels of formaldehyde
17 exposure reach those same levels as he was being -- as
18 he was exposed to in the travel trailer, then it does
19 probably put him at risk.
20      Q.   Well, he's not -- I mean, his lifestyle
21 doesn't change just because he's living in a house
22 versus a trailer.  He's -- he's in a -- if he's in a
23 trailer, he's presumably going to school as well,
24 correct?
25      A.   Well, not in the summers.
0224
 1      Q.   Okay.
 2      A.   Not over the Christmas holidays.  I mean,
 3 there are long -- not weekends.  I mean, you know, there
 4 are long periods of time when he was in the trailer.
 5      Q.   I just -- I just to make sure that you're not
 6 making the assumption that he's in the trailer 24-7; but
 7 when he's doing other things, when he's in a -- in the
 8 house, for instance, he's no longer in the house 24-7
 9 because he's doing other things.
10      A.   No.  He is in the house.  But as I said, the
11 house, you know, typically has better ventilation, has a
12 larger area.  So, you know, as you mentioned, how she
13 would determine what the formaldehyde levels would be,
14 she doesn't have that capability.
15      Q.   Okay.  And I -- I -- I -- I -- I guess my
16 problem understanding your answers, whenever you talk
```

Page 93

Laux Lila F  - Vol  I.txt

17      about the ventilation or anything else, is that you
18      measure the level of concentration.  And certainly you
19      can measure it in different areas, but that's true even
20      with a travel trailer.  So the level of concentration
21      that you test is the level of concentration that is
22      found, regard- --
23            A.    At that moment.
24            Q.    -- at that moment, regardless of the type of
25      ventilation you have, the number of windows that are
0225
1       open, whatever, they're all -- you have the level of
2       concentration, and that's -- that's a fact, correct?
3             A.    Right.  So you're telling me that, in his
4       home, he could have the same level of concentration of
5       so many molecules per cubic milliliter of air.
6             Q.    Correct.
7             A.    Cubic centimeter of air.  Well, yeah, if he
8       was being exposed to the same level of formaldehyde in
9       his home as he was in the trailer, then I would want to
10      know that, if I were his parent.
11            Q.    And in -- in fact, you've been talking about
12      potentially exposed, when you talk about travel
13      trailers.  So I would assume that the same potential
14      exposure would apply to buildings for school or his
15      site-built home or any other place where he could have
16      chronic exposure.
17            A.    Well, it's going to depend on what materials
18      are used to make those buildings and how old they are,
19      and what the temperatures inside and outside are, and
20      what the -- the humidity inside and outside are.  I
21      mean, there are so many factors that go into it.
22                  But if -- if it's being -- if the formaldehyde
23      level in the schools is .05 and they're in there being
24      exposed to it for however many hours a week, that
25      probably could be hazardous for children who have
0226
1       asthma.
2             Q.    Well, all those factors that you just
3       mentioned, they all the apply equally to the travel
4       trailers, correct?
5             A.    Sure.
6             Q.    Sure.
7             A.    But the travel trailer is small and the -- and
8       the fumes tend to get concentrated in there because they
9       don't have anyplace to go.
10            Q.    But that's -- again, that's my point.  It --
11      it -- you have -- it doesn't matter if you're talking
12      about a big building or a little building, the level of
13      formaldehyde is the level of formaldehyde.
14            A.    Well, that's true.  But, you know, if doors
15      are open and ventila- -- air comes in and out, you might
16      take it at one moment and the concentration might be X,
17      and five minutes later it might be very different;
18      whereas, in the travel trailer, I think the -- the
19      concentration is likely to be more stable.
20            Q.    What is the background level of formaldehyde
21      in some of the larger cities in the United States?
22            A.    It's pretty high, but I don't know what it is.
23            Q.    Would you -- would you consider that people
24      living in those cities are chronically exposed to those
25      levels?
0227
1             A.    Yes.

Page 94

Laux Lila F - Vol  I.txt

```
 2        Q.   As its background?
 3        A.   Yes.
 4        Q.   Should those cities warn people that they
 5   shouldn't live there?
 6        A.   Well, maybe they should warn people that they
 7   should take some kind of precautions.  Look at the
 8   incidence of asthma and how it's going up.  I mean, we
 9   know that it's part of the pollution in -- in city
10   environments.  And we know, from hospitals, that there's
11   a lot more people coming in with respiratory problems.
12        Q.   Let me show you what we've been talking about,
13   on some -- some level, for a little while here.  Did you
14   see what I will mark as Laux 8, a document that has a
15   FEMA stamp on it and it's Bates labeled FEMA 09, hyphen,
16   00386 and 87?
17        A.   I did see it.
18        Q.   Okay.
19        A.   In fact, I have it in my file.
20             MR. PENOT:  What is this?  This is Laux what?
21             MR. GLASS:  8.
22        Q.   (By Mr. Glass)  Okay.  You've said this is in
23   your file?
24        A.   Um-hmm.
25        Q.   And this is actually referenced in your --
0228
 1   port -- report, is it not?
 2        A.   Yes, it is.
 3        Q.   Okay.  Does this information convey adequately
 4   the information that -- that you would consider
 5   appropriate for Ms. Alexander to make a decision on
 6   whether to stay in the trailer?
 7        A.   Well, it wouldn't be the way I would do it, if
 8   I were trying to warn someone about the presence of
 9   formaldehyde.
10             It certainly is some information, but it
11   doesn't -- you know, it doesn't ever say "warning,"
12   even, or it doesn't even try to attract your attention.
13   It doesn't say how you should maintain the humidity at
14   40 to 50 percent.  It doesn't say how you should keep
15   the indoor temperatures monitored.  I mean, it -- and it
16   says, you know, it might affect you, and what -- and
17   what -- that's way down in the text.
18             These are -- these are not the sorts of things
19   that I would do to create a warning.
20        Q.   Okay.  So to answer my question, then, you
21   would not consider this to be adequate, an adequate
22   means of conveying the information that you feel
23   Ms. Alexander should have received?
24        A.   Nope, I don't think so.  When she moved into
25   that trailer, she needed something a lot more straight-
0229
 1   forward than this.
 2        Q.   Okay.  Do you know when she -- if she received
 3   this?
 4        A.   I don't think she did.  I mean, I didn't --
 5   she didn't tell me that she did, and I didn't see any
 6   evidence that she did.
 7        Q.   Do you know when FEMA distributed this?
 8        A.   No.  I couldn't find out.
 9        Q.   Okay.  Do you know if it was provided to all
10   of the recipients of FEMA trailers following Hurricane
11   Katrina?
12        A.   Not to my knowledge, it wasn't.
                       Page 95
```

Laux Lila F - Vol I.txt

13        Q.   Okay.  Did you see where FEMA provided any
14   information beyond what we've marked as Laux 8?
15        A.   I did see something that talked about how to
16   turn the air conditioning on and ventilate your trailer
17   and things like that.  I have that, actually, in my file
18   as well, the one you're marking now.
19        Q.   I will mark this as Laux 9.  I don't have a --
20   oh, I do.  I apologize.  It's FEMA09, hyphen, 000388.
21   Do you know if the people that were provided trailers
22   after Katrina were provided with this document?
23        A.   Some may have been, but I don't believe
24   Ms. Alexander was.  I -- she certainly didn't say that
25   she had, and I didn't see any evidence that she had.
0230
1         Q.   Okay.  Was -- is the information conveyed in
2    this document adequate, in your mind, regarding what you
3    perceive to be a hazard in the travel trailers?
4         A.   Well, it says you might have symptoms like a
5    common cold or the flu; or some people might have a
6    reaction, some people might be sensitive.  But it's not
7    really a warning.  It doesn't, you know -- certainly
8    it's information.
9         Q.   In answering my question, then, would this be,
10   in your mind, adequate to convey the information about
11   the perceived risk?
12        A.   Not to me.
13        Q.   Okay.  Is any warning just contained in an
14   owner's manual adequate?
15        A.   Well, just contained in an owner's manual?  In
16   this case I wouldn't think that that -- it would be
17   adequate to just put it in the owner's manual.  I think
18   that that's the reason that HUD recognizes that you have
19   to put their notice up right, you know, on the cabinets,
20   in big letters, so anybody who comes in there has to see
21   it.
22        Q.   And you -- you've looked at the tested levels
23   that were found in the Alexander trailer, correct?
24        A.   The ones that were done, what, a month or so
25   ago?
0231
1         Q.   Yes, ma'am.
2         A.   Yes, uh-huh.
3         Q.   What about the ones that were done back in
4    February -- or, I'm sorry, January of 2008?
5         A.   I don't think I had those.  You can look on
6    there, on the file, but I think there were only two --
7    two files that had to do with testing in her trailer.
8         Q.   Would testing that was done closer to the time
9    that Ms. Alexander actually lived in the unit have been
10   beneficial in your analysis?
11        A.   Well, yes.
12        Q.   Do you know whether the conditions under which
13   the Alexander trailer was tested in May 2009 was
14   representative of how the trailer was actually used by
15   Ms. Alexander?
16        A.   Well, I don't see how that's possible.  There
17   weren't any people living in it at the time that it was
18   tested.
19        Q.   That's exactly my point.  I couldn't have put
20   it better.  Is the formaldehyde level different in
21   occupied units versus unoccupied units?
22        A.   Probably.
23        Q.   You think there's any effect on the level of
Page 96

Laux Lila F  - Vol  I.txt
24  formaldehyde concentration in a unit that's been closed
25  up for more than a year?
0232
1        A.   That's possible.  But on the other hand, I
2   mean, when people live in it, they give off moisture;
3   and moisture accumulates, and that increases the
4   formaldehyde level.
5            What I'm saying, you know, throughout this
6   whole thing, is that it's the potential for harm that
7   people need to be aware of.  And unless you can
8   guarantee, the manufacturer can guarantee, that the
9   people living in these travel trailers for extended
10  periods of time are not going to be exposed to hazardous
11  levels of formaldehyde, when you know they are going to
12  be exposed to some level, then you need to alert them to
13  that.
14           I mean, that's what this stuff is all about.
15  I don't know when it was provided and who got it, but,
16  you know, it's clear that they're responding to exactly
17  those issues, the need to give people information.
18       Q.   And the fact that, at least in your opinion,
19  there was a causal relation between their staying in a
20  trailer and Chris's alleged formaldehyde -- I'm sorry,
21  alleged exacerbation of his asthma, that means that, at
22  least in your mind, this trailer or these trailers could
23  cause a potential or are a potential hazard to the
24  general population?
25       A.   Well, let's go back to that HUD statement.  It
0233
1   says you're at risk, and particularly you're at risk if
2   you're old, if you're young, if you're sick.  So the
3   population of people who are going to be living in this
4   trailer includes all of those.
5        Q.   And because of that, it's your opinion that
6   there should have been a warning not only in an owner's
7   manual but also on the product that would convey the
8   information like that contained in HUD but with more,
9   correct?
10       A.   Well, if it was an actual warning, yes.
11  Because that one just says health information.  And I
12  think that's very important, and I think it was good
13  information.  But I think it should have also, you know,
14  said:  Look, this is a health situation you need to
15  consider, and here's what you need to do.
16       Q.   You think people that smoke around other
17  people are responsible for warning the people standing
18  next to them that they could potentially be harmed by
19  the secondhand smoke?
20       A.   Not anymore.
21       Q.   Why is that?
22       A.   Because that's been such a huge public
23  information campaign that, I think, essentially,
24  everyone understands today that cigarette tobacco smoke
25  is harmful to everyone's health.
0234
1        Q.   Have  you done any studies to -- to establish
2   that everyone understands that?
3        A.   Well, I probably shouldn't have said
4   "everyone."  I'm sure not all children understand it.
5   And there are probably elderly people who don't read the
6   newspaper or watch TV or read magazines or listen to the
7   radio, who may not understand it.
8            But I think the vast majority of Americans,
Page 97

Laux Lila F - Vol I.txt
```
 9  especially those who might smoke, have learned it.  Kids
10  are learning in it school.  Doctors' offices have
11  pamphlets.  Pediatricians tell their patients don't
12  smoke around your children.  I mean . . .
13       Q.   You have not been asked, in this litigation,
14  to craft what you feel would be an appropriate warning
15  to accompany these travel trailers?
16       A.   No, I haven't.
17       Q.   Is it your opinion that a warning could be
18  crafted such that this product could be put -- or this
19  product can be used in everyday life?
20       A.   Well, I think it's going to depend.  Each --
21  each trailer, the -- the people who live there are going
22  to have to determine whether they can get the
23  formaldehyde levels down to an acceptable level that
24  they're willing to accept.
25            And it's going to depend on the length of
0235
 1  their exposure.  If they're only going to be in there
 2  two weeks or less, maybe they can get the level down to
 3  an acceptable level; since, I think, the ASTDR, or
 4  whatever it is, has various exposure levels for
 5  different exposure times.
 6            So, you know, again, we come back on this
 7  whole issue of, there are a lot of factors that have to
 8  be considered.  Is it better, perhaps, to go in there
 9  and be exposed to some formaldehyde than to be outside,
10  sleeping, you know, when there's mosquitoes around that
11  are biting you and giving you encephalitis?  Well, I
12  don't know.  There's a cost trade-off there.  So there
13  are just so many things that have to be considered.
14            But basically what I'm saying is that whoever
15  lives there needs to understand what their exposure is
16  and what the potential for that is, and let them make
17  their own decision:  Determine if they can mitigate the
18  effects; and if they can't, then determine whether or
19  not they can stay there.
20       Q.   Looking at the owner's manuals that you
21  compared to the manual provided in the current case, the
22  Alexander case, and any warnings that might have been
23  contained therein, do you find that there was an
24  adequate conveyance of information in any of the
25  manuals?
0236
 1       A.   I didn't analyze them.  I just don't remember
 2  seeing anything in all of them, I can't remember which
 3  ones, about -- I was looking specifically to see if
 4  there was anything about formaldehyde.  I don't remember
 5  seeing it, but I haven't analyzed them.
 6            MR. GLASS:  At this time I think I will pass
 7  you as a witness.  I appreciate your time today, Doctor.
 8            MR. DINNELL:  You have a flight to catch,
 9  don't you?  If you want to go in front of me, that's
10  fine.
11            MR. PENOT:  Okay.
12            MR. DINNELL:  Because I'm going to --
13            THE DEPONENT:  You don't have a --
14            MR. DINNELL:  I'm going to have some
15  questions.
16            MR. PENOT:  I'll bet you, you can hear me
17  better.
18            THE VIDEOGRAPHER:  Yeah.
19            MR. PINEDO:  Are you ready to proceed?
```

Laux Lila F  - Vol  I.txt

20            THE DEPONENT:  I'm ready to proceed, if they
21  are.  Do you want to take a break?
22            MR. PINEDO:  No, that's fine.
23            THE DEPONENT:  It's Friday night.  I want to
24  go home and relax.
25            MR. PENOT:  Me, too.  So I'll try to -- I'll
0237
1   try to do this as efficiently as I can, but we'll just
2   have to see what you tell me.
3                         EXAMINATION
4   BY MR. PENOT:
5       Q.    Dr. Laux, you spoke to Ms. Alexander for
6   approximately 15 or 30 minutes prior to producing your
7   report, correct?
8       A.    I did.
9       Q.    Did you record the conversation?
10      A.    No.
11      Q.    Did you take notes of the conversation?
12      A.    No.
13      Q.    You mentioned that -- so -- so there's no --
14  just to be clear, there's no record of that
15  conversation; it's just your memory of it?
16      A.    Well, there must be a telephone call record
17  somewhere --
18      Q.    Okay.
19      A.    -- in the telephone company, but . . .
20      Q.    Yeah, that it occurred.  But I'm -- I'm
21  talking about the content.
22      A.    Right.
23      Q.    No such record?
24      A.    No.
25      Q.    Okay.  Can you please tell me everything you
0238
1   recall that she told you in that conversation.
2       A.    Well, she told me she'd been living in Florida
3   with her brother, I think she said.  And -- well, first
4   she was some -- somewhere else, in some kind of
5   temporary facility.  And then she went in -- in Texas, I
6   think.  And then she went to Florida and lived there,
7   and at some point -- well, she -- and this I didn't
8   learn from her, but she had evidently applied for a
9   trailer, and finally she got one.
10            And she had it moved onto, I believe, her
11  parents's property, she told me.  And they came out and
12  hooked up the power and the sewer and all of that.  And
13  she moved in with her kids.
14            And she -- so then I said to her:  Okay, well,
15  tell me about your son's health, and she said:  Well, he
16  has asthma; and he'd had asthma before, but it wasn't as
17  bad, and it got worse when they lived in the trailer.
18            And when she -- and she didn't know about the
19  formaldehyde.  And she told me, as far as I recall, that
20  all she got was the manual; and that, when she heard
21  from an acquaintance at work, I think she said, about
22  the formaldehyde causing a problem for people who had
23  asthma, that was when she realized that it was -- you
24  know, could be related to her son's increasing incidence
25  of asthma.  And she began to make arrangements to move
0239
1   out, and moved in a with a family member, I think,
2   within a few weeks.
3             And that's what I remember, basically.
4       Q.    Okay.  Anything else?  Not a trick question.
                         Page 99

Laux Lila F  - Vol  I.txt

