UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION

MDL NO. 1873

SECTION "N-5"

JUDGE ENGELHARDT
MAG. JUDGE CHASEZ

THIS DOCUMENT IS RELATED TO:
*Lyndon Wright v. Forest River, Inc., et al.*
Case No. 09-2977 (E.D. La.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER
REGARDING TESTING OF THE PLAINTIFF LYNDON WRIGHT'S TEMPORARY HOUSING UNIT**

**MAY IT PLEASE THE COURT:**

Plaintiff Lyndon Wright (hereinafter "Plaintiff" or "Wright"), through undersigned counsel, respectfully brings this Opposition to Defendants' Motion for Protective Order regarding the testing of his emergency housing unit ("EHU") filed by Defendants Forest River, Inc. ("Forest River") and Shaw Environmental, Inc. ("Shaw") on or about June 18, 2009 in response to a testing protocol submitted by the Plaintiff on or about June 9, 2009.

   **I.   Background and Argument**

As the Court is aware, the PSC and Forest River reached an agreement nominating Lyndon Wright as the first Forest River trial plaintiff, and on or about April 6, 2009 the Court rendered Pre-Trial Order No. 34, which confirmed Wright as the Forest River trial plaintiff.  This determination was based on several factors including the fact that Mr. Wright's unit had been professionally tested via air sampling by the PSC.  However, the existence of an air sample should in no way be interpreted to mean that the PSC has had any opportunity to conduct destructive testing, non-destructive testing, or even a simple

1

walkthrough inspection. In fact, no member of the PSC or affiliated attorney has even seen the Wright EHU other than one photograph. This is contradictory to any assertion by any defendant that Plaintiffs have had any opportunity to inspect or test the EHU. The EHU is currently in the possession of the United State and the Federal Emergency Management Agency ("FEMA") in Melville, Louisiana, and has been in FEMA's custody since at least the fall of 2008, and certainly since the designation of Wright as the Forest River trial plaintiff. Contrary to any assertions otherwise, the Plaintiffs' Steering Committee ("PSC") has tested thousands of trailers and avers that it would be cost prohibitive for it to have conducted thorough inspections on all of them.

      The destructive testing protocol was invited and anticipated by this honorable Court and during a status conference in March, 2009, with additional discussion at a subsequent May 8, 2009 status conference, the Court advised all parties that it envisioned destructive testing for the Forest River trial and that a destructive testing protocol should be submitted. Pursuant to this Court's instruction, the Plaintiff undertook significant effort and time to prepare a proposed and thorough testing protocol that both articulated the required efforts necessary to accomplish effective sampling, testing and inspection, but also, at the request of defendant Forest River, an explanation of the reasons for the proposed sampling. This resulted in a sixteen page testing protocol (attached hereto as Exhibit "A") that discusses in detail the contemplated inspection, sampling and testing of the Forest River EHU. This protocol was circulated to Defendants on or about June 9, 2009 following several days of discussions and final clarifications between the parties. The PSC anticipated comment on the proposed protocol, and envisioned some modification based upon the input of defendants and their own experts within an acceptable time period. Further, the testing protocol submitted and circulated by the Plaintiff articulates the sharing of test results and component part samples with defendants and their experts. In fact on page 12 of the protocol, under d(i) it states that "[t]he samples will be cut in half and provided to defense for their own testing."

      Rather than cooperate and discuss the proposed protocol with the PSC to come to an agreeable resolution, defendants filed their Motion for Protective Order on or about June 18, 2009. At this point

Plaintiff has received no comment or further communication on the proposed protocol by the defendants. The PSC welcomes any comment by Defendants on the proposed protocol and believes that a defense testing protocol would be a sensible response, rather than seeking a protective order on testing which was anticipated by this Court.

Any argument by the defendants that the protocol was untimely submitted is misleading and untrue. There was no undue delay by the Plaintiff in developing this protocol. Instead, the Plaintiff's counsel developed a well articulated and precisely explained protocol that more completely illuminated the anticipated testing and the rationale therefore, and giving a 30 day lead time for comment by the defendants. The defendants have had significant time to identify and enlist experts in anticipation of the testing protocol being circulated. Further, there is ample time for defendants to comment on the proposed protocol. Any argument by the defendants that they have somehow been prejudiced or exposed to extreme or undue burden or hardship is nonsensical. It is important to note that Exhibit "I" attached to the defendants' Motion for Protective Order (and attached hereto as Exhibit "B") is dated May 4, 2009 and clearly gives 30 days to circulate the testing. Plaintiff Wright acknowledges that the protocol was circulated 34 days after this email was circulated, but that should not be preclusive of allowing testing, and certainly does not encompass any gross delay by the Plaintiff as the defendants would want this Court to believe. Plaintiff could have timely circulated an incomplete protocol, but the belief was that a more fully developed protocol facilitate cooperative efforts to reach a workable compromise protocol.

