# FEMA - FOREST RIVER TRAILER

## INSPECTION AND TESTING PROTOCOL

In Re:     FEMA Trailer Formaldehyde Products Liability Litigation
Untied States District Court, Eastern District of Louisiana
MDL No. 1873

---

The Plaintiffs' Steering Committee ("PSC") will inspect and test the travel trailer resided in by Plaintiff Lyndon Wright, Forest River Trailer, VIN # 4X4TSMH296C008992, ("The Trailer"). The Trailer is currently located at a FEMA Storage Facility in _____, Inventory Location: _____-Lot _____.

1. Inspections:
   a. General
      i. Once FEMA has identified the Trailer, FEMA should document whether the Trailer doors and/or windows were found in the open or closed position;
      ii. If any doors and/or windows are found in the open position, FEMA should will place them in a closed position;
      iii. The Trailer is to be moved to a separate location at the FEMA facility by FEMA for the purposes of facilitating all parties access to the Trailer for testing;
      iv. The location of the Trailer for testing should have an area large enough to adequately facilitate the inspection of the Trailer by numerous individuals and for the disassembly and reassembly of the Trailer;
      v. At some time agreeable to the parties, and at least seven days prior to testing, attorneys and photographers from interested parties will be permitted walkthrough access to briefly inspect the condition of the Trailer and ensure that all windows and doors are closed and that there are no issues relating to physical deterioration or other issues that would impact the testing;
      vi. If the initial walkthrough inspection finds any open windows or other conditions which would affect testing, the attorneys may take corrective action to create a weather tight environment inside the Trailer;
      vii. The following assumes that a power source will be reasonably close (within 30 feet) to the Trailer. If there will not be a source available we will be promptly notified so we may make accommodations;
      viii. Access to nearby restroom facilities is requested. Should access not be provided or is not in close proximity to the Trailer, PSC will



1

      be allowed to provide portable restroom facilities at the site of the inspection and testing;

ix. Estimated times do not include travel time from the entry gate of the facility to the Trailer nor time taken for lunch;

x. Times are estimates only. Actual testing and inspection times may vary;

xi. A FEMA employee should secure the Trailer, verifying all windows, doors and other openings are sealed;

xii. Once all exterior openings are deemed secure, the FEMA employee should lock the Trailer;

xiii. Before any interior access is allowed, the initial inspection, photographing, video taping or any other recordings to be taken of or at the exterior should occur;

xiv. Once the Trailer is identified to the PSC, all operable Trailer membrane openings (doors, windows, vents and exhausts) will be shut and closed and will remain so for at least 72 hours prior to the start of the testing, and a log shall be maintained by FEMA for any and all entries by personnel between the time of identification and initiation of testing, this log will include the reason for any and all entries into the Trailer;

xv. Prior to the start of the inspections and testing, the FEMA employee should verify that the Trailer has remained sealed for at least 72 hours prior to the start of the inspections and testing;

xvi. All of the windows, doors and other openings to the exterior of the Trailer shall remain closed for a minimum of 72 hours prior to the PSC's inspections;

xvii. Testing and inspection would begin at 9:00 AM CDT on July ____, 2009;

xviii. Testing and inspections will be conducted over 4 days;

xix. Day One of testing will be comprised of William Scott and Marco Kaltofen entering the trailer to conduct active air sampling and set a 24 hour passive dosimeter test, to take no longer than an hour, and with the Trailer to subsequently remain closed for 24 hours, with testing set to resume at approximately 9:30 a.m. CDT the following day at which time the passive dosimeter will be collected;

xx. At the end of testing on Day Two, and from that point forward, the air conditioning system will be operating between 70°F and 75°F, or as close as possible thereto, twenty-four hours a day (except as noted herein regarding the determination of air changes per hour for conditions that specify the air conditioning system, i.e. HVAC, be turned off, i.e. not operating);

xxi. Testing and inspections will end each day at approximately 5:00 PM CDT unless there are test procedures underway that are not complete by 5:00 PM CDT and interruption of the testing would render those test useless or invalid;

