**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

IN RE: FEMA TRAILER                                MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION          SECTION "N-5"

                                                   JUDGE ENGELHARDT
                                                   MAG. JUDGE CHASEZ

**THIS DOCUMENT IS RELATED TO ALL CASES**
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE UNITED STATES OF**
**AMERICA'S MOTION TO DISMISS PLAINTIFFS' REMAINING FTCA CLAIMS FOR**
**LACK OF SUBJECT MATTER JURISDICTION**

**I.**

**Background and Legal Standard**

In denying in part the United States' original Motion to Dismiss Plaintiffs' FTCA and

Contract Claims for Lack of Subject Matter Jurisdiction, the Court determined that plaintiffs had

asserted  colorable claims against FEMA under the Stafford Act and the FTCA concerning

FEMA's response or failure to respond to the known hazards presented by the off-gassing of

formaldehyde in EHUs distributed after the 2005 hurricanes, as well as FEMA's continuing to

supply EHUs containing unsafe formaldehyde levels after it acquired notice of the formaldehyde

issue, for a period of time to be established through the discovery process.  The Court indicated

that this period would begin in March 2006 (or earlier[1]), and continue through some time

_____

        [1]        *See* the United States' MOTION TO DISMISS PLAINTIFFS' REMAINING
FTCA CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION at Exhibits 4 (Rec. Doc.
1543-13); 17 (Rec. Doc. 1543-26) at FEMA 09-000364, 09-000373; and, Exhibit 21 (Rec. Doc.
1342-30) at 5.

thereafter when the evidence demonstrates that FEMA's actions began to fall within the discretionary function exception.[2]

The Court's decision was based upon an analysis of the discretionary function exception contained in both the Stafford Act and the FTCA.[3]  The Court also considered the United States' motion under Fed. R. Civ. P. 56.  Properly applying the jurisprudence applicable to the discretionary function exception, particularly regarding the second prong of the analysis, Your Honor found that the United States' response to the formaldehyde hazard and its continuing provision of similarly hazardous EHUs may not have entailed the kind of conduct that the discretionary function exception was designed to shield, that is, may not have been grounded on legitimate social, economic, or political policy.[4]

The United States' present argument that the Court now must proceed under Fed. R. Civ. P. 12(b)(1) employing an "objective" analysis devoid of any consideration of the actual, known facts of record, not only is illogical and legally-flawed, but is utterly inconsistent with a motion featuring the attachment of forty-eight new exhibits, including eight affidavits.  This reference to facts now placed in the record by the Government itself is important for another reason, since this Court's determination that the Government's original motion should have been considered under Rule 56, applies equally to the instant motion to dismiss.  FEMA's challenge to the FTCA claims against it in this MDL still turns on merits-related factual issues underlying plaintiffs' cause of

---

[2]     Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 28, n. 14; 42-43.

[3]     See 42 U.S.C. § 5148 and 28 U.S.C. §2680(a), respectively.

[4]     *U.S. v. Gaubert*, 499 U.S. 315, 324-325, 111 S.Ct. 1267, 1274 - 1275 (1991); *Commerce and Industry Ins. Co. v. Grinnell Corp*, 280 F.3d 566, 572 (5th Cir. 2002).

-2-

action.

The Court previously considered evidence submitted by both plaintiffs and the United States and found that material issues of fact existed concerning the nature of the United States' conduct and whether certain acts or omissions were grounded in policy or, rather, were based upon non-policy considerations like the avoidance of legal liability.[5]  The evidence considered by the Court consisted, in part, of certain communications by and among members of FEMA's Office of General Counsel (OGC) and numerous persons, many of whom apparently were not employed by FEMA, wherein it appeared that the OGC's concerns related to litigation or "potential litigation, liability exposure, and self-interest"[6] became a meaningful consideration in FEMA's exercise of its discretion.  The Court's analysis properly considered these facts in light of the evidence establishing the policy underpinnings of the Stafford Act, which policy concerns of necessity inform any allegedly-shielded discretionary act by a FEMA employee.  In particular, the Court considered not only the relevant language of the Stafford Act and federal regulations implementing the Act[7] pertaining to FEMA's obligation to provide "direct assistance" in cases where an eligible individual's primary residence has been rendered "uninhabitable" (*i.e.* "not safe, sanitary or fit to occupy."  44 C.F.R. 206.11), but also key general policy pronouncements made by several high-level FEMA operatives concerning the substance of the policy expressed under the Stafford Act and the purpose of the Individual Assistance Program.[8]  Indeed, each of

---

[5]      Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 40-42.

[6]      Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 39.

[7]      Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 24.

[8]      Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 37-39, 44-45.

the policy pronouncements by FEMA confirmed that EHUs provided under the Stafford Act in response to an emergency were intended to be "safe," "habitable," and "healthy" places to live during the recovery period.[9]  The Court's attention to the sources of these pronouncements is important, and consistent with the Supreme Court decision in *Gaubert*.  As one appellate court has observed,

> *Gaubert* itself provides some clues as to when courts ought to consult informal rules. There, the Justices indicated that such rules become significant to the discretionary function analysis when an agency promulgates 'regulations on some topics, but not on others,' or when it relies on 'internal guidelines rather than on published regulations' to govern official conduct.
>
> ............
>
> [And] it matters who speaks. To determine what is agency policy, courts customarily defer to the statements of the official policymaker, not others, even though the others may occupy important agency positions.

*Irving v. U.S. ,*162 F.3d 154, 164-166 (1st Cir. 1998), citing *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267;  *Martin v. Occupational Safety and Health Review Com'n* , 499 U.S. 144,  152-53, 111 S.Ct. 1171 (1991); *Director, OWCP v. Eastern Associated Coal Corp.,* 54 F.3d 141, 147 (3d Cir.1995).

In the matter at hand, this Court's earlier decision highlighted several key policy pronouncements attributable to FEMA:

1.      "The public statement of Harvey E. Johnson, *FEMA's Acting Deputy Administrator and Chief Operating Officer* that 'FEMA only provides temporary disaster housing units when all other  housing resources, including rental units, are unavailable. The assistance is only  used as a last resort to provide safe, secure, and sanitary housing for eligible disaster victims.'"[10]

2.      "Post-storm, FEMA officials made other general policy pronouncements. According to FEMA, it only provides temporary housing units when all other housing resources are unavailable, and the units are only used as a last resort to provide 'safe, secure, and

---

[9]      Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 37-38.

[10]      Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 17,  quoting Ex. 1 to Rec. Doc. 348, p. 5, emphasis added.

sanitary' housing for eligible disaster victims. (Ex. 36 to Rec. Doc. 196, FEMA09-000337). Kevin Souza of FEMA stated that the agency relied on vendors and manufacturers to provide 'safe habitable housing units. . . .' and that FEMA believed that these EHUs 'would provide safe and habitable' housing. (Exhibit 8 to Rec. Doc. 196, ¶7). Further, Bryan McCreary of FEMA stated that the agency 'relied exclusively upon the vendors' and manufacturers' expertise and experience. . .to construct and provide FEMA with new units. . .that would provide disaster victims with a safe, habitable place to live. . . .' (Exhibit 10 to Rec. Doc. 196, ¶10). *FEMA Administrator* David Paulison has explained that 'FEMA [is] committed to ensuring that victims of disaster have a safe and healthy place to live during the recovery period.' (Ex. 18 to Rec. Doc. 196 at 00008)."[11]

3.   "While FEMA claims to have decided to respond initially to the few complaints regarding formaldehyde on a case-by-case basis, *even Administrator Paulison* expressed being 'troubled' that some FEMA employees had not reacted 'with the speed and sensitivity I expect' to resident concerns. He then stated, 'FEMA's first priority is the health and welfare of disaster victims we serve. Anything less is totally unacceptable . . .' He pledged to 'hold sacred this . . . commitment.' (Ex. 25 to Rec. Doc. 196, FEMA10-000194)."[12]

Against this background, and based upon the evidence in the record before it, the Court concluded that the acts and/or omissions of FEMA personnel in connection with FEMA's response for some period of time after the Agency knew that certain EHUs[13] it had distributed (and was continuing to distribute), contained and were off-gassing exercise levels of formaldehyde, may not have been protected by the discretionary function exemption.[14]  The bases for this conclusion rest primarily in the second prong of the two-part analysis set forth in

---

[11]      Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 37-38, emphasis added.

[12]      Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 39, emphasis added.

[13]      The Court dismissed plaintiffs' claims against the Government regarding its provision of mobile homes which, as opposed to travel trailers and park models, were manufactured in accordance with HUD regulations governing formaldehyde content in component parts and requiring warnings regarding the off-gassing of formaldehyde.  Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 21, note 9, 44.

[14]      Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 38-45.

*Berkovitz v. U.S.*, 486 U.S. 531, 536-538, 108 S.Ct. 1954, 1958 - 1959 (1988).  The "delayed response" conduct/omissions of FEMA of which plaintiffs complaint are not shown as a matter of law to be grounded on proper public policy.  Indeed, after FEMA had decided to provide EHUs as "safe and habitable" disaster housing, the reports to FEMA that these same EHUs presented a potentially dangerous health hazard to those living in them, undeniably implicated the Agency's "official" responsibility to ensure that the housing provided to these disaster victims truly <u>was</u> safe and habitable.  Precautions then should have been implemented in a robust fashion consistent with this established policy.  Instead, concerns over lawsuits caused or contributed to delays in both testing and proper warnings to EHU residents.  The Court's original decision to deny discretionary function immunity as to FEMA's alleged negligence in responding to this public health crisis, therefore, was abundantly supported by evidence already in this record suggesting that considerations of legal liability contributed to the omissions and commission complained of, and therefore would not and legally could not support a finding that discretionary function immunity applied as a matter of law.  The Court also considered the important jurisprudence holding that the Government's technical safety assessments, particularly in the context of public safety, typically fall outside the exception because they do not involve the kind of policy choices which the discretionary function doctrine is meant to protect.[15]

The United States argues in support of its second Motion to Dismiss[16] that the Court impermissibly introduced the issues of the decision-maker's "status," "subjective intent," and/or

---

[15]     *Whisnant v. U.S.*, 400 F.3d at 1182-1183 and cases cited therein.

