# Exhibit E

# In The Matter Of:

*FEMA Trailer Formaldehyde Products Liability Litigation*

---

*James F. Shea, Gulf Stream Coach 30(b)(6)*
*May 28, 2009*

---

Original File JAMES SHEA.txt
Min-U-Script® with Word Index

Page 205

1  physician that treats workman's compensation claims
2  so...
3  Q Let me ask you this way because, again, I know that
4    you're very precise. Since 2002 has there ever
5    been an instance that you're aware of involving an
6    employee complaining of formaldehyde exposure or
7    exhibiting symptoms of formaldehyde exposure?
8  A When we looked at our OSHA log, I don't know that
9    we went back to 2002. I know we covered the period
10   of time of the course of production of the FEMA
11   trailers. But certainly during that time we found
12   no complaints or sickness or illness that we could
13   see was related to formaldehyde.
14       And we also asked the local physician who
15   treats workman's compensation or cases where -- of
16   worker injury what he saw, what he experienced in
17   treating people, what complaints he heard about.
18   And so he had none that he could recall or
19   recapitulate.
20 Q Now, when you did this investigation, you looked at
21   the OSHA log; that's what you said?
22 A The OSHA log. We also talked to management, you
23   know, see what had been reported to them. And like
24   I said, we talked to some physician -- a physician
25   in the area. So that's what we did to try to

Page 206

1    understand some of these things that were being
2    reported in the press or contended in the press.
3  Q So let me make sure I understand what you're
4    saying. Nobody filed a comp claim that you know
5    about regarding exposure?
6  A Correct.
7  Q And you're only talking about 2005, 2006, or did
8    you look into 2004?
9  A I don't know that we've looked into 2004 on that
10   subject. The press reports and the people that had
11   spoken to the press about this were -- occurred --
12   the ostensible occurrences that they spoke about
13   would have transpired during the course of
14   production of the 2005 contracts, which would have
15   been in 2005 and 2006.
16 Q Yeah. But you probably realize that's not the
17   universe of the people that are going to show up at
18   trial and talk about the problems they had at your
19   plants just because there's two people that got
20   interviewed.
21 A Well, I don't know who is going to show up, but I'm
22   telling you that we did our best, talked to
23   management, we talked to --
24 Q What did you ask management exactly?
25       MR. WEINSTOCK: Can you let him finish his

Page 207

1    answer?
2        MR. BUZBEE: Yeah.
3  A We talked to management staff, human resources
4    personnel, the people that deal in workplace
5    injuries and administrate first aid. We looked at
6    our OSHA log. We went to an area physician. And
7    so we tried to truly find whether there was any
8    substantiation to these complainants that were
9    appearing in the press. We just couldn't find any.
10 Q Okay. Management said nobody complained at all
11   about formaldehyde; is that what you're saying?
12 A They said nobody complained about formaldehyde.
13   There was people that said they were fainting or
14   something. There was other symptomology described,
15   you know, so we tried to determine whether, you
16   know, there was anything, not just, Hey,
17   formaldehyde is bothering me, but, Hey, I'm
18   bothered by a smell or an odor or, you know. We
19   couldn't find any symptomology or whatever or
20   evidence of that symptomology being reported to the
21   people that I've just described to you.
22       MR. WEINSTOCK: Can we take a break?
23       MR. BUZBEE: Yeah.
24       THE VIDEOGRAPHER: Please stand by. We're now
25   going off our video record at 14:34.

Page 208

1        (At this time a short break in the proceedings
2    was had.)
3        THE VIDEOGRAPHER: We are now back on our
4    video record at 14:29:14. And to correct my time
5    for our recess was 14:13:01.
6  Q Okay. We were talking about this screening that
7    was done. You sent down Mr. Pullin to do the
8    screening, but you don't think the screening was
9    valid because it wasn't scientific; is that
10   correct?
11 A The screening was valid for our purposes, which was
12   to measure changes in indoor air quality in the
13   units while utilizing the standard ventilation
14   equipment or the optional ventilation equipment.
15 Q Who came up with the protocol for this screening
16   that was done?
17 A Scott Pullin.
18 Q Did you have involvement with that?
19 A No.
20 Q Did you realize he opened all the windows and
21   turned on the fans before he did the screening?
22 A I think he followed various methodologies.
23 Q Let me ask you again. Did you understand that he
24   in some cases opened the windows and turned on the
25   fans for 15 minutes before actually doing a