# Exhibit H

# In The Matter Of:

*FEMA Trailer Formaldehyde Products Liability Litigation*

*James F. Shea, Gulf Stream Coach 30(b)(6)*
*May 28, 2009*

*Original File JAMES SHEA.txt*
*Min-U-Script® with Word Index*

Page 57

1  Q And if the receiver has been trained as to the
2     designations, certainly the designations used by a
3     20-year supplier, the receiver would know when he
4     sees a packing slip such as the one labeled
5     Exhibit 5 that what is being provided was not what
6     was ordered?
7  A I have no idea when Adorn started using the term
8     "reg."
9  Q Haven't you talked to them about this issue?
10 A We've talked to them about what that term meant
11    relative to our receipt of invoices on the FEMA
12    contract products that they provided. But, no, I
13    don't know when they started using the term "reg."
14    As I said, I've been around the business in the
15    industry for a long time. I've never seen the term
16    "reg" --
17 Q You don't typically --
18 A -- prior to this period.
19 Q You don't typically see the packing slips, though,
20    do you?
21 A Well, I don't typically see the packing slip or the
22    invoices, but I do occasionally see them. I mean,
23    I don't -- it's not typical, but, you know, I've
24    heard of the terms "LE" and "LFE" historically, but
25    not the term "reg," you know.

Page 58

1  Q I'm curious as to when you did -- when this issue
2     arose and you learned that --
3  A I know of no other vendors that use the term "reg."
4  Q Finished? When this --
5  A Yes.
6  Q When this issue arose and you inquired of Adorn as
7     to this term they were using --
8  A Uh-huh.
9  Q -- you're telling me that you didn't ask them, Hey,
10    wait a minute, have you been providing me reg wood
11    all this time, the last 20-some-odd years? You
12    didn't ask that question?
13 A We asked them what the term "reg" meant, and they
14    said that it meant product that didn't meet the HUD
15    requirement for emissions.
16 Q Did you say also to them, Well, wait a minute,
17    that's not what we ordered; we didn't order -- we
18    ordered HUD-certified materials; why are you giving
19    us non-HUD-certified materials? You didn't ask
20    them that?
21 A The -- I didn't ask them that. Our purchasing
22    manager asked them that, and they said that it was
23    a mistake. He asked their representative, their
24    sales representative. It was a mistake on their
25    part.

Page 59

1  Q So they admitted that they had made a mistake;
2     that's your testimony?
3  A Our purchasing agent asked their sales rep why, and
4     he said that it was confusion and a mistake on
5     their part.
6  Q And who is your purchasing agent that asked that
7     question?
8  A Jeff Zumbrun.
9  Q So Jeff Zumbrun is the purchasing agent for the
10    whole company?
11 A He was the director of purchasing for Gulf Stream
12    towables.
13 Q Is he still director of purchasing for Gulf Stream
14    towables?
15 A Yes.
16 Q Okay. So Jeff asked an individual from Adorn this
17    question; right?
18 A The representative he normally dealt with, as I
19    understand, yes.
20 Q And what was that representative's name?
21 A I don't know his name off the top of my head.
22 Q Okay. But what you're telling me is, no one
23    bothered to ask them how long they had been
24    providing reg products to your company?
25 A We were specifically asking about materials that we

Page 60

1     received subject to the contracts that we had with
2     FEMA.
3  Q Is it possible then that Adorn was providing reg
4     products to your company from as far back -- for
5     20-some-odd years?
6  A You know, as I've pointed out to you in the past,
7     we rely on our vendors' representations and their
8     systems and their certifications on the products we
9     receive. So when you present possibilities to me,
10    I suppose anything is possible but -- because, as I
11    said to you, the only way to know absolutely the
12    nature of a panel and how it performs relative to
13    the HUD requirement is to perform a large chamber
14    test, ASTM test.
15 Q Have you went back to look at the packing slips
16    that would have accompanied the shipments from
17    Adorn at Plant 57 back in 2004?
18 A I haven't.
19 Q Has anyone?
20 A I can't say for certain. I don't know.
21 Q As the chairman of this company, are you in the
22    least bit curious as to whether Adorn provided
23    HUD-certified materials to Plant 57 in 2004?
24 A Absolutely.
25 Q But even though this case has been in litigation

