# Exhibit I

# In The Matter Of:

*FEMA Trailer Formaldehyde Products Liability Litigation*

*Daniel Shea*
*June 1, 2009*

*Original File DANIEL SHEA.txt*
*Min-U-Script® with Word Index*

### Page 45

1  A  For many years. And of course, Gulf Stream has
2     different divisions and -- but I would think that
3     back in the '90s, that Gulf Stream would have been
4     buying product from Adorn for travel trailers.
5  Q  And your testimony is, is that for the first time
6     ever, you learned what that designation REG means
7     in March of 2006.
8        MR. MILLER: Objection. Mischaracterizes the
9     witness's testimony.
10 A  I had learned sometime in March or April of 2006
11    that Adorn has this term, "REG," that meant that
12    the product didn't necessarily meet the HUD
13    requirement.
14 Q  How did you learn that?
15 A  I was at one of our manufacturing facilities and I
16    was walking down the line with our production
17    manager, Jeff Zumbrun.
18 Q  Which plant?
19 A  That would have been our Plant 57 -- or I'm sorry,
20    it would have been Plant 75 in Etna Green. And we
21    were walking through that plant and it was just
22    toward the end of building FEMA units and we were
23    looking at starting our fifth wheel production in
24    there, and as that meeting was done, I started
25    looking at all the different wood products with

### Page 46

1     Jeff and --
2  Q  Jeff Zumbrun?
3  A  With Jeff Zumbrun. And we looked at a number of
4     the wood products that were in the plant, and we
5     were reading the labels --
6  Q  Why?
7  A  -- on the side.
8        This was either a week or week and a half
9     after this concern had come up.
10 Q  After you had gotten complaints of people being
11    exposed to formaldehyde in these trailers you had
12    sold the Government?
13 A  It was -- I believe there was a news report with
14    Mr. Stewart the week before, and we were in the
15    plant and I was asking -- we were looking at all
16    the wood products, and we had walked the line and
17    looked at a number of the different labels that
18    were on the wood products, and there were several
19    different manufacturers of these products that we
20    had wood there for, and I was trying to look at the
21    labels to see what the labels had said relative to
22    this.
23       And some companies, it would say LFE on the
24    label. Some might not say LFE, but somewhere it
25    might say this meets the HUD requirement.

### Page 47

1  Q  Right.
2  A  Others, there was nothing in the label that said
3     one way or the other, but there was a part number,
4     and in that part number it had an LE, so -- and
5     then we ran across this one from Adorn and we
6     really didn't see one thing, one way or the other,
7     whether it was LE or LFE, and I asked Jeff what he
8     knew about this, and he wasn't sure.
9  Q  He was the purchasing manager for the --
10 A  He was the purchasing manager and this term "REG,"
11    he wasn't familiar with. And we looked at it and
12    then he contacted Adorn and later reported back to
13    me that this REG meant that it didn't necessarily
14    meet that HUD emission requirement.
15 Q  And that's how you learned what REG means.
16 A  Yes.
17 Q  You just so happened to be -- you had in the back
18    of your mind this news story where somebody was
19    complaining, or alleging formaldehyde exposure, so
20    you're walking through the plant looking at the
21    wood to see if you could figure out what was going
22    on.
23 A  Yeah.
24 Q  And you saw this term "REG" and you didn't know
25    what it meant, and the purchasing manager for the

### Page 48

1     entire Gulf Stream towables didn't know what it
2     meant. Right?
3  A  That's my recollection.
4  Q  He was unsure; right?
5  A  That's my recollection, yes.
6  Q  And prior to that time, no one had actually looked
7     at the labels just to confirm that, in fact, you
8     were receiving LFE woods. Is that what you're
9     telling me?
10 A  I don't think I said that.
11 Q  Well, had, prior to that time, anyone bothered to
12    even look at the labels to make sure that you were
13    following your own policy?
14 A  I'm not sure of that.
15 Q  Okay. So obviously if this policy actually
16    existed, and it wasn't something that you just made
17    up after the fact because the Government was
18    putting some pressure on you, but if it actually
19    existed, there was no mechanism in place to make
20    sure that somebody was at least reading the labels
21    and confirming the policy was being followed.
22       MR. WEINSTOCK: Can I ask you to reask your
23    question without the narrative about the
24    Government.
25 Q  Prior to this time -- you can already see what I'm

### Page 49

1. going to say in the trial, but let me just see if I
2. can break it down so we can flesh this out a little
3. bit.
4.     Prior to you and Jeff walking through Plant 75
5. and actually looking at the labels because you were
6. concerned about what you were actually putting in
7. the trailers, there was no mechanism in place for
8. anyone to do exactly what you were doing,
9. confirming.
10. A We relied on our suppliers. We had a long-term
11. policy, the suppliers were very familiar with our
12. policy, and we relied on them to supply us with the
13. products that met our policy.
14. Q So your answer was no.
15. A To my knowledge, there was not a person that
16. would -- was specifically assigned to look at those
17. labels.
18. Q Well, relying on your suppliers was insufficient.
19. Would you agree?
20. A It was something that had worked for many, many
21. years, to my knowledge.
22. Q How do you know?
23. A I've not heard anything contrary to that.
24. Q Okay. So you're just basing that on the fact that
25. no one complained, that you know about.

