# Transcript of the Testimony of

# DANIEL SHEA

Date: June 1, 2009

FEMA Trailer Formaldehyde Products Liability Litigation
v.

A Yeah. And historically, before Florida -- as you're aware, we had sold trailers year to year to year, and they would go in the front yards of people that needed temporary housing, and whether it be roof damage or water leaks or -- that was my understanding, is that they would be there, you know, for more a period of months while this temporary work was done on someone's home.

And a lot of times people would live back and forth between their partially damaged or built home and the travel trailer. They would spend time in both.

Q But you were aware, of course, prior to 2004 that some individuals were living full time in trailers provided by FEMA and manufactured by you.

A Were living full time?

Q Uh-huh.

A Temporarily.

Q They were living in your trailers longer than a year. You knew that before 2004, didn't you?

A You know, I don't recall knowing that before 2004, that someone would have stayed in one of our trailers for more than a year.

Q You're not suggesting that since 1992, you had no idea that some of the trailers you were providing

in the specifications.

Q And as the president, you knew that meant they didn't want the people they were placing in the trailers to be sick; right?

A No, that is not something that I would read into the term "superior quality."

Q You wouldn't read that into the term?

A No.

Q Okay. So a trailer could be of superior quality but it could still make a child with asthma sicker.

MR. WEINSTOCK: Object to the form of the question.

A I don't know that.

Q But what you do know, at least as the president of this company, your position is, hey, superior quality of the trailer has nothing to do with whether people who live in it are exposed to formaldehyde and are caused sickness.

MR. WEINSTOCK: Object to the form of the question. No foundation.

Q Right?

A The specification didn't talk about the level of the wood products, and this product that we're talking about with Adorn would have been what was being supplied by the majority of the industry, is

the 50,000 units, this would not be accurate, isn't that correct, because you had received some complaints.
A Well, we had, to my knowledge, I believe it was two.
Q But you did have some complaints at that point.
A And I don't know that those were complaints -- those were complaints of illness. We had had two people call our service department on odors, but that's not what we were talking about. We were talking historically.
Q That's what I'm trying to say.
A Yeah.
Q You knew that there were complaints that related to formaldehyde. Whether they were valid, accurate, or whatnot, that's in dispute.
A There were two odor complaints. The one guy that they write the story about was the guy that was talking about formaldehyde.
Q And he had tested his unit, in fact.
A Yes, uh-huh.
Q And so you knew there was at least one complaint that related to formaldehyde at least.
A The one that they were writing the story about.
Q Right. And that would have been a unit that you

had provided to FEMA through a contract; correct?

A Yes.

Q So given on April 27th you knew about that complaint, this statement, if it referred to all FEMA contracts, would be inaccurate.

A Well, they were writing the story about this gentleman. That was what -- this had gone on over three or four weeks; it was what the whole story, them contacting us, was about, was, to our knowledge, Mr. Stewart. So we were talking about our historical experience.

Q Now, the next paragraph in this statement says "Built with the same materials commonly found in the marketplace and used to construct other types of housing, our trailers are safe, reliable and high quality products."

This is referring to the units that you made for FEMA; is that correct?

A Yes.

Q They were safe. You were telling the public and FEMA, on April 27, 2006, that these units were safe.

A That's correct.

Q And you still believe that they're safe.

A Yes.

Q And that they're high quality products; correct?
A Yes.
Q The last sentence in that second paragraph, "Although not required for travel trailers, our company goes the extra step to specify low formaldehyde emission building materials from our suppliers."
Is that correct?
A Yes.
Q At this point, April 27th, you knew at least 5 percent of the materials that you were getting, that may have gone into these units, were not low emission materials. Is that correct?
A Well, we weren't sure of that. There was 5 percent that may or may not have, but we had still specified that all that material should meet the HUD standard, and there was 5 percent that had come up that may or may not have met, but we had specified -- you know, we felt we had specified that historically to our suppliers.
Q And that's why, in that sentence there, you use the term "specify," but not necessarily, in fact, had used low emission materials. Right? You used that word "specify" specifically there for that purpose, because you knew that it may not be accurate, that

Transcript of the Testimony of

# SCOTT PULLIN

Date: June 2, 2009

FEMA Trailer Formaldehyde Products Liability Litigation
v.

