Transcript of the Testimony of

# DANIEL SHEA

Date: June 1, 2009

FEMA Trailer Formaldehyde Products Liability Litigation

v.

1    or --

2    Q  Are they different?

3    A  Yeah, I would say that the four buildings would

4        have been different.

5    Q  Okay.  So some of them have fans and some of them

6        don't?

7    A  I would think that most of them would have fans,

8        but depending on the building and when it was built

9        and so forth, it may have more.  There may have

10     been fans added afterwards.  It also depends on the

11     time of the year potentially.

12    Q  Why were fans added afterwards and where were they

13       added?

14    A  After?

15    Q  Yeah, you said fans may have been added afterwards.

16    A  Oh, after the building was built.

17    Q  Oh, okay.  All right.  Tell me who Jeff spoke to

18       from Adorn.

19    A  You know, I'm not sure of that.

20    Q  What did he learn from Adorn?

21    A  He had learned that they had made a mistake on

22       this, and that he had advised me that 5 percent of

23       the product came from Adorn.  And that I had been

24       told by Jeff this concept that he had talked to

25       several people, and that, number one was that the

1    A   We had a policy to buy LFE products and products

2        that met the HUD -- HUD emission level for those

3        products.  We did have a policy for that.

4            I'm not sure when I look at this invoice --

5        like I say, I see this term "REG" that I've become

6        familiar with over the last couple years that Adorn

7        uses, and I'm not sure whether when it says REG,

8        whether that product would have been below the HUD

9        emission requirement.

10           It is my understanding that it's not

11       necessary -- it's not certified to be below that

12       level, but whether it is or not, I would not know.

13   Q   Your policy is to use -- is to specify

14       HUD-certified wood components.  Isn't that the

15       policy?

16   A   Policies that meet the HUD product emissions

17       requirements.

18   Q   Right.  And if that wood that's described in

19       Exhibit 1 did not meet the HUD requirements, then

20       obviously your policy was violated.   True?

21   A   If this did not meet the HUD requirement, it would

22       not be within what we -- our policy would have

23       requested or required.

24   Q   And whose fault would that be?

25   A   Whose fault would it be?

1   Q   Whose mistake was it?

2   A   Well, the vendor, in this case, Adorn, was well

3       aware of our LFE policy.

4   Q   So it was Adorn's fault.

5   A   If the material would not meet the LFE requirement,

6       it would be Adorn's fault.

7   Q   It wouldn't be your gate guard's fault.

8   A   No, I don't think so, because we wouldn't

9       necessarily know when it says REG what that

10      designator is.

11  Q   How long has Adorn been providing decorative

12      hardwood plywood panels to put in trailers that you

13      sell to the general public?

14  A   A number of years.

15  Q   Your brother said 20 years.  Is that right or

16      wrong?

17  A   That could be.  I know they've been in business a

18      long time, and at times Adorn may sell us product

19      or times we may receive it from other suppliers.

20  Q   So for 20 years -- sorry.

21  A   Usually there's a number of different suppliers

22      that would supply us product.

23  Q   Right.  For 20 years, Adorn has been providing wood

24      products that have been used in the trailers you

25      sell to the public.  Isn't that right?

1    A   For many years.  And of course, Gulf Stream has

2        different divisions and -- but I would think that

3        back in the '90s, that Gulf Stream would have been

4        buying product from Adorn for travel trailers.

5    Q   And your testimony is, is that for the first time

6        ever, you learned what that designation REG means

7        in March of 2006.

8            MR. MILLER:  Objection.  Mischaracterizes the

9        witness's testimony.

10   A   I had learned sometime in March or April of 2006

11       that Adorn has this term, "REG," that meant that

12       the product didn't necessarily meet the HUD

13       requirement.

14   Q   How did you learn that?

15   A   I was at one of our manufacturing facilities and I

16       was walking down the line with our production

17       manager, Jeff Zumbrun.

