Transcript of the Testimony of

# JAMES F. SHEA - GULF STREAM COACH 30 (b)(6)

Date: May 28, 2009

FEMA Trailer Formaldehyde Products Liability Litigation
v.

1

INDEX OF EXHIBITS

2

| NUM. | DESCRIPTION | PAGE |
|------|-------------|------|
| Exhibit 1 | FEMA Plant Physical Addresses | 20 |
| Exhibit 2 | Spreadsheet of panels and vendors | 30 |
| Exhibit 3 | Adorn, LLC, Invoice dated 10/13/2005 | 48 |
| Exhibit 4 | Delivery Ticket dated 2/27/2006 | 51 |
| Exhibit 5 | Adorn Packing Slip dated 10/13/2005 | 54 |
| Exhibit 6 | Wood Bridge, Inc. Picking List by Order dated 10/17/2005 | 64 |
| Exhibit 7 | E-mail string beginning 3/17/2006 from Dan Shea to Stephen Miller | 86 |
| Exhibit 8 | Photographs (color copies) | 98 |
| Exhibit 9 | Warning label | 104 |
| Exhibit 10 | Memo to Steve Lidy, Phil Sarvari, Dan Shea, John Smith, and Mike Ward, Subject: FEMA-Purchased Unit | 133 |
| Exhibit 11 | E-mail string beginning 3/10/2006 from John Bruhn to Mike Ward and John Smith | 138 |
| Exhibit 12 | E-mail string beginning 3/17/2006 from Mary Martinet to David Porter | 144 |
| Exhibit 13 | E-mail string beginning 3/20/2006 from info@gulfstreamcoach.com to service@gulfstreamcoach.com | 148 |
| Exhibit 15 | Formaldemeter 400 brochure | 209 |

1    A    I think anything that I needed to clarify that I

2         stated in that deposition I think I had the

3         opportunity to clarify during the deposition.

4    Q    Okay.  I want to talk first with you about your

5         vendors that you use for Gulf Stream.  Okay?

6    A    Sure.

7    Q    And specifically I'm talking about vendors like

8         Adorn, Patrick Industries, those types of vendors.

9         Okay?  Yeah?

10   A    We have many, many vendors that produce many, many

11        things.  I don't know how you classify them by type

12        but...

13   Q    Well, I specifically want to discuss with you --

14        and we'll get in specifics in a moment -- about the

15        vendors that provide the wood products that your

16        company uses to build trailers with.  Right?

17             And you recall last time we were talking that

18        there was this issue about LFE versus reg wood used

19        in some of your trailers.  Do you remember talking

20        about that?

21   A    Yes, we did.

22   Q    Now, you told me that when your brother, Dan, who

23        is sitting here in the room 20 feet from you, was

24        going through one of the factories that he noticed

25        that some of the wood that was being used to build

1   A  They don't necessarily say regular because I

2       haven't seen the regular term used other than with

3       one vendor.

4   Q  Which vendor?

5   A  Adorn.  I've never really seen that term.  But I've

6       come to understand that sometimes the product that

7       was supplied to manufacturers who don't require --

8       or didn't require product that met the HUD emission

9       requirement, sometimes they would provide them

10      products that were LFE.

11  Q  Who from Robert Weed told you that?

12  A  David Weed.

13  Q  When did David Weed tell you this?

14  A  I can't say for certain.  I mean, this is something

15      that I've heard from -- in the past.  You know, and

16      yet I don't have a way of confirming it because

17      I've never gone into somebody else's plant and

18      pulled panels and sent them to a laboratory or

19      anything like that.  You know, it's hearsay.

20  Q  That's one thing I am familiar with.  But let me

21      drill down on this because you're telling me that

22      David Weed, who -- is he the president or the owner

23      of Robert Weed, this vendor?

24  A  Uh-huh.

25  Q  Yes?

1    was in their warehouses, and they would fulfill an

2    order with product that was ostensibly low emitting

3    when the order was for non-low emitting.

4  Q  What is the cost differential between the low

5    emitting and the just regular decorative hardwood

6    panels?

7  A  It's -- 10 to $20 per thousand is the amount that

8    comes to mind.

9  Q  Can you give me just a percentage of difference

10    between those two types of decorative hardwood

11    panels?

