UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION:  N(5) |
| | * | |
| This Document Relates to: | * | |
| *Charlie Age, et al. v.* | * | JUDGE: ENGELHARDT |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | |
| | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF GULF STREAM COACH, INC.'S
MOTION *IN LIMINE* TO EXCLUDE
EXPERT TESTIMONY OF MARCO KALTOFEN, PE**

**MAY IT PLEASE THE COURT:**

Gulf Stream Coach, Inc. respectfully submits the following Memorandum in Support of its Motion *in Limine* to Exclude Expert Testimony of Marco Kaltofen, PE

**I.      BACKGROUND**

**A.      Nature of Case**

This Multi-District Litigation is the consolidation of over one hundred-twenty state and federal toxic tort suits in which thousands of named plaintiffs claim to have inhabited emergency housing units ("EHUs") that were provided to them by the Federal Emergency Management Agency ("FEMA") as a result of the alleged uninhabitability of their residences due to Hurricanes Katrina and Rita.  Following denial of class certification, several plaintiffs, including bellwether plaintiffs Alana Alexander and Christopher Cooper (hereinafter collectively referred to as "Alexander"), filed suit against Gulf Stream Coach, Inc., alleging that it manufactured the EHUs used by the specific plaintiffs.  (*Age, et al v. Gulf Stream Coach, Inc., et al*, 09-2892, Doc. No. 1).  Moreover, plaintiffs have named as defendants the United States Government through

FEMA and Fluor Enterprises, Inc. (*Age,* Doc. No. 1), and plaintiffs seek recovery for alleged physical and mental pain and suffering, physical impairments and disability, medical expenses, loss of earnings capacity, loss of enjoyment and quality of life, loss of consortium, travel expenses, out-of-pocket expenses, and the loss of use and/or opportunity to use safe and adequate shelter allegedly resulting from the purported exposure to formaldehyde. (*Age*, Doc. No. 1, ¶ 117).   Specifically, the *Age* plaintiffs claim exposure to the allegedly dangerous levels of formaldehyde (or threat thereof) in those EHUs. (*Age*, Doc. No. 1, at ¶ 23).  Alexander itemized the theories of recovery against Gulf Stream Coach, Inc., in part, as follows:

1.   Failing to design the EHU so as to not emit allegedly dangerous levels of formaldehyde;

2.   Manufacturing an allegedly unreasonably dangerous EHU;

3.   Providing an EHU that did not conform to express warranties allegedly made by Gulf Stream Coach, Inc.; and

4.   Failing to warn of the allegedly excessive levels of emissions of formaldehyde and hazards associated with the allegedly excessive levels of formaldehyde emissions in the EHU.

(*Age*, Doc. No. 1, at ¶ 102).

## B.   Alexander's Civil Engineering Expert – Marco Kaltofen, PE.

Alexander provided twenty (20) written expert reports, including the report of Marco Kaltofen, PE ("Kaltofen") as a civil engineering expert in this case.   Exhibit "A," Kaltofen's May 19, 2009 Affidavit.  Kaltofen is a Massachusetts Registered Professional Civil Engineer and he is the President and owner of the Boston Chemical Data Corporation (BCD), an engineering consulting practice.  *Id.* and Exhibit "B," Deposition of Kaltofen dated 6/16/09, p. 343.  Kaltofen was retained to "…find a way to test FEMA housing units for formaldehyde in the air; to agree … on a protocol that would allow this testing to be

done in a reproducible, comparable manner; [and to] … look at the data that applied to [a] particular trailer, in light of the entire data set that had been put together on the other emergency housing units."  Exhibit "B," at pp. 36-37.

### C.    Basis of Kaltofen's Opinions

Kaltofen's opinions are based on a series of air samples performed within EHU's to determine formaldehyde concentrations.  Exhibit "A," at p. 3.  These samples were collected through testing performed by a variety of sources including, BCD, DeVany Industrial Consultants, W.D. Scott Group, Center for Disease Control (CDC), Bonner Analytical Testing Company, The Sierra Club, and even the occupants of the EHUs.  *Id.* at p. 5.  The results of these formaldehyde tests and the "particulars of the housing units tested" were collected and then recorded in a web-based database.  *Id.* at p. 6.  Kaltofen claims to have reviewed 10,499 records and calculated the median result as 0.205 parts per million (ppm) of formaldehyde in indoor air.  *Id.*  The mean calculation was 0.368 and the variance was 0.197.  *Id.*  Based on this information, Mr. Kaltofen concluded that the 5th percentile data point exceeded the ATSDR minimum risk level (MRL) of 0.008 ppm.  *Id.* at p. 8.  That is, 95% of the data he recorded in his database was higher than 0.008 ppm.  Exhibit "A," at p. 8.

