UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION:  N(5) |
| | * | |
| This Document Relates to: | * | |
| *Charlie Age, et al. v.* | * | JUDGE: ENGELHARDT |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | |
| | * | MAG: CHASEZ |

*********************************************************************

**MEMORANDUM IN SUPPORT OF GULF STREAM COACH, INC.'S
MOTION *IN LIMINE* TO LIMIT
EXPERT TESTIMONY OF STEPHEN SMULSKI, PH.D.**

**MAY IT PLEASE THE COURT:**

Gulf Stream Coach, Inc. respectfully submits the following Memorandum in Support of

its Motion *in Limine* to Limit Expert Testimony of Stephen Smulski, Ph.D.

## I.      BACKGROUND

### A.      Nature of Case

This Multi-District Litigation is the consolidation of over one hundred-seventy state and

federal toxic tort suits in which thousands of named plaintiffs claim to have inhabited emergency

housing units ("EHUs") that were provided to them by the Federal Emergency Management

Agency ("FEMA") as a result of the alleged uninhabitability of their residences due to

Hurricanes Katrina and Rita.  Following denial of class certification, several plaintiffs, including

bellwether plaintiffs Alana Alexander and Christopher Cooper (hereinafter collectively referred

to as "Alexander"), filed suit against Gulf Stream Coach, Inc., alleging that it manufactured the

EHUs used by the specific plaintiffs.  (*Age, et al v. Gulf Stream Coach, Inc., et al*, 09-2892, Doc.

No. 1).  Moreover, plaintiffs have named as defendants the United States Government through

1

FEMA and Fluor Enterprises, Inc. (*Age,* Doc. No. 1), and plaintiffs seek recovery for alleged physical and mental pain and suffering, physical impairments and disability, medical expenses, loss of earnings capacity, loss of enjoyment and quality of life, loss of consortium, travel expenses, out-of-pocket expenses, and the loss of use and/or opportunity to use safe and adequate shelter allegedly resulting from the purported exposure to formaldehyde. (*Age*, Doc. No. 1, ¶ 117). Specifically, the *Age* plaintiffs claim exposure to the allegedly dangerous levels of formaldehyde (or threat thereof) in those EHUs. (*Age*, Doc. No. 1, at ¶ 23). Alexander itemized the theories of recovery against Gulf Stream Coach, Inc., in part, as follows:

1.   Failing to design the EHU so as to not emit allegedly dangerous levels of formaldehyde;

2.   Manufacturing an allegedly unreasonably dangerous EHU;

3.   Providing an EHU that did not conform to express warranties allegedly made by Gulf Stream Coach, Inc.; and

4.   Failing to warn of the allegedly excessive levels of emissions of formaldehyde and hazards associated with the allegedly excessive levels of formaldehyde emissions in the EHU.

(*Age*, Doc. No. 1, at ¶ 102).

## B.   Alexander's Wood Science and Technology Expert – Stephen Smulski, Ph.D.

Alexander provided twenty (20) written expert reports, including the report of Stephen Smulski, Ph.D. ("Smulski") as a wood science/wood technology expert in this case. Exhibit "A," Smulski's May 18, 2009 Report.[1] Smulski is the sole principal in Wood Science Specialists, a private firm focusing on solving performance problems with wood products and the use of wood products. Exhibit "B," Deposition of Smulski dated 6/10/09, pp. 20-21

---

[1]   Smulski defines the specialization of wood science as "…the study of the anatomical, physical, chemical and mechanical properties of wood…" whereas wood technology "…is the application of those scientific principles to the manufacture, use, and in-service performance of wood and wood-based products." Exhibit "B," Deposition of Smulski dated 6/10/09, p. 18.

and Exhibit "C," Smulski *curriculum vitae*.  Smulski testified that he was retained in this matter to "…identify which composite wood products were used in the construction of the travel trailers [sic]."  Exhibit "B," at p. 45.

Smulski admits that he is not an expert in civil engineering, chemistry, medicine, industrial hygiene, emergency relief response, disaster relief response, toxicology, or epidemiology.  Exhibit "B," at pp. 66-67.  He is not an expert in OSHA regulations or regulations offered by any governmental agency.  *Id*. at p. 68.  Likewise, he is not an expert in sociology, psychology, biology or statistics.  *Id*. at pp. 71 and 229-30.

