**AFFIDAVIT OF STEPHEN SMULSKI, Ph.D.**

**COMMONWEALTH OF MASSACHUSETTS**

**COUNTY OF FRANKLIN**

BEFORE ME, the undersigned notary, appeared on this the 18th day of May, 2009, Stephen Smulski, Ph.D., a person whose identity is known to me. After being sworn under oath, he stated as follows:

1. All statements contained herein are true and correct and based upon my personal knowledge, education and experience, and I am a person of the full age of majority, competent to execute this affidavit.


I, Stephen Smulski, Ph.D., aver as follows:

1. I am a consulting wood scientist and the President of Wood Science Specialists Inc., 453 Wendell Road, Shutesbury, Massachusetts, 01072.

2. I am an expert in wood science and technology, specifically the anatomical, mechanical, physical, and chemical properties of wood and wood-based materials as well as the manufacture, use, and in-service performance of wood and wood-based products in residential, commercial, and industrial wood-frame construction.

3. I hold a B.S degree in Wood Science and Technology from the University of Massachusetts at Amherst, an M.S. degree in Environmental and Resource Engineering from the State University of New York at Syracuse, and a Ph.D. degree in Wood Science and Forest Products from Virginia Tech at Blacksburg. I have published numerous articles on wood and wood-based products and have given many invited lectures on the same. A true and correct copy of my curriculum vitae is attached hereto and marked "Exhibit A".

4. I am familiar with the manufacture, properties, use, and in-service performance of wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood. For thirteen years, while on the faculty of the Building Materials and Wood Science program at

ALX-EXP-73-000001

the University of Massachusetts at Amherst, I taught a course entitled Wood Adhesives Technology that covered all aspects of these and other glued wood products.

5. I am familiar with the propensity of wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood to release formaldehyde gas after being placed in service because of the formaldehyde-containing adhesives (also referred to as resins) used in their manufacture and that exposure to formaldehyde gas can cause adverse health effects. I taught this to my students from 1985 to 2001 while at the University of Massachusetts. In 1987, I published an article entitled "Formaldehyde Indoors" that summarized the then-current knowledge about the release of formaldehyde gas from wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood used in site-built houses and in factory-built manufactured houses and the adverse health effects that exposure to formaldehyde gas can cause. In 1989, I gave an invited lecture at the Northeast Solar Energy Association Advanced Residential Construction Conference entitled "Health Aspects of Building Products: Wood Products" in which I spoke about the release of formaldehyde gas from wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood and the adverse health effects that exposure to formaldehyde gas can cause. I am familiar with the Material Safety Data Sheets that the makers of wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood make available to the users of their products that state that these products contain and release formaldehyde gas.

6. I am aware that the release of formaldehyde gas from wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood is greatest in newly-manufactured products and that, after being placed in service, the release of and concentration of formaldehyde gas in the air inside buildings or structures containing these products depends on the age and number of sources, the volume of air inside the building or structure, and on the air temperature, relative humidity and air exchange rate (i.e., ventilation). The release of formaldehyde gas from these products increases as temperature and relative humidity increase. The concentration of formaldehyde gas inside a building or structure containing these products also increases as the number of sources increases and as the volume of the building or structure and the air exchange rate (i.e., ventilation) decrease.

ALX-EXP-73-000002

7. I am familiar with the methods for reducing the release of formaldehyde gas from particleboard and medium density fiberboard recommended by the Composite Panel Association (formerly the National Particleboard Association) in its publications "From Start To Finish Particleboard" and "From Start To Finish Medium Density Fiberboard" which were first published in 1986 and periodically since. Many of these same methods for reducing the release of formaldehyde gas from particleboard and medium density fiberboard are directly applicable to other wood composite panels including hardwood plywood.

8. I am aware that decorative overlays applied to wood-based composite panel products such as particleboard, medium density fiberboard, and hardwood plywood retard, but do not prevent, the release of formaldehyde gas through the surface over which they are applied. The efficacy of an overlay in retarding the release of formaldehyde gas from particleboard, medium density fiberboard, and hardwood plywood varies widely and depends on the type and properties of the overlay.

