Stephen J. Smulski
June 10, 2009

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION


IN RE: FEMA TRAILER        * MDL NO. 1873
        FORMALDEHYDE        *
        PRODUCTS LIABILITY  *
        LITIGATION          * SECTION: N(5)
                            *
This Document Relates to:  * JUDGE: ENGELHARDT
Charles Age, et al, v.      *
Gulf Stream Coach, Inc.,    *
et al, Docket No. 09-2892  * MAG: CHASEZ
* * * * * * * * * * * * * * * * * * * *

        Video-Taped Deposition of STEPHEN
SMULSKI, Ph.D., 435 Wendall Road, Shutesbury,
Massachusetts, 01072, taken in the law offices
of Lambert & Nelson, 701 Magazine Street, New
Orleans, Louisiana, 70130, on Wednesday, the
10th day of June, 2009.


APPEARANCES:


        T. CHRISTOPHER PINEDO
        ATTORNEY AT LAW
        4550 Jericho Road
        Corpus Christi, Texas  78413

                - and -

        FRANK J. D'AMICO
        ATTORNEY AT LAW
        622 Baronne Street
        New Orleans, Louisiana  70113


                - and -

        REICH & BINSTOCK, LLP
        (By:  Dennis C. Reich, P.C.)
        4265 San Felipe
        Suite 1000
        Houston, Texas  77027
                (Attorneys for the Plaintiffs)

Stephen J. Smulski
June 10, 2009

1   and Ph.D. degrees in wood science and

2   technology.

3   Q.       Where did you obtain that degree,

4   bachelor of science?

5   A.       My bachelor's degree is from the

6   University of Massachusetts at Amherst.

7   Q.       That was in 1977?

8   A.       Yes.

9   Q.       And your master of science degree

10  was obtained in 1980?

11  A.       Yes.

12  Q.       And your area of study for the

13  master of science?

14  A.       The title is "Environmental

15  Resource Engineering."  It is a wood science

16  and technology program.

17  Q.       What types of things are focused

18  on in a wood science and technology program?

19  A.       Wood science is the study of the

20  anatomical, physical, chemical, and mechanical

21  properties of wood.  Wood technology is the

22  application of those scientific principles to

23  the manufacture, use, and in-service

24  performance of wood and wood-based products.

25  Q.       You went on to get a doctorate in

Stephen J. Smulski
June 10, 2009

Page 20

1   A.       Certain wood products do release

2   VOC's, yes.

3   Q.       By virtue of your studies, are

4   you an expert and able to testify regarding

5   the emission rates of various species of woods

6   of VOC's?

7   A.       I would have to consult the

8   research literature to get that information,

9   but it is contained in the research

10  literature.

11  Q.       We will come back to more

12  specific examples.

13  Do you hold any professional

14  licenses in your area of expertise?

15  A.       No.  There are none required to

16  practice my profession.

17  Q.       You say there are none required.

18  Are there licenses that exist in

19  your area of expertise?

20  A.       Not that I am aware of.

21  Q.       Regarding your employment

22  history, you testified that you are currently

23  employed, or your business is Wood Science

24  Specialists, Inc.

25  How long have you been employed

Stephen J. Smulski
June 10, 2009

1    by that company?

2    A.        I have been employed by that

3    company since June of 1992.

4    Q.        You are the president?

5    A.        Yes.  I am the president and sole

6    employee.

7    Q.        Do you contract any work to

8    anyone through your company?

9    A.        Occasionally there are parts of

10   jobs that I take on that require me to

11   contract with an outside consultant.

12   Q.        What is the focus of Wood Science

13   Specialists, Inc.?

14   A.        I have focused on solving

15   performance problems with wood products and

16   residential, industrial, and institutional use

17   of wood products.  I also work with

18   architects, engineers in specifying wood

19   products for particular applications.

20   Q.        You also do some litigation work,

21   obviously, correct?

22   A.        Yes.

23   Q.        The types of problem solving that

24   you encounter in your practice through Wood

25   Science Specialists includes what types of

Stephen J. Smulski
June 10, 2009

Page 45

1    you that is the vehicle by which Ms. Alexander

2    and Mr. Cooper have sued Gulf Stream Coach,

3    and the other defendants.

4        MR. D'AMICO:

5    Object to the form of the

6    question.  I don't understand what you mean by

7    "vehicle," because you are talking about

8    travel trailers.

9    EXAMINATION BY MR. GLASS:

10   Q.     It's the pleading by which

11   they've sued my client.

12   What were you retained to do?

13   A.     I was retained to identify which

14   composite wood products were used in the

15   construction of the travel trailers.

16   Q.     Anything else?

17   A.     Not specifically.

18   Q.     Well, how about in general?

19   A.     Whatever would be required for me

20   to make that distinction as to what products

21   were used within the travel trailer.  For

22   example, recording dimensions.  Nobody said to

23   me, "Go measure the dimensions," but that's

24   part of what I would do as part of it.

25   Q.     If I am understanding you

Stephen J. Smulski
June 10, 2009

Page 46

1   correctly, you were asked to identify the wood

2   products used in this trailer, and that's it?

3   A.        Basically, yes.

4   Q.        Were you retained to offer any

5   opinion as to the amount of potential VOC's

6   that those products exposed Ms. Alexander and

7   Mr. Cooper to?

8   A.        No.

9   Q.        Were you asked to offer any

10  opinions as to how much formaldehyde was

11  present in the unit, if any, at any time while

12  Ms. Cooper -- excuse me -- Ms. Alexander or

13  Mr. Cooper were occupying the trailer?

14  A.        No.  I was asked to determine

15  what wood composite products were used in the

16  construction of the travel trailer.

17  Q.        Beyond offering an opinion as to

18  what you observed in the trailer regarding

19  composite wood products, is there any

20  relevance to your opinions that go beyond

21  that?

22       MR. D'AMICO:

23  Objection.  Calls for a legal

24  conclusion on the part of this expert.  Also I

25  am going to object, because obviously in this

Stephen J. Smulski
June 10, 2009

Page 47

1    trial, the PSC was not allowed to do

2    destructive testing, so obviously this expert

3    can only testify regarding what was allowed

4    pursuant to this trial.  Now, he may be

5    offering exactly that kind of testimony for a

6    future trial that we will be allowed to do.

