## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  FEMA Trailer Formaldehyde | * | MDL No. 1873 |
| Products Liability Litigation | * | |
| | * | Section N(5) |
| | * | |
| | * | Judge Engelhardt |
| | * | |
| This Document Relates To: | * | Magistrate Chasez |
| *Joseph Quezergue v. Jayco Enterprises, Inc., et al.* | * | |
| *Civil Action No. 09-3701* | * | Jury Demand |

**************************************************************************************

### PLAINTIFF'S FIRST SUPPLEMENTAL AND AMENDING COMPLAINT FOR DAMAGES

NOW INTO COURT, comes Joseph Quezergue, who through undersigned counsel, supplements and amends his original Complaint for Damages (Civil Action No. 09-3701, Rec. Doc. 1) in the following respects and otherwise reiterates and reavers all of the allegations, claims and prayers for relief contained therein.

## I. PARTIES

1.    Named Plaintiff is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the states in which Newly Added Defendants are citizens.

2.    Defendant American International Group Inc. (hereinafter, "AIG"), is, upon information and belief, a Delaware corporation, with its principle place of business in New York.  Further, defendant AIG provided insurance coverage for the risks involved herein of Fleetwood Enterprises, Inc., (hereinafter, "Fleetwood"), which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Louisiana.

3.     Defendant Starr Excess Liability Insurance Company, Ltd. (hereinafter, "Starr"), is,
       upon information and belief, a Delaware corporation, with its principle place of
       business in New York.  Further, defendant Starr provided insurance coverage for the
       risks involved herein of Fleetwood which manufactured and supplied FEMA trailers
       or housing units as defined below pursuant to contracts with FEMA for use in the
       State of Louisiana.

4.     Defendant American International Specialty Lines Insurance Company (hereinafter,
       "AISLIC"), is, upon information and belief, an Alaskan corporation, with its principle
       place of business in New York. Further, defendant AISLIC provided insurance
       coverage for the risks involved herein of Fleetwood, which manufactured and
       supplied FEMA trailers or housing units as defined below pursuant to contracts with
       FEMA for use in the State of Louisiana.

5.     Defendant Gibraltar Insurance Company, Ltd. (hereinafter, "Gibraltar"), is, upon
       information and belief, incorporated in Bermuda, with its principle place of business
       in a foreign state.  Further, defendant Gibraltar provided insurance coverage for the
       risks involved herein of Fleetwood, which manufactured and supplied FEMA trailers
       or housing units as defined below pursuant to contracts with FEMA for use in the
       State of Louisiana.

## II.  <u>JURISDICTION AND VENUE</u>

6.     This Court has subject matter jurisdiction over the United States of America and
       FEMA pursuant to 28 U.S.C. §§1346 and 2671, *et seq*.

7.     Plaintiff alleges to have suffered damages in an amount in excess of $75,000.00,
       exclusive of interest and costs.

8.  Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the newly added defendants with citizenship other than that of Plaintiff, because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9.  Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

10. AIG is subject to the *in personam* jurisdiction of this Court because it and its insured client, Fleetwood, does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

11. Starr is subject to the *in personam* jurisdiction of this Court because it and its insured client, Fleetwood, does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

12. AISLIC is subject to the *in personam* jurisdiction of this Court because it and its insured client, Fleetwood, does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation

13.   Gibraltar is subject to the *in personam* jurisdiction of this Court because it and its insured client, Fleetwood, does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

14.   Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, as the emergency housing unit was provided to the Plaintiff in this district, and Named Plaintiff's injuries were sustained in this district.

### III.  FACTS AND GENERAL ALLEGATIONS

15.   The Named Plaintiff, upon information and belief, resided or lived in a travel trailer (hereinafter referred to as "housing unit"), in the State of Louisiana provided by FEMA, manufactured by Fleetwood and hauled, installed and maintained by Shaw Environmental, Inc. after the landfalls of Hurricane Katrina and/or Rita in September of 2005.

16.   Upon information and belief the housing unit at issue was a travel trailer.  "Travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet.  They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities.  *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* http://www.cdc.gov/Features/FEMAtrailersFindings/pdf /interim_findings.pdf.

17.   The residence of Named Plaintiff was rendered unhabitable following hurricanes Katrina and/or Rita, leaving Plaintiff homeless and in need of housing assistance.

18.   FEMA contracted with Fleetwood to purchase thousands of the housing units, primarily travel trailers, for provision to the Named Plaintiff and other Gulf Coast residents as temporary housing.

