## Page 1

In Re: FEMA   Christopher De Rosa, Ph.D.   7/6/2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER
FORMALDEHYDE PRODUCT
LIABILITY LITIGATION

MDL NO. 1873
SECTION "N-5"
JUDGE ENGELHARDT
MAG. JUDGE CHASEZ

ORAL AND VIDEOTAPED DEPOSITION OF
CHRISTOPHER T. DE ROSA M.S., Ph.D.
July 6, 2009
9:25 a.m.
201 17th Street
Suite 1700
Atlanta, Georgia

Maureen S. Kreimer, RPR, CCR-B-1379

Tiffany Alley & Associates
770-343-9696

## Page 2

INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| CHRISTOPHER DE ROSA, M.S., Ph.D., | 11 |
| Examination by Mr. Meunier | 11 |
| Examination by Mr. Miller | 125 |
| Examination by Mr. Weinstock | 199 |
| Examination by Mr. Hines | 248 |
| Further Examination by Mr. Miller | 274 |
| Examination by Mr. Weinstock | 280 |
| Examination by Mr. Reich | 282 |

INDEX TO EXHIBITS

Plaintiff's

| Exhibit | Description | Page |
|---|---|---|
| 1 | Notice of Deposition | 11 |
| 2 | Subpoena | 12 |
| 3 | Division of Toxicology and Environmental Medicine - Vision statement | 20 |
| 4 | United States House of Representatives Hearing on: "Toxic Trailers: Have the Centers for Disease Control Failed to Protect the Public?" Statement of Christopher T. De Rosa M.S., Ph.D. DEROSA-0049-0059 | 27 |

Tiffany Alley & Associates
770-343-9696

## Page 3

| | | | |
|---|---|---|---|
| 5 | United States House of Representatives Hearing on: "Toxic Trailers: Have the Centers for Disease Control Failed to Protect the Public?" Statement of Christopher T. De Rosa M.S., Ph.D. labeled DEROSA-0049-0059 | 53 | |
| 6 | Health Consultation Formaldehyde Sampling at FEMA Temporary Housing Units, Baton Rouge, Louisiana February 1, 2007 labeled DEROSA-0114-0127 | 57 | |
| 7 | 2/27/07 Letter from De Rosa to Preston labeled DEROSA 0068 | 61 | |
| 8 | 3/17/07 Letter from Preston to Keim labeled DEROSA 0112-0113 | 61 | |
| 9 | May 29, '07 letter to Congressman Gene Taylor from Dr. Gerberding including Attachment Tab A and Tab B labeled DEROSA 0075-0082 | 81 | |
| 10 | E-mail string July 26, 2007 labeled DEROSA 0096-0097 | 107 | |
| 11 | Revised Health Consultation Report of October of '07 labeled DEROSA 0128-0168 | 116 | |
| 12 | 9/21/07 Letter to Dr. Howard Frumkin from Dr. De Rosa labeled DEROSA 0100-0106 | 117 | |
| 13 | 12/4/06, 12/2/06, 12/1/06 e-mail string Howard Frumkin and others, RE: Summary of bimonthly formaldehyde conference call | 131 | |
| 14 | 7/5/06 E-mail string from Same Coleman to Donald Benken and others, RE: FEMA Conference Call | 137 | |

Tiffany Alley & Associates
770-343-9696

## Page 4

| | | | |
|---|---|---|---|
| 15 | 11/30/06 Letter to Scott V. Wright from Patrick Preston | 147 | |
| 16 | 2/2/07 E-mail string from Richard Nickle to others, Subject: ATSDR Emergency Response Weekly Activity Report 2/01/2007 labeled DEROSA 0063-0065 | 153 | |
| 17 | 1/8/07 E-mail from Mike Allred to Joseph Little and others Subject: Formaldehyde consult | 160 | |
| 18 | 3/8/07 E-mail and 2/27/07 e-mail string between De Rosa, Frumkin and Sinks attaching a 2/27/07 letter from Dr. De Rosa to Patrick Preston at Office of Chief Counsel | 165 | |
| 19 | 8/07/07 E-mail and 3/9/07 e-mails RE: Draft letter to FEMA labeled DEROSA 0070 | 168 | |
| 20 | E-mail string 5/3 and 5/4/07, Subject: FEMA release requiring immediate review attaching a news release FEMA Study: Ventilating Travel Trailers can significantly reduce formaldehyde emission levels | 174 | |
| 21 | 7/10/07 and 6/1/07 E-mail string Subject: Indoor air formaldehyde | 177 | |
| 22 | Article "The Precision, Uses, and Limitations of Public Health Guidance Values" authored by John F. Risher and Christopher T. De Rosa published in Human and Ecological Risk Assessment, Vol. 3, No. 5, pp. 681-700 | 187 | |
| 23 | 4/6/07 E-mail from Howard Frumkin to others Subject: Newsletter labeled DEROSA 0084-0085 | 274 | |

EXHIBIT 1

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009

Page 5

| | | |
|---|---|---|
| 24 | Article captioned "Embryo Toxicity and Teratogenecity of Formaldehyde by Thrasher and Kilburn | 295 |
| 25 | Article titled: Maternal Exposure to low-level air pollution and risk of preterm birth. Authored by Maroziene and Grazuleviciene, published in Epidemiology 2003; 14 | 295 |
| 26 | Article titled Effect of industrial chemicals on male reproductive organ authored by Chopwdhury, published in Toxicology 2003 Sep 15 | 295 |
| 27 | Hurricane Katrina Executive Summary September 1, 2005 | 295 |
| 28 | Standard Operating Procedures December 9, 2008 Office of Policy Planning and Evaluations' Large-Volume document collection, Standard Operating Procedures | 295 |
| 29 | ATSDR Health Consultation Procedures Effective 5/27/1995 printout from NCEH/ATSDR, nine pages | 295 |

Tiffany Alley & Associates
770-343-9696

---

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009

Page 6

APPEARANCES OF COUNSEL:
On behalf of the Plaintiffs:

   GERARD MEUNIER (until 4:00 p.m.)
   Attorney at Law
   GAINSBURGH, BENJAMIN, DAVID,
   MEUNIER & WARSHAUER, LLC
   2800 Energy Centre
   1100 Poydras
   New Orleans, Louisiana 70163-2800
    -and-
   DENNIS C. REICH
   Attorney at Law
   REICH & BINSTOCK, LLP
   4265 San Felipe
   Suite 1100
   Houston, Texas 77027

On behalf of the Defendant
   United States of America:

   HENRY T. MILLER (until 5:43 p.m.)
   Attorney at Law
   U. S. DEPARTMENT OF JUSTICE,
   Civil Division, Environmental Torts
   1331 Pennsylvania Avenue, N.W.
   Washington, D. C. 20004

    -and-

   MARK S. KASHDAN
   Attorney at Law
   U. S. DEPARTMENT OF HEALTH
   AND HUMAN SERVICES
   Building 16, Room 4311, D-53
   1600 Clifton Road, N.E.
   Atlanta, Georgia 30333

Tiffany Alley & Associates
770-343-9696

---

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009

Page 7

APPEARANCES CONTINUED:

On behalf of the Defendants
   Heartland Recreational Vehicles, LLC:

   BRENT MAGGIO (Via telephone)
   Attorney at Law
   ALLEN GOOCH
   3900 N. Causeway Boulevard
   Suite 1450
   Metairie, Louisiana 70002

On behalf of the Defendant
   Gulf Stream Coach Inc.:

   ANDREW D. WEINSTOCK
   Attorney at Law
   DUPLASS, ZWAIN, BOURGEOIS,
   PFISTER & WEINSTOCK
   29th Floor
   3838 N. Causeway Boulevard
   Metairie, Louisiana 70002

On behalf of the Defendants
   CMH Manufacturing, Inc.; Southern Energy Homes,
   Inc.; Giles Family Holdings, Inc.; Giles
   Industries, Inc.; SunRay RV, LLC: SunRay
   Investments, LLC:
   JAMES K. CARROLL (Via telephone)
   Attorney at Law
   FOWLER RODRIGUEZ VALEZ-FAULI
   400 Poydras Street
   Suite 3000
   New Orleans, Louisiana 70130

On behalf of the Defendant:
   Bechtel National, Inc.:

   A. J. KROUSE (until 4:25 p.m.)
   Attorney at Law
   FRILOT LLC
   1100 Poydras Street, Suite 3700

Tiffany Alley & Associates
770-343-9696

---

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009

Page 8

APPEARANCES CONTINUED:

On behalf of the Defendants
   TL Industries, Inc.; Frontier RV, Inc.; Play'Mor
   Trailers, Inc.:
   RANDALL C. MULCAHY (Via telephone)
   Attorney at Law
   GARRISON, YOUNT, FORTE & MULCAHY, LLC
   909 Poydras Street
   Suite 1800
   New Orleans, Louisiana 70112

