```
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF LOUISIANA

 3                   NEW ORLEANS DIVISION

 4    In Re:   FEMA Trailer    )

 5    Formaldehyde Products    ) MDL No. 1873

 6    Liability Litigation     )

 7

 8                              Washington, D.C.

 9                              Tuesday, July 14, 2009

10    Videotape Deposition of MARTIN EDWARD McNEESE, called

11    for examination by counsel for Plaintiffs in the

12    above-entitled matter, the witness being duly sworn

13    by CHERYL A. LORD, a Notary Public in and for the

14    District of Columbia, taken at the offices of NELSON

15    MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16    Avenue N.W., Suite 900, Washington, D.C., at

17    9:03 a.m., and the proceedings being taken down by

18    Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22
```

EXHIBIT 2

Martin Edward McNeese  
Washington, DC  
July 14, 2009

### Page 2

1  APPEARANCES:
2
3  Plaintiffs' Co-Liaison Counsel:
4     TARA GILBREATH, ESQ.
5     JUSTIN I. WOODS, ESQ.
6     GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
7     WARSHAUER, LLC
8     1100 Poydras, Suite 2800
9     New Orleans, LA 70163-2800
10     (504) 522-2304
11
12  On behalf of the United States of America and Martin
13  Edward McNeese:
14     HENRY T. MILLER, ESQ.
15     Senior Trial Counsel
16     UNITED STATES DEPARTMENT OF JUSTICE
17     1331 Pennsylvania Avenue, N.W.
18     Washington, D.C. 20004
19     (202) 616-4223
20
21
22

### Page 3

1  APPEARANCES CONTINUED:
2
3  On behalf of Keystone RV Company, Dutchmen
4  Manufacturing Inc., DS Corp., Thor California Inc.,
5  and KZ RV, LP:
6     RYAN E. JOHNSON, ESQ.
7     JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
8     DENEGRE LLP
9     8555 United Plaza Boulevard
10     Baton Rouge, LA 70809-7000
11     (225) 248-2080
12     Appearing by telephone
13
14  On behalf of Fluor Enterprises Inc.:
15     LEZLY PETROVICH, ESQ.
16     MIDDLEBERG RIDDLE & GIANNA
17     201 St. Charles Avenue, Suite 3100
18     New Orleans, LA 70170
19     (504) 525-7200
20
21
22

### Page 4

1  APPEARANCES CONTINUED:
2
3  On behalf of Gulf Stream Coach Inc.:
4     TIMOTHY D. SCANDURRO, ESQ.
5     SCANDURRO & LAYRISSON LLC
6     607 St. Charles Avenue
7     New Orleans, LA 70130
8     (504) 522-7100
9
10  On behalf of Bechtel National Inc.:
11     A. J. KROUSE, ESQ.
12     FRILOT LLC
13     1100 Poydras Street, Suite 3700
14     New Orleans, LA 70163-3600
15     (504) 599-8021
16     Appearing by telephone
17
18
19
20
21
22

### Page 5

1  APPEARANCES CONTINUED:
2
3  On behalf of Heartland Recreational Vehicles:
4     BRENT M. MAGGIO, ESQ.
5     ALLEN & GOOCH, A LAW CORPORATION
6     3900 N. Causeway Boulevard, Suite 1450
7     Metairie, LA 70002
8     (504) 836-5200
9
10  On behalf of Recreation by Design LLC, TL Industries
11  Inc., Frontier RV Inc., and Play'mor Trailers Inc.
12     RANDALL C. MULCAHY, ESQ.
13     GARRISON, YOUNT, FORTE & MULCAHY LLC
14     909 Poydras Street, Suite 1800
15     New Orleans, LA 70112
16     (504) 527-0680
17     Appearing by telephone
18
19
20
21
22

2 (Pages 2 to 5)

### Page 6

APPEARANCES CONTINUED:

On behalf of Starcraft RV Inc. and Jayco Inc.:
  HAL L. ROACH JR., ESQ.
  WILLINGHAM, FULTZ & COUGILL LLP
  808 Travis, Suite 1608
  Houston, TX 77002
  (713) 333-7600
  Appearing by telephone

On behalf of Shaw Environmental Inc. and CH2M Hill Constructors Inc.:
  WADE M. BASS, ESQ.
  BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ PC
  3 Sanctuary Boulevard, Suite 201
  Mandeville, LA 70471
  (985) 819-8424

### Page 7

APPEARANCES CONTINUED:

On behalf of the Coachmen entities:
  STEWART THARP, ESQ.
  TAYLOR, PORTER, BROOK & PHILLIPS LLP
  451 Florida Street, 8th Floor
  Baton Rouge, LA 70821
  (225) 387-3221
  Appearing by telephone

ALSO PRESENT:
  Amber Gussin and Dan Reidy, videographer

### Page 8

CONTENTS

| WITNESS | EXAMINATION PAGE NO. |
|---|---|
| MARTIN EDWARD McNEESE | |
| By Ms. Gilbreath | 12 |
| By Mr. Woods | 85 |
| By Mr. Scandurro | 98 |
| By Mr. Miller | 115 |
| By Mr. Woods | 128 |

EXHIBITS
(Exhibits attached.)

| McNEESE EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 Notice of Oral and Videotaped Deposition of Martin McNeese | 12 |
| 2 Defendant United States of America's Motion to Dismiss Plaintiffs' Remaining FTCA Claims for Lack of Subject Matter Jurisdiction, U.S. Exhibit No. 41 | 21 |

### Page 9

EXHIBITS CONTINUED

| McNEESE EXHIBIT NO. | PAGE NO. |
|---|---|
| 3 Defendant United States of America's Motion to Dismiss Plaintiffs' Remaining FTCA Claims for Lack of Subject Matter Jurisdiction, U.S. Exhibit No. 30 | 49 |
| 4 Defendant United States of America's Motion to Dismiss Plaintiffs' Remaining FTCA Claims for Lack of Subject Matter Jurisdiction, U.S. Exhibit No. 38 | 54 |
| 5 Email, 8-30-06, FEMA17-00803 | 60 |
| 6 Email, 8-9-06, FEMA17-002480-81 | 62 |
| 7 Email, 10-11-06, FEMA17-000380-82 | 66 |
| 8 Email, 2-20-07, FEMA-Waxman-8/27/07 Production - 23536 | 67 |
| 9 Email, 3-6-07, FEMA17-003608 | 69 |
| 10 Email, 6-26-07, FEMA17-007449 | 77 |
| 11 Email, 8-22-07, FEMA17-011764-65 | 81 |

