UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER          * | | MDL NO. 1873 |
|     FORMALDEHYDE          * | | |
|     PRODUCTS LIABILITY    * | | SECTION:  N(5) |
|     LITIGATION            * | | |
|                           * | | JUDGE: ENGELHARDT |
| This Document Relates to:  *Charlie Age, et al. v.*  * | | |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892  * | | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

Defendant, Gulf Stream Coach, Inc. ("Gulf Stream"), respectfully submits this memorandum in support of its motion for summary judgment regarding its status as a government contractor. Gulf Stream asserts that it is entitled to immunity from state law tort immunity because of that status.

### I. BACKGROUND

As this Court is well aware, this Multi-District Litigation is the consolidation of several state and federal toxic tort suits in which an estimated thirty thousand named plaintiffs claimed to have inhabited emergency housing units ("EHUs") that were provided to them by the Federal Emergency Management Agency ("FEMA") as a result of the alleged uninhabitability of their residences due to Hurricanes Katrina and Rita. (Doc. No. 109, at ¶ 96). During the course of this litigation, the parties completed the class certification phase, conducted substantial discovery, and now have moved into the trial phase. Gulf Stream's bellwether plaintiff, Alana Alexander, originally joined this litigation on February 27, 2009. (*Age, et al. v. Gulf Stream Coach, Inc., et al.*, 09-2892, Doc. No. 1). On April 6, 2009, she was selected as the bellwether plaintiff in a trail

against Gulf Stream. (Doc. No. 1299). Since that time, the parties have identified the design and construction of the Plaintiff's EHU as one of the central issues in her case.

FEMA has long used travel trailers as emergency housing units in responding to disasters, including in Louisiana. *See* Deposition Transcript of David Garratt, taken on July 7, 2009, p. 22, attached as Exhibit "A" (stating that travel trailers were used in the disaster relief efforts undertaken for Hurricane Andrew in 1992). FEMA believed that trailers were the preferred direct temporary housing product. *Id.* at 207. Their size allowed them to be transported and installed quickly, they were less expensive than mobile homes, and they could be placed on an individual's property so that the individual could return home and rebuild his or her property more quickly. *Id.* at 207—08.

Because FEMA's use of travel trailers was extensive, it sought to specify the design of the units it would supply to disaster victims. To that end, FEMA issued procurement specifications detailing how the EHUs were to be built. *See, e.g.*, GULF005675—5679, attached as Exhibit "B." Just as it had done in years prior, FEMA in 2004 produced a set of these procurement specifications. *See id.* They were comprehensive, setting forth information about the size and configuration of the trailers, electrical service, plumbing service, appliances, furnishings, heating and cooling mechanisms, safety equipment, coverings, transportation methods, and other issues. *See id.* They were also thorough, detailing all aspects of the trailers' construction from the overall square footage to the quantity of master key sets that were required for each unit. *See id.*

After FEMA drafted its 2004 specifications, it supplied the information to Gulf Stream. *See* Deposition Transcript of Eddie Abbott, taken on July 10, 2009, p. 23, attached as Exhibit "C." Gulf Stream received those specifications and constructed the units accordingly. Thereafter,

FEMA took control of the units and put them into use as part of its disaster relief operations throughout the United States. Plaintiff Alexander inhabited one of the 2004 units after Hurricane Katrina, <u>and her unit was specifically inspected and approved by FEMA</u>. *See* Federal Emergency Management Agency Unit Inspection Report, dated December 15, 2004, attached as Exhibit "D."

Years later, the Plaintiff brought suit against FEMA and Gulf Stream, alleging that the trailer emitted formaldehyde that caused her and her minor child to suffer personal injuries. However, Gulf Stream asserts that it is immune from any liability it may face as a result of the Plaintiff's allegations. Gulf Stream built the Plaintiff's unit in accordance with specifications that had been drafted and approved by FEMA and did not learn of any dangers in the product that it had a responsibility to tell FEMA about. Therefore, Gulf Stream is entitled to immunity as a government contractor.

## II.   LEGAL STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be rendered if the pleadings, discovery, disclosure materials and affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* Further, "It is axiomatic that where questions of law alone are involved in a case, summary judgment is appropriate." *Int'l Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Tx. Steel Co.*, 538 F.2d 1116, 1119 (5th Cir. 1976).

