**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  FEMA Trailer Formaldehyde Products | * | MDL No. 1873 |
| Liability Litigation | * | |
| | * | Section N(5) |
| | * | |
| | * | Judge Engelhardt |
| This Document Relates To: | * | |
| *Robert James, Jr., et al. v.* | * | Magistrate Chasez |
| *FRH, Inc., f/k/a Hy-Line Enterprises, Inc., et al.* | * | |
| *Civil Action No.  09-3604* | * | Jury Demand |

*******************************************************************************

**PLAINTIFFS' FIRST SUPPLEMENTAL AND AMENDING COMPLAINT FOR DAMAGES**

NOW INTO COURT, come Robert James, Jr., together with all individuals whose names appear on "Exhibit A" (attached to Civ. Action No. 09-3604, Rec. Doc. 1), (hereinafter, "Named Plaintiffs"), who through undersigned counsel, supplement their original Complaint for Damages in the following respects and otherwise reiterate and reaver all of the allegations, claims and prayers for relief contained therein.

**I.  PARTIES**

1.    Each Named Plaintiff is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the states in which Defendants are citizens.

2.    Named Plaintiffs are those individuals and entities listed on "Exhibit A" (attached to Civ. Action No. 09-3604, Rec. Doc. 1).

3.    FRH, Inc., formerly known as Hy-Line Enterprises, Inc. (hereinafter, "Hy-Line") is, upon information and belief, an entity incorporated in the state of Indiana with its principle place of business in Indiana, which conducts business in the State of Louisiana, and which manufactured and supplied Federal Emergency Management Agency (hereinafter, "FEMA") trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Louisiana.

4.    Defendant Indiana Building Systems, LLC, doing business as Holly Park Homes

1

(hereinafter, "Holly Park") is, upon information and belief, an entity incorporated in the state of Indiana with its principle place of business in Indiana, which conducts business in the State of Louisiana, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Louisiana.

5.      CH2M Hill Constructors, Inc. (hereinafter, "CH2M"), a Delaware corporation with its principal place of business in Colorado, licensed to do business in the State of Louisiana and in good standing, received a No-Bid contract from FEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to persons displaced by hurricanes Katrina and Rita.

6.      MLU Services, Inc.  (hereinafter, "MLU"), a Georgia corporation with its principal place of business in Georgia, licensed to do business in the State of Louisiana and in good standing, received a contract from FEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to persons displaced by hurricanes Katrina and Rita.

7.      Defendant Fluor Enterprises, Inc. (hereinafter, "Fluor"), a California corporation with its principal place of business in Irving, Texas, licensed to do business in the State of Louisiana and in good standing, received a No-bid contract from FEMA, and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to persons displaced by Hurricanes Katrina and Rita. Further, upon information and belief,

2

Fluor entered into a contract(s) with MLU to provide installation, maintenance and deactivation of the temporary housing units provided by FEMA.

8.    Defendant Shaw Environmental, Inc. (hereinafter, "Shaw"), a Louisiana corporation, received a No-bid contract from FEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to persons displaced by Hurricanes Katrina and Rita. Further, upon information and belief, Shaw entered into a contract(s) with MLU to transport and inspect temporary housing units provided by FEMA.

## II.  <u>JURISDICTION AND VENUE</u>

9.    Each Plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

10.   Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendants with citizenship other than that of Plaintiffs, because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11.   Hy-Line is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

12.   Holly Park is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which

3

are the subject of this litigation.

13.    CH2M is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

14.    MLU is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

15.    Fluor is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

16.    Shaw is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

17.    Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, as the emergency housing units were provided to the Plaintiffs in this district, and Named Plaintiffs' injuries were sustained in this district.

### III.  FACTS AND GENERAL ALLEGATIONS

18.    The Named Plaintiffs resided in a travel trailer manufactured by Hy-Line and

installed by CH2M from November 2006 to February 2007 and a mobile home

manufactured by Holly Park and installed by MLU and/or Shaw and/or Fluor from

February 2007 to January 2008 (hereinafter referred to as "housing units") in the

State of Louisiana  provided by FEMA after the landfalls of Hurricane Katrina and/or

Rita in September of 2005.

19.    Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or

longer than 40 feet, for an average area greater than 320 square feet.  They are

designed to be used as permanent homes and are defined and regulated by the U.S.

