UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: FEMA TRAILER                    MDL NO. 1873
FORMALDEHYDE PRODUCTS                  SECTION N MAG. 5
LIABILITY LITIGATION


                                       JUDGE ENGELHARDT
                                       MAGISTRATE CHASEZ
THIS DOCUMENT IS RELATED
TO:
*Bauer, et al v. Liberty Homes, Inc.,*
*et al.*
*No. 08-5031*                          JURY DEMANDED


## PLAINTIFFS' SECOND SUPPLEMENTAL AND AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COME NOW, through undersigned counsel, the individual Plaintiffs, of certain

persons of the full age of majority, on behalf of themselves and, in some instances, on

behalf of individuals who lack the capacity to sue individually, more specifically set out

on **EXHIBIT "A"** attached hereto and incorporated herein by reference for all purposes,

(hereinafter referred to as "Plaintiffs"), and file this their Second Supplemental and

1

Amended Original Complaint naming as Defendants, LIBERTY HOMES, INC., ET AL and those Defendants set out on **Exhibit "A"** attached hereto and incorporated herein by reference for all purposes, (hereinafter referred to as "Defendants and/or "Manufacturers and/or Contractors Defendants"), and would respectfully show the Court as follows:

## I.

### PARTIES

1.      Belinda H. Bauer, the first named Plaintiff is a resident of Louisiana. The specific Defendant Manufacturer which is the Defendant regarding her claim is Liberty Homes, Inc., an entity, upon information and belief, incorporated in the state of  Indiana, which conducts business in the State of Louisiana, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Louisiana. The other Plaintiffs that are part of this mass action are specifically set out in **Exhibit "A"** attached hereto and incorporated herein for all purposes. **Exhibit "A"** identifies each Plaintiff, the Plaintiffs' residence state and the specific Manufacturer/Contractor/Defendant that is the subject of each Plaintiffs complaint. Plaintiffs are in the process of determining the proper venue of origin, for the Federal Court District, for each Plaintiff and will amend this Complaint, if so ordered by the Court, when that information becomes available.

2.      Plaintiffs named herein have not yet exhausted the requirements of the Federal Tort Claims Procedure, 28 U.S.C. § 2671, et seq. to submit their claims for administrative review and adjustment, and who now specifically assert all claims enumerated below against the Manufacturers/Contractors Defendants named herein,

reserving their rights to supplement this Complaint to include their claims, enumerated below, against the United States of America through the Federal Emergency Management Agency (hereinafter referred to, interchangeably as the "Federal Government" and "FEMA"), under the laws of Louisiana, Mississippi, Alabama and Texas, if their claims have not been administratively adjusted, and to include claims as additional Plaintiffs become eligible to pursue their claims against the Federal Government under the provisions of the Federal Tort Claims Act.

3.      Plaintiffs listed on **Exhibit "A"** attached hereto and incorporated herein by reference for all purposes, have filed their Standard Form 95 with the Federal Emergency Management Agency (FEMA), Office of the Director, 500 C Street SW, Washington, DC 20472.

4.      Plaintiffs listed on **Exhibit "A"** attached hereto and incorporated herein by reference for all purposes, have  delivered their Plaintiff Fact Sheets to Defendants' Liaison Counsel pursuant to Pretrial Order No. 2 filed in Case No. 2:07-md-01873 in the U.S. District Court, Eastern District of Louisiana (New Orleans) styled In Re: FEMA Trailer Formaldehyde Products Liability Litigation ("MDL 1873).

5.      Manufacturers and Contractors Defendants listed on **Exhibit "A"** and **Exhibit "B"** attached hereto and incorporated herein by reference for all purposes, are, upon information and belief, companies which conduct business in the states of Louisiana, Mississippi, Alabama and Texas, and which manufactured and supplied FEMA Housing or FEMA Homes as defined below pursuant to contracts with FEMA for use in those states to the Plaintiffs named in this Complaint.

6.     Plaintiffs aver that Insurance Defendant(s)  listed on the attached **Exhibits "A"** and **"B"**, which is incorporated herein as if set forth *in extenso and hereinafter* collectively referred to as the "Manufacturing Defendants had in full force and effect a policy of liability insurance affording coverage to the Defendant Bankruptcy Manufacturing Defendant(s)) with respect to the matters, risks and things for which this defendant is liable herein, thereby affording plaintiffs the right to proceed against this defendant insurer under the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655."

7.     Defendants listed on **Exhibit "A"** attached hereto and incorporated herein by reference for all purposes have already, or are in the process of currently being served. Plaintiffs wish to supplement and add Defendants listed on **Exhibit "B"**.   Most, if not all, of said Defendants have previously been served with process in MDL 1873.

8.     Plaintiffs wish to properly align the parties from those originally listed on Exhibit "A" attached to Plaintiffs' Original Complaint filed on December 1, 2008 by attaching an amended **Exhibit "A"** hereto and stating as follows:

(a) Pursuant to the Preservation of Defenses filed on February 26, 2009, Rec. Doc. 1129, Plaintiffs add the name "CMH Manufacturing, Inc." wherever the name "Cavalier Home Builders, LLC and Cavalier Homes, Inc." appears.

(b) Pursuant to the Preservation of Defenses filed on February 26, 2009, Rec. Doc. 1127, Plaintiffs add the name "Morgan Buildings & Spas, Inc." wherever the name "Morgan Building Systems, Inc." appears.

(c) Pursuant to the Preservation of Defenses filed on February 23, 2009, Rec. Doc. 1117, Plaintiffs substitute the name "Vanguard, LLC" wherever the name "Vanguard Industries of Michigan, Inc., (aka Palomino RV)" appears.

(d) Pursuant to the Preservation of Defenses filed on March 12, 2009, Rec. Doc. 1165, Plaintiffs substitute the name "Keystone RV Company" wherever the name "Keystone Industries, Inc." appears, which is a defunct entity pursuant to Doc. 1165.

4

(e) Plaintiffs, Gladys and Lewis Tillman were voluntarily dismissed from this action by Order dated February 27, 2009 (Rec. Doc. 1130).

(f) Plaintiff, Anthony Dixon was voluntarily dismissed from this action by Order dated April 8, 2009 (Rec. Doc. 1165).

(g) Plaintiffs Mark Bates, Muriel Crowley, Darryl Kimble, Joan Kimble and Joshua Spinks recently were voluntarily dismissed from this action by Order dated May 20, 2009 (Rec. Doc. 1555).

(h) Plaintiff Caroline Bailey was voluntarily dismissed from this action on July 30, 2009 (Rec. Doc. 2405).

(i)     By substituting the name "SunRay Investments, LLC" for the name SunRay RV, LLC, wherever the latter is named as Defendant in the Original Complaint as referenced in Plaintiff's First Supplemental and Amended Original Complaint filed on June 16, 2009 (Rec. Doc. 1773).

(j) Allegations against Defendant Integrity Midwest Inc., d/b/a US Adventure RV were voluntarily dismissed on May 28, 2009 (Rec. Doc. 1621). Plaintiffs substitute the name "Timberland RV Company d/b/a Adventure Manufacturing" wherever the name "Integrity Midwest Inc., d/b/a US Adventure RV appears.

