# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER | *  MDL NO. 1873 |
| FORMALDEHYDE | * |
| PRODUCTS LIABILITY LITIGATION | * SECTION N(5) |
| | * |
| | * JUDGE ENGELHARDT |
| | * |
| THIS DOCUMENT RELATES TO | * MAGISTRATE CHASEZ |
| *Johnson v. Fluor Enterprises, Inc., et al.,* | * |
| No. 2:09-cv-04047-DKE-ALC | * |

*************************************************************************

## FIRST SUPPLEMENTAL AND AMENDING COMPLAINT FOR DAMAGES

This Amended Complaint of certain persons of the full age of majority, on behalf of themselves and, in some instances, on behalf of individuals who lack the capacity to sue individually (hereinafter, "Named Plaintiffs" or "Plaintiffs"), who are all named in the annexed listing of all Named Plaintiffs (hereinafter, "Exhibit A"), through undersigned counsel, respectfully represents that this Amended Complaint supersedes the original complaint and:

## I. PARTIES

1. Each Named Plaintiff is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the state(s) in which Defendants are citizens.

2. Named Plaintiffs are those individuals and entities listed on the attached Exhibit A, which is incorporated herein as if set forth *in extenso*.

3. Upon information and belief, Defendant Insurco, Ltd. is a foreign entity, with its principal place of business in a foreign state, licensed to do business in the State of Louisiana and in good standing.

1

4. Plaintiffs aver that Defendant Insurco, Ltd. had in full force and effect a policy of insurance affording coverage to Patriot Homes, Inc. ("Patriot Homes"), which manufactured and supplied FEMA trailers or housing units discussed below, with respect to the matters, risks and things for which this Defendant is liable herein, thereby affording Plaintiffs the right to proceed against this defendant insurer under the provisions of the Louisiana Direct Action Statute., LSA-R.S.22:655.

5. Named Plaintiffs are proceeding against Insurco, Ltd. in place of Patriot Homes because Patriot Homes filed for bankruptcy protection under Chapter 11 under the United States Bankruptcy Code in the U.S. Bankruptcy Court, Northern District of Indiana (Case No. 08-33347) on or about September 28, 2008, and the commencement of a judicial proceeding by Plaintiffs against Patriot Homes is automatically stayed pursuant to 11 U.S.C. 362(a).

6. Defendant, Fluor Enterprises, Inc. ("Fluor"), a Delaware corporation with its principal place of business in Irving, Texas, licensed to do business in the State of Louisiana and in good standing, received a No-Bid contract from FEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repaid, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita.

## II. JURISDICTION AND VENUE

7. Each plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

8.  Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendant(s) with citizenship other than that of plaintiff(s), because of diversity of citizenship and because the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

9.  Insurco, Ltd. is subject to the in personam jurisdiction of this Court because it and its insured, Patriot Homes, do sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

10. Fluor is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

11. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, as the emergency housing units were provided to the Plaintiffs in this district, and Named Plaintiffs' injuries were sustained in this district.

### III. FACTS AND GENERAL ALLEGATIONS

12. The Named Plaintiffs residing or living in travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") in the State of Louisiana were provided these housing units by FEMA after the landfalls of Hurricane Katrina and/or Rita in September of 2005.

13. Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet.  They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD").  *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* http:www/cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

14. Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet.  They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities.  *Id.*

15. Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feed in area).  They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a voluntary American National Standards Institute ("ANSI") standard applying to their construction.  *Id.*

16. The residence of each Named Plaintiff was rendered uninhabitable following Hurricanes Katrina and/or Rita, leaving each plaintiff homeless and in need of housing assistance.

17. FEMA contracted with Patriot Homes to purchase thousands of housing units, primarily travel trailers, for provision to the Named Plaintiffs as temporary housing.

18. On information and belief, Patriot Homes expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by each Named Plaintiff containing higher than normal levels of formaldehyde.

19. On information and belief, the housing unit of each Named Plaintiff, including those units which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

20. Named Plaintiffs submit that each and all of the housing units which are at issue herein, both those which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

21. Named Plaintiffs submit that each of the housing units at issue, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Patriot Homes' use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that Patriot Homes failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

22. Named Plaintiffs submit that Patriot Homes ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to Patriot Homes' use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell Patriot Homes' products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

23. Each and all of the Named Plaintiffs spent significant time in the FEMA-provided housing units manufactured by Patriot Homes and provided to Plaintiffs by the Federal Government.  As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

24. Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesive used in the manufacture of the housing units. Pursuant to federal law, the defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure.  Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk.  Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. § 3280.209.

