UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE | * | MDL NO. 07-1873 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION "N" (5) |
| THIS DOCUMENTS IS RELATED TO: | * | |
| CIVIL ACTION NO. 07-9228 | * | JUDGE: ENGELHARDT |
| *Aldridge, et al. vs. Gulf Stream Coach, Inc., et al.* | * | |
| *(Elisha Dubuclet obo Timia Dubuclet vs. Fleetwood,* | * | |
| *Fluor Enterprises, Inc. and FEMA)* | * | |
| Case No. 07-9228 | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFFS' OPPOSITION TO FLEETWOOD ENTERPRISES, INC.'S
MOTION TO EXCLUDE PLAINTIFFS' TESTING RESULTS**

**MAY IT PLEASE THE COURT:**

The Dubuclet Plaintiffs submit this opposition to Defendant Fleetwood Enterprises, Inc.'s motion to exclude Plaintiffs' expert's testing results (Rec. Doc. 2356). As demonstrated by the attached Affidavit and exhibits, Plaintiffs' expert's testing has provided accurate, relevant and reliable information concerning the condition of the Dubuclet Plaintiffs' emergency housing unit ("EHU") which will assist the trier of fact. Fleetwood's motion should be denied.

**STATEMENT OF LAW**

The sole basis for Fleetwood's motion is the erroneous contention that the results are allegedly "not relevant" under Federal Rule of Evidence 401.[1] Defendants have not argued that the evidence should be excluded as unfairly prejudicial under Rule 403. Defendants do not dispute

---

[1] Defs. Memo. at 1.

Plaintiffs' expert's qualifications to perform the testing, or give testimony about the testing, under Rule 702. Defendants have also not contested the *reliability* of Plaintiffs' expert's testimony under *Daubert*.[2]

Under Rule 401, "[r]elevant evidence" means "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[3] Under Rule 402, all relevant evidence is generally admissible.[4] As such, the only question before the Court is whether Plaintiffs' expert's testing results have *any* probative value, i.e., whether they have "any tendency" to prove any consequential fact at issue. They do, and the test results are admissible.

## ARGUMENT

Fleetwood's motion should be denied for several reasons.

### I. The *Barnes* decision is factually distinguishable, and does not support the exclusion of Plaintiffs' expert's testing in this case.

*First*, the sole authority cited by Fleetwood, the *Barnes* decision,[5] bears no factual resemblance to the facts of this case, and does not support the exclusion of Plaintiffs' expert's testing.

---

[2] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[3] Fed. R. Evid. 401 (emphasis added).

[4] Fed. R. Evid. 402 ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.").

[5] *Barnes v. General Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977).

In *Barnes*, the plaintiff was injured when the vehicle he was driving left the roadway and crashed, allegedly because of a defect in the accelerator linkage. The key question was whether the engine mount separated before or as a result of the impact, and whether a "roll-stop" feature incorporated in the mount would have prevented the engine from lifting and binding the accelerator linkage. Not surprisingly, the Fifth Circuit held that an experiment conducted by the plaintiff's expert on a completely different vehicle, which had significantly different equipment than the original vehicle, should have been excluded from evidence. The original vehicle in *Barnes* was a standard vehicle; the test vehicle had been modified for use as a race car. The engine mounts on the original vehicle were "roll-stop" mounts, which were designed to prevent engine lift even though the mount itself might separate. However, the test car had been modified to remove the engine mounts and bolt the engine directly to the frame. Because of this significant modification of the key safety feature on the original vehicle, the test vehicle could not be tested to determine whether, even though the engine mount might separate, the roll-stop feature would prevent the engine lift from binding the accelerator. Finally, the original vehicle lost control on wet blacktop; the experiment was conducted on dry pavement. Not surprisingly, the Court of Appeal held that the "experiment" had "had no probative value whatsoever" and should have been excluded.[6]

By contrast, in this case, Plaintiffs' expert's testing was conducted on the same product at issue. The testing in this case is not an "experiment"; it is scientific testing designed to measure and

---

[6] *Barnes*, 547 F.2d at 277.

quantify the emissions at issue. Here, the testing performed by Plaintiffs' experts is relevant to prove the levels of Formaldehyde while Plaintiffs were living in the unit. In contrast to *Barnes*, the testing in this case is not intended to *simulate* or *reenact* the conditions present when the Plaintiffs lived in the unit, it is intended to gather factual evidence which will support and form the basis (along with other testimony) of the Plaintiffs' expert.

