UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |
| THIS DOCUMENT IS RELATED TO | * | |
| | * | |
| *Charlie Age, et al v. Gulf Stream Coach* | * | |
| *Inc., et al*, Docket No. 09-2892; | * | |
| Alana Alexander, individually and on behalf | * | |
| Of Christopher Cooper | * | |

**PLAINTIFF'S RESPONSE TO DEFENDANT GULF STREAM COACH, INC.'S
MOTION *IN LIMINE* TO EXCLUDE
EXPERT TESTIMONY OF MARCO KALTOFEN, PE**

Plaintiff, Alana Alexander, individually and on behalf of Christopher Cooper, files this response to Defendant Gulf Stream Coach, Inc.'s Motion *in Limine* to Exclude Expert Testimony of Marco Kaltofen, PE.

**I.
EXHIBITS**

Exhibit A.              Affidavit of Marco Kaltofen, PE

Exhibit B.              Excerpts from Kaltofen Deposition

1

## II.
## BACKGROUND

Marco Kaltofen is a Massachusetts Registered Professional Engineer, and president and owner of Boston Chemical Data Corporation, an environmental engineering consulting company. Exhibit A, p. 1; Exhibit B, pp. 341-42. In the course of his career, he has performed and evaluated tens of thousands of tests on air, water, and soil to determine the content of various contaminants. *See* Exhibit B, p. 343. Because of his background in environmental engineering, he was asked in this case to examine and evaluate the results of the totality of the FEMA trailer formaldehyde testing conducted by various entities; and based on the data, to derive an opinion of the average level of formaldehyde that could be expected to have been present in the Alexander trailer during its occupancy by the Alexander family. Exhibit B, pp. 358-60.

In its efforts to discredit him, Defendant Gulf Stream grossly distorts Mr. Kaltofen's testimony. Contrary to Defendant's characterization, Mr. Kaltofen never testified that he could predict a specific formaldehyde concentration in a previously untested EHU at a 95%, or any other confidence level. Likewise, he never attempted to substitute a "corrected" result for an actual test result. Defendant's arguments, which failed to address the testimony that Mr. Kaltofen actually offered, cannot negate the reliability of Mr. Kaltofen's actual opinions.

## III.
## ARGUMENT AND AUTHORITIES

1. <u>Mr. Kaltofen's testimony is admissible because his methodology is reliable to estimate the average ranges of formaldehyde to which the Alexander family was exposed.</u>

Mr. Kaltofen testified to an *average* level of formaldehyde to which the Alexander family was expected to be exposed. *See* Exhibit B, pp. 358, 360. He never attempted to determine a

specific concentration at any given time for the Anderson trailer or any other FEMA unit, at a 95% or any other confidence interval.

As explained by Mr. Kaltofen, many factors are known to affect the level of formaldehyde concentrations in units such as the FEMA trailers. *See* Exhibit A, p. 12; Exhibit B, p. 146.  Trailers differed as to their manufacturers, which each used differing amounts of formaldehyde-emitting substances, and as to the dates of manufacture. *See* Exhibit A, p. 12; Exhibit B, pp. 139-40, 148.  In the same trailer, the formaldehyde concentration will vary with differing temperatures and humidity levels. *See* Exhibit A, p. 12, Exhibit B, p. 147. Ventilation rates, which are dependent on factors such as whether windows and doors are open or closed and whether air conditioning is utilized, vary even during the space of a day. *See* Exhibit B, pp. 147-48, 150.  Even behavior of the occupants of the trailers, such as whether or not they smoked, can affect indoor formaldehyde concentration. *See* Exhibit B, pp. 147-48.  Because so many of the factors that impact formaldehyde concentration vary constantly, a single test result will not be representative of an average concentration over time in any particular unit. *See* Exhibit A, p. 12-13;  Exhibit B, pp. 159.

Mr. Kaltofen carefully described how statistical sampling overcomes the problem of constantly changing variables. *See* Exhibit A, p. 12; Exhibit B, pp. 152-53, 192.   When the formaldehyde concentration is measured in an appropriate sample size of units, all tested at different times and under different conditions, the results represent a statistically reliable profile of the units as a whole. *See* Exhibit A, p. 13; Exhibit B, p. 192.  The statistical profile provides a more accurate representation of an individual unit over time than would a single measurement of the unit at any one time. *See* Exhibit A, p. 13; Exhibit B, pp. 81-82, 85.   Mr. Kaltofen, thus explained the validity of his methodology to estimate an average range of formaldehyde to which

the Alexander family was exposed. *See* Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 US 579, 592-93 (1993).

