Stephen J. Smulski
June 10, 2009

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER          * MDL NO. 1873
        FORMALDEHYDE          *
        PRODUCTS LIABILITY    *
        LITIGATION            * SECTION: N(5)
                              *
This Document Relates to:     * JUDGE: ENGELHARDT
Charles Age, et al, v.        *
Gulf Stream Coach, Inc.,      *
et al, Docket No. 09-2892     * MAG: CHASEZ
* * * * * * * * * * * * * * * * * * *

Video-Taped Deposition of STEPHEN SMULSKI, Ph.D., 435 Wendall Road, Shutesbury, Massachusetts, 01072, taken in the law offices of Lambert & Nelson, 701 Magazine Street, New Orleans, Louisiana, 70130, on Wednesday, the 10th day of June, 2009.

APPEARANCES:

T. CHRISTOPHER PINEDO
ATTORNEY AT LAW
4550 Jericho Road
Corpus Christi, Texas  78413
    - and -
FRANK J. D'AMICO
ATTORNEY AT LAW
622 Baronne Street
New Orleans, Louisiana  70113

    - and -

REICH & BINSTOCK, LLP
(By: Dennis C. Reich, P.C.)
4265 San Felipe
Suite 1000
Houston, Texas  77027
    (Attorneys for the Plaintiffs)

Stratos Legal Services
800-971-1127

---

Stephen J. Smulski
June 10, 2009

Page 2

1  APPEARANCES: (Continued)
2
3  DUPLASS, ZWAIN, BOURGEOIS, MORTON,
   PFISTER & WEINSTOCK
4  (By: Joseph G. Glass, Esquire)
   3838 North Causeway Boulevard
5  Three Lakeway Center - Suite 2900
   Metairie, Louisiana 70002
6      (Attorneys for the Defendant,
7       Gulf Stream Coach, Inc.)

8  BAKER, DONELSON, BEARMAN, CALDWELL &
   BERKOWITZ, PC
9  (By: M. David Kurtz, Esquire)
   201 St. Charles Avenue - Suite 3600
10 New Orleans, Louisiana 70170
       (Attorneys for the Defendants,
11      Shaw Environmental and CH2M Hill
12      Constructors)

13 ALLEN & GOOCH
   (By: Brent M. Maggio, Esquire)
14 One Lakeway
   3900 North Causeway Boulevard
15 Suite 1450
   Metairie, Louisiana 70002
16     (Attorneys for the Defendant,
17     Recreational Vehicles, LLC)

   FRILOT PARTRIDGE
18 (By: John J. Hainkel, III)
   1100 Poydras Street - Suite 3600
19 New Orleans, Louisiana 70163
       (Attorneys for the Defendant,
20     Bechtel National, Inc.)
21
   U.S. DEPARTMENT OF JUSTICE
22 CIVIL DIVISION
   (By: Adam M. Dinnell, Esquire)
23 Ben Franklin Station
   P.O. Box 340
24 Washington, DC 20044
       (Attorneys for the Defendant, The
25     United States)

Stratos Legal Services
800-971-1127

---

Stephen J. Smulski
June 10, 2009

Page 3

1  APPEARANCES: (Continued)
2  GARRISON, YOUNT, FORTE & MULCAHY, L.L.C.
   (By: Kelly M. Morton, Esquire)
3  909 Poydras Street - Suite 1800
   New Orleans, Louisiana 70112
4      (Attorneys for the Defendants,
       Recreation By Design, LLC, TL
5      Industries, Inc., Frontier RV,
       Inc., PlayMor Trailers)
6
7  GIEGER, LABORDE & LAPEROUSE, L.L.C.
   (By: Jason D. Bone, Esquire)
8  Forty-Eighth Floor
   One Shell Square
9  701 Poydras Street
   New Orleans, Louisiana 70139-4800
10     (Attorneys for the Defendant,
       Forest River, Inc.)
11
12 MIDDLEBERG, RIDDLE & GIANNA
   (By: Richard A. Sherburne, Jr., Esq.)
13 450 Laurel Street - Suite 1101
   Baton Rouge, Louisiana 70801
14     (Attorneys for the Defendant,
       Fluor Enterprises)
15
16 (Via telephone)
   WILLINGHAM, FULTZ & COUGILL, LLP
17 (By: Thomas L. Cougill, Esquire)
   Niels Esperson Building
18 808 Travis - Suite 1608
   Houston, Texas 77002
19     (Attorneys for the Defendants,
       Jayco, Inc. and Starcraft RV,
20     Inc.)
21
   (Via telephone)
22 DEUTSCH, KERRIGAN & STILES
   (By: Joshua G. Keller, Esquire)
23 755 Magazine Street
   New Orleans, Louisiana 70130
24     (Attorneys for Defendants,
       Destiny Industries, LLC,
25     Lexington Homes, LLC and

Stratos Legal Services
800-971-1127

---

Stephen J. Smulski
June 10, 2009

Page 4

1  APPEARANCES: (Continued)
2
3  (Via telephone)
   JONES, WALKER, WAECHTER, POITEVENT,
   CARRERE & DENEGRE, L.L.P.
4  (By: James Percy, Esquire)
   8555 United Plaza Boulevard
5  Baton Rouge, Louisiana 70809-7000
       (Attorneys for the Defendants,
6      Keystone RV Company, DS
       Corporation (d/b/a CrossRoads),
7      Thor California, Dutchmen, KZ
       RV)
8
   ALSO PRESENT:
9
   (Via telephone)
10 KRAFT, GATZ, LANE, BENJAMIN, LLC
   Shyra L. Latiolais
11 Legal Assistant
   On behalf of Walter K. Jamison, III
12
13 DAMIEN W. DERAUSKAS, P.E.
   Professional Engineering Services
14
15
   VIDEOGRAPHER:
16
   MARY ELIZABETH GAASCH
17 STATOS LEGAL
18
   REPORTED BY:
19
20 NANCY LAPORTE, CCR
   STRATOS LEGAL
21 Certified Court Reporter
   State of Louisiana
22
23      * * * * *
24
25

