**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION**

**IN RE: FEMA TRAILER**     **MDL NO. 1873**
**FORMALDEHYDE**
**PRODUCT LIABILITY LITIGATION**   **SECTION "N-5"**
             **JUDGE ENGELHARDT**
             **MAG. JUDGE CHASEZ**

**THIS DOCUMENT IS RELATED TO ALL CASES**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**DEFENDANT UNITED STATES OF AMERICA'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF ITS "MOTION TO DISMISS
PLAINTIFFS' REMAINING  FTCA CLAIMS FOR LACK OF
SUBJECT MATTER JURISDICTION" [Dkt. 1545]**

## INTRODUCTION

Defendant United States of America ("United States") submits this Supplemental Memorandum in support of the United States' "Motion to Dismiss Plaintiffs' Remaining FTCA Claims for Lack of Subject Matter Jurisdiction" [Dkt. 1545]. Plaintiff Steering Committee ("PSC") argued in its Response Memorandum that the Court should deny the Government's motion, in part, because discovery will show that commencing on or about May 18, 2006, with the filing of the class action complaint in *Hillard v. United States*, 2007 WL 647292 (E.D. La. 2007), and continuing through Spring 2007, FEMA's response actions were controlled by the Federal Emergency Management ("FEMA") Office of Chief Counsel ("OCC") (formerly Office of General Counsel ("OGC") and that actions were taken based upon litigation strategy. *See* PSC Memo. at 10, 16, 22-23, 41[1] [Dkt. 2001]. PSC has now had an opportunity to depose witnesses that they claim possess this information: (1) Dr. Christopher DeRosa, a former employee of the Center for Disease Control/Agency for Toxic Substances and Disease Registry ("ATSDR"); (2) Commander Joseph Little, a Public Health Service Officer and author of the February 1, 2007, ATSDR, Health Consultation Report, *see* Exh. 3, Little Depo. pp.9-25/9-22; (3) Mr. David Garratt, Acting Deputy Administration, FEMA, *see* Exh. 11, Garratt Depo. pp. 14-17/21-12; (3) Mr. Kevin Souza, formerly the Supervisory Program Manager for the Individual Assistance Program Management Branch at FEMA, and the FEMA official with primary responsibility for formaldehyde response actions taken between June 2006 and August 2007, *see* Exh. 4, Souza

---

[1] In support of its position PSC relies primarily upon statements attributed to Dr. Christopher DeRosa and selective FEMA OCC e-mails reflecting attorney work product and attorney client communications that were obtained and published by Congress on the internet. *See* PSC Memo. at 22-23 [Dkt. 2001].

Depo. pp. 17-20/20-2; pp. 57-58/13-10; and (4) Mr. Martin McNeese, who was appointed by Mr.

Souza to serve as FEMA's primary point of contact with the Environmental Protection Agency

and ATSDR for testing of EHUs in Summer of 2006, *see* Exh. 2, McNeese Depo. pp. 24-27/11-

7; Exh. 4, Souza Depo. pp.66-68/14-6; .   The testimony of these four witnesses show that:

> \*\*\*    Dr. DeRosa has no personal knowledge regarding FEMA OCC's
> involvement in FEMA's response to formaldehyde concerns.

> \*\*\*    FEMA OCC Rick Preston's June 15, 2006, E-Mail to Mr. Souza stating
> that FEMA should not to initiate testing reflected FEMA OCC's concern
> that a plan of action should be in place before commencing testing, and
> that although Mr. Souza as the program officer shared that concern, he
> made the decision that testing would proceed anyway and FEMA would
> develop a plan of action after testing was underway.

> \*\*\*    FEMA OCC did participate in conference calls with FEMA, EPA, and
> ATSDR relating to testing; however, FEMA OCC was not an active
> participant and never instructed or imposed any restrictions or limitation
> on the nature or scope of EPA's testing or ATSDR's interpretation of the
> test data.

> \*\*\*    ATSDR's February 1, 2007, Health Consultation Report was prepared by
> an ATSDR Emergency Response Team operating under the ATSDR
> Office for Preparedness, Terrorism and Emergency Response ("OPTER")
> as part of the National Response Plan.  That report was reviewed and
> edited by appropriate ATSDR personnel prior to its issuance, including Dr.
> DeRosa's supervisor, Dr. Frumpkin.

> \*\*\*    FEMA OCC served as the conduit for transfer of the EPA test data to
> ATSDR, and transfer of ATSDR's report to FEMA, in part, to ensure that
> the test data and report remained confidential while FEMA deliberated and
> determined what actions, if any, it should take in response to that
> information.

> \*\*\*    Between February 2, 2007, and Summer of 2007, ATSDR confirmed on
> multiple occasions that 0.3 ppm was an appropriate emergency response
> ambient indoor air formaldehyde level of concern for sensitive individuals.

