Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION


IN RE:  FEMA TRAILER
FORMALDEHYDE PRODUCT
LIABILITY LITIGATION

                                MDL NO. 1873

        vs.

                                SECTION "N-5"

                                JUDGE ENGELHARDT

                                MAG. JUDGE CHASEZ




ORAL AND VIDEOTAPED DEPOSITION OF

JOSEPH D. LITTLE

June 23, 2009

9:25 a.m.

201 17th Street

Suite 1700

Atlanta, Georgia


Maureen S. Kreimer, RPR, CCR-B-1379

EXHIBIT
3
tabbies

In Re: FEMA              Joseph Little                    6/23/2009

## Page 2

```
 1          INDEX TO EXAMINATIONS
 2    Examination                    Page
 3    JOSEPH D. LITTLE                8
 4    Examination by Mr. Woods        8
 5    Examination by Ms. Gilbreath    99
 6    Examination by Mr. Weinstock    103
 7    Further Examination by Mr. Woods       133
 8    Further Examination by Mr. Weinstock   142
 9    Examination by Mr. Miller       142
10
11          INDEX TO EXHIBITS
12
13    Exhibit    Description          Page
14
        1    Notice of Deposition      9
15
        2    Exhibit No. 40 to the United States   32
16           of America's motion to dismiss
             Plaintiffs' remaining FTCA claims
17           for lack of subject matter
             jurisdiction, and it's a document
18           entitled: Declaration of Joseph
             Little
19
        3    7/28/06 E-mail from Martin McNeese   42
20
        4    E-mail from Joseph D. Little to    50
21           Howard Frumkin
22      5    Health Consultation, Formaldehyde   58
             Sampling of FEMA Temporary Housing
23           Units, Baton Rouge, Louisiana,
             February 1, 2007, Agency for Toxic
24           Substances and Disease Registry
25
```

## Page 3

```
 1      6    2/1/07 Letter to Patrick Edward    67
             Preston, trial attorney, at Office
 2           of Chief Counsel, FEMA, from Mark
             E. Keim, M.D., Acting Associate
 3           Director, Office of Terrorism,
             Preparedness and Emergency Response
 4
 5      7    Memorandum from the U. S. House of   69
             Representatives Committee on
 6           Science and Technology
 7      8    February 1, 2007 Health       108
             Consultation Formaldehyde Sampling
 8           at FEMA Temporary Housing Units
             Baton Rouge, Louisiana  by Agency
 9           for Toxic Substances and Disease
             Registry ATSDR FEMA-00001 to 00014
```

## Page 4

```
 1    APPEARANCES OF COUNSEL:
 2    On behalf of the Plaintiffs:
 3        JUSTIN I. WOODS
              Attorney at Law
 4        TARA GILBREATH
              Attorney at Law
 5        GAINSBURGH, BENJAMIN, DAVID,
           MEUNIER & WARSHAUER, LLC
 6        2800 Energy Centre
           1100 Poydras
 7        New Orleans, Louisiana  70163-2800
 8    On behalf of the Defendant
        United States of America:
 9
10        HENRY T. MILLER
              Attorney at Law
11        U. S. DEPARTMENT OF JUSTICE,
           Civil Division, Environmental Torts
12        1331 Pennsylvania Avenue, N.W.
           Washington, D. C. 20004
13
14        MARK S. KASHDAN
              Attorney at Law
15        U. S. DEPARTMENT OF HEALTH
           AND HUMAN SERVICES
16        Building 16, Room 4311, D-53
           1600 Clifton Road, N.E.
17        Atlanta, Georgia  30333
18
        On behalf of the Defendants
19      Heartland Recreational Vehicles, LLC:
20        LORI DAIGLE (Via telephone)
              Attorney at Law
21        ALLEN GOOCH
           3900 N. Causeway Boulevard
22        Suite 1450
           Metairie, Louisiana  70002
```

## Page 5

```
 1    APPEARANCES CONTINUED:
 2
 3    On behalf of the Defendants
        Shaw Environmental, Inc., and CH2M Hill
 4      Constructors, Inc.:
 5        KAREN KALER WHITFIELD (Via telephone)
              Attorney at Law
 6        BAKER, DONELSON, BEARMAN,
           CALDWELL & BERKOWITZ P.C.
 7        201 St. Charles Avenue
           Suite 3600
 8        New Orleans, Louisiana  70170
 9
10    On behalf of the Defendant
        Gulf Stream Coach Inc.:
11
12        ANDREW D. WEINSTOCK
              Attorney at Law
           DUPLASS, ZWAIN, BOURGEOIS,
13         PFISTER & WEINSTOCK
           29th Floor
           3838 N. Causeway Boulevard
14         Metairie, Louisiana  70002
15
16    On behalf of the Defendants
        CMH Manufacturing, Inc.; Southern Energy Homes,
17      Inc.; Giles Family Holdings, Inc.; Giles
        Industries, Inc.; SunRay RV, LLC: SunRay
18      Investments, LLC:
19        JAMES K. CARROLL (Via telephone)
              Attorney at Law
20        FOWLER RODRIGUEZ VALEZ-FAULI
           400 Poydras Street
21        Suite 3000
           New Orleans, Louisiana  70130
```

2  (Pages 2 to 5)

**Tiffany Alley & Associates**
**770-343-9696**

In Re: FEMA                Joseph Little              6/23/2009

Page 6

APPEARANCES CONTINUED:
On behalf of the Defendant:
    Bechtel National, Inc.:

        PETER R. TAFARO
        Attorney at Law
        FRILOT LLC
        1100 Poydras Street, Suite 3700
        New Orleans, Louisiana 70163-3700

On behalf of the Defendants
    TL Industries, Inc.; Frontier RV, Inc.; Play'Mor
    Trailers, Inc.:
        RANDALL C. MULCAHY (Via telephone)
        Attorney at Law
        GARRISON, YOUNT, FORTE & MULCAHY, LLC
        909 Poydras Street
        Suite 1800
        New Orleans, Louisiana 70112

On behalf of the Defendant
    Forest River Incorporated:

        CARSON W. STRICKLAND
        Attorney at Law
        GIEGER, LABORDE & LAPEROUSE, LLC
        Forty-Eighth Floor
        One Shell Square
        701 Poydras Street
        New Orleans, Louisiana 70139-3700

On behalf of the Defendants
    Keystone, KZRV, LP, Thor Industries, Thor
    California, Inc., Dutchmen, DS Corp.:
        RYAN E. JOHNSON
        Attorney at Law
        JONES WALKER
        8555 United Plaza Boulevard
        Baton Rouge, Louisiana 70809-7000

Page 7

APPEARANCES CONTINUED:
On behalf of the Defendants
    Morgan Buildings and Spas:

        DAN E. WEST (Via telephone)
        Attorney at Law
        McGLINCHEY STAFFORD, PLLC
        301 Main Street
        14th Floor
        Baton Rouge, Louisiana 70802

On behalf of the Defendant
    Fluor Enterprises, Inc.:

        RICHARD A. SHERBURNE, JR.
        Attorney at Law
        MIDDLEBERG, RIDDLE & GIANNA
        Suite 1101
        450 Laurel Street
        Baton Rouge, Louisiana 70801

On behalf of the Defendant
    Fleetwood Enterprises:

        TAYLOR T. DALY
        Attorney at Law
        NELSON MULLINS RILEY & SCARBOROUGH, LLP
        Atlantic Station
        201 17th Street
        Atlanta, Georgia 30363

On behalf of the Defendants
    Jayco, Inc., and Starcraft RV:

        HAL L. ROACH, JR. (Via telephone)
        Attorney at Law
        WILLINGHAM FULTZ & COUGILL, LLP
        Niels Esperson Building
        808 Travis, Suite 1608
        Houston, Texas 77002
Videographer: Mr. Peter Ausburn

Page 8

THE VIDEOGRAPHER: Stand by. Okay. This
will be the videotaped deposition of Commander Joseph
Little in regard to FEMA Trailer Formaldehyde Product
Liability litigation. Today's date is June 23rd,
2009, and the time is 9:22 a.m. We are now on video
record. You may now swear the witness.
        JOSEPH D. LITTLE,
having been first duly sworn, was examined and
testified as follows:
        EXAMINATION
BY MR. WOODS:
    Q.   Good morning, Mr. Little, Commander
Little, I'm sorry. My name is Justin Woods. I am
Plaintiffs counsel in the FEMA Trailer Formaldehyde
Products Liability litigation, which is an MDL
proceeding, proceeding in the Eastern District of
Louisiana.
        We've asked you here today to ask you
certain questions about this litigation, and any
knowledge that you have about this litigation, and
the background of this litigation, and the claims
that the Plaintiffs are pursuing.
        First thing I want to show you and mark as
an Exhibit is entitled a Notice of Videotaped
Deposition of Joseph Little.

Page 9

If you would just look at it. Did you --
have you seen that? Has it been shown to you by
counsel for the Government?
    A.   Yes.
        MR. WOODS: Okay. Just going to mark the
Notice as Joe Little 1.
        (Exhibit 1 marked.)
BY MR. WOODS:
    Q.   Now, Commander, I just want to get into
some general background questions about you; for
example, what is your educational background? If
you'd start with college going forward.
    A.   I have a Bachelor's of Science in Biology
from the University of Minnesota. I have a Master's
of Science in Public Health with a concentration in
Environmental Toxicology from Tulane University
School of Public Health and Tropical Medicine.
    Q.   And -- is that it?
    A.   That's it.
    Q.   Now, you're, obviously, in the military.
Can you tell me what is your military background?
    A.   I am in the Commission Corps of the United
States Public Health Service, which is a non-armed
uniform service.
    Q.   Generally, what is the -- what are the

                              3 (Pages 6 to 9)

In Re: FEMA                Joseph Little                6/23/2009

## Page 10

1  duties and responsibilities of that organization?
2      A.   They have approximately 6,000 officers,
3  science officers, assigned throughout the country,
4  some of the places they are assigned are Centers for
5  Disease Control, Indian Health Service, National
6  Institute of Health, departments within the
7  Department of Health and Human Services.
8      Q.   And how long have you had -- or how long
9  have you been a part of that?
10      A.   18 years.
11      Q.   Now, Commander, do you hold any special
12  certifications in regards to your positions?
13          MR. MILLER:   Objection, vague.  Go ahead.
14      A.   I hold a Registered Environmental Health
15  Specialist.
16  BY MR. WOODS:
17      Q.   And who granted you that certification?
18      A.   NEHA, National Environmental Health
19  Association.
20      Q.   And when did you receive that
21  certification?
22      A.   Oh, approximately ten years ago, I'm not
23  sure of the year.
24      Q.   So approximately around 1998 to '99?
25      A.   '99.  Maybe 2000, I'm not really sure of

## Page 11

1  the year.
2      Q.   And this certification, again, it's -- I'm
3  sorry, would you repeat the title again?
4      A.   It's a Registered Environmental Health
5  Specialist.  It is required for my category in the
6  Public Health Service.
7      Q.   And that category is what?
8      A.   Environmental Health Officer.
9      Q.   I want to just ask you a couple of
10  questions about your current position.  And there is
11  a declaration that you signed on May 12th, 2009, and
12  you indicated in that declaration that you have a
13  current position with NIOSH.  Could you tell me what
14  that position is?
15      A.   I'm an emergency coordinator for NIOSH,
16  which is the National Institute for Occupational
17  Safety and Health.
18      Q.   What are your duties as an emergency
19  coordinator for NIOSH?
20      A.   To be a focal point for technical requests
21  that come in during an emergency, and see to it that
22  they are handled by the appropriate person in NIOSH
23  with the appropriate expertise.
24      Q.   Would you give us just the -- what NIOSH
25  stands for?

