VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009

1 (Pages 1 to 4)

---

**Page 1**

```
 1    UNITED STATES DISTRICT COURT
 2    EASTERN DISTRICT OF LOUISIANA
 3    ---------------------------X
 4                               :
 5    IN RE: FEMA TRAILER        :
 6    FORMALDEHYDE PRODUCTS      : MDL NO. 1873
 7    LIABILITY LITIGATION       : Section "N" (5)
 8                               : Judge Engelhardt
 9                               : Magistrate Chasez
10    ---------------------------X
11
12         VIDEOTAPED DEPOSITION OF KEVIN SOUZA
13              Winchester, Virginia
14              Wednesday, July 15, 2009
15              10:34 a.m.
16
17
18
19
20    Job No.: 1-159429
21    Pages: 1 - 156
22    Reported by: Michelle L. Lonas, RPR, CCR
```

**Page 2**

```
 1         Videotaped deposition of KEVIN SOUZA, held
 2    at the:
 3
 4         Courtyard/Medical Center Marriott
 5         300 Marriott Drive
 6         Winchester, Virginia 22603
 7
 8
 9         Pursuant to agreement, before Michelle L.
10    Lonas, Registered Professional Reporter, Certified
11    Court Reporter, and Notary Public of the Commonwealth
12    of Virginia.
```

**Page 3**

```
 1              APPEARANCES
 2    ON BEHALF OF THE PLAINTIFFS:
 3         JUSTIN I. WOODS, ESQUIRE
 4         TARA GILBREATH, ESQUIRE
 5         GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
 6         WARSHAUER, L.L.C.
 7         2800 Energy Centre
 8         1100 Poydras Street
 9         New Orleans, Louisiana 70163-2800
10         (504) 522-2304
11
12
13
14    ON BEHALF OF THE DEFENDANT, FLUOR
15    ENTERPRISES, INC.:
16         LEZLY L. PETROVICH, ESQUIRE
17         MIDDLEBERG, RIDDLE & GIANNA
18         31st Floor
19         201 St. Charles Avenue
20         New Orleans, Louisiana 70170-3100
21         (504) 525-7200
22
```

**Page 4**

```
 1              APPEARANCES (CONTD.)
 2    ON BEHALF OF THE DEFENDANT, GULF STREAM COACH:
 3         TIMOTHY D. SCANDURRO, ESQUIRE
 4         SCANDURRO & LAYRISSON, L.L.C.
 5         607 St. Charles Avenue
 6         New Orleans, Louisiana 70130
 7         (504) 522-7100
 8
 9
10
11    ON BEHALF OF THE DEFENDANT, HEARTLAND
12    RECREATIONAL VEHICLES, L.L.C.:
13         BRENT M. MAGGIO, ESQUIRE
14         ALLEN & GOOCH
15         3900 N. Causeway Boulevard
16         Suite 1450
17         Metairie, Louisiana 70002
18         (504) 836-5200
```

EXHIBIT 4

**Page 5**

APPEARANCES (CONT'D.)
ON BEHALF OF THE DEFENDANT, FEMA:
  JANICE WILLIAMS-JONES, ESQUIRE
  FEDERAL EMERGENCY MANAGEMENT AGENCY
  409 3rd Street, S.W.
  Room 206
  Washington, D.C. 20472
  (202) 646-4168

    - and -

  JORDAN S. FRIED, ESQUIRE
  CHIEF COUNSEL FOR LITIGATION
  FEDERAL EMERGENCY MANAGEMENT AGENCY
  Suite 840
  500 C Street, S.W.
  Washington, D.C. 20472
  (202) 646-4112

**Page 6**

APPEARANCES (CONT'D.)
ON BEHALF OF THE UNITED STATES GOVERNMENT:
  HENRY T. MILLER, ESQUIRE
  SENIOR TRIAL ATTORNEY
  U.S. DEPARTMENT OF JUSTICE
  1331 Pennsylvania Avenue, N.W.
  Room 8220-N
  Washington, D.C. 20004
  (202) 616-4223

ALSO PRESENT: Antonio Tropeano, Videographer

**Page 7**

APPEARANCES VIA TELEPHONE
ON BEHALF OF CMH MANUFACTURED HOMES; SOUTHERN ENERGY, INC.; SUNRAY INVESTMENTS, LLC; GILES FAMILY HOLDINGS, LLC:
  JAMES K. CARROLL, ESQUIRE
  FOWLER, RODRIGUEZ, VALDES-FAULI
  400 Poydras Street
  30th Floor
  New Orleans, Louisiana 70130
  (504) 523-2600

ON BEHALF OF PROJECT RESOURCES, INC.:
  A. KIRK GASPERECZ, ESQUIRE
  ADAMS AND REESE, LLP
  4500 One Shell Square
  701 Poydras Street
  New Orleans, Louisiana 70139
  (504) 581-3234

**Page 8**

APPEARANCES VIA TELEPHONE
(CONT'D.)
ON BEHALF OF KEYSTONE RV COMPANY; THOR CALIFORNIA; THOR INDUSTRIES; DUTCHMEN MANUFACTURING; DS CORP, D/B/A CROSSROADS RV; KZ RV, LP:
  RYAN E. JOHNSON, ESQUIRE
  JONES WALKER
  Four United Plaza
  8555 United Plaza Boulevard
  Baton Rouge, Louisiana 70809
  (225) 248-2000

ON BEHALF OF BECHTEL NATIONAL, INC.:
  A. J. KROUSE, ESQUIRE
  FRILOT, L.L.C.
  3700 Energy Centre
  1100 Poydras Street
  New Orleans, Louisiana 70163
  (504) 599-8000

