```
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF LOUISIANA

 3                    NEW ORLEANS DIVISION

 4   In Re:  FEMA Trailer        )

 5   Formaldehyde Products       ) MDL No. 1873

 6   Liability Litigation        )

 7

 8                              Washington, D.C.

 9                              Tuesday, July 7, 2009

10   Videotape Deposition of DAVID EDWARD GARRATT, called

11   for examination by counsel for Plaintiffs in the

12   above-entitled matter, the witness being duly sworn

13   by CHERYL A. LORD, a Notary Public in and for the

14   District of Columbia, taken at the offices of NELSON

15   MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16   Avenue N.W., Suite 900, Washington, D.C., at 9:07

17   a.m., and the proceedings being taken down by

18   Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22
```

David Edward Garratt  
Washington, DC  
July 7, 2009

### Page 2

APPEARANCES:

Plaintiffs' Co-Liaison Counsel:
  JUSTIN I. WOODS, ESQ.
  GERALD E. MEUNIER, ESQ.
  TARA GILBREATH, ESQ.
  GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
  WARSHAUER, LLC
  1100 Poydras, Suite 2800
  New Orleans, LA 70163-2800
  (504) 522-2304

On behalf of the United States of America and David E. Garratt:
  HENRY T. MILLER, ESQ.
  Senior Trial Counsel
  UNITED STATES DEPARTMENT OF JUSTICE
  1331 Pennsylvania Avenue, N.W.
  Washington, D.C. 20004
  (202) 616-4223

### Page 3

APPEARANCES CONTINUED:

On behalf of the United States Federal Emergency Management Agency:
  JANICE WILLIAMS-JONES, ESQ.
  Trail Attorney
  JORDAN FRIED, ESQ.
  Deputy Chief
  UNITED STATES FEDERAL EMERGENCY MANAGEMENT AGENCY
  OFFICE OF THE CHIEF COUNSEL
  409 3rd Street S.W., Suite 206
  Washington, D.C. 20472
  (202) 646-4168

On behalf of Forest River Inc.:
  JASON D. BONE, ESQ.
  GIEGER, LABORDE & LAPEROUSE LLC
  701 Poydras Street, 48th Floor
  New Orleans, LA 70139-4800
  (504) 561-0400

### Page 4

APPEARANCES CONTINUED:

On behalf of Keystone RV Company, Dutchmen Manufacturing Inc., DS Corp., Thor California Inc., and KZ RV, LP:
  RYAN E. JOHNSON, ESQ.
  JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
  DENEGRE LLP
  8555 United Plaza Boulevard
  Baton Rouge, LA 70809-7000
  (225) 248-2080

On behalf of Fluor Enterprises Inc.:
  CHARLES R. PENOT JR., ESQ.
  MIDDLEBERG RIDDLE & GIANNA
  717 N. Harwood, Suite 2400
  Dallas, TX 75102
  (214) 220-6334

### Page 5

APPEARANCES CONTINUED:

On behalf of Fleetwood Enterprises Inc.:
  TAYLOR TAPLEY DALY, ESQ.
  NELSON MULLINS RILEY & SCARBOROUGH LLP
  201 17th Street N.W., Suite 1700
  Atlanta, GA 30363
  (404) 322-6156

On behalf of Gulf Stream Coach Inc.:
  TIMOTHY D. SCANDURRO, ESQ.
  SCANDURRO & LAYRISSON LLC
  607 St. Charles Avenue
  New Orleans, LA 70130
  (504) 522-7100

On behalf of Bechtel National Inc.:
  JOHN J. HAINKEL III, ESQ.
  FRILOT LLC
  1100 Poydras Street, Suite 3700
  New Orleans, LA 70163-3600
  (504) 599-8021

Page 6

1   APPEARANCES CONTINUED:
2
3   On behalf of Heartland Recreational Vehicles:
4       BRENT M. MAGGIO, ESQ.
5       ALLEN & GOOCH, A LAW CORPORATION
6       3900 N. Causeway Boulevard, Suite 1450
7       Metairie, LA 70002
8       (504) 836-5200
9
10  On behalf of Recreation by Design LLC, TL Industries
11  Inc., Frontier RV Inc., and Play'mor Trailers Inc.
12      RANDALL C. MULCAHY, ESQ.
13      GARRISON, YOUNT, FORTE & MULCAHY LLC
14      909 Poydras Street, Suite 1800
15      New Orleans, LA 70112
16      (504) 527-0680
17      Appearing by telephone

Page 7

1   APPEARANCES CONTINUED:
2
3   On behalf of Starcraft RV Inc. and Jayco Inc.:
4       HAL L. ROACH JR., ESQ.
5       WILLINGHAM, FULTZ & COUGILL LLP
6       808 Travis, Suite 1608
7       Houston, TX 77002
8       (713) 333-7600
9       Appearing by telephone
10
11  On behalf of CMH Manufacturing Inc., Southern Energy
12  Homes, SunRay Investments LLC, and Giles Family
13  Holdings LLC:
14      JAMES K. CARROLL, ESQ.
15      FOWLER RODRIGUEZ VALDES-FAULI
16      400 Poydras Street, 30th Floor
17      New Orleans, LA 70130
18      (504) 523-2600
19      Appearing by telephone

Page 8

1   APPEARANCES CONTINUED:
2
3   On behalf of Shaw Environmental Inc. and CH2M Hill
4   Constructors Inc.:
5       CATHERINE THIGPEN, ESQ.
6       BAKER, DONELSON, BEARMAN, CALDWELL &
7       BERKOWITZ PC
8       201 St. Charles Avenue, Suite 3600
9       New Orleans, LA 70170
10      (504) 566-5241
11      Appearing by telephone
12
13  On behalf of Morgan Building and Spas:
14      DAN E. WEST, ESQ.
15      McGLINCHEY STAFFORD PLLC
16      301 Main Street, 14th Floor
17      Baton Rouge, LA 70825
18      (225) 383-9000
19      Appearing by telephone
20  ALSO PRESENT:
21      Qais Ghafary, Charles "Al" Whitaker in PM
22      session only, and Dan Reidy, videographer

Page 9

1                   CONTENTS
2   WITNESS                     EXAMINATION
3                               PAGE NO.
4   DAVID EDWARD GARRATT
5       By Mr. Woods                 13
6       By Mr. Meunier               71
7       By Mr. Scandurro             203
8       By Mr. Hainkel               218
9       By Mr. Miller                228
10      By Mr. Meunier               234
11      By Mr. Miller                242
12
13              EXHIBITS
14          (Exhibits attached.)
15  GARRATT EXHIBIT NO.             PAGE NO.
16  1   Notice of Oral and Videotaped
17      Deposition of David Garratt        14
18  2   Defendant United States of
19      America's Motion to Dismiss
20      Plaintiffs' Remaining FTCA Claims
21      for Lack of Subject Matter Jurisdiction   27
22  3   Email, 8-17-06, FEMA-Waxman-2489-93       50

