UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RANDY J. GREEN and CARL DELCAMBRE | * | CIVIL ACTION #: **6:08-01107** |
| VERSUS | * | JUDGE:    T. MELANCON |
| FLEETWOOD ENTERPRISES, INC. and FLEETWOOD CANADA, Ltd. | * | MAGISTRATE: M. METHVIN |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FIRST AMENDING AND SUPPLEMENTAL COMPLAINT FOR DAMAGES

This Amending and Supplemental Complaint of certain persons of the full age of majority, on behalf of themselves and, in some instances, on behalf of individuals who lack the capacity to sue individually (hereinafter, "Named Plaintiffs"), who are all named in the annexed listing of all Named Plaintiffs (hereinafter, "Exhibit A"), through undersigned counsel, respectfully represents that:

### I.   PARTIES

1. Each Named Plaintiffs is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the state(s) in which Defendants are citizens.

2. Named Plaintiffs are those individuals and entities listed on the attached Exhibit A, which is incorporated herein as if set forth *in extenso*.

3. The Defendant United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the "Federal Government," "Government" and/or "FEMA".

4. Fleetwood, Enterprises, Inc., ("Fleetwood"), Gulf Stream Coach, Inc. ("Gulf Stream"), Coachman, Inc. ("Coachman"), Forest River, Inc. ("Forest River"), Pioneer, Inc.

("Pioneer"), and Silver Creek, Inc. ("Silver Creek") (hereinafter sometimes referred to as "the Named Manufacturers") all do substantial business in the State of Louisiana and within this federal District, and at all times relevant hereto, they engaged in commerce both in this federal judicial district and in the State of Louisiana.

5. The Defendants Shaw Environmental, Inc. ("Shaw"), Fluor Enterprises, Inc. ("Fluor"), CH2M Hill Constructors, Inc. ("CH2M) (hereinafter sometimes referred to as "the named No-bid Contractors" when referenced collectively) all received No-Bid contracts from the Federal Emergency Management Agency ("FEMA") and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§1346 and 2671, *et seq.*.

7. Each plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

8. Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendant(s) with citizenship other than that of plaintiff(s), because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9. Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

10. The aforementioned named Manufacturers are subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

11. The aforementioned named "No-Bid Contractors" are subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

12. Venue is proper in the Western District of Louisiana pursuant to 28 U.S.C. §1391, as the emergency housing units were provided to the Plaintiffs in this district, and Named Plaintiffs' injuries were sustained in this district.

## II. FACTS AND GENERAL ALLEGATIONS

13. The Named Plaintiffs residing or living in travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") in the State of Louisiana were provided these housing units by FEMA after the landfalls of Hurricane Katrina and/or Rita in September of 2005.

14. Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet. They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL

3

TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

15. Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet. They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. *Id.*

16. Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area). They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction. *Id.*

17. The residence of each Named Plaintiff was rendered unhabitable following Hurricanes Katrina and/or Rita, leaving each plaintiff homeless and in need of housing assistance.

18. FEMA contracted with the Named Manufacturers to purchase thousands of the housing units, primarily travel trailers, for provision to the Named Plaintiffs as temporary housing.

19. On information and belief, Named Manufactures expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by each Named Plaintiff containing higher than normal levels of formaldehyde.

20. On information and belief, the housing unit of each Named Plaintiff, including those units which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

21. Named Plaintiffs submit that each and all of the housing units which are at issue herein, both those which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

22. Named Plaintiffs submit that each of the housing units at issue, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to the Named Manufactures use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that the Named Manufacturers failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

23. Named Plaintiffs submit that the Named Manufacturers ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to the Named Manufacturers' use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell the Named

Manufacturers' products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

24. Each and all of the Named Plaintiffs spent significant time in the FEMA-provided housing units manufactured by the Named Manufacturers and provided to Plaintiffs by the Federal Government. As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

25. Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant to federal law, the defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

> If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

26. According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

27. Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to 1 ppm. In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

28. HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By

regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)..[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". *See* 24 C.F.R. §3280.308.

29. Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

30. The Named Manufacturers knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

31. FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act"). The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

32. In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged No-Bid Contractors with the named No-Bid contracts, eventually amounting to billions of dollars. The Federal Government also relied on the expertise and knowledge of the named No-Bid Contractors to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

33. The aforementioned named No-Bid Contractors were tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of