UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION** | * | **MDL NO. 1873** |
| | * | **SECTION "N" (5)** |
| | * | **JUDGE ENGELHARDT** |
| | * | **MAGISTRATE CHASEZ** |
| **THIS DOCUMENT IS RELATED TO** | * | |
| *Charlie Age, et al v. Gulf Stream Coach Inc., et al*, Docket No. 09-2892; Alana Alexander, individually and on behalf of Christopher Cooper | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**ALANA ALEXANDER'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS TO GULF STREAM COACH, INC.**

TO: Andrew D. Weinstock, Esq.
Joseph Glass, Esq.
Timothy Scandurro, Esq.
Counsel for Gulf Stream Coach, Inc.

**PLEASE TAKE NOTICE** that Plaintiff, Alana Alexander, propounds the following **Second Request For Production of Documents to Gulf Stream Coach, Inc.** pursuant to the Federal Rules of Civil Procedure. You are hereby notified and required to respond to each request within the delays provided in Federal Rules of Civil Procedure 34(b)(2)(A).

**INSTRUCTIONS**

1. In responding to this Request for Production, if the responding party encounters any ambiguities when construing a request or definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

2. Whenever in this Request you are asked to identify and/or produce a document which is deemed by you to be properly withheld from production for inspection or copying:

A.   With respect to any document or communication which you claim is privileged, identify the following facts to enable the Court to determine whether the claim of privilege is valid:

1.   If you are withholding the document under a claim of privilege (including, but not limited to, the attorney-client privilege and the work product doctrine), please provide the information set forth in Fed.R.Civ.P.26(b)(5),including the type of document, the general subject matter of the document, the date of the document, and such other information as is sufficient to identify the document, including where appropriate, the author, addressee, custodian, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability of the privilege or protection claimed by you;

2.   If you are withholding the document for any reason other than an objection that the document is beyond the scope of discovery or that a request is unduly burdensome, identify as to each document and, in addition to the information requested in paragraph 2(A)(1) above, please state the reason for withholding the document.

B.   When a document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material.  If a privilege is asserted with regard to part of the material contained in a document, the party claiming the privilege must clearly indicate the portion as to which the privilege is claimed.  When a document has been redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the identity of the person performing the redaction or alteration.  Any redaction must be clearly visible on the redacted document.

3.   If production of any requested document is objected to on the grounds that production is unduly burdensome, describe the burden or expense of the proposed discovery.

4.   All requests for computerized data are to be in a computer-readable format.

5.   Unless otherwise indicated, all requests are limited to documents applicable to, relating to, or concerned with, any or all properties, facilities and offices of defendant.

6.   If any requested document is known by you to have existed, but no longer exists or no longer

is in your possession, custody, or control, you are requested to identify the last known custodian thereof and state the date upon which it was lost or destroyed or otherwise became unavailable. If the document still exists, you are requested to identify its present custodian and location.

7. In accordance with Fed. R.Civ. P. 34(b), the documents shall be produced as they are kept in the usual course of business or shall be organized and identified to correspond with the following requests by number.

8. If the requested documents are maintained in a file, the file folder is included in the Request for Production.

9. Please note that the Defendant is under a continuing duty, pursuant to Fed. R.Civ.P.26(e), to supplement its responses to these Requests for Production upon obtaining subsequent additional information that renders the original answer incorrect or incomplete.

**DEFINITIONS**

1. The terms "you", "your", and "yours" shall mean the entity named herein, as well as all of its subsidiaries, parent companies, sibling companies, officers, contractors, agents, personnel, representatives, or other persons acting on behalf of, or at the request of, each individual entity named in Plaintiff's most recent Complaint.

2. The term "incident" shall mean the incident or incidents that form the basis of Plaintiff's most recent Complaint.

3. The term "document" shall mean any written, recorded, or graphic matter, however produced or reproduced, including photographs. The term "document" shall be interpreted in its customary broad sense and shall include, but is not limited to, the following items: letters of credit; promissory notes; budgets, journals; registers; cancelled checks; accounts; work sheets; books; records; reports; notes; summaries; surveys; estimates; agreements; diaries; calendars; day timers; correspondence; letters; telegrams; e-mails; electronic archives of e-mails (whether deleted or not); voicemail; magnetically or optically recorded documents; archival copies of magnetically or optically recorded documents; documents that have been logically deleted but not physically erased; the actual media (whether magnetic, optical or other) that have been used to record or forward documents; telexes; memoranda (including intra-office memoranda); summaries; notes; records of meetings; records of conferences; records of telephone conversations; records of personal interviews or conversations; drafts of documents; business records; maps; drawings; blueprints; charts; plans; specifications; computer printouts; computer archives (deleted or not); computer tapes; computer disks; CD ROMS; microfilm; microfiches; photographs; slides; negatives; motion pictures; video recordings; audio recordings (including transcription); data compilations from which information can be obtained, or translated into, a reasonably usable form; and any other

