# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA
### NEW ORLEANS DIVISION

IN RE:  FEMA TRAILER                    MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION        SECTION "N-5"

                                         JUDGE ENGELHARDT
                                         MAG. JUDGE CHASEZ

THIS DOCUMENT IS RELATED TO:
*Diana Bell, et al v. Keystone RV Company,*
*et al, No. 09-2967*

---------------------------------------------------------------------------------

## FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DAMAGES

       Named Plaintiffs, Diana Bell and Raymond Bell, III, persons of the full age of majority, through undersigned counsel, respectfully amend their original Complaint for Damages to reflect the following:

## I.  PARTIES

1. The Named Plaintiffs are, for purposes of 28 U.S.C. §1332, a citizen of a state other than the state(s) in which Defendants are citizens.

2. Defendant Keystone RV Company, "Keystone", is, upon information and belief, an entity incorporated in the state of Indiana, which conducts business in the State of Louisiana, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Louisiana.

3. The Defendant United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the "Federal Government," "Government" and/or "FEMA".

4.  Shaw Environmental, Inc. ("Shaw"), a Louisiana corporation, received a No-Bid contract from the Federal Emergency Management Agency ("FEMA") and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita.

## II.  JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§1346 and 2671, *et seq.*.

6.  The plaintiffs allege to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

7.  Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendant(s) with citizenship other than that of plaintiff(s), because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.  Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

9.  Keystone is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

10. Shaw is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

11. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, as the emergency housing unit was provided to the Plaintiffs in this district, and Named Plaintiffs' injuries were sustained in this district.

### III. FACTS AND GENERAL ALLEGATIONS

12. The Named Plaintiffs, residing or living in a travel trailer in the State of Louisiana, was provided this trailer by FEMA after the landfall of Hurricane Katrina. Thousands of other Gulf Coast residents were provided with similar travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") by FEMA after the landfalls of Hurricanes Katrina and/or Rita in September of 2005.

13. Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet.  They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities.  *Id.*

14. The residences of the Named Plaintiffs were rendered uninhabitable following Hurricane Katrina, leaving the plaintiffs homeless and in need of housing assistance.

15. FEMA contracted with the Keystone to purchase thousands of the housing units, primarily travel trailers, for provision to the Named Plaintiffs as temporary housing.

16. On information and belief, Keystone expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing unit occupied by the Named Plaintiffs containing higher than normal levels of formaldehyde.

17. On information and belief, the housing unit of the Named Plaintiffs deviated from Government specifications pertaining to the safety of the unit as a residence.

18. Named Plaintiffs submit that the housing unit which is at issue herein did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing unit pertinent to formaldehyde levels.

19. Named Plaintiffs submit that the housing unit at issue contained dangerous levels of formaldehyde due to Keystone's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that Keystone failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

20. Named Plaintiffs submit that Keystone ignored, or concealed and/or condoned the concealment of, the fact the housing unit at issue contained dangerous levels of formaldehyde due to Keystone's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell Keystone's products, and/or avoid the costs of safety

precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

21. The Named Plaintiffs spent significant time in the FEMA-provided housing unit manufactured by Keystone and provided to Plaintiffs by the Federal Government. As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing unit.

22. According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

23. Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to

5

which workers can be exposed over an 8-hour day from 3 ppm to 1 ppm.  In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

24. Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

25.  Keystone knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

26. FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act"). The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

27. In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Shaw with No-Bid contracts, eventually amounting to billions of dollars. The Federal Government also relied on the expertise and knowledge of the Shaw to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

28. Shaw was tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

29. Under the terms of their contracts, Shaw was obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same. Further, under their No-Bid contracts with FEMA, Shaw was

obligated to advise and instruct FEMA regarding the implementation of those contracts. Shaw failed to properly fulfill either of these tasks.

30. Shaw contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Shaw was tasked with operating. These new areas included staging areas to be managed and maintained as assigned to one of Shaw or individual locations and addresses where Shaw assigned that temporary housing unit would have obligations to manage and maintain it.

31. To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Shaw entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under their individual contracts with FEMA.

