# FEMA - FOREST RIVER TRAILER

# INSPECTION AND TESTING PROTOCOL

In Re:       FEMA Trailer Formaldehyde Products Liability Litigation
             Untied States District Court, Eastern District of Louisiana
             MDL No. 1873

---

The Plaintiffs' Steering Committee ("PSC") will inspect and test the travel trailer resided in by Plaintiff Lyndon Wright, Forest River Trailer, VIN # 4X4TSMH296C008992, ("The Trailer"). The Trailer is currently located at a FEMA Storage Facility in Melville, Louisiana, Inventory Location: Melville Staging Site - Lot THUWLAMEL1.

1. **Visitor Conduct At FEMA Staging Area.**
   a.  All visitors will comply with any instructions or orders issued by the representative of FEMA Logistics Management Directorate Logistics Operations, the representative from FEMA Office of Chief Counsel, and representative from Department of Justice while on site at the Melville Staging Site. In the event that such instructions or Orders interfere with inspection or testing, if good cause exists parties will be allowed additional days at the site to complete inspection and testing.
   b.  Any visitor who fails to promptly comply with any instruction or order issued by the representative from the FEMA Logistics Management Directorate Logistics Operations, the representative from FEMA Office of Chief Counsel, or representative from Department of Justice will be immediately escorted off the facility by FEMA Security and will not be allowed reentry to any FEMA Staging or Storage Facility.
   c.  All visitors will review and read the Test Protocol prior to entry to the FEMA facility, and agree to comply with all requirements and any restrictions set forth in the Test Protocol relating to their conduct and actions while at the facility.
   d.  Plaintiffs will not be allowed to bring in excess of 12 persons total onto the FEMA facility at one time.
   e.  Government employees may inspect any item, vehicle, or person coming onto the facility, and may inspect prior to the departure. If the Government has reason to believe that any of visitor has violated the restrictions set forth in the Test Protocol it may take whatever action it believes necessary and appropriate to enforce the Test Protocol, including the seizure of any recording devices or other items, and will hold such items until the issue is resolved.
   f.  All visitors will comply with any and all laws applicable to federal property and facilities, including but not limited to, no firearms or illegal



1

**substances are allowed on the facility. Persons in violation of any such laws are subject to arrest.**

2. **Inspections:**
   a. **General**
      i. FEMA will move the Trailer to an area of the FEMA Facility which will allow for the testing proposed in this protocol and allowing access by all parties and experts designated to be present and will not interfere or impair with FEMA's operation of the facility;
      ii. The location of the Trailer for testing should have an area large enough to adequately facilitate the inspection of the Trailer by numerous individuals and for the disassembly and reassembly of the Trailer;
      iii. All parties will provide the United States with a list of persons who they anticipate will participate in the inspection and testing.
      iv. All parties will provide written notice to the United States of the identity of persons who will access the FEMA facility at least 48 hours prior to seeking entry to the FEMA facility
      v. Each participant will sign and provide to FEMA a indemnity/hold harmless agreement and acknowledge that he/she has reviewed, read and understands the requirements and restrictions set forth in the Test Protocol;
      vi. At least 72 hours in advance of scheduled testing, a non-attorney representative of the Plaintiff will observe and inspect to ensure that Doors, Windows (and any other openings in the shell or envelope of the trailer which would not normally be open, i.e., any holes in the walls, roof, etc.) be noted and close/sealed. The inspector can use a strip of witness tape across the door and windows to ensure they remain closed prior to the commencement of ambient air testing. This inspector will take photographs of the door/windows and any other openings in the shell or envelope which would not normally be open. These photographs will be shared with liaison and government counsel within 48 hours. This same inspection will determine if the site location is appropriate for the anticipated testing. If not this will be reported immediately to PSC and will be forwarded to government counsel. Defendants will be allowed to send a non-attorney representative to this inspection;
      vii. Any party seeking to conduct testing that requires a power source to conduct testing must provide the generator or power source to accomplish the testing.;
      viii. Access to nearby restroom facilities is requested. Should access not be provided or is not in close proximity to the Trailer, PSC will be allowed to provide portable restroom facilities at the site of the inspection and testing;

