FEMA17-009336

## Kevin Souza

| | |
|---|---|
| From: | Heighberger, Eric B |
| Sent: | Wednesday, June 06, 2007 2:35 PM |
| To: | Souza, Kevin |
| Cc: | Andrews, Kathaleen |
| Subject: | RE: Meeting with Chief and Admiral |

Ms. Andrews would be THRILLED to work on this one, I am sure!

Eric

-----Original Message-----
From: Souza, Kevin
Sent: Wednesday, June 06, 2007 10:17 AM
To: Heighberger, Eric B
Subject: FW: Meeting with Chief and Admiral

Hi Eric,

Below is a chain of email regarding the Admiral's request for a meeting with DHS OHA on formaldehyde. Could you please help me set this up?

Thanks,

K

-----Original Message-----
From: Lang, William L Dr [mailto:bill.lang@dhs.gov]
Sent: Tuesday, June 05, 2007 6:14 PM
To: Souza, Kevin
Subject: Re: Meeting with Chief and Admiral

Happy to do it.
My best availability is Thursday afternoon. I'm out Friday and I'll be up on the hill for the TB discussion tomorrow morning. There isn't anything tomorrow afternoon or Thursday morning that I couldn't move if Thurs PM doesn't work.
-Bill Lang

----- Original Message -----
From: Souza, Kevin <kevin.souza@dhs.gov>
To: Lang, William L Dr <bill.lang@dhs.gov>
Sent: Tue Jun 05 17:11:52 2007
Subject: Meeting with Chief and Admiral

Hi Bill,

Admiral Johnson has requested a briefing by your office for him and the Chief to be "bought up to speed on the formaldehyde issues".

What does your availability look like for the rest of the week? I am out on Friday afternoon, but if you can give me some general times I can work it with the Administrator's office to coordinate with their schedules.

Thanks,

**PLAINTIFF'S EXHIBIT**
A

1                            FEMA_Waxman

FEMA17-009337

K

From: Johnson, Harvey E
Sent: Friday, June 01, 2007 9:18 PM
To: Garratt, David; Philbin, John (Pat); Trissell, David
Cc: Souza, Kevin; Wells, Tod; Bourne, Marko; Paulison, Robert David; Heighberger, Eric B
Subject: RE: Formaldehyde

Dave — As we discussed, I agree with the direction of your proposal, but recommend you slow roll any sales and/or provisions as opposed to a notice to suspend. Further, we need to have a discussion with the Chief, Public Affairs, Leg Affairs, and Legal to consider our public position. Once we have a position, then would support more visible suspension as we will then be in position to address the likely inquiries.

Further with the larger issues, appreciate your willingness to frame the four major issue of interest, and then to set up a meeting with the OHA folks. This course will permit me and the Chief a chance to come up to speed on the issues.

Also, I have attached the latest draft of the summary. Dave G has suggested a few more changes that I will finalize tomorrow. Let me know if you find glaring omissions or inaccuracies. Thanks

VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3      ------------------------------X

 4                                    :

 5     IN RE: FEMA TRAILER            :

 6        FORMALDEHYDE PRODUCTS       :    MDL NO. 1873

 7        LIABILITY LITIGATION        :    Section "N" (5)

 8                                    :    Judge Engelhardt

 9                                    :    Magistrate Chasez

10      ------------------------------X

11

12          VIDEOTAPED DEPOSITION OF KEVIN SOUZA

13                  Winchester, Virginia

14                 Wednesday, July 15, 2009

15                       10:34 a.m.

