UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  FEMA TRAILER | MDL NO. 07-1873 |
| FORMALDEHYDE PRODUCTS | |
| LIABILITY LITIGATION | SECTION N(5) |
| | |
| | JUDGE ENGELHARDT |
| THIS DOCUMENT RELATES TO: | |
| *Lyndon  Wright v. Forest River, Inc., et al.* | MAGISTRATE CHASEZ |
| No. 09-2977 (E.D. La.) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT**
**OF SHAW ENVIRONMENTAL, INC.'S**
**MOTION FOR SUMMARY JUDGMENT REGARDING PRESCRIPTION**

**MAY IT PLEASE THE COURT:**

Shaw Environmental, Inc. ("Shaw") moves this Court for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing all claims against Shaw in this matter for the simple reason that plaintiff Lyndon Wright's claims have prescribed.  Mr. Wright moved into his trailer in March 2006, and now has testified under oath that he immediately began to experience symptoms that he associates with formaldehyde exposure (and, more recently, mold).  Mr. Wright, however, did not file this action until March 2, 2009.  More than a year passed between the accrual of his action and the date of filing, with the effect that his claims against Shaw have

prescribed on their face.  Moreover, on the facts of this case, Shaw had no responsibility –
whether maintenance or otherwise – with regard to the emergency housing unit at issue in this
litigation after June 1, 2006.  Therefore, to the extent that plaintiff is claiming that he continued
to be harmed after he moved into the EHU, any Shaw conduct at issue concluded prior to or on
June 1, 2006.  This was two years and nine months before Mr. Wright filed suit.

Given these facts, Mr. Wright's case cannot proceed unless there was something that
suspended prescription.  Presumably, he will contend that the various class actions against trailer
manufacturers somehow rescue his claims against Shaw.  This boils down to a pure question of
law: Does *American Pipe* tolling operate to suspend the prescription of claims against third
parties who are not named as defendants in the putative class action?  This is a perfect question
for disposition on summary judgment, and Shaw submits that its answer is an unequivocal "No."

Or, perhaps Mr. Wright will try to invoke the continuing tort doctrine, or perhaps he will
claim that prescription is interrupted against joint tortfeasors.  But these theories will not help
him.  Any continuing tort, if there were one, ended on June 1, 2006.  And although a suit against
one joint tortfeasor interrupts prescription as to claims against other joint tortfeasors, Mr. Wright
did not sue anyone until March 2, 2009.  Mr. Wright simply has no way to avoid the effects of
his decision to wait until 2009 to sue Shaw about an emergency housing unit that he occupied in
2006.

As a matter of law, Mr. Wright's claims against Shaw prescribed, and Shaw respectfully
urges the Court to enter a summary judgment dismissing those claims.

## BACKGROUND

**A.**     *Mr. Wright Occupied the Trailer in March 2006.*

As part of its Individual Assistance / Technical Assistance Contract (the "FEMA Contract") with the Federal Emergency Management Agency ("FEMA"), Shaw was directed to install a travel trailer on property owned by Bobbie Wright[1] at 2315 Seminole Lane, New Orleans, Louisiana.  Shaw discharged this responsibility by having one of its subcontractors install a Forest River trailer bearing VIN # 4X4TSMH296C008992 (the "Trailer") as directed.  Then, on February 13, 2006, one of Shaw's subcontractors and Mr. Wright conducted a "Ready for Occupancy" inspection.  The inspection showed the Trailer to be in good condition, and Mr. Wright signed the inspection form and accepted the Trailer.[2]  At that point, Ms. Wright was considered to be "Leased-In" to the Trailer.

Apparently there was a delay in Mr. Wright's moving into the Trailer, and, according to Mr. Wright's Supplemental PFS and his deposition testimony, he began to occupy the Trailer in March 2006.  The exact date on which he occupied the Trailer is unknown, except that it had to

---

[1]     Ms. Wright is the plaintiff's mother and was the individual who actually applied for disaster assistance through FEMA.  (*See* Application/Registration for Disaster Assistance of Bobbie R. Wright, FEMA 124-000001, a copy of which is attached hereto as Exhibit "A.")  However, according to the Plaintiff Fact Sheet filled out by Mr. Wright, as well as his deposition testimony, Ms. Wright never resided in the trailer.  (A copy of Mr. Wright's Supplemental Plaintiff Fact Sheet (the "Supplemental PFS") is attached as Exhibit "B.")

