Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  FEMA TRAILER           MDL NO. 1873
FORMALDEHYDE PRODUCTS          SECTION "N"(4)
LIABILITY LITIGATION           JUDGE ENGELHARDT


* * *


VIDEOTAPED DEPOSITION OF LYNDON WRIGHT, 3417 SOUTH CLAIBORNE AVENUE, APARTMENT 5, NEW ORLEANS, LOUISIANA 70113, TAKEN AT THE OFFICES OF FRANK D'AMICO, 622 BARONNE STREET, NEW ORLEANS, LOUISIANA 70130, ON THE 10TH DAY OF JULY, 2009.

REPORTED BY:

   CATHY RENEE' POWELL, CCR
   PROFESSIONAL SHORTHAND REPORTERS
   (504)529-5255

VIDEOGRAPHER:

   BRIAN SOILEAU
   PROFESSIONAL SHORTHAND REPORTERS
   (504)529-5255

**EXHIBIT "D"**

1      Q.   What kind of information or
2   articles have you gotten from the City of
3   New Orleans' Web site?
4      A.   Pretty much the recovery
5   information they had on the Web site.
6   That's all.
7      Q.   Did you ever read anything on the
8   City of New Orleans' Web site about issues
9   relating to formaldehyde or otherwise
10  pertaining to these travel trailers?
11     A.   No.
12  MR. AHLQUIST:
13          The point of confusion was
14  probably that he works at the CDC.
15  MR. BONE:
16          I understand.  That's why I was
17  clarifying.
18  EXAMINATION BY MR. BONE:
19     Q.   Did you at any point review any
20  information online about formaldehyde or
21  about any issues other folks were having
22  relating to these trailers?
23     A.   No.
24     Q.   When you first believed or came to
25  the belief that your occupancy of this

1   particular unit was impacting your health,
2   did you tell your mother immediately?
3       A.   Yes.  I made the comment, because
4   I was coughing so much, I made the comment,
5   "Ma, I think this trailer is making me
6   sick."
7       Q.   Did you ask her to take any action
8   on your behalf in that regard?
9       A.   Initially, she wanted me to call
10  the maintenance people, but they gave me the
11  runaround.  They wanted all kinds of
12  personal information from my mom, so I told
13  my mom she had to call.
14           So she said she called to tell
15  them that I was smelling a foul odor.  They
16  gave her the runaround.  She said they gave
17  her another number to call.  She called that
18  number and somebody said they would get back
19  in touch with her.
20           She never did get a phone call,
21  and it just pretty much fell from there on.
22  That's when I started telling the
23  maintenance people when I saw them.
24      Q.   Do you recall when the phone call
25  was with your mother that you expressed to

Page 171

1  her that you believed your occupancy of this
2  unit was causing you a health problem?
3      A.   I would say probably April.
4      Q.   Of what year?
5      A.   '06.  Right after I got in the
6  trailer.
7      Q.   So in April of '06, you were of
8  the opinion that your occupancy of this unit
9  was causing you a health problem?
10     A.   I would say I thought it was
11 making me sick, yes.
12     Q.   And you expressed that to your
13 mother by May of 2006, correct?
14     A.   By April.
15     Q.   By April of 2006, correct?
16     A.   Yes.
17     Q.   Do you have any information as to
18 why your mother would have represented to
19 FEMA by February of 2008, that there were no
20 health concerns that she had about you
21 regarding your occupancy of this unit?
22     A.   No, I don't know.
23     Q.   Were you ever offered the
24 opportunity to purchase this unit?
25     A.   You would have to ask my mom.  I

1   lease?
2          I mean, how did it come about that
3   a letter like this was created?
4       MR. D'AMICO:
5            If you know.
6       THE WITNESS:
7            I can't recall.
8   EXAMINATION BY MR. KURTZ:
9       Q.   Do you know who she sent this
10  letter exhibit 7, to other that the copy
11  that she mailed to you?
12      A.   I would assume FEMA.
13      Q.   Okay.  In January of '06, your
14  mother was living in Texas, right?
15      A.   That's correct.
16      Q.   And you were on the cruise ship?
17      A.   '06, yes.
18      Q.   Okay.  Does your mom still live in
19  Texas?
20      A.   Yes, she does.
21      Q.   Does she still live in the same
22  area that she went to immediately after the
23  hurricane?
24      A.   The same area, yes.
25      Q.   She never lived in the trailer,

1   right?

