Transcript of the Testimony of
# Videotaped Deposition of Alana Alexander

**Date taken: June 29, 2009**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation**

***\*\*Note\*\****
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**

Page 393

```
 1    trailer?

 2         A.    Yes.

 3         Q.    Subpart (c) references plaintiff's

 4    mental anguish and emotional distress,

 5    including the fear of an increased risk of

 6    future serious disease, both in your own

 7    case and in the case of your minor son.

 8              You actually, in that fact sheet,

 9    did raise that you're claiming mental and

10    emotional damage as a result of living in

11    the trailer, correct?

12         A.    Yes.

13         Q.    Okay.  Did you seek any

14    professional help for your mental anguish or

15    emotional distress before April of 2009?

16         A.    No.

17         Q.    Do you remember when you first

18    became a bellwether plaintiff?

19         A.    When I became a what?

20         Q.    Okay.  Do you understand that your

21    case is going to trial in September?

22         A.    Yes.

23         Q.    When were you informed that your

24    case was going to trial in September?

25         A.    The first time I met Bob.
```

Page 394

1        Q.   Do you remember when that was?

2        A.   I don't exactly remember the date.

3        Q.   Do you remember whether it was

4    before Easter?

5        A.   I think it might have been before

6    Easter.  I'm not exactly sure.

7        Q.   Did you seek any treatment after

8    April of this year regarding emotional or

9    mental issues you might have as a result of

10   being in the trailer?

11       A.   No.

12       Q.   You did go see Dr. Shwery?

13       A.   Yes.

14       Q.   Who selected him as a treating

15   psychologist for you?

16       A.   I assume my attorneys.

17       Q.   You were told to go see him?

18       A.   Yes.

19       Q.   Did you have any relationship with

20   Dr. Shwery before you were told to go see

21   him?

22       A.   No.

23       Q.   Were you having any emotional

24   problems that you felt like you needed to

25   have addressed by a psychologist?

Page 395

1     A.    I would say probably, yes, but I

2  talked to my sister a lot.

3     Q.    What emotional problems were you

4  having that you felt needed to be addressed?

5     A.    It was mostly a feeling of guilt

6  about the situation that I had inadvertently

7  put my children in.

8     Q.    How did the feelings of guilt

9  affect your daily life?

10    A.    In the beginning, I guess you

11  could say I was a little depressed because I

12  would mostly -- when I am depressed, I clean

13  a lot.  And I was cleaning everything and

14  anything I could get my hands on.

15           That's what I did a lot.  I talked

16  to them a lot.  I mean, I don't cry in front

17  of my children, but when they weren't

18  around, you know, I would have a moment to

19  cry.

20    Q.    When did these feelings of guilt

21  first arise?

22    A.    Oh, they started way -- they

23  started in Katrina, but they escalated a

24  little more after we got into the trailer.

25    Q.    Do you remember speaking to

Page 401

```
 1       A.    Is that the big one?

 2       Q.    No, actually, you don't need to

 3   look at it because I'm correcting it for

 4   you.

 5             You already corrected in Exhibit 2

 6   where it was marked, "no," you're not

 7   claiming mental anguish and emotional

 8   distress for Chris Cooper, that's what you

 9   changed to "yes" today?

10       A.    Correct.

11       Q.    Okay.  Did Chris go see a

12   psychiatrist or psychologist before April of

13   2009?

14       A.    No.

15       Q.    Has he seen a psychiatrist or

16   psychologist since April of 2009?

17       A.    No.

18       Q.    Well, he went to see Dr. Shwery,

19   correct?

20       A.    Shwery was in 2009.

21       Q.    Right.  Again, you didn't seek out

22   any help for Chris for his mental or

23   emotional distress until after your counsel

24   called you?

25       A.    Correct.
```

Page 402

1       Q.    And you had no input as to who you

2   were going to go see, they selected a doctor

3   for you?

4       A.    Correct.

5       Q.    Did you say you wanted to go see a

6   psychologist or psychiatrist before they

7   called and told you to go see him?

8       A.    I would say no.

9       Q.    Did Chris express to you that he

10  was having emotional and mental problems?

11      A.    He would, you know, every now and

12  then talk about the emotional.

13      Q.    What did he tell you about the

14  emotional?

15      A.    It was mostly the fear that maybe

16  the exposure might have maybe made his

17  asthma worse.

18      Q.    When did he first express that to

19  you?

20      A.    I can't give you an exact date on

21  that.

22      Q.    Was it after you moved out of the

23  trailer?

24      A.    I would say yes.

25      Q.    Was it before he became a

# Transcript of the Testimony of
# **Videotaped Deposition of Dr. Edward Shwery**

## **Date taken: June 18, 2009**

## **In Re: FEMA Trailer Formaldehyde Products Liability Litigation**

### ***\*\*Note\*\****
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# **Professional Shorthand Reporters, Inc.**
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**

Page 191

1    focus is on "My son's asthma got worse.  I

2    wish I hadn't done that because I think it

3    got worse because we were in the trailer."

