The result is a single, overall and more precise estimate of any association between formaldehyde and each of several different forms of cancer.

In 2008, Bosetti (16) reported a meta-analysis of cohort studies (the most important type) of formaldehyde and cancer. They evaluated 12 studies that, together, included 5651 cancer deaths. They reported largely unremarkable findings for "all cancer", cancer of the "oral cavity and pharynx", cancer of the "sinus and nasal cavity" and, cancer of the "nasopharynx". For NPC there was a combined total of 9 deaths observed and 6.8 expected, giving a non-significant SMR of 133, reflecting findings from the NCI study (10). These meta-analyses support the views of Marsh and his colleagues, described above, as well as my own view that formaldehyde does not cause NPC or leukemia.

VII. Cancer of the Nasopharynx: General Epidemiology

Because this Case may focus on NPC, the following background information may be useful.

NPC is a very uncommon cancer in the U.S. and in most of the western world. Estimates are imprecise, but about 1800 new cases are diagnosed each year in this country. (For context: The American Cancer Society estimates that there will be about 1.4 million new cases of cancer diagnosed in 2008 in this country.)

For the U.S. population as a whole, the average incidence rate of NPC is 0.5 cases per 100,000 people per year (17). Among women, the incidence rates of NPC are similar for African-Americans and for Whites. However, among men, African-Americans have a rate that is about 80% higher than that of Whites. In the U.S. as a whole, the probability of developing NPC is only about 40 cases per 100,000 people, *over all of their entire lifetimes*.

Little is known of the causes of NPC in the western world. One recognized cause is the Epstein-Barr virus (EBV), (15) an agent that commonly infects Americans. The EBV causes infectious mononucleosis and some forms of Hodgkin's disease. It causes NPC and may account for about one-

fourth of cases of the disease in the U.S. Cigarette smoking also causes NPC and smokers have about twice the risk of non-smokers. Alcohol consumption is a suspect, but not an established cause of NPC. There is some evidence that a diet that includes a large amount of fresh fruits and vegetables offers some protection against NPC (17,18).

NPC is common in some parts of Africa, in China and in other parts of Asia. It is generally considered that the frequent consumption of smoked fish and cooking patterns are the causes of the high rates of NPC in these regions (17).

VIII. Fear of Cancer

A fear of developing cancer is almost universal among adults in the industrialized world. The major reason for this is that the mass media, and others, exaggerate and dramatize the significance of cancer as a public health problem. It has been commonplace since the mid-twentieth century for the media to represent that cancer is increasing. Usually it also was implied that this increase was due to environmental contamination. In fact, any real increase was due to a rise only in lung cancer and was attributable to cigarette smoking. There was a reduction, though not an end to these media messages in 1996. In that year the first report appeared in the scientific literature showing that cancer mortality actually was declining in the USA (1). In fact, it has been declining since 1990 and, excluding lung cancer, it has been declining since 1950 (19).

The reports of a decline in cancer mortality brought only a brief respite from the sensationalism surrounding cancer in the mass media. Even as I write this, the current issue of *TIME* (September 15, 2008) reports, *"Although it is uplifting to talk about living with cancer, dying with cancer is the more honest reality."* Is it? As described below at least 65% of American cancer patients will survive their disease. And, immediately continuing, *TIME* states *"Cancer is overtaking heart disease as the No. 1 killer in the U.S. ..."* Well, in some literal sense the statement is true but it is entirely misleading. The reality is that both cancer and heart disease mortality rates long have been declining – but the heart disease rate is doing so more sharply than the cancer rate.

A second reason for a generalized fear of cancer relates to a widespread perception among the layman that cancer is a particularly mysterious disease whose causes are unknown and whose treatment is ineffective. Again, there is an inconsistency between perceptions and reality: IARC lists more than 100 known causes of cancer in humans (20). In addition, from 1980 to 2000 the probability that a newly-diagnosed cancer patient would survive the disease increased from about 50% to 65% (21). Note that this is a 30%, not a 15%, increase in survivorship over a 20 year time period. Together, the combination of the declining incidence of cancer in the population and the increasing survival of cancer patients has produced a major reduction in the overall cancer mortality rate. In 1990, that rate was 216 deaths per 100,000 persons. In 2005, the rate had declined 15% to 184 (22). This was just as I had predicted (1,23).

It is commonplace and regrettable that the media give scant attention, usually none, to the continuing declines in cancer incidence and mortality. Unfortunately most Americans believe that cancer is still increasing in this country and they continue to have an excessive fear of the disease.

