UNITED STATES OF AMERICA'S SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF ITS MOTION FOR A PROTECTIVE ORDER TO PREVENT PLAINTIFFS'
DEPOSITION OF HARVEY E. JOHNSON, JR., FORMER
FEMA DEPUTY ADMINISTRATOR AND CHIEF OPERATING OFFICER


EXHIBIT 1 (MICHAEL LAPINSKI DEPOSITION EXCERPTS)

Michael Lapinski                                              July 24, 2009
                          Washington, DC
                                                                   Page 1

```
 1                    UNITED STATES DISTRICT COURT

 2                       DISTRICT OF LOUISIANA

 3                         NEW ORLEANS DIVISION

 4     -------------------------------X

 5     In Re: FEMA Trailer               :

 6     Formaldehyde Products             :    MDL No. 1873

 7     Liability Litigation              :

 8

 9     -------------------------------X

10                             Washington, D.C.

11                             Friday, July 24, 2009

12             Videotaped deposition of Michael J. Lapinski, a

13     witness herein, called for examination by counsel for

14     Plaintiffs in the above-entitled matter, pursuant to notice,

15     the witness being duly sworn by DENNIS A. DINKEL, a Notary

16     Public in and for the District of Columbia, taken at the

17     offices of Nelson Mullins Riley & Scarborough LLP, 101

18     Constitution Avenue, N.W., Washington, D.C. at 9:08 a.m.,

19     Friday, July 24, 2009, and the proceedings being taken down

20     by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed

21     under his direction.

22
```

Michael Lapinski                                                           July 24, 2009
                              Washington, DC

## Page 186

1  occurred?
2  A. Yes, sir.
3  Q. Okay.
4      MR. SCANDURRO: I have no further
5  questions.
6      MR. BAIN: Okay, Mr. Lapinski, I have just
7  a couple of questions to clarify a few things that
8  you said earlier.
9      EXAMINATION BY COUNSEL FOR DEFENDANT
10         THE UNITED STATES OF AMERICA
11 BY MR. BAIN:
12 Q. You were asked a question by Mr. Woods
13 regarding what the concerns of Admiral Johnson were
14 in delaying testing from October 2000 to December
15 2000; do you recall that?
16 A. Yes, sir.
17 Q. And of course Admiral Johnson would be the
18 only one who would know all the concerns that were in
19 his mind at that time; is that right?
20 A. That's right.
21 Q. But were you aware from talking with
22 Admiral Johnson and others what the reasons were for

## Page 187

1  the delay in testing from October to December?
2  A. The biggest concern, when we launched the
3  multifaceted program that was the IAA that I referred
4  to between CDC and FEMA, is that the expert panel
5  would provide us with some public health guidance.
6      We would do occupied unit testing,
7  simultaneous to some mitigation testing, so that when
8  we came up with the occupied unit results, we could
9  characterize them in a meaningful way to the people.
10     That would have to come in from the expert
11 panel.
12     And in the event that people still didn't
13 have housing solutions, the mitigation study was
14 going to bring in hopefully some sort of an
15 instrument that we could satisfy people that if they
16 wanted to stay, or had to stay, or the situation
17 forced them to stay in a temporary housing unit, we
18 could do everything within our ability to improve the
19 indoor air quality to help reduce their risk.
20 Whatever the risk is derived from, whether it is air
21 quality or proximity or dislocation or -- you know --
22 just too many people on top of each other.

## Page 188

1      So the IAA was intentionally multifaceted;
2  and the fact that one piece was moving ahead without
3  being informed by the other two was the greatest
4  concern that Admiral Johnson had. That I heard him
5  specifically say.
6      The other concern that I know he had,
7  because we talked about this in selecting courses of
8  action and timing for courses of action, is that in
9  the absence of the expert panel guidance, we were
10 positioning FEMA as public health experts, and we
11 would get these test results, and then FEMA would
12 have to convey to individual unit occupants the
13 number; to which the logical question from the
14 occupant is, am I safe or am I not safe?
15     And all the guidance that we had up to
16 that point is that it's a very -- as I said before --
17 a very personal decision that only really can be made
18 between an individual and their physician, because
19 how the number relates to what preexisting conditions
20 they might have, there's nobody in FEMA that can
21 advise them on that.
22     And so what we did get back from the

