UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 | |
| FORMALDEHYDE | * | | |
| PRODUCTS LIABILITY | * | | |
| LITIGATION | * | SECTION:  N(5) | |
| | * | | |
| This Document Relates to: | * | | |
| *Charlie Age, et al. v.* | * | JUDGE: ENGELHARDT | |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | | |
| | * | MAG: CHASEZ | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### REPLY MEMORANDUM REGARDING PLAINTIFF'S OPPOSITION
### TO GULF STREAM COACH, INC.'S MOTION *IN LIMINE* TO LIMIT
### EXPERT TESTIMONY OF STEPHEN SMULSKI, PH.D.

**MAY IT PLEASE THE COURT:**

Gulf Stream Coach, Inc. respectfully submits the following Reply Memorandum regarding Plaintiff's Opposition to its Motion *in Limine* to Limit Expert Testimony of Stephen Smulski, Ph.D.

**A.      Smulski's Opinions**

On July 28, 2009, Gulf Stream Coach, Inc. filed a Motion in Limine, seeking to limit the testimony of Stephen Smulski, Plaintiff's Wood Science expert.  (Rec. Doc. 2349).  On August 4, 2009, Plaintiff Opposed the Motion.  (Rec. Doc. 2485).  Based on admissions in the Opposition, Gulf Stream replies that Smulski should be <u>excluded</u> from offering testimony at the trial of this matter.

Despite only being assigned to inventory the composite wood products contained in the Alexander emergency housing unit, Smulski offers a host of opinions in "fleshing out the story." Exhibit "B," to Memorandum in Support of Motion to Limit Testimony of Stephen Smulski, Deposition of Smulski dated 6/10/09 (hereinafter Exhibit "B"), pp. 223-24.  However, in

responding to the Motion in Limine, Plaintiff argues that Smulski is only offering two opinions to the trier-of-fact.  (Rec. Doc. 2485, at pp. 3-4) ("Dr. Smulski's report contains only two opinions, which are listed as #26 and #27, and are both prefaced by the words '[I]t is my opinion.'").  These two opinions are as follows:

26. It is my opinion, to a reasonable degree of scientific certainty, that the Gulf Stream Coach, Inc. Cavalier model travel trailer supplied by FEMA to Ms. Alexander was not suitable for use as long-term housing because it was foreseeable and predictable that formaldehyde gas would be released from the wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood used in this trailer and that Ms. Alexander and her son Christopher Cooper would potentially suffer adverse health effects from chronic exposure to formaldehyde gas.

27. It is my opinion, to a reasonable degree of scientific certainty, that it was unreasonable for anyone to think that the health of persons living in this Gulf Stream Coach, Inc. Cavalier model trailer for a long period of time would not be adversely affected given: i) that the propensity for wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood to release formaldehyde gas has been known since the 1970s; ii) that exposure to formaldehyde gas causes adverse health effects has been known since the 1970s; iii) that the identical problem occurred in HUD-manufactured houses in the 1970s and early 1980s for identical reasons; and iv) that the techniques for mitigating formaldehyde gas inside buildings and structures of all kinds are well-known, widely published, and effective.

Exhibit "A," to Memorandum in Support of Motion to Limit Testimony of Stephen Smulski, Smulski's May 18, 2009 Report, at ¶¶ 26-27.  It is worth noting that Smulski is offered as an expert in the *Dubuclet* (bellwether Trial II) and *Wright* (bellwether Trial IV) cases.  In these two cases, Smulski also provided Affidavits outlining his opinions.  See *Dubuclet* Affidavit and *Wright* Affidavit, attached hereto as Exhibits "F" and "G," respectively.  Notably, Smulski does not include in these Affidavits the only two opinions he is offering in the *Age* case.  Gulf Stream submits that these opinions were likely removed since Smulski's two opinions do not assist the trier-of-fact, are duplicative, cumulative and are not reliable.  Thus, he should be excluded from testifying in the *Age* case, *in toto*, for the following reasons.

