## AFFIDAVIT OF STEPHEN SMULSKI, Ph.D.

**PARISH OF ORLEANS**

**STATE OF LOUISIANA**

BEFORE ME, the undersigned notary, appeared on this the 10th day of July, 2009, Stephen Smulski, Ph.D., a person whose identity is known to me. After being sworn under oath, he stated as follows:

1. All statements contained herein are true and correct and based upon my personal knowledge, education and experience, and I am a person of the full age of majority, competent to execute this affidavit.

I, Stephen Smulski, Ph.D., aver as follows:

1. I am a consulting wood scientist and the President of Wood Science Specialists Inc., 453 Wendell Road, Shutesbury, Massachusetts, 01072.

2. I am an expert in wood science and technology, specifically the anatomical, mechanical, physical, and chemical properties of wood and wood-based materials as well as the manufacture, use, and in-service performance of wood and wood-based products in residential, commercial, and industrial wood-frame construction.

3. I hold a B.S degree in Wood Science and Technology from the University of Massachusetts at Amherst, an M.S. degree in Environmental and Resource Engineering from the State University of New York at Syracuse, and a Ph.D. degree in Wood Science and Forest Products from Virginia Tech at Blacksburg. I have published numerous articles on wood and wood-based products and have given many invited lectures on the same. A true and correct copy of my curriculum vitae is attached hereto and marked "Exhibit A".

4. I am familiar with the manufacture, properties, use, and in-service performance of wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood. For thirteen years, while on the faculty of the Building Materials and Wood Science program at

the University of Massachusetts at Amherst, I taught a course entitled Wood Adhesives Technology that covered all aspects of these and other glued wood products.

5. I am familiar with the propensity of wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood to release formaldehyde gas after being placed in service because of the formaldehyde-containing adhesives (also referred to as resins) used in their manufacture and that exposure to formaldehyde gas can cause adverse health effects. I taught this to my students from 1985 to 2001 while at the University of Massachusetts. In 1987, I published an article entitled "Formaldehyde Indoors" that summarized the then-current knowledge about the release of formaldehyde gas from wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood used in site-built houses and in factory-built manufactured houses and the adverse health effects that exposure to formaldehyde gas can cause. In 1989, I gave an invited lecture at the Northeast Solar Energy Association Advanced Residential Construction Conference entitled "Health Aspects of Building Products: Wood Products" in which I spoke about the release of formaldehyde gas from wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood and the adverse health effects that exposure to formaldehyde gas can cause. I am familiar with the Material Safety Data Sheets that the makers of wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood make available to the users of their products that state that these products contain and release formaldehyde gas.

6. I am aware that the release of formaldehyde gas from wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood is greatest in newly-manufactured products and that, after being placed in service, the release of and concentration of formaldehyde gas in the air inside buildings or structures containing these products depends on the age and number of sources, the volume of air inside the building or structure, and on the air temperature, relative humidity and air exchange rate (i.e., ventilation). The release of formaldehyde gas from these products increases as temperature and relative humidity increase. The concentration of formaldehyde gas inside a building or structure containing these products also increases as the number of sources increases and as the volume of the building or structure and the air exchange rate (i.e., ventilation) decrease.

DUB000275

7. I am familiar with the methods for reducing the release of formaldehyde gas from particleboard and medium density fiberboard recommended by the Composite Panel Association (formerly the National Particleboard Association) in its publications "From Start To Finish Particleboard" and "From Start To Finish Medium Density Fiberboard" which were first published in 1986 and periodically since. Many of these same methods for reducing the release of formaldehyde gas from particleboard and medium density fiberboard are directly applicable to other wood composite panels including hardwood plywood.

8. I am aware that decorative overlays applied to wood-based composite panel products such as particleboard, medium density fiberboard, and hardwood plywood retard, but do not prevent, the release of formaldehyde gas through the surface over which they are applied. The efficacy of an overlay in retarding the release of formaldehyde gas from particleboard, medium density fiberboard, and hardwood plywood varies widely and depends on the type and properties of the overlay.

9. I am aware that FEMA supplied a Fleetwood Enterprises, Inc. 32FSH model travel trailer (VIN 4CJ1F322764015272, FEMA trailer 1373963) to Ms. Elisha Picot Dubuclet who lost her home in the wake of hurricane Katrina that hit the Gulf Coast on August 29, 2005. The trailer was manufactured in March 2006. It is my understanding that the trailer was then sent to and installed at 6046 Dorothea Street, New Orleans, Louisiana. Ms. Dubuclet, her daughter Timia Dubuclet, her son Timothy Dubuclet, and Ms. Leslie Picot (Timia's grandmother) lived in the trailer from on/about June 2006 to on/about September 2007.

