Fleetwood Enterprises, Inc.                                    June 25, 2009

---

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: FEMA TRAILER FORMALDEHYDE        MDL NO 1873
PRODUCTS LIABILITY LITIGATION
                                        SECTION "N" (5)
                                        JUDGE ENGELHARDT
                                        MAGISTRATE CHASEZ

THIS DOCUMENT IS RELATED TO

Elisha Dubuclet on behalf of
Timia Dubuclet vs. Fleetwood
--------------------------------

VIDEOTAPED DEPOSITION OF
FLEETWOOD ENTERPRISES, INC

June 25, 2009
10:07 a m

3649 Mission Inn Avenue
Riverside, California

Reported by Gail Nesson CSR No 7010

---

**Page 2**

APPEARANCES OF COUNSEL

For Plaintiff's Steering Committee:
BENCOMO & ASSOCIATES
RAUL R. BENCOMO, ESQ
639 Loyola Avenue, Suite 2110
New Orleans, Louisiana 70113
504 529 2929
504 529.2018 Fax
ben_law@bellsouth net

For Fleetwood Enterprises Inc :

NELSON, MULLINS RILEY & SCARBOROUGH LLP
RICHARD K. HINES V, ESQ.
201 17th Street NW, Suite 1700
Atlanta, Georgia 30363
404 322 6154
404.322.6050 Fax
richard.hines@nelsonmullins com
    -and-
LEAKE & ANDERSON LLP
JERRY L. SAPORITO, ESQ
1100 Poydras Street, Suite 1700
New Orleans, Louisiana 70163-1701
504 585 7500
504.585.7775 Fax
jsaporito@leakeanderson com

For Fluor Enterprises, inc.
MIDDLEBERG, RIDDLE & GIANNA
CHARLES R. PENOT, JR , ESQ
717 North Harwood, Suite 2400
Dallas, Texas 75201
214 220 6334
214.220.6640 Fax
cpenot@midrid.com

---

**Page 3**

APPEARANCES

For CH2M Hill Constructors Inc and Shaw Environmental Inc :

BAKER, DONELSON, BEARMAN CALDWELL & BERKOWITZ PC
GERARDO R. BARRIOS, ESQ.
3 Sanctuary Boulevard, Suite 201
Mandeville, Louisiana 70471
985 819 8416
985.819.6716 Fax
gbarrios@bakerdonelson.com

For Morgan Building and Spas:
MCGLINCHEY STAFFORD PLLC
DAN E. WEST, ESQ.
301 Main Street, 14th Floor, One American Place
Baton Rouge, Louisiana 70825
225 383 9000
225.343.3076 Fax
dwest@mcglinchey com

For The United States:

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
MICHELE S. GREIF, ESQ.
1331 Pennsylvania Avenue NW
Room 8022S, Nat'l Place
Washington, DC 20004
202 353 2492
202.616.4473 Fax
michele greif@usdoj gov

---

**Page 4**

APPEARANCES

For Keystone RV Company, Thor California, Thor
Industries, Dutchmen Manufacturing DS Corp (d/b/a
CrossRoads RV) and KZ RV, LP:
JONES, WALKER WAECHTER POITEVENT CARRERE & DENEGRE, L.L.P
RYAN JOHNSON ESQ.
(A.M. participation via telephone)
REGINA HAMILTON, ESQ.
(P M participation via telephone)
8555 United Plaza Boulevard, 5th Floor
Baton Rouge, Louisiana 70809
225 248 2088
225.248.3088 Fax
rhamilton@joneswalker.com

For Bechtel National Inc :

FRILOT L.L.C.
PETER R. TAFARO, ESQ.
(Participation via telephone)
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163-3700
504 599 8060
504.599.8152 Fax
PTafaro@frilot.com

For Jayco Inc and Starcraft RV Inc.:

WILLINGHAM FULTZ AND COUGILL
THOMAS COUGILL, ESQ.
(Participation via telephone)
808 Travis, Suite 1608
Houston Texas 77070
713.333.7600
tomc@willingham-law com

---



Toll Free: 800.300 1214
Facsimile: 951 784 9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.                                June 25, 2009

## Page 5

**APPEARANCES**

For Gulf Stream Coach, Inc.:
DUPLASS, ZWAIN, BOURGEOIS, PFISTER & WEINSTOCK
PHILIP WATSON, ESQ.
(Participation via telephone)
3838 North Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
504.832.3700
504.837.3119 Fax
pwatson@duplass.com

For Heartland Recreational Vehicles LLC:
ALLEN & GOOCH
LORI A. DAIGLE, ESQ.
(Participation via telephone)
One Lakeway
3900 North Causeway Boulevard, Suite 1450
Metairie, Louisiana 70002
504.836.5216
504.836.5219 Fax
LoriDaigle@AllenGooch.com

Also present:

MARIO KYPRIANOU, VIDEOGRAPHER
ROBERT WOZNIAK
FORREST THEOBALD
CRAIG BIAZO

For Recreation by Design, LLC, TL Industries Inc,
Frontier RV, Inc., PlayMor Trailers, Inc.:
GARRISON, YOUNT, FORTE & MULCAHY LLC
RANDALL C. MULCAHY, ESQ.
(Participation via telephone)
909 Poydras Street, Suite 1800
New Orleans, Louisiana 70112
504.527.0680
504.527.0686 Fax
RMulcahy@GarrisonYount.com

## Page 6

**INDEX OF EXAMINATION**

WITNESS: ROBERT WOZNIAK
EXAMINATION                                PAGE
By Mr. Bencomo                          11  115  215
By Ms. Greif                                  210

WITNESS: FORREST THEOBALD
EXAMINATION
By Mr. Bencomo                     41  94  133  223
                                        246  249
By Ms. Greif                                  199
By Mr. Hines                              235  248

WITNESS: CRAIG BIAZO
EXAMINATION
By Mr. Bencomo                       73, 141  221
By Ms. Greif                                  147
By Mr. Penot                                  163

SECTION OF TRANSCRIPT REQUESTED TO BE MARKED

| Page | Line |
|------|------|
| 67   | 18   |

## Page 7

**INDEX TO EXHIBITS**

| Exhibit | Description | Page |
|---|---|---|
| 1 | FEMA Unit Specifications 32FSH/32DFSH | 250 |
| 2 | Diagram | 250 |
| 3 | Pioneer 2006 Owner's Manual | 250 |
| 4 | Material Safety Data Sheet Urea Formaldehyde Bonded Panel Products | 250 |
| 5 | Material Safety Data Sheet | 250 |
| 6 | Material Safety Data Sheet | 250 |
| 7 | Material Safety Data Sheet | 250 |
| 8 | Panel Products document | 250 |
| 9 | FEMA Unit Specifications 32F/32FD | 250 |
| 10 | FEMA Unit Specifications 32FSH/32DFSH | 250 |
| 11 | Limited One-Year Warranty document | 250 |
| 12 | Warranty document | 250 |
| 13 | Important Notices and Warning document | 250 |
| 14 | Warning document | 250 |
| 15 | Propane System document | 250 |

## Page 8

| Exhibit | Description | Page |
|---|---|---|
| 16 | Document from Jim Croxton | 250 |
| 17 | RADCO Test Series 107 | 250 |
| 18 | RADCO Test document | 250 |
| 19 | RADCO Test document | 250 |
| 20 | RADCO Fact Finding Report Formaldehyde Evaluation | 250 |
| 21 | RADCO Test document | 250 |
| 22 | RADCO Test document | 250 |
| 23 | RADCO Test Report, Formaldehyde Levels in New Homes Before, During and After Treatment with Ammonia | 250 |
| 24 | RADCO Test Report, Large Scale Test Method for Determining Formaldehyde Emissions by the Large Chamber Method FTM 2-1983 | 250 |
| 25 | RADCO Test document | 250 |
| 26 | Number chart | 250 |
| 27 | Number chart | 250 |
| 28 | Fleetwood Memorandum dated August 20, 2004 | 250 |
| 29 | FEMA Model Travel Trailer Procurement Specifications | 250 |
| 30 | Important Notice document | 250 |
| 31 | FEMA Procedure Storage Site Manual Fall 2005 | 250 |
| 32 | Exhibit 8 | 250 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.                                June 25, 2009

