Stephen J. Smulski
June 10, 2009

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER          * MDL NO. 1873
       FORMALDEHYDE          *
       PRODUCTS LIABILITY    *
       LITIGATION            * SECTION: N(5)
                             *
This Document Relates to:    * JUDGE: ENGELHARDT
Charles Age, et al, v.       *
Gulf Stream Coach, Inc.,     *
et al, Docket No. 09-2892    * MAG: CHASEZ
* * * * * * * * * * * * * * * * * * * * *

    Video-Taped Deposition of STEPHEN SMULSKI, Ph.D., 435 Wendall Road, Shutesbury, Massachusetts, 01072, taken in the law offices of Lambert & Nelson, 701 Magazine Street, New Orleans, Louisiana, 70130, on Wednesday, the 10th day of June, 2009.


APPEARANCES:


        T. CHRISTOPHER PINEDO
        ATTORNEY AT LAW
        4550 Jericho Road
        Corpus Christi, Texas   78413

             - and -

        FRANK J. D'AMICO
        ATTORNEY AT LAW
        622 Baronne Street
        New Orleans, Louisiana   70113

             - and -

        REICH & BINSTOCK, LLP
        (By:  Dennis C. Reich, P.C.)
        4265 San Felipe
        Suite 1000
        Houston, Texas   77027
              (Attorneys for the Plaintiffs)

1  Q.     Yes.
2  A.     Yes, it is.
3  Q.     Do you know where that
4  formaldehyde is supplied to the manufacturers
5  of those products?  Where do they get their
6  formaldehyde?
7  A.     I don't.
8  Q.     Have you ever consulted with a
9  manufacturer of formaldehyde, or a supplier of
10 formaldehyde?
11 A.     I have not.
12 Q.     Prior to your being retained to
13 offer opinions in the class certification
14 phase of this litigation, had you done any
15 work with formaldehyde, specifically with
16 formaldehyde after you had drafted your 1987
17 article?
18 A.     I have not.
19 Q.     Is this the first case you have
20 been involved in that deals with formaldehyde
21 in relation to composite wood products?
22 A.     Yes, it is.
23 Q.     Other than the 1987 article, have
24 you drafted any other articles specifically
25 dealing with emissions from composite wood

Stephen J. Smulski
June 10, 2009

Page 34

1  products?
2  A.     Have I written any other?
3  Q.     Yes.
4  A.     No, I have not.
5  Q.     In fact, I think during the class
6  certification deposition, you actually
7  testified you have done nothing with
8  formaldehyde since you wrote the article in
9  1987; is that accurate?
10 A.     I don't recall what I said
11 exactly, but yes, I have -- since writing that
12 article in 1987, I have not written any other
13 articles on that topic.
14 Q.     In your C.V. you list a couple of
15 organizations that you have actually held some
16 positions in, but I want to talk about some
17 others, to make sure you haven't had any
18 consultation or positions with those
19 organizations.
20 Have you ever been on a committee
21 for the Environmental Protection Agency?
22 A.     No, I've not.
23 Q.     Have you ever been consulted by
24 the Environmental Protection Agency?
25 A.     No.

Stephen J. Smulski
June 10, 2009

Page 103

1  Q.      It also relies upon a conclusion
2  that the levels of formaldehyde that existed
3  at the time that they lived in the unit were
4  presumably higher than the ATSDR promulgated
5  levels of formaldehyde that they have asserted
6  in their publications?
7  A.      That is correct.
8  Q.      And are those -- first off, the
9  testing results, is that within your area of
10 expertise to evaluate the tests that were
11 provided to you by Mr. Scott?
12 A.      No.  That's outside of my
13 expertise.  He is the expert in formaldehyde
14 measurement.
15 Q.      Is it within your area of
16 expertise to offer an opinion as to whether
17 the level of formaldehyde in this trailer, if
18 any, constituted a health hazard to the people
19 within the trailer?
20 A.      This is what has been the levels
21 of formaldehyde at which there are adverse
22 health effects to occupants that have been
23 widely reported in the medical literature and
24 peer-reviewed journals, and these are the
25 levels that are identified as being problem

Stephen J. Smulski
June 10, 2009

Page 104

1  levels.
2  Q.        Is there a medical consensus
3  regarding the levels of formaldehyde to which
4  a person can be exposed before you might
5  expect to see health hazards?
6  A.        You will have to ask a medical
7  doctor.
8  Q.        You don't know that?
9  A.        I am not an expert in medical
10 matters.
11 Q.        You've mentioned the various
12 factors that go into determining how much
13 formaldehyde may be released from a composite
14 wood product:  The temperature, the humidity,
15 and specifically, as far as concentrations,
16 the air flow or ventilation.
17 What does a test of formaldehyde
18 in any structure, regardless of whether a
19 travel trailer, housing, site-built housing,
20 stick-built home, condominium, apartment, what
21 does that test show you about that
22 formaldehyde concentration in that area?
23 A.        Basically a snapshot point in
24 time.  At the day of the test, here is the
25 level that is recorded.

