UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
|      FORMALDEHYDE PRODUCTS | * | |
|      LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |
| THIS DOCUMENT IS RELATED TO | * | |
| | * | |
| *Charlie Age, et al v. Gulf Stream Coach* | * | |
| *Inc., et al*, Docket No. 09-2892; | * | |
| Alana Alexander, individually and on behalf of | * | |
| Christopher Cooper | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF SECOND
MOTION TO COMPEL WITH RESPECT TO
GULF STREAM COACH, INC.**

Plaintiff, Alana Alexander, individually and on behalf of Christopher Cooper ("Plaintiff" or "Ms. Alexander"), respectfully requests this Court to issue an order compelling Defendant Gulf Stream Coach, Inc. ("Gulf Stream") to produce documents that Gulf Stream has improperly withheld from production in response to previous discovery requests and, in support, would show the following:

**SUMMARY OF MOTION**

The PSC and Plaintiff previously served First Requests for Production to Gulf Stream on April 10, 2009 and May 5, 2009.  In response, Gulf Stream produced some hard copy documents, but withheld certain documents pursuant to privilege and work product claims. Plaintiff requests that the Court order Gulf Stream to produce certain withheld documents because Gulf Stream's privilege and work product claims are unfounded and Gulf Stream fails to meet its burden of showing why the privileges apply.

## BACKGROUND

This case is one of thousands of cases filed in this Multi District Litigation involving travel trailers provided to victims of Hurricanes Katrina and Rita.

The case of *Age, et al v. Gulf Stream Coach, Inc., et al* (of which Ms. Alexander is a Plaintiff) was filed on February 27, 2009. On April 6, 2009, the Court selected Ms. Alexander as the first trial plaintiff. On April 8, 2009, the Court issued a scheduling order for this case, setting trial to begin on September 14, 2009.

On April 10, 2009, the Plaintiffs' Steering Committee ("PSC") sent Gulf Stream a Master Set of Requests for Production of Documents. These Requests sought documents which are generally applicable to all Gulf Stream cases in the MDL. On May 18, 2009, Gulf Stream responded.

On May 5, 2009, Plaintiff sent Gulf Stream a First Request for Production of Documents, relating to Ms. Alexander's case only. On May 27, 2009, Gulf Stream responded.

Gulf Stream asserted privilege and work product protections in refusing to produce certain documents. Gulf Stream's privilege log is attached as **Exhibit A**.

## ARGUMENT AND AUTHORITIES

In response to Plaintiff and the PSC's First Request for Production, Gulf Stream asserted privilege and work product protections in refusing to produce certain documents.

**I.    WORK PRODUCT**

The party who asserts work-product protection must show that the materials warrant work-product protection. *Hodges, Grant & Kauffmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985).

The anticipated litigation must be identified and it must be proven that the communication in question was in preparation of that litigation. *In Re Vioxx Products Liability Litigation*, 501 F.Supp.2d 789, 808 (E.D.La.2007). Also, the party asserting the protection must show that the party had reason to anticipate litigation and 'the primary motivating purpose behind the creation of the document was to aid in possible future litigation.' *In re Kaiser Aluminum & Chem.* Co., 214 F.3d 586, 593 (5th Cir.2000). Generally, a reasonable anticipation of litigation requires existence of an <u>identifiable specific</u> claim or <u>impending litigation</u> at the time the materials were prepared. *Chemtech Royalty Associates, L.P. ex rel. Dow Europe, S.A. v. U.S.*, 2009 WL 854358, *2 (M.D.La., March 30, 2009)(emphasis added). As with the attorney-client privilege, a party can waive work product protection when the party "injected [the issue] into [the] litigation." *Conkling v. Turner*, 883 F.3d 431, 435 (5th Cir.1989).

All of the documents referenced in Gulf Stream's privilege log are dated on or before the date of the filing of the first lawsuit relating to formaldehyde in travel trailers, the *Hilliard* case, which was filed on May 12, 2006.

