Transcript of the Testimony of
# Videotaped Deposition of Alana Alexander

## Date taken: June 29, 2009

## In Re: FEMA Trailer Formaldehyde Products Liability Litigation

### **Note**
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a **Username** and
**Password**.

# Professional Shorthand Reporters, Inc.
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:     www.psrdocs.com**

EXHIBIT

tabbies

3

Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4

5

6    IN RE:  FEMA TRAILER          MDL NO. 1873

7    FORMALDEHYDE PRODUCTS         SECTION "N"(4)

8    LIABILITY LITIGATION          JUDGE ENGELHARDT

9

10                    *   *   *

11

12          VIDEOTAPED DEPOSITION OF ALANA

13   ALEXANDER, 1619 MIRABEAU AVENUE, NEW

14   ORLEANS, LOUISIANA 70122, TAKEN AT THE

15   OFFICES OF LAMBERT & NELSON, 701 MAGAZINE

16   STREET, NEW ORLEANS, LOUISIANA 70130, ON THE

17   29TH DAY OF JUNE, 2009.

18

19   REPORTED BY:

20        CATHY RENEE' POWELL, CCR

          PROFESSIONAL SHORTHAND REPORTERS

21        (504)529-5255

22   VIDEOGRAPHER:

23        MICHAEL BERGERON

          PROFESSIONAL SHORTHAND REPORTERS

24        (504)529-5255

25

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Videotaped Deposition of Alana Alexander

Page 2

```
1   APPEARANCES:
2     HILLIARD MUÑOZ GUERRA
       (BY:  ROBERT HILLIARD, ESQUIRE
3        REYNALDO A. PEÑA, ESQUIRE)
       719 S. SHORELINE BLVD # 500,
4      CORPUS CHRISTI, TEXAS 78401
5        ATTORNEYS FOR THE PLAINTIFFS
6     MIDDLEBERG, RIDDLE & GIANNA
       (BY:  LEZLE PETROVICH, ESQUIRE)
7      201 ST. CHARLES AVENUE
       NEW ORLEANS, LOUISIANA 70170
8
         ATTORNEYS FOR FLUOR ENTERPRISES,
9        INC.
10    DUPLASS, ZWAIN, BOURGEOIS,
       PFISTER & WEINSTOCK
11     (BY: JOSEPH G. GLASS, ESQUIRE)
       3838 NORTH CAUSEWAY BOULEVARD
12     SUITE 2900
       METAIRIE, LOUISIANA 70002
13
         ATTORNEYS FOR DEFENDANT,
14       GULF STREAM COACH, INC.
15    U.S. DEPARTMENT OF JUSTICE
       (BY: ADAM M. DINNELL, ESQUIRE)
16     CIVIL DIVISION
       1331 PENNSYLVANIA AVENUE, N.W.
17     ROOM 8210-N
       WASHINGTON, D.C. 20004
18
         ATTORNEYS FOR DEFENDANT, UNITED
19       STATES OF AMERICA
20
21
22
23
24
25
```

Page 4

```
1   APPEARANCES CONTINUED:
2
       GIEGER, LABORDE & LAPEROUSE, LLC
3        (BY: CARSON STRICKLAND, ESQUIRE)
       701 POYDRAS STREET
4      SUITE 4800
       NEW ORLEANS, LOUISIANA 70139
5        (VIA TELEPHONE)
6        ATTORNEYS FOR DEFENDANT, FOREST
         RIVER, INC.
7
8
9      GARRISON, YOUNT, FORTE &
         MULCAHY, L.L.C.
10       (BY: RANDALL C. MULCAHY, ESQUIRE)
       909 POYDRAS STREET
11     SUITE 1800
       NEW ORLEANS, LOUISIANA 70112
12       (VIA TELEPHONE)
13       ATTORNEYS FOR DEFENDANTS,
         RECREATION BY DESIGN, LLC, TL
14       INDUSTRIES, INC., FRONTIER
         RV, INC. AND PLAY'MOR TRAILERS,
15       INC.
16
17
         JONES, WALKER, WAECHTER, POITEVENT,
18       CARRERE & DENEGRE, LLP
         (BY: RYAN E. JOHNSON, ESQUIRE)
19     FOUR UNITED PLAZA
       8555 UNITED PLAZA BOULEVARD
20     BATON ROUGE, LOUISIANA 70809
         (VIA TELEPHONE)
21
         ATTORNEYS FOR DEFENDANTS,
22       KEYSTONE RV COMPANY, THOR
         CALIFORNIA, THOR INDUSTRIES,
23       DUTCHMEN MANUFACTURING, DS CORP
         (d/b/a CROSSROADS RV) AND KZ RV, LP
24
25
```

Page 3

```
1   APPEARANCES CONTINUED:
2     NELSON MULLINS
       (BY: AMANDA N. SHELTON, ESQUIRE)
3      201 17TH STREET NW, SUITE 1700
       ATLANTA, GEORGIA 30363
4        (VIA TELEPHONE)
5        ATTORNEYS FOR DEFENDANT,
         FLEETWOOD ENTERPRISES, INC.
6
     ALLEN & GOOCH
7      (BY: LORI A. DAIGLE, ESQUIRE)
       3900 N. CAUSEWAY BOULEVARD
8      SUITE 1450
       METAIRIE, LOUISIANA 70002
9
         ATTORNEYS FOR DEFENDANT,
10       HEARTLAND RECREATIONAL VEHICLES,
         LLC
11
12    BAKER DONELSON
       (BY: WADE BASS, ESQUIRE)
13     3 SANCTUARY BOULEVARD, SUITE 201
       MANDEVILLE, LOUISIANA 70471
14       (VIA TELEPHONE)
15       ATTORNEYS FOR DEFENDANTS,
         CH2M HILL CONSTRUCTORS, INC. AND
16       SHAW ENVIRONMENTAL, INC.
17    WILLINGHAM, FULTZ & COUGILL
       (BY: THOMAS L. COUGILL, ESQUIRE)
18     NIELS ESPERSON BUILDING
       808 TRAVIS, SUITE 1608
19     HOUSTON, TEXAS 77002
         (VIA TELEPHONE)
20
         ATTORNEYS FOR DEFENDANTS,
21       JAYCO, INC. AND STARCRAFT
         RV, INC.
22
23
24
25
```

Page 5

```
1
2              * * *
3         EXAMINATION INDEX
4   EXAMINATION BY MR. GLASS: ..............12
5   EXAMINATION BY MR. DINNELL: ...........277
6   EXAMINATION BY MS. PETROVICH: .........340
7   EXAMINATION BY MR. GLASS: .............375
8              * * *
9         INDEX OF EXHIBITS
10  Exhibit No. 1 .......................107
11    Plaintiff Fact sheet for Alana
12    Alexander.
13  Exhibit No. 2 .......................107
14    Plaintiff Fact Sheet for Chris J.
15    Cooper.
16  Exhibit Nos. 3-10 ...................207
17    Discovery responses incorporating
18    interrogatories and requests for
19    admissions.
20  Exhibit No. 11 ......................242
21    Notice of Videotaped Deposition of
22    Alana Alexander.
23  Exhibit No. 12 ......................242
24    "Charlie Age vs. Gulf Stream Coach,
25    Inc., Complaint for Damages,
```

2 (Pages 2 to 5)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation

Videotaped Deposition of Alana Alexander

Page 6

1   February 27, 2009.
2   Exhibit No. 13 .......................244
3     Document 1143 in MDL litigation,
4     First Supplemental and Amended
5     Complaint, March 3, 2009.
6   Exhibit No. 14 .......................245
7     Document 1313, Second Supplemental
8     and Amended Complaint, re: "Age,"
9     April 9, 2009.
10  Exhibit No. 15 .......................245
11    Document 1686, Third Supplemental
12    and Amended Complaint, Charlie Age,
13    June 15, 2009.
14  Exhibit No. 16 .......................278
15    Photograph of room Erika and
16    Christopher share.
17  Exhibit No. 17 .......................280
18    Photograph of the "blue room."
19  Exhibit No. 18 .......................281
20    Photograph of the backyard of the
21    Mirabeau address.
22  Exhibit No. 19 .......................282
23    Photograph depicting backyard at
24    the Mirabeau house.
25  Exhibit No. 20 .......................282

Page 8

1   Exhibit No. 28 .......................323
2     Document entitled "Claim for
3     Damage, Injury or Death."
4   Exhibit No. 29 .......................324
5     Document entitled "Claim for
6     Damage, Injury or Death."
7   Exhibit No. 30 .......................331
8     Photograph of Alexander unit being
9     tested in January of 2008.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1     Photograph depicting deck being
2     torn down at Mirabeau address.
3   Exhibit No. 21 .......................285
4     Request for Rental Assistance from
5     FEMA document dated February 20,
6     2008.
7   Exhibit No. 22 .......................292
8     Flier.
9   Exhibit No. 23 .......................301
10    Document entitled "Emergency
11    Shelter Agreement Rules of
12    Occupancy."
13  Exhibit No. 24 .......................306
14    Document entitled "Attention:  FEMA
15    Individuals and Households
16    Program," dated November 2, 2005.
17  Exhibit No. 25 .......................307
18    Document entitled "Attention:
19    FEMA," dated March 29, 2006.
20  Exhibit No. 26 .......................318
21    Resumé for Alana Alexander.
22  Exhibit No. 27 .......................321
23    Document entitled "FEMA, Important
24    Formaldehyde Information for FEMA
25    Housing Occupants."

Page 9

1                S T I P U L A T I O N
2
3        It is stipulated and agreed by and
4    between counsel for the parties hereto that
5    the deposition of the aforementioned witness
6    is hereby being taken for all purposes
7    allowed under the Federal Rules of Civil
8    Procedure, in accordance with law, pursuant
9    to notice;
10       That the formalities of reading and
11   signing are specifically not waived;
12       That the formalities of filing,
13   sealing, and certification are specifically
14   waived;
15       That all objections, save those as to
16   the form of the question and the
17   responsiveness of the answer, are hereby
18   reserved until such time as this deposition,
19   or any part thereof, may be used or sought
20   to be used in evidence.
21              * * *
22       CATHY RENEE' POWELL, CCR, Certified
23   Court Reporter, in and for the State of
24   Louisiana, officiated in administering the
25   oath to the witness.

