UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER          * | | MDL NO. 1873 |
|      FORMALDEHYDE         * | | |
|      PRODUCTS LIABILITY   * | | |
|      LITIGATION           * | | SECTION: N(5) |
|                          * | | |
| This Document Relates to: *Charlie Age, et al. v.*   * | | JUDGE: ENGELHARDT |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892   * | | |
|                          * | | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**<u>MEMORANDUM IN SUPPORT OF PARTIAL MOTION FOR SUMMARY JUDGMENT</u>**

**MAY IT PLEASE THE COURT:**

Defendant, Gulf Stream Coach, Inc. ("Gulf Stream"), respectfully submits this memorandum in support of its partial motion for summary judgment regarding the plaintiffs' inadequate warning claims under the Louisiana Products Liability Act ("LPLA," or "the Act"). Gulf Stream asserts it satisfied its duty to warn under the LPLA in all respects.

**I.     BACKGROUND**

As this Court is well aware, this Multi-District Litigation is the consolidation of several state and federal toxic tort suits in which tens of thousands of named plaintiffs claim to have inhabited emergency housing units ("EHUs") that were provided to them by the Federal Emergency Management Agency ("FEMA") as a result of the alleged uninhabitability of their residences due to Hurricanes Katrina and Rita. (Doc. No. 109, at ¶ 96). Plaintiffs claimed injuries resulting from their alleged exposure to the release of formaldehyde and/or formaldehyde vapors in those EHUs. (Doc. No. 109, at ¶ 30). One of those plaintiffs was Alana Alexander, who first filed suit on February 27, 2009. (*Age, et al. v. Gulf Stream Coach, Inc., et al.*, 09-2892, Doc. No. 1). After Katrina, the Plaintiff and her minor children resided in an EHU that was built in 2004.

In April of 2009, she and her minor child were selected as the bellwether plaintiffs in a trial against Gulf Stream. (Doc. No. 1299).

In her original Complaint for Damages, the Plaintiff alleged the EHU in which she resided was defective and unreasonably dangerous. (*Age, et al. v. Gulf Stream Coach, Inc., et al.*, 09-2892, Doc. No. 1, ¶ 101). She further alleged that the defects in the unit were the result of Gulf Stream's failure to warn the Plaintiff of the unreasonably dangerous nature of the housing unit, or to warn her adequately of the presence of excessive levels of formaldehyde emissions and all associated hazards. Id. at ¶ 102(iii), (vii).

On June 5, 2009, the plaintiffs filed their Third Supplemental and Amended Complaint. (Doc. No. 1686). Within the amended complaint, the plaintiffs made the following allegation:

> Plaintiff respectfully reiterates and incorporates all of the allegations set forth in the Original Complaint with respect to the cause of action against the defendant Gulf Stream manufacturer under the Louisiana Product Liability Act (Paragraphs 97 through 102 of the Original Complaint). Additionally, and more specifically, <u>plaintiff alleges that the defendant manufacturer's duty to warn her and her family about the dangers and risks of formaldehyde in this travel trailer was **continuing** in nature, and legally was owed to plaintiff by the defendant manufacturer during the entire period that plaintiff and her family occupied this travel trailer</u>.

*Id.* ¶ 12 (emphasis added).

In making this allegation, the Plaintiff has alleged that Gulf Stream's duty to warn about the risks of formaldehyde did not abate at the time the EHU left Gulf Stream's control but subsisted throughout the time the plaintiffs lived in the unit. In response, Gulf Stream brings this motion and asserts that it satisfied its duty to warn the Plaintiff in all respects.

## II.   LEGAL STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be rendered if the pleadings, discovery, disclosure materials and affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter

2

of law. FED.R.CIV.P. 56(c). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* Further, "It is axiomatic that where questions of law alone are involved in a case, summary judgment is appropriate." *Int'l Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Tx. Steel Co.*, 538 F.2d 1116, 1119 (5th Cir. 1976).

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *see also Lavespere v. Liberty Mut. Ins. Co.,* 910 F.2d 167, 178 (5th Cir.1990). Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must go beyond the pleadings and through affidavits, depositions, answers to interrogatories, and admissions on file must designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Auguster v. Vermillion Parish School Bd.,* 249 F .3d 400, 402 (5th Cir.2001).