```
 5    I just want to --
 6        A.    I just really --
 7        Q.    I just want to try to get everything --
 8        A.    -- thinking real hard.
 9        Q.    -- since there's no record of it.
10        A.    Yeah, no.  Basically, I just wanted to know
11    two things:  Did she know about the formaldehyde when
12    she moved in?  Did she know that her son had asthma when
13    she moved in, and when did she find out about the
14    formaldehyde, and when did she make the connection that
15    it might be related to her son's increasing severity of
16    asthma, which, she told me, she felt had increased in
17    severity while they were there.
18        Q.    Did she say she felt that it had increased in
19    severity?  Did she make any reference to an increase in
20    frequency?
21        A.    Yes.  She said he was having more frequent
22    need to use his ventilator, or whatever they call that
23    thing.
24             MR. PENOT:  Just bear with me one second.
25             MR. PINEDO:  Inhaler?
0240
 1             THE DEPONENT:  Inhaler.  My mother used to
 2    have to use one.  She had asthma.  And so I think she
 3    called it an inhalator.
 4        Q.    (By Mr. Penot)  Okay.  With respect to the
 5    trifle -- excuse me.  Let's call it Exhibit -- I think
 6    it's been marked as Laux No. 8.
 7        A.    Okay.
 8        Q.    You said -- well, it's your belief that she
 9    did not receive, Ms. Alexander did not receive, a copy
10    of Laux No. 8; is that correct?
11        A.    I asked her what she had received, and she
12    said the manual.
13        Q.    Okay.  Did you -- did you know, at the time
14    that you spoke to her, that FEMA had circulated Laux
15    No. 8 to the trailer residents in --
16        A.    No.
17        Q.    -- the Southeast?  Okay.  Gulf South, I should
18    say.  Okay.  So if you didn't know that at the time, you
19    certainly couldn't have asked her specifically about
20    whether she received this, correct?
21        A.    No.  But I asked her what information she
22    received, and she said she received the manual.  I'm
23    assuming that, if she had received additional material,
24    she would have told me.
25        Q.    Okay.  So again, you're making an assumption
0241
 1    there?
 2        A.    Yes.
 3        Q.    That she would have remembered that she got
 4    this and that she would have told you that she got it,
 5    right?
 6        A.    That's my assumption.
 7        Q.    All right.  Same for Laux No. 9.  You didn't
 8    know, at the time that you spoke to her, that FEMA had
 9    circulated Laux No. 9, or did you, to Gulf Coast
10    residents?
11        A.    No, I didn't.  And to be honest, I went to the
12    FEMA site and everywhere else, trying to find the dates
13    that these were published and what they did with them,
14    and there wasn't anything that told me.  Those were
15    there, but it didn't tell me anything about how they
```

Page 100

Laux Lila F - Vol I.txt

```
16  were admini- -- distributed or when they were
17  distributed or anything like that.
18        Q.   So -- so once again, you -- of course, if you
19  didn't know it was circulated, you probably didn't ask
20  her if she had received it, expressly, correct?
21        A.   Well, I knew that these were circulated.  I
22  just didn't know if they'd been circulated at the time
23  when she moved into her trailer.
24        Q.   Okay.  So, but you did not specifically ask
25  her:  Did you, Ms. Alexander, get Laux No. 9?
0242
1         A.   No, I didn't.
2         Q.   Okay.  So when you say she didn't get it,
3   again, you're assuming that she -- she would have
4   remembered and she would have had told you?
5         A.   Well, since I --
6         Q.   -- correct?
7         A.   -- specifically asked her what she received
8   when she moved into the trailer, which maybe is not the
9   appropriate question, because if these things were
10  circulated later, you know, I don't -- I didn't ask her:
11  Did you at some time other time get materials from Gulf
12  Stream?
13        Q.   Okay.  Or from FEMA?
14        A.   Or from FEMA.
15        Q.   You testified -- well, instead of me trying to
16  repeat what you said, let me just ask you if this
17  accurate:  That when -- it's your belief or your
18  understanding that when Ms. Alexander moved into the
19  trailer, she had a crack in the paneling, she talked to
20  FEMA, and they told her to tape it up.  Is that your
21  understanding?
22        A.   Well, it wasn't a crack in the paneling.  It
23  was where, evidently, two panels butt up against each
24  other and they were -- one of them had come kind of, I
25  guess you'd say, loose.
0243
1         Q.   Okay.  So where did you get that information
2   from?
3         A.   I don't recall.
4         Q.   Did you get that from Ms. Alexander?
5         A.   No.  Well, I got the part -- you're right, I
6   got the part about using the mask -- the -- what do we
7   call that silvery tape?
8              MR. PINEDO:  Duct tape.
9         A.   -- duct tape.  That, I did get from her, yes.
10        Q.   (By Mr. Penot)  Okay.
11        A.   And she -- either she told me or I read in her
12  fact sheet that that had happened either immediately or
13  almost immediately upon moving into the trailer.
14        Q.   Okay.  And you -- and you got that from
15  Ms. Alexander, either her fact sheet or from speaking to
16  her?
17        A.   I believe.
18        Q.   Or from reading in one of the expert reports?
19        A.   Could have been.
20        Q.   Okay.  So you're not sure, could have been one
21  of those three sources, at least?
22        A.   At least.
23        Q.   Okay.  But those are -- those are pieces of
24  information that others, some other, either
25  Ms. Alexander or some other expert, gave to you, and you
0244
```

Page 101

Laux Lila F  - Vol  I.txt

```
 1   are assuming the truth of them, correct?
 2        A.   There's no way I can know, other than being
 3   told.
 4        Q.   Right, okay.  But you've never looked at the
 5   trailer yourself?
 6        A.   No.  I've seen many pictures of it, but I've
 7   never been into it, you're right.
 8        Q.   And the pictures you saw were pictures that
 9   were provided for you by your counsel, correct?  I
10   mean --
11        A.   Well, he's not my counsel, but --
12        Q.   Excuse me.  It's been a -- it's been a long
13   couple of days.  I apologize.  By the counsel who
14   retained you?
15        A.   That's correct.
16        Q.   And those pictures, are you aware of the date
17   of those pictures?
18        A.   4-17-2009.
19        Q.   Okay.  So they were -- they were made just
20   April of this year?
21        A.   Right.
22        Q.   Correct.  And more than a year, about a year
23   and a half, almost a year and a half, year and four
24   months, after the -- Ms. Alexander and Chris Cooper
25   moved out of the trailer, correct?
0245
 1        A.   Correct.
 2        Q.   And do you know how the trailer was maintained
 3   or where it was maintained during that time period?
 4        A.   Oh, it was moved to a storage site, but I'm
 5   not sure where; Laudy, Louisiana; and just was not
 6   maintained, as far as I know.
 7        Q.   When -- when Ms. Alexander moved in, she
 8   detected something that stung her eyes that was
 9   obviously of a -- of a chemical nature?
10        A.   That's correct.
11        Q.   And where did you learn that?
12        A.   Probably from her -- something I read.  I'm
13   pretty sure she didn't tell me that when I talked with
14   her on the phone.
15        Q.   So it was something you read somewhere in
16   these, what we lawyers like to call, reliance materials,
17   that you and Mr. Glass spoke about, at length, at the
18   beginning of your deposition, correct?
19        A.   That's correct.
20        Q.   You -- you believe that she had some leaks in
21   the trailer, correct?
22        A.   Well, she said she did, in something I read.
23        Q.   Okay.  Again, that's something in the reliance
24   material?  It's not something she told you specifically?
25   It's something you read?
0246
 1        A.   I believe she did tell me specifically that
 2   she had a leak in the trailer.  A leak.  I don't
 3   remember her saying leaks, but that she had a leak.
 4        Q.   Okay well, tell me everything you recall about
 5   that, because I don't think you recalled that before.
 6        A.   I -- well, you know, as you talk about things,
 7   then they're going to come back to my mind.  Because I
 8   asked her --
 9        Q.   Absolutely.
10        A.   -- about the --
11        Q.   That's why I'm talking about it.
```

Page 102

Laux Lila F - Vol  I.txt

```
12        A.    -- humidity, and she said, you know, that she
13   had a leak.  And I can't remember how she said she
14   addressed it.  I think -- I know she had called someone
15   to come and fix it, and it didn't get fixed.
16        Q.    Do you know who she called?
17        A.    I think she called Fluor, but I'm not
18   positive.
19        Q.    Earlier you said FEMA.  Are you sure it was
20   FEMA or Fluor?  Excuse me, no, you said the people
21   maintaining the trailers.
22        A.    Who, I think, are Fluor, but I'm not positive.
23   I haven't really analyzed --
24        Q.    You think Fluor was maintaining the -- the
25   trailers when she called?
0247
 1        A.    I think they were the one who were supposed to
 2   be maintaining.  I don't know if they were or not.
 3        Q.    Where do you have that -- where'd you get that
 4   information from?
 5        A.    I think I got that from Mr. Pinedo, but that's
 6   all I know about Fluor.
 7        Q.    Oh, okay.
 8        A.    I saw something about Fluor in one of the
 9   reports.
10        Q.    Okay.  So -- so this came from a conversation
11   with Mr. Pinedo, the -- the lawyer who retained you?
12        A.    Maybe.
13        Q.    Okay.  You were retained and asked to do what,
14   precisely?  What were you -- what was -- what were you
15   asked to do by the lawyers who retained you?
16        A.    Precisely, I was asked to evaluate the hazard
17   communications system that was provided with the Gulf
18   Stream travel trailer, Cavalier travel trailer, that
19   Ms. Alexander got and lived in.
20        Q.    I'm sorry.  And you were --
21        MR. PENOT:  Could you read that back to me?
22        (Last answer read.)
23        Q.    (By Mr. Penot)  The hazard and
24   communication --
25        A.    Not hazard and communications; the hazard
0248
 1   communications.  That's just my way of saying any
 2   warnings and other information in manuals or stickers or
 3   even oral communications that were given to her, that's
 4   a hazard communications system.
 5        Q.    In connection with the trailer, correct?
 6        A.    Right.
 7        Q.    Okay.
 8        A.    And particularly with regard to formaldehyde.
 9   I wasn't asked to evaluate all the other -- any other
10   hazards.
11        Q.    Right.  Now, the opinions that you've reached
12   are exhausted by this list of 22 opinions in your
13   report.  Is that a fair statement?
14        A.    Are you exhausted, or are you staying I'm
15   exhausted, or have I exhausted my opinions?
16        Q.    Poor choice of words of, I apologize.  What --
17   what -- I think, though, that you know what I mean.  Do
18   I have all of your opinions that you have formed in
19   connection with the study of this case, when I read
20   these 22?
21        A.    All that I have -- you know, that I have to
22   date, yes, um-hmm.
```

Page 103

Laux Lila F - Vol I.txt

```
23      Q.   Well, do you intend to do further work after
24  this deposition?
25      A.   If I'm asked to do so, I will.
0249
 1      Q.   Okay.  Have you been asked at this point to?
 2      A.   No.
 3      Q.   Okay.  And, of course, if you are, you'll let
 4  us know and provide a supplemental report, correct?
 5      A.   I will.
 6      Q.   Okay.  And we can come back up here to Denver
 7  to talk to you --
 8      A.   And you love it, right?
 9      Q.   -- if necessary.  Well, the temperature's much
10  better here than in my hometown.
11      A.   Right.
12      Q.   When I look at these 22 opinions that appear
13  in your report, all the warning information or who knew
14  or should have known something, refers to Gulf Stream.
15  Were you asked to form any opinions as to whether anyone
16  else was to provide hazard communications concerning
17  formaldehyde in connection with the trailer?
18      A.   No.
19      Q.   Okay.  So you were not asked to evaluate, and
20  you did not evaluate, whether, for example, Fluor
21  Enterprises, that had a contract that involved hauling
22  and installing and, for a time, maintenance of trailers,
23  whether they should have warned; and whether, if they
24  did, was it adequate?  You weren't asked to do that, and
25  therefore you didn't do that?
0250
 1      A.   Correct.
 2      Q.   Okay.
 3           THE DEPONENT:  Getting tired?
 4           THE REPORTER:  A little bit.
 5      Q.   (By Mr. Penot)  I may be just about done, if
 6  you give my one minute to collect my thoughts.
 7      A.   Have all the time you want.
 8           MR. GLASS:  While you're doing that, I would
 9  like to make sure that the exhibits -- because I'm going
10  to be leaving in a moment, I want to make sure the
11  exhibits, I'm not walking off with one.
12           THE VIDEOGRAPHER:  All right.  We are going
13  off the record.  The time 17:35:39.
14           (Recess taken from 5:35 p.m. to 5:45 p.m.)
15           THE VIDEOGRAPHER:  We are back on the record
16  the time is 17:45:02.
17                        EXAMINATION
18  BY MR. GLASS:
19      Q.   Dr. Laux, I had asked you earlier about
20  whether you had ever been disqualified as an expert, and
21  I think you said -- you gave us the one instance that
22  you were aware of where you potentially had been
23  excluded on the appellate level.  And I think you said
24  you didn't recall any other circumstances.
25      A.   Not that I'm aware of, no.
0251
 1           MR. PINEDO:  Object to the form of the last
 2  question.
 3           MR. GLASS:  Okay.
 4      Q.   (By Mr. Glass)  Do you ever recall the Fifth
 5  Circuit Court of Appeal affirming your -- the district
 6  court's refusal to recognize you as an expert witness?
 7      A.   No.  I have no idea what you're even talking
```

Page 104

Laux Lila F  - Vol  I.txt