As to several of the issues raised in the defendant's Motion for Protective Order, many of these issues can be worked out by mutual consent, or are simply based upon inaccurate representations by the defendants. For instance, the defendants point out that the trailer is to be hauled by unspecified means to an unidentified location for testing and disassembly. This is inaccurate; a reading of p. 12 of Exhibit A clearly states: "It is to be understood all samples taken will be removed from the Trailer and the FEMA storage facility for off-site testing and storage." There is a big difference between component part testing, to take place off-site, and the trailer itself being taken off-site to be tested. This distinction is particularly

3

important since, as has already been articulated, the Plaintiff will share equal samples of any parts removed from the trailer with the defendants so they can conduct their own testing with identical component parts.

Plaintiff feels compelled to respond to an argument articulated by defendants in their Motion for Protective Order at page 8, wherein they state:

> Forest River and Shaw would add one more point relating to the "big picture" that should weigh against the plaintiff's protocol. Defendants agreed to try these bellwether candidates based on the information contained in the Plaintiff Fact Sheets ("PFS"), including *inter alia*, the results of any testing for formaldehyde.

This assertion and argument is ridiculous. Plaintiff Wright is now responding to his second set of additional discovery requests that develop and expand upon the information contained in his PFS. To follow this line of argument, Plaintiff Wright should be able to refuse to answer any discovery that is beyond the immediate scope of his PFS. The Plaintiff should certainly be allowed to further develop his own case.

As for the objections for active and passive indoor air monitoring, the defendants have not submitted any proposals of their own as to how the air testing should be accomplished. They merely object to the method proposed by the plaintiffs. Naturally, if the defendants feel there are issues relevant to the appropriateness of the methods employed by the plaintiff to test the air quality, these will be issues suitable to point out at trial of the matter. Additionally, the defendants' complain about a materials audit of the interior and exterior component parts of the EHU to be completed throughout the inspection. The defendants erroneously conclude that this audit will include destructive testing. No destructive testing will be done in the Plaintiff's protocol until after all the walkthrough inspections, video documentations and air testing have been completed. In fact, the destructive testing is specifically set forth to occur after all parties have been allowed to do whatever non-destructive testing they deem appropriate. This is specifically in appreciation that all parties should have equal opportunity to examine, inspect and test the unit prior to destructive testing commences, as it will irrevocably alter the make-up of the EHU.

The defendants contend that the PSC, again by unspecified means, intends to jack up the unit and place it on blocks. It has been repeatedly stated to the defendants that the Plaintiff intends to employ the jacking protocol as set forth by Shaw, Fluor or the Federal Government for the methods that they used in jacking the Trailer and placing it on blocks prior to Wright's occupancy. The PSC is in possession of a jacking protocol purportedly implemented by Fluor, but Shaw has been unable to give any direction or documentation related to jacking of EHUs. Communications on this issue with counsel for Shaw are attached as Exhibit "B", and clearly show that the Plaintiff requested from Shaw specific information relating to the jacking methods employed by Shaw, and attached the Fluor jacking procedures. The PSC has received no response on this issue, and as such, must approximate how Shaw installed the trailers on concrete blocks based on information provided by Fluor Enterprises, Inc. Despite this, the protocol on page 10 discusses jacking the trailer "according to Installation Drawings and Guidelines." The Plaintiff cannot be faulted for a lack of production by the defendants.

The assertions by the defendant that the testing protocol proposed by the PSC is costly, time-consuming and ultimately irrelevant would beg the question as to why the defendants would complain if it is ultimately irrelevant. If it is ultimately irrelevant, and they are correct, they do not have to employ any of the same testing protocol. If the PSC spends money needlessly, how does that prejudice the defendants? Also, the defendants erroneously state that as with the Gulfstream and Fleetwood units, the Plaintiff already has a formaldehyde level obtained while the EHU was tested at the Plaintiff's residence and therefore additional testing is meaningless and unnecessary. As this honorable Court discussed in its ruling granting the preemption motion brought by the non-litigation defendants (Doc. 1629), that HUD examination of single ambient air readings to be "inappropriate as the level of formaldehyde…varies with the temperature, ventilation, humidity and living habits of the owner." See, Doc. 1629, p. 20. Importantly, these factors, coupled with a degradation of the formaldehyde off-gassing over time support the need for multiple tests and multiple results to determine how the environmental factors impact curve applies to this EHU, as has this Court has recognized that one reading only gives a snapshot, and that

5

multiple readings may be necessary to determine actual levels of formaldehyde to which Plaintiff Wright was exposed.

In addition to this Court's examination of moving formaldehyde levels based upon environmental factors, the defendants' own expert, Mike Zieman of RADCO, a formaldehyde testing group, states in a July 9, 2004 email that: "Rule of thumb: The HCOH [Formaldehyde] level doubles for every 12 °F increase in temperature." (This email is attached hereto as Exhibit "C"). If defendants' own testing expert states that there is a doubling of formaldehyde level for every 12 degree change in temperature, there is certainly a need to see multiple readings in this unit. The initial test was conducted in October, 2008 and a subsequent test in July would be taken under very different environmental conditions.