2

xxii. The testing and inspections will be done by PSC's consultants, employees of the consultants or others hired to test, inspect or perform other duties on behalf of the consultants or PSC;

xxiii. Names of the participants will be provided in advance; however, PSC and its consultants reserve the right to add members to the inspection party as necessary depending upon the findings and unanticipated needs discovered during the testing and inspections;

xxiv. The PSC's attorneys, consultants and other members of the consultants party may be accompanied and directed to the Trailer by a FEMA employee and these persons will agree not to talk with any persons at the facilities about trailers or any matter that may in any way relate to the MDL action;

xxv. All members of the inspection and testing parties agree to restrict themselves to the area of the facility identified by FEMA as the access route and area for the testing and inspection of the Trailer, and the Trailer itself;

xxvi. The only unit to be accessed will be the Trailer;

xxvii. These persons will not access, seek to access, photograph, video tape, record or inspect any other trailers or portions of the facility. This does not include the incidental electronic or photographic capture of any other unit, portions of the facility or other images that may occur during or as a result of the photographing, video taping or recording of the Trailer;

xxviii. All persons electing to enter the Trailer for initial testing, observations, photographing or to video the proceedings will identify themselves to PSC's counsel on site and William Scott, P.E. prior to the any initial entry into the Trailer by anyone.

xxix. PSC Counsel will announce the start of this set-up and testing. PSC Counsel will then open the Trailer door once for all concerned to immediately and quickly enter the Trailer. Once set up for this testing begins, no one will be allowed to enter or exit the Trailer. All doors and windows will remain closed during sampling;

xxx. The number of people entering into the Trailer for the initial indoor air quality testing should be limited to only those experts or consultants qualified to perform these tests. This will assist in eliminating any possible effects an increased number of participants may have on the tests results;

xxxi. All parties initially entering into the Trailer each day must enter as a group at the same time. The door of the Trailer should remain open for only as long as needed for group to enter expeditiously and will remain closed thereafter until that phase of inspection or testing is concluded;

xxxii. The door of the Trailer shall remained closed for the entire duration of all the indoor air quality tests;

xxxiii. Prior to the envelope and air duct leakage tests, all plumbing sewer drains will be sealed or the p-traps will be filled with water. This

3

will occur at the sinks, lavatories, commode, bath tub, etc. – PSC will furnish the water;

xxxiv. All parties will complete all ambient air testing, surface testing, in situ testing of the wall, ceiling, floor and other cavities of the Trailer, moisture testing, infrared thermographic surveys, temperature and relative humidity recordings, envelope leakage/pressure testing, ventilation testing, air conditioning supply and return air duct testing, and furnace supply and return air duct testing to the satisfaction of all parties prior to the commencement of component part/destructive testing;

xxxv. All parties must agree in writing that all testing requiring the Trailer to be in full assembly has been performed to their complete satisfaction prior to the commencement of any destructive testing or permanent removal/disassembly of the Trailer's components;

xxxvi. PSC will provide a release document for each and every party to sign that they are in agreement destructive testing and disassembly can proceed;

xxxvii. All parties, within fifteen days of making any videotapes, photographs, or recordings, will provide to the other parties and liaison counsel duplicates of those materials.

xxxviii. All parties agree to produce within ten days of receipt to all other parties, copies of any and all documents and materials generated by testing of samples collected from this Trailer;

xxxix. All non-governmental persons who enter the FEMA facility agree to sign an indemnity/hold harmless agreement acceptable to all parties prior to entering the property. The government agrees to provide a copy of any indemnity/hold harmless agreement for review and approval by the PSC and other participants ten days prior to the initial inspection and testing date; and

xl. FEMA agrees not to sell or transfer ownership of this Trailer. Because the Trailer will be demolished during destructive testing, PSC agrees to pay an amount equal to the lowest sale price requested of others by FEMA for the purchase of a FEMA THU in similar condition.

4

b. Specific Non-Destructive Testing:

| Action: | Estimated Time (times will over-lap): | Estimated Personnel: (Not including Counsel or Photographer/Animator) |
|---|---|---|
| Day 1: Set up and obtain active air sample(s) measurements inside Trailer, set up passive dosimeter, leave trailer sealed for 24 hours. | 1.0 hours | 2-3 |
| Set up air sampling and measurement devices outside the Trailer. | 0.5 hours | 3-5 |