[16]     *See* United States' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' REMAINING FTCA CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION (Rec. Doc. 1543-6).

whether the decisionmaker actually considered policy considerations.  But none of this is relevant to the second prong inquiry of the discretionary function exception.  The United States further argues that this Court need only determine whether FEMA's response to this crisis was susceptible to policy analysis, in the sense that it "could have been" grounded on proper policy considerations.[17]  This argument recurs throughout the United States' Motion to Dismiss; and it amounts to an incorrect assertion that the status of the decision-maker pursuant to prior case law which employed the "planning verus operational" analysis, no longer is pertinent under *U.S. v. Gaubert*, 499 U.S. 315, 325-327.   The United States finally argues that its response to the formaldehyde crisis was, in all respects, subject to the discretionary function exception because at some point in time it did implement a "programmatic response" to the crisis, a "better late than never" proposition that truly vitiates any attempt to give meaning to the "safe housing" policy admitted to be applicable to Stafford Act assistance.

The ultimate authority cited for these remarkably broad considerations relevant to the *initial provision phase* of FEMA's response to the hurricanes under interpretations of discretionary function immunity, are two recent Fifth Circuit decisions addressing claims arising out of the Stafford Act.[18]

At the outset of plaintiffs' response to these new assertions, it must be noted that the United States has wrongly-framed the Court's original analysis.  In particular, plaintiffs maintain the United States perverts language (and judicial construction thereof) associated a "prong two

---

[17]     United States' Motion (Rec. Doc. 1543-6) at 6.

[18]     *See* cases cited in the United States' Motion (Rec. Doc. 1543-6) at 4, note 4, and particularly *Freeman v. U.S.*, 556 F.3d 326 (5th  Cir. 2009); and, *St. Tammany Parish, ex rel. Davis v. Federal Emergency Management Agency*, 556 F.3d 307 (5th Cir. 2009).

Berkovitz analysis" as it relates to whether the "nature" of the defendant's conduct was "susceptible" to policy analysis.  The fundamental argument advanced by the Government, i.e., that all acts or omissions in this case are immune because all are allegedly "susceptible to" policy analysis, also was advanced by the United States in *In re Katrina Canal Breaches Consol. Litigation*, 2009 WL 799976 (E.D.La. Mar 20, 2009).  There the United States argued that it did not need to prove it <u>actually</u> considered and weighed legitimate policies in order to be afforded discretionary function protection concerning acts and omissions following the construction of the Mississippi River Gulf Outlet ("MRGO"), particularly in light of the record evidence in that case that it (the Corps of Engineers) actually knew at the time of construction about the flood dangers created by the MRGO.  Rather, it argued that it merely needed to demonstrate that decisions related to the MRGO were "susceptible to" policy analysis.  Judge Duval, rejecting this argument, cited to the Ninth Circuit's  analysis of this argument in *Marlys Bear Medicine v. United States,* 241 F.3d 1208 (9th Cir.2001), a case which also bears relevance here.

        In  *Marlys Bear Medicine*, the Government argued that its decision not to ensure that adequate safety measures were taken with respect to the training of loggers (a responsibility it had assumed under a reservation of authority to inspect and ensure adherence to basic policy and forestry practices), was a "policy" decision. The appellate court noted that the Government's logic was based on its having misconstrued the Ninth Circuit's language in *Miller v. United States,* 163 F.3d 591, 593 (9th Cir.1998) which stated that a "'decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis,'" language that actually comes from the *Gaubert* case. In *Marlys Bear Medicine,* 241 F.3d at 1216, the appellate court met this "susceptible to" versus "actual" dichotomy head-on:

-8-

First our inquiry into the nature of a decision **is not meant to open the door to ex post rationalizations by the Government in an attempt to invoke the discretionary function shield**.  We have held that the Government has the burden of proving the discretionary function exception applies...and **this is not done by mere subjective statements**. There must be a reasonable support in the record for a court to find without imposing its own conjecture that a decision was policy-based or susceptible to a policy analysis. The passage from *Miller* is a paraphrase of a section of the Supreme Court's opinion in *United States v. Gaubert,* 499 U.S. 315, 324-35, 111 S.Ct. 1267, 1113 L.Ed.2d 335 (1991), addressing cases where 'established governmental policy [ ... ] allows a Government agent to exercise discretion.' There was no such established policy here. **Moreover, the quoted language was used illustratively to draw a distinction between protected discretionary activities (*e.g.,* selecting the method of supervising savings and loan associations) and unprotected discretionary activities  (*e.g.,* driving a car), not to widen the scope of the discretionary rule. It therefore should not be used to allow the Government to create after-the-fact justifications for the purpose of liability protections**.

*Id.* 241 F.3d at 1216-17 (citation is to *Miller v. United States,* 163 F.3d at 593, other citation omitted).[19]

The United States in this case engages in the very "ex post rationalizations" and "after-the-fact justifications for the purpose of liability protections" referenced in the foregoing. While on the one hand it argues that the pertinent discretionary function analysis is purely "objective," and does not allow for considerations of fact relative to the nature of its conduct or the status of decision-makers, it then presents to this Court no less than eight new affidavits from FEMA and non-FEMA personnel, containing fresh assertions that FEMA's actions indeed were policy-based, and that the advices of the Office of General Counsel played no significant role concerning FEMA's response to the formaldehyde issue.  The United States cannot have it both ways, arguing on the one hand that the Court limit an assessment of FEMA's response to the

---

[19]     *See also Shansky v. U.S.,* 164 F.3d 688, 692 -693 (1ˢᵗ Cir. 1999), ("We do not suggest that any conceivable policy justification will suffice to prime the discretionary function pump. Virtually any Government action can be traced back to a policy decision of some kind, but an attenuated tie is not enough to show that conduct is grounded in policy.")

formaldehyde crisis to the purely theoretical ("susceptible to") policy grounds in support of that response, but then urge the Court to consider  unchallenged affidavit testimony and selected email correspondence in actual, factual support of the position that FEMA's response truly was based on legitimate policy considerations.  This well illustrates how any meaningful analysis of discretionary function immunity in this case must entail the development and exposition of relevant facts.  Discovery concerning whether and to what extent the OGC may have influenced FEMA's decisions regarding how, and when, to respond to reports that dangerous levels of formaldehyde were present in EHUs being distributed by FEMA, is, as conceded by the United States, "arguably relevant under the Court's analysis of the discretionary function exception."[20] For these reasons, as well as those addressed in plaintiffs' original Memorandum in Opposition to the Untied States' Motion to Dismiss[21] and adopted by the Court in its Order and Reasons of October 3, 2008[22], and those addressed below, the United States' motion should once again be denied, discovery should be allowed, in accordance with the Court's original order[23], and all remaining claims against the Government under the FTCA and the Stafford Act should be deferred to trial (or a series of trials, if needed), on the merits.

## II.

## Argument

---

[20]    *See* MEMORANDUM IN SUPPORT OF DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR A PROTECTIVE ORDER TO PREVENT PLAINTIFFS' DEPOSITIONS OF PATRICK PRESTON AND MARY MARTINET (Rec. Doc. 1613) at 8.

[21]    *See* Rec. Doc. 348 at 1-5.

[22]    *See* Rec. Doc. 717 at 6-9.

[23]    Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 42.

1.      *Prong Two of the Discretionary Function Analysis.*

The United States' interpretation of the "susceptible to policy analysis" language in

*Gaubert* is as narrow as is attempt to construe the *Freeman* and *St. Tammany Parish* decisions

for applicability herein.  First, there are two separate scenarios involving how the discretionary

function exception operates pursuant to established governmental policy: (1) where established

policy allows a Government agent to exercise full-blown discretion regarding the relevant

conduct; and, (2) where prior established policy, which has elevated certain considerations over

others with respect to the relevant conduct, restricts an agents discretion in the implementation of

policy.  The former is perhaps best exemplified in *United States v. S.A. Empresa de Viacao Aera*

*Rio Grandese (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755  (1984), where the Federal

Aviation Administration had devised a system of  "spot-checking" airplanes.  The Supreme

Court held that  not only was the use of the spot-checking system discretionary, but that the acts

of agency employees in executing the program were as well, since employees had a broad range

of discretion to exercise in deciding how to carry out the spot-check activity.[24] The latter scenario

is what the Ninth Circuit addresses in *Marlys Bear Medicine* and other cases discussed below;

but it is <u>not</u> the scenario which pertains when, as here, a prior established policy forms the

backdrop for decision-making.  This distinction between the two categories of discretionary

function cases is described by the First Circuit as follows:

[T]o determine whether an action taken in such circumstances is grounded in

---

[24]      See *Varig Airlines,* 467 U.S. 797, 816-820, 104 S.Ct. 2755, 2766-2768 and the
description of the regulatory scheme which allowed for the FAA's implementation of a safety
compliance review program which *specifically* allowed for FAA employees to balance a broad
range of policy-based considerations in the exercise of the "spot-check" systems; and, *see*
*Gaubert*, 499 U.S. at 325.

policy-based discretion, the operative distinction is the one between a judgment that embodies a professional assessment undertaken pursuant to a policy of settled priorities and a fully discretionary judgment that balances incommensurable values in order to establish those priorities.

*Shansky v. U.S.* 164 F.3d at 694.

Here, there is no contention made, and certainly nothing in the record to suggest, that as of the time of this formaldehyde crisis FEMA had a specific policy pertaining to EHU post-provisions safety and warning issues (relative to formaldehyde or anything else), pursuant to which FEMA agents were granted broad discretion to determine how to execute this policy in response to the reports of formaldehyde issues in EHUs.[25] This case instead falls into the second category of discretionary function cases, ''where the challenged governmental activity involves safety considerations under an established policy [i.e., safe and habitable housing under the Stafford Act], rather than the balancing of competing policy considerations," and thus presents the very scenario where courts find the rationale for discretionary function immunity non-existent, and no shield afforded as a matter of law against claims of FTCA negligence by Government employees.  *ARA Leisure Services v. United States,* 831 F.2d 193, 195 (9th Cir.1987) (quoting *Aslakson v. United States,* 790 F.2d 688, 693 (8th Cir.1986)); *see also*

---

[25]     *See e.g.*:
Despite the initial awareness of a potential health hazard, on April 18, 2006, a FEMA field attorney wrote to FEMA's general counsel's office expressing the following concern regarding FEMA's inaction on the issue:

> I got a visit from our External Affairs folks, who want to know which of the available formaldehyde test protocols FEMA has decided to utilize.  ***GULP! I don't think FEMA has decided how to deal with the formaldehyde  issue, and certainly not the testing issue.***

Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 29 citing Ex. 7 to Rec. Doc. 349, p. 2 of 6, emphasis added.