**Page 169**

1  issue, but I know we spoke to Dr. Golden, and I
2  can't recall, per se, exactly when other scientists
3  came into the mix.
4  Q What led you to conclude that the work done by
5    Progressive Engineering was inconsequential and a
6    waste of money?
7  A It's not the proper test protocol for -- the HUD
8    standard is based on.
9  Q Okay. You just told me previously that you weren't
10   a scientist. Now you're telling me about the exact
11   protocol for HUD. So help me understand how you
12   were --
13 A Well, I don't really need to be a scientist to
14   discuss that.
15 Q Can you let me finish my question. Thank you.
16      How you, a confessed nonscientist, who is
17   upset that you're being asked about science, can
18   now testify that when an engineering firm provides
19   you a report, you conclude that it is
20   inconsequential and a waste of money. Did someone
21   help you with the report scientifically like
22   Dr. Golden, or how did you reach that conclusion?
23 A Well, I am well familiar with the HUD regulation.
24 Q Okay.
25 A The test methodology is spelled out in the HUD

**Page 170**

1  regulation.
2  Q Tell me about it.
3  A The HUD regulation calls for -- has an identified
4    test protocol in there, and it's a large chamber
5    test.
6  Q Tell me the protocol.
7  A Well, it's a very involved protocol. You can go to
8    the HUD regulation and find it in detail in black
9    and white so...
10 Q So when you got the results of the test, you broke
11   out your handy-dandy HUD protocol that you had on
12   your desk and you compared it to make sure that the
13   test was completely proper and scientifically done;
14   is that what you're saying?
15 A Well, I don't know that I can use the term
16   "completely," but I can look at the thing and say,
17   well, this is a desiccator test; it's not a large
18   chamber test.
19 Q I guess if you'd have liked the results of the
20   test, then you would have stood by it and said, Oh,
21   yeah, it was a great test. But since you didn't
22   like the results of the test, that's when you
23   decided the test was invalid.
24     MR. WEINSTOCK: Object to the form.
25 Q Is that right?

**Page 171**

1  A Could you repeat that question again.
2  Q You were unhappy with the results of the test,
3    weren't you?
4  A I was unhappy that they didn't give us what we
5    thought we were going to get, which was a large
6    chamber test which would have some kind of
7    meaningful values.
8  Q And your testimony would be that you concluded,
9    without input from Dr. Golden or any other
10   scientist, that the test was inconsequential and of
11   no merit because it wasn't a large chamber test?
12 A No. We had input from other people.
13 Q Who?
14 A Golden -- I think we discussed this with Golden, as
15   I recall. But it's pretty obvious that it's not
16   the testing methodology that's in the HUD code.
17   It's obvious to a layman.
18 Q Right. So you disregarded the results of that
19   test; is that true?
20 A Correct.
21 Q And that's why you didn't share that test with
22   FEMA?
23 A The test had no value.
24 Q I'm asking again, because you disregarded the
25   results of the test as being unscientific, you did

**Page 172**

1  not share the results with FEMA; is that true?
2  A Right. We didn't share the results with anybody.
3  Q Right. I know. You certainly didn't share it with
4    the people who lived in the trailers?
5  A It had no meaning.
6  Q Right. You did not share --
7  A No significance that we could see.
8  Q You did not share the results of that test with any
9    trailer residents, did you?
10 A Correct. Like I said, we didn't share those
11   results with anybody because we thought they were
12   meaningless.
13 Q But you talked about the results of those tests
14   with Adorn, didn't you?
15 A I don't recall talking to Adorn about them.
16 Q Are you sure?
17 A Me personally?
18 Q Anyone in your company, sir.
19 A Yeah. We may have. I just don't recall.
20 Q And Adorn told you, Well, of course the stuff we
21   provided you was not HUD certified; that's not what
22   you ordered. Isn't that true?
23     MR. WEINSTOCK: Object to the form.
24 A I don't think that's true, no.
25 Q I mean, you've had discussions with Adorn, and