### Page 50

1. A Or that I'm not -- no, I'm basing it on the fact
2. that I've never had -- we've never had a situation
3. where that's come up prior to this, that there was
4. a question of whether a supplier was supplying us
5. LFE or not.
6. Q Well, if you're relying on your suppliers, why
7. didn't you just call your suppliers up and ask them
8. rather than actually going and inspecting?
9. A I wasn't really -- my purpose down there really
10. wasn't to inspect wood. We were down there on
11. other business, and as I walk through the plants, I
12. will talk to people on the production line, see how
13. things are going, and we happened to get to the
14. department where there was wood, and at that point
15. it just -- my interest was in looking at some of
16. these wood labels.
17.     And that's when I started comparing the
18. various -- there was quite a variety between the
19. different companies on how they would label their
20. products, and I was looking at the various labels
21. and I had a question with Jeff on this particular
22. label with Adorn.
23. Q So Jeff made a call to Adorn?
24. A Yes.
25. Q Who did he call?

### Page 51

1. A You know, I'm not sure of the person's name.
2. Q Could you smell the formaldehyde when you were
3. standing there next to the wood?
4. A No, I don't recall that.
5. Q You can't recall smelling the formaldehyde when you
6. were standing there --
7. A No.
8. Q -- looking at the labels?
9. A I don't recall that. Sometimes you might smell,
10. there might be a wood or lumber smell in a plant,
11. but generally, all the doors are open, and I don't
12. recall any formaldehyde smell as I was looking at
13. those materials.
14. Q Do you keep both of the doors, the big doors open
15. in the plant?
16. A Generally in the springtime, yes. And particularly
17. when we're running FEMA, the doors are open quite a
18. bit because of materials coming in and out and the
19. forklifts coming in and out and there would
20. probably be more materials.
21. Q How many people wear masks during that production
22. phase of building these trailers?
23. A How many people wear masks?
24. Q Uh-huh.
25. A I'm not familiar with any that wear masks.

### Page 52

1. Q Do you have big fans blowing through there?
2. A Depending on the plant.
3. Q I want to talk about 57.
4. A Okay.
5. Q Are there big fans blowing?
6. A There's some -- I believe that there's fans like on
7. the end of the buildings. I'm not sure whether
8. there's fans through the roof on that building or
9. not.
10.     MR. MILLER: Are we talking 2004?
11.     THE VIDEOGRAPHER: Mr. Buzbee, can we take a
12. break real quick, pause, please?
13.     We are now going to Tape 2 at 12:07:06.
14.     (A brief recess was taken.)
15.     THE VIDEOGRAPHER: We are now back on our
16. video record at the time of 12:09:03 commencing
17. with Tape 2.
18. Q Let me just talk generally about fans at the
19. plants.
20. A Okay.
21. Q Whether it be 2005 or 2004, as a general matter,
22. you have fans running to air -- keep the
23. ventilation going within the plants. Is that true
24. or not?
25. A Is there a particular plant we're talking about now

Page 53

1  or --
2  Q Are they different?
3  A Yeah, I would say that the four buildings would
4     have been different.
5  Q Okay. So some of them have fans and some of them
6     don't?
7  A I would think that most of them would have fans,
8     but depending on the building and when it was built
9     and so forth, it may have more. There may have
10    been fans added afterwards. It also depends on the
11    time of the year potentially.
12 Q Why were fans added afterwards and where were they
13    added?
14 A After?
15 Q Yeah, you said fans may have been added afterwards.
16 A Oh, after the building was built.
17 Q Oh, okay. All right. Tell me who Jeff spoke to
18    from Adorn.
19 A You know, I'm not sure of that.
20 Q What did he learn from Adorn?
21 A He had learned that they had made a mistake on
22    this, and that he had advised me that 5 percent of
23    the product came from Adorn. And that I had been
24    told by Jeff this concept that he had talked to
25    several people, and that, number one was that the