think Dan gave the contact in Baton Rouge that direction.
Q So Dan is the one that told Burl to do that?
A I believe so.
Q Okay. You didn't tell Burl to do that?
A No, sir, not that I remember.
Q You knew Burl was going to do it?
A I did.
Q Okay. Did you agree with that approach?
A I did.
Q You knew that there was somebody complaining of an odor and eyes burning and breathing issues -- or headache, I think is what he said?
A I believe this gentleman said he had some irritation, yes.
Q He said his eyes were burning, and he said that he had headaches; right?
A I don't remember specifically.
Q Okay. But --
A It's probably documented somewhere.
Q It is. And you were aware of it because Dan was tasking one of your people directly?
A Burl was down there at the time. I think I was still in Nappanee. And Burl and I would communicate, and Dan and I would communicate, so

A That's correct.
Q 80.8 degrees inside?
A Correct.
Q 45 percent humidity?
A That's correct.
Q A formaldehyde reading outside of 0?
A Yes.
Q But an inside formaldehyde reading of 0.54 parts per million?
A As the document shows, that's the recording I had, yes.
Q And you knew at that point that that was over the -- what you -- and again, this is just your understanding of the HUD standard. You knew that was over the HUD standard?

MR. WEINSTOCK: Object to the form. HUD doesn't have a standard.

MR. BUZBEE: Again, don't coach him. I already said that he doesn't know, but whether he knows there's a HUD standard, whether he's wrong or right, if he knows it's over what he thinks the HUD standard is, that's absolutely relevant to the reasonableness of his conduct.

So whether he's right or wrong on the standard, whether there is a standard or not a

contractor, once they were contacted to come back out, had corrected a plumbing problem, and she was actually smelling wastewater.
Q You're talking about a lady named Brigitte Rolland?
A Yes.
Q Okay. The detector alarms, would that be the carbon monoxide?
A Unless they're specified there, I don't recall. Could have been the detector of CO2 or the smoke alarm.
Q Okay. You knew that the temperature going up would impact the amount of new smell in the trailer?
A Yes.
Q Did you ever tell FEMA or any of the residents that, Hey, the hotter it gets, the more the humidity goes up, the more you're going to smell that new smell?
A As I said before, I didn't have any direct conversation with FEMA. That was related to Dan and our conversations, and I don't know what Dan told FEMA.
Q Did you tell any residents that, Look, yeah, you can expect more of that new smell the hotter it gets?
A I have told customers it's like a new car smell; it

significant improvement is use different wood?
A I'm sorry?
Q One significant improvement, as you stated, is to use different types of wood?
A There are different substrates and wood available, yes.
Q And you certainly knew before these trailers were provided to FEMA either in 2004 or 2005 about the existence of this other type of wood, didn't you?
A I don't know that I knew that until some deep investigation was done and comparatives. You know, what I had always been told and directed was that we buy the FLE. So if there are improvements over that, it's like an '09 car over a 1970. There are significant improvements.
Q Let me ask it this way: This better -- can we call it better wood or less formaldehyde emitting wood?
A Less emitting.
Q Okay. This less emitting wood that you're using now at Gulf Stream --
A Yes.
Q -- it existed prior to 2004, didn't it?
A I don't know that.
Q Have you not looked into that?
A No, I have not.

# Transcript of the Testimony of

# BURL B. KEEL, III

Date: June 2, 2009

FEMA Trailer Formaldehyde Products Liability Litigation
v.


Q To talk about this lawsuit with anybody?

A No, sir.

Q Okay. You've been in a lot of different positions at Gulf Stream.

A Yes, sir.

Q Have you ever been involved in purchasing?

A No, sir.

Q Okay. Are you familiar with the component wood products that go into the trailer?

A Yes, sir.

Q Do you know what LFE means, the designation LFE?

A I believe it has something to do with what we're calling F4 rating, that all materials now must have an F4 rating for us to use it.

Q F4 means what?

A I don't know. I was just told it had to have F4 on there to use it.

Q Is that recently?

A About a year ago, year and a half ago.

Q How about before that; was there any policy that you knew about as far as formaldehyde?

A No, sir.

Q You never knew that there was any policy that the company would use only low formaldehyde emitting products?

Q And you never, in your 17 years of working at Gulf Stream, until last year, ever knew about any policy that required the use of low formaldehyde emitting materials; isn't that true?
A Yes, sir.
Q Just last year a new policy was implemented; right? About formaldehyde.
A Yes, sir.
Q And that was put in writing?
A I don't know, sir.
Q Have you seen it in writing anywhere?
A No, sir.
Q Who told you that you had to have -- all wood products had to have the F4 stamped on them?
A Jeff Zumbrun and I believe it was Rob Beck.
Q And that's -- Jeff Zumbrun is the purchasing manager for the company, towables?
A Yes, sir.
Q And who was the other fellow?
A Rob Beck.
Q Who is he?
A He was a purchasing agent for Plant 51.
Q Okay. And both of these men told you, Hey, this is the new policy?
A Well, actually Rob Beck, I asked him, What's this