18   Q   Which plant?

19   A   That would have been our Plant 57 -- or I'm sorry,

20       it would have been Plant 75 in Etna Green.  And we

21       were walking through that plant and it was just

22       toward the end of building FEMA units and we were

23       looking at starting our fifth wheel production in

24       there, and as that meeting was done, I started

25       looking at all the different wood products with

1    Q   Right.

2    A   Others, there was nothing in the label that said

3        one way or the other, but there was a part number,

4        and in that part number it had an LE, so -- and

5        then we ran across this one from Adorn and we

6        really didn't see one thing, one way or the other,

7        whether it was LE or LFE, and I asked Jeff what he

8        knew about this, and he wasn't sure.

9    Q   He was the purchasing manager for the --

10   A   He was the purchasing manager and this term "REG,"

11       he wasn't familiar with.  And we looked at it and

12       then he contacted Adorn and later reported back to

13       me that this REG meant that it didn't necessarily

14       meet that HUD emission requirement.

15   Q   And that's how you learned what REG means.

16   A   Yes.

17   Q   You just so happened to be -- you had in the back

18       of your mind this news story where somebody was

19       complaining, or alleging formaldehyde exposure, so

20       you're walking through the plant looking at the

21       wood to see if you could figure out what was going

22       on.

23   A   Yeah.

24   Q   And you saw this term "REG" and you didn't know

25       what it meant, and the purchasing manager for the

1   A   Or that I'm not -- no, I'm basing it on the fact

2       that I've never had -- we've never had a situation

3       where that's come up prior to this, that there was

4       a question of whether a supplier was supplying us

5       LFE or not.

6   Q   Well, if you're relying on your suppliers, why

7       didn't you just call your suppliers up and ask them

8       rather than actually going and inspecting?

9   A   I wasn't really -- my purpose down there really

10      wasn't to inspect wood.  We were down there on

11      other business, and as I walk through the plants, I

12      will talk to people on the production line, see how

13      things are going, and we happened to get to the

14      department where there was wood, and at that point

15      it just -- my interest was in looking at some of

16      these wood labels.

17          And that's when I started comparing the

18      various -- there was quite a variety between the

19      different companies on how they would label their

20      products, and I was looking at the various labels

21      and I had a question with Jeff on this particular

22      label with Adorn.

23  Q   So Jeff made a call to Adorn?

24  A   Yes.

25  Q   Who did he call?

1    or --

2    Q  Are they different?

3    A  Yeah, I would say that the four buildings would

4        have been different.

5    Q  Okay.  So some of them have fans and some of them

6        don't?

7    A  I would think that most of them would have fans,

8        but depending on the building and when it was built

9        and so forth, it may have more.  There may have

10      been fans added afterwards.  It also depends on the

11      time of the year potentially.

12    Q  Why were fans added afterwards and where were they

13      added?

14    A  After?

15    Q  Yeah, you said fans may have been added afterwards.

16    A  Oh, after the building was built.

17    Q  Oh, okay.  All right.  Tell me who Jeff spoke to

18      from Adorn.

19    A  You know, I'm not sure of that.

20    Q  What did he learn from Adorn?

21    A  He had learned that they had made a mistake on

22      this, and that he had advised me that 5 percent of

23      the product came from Adorn.  And that I had been

24      told by Jeff this concept that he had talked to

25      several people, and that, number one was that the

1   majority of the industry used this product that was

2   not LFE; that there were only a few companies that

3   used, at that time, products that were LFE, and

4   that we were one of the few -- one of a few

5   companies that required this LFE.

6       And that also he advised me that he had been

7   told that, just because something isn't

8   necessarily -- isn't necessarily stamped that it's

9   LFE, it may be LFE.  There's situations where a

10  mill will run LFE and put -- not necessarily put

11  the LFE stamp on it.

12  Q  What else did you learn from Adorn through Jeff?

13  A  That's what I recall right now.

14  Q  Did you ever speak directly with anybody from

15  Adorn?

16  A  No.

17  Q  Never.

18  A  You know, there was a gentleman -- regarding this

19  issue?