12  A  Ten percent.  Five to 10 percent, I guess.

13  Q  So it would be your belief that the cost difference

14    between low emitting decorative hardwood panels and

15    just regular hardwood panels would be about 5 to

16    10 percent?

17  A  Yes.

18  Q  Okay.  Did Adorn provide decorative hardwood panels

19    to Plant 57 back in 2004?

20  A  They may have.

21  Q  How can we find out?

22  A  Have to review the invoicing and receiving

23    documents.

24  Q  Okay.  So there is a way for us to go back and look

25    at the documents of the decorative -- that

1    have a process to -- that they have to go through

2    to meet their certifications, and so they may have

3    regraded it or recertified it or otherwise

4    concluded what the true nature of the panel that

5    they provided was.

6  Q  When your purchasing manager at Plant 57 receives a

7    shipment of Adorn decorative hardwood paneling,

8    does he or she look at the documentation that

9    accompanies the shipment to determine whether it

10    is, in fact, LFE pursuant to your policy?

11  A  Our purchasing agents, you know, occasionally

12    review documentation if it's brought to their

13    attention, you know.  Can I say that absolutely

14    they review every invoice and compare it to every

15    PO, no.

16  Q  Shouldn't they do so?

17  A  Well, we've been in business for many, many years,

18    and their methodologies, I think, have certainly

19    got the job done.  And, you know, in terms of

20    changing a policy or whatever or making them match

21    up every PO with every invoice, you know, I don't

22    think that's really necessary, no.

23  Q  So it's not necessary for whoever receives the

24    decorative hardwood paneling at Plant 57 to make

25    sure that they got exactly what they ordered; is

1      unwritten of course, since the '90s, if that were

2      an important policy, wouldn't that be something

3      that you would have some mechanism in place within

4      your company to make sure your receivers knew about

5      so they could enforce it?

6  A  I don't know how our receivers could enforce this.

7      I have told you numerous times here, and you see

8      fit to keep asking me the same question over and

9      over --

10  Q  Because you don't answer my question.

11  A  -- that the only -- I've told you exactly the

12      answer.  The answer is, there's no way that our

13      receivers can know the nature of those plywood

14      panels.

15  Q  Let's look at Exhibit 3.

16         MR. WEINSTOCK:  What number is it?

17         MR. BUZBEE:  I don't know.  He's got it in his

18      hand.

19         MR. WEINSTOCK:  4035.

20  Q  Now, what is Exhibit 3?

21  A  It looks to me like an invoice from Adorn

22      Corporation.

23  Q  Okay.  And in this process of receiving the

24      shipment, when would this document be presented to

25      your company?

1   Q   Okay.  So you know now, as you sit here, that at

2       least with regard to Adorn, which is one of your

3       vendors, that the designation of "reg" means the

4       product provided does not meet the HUD

5       requirements; true?

6   A   That's what they claim here.

7   Q   Adorn is a long-term vendor of your company, aren't

8       they?

9   A   Correct.

10  Q   Adorn, you told me, possibly provided the

11      decorative hardwood paneling that went into the

12      Alexander trailer when it was built in December of

13      2004?

14  A   Possibly, yes.

15  Q   Adorn very clearly puts on their invoice what sort

16      of product they are providing, at least with regard

17      to the HUD requirements; true?

18  A   It wouldn't have been clear to me at the time, you

19      know, in 2004.

20  Q   Right.

21  A   Because I had no idea what reg meant, never saw it

22      before, and I've never seen it used by any other

23      vendor, the term "reg."  It's their own term.

24  Q   Do you know what an ostrich is?

25  A   It's a large bird, long neck, native of Africa.

1   A  Typically, yeah.

2   Q  Okay.  Let's look at Plaintiffs' Exhibit 5, which

3      is Gulf Stream 4036.  There's a packing slip from

4      Adorn that provided some of this decorative

5      hardwood panels; isn't that true?

6   A  Yes.

7   Q  That's a slip that the receiver should have looked

8      at; true?

9   A  Correct.

10   Q  And if the receiver had been aware of a policy at

11      your company that required HUD-certified materials

12      and had known enough about this long-term supplier

13      to know what their designations were, he should

14      have known that what was being provided was not HUD

15      certified; true statement?