### D.    Kaltofen's Opinions

Kaltofen's analysis of the database leads to his observation that samples collected in the winter months resulted in expectedly lower formaldehyde concentrations than those samples collected in the summer months.  *Id.* at p. 6.  Kaltofen himself describes this theory as "axiomatic."  Exhibit "B," at pp. 51.  Kaltofen's opinions, however, are not so obvious. Kaltofen ultimately arrives at two separate opinions based on his analysis of the database. First, Kaltofen opines that by simply reviewing a statistically large body of data it is possible

to determine the most probable formaldehyde concentration for any given EHU – even if a particular EHU has never been tested.  Exhibit "B," at pp. 90-91.  Kaltofen claims that he can identify within a 95% "level of precision" the actual formaldehyde concentration of a trailer that has never been tested.  *Id.*  Second, Kaltofen opines that 95% of the data he recorded in his database was higher than 0.008 ppm.  Exhibit "A," at p. 8.

Both of these opinions are unreliable because Kaltofen is making general observations about specific EHUs.  Kaltofen did not attempt to replicate the actual living conditions of the EHU occupants.  Nor does Kaltofen take into consideration the many variables that influence specific formaldehyde concentrations in indoor air.  Kaltofen's opinions are based on nothing more than a series of assumptions.  The general assumptions that Kaltofen derived from his database undermine the likelihood that Kaltofen used actual data sufficiently tied to the facts of the Alexander EHU, or any other specific EHU.  Gulf Stream Coach, Inc. therefore moves to exclude the general estimates and assumptions made by Kaltofen about particular trailers because he fails to consider the many factors which affect individual formaldehyde concentrations in a particular trailer.

Kaltofen also offered specific opinions about the Alexander EHU. [1]  Although Kaltofen maintains that he is 95% confident that his database establishes the formaldehyde concentration for any given trailer, he offers an entirely different scrutiny regarding the Alexander EHU.  Suddenly, Kaltofen's opinions about formaldehyde concentrations include considerations of average outdoor temperatures, average logged interior temperatures, humidity, heat transfer profiles, ventilation, HVAC systems, structural materials, date of trailer

---

[1]    Kaltofen was part of Plaintiffs' third wave of experts to inspect the Alexander EHU on May 6-7, 2009. This Court ordered that the results of those tests would not be allowed, noting that, "Plaintiff's have failed to demonstrate how this third, much later test better depicts the air quality of the EHU as experienced by the bellwether plaintiffs while they resided therein." (Doc. Nos. 1547 and 2062).  Yet, Kaltofen still opines about **probable** formaldehyde concentrations in the Alexander EHU.

manufacture, move-in/move-out dates, etc.  Exhibit "A," at p. 9-11.[2]   Kaltofen's report even offers mathematical formulas illustrating how to "correct" the *actual* temperature and humidity conditions reported at the time of testing to a *standard* temperature and humidity condition.  *Id.* at p. 14-15.  Based on these calculated results – which were predictably higher than the actual measured results – Kaltofen again purports to establish the temperature and humidity dependence of formaldehyde concentrations.  *Id.*  In other words, Kaltofen took it upon himself to "correct" the actual temperature and humidity readings in the Alexander EHU so that he could suggest a higher formaldehyde concentration than the actual measured result.  Gulf Stream Coach, Inc. moves to exclude Kaltofen's opinions related to correction equations purporting to illustrate temperature and humidity dependence of formaldehyde concentrations on the basis that such equations are not considered reliable under the factors set forth in *Daubert* and it progeny.