Importantly, Smulski readily admits that he was not asked to offer opinions on the potential amount of volatile organic compounds (VOCs) from composite wood products used in the trailer to which Alexander was exposed.  *Id*. at p. 46.  He was not asked to offer opinions as to how much, if any, formaldehyde was present in the Alexander EHU at any time when Alexander occupied it.  *Id*.  Also, Smulski was not asked to formulate opinions as to ventilation rates in the EHU.  *Id*. at pp. 47-48.  He was not asked to formulate opinions as to what the levels of formaldehyde were in the EHU.  *Id.* at p. 48.  Additionally, Smulski was not asked to formulate a means of determining how much formaldehyde might have been present in the EHU in the past.  *Id*. at pp. 48-49.  He was not asked to offer opinions as to what information was provided to Alexander by anyone regarding potential hazards in the Alexander EHU.  *Id*. at p. 49.  Finally, Smulski was not asked to offer any opinions as to the health effects associated with exposure to any level of formaldehyde or a causal relationship between the alleged symptoms of Alexander and the plaintiffs' alleged exposure to formaldehyde in the EHU.  *Id*. at pp. 49-50.

Despite his testimony that he was simply asked to inventory the composite wood products that were used to construct the trailer, Smulski offers opinions on many of the foregoing topics that are not only admittedly outside his expertise, but also outside of his assigned task in this litigation. Smulski offers these opinions under the guise of "putting the whole formaldehyde release issue into context", "so that somebody who knows nothing about this can pick up this report, read it from start to finish and get the complete story, have everything in context." Exhibit "B," at pp. 137 and 167. In other words, most of the "opinions" in his report are Smulski's "attempt to tell the complete story here"[2] on areas admittedly beyond his expertise and scope of his assignment.

By Smulski's own admission, he is offering not sound expertise but, rather, pure advocacy as a witness who is filtering the evidence and information of other alleged experts and presenting it to the jury. Gulf Stream Coach, Inc. moves herein to exclude many of Smulski's opinions as they are of no assistance or relevance to the trier-of-fact, are well beyond his qualifications and/or field of expertise and/or are not based upon sound and reliable methodology. A brief overview of his numerous opinions is set forth in the following section and discussion of the grounds for exclusion of them follows.

C.    **Smulski's Opinions**

Smulski sets forth twenty-seven (27) enumerated paragraphs in his report for this case. Exhibit "A." As previously noted, although only two[3] of the twenty-seven paragraphs are expressly introduced as his opinions, Smulski offers numerous other opinions under the guise of offering a complete picture. Generally, Smulski opines that the 2004 Gulf Stream Coach, Inc. EHU used by Alexander following Hurricane

---

[2]    Exhibit "B," at p. 193.

[3]    Exhibit "A," at ¶¶ 26 and 27.

Katrina "…was not suitable for use as long-term housing because…formaldehyde gas would be released from the wood-based composite panels…used in this trailer and that Ms. Alexander and her son Christopher Cooper would potentially suffer adverse health effects from chronic exposure to formaldehyde gas."   Exhibit "A," at ¶ 26. Additionally, he generally opinions that "…it was unreasonable for anyone to think that the health of persons living in this Gulf Stream Coach, Inc. Cavalier model trailer for a long period of time would not be adversely affected…" due to a number of factors.  Exhibit "A," at ¶ 27.

Almost as an afterthought, in paragraph 10 of his report Smulski provides the inventory of composite wood products used in the construction of the Alexander EHU. Recall that this is the only task he was assigned in this litigation.  Exhibit "B," at p. 45. Nonetheless, Smulski parlays this assignment to offer expansive opinions on numerous other topics outside of his area of expertise and/or areas within the juror's own knowledge, including: alleged health effects associated with exposure to formaldehyde (Exhibit "A," ¶ 5); the climate in New Orleans, Louisiana, in general (Exhibit "A," ¶ 11); air exchange rates on an EHU ***other*** than the Alexander EHU (*Id*. at ¶ 12); owner's manual information (*Id*. at ¶ 13); installation of the EHUs, in general (*Id*. at ¶ 14); formaldehyde-emissions into the Alexander EHU (*Id*. at ¶ 15); testing results in the Alexander EHU – including test results excluded by Court Order (*Id*. at ¶ 16); reasonably anticipated use of the Alexander EHU (*Id*. at ¶ 17); tested formaldehyde levels in ***other*** EHUs as described in other entities' reports (*Id*. at ¶¶ 18, 19 and 22); and alternative designs for the Alexander EHU (*Id*. at ¶¶ 23, 24 and 25).  Gulf Stream respectfully submits that each of the foregoing "opinions" is outside of Smulski's area

of expertise.  At best, his recitation of the information contained in these opinions is cumulative and/or duplicative of testimony offered by Plaintiff's other experts.  At worst, his recitation of the information contained in these opinions elevates him to the level of an "über-juror", a term recently used by the Court.