9. I am aware that FEMA supplied a Gulf Stream Coach, Inc. Cavalier model travel trailer (VIN 1NL1GTR2551021783, FEMA trailer 1041407) to Ms. Alana Alexander who lost her home in the wake of hurricane Katrina that hit the Gulf Coast on August 29, 2005. The trailer was manufactured on December 13, 2004. It is my understanding that after being manufactured, the trailer was sent to and stored at a FEMA facility in Florida. It is my understanding that this trailer was moved to New Orleans after hurricane Katrina (with the built-in seating still wrapped in plastic) and that Ms. Alexander and her son Christopher Cooper lived in the trailer from on/about May 2006 to on/about December 2007.

10. On May 6, 2009, I visually examined the trailer. I observed that virtually the entire interior of the trailer including the subfloor, walls, ceiling, doors, cabinets, dining table, countertops, built-in seating and other furniture, and bed supports are constructed from the wood-based composite panel products particleboard, medium density fiberboard, and hardwood plywood that are known to release formaldehyde gas after being placed in service. In most cases, the product's visible face is covered with a decorative overlay but its back and edges are exposed wood with no overlay. In some cases, the product's back and/or edges has an overlay or edge band. In a few cases, the product has no overlay on its face, back or edges. A list of these items is attached hereto and marked "Exhibit B".

11. The trailer was installed in New Orleans, Louisiana, a location whose climate for much of the year is hot and humid. These are the exact conditions that maximize the release of formaldehyde gas from wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood.

12. The volume of air inside the trailer is small—approximately 1435 ft.$^3$—and its air exchange rate (i.e., ventilation) is low. The Lawrence Berkeley National Laboratory measured the air exchange rate in another FEMA-owned Gulf Stream Coach, Inc. Cavalier model travel trailer and reported it to be 0.21 air changes per hour (see Item 21). (In other words, the entire volume of contaminated air inside the trailer is replaced by fresh outdoor air once about every 4.76 hours.) These are the exact conditions that maximize the concentration of formaldehyde gas inside the trailer.

13. I have reviewed the owner's manual for the trailer given to Ms. Alexander. Nowhere in the owner's manual does it state that the particleboard, medium density fiberboard, and hardwood plywood used inside the trailer is made with urea formaldehyde adhesive, that these products will release formaldehyde gas inside the trailer, or that the formaldehyde gas can adversely affect peoples' health.

14. I am aware that the trailer was installed by inserting multiple supports beneath its frame. It is my understanding that during the process of installation that the frame and exterior shell can bend and twist, causing sealed joints in the walls, roof, ceiling, and floor to open. This can allow formaldehyde gas inside the wall, ceiling, and floor cavities to more easily enter the living space and increase the concentration of formaldehyde gas inside the trailer. It can also allow hot, humid air and rain to enter into the wall, ceiling, and floor cavities, causing the relative humidity inside the cavities to rise.

15. Even in the absence of installation-caused damage to the trailer, formaldehyde gas will escape from the exposed raw wood on the back and edges of the wall, ceiling, and floor panels and accumulate inside the wall, ceiling, and floor cavities. The formaldehyde gas will then naturally enter the living space, with differences in temperature, vapor pressure, and air pressure across the trailer's walls, ceiling, and floor providing the driving force for moving the air-borne gas

ALX-EXP-73-000004

through joints and penetrations in the walls, ceiling, and floor (e.g., switch plates, electric receptacles, heating and air-conditioning grilles, ceiling light fixtures, seams between panels). In addition, formaldehyde gas will naturally escape through the overlay on these panels' faces (much more slowly, of course) as well as from the products that are fully inside the trailer (e.g., cabinets, bed supports, built-in seating and furniture).

16. On January 28-29, 2008, three years after the trailer was manufactured and lived in, the W. D. Scott Group, Inc. measured the formaldehyde level inside the trailer at the nightstand in the bedroom and reported it to be 50 parts per billion (temperature 66-78 °F, relative humidity 41-52%). On May 6-7, 2009, more than four years after the trailer was manufactured and lived in, the W. D. Scott Group, Inc. measured the formaldehyde level inside the trailer at the nightstand in the bedroom and reported it to be 74 ppb (temperature 81-92 °F, relative humidity 64-74%). Formaldehyde levels at other locations inside the trailer ranged from 59 to 99 ppb.