7         MR. BONE:

8    Object to the colloquy --

9         MR. D'AMICO:

10   Because, I mean, it presumes

11   things of this expert that I don't think are

12   proper, so I think it needed to be --

13        MR. GLASS:

14   You can note your objection, and

15   I am only here to deal with the Age case.

16   EXAMINATION BY MR. GLASS:

17   Q.       If my understanding is correct,

18   your task that was assigned to you in this

19   case was to document what composite wood

20   products were contained in the trailer; is

21   that accurate?

22   A.       That is correct.

23   Q.       Were you asked to formulate

24   opinions as to ventilation rates in this

25   trailer?

Stephen J. Smulski
June 10, 2009

Page 48

1    A.        No.

2    Q.        Is that within your expertise?

3    A.        No, it's not.

4    Q.        Were you asked to formulate

5    opinions as to whether, or what the levels of

6    formaldehyde were in this trailer?

7    A.        I was asked to identify what

8    composite wood products were used to construct

9    the travel trailer.

10   Q.        I understand, and I know you are

11   going to get frustrated with me continuing to

12   ask additional questions, but it's not going

13   to stop me from asking them, unfortunately.

14   So am I correct that you were not

15   asked to offer an opinion as to how

16   formaldehyde is emitted from wood products

17   over time?

18          MR. PINEDO:

19   Objection to form.

20          THE WITNESS:

21   My role was to determine what

22   composite wood products were used in the

23   construction of the travel trailer.

24   EXAMINATION BY MR. GLASS:

25   Q.        So it would be accurate to say

Stephen J. Smulski
June 10, 2009

Page 49

1    that you were not asked to formulate any kind

2    of equation as to how much formaldehyde might

3    have been present in this unit at some time in

4    the past?

5    A.        That is correct.

6    Q.        Is that within your area of

7    expertise?

8    A.        No, it is not.

9    Q.        Were you asked to offer any

10   opinions as to what information was provided

11   to Ms. Alexander by anyone regarding potential

12   hazards in the travel trailer?

13   A.        No.

14   Q.        Is that within your area of

15   expertise?

16   A.        No, it isn't.

17   Q.        Were you asked to offer any

18   opinions regarding the health effects

19   associated with exposure to any level of

20   formaldehyde?

21   A.        Again, my role was to determine

22   what composite wood products were used in the

23   construction of the trailer.

24   Q.        So I would be accurate in stating

25   you were not asked to address any issues

Stephen J. Smulski
June 10, 2009

1   concerning a causal relationship between any

2   alleged symptoms in Ms. Alexander or

3   Mr. Cooper and their alleged exposure to

4   formaldehyde in the trailer?

5   A.      That's correct.  My role was to

6   determine what composite wood products were

7   used in the construction of the trailer.

8   Q.      Would it be within your area of

9   expertise to offer any opinions regarding the

10  causal relationship between any alleged

11  exposure and any alleged symptoms resulting

12  therefrom?

13  A.      No.

14  Q.      Were you asked in the present

15  case to offer historical review of the

16  out-gassing of formaldehyde from wood

17  products?

18       MR. PINEDO:

19  Objection to form.

20       THE WITNESS:

21  I wasn't asked to do that

22  specifically, but that's part of the

23  background information that needs to be

24  presented to put the current case in context.

25  EXAMINATION BY MR. GLASS:

Stephen J. Smulski
June 10, 2009

1    Q.        We will get to those in your

2    opinion -- in your affidavit in a moment.

3    Are you an expert in the area of

4    civil engineering?

5    A.        No.

6    Q.        You are not a licensed engineer,

7    correct?

8    A.        No, I am not.

9    Q.        Are you an expert in chemistry?

10   A.        No.  I am not, although my

11   education includes many, many courses in

12   chemistry.

13   Q.        Are you a medical expert?

14   A.        No, I am not.

15   Q.        Do you have any expertise in the

16   area of industrial hygiene?

17   A.        No, I do not.

18   Q.        Any expertise in the area of

19   emergency relief response?

20   A.        No.  My expertise is in wood

21   science and technology.

22   Q.        I understand.

23   Do you have any expertise in

24   disaster relief response?

25   A.        No.

Stephen J. Smulski
June 10, 2009

Page 67

1    Q.        Any expertise in toxicology?

2    A.        My expertise is in wood science

3    and technology.

4    Q.        I appreciate that.

5    Do you have any expertise in

6    epidemiology?

7    A.        No.

8    Q.        Are you qualified to offer expert

9    opinions regarding architecture?

10   A.        That one you would have to

11   explain a little more.

12   Q.        Okay.

13   Have you ever been qualified in a

14   court of law as an expert architect?

15   A.        No.

16   Q.        Have you ever offered a legal

17   opinion -- offered an expert opinion in any

18   legal proceeding regarding architecture?

19   A.        You would have to explain.

20   Q.        I understand that you've offered

21   opinions to people regarding troubleshooting

22   in composite wood products, but have you ever

23   offered any opinions that the design of a

24   house was defective, for lack of a better

25   word?

Stephen J. Smulski
June 10, 2009

Page 68

1    A.        I have worked many times over the

2    years directly with architects in reviewing

3    specifications that they have written, and

4    assisting them in selecting wood products for

5    various applications, and reviewing and

6    refining the design of wood frame buildings

7    and millwork and other built-in wood products

8    that go into wood buildings.  Excuse me.  Go

9    into buildings in general.

10   Q.        Are you an expert in OSHA

11   regulations?

12   A.        No.

13   Q.        Any regulations offered by any

14   governmental agency, are you an expert in

15   those regulations?

16   A.        I am not an expert in any

17   regulations, but I have a general awareness of

18   those that apply to wood products.

19   Q.        Which regulations apply to wood

20   products?

21   A.        In this particular instance, the

22   HUD regulations that would apply to

23   formaldehyde emission from composite wood

24   products.

25   Q.        Are you talking about the

Stephen J. Smulski
June 10, 2009

1    said?

2    A.        Yes.

3    Q.        Do you know what the level of

4    emission allowed under HUD regulations is for

5    formaldehyde?