19.   On information and belief, Fleetwood expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing unit occupied by Named Plaintiff containing higher than normal levels of formaldehyde.

20.   On information and belief, Plaintiff's housing unit, whether manufactured prior to the hurricanes or later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

21.   Named Plaintiff submits that the housing unit which is at issue herein, whether manufactured prior to the hurricanes or later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing unit pertinent to formaldehyde levels.

22.   Named Plaintiff submits that the housing unit at issue, whether manufactured prior to the hurricanes or later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Fleetwood's use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing unit as a

temporary residence for at least 18 months, but that Fleetwood failed to warn the Federal Government about these dangers.

23.   Named Plaintiff submits that Fleetwood ignored, or concealed and/or condoned the concealment of, the fact that the housing unit at issue contained dangerous levels of formaldehyde due to Fleetwood's use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing unit as a temporary residence for at least 18 months, all in order to sell Fleetwood's products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

24.   Named Plaintiff spent significant time in the FEMA-provided housing unit manufactured by Fleetwood and provided to Plaintiff by the Federal Government. As a result, Named Plaintiff unwittingly was exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing unit.

25.   Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing unit.  Pursuant to federal law, the defendants are required to display a "Health Notice" in manufactured homes about exposure to formaldehyde which reads:

IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

26.     According to the National Cancer Institute, formaldehyde has been classified as a

human carcinogen (cancer-causing substance) by the International Agency for

Research on Cancer and as a probable human carcinogen by the U.S. Environmental

Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and

Disease Registry ("ATSDR") has reported to FEMA and members of Congress that

not only is formaldehyde classified as "reasonably anticipated to be a human

carcinogen," but also that there is no recognized safe level of exposure, and that any

level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

27.     Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases.  Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects.  In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 parts per million (hereinafter, "ppm") to1 ppm.  In May, 1992, the formaldehyde exposure limit was further reduced to 0.75 ppm.

28.     HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes).  HUD has far stricter exposure limits for residential formaldehyde emissions.  By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...".  *See* 24 C.F.R. §3280.308.

29.    Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure,

which are reproduced below, which values are applicable herein since the FEMA

trailer/housing unit at issue was intended to be occupied for up to a year and a half

by Plaintiff. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between  15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental

Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19,

2007, *available at*  http://www.ucsusa.org/scientific_integrity/interference/fema-

trailers.html.

30.    Fleetwood knew or should have known of the health hazards inherent in the

products it constructed, by familiarity with industry standards, the material safety

data sheets in its possession, and published medical studies.

31.    FEMA's disaster response obligations are delineated in the Robert T. Stafford

Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (hereinafter,

"Stafford Act").  The Stafford Act outlines two types of temporary housing assistance

to be made available to eligible, displaced applicants: financial assistance and direct

services. This aid is sometimes referred to as Section 408 assistance. This provision

was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

32.   In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Shaw with No-Bid contracts, eventually amounting to over eight hundred million dollars. The Federal Government also relied on the expertise and knowledge of Shaw to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

33.   Shaw was tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

34.   Under the terms of their contracts, Shaw was obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same. Further, under their No-Bid contracts with FEMA,

Shaw was obligated to advise and instruct FEMA regarding the implementation of those contracts Shaw failed to properly fulfill either of these tasks.

35.    Shaw contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Shaw was tasked with operating.  These new areas included staging areas to be managed and maintained as assigned to Shaw or individual locations and addresses where Shaw assigned that temporary housing unit would have obligations to manage and maintain it.

36.    To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Shaw entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under their individual contracts with FEMA.

37.    Shaw was tasked under its contracts with FEMA to identify and prepare the infrastructure  for the various group site locations.  This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc .  Shaw knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

38.    Once the temporary housing unit manufactured by Fleetwood and occupied by the Named Plaintiff was transported and delivered to its particular location, Shaw had the responsibility for installing that temporary housing unit.  Shaw installed the

temporary housing unit by "blocking" the unit.  This meant raising the Plaintiff's unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

40.     By blocking the Named Plaintiff's temporary housing unit, Shaw  created stress and flexing on the frame of the unit as it was not designed to be lifted off of the wheel base.  In fact, the manufacturers of the temporary housing units warned in the various owners' manuals provided with some of the units, that units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

41.     The stress and flexing of the temporary housing unit's frame caused by Shaw "blocking" it with weight off of the wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

42.     The temporary housing unit occupied by the Named Plaintiff which was provided by FEMA was, upon information and belief, a travel trailer. Travel trailers are, by definition, mobile.  They are designed for and intended for periodic, recreational use and not for long-term habitation.  By installing the travel trailer on concrete blocks for extended occupancy, Shaw knowingly and intentionally modified the design and the actual use of the unit occupied by the Named Plaintiff by converting it into a temporary housing unit to be used as a residence for long-term occupancy in some instances exceeding 18 months.