On behalf of the Defendant
   Forest River Incorporated:

   JASON BONE (Until 5:43 p.m.)
   Attorney at Law
   GIEGER, LABORDE & LAPEROUSE, LLC
   Forty-Eighth Floor
   One Shell Square
   701 Poydras Street
   New Orleans, Louisiana 70139-3700

On behalf of the Defendants
   Keystone, KZ RV, LP, Thor Industries, Thor
   California, Dutchmen, DS Corp.:
   RYAN E. JOHNSON (Via telephone)
   Attorney at Law
   JONES WALKER
   8555 United Plaza Boulevard
   Baton Rouge, Louisiana 70809-7000

Tiffany Alley & Associates
770-343-9696

In Re: FEMA      Christopher De Rosa, Ph.D.      7/6/2009

Page 9

APPEARANCES CONTINUED:
On behalf of the Defendants
  Morgan Buildings and Spas:

    DAN E. WEST (Via telephone)
    Attorney at Law
    McGLINCHEY STAFFORD, PLLC
    301 Main Street
    14th Floor
    Baton Rouge, Louisiana 70802

On behalf of the Defendant
  Fluor Enterprises, Inc.:

    RICHARD A. SHERBURNE, JR. (Via telephone)
    Attorney at Law
    MIDDLEBERG, RIDDLE & GIANNA
    Suite 1101
    450 Laurel Street
    Baton Rouge, Louisiana 70801

On behalf of the Defendant
  Fleetwood Enterprises:

    RICHARD K. HINES IV
    Attorney at Law
    NELSON MULLINS RILEY & SCARBOROUGH, LLP
    Atlantic Station
    201 17th Street
    Atlanta, Georgia 30363

On behalf of the Defendants
  Jayco, Inc., and Starcraft RV:

    HAL L. ROACH, JR. (Via telephone)
    Attorney at Law
    WILLINGHAM FULTZ & COUGILL, LLP
    Niels Esperson Building
    808 Travis, Suite 1608
    Houston, Texas 77002

Tiffany Alley & Associates
770-343-9696

Page 10

APPEARANCES CONTINUED:

On behalf of the Witness:
    JAMES E. RADFORD, JR.
    Attorney at Law
    PARKS, CHESIN & WALBERT P.C.
    26th Floor
    75 Fourteenth Street
    Atlanta, Georgia 30309

Videographer: Mr. Peter Ausburn

Tiffany Alley & Associates
770-343-9696

Page 11

1   THE VIDEOGRAPHER: Stand by. This will be
2   the videotaped deposition of Dr. Christopher De Rosa
3   in regards to the FEMA trailer. Today's date is
4   July 6th, 2009, and the time is 9:19 a.m. You are
5   now on video record. You may now swear the witness.
6       CHRISTOPHER DE ROSA, M.S., Ph.D.,
7   having been first duly sworn, was examined and
8   testified as follows:
9           EXAMINATION
10  BY MR. MEUNIER:
11      Q. Good morning, Dr. De Rosa.
12      A. Morning.
13      Q. My name is Gerry Meunier. I represent the
14  Plaintiffs in this matter.
15      MR. MEUNIER: This deposition is being
16  noticed and taken for all purposes including use at
17  trial. And I will mark as De Rosa No. 1 the Notice
18  of the Oral and Videotaped Deposition Of Christopher
19  De Rosa.
20      (Exhibit-1 was marked.)
21  BY MR. MEUNIER:
22      Q. And Dr. De Rosa, you were asked by
23  subpoena to bring certain documents with you to this
24  deposition; is that correct?
25      A. That is correct.

Tiffany Alley & Associates
770-343-9696

Page 12

1       MR. MEUNIER: Now I will mark as De Rosa
2   Number 2 the deposition subpoena asking that the
3   witness bring any documents regarding health issues
4   and concerns related to formaldehyde in FEMA-provided
5   emergency housing units, and any communications
6   regarding formaldehyde exposure in FEMA-supplied
7   emergency housing units. That will be De Rosa No. 2.
8       (Exhibit-2 was marked.)
9   BY MR. MEUNIER:
10      Q. Dr. De Rosa, did you attempt to put
11  together and bring with you those documents?
12      A. I did, and I actually provided those prior
13  to the deposition today to my attorney.
14      Q. And it's my understanding that some of
15  those documents are the subject of a privilege claim
16  by the United States, and are not today going to be
17  looked at --
18      MR. MEUNIER: Is that correct, Counsel?
19      MR. MILLER: There are three documents
20  that have been withheld on the grounds of privilege,
21  yes.
22      MR. MEUNIER: Other than those three,
23  though, all the documents produced by the witness
24  have been made available; is that correct?
25      MR. MILLER: Yes, they have.

Tiffany Alley & Associates
770-343-9696

1  but there is an issue about the enforcement of the
2  settlement agreement, so I'm going to advise him not
3  to comment on sort of what's happening with that
4  right now.
5       MR. MEUNIER: Sure. We understand. Well,
6  it's 12:40, and I think we're going to probably
7  reserve our remaining time for redirect, so this
8  might be a good time to break for lunch.
9       MR. WEINSTOCK: Sounds good.
10      THE VIDEOGRAPHER: 12:42 p.m., off video
11 record.
12      (Recess 12:42-1:28 p.m.)
13      THE VIDEOGRAPHER: 1:28 p.m., back on
14 video record.
15           EXAMINATION
16 BY MR. MILLER:
17      Q. Dr. De Rosa, my name is Henry Miller. I'm
18 an attorney with the United States Department of
19 Justice, and I represent the United States, which is
20 a defendant in this litigation. I have some followup
21 questions to ask you, and I wanted to start off sort
22 of going through the timeline and your involvement
23 with the FEMA trailers.
24      Now, first, I understand that your first
25 involvement came as a result of a call or an e-mail

1  or some communication that you had with FEMA about a
2  statement that they wanted to issue relating to
3  formaldehyde?
4       A. That's correct.
5       Q. And I think you indicated in your
6  testimony that that occurred about the time that
7  there were reports in the press about citizen
8  complaints about formaldehyde in the units?
9       A. I think that's about right. I think that
10 was the time the individual who ended up I think
11 representing the Sierra Club, Becky Gillette, was --
12 I don't think she was yet affiliated with Sierra Club
13 at that point. But she was raising some complaints.
14      Q. Did you ever talk with Ms. Gillette?
15      A. No, I didn't.
16      Q. And just to put that into context, if the
17 first complaints actually were reported in the press
18 about March, mid-March, 2006, would that be
19 consistent with when you believe you would have
20 received this first contact from FEMA?
21      A. It may have been later than that. I think
22 it was when they were really trying to get their
23 hands around the issue as the reports continued to
24 develop.
25      Q. Now, from what I understand with

1  everything that you said here today, that
2  communication was the only direct communication that
3  you yourself had with FEMA?
4       A. With respect to the hurricanes, that's
5  correct. I had been working extensively with FEMA,
6  though, prior to 9-11 and thereafter, in developing
7  an interagency working agreement.
8       Q. And I just want to step back, and I want
9  to restrict my question to the trailer response. The
10 only communication you ever had with FEMA about
11 formaldehyde in trailers was that conversation in
12 spring 2006?
13      A. Right. I believe it was a conversation
14 that then was followed by an e-mail because I was
15 waiting for the e-mail to review it based on the
16 phone call.
17      Q. And my understanding is that no one has
18 ever been able to find any of those e-mails?
19      A. No.
20      Q. And that's from on the FEMA side, or your
21 side?
22      A. To the best of my knowledge, yes.
23      Q. So and this conversation was for the
24 purpose of FEMA issuing a statement later that day?
25      A. That was my understanding, yes, they were

1  preparing for a public meeting.
2       Q. This would be like a media report, or a
3  public statement, what was your understanding?
4       A. My understanding was that it was supposed
5  to be some sort of a handout. It was structured as
6  the Fact Sheets are in a Q&A format written at a lay
7  level, and basically trying to anticipate the types
8  of questions the public might have: How can I be
9  exposed? How can it affect my health? And where
10 cane get more information? That type of thing.
11      Q. And as you sit here today, you have no
12 recollection who that person was you spoke with?
13      A. No. All I recall it that it was from
14 someone in Region IV.
15      Q. Now, I gather from your testimony today
16 that you never, ever spoke with Rick Preston?
17      A. No, I didn't, unless he was the person who
18 contacted me and I don't have any recollection.
19      Q. And that's correct. I understand that.
20 But other than that communication, you never talked
21 to Rick Preston about the February 2007 report?
22      A. No. The lead senior manager at the time
23 was Mr. Don Benken, who was from the Coordinating
24 Office for Preparedness, Emergency Response,
25 Terrorism and Emergency Response. That was the

1  office that Mark Keim eventually was in, and before
2  that Scott Deitchman also.
3      Q.  And then that's just what I want to get
4  to, you yourself never spoke with Rick Preston, to
5  the best of your knowledge?
6      A.  To the best of my knowledge, I never spoke
7  with him.
8      Q.  You never heard Rick Preston ever say
9  limit this to short term analysis, short term
10 exposure, did you?
11     A.  No, I would not have since I didn't speak
12 to him.
13     Q.  Exactly. And, in fact, as to the scope of
14 that February 2007 report that was issued, the only
15 thing you know about the instructions that ATSDR
16 received was the letter that Mr. Preston issued?
17     A.  No. In fact, it was the statement in the
18 opening paragraph of the consultation on February 1st
19 where they describe that FEMA -- this was done at the
20 request of the Office of Special Counsel, Rick
21 Preston and FEMA; and that it was limited to the
22 short term effects of formaldehyde.
23     Q.  And that was what was in the report, but
24 that is not necessarily the instructions that
25 Mr. Preston issued, is it?