## Page 10

1   PROCEEDINGS
2
3       THE VIDEOGRAPHER: This begins tape number
4   1 in the video deposition of Martin McNeese, taken by
5   the plaintiff in regards to the FEMA trailer
6   formaldehyde products liability litigation, filed in
7   the U.S. District Court, Eastern District of
8   Louisiana, MDL number 1873.
9       Today's deposition is being held at the
10  law offices of Nelson Mullins Riley & Scarborough
11  LLP, 101 Constitution Avenue N.W., and we're in the
12  Riley conference room on the eighth floor. This is
13  in Washington, D.C., 20001.
14      For identification purposes, I am Dan
15  Reidy, the video operator with Alderson Court
16  Reporting. The stenographer is Cheryl Lord, also
17  with Alderson Court Reporting.
18      Today's date is July 14th, 2009. The time
19  on the video is 9:03 AM. We are on the record.
20      At this time, will all counsel please
21  introduce yourself and to whom you represent,
22  starting with the plaintiffs' counsel, please.

## Page 11

1       MS. GILBREATH: Tara Gilbreath, on behalf
2   of the plaintiffs.
3       MR. WOODS: Justin Woods on behalf of the
4   plaintiffs.
5       MR. SCANDURRO: Tim Scandurro, on behalf
6   of Gulf Stream Coach.
7       MS. PETROVICH: Lezly Petrovich, on behalf
8   of Fluor Enterprises Inc.
9       MR. MAGGIO: Brent Maggio, for Heartland
10  Recreational Vehicles.
11      MR. BASS: Wade Bass, for CH2M Hill and
12  Shaw.
13      MR. MILLER: Henry Miller and Amber Gussin
14  for the United States.
15      THE VIDEOGRAPHER: Will the court reporter
16  please swear in the witness.
17
18  Whereupon,
19          MARTIN EDWARD McNEESE
20  was called as a witness by counsel for Plaintiffs,
21  and, having been duly sworn by the Notary Public, was
22  examined and testified as follows:

## Page 12

1       EXAMINATION BY COUNSEL FOR PLAINTIFFS
2       BY MS. GILBREATH:
3   Q.  Morning, Mr. McNeese. My name is Tara
4   Gilbreath.
5   A.  Morning.
6   Q.  If you'll excuse me, I should have done
7   this before we started.
8       Mr. McNeese, I'm going to hand you what I
9   have premarked as McNeese exhibit 1.
10      Do you recognize this document?
11          (McNeese Exhibit No. 1
12          was marked for
13          identification.)
14  A.  I do.
15      MS. GILBREATH: And so just for the
16  record, we are attaching as exhibit 1 the notice of
17  deposition of Martin McNeese.
18      BY MS. GILBREATH:
19  Q.  Mr. McNeese, can you state your full name
20  for the record?
21  A.  It's Martin Edward McNeese.
22  Q.  And can you give us a little bit of

## Page 13

1   background on your education.
2       Did you attend college?
3   A.  I did attend college. I graduated with an
4   associate in science electrical technology from the
5   University of Texas in Arlington, Texas.
6   Q.  I'm sorry.
7       Did you say that was an Associate of
8   Science --
9   A.  Associate of Science.
10  Q.  -- degree.
11      Now, if you excuse me.
12      Was that a 4-year degree program or --
13  A.  It's a 2-year.
14  Q.  It's a 2-year degree.
15      Have you ever attended any other type of
16  higher education beyond high school?
17      MR. MILLER: Objection, vague, narrative.
18  A.  Actually, no.
19      BY MS. GILBREATH:
20  Q.  Have you ever received any special
21  certifications since graduating with your Associate
22  of Science degree?

### Page 22

1  BY MS. GILBREATH:
2  Q. Mr. McNeese, I'm handing you now what's
3  been labeled as McNeese exhibit 2, which is also the
4  defendant United States of America's motion to
5  dismiss plaintiffs' remaining FTCA claims for lack of
6  subject matter jurisdiction, exhibit 41.
7      Mr. McNeese, if you'll turn to the last
8  page.
9      Is that your signature above your name?
10 A. That is my signature.
11 Q. And it's dated in handwriting, 5-8-09; is
12 that correct?
13 A. That's correct.
14 Q. And so the text that says that this was
15 executed on the 8th day of May, 2007, would likely be
16 typogra- -- typographical error.
17     Correct?
18 A. Yes, it's incorrect.
19 Q. Okay. But it was done in '07, not in
20 2009, just to clarify.
21     MR. MILLER: Done in '09, not in '07.
22 A. We were --

### Page 23

1      MS. GILBREATH: Did I get it backwards?
2  A. -- done in '09 and --
3      BY MS. GILBREATH:
4  Q. Okay.
5  A. -- signed in '09.
6  Q. Okay. There we go. Clears that up.
7      Mr. McNeese, did you draft this document?
8  A. I did draft it by quoting a lot of the
9  statements and then modifying it and correcting it
10 and setting it correct.
11 Q. To whom did you quote these statements?
12 A. In a conversation with Henry Miller
13 earlier this year.
14 Q. And you say you corrected some of the
15 statements?
16 A. I modified, corrected, and made the
17 document correct.
18 Q. Okay. How did you correct the document?
19     What were the corrections made?
20 A. I honestly couldn't tell you that at this
21 point in time. I reviewed the document, made all the
22 corrections that we -- to be my statement, and I

### Page 24

1  don't have an audit trail of that.
2  Q. Were -- do you remember if your
3  corrections were substantive in nature or
4  typographical in nature, if you remember?
5  A. They -- they were both substantive and
6  typographical.
7  Q. Mr. McNeese, I want to point you to
8  paragraph 2 on -- my Greek is kind of fuzzy, but I am
9  guessing that that is page 1 at the bottom.
10     It states: On or about July 2006,
11 Mr. Kevin Souza requested that I serve as FEMA's
12 primary point of contact, quote, POC, end quote, for
13 purposes of interacting with the United States
14 Environmental Protection Agency, quote, EPA, end
15 quote, and Center for Disease Control, agency for
16 toxic substances and disease registry, ATSDR, for
17 purposes of facilitating their testing of temporary
18 emergency housing units, EHU, for formaldehyde.
19     Do you see where I am?
20 A. I do.
21 Q. And did I read that correctly?
22 A. You did.