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that

the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *see also Lavespere v. Liberty Mut. Ins. Co.,* 910 F.2d 167, 178 (5th Cir.1990). Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must go beyond the pleadings and through affidavits, depositions, answers to interrogatories, and admissions on file must designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Auguster v. Vermillion Parish School Bd.,* 249 F .3d 400, 402 (5th Cir.2001).

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir.2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *See id.* (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir.2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate"

precisely how that evidence supports his claims. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.1994), *cert. denied,* 513 U.S. 871 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little,* 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys,* 298 F.3d 434, 440 (5th Cir.2002).

### III. LAW AND ARGUMENT

The question of immunity for government contractors begins with the question of federal pre-emption of state law. In *Boyle v. United Tech Corp.*, the U.S. Supreme Court held that some areas of activity – those involving "uniquely federal interests" – are so committed to federal control that any applicable state law becomes pre-empted. *See* 487 U.S. 500, 504 (1988). The government's procurement of equipment (and specifically military equipment, as in the *Boyle* decision) is one of those areas. *See id*. at 507. The fact that procurement is a uniquely federal interest, however, does not automatically mean that state law will be pre-empted. *Id*. Pre-emption, or "displacement," of state law will occur only when a significant conflict exists between an identifiable federal interest and the operation of applicable state law, or when the operation of state law would hinder the specific objectives that federal legislation was designed to achieve. *Id*. In determining whether such "displacement" is warranted, the Court held that state-law liability for design defects in military equipment cannot be imposed when "<u>(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the</u>

equipment that were known to the supplier but not to the United States." *Id*. at 512. (emphasis added).

In decisions that have followed *Boyle*, the scope of the government contractor immunity defense was expanded beyond the military equipment context. The Court later described the defense in much broader terms: "The Government contractor defense . . . shields contractors from tort liability for products manufactured for the Government in accordance with Government specifications, if the contractor warned the United States about any hazards known to the contractor but not to the Government." *Hercules, Inc. v. U.S.*, 516 U.S. 417, 421—22 (1996). Likewise, a court within the U.S. Court of Appeals for the Fifth Circuit jurisdiction held that the defense applied to all contractors, not just military contractors. *Guillory v. Ree's Contract Serv.*, 872 F.Supp. 344, 346 (S.D. Miss. 1994) (citing *Carley v. Wheeled Coach,* 991 F.2d 1117, 1119 (3d Cir. 1993); *Richland-Lexington Airport v. Atlas Properties,* 854 F.Supp. 400, 422 (D.S.C. 1994); *Lamb v. Martin Marietta Energy Sys.,* 835 F.Supp. 959, 966 n. 7 (W.D.Ky. 1993)).

Under the jurisprudence that sets forth the government contractor defense and makes it applicable beyond the military context, Gulf Stream submits that it is entitled to the defense because it can show that the United States approved "reasonably precise" specifications for EHUs, Gulf Stream's equipment conformed to those specifications, and Gulf Stream had no obligation to warn the government about any alleged dangers in the 2004 units of which it was unaware.

**A. Government's Approval of Reasonably Precise Specifications**

The first prong of the defense calls for the government to "approve" specifications that are "reasonably precise." The government's approval turns on whether it exercised discretion over the product design, or simply delegated discretion to the contractor. *See Trevino v. Gen.*

*Dynamics*, 865 F.2d 1474, 1480 (5th Cir. 1989). Mere acceptance of the contractor's design choice without significant evaluation is "rubber stamping," not substantive review. *See Stout v. Berg-Warner Corp.*, 933 F.2d 331, 336 (5th Cir. 1991). The government exercises its discretion when it actually chooses a design feature. *Trevino,* 865 F.2d at 1480. As the Fifth Circuit has stated:

> The government delegates the design discretion when it buys a product designed by a private manufacturer; when it contracts for the design of a product or a feature of a product, leaving the critical design decisions to the private contractor; or when it contracts out the design of a concept generated by the government, requiring only that the final design satisfy minimal or general standards established by the government.

*Id*.