Department of Housing and Urban Development ("HUD"). *See* Center for Disease

Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED

TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at*

http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

20.    Of the housing units at issue, "travel trailers" are wheel-mounted and generally no

larger than 8 feet wide and 40 feet long, for an average area of less than 320 square

feet.  They are designed to provide temporary living quarters and are generally

considered vehicles, regulated by state transportation authorities rather than

housing authorities.  *Id.*

21.    The residence of Named Plaintiffs was rendered unhabitable following hurricanes

Katrina and/or Rita, leaving each Plaintiff homeless and in need of housing

assistance.

22.    FEMA contracted with Hy-Line to purchase thousands of the housing units,

primarily travel trailers, for provision to the Named Plaintiffs and other Gulf Coast

residents as temporary housing.

23.    FEMA contracted with Holly Park to purchase thousands of the housing units for

5

provision to the Named Plaintiffs and other Gulf Coast residents as temporary housing.

24.    On information and belief, Hy-Line expedited production of these travel trailers, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the travel trailer occupied by Named Plaintiffs containing higher than normal levels of formaldehyde.

25.    On information and belief, Holly Park expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the mobile home occupied by Named Plaintiffs containing higher than normal levels of formaldehyde.

26.    On information and belief, the housing units of Named Plaintiffs, including those units which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

27.    Named Plaintiffs submit that each and all of the housing units which are at issue herein, both those which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

28.    Named Plaintiffs submit that the travel trailer at issue, whether manufactured prior to the hurricanes or later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Hy-Line's use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing unit as a

6

temporary residence for at least 18 months, but that Hy-Line failed to warn the Federal Government about these dangers.

29.    Named Plaintiffs submit that the mobile home at issue, whether manufactured prior to the hurricanes or later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Holly Park's use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing unit as a temporary residence for at least 18 months, but that Holly Park failed to warn the Federal Government about these dangers.

30.    Named Plaintiffs submit that Hy-Line ignored, or concealed and/or condoned the concealment of, the fact that the travel trailer contained dangerous levels of formaldehyde due to Hy-Line's use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing unit as a temporary residence for at least 18 months, all in order to sell Hy-Line's products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

31.    Named Plaintiffs submit that Holly Park ignored, or concealed and/or condoned the concealment of, the fact that the mobile home contained dangerous levels of formaldehyde due to Holly Park's use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing unit as a temporary residence for at least 18 months, all in order to sell Holly Park's products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

32.    Each and all of the Named Plaintiffs spent significant time in the FEMA-provided

travel trailer manufactured by Hy-Line and provided to Plaintiffs by the Federal Government.  As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing unit.

33. Each and all of the Named Plaintiffs spent significant time in the FEMA-provided mobile home manufactured by Holly Park and provided to Plaintiffs by the Federal Government.  As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing unit.

34. Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units.  Pursuant to federal law, the defendants are required to display a "Health Notice" in manufactured homes about exposure to formaldehyde which reads:

### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde.  Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure.  Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk.  Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air.  Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer.  Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels.  When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels.  Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

35.    According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA").  Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

36.    Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases.  Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects.  In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 parts per million (hereinafter, "ppm") to 1 ppm.  In May, 1992, the formaldehyde exposure limit was further reduced to 0.75 ppm.

37.    HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes).  HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and]

9

(2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". *See* 24 C.F.R. §3280.308.

38.     Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by Plaintiffs. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

39.     Hy-Line knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

40.     Holly Park knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

41.     FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (hereinafter, "Stafford Act"). The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This

aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

42.   In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged CH2M with No-Bid contracts, eventually amounting to approximately half a billion dollars. The Federal Government also relied on the expertise and knowledge of CH2M to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

43.   In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged MLU with contracts, eventually amounting to more than forty million dollars. The Federal Government also relied on the expertise and knowledge of MLU to haul, install and maintain mobile homes that were to be used as temporary housing units for periods up to, and potentially exceeding, eighteen months in duration. Further, upon information and belief, MLU contracted with both Fluor and Shaw to transport, install, maintain and deactivate temporary housing units provided by FEMA

44.   In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Fluor with No-Bid contracts, eventually amounting to over one billion dollars. The Federal Government also relied on the expertise and knowledge of Fluor to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for

periods up to, and potentially exceeding, eighteen months in duration. Further, upon information and belief, Fluor entered into a contract(s) with MLU to provide installation, maintenance and deactivation of the temporary housing units provided by FEMA.

45.     In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Shaw with No-Bid contracts, eventually amounting to over eight hundred million dollars.  The Federal Government also relied on the expertise and knowledge of Shaw to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration. Further, upon information and belief, Shaw entered into a contract(s) with MLU to transport and inspect temporary housing units provided by FEMA.