(k) Pursuant to the Preservation of Defense filed on May 22, 2009, Rec. Doc. 1568, Plaintiffs substitute the name "Champion Home Builders Co." wherever the name "Champion Homes" appears.

(l) Pursuant to the Preservation of Defense filed on February 26, 2009, Rec. Doc. 1129, Plaintiffs substitute the name "Redman Homes, Inc., f/k/a Dutch Homes, Inc., wherever the name "Redman Homes, Inc., f/k/a Dutch Homes" appears.

(m) Plaintiff Shannon Larter was inadvertently listed twice on Exhibit "A" to Plaintiff's Original Complaint.  Therefore, the duplication of Shannon Larter has been omitted on the Exhibit "A" attached hereto.

(n) Plaintiff Theresa Long McKay was inadvertently listed twice on Exhibit "A" to Plaintiff's Original Complaint.  Therefore, the duplication of Theresa Long McKay has been omitted on the Exhibit "A" attached hereto.

9.     This is a mass action on behalf of those persons residing or living in travel trailers, park models, and mobile homes (hereinafter all referred to as "housing units") along the Gulf Coast of the United States. These housing units were provided by FEMA after the landfalls of Hurricanes Katrina and Rita in August and September of 2005. This action

involves monetary claims of 100 or more persons who Plaintiffs propose to be tried jointly on the ground that Plaintiffs' claims involve common questions of law or fact.

## II.

## JURISDICTION AND VENUE

10.     Certain Manufacturers/Contractors named herein are subject to the *in personam* jurisdiction of this Court because they do substantial business in the State of Louisiana and within this federal district, and at all times relevant hereto engaged in commerce both in this federal district and in the State of Louisiana. The remaining Manufacturers/Contractors and/or Defendants do substantial business in the States of Mississippi, and/or Alabama, and/or Texas, and at all times relevant hereto engaged in commerce in federal districts in those States and the courts in those districts would have *in personam* jurisdiction over these Defendants.

11.     Plaintiffs allege that they individually have suffered damages in an amount in excess of $75,000.00 exclusive of interest and costs.

12.     There is subject matter jurisdiction due to ample diversity pursuant to the terms of the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2) and (d)(11)(A) and (B)(i)) as a mass action in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the grounds that the Plaintiffs' claims involve common questions of law or fact.

13.     There is subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question).

6

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a large portion of the negligent and wrongful actions of the Defendants occurred in the Eastern District of Louisiana.

15.     Venue is also proper in this district under the provisions of 28 U.S.C. § 1407, since the MDL Court for MDL No. 1873 has been determined the appropriate transferee Court pursuant to the order of the United States Judicial Panel on Multidistrict Litigation, entered October 24, 2007.

16.     Pursuant to 28 U.S.C. § 1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

III.

**FACTS AND GENERAL ALLEGATIONS**

A.     **General Allegations.**

17.     The named Plaintiffs residing or living in travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") along the Gulf Coast states were provided these housing units by FEMA after the landfalls of Hurricanes Katrina and/or Rita in September of 2005.

18.     Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet. They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, FEB. 29, 2008,

at 4, *available at*

http://www.cdc.gov/Features/FEMAtrailersFindings/pdf.interimfindings.pdf.

19.     Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet. They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. *Id.*

20.     Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area). They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction. *Id.*

21.     Despite the fact that the scope of the damage to the coastal areas of Louisiana, Mississippi, Alabama and Texas was foreseeable, the Federal Government was unprepared to handle the devastation wrought by the Hurricanes and the damage was too great to be handled by the state and local governments.

22.     The homes of hundreds of thousands of citizens of the United States who resided along the Gulf Coast were rendered uninhabitable leaving these citizens homeless. Eventually, the United States of America, through FEMA, began providing temporary housing to plaintiffs in the form of housing units which became known as "FEMA trailers".

23.     The provision of temporary housing to plaintiffs entailed a duty on the part of the Federal Government to insure that such housing was safe for habitation. Unfortunately, the housing provided was and is unsafe, and presents a clear and present danger to the health and

8

wellbeing of the plaintiffs and their families.

24.    FEMA contracted with the Manufacturing Defendants to purchase thousands of the housing units, primarily travel trailers, for provision to the plaintiffs as temporary housing.

25.    Many of these housing units were purchased directly off the lots of some of the Manufacturing Defendants and/or their vendors.

26.    In addition, the Manufacturing Defendants rushed through production many of the housing units, using substandard materials and/or employing irregular practices during the manufacturing process which resulted in the housing units containing high levels of formaldehyde.

27.    Plaintiffs submit that the housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, were neither constructed nor designed in accordance with reasonably precise Government specifications.

28.    Plaintiffs submit that there existed no Governmental specifications addressed to the design/manufacture/construction and/or warnings relative to formaldehyde levels in the housing units.

29.    Plaintiffs submit that the housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units as pertains to formaldehyde levels.

30.    Plaintiffs submit that the housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to the Manufacturing Defendants' use of certain materials in their construction and/or posed the threat of producing dangerous levels of formaldehyde due

9

to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that the Manufacturing Defendants failed to warn the Federal Government about these dangers, which were not known to the Federal Government.

31.    Plaintiffs submit that Manufacturing Defendants ignored or deliberately and fraudulently concealed and/or condoned the concealment, and/or conspired with, advised, encouraged, or aided others and/or each other to conceal that the housing units, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to the Manufacturing Defendants' use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell the Manufacturing Defendants' products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

32.    All of the Plaintiffs have spent significant time in the FEMA-provided housing units manufactured by one or more of the named or unnamed Manufacturing Defendants and provided to Plaintiffs by the Federal Government. As a result, Plaintiffs unwittingly have been exposed to dangerously high concentrations of the formaldehyde which is emitted from products used in the manufacture of the subject housing units.

33.    Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant to federal law, the defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

See 24 C.F.R. §3280.309.

34.     According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency

("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

35.     Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40 hour workweek, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3ppm to 1 ppm. In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

36.     HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)... [and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". See 24 C.F.R. §3280.308.

37.     While federal standards exist for formaldehyde content in some building materials or in workplace exposures, there is no federal standard regulating indoor air quality. However, the EPA and the ATSDR have suggested values for safe exposure, which are reproduced below, keeping in mind that FEMA trailers/housing units are intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels MRL | 0.04 ppm - short exposures up to 14 days |
|  | 0.03 ppm - exposure durations between 2 weeks and a year |
|  | 0.008 ppm - exposures exceeding 365 days |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde,* Updated on Dec 19, 2007, *available at*

http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

38.     The Federal Government and the Manufacturing Defendants/Contractors knew or should have known of the health hazards inherent in the products they distributed and constructed, by familiarity with industry standards and published medical studies.

39.     Nevertheless, the Federal Government provided housing to the Plaintiffs which contained formaldehyde capable of emitting levels which are

dangerously unhealthy and exceed the levels permitted by law and have, and will result in injury to the Plaintiffs.