25. According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

26. Most published exposure standards for formaldehyde address protection levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure level or protection levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels

7

established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects.  In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to 1 ppm.  In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

27. HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes).  HUD has far stricter exposure limits for residential formaldehyde emissions.  By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)…[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm…"  *See* 24 C.F.R. § 3280.308.

28. Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees.  *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm – short exposures up to 14 days |
|  | 0.03 ppm – exposure durations between 15 and 364 days |
|  | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec. 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

29. Patriot Homes knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

30. FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 4121, *et seq*. (the "Stafford Act"). The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services.  This aid is sometimes referred to as Section 408 assistance.  This provision was enacted as Public Law 93-288, Title IV, § 408 (1988).  Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

31. In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Fluor with No-Bid contracts, eventually amounting to billions of dollars.  The Federal Government also relied on the expertise and knowledge of Fluor to provide information and advice on, among other things, the

conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

32. Fluor was tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

33. Under the terms of its contracts, Fluor was obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same.  Further, under its No-Bid contracts with FEMA, Fluor was obligated to advise and instruct FEMA regarding the implementation of those contracts. Fluor failed to properly fulfill either of these tasks.

34. Fluor contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Fluor was tasked with operating.  These new areas included staging areas to be managed and maintained as assigned to one of Fluor or individual locations and addresses where Fluor assigned that temporary housing unit would have obligations to manage and maintain it.

35. To accomplish its contractual obligations with FEMA, in addition to the use of subsidiary companies, Fluor entered into numerous subcontracts, but at all times retained supervisory capacity and responsibility under its individual contracts with FEMA.

36. Fluor was tasked under its contracts with FEMA to identify and prepare the infrastructure for the various group site locations.  This included, amongst other things, ensuring there

would be adequate water, sewage, electricity, etc.  Fluor knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

37. Once the temporary housing unit(s) occupied by the Plaintiff(s) were transported and delivered to a particular location, Fluor had the responsibility for installing that temporary housing unit.  Fluor installed the temporary housing units by "blocking" the unit.  This meant raising the Plaintiff's unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

38. By blocking the temporary housing unit(s) of each Plaintiff, Fluor created stress and flexing on the frames of the unit as it were not designed to be lifted off of the wheel base. In fact, the manufacturers of the temporary housing units warned in the various owners' manuals provided with the units, that units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

39. The stress and flexing of temporary housing units' frames caused by Fluor "blocking" them with weight off of the wheels created distortion in the travel trailer's shell, allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

40. The temporary housing unit(s) occupied by the plaintiff(s) which were provided by FEMA were for the most part travel trailers.  The travel trailers are, by definition, mobile. They are designed for and intended for periodic, recreational use and not for long-term habitation.  By installing the travel trailers on concrete blocks for extended occupancy, Fluor knowingly and intentionally modified the design and the actual use of these units occupied by the plaintiff(s) by converting them into a temporary housing unit to be used as a residence for long term occupancy in some instances exceeding 18 months.

41. Fluor failed to consult with the manufacturers of the temporary housing units with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long term residence and occupation.  Fluor took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

42. Once Fluor had completed the transportation, delivery and installation of the temporary housing unit(s) occupied by the Plaintiff(s), Fluor was tasked with inspecting each unit to ensure that it was safe and habitable, prior to occupancy by the Plaintiff(s).  Upon information and belief, Fluor failed to adequately inspect the temporary housing units occupied by the Plaintiff(s) to ensure that the units were safe and suitable for their intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita.  This failure to properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by the Plaintiffs.

43. In addition to transportation, site identification, installation and inspection, the temporary housing units occupied by the Plaintiffs provided in response to hurricanes Katrina and Rita were also managed, maintained and repaired by Fluor or one of its various subcontractors over whom it maintained direct oversight and responsibility.  Upon information and belief, Fluor failed to adequately manage, maintain and repair the temporary housing units which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst the Plaintiffs.

44. Parallel to its duty to manage, maintain and repair each temporary housing unit, Fluor failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the Plaintiffs-occupants of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

45. Following the Plaintiffs' occupancy of each temporary housing unit Fluor was tasked with its de-installation.  Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, Fluor failed to identify the unsuitability of the temporary housing units for long-term occupancy.