**II.   There is no evidence or testimony that Plaintiffs' expert's testing is unreliable or not probative.**

*Second*, Defendant has not provided any evidence, much less expert testimony, that an air modeling test performed in July 2009 is inaccurate or not probative.

**III.   Fleetwood agreed to the testing protocol, without objection.**

*Third*, at no point did defendant object to the plaintiffs' testing protocol (attached as Exhibit 1). The testing, in accordance with the protocol, was performed while the trailer was at the FEMA lot in Lottie, Louisiana, over a two-day period (July 8th and 9th). No objections to the testing were raised by defendant either verbally or in writing prior to said testing.

**IV. Fleetwood belies its own argument, by submitting its *own* Air Sampling Protocol.**

*Fourth*, Fleetwood belies its own argument by submitting its own Air Sampling Protocol (attached Exhibit 2). Fleetwood proposes to conduct sampling of the Dubuclets' trailer the week of August 10-14, 2009, in Lottie, Louisiana. Nowhere in defendant's expert's Air Sampling Protocol is there language suggesting that it is impossible to perform an Air Sampling Protocol on Plaintiffs' trailer at this time. Moreover, according to Fleetwood's Protocol:

> [A]ir samples will be collected and analyzed according to generally accepted industrial hygiene practices. More specifically, **the formaldehyde air samples will be collected according to NIOSH Method 2016.** (Exhibit 2, Defendant's Proposed Air Sampling Protocol, at pg. 1).

Appendix A of defendant's Protocol (NIOSH Method 2016) does <u>not</u> state, anywhere, that any test results obtained are invalid if the subject of the test is a trailer that has been vacant for a certain period of time. To the contrary, as previously indicated, the presence of formaldehyde, as found by the test performed on the Dubuclets' trailer by Plaintiffs' expert, establishes that formaldehyde was present *in even greater concentrations* while the Dubuclets were living in the trailer. To put it simply, Fleetwood is unhappy with the elevated formaldehyde readings found in the Dubuclet trailer. That, of course, is not the basis for striking tests performed "according to generally accepted industrial hygiene practice." (*See* Exhibit 3, Appendix A.)

### V. The vacancy period does not affect the validity or the probative value of the test results.

*Fifth*, the fact that the THU was vacant for 22 months does not invalidate Plaintiffs' test results. To the contrary, the evidence will show that the measured concentration of Formaldehyde at the time of *testing* will be significantly *less* than the concentration of Formaldehyde when the Dubuclets inhabited the unit. This is due to the documented and irrefutable behavior of the off-gassing of COH wood products over time.

This phenomenon is well-explained and documented in the Reports of William D. Scott (Exhibit 4, Section 12, C), Dr. Stephen Smulsky (Exhibit 5), Lawrence Berkeley Laboratory (Exhibit 6), and the CDC Final Report (Exhibit 7).

As demonstrated by the attached Affidavit of William D. Scott (Exhibit 8), the off-gassing rates of formaldehyde containing building materials over time is well documented. The rate at which formaldehyde emission levels decrease is not constant, but decreases with time.[7] Generally, formaldehyde emission levels decrease linearly with respect to the natural log of time.[8] In simple terms, the rate of off gassing of formaldehyde containing building materials decreases over time.[9]

The Sampling Event occurred approximately 39 months after the THU was constructed in March 2006. Therefore, the formaldehyde concentrations measured in the THU occurred well after the initial peak formaldehyde off gassing period.[10] This implies that the actual peak and average formaldehyde concentrations experienced by the THU's occupants significantly exceeded the concentrations observed in the Sampling Event.[11]

---

[7] Exhibit 8, Affidavit of William D. Scott (7/17/09).

[8] Exhibit 8, Affidavit of William D. Scott (8/4/09).

[9] Exhibit 8, Affidavit of William D. Scott (8/4/09).

[10] Exhibit 8, Affidavit of William D. Scott.

[11] Exhibit 8, Affidavit of William D. Scott.