2.  Mr. Kaltofen's testimony is admissible because his data is reliable, having been gathered by experts in the field.

Mr. Kaltofen based his opinions on a database compilation of 10,499 actual test results performed on the FEMA trailers. *See* Exhibit A, p. 6.  The testing was performed by various entities, including the CDC, EPA, FEMA, the Scott Group, OSHA, the Sierra Club, and many more, all respected professionals in the filed. *See* Exhibit A, p. 6.  The dates of testing ranged from the fall of 2006, through August of 2008, and encompassed all of the corresponding seasonal weather changes. *See* Exhibit A, p. 6.  The testing was done according to OSHA- and NIOSH-approved methodology. *See* Exhibit A, pp. 5-6.  There can be no doubt that Mr. Kaltofen's data is of the type on which experts in the field reasonably rely. *See* In re TMI Litigation, 193 F.3d 613, 697 (3rd Cir. 1999).

Reliability of the data to the 95% confidence interval is the CDC's determination, not that of Mr. Kaltofen.  In its July, 2008 final report, the CDC concluded that 95% confidence in the data could be achieved by testing a minimum of 38 randomly selected units. *See* Exhibit A, p. 13; Exhibit B, pp. 395-97.  Mr. Kaltofen's evaluation, which included over 10,000 test results and far exceeded the CDC's criteria, necessarily encompassed a wide variety of variables: different manufacturers, different manufacturing dates, different components, different sizes and volumes, differing occupant habits, differing occupancy status, and the different climatic variables present at the different testing dates. *See* Exhibit A, p. 12; Exhibit B, pp. 149-51.  Using so many test results that encompassed such a wide range of variables resulted in a better representation of the average formaldehyde concentration over time for any one unit than would

4

have an actual test result of the unit at any one point in time.  *See* Exhibit A, pp. 12-13; Exhibit B, pp. 81-82, 84-85.  Mr. Kaltofen's adoption of the methodology used by the CDC in its own report is yet another indicia of reliability.  *See* Id.

3. Mr. Kaltofen's testimony is reliable because he thoroughly explained the reasoning behind his methodology and conclusions.

Mr. Kaltofen provided an in-depth discussion of how the test results from the database were used to determine an *average* formaldehyde concentration over time to which the Anderson family was exposed.  He explained why his statistical analysis necessarily accounts for the constantly changing variables, both time-related and unit-related.  He evaluated the data set to make sure it conformed to expectations based on scientific facts, assuring its reliability.  *See* In re TMI Litigation, 193 F.3d at 697.  The CDC's determination that statistical significance was achieved to the 95% confidence level is another indicia of reliability.  *See* Id.  Mr. Kaltofen used factual data, cited the CDC for his methodology's reliability, and thoroughly explained the reasoning he used in deriving his opinions.  His opinions, therefore, are fully reliable and admissible.  *See* In re TMI Litigation, 193 F.3d at 697;  General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

4. Defendant failed to negate the reliability of Mr. Kaltofen's opinions.

Defendant's arguments are not only unscientific, but disingenuous.  While admitting that each unit contains numerous variables that affect formaldehyde concentration over time, Defendant refuses to admit that because those variables are constantly changing, one test result on one date at one time cannot represent the concentration in the same unit at any time other than the time of testing.  *See* Defendant's Memo, p. 12.   Defendant further refuses to acknowledge

that Mr. Kaltofen is not opining as to a specific formaldehyde concentration in the Anderson unit at any particular time, but rather to the *average* conditions encountered over their period of occupancy. *See* Defendant's Memo, pp. 11-12. Defendant provides a speciously inaccurate interpretation of Mr. Kaltofen's explanation that every additional data point will impact the overall profile less and less, which actually means that the more data you have, the more accurate your results. *See* Defendant's Memo, pp. 11-12, Exhibit B, 170.

Most egregiously, Defendant refuses to understand Mr. Kaltofen's use of the term "all other things being equal," and incorrectly portrays it as a "fundamental flaw . . . because all things are not equal." *See* Defendant's Memo, pp. 12-13. Mr. Kaltofen, however, used the phrase only in response to Defendant's numerous questions concerning changes in only *one* variable. *See* Exhibit B, pp. 149-150. In reality, many variables affecting formaldehyde constantly change at the same time. In order to appropriately respond to Defendant's hypothetical of only one variable changing, Mr. Kaltofen had to hypothetically assume that all other variables were remaining static. *See* Exhibit B, pp. 149-50. His use of the terminology of "all things being equal" was merely his way of stating that he was responding to a hypothetical situation.