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 21

1   by that company?
2   A.   I have been employed by that
3   company since June of 1992.
4   Q.   You are the president?
5   A.   Yes. I am the president and sole
6   employee.
7   Q.   Do you contract any work to
8   anyone through your company?
9   A.   Occasionally there are parts of
10  jobs that I take on that require me to
11  contract with an outside consultant.
12  Q.   What is the focus of Wood Science
13  Specialists, Inc.?
14  A.   I have focused on solving
15  performance problems with wood products and
16  residential, industrial, and institutional use
17  of wood products. I also work with
18  architects, engineers in specifying wood
19  products for particular applications.
20  Q.   You also do some litigation work,
21  obviously, correct?
22  A.   Yes.
23  Q.   The types of problem solving that
24  you encounter in your practice through Wood
25  Science Specialists includes what types of

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 22

1   things?
2   A.   Most of the troubleshooting or
3   problem solving that I do involves
4   moisture-caused problems with wood products,
5   but it runs the gamut from virtually any type
6   of product that can arise -- excuse me --
7   problem that can arise with a wood product
8   when placed in service. It could be a problem
9   with a finish applied to wood product with an
10  adhesive used for wood product.
11  Q.   And when you are talking about
12  performance-based problems, are you speaking
13  about failure of the wood that is used in that
14  building product, or in that final building at
15  issue?
16  A.   I would say failure in the
17  general sense that the users of that wood
18  product have an expectation of how it is
19  expected to perform, and when it doesn't meet
20  that expectation, it is termed a problem, and
21  I am asked to determine what has caused the
22  problem.
23  Q.   During the course of your
24  education, did you ever take any classes
25  specifically geared towards the construction

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 23

1   of travel trailers?
2   A.   I have not taken any classes
3   specifically for travel trailers, but I have
4   taken classes in house design and construction
5   and the structural re-uses of wood, and
6   various applications of wood products.
7   Q.   And if I recall correctly from
8   your previous deposition, throughout your
9   career you have primarily been focused on
10  site-built homes; is that accurate?
11  A.   Yes, because that's where the
12  largest volume of wood products is used.
13  Q.   When you say "the largest volume
14  of wood products is used," are you talking
15  about the United States, or worldwide?
16  A.   In the United States.
17  Q.   Are you able to quantify the
18  percentage of wood products that are used in
19  what I'll call site-built homes, versus other
20  types of construction?
21  A.   The figure I see cited is about
22  50 percent of all the wood products that are
23  manufactured are used to construct stick-built
24  homes.
25  Q.   If I recall correctly, from your

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 24

1   last deposition, there's no difference in wood
2   performance just because it's in a stick-built
3   home versus some other type of product,
4   correct?
5   A.   In the sense that the wood
6   product is unaware of the application that it
7   is being used for; however, as the
8   environmental conditions under which that, or
9   to which that product is being exposed change,
10  the wood product is going to respond
11  accordingly.
12  Q.   And those factors, regardless of
13  where the wood is being used, those factors
14  apply equally to the wood, correct?
15     MR. PINEDO:
16  Objection to form.
17     THE WITNESS:
18  In the sense that wood tends to
19  behave the same way under the same
20  environmental conditions, independent of the
21  actual application of the product.
22  EXAMINATION BY MR. GLASS:
23  Q.   A much better way to say it,
24  thank you.
25  So if I understood you correctly,

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 29

1  trusses.
2  Q.    Do those standards have any
3  connection to emissions from the wood product
4  itself?
5  A.    No. The standards refer to the
6  materials, quality of fabrication, and
7  engineering behind trusses.
8  Q.    So it's dealing more with the
9  structural factors associated with the
10 connection between the metal and the wood,
11 rather than how the wood performs after it's
12 put in place?
13 A.    Again, it deals with the
14 engineering standards that apply to trusses,
15 and the quality control, fabrication
16 standards.
17 Q.    Have you conducted any surveys
18 regarding composite wood product manufacturers
19 manufacturing processes?
20 A.    I've never conducted any surveys,
21 but again, I've taken courses in wood
22 composite product manufacture. I've toured
23 numerous wood composite manufacturing
24 facilities.
25 Q.    Have you done anything in your

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 30

1  course of study, or throughout your career,
2  dealing with quality control of composite wood
3  products?
4  A.    I've never done anything with
5  quality control, per se. However, as part of
6  the course that I used to teach at University
7  of Massachusetts in wood adhesives technology,
8  there was a laboratory component to that
9  course, and as part of the laboratory
10 components, I would have my students test wood
11 composite products, using the standardized
12 test procedures that apply to those products.
13 Q.    What were you testing for during
14 the lab while you were a professor?
15 A.    The purpose of those exercises
16 was so that students understood that there
17 were standardized test procedures available
18 for wood composite products, what the
19 properties of those wood composite products
20 should be. We would test for things like
21 bending strength, internal bond, density,
22 moisture content.
23 Q.    And you have also written, I
24 assume, numerous articles that we'll talk
25 about in your C.V. regarding composite wood