The deposition testimony establishes that FEMA OCC at no point in the discussions

regarding formaldehyde in EHUs caused a delay in the Government's responses.  Since the only

"colorable" basis found by the Court for PSC's suit is now contradicted by the undisputable

evidence, the claims against the United States should be dismissed.

**I.    Dr. DeRosa Has No Personal Knowledge Regarding FEMA OCC Involvement With FEMA's Response To Formaldehyde Concerns In EHUs.**

PSC in its Opposition Memorandum, citing to Dr. DeRosa, states that "FEMA's ***legal***

***counsel*** . . . , as early as the Spring of 2006, first suggested that in evaluating 'safe levels of

exposure' the ATSDR restrict its evaluation to short term exposures."  PSC Memo. at 22-23

[Dkt. 2001] (emphasis original).  Dr. DeRosa's involvement with FEMA relating to

formaldehyde in EHUs consisted of a single event in the Spring of 2006.  Dr. DeRosa testified:

> Q:      . . . The only communication you ever had with FEMA about
> formaldehyde in trailers was that conversation Spring 2006?
>
> A.      Right.  I believe it was a conversation that was followed by an e-mail
> because I was waiting for the e-mail to review it based on the phone call.
>
> *        *        *
>
> Q:      . . . this conversation was for the purpose of FEMA issuing a statement
> later that day?
>
> A:      That was my understanding, yes, they were preparing for a public meeting.

Exh. 1, DeRosa Depo. at 127-28/8-16, 23-1.

> Q:      . . . Do you know whether FEMA, in fact, ever issued a statement as a
> result of that consultation?
>
> A:      I had no followup with that, no.

Exh. 1, DeRosa Depo. at 130-31/25-3.

Dr. DeRosa never spoke with FEMA OCC Rick Preston about testing for formaldehyde

3

or ATSDR's analysis of the EPA data.

> Q:     Now, I gather from your testimony today that you never, ever spoke with
>        Rick Preston?
>
> A:     No, I didn't; unless he was the person who contacted me and I don't have
>        any recollection.

Exh. 1, DeRosa Depo. p. 128/15-18.

*       *       *

> Q:     . . .  you yourself have never spoke with Rick Preston, to best of your
>        knowledge?
>
> A:     To the best of my knowledge, I never spoke with him.
>
> Q:     You never heard Rick Preston ever say limit this to short term analysis,
>        short term exposure, did you?
>
> A:     No, I would not have since I did not speak to him.

Exh. 1, DeRosa Depo. p. 129/3-12

The sole basis for Dr. DeRosa's belief that FEMA OCC directed and restricted the scope

of the ATSDR February 1, 2007, Health Consultation Report is his reading and interpretation of

the statement in the opening paragraph of the report which indicates that the EPA test data had

been transmitted to ATSDR by FEMA OCC.

> Q:     . . . as to the scope of that February 2007 report that was issued, the
>        only thing you know about instructions that ATSDR received was
>        the letter Mr. Preston issued?
>
> A:     No.  In fact, it was the statement in the opening paragraphs of the
>        consultation on the February 1st where they describe that FEMA – this
>        was done at the request of Office of Special Counsel, Rick Preston and
>        FEMA, and it was limited to the short term effects of formaldehyde.

4

Exh. 1, DeRosa Depo. p. 129/13-22.[2]

Dr. DeRosa agrees that the persons who would have actual knowledge of any instructions from FEMA or FEMA OCC would be the reports authors, Commander Joseph Little (a uniformed Officer in the Public Health Service) and Mr. Scott Wright.  *See* Exh. 1, DeRosa Depo. p.130/4-20.  However, Dr. DeRosa never made any inquiry or any attempt to determine from Commander Little or Mr. Wright what FEMA requested or who from FEMA made the request.

> Q:   Did you make any inquiry or any attempt to inquire from Scott Wright or Joe Little what in fact, FEMA wanted to use this data for?
>
> A:   No.  No, as I mentioned earlier, they were third-line reports to me and they would normally report that to Rich Nickel, who was the team lead, Rich Nickel, at his discretion, would report it to the branch chief, and then the branch chief at their discretion or his discretion would bring it to my attention . . .

Exh. 1, DeRosa Depo. at 136/16-25.  That Dr. DeRosa does not possess such information is not unexpected because as Commander Little explained:  "Dr. DeRosa did not normally participate in any emergency type of activity, so he was not involved in any aspect of the hurricane response, or really any of the emergency response activities."  Exh. 3, Little Depo. p. 85/4-17.

---

[2]  Dr. DeRosa did not learn about the November 30, 2006, letter from Rick Preston, FEMA OCC to ATSDR transmitting the EPA test data for analysis until after he spoke with Congressional staff members.  *See* Exh. 1, DeRosa Depo. pp. 147-48/22-17; 149/14-17.