## Page 12

1          MR. MILLER:   Objection.  Asked and
2  answered.  Go ahead.
3      A.   National Institute for Occupational Safety
4  and Health.
5  BY MR. WOODS:
6      Q.   And how long have you held the position as
7  emergency coordinator?
8      A.   For NIOSH, since 2008, January.
9      Q.   Is NIOSH located here in Atlanta, Georgia?
10      A.   Yes.
11      Q.   Can you explain the relationship between
12  NIOSH and CDC, the Centers for Disease Control?
13      A.   It is considered one of the centers of the
14  Centers for Disease Control.
15      Q.   Can you explain that further, what do you
16  mean by one of the centers?
17      A.   Well, you have the National Center for
18  Environmental Health, you have the National Center
19  for Infectious Disease, and then you have the
20  National Institute for Occupational Safety and
21  Health, and there is many others, I forget the names.
22      Q.   Well, for lack of a better term, would
23  NIOSH come under the CDC umbrella?
24      A.   Yes.
25      Q.   Prior to holding that position, or getting

## Page 13

1  the position as emergency coordinator in January of
2  2008, where were you employed prior to that?
3      A.   Within the Agency for Toxic Substances and
4  Disease Registry, which is part of the National
5  Center for Environmental Health.
6      Q.   And that's what's typically known as
7  ATSDR?
8      A.   Yes, correct.
9      Q.   What was your job title with ATSDR?
10      A.   Emergency response coordinator.
11      Q.   And how long did you hold that position?
12      A.   17 years.
13      Q.   And isn't that from the beginning when
14  ATSDR was actually formulated 17 years ago, or?
15      A.   No, it was formulated in the Eighties.
16      Q.   In the Eighties?
17      A.   In the Eighties.
18      Q.   Can you give me an exact start date?
19      A.   I think the agency was formed around 1986.
20      Q.   And you began in?
21      A.   I was hired in the fall of 1990.  I was in
22  the technical support section for the first three
23  years, and then I was officially an emergency
24  coordinator.
25      Q.   So you joined ATSDR four years after it

Tiffany Alley & Associates
770-343-9696

In Re: FEMA                Joseph Little                6/23/2009

---

Page 14

1  was officially an organization, so you spent a large
2  amount of time with ATSDR during its entire history?
3      A.   Since 1990, yes.
4      Q.   Now, you said that you began in the
5  Technical Support section?
6      A.   Yes, of the Emergency Response branch.
7      Q.   What were your duties there?
8      A.   I was a toxicologist.
9      Q.   And generally, what does a toxicologist
10 do?
11     A.   I was the on-call toxicologist for
12 technical support for emergency situations where
13 other federal agencies, hospitals, fire departments,
14 would call when they needed help with a chemical
15 emergency they were dealing with, hazardous materials
16 incidents.
17     Q.   So if there was some sort of hazardous
18 materials spill that occurred anywhere in the United
19 States, ATSDR would in some way be a responder?
20         MR. MILLER: Objection. Hold on.
21 Objection, mischaracterizes the witness's testimony,
22 assumes facts not in evidence.
23     A.   We were to provide technical support. We
24 were not necessarily a responder.
25 BY MR. WOODS:

---

Page 15

1      Q.   When you say technical support, is that --
2  were the job duties mainly entailing analysis of data
3  or scientific information?
4      A.   Yes.
5      Q.   If you could, could you give me just a
6  general rundown of how ATSDR, and how you would
7  become involved in providing technical assistance
8  when there is a sort of hazardous incident?
9          MR. MILLER: Objection, vague, time.
10     A.   CDC operates 24-hour emergency operations
11 centers where various local governments, other
12 federal agencies, can call in for assistance, and
13 they will contact the appropriate person to provide
14 that technical information.
15 BY MR. WOODS:
16     Q.   Can you provide me a list, a short list,
17 of maybe some of the more noteworthy projects that
18 you've provided technical assistance on in that
19 particular role?
20     A.   Throughout my career? Okay. I was at the
21 train derailment in Superior, Wisconsin. I responded
22 to another train derailment in Marietta, Florida,
23 another train derailment in Flomaton, Alabama, and
24 numerous support over the telephone for hazardous
25 materials incidents all over the country.

---

Page 16

1      Q.   So is it that an agency, or some
2  governmental body, would be able to call ATSDR and
3  ask particular questions about a particular chemical,
4  for example, that may have been released during one
5  of these train derailments and you were able to
6  provide them particular technical assistance,
7  meaning, information about the chemical and what
8  effects it might have on any surrounding populations
9  or any emergency responders?
10     A.   Yes.
11         MR. MILLER: Hold on a little bit.
12 Objection. Vague, narrative, compound. Go ahead.
13 MR. WOODS:
14     Q.   But the answer is yes?
15     A.   Yes.
16     Q.   After your role in the technical support
17 section, what did you do next for ATSDR?
18     A.   I was -- then became an emergency
19 coordinator that -- I still had the same duties as a
20 toxicologist, and also more duties as potentially
21 responding on the scene, but the duties were very
22 similar.
23     Q.   But you would maybe have had more
24 interaction maybe instead of -- you talked about the
25 telephone assistance --

---

Page 17

1      A.   I --
2      Q.   Let me finish this question. Is it that
3  you could have appeared on the scene of a derailment,
4  or of some sort of chemical release --
5      A.   I had --
6      Q.   -- in this position?
7      A.   I had more direct -- requesters had more
8  direct access to me, so...
9      Q.   When you say requesters had more direct
10 access to you, is that an indication that if there
11 were some sort of situation that needed a response,
12 instead of going through a supervisor, for lack of a
13 better term, a requester could come directly to you
14 for information?
15     A.   It means I would act as an on-call duty
16 officer on a six-week rotation -- on a week at a
17 time, on a six-week rotation.
18     Q.   For that six-week rotation, does that mean
19 that you were available a 24-hour period during that
20 six weeks?
21     A.   It was one week at a time, 24 hours a day,
22 seven days a week, every sixth week. We rotated
23 among six different people.
24         MR. MILLER: I would encourage both of you
25 guys not to try to talk over each other. The court

---

5 (Pages 14 to 17)

In Re: **FEMA**                    Joseph Little                    6/23/2009

| Page 18 | Page 20 |
|---|---|

**Page 18**

1  reporter will have a problem. You need to let him
2  finish his question before you start answering, and
3  let Joe finish his answer before you start
4  questioning.
5      A.  Okay.
6          MR. MILLER: Thanks.
7          MR. WOODS: Point well taken. Generally
8  as depositions go, it is to try to have a
9  conversational give and take, but it's very important
10  that the court reporter gets every word.
11         I wish I had the declaration that you've
12  completed, or assigned in this case. I don't. We
13  were waiting for some documents to arrive.
14         MR. MILLER: Justin, do you have yours
15  marked up?
16         MR. WOODS: Yeah.
17         MR. MILLER: Does anyone have an unmarked
18  copy that we could then get copies made?
19         MR. WEINSTOCK: Of the notice?
20         MR. MILLER: No.
21         MS. DALY: Of the declaration, yes.
22         MR. MILLER: Want to go off the record for
23  about five minutes?
24         MR. WOODS: Yes. Can we go off the
25  record?

**Page 20**

1  could possibly have on their bodily functions, or in
2  association with their health?
3      A.  Health effects associated with chemicals,
4  yes.
5      Q.  Now, you also said that it involved the
6  study of pharmacology, what is the study of
7  pharmacology?
8      A.  It is how a chemical moves through the
9  body, how it is metabolized, and the effects on the
10  body.
11     Q.  Since completing your studies, have you
12  ever been qualified as an expert in litigation?
13     A.  No.
14     Q.  Have you ever been asked in any way to
15  give an expert opinion in any matter involving
16  litigation?
17     A.  No.
18     Q.  And I want to be clear about that
19  question. In your role with ATSDR, has any other
20  governmental agency asked for an expert opinion from
21  you regarding any matters that are, or were in
22  litigation?
23     A.  Not that I'm aware of.
24     Q.  At ATSDR in your duties as an emergency
25  coordinator, would you please give me the

**Page 19**

1          THE VIDEOGRAPHER: 9:40 a.m., off video
2  record.
3          (Recess 9:40-9:44 a.m.)
4          THE VIDEOGRAPHER: Stand by. 9:44 a.m.,
5  back on video record.
6  BY MR. WOODS:
7      Q.  Commander Little, let's -- you didn't go
8  into great detail in your education. In 1989 you
9  received from Tulane University School of Public
10  Health and Tropical Medicine a Master's of Science in
11  Public Health with a concentration in Environmental
12  Toxicology; is that correct?
13     A.  Yes.
14     Q.  Could you tell us just basically what was
15  your course of study in receiving that degree?
16     A.  I had a variety of courses in
17  environmental science, including things related to
18  industrial hygiene, epidemiology, and several courses
19  in toxicology, one course in pharmacology.
20     Q.  Can you explain to us what is the study of
21  toxicology?
22     A.  It's the study of the adverse effect of
23  chemicals, on biological -- biological tissues.
24     Q.  So you'd be familiar and you'd be able to
25  tell someone what effect a chemical would have, or