Page 9

APPEARANCES VIA TELEPHONE
(CONT'D.)
ON BEHALF OF SHAW ENVIRONMENTAL, INC. AND CH2M HILL CONSTRUCTORS, INC.:
   DAVID KURTZ, ESQUIRE
   BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC:
   201 St. Charles Avenue
   Suite 3600
   New Orleans, Louisiana 70170
   (504) 566-5200

ON BEHALF OF RECREATION BY DESIGN, LLC; TL INDUSTRIES, INC.; FRONTIER RV, INC.; PLAY'MOR TRAILERS, INC.:
   RANDALL C. MULCAHY, ESQUIRE
   GARRISON, YOUNT, FORTE & MULCAHY, LLC
   909 Poydras Street
   Suite 1800
   New Orleans, Louisiana 70112
   (504) 527-0680

Page 10

CONTENTS

| WITNESS | PAGE |
|---|---|
| KEVIN SOUZA | |
| By Mr. Woods | 15, 149 |
| By Ms. Petrovich | 130 |
| By Mr. Scandurro | 132 |
| By Mr. Miller | 143 |

EXHIBITS
(Attached to the Transcript)

| SOUZA NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Amended Notice of Oral and Videotaped Deposition of Kevin Souza | 13 |
| 2 | Exhibit No. 28 to Defendant United States of America's Motion to Dismiss Plaintiffs' Remaining FTCA Claims for Lack of Subject Matter Jurisdiction | 21 |
| 3 | E-mail string (FEMA 17-015068) | 82 |
| 4 | E-mail string (FEMA 17-008999 - FEMA 17-009007) | 84 |

Page 11

EXHIBITS (CONT'D.)
(Attached to the Transcript)

| SOUZA NO. | DESCRIPTION | PAGE |
|---|---|---|
| 5 | E-mail string (FEMA 17-008762 - FEMA 17-008764) | 91 |
| 6 | E-mail string (FEMA 17-015050 - FEMA 17-015052) | 95 |
| 7 | E-mail string (FEMA 17-009102) | 98 |
| 8 | E-mail string (FEMA 17-008912 - FEMA 17-008915) | 103 |
| 9 | E-mail string (FEMA 17-009024 - FEMA 17-009026) | 105 |
| 10 | E-mail string (FEMA 17-009232 - FEMA 17-009236) | 108 |
| 11 | E-mail string (FEMA 17-009336 - FEMA 17-009337) | 110 |
| 12 | E-mail string (FEMA 17-009367 - FEMA 17-009371) | 113 |
| 13 | E-mail string (FEMA 17-009247) | 116 |
| 14 | E-mail string (FEMA 17-009330 - FEMA 17-009331) | 118 |

Page 12

EXHIBITS (CONT'D.)
(Attached to the Transcript)

| SOUZA NO. | DESCRIPTION | PAGE |
|---|---|---|
| 15 | E-mail string (FEMA 17-007251 - FEMA 17-007255) | 121 |
| 16 | E-mail string (FEMA 17-015220 - FEMA 17-015221) | 123 |
| 17 | E-mail string (FEMA 17-009688 - FEMA 17-009690) | 125 |

VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009

4 (Pages 13 to 16)

---

Page 13

1    PROCEEDINGS
2    (Mr. Fried is not present.)
3    (Exhibit Souza 1 was marked for
4    identification and attached to the transcript.)
5        THE VIDEOGRAPHER: Here begins tape number
6    one in the deposition of Kevin Souza, In Re: FEMA
7    Trailer Formaldehyde Products-Liability Litigation, In
8    the United States District Court, Eastern District of
9    Louisiana, Case Number MDL 1873. Today's date is
10   July 15, 2009. The time on the video monitor is
11   10:35 a.m. The video operator today is Antonio
12   Tropeano on behalf of Professional Shorthand
13   Reporters. This video is taking place -- this video
14   deposition is taking place at 300 Marriott Drive,
15   Winchester, Virginia, 22603.
16       Counsel, please voice identify yourselves
17   and state whom you represent.
18       MR. WOODS: Justin Woods for the
19   plaintiffs.
20       MS. GILBREATH: Tara Gilbreath for the
21   plaintiffs.
22       MR. MAGGIO: Brent Maggio for Heartland

---

Page 14

1    Recreational.
2        MR. SCANDURRO: Tim Scandurro for Gulf
3    Stream Coach.
4        MS. WILLIAMS-JONES: Jan --
5        MS. PETROVICH: Lezly -- oh. Lezly
6    Petrovich for Fluor Enterprises, Inc.
7        MS. WILLIAMS-JONES: Janice Williams-Jones
8    for FEMA.
9        MR. MILLER: Henry Miller, Department of
10   Justice for the United States.
11       THE VIDEOGRAPHER: The court reporter today
12   is Michelle Lonas on behalf of Professional Shorthand
13   Reporters. Would the reporter please swear in the
14   witness?
15       THE REPORTER: Would you raise your right
16   hand, please?
17       (Witness sworn by the reporter.)
18       THE VIDEOGRAPHER: Please begin.
19
20
21
22

---

Page 15

1        KEVIN SOUZA,
2    having been duly sworn, was examined and testified as
3        follows:
4    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
5    BY MR. WOODS:
6    Q    Good morning, Mr. Souza.
7    A    Good morning.
8    Q    I'm Justin Woods. We've met in the past,
9    but would you state your full name and address for the
10   record, please?
11   A    Home address?
12       MR. MILLER: No, work address.
13   BY MR. WOODS:
14   Q    Work address.
15   A    It's Kevin Souza. And the address is 430
16   Market Street, Winchester, Virginia. I don't know the
17   ZIP.
18   Q    Thank you. Mr. Souza, what I'm going to
19   show you now is what we're going to attach as Exhibit
20   Souza 1 to this deposition. And it's really just a
21   Notice of Deposition. Have you seen that before?
22   A    No.