Page 10

1              EXHIBITS CONTINUED
2     GARRATT EXHIBIT NO.                    PAGE NO.
3
4     4   Letter, FEMA17-010962-63              58
5     5   Email, 5-18-07, DHS_S&T_6040-44       64
6     6   Email, 6-27-06, FEMA-Waxman - 791-92  143
7     7   Email, 5-17-07, FEMA17-0009030-33     160
8     8   Email, 5-18-07, DHS_S&T_4856-57       166
9     9   Email, 5-23-07, DHS_S&T_3702-03       174
10    10  Email, 5-25-07, FEMA17-006442-58      177
11    11  Email, 6-4-07, FEMA17-009258          185
12    12  Email, 6-5-07, FEMA17-009327          188
13    13  Email, 6-8-07, FEMA17-009411-12       194
14    14  Email, 11-2-07, FEMA17-013853-54      196
15    15  Email, 7-30-07, FEMA17-015474-76      198
16    16  Email, 8-18-07, DHS_S&T_4060-62       203
17    17  Memorandum, 7-26-06, FEMA-Waxman
18        - 23-25                              213
19    18  Email, 7-30-07, FEMA17-015472-73     240
20
21
22

Page 11

1              PROCEEDINGS
2
3        THE VIDEOGRAPHER: This begins tape number
4    1 in the video deposition of David Garratt, taken by
5    the plaintiff in regards to the FEMA trailer
6    formaldehyde products liability litigation filed in
7    the U.S. District Court, Eastern District of
8    Louisiana, number MDL 1873.
9        Today's deposition is being held at the
10   law offices of the Nelson Mullins, 101 Constitution
11   Avenue N.W., suite 900, Washington, D.C., 20001.
12       For identification purposes, I'm Dan
13   Reidy, the video operator, with Alderson Court
14   Reporting. The stenographer is Cheryl Lord, also
15   with Alderson Court Reporting.
16       Today's date is July it 7th, 2009. The
17   time on the video is 9:07 AM. We are on the record.
18       At this time, will all counsel please
19   introduce yourself and whom you represent, starting
20   with the plaintiffs' counsel, please.
21       MR. WOODS: Justin Woods, for plaintiffs.
22       MR. MEUNIER: Gerry Meunier, for

Page 12

1    plaintiffs.
2        MR. BONE: Jason Bone, Forest River
3    Incorporated.
4        MR. JOHNSON: Ryan Johnson, for Keystone
5    RV, Thor California, Dutchmen Manufacturing, DS
6    Corp., KZ RV.
7        MS. DALY: Taylor Daly for the Fleetwood
8    defendants.
9        MR. PENOT: Charles Penot, for Fluor
10   Enterprises Inc.
11       MR. MAGGIO: Brent Maggio, for Heartland
12   Recreational.
13       MR. HAINKEL: John Hainkel, for Bechtel
14   National Inc.
15       MR. SCANDURRO: Tim Scandurro, for Gulf
16   Stream Coach.
17       MS. GILBREATH: Tara Gilbreath, for the
18   plaintiffs.
19       MR. MILLER: Henry Miller, for the United
20   States.
21       MR. GHAFARY: Qais Ghafary, for the United
22   States.

Page 13

1        THE VIDEOGRAPHER: Will the court reporter
2    please swear in the witness.
3
4    Whereupon,
5        DAVID EDWARD GARRATT
6    was called as a witness by counsel for Plaintiffs,
7    and, having been duly sworn by the Notary Public, was
8    examined and testified as follows:
9
10       EXAMINATION BY COUNSEL FOR PLAINTIFFS
11   BY MR. WOODS:
12       Q.  Good morning, Mr. Garratt.
13       Again, my name is Justin Woods. I'm
14   counsel for the plaintiffs in this MDL litigation,
15   along with Gerry Meunier and Tara Gilbreath from --
16   from our office of Gainsburgh, Benjamin in New
17   Orleans.
18       First I want to start just some
19   administrative task, and that is to -- I want to ask
20   you if you've seen this notice of oral and videotape
21   deposition of David Garratt.
22       A.  No, I don't recall seeing this.

Page 14

1  Q.  Okay. What it is is basically a notice to
2  all counsel that we're taking your deposition. The
3  plaintiffs are taking your deposition today, July 7,
4  2009.
5      Now, I had an understanding before we went
6  officially on the record that Garratt is spelled
7  G-A-R-R-A-T-T.
8  A.  Correct.
9  Q.  The notice has -E-T, so I'll just make
10 that correction to the notice if there's no
11 objection.
12     And we'll mark as Garratt 1 the notice of
13 deposition.
14         (Garratt Exhibit No. 1
15          was marked for
16          identification.)
17     MR. MILLER: Everybody, please mute your
18 telephones if you're listening on-line.
19     Thank you.
20     BY MR. WOODS:
21 Q.  Mr. Garratt, could you tell us what
22 position you hold currently?

Page 15

1  A.  Acting deputy administrator of the Federal
2  Emergency Management Agency.
3  Q.  Could you give us a brief description of
4  what your duties are as acting deputy.
5  A.  Basically to manage the Federal Emergency
6  Management Agency and support the administrator in
7  the management of the agency.
8  Q.  When you say, support that admin -- the
9  administrator, who is currently the administrator?
10 A.  W. Craig Fugate.
11 Q.  And how long have you held your position
12 as acting deputy director?
13 A.  Since January 21st.
14 Q.  Of?
15 A.  2009.
16 Q.  And prior to January 21st, 2009, what was
17 your job title?
18 A.  Deputy assistant administrator of disaster
19 assistance.
20 Q.  And how long did you hold that position?
21 A.  On and off since May of 2005.
22 Q.  And what were your duties involved in that

Page 16

1  position?
2  A.  Managing the programs and responsibilities
3  of that directorate, supporting the -- either
4  recovery director or assistant administrator in that
5  capacity.
6  Q.  I just want to go back for a second.
7      You said W. Craig Fugate is the --
8  A.  -- administrator.
9  Q.  -- administrator.
10     Who does Mr. Fugate report to?
11 A.  Secretary Napolitano, the Department of
12 Homeland Security.
13 Q.  And how long has Mr. Fugate been
14 administrator?
15 A.  Approximately a month and a half. I don't
16 remember the exact date that he was confirmed and
17 came on board.
18 Q.  So all of these -- your position as acting
19 deputy director and Mr. Fugate's position as
20 administrator, is that current because of the change
21 in administration to the Obama administration?
22 A.  I'm in this position because the outgoing