information containing paper, writing, or physical thing in defendants' actual or constructive possession, custody or control.  If any documents were, but are no longer, in defendant's actual or constructive possession, custody, or control, identify the document and state the date and manner of its disposition.

4.      The term "identify", when used with respect to a natural person, shall mean that person's full name, present or last known employment, present or last known address, and most recent telephone number or numbers.

5.      The term "identify", when used with respect to a document or photographs, shall mean to state the type of document (e.g. lease, memorandum, contract, e-mail, chart, diagram, etc.), its location and custodian, the date the document was created, and the identity of the party or parties whose names appear thereon.  You may attach a copy of such document in lieu thereof.

6.      The singular of each word herein shall be deemed to include the plural and vice-versa; the term "and" shall be deemed to include "or" and vice-versa; the term "any" shall be construed to include the term "all" and vice-versa; and the term "each" shall be construed to include the term "every" and vice-versa; the present tense shall be construed to include the past tense and vice-versa.

7.      The term "defendant" and the term "you" shall be deemed synonymous and shall be deemed to include any and all appropriate agents, servants, employees, attorneys and other representatives of the defendant, expert witness, or any other person who has been retained or has otherwise been employed by Defendant in connection with this civil action or its underlying subject matter.

8.      The term "date" shall mean the day of the month, the month, and the year. If the exact date is not known and is not available, give the approximate date and indicate that it is only approximate.

9.      The term "address" shall mean the post office box number, street number, street, city, state or province, country (other than the United States of America), and zip code.

10.     The terms "relating", "concerning", and "reflecting" (or any of their forms) shall mean relating to, reflecting, constituting, representing, supporting, contradicting, referring to, relevant to, containing information about, stating, describing, analyzing, learning, embodying, containing, mentioning, studying, recording, discussing, or evaluating whether in opposition to or in support of defendant's allegations, contentions, positions, and claims in this action.

11.    The term "communication" shall mean any transmission of information (whether written, electronic, or oral), the information transmitted, and the process by which the information is transmitted.

12.    The term "person" means any natural person, business, legal or governmental entity or association.

13.    The acronym "FEMA" is defined as the Federal Emergency Management Agency, as well as any umbrella or parental federal department encompassing the Federal Emergency Management Agency, such as the United States Department of Homeland Security.  The acronym "DHS" is defined as the United States Department of Homeland Security.

14.    The acronyms CDC, ATSDR, OTPER, OSHA, and NIOSH mean Centers for Disease Control and Prevention, Agency for Toxic Substances and Disease Registry, Office of Terrorism Preparedness and Emergency Response, Occupational Safety and Health Administration, and National Institute for Occupational Safety and Health, respectively.

15.    The terms "temporary housing units" or "THUs" are defined as travel trailers and park trailers, and refers to emergency housing units provided by FEMA.

16.    The term "manufacture" means manufacture, produce, assemble, and distribute.

17.    The term "install" means the process by which the manufactured housing unit is delivered to the person or persons displaced by all hurricanes that occurred from January 1, 2004 to present and integrated into whichever electrical, water and sewage systems that serve the property on which the manufactured housing unit is delivered.  The term "install" also encompasses the manner in which the unit is placed on the property for use.

18.    The term "formaldehyde" means formaldehyde and all formaldehyde-based resins.

19.    The term "sale" means sale, donation, giving in kind, giving in payment, and all other acts that transfer ownership.

20.    The term "standards" means standards, specifications, rules, regulations, and guidelines.

21.    The acronym "ppm" means parts per million.

22.    The term "facilities" means yards, offices, warehouses, production plants, manufacturing facilities, storage facilities and all other locations owned or leased by you in which your business is transacted.

23.    The terms "occurrence" and "transaction" mean the events described in the Complaint and other pleadings, as pleadings is defined in Fed.R.Civ.P.7(a).

24.    "Wood Products" includes any type of engineered wood or composite wood products, including particle board, plywood, hardwood or hardboard, medium-density fiberboard (or MDF), oriented strand board (or OSB), wood composition board, laminate board, or similar product.