32. Shaw was tasked under its contracts with FEMA to identify and prepare the infrastructure for the various group site locations. This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc. Shaw knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

33. Once the temporary housing unit occupied by the plaintiffs was transported and delivered to a particular location, Shaw had the responsibility for installing that temporary housing unit. Shaw installed the temporary housing units by "blocking" the unit. This meant raising the plaintiffs' unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

34. By blocking the temporary housing unit of the plaintiffs, Shaw created stress and flexing on the frames of the unit as it were not designed to be lifted off of the wheel base. In fact, the manufacturers of the temporary housing units warned in the various owners'

8

manuals provided with the units, that units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

35. The stress and flexing of temporary housing units' frames caused by Shaw "blocking" them with weight off of the wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

36. The temporary housing unit occupied by the plaintiffs, which was provided by FEMA was a travel trailer. Travel trailers are, by definition, mobile.  They are designed for and intended for periodic, recreational use and not for long-term habitation.  By installing the travel trailer on concrete blocks for extended occupancy, Shaw knowingly and intentionally modified the design and the actual use of the unit occupied by the plaintiffs by converting it into a temporary housing unit to be used as a residence for long term occupancy in some instances exceeding 18 months.

37. Shaw failed to consult with the manufacturers of the temporary housing units, including Keystone, with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long term residence and occupation.  Shaw took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

38. Once Shaw had completed the transportation, delivery and installation of the temporary housing unit occupied by the plaintiffs, Shaw was tasked with inspecting the unit to ensure that it was safe and habitable, prior to occupancy by the plaintiffs.  Upon information and belief, Shaw failed to adequately inspect the temporary housing units occupied by the plaintiffs to ensure that the unit was safe and suitable for its intended use –long-term occupancy by an individual displaced by Hurricane Katrina.  This failure to

properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by the plaintiffs.

39. In addition to transportation, site identification, installation and inspection, the temporary housing unit occupied by the plaintiffs provided in response to Hurricanes Katrina was also managed, maintained and repaired by Shaw, or their various subcontractors over whom they maintained direct oversight and responsibility.  Upon information and belief, Shaw failed to adequately manage, maintain and repair the travel trailer which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects.

40. Parallel to their duty to manage, maintain and repair each temporary housing unit Shaw failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the plaintiffs-occupants of the temporary housing unit to various adverse health effects caused by exposure to elevated levels of formaldehyde.

41. Following the plaintiffs' occupancy of the temporary housing unit, Shaw was tasked with its de-installation.  Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, Shaw failed to identify the unsuitability of the temporary housing unit for long-term occupancy.

42. In addition to de-installation of the temporary housing units, Shaw was tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to Hurricanes Katrina and Rita or for use in the future.  By restoring and refurbishing these temporary housing units, Shaw warranted that the units were fit for their intended use, long term occupancy in response to disaster related displacement.  By restoring and refurbishing these temporary housing units, Shaw created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects

10

caused by the elevated levels of formaldehyde in the temporary housing units.  Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by Hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

43. Shaw, at every stage of their involvement, failed to warn the plaintiffs of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects.

44. Through their actions and omissions, Shaw created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Shaw negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

45. Shaw failed to warn the plaintiffs of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing units.

46. By restoring and refurbishing the trailer for future habitation, Shaw improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

47. Finally, despite these failures, Shaw received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of the plaintiffs-occupants who simply had nowhere else to go and who was relying on FEMA and its contractors to

keep her safe in the aftermath of the greatest natural disaster in the history of the United States.

48. Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

49. In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels.  *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiffs herein, November 16, 2007.

50. Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Gulf Coast, the Inspector General of the Department of Homeland Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-

Katrina, 75,000 travel trailers had been delivered to the Gulf Coast. *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

51. The Federal Government also continued to supply the defective and dangerous housing units to the Gulf Coast after March of 2006 .

52. The Federal Government continued to supply the defective and dangerous housing units to the Gulf Coast even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

53. The Federal Government continued to supply the defective and dangerous housing units to the Gulf Coast even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value.  Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http://oversight.house.gov/documents/20070719113015.pdf)   and   D   (*available   at* http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

54. The Federal Government continued to supply the defective and dangerous housing units to the Gulf Coast even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde

emissions in their housing units. Union of Concerned Scientists, *supra*, and Exhibits E (*available at* http://oversight.house.gov/documents/20070719113322.pdf), I (*available at* http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at* http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

55. While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue."  Union of Concerned Scientists, *supra*, and Supplemental A (various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B (various emails *available at* http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

56. Named Plaintiffs aver that, even as the Named Plaintiffs were being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the manufacturers concerning formaldehyde

exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

57. FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher.  The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light.  Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at* http://oversight.house.gov/documents/20070719114058.pdf)    attached thereto.

58. FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers.  This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months,  were useless for determining a policy to protect trailer residents.  This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana.  Union of Concerned Scientists, and Exhibit R attached thereto, *supra*.  *See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry,            Feb            1,            2007,            *available at*http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report _0507.pdf.