2

ix. Estimated times do not include travel time from the entry gate of the facility to the Trailer nor time taken for lunch;

x. Times are estimates only. Actual testing and inspection times may vary;

xi. Once the initial inspection occurs and any openings are closed and sealed with witness tape, no access will be made to the unit by FEMA or any other party (barring emergency circumstances, which will be noted and explained) prior to the commencement of testing;

xii. Before any interior access is allowed, the initial inspection, photographing, video-taping or any other recordings to be taken of or at the exterior should occur;

xiii. The PSC will maintain a log for any and all entries by attendees to the testing which will include the reason for any and all entries into the Trailer;

xiv. All of the windows, doors and other openings to the exterior of the Trailer shall remain closed for a minimum of 72 hours prior to the PSC's inspection and testing;

xv. Testing and inspection would begin at 9:00 (or one hour after the opening of the facility, whichever occurs earlier) AM CDT on Monday, July, 27, 2009;

xvi. PSC and Defendant testing and inspections will take place over fifteen (15) business days (three weeks), absent good cause shown for any additional days;

xvii. Each party will be responsible to ensure inspection and testing is done in a safe and appropriate manner, and for any first aid or medical care required by their counsel, experts, consultants, or representatives while at the FEMA facility;

xviii. Day One of testing will be comprised of William Scott, or representative of W.D. Scott Group, entering the trailer to conduct active air sampling and set a 24 hour passive dosimeter test, to take no longer than an hour, and with the Trailer to subsequently remain closed for 24 hours, with testing set to resume at approximately 9:00 a.m. CDT the following day at which time the passive dosimeter will be collected;

xix. At the end of testing on Day Two, and from that point forward, the air conditioning system will be operating between 70°F and 75°F, or as close as possible thereto, twenty-four hours a day (except as noted herein regarding the determination of air changes per hour for conditions that specify the air conditioning system, i.e. HVAC, be turned off, i.e. not operating);

xx. Authorized visitors may enter the FEMA facility one hour after facility operations opens, and must depart facility one hour before it closes;

xxi. The testing and inspections will be done by PSC's and Defendants' consultants, employees of the consultants or others hired to test,

3

|       |   |
|------:|---|
|       | inspect or perform other duties on behalf of the consultants or parties; |
| xxii. | The PSC's attorneys, consultants and other members of the consultants party may be escorted to the Trailer by a FEMA employee and these persons will agree not to talk with any persons at the facilities about trailers or any matter that may in any way relate to the MDL action; |
| xxiii.| All members of the inspection and testing parties agree to restrict themselves to the area of the facility identified by FEMA as the access route and area for the testing and inspection of the Trailer, and the Trailer itself; |
| xxiv. | The only unit to be accessed will be the Trailer; |
| xxv.  | These persons will not access, seek to access, photograph, video tape, record or inspect any other trailers or portions of the facility; |
| xxvi. | All persons electing to enter the Trailer for PSC's initial testing, observations, photographing or to video the proceedings will identify themselves to William Scott, or the designated representative of WD Scott Group, prior to the any initial entry into the Trailer by anyone; |
| xxvii.| Mr. Scott or the designated representative of WD Scott Group will announce and inform each Defendant's counsel or designated representative of the intent to start of this set-up and testing. PSC Counsel will then open the Trailer door once for all concerned to enter the Trailer. Once set up for this testing begins, no one will be allowed to enter or exit the Trailer. All doors and windows will remain closed during sampling; |
| xxviii.| The number of people entering into the Trailer for the initial indoor air quality testing will be restricted. The only persons allowed to enter the trailer are: (1) a representative of FEMA Logistics Management Directorate Logistics operations, the representative from FEMA Office of Chief Counsel, or a representative from Department of Justice and (2) experts or consultants designated by each party's counsel; |
| xxix. | All parties initially entering into the Trailer each day must enter as a group at the same time. The door of the Trailer should remain open for only as long as needed for group to enter expeditiously and will remain closed thereafter until that phase of inspection or testing is concluded; |
| xxx.  | The door of the Trailer shall remained closed for the entire duration of all the indoor air quality tests; |
| xxxi. | Prior to the envelope and air duct leakage tests, PSC's representative monitored by Defendant's consultants will seal all plumbing sewer drains or fill the p-traps will be filled with water. This will occur at the sinks, lavatories, commode, bath tub, etc. – PSC will furnish the water; |

4

xxxii. All parties will complete all ambient air testing, surface testing, in situ testing of the wall, ceiling, floor and other cavities of the Trailer, moisture testing, infrared thermographic surveys, temperature and relative humidity recordings, envelope leakage/pressure testing, ventilation testing, air conditioning supply and return air duct testing, and furnace supply and return air duct testing to the satisfaction of all parties prior to the commencement of component part/destructive testing;

xxxiii. At the end of each day that PSC is testing unit they may close doors and windows, if they so choose, and place a strip of witness tape to ensure the unit is not accessed;

xxxiv. All parties must agree in writing that all testing requiring the Trailer to be in full assembly has been performed to their complete satisfaction prior to the commencement of any destructive testing or permanent removal/disassembly of the Trailer's components;

xxxv. PSC will provide a release document for each and every party to sign that they are in agreement that the destructive testing and disassembly can proceed;

xxxvi. All parties, within fifteen days of making any videotapes, photographs, or recordings, will provide to the other parties and liaison counsel duplicates of those materials.