16

17

18

19

20     Job No.:  1-159429

21     Pages:  1 - 156

22     Reported by:  Michelle L. Lonas, RPR, CCR
```

PLAINTIFF'S EXHIBIT 13

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009

Page 110

1 participating in this call?
2   A   If you can give me a moment to review the
3 context of the E-mail.
4   Q   Sure.
5   A   Okay. I think what I meant here was that
6 Dave had E-mailed earlier some additional questions
7 that he wanted addressed, and Dr. Lang had kind of
8 characterized, looks like about three, three broad
9 topics that needed to be discussed. And I was just
10 trying to make sure that me and my boss were on the
11 same page before attending the call, make sure I
12 covered the topics he wanted covered.
13       (Exhibit Souza 11 was marked for
14 identification and attached to the transcript.)
15 BY MR. WOODS:
16   Q   Okay. The next document, Mr. Souza, we've
17 attached as Souza 11. And for identification
18 purposes, it's Bates labeled FEMA 17-009336 through
19 FEMA 17-009337. And it begins an E-mail conversation
20 begun by Harvey Johnson on June 1st, 2007, and it's to
21 David Garratt, John Philbin, and David Trissell, and
22 you're one of the CCs on that original E-mail. Do you

Page 111

1 see that?
2   A   Yes.
3   Q   It says, Dave, as we discussed, I agree
4 with the direction of your proposal, but recommend you
5 slow roll any sales and/or provisions as opposed to a
6 notice to suspend. Further, we need to have a
7 discussion with the Chief, Public Affairs, Leg
8 Affairs, which I'm assuming is Legislative Affairs,
9 and Legal to consider our public position.
10       You go to the second paragraph, it says,
11 Further with the larger issues, appreciate your
12 willingness to frame the four major issue of interest,
13 and then to set up a meeting with the OHA folks.
14 This, of course -- this course will permit me and the
15 Chief a chance to come up to speed on the issues.
16       What did you understand to be the purpose
17 of the meeting that the Admiral Johnson was requesting
18 at this time?
19       MR. MILLER: I'm going to object,
20 completeness, Counsel. You omitted one of the
21 sentences in the two paragraphs. Go ahead.
22   A   What it says here in the Admiral's E-mail,

Page 112

1 which was -- I thought the purpose of that meeting was
2 to get the Office of Health Affairs to brief the Chief
3 and the Admiral on their scientific understanding of
4 formaldehyde, the medical practitioner, and answer any
5 questions he may have about formaldehyde and things
6 like that.
7 BY MR. WOODS:
8   Q   What is your understanding for the basis of
9 reasoning behind the Admiral requesting the meeting?
10       MR. MILLER: Objection, foundation.
11   A   I don't know, other than this was getting a
12 lot of visibility, and it sounds like he and the Chief
13 wanted to be brought up to speed on what was taking
14 place in the agency.
15 BY MR. WOODS:
16   Q   Do you think that's something that's best
17 asked of the Admiral as to why he requested this
18 meeting?
19   A   Certainly.
20   Q   Did you attend the meeting with the
21 Admiral?
22   A   Yes, I was there.

Page 113

1   Q   And what was discussed at that meeting?
2   A   Um, Dr. Lang and I believe Dr. Lake were
3 both present, and they made a presentation to the
4 Admiral. I can't remember if the Chief was there or
5 not. But they made a presentation about formaldehyde,
6 and some of the history of formaldehyde, and some of
7 the various federal standards that existed for
8 formaldehyde.
9   Q   And I'm sorry. Who was all in attendance
10 at this meeting?
11   A   I don't recall. I was there. Dr. Lang was
12 there I think. Merritt Lake was there. The Admiral
13 was there. And I don't remember him being there, but
14 I -- I suspect that Dave Garratt was there as well.
15   Q   Anyone from OGC?
16   A   I don't remember.
17   Q   Okay.
18       (Exhibit Souza 12 was marked for
19 identification and attached to the transcript.)
20 BY MR. WOODS:
21   Q   Next document is labeled Souza 12. For
22 identification purposes, it's FEMA 17-009367 through

29 (Pages 110 to 113)

VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009

### Page 114

1  FEMA 17-09371. And it's a series of E-mails
2  beginning -- again, this is -- it seems to be almost a
3  continuation or exchange of E-mail chain that was
4  Souza 11. It's the E-mail that begins from Harvey
5  Johnson on Friday June 1st, 2007. But I want to
6  concentrate or send you -- or focus on an E-mail from
7  you on page two of the document, but you can look
8  at and verify that this is just pretty much a
9  continuation of the previous E-mail string.
10    A    Yes.
11    Q    It is?
12        On page two, there's an E-mail from you,
13  Mr. Souza, to David Garratt, dated June 7th, 2007.
14  And it says, Dave, now that the executive summary with
15  the four CD -- quote, "4 CDC Tasks" is complete, can
16  we please more forward with having somebody start
17  drafting the appropriate FEMA task documents to CDC?
18  Could you tell me, what are the "4 CDC Tasks"?