[2]     *See* Temporary Housing Unit Inspection Report, dated February 13, 2006, a copy of which is attached hereto as Exhibit "C."  Mr. Wright testified at his deposition that he signed his mother's name to the form.  (Excerpts from the Deposition of Lyndon T. Wright are attached hereto as Exhibit "D"; see p. 258.).  Notably, although Ms. Wright was the FEMA applicant, and although she applied for extensions of the Trailer lease based on her own income information, she never lived in the Trailer, and neither she nor Mr. Wright ever told FEMA that Ms. Wright was not going to live in the Trailer. Ex. "D," Wright Deposition, p. 339.

be prior to March 19, 2006, when Mr. Wright lodged a complaint to the effect that the furnace

was not working properly.[3]

**B.**   ***Mr. Wright Knew About His Alleged Injuries by March 2006.***

Mr. Wright contends that he began to suffer a litany of allegedly formaldehyde-related

(or, perhaps, mold-related) complaints immediately upon occupancy in March 2006, as shown by

the following excerpt from Mr. Wright's Supplemental PFS:[4]

> 3.   During the time that you lived in your FEMA trailer, did you experience or report to a physician any of the following symptoms?  If yes, place a check mark (✓) by the symptom that you experienced.

| | |
|---|---|
| ☒ irritation to eyes | ☒ tingling or swelling of lips or face area |
| ☒ burning of eyes | ☒ headaches |
| ☒ tearing of eyes | ☒ nausea |
| ☒ irritation to nasal membranes (inside of nose) | ☐ vomiting |
| ☒ burning of nasal membranes (inside of nose) | ☐ bloody vomiting |
| ☒ bleeding of nasal membranes (inside of nose) | ☐ abdominal pain |
| ☒ irritation or itching of skin | ☒ diarrhea |
| ☒ burning of skin | ☒ difficulty in breathing |
| ☒ rashes on skin | ☒ wheezing |
| ☒ drying or scaling of skin | ☒ shortness of breath |
| ☒ scaling or itching of eyelids | ☒ persistent cough |
| ☒ irritation or swelling of eyelids or eye area | ☒ tightness of the chest |

(excerpt continued next page)

---

[3]        *See* Call Center Maintenance Request Form, March 19, 2006, a copy of which is attached hereto as Exhibit "E."  The furnace issue is not relevant to these proceedings except to establish the latest possible date when Mr. Wright could have first occupied the Trailer.

[4]        *See* Ex. "B," Supplemental PFS, pp. 3-4.

☒ bronchitis
☒ throat irritation
☒ hoarseness
☒ laryngitis
☒ pneumonia
☒ upper respiratory tract infections
☐ pulmonary edema
☒ asthma attacks for the first time in your life
☐ asthma attacks that are recurrence of
    childhood asthma
☐ allergies for the first time in your life
☒ worsening of allergies that you had previous
    to living in FEMA trailer

☐ allergic contact dermatitis
☒ dizziness
☐ unconsciousness
☐ convulsions or seizures
☐ blood in urine
☐ abnormal liver enzymes
☒ nephritis (inflammation of kidneys)
☐ low blood pressure
☒ hypothermia (low body temperature)
☐ miscarriage or stillbirth
☒ abnormal laboratory tests on blood
☐ abnormal laboratory tests on urine

Please list any other symptoms you have suffered as a result of residing in a
FEMA trailer (not listed above) and any conditions for which you have
been diagnosed by a physician.
sneezing, eyes red, high blood pressure, numbness of the hands

. . .

5.    When do you claim this injury or disease first occurred? 3/2006

In fact, Mr. Wright claims that he suffered from asthma and "walking pneumonia" for the

first time "since living in the Trailer":[5]

F.    Have you ever suffered from any of the following illnesses, diseases or abnormal
    physical conditions?

    1.    Lung or other respiratory disease
        Yes ☒        No ☐

        *If "Yes,"* please indicate the following:

        Name and description of each illness, disease, or abnormal condition:
        asthma for the first time in life since living in FEMA trailer.

        The date of illness:
        2006-Present

    2.    Infectious disease (such as, tuberculosis, pneumonia, hepatitis)
        Yes ☒        No ☐

        *If "Yes,"* please indicate the following.

        Name and description of each illness, disease, or abnormal condition:
        walking pneumonia since living in FEMA trailer.