2        A.    No, she just visited.

3        Q.    She visited occasionally?

4        A.    Yes.

5        Q.    Spent the night sometimes?

6        A.    About a week.

7        Q.    A week at a time?

8        A.    Yes, because that was her only

9   place to reside.

10       Q.    Okay. I'm going to mark as

11  Exhibit 8 an inspection report bearing Bates

12  SHAW-WRI-00007.

13       Q.    Mr. Wright, first of all, is that

14  your mother's signature in the bottom left

15  corner of Exhibit 8?

16       A.    I don't think it is.

17       Q.    Okay. Do you know whose

18  signature --

19       A.    I really can't relate. I don't

20  know if my mom came down and took care of

21  this or not. Because I know there was a

22  couple of documents they told me I had to

23  sign my mother's name on it.

24       Q.    I was about to ask you, is that

25  your handwriting of her name on Exhibit 8 in

```
 1   the lower left-hand --
 2        A.   I don't know.
 3        Q.   Okay.  This is a document that was
 4   created when the trailer was inspected,
 5   right?
 6        A.   Yes.  I signed her name.
 7        Q.   Your mom was not present at the
 8   inspection of the unit, right?
 9        A.   No.
10        Q.   It was just you acting on her
11   behalf?
12        A.   Yes.
13        Q.   Okay.  Now, you see the name
14   that's to the right of your mother's name,
15   "M.B. Weddington," you see that?
16        A.   Weddington, yes.
17        Q.   Is that the person who walked
18   around the trailer with you at that time?
19        A.   That's correct.
20        Q.   And is the date accurate,
21   February 13, 2006, for the inspection of the
22   trailer?
23        A.   Approximately.
24        Q.   Okay.  You had walked around the
25   exterior of the trailer prior to signing
```

1       Q.    No, sir.  After the inspection,
2   what I'm trying --
3       A.    Oh, after the inspection?
4       Q.    Did you move in, like, that day,
5   on February 13, 2006, when you signed your
6   mother's name to Exhibit 8, or did some more
7   time pass before you could actually move in
8   due to any kind of problem?
9       A.    Actually, the only way this
10  inspection could have took place was because
11  the electrical might have been hooked up.
12  That's the only way I could have gotten the
13  keys.
14      Q.    Okay.  So your testimony is, you
15  would have moved in immediately following
16  this inspection.  He handed you the keys
17  after this inspection and you moved in?
18      A.    I didn't move in right away, no.
19      Q.    Okay.  I thought you told me that
20  you moved in in March of 2006.
21      A.    Yeah.
22      Q.    And this is in February of 2006.
23  So I'm trying to figure out why there's a
24  gap there.
25      A.    Well, I was still staying on the

1   2006?  Was it cold or raining, anything like
2   that?
3        A.   I don't recall it.
4        Q.   Okay.  Do you recall seeing any
5   leaks at the time of the inspection,
6   February 13, 2006, or any evidence that
7   water had leaked into the trailer?
8        A.   No.
9        Q.   Okay.  At that point in time, you
10  did not have the problem with water coming
11  in through the door, right?
12       A.   No, not at that time.
13       Q.   That happened later, correct?
14       A.   Yes.
15       Q.   Did you observe any holes in the
16  trailer, like from the inside you might see
17  daylight coming in from the outside or
18  something like that?
19       A.   No.
20       Q.   Did you smell anything unusual at
21  that time, February 13, 2006?
22       A.   It had like this new smell.
23       Q.   Like a new car smell?
24       A.   Yeah.
25       Q.   Now, is the new smell the same as