4              It's that issue more than the

5    formaldehyde.  It's really more looking at,

6    "I wish I hadn't done that.  My son was

7    doing fine in Florida, now I put him in that

8    trailer and now he's worse."

9              It's more in the nature of what

10   happened to her son than it is --

11        Q.   The cause?

12        A.   -- looking at a toxin.

13        Q.   Based upon your interview with

14   Ms. Alexander, did you diagnose any kind of

15   anxiety disorder or depression with

16   Ms. Alexander?

17        A.   No.  In fact, I said no mental

18   disorder.  She really doesn't have any

19   diagnosable condition.  She has worries and

20   concerns, but they're really not -- they

21   don't rise to the level of a diagnosable

22   condition.

23        Q.   The types of worries and concerns

24   that most parents deal with every day?

25        A.   Yes.  Hers is a little more

Page 192

1   because she saw her son go through an

2   exacerbation of his illness, but she's

3   pretty competent.

4          She knows what to do, she seeks

5   out assistance, like from the doctors, she

6   takes cares of them with proper diet, she

7   makes sure that they're not doing things

8   that are going to affect their health poorly

9   or badly.

10         The other thing is, she focuses on

11  her son to not get caught up in having

12  asthma.  It's almost like, if I could put

13  this into words for her, it would be like,

14  "I don't want my son to be dependent, I want

15  him to be independent and be able to do as

16  much as he can in spite of his asthma."

17  That's a characterization of her.

18     Q.   On Axis V, you give her a GAF of

19  80, correct?

20     A.   Yes.

21     Q.   And as you indicated a few moments

22  ago, that would be toward the middle range

23  of where your "normal" person would be?

24     A.   Yes.  I'd probably be an 80.

25  There are things in my life that stress me.

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Dr. Edward Shwery

Page 193

1    But yes.  I think that's appropriate for

2    her, 80.  That would be about right.

3            That's in the higher ranges.

4        Q.   Any recommendations based upon

5    your interview with Ms. Alexander with

6    No. 1, that she would benefit from brief

7    counseling to assist her in improving her

8    coping skills for anxiety and worrying about

9    her children's future?  How long would the

10   brief counseling be?

11       A.   Well, I would tie together No. 1

12   and No. 2.  She needs, in addition to

13   counseling, she needs some ongoing or some

14   period of consultation to help her

15   understand the risk factors, what to be

16   concerned with in the future, consultation

17   with a parent about what this is going to be

18   like for your child when he's 15, 16, he's

19   going to have normal adolescent issues, and

20   he might not want to take medicine and

21   things like that.

22           I would think the whole package of

23   counseling and consultation, I don't think

24   she would need more than eight or ten

25   sessions of counseling at most, I would

Page 194

1    think, because it's not an ingrained

2    problem.  She's a pretty good -- she's a

3    very good mother.

4           But I think the consultation would

5    maybe be more periodic.

6       Q.   This would be in addition to the

7    family counseling that we discussed with

8    Christopher?

9       A.   Yes, that would be more focused on

10   helping her and Christopher improve their

11   communication.

12          With a situation like this, people

13   tend to carry a lot of misconceptions in

14   their mind or they carry a lot of

15   assumptions that, my mother probably knows

16   this or my son ought to know this.  But when

17   you get into these medical or psychological

18   issues and you try to help somebody to cope

19   with it, you find a lot of

20   misunderstandings.  So the mother/son

21   therapy would hopefully eliminate or reduce

22   that.

23      Q.   Is that what you were referring to

24   in recommendation No. 3, "Assistance in

25   helping her children to cope with their

Page 208

```
 1    opinion, prior to the storm resulted from

 2    asthma, correct?

 3         A.   Specifically, yes.  But it had

 4    gone down.  But it did occur in time

 5    predating the storm.

 6         Q.   And in the history from

 7    Ms. Alexander, Christopher's asthma and

 8    allergy issues existed prior to the storm,

 9    correct?

10         A.   Oh, yes, they had been dealing

11    with that issue since he was a little kid.

12         Q.   In the report on Ms. Alexander,

13    you state that, "Ms. Alexander fears that as

14    Christopher becomes aware of the increased

15    risk of cancer."

16              Is it your understanding that

17    currently Christopher has no understanding

18    of any increased risk of cancer, if one

19    exists?

20         A.   That's my appreciation, that if he

21    does, it's a very vague notion.

22         Q.   Now, under your diagnoses for

23    Ms. Alexander, and I think you said earlier

24    that these diagnoses were made under

25    DSM-IV-TR?
```

Transcript of the Testimony of
# Videotaped Deposition of Megan A. Ciota, Ph.D.