IX. Screening as an approach to Cancer Control

*Note – in this Case the term "medical monitoring" is used. Apparently the term is intended to be synonymous with screening as an approach to disease control. The term "medical monitoring" does not appear in the scientific, medical or epidemiologic literature. It is not used by public health organizations and medical care providers in literature prepared for the general public. Indeed, I have not seen the term in any context outside of a legal case. I will use the term "screening".*

There are few topics in medicine and public health that generate more misunderstanding than does screening. This misunderstanding reflects the fact that screening has great intuitive appeal. It seems to be a simple, obvious and effective approach to cancer control. In reality, cancer screening is a complex practice that is expensive, potentially dangerous and with few exceptions produces little or no benefit. The limitations of screening are well recognized and understood by those who have studied and written about it (4,24,25).

The major concepts in cancer screening were developed nearly 30 years ago (4,24) and have remained essentially unchanged ever since (24,25). The most important issues are: 1) Screening may be appropriate for a cancer that is *relatively common in its preclinical, or latent, phase* among the people for whom screening is intended. 2) The cancer must be *more successfully* treated when it is screen-detected than when it is symptom-diagnosed. 3) There must be available a screening test that is known to be both highly *sensitive* (nearly always detects latent disease) and highly *specific* (does not produce a false positive result in the absence of disease).

X. Screening for Nasopharyngeal Cancer and Leukemia

Among human beings, NPC is the only form of cancer recognized by any agency as likely to be caused by formaldehyde. As was mentioned above, even the relationship between formaldehyde and NPC is controversial. But, to address the screening issue in this Case, I will discuss aspects of screening as they apply to NPC. I also will discuss screening for leukemia because that disease may be an issue in this Case. This discussion will relate first to the issues listed above and then to the positions of recognized organizations.

1. Common disease in the preclinical, latent phase.

NPC is a rare form of cancer both in the White and in the African-American populations of the USA. The *lifetime* risk of developing the disease is only about 40 cases in 100,000 people. (For perspective, The American Cancer Society estimates that among 100,000 Americans, **40,000** or more will develop cancer during their lifetimes.) There is no way to estimate the amount of excess NPC or of leukemia that might occur among the occupants of the THUs from any formaldehyde exposure. That is so because any such excesses are entirely hypothetical, very low, and so imprecise as to defy quantification.

2. Improved effect of treatment.

I am not aware of any screening program that has been conducted for NPC or for leukemia. There are no data that address the effects of early treatment among persons who have had NPC or leukemia detected by screening.

3. Accepted screening test.

There is no body fluid (including blood) or imaging study that has been evaluated as a screening test for NPC or for leukemia. I am not aware of any estimate of the sensitivity or specificity of any screening test for NPC or leukemia.

Thus, in terms of principles, NPC and leukemia are not diseases for which there is a rational basis for screening.

There are three highly-regarded public health agencies that from time-to-time have published updated guidelines for screening for various forms of cancer. These agencies (and citations to their websites where their cancer screening guidelines may be found) are: The American Cancer Society (26), The U.S. National Cancer Institute (27) and The United States Preventive Services Task Force (28).

Notably, these three agencies are uniform in their position on screening for NPC: none of them even mentions it. The three agencies have treated leukemia screening in exactly the same way. They do not mention it. The positions of these three agencies are entirely consistent with one another, with the positions I believe to be held in the medical and public health communities and with my own views.

The second edition of a standard textbook, *Cancer Epidemiology and Prevention,* includes a chapter entitled "Fundamental Issues in Screening for Cancer" (29). It was written by Dr. Anthony Miller, a former Director of the National Cancer Institute of Canada and of the Canadian Cancer Society. Dr. Miller cautions that, for a screening test to be acceptable it must be safe. He also indicates that, *"It cannot necessarily be assumed that a screening program for cancer will benefit the population to which it is applied. Not only do ethics demand that only programs with proven effectiveness be widely disseminated, it is also necessary to ensure that the program is continually monitored to confirm that effectiveness is maintained."*

- 14 -

The perception that a screening test and program can be ineffective and harmful may appear surprising. But, as just one example of these kinds of difficulties, consider the long-standing concerns over screening for prostate cancer. First, there is little evidence that prostate cancer screening (usually based on a blood test for prostate-specific antigen) actually lowers prostate cancer mortality among men who have been screened. In addition, men who test positive may be subjected to major surgery – surgery with a significant probability of producing serious side effects.

Dr. Miller's positions, which I fully endorse, exemplify the accepted professional views that cancer screening can be both ineffective and even harmful.

XI. Opinions of Plaintiffs' Experts

I have read the Affidavits of the following plaintiffs' experts in this Case:

1. Ms Mary DeVany

2. Mr. Marco Kaltonen

3. Dr. Gerald McGwin

4. Dr. Harry Milman

5. Dr. Jeff Shelito

6. Dr. William Stein

7. Dr. Patricia Williams

It is not practical to comment here on each of the opinions of these experts with which I disagree. I can state that:

1. To the extent that any expert represents that formaldehyde should be considered a human carcinogen, I disagree with that opinion.