## Page 189

1  expert panel is that it's not an empirical result to
2  occupational testing that is going to help somebody
3  determine stay or go; and that it was going to be a
4  relative risk determination; and Admiral Johnson --
5  smart guy -- knew that risk is one of the hardest
6  things to convey to somebody because you can't
7  give -- you can't show them a chart and have them
8  report to where they are. And you can't show them an
9  instrument and a dial and have them make any sense of
10 that.
11     It is far too personal, and it involves
12 understanding of science and biology that -- you
13 know -- some people would have gathered but not
14 everybody would have gathered and it would not have
15 been uniform.
16     And so we knew that we really needed a
17 strong partner that was going to convey the results
18 in terms of risk, and we didn't have that in -- you
19 know -- by the middle of October when we hoped to
20 have that, we didn't have that assurance from anybody
21 in the interagency, whether it was from the state
22 level, department of health, and we worked with the

48 (Pages 186 to 189)

Michael Lapinski
Washington, DC
July 24, 2009

### Page 190

1  two state directors of health in both Louisiana and
2  Mississippi. We didn't have that at the federal
3  level.
4      And you know, finding out that the results
5  were going to come out not in a parts per million
6  number but in a relative risk number, we just didn't
7  have any way to convey that to help people make good
8  decisions and not put themselves at greater risk by
9  just thinking that the only solution was to get out
10 of -- was to leave the travel trailer.
11     Q.  So is it fair to say that you were
12 expecting this expert panel to come up with some type
13 of benchmark which could be used; but instead, what
14 you got was a recommendation that the risks needed to
15 be explained to the occupants?
16     A.  The expert panel, when this group got
17 together, did make the determination as I've said
18 now, and I benefitted from them, that there is no
19 empirical number that you can read off a dial that
20 tells you stay or go.
21     They said there's far too many variables
22 and if you just react to the formaldehyde issue,

### Page 191

1  which is what we were measuring, you're missing a
2  whole host of other risks and you're not providing
3  people with the best possible information to make a
4  decision.
5      Q.  And because you didn't get what you might
6  have been expecting from the panel, then at that
7  point, FEMA had to have a strategy as far as how to
8  communicate risk to the people; is that correct?
9      A.  That's correct. And we knew that that was
10 not -- that could not be a FEMA strategy developed in
11 a vacuum. That had to be developed in an interagency
12 setting with consultation with the states and with
13 academics.
14     Q.  And from your point of view, that was the
15 reason, need for this risk communication strategy,
16 for the delay in the testing from October to
17 December; is that right?
18     A.  Yes.
19     Q.  And you were involved in that
20 decision-making process as far as whether to go
21 forward or whether to delay it for some time; is that
22 right?

### Page 192

1      A.  Yes, sir. I personally didn't want FEMA
2  to get a bloody nose over what appeared like foot
3  dragging or bureaucracy, but fully appreciated all of
4  the challenges to housing on the Gulf Coast, wanted
5  to make an informed decision, but knew -- like I
6  said -- that we had to rely on a lot of partners to
7  come to the table with their area of expertise in
8  order to develop a national position on this, not a
9  FEMA position or even a federal position.
10     MR. BAIN: That's all I have.
11     EXAMINATION BY COUNSEL FOR PLAINTIFFS
12     BY MR. WOODS:
13     Q.  Just as follow-up to what you just have
14 been asked, you were involved in the decision-making
15 process as far as what resulted in a delay of the
16 testing, but it wasn't your ultimate responsibility,
17 correct?
18     A.  My responsibility was to present the
19 information that was available -- that was out there
20 that I was -- you know -- devoted full-time to
21 gathering to help leadership make an informed
22 decision, knowing that it wasn't even a FEMA

### Page 193

1  leadership at this point, a FEMA leadership decision,
2  yes, sir.
3      Q.  But you said it was to help FEMA
4  leadership make an informed decision, correct?
5      A.  Yes, sir.
6      Q.  And that was the ultimate goal, your
7  responsibility was to coordinate the information,
8  coordinate the agencies to allow FEMA leadership to
9  make the appropriate decision, correct?
10     A.  Yes, sir.
11     MR. BAIN: Thank you.
12     MR. WOODS: That's it.
13     MR. SCANDURRO: That's it.
14     MR. BAIN: You have the opportunity to
15 read and sign your deposition.
16     So I would like you to take that
17 opportunity to do that once it's been transcribed.
18 You want to do that?
19     THE WITNESS: I need to talk to you about
20 the implications --
21     MR. WOODS: Say yes.
22     THE WITNESS: Yes.

49 (Pages 190 to 193)

Alderson Reporting Company
1-800-FOR-DEPO