### 1.     Opinions Are Not Reliable and do Not Assist the Jury

Simply put, the cornerstone of Smulski's two opinions here is that the Alexander's specific trailer was unsuitable for housing because of the *potential* that Alexander and/or Cooper would suffer adverse health effects from chronic exposure to formaldehyde gas.   However, Smulski's opinions should be excluded because:  1) the opinions are inextricably bound with the conclusion that a specific level of formaldehyde exposure constitutes a health hazard, and this conclusion is admittedly beyond Smulski's area of expertise; 2) these opinions are completely unreliable and amount to nothing more that pure conjecture in relation to the Plaintiff's claim; and 3) Smulski has revealed himself to be nothing more than a biased advocate, the proverbial "hired gun," who attempts to filter the evidence and offer to the jury the ultimate determination it is tasked to make in this trial.

First, the conclusion that the Alexander trailer is unsuitable as long-term housing[1] is unquestioningly based on Smulski's unwavering acceptance of the ATSDR "safe level" for chronic formaldehyde exposure (greater than 365 days) of .008 parts per million.  In other words, the ultimate opinions contained in paragraph 26 and 27 of Smulski's affidavit are founded on the conclusion that potential formaldehyde exposure greater than .008 parts per million constituted a potential health hazard to Plaintiff.  However, Smulski has admitted that he is not qualified to reach the conclusion made the foundation of his opinions.  At his deposition, Smulski testified:

> Q.     It [suitability opinion] also relies upon a conclusion that the levels of formaldehyde that existed at the time that they lived in the unit were presumably higher than the ATSDR promulgated levels of formaldehyde that they have asserted in their publications?
>
> A.     That is correct.

---

[1]     And Smulski's opinion that therefore it is unreasonable for anyone to think that the health of persons residing therein would not be adversely affected.

* * *

Q.    Is it within your area of expertise to offer an opinion as to whether the level of formaldehyde in this trailer, if any, constituted a health hazard to the people within the trailer?

A.    This is what has been the levels of formaldehyde at which there are adverse health effects to occupants that have been widely reported in the medical literature and peer-reviewed journals, and these are the levels that are identified as being problem levels.

Q.    Is there a medical consensus regarding the levels of formaldehyde to which a person can be exposed before you might expect to see health hazards?

A.    You will have to ask a medical doctor.

Q.    You don't know that?

A.    I am not an expert in medical matters.

Exhibit "B," at pp. 103-04 (attached as supplement to original Exhibit).

The foregoing testimony establishes that Smulski does not have the expertise to determine the key facts upon which the opinions are founded: at what level of formaldehyde exposure the units are rendered unsafe and at which one will observe health effects. Smulski, as an expert, is not permitted to simply distill from studies a medical conclusion that supports what he wants to opine, while disregarding contrary medical studies, then hide behind a statement "You will have to ask a medical doctor." As such, Smulski is acting as nothing more than a juror. The jury can listen to the medical and scientific evidence presented by those expert and make its own determination regarding whether the amount of formaldehyde present in this specific unit caused harm to Plaintiff, thereby rendering it unsuitable for long-term habitation.

Plaintiff argues that Smulski routinely lectures on adverse health effects from the off-gassing of formaldehyde from particle board, fiberboard and plywood. (Rec. Doc. 2485, p. 2.) Contrarily, Smulski testified:

4

Q.     Prior to your being retained to offer opinions in the class certification phase of this litigation, had you done any work with formaldehyde, specifically with formaldehyde after you had drafted your 1987 article?

A.     I have not.

Q.     Is this the first case you have been involved in that deals with formaldehyde in relation to composite wood products?

A.     Yes, it is.

Q.     Other than the 1987 article, have you drafted any other articles specifically dealing with emissions from composite wood products?

A.     Have I written any other?

Q.     Yes.

A.     No, I have not.

Q.     In fact, I think during the class certification deposition, you actually testified you have done nothing with formaldehyde since you wrote the article in 1987; is that accurate?

A.     I don't recall what I said exactly, but yes, I have -- since writing that article in 1987, I have not written any other articles on that topic.

Exhibit "B," at pp. 33-34 (attached as supplement to original Exhibit).

Second, the opinion is completely unreliable.  Smulski admits that he does not know the specific levels of formaldehyde to which Plaintiff here was exposed or whether the exposure, if any, resulted in an adverse health effect.  Exhibit "B," at pp. 223 and 272 (p. 272 attached as supplement to original Exhibit).  Indeed, Smulski testified:

Q.     "Ms. Alexander and Christopher Cooper would potentially suffer adverse health effects from chronic exposure to formaldehyde gas."  You say "potentially."  Did they suffer adverse health effects from chronic exposure to formaldehyde gas?