10. On July 9, 2009, I visually examined the trailer. I observed that most of the interior of the trailer including the walls, ceiling, doors, cabinets, countertops, built-in seating and other furniture, and bed support are constructed from the wood-based composite panel products particleboard, medium density fiberboard, and hardwood plywood that are known to release formaldehyde gas after being placed in service. In most cases, the product's visible face is covered with a decorative overlay but its back and edges are exposed wood with no overlay. In some cases, the product's back and/or edges has an overlay or edge band. A list of these items is attached hereto and marked "Exhibit B".

11. The trailer was installed in New Orleans, Louisiana, a location whose climate for much of the year is hot and humid. These are the exact conditions that increase the release of formaldehyde gas from wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood.

12. The volume of air inside the trailer is small—approximately 1658 ft.$^3$—and its air exchange rate (i.e., ventilation) is low. These are the exact conditions that increase the concentration of formaldehyde gas inside the trailer.

13. I have reviewed the 2006 Owner's Manual for the trailer. On page 03-1 it states *"The particle board, hardwood plywood, or paneling used in your RV are made with urea-formaldehyde resin. The companies that supply us with these materials have asked that we tell you about urea-formaldehyde with the statements on this page."* The statements are:

    *!WARNING*
    *This product is manufactured with urea-formaldehyde resin. Formaldehyde vapor may in some people cause headaches, eye, nose and throat irritation, and aggravation of allergies and respiratory problems, such as asthma. Proper ventilation should reduce the risk of such problems.*

    *!WARNING*
    *This product is manufactured with a urea-formaldehyde resin and will release small quantities of formaldehyde. Formaldehyde levels in the indoor air can cause temporary eye and respiratory irritation, and may aggravate respiratory conditions or allergies. Ventilation will reduce indoor formaldehyde levels.*

    *!WARNING*
    *Irritant: This product contains a urea-formaldehyde resin and may release formaldehyde vapors in low concentrations. Formaldehyde can be irritating to the eyes and upper respiratory system of especially susceptible persons such as those with allergies or respiratory ailments. Use with adequate ventilation. If symptoms develop, consult your physician.*

    A near-identical warning notice is affixed to the rear of the mirror on the medicine cabinet.

14. I am aware that the trailer was installed by inserting multiple supports beneath its frame. It is my understanding that during the process of installation that the frame and exterior shell can bend and twist, causing sealed joints in the walls, roof, ceiling, and floor to open. This can allow formaldehyde gas inside the wall and ceiling cavities to more easily enter the living space and increase the concentration of formaldehyde gas inside the trailer. It can also allow hot, humid

DUB000277

air and rain to enter into the wall, ceiling, and floor cavities, causing the relative humidity inside the cavities to rise.

15. Even in the absence of installation-caused damage to the trailer, formaldehyde gas will escape from the exposed raw wood on the back and edges of the wall and ceiling panels and accumulate inside the wall and ceiling cavities. The formaldehyde gas will then naturally enter the living space, with differences in temperature, vapor pressure, and air pressure across the trailer's walls and ceiling providing the driving force for moving the air-borne gas through joints and penetrations in the walls and ceiling (e.g., switch plates, electric receptacles, air-conditioning grilles, ceiling light fixtures, seams between panels). In addition, formaldehyde gas will naturally escape through the overlay on these panels' faces (much more slowly, of course) as well as from the products that are fully inside the trailer (e.g., cabinets, bed support, built-in seating and furniture).

16. On July 8-9, 2009, more than three years after the trailer was manufactured and lived in, the W. D. Scott Group, Inc. measured the formaldehyde level inside the trailer at the left nightstand in the bedroom and reported it to be 230 parts per billion (0.230 ppm) by the active tube sample method and 340 ppb (0.340 ppm) by the passive badge dosimeter method (temperature 84 °F, relative humidity 63-85%).

17. A sticker affixed to the exterior of the trailer to the left of the entrance door states that the trailer supplied by FEMA to Ms. Dubuclet is an *Emergency Living Unit 1015188*. The sticker states that *MANUFACTURER CERTIFIES COMPLIANCE WITH FEMA SPECIFICATIONS* and that the trailer is *NOT INTENDED FOR RECREATIONAL USE*.