### Page 9

```
 1    DEPOSITION OF FLEETWOOD ENTERPRISES, INC.
 2                June 25 2009
 3
 4        THE VIDEOGRAPHER: We are now going on the video
 5   record
 6        Today is 10:07 a m.
 7        Can we do a test? Can you say something?
 8        THE WITNESS: Good morning
 9        THE VIDEOGRAPHER: Thank you  Sorry about that
10        Going on the record at 10:07 a m.
11        This is Aldridge versus Gulf Stream Coach
12        What's the case, please?
13        MR SAPORITO: That is on the deposition notice
14        Have you got something?
15        MR BENCOMO: Obviously not. That should be
16   Aldridge versus Fleetwood Enterprises
17        THE VIDEOGRAPHER: Off the record
18        (Discussion off the record)
19        THE VIDEOGRAPHER: Okay
20        We are going on the video record at 10:10 a m
21        The case is Dubuclet versus Fleetwood Inc. MDL
22   No 1873, Section N Magistrate 5. in re FEMA Trailer
23   Formaldehyde Products Liability Litigation
24        The witness is Robert Wozniak
25        The location of the deposition is 3649 Mission
```

### Page 10

```
 1   Avenue Mission Inn Hotel
 2        Would everybody present please identify
 3   themselves for the record
 4        MR. BENCOMO: My name is Raul Bencomo on behalf
 5   of the Plaintiffs Elisha Dubuclet on the behalf Timia
 6   Dubuclet
 7        MS GREIF: Michele Greif with the
 8   United States
 9        MR WEST: Dan West with Morgan Building and
10   Spas.
11        MR. BARRIOS: Gerry Barrios for CH2M Hill
12   Constructors Inc and Shaw Environmental
13        MR PENOT: Charles Penot representing Fluor
14   Enterprises Inc
15        MR SAPORITO: Jerry Saporito representing
16   Fleetwood.
17        MR HINES: Richard Hines representing Fleetwood
18   in its various capacities
19        Also for the record while you did say that
20   Mr Wozniak was the witness, really, the witness is
21   Fleetwood and there will be a number of speaking
22   witnesses since Fleetwood in its corporate capacity
23   cannot actually speak
24        THE WITNESS: And I m Robert Wozniak.
25        THE VIDEOGRAPHER: The witness may now be sworn
```

### Page 11

```
 1   in.
 2                ROBERT WOZNIAK,
 3   having been first duly sworn testifies as follows:
 4                   EXAMINATION
 5   BY MR BENCOMO:
 6        Q  Would you please state your name for the record
 7   sir
 8        A  Robert Wozniak
 9        Q  What is your home address?
10        A  16463 Rancho Escondido Drive, Riverside
11   California.
12        MR PENOT: Raul I m sorry I thought we were
13   going to put some procedural matters on the record first
14        MR BENCOMO: Go ahead
15        MR PENOT: I don t want to waste a lot of time
16   for you but I do want to note on the record an objection
17   on behalf of Fluor Enterprises, Inc and reserve -- to
18   the deposition going forward today and reserve the right
19   to seek -- to continue the deposition or seek further
20   questioning of Fleetwood witnesses if necessary for the
21   following reason
22        No reflection whatsoever on any counsel in the
23   case, whether plaintiff or defendant or Fleetwood or
24   Fleetwood corporation. I think everybody has
25   demonstrated that they're working in absolute good faith
```

### Page 12

```
 1   to try to get things done but the reality is with
 2   respect to the court this is an incredibly compressed
 3   schedule and as a result 30(b)(6) categories I don t
 4   believe were provided to Fleetwood until only days
 5   before this deposition
 6        Fluor did not get to see those and have input
 7   into any cross designations in time
 8        More than 10 000 pages I think of documents
 9   have been produced by Fleetwood who may be -- I may have
10   this wrong but possibly through May late May more than
11   10,000 pages of documents have been produced by
12   Fleetwood but just within the past 48 hours another
13   3,800 pages of documents have been produced some as late
14   as 6:00 o'clock last night by e-mail
15        Again. that's not a reflection on any counsel or
16   any party They're trying to do their best
17        It's just not possible to digest that volume of
18   information to do justice for my client in those time
19   periods
20        If necessary I reserve the right to go to the
21   court to try to demonstrate good cause for a continuation
22   of this deposition.
23        MR BARRIOS: CH2M Hill joins in that objection.
24        MS. GREIF: So does the United States
25        MR BENCOMO: We, obviously, as plaintiffs also
```



Toll Free: 800 300 1214
Facsimile: 951 784 9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www esquiresolutions com

Fleetwood Enterprises, Inc.                                    June 25, 2009

## 21

1  THE WITNESS: It's my understanding that FEMA
2  trailers were a specific design that met the
3  specifications put out by FEMA
4  BY MR BENCOMO:
5    Q  Did you review the specifications provided by
6  FEMA and compare or contrast them to the specifications
7  of other travel trailers produced by Fleetwood?
8    MR HINES: Let me object to form and
9  foundation Clarify. We did not get specifications
10 directly from FEMA We got specifications sent to us
11 through Morgan.
12   THE WITNESS: Can I have the question again
13 please.
14   MR BENCOMO: Would you please read the question
15 back Ms Court Reporter
16   (Record read)
17   THE WITNESS: No I did not.
18 BY MR BENCOMO:
19   Q  I'm going to show you a document and ask you if
20 you can identify this particular document for the record
21   A  The document looks familiar yes
22   Q  What does that document represent, if you know?
23   A  There's a Bates number in the corner that is
24 FLE-00006492 It's dated November 17th 2005 and it
25 looks like some type of a summary of what the FEMA unit

## 22

1  specifications would have been
2    Q  Did you ever have the opportunity to review
3  those FEMA unit specifications in connection with your
4  role at Fleetwood?
5    A  In preparation for this deposition I did, yes
6    Q  What about while the trailers were either being
7  built or before they were built?
8    A  I did not get involved with that at that point
9    Q  Who would have been involved with that?
10   A  The travel trailer product development group
11   Q  Who headed that group at the time?
12   A  I'm not really sure who that was at that time
13   Q  What type of trailer is that particular
14 specification? Do you know?
15   A  What do you mean by "type," sir?
16   Q  It says "FEMA Unit Specifications"; is that
17 correct?
18   A  Yes
19   Q  What is that unit called?
20   A  On this, it's designated as a model 32FSH or a
21 model 32DFSH
22   Q  Do you know what that particular model is?
23   A  To my understanding from preparation for this
24 deposition, it's conventional travel trailers
25   MR. BARRIOS: Is this Exhibit 1?

## 23

1    MR BENCOMO: Not yet.
2    Q  When you say that you first saw it in
3  preparation for this deposition who presented that
4  document to you?
5    A  Counsel.
6    Q  Which counsel are you referring to?
7    A  Right here
8    Q  Mr Hines
9    Now I'm going to show you another document
10 which is a diagram of a travel trailer, and ask if you
11 can tell us what type of travel trailer that is
12   MR PENOT: Could we have the Bates numbers
13   THE WITNESS: Yes The document I was given is
14 Bates No FLE-00006494
15   And this is a floor plan of what research has
16 indicated to be a 32FSH trailer.
17 BY MR BENCOMO:
18   Q  Does the No 32 mean anything?
19   A  No
20   Q  So it doesn't stand for, like, 32-foot trailer?
21   A  I'd have to look at the specifications. but
22 that's a model designation
23   Q  Those particular trailers they contain I'm
24 assuming, a bedroom area. a kitchen area and so on and
25 so forth; is that correct?