Stephen J. Smulski
June 10, 2009

Page 235

1   it was 3 parts per billion from the day the
2   occupants first went inside that unit until
3   when they left.
4   EXAMINATION BY MR. GLASS:
5   Q.      Are you using a different
6   assumption for the .003 parts per million than
7   you're using for any other test that was done
8   on any other unit?
9   A.      I don't understand your question.
10  Q.      You qualified it that you're
11  making the assumption that it was .003 through
12  the entire time, and that somebody was
13  occupying.
14  It is that different from any
15  other unit?
16  A.      What I am saying is that the CDC
17  went into these units, some of which had been
18  in service for over two years at the time they
19  made their measurements, so they came up with
20  a certain measurement on a certain day.  What
21  I am saying is it would be suitable for
22  housing if it were 3 parts per billion, which
23  meets the ATS --
24      MR. D'AMICO:
25  DR.

Stephen J. Smulski
June 10, 2009

Page 236

1        THE WITNESS:
2    -- DR standard from the day the
3    occupants first set foot inside of the unit.
4    EXAMINATION BY MR. GLASS:
5    Q.        Can you tell me what the levels
6    of formaldehyde exposure were in the Alexander
7    unit at any given time other than the W.D.
8    Scott test that you have been provided by
9    Mr. Scott?
10       MR. D'AMICO:
11   Objection.  Asked and answered.
12       THE WITNESS:
13   I cannot.  I can only infer from
14   what we know about formaldehyde release that
15   they were more likely than not higher prior to
16   measurements made by Mr. Scott.
17   EXAMINATION BY MR. GLASS:
18   Q.        The studies that you identified
19   in No. 18 do not tell us what the levels of
20   formaldehyde were in the Alexander unit; is
21   that accurate?
22   A.        That is correct.
23   Q.        So for No. 19, same question.
24   Where you are identifying
25   averages in the CDC study, that does not tell

Stephen J. Smulski
June 10, 2009

Page 272

1   that this travel trailer is unsuitable for use
2   on a long-term housing of people.  They knew
3   formaldehyde gas would be emitted.  They knew
4   the occupants of the trailers would be exposed
5   to it.  They knew of the adverse health
6   effects.  They knew of the existence of
7   alternative materials and alternative systems
8   that would be useful in reducing the amount of
9   formaldehyde.
10  Q.      "Ms. Alexander and Christopher
11  Cooper would potentially suffer adverse health
12  effects from chronic exposure to formaldehyde
13  gas."
14  You say "potentially."  Did they
15  suffer adverse health effects from chronic
16  exposure to formaldehyde gas?
17  A.      I don't know.  That determination
18  has to be made by a medical doctor.
19  Q.      Were they exposed to --
20  chronically exposed to formaldehyde gas in the
21  specific trailer which they resided?
22  A.      In my opinion, yes.
23  Q.      Are they being chronically
24  exposed to formaldehyde gas in their current
25  residence?

1  fact, the jury, hears all of this evidence
2  they conclude that the level actually tested
3  in this trailer did not constitute a health
4  risk for Ms. Alexander and Christopher Cooper,
5  is it your opinion in that circumstance that
6  the travel trailer would still be an
7  unsuitable housing situation for those
8  plaintiffs?
9       MR. PINEDO:
10 Objection to form.
11      THE WITNESS:
12 I don't know how to answer that
13 question, quite frankly.  The jury can arrive
14 at any conclusion.  That conclusion doesn't
15 necessarily have to be fact-based.  It doesn't
16 necessarily have to be -- represent the
17 majority of opinion of people who are
18 qualified as experts to look at and assess
19 this issue, so I don't know how to answer your
20 question.
21 EXAMINATION BY MR. GLASS:
22 Q.       I understand.  That's fine.
23 Is it your opinion that any
24 housing situation wherein formaldehyde is
25 tested at any time in excess of .008 parts per