## II.  ATTORNEY-CLIENT PRIVILEGE

"The attorney-client privilege is an exception to the general rule that the law is entitled to every man's evidence. The privilege protects communications from the client to the attorney, and responsive communications from the attorney to the client." *In Re Vioxx Products Liability Litigation*, 501 F.Supp.2d 789, 795 (E.D.La.2007).[1]   "The burden to establish the applicability of the attorney-client privilege rests on the party who invokes it." *Hodges, Grant & Kaufmann v. United States Government*, 768 F.2d 719, 21 (5th Cir.1985). The proponent of the privilege "must establish not only that an attorney-client relationship existed, but also that the particular

---

[1] This opinion by Judge Fallon contains a thorough examination of the attorney-client privilege and its limits.

communications at issue are privileged and that the privilege was not waived." *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982)).

"When confidential communications are made a material issue in a judicial proceeding, fairness demands treating the defense as a waiver of the privilege." *Conkling,* 883 F.2d at 435. Accordingly, "the attorney-client privilege is waived when a litigant 'places information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.'" *Id*.

### III.    IMPROPERLY WITHHELD DOCUMENTS

Gulf Stream has refused to produce other documents, under claim of attorney client privilege and work product protection. From the face of the log, it is clear that the withheld documents are not properly withheld.

#### A.  Test Results

In March of 2006, Gulf Stream employees and contractors tested trailers and wood products for formaldehyde emissions and recorded those test results. This testing was done by two Gulf Stream employees and a testing service.

Obviously, those test results did not come out as Gulf Stream had hoped. At that point, Gulf Stream clearly decided to say that the testing had been done "in anticipation of litigation." Of course, not a single lawsuit had been filed at that time, and not a single person had made a claim or said or written anything remotely indicating that they would file a claim.

The testing involved two components: (1) testing of trailers done by Gulf Stream employees and at the instruction of Gulf Stream senior management (not attorneys) in March 2006 and (2) testing of wood products done by a third party testing service, apparently retained

by attorneys in March or April 2006.

      1.  <u>Trailer Testing</u>

When the first reports of formaldehyde came to bear in March 2006, Gulf Stream senior management sent a senior employee, Scott Pullin, to test travel trailers for formaldehyde to "see what was going on". These results were provided to Congress to demonstrate that Gulf Stream had responded responsibly to the formaldehyde issue.

> Q  Who told you to go down to Louisiana and test trailers?
>
> A  Mr. Shea.
>
> Q  What did he tell you to do?
>
> A  Take some screening samples.

Deposition of Scott Pullin, at page 8, lines 13 to 17, attached as **Exhibit B**.

> Q  Okay. And why did he tell you, if you know, to go down to Louisiana and do some screening?
>
> A  The news had surfaced about some concerns, and we just wanted to get down and see what was going on, get some samples and see what the conditions were.
>
> Q  And what did you do to prepare yourself? Do you remember when he told you to go down and do some screening?
>
> A  I believe it was towards the end of March or the beginning of April.

Deposition of Scott Pullin, at page 9, lines 5 to 14, attached as **Exhibit C**.

> Q  What led to sending Mr. Pullin down to New Orleans to do some screening of these trailers?
>
> A  Well, there was obviously the concern brought up in the press, and we wanted to do whatever we could to learn more about formaldehyde and any complaint that may be out there. And we had gone out of our way to follow up on any complaints that were out there to see if we could provide any assistance. And part of this information collecting was to have Scott go down and -- I believe he was already going down to, what is it, St. Bernard? And to collect information, talk to people, and give us feedback whether there were people that had complaints, because we really weren't -- we had seen the report in the press and we wanted to learn as much as we could about this.

Deposition of Dan Shea, at page 130, line 13 page 131, line 3, attached as **Exhibit D**.

> Q Was Mr. Pullin screening, testing, whatever we want to call it; was this being done at the instruction of Gulf Stream Coach's counsel or at the request of yourself or some other person or entity at Gulf Stream Coach?
>
> A Scott was working for me at the time, and I had been talking to counsel since --
>
> MR. WEINSTOCK: Okay, that's enough.
>
> ---
>
> Q Was it done at your request?
>
> A Yes.

Deposition of Dan Shea, at page 219, line 10 to page 220, line 3, attached as **Exhibit E**.