Page 10

Page 12

1    Reynaldo Peña for Ms. Alexander
2    and Mr. Cooper.
3              ALANA ALEXANDER
4    having been first duly sworn as a witness,
5    was examined and testified as follows:
6    EXAMINATION BY MR. GLASS:
7         Q.   Good morning, ma'am.
8         A.   Good morning.
9         Q.   You heard me introduce myself a
10   minute ago.  My name is Joe Glass and I
11   represent Gulf Stream Coach.  I'm here to
12   ask you some questions today about the claim
13   that's been brought on your behalf and on
14   behalf of your son.
15             Have you ever given a deposition
16   before?
17        A.   No.
18        Q.   I'm sure your attorney has gone
19   through the process, but I'm just going to
20   ask you some questions and you're going to
21   provide those answers to me.
22             You are under oath.  Do you
23   understand that?
24        A.   Yes.
25        Q.   If you don't understand a question

Page 11

1         THE VIDEOGRAPHER:
2              Today is the 29th day of June,
3    2009.  The time is approximately 8:21.
4              This is the videotaped deposition
5    of Ms. Alana Alexander, taken at the offices
6    of Lambert & Nelson, for the case entitled
7    "FEMA Trailer Formaldehyde Products
8    Liability Litigation."
9              Will counsel please identify
10   themselves and which parties they represent.
11        MR. HILLIARD:
12             I'm Bob Hilliard.  I'm the
13   attorney for Alana Alexander, Christopher
14   Cooper and Erika, who will be deposed
15   tomorrow.
16        MR. GLASS:
17             Joe Glass representing Gulf Stream
18   Coach, Inc.
19        MR. DINNELL:
20             Adam Dinnell for the defendant,
21   United States.
22        MS. PETROVICH:
23             Lezle Petrovich for Fluor
24   Enterprises, Inc.
25        MR. PENA:

Page 13

1    that I ask, please ask me to rephrase it.
2    I'm going to assume that if you respond, you
3    understood my question.
4              If you need a break at any point,
5    just let me know and we'll go ahead and try
6    and accommodate that.  This is not an
7    endurance contest or anything like that, and
8    we'll try and accommodate you as best we
9    can.
10             When I ask you a question, if you
11   will please allow me to finish asking that
12   question, please, before you answer, I would
13   greatly appreciate that.  You may think you
14   know where I'm going with the question, but
15   I prefer you let me finish it, and that way
16   it will be much more clear on the record and
17   you will know exactly what I am asking.
18             I will try and afford you the same
19   courtesy and allow you to completely finish
20   your response before I go on to my next
21   question.
22             Is there any reason today why you
23   feel like your ability to testify would be
24   impaired?
25        A.   No.

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Videotaped Deposition of Alana Alexander

Page 138

1    Q.   Did you receive the benefit of any
2  of the money that was provided to Debra?
3    A.   No, she had her own two children
4  to take care of.
5    Q.   So she kept the $2,000 and the
6  $1,500 from Red Cross?
7    A.   Uh-huh.
8    Q.   That's a "yes"?
9    A.   Yes.
10    Q.   Were you receiving assistance or
11  funds while living in Houston from any other
12  source?
13    A.   Only the money I had in my account
14  and my sister, Maria, was still living in
15  New York at the time, and her church did a
16  collection, and we received -- I think it
17  was $2,000, I want to say, from her church.
18    Q.   You received that while you were
19  in Houston?
20    A.   Yeah, we got that just before we
21  left, yes.
22    Q.   Where did you maintain your
23  savings account?
24    A.   It was at AmSouth before; it's
25  Regions now.

Page 139

1    Q.   Did you have a credit card with
2  them?
3    A.   No.
4    Q.   Do you have any credit cards?
5    A.   Uh-huh.  Yes.
6    Q.   At the time that you were living
7  in Houston, did you have credit cards?
8    A.   Yes.
9    Q.   Which credit cards did you have?
10    A.   I had a Sears.
11    Q.   Any others?
12    A.   No, that was it at the time.  That
13  was it.
14    Q.   What was your reason for leaving
15  Ms. Williams's house after ten days?
16    A.   Because my momma wanted to go
17  where my daddy was and my daddy had
18  eventually made it to Jacksonville, by my
19  brother's.
20    Q.   You mentioned the people who moved
21  into the Williams's household in Houston,
22  how many people lived there full time
23  besides Ms. Williams?
24    A.   Before the storm?
25    Q.   Yes.

Page 140

1    A.   Only Lauren.
2    Q.   So she had the house to herself?
3    A.   Yes.
4    Q.   How big was the house?
5    A.   It's four bedrooms, living
6  room/kitchen combo and dining room.
7    Q.   It was not an apartment, it's a
8  house.
9    A.   No, it's a house.
10    Q.   What types of floors did she have
11  in that house?
12    A.   She had carpet.
13    Q.   Was it a new house?
14    A.   Yes.  No, no, it wasn't.  No.
15    Q.   Did Christopher have any problems
16  while he was in that house?
17    A.   No.
18    Q.   Did he have to use his inhaler at
19  all?
20    A.   No.
21    Q.   Did you have any health problems
22  while you were in the house?
23    A.   No.
24    Q.   How did you get from Houston to
25  Jacksonville?

Page 141

1    A.   My sister's church, Maria's
2  church, rented us a van and I drove from
3  Houston to Jacksonville.
4    Q.   Do you remember the name of
5  Maria's church?
6    A.   Church of Christ or something.
7    Q.   So sometime in September, you were
8  then in Jacksonville, Florida?
9    A.   Yes.
10    Q.   Where did you live when you first
11  got to Jacksonville, Florida?
12    A.   When I first got to Jacksonville,
13  Florida, I lived in an apartment -- I'm
14  trying to think of the name of it, but it
15  was an apartment complex in Jacksonville,
16  Florida.
17    Q.   How did you obtain those quarters?
18    A.   Before we got there, my brother
19  looked around to see who was having a
20  program to assist Hurricane Katrina victims
21  and he found that apartment complex.
22          So I was able to stay there.
23    Q.   Was that at 3333 Monument Road?
24    A.   Yeah.
25    Q.   Apartment 115 in Jacksonville,

36 (Pages 138 to 141)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation | Videotaped Deposition of Alana Alexander

Page 142

1  Florida?
2      A.  Yes.
3      Q.  Was that a government housing
4  project?
5      A.  No, it was a regular apartment
6  complex.
7      Q.  Okay.  How long did you stay in
8  that apartment?
9      A.  I think -- I want to say four
10  months.
11      Q.  So you were in that apartment from
12  approximately September '05 until
13  January '06?
14      A.  No.  Go back.  It was less than
15  four months then.  So it must have been
16  about three months.
17      Q.  So about December?
18      A.  I think it was around in December.
19      Q.  Did you spend Christmas in that
20  apartment?
21      A.  I'm thinking.  To be honest, I
22  really don't remember if we were there for
23  Christmas.
24      Q.  Who lived in that apartment?
25      A.  Me, Erika and Christopher.

Page 143

1      Q.  Just the three of you?
2      A.  Yes.
3      Q.  Did you have any health problems
4  while you were in that apartment?
5      A.  No.
6      Q.  Did Christopher have any health
7  problems while in that apartment?
8      A.  No.
9      Q.  Did he have to use his inhaler at
10  all?
11      A.  I think maybe one time.
12      Q.  Did you have a nebulizer at that
13  point?
14      A.  No.
15      Q.  Did you have a doctor that you
16  visited at that point for Christopher?
17      A.  No.
18      Q.  Were there any physical problems
19  with the apartment that you were provided?
20      A.  No.
21      Q.  Were there any problems with mold
22  or dust or anything like that?
23      A.  No.
24      Q.  It was a clean apartment?
25      A.  Yes, very.

Page 144

1      Q.  Was it a new apartment?
2      A.  I'm not sure.
3      Q.  What kind of flooring did the
4  apartment have?
5      A.  Carpeting.
6      Q.  Was it a big apartment?
7      A.  Yes.
8      Q.  Okay.  How big was it?
9      A.  Two bedrooms and a living, you
10  know, area and the kitchen.
11      Q.  How many baths?
12      A.  Two.
13      Q.  Did you have to pay rent at that
14  apartment?
15      A.  No.
16      Q.  That was taken care of through the
17  program?
18      A.  Well, the first month was taken
19  care of.  They just gave us the first month
20  free, and with the contingency that the FEMA
21  stuff would kick in.
22          But that didn't kick in, so I --
23  there was a program that one of the churches
24  had in the general area that they were
25  providing, you know, rental assistance for

Page 145

1  people who didn't get the amount through
2  Hurricane Katrina, so they paid that
3  following month.
4          Like I said, I stayed there as
5  long as I could, but since the FEMA money
6  never came in, I had to move.
7      Q.  So as of the time that you were
8  living in the apartment in Jacksonville,
9  were you still seeking assistance from FEMA?
10      A.  I was trying, yes.
11      Q.  You made contact with the program
12  and tried to get the information?
13      A.  Yes.  I --
14      Q.  I'm sorry, the assistance?
15      A.  Yes.
16      Q.  Did they give you a reason as to
17  why you weren't getting assistance?
18      A.  It was basically the same thing.
19  Too many people had applied from that
20  address.  At one point, they had put my
21  brother down as living there, and he did not
22  even live there.  Even when I sent letter
23  after letter explaining the situation and
24  everything, they never approved me for any
25  money.

37 (Pages 142 to 145)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation

Videotaped Deposition of Alana Alexander

Page 146

1    Q.   Which brother?
2    A.   Ronald.
3    Q.   Did Ronald receive assistance?
4    A.   He did, but he sent it back
5  because he knew he did not live at that
6  address.
7    Q.   When you filled out a form
8  requesting assistance, did you have to
9  represent that you lived in that residence?
10   A.   Yes, I did.
11   Q.   And Ronald represented that he
12 lived in that residence?
13   A.   No, he didn't.  Prior to the
14 storm, Ronald was getting mail there, but he
15 didn't live there.  And, so --
16   Q.   Who else received assistance from
17 that address?
18   A.   Just Debra.
19   Q.   Okay.  Did you try and obtain
20 assistance from any other source besides
21 FEMA?
22   A.   The only other source I ever
23 received from was the Red Cross.
24   Q.   While you were in the apartment at
25 3333 Monument Road, did you receive Red

Page 147

1  Cross assistance?
2    A.   Yes.
3    Q.   How much did you receive from Red
4  Cross?
5    A.   I think Red Cross gave us
6  initially -- I think we got like, I want to
7  say 25 when we got to Florida.
8    Q.   $2,500 when you got to Florida?
9    A.   Yes.
10   Q.   Did you ever receive additional
11 assistance from Red Cross?
12   A.   No.
13   Q.   How many months did the church pay
14 for the rent at the apartment?
15   A.   One.
16   Q.   So for the last month, basically,
17 there was nobody to pay the rent, so you had
18 to move out?
19   A.   Yes.
20   Q.   Were you told that you were going
21 to be evicted?
22   A.   Yes.
23   Q.   Do you remember who the owner was
24 of the property?
25   A.   No, I don't.