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir.2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). The Court will not, "in the absence of any proof, assume that the nonmoving party

could or would prove the necessary facts." *See id.* (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir.2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.1994), *cert. denied,* 513 U.S. 871 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little,* 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys,* 298 F.3d 434, 440 (5th Cir.2002).

### III.   LAW AND ARGUMENT

**A. FEMA's status as a sophisticated user absolves Gulf Stream of any alleged duty to warn.**

Under the LPLA, a manufacturer is liable for damage caused by a characteristic of the manufacturer's product that renders the product unreasonably dangerous. La. Rev. Stat. § 9:2800.54(A) (2009). A product is considered "unreasonably dangerous" when the manufacturer who made the product fails to provide an adequate warning about a characteristic of the product

that may cause damage, assuming that characteristic was present at the time the product left the manufacturer's control. *Id.* § 9:2800.57(A). However, the manufacturer is not required to provide an adequate warning about his product when the user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic. *Id.* § 9:2800.57(B)(2). These knowledgeable users are sometimes referred to as sophisticated users or intermediaries. *Jones v. Flowserve FCD Corp.*, 73 Fed.Appx. 706, 711 (5th Cir. 2003). "Similarly, a manufacturer has no duty to warn a sophisticated *purchaser*,"[1] and in fact many cases use the terms sophisticated user and sophisticated purchaser interchangeably. *See Laird v. Deep Marine Technology, Inc.*, 2005 WL 22949, *4 (E.D.La. Jan. 4, 2005); *Abadie v. Metropolitan Life Ins. Co.*, 784 So.2d 46, 78 (La. App. 5 Cir. 2001).

In this case, the United States is a sophisticated user and purchaser of Emergency Housing Units, and thus Gulf Stream was under no obligation to provide an adequate warning about any potentially damage-causing characteristics in the EHUs. Multiple cases have analyzed whether the federal government can be a sophisticated user/purchaser. In *Morgan v. Brush Wellman, Inc.*, the plaintiffs brought a products liability action against the United States and multiple manufacturers for injuries sustained after the plaintiffs were exposed to beryllium. 165 F.Supp.2d 704, 706 (E.D. Tenn. 2001). The defendant-manufacturers supplied beryllium to a number of facilities owned by the United States and used for the construction of nuclear weapons. *Id.* at 708, 713. The plaintiffs worked at these facilities and were in turn exposed to beryllium-containing parts of nuclear weapons. *Id.* at 706.

In response to the plaintiff's allegations, the court acknowledged that Tennessee law states a manufacturer is relieved of its duty to warn about the dangers of its products when the

---

[1] *Davis v. Avondale Indus.*, 975 F.2d 169, 172 (5th Cir. 1992) (emphasis in original).

5

products are sold to a sophisticated user.[2] The court then concluded that the United States was a sophisticated user because it used beryllium in the creation of the first atomic bomb, the Dept. of Energy performed the first studies on beryllium toxicity and set the standards for occupational and out-of-plant exposures, and other U.S. agencies executed comprehensive safety programs for worker protection from beryllium dangers. *Morgan*, 165 F.2d at 718. In the court's opinion, "the United States is arguably the world's most sophisticated user of special nuclear materials, including beryllium." *Id*. Thus, all of the plaintiff's claims against the manufacturing defendants based on their alleged failure to warn were barred by the defense. *Id*.

In *Akin v. Ashland Chem. Co.*, the plaintiffs alleged they were injured while cleaning jet engine parts due to low-level, chronic exposure to chemicals produced by the defendant-manufacturer. 156 F.3d 1030, 1037 (10th Cir. 1998). The plaintiffs suffered these injuries while working at a United States Air Force base in Oklahoma. *See id*. at 1035 n. 3. In considering whether the manufacturer failed to warn the plaintiffs about the dangers associated with the chemicals at issue, the court acknowledged that – just as under the LPLA – where the product's danger or potential for danger is known to the user, the duty to warn is eliminated. *Id*. at 1037. The court held that the United States, which had purchased the chemicals from the manufacturer, was a sophisticated purchaser that should have known the risks involved with low-level chemical exposure because there was a the wealth of research available on the topic, the Air Force was able to conduct studies, and it had an extremely knowledgeable staff. *Id*.