```
 8   about.
 9        Q.    You -- you don't recall the Fifth Circuit ever
10   calling your opinions truly bizarre?
11        A.    No.
12        Q.    Okay.  Do you ever --
13        A.    Fifth Circuit where?
14        Q.    Fifth Circuit Court of Appeal, Federal Fifth
15   Circuit.
16        A.    Where is that?
17        Q.    That's --
18        A.    I have no idea.
19        Q.    That encompasses Texas, Louisiana,
20   Mississippi.
21        A.    No.
22        Q.    Did you -- did you testify in a case called --
23   I may mispronounce this -- Thottakkara,
24   T-h-o-t-t-a-k-k-a-r-a?
25        A.    Not that I recall.
0252
 1        Q.    v. HCA Health Services of Texas?
 2        A.    I wonder if that was one I did 18 or 19 years
 3   ago.
 4        Q.    It was 1996.
 5        A.    If she was a nurse, maybe.
 6        Q.    Correct.  I'll read you the -- the portion,
 7   into the record, and ask you if that refreshes your
 8   recollection:
 9             The District Court did not abuse its
10   discretion in refusing to recognize Thottakkara's
11   proffered expert witness, Lila Laux.  Laux had no
12   training in nursing or medicine and had not performed or
13   reviewed studies of how hospital nurses were
14   disciplined.  Laux would offer intralie (phonetic) the
15   truly bizarre opinion that Fischl -- F-i-s-c-h-l -- was
16   likely motivated by bias against dark-skinned people
17   because Fischl's parents were born and reared in
18   Austria, though Fischl herself was born and reared in
19   Canada and was not shown to ever have been to Austria or
20   Germany; and Laux, who had lived in Germany for
21   approximately eight years, just when or where, at what
22   age, is not reflected, thought Germans tended to be
23   prejudiced against dark-skinned people.
24        A.    Well, that's their opinion.
25        Q.    Well, did you -- do you remember that case?
0253
 1        A.    I do.  I mean, I vaguely remember it,
 2   but . . .
 3        Q.    And you offered the opinion that Germans tend
 4   to be prejudiced against dark-skinned people?
 5        A.    Not necessarily.  What I was talking about was
 6   a specific instance where she was, first, if I recall
 7   this, and it's been a long time -- she first -- in her
 8   first, I don't know how many -- many -- reviews got very
 9   good ratings, and then she had a new supervisor.  And I
10   think there were reasons why I believed that this woman
11   was prejudiced against her, and one of those reasons, I
12   believed, was her -- her background, her -- the way she
13   was raised.  It's just my -- you know.
14        Q.    Sure.  Well, do you have any reason to dispute
15   what the Fifth Circuit wrote here, that you were
16   offering the opinion that you thought Germans tend to be
17   prejudiced against dark-skinned people?
18        A.    I do argue with that.  I don't think I ever
```

Page 105

Laux Lila F - Vol I.txt

19  said that.  I said that in Germany, there is some, and
20  there is.
21       Q.   You mentioned to me the boat case, Douglas v.
22  Mercury Marine.  Do you remember ever being or having
23  your opinions excluded in a case in the Eastern District
24  of Texas against Ford Motor Company?
25       A.   I'd have to know more.
0254
1        Q.   Okay.
2        A.   I don't recall it, no.
3        Q.   Do you remember offering an opinion that any
4   vehicle with a blind spot large enough for a small
5   child, that did not include a rear sensor, was
6   defective?
7        A.   I don't know that I said it was defective.
8   That doesn't sound like what I would say.  But I
9   certainly said that it created a hazard, and it does.
10       Q.   Okay.  Do you know if that opinion was
11  excluded by the Eastern District of Texas?
12       A.   I didn't know that it was, no.
13       Q.   Okay.  In that case, you also offered opinions
14  very similar to the opinions in this case:  That the
15  company, Ford, showed a callous disregard for the safety
16  of children and adults, and that failing to provide a
17  rear -- or, excuse me, reverse sensor system and failing
18  to educate the purchasers of the Expedition about the
19  availability and need for such a system shows a callous
20  disregard for the safety of both children and adults.
21            Do you know if the court accepted those
22  opinions in your area of expertise?
23            MR. PINEDO:  Objection, form.
24       A.   I don't know.
25       Q.   (By Mr. Glass)  Okay.
0255
1        A.   Evidently, from what you just said, they
2   didn't.  I don't know, though.
3        Q.   In fact, I'll -- I'll let you know, it says
4   that:  Those comments were made by Laux in her expert
5   report and were gratuitous expressions of subjective
6   belief, not based on specialized knowledge and lack any
7   indicia of reliability.  As such, they are an improper
8   subject for expert testimony.
9             You weren't aware that those types of opinions
10  had been struck?
11       A.   That that opinion had been struck, no.
12       Q.   All right.
13       A.   I don't think those types of opinions have
14  been struck, but evidently that opinion was struck.
15       Q.   Okay.  The opinion concerning the callous
16  disregard for the safety by the manufacturer of the
17  product?
18       A.   If that's what they say, that's what they say.
19            MR. GLASS:  Okay.  That's all the questions I
20  have.  Thank you very much.
21                      EXAMINATION
22  BY MR. DINNELL:
23       Q.   Dr. Laux, my name is Adam Dinnell.  I
24  represent the United States in this case.  Just like
25  these other guys have been doing, I'm going to ask you a
0256
1   few questions.  And I just want to let you know that we
2   ask that you read and sign the deposition transcript
3   when you get it.

Laux Lila F - Vol I.txt

```
 4        A.    I always do.
 5        Q.    All right.  Good.  What we have marked as
 6  Exhibit 6, the testimony list --
 7        A.    Right.
 8        Q.    -- reflects that you've testified in three
 9  different cases where you were retained by Mr. Pinedo.
10        A.    That's correct.
11        Q.    In the past four years.  How many cases have
12  you worked with him on?
13        A.    I think that's it.
14        Q.    Those three?
15        A.    I think so.
16        Q.    Okay.  When did you agree to work on this
17  case?
18        A.    Oh, April 26th or something like that.
19        Q.    So today is May 29th.  You've been working on
20  the case for a month and three days?
21        A.    Sounds about right.
22        Q.    Okay.  Now, Mr. Penot asked you about what
23  your task was when you signed up to work on this case
24  with Mr. Pinedo.  I just want to clarify, you were not
25  tasked with researching or forming any opinions about
0257
 1  information or any warnings that were issued by the
 2  United States Government or FEMA in regard to this case;
 3  is that true?
 4        A.    That's true.
 5        Q.    Okay.  And there's no such opinions, in your
 6  expert report, about FEMA or the United States?
 7        A.    That's correct.
 8        Q.    All the opinions that you have formed in
 9  relation to this case deal with the manufacturer of the
10  unit, Gulf Stream Coach; is that right?
11        A.    That's correct.
12        Q.    Okay.  Were you ever asked, at any point, to
13  look into instructions and warnings that the United
14  States or FEMA may have issued?
15        A.    No.
16        Q.    Okay.  Has it been discussed as to whether you
17  may be asked to do that in the future?
18        A.    No.
19        Q.    So at this point your understanding is that
20  you will not be offering any opinions about instructions
21  or warnings that the United States or FEMA may have
22  given; is that right?
23        A.    I have no knowledge if I'm going to be asked
24  to do that, that's correct.
25        Q.    And you haven't taken the time to look into
0258
 1  those potential instructions and warnings and research
 2  them; is that right?
 3        A.    That's correct.
 4        Q.    You spoke earlier about the whole issue of you
 5  can't -- I -- you know, can you warn people about
 6  everything, and there was a discussion about that.
 7  Obviously, would you agree that deciding what you're
 8  going to warn about requires weighing and balancing
 9  risk?
10        A.    That's why --
11        Q.    Is that true?
12        A.    That's part of it.  You do a hazard pattern
13  analysis, and you try to evaluate what your target
14  population actually already know and how they -- the
```
                            Page 107

Laux Lila F  - Vol  I.txt

15  kinds of experiences they've had.  And you weigh the
16  probabilities that something could happen as a result of
17  this thing that you understand is a hazard.
18          And so then you have to make a decision about
19  which things you will warn about on the product, which
20  things you might then include in the manual, in addition
21  to what's on the product.
22          I mean, this is a process that you have to go
23  through with the entire system, not just as we're doing
24  in this case, as I'm doing in this case, just about this
25  one hazard.
0259
1       Q.   And that applies both when you're deciding
2  whether to issue a warning and in how you craft the
3  warning, right?
4       A.   Yes.  And -- and it also would apply about,
5  you know, whether you're going to put the warning on the
6  product or you're going to try and fix it so that the
7  user of the product has to see the warning; which you
8  can do, in some instances, by placing it so that the
9  warning has to be destroyed when the product is -- I
10  mean, there are all kinds of things we think about when
11  we come to the point of trying to figure out how to
12  warn.
13      Q.   So the party considering the warning has to
14  balance risk, has to balance social factors, has to take
15  any number of things into consideration?
16      A.   That's correct.  And that -- that's -- you'll
17  see that when you get my list, checklist.
18      Q.   Okay.  Right, and we had asked for -- for the
19  checklist earlier.  And that checklist is going to be a
20  checklist of things that you look at in terms of
21  assessing the adequacy of a warning; is that true?
22      A.   It's the checklist that I provide to my
23  customer, or, you know, when I teach -- I'm teaching the
24  class, and we work through it together to show how --
25  you know, what things you need to consider, how you need
0260
1  to weight them, what additional information you need to
2  gather, if you don't have the information that's
3  included.
4          For instance, if you don't know the
5  characteristics of your target population, how do you
6  find out what those people know and what they -- are
7  they capable of understanding any -- if it's a very
8  complex hazard, how do you communicate that?  If the
9  population is the entire United States, you know, how do
10  you figure out how to tell the -- the most illiterate,
11  the -- the least experienced, the least educated people
12  about this hazard?
13      Q.   And figuring out what to say and how to say it
14  requires you to, one, know what the hazard is?
15      A.   Yes.
16      Q.   Is that right?  And, I guess, two, it requires
17  you to -- it requires time.  You talked about knowing
18  the target audience, knowing the ins and out of the
19  hazard.  I would think it takes time and research to
20  craft what you would consider an adequate hazard.  Is
21  that true?  Or, I'm sorry, an --
22      A.   An adequate warning.
23      Q.   An adequate warning.
24      A.   Well, when I work with companies, you know, we
25  don't just sit down one day and say, "Okay, here's the
                        Page 108

0261
1  warning."
2          So what we'll do is, we'll start, you know,
3  bringing in everybody in the company that has
4  information.  We'll start looking at what information we
5  have.  We may get in touch with CPSC or the Automobile
6  Manufacturers Association or the chemical -- you find
7  out what they know.  The National Safety Council,
8  National Safety -- you know, all these people who might
9  have some information for us, particularly a
10 manufacturers association, because they will have other
11 instances of problems.
12         And so we consider all those things.  We look
13 at probabilities.  CPSC can sometimes help you with
14 that, for many products.
15         And then we start working on the wording and
16 how -- what are we going to say, and who are the people
17 who need to know this, and how can we communicate it to
18 them.
19     Q.   I was going to ask you how long, generally, it
20 would take to craft an adequate warning, but I guess
21 that depends on the product, right?
22     A.   It depends on the product, and particularly it
23 depends on the history of the product:  How -- how long
24 has this product been around and what kind of
25 information do we have to help us identify what the
0262
1  hazards are?  Is it similar to another product that's
2  out there, where we know people have been having
3  difficulty?
4     Q.   With regard to a travel trailer and
5  formaldehyde, how long do you think it would take to sit
6  down and craft what you would consider an adequate
7  warning?
8     A.   Well, based on what I know now, I think
9  that -- you know, and -- and given all these government
10 proclamations about formaldehyde and -- and the -- the
11 hazards associated with it and who might be associated
12 with it, I think it could take some weeks, maybe,
13 because the target audience is a very diverse group in
14 this case.
15     Q.   And to do so, you have to know a lot about the
16 product that you're warning about --
17     A.   That --
18     Q.   -- is that right?
19     A.   That's the reason I don't develop the warning
20 myself.  That's why I make my clients develop the
21 warning, with my assistance.
22     Q.   Because, I guess this goes back to something
23 you said earlier, the designer of a product, the
24 manufacturer of a product, has psychological ownership
25 were your words, over the product?
0263
1     A.   That's correct.
2     Q.   That product, the manufacturer is the one that
3  knows what the product is and knows everything about it,
4  presumably?
5     A.   Yes.  But sometimes that's the -- that's part
6  of the problem, because to the engineer or the scientist
7  who develops the product, it may not seem hazardous, it
8  may not seem that there's anything that everybody
9  wouldn't know.
10         So that's why you have to also be sure that
                        Page 109

Laux Lila F  - Vol  I.txt
11   you bring in marketing and, you know, everybody else who
12   has a -- has a stake in this, because you can't rely on
13   just the designers and developers of the product.
14        Q.    But you -- you said earlier that you wouldn't
15   want to craft a warning for a product because you're not
16   a manufacturer, you're not the designer of the product.
17        A.    And I'm not the psychological owner of the
18   product.
19        Q.    It would be very difficult for any outside
20   entity or third party, like yourself or anyone else, to
21   come in and craft a warning about someone else's
22   product; is that true?
23        A.    Not necessarily.  Some -- you know, some -- in
24   some areas, I have expertise where I could probably do
25   that.  But it's not the best way to do it, because, as I
0264
1    said, we want the manufacturer and their people to say:
2    Okay, this is my product.  I'm concerned about the
3    people who use it.  I want to be sure that I'm getting
4    the best information out there, to them.  I've got a
5    hotline out there, and I'm asking people to call me in
6    when they have problems.
7             You know, so we really want the owner -- the
8    manufacturer to own --
9         Q.    Um-hmm.
10        A.    -- that warning information, that manual,
11   those warnings, those labels, and everything associated
12   with it.
13        Q.    But it's crucial for anyone crafting a warning
14   to know about that product, as much as possible; is that
15   true?
16        A.    That's true.  The more they know, the better
17   they can make decisions about what to warn about.
18        Q.    Earlier you were talking about the
19   conversation you had with Alana Alexander, right?
20        A.    Right.
21        Q.    Did you ever speak with Chris Cooper?
22        A.    No, I didn't.
23        Q.    Okay.  And when you spoke with Alana
24   Alexander, that was over the phone?
25        A.    Yes.
0265
1         Q.    And wasn't under oath in any way --
2         A.    No.
3         Q.    -- is that right?
4         A.    Not under oath in any way, neither she nor me.
5         Q.    Right.  You'd said that everything that you've
6    relied upon, to date, in forming your opinions is laid
7    out in your expert report, right?
8         A.    Well, all the information.  But, of course,
9    you can't discount my long history of -- of studying
10   about warnings and figuring out how to -- how to
11   communicate with people, and teaching 30-something
12   classes to manufacturers about how to develop warnings,
13   and the interactions I've had with them.  And -- and,
14   for instance, with the -- with NASA right now in the
15   designing of the spacecraft, I mean, there are lots of
16   warnings that we have to consider in the design of the
17   spacecraft.
18        Q.    Were there any human factors studies or pieces
19   of literature that you thought were relevant enough to
20   put in the report?
21        A.    Well, I cite a lot of them, you know, in
                        Page 110

Laux Lila F  - Vol  I.txt
```
22   the -- in the citations, but those are all things that:
23   Yes.  Did I rely on them?  No.  But do I know them, yes.
24        Q.   Right.
25        A.   You -- you have to remember that I actually
0266
 1   taught human factors psychology at Rice, and I applied
 2   my human factors background and research there and at
 3   Baylor College of Medicine.  So I cite them so that
 4   other people, who don't know the literature, can go and
 5   get some insight into what a human factors engineer
 6   does.
 7        Q.   Okay.  But in forming your opinions in this
 8   case, you relied on your own experience, not on any
 9   specific pieces of literature or studies?
10        A.   I don't think I need to rely on any literature
11   or studies --
12        Q.   That's fine.
13        A.   -- from the human factors field, since I'm
14   considered an expert in that field, myself.
15        Q.   That's fine.  The things that you did cite --
16   I'm at your expert report, which we -- what did we mark
17   your expert report as?
18        A.   There it is.
19        MR. GLASS:  2.
20        Q.   (By Mr. Dinnell)  2?
21        A.   Uh-huh.
22        Q.   I'm just on Page 4 of Exhibit 2.
23        A.   Okay.
24        Q.   There's seven, I guess, pieces of literature,
25   either about psychology or human factors; is that right?
0267
 1        A.   That's -- well, let's see.  Let me make sure
 2   they all are.
 3        Q.   Okay.
 4        A.   Yep, they are.
 5        Q.   All right.  I won't list them off, but at
 6   least seven sources listed on the seven footnotes on
 7   Page 4, would you consider those authoritative texts in
 8   your field?  Valuable texts?
 9        A.   Yes.
10        Q.   Things that you consult when you're discussing
11   human factors?
12        A.   No, I wouldn't consult them, but I know what's
13   in them, and they represent what the field of human
14   factors believes.
15        Q.   You'd reference someone else to those sources
16   as important and useful sources to learn about human
17   factors?
18        A.   Yes.
19        Q.   Okay.  Now, again, we -- you said earlier,
20   human factors engineering and human factors psychology,
21   I get.  Is that your term, those two things?
22        A.   They're sort of interchangeable.
23        Q.   Okay.  But that is your expertise --
24        A.   That's correct.
25        Q.   -- right?  And you've described, at length, at
0268
 1   Exhibit 2, your expert report, on Page 2, 3, and, I
 2   guess --
 3        A.   2 and 3.
 4        Q.   -- the first paragraph.  Basically, Pages 2
 5   and 3 of Exhibit 2, your expert report, you've described
 6   what human factors engineering consists of right?
```
Page 111