## II. Summary of Existing Information on the Science of Formaldehyde Emission from Pressed Wood Products

As the Court is aware, indoor formaldehyde emissions from pressed wood products containing urea formaldehyde are well known and have been documented for decades. It is indisputable that formaldehyde emission rates from urea formaldehyde pressed wood products vary in relation to temperature and relative humidity levels. Further, the following points are specific to the need for testing in Wright's trailer:

A: Lyndon Wright's Travel Trailer contains pressed wood products and formaldehyde that was measured in the air within the Trailer. Further testing will provide much data required to determine the initial steady state concentrations of formaldehyde gas within the EHU and help determine the off-gas rate or decay curve of the formaldehyde contained in the EHU. The following pieces of information are necessary to accomplish this: (1) a catalogue of the indoor components that emit formaldehyde, (2) the surface area of those components, (3) any barriers or surface coverings over those indoor components; and (4) the surface area of the barriers/surface coverings. This data is unavailable at this time.

B: Formaldehyde emission rate equations, also known as formaldehyde emission rate data for each indoor pressed-wood products, describe the emission rate as a function of indoor concentration. Because the pressed wood components within the EHU have not yet been

6

catalogued, and because the defendants cannot adequately detail what pressed wood components are in the EHU and who the manufacturers were, it is not know at this time what the emission rates for these particular wood products is within Wright's EHU. Also, the average and range of air exchange rate values of the EHU are unknown at this time. The air exchange rate data is scheduled to be collected and is part of the protocol set out by the Plaintiff in the protocol sent to the defendants.  This data will need to be combined with the Plaintiff"s specific information to determine the average and range of air exchange rates experienced during the period of occupancy.

The PSC wood science expert, Dr. Stephen Smulski, in his expert report for the Gulf Stream trial (attached hereto as Exhibit "D") articulates and expounds upon these points and states in his affidavit at paragraph 6:

> I am aware that the release of formaldehyde gas from wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood is greatest in newly-manufactured products and that, after being placed in service, the release of and concentration of formaldehyde gas in the air inside buildings or structures containing these products depends on the age and number of sources, the volume of air inside the building or structure, and on the air temperature, relative humidity and air exchange rate (i.e., ventilation).  The release of formaldehyde gas from these products increases as temperature and relative humidity increase.  The concentration of formaldehyde gas inside a building or structure containing these products also increases as the number of sources increases and as the volume of the building or structure and the air exchange rate (i.e., ventilation) decreases.

The defendants also argue that the protocol seeks to test under "fabricated conditions" by closing the unit off prior to testing with the air conditioning off.  Plaintiff would simply counter by stating that any time Wright left for work, he would close his unit and would have the air conditioner off, and thus would be exposed to whatever accumulated levels were present upon his return home after his work day ended, sometimes 12-14 hours later.

For the Court's edification we invite review of an article introduced during William Scott's, a Plaintiffs' Expert, June 11, 2009 deposition.    It is an article taken from the Forest Product's Journal volume 40, number 6, *Long-term study of Formaldehyde emission decay from particleboard*, Zinn, et al.

7

(attached hereto as Exhibit "E"), in which the characteristics of wood panel formaldehyde emissions are outlined and graphed. From the deposition and from a review of the article, it is apparent that formaldehyde emission levels from particleboard can be expected to decrease over time. Also, that the rate at which emission levels decrease is not constant, but diminishes with time. Generally, formaldehyde emission levels decrease linearly with respect to the natural log of time, however the decay of panel emission levels with respect to time of these medium density particleboards can be strongly related to initial emission levels. Consequently, it is necessary for the plaintiffs to catalogue and identify the types of wood products that were used in Lyndon Wright's Trailer so that an accurate model can be demonstrated to the jury depicting what in all probability Mr. Wright's exposure level while he lived in the Trailer actually was.

Because of these reasons, the PSC is requesting that they be allowed to do additional air sampling so that they have more information to put into the equation to determine what the real exposure levels were during Mr. Lyndon Wright's occupancy of the Trailer.  Further, limiting testing would unjustly hand-cuff the Plaintiff and prevent the finder of fact from examining crucial data in the instant case.  Most importantly, this Court has anticipated destructive testing, and any argument that the defendants were surprised by the submission of the proposed test protocol is simply untrue.

Plaintiff Lyndon Wright, for the reasons articulated herein, believes that additional testing is absolutely necessary for a complete understanding of his EHU and the various exposures he was subjected to, and that the defendants' Motion for Protective Order should be denied.  Further, Plaintiff prays that this Court extend the expert report deadline to accommodate for the delay caused by the Motion for Protective Order or accelerate it consideration of the Motion and this Opposition to allow for timely testing and inspection.

RESPECTFULLY SUBMITTED:

**FRANK J. D'AMICO, JR.,
APLC**

BY:   s/Frank J. D'Amico, Jr.
FRANK J. D'AMICO, JR., T.A. (#17519)
AARON Z. AHLQUIST (#29063)
**FRANK J. D'AMICO, JR., APLC**
622 Baronne Street
New Orleans, LA 70113
Telephone:   (504) 525-7272
Fax:              (504) 525-952
*Counsel for Lyndon Wright*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

s/Frank J. D'Amico
FRANK J. D'AMICO, #17519