5

| | | |
|---|---|---|
| Conduct air sampling (IAQ, formaldehyde and other type) tests: outdoor and indoor air testing. Access will be restricted during these tests. Tests will be performed by W. D. Scott Group, Inc. and/or Boston Chemical Group to determine the current air quality within the Trailer.<br><br>Testing requires an undisturbed test area. No movement into or out of the Trailer will occur during this time. | 2.0 hours | 3-5 |
| Collect air sampling and measuring devices. | 0.5 hours | 3-5 |
| Preliminary inspection, photographing, videotaping, measuring, and recording of the exterior undercarriage, underbelly, walls, windows, doors, envelope penetrations, roof, accessories and sealants. Removal of the roof top air conditioning unit cover will be performed to inspect and document the unit.<br><br>Temperature and Relative Humidity monitoring devices will be set up on the exterior and interior of the Trailer for continuous readings throughout the inspection and testing on a 24 hour basis.<br>This will be performed by First General Services and Ritter Consulting to provide data to assist experts in compiling indoor formaldehyde air quality assessments. | 2.5 hours | All personnel |

6

| | | |
|---|---|---|
| Installation of a logging velometer on the interior of the Trailer in the locations typically assigned for the placement of formaldehyde badges. This will be performed by First General Services to determine air flow within the Trailer without the aid of mechanical units or opening of fenestrations. | 1.0 hours | 1-3 |

| | | |
|---|---|---|
| Infrared thermographic survey. This will be performed by Lagrange Consulting and First General Services to document the temperature differentials between the interior and exterior surfaces of the Trailer. This will identify potential air leakage, moisture intrusion and water intrusion into the unit. | 1.0 hours | 2-3 |
| Taking of mold samples will be done prior to the HVAC system being activated. This will be performed by W. D. Scott Group, Inc. and/or Boston Chemical, to obtain bulk, surface and air samples, for viable and/or direct laboratory analysis as dictated by the conditions in the Trailer, and to identify, quantify and classify any possible surface microbial growth.<br><br>This function will be performed concurrently with other destructive testing. | 2.5 hours | 3-4 |

| | | |
|---|---|---|
| Environmental walk through, survey, photograph, and video of Trailer. | 3.5 hours | 4-6 |
| Examination and documentation of the interior construction means and methods. | 3.5 hours | 3-5 |
| Examination of the electrical system and components. To be performed concurrent with the interior examination listed above. This will be performed by Darryl Hicks, P.E. to identify any issues regarding the system as a result of exposure to high levels of moisture and or water. | 2.5 hours | 2-3 |
| Materials Audit and Measurements. Note: measurements will be ongoing on the exterior and interior of the Trailer throughout the inspection period. This will be performed by Dr. Stephen Smulski to identify the materials utilized in the construction of the Trailer and to determine the manufacturer and certifying agency of each material. | 3.0 hours | 3-5 |

9

| | | |
|---|---|---|
| Observe and measure door and window units for plumb and square positions prior to jacking. Performed by David Moore, P.E. and First General Services. | 2-3 hours | 4-6 |
| Jack up the Trailer and block same according to Installation Drawings and Guidelines. This can occur concurrently with other events/inspections after the initial IAQ indoor tests are completed. This will be performed by First General Services. This will attempt to provide data regarding the effects of jacking up the Trailer had on the undercarriage frame, floors, walls, roof, windows and doors as it relates to the infiltration of air, moisture and water into the envelope of the Trailer. These elements have been shown to elevate the emission of formaldehyde and provide needed sources of moisture for the proliferation of mold. | | |
| Observe and measure door and window units for plumb and square positions during and after the procedures of jacking up and blocking the Trailer. Performed by David Moore and First General Services. | | |
| Observation and level, plumb and square measurements of the floors, walls and roof of the Trailer during and after the jacking and blocking procedures. | | |

| | | |
|---|---|---|
| Ventilation Testing, air changes (ACH) per hour [including ACHs measured (i) when trailer is closed and HVAC is not operating, (ii) when trailer is closed and HVAC is operating, (iii) when HVAC is not operating and windows are open] after the final IAQ samplings of the day, envelope air leakage testing, air duct leakage testing, air pressure testing, and infrared thermographic survey. This will be performed by First General Services and Lagrange Consulting to test for envelope air leakage and HVAC duct leakage. | 3.0 hours | 3-5 |

c. **Air Sampling Protocol**

   i. Air sampling will be conducted in accordance with the Protocol entitled *Formaldehyde Sampling: Active and Passive Sampling Protocols – Procedures for Evaluating Formaldehyde Levels in FEMA Temporary Housing Units,* prepared and developed by DeVany Industrial Consultants, March 2008;

   ii. Measurements of the Trailer/Material Audit will be conducted so as to catalogue components consistent with "Aldehyde and Other Volatile Organic Chemical Emissions in four FEMA Temporary Housing Units - Final Report," by LBNL's Randy Maddalena, Marion Russell, Douglas P. Sullivan, and Michael G. Apte, Environmental Energy Technologies Division, November 2008, available at:

   http://www.cdc.gov/nceh/ehhe/trailerstudy/pdfs/LBNL-254E.pdf

   ("LBNL Report"), including measurements of each surface material, component part and opening in the trailer.