-12-

*Summers v. U.S.*, 905 F.2d 1212, 1215 (9th Cir. 1990).[26]

The United States' reliance upon recent Fifth Circuit decisions concerning cases arising under the Stafford Act, *Freeman* and *St. Tammany Parish*, supra, and certain Eastern District cases [27] thus proves unavailing under the facts and circumstances presented in this case. First, at least three of these cases are generally distinguishable in that the plaintiffs' claims in these matters were all based upon the alleged failure of the Government to perform certain mandatory duties under the Stafford Act, rather than based on the allegedly-negligent exercise of

---

[26]     *But see Rosebush v. U.S.,* 119 F.3d 438, 444 (6th Cir.1997), cited by the United States in support of its argument that the proper inquiry under a second prong analysis is whether the challenged actions are "susceptible to policy analysis," not whether they were the result of a policy analysis.  The 6th Circuit, relying upon *Gaubert* did not consider whether the challenged conduct departed from safety considerations under an established policy and the Government was not required to demonstrate how its failure to warn of the dangers of open fire pits in the national park was policy-based.  As the dissent rightly pointed out, the majority's rigid application of *Gaubert's* discussion of the phrases "grounded in policy" and "susceptible to policy analysis," may have unintended consequences:

> If we are not careful in our application of the second prong of the test, the discretionary function exception to the Tort Claims Act could potentially swallow the entire Act. As a result of the *Gaubert* decision, courts have given considerable deference to Government assertions of policy discretion. Donald N. Zillman, *Protecting Discretion: Judicial Interpretation of the Discretionary Function Exception to the Federal Tort Claims Act,* 47 Me. L.Rev. 365, 382 (1995). "'The Court ought not to use one phrase in one sub-section of the FTCA [Federal Tort Claims Act] to emasculate the rest of the statute.' William P. Kratzke, *The Supreme Court's Recent Overhaul of the Discretionary Function Exception to The Federal Tort Claims Act,* 7 Admin. L.J. Am. U. 1, 31 (1993).

*Rosebush v. U.S.,* 119 F.3d at 445.

[27]     *In re Katrina Canal Breaches Consol. Litigation*, 2008 WL 2186400 (E.D.La. 2008), and *Johnson v. Federal Emergency Management Agency*, 2007 WL 1592978 (E.D.La. 2007) cited in the United States' Motion to Dismiss (Rec. Doc. 1543-6) at 4, n. 4.

discretionary decision-making that cannot be seen as grounded in policy.[28]  Second, while the

Fifth Circuit does discuss language contained in *Berkovitz* and *Gaubert* concerning the

discretionary function analysis and the necessity to focus on the "nature of the conduct" and

whether the conduct is "susceptible to policy analysis," as discussed above, nothing in those

decisions impugns this Court's analysis of the United States' original Motion.  And, thirdly, these

cases all involved claims similar to those plaintiffs made in connection with FEMA's initial

selection of EHUs, that is, they challenged  FEMA's decisions concerning its initial hurricane

response and disaster funding criteria.  This Court and the Fifth Circuit both rejected the

plaintiffs' "mandatory duty" arguments under the Stafford Act.  This Court and the Fifth Circuit

both considered the "first phase" response conduct of the Government under the second prong of

the discretionary function analysis.  In this case, the Court has determined that FEMA's initial

EHU selection decision was vested with the broad policy considerations of "cost-effectiveness,

convenience to the individuals and households, and such other factors as the President may

consider appropriate" in that FEMA acted to supply a massive demand of homeless disaster

---

[28]      *Freeman* dealt with plaintiffs who, after having been stranded at various locations
in New Orleans post-Katrina, subsequently died and whose heirs alleged that the United States
caused or contributed to their deaths by negligently failing to perform nondiscretionary duties
arising under the National Response Plan; the plaintiff in *St. Tammany Parish* asserted, in
pertinent part, that the Stafford Act, and regulations and directives issued pursuant thereto,
created a non-discretionary duty on FEMA to fund requested debris removal; and,; *Johnson* dealt
with plaintiff's claim that he was denied disaster relief by FEMA in violation of an unspecified
mandatory duty.  Only in *Katrina Canal Breaches Consol. Litigation*, at 2008 WL 2186400,
were plaintiffs asserting that the United States violated certain mandatory duties and/or
negligently exercised discretion in the performance of duties arising under the Stafford Act in
connection, generally, with its preparation for and response to Hurricane Katrina.

victims for temporary housing.[29]  Similarly, the Fifth Circuit determined in *Freeman* that

"decisions regarding the feasibility, safety, and benefit of mobilizing federal resources in the

aftermath of a national disaster are grounded in social, economic, and public policy,"[30] and in *St.*

*Tammany Parish* that "funding decisions related to the extent of debris removal that is necessary

to protect improved property, public health, and safety are exactly the type of public policy

considerations that [the discretionary function exception] shields from judicial scrutiny."[31]

      Plaintiffs maintain that FEMA's response to a safety hazard reported on these EHUs <u>after</u>

they were chosen to serve as Stafford Act emergency housing, cannot be seen on the present

record as subject to the same broad policy considerations afforded for the initial EHU selection

process.  Neither can it be concluded as a matter of law, on the present record, that FEMA

personnel were vested with broad *Varig*-like discretionary latitude in responding to the

formaldehyde crisis. The additional facts now offered by the United States through affidavits, etc.

have not significantly altered the landscape concerning the claims plaintiffs here are making

regarding the nature of FEMA's conduct in responding to the formaldehyde issue, and in

continuing to supply EHUs with potentially dangerous levels of formaldehyde without warning

to occupants.

      The Fifth Circuit decisions in *Freeman* and *St. Tammany Parish* however, do posit an

interesting question which may have relevance in this case: Given the differences in the

---

[29]    Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 19, citing 42 U.S.C. §5174(b)(2)(A); 42 CFR §206.110(c).

[30]    *Freeman,* 556 F.3d at 341.

[31]    *St. Tammany Parish,* 556 F.3d at 325.

discretionary function language contained in the Stafford Act (at 42 U.S.C. § 5148) and the FTCA (at 28 U.S.C.§ 2680 (a)), wherein the latter protects against abuses of discretion and the former does not incorporate this language, does the Stafford Act liability exemption cover "all conduct," and, specifically,  does purport to exempt abuses of discretion?    Plaintiffs address this issue in a separate section, *infra*, at pp. 41 *ff*.

As to Supreme Corut jurisprudence, it is clear that *Gaubert* does not support the United States' argument that factual considerations are irrelevant to the discretionary function analysis. The Supreme Court there in fact acknowledged that facts are relevant where they may support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime in order to survive a motion to dismiss.[32]  For this reason, the Court's original ruling correctly applied the second prong of the discretionary analysis when it considered the evidence presented in this record as to the "nature" of the decisions made by FEMA.  Many considerations, in fact, inform the proper inquiry regarding whether FEMA's conduct was policy-based or not; and this Court properly has considered such material factors: Who was involved in the formaldehyde response?  What were FEMA's established, pre-existing policies regarding the implementation of individual assistance under the Stafford Act?  Was FEMA's prior established safety policy (to insure "safe" emergency housing) reflected in the decisions and/or acts taken after it discovered that formaldehyde was present in potentially unsafe levels in the EHUs?  The relevance of these considerations, and the need for proper discovery pertinent to same, is recognized by other discretionary function jurisprudence as well:

'What matters is not what the decision maker was thinking, but whether the type

---

[32]        *Gaubert*, 499 U.S. at 324-325.

of decision being challenged is grounded in social, economic, or political policy. ***Evidence of the actual decision may be helpful in understanding whether the 'nature' of the decision implicated policy judgments***, but the applicability of the exemption does not turn on whether the challenged decision involved such judgments.'

*Macharia v. U.S.,* 334 F.3d 61, 67 (C.A.D.C., 2003), (citing *Cope v. Scott,* 45 F.3d 445, 449 (D.C.Cir.1995) [emphasis added].

The United States' criticizes this Court's reference to Justice Scalia's concurrence in *Gaubert*; but the Court merely has stated that it found "instructive" that Justice's observance that the level at which the decision is made is "often *relevant* to the discretionary function inquiry, since the answer to that inquiry turns on *both* the subject matter *and* the office of the decision maker." *Id. 499* U.S. at 335.[33]   FEMA as an entity operates through individuals and there has been evidence adduced to date which casts doubt upon whether the omissions or commissions of FEMA representatives in responding to the formaldehyde crisis were indeed grounded in policy considerations.  Plaintiffs maintain that FEMA personnel were constrained by litigation concerns in the exercise of any discretion to promote the health and safety of the EHU residents, even though such safety-related policy factors must be associated with any post-EHU provision

---

[33]      *See also Irving v. U.S.*, 162 F.3d 154, 181 (1st Cir. 1998), dissenting opinion,

> [W]hile the Supreme Court has rejected a rigid dichotomy between high-level and operational decisions, *see Gaubert,* 499 U.S. at 326, 111 S.Ct. 1267, the relative place of the individual within the hierarchy does shed some light on the question of whether that 'acting employee's' conduct is of the kind that Congress would have shielded. *See id.* at 335, 111 S.Ct. 1267 (Scalia, J., concurring); *Coumou v. United States,* 114 F.3d 64, 65 (5th Cir.1997) (recognizing some difference 'between decisions at a planning level, or decisions that exercise policy judgment, and decisions at a[n] operational level, or decisions that are merely incident to carrying out a Government policy.').

decision-making under the Stafford Act, federal regulations, and the interpretation thereof by high-ranking officials of FEMA.  Further, considerations pertinent to pending or anticipated liability claims clearly appear from the record evidence to have colored FEMA's decision-making process in response to the crisis.  There are no actual, or even theoretical (post-hoc), policy considerations which change this fact.

Along these lines, and addressing the Government's protestation that the issue of negligence is not relevant to the discretionary function analysis, plaintiffs maintain that while the question of *whether* the Government was negligent may not be relevant to the applicability of the discretionary function exception, the question of *how* the Government is alleged to have been negligent, is critical for present purposes.  Plaintiffs are alleging that FEMA failed to properly respond to a safety and health crisis appropriately because it did not implement previously established safety-related policy considerations, and/or its response did not incorporate and apply matters of scientific and professional judgment related to safety, and/or its response was delayed or improperly influenced by litigation concerns through the involvement of FEMA's Office of General Counsel.  On these grounds, it is respectfully submitted that FEMA's response to the crisis cannot — as a matter of law — be seen as based on, or even susceptible to, social, economic, or political policy considerations that warrant discretionary function immunity.