| Page 173 | Page 175 |
|---|---|
| 1 they've made it quite clear to you that there was<br>2 no mistake, that they provided you exactly what you<br>3 ordered; isn't that true?<br>4 A We've had discussions with their sales rep that<br>5 said they made a mistake proximate to that time.<br>6 Q Let me make sure I understand because this may<br>7 become important. Your testimony is that Adorn<br>8 admitted that they had made a mistake when they<br>9 provided you non-HUD-certified wood?<br>10 A Their sales rep said they made a mistake. That's<br>11 what they told our Jeff Zumbrun. They didn't tell<br>12 it to me; they told it to our Jeff Zumbrun.<br>13 Q Okay. How long did the Progressive Engineering<br>14 testing take?<br>15 A My recollection is six weeks.<br>16 Q Who recommended Progressive Engineering to you?<br>17 A We've done business with Progressive Engineering.<br>18 They've done testing for us of other natures in the<br>19 past.<br>20 Q What other natures of testing have they done?<br>21 A More structural type of testing for floor systems<br>22 and trusses and things like that.<br>23 Q They've never done any testing of the formaldehyde<br>24 content of wood for you in the past?<br>25 A If they had done any in the past, it was in the | 1 guess, you're doing testing now, you know.<br>2 Q Who from Progressive Engineering were you dealing<br>3 with?<br>4 A The gentleman's first name is Jim, but I just don't<br>5 recall his last name. He's been there a long time.<br>6 Q Right. And you were talking directly to him,<br>7 weren't you?<br>8 A I don't think I talked directly to him about this<br>9 issue.<br>10 Q You didn't?<br>11 A At that time, about this testing. I mean, I've had<br>12 conversations with him since.<br>13 Q About what?<br>14 A Well, they did eventually get a large chamber<br>15 test -- testing device later.<br>16 Q Tell me about that.<br>17 A So we had conversations on that and --<br>18 Q And did he perform any more testing for you?<br>19 A He performed testing when we went to the use of<br>20 CARB-compliant product or CARB-equivalent product.<br>21 Q He's doing testing for that so you can comply with<br>22 that standard that you've adopted?<br>23 A We talked to him about doing testing. I'm not sure<br>24 that we've had him do any testing using his large<br>25 chamber for that. But we have seen it. We've seen |

| Page 174 | Page 176 |
|---|---|
| 1 manufactured housing days where they -- when you<br>2 say "of wood," I think in the manufactured housing<br>3 days they may have offered some services of ambient<br>4 air testing, but that was many, many years ago.<br>5 I'm just going back from my memory.<br>6 Q Right. Have they done any testing of the<br>7 formaldehyde content of any of the wood products<br>8 that you put into trailers prior to April of 2006?<br>9 A No.<br>10 Q Did they test the formaldehyde content of any wood<br>11 products used in the manufactured housing side of<br>12 your business?<br>13 A No.<br>14 Q Never done that?<br>15 A No. Like I say, my recollection is they did some<br>16 ambient air testing in the '80s but not wood<br>17 product testing analysis.<br>18 Q Why would you be doing ambient air testing?<br>19 A In the '80s?<br>20 Q Well, whether it's the '80s or tomorrow, for what<br>21 purpose?<br>22 A Like I told you earlier, we had complaints, people<br>23 in that time period, especially before the<br>24 regulations went into effect. There was legal<br>25 issues and complaints, so it's the same reason, I | 1 his unit or his apparatus.<br>2 Q Where is Progressive Engineering located?<br>3 A Goshen, Indiana.<br>4 Q And when was the last time you spoke to Jim, who<br>5 you don't know the last name?<br>6 A I would say it's probably been about a year ago or<br>7 maybe -- let's see. Maybe a year and a half.<br>8 Q And when you spoke to him a year and a half ago,<br>9 did you express your disappointment in his firm for<br>10 failing to conduct a scientific test?<br>11 A Well, you know, we acknowledged the fact that<br>12 certainly now they had a large chamber testing<br>13 device, it was a big investment for them, and that<br>14 it's what is required if you're going to make<br>15 comparisons to the HUD standard.<br>16 Q I'm going to ask again.<br>17 A You can't do it with a desiccator type of a testing<br>18 protocol.<br>19 Q Did you express your disappointment to him, that<br>20 was the question.<br>21 A Well, like I said, you know, there was apparently a<br>22 failure to communicate at the time so --<br>23 Q Between -- amongst whom?<br>24 A Between our agent and his staff about their<br>25 capacity and what kind of testing they had |