Page 54

1     majority of the industry used this product that was
2     not LFE; that there were only a few companies that
3     used, at that time, products that were LFE, and
4     that we were one of the few -- one of a few
5     companies that required this LFE.
6        And that also he advised me that he had been
7     told that, just because something isn't
8     necessarily -- isn't necessarily stamped that it's
9     LFE, it may be LFE. There's situations where a
10    mill will run LFE and put -- not necessarily put
11    the LFE stamp on it.
12 Q What else did you learn from Adorn through Jeff?
13 A That's what I recall right now.
14 Q Did you ever speak directly with anybody from
15    Adorn?
16 A No.
17 Q Never.
18 A You know, there was a gentleman -- regarding this
19    issue?
20 Q Right.
21 A No. I never spoke to anyone from Adorn. There was
22    a gentleman that used to own Adorn that I had
23    known; I don't know if he was involved with Adorn;
24    I think he had sold out. I don't know whether he
25    was involved at the time, but I never really spoke

Page 55

1     to him on -- I never spoke to him on this issue.
2     But I might have spoke to him since this, but I
3     normally wouldn't be involved with the individual
4     salespeople from the various companies.
5  Q But on this issue, you're telling me this wasn't an
6     important enough issue for you to talk to any of
7     the leadership of Adorn?
8  A No, I did not.
9  Q Okay. Does your company or any of the brothers
10    have any ownership interest in Adorn?
11 A Not to my knowledge.
12 Q Have you ever had any ownership interest in Adorn?
13 A No.
14 Q So what you learned -- I guess what Jeff learned
15    and reported to you was, 5 percent of the products
16    that you put -- of the wood products that went into
17    your trailers were from Adorn.
18       MR. WEINSTOCK: No.
19       MR. BUZBEE: Let me clarify this. He can
20    figure this out. He's smart enough to do this.
21       MR. WEINSTOCK: You're right. You're right.
22    Go ahead.
23 A Yeah, it was my understanding at that time from
24    Jeff that 5 percent of the products were from --
25    were from Adorn.

Page 56

1  Q Okay. So in other words, you had -- your brother
2     told me that there are approximately six -- for
3     that big FEMA order in 2005, there were
4     approximately six decorative hardwood panel
5     companies you were purchasing from, Adorn being one
6     of them. Is that right?
7  A In 2005? Yes.
8  Q Okay. And you're telling me that of those six,
9     Adorn had only about 5 percent of the business.
10 A Yes, that's my recollection of what Jeff had told
11    me --
12 Q Okay.
13 A -- back in March or -- late March of 2006.
14 Q Right. So in other words, the other five companies
15    that provided these decorative hardwood panels made
16    up 95 percent of the wood products that you were
17    purchasing.
18 A That would have been my understanding at the time.
19 Q And are you also telling me that 100 percent of the
20    products provided by Adorn were, in fact, REG?
21 A You know, I don't recall specifically that coming
22    up at the time, that all hundred percent of the
23    5 percent were REG. It seemed like that there was
24    still question of, even of the 5 percent, how much
25    would have specifically been designated as REG.

Page 65

1  these 2005 trailers that was not HUD certified?
2  A You know, I'm not sure. I think that -- as far as
3     what Weyerhaeuser and Samling provided us, they
4     would probably be the best to ask. And I'm not
5     sure what other materials -- what other companies
6     may have supplied roof decking in addition to
7     Weyerhaeuser and Samling.
8  Q Can you point me to a letter where you told the
9     Government that, at least with regard to these two
10    suppliers, two-thirds of the products they supplied
11    were not HUD certified?
12 A Like I say, that was something that was discovered
13    in August or September of 2007, and I'm not
14    familiar with a letter.
15 Q So you didn't write a letter --
16 A No.
17 Q -- letting the Government know?
18 A No.
19 Q You didn't write an e-mail?
20 A No. This product -- you got to remember, this
21    product was what the majority of the industry was
22    using. This product met the -- any requirement of
23    the FEMA specification.
24 Q Right. But remember your letters and e-mails to
25    the Government? Remember those?

Page 66

1  A I had sent an e-mail to Steve Miller.
2  Q That was flat out wrong, though, wasn't it, what
3     you put in your e-mail?
4  A Later, we determined that, you know, this 5 percent
5     may or may not have met the HUD standard.
6  Q And then later you learned it was more like
7     15 percent.
8  A Yes. And at that point, I had advised Steve Miller
9     that there was -- you know, we had material that
10    may or may not have met the HUD standard that we
11    had used.
12 Q Did your company pay for LFE materials from these
13    three companies?
14 A I think we did.
15 Q Did you get reimbursement or a refund from them?
16 A No, we have not.
17 Q Do you intend to?
18 A I'm not sure.
19 Q But you believe that they did not provide what you
20    ordered.
21 A We had a clear policy that those companies had
22    provided us materials, and I believe that they knew
23    exactly what we ordered. And it was specifically
24    on the purchase order with Samling and Weyerhaeuser
25    that the materials must meet the HUD specification;