20  Q  Right.

21  A  No.  I never spoke to anyone from Adorn.  There was

22  a gentleman that used to own Adorn that I had

23  known; I don't know if he was involved with Adorn;

24  I think he had sold out.  I don't know whether he

25  was involved at the time, but I never really spoke

1    to him on -- I never spoke to him on this issue.

2    But I might have spoke to him since this, but I

3    normally wouldn't be involved with the individual

4    salespeople from the various companies.

5  Q  But on this issue, you're telling me this wasn't an

6    important enough issue for you to talk to any of

7    the leadership of Adorn?

8  A  No, I did not.

9  Q  Okay.  Does your company or any of the brothers

10    have any ownership interest in Adorn?

11  A  Not to my knowledge.

12  Q  Have you ever had any ownership interest in Adorn?

13  A  No.

14  Q  So what you learned -- I guess what Jeff learned

15    and reported to you was, 5 percent of the products

16    that you put -- of the wood products that went into

17    your trailers were from Adorn.

18        MR. WEINSTOCK:  No.

19        MR. BUZBEE:  Let me clarify this.  He can

20    figure this out.  He's smart enough to do this.

21        MR. WEINSTOCK:  You're right.  You're right.

22    Go ahead.

23  A  Yeah, it was my understanding at that time from

24    Jeff that 5 percent of the products were from --

25    were from Adorn.

1    Q    Okay.  So in other words, you had -- your brother

2         told me that there are approximately six -- for

3         that big FEMA order in 2005, there were

4         approximately six decorative hardwood panel

5         companies you were purchasing from, Adorn being one

6         of them.  Is that right?

7    A    In 2005?  Yes.

8    Q    Okay.  And you're telling me that of those six,

9         Adorn had only about 5 percent of the business.

10   A    Yes, that's my recollection of what Jeff had told

11        me --

12   Q    Okay.

13   A    -- back in March or -- late March of 2006.

14   Q    Right.  So in other words, the other five companies

15        that provided these decorative hardwood panels made

16        up 95 percent of the wood products that you were

17        purchasing.

18   A    That would have been my understanding at the time.

19   Q    And are you also telling me that 100 percent of the

20        products provided by Adorn were, in fact, REG?

21   A    You know, I don't recall specifically that coming

22        up at the time, that all hundred percent of the

23        5 percent were REG.  It seemed like that there was

24        still question of, even of the 5 percent, how much

25        would have specifically been designated as REG.

1    generally about 10 percent more in price.  Isn't

2    that right?

3  A  You know, I'm not sure of that.  Lauan's kind of a

4    commodity and the price goes up and down, but

5    10 percent could be a number, 10 to 15, 20 percent.

6    Probably 10 percent, but that's something I really

7    wouldn't have a memory of.

8  Q  You wouldn't have a memory of that?

9  A  Of the exact difference, no.  It's something that

10    would depend on the vinyl that would go on the

11    product.  When you buy something, you're not only

12    buying the lauan but you're buying the vinyl that

13    goes on it.  LFE would be more, but I'm not sure

14    how much more.

15  Q  Okay.  So just so we're clear, LFE would be more.

16  A  Yeah, I think -- I think it would be more.

17  Q  Okay.  LFE costs more.

18  A  They would charge us more.

19  Q  Yes.  Okay.  Now, I'm trying to figure out, you

20    figured that at least of the FEMA order of 2005,

21    Adorn provided 5 percent of the wood products.

22  A  That was my understanding back then in March or

23    April of 2006.

24  Q  Is that still your understanding?

25  A  No.  We later found out that, I think the number is

1    as much as 15 percent.

2    Q   Okay.  So now, since you've done further

3        investigation, you've determined that for the 2005

4        FEMA order, the 50,000 trailer order, that Adorn

5        provided approximately 15 percent of the wood

6        products that went into those trailers.

7    A   Yes, that's my understanding today.

8    Q   And you don't know for sure, but you're just

9        assuming that those -- that 15 percent of the wood

10       products were not HUD certified.

11   A   The 15 percent were not certified to meet the HUD

12       standard, but that doesn't necessarily mean that

13       they didn't.