16   A  Not true.

17   Q  Tell me why.

18   A  I don't see how the vendor could tell from this

19      packing -- or how the receiver could tell from this

20      packing strip -- or slip what the formaldehyde

21      emitting characteristics of the panel were.

22   Q  It says "Lauan, Reg," doesn't it?

23   A  Yes.

24   Q  And you've already told me that you guys learned

25      later that was a designation that Adorn used when

Page 55

1     they were providing non-HUD-certified materials;

2     isn't that true?

3  A  This was a designation that they told us in

4     March -- or subsequent to March 2006 that they used

5     to designate panels that were -- did not meet the

6     HUD emissions requirement.

7  Q  And how long had Adorn been a supplier of your

8     company?

9  A  I would say 20 years.

10  Q  So for 20 years Adorn has supplied your company,

11     Gulf Stream, with decorative hardwood panels; true?

12  A  That would be my -- that would be my guess, yes.

13     Approximately 20 years.

14  Q  And your testimony today is for the first time ever

15     in 2006 you learned that when they were providing

16     non-HUD-certified materials, they designated those

17     as reg.

18  A  Correct.

19  Q  And you went back, I'm sure, and looked at many,

20     many, many packing slips that Adorn sent along with

21     shipments and saw this term "reg," have you not?

22  A  Certainly saw POs issued during the course of

23     production of the 2005 FEMA contract, 2006

24     production for those FEMA contracts.  I certainly

25     saw them during that period.

Page 58

1    Q   I'm curious as to when you did -- when this issue

2        arose and you learned that --

3    A   I know of no other vendors that use the term "reg."

4    Q   Finished?  When this --

5    A   Yes.

6    Q   When this issue arose and you inquired of Adorn as

7        to this term they were using --

8    A   Uh-huh.

9    Q   -- you're telling me that you didn't ask them, Hey,

10       wait a minute, have you been providing me reg wood

11       all this time, the last 20-some-odd years?  You

12       didn't ask that question?

13   A   We asked them what the term "reg" meant, and they

14       said that it meant product that didn't meet the HUD

15       requirement for emissions.

16   Q   Did you say also to them, Well, wait a minute,

17       that's not what we ordered; we didn't order -- we

18       ordered HUD-certified materials; why are you giving

19       us non-HUD-certified materials?  You didn't ask

20       them that?

21   A   The -- I didn't ask them that.  Our purchasing

22       manager asked them that, and they said that it was

23       a mistake.  He asked their representative, their

24       sales representative.  It was a mistake on their

25       part.

1  Q  So they admitted that they had made a mistake;

2     that's your testimony?

3  A  Our purchasing agent asked their sales rep why, and

4     he said that it was confusion and a mistake on

5     their part.

6  Q  And who is your purchasing agent that asked that

7     question?

8  A  Jeff Zumbrun.

9  Q  So Jeff Zumbrun is the purchasing agent for the

10    whole company?

11 A  He was the director of purchasing for Gulf Stream

12    towables.

13 Q  Is he still director of purchasing for Gulf Stream

14    towables?

15 A  Yes.

16 Q  Okay.  So Jeff asked an individual from Adorn this

17    question; right?

18 A  The representative he normally dealt with, as I

19    understand, yes.

20 Q  And what was that representative's name?

21 A  I don't know his name off the top of my head.

22 Q  Okay.  But what you're telling me is, no one

23    bothered to ask them how long they had been

24    providing reg products to your company?

25 A  We were specifically asking about materials that we

1    received subject to the contracts that we had with

2    FEMA.

3  Q  Is it possible then that Adorn was providing reg

4    products to your company from as far back -- for

5    20-some-odd years?

6  A  You know, as I've pointed out to you in the past,

7    we rely on our vendors' representations and their

8    systems and their certifications on the products we

9    receive.  So when you present possibilities to me,

10   I suppose anything is possible but -- because, as I

11   said to you, the only way to know absolutely the

12   nature of a panel and how it performs relative to

13   the HUD requirement is to perform a large chamber

14   test, ASTM test.