## II.      ADMISSIBILITY OF EXPERT OPINIONS

### A.  Rules 702, 703, *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and Its Progeny

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony. The trial judge serves as a gatekeeper to keep out expert testimony that is based solely on speculation or unsupported conclusion.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-590 (1993).  In *Daubert*, the Supreme Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but it is also reliable.  *See, Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  A party seeking to admit expert testimony bears the burden of demonstrating that the expert's findings and conclusions are based on the scientific method, and therefore, is more

---

[2]      The majority of pages 9-11 of Kaltofen's report have already been excluded by this Court's Order that Plaintiff's will not be allowed to use the results of the May 2009 tests.  (Doc. Nos. 1547 and 2062).  Gulf Stream Coach, Inc., however, moves to exclude any opinions about formaldehyde concentration which Kaltofen opines are more likely to be representative of what Alexander actually experienced.  This is the definition of speculation.

reliable. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). And where such testimony's factual basis, data, principles, methods, or their application are called into question, the trial judge is required to determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. *Kumho Tire*, 526 U.S. at 149. This requires an objective, independent validation of the expert's methodology. *Moore*, 151 F.3d at 276. The expert's mere assurance that he has used generally accepted scientific methodology is insufficient. *Id*. The proponent of the expert's testimony must prove to the judge by a preponderance of the evidence that the testimony is reliable. *Id*. Thus, the goal of the court is to ensure that that expert's opinion is based on sufficient data and an appropriate methodology such that the opinion is connected to the facts by more than conclusory assertions of the expert.

Rule 703 focuses on the data underlying the expert's opinion. *In Re TMI Litigation*, 193 F.3d 613, 697 (3rd Cir. 1999). As part of its gatekeeper role, the trial court must ensure that the underlying facts and/or data upon which a proffered expert's opinion is based are in and of themselves reliable. If an expert's opinion is based on unreliable facts, the opinion must be excluded. *See In Re TMI Litigation*, 193 F.3d at 697. That is, Rule 703's reliability standard is similar to Rule 702's reliability requirement in that there must be good grounds on which to find the data reliable. *Id*. Rule 703 permits an expert to rely on hearsay, so long as that hearsay is of the kind normally employed by experts in the field. *Id*. (*citing In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1245 (E.D. N.Y. 1985)).

In *Daubert*, the Supreme Court enunciated a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the expert's methodology is scientifically valid or reliable. *Moore*, 151 F.3d at 275 (*citing Daubert*, 509 U.S. at 593-595). These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has

been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.  *Id*.

In addition to the guiding principles set forth in *Daubert*, other factors relevant to the consideration of whether an expert's testimony and opinions are sufficiently reliable so as to allow their admission are as follows: (1) whether the expert is proposing to testify about matters growing naturally and directly out of the expert's research conducted independent of the litigation or whether the expert has developed the opinion expressly for the purpose of testifying in the litigation; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as she would be in her regular professional work outside of her paid litigation consulting; and (5) whether the field of expertise claimed by the expert is known to reach reliable results consistent with the type of opinion the expert is giving.  *See e.g. Kumho  Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998) (*en banc*); *Sheehan v. Daily Racing Form, Inc.*, 104 F. 3d 940, 942 (7th Cir. 1997); *Daubert v. Merrill Dow Pharmaceuticals, Inc.* 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*); and *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994).

Considering these elements as discussed below, Kaltofen's opinions that statistical sampling gives him a 95% probability of identifying the formaldehyde concentration for any given EHU is derived through presupposition without consideration of the actual conditions experienced by Alexander.  Likewise, Kaltofen's "observation" that 95% of the EHUs in his

database reported formaldehyde concentrations above 0.008 ppm is unreliable. Many of the samples reported in the database were measured in occupied units or previously occupied units; so, those test results were influenced by independent variables unrelated to the EHUs. Also, the vast majority of the EHUs tested and reported in the database were manufactured in 2005 and 2006. Kaltofen's opinion derived from that data is of no value in this case because Alexander resided in an EHU manufactured in 2004. Finally, Kaltofen's opinions regarding the relationship between temperature and humidity and formaldehyde concentration in indoor air are "axiomatic" and his use of a database and/or correction factors to illustrate this point fails the *Daubert* test and should be excluded.

> **B.** **Kaltofen's opinion that statistical sampling gives him a 95% probability of identifying the formaldehyde concentration for any given EHU is derived through presupposition without consideration of the actual conditions experienced by Alexander.**

Kaltofen intends to testify to specific, definite information about the Alexander EHU by relying on data obtained from a large number of similar units under a "fairly wide range of conditions." Exhibit "B," at pp. 87-88. Kaltofen opines that the conditions derived from his knowledge of other trailers "are generally going to be very similar to what is experienced in the Alexander/Cooper unit." *Id.* Based on this standard set of conditions, Kaltofen claims that there is a "very good probability, probably 95 percent or greater, of knowing what the [formaldehyde] result is for [any given trailer]." Exhibit "B," at p. 91. Regardless of this hypothetical probability, Kaltofen did not utilize the actual conditions experienced by Alexander. Kaltofen cannot simply create a set of conditions derived from a database to predict what he believes formaldehyde concentrations would have been if the Alexander EHU had been tested on a different date. W.D. Scott Group measured the actual formaldehyde concentration in air located inside the Alexander EHU on January 28 and 29 of 2008. Exhibit "A," at p. 9.