Smulski's opinions in this case, based on both his written report and his deposition testimony, amount to a conclusion by him that every living quarter in the world which potentially exposes occupants for any period of time to formaldehyde levels in excess of .008 parts per million (regardless of whether the unit is a site built home, apartment, condominium, manufactured house or travel trailer) is unsuitable for habitation and is in need of remediation. Exhibit "B", at pp. 122-23, 234-35 and 279-80.  Smulski reaches this conclusion despite the fact that he previously authored a 1987 article that reported that the average, airborne formaldehyde concentration for outdoor, urban air was 0.08 ppm (10 times the level that renders a home uninhabitable, according to Smulski).  Exhibit "B," at p. 129.  More recently, Smulski's own notes of May 13, 2009 reflect an ambient outdoor level of 8 ppb to 16 ppb (0.008 ppm to 0.016 ppm) and indoor level in other residences of 10 ppb to 20 ppb (.010 ppm to .020 ppm), all of which exceed the level of formaldehyde acceptable for habitability of a structure, according to his testimony.  *See* "Inside Formaldehyde" Article and notes, attached hereto as Exhibits "D" and "E," respectively.[4]

## II.      ADMISSIBILITY OF EXPERT OPINIONS

### A.     Applicable Law

As this Court has recently instructed:

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

---

[4]      These two exhibits were attached to Smulski's Deposition as Exhibits 9 and 11, respectively.

an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The United States Supreme Court's decision in *Daubert v. Merrell DowPharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir.2004); see *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

A number of nonexclusive factors may be relevant to the reliability inquiry, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir.2004); see *Runnels v. Tex. Children's Hosp. Select Plan*, 167 Fed.Appx. 377, 381 (5th Cir.2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's reliability.'" (citing *Kumho Tire*, 526 U.S. at 152)). With respect to the determination of relevancy pursuant to Rule 702 and *Daubert*, the proposed expert testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003).

*In Re FEMA Trailer Formaldehyde Products Liability Litigation*, MDL 07-1873 (E.D. La. 7/15/09), 2009 WL 2169224, at *2.

*Daubert* also cautions against admitting expert testimony in a case when the application of the expert's methodology to the facts of the case involves an impermissible leap of faith. The Supreme Court in *General Electric v. Joiner* acknowledged, "[t]rained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of

Evidence requires a district court to admit opinion evidence which is connected to the existing data only by the *ipse dixit* of the expert." *General Electric v. Joiner,* 522 U.S. 136, 146, 139 L. Ed. 508, 519 (1997).  If there exists too great an analytical gap between the data and the opinion offered, the testimony is not reliable.  *Id.  Joiner* reminds district courts that they must review the reasoning used by an expert in applying a given methodology to the expert's ultimate opinion.  It is imperative that an expert explains the "how" and the "why" behind his conclusions.  See *Id.* at 144; see also *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) (stressing that the expert must state both the foundation for his opinions and the reasoning from that foundation).  Ultimately, when the evidence does not "fit" with the conclusion, the testimonial evidence is not reliable.  *Cavallo v. Star Enterprises*, 892 F. Supp. 756, 761-63 (E.D. Va. 1995), *aff d in part and rev'd in part*, 100 F.3d 1150 (4[th]Cir. 1996).

### B.    Stephen J. Smulski, Ph.D. Lacks Qualifications to Support His Opinions

1.    <u>Qualification of the expert is required for each opinion proffered</u>.

A district court is to allow the submission of expert testimony only if the expert is qualified to testify by virtue of his "knowledge, skill, experience, training, or education."  Fed. Rule of Evid. 702.  A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.  *Wilson v. Woods,* 163 F.3d 935 (5[1h] Cir. 1998).  The qualification of a witness as an expert, separate and apart from the witness' opinion, is a determination that is a discreet, independent and important requirement in considering the admissibility of an expert's testimony.  *See U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).

2.     <u>Smulski lacks qualifications to render the general opinions proffered.</u>

As previously noted, Smulski offers two generalized opinions in his Affidavit. First, he opines that the Alexander EHU is not suitable for long-term use because of formaldehyde emissions and that Alexander would potentially suffer adverse health effects from chronic exposure to formaldehyde gas.  Exhibit "A," at ¶ 26.  Second, Smulski opines that it was unreasonable for anyone to think that the health of persons living in the Alexander EHU for a long period of time would not be adversely affected. Exhibit "A," at ¶ 27.  By his own admission, Smulski is not qualified to render these opinions.  Smulski is a wood scientist.  Exhibit "C."  Smulski admits that he is not an expert in civil engineering, chemistry, medicine, industrial hygiene, emergency relief response, disaster relief response, toxicology, or epidemiology.  Exhibit "B," at pp. 66-67. Likewise, he is not an expert in sociology, psychology, biology or statistics.  *Id*. at pp. 71 and 229-30.  Indeed, Smulski admits he was not asked to offer any opinions as to the health effects associated with exposure to any level of formaldehyde or a causal relationship between the alleged symptoms of Alexander and the plaintiffs' alleged exposure to formaldehyde in the EHU.  *Id*. at pp. 49-50.