17. The trailer supplied by FEMA to Ms. Alexander is intended to be used for short-term recreational use. As such, it is reasonable to assume that the trailer would normally be used temporarily by occupants for perhaps a few weeks while on vacation. During this time they would be subjected to acute exposure to formaldehyde gas. When the trailer was installed on a foundation and hard-wired and hard-plumbed, however, it was converted from short-term recreational use to long-term housing. As a consequence, Ms. Alexander and her son Christopher Cooper were subjected to chronic exposure to formaldehyde gas. The use of this trailer by Ms. Alexander and her son was a reasonably anticipated use given that this trailer was sold to FEMA for the purpose of housing persons displaced by natural disasters like hurricane Katrina.

18. I have reviewed reports regarding the levels of formaldehyde measured inside all types of FEMA-supplied emergency housing units including "An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers Baton Rouge, Louisiana, September-October, 2006" by the U.S. Department of Health and Human Services dated October 2007; "Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes" by the Centers for Disease Control and Prevention dated July 2, 2008; and "Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units—Final Report" by the Environmental Energy Technologies Division

Lawrence Berkeley National Laboratory dated November 2008. The formaldehyde levels measured inside many of the emergency housing units, some two or more years after being placed in service, equal or exceed the 100 parts per billion threshold that the Centers for Disease Control and Prevention identifies in its July 2, 2008, report as *"the level at which health effects have been described in sensitive persons"*.

19. In December 2007 and January 2008 the Centers for Disease Control and Prevention measured formaldehyde levels inside one hundred twenty-three FEMA-supplied Gulf Stream travel trailers installed in Louisiana and Mississippi. All trailers were occupied; some were two or more years old. In its "Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes" dated July 2, 2008, the CDC reported that the average formaldehyde level inside the trailers was 104 parts per billion with a range of 3-590 ppb. The CDC reported that the formaldehyde level in fifty-six percent of the trailers was equal to or greater than 100 ppb and that in nine percent of the trailers the formaldehyde level was equal to or greater than 300 ppb.

20. In summary, five factors affect the release of and concentration of formaldehyde gas in the air inside a travel trailer: i) the age and number of formaldehyde-emitting wood composite products used to construct the trailer; ii) the volume of air inside the trailer; iii) the trailer's air exchange rate (i.e., ventilation); iv) the temperature inside the trailer; and v) the relative humidity inside the trailer. The release of formaldehyde gas inside a trailer is greatest in newly-manufactured products and increases as temperature and relative humidity increase. The concentration of formaldehyde gas inside a trailer increases as the number of sources increases and as the volume of air inside the trailer and the air exchange rate (i.e., ventilation) decrease. All five of these factors were acting individually and in concert to increase the release of and concentration of formaldehyde gas inside the Gulf Stream Coach, Inc. Cavalier model travel trailer FEMA supplied to Ms. Alexander.

21. Three of the five factors that affect the release of and concentration of formaldehyde gas inside the trailer are largely beyond the control of manufacturer Gulf Stream Coach, Inc.—the volume of air inside the trailer (factor ii), temperature (factor iv), and relative humidity (factor v). The other two factors—the number of formaldehyde-emitting wood composite products used to

ALX-EXP-73-000006

construct the trailer (factor i) and the air exchange rate (i.e., ventilation) (factor iii) were determined by Gulf Stream Coach, Inc.

22. In November 2007 the Lawrence Berkeley National Laboratory measured formaldehyde gas levels inside four never-occupied FEMA travel trailers including a Gulf Stream Coach, Inc. Cavalier model manufactured in March 2006. In its "Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units—Final Report" dated November 2008, the LBNL reported that *"We conclude that whole trailer formaldehyde emission factors are high, but the materials may be within those commonly found in the building industry.* [In other words, the concentration of formaldehyde gas inside the trailers is high even though the wood-based composites used to construct them meet the formaldehyde gas emission limits of HUD Standard 24 CFR Chapter XX Part 3280 Manufactured Home Construction and Safety Standards.] *This indicates a difference in the construction/design* [which is determined by Gulf Stream Coach, Inc.] *that may lead to elevated concentrations and whole trailer emission rates. Three features of material application in the THUs differ from most other dwellings: 1) the extensive use of lightweight composite wood products* [factor i]*, 2) very high surface loading of composite wood products* [factor i] *and 3) low fresh air per unit surface area of composite wood products in the THUs* [factor iii]. The LBNL concluded that *"The high loading factor (material surface area divided by THU volume) of composite wood products in the THUs* [factor i] *and the low fresh air exchange relative to the material surface area* [factor iii] *may be responsible for the excessive concentrations observed for some of the VOCs and formaldehyde."*