6          MR. D'AMICO:

7    Object to the form.

8          THE WITNESS:

9    Those are also the same numbers

10   HUD uses.

11   EXAMINATION BY MR. GLASS:

12   Q.        Do you have any expertise in

13   sociology?

14   A.        No.

15   Q.        Any expertise in psychology?

16   A.        I am a wood scientist.

17   Q.        Do you have any expertise in

18   biology?

19   A.        I'm a wood scientist.

20   Q.        To answer both of those questions

21   for psychology and biology, I would be

22   accurate in saying that you do not have an

23   expertise in those areas?

24   A.        That's correct.  I am a wood

25   scientist.

Stephen J. Smulski
June 10, 2009

Page 122

1    concentration --

2         MR. D'AMICO:

3    Say it again for me, please?

4         MR. GLASS:

5    .050.

6         MR. D'AMICO.

7    .050 ppm.  Million with an "M,"

8    stick-built.

9    EXAMINATION BY MR. GLASS:

10   Q.      And I test a travel trailer, and

11   it's .050 parts per million, "M" as in "Mary,"

12   the concentration of formaldehyde is

13   identical; is that not correct?

14   A.      Under your scenario, yes.

15   Q.      It doesn't matter, all of the

16   other factors you talked about:  Ventilation

17   rates, sources of formaldehyde, the

18   temperature, the humidity, all of those

19   factors go into making the determination of

20   what the formaldehyde level is, correct?

21   Regardless of where you are making the test.

22   A.      That's correct.

23   Q.      So, if you have a site-built home

24   that exceeds the levels you have discussed,

25   .008 parts per million, or 8 parts per billion

Stephen J. Smulski
June 10, 2009

Page 123

1    as you've described it, in your opinion, that

2    is an unsuitable home, regardless of the type

3    of home it is?

4    A.       That would -- if I agree with

5    your scenario, then it suggests to me some

6    type of remediation has to be done in that

7    home to lower the formaldehyde levels, yes.

8    Q.       Including whether it's a

9    site-built home, correct?

10   A.       Yes.

11   Q.       Including whether it's an

12   apartment, correct?

13   A.       I would say any type of

14   residential living situation.

15   Q.       Condominium, that would be

16   included?

17   A.       Yes.

18   Q.       Travel trailer?

19   A.       Yes.

20   Q.       Manufactured home?

21   A.       Yes.

22   Q.       Have you seen any studies in the

23   scientific community that suggest that the

24   levels of formaldehyde in site-built or

25   stick-built homes, as you referred to them,

Stephen J. Smulski
June 10, 2009

Page 129

1    EXAMINATION BY MR. GLASS:

2    Q.        You also cite the average,

3    airborne formaldehyde concentration for

4    outdoor, urban air in this article on page 11;

5    is that correct?

6    A.        That is one of the categories

7    here, yes.

8    Q.        What is the level that you have

9    cited as the average, airborne formaldehyde

10   concentration for outdoor, urban air?

11   A.        The level that this author

12   reported, that is Tarosky, is zero-point-eight

13   parts per million.

14   Q.        I know you keep referring to this

15   author, but you've incorporated that into your

16   article, so you must have assumed that it was

17   authoritative, correct?

18   A.        In my literature search in

19   putting this article together, yes.  This is

20   one of the pieces of information that I found.

21   It's coming from the American Chemical

22   Society.  That appears to me to be an

23   authoritative source.  Again, this represents

24   state of the art in 1987.  Maybe we have

25   cleaned up our outdoor, urban air.  Maybe this

Stephen J. Smulski
June 10, 2009

1    are used.

2    EXAMINATION BY MR. GLASS:

3    Q.       I am a little confused as to the

4    reasoning for the opinion in No. 6.  It's my

5    understanding, based on your earlier

6    testimony, that you were asked to identify the

7    composite wood products and inventory them in

8    this travel trailer.

9    What is the importance of the

10   information contained in this first sentence

11   of Paragraph 6 to your inventory of composite

12   wood products?

13   A.       This is putting the whole

14   formaldehyde release issue into context.

15   These are the principles that govern the

16   release of formaldehyde from urea-formaldehyde

17   bonded wood products.  I am telling the whole

18   store here, the larger story.

19   Q.       I am a little confused, because

20   you can tell a story about the color of the

21   sky.

22   If you were asked to identify the

23   composite wood products and inventory them in

24   the Alexander travel trailer, does complying

25   with that request require the statement about

Stephen J. Smulski
June 10, 2009

1     A.        No, it would not.

2     Q.        What would be your understanding

3     of how the formaldehyde was being off-gassed

4     as of May 2006?

5     A.        I don't know what the particular

6     levels -- formaldehyde levels within the

7     travel trailer would have been, but to a

8     reasonable degree of scientific certainty, I

9     would expect they would be lower than what

10    they were at the time of manufacture in 2004.

11    Q.        Again, regarding all of the

12    information contained in Paragraph 9, is that

13    something that is relevant to your

14    documentation of the composite wood products

15    in the Alexander trailer that you were asked

16    to do?

17    A.        It's relevant to my report, and

18    again, my purpose in writing this report is

19    that so -- is that somebody who knows nothing

20    about this can pick up this report, read it

21    from start to finish and get the complete

22    story, have everything in context.

23    Q.        You said "get the complete story

24    and everything in context."

25    Based upon the information you

Stephen J. Smulski
June 10, 2009

1    that trailer?

2    A.      I don't know.  You will have to

3    consult the document.

4    Q.      Do you know any of the factors

5    concerning the travel trailer itself?  How

6    long after construction it was tested?  How

7    many composite wood products?  Did it have any

8    of that kind of information?

9    A.      It's all contained in the report.

10   Q.      You read the report from start to

11   finish?

12   A.      I have, and it's consistent with

13   what we observed in the Alexander trailer.

14   Q.      How many units were tested in

15   that study?

16   A.      One.  One Gulf Stream Cavalier.

17   Q.      Is it your opinion that it's

18   scientifically valid to relate this single

19   test to all Gulf Stream Coach units?

20   A.      No.  The air exchange rate in

21   each trailer is going to vary on an individual

22   basis, but in the absence of any other

23   information, that's the best information that

24   was available.