43.    Shaw failed to consult with the manufacturers of the temporary housing units, including Fleetwood , with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long-term residence and occupation.  Shaw took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

44.    Once Shaw  had completed the transportation, delivery and installation of the temporary housing unit occupied by the Plaintiff, Shaw  was tasked with inspecting the unit to ensure that it was safe and habitable, prior to occupancy by the Plaintiff. Upon information and belief, Shaw failed to adequately inspect the temporary housing unit occupied by the Plaintiff to ensure that the unit was safe and suitable for its intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita.  This failure to properly inspect the unit for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by the Plaintiff after he was displaced by hurricanes Katrina and Rita.

45.    In addition to transportation, site identification, installation and inspection, the temporary housing unit occupied by the Named Plaintiff and provided in response to hurricanes Katrina and Rita was also managed, maintained and repaired by Shaw, or their various subcontractors over whom they maintained direct oversight and responsibility.  Upon information and belief, Shaw  failed to adequately manage, maintain and repair the temporary housing unit which enabled and contributed to

the unsafe and hazardous conditions that led to adverse health effects suffered by the Plaintiff.

46.     Parallel to their duty to manage, maintain and repair each temporary housing unit Shaw failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the occupants of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

47.     Following the Plaintiff's occupancy of the temporary housing unit, Shaw was tasked with its de-installation.  Upon discovering the deteriorated condition of the temporary housing unit at the time of de-installation and removal, Shaw failed to identify the unsuitability of the temporary housing unit for long-term occupancy.

48.     In addition to de-installation of the temporary housing units, Shaw was tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to hurricanes Katrina and Rita or for use in the future.  By restoring and refurbishing these temporary housing units, Shaw  warranted that the units were fit for their intended use, long-term occupancy in response to disaster related displacement.  By restoring and refurbishing these temporary housing units, Shaw created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units.  Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by

new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

49.  Shaw, at every stage of their involvement, failed to warn the Plaintiff-occupant of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects.

50.  Through their actions and omissions, Shaw created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Shaw negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

51.  Shaw failed to warn the Plaintiff of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing unit.

52.  By restoring and refurbishing the trailer for future habitation, Shaw improperly and negligently warranted that the unit was fit for the intended use of long-term occupancy.

53.     Finally, despite these failures, Shaw received over eight hundred million dollars in
        contracts from FEMA and the United States government, at the expense of the health
        of the Plaintiff-occupant of the temporary housing unit who simply had nowhere
        else to go and who was relying on FEMA and its contractors to keep him safe in the
        aftermath of the greatest natural disaster in the history of the United States.

54.     The Federal Government has been aware for years that formaldehyde is used in
        certain construction materials used in manufactured housing, has regulated
        emissions standards for HUD-regulated mobile homes, has, since the hurricanes,
        adopted the HUD emissions regulations for travel trailer purchase specifications,
        and has known for over thirty years of the relationship between formaldehyde
        emissions in indoor environments and health problems associated therewith.  *See*
        Statement of R. David Paulison, Administrator, Federal Emergency Management
        Agency, Department of Homeland Security, before the Committee on Oversight and
        Government Reform, U.S. House of Representatives, July 19, 2007, *available at*
        http://oversight.house.gov/documents/20070719131219.pdf.

55.     Although, as alleged above, FEMA has long been aware of the presence of
        formaldehyde in certain construction materials used in manufactured housing,
        including these housing units, and specifically was aware of the published dangers
        associated with the "out" or "off-gassing" or the gradual release into the
        atmosphere of formaldehyde, upon information and belief, in March of 2006, a

family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

56.     In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATSDR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels.  *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff in a related matter, November 16, 2007.

57.     Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in the housing unit scheduled for delivery to the Named Plaintiff,  the Inspector General of the Department of Homeland Security,  testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Gulf Coast residents, including Named Plaintiff.  *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on

Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

58.   The Federal Government also continued to supply the defective and dangerous housing unit to the Named Plaintiff after March of 2006.