1      A.  I believe it actually references FEMA has
2  requested an evaluation of the short term health
3  effects only.
4      Q.  Do you know who Mr. Preston would have
5  instructed, apparently, to do that?
6      A.  My assumption is that it was Scott Wright,
7  with whom he had the correspondence, and who was
8  actually the senior person, including Joe Little,
9  that would have had that communication.
10     Q.  And do you know whether he had any such
11 communications?
12     A.  My assumption is that he did. I don't
13 have -- I believe he indicated that he did. They
14 were communicating on a regular basis, as I
15 indicated, every two weeks with I think it was Sam
16 Coleman at EPA, and also Don Benken was involved in
17 those early conference calls, and then he'd do staff
18 changes and so forth. Don may have been supplanted
19 by Mike Allred, because he shortly thereafter moved
20 to another position, as I recall.
21     Q.  Okay. Let me step back. Let's go back to
22 this draft statement that FEMA discussed with you in
23 the spring of 2006, okay?
24     A.  Mm-hmm.
25     Q.  Let's start with that. Do you know

1  whether FEMA, in fact, ever issued a statement as a
2  result of that consultation?
3      A.  I had no followup with that, no.
4      (Exhibit-13 was marked.)
5  BY MR. MILLER:
6      Q.  Sir, you've been handed a document that's
7  been marked Exhibit No. 13. And this is an e-mail
8  that starts off from Mr. Allred to a Joseph Little
9  dated December 4th, 2006. Do you see that?
10     A.  Yes.
11     Q.  And below that is a second e-mail that's
12 from Mr. Little, or Commander Little to Mr. Frumkin.
13 Is that --
14     A.  Mm-hmm.
15     Q.  And you were cc'd on that e-mail; correct?
16     A.  Yes, I was.
17     Q.  Now, this is in reference to the testing
18 of the 96 unoccupied units; is that correct?
19     A.  I didn't know at that time that there were
20 96 units involved. I didn't have the details, other
21 than that they had been having ongoing discussions
22 regarding the sampling analysis.
23     Q.  That's what I want to get to. This e-mail
24 from Mr. Little to Mr. Frumkin details out the
25 involvement that the CDC, the EPA and FEMA had in the

1  development and testing of those units, and then what
2  was planned to do with the data that was generated;
3  is that right?
4      A.  Not fully; because it does reference the
5  earlier activities that had been referenced in the
6  weekly activity reports that I had mentioned earlier.
7      This was not an unremarkable situation
8  that we typically would be called by EPA, as we were
9  in this case initially, to consult with them
10 regarding the sampling protocol.
11     Q.  And if you look at the first -- the second
12 page of this. This starts off with an e-mail from a
13 Mr. Sam Coleman --
14     A.  Yes.
15     Q.  -- dated December 1st. Do you know
16 Mr. Coleman?
17     A.  No, I don't.
18     Q.  Have you ever had any conversations with
19 Mr. Coleman?
20     A.  It's possible that I did, because I do see
21 that he is a Superfund division director, and I
22 probably have interacted with him at some point
23 because we had regular meetings with the division
24 directors, or counterparts, within the Superfund
25 organization.

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009

Page 133

1  Q. Do you see where he says on December 1st
2  the second sentence there: We at EPA are concerned
3  that FEMA might not be properly interpreting the
4  data? Do you see that?
5  A. I see --
6  Q. At the bottom of the page there,
7  Mr. Coleman's e-mail?
8  A. Right. Yes, I do see that.
9  Q. And this was an e-mail that you would have
10 received this chain of the e-mails on or about
11 December 4th; correct?
12 A. I don't know that I was involved in that.
13 I don't know if I received it then, or if I obtained
14 it later.
15 Q. Well, turn to the next page. This is an
16 e-mail chain, sir, and you're cc'd on the next e-mail
17 that this one is attached to, isn't it?
18 A. Yes. If it was part of the chain, then I
19 guess I would have received it.
20 Q. And all I'm saying is here as of
21 December 4th, it appears that you were aware that EPA
22 had some concerns that FEMA might not be properly
23 interpreting the data that was generated from
24 testing?
25 A. Right. They may not be properly

Tiffany Alley & Associates
770-343-9696

Page 134

1  interpreting the data, right.
2  Q. Now, if we go to what Mr. Little wrote to
3  Mr. Frumkin and cc'd you, turn to that first
4  paragraph there. It says: Scott Wright and myself
5  are currently awaiting to receive sampling data from
6  FEMA concerning formaldehyde in temporary housing
7  unit examples similar to those utilized by Hurricane
8  Katrina displaced persons. Rick Preston from FEMA's
9  Office of General Counsel, OGC, indicated last
10 Thursday, November 30, that he would send by FedEx a
11 CD with the data to us.
12     At this moment, the data has not been
13 received, but is expected sometime today
14 December 4th. We indicated to FEMA that once the
15 data is received, we would be able to provide a quick
16 turnaround evaluation, as is standard protocol for
17 evaluation of EPA data by the Emergency Response
18 program within the Division of Toxicology and
19 Environmental Medicine.
20     A time frame of approximately 10 days or
21 less was discussed for our evaluation. FEMA will use
22 the ATSDR's evaluation to effect their policy
23 decision. The ATSDR Emergency Response Team's
24 activities involving this issue have been described
25 in the program's weekly activity reports. Do you see

Tiffany Alley & Associates
770-343-9696

Page 135

1  that?
2  A. Yes, I do.
3  Q. You were aware on December 4th that Joe
4  Little and Scott Wright were going to take this data,
5  turn around and give a report to FEMA on it?
6  A. Not a report, an evaluation.
7  Q. An evaluation.
8  A. And up to that time, these had all been
9  verbal. This is not a discussion about a formal
10 consultation, but an evaluation of sampling data.
11 There is a distinct difference.
12 Q. Understood. You understood they were
13 going to turn around real quickly, though, and report
14 to FEMA the results?
15 A. Right.
16 Q. And you understood that FEMA was going to
17 rely upon those results to make policy decisions?
18 A. I was aware that they were going to
19 evaluate sampling data; evaluate sampling data, not
20 necessarily interpret the health significance of the
21 sampling data, but how the sampling was done and so
22 forth.
23 Q. I'm not -- I don't think we're arguing at
24 cross purposes. I'm just saying you understood that
25 whatever the results Joe Little or Scott Wright gave

Tiffany Alley & Associates
770-343-9696

Page 136

1  to FEMA, FEMA was intending to use that to make
2  policy decisions?
3  A. Well, it says their policy decision. I
4  don't know what that refers to.
5  Q. Okay.
6  A. Whether it's a policy decision as to how
7  they collect additional sampling data, or whatever
8  that might be.
9  Q. Or how they respond to concerns about
10 formaldehyde in the travel trailers?
11 A. Well, I'm not sure that I would read that
12 into it. But you know, maybe it would be that they
13 would use it to determine whether they do additional
14 sampling either of occupied or unoccupied trailers.
15 I don't know.
16 Q. Did you make any inquiry or any attempt to
17 inquire from Scott Wright or Joe Little what, in
18 fact, FEMA wanted to use this data for?
19 A. No. No, as I mentioned earlier, they were
20 third-line reports to me and they would normally
21 report that to Rich Nickel, who was the team lead,
22 Rich Nickel, at his discretion, would report it to
23 the branch chief, and then the branch chief at their
24 discretion or his discretion would bring it to my
25 attention either in our scheduled one-on-ones, which