### Page 25

1  Q. Who is Kevin Souza?
2  A. Kevin Souza is a -- do you want to know at
3  this point in time or what he was in July of 2006?
4  Q. Both.
5      Let's start with who he was, what was his
6  capacity in July of 2006.
7  A. In July of 2006, he was the individual
8  assistance program manager in FEMA headquarters.
9  Currently he's still employed. I'm not sure what his
10 current title is with FEMA.
11 Q. And what was his position in relation to
12 yours?
13     Was he above in a direct chain of command?
14     What was the relationship between --
15 A. There was no --
16 Q. -- the 2 positions?
17 A. There's no chain of command between the
18 field and FEMA headquarters except through the
19 regional offices.
20 Q. And so when Mr. Souza requested that you
21 serve as the primary point of contact, in what
22 capacity was he asking you to do that?

Page 26

1    MR. MILLER: Objection, foundation.
2    Go ahead.
3    A.  He was asking as the individual assistance
4    program manager in headquarters, because he had a
5    task to do, and he was ask- -- I mean, it's not an
6    order to do it. I was not committed to take that
7    responsibility.
8    It was -- he wanted to know if I would
9    take the project, and I agreed to do it, so --
10   BY MS. GILBREATH:
11   Q.  And at that time, in July of 2006, what
12   did you believe that project to be?
13   A.  I believed it to be to test the units for
14   a baseline -- well, to test the units for
15   formaldehyde content and volatile inorganic compounds
16   and to find a -- out if there was a way to reduce
17   those levels in the units.
18   Q.  And when Mr. Souza requested that you
19   serve as the primary point of contact, what is your
20   understanding of the reason why he asked you to serve
21   in that position?
22   A.  I'm actually very good at project

Page 27

1    management, and we have -- we've known each other for
2    a long time, and so I'm -- it's my opinion not stated
3    by him that I was asked to do that because I am very
4    good at project management.
5    Q.  Not because you have any specific training
6    or expertise in formaldehyde or air quality control?
7    A.  I have none.
8    MR. MILLER: Objection, foundation.
9    BY MS. GILBREATH:
10   Q.  I'm sorry.
11   What was your answer?
12   A.  I said, I have none.
13   Q.  Oh.
14   Further on in that same paragraph,
15   paragraph 2 or section 2, at the top of the next
16   page, based upon my review.
17   Do you see where I am?
18   A.  I see that.
19   Q.  It says: Based upon my review of that
20   report, I informed Mr. Souza on or about March,
21   slash -- February, slash, March of 2007 that travel
22   trailers in combination with ventilation remained a

Page 28

1    viable temporary emergency housing unit -- I'm sorry
2    -- housing option.
3    Did I read that correctly after I
4    corrected myself?
5    A.  On the final correction, yes.
6    Q.  When you say, based on your review of that
7    report, did that report have the -- conclude the
8    trailer -- travel trailers in combination with
9    ventilation remained a viable temporary emergency
10   housing option?
11   A.  Not specifically.
12   Q.  So what was your basis for informing
13   Mr. Souza that the travel trailers in combination
14   with ventilation remained a viable temporary --
15   temporary emergency housing option?
16   A.  The report actually stated, you know,
17   graphically depicted and stated that the units could
18   be brought down below what they'd identified as a
19   level of concern for sensitive people. And so if the
20   trailers could be brought there, I felt that left
21   them as a viable option.
22   Q.  What did you mean by the term viable?

Page 29

1    A.  Meant that they could still be used.
2    Q.  That they were safe, in other words?
3    A.  I didn't say that.
4    Q.  But you felt that after ventilation that
5    they were appropriate to be provided to disaster --
6    A.  I'll say that my feeling was that they
7    were suitable for being used as emergency housing
8    units.
9    Q.  But that -- you're not testifying that
10   that made them safe?
11   A.  I'm not saying either way. I'm not sure
12   that that was a part of my consideration.
13   Q.  You're saying now that whether or not the
14   travel trailers were safe was not part of your
15   consideration in determining whether or not --
16   A.  I'm not saying that.
17   MR. MILLER: Hold on. Hold on.
18   BY MS. GILBREATH:
19   Q.  Yeah.
20   Sorry. Please let me finish.
21   MR. MILLER: She's got to finish. I've
22   got to get an objection in if necessary.

Page 30

1    MS. GILBREATH: Now I forgot what I said.
2    BY MS. GILBREATH:
3    Q. So you're saying now, though, that whether
4  or not the travel trailers were safe was not part of
5  your consideration in determining whether or not they
6  were a viable temporary housing option?
7    MR. MILLER: Objection, mischaracterizes
8  the witness's testimony.
9    Go ahead.
10   A. Okay. What I'm saying is that in the
11 considering that the ventilation -- the ventilation
12 levels and what the ATSDR determined as a level of
13 concern was not strictly a safety. It was a -- that
14 this was okay, that the units could be brought down,
15 that we were looking at indoor air quality.
16   I'm not saying that I was not concerned
17 about the safety of the units, because I will tell
18 you right now on record, the number one thing we
19 concern with -- ourself with in housing is safety of
20 the applicants. But in the indoor air quality, I'm
21 predominantly looking at that report, and that report
22 was not a, quote-unquote, safety report. It was an

Page 31

1  indoor air quality report.
2    BY MS. GILBREATH:
3    Q. You are aware, though, that the report
4  from ATSDR, was also -- was actually entitled a
5  health consultation.
6    Correct?
7    A. I don't remember that. I don't know.
8    Q. Mr. McNeese, to go back to this same
9  statement, you previously testified that upon the
10 review of the report, you came to the conclusion that
11 the travel trailers in combination with the
12 ventilation remained a viable option.
13   Correct?
14   A. A viable temporary housing, emergency
15 housing option.
16   Q. And that you based that conclusion upon
17 that -- the study itself?
18   A. That's correct.
19   Q. Outside of the study, do you have any sort
20 of special knowledge or training on which to evaluate
21 air quality control or whether or not travel trailers
22 with ventilation were a viable temporary housing

Page 32

1  option?
2    MR. MILLER: Objection, compound.
3    A. Beyond the report, no.
4    BY MS. GILBREATH:
5    Q. Mr. McNeese, I now want to turn to section
6  3 of the same page.
7    About 5 lines down, it states: EPA and
8  ATSDR advised and a consensus was reached that
9  initial testing would focus on new, unused travel
10 trailers because this would provide baseline
11 formaldehyde levels in units and allow them to
12 determine whether formaldehyde was a problem in the
13 units and whether the venting was an effective
14 response.
15   Do you see --
16   A. I see that.
17   Q. -- there was -- and did I read that
18 correctly?
19   A. Yes, you did.
20   Q. Can you tell me how a consensus was
21 reached?
22   A. The consensus was between EPA, ATSDR, FEMA