Furthermore, the approval does not mean the government has to prepare the specifications. *Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000). All that is required is that the government performs a "substantive review" of the specifications. *Trevino,* 865 F.2d at 1480. Whether the government has undertaken such a review is based on several factors, including an examination of drawings, periodic evaluation, criticism, and extensive government testing. *Kerstetter*, 210 F.3d at 435. To complete a substantive review, there must be a "continuous back and forth between the contractor and government." *Id*. Furthermore, it is not necessary that the specifications depict the alleged defect, as long as the government evaluated the design aspect in question. *Id*.

Several decisions from the Fifth Circuit have dealt with the issue of whether the government approved reasonably precise specifications. In *Stout v. Berg-Warner Corp.*, the manufacturer alleged that the government approved reasonably precise specifications on an air conditioning unit used to cool a U.S. Army missile repair unit. *Id*. at 335. The manufacturer pointed out that the Army controlled the design process by modifying the design of the air

conditioner; reviewed, evaluated, tested and approved detailed design drawings at different stages during the process, including the prototype phase; and approved over fifty pages of design drawings. *Id*. The court agreed with the manufacturer and further acknowledged that the government had reviewed detailed drawings that the contractor submitted at various progressive stages of the design, performed critical design reviews, and evaluated and tested for months the prototype models produced by the manufacturer.

In *Smith v. Xerox Corp.*, an Army soldier was injured when a weapon simulator he was using exploded prematurely and burned his arm and torso. 866 F.2d 135, 136 (5th Cir. 1989). The soldier sued Xerox, the manufacturer of the weapon, for his personal injuries. *Id*. Xerox filed for summary judgment under the government contractor defense, and it won the motion. *Id*. On appeal, the Fifth Circuit noted that although Xerox failed to produce complete specifications for the original simulator, Xerox did produce a listing of those specifications, a copy of the original government performance criteria dictating the environmental specifications the government wanted the simulator to meet, and a production contract furnished by Xerox for a series of simulators containing specific reference to government-approved specifications. *Id*. at 138. Further, a Xerox employee who was involved with the development of the simulator testified that the Army reviewed and approved the drawings and specifications prepared by Xerox. *Id*. Because the government in this case supplied the relevant environmental specifications, and because the employee's unrebutted testimony was that the government reviewed and approved Xerox's final drawings and specifications, the court held that the government had approved reasonably precise specifications. *Id*.

In *In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90*, the plaintiffs brought product liability claims against the manufacturers of a military plane that crashed, tragically

killing 13 of the 17 servicemen aboard. 81 F.3d 570, 571—72 (5th Cir. 1996). In considering the government contractor defense, the court acknowledged that the U.S. Air Force's substantive review, evaluation and testing of the aircraft "clearly implicate[d] the Government's discretionary function and approval of reasonably precise specifications." *Id*. at 575. Affidavits established that the manufacturers and the Air Force had worked closely together on the development of the plane from planning through production. *Id*. In addition, the Air Force inspected and supervised all aspects of the aircraft's production. *Id*. As the court said, "Clearly, the approvals in this case go far beyond mere rubber stamping." *Id*.

Applying these cases to the instant litigation, Gulf Stream asserts that the government approved reasonably precise specifications for the EHUs. In fact, FEMA did more than any of the other governmental entities discussed in the aforementioned cases – it actually prepared the original set of procurement specifications for FEMA Model Travel Trailers. *See* Exhibit B. FEMA's specifications described minimum square footage of living space, floor plan configuration, finishes, furnishings, and environmental living conditions necessary to provide emergency housing during periods of disaster relief. *Id*. The manufacturer who produced these emergency units had to construct them with a superior quality of workmanship, and the specifications did not constitute any type of deviation from federal regulatory requirements. *Id*. By making these pronouncements, FEMA supplied the relevant specifications that formed the basis of the production of travel trailers, much like the U.S. Army did in the *Smith* decision. FEMA specifically chose the design features for the trailer, and in doing so exercised great discretion over the complete design. *See Trevino,* 865 F.2d at 1480. Never did FEMA delegate design choices to Gulf Stream carte blanche; instead, FEMA created the preferred design itself.