46.     CH2M was tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

47.     Fluor and/or Shaw and/or MLU was tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

48.     Under the terms of their contracts, CH2M was obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the

manufacturers of same.  Further, under their No-Bid contracts with FEMA, CH2M was obligated to advise and instruct FEMA regarding the implementation of those contracts. CH2M failed to properly fulfill either of these tasks.

49.     Under the terms of their contracts, Fluor and/or Shaw and/or MLU was obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same.  Further, under their contracts with FEMA, Fluor and/or Shaw and/or MLU was obligated to advise and instruct FEMA regarding the implementation of those contracts. Fluor and/or Shaw and/or MLU failed to properly fulfill either of these tasks.

50.     CH2M contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which CH2M was tasked with operating. These new areas included staging areas to be managed and maintained as assigned to CH2M or individual locations and addresses where CH2M assigned that temporary housing unit would have obligations to manage and maintain it.

51.     Fluor and/or Shaw and/or MLU contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Fluor and/or Shaw and/or MLU was tasked with operating.  These new areas included staging areas to be managed and maintained as assigned to Fluor and/or Shaw and/or  MLU or individual locations and addresses where Fluor and/or Shaw and/or MLU assigned that temporary housing unit would have obligations to manage and maintain it.

52.     To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, CH2M entered into numerous sub-contracts, but at all times

retained supervisory capacity and responsibility under their individual contracts with FEMA.

53. To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Fluor and/or Shaw and/or MLU entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under their individual contracts with FEMA.

54. CH2M was tasked under its contracts with FEMA to identify and prepare the infrastructure for the various group site locations. This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc. CH2M knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

55. Fluor and/or Shaw and/or MLU was tasked under its contracts with FEMA to identify and prepare the infrastructure for the various group site locations. This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc. Fluor and/or Shaw and/or MLU knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

56. Once the travel trailer occupied by the Named Plaintiffs was transported and delivered to the particular location, CH2M had the responsibility for installing that temporary housing unit. CH2M installed the temporary housing units by "blocking" the unit. This meant raising the plaintiff's unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

57. By blocking the Named Plaintiffs' travel trailer, CH2M created stress and flexing on the frame of the unit as it was not designed to be lifted off of the wheel base. In fact, the manufacturers of the temporary housing units warned in the various owners' manuals

14

provided with some of the units, that units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

58.   The stress and flexing of the travel trailer's frame caused by CH2M "blocking" it with weight off of the wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

59.   The temporary housing units occupied by the Named Plaintiffs which were provided by FEMA were for the most part travel trailers. Travel trailers are, by definition, mobile. They are designed for and intended for periodic, recreational use and not for long-term habitation.  By installing the travel trailer on concrete blocks for extended occupancy, CH2M knowingly and intentionally modified the design and the actual use of the travel trailer occupied by the Named Plaintiffs by converting it into a temporary housing unit to be used as a residence for long-term occupancy.

60.   CH2M failed to consult with the manufacturers of the temporary housing units, including Hy-Line, with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long-term residence and occupation. CH2M took actions which voided the warranties of the manufacturer and directly created or contributed to unsafe and hazardous living conditions in the travel trailer.

61.   Once CH2M completed the transportation, delivery and installation of the travel trailer occupied by the Plaintiffs, CH2M was tasked with inspecting the unit to ensure that it was safe and habitable, prior to occupancy by the Plaintiffs.  Upon information and belief, CH2M failed to adequately inspect the travel trailer occupied by the Plaintiffs to ensure that the unit was safe and suitable for its intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita.  This

failure to properly inspect the unit for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by Named Plaintiffs and other individuals displaced by hurricanes Katrina and Rita.

62.    Once Fluor and/or Shaw and/or MLU completed the transportation, delivery and installation of the mobile home occupied by the Plaintiffs, Fluor and/or Shaw and/or MLU was tasked with inspecting the unit to ensure that it was safe and habitable, prior to occupancy by the Plaintiffs. Upon information and belief, Fluor and/or Shaw and/or MLU failed to adequately inspect the mobile home occupied by the Named Plaintiffs to ensure that the unit was safe and suitable for its intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita. This failure to properly inspect the unit for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by Named Plaintiffs and other individuals displaced by hurricanes Katrina and Rita.