**B.  Allegations Addressing the Inapplicability of the "Discretionary Function" Exception to Plaintiffs' claims under the Federal Tort Claims Act, to the extent the Manufacturing Defendants claim they are also entitled to rely on that Defense.**

40.  Plaintiffs and incorporate the above allegations as if fully repeated verbatim herein.

41.  FEMA was established in 1979 to provide a single point of accountability for the Federal Government's disaster response. Since its inception, FEMA has been charged with providing temporary housing to victims of numerous major disasters such as hurricanes, earthquakes, wildfires, and civil unrest, and in many of those cases FEMA's response has been found to be woefully inadequate. John K. Pierre and Gail S. Stephenson, *AFTER KATRINA: A CRITICAL LOOK AT FEMA'S FAILURE TO PROVIDE HOUSING FOR VICTIMS OF NATURAL DISASTERS,* 68 La. L. Rev. 443, 444, 449, 458-477 (2008).

42.  The mission of FEMA as set forth in the Robert T. Stafford Disaster Relief Act ("Stafford Act") is to assist the efforts of the states "in expediting the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of areas devastated by disasters." 42 U.S.C. § 5121(a)(2) (2006).

43.  The Stafford Act authorizes federal aid to individuals and households and provides that the President may provide temporary housing assistance to individuals and households "who are displaced from their pre-disaster primary residences or whose pre-disaster primary residences are rendered uninhabitable ... as a result of damage caused by a major disaster." 42 U.S.C.A. § 5174(b)(1) (Supp. 2007).

14

44.     Under the federal regulations implementing the Stafford Act, a "displaced applicant" is one "whose primary residence is *uninhabitable,* inaccessible, made unavailable by the landlord...or *not functional* as a direct result of the disaster and has no other housing available in the area." The term "functional" is defined as "an item or home capable of being used for its intended purpose." The term "uninhabitable" is defined as meaning the "dwelling is not safe, sanitary or fit to occupy." 44 C.F.R. 206.11.

45.     FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act"). The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988).

46.     Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A). *See also* 44 C.F.R. § 206.117(b)(ii).

47.     According to FEMA, the agency only provides temporary housing units when all other housing resources are unavailable, and are only used as a last resort to provide "safe, secure, and sanitary" housing for eligible disaster victims, but acknowledges that these units were never designed for long-term occupation. Statement of Harvey E. Johnson, Jr., Acting

Deputy Administrator and Chief Operating Officer, Federal Emergency Management Agency, Department of Homeland Security, before the Subcommittee on Disaster Recovery and Subcommittee on State, Local, and Private Sector Preparedness and Integration, Homeland Security and Governmental Affairs Committee, United States Senate, March 4, 2008, at 5.

48.    This temporary housing is available for an 18-month period beginning on the date of the declaration of the major disaster by the President, after which the Federal Government may charge fair market rent for each temporary housing unit provided. 42 U.S.C.A. § 5174 (c)(1) (B)(ii)(iii). *See also* 44 C.F.R. § 206.117(b)(ii)(F).

49.    Under the terms of the Stafford Act and its implementing regulations if the Federal Government implements the "direct assistance" type of aid to the applicants (Plaintiffs herein), the Government is required to provide housing which would not be declared unfit under the Stafford Act, that is the temporary housing must be habitable and functional. Therefore, once FEMA provides such housing, the safety and habitability of the housing is mandatory.

50.    For reasons more fully set forth herein, Plaintiffs assert that the Federal Government violated its own mandatory regulations and policy when it knowingly provided dangerous housing units, which were capable of emitting and did emit harmful levels of formaldehyde causing injuries to the Plaintiffs/applicants, not only when it initiated the direct assistance plan, but also when it continued to distribute the subject housing units when the Federal Government had notice/knowledge/evidence of the existence of dangerous levels of formaldehyde in the subject housing units through complaints filed with the Federal Government and testing performed by the Federal Government and independent sources.

16

51.     Hurricane Katrina alone left a 250-mile path of destruction along the Gulf Coast. Eighty percent of Orleans Parish, ninety-nine percent of St. Bernard Parish, and forty percent of Jefferson Parish were flooded. The storm rendered over 100,000 families homeless, destroyed approximately ninety-percent of the buildings along the Mississippi Coast, and submerged much of Mobile County, Alabama. Pierre and Stephenson, *supra* at 453-454.

52.     In response to Hurricanes Katrina and Rita, FEMA, upon information and belief, provided approximately 143,000 housing units pursuant to the direct housing assistance provisions of the Stafford Act, which FEMA purchased from the Manufacturing Defendants, to Gulf Coast residents in the four states at issue. *See* FEMA, *Katrina/Rita Housing Facts,* HQ-08-008 Factsheet January 29, 2008, *available at*

http://www.fema.govinews/newsrelease.fema?id=42417.

53.     In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Contractors with No-Bid contracts, eventually amounting to billions of dollars. The Federal Government also relied on the expertise and knowledge of the Contractors to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

54.     Contractors were tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

55.     Under the terms of their contracts, Contractors were obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same. Further, under their No-Bid contracts with FEMA, Contractors were obligated to advise and instruct FEMA regarding the implementation of those contracts. Contractors failed to properly fulfill either of these tasks.

56.     Contractors contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Contractors were tasked with operating. These new areas included staging areas to be managed and maintained as assigned to one of the Contractors or individual locations and addresses where Contractors assigned that temporary housing unit would have obligations to manage and maintain it.

57.     To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Contractors entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under their individual contracts with FEMA.

58.     Contractors were tasked under their contracts with FEMA to identify and prepare the infrastructure for the various group site locations. This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc. Contractors knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

59.     Once the temporary housing unit(s) occupied by Plaintiff(s) were transported and delivered to a particular location, Contractors had the responsibility for

18

installing that temporary housing unit. Contractors installed the temporary housing units by "blocking" the unit. This meant raising the Plaintiff's unit several feet into the air and off of its wheel base, and setting in on concrete blocks.

60.    By blocking the temporary housing unit(s) of each Plaintiff, Contractors created stress and flexing on the frames of the unit as it was not designed to be lifted off of the wheel base. In fact, the manufacturers of the temporary housing units warned in the various owners' manuals provided with the units, that units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

61.    The stress and flexing of temporary housing units' frames caused by Contractors "blocking" them with weight off of the wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

62.    The temporary housing unit(s) occupied by the Plaintiff(s) which were provided by FEMA were for the most part travel trailers. The travel trailers are, by definition, mobile. They are designed for and intended for periodic, recreational use and not for long-term habitation. By installing the travel trailers on concrete blocks for extended occupancy, Contractors knowingly and intentionally modified the design and the actual use of these units occupied by the Plaintiff(s) by converting them into a temporary housing unit to be used as a residence for long term occupancy, in some instances exceeding 18 months.

63.    Contractors failed to consult with the manufacturers of the temporary housing units, including Manufacturing Defendants, with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long-term residence

and occupation. Contractors took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

64.    Once the Contractors had completed the transportation, delivery and installation of the temporary housing unit(s) occupied by the Plaintiff(s), Contractors were tasked with inspecting each unit to ensure that it was safe and habitable, prior to occupancy by the Plaintiff(s). Upon information and belief, Contractors failed to adequately inspect the temporary housing units occupied by the Plaintiff(s) to ensure that the units were safe and suitable for their intended us – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita. This failure to properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by hurricane victims.