46. In addition to de-installation of the temporary housing units, Fluor was tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to hurricane Katrina and Rita or for use in the future.  By restoring and refurbishing these temporary housing units, Fluor warranted that the units were fit their intended use, long term occupancy in response to disaster related displacement.  By restoring and refurbishing these temporary housing units, Fluor created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units.  Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

47. Fluor, at every stage of its involvement, failed to warn the Plaintiffs, and other Gulf Coast residents residing in the temporary housing units, of the potential risk of hazardous and

13

unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects.

48. Through its actions and omissions, Fluor created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects.  Fluor negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

49. Fluor failed to warn the occupants of temporary housing unit(s) of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing units.

50. By restoring and refurbishing the trailer for future habitation, Fluor improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

51.  Finally, despite these failures Fluor received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of the Plaintiffs-occupants of the temporary housing units who simply had nowhere else to go and who were relying on FEMA and its contactors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

**COUNT 1:**

**CAUSE OF ACTION AGAINST INSURCO, LTD. UNDER**

**LOUISIANA PRODUCTS LIABILITY ACT**

52. Patriot Homes is a manufacturer of each of the housing units occupied by the Named Plaintiffs, which units constitute products under the Louisiana Products Liability Act [LPLA].

53. The exposure of each Named Plaintiff to formaldehyde fumes from Patriot Homes' products and equipment resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration in the condition in which Patriot Homes sold these housing units.

54. The design of the housing units, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to each Named Plaintiff.

55. Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to each Named Plaintiff.

56. Patriot Homes' product, equipment and supplies used by each Named Plaintiff were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left Patriot Homes' control.  Each Named Plaintiff was an intended and foreseeable user of the alleged defective products and damages and losses to each Named Plaintiff reasonably could have been anticipated by Patriot Homes.

57. The defects in Patriot Homes' housing units are the result of and/or include, but are not limited to, the following:

    a.    In failing to design their respective products so as not to emit dangerous levels of formaldehyde;

    b.    In providing housing units which, by virtue of their design and/or manufacture and/or composition, were unreasonably dangerous under reasonably anticipated use;

    c.    In providing housing units which, by virtue of a lack of an adequate warning(s), were unreasonably dangerous under reasonable anticipated use;

    d.    In providing housing units which did not conform to the express warranties made by Patriot Homes regarding their fitness for use as reasonably anticipated;

    e.    In manufacturing, testing marketing, distributing, licensing and selling of unreasonably dangerous housing units;

    f.    In failing to properly test the housing units to property evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

    g.    In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the housing unit occupied by the Plaintiff, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the

hazards associated with the excess levels of emissions of formaldehyde in the unit.

h.  In failing to ensure that the housing units it manufactured and provided to each Named Plaintiff were suitable for their intended use;

i.  In failing to adhere to any and all express warranties of fitness and safety for the housing units it manufactured and provided;

j.  In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

k.  Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

## COUNT 2:

## <u>CAUSE OF ACTION AGAINST FLUOR UNDER</u>

## <u>THE LOUISIANA PRODUCTS LIABILITY ACT</u>

58. Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

59. Fluor qualifies as a manufacturer under the Louisiana Products Liability Act ("LPLA"), as it performed work pursuant to its contracts with FEMA which altered the character, design, construction, and/or quality of the product, and the housing units constitute products under the LPLA.

60. The increased exposure to formaldehyde fumes from the alteration of the temporary units by Fluor resulted from the normal, foreseeable, and intended use of the products and equipment.

17

61. The installation and alteration of the temporary housing units, the modifications to the manufacturers' designs, and the "blocking" of units off their wheel base, altered the product which increased the effects of the product's defect and posed an unreasonable risk of harm to each Named Plaintiff.

62. Each Named Plaintiff was an intended and foreseeable user of the alleged defective products, and damages and losses to each Named Plaintiff reasonably could have been anticipated by Fluor.

63. Fluor, by installing the temporary housing units on concrete blocks for extended occupancy and, further, by installing residential appliances and heating and air conditioning units, knowingly and intentionally modified the design and the actual use of the units.