The same conclusion was reached by the U.S. Centers for Disease Control and Prevention (CDC) regarding their study of formaldehyde concentrations of 519 FEMA supplied occupied travel trailers, park models, and mobile homes conducted in December/January, 2008.[12]

> **These measured levels probably under-represent occupant exposures** in the early months of occupation and even the average exposure over time the trailers were occupied because formaldehyde levels tend to be higher in newly constructed trailers and during warm weather. (Exhibit 7, CDC Final Report, pg. 13 (emphasis added)).

**VI.  Whether the "Slide-Out" was fully extended does not affect the validity or the probative value of the test results.**

*Sixth*, the fact that the "slide-out" on the unit was (or was not) fully extended does not affect the validity or probative value of the testing.

This is because the THU interior volume at the time of sampling is irrelevant to the measured formaldehyde concentrations.[13]  The Defense Motion wrongly and incorrectly assumes that release of formaldehyde to the THU interior is a static phenomenon.[14]  In fact, the formaldehyde concentration present in the atmosphere of the THU at the time of sampling is the result of a dynamic process.[15]  The off gassing of formaldehyde containing building materials to

---

[12] Exhibit 7, CDC Final Report.

[13] Exhibit 8, Affidavit of William D. Scott.

[14] Exhibit 8, Affidavit of William D. Scott.

[15] Exhibit 8, Affidavit of William D. Scott.

the surrounding atmosphere is a well documented process, governed by Henry's Law.[16] In chemistry, Henry's Law is one of the gas laws, formulated by William Henry in 1803.

At a constant temperature, according to Henry's Law, the amount of a given gas dissolved in a given type and volume of liquid is directly proportional to the partial pressure of that gas in equilibrium with that liquid.[17] An equivalent way of stating the law is that the solubility of a gas in a liquid is proportional to the pressure of that gas above the liquid.[18] Henry's Law has been shown to apply for a wide range of dilute solutions, not merely those of gases.[19]

Henry's Law can be put into mathematical terms (at constant temperature) as

$$p = k_H C$$

where:

**p** is the partial pressure of the solute,

**C** is the concentration of the solute, and

**kH** is a constant with the dimensions of pressure divided by concentration.

---

[16] Exhibit 8, Affidavit of William D. Scott.

[17] Exhibit 8, Affidavit of William D. Scott.

[18] Exhibit 8, Affidavit of William D. Scott.

[19] Exhibit 8, Affidavit of William D. Scott.

The constant (kH), known as the Henry's Law Constant, depends on the solute, the solvent and the temperature.[20]

It is important to note that there is **no volume parameter** in the Henry's Law expression. The behavior of the solute is completely independent of volume.[21]

An everyday example of Henry's Law is given by carbonated soft drinks. Before the bottle is opened, the atmosphere above the drink is almost pure carbon dioxide at a pressure lightly higher than atmospheric pressure. The drink itself contains dissolved carbon dioxide. When the bottle is opened, some of this gas escapes, giving the characteristic hiss. Because the pressure above the liquid has been lowered, some of the dissolved carbon dioxide comes out of solution as bubbles. If a glass of the drink is left in the open, the concentration of carbon dioxide in solution will come into equilibrium with the carbon dioxide in the air, and the drink will go "flat."[22]

In the case of the THU, with the slide-out in the stowed position, an equilibrium is established between the formaldehyde in the wood building products and the surrounding atmosphere resulting in the equilibrium concentration of formaldehyde.[23] When the slide out is

---

[20] Exhibit 8, Affidavit of William D. Scott.

[21] Exhibit 8 Affidavit of William D. Scott.

[22] Exhibit 8, Affidavit of William D. Scott.