Given the amount of actual data used, the rationality of Mr. Kaltofen's explanations, and the generally accepted reliability of statistical analysis in situations encompassing constantly changing variables, Defendant's unfounded arguments cannot negate the reliability of Mr. Kaltofen's testimony. *See* <u>Daubert</u>, 509 US at 592-93.

5.      *Defendant misrepresents the purpose of Mr. Kaltofen's illustration of the impact of temperature and humidity on formaldehyde concentration.*

Defendant goes into detail *ad nauseum* in a misplaced attempt to discredit Mr. Kaltofen's use of temperature and humidity corrections. *See* Defendant's Memo, pp. 15-20.  Mr. Kaltofen discussed correction factors only to illustrate the extent of the effect temperature and humidity have on formaldehyde concentration. *See* Exhibit B, pp. 139, 380.  He stated unequivocally that he was not using the calculation to extrapolate from test results to a specific level of formaldehyde at any specific time or place. *See* Exhibit B, pp. 191, 195, 232-33, 378, 380.

By way of illustration only, Mr. Kaltofen used the actual test results from the Alexander trailer. *See* Exhibit A, pp. 8, 9.  He noted that the January, 2008, test result was .05 ppm, while the May, 2009, test resulted in a higher .085 ppm. *See* Exhibit A, pp. 8, 9.  Commenting on the difference, Mr. Kaltofen found the results consistent with the facts that (1) formaldehyde concentrations rise with temperature, and (2) that temperatures are generally higher in May than in January. *See* Exhibit A, p. 10.  He then applied the ASTM correction factors as a demonstration of how much the concentration of formaldehyde can be expected to rise with temperature. Exhibit B, pp. 68-69, 139, 185.  Nowhere did he attempt to substitute a "corrected" result for an actual test result. *See* Exhibit A, pp, 9, 14-15.

## IV.
## CONCLUSION

Recognized indicia of reliability abound as related to Mr. Kaltofen's testimony.  The subject of his testimony arises naturally and directly out of his professional experience. *See* Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995)(Daubert II). The data he worked from was collected by the CDC and other respected governmental and

7

private entities, all recognized experts in the field. *See* <u>In re TMI Litigation</u>, 193 F.3d at 697. The large number of data points he considered complied with the CDC's methodology to reach a 95% confidence interval. *See* <u>Daubert</u>, 509 US at 594.  He reasonably explained how he used to data and known scientific principles to arrive at his conclusions. *See* <u>Joiner</u>, 522 U.S. at 146. There can be no question that Mr. Kaltofen's testimony is reliable and admissible. *See* <u>Daubert</u>, 509 US at 592-94.

## V.
## PRAYER

For the reasons stated in this Response, Plaintiff respectfully requests that the Court deny Defendant's Motion *in limine*.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE**
**PRODUCT LIABILITY LITIGATION**


BY:	<u>s/Gerald E. Meunier</u>
	GERALD E. MEUNIER, #9471
	**PLAINTIFFS' CO-LIAISON COUNSEL**
	Gainsburgh, Benjamin, David, Meunier &
	Warshauer, L.L.C.
	2800 Energy Centre, 1100 Poydras Street
	New Orleans, Louisiana 70163
	Telephone:    504/522-2304
	Facsimile:     504/528-9973
	gmeunier@gainsben.com

	<u>s/Justin I. Woods</u>
	JUSTIN I. WOODS, #24713
	**PLAINTIFFS' CO-LIAISON COUNSEL**
	Gainsburgh, Benjamin, David, Meunier &
	Warshauer, L.L.C.
	2800 Energy Centre, 1100 Poydras Street
	New Orleans, Louisiana 70163
	Telephone:    504/522-2304

        Facsimile:    504/528-9973
        jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS'**
**STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
ROBERT BECNEL, #14072
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
DENNIS REICH, Texas #16739600
MIKAL WATTS, Texas # 20981820

### CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing document has been served upon counsel of record as indicated below in accordance with the Federal Rules of Civil Procedure on August 4, 2009.

        /s/Gerald E. Meunier
        GERALD E. MEUNIER