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 31

1  products; is that accurate?
2  A.    I have written articles in which
3  composite wood products are referred to, yes.
4  Q.    Are there any that deal
5  specifically with emissions of various
6  chemicals or components from wood products in
7  use?
8  A.    Yes. I wrote an article in 1987
9  entitled "Formaldehyde Indoors," that was a
10 summary of the then current state of the
11 knowledge about formaldehyde released from
12 certain wood composite products.
13 Q.    You say "the then current state
14 of knowledge."
15 Is it your understanding that the
16 state of knowledge has changed since 1987?
17 A.    I would anticipate that it has
18 changed, yes.
19 Q.    The way you've answered that, you
20 said you would anticipate.
21 Does that mean you have -- well,
22 let me ask it this way: Have you surveyed or
23 done any research to update the information
24 that was contained in your 1987 article?
25 A.    Let me apologize for my poor

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 32

1  choice of the word "anticipate." The wood
2  products industry has continued to improve on
3  the methods for formulating adhesives and
4  manufacturing wood products for the goal of
5  lowering formaldehyde emissions from those
6  composite wood products, since I wrote that
7  article.
8  Q.    Have you performed any research
9  to update your knowledge concerning the topics
10 of the article that you -- that was published
11 in April of 1987?
12 A.    I continually update my knowledge
13 through the professional journals that I
14 subscribe to through popular press, and books
15 that are published in my field, to make myself
16 aware of what changes are going on in the
17 field.
18 Q.    Have you ever consulted with any
19 manufacturer dealing specifically with
20 formaldehyde as a component in other products?
21 A.    I am not sure what you mean by
22 "other products."
23 Q.    Formaldehyde is used in a lot of
24 different types of products, correct?
25 A.    In addition to wood products?

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 369

1  that.
2  Q.   In your investigation, did you
3  find anything that the -- as a wood science
4  matter, that you felt that the contractors who
5  installed these trailers and maintained them
6  did or didn't do that increased the ambient
7  level of formaldehyde in the trailers?
8  A.   No.
9     MR. KURTZ:
10       That's all I have.
11     THE VIDEOGRAPHER:
12       We are off of the record at 5:38
13  p.m.
14  (Whereupon a brief recess was taken at this
15  time.)
16     THE VIDEOGRAPHER:
17       We are back on the record at 6:00
18  p.m.
19     MR. GLASS:
20       Just a real quick objection
21  before you start your direct that, to the
22  extent that you elicit any opinions beyond
23  those contained in his report dated May 18th,
24  2009, I object to that, as well as to any
25  opinions that go beyond the scope of his

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 370

1  expertise.
2  EXAMINATION BY MR. PINEDO:
3  Q.   Dr. Smulski, are you ready to
4  proceed?
5  A.   I am.
6  Q.   Could you tell the ladies and
7  gentlemen of the jury your background,
8  starting out with your college degree?
9  A.   I hold a bachelor's degree in
10  wood science and technology from the
11  University of Massachusetts at Amherst; a
12  master's degree in environmental and resource
13  engineering from State University of New York
14  at Syracuse; and a Ph.D. in forest products
15  from Virginia Tech at Blacksburg.
16  Q.   And your qualifications, are they
17  set forth in Exhibit 4, Smulski 4?
18  A.   Yes, they are.  That is a copy of
19  my C.V.
20  Q.   You've used the term "wood
21  science."
22  Could you define for the ladies
23  and gentlemen of the jury what is wood
24  science?
25  A.   Wood science is the study of the

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 371

1  anatomical, mechanical, physical, and chemical
2  properties of wood and wood-based products.
3  Q.   And you received a Ph.D. in wood
4  science?
5  A.   Yes.  I believe it was actually
6  called wood science of forest products.
7  Q.   And how many years did it take
8  you cumulatively to get your Ph.D. in wood
9  science?
10  A.   Three years.
11  Q.   And how many years did you spend
12  with your master's degree in environmental and
13  resource engineering?
14  A.   Two.
15  Q.   And then how many years in
16  getting your bachelor in wood science
17  technology from the University of
18  Massachusetts at Amherst?
19  A.   Four.
20  Q.   And you received your Ph.D. in
21  what year?
22  A.   1985.
23  Q.   And how would you generally
24  describe, broadly speaking, your area of
25  expertise for the ladies and gentlemen of the

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 372

1  jury?
2  A.   Again, my expertise is in wood
3  science, as I already explained, and then the
4  other part of my expertise is in wood
5  technology, which is the application of wood
6  science to the manufacture, use, and
7  in-service performance of wood and wood-based
8  products.
9  Q.   And how are you currently
10  employed?
11  A.   I am self-employed as president
12  of Wood Science Specialists, Incorporated.
13  Q.   And what does Wood Science
14  Specialists, Incorporated do?
15  A.   My primary focus is on the
16  investigation of performance problems with
17  wood products, and a secondary focus in
18  working with architects, engineers, and
19  designers in helping them specify wood
20  products, choosing the proper wood products
21  for their application.  Sometimes I oversee
22  installation of wood products as well.
23  Q.   In addition to your work as
24  president of Wood Science Specialists, Inc.,
25  have you also taught in the university realm?

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 49

1  that you were not asked to formulate any kind
2  of equation as to how much formaldehyde might
3  have been present in this unit at some time in
4  the past?
5  A.    That is correct.
6  Q.    Is that within your area of
7  expertise?
8  A.    No, it is not.
9  Q.    Were you asked to offer any
10 opinions as to what information was provided
11 to Ms. Alexander by anyone regarding potential
12 hazards in the travel trailer?
13 A.    No.
14 Q.    Is that within your area of
15 expertise?
16 A.    No, it isn't.
17 Q.    Were you asked to offer any
18 opinions regarding the health effects
19 associated with exposure to any level of
20 formaldehyde?
21 A.    Again, my role was to determine
22 what composite wood products were used in the
23 construction of the trailer.
24 Q.    So I would be accurate in stating
25 you were not asked to address any issues