Mr. McNeese testified that Individual Assistance Program Management, FEMA Headquarters, and FEMA OCC all requested that EPA and ATSDR test both occupied and unoccupied units, however, EPA and ATSDR advised that the testing should be restricted to unoccupied units.  Exh. 2, McNeese Depo. pp. 123-25/10-7.

**II.     FEMA Did Not Delay Testing EHUs Because Of Concerns Voiced By FEMA OCC Rick Preston In His June 15, 2006, E-Mail To Mr. Kevin Souza And Other FEMA Officials.**

This Court and PSC have cited FEMA OCC Rick Preston's June 15, 2006, E-Mail to Mr. Souza as support for the proposition that FEMA OCC may have controlled FEMA's response actions and that the response actions were based upon litigation strategy. PSC suggests in its Response Memorandum that the E-Mail demonstrates that FEMA OCC "was campaigning against any proactive response by FEMA." PSC Memo. at 20 [Dkt. 2001]. The June 15, 2006, E-Mail from Rick Preston stated:

> Do not initiate any testing until we give the OK. While I agree we should conduct testing we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is running on our duty to respond.

*See* Exhibit 5 [Dkt. 348]; *see also* PSC Memo. at 20-21 [Dkt. 2001].

As previously noted, in June 2006, Mr. Kevin Souza was the Chief of the Individual Assistance Program Management Branch at FEMA and he was assigned responsibility for taking the lead in coordinating with the field and other elements, FEMA's formaldehyde response actions, and in particular, the EPA testing of EHUs. Exh. 4, Souza Depo. pp. 57-58/16-10; Souza Dec. ¶1 [Dkt. 1543-36]. Because of the pending litigation, FEMA OCC was kept in the loop regarding FEMA's response to formaldehyde concerns in EHUs. Exh. 4, Souza Depo. pp. 58-59/11-17. The United States has already submitted evidence showing that neither FEMA, nor EPA's testing of EHUs was delayed because of Mr. Preston's E-Mail. *See* U.S. Memo. at 19-21 [Dkt. 1543-6]. Since then, Mr. Souza in response to Plaintiffs' questions placed Mr. Preston's E-Mail squarely into context, and explained that the decision on whether to test belonged to FEMA

Individual Assistance, not FEMA OCC, the concern voiced by FEMA OCC was a programmatic not a legal issue, and that issued did not delay testing.

Q:     Did Mr. Preston or anyone from OGC ever suggest a plan of action in responding to occupant concerns? . . .

A:     I don't recall the specific phone calls, the topics of the phone calls.

Q:     Any specific E-mails?

A:     In regards to --

Q:     Any plans of action suggested by anyone from OGC. . . .

A:     There was an E-mail from Rick Preston where he agreed that testing should be done, but he wanted to make sure we had a -- that the program side of the house had a course of action laid out before we started.

Q:     What was -- why -- what did you understand to be his concern for the program side having a course of action set up?

A:     His concern, quite frankly, was already one of the program concerns, which is, if we started testing with EPA, and the results came back requiring us to take action, what would that action be?  His concern was pretty much that we have a plan of action before we begin the concern.  At least that's how I understood his concern.

Q:     So you understood his concern to wait, not perform testing until there is an appropriate plan of action?

A:     I believe that was his concern, yes.

Q:     Did it not concern you, sir, that individuals were complaining about formaldehyde emissions while FEMA and its lawyers took time to come up with an appropriate plan of action in response to if there were actual elevated levels?

A:     As I mentioned, those were Rick's concerns, or OCC's concerns.  ***My position as the program officer was that the testing would proceed forward, and that we would develop the plan of action simultaneously with getting the testing underway.***

> Q:      Okay. So, once Rick was -- Rick Preston was okay with a plan of action in response to possible elevated formaldehyde emission levels, then the testing would be allowed to commence, correct?
>
> A:      No.  And to be frank, I felt the decision was mine to make in coordination with the program leadership, Mr. Garratt.  So, I was not overly concerned with Rick's concerns.  ***He made a good and – what I considered to be a good and valid point in terms of a course of action, but we had already considered it, and the decision was made that we were moving forward, and we did.***
>
> Q:      But you did consider his concerns?
>
> A:      Like I said, we had already considered his concerns.  It was already one of our concerns.
>
> Q:      Litigation?
>
> A:      No.  What I saw in his E-mail was that he was concerned that we have an appropriate course of action before we begin testing.  That's what I'm referencing.
>
> Q:      Between Mr. Preston's E-mail, I believe, of June 15, 2006, when was an appropriate, or what FEMA considered an appropriate plan of action developed and formalized?
>
> A:       I don't -- I don't recall that we ever developed an actual written plan, although there may have been one. The discussions began immediately in terms of possible options given the various results that we may get back.