**Page 21**

1  organizational chart, if you know what that means, or
2  the levels of command of individuals above you or
3  that supervised you, starting at the top?
4          MR. MILLER: Objection, vague, time.
5          MR. WOODS: That's a fair question.
6  That's a fair -- a qualifier.
7      A.  I guess you could say.
8  BY MR. WOODS:
9      Q.  From the period of, let's say, 2005, to
10  the time in which you left and went to NIOSH?
11     A.  Is this during an emergency, or not an
12  emergency?
13     Q.  Let's have it both ways. Let's start
14  first with an emergency situation?
15     A.  During an emergency, if -- the chain of
16  command would be, go through from the director of CDC
17  to the person assigned to be in charge of the
18  incident at the emergency operation center, then
19  through our section chief, and then through us.
20     Q.  Okay. And the non-emergency situation
21  was?
22     A.  I think the non-emergency could go to the
23  head of CDC, the head of the coordinating center for
24  Environmental Health and Injury Control Prevention.
25  The head of ATSDR --

6 (Pages 18 to 21)

In Re: FEMA                    Joseph Little                    6/23/2009

| Page 22 | Page 24 |
|---|---|
| 1  Q.  I'm sorry.  Could you -- and could I ask | The SF10 was activated for the hurricane response. |
| 2  you to speak up just a bit, but that last position | 2    Q.  Was there a concern about hazardous |
| 3  after the head of CDC? | 3  materials?  What was the concern about hazardous |
| 4    A.  Head of CDC.  The next chain would be the | 4  materials as a result of Hurricane Katrina? |
| 5  director of the Coordinating Center for Environmental | 5        MR. MILLER:  Objection, foundation.  Go |
| 6  Health and Injury Prevention. | 6  ahead. |
| 7    Q.  Mm-hmm. | 7    A.  The potential for large amounts of |
| 8    A.  Next would have been the director for | 8  hazardous chemicals released throughout the area of |
| 9  ATSDR.  Next would be the division director for the | 9  the hurricane. |
| 10  Division of Toxicology. | 10  BY MR. WOODS: |
| 11    Q.  Okay. | 11    Q.  Were you personally involved as an |
| 12    A.  Next would be the branch chief for the | 12  employee in your role with ATSDR in responding -- as |
| 13  Emergency Response, I think it's called Preventive | 13  part of the Federal Response Plan for Hurricane |
| 14  Medicine Branch.  It's changed names. | 14  Katrina? |
| 15    Q.  Okay. | 15    A.  Yes.  I was assigned to the Emergency |
| 16    A.  Then the section chief, or team lead they | 16  Operations Center. |
| 17  are called now. | 17    Q.  And what were your duties? |
| 18    Q.  Okay. | 18    A.  Technical support for hazardous materials |
| 19    A.  And then the staff. | 19  issues. |
| 20    Q.  Now, that's a non-emergency situation. | 20    Q.  Were you deployed to any particular area |
| 21  What would have been considered, or give me an | 21  in the region which was affected by Hurricane |
| 22  example of what would have been considered an | 22  Katrina? |
| 23  emergency situation. | 23    A.  No.  I was in the command post in Atlanta. |
| 24    A.  A chemical spill, or any response that's | 24    Q.  So here in the command post you would |
| 25  done under the activation of the Federal Response | 25  basically field calls from individuals, or |

| Page 23 | Page 25 |
|---|---|
| 1  Plan. | 1  individuals concerned about the potential for |
| 2    Q.  The Federal Response Plan, is that a plan | 2  hazardous chemicals being released? |
| 3  that's activated when there is an immediate danger to | 3    A.  Primary -- primarily our duty during that |
| 4  health? | 4  was looking at sampling data from the Environmental |
| 5    A.  It's a response plan for various emergency | 5  Protection Agency. |
| 6  entities; Health and Human Services is only one of | 6    Q.  How long was the Federal Response Plan |
| 7  them.  It's activated during a disaster. | 7  activated? |
| 8    Q.  Would that plan have been activated, for | 8        MR. MILLER:  Objection, foundation. |
| 9  example, in response to Hurricane Katrina in | 9    A.  I'm not -- I'm not sure when it officially |
| 10  August 29, 2005? | 10  was deactivated. |
| 11    A.  Yes, it was. | 11  BY MR. WOODS: |
| 12    Q.  Was such a plan activated, and was ATSDR | 12    Q.  Do you know if it was still active or |
| 13  asked to participate, and was ATSDR participate in that | 13  activated when ATSDR was asked to become involved in |
| 14  response plan that was activated for August -- | 14  the formaldehyde in travel trailers issue? |
| 15    A.  Yes. | 15    A.  Yes, it was. |
| 16    Q.  -- on August 29, 2005, in response to | 16    Q.  Okay.  Because the plan was still |
| 17  Hurricane Katrina? | 17  activated and was under an emergency situation; |
| 18        MR. MILLER:  Objection, foundation.  Go | 18  correct -- |
| 19  ahead. | 19    A.  Yes. |
| 20    A.  Yes, ATSDR was. | 20    Q.  -- when ATSDR became involved in the |
| 21  BY MR. WOODS: | 21  formaldehyde issue in travel trailers; correct? |
| 22    Q.  What was ATSDR tasked to do? | 22    A.  Yes, yes. |
| 23    A.  ATSDR's role when the Federal Response | 23    Q.  At that time, who was the director of CDC? |
| 24  Plan is activated, particularly Emergency Support | 24    A.  Dr. Gerberding. |
| 25  Function Number 10, which is hazardous materials. | 25    Q.  Okay.  And using your words, who was the |

7 (Pages 22 to 25)

In Re: FEMA          Joseph Little          6/23/2009

---

Page 26

1  person assigned at the Emergency Operation Center?
2      A.  Don Benken was the lead for the hurricane
3  response.
4      Q.  I'm sorry, John?
5      A.  Don Benken.
6      Q.  Could you spell his last name?
7      A.  B-E-N-K-E-N.
8      Q.  And who was the section chief?
9      A.  Mike Allred.
10     Q.  I'm sorry?
11     A.  Mike Allred.
12         MR. MILLER: I think it's A-L-L-R-E-D.
13         MS. DALY: Does anybody want any more of
14  these?
15         MR. JOHNSON: If you wouldn't mind, I'd
16  like to get a copy.
17  BY MR. WOODS:
18     Q.  So according to your earlier testimony,
19  the Federal Response Plan was still activated when
20  ATSDR became involved in the formaldehyde issue in
21  travel trailers, and the organizational chart, or
22  order of command that you gave, would be
23  Dr. Gerberding, Don Benken, Mike Allred, and then
24  you?
25     A.  (Nods head affirmatively).

---

Page 27

1          MR. MILLER: Objection. Asked and
2  answered. Compound.
3          MR. WOODS: Issue?
4          MR. MILLER: Pardon me?
5          MR. WOODS: You have it?
6          MR. MILLER: I have it. So that will be
7  the witnesses that you have there.
8      A.  Can I clarify something?
9  MR. WOODS:
10     Q.  Please.
11     A.  Mike Allred eventually became the Deputy
12  Director of the Office of Terrorism Preparedness and
13  Response. I'm not sure exactly when that changeover
14  date was.
15     Q.  Who else could it have possibly been, if
16  it weren't Mike Allred?
17     A.  I don't believe there was anybody named
18  acting in his place.
19     Q.  So it's possible, then, that at that time
20  it could have been just Dr. Gerberding, Don Benken,
21  and then yourself as the chain of command?
22     A.  Scott Wright, yes. I was helping Scott
23  Wright.
24     Q.  And who is Scott Wright?
25     A.  He's another senior staff person.

---

Page 28

1      Q.  And what's his title?
2      A.  Emergency coordinator.
3      Q.  Is Scott Wright still with ATSDR?
4      A.  Yes, he is.
5      Q.  Okay. If you could just take us through
6  how the request for ATSDR to become involved in the
7  formaldehyde in travel trailers issue came about, and
8  who made the request?
9          MR. MILLER: Objection, vague. Narrative.
10     A.  There was a conference call that came in
11  through -- or there was a request that came in
12  through the CDC Emergency Operation Center where they
13  requested a conference call. The Emergency Operation
14  Center contacted Scott Wright, and Scott rounded up a
15  bunch of people in our building, including Don
16  Benken, to be on this conference call.
17  BY MR. WOODS:
18     Q.  And what's your understanding as to what
19  was the purpose of the conference call?
20         MR. MILLER: Objection, foundation.
21     A.  When the call was announced, I think they
22  said about formaldehyde. I don't remember much more
23  than that. Trailers -- formaldehyde in trailers.
24  BY MR. WOODS:
25     Q.  And who asked you to participate in this

---

Page 29

1  conference call?
2      A.  Scott Wright.
3      Q.  Do you recall when this call came in from
4  the CDC Emergency Operation Center?
5      A.  I think the date was June 19th.
6      Q.  The call came in on June 19th. When was
7  the conference call actually held?
8      A.  I don't remember the time.
9      Q.  Do you know who participated in that
10  conference call?
11     A.  Scott Wright and myself, Don Benken, Sam
12  Coleman from EPA. Rick Preston from FEMA, and there
13  were many other FEMA, CDC, and ATSDR staff on the
14  call. I don't remember the names.
15     Q.  How many times would you say over your
16  history, or time with ATSDR, did you ever participate
17  or respond to a CDC Emergency Operation Center's
18  call?
19     A.  Many, many times.
20     Q.  And generally, who would participate in
21  those calls, not necessarily by name, but just by job
22  titles or descriptions, or who would be the
23  interested parties?
24         MR. MILLER: Objection, vague. Narrative.
25  Go ahead.

---

8 (Pages 26 to 29)

In Re: FEMA          Joseph Little          6/23/2009

Page 22

1    Q.  I'm sorry.  Could you -- and could I ask
2  you to speak up just a bit, but that last position
3  after the head of CDC?
4    A.  Head of CDC.  The next chain would be the
5  director of the Coordinating Center for Environmental
6  Health and Injury Prevention.
7    Q.  Mm-hmm.
8    A.  Next would have been the director for
9  ATSDR.  Next would be the division director for the
10  Division of Toxicology.
11    Q.  Okay.
12    A.  Next would be the branch chief for the
13  Emergency Response, I think it's called Preventive
14  Medicine Branch.  It's changed names.
15    Q.  Okay.
16    A.  Then the section chief, or team lead they
17  are called now.
18    Q.  Okay.
19    A.  And then the staff.
20    Q.  Now, that's a non-emergency situation.
21  What would have been considered, or give me an
22  example of what would have been considered an
23  emergency situation.
24    A.  A chemical spill, or any response that's
25  done under the activation of the Federal Response

Page 23

1  Plan.
2    Q.  The Federal Response Plan, is that a plan
3  that's activated when there is an immediate danger to
4  health?
5    A.  It's a response plan for various emergency
6  entities; Health and Human Services is only one of
7  them.  It's activated during a disaster.
8    Q.  Would that plan have been activated, for
9  example, in response to Hurricane Katrina in
10  August 29, 2005?
11    A.  Yes, it was.
12    Q.  Was such a plan activated, and was ATSDR
13  asked to participate, in some way participate in that
14  response plan that was activated for August --
15    A.  Yes.
16    Q.  -- on August 29, 2005, in response to
17  Hurricane Katrina?
18        MR. MILLER:  Objection, foundation.  Go
19  ahead.
20    A.  Yes, ATSDR was.
21  BY MR. WOODS:
22    Q.  What was ATSDR tasked to do?
23    A.  ATSDR's role when the Federal Response
24  Plan is activated, particularly Emergency Support
25  Function Number 10, which is hazardous materials.