---

Page 16

1    Q    Okay. Well, it's just giving notice to the
2    parties in the litigation that your deposition is
3    taking place today, and it's being used -- this
4    deposition is to be used for all purposes, and it's
5    regarding information that we'll solicit from you in
6    this litigation. And we'll attach that as Exhibit
7    Souza 1.
8        And I know you've been through this, this
9    process before. We've been here -- well, not here, in
10   Washington, D.C., taking your deposition before. But
11   for this particular record, if you could give -- just
12   give me, what is your current job title?
13   A    I am currently the Enterprise Coordination
14   and Information Management Section Chief.
15   Q    And for whom are you employed? And by whom
16   are you employed?
17   A    The FEMA Virginia NPSC, or National
18   Processing Service Center.
19   Q    And how long have you held that position?
20   A    Since May of 2008.
21   Q    Briefly, what are -- what are your job
22   duties involved with this position?

17

1  A  Well, it's essentially an information
2  management position, responsible for coordinating
3  information management, data analysis, and database
4  systems across the multiple national processing
5  service centers.
6  Q  And that job is actually located here in
7  Winchester, Virginia?
8  A  It is.
9  Q  Prior to May of 2008, were you employed by
10 FEMA?
11 A  Yes.
12 Q  What was your position?
13 A  I had --
14    MR. MILLER: Hold on. Objection, vague.
15 A  -- multiple positions.
16 BY MR. WOODS:
17 Q  Okay. Let's -- I know you've had multiple
18 positions. How long have you been employed by FEMA?
19 A  Sixteen years.
20 Q  Sixteen years. And from 16 years ago,
21 would you give me all of the job titles you've had?
22    MR. MILLER: Objection, vague, narrative.

18

1  A  I was a Disaster Assistance employee. I've
2  been an Emergency Management Program Specialist. I've
3  been a Supervisory Program Specialist. I've been an
4  executive officer. And I've been an Acting Division
5  Director.
6  BY MR. WOODS:
7  Q  I'm sorry?
8  A  Acting Division Director.
9  Q  Of what division?
10 A  Individual Assistance Division. Oh. Let
11 me restate that. I was the Acting Deputy Division
12 Director.
13 Q  And was that the last position that you
14 held prior to the current position of Enterprise
15 Coordinator --
16 A  Yes.
17 Q  -- coordination of info?
18 A  Yes.
19 Q  Okay. Is that position, Acting Deputy
20 Division Director of Individual Assistance, was that
21 the position you held in August of 2005?
22 A  No.

19

1  Q  When did you begin with that -- in that
2  position?
3  A  Probably -- approximately November of 2007.
4  Q  So that was November 2007 through May of
5  2008?
6  A  Approximately, yes.
7  Q  Before that, you said you were an executive
8  officer. Executive officer of what? What department?
9  A  Actually, immediately prior to that
10 position, I was a Supervisory Program Manager for the
11 Individual Assistance Program Management Branch.
12 Q  And what were the start and end dates of
13 that position, Supervisory Program Manager?
14 A  Approximately September of 2005 to November
15 of 2007.
16 Q  And the position immediately before that
17 particular position?
18 A  That was the executive officer position.
19 Q  Executive officer of a particular
20 department, or --
21 A  Of the Recovery Division at that point.
22 Q  And how long did you hold that position?

20

1  A  From February of 2004 until approximately
2  August or September of 2005.
3  Q  Okay. Did you attend college, Mr. Souza?
4  A  Yes.
5  Q  Did you graduate from college?
6  A  Yes.
7  Q  What college did you attend or grad --
8  which college did you graduate from and what was your
9  degree in?
10 A  Castleton State College.
11 Q  Okay.
12 A  And I was a double major in Psychology and
13 Criminal Justice.
14 Q  And when did you receive your degree?
15 A  1992.
16 Q  And where is Castleton State College?
17 A  It's in Vermont.
18 Q  Do you hold any advanced degrees?
19 A  No.
20 Q  Any special certifications?
21    MR. MILLER: Objection, vague.
22 A  No.

**Page 53**

1  assignment in this case normally would have been
2  cleared through the Gulf Coast Recovery Office to
3  perhaps the comptroller at one of the field offices
4  for approval of the funds. It usually requires a
5  general statement of the request and what's to take
6  place, and then agreement from EPA to accept the
7  mission assignment and begin the work.
8      Q   So, that's, I guess, what we would all
9  refer to as bureaucratic red tape that needs to be
10 negotiated before anything is to take -- or any
11 actions take place?
12         MR. MILLER: Objection, argumentative,
13 mischaracterizes witness' testimony.
14     A   I wouldn't characterize it as bureaucratic
15 red tape. I'm not sure how long this particular
16 mission assignment took to get approved, but in
17 general, mission assignment authority is designed to
18 be relatively quick.
19 BY MR. WOODS:
20     Q   But it still took -- once the decision was
21 made, it still took three months for anything to --
22 any testing to take place based -- basically -- based

**Page 54**

1  upon the funding issues, the logistics, the powering
2  of units --
3      A   And the scientific concerns was probably
4  the larger of all of those you just mentioned. We
5  were instructed by EPA that in order to get valid
6  results, they needed to develop a testing methodology
7  that would be scientifically sound, and they needed to
8  have that methodology reviewed by other scientific
9  peers before they could actually begin the testing.
10     Q   Do you know what scientific methodology EPA
11 used to conduct its testing?
12     A   Generally, I guess. I'm not sure what
13 you're asking.
14     Q   What -- what was their testing mechanism?
15     A   In terms of --
16        MR. MILLER: Object, vague.
17     A   In terms of the instruments they used?
18 BY MR. WOODS:
19     Q   Yes.
20     A   I don't know.
21     Q   You don't know? You don't know if they did
22 passive or active testing of units?