Page 17

1  administration -- the politicals (phonetic) in the
2  administration now left the agency. Mr. Fugate came
3  on board as the new political administrator for the
4  agency.
5  Q.  Okay. You said you've held the position
6  as deputy administrator on and off for a period since
7  May of 2005.
8  A.  Deputy assistant administrator, and during
9  a part of that time as the deputy director. There's
10 been a title change within that organization since
11 2005. Responsibilities are the same. Title's
12 changed.
13 Q.  Okay. Prior to May of 2005, what was your
14 job position?
15 A.  I was the acting director of preparedness.
16 Q.  And how long did -- when were you
17 appointed to that position?
18 A.  It was either December or January of two
19 thousand and -- either December of 2004 or January of
20 2005.
21 Q.  So you held that position from January of
22 2005 to May of 2005?

Page 42

1  performance requirements.
2      Q.  Okay. Specifically, what were the
3  provisions of the contract in how they were to
4  respond to complaints?
5      A.  I think they had to respond within a
6  specific period of time to every complaint that was
7  received. Beyond that, I'm not sure what the
8  performance provisions are of the contracts.
9      Q.  You go on to state in section 5 that:
10 Mr. Kevin Souza -- who you've already mentioned --
11 took the lead for working this issue, and sometime in
12 late June, he briefed me regarding his recommendation
13 for dealing with the assertions regarding elevated
14 levels of formaldehyde in EHUs.
15     You further state that: He also
16 recommended that the testing should be conducted by
17 an independent federal agency with experience in such
18 matters, and further recommended the environmental
19 protection agency.
20     Specifically, what testing was Mr. Souza
21 talking about?
22     What was your understanding of what

Page 43

1  testing needed to take place?
2      A.  Essentially validation testing. Sierra
3  Club had just released a report that asserted that
4  the levels of formaldehyde, emitted formaldehyde in
5  some number of units that they had testing were very
6  high. What we wanted was corroborative evidence to
7  that effect.
8      Didn't know what -- for example at the
9  time and none of us were or are formaldehyde or
10 industrial hygiene experts, know what scientific
11 basis Sierra Club used to -- to come up with -- with
12 their assertions.
13     And what we wanted was validation, so we
14 wanted an independent credible third party to go in
15 and essentially tell us that either Sierra Club was
16 on the mark or that they weren't.
17     Q.  And so you further state that you agree
18 with Mr. Souza's recommendation and advised him to
19 issue a safety notice to occupants and engage with
20 the EPA to commence testing.
21     What was the safety notice that was issued
22 to occupants?

Page 44

1      A.  We issued a number of safety notices or
2  have issued a number safety notices. I -- I'm not
3  sure I remember exactly what that first safety notice
4  was, but I believe it was a notice that advised them
5  of the concerns and recommended that they take
6  certain precautions to reduce the potential for
7  formaldehyde buildup, such as increased ventilation.
8      Q.  And when was this notice issued?
9      Do you recall?
10     A.  I think it was around the July time frame.
11     Q.  So at this point, you really had no
12 scientific evidence to go on, but notice was issued
13 anyway regardless?
14     A.  That's correct.
15     Q.  And you don't recall the specific document
16 that was the subject of the first issued notice?
17     A.  If -- if it's the one I am thinking of, it
18 had a picture of a travel trailer or a drawing of a
19 travel trailer on it, and again, it basically
20 addressed the things that I just discussed, but I'm
21 not entirely positive that that was the first notice.
22 That may have been the second notice.

Page 45

1      Q.  If that may have been the second notice --
2  you're not saying -- you're just not certain whether
3  or not that particular notice you're referring to
4  with the drawing of the trailer on it was this one
5  issued in July. You're not saying that there was one
6  issued prior to that.
7      You're just not certain which document --
8      A.  Correct.
9      Q.  -- is --
10     If you turn, sir, to page 4 of 6. This is
11 included in section 6. I want to direct you to the
12 last sentence of section 6.
13     And it says that: My office, the
14 directorate, weighed competing concerns, including
15 those voiced by OCC and others regarding the
16 different ways in which we could handle this matter.
17 And I agree with Mr. Souza that FEMA should prepare
18 and issue a safety notice and test for formaldehyde.
19     And again, are you talking about that same
20 notice in July of '06?
21     A.  I believe that's the same notice, yes.
22     Q.  Okay. In that statement, what were the

David Edward Garratt                                                                                           July 7, 2009
Washington, DC

Page 46

1 competing concerns that were discussed or considered
2 when issuing the notice that you refer to in section
3 6?
4   A.  I'm not sure I know what those issues
5 were. I'm just aware that there were issues and that
6 there were -- there was concern with us moving out
7 with the safety notice at that time.
8   Q.  What were the concerns?
9   A.  They were voiced or at least in terms of
10 the email exchange that I had with Mr. Souza at the
11 time concern from general counsel that -- that I
12 think they wanted additional time to -- I think they
13 were not ready to have us issue that notice at that
14 point.
15   Q.  And what is your understanding as to why
16 they needed this additional time or they weren't
17 ready for you to issue that notice?
18   A.  I'd be speculating.
19   Q.  But you left that concern -- you
20 considered that concern.
21       Correct?
22   A.  I was aware of that concern at the time

Page 47

1 that I told Mr. Souza to move ahead with testing and
2 distribution of that safety notice anyway.
3   Q.  But your statement says you weighed
4 competing concerns, so you weighed that.
5       You weighed the concerns of the Office of
6 General Counsel.
7       Correct?
8   A.  Well, I was aware of it, so obviously, I
9 weighed it.
10   Q.  So this is just a general statement.
11       You made this -- this declaration on May
12 12, 2009, at this point, approximately 2 months ago.
13       Correct?
14   A.  Seems a lot longer.
15   Q.  And at that time 2 months ago, you say
16 that you weighed competing concerns including those
17 voiced by OCC and others, but today as you sit here,
18 you can't tell me what those concerns were?
19   A.  Well, I'm aware this that this exchange
20 that led to that decision to place in a number of
21 email exchanges, and those email exchanges involved
22 or reflected a concern by the Office of Chief