25.    The term "end user" means the occupant(s) of the manufactured housing unit and/or the intended recipient or user.  The term "end user" differs from the term "customer", who might buy the manufactured housing unit, but does not necessarily use it.

26.    "Trailer" or "the trailer" means the travel trailer with the Vehicle Identification Number of 1NL1GTR2551021783 and the FEMA Bar Code of 1041407.

27.    "Plaintiffs" means Alana Alexander and Christopher Cooper.

## REQUESTS FOR PRODUCTION

NOTE: Plaintiff contends that the following have already been requested from Gulf Stream, however, makes the following very specific requests so there can be no question that Plaintiff is requesting the following.

1. Notices or related memos from trade organizations relating to the risks of formaldehyde exposure.

2. Any third party test results for any wood products used in making travel trailers or mobile homes.  The time period on this request is January 1, 2002 to the present.

3. Any correspondence (including e-mails) exchanged with Porter Novelli regarding your response to the media reports that there were allegedly elevated or unsafe levels of formaldehyde in the THUs that you had provided to FEMA.

4. Documents (including e-mails) relating to the "wood change out" that Burl Keel did for a FEMA resident in 2006, as discussed in detail in pages 10 to 23 of his deposition (excerpted pages attached for reference).

5. Documents (including e-mails) relating to the various work Burl Keel did on trailers, fans, ventilations systems, as discussed in detail in pages 72 to 77 of his deposition (excerpted pages attached for reference).

6. Engineering specifications or designs for your FEMA model trailers (believed to be referred to as "CV-DH") provided to FEMA or for use by FEMA from July 1, 2004 to June 30, 2006.

7. Labels on wood products that are received by you from vendors, which relate to formaldehyde.

8. Documents (including e-mails) regarding any policy you have to remove labels on wood products that are delivered to you by vendors, which relate to formaldehyde.

9. Documents relating to complaints from your employees, or any workers compensation claims from any of your employees regarding symptoms that are consistent with formaldehyde exposure, including irritation of the eyes, nose, throat and sinuses; burning, dryness, redness and itching of eyes; nasal dryness, soreness, runniness; sore or dry throat; sinus congestion or post-nasal drip; cough, chest tightness, excessive phlegm production, repeated sinus infections, eye infections and bronchitis.  You may redact the name of the complaining person/claimant and any personal identifiers such as social security numbers.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**


BY:     s/Gerald E. Meunier
GERALD E. MEUNIER, #9471
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:     504/522-2304
Facsimile:     504/528-9973
gmeunier@gainsben.com


s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:     504/522-2304
Facsimile:     504/528-9973
jwoods@gainsben.com


**COURT-APPOINTED PLAINTIFFS'
STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
MIKAL WATTS, Texas # 20981820
ROBERT BECNEL
DENNIS REICH

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission on June 19, 2009.

s/Anthony G. Buzbee
Anthony G. Buzbee

**In The Matter Of:**

*FEMA Trailer Formaldehyde Products Liability Litigation*

---

*Burl B. Keel, III*

*June 2, 2009*

---

*Original File BURL KEEL.txt*

*Min-U-Script® with Word Index*

Page 9

Q And his boss is Scott Pullin?
A Yes, sir.
Q Who else works in the service department?
A Bill Leitch and Dale Schuler.
Q Okay. Tell me, were you a guy that was sent to Louisiana to deal with some of these complaints of formaldehyde?
A No, I was not.
Q Tell me what your role in all this is. You filled in for Scott when he was in a car accident or something like that?
MR. MILLER: Objection, vague. Go ahead.
Q Go ahead.
A Well, I was down in Louisiana, and I did fill in for going to a customer's house when Scott was in an accident, yes.
Q Okay. And what were you doing down in Louisiana?
A I was sent down there to warranty -- do warranty-type work for Gulf Stream on the FEMA product.
Q Warranty work?
A Warranty-type work.
Q And were you -- tell me the time frame when you were down in Louisiana.
A I don't remember the dates exactly.