15

59. This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.   Union of Concerned Scientists, *supra*.

60. FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units occupied by the plaintiffs supplied in the wake of the hurricanes in order to avoid legal liability for injuries to the Plaintiffs herein as a result of her exposure to formaldehyde.   FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006.  *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

61. FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review.   FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units.  *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for

Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

62. FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this "level of concern," the average sampling results still were higher. *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents/20070719102502.pdf.

63. Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw… I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/20071114164004.pdf.

17

64. On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

65. Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation"did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at* http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

66. The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiffs' exposure to dangerous levels of formaldehyde in the housing unit, and causing her serious injuries.

67. It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units.  *See* Statement of Howard   Frumkin,   M.D.,   DrPH,   Director,   National   Center   for   Environmental

Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC's RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

68. The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

69. The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest

comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

70. As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing. The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

71. The Federal Government's actions with regard to the Plaintiffs in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy. Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

72. Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

### COUNT 1:

### <u>CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT</u>

73. At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to the Named Plaintiffs.

74. The Federal Government was obligated to promptly warn the Named Plaintiffs of any defects in the housing units which could cause harm and of which the Federal Government was aware.

75. The Federal Government, after becoming aware of the potential for such harm, violated this duty to the Named Plaintiffs, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

76. As a direct and proximate result of the acts and/or omissions of the Federal Government, as well as its violation(s) of state and federal laws, the Named Plaintiffs have suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

77. Further, since the Plaintiffs are within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, the Plaintiffs specifically plead the application of the doctrine of negligence *per se.*

78. The Federal Government was negligent and at fault in the following non-exclusive particulars:

   a.    In failing to warn the Named Plaintiffs of the unreasonably dangerous nature of the housing unit which that Plaintiffs occupied;

b.      In failing to promptly remedy the dangerous nature of each such housing unit, on becoming aware of the formaldehyde dangers associated with the unit;

c.      In failing to timely implement adequate safety measures and procedures to address the defects in the housing unit of the Named Plaintiffs, on becoming aware of the formaldehyde danger associated with the unit; and

d.      Such other actions of negligence and fault as will be shown at the trial of this matter.

**COUNT 2:**

**CAUSE OF ACTION AGAINST KEYSTONE UNDER
LOUISIANA PRODUCTS LIABILITY ACT**

79. Keystone is a manufacturer of the housing unit occupied by the Named Plaintiffs, which unit constitutes a product under the Louisiana Products Liability Act [LPLA].

80. The exposure to the Named Plaintiffs to formaldehyde fumes from Keystone's products and equipment resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration in the condition in which Keystone sold these housing units.

81. The design of the housing units, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to the Named Plaintiffs.

82. Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to the Named Plaintiffs.

83. Keystone's product, equipment and supplies used by the Named Plaintiffs were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left Keystone's control.  The Named Plaintiffs were an intended and foreseeable user of the alleged defective products and damages and losses to the Named Plaintiffs reasonably could have been anticipated by Keystone.

84. The defects in Keystone's housing units are the result of and/or include, but are not limited to, the following:

   i.   In failing to design their respective products so as not to emit dangerous levels of formaldehyde;

   ii.  In providing housing units which, by virtue of their design and/or manufacture and/or composition, were unreasonably dangerous under reasonably anticipated use;

   iii. In providing housing units which, by virtue of a lack of an adequate warning(s), were unreasonably dangerous under reasonably anticipated use;

23

iv.  In providing housing units which did not conform to the express warranties made by the Keystone regarding their fitness for use as reasonably anticipated;

v.  In manufacturing, testing, marketing, distributing, licensing and selling of unreasonably dangerous housing units;

vi.  In failing to properly test the housing units to property evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

vii.  In failing to warn the Named Plaintiffs of the unreasonably dangerous nature of the housing unit occupied by the Plaintiffs, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit;

viii.  In failing to ensure that the housing unit it manufactured and provided to the Named Plaintiffs was suitable for their intended use;

ix.  In failing to adhere to any and all express warranties of fitness and safety for the housing units they manufactured and provided;

x.  In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

xi.   Such other indicia of fault under the LPLA  as will be shown at the trial of

this matter


**COUNT 3:**

**CAUSE OF ACTION AGAINST SHAW UNDER THE LOUISIANA PRODUCTS LIABILITY ACT**

85. Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

86. Shaw qualifies as a manufacturer under the Louisiana Products Liability Act ("LPLA"), as they performed work pursuant to their contracts with FEMA which altered the character, design, construction, and/or quality of the product and the housing units constitute products under the LPLA.