xxxvii. All parties agree to produce within ten days of receipt to all other parties, copies of any and all documents and materials generated by testing of samples collected from this Trailer;

xxxviii. FEMA agrees not to sell or transfer ownership of this Trailer. Because the Trailer will be demolished as a result of implementation of this Test Protocol, PSC will pay to FEMA $6,000.00 prior to the commencement of any inspection or testing;

xxxix. PSC will arrange and coordinate with Jan Jones and/or Diane Donley at FEMA for the transfer of $6,000 agreed upon by parties for the destructive testing of this Trailer prior to commencement of any inspection or testing;

xl. PSC will be responsible for picking up and policing the area in and around the trailer each evening to clean-up from any mess caused by its testing;

xli. PSC will identify and propose a third party entity that will be responsible for disposing of whatever is left of the unit after testing. PSC will arrange for a dumpster to be placed on-site at the FEMA facility to facilitate clean-up and debris removal;

xlii. PSC may have two attorneys present during the inspection and testing outlined by this protocol, all other non-Governmental parties may have two attorney presents. All defendants may have any other experts or consultants they consider necessary to be present to observe and monitor testing. The same conditions apply to PSC for purposes of monitor any testing done by any non-Governmental party;

5

xliii. PSC will share its air sampling test results with defendants and will divide any physical component samples taken from the Trailer into four equal parts – one for each party;

xliv. Any physical component sample taken from the Trailer that a party intends to remove from the FEMA facility will be photographed in place prior to removal, will be photographed after removal, and will be photographed a third time after sample is divided into four equal parts – one for PSC, one for Forest River, one for United States, and one for Shaw.

xlv. PCS will arrange for the removal of the dumpster as required and twenty-four (24) hours after completion of inspection and testing by all parties, will arrange for removal of dumpster and remains of the trailer. .

b. **Specific Non-Destructive Testing:**

| Action: | Estimated Time (times will over-lap): | Estimated Personnel: (Not including Counsel or Photographer/Animator) |
|---|---|---|
| Day 1: Set up and obtain active air sample(s) measurements inside Trailer, set up passive dosimeter, leave trailer sealed for 24 hours. | 1.0 hours | 2-3 |
| Set up air sampling and measurement devices outside the Trailer. | 0.5 hours | 3-5 |

| | | |
|---|---|---|
| Conduct air sampling (IAQ, formaldehyde and other type) tests: outdoor and indoor air testing. Access will be restricted during these tests. Tests will be performed by W. D. Scott Group, Inc. and/or Boston Chemical Group to determine the current air quality within the Trailer.<br><br>Testing requires an undisturbed test area. No movement into or out of the Trailer will occur during this time. | 2.0 hours | 3-5 |
| Collect air sampling and measuring devices. Test results will be shared with defendants. | 0.5 hours | 3-5 |
| Preliminary inspection, photographing, videotaping, measuring, and recording of the exterior undercarriage, underbelly, walls, windows, doors, envelope penetrations, roof, accessories and sealants. Removal of the roof top air conditioning unit cover will be performed to inspect and document the unit.<br><br>Temperature and Relative Humidity monitoring devices will be set up on the exterior and interior of the Trailer for continuous readings throughout the inspection and testing on a 24 hour basis.<br>This will be performed by First General Services and Ritter Consulting to provide data to assist experts in compiling indoor formaldehyde air quality | 2.5 hours | All personnel |

8

| | | |
|---|---|---|
| Installation of a logging velometer on the interior of the Trailer in the locations typically assigned for the placement of formaldehyde badges. This will be performed by First General Services to determine air flow within the Trailer without the aid of mechanical units or opening of fenestrations. | 1.0 hours | 1-3 |

| | | |
|---|---|---|
| Infrared thermographic survey. This will be performed by Lagrange Consulting and First General Services to document the temperature differentials between the interior and exterior surfaces of the Trailer. This will identify potential air leakage, moisture intrusion and water intrusion into the unit.<br><br>**Mold Protocol:**<br>Taking of mold samples will be done prior to the HVAC system being activated. This will be performed by W. D. Scott Group, Inc. and/or Boston Chemical, to obtain bulk, surface and air samples, for viable and/or direct laboratory analysis as dictated by the conditions in the Trailer, and to identify, quantify and classify any possible surface microbial growth.<br><br>This function will be performed concurrently with other destructive testing.<br><br>The mold sampling will be as follows: | 1.0 hours | 2-3 |