19    A    I don't specifically recall. I think some
20  of them were the ones -- three of them were the ones
21  listed by Dr. Lang in that other E-mail. Yeah,
22  numbers one, two, and three.

### Page 115

1    Q    You're referring to -- what's the --
2    A    Oh, sorry. Exhibit 10.
3    Q    Okay.
4    A    But again, I don't specifically recall, but
5  I think these were at least three out of the four, and
6  I don't remember what the fourth one was.
7    Q    Okay. In the second paragraph of that
8  E-mail of June 7, 2007, you say, I think you mentioned
9  previously that you would request Ops and OCC to draft
10  the actual document. First of all, who's Ops?
11    A    Operations.
12    Q    Just --
13    A    They're -- in a -- I mentioned earlier that
14  sometimes we'll have people in the field create some
15  of the documents on our behalf. I think that's
16  what -- the operations I was referring to. There's
17  several different operations, but I think here I was
18  referring to the people in the field who could get the
19  funding for us.
20    Q    Okay. Would OCC normally be involved in
21  the drafting of the funding docs?
22    A    No. Ops would be the funding piece. The

### Page 116

1  Chief Counsel's Office does assist the program
2  regularly in the drafting of things like interagency
3  agreements, memorandum of understandings, memorandum
4  of agreements, those sorts of things.
5    Q    Just one question, if you'd turn to page
6  one, at the bottom, it's an E-mail, the very last
7  E-mail on that page from David Garratt to you. It
8  says, Did you have the meeting with F2/Lang? Who is
9  F2?
10    A    That's Admiral Johnson.
11    Q    Okay. Who's -- there's also an S1.
12  Who's --
13    A    That would be the secretary.
14    Q    Well, who would F1 be?
15    A    Chief Paulison.
16        (Exhibit Souza 13 was marked for
17  identification and attached to the transcript.)
18  BY MR. WOODS:
19    Q    Mr. Souza, what I'm handing you is now
20  Souza Exhibit Number 13. For identification purposes,
21  it's Bates labeled FEMA 17-009247. It's a series --
22  well, it's three E-mails beginning with Dave -- David

### Page 117

1  Garratt sent on June 1, 2007, to Robert David
2  Paulison, Harvey E. Johnson and Marko Bourne. And
3  CCing Kevin Souza and Tod Wells. I recognize a number
4  of these names, but Marko Bourne, who is Marko Bourne?
5    A    Marko Bourne led -- he led the policy
6  office, the Administrative Policy Office.
7    Q    Is he still with FEMA, do you know?
8    A    No, he's not.
9    Q    Go up to Harvey E. Johnson's E-mail sent on
10  Friday, June 1, 2007, at 9:18 p.m., to David Garratt,
11  John Philbin and David Trissell, CCing you, Kevin
12  Souza, Tod Wells, Marko Bourne, Robert David Paulison
13  and Eric B. Heighberger. It says, Dave, as we
14  discussed, I agree with the direction of your
15  proposal, but recommend you slow roll any sales and/or
16  provisions as opposed to a notice to suspend.
17  Further, we need to have a discussion with the Chief,
18  Public Affairs, Legislative Affairs and Legal to
19  consider our public position.
20        Why do you think that -- or what is your
21  belief, why would Admiral Johnson want Legal to
22  participate in a discussion concerning the public

Page 118

1  position?
2      MR. MILLER: Objection, foundation.
3  A   Um, you asked me, I think, what my belief
4  was. My general belief is when issues this big came
5  up at the agency, that it wasn't uncommon for senior
6  leadership to call senior leadership meetings, all of
7  the senior executives in the administrator's office,
8  counsel being one of them, to discuss kind of courses
9  of action, public positions, and things like that.
10 BY MR. WOODS:
11 Q   Did Admiral Johnson tell you what his
12 reasoning was behind having all of these individuals
13 put -- have their input into the public position?
14 A   No.
15     (Exhibit Souza 14 was marked for
16 identification and attached to the transcript.)
17 BY MR. WOODS:
18 Q   Mr. Souza I'm now handing you what we've
19 labeled as Souza Exhibit 14 as an attachment to this
20 deposition transcript. For identification purposes,
21 it's FEMA 17-009560, through 0 -- FEMA 17-09 --
22 009561. And it also includes FEMA 17-009330 through

Page 119

1  FEMA 17-009331.
2      MR. MILLER: Is there -- one document, two
3  pages?
4      MS. PETROVICH: I think we're miss -- I
5  think this is -- the numbers you read, Justin, are not
6  the same document we're talking about. Maybe I'm
7  incorrect.
8      MR. WOODS: These may have been put
9  together -- you know what?
10     MR. MILLER: Justin, I have two pages here:
11 One is 9330, and page two is 9331. Is that what you
12 have?
13     MR. WOODS: Yeah.
14     MR. MILLER: Okay.
15     MR. SCANDURRO: What's the exhibit number?
16 A   Fourteen.
17     MR. WOODS: Fourteen.
18     MR. MILLER: We're good.
19 BY MR. WOODS:
20 Q   I want to draw your attention to your
21 E-mail. It's the second one on the first page of --
22 well, it's on FEMA 17-009330. Do you see that?