        The date of illness:
        2006

---

[5]    *See* Ex. "B," Supplemental PFS, p. 13.

At his deposition, the plaintiff confirmed these admissions.  He specifically confirmed the accuracy of the Supplemental PFS, including the reference to his symptoms having begun in March 2006.[6]  He said that as early as the February 2006 walkthrough, he noticed a "new smell" that made him sneeze.[7]  Most tellingly, he even testified that in April 2006, he told his mother that he believed the Trailer was making him sick:

> Q:     When you first believed or came to the belief that your occupancy of this particular unit was impacting your health, did you tell your mother immediately?
>
> A:     Yes.  I made the comment, because I was coughing so much, I made the comment, "Ma, I think this trailer is making me sick."
>
>        . . .
>
> Q:     Do you recall when the phone call was with your mother that you expressed to her that you believed your occupancy of this unit was causing you a health problem?
>
> A:     I would say probably April.
>
> Q:     Of what year?
>
> A:     '06.  Right after I got in the trailer.
>
> Q:     So in April of '06, you were of the opinion that your occupancy of this unit was causing you a health problem?
>
> A:     I would say I thought it was making me sick, yes.
>
> Q:     And you expressed that to your mother by May of 2006, correct?
>
> A:     By April.
>
> Q:     By April of 2006, correct?
>
> A:     Yes.[8]

---

[6]     Ex. "D," Wright Deposition, p. 293.

[7]     Ex. "D," Wright Deposition, pp. 267-68.

[8]     Ex. "D," Wright Deposition, pp. 169-71.  Mr. Wright reconfirmed these dates later in the deposition:

> Q:     You said you had a conversation with your mother in which you told her that you thought the trailer was making you sick, right?

In light of the statements made in Mr. Wright's Supplemental Plaintiff Fact Sheet, together with his deposition testimony, there can be no serious dispute that he actually knew about his symptoms, and that he specifically associated them with the Trailer, within a month after he first began to occupy the Trailer in March 2006.

### C.   *Shaw Had Nothing To Do With the Trailer After June 1, 2006.*

In opposing Shaw's and CH2M HILL's motion to dismiss the *Aldridge* matter on grounds of prescription,[9] the plaintiffs in that case relied on the continuing tort doctrine.[10]  That doctrine cannot resurrect Mr. Wright's untimely claim on the facts of this case, however, for the simple reason that Shaw had nothing to do with the Trailer after June 1, 2006 – just shy of three years prior to when Mr. Wright filed the Complaint in this action.

FEMA's contract with Shaw originally called for a term of service that expired on January 15, 2006.  Although the terms of certain FEMA Contract tasks were extended, during May 2006, FEMA elected to separately contract maintenance responsibility for trailers installed at private sites directly to "Maintenance and Deactivation Contractors," or "MDCs."  FEMA's process for transferring the contractual maintenance responsibility directly to the MDCs became known as the "MDC turnover."[11]

---

A:     Yes.

Q:     And you said that conversation occurred in April 2006, right?

A:     Yes.

*Id.* at 295.

[9]     Rec. Doc. 1324.

[10]    Rec. Doc. 1361, pp. 9-10.  Coincidentally, Mr. Wright is represented for trial purposes by the same counsel who filed that opposition brief.

[11]    The Affidavit of Allison Hansen (the "Hansen Affidavit"), Shaw's Operations Manager during the

As discussed during a May 18, 2006, meeting among representatives of FEMA, Shaw, and certain MDCs, the MDC turnover was to proceed by zip code, in that different MDCs would assume responsibilities for trailers located in different zip codes.[12]  Because the Trailer was located in zip code 70125,[13] C. Martin Company was the MDC that accepted responsibility for the Trailer.[14]

As further discussed during the May 18, 2006 meeting, the MDC turnover was to be facilitated by a "Preventative Maintenance Inspection Form," or "PMI," which would record the condition of each trailer at the time of the MDC turnover.  By recording the state of the trailer on the PMI, the MDC could establish that a given maintenance issue existed prior to the turnover.  Conversely, if a maintenance issue arose after turnover and was not recorded on the form, the issue would be presumed to be the MDC's responsibility under its new contract.  MDCs were instructed that when a trailer passed the inspection, the MDC should write "ACCEPTED" on the form for that trailer and return it to Shaw.[15]  As instructed, when C. Martin accepted the Trailer, it filled out a PMI specific to the Trailer and wrote "ACCEPTED 6-1-06" on that form.[16]

Once C. Martin accepted the Trailer through the FEMA MDC turnover process, Shaw no longer had any responsibilities with regard to the Trailer, through the FEMA Contract or

FEMA Contract, is attached hereto as Exhibit "F."  *See* ¶¶ 3-4.