1   or different from the wet carpet odor that
2   you were talking about with Mr. Bone
3   earlier?
4        A.   Different?  Yes.  It was
5   definitely different.
6        Q.   Let's talk about the new smell.
7   Did the new smell make you cough when you
8   went into the trailer for the first time?
9        A.   I think I sneezed.
10       Q.   Sneezed?
11       A.   Yes.
12       Q.   Okay.  Did it make your eyes
13  water?
14       A.   I really can't say because he was
15  talking, telling me how I have one of the
16  newer trailers and stuff.  So there was a
17  lot of things I probably wasn't paying
18  attention to offhand, you know.
19       Q.   Okay.  Did you think that the new
20  smell was irritating enough to be a problem?
21       A.   Being excited with getting in the
22  trailer, no, I didn't really see it would be
23  a problem, the new smell and everything.
24       Q.   How long did the new smell last?
25       A.   I can't recall.  I can't recall.

1      A.   I thought you was talking about
2   the certification page itself.
3      Q.   Oh, I'm sorry.  No.
4           I meant the data and information
5   in the packet, all that's accurate?
6      A.   Yes.
7      Q.   Okay.  I apologize.  We're talking
8   over one another, and I'm letting you do
9   that and I shouldn't.
10          Let me ask you specifically to
11  look at page 4 of that document.
12  Mr. Wright, you see above that, there are
13  some check boxes, in fact, they go back to
14  page 3, where a bunch of symptoms are
15  indicated.  You see that?
16     A.   Yes.
17     Q.   And then you see on page 4,
18  question No. 5 says, "When do you claim this
19  injury or disease first occurred," right?
20     A.   Yes.
21     Q.   And your answer was what?
22     A.   March of '06.
23     Q.   Okay.  Is that accurate?
24     A.   Injury or disease?  Yes.
25     Q.   Mr. Bone asked you some questions

In Re: FEMA Trailer Formaldehyde Products Liability Litigation     Videotaped Deposition of Lyndon Wright

Page 295

1  Q. You said you had a conversation
2  with your mother in which you told her that
3  you thought the trailer was making you sick,
4  right?
5  A. Yes.
6  Q. And you said that conversation
7  occurred in April of 2006, right?
8  A. Yes.
9  Q. Had you already seen a doctor
10  about the trailer making you sick prior to
11  talking to your mom or did you go see one
12  after talking to your mom?
13  A. After. After talking to my mom.
14  Q. About how long after?
15  A. I can't say. It was basically a
16  regular doctor's appointment.
17      No, it wasn't a regular doctor's
18  appointment. That's when I had stuff in my
19  eyes, and I saw Dr. Fox about that and he
20  gave me eyedrops.
21  Q. Is he -- you mean -- sorry. Go
22  ahead.
23  A. That was the first time I started
24  going about my problems with my eyes and
25  stuff.

1    Q.   Right.  You didn't know about that
2    at that point in time?
3    A.   It was just a statement I said to
4    my mom, but she wanted to call and have
5    somebody come check it.
6    Q.   Okay.  You said initially your mom
7    was going to come back and live in the
8    trailer as well; is that correct?
9    A.   That's correct.
10   Q.   Did either you or her ever tell
11   FEMA that she wasn't going to come back and
12   live in the trailer?
13   A.   Not that I recall.
14   Q.   You talked about having a packet
15   of materials in a white envelope.  Do you
16   recall that?
17   A.   Yes.
18   Q.   And you said you had no idea what
19   was in it, right?
20   A.   No.
21   Q.   It could have been owner's
22   manuals, right?
23   A.   Could have been.
24   Q.   The condensation on the window,
25   you described condensation on the inside of