## Date taken: July 16, 2009

## In Re: FEMA Trailer Formaldehyde Products Liability Litigation

### **Note**
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**

Page 21

```
 1        A     Not exactly.  I don't have a great
 2   recollection of it.  It may have been about
 3   logistics.
 4        Q     Okay.
 5        A     But I really don't have a great
 6   recollection of that.
 7        Q     There's an "e-mail," 6-8-09?
 8        A     "Eval."
 9        Q     "Eval"?
10        A     Right.
11        Q     And you evaluated who and what?
12        A     Christopher Cooper and Alana
13   Alexander on those days.
14        Q     Okay.
15        A     They came to the office.
16        Q     And then on 6-18, you have a one
17   hour and 45 minute meeting.  Who was that
18   with?
19        A     That was with Mr. Glass.
20        Q     After the evaluation?
21        A     Right.
22        Q     Okay.  When did you prepare the
23   report?
24        A     I believe --
25        Q     You can take a look at it if you
```

Page 29

1   reviewed.

2       Q    Okay.  Is there anything in your

3   report regarding Alana that you would

4   change?

5       A    No.

6       Q    And did you include all of the

7   opinions and conclusions that you intend to

8   testify about in that report?

9       A    Yes.

10      Q    Okay.  And you agreed with

11  Dr. Shwery that Alana would benefit from

12  education regarding formaldehyde, correct?

13      A    Let me see what he said.  I think

14  he did say that.  Let me just double-check.

15      Q    Well, let me read what you said.

16  "I agree with Dr. Shwery" --

17      A    Yeah.

18      Q    -- "that she would benefit from

19  education"?

20      A    Right.  And I think he testified

21  and said that, right.  So, yes, I do agree.

22      Q    Okay.  And do you believe that --

23  And I know that you said that you weren't

24  going to analyze medical conditions, and I

25  don't want you to.  I just want to know what

Page 45

1     A     That's correct.

2     Q     Okay.  And they both had been

3   locked in a box and you knew it and they

4   both suffered from what you were evaluating

5   as potential claustrophobia, would it matter

6   to you that they really had been locked in a

7   box?

8     A     Well, if they had been locked in a

9   box, yes, that would matter to me.

10     Q     Okay.

11     A     But another hypothetical set of

12   people could have developed claustrophobia

13   and not been locked in a box, so it's not

14   imperative that that situation occurred.

15   Like I was alluding to before, it's their

16   perception and, like we established, I had

17   no reason to disbelieve the information that

18   I was given from either Chris or his mother.

19     Q     Okay.  All right.  Now, you do

20   know -- And let's go with Christopher now.

21   Well, first of all, with regard to Alana,

22   you also believed that she would benefit

23   from some therapy; is that correct?

24     A     I think I said some education, you

25   know, regarding formaldehyde.  I also

Page 46

1    thought that she might benefit from some

2    assistance in developing a plan, a treatment

3    plan for Chris's asthma symptoms.

4         Q    Okay.  Dr. Shwery believed that

5    she would benefit from some therapy, as I

6    recall?  I'm looking for the exact wording.

7         A    Youth counseling?

8         Q    Yes, counseling.  "Counseling

9    would assist her in improving her coping

10   skills for anxiety and worry about her

11   children's future."  Do you believe that's

12   true?

13        A    I don't think she needs a great

14   deal of counseling, but brief counseling to

15   educate her about whatever the actual risks

16   are would probably be beneficial to her.

17   That I do agree with, yes.

18        Q    Okay.  And what about --

19        A    But I don't think she has an

20   overwhelming amount of anxiety or worry.

21   That's at least not how she presented to me,

22   as being, you know, very anxious or having a

23   great deal of worry that interfered a lot

24   with her life.

25        Q    I understand.  But you agreed with

Page 47

```
1   Dr. Shwery in terms of his opinion that she

2   would benefit from some counseling, correct?

3        A     Right, some education,

4   psychoeducation is what I would call it, or

5   counseling.

6        Q     Okay.  However you want to call

7   it.

8        A     Okay.

9        Q     And part of that hopefully would

10  help her deal with the anxiety that you saw.

11  Whether you saw it as high a level as

12  Dr. Shwery or not, it would help her benefit

13  with the anxiety she has in connection with

14  her concern about her children's exposure?

15       MR. GLASS:

16            Object to the form of the

17  question.

18       THE WITNESS:

19            No.  No.  And when I evaluated

20  her, in her presentation with me, she did

21  not present with anxiety.  She expressed

22  some concern that wasn't overwhelming to

23  her, so I wouldn't agree that she had

24  anxiety.

25  EXAMINATION BY MR. LAMBERT:
```