2. To the extent that any expert represents that his, or her, basis for the above opinion is the IARC classification, I disagree with the basis for that opinion. I have stated my reasons for this disagreement in Sections V and VI of this Affidavit.

- 15 -

3. To the extent that any expert represents that the occupants of the FEMA-supplied THUs should receive screening for cancer, of any form, and that, as at least one expert has suggested, such screening should begin immediately, I disagree with that opinion for the reasons given in Sections X and XI of this Affidavit.

XII. Summary and Opinions

Nasopharyngeal cancer is the only form of cancer in human beings considered by the International Agency for Research on Cancer to be caused by formaldehyde. This position has been challenged because it is based largely on the findings from one occupational study and, possibly, on the findings of just one of several plants in that study.

The persons who have been living in FEMA-supplied THUs are exposed to levels of formaldehyde that are far lower than the levels in occupational studies. There is no epidemiologic study that shows an increase in cancer as a result of residential exposure to formaldehyde.

A fear of cancer, based on exposure to formaldehyde that resulted from exposures in the THUs is not justified by scientific evidence.

There is no established screening test or program for NPC or leukemia.

XIII. Appendices

A. Estimating the duration of formaldehyde exposure in FEMA-supplied THUs.

There are (365 days x 24 hrs/day) 8760 hours in a calendar year. A work year is considered to consist of (250 days x 8 hrs/day) 2000 hours in a calendar year.

There is no uniform agreement on a "residence year" – the number of hours the average American spends in his or her home. Nonetheless, it is widely accepted that a residence year would range from 50% to 60% of a calendar year. I use the midpoint of this range and consider that a residence year is (0.55 x 8760 hours) 4818 hours.

Thus, a residence year is (4818/2000) 2.4 times as long as a work year.

Note that it is unlikely that occupants of FEMA-supplied THUs actually spent 4800 hours per year in their THUs. That is because as soon as some began to complain about the air in the THUs, they were advised to spend as much time as possible out of doors or in other housing.

Finally, the average duration of occupancy of the THUs is unknown but 18-24 months seems likely.

B. The Standardized Mortality Ratio (SMR)

The SMR is an epidemiologic measure that describes the mortality rate in a group of interest (workers exposed to formaldehyde) relative to the rate that they would normally experience. For example, an SMR of 100 means that the group has an entirely normal rate. An SMR of 120 means that the group has a rate 20% higher than expected. The SMR accommodates the specific age-gender-race composition of the group of interest.

XIV. References

1. Cole P, Rodu B: Declining cancer mortality in the United States. *Cancer,* 78:2045-2048, 1996.

2. Cole P: Causality in epidemiology, health policy and law. *Environmental Law Reporter,* 26(6):10279-10285, 1997.

3. Cole P, Axten C: Formaldehyde and leukemia: An improbable causal relationship. *Regul Toxicol Pharmacol,* 40:107-112, 2004.

4. Cole P, Morrison A: Basic issues in population screening for cancer. *J Natl Cancer Inst,* 64:1263-1272, 1980.

5. Formaldehyde, 2-Butoxyethanol and 1-tert-butoxypropan-2-ol. *IARC Monographs of the Evaluation of Carcinogenic Risks to Humans,* Vol. 88, 478 pp., 2006.

6. Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes. Centers for Disease Control and Prevention, 2008.

7. Coggan D *et al*: Extended follow-up of a cohort of British chemical workers exposed to formaldehyde. *J Natl Cancer Inst,* 95:1608-1615, 2003.

8. Schottenfeld D, Fraumeni J (eds.): *Cancer Epidemiology and Prevention,* third ed., Oxford University Press, New York: 2006.

9. Adami H-O, *et al* (eds.): *Textbook of Cancer Epidemiology,* second ed., Oxford University Press, New York: 2008.

26. American Cancer Society Website:
    www.cancer.org/docroot/PED_2_3X_cancer_detection_guidelines_36.asp

27. National Cancer Institute Website: www.cancer.gov/cancertopics/screening

28. United States Preventive Services Task Force Website
    www.ahrq.gov/clinic/cps3dix.htm#cancer

29. Miller A: Fundamental issues in screening for cancer. Chapter 66 in: *Cancer Epidemiology and Prevention*, Schottenfeld D, Fraumeni J (eds.), second ed., Oxford University Press, New York: 1996.

FURTHER AFFIANT SAYETH NOT.

*[Signature: Philip Cole, MD]*

Sworn to and subscribed before me
this 16 day of September, 2008.

*[Signature: Jeanelle R. Bennett]*
Notary Public
My Commission expires: 5/11/2009