A.     I don't know.  That determination has to be made by a medical doctor.

Exhibit "B," at pp. 272 (attached as supplement to original Exhibit).

5

The inherent unreliability of this opinion is demonstrated by a simple example. Every tire in the world has the *potential* to fail. That fact alone does not make every tire defective. Just as important, it does not make every tire that fails defective. A scientifically valid methodology must be employed to evaluate the specific circumstances of the particular tire failure to determine whether there was a defect.

Likewise, it is not scientifically valid for Smulski to opine that all trailers had the *potential* to off-gas formaldehyde and *potentially* harm the occupants thereby rendering the trailer unsuitable for long-term housing (defective). Indeed, such testimony is irrelevant to the determination of whether the *specific* level of formaldehyde in this *specific* trailer cause harm to this *specific* plaintiff. At best, this testimony creates confusion for the jury, who will hear an expert witness offer an opinion on the very issue (no matter whether couched in legal or layman terms) it will be asked to determine and on which Smulski does not have specific knowledge or specific expertise. Any way one wants to phrase it, Smulski is stepping into the role of an über-juror.

Third, taken to its logical conclusion, Smulski's testimony confirms that he is nothing more than a "hired gun" who provides no assistance to the jury. As summarized in its Original Memorandum:

> Smulski's opinions in this case, based on both his written report and his deposition testimony, amount to a conclusion by him that every living quarter in the world which potentially exposes occupants for any period of time to formaldehyde levels in excess of .008 parts per million (regardless of whether the unit is a site built home, apartment, condominium, manufactured house or travel trailer) is unsuitable for habitation and is in need of remediation. Exhibit "B", at pp. 122-23, 234-35 and 279-80. Smulski reaches this conclusion despite the fact that he previously authored a 1987 article that reported that the average, airborne formaldehyde concentration for outdoor, urban air was 0.08 ppm (10 times the level that renders a home uninhabitable, according to Smulski). Exhibit "B," at p. 129. More recently, Smulski's own notes of May 13, 2009 reflect an ambient outdoor level of 8 ppb to 16 ppb (0.008 ppm to 0.016 ppm) and indoor level in other residences of 10 ppb to 20 ppb (.010 ppm to .020 ppm), all of which exceed the level of formaldehyde acceptable for

6

habitability of a structure, according to his testimony. *See* "Inside Formaldehyde" Article and notes, attached hereto as Exhibits "D" and "E," respectively.

(Rec. Doc. 2349, p. 6)(footnote omitted).

In other words, Smulski's opinion is that virtually every living quarter in Louisiana is unsuitable for long-term habitation, and people should never venture outdoors. While this opinion alone is sufficient to demonstrate Smulski's inability to assist the jury, Smulski continues:

> Q.      Let me ask it this way. Very direct question. The unit in the CDC study that was at .003 parts per million in the study that you have referenced, was that unit suitable for habitation?
>
> MR. PINEDO:
> Objection form. Asked and answered.
>
> THE WITNESS:
> If I use as the yardstick the ATSDR, then yes, it was suitable for habitation, because it falls below the 8 parts per billion, and I am reading into that that it was 3 parts per billion from the day the occupants first went inside that unit until when they left.
>
> EXAMINATION BY MR. GLASS:
> Q.      Are you using a different assumption for the .003 parts per million than you're using for any other test that was done on any other unit?
>
> A.      I don't understand your question.
>
> Q.      You qualified it that you're making the assumption that it was .003 through the entire time, and that somebody was occupying. It is that different from any other unit?
>
> A.      What I am saying is that the CDC went into these units, some of which had been in service for over two years at the time they made their measurements, so they came up with a certain measurement on a certain day. What I am saying is it would be suitable for housing if it were 3 parts per billion, which meets the ATS –
>
> MR. D'AMICO:
> DR.
>
> THE WITNESS:
>  -- DR standard from the day the occupants first set foot inside of the unit.

Exhibit "B," at pp. 235-36 (attached as supplement to original Exhibit).

Thus, according to Smulski, the potential formaldehyde level in any given trailer can never exceed 0.008 parts per million, or the unit is unsuitable for habitation.  This contorted logic is clearly designed to ensure that Smulski can always opine that a trailer is unsuitable for long-term habitation in case he is confronted with a trailer with tested levels that are even below .008 parts per million.