18. An advisory on page 05-4 of the 2006 Owner's Manual states that:
    **NOTE**
    *Your trailer is not designed to be used as permanent housing. Use of this product for long term or permanent occupancy may lead to premature deterioration of structure, interior finishes, fabrics, carpeting and drapes.*

    The accompanying text describes how condensation can form inside the trailer and cause damage to the trailer. It explains how occupants can reduce or eliminate condensation by reducing the amount of moisture released into the air inside the trailer and by increasing the ventilation by running the kitchen and bath exhaust fans, and by opening the roof vent and

DUB000278

windows. Although the text in the 2006 Owner's Manual explicitly addresses condensation caused by water vapor in the air inside the trailer, the underlying principles apply to all gases in the air inside the trailer including formaldehyde gas. Fleetwood Enterprises, Inc. could have reduced the concentration of formaldehyde gas inside the trailer by reducing the number of formaldehyde-emitting wood composite products it used to construct the trailer and by increasing the ventilation with a built-in mechanical system.

Ms. Dubuclet, Timia, Timothy, and Ms. Picot were subjected to chronic exposure to formaldehyde gas as a consequence of using this trailer as long-term housing.

19. I have reviewed reports regarding the levels of formaldehyde measured inside all types of FEMA-supplied emergency housing units including "An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers Baton Rouge, Louisiana, September-October, 2006" by the U.S. Department of Health and Human Services dated October 2007; "Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Houses" by the Centers for Disease Control and Prevention dated July 2, 2008; and "Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units—Final Report" by the Environmental Energy Technologies Division Lawrence Berkeley National Laboratory dated November 2008. The formaldehyde levels measured inside many of the emergency housing units, some two or more years after being placed in service, equal or exceed the 100 ppb threshold that the Centers for Disease Control and Prevention (CDC) identifies in its July 2, 2008, report as *"the level at which health effects have been described in sensitive persons"*. The formaldehyde levels measured inside many of the emergency housing units, some two or more years after being placed in service, equal or exceed ATSDR's chronic minimal risk level of 8 ppb for an exposure period of 365 days or longer, ATSDR's intermediate minimal risk level of 30 ppb for an exposure period of 15 to 364 days, and ATSDR's acute minimal risk level of 40 ppb for an exposure period of up to 14 days.

20. In December 2007 and January 2008 the CDC measured formaldehyde levels inside forty-seven Fleetwood and thirty-nine Fleetwood CA FEMA-supplied travel trailers installed in Louisiana and Mississippi. All trailers were occupied; some were two or more years old. In its "Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Houses" dated July 2, 2008, the CDC reported that the average formaldehyde level inside the Fleetwood trailers

DUB000279

was 39 ppb with a range of 3-140 ppb. The formaldehyde level in six percent of the Fleetwood trailers was equal to or greater than 100 ppb. The average formaldehyde level inside the Fleetwood CA trailers was reported by the CDC to be 43 ppb with a range of 7-300 ppb. The formaldehyde level in thirteen percent of the Fleetwood CA trailers was equal to or greater than 100 ppb and in three percent of the trailers the formaldehyde level was equal to or greater than 300 ppb.

21. In summary, five factors affect the release of and concentration of formaldehyde gas in the air inside a travel trailer: i) the age and number of formaldehyde-emitting wood composite products used to construct the trailer; ii) the volume of air inside the trailer; iii) the trailer's air exchange rate (i.e., ventilation); iv) the temperature inside the trailer; and v) the relative humidity inside the trailer. The release of formaldehyde gas inside a trailer is greatest in newly-manufactured products and increases as temperature and relative humidity increase. The concentration of formaldehyde gas inside a trailer increases as the number of sources increases and as the volume of air inside the trailer and the air exchange rate (i.e., ventilation) decrease. All five of these factors were acting individually and in concert to increase the release of and concentration of formaldehyde gas inside the Fleetwood Enterprises, Inc. 32FSH model travel trailer FEMA supplied to Ms. Dubuclet.

22. Three of the five factors that affect the release of and concentration of formaldehyde gas inside the trailer are largely beyond the control of manufacturer Fleetwood Enterprises, Inc.—the volume of air inside the trailer (factor ii), temperature (factor iv), and relative humidity (factor v). The other two factors—the number of formaldehyde-emitting wood composite products used to construct the trailer (factor i) and the air exchange rate (i.e., ventilation) (factor iii) were determined by Fleetwood Enterprises, Inc.