## 24

1    A  That's correct
2    Q  Before a trailer like that is delivered to the
3  ultimate consumer by Fleetwood you know that that
4  trailer is going to be used as something for someone to
5  live in; is that correct?
6    A  Fleetwood does not deliver anything directly to
7  consumers We always have somebody between us and the
8  consumer So the dealer typically makes the delivery to
9  the consumer
10   Q  Other than the fact that you don t deliver
11 directly to the consumers are you aware that that
12 trailer is going to be used as a habitation?
13   A  Yes
14   Q  Now I m going to ask you to refer to the
15 owner's manual if you will
16   I have some questions I want to go through with
17 you If you would be kind enough to identify that entire
18 document with the Bates number the initial Bates number
19 and if you'll notice right in the center there is a
20 Bates number
21   A  The document I have in front of me is a Pioneer
22 FEMA Owner s Manual, 2006 version with a Bates number on
23 it on the top page of PSC021468.
24   MR HINES: Let me just also add that there's a
25 concomitant Fleetwood Bates number which inclusively runs



Toll Free: 800.300.1214
Facsimile: 951 784 9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.                                    June 25, 2009

### 29

1    the FEMA trailers.
2      Q  My question though is: Is there any
3    documentation or information that you have, you being
4    Fleetwood, that would suggest that this trailer when
5    inhabited by Ms. Dubuclet and her family was not
6    subjected to normal use?
7      MR. HINES: Let me just object to that
8    particular question because it's not a category covered
9    by the 30(b)(6). He certainly was not prepared on that
10   particular subject matter in that question.
11     He can certainly answer questions with respect
12   to the warranty manual.
13     With respect to that question, he just found
14   that the Dubuclet unit itself is an issue in this case
15   seven days ago, eight days ago. I think it's premature
16   to ask.
17     I also think it is beyond the scope of the
18   30(b)(6) notice.
19     MR. BENCOMO: Richard, if I may, one of the
20   things is if we're going to keep it open for all of these
21   things, we're going to have to come back yet again for
22   other issues. You have two other gentlemen here, and the
23   question is going to be asked of them also.
24     The question is really very simple. Are there
25   any records that I could look at that would suggest that

### 30

1    this trailer, Dubuclet trailer, was not subjected to
2    normal use? Either there are or there aren't.
3      MR. HINES: I don't know whether there are. We
4    haven't looked for any.
5      THE WITNESS: I don't know. As an engineering
6    function, I would not know that.
7    BY MR. BENCOMO:
8      Q  Who that is in this room would know the answer
9    to that question? Would it be Mr. Theobald, or would it
10   be Mr. Biazo?
11     A  I don't know what they know.
12     MR. HINES: I'll say that no one does. They
13   haven't been designated to look for that.
14   BY MR. BENCOMO:
15     Q  Let me then be general as opposed to specific.
16   Does Fleetwood keep a file on each travel
17   trailer that it sells?
18     A  To my understanding, yes.
19     Q  Now, does that file contain any information
20   about whether or not a particular trailer has been
21   subjected to normal use by the inhabitants of that
22   trailer?
23     A  It's my understanding that what I will call a
24   unit file contains all the information related to that
25   travel trailer that has been received by Fleetwood. It's

### 31

1    my belief that typically includes the paperwork that goes
2    to the dealer and any other subsequent correspondence or
3    contacts related to that unit. As such, each unit file
4    is unique to itself.
5      MR. BENCOMO: And I believe, then, that that is
6    one of the files that was just located.
7      Is that correct, Mr. Hines?
8      MR. HINES: Right. We've got the original here
9    for you to look at if you want to look at it.
10     MR. BENCOMO: Obviously we don't have time to
11   look at it now.
12     MR. HINES: It's six pages long. I will say
13   this. The file is here in its original format. The only
14   thing -- you're free to look at it. The only thing the
15   file contains is a build checklist for the build of the
16   unit. There are no subsequent data, information, slips
17   of paper, otherwise indicating anything beyond the
18   shipment date of 3/28/06.
19   BY MR. BENCOMO:
20     Q  Now look at the same document --
21     MR. HINES: 4/28 -- 3/28.
22   BY MR. BENCOMO:
23     Q  -- of the right-hand column where it reads, "Any
24   implied warranties."
25   Do you see that?

### 32

1      A  I do.
2      Q  Would you mind reading that particular paragraph
3    into the record.
4      A  It says "Any implied warranties, including but
5    not limited to, the implied warranties of workmanlike
6    construction, habitability, merchantability and fitness
7    for a particular use are limited in duration to the
8    duration of this one-year warranty."
9      Q  Now, do you know what the warranty of
10   habitability is?
11     A  I cannot define that.
12     Q  Do you know -- or how do you define the word
13   'habitability"?
14     A  I just said I don't know how to define it.
15     Q  My question was "How do you define the warranty
16   of habitability, to which you responded, "I don't know
17   how to answer that or how to define that."
18     Then if I asked you a more specific question
19   which has to do not with warranty, but it has to do with
20   the word "habitability," how would you, an engineer,
21   define 'habitability"?
22     A  That the user of the recreational vehicle would
23   be able to eat and sleep in the unit.
24     Q  Have you ever looked up the definition of the
25   word "habitability" in any dictionary?



Toll Free: 800 300 1214
Facsimile: 951 784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.                                June 25, 2009

## 37

1  to work with Fleetwood; is that correct?
2     A   It could have been during my education someplace
3  even too, yes
4     Q   How far back do we go when you last had your
5  education? How many years back would that be?
6     A   I graduated from college in 1974
7     Q   Now the second sentence of that paragraph reads
8  and you just read quote 'The companies that supply us
9  with these materials have asked that we tell you about
10 urea formaldehyde with the statements on this page'
11    Did you ever have any conversation with any of
12 the suppliers of your components where they asked you
13 that you tell the consumers about urea formaldehyde?
14    A   I did not have those conversations
15    Q   Do you know of anyone at Fleetwood who had those
16 conversations?
17    A   It's my belief that those conversations were
18 held even before I got there
19    MR. HINES: Let me also put on the record, as
20 you know he has not been offered as a corporate witness
21 on that subject
22    You can certainly ask him some of these personal
23 questions about him and formaldehyde. The 30(b)(6)
24 witness on formaldehyde is Mr. Theobald not Mr. Wozniak
25    MR. BENCOMO: That's why I also broke it down to

## 38

1  ask him if he personally --
2     MR. HINES: I understand I understand
3  BY MR. BENCOMO:
4     Q   Who was responsible for this language that is
5  contained that you just read about 'The companies that
6  supply us with these materials ask that we tell you about
7  urea formaldehyde'?
8     A   I do not know
9     MR. HINES: Mr Theobald would know
10    THE WITNESS: That would be an assumption
11    MR. HINES: That's my statement for the record
12    MR. BENCOMO: Richard, I would appreciate it if
13 you would just not keep injecting.
14    MR. HINES: We're here for a 30(b)(6) not a
15 personal deposition. I'm just trying to keep moving in
16 the right direction
17    MR. BENCOMO: I understand We're going to
18 move believe me. We'll move exactly as I'm trying to
19 move
20    Q   Did you ever tell any consumer that you
21 Fleetwood, had conducted tests pertaining to urea
22 formaldehyde as early as the late 1970s?
23    MR. HINES: Let me object to your asking this
24 witness that question because he's not being offered as a
25 30(b)(6) witness.

## 39

1     If you want to ask him personally then,
2  otherwise we're going to run into an issue of his saying
3  perhaps one thing and then Mr. Theobald who knows the
4  answers to these questions will address that very
5  subject matter
6     I can't tell whether you're asking a personal
7  question or a corporate 30(b)(6) question
8     When you say 'you' you're talking about the
9  corporation. He can answer on his behalf
10    MR. BENCOMO: It would be interesting if they
11 both had different answers. Based on what you just said
12 he might say one thing and Mr. Theobald might say
13 another
14    MR. HINES: He may say he personally had no
15 conversation. He may say the corporation did for
16 example
17    MR. BENCOMO: We're going to get that from
18 Theobald He's listening
19    I'll tell you what. Why don't we then, for the
20 time being why don't we get Mr Theobald sworn in so
21 that he can maybe answer some of these questions
22    MR. HINES: Sure. That's fine
23    THE VIDEOGRAPHER: Off the record at 10:20 a m
24    (Recess taken)
25    (On written record only)

## 40

1     MR BENCOMO: We're on the record
2     Richard as you and I have discussed I think
3  on a number of occasions Mr Theobald you represented
4  to me. is the general counsel of Fleetwood and you are
5  actually offering him as the individual who has the
6  knowledge pertaining to issues surrounding formaldehyde
7  and possibly other issues
8     Along those lines you are not going to be
9  interposing objections about privileges because of his
10 role as counsel; is that correct?
11    MR. HINES: Well, yeah I think as a very
12 general statement that's correct just as if he were a
13 nonlawyer and you were asking him questions There may
14 be a question that would be covered by the
15 attorney-client privilege because of that particular
16 communication I'm going to be very liberal because we
17 have offered him as a fact witness
18    He will certainly be -- we have discussed he
19 will talk to you about anything that is of a public
20 record, public filing public position taken by
21 Fleetwood
22    If there is some particular area that I feel
23 that would be subject to the attorney-client
24 privilege -- I'm not going to sit here and waive it in
25 advance. I will assert it at that point, but I'm going


ESQUIRE
an Alexander Gallo Company

Toll Free: 800 300.1214
Facsimile: 951 784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.                              June 25, 2009

---

**57**

1  correct?
2  A   That's what the facing page reads, yes,
3  formaldehyde evaluation
4  Q   Did you consider RADCO to be competent in the
5  services they provided to Fleetwood?
6  A   Yes.
7  Q   Did you consider them to be authoritative in the
8  information that they provided to Fleetwood?
9  A   I'm not sure what you mean by "authoritative,"
10 but I think they were certainly reliable
11 Q   Did you ever have a situation where you
12 questioned their reliability?
13 A   Not that I recall.
14 Q   Now I next refer your attention to Fleetwood
15 00006696.
16 A   Yes
17 Q   Do you have that document in front of you?
18 A   I do yes sir
19 Q   Would you mind reading the first sentence of the
20 summary that is contained in that page.
21 A   "RADCO's testing was undertaken to evaluate
22 alternative methods for the reduction of HCHO levels
23 measured in homes."
24 Q   What exactly is HCHO?
25 A   That's the chemical signature for formaldehyde.