### 2. Wood Product Testing

At about this time, April 2006, Gulf Stream, through its counsel, also sent certain wood products to a third party testing service for chamber testing to determine if wood products from a certain supplier were really "LFE" or low formaldehyde emitting. These results were later provided to Congress in an effort to demonstrate that Gulf Stream was not responsible for the formaldehyde problems.

> Q Tell me about the firm that you retained to do destructive testing, Progressive Engineering.
>
> A I don't think -- Progressive Engineering is an engineering testing inspection firm in Goshen, Indiana.
>
> Q And what did you retain them to do?
>
> A I don't know that we retained them exactly. We gave them a sample of material to –
>
> Q You paid them, didn't you?
>
> A I think we did pay them, yeah.
>
> Q They didn't do it for free, did they?

    A  No.

    Q  Okay.

Deposition of James Shea, at page 160, lines 7 to 18, attached as **Exhibit F.**

    Q  All right.  When you hired Progressive Engineering to do some work for your company, what did you hire them to do?

    A  We had some material, some Adorn material, and we asked them to submit it to the kind of testing that would be required by the HUD standard.

    Q  So you had them test some interior decorative --the stuff that's used on the walls?

    A  Correct.

    Q  Did you have them test anything else other than the --

    A  No.

    Q  Just the wall –

    A  It was interior wall panel.

    Q  Okay.  And when did that happen?

    A  It happened between -- when did it happen?  When did we give the material to them?

    Q  Yes.

    A  I think we gave the material to them in early April, as I recall.

    Q  Of '06?

    A  Yes.

Deposition of James Shea, at page 161, line 5 to page 162, line 1, attached as **Exhibit G.**

    Q  But let's just talk about what Progressive Engineering did and what they told you and what you learned.

    A  Progressive Engineering subjected the material to a  testing protocol and ultimately gave us some results.

Deposition of James Shea, at page 163, line 21 to page 163, line 1, attached as **Exhibit H**.

    Q  Let me ask you again.  Did you receive a written report from Progressive Engineering?

    A  There was a written report that had values and numbers on it, yes.

    Q  Did you read it?

    A  I remember reading the report, yes.

Deposition of James Shea, at page 168, lines 4 to 10, attached as **Exhibit I**.

    Q  All right.  When you hired Progressive Engineering to do some work for your company, what did you hire them to do?

    A  We had some material, some Adorn material, and we asked them to submit it to the kind of testing that would be required by the HUD standard.

Deposition of James Shea, at page 161, lines 5 to 10, attached as **Exhibit J.**

    Q  At the same time this testing, or informal testing was being done by Scott, were you also doing some testing of some of your component parts, or component woods, for instance, from Adorn?

    A  Our attorneys, in Indiana, were looking into the -- some material that we had received from – from Adorn.

    Q  Why did you choose Adorn?  Adorn only provided you 15 percent of your woods, but you chose Adorn for some reason.  Explain why.

    A  Well, it was the idea that we had found this material that was designated as REG, and the fact that it may or may not have complied to the –

Deposition of Dan Shea, at page 154, line 8 to 20, attached as **Exhibit K**.

    Q  And was that information shared with anyone, this Progressive Engineering testing?

    A  I believe it was shared with -- I believe it -- well, it was something that Congress ultimately obtained.

    Q  Okay.  So it was shared with members of Congress.

    A  I don't know if shared; I think they -- I'm not sure what the –

    Q  I'm not a wordsmith like your brother.  I just mean you provided it to Congress.  Right?

A  They had worked with our legal counsel and obtained it.

Deposition of Dan Shea, at page 156, lines 12 to 23, attached as **Exhibit L**.

### 3.  Gulf Stream's Alleged Anticipation of Litigation

Although the first lawsuit in this matter was not filed until May 12, 2006, and although Gulf Stream later determined that the testing was "unreliable", Gulf Stream claims that it anticipated litigation the minute that it heard that a Gulf Stream trailer had possible formaldehyde emissions.