Page 148

1    Q.   When you were told that you needed
2  to move out, what did you do at that point?
3    A.   I went and lived by my other
4  brother's house, Dwayne.
5    Q.   Was that at 1437 East 12th Street
6  in Jacksonville?
7    A.   Yes.
8    Q.   And this would have been sometime
9  around December or January 2005/2006?
10   A.   Yes.
11   Q.   How long did you stay at that
12 address?
13   A.   Until I moved in May.
14   Q.   May of '06?
15   A.   Yes.
16   Q.   Who was in your brother Dwayne's
17 house besides Dwayne?
18   A.   Dwayne and -- just Dwayne.  His
19 children would come on the weekends.
20   Q.   How many kids did he have?
21   A.   Two.
22   Q.   You, Erika and Christopher moved
23 into the home?
24   A.   Yes.
25   Q.   Did anybody else move into the

Page 149

1  home with you guys?
2    A.   Shortly thereafter, Debra moved
3  into the home too.
4    Q.   With her two kids?
5    A.   No, by that time, her son, Jared,
6  had gotten a scholarship to Iowa State and
7  he went off to college.  Matthew went back
8  to New Orleans and lived in the dorms at
9  UNO.
10   Q.   What was the reason for moving
11 from Dwayne's house in May of '06?
12   A.   Because I was ready to come back
13 home.
14   Q.   Did you have a place to stay?
15   A.   The FEMA trailer was there by the
16 time we got back.
17   Q.   What kind of house did Dwayne
18 have?
19   A.   Two-story house.  It had four
20 bedrooms -- five bedrooms.
21   Q.   What was it made out of?
22   A.   It was a wooden house.
23   Q.   Were there wood floors?
24   A.   Yes.
25   Q.   Did you ever have any health

38 (Pages 146 to 149)

Page 162

1    smelled or how it looked other than just
2    describing what was in it?
3        A.   No, she didn't.
4        Q.   Do you know if the trailer came
5    with any documentation?
6        A.   I would say yes.
7        Q.   Do you know if any of that
8    documentation was removed before you
9    actually got back to New Orleans?
10       A.   I really don't know.
11       Q.   Did your mom or dad say to you
12   that they had taken anything out of the
13   trailer?
14       A.   No, they didn't take nothing out
15   of the trailer.
16       Q.   When you first got back to New
17   Orleans, the trailer was already set up?
18       A.   Yes.
19       Q.   Okay.  Did it have all of the
20   utilities already attached or hooked up?
21       A.   Yes.
22       Q.   So you had running water?
23       A.   Yes.
24       Q.   You had use of the bathroom
25   facilities?

Page 164

1        A.   Yes.
2        Q.   Who came out to see you?
3        A.   I'm not sure.  I don't remember
4    what the lady's name was.
5        Q.   Who was she with?
6        A.   I think she was with Gulf Stream.
7    She said she was with the trailer people.
8        Q.   Okay.  What did she tell you?
9        A.   She explained how to hook up the
10   propane tanks and everything.  She told us
11   how to use the stove, how to use the
12   microwave and everything, and she showed us
13   around.  She said the smell that we were
14   smelling was because the trailer was new and
15   had been closed up and to just air the
16   trailer out.
17       Like I say, when we first got
18   there, nobody was there.  So I pointed out
19   to her that the panel in the main bedroom
20   had buckled.  She told me that was because
21   it was held by tape, and because of the
22   humidity in New Orleans, that the tape had
23   come loose and to put duct tape on it.
24       Q.   Did you raise any issues with her
25   about the condition of the trailer?

Page 163

1        A.   Yes.
2        Q.   Okay.  The stove was hooked up?
3        A.   Yes.
4        Q.   Okay.  Did the trailer have an air
5    conditioner?
6        A.   Yes.
7        Q.   What about a heater, did it have a
8    heater?
9        A.   Yes.
10       Q.   When you first got to the trailer,
11   had the trailer been aired out at all?
12       A.   No.
13       Q.   It was still locked up?
14       A.   Yes.
15       Q.   Who gave you the keys to the
16   trailer?
17       A.   My mom.
18       Q.   Did your mom tell you that she had
19   been provided any kind of orientation by
20   anyone regarding the trailer?
21       A.   No.
22       Q.   Were you provided any instructions
23   concerning the trailer?
24       A.   After we got in the trailer.
25       Q.   Somebody came out to see you?

Page 165

1        A.   Other than the buckling part, no.
2        Q.   Did you notice any issues with the
3    way the doors or the windows worked in the
4    trailer?
5        A.   No.  After she showed us how, you
6    know, to lift it up and push it out, it was
7    simple enough.
8        Q.   Did it seem like the doors and
9    windows fit appropriately?
10       A.   I would say yes.
11       Q.   Did you see any cracks or warps or
12   buckles, anything like that?
13       A.   I would say, no, I didn't.
14       Q.   Okay.  What did she tell you about
15   the use of the stove?
16       A.   She just said that it was hooked
17   to the propane and everything and how to --
18   because it had the automatic ignition.  So
19   you would have to turn it and it would make
20   the click and then the flame would start.
21       Q.   Were you told anything about other
22   things you had to do if you were going to
23   use the stove?
24       A.   No, that's all I was told.
25       Q.   Were you provided any

42 (Pages 162 to 165)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Videotaped Deposition of Alana Alexander



Page 166

1  documentation when this lady gave you this
2  orientation?
3      A.  Yes, she gave us the book.
4      Q.  Okay.  What book are you referring
5  to?
6      A.  It was like an owner's manual book
7  and it had --
8      Q.  One owner's manual for the
9  trailer?
10     A.  Yes, it was the owner's manual for
11 the trailer, and how to use the stove and
12 the refrigerator.
13     Q.  Did you read the owner's manual?
14     A.  Yes.
15     Q.  When did you read the owner's
16 manual?
17     A.  I would say -- I can't say as soon
18 as she gave it to me, but I would say within
19 the next few days after she gave it to me.
20     Q.  Do you remember any information
21 specifically that was provided in that
22 owner's manual that stood out in your mind?
23     A.  Not really, nothing in particular.
24     Q.  What did she tell you about airing
25 the trailer out?

Page 167

1      A.  She said just open the windows and
2  the door, because there was a screen door on
3  it.  You open the windows and the door and
4  you could turn the air conditioner on and
5  let it blow out.  Especially if we was gone
6  for the day and was coming back in, to let
7  that happen for a few minutes.
8      Q.  So she said if you were out and
9  the trailer had been closed up, to make sure
10 that you opened the door and windows and
11 turned on the AC for a little while?
12     A.  Yes.
13     Q.  What smell were you talking about
14 when you said that you spoke to her about
15 the smell?
16     A.  I would say that chemical smell
17 because when you walked in, I initially got
18 a tingle in the back of the throat and a
19 little burning sensation in the nose and did
20 some sneezing.  And that was the initial --
21 and itchy eyes a bit.
22     Q.  That was the first day you moved
23 in?
24     A.  Yes.
25     Q.  Did Chris or Erika express any

Page 168

1  similar problems?
2      A.  Yes.
3      Q.  Anything else that Chris felt like
4  he had a problem with that he told you
5  about?
6      A.  Not initially.
7      Q.  Once the lady left, did you follow
8  the instructions to open the windows and
9  door and to use the AC?
10     A.  Yes.
11     Q.  Okay.  And what happened at that
12 point, did it clear out the smell?
13     A.  Yeah, it started to like dissipate
14 after about an hour of airing it out.
15     Q.  Did you continue to have sneezing
16 and itchy eyes after it had been aired out?
17     A.  No, not after it aired out.
18     Q.  Did anyone live in the trailer
19 with you besides your kids?
20     A.  No.
21     Q.  At any time that you were in the
22 trailer, did anybody stay for more than a
23 day?
24     A.  No.
25     Q.  Did you have visitors at the

Page 169

1  trailer?
2      A.  Did I have what?
3      Q.  Visitors at the trailer?
4      A.  Yes.
5      Q.  Who came to visit you at the
6  trailer?
7      A.  Donna and her children, my mom, my
8  dad, my brother, Ronald.  Debra didn't come
9  in too often.  Matthew and Jared -- when
10 Jared was in town and Matthew would visit.
11     Q.  When people would come to visit,
12 did they ever express any concern or
13 complaints about the way the trailer
14 smelled?
15     A.  In the beginning, yes.  When they
16 would come in, they would all have that
17 same -- the little itching and the burning
18 in your eyes.
19     Q.  Which of the visitors would have
20 problems with the burning and the itching of
21 the eyes?
22     A.  Well, Donna's son, Calvin, because
23 he's also asthmatic.  Her daughter, Lynn.
24         And like I said, Debra didn't come
25 in the trailer at all.

43 (Pages 166 to 169)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation | Videotaped Deposition of Alana Alexander

Page 174

1  work?
2      A.  Around 4:30, 5:00, somewhere
3  around that.
4      Q.  Where did you work at the time you
5  were living in the trailer?
6      A.  When I first got back, I started
7  working at the New Orleans Parish School
8  Board.  And it's got an extended school year
9  program.  It's a summer camp for special ed
10  children.
11      Q.  What did you do with your kids
12  while you were working?
13      A.  Most of the days they stayed in
14  the trailer or, like I said, my momma was
15  next door and, like I say, Donna and her
16  children were right down the street.
17      Q.  Did the kids stay in the trailer
18  by themselves?
19      A.  Uh-huh.
20      Q.  That's a "yes"?
21      A.  Yes.
22      Q.  When you left and the kids were
23  still there during the summer, did you turn
24  off the air conditioner?
25      A.  No.