*Morgan* and *Akin* are directly applicable to the instant litigation to show that the United States, through FEMA, is a sophisticated user/purchaser of EHUs. First, prior to Hurricane

---

[2]    *Id*. While the court did not compare the Tennessee law to counterparts in other states, it is important to note that this law and Louisiana law both relieve a manufacturer of its duty to warn when the user is "sophisticated" with respect to product characteristics. *See id*.; LA. REV. STAT. § 9:2800.57(B)(2) (2009).

6

Katrina, FEMA had many years of experience supplying both travel trailers and other forms of temporary housing to disaster victims, including Louisiana residents. *See* Deposition of David Garratt, taken on July 7, 2009, p. 22, attached as Exhibit "A" (stating that travel trailers were used in the disaster relief efforts undertaken for Hurricane Andrew in 1992). Because of its extensive experience, FEMA knew exactly what it was buying when it purchased EHUs for disaster relief post-Katrina. *See id*. at 157—58; Deposition of David Porter, taken on July 8, 2009, p. 115—16, 161—62, attached as Exhibit "B." For example, it knew that manufacturers of manufactured housing built units that complied with HUD standards, and it knew that the manufacturers of travel trailers were providing recreational vehicles to which no HUD standards applied. *See id*. It also knew that travel trailers contained formaldehyde. *See* Deposition of Martin McNeese, taken on July 14, 2009, p. 35, attached as Exhibit "C." As Martin McNeese, FEMA's Emergency Program Specialist at the time of Hurricane Katrina, stated, it was no surprise that the travel trailers contained that chemical. *Id*. at 108. In fact, FEMA knew that not only an industry-standard travel trailer but also a conventional home would contain formaldehyde. *Id*. at 107—08. Nevertheless, FEMA deliberately chose to use travel trailers, rather than mobile homes, because of their practicality and functionality. *See* Exhibit A, at 207—08. Just like the government in *Morgan*, FEMA's extensive use of EHUs prior to Katrina and its knowledge of the component parts therein make it a sophisticated user/purchaser of the product.

Second, with respect to the installation of EHUs after Katrina and the formaldehyde issues that followed, FEMA showed its sophistication by taking responsibility for handling the situation. *See id*. at 225—26. During emergencies, FEMA is solely responsible for the disaster environment, as well as the coordination, engagement and application of all federal resources – including EHUs – to support the affected state. *See id*. at 226—27. In terms of expertise and

7

agency responsibility, FEMA shares the accountability with other agencies, but FEMA is at the top of the multi-organizational activity. *Id*. As part of this overarching responsibility, FEMA hired multiple contractors to install and setup EHUs after Katrina, and these contractors aired out the units to make them ready for occupancy. Exhibit B, at 56, 93—95. FEMA expected its contractors to interact with occupants, and receive and handle complaints in the first instance. *See* Exhibit A, at 39—40. It also addressed the limited air quality complaints it received on a case-by-case basis with ventilation instructions, and if necessary, made a "swap" of the trailer for a different one. *See id*. at 88—89, 92—96. Additionally, FEMA ran formaldehyde tests on unoccupied trailers in its inventory beginning in March 2006, the month FEMA says it learned of the formaldehyde concern.[3] Thus, just as in the *Akin* decision, FEMA had the ability to study the effects of the product it purchased, and it did so. The fact that FEMA used its contractors to air out the units, and that FEMA tested the units for formaldehyde levels, shows that FEMA was aware of the characteristics inherent in these units before the Plaintiff ever moved in. Considering FEMA's involvement in purchasing, utilizing, and responding to complaints regarding EHUs, Gulf Stream asserts that FEMA is a sophisticated user/purchaser of EHUs. From its prior experience, FEMA knew what it was purchasing when it obtained these units, and this knowledge included the awareness that the units contained formaldehyde.