```
7      A.   Yes.
8      Q.   So you've -- in your expert report, you've
9  laid out what your expertise is, through this document?
10     A.   Well, I don't know that I think that's my
11 expertise necessarily.  I've said what human factors
12 engineers do.
13     Q.   And you've said that you are an expert in
14 human factors?
15     A.   I am.
16     Q.   Would you agree, in designing any kind of
17 warning, the amount of information that you're providing
18 is important?  In other words, you have to strike a
19 balance between handing somebody a treatise and making
20 it easy to read, easy to understand; and I guess brevity
21 is important.  Is that true?
22     A.   Well, that was exactly the point of the -- the
23 MSDS study and the studies that I did at Baylor on the
24 patient inserts, you know.  I mean, there's way too much
25 information in those --
0269
1      Q.   Right.
2      A.   -- for the average user.
3      Q.   And we looked at two documents that we marked
4  as Exhibits 8 and 9, these two FEMA documents.  You
5  could certainly provide somebody with 10, 20, a hundred
6  pages on the subject of formaldehyde, potential health
7  problems, et cetera, but that would not be an effective
8  warning; is that right?
9      A.   That wouldn't be appropriate for this target
10 audience; that's correct.
11     Q.   You have to make, I guess, value judgments
12 and, sort of, you have to weigh what's important enough
13 to be included and what's not; is that right?
14     A.   That's true.  But again, you know, if you were
15 making this information available to a physician, it
16 would be different information than you're going to be
17 making to this population.
18     Q.   And again, to really study that target
19 audience, you need time and, I guess, resources to think
20 about it?
21     A.   Well, most manufacturers might.  I don't,
22 since I've worked with this population, you know, for
23 many years, and I understand their characteristics,
24 because these are the same characteristics, in many
25 cases, as the people we had in the community clinics at
0270
1  Baylor.
2      Q.   You've talked about some decisions that Alana
3  Alexander made.  And I guess we can only talk -- is it
4  fair to only talk about Alana Alexander's decisions,
5  since the other person, Chris Cooper, is a child?
6      A.   I don't think he had any input into whether or
7  not they moved --
8      Q.   Okay.
9      A.   -- into the trailer.
10     Q.   Would you agree that how people respond to
11 information, how people react to certain outside forces,
12 would be different in a disaster setting than in a
13 normal sitting?
14     A.   Highly likely.
15     Q.   Okay.
16     A.   In some instances.  I wouldn't say in every
17 instance, no.
```

Laux Lila F - Vol I.txt
```
18       Q.   Okay.
19       A.   I think, if you saw an immediate serious
20   hazard, you would respond.
21       Q.   But your --
22       A.   Regardless.
23       Q.   Your hazard analysis could be different in a
24   disaster setting versus a normal setting?
25       A.   Well, there probably would be different
0271
 1   ancillary hazards and conditions that would go along
 2   with it.
 3       Q.   Okay.  Would you agree that an individual's
 4   unique factors, unique point of view, would affect the
 5   choices that that individual makes?
 6       A.   Yes, but they usually are representative of a
 7   group of people --
 8       Q.   Okay.
 9       A.   -- who, you can say, okay, you know, old
10   people, young women, teenagers, they have -- tend to
11   have common ways of responding.
12       Q.   Right.
13       A.   They may have some differences too, but you
14   can look at their commonalities.
15       Q.   But you and I could be provided the same
16   information and, drawing on my life experience versus
17   your life experience, we could react in totally
18   different ways to the same piece of information?
19       A.   Well, possibly to the same piece of
20   information, but not necessarily to a warning.  I mean,
21   I think, once people understand that the word "danger"
22   means that you have to do something immediately to avoid
23   having a serious consequence, then we'll all pretty much
24   respond in the same way.  And that is to attempt to
25   comply with whatever we're told to do.
0272
 1       Q.   But the warning or information could be the
 2   best-crafted piece of information in the world; you
 3   could still choose to either ignore the warning, not
 4   read it, or disregard it?
 5       A.   Yes, that's certainly true.
 6       Q.   Just to clarify one point, to make sure I have
 7   this right, you've assumed that there were toxic levels
 8   of formaldehyde in these travel trailers; is that
 9   correct?
10       A.   I've assumed that there could be, yes.
11       Q.   Okay.
12       A.   Not necessarily in every one, but that there
13   could be, because of the way they were constructed and
14   the way that they operate.
15       Q.   Okay.  And your opinions about warnings hinge
16   on that assumption that these were, in fact, toxic
17   trailers, basically?
18            MR. PINEDO:  Objection, form.
19       A.   Yes.
20       Q.   (By Mr. Dinnell)  Is that right?  And just to
21   make sure one other thing is clear, you could be
22   informed of hazards through any number of means,
23   basically, different types of communications?
24       A.   Sure.
25       Q.   You could have authoritative communications
0273
 1   such as warnings; is that right?
 2       A.   No.  A warning isn't an authoritative
```
Page 113

Laux Lila F  - Vol  I.txt

3   communication.  It's the source of the warning that's
4   authoritative --
5        Q.   Okay.
6        A.   -- or not.
7        Q.   So let's say a manufacturer would be an
8   authoritative source of a warning --
9        A.   Yes.
10       Q.   -- is that right?  The news media could be a
11  source of information or warning that would affect your
12  hazard analysis?
13       A.   It could, depending on whether you considered
14  them to be authoritative.
15       Q.   Right.  Peers could affect your hazard
16  analysis, depending on what information they give you;
17  is that right?
18       A.   Again, assuming that you believe that the
19  information that they have is authoritative, yes.
20       Q.   And humans can certainly appreciate risk and
21  appreciate hazards, without any external information
22  coming in from other --
23       A.   Well --
24       Q.   -- from other parties?
25       A.   You mean -- oh, from -- from their neighbors?
0274
1        Q.   No.  I'm saying --
2        A.   Oh, you mean not coming in from other --
3        Q.   If I'm -- I mean, a human can certainly
4   perceive hazard, on his own accord, without any
5   warnings, without any communications, without any other
6   outside source?
7        A.   Sometimes.  They certainly can perceive, you
8   know, a fall hazard or a cutting hazard, because they
9   have experience with both of those.
10       Q.   Right.  Now, a person -- a person could
11  perceive risk or perceive hazard by -- through
12  irritation?
13       A.   Yes.
14       Q.   If I walk into a space and suddenly I'm
15  overcome with irritation, it could be a natural human
16  response to perceive that as a hazard and leave, right?
17       A.   Well, you certainly would want to leave.
18       Q.   Right.
19       A.   She's giving you a message.
20            MR. DINNELL:  All right.  Let's -- let's hold
21  off on that.  And you can change it, if you want.
22            THE VIDEOGRAPHER:  All right.  This ends Tape
23  No. 4 in the deposition of Lila --
24            MR. PINEDO:  Laux.
25            THE VIDEOGRAPHER:  The time is 18:10:55.
0275
1            (Recess taken from 6:10 p.m. to 6:13 p.m.)
2            THE VIDEOGRAPHER:  This is the beginning of
3   Tape No. 5 in the deposition of Lila Laux.  The time is
4   18:13:50.
5        Q.   (By Mr. Dinnell)  Doctor, you'd -- would you
6   agree with me that various factors, such as resources,
7   money, familial relationships, can all shape the
8   decisions that a person makes?
9        A.   Yes.
10       Q.   Do you know whether the -- you made a bunch of
11  references earlier to the OSHA PEL, the .75 per million
12  level.  Do you remember that?
13       A.   I did, um-hmm.

Page 114

Laux Lila F - Vol I.txt
14      Q.   And that was the eight-hour time-weighted
15  average number?
16      A.   Yes.
17      Q.   Do you know if that refers to the exposure of
18  a worker over a lifetime of working?
19      A.   No, I don't.
20      Q.   Okay.  You made a reference, in your -- in
21  your expert, report to -- I'll get there later.  You
22  listed the ATSDR tox profile for formaldehyde.  Do you
23  remember that document?
24      A.   Sort of.
25      Q.   Okay.  Did you read that document?
0276
1       A.   Yes.  But I read, you know, any number of
2   chemical sheets from idfferent --
3       Q.   Did you read --
4       A.   -- sources.
5       Q.   Were you able to read all of it before forming
6   your opinions in this case?
7       A.   I believe I did.
8       Q.   Okay.  You referenced the NIOSH Immediately
9   Dangerous to Life or Health concentrations
10  documentation?
11      A.   Yes.
12      Q.   Do you remember what their number for the
13  IDLH, the Immediately Dangerous to Life or Health
14  Concentration was?
15      A.   No.  Was it -- might have been 2 parts per
16  million, but I don't -- I don't recall what it was, to
17  be honest.
18      Q.   Okay.  Do you remember a hundred-part-per-
19  million number?
20      A.   I don't, but that doesn't mean it isn't in
21  there.
22      Q.   Okay.
23      THE DEPONENT:  Gesundheit.
24      Q.   (By Mr. Dinnell)  Just to clarify one more
25  thing, your second opinion:  Ms. Alexander reasonably
0277
1   relied on Gulf Stream, the manufacturer of the Cavalier
2   travel trailer that she was provided, to warn her if
3   there were conditions which could create a hazard for
4   herself and her children.
5       A.   That's -- yeah --
6       Q.   Right?
7       A.   -- I believe that's what I said.
8       Q.   You would agree that the manufacturer of the
9   travel trailer would be in the best position to warn if
10  they knew about certain conditions in the travel
11  trailer?
12      A.   Well, they certainly had the best and easiest
13  access to the person at risk.
14      Q.   (By Mr. Dinnell)  Okay.  Would you agree it
15  would not take a warning for someone to know that
16  sitting in a trailer that's closed up, in 95-degree
17  temperature, is a bad idea?  In other words, that would
18  be a scenario where an occupant could perceive risk or
19  perceive irritation just by -- from the heat; they'd
20  want to remove themselves from that scenario?
21      A.   Well, they certainly would want to reduce the
22  temperature, you're right.
23      Q.   All right.  Is the time of warning important?
24  In other words, is it more important for the warning to
                      Page 115

Laux Lila F  - Vol  I.txt
```
25    be provided at the time of somebody receiving a unit
0278
1     versus later on down the line?
2          A.    Well, in my opinion, you can't make a decision
3     about whether you want to move into one of these
4     trailers unless you -- or -- or whether you've made a
5     bad decision, if you've chosen to move in, unless you're
6     warned at that time when you're making that decision.
7          Q.    And once somebody has moved into -- or in
8     this -- I guess it could be applied to any number of
9     circumstances.  But in this situation, once somebody
10    moved into a unit, their decision analysis would change?
11    In other words, if I'm already moved into a unit, for
12    lack of a better word, I have equity in the unit, my
13    decision is going to be different than the first day
14    that I could have moved into the unit?
15         A.    Or prior to, you mean?
16         Q.    Yes.
17         A.    Well, yes.  But a lot of that's going to
18    depend on what your other options are.  And, yes, it's
19    true, if you've moved in all your stuff and it's in
20    there and, you know, you now have -- are faced with the
21    cost of moving out, that's -- it could affect your
22    decision.  Although, I think that, in the time when you
23    perceive a risk to your child, you would at least remove
24    the child.
25         Q.    Your opinion earlier, and it's stated in the
0279
1     report, is that Alana Alexander had other options to
2     consider, other than the travel trailer; is that right?
3          A.    That's what she told me, yes.
4          Q.    Okay.  Now, is it your understanding that
5     Alana Alexan- -- do you know if Alana Alexander paid for
6     anything, paid for the travel trailer or paid to live in
7     the travel trailer?
8          A.    I don't believe she did.
9          Q.    Okay.  And it's your opinion that she had the
10    option to live with friends -- or, I'm sorry, live with
11    family in New Orleans or potentially stay in Florida,
12    with whoever she was with in Florida?
13         A.    That's what I was told.
14         Q.    And that's what she told you?
15         A.    Yes.
16         Q.    Okay.  And that's important to your opinions
17    in this case?
18         A.    Well, it's certainly important in the sense
19    that, you know, she is one of the people who really had
20    an option.  If she had made the decision to not occupy
21    the trailer, she did have another option.  There may
22    have been many very poor people, who had no connections,
23    who would have either had to live outside or live in a
24    trailer.  And so that's certainly going to weigh into
25    their decision.
0280
1          Q.    But she had asked for the trailer
2     specifically, and had other options, other than the
3     trailer --
4          A.    She did ask --
5          Q.    -- throughout this time period?
6          A.    -- for the trailer specifically.  And she had
7     had other options.  She had been living with her
8     brother, I believe.
9               Can somebody pour me some water?
```
                              Page 116

Laux Lila F  - Vol  I.txt
```
10        Q.    Got you.
11        A.    Since I'm tied down with this?
12        Q.    Sure, here you go.
13        A.    Thank you.
14        Q.    In your -- in Opinion 21 in your report, where
15   you talk about "as soon as she," meaning Ms. Alexander,
16   "learned about the hazards associated with formaldehyde
17   off-gassing in the trailer, she moved her family out."
18        A.    That's correct.
19        Q.    Right?  And as a part of that opinion, you
20   assumed that the first time she ever learned about the
21   hazards associated with formaldehyde off-gassing in her
22   trailer was in December of 2007?
23        A.    I didn't assume that.  That's what she told
24   me.
25        Q.    Well, for your opinion, you're assuming that
0281
1    what she told you --
2         A.    Was true.
3         Q.    -- is correct?
4         A.    That's right.
5         Q.    Okay.  And again, what she told you was, she
6    learned about the hazards associated with formaldehyde
7    off-gassing in the trailer, for the first time, from a
8    friend?
9         A.    I think it was a colleague at work or a
10   friend, someone that she -- an acquaintance.
11        Q.    And that first occurred December 2007?
12        A.    That's what she told me; that, you know, that
13   was her first awareness of the potential for the
14   formaldehyde to be causing her son's asthma.
15        Q.    Certainly people -- well, let me ask you this:
16   If she -- let's say, after that time period, after
17   December 2007, if she knew of the hazards of --
18   potential hazards of formaldehyde in these units and
19   stayed, with a kid that has asthma, in the unit, would
20   that make her unreasonable?
21        A.    Well, I guess, again, it would be depend on
22   what options she had.  If she had to move out with her
23   children and live in a homeless shelter, maybe she would
24   decide to take -- you know, that the risk of
25   formaldehyde was lower than the risk of being mugged or
0282
1    whatever in a homeless shelter, so --
2         Q.    But you said she did have options?
3         A.    She did.
4         Q.    Okay.  So after she learned of the potential
5    risk of formaldehyde in the unit, it would be
6    unreasonable for her to stay there with a child, in the
7    unit?
8         A.    Unless she checked it out and, you know,
9    determined that it was not harmful to her or to her
10   child.
11        Q.    All right.  Just a couple more things.  You
12   testified earlier that you're not an expert in
13   toxicology, right?
14        A.    That's correct.
15        Q.    And nor are you an expert in disaster response
16   or emergency response?
17        A.    That's also correct.
18        Q.    You said you've never designed a warning
19   regarding formaldehyde?
20        A.    That's correct too.
```
                              Page 117