11

    iii. Ventilation testing will be done according to either: (1) "Measurements of Steady-State Ventilation Rates", as discussed in the LBNL Study; or (2) ASTM E1827 - 96(2007, Standard Test Methods for Determining Air Tightness of Buildings Using an Orifice Blower Door.

    iv. Air conditioning return air and supply air duct testing and furnace return air duct and supply air duct testing will be performed in accordance with ASTM E1554-03, Determining External Air Leakage of Air Distribution Systems by Fan Pressurization.

d. **Specific Destructive Testing:**

    i. Upon completion of the testing set out above, we will cut and remove from the Trailer representative samples of materials (approximately 18 in. by 18 in. per sample where practicable). The samples will be cut in half and provided to defense for their own testing. The samples will be tested according to the procedures set out in the LBNL study or ASTM E1333-96 (2002) or a relevant applicable recognized standard. Multiple samples of the same material may be taken for testing and demonstrative purposes during trial. It is to be understood all samples taken will be removed from the Trailer and the FEMA storage facility for off-site testing and storage.

| Action: | Estimated Time: | Estimated Personnel: (Not including Counsel or Photographer/Animator) |
|---|---|---|
| Removal of underbelly board or enclosure for testing of the materials perm rating. To determine if the material is a moisture/air vapor barrier or retarder. This will be performed by First General Services and Ritter Consulting and will assist in determining moisture and air | 2.0 hours | 2-4 |

12

| | | |
|---|---|---|
| intrusion into the Trailer.<br><br>Observations of the underbelly insulation and taking of samples for identification purposes.<br><br>Observation of the floor joist system and the underside of the floor sheathing and the means and methods of connections of all undercarriage and cavity components. This will be performed by David Moore and First General Services to compare the Trailer's construction means and methods to that of the manufacturer's specifications.<br><br>Removal of the underbelly material to observe the installation and insulating means and methods of the furnace duct system for compliance with code and the manufacturer's specifications. This will be performed by First General Services and Ritter Consulting to determine air leakage from the duct system and the installer's compliance with the code and manufacturer's standards. | | |

|  |  |  |
|---|---|---|
| Removal of one or more samples of the following wood composite products and items for observation, identification, testing and exhibition:<br>1) Sub-flooring<br>2) Wall panels<br>3) Ceiling panels<br>4) Interior doors<br>5) All built-in items:<br>6) Cabinets-upper and lower kitchen<br>7) Kitchen countertops<br>8) Bathroom vanity and countertop<br>9) Furniture<br>10) Dining area seating<br>11) Dining area table top<br>12) Bed platforms<br>13) Any and all items identified as potentially containing formaldehyde or fungal spores/growth<br><br>All samples to be taken will be a minimum of 18" x 18" by the thickness of the material where possible.<br><br>Samples of all built-in items would be smaller in proportion to the actual size of the item being sampled. | 3-4 hours | 2-3 |

| | | |
|---|---|---|
| Make small cuts into certain parts of the built-in, e.g. cut through an overlay to identify the substrate. This would allow for confirmation of wood composite products used without the need to remove the sample.<br><br>Removal of samples from items of which we are not presently aware but are discovered during the sampling.<br><br>The samples would be taken for the purposes of confirming:<br>1. The type of wood composite product used for each item in the trailer;<br>2. That the wood composite product was bonded with a urea-formaldehyde adhesive (by submitting a specimen from the sample for chemical analysis).<br>3. The composite wood product manufacturer and third-party certifying agency by locating their stamps;<br>4. The types of overlay(s) applied to each composite wood product;<br>5 Use of the samples as exhibits at trial; | | |

|  |  |  |
|---|---|---|
| Removal of the sub-flooring, walls and ceiling panels will; 1. Allow us to confirm how and from what other materials the floor, walls, and ceilings are constructed; 2. Allow for the identification of the manufacturer's and certifying agency's stamps; |  |  |
| Removal of all items would be performed after all IAQ testing is completed. |  |  |

16