### A.     *The Inappropriate Role of the Office of General Counsel.*

The Court's previous exposition of the evidence regarding the OGC's interference with FEMA's response is adopted herein and, as the Court previously determined, the evidence does call into question FEMA's assertions that its decision all were susceptible to prior established policy regarding the Individual Assistance Program.  *See* Order and Reasons of October 3, 2008

(Rec. Doc. 717) at 31-32, 38-39, 41-42.  Now, with the filing of the United States' second

Motion to Dismiss, the Government has introduced additional evidence of the OGC's

inappropriate involvement in the formation and implementation of FEMA's response, together

with some self-serving testimony in the form of affidavits that the OGC's admonitions to delay

or defer responding did not otherwise impede FEMA's decisions.  This additional evidence only

further demonstrates how OGC interjected itself in nearly all phases of FEMA's response to the

formaldehyde problem, and without question caused a delay in FEMA's implementation of

safety-based measures such as early warnings and testing.  The evidence (including the new

evidence) suggests that FEMA representatives decided to embark upon a *reactive* (case by case)

rather than *proactive* response to a public health crisis, and did so in large measure due to the

advice of its counsel who were motivated by how best to defend the Agency in litigation

provoked by the crisis.

  For instance, in March of 2006 a FEMA representative, in response to an email

concerning news reports of formaldehyde in a Mississippi trailer, suggests immediate testing, and

expresses the need to "take a proactive approach; the implications are much too large to not take

immediate steps to assure the safety of our units," to which a FEMA field attorney replies

"Shouldn't the manufacturers be contacted about this problem?  Seems that they have warranty

responsibilities."[34]  In a following email, the same attorney (shockingly) suggests that FEMA has

had similar problems with EHUs, by noting "haven't we had these kind of problems in the past?"

As the email exchange then begins to focus on the manufacturers' role with respect to

certifications, statements, specifications, and possible testing, Wayne Stroeh writes, "I have had

---

[34]  Motion to Dismiss, Exhibit 21 (Rec. Doc. 1543-30) at 4-5.

OSHA conducting random testing throughout the last five months.  The results should have been sent to the JFO safety." In response, a recipient writes to a FEMA public affairs employee, "FYI. I didn't know this OSHA thing was ongoing," which message then is forwarded to the same FEMA field attorney and others.[35]

Kevin Souza, FEMA's Chief of the Individual Assistance Program Management Branch of the Individual Assistance Division, states in his affidavit: "In June 2006, I was made aware of *ongoing discussions between FEMA field program staff and FEMA's Office of General Counsel (OGC) regarding formaldehyde related applicant requests for EHU information*. At that time, I recommended to field staff *and FEMA OGC* that the Agency conduct our own testing of EHUs (vs. reliance on non-federal testing)."[36]  We now know the substance of these "ongoing discussions." The OGC was campaigning against any proactive response by FEMA to the EHU population, as emails dating from June 2006 reflect.

On June 16, 2006, a conference call was held wherein FEMA decided to address the formaldehyde issue on an "individual basis." It is summarized: "OGC has advised that we do not do testing, which would imply FEMA's ownership of this issue."[37]  A June 19, 2006 conference call (on which the OGC participates) then leads to this unequivocal disclosure of FEMA's concerns about formaldehyde:  "Concerns by FEMA about the issue are due to a pending lawsuit

---

[35]     Motion to Dismiss, Exhibit 21 (Rec. Doc. 1543-30) at 1-3.

[36]     Motion to Dismiss, Exhibit 28 (Rec. Doc. 1543-36) at ¶ 12.

[37]     Motion to Dismiss, Exhibit 45 (Rec. Doc. 1543-53).

against FEMA concerning formaldehyde exposure from [EHUs]."[38]  The Court already has noted the OGC's rejection of Mr. Souza's earlier suggestion to immediately conduct testing, warn EHU residents, and remove residents from harm where necessary: "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is running on our duty to respond to them."[39]  On June 27th, the reported suspected death of an EHU resident in St. Tammany Parish elicits the following:  "[W]e need to move past OGC objections to possible testing and move forward with our safety notice (similar to the one HUD uses for Mobile Homes). I believe this issue is well past the point of 'wait and see'." Discussion ensues regarding a plan to create a "standardized notice" but to "sit tight" on testing based on the potential EPA mission assignment...as the safety of MH/TTs is not a FEMA only issue."  Mr. Souza responds stating that FEMA's response must be a coordinated effort involving, in part, "a communication strategy, congressional and Office of General Counsel coordination."[40]

Further evidence of the OGC's entrenchment in the planning and implementation of FEMA's response is suggested in the following emails.  On May 30, 2006, in an email chain discussing the Sierra Club testing, it is said that "if an applicant comes to us with air quality testing in hand, perhaps we should take those to OGC for a determination before we act or do not

---

[38]    Motion to Dismiss, Exhibit 39 (Rec. Doc. 1543-47) at 1, and Exhibit 40 (Rec. Doc. 1543-48) at ¶ 3.

[39]     Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 31 (quoting from Ex. 5 to Rec. Doc. 348; Ex. 7 to Rec. Doc. 348, p. 2 of 6).

[40]    Motion to Dismiss, Exhibit 29 (Rec. Doc. 1543-37) at FEMA17-007073-7075.

act."[41] On June 28, 2006, "There are a lot of folks that need to be involved in the travel trailer/formaldehyde related efforts--particularly following decisions yesterday ... to develop standardized safety messages for all trailer residents, testing of units for formaldehyde safety assessments/recommendations. As there is active litigation related to this issue, *OGC must be included in all discussions*."[42]  A July 11, 2006 email summarizing an EPA conference call states: "Although it was supposed to be a technical call, the discussion was more strategic in nature (Rick Preston of FEMA OGC was a participant)....[EPA has] done some preliminary research to establish a health base level for formaldehyde and it appears that it will be much lower than we suspected. The 14 day exposure maximum may be .03 ppm and the one year level may top out at .008 ppm. The levels we find after testing may well be more than 100 times higher than the health base level. [EPA representatives] again expressed concern with regard to the advisability of testing at all... EPA again summarized their concerns as follows:  *Testing levels of formaldehyde may well be far higher than the health base level,...It will be almost impossible to not to release testing results to the public,  The media will characterize any findings in the worst possible light*."[43]

Without discovery, plaintiffs can only speculate as to the credentials of the EPA personnel on this call and which parties were involved in the strategizing which clearly involved liability and publicity concerns.  Plaintiffs do know that Dr. Chris DeRosa, the ATSDR whistle-

-------

[41]     Motion to Dismiss, Exhibit 44 (Rec. Doc. 1543-52) at FEMA17-022665.  *See also* FEMA17-022664 for an interesting recitation of FEMA's potential liability concerns and the Sierra Club testing.

[42]     Motion to Dismiss, Exhibit 42 (Rec. Doc. 1543-50).

[43]     Motion to Dismiss, Exhibit 38 (Rec. Doc. 1543-46).

blower, has testified that it was at the specific direction of FEMA's <u>attorney</u> that the evaluation

of EPA's data not be performed by his office, which normally would have conducted the

evaluation, but go instead through  Office for Preparedness, Terrorism and Emergency Response

(OPTER).[44]  Dr. DeRosa also testified that it was FEMA's <u>legal counsel</u> who, as early as the

Spring of 2006, first suggested that in evaluating "safe levels of exposure" the ATSDR restrict its

evaluation to short term exposures, to which Dr. DeRosa objected because failure to address long

term health effects could be misleading.[45]

In addition to the evidence discussed above, the affidavit testimony now presented by

FEMA would appear to confirm that the OGC was more than just a passive participant in the

response planning.  Bronson Brown, the Section Chief of the Occupational Safety, Health and

Security Branch under the Facilities Management Division at FEMA, states, " On or about June

or July 2006, I learned that the FEMA *Office of General Counsel ('OGC')* and the FEMA

Individual Assistance ('IA') had engaged the... 'EPA' to test for formaldehyde in temporary

emergency housing units. In response, I *informed OGC and IA that the Safety Office had the*

*ability to test for formaldehyde and I recommended that the Safety Office be tasked with*

*responsibility for conducting additional occupational testing. My recommendation was not*

*accepted at that time.*"[46]  Martin NcNeese, FEMA's primary Point of Contact for purposes of

interacting with the EPA and ATSDR for the testing of EHUs conducted in the Fall of 2006, has

testified by affidavit that FEMA's OGC was the conduit through which the EPA testing results

---

[44]     *See* Exhibit 9 to Rec. Doc. 348 at 4, 6-7.

[45]     Exhibit 9 to Rec. Doc. 348 at 6.

[46]     Motion to Dismiss, Exhibit 6 (Rec. Doc. 1543-15) at ¶ 11.

were forwarded on to the ATSDR for analysis in late 2006, and from which he received the February 2007 initial Health Consultation.[47]

This is indeed the rare case where "the Government's invocation of a policy justification may be so far-fetched as to defy any plausible nexus between the challenged conduct and the asserted justification." *Shansky v. U.S.,* 164 F.3d at 695 -696.  FEMA cannot seriously contend that advice concerning whether their actions would implicate them in litigation were legitimate policy-based considerations in how and when to respond to the health crisis presented by off-gassing formaldehyde.  FEMA officials would have been better-served to ignore legal counsel by not inappropriately delaying their response, and/or by allowing science rather than litigation strategy to determine what warnings and testing should occur in response to a reported crisis affecting thousands of EHU occupants, and thousands more awaiting placement in EHUs.

B.     **Safety precautions should have been implemented in robust fashion consistent with FEMA's established policy which emphasized safety and human health over other policy factors**.

While the Stafford Act and implementing regulations may not have set forth "specific" directives regarding how FEMA should respond to a formaldehyde crisis, it is clear that FEMA's public safety policy was highlighted by the Agency itself in regard to EHU residents under the Individual Assistance Program.  FEMA had determined that once Individual Assistance in the form of EHUs had been provided under the Stafford Act, that housing was intended to be "safe"

---

[47]     Motion to Dismiss, Exhibit 41 (Rec. Doc. 1543-49) at ¶¶ 6, 7.  *See also* Exhibit 40 (Rec. Doc. 1543-48) at ¶ 7 (Joseph Little with the ATSDR receives EPA data from the FEMA OGC).

and "habitable" for the residents.[48]

> Despite the Court's conclusion that there existed no specific statute, regulation, or policy giving direction as to how FEMA should respond to complaints and concerns of formaldehyde in EHUs, there certainly were general policies in place, before Hurricanes Katrina and Rita that, on this evidence, seem to preclude and/or prohibit FEMA's initial response (or lack thereof) to the complaints and concerns of formaldehyde.

Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 37.  *See also* Order and Reasons at 37-38 for the relevant policy pronouncements which have been quoted *supra*.