Page 67

1     and if they did not meet those specifications, I
2     don't believe that they would have supplied us what
3     we were asking for.
4  Q You realize when your purchaser, Mr. Zumbrun, when
5     he purchases, he purchases by product number. You
6     realize that.
7  A By part number?
8  Q Yes.
9  A I'm not sure if he does that all the time he
10    orders. Sometimes he would -- I don't know if
11    sometimes he may do verbal orders on some things.
12 Q All right. You realize, though, that the part
13    number that he ordered was exactly what was
14    received by you.
15 A The part number ordered.
16 Q Uh-huh.
17 A What are we referring to now?
18 Q We're referring to the part number you ordered is
19    exactly what was delivered. In other words, the
20    mistake was on your end, sir. Did you know that?
21 A What part number are we talking about?
22 Q The part number for the lauan that's not HUD
23    certified.
24    MR. MILLER: From Adorn?
25    MR. BUZBEE: From Adorn.

Page 68

1     MR. WEINSTOCK: Hang on, I'm sorry. Just for
2     clarification, what he said was the purchase orders
3     to Weyerhaeuser and Samling said HUD. Now you're
4     changing this to the Adorn purchase orders?
5     MR. BUZBEE: Yes, I am. I'm asking him a
6     question.
7     MR. WEINSTOCK: I understand that, Tony, but
8     what I want you to do, if you don't mind, is
9     clarify which purchaser -- who you're buying
10    product from, because you've changed your question.
11    MR. BUZBEE: Can you read the question back?
12    It was very clear.
13 Q What part number are we talking about? The part
14    number for lauan that's not HUD certified.
15    I'm asking you again, do you realize that the
16    part number you ordered from Adorn is exactly the
17    part number that Adorn delivered to you?
18 A I'm not familiar with what part number we're
19    talking about or what was -- is there a specific
20    purchase order we're talking about?
21 Q There's one in front of you. There's one in front
22    of you. Right there, Exhibit 1.
23 A Okay.
24 Q That's a packing slip. That tells you what was
25    delivered. Did you know that Adorn has a different

Page 69

1  part number for LFE materials?
2  A Can you repeat that question, please?
3  Q Did you know that Adorn uses a different part
4     number for LFE materials?
5  A No, I did not know that.
6  Q Did you know that Adorn delivered the exact part
7     number that your purchasing manager ordered?
8  A I'm not sure what was -- the purchasing manager
9     ordered.
10 Q Didn't you -- when this all came up, when you
11    learned that your statements you had given to the
12    Government were false, did you not ask him, Hey,
13    what did you exactly order, Jeff?
14     MR. WEINSTOCK: I'm going to object to that
15    colloquy. If you can just strictly limit it to the
16    question, leave out the part about the
17    Congressional testimony, just ask him a specific
18    question.
19 Q I'm not asking -- you never testified in front of
20    Congress, did you?
21 A No.
22 Q But you did send e-mails to Mr. Miller, didn't you?
23 A Yes, I did send --
24 Q And you told him that you guys use -- that's the
25    word you used -- LFE materials, LFE wood products,

Page 70

1     didn't you?
2  A Yes, I did.
3  Q Okay. That's not true, is it?
4  A Later we found out that this -- shortly after that,
5     we found out that there was 5 percent that, from
6     Adorn, that may or may not meet the HUD standard.
7  Q Uh-huh. Now, you also used Adorn, the supplier,
8     for the 2004 FEMA trailers, didn't you?
9  A You know, I'm not -- I'm not sure of that.
10 Q Why not?
11 A We're still trying to find those records for 2004.
12 Q So your testimony would be, At this point, Tony, I
13    can't tell you whether Adorn was one of the wood
14    product suppliers for the 2004 FEMA order.
15 A That's correct.
16 Q But I intend to find out.
17 A Yes.
18 Q Because it's real important.
19 A Yes. We're going to do our best effort to find all
20    the information on the 2004 products.
21 Q When you guys spoke to Adorn, and I mean
22    specifically Jeff, did he ask Adorn, Hey, have you
23    always been providing us this, quote, REG product?
24 A You know, I'm not -- I don't recall him talking
25    about that to me, but I do remember Jeff talking

Page 71

1     about how all of the suppliers that he had talked
2     to had reinforced that they were well aware of our
3     policy to buy LFE product and that it had not been
4     a question.
5  Q Does Adorn sell LFE wood products?
6  A Yes, I believe they do. At least they did at the
7     time.
8  Q At what time?
9  A In 2004 and 2005.
10 Q They just didn't deliver. And certainly in 2005,
11    that's not what they provided you.
12 A You know, I'm not sure what the product was that
13    they had provided us.
14 Q But you know that it was not HUD certified.
15    Whether it met the requirements or not, you know it
16    wasn't HUD certified.
17 A And I'm not sure if, necessarily, all of the
18    material that they had provided us had this REG
19    designation or not.
20 Q Can't you find that out?
21 A Yes, we can look through the, the best of our
22    ability, the documents we have.
23 Q Now, do you have policies and procedures at Gulf
24    Stream Coach towables?
25 A Yes.