14   Q   It doesn't necessarily mean they did either.

15       Right?

16   A   Correct.

17   Q   Okay.  So what you're telling me today is that

18       15 percent of the products, the wood products that

19       went into the 50,000 trailer order were not HUD

20       certified.

21           MR. MILLER:  Objection.  Mischaracterizes the

22       witness's testimony.

23   A   Could you repeat that, please?

24   Q   Yeah.  What you're saying is, the 15 percent of the

25       wood products that went into these 50,000 trailers,

1        based on as best as you can calculate, those wood

2        products were not, quote, HUD certified.

3              MR. MILLER:   Same objection.

4    A   Well, my statement would be that Adorn, it's my

5        understanding, is roughly 15 percent of the

6        products that we purchased, the lauan products with

7        the interior, the vinyls, and that that product

8        that we purchased, Adorn did not certify that those

9        met the HUD emission standard.

10   Q   Okay.  Now, did you determine that other wood

11       products from other vendors were also not HUD

12       certified?

13   A   Yes, that did come up.  That did come up later.

14   Q   Tell me how that came up later and what came up.

15   A   I believe it was in July, August, or September of

16       2007, and we had been through the invoices and

17       paperwork and so forth, purchase orders that we

18       had, and our purchasing department had

19       double-checked things, and we felt confident that

20       we had gone through everything.

21            And after -- I think there was a hearing, I

22       think that's when there was a hearing in D.C., in

23       2007, and we went back and we wanted to

24       double-check everything and we were looking at the

25       letters we had, invoices, everything, and there

1      have that -- those numbers.

2    Q  You realize your brother testified in front of

3       Congress?

4    A  Yes, I do.

5    Q  You realize that you've sent letters to the United

6       States Government affirming the types of products

7       you use in your trailers?

8    A  We've sent letters to the Government.

9    Q  Show me the letter where you told the Government

10      that 15 percent of the products you put, from

11      Adorn, into your trailers were not HUD certified?

12   A  I did have a conversation with Steve Miller --

13   Q  I didn't ask that.

14   A  -- regarding that.

15   Q  When?

16   A  In, it would have been April or May of 2007.

17   Q  After you were sued.

18   A  It was -- it would have been after we had done this

19      further look into the amount of material that came

20      from the various companies.

21   Q  Can you tell me any -- show me any letter where you

22      sent to correct your prior letters and e-mails?

23   A  No, it was a discussion we had had.

24   Q  Now, who within your company would know the exact

25      percentage of roof underlayment that was put in

1    and if they did not meet those specifications, I

2    don't believe that they would have supplied us what

3    we were asking for.

4  Q  You realize when your purchaser, Mr. Zumbrun, when

5    he purchases, he purchases by product number.  You

6    realize that.

7  A  By part number?

8  Q  Yes.

9  A  I'm not sure if he does that all the time he

10   orders.  Sometimes he would -- I don't know if

11   sometimes he may do verbal orders on some things.

12 Q  All right.  You realize, though, that the part

13   number that he ordered was exactly what was

14   received by you.

15 A  The part number ordered.

16 Q  Uh-huh.

17 A  What are we referring to now?

18 Q  We're referring to the part number you ordered is

19   exactly what was delivered.  In other words, the

20   mistake was on your end, sir.  Did you know that?

21 A  What part number are we talking about?

22 Q  The part number for the lauan that's not HUD

23   certified.

24        MR. MILLER:  From Adorn?

25        MR. BUZBEE:  From Adorn.

Page 68

1          MR. WEINSTOCK:  Hang on, I'm sorry.  Just for

2     clarification, what he said was the purchase orders

3     to Weyerhaeuser and Samling said HUD.  Now you're

4     changing this to the Adorn purchase orders?

5          MR. BUZBEE:  Yes, I am.  I'm asking him a

6     question.

7          MR. WEINSTOCK:  I understand that, Tony, but

8     what I want you to do, if you don't mind, is

9     clarify which purchaser -- who you're buying

10    product from, because you've changed your question.