15 Q  Have you went back to look at the packing slips

16   that would have accompanied the shipments from

17   Adorn at Plant 57 back in 2004?

18 A  I haven't.

19 Q  Has anyone?

20 A  I can't say for certain.  I don't know.

21 Q  As the chairman of this company, are you in the

22   least bit curious as to whether Adorn provided

23   HUD-certified materials to Plant 57 in 2004?

24 A  Absolutely.

25 Q  But even though this case has been in litigation

1    and -- I mean, this issue, you had to testify

2    before Congress, you've been sued by thousands of

3    individuals, so far you haven't determined whether

4    Adorn has been providing you reg products for the

5    last 20 years?

6         MR. WEINSTOCK:  I'm going to object to the

7    form of the question.  This case, the 2004

8    Alexander unit, has been in litigation since

9    April 6, 2009.

10   A  Yes.  I did a lot of preparation and went through

11   thousands and thousands and thousands of documents

12   and probably beyond what most chairmen of a

13   corporation would do.  Spent a tremendous amount of

14   time in detail, especially relative to the 2005,

15   2006 FEMA contracts and my testimony in front of

16   Congress.

17        But in this particular instance I can't say

18   that I have reviewed documents for the 2004

19   production.  I know people in our company have and

20   could speak to them, but I haven't.

21   Q  Who are the people in your company that have done

22   that so I can speak to them?

23   A  I certainly know that our attorney has been through

24   those kinds of documents.

25   Q  I don't want to talk to him.  Have you got anybody

1      wood used in the Alexander trailer would be used in

2      this trailer I've been able to get my hands on?

3   A  You said "highly likely."  I said it would be

4      likely that we could identify which vendor or

5      vendors supplied the lauan plywood for that unit.

6   Q  The lauan plywood, does it have, the actual plywood

7      itself -- maybe I'll ask Dan this; he probably

8      knows since he discovered this in the plant, you

9      say.  Would it have a stamp on the back that either

10     says LFE or non-LFE?

11  A  Some vendors would stamp the product, some vendors

12     wouldn't.

13  Q  I'm talking about Adorn.

14  A  Adorn, they would stamp the panel -- I'm not

15     exactly sure -- I'm really not positive about that.

16  Q  You don't know for sure?

17  A  I've seen Adorn panels with stamps on them,

18     especially in the manufactured housing plants, but

19     I'm not sure I have seen that in the RV plant.

20  Q  What was it that Dan, your brother, actually saw

21     that cued him in to, look, this is not LFE product

22     here in this factory?

23  A  Well, he saw this term "reg."

24  Q  Where was it written?

25  A  It was on a label.

1    Q   Okay.  So --

2    A   On the bunk, on the bunk of the plywood.

3    Q   Okay.  So there's some sort of stack of plywood and

4        there was a label on it?

5    A   Yeah.  Plywoods come in in what we call bunk.  It's

6        maybe a hundred sheets.

7    Q   Okay.  And he just so happened to be walking by and

8        there was a label that said "reg" on it?

9    A   Right.

10   Q   And being the curious sort, he asked a few

11       questions?

12   A   Correct.

13   Q   And what --

14   A   I think it was a term he wasn't familiar with, but

15       you'd have to ask him about that.

16   Q   Which supplier provided that bunk?

17   A   Adorn.

18   Q   Okay.  Let me show you Plaintiffs' Exhibit 6, which

19       is Bates stamped 4244.  Is Wood Bridge one of the

20       suppliers of this decorative hardwood paneling?

21   A   Yes.

22   Q   Wood Bridge wasn't on that list, though, were they,

23       or am I wrong?  The previous list I gave you.

24   A   I thought they were.

25   Q   Were they?  Okay.  You skipped over it.  There it

1     that the wood products in her trailer are

2     HUD-certified wood products, can you?

3  A  Well, as I've mentioned to you before, we rely on

4     our vendors to provide us with products that meet

5     the HUD requirements for emissions, and there's no

6     way we can absolutely know unless we were to test

7     the individual panel.

8  Q  Adorn no longer exists; is that true?

9  A  I think Adorn is part of Patrick Plywood now.

10  Q  Patrick Industries purchased Adorn?

11  A  I think it's a division of.

12  Q  Is it a division?

13  A  I'm not completely familiar with their corporate

14     structure because corporate structures in the

15     industry are moving around quite a bit right now.