The actual formaldehyde concentration was reported at 0.05 ppm.  *Id.*  Kaltofen claims that the concentration measured in the Alexander EHU on January 28 and 29, 2009 is "very **likely** to be a low value because it is at a lower temperature period, and it is also after a significant period of aging."  Exhibit "B," at p. 196. (emphasis added).   Based on this proposed *likelihood,* Kaltofen wants to suggest a higher formaldehyde concentration than what was actually tested.   For instance, Kaltofen opines that the CDC testing (not Kaltofen's own testing) of other occupied trailers tested at the same time Alexander resided in the EHU would be an adequate representation of the "average" concentration in the Alexander EHU. Exhibit "B," at pp. 196-97.[3]  Again, Kaltofen claims that this "average" can be statistically determined within a 95% scientific certainty.   *Id.*   Kaltofen noticeably disregards peer-reviewed journal articles – which were not created for purposes of litigation – that addressed surveys of indoor air quality with the highest formaldehyde concentrations collected in the winter months.   Exhibit "C," Lemus R; Abdelghani; *Potential health risks from exposure to indoor formaldehyde.* 13(1-2):91-8 (Rev. Environ. Health 1998, Jan-Jun).     Kaltofen's methodology is conveniently tailored to achieve his end result.

There is no evidence that the set of conditions considered by Kaltofen accurately replicated or even approximated those at the time Alexander resided in the EHU.  There are a multitude of independent factors which affect formaldehyde concentration in indoor air. Kaltofen himself testified about numerous variables which can influence the level of formaldehyde in individual trailers:

> "Q.    Now, with regard to Section 4, which begins on page 12, and we talked about this in your previous deposition with regard to class certification issues.  There are many variables that go into ultimately what results in a level of formaldehyde in a trailer when it is tested on a particular date.  Correct?

---

[3]      The CDC's median level was .081 ppm. Exhibit "B," at p. 197

A.      Yes.

Q.      And you would agree that those variations are the level of off-gassing of any component parts that contain formaldehyde, correct?

A.      That's one.

Q.      Any other sources other than component parts of the trailer that might actually find their way into the interior of the trailer, correct?

A.      Yes.

Q.      What are the rates of ventilation in the trailer?

A.      Yes.

Q.      Interior temperature of the trailer?

A.      Yes.

Q.      Interior humidity levels of the trailer; that would be a factor?

A.      Yes.

Q.      Behavioral issues of the actual residents of the trailer also play a role in the ultimate level of formaldehyde found in the trailer, correct?

A.      Different from what we have already discussed?   How behaviors affect ventilation, other materials and so on?

Q.      And let's just use some examples and make sure we're talking about the same thing.  Smoking is a behavioral issue that could, in fact, affect the levels of formaldehyde in a resident's trailer?

A.      I assumed you included that in other materials.

Q.      But you would agree, smoking can –

A.      Smoking can affect formaldehyde.

Q.      Cosmetics that may contain formaldehyde?

A.      Again, same answer.

Q.      Permanent press fabrics?

A.      Not as much, but yeah.  Yeah.

Q.      Opening and closing doors?

A.      In that it affects the ventilation, yes.

Q.      Opening and closing of windows?

A.      Yes.

Q.      Cooking?

A.      Cooking.

Q.      How does cooking affect levels of formaldehyde in a particular unit?

A.      Combustion, breakdown of materials that might produce hydrocarbons that
        might form into formaldehyde

Q.      And according to your report, age of the unit affects levels of formaldehyde?

A.      All other things being equal, yes.

Exhibit "B," at pp. 149-51.