As such, Smulski's opinions in paragraphs 26 and 27 of his Affidavit regarding the suitability of the EHU for long-term occupancy based on formaldehyde emissions, and the potential health effects resulting there from, should be excluded.  Smulski is simply not qualified, as a wood scientist, to render these generalized medical conclusions.  More importantly, even were he qualified, these opinions extend beyond assisting the trier-of-fact in

making a determination, to actually making a determination for the trier-of-fact.  Smulski has

stepped into the über-juror role by offering these two opinions.

      **C.**      **Smulski's Specific Opinions are not Based on Reliable Methodology, Provide No Assistance to the Trier-of-Fact and are not Within His Area of Expertise**

Beyond Smulski's two generalized opinions, he offers a number of underlying specific

opinions for "context" to his inventory of composite wood products found in the Alexander

EHU.  Addressing each of these opinions in turn:

      1.      <u>Affidavit Paragraph 5</u>

Smulski offers to the trier-of-fact opinions on the alleged adverse health effects from

exposure to formaldehyde.  Exhibit "A," at ¶ 11.  As noted above, Smulski is not a medical

expert and he was not asked to offer any opinions as to the health effects associated with

exposure to any level of formaldehyde or a causal relationship between the alleged

symptoms of Alexander and the plaintiffs' alleged exposure to formaldehyde in the EHU.

Exhibit "B," at pp. 49-50 and 66-67.  Certainly, the litigants' medical experts will address

this issue exhaustively, and Smulski's personal thoughts are simply duplicative and outside

of his professed expertise.   The opinions contained in paragraph 5 must be excluded for the

foregoing reasons.

      2.      <u>Affidavit Paragraph 11</u>

Smulski, a Massachusetts resident, offers to the New Orleans jurors opinions on New

Orleans climate and its effect on formaldehyde emissions.  Exhibit "A," at ¶ 11.  Beyond

offering an opinion that, in general, the release of formaldehyde gas from composite wood

products increases as temperature and relative humidity increase (Exhibit "A," at ¶ 6), opining on

New Orleans climate is not something on which New Orleans jurors require assistance.

3.      Affidavit Paragraph 12

Smulski offers to the trier-of-fact opinions on the air exchange rate of the Alexander EHU based on Lawrence Berkeley National Laboratory testing of an EHU, other than the Alexander EHU.   Exhibit "A," at ¶ 12.  Beyond offering an opinion that, in general, increased ventilation will decrease formaldehyde concentration (Exhibit "A," at ¶ 6), Smulski's opinions on ventilation are not reliable.  Indeed, Smulski admits as much when he testified:

Q.      How many units were tested in that study?

A.      One.  One Gulf Stream Cavalier.

Q.       Is it your opinion that it's scientifically valid to relate this single test to all Gulf Stream Coach units?

A.       No.  The air exchange rate in each trailer is going to vary on an individual basis, but in the absence of any other information, that's the best information that was available.

Exhibit "B," at p. 190.

Moreover, Smulski specifically admits that this opinion is beyond his expertise when he testified:

Q.      Were you asked to formulate opinions as to ventilation rates in this trailer?

A.      No.

Q.      Is that within your expertise?

A.      No, it's not.

Exhibit "B," at pp. 47-48.

The opinions contained in paragraph 12 must be excluded for the foregoing reasons.

4.      Affidavit Paragraph 13

Smulski offers to the trier-of-fact opinions regarding the information contained in the Alexander EHU manual.   Exhibit "A," at ¶ 13.  He has no expertise in drafting or interpreting

owner's manuals.  His opinions are nothing more than a statement of what the manual says or does not say – something that the jury is fully capable of understanding on its own.

> Q.      …First, are you an expert in reviewing owner's manuals?
>
> A.      I am not an expert in reviewing owner's manuals, but I can read, and understand what I read, and there is no statements in that owner's manual about formaldehyde gas.
>
> * * *
>
> Q.      My question means:  Do you have some kind of expertise that offers assistance to the trier of fact in reading a document that they can read for themselves?
>
> MR. PINEDO:
> Objection to form.
>
> THE WITNESS:
> Well, I think I've provided it here.  I've read the owner's manual looking to see if there was any mention of formaldehyde, and there is no mention of formaldehyde in this owner's manual.
>
> Exhibit "B," at pp. 192-93.

Smulski's opinions as to the owner's manual do not assist the trier-of-fact in any way. The opinions contained in paragraph 13 must be excluded for the foregoing reasons.

> 5.      Affidavit Paragraph 14

Smulski next offers to the trier-of-fact opinions regarding the installation of the Alexander EHU and its effect on formaldehyde emissions.    Exhibit "A," at ¶¶ 14-15.  Once again, these opinions are not reliable and they are not within Smulski's professed expertise. Regarding these opinions, Smulski acknowledged:

> Q.      No. 14, "I am aware that the trailer was installed by inserting multiple supports beneath its frame."  You are talking about the Alexander trailer?
>
> A.      Yes.
>
> Q.      What is the source of that information?