23. The current formaldehyde gas problem in the FEMA-supplied travel trailers could have been prevented had Gulf Stream Coach, Inc. (and FEMA) employed the mitigation techniques detailed in the extensive body of literature documenting an identical formaldehyde gas problem that plagued HUD-Code manufactured houses in the 1970s and early 1980s for identical reasons. At that time the subfloor, walls, ceiling, doors, and cabinets in HUD-Code manufactured houses were constructed from particleboard, medium density fiberboard, and hardwood plywood that released formaldehyde gas after being placed in service. The HUD-Code manufactured houses of that time were small in volume and had a low air exchange rate (i.e., ventilation); complaints about formaldehyde gas were common. The problem was investigated, its causes identified, solutions put in place, and by the late 1980s formaldehyde gas inside HUD-Code manufactured

houses ceased to be a problem. Gulf Stream Coach, Inc. could have modified its materials and construction and design practices based on that extensively researched and documented prior experience.

24. Gulf Stream Coach, Inc. could have reduced the number of formaldehyde-emitting products inside the trailer by using wood-based composites that either do not emit formaldehyde (medium density fiberboard and hardwood plywood are also made with adhesives that do not contain formaldehyde) or emit so little formaldehyde that they are not subject to the HUD standard (oriented strand board for subflooring instead of particleboard and hardboard for walls and ceilings instead of hardwood plywood). At the time this trailer was manufactured, Gulf Stream Coach, Inc. had available to it alternative materials that, if used, would have emitted little or no formaldehyde gas.

25. Gulf Stream Coach, Inc. could have increased the trailer's air exchange rate (i.e., ventilation) by equipping it with a mechanical system that blows contaminated indoor air outside and draws fresh outdoor air inside as has been required in HUD-Code manufactured houses since 1984. If Gulf Stream Coach, Inc. had utilized such a mechanical system, it would have reduced the level of formaldehyde gas inside the trailer.

26. It is my opinion, to a reasonable degree of scientific certainty, that the Gulf Stream Coach, Inc. Cavalier model travel trailer supplied by FEMA to Ms. Alexander was not suitable for use as long-term housing because it was foreseeable and predictable that formaldehyde gas would be released from the wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood used in this trailer and that Ms. Alexander and her son Christopher Cooper would potentially suffer adverse health effects from chronic exposure to formaldehyde gas.

27. It is my opinion, to a reasonable degree of scientific certainty, that it was unreasonable for anyone to think that the health of persons living in this Gulf Stream Coach, Inc. Cavalier model trailer for a long period of time would not be adversely affected given: i) that the propensity for wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood to release formaldehyde gas has been known since the 1970s; ii) that exposure to formaldehyde gas causes adverse health effects has been known since the 1970s;

ALX-EXP-73-000008

iii) that the identical problem occurred in HUD-Code manufactured houses in the 1970s and early 1980s for identical reasons; and iv) that the techniques for mitigating formaldehyde gas inside buildings and structures of all kinds are well-known, widely published, and effective.

I reserve the right to submit further affidavits if so deemed necessary.

FURTHER AFFIANT SAYETH NOT.

Thus, signed and sworn on this the 18th day of May, 2009.

_____
Stephen Smulski, Ph.D.
453 Wendell Road
Shutesbury, MA 01072

COMMONWEALTH OF MASS.
HAMPSHIRE COUNTY,   MAY 18, 2009

_____
Notary Public Signature

RUSSELL DEAN
Notary Public Name

_____
Notary Number

12/06/2013
Commission Expires

Exhibit B. Formaldehyde-emitting wood products inside Gulf Stream Coach, Inc. Cavalier model travel trailer occupied by Ms. Alana Alexander based on visual inspection.