25   Q.      The last part of paragraph 12 is

Stephen J. Smulski
June 10, 2009

1    products will release formaldehyde gas inside

2    the trailer, or that the formaldehyde gas can

3    adversely affect people's health."

4    First, are you an expert in

5    reviewing owner's manuals?

6    A.        I am not an expert in reviewing

7    owner's manuals, but I can read, and

8    understand what I read, and there is no

9    statements in that owner's manual about

10   formaldehyde gas.

11   Q.        Are you more qualified to read an

12   owner's manual than the trier of fact?

13          MR. PINEDO:

14   Objection to form.

15          THE WITNESS:

16   I don't know who you mean by the

17   "trier of fact."

18   EXAMINATION BY MR. GLASS:

19   Q.        Are you an expert in reading

20   material?

21          MR. PINEDO:

22   Objection to form.

23          THE WITNESS:

24   I don't know what your question

25   means.

Stephen J. Smulski
June 10, 2009

Page 193

1    EXAMINATION BY MR. GLASS:

2    Q.      My question means:  Do you have

3    some kind of expertise that offers assistance

4    to the trier of fact in reading a document

5    that they can read for themselves?

6          MR. PINEDO:

7    Objection to form.

8          THE WITNESS:

9    Well, I think I've provided it

10   here.  I've read the owner's manual looking to

11   see if there was any mention of formaldehyde,

12   and there is no mention of formaldehyde in

13   this owner's manual.

14   EXAMINATION BY MR. GLASS:

15   Q.      Does that assist you in your

16   evaluation or inventory of the wood products

17   contained in the Alexander unit?

18         MR. PINEDO:

19   Objection to form.

20         THE WITNESS:

21   No, it doesn't, but I am

22   attempting to tell the complete story here.

23   Having read the owner's manual for other

24   manufacturers' travel trailers who have

25   explicit warnings about the use of

Stephen J. Smulski
June 10, 2009

Page 204

1      questioning.  This calls for medical

2      conclusions.  He's not a medical expert.

3              MR. GLASS:

4      He's making medical conclusions

5      in his opinions.

6              MR. D'AMICO:

7      He's not.  That's argumentative.

8      Object to the form.

9              MR. GLASS:

10     Object to the form.

11             MR. D'AMICO:

12     Object to the form.

13     EXAMINATION BY MR. GLASS:

14     Q.        Go ahead.

15     A.        Again, I am not a medical doctor,

16     and I don't consider anything I've said in my

17     affidavit as a medical conclusion.

18     Q.        No. 13, the last clause, "or that

19     the formaldehyde gas can adversely affect

20     people's health."

21     What is the source of that

22     opinion?

23     A.        That is established fact from the

24     literature.  That has been known for years

25     that formaldehyde exposure, or exposure to

formaldehyde can adversely affect people's health. That's why formaldehyde exposure is regulated in the workplace. That's why there are voluntary product standards relating to formaldehyde release from certain wood products, and I suspect from many other materials as well.

Q. At what level?

A. You will have to ask a medical professional.

Q. No. 14, "I am aware that the trailer was installed by inserting multiple supports beneath its frame."
You are talking about the Alexander trailer?

A. Yes.

Q. What is the source of that information?

A. Mrs. Alexander.

Q. She told you that she saw how it was installed?

MR. PINEDO:
Objection to form.

THE WITNESS:
She confirmed that her trailer

Stephen J. Smulski
June 10, 2009

1   was sitting on some type of support.

2   EXAMINATION BY MR. GLASS:

3   Q.       "It is my understanding that

4   during the process of installation that the

5   frame and exterior shell can bend and twist."

6   What is the source of that

7   information?

8   A.       That's the -- that is coming from

9   other experts who are experts in travel

10  trailers.

11  Q.       What expert?

12  A.       Al Mallet, Gary Bunzer.

13  Q.       Anybody else?

14  A.       Not that I can think of.

15  Q.       You said "can."

16  Do you know whether with the

17  Alexander unit that that actually occurred?

18  A.       I don't.

19  Q.       Do you know how this unit was

20  handled, transported, anything that happened

21  to it between the time that Ms. Alexander

22  moved out, and the time you looked at it?

23  A.       I do not.

24  Q.       Do you know how the unit looked

25  at the time it was installed at the 4415 Dale

Stephen J. Smulski
June 10, 2009

Page 207

1    Street address?

2    A.        I do not.

3    Q.        This next portion of that

4    sentence says, "causing sealed joints in the

5    walls, roof, ceiling, and floor to open."

6    Again, this is just something

7    that you've been told can happen?

8    A.        This was told to me by

9    Mr. Mallet, Mr. Bunzer, and this is also based

10   on my experience in the construction industry

11   and in life in general.  Something that is

12   built square, plumb, and level, if you twist

13   it, you will cause joints to open, members to

14   bend, et cetera.

15   Q.        But you don't know whether that

16   happened in the Alexander unit?

17   A.        I do not.

18   Q.        And you don't know if it did

19   happen, when it occurred?

20   A.        That is correct.

21   Q.        The next sentence, "This can

22   allow formaldehyde gas inside the wall,

23   ceiling, and floor cavities to more easily

24   enter the living space and increase the

25   concentration of formaldehyde gas in the

Stephen J. Smulski
June 10, 2009

1    trailer."

2    If I understood your earlier

3    testimony correctly, based upon various

4    factors such as temperature differential, air

5    pressure, and concentration, we could also

6    state that the openings can more easily allow

7    the formaldehyde to enter the exterior of the

8    trailer, would that be accurate?

9    A.        Yes.  It's a two-edged sword.

10   Depending on what the conditions are, the

11   movement could be in either direction.

12   Q.        "It can also allow hot, humid air

13   and rain to enter into the walls, ceiling, and

14   floor cavities, causing the relative humidity

15   inside the cavities to increase."

16   That would require that there be

17   some path for the exterior air and rain to go

18   all of the way from the outside to the

19   interior of the trailer, correct?