59.   The Federal Government continued to  supply the defective and dangerous housing unit to the Named Plaintiff even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

60.   The Federal Government continued to supply the defective and dangerous housing unit to the Named Plaintiff even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied  housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value.  Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http://oversight.house.gov/documents/20070719113015.pdf)  and D (*available at*  http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

61. The Federal Government continued to supply the defective and dangerous housing unit to the Plaintiff even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, *supra*, and Exhibits E (*available at* http://oversight.house.gov/documents/20070719113322.pdf), I (*available at* http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at* http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

62. While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue."  Union of Concerned Scientists, *supra*, and Supplemental A (various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B

(various emails *available at*

http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

63. Named Plaintiff avers that, even as he was being placed at risk in unsafe temporary

housing, the Federal Government had reviewed the results of all earlier testing and

complaints of formaldehyde associated with the housing units and were actively

conferring with one or more of the manufacturers concerning formaldehyde

exposure in the housing units and how best to deal with the publicity fall-out as the

media reports of same increased.

64. FEMA participated in an inter-agency meeting with the EPA and the Centers for

Disease Control and Prevention (CDC) in July of 2006, during which senior EPA

officials advised FEMA that the "health base level" for formaldehyde might be much

lower than previously expected, with anticipated levels being more than 100 times

higher.  The discussions during this conference were more "strategic" in nature,

with the EPA warning against the "the advisability of testing at all" concerned that

the data would have to be released to the public and that the media would

characterize the findings in the worst possible light.  Union of Concerned Scientists,

*supra*, and Exhibit R (various emails *available at*

http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

65. FEMA and EPA senior leadership instead agreed to test ventilation methods on

unoccupied trailers.  This testing methodology completely failed to simulate the

living conditions of a trailer resident, so results, which would not be released for

another seven to eight months,  were useless for determining a policy to protect

trailer residents.  This testing was conducted by FEMA and EPA in September and

October of 2006 at a trailer staging area located in Baton Rouge,  Louisiana.  Union

of Concerned Scientists, and Exhibit R attached thereto, *supra.  See also* Original

Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units,

Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available at*

http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_

report_0507.pdf.

66.    This testing methodology did not simulate the living conditions, temperatures,

humidities, standard ventilation practices, or timescales at which residents lived in

the trailers. It also did not take into account that the trailer building materials

continue to emit formaldehyde for four to five years.   Union of Concerned Scientists,

*supra*.

67.    FEMA and FEMA's lawyers purposefully interfered with the design and

implementation of the earlier testing of the housing units occupied by the Plaintiff

and other Gulf Coast residents and supplied in the wake of the hurricanes in order

to avoid legal liability for injuries to Plaintiff herein as a result of his exposure to

formaldehyde.  FEMA's activities, which included hiding, manipulating and ignoring

the extant science and scientific work and concerns of federal scientists in other

agencies, began immediately after FEMA began to receive complaints from trailer

residents concerning formaldehyde fumes in 2006.  *See* correspondence from U.S.

House of Representatives, Committee on Science and Technology, to Michael

Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

68.    FEMA further manipulated the governmental testing by involving a little-known

office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to

ensure that no long-term exposure considerations would be included in the health

consultation by removing the consultation from the normal ATSDR review process

so that scientists who had specifically recommended looking at long-term exposure

effects were excluded from the review.  FEMA did so in order to avoid negative

publicity and legal liability in connection with the presence of formaldehyde in the

housing units.  *See* correspondence from U.S. House of Representatives, Committee

on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard

Frumkin, Director, National Center for Environmental Health/Agency for Toxic

Substances and Disease Registry, January 28, 2008.

69.    FEMA's manipulation of the data was evidenced in the testing designed and

implemented by FEMA through the ATSDR in July of 2006.  The testing results of the

study showed high levels of formaldehyde in nearly all of the trailers, yet the

ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit

of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its

"level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit.

Yet even applying this "level of concern," the average sampling results still were

higher.  *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE

Exposures Within FEMA Travel Trailers Issued Hurricane Disaster Victims, and Recommended Action Items, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents /20070719102502.pdf.

70.     Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw... I think it was a complete violation of our professional code of ethics."  Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/ 20071114164004.pdf.