Tiffany Alley & Associates
770-343-9696

1  were every two weeks, or in other independent
2  meetings that had been scheduled.
3       (Exhibit-14 was marked.)
4  BY MR. MILLER:
5     Q.  I want to hand you a document which will
6  be marked Exhibit No. 14. And this is an e-mail from
7  Sam Coleman from the EPA to Donald Benken at CDC
8  dated July 5th, 2006.
9     A.  Mm-hmm.
10    Q.  Do you see that?
11    A.  Mm-hmm.
12    Q.  Have you seen this e-mail before?
13    A.  I see an e-mail that's addressed 2005 --
14  oh, 7/5/2006, is that the one you're referring?
15    Q.  Yeah. Well, there is two e-mails here,
16  and they're both July of 2006; correct?
17    A.  Mine says -- well, okay. I was
18  interpreting the 5th, but instead of the 6th, yeah,
19  July of 2006, July 5th of 2006.
20    Q.  Have you seen these e-mails before?
21    A.  Yes.
22    Q.  And who is Donald Benken?
23    A.  He was the, as it indicates, the Acting
24  Deputy Director for the Coordinating Center for the
25  Office of Terrorism Preparedness and Emergency

Tiffany Alley & Associates
770-343-9696

1  Response. He was the senior manager there. NCEH had
2  had the lead on the post-Katrina activities.
3     Q.  And so his office had the lead on the
4  post-Katrina response activities?
5     A.  Yes.
6     Q.  And he was communicating with Sam Coleman
7  from the EPA; correct?
8     A.  Yes.
9     Q.  And you indicated that it was Sam Coleman
10  who initially got the CDC ATSDR involved, is that
11  right? That was your understanding?
12    A.  That was -- that was -- well, yes, that
13  was my understanding, that's correct.
14    Q.  Now, it says here in the second paragraph
15  of Mr. Benken -- or is it Dr. Benken?
16    A.  Mr. Benken.
17    Q.  Mr. Benken in his e-mail to Mr. Coleman in
18  the second full paragraph, or actually start with the
19  first one: Sam, have you heard anything else from
20  FEMA with the issue that addresses interior air
21  quality related to their trailers, formaldehyde?
22  From the call, it was clear they have a specific
23  interest in testing a random sample of the current
24  trailers in New Orleans, or at least those trailers
25  that will come into the area from the manufacturers.

Tiffany Alley & Associates
770-343-9696

1  Will they continue to seek assistance from the
2  Consumer Protection Agency, or the manufacturers?
3       Were you aware back in June or July what
4  FEMA was asking CDC and ATSDR to do?
5     A.  I was just, as it says, aware that they
6  were interested in doing some sampling.
7     Q.  Were you aware of what type of sampling,
8  how many units they were trying to sample?
9     A.  No.
10    Q.  Do you know whether FEMA was asking for
11  occupied, or unoccupied, units to be sampled?
12    A.  It says here that it's unclear as to what
13  they were going to do.
14    Q.  You have no knowledge what FEMA was asking
15  of CDC, ATSDR or EPA; is that right?
16    A.  Well, I have knowledge that they were
17  asking for advice on collection methods, the protocol
18  for the testing that would be used.
19    Q.  But and then if you go to the next
20  paragraph it says: Clearly, testing of the trailers
21  is not in our jurisdiction, but I don't want to be
22  unresponsive to their request. After the lengthy
23  conference call with FEMA, EPA, CDC, ATSDR, et al,
24  last week and recommendations against testing, if
25  they determine that it is still a viable mission

Tiffany Alley & Associates
770-343-9696

1  assignment, we will be willing to review the protocol
2  for testing to determine the best collection methods
3  and determine if we can measure the benefits from a
4  public health perspective.
5       Is that correct, that's what Mr. Benken
6  wrote at that time?
7     A.  Yes.
8     Q.  And did you -- were you aware that someone
9  was recommending against testing units at that time?
10    A.  I don't think that struck me in this
11  particular e-mail.
12    Q.  Do you know whether Joe Little or Scott
13  Wright recommended against testing?
14    A.  I do not know who recommended that.
15    Q.  Do you know whether EPA recommended
16  against testing?
17    A.  I do not know. It said recommendations,
18  so I assume that there were multiple recommendations.
19    Q.  If you go to the next e-mail, the e-mail
20  from Mr. Coleman back to Mr. Benken there, it says:
21  I spoke to them on Monday. And I assume that that
22  means FEMA. They continue to want to do some
23  testing. I suggested that we have a followup
24  conference call this week. Additionally, I strongly
25  suggest that this is a policy decision. We need to

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 145

1  Q. And you yourself didn't participate in any
2  of those discussions, did you?
3  A. I did not.
4  Q. What you got was the weekly reports from
5  Scott Wright and Joe Little?
6  A. Right.
7  Q. And that's the only thing you knew about
8  personally, was what was told to you in the reports?
9  A. And that Don Benken was, obviously, the
10 lead manager involved from our Agency.
11 Q. Okay. And by that, Don Benken was the
12 head of what office, again, sir?
13 A. He was the Deputy Director of the
14 Coordinating Center for Terrorism Emergency Response
15 Prepared Terrorism -- for Coordinating Center for
16 Preparedness, Terrorism and Emergency Response,
17 affectionately known as COTPER.
18 Q. And OTPER, and it's O-T-P-E-R?
19 A. O-T-P-E-R.
20 Q. O-T-P-E-R. That's the entity that's
21 supposed to respond, or was the lead responder to
22 Hurricane Katrina to assist FEMA?
23 A. No. That came directly out of the
24 Director's Emergency Operations Center,
25 Dr. Gerberding's Emergency Operation Center. Tom

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 146

1  Sinks was assigned to the Emergency Operation Center
2  to oversee the initial and subsequent responses to
3  the situation Katrina on day-to-day basis. As I
4  recall, he was spending his time there in the
5  Director's Emergency Operations Center.
6  Q. Now, if we go to that same e-mail, and you
7  go to that second page there, it says: Bimonthly
8  conference calls have been conducted concerning the
9  status of the sampling project. A total of 96
10 trailers unoccupied from various manufacturers used
11 by FEMA was sampled. A sampling plan was provided by
12 EPA and ATSDR ER had the opportunity to review the
13 plan. Do you see that?
14 A. Yes.
15 Q. And you were aware the ATSDR ER, that
16 would have been Joe Little and Scott Wright, had an
17 opportunity to review the EPA sampling plan?
18 A. Yes. That would be the standard practice
19 that is done in many of these types of situations in
20 consultation with EPA. They generally would have the
21 lead, and we would be involved at their request.
22   So apparently, there was an agreement by
23 ATSDR and EPA to go forward with the sampling; and it
24 may be that they agreed to do so based on the fact
25 that it's now clear that they are doing sampling on

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 147

1  unoccupied trailers, so there seems to be a bit of a
2  flip-flop back and forth between the two paragraphs,
3  because they are talking about due to the large
4  number of other formaldehyde sources from other
5  products in the home and individual lifestyle, but
6  then they go on in the next paragraph to say that
7  they are looking at unoccupied trailers.
8  Q. And you think that could have been the
9  concern, that if you tested occupied, then you have
10 the lifestyle or environmental factors?
11 A. It appears to me that in retrospect what
12 happens is as a result of their iterative dialogue
13 that they determined the best way to deal with these
14 other products in the home and individual lifestyle
15 was to look at unoccupied trailers.
16   So again, that's sort of, again, an
17 ongoing deliberative process to try to arrive at what
18 everyone thinks they feel is an appropriate path
19 forward.
20   (Exhibit-15 was marked.)
21 BY MR. MILLER:
22 Q. I'm going to hand you what is Exhibit
23 No. 15, and this is a one-page letter dated
24 November 30th, 2006, to Scott Wright from Patrick
25 Edward Preston, Trial Attorney, Office of Chief

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 148

1  Counsel FEMA.
2    You've seen this letter before; correct?
3  A. Yes, I did.
4  Q. When was the first time you saw this
5  letter?
6  A. This was following the Congressional
7  hearings. I'm thinking it was brought to me by Scott
8  and Joe. I asked to meet with them. They had been
9  out shortly thereafter, both were out, and I met with
10 Rich Nickel, and -- who was their team lead. And we
11 had a discussion about this, and the entire
12 consultation issue.
13   And I remember Rich saying, well, you
14 know, there is a need sometimes to give people
15 information they can use. And I indicated to him
16 that that was not our function, to determine what
17 information they can or cannot use. Our --
18 Q. And let me step back. All I'm asking you
19 is, you have seen this letter before, right?
20 A. And I'm attempting to respond to provide a
21 context in which I saw this. And it was in the
22 aftermath, and it was being explained to me why
23 things were being done the way they were being done.
24 Q. Okay.
25 A. And that was to determine that they wanted