Page 33

1  at that point in time.
2    Q. Prior to this consensus being reached,
3  though, I take it that there was a disagreement as to
4  whether or not occupied versus unoccupied trailers
5  would be tested?
6    A. Actually, if you would read the words
7  before that, the -- FEMA had regionally asked that we
8  test unoccupied and occupied, so this is only a
9  continuation of a prior statement in that paragraph.
10   Q. However for a consensus to be reached that
11 only unoccupied trailers would be tested, at some
12 point, someone would have had to disagree with FEMA's
13 initial request.
14   Correct?
15   A. Well, EPA and ATSDR both advised us that
16 the units -- testing occupied units would be
17 difficult, because they don't -- they would have to
18 have a full range of protocol to factor in the air
19 quality from the occupants.
20   Q. At the end of that sentence, you say: To
21 allow them to determine whether formaldehyde was a
22 problem in the units and whether venting was an

Page 38

1  noted, EPA commenced the testing of the units in
2  mid-September and testing was completed by
3  mid-October.
4      Who from FEMA was responsible for setting
5  up the testing area?
6      A.  By name, I don't remember that.
7      It was our -- we had a Baton Rouge staging
8  area, and the logistics area that was over there were
9  responsible for setting aside the area and getting it
10 prepared.
11     Q.  So someone in the Baton Rouge field
12 office?
13     A.  In the Baton Rouge field office or staging
14 area. I'm not sure which.
15     MR. SCANDURRO: Can we take a quick
16 2-second break to discuss an email that I just got?
17     Go off the record.
18     THE VIDEOGRAPHER: We're going off the
19 record. The time on the video is 9:38 AM.
20     (Recess.)
21     (All parties appearing by telephone joined
22     the proceedings.)

Page 39

1      THE VIDEOGRAPHER: We're back on the
2  record. The time on the video is 9:48 AM.
3      BY MS. GILBREATH:
4      Q.  Mr. McNeese, you previously testified that
5  the Baton Rouge field office logistics, they were the
6  ones responsible for setting up the testing area for
7  the EPA, ATSDR test?
8      MR. MILLER: Objection, mischaracterizes
9  the witness's testimony.
10     A.  Actually, I didn't say anything about
11 logistics. It was either the staging area or the
12 Baton Rouge field office.
13     BY MS. GILBREATH:
14     Q.  So you did not have any involvement in the
15 setting up the testing area?
16     A.  That's correct.
17     Q.  In paragraph 6, or section 6, it states:
18 EPA completed its processing of the test data in
19 November. And the data was provided to FEMA's
20 counsel, Rick Preston, who sent it on to the ATSDR
21 for analysis.
22     Why did EPA's test results go through Rick

Page 40

1  Preston?
2      A.  It was agreed upon that they would be
3  for -- for the record that Rick would be the
4  custodian of the data.
5      Q.  And why was he chosen for that task?
6      A.  You know, I don't remember at the time why
7  we chose that. We wanted to control it, but I don't
8  remember why we chose Rick.
9      Q.  When you say, we wanted to control it, who
10 is "we"?
11     A.  It would be EPA, FEMA, and ATSDR. We
12 wanted the results, you know, the test -- that was
13 raw data that we're talking about right now, that
14 it be channeled to where it wasn't pulled out of
15 context until it had been analyzed by ATSDR.
16     Q.  So when you say, control, you mean not
17 letting anyone else see it until it had been
18 interpreted by ATSDR?
19     A.  That's -- that is part of control, yes.
20     Q.  What is else invol- -- what else is
21 involved in control?
22     A.  Just not to have the data released and to

Page 41

1  have -- the intent was to have ATSDR analyze the data
2  before anyone else analyzed the data, and that was
3  our protocol, and that was the procedure we were
4  following.
5      Q.  So for lack of a better word, you wanted
6  to make sure that the raw data stayed confidential?
7      A.  That's one way to put it. We wanted to
8  make sure it stayed in our control.
9      Q.  But you don't remember why Rick Preston
10 was put in charge of keeping the data in control?
11     MR. MILLER: Objection, asked and
12 answered.
13     Go ahead.
14     A.  No, I don't.
15     BY MS. GILBREATH:
16     Q.  In section 7, it says: In February 2007,
17 I received a copy of the ATSDR's health consultation
18 report from FEMA's counsel Rick Preston. I reviewed
19 that report and based on ATSDR's analysis, I
20 concluded that the travel trailers if vented remained
21 a viable housing option, and I shared my opinion in
22 the ATSD- -- -S- -- ATSDR report with Mr. Souza.

11 (Pages 38 to 41)

Page 62

1  though it would feed to them.
2       So I don't remember specifically remember
3  what their agendas were at that point.
4    Q.  Who is Bronson Brown?
5    A.  Bronson Brown was with FEMA safety.
6    Q.  And he was concerned about the OSHA
7  testing levels or the OSHA --
8    A.  I don't remember. That's his primary
9  responsibility, is implementing the OSHA guidelines.
10           (McNeese Exhibit No. 6
11            was marked for
12            identification.)
13  BY MS. GILBREATH:
14   Q.  I'm now handing you what's been premarked
15  McNeese exhibit 6, which appears to be an email
16  string that begins with an email from David Phillips
17  to Gail Haubrich concerning a formaldehyde unit.
18       Who is David Phillips?
19   A.  David Phillips was the head -- I don't
20  remember a specific title -- of the Lake Charles area
21  office in Louisiana.
22   Q.  In this email, he states towards the

Page 63

1  bottom: Once deactivated, we will mark the unit as
2  nonhabitable and ship to BR staging area.
3       Do you see --
4    A.  I see that.
5    Q.  Further up, it shows that you were
6  forwarded this email from David -- or no -- from Gail
7  Haubrich on August 30th, 2006.
8       Do you see that right above it?
9    A.  Yes.
10   Q.  On August 30th -- later on August 30th,
11  2006, you responded in an email to David Phillips
12  that stated -- the third line down -- I am very
13  concerned that you are recommending a level of
14  habitability for the units when no other federal
15  agency has set a threshold for residential
16  formaldehyde levels.
17       Do you see where I am?
18   A.  I see that.
19   Q.  How did you interpret that he was
20  recommending a level of habitability from his
21  previous email?
22   A.  Well, because he actually said that -- in