Additionally, FEMA exercised its discretion over the product design by specifically choosing to use travel trailers as part of its disaster relief efforts. *See* Exhibit A, p. 203 (stating that FEMA supplied thousands of travel trailers for natural disasters prior to Katrina). As stated above, FEMA had used this product since at least the early 1990s in south Louisiana. *See id*. at 22. Its use of these trailers as part of its disaster relief operations, especially in the same type of hot and humid climate that exists in this area, was extensive and well documented. *See id*. Travel trailers were not a revolutionary product – FEMA knew exactly what was in them and used them without incident prior to Hurricane Katrina. *See* Deposition Transcript of Martin McNeese, taken on July 14, 2009, p. 100—01, 106—08, attached as Exhibit "E."

Furthermore, the Plaintiff's <u>unit was inspected and approved by FEMA</u>. *See* Exhibit D. Just like the above-cited cases, the government evaluated and examined the unit. By doing so, FEMA went well beyond simply providing a "rubber stamp" to the design. Therefore, its approval of these reasonably precise specifications satisfies the first prong of the *Boyle* test.

### B. Conformance to Specifications

The second prong requires the contractor to prove that the equipment it produced conformed to the specifications that were approved by the government. *Boyle*, 487 U.S. at 512. The Fifth Circuit has held:

> Nonconformance with a specification means more than that the ultimate design feature does not achieve its intended goal. The alleged defect must exist independently of the design itself, and must result from a deviation from the required military specifications. Extensive government involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production, is evidence that the product line generally conformed with the government-approved specifications.

*Kerstetter*, 210 F.3d at 435—36.

Decisions from the Fifth Circuit have reinforced the general rule. *In re Air Disaster*, discussed previously, held that the manufacturer's equipment conformed to specifications because the government inspectors were present and actively involved throughout the design, review, development and testing of the plane that crashed. 81 F.3d at 575. Furthermore, the evidenced showed that the Air Force accepted and had used the plane for over 20 years without any significant problems before the crash. *Id*. Likewise, in the *Xerox* decision, the court held that the evidence showed the manufacturer of the weapon that discharged prematurely had complied with the specifications for the product. *See* 866 F.2d at 138. When technicians analyzed the weapon after the accident, they could not duplicate the problem. *Id*. at 139. After the product was reassembled, the government put the product back into use. *Id*. Thus, the court held that the product complied with the applicable specifications. *See id*.

In this case, Gulf Stream submits that its production of the subject EHU conformed to the specifications set forth by FEMA. There has been no evidence to show that Gulf Stream's 2004 units were built out of conformance with FEMA's specifications. Gulf Stream reviewed nearly 20 years worth of records related to the production of EHUs for FEMA and found zero complaints. *See* Deposition Transcript of Gulf Stream Coach, Inc. (through James F. Shea), taken on May 28, 2009, p. 130, attached as Exhibit "F." Additionally, FEMA's own personnel testified that prior to Katrina, there was not a shred of written evidence or documentation that showed problems with formaldehyde. *See* Exhibit A, p. 179; Exhibit E, p. 100—01; Deposition Transcript of Stephen Miller, taken on July 9, 2009, p. 184—85, attached as Exhibit "G." Additionally, FEMA put some of the 2004 units – including the Plaintiff's unit – into the field as part of its Katrina/Rita disaster relief efforts. In fact, FEMA used 2004 units as replacement units for some individuals who complained about formaldehyde, and those replacement units resolved

those complaints. Exhibit E, p. 106—07. Just as with the *In re Air Disaster* and *Xerox* cases, the government used Gulf Stream's products extensively as part of its disaster relief efforts prior to Hurricane Katrina. Such evidence shows that Gulf Stream complied with FEMA's specifications, and thus satisfied the second prong of the *Boyle* test.

### C.  Warnings about Dangers in the Equipment Not Known by the Government

The final prong requires the contractor to warn the government about dangers in the use of the equipment that are known to the contractor but not known to the government. *Kerstetter*, 210 F.3d at 436. The contractor has no obligation to inform the government of those dangers already known to the government. *Boyle*, 487 U.S. at 512. Additionally, "the purpose of this element is not to create an incentive to discover latent defects in a product designed for the government." *Kerstetter*, 210 F.3d at 436 (emphasis in original). Thus, the contractor only has a duty to inform of dangers it actually knows about, not those it should have known about. *Id*.