63.    In addition to transportation, site identification, installation and inspection, the travel trailer occupied by the Named Plaintiffs and provided in response to hurricanes Katrina and Rita was also managed, maintained and repaired by CH2M, or their various subcontractors over whom they maintained direct oversight and responsibility. Upon information and belief, CH2M failed to adequately manage, maintain and repair the travel trailer which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects suffered by the Plaintiffs.

64.    In addition to transportation, site identification, installation and inspection, the mobile home occupied by the Named Plaintiffs and provided in response to hurricanes Katrina and Rita was also managed, maintained and repaired by Fluor and/or Shaw and/or MLU, or their various subcontractors over whom they maintained direct oversight and responsibility. Upon information and belief, Fluor and/or Shaw and/or MLU failed to

16

adequately manage, maintain and repair the mobile home which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects suffered by the Plaintiffs.

65.  Parallel to their duty to manage, maintain and repair each temporary housing unit CH2M failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the plaintiffs-occupants of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

66.  Parallel to their duty to manage, maintain and repair each temporary housing unit Fluor and/or Shaw and/or MLU failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the plaintiffs-occupants of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

67.  Following the Plaintiffs' occupancy of the travel trailer, CH2M was tasked with its de-installation.  Upon discovering the deteriorated condition of the temporary housing unit at the time of de-installation and removal, CH2M failed to identify the unsuitability of the temporary housing unit for long-term occupancy.

68.  Following the Plaintiffs' occupancy of the mobile home, Fluor and/or Shaw and/or MLU was tasked with its de-installation.  Upon discovering the deteriorated condition of the temporary housing unit at the time of de-installation and removal, MLU failed to identify the unsuitability of the temporary housing unit for long-term occupancy.

69.  In addition to de-installation of the travel trailer, CH2M was tasked with refurbishment and restoration of the travel trailer for use, either in direct response to hurricanes Katrina and Rita or for use in the future.  By restoring and refurbishing the travel

trailer, CH2M warranted that the unit was fit for its intended use, long-term occupancy in response to disaster related displacement. By restoring and refurbishing the temporary housing unit, CH2M created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing unit. Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

70.    In addition to de-installation of the mobile home, Fluor and/or Shaw and/or MLU was tasked with refurbishment and restoration of the mobile home for use, either in direct response to hurricanes Katrina and Rita or for use in the future. By restoring and refurbishing the mobile home, Fluor and/or Shaw and/or MLU warranted that the unit was fit for its intended use, long-term occupancy in response to disaster related displacement. By restoring and refurbishing the temporary housing unit, Fluor and/or Shaw and/or MLU created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing unit. Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

71.    CH2M, at every stage of their involvement, failed to warn the Plaintiff-occupants of the travel trailer of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but not limited to the advent of childhood asthma and the onset of adult asthma in some of the occupants.

72.   Fluor and/or Shaw and/or MLU, at every stage of their involvement, failed to warn the Plaintiff-occupants of the mobile home of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but not limited to the advent of childhood asthma and the onset of adult asthma in some of the occupants.

73.   Through their actions and omissions, CH2M created and perpetuated a situation wherein occupants of the travel trailer were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. CH2M negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing unit; (2) the installation and set-up of the temporary housing unit; and (3) the warning that the temporary housing unit contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

74.   Through their actions and omissions, Fluor and/or Shaw and/or MLU created and perpetuated a situation wherein occupants of the mobile home were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Fluor and/or Shaw and/or MLU negligently failed to adhere to the manufacturer instructions and warnings related to the warning that the mobile home contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

75.   CH2M failed to warn the occupants of the travel trailer of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing unit.

76.   Fluor and/or Shaw and/or MLU failed to warn the occupants of the mobile home of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing unit.

77.   By restoring and refurbishing the travel trailer for future habitation, CH2M improperly and negligently warranted that the unit was fit for its intended use of long-term occupancy.

78.   Finally, despite these failures, CH2M received millions of dollars in contracts from FEMA and the United States government, at the expense of the health of the Plaintiff-occupants of the travel trailer who simply had nowhere else to go and who were relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

79.   Finally, despite these failures, Fluor and/or Shaw and/or MLU received millions of dollars in contracts from FEMA and the United States government, at the expense of the health of the Plaintiff-occupants of the mobile home who simply had nowhere else to go and who were relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

80.   The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith.  *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S.

House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

81.   Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

82.   In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels.  *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff in a related matter, November 16, 2007.