65.    In addition to transportation, site identification, installation and inspection, the temporary housing units occupied by the Plaintiff(s) provided in response to hurricanes Katrina and Rita were also managed, maintained and repaired by one of the Contractors, or their various subcontractors over whom they maintained direct oversight and responsibility. Upon information and belief, Contractors failed to adequately manage, maintain and repair the temporary housing unit(s) which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst the Plaintiff(s).

66.    Parallel to their duty to manage, maintain and repair each temporary housing unit Contractors failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the Plaintiff-occupant(s) of the temporary

20

housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

67.     Following the Plaintiff(s)' occupancy of each temporary housing unit, Contractors were tasked with its de-installation. Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, Contractors failed to identify the unsuitability of the temporary housing units for long-term occupancy.

68.     In addition to de-installation of the temporary housing units, Contractors were tasked with refurbishment and restoration of the temporary housing unit(s) for use, either in direct response to hurricanes Katrina and Rita or for use in the future. By restoring and refurbishing these temporary housing units, Contractors warranted that the units were fit for their intended use, long-term occupancy in response to disaster related displacement. By restoring and refurbishing these temporary housing units, Contractors created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units. Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

69.     Contractors, at every stage of their involvement, failed to warn the Plaintiff(s)-occupant(s) of each temporary housing unit of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but

not limited to the advent of childhood asthma and the onset of adult asthma in some of the Plaintiff(s).

70.     Through their actions and omissions, Contractors created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Contractors negligently failed to adhere to the manufacturer's instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly in to the intended living space.

71.     Contractors failed to warn the occupants of temporary housing unit(s) of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing unit(s).

72.     By restoring and refurbishing the trailer for future habitation, Contractors improperly and negligently warranted that the unit(s) were fit for the intended use of long-term occupancy.

73.     Finally, despite these failures, Contractors received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of Plaintiff(s)-occupant(s) of the temporary housing unit(s) who simply had nowhere else to go and who were relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

74.     The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated

22

emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith. *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

75.     Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off' - gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde. Plaintiffs do not suggest that this report was communicated in such a way so as to have notified all potential claimants, nor do they suggest that this was the *first* specific notification of the formaldehyde problem to the Federal Government, as this information has not necessarily been published and will be the subject of discovery in this case.

76.     In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006. The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk

levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels. *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007.

77.     Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the plaintiffs, the Inspector General of the Department of Homeland Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to plaintiffs. *See* Statement of Richard L Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://wvvw.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

78.     The Federal Government also continued to supply the defective and dangerous housing units to Plaintiffs after March of 2006.

79.     The Federal Government continued to supply the defective and dangerous housing units to Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

80.     The Federal Government continued to supply the defective and dangerous housing units to Plaintiffs even though the Federal Government, through FEMA, in March

of 2006, conducted formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value. Union of Concerned Scientists, *supra,* and Exhibits B *(available at* http://oversight.house.gov/documents/20070719113015.pdf) and D *(available at* http://oversight. house. gov/documents/20070719113219.pdf) attached thereto.

81.    The Federal Government continued to supply the defective and dangerous housing units to the plaintiffs even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, *supra,* and Exhibits E *(available at* http://oversight.house.gov/documents/20070719113322.pdf), I *(available at* http://oversight.house.gov/documents/20070719113515.pdf) and M *(available at* http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

82.    While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some

problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue." Union of Concerned Scientists, *supra,* and Supplemental A (various emails *available at*

http://oversight.house.gov/documents/20070809120917.pdf) and

Supplemental B (various emails *available at*

http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

83.    Plaintiffs aver that, even as Plaintiffs and their families were being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the Manufacturing Defendants concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

84.    Evidence of communications among the Defendants exists by way of emails emanating from the FEMA Office of General Counsel (OCG). For example, in June 16, 2006 the same email which states "OGC has advised that we do not do testing," states that "Gulfstream is working closely with FEMA to resolve the formaldehyde problem in smaller travel trailer (Cavalier) units." A later email reflects relief of the FEMA OCG at the "good news" that "one of the major manufacturers of national housing units (Gulfstream I think)...wanted to get with External Affairs so they could get on the same page...we may get the benefit of the manufacturer's 'science' and 'public relations' approaches." *See* U.S. House of Representatives, Committee on Oversight and Government Reform, FEMA's TRAVEL TRAILERS:

26

LITIGATION CONSIDERATIONS V. HEALTH AND SAFETY CONSIDERATIONS, AND THE W I N N E R Is?, July 19, 2007, *available at*

http://republicans.oversight.house.gov/Media/PDFs/20070719FEMAEmails.pdf.

85.     FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher. The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light. Union of Concerned Scientists, *supra,* and Exhibit R (various emails *available at*

http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

86.     FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers. This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists, and Exhibit R attached thereto, *supra. See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available* at

http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report_
0507.pdf.

87.     This testing methodology did not simulate the living conditions,
temperatures, humidities, standard ventilation practices, or timescales at which residents
lived in the trailers. It also did not take into account that the trailer building materials continue
to emit formaldehyde for four to five years. Union of Concerned Scientists, *supra.*

88.     FEMA and FEMA's lawyers purposefully interfered with the design and
implementation of the earlier testing of the housing units supplied in the wake of the hurricanes in
order to avoid legal liability for injuries to Plaintiffs herein as a result of their exposure to
formaldehyde. FEMA's activities, which included hiding, manipulating and ignoring the extant
science and scientific work and concerns of federal scientists in other agencies, began
immediately after FEMA began to receive complaints from trailer residents concerning
formaldehyde fumes in 2006. *See* correspondence from U.S. House of Representatives,
Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of
Homeland Security, January 28, 2008.

89.     FEMA further manipulated the governmental testing by involving a little-known
office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure
that no long-term exposure considerations would be included in the health consultation by
removing the consultation from the normal ATSDR review process so that scientists who
had specifically recommended looking at long-term exposure effects were excluded from the
review. FEMA did so in order to avoid negative publicity and legal liability in connection with
the presence of formaldehyde in the housing units. *See* correspondence from U.S. House of
Representatives, Committee on Science and Technology, to Michael Chertoff, January 28,

2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

90.     FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern, "a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this "level of concern," the average sampling results still were higher. *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at *7, available at*

http://oversight.house.gov/documents/20070719102502.pdf.

91.     Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw... I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available     a t*

http://oversight.house.gov/documents/20071114164004.pdf.

29

92.     After the publication of the Original Health Consultation in February of 2007, the Director of the Division of Toxicology and Environmental Medicine, Chris De Rosa, M.D., the office specifically by-passed within the ATSDR during the review process, immediately wrote to FEMA general counsel and Dr. Frumkin of the ATSDR advising that the Health Consultation was "incomplete and misleading" because formaldehyde is classified as "reasonably anticipated to be a human carcinogen" and there is "no recognized `safe level' of exposure." *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Dr. Howard Frumkin, January 28, 2008, and attachments thereto.