64. The defects in Fluor's products are the result of and/or include, but are not limited to the following:

    a.    In creating stress and flexing on the frames of the units by lifting significant weight from the wheel base, which distorted the travel trailers' shells allowing for increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell;

    b.    In providing temporary housing units to the each Named Plaintiff which, by virtue of their composition, refurbishment, reconditioning, and/or construction were unreasonably dangerous under reasonably anticipated use;

c.       In providing temporary housing units to each Named Plaintiff which, lacking adequate warnings, were unreasonably dangerous under reasonably anticipated use;

d.       In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the travel trailer(s) converted to temporary housing units for their intended use by FEMA or of the presence of excessive levels of emissions of formaldehyde;

e.       In failing to ensure that the temporary housing units it installed, refurbished, and reconditioned were suitable for their intended use, as long term housing;

f.       In failing to adhere to any and all of the warning against the jacking of the units with weight off their wheel base by the manufacturers;

g.       In failing to follow the manufacturers' instructions for the installation and intended use of the temporary housing units;

h.       In providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

i.       Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

**COUNT 3:**

**NEGLIGENCE OF FLUOR UNDER LOUISIANA LAW**

65. Each Named Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

66. At all relevant times Fluor was tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused the Plaintiffs' injuries.

67. Fluor owed a duty to each Named Plaintiff to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

68. Fluor knew or should have known when it provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing units by each Plaintiff, and that the temporary housing units would be used in the manner that each Plaintiff herein used the temporary housing units.

69. Fluor breached its duty to each Named Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units specifically by:

a.  Failing to sufficiently warn the Plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy;

b.  Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units.

70. Fluor's actions were the proximate cause of the increased exposure of formaldehyde to each Named Plaintiff.

71. Fluor contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

## COMPENSATORY DAMAGES

72. In addition to and by way of summarizing the compensatory damages prayed for herein, each Named Plaintiff avers that the Defendants, Insurco, Ltd. through Patriot Homes and Fluor, individually and/or jointly, are responsible for all damages which each Named Plaintiff herein has suffered and continues to suffer as a consequence of Defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

**REQUEST FOR JURY TRIAL**

Each Named Plaintiff is entitled to and demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, the Named Plaintiffs pray that Insurco, Ltd. and Fluor be served with a copy of this Complaint, and that, after due proceedings:

1. there be a judgment herein in favor of each Named Plaintiff and against Defendants for all compensatory damages together with legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2. there be specially included in the judgment in each Named Plaintiffs' favor provisions for the following damages and relief as found applicable and supported by the evidence:

   a. past and future physical injuries,

   b. past and future mental and physical pain and suffering,

   c. past and future physical impairments and disability,

   d. past and future reasonable and necessary medical expenses,

   e. past and future loss of earning capacity,

   f. past and future loss of enjoyment and quality of life,

   g. loss of consortium and/or society,

   h. compensable out-of-pocket expenses related to defendants' wrongdoing, and

   i. costs of court;

3. all other general, equitable, and further relief as the Court may deem just and proper.

Respectfully submitted,

HURRICANE  LEGAL CENTER, LLC.


BY:   _/s/ Lawrence J. Centola, Jr._
      LAWRENCE J. CENTOLA, JR.

Lawrence J. Centola, Jr., LA Bar #3962
Paul Y. Lee, CA Bar #118981
Hurricane Legal Center, LLC
 602 Carondelet Street, Suite 602
New Orleans, LA 70130
Telephone: (504) 525-1944
Facsimile: (504) 525-1279
lcentola@hurricanelegal.com
lee@kaplanleeoc.com


**PLEASE SERVE:**

**Insurco, Ltd. Insurance Corporation**
Through the Louisiana Secretary of State
Legal Services Section
P.O. Box 94125
Baton Rouge, LA 70804-9125

**Fluor Enterprises, Inc.**
Through its Agent for Service of Process
Corporation Service Company
320 Somerulos St.
Baton Rouge, LA 70808

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August _1st___, 2009 I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participations.  I further certify that I mailed a foregoing document and a notice of electronic filing by first class mail to all counsel on record who are non-CM/ECF participants:  No Non-CM/ECF participants.

*/s/ Lawrence J. Centola, Jr.*
LAWRENCE J. CENTOLA, JR.

Exhibit "A"
**Additional Plaintiffs**

Carol Johnson
Wanda Price
Ethel Price
Kiesha Price
Leon Price
Byron Price
Kiesha Price on behalf of Tieron Price
Kiesha Price on behalf of Alexzander Anthony
Allison Estem
James Price
Lolita Braxton Price