[23] Exhibit 8, Affidavit of William D. Scott.

extended, the formaldehyde concentration in the atmosphere will **temporarily** decrease, allowing more formaldehyde to "off gas" to the environment, until the equilibrium between the formaldehyde in the wood building products and the formaldehyde concentration in the THU atmosphere is re-reestablished at the same, initial, concentration.[24]

It is well-recognized that experts may extrapolate from evidence provided *after* an incident to make assumptions about conditions at the time of the incident. As noted by this Court, "[i]t is not uncommon for trained experts to extrapolate from existing data."[25]

Experts are permitted to extrapolate from tests conducted after a relevant event all the time. Just one example is a case involving a party who was allegedly driving while intoxicated. If defense counsel was involved in such a case, they would presumably argue to exclude a Breathalyzer test result on the grounds that it was performed several hours after the subject stopped drinking, and not immediately after he had stopped drinking. That argument is no more valid in the DUI case than it is in this one. Experts can and do validly extrapolate backwards from later test results to support relevant and reliable opinions. The science is clear that, the longer the time lapse, the lower the reading. Whether it is blood alcohol or formaldehyde, the principle is the same.

---

[24] Exhibit 8, Affidavit of William D. Scott.

[25] *Martin v. Nabors Offshore Corp.*, No. Civ. A 00-3284, 2002 WL 34360292 at *2 (E.D. La. Apr. 2, 2002) (Engelhardt, J.).

At a minimum, the test results obtained during the inspection establish two things (1) the off-gasing is at a diminished rate (due to an 18-month half life which the experts will testify to), meaning that the level of formaldehyde would have been higher earlier on, and (2) formaldehyde was present in the Dubuclet trailer while they were living in it.[26]

### VII. Conditions At Lottie, Louisiana

Scott also refutes defendants assertions pertaining to the conditions that existed at Lottie, LA by clearly showing that:

The design of the THU's air conditioning system is such that the air conditioning system does not introduce make-up or outside air to the THU under normal operating conditions. The air conditioning system merely recirculates and cools the air within the THU. This determination is contained in Alexis Mallet's report. The functioning of the air conditioner is irrelevant (in terms of "air dilution" or lack thereof) to the measured formaldehyde concentrations in the THU or to the formaldehyde exposure of the Dubuclet THU occupants. (Exhibit 8, Affidavit of William Scott 8-4-09).

The contention that the THU was hermetically sealed due to the closure of doors and windows and the non-operation of the air conditioning system is a misrepresentation. Assuming that THU was constructed to the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) standards and maintained in that condition, approximately

---

[26] Exhibit 8, Affidavit of William D. Scott.

one-third of the interior air volume is and was replaced every hour (0.35 Air Exchange Rate) of the THU's existence since manufacture. This air exchange occurs through the walls, ceiling, and floor of the THU due to the permeability of building materials and discontinuities in the THU membrane. There are no dedicated makeup air devices in the Dubuclet THU. This air exchange process includes the 22 month period between the cessation of the Dubuclet's occupancy and the time of Plaintiff's formaldehyde sampling. (Exhibit 8, Affidavit of William Scott 8-4-09).

The temperature at which the Plaintiff's sample(s) were obtained is documented and recognized in the report of William D. Scott. William D. Scott's report provides the peer reviewed, empirically determined, mathematical expression to correct for temperature variations from the temperature at the time of formaldehyde measurement to standard recirculates and cools the air within the THU. This determination is contained in Alexis Mallet's report. The functioning of the air conditioner is irrelevant (in terms of "air dilution" or lack thereof) to the measured formaldehyde concentrations in the THU or to the formaldehyde exposure of the Dubuclet THU occupants. (Exhibit 8, Affidavit of William Scott 8-4-09).

### VIII. Other Factors Do Not Affect the Validity of the Testing.

Fleetwood is expected to argue that they, unlike other trailer manufacturing defendants, purchased low formaldehyde-emitting (LFE) wood components to manufacture their trailers. During the course of Fleetwood's 30(b)(6) deposition (not yet concluded) . . . their designee on formaldehyde testified as follows:

> **"All of our products are specified to be low formaldehyde emitting materials. And some of the materials that would have formaldehyde would have had the low formaldehyde emitting materials in them."**[27]  (Exhibit 9).

The inference would be and Defendant will argue to the jury that by using LFE materials, the occupants of Fleetwood's units encountered significantly less formaldehyde. What the test results that Defendant seek to strike show is that any claim to that effect is not accurate and that the use of LFE materials is in fact irrelevant when such a large number of formaldehyde emitting wood components are placed in such a confined space as the subject trailer.