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 50

1  concerning a causal relationship between any
2  alleged symptoms in Ms. Alexander or
3  Mr. Cooper and their alleged exposure to
4  formaldehyde in the trailer?
5  A.    That's correct. My role was to
6  determine what composite wood products were
7  used in the construction of the trailer.
8  Q.    Would it be within your area of
9  expertise to offer any opinions regarding the
10 causal relationship between any alleged
11 exposure and any alleged symptoms resulting
12 therefrom?
13 A.    No.
14 Q.    Were you asked in the present
15 case to offer historical review of the
16 out-gassing of formaldehyde from wood
17 products?
18    MR. PINEDO:
19 Objection to form.
20    THE WITNESS:
21 I wasn't asked to do that
22 specifically, but that's part of the
23 background information that needs to be
24 presented to put the current case in context.
25 EXAMINATION BY MR. GLASS:

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 51

1  Q.    In what respect is it important
2  to put into context?
3  A.    It's important to -- first to
4  identify what composite wood products are
5  present in the trailer, whether or not those
6  wood products have the potential to emit
7  formaldehyde; what has been known historically
8  about composite wood products and their
9  propensity to emit formaldehyde.
10 Q.    Those are all things that you
11 drew upon in drafting your affidavit dated May
12 18, 2009?
13 A.    They are all things that were
14 included in the affidavit. Again, to put
15 things into context.
16 Q.    What is your normal methodology
17 used to render opinions such as those
18 contained in the May 18, 2009, affidavit you
19 prepared in this case?
20 A.    It obviously varies from project
21 to project that I am working on, but typically
22 it involves a site visit, site inspection.
23 That may involve sampling of materials,
24 consequent testing, or laboratory examination
25 of materials, a review of the literature

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 52

1  pertinent to the topic at hand, and then
2  preparation of a report.
3  Q.    The first thing you spoke about
4  is the site visit or site inspection.
5  Is that when you are asked to
6  address -- I am sorry -- I think you termed it
7  as "troubleshoot" a site where there is some
8  kind of issue?
9  A.    Yes. I have got to be able to
10 examine either the site, or have materials
11 sent to me in order to determine what is the
12 problem, what is the cause of the problem.
13 Q.    You followed your normal
14 methodology in this case; is that accurate?
15 A.    I followed a methodology that
16 would be appropriate to the task at hand.
17 Q.    You visited the Alexander unit?
18 A.    Yes.
19 Q.    When did you do that?
20 A.    May 6th.
21 Q.    Of this year?
22 A.    Yes.
23 Q.    When you examined the unit on May
24 6th, what was its condition?
25 A.    You will have to tell me what you

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 177

1  at any time that the Alexanders actually lived
2  in the trailer?
3  A.   No. The only thing I can tell
4  you was that the day we inspected the trailer,
5  Bill Scott made a measurement of formaldehyde
6  level within the trailer, and it was 74 parts
7  per billion.
8  Q.   Under what conditions was that
9  test conducted?
10 A.   You'll have to ask Mr. Scott.
11 Q.   Well, you observed the situation.
12 Was the unit being lived in at
13 that time?
14 A.   No, it wasn't.
15 Q.   Was the unit hooked up to any
16 kind of power at the time of the test?
17 A.   No.
18 Q.   Was there any kind of air
19 conditioning being run inside of the unit?
20 A.   No.
21 Q.   What was the temperature at the
22 time of the test?
23 A.   I don't know. It's indicated in
24 my report here.
25 Q.   We will get to that.

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 178

1  No. 11, "The trailer was
2  installed in New Orleans, Louisiana, a
3  location whose climate for much of the year is
4  hot and humid."
5  This is just more of the
6  background for the complete story for your
7  inventory?
8  A.   Yes, and it's also showing that,
9  knowing that formaldehyde release increases as
10 temperature increase, and relative humidity
11 increase, that the trailer was installed in an
12 environment that has high-average annual
13 temperature and high-average annual relative
14 humidity.
15 Q.   You state that, "These are the
16 exact conditions that maximize the release of
17 formaldehyde gas from wood-based composite
18 panels including particle board, medium
19 density fiberboard, and hardwood plywood."
20 So what you are saying is that
21 the location, New Orleans, Louisiana, is the
22 exact conditions to maximize release of
23 formaldehyde gas?
24 A.   In the sense that you have here
25 in New Orleans high-average annual

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 179

1  temperature, high-average annual relative
2  humidity, yes.
3  Q.   There is no place else in the
4  world where formaldehyde released from
5  wood-based composite panels would be greater
6  than the New Orleans, Louisiana area?
7  A.   There very well could be. That's
8  not what I am saying there.
9  Q.   You said, "These are the exact
10 conditions to maximize the release of
11 formaldehyde gas"?
12 A.   That's right. What I'm saying
13 is, if you want to emit from a
14 formaldehyde-containing wood product as much
15 as you could get out of it, raise the
16 temperature, raise the relative humidity.
17 Q.   So we could go to higher
18 temperatures or higher humidities, and there
19 actually would be even greater release of
20 formaldehyde gas than what you're opining here
21 in 11?
22 A.   You could probably find some
23 other place on the planet, yes. I guess if
24 you mean am I using the word "maximize"
25 literally as there is no place else in the

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 180

1  world where you could ever have more coming
2  out, that is not my intention. My intention
3  is that you have placed the travel trailer in
4  a climate that has high-average annual
5  temperature and high-average annual relative
6  humidity, and by doing that, you are going to
7  have an increase of formaldehyde emission from
8  those products.
9  Q.   To me, and maybe I am not -- I
10 can't give you the exact definition, but
11 "maximize" means "the most," doesn't it?
12 A.   Yes, and that's just what I said.
13 You are interpreting the word literally. I am
14 not using it that way. I am saying, in the
15 practical use of formaldehyde-containing wood
16 products in residences, if you want the most
17 formaldehyde to come out of it, raise the
18 temperature and raise the relative humidity.
19 Q.   I understand what you are saying,
20 but I can only rely on the words you have in
21 your report. If there are other words that
22 don't have the normal ordinary meaning, I need
23 to know that.
24      MR. PINEDO:
25 Objection. Form.