Exh. 4, Souza Depo. 59-64/18-16 [emphasis added]; *see also* Exh. 11, Garratt Depo. pp. 42-50/15-8; pp. 96-105/18-16; pp. 113-122/12-7.  Consistent with Mr. Souza's testimony, on June 19, 2006, just four days after Mr. Preston sent his E-Mail, FEMA held a conference call with EPA and ATSDR for purposes of having them test EHUs.  *See* Little, E-Mail [Dkt. 1543-47].  Mr. Souza went on to explain the discussions regarding options if test results were negative or adverse.

> Q:      . . . There were some questions that related to the testing that was done by

8

the EPA, and what response actions would come back if that testing came back and the results suggested that the levels of concern was much lower than .3 PPM, and venting was not an effective solution.  Do you recall that?

A:      Yes.

Q:      Did -- did FEMA work up or consider or discuss what were the possible contingency plans of what action it would take if such results came back negatively or adversely or -- actually, let me step back. What were those discussions between July -- or 16 June of 2006 and December of 2006? Were there discussions regarding that matter?

A:      At the program level, we were discussing if the results came back from EP -- EPA and CDC and they came back and told us that the results that they had were of concern, and that we needed to take action as a result of the, of the findings, obviously, we had over a hundred thousand families in these units.  The reason that they were in the units was because there were no immediate or surrounding other adequate alternate housing solutions. And so if we couldn't use those units and we had to get people out quickly, there was general mutual agreement that the only real viable solution available to us was to move people out of the immediate impacted area and most likely out of the state altogether to available rental units that were already available elsewhere in the country.

Exh. 4, Souza Depo. pp. 145-47/22-10.  Mr. McNeese independently confirmed Mr. Souza's

testimony, explaining that:

Q:      If in fact – at this time period, if in fact FEMA had been made aware that the level of concern was substantially lower – let us say that 0.008 PPM level – and that ventilation didn't reduce it below that level, would there have been alternative housing in the Gulf Coast area that you could have put all these 118,000 families in?  Could you have left these people in New Orleans?

A:      In all honesty, we – we would not have been able to house them.  We would have done what needed to be done, but that would have probably been a reverse of the procedure that brought them into the housing in the Gulf, which would – the only thing we would do then and today would be to have to send them to other states to find enough housing to – or elsewhere in the state.

9

Exh. 2, McNeese Depo. pp. 118-19/22-16; *see also* Exh. 2, McNeese Depo. pp. 116-21/14-19.

**III.    FEMA OCC Participated In Conference Calls Relating To EPA Testing, However, Neither FEMA, Nor FEMA OCC, Issued Any Instructions or Directions To EPA or ATSDR Regarding Testing Or Interpretation of the Test Results.**

PSC, again citing Dr. DeRosa, "speculates" that FEMA's conference calls with EPA and

ATSDR "involved strategizing which clearly involved liability and publicity concerns."  PSC

Memo. at 22-23 [Dkt. 2001].  The discovery that PSC sought to resolve that "speculation" has

been completed; and, as previously noted, Dr. DeRosa has absolutely no personal knowledge

regarding the substance of any of those conference calls, *see supra* at 2-4; and as Commander

Little testified, neither FEMA nor FEMA OCC ever instructed or placed any limitation or

restrictions on what EPA should test, or, on the analysis of those test results.

> Q:    In June, when these initial conversations were occurring, did FEMA indicate, people from FEMA who were on the line, indicate that they wanted EPA to test both occupied and unoccupied in short?
>
> A:    I think they initially wanted a broad, broader type of project.
>
> Q:    And when you say broader type of project, did that encompass both the new and the not - - and occupied units?
>
> A:    Yes, it would include both.
>
> Q:    . . . you're aware that FEMA– that Rick Preston was FEMA counsel; is that correct?
>
> A:    Yes.
>
> Q:    He was an attorney with FEMA?
>
> A:    Yes.
>
> Q:    Did at any time during these biweekly conference calls, did Mr. Preston ever instruct or place any limitation or restrictions on what could be tested, when it could be tested, or how it could be tested?

A:      No.

Q:      Do you know whether or not Mr. Preston participated in those biweekly
        telephone conference calls?  Was he on the line?

A:      I believe he was on the line.

Q:      Now, you received the data, or ATSDR received the EPA test data from
        Mr. Preston; is that correct?

A:      Yes.

Exh. 3, Little Depo. at 148-49/18-21; *see also* Exh. 5, July 5, 2006, E-Mail Coleman, EPA to

Benken, CDC (EPA and ATSDR representatives discussing their recommendation that FEMA

not test and stating that whether to assist and test units is a policy decision).  Commander Little

further testified:

Q:      Did Mr. Preston ever instruct you, place any restriction, limitation, or
        anything on ATSDR's review and analysis of the EPA data?

A:      No.

Q:      Did you in any way modify, alter, or change your report, the February 1,
        2007, report, which is Exhibit No. 8, because of anything Mr. Preston told
        you or did?

A:      No.

Exh. 3, Little Depo. at 150/17-25; *see also* Exh. 2, McNeese Depo. pp. 87-88/1-5; p. 89/1-16;

pp.121-25/20-7.