Page 24

1  The SF10 was activated for the hurricane response.
2    Q.  Was there a concern about hazardous
3  materials?  What was the concern about hazardous
4  materials as a result of Hurricane Katrina?
5        MR. MILLER:  Objection, foundation.  Go
6  ahead.
7    A.  The potential for large amounts of
8  hazardous chemicals released throughout the area of
9  the hurricane.
10  BY MR. WOODS:
11    Q.  Were you personally involved as an
12  employee in your role with ATSDR in responding -- as
13  part of the Federal Response Plan for Hurricane
14  Katrina?
15.    A.  Yes.  I was assigned to the Emergency
16  Operations Center.
17    Q.  And what were your duties?
18    A.  Technical support for hazardous materials
19  issues.
20    Q.  Were you deployed to any particular area
21  in the region which was affected by Hurricane
22  Katrina?
23    A.  No.  I was in the command post in Atlanta.
24    Q.  So here in the command post you would
25  basically field calls from individuals, or

Page 25

1  individuals concerned about the potential for
2  hazardous chemicals being released?
3    A.  Primary -- primarily our duty during that
4  was looking at sampling data from the Environmental
5  Protection Agency.
6    Q.  How long was the Federal Response Plan
7  activated?
8        MR. MILLER:  Objection, foundation.
9    A.  I'm not -- I'm not sure when it officially
10  was deactivated.
11  BY MR. WOODS:
12    Q.  Do you know if it was still active or
13  activated when ATSDR was asked to become involved in
14  the formaldehyde in travel trailers issue?
15    A.  Yes, it was.
16    Q.  Okay.  Because the plan was still
17  activated and was under an emergency situation;
18  correct --
19    A.  Yes.
20    Q.  -- when ATSDR became involved in the
21  formaldehyde issue in travel trailers; correct?
22    A.  Yes, yes.
23    Q.  At that time, who was the director of CDC?
24    A.  Dr. Gerberding.
25    Q.  Okay.  And using your words, who was the

7 (Pages 22 to 25)

In Re: FEMA            Joseph Little            6/23/2009

## Page 26

1  person assigned at the Emergency Operation Center?
2      A.   Don Benken was the lead for the hurricane
3  response.
4      Q.   I'm sorry, John?
5      A.   Don Benken.
6      Q.   Could you spell his last name?
7      A.   B-E-N-K-E-N.
8      Q.   And who was the section chief?
9      A.   Mike Allred.
10      Q.   I'm sorry?
11      A.   Mike Allred.
12      MR. MILLER: I think it's A-L-L-R-E-D.
13      MS. DALY: Does anybody want any more of
14  these?
15      MR. JOHNSON: If you wouldn't mind, I'd
16  like to get a copy.
17  BY MR. WOODS:
18      Q.   So according to your earlier testimony,
19  the Federal Response Plan was still activated when
20  ATSDR became involved in the formaldehyde issue in
21  travel trailers, and the organizational chart, or
22  order of command that you gave, would be
23  Dr. Gerberding, Don Benken, Mike Allred, and then
24  you?
25      A.   (Nods head affirmatively).

## Page 27

1      MR. MILLER: Objection. Asked and
2  answered. Compound.
3      MR. WOODS: Issue?
4      MR. MILLER: Pardon me?
5      MR. WOODS: You have it?
6      MR. MILLER: I have it. So that will be
7  the witnesses that you have there.
8      A.   Can I clarify something?
9  MR. WOODS:
10      Q.   Please.
11      A.   Mike Allred eventually became the Deputy
12  Director of the Office of Terrorism Preparedness and
13  Response. I'm not sure exactly when that changeover
14  date was.
15      Q.   Who else could it have possibly been, if
16  it weren't Mike Allred?
17      A.   I don't believe there was anybody named
18  acting in his place.
19      Q.   So it's possible, then, that at that time
20  it could have been just Dr. Gerberding, Don Benken,
21  and then yourself as the chain of command?
22      A.   Scott Wright, yes. I was helping Scott
23  Wright.
24      Q.   And who is Scott Wright?
25      A.   He's another senior staff person.

## Page 28

1      Q.   And what's his title?
2      A.   Emergency coordinator.
3      Q.   Is Scott Wright still with ATSDR?
4      A.   Yes, he is.
5      Q.   Okay. If you could just take us through
6  how the request for ATSDR to become involved in the
7  formaldehyde in travel trailers issue came about, and
8  who made the request?
9      MR. MILLER: Objection, vague. Narrative.
10      A.   There was a conference call that came in
11  through -- or there was a request that came in
12  through the CDC Emergency Operation Center where they
13  requested a conference call. The Emergency Operation
14  Center contacted Scott Wright, and Scott rounded up a
15  bunch of people in our building, including Don
16  Benken, to be on this conference call.
17  BY MR. WOODS:
18      Q.   And what's your understanding as to what
19  was the purpose of the conference call?
20      MR. MILLER: Objection, foundation.
21      A.   When the call was announced, I think they
22  said about formaldehyde. I don't remember much more
23  than that. Trailers -- formaldehyde in trailers.
24  BY MR. WOODS:
25      Q.   And who asked you to participate in this

## Page 29

1  conference call?
2      A.   Scott Wright.
3      Q.   Do you recall when this call came in from
4  the CDC Emergency Operation Center?
5      A.   I think the date was June 19th.
6      Q.   The call came in on June 19th. When was
7  the conference call actually held?
8      A.   I don't remember the time.
9      Q.   Do you know who participated in that
10  conference call?
11      A.   Scott Wright and myself, Don Benken, Sam
12  Coleman from EPA. Rick Preston from FEMA, and there
13  were many other FEMA, CDC, and ATSDR staff on the
14  call. I don't remember the names.
15      Q.   How many times would you say over your
16  history, or time with ATSDR, did you ever participate
17  or respond to a CDC Emergency Operation Center's
18  call?
19      A.   Many, many times.
20      Q.   And generally, who would participate in
21  those calls, not necessarily by name, but just by job
22  titles or descriptions, or who would be the
23  interested parties?
24      MR. MILLER: Objection, vague. Narrative.
25  Go ahead.

8 (Pages 26 to 29)

In Re: FEMA            Joseph Little            6/23/2009

<table>
<tr><th>Page 82</th><th>Page 84</th></tr>
</table>

**Page 82**

1    about ATSDR work with regard to formaldehyde for
2    FEMA?
3            MR. MILLER: Objection. That assumes
4    facts not in evidence.
5        A.   No, this is between Don Benken and
6    Dr. Sinks. We were not provided any information
7    about their conversation or anything like that.
8    BY MR. WOODS:
9        Q.   So at the time that you were performing
10   work, and when the conference calls were taking place
11   you weren't aware that Dr. Sinks was aware of ATSDR's
12   involvement with the formaldehyde issue?
13       A.   I personally wasn't, no.
14       Q.   Page 15, the first full paragraph, it
15   says -- it begins "in fact". Do you see that?
16       A.   Yes.
17       Q.   It says: In fact, the letter from Rick
18   Preston to Scott Wright requests that the report be
19   kept secret. Quote: Please keep this information in
20   your analysis confidential, Preston wrote.
21   Additional quote: No information should be released
22   to any third-party without my express permission.
23           And that was again, your understanding of
24   your marching orders from Rick Preston; correct?
25           MR. MILLER: Objection, argumentative.

**Page 83**

1        A.   That was in the transmittal memo when we
2    received the data. I don't know if that's the exact
3    wording.
4    BY MR. WOODS:
5        Q.   But, in theory, you basically followed
6    Preston's orders on that; correct?
7        A.   His request, yes.
8        Q.   And, again, you have no idea why your
9    analysis, and the analysis performed by you and Scott
10   Wright should be kept confidential; correct?
11       A.   No, I don't know Rick Preston's
12   reasonings.
13       Q.   And, again, you had never received this
14   sort of request from a lawyer involved in any
15   response, emergency response plan; correct?
16           MR. MILLER: Objection. Objection. Asked
17   and answered.
18       A.   No.
19   BY MR. WOODS:
20       Q.   Let me ask this question. Is there a
21   Memorandum of Understanding, or an Executive Order or
22   a Directive Order, any other document, that provides
23   for a consultation relationship between governmental
24   agencies that basically would have resulted, or
25   authorized, ATSDR's involvement in the formaldehyde

**Page 84**

1    issue?
2        A.   Well, we were involved because of a
3    mission assignment under the Federal Response Plan as
4    part of the Hurricane Katrina emergency. This whole
5    thing was a mission assignment from FEMA.
6        Q.   I guess my question is then how would it
7    come about what authority is given, or where could we
8    look to find the authority that was given for
9    governmental agencies and ATSDR to be requested to
10   perform the work that you did?
11       A.   It's part of the Federal Response Plan,
12   the plan was activated.
13       Q.   Okay. And I would assume that's some sort
14   of Congressionally mandated, or approved plan?
15       A.   Yes.
16       Q.   Would you turn quickly to page 19 of the
17   report. It begins at Section B. It says "Dr. DeRosa
18   raises red flags." Are you there?
19           Second paragraph begins: Dr. DeRosa
20   called Scott Wright and Joe Little into his office to
21   discuss the health consultation, his concerns, and
22   questioned why he was not aware that it was being
23   prepared. He followed up that same day with an
24   e-mail to Dr. Sinks and Dr. Frumkin in which he
25   included a draft letter he had written to Rick