**Page 55**

1      A   I don't know.
2      Q   In section 11 of your declaration, the last
3  sentence, you say that FEMA began to consider various
4  response actions, including the testing of individual
5  units and the installation of vent fans. Can you tell
6  me what went into the consideration of the
7  installation of vent fans as a possible response
8  action?
9      A   What I mean here was that I recalled
10 conversations about whether or not if there was
11 formaldehyde in the units, whether or not there were
12 any structural changes we could make to a unit to help
13 ventilate them in terms of installation of vent fans.
14     Q   Okay. And was that a discussion that was
15 had with the manufacturers of the units regarding the
16 possibility of installation of vent fans?
17     A   I believe there was. I don't recall when
18 and I don't recall who.
19     Q   But obviously, installation of vent fans
20 wasn't chosen as a response action, correct?
21     A   That's correct.
22     Q   And why is that?

**Page 56**

1      A   My general recollection was that -- and
2  again, without the context of when -- at this point,
3  we weren't even sure we had a problem, but at some
4  point I believe we decided that the vent fan that
5  would need to be installed would require major
6  structural changes to the unit in terms of cutting
7  holes in the units, and external, I think they
8  characterized them as blowers, and there were going to
9  be major structural changes to the unit. And so we
10 were -- while we investigated whether or not we had an
11 issue, we tried to find other potential solutions like
12 filters or something else that may work.
13     Q   Did you know or have an idea as to what
14 would be an estimated cost for the installation of the
15 vent fans?
16     A   No.
17     Q   No? Was it a cost factor -- was cost a
18 factor in determining or deciding not to install vent
19 fans?
20     A   I don't recall.
21     Q   But -- you talked about the alteration of
22 the units, but it was a possibility to install the

Page 57

1  vent fans?
2      MR. MILLER: Objection.
3  A   Again, it was a possibility to install the
4  vent fans.
5  BY MR. WOODS:
6  Q   But for some reason, there was a decision
7  not to do such?
8  A   Correct.
9  Q   In section 12 of your declaration, at the
10 bottom of page four, last sent -- well, the sentence
11 begins, As part of. Do you see that?
12 A   Uh-huh. Yes.
13 Q   Flip over. It says, As part of my duties,
14 I served as the FEMA headquarters Individual
15 Assistance Program point of contact for
16 formaldehyde-related issues. Exactly what were your
17 duties as point of contact for formaldehyde-related
18 issues?
19 A   I don't know exactly what they were.
20 Essentially, I was asked by Mr. Garratt, who was our
21 division -- Deputy Division Director at the time, or
22 may have been Acting Division Director, to take the

Page 58

1  lead in coordinating with the field and other elements
2  of the agency, our -- our formaldehyde actions, in
3  particular, this EPA initiative that I had asked to
4  take place.
5  Q   So were you, for lack of a better term, the
6  coordinator of all of these related issues, all
7  formaldehyde-related issues?
8  A   I'll say that my office was coordinating
9  this EPA testing on behalf of headquarters
10 IA division.
11 Q   And what was your understanding as to OGC's
12 role in the coordination of the related --
13 formaldehyde-related issues?
14 A   They became one of multiple players in the
15 formaldehyde actions that we were taking.
16 Q   But what is your understanding as to
17 specifically why OGC was involved?
18 A   Oh. There was litigation or pending
19 litigation regarding formaldehyde, and so they wanted
20 to be kept in the loop.
21 Q   And whom from OGC asked to be kept in the
22 loop?

Page 59

1  A   Rick Preston. I believe I saw E-mails from
2  Jordan Fried and Jill Igert, who was a field attorney
3  at that time.
4  Q   We've had testimony from other individuals
5  that there were bi-weekly or twice-monthly telephone
6  conferences regarding the formaldehyde issues and
7  concerns. Were you a part of those telephone
8  conversations?
9  A   I think I sat in on a couple of them.
10 Q   Do you recall Mr. Preston participating in
11 those conferences?
12 A   The one that I -- the one or two that I sat
13 in on, yes, I think he was present.
14 Q   And again, you believe that OGC,
15 Mr. Preston in particular, was involved because of
16 litigation concerns?
17 A   Yes.
18 Q   Did Mr. Preston or anyone from OGC ever
19 suggest a plan of action in responding to occupant
20 concerns?
21     MR. MILLER: I'm going to object, and I'm
22 going to instruct the witness not to answer except to

Page 60

1  the extent it relates to communications during these
2  bi-monthly or bi-weekly telephone calls.
3  A   I don't recall the specific phone calls,
4  the topics of the phone calls.
5  BY MR. WOODS:
6  Q   Any specific E-mails?
7  A   In regards to --
8  Q   Any plans of action suggested by anyone
9  from OGC.
10 A   I recall an E-mail from Rick Preston saying
11 that --
12     MR. MILLER: Hold on one minute.
13     MR. WOODS: What's going on?
14     MR. MILLER: I just -- I need to consult
15 with the witness. I need to find out what he's going
16 to talk about before I determine whether I need to
17 object, counsel.
18     MR. WOODS: We're in the middle of a --
19     MR. MILLER: It's in determination of
20 whether the question is privileged. I'm allowed to
21 consult with my client at that point, counsel. Do you
22 understand that?

VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009

16 (Pages 61 to 64)

**Page 61**

1    (Counsel conferred with the witness.)
2    MR. MILLER: Go ahead and answer the
3    question.
4    A   There was an E-mail from Rick Preston where
5    he agreed that testing should be done, but he wanted
6    to make sure we had a -- that the program side of the
7    house had a course of action laid out before we
8    started.
9    BY MR. WOODS:
10   Q   What was -- why -- what did you understand
11   to be his concern for the program side having a course
12   of action set up?
13   A   His concern, quite frankly, was already one
14   of the program concerns, which is, if we started
15   testing with EPA, and the results came back requiring
16   us to take action, what would that action be? His
17   concern was pretty much that we have a plan of action
18   before we begin the concern. At least that's how I
19   understood his concern.
20   Q   So you understood his concern to wait, not
21   perform testing until there is an appropriate plan of
22   action?

**Page 62**

1    A   I believe that was his concern, yes.
2    Q   Did it not concern you, sir, that
3    individuals were complaining about formaldehyde
4    emissions while FEMA and its lawyers took time to come
5    up with an appropriate plan of action in response to
6    if there were actual elevated levels?
7    MR. MILLER: Hold on a minute. Can you
8    re-read that question back?
9    (Last question was read back by the
10   reporter.)
11   MR. MILLER: Objection. Assumes facts not
12   in evidence, mischaracterizes the witness' testimony,
13   and is vague as to time.
14   A   As I mentioned, those were Rick's concerns,
15   or OCC's concerns. My position as the program officer
16   was that the testing would proceed forward, and that
17   we would develop the plan of action simultaneously
18   with getting the testing underway.
19   BY MR. WOODS:
20   Q   Okay. So, once Rick was -- Rick Preston
21   was okay with a plan of action in response to possible
22   elevated formaldehyde emission levels, then the

**Page 63**

1    testing would be allowed to commence, correct?
2    MR. MILLER: Objection. Mischaracterizes
3    witness' testimony, assumes facts not in evidence.
4    And I want to make it very clear the E-mail that the
5    witness is talking about is that June 15th, 2006,
6    E-mail that's been released by Congress.
7    A   No. And to be frank, I felt the decision
8    was mine to make in coordination with the program
9    leadership, Mr. Garratt. So, I was not overly
10   concerned with Rick's concerns. He made a good and --
11   what I considered to be a good and valid point in
12   terms of a course of action, but we had already
13   considered it, and the decision was made that we were
14   moving forward, and we did.
15   BY MR. WOODS:
16   Q   But you did consider his concerns?
17   A   Like I said, we had already considered his
18   concerns. It was already one of our concerns.
19   Q   Litigation?
20   MR. MILLER: Objection, mischaracterizes
21   witness' testimony.
22   A   No. What I saw in his E-mail was that he

**Page 64**

1    was concerned that we have an appropriate course of
2    action before we begin testing. That's what I'm
3    referencing.
4    BY MR. WOODS:
5    Q   Between Mr. Preston's E-mail, I believe, of
6    June 15, 2006, when was an appropriate, or what FEMA
7    considered an appropriate plan of action developed and
8    formalized?
9    MR. MILLER: I'm going to object, vague.
10   Go ahead.
11   A   I don't -- I don't recall that we ever
12   developed an actual written plan, although there may
13   have been one. The discussions began immediately in
14   terms of possible options given the various results
15   that we may get back.
16   BY MR. WOODS:
17   Q   But meanwhile, while all of these
18   discussions are going on between Mr. Preston or any
19   other member of OGC and FEMA, there were complaints
20   that were still being received from occupants about --
21   or concerns about formaldehyde emissions, correct?
22   MR. MILLER: Object. One, vague as to

**Page 65**

1  time, two, mischaracterizes witness' testimony, and
2  three, assumes facts not in evidence.
3  A    I don't know.
4  BY MR. WOODS:
5  Q    You don't know of any complaints or
6  concerns that were being voiced by occupants during
7  this time?
8       MR. MILLER: Objection, vague, time.
9  A    Yeah, I don't know when the complaints came
10 into the maintenance line.
11 BY MR. WOODS:
12 Q    But you knew that concerns had been raised,
13 according to your declaration in, I believe, April or
14 May of 2006, correct?
15      MR. MILLER: I'm sorry. What are you
16 referring to, counsel? Ten?
17      MR. WOODS: Yes.
18 A    Yes.
19 BY MR. WOODS:
20 Q    And those concerns went unanswered and
21 unaddressed until an appropriate plan of action was
22 developed between OGC and FEMA?