Page 48

1 Counsel, so I was aware that the Office of Chief
2 Counsel had concerns with moving out this quickly
3 with this. We rejected those concerns in favor of
4 moving out.
5   Q.  You were aware that those concerns had to
6 do with litigation, I assume?
7       MR. MILLER: Objection, assumes facts not
8 in evidence.
9   A.  I would say that -- I can't say I was
10 aware of that, but given that that's the role of our
11 attorneys, is to deal with litigation, then I'm not
12 sure it mattered to me one way or the other what the
13 basis for that concern was. It was outweighed by --
14 regardless of what the concern was.
15       BY MR. WOODS:
16   Q.  Let's go on to section 7.
17       In the second sentence, you say: I was
18 later advised by Mr. Souza that the EPA subsequently
19 recommended that only unoccupied units be tested
20 since the purpose of the test was to determine
21 whether the units themselves as opposed to materials
22 introduced by occupants were generating elevated

Page 49

1 formaldehyde levels.
2       What information or knowledge do you have
3 regarding EPA's recommendations?
4   A.  Only what was conveyed to me by Mr. Souza.
5   Q.  And what -- what did Mr. Souza convey to
6 you?
7   A.  That he had returned -- let me back up a
8 little bit.
9       Our initial engagement was that Mr. Souza
10 recommended and I completely agreed with him that EPA
11 needed to go in and essentially replicate what the
12 Sierra Club had done. We need to find out if the
13 Sierra Club's findings were accurate or not.
14       So we were envisioning that they would be
15 going in and evaluating occupied units as the Sierra
16 Club had done. After Mr. Souza engaged with the EPA,
17 he came back at some point and said that based on our
18 discussions, EPA was recommending that we reengineer
19 our approach, since what we were attempting to
20 determine was whether our units were producing the
21 formaldehyde versus whether the formaldehyde was
22 largely the result of occupants introducing products

Page 50

1  into these units or to include for example smoking,
2  and that was generating those levels.
3       And the only way to make that
4  determination was to test unoccupied units that had
5  never been lived in. Agreed with him.
6       So again, he -- Mr. Souza was the one who
7  was most engaged with the EPA, and again my awareness
8  of their concerns was through him.
9            (Garratt Exhibit No. 3
10               was marked for
11               identification.)
12      BY MR. WOODS:
13   Q.  Mr. Garratt, what I'm handing you is a
14  document at the top -- it's produced by FEMA counsel.
15  It's Bates-labeled FEMA 17, dash, 002489. It's also
16  produced as part of the Congressional Record. It's
17  at the bottom labeled FEMA, dash, Waxman, dash, 2489.
18      And it's not the best copy. It's sort of
19  grayed-out, but hopefully you can follow along with
20  me on it.
21      If you'd look down, please, sir -- it's a
22  series of emails, email chain. If you go back to the

Page 51

1  last page, it appears as if it's beginning from a
2  Russ Knocke to Edward Buckley, Lauren Isenhour, and
3  cc'ing Price Roe.
4       But I want to bring you back forward to
5  page 2 of 5 of the document. And if you'll see,
6  there is an original message from Price Roe to John
7  Philbin, David Garratt, cc'ing Harvey Johnson and
8  William R. Knocke. And it's sent on July 25th. And
9  the time is 2003, 2006.
10      Can you see that?
11      Can you read that?
12   A.  I can.
13   Q.  Okay. And it says, Pat and Dave, see
14  below and please advise if I am capturing this
15  correctly.
16      First of all, who is Price Roe?
17   A.  He was the counselor to the secretary.
18   Q.  And you say, counselor to the secretary.
19      Was he legal counsel --
20   A.  No.
21   Q.  -- to the secretary?
22   A.  He may be -- he may have been a lawyer,

Page 52

1  but that was not the role of that counselor position.
2   Q.  Okay. It says: We should lead the memo
3  with the media angle in a way that addresses the
4  media context and FEMA's monitoring of the situation.
5  Note well my language on why the secretary didn't
6  hear about this earlier. Attached doc has edits,
7  opening 2 paragraphs as follows. I won't share this
8  with S 1 until I get your green light.
9       Who is S 1?
10   A.  The secretary.
11   Q.  Okay. If you go down to -- it says, media
12  exposure.
13      Can you see that?
14   A.  Yep.
15   Q.  Okay. If you go down to, I think it's the
16  third sentence, it begins, following the MSNBC, dot,
17  com story.
18      Do you see that?
19   A.  I do.
20   Q.  Okay.
21      Following the MSNBC, dot, com story that
22  ran the weekend of July 22, media attention in this

Page 53

1  story has increased though not dramatically. While
2  FEMA has not directly briefed the secretary on this
3  issue, believing it was being appropriately handled
4  by FEMA legal counsel and FEMA's complaint resolution
5  process.
6       Did I read that statement correctly?
7   A.  Yes.
8   Q.  If you go further up the page on this
9  document, and it's an email from you, David Garratt,
10  to Price Roe, John Philbin, cc'ing Harvey Johnson,
11  William Knocke, Robert Paulison, John Daraujo, and
12  Kevin Souza.
13      You say: Price, okay with everything
14  except the statement that FEMA believes this problem
15  is not widespread. In fact we do not know. It is
16  entirely possible this will be widespread problem.
17  Dave.
18      Did I read that correctly?
19   A.  Yes.
20   Q.  Okay. So I can take that, Mr. Garratt, as
21  you're saying that the statement which I read
22  previously under media exposure, you took no issue

Page 54

1   with that particular statement.
2           You only took issue with the statement
3   that FEMA believes this problem is not widespread; is
4   that correct?
5       A.  That certainly appears to be the case.
6       Q.  Okay.
7           THE VIDEOGRAPHER: Sir, we need to change
8   the tape.
9           MR. WOODS: Okay. We're going to go off
10  the record for a second.
11          THE VIDEOGRAPHER: We're going off the
12  record. The time on the video is 10:03 AM.
13          (Discussion off the record.)
14          THE VIDEOGRAPHER: This begins tape number
15  2 in the video deposition of David Garratt. The time
16  on the video is 10:09 AM. We are on the record.
17          BY MR. WOODS:
18      Q.  Mr. Garratt, back to the document we were
19  discussing. I want to bring you forward again to an
20  email from Price Roe.
21          It's on the first page, beginning on the
22  first page. And it's to David Garratt, John Philbin,

Page 55

1   Harvey Johnson, William Knocke, Robert Paulison, and
2   it's sent on Tuesday, July 25th, 2028, 2006, and it's
3   the revised info memo, dash, FEMA toxic trailers.
4           And this is in response to your email,
5   Price Roe writes back, and he begins by saying, would
6   it be more accurate to say?
7           Do you see that?
8       A.  Yep.
9       Q.  Okay. You go back down to his section on
10  media exposure. And again, if you look at the
11  sentence -- I believe it's the fourth sentence that
12  begins, following.
13          Do you see that?
14      A.  Yes.
15      Q.  Okay. It says: Following the MSNBC, dot,
16  com story that ran the weekend of July 22, media
17  attention in this story has increased though not
18  dramatically. While FEMA has not directly briefed
19  the secretary on this issue, believing it was being
20  appropriately handled by FEMA legal counsel and
21  FEMA's complaint resolution process.
22          Did I read that accurately?