Page 10

Q Well, give me the general time frame.
A I was in there December and January, and then I came back for a couple weeks. And then I was there for a couple more weeks, and then I went back down, and I was back and forth for approximately six months.
Q Okay. So you said December. That was '05? Let me just put it in context. The hurricane hit in August of '05. Trailers began to be delivered sometime, I believe, in November -- October, November '05.
A So it was in the beginning of December I was down in Louisiana.
Q And where in Louisiana were you?
A Baton Rouge.
Q Okay. And you said that Scott was in a car accident?
A Yes.
Q Where were you guys working when that happened?
A I --
Q Let me try it again, Mr. Keel. You were asked to fill in for Scott, is what you told me; right?
A Yes, sir.
Q What were you asked to do?
A To go to a customer's house and exchange some

Page 11

boards out on the bed -- on the beds.
Q What does that mean, "exchange some boards out"?
A We took some lauan off the beds and put OSB on there.
Q Why did you do that?
A Scott Pullin told me to do it.
Q Well, you're not a dumb person. You probably asked why, didn't you?
MR. WALDRON: Objection to the dumb characterization. Go ahead.
MR. BUZBEE: That's the dumb objection. I haven't heard that one before.
Q But did you ask why you were taking off the wood from the bed?
A The customer -- as I understand it, the customer said there was a smell in the unit.
Q Okay. And Scott, I guess, put two and two together and decided that you needed to take some of that wood off the bed?
A I don't really know what he assumed, but all I know is he called me and asked me if I had some OSB and to go do this job.
Q And so you were down in Louisiana and you had some OSB?
A Yes, sir.

Page 12

Q Why did you have OSB when you were down in Louisiana?
A It was sent down there. We were putting OSB on some of the beds. Some of the beds came down with OSB; some of them came down with lauan.
Q Okay. Help me understand that. You were down there in Louisiana, I guess, Baton Rouge you said; right?
A Yes, sir.
Q And when you went down there, you took OSB with you?
A Not initially when I went down, no, sir.
Q Okay. Well, help me understand how it came to be that you -- and OSB is this -- just a kind of wood, some kind of manufactured wood; right?
A Correct.
Q OSB stands for what?
A I have no idea, sir.
Q Okay. But anyway, OSB is different than lauan?
A Yes, sir.
Q OSB, at least you don't believe that it gives off any formaldehyde fumes; right?
A I don't know about that, sir.
MR. WALDRON: Objection, foundation.
Q Do you know how to smell? Can you smell

formaldehyde?
A I can smell, yes, sir.
Q Yeah. And you can smell lauan and you can smell formaldehyde on it, can't you?
A I can -- I notice the smell once in a while, yes.
Q Yes. I know you do. And OSB is not as bad; true statement?
A Yes, sir.
Q In your long experience of dealing with lauan and OSB -- I can tell you're a commonsense guy -- you've determined that lauan has more of a smell of formaldehyde than does OSB; true?
A I don't understand how you're wording the question but --
Q I'm just wording it where, you know, I've got two pieces of wood here, and I can smell each one, and I can smell formaldehyde on the lauan but I can't smell it on the OSB; true?
A True.
Q Okay. Thought so. Now, so you were down in Louisiana, Baton Rouge, and at some point it was decided to send down some OSB; is that right?
A Yes, sir.
Q Who made that decision?
A I don't know, sir.

Q Okay. Where was the OSB sent to? Where was it kept, I guess I should say.
A Before it was sent, I don't know, sir.
Q I don't care about before it was sent. When it was finally sent, where did you all keep it?
A In Baton Rouge and there's a little warehouse thing there that I had four sheets of OSB in.
Q There was only four sheets sent down?
A Only four sheets were sent down, yes, sir.
Q Okay. And those four sheets were sent down specifically to deal with some complaints?
A I don't know that, sir.
Q Okay. So there's four sheets of OSB in some little warehouse, you said; right?
A Yes, sir.
Q This is in the what time frame?
A I want to say January, February time frame, sir.
Q Of 2006?
A Yes, sir.
Q Do you keep a little -- any kind of notes or a daily book or any kind of log about what you do every day?
A No, sir.
Q Do you keep any kind of notes on your life?
A On my life?

Q Well, you know, some guys who work for a living, they like to keep a book so they can remember what they were doing and where they were at certain times. Do you do that?
A No, sir.
Q You just rely on the old noggin.
A Yes, sir.
Q Okay. So somewhere in the, you said, January time frame this OSB was down in this warehouse; right?
A Four sheets of it, yes, sir.
Q Four sheets. So tell me how it came to be that you went to get one of these sheets to put it on this person's bed.
A Scott Pullin called me and asked me to have some bed boards cut and take them to this customer's house and look at the unit and put them on, exchange them out.
Q Okay. And you say the customer's house. You mean their house meaning the Gulf Stream trailer they were living in?
A Yes, sir.
Q Okay. You're calling that their house; right?
A Yes, sir.
Q Okay. So tell me how that happened. I am assuming you did that. Right?