87. The increased exposure to formaldehyde fumes from the alteration of the temporary housing units by Shaw resulted from the normal, foreseeable, and intended use of the products and equipment.

88. The installation and alteration of the temporary housing units, the modifications to the manufacturers' designs, and the "blocking" of units off their wheel base, altered the product which increased the effects of the product's defect and posed an unreasonable risk of harm to the Named Plaintiffs.

89. The Named Plaintiffs were an intended and foreseeable user of the alleged defective products, and damages and losses to the Named Plaintiffs reasonably could have been anticipated by Shaw.

25

90. Shaw, by installing the temporary housing units on concrete blocks for extended occupancy and, further, by installing residential appliances and heating and air conditioning units, knowingly and intentionally modified the design and the actual use of the units.

91. The defects in the Shaw products are the result of and/or include, but are not limited to the following:

  a. In creating stress and flexing on the frames of the units by lifting significant weight from the wheel base, which distorted the travel trailers' shells allowing for increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell;

  b. In providing a temporary housing unit to the Named Plaintiffs which, by virtue of its composition, refurbishment, reconditioning, and/or construction was unreasonably dangerous under reasonably anticipated use;

  c. In providing a temporary housing unit to the Named Plaintiffs which, lacking adequate warnings, was unreasonably dangerous under reasonably anticipated use;

  d. In failing to warn the Named Plaintiffs of the unreasonably dangerous nature of the travel trailer converted to a temporary housing unit  for its intended use by FEMA or of the presence of excessive levels of emissions of formaldehyde;

  e. In failure to ensure that the temporary housing unit they installed, refurbished, and reconditioned was suitable for their intended use, as long term housing;

  f. In failing to adhere to any and all of the warning against the jacking of the units with weight off its wheel base by the manufacturers;

g.  In failing to follow the manufacturers' instructions for the installation and intended use of the temporary housing unit;

h.  In providing housing units which were unduly dangerous due to their emissions of formaldehyde; and

i.  Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

### COUNT 4:
### NEGLIGENCE OF SHAW UNDER LOUISIANA LAW

92.   The Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

93.  At all relevant times Shaw was tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused the Plaintiffs' injuries.

94.  Shaw owed a duty to the Named Plaintiffs to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

95.   Shaw knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing units by the plaintiffs, and that the temporary housing unit would be used in the manner that the plaintiffs herein used the temporary housing unit.

27

96. Shaw breached its duty to the Named Plaintiffs in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

    a. Failing to sufficiently warn the plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy; and

    b. Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units.

97. Shaw actions were the proximate cause of the increased exposure of formaldehyde to the Named Plaintiffs.

98. Shaw contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.


## IV. COMPENSATORY DAMAGES


99. In addition to and by way of summarizing the compensatory damages prayed for herein, the Named Plaintiffs aver that the defendants, the United States of America through FEMA and Keystone, as well as Shaw, individually and/or jointly are responsible for all damages which the Named Plaintiffs herein have suffered and continues to suffer as a consequence of defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning

capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and  loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

## **REQUEST FOR JURY TRIAL**

The Named Plaintiffs are entitled to and demands a trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, the Named Plaintiffs pray that Keystone, Shaw, and the Federal Government be served with a copy of this Complaint, and that, after due proceedings:

1. there be a judgment herein in favor of the Named Plaintiffs and against Defendants for all compensatory damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2. there be specially included in the judgment in the Named Plaintiff's favor, provisions for the following damages and relief as found applicable and supported by the evidence:

   a.    past and future physical injuries,

b.      past and future mental and physical pain and suffering,

c.      past and future physical impairments and disability,

d.      past and future reasonable and necessary medical expenses,

e.      past and future loss of earning capacity,

f.      past and future loss of enjoyment and quality of life,

g.      loss of consortium and/or society,

h.      compensable out-of-pocket expenses related to defendants' wrongdoing, and

i.      costs of court,

3.   all other general, equitable, and further relief as the Court may deem just and proper.

Respectfully submitted:

BY:  s/Gerald E. Meunier_____
GERALD E. MEUNIER, #9471
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana  70163
Telephone:     504/522-2304
Facsimile:      504/528-9973
gmeunier@gainsben.com
jwoods@gainsben.com

30

**COURT-APPOINTED        PLAINTIFFS'
STEERING COMMITTEE**
ANTHONY BUZBEE, TEXAS #24001820
ROBERT BECNEL, #14072
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
DENNIS REICH, Texas #16739600
MIKAL WATTS, Texas #20981820

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

s/Gerald E. Meunier
GERALD E. MEUNIER, #9471