| | | |
|---|---|---|
| Mold Testing Protocol:<br>1. Plaintiffs will take culturable air samples using the Anderson N-6 Sampler (or a variant thereof). | 1.0   hrs | 2-4 people |
| 2. Surface sampling will be done using both swab and bulk testing using culturette swabs and/or bulk samples taken from the trailer. | 3.0 hours | 2-4 people |
| 3. The sample locations will be determined in the field based on visual inspection, could include the HVAC system and its component parts, architectural surfaces, and sub-architectural surfaces (wall, ceiling, and floor cavities; cabinet interiors, etc.). | | |
| 4. All mold samples taken from the Trailer will be submitted for viable laboratory analysis to determine mold speciation on samples. | 2 weeks | |

| | | |
|---|---|---|
| Environmental walk through, survey, photograph, and video of Trailer. | 3.5 hours | 4-6 |
| Examination and documentation of the interior construction means and methods. | 3.5 hours | 3-5 |
| Examination of the electrical system and components. To be performed concurrent with the interior examination listed above. This will be performed by Darryl Hicks, P.E. to identify any issues regarding the system as a result of exposure to high levels of moisture and or water. | 2.5 hours | 2-3 |
| Materials Audit and Measurements. Note: measurements will be ongoing on the exterior and interior of the Trailer throughout the inspection period. This will be performed by Dr. Stephen Smulski to identify the materials utilized in the construction of the Trailer and to determine the manufacturer and certifying agency of each material. | 3.0 hours | 3-5 |
| Ventilation Testing, air changes (ACH) per hour [including ACHs measured (i) when trailer is closed and HVAC is not operating, (ii) when trailer is closed and HVAC is operating, (iii) when | 3.0 Hours | 3-5 people |

| | | |
|---|---|---|
| HVAC is not operating and windows are open] after the final IAQ samplings of the day, envelope air leakage testing, air duct leakage testing, air pressure testing, and infrared thermographic survey. This will be performed by First General Services and Lagrange Consulting to test for envelope air leakage and HVAC duct leakage. | | |

| Jacking and Installation Procedure: | 4-8 hours | 2-4 people |
|---|---|---|
| Jack up the Trailer and block same according to Installation Guidelines, Instructions and Diagrams provided by Shaw. Further, all jacking and blocking will comply with the Installation section of the FEMA/Shaw Scope of Work Exhibit 7. If This can occur concurrently with other events and inspections after the initial IAQ indoor tests are completed. This will be performed by First General Services. This will attempt to provide data regarding the effects of jacking up the Trailer had on the undercarriage frame, floors, walls, roof, windows and doors as it relates to the infiltration of air, moisture and water into the envelope of the Trailer. These elements have been shown to elevate the emission of formaldehyde and provide needed sources of moisture for the proliferation of mold.<br><br>If no guidelines or instructions are provided by Shaw, then PSC, through First General Services, will utilize the following procedure: (a) 3-ton jacks or larger will be used as individual jacks, not part of a unified jacking system; (b) one or two layers of ¾" thick CDX plywood 2' x 2' in dimension between the site surface and the jacks to provide support for the jacks, (c) At least one nominal 2" x4" wood block approximately one foot long will be placed between the top of the jack and the primary frame of the trailer, (d) Each jack will be set within 30" of the corners or edge of the primary frame of the Trailer to place blocking 6" from the corners, (e) all middle piers will be evenly spaced between the front and rear piers. Any jacks will be placed within 30" of the location of the middle piers of the Trailer.<br><br>The sequence of jacking (provided that the PSC is not in receipt of any instructions from Shaw) will be as follows: (a) for each of the jacking sequences listed below, the middle pier will be evenly spaced from the front and rear piers, which will most likely be in front of the tires, (b) two front corners at the same time then two rear corners at the same time, then the two middle piers at the same time, (c) two rear corners at same time, then front corners at the same time, then middle piers at the same time, (d) the left side of the Trailer will be jacked up by placing the jacks at the front and rear corners then the rights side will be jacked up in the same manner, then the middle section will be jacked and put on piers, (e) then the right side will be jacked up first followed by the left in reverse of (d) above, (f) one corner at a time, then middle piers, (g) The jacking will be performed using a two man crew.<br><br>Observe and measure door and window units for plumb and square positions prior to jacking. Performed by David Moore, P.E. and First General Services.<br><br>Observe and measure door and window units for plumb and square positions during and after the procedures of jacking up and blocking the Trailer. Performed by David Moore and First General Services. | | |
| Observation and level, plumb and square measurements of the floors, walls and roof of the Trailer during and after the jacking and blocking procedures. | | 14 |