Page 120

1  A   Yes, the one at 1:28?
2  Q   On June 5th, 2007, 1:28.
3  A   Yes.
4  Q   And it's to Martin McNeese, and it's,
5  Forward, Letter from Department of Health and Human
6  Services. It says, Hi Martin! Thank you and welcome
7  to Formaldehyde-Round Two. I will try to keep you
8  involved without overwhelming you. Let's talk soon.
9  What did you mean by Formaldehyde-Round Two?
10 A   It was a bit of an attempt at humor.
11 Martin was involved in round one, which I
12 characterized as the EPA study, and then when we
13 needed some additional help for the CDC study, I was
14 characterizing the CDC study as round two.
15 Q   So the fight wasn't over in round one. You
16 couldn't declare victory in round one?
17     MR. MILLER: Objection, argumentative,
18 speculation.
19 A   Well, I didn't mean that.
20 BY MR. WOODS:
21 Q   But you did see it as sort of another
22 additional go-round to the formaldehyde issue?

Page 121

1  A   Sure. It was another study to be
2  conducted, yes.
3  Q   It wasn't even a TKO in round one?
4      MR. MILLER: Objection, argumentative.
5  A   Again, I --
6      MR. MILLER: Hold on. Mischaracterizes
7  witness' testimony, assumes facts not in evidence.
8  A   Again, I wasn't thinking of it in terms
9  like that.
10     (Exhibit Souza 15 was marked for
11 identification and attached to the transcript.)
12 BY MR. WOODS:
13 Q   The next document I'm handing you is
14 labeled Souza 15. For identification purposes, it's
15 FEMA 17-007251 through FEMA 17-007255. And I just
16 have one basic question. Well, two actually. If you
17 look at Dr. Lang's E-mail to you dated June 6, 2007,
18 and if you go to page two, it has final questions one
19 through four. I want you to take a look at these and
20 see if that could possibly be the four CDC tasks that
21 we -- that I asked you about earlier that you
22 mentioned in an earlier E-mail.

VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009

Page 122

1  A   Yes, they appear to be.
2  Q   Okay. Then I want you to look at your
3  E-mail above that dated Wednesday, June 6, 2007, Re:
4  The 4 questions and next steps. And it's to Bill
5  Lang, and it looks like you -- well, for whatever
6  reason I guess you sent one, it's a copy to yourself
7  and CCed some other individuals. It says, Thanks
8  Bill. Will incorporate the final questions into the
9  Exec Summary. Will make attempts today to arrange a
10 briefing on Thursday (tomorrow) for the Chief and
11 Admiral (slides will come in handy). Were slides ever
12 developed or created for that executive summary?
13 A   Yes. There was the presentation that I
14 referenced earlier.
15 Q   And when would those -- do you know how
16 many slides and who created those slides?
17 A   The Office of Health Affairs created them,
18 and there may have been approximately ten.
19      MR. WOODS: Counsel, I don't -- I'm not
20 certain, but I don't believe that we have those ten
21 slides. Those -- I don't believe they've been
22 produced, but I'll do a formal request for them.

Page 123

1  I think we're almost there.
2       (Exhibit Souza 16 was marked for
3  identification and attached to the transcript.)
4  BY MR. WOODS:
5  Q   Mr. Souza I'm handing you a document which
6  is being attached as an exhibit. It will be Souza 16.
7  For identification purposes, it's Bates labeled FEMA
8  17-015220 through FEMA 17 -- no, this can't be right.
9  Okay. Through FEMA 17-015221. And it's a series of
10 E-mails beginning on -- from Harvey E. Johnson dated
11 July 22nd, 2007, to Rob Paulison, Bob Shea, Marko
12 Bourne, Carlos Castillo, David Garratt, Gil Jamieson,
13 John Philbin, David Trissell, William Lang, Merritt
14 Lake, Jeff Runge, Michael Jackson, CCing Kevin Souza
15 and others. And the first question, but I believe
16 you've answered this now, the second paragraph says,
17 The intent at this point is to flesh out this outline
18 in anticipation of an alignment session with S2 and
19 senior DHS/FEMA/OHA tomorrow afternoon. And I believe
20 you told us that S2 was -- I'm sorry, tell me again?
21 A   Deputy Secretary Michael Jackson.
22 Q   Michael Jackson. Okay.

Page 124

1       The last paragraph says, Please remember
2  that all of our discussion and pre-decisional and the
3  information contained herein must remain within our
4  decision group until specifically authorized
5  otherwise.
6       Do you have an understanding as to why
7  Admiral Johnson would have wanted this information to
8  remain contained?
9       MR. MILLER: Objection, foundation.
10 A   I don't know specifically. I suspect it
11 was because some of the decisions that we were talking
12 about making sounds like would have some fairly large
13 implications for a bunch of folks, and he just wanted
14 to make sure that there wasn't any misinformation that
15 got out there before -- that was pre-decisional before
16 an actual decision had been made.
17 BY MR. WOODS:
18 Q   Do you know if Admiral Johnson was advised
19 as such to keep the information within the decision
20 group by OGC?
21 A   I don't -- I don't know.
22

Page 125