[12]     Ex. "F," Hansen Affidavit, ¶ 5.

[13]     Ex. "B," Supplemental PFS, p.6, ¶ IV.A.

[14]     Ex. "F," Hansen Affidavit, ¶ 7.

[15]     Ex. "F," Hansen Affidavit, ¶ 11.

[16]     A copy of the PMI for the Trailer is attached to the Hansen Affidavit as Exhibit "3."  Notably, the PMI reflects that the Trailer suffered from no defects at that time.

otherwise.  Moreover, it is clear that FEMA directed, participated in, was informed of, and accepted, the transfer of responsibilities from Shaw to C. Martin, which included responsibility for the Trailer.  On June 1, 2006, C. Martin's Robyn Williams emailed Shaw's Pamela Wolfe a spreadsheet that listed all of the trailers that had been transferred to C. Martin.[17]  At line 3700 of the spreadsheet, the Trailer is indicated as having been transferred to C. Martin.[18]  Moreover, as reflected on the "To:" line of Ms. Williams' email, C. Martin notified FEMA of its acceptance of the trailers through Gary Keyser (the FEMA Contracting Officer's Technical Representative assigned to Shaw) and James Blair of FEMA.[19]

In sum, as of June 1, 2006, responsibility for the Trailer had been transferred from Shaw to C. Martin.  This turnover occurred at the direction of, and with the full knowledge of, FEMA.  Shaw simply had no responsibility for the Trailer after that date.  Shaw did not maintain the Trailer after that date, and Shaw did not participate in the deactivation of the Trailer.[20]  Thus, although plaintiff might wish to look to the continuing tort doctrine to find solace for his untimely claim, he cannot do so due to the uncontested fact that Shaw had nothing to do with the Trailer after June 1, 2006 – two years and nine months before plaintiff filed suit.

---

[17]     Ex. "F," Hansen Affidavit, ¶ 8.

[18]     A copy of an excerpt from the spreadsheet (which is quite long) is attached to the Hansen Affidavit as Exhibit "2" to that document.  Information about other disaster relief applicants, which is protected by the Privacy Act, has been redacted.

[19]     Ex. "F," Hansen Affidavit, ¶ 10.  In fairness, Mr. Keyser's email address is spelled incorrectly, but FEMA received notice through Mr. Blair at a minimum, and there is no evidence or contention that FEMA lacked knowledge of the turnover.

[20]     Ex. "F," Hansen Affidavit, ¶ 12.

## LAW AND ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Plaintiff's claims against Shaw are ripe for summary resolution and should be dismissed as a matter of law.  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[21]

Ordinarily, the party pleading prescription bears the burden of proving that the plaintiff's claims have prescribed.  However, once it is shown that more than a year has elapsed between the time of the tortious conduct and the filing of a tort suit, the burden shifts to the plaintiff to prove suspension, interruption, or some other exception to prescription.[22]  To satisfy this burden, the nonmoving party must go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.[23]

Summary judgment dismissing Shaw from this lawsuit is appropriate because the record clearly reflects that Mr. Wright did not file his claim against Shaw within the one-year prescriptive period as required under Louisiana law.  Accordingly, the only way for plaintiff to defeat Shaw's Motion for Summary Judgment is to prove that prescription somehow was

---

[21]    Fed. R. Civ. Pro. 56, *see also American Crew Boats and Marine Transportation, LLC v. Fisk Corp. et al.*, 2008 WL 4449966, *1 (E.D. La. 9/29/08) (Engelhardt, J.) (quoting Fed. R. Civ. Pro. 56(c)).

[22]    *Terrebonne Parish School Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002), *citing In re Moses,* 788 So.2d 1173, 1177-78 (La. 2001); *Stett v. Greve,* 810 So.2d 1203, 1208 (La. App. 2nd Cir. 2002); *Strata v. Patin,* 545 So.2d 1180, 1189 (La. App. 4th Cir.), *writ denied,* 550 So.2d 618 (La.1989).

[23]    *American Crew Boats*, 2008 WL 4449966 at 1 (citations omitted).

suspended or interrupted or that some other exception to prescription applies.  Plaintiff cannot do so.