Page 48

```
1        Q     Okay.  So what do you want to call
2   it, concern?
3        A     Yeah, her concerns.  Anxiety
4   implies kind of a deeper level of
5   disturbance than I would -- or that she at
6   least presented to me when I saw her.
7        Q     Okay.  Well, let's do it this way.
8   Would she benefit from some counseling to
9   help her deal with her concerns about her
10  children's health, long-term health issues?
11       A     Yes.
12       Q     Okay.
13       A     I think she should get some
14  education about what the risks are, and I
15  think that would be beneficial to her, and
16  what the risks may not be.
17       Q     Well, whether the risks are real
18  or not real has a whole lot to do with
19  things that you don't know about regarding
20  the effects of formaldehyde, correct?
21       A     Correct.
22       Q     Okay.  So let's not go there.
23       A     I didn't go there.  I just said I
24  think she would benefit from getting some
25  factual information about risks, right.
```

Page 49

```
 1      Q     Right, and that that would help

 2   her deal with -- And we're not going to use

 3   the word "anxiety," because you don't want

 4   to.  We will use "concern."

 5      A     Right, because anxiety was not --

 6   She did not present as anxious when I saw

 7   her.

 8      Q     Okay.  Now, I imagine you have

 9   seen some anxious people as a result of

10   Katrina, haven't you?

11      A     Yes.

12      Q     Forget travel trailers for a

13   minute.  Let's just talk about getting

14   flooded to the point where you're hiding in

15   an attic and walking for days through water,

16   which these people experienced, correct?

17      MR. GLASS:

18           Object to the form of the

19   question.

20      THE WITNESS:

21           Correct.

22   EXAMINATION BY MR. LAMBERT:

23      Q     Okay.  And being homeless and

24   displaced over months, moving around the

25   country, right?
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Megan A. Ciota, Ph.D.

Page 51

1    to facts not in evidence, lack of

2    foundation.  Go ahead.

3         THE WITNESS:

4              Yeah, she's a pretty remarkable

5    and resilient woman.  I was very impressed.

6    EXAMINATION BY MR. LAMBERT:

7         Q    I'm sure she is.  Now let's talk

8    about her son, who is how old, 14?

9         A    12.

10        Q    12.  His sister is 14.  Right.

11   You didn't see the sister?

12        A    Yeah, I didn't see the sister.

13        Q    Okay.  12 years old.  Now, part of

14   what you recorded in your report was -- Let

15   me back up to my last question.

16        A    Okay.

17        Q    Your opinion, Dr. Ciota, is that

18   Alana was not anxious with regard to

19   anything when you saw her?

20        A    Right.  She didn't exhibit

21   anxiety.

22        Q    Okay.  But you agree with me that

23   she definitely voiced to you a concern about

24   her children's long-term health,

25   particularly her son, based on what she

Transcript of the Testimony of
# Videotaped Deposition of Erika Alexander

**Date taken: June 30, 2009**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation**

***\*\*Note\*\****
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**

Page 63

1    McDonough 15?

2         A.   Band instructor, yes.

3         Q.   Do you know his first name?

4         A.   Calvin.

5         Q.   So the plan is that hopefully

6    Chris will be active in the band and they

7    will be out doing different performances for

8    various people?

9         A.   Yes.

10        Q.   So Chris hasn't talked to you

11   about any fears of dying or anything that he

12   has?

13        A.   No.

14        Q.   Does he seem like he's in pretty

15   good spirits?

16        A.   Yes.  Sometimes he's too happy.

17        Q.   Why do you say that?

18        A.   Because it's like he's really,

19   really jolly.  Sometimes I just look at him,

20   like, "Christopher, chill out.  It's too

21   early in the morning for that."

22        Q.   So he should be a more moody

23   person?

24        A.   No.  I'm just saying he should be

25   mellow sometimes.  It's like he injected

Page 64

1    himself with Pixie Stix dust.

2        Q.    How about your mom, has she talked

3    to you about any fears or anxieties she has

4    had as a result of living in the trailer?

5        A.    No.

6        Q.    How has she seemed as far as her

7    mood?

8        A.    Same with Christopher, too jolly.

9        Q.    How about yourself, how do you

10   feel?

11       A.    I guess I'm just a normal teenage

12   girl.

13       Q.    Other than the allergies and the

14   asthma, has Chris had any other health

15   problems since living in Florida?

16       A.    No.

17       Q.    At what temperature is your aunt's

18   house set at when it's the hot summer

19   months?

20       A.    I have no idea because for some

21   reason my aunt likes to keep it cool.  Like,

22   she doesn't really use any air conditioner,

23   so most of the time we use the fans, because

24   I guess she's trying to cut back on global

25   warming or whatever.  She doesn't believe in