As a final demonstration of Smulski's hired gun mentality, Smulski testified:

Q.      You've told me you are relying on the ATSDR standard 008 parts per million, .008 parts per million as a level of exposure chronically that you have accepted as potential for health risk for people exposed at that level, correct?

A.      That's one of the pieces of information.

Q.      I understand it's one of the pieces.  My question to you is:  If the trier of fact concludes that the actual test in this trailer showing .05 parts per million does not constitute a health hazard for its occupants, invalidating the assumption that you are relying on, in part, that .008 is a health concern for the occupants, is it your opinion that, despite that fact, this would still be unsuitable housing for the Alexander/Cooper plaintiffs?

MR. PINEDO:
Objection to form.

THE WITNESS:
Is the trier of fact a medical doctor?  **Because I think that's a medical doctor, an industrial hygienist, an indoor air quality expert, those are kind of people who are qualified to make that decision.**

EXAMINATION BY MR. GLASS:
Q.      And the trier of fact, I will represent to you, will make that decision based upon --

A.      What I am asking you, is the trier of fact a medical doctor?

Q.      I will tell you –

A.      I don't understand who you mean by the "trier of fact."

Q.      Medical doctors will be testifying in this case from both sides.  There is going to be a dispute as to what a safe level of formaldehyde exposure is.  I am asking you, as a hypothetical, to assume that when the trier of fact, the jury, hears all of this evidence they conclude that the level actually tested in this trailer did not

8

constitute a health risk for Ms. Alexander and Christopher Cooper, is it your opinion in that circumstance that the travel trailer would still be an unsuitable housing situation for those plaintiffs?

MR. PINEDO:
Objection to form.

THE WITNESS:
I don't know how to answer that question, quite frankly.  The jury can arrive at any conclusion.   That conclusion doesn't necessarily have to be fact-based.   It doesn't necessarily have to be -- represent the majority of opinion of people who are qualified as experts to look at and assess this issue, so I don't know how to answer your question.

Exhibit "B," at pp. 277-79 (emphasis added) (p. 279 attached as supplement to original Exhibit).

As admitted by Smulski in the emphasized testimony above, he is admittedly not qualified to make these opinions, as he is not a medical doctor, industrial hygienist or an indoor air quality expert.  Exhibit "B," at pp. 66-67.  But more importantly, he essentially holds the jury in distain, and implies that he is in a better position to evaluate the evidence than the jury.  If this does not invade the role of the jury, it is difficult to imagine what does.  Moreover, the jury does not require any assistance is evaluating the testimony of the other experts.  "[W]here ... expert testimony is offered on an issue that a jury is capable of assessing for itself, it is plainly within the trial court's discretion to rule that testimony inadmissible because it would not even marginally assist the trier of fact."  *Marketfare Annunciation, LLC v. United Fire & Cas. Co.*, No. 06-7232, 2008 WL 1924242, *2 (E.D.La. 4/23/08)(quoting *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 939 (10th Cir. 1994)).

## IV. CONCLUSION

Based on Plaintiff's argument that Smulski is offering two opinions, contained in paragraphs 26 and 27 of his Affidavit, Gulf Stream respectfully suggests that Smulski should be excluded from testifying at the trial of this matter as Smulski's two opinions do not assist the

trier-of-fact, are duplicative, cumulative and are not reliable, and for the reasons asserted in its

original Memorandum in Support (Rec. Doc. 2349).

Respectfully submitted,

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER, & WEINSTOCK**

s/Andrew D. Weinstock

_____

**ANDREW D. WEINSTOCK #18495
JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700
Fax: (504) 837-3119
andreww@duplass.com
jglass@duplass.com
*Counsel for Defendant, Gulf Stream Coach, Inc.*

and

**SCANDURRO & LAYRISSON
Timothy D. Scandurro #18424
Dewey M. Scandurro #23291**
607 St. Charles Avenue
New Orleans, LA 70130
Telephone: (504) 522-7100

## C E R T I F I C A T E

I hereby certify that on the 12th day of August, 2009, a copy of the foregoing Reply

Memorandum Regarding Plaintiff's Opposition to Gulf Stream Coach, Inc.'s Motion in Limine

to Limit Expert Testimony of Stephen Smulski, Ph.D. was filed electronically with the Clerk of

Court using the CM/ECF system.  Notice of this file will be sent to all known counsel of record

by operation of the court's electronic filing system.

s/Andrew D. Weinstock

_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com

10