23. In November 2007 the Lawrence Berkeley National Laboratory measured formaldehyde gas levels inside four never-occupied FEMA travel trailers. (No Fleetwood Enterprises, Inc. travel trailer was among those examined by the LBNL.) In its "Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units—Final Report" dated November 2008, the LBNL reported that *"We conclude that whole trailer formaldehyde emission factors are high, but the materials may be within those commonly found in the building industry.* [In other words, the concentration of formaldehyde gas inside the trailers is high even though the wood-

DUB000280

based composites used to construct them meet the formaldehyde gas emission limits of HUD Standard 24 CFR Chapter XX Part 3280 Manufactured Home Construction and Safety Standards. The HUD Standard requires that wood composite products be tested under the specific conditions set forth in ASTM E 1333 Standard Test Method for Determining Formaldehyde Concentrations in Air and Emission Rates from Wood Products Using a Large Chamber. Under the HUD Standard the maximum amount of formaldehyde gas that can be released is 200 ppb for hardwood plywood and 300 ppb for particleboard. Wood composite products that meet the HUD standard are referred to as low formaldehyde emission or LFE.] *This indicates a difference in the construction/design* [which is determined by Fleetwood Enterprises, Inc.] *that may lead to elevated concentrations and whole trailer emission rates. Three features of material application in the THUs differ from most other dwellings: 1) the extensive use of lightweight composite wood products* [factor i], *2) very high surface loading of composite wood products* [factor i] *and 3) low fresh air per unit surface area of composite wood products in the THUs* [factor iii]. The LBNL concluded that *"The high loading factor (material surface area divided by THU volume) of composite wood products in the THUs* [factor i] *and the low fresh air exchange relative to the material surface area* [factor iii] *may be responsible for the excessive concentrations observed for some of the VOCs and formaldehyde."*

24. The current formaldehyde gas problem in the FEMA-supplied travel trailers could have been prevented had Fleetwood Enterprises, Inc. (and FEMA) employed the mitigation techniques detailed in the extensive body of literature documenting an identical formaldehyde gas problem that plagued HUD-Code manufactured houses in the 1970s and early 1980s for identical reasons. At that time the subfloor, walls, ceiling, doors, and cabinets in HUD-Code manufactured houses were constructed from particleboard, medium density fiberboard, and hardwood plywood that released formaldehyde gas after being placed in service. The HUD-Code manufactured houses of that time were small in volume and had a low air exchange rate (i.e., ventilation); complaints about formaldehyde gas were common. The problem was investigated, its causes identified, solutions put in place, and by the late 1980s formaldehyde gas inside HUD-Code manufactured houses ceased to be a problem.

25. Fleetwood Enterprises, Inc. was aware of the formaldehyde gas problem that plagued HUD-Code manufactured houses in the 1970s and 1980s. Fleetwood Enterprises, Inc. designed and built HUD-Code manufactured houses in the 1970s and 1980s. Fleetwood Enterprises, Inc.

DUB000281

several times hired consulting engineers Resources Applications, Designs and Controls, Inc. (RADCO) to, among other things, identify the materials that Fleetwood Enterprises, Inc. used in its HUD-Code manufactured houses that released formaldehyde gas and to evaluate various methods of reducing the amount of formaldehyde gas inside its HUD-Code manufactured houses. In its report to Fleetwood Enterprises, Inc. dated April 30, 1979, RADCO identified urea-formaldehyde bonded lauan paneling (i.e., tropical hardwood plywood) and particleboard as *"significant contributors"* of formaldehyde gas. In the report RADCO advised Fleetwood Enterprises, Inc. that *"The best solution would obviously be to reduce or eliminate the excess HCHO* [i.e., formaldehyde] *at the point of material manufacture."* and that *"Induced outside air ventilation was found to be the most effective means of reducing the HCHO level in a home."* Although these statements explicitly address formaldehyde gas in HUD-Code manufactured houses, the underlying principles apply to all buildings and structures including travel trailers. Fleetwood Enterprises, Inc. could have modified its materials and construction and design practices for its travel trailers based on its own prior experience with formaldehyde gas in its HUD-Code manufactured houses.

26. Fleetwood Enterprises, Inc. could have reduced the number of formaldehyde-emitting products inside the trailer by using wood-based composites that either do not emit formaldehyde (hardwood plywood, medium density fiberboard, and particleboard are also made with adhesives that do not contain formaldehyde) or emit so little formaldehyde that they are exempt from the HUD standard (hardboard for walls and ceilings instead of hardwood plywood). At the time this trailer was manufactured, Fleetwood Enterprises, Inc. had available to it alternative materials that, if used, would have emitted little or no formaldehyde gas.