**58**

1  Q   Specifically, urea formaldehyde; is that
2  correct?
3  A   No.
4     MR. HINES:  No.
5  BY MR. BENCOMO:
6  Q   Just formaldehyde?
7  A   Just formaldehyde, two hydrogen molecules an
8  oxygen molecule, and a carbon molecule
9  Q   What was the test program undertaken to
10 evaluate which appears in the second paragraph of that
11 summary?
12    Would you mind reading that.
13 A   The test program was undertaken to evaluate
14 corrective measures which could be taken using existing
15 state-of-the-art products that are now available "
16    Do you want me to read the rest of it?
17 Q   No that's all right  I'm going to ask you some
18 other questions
19    I take it that this particular evaluation was,
20 according to this summary. done in order to look at
21 alternative methods for the reduction of formaldehyde
22 levels measured in homes; correct?
23 A   Well, that's what the first sentence of the
24 summary reads, yes
25 Q   Fleetwood is in the business of manufacturing

**59**

1  homes and also manufacturing travel trailers; is that
2  correct?
3  A   Yes
4  Q   Is there a Chinese wall that is drawn between
5  the manufactured housing division and the travel trailer
6  division?
7  A   No
8  Q   So the folks at the travel trailer division
9  would speak to the folks at the manufactured housing
10 division and vice versa?
11 A   Well sometimes but they were totally separate
12 operations  And maybe I just misunderstood your Chinese
13 wall  I understand what a Chinese wall refers to  but it
14 wasn't as though there was just one big ball and
15 everybody was mixed up just in one Fleetwood ball  That
16 really was not -- the manufactured housing operation over
17 here. the recreational vehicle operation over here  while
18 in the classic sense of Chinese wall that didn't exist
19 they still operated separately
20 Q   Having said that  look back at 6692  which is
21 the first page --
22 A   Okay
23 Q   -- this formaldehyde evaluation was sent to the
24 parent company; is that not correct?
25 A   It's prepared for Fleetwood Enterprises, that's

**60**

1  correct
2  Q   What was the corporate address?
3  A   3125 Myers, M-y-e-r-s  Street
4  Q   Riverside  California?
5  A   Riverside. California  yes, sir
6  Q   And as a matter of fact, that was its address on
7  the day you retired; correct?
8  A   Yes indeed
9  Q   Now, was there a prohibition or any mandate at
10 corporate headquarters that testing that related to the
11 issue of urea formaldehyde was only to be made available
12 to the manufactured housing division  but that the travel
13 trailer division would not be allowed to see those
14 results or reports?  'Yes' or "no"?
15 A   No
16 Q   Did you at any time retain RADCO to conduct an
17 evaluation -- specifically, a formaldehyde evaluation of
18 your travel trailers?  "Yes" or "no"?
19 A   Not to my knowledge  but it wouldn't have been
20 necessary
21 Q   Why would it not have been necessary?
22 A   They're basically using the same materials, so
23 an evaluation of material for a housing division would
24 have been an evaluation for the material for the RV
25 division.



Toll Free: 800 300 1214
Facsimile: 951 784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.                                    June 25, 2009

### 61

1  Q  Now did Fleetwood ever notify either FEMA the
2  Centers for Disease Control Morgan Building and Spas or
3  Fluor Enterprises of their findings as it pertained to
4  formaldehyde as early as 1979? "Yes" or "no"?
5  A  I'm trying to process your question relative to
6  the jackhammer that's going on outside so could you
7  repeat that again
8      MR BENCOMO: Ms Court Reporter, were you able
9  to get the question? Would you mind reading it back
10 please
11     (Record read)
12     MR HINES: Let me just object to the question
13 being argumentative There was no entity known as FEMA
14 in 1979, to the best of my knowledge
15 BY MR BENCOMO:
16 Q  I'll take FEMA out and ask about the
17 United States government and the other entities that I
18 referred to
19 A  Not to my knowledge No not to my knowledge
20 Q  Now please look at Fleetwood 00006776
21 A  Okay
22 Q  What is the heading in that particular page?
23 A  "Presentation of Results Testing in Homes"
24 Q  What is the first thing that is discussed under
25 that category?

### 62

1  A  Variables
2  Q  I'm going to ask you to read that sentence and
3  then the four variables that are listed there and then
4  we're going to have to go off the record for a second
5  because the videographer told me he's about out of tape
6  So if you would kindly read that into the record
7  A  "There are a number of variables which affect
8  the HCHO level in the home at any given time Some of
9  these variables are: (1) Temperature of the HCHO
10 emitting materials; (2) Air temperature; (3) Relative
11 humidity; (4) Ventilation rate
12 Q  Thank you
13     We'll go off the record for a couple of minutes
14 while the tape is charging
15     THE VIDEOGRAPHER: We're going off the record at
16 11:30 a m
17     (Recess taken)
18     THE VIDEOGRAPHER: We're going back on the
19 record at 11:44 a m
20     This is the beginning of Tape No 2
21 BY MR BENCOMO:
22 Q  Mr Theobald just before we took the break you
23 read into the record the four variables which affect
24 levels of formaldehyde; is that correct?
25 A  Well, the paper recites four of a number of

### 63

1  variables not the four variables
2  Q  Could you give me the four variables --
3  A  Yes sir
4  Q  -- that form the paper
5  A  Yes
6  Q  Since you seem to know about other variables,
7  why don't you share with us what the other variables are
8  A  No I didn't say that  I was just reflecting
9  what's written here  And it's 'Some of these variables
10 are" and This paper is reciting some of the variables
11 Q  It's not as if you were going to give us the
12 edification of the other variables?
13 A  That's correct
14 Q  Now can you tell the jury what the temperature
15 of the HCHO emitting materials was when the trailers left
16 your plant to be delivered to Morgan Building and Spas as
17 a result of Hurricanes Katrina and Rita?
18 A  No
19     MR HINES: Object as to form. Past his
20 employment. He was not employed there.
21     MR BENCOMO: I appreciate the objection
22     Who do you have, Mr Hines who can respond to
23 this series of questions?
24     MR HINES: I don't know what the series of
25 questions will be. I don't know that there's a 30(b)(6)

### 64

1  category If you wanted to ask about the Plant 40, we
2  could look on the date the unit was shipped, March 28,
3  2006 and see what the temperature was And that would
4  be the temperature of the unit at the time it was
5  shipped
6      MR. BENCOMO: I think my question was a little
7  bit different because it has to do with the temperature
8  of the HCHO materials not the temperature at the plant
9      MR HINES: I think the wood product would be
10 essentially the same --
11     MR BENCOMO: Are you a scientist?
12     MR HINES: No I'm just saying I think that's
13 what it is
14 BY MR BENCOMO:
15 Q  Mr Theobald can you tell the jury whether or
16 not Fleetwood ever determined -- and I'm referring to
17 before you retired -- what the temperature of the HCHO
18 emitting materials would have been in a trailer that was
19 to leave a plant, and let's use Plant No 40 as an
20 example, as it was leaving the plant?
21 A  Not to my knowledge Some other entity might
22 have been able to do that at any given time since a
23 variety of governmental agencies and private agencies
24 were doing all sorts of research at the time all this was
25 an issue. So somebody may have been doing that, but to



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Fleetwood Enterprises, Inc.                                June 25, 2009

---

Page 65

1  my knowledge Fleetwood did not
2     Q  Did Fleetwood determine the air temperature for
3  a particular unit before it left the unit?
4     A  Not to my knowledge.
5     Q  Did Fleetwood determine the relative humidity of
6  a particular unit, unit being a travel trailer, before it
7  left the plant?
8     A  Not to my knowledge.
9     Q  Did Fleetwood determine the ventilation rate for
10 any particular unit before it left the production plant?
11    A  Not to my knowledge
12    Q  Did Fleetwood ever in its owner's manual prior
13 to your retiring ever let the consumer know that there
14 were a number of variables which affected the
15 formaldehyde level in their travel trailers at any given
16 time and advised them that some of those variables were
17 No 1 temperature of the formaldehyde emitting
18 materials, No 2, air temperature, No 3, relative
19 humidity, No 4, ventilation rate?
20    A  I believe so
21    Q  Tell me where I could find that document.
22    A  In the owner's manual.
23    Q  Would you please refer me to the owner's manual
24 which is in front of you, as to where I could find that
25 language in the manual.