> Q  Last time we talked about when you anticipated litigation.  You told me that was in March of '06; is that right?
>
> A  Certainly when this occurred, because of my background in the '80s in manufactured housing, we discussed the situation with our counsel.
>
> Q  You said "when this occurred."  I think, if I'm not mistaken, that's a pronoun.  What are you talking about, "when this occurred"?
>
> A  The beginning circumstance of this formaldehyde issue in March of 2006.
>
> Q  Okay.  So –
>
> A  We at that time certainly began to discuss the situation with our legal counsel.
>
> Q  So just so we're clear, because it's important when you actually anticipated litigation, your testimony is that after the first complaint in March of 2006, which would have been March 10th, I believe, that's when you anticipated litigation?
>
> A  I think we certainly understood potential for litigation and certainly because of our experiences in the '80s -- or my experience in the '80s in manufactured housing.
>
> Q  So March 10, 2006?
>
> A  Well, proximate to that time, yes.
>
> Q  Okay.  And you told me previously you anticipated litigation with residents living in the trailers.
>
> A  Well, you know, I think there is a variety of litigation that we recognize could have transpired, and one of them would have been on behalf of residents.

Deposition of James Shea, at page 261, line 8 to page 262, line 13, attached as **Exhibit M.**

    4.   Withheld Documents

Gulf Stream has withheld various test results under claim of work product, as follows:

| Privilege Log No. | Gulf Stream's Description |
|---|---|
| 22 | Handwritten notes re screening of trailers |
| 23 | Record of screening of unoccupied trailer (Baton Rouge storage area) |
| 24 | E-mail regarding attached blank screening form |
| 25 | Records of screening of unoccupied trailers (with handwritten notes)(Baton Rouge storage area, including non-Gulf Stream units) |
| 27 | Transmittal of screening records of unoccupied trailers in Baton Rouge and occupied St. Bernard trailers |

It does not appear that Gulf Stream included the test results from Progressive Engineering on its privilege log.[2] Those documents should be compelled as well.

All of the withheld documents are dated before the first lawsuit relating to formaldehyde in travel trailers, the *Hilliard* case, which was filed on May 12, 2006. Despite Gulf Stream's alleged anticipation of litigation in March 2006, at the time of both types of testing, there was no "identifiable specific claim or impending litigation." *Chemtech Royalty Associates, L.P. ex rel. Dow Europe, S.A. v. U.S.*, 2009 WL 854358, *2 (M.D.La., March 30, 2009). As of March 2006, Gulf Stream's CEO only discusses "potential" litigation that "could have transpired."

Further, with respect to the trailer testing, it is clear that this testing was not done on the instruction or guidance of counsel.

Further, the primary motivating purpose behind both sets of testing was to "see what was going on" and to determine if its wood supplier Adorn had provided non-LFE (low formaldehyde

---

[2] S. Pullin Depo., at page 24, line 14 to page 25, line 6, attached as **Exhibit N**.

emitting) wood, not to aid in possible future litigation. *See In re Kaiser Aluminum & Chem.* Co., 214 F.3d 586, 593 (5th Cir.2000).

Further, Gulf Stream waived any work product or privilege by providing these results to Congress.

Finally, if the results are protected and if the protection has not been waived, Plaintiff has a "substantial need" for the test results in the preparation of her case and she cannot obtain the substantial equivalent of the material by other means without "undue hardship." Ordinary work-product generally consists of "primary information, such as verbatim witness testimony or objective data" collected by or for a party or a party's representative. *Kent Corp. v. NLRB*, 530 F.2d 612, 624 (5th Cir.1976). A court may order production of ordinary work-product if the party seeking production can show that it has a "substantial need" for the material in the preparation of its case and that it cannot obtain the substantial equivalent of the material by other means without "undue hardship." FED. R. CIV. P. 26(b)(3). There is no other way to determine what Gulf Stream's test results showed, other than provision of the results themselves.

It is obvious that these test results showed elevated levels of formaldehyde emissions in trailers, and in the products used to make the trailers, and that Gulf Stream knew this in the Spring of 2006—before or at the time Ms. Alexander took residence in her trailer. As set forth in previous briefing, these facts are relevant to Gulf Stream's obligation to warn Plaintiff of dangers in the trailer.