Page 175

1      Q.  The air conditioner was left on?
2      A.  Yes.
3      Q.  And it was set at approximately
4  75?
5      A.  Yes.
6      Q.  But when you would get home, in
7  that circumstance, you would still air out
8  the trailer?
9      A.  Well, no, not if they were there
10  all day with the air conditioner on, no.
11      Q.  So the days when school, for
12  instance, started back up, and all of the
13  kids were out of the trailer and you were
14  out of the trailer, when you would get back,
15  were you usually the first one home?
16      A.  We all came home together because,
17  by that time, Christopher was at the school,
18  at McDonough 15 with me.  Erika was at
19  St. Mary's, but my momma picked her up.
20      Q.  Would you usually get back before
21  Erika got back?
22      A.  Yes, but Erika would go and stay
23  by my momma until I got home.
24      Q.  So then the first thing you'd do
25  on those days would be open up the

Page 176

1  trailer --
2      A.  And air it out.
3      Q.  Air it out.
4          Did you open up the windows?
5      A.  Yeah, open up the windows, the
6  door, turn the air conditioner on.
7      Q.  So you opened up the windows all
8  the way?
9      A.  Yes.  There was only one position.
10      Q.  How many windows?
11      A.  Four.
12      Q.  And you opened up the door as
13  well?
14      A.  Yes.
15      Q.  How long would you leave the
16  windows and door open?
17      A.  Usually when I cooked.  Because
18  when I came home from work, I immediately
19  started cooking.  And usually, I didn't
20  close it up until after I finished cooking.
21      Q.  How long would it take you to
22  cook, typically?
23      A.  About an hour.
24      Q.  Did you cook the same types of
25  things in the trailer that you cooked when

Page 177

1  you were living in the house on Dale Street?
2      A.  Yes.  But I cut back a lot on the
3  frying because I really didn't -- the little
4  stove was so small, I didn't like cooking a
5  lot of stuff on it actually.
6      Q.  On Fridays, did you still have
7  fish?
8      A.  Not all the time.  My momma was
9  right next door, so we would go cook over
10  there.
11      Q.  Was your mom's house livable after
12  the hurricane when you were in the trailer?
13      A.  Yeah, they were living in the
14  barber shop that was right next door.
15      Q.  Had the barber shop been repaired?
16      A.  Yes.  My daddy had come back
17  before everybody else and fixed up the
18  barber shop.
19      Q.  Turned it into more of a house
20  rather than a barber shop?
21      A.  Well, it was still a house, but
22  the barber shop was like in the front area
23  and the house part was in the back area.
24      Q.  How much time did you spend over
25  at the barber shop typically when you were

Page 178

1  in the trailer?
2      A.  Well, after I would come back from
3  work, I would go see my momma and talk to
4  her for about an hour.  So after I finished
5  cooking or whatever.  So I would say maybe
6  about an hour, two hours.
7      Q.  Every day?
8      A.  Pretty much, yes.
9      Q.  Did the kids spend time over at
10  the barber shop?
11      A.  Yes.
12      Q.  You said Erika did.
13      A.  Yes, and if they weren't at the
14  barber shop or in the trailer, they were
15  down the street.
16      Q.  Who were they with down the
17  street?
18      A.  Donna and her children.
19      Q.  About how many days a week would
20  you cook in the trailer versus at the barber
21  shop?
22      A.  I would say five in the trailer.
23      Q.  Did you use any other vents in the
24  trailer while you were doing activities?
25  Did you have a bathroom vent in the trailer?

Page 179

1      A.  They had a bathroom vent, yes.
2      Q.  Did you leave that open all the
3  time?
4      A.  Yes.  The only time we really
5  closed it is when it rained.
6      Q.  Was there a vent with the stove?
7      A.  Yes, there was a vent.
8      Q.  Did you use the vent when you
9  cooked?
10      A.  Yes.
11      Q.  Every time you cooked?
12      A.  I wouldn't say every time.
13      Q.  Was it more typical for you to use
14  the vent when you were cooking than not
15  using it?
16      A.  It was more typical to use it.
17      Q.  When you were cooking and using
18  the vents, did the vents run the whole time
19  that you were cooking?
20      A.  Yes.
21      Q.  When you were in the trailer, did
22  you have any open flames like candles,
23  anything like that?
24      A.  No.
25      Q.  Did you use a space heater in the

Page 180

1  trailer?
2      A.  Yes.
3      Q.  Do you remember what kind of
4  heater?
5      A.  No, I don't remember.
6      Q.  Where was that heater placed?
7      A.  In -- like I guess you would say
8  in the kitchen area.  It was the middle of
9  the trailer between two rooms.
10      Q.  Which way did the heater face when
11  you --
12      A.  I faced it toward where Erika and
13  Christopher was.  Near the back of the
14  trailer.
15      Q.  What were the sleeping
16  arrangements in the trailer?
17      A.  Well, I had the big bedroom, and
18  in the trailer, it was like a cubbyhole and
19  it had like a bunk bed area and Christopher
20  was at the top and Erika was at the bottom.
21      Q.  Did the kids say anything about
22  the arrangements that were provided for them
23  for sleeping?
24      A.  Well, in the beginning, they were
25  just excited to get back home.  Like I said,

Page 181

1  they felt it was fun to be in the trailer.
2  I guess after a while, it started wearing on
3  their nerves that they were always so close
4  together.  Especially Erika, being a girl,
5  she wanted her privacy and everything.  And
6  there was just no privacy at all, especially
7  back there for them.
8      Q.  Did Christopher express any
9  thoughts about the sleeping arrangements,
10  whether he liked them or disliked them?
11      A.  Well, they didn't care for it.  It
12  was just so small.  Whenever they would roll
13  over, they would bump into the walls in the
14  trailer, you know, so it was pretty cramped
15  back there.  I wouldn't even get in there.
16      Q.  Did it scare Chris at all?
17      A.  No, I would say I don't think it
18  did.
19      Q.  You said the smell started
20  dissipating once you aired it out.  Did you
21  continue to have burning eyes over the first
22  couple of weeks?
23      A.  I would say the first two weeks we
24  kept with the burning eye sensation, and as
25  time went on, each of the little symptoms,

In Re: FEMA Trailer Formaldehyde Products Liability Litigation        Videotaped Deposition of Alana Alexander

Page 190

1    leak initially happened, when I called them,
2    they were out the next day.
3        Q.   How many times did you have to
4    call them regarding the leak?
5        A.   I called them -- you talking about
6    the first time?
7        Q.   No, in --
8        A.   All?  Probably twice.
9        Q.   Why didn't you call if it was
10   still leaking?
11       A.   Because initially when they put
12   the caulking up there, it did stop the leak.
13   Because when he put it up, he told my momma,
14   it will probably leak again.
15            And I would say by the time it
16   started leaking again, I called and I don't
17   remember if they came out the second time.
18   Because that was around close to the time
19   when we were actually about to move out.
20       Q.   When did you move out?
21       A.   We moved out in December of 2007.
22       Q.   Why did you move out?
23       A.   Because I had started hearing
24   about the effects that -- I found out that
25   the odor we were initially smelling was

Page 191

1    formaldehyde and how it affected people with
2    respiratory and asthma problems.  And like,
3    it was time for us to go.
4        Q.   Did you tell anybody that's why
5    you were moving out?
6        A.   Yeah, I told my family that's why
7    we were moving out.
8        Q.   Did you tell anybody else who
9    wasn't a family member?
10       A.   Donna, uh-huh.
11       Q.   Did you tell anyone a different
12   reason for moving out?
13       A.   No.
14       Q.   And the reason that you said you
15   moved out -- did you start thinking about
16   the reason to move out in December?
17       A.   Yes, in December, but -- yeah.  In
18   December.  Yeah.
19       Q.   So sometime in December is when
20   you first heard about potentially a problem
21   with the FEMA trailers regarding
22   formaldehyde?
23       A.   Yes.  Around December.  Late
24   November, early December.
25       Q.   Did you ever tell anybody that you

Page 192

1    were moving out because you had a new home
2    to go to?
3        A.   No, I never told anybody I had a
4    new home to go to.
5        Q.   Did you ever tell anybody that?
6        A.   That I had a new home?  I didn't
7    have a new home to move to.
8        Q.   Did you inform anybody that you
9    were moving out because the trailer park was
10   closing?
11       A.   I never lived in a trailer park.
12       Q.   I understand, but did you ever
13   tell anybody that you were moving out of the
14   trailer, the reason for leaving is because
15   the trailer park was closing?
16       A.   I don't understand.  If I never
17   lived in a trailer park --
18       Q.   I assume the answer would be no,
19   you never told anybody.
20            Did you ever tell anybody that you
21   were moving out because they were placing a
22   modular home on your Dale Street property?
23       A.   I was trying to.
24       Q.   Did you tell anybody that's why
25   you were moving out of the trailer?

Page 193

1        A.   That was one of the reasons, but
2    after I found out that modulars also have
3    formaldehyde, I totality went a different
4    way.  And it was, like, I'm still getting
5    out of this trailer.
6        Q.   Did you ever tell anybody besides
7    your family and Donna that the reason you
8    were moving out of your trailer was
9    formaldehyde?
10       A.   Anybody else?  I probably did.
11       Q.   Did you tell anybody with the
12   government that you were moving out because
13   of potential formaldehyde exposure?
14       A.   Did I tell anybody with the
15   government?  Yeah, the people at the
16   trailer, because when I initially called to
17   start getting stuff disconnected, they asked
18   me why and I said because I had heard of the
19   potential of possible problems.
20       Q.   Did you ever speak with anybody
21   from the government regarding potential
22   formaldehyde exposure besides what you just
23   described for me in a telephone call?
24       A.   I would say not to my knowledge.
25   I don't think I did.

49 (Pages 190 to 193)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation

Videotaped Deposition of Alana Alexander

Page 194

```
1      Q.   When you first got into the
2   trailer, you told me about the owner's
3   manual that you received and that you read
4   it.
5         Do you specifically recall any
6   representations that you relied upon in
7   staying in the trailer?
8      A.   Wait.  Say that again.
9      Q.   Sure.  You told me that you read
10   the owner's manual.
11      A.   Right.
12      Q.   When you read the owner's manual,
13   was there anything that you read that you
14   relied on in staying in the trailer?
15      A.   That I relied on as a basis for
16   staying in the trailer?
17      Q.   Yes.
18      A.   I would have to say no.
19      Q.   Do you remember receiving any
20   other manuals that accompanied the trailer
21   that you read?
22      A.   The only other manual that came
23   with the trailer was the one about the stove
24   and the refrigerator and the microwave.
25      Q.   You read all of those manuals?
```

Page 195

```
1      A.   Yes.
2      Q.   Did you keep the stove,
3   refrigerator and microwave manuals?
4      A.   Yes.
5      Q.   Do you still have those?
6      A.   No, everything I had I gave to
7   them.
8      Q.   You gave to your attorneys?
9      A.   Yes.
10      Q.   Did you receive documentation
11   through the mail or any other source while
12   you were living in the trailer concerning
13   issues with the trailer?
14      A.   They came out with saying there
15   was a problem with the keys because it was
16   like everybody's key could pretty much open
17   everybody else's trailer.  So they came out
18   and changed the keys and gave me another
19   key.
20         We received something when the
21   formaldehyde stuff started coming out, a
22   possible flyer I got one time.  And he just
23   stuck it to the trailer.
24      Q.   Do you remember when you received
25   that flyer?
```