**B. FEMA instructed Gulf Stream not to contact EHU residents, and Gulf Stream had no way of identifying the Plaintiff by name or address.**

Further, Gulf Stream asserts that it did not violate any obligation to warn because it had no ability to provide a warning to the end users of the EHUs, including the Plaintiff in this case. Early in the timeline of formaldehyde complaints, Gulf Stream advised FEMA that it was "ready,

---

[3]   (Rec. Doc. 1545-12, ¶¶ 3, 8—9). These tests occurred more than two months before the Plaintiff and her minor child moved into the 2004 Gulf Stream unit. Thus, the evidence shows that FEMA was aware of and responding to the formaldehyde issue well before the Plaintiff became an EHU resident.

willing, and able to work with FEMA with regard to any complaint," but Gulf Stream was expressly instructed to address any such complaints to FEMA and <u>not</u> to make any future contact with travel trailer occupants. *See* GULF0004478, attached as Exhibit "D." Instead, Gulf Stream was directed to refer any and all such complaints to FEMA for future handling. *Id*. Thus, even if Gulf Stream desired to communicate with the EHU occupants, FEMA forbade such interaction, at least without its consent. This Court has become well acquainted with FEMA's "Privacy Act" policy with regard to the occupants of its travel trailers. Under that policy, only FEMA had information about the identities of the thousands of EHU occupants, and FEMA considered itself legally bound not to disclose that information to anyone. In turn, Gulf Stream had no way of identifying the occupants, including the Plaintiff in this case, unless they made a direct complaint to Gulf Stream. Even if the Plaintiff had made such a complaint, Gulf Stream was directed by FEMA to refer any such inquiry back to the Agency. *See id*.

In addition to Gulf Stream, Fluor, the installation contractor who setup the Plaintiff's EHU, discussed the issue of formaldehyde with FEMA. *See* Deposition of Charles Whitaker, Jr., taken on August 5, 2009, p. 131—32, attached as Exhibit "E." FEMA told Fluor that the Agency was developing a plan for a communications and mitigation. *Id*. According to FEMA, the formaldehyde complaints were "not [Fluor's] issue," no further action on Fluor's part was necessary, and FEMA did not need Fluor's assistance. *Id*. at 131—32, 145.

This evidence shows that FEMA took ownership of this issue from the start, to the exclusion of all other parties. There was absolutely no feasible, practical or possible way for Gulf Stream to get any post-sale warning, even if one were due, directly to the Plaintiff. From the start of its disaster relief operations to their conclusion, FEMA had the responsibility for the timing, content, and distribution of all notices to its occupants. *See* Exhibit A, at 100—02.

9

Admittedly, the Fifth Circuit has noted that no Louisiana court has addressed whether a manufacturer who sells to a sophisticated user has a continuing duty to warn foreseeable third party users other than the sophisticated purchaser. *Mozeke v. Int'l Paper Co.*, 933 F.2d 1293, 1297 (5th Cir. 1991). Although thorough research since that case has not turned up any applicable jurisprudence on the issue, authorities from other jurisdictions have discussed the matter. As recognized by the Fifth Circuit, some courts and statutes outside of this jurisdiction shape the issue of warning end users in terms of what the manufacturer can expect an intermediary to do, especially if the intermediary has a duty to the end user. *See Davis v. Avondale Indus.*, 975 F.2d 169, 173 (5th Cir. 1992) (citing *Adams v. Union Carbide Corp.,* 737 F.2d 1453, 1457 (6th Cir. 1984)); *see also* Restatement (Second) of Torts § 388 cmt. n ("Modern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, **particularly if it is their duty to do so**.") (emphasis added). Here, Gulf Stream had no access to the end users other than through FEMA, so it had no capacity to provide this information directly to the EHU occupants. FEMA was the only entity that held the identities of its occupants, so Gulf Stream was justified in relying on FEMA to provide health notices to the occupants. Accordingly, Gulf Stream believes that under these circumstances, it had no obligation to warn FEMA about characteristics of the EHUs that FEMA already knew about, and Gulf Stream had no ability to provide any warnings beyond FEMA. Gulf Stream satisfied any duty it had to warn FEMA or the end users and handlers of these EHUs.