```
21      Q.    Never published anything about warnings
22 regarding formaldehyde?
23      A.    Nope, I haven't.
24      Q.    Did anyone help or assist you with your
25 report?
0283
1       A.    No.
2       Q.    Okay.  Do you ever advertise your expert
3 services?
4       A.    No.
5       Q.    All right.  Last thing.  Let's take a look,
6 first, at Exhibit 8.
7       A.    All righty.
8       Q.    Titled "Important Information for Travel
9 Trailer Occupants."
10      A.    Correct.
11      Q.    All right.  Now, again, you said that it's
12 very difficult for a third party to warn about someone
13 else's product; is that right?
14      A.    Oh, I don't know that I said it was very
15 difficult, but I said that the manufacturer or developer
16 of the product has the best opportunities to warn.
17      Q.    Okay.  Would you agree that it's also very
18 difficult to warn about different products at the same
19 time?
20      A.    I don't guess I'm understanding your question.
21      Q.    In other words, it's difficult to issue a
22 warning about a group of products that may be different,
23 rather than about a single product?
24      A.    So, for instance, it would be difficult to
25 issue a warning about all kinds of toys, like blocks and
0284
1 beads and stuff like that, rather than issuing a
2 specific warning about beads, that they can be
3 swallowed?
4       Q.    Um-hmm, yeah.
5       A.    Well, it would depend, to some extent, on how
6 different the products were.  But, sure, if they were
7 very different and had very different hazards associated
8 with them, then that would be more difficult.
9       Q.    Now, when we were talking about this Exhibit 8
10 earlier, when Mr. Glass was asking you questions, you
11 said that you didn't feel like this information brochure
12 was adequate.  That's what you said.
13      A.    I probably did say that.
14      Q.    But this brochure certainly provides an
15 occupant with more information than they would have had;
16 is that right?
17      A.    But a lot of this information is really
18 irrelevant.  I mean, telling them that, you know,
19 they're getting formaldehyde from dishwashing liquids
20 and --
21      Q.    Right.
22      A.    -- shampoos is not relevant to the issue at
23 hand.
24      Q.    But you stressed earlier, when you were
25 talking about the HUD notice, it is very relevant to let
0285
1 people know that children and the elderly may be more
2 sensitive to formaldehyde.
3       A.    That is relevant.
4       Q.    And that's contained in this Exhibit 8 --
5       A.    Yes, it's --
```

Laux Lila F  - Vol  I.txt