Of particular relevance concerning FEMA's prioritization of safety over other policy considerations concerning EHU resident maintenance, is the FEMA Administrator's testimony that pursuant to this prior established policy he would have expected FEMA's response not to have been delayed or stymied as it was.

> While FEMA claims to have decided to respond initially to the few complaints regarding formaldehyde on a case-by-case basis, even Administrator Paulison expressed being '*troubled' that some FEMA employees had not reacted 'with the speed and sensitivity I expect' to resident concerns*. He then stated, 'FEMA's first *priority is the health and welfare of disaster victims we serve. Anything less is totally unacceptable . . ...*' He pledged to 'hold sacred this . . . commitment.'

Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 39, quoting from Ex. 25 to Rec. Doc. 196, FEMA10-000194, emphasis added.

While it is true *Gaubert* and *Berkovitz* admonish that under the second prong of the discretionary function analysis the test is "whether that judgment is of the kind that the discretionary function exception was designed to shield," *Berkovitz,* 486 U.S. at 536, and only decisions "susceptible to policy analysis" are protected by the exception, *Gaubert*, 499 U.S. 315,

---

[48]     *See e.g.* FEMA's Administrator David Paulison explaination that "FEMA [is] committed to ensuring that victims of disaster have a safe and healthy place to live during the recovery period." (Ex. 18 to Rec. Doc. 196 at 00008).

325, such established governmental policy is extremely relevant, and "the facts of the specific

case may overcome the presumption to which the Government is entitled under *Gaubert*. In

certain circumstances, it may be obvious that a decision implicates none of the public policies

that ordinarily inform an agency's decisionmaking." *Elder v. U.S.*, 312 F.3d 1172, 1182 (10th

Cir. 2002).

      Here, although FEMA's policies as expressed in the relevant statutes, regulations, and

pronouncements promoting safety have been determined by the Court not to be sufficient to meet

the *Berkovitz* requirement for specific regulations setting out a clear duty, discretionary function

immunity does not protect the Government where there has been "'a failure to effectuate policy

choices already made.'" *Marlys Bear Medicine,* 241 F.3d at1215 (9th Cir. 2001) (quoting

*Camozzi v. Roland/Miller and Hope Consulting Group,* 866 F.2d 287, 290 (9th Cir.1989)).

Plaintiffs are challenging FEMA judgments which implicate "safety assessments (and principally

technical and scientifically-based) ***conducted pursuant to prior policy choices***." *Shansky v. U.S.*

164 F.3d at 694.

      The Court found in its original decision that, when it came to FEMA's initial selection

decision to utilize travel trailers and park models as EHUs, the Stafford Act provided

unchallengeable discretion to select the *types of housing assistance*, "The President shall

determine appropriate types of housing assistance to be provided ...to [eligible] individuals and

households ... based on considerations of cost effectiveness, convenience to the individuals and

households, and such other factors as the President may consider appropriate." 42 U.S.C.

§5174(b)(2)(A), 44 C.F.R. §§ 206.110(a),(c), 206.117.[49]   The United States now goes much

---

    [49]    Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 19-21.

farther, suggesting that all FEMA agents continued to posses the unchallengeable right to decide how and when to respond to health and safety-related complaints associated with formaldehyde, even to the point of basing such decisions on litigation strategy.  Yet the United States points to no statutory, regulatory or internal policy pronouncements which support this extraordinary position.  All the evidence adduced to date in fact suggests just the opposite: with regard to the protection of EHU residents <u>after</u> the selection and provision of EHUs had been made, FEMA officials have gone on record to declare that they purported to ensure the safety of the housing which had been provided.  As  FEMA Administrator David Paulison has stated, "FEMA [is] committed to ensuring that victims of disaster have a safe and healthy place to live during the recovery period."   Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 38 (quoting Exhibit 18 to Rec. Doc. 196 at 00008).  There is no way to square this purported focus on safe housing with a delay response predicated (at least in part) upon how FEMA's actions would play out in litigation involving formaldehyde-related personal injuries.

The United States argues that the  "programmatic" approach it allegedly took with respect to (eventually) initiating EPA testing and issuing warnings, was susceptible to the same broad policy considerations available to FEMA in selecting EHUs.  Plaintiffs vehemently disagree.  The evidence already in the record suggests that  the initiation of FEMA-sponsored testing begun in <u>October 2005</u> (the results of which were known to FEMA in October 2005), was inexplicably curtailed, even though, according to Bronson Brown, FEMA itself was fully capable of conducting formaldehyde testing, and actually did so for FEMA employees in March 2006.[50]  Mr.

---

[50]      Motion to Dismiss, Exhibit 6 (Rec. Doc. 1543-15) at ¶¶ 6-8, 11; and, Exhibit 17 (Rec. Doc. 1543-26).

Brown also states that when he personally was made aware of the OSHA-conducted testing for FEMA in March 2006, he immediately issued instructions to FEMA employees warning them of formaldehyde and advising that they allow for a period of off-gassing prior to entering trailers.[51]

FEMA clearly was on notice that formaldehyde was present in potentially unsafe levels in the EHUs it provided as early as October 2005, if not earlier.[52] How can a claimed "programmatic" response more than six months later be held up as a basis for immunity?

The plaintiffs further draw the Court's attention not only to the email from FEMA field attorney Mary Ellen Martinet[53], but also to testimony and evidence concerning the Gulf Stream production process. In its first motion to dismiss, the Government attached the affidavit of Stephen Miller[54] a FEMA Contracting Officer Technical Representative, who testified that FEMA, "maintained at various times between three and five Contract Officer Technical Inspectors (TI) on site at the Gulf Stream Coach manufacturing facility in Indiana," where the TI's not only monitored the production schedule, but also inspected approximately one out of five EHUs on the Gulf Stream production line.[55] By September 9, 2005, Gulf Stream had

---

[51]    Motion to Dismiss, Exhibit 6 (Rec. Doc. 1543-15) at ¶ 8, and Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 28-29.

[52]    *See* Brown affidavit, Motion to Dismiss, Exhibit 6 (Rec. Doc. 1543-15) at ¶¶ 6-8, 11; Exhibit 17 (Rec. Doc. 1543-26); and, affidavit of Clyde Payne, Exhibit 4 (Rec. Doc. 1543-13) at ¶¶ 4-10.

[53]    "[H]aven't we had these kind of problems in the past?" Motion to Dismiss, Exhibit 21 (Rec. Doc . 1543-30) at 4.

[54]    *See* Motion to Dismiss, Exhibit 11 (Rec.Doc. 196-21).

[55]    Motion to Dismiss, Exhibit 11 (Rec.Doc. 196-21) at ¶ 5.

secured two contracts with FEMA to produce over 50,000 trailers.[56] Several Gulf Stream

employees working at the Gulf Stream plants testified before a Congressional Oversight

Committee that they suffered physical symptoms during the early production phase including

"nose bleeds," "shortness of breath," "dizziness," "ears bleeding"and symptoms like  "sinus

infection."  These employees attributed their health effects to formaldehyde exposure. One of the

employees reported that "the wood materials Gulf Stream used in the production of the travel

trailers for FEMA had a 'foul odor' and that the odor 'got worse' as 'more and more

came.'....According to the employee, 'anywhere you went in the plant, you could smell it .... It

was throughout the entire plant.'"  The testifying employees stated that, "some of the wood

products Gulf Stream used in the assembly of the travel trailers for FEMA was of low quality and

'very sticky.'" Another employee told the Committee that "it was well known at the Gulf Stream

plant that the travel trailers contained a strong odor after their production. She said: 'Everybody

was aware of that odor. It wasn't something you had to report. Everybody smelled it.'"[57]  It is

highly unlikely that FEMA inspectors would not also have noticed pervasive formaldehyde odors

and substandard materials at the Gulf Stream plant.  Yet, a "programmatic" response to the crisis

in the summer of 2006 is now held up as an absolute shield against claims that FEMA failed to

respond to this crisis much earlier on, when it initially became aware of the health issues

associated with these EHUs in the fall of 2005..

Among failure to warn cases, of which this case certainly is one, safety considerations

under an established policy are not seen as falling within the discretionary function exception:

---

[56]     *See* Motion to Dismiss, Exhibit 32 (Rec. Doc. 1543-40) at 9-10.

[57]     Motion to Dismiss, Exhibit 32 (Rec. Doc. 1543-40) at 11.

[S]pecial consideration must be given to claims involving safety concerns or failure to give warnings. It is true, of course, that a failure to warn falls within the discretionary function exception only if it implicates political or economic policy considerations. In the usual case, the failure to warn involves only 'safety considerations under an established policy, rather than the balancing of competing policy considerations.' Thus, the discretionary function exception does not apply.

*Lesoeur v. U.S.,* 21 F.3d 965, 970 (9th Cir. 1994) (citing *Summers v. United States,* 905 F.2d 1212, 1215 (9th Cir.1990))[58]

The United States offers no policy basis for delaying its first notice related to formaldehyde directed to all EHU residents until July 2006 when it states it distributed a brochure through FEMA's maintenance contractors.[59]   Relatedly, failure to warn cases, where there is no exercise of policy-based judgment, will not fall within the discretionary function exception.  For instance in  *Boyd v. United States ex rel. U.S. Army, Corps of Eng'rs*, 881 F.2d 895, 897 (10th Cir.1989), the Army Corps' failure to warn swimmers of known dangerous conditions at a popular swimming locale was not part of the policy decision to leave the area unzoned and its use

---

[58]        *Compare with* the following cases cited by the Untied States in its Motion, *Smith v. Johns-Manville Corp.,* 795 F.2d 301,306 (3rd Cir. 1986), (Where General Service Administration's decision to sell surplus asbestos "as is," without warnings or warranties, fell within discretionary-function exception to Federal Tort Claims Act, its failure to warn borne out of policy to minimize the costs of the sale to the Government, as GSA believed the Stock Piling Act required.); *Lesoeur v. U.S.,* 21 F.3d 965 (9th Cir. 1994), (National Park Service's decision to exempt Indian tribe's river tours from regulation fell within discretionary function exception to sovereign immunity under Federal Tort Claims Act (FTCA), as did its decision not to warn that tribe's tours were not regulated, as these decisions effectuated prior policy choice to refrain from asserting regulatory authority over the tribe's tours due to the tribe's claims of sovereignty linked to a border dispute with the Government.); and, *Kiehn v. U.S.,* 984 F.2d 1100, 1103-1104 (10th Cir. 1993), (National Park Service's decision not to post warning signs in national forest fell within discretionary function exception as it implicated established policy that signs should "minimally intrude upon the natural or historic setting," thereby elevating aesthetics over other policy factors.).