Page 72

1  Q Are they written?
2  A Some are written, some are verbal.
3  Q Are there any important policies that are verbal,
4     that is, not written?
5  A I'm not sure.
6  Q Can you name one important policy at Gulf Stream
7     Coach towables that isn't in writing.
8  A Would seem to me that a lot of our policies
9     wouldn't be in writing.
10 Q Name one.
11 A You know, I just -- I can't think right now.
12 Q You know, we've heard from various witnesses about
13    this LFE policy that originated in the early '90s.
14 A Uh-huh.
15 Q Yes?
16 A Yes, that's my understanding.
17 Q How did that policy originate?
18 A You know, I'm not sure. I believe it was something
19    that my father had initiated.
20 Q What were you -- when did you start working at Gulf
21    Stream Coach?
22 A I started at Gulf Stream part time in 1983 and '84,
23    full time in 1986. I primarily worked with the --
24    I worked in motor homes and primarily with the van
25    conversion division through the mid-'90s. I really

Page 125

1  cut for the various different types of cabinets.
2  There would possibly be panels cut for interior
3  partitions that aren't necessarily the length of a
4  piece of paneling. There would be cabinet styles
5  that would be cut.
6      There would be probably lumber that would be
7  cut. There would be possibly -- possibly the floor
8  decking, but I'm not sure. A lot of times that
9  would fit just on the size of the trailer.
10     Those are some of the -- the same with the
11 ceiling panel; you might have a cut there. If the
12 ceiling panel wasn't exactly the length that would
13 allow six or eight pieces, you might have one cut
14 there.
15 Q Is there a way to seal those edges, those --
16 A You know, not that I'm familiar with. I don't
17   know. I'm not familiar with anybody in the
18   industry seals those edges, but maybe they do.
19 Q Don't you routinely refer to yourself as the
20   industry leader?
21 A The industry leader.
22 Q Yeah.
23 A I think we are the industry leader in some areas.
24 Q You told the Government you're the industry leader
25   in reducing formaldehyde emissions in product,

Page 126

1  didn't you?
2  A Yes, I believe so.
3  Q Okay. So you keep falling back on what everybody
4    else does, but I'm talking to the industry leader
5    here, am I not?
6  A Regarding this claim as far as reducing
7    formaldehyde emissions?
8  Q Uh-huh.
9  A Yeah, I think we were one of the first companies to
10   go to the CARB standard.
11 Q So you are the industry leader.
12 A Yes, I'd say one of them.
13 Q Okay. So I'm going to ask you as the industry
14   leader, why don't you seal those -- or why didn't
15   you, I should say, 2004 and '5, seal those edges of
16   the --
17 A I have no knowledge of what the -- sealing the edge
18   would do or not do.
19 Q Okay. Is the HVAC system in your FEMA trailers
20   designed for full-time use?
21 A You know, I'm not sure, when we talk about our
22   design being full-time use -- I guess you have laid
23   out here what the ANSI designation for full-time
24   use is, but I'm not sure if I would say that
25   particular components or designs of our trailer

Page 127

1  were full time versus temporary.
2  Q So does that mean you don't know?
3  A Yes.
4  Q Okay. Does the design of the trailer that you sold
5    to FEMA, does it account for accumulation of
6    moisture, or does it account for people living in
7    the trailer and creating moisture, whether it be
8    because the inside's cooler than the outside or
9    whether it be because someone's breathing inside
10   the trailer, that sort of thing.
11 A You know, I'm not sure that the air conditioner
12   that we put in the FEMA unit was -- requested by
13   FEMA to be a 15,000 BTU air conditioner; probably
14   in a travel trailer that size, historically would
15   have probably taken a 13,500 BTU air conditioner,
16   which is the one we use the most of, I would say.
17   But FEMA did specify that we use a 15,000 BTU air
18   conditioner in that trailer, so we did.
19 Q But you don't know whether that would be sufficient
20   for long-term or full-time use.
21 A I'm not sure, you know, what the difference would
22   be between temporary and full-time use regarding
23   that air conditioner.
24 Q Who in your company is involved in the design and
25   the specifications of these trailers?