11         MR. BUZBEE:  Can you read the question back?

12         It was very clear.

13  Q  What part number are we talking about?  The part

14    number for lauan that's not HUD certified.

15         I'm asking you again, do you realize that the

16    part number you ordered from Adorn is exactly the

17    part number that Adorn delivered to you?

18  A  I'm not familiar with what part number we're

19    talking about or what was -- is there a specific

20    purchase order we're talking about?

21  Q  There's one in front of you.  There's one in front

22    of you.  Right there, Exhibit 1.

23  A  Okay.

24  Q  That's a packing slip.  That tells you what was

25    delivered.  Did you know that Adorn has a different

1    part number for LFE materials?

2  A  Can you repeat that question, please?

3  Q  Did you know that Adorn uses a different part

4     number for LFE materials?

5  A  No, I did not know that.

6  Q  Did you know that Adorn delivered the exact part

7     number that your purchasing manager ordered?

8  A  I'm not sure what was -- the purchasing manager

9     ordered.

10  Q  Didn't you -- when this all came up, when you

11     learned that your statements you had given to the

12     Government were false, did you not ask him, Hey,

13     what did you exactly order, Jeff?

14        MR. WEINSTOCK:  I'm going to object to that

15     colloquy.  If you can just strictly limit it to the

16     question, leave out the part about the

17     Congressional testimony, just ask him a specific

18     question.

19  Q  I'm not asking -- you never testified in front of

20     Congress, did you?

21  A  No.

22  Q  But you did send e-mails to Mr. Miller, didn't you?

23  A  Yes, I did send --

24  Q  And you told him that you guys use -- that's the

25     word you used -- LFE materials, LFE wood products,

1    didn't you?

2    A  Yes, I did.

3    Q  Okay.  That's not true, is it?

4    A  Later we found out that this -- shortly after that,

5    we found out that there was 5 percent that, from

6    Adorn, that may or may not meet the HUD standard.

7    Q  Uh-huh.  Now, you also used Adorn, the supplier,

8    for the 2004 FEMA trailers, didn't you?

9    A  You know, I'm not -- I'm not sure of that.

10    Q  Why not?

11    A  We're still trying to find those records for 2004.

12    Q  So your testimony would be, At this point, Tony, I

13    can't tell you whether Adorn was one of the wood

14    product suppliers for the 2004 FEMA order.

15    A  That's correct.

16    Q  But I intend to find out.

17    A  Yes.

18    Q  Because it's real important.

19    A  Yes.  We're going to do our best effort to find all

20    the information on the 2004 products.

21    Q  When you guys spoke to Adorn, and I mean

22    specifically Jeff, did he ask Adorn, Hey, have you

23    always been providing us this, quote, REG product?

24    A  You know, I'm not -- I don't recall him talking

25    about that to me, but I do remember Jeff talking

1        about how all of the suppliers that he had talked

2        to had reinforced that they were well aware of our

3        policy to buy LFE product and that it had not been

4        a question.

5    Q   Does Adorn sell LFE wood products?

6    A   Yes, I believe they do.  At least they did at the

7        time.

8    Q   At what time?

9    A   In 2004 and 2005.

10   Q   They just didn't deliver.  And certainly in 2005,

11       that's not what they provided you.

12   A   You know, I'm not sure what the product was that

13       they had provided us.

14   Q   But you know that it was not HUD certified.

15       Whether it met the requirements or not, you know it

16       wasn't HUD certified.

17   A   And I'm not sure if, necessarily, all of the

18       material that they had provided us had this REG

19       designation or not.

20   Q   Can't you find that out?

21   A   Yes, we can look through the, the best of our

22       ability, the documents we have.

23   Q   Now, do you have policies and procedures at Gulf

24       Stream Coach towables?

25   A   Yes.

1      policy.