16     But my understanding is it's a division now.  At

17     least it was a division at the first point that

18     they made the acquisition.

19  Q  Patrick Industries was a -- wasn't that one of the

20     companies that provided also decorative wood

21     products or decorative wood --

22  A  Correct.

23  Q  Do you know whether they provided HUD-certified

24     decorative hardwood panels that were used in your

25     trailers?

1      MR. WEINSTOCK:  I understand that.  I just

2    wanted the record to be clear.

3  Q  Let's talk about who the vendors for roof

4    underlayment were.  Let's just go to 2004 since

5    that's what's really important.  Who were those

6    vendors that would have provided roof underlayment?

7  A  For 2004?

8  Q  Yes, sir.

9  A  I don't know that.

10  Q  But again, that's something that can easily be

11    determined by simply going to the purchase orders,

12    invoices, and packing slips at that particular

13    plant, Plant 57; right?

14  A  Yes.  You could go to the purchasing documents and,

15    I think, get a pretty good idea of the likely

16    suppliers for Plant 57 production in 2004.

17  Q  Let me ask you something.  When you found out that

18    Adorn was providing you reg materials, did you also

19    look to see what your purchase orders said?  In

20    other words, did you see -- did you try to

21    determine why it was that -- strike that.

22      With regard to the decorative hardwood panels

23    and the purchase orders sent to Adorn --

24  A  Uh-huh, yes.

25  Q  -- were you telling Adorn, Hey, we are buying from

1     you, we're ordering from you LFE materials?  Or did

2     you even specify?

3  A  Like I told you, we've been specifying to our

4     vendors that they provide us with HUD-equivalent

5     product since the early '90s.

6  Q  So when I look at the purchase orders for those

7     decorative hardwood panels that were purchased,

8     those purchase orders should be asking specifically

9     for HUD-certified materials?

10  A  I think -- are you talking about 2004 purchase

11     orders?

12  Q  Uh-huh.

13  A  I haven't reviewed 2004 purchase orders that might

14     relate to the production units we're talking about

15     here.

16  Q  Well, don't you think there's different numbers or

17     a product number associated with reg materials as

18     opposed to non- -- or LFE materials?

19  A  On the part of the vendor?

20  Q  Uh-huh.

21  A  I don't know.  You know, some vendors use the same

22     number, change letters in the number.  I mean, I

23     just don't know.

24  Q  Let's talk about Adorn.  Doesn't Adorn have one

25     product number for LFE decorative hardwood panels

1    and a different product number for reg decorative

2    hardwood panels?

3           MR. WEINSTOCK:   2004 or 2005?

4           MR. BUZBEE:   2004.

5    A   I don't know.

6    Q   Because if you're ordering a particular product, do

7        you order it by product number?  Is that how you

8        would order it?

9    A   Product number and description.

10   Q   Okay.  So if they use a different product number,

11       wouldn't it be very easy for a receiver to

12       determine that the wrong product was being

13       received?

14   A   I don't know.  I mean, there's -- every vendor

15       varies on how they designate the products.

16   Q   But we're talking about your 20-year supplier,

17       Adorn, somebody who's, according to what you told

18       Congress, a long-term supplier.  Now, certainly you

19       would know by this point whether they had a

20       different product number for reg products versus

21       LFE products.

22   A   I don't know whether there's a variation in the

23       number and the designation or whether both vary.  I

24       just don't know.

25   Q   Well, it would make sense, especially if there's a

Page 161

1   Q   Okay.  You hired them to do some work for you?

2   A   Right.  Okay.

3   Q   All right.  I've got to be very careful which words

4       I use.

5           All right.  When you hired Progressive

6       Engineering to do some work for your company, what

7       did you hire them to do?

8   A   We had some material, some Adorn material, and we

9       asked them to submit it to the kind of testing that

10      would be required by the HUD standard.

11  Q   So you had them test some interior decorative --

12      the stuff that's used on the walls?

13  A   Correct.

14  Q   Did you have them test anything else other than

15      the --

16  A   No.

17  Q   Just the wall --

18  A   It was interior wall panel.

19  Q   Okay.  And when did that happen?

20  A   It happened between -- when did it happen?  When

21      did we give the material to them?