Simply calculating the mean, median, and variance of 10,499 EHU's provides no
specific information about any one particular trailer.  Yet, Kaltofen claims that he can
determine within a 95% probability the individual outcome of the formaldehyde test result for
any given EHU – even one that has never been tested.  Exhibit "B," at pp. 90-91.  Kaltofen
acknowledges that this method is not precise.  Exhibit "B," at pp. 91.  And he recognizes the
probability that an individual EHU could potentially test below the detection limit.  *Id.*

The level of precision (95%) that Kaltofen has offered as his opinion is suspect and
unreliable.  Kaltofen was questioned whether his 95% calculation has changed as he has
accumulated more and more data. Exhibit "B," at p. 173.  He testified that "every new data
point is going to make a smaller and smaller difference.  That is the nature of this data set."
*Id.*  This means that Kaltofen's level of precision is changing (either up or down) each time

a new test result is added to the database.  Kaltofen testified that he expects a variation of test results even between tests taken of the same unit at different times.  Exhibit "B," at p. 182. Kaltofen cannot possibly predict the *genuine* formaldehyde concentration in a particular EHU without actually performing a test in that EHU.  There are simply too many variables. In addition to those variables, Kaltofens' database is comprised of formaldehyde concentrations collected by a variety of groups and/or individuals.  There is no assurance that these tests were performed under the same conditions.  Some of the EHU's were occupied at the time of testing, while others were not.  Some tests were conducted with the HVAC system running, while some tests were performed in the middle of the summer with no power at all.

Kaltofen's himself has to qualify his "level of probability."  Throughout his deposition, he consistently uses phrases such as, "given a certain set of conditions" and "all other things being equal."  Exhibit "B," at pp. 91, 53, 77, 80, 100.  Those stipulations, however, are the fundamental flaw in Kaltofen's opinion because all things are *not* equal. Kaltofen says it best when he testified, "if we are talking about a particular trailer, we're not talking about all things being equal.  We look at the history of things that can affect the formaldehyde concentration."  Exhibit "B" at p. 111.  For instance, HVAC systems:

> Q.   So if you wanted to know what a particular resident was exposed to in a particular unit, don't you think it would be important to know whether the HVAC system was operating and/or whether the doors and windows were opened routinely?
>
> A.   That's all part of the same variable [ventilation rate].  And I am very comfortable thinking that we really would like to see that data generally. Ventilation rates, temperature, humidity.  They all impact the formaldehyde concentration.

Q.     You would like to see that data?

A.     That's all part of how that actual concentration is arrived at.

Exhibit "B," at pp. 117-18.

Kaltofen admits that "it can be helpful" to test the EHU at an indoor temperature where the person who is occupying the trailer was actually living.  Exhibit "B," at 83.  Oddly enough, Kaltofen is not even aware whether DeVany Consulting performed her tests with the HVAC systems running.  *Id.* at p. 109.  DeVany was responsible for performing 5,031 of the 10,499 test samples reported in Kaltofen's database.  *Id.* at 108-09.  The majority of DeVany's tests were performed in the "hottest months" and her median result was admittedly higher than the median results from Kaltofen's own tests.  *Id.*   Nonetheless, the data is all included in the database, mathematically calculated, and ultimately incorporated into Kaltofen's final opinions.

A concentration level that is measured when temperature and humidity conditions are higher than those actually experienced by the occupant does not reflect that occupant's actual exposure level.  Nor can a database with a "variety of conditions" purport to represent the habits of any one EHU occupant.  Alexander's own testimony is a perfect demonstration of why one "set of conditions" cannot apply to individual EHU occupants.  For instance, unlike DeVany's tests, the HVAC system in the Alexander EHU was operated all day during the summer months when the kids were not in school:

Q.     When you left and the kids were still there during the summer, did you turn off the air conditioner?

A.     No.

Q.     The air conditioner was left on?

13

A.      Yes.

Q.      And it was set at approximately 75?

A.      Yes.

Exhibit "D," Deposition of Alana Alexander pp. 174-75 (June 29, 2009).

Alexander testified that, when it was hot outside, the trailer would not have been closed up nor would the air conditioner have been turned off.  *Id.* at 379.   She would always try to maintain a comfortable temperature inside the EHU.  *Id.* at 287.  If necessary, this included opening and closing windows, vents, and doors.  *Id.*  Alexander's ventilation habits were especially true when she was cooking inside the trailer (which was generally five times a week) and also on "those very nice days in New Orleans" when temperatures were not extremely hot or extremely cold.  *Id.* at 176-78 and 414-15.

Kaltofen's scientific opinion is limited to the understanding that formaldehyde release rates rise with rising temperature and humidity.  The remainder of Kaltofen's opinions is based on speculation about worst case formaldehyde concentrations when temperature and humidity are increased.  Kaltofen's opinions have no value when determining actual exposure levels experienced by EHU occupants because he does not consider the actual living conditions experienced by Alexander.  Likewise, his 95% confidence level fails to account for the many independent variables that can influence formaldehyde concentrations.  Kaltofen should not be allowed to opine about possible exposure levels and/or concentration levels when actual test data (0.05ppm) is available.  This Court correctly stated that Plaintiffs' own expert (W.D. Scott) has validated the results of that test.  (Rec. Doc. 1547).