A.     Mrs. Alexander.

Q.     She told you that she saw how it was installed?

MR. PINEDO:
Objection to form.

THE WITNESS:
She confirmed that her trailer was sitting on some type of support.

EXAMINATION BY MR. GLASS:
Q.     "It is my understanding that during the process of installation that the frame and exterior shell can bend and twist."  What is the source of that information?

A.     That's the -- that is coming from other experts who are experts in travel trailers.

Q.     What expert?

A.     Al Mallet, Gary Bunzer.

Q.     Anybody else?

A.     Not that I can think of.

Q.     You said "can."  Do you know whether with the Alexander unit that that actually occurred?

A.     I don't.

Q.     Do you know how this unit was handled, transported, anything that happened to it between the time that Ms. Alexander moved out, and the time you looked at it?

A.     I do not.

Q.     Do you know how the unit looked at the time it was installed at the 4415 Dale Street address?

A.     I do not.

Q.     This next portion of that sentence says, "causing sealed joints in the walls, roof, ceiling, and floor to open."  Again, this is just something that you've been told can happen?

A.     This was told to me by Mr. Mallet, Mr. Bunzer, and this is also based on my experience in the construction industry and in life in general.  Something that is

built square, plumb, and level, if you twist it, you will cause joints to open, members to bend, et cetera.

Q.    But you don't know whether that happened in the Alexander unit?

A.    I do not.

Q.    And you don't know if it did happen, when it occurred?

A.    That is correct.

Q.    The next sentence, "This can allow formaldehyde gas inside the wall, ceiling, and floor cavities to more easily enter the living space and increase the concentration of formaldehyde gas in the trailer."  If I understood your earlier testimony correctly, based upon various factors such as temperature differential, air pressure, and concentration, we could also state that the openings can more easily allow the formaldehyde to enter the exterior of the trailer, would that be accurate?

A.    Yes.  It's a two-edged sword.  Depending on what the conditions are, the movement could be in either direction.

Q.    "It can also allow hot, humid air and rain to enter into the walls, ceiling, and floor cavities, causing the relative humidity inside the cavities to increase."  That would require that there be some path for the exterior air and rain to go all of the way from the outside to the interior of the trailer, correct?

A.    That's correct, and we actually observed that in the Alexander trailer.  There is a ceiling light fixture over the bed in the bedroom, which has been leaking water. When we got up on the roof of the travel trailer, we could see that there was an open seam in the roof membrane, and that was where the water was entering through, exiting in the ceiling light fixture, and then actually ending up on the bed platform and mattress itself.

Q.    Do you know when that damage occurred?

A.    I do not.

Exhibit "B," at pp. 204-09.

The foregoing testimony establishes that these opinions are anything but reliable.  First, Mr. Smulski has no expertise in the set up of travel trailers or in diagnosing the cause of intrusion of water or opening of seams in a travel trailer.  Second, Mr. Smulski offers no evidence as to when any open seam observed on the unit occurred.  Third, he offers no evidence

that the set up of the trailer was done improperly or done in a manner that resulted in any of the problems he claims were observed in the unit. The opinions simply state what could happen, but not what actually happened, in the Alexander EHU.  Moreover, Smulski states that at least a portion of these opinions is based on knowledge he gained from "life in general," which is presumably within the common knowledge of the average juror. The opinions contained in paragraph 14 must be excluded for the foregoing reasons.

      6.    <u>Affidavit Paragraph 15</u>

Smulski further offers to the trier-of-fact opinions regarding the installation of the Alexander EHU and its effect on formaldehyde emissions.     Exhibit "A," at ¶¶ 14-15.  Once again, these opinions are not reliable and they are not within Smulski's professed expertise. Regarding these opinions, Smulski confirmed:

> Q.    No. 15, "Even in the absence of installation-caused damage to the trailer, formaldehyde gas will escape from the exposed raw wood on the back edges of the wall, ceiling, and floor panels and accumulate inside the wall, ceiling, and floor cavities."  That's just a function of the properties of the wood and the adhesive, correct?
>
> A.    It's due to the fact that the rear of the panel is raw wood, and that is going to be an avenue of escape for the formaldehyde gas that is going to then accumulate in the wall cavity.  As outdoor air leaks through the walls into the wall cavity, it's going to absorb that formaldehyde, and then leak into the interior of the travel trailer itself through joints and   penetrations.
>
> Q.    "The formaldehyde gas will then naturally enter the living space."  We are talking about the living space of the Alexander's unit?
>
> A.    Yes.
>
> Q.    Let me actually complete the sentence.  "The formaldehyde gas will then naturally enter the living space, with differences in temperature, vapor pressure, and air pressure across the trailer's walls, ceiling, and floor providing the driving force for moving the airborne gas through joints and penetrations in the walls, ceiling, and floor (e.g., switch plates, electrical receptacles, heating and air-conditioning grilles, ceiling light fixtures, seams between panels)." What is the source of that information?