| location | item | description |
|---|---|---|
| | subfloor | 5/8 in. particleboard-vinyl sheet floor covering on face, exposed back and edges |
| | walls | 1/8 in. tropical hardwood plywood-overlay on face, exposed back and edges |
| | ceilings | 1/8 in. tropical hardwood plywood-overlay on face, exposed back and edges |
| | wall and ceiling between-panel trim | 1/8 in. tropical hardwood plywood-overlay on face and edges, exposed back and ends |
| bedroom | platform bed with storage compartment below | 3/8 in. tropical hardwood plywood mattress support panel-exposed face, back and edges; 1/8 in. tropical hardwood plywood left side panel, right side panel, foot panel-overlay on face, exposed back and edges |
| | closet | 5/8 in. door panel of unknown substrate-overlay on face, back and edges |
| | nightstand | 5/8 in. door panel of unknown substrate-overlay on face, back and edges; 5/8 in. frame of unknown substrate-overlay on face, back and edges;1/8 in. tropical hardwood plywood right side panel-overlay on face, exposed back and edges; ¾ in. medium density fiberboard top-overlay on face, exposed back, edge band on edges |
| | door | 1/8 in. tropical hardwood plywood skin on both sides of door-overlay on face, exposed back and edges; 1 in. medium density fiberboard top rail-exposed edge |
| living area | pull-out sofa with storage compartment below | 1/8 in. tropical hardwood plywood front panel-fabric on face, exposed back and edges; 1/8 in. tropical hardwood plywood left side panel-overlay on face, exposed back and edges; 1/8 in. tropical hardwood plywood armrest-overlay on face, exposed back and edges |
| dining area | bench seats | 5/8 in. particleboard seat back top cap and side trim-overlay on face, back and edges; 1/8 in. tropical hardwood plywood seat back-overlay on face, exposed back and edges; 3/8 in. tropical hardwood plywood seat support panel-exposed face, back and edges; 1/8 in. tropical hardwood plywood front, side and rear panel enclosing bench seats-overlay on face, exposed back and edges |
| | table | ¾ in. particleboard tabletop; overlay on face and back, edge band on edges |
| kitchen | upper cabinets | 5/8 in. door panels of unknown substrate-overlay on face, back and edges; 5/8 in. particleboard frame-overlay on face, back and edges, exposed end; 5/8 in. medium density fiberboard right side panel-overlay on face and back, edge band on edges |
| | lower cabinets | 5/8 in. door panels of unknown substrate-overlay on face, back and edges; 5/8 in. particleboard frame-overlay on face, back and edges; 1/8 in. tropical hardwood plywood front panels-overlay on face, exposed back and edges |
| | drawers | 5/8 in. front panels of unknown substrate-overlay on face, back and edges; 1/4 in. particleboard bottom-overlay on face, exposed back and edges; 3/8 in. hardwood plywood left side, right side and rear-exposed face, back and edges |
| | countertop | ¾ in. particleboard-overlay on face and back, visible edge with edge band, exposed hidden edges |

ALX-EXP-73-000010

Exhibit B (continued). Formaldehyde-emitting wood products inside Gulf Stream Coach, Inc. Cavalier model travel trailer occupied by Ms. Alana Alexander based on visual inspection.

| location | item | description |
|---|---|---|
| bunk beds with storage compartment below | | ¼ in. tropical hardwood plywood mattress support-exposed face, back and edges; 1/8 in. tropical hardwood plywood storage compartment front panel-overlay on face, exposed back and edges |
| bathroom | door | 1/8 in. tropical hardwood plywood skin on both sides of door-overlay on face, exposed back and edges; 1 in. medium density fiberboard top rail-exposed edge |
| | closet | 5/8 in. door panel of unknown substrate-overlay on face, back and edges; 5/8 in. particleboard door frame-overlay on face and edges, exposed back |
| | vanity | ¾ in. particleboard countertop-overlay on face and back, exposed edges; 5/8 in. door panel of unknown substrate-overlay on face, back and edges; 5/8 in. particleboard door frame-overlay on face and edges, exposed back |

Notes:
- All dimensions are nominal.
- Overlay is vinyl, plastic laminate or kraft paper.
- "Exposed" means that surface is raw wood without an overlay; surface may not be visible.
- Left end of sofa has two tropical hardwood plywood side panels separated by 2x2 solid wood framing.
- Bench seat back consists of two sheets of tropical hardwood plywood placed back-to-back so that overlaid faces are visible.

ALX-EXP-73-000011