20   A.        That's correct, and we actually

21   observed that in the Alexander trailer.  There

22   is a ceiling light fixture over the bed in the

23   bedroom, which has been leaking water.  When

24   we got up on the roof of the travel trailer,

25   we could see that there was an open seam in

Stephen J. Smulski
June 10, 2009

Page 209

1    the roof membrane, and that was where the

2    water was entering through, exiting in the

3    ceiling light fixture, and then actually

4    ending up on the bed platform and mattress

5    itself.

6    Q.       Do you know when that damage

7    occurred?

8    A.       I do not.

9    Q.       Do you know if that was a

10   condition that existed at the time

11   Ms. Alexander and her son lived in the

12   trailer?

13   A.       My recollection is Mrs. Alexander

14   had complained about that leak to somebody to

15   have it repaired, so it occurred while they

16   were living in the trailer.

17   Q.       Do you know when?

18   A.       I don't know when.

19   Q.       No. 15, "Even in the absence of

20   installation-caused damage to the trailer,

21   formaldehyde gas will escape from the exposed

22   raw wood on the back edges of the wall,

23   ceiling, and floor panels and accumulate

24   inside the wall, ceiling, and floor cavities."

25   That's just a function of the

Stephen J. Smulski
June 10, 2009

Page 210

1    properties of the wood and the adhesive,

2    correct?

3    A.       It's due to the fact that the

4    rear of the panel is raw wood, and that is

5    going to be an avenue of escape for the

6    formaldehyde gas that is going to then

7    accumulate in the wall cavity.  As outdoor air

8    leaks through the walls into the wall cavity,

9    it's going to absorb that formaldehyde, and

10   then leak into the interior of the travel

11   trailer itself through joints and

12   penetrations.

13   Q.       "The formaldehyde gas will then

14   naturally enter the living space."

15   We are talking about the living

16   space of the Alexander's unit?

17   A.       Yes.

18   Q.       Let me actually complete the

19   sentence.  "The formaldehyde gas will then

20   naturally enter the living space, with

21   differences in temperature, vapor pressure,

22   and air pressure across the trailer's walls,

23   ceiling, and floor providing the driving force

24   for moving the airborne gas through joints and

25   penetrations in the walls, ceiling, and floor

Stephen J. Smulski
June 10, 2009

1    (e.g., switch plates, electrical receptacles,

2    heating and air-conditioning grilles, ceiling

3    light fixtures, seams between panels)."

4    What is the source of that

5    information?

6    A.      There is no source.  That is my

7    experience in 31 years of education and

8    experience and in investigating moisture

9    problems in residential buildings in the last

10   17 years, those are the passageways by which

11   airborne moisture moves within a building and

12   across the walls, floor of the buildings.  The

13   same thing is happening here with the

14   formaldehyde gas.

15   Q.      As you indicated in the previous

16   opinion in 14, based upon those same

17   differences in temperature, vapor barrier --

18   excuse me -- vapor pressure, and air pressure

19   across the various components of the trailer,

20   the air could just as easily, naturally leave

21   the living space, correct?

22        MR. PINEDO:

23   Objection to form.

24        THE WITNESS:

25   It can go the other way, yes.

Stephen J. Smulski
June 10, 2009

Page 212

1    EXAMINATION BY MR. GLASS:

2    Q.      Did you do any testing to confirm

3    your conclusions in this first two sentences

4    as to what the path of the formaldehyde gas

5    being emitted was in the Alexander travel

6    trailer unit?

7    A.      I didn't do any testing, but the

8    gas passes through joints and penetrations.

9    That is the air passageways in the travel

10   trailer, in a HUD-Code home, in a manufactured

11   home, in a high-rise commercial office

12   building, in this building we are sitting in

13   here today.

14   Q.      How much formaldehyde gas was in

15   the travel trailer at its peak when the

16   Alexanders lived in it?

17   A.      I don't know.  I only know that

18   in January 2008 the reading of 50 parts per

19   billion was made in the trailer, and in May

20   2009, a reading of 74 parts per billion was

21   made in the trailer.

22   Q.      "In addition, formaldehyde gas

23   will naturally escape through the overlay on

24   these panels' faces (much more slowly, of

25   course) as well as from the products that are

Stephen J. Smulski
June 10, 2009

Page 213

1   fully inside the trailer (e.g., cabinets, bed

2   supports, built-in seating and furniture)."   I

3   think that is pretty straightforward.

4       On 16, "On January 28-29, 2008,

5   three years after the trailer was manufactured

6   and lived in, the W.D. Scott Group, Inc.

7   measured the formaldehyde level inside the

8   trailer at the nightstand in the bedroom and

9   reported it to be 50 parts per billion

10  (temperature 66 to 78 degrees Fahrenheit,

11  relative humidity 41 to 52 percent)."

12  What is the source of that

13  information?

14  A.      Bill Scott.

15  Q.      Do you have any expertise to

16  validate his testing?

17  A.      No.

18  Q.      So you are simply relaying the

19  information he provided to you?

20  A.      Mr. Scott does this for his

21  profession.

22  Q.      And you are simply repeating the

23  information that he's provided to you?

24  A.      Yes.

25  Q.      "On May 6-7, 2009, more than four

Stephen J. Smulski
June 10, 2009

Page 220

1    EXAMINATION BY MR. GLASS:

2    Q.       Is it your understanding that the

3    test results, or the testing that was done by

4    Mr. Scott represented how the -- Ms. Alexander

5    and her son lived in the housing unit?

6    A.       No.  Again, the test results

7    represent a snapshot in time of what were the

8    formaldehyde concentrations inside of the

9    trailer in January 2008, and again in May

10   2009.

11   Q.       No. 17, "The trailer supplied by

12   FEMA to Ms. Alexander is intended to be used

13   for short-term recreational use."

14   What is the source of the

15   information for that sentence, the first one?

16   A.       That's my understanding of how

17   people typically use travel trailers, and in

18   the owner's manual itself, they infer it is

19   typically used for short periods of time,

20   rather than on the long term.

21   Q.       I'm skipping a sentence.  "During

22   this time they would be subjected to acute

23   exposure to formaldehyde gas."

24   What do you mean by the term

25   "acute exposure"?

Stephen J. Smulski
June 10, 2009

Page 221

1  A.       Acute is the immediate exposure.

2  What happens to you when you are immediately

3  put in an environment with formaldehyde gas.