71.     On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

72.     Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation "did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially

incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at* http://www.atsdr.cdc.gov/ substances/formaldehyde/public_assessment.html.

73.    The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiff's  exposure to dangerous levels of formaldehyde in the housing unit, and causing him serious injuries.

74.    It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units.  *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC's Response to Health Concerns Related to FEMA-Provided Travel Trailers and Mobil Homes in the Gulf Coast Region, March 4, 2008, at 1, 3-4.

75.    The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes

and apartments; (2) levels ranged from 3 parts per billion (hereinafter, "ppb") to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments.  *Id.* at 4.

76.    The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions.  *Id.* at 5-6, 11.

77.     As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing.  The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

78.     The Federal Government's actions with regard to Named Plaintiff in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy.  Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

79.     Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

**COUNT 1:**

**CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT**

80.    Named Plaintiff incorporates the above allegations as if fully repeated verbatim

herein.

81.    At all times herein, the Federal Government was under a duty to use due care and

caution for the safety of the foreseeable users and occupants of the subject housing

unit, which duty extended to the Named Plaintiff herein.

82.    The Federal Government was obligated to promptly warn the Named Plaintiff of any

defects in the Fleetwood housing unit which could cause harm and of which the

Federal Government was aware.

83.    The Federal Government, after becoming aware of the potential for such harm,

violated this duty to Named Plaintiff, rendering the Federal Government negligent,

grossly negligent, reckless, willful and/or wanton.

84.    As a direct and proximate result of the acts and/or omissions of the Federal

Government, as well as its violation(s) of state and federal laws, Named Plaintiff has

suffered, and will continue to suffer harm and injuries, and is entitled to recover

damages from the Federal Government.

85.    Further, since Named Plaintiff is within the class and category of individuals meant

to be protected by the state and federal statutory and regulatory laws which the

Federal Government violated, Named Plaintiff specifically pleads the application of the doctrine of negligence *per se.*

86.   The Federal Government was negligent and at fault in the following non-exclusive particulars:

   a.   In failing to warn the Named Plaintiff of the unreasonably dangerous nature of the Fleetwood housing unit that Plaintiff occupied;

   b.   In failing to promptly remedy the dangerous nature of the Fleetwood housing unit, on becoming aware of the formaldehyde dangers associated with the unit;

   c.   In failing to timely implement adequate safety measures and procedures to address the defects in the Named Plaintiff's housing unit, on becoming aware of the formaldehyde danger associated with the unit; and

   d.   Such other actions of negligence and fault as will be shown at the trial of this matter.

**COUNT 2:**

**<u>CAUSE OF ACTION AGAINST AIG THROUGH FLEETWOOD, AISLIC THROUGH
FLEETWOOD, GIBRALTAR THROUGH FLEETWOOD AND STARR THROUGH
FLEETWOOD UNDER THE LOUISIANA PRODUCTS LIABILITY ACT</u>**

87.    Named Plaintiff incorporates the above allegations as if fully repeated verbatim
herein.

88.    Fleetwood  is the manufacturer of the housing unit occupied by the Named Plaintiff,
which unit constitutes a product under the Louisiana Products Liability Act
(hereinafter, "LPLA").

89.    Named Plaintiff's exposure to formaldehyde fumes from Fleetwood's  product and
equipment resulted from the normal, foreseeable, and intended use of the product
and equipment, without substantial alteration in the condition in which Fleetwood
sold the housing unit.

90.    The design of the housing unit, using plywood, press board, other composite wood
products and other products that contain formaldehyde is defective and posed an
unreasonable risk of harm to Named Plaintiff.

91.    Alternatively, the use of plywood, press board, other composite wood products and
other products that contain formaldehyde constitutes a defect in composition or
manufacture that posed an unreasonable risk of harm to Named Plaintiff.

92.    Fleetwood's product, equipment and supplies used by Named Plaintiff were in a
defective condition and were unreasonably dangerous under normal use at the time

the product and equipment left Fleetwood's control. Named Plaintiff was an intended and foreseeable user of the alleged defective product and damages and losses to Named Plaintiff reasonably could have been anticipated by Fleetwood.