Tiffany Alley & Associates
770-343-9696

1  to provide information people could use. And I went
2  on to say that that is not our function, we are here
3  to make a health call and not interpret what people
4  can or cannot use.
5      Q.  Now, my question to you, and it was much
6  simpler than that, when did you first see this
7  letter? That's all I want to know at this stage.
8      A.  And what I have tried to share with you is
9  that...
10     Q.  Can you just tell me a date here? That's
11 all I'm trying to get to.
12     A.  I'm trying to respond to your question,
13 but you're interrupting me.
14     Q.  My question was what was the date you
15 first saw this letter?
16     A.  It was sometime during the period in July
17 to early August.
18     Q.  Now, when you saw that letter at this
19 time, what it says in that first paragraph, it says:
20 Enclosed you will find a DVD disk containing the test
21 results and related data from the FEMA trailer
22 formaldehyde testing conducted by EPA. Please review
23 the data and provide -- I'm not sure what that --
24     A.  Your analysis. Provide me -- to me.
25     Q.  To me, a written report of your analysis

1  of the results of those tests and any conclusions or
2  recommendations that can be derived therefrom.
3      Next paragraph. Please keep this
4  information and your analysis confidential. No
5  information should be released to any third-party
6  without my express permission. Please contact me
7  directly if you have any questions.
8      Now, the report that Joe Little and Scott
9  Wright prepared, they shared that report with other
10 people at ATSDR, CDC, didn't they?
11     A.  I know that Mike Allred, who was then in
12 place of Don Benken, relayed their evaluations
13 physically back and forth between the Office of the
14 Director, according to them, on at least four
15 occasions.
16     Q.  Do you have any reason to believe that
17 that's incorrect?
18     A.  No. In fact, I have their personal notes
19 to indicate that.
20     Q.  And so they did share this data with
21 people at CDC ATSDR?
22     A.  They shared it with Mike Allred, and then
23 Mike Allred shared it with the OD.
24     Q.  Are you aware of any time Mr. Preston said
25 don't share this with Dr. De Rosa?

1      A.  Again, I have not had any conversations
2  with him, and the -- my name was not mentioned.
3      Q.  And I understand that. But do you have
4  any information that suggests to you that Rick
5  Preston said keep Dr. De Rosa out of the loop, we
6  don't want him to look at this data?
7      A.  I think that's a fairly strong statement.
8  I think that it's clear to me that there was to be a
9  restricted ring of individuals be looking at this.
10     The staffers felt that they were working
11 directly through the standardized response chain for
12 the Katrina event, which was handled through OTPER,
13 then up through the OD in this case.
14     Q.  And if they were working through the
15 standard Katrina response through OTPER, what would
16 be the way the document would be reviewed?
17     A.  The protocol there is somewhat ambiguous.
18 The protocol that was supposed to have been in place
19 involved a -- with time permitting, a
20 cross-divisional clearance. And that was the policy
21 established with our assistance by Drs. Frumkin and
22 Sinks prior to, just prior to Hurricane Katrina.
23     Q.  Now, Dr. Frumkin was your boss at the
24 time?
25     A.  That's correct.

1      Q.  And Dr. Frumkin reviewed the report that
2  Scott and Joe Little prepared; is that right?
3      A.  That's what I understand, yes.
4      Q.  And Mr. Allred also reviewed that report?
5      A.  I know that he relayed it. I don't know
6  that he reviewed and provided comment.
7      Q.  And did -- is it Dr. Frumkin, or
8  Mr. Frumkin?
9      A.  It's Dr. Frumkin.
10     Q.  And at any point in time between December
11 4th and the issuance of the report on February 1st,
12 2007, did Dr. Frumkin ask to include you in the loop
13 on this?
14     A.  Not to my knowledge.
15     Q.  If you go into that pile of documents that
16 the Plaintiff's counsel have given you.
17     MR. MEUNIER: Excuse me, Henry. Before
18 you move on, are you attaching the Preston letter,
19 giving it a Deposition Exhibit number?
20     MR. MILLER: We marked it as an Exhibit.
21     MR. MEUNIER: What number is it?
22     MR. MILLER: 15.
23     MR. MEUNIER: Thank you.
24     MR. MILLER: Going to hand you a document
25 which is DEROSA-63 and 64. We'll mark that as

1  to provide information people could use. And I went
2  on to say that that is not our function, we are here
3  to make a health call and not interpret what people
4  can or cannot use.
5     Q.  Now, my question to you, and it was much
6  simpler than that, when did you first see this
7  letter? That's all I want to know at this stage.
8     A.  And what I have tried to share with you is
9  that...
10    Q.  Can you just tell me a date here? That's
11 all I'm trying to get to.
12    A.  I'm trying to respond to your question,
13 but you're interrupting me.
14    Q.  My question was what was the date you
15 first saw this letter?
16    A.  It was sometime during the period in July
17 to early August.
18    Q.  Now, when you saw that letter at this
19 time, what it says in that first paragraph, it says:
20 Enclosed you will find a DVD disk containing the test
21 results and related data from the FEMA trailer
22 formaldehyde testing conducted by EPA. Please review
23 the data and provide -- I'm not sure what that --
24    A.  Your analysis. Provide me -- to me.
25    Q.  To me, a written report of your analysis

1  of the results of those tests and any conclusions or
2  recommendations that can be derived therefrom.
3     Next paragraph. Please keep this
4  information and your analysis confidential. No
5  information should be released to any third-party
6  without my express permission. Please contact me
7  directly if you have any questions.
8     Now, the report that Joe Little and Scott
9  Wright prepared, they shared that report with other
10 people at ATSDR, CDC, didn't they?
11    A.  I know that Mike Allred, who was then in
12 place of Don Benken, relayed their evaluations
13 physically back and forth between the Office of the
14 Director, according to them, on at least four
15 occasions.
16    Q.  Do you have any reason to believe that
17 that's incorrect?
18    A.  No. In fact, I have their personal notes
19 to indicate that.
20    Q.  And so they did share this data with
21 people at CDC ATSDR?
22    A.  They shared it with Mike Allred, and then
23 Mike Allred shared it with the OD.
24    Q.  Are you aware of any time Mr. Preston said
25 don't share this with Dr. De Rosa?

1     A.  Again, I have not had any conversations
2  with him, and the -- my name was not mentioned.
3     Q.  And I understand that. But do you have
4  any information that suggests to you that Rick
5  Preston said keep Dr. De Rosa out of the loop, we
6  don't want him to look at this data?
7     A.  I think that's a fairly strong statement.
8  I think that it's clear to me that there was to be a
9  restricted ring of individuals be looking at this.
10    The staffers felt that they were working
11 directly through the standardized response chain for
12 the Katrina event, which was handled through OTPER,
13 then up through the OD in this case.
14    Q.  And if they were working through the
15 standard Katrina response through OTPER, what would
16 be the way the document would be reviewed?
17    A.  The protocol there is somewhat ambiguous.
18 The protocol that was supposed to have been in place
19 involved a -- with time permitting, a
20 cross-divisional clearance. And that was the policy
21 established with our assistance by Drs. Frumkin and
22 Sinks prior to, just prior to Hurricane Katrina.
23    Q.  Now, Dr. Frumkin was your boss at the
24 time?
25    A.  That's correct.

1     Q.  And Dr. Frumkin reviewed the report that
2  Scott and Joe Little prepared; is that right?
3     A.  That's what I understand, yes.
4     Q.  And Mr. Allred also reviewed that report?
5     A.  I know that he relayed it. I don't know
6  that he reviewed and provided comment.
7     Q.  And did -- is it Dr. Frumkin, or
8  Mr. Frumkin?
9     A.  It's Dr. Frumkin.
10    Q.  And at any point in time between December
11 4th and the issuance of the report on February 1st,
12 2007, did Dr. Frumkin ask to include you in the loop
13 on this?
14    A.  Not to my knowledge.
15    Q.  If you go into that pile of documents that
16 the Plaintiff's counsel have given you.
17    MR. MEUNIER: Excuse me, Henry. Before
18 you move on, are you attaching the Preston letter,
19 giving it a Deposition Exhibit number?
20    MR. MILLER: We marked it as an Exhibit.
21    MR. MEUNIER: What number is it?
22    MR. MILLER: 15.
23    MR. MEUNIER: Thank you.
24    MR. MILLER: Going to hand you a document
25 which is DEROSA-63 and 64. We'll mark that as