Page 64

1  this part you read before, once deactivated, we mark
2  the unit as nonhabitable. And that's not his job, to
3  determine habitability or not habitability.
4    Q.  The unit in reference that he says he will
5  mark as nonhabitable, it was one that had been found
6  with his, quote, excessively high levels of
7  formaldehyde; is that correct?
8    A.  That's what he's quoting.
9    Q.  So are you taking the position, then, that
10  a travel trailer with as he states an excessively
11  high level of formaldehyde, he could not determine
12  that that was nonhabitable?
13   A.  I'm not taking that position.
14      I'm just saying, that's not his job, to
15  determine nonhabitable. It's his job to report
16  the -- that there are high levels of formaldehyde,
17  report the findings, let it -- take it back to Baton
18  Rouge, because his report doesn't actually list what
19  the OSHA level of determination was.
20      This was just an attempt to get him to
21  stay in his lane.
22   Q.  Was there ever a travel trailer that was

Page 65

1  tested with high levels of formaldehyde that was ever
2  deemed habitable?
3    A.  I'm not aware of any.
4    Q.  So it was merely his determination that
5  the unit was nonhabitable that you were correcting?
6    A.  Merely -- not "merely," but in addition
7  to -- I mean, it's not his role to determine
8  habitability of the unit.
9       He had direct housing operations people.
10  We have unit specialists. We have logistics. It's
11  to identify the unit and send it back. The,
12  quote-unquote, nonhabitable is -- is just an arena
13  that he should not be playing in.
14      Taking people out of trailers that are not
15  safe, that he can do. Determining the condition of
16  the unit is really something that needs to be done by
17  experts.
18   Q.  Mr. McNeese, if we could go back to
19  exhibit McNeese 5.
20   A.  Okay.
21   Q.  The email from you to Kevin Souza.
22      At the bottom, it says: I hope you are

Martin Edward McNeese
Washington, DC
July 14, 2009

### Page 66

1  doing okay, hang in there, UFAS is coming.
2      What is UAS -- UFAS?
3      A.  UFAS is the Uniform Federal Accessibility
4  Standards, and that was in reference to totally
5  separate topic of our disability units that we were
6  working on providing -- getting -- making available
7  to the Gulf Coast.
8          (McNeese Exhibit No. 7
9           was marked for
10          identification.)
11     BY MS. GILBREATH:
12     Q.  I'm handing you now what has been
13  premarked exhibit McNeese 7.  This is an email sent
14  from you to a Michael Senycz -- Senycz.
15         On the second page, in the last paragraph
16  of this first email, it states that:  All data and
17  recommendations from EPA and CDC will be handled
18  through OCC channels.
19         Are you referencing Rick Preston as the
20  custodian of the data in that sentence?
21     A.  That would have been probably my reference
22  at that point, yes.

### Page 67

1      Q.  Is it normal for data and recommendations
2  to go through OCC?
3      A.  It's actually a procedure that goes
4  through that allows us to control the distribution
5  part of it until it's reached, you know, where we
6  want to be, because the -- by sending it through
7  there, it doesn't allow it to be a 4-year-type
8  document at that point in time.
9          And what we were trying to do at this
10  point in time was not begin to get random conjectures
11  and stuff of any of the testing until we had the
12  formal ATSDR result and analysis.
13         (McNeese Exhibit No. 8
14          was marked for
15          identification.)
16     BY MS. GILBREATH:
17     Q.  I'm now handing you what's been premarked
18  as exhibit McNeese 8.
19         Mr. McNeese, do you know who Jotham Allen
20  is?
21         Do you see that at the top of the email?
22     A.  I believe Jotham Allen is with our Office

### Page 68

1  of Chief Counsel.
2      Q.  Do you believe he's an attorney with the
3  Office of Chief Counsel?
4      A.  I don't know.  All I know is, when we were
5  collecting documents, he was one of the people that
6  was asking for the documents.
7      Q.  Mr. McNeese, I'd like to turn to the
8  second page of the document.  It's an email from you
9  to Patrick Preston, February 12th, 2007.
10         Do you see where I am?
11     A.  I do.
12     Q.  It starts:  Thanks, Rick, I think that the
13  report gave us what we were looking for.
14         I'm going to stop there.
15         What --
16         MR. MILLER:  I'm going to object first.
17         I think the document is incomplete.  I
18  just note it for the record:  It indicates that it's
19  2 of 3 pages, and it's just a 2-page document
20  presented.
21         Go ahead.
22         MS. GILBREATH:  Yeah.

### Page 69

1      BY MS. GILBREATH:
2      Q.  Mr. McNeese, what were you looking for?
3      A.  What we were looking for was air quality
4  levels and for effects of multiple ventilation
5  techniques on those formaldehyde levels, so --
6      Q.  Your next sentence says:  Changing air via
7  external venting is effective in reducing the
8  formaldehyde levels.
9          Is that sentence your opinion, or was that
10  sentence something you drew from the report?
11     A.  It's my opinion that I drew from reading
12  the report.
13     Q.  So to your knowledge, the report did not
14  state that changing air via external venting is
15  effective in reducing formaldehyde levels?
16     A.  I don't remember the report.
17     Q.  You don't remember the report, but you do
18  remember that this was your opinion from reading the
19  report?
20     A.  That's correct.
21         (McNeese Exhibit No. 9
22          was marked for

18 (Pages 66 to 69)

Page 86

1   you know, we were just trying to build some data
2   related to the air quality in the travel trailers
3   which had -- we had no data we could get from the
4   manufacturers or from any industry records, you know.
5        BY MR. WOODS:
6        Q.   Were you told anything by Rick Preston or
7   any other member of OGC regarding the need for the
8   EPA testing?
9        MR. MILLER: Objection, privileged
10  communication.
11       And I instruct the witness not to answer,
12  but would request you to figure out the boundaries of
13  it before you go into it. There are some
14  conversations that would be possible to address, but
15  others that we believe are privileged.
16       MR. WOODS: Well, with that caveat, I'm
17  not sure that -- I think I would need you to put a
18  time frame on it.
19       MR. MILLER: No.
20       It depends upon who is participating in
21  the conversation.
22       BY MR. WOODS:

Page 87

1        Q.   When you became involved in the summer of
2   '06, at whose request did you become involved in the
3   EPA testing endeavor?
4        A.   It was at the request of Kevin Souza, IA
5   program management.
6        Q.   And was it Kevin Souza that gave you the
7   reasoning behind the need for the EPA testing?
8        A.   Yes, it was.
9        Q.   At what point did you become aware that
10  OGC was also involved in this testing endeavor?
11       A.   I'm not totally certain of the time. It
12  would have been mid-July when I actually took over
13  conducting the meetings for the formaldehyde testing.
14       Q.   And when you conducted these meetings,
15  there was always a member of OGC as a participant in
16  these calls?
17       A.   Yes, there was.
18       Q.   What was your understanding as to the need
19  or the reason behind a member of OGC participating in
20  those conference calls?
21       A.   Well, there are multiple reasons, but for
22  one, it was an interagency agreement involved, so

Page 88

1   when we have interagency agreements and contracts, we
2   almost always have an OCC representative there.
3        And secondly, it's a major project, and
4   major projects in IA, we always have an OCC
5   representative on them.
6        Q.   During those phone calls where a member of
7   OGC was involved or Rick Preston himself was
8   involved, what was communicated to that group on
9   those con- -- conference calls as to the reasons
10  behind OGC being involved in this particular testing
11  endeavor?
12       MR. MILLER: Okay. I'm going to object
13  that it's vague as to time and as to specific
14  conference, and so it's unclear whether or not that
15  communication privileged.
16       I think if you drill down on it more,
17  you'll be able to figure out -- we'll be able to
18  figure out whether it is privileged or not privileged
19  and whether you can ask the question.
20       So at this point, I'm instructing him not
21  to answer that question.
22       BY MR. WOODS:

Page 89

1        Q.   Well, there are clearly conference calls
2   that took place, correct, with a member of OGC and
3   other members -- I'm sorry -- other FEMA employees
4   and EPA employees.
5        Correct?
6        A.   That's correct.
7        We held biweekly phone calls.
8        Q.   At any time during those conference calls,
9   those biweekly conference calls with all of the
10  participants from EPA and FEMA and OGC, were you ever
11  informed that litigation was a key concern for the
12  basis for the testing?
13       MR. MILLER: I'm going to object.
14       It's vague as to time.
15       Go ahead and answer, please.
16       A.   No, we weren't.
17       BY MR. WOODS:
18       Q.   Were you ever aware that litigation was a
19  concern regarding formaldehyde levels in EHUs?
20       A.   Was I aware that there was litigation
21  pending?
22       Is that the question?

23 (Pages 86 to 89)

Page 90

1   Q. That's a fair interpretation of it.
2   A. I mean, I was aware that there was
3   litigation.
4   Q. What did you know about the litigation at
5   that time?
6   A. Only that we were in litigation and that
7   FEMA was also engaged in it.
8   Q. What was your understanding as to the
9   basis of the litigation?
10  A. I don't know -- know anything -- anything
11  beyond that.
12  Q. You only knew that FEMA was being sued,
13  but you had no idea as to why?
14  A. That's correct.
15  Q. Do -- you have a general sense that it had
16  something to do with claimed formaldehyde exposure.
17  Correct?
18  A. I'm not sure that I did, but I did know we
19  were being sued.
20  Q. Did it have to do with an employee driving
21  recklessly a -- a FEMA vehicle that resulted in -- in
22  the litigation?

Page 91

1   A. No.
2   I mean, I did know it related to the
3   emergency housing units also.
4   Q. But you didn't know the basis of it.
5   You didn't know whether or not it had
6   anything whatsoever to do with the formaldehyde
7   issue?
8   A. No.
9   MR. MILLER: Objection, mischaracterizes
10  the witness's testimony.
11  A. I hadn't read the -- the basis of what the
12  litigation or the court suit was, so I didn't really
13  know what it was.
14  BY MR. WOODS:
15  Q. Okay. Let me -- let me be clear.
16  I'm not asking if you ever read any
17  complaints or lawsuits that were filed. I'm asking
18  you what was your --
19  (Noise from telephone conference call.)
20  MR. MILLER: Let's go off the record for a
21  minute.
22  THE VIDEOGRAPHER: We're going off the

Page 92

1   record. The time on the video is 11:28 AM.
2   (Discussion off the record.)
3   THE VIDEOGRAPHER: This begins tape number
4   3 in the video deposition of Martin McNeese. The
5   time on the video is 11:32 AM. We are on the record.
6   BY MR. WOODS:
7   Q. Mr. McNeese, okay. I want to refer you
8   back to what was marked as McNeese number 8.
9   Do you have it?
10  A. I do.
11  Q. Okay. And again, turning to page 2,
12  although it says, page 2 of 3 -- I don't know where
13  the third page is -- but I want to concentrate on
14  your email sent on Monday, February 12, 2007, to
15  Patrick Preston and cc'ing David Chawaga and Kevin
16  Souza.
17  And again, if you would go down to the
18  fifth paragraph.
19  A. Okay.
20  Q. And Ms. Gilbreath asked you some questions
21  about that -- that particular paragraph, and I just
22  wanted to get some clarification.

Page 93

1   When you say that you cannot -- at that
2   time, you cannot speak, but the tests verified most
3   of what the manufacturers told us, you can't recall
4   which -- which manufacturers you're speaking of
5   there?
6   A. I can't. I cannot. That's correct.
7   Q. And when you go on to say, since we know
8   that the air does not recirculate, there is probably
9   not enough air exchange in heat to cause an effect
10  without extra venting, you're not there talking about
11  that there was some attempt to cause an effect by
12  using the heaters in EHUs, were you?
13  A. No.
14  Q. You're merely talking about what the
15  environment or the -- the -- the atmospheric
16  conditions --
17  MR. MILLER: Objection.
18  Q. -- of an EHU, are you?
19  MR. MILLER: Objection, assumes facts not
20  in evidence, mischaracterizes the witness's
21  testimony.
22  Go ahead.

Page 114

1    with air conditioning.
2         I wanted to ask you a followup question
3    about that observation.
4         First of all, are you basing that on your
5    review of the ATSDR report?
6    A.   Hang on. I'm trying to figure out where
7    you are in there.
8    Q.   I'm in the third sentence of your email.
9    A.   Okay. Actually, that was as a result of
10   reading the ATSDR results, yes.
11   Q.   Okay. Although you use the term total
12   ineffectiveness of vent fans in conjunction with air
13   conditioning, do you in fact recall that vent fans in
14   conjunction with air conditioning did have a positive
15   effect on lowering formaldehyde levels, but it wasn't
16   as effective as open window or open door ventilation?
17   A.   That's correct.
18        It did reduce them.
19   Q.   So in hindsight, it wasn't totally
20   ineffective.
21        It was effective but not as effective as
22   window ventilation?