With respect to this prong, Gulf Stream asserts – as it has done before – that it learned of absolutely no alleged dangers in the 2004 model EHUs. *See* Exhibit F, p. 130. FEMA's personnel testified, there was no evidence or documentation that showed problems with formaldehyde prior to Katrina. *See* Exhibit A, p. 179; Exhibit E, p. 100—01; Exhibit G, p. 184—85. Thus, Gulf Stream did not know and could not have known of any formaldehyde problems with its units. Without actual knowledge of any dangers, Gulf Stream had no responsibility to communicate any information to FEMA.

Furthermore, to the extent the existence of formaldehyde would qualify as a "danger" that Gulf Stream had an obligation to convey to FEMA, FEMA was well aware of the presence of formaldehyde. *See* Exhibit E, p. 35. As Martin McNeese, FEMA's Emergency Program Specialist at the time of Hurricane Katrina, stated, it was no surprise that the travel trailers

contained formaldehyde. *Id.* at 108. Clearly, FEMA knew that the subject unit contained the compound. In fact, it was known to FEMA that not only an industry standard travel trailer, but also a conventional home, would contain formaldehyde. Exhibit E, p. 107—08. Because Gulf Stream had no obligation to inform FEMA of dangers FEMA already knew about, and because Gulf Stream never learned of any dangerous conditions regarding the presence of formaldehyde, it has satisfied the third prong of the *Boyle* test.

Finally, it is important to note that the Plaintiff's own formaldehyde test of the Alexander unit shortly after it was vacated, even without ventilation or any attempt to engage the HVAC system to simulate actual living conditions, yielded a result of 0.05 parts per million. *See* Deposition Transcript of William D. Scott, taken on June 11, 2009, p. 113, 117, 205, attached as Exhibit "H." This is within the range of outdoor air formaldehyde levels in an American urban area like New Orleans;[1] below the levels measured during both the wintertime and summertime in HUD-regulated mobile homes;[2] over seven times lower than the average indoor air level found in a study of South Louisiana residences;[3] and within the range emitted in exhaled human breath.[4] Although the presence of the ubiquitous compound was known to FEMA and Gulf Stream, neither of them had any awareness or knowledge of any "danger" in the 2004 units. Moreover, the Plaintiff's own test underscores the reasonableness of that lack of knowledge.

---

[1] Doc. No. 196-34, p. 9.

[2] *Id.*

[3] R. Lemus et al., *Potential Health Risks from Exposure to Indoor Formaldehyde*, 13 REVIEWS ON ENVIRONMENTAL HEALTH (Nos. 1—2) 91, 91—98 (1998), attached as Exhibit "I."

[4] Berthold Moser et al., *Mass Spectrometric Profile of Exhaled Breath – Field Study by PTR-MS*, 145 RESPIRATORY PHYSIOLOGY & NEUROLOGY 295, 295—300 (2005), attached as Exhibit "J."

## IV.     CONCLUSION

Because Gulf Stream has satisfied each prong of the government contractor defense – showing that the government approved reasonably precise specifications, that it complied with those specifications, and that it knew of no dangers in the product that it was obligated to bring to the government's attention – Gulf Stream asks this Court to grant summary judgment in its favor, thereby dismissing the Plaintiff's claims against Gulf Stream.

Respectfully Submitted:

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER & WEINSTOCK**

s/Andrew D. Weinstock
_____
**ANDREW D. WEINSTOCK #18495
JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
(504) 832-3700
(504) 837-3119 (FAX)
andreww@duplass.com
jglass@duplass.com

and

**SCANDURRO & LAYRISSON
Timothy D. Scandurro #18424
Dewey M. Scandurro #23291**
607 St. Charles Avenue
New Orleans, LA 70130
(504) 522-7100
(504) 529-6199 (FAX)
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc.**

## **C E R T I F I C A T E**

I hereby certify that on the 31st day of July, 2009, a copy of the foregoing Memorandum in Support of Motion for Summary Judgment was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com