83.   Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Named Plaintiffs and other Gulf Coast residents, the Inspector General of the Department of Homeland Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Gulf Coast residents, including Named Plaintiffs. *See* Statement of

Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

84. The Federal Government also continued to supply the defective and dangerous housing units to the Named Plaintiffs after March of 2006.

85. The Federal Government continued to  supply the defective and dangerous housing units to the Named Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

86. The Federal Government continued to supply the defective and dangerous housing units to the Named Plaintiffs even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied  housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value.  Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http://oversight.house.gov/documents/20070719113015.pdf)  and D (*available at* http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

87. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, *supra*,

and Exhibits E (*available at* http://oversight.house.gov/documents /20070719113322.pdf), I (*available at* http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at* http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

88.    While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue."   Union of Concerned Scientists, *supra*, and Supplemental A (various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B (various emails *available at* http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

89.    Named Plaintiffs aver that, even as each Named Plaintiff was being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the manufacturers concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

90.     FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease
        Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised
        FEMA that the "health base level" for formaldehyde might be much lower than
        previously expected, with anticipated levels being more than 100 times higher.  The
        discussions during this conference were more "strategic" in nature, with the EPA
        warning against the "the advisability of testing at all" concerned that the data would
        have to be released to the public and that the media would characterize the findings in
        the worst possible light.  Union of Concerned Scientists, *supra*, and Exhibit R (various
        emails *available at* http://oversight.house.gov/documents/20070719114058.pdf)
        attached thereto.

91.     FEMA and EPA senior leadership instead agreed to test ventilation methods on
        unoccupied trailers.  This testing methodology completely failed to simulate the living
        conditions of a trailer resident, so results, which would not be released for another
        seven to eight months,  were useless for determining a policy to protect trailer
        residents.  This testing was conducted by FEMA and EPA in September and October of
        2006 at a trailer staging area located in Baton Rouge,  Louisiana.  Union of Concerned
        Scientists, and Exhibit R attached thereto, *supra*. *See also* Original Health Consultation:
        Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic
        Substances and Disease Registry, Feb 1, 2007, *available at*
        http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_
        report_0507.pdf.

92.     This testing methodology did not simulate the living conditions, temperatures,
        humidities, standard ventilation practices, or timescales at which residents lived in the
        trailers. It also did not take into account that the trailer building materials continue to
        emit formaldehyde for four to five years.   Union of Concerned Scientists, *supra*.

93.     FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units occupied by the Plaintiffs and supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Plaintiffs herein as a result of their exposure to formaldehyde. FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006.  *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

94.     FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review.  FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units.  *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

95.     FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006.  The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008

ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit.  Yet even applying this "level of concern," the average sampling results still were higher. *See* The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued Hurricane Disaster Victims, and Recommended Action Items, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents /20070719102502.pdf.

96.   Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw... I think it was a complete violation of our professional code of ethics."  Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/ 20071114164004.pdf.

97.   On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

98.   Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation "did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially

incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at* http://www.atsdr.cdc.gov/ substances/formaldehyde/public_assessment.html.

99.   The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

100.  It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units. *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC's Response to Health Concerns Related to FEMA-Provided Travel Trailers and Mobil Homes in the Gulf Coast Region, March 4, 2008, at 1, 3-4.

101.  The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (hereinafter, "ppb") to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels

tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

102.   The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

103.   As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing. The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

104.   The Federal Government's actions with regard to these Named Plaintiffs in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy.

28

Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

105.    Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

## COUNT 1:

## CAUSE OF ACTION AGAINST HY-LINE UNDER

## THE LOUISIANA PRODUCTS LIABILITY ACT

106.    Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

107.    Hy-Line is the manufacturer of the travel trailer occupied by the Named Plaintiffs, which unit constitutes a product under the Louisiana Products Liability Act (hereinafter, "LPLA").

108.    The exposure to each Named Plaintiff to formaldehyde fumes from Hy-Line's product and equipment resulted from the normal, foreseeable, and intended use of the product and equipment, without substantial alteration in the condition in which Hy-Line sold the housing unit.

109.    The design of the housing unit, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to each Named Plaintiff.

110.    Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to each Named Plaintiff.

29

111.    Hy-Line's product, equipment and supplies used by each Named Plaintiff was in a
defective condition and was unreasonably dangerous under normal use at the time the
product and equipment left Hy-Line's control.  Each Named Plaintiff was an intended
and foreseeable user of the alleged defective product and damages and losses to each
Named Plaintiff reasonably could have been anticipated by Hy-Line.