93.     On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

94.     Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation "did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." See An Update and Revision of ATSDR' s February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana,        September - October, 2006, *available at* http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

95.    The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

96.    It was not until December of 2007, that the Federal Government initiated testing of occupied housing units. Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units. *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC's RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

97.    The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde

levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

98.    The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA-provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

99.    As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing. The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

100.    As set forth above, Plaintiffs assert that the Federal Government violated its own mandatory regulations and policies by initially issuing and/or continuing to issue the subject housing units when it was aware that the housing units were constructed with materials which emitted unsafe levels of formaldehyde, thus rendering

32

the housing units provided under the "direct assistance" form of aid neither habitable nor functional and, thus, no better, if not worse, than the Plaintiffs' primary residences which had been destroyed.

101.   Additionally and/or in the alternative, the Federal Government's actions in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy. Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

102.   Additionally and/or in the alternative as owners/lessors of the subject housing units, the Federal Government had an obligation to provide the Plaintiffs with safe and habitable housing under the "direct assistance" program, and, when the Federal Government became aware of the presence of formaldehyde in the housing units it provided, it was obliged to remove the danger or the Plaintiffs from the housing units, as it ultimately has decided to do. The Federal Government's initial implementation of a flawed testing protocol and misinformation campaign, all in violation of objective, scientific guidelines, constitute not only a violation of the Government's obligations as premises owner/lessor, but also the Government's duty to implement safety measures which would have removed an obvious health hazard. As such, the Federal Government's failure to implement an adequate response to the known health hazards

presented by plaintiffs' continuing to reside in the subject housing units is not protected under the discretionary function exception.

103.    Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided. In light of the facts alleged herein, the Federal Government's acts and/or omissions are not susceptible to policy analysis and are not protected under the discretionary function exception.

## IV.

## CLAIMS ASSERTED AGAINST THE MANUFACTURING AND/OR CONTRACTOR DEFENDANTS

## A. LOUISIANA STATE-BASED CLAIMS

## COUNT 1:

## CAUSE OF ACTION AGAINST THE MANUFACTURERS UNDER LOUISIANA PRODUCTS LIABILITY ACT

104.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

105.    The Manufacturing Defendants are manufacturers of the housing units occupied by the Plaintiffs and their housing units constitute products under the Louisiana Products Liability Act [LPLA].

106.    The exposure to Plaintiff(s) to formaldehyde fumes from the Manufacturing Defendants' products and equipment resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration in the condition in which the Manufacturing Defendants' s sold these housing units.

107.    The design of the housing units, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and poses an unreasonable risk of harm to the Plaintiffs.

108.    Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that poses an unreasonable risk of harm to the Plaintiffs.

109.    The Manufacturing Defendants' products, equipment and supplies used by Plaintiff(s) were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left the respective Manufacturing Defendants' control. The Plaintiffs were intended and foreseeable users of the alleged defective products, and damages and losses to the Plaintiffs reasonably could have been anticipated by the Manufacturing Defendants.

110. The defects in the Manufacturing Defendants' housing units are the result of and/or include, but are not limited to, the following:

a.    In failing to design their respective products so as not to emit dangerous levels of formaldehyde;

b.    In providing housing units to the Plaintiffs which, by virtue of their design and/or manufacture and/or composition were unreasonably dangerous under reasonably anticipated use;

c.    In providing housing units to the Plaintiffs which, by virtue of a lack of an adequate warning(s) were unreasonably dangerous under reasonably anticipated use;

d.    In providing housing units to the Plaintiffs which did not conform to the express warranties made by the Manufacturing Defendants regarding their fitness for use as reasonably anticipated;

e.    In manufacturing, testing, marketing, distributing, licensing and selling of unreasonably dangerous housing units;

f.    In failing to properly test the housing units to properly evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time.

g.    In failing to warn Plaintiffs of the unreasonably dangerous nature of the housing unit(s) occupied by Plaintiffs, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit(s);

h.    In failing to ensure that the housing units they manufactured and provided to the Plaintiffs were suitable for their intended use;

i.    In failing to adhere to any and all express warranties of fitness and safety for the housing units they manufactured and provided;

j.    In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

k.    Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

## COUNT 2:

## CONTRACTOR DEFENDANTS UNDER THE LOUISIANA PRODUCTS LIABILITY ACT

111.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

112.    Contractors qualify as manufacturers under the Louisiana Products Liability Act ("LPLA"), as they performed work pursuant to their contracts with FEMA which altered the character, design, construction, and/or quality of the product and the housing units constitute products under the LPLA.

113.    The increased exposure to formaldehyde fumes from the alteration of the temporary housing units by Contractors resulted from the normal, foreseeable, and intended use of the products and equipment.

114.    The installation and alteration of the temporary housing units, the modifications to the manufacturers' designs, and the "blocking" of units off their wheel base, altered the product which increased the effects of the products' defect and posed an unreasonable risk of harm to each Plaintiff.

36

115.     Plaintiffs were intended and foreseeable users of the alleged defective products, and damages and losses to each Plaintiff reasonably could have been anticipated by Contractors.

116.     Contractors, by installing the temporary housing units on concrete blocks for extended occupancy and, further, by installing residential appliances and heating and air conditioning units, knowingly and intentionally modified the design and the actual use of the units.

117.     The defects in Contractors' products are the result of and/or include, but are not limited to the following:

   a.     In creating stress and flexing on the frames of the unit(s) by lifting significant weight from the wheel base, which distorted the travel trailers' shells allowing for increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell;

   b.     In providing temporary housing unit(s) to the Plaintiff(s) which, by virtue of their composition, refurbishment, reconditioning, and/or construction were unreasonably dangerous under reasonably anticipated use;

   c.     In providing temporary housing unit(s) to the Plaintiff(s) which, lacking adequate warnings, were unreasonably dangerous under reasonably anticipated use;

   d.     In failing to warn Plaintiff(s) of the unreasonably dangerous nature of the travel trailer(s) converted to temporary housing units for their intended use by FEMA or of the presence of excessive levels of emissions of formaldehyde;

   e.     In failure to ensure that the temporary housing units they installed, refurbished, and reconditioned were suitable for their intended use, as long-term housing;

   f.     In failing to adhere to any and all of the warnings against the jacking of the units with weight off their wheel base by the manufacturers;

   g.     In failing to follow the manufacturers' instructions for the installation and intended use of the temporary housing units;

   h.     In providing housing units which were unduly dangerous due to their emission of formaldehyde; and

    i.      Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

**COUNT 3:**

**NEGLIGENCE OF CONTRACTOR DEFENDANTS UNDER LOUISIANA LAW**

118.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

119.    At all relevant times, Contractors were tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused Plaintiffs' injuries.

120.    Contractors owed a duty to Plaintiff(s) to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

121.    Contractors knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing unit(s) by Plaintiff(s), and that the temporary housing units would be used in the manner that Plaintiff(s) herein used the temporary housing unit(s).