Defendants further assert that the Dubuclets' trailer was properly ventilated. As a matter of fact, Mrs. Dubuclet has testified that "half of the time it [the air conditioner] was broken."[28] She described the problems with the air conditioning as "Constant(ly). Sometimes we would go a week without air."[29] She also testified that the problems were worse in the summer.[30]

**IX.    Defendant's arguments go to the weight of the test results, not their admissibility, and Defendant may raise any such objections during cross-examination.**

---

[27] See Exhibit 9 . . . Fleetwood 30(b)6 Deposition.

[28] *See* Exhibit 10, Elisha Dubuclet deposition, at page 22, lines 13-17.

[29] Exhibit 10, Elisha Dubuclet deposition, at page 102, lines 21-25.

[30] Exhibit 10, Elisha Dubuclet deposition, at page 97, lines 3-11.

As noted above, "[i]t is not uncommon for trained experts to extrapolate from existing data."[31] Here, Plaintiffs' experts will make extrapolations of the Formaldehyde levels in the trailer when the Dubuclets were living there based on the testing performed in July 2009. Defendant's challenge goes to the *weight* of Plaintiff's expert's testimony, "rather than its admissibility."[32] As this Court concluded in another case, "[i]t is the province of the jury to weigh his testimony with all of the other evidence in the case, and to determine the facts in dispute."[33]

Plaintiff has made a threshold showing of reliability, and that Plaintiffs' expert's testing will be helpful to the trier of fact. Defendant can vigorously cross-examine Plaintiffs' experts about their credentials, their report and the basis for the observations in it, and any discrepancies between the report and other evidence in the case. As explained by the U.S. Supreme Court in *Daubert*, the traditional and appropriate means for Defendant to attack Plaintiffs' expert's testing is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."[34]

## CONCLUSION

---

[31] *Martin v. Nabors Offshore Corp.*, No. Civ. A 00-3284, 2002 WL 34360292 at *2 (E.D. La. Apr. 2, 2002) (Engelhardt, J.).

[32] *Id.*

[33] *Id.*

[34] *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."), *cited by Gustings v. Travelers & Standard Fire Ins. Co.*, No. Civ. A 07-4443, 2008 WL 4948837 at *6 (E.D. La. Nov. 18, 2008) (Engelhardt, J.).

Defendant's Motion to Exclude Plaintiffs' Testing Results should be denied.

> Respectfully submitted,
>
> **FEMA TRAILER FORMALDEHYDE
> PRODUCT LIABILITY LITIGATION**
>
> BY:   */s/ Raúl R. Bencomo*
>     RAUL R. BENCOMO (LA Bar #2932)
> **PLAINTIFF'S STEERING COMMITTEE**
>
> **COURT-APPOINTED PLAINTIFFS'
> STEERING COMMITTEE**
> GERALD E. MEUNIER (LA Bar #9471)
> JUSTIN I. WOODS (LA Bar #24713)
> LINDA J. NELSON (LA Bar #9938)
> ANTHONY BUZBEE, TX (#24001820)
> FRANK D'AMICO (LA Bar #17519)
> MATT MORELAND (LA Bar #24567)
> MIKAL WATTS, TX (#20981820)
> ROBERT M. BECNEL (#14072)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon counsel for all parties by electronic mail (CM/ECF) addressed this 4th day of August, 2009.

> _____/s/ Raúl R. Bencomo_____
>     **RAÚL R. BENCOMO**

**EXHIBITS TO
PLAINTIFFS' OPPOSITION TO FLEETWOOD ENTERPRISES, INC.'S
MOTION TO EXCLUDE PLAINTIFFS' TESTING RESULTS**

Exhibit 1        Plaintiffs' expert's testing protocol

Exhibit 2        Fleetwood's Air Sampling Protocol

Exhibit 3        Defendant's Air Sampling Protocol, Appendix A (NIOSH Method 2016)

Exhibit 4        Expert Report of William D. Scott 7/17/09

Exhibit 5        Expert Report of Dr. Stephen Smulski

Exhibit 6        Expert Report of Lawrence Berkeley Laboratory

Exhibit 7        CDC Final Report

Exhibit 8        Affidavit of William D. Scott 8/4/09

Exhibit 9        Fleetwood 30(b)6 Deposition

Exhibit 10       Elisha Dubuclet Deposition at 22, 97, 102.