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 193

1  EXAMINATION BY MR. GLASS:
2  Q.    My question means: Do you have
3  some kind of expertise that offers assistance
4  to the trier of fact in reading a document
5  that they can read for themselves?
6      MR. PINEDO:
7  Objection to form.
8      THE WITNESS:
9  Well, I think I've provided it
10 here. I've read the owner's manual looking to
11 see if there was any mention of formaldehyde,
12 and there is no mention of formaldehyde in
13 this owner's manual.
14 EXAMINATION BY MR. GLASS:
15 Q.    Does that assist you in your
16 evaluation or inventory of the wood products
17 contained in the Alexander unit?
18     MR. PINEDO:
19 Objection to form.
20     THE WITNESS:
21 No, it doesn't, but I am
22 attempting to tell the complete story here.
23 Having read the owner's manual for other
24 manufacturers' travel trailers who have
25 explicit warnings about the use of

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 194

1  formaldehyde gas, about the potential problems
2  or adverse health effects that the occupants
3  could have because of exposure to that
4  formaldehyde gas, makes me wonder why those
5  same type warnings and notices weren't
6  included in the Gulf Stream owner's manual.
7  EXAMINATION BY MR. GLASS:
8  Q.    Are you an expert in warnings?
9  A.    No, I am not.
10 Q.    Or when warnings are required?
11 A.    No, I'm not.
12 Q.    The statement that nowhere does
13 it say that the plywood -- hardwood plywood,
14 medium density fiberboard, and particle board
15 used in the trailer is made with
16 urea-formaldehyde adhesive.
17 Are there other options in the
18 manufacture of composite wood products that do
19 not use urea-formaldehyde adhesive?
20 A.    Yes, there are.
21 Q.    How did you determine there was
22 urea-formaldehyde adhesive used in the
23 products contained in the travel trailer
24 utilized by the -- Ms. Alexander and
25 Mr. Cooper?

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 195

1  A.    Again, I was limited to visual
2  examination of those products. Three things
3  that are important here. First, in my 31
4  years education and experience, hardwood
5  plywood, particle board, and medium density
6  fiberboard are almost always manufactured and
7  made with urea-formaldehyde adhesives.
8  Secondly, Centers for Disease Control has
9  measured formaldehyde levels in 123 Gulf
10 Stream Cavalier travel trailers. They
11 reported an average value of 104 parts per
12 billion and a range of 3 to 590 parts per
13 billion. That indicates there is a
14 significant source of formaldehyde-emitting
15 materials somewhere in those travel trailers.
16 And thirdly, the Lawrence Berkeley National
17 Laboratory sampled from a Gulf Stream Cavalier
18 trailer, tested the hardwood plywood, tested
19 the medium density fiberboard, tested the
20 particle board, and confirmed that it was in
21 fact manufactured from urea-formaldehyde
22 adhesives.
23 Q.    In the Alexander travel trailer?
24 A.    No, in another trailer.
25 Q.    Can the material from trailer to

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 196

1  trailer -- well, I'm sorry.
2  How did you determine that the
3  same material was used in every single travel
4  trailer manufactured by Gulf Stream Coach?
5  A.    I don't know that for a fact.
6  What I do know is, based on my 31 years
7  experience in wood science and technology,
8  hardwood plywood, medium density fiberboard,
9  and particle board are almost always made with
10 urea-formaldehyde adhesives. The CDC measured
11 high levels of formaldehyde in 123 Gulf Stream
12 Cavalier trailers. That indicates there has
13 to be a source of formaldehyde somewhere in
14 those trailers.
15 The Lawrence Berkeley National
16 Laboratory has confirmed through testing of
17 the hardwood plywood, medium density
18 fiberboard, and the particle board, that
19 indeed they did use, in their travel trailers,
20 urea-formaldehyde emitting products. If it's
21 not the wood composite products in the travel
22 trailer, what is the source of the
23 formaldehyde? We know that it's not the
24 stainless steel sink. We know it's not the
25 refrigerator. We know it's not metals. What

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 205

1 formaldehyde can adversely affect people's
2 health. That's why formaldehyde exposure is
3 regulated in the workplace. That's why there
4 are voluntary product standards relating to
5 formaldehyde release from certain wood
6 products, and I suspect from many other
7 materials as well.
8  Q.  At what level?
9  A.  You will have to ask a medical
10 professional.
11  Q.  No. 14, "I am aware that the
12 trailer was installed by inserting multiple
13 supports beneath its frame."
14 You are talking about the
15 Alexander trailer?
16  A.  Yes.
17  Q.  What is the source of that
18 information?
19  A.  Mrs. Alexander.
20  Q.  She told you that she saw how it
21 was installed?
22     MR. PINEDO:
23 Objection to form.
24     THE WITNESS:
25 She confirmed that her trailer

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 206

1 was sitting on some type of support.
2 EXAMINATION BY MR. GLASS:
3  Q.  "It is my understanding that
4 during the process of installation that the
5 frame and exterior shell can bend and twist."
6 What is the source of that
7 information?
8  A.  That's the -- that is coming from
9 other experts who are experts in travel
10 trailers.
11  Q.  What expert?
12  A.  Al Mallet, Gary Bunzer.
13  Q.  Anybody else?
14  A.  Not that I can think of.
15  Q.  You said "can."
16 Do you know whether with the
17 Alexander unit that that actually occurred?
18  A.  I don't.
19  Q.  Do you know how this unit was
20 handled, transported, anything that happened
21 to it between the time that Ms. Alexander
22 moved out, and the time you looked at it?
23  A.  I do not.
24  Q.  Do you know how the unit looked
25 at the time it was installed at the 4415 Dale