Q:      Having looked at this report, this indicates that there was a November 30,
        2006, letter from Rick Preston to Scott Wright.  Does that refresh your
        recollection? . . .

A:      That's probably the transmittal letter, that's probably when he mailed it,
        and we received it on the 6th.

11

Q:      Other than that letter from Mr. Preston, did you receive any other
        instructions from Mr. Preston regarding how you should analyze the data
        that was generated by EPA.

A:      No.

Q:      So that letter was the entirety of what FEMA's instructions were to you in
        terms of your analysis of the data?

A:      Yes.

Exh. 3, Little Depo. p.151/1-22; *see also* Exh. 2, McNeese Depo. pp. 87-88/1-5; p. 89/1-16;

pp.121-25/20-7.

The November 30, 2006, letter from FEMA OCC Rick Preston to ATSDR placed no

limits or restrictions upon ATSDR analysis of the test data.  Rather, Mr. Preston wrote:

> Enclosed you will find a DVD disk containing the test results and related
> data from FEMA trailer formaldehyde testing conducted by EPA.  ***Please review
> the data and provide to me a written report of your analysis of the results of
> these tests and any conclusions or recommendations that can be derived
> therefrom.***
>
> Please keep this information and your analysis confidential.  No
> information should be released to any third party without my express permission.
> Please contact me directly if you have any questions . . .

Exh. 6, Nov. 30, 2006, Letter FEMA OCC to ATSDR (emphasis added); *see also* Exh. 3, Little

Depo. at 150/5-25.[3]

---

[3]  Mr. Little further testified that he concluded that use of ATSDR Minimum Risk Levels
was inappropriate because those levels are below formaldehyde background levels, and that he
selected 0.3 ppm, or 300 parts-per-billion, for purposes of the emergency response action because
it constituted what his review of the peer reviewed literature showed was a real no effect level.
Exh. 3, Little Depo. at 130–32/14-24.

**IV.**   **ATSDR Prepared The Health Consultation Report As Part Of The National Response Plan, And The Report Was Reviewed By Appropriate ATSDR Personal Prior To Its Issuance.**

PSC speculates and asserts – again relying on statements attributed to Dr. DeRosa – that it was at the "specific direction of FEMA's ***attorney*** that the evaluation of EPA's data not be performed by his [Dr. DeRosa's] office . .  but instead go through Office for Preparedness, Terrorism and Emergency Response ("OPTER")."  PSC Memo. at 22-23 (emphasis original). Commander Little, in response to Plaintiffs' counsel's questions, explained that ATSDR issued the Health Consultation Report as part of its responsibility under the National Response Plan, not because of litigation.

> Q:      . . . Is there a Memorandum of Understanding, or an Executive Order or a Directive Order, any other document, that provides for a consultation relationship between governmental agencies that basically would have resulted, or authorized, ATSDR's involvement in the formaldehyde issue.
>
> A:      Well, we were involved because of a mission assignment under the Federal Response Plan as part of the Hurricane Katrina emergency.  This whole thing was a mission assignment from FEMA.
>
> Q:      . . . how would it come about what authority is given, or where could we look to find the authority that was given for governmental agencies and ATSDR to be requested to perform the work you did.
>
> A:      Its part of the Federal Response Plan, the plan was activated.

Exh. 3, Little Depo. pp. 83-84/20-12.

Furthermore, contrary to PSC's assertion, Commander Little and Mr. Wright in preparing that report were operating as an ATSDR Emergency Response Team ("ERT") under the auspices of the Office of Terrorism Prevention and Emergency Response ("OTPER").  Exh. 1, DeRosa Depo. pp. 158-61/21-24; 162/11-25; Exh. 3, Little Depo. pp. 144-45/3-22.  If reviewed, the

appropriate persons at ATSDR to review it would have been their supervisor, Dr. Michael Allred

(who has a doctorate degree in biochemistry); Dr. Allred's supervisor, Dr. Mark Keim (a medical

doctor); and Dr. Keim's supervisor, Dr. Frumpkin (a medical doctor with special training in

occupational medicine, head of ATSDR **and** Dr. DeRosa's supervisor).  Exh. 1, DeRosa Depo.

pp. 158-61/21-24; 162/11-25; Exh. 3, Little Depo. pp. 144-45/3-22.  Significantly, the report was

reviewed by all of these CDC/ATSDR officials – Dr. Allred, Dr. Keim, and Dr. Frumpkin prior

to being sent to FEMA.  Exh. 1, DeRosa Depo. 162-65/15-12; Exh. 3, Little Depo. pp. 144-45/3-

22; Exh. 7, Jan. 8, 2007, E-Mail Dr. Allred to Commander Little.  As previously noted, Dr.