**Page 85**

1    Preston pointing out the significant flaws and
2    omissions in the February 1 health consultation on
3    formaldehyde.
4            Is the reason Dr. DeRosa was not aware of
5    the health consultation was because he was not a part
6    of the emergency situation Federal Response Plan
7    organization?
8            MR. MILLER: Objection. Assumes facts not
9    in evidence.
10       A.   Dr. DeRosa was provided copies of the
11   weekly reports so he had access to knowledge about
12   this project, what was going on.
13           Dr. DeRosa did not normally participate in
14   any emergency type of activity, so he was not
15   involved in any aspect of the hurricane response, or
16   really any of the emergency response activities.
17   BY MR. WOODS:
18       Q.   But you're testifying that he was aware
19   that the project was ongoing?
20       A.   He was -- the weekly reports were provided
21   to him; whether he read them or not, I can't say.
22       Q.   And the weekly reports were in what
23   format, were they e-mails, or memos?
24       A.   They were e-mail, and they were the weekly
25   activities of the section put forward by the duty

22 (Pages 82 to 85)

In Re: FEMA               Joseph Little               6/23/2009

| Page 86 |
|---|
| 1    officer of that week. |
| 2        Q.   Were you aware that Dr. DeRosa had serious |
| 3    concerns about the Health Consultation Report? |
| 4        A.   I saw a letter he had written, a copy of a |
| 5    letter he had written, yes. |
| 6        Q.   Are you talking about the letter that was |
| 7    directed to Rick Preston, FEMA's General Counsel in |
| 8    FEMA's Office of General Counsel? |
| 9        A.   I believe so. |
| 10       Q.   Let me ask you this question about the |
| 11   Health Consultation Report.  When it was drafted in |
| 12   '07, do you know whom else at FEMA received a copy of |
| 13   the report? |
| 14       A.   No, I don't know. |
| 15       Q.   All you know is that Rick Preston |
| 16   definitely received a copy? |
| 17       A.   Yes, it was sent to Rick Preston. |
| 18       Q.   You don't know who he forwarded it to -- |
| 19       A.   No. |
| 20       Q.   -- after that?  If you turn to page 21. |
| 21   The last paragraph that begins "Dr. Sinks", do you |
| 22   see that paragraph? |
| 23       A.   Yes. |
| 24       Q.   And if you'd go down to the fifth line in |
| 25   the sentence that begins, "in fact".  Do you see |

| Page 87 |
|---|
| 1    where I'm talking about? |
| 2        A.   In fact. |
| 3        Q.   It says:  In fact, Joe Little said of the |
| 4    consultation:  This was the first report I worked on |
| 5    in 17 years that ever went to the director's office, |
| 6    and it went to them because it was politically |
| 7    sensitive, and it was being worked on by FEMA's |
| 8    Office of General Counsel. |
| 9        A.   Yes. |
| 10       Q.   Is that your statement? |
| 11       A.   Similar.  I don't know if that's my exact |
| 12   words, but yes, this is the first report I ever had |
| 13   go to the ATSDR's director's office. |
| 14       Q.   In this statement, do you agree that it |
| 15   went to the director's office because it was a |
| 16   politically sensitive issue? |
| 17          MR. MILLER:  Objection, foundation. |
| 18       A.   Yes, it was a sensitive issue. |
| 19   BY MR. WOODS: |
| 20       Q.   And did it go to the director's office |
| 21   because it was being worked on by FEMA's Office of |
| 22   General Counsel? |
| 23          MR. MILLER:  Objection, foundation. |
| 24       A.   That had never happened before, so I |
| 25   thought it needed to go to the head of the Agency. |

| Page 88 |
|---|
| 1    BY MR. WOODS: |
| 2        Q.   So it was your decision to give it to the |
| 3    head of the Agency, it wasn't a direction? |
| 4        A.   Well, it wasn't my decision.  It was Mike |
| 5    Allred, but I thought it was a good idea that he |
| 6    review it. |
| 7        Q.   What did you appreciate to be the |
| 8    political sensitivity of the issue? |
| 9        A.   Well, it's involving the largest disaster |
| 10   the country has ever been involved in.  And the first |
| 11   project I ever worked on with a general counsel |
| 12   person, so it was not the norm. |
| 13       Q.   So recognizing that it was the largest |
| 14   disaster being dealt with, and I'm just going to, I |
| 15   guess, paraphrase it, in the country you recognize |
| 16   that it was an important issue, something that |
| 17   probably deserved different attention, and -- is that |
| 18   correct? |
| 19       A.   I think it was an important enough issue |
| 20   to get the -- to deserve the attention of the ATSDR |
| 21   director, yes. |
| 22       Q.   Okay.  And then the fact that a lawyer, |
| 23   counsel for FEMA, was involved in this issue also |
| 24   raised a certain level of sensitivity for you; |
| 25   correct? |

| Page 89 |
|---|
| 1        A.   For me personally, yes.  It had never |
| 2    happened before. |
| 3        Q.   And it was that your political sensitivity |
| 4    -- or sensitivity to this issue in a political sense |
| 5    was raised because there was litigation involved? |
| 6        A.   That was -- it was a factor. |
| 7        Q.   Now, the statement that again, that this |
| 8    report attributes to you, it says that, partially |
| 9    quote it, it went to them because it was politically |
| 10   sensitive and it was being worked on by FEMA's Office |
| 11   of General Counsel.  What do you mean by the term or |
| 12   phrase "worked on"? |
| 13          MR. MILLER:  Object.  The witness has not |
| 14   ratified that this is his accurate statement that |
| 15   you're referring to that you're attempting to |
| 16   identify.  So go ahead. |
| 17       A.   It came through them that -- I mean, |
| 18   that's -- they were the point of contact. |
| 19   BY MR. WOODS: |
| 20       Q.   So they had a significant role in this |
| 21   investigation process? |
| 22          MR. MILLER:  Objection.  Mischaracterizes |
| 23   the witness's testimony. |
| 24       A.   No.  They were the point of contact for |
| 25   the project.  I don't know what they did back at |

23 (Pages 86 to 89)

In Re: FEMA          Joseph Little          6/23/2009

Page 86

1  officer of that week.
2      Q.   Were you aware that Dr. DeRosa had serious
3  concerns about the Health Consultation Report?
4      A.   I saw a letter he had written, a copy of a
5  letter he had written, yes.
6      Q.   Are you talking about the letter that was
7  directed to Rick Preston, FEMA's General Counsel in
8  FEMA's Office of General Counsel?
9      A.   I believe so.
10     Q.   Let me ask you this question about the
11 Health Consultation Report.  When it was drafted in
12 '07, do you know whom else at FEMA received a copy of
13 the report?
14     A.   No, I don't know.
15     Q.   All you know is that Rick Preston
16 definitely received a copy?
17     A.   Yes, it was sent to Rick Preston.
18     Q.   You don't know who he forwarded it to --
19     A.   No.
20     Q.   -- after that?  If you turn to page 21.
21 The last paragraph that begins "Dr. Sinks", do you
22 see that paragraph?
23     A.   Yes.
24     Q.   And if you'd go down to the fifth line in
25 the sentence that begins, "in fact".  Do you see

Page 87

1  where I'm talking about?
2      A.   In fact.
3      Q.   It says:  In fact, Joe Little said of the
4  consultation:  This was the first report I worked on
5  in 17 years that ever went to the director's office,
6  and it went to them because it was politically
7  sensitive, and it was being worked on by FEMA's
8  Office of General Counsel.
9      A.   Yes.
10     Q.   Is that your statement?
11     A.   Similar.  I don't know if that's my exact
12 words, but yes, this is the first report I ever had
13 go to the ATSDR's director's office.
14     Q.   In this statement, do you agree that it
15 went to the director's office because it was a
16 politically sensitive issue?
17         MR. MILLER:  Objection, foundation.
18     A.   Yes, it was a sensitive issue.
19 BY MR. WOODS:
20     Q.   And did it go to the director's office
21 because it was being worked on by FEMA's Office of
22 General Counsel?
23         MR. MILLER:  Objection, foundation.
24     A.   That had never happened before, so I
25 thought it needed to go to the head of the Agency.

Page 88

1  BY MR. WOODS:
2      Q.   So it was your decision to give it to the
3  head of the Agency, it wasn't a direction?
4      A.   Well, it wasn't my decision.  It was Mike
5  Allred, but I thought it was a good idea that he
6  review it.
7      Q.   What did you appreciate to be the
8  political sensitivity of the issue?
9      A.   Well, it's involving the largest disaster
10 the country has ever been involved in.  And the first
11 project I ever worked on with a general counsel
12 person, so it was not the norm.
13     Q.   So recognizing that it was the largest
14 disaster being dealt with, and I'm just going to, I
15 guess, paraphrase it, in the country you recognize
16 that it was an important issue, something that
17 probably deserved different attention, and -- is that
18 correct?
19     A.   I think it was an important enough issue
20 to get the -- to deserve the attention of the ATSDR
21 director, yes.
22     Q.   Okay.  And then the fact that a lawyer,
23 counsel for FEMA, was involved in this issue also
24 raised a certain level of sensitivity for you;
25 correct?

Page 89

1      A.   For me personally, yes.  It had never
2  happened before.
3      Q.   And it was that your political sensitivity
4  -- or sensitivity to this issue in a political sense
5  was raised because there was litigation involved?
6      A.   That was -- it was a factor.
7      Q.   Now, the statement that again, that this
8  report attributes to you, it says that, partially
9  quote it, it went to them because it was politically
10 sensitive and it was being worked on by FEMA's Office
11 of General Counsel.  What do you mean by the term or
12 phrase "worked on"?
13         MR. MILLER:  Object.  The witness has not
14 ratified that this is his accurate statement that
15 you're referring to that you're attempting to
16 identify.  So go ahead.
17     A.   It came through them that -- I mean,
18 that's -- they were the point of contact.
19 BY MR. WOODS:
20     Q.   So they had a significant role in this
21 investigation process?
22         MR. MILLER:  Objection.  Mischaracterizes
23 the witness's testimony.
24     A.   No.  They were the point of contact for
25 the project.  I don't know what they did back at

23 (Pages 86 to 89)

In Re: FEMA          Joseph Little          6/23/2009

Page 90

1    FEMA.
2    BY MR. WOODS:
3        Q.  But you would agree that they had a
4    significant role in this process?
5            MR. MILLER: Objection, mischaracterizes
6    the witness's testimony.
7        A.  They were the point of contact.
8    BY MR. WOODS:
9        Q.  But that had never happened before in your
10   17 years?
11           MR. MILLER: Objection. Asked and
12   answered.
13       A.  No.
14   BY MR. WOODS:
15       Q.  If you turn to page 22, Section C,
16   Collision Course. And if you go to the second
17   paragraph which begins "it seems", see where we are?
18       A.  Yes.
19       Q.  Okay. Second sentence begins: Both the
20   role of FEMA's Office of General Counsel and the
21   potential public health implications of the
22   formaldehyde issue were, in fact, the key factors
23   that drove this issue up the ATSDR chain and into the
24   Office of Director, according to Joe Little, Scott
25   Wright, Don Benken and Mike Allred. Do you disagree