**Page 66**

1       MR. MILLER: Objection, mischaracterizes
2  witness' testimony, assumes facts not in evidence.
3  A    No, I don't believe that that's the case.
4  I think they were addressed at the field level.
5  Q    How so?
6       (Mr. Maggio exited the room.)
7  A    My understanding is that they advised
8  applicants to ventilate the units, and there may have
9  actually been some site visits conducted by housing
10 specialists.
11 BY MR. WOODS:
12 Q    Was that a programatic response?
13 A    Yes.
14 Q    In paragraph 15, or section 15 of your
15 declaration, in your last sentence, you talk about
16 Mr. Haynes and Mr. McNeese. You say, Mr. Haynes and,
17 later, Mr. McNeese reported to me on a regular basis
18 regarding the status of the testing project --
19 project, and if they deemed it appropriate, would seek
20 my direct involvement in conference calls and seek my
21 assistance in resolving issues of concern.
22      First of all, who's Mr. Haynes and who's

**Page 67**

1  Mr. McNeese?
2       MR. MILLER: I'm going to object, compound.
3  A    Tracy Haynes and Martin McNeese were other
4  Individual Assistance Program Specialists.
5  BY MR. WOODS:
6  Q    And what were they tasked to do?
7  A    At first --
8       MR. MILLER: Actually, hold on. Vague and
9  narrative.
10 A    At first, Tracy Haynes was in the field,
11 still in Louisiana, and I had asked him to help me
12 coordinate some of the aspects from the field office.
13 And then I can't remember when, but I asked Martin
14 McNeese to come into FEMA headquarters, I think it was
15 FEMA headquarters, to help us get this testing off the
16 ground.
17 BY MR. WOODS:
18 Q    So, basically, if I read your last sentence
19 properly in section 15, you said that, Mr. Haynes and,
20 later, Mr. McNeese reported to me on a regular basis
21 regarding the status of the testing project, and if
22 they deemed it appropriate, would seek my direct

**Page 68**

1  involvement. Does that mean, sir, that Mr. Haynes and
2  Mr. McNeese were tasked with the testing project and
3  only if some important issue were to -- were to result
4  or occur, then they would consult you?
5  A    Yes. I delegated the responsibility to
6  them to get the testing underway.
7  Q    You said that, They would seek my direct
8  involvement in conference calls and seek my assistance
9  in resolving issues of concerned -- of concern. I
10 know this was back in July of 2006, but do you recall
11 any conference calls with Mr. Haynes or Mr. McNeese
12 required to resolve issues of concern?
13 A    I -- generally, I think I recall Martin
14 sent me an E-mail about -- I think it was EPA concerns
15 about the discussions about the levels that we were
16 going to use or potentially could be used in the
17 units, and EPA's general concern that those unit --
18 that those -- that the units that they were going to
19 test were going to be above those unit levels, and
20 there was discussion on how we wanted to proceed in
21 terms of a particular level.
22 Q    When you say unit level, what are you

VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009

22 (Pages 85 to 88)

Page 85

1  BY MR. WOODS:
2     Q    The next document I'm handing to you is
3  labeled Souza 4, Exhibit 4. For identification
4  purposes, it has a FEMA Bates number of FEMA 17-008999
5  through FEMA 17-009007. And it's also, apparently was
6  produced as part of the Waxman report. And Mr. Souza,
7  if you would -- I understand it's a series of E-mails,
8  but I want to take -- concentrate on one particular
9  E-mail in the string. Well, actually two. If you
10 would turn to page two. And at the bottom of page
11 two, it's an E-mail from Harvey E. Johnson to Jeff
12 Runge and CCing various other people. You're one of
13 the CCed individuals on this document. What did you
14 understand -- in receiving this E-mail from Harvey
15 Johnson, what did you understand his role to be in the
16 formaldehyde response, for lack of a better term,
17 program?
18        MR. MILLER: Objection, vague, assumes
19 facts not in evidence.
20    A    The deputy administrator?
21 BY MR. WOODS:
22    Q    Yes.

Page 86

1     A    What did I perceive his role to be? As the
2  deputy administrator, I suppose any ultimate decisions
3  on how to proceed may have been his as they elevated
4  up to his level as necessary.
5     Q    So he would be the ultimate decision-maker,
6  wouldn't he?
7     A    For any decision that was elevated to him
8  for consideration. In other words, he was delegating
9  this to Dave Garratt and also to me. So I think his
10 expectation was that we would handle this. But
11 ultimately, if we had questions and brought them to
12 him, that he would be the ultimate decision-maker.
13    Q    But in the, let's say in the organizational
14 chart, he would be the one that would have assumed the
15 ultimate responsibility for the formaldehyde response,
16 correct?
17        MR. MILLER: Objection. Mischaracterizes
18 the witness' testimony, assumes facts not in evidence.
19    A    I don't know that.
20 BY MR. WOODS:
21    Q    But in the organizational chart, he is a
22 position above you, correct? He would have -- he

Page 87

1  is --
2     A    He -- he is above me certainly and he's
3  above Mr. Garratt. But he answered to Administrator
4  Paulison who adminis -- who answered to the Deputy
5  Secretary, who answered to the Secretary. So I don't
6  know that he would ultimately have absolute
7  decision-making authority in the formaldehyde, but --
8     Q    All right. But you would answer to him?
9     A    Yes.
10    Q    And when you say that Admiral Johnson would
11 have that authority, did he ever exercise that
12 authority over you?
13    A    Yes.
14    Q    If you would, if you turn to that first
15 page of those E-mails, and there's one from you dated
16 Thursday, May 17, 2007, to David Garratt, John
17 Philbin, Adrian Sevier, and Dan Shulman, and CCing
18 other individuals. And it's regarding the CBS evening
19 news on formaldehyde in FEMA trailers. Do you see
20 that E-mail?
21    A    Yes.
22    Q    Okay. It says, Dave, I am out of the