Page 56

1       A.  You did.
2       Q.  Okay.
3           MR. MILLER: I'm going to object to that
4   document, incomplete. It goes on.
5           BY MR. WOODS:
6       Q.  If you go up, Mr. Garratt, to your email
7   in response to Price Roe's email you sent to him on
8   July 25th, 2006, at 9:10 PM. It's to Price Roe,
9   David Garratt, John Philbin, cc'ing Harvey Johnson,
10  William Knocke, Robert Paulison, John Daraujo, and
11  Kevin Souza, and it's regarding revised info memo,
12  dash, FEMA toxic trailers.
13          You say, yes, much better price; is that
14  correct?
15      A.  I did.
16      Q.  Okay. Again, you made no change or
17  comment to Mr. Roe's suggested language under, media
18  exposure.
19          Correct?
20      A.  I don't think I was reacting to that. I
21  was -- in fact, I can't even say I read that.
22          I was reading the paragraph that was

Page 57

1   immediately under, would it be more accurate to say.
2           BY MR. WOODS:
3       Q.  Okay. But you did see that sentence
4   under -- or that's media exposure?
5       A.  I can't say that I did.
6       Q.  But you did receive this email?
7       A.  Yes.
8       Q.  And you were asked to advise whether or
9   not he was capturing this correctly.
10          Correct?
11      A.  Right.
12      Q.  Okay.
13      A.  What I was responding to, however, was, I
14  don't believe I ever re-read that media exposure
15  bullet, because I think I thought that was just a
16  repeat from a previous message, and I was responding
17  when I said, yes, much better price, only to the
18  paragraph that begins, while the number of complaints
19  recorded by FEMA.
20      Q.  That's fine.
21          But you -- you didn't make any changes the
22  first time around to this media exposure bullet --

Page 94

1   don't remember from which MDC, or maintenance and
2   deactivation contractor, that was, but I do recall
3   seeing some records.
4       Q.  And what did those records indicate to you
5   in terms of the volume or number of air quality or
6   formaldehyde-related calls?
7       A.  At the time, there were not that many.  I
8   don't remember how many there were, and I'm not even
9   sure I remember exactly what the circumstances were
10  under which we requested that information.
11          It may have been for a snapshot in time as
12  opposed to everything to that point.  I recall us
13  asking to be pro- --- asking the field to provide us
14  records dealing with some period in time, but I don't
15  recall what that time was or even the -- necessarily
16  the impetus -- the impetus for that request.
17      Q.  And what do the records reflect was being
18  said to people who complained about air quality or
19  formaldehyde?
20          What -- what kind of response was being
21  given to those types of complaints?
22      A.  I would -- as I recall, different types of

Page 95

1   responses were being provided to individuals, but
2   those responses were generally related to what it was
3   that was being reported.
4           For example, air quality issues: my unit
5   has an odor to it, or, my eyes are watering.  And I'm
6   not saying that these are specific things that they
7   reported at the time.
8           I don't recall for most of the complaints
9   that I saw prior to -- and my memory is vague here --
10  that formaldehyde was mentioned.  It was typically
11  air -- general air quality issues that were
12  mentioned.  It was characterized that way.
13          It wasn't really formaldehyde being
14  reported as the problem until after this became a
15  public issue.
16      Q.  Yes, sir.
17          But my question was, if you can tell me
18  what types of responses were being given to those who
19  called about things like air quality, smell, watery
20  eyes, et cetera?
21          MR. MILLER:  Objection, foundation.
22          BY MR. MEUNIER:

Page 96

1       Q.  According to the records that you
2   reviewed.
3       A.  I recall imperfectly different responses.
4           In some cases, individuals were told to
5   try and ventilate their units or air it out and then
6   (phonetic) call back.  In some cases, people went out
7   to the units to check on them themselves.  In some
8   cases, a determination was made they needed to swap
9   out a unit.
10          It depends, but different responses.
11      Q.  Now, again, in your declaration, and this
12  is at page 3, you talk about Mr. Souza making a
13  recommendation in late June, which you authorized
14  and -- and supported that FEMA both prepare and issue
15  a safety notice and proceed with testing.
16          Correct?
17      A.  Correct.
18      Q.  You then in late June of '06 as the acting
19  deputy administrator of FEMA had the authority
20  whether or not to approve safety notices, whether or
21  not to approve testing of these trailers.
22          Correct?

Page 97

1       A.  I'm sorry.
2           Repeat that.
3       Q.  You had the authority, then, in June of
4   '06 to authorize both the issuance of safety notices
5   and the commencement of testing.
6       A.  Well, I certainly assumed I had the
7   authority.
8       Q.  And without you authorizing it, it
9   wouldn't happen?
10      A.  I can't say that.
11      Q.  You think Mr. Souza could have gone
12  forward without you?
13      A.  I don't know, but I can't say that it
14  would not have gone forward whether I authorized it
15  at that point in time or not.
16      Q.  But in any event, you were asked to
17  authorize it and did so?
18      A.  Correct.
19      Q.  And on your authorization, it happened.
20      A.  Correct.
21      Q.  Is it -- is it safe to say that for the
22  period May '06 to June -- January '09, Mr. Johnson,

### Page 98

1  in the same position of acting deputy administrator
2  of FEMA, would have that kind of authority to
3  authorize notices to occupants or the commencement of
4  testing of the units?
5     A.  Admiral Johnson?
6     Q.  Admiral Johnson.
7     A.  Okay. I'm sorry.
8        Could you ask that question one more time.
9     Q.  Would Admiral Johnson's authority in the
10 position of acting deputy administrator of FEMA from
11 May '06 to January '09, preceding you, likewise vest
12 him with the authority to authorize notices to
13 occupants such as you did or the commencement of
14 testing of units such as you did?
15    A.  Had he been there at that time, that is
16 correct.
17       I'm not entirely sure that -- again I'm
18 trying to remember when Admiral Johnson came on
19 board. It was about this time, I believe, but it --
20 the bottom line is, if I have that authority, then
21 anybody above me also has that authority.
22    Q.  Right.