A Yes, sir.
Q Tell me how that occurred.
A Well, I went to the unit that was in the yard, and I took out the beds because I didn't have time to cut them. So I took out the OSB out of that unit, went to the customer's house and spoke with the customer, and then I started exchanging the boards.
Q Tell me what the customer told you.
A That there was a smell and his eyes were burning.
Q Tell me what the customer's name was.
A Beaux, Beauxman or Beaux something.
Q Breaux?
A Breaux maybe, yes.
Q Breaux. Okay. That's a Louisiana name, Breaux, B-r-e-a-u-x. That sound right?
A I have no idea, sir. I had the address on a piece of paper, that's it.
Q Okay. And Mr. Breaux, was he a white man or black man?
A I believe he was white.
Q Okay. And he told you that his eyes were burning?
A Yes, sir.
Q He was having problems with what he thought to be formaldehyde?
A Yes, sir.

Page 17

Q It was bothering his nose?
A I don't recall the nose part, but he could smell. I don't recall it bothering him.
Q Well, it was bothering him enough it was burning his eyes.
A His eyes, yes, sir.
Q Did you go inside his trailer?
A Yes, I did, sir.
Q Did you notice the formaldehyde smell as well?
A I noticed the smell, yes, sir.
Q And was it burning your eyes?
A It did not burn my eyes initially, sir, no.
Q But once you were in there it started burning your eyes?
A Yes, sir.
Q Was the air conditioning running?
A No, sir.
Q Why not?
A I don't know why he didn't have it on.
Q Okay. So he was inside this trailer in January time frame of '06 without the air on?
MR. WEINSTOCK: Object to the form. He said January, February.
Q January, February '06. I want to make sure I'm precise. Sometime in January, February '06 when

Page 18

you were doing this; right?
A I believe so, yes, sir.
Q Okay. And when you went into the trailer to talk to him, you noticed that he wasn't running the air conditioning?
A Correct, sir.
Q Did you ask him why he's not running the air conditioning?
A No, sir, I did not ask why that --
Q Was he -- go ahead.
A That I recall.
Q Okay. Why didn't you just tell him, Hey, turn your air on?
A After a period of time, we started talking about ventilation of the unit, and at that time it was mentioned, yes, sir.
Q Okay. But that's after you changed out his boards?
A That was during the time.
Q During the time.
A Because he started asking questions while I was changing the boards out.
Q Okay. When you were speaking with him, was he running any of the vents?
A No, sir.
Q Or the fans?

Page 19

A No, sir.
Q How many fans were there in that particular unit?
A You have a range hood fan, you have a bathroom fan, you have a fan on the furnace, and you have the AC.
Q Okay. So there's three fans and then the air conditioning unit?
A Yes, sir.
Q And one of the fans is inside the little bathroom?
A Yes, sir.
Q Okay. Do you know whether he was running the fans?
A I didn't hear them running, sir.
Q Okay. All right. So he was saying his eyes were burning and that there was this smell; right?
A Yes, sir.
Q And he was saying that it had not went away; right?
A I don't recall that, sir.
Q Okay. And then once you were in the trailer, you noticed your eyes were burning too after a while?
A After a while in there, yes, sir.
Q And when you were inside there changing out the boards, did you not turn on the air conditioning?
A It's not my home, so I don't feel like it was my responsibility just to step in and do that.
Q Okay. But was it hot?
A Not extremely hot, no, sir.

Page 20

Q Okay. So it wasn't that hot down there during January, February of '06?
A I don't recall it being extremely hot, no.
Q Okay. How long does it take to change out the lauan to OSB in a trailer like that?
A If I recall correctly, it took me about an hour, hour and 15 minutes to do his unit.
Q Okay. Can you tell me exactly what pieces of wood you changed out? I know you said the bed board, but I need to know what all that means.
A The bed board is the piece underneath the mattress.
Q Okay.
A Not the framing, just what lays on top.
Q Just supports the mattress itself?
A Correct, sir.
Q These things have a little, thin mattress; right?
A Well, the bunk beds did, yes.
Q Yeah. So how many beds are in this unit?
A There's two bunk beds and the main bed, double.
Q Did you change out the lauan in all three beds?
A Yes, sir.
Q What else did you change out?
A The dinette boards.
Q What's the dinette boards?
A It's where the dinette -- or the cushions the