c. **Air Sampling Protocol**

    i. Air sampling will be conducted in accordance with the Protocol entitled *Formaldehyde Sampling: Active and Passive Sampling Protocols – Procedures for Evaluating Formaldehyde Levels in FEMA Temporary Housing Units,* prepared and developed by DeVany Industrial Consultants, March 2008;

    ii. Measurements of the Trailer/Material Audit will be conducted so as to catalogue components consistent with "Aldehyde and Other Volatile Organic Chemical Emissions in four FEMA Temporary Housing Units - Final Report," by LBNL's Randy Maddalena, Marion Russell, Douglas P. Sullivan, and Michael G. Apte, Environmental Energy Technologies Division, November 2008, available at:

http://www.cdc.gov/nceh/ehhe/trailerstudy/pdfs/LBNL-254E.pdf

("LBNL Report"), including measurements of each surface material, component part and opening in the trailer.

    iii. Ventilation testing will be done according to either: (1) "Measurements of Steady-State Ventilation Rates", as discussed in the LBNL Study; or (2) ASTM E1827 - 96(2007, Standard Test Methods for Determining Air Tightness of Buildings Using an Orifice Blower Door.

    iv. Air conditioning return air and supply air duct testing and furnace return air duct and supply air duct testing will be performed in accordance with ASTM E1554-03, Determining External Air Leakage of Air Distribution Systems by Fan Pressurization.

d. **Specific Destructive Testing:**

15

| Action: | Estimated Time: | Estimated Personnel: (Not including Counsel or Photographer/Animator) |
|---|---|---|
| Removal of underbelly board or enclosure for testing of the materials perm rating. To determine if the material is a moisture/air vapor barrier or retarder. This will be performed by First General Services and Ritter Consulting and will assist in determining moisture and air intrusion into the Trailer.<br><br>Observations of the underbelly insulation and taking of samples for identification purposes.<br><br>Observation of the floor joist system and the underside of the floor sheathing and the means and methods of connections of all undercarriage and cavity components. This will be performed by David Moore and First General Services to compare the Trailer's construction means and methods to that of the manufacturer's specifications.<br><br>Removal of the underbelly material to observe the installation and insulating means and methods of the furnace | 2.0 hours | 2-4 |

| | | |
|---|---|---|
| duct system for compliance with code and the manufacturer's specifications. This will be performed by First General Services and Ritter Consulting to determine air leakage from the duct system and the installer's compliance with the code and manufacturer's standards. | | |
| Removal of representative samples of some or all of the following wood composite products and items for observation, identification, testing and exhibition:<br>1) Sub-flooring<br>2) Wall panels<br>3) Ceiling panels<br>4) Interior doors<br>5) All built-in items:<br>6) Cabinets-upper and lower kitchen<br>7) Kitchen countertops<br>8) Bathroom vanity and countertop<br>9) Furniture<br>10) Dining area seating<br>11) Dining area table top<br>12) Bed platforms<br>13) Any and all items identified as potentially containing formaldehyde or fungal spores/growth<br>14) Wall/floor and ceiling insulation<br>15) Architectural surfaces. | 3-4 hours | 2-3 |

| | | |
|---|---|---|
| All samples to be taken will be a minimum of 18" x 18" by the thickness of the material where possible, and will be cut in half and shared with defendants.<br><br>Samples of all built-in items would be smaller in proportion to the actual size of the item being sampled.<br><br>Make small cuts into certain parts of the built-in, e.g. cut through an overlay to identify the substrate. This would allow for confirmation of wood composite products used without the need to remove the sample.<br><br>Removal of samples from items of which we are not presently aware but are discovered during the sampling.<br><br>The samples would be taken for the purposes of confirming:<br>1. The type of wood composite product used for each item in the trailer;<br>2. That the wood composite product was bonded with a urea-formaldehyde adhesive (by submitting a specimen from the sample for chemical analysis).<br>3. The composite wood | | |

| | | |
|---|---|---|
| product manufacturer and third-party certifying agency by locating their stamps;<br>4. The types of overlay(s) applied to each composite wood product;<br>5. Presence of mold and speciation; and<br>6. Use of the samples as exhibits at trial; | | |
| Removal of the sub-flooring, walls and ceiling panels will;<br>1. Allow us to confirm how and from what other materials the floor, walls, and ceilings are constructed;<br>2. Allow for the identification of the manufacturer's and certifying agency's stamps; | | |
| Removal of all items would be performed after all IAQ testing is completed. | | |