1       (Exhibit Souza 17 was marked for
2  identification and attached to the transcript.)
3  BY MR. WOODS:
4  Q   The next document, Mr. Souza, I'm showing
5  you is going to be labeled as Souza 17. For
6  identification purposes, it's FEMA 17-009689 through
7  FEMA 17-009690. A series of E-mails beginning with
8  one from Jon Krohmer to Harvey E. Johnson, and the
9  subject matter is FEMA CD -- dash CDC study. It's
10 dated July 11, 2007. And if you would go up, sir, to
11 your E-mail, it's dated July 12, 2007. It's on the
12 first page. It's from you to David Garratt, Harvey
13 Johnson, CCing Carlos Castillo, Leslie Bailey and
14 Donna Dannels. And you say, As of yesterday
15 afternoon, the CDC letters were with ODC for review
16 and concur -- slash concurrence. What CDC letter are
17 you referring to here?
18 A   If I can have a moment and just look at the
19 context. (Pause)
20      Looks like this was the letter that was
21 going to go from FEMA to CDC asking for their
22 assistance with additional testing formally.

FEMA17-015220

Page 1 of 2

**Johnson, Harvey E**

| | |
|---|---|
| From: | McQueeney, Michelle |
| Sent: | Monday, July 23, 2007 3:32 PM |
| To: | McQueeney, Michelle; 'McQueeney, Michelle'; 'Garratt, David'; 'Heighberger, Eric B'; 'Castillo, Carlos'; 'Jamieson, Gil'; 'Philbin, John (Pat)'; 'Trissell, David'; Lang, William L Dr; Lake, Merritt; Runge, Jeff |
| Cc: | 'Souza, Kevin'; 'Wells, Tod'; 'Bailey, Leslie'; Johnson, Harvey E |
| Subject: | RE: FEMA Preliminary Formaldehyde Action Plan.doc |
| Attachments: | Ongoing Monitoring Program_draft_072307 1500hours.doc |

Attached is the revised draft of the On-going Monitoring Plan to reflect the Admiral's changes.

---

**From:** McQueeney, Michelle
**Sent:** Monday, July 23, 2007 10:29 AM
**To:** 'McQueeney, Michelle'; Garratt, David; Heighberger, Eric B; Castillo, Carlos; Jamieson, Gil; Philbin, John (Pat); Trissell, David; Lang, William L Dr; Lake, Merritt; Runge, Jeff
**Cc:** Souza, Kevin; Wells, Tod; Bailey, Leslie
**Subject:** RE: FEMA Preliminary Formaldehyde Action Plan.doc

With attachments this time—sorry.

---

**From:** McQueeney, Michelle [mailto:michelle.mcqueeney@dhs.gov]
**Sent:** Monday, July 23, 2007 10:28 AM
**To:** Garratt, David; Heighberger, Eric B; Castillo, Carlos; Jamieson, Gil; Philbin, John (Pat); Trissell, David; Lang, William L Dr; Lake, Merritt; Runge, Jeff
**Cc:** Souza, Kevin; McQueeney, Michelle; Wells, Tod; Bailey, Leslie
**Subject:** RE: FEMA Preliminary Formaldehyde Action Plan.doc

Attached are:
IV "Post Program Test Plan/ Courses of Action Based on Testing Results", and
VI "On-Going Monitoring Program"

-Michelle

---

**From:** Garratt, David [mailto:david.garratt@dhs.gov]
**Sent:** Monday, July 23, 2007 10:23 AM
**To:** Heighberger, Eric B; Castillo, Carlos; Jamieson, Gil; Philbin, John (Pat); Trissell, David; Lang, William L Dr; Lake, Merritt; Runge, Jeff
**Cc:** Souza, Kevin; McQueeney, Michelle; Wells, Tod; Bailey, Leslie
**Subject:** RE: FEMA Preliminary Formaldehyde Action Plan.doc

Attached is the paper supporting item VIII "Suspension Actions." You will be receiving the other two joint DAD/GCRO-assigned products from Michelle shortly. Note that we need to review products of other efforts before completing "Interim Period" piece. The "Immediate Interim Period" has been addressed.

Dave

---

**From:** Heighberger, Eric B

2/14/2008

PLAINTIFF'S EXHIBIT C

DHS_S&T_3865

FEMA17-015220

FCP006-000084

**Sent:** Monday, July 23, 2007 8:26 AM
**To:** Castillo, Carlos; Garratt, David; Jamieson, Gil; Philbin, John (Pat); 'Trissell, David'; Lang, William L Dr; Lake, Merritt; Runge, Jeff
**Cc:** Souza, Kevin; 'McQueeney, Michelle'
**Subject:** RE: FEMA Preliminary Formaldehyde Action Plan.doc

Dear All:

Admiral Johnson just asked me to make sure that people knew that he was looking for something from the responsible parties this morning per the below email. I am sure you know this – so just count this as a friendly reminder. Please let me know of any issues if you would like me to pass them on to Admiral Johnson.

Eric

---

**From:** Johnson, Harvey E
**Sent:** Sunday, July 22, 2007 7:03 PM
**To:** Paulison, Robert David; Shea, Bob; 'Bourne, Marko'; Castillo, Carlos; Garratt, David; Jamieson, Gil; Philbin, John (Pat); Trissell, David; Lang, William L Dr; Lake, Merritt; Runge, Jeff; 'Jackson, Michael'
**Cc:** Souza, Kevin; 'McQueeney, Michelle'; Heighberger, Eric B; Waters, Bennet; 'Roe, Price'; Fogg, Nathaniel
**Subject:** FEMA Preliminary Formaldehyde Action Plan.doc

Please review for consistency with our discussioin this afternoon. Looking for the responsible office to develop this general description into a more complete discussion of the action that will need to take place. Please ensure that you describe and identify decision points as well we list any particular cautions for concerns that need illimination in our decision making process. Please also identify any entitiy external to DHS/FEMA/OHA whom you think may propose to consult in affirrming the overall direcion of this action plan. Please develop your work, provide status by about 1000 expecting a product by noon Monday.