## II.   MR. WRIGHT'S CLAIMS ARE BARRED BY LIBERATIVE PRESCRIPTION OF ONE YEAR.

The character of an action disclosed in the pleadings determines the prescriptive period applicable to that action.[24]  It is well settled under Louisiana law that a cause of action based on negligence is a delictual action subject to a one year prescriptive period commencing on the "day the injury or damage is sustained."[25]  This period is equally applicable to claims brought under the LPLA.[26]

As a general rule, prescription begins to run "when plaintiff has actual or constructive notice of the alleged tortious act."[27]  Stated another way, prescription begins to run when it can be objectively determined that the exercise of reasonable diligence would have alerted a reasonably minded plaintiff of the reasonable possibility that it was a victim of tortious conduct.[28]

Here, the plaintiff's knowledge of his alleged injuries could not have been more clear. He knew enough in April 2006 to tell his mother that he thought that the trailer was making him

---

[24]      *Kendall Co. v. Southern Medical Supplies, Inc.*, 913 F. Supp. 483 (E.D. La. 1996).

[25]      La. Civ. Code. Art. 3492.

[26]      *Denoux v. Vessel Management Services, Inc.*, 2007-0163 (La. App. 4 Cir. 7/11/07), 964 So.2d 1081 (Louisiana's one-year prescriptive period applies to all delictual actions, including those brought pursuant to the Louisiana Products Liability Act); *see also Bultman v. Danek Medical, Inc.*, 1999 WL 33537321 (E.D. La. 1999).

[27]      *Mistich v. Cordis Manufacturing Co.*, 607 So. 2d 955, 956 (La. App. 4th Cir. 1992).

[28]      *Griffin v. Minberger*, 507 So. 2d 821, 823 (La. 1987).

sick.[29]  This fact alone – and especially taken together with all of the other admissions set forth above – means that Mr. Wright's claims against Shaw prescribed at the latest in April 2007.

### III.    PRESCRIPTION WAS NOT SUSPENDED OR INTERRUPTED.

Because Shaw has established that more than one year has passed between the time Mr. Wright discovered his alleged injuries and the filing of this suit, the burden shifts to the plaintiff to prove an exception to prescription.

### A.    The Putative Class Actions Against Trailer Manufacturers Had No Effect on the Prescription of Mr. Wright's Claims Against Shaw.

Shaw anticipates that plaintiff may argue that prescription was suspended by the commencement of the *Hillard* class action pursuant to the doctrine of *American Pipe* tolling (or, equivalently, Article 596 of the Louisiana Code of Civil Procedure).  In general, when a putative class action is filed, *American Pipe* tolling operates to suspend the prescription of certain claims: "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."[30]

Plaintiff presumably would argue that he was a putative class member of the *Hillard* class and therefore should benefit from *American* Pipe tolling.  However, this argument fails to recognize that the putative *Hillard* class **did not** purport to assert any claims against Shaw. *American Pipe* speaks only of claims actually brought by the putative class members and not every claim that might have been added against **potential, unnamed defendants**.  Indeed, the

---

[29]        Ex. "D," Wright Deposition, pp. 169-71 and p. 295.

[30]        *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974).

whole premise of *American Pipe* tolling is that the tolling would not be inconsistent with the function of a prescriptive period (or, equivalently, a statute of limitations) because the defendants named in the putative class action had been made aware of the claims against them:

> The policies of ensuring essential fairness to defendants and of barring a plaintiff who 'has slept on his rights,' are satisfied when, as here, a named plaintiff who is found to be representative of a class commences a suit and thereby notifies ***the defendants*** not only of the substantive claims being brought against ***them***, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. Within the period set by the statute of limitations, ***the defendants*** have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional intervenors.[31]

The logic of the United States Supreme Court is compelling.  When a defendant is actually named in a putative class action, it is on notice of the action against it and can take steps to defend itself, thereby satisfying the fundamental public policy of the applicable limitations period.  Conversely, when a defendant is not named in the putative class action, there is absolutely no reason to assume that the unnamed, potential defendant knows about the possibility of a later lawsuit and is taking steps to preserve essential information.  *American Pipe* simply has no application to claims against parties who are not defendants in the putative class action.