27. It is my understanding that Fleetwood Enterprises, Inc. used only low formaldehyde emission (LFE) wood composite products in its travel trailers. At the time the wood composite products Fleetwood Enterprises, Inc. used in the Dubuclet trailer were manufactured (prior to March 2006), the LFE designation meant only that the wood composite products did not emit more than a specified maximum amount of formaldehyde gas when tested under the specific conditions set forth in ASTM E 1333 Standard Test Method for Determining Formaldehyde Concentrations in Air and Emission Rates from Wood Products Using a Large Chamber (200 ppb for hardwood plywood and 300 ppb for particleboard). The LFE designation is not a predictor of

what the actual concentration of formaldehyde gas will be inside a travel trailer (or any other kind of building or structure) constructed with LFE wood composite products. This is because the release of and concentration of formaldehyde gas in the air inside a travel trailer depends upon the interaction of: i) the age and number of formaldehyde-emitting wood composite products used to construct the trailer; ii) the volume of air inside the trailer; iii) the trailer's air exchange rate (i.e., ventilation); iv) the temperature inside the trailer; and v) the relative humidity inside the trailer.

28. The HUD Standard for LFE wood composite products was recently superseded by the California Air Resources Board (CARB) Standard to further reduce the amount of formaldehyde gas to which the users of products made with wood composite products, including travel trailers, are exposed. The CARB Standard Phase One became effective January 1, 2009. Under the CARB Standard Phase One, the maximum amount of formaldehyde gas that can be released from wood composite products when tested under ASTM E 1333 is: i) less than 80 ppb for hardwood plywood; ii) less than 180 ppb for particleboard; and iii) less than 210 ppb for medium density fiberboard. The maximum formaldehyde gas emission levels will be even lower under the CARB Standard Phase Two that takes effect in 2010 and 2011. The Recreational Vehicle Industry Association (RVIA), of which Fleetwood Enterprises, Inc. is a member, recently adopted the CARB Standard. As a condition of membership in the RVIA, companies that manufacture recreational vehicles including travel trailers must use only wood composite products that meet the CARB Standard also beginning January 1, 2009. In November 2008, FEMA released a new specification for travel trailers to be used as temporary housing following natural disasters. The specification requires that *"Once constructed, the unit's formaldehyde emission level shall be less than 0.016 ppm* [16 ppb] *during initial testing period prior to delivery from the manufacturing plant. No Luan* [sic]*, MDF, vinyl gypsum, or products which contain urea-formaldehyde will be allowed."*

29. Fleetwood Enterprises, Inc. could have increased the trailer's air exchange rate (i.e., ventilation) by equipping it with a mechanical system that blows contaminated indoor air outside and draws fresh outdoor air inside as has been required in HUD-Code manufactured houses since 1984. If Fleetwood Enterprises, Inc. had utilized such a mechanical system, it would have reduced the level of formaldehyde gas inside the trailer.

DUB000283

30. It is my opinion, to a reasonable degree of scientific certainty, that the Fleetwood Enterprises, Inc. 32FSH model travel trailer supplied by FEMA to Ms. Dubuclet was not suitable for use as long-term housing because it was foreseeable and predictable that formaldehyde gas would be released from the wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood used in this trailer and that Ms. Dubuclet, her daughter Timia, her son Timothy, and Ms. Picot (Timia's grandmother) would potentially suffer adverse health effects from chronic exposure to formaldehyde gas.

31. It is my opinion, to a reasonable degree of scientific certainty, that it was unreasonable for anyone involved in the decision to use a travel trailer for long-term housing to think that the health of persons living in this Fleetwood Enterprises, Inc. 32FSH model trailer for a long period of time would not be adversely affected given: i) that the propensity for wood-based composite panels including particleboard, medium density fiberboard, and hardwood plywood to release formaldehyde gas has been known since the 1970s; ii) that exposure to formaldehyde gas causes adverse health effects has been known since the 1970s; iii) that the identical problem occurred in HUD-Code manufactured houses in the 1970s and early 1980s for identical reasons; and iv) that the techniques for mitigating formaldehyde gas inside buildings and structures of all kinds are well-known, widely published, and effective.

I reserve the right to submit further affidavits if so deemed necessary.

FURTHER AFFIANT SAYETH NOT.

Thus, signed and sworn on this the 10th day of July, 2009.

_____
Stephen Smulski, Ph.D.
453 Wendell Road
Shutesbury, MA 01072

_____           LINDA J. NELSON
Notary Public Signature                             Notary Public Name

LA BAR #9938                                         with life
Notary Number                                        Commission Expires

DUB000284