Page 66

1     A  Wherever it says 'ventilation.'
2        MR BENCOMO: Let the record reflect Mr Hines
3  is helping find that page for Mr Theobald
4        MR HINES: Mr Theobald was asking me where it
5  was, so I was handing it to him. He was telling me where
6  it was
7        THE WITNESS: There's a section in the owner's
8  manual relative to ventilation and its importance
9  BY MR BENCOMO:
10    Q  Which particular document are you referring to
11 in the owner's manual?
12    A  I'm referring to PSC021478
13    Q  And you say that there is a mention of
14 ventilation.
15       Would you please tell the jury where that
16 appears on that particular document.
17    A  Yes. On the left-hand side of that page, the
18 third paragraph from the top reads 'Ventilation is
19 important for making the interior of your RV comfortable.
20 Please read the section about ventilation and prolonged
21 occupancy in the Living With Your Trailer chapter in this
22 owner's manual '
23    Q  Now, that is the fourth variable that is
24 mentioned in Fleetwood 00006776; is that not correct?
25    A  The fourth variable is ventilation rate, yes.

Page 67

1     Q  Now, tell me where in the owner's manual the
2  other three variables appear, if you will
3     A  I would have to read the owner's manual to see
4     Q  If I were to represent to you that the first
5  three variables do not appear in the owner's manual
6  would you dispute or disagree with that statement?
7        MR BARRIOS: Object to the form
8        MR PENOT: Join in that
9        THE WITNESS: Well, having not had the
10 opportunity to read it I don't think I could agree nor
11 disagree.
12 BY MR BENCOMO:
13    Q  When we take a break I'm going to ask you to
14 read it
15    A  Read the owner's manual?
16    Q  Yes, sir And I'm going to ask you to give me
17 the answer to that question
18       Ms Court Reporter, would you mark that
19       When you say "not having read it" you were
20 familiar with the owner's manual during the years of
21 employment at Fleetwood were you not?
22    A  Generally so.
23    Q  As a matter of fact, as the head lawyer, you
24 wanted to make sure that accuracy was part of that
25 manual; is that not correct?

Page 68

1     A  Yes
2     Q  If there was something that you felt that should
3  not have been in that manual, you would have ordered it
4  be stricken from the manual; correct?
5     A  Not necessarily
6     Q  Tell me under what circumstances you would not
7  have done so
8     A  Well, it really wasn't my position to order
9  anything
10    Q  Who makes the ultimate decision as to what's in
11 and what's out of an owner's manual?
12    A  I don't know that any one person makes that
13 decision. It would be a collective effort
14    Q  That collective effort it seems to me would
15 include the top lawyer in the company; correct?
16       MR HINES: Object to the form
17       THE WITNESS: Or a staff member, yes
18 BY MR BENCOMO:
19    Q  A staff member of the top lawyer?
20    A  Yes.
21    Q  Who would have then consulted with the top
22 lawyer to make sure the top lawyer would sign off on it?
23    A  Perhaps It just depends
24    Q  Depends on what?
25    A  It depends. It could depend on how senior the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951 784 9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.  June 25, 2009

### 73

1  don't know. I suppose there's more -- generally, there's
2  more of a volume of air in a larger space than there is
3  in a smaller space. I could probably say yes to that.
4      MR. BENCOMO: Now, Richard, I need to ask some
5  questions about communications with trailer residents,
6  and if you're going to tell me well he was not there
7  anymore he's not the person to talk about that I think
8  maybe we ought --
9      MR. HINES: He is not. Craig Biazo would.
10     MR. BENCOMO: Let's get Craig on deck, and then
11 we'll maybe bring the Mr. Theobald back.
12     (Discussion off the record)
13         CRAIG BIAZO,
14 having been duly sworn, was examined and testified as
15 follows:
16         EXAMINATION
17 BY MR. BENCOMO:
18  Q  Mr. Biazo, how are you?
19  A  I'm good. How are you?
20  Q  Great, thank you.
21     Would you please give us your full name.
22  A  Craig Biazo. Last name is spelled B, as in boy,
23 i-a-z-o.
24  Q  Where do you reside, Mr. Biazo?
25  A  I reside at 9310 Newbridge Drive here in

### 74

1  Riverside, California.
2  Q  In August of 2005, were you employed by
3  Fleetwood?
4  A  I was.
5  Q  In what capacity?
6  A  I was the director of parts and service for
7  Fleetwood Travel Trailers.
8  Q  Where was your physical office located?
9  A  It was at our corporate offices.
10 Q  On Myers?
11 A  On Myers Street, yes.
12 Q  Did you have occasion to travel from time to
13 time to the other travel trailer -- or to the travel
14 trailer plants?
15 A  I did.
16 Q  Do you know where the specific travel trailer
17 involved in this case, the Dubuclet trailer, was built?
18 A  I do.
19 Q  Where was that?
20 A  That was in Longview, Texas.
21 Q  Did you ever have occasion to travel to that
22 plant?
23 A  I did.
24 Q  On how many occasions?
25 A  I've been there on half a dozen occasions.

### 75

1  Q  So you were familiar with that plant?
2  A  I was.
3  Q  What type of procedure did Fleetwood have in
4  order to communicate with a consumer such as
5  Ms. Dubuclet a trailer tenant about issues pertaining
6  to her travel trailer?
7      MR. HINES: Let me be sure we're limiting this
8  to the FEMA residents, not a nonFEMA resident.
9      MR. BENCOMO: I'm happy to rephrase the
10 question.
11 Q  Would you please tell the jury what specific
12 means of communication Fleetwood had in order to
13 communicate with FEMA victims of Katrina and Rita about
14 issues pertaining to their trailer.
15 A  We had several ways that we could communicate
16 with customers. Obviously, a letter, e-mail, phone, that
17 type of thing, but specifically for FEMA, we had all of
18 our service communications as it pertained to units that
19 had been placed in the disaster areas come through our
20 service center there in Longview, Texas.
21     They were -- we designated that based on our
22 previous experience that we were advised by by our
23 housing department.
24 Q  What was that experience?
25 A  Well, that there wasn't a terribly lot of volume

### 76

1  associated with units once they were placed with
2  residents or victims of the disasters. So we had set
3  that up to funnel through one location because we felt it
4  would be a lot more streamlined way to communicate with
5  Morgan specifically. Any communication for the most part
6  for warranty purposes or concerns with the travel
7  trailers would have gone either through FEMA to Morgan
8  and then to us or from Morgan directly to us.
9  Q  Did you communicate either by letter, e-mail, or
10 phone with Ms. Dubuclet specifically?
11     MR. HINES: Let me just object to the form. I
12 think what he testified to just a second ago, they had no
13 direct communication. It was either through Morgan or in
14 rare instances through FEMA, never directly with the
15 inhabitant of the home.
16     MR. BENCOMO: I'm getting that to make it
17 perfectly clear for the jury. That's why I'm asking the
18 question in this fashion.
19 Q  Did you communicate in any way, shape, or form
20 either by letter, by e-mail, or by phone with
21 Ms. Dubuclet?
22 A  We had -- no.
23 Q  "Yes" or "no"?
24 A  No.
25     MR. HINES: Listen to the question.