Gulf Stream cannot meet and has not met its burden of showing that these documents are privileged.

B. **Other Improperly Withheld Documents**

The following sets out other documents withheld by Gulf Stream and the reasons why Gulf Stream has failed to meet its burden of demonstrating the protections of privilege:

| Privilege Log No. | Gulf Stream's Description | Plaintiff's Response |
|---|---|---|
| 10 | E-mail transmittal of draft letter to Bryan McCreary based on discussions with counsel M. Madsen regarding formaldehyde | Gulf Stream does not claim that this is a communication between a lawyer and client, but between two Gulf Stream employees (the CEO and his secretary) after one of them talked to a lawyer. By definition of the privilege, this is not a privileged communication. |
| 12 | E-mail forwarding recommendations regarding formaldehyde expert consultants | Again, this is a communication between two Gulf Stream employees (non-lawyers) and, by definition, is not privileged. |
| 13 | E-mail transmittal of attached draft press release and draft letter text regarding formaldehyde | Again, this is a communication between two Gulf Stream employees (non-lawyers) and, by definition, is not privileged. |
| 16 | Handwritten notes from conversation with consultant regarding anticipated litigation | Again, this is a communication between a Gulf Stream employee and "the file" and, by definition, is not privileged or work product. |
| 17 | E-mail transmittal of attached draft press release | Again, this is a communication between two Gulf Stream employees (non-lawyers) and, by definition, is not privileged. |
| 19 | E-mail forwarding information sent to counsel M. Madsen regarding possible responses to news stories and FEMA, for review and comment | Again, this is a communication between two Gulf Stream employees (non-lawyers) and, by definition, is not privileged. Apparently, Gulf Stream contends that this is privileged because the sender is forwarding items that he sent to a lawyer. However, the law is clear that simply because you send documents to a lawyer does not make them privileged. When you re-forward those same documents to someone in your office, they are not privileged either. *In Re Vioxx,* 501 F.Supp.2d at 805. ("When, for example, [a party] simultaneously sends communications to both lawyers and non-lawyers, it usually cannot claim that the primary purpose of the communication was for legal advice or assistance because the communication served both business and legal purposes." (internal citations omitted)). |
| 20 | E-mail from consultant regarding press release and OSHA PEL | This is a transmission between and Gulf Stream employee and a consultant. An attorney is not involved |

| | | at all. Therefore, this cannot be work product. |
|---|---|---|
| 21 | Duplicate of document contained in No. 19 above | See response to 19. |
| 37 | Handwritten notes generated in conversations with counsel M. Madsen regarding a draft letter | Again, these are notes "to the file" from a Gulf Stream employee. Simply because they were written after the employee talked to a lawyer does not make them privileged. |
| 51 | E-mail regarding formaldehyde from consultant | This is a transmission between a Gulf Stream employee and a consultant. An attorney is not involved at all. Therefore, this cannot be protected by the attorney-client privilege or work product doctrine. |

## CONCLUSION AND PRAYER

It is clear that Gulf Stream has improperly withheld documents and has failed to meet its burden of showing that these documents are protected from disclosure.

Plaintiff respectfully requests that the Court grant her Motion, order immediate production of the referenced documents withheld from protection under claim of privilege or work product doctrine, including all documents relating to the testing discussed herein.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:  s/Gerald E. Meunier
 GERALD E. MEUNIER, #9471
 **PLAINTIFFS' CO-LIAISON COUNSEL**
 Gainsburgh, Benjamin, David, Meunier &
 Warshauer, L.L.C.
 2800 Energy Centre, 1100 Poydras Street
 New Orleans, Louisiana 70163
 Telephone:  504/522-2304
 Facsimile:  504/528-9973
 gmeunier@gainsben.com

s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:     504/522-2304
Facsimile:     504/528-9973
jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS'
STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
MIKAL WATTS, Texas # 20981820
ROBERT BECNEL
DENNIS REICH, Texas # 16739600

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

s/Gerald E. Meunier
GERALD E. MEUNIER, #9471