Page 196

```
1      A.   As far as the day, I can't
2   remember.
3      Q.   Do you remember the contents of
4   that flyer?
5      A.   Not really.  I just know they made
6   mention to the fact of the smell that we
7   were smelling and the symptoms you would
8   have in the trailer if you were smelling the
9   formaldehyde.  Stuff like that.
10      Q.   Did they tell you what to do about
11   that?
12      A.   I can't say I specifically
13   remember what was written totally on there.
14      Q.   Did you read the flyer?
15      A.   Yes, I read the flyer.
16      Q.   Did you receive more than one
17   flyer regarding formaldehyde?
18      A.   I only received the one, like I
19   say, that was stuck to the trailer.
20      Q.   Were there any warnings on the
21   trailer when you first moved in?
22      A.   No.  Only about the propane.
23      Q.   Once you moved out of the trailer
24   in December of 2007, where did you go?
25      A.   I went by my sister's house at
```

Page 197

```
1   1619 Mirabeau.
2      Q.   And that is Maria?
3      A.   Yes.
4      Q.   Maria Alexander?
5      A.   Yes.
6      Q.   Was she living at that address?
7      A.   Yes.
8      Q.   She had come back from New York?
9      A.   Yes.
10      Q.   Who else was living in that house
11   besides Maria?
12      A.   No one.
13      Q.   How big of a house was it?
14      A.   Two stories.  On the second floor
15   there is four bedrooms, two bathrooms.  And
16   on the first floor, there is a, I guess you
17   would say a living room, a dining room and
18   TV room and the kitchen and a dining area.
19      Q.   What kind of floors does the house
20   have?
21      A.   Hardwood.
22      Q.   What kinds of walls does it have?
23      A.   That, I don't really know, to be
24   honest.
25      Q.   Does it have central AC?
```

50 (Pages 194 to 197)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                     Videotaped Deposition of Alana Alexander

Page 222

1    medically reviewing Chris, his X-rays, his
2    breathing restrictions, et cetera, et
3    cetera.
4           I just want to make sure that you
5    are on the same page with this witness and
6    that you're just asking her to affirm that
7    her Plaintiff Fact Sheet is accurate, but
8    you're not asking her to restrict experts
9    that may know things about her son that even
10   she doesn't know just because of the
11   testing.
12        MR. GLASS:
13          Fair enough.  I appreciate the
14   clarification.  I'm not opposed to telling
15   you where I'm actually going with this.
16          The Plaintiff Fact Sheets
17   represent that they are not making certain
18   claims, and then when we get to the
19   complaint, you're going to see you are
20   making those claims, and I am trying to
21   reconcile the two, especially since the
22   discovery responses refer us to Plaintiff
23   Fact Sheets which say that you are not
24   making certain claims.  So --
25        MR. HILLIARD:

Page 223

1            Not that you need me to, but you
2    may proceed.
3    EXAMINATION BY MR. GLASS:
4       Q.  You moved out of the trailer on or
5    about December of 2007 or January of 2008;
6    is that accurate?
7       A.  More December of '07.
8       Q.  December 2007, I'm sorry.  I
9    probably was messing it up with one of the
10   earlier residences.
11          When you moved out, did you ever
12   go back to the trailer?
13      A.  Only to clean it because they said
14   it had to be cleaned before they picked it
15   up.
16      Q.  When did you clean it?
17      A.  I would say the following day
18   after I moved out.  Day or two after I moved
19   out.
20      Q.  After you cleaned it, did you ever
21   go back to the trailer?
22      A.  No.
23      Q.  Were you at the trailer later when
24   it was tested?
25      A.  Only, I think I had only opened

Page 224

1    the door -- unlocked the door.
2       Q.  So I will represent to you the
3    testing was done on January 28, 2007?  I'm
4    sorry, 2008.
5           Did you go back and just open the
6    door and then left?
7       A.  Yes.  She put the -- yeah.  She
8    put it in there and I locked the door back.
9       Q.  Okay.  Describe for me exactly
10   what you did when you went to the trailer
11   for the testing in 2008.
12      A.  I unlocked the door, the lady went
13   in.  She put whatever she needed to put in
14   there and then I locked the door back after
15   she came out.
16      Q.  How long was the lady in the
17   trailer?
18      A.  I don't know.  It wasn't long.  I
19   won't say long.
20      Q.  Was the door open the whole time
21   she went in and then when she went out or
22   did they have that closed?
23      A.  That I really don't remember.
24      Q.  You said "not long."  Are we
25   talking a matter of minutes or 15-minute

Page 225

1    increments?  Can you give me an idea?
2       A.  I would say it wasn't as long as
3    half an hour.
4       Q.  Did you see what she did inside
5    the trailer?
6       A.  No.
7       Q.  Were any windows open?
8       A.  I really don't recall any windows
9    being open.
10      Q.  Did you open any windows?
11      A.  No, because I never went in.
12      Q.  Was the air-conditioning on?
13      A.  No.
14      Q.  Was there any power to the unit?
15      A.  I think the power had already been
16   shut off.
17      Q.  Between the time that you cleaned
18   the trailer and the date of the test, had
19   anybody been in the trailer?
20      A.  No.
21      Q.  It had been closed up the entire
22   time?
23      A.  Yes.
24      Q.  At any time between your cleaning
25   of the trailer and the date of the test, was

57 (Pages 222 to 225)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation

Videotaped Deposition of Alana Alexander

Page 234

1    A.  Yeah, like the bench had, like, a
2  little decorative piece of wood and it had
3  fallen off.
4    Q.  Did you do anything to repair
5  that?
6    A.  I tried to nail it back, but it
7  kept coming loose.  Particle board falling
8  apart.
9    Q.  During the time that you came back
10 to New Orleans, specifically say the first
11 year you were back, did you see any news
12 reports on TV about formaldehyde and FEMA
13 trailers?
14   A.  No.
15   Q.  The first time you heard about
16 formaldehyde and FEMA trailers was during --
17 when you received the brochure?
18   A.  Roughly, yes.
19   Q.  Did you see any advertising
20 anywhere on TV concerning lawsuits that were
21 going on about formaldehyde?
22   A.  Yeah, I did.  Roughly there around
23 the same time I saw the flier and started
24 seeing stuff on the news and everything.
25   Q.  When you went back with the lady

Page 235

1  for the test in January of 2008, all you saw
2  was the lady go into the trailer and then
3  she came out a little while later and then
4  you left?
5    A.  Uh-huh.
6    Q.  That's "yes"?
7    A.  Yes.
8    Q.  Were there any other preparations
9  or cleaning or anything like that done to
10 the trailer before the test was taken?
11   A.  No.
12   Q.  Did you ever get a copy of the
13 test results?
14   A.  No.
15   Q.  Regarding the discovery that was
16 propounded about you and Chris, and it's
17 been marked as Exhibits A. Alexander
18 3 through 8 -- excuse me, 10 -- did you
19 provide information to answer those
20 discovery requests?
21   A.  You talking about one of the
22 papers there?
23   Q.  Yes.
24   A.  Yes.
25   Q.  I think when we broke for lunch,

Page 236

1  we were talking about your new house.  What
2  types of floors do you have in there?
3    A.  Carpet.
4    Q.  Do you have any wood floors in
5  there?
6    A.  No.
7    Q.  While Chris was in the trailer, I
8  think you testified that he started using
9  the inhaler more?
10   A.  Yes.
11   Q.  Did he have any attacks that
12 required him to go to the hospital while he
13 was living in the trailer?
14   A.  Yes.
15   Q.  When did that occur?
16   A.  I think it was in that January --
17 excuse me, not January, that December of
18 2007.
19   Q.  When you moved out of the trailer?
20   A.  Just before we moved out of the
21 trailer.
22   Q.  So you were still in the trailer
23 at the time he went to the hospital?
24   A.  Yes.  And we went one other time
25 before because of his eyes.

Page 237

1    Q.  Where did you go for his eyes?
2    A.  Children's Hospital.
3    Q.  Was he having the same problems he
4  had in Florida?
5    A.  Yes.  Conjunctivitis.
6    Q.  Since you moved out of trailer,
7  has Chris been to the emergency room?
8    A.  No.
9    Q.  Has he had any asthma attacks
10 since you moved out of the trailer?
11   A.  You know what?  He did go to the
12 hospital once.  I did think about that.
13 Since we have been by Maria, he did go to
14 the hospital once.
15   Q.  When he went to the hospital in
16 December of 2007, was the information you
17 provided to the doctors at that time
18 accurate?
19   A.  Yes.
20   Q.  When you went to the hospital one
21 time after you moved out of the trailer, was
22 the information you provided to the doctor
23 accurate?
24   A.  Yes.
25   Q.  After Chris moved out of the

Page 286

1   1619 Mirabeau Avenue was $1100 on this thing
2   that you faxed in, correct?
3       A.   Yes.
4       Q.   All right.  You were asked earlier
5   about airing out the trailer, ventilating
6   the trailer?
7       A.   Yes.
8       Q.   Is it correct that from the first
9   day that you moved into the trailer that you
10  tried to air it out and ventilate it?
11      A.   Yes.
12      Q.   You opened the door and windows to
13  ventilate the trailer?
14      A.   Yes.
15      Q.   And you did that from day one when
16  you arrived until day whatever when you
17  moved out of the unit; is that right?
18      A.   No.
19      Q.   No?  When did you stop venting out
20  the trailer?
21      A.   When we would walk in and you
22  wouldn't smell it.
23      Q.   Okay.  So for the first couple of
24  months you lived in the unit, you tried to
25  ventilate it as much as possible?