**C. Gulf Stream had no continuing duty to warn the plaintiffs in this case.**

As stated above, the plaintiffs have recently amended their complaint to include the claim that Gulf Stream's duty to warn them about the dangers and risks of formaldehyde in the subject EHU was continuing in nature and was owed during the pendency of the plaintiffs' occupancy in

10

the EHU. (Doc. No. 1686, ¶ 12). This allegation implicates provisions of the LPLA; namely, if the manufacturer acquires knowledge after the product has left the manufacturer's control that any characteristic of the product may cause damage, he is liable for his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product. *Id*. § 9:2800.57(C). Thus, "the manufacturer's duty to warn is a continuing one." *Am. Cent. Ins. Co. v. Terex Crane*, 861 So.2d 228, 231 (La. App. 1 Cir. 2003).

A Louisiana state court decision, *Am. Cent. Ins. Co. v. Terex Crane*, provides an excellent example of the continuing duty a manufacturer owes to the users and handlers of its product. The plaintiff sought damages from a number of defendants, including the manufacturer of an industrial crane, for injuries sustained when that crane malfunctioned in 1996. *Id*. at 231—32. The malfunction occurred when an anchor bolt securing the brakes on the crane failed. *Id*. at 232. The parties learned that the same type of anchor bolt had failed in 1985. *Id*. at 232—33. As part of its adequate warning analysis, the court stated that failure of the bolt in 1985 put the manufacturer on notice that the anchor bolt required maintenance critical for safety. *Id*. at 233. The manufacturer's failure to advise the user about the danger inherent in the bolt could have resulted in the same accident occurring in 1996. *Id*. Thus, the court upheld the trial court's ruling that the manufacturer was at fault for failing to warn the crane operator about the problems with the anchor bolt. *See id*. at 233—34.

In this case, the plaintiffs have attempted to make the same type of argument that the plaintiff did in *Terex Crane*: Gulf Stream learned of a potentially damage-causing characteristic after the EHU left its control, and thus it had an obligation to warn its users about that characteristic. However, there is a crucial fact present in *Terex Crane* that is not present in this case – in 1985, the crane manufacturer learned of a problem with the same type of bolt that

11

eventually failed again in 1996. In sharp contrast, Gulf Stream has acquired absolutely no knowledge about the same type of characteristics in the Plaintiff's EHU that would give rise to a continuing duty to warn. The Plaintiff resided in an EHU that was built in 2004, prior to the Katrina and Rita hurricanes. The evidence shows that EHU residents experienced zero problems with the 2004 Gulf Stream units. Prior to Katrina, Gulf Stream's track record with respect to providing EHUs was one of success, and this specifically included the experience with the thousands of travel trailers sold to FEMA in the wake of the 2004 Florida hurricanes. *See* Exhibit B, at 76—78; Exhibit C, at 100—01; Deposition of Stephen Miller, taken on July 9, 2009, p. 184, attached as Exhibit "F." Though they had no knowledge of formaldehyde-related complaints, senior officials at FEMA even attempted to research and track down alleged anecdotal reports of pre-Katrina issues. *See* Exhibit A, at 178—81, 204—06. However, they were unable to turn up anything resembling an "issue," let alone any hint of an "unreasonably dangerous" condition that could potentially trigger any post-sale duty to warn. *Id.* As David Garratt, Acting Deputy Administrator of FEMA, said:

> Q. As we sit here today, based on whatever investigation that you're aware of that FEMA has done, you're not aware of any single formaldehyde claim presented to FEMA based on travel trailers put out into the public prior to Hurricane Katrina?
>
> A. I have no direct knowledge of that. Again, there [are] anecdotal reports of that. Nothing that has been confirmed that I'm aware of.
>
> Q. As of September the 1st, 2005, when you walked into the Katrina situation, did you have any reason to believe that travel trailers were going to be a problem?
>
> A. From a formaldehyde --
>
> Q. From a formaldehyde standpoint.
>
> A. None whatsoever.

*Id.* at 206—07.