```
 6        Q.   -- brochure?
 7        A.   -- way down at the bottom of the second
 8   column, but it's there.
 9        Q.   "People who suspect they are sensitive to
10   formaldehyde should work closely with a doctor to see if
11   formaldehyde is causing their symptoms."
12             That certainly puts a person on notice that
13   there's a potential health issue, right?
14        A.   Well, I don't know about that, whether that
15   puts them on notice.  It says, you know, if you can
16   afford to go see a doctor or if you have insurance,
17   then -- and you're having some kind of problems, even
18   though, you know, according to this, you -- you know,
19   all -- you're getting exposed to this stuff all the time
20   and, you know, it's everywhere and it can be found in
21   all of your daily products.  But if think you're having
22   a problem with it, you could maybe get to -- go to a
23   doctor and see what the doctor thinks.
24        Q.   And you'd agree that health advice shouldn't
25   be conveyed through a mass mailing or brochure?
0286
 1        A.   Well, I wouldn't necessarily agree to that.  I
 2   mean, let's face it, we tell people not to smoke, and
 3   I'm happy with a mass mailing for that.
 4        Q.   But you can't tell somebody, through a
 5   brochure, whether or not smoking is causing their
 6   problems?
 7        A.   No, but --
 8        Q.   That requires a doctor?
 9        A.   -- you could say smoking will --
10             THE REPORTER:  Wait.
11             MR. DINNEL:  Sorry.
12             THE REPORTER:  It's okay.
13        A.   -- smoking can cause problems; and if you're
14   experiencing any of these problems, it could be due to
15   smoking.
16        Q.   Okay.  And then this brochure goes on and
17   says, "what can I do to reduce my exposure to
18   formaldehyde in my travel trailer?"
19        A.   That's correct.
20        Q.   That's providing the occupant with some
21   additional information about what they may be able to do
22   to reduce formaldehyde?
23        A.   Yeah, although on Gulf Coast, Louisiana, how
24   in the world are they going to get that -- that humidity
25   rate down to 40 or 50 percent?  I mean, it seems like
0287
 1   advice that you're going to have a very hard time doing,
 2   especially if you're going to be opening the windows and
 3   doors.
 4        Q.   But again, what you include in any kind of
 5   brochure like this, or informational literature,
 6   requires you to weigh the risks, research the
 7   information, think about what's important and what's not
 8   important using the information that you have at your
 9   disposal?
10        A.   Would I do that if I were being tasked to
11   write this kind of brochure?  Sure, that's what I would
12   do.  And then I would figure out, okay, what's the most
13   important information and what's the level of urgency I
14   need to convey, and I would start with that.
15        Q.   And that takes -- that takes expertise?
16        A.   Well, I don't think that the man on the street
```

Page 119

17  can do it, no.
18      Q.    Okay.  Let's look at the next one, which was
19  Exhibit 9.  This is the second document that we talked
20  about, on FEMA letterhead.  It says, in bold -- or in
21  the bold block at the top, "Important Formaldehyde
22  Information for FEMA Housing Occupants."
23      A.    Correct.
24      Q.    You said you felt that this document was
25  inadequate as well.
0288
1       A.    Well, I just don't think that -- I mean, in
2   all these cases, you know, it talks about how it's a
3   common thing and it's colorless and, you know, it's in
4   all kinds of material.  So it makes it sound like, you
5   know, this is just a -- you know, everybody's being
6   exposed to this stuff all the time; which is true, but
7   that's not the issue at hand.  That's not really what
8   you want to be telling people.
9           You want to be telling people:  In this
10  trailer there's a chance that, because of the way the
11  trailer is put together and the ventilation of it,
12  there's a chance you might be being exposed to levels
13  that are not good for you.  And you need -- especially
14  if you have a child or an elderly person, you need to be
15  getting information.
16          And there is a number on here, which is great,
17  that's wonderful, if people can actually get through and
18  if they actually can get an answer.
19      Q.    Okay.  And certainly with both of these
20  documents, Exhibits 8 and 9, providing some information
21  is better than providing no information?
22      A.    Well, absolutely.
23          MR. DINNELL:  I have no other questions.
24          THE REPORTER:  I need a little break.
25          MR. PINEDO:  All right.  We'll just take a
0289
1   break.
2           THE VIDEOGRAPHER:  All right.  We're going off
3   the record.  The time is 18:31:15.
4           (Recess taken from 6:31 p.m. to 6:44 p.m.)
5           THE VIDEOGRAPHER:  We are back on the record.
6   The time is 18:44:16.
7                       EXAMINATION
8   BY MR. PINEDO:
9       Q.    Dr. Laux, are you ready to proceed with your
10  deposition here today?
11      A.    Yes.
12      Q.    Could you tell us about your educational
13  background?
14      A.    Well, I went to Rice University and did my
15  undergraduate work there and graduated in 1961, and then
16  moved with my husband to North Carolina, and then to New
17  Orleans.  And then I went -- we went to Europe, and when
18  we came back, I went back and got a master's degree, at
19  the University of Southwest Louisiana, as it was known
20  at that time, in applied psychology.
21      Q.    And could you describe for the ladies and
22  gentlemen of the jury as to what is applied psychology?
23      A.    Well, applied psychology, in the -- in the way
24  that I did it, was to look at how to assess what people
25  know, how smart they are, what their beliefs are.
0290
1           So I did my master's, basically, in how to

Laux Lila F  - Vol  I.txt

2   evaluate the characteristics of people.  And you would
3   use that then, of course, in counseling and therapy,
4   which I didn't decide to go on and do.
5        Q.    Did you later get a doctorate in industrial
6   psychology?
7        A.    Right.  After I finished the master's in
8   applied psychology, I went back to Rice and got a Ph.D.
9   in industrial psychology.  But my specialty was in human
10  factors engineering, which is the application of
11  psychological principles to the design of everything
12  that human beings use, environments from -- anything
13  from -- anything from a toothbrush to a spaceship.  As
14  you know, I'm working on the new -- new spaceship,
15  that's going to replace the Shuttle, right now.
16       Q.    Could you explain, in layman's terms, what is
17  human factors engineering?
18       A.    Well, human factors engineering is considering
19  the human being just like any other component of a
20  system.  So how do you make the human fit into the
21  system?  Well, you know -- you may not know, but
22  originally, when typewriters were first developed, they
23  were developed with the keyboard we have today, the
24  QWERTY keyboard, to slow people down.  Because in those
25  days, if people could type really fast, what happened
0291
1   was, the keys got all jammed up.
2             So that was an example of applying a human
3   factors principle to the design.  Today we could
4   certainly redesign the keyboard to make it faster, but
5   we don't.  Why?  Because we know that too many people
6   are used to the QWERTY keyboard and it would -- you
7   know, they'd have to completely relearn.  So what we do
8   today is we provide the option for people to redesign
9   their keyboards to make them any way they want.
10       Q.    Do you have a curriculum vitae before you?
11       A.    Yes, I do.
12       Q.    And that's marked as Exhibit No. 3; is that
13  right?
14       A.    This one is 4.
15       Q.    And that sets forth your education,
16  experience, and background?
17       A.    Yes, it does.
18       Q.    And have you also written several papers?
19       A.    Yes, I've written a number of papers.
20       Q.    And are they related to hazard communication
21  and warnings, to any degree?
22       A.    Some of them are, yes.
23       Q.    Do you consider that an area of your
24  specialty?
25       A.    Well, it's one of the areas that I do the most
0292
1   work in, because I've been teaching a class about
2   warnings and how to evaluate warnings, at the University
3   of Wisconsin, twice a year for industry, for the last
4   16 years, I think.
5        Q.    And is that a class that students take, or is
6   that a class that corporations send representatives to,
7   to learn how to communicate hazards to people who are
8   buying the product?
9        A.    This is a class and it's a three-day seminar
10  in the School of Engineering Professional Development.
11  So companies send their engineers, their people who
12  write their manuals, their designers, all these kinds of
Page 121

Laux Lila F  - Vol  I.txt

13  folks, to take this class to learn how to develop the
14  material that needs to go in a warning, how to decide
15  what should be warned about, how to evaluate whether
16  their warnings are going to be good or not.
17       Q.   So is -- the focus of this class is to teach
18  individuals, who are working for corporations, on how to
19  write warnings for products?
20       A.   Well, not just how to write a warning, no.
21  It's how to determine what warnings need to be written;
22  where the warning should go; what the warning should
23  look like; how to test the warning and determine if it
24  works; if they're going to develop a symbol or a
25  pictorial, how to go about doing that; how to identify
0293
1  the appropriate user population that need to get the
2  information; how to figure out what the information is
3  they need.
4            It's a very complicated process -- or not
5  complicated, but complex.  There are many aspects to
6  figure.  You don't just walk in and draw up a warning
7  and stick it on the product.
8       Q.   Are there certain hazards that are open and
9  obvious and it's not necessary to warn?
10       A.   There are a few.  We have to know our
11  population.  We certainly know that once a child gets to
12  be a few months old, they are afraid of heights
13  naturally, so they're not going to crawl off the edge of
14  a cliff.  And most people who are not blind certainly
15  don't have to be warned of that hazard.  Sharp knives,
16  people have learned about sharp.  People have learned
17  about hot.  We learn those things as little children,
18  through often bad experiences, but we do learn.
19       Q.   And then as a corollary to that, that hazards
20  that are not open and obvious should be warned about?
21       A.   Well, if a hazard is not open and obvious but
22  it puts a person who's going to be exposed to the hazard
23  at risk and the risk is serious, then for sure they
24  should be warned about it.
25       Q.   And what other classes or professorships,
0294
1  assistant professorships, have you held in your career?
2       A.   Well, I -- I was a teaching assistant at the
3  University of Southwest Louisiana, and I taught there
4  during the time I was working on my master's.  And I
5  worked at the counseling center there, as the counselor.
6            And at Rice I was a guest lecturer and
7  associate researcher.  And at the Baylor College of
8  Medicine, I was assistant professor.
9       Q.   And what were you assistant professor in at
10  Baylor College of Medicine?
11       A.   In the department of community medicine, where
12  we were working with patients in the 11, I think,
13  community health clinics, and looking at how to teach
14  them about hazards, for instance, associated with
15  diabetes or associated with various medical devices they
16  had to use.  And we were also looking at how to teach
17  physicians how to communicate these hazards to their
18  patients more effectively.
19       Q.   Are you still involved in academia or working
20  in universities?
21       A.   Well, I do still go to the University of
22  Wisconsin twice a year to teach that class.  I still do
23  that.  And I'm still an adjunct at Baylor.  At least I
                        Page 122

Laux Lila F - Vol I.txt

24  think that I still am.  I usually get a letter every
25  year, and I don't remember if I've gotten one this year
0295
1   yet or not.
2        Q.    Do you have also have a business for -- called
3   Human Factors Consulting?
4        A.    Well, that's just me.  I'm -- I do this
5   consulting with industry and with attorneys, outside of
6   my regular work with this consulting company where --
7   who have sent me to Lockheed to work on the space plane.
8        Q.    Tell us briefly what you do with Lockheed
9   related to the space program.
10       A.    Well, I'm a consultant to the Lockheed human
11  engineering group.  And this last three months, I've
12  written three technical data sheets on how to assess the
13  handling qualities of a spacecraft, the human's ability
14  to handle the spacecraft, how to assist the workload
15  associated with flying a spacecraft and being in a
16  spacecraft, and how to assess whether they're going --
17  the astronauts are going to make errors in the inter- --
18  using the equipment and stuff that we've provided for
19  them in the -- in the spacecraft.
20            And those three technical data sheets will go
21  to NASA.  They have gone and will be discussed.  And
22  I've seen some additions from NASA already, some
23  responses and changes in our requirements, to
24  accommodate what's in those technical data sheets.
25       Q.    Has a significant portion of your work in
0296
1   these last 30 years been related to hazard communication
2   and how to warn or craft warnings for manufacturers for
3   related products?
4        A.    Well, I think it's a significant part.  As I
5   said, I've continued to teach that class at the
6   University of Wisconsin, even though I've left academia.
7            And, of course, when I was at Rice, most of my
8   work was concerned with that, either through contracts
9   we had with manufacturing companies like General Motors
10  or other companies that came to us for advice.  And so
11  most of my research was associated with that.
12       Q.    Have you been qualified to and testified as an
13  expert in court regarding warnings and hazard
14  communication?
15       A.    Yes, I have, both by deposition and at trial.
16       Q.    And have you indeed testified in many court
17  cases across the United States with regard to warnings
18  and hazard communication?
19       A.    I've probably testified in 10 or 12.  I
20  wouldn't say a lot, but, yes.
21       Q.    But you have been involved in how many cases,
22  over the years, where you have evaluated warnings or
23  hazard communications?
24       A.    Well, probably between a hundred and fifty and
25  250.  I -- I just don't know.  It's been 24 years, or
0297
1   however long.
2        Q.    Were you retained by the plaintiffs in the
3   Alexander/Cooper case?
4        A.    Yes, I was.
5        Q.    And what were you asked to do in that case?
6        A.    I was asked to evaluate the warnings and other
7   kinds of hazard information that were provided by Gulf
8   Stream to Ms. Alexander.
                        Page 123

Laux Lila F  - Vol  I.txt

 9      Q.   Did you review any materials related to that
10   case?
11      A.   Yes, a lot of materials.
12      Q.   Could you briefly tell us what kinds of
13   materials, what types of materials, you reviewed with
14   regard to the Alexander/Cooper case?
15      A.   Well, I was particularly concerned to know
16   what was known about the hazards associated with
17   formaldehyde, so the -- a lot of the research I did was
18   tracking down what's known about the hazards associated
19   with formaldehyde.
20           Then I was also interested in determining what
21   was known about the levels of formaldehyde in travel
22   trailers and other small, enclosed spaces, so I spent
23   some time tracking that down.
24           And then I was interested in knowing what
25   exactly -- what information exactly was provided to
0298
 1   Ms. Alexander, and so that was a part of what I looked
 2   at in the materials that were provided to me by you.
 3      Q.   And you understand that I am one of the
 4   attorneys representing Chris Cooper and Alana Alexander
 5   in this case?
 6      A.   Yes, I do know that.
 7      Q.   And you -- did you prepare a report in this
 8   case?
 9      A.   Yes.  I have it in front of me.
10      Q.   And what is the exhibit number on that report?
11      A.   No. 2.
12      Q.   And does that set forth your opinions in this
13   case?
14      A.   Yes, it does.
15      Q.   Well, one of the things you mentioned that you
16   reviewed are the hazards associated with formaldehyde.
17   Did you do some research on that?
18      A.   Well, I researched the literature to determine
19   whether there were -- whether it was known that there
20   were hazards or potential hazards associated with
21   exposure to formaldehyde and what the cost, the dose
22   response levels, would be.  In other words, at what
23   level does it begin to be hazardous and -- and -- and
24   what exposures are hazardous?
25      Q.   And then this aspect of reviewing the hazards
0299
 1   associated with formaldehyde, is that the same kind of
 2   steps that you would take, or you instruct your students
 3   to take in courses with regard to hazard communication,
 4   to be able to quantify what hazard there is?
 5      A.   Well, yes.  The first things you have to know
 6   is, you have to identify whether there is a hazard or
 7   not.  And the only way you can be sure of that is to
 8   look at all the research literature that's out there,
 9   to -- I mean, sometimes you can tell from the design.
10   If it's a stamping machine and there's no -- nothing to
11   guard the person's hands against the stamper, well, you
12   can pretty much predict, because we know from history,
13   that people will accidentally get their hands in there.
14   So you can see that hazard.
15           But in other instances, like off-gassing, you
16   have to go to the scientific literature and see what's
17   been discovered and what's known about the product and
18   what's been discovered through experiences, good and
19   bad, about people being exposed to formaldehyde or any
                          Page 124

Laux Lila F  - Vol  I.txt

20  other chemical.
21         So as far as chemicals are concerned, there's
22  a vast literature associated with understanding the
23  hazards to people and trying to figure out what the
24  hazards are and what levels of exposure create a hazard.
25     Q.   The step of reviewing the scientific
0300
1  literature about a particular hazard, that is something
2  you would do in your own practice, say, for example,
3  either as a consultant or working for industry?
4     A.   Oh, sure.  In fact, I've worked for the
5  Nuclear -- Nuclear Regulatory Commission, and we did a
6  big study on hazards associated with the design of the
7  control room.
8     Q.   And then after you assess what the hazard is,
9  then you -- do you examine how to best communicate that
10  hazard risk to the user, and what type of communication
11  would get their interest?  Is that kind of the process
12  that you follow?
13     A.   Well, the next aspect is going to be to
14  determine who's exposed to the hazard, so you have to
15  figure out who's your target population because you
16  don't want to just warn everybody willy-nilly.  You want
17  to figure out who's likely to -- to need the
18  information.
19         So you have to identify what we call the
20  target population, which is -- who's likely to be
21  exposed to the hazard; and, in this case, if it's
22  children, how to best communicate the information to
23  their caregivers.
24         So you're going to be looking at the
25  population of people who are going to be exposed to the
0301
1  hazard, and you need to consider their knowledge, the
2  levels of knowledge and education they have, their
3  language skills, how much comprehension they might have
4  about complex hazards that would be in the environment.
5  And based on all of that, then you would try to craft
6  the message that you would provide, targeting that
7  specific population.
8         So if I'm writing a warning about a chemical,
9  I might have several different target audiences, and I
10  might craft several different communications for those
11  different audiences.
12     Q.   Is it fair to say that it's three steps;
13  first, researching the hazard; second, identifying your
14  target population; and then, thirdly, crafting the
15  warner, or the hazard communication?
16     A.   Well, in a very general sense, yes.  But
17  researching the hazard, first identifying the hazard or
18  identifying the potential for a hazard.  And there's a
19  well-known method, called the failure modes and effects
20  analysis, or a hazard pattern analysis.  These are
21  all -- these have been around for 40 or 50 years.  For
22  any time you have a product, to go through and try to
23  identify all the potential points at which the -- the
24  user could be exposed to a hazard.
25         And then you have to do an evaluation:  Okay,
0302
1  how likely is that to happen?  How severe would it be?
2  What would the consequences be?  Is there some way to
3  recover from this hazard?  What does the person need to
4  know?  Do we need to change the design and instead
                        Page 125

Laux Lila F  - Vol  I.txt

```
 5   create a guarded system or, you know, a system that
 6   the -- where the potential for risk is lower.
 7        Q.   I had used the term "hazard identification,"
 8   but you'd also used the terms "failure mode and effects
 9   analysis" -- "failure modes effects analysis." Is that
10   the type of analysis you did in the case of Alexander/
11   Cooper that we're talking about today?
12        A.   Well, I certainly did a very abbreviated one,
13   because what we're talking about with the failure modes
14   and effects analysis is:  Where are the decision points
15   that someone has to make when they are being exposed to
16   a hazard?  And is there -- from -- from the human
17   failure modes, if you're talking about a car, the
18   failure modes might be that the brakes don't work or
19   the -- you know, the -- the turn lights don't come on,
20   that could be a failure mode.
21             When you're talking about the human
22   components, the failure mode is either the failure to
23   detect, the failure to know, the failure to understand,
24   the failure to take the proper action.  And if it's
25   that, then you try to figure out, okay, what was the
0303
 1   motivation, why did they fail to take the proper action.
 2             So in a human failure modes and effects
 3   analysis, then -- and criticality analysis, you have a
 4   slightly different approach than the traditional one,
 5   which looks at, okay, what's the likelihood of that
 6   piece of steel failing, and we can get a -- we can get a
 7   firm number on that.  We know that it's going to bend at
 8   10,000 pounds.  It's a little bit harder to get those
 9   numbers on human beings.
10        Q.   But the -- the analysis that you teach on
11   hazard communication in your courses that you've taught
12   in the past, is that the same type of analysis that you
13   used in this case of Alexander/Cooper?
14        A.   Yes.  But, of course, much abbreviated,
15   because I didn't examine all of the hazards associated
16   with this trailer.
17        Q.   The hazards that you were focused on was what?
18        A.   Was the potential for that harm based on the
19   exposure to formaldehyde which was off-gassing from the
20   components in the trailer.
21        Q.   And you had mentioned, you had done research
22   on formaldehyde and the risks associated with
23   formaldehyde.  Could you summarize, for the ladies and
24   gentlemen of the jury, what risks you saw associated
25   with exposure to formaldehyde?
0304
 1        A.   Well, based on the medical literature and the
 2   other literature that I looked at, the risks are
 3   increased aggravation of conditions like asthma and
 4   potentially a small risk of increased risk of cancer.
 5        Q.   Is that --
 6        A.   I think I didn't say that properly, but I
 7   think you understand what I mean.
 8        Q.   Is that something you routinely do in your
 9   practice, whether it is a case related to litigation or
10   not, is that you examine what the medical literature or
11   scientific literature says about a particular agent,
12   such as a chemical, to determine what the risk or the
13   hazard is?
14        A.   Yes.  And we have to do a lot of that when
15   we're working on the spaceship, for instance, because,
```

Page 126

Laux Lila F - Vol I.txt

16  you know, the different chemicals that are being used
17  are going to be off-gassing in space, and it creates a
18  significant hazard.  We have to be very careful what
19  materials we use, and what we select to go into the --
20  the crew cabin is really important because the air in
21  there is -- that's all the air they have.
22      Q.   Did the medical literature reflect any
23  particular hazard for individuals who have asthma and
24  formaldehyde exposure?
25      A.   Well, the literature suggests, and certainly
0305
1  suggests strongly, that there is a strong correlation
2  between exposure to formaldehyde and the worsening of
3  asthma conditions.
4      Q.   Did it say anything about formaldehyde in
5  children, in particular?
6      A.   Well, it called out for children and the
7  elderly and anyone with any kind of respiratory problem
8  as being at particular risk that's of -- of some
9  negative effects of formaldehyde.
10      Q.   Did you do any assessment as to what type of
11  information Alana Alexander received regarding
12  formaldehyde?
13      A.   Based on what she told me, the only
14  information she received about the trailer, at all, was
15  from the owner's manual.  And as far as she recalls, she
16  didn't receive any specific information about
17  formaldehyde until the December when she chose to move
18  out, and then she heard it from an acquaintance or a
19  colleague at work.  I can't recall who.
20      Q.   Well, let's be more specific.  Did Alana
21  Alexander tell you or did you become aware that she
22  received a owner's manual?
23      A.   Yes.  She told me she had gotten the owner's
24  manual.
25      Q.   And was this a owner's manual for a Gulf
0306
1  Stream travel trailer?
2      A.   Yes, it was.
3      Q.   And it's your understanding she was living in
4  a Gulf Stream travel trailer?
5      A.   Yes.  It was a 30-page manual about that
6  particular Gulf Stream travel trailer.
7      Q.   And did you review that owner's manual
8  carefully?
9      A.   Yes, I did.
10      Q.   Did you see any warning in that owner's manual
11  about formaldehyde?
12      A.   I didn't see any mention of formaldehyde or
13  bad air quality except when in terms of humidity.  That
14  was the only thing that was mentioned.
15      Q.   Earlier on today, there was a document that
16  was marked as Exhibit 8, "Important Information for
17  Travel Trailer Occupants."  Do you have that in front of
18  you?
19      A.   I do, right here.
20      Q.   And when Ms. Alexander was asked if she'd
21  gotten any written materials besides the owner's manual,
22  she denied receiving any such materials, didn't she?
23      A.   She told me that she certainly had no
24  recollection of having received anything in addition to
25  the owner's manual, which she still had.
0307

Laux Lila F  - Vol  I.txt