[59]        *See* Motion to Dismiss, Statement of Facts (Rec. Doc. 1543-8) at ¶ 18, the brochure is located at Exhibit 31 (Rec. Doc. 1543-39).

unrestricted, as there were no public policy considerations involved that would support the Government's decision not to warn swimmers.

As discussed above, the first proactive steps to test or warn that FEMA took were exclusively for the benefit of FEMA employees, and specifically FEMA employees at the JFO in Biloxi, Mississippi.  This testing began in October 2005, new testing was performed in March 2006, and a  memorandum with the following instructions to FEMA personnel in Biloxi was issued in May 2006: "1. FEMA employees assigned to trailers staging operations must receive formaldehyde training to accordance, with OSHA 29 CFR 1910.1048 guidelines and hazard communication training in accordance with OSHA 29 CFR 1910.1200; 2. Standard operating procedures are to be written for FEMA trailer staging operations and provided to all FEMA employees required to perform work in the trailers for review.; 3. Manufactures' recommendations for trailer occupancy are to be posted in all trailers prior to public receipt."[60] These were the recommendations of FEMA's Mr. Brown even though he testified that his March testing reflected all formaldehyde levels were below OSHA PEL's.[61]  FEMA therefore took no proactive measures to warn or educate EHU residents generally until (at the earliest) July of 2006, a more than six-month delay that essentially ignored the protestations of FEMA personnel to take earlier steps to warn residents.[62]  In fact, it was not until a year later, in  July  2007, that

---

[60]     See  Motion to Dismiss, Exhibit 6 (Rec. Doc. 1543-15) at ¶¶ 3-9; Exhibit 46 (Rec. Doc. 1543-54).

[61]     Motion to Dismiss, Exhibit 6 (Rec. Doc. 1543-15) at ¶ 8; Exhibit 46 (Rec. Doc. 1543-54).

[62]     Motion to Dismiss, Exhibit 21 (Rec. Doc. 1543-30) at 5; Exhibit 29 (Rec. Doc. 1543-37) at 4.

the Agency opened its dedicated call center and actually began to publish its offer to move residents from trailers.[63]

The United States cites a media report and certain steps its contractor, Bechtel, took in Mississippi as evidence that it did not ignore the problem and "took action" to warn occupants. Yet the earliest of these so-called warnings were localized to Mississippi residents, were reactive in nature, and generally minimized the health issue.  For example, the extent of FEMA's "warning" in the March 16, 2006 press release [Motion to Dismiss, Exhibit 22 (FEMA17-003670-3671)], related to a Mississippi family's formaldehyde testing, asserted that "some people are more sensitive than others," and suggested only that "opening windows and doors should alleviate the *odor*." (Emphasis added).  The other action FEMA took in March 2006 was to request its Mississippi contractor to reference unspecified "trailer manufacturers" recommendations regarding ventilation *if* a resident calling its maintenance phone number was complaining of "formaldehyde smell."[64]  FEMA employee Stephen Miller confirms that FEMA's reactive response was on a case-by-case basis between April and June of 2006, responding only to complaints FEMA received by recommending ventilation; swapping out the EHU for an older unit; or, employing the other Direct Assistance tool FEMA always had at its disposal, offering alternative housing or reimbursement for same (hotels).[65]

---

[63]     *See* Motion to Dismiss, Exhibit 28 (Rec. Doc. 1543-36) at ¶ 20.

[64]     Motion to Dismiss, Exhibit 24 (Rec. Doc. 1543-32).

[65]     Motion to Dismiss, Exhibit 23 (Rec. Doc. 1543-31) at ¶ 8; *see also* Motion to Dismiss, Exhibit 45 (Rec. Doc. 1543-53), apparently"swapping out" of the unit was an option of the last resort.

The July 2006 brochure[66] still was not adequate in light of what FEMA knew by that time regarding the pervasiveness of formaldehyde in the EHUs, the probable or potential levels of formaldehyde, and the health effects likely to result among unwitting residents from prolonged exposure.  The brochure lists EHU building products among a laundry list of other potential formaldehyde producing items, recommends only ventilation, and does not address long-term exposure health concerns.  In fact FEMA purposely did *not* include a phone number because it did not want to "generate a lot of calls."[67]  This was hardly an adequate or a proactive response to what it knew to be a serious health threat.

For these reasons and those recited by the Court in its original Order and Reasons, plaintiffs submit no proper policy basis can justify or shield through immunity the response by FEMA to this crisis.  FEMA's conduct insofar as responding with warnings or meaningful information regarding the risks of formaldehyde, and its action to move residents out of EHUs, did not *begin* on a regional basis until July of 2007, nearly two years after Hurricanes Katrina and Rita.[68]

The United States cites *Shea Homes Ltd. Partnership v. U.S.*, 397 F.Supp.2d 1194 (N.D.Cal. 2005) in support of its argument that plaintiffs' claims are based upon FEMA's failure to respond sooner[69] are barred under the discretionary function exception.  Plaintiffs' claims are more complex than characterized by the United States and, unlike the plaintiff in the *Shea* case,

---

[66]    Motion to Dismiss, Exhibit 31 (Rec. Doc. 1543-39).

[67]    Motion to Dismiss, Exhibit 30 (Rec. Doc. 1543-38) at FEMA10-000183.

[68]    *See* Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 33-34.

[69]    *See Shea,* 397 F.Supp.2d at 1197, 1201 at n. 3.

plaintiffs' claims are directed to FEMA's failure to implement a response which was proactively protective of all residents' health and safety pursuant to it's own policy directives, as well as its failure to properly apply, and/or its manipulation of, objective scientific standards applicable to a proper response.  The plaintiff's complaint in *Shea* did not challenge the Untied States' (Army Corps) design of its response plan to abate methane gas migration from a landfill site, but rather challenged the timeliness of the Government's implementation of its plan, alleging the delay caused damages.  Importantly, the challenge in *Shea* was not that the Government failed to effectuate safety-related policy choices already made by the Army Corps in the implementation of its environmental response.  Here plaintiffs do indeed assert that FEMA failed to effectuate the human health and safety policy choices it had previously made in connection with EHU provision and maintenance under the Stafford Act.  Further, the response to formaldehyde in this case certainly involved technical matters of scientific and professional judgment, particularly concerning safety, as is evidenced by FEMA's enlisting governmental scientists to assist in the response and, under the facts of this case, could not be considered to be susceptible to social, economic, or political policy.

      **C.**    **FEMA's delay in response was not protected by the discretionary function exception because decisions concerning matters of scientific and professional judgement, particularly concerning safety, rarely are susceptible to policy analysis**.

      In its prior Order and Reasons, the Court in part relied, and should continue to rely, upon the discretionary function analysis in *Indian Towing Co. v. United States*, 350 U.S 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) and *Whisnant v. U.S.,* 400 F.3d 1177 (9th Cir. 2005).  As the Court noted, although the analysis in *Indian Towing* is not addressed to the discretionary function

exception, "subsequent Supreme Court precedent has treated *Indian Towing* as relevant authority in this area, *see Berkovitz,* 486 U.S. at 538 n. 3, 108 S.Ct. 1954 ("'The decision in *Indian Towing* ... illuminates the appropriate scope of the discretionary function exception.')." *Whisnant v. U.S.* 400 F.3d at 1182 at n. 2. *See* Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 25. The *Indian Towing* analysis is summarized as follows:

> [O]nce the Government has undertaken responsibility for the safety of a project, the execution of that responsibility is not subject to the discretionary function exception. The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not.

*Marlys Bear Medicine,* 241 F.3d at 1215  (citation omitted).[70]

This case, not unlike the MRGO litigation,  involves the Government's creation of a health hazard as a result of its selection of the EHUs at issue and its failure to use due care in responding to the hazard and, in particular, timely and adequately warn or advise  EHU residents of all potential dangers associated with formaldehyde exposure.[71]  Several issues of material fact have been raised  concerning whether FEMA was obligated to do more and sooner to inform the

---

[70]     *See also Wiggins v. U.S. Through Dept. of Army*, 799 F.2d 962, 966 (5th Cir. 1986), (Explaining that the reasoning in *Indian Towing* is that once the Government does undertake to supply a service, then it must be held responsible for negligent acts in supplying the service. "This means that the discretionary exception only reaches the discretionary decision as to whether to supply the service or not. But once the discretionary decision has been made to supply the service, then the very purpose of the Tort Claims Act was to waive sovereign immunity and allow recovery for negligent actions of the Government beyond the discretionary decision."); *Payton v. U.S.*, 2001 WL 1479105, 2 (E.D.La. 2001) (Where issues as to the proper maintenance of the vessel and in particular as to the maintenance of the piping next to freezer were at issue, the discretionary function exception did not apply to these allegations. Plaintiff did not claim that the policy decision to place piping by the freezer was incorrect. Thus, plaintiff's allegations simply do not trigger a policy analysis.).

[71]     *See In re Katrina Canal Breaches Consol. Litigation*, 2009 WL 799976, *30-23 and collected cases discussed therein.

affected residents and take measures to mitigate exposures or to separate residents from their EHUs.

The Court also partially relied upon the Ninth Circuits decision in *Whisnant* which addressed the line of cases which hold that "matters of scientific and professional judgment-particularly judgments concerning safety- are rarely considered to be susceptible to social, economic, or political policy." *Whisnant v. U.S.,* 400 F.3d at 1181. *See* Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 27, 40, and n. 18. FEMA has admitted in this case that not only did scientific standards apply to its safety response[72], but also that there were several regulatory and industry standards relative to formaldehyde and human health.[73]

The Government argues that the delay in its testing program was because "it had no mechanism in place" to conduct such testing.[74] This is simply not the case. First, it has already been pointed out that FEMA had enlisted OSHA to conduct testing of EHUs in Mississippi in October 2005. In addition, FEMA paid its contractor CH2M Hill for the testing conducted of the

---

[72]      Memorandum in Support of Motion to Dismiss (Rec. Doc. 1543-6) at 20.

[73]      *See* Memorandum in Support of Motion to Dismiss (Rec. Doc. 1543-6) at 9, n.8. Comparatively, where there are applicable safety standards pertaining to the hazard (similar to the objective/scientific line of cases) failure to follow such standards expose the Government to liability under the FTCA. *Compare Kelly v. U.S.,* 241 F.3d 755, 763 -764 (9th Cir. 2001) (Forest Service's decision not to require its contract firefighting pilots to have crew resource management training fell within discretionary function exception to FTCA's waiver of sovereign immunity. However, unlike this case, in that case there was no safety standard, industry or otherwise, with respect to requiring contract pilots to have CRM training; nor do the plaintiffs claim that the Forest Service created a hazard and failed to provide adequate warning.