Page 128

1  A Well, FEMA, obviously, would do the specifications,
2    and our people would look at it. Our people would
3    be, oh, purchasing; production and engineering
4    would evaluate the specs and evaluate a trailer
5    that we were building and determine what changes we
6    would need to make to assure that the trailer was
7    going to meet those specifications.
8  Q Okay. But I guess I'm -- it's my fault again, I'm
9    sure. Can you identify the person within Gulf
10   Stream Coach towables who is in charge of what wood
11   to use, what floor plan to use, what HVAC system to
12   use, how many vents to put in, that sort of thing.
13 A And for what period of time are we talking now?
14 Q 2004, '05.
15 A Okay. Eddie Abbot was involved in the design from
16   the engineering standpoint.
17 Q Okay.
18 A I believe Dan Hammond did some work on that. Dan
19   Hammond is production manager.
20 Q What was Eddie Abbot's job?
21 A He was in engineering.
22 Q Okay.
23 A And again, Jeff Zumbrun would have been involved in
24   that as well.
25 Q Purchasing? Okay.

**Page 129**

1  A  And those would be the primary people that would
2     have been involved in evaluating the specs for the
3     trailer.
4        And of course, we rely on our vendors. Our
5     vendors, you know, we'll go to them as far as --
6  Q  I've heard that before.
7  A  -- a frame.
8        MR. WEINSTOCK: I appreciate that, but don't
9     interrupt him, please.
10 A  Our vendors would -- we rely on our vendors as far
11    as the components that they sell us and advising us
12    how to use those components.
13 Q  Sure. Okay. I want to talk to you about the
14    ambient air quality testing that was done in March
15    of 2006. Do you recall that? March and April of
16    2006.
17 A  Are you referring to the screenings that Scott
18    Pullin had done?
19 Q  I'm referring to whatever you call what Scott
20    Pullin did.
21 A  Okay.
22       MR. WEINSTOCK: Before you start, can we get
23    the same agreement we had Thursday, that to the
24    extent that we consider it privileged; to the
25    extent it has not already been waived --

**Page 130**

1        MR. BUZBEE: Yes, sir.
2        MR. WEINSTOCK: -- letting you ask about it
3     does not further waive it?
4        MR. BUZBEE: Yes. Did we have that agreement
5     in the first deposition with Mr. Shea?
6        MR. WEINSTOCK: We did. Oh --
7        MR. BUZBEE: Like back last summer?
8        MR. MILLER: No.
9        MR. BUZBEE: I didn't think so.
10       MR. WEINSTOCK: I don't think you asked about
11    specific numbers, though.
12       MR. BUZBEE: Okay. All right.
13 Q  What led to sending Mr. Pullin down to New Orleans
14    to do some screening of these trailers?
15 A  Well, there was obviously the concern brought up in
16    the press, and we wanted to do whatever we could to
17    learn more about formaldehyde and any complaint
18    that may be out there. And we had gone out of our
19    way to follow up on any complaints that were out
20    there to see if we could provide any assistance.
21       And part of this information collecting was to
22    have Scott go down and -- I believe he was already
23    going down to, what is it, St. Bernard? And to
24    collect information, talk to people, and give us
25    feedback whether there were people that had

**Page 131**

1     complaints, because we really weren't -- we had
2     seen the report in the press and we wanted to learn
3     as much as we could about this.
4  Q  You sent him down there because you told the
5     Government you were going to. Isn't that right?
6  A  No.
7  Q  You did tell the Government you were going to do
8     some testing, didn't you?
9  A  Well, there was a contact where Steve Miller had
10    sent me a request to see if our field people could
11    do some testing. And I naively thought that, as
12    probably Steve, hey, that was something that a
13    field rep could do. I had no idea.
14       Prior to that, I had heard very, very little
15    about formaldehyde in the ten years that I had been
16    in charge of the towable division. I can't even
17    hardly remember much about formaldehyde coming up.
18       So this was a couple days after we had heard
19    the first complaint, and I had an e-mail from Steve
20    asking if we could have a field person do it.
21    Looked online, said, Hey -- looked at these instant
22    read things; said, Hey, we could get one of these
23    and have one of our guys to do some testing.
24       And you know, I had no idea. I mean, this
25    was -- this was obviously something that is beyond