2   A  Yes.  Yes.

3   Q  Obvious that Adorn knew about the policy?

4   A  Yes.

5   Q  Obvious that Weyerhaeuser knew about the policy?

6   A  Yes.

7   Q  Obvious that Samling knew about the policy?

8   A  Yes.

9   Q  Was Samling a new supplier?

10  A  You're talking now in 2005.

11  Q  I am.

12  A  You know, I'm not sure of that.  There was some

13     type of name change.  I don't know if they're a

14     part of -- used to be Sterling, but I believe they

15     had purchased -- or sold us products prior to 2005

16     hurricane.  And before that, it may have been under

17     a different division or different name.

18  Q  So Weyerhaeuser and Samling may have provided

19     products to Plant 57 that built the Alexander

20     trailer?

21  A  Yeah.  Again, that's something that I hope we can

22     find those invoices shortly here and be able to

23     determine what was in there, but certainly

24     Weyerhaeuser would have supplied us material

25     historically.

1        single day?  The smell won't go away?

2    A   I don't -- as far as these occupants here that he

3        had visited, I don't recall him telling me that.

4    Q   Didn't tell you.  If he had told you that, what

5        would you have done?

6    A   I would have said, Hey, is there something we can

7        do to assist this occupant.

8    Q   At the same time this testing, or informal testing

9        was being done by Scott, were you also doing some

10       testing of some of your component parts, or

11       component woods, for instance, from Adorn?

12   A   Our attorneys, in Indiana, were looking into the --

13       some material that we had received from -- from

14       Adorn.

15   Q   Why did you choose Adorn?  Adorn only provided you

16       15 percent of your woods, but you chose Adorn for

17       some reason.  Explain why.

18   A   Well, it was the idea that we had found this

19       material that was designated as REG, and the fact

20       that it may or may not have complied to the --

21           MR. WEINSTOCK:  I'm sorry.  What was the

22       question?  I apologize.

23           MR. BUZBEE:  Why did you choose Adorn to have

24       the product tested.  He was telling me that, well,

25       we -- we're walking through the facts.

1        in the specifications.

2    Q   And as the president, you knew that meant they

3        didn't want the people they were placing in the

4        trailers to be sick; right?

5    A   No, that is not something that I would read into

6        the term "superior quality."

7    Q   You wouldn't read that into the term?

8    A   No.

9    Q   Okay.  So a trailer could be of superior quality

10       but it could still make a child with asthma sicker.

11       MR. WEINSTOCK:  Object to the form of the

12       question.

13   A   I don't know that.

14   Q   But what you do know, at least as the president of

15       this company, your position is, hey, superior

16       quality of the trailer has nothing to do with

17       whether people who live in it are exposed to

18       formaldehyde and are caused sickness.

19       MR. WEINSTOCK:  Object to the form of the

20       question.  No foundation.

21   Q   Right?

22   A   The specification didn't talk about the level of

23       the wood products, and this product that we're

24       talking about with Adorn would have been what was

25       being supplied by the majority of the industry, is

1       it was, like, ten were possibly elevated.

2    Q  Ten trailers?

3    A  Ten to 12 or 15, something like -- a small number

4       of the hundreds had what was told me to be --

5    Q  All right.  Let me see if I understand this.  You

6       were informed that sometime in the fall of 2005 --

7    A  Uh-huh.

8    Q  You learned this after the fact, but you were told

9       that sometime in the fall of '05, that FEMA was

10      doing some trailer testing?

11   A  Yes.

12   Q  When did you learn that?

13   A  Either in March or early April.

14   Q  Of '06.

15   A  Yes.

16   Q  But this was the first time you knew that FEMA had

17      been doing formaldehyde testing on some of these

18      trailers?

19   A  When I first -- when I heard this?

20   Q  Yes.

21   A  Yes.

22   Q  Now, didn't you have technical, or technicians at

23      each of the distribution points?

24   A  Yes, we did.

25   Q  Now, why had you -- why would you just now have

1    sold the trailers.

2  A  No, not to my knowledge.

3       THE VIDEOGRAPHER:  Mr. Buzbee, can we take a

4     brief pause?

5       MR. WEINSTOCK:  More than brief.

6       THE VIDEOGRAPHER:  We are going to go to Tape

7     No. 5.  We're now off the record at 15:36:05.

8       (A brief recess was taken.)