22  Q   Yes.

23  A   I think we gave the material to them in early

24      April, as I recall.

25  Q   Of '06?

1   waives something that wasn't already waived.

2       MR. WEINSTOCK:  Go on with your questions

3   then.

4       MR. BUZBEE:  Thank you.

5   Q  All right.  You --

6       MR. DINNELL:  Same for me because I'm going to

7   ask him that.

8   Q  Okay.  You guys hired Progressive Engineering and

9   sent to them some of this interior decorative wall

10  covering?

11  A  Correct.

12  Q  From Adorn?

13  A  Well, we asked our attorney to hire them.

14  Q  Don't tell me anything that you said to your

15  attorney.

16      MR. WEINSTOCK:  That one, there's no question

17  we haven't waived that.

18  Q  I'm not even interested in knowing.  I'm sure that

19  you said a lot of mean stuff about me, probably all

20  of it unfair and untrue.

21      But let's just talk about what Progressive

22  Engineering did and what they told you and what you

23  learned.

24  A  Progressive Engineering subjected the material to a

25  testing protocol and ultimately gave us some

1      not share the results with FEMA; is that true?

2   A  Right.  We didn't share the results with anybody.

3   Q  Right.  I know.  You certainly didn't share it with

4      the people who lived in the trailers?

5   A  It had no meaning.

6   Q  Right.  You did not share --

7   A  No significance that we could see.

8   Q  You did not share the results of that test with any

9      trailer residents, did you?

10   A  Correct.  Like I said, we didn't share those

11      results with anybody because we thought they were

12      meaningless.

13   Q  But you talked about the results of those tests

14      with Adorn, didn't you?

15   A  I don't recall talking to Adorn about them.

16   Q  Are you sure?

17   A  Me personally?

18   Q  Anyone in your company, sir.

19   A  Yeah.  We may have.  I just don't recall.

20   Q  And Adorn told you, Well, of course the stuff we

21      provided you was not HUD certified; that's not what

22      you ordered.  Isn't that true?

23           MR. WEINSTOCK:  Object to the form.

24   A  I don't think that's true, no.

25   Q  I mean, you've had discussions with Adorn, and

1    they've made it quite clear to you that there was

2    no mistake, that they provided you exactly what you

3    ordered; isn't that true?

4  A  We've had discussions with their sales rep that

5    said they made a mistake proximate to that time.

6  Q  Let me make sure I understand because this may

7    become important.  Your testimony is that Adorn

8    admitted that they had made a mistake when they

9    provided you non-HUD-certified wood?

10 A  Their sales rep said they made a mistake.  That's

11   what they told our Jeff Zumbrun.  They didn't tell

12   it to me; they told it to our Jeff Zumbrun.

13 Q  Okay.  How long did the Progressive Engineering

14   testing take?

15 A  My recollection is six weeks.

16 Q  Who recommended Progressive Engineering to you?

17 A  We've done business with Progressive Engineering.

18   They've done testing for us of other natures in the

19   past.

20 Q  What other natures of testing have they done?

21 A  More structural type of testing for floor systems

22   and trusses and things like that.

23 Q  They've never done any testing of the formaldehyde

24   content of wood for you in the past?

25 A  If they had done any in the past, it was in the

1    Q   From where?

2    A   Or -- from us, that we provided them.

3    Q   And who made the paneling?

4    A   Well, it was supplied to us by various vendors.

5    Q   Which vendors?

6    A   Robert Weed, for one.

7    Q   That's one.  Tell me the rest.

8    A   Oh, I can say conclusively Robert Weed.  There's

9        other vendors, various wood products vendors that I

10       think they've done testing of materials for.

11   Q   Adorn?

12   A   I don't know if they've done any testing for Adorn.

13   Q   How did you choose to use these wood products to be

14       tested from Robert Weed?

15   A   Well, it's not just Robert Weed.  There's other

16       vendors, but I just can't say exactly which ones.

17       There's people in our organization that could.

18   Q   Who?

19   A   Jeff Zumbrun would be able to.

20   Q   He'll be able to tell me which of those six wood

21       manufacturers you've tested?