Kaltofen's opinions are constructed to manipulate the actual test result of 0.05 ppm to

establish his underlying theory that the "May 2009 data[4] is more likely to be representative of what Ms. Alexander and Christopher Cooper actually experienced while residing in their trailer unit, than the uncorrected January 2008 data."   Exhibit "A," at p. 10.   In similar fashion, Kaltofen's opinion that CDC's median concentration is a better representation than the actual test data from the Alexander EHU is just another attempt to transform the actual formaldehyde concentration obtained by Plaintiffs' own expert, W.D. Scott.

> **C.      Kaltofen's general opinion that formaldehyde concentrations are dependent upon temperature and humidity is "axiomatic."  Kaltofen's database and/or use of  correction equations purporting to quantify or illustrate this dependency are not reliable.**

As previously stated W.D. Scott Group tested the Alexander EHU in January 2008 and reported a formaldehyde concentration of 0.05 ppm.  W.D. Scott Group's data also reports a temperature range of 65.6° to 78.0° Fahrenheit and a relative humidity range of 41.2% to 52.0%. Exhibit "A," at p. 9.   These measurements resulted in an average logged interior temperature of 71.8° Fahrenheit and an average logged interior humidity of approximately 47%.  *Id.*

Kaltofen's database supposedly represents a large number of units under a "fairly wide range of conditions."   Accordingly, the conditions under which the Alexander EHU was tested would represent one of the data entries in that range.  Contrarily, Kaltofen specifically refers to the Alexander EHU data reported by W.D. Scott Group as the "uncorrected January 2008 data." *Id.* at 10.  Kaltofen's report provides a standard method for "correcting" the *actual* temperature and humidity conditions on January 28 and 29 to a *standard* temperature and humidity condition. *Id.* at 10; 14-15.  Kaltofen employs the "standard conditions" used by ASTM International (ASTM) in a standard test method for determining formaldehyde concentration in air and emission rates from wood products using a large chamber. *Id.* and Exhibit "E," ASTM E 1333-

---

4          This data was excluded by Court Order. (Doc. Nos. 1547 and 2062).

15

96 (2002), *Standard Test Method for Determining Formaldehyde Concentrations in Air and Emission Rates from Wood Products Using a Large Chamber.* The standard temperature and humidity, according to the procedures for this particular test, is 25 ± 1° Celsius (77 ± 2° Fahrenheit) and 50 ± 4% relative humidity. *Id.* Thus, Kaltofen artificially increases the observed average temperature on January 28-29, 2009 by 5.2° Fahrenheit and increases the average observed humidity by 3% for the sole purpose of increasing the alleged level of formaldehyde in the Alexander EHU.

Kaltofen testified that this correction equation is "another example of the accepted principle that higher temperatures result in higher formaldehyde concentrations." Exhibit "B," at p. 142. Kaltofen purports to illustrate what the formaldehyde concentration would have been on January 28 and 29 if temperature was increased to 77° Fahrenheit and relative humidity was increased to 50%.[5] None of the other test results analyzed by Kaltofen were subject to such "correction." Notably, Kaltofen does not illustrate the correction of test results that were reported at temperature and humidity conditions higher than the "standard condition."

        1.     **Kaltofen's Predicted Formaldehyde Concentration is Based on Flawed Methodology and is Insufficiently Reliable to Satisfy the *Daubert/Kumho* Threshold.**

The correction equations referenced in ASTM E 1333-96 (2002) and used by Kaltofen are based on the "Berge formula" to "correct" formaldehyde concentrations. Kaltofen applies the Berge formula and reaches the conclusion that a 5° Fahrenheit rise in temperature yields a 36% "correction factor" for formaldehyde concentration. Exhibit "A," at p. 10. He also concludes that a 3% increase in relative humidity yields a 6% "correction factor" for formaldehyde concentration. *Id.* After making these corrections, Kaltofen's report reflects that the formaldehyde concentration value on January 28 and 29, 2008 was as high as 0.072 ppm if

---

[5]    Gulf Stream Coach, Inc. is not alleging that Kaltofen considered the "corrected data" in his database.