A.     There is no source.  That is my experience in 31 years of education and experience and in investigating moisture problems in residential buildings in the last 17 years, those are the passageways by which airborne moisture moves within a building and across the walls, floor of the buildings.  The same thing is happening here with the formaldehyde gas.

Q.     As you indicated in the previous opinion in 14, based upon those same differences in temperature, vapor barrier -- excuse me -- vapor pressure, and air pressure across the various components of the trailer, the air could just as easily, naturally leave the living space, correct?

MR. PINEDO:
Objection to form.

THE WITNESS:
It can go the other way, yes.

EXAMINATION BY MR. GLASS:
Q.     Did you do any testing to confirm your conclusions in this first two sentences as to what the path of the formaldehyde gas being emitted was in the Alexander travel trailer unit?

A.     I didn't do any testing, but the gas passes through joints and penetrations.  That is the air passageways in the travel trailer, in a HUD-Code home, in a manufactured home, in a high-rise commercial office building, in this building we are sitting in here today.

Q.     How much formaldehyde gas was in the travel trailer at its peak when the Alexanders lived in it?

A.     I don't know.  I only know that in January 2008 the reading of 50 parts per billion was made in the trailer, and in May 2009, a reading of 74 parts per billion was made in the trailer.

Exhibit "B," at pp. 209-13.

Again, the foregoing testimony establishes that these opinions are anything but reliable.

By his own admission, Smulski did no tests or procedures of any kind to determine whether his opinions regarding the manner and method of alleged formaldehyde emissions was actually occurring in the unit.  His opinions simply state what could happen, but not what actually happened in the Alexander EHU.  Moreover, Smulski fails to identify his expertise in

16

installation of EHUs and the effects of damage incurred during installation on formaldehyde concentrations in the EHU. The opinions contained in paragraph 15 must be excluded for the foregoing reasons.

      7.     <u>Affidavit Paragraph 16</u>

      Next, Smulski offers to the trier-of-fact a recitation of the Alexander EHU testing results provided by another of Alexander's experts, including testing results that the Court has specifically excluded (Rec. Docs. 1547 and 2062). Exhibit "A," at ¶¶ 16. Once again, these opinions are not within Smulski's professed expertise, and he is simply cumulatively and duplicatively testifying regarding another expert's work. Regarding these opinions, Smulski testified:

      Q.    ….On 16, "On January 28-29, 2008, three years after the trailer was manufactured and lived in, the W.D. Scott Group, Inc. measured the formaldehyde level inside the trailer at the nightstand in the bedroom and reported it to be 50 parts per billion  (temperature 66 to 78 degrees Fahrenheit, relative humidity 41 to 52 percent)." What is the source of that information?

      A.    Bill Scott.

      Q.    Do you have any expertise to validate his testing?

      A.    No.

      Q.    So you are simply relaying the information he provided to you?

      A.    Mr. Scott does this for his profession.

      Q.    And you are simply repeating the information that he's provided to you?

      A.    Yes.

Exhibit "B," at p. 213.

      The foregoing testimony establishes that these opinions are simply duplicative and cumulative of testimony that, if allowed, will be offered by other experts. More importantly,

further opinions in this paragraph relate, in part, to testing subsequently performed on May 6-7, 2009, which this Court has specifically excluded.  The opinions contained in paragraph 16 must be excluded for the foregoing reasons.

       8.    <u>Affidavit Paragraph 17</u>

Next, Smulski offers to the trier-of-fact opinions regarding the reasonably anticipated use of the Alexander EHU.   Exhibit "A," at ¶ 17.   Once again, these opinions are not within Smulski's professed expertise.  Regarding these opinions, Smulski testified:

> Q.    No. 17, "The trailer supplied by FEMA to Ms. Alexander is intended to be used for short-term recreational use."  What is the source of the information for that sentence, the first one?
>
> A.    That's my understanding of how people typically use travel trailers, and in the owner's manual itself, they infer it is typically used for short periods of time, rather than on the long term.
>
> * * *
>
> Q.    The next sentence says, "When the trailer was installed on a foundation and hard-wired and hard-plumbed, however, it was converted from short-term recreational use to long-term housing."  What is the basis of that opinion?
>
> A.    Common sense.  It used to be a vehicle towed from location to location for vacation use.  It has been converted to a house, which is set up on a foundation, equipped with -- hooked into the electrical grid, hooked into the sewer system, hooked into the water system.
>
> Q.    Next sentence is, "As a consequence, Ms. Alexander and her son Christopher Cooper were subjected to chronic exposure to formaldehyde gas."  What do you mean by "chronic exposure"?
>
> A.    Long term as -- as used in the same sense that ASTDR uses chronic, intermediate, and acute exposure.
>
> Q.    What do you consider long term?
>
> A.    I would say if I were to be displaced from my house and put up in a hotel for three or four weeks, that would be short term.  I would say if I were in that hotel for months and years, that would be long term.  If you go with the ATSDR

definitions, acute is up to 14 days, intermediate is 15 to 365 days, chronic is over 365 days.