4  Q.       Are people exposed to

5  formaldehyde gas in all kinds of daily

6  activities?

7  A.       I would say there certainly are

8  some kinds of daily activities.  Some people

9  may be exposed to it as a part of their

10  employment in manufacturing, for example.

11  Q.       I didn't mean to cut you off.

12  A.       I'm finished.

13  Q.       We've already talked that there

14  are background levels of formaldehyde,

15  correct?

16  A.       Yes.

17  Q.       Do you know what the background

18  levels of formaldehyde were at the times of

19  tests done by Mr. Scott?

20  A.       I don't.

21  Q.       Do you know what the background

22  levels of formaldehyde were at any time that

23  the Alexanders used the unit?  And I am

24  talking about specifically background levels

25  around the Dale Street address.

Stephen J. Smulski
June 10, 2009

Page 222

1    A.      I don't.

2    Q.      The next sentence says, "When the

3    trailer was installed on a foundation and

4    hard-wired and hard-plumbed, however, it was

5    converted from short-term recreational use to

6    long-term housing."

7    What is the basis of that

8    opinion?

9    A.      Common sense.  It used to be a

10   vehicle towed from location to location for

11   vacation use.  It has been converted to a

12   house, which is set up on a foundation,

13   equipped with -- hooked into the electrical

14   grid, hooked into the sewer system, hooked

15   into the water system.

16   Q.      Next sentence is, "As a

17   consequence, Ms. Alexander and her son

18   Christopher Cooper were subjected to chronic

19   exposure to formaldehyde gas."

20   What do you mean by "chronic

21   exposure"?

22   A.      Long term as -- as used in the

23   same sense that ASTDR uses chronic,

24   intermediate, and acute exposure.

25   Q.      What do you consider long term?

Stephen J. Smulski
June 10, 2009

Page 223

1    A.      I would say if I were to be

2    displaced from my house and put up in a hotel

3    for three or four weeks, that would be short

4    term.  I would say if I were in that hotel for

5    months and years, that would be long term.  If

6    you go with the ATSDR definitions, acute is up

7    to 14 days, intermediate is 15 to 365 days,

8    chronic is over 365 days.

9    Q.      Do you know what level of

10   formaldehyde gas Ms. Alexander and her son

11   Christopher Cooper were exposed to as opined

12   in paragraph 17?

13   A.      I don't.

14   Q.      "The use of this trailer by

15   Ms. Alexander and her son was a reasonably

16   anticipated use given that this trailer was

17   sold to FEMA for the purpose of housing

18   persons displaced by natural disasters like

19   Hurricane Katrina."

20   In regards to your task of

21   identifying and inventorying the composite

22   wood products in the Alexander trailer, what

23   is the purpose of this statement about

24   "reasonably anticipated use"?

25   A.      Again, I am fleshing out the

Stephen J. Smulski
June 10, 2009

Page 224

1   story.  I want somebody to be able to pick up

2   this document with no knowledge, read it in

3   its entirety, and understand the context in

4   which these formaldehyde-emitting wood

5   products were used, and the consequences for

6   the occupants of those travel trailers.

7   Q.      Did you conduct any kind of

8   inquiry of Ms. Alexander to determine whether

9   she in fact used this trailer in its, as you

10  described it, anticipated use by the

11  manufacturer?

12        MR. PINEDO:

13  Objection to form.

14        THE WITNESS:

15  I did not.  As I said, I listened

16  in on a conference call with Mrs. Alexander.

17  I never spoke to her directly.

18  EXAMINATION BY MR. GLASS:

19  Q.      Was there any discussion during

20  that conversation about how she may have

21  misused the product?

22  A.      Not that I recall.

23  Q.      Do you recall any specific

24  questions asking her how she used the trailer?

25  A.      I don't.

Stephen J. Smulski
June 10, 2009

1    Q.        No. 18, "I have reviewed reports

2    regarding the levels of formaldehyde measured

3    inside all types of FEMA-supplied emergency

4    housing units including 'An Update and

5    Revision of ATSDR's February 2007 Health

6    Consultation' by the U.S. Department of Health

7    & Human Services dated October 7."  You

8    identified the "Final Report on Formaldehyde

9    Levels in FEMA-Supplied Travel Trailers, Park

10   Models, and Mobile Homes" by the Centers for

11   Disease Control and Prevention from July 2nd,

12   2008, and you also identify an Environmental

13   Energy Toxicologies (sic) Division Lawrence

14   Berkeley National Laboratory report dated

15   November 2008.

16   How did you go about choosing

17   these select reports to review?

18   A.        The existence of those reports

19   was made to -- I was made aware of the

20   existence of those reports by various

21   attorneys, and I then downloaded them from the

22   web and read them.

23   Q.        Any -- do any of these reports

24   chronicle any testing done on the Alexander

25   unit?

Stephen J. Smulski
June 10, 2009

Page 229

1   We had a range of from 3 to 590 parts per

2   billion, but they didn't look at what are the

3   sources of formaldehyde, how many of those

4   sources are there, ventilation, air exchange

5   rate, et cetera.  They simply went into the

6   units, measured them.

7   I think what one can infer from

8   this is when you make measurements on 123

9   different Gulf Stream Cavalier trailers, and

10  you come up with an average formaldehyde level

11  of 104 parts per billion, which is far in

12  excess of what ATSDR is citing as even a safe

13  level for acute exposure that we have had.

14  That there have been inside these travel

15  trailers consistently high levels of

16  formaldehyde, and that the users of those

17  trailers have been exposed to that

18  formaldehyde.

19  EXAMINATION BY MR. GLASS:

20  Q.       Are you an expert statistician?

21  A.        No, I'm not, but I have taken

22  enough statistics in my bachelor's and

23  master's and Ph.D. degree pursuits to know

24  that a small sample size is considered 30, and

25  from that one can draw -- from that

Stephen J. Smulski
June 10, 2009

Page 230

1   statistical sample size, one can draw

2   inferences about mean standard deviation, et

3   cetera, for the larger population, and here we

4   have 123 travel trailers that have been

5   sampled.

6   Q.      Is it within your area of

7   expertise to testify about statistically

8   anything in this litigation regarding

9   formaldehyde exposure?