93. The defects in Fleetwood's housing unit is the result of and/or includes, but is not limited to, the following:

94. In failing to design their respective product so as not to emit dangerous levels of formaldehyde;

95. In providing a housing unit which, by virtue of its design and/or manufacture and/or composition, was unreasonably dangerous under reasonably anticipated use;

96. In providing a housing unit which, by virtue of a lack of an adequate warning(s), was unreasonably dangerous under reasonably anticipated use;

97. In providing a housing unit which did not conform to the express warranties made by Fleetwood regarding its fitness for use as reasonably anticipated;

98. In manufacturing, testing, marketing, distributing, licensing and selling of an unreasonably dangerous housing unit;

99. In failing to properly test the housing unit to correctly evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

100.    In failing to warn Named Plaintiff of the unreasonably dangerous nature of the housing unit occupied by the Plaintiff, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit.

101.    In failing to ensure that the housing unit it manufactured and provided to Named Plaintiff was suitable for its intended use;

102.    In failing to adhere to any and all express warranties of fitness and safety for the housing unit they manufactured and provided;

103.    In manufacturing and providing a housing unit that was unduly dangerous due to its emissions of formaldehyde; and,

104.    Such other indicia of fault under the LPLA  as will be shown at the trial of this matter.

**COUNT 3:**
**CAUSE OF ACTION AGAINST SHAW**
**UNDER THE LOUISIANA PRODUCTS LIABILITY ACT**

105.    Named Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

106.    Shaw qualifies as a manufacturer under the Louisiana Products Liability Act ("LPLA"), as they performed work pursuant to their contracts with FEMA which altered the character, design, construction, and/or quality of the product and the housing unit constitutes a  product under the LPLA.

107.   The increased exposure to formaldehyde fumes from the alteration of the
Fleetwood temporary housing unit by Shaw resulted from the normal, foreseeable,
and intended use of the product and equipment.

108.   The installation and alteration of the temporary housing unit, the modifications to
the manufacturer's designs, and the "blocking" of the unit off its  wheel base, altered
the product which increased the effects of the product's defect and posed an
unreasonable risk of harm to Named Plaintiff.

109.   Named Plaintiff was an intended and foreseeable user of the alleged defective
product, and damages and losses to Named Plaintiff reasonably could have been
anticipated by Shaw.

110.   Shaw, by installing the temporary housing unit on concrete blocks for extended
occupancy and, further, by installing residential appliances and heating and air
conditioning units, knowingly and intentionally modified the design and the actual
use of the unit.

111.   The defects in Shaw's product is the result of and/or includes, but is not limited to
the following:

112.   In creating stress and flexing on the frame of the unit by lifting significant weight
from the wheel base, which distorted the travel trailer's shell allowing for increased
moisture intrusion and formaldehyde exposure due to cracks and openings in the
shell;

113.    In providing a temporary housing unit to Named Plaintiff which, by virtue of its composition, refurbishment, reconditioning, and/or construction was unreasonably dangerous under reasonably anticipated use;

114.    In providing a temporary housing unit to Named Plaintiff which, lacking adequate warnings, was unreasonably dangerous under reasonably anticipated use;

115.    In failing to warn Named Plaintiff of the unreasonably dangerous nature of the travel trailer converted to a temporary housing unit  for its intended use by FEMA or of the presence of excessive levels of emissions of formaldehyde;

116.    In failure to ensure that the temporary housing unit they installed, refurbished, and reconditioned was suitable for its  intended use, as long-term housing;

117.    In failing to adhere to any and all of the warnings against the jacking of the unit with weight off its wheel base by the manufacturers;

118.    In failing to follow the manufacturer's instructions for the installation and intended use of the temporary housing unit;

119.    In providing a housing unit which was unduly dangerous due to its emissions of formaldehyde; and,

120.    Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

**COUNT 4:**

**NEGLIGENCE OF SHAW UNDER LOUISIANA LAW**

121.   Named Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

122.   At all relevant times Shaw was tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing unit, which caused the Plaintiff's injuries.

123.   Shaw owed a duty to Named Plaintiff to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore a safe temporary housing unit that did not emit hazardous levels of formaldehyde.

124.   Shaw knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing unit to the general public (thereby modifying and converting the mobile unit into a residential installation) the actual and intended use of the temporary housing unit by Named Plaintiff, and that the temporary housing unit would be used in the manner that Named Plaintiff herein used the temporary housing unit.

125.   Shaw breached their duty to Named Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing unit; specifically by:

126.   Failing to sufficiently warn the Named Plaintiff of the inherently dangerous

        properties or the foreseeable conditions of the temporary housing unit when used

        for long-term occupancy; and

127.   Failing to adhere to the manufacturer's warnings against jacking the temporary

        housing unit off its wheel base by "blocking" the unit.