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 153

1   Exhibit 16.
2   (Off-the-record discussion.)
3   (Exhibit-16 was marked.)
4   BY MR. MILLER:
5   Q. Now, sir, what has been marked Exhibit
6   No. 16 is an e-mail from a Rich Nickel dated
7   February 2nd, 2007. And you are cc'd on this;
8   correct?
9   A. Yes, I am.
10  Q. Okay. And this is one day after the
11  February 1st report came out; correct?
12  A. Yes.
13  Q. And this discloses to all the people, and
14  this is one of those big super-duper, a lot of
15  people --
16  A. Global.
17  Q. -- global e-mails; correct?
18  A. Right.
19  Q. And it says: "Subject: Operations".
20  A. Right.
21  Q. "Throughout the week, ERT continued
22  support of EPA 1, ATSDR 1, and State Health, after an
23  explosion in the print shop" -- let me skip that.
24  Going down to the next page, okay?
25  MR. MEUNIER: Excuse me. Is there an

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 154

1   extra copy of this, Counselor?
2   MR. MILLER: This is your document.
3   MR. MEUNIER: What's the Bates number?
4   MR. HINES: 63.
5   MR. MILLER: 63 and 64.
6   MR. MEUNIER: I'm sorry.
7   BY MR. MILLER:
8   Q. If you go to the second page there, it
9   says: "On 2/1, ERT" -- what does ERT stand for?
10  A. Emergency Response Team.
11  Q. "Emergency Response Team finalized the
12  Formaldehyde Health Consultation for the Federal
13  Emergency Management Agency (FEMA). This
14  consultation discusses the evaluation of EPA data
15  generated from sampling of FEMA manufactured homes
16  during the time period of September 19th through
17  October 7th, 2006. A total of 96 new, never occupied
18  homes were tested at a location in the Greater New
19  Orleans/Baton Rouge area. In summary, the opening of
20  windows and vents was effective in reducing
21  formaldehyde concentrations below levels of health
22  concern. Running the heating, ventilation and air
23  conditioning systems did not provide adequate air
24  exchanges to adequately reduce the formaldehyde
25  concentrations."

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 155

1   And this was sent to you on February 2nd,
2   2007; correct?
3   A. That's correct.
4   Q. And is this a document you would have
5   reviewed that time?
6   A. Typically, yes.
7   Q. Okay.
8   A. However --
9   Q. At that point, were you -- go ahead, I
10  apologize. I didn't mean to interrupt.
11  A. However, my deputy had died the previous
12  Wednesday. I was involved with informing his widow
13  and mother of his death. He was 52 years old. I was
14  engaged in grief counseling for my staff and on
15  Sunday, Monday, I'm sorry, on Saturday, I had a
16  relapse of my -- following the funeral, which I gave
17  the eulogy, was a pallbearer I had a relapse of
18  disease I contracted in India which is a alphavirus
19  known as Chikungunya. It affects the involuntary
20  contraction of muscles, cramping of muscle groups.
21  And I was hospitalized on I believe it was Monday of
22  that week for about four days.
23  My deputy would have been in charge at
24  that time. However, under the circumstances that
25  fell to another individual, and I believe it was

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 156

1   probably Jim Holler, but I do not know, I don't
2   recall who was in charge at the time, but I was out
3   of the loop, so to speak.
4   Q. And what I wanted to gather, though, was
5   there wasn't any attempt to restrict or prevent you
6   from knowing or learning about the fact that this
7   response had been issued by ATSDR?
8   A. Right. And yet, having said that, this
9   does not, to me, speak to a health issue other than
10  they say it was effective, opening windows and vents
11  were effective, in reducing formaldehyde below
12  concentrations of health concern.
13  This, to me, still strikes me, unless one
14  is looking back in hindsight, as a evaluation of
15  analytic data, as opposed to a Health Consultation.
16  Q. Who is Richard Nickel?
17  A. Richard Nickel is the Emergency Response
18  Team lead.
19  Q. I'm sorry, what was that?
20  A. Emergency Response Team lead.
21  Q. And would he have been responsible for
22  writing this up?
23  A. Yes.
24  Q. And so he's the one who said that the
25  Health Consultation that was provided in summary, the

Tiffany Alley & Associates
770-343-9696

In Re: FEMA        Christopher De Rosa, Ph.D.        7/6/2009
Page 157

1  opening of windows and vents was effective in
2  reducing formaldehyde concentrations below levels of
3  health concern?
4      A.  That's correct.
5      Q.  And that's what he told everybody on this
6  large e-mail that he circulated around ATSDR?
7      A.  Yes.
8      Q.  And it would be reasonable to anybody who
9  got this e-mail, it would be reasonable to assume
10 that if they saw this, they would think that if you
11 opened the windows in the trailers, that would reduce
12 the formaldehyde levels below levels of health
13 concerns?
14     A.  Yes.
15     Q.  Isn't that reasonable?
16     A.  Yes. Mm-hmm.
17     Q.  And would you have reviewed this e-mail
18 when you came back from your illness, sir?
19     A.  I typically tried to do that because I
20 recognized that the staff did not like to do these
21 reports. But I tried to provide positive feedback
22 and acknowledge their receipt and that type of thing.
23     What I was doing exactly when I came back
24 after that period of time, I don't know. I really
25 would have to go back and check what I was involved

Tiffany Alley & Associates
770-343-9696

In Re: FEMA        Christopher De Rosa, Ph.D.        7/6/2009
Page 158

1  with at the time.
2      Q.  Have you seen any documentation or
3  communications from FEMA indicating that FEMA wanted
4  to restrict the persons at CDC, ATSDR, who would
5  review the data and the report to people in OTPER?
6      A.  To my knowledge, it said do not share with
7  any third-party without express consent from me.
8      Q.  But Joe Little and Scott Wright did share
9  that with the people in OTPER; right?
10     A.  They did, yes.
11     Q.  That's what they thought was the normal
12 review for the work that they were doing at the time?
13     A.  I don't know what they were thinking at
14 the time because I did meet with them and -- right
15 after February 27th and reaffirmed it. As I
16 indicated in the memo to Dr. Frumkin and Sinks that I
17 have now reaffirmed what our standard operating
18 procedures are, and which had been in place since
19 1993 when I established the policy for review of all
20 documents generated by the division.
21     Q.  Mr. Allred, what is his -- is he a doctor
22 or a Mr.?
23     A.  He's doctor, post hole digger, not a
24 medical digger.
25     Q.  What type of doctor is he?

Tiffany Alley & Associates
770-343-9696

In Re: FEMA        Christopher De Rosa, Ph.D.        7/6/2009
Page 159

1      A.  Ph.D. in, I believe, biochemistry.
2      Q.  And Mr. Keim, is he a Mr. Keim, or a
3  Dr. Keim?
4      A.  He's a Dr. Keim.
5      Q.  And is he an M.D., or a post hole digger?
6      A.  He's a medical deity.
7      Q.  Okay. And what is his specialty in?
8      A.  He is a broadly trained physician who
9  oversaw some health programs in Oceana prior to being
10 assigned to COTPER.
11     Q.  And Dr. Frumkin, what type of doctor is
12 he?
13     A.  He's an occupational physician.
14     Q.  And the report, the February 1st, 2007,
15 report that went out under Dr. Keim's signature;
16 correct?
17     A.  We typically say over, but the same point,
18 yes.
19     Q.  It went over his signature. And when you
20 issue a report or a document that goes out over your
21 signature, would you review that, is that standard
22 protocol?
23     A.  A document that goes over my signature?
24     Q.  Correct.
25     A.  Absolutely, yes.

Tiffany Alley & Associates
770-343-9696

In Re: FEMA        Christopher De Rosa, Ph.D.        7/6/2009
Page 160

1      Q.  In fact, that's probably standard protocol
2  for almost everyone at CDC, if a report goes out over
3  your signature, you review it before you send it out?
4      A.  That, I don't know. There are some things
5  that are signed, and you know, it may go through
6  prior approval chain that addresses the concerns of
7  the person who is signing it, and their signature may
8  be perfunctory, based on the knowledge of others'
9  review.
10     MR. MILLER:  17.
11     (Exhibit-17 was marked.)
12 BY MR. MILLER:
13     Q.  Doc, I'm handing you a document we've
14 marked as Exhibit No. 17. And it's an e-mail from I
15 think Mark Allred to Commander Little and Scott
16 Wright, and also cc'd is Mark Keim. Do you see that?
17     A.  Yeah. Yes, I do.
18     Q.  And he says: Joe and Scott. And it's
19 dated -- what is it dated there, January 8th, 2007,
20 is that right?
21     A.  Yes.
22     Q.  It's a one-page document, and it says:
23 Joe and Scott --
24     MR. MEUNIER:  Before you begin, let me
25 just make an objection, unless you lay a foundation