Page 115

1    A.   Your statement would be correct if you
2    wanted to actually get below the level of concern and
3    stay below it, because it -- the vent fan and the air
4    conditioner, if I remember, actually kind of leveled
5    out right about the level of concern, whereas the
6    open windows went considerably below it.
7         So that was probably my interpretation of
8    ineffectiveness as we were driving for that level of
9    concern at that point in time.
10   Q.   And again, that level of concern your
11   understanding was only for sensitive individuals who
12   had been previously sensitized to formaldehyde?
13   A.   That was the definition from ATSDR, yes.
14        MR. SCANDURRO: I have no further
15   questions.
16
17        EXAMINATION BY COUNSEL FOR THE UNITED STATES OF
18        AMERICA AND MARTIN EDWARD MCNEESE
19        BY MR. MILLER:
20   Q.   Mr. McNeese, my name is Henry Miller, and
21   I represent the defendant, the United States of
22   America.

Page 116

1         I have just a couple followup questions,
2    and what I'd ask you to do is pull out the document
3    which is marked exhibit number 7 and is Bates-stamped
4    at the top, FEMA.17, dash, 000380 through 382.
5         And the first page is an email authored by
6    you dated October 11, 2006.
7         Do you see that?
8    A.   I do.
9    Q.   And is this -- that first page, is that an
10   email that you authored?
11   A.   On the email back to Mike?
12   Q.   Correct.
13   A.   I would say yes.
14   Q.   You were asked some questions about the
15   numbers there. And as I read it, given your
16   testimony, at this point in time, there were about 70
17   complaints, formaldehyde-type complaints in
18   Mississippi and Louisiana, and there were a total of
19   118,000 families residing in EHUs, emergency housing
20   units; is that right?
21   A.   That's correct.
22   Q.   And the emergency housing units were

Page 117

1    primarily travel trailers?
2    A.   That is correct.
3    Q.   Up until -- up -- was the purpose of the
4    study to identify whether these complaints was a
5    concern in all the units -- is that one of the
6    purposes of the study that was undertaken, whether
7    formaldehyde was a concern in all these units?
8    A.   The -- I don't know if the -- the final
9    results could have been extrapolated against all of
10   them, but by the EPA guidance, they were -- our
11   instructions to them was to try to develop a protocol
12   that would be -- would give us a representative
13   sample of the whole 118,000 units.
14        And so it was our hope that we would be
15   able to get a picture of what the formaldehyde unit
16   was in the entire EHU base at that point.
17   Q.   And the reason I'm asking these questions
18   is, I think what I heard you to say, and I may be
19   wrong about this, but you indicated that if there was
20   a problem in one unit, you thought it a problem poss-
21   -- possibly in all units.
22        And at this point in time, was it your

Page 118

1  understanding or belief that you had a formaldehyde
2  problem in all of these 118,000 units that were out
3  there?
4      A.  No, that's not true.
5      Q.  And so that's -- that's what I'm trying to
6  get at.
7          At that point, what was your understanding
8  of the nature and scope of the problem that existed?
9      A.  Well, we had complaints, and obviously
10 that's where these 50 and others came from. There
11 were complaints in the media that were not
12 necessarily reported directly to us.
13         And we were trying to find out, number 1,
14 what the level of formaldehyde in the units was, and
15 number 2, if there were procedures that could reduce
16 that level.
17         And my statements to being concerned for
18 one for all is that if -- if we -- in fact we cannot
19 bring the units to the level of people that are
20 sensitized to formaldehyde, then that would have been
21 a challenge across the board.
22     Q.  If in fact -- at this time period, if in

Page 119

1  fact FEMA had been made aware that the level of
2  concern was substantially lower -- let us say that
3  .008 PPM level -- and that ventilation didn't reduce
4  it below that level, would there have been
5  alternative housing in the Gulf Coast area that you
6  could have put all these 118,000 families in?
7          Could you have left these people in New
8  Orleans?
9      A.  In all honesty, we -- we would not have
10 been able to house them. We would have done what
11 needed to be done, but that would have probably been
12 a reverse of the procedure that brought them into the
13 housing in the Gulf, which would -- the only thing we
14 would do then and today would be to have to send them
15 to other states to find enough housing to -- or
16 elsewhere in the state.
17     Q.  And as -- in your position as the chief of
18 IA for the Louisiana TRO at this time, were aware of
19 what the condition for housing -- local housing
20 conditions were?
21     A.  As far as availability of housing, I was
22 aware of that, yes.

Page 120

1      Q.  And from what I gather is, at this point
2  in time, there wasn't enough available alternative
3  local housing to house all these people, these
4  families that wanted to remain in New Orleans and
5  rebuild?
6      A.  That's probably a correct statement even
7  with hotels at that point, yes.
8      Q.  In your experience, when you -- when a
9  person -- when families have to relocate or you have
10 to relocate 118,000 families to distant states or
11 locations, are there risks associated with those
12 movements of people to transfer such a large
13 population?
14     A.  There's always risk when you're moving and
15 evacuating and transferring people, and just from the
16 buses and the airplanes and on down the line.
17 There's also risks of being able to get them back
18 home whenever the conditions are prevailient
19 (phonetic).
20     Q.  What do you mean, the problem of getting
21 them back home, sir?
22     A.  Well, once they're displaced and the time

Page 121

1  that goes in to actually reestablish housing, at some
2  point, you're going to have to actually transport
3  them back, and the programs may be over -- the
4  federal programs may be ended at that point in time
5  that would allow us to transport them home.
6      Q.  And so they may not have a way to get
7  home; is that right?
8      A.  Not without, you know, congressional
9  interaction.
10     Q.  And that's what I mean.
11         Some -- some persons are relying upon the
12 gover- -- they want to move back to New Orleans, they
13 had to rely upon the government to get them back
14 there?
15     A.  That's correct.
16     Q.  And once the program would end, that --
17 that assistance would not be there any longer?
18     A.  That's correct, without voluntary agencies
19 or someone else stepping up.
20     Q.  There was some questions by Mr. Scandurro,
21 the representative of Gulf Stream Coach, about the --
22 FEMA's involvement with the ATSDR study that came