112.    The defects in Hy-Line's housing unit was the result of and/or include, but are not
limited to, the following:

113.    In failing to design their respective product so as not to emit dangerous levels of
formaldehyde;

114.    In providing a housing unit which, by virtue of its design and/or manufacture and/or
composition, was unreasonably dangerous under reasonably anticipated use;

115.    In providing a housing unit which, by virtue of a lack of an adequate warning(s), was
unreasonably dangerous under reasonably anticipated use;

116.    In providing a housing unit which did not conform to the express warranties made by
Hy-Line regarding its fitness for use as reasonably anticipated;

117.    In manufacturing, testing, marketing, distributing, licensing and selling of an
unreasonably dangerous housing unit;

118.    In failing to properly test the housing unit to correctly evaluate the level of emissions
of formaldehyde under foreseeable conditions for extended periods of time;

119.    In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the
housing unit occupied by the Plaintiff, or warn adequately of the presence of excessive

30

levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit.

120.   In failing to ensure that the housing unit it manufactured and provided to Named Plaintiffs was suitable for its intended use;

121.   In failing to adhere to any and all express warranties of fitness and safety for the housing unit they manufactured and provided;

122.   In manufacturing and providing a housing unit which was unduly dangerous due to its emissions of formaldehyde; and,

123.   Such other indicia of fault under the LPLA  as will be shown at the trial of this matter.

**COUNT 2:**

**<u>CAUSE OF ACTION AGAINST HOLLY PARK UNDER</u>**

**<u>THE LOUISIANA PRODUCTS LIABILITY ACT</u>**

124.   Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

125.   Holly Park is the manufacturer of the mobile home occupied by the Named Plaintiffs, which unit constitutes a product under the Louisiana Products Liability Act (hereinafter, "LPLA").

126.   The exposure to each Named Plaintiff to formaldehyde fumes from Holly Park's product and equipment resulted from the normal, foreseeable, and intended use of the product and equipment, without substantial alteration in the condition in which Holly Park sold the housing unit.

127.   The design of the housing unit, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to each Named Plaintiff.

128.   Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to each Named Plaintiff.

129.   Holly Park's product, equipment and supplies used by each Named Plaintiff was in a defective condition and was unreasonably dangerous under normal use at the time the products and equipment left Holly Park's control.  Each Named Plaintiff was an intended and foreseeable user of the alleged defective products and damages and losses to each Named Plaintiff reasonably could have been anticipated by Holly Park.

130.   The defects in Holly Park's housing unit was the result of and/or include, but are not limited to, the following:

131.   In failing to design their respective products so as not to emit dangerous levels of formaldehyde;

132.   In providing a housing unit which, by virtue of its design and/or manufacture and/or composition, was unreasonably dangerous under reasonably anticipated use;

133.   In providing a housing unit which, by virtue of a lack of an adequate warning(s), was unreasonably dangerous under reasonably anticipated use;

134.   In providing a housing unit which did not conform to the express warranties made by Holly Park regarding its fitness for use as reasonably anticipated;

135.   In manufacturing, testing, marketing, distributing, licensing and selling of
       unreasonably dangerous housing unit;

136.   In failing to properly test the housing unit to correctly evaluate the level of
       emissions of formaldehyde under foreseeable conditions for extended periods of
       time;

137.   In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the
       housing unit occupied by the Plaintiff, or warn adequately of the presence of
       excessive levels of emissions of formaldehyde and the hazards associated with the
       excess levels of emissions of formaldehyde in the unit.

138.   In failing to ensure that the housing unit it manufactured and provided to Named
       Plaintiffs was suitable for its intended use;

139.   In failing to adhere to any and all express warranties of fitness and safety for the
       housing unit they manufactured and provided;

140.   In manufacturing and providing a housing unit which was unduly dangerous due to
       its emissions of formaldehyde; and,

141.   Such other indicia of fault under the LPLA  as will be shown at the trial of this matter

## COUNT 3:

## CAUSE OF ACTION AGAINST CH2M  UNDER

## THE LOUISIANA PRODUCTS LIABILITY ACT

142.   Named Plaintiffs incorporate the above allegations as if fully repeated verbatim
       herein.

143   CH2M qualifies as manufacturer under the Louisiana Products Liability Act
      ("LPLA"), as they performed work pursuant to their contracts with FEMA which

33

altered the character, design, construction, and/or quality of the product and the housing unit (travel trailer) constitutes a product under the LPLA.

144.    The increased exposure to formaldehyde fumes from the alteration of the travel trailer by CH2M resulted from the normal, foreseeable, and intended use of the product and equipment.