122.    Contractors breached their duty to each Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

    a.      Failing to sufficiently warn Plaintiff(s) of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long-term occupancy; and

b.     Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units.

123.   Contractors' actions were the proximate cause of the increased exposure of formaldehyde to Plaintiff(s).

124.   Contractors contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

## COUNT 4:

## COMPENSATORY DAMAGES

125.   Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

126.   In addition to and by way of summarizing the compensatory damages prayed for herein, each Plaintiff avers that the Manufacturer Defendants, as well as Contractor Defendants, individually and/or jointly are responsible for all damages which each Plaintiff herein has suffered and continues to suffer as a consequence of Defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and  loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

127.    The damages sought herein by Plaintiffs on behalf of deceased family members were caused by decedent's exposure to formaldehyde as set forth herein, which damages include, but are not limited to, those available to Plaintiffs in wrongful death and survival actions, including loss of society, loss of support, survivor's grief, and incidental damages such as funeral and burial expenses.

## B. MISSISSIPPI STATE-BASED CLAIMS

### COUNT 5:

### STRICT PRODUCTS LIABILITY
### MS CODE ANNOTATED § 11-1-63

## 1. PRODUCTS LIABILITY: DEFECTIVE MANUFACTURING AND DESIGN

128.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

129.    The Manufacturing Defendants, at the time the subject housing units left their control, knew or should have known that the products were defective because they deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications.

130.    The Manufacturing Defendants knew or should have known that the defective condition rendered the subject housing units unreasonably dangerous to the user or consumer or others; and

131.    The defective and unreasonably dangerous condition of the product (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by Plaintiffs.

132.    At the time the subject housing units left the control of Defendants, the subject housing units did not contain properly selected prepared and installed

40

components.

133.   At all relative times, Plaintiffs lacked actual or constructive knowledge of the defective condition of the products (housing units) and that the defective products were inconsistent with their safety.

134.   At all relevant times, Plaintiffs did not appreciate the danger of the subject housing units' defective conditions.

135.   At all relevant times, Plaintiffs did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

136.   The subject housing units in question failed to function as expected as a result of their design characteristics.

137.   An alternative design existed at the time the housing units left the control of the Manufacturing Defendants which would have not impaired the products' usefulness or desirability.

138.   The alternative design would have, to a reasonable probability, prevented the toxic exposure of the Plaintiffs.

## 2. PRODUCTS LIABILITY: FAILURE TO WARN

139.   The products (housing units) were defective because they failed to contain adequate warnings or instructions.

## 3. PRODUCTS LIABILITY: BREACH OF EXPRESS WARRANTY

140.   The products (housing units) breached an express warranty and/or failed to conform to other express factual representations upon which the Plaintiffs justifiably relied in electing to use these products.

41

**COUNT 6:**

**NEGLIGENCE OF CONTRACTOR DEFENDANTS UNDER MISSISSIPPI LAW**

141     Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

142.     At all relevant times, Contractors were tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused Plaintiffs' injuries.

143.     Contractors owed a duty to Plaintiff(s) to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

144.     Contractors knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing unit(s) by Plaintiff(s), and that the temporary housing units would be used in the manner that Plaintiff(s) herein used the temporary housing unit(s).

145.     Contractors breached their duty to each Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

a.     Failing to sufficiently warn Plaintiff(s) of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long-term occupancy; and

b.     Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units.

146.   Contractors' actions were the proximate cause of the increased exposure of formaldehyde to Plaintiff(s).

147.   Contractors contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

## COUNT 7:

## COMPENSATORY DAMAGES

148.   Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

149.   In addition to and by way of summarizing the compensatory damages prayed for herein, each Plaintiff avers that the Manufacturer Defendants, as well as Contractor Defendants, individually and/or jointly are responsible for all damages which each Plaintiff herein has suffered and continues to suffer as a consequence of Defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and  loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

150.   The damages sought herein by Plaintiffs on behalf of deceased family members were caused by decedent's exposure to formaldehyde as set forth herein,

which damages include, but are not limited to, those available to Plaintiffs in wrongful death and survival actions, including loss of society, loss of support, survivor's grief, and incidental damages such as funeral and burial expenses.

## COUNT 8:

### PUNITIVE / EXEMPLARY DAMAGES

151.   Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

152.   Pursuant to Miss. Code Ann. § 11-1-65, inasmuch as the conduct of the Manufacturing Defendants and/or Contractor Defendants and their servant/employees constitutes willful, wanton, egregious and reckless disregard for the rights and safety of the Plaintiffs, an award of punitive damages is appropriate and necessary under these facts.

## C. ALABAMA STATE-BASED CLAIMS

## COUNT 9:

### ALABAMA EXTENDED MANUFACTURER'S LIABILITY DOCTRINE
### Code of Ala. § 6-5-521

## 1. PRODUCTS LIABILITY: DEFECTIVE MANUFACTURING AND DESIGN

153.   Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

154.   The Manufacturing Defendants were negligent in the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of the subject housing units based upon (1) negligence, (2) innocent or negligent misrepresentation, (3) the manufacturer's

liability doctrine as it exists or is hereafter constructed or modified, (5) breach of any implied warranty, and (6) breach of any oral express warranty and no other.

155.   The Manufacturing Defendants, at the time the subject housing units left their control, knew or should have known that the products (housing units) were defective because they deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications.

156.   The Manufacturing Defendants knew or should have known that the defective condition rendered the subject housing units unreasonably dangerous to the user or consumer or others; and

157.   The defective and unreasonably dangerous condition of the products (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by Plaintiffs.

158.   At the time the subject housing units left the control of the Manufacturing Defendants, the subject housing units did not contain properly selected prepared and installed components.

159.   At all relative times, Plaintiffs lacked actual or constructive knowledge of the defective condition of the products (housing units) and that the defective products were inconsistent with their safety.

160.   At all relevant times, Plaintiffs did not appreciate the danger of the subject housing units' defective conditions.

161.   At all relevant times, Plaintiffs did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

162.   The subject housing units failed to function as expected as a result of the design characteristics.

163.   An alternative design existed at the time the housing units left the control of the Manufacturing Defendants which would have not impaired the products' usefulness or desirability.

164.   The alternative design would have, to a reasonable probability, prevented the toxic exposure of the Plaintiffs.

**2. PRODUCTS LIABILITY: FAILURE TO WARN**

165.   The products (housing units) were defective because they failed to contain adequate warnings or instructions.

**3. PRODUCTS LIABILITY: BREACH OF EXPRESS AND IMPLIED WARRANTY OF MERCHANTABILITY**

166.   The products (housing units) breached express warranties and/or failed to conform to other express factual representations and the warranties of merchantability upon which the claimants justifiably relied in electing to use the products.

**COUNT 10:**

**NEGLIGENCE OF CONTRACTOR DEFENDANTS UNDER ALABAMA LAW**

167.   Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

168.   At all relevant times, Contractors were tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused Plaintiffs' injuries.

169.   Contractors owed a duty to Plaintiff(s) to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

46

170.    Contractors knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing unit(s) by Plaintiff(s), and that the temporary housing units would be used in the manner that Plaintiff(s) herein used the temporary housing unit(s).