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 207

1 Street address?
2  A.  I do not.
3  Q.  This next portion of that
4 sentence says, "causing sealed joints in the
5 walls, roof, ceiling, and floor to open."
6 Again, this is just something
7 that you've been told can happen?
8  A.  This was told to me by
9 Mr. Mallet, Mr. Bunzer, and this is also based
10 on my experience in the construction industry
11 and in life in general. Something that is
12 built square, plumb, and level, if you twist
13 it, you will cause joints to open, members to
14 bend, et cetera.
15  Q.  But you don't know whether that
16 happened in the Alexander unit?
17  A.  I do not.
18  Q.  And you don't know if it did
19 happen, when it occurred?
20  A.  That is correct.
21  Q.  The next sentence, "This can
22 allow formaldehyde gas inside the wall,
23 ceiling, and floor cavities to more easily
24 enter the living space and increase the
25 concentration of formaldehyde gas in the

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 208

1 trailer."
2 If I understood your earlier
3 testimony correctly, based upon various
4 factors such as temperature differential, air
5 pressure, and concentration, we could also
6 state that the openings can more easily allow
7 the formaldehyde to enter the exterior of the
8 trailer, would that be accurate?
9  A.  Yes. It's a two-edged sword.
10 Depending on what the conditions are, the
11 movement could be in either direction.
12  Q.  "It can also allow hot, humid air
13 and rain to enter into the walls, ceiling, and
14 floor cavities, causing the relative humidity
15 inside the cavities to increase."
16 That would require that there be
17 some path for the exterior air and rain to go
18 all of the way from the outside to the
19 interior of the trailer, correct?
20  A.  That's correct, and we actually
21 observed that in the Alexander trailer. There
22 is a ceiling light fixture over the bed in the
23 bedroom, which has been leaking water. When
24 we got up on the roof of the travel trailer,
25 we could see that there was an open seam in

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 209

1  the roof membrane, and that was where the
2  water was entering through, exiting in the
3  ceiling light fixture, and then actually
4  ending up on the bed platform and mattress
5  itself.
6  Q.    Do you know when that damage
7  occurred?
8  A.    I do not.
9  Q.    Do you know if that was a
10 condition that existed at the time
11 Ms. Alexander and her son lived in the
12 trailer?
13 A.    My recollection is Mrs. Alexander
14 had complained about that leak to somebody to
15 have it repaired, so it occurred while they
16 were living in the trailer.
17 Q.    Do you know when?
18 A.    I don't know when.
19 Q.    No. 15, "Even in the absence of
20 installation-caused damage to the trailer,
21 formaldehyde gas will escape from the exposed
22 raw wood on the back edges of the wall,
23 ceiling, and floor panels and accumulate
24 inside the wall, ceiling, and floor cavities."
25 That's just a function of the

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 210

1  properties of the wood and the adhesive,
2  correct?
3  A.    It's due to the fact that the
4  rear of the panel is raw wood, and that is
5  going to be an avenue of escape for the
6  formaldehyde gas that is going to then
7  accumulate in the wall cavity. As outdoor air
8  leaks through the walls into the wall cavity,
9  it's going to absorb that formaldehyde, and
10 then leak into the interior of the travel
11 trailer itself through joints and
12 penetrations.
13 Q.    "The formaldehyde gas will then
14 naturally enter the living space."
15 We are talking about the living
16 space of the Alexander's unit?
17 A.    Yes.
18 Q.    Let me actually complete the
19 sentence. "The formaldehyde gas will then
20 naturally enter the living space, with
21 differences in temperature, vapor pressure,
22 and air pressure across the trailer's walls,
23 ceiling, and floor providing the driving force
24 for moving the airborne gas through joints and
25 penetrations in the walls, ceiling, and floor

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 211

1  (e.g., switch plates, electrical receptacles,
2  heating and air-conditioning grilles, ceiling
3  light fixtures, seams between panels)."
4  What is the source of that
5  information?
6  A.    There is no source. That is my
7  experience in 31 years of education and
8  experience and in investigating moisture
9  problems in residential buildings in the last
10 17 years, those are the passageways by which
11 airborne moisture moves within a building and
12 across the walls, floor of the buildings. The
13 same thing is happening here with the
14 formaldehyde gas.
15 Q.    As you indicated in the previous
16 opinion in 14, based upon those same
17 differences in temperature, vapor barrier --
18 excuse me -- vapor pressure, and air pressure
19 across the various components of the trailer,
20 the air could just as easily, naturally leave
21 the living space, correct?
22      MR. PINEDO:
23 Objection to form.
24      THE WITNESS:
25 It can go the other way, yes.

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 212

1  EXAMINATION BY MR. GLASS:
2  Q.    Did you do any testing to confirm
3  your conclusions in this first two sentences
4  as to what the path of the formaldehyde gas
5  being emitted was in the Alexander travel
6  trailer unit?
7  A.    I didn't do any testing, but the
8  gas passes through joints and penetrations.
9  That is the air passageways in the travel
10 trailer, in a HUD-Code home, in a manufactured
11 home, in a high-rise commercial office
12 building, in this building we are sitting in
13 here today.
14 Q.    How much formaldehyde gas was in
15 the travel trailer at its peak when the
16 Alexanders lived in it?
17 A.    I don't know. I only know that
18 in January 2008 the reading of 50 parts per
19 billion was made in the trailer, and in May
20 2009, a reading of 74 parts per billion was
21 made in the trailer.
22 Q.    "In addition, formaldehyde gas
23 will naturally escape through the overlay on
24 these panels' faces (much more slowly, of
25 course) as well as from the products that are