DeRosa did not review the report because he "did not normally participate in any emergency type

of activity, so he was not involved in any aspect of the hurricane response, or really any of the

emergency response activities."  Exh. 3, Little Depo. p. 85/4-17.[4]

IV.    **FEMA OCC Transferred EPA Test Data To ATSDR And ATSDR's Report To**
       **FEMA In Part To Ensure That The Information Remained Confidential While**
       **FEMA Determined What, If Any, Actions To Take In Response To That**
       **Information.**

       PSC suggests that litigation concerns or litigation strategy were involved because FEMA

---

[4]  Significantly, the person in Dr. DeRosa's office who would have reviewed the report if
it had been generated by his office, instead of OPTER, would have been Rich Nickel.  *See*
DeRosa Depo. at 136/16-25.  Mr. Nickel was well aware of the fact that Commander Little and
Mr. Wright had issued the report because on February 2, 2007, the day after the report was
completed, Mr. Nickles sent an E-Mail to over eighty (80) CDC/ATSDR employees, including
Dr. DeRosa, stating that "[o]n 2/1 ERT [Emergency Response Team]. . . finalized the
Formaldehyde Consultation for the Federal Emergency Management Agency (FEMA).  ***This
consultation discusses the evaluation of EPA data generated from sampling FEMA
manufactured homes . . .  In summary, the opening of windows and vents was effective in
reducing formaldehyde concentrations below levels of health concern.***  Running the heating,
ventilation and air conditioning systems did not provide adequate air exchanges to adequately
reduce the formaldehyde concentrations."  Exh. 8, Feb. 2, 2007, E-Mail, Nickles to ATSDR
(emphasis added); *see also* Exh. 1, DeRosa Depo. at 152-55/24-3.

OCC instructed ATSDR to "keep this information [EPA test data] and your analysis confidential. No information should be released to any third party without my express permission.  Please contact me directly if you have any questions . . ."  Nov. 30, 2006,  Letter FEMA to ATSDR; *see also* Exh. 3, Little Depo. p. 150/5-25.  As an initial matter, Commander Little explained that FEMA OCC simply served as the point of contact for transmission of the EPA data and report:

> Q: Now, the statement that again, this [Congressional] report attributes to you, it says that, partially quote it, it went to them because it was politically sensitive and it was being worked on by FEMA Office of General Counsel.  What do you mean by the term or phrase "worked on."? . . .

> A: It came through them that – I mean that's – they were the point of contact.

> Q: So they had a significant role in this investigation process? . . .

> A: No.  They were the point of contact for the project.  I don't know what they did back at FEMA.

> Q: But you would agree that they had a significant role in this process? . . .

> A: They were the point of contact.

> *       *       *

> Q: But they weren't apparently concerned about it for public health interests. They were only concerned about it for litigation interests, is that what you are saying?

> A: No, it's not.

Exh. 3, Little Depo. p. 92/14-23; *see also* Exh. 2, McNeese Depo. pp. 87-88/1-5; p. 89/1-16; pp.121-25/20-7.

Mr. McNeese, FEMA's primary point of contact for interacting with EPA and ATSDR, *see* Exh. 2, McNeese Depo. p. 24/11-22; p. 25-27/20-4, explained that one of the reasons FEMA

15

OCC served as the point of contact was to ensure that FEMA retained control of the data and that it was not released to the public and pulled out of context before FEMA had an opportunity to review and determine, what, if any action should be taken in response to those findings.  Exh. 2, McNeese Depo. pp. 39-40/17-14; pp. 66-67/12-12.

Moreover, as Commander Little explained, this was an emergency response action, there were no applicable regulations or guidelines, and he selected 0.3 ppm as the level of concern because that was what he was able to identify as the real effect level for sensitive individuals:

Q:      Why were you relying upon the peer-reviewed effects level literature?

A:      Because there was no guide, no guideline.

Q:      Well, there is the MRL [ATSDR Minimum Risk Levels], isn't there?

A:      That's not a guide.  That's not a standard.

Q:      [W]hy would you use the effect level, as opposed to some guideline, or something like that, such as the MRL?

A:      Because the effect level is more accurate.

Q:      That's the level where you might find a real effect?

A:      Yes.

Q:      Now, again, one of the critiques . . . was the issue of long-term effects' carcinogenicity.  Why did you not address the long-term effects and carcinogenicity in your report?

A:      Because this was an emergency report, or an emergency response.

Q:      But does that mean that cancer is not an issue of health concern?  Why wouldn't you still – why wouldn't you address cancer?

A:      Cancer is a huge issue involving many, many years of exposure.

Q:      When you say many, many, years of exposure, what are we talking about

there?

A:      10, 20 years.

Q:      Were you operating under the assumption that these trailers were
        temporary in nature and wouldn't be used for 10 years?

A:      Yes.

Exh. 3, Little Depo. pp. 153-55/23-5.