Page 91

1    with that statement?
2            MR. MILLER: Objection, foundation.
3        A.  That's not my words. But it was a serious
4    issue like we discussed and...
5    BY MR. WOODS:
6        Q.  Do you disagree with that statement?
7            MR. MILLER: Objection, foundation.
8        A.  No, I don't.
9    BY MR. WOODS:
10       Q.  With the role of FEMA's Office of General
11   Counsel involved in the potential public health
12   implications of the formaldehyde issue, you would
13   agree, wouldn't you, Commander, that the Office of
14   General Counsel was interested in limiting its legal
15   exposure, or FEMA's legal exposure, to individuals
16   that may have been negatively affected by
17   formaldehyde in travel trailers; correct?
18           MR. MILLER: Objection, foundation.
19       A.  I don't know their thoughts.
20   BY MR. WOODS:
21       Q.  But if general counsel is involved, and
22   potential public health implications are the driving
23   issues as to why this was so important to go
24   immediately to the director's office, isn't it easy
25   to draw the conclusion that litigation and FEMA's

Page 92

1    interest in limiting their exposure would be a
2    paramount concern?
3            MR. MILLER: Objection, argumentative,
4    foundation, calls for legal conclusion.
5        A.  That's -- FEMA can speak for FEMA's
6    feelings, so...
7    BY MR. WOODS:
8        Q.  I'm asking your understanding.
9            MR. MILLER: Objection, foundation,
10   speculation.
11       A.  Well, they were concerned about it.
12   That's why they were there, so...
13   BY MR. WOODS:
14       Q.  But they weren't apparently concerned
15   about it for public health interests. They were only
16   concerned about it for litigation interests, is that
17   what you're saying?
18       A.  No, it's not.
19           MR. MILLER: Objection -- hold on.
20   Objection. Assumes facts not in evidence. You need
21   the question read back?
22       A.  Oh. FEMA's litigation concerns were not
23   discussed with me, if there were any.
24   BY MR. WOODS:
25       Q.  I want to skip ahead to page 39. Look at

Page 93

1    the first full paragraph, the last sentence. It
2    states: The day after Congressional hearings in
3    July 2007 on this issue Scott Wright, one of the two
4    primary authors of the February Health Consultation
5    wrote, quote: ATSDR emphatically stated in the
6    conclusions of the February report that the levels of
7    formaldehyde seen in trailers was of a health
8    concern, exclamation point.
9            Do you have any reason to disagree with
10   that statement?
11       A.  I think that's taken out of context. I
12   think what he's implying was that one ventilation
13   practice was not effective at lowering it below our
14   reference point. I'm not sure if this is his words,
15   or...
16       Q.  Okay. Well, would you agree that the
17   formaldehyde levels seen in those 96 units were of a
18   health concern?
19       A.  At the levels that were above that .3,
20   are, yes, that's a health concern.
21       Q.  Now, you were aware, weren't you,
22   Commander, that units similar to those that were
23   tested were being issued to victims of Hurricanes
24   Katrina and Rita, were you not?
25       A.  Yes. That's why these trailers were there

24 (Pages 90 to 93)

In Re: FEMA                Joseph Little                6/23/2009

| Page 126 | Page 128 |
|---|---|
| 1  Q.  Well, and you may or may not know the<br>2 answer, but is formaldehyde necessary for normal<br>3 metabolism in the human body?<br>4  A.  It's a breakdown product in itself of<br>5 metabolism. It's a product of metabolism.<br>6  Q.  And, in fact, we produce it ourselves?<br>7  A.  Yes.<br>8  Q.  At much higher levels than<br>9 50 parts-per-billion?<br>10  A.  Yes.<br>11  Q.  In fact --<br>12  A.  But it's not -- it's not in an air level<br>13 in your body.<br>14  Q.  Right. But in your blood it's at, it<br>15 looks like you stated in here, at 2.5<br>16 parts-per-million?<br>17  A.  Yes.<br>18  Q.  Or 2,500 parts-per-billion?<br>19  A.  Yes.<br>20  Q.  The next paragraph on page 8 is where you<br>21 stated: A level of concern for formaldehyde in<br>22 trailers used for temporary housing would be .3<br>23 parts-per-million; correct?<br>24  A.  I used that as my comparison point.<br>25  Q.  And that was your -- you based it on the | 1 Mr. Little.<br>2  A.  Yes.<br>3  Q.  I do that all the time. One of the things<br>4 that came up after this report was issued was<br>5 questions about why it didn't address<br>6 carcinogenicity. Why didn't this report address<br>7 carcinogenicity?<br>8  A.  Because this was an emergency response,<br>9 and carcinogenicity is usually an issue for over<br>10 many, many, many years of exposure.<br>11  Q.  10 or more?<br>12  A.  10, usually 10 or more.<br>13  Q.  We've come a long way since August 29th,<br>14 2005. As we sit here today in the summer of 2009, is<br>15 it your belief that people are going to be staying in<br>16 these trailers for 10 years or more, do you have any<br>17 understanding of that?<br>18  A.  No, I don't believe that's the intent.<br>19  Q.  We've had a number of discussions in this<br>20 case about MRLs. What is an MRL?<br>21  A.  An MRL is a screening tool, it's based off<br>22 an effect level in either animal or human, and they<br>23 usually have several safety factors, and -- or they<br>24 are usually multiplied by several safety factors for<br>25 uncertainties that bring them lower. |

| Page 127 | Page 129 |
|---|---|
| 1 effect level associated with narrowing of the bronchi<br>2 in sensitive individuals?<br>3  A.  Yes, the allergic response.<br>4  Q.  And we talked earlier about irritant<br>5 response is at a higher level?<br>6  A.  Yes.<br>7  Q.  So you were comfortable setting this as<br>8 the level of concern?<br>9  A.  Yes. It was the lowest actual effect<br>10 level I found in the literature.<br>11  Q.  The lowest actual effect level you found<br>12 in the literature. We're talking about the<br>13 toxicological literature?<br>14  A.  Yes.<br>15  Q.  To put it mildly, you've been put through<br>16 the wringer for reaching that conclusion, haven't<br>17 you?<br>18  A.  Yes.<br>19  Q.  But as we sit here today, you still have<br>20 the same conclusion, don't you?<br>21  A.  Yes.<br>22  Q.  Regardless of who sued who, or who got<br>23 dragged before Congress, you still believe what you<br>24 wrote in February 2007 and signed it off with<br>25 Mr. Little; correct? With Mr. Wright. You are | 1  Q.  So when you say a safety factor, for<br>2 example, it might be multiplied by .1 to give it a 10<br>3 times safety factor?<br>4  A.  Sometimes they are divided by three to<br>5 account for human variability. There is some other<br>6 numbers, depending on the type of study that was<br>7 used, if it was an animal study.<br>8  Q.  Let's talk about formaldehyde MRLs in the<br>9 1999 ATSDR tox profile, okay, for a moment?<br>10  A.  Okay.<br>11  Q.  One of those MRLs is a chronic exposure of<br>12 eight parts-per-billion. Are you familiar with that<br>13 one?<br>14  A.  Yes.<br>15  Q.  But that doesn't mean at 9<br>16 parts-per-billion somebody's getting sick, does it?<br>17  A.  No, the MRLs are not an effect level.<br>18  Q.  And that's what you talked about before,<br>19 where do we see real effects. And it's got nothing<br>20 to do with these MRLs; correct?<br>21  A.  Yes.<br>22  MR. WOODS: Objection, lack of foundation.<br>23 BY MR. WEINSTOCK:<br>24  Q.  Would you agree that the ATSDR acute and<br>25 intermediate MRLs are not appropriate for use as a |

In Re: FEMA                Joseph Little              6/23/2009

## Page 130

1  comparison point for a level of concern because they
2  were based on actual effect levels that were higher
3  than .3 ppm, and they were adjusted downward by
4  safety factors ranging from nine to 30?
5      MR. MILLER: Objection. Vague, compound.
6      A. That's how they were derived.
7  BY MR. WEINSTOCK:
8      Q. If you would go to --
9      MR. MILLER: Exhibit No. 2.
10  BY MR. WEINSTOCK:
11      Q. Exhibit No. 2, paragraph 10. And I'll ask
12  you in a slightly different way.
13      A. Okay.
14      Q. Would you agree that we concluded that the
15  ATSDR acute and intermediate MRLs were not
16  appropriate for use as a comparison point or level of
17  concern because they were based upon actual effect
18  levels that were higher than .3 ppm, that were then
19  adjusted downward by safety factors ranging from nine
20  to 30?
21      A. Yes.
22      Q. You would agree with it because you wrote
23  it?
24      A. Yes.
25      Q. And you still believe it as we sit here

## Page 131

1  today?
2      A. Yes.
3      Q. A little further down: The ATSDR chronic
4  MRL was not used because it was based on an average
5  exposure time frame of approximately 10 years;
6  correct?
7      A. Yes.
8      Q. And here's my favorite part: And also,
9  because it was below background levels at the test
10  site, and below background levels found in most urban
11  areas throughout the United States; is that correct?
12      A. Yes.
13      MR. WOODS: Object to the question. If
14  you're going to read the statement of the witness,
15  there is a parenthetical comment following.
16      MR. MILLER: Completeness is the
17  objection.
18      MR. WOODS: I'm sorry. Completeness.
19  BY MR. WEINSTOCK:
20      Q. Let me ask the question again, although I
21  was reading, I did not ask if I read it correctly.
22  But I'll ask it again.
23      Is it correct that the ATSDR chronic MRL
24  was not used because it was based on an average
25  exposure time frame of approximately 10 years? Yes?