Page 88

1  office today and do not have ready access to these
2  materials. You go on to say, Public Affairs, OCC and
3  OLA have all been extensively involved in this process
4  as a result of litigation, Congressional inquiries,
5  and other media reports. You go on to say, Am
6  requesting by way of this E-mail that they provide you
7  with all related press releases, talking points,
8  Congressional responses (QFRs and letters) and
9  litigation findings. What type of litigation findings
10 were you requesting?
11        MR. MILLER: I'm going to instruct the
12 witness to answer the question, except not to disclose
13 the information contained inside those -- within those
14 documents on the grounds that it's privileged.
15        Go ahead.
16    A    In general, what I meant by this E-mail was
17 the status of any of the litigation findings
18 previously that may have occurred, or an update on the
19 status of where current pending litigation was, and
20 maybe any associated materials that we had collected
21 along the way in response to those, those litigations.
22 BY MR. WOODS:

Page 89

1  Q  And when you say that Public Affairs, OCC
2  and OLA have all been extensively involved in the
3  process, in this process, again, explain to me how
4  extensively involved OCC was in the process.
5      MR. MILLER: Objection, vague.
6  A  All I meant by what I said here was that
7  people like Rick Preston and others had been parts of
8  conference calls, and they had looked at documents
9  that were created from a -- from the legal
10 perspective, and they had been one of the players who
11 had been involved from a very early stage.
12 BY MR. WOODS:
13 Q  And it was your understanding that they
14 were involved, again, because of the pending
15 litigation?
16 A  Right.
17 Q  Would you have expected OCC to be involved
18 if there weren't pending litigation?
19 A  Possibly.
20 Q  Why do you say that?
21 A  At the program level, it's not unusual if
22 I, for example, were to anticipate that it's possible

Page 90

1  that legal action may result as a pro -- as a result
2  of a program decision I was considering making, I may
3  seek their counsel on the risks associated with the
4  course of action I was considering taking.
5  Q  In this particular response, formaldehyde
6  response, was there any program action that you were
7  taking that would have, you thought, should have
8  received OCC review?
9  A  Can you drill down a little bit in the
10 question?
11 Q  Now, you say that as a result of a program
12 decision that you were considering making, you may
13 seek their counsel on the risks associated with the
14 course of action you were considering taking. So in
15 this particular response effort, formaldehyde response
16 effort, was there any action that you were considering
17 taking that you thought would require OCC review?
18     MR. MILLER: Object, vague as to time, and
19 also instruct the witness not to disclose any such --
20 the nature of any actual such discussions or
21 conversations with OCC. Go ahead.
22 A  Given the pending litigation, again,

Page 91

1  general practice is if there's pending litigation,
2  that we keep them informed of just about everything
3  that we're actually doing so that they're informed of
4  it.
5  BY MR. WOODS:
6  Q  So because of the pending litigation,
7  any -- the actions that you considered, or action
8  plans that were developed required OCC review?
9      MR. MILLER: Objection, mischaracterizes
10 the witness' testimony.
11 A  I don't know if they required review, but
12 they were included from an informational perspective
13 at least, yeah.
14 BY MR. WOODS:
15 Q  And they were given -- giving their input?
16 A  They were providing their, their legal
17 counsel, yes.
18     (Exhibit Souza 5 was marked for
19 identification and attached to the transcript.)
20 BY MR. WOODS:
21 Q  Next document I'm handing you is going to
22 be labeled Exhibit Souza 5. And for identification

Page 92

1  purposes, it's produced in this litigation, it's Bates
2  label FEMA 17-008762 through FEMA 17-008764. Again,
3  it's a series of E-mails, and I just want to pay
4  attention right now to the top E-mail on page one.
5  It's from Kevin Souza to Tod Wells and David Garratt,
6  CCing other individuals. It's dated May 17, 2007,
7  regarding formaldehyde issues. It's to Tod. Tod,
8  check with the safety folks in Logistics. I seem to
9  recall something about staging area safety, K.
10     What do you recall about this staging area
11 safety with regard to formaldehyde?
12     MR. MILLER: And I'm going to instruct the
13 witness, you can review the entire document if you
14 need to to make you comfortable with the part before
15 you answer that question, if you believe it's
16 necessary.
17 A  I think when I wrote this, I was
18 referencing -- I think at the time I recalled seeing
19 some E-mails about, I don't know if it was the Bonner
20 analytical testing or some other testing that was done
21 at a staging area. I recalled seeing some E-mails or
22 something like that, and I knew that they were from

**141**

1 trailers as a temporary house -- emergency housing
2 option to bridge the gap between living in a tent and
3 moving into more permanent housing?
4   A   Yes.
5       MR. WOODS: Object to the form of the
6 question.
7 BY MR. SCANDURRO:
8   Q   What was your answer, sir?
9   A   Yes.
10  Q   And am I correct that what you referred to
11 as formaldehyde round two in 2007 was triggered by a
12 physician somewhere on the Gulf Coast who raised a
13 question as to whether or not there might be some
14 association between travel trailers and illnesses?
15  A   Yes.
16  Q   Was there a particular concern about
17 children illnesses?
18  A   Yes. I think he was a pediatrician and it
19 was related to children.
20  Q   And I noted that Mr. Garratt, your
21 superior, said he felt like you guys ought to
22 investigate the doctor's claims; is that right?