### Page 99

1        So from May -- I think you told us earlier
2  that Johnson assumed the position of acting deputy
3  administrator for FEMA in May of '06 and held it till
4  January of '09.
5     A.  I think that's correct.
6     Q.  And so for that period of time, he had and
7  exercised the same decision-making authority which
8  you have had and exercised since January 21, '09.
9        True?
10    A.  Well, he was the deputy administrator of
11 the agency. I was the either -- I'm not sure at this
12 point in time -- I was either the acting assistant
13 administrator of this directorate or the deputy
14 assistant administrator of this directorate, so in
15 either of those positions, I would be below him in
16 the food chain.
17    Q.  But certainly any decision-making
18 authority you had, he would have?
19    A.  Agreed.
20    Q.  Now, let me ask you about the safety
21 notice that you authorized in late June of '06.
22       You told Mr. Woods that there were a,

### Page 100

1  quote, number of these safety notices to occupants.
2     A.  Correct.
3     Q.  How many?
4     A.  Don't recall.
5     Q.  Less than a dozen, more than a dozen, 5,
6  6?
7        Can you give me some idea?
8     A.  Well, less than a dozen.
9     Q.  Less than 10, less than 5?
10    A.  I honestly don't know, because not all
11 safety notices were necessarily generated or directed
12 by FEMA headquarters. The TROs, regions, had the
13 authority to do this on their own.
14    Q.  Who would know the total number of safety
15 notices that were directed to occupants regard- --
16 specifically regarding the formaldehyde concerns in
17 these units?
18    A.  You'd have to talk to whoever was heading
19 up the individual transitional recovery offices at
20 the time.
21    Q.  Well, there's no one person, then, you're
22 saying, at FEMA who had the kind of oversight who

### Page 101

1  could tell us officially how many safety notices
2  issued to occupants?
3     A.  I think it depends on what it is that you
4  want to talk -- consider a safety notice.
5        For example, we --
6     Q.  Using your term.
7     A.  Right.
8        We approved a safety notice during this
9  period of time, and we directed that this notice be
10 provided to all occupants of all units at that
11 particular time.
12       Now, that does not mean that a TRO on
13 their own could not have gone in and reprovided
14 followup versions of these if they changed a phone
15 number, for example, and wanted to provide new
16 notices to all of the occupants with the new phone
17 numbers on them. They changed maintenance and
18 deactivation contractors, so they're going out and
19 they're reproviding. I don't know that they -- that
20 could have happened.
21       The bottom line is, what I know is what
22 headquarters directed, but that does not mean that --

David Edward Garratt						July 7, 2009
Washington, DC

Page 102

1  that our field guys didn't on their own also do some
2  distribution of notices.
3      Q.  All right. Let's just talk about what
4  headquarters directed.
5          Who had input into the language of the
6  safety notice?
7      A.  Our directorate, Office of Chief Counsel.
8  I think our safety office was involved. The office
9  of health affairs was involved. We consulted CDC and
10 the Department of Health and Human Services.
11         And I think either Admiral Johnson and/or
12 Chief Paulison were likely involved in that, and it's
13 possible that higher headquarters at the department
14 level was involved as well, but I don't have any
15 specific memory of that.
16     Q.  Did you mention legal counsel?
17     A.  I did.
18     Q.  Who -- which legal counsel had input into
19 the language of the safety notices?
20     A.  I don't recall.
21     Q.  What did the safety notices tell occupants
22 regarding the effects of long-term exposure to

Page 103

1  formaldehyde?
2          MR. MILLER: Objection, vague, time.
3      A.  I don't recall.
4          BY MR. MEUNIER:
5      Q.  Do you believe that subject was addressed
6  in the safety notice?
7      A.  I don't know.
8      Q.  Do you believe it should have been
9  addressed in the safety notice?
10     A.  That's another good question.
11     Q.  Thank you.
12     A.  At the time, we didn't know what the
13 long-term effects of formaldehyde exposure --
14 exposure were.
15     Q.  Wait a minute.
16         At the time.
17         We're talking about late June of '06 --
18     A.  Right.
19     Q.  -- that you authorized the safety notice.
20         You're saying you didn't know at that time
21 what the long-term exposure effects of formaldehyde
22 were?

Page 104

1      A.  I did not.
2      Q.  Okay. Are you suggesting that science in
3  late June of '06 provided no information regarding
4  the long-term exposure effects of formaldehyde?
5      A.  I don't believe I did say that. I believe
6  what I said was, I did not know.
7      Q.  Well, did any of the individuals having
8  input into the language of the safety notice as far
9  as you know have information to share about the
10 long-term effects of formaldehyde?
11     A.  There was certainly discussion, a lot of
12 discussion about formaldehyde throughout that period
13 of time. And we were reaching out to and consulting
14 any number of people who try to get a handle on
15 exactly what we were dealing with at this particular
16 time.
17         Central to those discussions were
18 obviously the department's office of health affairs
19 and CDC, at least in 2007 when we actively engaged
20 them. In 2006, when this issue first arose, I think
21 at the time that we were starting this process, we
22 did not yet know what the extent of this potential

Page 105

1  problem was.
2          What we recognized was that the Sierra
3  Club was asserting that in fact there was a systemic
4  issue, which prior to that, we did not recognize. So
5  they had asserted there was a systemic issue, and
6  what we wanted was validation.
7          And that's really the point that we were
8  at at that point in time, and what we were interested
9  in doing was reducing the formaldehyde levels in
10 these units, and so the safety notices were designed
11 to help those occupants who really didn't have any
12 other place to go to actions to reduce formaldehyde
13 in their units.
14     Q.  Meaning ventilate the units?
15     A.  Ventilate the units was the principal
16 mechanism for reducing formaldehyde.
17         MR. MEUNIER: We have to change the tape.
18         THE VIDEOGRAPHER: This concludes tape
19 number 2 in the videotape deposition of David
20 Garratt. The time on the video is 11:24 AM. We are
21 off the record.
22         (Discussion off the record.)