Page 21

dinette -- or I'm sorry, the boards that the cushions set on on the dinette, very similar to the mattress, what supports the cushions.
Q Right. So that's where somebody's rear end would be sitting on the cushion, and underneath that is the lauan?
A Yes, sir.
Q That's what you changed out?
A The -- yeah. It's a 24 by --
Q Yeah. What else did you change out?
A That's all I recall changing out, sir.
Q What was the brand of the lauan that was being used for those pieces of that trailer?
A I have no idea, sir.
Q Okay. But you could smell the formaldehyde coming out of those pieces of wood you changed out?
A Yes, sir, I could.
Q Okay. What did you do with that wood?
A I threw it away.
Q Okay. Is that the only trailer that you changed wood out in?
A To my knowledge, yes, sir.
Q Okay. You've obviously spoken to Scott Pullin about that issue; right? About changing out the woods?

Page 22

A At that time, yes, sir.
Q All right. Was the plan to change out other woods?
A No, sir, not that I am aware of.
Q Okay. So the OSB was there just in case you needed to change out the other woods?
A We had OSB in the units, and sometimes the OSB got broke in transit. So I had OSB on site in case I needed to fix it when we were checking out the units.
Q Now, did you just tell me that you didn't have time to cut it so you took the OSB out of another trailer?
A Yes, sir.
Q So fair to say that some trailers had OSB in those parts you changed out but other ones did not?
A Yes, sir.
Q And you found one that had OSB in the benches, the bunk beds, and the main bed, and you just took that and used that instead of having to cut some?
A Correct, sir.
Q And that's the only time you ever did that?
A Correct, sir.
Q Okay. Once you did that, was the customer happy?
A The customer seemed to be extremely happy when I left.

Page 23

Q Okay. Did you ever have any contact with that customer again?
A Not that I am aware of, sir.
Q Okay. Have you had any contact with any of the other FEMA customers? Let me make clear, the folks living in FEMA trailers in Louisiana or Mississippi, have you went to other trailers?
A Yes, sir, I have.
Q Tell me about that. I mean, is that what you did for all those months that you were down there?
A No, that is not what I did. But when I was called and asked to help out our contractor -- or FEMA's contractor in assisting in repairs or teaching them how to fix ACs and that kind of stuff, then, yes, I did go to customers' houses to show them how to do it.
Q Okay. How many times did you smell formaldehyde when you were in those houses?
A Almost none.
Q Almost none but sometimes?
A Maybe once. I don't recall exactly how many, sir.
Q Okay. How many different homes -- if you can remember, in that time frame you told us about when you were down there, how many different homes or trailers did you go inside?

Page 24

A Oh, my goodness. Well, we went down to this -- someplace down south by the ocean or by the -- and there was 31 on that lot, and I went in every one of them.
Q What for?
A Mainly, if I recall correctly, I was down there to train the contractor down there because they were having issues with various items in the unit.
Q Which contractor?
A I don't recall, sir.
Q Where were you? When you said you were on the coastal area, where were you?
A I don't recall the name of the town, sir.
Q Were you in Louisiana or Mississippi?
A I was in Louisiana.
Q Okay. And so you were helping them with just various issues within the trailer?
A Yes, sir.
Q Training them or providing expertise, that sort of thing?
A Yes, sir.
Q Can you help me understand what sorts of things were you telling them about or were providing expertise on?
A They would plug the unit in and the AC wouldn't

Page 69

A I just -- personally I thought it was a waste of my time.
Q Why is that?
A Because the numbers, to me, didn't make sense.
Q Okay. Help me understand what that means, Mr. Keel.
A You're asking what I remember from back then. I don't know for sure what all the numbers meant, what each category was. I mean, I can read it and figure it out. But to me, I remember thinking that why are we doing this. But that's what I remember.
Q You were thinking that this was a complete waste of time, you said.
A In my opinion, it was a complete waste of my time when I could be fixing units instead of doing this.
Q Okay. So you didn't agree with doing this testing?
A No, sir, I didn't.
Q I mean, bottom line is, you're saying, Look, we're testing for something we already know to be the case. Right?
MR. WEINSTOCK: Object to the form.
MR. PENOT: Join.
A No. That had nothing to do with what I was thinking.
Q Okay. Help me understand why you thought it was a

Page 70

waste of time.
A I'd be in the kitchen at 85 degrees, 54 percent humidity, and have some kind of reading like, if I can remember what the readings were, 0.04. And then an hour later I got exactly the same humidity and temperature and I'd have a 0.000. I never understood what the purpose of all this was, because this machine, I felt like, I was using just --
Q You didn't think it was accurate?
A I didn't know what to think about it. I just didn't think -- to me, two and two wasn't making four with the numbers.
Q And it was your belief -- and again, you were no expert at this, but you were trying to learn as you go.
A Well, I was doing what I was told.
Q Right. But your belief was that if you took a reading in one spot with the same humidity, same temperature, it should be the same over time?
A Under the same circumstances.
Q And you didn't realize that off-gassing of formaldehyde can change and it has to do with ventilation and that sort of thing?
MR. WEINSTOCK: Object to the form.