The intent at this point is to flesh out this outline in anticipation of an alignment session with S2 and senior DHS/FEMA/OHA tomorrow afternoon. Once we get internal alignment, we will likely want to reach out to other entities with whom we may want to engage in discussion and information sharing.

Please remember that all of our discussion are pre-decisional and the information contained herein must remain within our decision group until specirfically athorized otherwise.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * * | CIVIL ACTION 2:07-MD-1873<br><br>JUDGE ENGLEHARDT -DIV. N<br><br>MAG. JUDGE CHASEZ - MAG. 5 |

**************************************************************************

### DECLARATION OF MICHAEL LAPINSKI

I, Michael Lapinski state and declare as follows:

1. I am employed as a Federal Coordinating Officer, in the Office of Federal Coordinating Officer Operations, Federal Emergency Management Agency ("FEMA"). From August 2007 through June 2008, I was the official responsible for coordinating FEMA's response to formaldehyde concerns in temporary emergency housing units ("EHU"). In this capacity I reported to Admiral Harvey E. Johnson, Jr., Deputy Administrator and Chief Operating Officer, FEMA. As a result of my duties and responsibilities I am familiar with FEMA's actions taken in response to formaldehyde concerns in EHUs between the time of May 2007 and June 2008.

2. In mid-May 2007, FEMA learned that a Mississippi pediatrician had identified formaldehyde exposure type symptoms in children living in travel trailers. In response and because of concerns that its current response may not be sufficiently protective of occupants health and safety, FEMA requested assistance from the Department of Homeland Security ("DHS") Office of Health Affairs ("OHA") in contacting the Department of Health and Human


PLAINTIFF'S EXHIBIT D

Services and Centers for Disease Control and Prevention ("CDC") to evaluate the claims made by the Mississippi pediatrician. Thereafter, FEMA engaged DHS OHA, CDC, National Center for Environmental Health ("NCEH"), and the National Institute for Occupational Safety and Health ("NIOSH") to develop a strategy to determine actual indoor air quality conditions in occupied units, to determine a scientifically valid target for air quality improvement and to assess engineering solutions that could achieve those levels.

3.  In mid-July 2007, FEMA formalized this request and asked CDC to investigate and determine the actual air quality conditions in travel trailers when they are used for prolonged periods of time under real life conditions and to determine if there is an association between poor indoor air quality in travel trailers and adverse health effects in children who live in them.

4.  Later in July 2007, FEMA Administrator Paulison announced several additional steps FEMA was taking to address formaldehyde concerns and work more closely with EHU occupants who may have concerns about formaldehyde exposure. A dedicated formaldehyde call center was established to answer EHU occupant questions and to better assist occupants in finding alternate housing. Any occupant who contacted the call center was asked whether they wanted alternate temporary housing and if they did, steps were taken to relocate them. In addition, if the occupant had health concerns or questions regarding formaldehyde their call was routed to a CDC health care consultant. In addition, a Formaldehyde Fact Sheet was prepared and distributed to all EHU occupants. The Fact Sheet identified the telephone number for the formaldehyde call center, discussed mitigation strategies, and encouraged occupants to call if they had concerns.

5.  Commencing from on or about mid-May 2007 onward, FEMA attempted to

promptly relocate, usually within seven to ten days, any EHU occupant who informed FEMA that they were dissatisfied with their EHU and wanted to be placed in alternative temporary housing. From mid-July 2007 onward, EHU occupants that contacted the FEMA formaldehyde call center have been offered alternate temporary emergency housing, and persons that requested alternate housing have been promptly relocated - again, usually within seven to ten days. In addition, if more permanent housing, acceptable to the occupant was identified and available, FEMA would provide rental assistance, and relocation assistance. During this period, many programs were implemented that were designed to incentivize relocation from EHUs. I personally tracked the numbers of households moving out of EHUs to alternative housing, and reported that information weekly to FEMA senior leadership. Commencing or about February 2008, after receipt of CDC initial reports regarding testing of occupied EHUs, FEMA prioritized relocation of persons identified as being more susceptible or at higher risk from exposure to formaldehyde.