To extend *American Pipe* tolling to defendants who were not named in the original putative class action would run contrary to the Supreme Court's logic and contrary to the public policy behind prescriptive / limitations periods.  No reported case has ever extended *American Pipe* to a defendant who was not named in the original putative class action, and this Court

---

[31] *Id.* at 554-555 (emphases added; internal citation omitted).

should not be the first.  Because Shaw was not named as a defendant in *Hillard*, plaintiff may not benefit from *American Pipe* tolling.

      **B.**      **Prescription of Mr. Wright's Claims Has Not Been Interrupted.**

      Shaw also anticipates that plaintiff may try to avoid prescription by arguing that he should benefit from Article 2324 of the Louisiana Civil Code, which provides that interruption of prescription as to one joint tortfeasor is effective against all joint tortfeasors.  First, plaintiff presumably would argue that Shaw is a joint tortfeasor with the manufacturer defendants who were named in the *Hillard* action.  Plaintiff would then argue that because prescription against the *Hillard* defendants was interrupted by the filing of that lawsuit,[32] interruption of prescription is also effective against the claims asserted against joint tortfeasor, Shaw, in the instant matter.  Leaving aside the question of whether Shaw really is a joint tortfeasor, the anticipated argument will fail for two reasons.  First, unlike *American Pipe* tolling, Article 2324 does not apply to the claims of every putative class member and/or every conceivable plaintiff.  Only the named plaintiffs in *Hillard* interrupted prescription by filing their action, and accordingly only they can avail themselves of the joint tortfeasor doctrine under that article.  Because Mr. Wright did not purport to bring claims in his own name in *Hillard* – or in any other case prior to March 2, 2009 – Article 2324 does not apply to him.

      Second, even if *American Pipe* tolled the prescription of claims against the Trailer's manufacturer or FEMA, that tolling is clearly a suspension of prescription, and not an

---

[32] La. Civ. Code art. 3462 provides for the interruption of prescription upon the commencement of a lawsuit.

interruption.[33]   Article 2324 of the Civil Code applies only when prescription is interrupted, not when it is merely suspended: "Interruption of prescription against one joint tortfeasor is effective against all joint tortfeasors."   The distinction between interruption and suspension is both clear and well-known to the redactors of the Civil Code.   The prescription of Mr. Wright's claims against the manufacturers and FEMA was merely suspended by *American* Pipe, and therefore, Article 2324 simply has no application to his claims against Shaw, even if Shaw were shown to be a joint tortfeasor.   To conclude otherwise would be to write "suspension" into Article 2324. Shaw respectfully submits that this is the province of the Louisiana Legislature alone, and not the Court.

### C.    The Continuing Tort Doctrine Does Not Apply.

Finally, Shaw anticipates that plaintiff will seek to avoid the consequences of his late filing by invoking the doctrine of continuing tort.   "Continuing tort," however, refers only to a tort "where the operating cause of injury is a continuous one and gives rise to successive damages."[34]   Stated another way, "a continuing tort is occasioned by unlawful acts, not the

---

[33]    *American Pipe* referred to the days remaining in the applicable limitations period at the time when the putative class action was filed.  Eleven days remained in the period at the time when the putative class was filed; because the intervenors sought to join the case eight days after the denial of class certification, the Court held that the intervention was timely and should have been allowed.  414 U.S. at 561.  Though expressed in common law terms, clearly this is an application of suspension rather than interruption.  *Compare* La. C.C. art. 3466 (interruption) with La. C.C. art. 3472 (suspension).

[34]    *Miller v. Conagra, Inc.*, 2008-0021 (La. 09/08/08), 991 So.2d 445, 456, *citing Crump v. Sabine River Authority,* 1998-2326, p. 7 (La. 06/29/99), 737 So.2d 720, 726.

continuation of ill effects of an original, wrongful act."[35]   The continuing tort doctrine only applies when continuous conduct causes continuing damages.[36]

When a plaintiff attempts to avail himself of the continuing tort theory, the plaintiff bears the burden of establishing its applicability.[37]   To allege a continuing tort, plaintiff must allege both continuous actions and continuous damage.[38]   However, no such allegations are present in plaintiff's Complaint.

In *Crump v. Sabine River Authority*, the Louisiana Supreme Court rejected the contention that a continuing tort could consist of a defendant's failure to remedy the harm caused by the initial tortious conduct, stating that "the breach of the duty to right the wrong and make the plaintiff whole simply cannot be a continuing wrong which suspends the running of prescription, as that is the purpose of any lawsuit and the obligation of every tortfeasor."[39]   Here, a majority of the claims asserted by plaintiff involve Shaw's alleged failure to remedy a harm caused by its initial conduct.   Based on the reasoning in *Crump*, such conduct does not constitute a continuing tort.