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.                                June 25, 2009

### 77

1  THE WITNESS: We had no communications with any
2  of the residents in the disaster area concerning these
3  types of incidents.
4      MR. BENCOMO: Ms. Court Reporter, can you read
5  that question back so that the witness can answer the
6  question.
7      I'm afraid that when Mr. Hines was talking over
8  the witness it's not going to be clear and it's going to
9  impede the record somehow when we play this at trial.
10     (Record read)
11     MR. BENCOMO: I guess Mr. Videographer, are we
12  hearing Mr. Hines in the background when you kind of
13  jumped in?
14     THE VIDEOGRAPHER: They hear him just like you
15  can hear him here. She's typing the record so --
16     MR. BENCOMO: Maybe what we'll do -- why don't
17  you read the question again, and hopefully, Richard if
18  you want to interpose an objection that's fine.
19     MR. HINES: I will.
20     MR. BENCOMO: After that let him kind of answer
21  so that the record doesn't get garbled.
22     (Record read)
23     MR. HINES: Let me just object it's been asked
24  and answered and argumentative because he's already
25  testified that Fleetwood itself had no direct

### 78

1  communication with any inhabitant of the FEMA-supplied
2  unit in light of the fact that all of the inhabitants of
3  the FEMA-supplied units communicated through Morgan to
4  Fleetwood. Fleetwood was under direction to communicate
5  with Morgan. That's where the complaints went to
6  Morgan, then to us.
7      MR. BENCOMO: Also, that was a speaking
8  objection. I'm going to ask you to please refrain from
9  speaking objections. I let you go on a number of them,
10  but, please, so we can save some time.
11  Q  Would you please, answer the question subject
12  to the objection.
13  A  No we had no direct communications with the
14  Dubuclets.
15  Q  Thank you.
16     Now, can you or anyone with Fleetwood testify to
17  the fact that any documentation including an owner's
18  manual was in fact given to Ms. Dubuclet?
19     MR. HINES: Same objection. We did not sell to
20  Ms. Dubuclet.
21     MR. BENCOMO: Richard, please. That's a
22  speaking objection. Just object, and then he can answer
23  the question subject to the objection.
24     THE WITNESS: I know --
25     MR. HINES: Let me go back.

### 79

1  There's no foundation for the question that we
2  had any dealings whatever and I think the question is
3  improper. It's argumentative; no foundation. It's a
4  form objection. You're asking a question for the record
5  that is obviously argumentative.
6  BY MR. BENCOMO:
7  Q  Do you remember the question that I asked you?
8  A  Yes.
9  Q  Please answer it.
10 A  The only thing that we could testify to is that
11 the owner's manual was shipped with the unit.
12 Q  But you cannot testify to whether or not that
13 owner's manual was in fact in the unit when it was
14 delivered to the occupant; correct?
15     MR. HINES: Object; asked and answered.
16 BY MR. BENCOMO:
17 Q  You can answer subject to the objection.
18 A  No.
19 Q  What communications did you have with either
20 Morgan or Fluor about giving you verification that the
21 owner's manual had in fact, been given to a victim of
22 Katrina or Rita?
23     MR. HINES: Object; foundation.
24     THE WITNESS: I don't have anything communicated
25 from FEMA or from Morgan that would indicate that the

### 80

1  owner's manual was given to the Dubuclets, but I know
2  they did check in the units when they were received at
3  the staging yards, and if those things were missing they
4  would routinely ask us for that type of information or
5  items.
6  BY MR. BENCOMO:
7  Q  Specifically as to the Dubuclet trailer you
8  cannot testify to that?
9  A  I only know that from the documentation that was
10 shipped with the unit.
11 Q  That's the documentation we haven't seen yet,
12 that file that was located, that production file or
13 something like that?
14 A  Yes.
15     MR. HINES: Got it right here. If you want to
16 see it, it's --
17     MR. BENCOMO: Counsel indicated we haven't had
18 time to review it and may not have time because people
19 are still here waiting to ask questions also.
20     MR. HINES: It's six pages long. You asked
21 Mr. Theobald to read a 200-page document to answer a
22 question.
23 BY MR. BENCOMO:
24 Q  Other than an owner's manual, what other
25 communication or information, either directly or



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.                            June 25, 2009

### Page 81

1  indirectly directly being either letter, e-mail, or
2  phone indirectly being through Morgan or Fluor, what
3  other communication or information did you furnish to
4  trailer residents after they had been living in the
5  trailers, if any?
6       MR. HINES: Object; overly broad; not even the
7  subject -- go ahead.
8       THE WITNESS: I know that at one time during the
9  days that we were supplying those trailers that we had a
10 sealant upgrade service bulletin that was delivered to
11 Morgan that would need to be distributed to the
12 consumers. And that would be the only communication
13 indirectly that I'm aware of that we would have delivered
14 to them
15 BY MR. BENCOMO:
16    Q   About a sealant upgrade?
17    A   Yes
18    Q   Did you deliver any information pertaining to
19 urea formaldehyde to Morgan requesting them to convey
20 that information to the travel trailer residents?
21      MR. HINES: Object to the form; foundation.
22      THE WITNESS: Can you read the question back  I
23 want to make sure I understand it
24      (Record read)
25      THE WITNESS: No, not to my knowledge.

### Page 82

1  BY MR. BENCOMO:
2     Q   Now you are familiar with mobile housing; is
3  that correct?
4     A   I'm familiar with manufactured housing in the
5  sense that thats another part of our business.
6     Q   Have you ever worked in the manufactured housing
7  end of the business?
8     A   I have not
9     Q   You've basically worked in the RV end of the
10 business?
11    A   That's correct.
12    Q   And the RV, as we I believe, asked Mr Wozniak
13 before, encompasses travel trailers?
14    A   That's correct.
15    Q   How does a manufactured home compare to a travel
16 trailer for instance in terms of size?
17    A   In relation to the units that were delivered to
18 FEMA?
19    Q   Yes, sir
20    A   They are in -- I don't know that I know the
21 answer to that. I don't know how long the manufactured
22 homes were, so I'm not real familiar to where I could
23 give you a comparative. I know that our trailers were
24 approximately 32 feet long.
25    Q   You don't know the length of manufactured

### Page 83

1  housing?
2     A   I don t off the top my head  no.
3     Q   Did you deal with any of the issues of the
4  volume in a travel trailer as opposed to the volume in a
5  manufactured home  air volume  for instance?
6     A   No
7     Q   Do you know the meaning of the term 'ambient
8  air'?
9     A   I have an idea in my mind of what that means.
10    Q   What does that mean to you?
11    A   Ambient air would be just the air that surrounds
12 you in the environment that you're in  That's what it
13 would mean to me.
14    Q   If you were in a travel trailer, that the
15 ambient air in the travel trailer would be the air that
16 is in that travel trailer to you?
17    A   Depending on the condition and how you're set
18 up  yes
19    Q   Do you know how manufactured homes compare to
20 travel trailers in terms of formaldehyde? And I m
21 referring again to FEMA travel trailers
22    A   No, I don't
23    Q   By the way  had you ever been privy to or
24 furnished with any of the RADCO studies that were
25 referred to earlier?

### Page 84

1     A   No  I've never seen those
2     Q   So when is the first time that you saw the RADCO
3  studies?
4     A   I've never seen them
5     Q   You have never seen them as we sit here today?
6     A   As we sit here today
7     Q   When I started asking questions about the RADCO
8  studies, you were clueless, if you will? I don't mean to
9  belittle that. You did not know what they were?
10    A   I'm not clueless, but I did peek at his computer
11 screen, and I did see that he had it pulled up on there,
12 and I glanced at something that you were talking about
13    Q   While you were here?
14    A   Yeah
15    Q   Other than that, you would have been clueless;
16 correct?
17    A   I would have never known what the RADCO report
18 was
19    Q   Do you know of anyone in the travel trailer
20 division of Fleetwood who was ever provided with any
21 information pertaining to the findings and
22 recommendations of the RADCO studies?
23      MR. HINES: You're asking him personally because
24 he's not offered on that subject  He already told you he
25 knows nothing about that. This is no speaking objection.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800 300 1214
Facsimile: 951 784 9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.                                June 25, 2009

### Page 89

1  evidence.
2      MR. PENOT: I object to form also
3      MR HINES: You can answer.
4      THE WITNESS: I don't know that we had any
5  specific testing done  We've been building trailers and
6  motor homes for 50 years  and we understand the typical
7  effects of someone living in a unit as far as durability
8  of products, fabrics, that type of thing
9  BY MR BENCOMO:
10     Q   Someone living in a unit for a long period time
11 extended period of time?
12     A   Yes
13     Q   What effects does it have on the trailer?
14     A   Well, because the materials that are used in the
15 design of these products are developed from the
16 standpoint that it's going to be used as a recreational
17 vehicle and not as a full-time residence  so there are
18 durability concerns when someone is living in it
19 full-time because it's seeing a lot more use than we
20 would say is typical use of an RV
21     Q   Were the FEMA trailers designed for long-term
22 occupancy?
23     MS GREIF: Object to form.
24     MR. BARRIOS: I join in the objection
25     MR. PENOT: Join in the objection.