Page 287

1       A.   No, I did ventilate it every day.
2       Q.   Okay.  And that included opening
3   doors and opening windows?
4       A.   Yes.
5       Q.   Would you also use the AC to keep
6   temperatures low inside the unit?
7       A.   Yes.
8       Q.   Did that occur from day one
9   through the end of your time in the unit?
10      A.   Yes.  During the summer months.
11      Q.   Right.  You would always try to
12  maintain a comfortable temperature in the
13  unit when you lived in it, correct?
14      A.   Yes.
15      Q.   Did you ever smoke inside the
16  unit?
17      A.   No.
18      Q.   Have you ever smoked?
19      A.   No.
20      Q.   I assume Chris has never smoked
21  that you know of?
22      A.   No, he doesn't smoke.
23      Q.   You've never seen Chris smoke?
24      A.   He doesn't smoke.
25      Q.   Okay.  You worked as an EMT,

Page 288

1   basically, on two separate occasions, is
2   what you were saying earlier, correct?
3       A.   Yes.
4       Q.   And your work as an EMT was for
5   about, what, 14 years; is that right?
6       A.   No.
7       Q.   How long?
8       A.   It was roughly, all together,
9   probably about eight years, eight or nine
10  years.
11      Q.   Okay, I'm sorry.  I assume during
12  your -- you probably knew this before then,
13  but as you worked as an EMT, I assume you
14  knew that it was important that patients
15  coming in provide as much information as
16  possible so the doctor can figure out what's
17  wrong with them, right?
18      A.   Yes.
19      Q.   And I assume whenever you have
20  gone into the doctor with Chris, you've
21  tried to provide as accurate information as
22  possible so that the doctor can help him
23  out, right?
24      A.   Yes.
25      Q.   Whenever he's had a serious

Page 289

1   problem, have you tried to take him in to a
2   doctor or nurse?
3       A.   When he did have serious asthma
4   attacks, yes, we always went to the
5   hospital.
6       Q.   Is there any time you can remember
7   when Chris had a serious asthma attack or
8   breathing problems when you didn't take him
9   in to an emergency room or a doctor?
10      A.   Only prior to the storm when we
11  had the nebulizer.
12      Q.   Because you could handle the
13  problem yourself with the nebulizer?
14      A.   Yes.
15      Q.   So after the storm, if there was
16  ever an incident where Chris had breathing
17  problems or an asthma attack, you made sure
18  that he was taken to the ER or to a doctor
19  to figure out what was wrong, right?
20      A.   Yes.
21      MR. HILLIARD:
22          Do you have the rest of this
23  document?
24      MR. DINNELL:
25          The rest of it?

73 (Pages 286 to 289)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation

Videotaped Deposition of Alana Alexander

Page 290

```
1        MR. HILLIARD:
2          Uh-huh.
3        MR. DINNELL:
4          You have it.
5        MR. HILLIARD:
6          Do you have it handy?
7        MR. DINNELL:
8          I could look for it at the break.
9        MR. HILLIARD:
10         If you have it handy.  I don't
11   want you to stop anything.
12        MR. DINNELL:
13         Okay.
14        MR. HILLIARD:
15         Thank you.
16   EXAMINATION BY MR. DINNELL:
17        Q.  I believe you said earlier that
18   you don't think you've -- well, you said
19   earlier that you haven't received any
20   monetary funds from FEMA, correct?
21        A.  Correct.
22        Q.  Do you know how much in the way of
23   assistance monetarily your other family
24   members have received?
25        A.  No.
```

Page 291

```
1        Q.  Do you know how much money Debra
2   has received from FEMA?
3        A.  No.
4        Q.  Earlier you were asked about media
5   reports in December of 2007, right?
6        A.  Uh-huh.
7        Q.  And I think you said, correct me
8   if I'm wrong, but I think you said that in
9   December of 2007 was the first time you ever
10   heard a media report about trailers and
11   formaldehyde.
12        A.  Yes.
13        Q.  Right?
14        A.  Yes.
15        Q.  And you said that, normally, you
16   watched WDSU Channel 6 to get your news
17   every day, basically?
18        A.  Pretty much, yes.
19        Q.  But you don't receive the "Times
20   Picayune" every day?
21        A.  No, I don't.
22        Q.  You also talked about how at some
23   point you had a brochure about formaldehyde
24   in trailers stuck in your door?
25        A.  Not a brochure, it was only, like,
```

Page 292

```
1   a sheet of paper taped to the door.
2        Q.  Okay.  A sheet of paper was taped
3   to the door.  And I believe you said you
4   don't know when that happened?
5        A.  No, I really don't.  But I would
6   roughly say it was around the same time I
7   started hearing about it over the news.
8        Q.  Was it in black and white?
9        A.  I don't remember what color it
10   was.
11        Q.  I'm going to hand you what we're
12   going to mark as Exhibit 22.  Take a look at
13   that.
14             Have you had a chance to look at
15   it?
16        A.  Uh-huh.
17        Q.  Is this the piece of paper that
18   was stuck on your unit?
19        A.  It could be.  I'm not for sure.
20        Q.  You don't know for sure?
21        A.  I don't know for sure.
22        Q.  Does this document look familiar
23   at all?
24        A.  Yes.
25        Q.  Can you say it's more than likely
```

Page 293

```
1   that's the document you received stuck on
2   your unit?
3        A.  I won't say more than likely, but
4   I will say it's a possibility.
5        Q.  And you think that that document
6   looks somewhat familiar to you?
7        A.  Somewhat familiar, yes.
8        Q.  What other kinds of stuff would
9   you find stuck to the unit in the way of
10   documents or paper?
11        A.  If they did an inspection while I
12   wasn't home, they would put a paper saying
13   that they came and did an inspection.
14        Q.  Did you keep all those pieces of
15   paper?
16        A.  No, I did not.
17        Q.  What would you do with them after
18   you took them off the wall of the unit?
19        A.  I would read them and make sure
20   that it still said everything was okay on
21   the trailer and probably shortly thereafter
22   just tossed them.
23        Q.  After you read it?
24        A.  Made sure everything was still
25   okay.
```

74 (Pages 290 to 293)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Videotaped Deposition of Alana Alexander

Page 294

1    Q.  How many pieces of paper would you
2  say you found stuck to that trailer
3  throughout the entire time you lived in it?
4    A.  I don't know.  I could not give
5  you a number on that.  I think they roughly
6  did an inspection every month, and if they
7  stuck one on there and it didn't rain before
8  I got home from work, I got the inspection
9  paper.
10    Q.  So we're talking -- you were there
11  in the unit for 19 months, so we're talking
12  somewhere around 20 documents, you think?
13    A.  I guess if you want to say 20.
14    Q.  It wasn't just two or three over
15  the time you lived in the trailer?
16    A.  No, I wouldn't say it was just two
17  or three.
18    Q.  There were a lot of documents and
19  papers being stuck to that unit while you
20  lived there?
21    A.  Like I said, it was mostly when he
22  came and he inspected it.
23    Q.  Sometimes it would rain?
24    A.  Yes.
25    Q.  And then that document -- well,

Page 295

1  correct.
2    But sometimes you wouldn't be able
3  to read the documents that had been stuck
4  there on the unit?
5    A.  That's correct.
6    Q.  Because they would get wet from
7  the rain?
8    A.  Yes.
9    Q.  And during the days, you would be
10  at work, right?
11    A.  Yes.
12    Q.  So if somebody came by the trailer
13  to give you something and you were at work,
14  they would probably leave it for you on the
15  trailer?
16    A.  Yeah, they would stick it on the
17  trailer.  And depending if it didn't blow
18  away too.
19    Q.  Your first -- I know Joe asked you
20  about this earlier, I just want to quickly
21  recap.  You moved into the unit in what you
22  said was May of '06?
23    A.  Yes.
24    Q.  And you got a job at where?
25    A.  Orleans Parish School Board.

Page 296

1    Q.  And then you eventually left
2  Orleans Parish School Board and went to KIPP
3  NOLA?
4    A.  I didn't leave them.  The job
5  ended.  It was only a two-month program, so
6  when it ended, by that time I had gotten on
7  with KIPP NOLA.
8    Q.  Were you ever working more than
9  one job at one time?
10    A.  No.
11    Q.  And were your hours basically the
12  same throughout the time period that you
13  lived in the trailer, whether it was with
14  Orleans Parish or with KIPP NOLA?
15    A.  No, because Orleans Parish, it was
16  from, I want to say, 8:00 to 3:00, and KIPP
17  is, I will be at work at 7:30, and it
18  doesn't end until 5:45 -- I mean, 4:45, and
19  I would actually get home roughly about
20  6:00, I'd be getting home.
21    Q.  Do either your five brothers or
22  your two sisters have asthma?
23    A.  No.
24    Q.  When you were living in the
25  trailer at the Dale Street address, was

Page 297

1  there still a mailbox at that address?
2    A.  Yes.
3    Q.  Was the mailbox right along the
4  street?
5    A.  Yes.
6    Q.  And that's where you would receive
7  mail?
8    A.  Yes.
9    Q.  And you said right after you moved
10  into the trailer, there would be problems
11  with mail arriving on time and regularly?
12    A.  Yes.
13    Q.  Now, you've lived -- you have
14  basically lived in New Orleans your whole
15  life; is that right?
16    A.  Yes.
17    Q.  Aside from after the storm, being
18  in Houston, Jacksonville, you've been in New
19  Orleans from birth to the present?
20    A.  Yes.
21    Q.  And that 4415 Dale Street address
22  is where you grew up, right?
23    A.  Yes.
24    Q.  After the storm, why was it
25  important for you -- well, I'll ask:  Was it

75 (Pages 294 to 297)

Page 298

1  important for you to come back to New
2  Orleans after the storm?
3       A.  Yes.
4       Q.  Why?
5       A.  Because I lived here all my life,
6  my mom and my dad was here and I had roots
7  here.  This is my home.
8       Q.  And why not just stay in
9  Jacksonville?
10      A.  Because I didn't like Florida.
11      Q.  You wanted to come back and be
12 around family that was in New Orleans?
13      A.  Family and my home.  This is where
14 I live.
15      Q.  Now, did you ask FEMA for a travel
16 trailer or some sort of housing unit so you
17 could come back to New Orleans?
18      A.  Yes.
19      Q.  And eventually, you were provided
20 with one, correct?
21      A.  Correct.
22      Q.  Did you pay anything for the
23 travel trailer unit?
24      A.  No.
25      Q.  Did you pay any rent to live in

Page 299

1  the unit?
2       A.  No.
3       Q.  When you were first coming back to
4  New Orleans, did you do a search for
5  apartments in the area?
6       A.  Like I say, I had a cousin who
7  lived here, and I had her looking out for
8  reasonably priced apartments.  But after
9  Katrina, when you came back, there was
10 really no reasonable rental places in the
11 city.
12      Q.  There was nothing available,
13 right?
14      A.  I wouldn't say there was nothing
15 available, I would say there was nothing
16 reasonably priced.
17      Q.  And that's why you lived in the
18 trailer, because you couldn't find something
19 that worked for you, correct?
20      A.  That's correct.
21      Q.  Did you ever think about moving
22 into the barber shop building instead of
23 living in the trailer?
24      A.  My mom and my dad and my sister
25 was in the barber shop.