The utter lack of any complaints regarding formaldehyde in the 2004-model EHUs shows that Gulf Stream had no reason to believe that any of the 2004 trailers contained a potentially damage-causing characteristic. The Plaintiff has alleged that Gulf Stream learned of formaldehyde complaints during the Plaintiff's occupancy, and this created a duty on the part of Gulf Stream to warn of those dangerous conditions. However, whatever Gulf Stream may have learned about problems in post-Katrina units would have no impact on what it knew about 2004 units. Because the Plaintiff resided in a 2004 unit, Gulf Stream never learned of any damage-causing characteristic in the Plaintiff's EHU after the unit left Gulf Stream's control that would trigger the continuing duty to warn. The absence of evidence regarding problems in the 2004 units also shows that Gulf Stream never breached its duty to warn when the trailers were still in Gulf Stream's control because there was no indication that the trailers contained a damage-causing characteristic. Thus, Gulf Stream asserts that it satisfied its duty to warn in all respects.

## IV.    CONCLUSION

Gulf Stream asks this Court to grant summary judgment in its favor because Gulf Stream has satisfied its duty to warn under the LPLA in all respects.

Respectfully Submitted:

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER & WEINSTOCK**

s/Andrew D. Weinstock
_____
**ANDREW D. WEINSTOCK #18495
JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
(504) 832-3700
(504) 837-3119 (FAX)
andreww@duplass.com
jglass@duplass.com

and

**SCANDURRO & LAYRISSON**
**Timothy D. Scandurro #18424**
**Dewey M. Scandurro #23291**
607 St. Charles Avenue
New Orleans, LA 70130
(504) 522-7100
(504) 529-6199 (FAX)
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc.**

## C E R T I F I C A T E

I hereby certify that on the 17th day of August, 2009, a copy of the foregoing Memorandum in Support of Motion for Partial Summary Judgment was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
|     FORMALDEHYDE | * | |
|     PRODUCTS LIABILITY | * | SECTION: N(5) |
|     LITIGATION | * | |
| | * | JUDGE: ENGELHARDT |
| This Document Relates to: *Charlie Age, et al. v.* | * | |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**GULF STREAM'S STATEMENT OF UNCONTESTED MATERIAL FACTS**

**NOW INTO COURT,** through undersigned counsel, comes Defendant, Gulf Stream Coach, Inc. ("Gulf Stream"), who, in support of its Motion for Summary Judgment states the following uncontested material facts solely for the purpose of this Motion.

1. This Multi-District Litigation is the consolidation of several state and federal toxic tort suits in which an estimated thirty thousand named plaintiffs claimed to have inhabited emergency housing units that were provided to them by the Federal Emergency Management Agency as a result of the alleged uninhabitability of their residences due to Hurricanes Katrina and Rita.

2. The Plaintiff, Alana Alexander, resided in a travel trailer, VIN No. 1NL1GTR2551021783, after Hurricane Katrina.

3. That unit, VIN No. 1NL1GTR2551021783, was built in 2004.

4. The Plaintiff initially moved into that unit in May 2006.

5. In the Fall of 2004, Gulf Stream ordered and specified low formaldehyde-emitting ("LFE") wood for use in its products.

6. For nearly 20 years, FEMA has purchased travel trailers for use in its hurricane relief efforts throughout the United States.

15

7. FEMA knew that these trailers contained formaldehyde.

8. Pursuant to its Privacy Act, FEMA prevented Gulf Stream from dealing directly with hurricane victims who occupied temporary housing.

    Respectfully Submitted:

    **DUPLASS, ZWAIN, BOURGEOIS,**
    **PFISTER & WEINSTOCK**

    s/Andrew D. Weinstock
    _____
    **ANDREW D. WEINSTOCK #18495**
    **JOSEPH G. GLASS #25397**
    3838 N. Causeway Boulevard, Suite 2900
    Metairie, Louisiana 70002
    (504) 832-3700
    (504) 837-3119 (FAX)
    andreww@duplass.com
    jglass@duplass.com

    and

    **SCANDURRO & LAYRISSON**
    **Timothy D. Scandurro #18424**
    **Dewey M. Scandurro #23291**
    607 St. Charles Avenue
    New Orleans, LA 70130
    (504) 522-7100
    (504) 529-6199 (FAX)
    tim@scanlayr.com
    dewey@scanlayr.com
    **Counsel for Defendant, Gulf Stream Coach, Inc.**

## C E R T I F I C A T E

I hereby certify that on the _____ day of ____, 2009, a copy of the foregoing Statement of Uncontested Material Facts was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

    s/Andrew D. Weinstock

_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com