```
 1            And my belief is that if she had received
 2   additional material, she would have kept them with the
 3   owner's manual.  So my -- my belief is that her
 4   recollection that she didn't receive it, is probably
 5   accurate.
 6        Q.    And the same question if I ask you about
 7   Exhibit No. 9.  Do you have that in front of you?  It is
 8   a document entitled, "Important Formaldehyde Information
 9   for FEMA Housing Occupants."  Do you have that?
10        A.    I do.
11        Q.    Is it your understanding, when specifically
12   asked if she'd received any such document, she did not?
13            MR. DINNELL:  Objection, mischaracterizes her
14   prior to testimony.
15        A.    At the time that I wrote my report, my opinion
16   was based on her testimony that she had never received
17   anything like this.
18        Q.    (By Mr. Pinedo)  Okay.  And if she
19   testified -- if she testifies that she never received
20   anything like this, you wouldn't consider this as
21   something that would have put her on notice of a risk of
22   formaldehyde in the travel trailer, would you?
23        A.    If she didn't receive it, certainly not.
24        Q.    And the same would be true of the document
25   that's been marked as Exhibit 8, "Important Information
0308
 1   for Travel Trailer Occupants?"
 2        A.    If she didn't receive that or if she received
 3   it but didn't realize that it was information that she
 4   needed to, you know, look through and -- and respond to,
 5   which is -- you know, could be possible, if she'd been
 6   living in there for some time, that she might feel that
 7   she didn't need any additional information.
 8        Q.    During your deposition you were asked about
 9   various documents that Alana Alexander may have received
10   by the attorney for Gulf Stream.  Do you recollect that?
11        A.    I do.  Mr. Glass?
12        Q.    Mr. Glass.  Do you remember the attorney for
13   Gulf Stream saying anything like, it has been
14   established that Alana Alexander received a warning
15   similar to what is contained in your report, which we've
16   called the HUD warning, which is contained in 24CFR38 --
17   3280?
18        A.    My assumption is that he was talking to
19   that -- about that single page that seems to have been
20   added on to the end of the owner's manuals at some
21   point, but wasn't on the page that she received.  So if
22   he's relying on her having received that single page,
23   Page 31, of the owner's manual, which turned up in a --
24   in an owner's manual that I also got, she says that
25   wasn't the owner's manual she got.  And the one she --
0309
 1   that she gave us didn't have that on it.  So my opinion
 2   is that she never received any information about
 3   formaldehyde.
 4        Q.    Well, let's be very clear.  The owner's manual
 5   that Alana Alexander received on the Gulf Stream trailer
 6   did not contain anything about formaldehyde, did it?
 7        A.    Nothing.  It had 30 pages and nothing about
 8   formaldehyde.
 9        Q.    However, you did see a different version of a
10   owner's manual for a Gulf Stream travel trailer that had
11   a last page that had something about formaldehyde; is
```

Laux Lila F - Vol I.txt

12  that right?
13      A.    I did see the same owner's manual, and it was
14  exactly, except there was a Page 31 that had been added
15  on to the back, which was -- included most of that
16  warning that is in my opinions on Page -- whatever; but
17  which she said she did not receive and which was not on
18  the -- the manual that she provided to you and which you
19  provided to me.
20      Q.    And I'll represent that the manual that I gave
21  to you is the very same manual that she gave to -- to
22  us, her attorneys.
23      A.    Right.
24      Q.    When the attorney for Gulf Stream represented
25  that Alana Alexander had been established, in some
0310
1   regard, that she had received a warning similar to the
2   one you're talking about on Page 10 of your report, he
3   didn't tell you had it -- how it had been, quote,
4   unquote, established, did he?
5       A.    No, he didn't.  And certainly she doesn't --
6   if -- if he believes they did, she doesn't recall it.
7   And it certainly wasn't part of the owner's manual that
8   she provided to us.  What's on that Page 31 is just this
9   first part, the first paragraph of this health notice on
10  formaldehyde emissions that's in my report.
11      Q.    That's the paragraph that begins, "Some
12  building materials used in this home emitted
13  formaldehyde," and ends with the sentence, "Research is
14  continuing on the possible long-term effects of exposure
15  to formaldehyde"?
16      A.    That's correct.
17      Q.    Do you think it would be important for
18  somebody who is living in a travel trailer to be aware
19  of that, that some buildings materials used in this home
20  emit formaldehyde?
21      A.    Well, I think it's important, and I think that
22  you -- in order to make an adequate decision for her,
23  for the safety of her children, she had to be able to
24  make an evaluation about that.
25      Q.    Despite what the attorney for Gulf Stream said
0311
1   about what had been established, that Alana Alexander
2   received, are you aware that the president and CEO of
3   Gulf Stream, Jim Shea, testified under oath that Gulf
4   Stream never provided any warning information on
5   formaldehyde to the occupants of the travel trailers?
6       A.    I haven't seen that testimony, but you've told
7   me that.
8       Q.    Let's take a look at your report here.  Does
9   it set forth your opinions?
10      A.    Yes, it does.
11      Q.    And in addition to the scientific articles and
12  medical articles that you reviewed, did you review any
13  medical records for Chris Cooper?
14      A.    I did review what they had, not everything
15  that was -- had -- not all of his records were
16  available, because of Katrina, but I reviewed all the
17  records that were available.
18      Q.    Now, what do you mean, "not all of his records
19  were available," due to Katrina?
20      A.    I think some of the -- based on what I recall,
21  and I guess I could be wrong, some of his records had
22  been destroyed.
                          Page 129

Laux Lila F  - Vol  I.txt

23      Q.   Did you also ask Alana Alexander, Chris
24   Cooper's mother, about Chris Cooper's medical condition
25   before, after, and during living in the trailer?
0312
1        A.   Well, I didn't ask her about after, but I did
2    ask her about before and during, and she said that, you
3    know, he had asthma, she knew that; but that when they
4    were living in the trailer, it did get progressively
5    worse.
6        Q.   Did you see anything in the medical records
7    that would indicate something similar for Chris Cooper,
8    that while he was living there, there was a change in
9    his conditions related to asthma?
10       A.   I did see, in the medical records and then
11   also in the reports of the physicians, that he had had
12   to use the inhaler more frequently, that he had more
13   events, and that he also had actually been hospitalized
14   for an asthma attack during that time.
15       Q.   "During that time" would be the time that he
16   was living in the travel trailer?
17       A.   Yes.
18       Q.   And did it appear to you that his asthma was
19   exacerbated in the term that he was living in the travel
20   trailer?
21       A.   Well, I wouldn't make that conclusion, but the
22   doctors who reviewed his records did make that
23   conclusion, so I accept that, yes.
24       Q.   Do you have any opinion as to whether an
25   exacerbation of asthma is consistent with what you read
0313
1    in the medical records with regard to people with
2    preexisting asthma being exposed to formaldehyde?
3        A.   Yes.  I think that's fairly frequently in
4    the -- in the -- in the materials that I read about
5    formaldehyde, from the medical field, that people who
6    are exposed to it do experience worse asthma.
7        Q.   And at least the medical records you saw from
8    Chris Cooper, were they consistent with that?
9        A.   Well, he did get worse as he lived in the
10   trailer, so, yes, that is consistent.
11       Q.   When we look at your report on Pages 5, 6, 7,
12   and 8, do they set forth the various materials that you
13   have reviewed?
14       A.   Yes.  There are some things, in addition to
15   that, that I've reviewed since then.
16       Q.   And those materials, did they include various
17   standards for formaldehyde?
18       A.   Yes, they did.
19       Q.   And what is your understanding of the
20   standards with regard to formaldehyde?
21       A.   Well, my understanding is that there are a
22   variety of standards, depending on the length of
23   exposure and who you are and where you're getting
24   exposed.  So, you know, there are all kinds of standards
25   for exposure to formaldehyde.
0314
1        Q.   Do the standards change, the longer you are
2    exposed to formaldehyde?
3        A.   I think that's the ATSDR -- and I can't
4    remember if that's the right initials or not, but it's a
5    branch of CDC -- have recommended lower exposure levels
6    for people who are going to be exposed for longer
7    periods of time.
                          Page 130

Laux Lila F  - Vol  I.txt

8      Q.    And as you sit here today, do you happen to
9  recollect what any of those standards are, the longer
10  the period of time that you're exposed?
11      A.    Well, if I recall, it's .03 parts per million
12  for short term, like a couple of weeks; it's point --
13  oh, I think it's .008, maybe, for very long-term
14  exposure.  I'm not sure.  I'd have to go back and look
15  in the literature.
16      Q.    What are some of the other agencies that have
17  come out with standards with regard to formaldehyde
18  exposure?
19      A.    Well, OSHA has and HUD has, I know.
20      Q.    And OSHA standards are related to what type of
21  exposure?
22      A.    To workplace exposure for healthy adults who
23  are in the workplace.
24      Q.    And would you consider Chris Cooper as
25  somebody who would be under a different standard or some-
0315
1  body who would be under a different standard?
2      A.    Well, I -- if he's covered by any standard, it
3  certainly isn't that, since he isn't in the workplace.
4      Q.    Suffice it to say, you're not being offered
5  here today -- you're not offering opinions as a
6  toxicologist?
7      A.    No, I'm not.
8      Q.    You're aware of various standards that have
9  been published in the toxicological field with regard to
10  formaldehyde exposure, but your main focus is with
11  regard to the hazard communication of exposure to
12  formaldehyde?
13      A.    That's correct.  I've -- you know, I have the
14  NIOSH hazardous chemical exposure manual.  And, you
15  know, I can read it, and so can Gulf Stream.  And I can
16  go online and you find out what the American Congress of
17  Industrial Hygienists recommends, and I can go online
18  and find out what OSHA recommends.  But that isn't the
19  focus of my analysis.
20      Q.    And are your opinions summarized beginning on
21  Page 8 of your report?
22      A.    Yes, they are.
23      Q.    And was one of the main aspects of your
24  opinions is evaluating the behavior in the hazard
25  communication of Alana Alexander?
0316
1      A.    Well, not her hazard communication, no, but
2  her behavior in response to knowledge about hazards,
3  yes.
4      Q.    Do you believe that it was reasonable for
5  Alana Alexander to move into this travel trailer?
6      A.    Well, I think, you know, it was absolutely
7  reasonable and foreseeable.  She had no reason to
8  believe that there was -- that there was any reason why
9  she couldn't.  I mean, the government was providing it
10  to her and, you know, everyone she knew of, probably all
11  around her, were moving into them, and no one -- you
12  know, there was nothing to tell her that she shouldn't
13  do it.
14      Q.    Do you believe it was reasonable for Alana
15  Alexander to rely upon the written material in the
16  owner's manual in the Gulf Stream trailer that she had
17  received?
18      A.    Well, yes.  But I think it certainly would
                        Page 131

19   have been better if they had provided the information to
20   her in what we call a more salient way than expecting
21   her to go in and read the owner's manual from cover to
22   cover prior to making the decision.
23          Q.    In your work in hazard communication, do you
24   render your opinions based upon reasonable scientific
25   probability?
0317
1          A.    Yes.
2          Q.    And the opinions you're holding in this case,
3    are they all based on reasonable scientific probability?
4          A.    They are.  They're based on the research that
5    I and my colleagues have done over the last 25 years on
6    the way humans respond to warnings and how to develop
7    effective warnings and what to anticipate from humans
8    who are exposed to hazards and -- and are warned about
9    it.
10         Q.    So in asking you about your opinions, can we
11   have the understanding today that any opinions that you
12   are giving and telling today are based upon reasonable
13   scientific probability?
14         A.    That's my belief, yes.
15         Q.    And the opinions you have set forth in your
16   report are based on reasonable scientific probability?
17         A.    Yes, I believe they are.
18         Q.    Now, if we look at your third opinion, on
19   Page 9, it relates to whether or not she could smell the
20   fumes.  Could you describe for the ladies and gentlemen
21   of the jury what is the importance of whether or not she
22   could smell the fumes in the trailer.
23         A.    Well, it was important because that's an
24   olfactory warning.  I mean, I don't know, it's like we
25   put the gas -- the nasty smell in natural gas so that
0318
1    people can detect that there is something there that
2    that they need to pay attention to.
3                So, yes, she could smell it, and it was --
4    because she could smell it, she was probably being
5    exposed to too much formaldehyde.  But she wasn't aware
6    of the connection between what she smelled and the
7    hazard.
8          Q.    Did you see anything to indicate that
9    Ms. Alexander was warned that if she could smell it,
10   that she was being exposed to a toxic level of
11   formaldehyde?
12         A.    There was nothing in there that warned her
13   that if she was -- could smell it, she might be being
14   exposed to something hazardous.
15         Q.    Did you see any written warnings or any
16   written communication that high temperatures or high
17   humidity increased formaldehyde?
18         A.    No.  She didn't get that information.  It
19   doesn't increase formaldehyde, but it does increase the
20   off-gassing, so the percentage of formaldehyde in the
21   environment is going to be higher.
22         Q.    Let's turn to Opinion No. 5.  Was she
23   informed, in any way, with regard to long-term health
24   effects of exposure to formaldehyde?
25         A.    Not that I'm aware of, no.
0319
1          Q.    And what does Opinion No. 6 cover?
2          A.    Well, that was the -- a really critical piece
3    of the information because even if she had decided that
                              Page 132

Laux Lila F  -  Vol  I.txt
```
 4   it would be okay to accept the risk for herself, she
 5   wasn't informed that her child, who had asthma, could be
 6   at much greater risk than she was, which would have
 7   certainly influenced her decision about whether to move
 8   into the trailer or stay in the trailer, in my opinion.
 9        Q.    Do you have an opinion as to whether or not
10   she was informed of low levels of formaldehyde exposure
11   and the risks thereof?
12        A.    Well, she wasn't informed about anything about
13   the risk of the exposure to formaldehyde, low or high.
14        Q.    And why would it be important to be warned of
15   even low levels of formaldehyde exposure?
16        A.    Well, for instance, if it wasn't bothering
17   her, it wasn't making her eyes tear up or, you know,
18   irritating her nasal passages, she might have assumed
19   that the level of exposure was okay for herself and for
20   her children, when, in fact, particularly with regard to
21   her child, it probably wasn't okay.
22        Q.    Let's talk about the conduct of Gulf Stream
23   generally and then specifically with regard to the
24   warnings or hazard communication.  But let me ask you
25   this:  Did you examine the written materials that Gulf
0320
 1   Stream supplied regarding warnings?
 2        A.    Well, I examined the -- the owner's manual,
 3   yes.
 4        Q.    And --
 5        A.    As far as I know, that was it.
 6        Q.    And how would you summarize what Gulf Stream
 7   knew or should have known with regard to the risks of
 8   formaldehyde in this travel trailer?
 9        A.    Well, I believe they did know about those
10   hazards because, you know, for one thing, they put
11   specifications about formaldehyde on the -- the
12   components that they bought to put into the trailers.
13        And at some point, they actually put a warning
14   on the manual, about formaldehyde.  And this warning
15   about mobile homes had been out for quite some time, so
16   people were aware that there was a potential hazard
17   associated with the formaldehyde that was being
18   off-gassed from the materials that were buying to put
19   into the travel trailers.
20        Q.    Do you have an opinion as to whether or not
21   Gulf Stream knew or should have known that people would
22   be living in these trailers for an extended period of
23   time?
24        A.    Well, I don't think that's my opinion.  I
25   mean, I think that was exactly why they were being
0321
 1   provided with these trailers after Hurricane Katrina,
 2   when there was such massive damage to the environment.
 3   There was no possibility that people, everyone who got a
 4   trailer, was going to be able to get out of there in a
 5   couple of weeks.
 6        Q.    Do you have an opinion as to whether Gulf
 7   Stream knew or should have known that extended exposure
 8   to formaldehyde increased the risk of injury or harm?
 9        A.    Well, I certainly believe they should have
10   known that, that's right.
11        Q.    And what's the -- the basis for your opinion
12   on that?
13        A.    Well, the medical literature was certainly
14   there.  The HUD warning was there.  The OSHA standards
```
Page 133

Laux Lila F  - Vol  I.txt

15   were there.  So, you know, by any reasonable method,
16   they should have -- if they hadn't been directly
17   informed by someone, they should have been finding that
18   information.
19           They were using these products.  They knew
20   that they were buying products that had limited
21   off-gassing requirements, so they must have understood
22   that, at some level, formaldehyde off-gassing created a
23   hazard.  Otherwise, why would they have been requiring
24   their suppliers to provide them with materials that had
25   specific lowish levels?
0322
1        Q.    When you say they knew or should have known
2    about the HUD standard, how long has the HUD standard
3    been in existence?
4        A.    Well, I don't know.  In its present form, it's
5    been in existence since '93, I think.  In its -- and it
6    was originally promulgated in '84, I think.  And the
7    final version, that we have now, has been updated in
8    '93.  So at least since then, they knew this, for sure.
9        Q.    At least since what year?
10       A.    '93.
11       Q.    And when we say "the HUD standard," that
12   applies to manufactured homes, which are different from
13   travel trailers; is that right?
14       A.    Yes.  There is no emissions standard for
15   travel trailers, that I'm aware of.
16       Q.    And then the medical literature, how far back
17   does the medical literature go back, talking about the
18   risks of formaldehyde exposure?
19       A.    You know, I don't know.  Pretty far back.  Not
20   everything from the early days is available online, and
21   I hadn't gotten a chance to get to the medical school
22   library, which I probably will do.
23       Q.    Did you see any articles back from the '80s
24   and '90s?
25       A.    Oh, yes, there are articles from the '80s and
0323
1    '90s.
2        Q.    Do you have an opinion as to whether or not
3    Gulf Stream knew or should have known that people living
4    in this travel trailer would be able to determine
5    whether or not they were indeed being exposed to a toxic
6    level?
7        A.    Well, I don't think that takes a whole lot of
8    expertise to determ- -- to know that people who are not
9    sophisticated in chemistry and toxicology would not
10   understand that a trailer that they were being supplied
11   to live in would present a hazard to them or how to
12   evaluate whether there was a hazard.  I just can't
13   imagine that any company could assume that they would be
14   that sophisticated.
15       Q.    Do you have an opinion as to whether or not
16   Gulf Stream knew or should have known that water damage
17   would increase the formaldehyde off-gassing?
18       A.    Well, they should have known it, yes.
19       Q.    And that's based upon what?
20       A.    Well, that's based upon the information that's
21   out there in the literature.  You know, and companies
22   have a responsibility to be checking on, you know,
23   what's being published about their products.
24       Q.    And do you have an opinion as to whether or
25   not the small size of the trailer and the off-gassing,
Page 134

Laux Lila F  - Vol  I.txt

0324
1    whether Gulf Stream knew or should have known that that
2    presented a particular hazard or risk?
3         A.   Well, it's more than just the small size.
4    It's the fact that there's so much formaldehyde
5    off-gassing material in there, and that the temperature
6    and humidity are high, and that the ventilation in these
7    trailers is not exceptionally good.
8         So there's a confluence of factors which would
9    lead them, if they did the analysis, to realize that
10   there's a good possibility that if they're putting these
11   products that have formaldehyde in them into this space,
12   this 320-square-foot trailer -- in hot, humid south
13   Louisiana -- that there was a pretty good chance that
14   there would be excessive, what I consider excessive or
15   at least potentially hazardous, off-gassing of
16   formaldehyde into that trailer.
17        Q.   And what should have Gulf Stream done with
18   regard to their written materials?
19        A.   Well, certainly they should, as I've said, at
20   least have put in the information that was in the HUD
21   health information.
22        But, you know, in my opinion, the thing they
23   should have done was to have alerted the person who was
24   moving into the trailer to the fact that there was going
25   to be formaldehyde off-gassing.  And then particularly
0325
1    if they were moving in with children or elderly people
2    or people who were ill, they needed to be sure that the
3    level of formaldehyde wasn't going to be harmful to
4    them.
5         Now, how could they be sure?  That's --
6    that's -- you know, that's not the easiest thing in the
7    world to be sure of.  If you can smell it, maybe you are
8    being exposed to it, but -- at a dangerous level.  But
9    just relying on smell is not adequate either, since
10   people lose their sense of smell for these chemical.
11        So, you know, to me the warning should have
12   said:  You need to have these levels checked out to
13   determine if you're being exposed to a level that could
14   put you or your dependents at risk.
15        MR. PINEDO:  Let's go off the record, change
16   tapes.
17        THE VIDEOGRAPHER:  This ends Tape No. 5 in the
18   deposition of Lila Laux.  The time is 19:27:32.
19        (Recess taken from 7:27 p.m. to 7:30 p.m.)
20        THE VIDEOGRAPHER:  This marks the beginning of
21   Tape No. 6 in the deposition of Lila Laux.  Time is
22   19:30:07.
23        Q.   (By Mr. Pinedo)  I'm looking again at your
24   report.  Do you have an opinion as to whether or not the
25   warnings and instructions that were provided by Gulf
0326
1    Stream to the occupants of this trailer were reasonable?
2         A.   Well, I can't testify about all the warnings
3    and instructions, but certainly there were no warnings
4    instructions about formaldehyde off-gassing and the
5    potential hazard associated with that in this trailer.
6         Q.   So would you consider that unreasonable?
7         A.   I would consider that unreasonable.
8         Q.   Let's talk about the HUD warning.  What is
9    your understanding that, in a manufactured home, where
10   or how this warning is supposed to be displayed?

Page 135

11    A.    Oh, it's -- according to this Title 24CFR,
12 it's supposed to be either on the kitchen cabinet door
13 or on the counter, and it's in a very obvious place.
14 And, let's see, what does it say:  Displayed in a
15 temporary manner in the kitchen; for example, countertop
16 or exposed cabinet face.
17    Q.    And you reviewed over 400 photos of this
18 travel trailer that Alana Alexander was living in?
19    A.    I did.
20    Q.    And did you see any warning posted in the
21 kitchen or anywhere inside it?
22    A.    No.  But I wouldn't have expected this to have
23 still been there at that point, anyway.
24    Q.    But at least when you talked to her, what did
25 she say about any warning she got on formaldehyde?
0327
1    A.    She got nothing on formaldehyde.  And
2 certainly she didn't get this one posted on the -- in
3 the kitchen.
4    Q.    And you would consider a warning posted on the
5 kitchen as to be more likely to be heeded than something
6 that would be hidden in a manual on Page 31 or Page 34?
7    A.    Well, I certainly would expect everyone who
8 goes into this trailer is going to go into the kitchen.
9 You -- you have to go into the kitchen to go back and
10 forth, for one thing, because it's sort of in the center
11 of the kitchen -- in the center of the trailer.
12    Q.    Let's take a look at your second opinion on
13 Page 10.  Do you have that in front of you?
14    A.    Second opinion on Page 10?  Yes.
15    Q.    And I remember earlier that the Gulf Stream
16 attorney described this as his favorite opinion.  Do you
17 recollect something like that?
18    A.    "The warnings and instructions that were
19 provided by Gulf Stream to the occupants of the Cavalier
20 trailer failed to alert [her] to the hazard Gulf Stream
21 could reasonably expect she would be exposed to upon
22 moving into the travel trailer"?
23    Q.    Well, let me direct your attention to the
24 opinion that's Marked No. 17.
25    A.    All right.
0328
1    Q.    And the last sentence there, could you please
2 read that to the ladies and gentlemen of the jury.
3    A.    "Failure to provide adequate warnings and
4 instructions was unconscionable and showed a disregard
5 for the health of the people who used their travel
6 trailers after Katrina."
7    Q.    Is that your opinion?
8    A.    Yes, it is.
9    Q.    And what do you mean, it's unconscionable?
10    A.    I mean that it's -- it -- you know, that they
11 were aware of this, but they just didn't bother to
12 communicate to the people who were going to be exposed
13 to this hazard.  And I think that they have a duty to
14 alert people to this kind of hazard and their exposure,
15 particularly when there are children involved.
16    Q.    Do you have an opinion, and I'm trying to
17 summarize here, whether or not this trailer was safe for
18 Alana Alexander to move in with her child, Chris Cooper?
19    A.    No, it wasn't safe for her to move in.  If
20 there was formaldehyde off-gassing in this trailer,
21 which I have to assume there was, then it wasn't safe

Page 136

Laux Lila F  - Vol  I.txt
22   for him to be in there.
23        Q.    Do you consider this trailer to be
24   unreasonably dangerous for Chris Cooper and Alana
25   Alexander?
0329
 1        A.    Well, those are not terms I would use, but
 2   they -- I certainly do consider it to be dangerous to
 3   them.  And it's unreasonable because they didn't have to
 4   be exposed to it.  And if they had been aware of the
 5   hazard, I think they wouldn't have been exposed to it.
 6   That's where the unreasonableness comes in, to me.
 7        Q.    And the danger you're talking about is the
 8   danger of being exposed to formaldehyde?
 9        A.    Yes, particularly for him, with his asthma.
10   You know, asthma can be deadly.
11        Q.    Do you have an opinion as to whether or not
12   Alana Alexander would have moved into this trailer if
13   she had known about the risks of formaldehyde and the
14   health hazard that posed for people with asthma?
15        A.    I believe, based on what she told me and based
16   on the fact that I think she's a reasonable human being,
17   that she would not have, particularly because I know
18   that she had other options.
19        Q.    And it is -- do you have an opinion as to
20   whether or not she would have moved in, in the first
21   place, if she had been adequately warned about the risks
22   of formaldehyde with this particular travel trailer?
23        A.    Well, if she had known before she made the
24   decision to move in, I believe she would not have moved
25   in.  And certainly, no, she could have been alerted
0330
 1   prior to moving into the trailer.
 2        Q.    Do you believe that you were provided
 3   sufficient information to render and base your opinions
 4   in this case thus far?
 5        A.    I do believe so.  Not -- not that you provided
 6   it, but that I have been able to get the information I
 7   needed.
 8        Q.    And you understand there was a class
 9   certification procedure prior to your being involved in
10   this case?
11        A.    That's what you told me, yes.
12        Q.    And you were not asked to render any opinions
13   in the class certification stage, were you?
14        A.    No, I wasn't.
15        Q.    And you haven't seen any of the opinions of
16   the defense experts in the class certification stage?
17        A.    No, I haven't.
18        Q.    But you believe the information you have
19   reviewed was sufficient for you to form opinions in this
20   case?
21        A.    I do believe that I can form a reasonable
22   opinion in this case, based on the information that I --
23   you -- you provided me and that I was able to retrieve
24   myself.  And my training and experience.
25            MR. PINEDO:  Pass the witness.
0331
 1            MR. DINNELL:  Do you want to say anything?
 2            MR. PERCY:  We reserve the right to redepose
 3   the witness if and when she renders any opinions on
 4   manufacturers other than Gulf Stream.
 5            MR. PINEDO:  Well, let's just be clear, the
 6   manufacturer you're representing today is?
                            Page 137

Laux Lila F  - Vol  I.txt