[74]      Memorandum in Support of Motion to Dismiss (Rec. Doc. 1543-6) at 20.

Sistrunk family's EHU in Mississippi in April 2006.[75]  It also has been highlighted that Bronson

Brown advised FEMA's Individual Assistance and FEMA's OGC that his Safety Office had the

ability to conduct testing, but his offer to continue to conduct testing for FEMA (as he had done

in Biloxi in March 2006) was rejected.[76]   Additionally, in March of 2006, Stephen Miller,

FEMA's Logistic Management Specialist Supervisor, recruited Gulf Stream to conduct testing of

its EHUs, which Gulf Stream did, and then offered to share the test results (which ranged from .1

ppm to 2.0 ppm, all at and well above the levels recognized for acute adverse health effects)[77]

with FEMA.  However, neither Mr. Miller nor anyone else at FEMA even asked for Gulf

Stream's results.[78]  For reasons not entirely known, FEMA then elected to engage EPA and

CDC/ATSDR to test and analyze, first, unoccupied EHUs in late 2006 and early 2007 and,

second, occupied EHUs, from December 2007 to February 2008.[79]

　　　　The United States' argument and affidavit evidence pertaining to the late 2006 testing of

unoccupied EHUs, and the run-up to the coordination of that effort with the EPA and

CDC/ATSDR, do not negate the arguments and evidence plaintiffs submitted in their original

opposition memorandum.  These do indeed create genuine issues of material facts surrounding

---

[75]　　　Motion to Dismiss, Exhibit 34 (Rec. Doc. 1543-42) at pp.156-161, 169-172; and, Exhibit 35 (Rec. Doc.) 1543-43.

[76]　　　Motion to Dismiss, Exhibit 6 (Rec. Doc. 1543-15) at ¶ 6.

[77]　　　Motion to Dismiss, Exhibit 32 (Rec. Doc. 1543-40) at 2.

[78]　　　See Motion to Dismiss, Exhibit 23 (Rec. Doc. 1543-31) at ¶ ¶ 3-7; Exhibit 32 (Rec. Doc. 1543-40) at 2-3.

[79]　　　See Motion to Dismiss, Exhibit 27 (Rec. Doc. 1543-35) at ¶ 11; Exhibit 41 (Rec. Doc. 1543-49) at ¶ 5-7.

the motives for the consultation with non-FEMA agencies, the utilization of the .3 ppm "level of

concern," and the  data initially published resulting from this testing in the Original Health

Consultation of February 2007.[80]   The United States now offers the affidavit of Joseph Little, a

Registered Environmental Health Specialist, who was working with the OPTER division of the

CDC/ATSDR, and whose testimony is intended to rationalize the delay in getting testing started,

the decision to test only unoccupied EHUs, and the selection of the .3 ppm level of concern.  Yet

almost everything Mr. Little asserts has been controverted by Dr. Chris DeRosa, the previous

ATSDR Director of the Division of Toxicology and Environmental Medicine; and his testimony

in particular regarding the use of .3 ppm as the level of concern has been criticized not only by

Dr. DeRosa, but also by other scientists who have testified before Congress and whose testimony

was attached as exhibits to plaintiffs' original memorandum.[81]

　　　Dr. DeRosa speaks with some authority and with personal knowledge when he criticized

FEMA's design of the 2006 testing and the inadequacy of the February 2007 Health

---

[80]　　　*S ee* PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT
UNITED STATES OF AMERICA'S MOTION TO DISMISS PLAINTIFFS' FTCA AND
CONTRACT CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION at 41-47.

[81]　　　*See* Rec. Doc. 348 and the following exhibits attached thereto: Exhibits 8
(Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform,
U.S. House of Representatives, July 19, 2007), 9 (Statement of Christopher T. De Rosa, M.S.,
Ph. D. to the Subcommittee on Investigations and Oversight Committee on Science and
Technology United States House of Representatives, April 1, 2008), 11 (Testimony of Dr. Meryl
H. Karol, Professor Emerita, University of Pittsburgh, Pittsburgh, Pennsylvania, Before the U.S.
House Committee on Science and Technology Subcommittee on Investigations and Oversight,
April 1, 2008),  and 12 (Testimony of Heidi Sinclair MD, MPH, FAAP Medical Director, Baton
Rouge Children's Health Project, Assistant Professor, Department of Pediatrics Louisiana State
University Health Sciences Center, to U.S. House of Representatives Committee on Science and
Technology Subcommittee on Investigations and Oversight, April 1, 2008).

Consultation.  Dr. DeRosa was an active participant with ATSDR in the development of the testing protocol until FEMA's OGC had him removed from the evaluation process in December 2006.[82]  Dr. DeRosa's involvement up to this time period is also evidenced by the fact that he is still in the "cc" line of an email sent by Mr. Little on December 4, 2006, regarding his summary of bi-monthly formaldehyde conference calls.[83]

Dr. DeRosa directly challenges the propriety of the .3 ppm level of concern used in the initial testing, the interference of FEMA's OGC in the selection of the level of concern, and the adequacy of the initial Health Consultation which he has testified was "incomplete and misleading" because formaldehyde is classified as "reasonably anticipated to be a human carcinogen," there is "no recognized 'safe level' of exposure," and because it was at cross-purposes with what the Health Consultation was designed for: to fulfill the Comprehensive Emergency Response, Compensation and Liability Act (CERCLA) public health mandates as a formal response to what may be *time sensitive issues*.[84]   Indeed, after the publication of the original Health Consultation, Dr. DeRosa repeatedly cautioned Dr. Frumkin and others against FEMA's request for "safe" exposure levels for formaldehyde, there being none in his opinion; recommended using the ATSDR's short, intermediate and long term exposure values in assessing the hazards posed by FEMA trailers; and requested that the Government initiate health interventions to interdict exposures and mitigate health effects, and issue warnings to the

---

[82]     *See* plaintiffs' original Memorandum in Opposition to Motion to Dismiss (Rec. Doc. 348) at 45.

[83]     Motion to Dismiss, Exhibit 39 (Rec. Doc. 1543-47).

[84]      *See*  Plaintiffs' Ex. 9 to Rec. Doc. 348  at 3, 5-7.

residents regarding all health effects, including the potential reproductive, developmental and carcinogenic effects of formaldehyde exposure.[85]

FEMA cannot argue that scientific and objective measures and criteria applied to the testing and warning response issues in this case, given the evidence in the record confirming that litigation concerns clearly influenced (and delayed) the Agency's response.  Likewise, FEMA's argument that there is no "bright line" or singular formaldehyde health-risk level is not availing when it was evident that the health and safety of thousands of individuals were in fact at stake from prolonged exposure to formaldehyde, even at the lower, published exposure and risk levels. What "objective" science possibly justifies a decision by FEMA to not even issue its <u>first</u> general notice to residents about  the virtues of ventilation, until <u>July of 2006</u>?[86]

Plaintiffs go further, and submit that the Untied States did not really begin to take adequate measures to notify residents of the dangers of formaldehyde or mitigation strategies, much less implement programs designed to remove residents from EHUs if requested, until <u>July 2007</u>.  In fact, it was not until July of 2007 that FEMA actually ceased EHU sales to residents and  established call centers, and even these efforts arguably did not achieve "policy-based" status until some time in 2008.[87]  Again, how can it be determined at this time, as a matter of law, that such a delay was based on objective science?  How can such a delay be even remotely consistent with a pre-existing policy to provide safe and habitable housing to EHU residents?

---

[85]     *Id.* at 5-7.

[86]     Further, FEMA has offered no evidence to support that all travel trailers were equipped with a formaldehyde/ventilation warning, wether in "sticker' form or as part of the trailers' owner's manuals.

[87]     *See* Order and Reasons of October 3, 2008 (Rec. Doc. 717) at 34-35.

What legitimate policy factors, devoid of concern for pending litigation, can explain such egregious delay?  Plaintiffs ought to be able to explore these issues through discovery, and the Court as trier of fact should await the merits trial to determine when FEMA's response became compliant under the discretionary function analysis.

**2.**      ***Does the Stafford Act provide protection under the discretionary function exception for abuses of discretion?***

In this case the plaintiffs' surviving counts (1 and 2) against the United States assert that the Government is liable to the plaintiffs under state-based negligence law (only Louisiana substantive law was pled in the Administrative Master Complaint as the named plaintiffs who had then complied with the provisions of  the Federal Tort Claims Procedure, 28 U.S.C. 2671, *et seq.*, were all Louisiana residents)[88] based upon the Governments' negligent conduct which, in part, is grounded in allegations it violated certain provisions of or duties arising under the Stafford Act and its implementing regulations, which plaintiffs assert constitute breaches of duties analogous to those imposed upon a Louisiana owner/custodian of things (EHUs) which, because of vices or defects, cause harm to plaintiffs.[89]  The plaintiffs must bring their claims pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674, since the FTCA actually

---

[88]      *See* the ADMINISTRATIVE MASTER COMPLAINT at (Rec. Doc. 109).

[89]      *See* ADMINISTRATIVE MASTER COMPLAINT (Rec. Doc. 109) at ¶¶ 40-82, 98-118; and, *Johnson v. Sawyer,* 47 F.3d 716, 727 (5th Cir. 1995), ("The FTCA's 'law of the place' requirement is not satisfied by direct violations of the Federal Constitution, *see Contemporary Mission, Inc. v. USPS,* 648 F.2d 97, 104-05 n. 2 (2d Cir.1981); *Birnbaum v. United States,* 588 F.2d 319, 328 (2d Cir.1978), or of federal statutes or regulations standing alone, *Cecile Indus., Inc. v. United States,* 793 F.2d 97, 100 (3d Cir.1986); *Art Metal-U.S.A., Inc. v. United States,* 753 F.2d 1151, 1157-58 (D.C.Cir.1985); *Birnbaum,* 588 F.2d at 328; *Nichols [v. Block],* 656 F.Supp. [1436] at 1444-45 [ (D.Mont.1987) ]. The alleged federal violations also must constitute violations of duties 'analogous to those imposed under local law.' *Cecile Indus.,* 793 F.2d at 100 (quoting *Art Metal,* 753 F.2d at 1158.)").

provides the limited waiver of sovereign immunity, as summarized recently by the Fifth Circuit:

> [T]he FTCA waives sovereign immunity and permits suits against the United States sounding in state tort for money damages. *In re Supreme Beef Processors, Inc.,* 468 F.3d 248, 252 (5th Cir.2006). As long as state tort law creates the relevant duty, the FTCA permits suit for violations of federal statutes and regulations. *See Johnson v. Sawyer,* 47 F.3d 716, 728 (5th Cir.1995) (en banc) ('[T]he violation of a federal statute or regulation does not give rise to FTCA liability unless the relationship between the offending federal employee or agency and the injured party is such that the former, if a private person or entity, would owe a duty under state law to the latter in a *nonfederal* context. If the requisite relationship and duty exist, then the statutory or regulatory violation may constitute or be evidence of negligence in the performance of that state law duty.').  The FTCA, however, excepts discretionary functions and duties from this waiver of sovereign immunity. *See* 28 U.S.C. § 2680(a). This 'discretionary function exception' provides that the waiver of sovereign immunity in § 1346(b) does not apply to:

> Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. *Id.* The 'discretionary function exception is thus a form of retained sovereign immunity.' *In re World Trade Ctr. Disaster Site Litig.,* 521 F.3d 169, 190 (2d Cir.2008).