**Page 132**

1     a field rep doing; something the CDC spent seven
2     months doing, or six months doing; the EPA spent
3     many months doing. So there's a lot more involved
4     in testing than having a field rep with some type
5     of instant read thing go down there and do testing.
6        And it's my recollection that I talked to
7     Steve later that week and told him that we were
8     having a problem getting direct -- or we were
9     having a problem getting an instrument to do this
10    testing. And we had, to my recollection, not
11    really had a conversation after that about this
12    request for him to have a -- for us to have a field
13    rep do testing down there.
14       And what Scott was doing was not this test
15    that we had talked about; it was some informal
16    gathering of information.
17 Q  Are you done?
18 A  Yes.
19 Q  Okay. All right.
20       (Plaintiffs' Exhibit 4 was marked for
21    identification.)
22 Q  I'll show you Exhibit 4, Gulf Stream 4466. This is
23    an e-mail you sent on March 17th of 2006, after you
24    were aware that there was some issue or some
25    complaints being made about ambient air quality in

Page 285

1  showing you, I'll mark them Exhibit 30, and it's
2  Gulf802 through --
3      MR. WEINSTOCK: 808.
4  Q -- 808. Does that answer the question for you? Is
5    this the rail ready design or --
6      (Plaintiffs' Exhibit 30 was marked for
7    identification.)
8  A Let me see. I'm looking at one print. Okay, this
9    is the rail ready design print right here.
10 Q Exhibit 30. Or a particular page?
11 A It's Gulf804. It's the T-32 FEMA frame and it's
12   August 29, 2005. And that shows a tube frame, I
13   believe. I'm pretty sure that's a tube frame.
14 Q Who at Gulf Stream was sort of heading up this
15   effort to move to the rail ready frame?
16 A That was Eddie Abbot.
17 Q Eddie Abbot.
18 A Uh-huh.
19 Q Is he still with the company?
20 A Yes, he is.
21 Q Where is he located?
22 A He works in Nappanee.
23 Q Let me show you one other document.
24 A Yeah, this says tube frame here, this 805, 32 tube
25   frame, and that's 8/31/2005.

Page 286

1  Q Which document are you looking at?
2  A 805.
3  Q Okay.
4  A These apparently are all from the '05, and they
5    show the railroad, versions of the railroad frame.
6  Q And what was the difference between the tube frame
7    and the frame that was being used in 2004? I mean,
8    the 2004 was not --
9  A I was hoping you had a print for the '04 frame,
10   but...
11 Q You know, I was hoping I did, too. But I could be
12   wrong, maybe I saw it and I didn't know what I was
13   looking at, but I don't believe we -- I don't
14   believe we do. I would like to see one.
15 A It's my recollection that the '04 frame would have
16   been an I beam frame, but it could have been a tube
17   frame, but...
18 Q Did the rail ready project go -- I'm sorry, did I
19   cut you off?
20 A No, I was done.
21 Q Did the rail ready frame go through stages of
22   development? I mean, is it possible that at one
23   point it was simply a beefed-up I frame?
24 A No, I don't think so. There were probably changes
25   made maybe to locations of brackets, locations of

Page 287

1  tiedowns, but as far as it being a tube frame,
2  there were times when it was a 2 x 6 and a 2 x 2
3  together, making an 8-inch tube, and other times
4  when it was just a solid 8-inch tube.
5  Q What is your degree in? Do you have a college
6    degree?
7  A In finance.
8      MR. PENOT: Give me one minute, because I --
9    there's some document that suggests that it's --
10   well, okay.
11 Q What are the difference in the characteristics of
12   the tube frame and the I frame? The performance
13   characteristics of them.
14 A That I might not be the best person to respond on.
15 Q Okay. And who would be?
16 A Either Scott or Eddie or frame supplier.
17 Q Scott Pullin or Eddie Abbot?
18 A Or Eddie Abbot.
19 Q Okay. And speaking of frame suppliers, there was
20   an exhibit that we looked at on Thursday.
21     MR. WEINSTOCK: That microscopic one?
22     MR. PENOT: Whatever you gave me. Right.
23     MR. WEINSTOCK: What number did you attach it?
24   Because I can actually blow it up on my computer.
25     MR. PENOT: Give me a minute here. It was

Page 288

1  Exhibit -- it was Exhibit 19 in Phil's deposition.
2  And it is very difficult. It's Gulf38, Exhibit 19.
3     MR. MILLER: I have an extra copy here. I
4  just need that back.
5     MR. PENOT: If you would give that to the
6  witness, please.
7     MR. WEINSTOCK: You said Phil's deposition; it
8  was actually the 30(b)(6) of Gulf Stream Coach.
9     MR. PENOT: Correct. I stand corrected.
10 Q Do you recognize this document? This is some sort
11   of a purchasing log or supply log that your company
12   keeps?
13 A Yes, I've seen these before.
14 Q And it's kept by the purchasing people. Is that
15   correct?
16 A Yes.
17 Q Okay. And if you look at the lower right-hand
18   corner, I know the print's very small, but it just
19   looks like it dates from March.
20 A March 30th, 2006.
21 Q The frame suppliers at that point in time were
22   Venture, M-Tec and Lippert. Is that right?
23 A Yes.
24 Q And do you know who they were in 2004?
25 A You know, I'm not sure of that.