9       THE VIDEOGRAPHER:  This is the videographer.

10    We are now back on the video record with Tape 5

11    commencing at 15:53:01.

12  Q  Let me show you Plaintiffs' Exhibit 13.  Tell us,

13    that's a purchase order, is it not?

14       (Plaintiffs' Exhibit 13 was marked for

15    identification.)

16  A  Yes, it is.

17  Q  It's a purchase order from whom?

18  A  From Adorn.

19  Q  Or to Adorn, right, from your company.

20  A  Yes.  Yes.

21  Q  Now, was it typical for Friendship Homes to be

22    purchasing woods to be used in Gulf Stream

23    trailers?

24  A  No, I don't think so.

25  Q  Okay.  So is it fair, then, to assume that that

Page 189

1   Q  Friendship Homes of Minnesota.

2   A  Yes.

3   Q  That's another document provided to me as an

4      exemplar, and that document's dated October of '05;

5      correct?

6   A  October 13, 2005.

7   Q  And would you agree with me that it's possible that

8      Friendship Homes of Minnesota was ordering wood

9      products that were ultimately used in Gulf Stream

10     Coach trailers?

11   A  I don't know that that's the case because this is

12     something that the -- this is like you had brought

13     up earlier, this is a packing slip.  And how Adorn

14     had addressed it, it was being -- it says ship to

15     Gulf Stream No. 76 in Montevideo in Minnesota.

16   Q  Is that one of your factories for Gulf Stream

17     trailers?

18   A  Yes.

19   Q  Okay.  So I'm going to ask you again.  Is it

20     possible that Friendship Homes was purchasing wood

21     products on behalf of Gulf Stream?

22   A  To my knowledge, that wasn't the case, but I

23     suppose it would be possible.

24   Q  And who is the purchasing manager for Friendship

25     Homes?

1      able to be HUD certified, but are still able to be

2      sold on the market?

3    A  No, I would not have knowledge that that's why you

4      would use the term "second," because it did not

5      meet a standard.

6    Q  You realize that the individual or entity using

7      this word "second" was someone from either Gulf

8      Stream or Friendship Homes.

9    A  Yes, I can see that.

10   Q  Okay.  So who within Friendship Homes or Gulf

11     Stream should I ask what the word second means?

12   A  Well, there's a contact down here, Wayne Sundstedt.

13   Q  Who is that?

14   A  It says right here, contact.

15   Q  Well, that's the contact at Adorn, isn't it, or is

16     that the contact from Friendship?

17   A  I think that would be the contact from Friendship.

18   Q  Okay.  So he's the gentleman that I should ask.

19   A  Yes.  I think he would know better what a lauan

20     second was.

21   Q  What a lauan second -- and as you sit here, you

22     simply cannot tell me, Tony, here is what a lauan

23     second is, can you?

24   A  No.

25   Q  Do you remember when one of these residents was

Page 206

1    Q   Yeah.

2    A   -- regulations in D.C. regarding lobbyists and --

3        yes, I do.

4    Q   You do.  We will see.  Okay.

5            You told me you never talked to Adorn; right?

6        I'm trying to finish up here.  Never spoke to

7        Adorn.

8    A   I never, ever talked to Adorn?

9    Q   Let me finish.

10           MR. WEINSTOCK:  Start again.  How about that.

11   Q   Okay.  You never spoke to Adorn about this

12       formaldehyde issue once it came up; right?

13   A   That's my recollection personally, yes.

14   Q   Have you spoken about the formaldehyde issue with

15       other manufacturers who were your competitors?

16   A   Yes.

17   Q   Which ones?

18   A   I had talked to -- oh, the RVIA had talked about

19       making this HUD requirement an industry standard,

20       and then making, after that, the CARB requirement

21       an industry standard.  And so in that period, I

22       would have talked to manufacturers in 2006, 2007.

23       Who they were, I'd imagine, you know, I would have

24       talked to Forest River, Coachmen, Fluor, Starcraft;

25       probably several other manufacturers as well.

1   learned that perhaps that may not have been

2   accurate.