22   A   That we've tested product from?

23   Q   Uh-huh.

24   A   Yes.

25   Q   Where did the product come from, from trailers or

Page 182

```
 1   A  Correct.
 2   Q  And did you find when you were conducting this
 3      testing that some of the product being provided was
 4      mislabeled or not correctly identified?
 5   A  There may have been some -- a few products, very
 6      few instances where the product didn't conform.
 7   Q  And which companies provided that product?
 8   A  I really don't recall.
 9   Q  Why is it you can only recall Robert Weed?
10   A  Well, they're a large vendor.  They were the first
11      people to provide us with the low, very low
12      CARB-equivalent product.  It wasn't really even --
13      you couldn't even get it in the U.S.  It took -- so
14      we did a plan with them to make a commitment and go
15      forward with that product.  It was relatively early
16      in its availability.  And so that's why I remember
17      them the best, because they were the people we kind
18      of led off with.
19   Q  Do you still purchase wood products for your
20      trailers from either Adorn or Patrick Industries?
21   A  I think we still purchase them from Patrick
22      Industries.
23   Q  But Adorn, you've told me, is a division now of
24      Patrick Industries; right?
25   A  I'm not sure what the status is on the Adorn -- use
```

1     of the Adorn name and division and so forth.

2  Q  Do you purchase products from the Adorn division,

3     regardless of what the corporate makeup is?

4  A  I don't think we purchase from Adorn.

5  Q  So you don't do business with Adorn anymore, do

6     you?

7  A  I haven't seen any Adorn invoices.

8  Q  Well, you decided that you're not going to do

9     business with Adorn; isn't that true?

10  A  I still think, though, you know -- I don't know

11     what the status of the Adorn division is.  You

12     know, it seems to me that we still bought some

13     products from Adorn.  I'm not sure when that

14     changed.

15  Q  Have you --

16  A  You know, I don't know when the last time we

17     bought -- they sell particleboard and styles and

18     cabinet doors.

19  Q  You don't know, is your answer, I guess.

20  A  I'm not positive what we buy from them --

21  Q  Are you telling me that --

22  A  -- and when they quit with their division.  I just

23     don't know.

24  Q  Okay.  Are you telling me PEI has not tested on

25     your behalf woods that were not supposedly

1      CARB-compliant?

2    A   I don't exactly know what you mean by that.

3    Q   What I mean is --

4    A   You were asking me earlier about did they test

5        woods from FEMA units.  Now you're saying did they

6        test woods that were non-CARB-compliant?

7    Q   What I mean is they're not labeled CARB-compliant,

8        just woods.

9    A   Well, you couldn't really have CARB-compliant wood

10       until this year.  But we are buying woods whose

11       emission characteristics were equivalent to the

12       pending CARB emissions requirements.

13   Q   What I'm asking is, did you take any of the woods

14       that you had purchased from Robert Weed or Adorn or

15       any of the other six or so wood providers and test

16       it, not woods that --

17   A   Well, that's what I told you.  I mean, we have

18       tested some of the products as we've begun to

19       acquire and got into our program with

20       CARB-equivalent products.  We would initially test

21       them when they brought them in, and then we would,

22       you know, do some follow-up testing on kind of --

23       it wasn't a hundred percent testing.

24   Q   What I understood -- maybe I'm wrong -- you took

25       some woods that were equivalent of CARB-compliant

1   Q   So you didn't test any woods that you knew were not

2       CARB-compliant, like woods that you had previously

3       purchased from Adorn --

4   A   No.

5   Q   -- or woods that you had previously purchased from

6       Robert Weed or any of these suppliers?

7   A   I don't recall doing any of that.  We would test

8       woods that were being marketed to us as

9       CARB-equivalent products.

10  Q   And how much did that testing --

11  A   That's what I recall.

12  Q   I'm sorry, go ahead.

13  A   I said that's what our intent was.

14  Q   How much did that testing cost you?

15  A   I think it cost us about four or $500 to do a large

16      chamber test on a grouping of panels.

17  Q   So you would take a sample from a grouping of

18      panels and test it just to make sure that what was

19      being sold to you was indeed CARB-compliant or

20      CARB-equivalent?

21  A   Correct.

22  Q   And would you charge the vendor or supplier with

23      that test cost, or would you absorb it yourself?

24  A   I don't believe we charged the vendor for it.

25  Q   Okay.  So is this going to be the new policy now?