the EHU was climate controlled to 77° Fahrenheit and 50% relative humidity. *Id.* at pp. 14-15.
Then, when questioned about this calculation at his deposition, Kaltofen testified that this is not
his "specific opinion." Exhibit "B," at p. 234. Instead, it is just another "illustration" that
formaldehyde concentrations are higher when temperatures increase. *Id.*

Even if this illustration would somehow assist the trier-of-fact, the ASTM test method
referenced by Kaltofen was not designed to measure formaldehyde levels for indoor air. Rather,
ASTM E 1333-96 (2002) was designed to provide a standard means of testing, under strict
conditions (inside of a chamber), certain building products that have formaldehyde emission
limitations. Exhibit "D." The Berge formula was specifically created as a mathematical model
to describe the influence of various parameters on formaldehyde concentration in *the atmosphere
of a chamber* containing *particleboard*. Exhibit "F," A. Berge, Mellegaard, *Formaldehyde
Release from Particleboard- Evaluation of a Mathematical Model* 251-55 (Holz als Roh-und
Werkstoff, 38, 1980). Even Berge himself recognized that the mathematical relations used in the
chamber testing are of model character only, and therefore, they cannot be transferred
uncritically to every board system. Exhibit "F," at p. 251. Kaltofen is well aware of this
concept:

> Q.    But you recognize the Berge calculation is not an appropriate calculation to do
> on the test results of these trials (*sic*) to try to find out a specific level?
>
> A.    I would not use this calculation.
>
> Q.    And again, just for illustrative purposes, the correcting to 50 percent humidity
> on a 6 percent factor, where does that come from?
>
> A.    Again, it comes from the same methodology, and it's again designed to allow
> for inter-laboratory calibration, and it's not something I would do to the data
> point for the Alexander trailer.

Exhibit "B," at pp. 235-36.

Kaltofen, however, uses the actual test results from the Alexander EHU to perform an illustration of what happens to that data when the correction factors are considered. The same calculation can just as easily be performed to demonstrate a decrease in formaldehyde concentrations for the multitude of test results that were obtained at temperature and humidity conditions above the ASTM standard conditions. Neither of these calculations will assist the trier-of-fact because the end results do not represent real data.

> **2.      Kaltofen's Theories Have Not Been Tested, Are Not Generally Accepted Within the Scientific Community, and Have Not Undergone Peer Review within the Meaning of the Term as Required by *Daubert***

There are no relevant scientific studies supporting the use of temperature and humidity correction factors when conducting passive air sampling to predict formaldehyde concentration of *inside air* from *multiple wood sources.* There is no indication or evidence to show that Mr. Kaltofen's opinion or his "methodology" has been published in any type of scientific journal so that others in the field may assess the scientific validity of Kaltofen's approach. In addition, the methodology employed in measuring formaldehyde levels for indoor air is not so specific or limited so as to have escaped publication. The use of correction factors creates too much of an uncertainty when measuring indoor air because of the many variables which influence formaldehyde release. Without any significant peer review, it goes without saying that Kaltofen's methodology is not one that has been generally accepted in the scientific community.

> **3.      The Berge Formula has a substantial and unquantifiable rate or error.**

The Berge formula has no quantifiable rate of error. Even the protocol for ASTM E 1333-96 (2002) notes that "the greater the variance between actual and corrected temperature, the greater the potential error." Exhibit "E," at p. 6. In fact, the temperature conversion table

cited by ASTM (based on the Berge formula) does not even attempt to predict corrected formaldehyde concentrations when there is more that a 5° Fahrenheit deviation from the standard temperature.  Exhibit "E," at p. 6.  Kaltofen's own report stipulates that "the average temperature and humidity during the period Alana Alexander and Christopher Cooper resided in the unit was larger than the range of values used in this formula, which is only 5° Fahrenheit."  Exhibit "A," at p. 14.    Kaltofen's calculations admittedly fall outside the range of values used in the ASTM correction formulas.  If the rate of error for the correction formulas cannot be quantified within a 5° Fahrenheit variance, then Kaltofen's calculations are even less quantifiable and are subject to an even greater potential for error.   Correction equations, such as the Berge formula, are predictors of formaldehyde concentration and are only intended to describe the influence of certain climatic factors when conducting laboratory testing.  Kaltofen's opinions based on the temperature and humidity conversion factors for formaldehyde are a prediction at best.