Q.   Do you know what level of formaldehyde gas Ms. Alexander and her son Christopher Cooper were exposed to as opined in paragraph 17?

A.   I don't.

Q.   "The use of this trailer by Ms. Alexander and her son was a reasonably anticipated use given that this trailer was sold to FEMA for the purpose of housing persons displaced by natural disasters like Hurricane Katrina."  In regards to your task of identifying and inventorying the composite wood products in the Alexander trailer, what is the purpose of this statement about "reasonably anticipated use"?

A.   Again, I am fleshing out the story.  I want somebody to be able to pick up this document with no knowledge, read it in its entirety, and understand the context in which these formaldehyde-emitting wood products were used, and the consequences for the occupants of those travel trailers.

Q.   Did you conduct any kind of inquiry of Ms. Alexander to determine whether she in fact used this trailer in its, as you described it, anticipated use by the manufacturer?

MR. PINEDO:
Objection to form.

THE WITNESS:
I did not.  As I said, I listened in on a conference call with Mrs. Alexander.  I never spoke to her directly.

EXAMINATION BY MR. GLASS:
Q.   Was there any discussion during that conversation about how she may have misused the product?

A.   Not that I recall.

Q.   Do you recall any specific questions asking her how she used the trailer?

A.   I don't.

Exhibit "B," at pp. 220-25.

Again, the foregoing testimony establishes that these opinions are not reliable.  The

opinions are not based on what actually happened in the Alexander EHU, or any methodology

that is subject to duplication.  Indeed, in developing the opinions, Smulski relied on little more than common sense.  One expects that the jurors will possess common sense, and under such circumstances, the opinion provides no assistance to the jurors.  Moreover, Smulski fails to identify his expertise in determining what constitutes reasonably anticipated use of EHUs. Smulski should not be allowed to offer opinions to "flesh out" the story in the role of an "über-juror."  The opinions contained in paragraph 17 must be excluded for the foregoing reasons.

9.    <u>Affidavit Paragraphs 18, 19 and 22</u>

Next, Smulski offers to the trier-of-fact opinions regarding the results of various other agencies' testing of formaldehyde levels in EHUs other than the Alexander EHU.   Exhibit "A," at ¶¶ 18, 19 and 22.  Smulski offers a summary of reports by the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, and the Lawrence Berkeley National Laboratory.  *Id.*  Regarding the reports, Smulski confirmed:

> Q.    Can you tell me what the levels of formaldehyde exposure were in the Alexander unit at any given time other than the W.D. Scott test that you have been provided by Mr. Scott?
>
> MR. D'AMICO:
> Objection.  Asked and answered.
>
> THE WITNESS:
> I cannot.  I can only infer from what we know about formaldehyde release that they were more likely than not higher prior to measurements made by Mr. Scott.
>
> EXAMINATION BY MR. GLASS:
> Q.    The studies that you identified in No. 18 do not tell us what the levels of formaldehyde were in the Alexander unit; is that accurate?
>
> A.    That is correct.
>
> Q.    So for No. 19, same question.  Where you are identifying averages in the CDC study, that does not tell us what the levels of formaldehyde were at any time the Alexanders occupied the Gulf Stream unit; is that accurate?

MR. PINEDO:
Objection.  Asked and answered.

MR. GLASS:
That's a different opinion.  I'm asking it again.

THE WITNESS:
Yes, but it provides --

MR. D'AMICO:
Same one.

THE WITNESS:
Yes, but it provides the basis for making inferences about what the formaldehyde levels likely were inside the Alexander trailer, given that it's the same model trailer, and it's the same volume of air, and it was used for the same purpose, and it was located in the same general geographical region.

Exhibit "B," at pp. 236-37.

Smulski further testifies:

Q.    In opinion No. 22, you speak again to the November 2007 Lawrence Berkeley National Laboratory report.  Does that report tell you what the level of formaldehyde was at any time that the Alexanders occupied the Gulf Stream Coach unit?

MR. PINEDO:
Objection to form.

THE WITNESS:
No, because the FEMA tests -- excuse me -- the Lawrence Berkeley National Lab did not conduct tests on the Alexander trailer.  They did conduct tests, however, on another Gulf Stream Cavalier model.

Exhibit "B," at pp. 249-50.