10  A.      No.  I am not an expert in

11  statistics.  I have been educated in basic

12  statistics.  I have used them in my own

13  research when I was at the university.

14  Q.      You've said that the range was

15  from .003 parts per million to some other

16  number.

17  If we were dealing with -- assume

18  for me the Alexander unit had .003 parts per

19  million.  Is it your testimony that unit then

20  was unsuitable for habitation?

21      MR. PINEDO:

22  Objection to form.

23      THE WITNESS:

24  I would never agree with your

25  assumption that it was that low.  First, we

Stephen J. Smulski
June 10, 2009

Page 234

1          MR. REIGH:

2      Have the court reporter read it

3      back.

4      (Whereupon the previous answer was read back

5      by the court reporter at this time.)

6          MR. D'AMICO:

7      It was an implied yes.  It meets

8      the standard --

9          MR. GLASS:

10     An implied yes is not a yes.

11     EXAMINATION BY MR. GLASS:

12     Q.      Let me ask it this way.  Very

13     direct question.

14     The unit in the CDC study that

15     was at .003 parts per million in the study

16     that you have referenced, was that unit

17     suitable for habitation?

18         MR. PINEDO:

19     Objection form.  Asked and

20     answered.

21         THE WITNESS:

22     If I use as the yardstick the

23     ATSDR, then yes, it was suitable for

24     habitation, because it falls below the 8 parts

25     per billion, and I am reading into that that

Stephen J. Smulski
June 10, 2009

Page 235

1   it was 3 parts per billion from the day the

2   occupants first went inside that unit until

3   when they left.

4   EXAMINATION BY MR. GLASS:

5   Q.      Are you using a different

6   assumption for the .003 parts per million than

7   you're using for any other test that was done

8   on any other unit?

9   A.      I don't understand your question.

10  Q.      You qualified it that you're

11  making the assumption that it was .003 through

12  the entire time, and that somebody was

13  occupying.

14  It is that different from any

15  other unit?

16  A.      What I am saying is that the CDC

17  went into these units, some of which had been

18  in service for over two years at the time they

19  made their measurements, so they came up with

20  a certain measurement on a certain day.  What

21  I am saying is it would be suitable for

22  housing if it were 3 parts per billion, which

23  meets the ATS --

24      MR. D'AMICO:

25  DR.

Stephen J. Smulski
June 10, 2009

Page 236

1        THE WITNESS:

2   -- DR standard from the day the

3   occupants first set foot inside of the unit.

4   EXAMINATION BY MR. GLASS:

5   Q.        Can you tell me what the levels

6   of formaldehyde exposure were in the Alexander

7   unit at any given time other than the W.D.

8   Scott test that you have been provided by

9   Mr. Scott?

10        MR. D'AMICO:

11   Objection.  Asked and answered.

12        THE WITNESS:

13   I cannot.  I can only infer from

14   what we know about formaldehyde release that

15   they were more likely than not higher prior to

16   measurements made by Mr. Scott.

17   EXAMINATION BY MR. GLASS:

18   Q.        The studies that you identified

19   in No. 18 do not tell us what the levels of

20   formaldehyde were in the Alexander unit; is

21   that accurate?

22   A.        That is correct.

23   Q.        So for No. 19, same question.

24   Where you are identifying

25   averages in the CDC study, that does not tell

Stephen J. Smulski
June 10, 2009

Page 237

1    us what the levels of formaldehyde were at any

2    time the Alexanders occupied the Gulf Stream

3    unit; is that accurate?

4          MR. PINEDO:

5    Objection.  Asked and answered.

6          MR. GLASS:

7    That's a different opinion.  I'm

8    asking it again.

9          THE WITNESS:

10   Yes, but it provides --

11         MR. D'AMICO:

12   Same one.

13         THE WITNESS:

14   Yes, but it provides the basis

15   for making inferences about what the

16   formaldehyde levels likely were inside the

17   Alexander trailer, given that it's the same

18   model trailer, and it's the same volume of

19   air, and it was used for the same purpose, and

20   it was located in the same general

21   geographical region.

22   EXAMINATION BY MR. D'AMICO:

23   Q.       Is it within your expertise to

24   extrapolate back from testing on models other

25   than the Alexander temporary housing unit what

Stephen J. Smulski
June 10, 2009

Page 249

1    A.        As far as I can see, none.

2    Q.        Did they have a roof vent?

3    A.        They were relying on natural

4    leakage of air through joints and

5    penetrations.  They did have an exhaust system

6    in the bathroom, a roof vent.  There was an

7    exhaust system for the kitchen range, and they

8    did have an air-conditioning system for

9    cooling.  My understanding of the

10   air-conditioning system, however, it does not

11   have an outside air duct.  It's simply

12   recirculating the air it naturally leaks into

13   the trailer.

14   Q.        In opinion No. 22, you speak

15   again to the November 2007 Lawrence Berkeley

16   National Laboratory report.

17   Does that report tell you what

18   the level of formaldehyde was at any time that

19   the Alexanders occupied the Gulf Stream Coach

20   unit?

21       MR. PINEDO:

22   Objection to form.

23       THE WITNESS:

24   No, because the FEMA tests --

25   excuse me -- the Lawrence Berkeley National

Stephen J. Smulski
June 10, 2009

Page 250

1    Lab did not conduct tests on the Alexander

2    trailer.  They did conduct tests, however, on

3    another Gulf Stream Cavalier model.

4    EXAMINATION BY MR. GLASS:

5    Q.        No. 23, "The current formaldehyde

6    gas problem," what is your definition of the

7    "current formaldehyde gas problem"?

8    A.        Excessive levels of formaldehyde

9    inside the travel trailer, and exposing the

10   occupants of those travel trailers to --

11   chronically to formaldehyde gas.  I didn't

12   identify the problem.  The Centers for Disease

13   Control identified the problem.  That's why

14   they sent their technicians, or sent

15   technicians out in the field to make

16   measurements of formaldehyde levels in travel

17   trailers.

18   Q.        What do you define "excessive

19   levels" as?

20   A.        I would again refer to the AST --

21   excuse me -- ATSDR levels for acute,

22   intermediate, and chronic exposure.