128.   Shaw's actions were the proximate cause of the increased exposure of formaldehyde

        to Named Plaintiff.

129.   Shaw contributed to and exacerbated the adverse health impacts upon the Plaintiff,

        living in the temporary housing unit.

## IV.  COMPENSATORY DAMAGES

130.   In addition to and by way of summarizing the compensatory damages prayed for

        herein, Named Plaintiff avers that the defendants, AIG through Fleetwood, AISLIC

        through Fleetwood, Gibraltar through Fleetwood, Starr through Fleetwood, Shaw,

        the United States of America through FEMA , and Jayco Enterprises, Inc. individually

        and/or jointly are responsible for all damages which Named Plaintiff herein has

        suffered and continues to suffer as a consequence of defendants' acts and/or

        omissions as pled herein, which damages include, but are not limited to, past and

        future physical injuries, past and future mental and physical pain and suffering, past

        and future physical impairments and disability, past and future reasonable and

        necessary medical expenses, past and future loss of earning capacity, past and

        future loss of enjoyment and quality of life and other damages and injuries, loss of

consortium, and  loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

## V.  REQUEST FOR JURY TRIAL

Named Plaintiff is entitled to and demands a trial by jury.

## VI.  PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiff prays that AIG, AISLIC, Gibraltar, Starr, Shaw, the Federal Government and Jayco be served with a copy of this Complaint, and that, after due proceedings:

1. there be a judgment herein in favor of Named Plaintiff and against Defendants for all compensatory damages together with legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2. there be specially included in the judgment in Named Plaintiff's favor, provisions for the following damages and relief as found applicable and supported by the evidence:

   a. past and future physical injuries,

   b. past and future mental and physical pain and suffering,

   c. past and future physical impairments and disability,

d.      past and future reasonable and necessary medical expenses,

e.      past and future loss of earning capacity,

f.      past and future loss of enjoyment and quality of life,

g.      loss of consortium and/or society,

h.      compensable out-of-pocket expenses related to defendants'

        wrongdoing, and

i.      costs of court; and

j.      all other general, equitable and further relief, as the Court may deem

        just and proper.

                        Respectfully submitted,

                         /s/Hugh P. Lambert
                        HUGH P. LAMBERT, ESQ. (LA Bar #7933)
                        LINDA J. NELSON, ESQ. (LA Bar #9938)
                        LAMBERT & NELSON, PLC
                        701 Magazine Street
                        New Orleans, LA 70130
                        Telephone: (504)581-1750
                        Facsimile: (504)529-2931
                        hlambert@lambertandnelson.com
                        lnelson@lambertandnelson.com

**PLEASE SERVE:**

1.  Starr Excess Liability Insurance Company, Ltd.
    ***Through its CEO***
    175 Water Street, 19th Floor
    New York, New York 10038

2.  American International Specialty Lines Insurance Company
    ***Through the Secretary of State***
    State of Louisiana
    8585 Archives Ave
    Baton Rouge, Louisiana 70809

3.  Gibraltar Insurance Company, Ltd.
    ***Through its Registered Agent for Service***
    Quest Management Solutions
    FB Perry Building
    40 Church Street
    Hamilton, HM 11
    Bermuda

4.  Shaw Environmental, Inc.
    ***Through its registered agent for service:***
    C T Corporation System
    5615 Corporate Blvd., Suite 400B
    Baton Rouge, LA 70808

5.  The United States Government
    ***Through***
    U.S. Attorney's Office, Eastern District of Louisiana
    500 Poydras Street
    Room B210
    New Orleans, Louisiana 70130
    ***And through***
    Attorney General of the United States
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 30530-0001

*And through*
Federal Emergency Management Agency
Office of the Director, Office of the General Counsel
500 C Street, SW
Washington, DC 20472

6.     Jayco, Inc., a/k/a Bottom Line RV
       *Through its registered agent for service:*
       Glenn E. Killoren
       121 W Franklin St, Ste 200
       Elkhart, IN 46516

**PLEASE WITHHOLD SERVICE TO:**

1.     American International Group, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the above and foregoing pleadings were served on all counsel of record through electronic notification pursuant to the electronic filing in the United States District Court for the Eastern District of Louisiana this 29t day of July, 2009.

    */s/Hugh P. Lambert*
Hugh P. Lambert, Esq. (#7933)