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 161

1  that he's seen, or would have had reason to have seen
2  the e-mail, I'll object to any questions of this
3  witness about it.
4  BY MR. MILLER:
5     Q.   He says: Joe and Scott, your consult
6  looked good to me from a content standpoint.
7        Do you know whether or not Dr. Allred
8  reviewed the draft report, the February 1st, 2007,
9  report?
10    A.   From this, it's evident that he did. I
11 didn't know that he had, other than what I know is he
12 took things back and forth.
13    Q.   You've worked with Dr. Allred for a while,
14 haven't you?
15    A.   Yes.
16    Q.   And it would be standard, his standard
17 operating practice, given your understanding, to look
18 at draft reports that come to him?
19    A.   Yes.
20    Q.   You wouldn't find it unusual to find that
21 if Scott and Joe issued a report to him that he would
22 review it for content?
23    A.   No, I wouldn't find that unusual. I would
24 find that to be the appropriate thing to do.
25    Q.   And then he goes on to say: "Frumkin had

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 162

1  some concerns, however."
2        Now, is it Dr. Frumkin's standard practice
3  to review Emergency Response Reports in your
4  practice, experience?
5     A.   Not routine reports, no. But I imagine
6  perhaps in the case of Katrina, he would,
7  particularly in light of the fact that in December he
8  indicated he had -- was unaware of it, despite the
9  weekly reports that had reported it on multiple
10 events, occasions, rather.
11    Q.   And then -- now, in the chain of command
12 here you've got Joe and Scott in the OTPER if it were
13 going through an OTPER reporting system?
14    A.   An ERT going through the OTPER.
15    Q.   Emergency Response Team going through
16 OTPER. Joe and Scott would report to Dr. Allred?
17    A.   They would, yes. It would be handled
18 through that office.
19    Q.   And then Dr. Allred, in the normal chain
20 of command in the ERT, OTPER, who would he report to?
21    A.   Well, he would report to the Director,
22 Mark Keim.
23    Q.   And who would Dr. Keim report to?
24    A.   He would report to Frumkin, and in his
25 absence, Dr. Sinks.

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 163

1     Q.   And so in this case, it appears that at
2  least from this e-mail, and I understand Counsel's
3  objection, but it appears that all of those persons
4  from OTPER are being included in the e-mail chain or
5  referenced, at least.
6        MR. MEUNIER: Henry, just let me make my
7  objection that all questions about this e-mail,
8  continuing the grounds that this witness has not seen
9  it before, was not sent a copy of it, and it
10 constitutes the hearsay of people not here, and he
11 cannot know. And I'll just make that a continuing
12 objection.
13 BY MR. MILLER:
14    Q.   As you sit here today, if you had heard --
15 Counsel asked you some questions about Joe little's
16 testimony -- if Joe Little had testified that the
17 report that he prepared, the draft report, was
18 reviewed by Dr. Allred, Dr. Keim, and Dr. Frumkin,
19 would you have any reason to disagree with that?
20    A.   Disagree with what?
21    Q.   With Joe Little's testimony that
22 Dr. Allred, Dr. Keim and Dr. Frumkin all reviewed
23 that report before it was issued to FEMA?
24    A.   And Dr. Sinks?
25    Q.   And Dr. Sinks?

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 164

1        MR. MEUNIER: Objection. Calls for
2  speculation by this witness.
3     A.   I was told by the Congressional staff, I
4  believe it's in the report of the subcommittee, that
5  there were approximately 12 or 13 times during which
6  Frumkin and Sinks were briefed on this in the issues
7  management meetings that occurred on a weekly basis.
8  And that would be between December, perhaps, and
9  February, or maybe it was before, because to have it
10 done 13 times, and it wasn't done at each meeting. I
11 think, as I recall now, it was between -- well, I
12 won't -- I can't recall.
13    Q.   And what I just wanted to identify here
14 is, obviously, Joe Little and Scott Wright didn't
15 have any objections or problems sharing it with the
16 hierarchy or the management chain in OTPER; is that
17 correct, to the best of your knowledge?
18    A.   Right, they would not. It would be as
19 though if I were to be working directly at the behest
20 of Secretary Levitt, I would assume that someone
21 higher in the food chain is responsible for this.
22    Q.   And the person who was left out of this
23 loop was you; is that right?
24    A.   Not the person, the program that was left
25 out of the loop, the program, which has the subject

Tiffany Alley & Associates
770-343-9696

In Re: FEMA   Christopher De Rosa, Ph.D.   7/6/2009

In Re: FEMA   Christopher De Rosa, Ph.D.   7/6/2009

Page 165

1  matter expertise to make the final determination on
2  this issue.
3      Q.   And that program that you're talking
4  about, that all comes under Dr. Frumkin's
5  jurisdiction; correct?
6      A.   It comes under his ultimately, yes.
7      Q.   And so if Dr. Frumkin thought it was
8  necessary, he could have said pass this onto
9  Dr. De Rosa?
10     A.   He could have said that, yes.  Or ask who
11 had been involved in the review and development of
12 the report.
13         MR. MILLER:  We have to change the tape,
14 so we'll take a short break.
15         THE VIDEOGRAPHER:  End of Tape 2, 2:25
16 p.m., off video record.
17         (Off-the-record discussion.)
18         VIDEOGRAPHER:  Please stand by.  Tape 3,
19 2:28 p.m., back on video record.
20         (Exhibit-18 was marked.)
21 BY MR. MILLER:
22     Q.   Doc, you've been handed a document which
23 has been marked Exhibit No. 18, and this appears to
24 be two e-mails from yourself, one dated March 8th,
25 and another one dated March -- February 27th, both

Page 166

1  2007, and the second page is a letter that you went
2  through with Plaintiff's counsel that you drafted to
3  Mr. Rick Preston. Do you see that?
4      A.   I do.
5      Q.   Is this a true and accurate copy of the
6  e-mails that you sent and the draft letter you
7  attached to the e-mails?
8      A.   Yes, it is.
9      Q.   I want to refer you to the second e-mail,
10 which is the February 27, 2007 e-mail.  Do you see
11 that?
12     A.   Yes.
13     Q.   And it says:  This is the issue I
14 discussed with you, Tom, this afternoon.  And by that
15 you're referring to Dr. Sinks?
16     A.   Yes.
17     Q.   And it says:  The letter captures some of
18 my concerns on this consult, which I saw for the
19 first time today.  In my discussions with staff
20 regarding why I was not in the loop, I was informed
21 that they were working on this under the direct
22 direction of your office.
23         So you learned at some time between
24 getting the report and reviewing it that in fact that
25 they were working under OTPER and for Mr. --

Page 167

1  Dr. Frumkin, is that right?
2      A.   Under Tom's office, I think at that point
3  it was Tom's office.  They were somewhat circumspect
4  in their conversations with me, but I, at this point
5  at that point I felt as though when I wrote the
6  earlier e-mail that our staff had just gone out of
7  the loop, but I didn't realize that his office was
8  involved.
9          And even though his office was involved, I
10 still felt that I should have been in the review loop
11 of anything going out of the division that wasn't
12 time sensitive, and I wanted to speak on behalf of
13 Scott and Joe that they were in a very difficult
14 position.  They did not have a strong health science
15 background.  They are first responders, and typically
16 a first responder is given authority in dealing with
17 very time-sensitive issues and making a call, a
18 health call.
19         But on something that is more involved and
20 under development over a period of time, it's
21 understood that that is not the point at which they
22 can exercise that discretion.
23         So there is a balance here between being
24 responsive, and also taking adequate time to be sure
25 that the appropriate criteria have been followed,

Page 168

1  protocols have been followed in developing a document
2  that speaks to the Agency on these issues.
3      Q.   And you attached to that your letter to
4  Mr. Preston, which contained your critiques, or the
5  problems which you identified and you thought he had
6  to be aware of, the shortcomings of the report?
7      A.   Right.  It says that the letter captures
8  some of my concerns.  In my e-mail of transmittal, it
9  says it captures some of my concerns.
10         (Exhibit-19 was marked.)
11 BY MR. MILLER:
12     Q.   Sir, I'm handing you a document which has
13 been marked Exhibit 19 DEROSA-0070, and that is a
14 series of e-mails on one page.  And what I'd refer
15 you to is the first e-mail from Dr. Frumkin that's
16 dated, appears to be March 9th --
17     A.   Correct.
18     Q.   -- 2007.  Do you see that?
19     A.   Yes.
20     Q.   And it says:  "Mark, Chris contacted me
21 about a week ago, as you can see below, with concerns
22 that we had responded to a FEMA request about
23 formaldehyde exposures in mobile homes and had
24 restricted our response to acute toxicity (omitting
25 to mention of formaldehyde carcinogenicity).  He's