Page 122

1  out.
2      To the best of your knowledge, did anyone
3  on your task force have any involvement in the actual
4  drafting of the ATSDR report?
5      A.  No, we did not.
6      Q.  Did anyone on this task force at any time
7  direct or specify what level of concern ATSDR should
8  adopt in that report?
9      A.  Not to my knowledge, they didn't.
10     Q.  You had some discussions with plaintiffs'
11 counsel, Mr. Woods, about the input that FEMA
12 counsel, Rick Preston, had during these meetings with
13 the EPA and CDC.
14     And I want to limit my questions here just
15 to those meetings.
16     A.  Okay.
17     Q.  My understanding is that Mr. Preston is
18 from FEMA's Office of Chief Counsel?
19     A.  That's correct.
20     Q.  Or was at that time; is that right?
21     A.  That's correct.
22     Q.  And that for the most part, he listened in

Page 123

1  on -- on the bimonthly telephone conferences that
2  took place between EPA, CDC, ATSDR, and FEMA; is that
3  right?
4      A.  The biweekly calls, that's correct, yes.
5      Q.  Now, I always get confused, biweekly or
6  bimonthly.
7      There's 2 calls a month, is that right, or
8  2 calls a week?
9      A.  Every other week.
10     Q.  Okay.  And to the best of your
11 recollection, did Mr. Preston ever direct or instruct
12 what type of units should be tested for formaldehyde
13 as part of the -- the test protocol?
14     A.  He didn't direct -- or the types of units,
15 even though he was engaged in the occupied versus
16 unoccupied when he was on those calls when we were
17 discussing that with the EPA and CDC, because Rick
18 was of the opinion along with headquarters and the
19 rest of FEMA that -- that tests would originally
20 include occupied and unoccupied.
21     So -- but that's the extent that he was
22 involved in the units, you know.

Page 124

1      Q.  So your recollection, as you sit here
2  today, is that Mr. Preston was advocating the testing
3  of both occupied and unoccupied units?
4      A.  Along with -- not alone, but along with
5  IA -- with our IA program management and
6  headquarters, yes.
7      Q.  In fact as I understand it, what you're
8  saying is that FEMA's position in those conversations
9  or discussions is, we wanted to test both occupied
10 and unoccupied units?
11     A.  That's correct.
12     Q.  And obviously what was tested eventually
13 was unoccupied, never-used units?
14     A.  That's correct.
15     Q.  As you sit here today, what is your
16 recollection of who advised or was advocating that
17 the initial testing be restricted to unoccupied new
18 units?
19     A.  Actually, EPA and CDC brought up the
20 challenges of what would happen to -- to -- or the
21 extent of effort it would take to build the protocol
22 to test the occupied units.

Page 125

1      The end result of that would have been
2  even though it would have been a good test -- and in
3  the end after the 2007 and the un-on (phonetic) test,
4  that's what we got, it would have basically skewed
5  the whole testing until mid-winter or into the spring
6  of the next year, and we weren't prepared for that at
7  that point in time.
8      Q.  Now, Mr. Scandurro, who represents Gulf
9  Stream Coach, did you become aware at some point in
10 time that Gulf Stream Coach wanted to inject itself
11 into this testing?
12     MR. SCANDURRO:  Object to the form of the
13 question.
14     BY MR. MILLER:
15     Q.  Did they ask to par- -- did
16 representatives of Gulf Stream Coach ask to
17 participate in this testing?
18     A.  Yes, they did.
19     Q.  And are you aware that that happened?
20     A.  I am aware, yes.
21     Q.  Were they allowed to participate in the
22 testing?

32 (Pages 122 to 125)

### Page 126

1   A.   No.
2       We felt that it should -- it should
3   actually be con- -- FEMA to the EPA and that the more
4   parties that were involved, the more other agendas
5   would come out of the testing.
6   Q.   How long did it take you to make that
7   decision not to allow Gulf Stream Coach to
8   participate?
9   A.   Not very long.
10  Q.   Why is that?
11  A.   Because we -- we really did not want to
12  inject additional factors into the testing. The
13  testing was across all manufacturers. We would have
14  had to inject -- invite all of the manufacturers in.
15      It would have once again been a very
16  burdensome test at that point in time. The way we
17  were going, we were going to take a random sample of
18  every one that we could lay our hands on.
19      Original intention was to take the ones
20  that there were most of, but what we ended up with
21  was taking 12 units of the 8 manufacturers that we
22  could get 12 units unoccupied in that time frame.

### Page 127

1   And it allowed the test to proceed on time.
2   Q.   Did you actually have difficulty obtaining
3   12 new unoccupied -- unoccupied units to do this
4   testing on?
5   A.   For some manufacturers, that was true,
6   because at that point, we were still actively engaged
7   in placing people into the units.
8       MR. MILLER: Mr. McNeese, I do not have
9   any further questions.
10      The government reserves the right to read
11  and sign.
12      MR. WOODS: Wait a minute.
13      I have some redirect.
14      MR. MILLER: And I should ask: We're at
15  12:15.
16      How long do you think you'll go?
17      MR. WOODS: Not long enough to --
18      MR. MILLER: Okay. That's what I'm
19  asking.
20
21
22

### Page 128

1   FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
2       BY MR. WOODS:
3   Q.   Mr. McNeese, I just have a followup
4   questions based on what you've been asked by
5   Mr. Scandurro and Mr. Miller.
6       You're not a statistician, are you?
7   A.   I am not, no.
8   Q.   You have no experience in extrapolation of
9   test results to other subjects of what might -- might
10  have been tested?
11  A.   Yes.
12      That's correct, I don't.
13  Q.   Okay. Do you have any idea following
14  hurricanes Katrina and Rita how many individuals were
15  transitioned through the federal government through
16  evacuation processes to other cities or states?
17  A.   Roughly 700,000 at one point.
18  Q.   700,000 people roughly in your estimation
19  were -- were displaced following hurricanes Katrina
20  and Rita?
21      MR. MILLER: Objection, mischaracterizes
22  the witness's testimony.

### Page 129

1       BY MR. WOODS:
2   Q.   I'm sorry.
3       Transitioned following Hurricane Rita and
4   Katrina through the government relocation or
5   transition program?
6       MR. MILLER: If I can clarify and explain.
7       I think your initial question was limited
8   to Katrina, and then you expanded to 700,000 Katrina
9   and Rita, and I don't -- that may have been wrong, I
10  heard it wrong.
11      But the witness can --
12  A.   That's correct.
13      BY MR. WOODS:
14  Q.   Okay. But you also -- also, sir, are
15  aware that in addition to the 700,000 that were
16  transitioned through the government transition
17  programs or evacuation programs that there were other
18  individuals that evacuated under their own costs and
19  under their own power.
20      Correct?
21  A.   I am aware of that, yes.
22  Q.   And are you aware that all residents