145.    The installation and alteration of the travel trailer, the modifications to the manufacturer's designs, and the "blocking" of the unit off its wheel base, altered the product which increased the effects of the product's defect and posed an unreasonable risk of harm to each Named Plaintiff.

146.    Each Named Plaintiff was an intended and foreseeable user of the alleged defective products, and damages and losses to each Named Plaintiff reasonably could have been anticipated by CH2M .

147.    CH2M, by installing the travel trailer on concrete blocks for extended occupancy and, further, by installing residential appliances and heating and air conditioning units, knowingly and intentionally modified the design and the actual use of the unit.

148.    The defects in CH2M's product are the result of and/or include, but are not limited to the following:

149.    In creating stress and flexing on the frame of the unit by lifting significant weight from the wheel base, which distorted the travel trailer's shell allowing for increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell;

34

150.  In providing a temporary housing unit to Named Plaintiffs which, by virtue of its composition, refurbishment, reconditioning, and/or construction was unreasonably dangerous under reasonably anticipated use;

151.  In providing a temporary housing unit to Named Plaintiffs which, lacking adequate warnings, was unreasonably dangerous under reasonably anticipated use;

152.  In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the travel trailer converted to a temporary housing unit  for its intended use by FEMA or of the presence of excessive levels of emissions of formaldehyde;

153.  In failure to ensure that the temporary housing unit they installed, refurbished, and reconditioned was suitable for its intended use, as long-term housing;

154.  In failing to adhere to any and all of the warning(s) against the jacking of the unit with weight off its wheel base by the manufacturer;

155.  In failing to follow the manufacturer's instructions for the installation and intended use of the temporary housing unit;

156.  In providing a housing unit which was unduly dangerous due to its emission of formaldehyde; and,

157.  Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

**COUNT 4:**

**CAUSE OF ACTION AGAINST FLUOR AND/OR SHAW AND/OR MLU UNDER THE LOUISIANA PRODUCTS LIABILITY ACT**

158.  Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

35

159.  Fluor and/or Shaw and/or MLU qualifies as a manufacturer under the Louisiana
      Products Liability Act ("LPLA"), as they performed work pursuant to their contracts
      with FEMA which altered the character, design, construction, and/or quality of the
      product and the housing unit constitutes a product under the LPLA.

160.  The increased exposure to formaldehyde fumes from the alteration of the
      temporary housing unit by Fluor and/or Shaw and/or MLU resulted from the
      normal, foreseeable, and intended use of the products and equipment.

161.  Each Named Plaintiff was an intended and foreseeable user of the alleged defective
      product, and damages and losses to each Named Plaintiff reasonably could have
      been anticipated by Fluor and/or Shaw and/or MLU.

162.  The defects in Fluor and/or Shaw and/or MLU's product is the result of and/or
      includes, but is not limited to the following:

163.  In providing a mobile home to Named Plaintiffs which, by virtue of its composition,
      refurbishment, reconditioning, and/or construction was unreasonably dangerous
      under reasonably anticipated use;

164.  In providing a mobile home to Named Plaintiffs which, lacking adequate warnings,
      was unreasonably dangerous under reasonably anticipated use;

165.  In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the
      presence of excessive levels of emissions of formaldehyde in the mobile home;

166.  In failure to ensure that the mobile home they installed, refurbished, and
      reconditioned were suitable for their intended use, as long-term housing;

167.   In providing a housing unit which was unduly dangerous due to its emissions of formaldehyde; and,

168.   Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

**COUNT 5:**

**NEGLIGENCE OF CH2M UNDER LOUISIANA LAW**

169.   Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

170.   At all relevant times CH2M was tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the travel trailer, which caused the Named Plaintiffs' injuries.

171.   CH2M owed a duty to each Named Plaintiff to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe a temporary housing unit that did not emit hazardous levels of formaldehyde.

172.   CH2M  knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing unit to the general public (thereby modifying and converting the mobile unit into a residential installation) the actual and intended use of the temporary housing unit by Named Plaintiffs, and that the temporary housing unit would be used in the manner that Named Plaintiffs herein used the temporary housing unit.

173.    CH2M breached their duty to each Named Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing unit; specifically by:

174.    Failing to sufficiently warn the Named Plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing unit when used for long-term occupancy; and

175.    Failing to adhere to the manufacturer's warnings against jacking the temporary housing unit off the wheel base by "blocking" the unit.