171.    Contractors breached their duty to each Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

   a.    Failing to sufficiently warn Plaintiff(s) of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long-term occupancy; and

   b.    Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units.

172.    Contractors' actions were the proximate cause of the increased exposure of formaldehyde to Plaintiff(s).

173.    Contractors contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

## COUNT 11:

## COMPENSATORY DAMAGES

174.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

175.    In addition to and by way of summarizing the compensatory damages prayed for herein, each Plaintiff avers that the Manufacturer Defendants, as well as

47

Contractor Defendants, individually and/or jointly are responsible for all damages which each Plaintiff herein has suffered and continues to suffer as a consequence of Defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and  loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

176.   The damages sought herein by Plaintiffs on behalf of deceased family members were caused by decedent's exposure to formaldehyde as set forth herein, which damages include, but are not limited to, those available to Plaintiffs in wrongful death and survival actions, including loss of society, loss of support, survivor's grief, and incidental damages such as funeral and burial expenses.

**COUNT 12:**

**CODE OF ALABAMA § 6-11-23 PUNITIVE / EXEMPLARY DAMAGES**

177.   Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

178.   Pursuant to Alabama Law, inasmuch as the conduct of the Manufacturing Defendants and/or Contractor Defendants and their servant/employees constitutes willful, wanton, egregious and reckless disregard for the rights and safety of the Plaintiffs, an award of punitive damages is appropriate

48

and necessary under these facts.

**D. TEXAS STATE-BASED CLAIMS**

**COUNT 13:**

**CAUSE OF ACTION AGAINST MANUFACTURERS UNDER
TEXAS PRODUCTS LIABILITY LAW**

179.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

180.    The Manufacturing Defendants at all relevant times, were in the business of designing and manufacturing the housing units for commercial gain and placed the housing units in the stream of commerce.

181.    The housing units contained design, manufacturing and/or marketing defects at the time the housing units left the Manufacturing Defendants' possession and/or control.

182.    Those defects caused the housing units to be unreasonably dangerous and such defects were a producing cause of Plaintiffs' damages.

183.    The design of the housing units, using plywood, press board, other composite wood products or other products that contain formaldehyde, is defective and poses an unreasonable risk of harm to the Plaintiffs.

184.    Further, the use of plywood, press board, other composite wood products, or other products that contain formaldehyde constitutes a defect in composition or manufacture, which poses an unreasonable risk of harm to the Plaintiffs.

185.    Additionally, the Manufacturing Defendants failed to adequately warn Plaintiffs, the end users of such products, of the dangers associated with formaldehyde exposure, the risk of exposure to formaldehyde by using such products, and the means to mitigate such risks, which constitute a marketing defect.

186.    Specifically, the defects in Manufacturing Defendants' housing units include, without limitation:

a.    Inherent characteristics, known to Manufacturing Defendants, which gave the products such a potential for causing health problems as to render the products unreasonable *per se;*

b.    Lack of warnings or lack of sufficient warnings of the inherently dangerous properties of the products when used in the fashion for which they were anticipated or should have been anticipated being used;

c.    Lack of instructions or lack of sufficient instructions for eliminating or minimizing the health risks inherent in the use of the products;

d.    Lack of sufficient inspections by the Manufacturing Defendants of their products to ensure that such products contained sufficient warnings of the dangerous properties of the products;

e.    Lack of reasonable inspections by the Manufacturing Defendants of their products to ensure that such products contained sufficient instructions for eliminating or minimizing the health risks inherent in the use of the products;

f.    Lack of testing or lack of sufficient tests to determine the effects and/or the risks of formaldehyde fumes on intended users of the products or their guests; and

g.    Defective designs calling for the inclusion of materials which include formaldehyde, when equally suitable materials which did not contain formaldehyde were available, would have prevented or significantly reduced the risk of Plaintiffs' damages without substantially impairing the products' utility, and which were economically and technologically feasible at the time the products left the control of the Manufacturing Defendants.

187.    The defects in the housing units rendered such products unreasonably dangerous and each was each a producing cause of Plaintiffs' damages, as set forth herein. Plaintiffs' damages resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration, in the condition in which the Manufacturing Defendants sold the housing units, or in which they left Manufacturing Defendants' control.

188.     Plaintiffs were all intended and foreseeable users of the housing units, and damages and losses to the Plaintiffs through normal, foreseeable and intended use of the products, could reasonably be anticipated by the Manufacturing Defendants.

189.     If the Manufacturing Defendants claim that any of the housing units are governed by any local, state or federal government's procedures, regulations or requirements for building or marketing the housing units, then Plaintiffs would show that:

a.     The Manufacturing Defendants did not follow such procedures, regulations or requirements and the housing units did not and do not comply with such procedures, regulations or requirements;

b.     Even if such procedures, regulations or requirements apply, and even if the Manufacturing Defendants built and manufactured the housing units according to such procedures, regulations or requirements, then the housing units still contain manufacturing flaws or defects; and/or,

c.     Any such safety standards, regulations or requirements are or were inadequate to protect the public from unreasonable risks of injury or damage caused by the housing units; and/or,

d.     The Manufacturing Defendants withheld or misrepresented information or material relevant to the government's or agency's determination of adequacy of the safety standards or regulations at issue in this lawsuit.

## COUNT 14:

## CAUSE OF ACTION AGAINST MANUFACTURERS FOR NEGLIGENCE UNDER TEXAS LAW

190.     Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

191.     At all times material the Manufacturing Defendants were the designers, marketers, manufacturers, distributors, and/or sellers of the housing units, which have caused Plaintiffs' injuries.

192.    The Manufacturing Defendants owed a duty to Plaintiffs to provide safe housing units that did not emit unsafe levels of formaldehyde.

193.    The Manufacturing Defendants knew or should have known that when they provided the housing units to the general public, or directly to FEMA, that the housing units would be used in the manner that each Plaintiff herein used the housing units.

194.    The Manufacturing Defendants breached their duty to Plaintiffs in failing to act reasonably in the design, marketing, distribution and sale of the housing units; specifically by:

a.    Failing to provide any/or sufficient warnings regarding the inherently dangerous properties of the housing units when used in the fashion for which they were anticipated or should have been anticipated being used;

b.    Failing to provide any/or sufficient instructions for eliminating or minimizing the health risks inherent in the use of the housing units, in particular, the risk of the exposure to formaldehyde;

c.    Failing to adequately and properly inspect the housing units to ensure that the housing units contained sufficient warnings of their dangerous properties of the products, in particular, the risk of the exposure to formaldehyde;

d.    Failing to adequately and properly inspect the housing units to ensure that such products contained sufficient instructions for eliminating or minimizing the health risks inherent in the use of the products, in particular, the risk of the exposure to formaldehyde;

e.    Failing to test, or lack of sufficient tests, to determine the effects and/or the risks of formaldehyde fumes on intended users of the housing units or their guests;

f.    Failing to properly design the housing units, including inappropriate designs calling for the inclusion of materials which included formaldehyde, when equally suitable materials which did not contain formaldehyde were available, which would have prevented or significantly reduced the risk of Plaintiffs' damages without substantially impairing the housing units' utility, and which were economically and technologically feasible at the time the housing units left the control of the Manufacturing Defendants;

g.   Failing to properly manufacture the housing units by incorporating materials in the housing units which included formaldehyde, when equally suitable materials which did not contain formaldehyde were available, which would have prevented or significantly reduced the risk of Plaintiffs' damages without substantially impairing the housing units' utility, and which were economically and technologically feasible at the time the housing units left the control of the Manufacturing Defendants; and,

h.   Failing to disclose to FEMA or Plaintiffs that the housing units emitted formaldehyde fumes and that such fumes caused health problems, despite the fact that the Manufacturing Defendants knew of the dangers of formaldehyde exposure and the emission of formaldehyde from the housing units.