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 217

1  affect the readings that you make at any point
2  in time. The general trend, as shown in the
3  laboratory, is that you start with a finite
4  amount of formaldehyde in a composite wood
5  product, and that amount of formaldehyde
6  decreases over time because it escapes from
7  the product.
8  EXAMINATION BY MR. GLASS:
9  Q.    How the trailer is used by the
10 individual will also affect the amount of
11 formaldehyde concentration in that unit?
12 A.    Yes, it will.
13 Q.    People using a trailer can bring
14 in multiple sources of formaldehyde into the
15 trailer on their own, correct?
16 A.    Yes, they could.
17 Q.    Various activities in any
18 structure can increase the levels of
19 formaldehyde in that structure?
20 A.    It can, but those activities
21 would typically represent a little bump. They
22 might increase it temporarily, and then things
23 return to a -- closer to what you would
24 consider sort of a background that's more
25 typical of what is going on inside.

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 218

1  MR. GLASS:
2  We are going to take a break to
3  let them switch the tape.
4  THE VIDEOGRAPHER:
5  We are off the record at 2:23
6  p.m. This is the end of tape 3.
7  (Whereupon a brief recess was taken at this
8  time.)
9  THE VIDEOGRAPHER:
10 We are back on the record at 2:32
11 p.m. This is the beginning of tape 4.
12 EXAMINATION BY MR. GLASS:
13 Q.    I am going to start by attaching
14 as Smulski 8 the two discs that were provided,
15 the two presentations that I haven't looked at
16 yet. I will attach those as 8.
17 When we left off, we were talking
18 about your opinion on page 5 of your report,
19 No. 16.
20 When you are relaying the
21 information about Mr. Scott's testing, the
22 temperatures, are those interior temperatures
23 or exterior temperatures?
24 A.    My understanding is both
25 temperature and relative humidity are inside.

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 219

1  Q.    We were talking about the various
2  activities of the occupants could affect the
3  level of formaldehyde in the unit; is that
4  accurate?
5  A.    Yes.
6  Q.    And when we were talking about
7  activities, that could be anything from the
8  types of things that they cooked to the types
9  of products that are used in the structure; is
10 that accurate?
11 A.    I don't know what you mean by
12 "the types of products used in the structure."
13 Q.    If they used certain types of
14 cleaners, that might release some formaldehyde
15 in the air?
16 A.    Yes.
17 Q.    Are the test results from
18 Mr. Scott done under conditions that would
19 accurately represent a unit that is being
20 lived in?
21 MR. PINEDO:
22 Objection to form.
23 THE WITNESS:
24 I would say no. The trailer was
25 empty at the time of the test.

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 220

1  EXAMINATION BY MR. GLASS:
2  Q.    Is it your understanding that the
3  test results, or the testing that was done by
4  Mr. Scott represented how the -- Ms. Alexander
5  and her son lived in the housing unit?
6  A.    No. Again, the test results
7  represent a snapshot in time of what were the
8  formaldehyde concentrations inside of the
9  trailer in January 2008, and again in May
10 2009.
11 Q.    No. 17, "The trailer supplied by
12 FEMA to Ms. Alexander is intended to be used
13 for short-term recreational use."
14 What is the source of the
15 information for that sentence, the first one?
16 A.    That's my understanding of how
17 people typically use travel trailers, and in
18 the owner's manual itself, they infer it is
19 typically used for short periods of time,
20 rather than on the long term.
21 Q.    I'm skipping a sentence. "During
22 this time they would be subjected to acute
23 exposure to formaldehyde gas."
24 What do you mean by the term
25 "acute exposure"?

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 221

1  A.   Acute is the immediate exposure.
2  What happens to you when you are immediately
3  put in an environment with formaldehyde gas.
4  Q.   Are people exposed to
5  formaldehyde gas in all kinds of daily
6  activities?
7  A.   I would say there certainly are
8  some kinds of daily activities. Some people
9  may be exposed to it as a part of their
10 employment in manufacturing, for example.
11 Q.   I didn't mean to cut you off.
12 A.   I'm finished.
13 Q.   We've already talked that there
14 are background levels of formaldehyde,
15 correct?
16 A.   Yes.
17 Q.   Do you know what the background
18 levels of formaldehyde were at the times of
19 tests done by Mr. Scott?
20 A.   I don't.
21 Q.   Do you know what the background
22 levels of formaldehyde were at any time that
23 the Alexanders used the unit? And I am
24 talking about specifically background levels
25 around the Dale Street address.

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 222

1  A.   I don't.
2  Q.   The next sentence says, "When the
3  trailer was installed on a foundation and
4  hard-wired and hard-plumbed, however, it was
5  converted from short-term recreational use to
6  long-term housing."
7  What is the basis of that
8  opinion?
9  A.   Common sense. It used to be a
10 vehicle towed from location to location for
11 vacation use. It has been converted to a
12 house, which is set up on a foundation,
13 equipped with -- hooked into the electrical
14 grid, hooked into the sewer system, hooked
15 into the water system.
16 Q.   Next sentence is, "As a
17 consequence, Ms. Alexander and her son
18 Christopher Cooper were subjected to chronic
19 exposure to formaldehyde gas."
20 What do you mean by "chronic
21 exposure"?
22 A.   Long term as -- as used in the
23 same sense that ASTDR uses chronic,
24 intermediate, and acute exposure.
25 Q.   What do you consider long term?