**V.    ATSDR Use Of 0.3 ppm As An Appropriate Level Of Concern For Formaldehyde
        In EHUs Does Not Demonstrate That FEMA OCC Directed Or Influenced
        ATSDR's Actions.**

     PSC again relies upon Dr. DeRosa to support its assertion that ATSDR's use of 0.3 ppm

as an emergency response level of concern demonstrates that FEMA OCC directed and

controlled ATSDR's actions.  *See* PSC Memo. at 38-40.  But Dr. DeRosa testified that neither

he, nor anybody else at ATSDR, ever challenged the use of 0.3 ppm as the level of concern until

well **after** FEMA had already re-engaged Government health organizations to reassess its

formaldehyde response action because of concerns resulting from media reports received in mid-

May 2007 relaying concerns from a doctor in Mississippi.  Exh. 1, DeRosa Depo. at 274-79/17-

22.

     Moreover, between February 2007 and Summer 2007, ATSDR confirmed on multiple

occasions that simply venting the units was a sufficient response.  Thus, as previously noted, on

February 2, 2007, one day after the ATSDR issued the report, CDC issued an internal E-Mail that

explained:

            On 2/1 ERT . . . [Emergency Response Team] finalized the Formaldehyde
            Consultation for the Federal Emergency Management Agency (FEMA).
            This consultation discusses the evaluation of EPA data generated from
            sampling FEMA manufactured homes during the time period September

17

19th through October 7th, 2006. . . *In summary, the opening of windows and vents was effective in reducing formaldehyde concentrations below levels of health concern.* Running the heating, ventilation and air conditioning systems did not provide adequate air exchanges to adequately reduce the formaldehyde concentrations.

Exh. 8, Feb. 2, 2007, E-Mail, Nickles to ATSDR (emphasis added); *see also* Exh. 1, DeRosa

Depo. at 152-55/24-3.

On April 6, 2007, the CDC, Dr. Howard Frumpkin, Dr. DeRosa's supervisor and one of

the persons who reviewed and edited the Health Consultation Report, issued a Newsletter to

CDC employees and reported:

Congressman Gene Taylor wrote to Dr. Gerberding to encourage CDC to initiate an investigation of the toxic vapors released from FEMA trailers. . . NCEH [National Center for Environmental Health]/ATSDR staff have collaborated to prepare a response to the Congressman. At the request of FEMA, EPA and our staff analyzed the formaldehyde levels in unoccupied FEMA emergency housing trailers. *These data indicated that in trailers with close windows, formaldehyde levels are similar to those found in new conventional housing. At this time, we do not plan to conduct a health assessment of formaldehyde exposure in FEMA trailers. We have offered the Congressman practical recommendations to reduce exposures to formaldehyde in emergency housing trailers*. . .

Exh. 9, Apr. 6, 2007, E-Mail Frumpkin to ATSDR (emphasis added).

Finally, on May 3, 2007, FEMA requested that ATSDR review for scientific accuracy a

draft News Release relating to formaldehyde in EHUs.  Exh. 10, May 3, 2007, E-Mail, Bell at

DeRosa-000115-16.  The draft News Release provided in part that:

According to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry (ATSDR) the average concentration of formaldehyde per day in the units using open window ventilation dropped below 0.3 ppm after four days of ventilation and remained low for the rest of the test period.  Average, per day levels in the test group of trailers using air conditioning only with open static vent in the bathroom, remained above 0.3 ppm for all but two days of the test period.  The level for health concerns for sensitive individuals was referenced by ATSDR at 0.3 ppm and above.

18

*Id.* at DeRosa-00016.  Significantly, Commander Little in his response to the request, notified

both Mr. Nickles and Dr. Allred that he had "reviewed the news release and concur[red] with the

content."  *Id.* at DeRosa-000114; *see also* Exh. 1, DeRosa Depo. at 274-79/17-22 (Dr. DeRosa

acknowledges that he reviewed the report in late February 2007 and took absolutely no steps to

challenge the use of 0.3 ppm as a level of concern until after FEMA re-engaged government

health agencies to assist it in determining the appropriate response action, and after it had already

commenced moving persons out of EHUs).

**VI.  FEMA OCC Involvement And Monitoring Of FEMA Discussions Regarding Formaldehyde Response Action Was Appropriate Given That There Was Pending Litigation Against The Government Challenging FEMA's Response Actions.**

PSC suggests that FEMA somehow acted improperly by allowing FEMA OCC to

monitor and participate in discussions regarding FEMA's formaldehyde response actions, and

that allowing FEMA OCC to engage in such action demonstrates that the response actions were

actually controlled and directed by FEMA OCC.  *See* PSC Memo. at 21-22.[5]  As Mr. Souza

explained, when there is pending litigation, it is FEMA's standard operating procedure to keep

FEMA OCC informed of all actions that potentially relate to that litigation:

> Q     And when you say that Public Affairs, OCC and OLA have all been
>        extensively involved in the process, in this process, again, explain to me