## Page 132

1      A. One of the reasons.
2      Q. One of the reasons. And also, because it
3  was below background levels at the test site?
4      A. Yes.
5      Q. And below background levels found in most
6  urban areas throughout the United States?
7      A. Yes.
8      Q. And if I read most of what we've gone over
9  here today correctly, the MRL is exceeded in most
10  conventional homes?
11      A. Yes, that's correct.
12      Q. And exceeded in most urban areas?
13      A. Yes.
14      Q. And grossly exceeded in high traffic urban
15  areas?
16      A. Could be, yes.
17      Q. But, lastly, as I sit here today, you put
18  forth .3 ppm, or 300 parts-per-billion as the no
19  effect level, and you still believe it as we sit here
20  today?
21      A. As an effect level?
22      Q. Yes, as an effect level. And there was no
23  effect below that level?
24      A. I did not come across that.
25      MR. WEINSTOCK: That's all the questions I

## Page 133

1  have. Thank you.
2      MR. WOODS: Anyone else?
3      MR. MILLER: I have got some followup
4  questions, but...
5      MS. DALY: Can we go off for just one
6  second?
7      THE VIDEOGRAPHER: 2:15 p.m., off video
8  record.
9      (Recess 2:15-2:22 p.m.)
10      THE VIDEOGRAPHER: Stand by. 2:22 p.m.,
11  back on video record.
12      MR. WOODS: Thank you.
13      FURTHER EXAMINATION
14  BY MR. WOODS:
15      Q. Commander Little, Justin Woods again. I
16  just want to followup on some of the questions that
17  Mr. Weinstock asked you.
18      You stated that the references used in the
19  Health Consultation Report were -- and they are
20  listed on page 14, if you want to take a look at it
21  and there are six references listed, that that formed
22  the basis for which you were able to develop the .3
23  ppm level; is that correct?
24      A. Yes.
25      Q. And will you agree that those references

34 (Pages 130 to 133)

Tiffany Alley & Associates
770-343-9696

In Re: FEMA          Joseph Little              6/23/2009

## Page 134

1  that you reference in the report are primarily from
2  studies performed in occupational situations, and not
3  residential living situations?
4      A.   Not necessarily.
5      Q.   Well, can you identify what might have
6  been a study that was conducted of formaldehyde
7  exposure in residential settings?
8      A.   The evaluation of the housing were from
9  studies that were not occupational.
10     Q.   Okay.  So I see that would be four?
11     A.   In the tox profile.  No, they are from the
12  tox profile number two.
13     Q.   Number two.  Do the studies that you
14  reference that give you the .3 ppm level, do they
15  take into effect that there are individuals living in
16  situations in travel trailers for a 24-hour
17  seven-day-a-week period?
18          MR. WEINSTOCK: Object to the form of the
19  question to the extent it involves the Alexander
20  case, it's lack of foundation.  You can answer, sir.
21          MR. MILLER:  Lack of foundation as to
22  every case.
23     A.   Yeah.  The exposure to the .3, I'm not
24  aware of a time frame on that exposure.  I was
25  assuming it was instantaneous.

## Page 135

1  BY MR. WOODS:
2      Q.   One of the criticisms or concerns that the
3  Congressional committee had concerning your Health
4  Consultation Report is that it didn't look to other
5  sources to really develop or reference a legitimate
6  level of concern, would you agree with me that that
7  was one of their criticisms?
8          MR. MILLER:  Objection, foundation.
9      A.   I don't believe -- I haven't read that.
10 BY MR. WOODS:
11     Q.   Okay.  Well, if you'll return to what is
12  marked --
13          MR. MILLER:  Exhibit 8.
14 BY MR. WOODS:
15     Q.   It would be that.  If you could turn to
16  page 17 of the Committee's report.  Okay.
17     A.   Okay.
18     Q.   If you look at the section entitled Level
19  of Concern, second paragraph that begins "both Little
20  and Wright."  If you'll go down to the sixth line,
21  the sentence that begins in a quote, "for the file
22  memorandum"; do you see that line?
23          MR. WEINSTOCK:  I'm sorry?
24     A.   No, no.  Oh, okay, I see it.  Yeah.
25 BY MR. WOODS:

## Page 136

1      Q.   It says: "In a report for file memorandum
2  written by Joe Little regarding how he came to
3  chose", I guess it should be choose, not "chose",
4  3 ppm as the level of concern, he wrote that his
5  decision was based on the fact that it was the lowest
6  actual human effect level found in the peer-reviewed
7  literature from ATSDR in the National Library of
8  Medicine.  Is that a true statement?
9      A.   They left out from the Hazardous
10  Substances Data Bank, which is maintained by the
11  National Library of Medicine.
12     Q.   National Substance Data Bank?
13     A.   Hazardous Substances Data Bank, HSDB it's
14  called.  I believe it's in the line reference.  Yes,
15  reference number three.
16     Q.   And what if we go to that reference, what
17  will we find there?
18     A.   It's a summary of up-to-date peer-reviewed
19  studies concerning that particular chemical.  I
20  believe it's updated every quarter.
21     Q.   If you read further, the report seems to
22  criticize that a search of Medline Plus, the primary
23  search tool of the National Library of Medicine,
24  reveals publications by the Environmental Protection
25  Agency, the National Cancer Institute, and

## Page 137

1  Occupational Safety and Health Administration, which
2  all cite .1 ppm as a level at which exposure to
3  formaldehyde may cause potential health effects,
4  including irritation of the eye, nose and throat,
5  wheezing and coughing, fatigue, skin rash, and severe
6  allergic reactions.
7          My question to you, Commander, is did you
8  at any time consult the Environmental -- the
9  publications by the Environmental Protection Agency,
10  the National Cancer Institute, or OSHA?
11          MR. WEINSTOCK: Object to the form.  It's
12  a compound question.
13     A.   No, I consulted the references in my
14  report that are listed.
15 BY MR. WOODS:
16     Q.   Is there a reason why you did not consult
17  these additional references?
18     A.   Because the Hazardous Substances Data Bank
19  is considered to be the most up-to-date, and one of
20  the best sources for this type of information, and
21  it's -- all the entries that get into that data bank
22  are peer-reviewed.
23     Q.   And who maintains this --
24     A.   National Library of Medicine.
25     Q.   So you're saying that you would have

35  (Pages 134 to 137)

In Re: FEMA                 Joseph Little                 6/23/2009

---

Page 142

1    A.  No.
2         MR. WOODS:  That's it.
3         MR. WEINSTOCK:  I do have one followup
4    question, if I may.
5              FURTHER EXAMINATION
6    BY MR. WEINSTOCK:
7    Q.  I was a little late today, I walked in
8    when the deposition already started.  Before I walked
9    in that door, had you ever laid eyes on me before?
10   A.  No.
11   Q.  Have we ever spoken on the telephone?
12   A.  No.
13        MR. WEINSTOCK:  Thank you.
14        MR. MILLER:  May I go?
15             EXAMINATION
16   BY MR. MILLER:
17   Q.  Sir, my name is Henry Miller.  I represent
18   the Defendant, United States of America in this case.
19   Other than myself and Mr. Kashdan, have you ever met
20   anybody who is in this room before today?
21   A.  No.
22   Q.  To the best of your knowledge, had you had
23   any conversations with Mr. Woods, or anyone else in
24   this room, before today?
25   A.  No.

---

Page 143

1    Q.  Now, I want to ask you to pull out the
2    document which is marked Exhibit No. 4.  It was your
3    e-mail to Mr. Frumkin dated December 4th, 2006.  It's
4    assigned Bates number CDC 104-001024 to 1026.  Do you
5    have it in front of you?
6    A.  Is this it?
7    Q.  That's it.
8    A.  Okay.
9    Q.  There was some discussions earlier about
10   Dr. DeRosa not being aware that the report was going
11   out, or that you were doing this analysis.  This
12   e-mail where you informed Dr. Frumkin about what went
13   on, was this also sent to Dr. DeRosa?
14   A.  Yes, I believe he's on the cc list.  Yes.
15   Q.  And what was the date that this would have
16   been sent to him?
17   A.  It says December 4th, 2006.
18   Q.  Now, we were talking earlier about the
19   chain of command Mr. Woods discussed, or the chain of
20   review, I think it was, people that were in the
21   review process.  And for the emergency response, an
22   emergency response such as this, I think you had the
23   director of CDC, the Incident Operation Control
24   Center, the section chief, and then the ER
25   coordinator; is that correct?

---

Page 144

1    A.  I had -- I believe I mentioned like CDC
2    director, then Don Benken, who was the...
3    Q.  No.  Let me go through the positions
4    first, and then we'll fill in who was in each
5    position.  There is yourself and Joe Wright as
6    environmental coordinator?
7    A.  Scott Wright.
8    Q.  Scott Wright.  And who do you report to
9    when you're doing an emergency response?
10   A.  Usually our section chief.
11   Q.  And who would have been the section chief
12   in December '05 through February '06 or '07?  Hold
13   on, let me step back.  That's really a bad question.
14        Who was the section chief from December
15   '06 through February '07?
16   A.  Our section chief was Mike Allred, but he
17   got a different position to be the deputy director,
18   I'm not sure exactly when that time frame was.
19   Q.  Okay.  And who was the -- so who, when you
20   were reporting, you and Scott were reporting at that
21   time, this emergency response, who were you reporting
22   to then?
23   A.  I think for this one was, we reported to
24   -- directly to Don Benken, and then when Mike Allred
25   took that over, then he was -- took over Don Benken's

---

Page 145

1    position.
2    Q.  So you and Scott were reporting, from what
3    I gather, either to Mr. Benken, or Dr. Benken, or
4    Mr. Allred; is that right?
5    A.  Yes.
6    Q.  Then who did they report to in the line of
7    command?
8    A.  Mark Keim, who was out of the country.  So
9    from there, they would report to Dr. Frumkin, or
10   Dr. Sinks.
11   Q.  So as I get it, there is Dr. Frumkin, then
12   there is Dr. Sinks?
13   A.  (Nods head affirmatively).
14   Q.  Then there's Don Benken, or Mike Allred,
15   and then there is you and Scott?
16   A.  Yes.  During this emergency, yes.
17   Q.  And is that the process, is this the
18   process that was followed with the -- what's the
19   Exhibit Number on that?  Exhibit No. 8, which is the
20   final report, the February 1st, 2007, report, is that
21   the process that was followed with this report?
22   A.  Yes.
23   Q.  Now, you indicated earlier that there were
24   these biweekly conference, telephone conference calls
25   that commenced on or about June 19th of 2006; is that

---

37 (Pages 142 to 145)

In Re: FEMA                 Joseph Little                 6/23/2009

---

**Page 146**

1  right?
2      A.  I think they started after July.
3      Q.  And these conferences, who participated in
4  them?
5      A.  Me and Scott, EPA staff, and FEMA staff.
6      Q.  To the best of your knowledge, was
7  Mr. Rick Preston involved in those conference calls?
8      A.  I think he was on those calls.
9      Q.  Now, as I see it, there were basically two
10  issues that were sort of resolved; one, is what would
11  be tested, and then the testing protocol that would
12  be issued; and, secondly, the analysis of those test
13  results.  Is that right?
14      A.  Say that again.
15      Q.  There is basically two real things that
16  were done here.  First was a determination, what
17  would be tested, and the resulting test protocol for
18  that?
19      A.  Yeah, the sampling plan.
20      Q.  And then the second thing was the analysis
21  of the data generated from that sampling plan after
22  testing was done?
23      A.  Yes.  But a major component of those
24  calls, those biweekly calls, were primarily about
25  logistical issues, setting up the staging facility.