**142**

1   A   Yes.
2   Q   But did you also feel as he did, that the
3 doctor's claims seemed to be inconsistent with or
4 possibly refuted by the ATSDR report from earlier that
5 year?
6       MR. WOODS: Objection, lack of foundation,
7 assumes facts not in evidence.
8       MR. MILLER: Join.
9   A   I wouldn't say that they contradicted or
10 refuted, but that they warranted additional
11 investigation.
12 BY MR. SCANDURRO:
13  Q   Okay. Did -- are you aware of the fact
14 that the CDC, in fact, did do an initial study of
15 children's medical visits in Hancock County,
16 Mississippi?
17  A   I wasn't aware of that.
18  Q   Okay.
19      MR. SCANDURRO: I have no further
20 questions. Thanks.
21      MR. MILLER: I have some questions to
22 follow up here on.

**143**

1       EXAMINATION BY COUNSEL FOR THE UNITED STATES
2                    GOVERNMENT
3 BY MR. MILLER:
4   Q   Mr. Souza, my name is Henry Miller, and I
5 represent the United States which is a defendant in
6 this litigation. You were just asked some questions
7 about FEMA's plan at the time of the response, and how
8 this included sort of a three-prong approach. Were
9 travel trailers FEMA's initial choice for the
10 temporary emergency housing, or were there alternative
11 housing methods that were considered?
12  A   We had talked about using manufactured
13 homes or mobile homes as, as the initial going-in
14 position.
15  Q   Was a decision made -- well, what was
16 decided?
17  A   The decision was made to use travel
18 trailers as opposed to mobile homes.
19  Q   Were you involved with that decision-making
20 process? Actually, let me rephrase it. Do you
21 have -- did you -- do you have knowledge of that
22 decision-making process?

**144**

1   A   Yes.
2   Q   And how do you have that knowledge?
3   A   As part of the housing area command, there
4 were discussions about what types of units we could
5 use and where we could place them.
6   Q   And what is your understanding why the
7 decision was made to use travel trailers as opposed to
8 manufactured housing or mobile homes as the primary
9 temporary emergency housing response for Hurricane
10 Katrina victims and Hurricane Rita disaster victims?
11  A   My recollection was that we were going to
12 use mobile homes, but because of the size of mobile
13 homes and the quantity in which we needed them, the
14 areas available to us to put those mobile homes were
15 outside of the impacted areas. In other words, they
16 were outside of the areas of New Orleans, and really
17 not even a practical solution in the immediate
18 vicinity of Baton Rouge. They would have to be
19 probably even further north than that. And when we
20 made this proposal to the state, concerns were raised
21 that people wanted to live closer to their impacted
22 homes, if they were homeowners, so that they could

**145**

begin making immediate repairs. There were concerns that rebuilding the community in terms of businesses and economic stability and re-invigorating the economy, that putting people that far away from those impacted areas would not be a preferable solution.

Q   Were there discussions about the effects that this may have on the future demographics of New Orleans? Population makeup of New Orleans?

A   There were discussions about demographics, but I don't specifically recall whether or not they were in regards to the mobile home or travel trailer discussion versus people moving out of the state discussion.

Q   Was there a concern that if you used mobile homes as opposed to travel trailers, that many of the people, because they'd have to be placed farther away from New Orleans or Baton Rouge, that they may not eventually move back to New Orleans?

MR. WOODS: Objection, lack of foundation.

A   Yes, there were those concerns.

BY MR. MILLER:

Q   Mr. Woods, plaintiffs' counsel, asked you

**146**

some questions relating to what response actions FEMA would have taken -- well, let me step back and rephrase this.

There were some questions that related to the testing that was done by the EPA, and what response actions would come back if that testing came back and the results suggested that the levels of concern was much lower than .3 PPM, and venting was not an effective solution. Do you recall that?

A   Yes.

Q   Did -- did FEMA work up or consider or discuss what were the possible contingency plans of what action it would take if such results came back negatively or adversely or -- actually, let me step back. What were those discussions between July -- or June of 2006 and December of 2006? Were there discussions regarding that matter?

A   At the program level, we were discussing if the results came back from EP -- EPA and CDC and they came back and told us that the results that they had were of concern, and that we needed to take action as a result of the, of the findings, obviously, we had

**147**

over a hundred thousand families in these units. The reason that they were in the units was because there were no immediate or surrounding other adequate alternate housing solutions. And so if we couldn't use those units and we had to get people out quickly, there was general mutual agreement that the only real viable solution available to us was to move people out of the immediate impacted area and most likely out of the state altogether to available rental units that were already available elsewhere in the country.

Q   I want to ask you to refer to Exhibit Number 3 that I'm providing you here marked by plaintiffs' counsel, and it's a document which is Bates stamped FEMA 17-015068. And Mr. Woods, the plaintiffs' counsel, asked you some questions about the second E-mail on that page, which was an E-mail from yourself to Mr. Garratt and several other people dated May 16th, 2007. And it said, Our test focused on reducing F-mald emissions. .I think by F-mald, you were talking formaldehyde?

A   Yes.

Q   And what I wanted to focus on this

**148**

question, the use of the word focus. Not only was it on reducing formaldehyde emissions, but you also were trying to determine what was the baseline level of concern; isn't that correct?

MR. WOODS: Object to the form of the question.

BY MR. MILLER:

Q   Well, what were all of the issues that you were relying upon that study to supply you information on?

MR. WOODS: Objection, asked and answered.

A   Yeah, I --

MR. MILLER: Wait, hold on. Let me respond to that. I have not asked that question before, and therefore I get to ask the question. Go ahead.

MR. WOODS: Same objection.

A   We were trying to reduce the formaldehyde emissions. But as part of that reduction, we were asking for, reduce them to what level? What level would be safe for occupants to stay in the units essentially?