27 (Pages 102 to 105)

David Edward Garratt                                                                July 7, 2009
Washington, DC

Page 110

1  transitional recovery offices were operating, that
2  they would hand someone a stack of notices and assume
3  that they had provided those.
4       If I was managing this out in the field,
5  we would be sitting everyone down who is responsible
6  for doing this, we'd be articulating exactly what
7  their area of responsibility is and how many units
8  are in that particular area, and they would report
9  back when they came back that they had completed all
10 of their assigned deliveries.
11      Q.   And if you were managing it, you'd have
12 some document or checkoff sheet that would show that
13 a specific unit got a notice?
14      MR. MILLER:  Objection, assumes facts not
15 in evidence, calls for speculation.
16      BY MR. MEUNIER:
17      Q.   If you -- if you were managing the
18 operation.
19      A.   And in fact, that may have happened,
20 because we did ask the TROs to report back at least
21 during this first go-around the status of their
22 deliveries and were tracking when they completed

Page 111

1  those deliveries.
2       Q.   So you do have some status reports in that
3  regard?
4       A.   I think we have -- I recall seeing I think
5  emails, or we may have had this report on
6  teleconferences -- I'm not sure -- but the bottom
7  line was, we were getting reports back from the field
8  on their progress and were tracking those -- progress
9  through completion.
10      Q.   And so there would be some emails today
11 that would evidence discussions on that tracking
12 effort?
13      A.   Wouldn't be surprised.
14      Q.   All right.  And you would have been part
15 of the email string?
16      A.   I would think so.
17      Q.   Okay.  Would there have been someone at
18 FEMA who was directly in charge with oversight of
19 the -- of the notice delivery system other than in
20 these individual transitional recovery offices?
21      A.   Well, as either the acting -- if I was
22 acting at the time, then I would have been

Page 112

1  responsible for anything that happens in any program
2  area in our directorate.  In terms of this particular
3  tasking, Kevin Souza was my assigned lead for working
4  this particular project, but the responsibility was
5  mine.
6       Q.   Given the importance of the safety notice
7  and what was at stake, I assume that the intent, if
8  they have a hundred percent delivery of a notice,
9  that is, every occupant in every -- every unit was to
10 physically receive the notice.
11      That was the intent?
12      A.   Correct.
13      Q.   Did you achieve that?
14      A.   To the best of my recollection, yes.
15      Q.   So that it didn't matter where a unit was,
16 in other words, if it was in a trailer park or if it
17 was on someone's private property, a single address,
18 if you will, didn't matter.
19      Every one of those units by intent was to
20 get a physical delivery of the -- of the notice?
21      A.   A notice, yes, a notice delivered to each
22 unit, not necessarily to a hot body in that unit.

Page 113

1       Q.   All right.  Explain what you mean by that.
2       A.   I mean, if they stopped by a unit and no
3  one answered the door, then they would tape that unit
4  (sic) to the door, or they would put it on the door
5  or slip it under the door.
6       Q.   Those were the instructions?
7       A.   No.
8       I'm just -- I don't know what the specific
9  instructions were, but the answer -- the tasking was
10 to make sure that these fliers were provided to all
11 units.
12      Q.   Now, you wanted -- let's talk about
13 testing for a minute.
14      You authorized testing as recommended by
15 Souza?
16      A.   As recommended by the EPA.
17      Q.   By the EPA.
18      And you felt that they were a qualified,
19 independent entity for the purpose of that testing?
20      A.   Absolutely.
21      Q.   When you talk in your statement about
22 wanting testing by a qualified independent third

29 (Pages 110 to 113)

David Edward Garratt                                                                                       July 7, 2009
                              Washington, DC

### Page 114

1    party, you don't necessarily mean someone outside of
2    the federal government, but a third party in that
3    they're not FEMA?
4        A.   Correct.
5        Q.   So another government agency such as EPA
6    was what you had in mind?
7        A.   With experience in this sort of stuff.
8        Q.   And the purpose of the testing that you
9    authorized was to either validate or not the Sierra
10   Club test results that had been reported about unsafe
11   levels of formaldehyde?
12       A.   Initially what we wanted to do was -- when
13   we initially started this process -- initial
14   discussion with Mr. Souza about this, it was to
15   validate what the Sierra Club was asserting, and that
16   was that these high levels of formaldehyde existed in
17   the units, that they were attributing to the units
18   that we were providing.
19            Now, subsequent to that, however --
20       Q.   Yeah.
21       A.   -- it he involved into wanting to
22   determine what was -- what levels of formaldehyde

### Page 115

1    were the units themselves producing.
2             So we were not necessarily at that point
3    validating what the Sierra Club had come up with,
4    because they were measuring occupied units. And we
5    in fact were just verifying whether our units were
6    producing sufficient formaldehyde to generate a level
7    of concern among us as well.
8        Q.   Right.
9             That's -- that's the point I wanted to
10   clarify.
11            In fact, the testing you did because it
12   was unoccupied units didn't directly address the test
13   results from the Sierra Club --
14       A.   Correct.
15       Q.   -- for occupied units.
16            Correct?
17       A.   Indirectly, but not directly.
18            Or excuse me.
19            Let me rephrase that.
20            It wasn't a one-for-one sets of tests.
21       Q.   Certainly since you're not a scientist on
22   this issue, you're not in a position to tell us the

### Page 116

1    extent to which you could take the test result from
2    an unoccupied unit and make decisions or conclusions
3    about the validity of the test results from an
4    occupied unit.
5             You can't do that, can you?
6        A.   Wouldn't try.
7        Q.   Now, at page 4 of your declaration, you do
8    talk about the involvement of OCC, the Office of
9    Chief Counsel. And you say that they were involved
10   or that office was involved with and did issue advice
11   regarding formaldehyde response actions.
12            Over what period of time did the OCC have
13   that involvement?
14       A.   I would imagine from the very beginning.
15       Q.   And if we assume for the purpose of my
16   question that the first complaints to reach FEMA
17   about formaldehyde concerns in the travel trailers
18   was in October of '05, you would say that's the
19   period which started the involvement of OCC?
20       A.   No, I did not.
21       Q.   All right. When you said, from the very
22   finishing, what did you mean?

### Page 117

1        A.   The beginning of our engagement following
2    the publication of the Sierra Club report. When met
3    with Kevin and sent Kevin out to tackle this, that
4    OCC would have been -- excuse me -- Office of Chief
5    Counsel would have been involved in that effort. He
6    would have been reaching out to and engaging whoever
7    he needed to within the agency to participate in that
8    process.
9        Q.   And would you -- would you say that they
10   were frequent participants in the telephone and other
11   meetings concerning what response action should be
12   taken?
13       A.   Spec- -- I'd be speculating since I did
14   not participate in very many of those meetings.
15   Kevin managed most of those with the team that he had
16   assembled.
17       Q.   Was it the intent, though, to involve them
18   in all important discussions regarding formaldehyde
19   response actions?
20       A.   I'm certain that was his intent.
21       Q.   But was it your intent?
22       A.   I'm not sure I had an intent at that point

David Edward Garratt                                                                July 7, 2009
                              Washington, DC

Page 118

1  other than the direction that I had given to Kevin,
2  which was to reach out and get this going.
3           How he managed that and how he worked that
4  left up to him, but I certainly would assume again
5  that OCC -- excuse me -- the Office of Chief Counsel
6  would have been integral to that engagement.
7      Q.  Now, the Office of Chief Counsel expressed
8  concerns about proceeding with testing.
9           True?
10     A.  Yes.
11          MR. MILLER: Objection.
12          BY MR. MEUNIER:
13     Q.  They wanted to delay testing.
14          True?
15     A.  According to the email records, yes.
16     Q.  And we wanted to delay testing because of
17 concerns about pending litigation.
18          True?
19     A.  I do not know that that's true.
20     Q.  Do you deny that's true?
21     A.  I do not deny that that's true.
22     Q.  You're not in a position to deny that.