Page 71

A No. I didn't understand formaldehyde, and I still don't understand it completely but...
Q But you know more about it now?
A Well, yes, sir.
Q Tell me how you know more about it now.
A Just from what I've heard on the news and everything and everybody talking about it.
Q It's a big issue at Gulf Stream?
A Well, it's becoming a big issue.
Q Right. So what you're telling me, I believe, is, Look, Tony, I did exactly what Scott told me. Right?
A Yes, sir.
Q He said record the temperature, by golly, I recorded the temperature.
A At 4:30, whatever the temperature was, I recorded it.
Q He told me how to take the reading, by golly, I took the reading just exactly the way he told me. Right?
A Yes, sir.
Q My problem with the whole testing, the reason I thought it was a waste of time, is because I thought it was completely inconsistent and I didn't understand it. Right?

Page 72

A Yes, sir.
Q Okay. And if someone -- and to this day no one sat you down and explained to you the results?
A No, sir.
Q Okay. Was there any other testing done that you're aware of?
A No, sir.
Q None at all?
A Any other testing? You're referring to using a machine and stuff? None that I am aware --
Q Whether it be this kind of machine or any other kind of machine. Do you know of any other testing that took place, either in that time frame or any other time frame?
A No, sir. I don't know that anything was done for this purpose.
Q Well, there was some testing done obviously, I can tell, so tell me about it.
A I don't know about the testing. I put some vents in some units. I put some dehumidifiers in some units. I plugged some units in.
Q Tell me about that.
A I was called and asked to go put a vent in the roof. I was called and asked to go put a vent in the side wall.

Page 73

Q Because of formaldehyde issues?
A I don't know why. I never asked.
Q Was there people in the home when you did this?
A No. This was not even down there.
Q Where was it?
A That was here.
Q Tell me about this.
A I did.
Q Well, there's more to it than that.
A No, sir, there's not. I was called and asked to do this job. I don't question my supervisors. I may not like it, but I do what I'm told.
Q Yes. And I hear what you're saying, Burl. I mean, I hear you. But you also know, I mean, you don't operate in a vacuum. You hear things, people talk; isn't that right?
A Hearsay or -- not hearsay --
Q You can call it hearsay.
A -- but craphouse rumors, whatever you want to call it.
Q Rumor mill.
A Rumor mill.
Q There you go.
A I'm sorry.
Q Were you in the military?

Page 74

A Yes, sir.
Q What were you in?
A I was a combat engineer and atomic demolition specialist.
Q In the Army?
A Yes, sir.
Q Okay. So you definitely know the word "scuttlebutt"?
A Yes, sir.
Q Okay. That's a word that we used, right, scuttlebutt?
A Yes, sir.
Q What's the scuttlebutt. And there's scuttlebutt at Gulf Stream, isn't there?
A There always is, every place you're at.
Q Right. And you have heard the scuttlebutt as to why you're putting in fans and why you're putting in vents, haven't you?
A I heard rumors, yes, or scuttlebutt.
Q Tell me the scuttlebutt. Or as we say, give me the scuttlebutt.
A I don't even know how to put it into words.
Q Put it into words the best you can.
A They call me and they say, Burl, I want this fan put in the roof; you may have to cut a new hole; I

Page 75

want it wired for -- well, the one time it was wired to the 12-volt light. Okay?
And then I'd come down and the scuttlebutt was, Burl, you're over there working on the FEMA trailer again. That's the scuttlebutt.
Q So there's some trailer they're doing some kind of adjustments to see if we can adjust the ventilation?
MR. MILLER: Objection, foundation.
Q In other words, change the trailer in some way to see if that affects the ambient air inside?
MR. MILLER: Foundation.
A I assume so, yes.
Q That was the scuttlebutt?
A But I don't know that. That's the -- I mean --
Q But that was done here in Indiana?
A Yes, sir.
Q How often was that sort of thing being done?
A I think I did three different things.
Q When?
A August. I don't know.
Q August of --
A It would have been -- I don't really know the date because they were so far apart that, I mean, it might be January I'd go do something, and then it