6. In September 2007, CDC prepared a protocol to test occupied units. Initial testing of occupied units was scheduled to commence in October 2007. However, that testing was delayed until December 2007, because of concerns at FEMA, the Department of Homeland Security and the White House regarding how the federal government would characterize the results in order to make them meaningful to not only EHU occupants, but the public at large. This was because no agency with public health responsibility or authority had provided guidance or standards on what concentration of formaldehyde constituted a "safe" level. Secondarily, federal interagency leadership wanted to review and assess contingency plans in the event the government had to immediately evacuate all occupants from EHUs.

7. Testing of a statistically significant representative sample (519) across all strata of

EHU began in December 2007. In February 2008, CDC issued the initial results from testing of these occupied units. A flyer reflecting those results was prepared and distributed to EHU occupants, and FEMA continued its efforts to relocate EHU occupants to more permanent housing or alternate temporary emergency housing such as hotels. As previously noted, as a result of CDC's report, FEMA prioritized the relocation of higher risk persons.

8. In late February 2008, FEMA contracted with Bureau Veritas of North America ("BVNA") to test occupied EHUs. BVNA was the entity that CDC used to test occupied units in December 2007 and January 2008. FEMA offered to have BVNA test upon request any FEMA-provided EHU.

9. Notwithstanding FEMA's efforts, many EHU occupants for a variety of reasons refused to relocate. Some occupants declined FEMA's relocation offers because available alternate temporary housing would interfere with their rebuilding efforts. Although cognizant of CDC's recommendations that all persons in EHUs should be relocated, FEMA made the decision to allow the disaster victims to make the decision whether to stay in the EHU, rather then require them, or compel them to relocate to other alternate temporary emergency housing. DHS OHA advised that relocation involved risks of its own and only the occupant could weigh all the available information and make a best option determination.

10. To determine a scientifically valid formaldehyde indoor air target level in temporary emergency housing units, FEMA appointed and funded a panel of medical and scientific experts to investigate this issue. That panel was unable to reach a consensus and ultimately did not provide FEMA with a formaldehyde indoor air target level.

11. To reduce future disaster victims potential exposure to formaldehyde in temporary

emergency housing units, in July 2007, FEMA issued an Interim Direction establishing that, henceforth, no manufactured housing or travel trailers of any kind would be provided to disaster victims unless it had been tested for formaldehyde levels in advance, and the test results shared with the State. States would be required to approve the deployment/provision of any FEMA provided manufactured housing or travel trailers. Further, per FEMA's Disaster Housing Plan, travel trailers will only be used as a temporary emergency housing option of last resort and in very limited circumstances.

12. FEMA also initiated efforts to purchase new factory built housing and travel trailers designed specifically to have extremely reduced formaldehyde levels. Since March 2008, all newly acquired temporary housing units manufactured for FEMA are independently tested and certified to emit less than .016 parts per million ("ppm") of formaldehyde by an independent, American Industrial Hygiene Association ("AHIA") certified laboratory.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of May 2009.

_____
MICHAEL LAPENSKI
Federal Coordinating Officer
Office of Federal Coordinating Officer Operations
Federal Emergency Management Agency
Washington, D.C.

Michael Lapinski                                                                July 24, 2009
                              Washington, DC

                                                                                    Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF LOUISIANA

 3                    NEW ORLEANS DIVISION

 4   ---------------------------------X

 5   In Re: FEMA Trailer               :

 6   Formaldehyde Products             :   MDL No. 1873

 7   Liability Litigation              :

 8

 9   ---------------------------------X

10                        Washington, D.C.

11                        Friday, July 24, 2009

12           Videotaped deposition of Michael J. Lapinski, a

13   witness herein, called for examination by counsel for

14   Plaintiffs in the above-entitled matter, pursuant to notice,

15   the witness being duly sworn by DENNIS A. DINKEL, a Notary

16   Public in and for the District of Columbia, taken at the

17   offices of Nelson Mullins Riley & Scarborough LLP, 101

18   Constitution Avenue, N.W., Washington, D.C. at 9:08 a.m.,

19   Friday, July 24, 2009, and the proceedings being taken down

20   by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed

21   under his direction.

22
```