Plaintiff also complains of Shaw's alleged failure to warn "of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde."

---

[35]   *Id*.

[36]   *Risin v. D.N.C. Investments, LLC*, 2005-0415, p. 4 (La. App. 4 Cir. 120/7/05), 921 So.2d 133, 136.

[37]   *James v. New Century Mortgage Corp.*, 2006 WL 2989242 (E.D. La. 2006), *citing In re Med. Review Panel for Maria Moses*, 2000-2643, p. 6 (La. 05/25/01), 788 So. 2d 1173, 1177.

[38]   *Stanford v. Administrators of Tulane Educational Fund*, 2007-0678, pp. 8-9 (La. 4 Cir. 01/09/08), 975 So.2d 104, 109-110.

[39]   *Crump v. Sabine River Authority,* 1998-2326, (La. 06/29/99), 737 So.2d 720, 726.

In *GHR Energy Corp. v. Carboline Co.*, this Court specifically noted that "the continuing tort theory of prescription cannot apply to a failure to warn since a failure to warn is not capable of abatement, especially if there is no disclosure. . . .  Were courts to find otherwise, prescription would for all practical purposes cease to exist in failure to warn cases – regardless of whether the plaintiff had learned of the danger of the occurrence of the injury."[40]

In this case, even assuming that Shaw committed a continuing tort, there have been no acts or conduct by Shaw since June 1, 2006.[41]  Even where the cause of injury is a continuous one giving rise to successive damages, prescription begins to run when the conduct stops.[42] Shaw is alleged to have installed Mr. Wright's travel trailer incorrectly – a point that will be hotly debated but certainly occurred only once, and not continuously.   As for Shaw's maintenance responsibilities, those duties ended a few months after plaintiff moved into the Trailer.  Thus, any alleged wrongful conduct ended when Shaw ceased maintenance operations with regard to the Trailer on June 1, 2006.

Mr. Wright did not file his lawsuit until well more than a year had passed after Shaw's maintenance of the Trailer ended.  Accordingly, the continuing tort doctrine does not revive his untimely claim.

---

[40]     744 F. Supp. 1405, 1407 (E.D. La. 1990).

[41]     Ex "F," Hansen Affidavit, ¶ 12.

[42]     *South Central Bell Telephone Co. v. Texaco, Inc.* 418 So.2d 531, 533 (La. 1982).

## CONCLUSION

The question of whether Mr. Wright's claims against Shaw have prescribed is a simple one that is ripe for summary disposition.  Mr. Wright filed this action on March 2, 2009, roughly three years after he moved into the Trailer and told his mother that the Trailer was making him sick, and two years and nine months after FEMA hired a different contractor to maintain the Trailer.  Undoubtedly, Mr. Wright did not file this action within a year of being injured or within a year of knowing that he had been injured.

Having brought a claim that is so plainly prescribed on its face, Mr. Wright presumably will seek respite in *American Pipe*, Article 2324, or the continuing tort doctrine.  But none of these theories helps him.  *American Pipe* does not affect claims not asserted in the former putative class action – such as the claims now asserted against Shaw – and this Court should not extend it.  Article 2324 relates to the effect of a claim actually brought by a plaintiff, not a claim made later in a separate lawsuit by someone else who perhaps had been a putative class member, and this Court should not extend it.  And any continuing tort, even if that doctrine applies at all, must have ceased when Shaw's responsibilities for the Trailer ended on June 1, 2006.

Mr. Wright's attempts to avoid prescription are without merit.  He filed his action three years after his alleged injury, and nothing suspended prescription in the interim.  His claims against Shaw prescribed in 2007, two years before he brought this action.  Shaw respectfully urges the Court to give effect to Louisiana's one-year prescriptive period by dismissing all claims against Shaw in this action.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**


　/s/ M. David Kurtz
M. DAVID KURTZ (#23821)
KAREN KALER WHITFIELD (#19350)
CATHERINE N. THIGPEN (#30001)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000

**ATTORNEYS FOR DEFENDANT,
SHAW ENVIRONMENTAL, INC.**


## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2009, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sent notification of such filing to all court-appointed liaison counsel.


　/s/ M. David Kurtz