### Page 90

1      THE WITNESS: The FEMA units were designed to be
2  used as temporary housing units  That's what they were
3  designed for
4  BY MR. BENCOMO:
5      Q   As opposed to long-term housing; correct?
6      A   Correct
7      Q   It was not intended to be used as long-term
8  housing; correct?
9      MR HINES: Object to form
10     MR. BARRIOS: Object to the form
11     MR PENOT: Object
12     MR HINES: Everybody objects  Why don't we
13 have one objection  standing objection for all so you
14 don't have to worry about it
15     MR BENCOMO: I'm happy with that.
16     THE WITNESS: That's my understanding
17 BY MR BENCOMO:
18     Q   Your understanding being?
19     A   Being that they were not developed to be used as
20 permanent residences.
21     Q   Did you keep up with the news during the
22 aftermath of Katrina?
23     A   Yeah. I was aware of the news articles that
24 came out  That's how many of us had found out that there
25 was formaldehyde being looked at in the trailers.

### Page 91

1      Q   When you found out about formaldehyde in the
2  trailers, did Fleetwood convene a meeting to discuss the
3  issue of formaldehyde in FEMA trailers?
4      MS. GREIF: Objection
5      THE WITNESS: I'm not aware of any specific
6  meeting that was convened to discuss that specific issue.
7  BY MR BENCOMO:
8      Q   Did you participate in a meeting with anyone at
9  Fleetwood to discuss the issue of formaldehyde in the
10 FEMA travel trailers?
11     MR HINES: Let me just object to the extent
12 that it calls for an attorney-client meeting that we may
13 have had
14     If you ask him precisely when it was that he
15 found out about it, it would be after the Hillard case
16 was filed.
17     MR BENCOMO: Richard, please, it's a speaking
18 objection. You can't keep having speaking objections.
19     MR. HINES: Well, the point is you've asked a
20 very broad question that  in essence, triggers an
21 attorney-client or potential attorney-client conversation
22 that —
23     MR BENCOMO: It's not right for you to mention
24 it came after a certain case. You're giving him
25 information that he may not have had prior to your

### Page 92

1  statement
2      MR HINES: If you ask him that question  he'll
3  say exactly --
4      MR. BENCOMO: I'm asking you because, really,
5  this is -- none of the other depositions have gone like
6  this where people just object and then the question gets
7  asked. You keep having speaking objections, which I
8  object to
9      MR HINES: You can object, but I'm saying
10 you're now triggering -- the nature of the broad scope of
11 that question triggers an attorney-client objection  if
12 necessary, and I'm telling him don't answer with respect
13 to any communication he had after the filing of that
14 lawsuit with any attorney or anybody within the company
15 who was discussing this litigation.
16 BY MR BENCOMO:
17     Q   Did you ever discuss the issue of formaldehyde
18 in FEMA trailers with anyone other than an attorney?
19     A   Yes
20     Q   Who did you discuss it with?
21     A   We had general discussions in our normal staff
22 meetings about the information that was being presented
23 in the news media and that type of thing and what
24 possible effects that might have on our existing customer
25 base, how that might impact our organization from people



Toll Free: 800 300 1214
Facsimile: 951.784 9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.                                June 25, 2009

### 101

1  limited evidence in humans. A number of new
2  epidemiological studies on persons in a variety of
3  occupations with potential exposure to formaldehyde were
4  used in the evaluation. Cancers that occurred in excess
5  in more than one study are Hodgkins disease, leukemia
6  cancers of the buccal cavity." I probably mispronounced
7  that. "And pharynx, particularly nasopharynx lung,
8  nose, prostate, bladder, brain, colon, skin and kidney."
9      Q   What does the next paragraph say about exposure
10 to formaldehyde if you'll please read that.
11     A   Again, you want me to read the entire paragraph?
12     Q   Please. Yes, sir.
13     A   "Exposure to formaldehyde at concentrations in
14 excess of 1 part per million may cause significant
15 irritation of the eyes and upper respiratory tract. The
16 irritation threshold appeared to be about 3 parts per
17 million. Pulmonary sensitization, although rare, does
18 occurs in humans. Formaldehyde solutions can cause
19 severe eye and moderate skin irritation. Repeated skin
20 exposure to solutions of 2 percent or more formaldehyde
21 has caused allergic skin reactions. Formaldehyde was
22 found to be weakly active in a number of in vitro
23 genotoxity tests, but inactive in vivo. Formaldehyde
24 does not cause birth defects in offspring of female mice
25 who were exposed to concentrations up to 10 parts per

### 102

1  million. Lifetime inhalation of formaldehyde at
2  concentrations above 5 parts per million for 6 hours per
3  day caused nasal tumors in laboratory animals.
4  Many epidemiological studies have failed to link cancer
5  in humans with occupational exposure to formaldehyde."
6      Q   I'd like to ask you a question about components
7  of travel trailers as they pertain to formaldehyde. I
8  refer you to FLE-00006405 --
9      A   Okay.
10     Q   -- which deals with panel products; is that not
11 correct?
12     A   Yes, sir. That is -- those are the words at the
13 top of the page.
14     Q   Now, the next box after the box that you just
15 read from panel products, contains a number of products.
16     Would you tell me which ones you are aware of
17 that are listed there that contain urea formaldehyde.
18     A   Particle board may contain urea formaldehyde.
19 Medium density fiberboard may contain urea formaldehyde.
20 Lauan L-a-u-a-n Luaun if indeed that's the same as
21 hardwood plywood may contain urea formaldehyde. The
22 other three listed there I believe are phenol.
23     Q   What is phenol?
24     A   Again I'm not an expert but to my knowledge,
25 it's another resin, phenol formaldehyde resin as opposed

### 103

1  to urea formaldehyde resin.
2      Q   What do you know based on having worked at the
3  company for as long as you did and having been tendered
4  as the expert on formaldehyde what do you know about the
5  difference between phenol formaldehyde and urea
6  formaldehyde?
7      MR HINES:  Let me object to the categorization
8  of his being offered as an expert on formaldehyde. He
9  was offered as an expert in the formaldehyde-related
10 categories of the 30(b)(6).
11 BY MR. BENCOMO:
12     Q   That's fine.
13     Subject to the objection.
14     A   My understanding is that the emission
15 characteristics of formaldehyde emission characteristics
16 of phenol formaldehyde resins are less than urea
17 formaldehyde resins.
18     Q   Is there a reason why Fleetwood did not use
19 phenol formaldehyde resins in its component parts in the
20 travel trailers?
21     MR HINES:  Let me just object to the form of
22 the question.
23     Are you talking about -- we did not combine
24 resins with wood products? We call it finished wood
25 products.

### 104

1  BY MR. BENCOMO:
2      Q   Please.
3      A   Okay. I was going to say the same thing.
4      Q   I would expect you to.
5      That's why, Richard, please just object and
6  don't give the rationale behind the objection. Just give
7  the technical basis.
8      A   Fleetwood purchased materials. We purchased
9  wood products. The wood products were already
10 manufactured and whether it's a urea formaldehyde or a
11 phenol formaldehyde or lumber it was a complete product
12 when we bought it.
13     Q   Did you specify that you wanted only phenol
14 formaldehyde products? Was that part of your
15 specification?
16     A   Well I was not a purchasing person so I would
17 not be specifying but I can tell you from my knowledge
18 that the wood product itself would have been specified
19 and not a wood product with a specific resin. So our
20 purchasing people knew -- well I believe our purchasing
21 people knew that certain materials were urea
22 formaldehyde -- used urea formaldehyde resin and other
23 materials other wood -- manufactured wood products were
24 phenol products.
25     Q   Now, you may not be able to answer this



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.            June 25, 2009

### Page 121

1  A  That's so hypothetical. You would have to look
2  at each individual incident because there's so many
3  variables that surround that.
4  Q  Are you supposed to use the stabilizer jack to
5  lift the weight of the trailer?
6  A  No.
7  Q  Why not?
8  A  They're not designed for that. I just
9  previously answered that I thought
10  Q  One was to raise it? The other was to lift the
11  weight?
12  A  There's a difference between raising and
13  lifting? I thought it was the same thing. I'm sorry.
14  Q  What about the raising of the tires off the
15  ground?
16  A  That is not a recommendation made by Fleetwood
17  Q  Why not?
18  A  We don't have any experience in that. We're not
19  sure what happens to the components when you did do that
20  Q  I'm sorry?
21  A  We're not sure what would happen to the trailer
22  if you did do that.
23  Q  You all have never attempted to raise the tires
24  off the ground at the plant to determine what impact it
25  would have on the trailer itself?