Page 300

1       MS. PETROVICH:
2            Debra?
3       THE WITNESS:
4            Yes, Debra, I'm sorry.
5  EXAMINATION BY MR. DINNELL:
6       Q.  You were saying earlier, and it
7  doesn't take much to figure this out, when
8  you go in these things, the trailer was
9  small and you didn't have much privacy when
10 you were in it, right?
11      A.  Yes.
12      Q.  Did that make you want to try to
13 find another place to live as soon as
14 possible?
15      A.  Yes.
16      Q.  Did you try to find other places
17 to live while you were in the trailer?
18      A.  Yes.
19      Q.  And you just weren't able to find
20 anything?
21      A.  Yes.
22      Q.  And that's because there just
23 wasn't much housing to go around after the
24 storm; is that right?
25      A.  Correct.

Page 301

1       Q.  Let's take a look at what I'm
2  going to mark next in order, which I believe
3  should be Exhibit 23.
4            Take a look at what I'm marking as
5  Exhibit 23 here.  Have you had a chance to
6  look at it?
7       A.  Yes.
8       Q.  All right.  Exhibit 23 is entitled
9  "Emergency Shelter Agreement Rules of
10 Occupancy."
11           And about halfway down, it says,
12 "Name of person assigned the shelter unit,
13 Alana M. Alexander," and then there's a
14 signature there.
15           Is that your signature?
16      A.  Yes.
17      Q.  Did you sign this document?
18      A.  Yes.
19      Q.  It's dated 3-20-06.
20           Were you back in New Orleans in
21 March of '06?
22      A.  No, I wasn't.
23      Q.  Do you know how you were able to
24 sign this document?
25      A.  If I'm not mistaken, I think this

Page 302

```
1   was one of the ones we faxed.
2       Q.  Now, you see up above the
3   signature, the No. 4?  Actually, I will go
4   up.
5           The document says, "I have been
6   informed and understand any violation of any
7   of the rules listed below may result in my
8   leaving the unit immediately.  I agree that
9   I," and then down below No. 4, it says,
10  "must accept other housing options when they
11  become available."
12          Do you see that?
13      A.  Yes.
14      Q.  Now, throughout the entire time
15  you were in the trailer, there were no other
16  housing options available?
17      A.  Not to me.  Like I say, they were
18  way too expensive.
19      Q.  All right.  So you abided by the
20  No. 4 in this document, correct?
21      A.  I would say yes.
22      Q.  So if something would have become
23  available for you, you would have moved out
24  of the trailer?
25      A.  Yes.
```

Page 303

```
1       Q.  But there was nothing available?
2       A.  Correct.
3       Q.  I just want to pick up a few
4   things.
5           Has Chris always lived with you
6   throughout his whole life?
7       A.  Yes.
8       Q.  When you were living at 4415 Dale
9   Street before the storm, did you have to pay
10  any rent to your parents?
11      A.  Yes.
12      Q.  How much, do you remember?
13      A.  $250.
14      Q.  Did Debra Austin have to pay any
15  rent?
16      A.  Yes.
17      Q.  The same amount?
18      A.  I don't know.
19      Q.  Talking about Chris's health for a
20  moment, when you have used different
21  cleaning sprays and cleaned areas of your
22  house, have you ever seen Chris have an
23  asthmatic response to you doing that?
24      A.  No.
25      Q.  Have you ever seen him have a
```

Page 304

```
1   response to you cooking or frying anything?
2       A.  No.
3       Q.  When Chris first walked into the
4   travel trailer unit, did he immediately have
5   any kind of asthmatic response?
6       A.  No.
7       Q.  He didn't have any of the "itching
8   of the chest"?
9       A.  I had that.  I mean, the itching
10  of the throat and the runny eyes and the
11  sneezing.
12      Q.  Did he have to use his inhaler
13  right after he walked into the unit for the
14  first time?
15      A.  No.
16      Q.  Now, earlier there was an issue
17  where we were talking about your
18  applications for FEMA assistance and there
19  was an issue with your brother.
20          Do you remember that?
21      A.  Yes.
22      Q.  Do you know if your brother had to
23  return money to FEMA or the government?
24      A.  Yes.  I told you that.  I said he
25  returned the check.
```

Page 305

```
1       Q.  Do you know why?
2       A.  He returned the check because he
3   did not live at 4415 Dale Street, so he gave
4   the check back.
5       Q.  Do you remember there being an
6   issue with your FEMA application where you
7   may have answered a question incorrectly?
8       A.  Yes.  It had to do with the
9   address.  I'm not exactly -- I don't
10  remember exactly what it was right now.  But
11  I did write letters to them often to try to
12  explain the mistake that was made.
13      Q.  Did you call them often?
14      A.  As often as I could.  Pretty much
15  every day.
16      Q.  And you knew FEMA's telephone
17  number, right?
18      A.  It was programmed into my phone.
19      Q.  And you knew the address where you
20  should send letters?
21      A.  The address at the time, the
22  address and a fax number.
23      Q.  Do you remember your cell phone
24  number at the time?
25      A.  It has always been the same,
```

77 (Pages 302 to 305)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation

Videotaped Deposition of Alana Alexander

Page 306

1 (504)577-0737.
2    MS. PETROVICH:
3       Who is your provider?
4 THE WITNESS:
5       Right now, it's AT&T, but I think
6 it was Sprint at that time.
7 EXAMINATION BY MR. DINNELL:
8    Q.  And you wrote a few letters to
9 FEMA trying to explain your situation and
10 your appeal of getting disaster benefits,
11 right?
12    A.  Yes.
13    Q.  I'll just show you Exhibit 24,
14 what we have marked as Exhibit 24.
15       24 is dated November 2, '05, and
16 it's titled "Attention: FEMA Individuals
17 and Households Program."
18       Is that right?
19    A.  Correct.
20    Q.  Is that your signature at the
21 bottom?
22    A.  Yes, it is.
23    Q.  And in this document, you explain
24 that you may have filled out your
25 application for assistance incorrectly; is

Page 307

1 that right?
2    A.  Correct.
3    Q.  And then you tried to explain the
4 situation?
5    A.  Correct.
6    Q.  All right.  Okay.
7    A.  To no avail.
8    Q.  In fact, you sent another
9 letter --
10    A.  Sure did.
11    Q.  -- and I will mark this one,
12 Alexander Exhibit 25.
13       Again, Alexander Exhibit 25 is
14 dated March 29, 2006.  It says, "Attention:
15 FEMA."
16       And is that your signature at the
17 bottom of Exhibit 25?
18    A.  Yes.
19    Q.  And in this one you're explaining
20 to FEMA that there was an issue with both
21 your sister and your brother being listed at
22 the same address as you, right?
23    A.  Correct.
24    Q.  Now, in addition to you sending
25 letters to FEMA, FEMA would occasionally

Page 308

1 send you letters, right?
2    A.  Yes.
3    Q.  Do you remember how many letters
4 you received from FEMA?
5    A.  I don't know totally.
6    Q.  Did you receive letters when you
7 were in Houston from FEMA?
8    A.  I want to say yes, I probably did.
9    Q.  Did you receive letters from FEMA
10 when you were in Florida?
11    A.  Yes.
12    Q.  And I assume you received letters
13 from FEMA when you were in New Orleans back
14 at the Dale Street address, correct?
15    A.  I would assume, yes.
16    Q.  What kind of things would those
17 letters say?
18    A.  Some of them had to do with the
19 appeal process, the ones in Florida.  The
20 ones in New Orleans, basically, had to do
21 with the trailer.
22    Q.  Do you remember a letter about
23 having things near the furnace exhaust vent
24 of the trailer?
25    A.  I don't really remember that one.

Page 309

1    Q.  Okay.  Do you remember a letter
2 about extending the temporary housing
3 program for people in trailers?
4    A.  I do remember that one.
5    Q.  Is it fair to say that you were
6 receiving a lot of letters from FEMA about
7 the trailer and about your assistance?
8    A.  I guess you could say yes.
9    Q.  Did you keep all those letters
10 that you received?
11    A.  Not everything.
12    Q.  This would be like the things that
13 would be left on the outside of the trailer,
14 you would just read it and just throw it
15 away afterwards?
16    A.  I guess you could say yes.
17    Q.  "Yes"?
18    A.  Yes.
19    Q.  At one point, and I apologize for
20 jumping around with a bunch of stuff here,
21 but at one point, your house was demolished,
22 right?
23    A.  Yes.
24    Q.  Did FEMA put you up in a hotel
25 while the house was demolished?

78 (Pages 306 to 309)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Alana Alexander

Page 310

1      A.   Yes.
2      Q.   At the Super 8 on Chef Menteur
3  Highway?
4      A.   Yes.
5      Q.   You didn't have to pay for that
6  hotel room?
7      A.   No.
8      Q.   FEMA paid for it?
9      A.   Yes.
10      Q.   And you may have said this
11  earlier, but the Dale Street address is
12  about two blocks away from Chef Menteur
13  Highway?
14      A.   It's the third block.
15      Q.   Third block away?
16      A.   Yes.
17      Q.   And on the other side of Chef
18  Menteur Highway, it's kind of an industrial
19  area right there, right?
20      A.   Yes, some housing and mostly
21  industrial.
22      Q.   Now, you said earlier that when
23  entering the unit, there were some odors and
24  smells in the unit, right?
25      A.   Yes.

Page 311

1      Q.   And you said that you talked about
2  those odors and smells with a person who was
3  there with you in the unit; is that correct?
4      A.   Yes.
5      Q.   And that was somebody who was
6  walking you through the unit for the first
7  time?
8      A.   Yes.
9      Q.   After that conversation, did you
10  ever call anyone about the odors or smells?
11      A.   No.
12      Q.   Do you remember there being a
13  telephone number listed inside of the unit?
14      A.   Not in the unit, I think it was in
15  the book.
16      Q.   There was a number you understood
17  to be a number for maintenance calls?
18      A.   Yes.
19      Q.   Okay.  And you never called that
20  maintenance number about odors or smells?
21      A.   No.
22      Q.   In addition, there's a separate
23  FEMA phone number that you knew about to
24  call about getting assistance from FEMA,
25  right?

Page 312

1      A.   Yes.
2      Q.   Did you ever call FEMA about any
3  odors or smells in the unit?
4      A.   No.
5      Q.   I will ask a slightly different
6  question now, and I think I know your answer
7  because you said you first heard about
8  formaldehyde in December of 2007.  That's
9  what you said?
10      A.   Yes.
11      Q.   So you would have never made any
12  complaints specifically about formaldehyde
13  to anyone on that maintenance phone number,
14  right?
15      A.   Correct.
16      Q.   And you've never made any
17  formaldehyde complaints to FEMA using the
18  FEMA telephone number?
19      A.   That's correct.
20      Q.   Did you ever visit the FEMA Web
21  site?
22      A.   I probably did.
23      Q.   For what purpose, do you remember?
24      A.   Sometimes it was -- well, now,
25  this was prior to me getting the trailer

Page 313

1  because I didn't have Internet access when I
2  got into the trailer.  When we were in
3  Florida, I probably did in order to get the
4  telephone numbers or something.  Because
5  every now and then, you know, I wouldn't
6  have it for whatever reason.
7      Q.   And you're saying that you didn't
8  have any Internet access throughout the time
9  when you lived in the trailer?
10      A.   Only when I was at work.
11      Q.   Could you access the Internet from
12  your parents' house?
13      A.   No, because they don't have that.
14      Q.   Is the only time you could access
15  the Internet throughout the time you were in
16  the trailer when you were at work?
17      A.   Yes, sir.
18      Q.   Now, you said these odors and
19  smells in the unit were there from the first
20  moment you walked into the unit?
21      A.   Yes.
22      Q.   And those odors and smells
23  irritated you at the first moment you walked
24  into the unit?
25      A.   Yes.