```
 7             MR. PERCY:  Keystone.
 8             MR. PINEDO:  Okay.  I'm not necessarily
 9    agreeing to bring her back, on your reservation or any
10    other manufacturer.  I will agree with regard to
11    Keystone.
12             MR. PERCY:  Well, and Jason Bone, who had to
13    leave to catch a plane, wanted me to make the same
14    reservation on his behalf, so I'll do that.  He's Forest
15    River.
16                      EXAMINATION
17    BY MR. PERCY:
18        Q.   But you've not rendered any opinions as to
19    Forest River, either, have you?
20        A.   You've seen them all.
21        Q.   Well, is the answer to the question:  No, I
22    have not rendered any opinions as to Forest River?
23        A.   Yes, that's the -- that's the answer.
24             MR. PERCY:  Thank you.
25             MS. DAIGLE:  We'd like to make the same
0332
 1    reservation as to Heartland.
 2             MR. MULCAHY:  And the same for our clients,
 3    Recreation By Design.
 4             MR. PINEDO:  Nothing further.
 5             THE VIDEOGRAPHER:  This -- this Tape No. 6 in
 6    the deposition, and also ends the deposition of Lila
 7    Laux on May 29th, 2009.  The time is 9:37:15.  We are
 8    off the record.
 9             (The deposition concluded at 7:37 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0333
 1             I, LILA F. LAUX, Ph.D., the witness in the
 2    above deposition, do hereby acknowledge that I have read
 3    the foregoing transcript of my testimony and state under
 4    oath that it, together with any attached Amendment to
 5    Deposition pages, constitutes my sworn testimony.
 6             I ( ) have ( ) have not made corrections
 7    on the attached Amendment to Deposition form.
 8
 9             _____
                 LILA F. LAUX, Ph.D.
10
11
         Subscribed and sworn before me this
12
    _____ day of _____, 2009.
13
14       My commission expires:_____
```

Page 138

Laux Lila F  - Vol  I.txt

```
15
16        _____
                   NOTARY PUBLIC
17
18
19
20
21
22
23
24
25
0334
1    STATE OF COLORADO)
                     )      ss.
2    COUNTY OF DENVER )
3               THIS IS TO CERTIFY that the deposition of
4    LILA F. LAUX, Ph.D., was taken before me, Carla D.
5    Capritta, Registered Professional Reporter and Notary
6    Public within and for the State of Colorado.
7               THAT SAID DEPONENT WAS, by me, previous to
8    examination, duly sworn to testify to the truth, the
9    whole truth, and nothing but the truth in said cause.
10              THAT THE TESTIMONY of said deponent was
11   reported by me, in shorthand, at the time and place
12   herein set forth, and was thereafter reduced to
13   typewritten form; and that the foregoing constitutes a
14   full, true, and correct transcription.
15              I FURTHER CERTIFY that I am not related to
16   or otherwise associated with any of the parties to said
17   cause of action, and that I am not interested in the
18   result of the event thereof.
19              WITNESS MY HAND and official seal this
20   6th day of June, 2009.
21              My commission expires May 23, 2013.
22
23              _____
                Carla D. Capritta, RPR
24              579 South Washington Street
                Denver, Colorado  80209
25
```

Page 139