*St. Tammany Parish*, 556 F.3d at 317; *see also U.S. v. Olson,* 546 U.S. 43, 46-47, 126 S.Ct. 510, 513 (2005), ("The Act makes the United States liable 'in the same manner and to the same extent as a private individual under *like circumstances*." 28 U.S.C. § 2674 (emphasis added). As this Court said in *Indian Towing,* the words " 'like circumstances' " do not restrict a court's inquiry to the *same circumstances,* but require it to look further afield. 350 U.S., at 64, 76 S.Ct. 122; see also S.Rep. No. 1400, 79th Cong., 2d Sess., 32 (1946) (purpose of FTCA was to make the tort liability of the United States "'the same as that of a private person under like circumstance, in accordance with the local law').

While the Stafford Act does not contain a waiver of sovereign immunity, it does set froth

arguably *the* sole discretionary function *defense* to governmental liability.[90]  The Stafford Act's

---

[90]      *St. Tammany Parish*, 556 F.3d at 318, ("The Stafford Act's discretionary function exception exists, despite the lack of an express waiver of sovereign immunity, to protect the Government from liability for claims based on its discretionary conduct brought pursuant to the FTCA."); *see also Freeman*, 556 F.3d at 335-336.

discretionary function exception provides that the United States will not be liable for:

> [A]ny claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a Federal agency or an employee of the Federal Government in carrying out the provisions of this chapter.

42 U.S.C. § 5148.

In *St. Tammany Parish* and *Freeman*, the Fifth Circuit raised the issue of whether the discretionary function exception in the Stafford Act provides immunity for "all conduct," and specifically conduct involving "abuse of discretion."[91]  The question is posed by the variations between the two discretionary function provisions:

> The FTCA's and Stafford Act's discretionary function provisions are not identical. .. § 2680(a) expressly precludes review 'whether or not the discretion involved be abused,' while § 5148 contains no such express provision.

*Freeman*, 556 F.3d at 336, n. 10.  *See also In re World Trade Ctr. Disaster Site Litig.,* 521 F.3d 169, 198, n.21 (2d Cir.2008).  The question was left unanswered since plaintiffs in neither case argued the Government was liable for discretionary-based actions or abuses of discretion.  The Fifth Circuit held only that the phrase "discretionary function or duty " have the same meaning under both the FTCA's and the Stafford Act's discretionary function exceptions, and that the jurisprudence arising under the FTCA interpreting that phrase is applicable to the analysis of the Stafford Act's exception.[92]

Yet the Fifth Circuit did explore the issue in *St. Tammany Parish*, where it suggested that the Stafford Act's more specific discretionary function exception may control over the FTCA's

---

[91]     *See St. Tammany Parish*, 556 F.3d at 318 at n.6, 321; *Freeman*, 556 F.3d at 336 at n. 10.

[92]     *See St. Tammany Parish*, 556 F.3d at 319-320; *Freeman*, 556 F.3d at 336-337.

more general exception:

> Both parties agree that the Stafford Act's discretionary function exception governs the current dispute. We note that, for this case, our conclusion regarding the applicability of § 5148 will dictate the outcome of the FTCA claims, whether § 5148 controls over the more general discretionary function exception in § 2680(a), *see Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384-85, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general[....]"); *Mocklin v. Orleans Levee Dist.,* 877 F.2d 427, 428 (5ᵗʰ Cir.1989) (applying the specific Flood Control Act of 1938, 33 U.S.C. § 702c, instead of the general FTCA), or § 2680(a)'s similar discretionary function exception applies concurrently with that of § 5148, *see* § 2680(a) (defining the inapplicability of the FTCA's waiver of sovereign immunity for discretionary conduct).

*St. Tammany Parish*, 556 F.3d at 318, n.6.

*Morales v. Trans World Airlines, Inc.,* was cited for the proposition that, "it is a commonplace of statutory construction that the specific governs the general," in case holding that the specific substantive pre-emption provision of the Airline Deregulation Act superseded a pre-existing "savings clause" under the Federal Aviation Act which had allowed for statutory or common law-based remedies affecting, among other things, the regulation of intrastate airfares. Notably the Stafford Act's more narrow discretionary function provision was enacted after that contained in the FTCA and, "provides a specific congressional recognition of discretionary function immunity." *In re World Trade Ctr. Disaster Site Litig.,* 521 F.3d at 188-189 at n. 22, 192.[93] *Mocklin v. Orleans Levee Dist.*, also cited by the Court, is interesting because there the plaintiff was making a personal injury claim under the FTCA, which the district court dismissed based, in part, upon the FTCA's discretionary function exception, yet the Fifth Circuit, in

---

[93]     *See also In re Armstrong,* 206 F.3d 465, 470 -471 (5ᵗʰ Cir. 2000) ("One basic principle of statutory construction is that where two statutes appear to conflict, the statute addressing the relevant matter in more specific terms governs.").

-44-

affirming the dismissal, determined that the more specific, and broader, immunity provided under the Flood Control Act was controlling.  *See Id.* at 428-429.

While it appears that the discretionary function defense in the Stafford Act was based upon the discretionary function exception in the FTCA[94], and the language of the exception has remained the same since its first inclusion in the the original Stafford Act of 1950[95], it is also clear that Congress did not, and has not incorporated immunity for abuses of discretion into § 5148.  Therefore, where the FTCA may provide the right of action against the Government, and the Stafford Act informs the "discretionary conduct" at issue when analyzing plaintiffs' causes of action under Louisiana negligence, the specific discretionary function defense found in the Stafford Act should apply.  If the specific exception in this case governs the general FTCA exception, then conduct which amounts to abuse of discretion under the Stafford Act would not be immune from liability:

> [W]e are prohibited from reading into clear statutory language a restriction that Congress itself did not include. ...'"[A]bsent any indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it.'.

*Hamilton v. United Healthcare of Louisiana, Inc.*, 310 F.3d 385, 392 (C.A.5 (La.),2002) (quoting *Hubbard v. United States,* 514 U.S. 695, 703, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995)).

The Congress specifically limited immunity under the Stafford Act for any claim "based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty."  42 U.S.C.A. § 5148. Courts conduct a two-part test to determine whether conduct

---

[94]      *St. Tammany Parish,* 556 F.3d at 321.

[95]      *Sunrise Village Mobile Home Park, L.C. v. U.S.,* 42 Fed.Cl. 392, 400 (Fed.Cl. 1998).

qualifies as a discretionary function or duty under § 2680(a). *Gaubert,* 499 U.S. at 322-23.  For whatever reason, Congress did not include the FTCA's protection against abuses of discretionary acts.  Many of plaintiffs' asserted claims that the Government's exercise of discretion was not policy-based may also be cast as abuses of discretion in this matter.  Therefore, under either scenario, the United States' motion to dismiss should be denied and all issues relative to plaintiffs' remaining claims be referred to the merits.

## CONCLUSION

At pp.2-4 of the brief in support of the present motion, the Government summarizes its present position by setting forth two reasons why this Court now should reverse its early decision and confer discretionary function immunity as to the "failure to respond" liability theory of plaintiffs' case against FEMA.

First, the Government argues that even litigation concerns can be permissible grounds for FEMA's response to this formaldehyde crisis, as long as the response was susceptible to other, proper policy considerations.  This twisting of the "susceptible to" language in the case law truly turns the discretionary function doctrine on its ear.  If adopted, the Government's reasoning in fact would invite every FTCA case to be dismissed on an after-the-fact rationalization of what in actuality was done by federal employees on an improper (litigation-motivated), as opposed to proper (safety-motivated), policy basis.  If the Government's position were adopted, the second prong of the *Berkovitz* test would be eviscerated, and the Government's burden in discretionary function defense cases would be trivialized to the point of being not just featherweight, but non-existent.

Second, the Government insists that its delay in response to the crisis in fact was based on

-46-

proper policy concerns, as reflected in a reasonable "programmatic" response to the crisis. These conclusory assertions, supported by witnesses not yet deposed, are no less than the Government's statement of its defense on the merits of the case. Discovery in fact will demonstrate in full — as the record already reflects — that lawsuit worries prevailed over science and concern for public safety, and that no "programmatic" response was implemented until long after FEMA was aware of the danger to which EHU occupants were being exposed on a daily basis. Regardless, in the context of this Rule 12(b)(6) or Rule 56 motion, this dispute as to what in fact occurred, is itself sufficient to defeat the Government's instant request for dismissal as a matter of law.

Plaintiffs therefore submit that this renewed motion to dismiss by the United States, like its earlier motion, should be denied with respect to plaintiffs' FTCA claims arising out of FEMA's response to the formaldehyde crisis which is at issue in this litigation.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:     s/Gerald E. Meunier
        GERALD E. MEUNIER, #9471
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warshauer, L.L.C.
        2800 Energy Centre, 1100 Poydras Street
        New Orleans, Louisiana 70163
        Telephone:     504/522-2304
        Facsimile:     504/528-9973
        gmeunier@gainsben.com

        s/Justin I. Woods
        JUSTIN I. WOODS, #24713
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warshauer, L.L.C.

-47-

2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:     504/522-2304
Facsimile:      504/528-9973
jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS'**
**STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
ROBERT M. BECNEL, #14072
RAUL BENCOMO, #2932
FRANK D'AMICO, JR., #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
DENNIS REICH, Texas #16739600
MIKAL C. WATTS, Texas #20981820

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2009, I electronically filed the foregoing with the Clerk

of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel

of record who are CM/ECF participants.  I further certify that I mailed the foregoing document

and the notice of electronic filing by first-class mail to all counsel of record who are non-

CM/ECF participants.

s/Gerald E. Meunier
GERALD E. MEUNIER, #9471

-48-