**Page 289**

1  Q And who would be the best person to tell me that?
2  A Jeff Zumbrun.
3  Q A little bit further down on that page, Plaintiffs'
4     Exhibit 19, left-hand column, we're looking at
5     frames, and we've got tires, and then you've got,
6     it says -- reads, literally, stab jack, but is that
7     the stabilizer jack that we've been talking about?
8  A Yes, I believe it is.
9  Q What's the difference between that and a 2000-pound
10    jack?
11 A You know, I'm not sure if that -- there would be a
12    jack in the front of the unit, the hitch jack; I
13    don't know if that's what is referred to by the
14    2000-pound jack or not.
15    MR. PENOT: Give me one minute and I think I'm
16    just about done.
17    Thank you, Mr. Shea. I yield whatever time I
18    have left to Mr. Miller.
19    MR. MILLER: I don't believe we have any time
20    left.
21    MR. WEINSTOCK: I don't think you do.
22    MR. BUZBEE: I have a little bit of time, but
23    I want to ask --
24    MR. WEINSTOCK: You've only got a few minutes.
25    MR. BUZBEE: Do you have the complete copy of

**Page 290**

1     that document, Exhibit 19, to the 30(b)(6)?
2     MR. MILLER: That was the only page I had that
3  was part of it. That was the complete.
4     MR. BUZBEE: Okay.
5     MR. WEINSTOCK: That was the complete exhibit,
6     although you had more pages in your packet.
7  REDIRECT EXAMINATION
8  BY MR. BUZBEE:
9  Q Let me ask you this, Mr. Shea. Exhibit 19 to the
10    30(b)(6) deposition, which you were reading from,
11    is actually a 12-page document. Did you understand
12    that to be true? That's just one page of it.
13 A I didn't realize it was 12 pages.
14 Q Whether it was 10 or --
15 A I think I knew there were more pages to it.
16 Q -- 11 or 12, there's more than one page to it.
17    True?
18 A Yes, that's my understanding.
19 Q It dealt with all of the vendors and component
20    parts of the 2005 trailer order, did it not?
21 A I'm not sure that it would have been all of the
22    parts, but it would be a number of the parts.
23 Q And did you know that on that -- and I wish I had
24    it here because it's very interesting to me, that
25    with regard to the lauan that's listed --

**Page 291**

1  A Uh-huh.
2  Q -- that someone, someone within purchasing, every
3     time they mentioned Adorn, there was a reference,
4     This material must be LFE. Did you know that?
5  A Do you have that?
6  Q I bet your lawyer has it right there on his
7     computer.
8     MR. BUZBEE: No?
9     MR. WEINSTOCK: Somewhere in here
10    (indicating).
11    MR. BUZBEE: In there.
12 Q Well, let's assume that's true, because I'm not a
13    liar, contrary to popular belief. Let's assume
14    that at least --
15    MR. WEINSTOCK: Let's leave that out of your
16    question and just ask a new question.
17    MR. MILLER: Nobody has ever said that you
18    were a liar.
19    MR. BUZBEE: Well, you don't know everybody I
20    know.
21    MR. MILLER: Oh, well.
22    MR. BUZBEE: Let's start over.
23 Q Let's assume that on that -- that's a purchasing
24    department document, is it not?
25 A That's my understanding of it. It's some type of

**Page 292**

1     minutes or something.
2  Q Yeah. Basically when the purchasing folks get
3     together to talk about shortages or where they're
4     going to get particular component parts from.
5  A This one was something on March 30th, 2006.
6  Q Right. Why would it be, if you know as the
7     president of Gulf Stream towables, why would it be
8     that every time they mentioned Adorn -- they were
9     going through the various wood product suppliers;
10    when they would mention Adorn, they would put on --
11    there was a reference that says must be LFE. Can
12    you explain why that would be?
13 A You know, I don't know if I could explain that, but
14    it would obviously be easier if I had a document to
15    look at.
16 Q Yeah, I bet it would, since you know I don't have
17    it. I'm asking you about the --
18    MR. WEINSTOCK: Come on, Tony. That's
19    uncalled for.
20    MR. BUZBEE: Well, I mean, really. This is
21    typical.
22 Q Let me just ask again.
23 A Well, you're asking me about a document I can't
24    look at, but...
25 Q Right. Every time -- they had Genesis products and