3   A   Yeah.  It was the next week sometime.  We had

4   determined that, or come up with 5 percent was this

5   material that the rest of the industry used rather

6   than the LFE that it was our policy to buy.  And

7   that we weren't certain whether that 5 percent

8   maybe perhaps still met the emission requirement

9   even though it wasn't certified to it.

10  Q   Yeah, you said that you called up Stephen Miller

11  and you told him of your error.  Is that correct?

12  A   No, it was a -- I actually had met with him in

13  person.

14  Q   And when did you tell him?  When would that meeting

15  have taken place?

16  A   I think it was either April or May of 2007.  It was

17  shortly after there were more media -- more media

18  activity on this, and at that point we went back

19  and we double-checked everything else.

20      We got confirmatory letters from our

21  suppliers; we tried to look back into this again,

22  and it was at that point that we saw that this

23  Adorn material might be as much as 15 percent of

24  that product.

25      And I had a meeting and advised Steve Miller

1   A  Uh-huh.

2   Q  -- that someone, someone within purchasing, every

3       time they mentioned Adorn, there was a reference,

4       This material must be LFE.  Did you know that?

5   A  Do you have that?

6   Q  I bet your lawyer has it right there on his

7       computer.

8          MR. BUZBEE:  No?

9          MR. WEINSTOCK:  Somewhere in here

10      (indicating).

11         MR. BUZBEE:  In there.

12   Q  Well, let's assume that's true, because I'm not a

13      liar, contrary to popular belief.  Let's assume

14      that at least --

15         MR. WEINSTOCK:  Let's leave that out of your

16      question and just ask a new question.

17         MR. MILLER:  Nobody has ever said that you

18      were a liar.

19         MR. BUZBEE:  Well, you don't know everybody I

20      know.

21         MR. MILLER:  Oh, well.

22         MR. BUZBEE:  Let's start over.

23   Q  Let's assume that on that -- that's a purchasing

24      department document, is it not?

25   A  That's my understanding of it.  It's some type of

1     minutes or something.

2  Q  Yeah.  Basically when the purchasing folks get

3     together to talk about shortages or where they're

4     going to get particular component parts from.

5  A  This one was something on March 30th, 2006.

6  Q  Right.  Why would it be, if you know as the

7     president of Gulf Stream towables, why would it be

8     that every time they mentioned Adorn -- they were

9     going through the various wood product suppliers;

10    when they would mention Adorn, they would put on --

11    there was a reference that says must be LFE.  Can

12    you explain why that would be?

13  A  You know, I don't know if I could explain that, but

14    it would obviously be easier if I had a document to

15    look at.

16  Q  Yeah, I bet it would, since you know I don't have

17    it.  I'm asking you about the --

18       MR. WEINSTOCK:  Come on, Tony.  That's

19    uncalled for.

20       MR. BUZBEE:  Well, I mean, really.  This is

21    typical.

22  Q  Let me just ask again.

23  A  Well, you're asking me about a document I can't

24    look at, but...

25  Q  Right.  Every time -- they had Genesis products and

1     they have Robert Weed and they have Patrick

2     Industries, all these wood products that are

3     provided for this trailer order, okay, why -- each

4     time they referenced Adorn, why would they say

5     these products must be LFE?

6          MR. MILLER:  Objection.  Foundation.

7  A  Well, I wasn't really in the meeting, so even if I

8     had the document, I don't know that I would really

9     know the answer to that.

10  Q  When you did your investigation, did you go back

11     and look at the various purchasing department

12     documents?

13  A  These documents?

14  Q  Yes.

15  A  Some of them.

16  Q  And when you say "these," for instance, an exemplar

17     would be Exhibit 19 to --

18  A  Yeah.  I think there were many, many of them.

19  Q  Yeah, they did them weekly.  Sometimes even more

20     frequently than that.  Isn't that right?

21  A  You know, I'm not sure whether they did them weekly

22     or biweekly or once -- you know, I'm not sure of

23     that, but there were several of them provided along

24     the way.

25  Q  That's something I could ask Scott?