### 4. Other Courts Have Rejected the Berge Formula As Unreliable When Testing Indoor Air.

In *Wallace,* the Court affirmed the trial court's decision excluding the opinions of plaintiff's expert, Thaddeus Godish, Ph.D., concerning the use of the Berge equation to extrapolate formaldehyde concentrations in a manufactured home because the methodology was not generally accepted in the relevant scientific community.   *Wallace v. Meadow Acres Manufactured Housing Inc.*, 730 N.E.2d 809 (Ind. Ct. App. 2000), trans. denied, (Ind. Feb. 5, 2001).  On October 8, 1994, Dr. Godish tested the air inside of plaintiff's manufactured home by obtaining ambient air samples.  *Id.* at 812-13.  Dr. Godish reported indoor temperature of 71.5° Fahrenheit and indoor relative humidity of 70%.  *Id.*  In order to determine the formaldehyde levels that would have been present at 78° Fahrenheit, Dr. Godish applied the Berge equation.

*Id.* Using this formula, he determined that formaldehyde levels would have been as high as .17 ppm if the home had been heated to 78° Fahrenheit. *Id.*

The Court in *Wallace* concluded that Dr. Godish's use of the Berge equation was unreliable for several reasons. *Wallace*, 730 N.E.2d at 813-17. First, there is no general acceptance in the relevant scientific community for use of the Berge equation to "correct" ambient air formaldehyde level measurements in a manufactured home and certainly not when only one sample is analyzed. *Id.* at 815. Second, Dr. Godish's theory cannot be empirically tested because he relied on numerous variables which were not preconditioned. *Id.* Third, his theory and methodology lack substantial peer review. *Id.* Finally, his theory and methodology have a substantial and unquantifiable rate of error – Dr. Godish admitted that the Berge equation by itself has a rate of error no less than ± 12%. *Id.* at 816.

Similarly, Kaltofen's opinions are based on speculation and estimation that is subject to gross error. Kaltofen's opinions all fail to account for the variables that affect formaldehyde concentrations in indoor air. Kaltofen ignores normal temperature and humidity conditions actually experienced by Alexander and other EHU occupants as a factor that could affect his "level of precision." Kaltofen makes no effort to identify whether all of the data entries reported in his database were performed under the same test conditions. He simply gathered a bunch of data from an assortment of test takers and plugged it into a database. Kaltofen's calculations and opinions based on that database are merely several steps of unsupported speculation. "Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." *Mitchell v. Gencorp, Inc.,* 165 F.3d 778, 781 (10th Cir. 1999) (citing *Daubert,* 509 U.S. at 2795).

**VI.**
**Conclusion**

Marco Kaltofen, Plaintiff's designated civil engineering expert, has opined that his database reflects a "statistically valid" number of EHU's to determine overall formaldehyde concentrations within a 95% confidence level.  He also opines that 95% of his data falls above the 0.008 ppm ATSDR MRL.   Kaltofen's opinion, however, fails to correctly consider the actual conditions at the time Alexander resided in the EHU, including the many independent factors which affect formaldehyde concentration in indoor air.  Kaltofen should be precluded from opining about statistically probable exposure and/or concentration levels.  Kaltofen also purports to illustrate temperature and humidity dependence of formaldehyde concentrations by employing correction equations to manipulate the actual test results obtained by W.D. Scott Group.  Such equations are unreliable when testing indoor air and should be excluded as part of the Court's "gatekeeping" function under *Daubert*.

Respectfully Submitted,

> **DUPLASS, ZWAIN, BOURGEOIS,**
> **PFISTER, & WEINSTOCK**
>
> s/Andrew D. Weinstock
> _____
> **ANDREW D. WEINSTOCK #18495**
> **JOSEPH G. GLASS #25397**
> 3838 N. Causeway Boulevard, Suite 2900
> Metairie, Louisiana 70002
> Telephone: (504) 832-3700
> Fax: (504) 837-3119
> andreww@duplass.com
> jglass@duplass.com

and

**SCANDURRO & LAYRISSON**
**Timothy D. Scandurro #18424**
**Dewey M. Scandurro #23291**
607 St. Charles Avenue
New Orleans, LA 70130
Telephone: (504) 522-7100
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of July, 2009, a copy of the foregoing Memorandum

in Support of Motion *in Limine* to Exclude Expert Testimony of Marco Kaltofen filed o/b/o Gulf

Stream Coach, Inc. was filed electronically with the Clerk of Court using the CM/ECF system.

Notice of this file will be sent to all known counsel of record by operation of the court's

electronic filing system.


s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495