The foregoing testimony establishes that these opinions are not reliable.  The opinions are not based on what actually happened in the Alexander EHU, or any methodology that is subject to duplication or testing.  Moreover, the testing of the EHUs made the subject of the various reports is not relevant to the Alexander EHU.   The Court has excluded testing

conducted on the Alexander unit years after the Alexanders lived in the EHU as potentially causing confusion.  (Rec. Doc. 1547).  In light of this ruling, it is absurd for Smulski to offer opinions on tests performed on other EHUs.  This would result in even more confusion.  The opinions contained in paragraphs 18, 19 and 22 must be excluded for the foregoing reasons.

     10.   <u>Affidavit Paragraphs 23, 24 and 25</u>

     Finally, Smulski offers to the trier-of-fact opinions regarding alternative designs available to Gulf Stream regarding the construction of EHUs.    Specifically, Smulski offers opinions that the Gulf Stream could have:  1) modified its material and construction of the EHU; 2) reduced the number formaldehyde-emitting products inside the EHU; and 3) increased the EHU's air exchange rate (ventilation) by including a mechanical system to exchange the indoor/outdoor air.  Exhibit "A," at ¶¶ 23, 24 and 25.  *Id.*  Regarding his opinions in paragraph 22, Smulski confirmed:

> Q.    You're an expert in the manufacture of travel trailer products?
>
> A.    I am not an expert in the manufacture of travel trailers, but common sense tells me those are the types of things that need to be considered.  Those are the types of things we think about in single-family homes.  Those are the things we think about in the construction of all of the buildings we build.  Everybody in the last 20 years is aware of "sick building syndrome," indoor air quality problems.  Everybody should have an awareness that if we are building some kind of structure, and we are going to house people in it, we need to think about those things.

Exhibit "B," at pp. 259-60.

Smulski further clarified:

> Q.    Is common sense something you consider the average person to possess?
>
> A.    I hope they do.
>
> Q.    It's called common sense, so you assume it's common among the people; is that accurate?

A.      Yes.  I hope most people possess common sense.

Exhibit "B," at pp. 264-65.

Concerning the opinions in paragraphs 24 and 25, Smulski testified:

Q.      If you do all of these subjects or changes, modifications, ultimately you could just build a house for everybody, correct?  A site-built house?

A.      You could.

Q.      Was that practical for the people who were displaced from Louisiana after the hurricane?

A.      Probably not.

Exhibit "B," at pp. 267-68.

Again, the foregoing testimony establishes that these opinions do not assist the trier-of-fact.  In developing the opinions, Smulski relied on nothing more than common sense.  One expects that the jurors will possess common sense, and under such circumstances, the opinions provide no assistance to the jurors.  Moreover, Smulski fails to identify his expertise in developing alternative designs for EHUs.  Smulski should not be allowed to offer opinions regarding subjects that facially encroach on areas of expertise beyond his own (e.g. engineering).  The opinions contained in paragraphs 23, 24 and 25 must be excluded for the foregoing reasons.

11.      Affidavit Paragraph 10

Not to be forgotten, we finally come to the opinion that Smulski was actually tasked to offer:  an inventory of the composite wood products present in the Alexander EHU.  Gulf Stream simply points out that all of the foregoing testimony was offered by Smulski to "flesh out" his inventory list attached to his report as Exhibit "B".  Gulf Stream respectfully suggests that none of the foregoing opinions are relevant to the inventory prepared by Smulski.

## IV. CONCLUSION

Stephen Smulski, Plaintiffs' designated wood science/wood technology expert, offers myriad opinions in relation to the Alexander EHU.  Most of these opinions are either outside of his expertise or provide no assistance to the trier-of-fact.  Some of his opinions are not based on scientifically reliable methodology.  Thus, Plaintiffs' expert testimony in paragraphs 5, 11 through 19 and 22 through 27 proffered by Stephen Smulski is not relevant or reliable and should be excluded as part of the Court's "gatekeeping" function under *Daubert*.

Respectfully submitted,

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER, & WEINSTOCK**

s/Andrew D. Weinstock

_____
**ANDREW D. WEINSTOCK #18495**
**JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700
Fax: (504) 837-3119
andreww@duplass.com
jglass@duplass.com
***Counsel for Defendant, Gulf Stream Coach, Inc.***

and

**SCANDURRO & LAYRISSON**
**Timothy D. Scandurro #18424**
**Dewey M. Scandurro #23291**
607 St. Charles Avenue
New Orleans, LA 70130
Telephone: (504) 522-7100
tim@scanlayr.com
dewey@scanlayr.com

**C E R T I F I C A T E**

I hereby certify that on the 28th day of July, 2009, a copy of the foregoing Memorandum in Support of Gulf Stream Coach, Inc.'s Motion in Limine to Limit Expert Testimony of Stephen Smulski, Ph.D. was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to all known counsel of record by operation of the court's electronic filing system.

s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com