23   Q.        It's your opinion that the -- as

24   you defined it -- "Current formaldehyde gas

25   problem could have been prevented had Gulf

Stephen J. Smulski
June 10, 2009

Page 259

1    trailer.  Somebody in Gulf Stream Coach should

2    have asked themselves the question, "Are we

3    going to create a formaldehyde problem inside

4    these travel trailers, just like the one that

5    happened in HUD-Code manufactured homes over

6    20 years ago?  Because, you know, we have

7    exactly the same thing going on here.  We are

8    using a large volume of formaldehyde-releasing

9    products.  We are enclosing a small volume of

10   air.  It has low air exchange rate.  We are

11   going to put these things down into Louisiana

12   and Mississippi that has high-average annual

13   temperature, high-average annual relative

14   humidity.  We might have a problem here.

15   Maybe we need to consider using alternative

16   materials that don't give off formaldehyde, or

17   give off so little formaldehyde they are

18   exempt from the HUD standards.  Maybe we

19   should think about using mechanical

20   ventilation in here to move stale indoor air

21   out of these little boxes and introduce fresh

22   air from the outside."  Those are basic

23   considerations that should have been thought

24   about.

25        Q.       You're an expert in the

Stephen J. Smulski
June 10, 2009

Page 260

1    manufacture of travel trailer products?

2    A.        I am not an expert in the

3    manufacture of travel trailers, but common

4    sense tells me those are the types of things

5    that need to be considered.  Those are the

6    types of things we think about in

7    single-family homes.  Those are the things we

8    think about in the construction of all of the

9    buildings we build.  Everybody in the last 20

10   years is aware of "sick building syndrome,"

11   indoor air quality problems.  Everybody should

12   have an awareness that if we are building some

13   kind of structure, and we are going to house

14   people in it, we need to think about those

15   things.

16   Q.        Especially if it's going to be

17   above your ATSDR standard of cleansers or 80

18   parts per million, correct?

19   A.        That is one of the things we need

20   to take into consideration.  Are there

21   standards for indoor air quality?  What are

22   they?  How do they apply to the product we are

23   making?  How is that going to affect the

24   occupants of that travel trailer?

25   Q.        Anybody who ever constructs a

Stephen J. Smulski
June 10, 2009

Page 267

1    Q.        You could put in sub-zero

2    refrigerators into a travel trailer, correct?

3    A.        If you wanted to.

4    Q.        You could put in a water bed, or

5    any kind of other material you wanted to put

6    into a travel trailer, correct?

7    A.        Yes, I agree there are all types

8    of options.  There are many things they could

9    have done.  What is important here is what

10   they did do, which is they built a small

11   wooden box from particle board, medium density

12   fiberboard, and hardwood plywood that was

13   emitting formaldehyde.  They then filled that

14   small wooden box with built-in cabinets and

15   furniture also made of particle board, medium

16   density fiberboard, and hardwood plywood that

17   also emitted formaldehyde.  And in doing so,

18   they created the formaldehyde problem that

19   occurred within these travel trailers.

20   Q.        If you do all of these subjects

21   or changes, modifications, ultimately you

22   could just build a house for everybody,

23   correct?  A site-built house?

24   A.        You could.

25   Q.        Was that practical for the people

Stephen J. Smulski
June 10, 2009

Page 268

1    who were displaced from Louisiana after the

2    hurricane?

3    A.        Probably not.

4    Q.        No. 26, this is the first time

5    you say, "It's my opinion," is this No. 26, is

6    this where you are intending to give your

7    opinion regarding the inventory on the

8    composite wood products contained in the

9    travel trailer used by the Alexanders?

10   A.        I don't understand your question.

11   Q.        You said you were tasked to

12   identify and inventory the composite wood

13   products in the Alexander travel trailer unit;

14   is that correct?

15   A.        Yes.

16   Q.        And you've also testified you

17   were just trying to give a picture through all

18   of this other information we've been talking

19   about, which I assume is a picture of the

20   inventory of composite wood products in the

21   Alexander travel trailer.

22   Is that an incorrect assumption?

23   A.        That is a small part of the

24   bigger picture.  Again, my purpose in writing

25   this report was that somebody who had no

Stephen J. Smulski
June 10, 2009

1    fact, the jury, hears all of this evidence

2    they conclude that the level actually tested

3    in this trailer did not constitute a health

4    risk for Ms. Alexander and Christopher Cooper,

5    is it your opinion in that circumstance that

6    the travel trailer would still be an

7    unsuitable housing situation for those

8    plaintiffs?

9          MR. PINEDO:

10   Objection to form.

11         THE WITNESS:

12   I don't know how to answer that

13   question, quite frankly.  The jury can arrive

14   at any conclusion.  That conclusion doesn't

15   necessarily have to be fact-based.  It doesn't

16   necessarily have to be -- represent the

17   majority of opinion of people who are

18   qualified as experts to look at and assess

19   this issue, so I don't know how to answer your

20   question.

21   EXAMINATION BY MR. GLASS:

22   Q.       I understand.  That's fine.

23   Is it your opinion that any

24   housing situation wherein formaldehyde is

25   tested at any time in excess of .008 parts per

Stephen J. Smulski
June 10, 2009

Page 280

1    million is unsuitable for long-term living?

2        MR. PINEDO:

3    Objection.  Asked and answered.

4        THE WITNESS:

5    In my thinking, that is a problem

6    house that needs some type of remediation.

7    EXAMINATION BY MR. GLASS:

8    Q.       No. 27, "It is my opinion, to a

9    reasonable degree of scientific certainty,

10   that it was unreasonable for anyone to think

11   that the health of persons living in this Gulf

12   Stream Coach, Inc. Cavalier model trailer for

13   a long period of time would not be adversely

14   affected given," and you list out four

15   different points.

16   I asked you this in the class

17   certification hearing.  I will ask you again.

18   "Anyone" means anyone, correct?

19   A.       In the literal sense of the term,

20   yes.  Let me tell you what I meant by using

21   the word "anyone."  I meant anyone, that is,

22   those parties who were involved in the

23   decision to use travel trailers as long-term

24   housing for the victims of Hurricane Katrina.

25   That would be specifically the travel trailer