Tiffany Alley & Associates
770-343-9696

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 273

1   at the same time.
2       A.   Well, I have tried to make that argument
3   with my wife, but she doesn't believe it.
4       MR. REICH: It's an acquired skill.
5       A.   But, anyway, the point being that our
6   ability to detect biological effects and interpret
7   their significance has not kept pace with each other.
8   We are much better able to detect than to interpret
9   the significance of some effects, increasingly subtle
10  types of effects.
11      And while they are subtle, they may be
12  very profound in their impact. I know you didn't
13  want to hear the rest of that, that's fine, I
14  understand.
15      MR. HINES: Let me just object to the
16  responsiveness.
17  BY MR. HINES:
18      Q.   Let me just ask one other question with
19  respect to this document. The principles that you
20  and -- is it Dr. Fisher?
21      A.   Dr. Fisher is the person over in -- at
22  UGA. I went to graduate school with him.
23      Q.   Dr. Risher?
24      A.   Risher.
25      Q.   Right. You and Dr. Risher. Are the

Tiffany Alley & Associates
770-343-9696

---

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 274

1   principles of the use of health guidance values that
2   are contained in your 1997 paper, are those
3   principles that you enunciated here still equally
4   applicable today?
5       A.   No.
6       Q.   No?
7       A.   No.
8       Q.   For the reasons you just told us?
9       A.   Yes.
10      MR. HINES: Thank you. That's all I have
11  got.
12      MR. MILLER: I have just a couple of
13  questions.
14      (Exhibit-23 was marked.)
15      FURTHER EXAMINATION
16  BY MR. MILLER:
17      Q.   Dr. De Rosa, you've been handed a document
18  which is Bates stamped DEROSA-0084 through 0085. And
19  it's been marked Exhibit --
20      A.   23.
21      Q.   -- 23. Do you recognize that document?
22      A.   I do.
23      Q.   What is that document, sir?
24      A.   This was a document that was circulated,
25  as others of its kind were, based on my suggestion to

Tiffany Alley & Associates
770-343-9696

---

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 275

1   Dr. Frumkin to address the severe morale issues
2   identified by the Department's Survey of Human
3   Capital that ATSDR had the lowest morale of any
4   entity within HHS.
5       And I suggested that communication on a
6   regular basis to make things a little bit more
7   transparent would be very helpful. And he accepted
8   the recommendation.
9       Q.   And this document is an e-mail from
10  Dr. Frumkin dated April 6, 2007?
11      A.   Yes.
12      Q.   And what was attached to the e-mail was a
13  newsletter?
14      A.   Yes.
15      Q.   And that newsletter was sent to all people
16  at CDC?
17      A.   It was.
18      Q.   And that would have included --
19      A.   And NCEH, yes.
20      Q.   And what you have here is two pages, but
21  this appears that this was part of a larger e-mail,
22  probably 35 pages total, and so what you have is the
23  second page is an excerpt, if you look at the top
24  right-hand corner?
25      A.   Page 1 of 35, page 7 of 35, yes.

Tiffany Alley & Associates
770-343-9696

---

In Re: FEMA    Christopher De Rosa, Ph.D.    7/6/2009
Page 276

1       Q.   What I want to refer you to is the second
2   page there?
3       MR. REICH: Is this an extra copy?
4       MR. MILLER: This is your Exhibit. I only
5   have one.
6       MR. REICH: Oh, it's mine. Okay.
7   BY MR. MILLER:
8       Q.   It says "Post-Katrina Temporary Housing",
9   you see that?
10      A.   Yes.
11      Q.   And it says "Congressman Gene" -- and this
12  is what Dr. Frumkin was reporting to all persons at
13  ATSDR and CDC in April of 2007; correct?
14      A.   Yes.
15      Q.   Post-Katrina Temporary Housing.
16  Congressman Gene Taylor wrote to Dr. Gerberding to
17  encourage CDC to initiate an investigation of the
18  toxic vapors released from FEMA trailers. His letter
19  was spurred by an article entitled "Toxic Trailers"
20  that was featured in the February 26th issue of The
21  Nation, and was reprinted in the (Biloxi) Sun Herald.
22  The article detailed a variety of prolonged
23  respiratory illnesses and other health problems faced
24  by many of the Mississippi and Louisiana residents
25  living in FEMA trailers. NCEH/ATSDR staff -- what is

Tiffany Alley & Associates
770-343-9696

In Re: FEMA        Christopher De Rosa, Ph.D.      7/6/2009

Page 277

1    NCEH again?
2      A.  The National Center for Environmental
3    Health.
4      Q.  And that's part of the CDC?
5      A.  It is.
6      Q.  NCEH/ATSDR staff have corroborated (sic)
7    to prepare a response to the Congressman. At the
8    request of FEMA, EPA and our staff analyzed the
9    formaldehyde levels in unoccupied FEMA emergency
10   housing trailers. These data indicate that in
11   trailers with closed windows, formaldehyde levels are
12   similar to those found in new conventional housing.
13   At this time, we do not plan to conduct a health
14   assessment of formaldehyde exposure in FEMA trailers.
15   We have offered the Congressman practical
16   recommendations to reduce exposures to formaldehyde
17   in the emergency housing trailers. Thanks to Mary
18   Jean Brown for coordinating with several divisions
19   and offices to provide a timely response to
20   Representative Taylor. Do you see that?
21     A.  Yes.
22     Q.  Doctor, that was what was circulated to
23   all the persons at CDC, ATSDR in April of 2007;
24   correct?
25     A.  Yes, it was.

Tiffany Alley & Associates
770-343-9696

Page 278

1      Q.  And just to go back, what he's referring
2    to there is the February 1st, 2007, ATSDR report to
3    FEMA; correct?
4      A.  Yes.
5      Q.  From February 1st, 2007, until the summer
6    of 2007, the only correction or documentation that
7    was sent to FEMA to correct any problems with that
8    report, was the letter that you drafted, and then
9    went out under Dr. Keim's signature?
10     A.  Yes, that's correct, as far as I know.
11     Q.  And that was the only -- and that letter
12   did not identify or tell FEMA at all that the .3 ppm
13   level of concern was something they needed to review
14   and revisit?
15     A.  It did not say that, no, made no mention
16   of that.
17     Q.  And in fact, in May 2007, before ATSDR/CDC
18   picked this issue up again, FEMA, because of reports
19   of respiratory illnesses from the children in
20   Mississippi, reengaged CDC/ATSDR to revisit and
21   reinvestigate, especially whether they should be
22   using that .3 ppm level; isn't that right?
23     A.  I don't know if they made reference to the
24   NCEH -- the .3 parts per million level. And they
25   engaged NCEH, not ATSDR.

Tiffany Alley & Associates
770-343-9696

Page 279

1      Q.  But they reengaged health agencies to
2    revisit this issue?
3      A.  They engaged NCEH to revisit the issue,
4    yes, that's my understanding.
5      Q.  And NCEH engaged ATSDR through the e-mails
6    that we went through earlier; right?
7      A.  Yes. They engaged a sister division, who
8    then, in turn, engaged my division.
9      Q.  Do you have any knowledge or information
10   of what other actions FEMA took as a result of its
11   concern about those reports of children in the
12   trailers having respiratory problems in
13   May-June 2007?
14     A.  No, I don't.
15     Q.  Were you aware that in July 2007 FEMA
16   changed its policy in offering to move anyone in a
17   trailer who wanted out into alternate housing?
18     A.  I do recall that, yes.
19     Q.  And given the reports that they received
20   of Mississippi, children in Mississippi in May of
21   2007, do you think that was an appropriate action?
22     A.  I do.
23         MR. MILLER: Sir, I really appreciate your
24   time and your patience with me. Thank you very much,
25   sir.

Tiffany Alley & Associates
770-343-9696

Page 280

1         THE WITNESS: Thank you, likewise, for
2    your patience and time.
3         MR. WEINSTOCK: Dennis, if there is any
4    time left for the defense, I have a couple of quick
5    questions.
6         MR. REICH: What do you want, a couple of
7    minutes?
8         MR. WEINSTOCK: Yes. I just have a couple
9    of quick questions. I'll be very quick.
10        MR. MILLER: Guys, I'm leaving. Mark is
11   here. He can object, we are allowed two people, and
12   he can ask questions if he needs any rebuttal. Thank
13   you.
14            FURTHER EXAMINATION
15   BY MR. WEINSTOCK:
16     Q.  Andy Weinstock again. Doctor, previously
17   you had talked about reports of kids in Mississippi
18   who were being treated at the emergency room;
19   correct?
20     A.  I referenced kids presenting clinical
21   signs in a number of different settings.
22     Q.  Did you review medical records from any of
23   those cases?
24     A.  No, I didn't.
25     Q.  Going back to site-built homes for an

Tiffany Alley & Associates
770-343-9696