176.    CH2M's actions were the proximate cause of the increased exposure of formaldehyde to each Named Plaintiff.

177.    CH2M contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing unit.

**COUNT 6:**

**NEGLIGENCE OF FLUOR AND/OR SHAW AND/OR MLU UNDER LOUISIANA LAW**

178.    Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

179.    At all relevant times Fluor and/or Shaw and/or MLU was tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the mobile home, which caused the Plaintiffs' injuries.

180.    Fluor and/or Shaw and/or MLU owed a duty to each Named Plaintiff to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore a safe temporary housing unit that did not emit hazardous levels of formaldehyde.

181.   Fluor and/or Shaw and/ or MLU knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing unit to the general public the actual and intended use of the temporary housing unit by Named Plaintiffs, and that the temporary housing unit would be used in the manner that each Named Plaintiff herein used the temporary housing unit.

182.   Fluor and/or Shaw and/or MLU breached its duty to each Named Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing unit; specifically by:

183.   Failing to sufficiently warn the Named Plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing unit when used for long-term occupancy.

184.   Fluor and/or Shaw and/or MLU's actions were the proximate cause of the increased exposure of formaldehyde to each Named Plaintiff.

185.   Fluor and/or Shaw and/or MLU contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing unit.

### IV.  COMPENSATORY DAMAGES

186.   In addition to and by way of summarizing the compensatory damages prayed for herein, each Named Plaintiff avers that the defendants, Fluor, Shaw, MLU,  Hy-Line, Holly Park and CH2M, individually and/or jointly are responsible for all damages which each Named Plaintiff herein has suffered and continues to suffer as a consequence of defendants' acts and/or omissions as pled herein, which damages

include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and  loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

## V.  REQUEST FOR JURY TRIAL

Each Named Plaintiff is entitled to and demands a trial by jury.

## VI.  PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs pray that Fluor, Shaw, MLU, Hy-Line, Holly Park and CH2M be served with a copy of this Complaint, and that, after due proceedings:

1.      there be a judgment herein in favor of each Named Plaintiff and against Defendants for all compensatory damages together with legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2.      there be specially included in the judgment in each Named Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

a.      past and future physical injuries,

40

b.      past and future mental and physical pain and suffering,

c.      past and future physical impairments and disability,

d.      past and future reasonable and necessary medical expenses,

e.      past and future loss of earning capacity,

f.      past and future loss of enjoyment and quality of life,

g.      loss of consortium and/or society,

h.      compensable out-of-pocket expenses related to defendants'
        wrongdoing,

i.      costs of court; and

j.      all other general, equitable and further relief, as the Court may deem
        just and proper.

Respectfully submitted,

  /s/ Hugh P. Lambert
HUGH P. LAMBERT, ESQ. (LA Bar #7933)
LINDA J. NELSON, ESQ. (LA Bar #9938)
LAMBERT & NELSON, PLC
701 Magazine Street
New Orleans, LA 70130
Telephone: (504)581-1750
Facsimile: (504)529-2931
hlambert@lambertandnelson.com
lnelson@lambertandnelson.com

**PLEASE SERVE:**

1.   Fluor Enterprises, Inc.
     **Through its registered agent for service:**
     Corporation Service Company
     320 Somerulos St.
     Baton Rouge, LA 70802-6129

2.   Shaw Environmental, Inc.
     **through its registered agent for service:**
     C T Corporation System
     5615 Corporate Blvd., Sutie 400B
     Baton Rouge, LA

3.   FRH, Inc., f/k/a Hy-Line Enterprises, Inc.
     **through its registered agent for service:**
     Margaret Flager
     52219 Delta Ct.
     Elkhart, IN 46514

4.   Indiana Building Systems, LLC, d/b/a Holly Park Homes
     **through its registered agent for service:**
     Lisa Kuhtic
     51700 Lovejoy Dr.
     Middlebury, IN 46540

5.   CH2M Hill Constructors, Inc.
     **through its registered agent for service:**
     C T Corporation System
     5615 Corporate Blvd., Suite 400B
     Baton Rouge, LA 70808

6    MLU Services, Inc.
     **through its registered agent for service:**
     William L. Ulm
     10940 East I-10 Service Rd.
     New Orleans, LA 70122

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the above and foregoing pleadings were served on all counsel of record through electronic notification pursuant to the electronic filing in the United States District Court for the Eastern District of Louisiana this 31st day of July, 2009.

                                    ___/s/ Hugh P. Lambert_____
                                    Hugh P. Lambert, Esq. (#7933)