195.   The Manufacturing Defendants' breaches were a proximate, direct and/or producing cause of Plaintiffs damages, as set forth herein.

## COUNT 15:

## CAUSE OF ACTION AGAINST MANUFACTURERS FOR BREACH OF IMPLIED WARRANTY UNDER TEXAS LAW

196.   Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

197.   At times material herein, the Manufacturing Defendants impliedly warranted that the housing units were made in a good and workmanlike manner, and would be merchantable and habitable, and were fit for their intended purpose as safe and compliant housing units to be used, among other things, to house the Plaintiffs.

198.   As set forth herein, the housing units were not fit for their intended purpose as safe and compliant housing units for the Plaintiffs.

199.   Therefore the Manufacturing Defendants breached these warranties.

200.   Plaintiffs have notified the Manufacturing Defendants of this breach, or have been unable to do so because the housing units have been removed in many cases.

201.    As set forth herein, the Manufacturing Defendants' conduct was a producing cause of Plaintiff's damages incurred and set forth herein.

**COUNT 16:**

**NEGLIGENCE OF CONTRACTOR DEFENDANTS UNDER TEXAS LAW**

202.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

203.    At all relevant times, Contractors were tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused Plaintiffs' injuries.

204.    Contractors owed a duty to Plaintiff(s) to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

205.    Contractors knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing unit(s) by Plaintiff(s), and that the temporary housing units would be used in the manner that Plaintiff(s) herein used the temporary housing unit(s).

206.    Contractors breached their duty to each Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

a.    Failing to sufficiently warn Plaintiff(s) of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long-term occupancy; and

b.      Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units.

207.    Contractors' actions were the proximate cause of the increased exposure of formaldehyde to Plaintiff(s).

208.    Contractors contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

## COUNT 17:

## COMPENSATORY DAMAGES

209.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

210.    In addition to and by way of summarizing the compensatory damages prayed for herein, Plaintiffs aver that the Manufacturing Defendants, as well as, the Contractor Defendants, individually and/or jointly are responsible for all damages which Plaintiffs herein have suffered and continue to suffer, proximately caused by the Defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of Plaintiffs' displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

211.    The damages sought herein by Plaintiffs on behalf of deceased family members were caused by decedent's exposure to formaldehyde as set forth herein, which damages include, but are not limited to, those available to Plaintiffs in wrongful

death and survival actions, including loss of society, loss of support, survivor's grief, and incidental damages such as funeral and burial expenses.

## COUNT 18:

## PUNITIVE DAMAGES

212.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

213.    Under the laws of the State of Texas, each Plaintiff seeking relief under the statutory provisions set forth herein are also entitled to awards for  punitive damages as are appropriate and necessary under these facts.

## COUNT 19:

## TOLLING OF LIMITATIONS

214.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

215.    Plaintiffs plead that any statute of limitations or prescription are tolled by the filing of state and federal putative class actions. In addition, and in the alternative, Plaintiffs would plead the discovery rule as that tolling doctrine is known in Texas and other states either as a judicial doctrine or codified in statute. Pleading further, and in the alternative, Plaintiffs would plead that the existence of any claims they may have and any relevant limitations should be tolled based on the doctrine of fraudulent concealment. Plaintiffs rely on the allegations contained herein related to all damages incurred because of the trailers and housing units provided to the Plaintiffs.

## REQUEST FOR JURY TRIAL

216.   Plaintiffs are entitled to and demand a trial by jury.

## PRAYER FOR RELIEF

217.   WHEREFORE, Plaintiffs pray **that:**

1.   After due proceedings had, and a trial by jury, there be a judgment in this matter in favor of the Plaintiffs and against the Defendants for all compensatory damages together with legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the Defendants are liable to Plaintiffs for all applicable damages and relief as found applicable and supported by the evidence as follows:

2.   There be specifically included in the judgment in each Plaintiff's favor, provisions for the following damages and relief as found applicable and supported by the evidence:

(a) past and future physical injuries;

(b) past and future mental and physical pain and suffering;

(c) past and future physical impairments and disability;

(d) past and future reasonable and necessary medical expenses;

(e) past and future loss of earning capacity;

(f)  past and future loss of enjoyment and quality of life;

(g) loss of consortium and/or society;

(h) compensable out-of-pocket expenses related to Defendants' wrongdoing;

(i)  costs of Court; and

(j)  punitive damages.

3.   Plaintiffs be awarded wrongful death and/or survivors damages for claims brought on behalf of deceased family members.

4.   Plaintiffs be awarded such other general, equitable, and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Robert C. Hilliard

_____

**ROBERT C. HILLIARD**
**Trial Attorney in Charge for Plaintiffs**
Texas State Bar No. 09677700
Southern District of TX Federal ID No.  5912
Kevin W. Grillo, Of Counsel
Texas State Bar No. 08493500
Southern District of TX Federal ID No. 4647
ROBERT C. HILLIARD, L.L.P.
719 S. Shoreline Boulevard, Suite 500
Corpus Christi, Texas 78401
Telephone:  (361) 882-1612
Facsimile:  (361) 882-3015

**MIKAL C. WATTS**
Texas State Bar No. 20981820
Southern District of TX Federal ID No. 12419
MIKAL C. WATTS, P.C.
2506 N. Port Ave.
Corpus Christi, Texas 78401
Telephone: (800) 994-0019
Facsimile: (361) 882-1261

**RICHARD P. IEYOUB**
Louisiana State Bar and
Eastern District of Louisiana Federal ID No. 2217
CARLETON DUNLAP OLINDE & MOORE, LLC
One American Place, Suite 900
Baton Rouge, LA 70825
Phone 225-282-0600
Fax 225-282-0650

**DANIEL D. WARE**
Mississippi State Bar and
Southern District of Mississippi Federal ID No. 10847
**CARROLL LOUIS CLIFFORD IV**
Mississippi State Bar and
Southern District of Mississippi Federal ID No. 99545

WARE CLIFFORD LAW FIRM PLLC
2625 Ridgewood Rd., Ste 100
Jackson, MS 39216
Phone 601-368-9310
Fax 601-368-9958
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2009, a true and correct copy of the foregoing pleading was filed electronically using the CM/ECF system. Notice of this filing will be sent to all known counsel by operation of the court's electronic filing system.


/s/ Robert C. Hilliard

_____

**ROBERT C. HILLIARD**