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 223

1  A.   I would say if I were to be
2  displaced from my house and put up in a hotel
3  for three or four weeks, that would be short
4  term. I would say if I were in that hotel for
5  months and years, that would be long term. If
6  you go with the ATSDR definitions, acute is up
7  to 14 days, intermediate is 15 to 365 days,
8  chronic is over 365 days.
9  Q.   Do you know what level of
10 formaldehyde gas Ms. Alexander and her son
11 Christopher Cooper were exposed to as opined
12 in paragraph 17?
13 A.   I don't.
14 Q.   "The use of this trailer by
15 Ms. Alexander and her son was a reasonably
16 anticipated use given that this trailer was
17 sold to FEMA for the purpose of housing
18 persons displaced by natural disasters like
19 Hurricane Katrina."
20 In regards to your task of
21 identifying and inventorying the composite
22 wood products in the Alexander trailer, what
23 is the purpose of this statement about
24 "reasonably anticipated use"?
25 A.   Again, I am fleshing out the

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 224

1  story. I want somebody to be able to pick up
2  this document with no knowledge, read it in
3  its entirety, and understand the context in
4  which these formaldehyde-emitting wood
5  products were used, and the consequences for
6  the occupants of those travel trailers.
7  Q.   Did you conduct any kind of
8  inquiry of Ms. Alexander to determine whether
9  she in fact used this trailer in its, as you
10 described it, anticipated use by the
11 manufacturer?
12    MR. PINEDO:
13 Objection to form.
14    THE WITNESS:
15 I did not. As I said, I listened
16 in on a conference call with Mrs. Alexander.
17 I never spoke to her directly.
18 EXAMINATION BY MR. GLASS:
19 Q.   Was there any discussion during
20 that conversation about how she may have
21 misused the product?
22 A.   Not that I recall.
23 Q.   Do you recall any specific
24 questions asking her how she used the trailer?
25 A.   I don't.

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 249

1  A.   As far as I can see, none.
2  Q.   Did they have a roof vent?
3  A.   They were relying on natural
4  leakage of air through joints and
5  penetrations. They did have an exhaust system
6  in the bathroom, a roof vent. There was an
7  exhaust system for the kitchen range, and they
8  did have an air-conditioning system for
9  cooling. My understanding of the
10 air-conditioning system, however, it does not
11 have an outside air duct. It's simply
12 recirculating the air it naturally leaks into
13 the trailer.
14 Q.   In opinion No. 22, you speak
15 again to the November 2007 Lawrence Berkeley
16 National Laboratory report.
17 Does that report tell you what
18 the level of formaldehyde was at any time that
19 the Alexanders occupied the Gulf Stream Coach
20 unit?
21    MR. PINEDO:
22 Objection to form.
23    THE WITNESS:
24 No, because the FEMA tests --
25 excuse me -- the Lawrence Berkeley National

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 250

1  Lab did not conduct tests on the Alexander
2  trailer. They did conduct tests, however, on
3  another Gulf Stream Cavalier model.
4  EXAMINATION BY MR. GLASS:
5  Q.   No. 23, "The current formaldehyde
6  gas problem," what is your definition of the
7  "current formaldehyde gas problem"?
8  A.   Excessive levels of formaldehyde
9  inside the travel trailer, and exposing the
10 occupants of those travel trailers to --
11 chronically to formaldehyde gas. I didn't
12 identify the problem. The Centers for Disease
13 Control identified the problem. That's why
14 they sent their technicians, or sent
15 technicians out in the field to make
16 measurements of formaldehyde levels in travel
17 trailers.
18 Q.   What do you define "excessive
19 levels" as?
20 A.   I would again refer to the AST --
21 excuse me -- ATSDR levels for acute,
22 intermediate, and chronic exposure.
23 Q.   It's your opinion that the -- as
24 you defined it -- "Current formaldehyde gas
25 problem could have been prevented had Gulf

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 251

1  Stream Coach, Inc. and FEMA employed the
2  mitigation techniques detailed in the
3  extensive body of literature documenting an
4  identical formaldehyde gas problem that
5  plagued HUD-Code manufactured houses in the
6  1970s and early 1980s for identical reasons."
7  What is the source of that
8  opinion?
9  A.   The actual event itself, which is
10 the formaldehyde gas problem that existed in
11 HUD-Code homes in the 1970s and 1980s.
12 Q.   What were the mitigation
13 techniques employed following the 1970s and
14 1980s?
15 A.   The mitigation techniques were a
16 reformulation of urea-formaldehyde adhesives
17 so they contained less formaldehyde. The
18 institution of voluntary product standards
19 with regard to the amount of formaldehyde that
20 can be emitted from medium density fiberboard,
21 particle board, hardwood plywood. The HUD
22 requirement that HUD-Code manufactured housing
23 have active, mechanical ventilation. That is
24 a system that exhausted, contaminated indoor
25 air to the outside, and replaced it with fresh

Stratos Legal Services
800-971-1127

Stephen J. Smulski
June 10, 2009

Page 252

1  air directly from the outside.
2  Q.   Anything else?
3  A.   The use of, for example,
4  formaldehyde scavengers by the makers of,
5  particularly particle board, to capture the
6  formaldehyde and trap it within the panels,
7  increased awareness of the use of various
8  types of overlays as barriers to retard the
9  escape of formaldehyde from panels into the
10 air, and a general recognition that
11 formaldehyde released from these wood
12 composite products was causing adverse health
13 effects in the occupants of HUD-Code mobile
14 (sic) homes. The problem was recognized. It
15 was investigated. Solutions were put in
16 place, and by the mid 1980s it ceased to be a
17 problem.
18 What we have here today in the
19 FEMA-supplied travel trailers is a repeat of
20 history. It's the exact same problem as
21 identified by the Centers for Disease Control
22 happening for the exact same reasons. They
23 built the travel trailers with large numbers
24 of formaldehyde-emitting products that were
25 freshly manufactured. They designed travel

Stratos Legal Services
800-971-1127