---

[5]  PSC's argument that FEMA OCC's providing advice, counsel or monitoring FEMA's response actions is a bit ironic given that it is PSC who filed the lawsuits – lawsuits that are part of this Multi-District Litigation action – that caused FEMA OCC to be involved.  Moreover, those lawsuit sought class action status on behalf of all occupants of EHUs and as PSC has suggested to this Court, pending resolution of class action status PSC had a fiduciary duty to all potential class claimants, i.e., current and former EHU occupants.  Thus, PSC's argument appears to be that although the EHU occupants had legal counsel as of May 2006 whose purposes was to assist and pursue claims on their behalf as a result of formaldehyde in EHUs, FEMA was required to forego legal advice and apparently was not allowed to defend itself against the claims until a claimants moved out of the EHUs.

how extensively involved OCC was in the process. . . .

A:    All I meant by what I said here was that people like Rick Preston and others had been parts of conference calls, and they had looked at documents that were created from a -- from the legal perspective, and they had been one of the players who had been involved from a very early stage.

Q:    And it was your understanding that they were involved, again, because of the pending litigation?

A:    Right.

Q:    Would you have expected OCC to be involved if there weren't pending litigation?

A:    Possibly.

Q:    Why do you say that?

A:    At the program level, it's not unusual if I, for example, were to anticipate that it's possible that legal action may result as a pro -- as a result of a program decision I was considering making, I may seek their counsel on the risks associated with the course of action I was considering taking.

Q:    In this particular response, formaldehyde response, was there any program action that you were taking that would have, you thought, should have received OCC review?

A:    Can you drill down a little bit in the question?

Q:    Now, you say that as a result of a program decision that you were considering making, you may seek their counsel on the risks associated with the course of action you were considering taking. So in this particular response effort, formaldehyde response effort, was there any action that you were considering taking that you thought would require OCC review?

MR. MILLER: Object, vague as to time, and also instruct the witness not to disclose any such --the nature of any actual such discussions or conversations with OCC. Go ahead.

A:    Given the pending litigation, again, general practice is if there's pending litigation, that we keep them informed of just about everything that we're

actually doing so that they're informed of it.

Q:      So because of the pending litigation, any -- the actions that you considered,
        or action plans that were developed required OCC review? . . .

A:       I don't know if they required review, but they were included from an
        informational perspective at least, yeah.

Q:      And they were given -- giving their input?

A:      They were providing their, their legal counsel, yes.

Exh. 4, Souza Depo. pp. 89-91/1-17; *see also* Exh. 11, Garratt Depo. pp. 116-20/7-5.  FEMA and
FEMA OCC acted in a manner consistent with standard operating procedure.  Moreover, any
ruling that FEMA OCC's involvement was inappropriate would improperly interfere the
Government's ability to defend itself against claims such as the *Hillard* action that sought class
action status, damages in excess of $1 billion, and injunctive relief that would have required the
court to interject and potentially second-guess ongoing emergency response actions.

## CONCLUSION

While, as explained in the United States' recent pleadings, the discretionary function
exception would bar the instant action even if FEMA OCC suggestions had influenced
formaldehyde response actions, even if that were not the law, ***the recent round of depositions
shows that FEMA OCC suggestions did not influence those response actions.***  Specifically, the
evidence now conclusively shows that: (1) FEMA OCC did not direct FEMA's response actions,
(2) FEMA OCC's provision of legal advice to FEMA decision-makers did not prevent or delay
testing of EHUs, and (3) FEMA's response actions were not subjectively and improperly
motivated by litigation strategy. Accordingly, the Court should grant the Untied States' motion
and dismiss Plaintiffs' remaining FTCA claims.

Dated: July 29, 2009                          Respectfully Submitted,

TONY WEST                                     ADAM BAIN
Assistant Attorney General, Civil Division    Senior Trial Counsel

J. PATRICK GLYNN                              ADAM DINNELL
Director, Torts Branch, Civil Division        MICHELE GREIF
                                              JONATHAN WALDRON
DAVID S. FISHBACK                             Trial Attorneys
Assistant Director

                                              //S// *Henry T. Miller*
                                              HENRY T. MILLER (D.C. Bar No. 411885)
OF COUNSEL:                                   Senior Trial Counsel
JORDAN FRIED                                  United States Department of Justice
Associate Chief Counsel                       Civil Division – Torts Branch
                                              P.O. Box 340, Ben Franklin Station
JANICE WILLIAM-JONES                          Washington, D.C. 20004
Trial Attorney                                Telephone No: (202) 616-4223
FEMA/DHS                                      E-mail: Henry.Miller@USDOJ.Gov
Department of Homeland Security
Washington, D.C. 20472                        Attorneys for the United States of America

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2009, the foregoing document was filed via the U.S. District Court's CM/ECF electronic filing system and a copy thereof was served upon Liaison Counsel.

                    //S// *Henry T. Miller*
                    HENRY T. MILLER (D.C. Bar No. 411885)

22