---

**Page 147**

1      Q.  Okay.  And I understand that.  What I want
2  to break it down, though, is let's first talk about
3  -- I want to divide out these subject matters.  The
4  first was the determination of what would be tested,
5  and the preparation for the testing protocol?
6      A.  Okay.
7      Q.  Then there was the actual testing that
8  went on?
9      A.  Yes.
10      Q.  And then there was the data that was
11  generated, and ATSDR's analysis of that data?
12      A.  Yes.
13      Q.  Let's talk about the first issue, which
14  was the determination of what would be tested.  Was
15  that discussed during these conference calls?
16      A.  The early ones.
17      Q.  And would you pull out your declaration,
18  Exhibit No. 2.  And go to the third page, paragraph
19  number five.  Do you have that in front of you?
20      A.  Yes.
21      Q.  And it says:  Bimonthly, every two weeks,
22  conference calls were held for purposes of
23  implementing the testing.  Although FEMA wanted EPA
24  to test new and occupied units, a consensus was
25  reached that the initial testing should be confined

---

**Page 148**

1  to new, unoccupied units.  Do you see that?
2      A.  Yes.
3      Q.  Do you recall as you sit here today that
4  FEMA was asking EPA to test the both new and unused
5  units -- new and occupied units?
6      A.  Initially, there was a very broad
7  undefined project; they hadn't decided exactly what
8  to get.
9      Q.  Were there discussions about going forward
10  with testing occupied units as well as the unoccupied
11  units?
12      A.  I don't recall, but that would most likely
13  occur after the baseline was established.
14      Q.  Okay.  That was something that would have
15  -- any testing of occupied units would have occurred
16  after this initial study?
17      A.  After this, yes.
18      Q.  In June, when these initial conversations
19  were occurring, did FEMA indicate, people from FEMA
20  who were on the line, indicate that they wanted EPA
21  to test both occupied and unoccupied in short?
22      A.  I think they initially wanted a broad,
23  broader type of project.
24      Q.  And when you say broader type of project,
25  did that encompass both the new and the not -- and

---

**Page 149**

1  occupied units?
2      A.  Yes, it would include both.
3      Q.  At any time -- you're aware that FEMA --
4  that Rick Preston was FEMA counsel; is that correct?
5      A.  Yes.
6      Q.  He was an attorney with FEMA?
7      A.  Yes.
8      Q.  Did at any time during these biweekly
9  conference calls, did Mr. Preston ever instruct or
10  place any limitation or restrictions on what could be
11  tested, when it could be tested, or how it could be
12  tested?
13      A.  No.
14      Q.  Do you know whether or not Mr. Preston
15  participated in those biweekly telephone conference
16  calls?  Was he on the line?
17      A.  I believe he was on the line.
18      Q.  Now, you received the data, or ATSDR
19  received the EPA test data from Mr. Preston; is that
20  correct?
21      A.  Yes.
22      Q.  Now, I want to ask you to turn to this
23  report, Exhibit No. 7, from Congress that Mr. Woods
24  questioned you a lot about.  It's Exhibit No. 7.  And
25  go to page number 14.

---

38  (Pages 146 to 149)

In Re: FEMA                Joseph Little                6/23/2009

## Page 150

1    And if you go to that last paragraph on
2 the page, it starts with "the letter", do you see
3 that?
4    A.  Yes.
5    Q.  It says: The letter from FEMA's Rick
6 Preston to ATSDR's Scott Wright accompanied the
7 delivery of a disk, said in part.
8        Now, the delivery of the disk, that's
9 referring to the disk that contained the test data?
10   A.  Yes.
11   Q.  Quote:  Please review the data and provide
12 to me a written report of your analysis of the
13 results of these tests and any conclusions or
14 recommendations that can be derived therefrom.  You
15 see that?
16   A.  Yes.
17   Q.  Did Mr. Preston ever instruct you, place
18 any restriction, limitation, or anything, on ATSDR's
19 review and analysis of the EPA data?
20   A.  No.
21   Q.  Did you in any way modify, alter, or
22 change your report, the February 1, 2007, report,
23 which is Exhibit No. 8, because of anything
24 Mr. Preston told you or did?
25   A.  No.

## Page 151

1    Q.  Now, you sometimes referred to the
2 document that transferred the disk to you, or to
3 ATSDR that was authored by Mr. Preston as a
4 memorandum.  Do you recall that?
5    A.  Yes.
6    Q.  Having looked at this report, this
7 indicates that there was a November 30th, 2006,
8 letter from Rick Preston to Scott Wright.  Does that
9 refresh your recollection?  If you look at like
10 footnote 70 here.
11   A.  That's probably the transmittal letter,
12 that's probably when he mailed it, and we received it
13 on the 6th.
14   Q.  Other than that letter from Mr. Preston,
15 did you receive any other instructions from
16 Mr. Preston regarding how you should analyze the data
17 that was generated by EPA?
18   A.  No.
19   Q.  So that letter was the entirety of what
20 FEMA's instructions were to you in terms of your
21 analysis of the data?
22   A.  Yes.
23   Q.  If you go to page 17 of Exhibit No. 7,
24 which is a Congressional report.  Again, Mr. Woods
25 asked you several questions about -- page 17 and 18

## Page 152

1 of Exhibit 7 -- the 0.1 ppm level, which is
2 referenced by the Environmental Protection Agency,
3 National Cancer Institute, and Occupational Safety
4 and Health Administration.  Do you have any idea how
5 those agencies calculated that .1 ppm?
6    A.  No.
7    Q.  Do you know whether that .1 ppm,
8 100 parts-per-billion, is an actual effect level?
9    A.  No.
10   Q.  When you were doing -- in fact, unless it
11 was an actual effect level, comparing what you did to
12 what they did is like comparing apples to oranges,
13 isn't it?
14   A.  Yes.
15   Q.  Now, the database that you looked at, both
16 the ATSDR tox profile, the National Library of
17 Medicine, Hazardous Substances Data Bank, all the
18 materials and documents cited in there, are they
19 peer-reviewed?
20   A.  Yes.
21   Q.  What does peer-review mean?  Explain.
22   A.  That means it's been reviewed by other
23 scientists in the field and they approve it.  It's
24 accurate enough to be placed in that database.
25   Q.  And who are the type of persons who do a

## Page 153

1 peer review, you know, peer-review these type of
2 literature, or these type of documents or studies?
3    A.  They would be specialists in toxicology
4 and medicine, biological science.
5    Q.  Now, in your study, or your report, why
6 did you use an actual effect level, as opposed to a
7 regulatory safety level, or some regulatory standard
8 as your level of concern?
9    A.  Because we were evaluating ventilation
10 practices.  We weren't evaluating places where people
11 were living.
12   Q.  Is there a difference between -- have you
13 ever been involved with the Government's
14 establishment of a regulatory standard?
15   A.  No.
16   Q.  And I guess I want to step back again.
17 Why were you using an actual effect level on the
18 study?  Because it appears to be what Congress and
19 what Mr. Woods was discussing about the critique or
20 criticism was that you used an actual effect level,
21 as opposed to some regulatory safety level, or
22 unpublished guideline.
23        Why were you relying upon the
24 peer-reviewed effects level literature?
25   A.  Because there was no guide, guideline.

39 (Pages 150 to 153)

In Re:  FEMA            Joseph Little            6/23/2009

---

**Page 154**

1  Q.  Well, there is the MRL, isn't there?
2  A.  That's not a guide.  That's not a
3  standard.
4  Q.  So why would you not use a -- why would
5  you use the effect level, as opposed to some
6  guideline, or something like that, such as the MRL?
7  A.  Because the effect level is more accurate.
8  Q.  That's the level where you might find a
9  real actual effect?
10  A.  Yes.
11  Q.  Now, again, one of the critiques that
12  Mr. Woods talked about, and Mr. Weinstock talked to
13  you about this issue as well, was the issue of
14  long-term effects' carcinogenicity.  Why did you not
15  address the long-term effects and carcinogenicity in
16  your report?
17  A.  Because this was an emergency report, or
18  an emergency response.
19  Q.  But does that mean that cancer is not an
20  issue of health concern?  Why wouldn't you still --
21  why wouldn't you address cancer?
22  A.  Cancer is a huge issue involving many,
23  many years of exposure.
24  Q.  When you say many, many years of exposure,
25  what are we talking about there?

**Page 155**

1  A.  10, 20 years.
2  Q.  Were you operating under the assumption
3  that these trailers were temporary in nature and
4  wouldn't be used for 10 years?
5  A.  Yes.
6  MR. MILLER:  I have no further questions.
7  I pass the witness, but the United States and the
8  witness reserves the right to read and sign.
9  Mr. Woods may have some more questions,
10  and Mr. Weinstock might have some more questions.
11  MR. WEINSTOCK:  No.
12  MR. MILLER:  Nothing.
13  (Off the record.)
14  MR. MILLER:  So ends the deposition, is
15  that right?  You all done?
16  MR. WOODS:  Well, there is one issue, and
17  honestly I don't know the response to it.  I know we
18  sent discovery requests.  We could not find the
19  Commander's log record that's referenced, or notes.
20  MR. MILLER:  Let me ask you, but for that,
21  are we done with the deposition?
22  MR. WOODS:  But for that.  But if we, you
23  know, if we --
24  MR. MILLER:  We can end the deposition at
25  this point.  You can reserve that right.

**Page 156**

1  MR. WOODS:  We're going to reserve the
2  right to reopen.
3  MR. MILLER:  I understand.
4  THE VIDEOGRAPHER:  This concludes the
5  videotaped deposition of Commander Joseph Little.
6  The time is 2:56 p.m.  We are now off video record.
7  (Deposition concluded at 3:00 p.m.)
8  (Signature reserved.)

**Page 157**

1  CERTIFICATE
2
3  STATE OF GEORGIA:
4  COUNTY OF FULTON:
5
6  I hereby certify that the foregoing
7  transcript was taken down, as stated in the caption,
8  and the colloquies, questions and answers were
9  reduced to typewriting under my direction; that the
10  transcript is a true and correct record of the
11  evidence given upon said proceeding.
12  I further certify that I am not a relative
13  or employee or attorney of any party, nor am I
14  financially interested in the outcome of this action.
15  This, the 6th day of July, 2009.
16
17
18  MAUREEN KREIMER, CCR-B-1379
   Notary Public in and for the
19  State of Georgia.  My Commission
   expires August 14, 2012.

40  (Pages 154 to 157)