Page 119

1      A.  I'm not.
2      Q.  In fact, have you seen email from
3  attorneys with FEMA talking about once you get the
4  results, you have a duty to respond, and let's be
5  careful, because this implies FEMA's ownership in the
6  issue?
7      A.  I have.
8      Q.  That would suggest that there was a real
9  concern about litigation on the part of those
10 individuals.
11     A.  Well, it might suggest that, but it also
12 might suggest just an operational concern as well.
13          In other words, before we roll out this
14 testing, let's get our ducks in order here.  I don't
15 see any reference in that citation you just did to
16 litigation.  There are other emails that reference
17 that, but I don't think that one does.
18     Q.  So when an attorney -- a trial attorney
19 for FEMA writes in an email, do not initiate testing
20 until we give the okay, once you get results and
21 should they indicate some problem, the clock is
22 running on our duty to respond to them, do you see

Page 120

1  that as operational, not legal in intent?
2      A.  I see it both.
3           Legal is intent, but it certainly has an
4  operational -- or it's geared to or directed at our
5  operational response.
6      Q.  Now, you mention in your declaration at
7  page 4 that the ATSDR reported that ventilation was
8  an effective method to reduce the levels in the units
9  to below levels of concern.
10          Correct?
11     A.  Correct.
12     Q.  What was the level of concern?
13     A.  I don't recall.
14     Q.  And so you don't know how that level of
15 concern, for example, compares to various government
16 agency standards regarding formaldehyde?
17     A.  Well, I know that there are different
18 standards within the government for levels of
19 formaldehyde.
20          I do not know how that level of concern --
21 bottom line is, no, I don't.
22     Q.  Well, was it your understanding at that

Page 121

1  time that if people ventilated their units, they
2  could get the level of formaldehyde below that which
3  would be a health risk for them?
4           MR. MILLER: Objection, time, vague.
5      A.  I don't know that it would be accurate to
6  say that they could get them below a level that would
7  be a health risk to them.  I'm not in -- was never in
8  a position to -- to state that.
9           What I was in a position to do was take
10 the results of the qualified agency that we had asked
11 to make recommendations to us, who said, if you
12 ventilate them to these levels, then they are safe
13 for these folks to live in, and they can get them to
14 acceptable levels.
15          Now, the health risk --
16          BY MR. MEUNIER:
17     Q.  Well, but -- so your -- your conclusion
18 going forward was, if you ventilate the units,
19 they're safe to occupy.
20          True?
21     A.  Or can be made safe to occupy if they're
22 ventilated, yes.

Page 122

1   Q.   And that's in fact what you communicated
2   going forward from that point in time to people, that
3   if they ventilated the units, they would be safe to
4   occupy?
5   A.   Safe in comparison to the average living
6   environment that the average -- that we live in,
7   correct, as opposed to absolutely safe.
8   Q.   At page 5 of your declaration, you make
9   reference to a second formaldehyde safety sheet to
10  occupants.
11       That's in paragraph 10. And that -- and
12  the reference in date time here seems to be July of
13  2007.
14       Do you see that?
15  A.   I do.
16  Q.   All right. So we've talked about a safety
17  notice that went -- that appears to have been
18  generated back in the summer of '06.
19       When you say, a second formaldehyde safety
20  sheet, do we assume now that the second safety notice
21  to occupants came roughly a year later in the summer
22  of '07?

Page 123

1   A.   Where -- I'm looking for it says, second
2   to safety notice.
3   Q.   It's the third line up, paragraph 10, page
4   5 of your declaration.
5   A.   Page 5, third line up, 10.
6   Q.   Paragraph 10.
7   A.   Okay. Okay.
8        I'm sorry.
9        Could you repeat the question again?
10  Q.   All right. We talked about the safety
11  notice that went out in the summer of '06 that was
12  meant to be hand-delivered to every unit.
13       Do I assume that when you say there was a
14  second formaldehyde safety sheet to occupants,
15  quote-unquote, and this is occurring in July of '07,
16  that a year passed roughly between the first safety
17  sheet notice to occupants and the second?
18  A.   Between the first headquarters-directed
19  safety notice to occupants and the second.
20  Q.   And do I assume that for the second safety
21  sheet notice in July of '07, you had the same
22  distribution plan, which was hand-delivery to every

Page 124

1   single unit?
2   A.   I think that's correct, but I'm not a
3   hundred percent sure. We may have also mailed those
4   safety notices as well, but I don't recall.
5   Q.   You wouldn't have mailed them by certified
6   mail.
7        You would have -- if you mailed them, by
8   regular mail.
9        Correct?
10  A.   I think so. We have used certified mail
11  in the past, but I can't say that we used it for
12  this.
13  Q.   If they came back undelivered because of a
14  bad address, what was the plan?
15  A.   We typically do initial outreach at that
16  point, and that's typical of any of the forms of
17  assistance that we provide when we communicate with
18  disaster victims -- excuse me -- survivors.
19  Q.   And in your declaration at page 6,
20  paragraph 12, you say: In the spring of 2008, FEMA
21  hired a contractor to test occupied units, and over
22  3,000 occupants have now had their units tested for

Page 125

1   formaldehyde.
2        Correct?
3   A.   Yes.
4   Q.   And who is the contractor?
5   A.   It was Bureau Veritas.
6   Q.   We talked earlier about the fact that if
7   you test occupied units, you -- you bring in the
8   variable or the confounder of something other than
9   what might be generating or emitting formaldehyde in
10  the unit.
11       To your knowledge, had the -- had the
12  testing of occupied units by Bureau Veritas accounted
13  for those variables?
14  A.   By, accounted for those variables, what
15  exactly do you mean?
16  Q.   What I mean is, are the -- is the aim of
17  this testing program to find out what formaldehyde is
18  being emitted by components within the unit itself?
19  A.   No.
20  Q.   So the testing here is only aimed at --
21  A.   -- informing the occupant.
22  Q.   -- at discerning -- at discerning how much

32 (Pages 122 to 125)