Page 76

wouldn't be until April I did something else.
Q Okay. But you're talking about of 2007, '-8? Which year?
A Probably '-7. I don't know.
Q Okay. So the things that you did was you cut a hole and put in an extra fan. That's one thing you did; right?
A An extra --
Q An extra vent fan?
A An extra type of fan, yes. It was a solar-type fan. It worked off the sun.
Q Okay. What else -- what other thing did you do on the FEMA trailer?
A We put -- I put a dehumidifier in one.
Q Where did you put that at?
A I put it in the front -- I don't remember, sir.
Q Okay. You don't have to call me sir, Burl. You're older than me.
A Probably.
Q What else did you do? You put in a humidifier. You put in a solar fan. What else?
A There was some type of fan that had a hose in it. It ran through the floor and into the side wall -- or through the side wall. And I ran a hose.
Q Into the side wall?

Page 77

A I don't -- I cut a hole in the side wall, 4-inch hole, 4 1/2-inch hole in the side wall, put a duct on it, and it had a little motor on the floor.
Q What would it do?
A It would run. That's all I know about it, sir.
Q Would it suck air out of the trailer into the outside or vice versa?
A If I remember correctly, it had two fan blades; one was blue, one was red. You had to change the fan blades out to change the operation of the fan.
Q Okay. So it was vice versa, either way?
A I think that one went both ways, whichever way you wanted to...
Q What else did you do? That's three things.
A I believe there was another type of ceiling vent. I don't --
Q That you had to install?
A Yeah. There was two -- I think there was two, maybe three different types of solar vents that was put in the roof. I mean, it could have very easily just been two.
Q What else.
A That's all I recall, sir.
Q And you believe all this happened in '07, or could it have been in '06?

Page 78

A Could have been both years, sir, because it was so far apart that I did these that it could have been part of '06 and '07.
Q Okay. Who was telling you to do this stuff?
A Dan Shea.
Q All right.
A And one of them was -- I don't remember who told me -- I don't remember who told me to do the humidifier.
Q Okay. So Dan gave you some of these instructions?
A Yes, sir.
Q Have you been talking with Dan off and on since this whole issue came up?
A No, sir. We haven't really spoke at all.
Q Okay. He just called you up and told you go do this or go do that?
A Yes, sir.
Q And didn't tell you why?
A No, sir.
Q Was there any other kind of testing?
A Not that I am aware of, sir.
Q Now, do you remember there being any kind of OSHA testing in Baton Rouge?
A OSHA testing?
Q Yeah. Like the government out there doing some

Page 79

testing.
A I -- no, sir.
Q No. You never did any work in Mississippi on this Gulf Stream order.
A Purvis. Purvis, Mississippi? Was that Mississippi?
Q Yeah. That was a big staging area. Did you go over there?
A Yeah. I was there for a short period of time.
Q Do you remember there being any testing over there?
A No, sir.
Q Do you remember there being any complaints of people of eyes burning, that sort of thing?
A No, sir.
Q You don't remember that at all?
A No, sir.
Q Do you remember any, whether it be Louisiana, Mississippi, or wherever, any resident that you may have interacted with complaining of any sort of symptom besides Mr. Breaux?
A No -- no, sir. I was at a lock changing staging area, at a site there for lock changing, and they asked questions about the unit, but I don't recall it being anything to do with eyes burning or anything like that.

Page 80

Q What kind of questions were they asking?
A The one lady said something about her furnace fan runs all the time. No. I think she said that her furnace fan never runs. And I commented to the contractor that they might want to look at the fuse to see if the fuse is blown on it.
Q Okay. Do you remember what time frame you were out in Purvis?
A November. November, early December, because it was before they were sent home for Christmas. No, it was in November.
Q November?
A I believe it was November, yes, sir.
Q And there was no scuttlebutt out at Purvis about formaldehyde or air quality issues in the trailer?
A No, sir.
Q And there was no scuttlebutt in Baton Rouge?
A Not when I first got there, no, sir.
Q All right. At some point there was?
A At some point there was, yes, sir.
Q After the news stuff came out?
A I believe it was about the same time frame, yes, sir.
Q And what were people saying and who was saying it?
MR. MILLER: Objection, foundation, compound,