                         Alderson Reporting Company
                            1-800-FOR-DEPO

PLAINTIFF'S EXHIBIT E

Michael Lapinski	July 24, 2009
Washington, DC

### Page 54

1  guidance on behalf of the federal government by
2  preparing documents that we're giving out to people.
3       We needed support from public health
4  professionals. And the information that we were
5  putting out needed to reflect what public health was
6  saying, not what FEMA was saying or not what would be
7  easy for FEMA. But on behalf of the federal
8  government what is right for people and what's the
9  right position for the federal government to take.
10      The issue of what the housing market was
11 on the Gulf Coast still two years after Katrina and
12 the ability of people to manage their own individual
13 risk with all of the risk factors that are impacting
14 them in addition to indoor air quality.
15   Q.  Okay. Who within FEMA would have made the
16 decision, would have had the authority to make the
17 decision that even though this testing was to
18 commence in October of 2007, but ultimately delayed
19 it until December 2007, who would that individual be?
20   A.  Admiral Johnson.
21   Q.  And what were Admiral Johnson's concerns
22 and his reasoning behind delaying the testing from

### Page 55

1  October 2007 until December 2007?
2    A.  I --
3       MR. BAIN: Objection. Lack of foundation.
4       Go ahead and answer if you can.
5       THE WITNESS: Yeah, the answer is that I
6  would have to speculate on what Admiral Johnson was
7  thinking.
8       BY MR. WOODS:
9    Q.  That's fine. Of course, only Admiral
10 Johnson could answer that question.
11   A.  Yes, sir.
12   Q.  In section 7, you go on to state that,
13 "Testing of a statistically significant
14 representative sample (519) across all strata of EHU
15 began in December of 2007. In February 2008, CDC
16 issued the initial results from testing of these
17 occupied units. A flyer reflecting those results was
18 prepared and distributed to EHU occupants, and FEMA
19 continued its efforts to relocate EHU occupants to
20 more permanent housing or alternate temporary
21 emergency housing such as hotels."
22      Again, sir, if you could look at this

### Page 56

1  binder and identify for me, please, that particular
2  flier?
3    A.  The flier that I reference in that part of
4  the declaration is at tab 23 of the binder that you
5  have provided me.
6    Q.  Okay. Thank you.
7       MR. WOODS: And for the record, this will
8  be labeled as Lapinski 4.
9            (A document was marked for
10               identification as
11               Exhibit No. Lapinski 4)
12      MR. WOODS: It is Bates labeled FEMA
13 09-000390 through FEMA 09-000391.
14      BY MR. WOODS:
15   Q.  Sir, can you tell me exactly how this
16 flier was disseminated to trailer occupants in
17 February of 2008?
18   A.  My understanding -- and it's -- I
19 emphasize it's my understanding -- I didn't
20 distribute them or wasn't responsible for
21 distributing them -- but they were distributed
22 through the Gulf Coast Recovery Office and

### Page 57

1  delivered -- hand delivered to each emergency housing
2  unit as well as in general areas where housing units
3  were located, it was posted, it was made available,
4  it was provided to members of the media.
5       In group sites, it was visibly posted in
6  addition to individually delivered.
7    Q.  But you have -- I'm sorry. You have no
8  personal knowledge, though, of any specific
9  individual receiving this specific flier, correct?
10   A.  No, sir.
11   Q.  In February of 2008, would that same
12 individual that may have that knowledge be Blair
13 McDonald?
14   A.  Yes, sir. She would have the best
15 knowledge on to how we operationalized that
16 distribution plan.
17   Q.  So this flier being developed in February
18 2008, did you have any input into the development of
19 this particular flier in your role as Federal
20 Coordinating Officer?
21   A.  My role would just have been coordinating
22 between CDC, FEMA, and I'm looking at this to see if

15 (Pages 54 to 57)