### Page 122

1  A  I have not been made aware of any of that kind
2  of activity, no.
3  Q  Are you aware of what impact the raising of the
4  tires off the ground would have on the frame a trailer?
5  A  Not as I sit here
6  MR. PENOT: Object to form. Ambiguous to the
7  word 'frame' -- with respect to the word 'frame."
8  BY MR. BENCOMO:
9  Q  What does the term "off gasing" mean to you?
10  A  That would mean if you have a fluid or a solid
11  or something, something comes off of the surface.
12  Q  What knowledge do you have pertaining to the
13  effect of damage to the frame or undercarriage of a
14  trailer on the issue of off gasing of formaldehyde?
15  MR. BARRIOS: Object to form
16  THE WITNESS: Say that again.
17  BY MR. BENCOMO:
18  Q  Do you have any knowledge concerning the effect
19  that that damage to the frame or undercarriage can have
20  on the off gasing of formaldehyde inside a trailer?
21  A  Damaging? You're saying damaging the frame
22  causes formaldehyde to release inside the trailer?
23  Q  Do you have any knowledge of that being a
24  byproduct of the damaging of a frame or undercarriage?
25  A  No, I do not.

### Page 123

1  MR. PENOT: I'm going to object to the ambiguity
2  because when you say "frame, I don't know if you're
3  talking about the chassis or the box
4  MR. BENCOMO: That's fine
5  Q  Now is a trailer travel trailer specifically
6  designed to be used as permanent housing?
7  A  Craig answered that question earlier this
8  morning. No
9  Q  You agree with that?
10  A  Yes
11  Q  Did you ever convey to either Morgan Fluor or
12  FEMA that the travel trailers that you all were putting
13  into commerce to the victims of Katrina and Rita were not
14  to be used as permanent housing?
15  A  I didn't have any conversations with any of
16  those people
17  Q  Whose responsibility would it have been to
18  impart that information to Morgan Fluor or FEMA within
19  Fleetwood?
20  A  Whoever led the negotiations with them
21  MR. BENCOMO: Do we have that person designated
22  because that is the subject of our inquiry?
23  MR. HINES: With respect to -- I don't know
24  that. You said there's nothing in there with respect to
25  a 30(b)(6) witness to testify to what you just asked,

### Page 124

1  which was that the travel trailers was not to be used as
2  long-term housing because no. 1, I didn't object, but
3  there's no foundation for such a basis anyway. The
4  operator's manual certainly speaks for itself.
5  MR. BENCOMO: <u>Look, you already objected,</u>
6  <u>please. I know that Mr. Saporito just whispered to you,</u>
7  <u>and at which point you parroted whatever he told you</u>
8  <u>would appreciate the objection and not the speaking</u>
9  <u>objection.</u>
10  MR. HINES: He made such a good comment
11  BY MR. BENCOMO:
12  Q  I'd like to ask you some questions about
13  interior storage in a trailer
14  What are the closets and cabinets made out of in
15  FEMA travel trailers?
16  A  By review of materials, I believe they're mostly
17  pre-finished.
18  MR. PENOT: I didn't hear that
19  MR. SAPORITO: You mean Fleetwood travel
20  trailers; right?
21  MR. BENCOMO: Of course. That's all we're here
22  on.
23  MR. PENOT: I'm sorry I didn't hear the
24  answer.
25  THE WITNESS: By review of materials for the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Fleetwood Enterprises, Inc.                                              June 25, 2009

### 229

1  apparently --
2       Let me finish.
3       If you look at the file, you will look at the
4  unit production file, and you look at a final finish
5  checkoff. You will see that box is checked off on the
6  unit file for this unit. That way you know all the
7  warnings have been put in
8       MR. BENCOMO: But that's the only evidence.
9       MR. HINES: That is the record evidence from
10 Fleetwood that the unit was put in plus the assembly
11 manual, plus the diagram plus the glue that would have
12 been on the back of the sticker and the owner's manual
13 page unless somebody took the owner manual out, ripped
14 the page out, and ripped the glued stickers off. And if
15 there's testimony that that was done so be it.
16 BY MR. BENCOMO:
17      Q  Do you have any documentation that would show
18 that any of the RADCO tests were made known or available
19 to the travel trailer division of Fleetwood?
20      A  Do I have any record?
21      Q  Yes, sir.
22      A  Written record?
23      Q  Yes sir
24      A  I wouldn't be aware of any but I do know that
25 that information was made available, yes, sir, I do.

### 230

1       Q  Do you know why it is that Mr Wozniak found out
2  about RADCO today when preparing for the deposition?
3       MR. HINES: Object to the form. That's not his
4  testimony. His testimony was he was aware of it He
5  simply had not seen the particular test
6  BY MR BENCOMO:
7       Q  Do you know why Mr Wozniak would not have seen
8  those tests prior to today?
9       A  Those tests were done prior to his beginning
10 work for Fleetwood.
11      Q  And that would be your response to that
12 question?
13      A  Yeah
14      Q  When do you believe that he began working for
15 Fleetwood?
16      A  I believe December '83 I think that's correct
17      Q  So you don't remember me showing RADCO studies
18 as late as 1991?
19      A  Yes. Yes there is one in 1991 Yes, there is
20      Q  So he would have been working for Fleetwood when
21 that study was performed; is that not correct?
22      A  Yes, that's correct I stand corrected I
23 can't think of any reason why Bob would have known about
24 this or needed to know about it
25      This particular document, incidentally, is

### 231

1  prepared for Fleetwood Homes of Oregon Inc a Fleetwood
2  subsidiary and not Fleetwood Enterprises
3       Q  You were -- when I asked you the question about
4  the Chinese wall and whether or not that is something --
5  that came out of which particular files? Did it come out
6  of the Fleetwood corporate offices?
7       A  I don't know that.
8       MR. BENCOMO: Can somebody tell me where those
9  came from?
10      MR. HINES: I don't know where they come from
11      MR. BENCOMO: Is there anyone who can respond to
12 that question? Because I need to depose that person to
13 see whether or not those were in the Fleetwood corporate
14 offices because the witness suggested these may have been
15 in Oregon as opposed to at Fleetwood corporate
16 headquarters
17      THE WITNESS: It really wouldn't have made any
18 difference
19 BY MR. BENCOMO:
20      Q  Are you saying that those documents the 1991
21 RADCO studies, were not located at the Fleetwood
22 corporate offices here in Riverside, California?
23      A  No. What I'm saying is that Mr Wozniak -- this
24 would have not been anything that Mr Wozniak would have
25 reviewed.

### 232

1       Q  And the reason for that is?
2       A  The issue -- I don't know this for sure but
3  this was done in 1991 All of the issues with respect to
4  low-emission formaldehyde wood materials had been
5  resolved That was resolved -- that was resolved by the
6  HUD regulations in 1984 That was resolved
7       We were using -- Fleetwood was using wood
8  materials that met or exceeded the HUD specs in the
9  housing group as well as the travel trailer group. All
10 the recreational vehicle group all Fleetwood Enterprises
11 groups was using that. That issue was taken care of
12      Now, what this -- honestly I don't know why
13 this would have been done It may very well have been
14 done as a -- to check the standards to make sure that
15 this particular vendor was meeting the standard at that
16 particular time I'm not sure, but that issue was long
17 resolved by 1991
18      Q  You feel that insofar as Fleetwood was
19 concerned, the urea formaldehyde resin issue was a closed
20 issue sometime in the 1980s?
21      A  I wouldn't say it was closed because we were
22 still adhering to formaldehyde product regulations. It
23 certainly wasn't closed
24      Q  But you said it became a nonissue after 1984; is
25 that correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800 300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com