79 (Pages 310 to 313)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Alana Alexander

Page 362

1   Q.   And you were in your trailer?
2   A.   I was in the trailer.  Actually,
3   Donna called me.  It was late at night and
4   she said, You heard that there is a tornado
5   headed our way?"
6       So I immediately left and went
7   next door by my momma's house.
8   Q.   Did you ever write letters to FEMA
9   or the maintenance people about issues
10  regarding the trailer?
11  A.   No.
12  Q.   Did you ever send e-mails to
13  people about maintenance on the FEMA
14  trailer?
15  A.   No.
16  Q.   Did you ever complain about the
17  mold to the maintenance contractor?
18  A.   No.
19  Q.   Would it be fair to say that the
20  mold did not show up until after the leaks?
21  A.   I would have to say yes.
22  Q.   Tell me first, the first time you
23  noticed the leak?
24  A.   I was sleeping in my bed and it
25  started dripping on my forehead.

Page 363

1   Q.   Was the leak just from the light
2   in the --
3   A.   Yes.
4   Q.   Do you remember when that was?
5   A.   I would have to say probably
6   March.  March, April, May.  You know, when
7   it really starts like raining again in the
8   city a lot.
9       So like March, April, May of 2007.
10  Q.   Did you call the maintenance
11  number and report that leak?
12  A.   Oh, yes.
13  Q.   Did they come and fix it?
14  A.   Yes.
15  Q.   The bedroom wall you described,
16  you said you put tape on it, correct?
17  A.   Yes.
18  Q.   Did it come undone?
19  A.   Yes.
20  Q.   How many times?
21  A.   I can't give you a number on that.
22  Just whenever it come undone, I stuck more
23  tape on it.
24  Q.   And you never called and
25  complained about that?

Page 364

1   A.   No.
2   Q.   And do you recall a second leak
3   from the light fixture at some point?
4   A.   Yes, I do.
5   Q.   And when did that happen, was that
6   months later?
7   A.   Yes, it was months later when it
8   happened.
9   Q.   And did the maintenance people
10  come out and fix it again?
11  A.   Yes.
12  Q.   Did you ever have any other leaks
13  when you were living there?
14  A.   No, that was really the only one.
15  Q.   And you had the ability to clean
16  up the mold yourself, correct?
17  A.   Correct.
18  Q.   Okay.  And then outside of the
19  trailer, you said there was foam somewhere,
20  correct?
21  A.   Correct.
22  Q.   When did you first notice that?
23  A.   It was just one of those times I
24  was out there cutting the grass and I
25  noticed it was on the side of the trailer.

Page 365

1   Q.   Where was it exactly?
2   A.   It was on the side, like I said,
3   where the electrical plug was.  It was on
4   that side of the trailer.
5   Q.   Did that foam hold up while you
6   lived there?
7   A.   Yes, to the best of my knowledge,
8   it did.
9   Q.   And tell about the holes --
10  scratch that.  Strike that.
11      You told us about a way that you
12  fixed the underbelly of the trailer so that
13  mice wouldn't get in?
14  A.   Correct.
15  Q.   Okay.  Describe what you had to
16  fix and what was the problem on the outside
17  of the underbelly of the trailer.
18  A.   Well, everywhere under the
19  trailer, like where the plumbing went into
20  the sink and into the toilet.
21      Underneath where the pipe was, it
22  was almost like the hole was a little too
23  big around where the pipe was, and there was
24  a space in between where the mice got in
25  between underneath the floor.

92 (Pages 362 to 365)

Page 378

1    Q.   What's your understanding of other
2  items of daily life that may contain
3  formaldehyde?
4    A.   I understand now that they have it
5  in particle board, that it's in some
6  plastics, that it's in carpet, and I learned
7  that that new car smell is formaldehyde.
8    Q.   And have you learned that there's
9  potentially formaldehyde in the air in
10 cities?
11   A.   Yes, I've heard that.
12   Q.   Have you heard that you breathe
13 out formaldehyde?
14   A.   I didn't know that I breathe it
15 out.
16   Q.   Have you read anything or learned
17 of any information that formaldehyde is
18 contained in regular homes like the one you
19 currently live in?
20   A.   I did hear that.
21   Q.   Do you know at what levels?
22   A.   No, but I heard that it was at
23 lower levels than considered for trailers.
24   Q.   Do you have any idea of the level
25 of formaldehyde as tested in your trailer?

Page 379

1    A.   No, I do not.
2    Q.   Was there any period of time while
3  you were in the trailer that you stayed in
4  the trailer in hot weather with the
5  air-conditioning off?
6    A.   Off?
7    Q.   Yes.
8    A.   Only if I was cooking.
9    Q.   Okay.  But at that time, you had
10 the trailer open with the windows and door,
11 if I understood correctly?
12   A.   Correct.
13   Q.   Okay.  So there was no time when
14 you lived in the trailer that you closed it
15 up and kept the air-conditioning off when it
16 was hot outside?
17   A.   Oh, no.
18   Q.   It would get too hot inside?
19   A.   Yes, it would.
20   Q.   So if I understood your testimony,
21 and I know it's subject to your earlier
22 objection, that your understanding of why
23 Gulf Stream Coach was sued is because,
24 No. 1, of the potential of exposure to
25 formaldehyde in the trailer; and No. 2,

Page 380

1  because you've alleged that there was no
2  warning regarding formaldehyde being in the
3  trailer?
4    A.   Yes.  When I --
5    MR. HILLIARD:
6       Can I have the same objection
7  without repeating it?
8    MR. GLASS:
9       Yes.
10   THE WITNESS:
11      Yes, without knowing beforehand
12 when I initially moved in.
13 EXAMINATION BY MR. GLASS:
14   Q.   Okay.  And what's your
15 understanding of why FEMA was sued?
16   A.   Because FEMA ordered the trailers.
17 And also, their lack of informing us of the
18 potential hazards, you know, that were in
19 the trailer.
20   Q.   There are a whole bunch of
21 allegations or background information on the
22 first 25 pages or so of the complaint that's
23 been marked as Exhibit 12.
24      Did you have any input as to where
25 this information came from?

Page 381

1    A.   Of all of this?  I don't know.
2    Q.   You haven't read through this
3  entire document?
4    A.   No.  This is the one I told you I
5  never saw before.
6    Q.   On page 25, there are some causes
7  of action, and I'll represent to you that
8  these counts contained in Count Two, which
9  is contained on pages 25, 26, 27 and 28, are
10 adopted in the Third Supplemental and
11 Amended Complaint marked as Exhibit 15.
12      Specifically, they are adopted in
13 paragraph 12 of your Third Supplemental and
14 Amended Complaint.
15      Did you look at the allegations
16 against Gulf Stream Coach?
17   A.   And you're talking about in which
18 one now?  I don't know where you are.
19   Q.   Well, I'm talking about Count Two
20 on page 25 that was adopted by supplemental
21 complaint No. 3.
22   A.   I have that one.
23      (Discussion off the record.)
24 EXAMINATION BY MR. GLASS:
25   Q.   All of the counts in paragraphs

In Re: FEMA Trailer Formaldehyde Products Liability Litigation            Videotaped Deposition of Alana Alexander

Page 414

1    A.   From time to time, yes.
2    Q.   Do you remember telling Dr. Ciota
3 that you don't lose sleep over your
4 concerns?
5    A.   Not really.  I don't remember
6 telling her that.  When she say "lose
7 sleep," I don't lose sleep.
8    MR. HILLIARD:
9        Did you hear that part of the
10 answer?
11    MR. GLASS:
12        Yes.
13 EXAMINATION BY MR. GLASS:
14    Q.   Other than ventilating the trailer
15 when you first got back and were cooking on
16 a typical day, did you open the windows or
17 the door of the trailer other than going in
18 and out of the door?  That was confusing.
19        Did you open the windows any time
20 other than just to ventilate when you were
21 cooking?
22    A.   Yes.
23    Q.   When would you open the windows?
24    A.   If it wasn't an extremely hot day
25 or if it wasn't an extremely cold day.  If

Page 415

1 it was one of those few nice days we get in
2 New Orleans, I would leave the trailer open.
3    Q.   Okay.  When you were in the Dale
4 Street home, the site-built house before the
5 trailer was there, before the storm, did you
6 open the windows?
7    A.   Oh, yeah.  I prefer a regular
8 breeze.
9    Q.   You said you had air-conditioning
10 in the house?
11    A.   Correct.
12    Q.   You kept the air-conditioning in
13 the house at about the same, 75 degrees?
14    A.   Pretty much, yes.
15    Q.   Are you claiming that you have
16 lost any wages as a result of the damages or
17 as a result of the time that you spent in
18 the trailer?
19    A.   Yeah, in the few times that I had
20 to leave to bring him to doctors'
21 appointments.
22    Q.   What about your time going
23 forward, do you feel like you've lost your
24 ability to earn income going forward from
25 any time that you lived in the trailer?

Page 416

1    A.   No.  I have lost, you know, but
2 that's all.
3    MR. GLASS:
4        Okay.  I think that's all the
5 questions I have.  Thank you very much.
6    MR. HILLIARD:
7        We will reserve our questions
8 until the time of trial.
9    THE VIDEOGRAPHER:
10        That concludes today's deposition;
11 it is 5:20.
12        (Which concluded the deposition.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 417

1
2
3
4        WITNESS' CERTIFICATE
5
6    I have read or have had the foregoing
7 testimony read to me and hereby certify that
8 it is a true and correct transcription of my
9 testimony with the exception of any attached
10 corrections or changes.
11
12
13
14
15    _____
15    ALANA ALEXANDER
16
17 PLEASE INDICATE
18 ( ) NO CORRECTIONS
19 ( ) CORRECTIONS; ERRATA SHEET(S) ENCLOSED
20
21
22
23
24
25