David Edward Garratt                                      July 7, 2009
Washington, DC

Page 1

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF LOUISIANA

3                      NEW ORLEANS DIVISION

4    In Re:  FEMA Trailer    )

5    Formaldehyde Products  ) MDL No.  1873

6    Liability Litigation    )

7

8                              Washington, D.C.

9                              Tuesday, July 7, 2009

10   Videotape Deposition of DAVID EDWARD GARRATT, called

11   for examination by counsel for Plaintiffs in the

12   above-entitled matter, the witness being duly sworn

13   by CHERYL A. LORD, a Notary Public in and for the

14   District of Columbia, taken at the offices of NELSON

15   MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16   Avenue N.W., Suite 900, Washington, D.C., at 9:07

17   a.m., and the proceedings being taken down by

18   Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22

David Edward Garratt                                          July 7, 2009
Washington, DC

1          What was your -- do you recall what your

2    first job title was?

3        A.    Just a program specialist.  I'm not sure I

4    had a title per se, other than the position that I

5    applied for.  It was in the federal planning branch,

6    I believe.

7        Q.    So once you began your tenure with FEMA,

8    you began as a program specialist, but eventually,

9    throughout the past 14 years worked in various

10   positions and through the reorganization of FEMA, and

11   that was in 2007?

12       A.    Couple of reorganizations.

13       Q.    To where you're now the acting deputy

14   director?

15       A.    Deputy administrator.  And again, this is

16   a temp gig.

17       Q.    What does that mean?

18       A.    It means that this is a Senate-confirmed

19   position, so there will be a Senate-confirmed

20   appointee coming in to replace me, and I'll be

21   reverting back to the deputy assistant administrator

22   of disaster assistance, career position that I

David Edward Garratt                                    July 7, 2009
Washington, DC

Page 39

1      A.      Well, because the emergency housing units

2    are provided under the aegis of the individual

3    assistance program and the public assistance program,

4    those programs are managed at least at the

5    headquarters level by our directorate, so I don't

6    think there was any doubt that this was our

7    directorate's responsibility at the time.

8      Q.      Well, go on to say that prior to the

9    disaster assistance directorate assuming response

10   coordination responsibility of the formaldehyde issue

11   in June 2006, FEMA's Gulf Coast recovery office had

12   through its assigned transitional recovery offices in

13   each state been responding to occupants' air quality

14   complaints on a case-by-case basis.

15          What was your understanding in June of

16   2006 of how the Gulf Coast recovery office was

17   responding to air quality complaints?

18     A.      I'm not sure what you mean when you say my

19   understanding of how they were responding to

20   complaints.

21          You mean the -- the mechanism by which

22   they respond to complaints, how they're set up to

David Edward Garratt                                          July 7, 2009
Washington, DC

Page 40

```
 1    respond to complaints?

 2         Q.    How they're set up to respond to

 3    complaints and how did they actually respond to

 4    complaints, if you know?

 5              MR. MILLER:  Objection, compound.

 6         A.    In terms of the former, the transitional

 7    recovery offices, which are really extended versions

 8    of our joint field offices that we set up in every

 9    disaster operation, but these are there long term,

10    and we typically staff them with longer-term

11    employees, have maintenance and deactivation

12    contracts, and those maintenance and deactivation

13    contractors -- and they had numerous maintenance and

14    deactivation contractors -- supporting each of the

15    transitional recovery offices, depending on which

16    state that you're in are assigned a certain sector

17    area, and occupants of emergency housing units in

18    those areas would call this particular maintenance

19    and deactivation contractor if they have an issue or

20    a problem with a unit, and it was that contractor's

21    responsibility to respond and address and deal with

22    the issue.
```

David Edward Garratt                                          July 7, 2009
                         Washington, DC

Page 88

1    any way to answer that.

2         Q.    What if any mechanism was in place for

3    FEMA to follow up on the installation work by these

4    contractors in order to determine whether or not in

5    fact formaldehyde levels might have been affected by

6    what they did?

7              MR. MILLER:  Objection, foundation.

8         A.    I'm not aware that any retroactive

9    activity took place to see if any of the installation

10   actions of any of the contractors may have contribute

11   to do an increase in formaldehyde.

12             BY MR. MEUNIER:

13        Q.    Now, in your declaration at page 3, you

14   also talked today about the fact that prior to June

15   of 2006, FEMA was responding to occupant complaints

16   about air quality in the units on a case-by-case

17   basis.

18             Correct?

19        A.    Correct.

20        Q.    And do you know as you sit here today when

21   the first complaints reached FEMA concerning air

22   quality in these units?

David Edward Garratt                                                July 7, 2009
Washington, DC

Page 89

1      A.    I do not.

2      Q.    Would you be in a position to deny the

3  fact that the first complaints reached FEMA as early

4  as October of 2005?

5      A.    I've got no basis to deny that.

6      Q.    And so assuming that to be true, between

7  October 2005 and June 2006, for roughly an 8-month

8  period of time, FEMA was handling complaints about

9  these units -- complaints by occupants on a

10  case-by-case rather than programmatic basis.

11            MR. MILLER:  Objection, assumes --

12            BY MR. MEUNIER:

13      Q.    True?

14            MR. MILLER:  Objection, assumes facts not

15  in evidence, hypothetical.

16      A.    Certainly true as far as air quality

17  issues.

18            BY MR. MEUNIER:

19      Q.    So there was no programmatic coordination

20  of FEMA's responses to the complaints that it was

21  receiving about formaldehyde concerns for the 8-month

22  period of time we're talking about?

David Edward Garratt                                                July 7, 2009
Washington, DC

```
 1              So they are the ones who would be
 2    responsible for generating at their level direction
 3    and guidance to the entities operating under their
 4    authority.
 5              BY MR. MEUNIER:
 6         Q.   They were not receiving any direction from
 7    above, that is, from FEMA.
 8              True?
 9              MR. MILLER:  Objection.
10         A.   I would say that's false.
11              They were receiving a lot of general
12    policy-related direction from FEMA.  I am not aware
13    that they were receiving any specific direction
14    regarding air quality from FEMA headquarters at that
15    time.
16              BY MR. MEUNIER:
17         Q.   Now, you've testified today that there
18    were a, quote, slew, in your words, or, quote, many
19    complaints that were being received and handled on a
20    case-by-case basis prior to June 2006.
21              Correct?
22         A.   Correct.
```

David Edward Garratt                                    July 7, 2009
                        Washington, DC

Page 93

1        Q.    Any idea, how many?

2              Can you quantify?

3        A.    When I said, slew, I was referring to the

4   full range of occupant-related issues, whether it be

5   a refrigerator that's not working or a crack in the

6   door, or, my unit is -- is wobbly.

7              I'm talking about the range of concerns.

8   And, no, I --

9        Q.    Okay.

10       A.    -- don't have an idea.

11       Q.    Does -- do you know of any records that

12  exist today which would tell us the number of

13  complaints that were received by these various

14  offices in the field specifically regarding air

15  quality or formaldehyde?

16       A.    They're all required to -- those

17  maintenance and deactivation contractors maintain

18  records and keep those records, so, yes, those

19  records should be available.

20       Q.    Have you reviewed those records?

21       A.    I recall seeing a -- one set of records

22  probably about year and a half to 2 years ago.  I

David Edward Garratt                                                July 7, 2009
                        Washington, DC

1    don't remember from which MDC, or maintenance and

2    deactivation contractor, that was, but I do recall

3    seeing some records.

4        Q.    And what did those records indicate to you

5    in terms of the volume or number of air quality or

6    formaldehyde-related calls?

7        A.    At the time, there were not that many.  I

8    don't remember how many there were, and I'm not even

9    sure I remember exactly what the circumstances were

10   under which we requested that information.

11            It may have been for a snapshot in time as

12   opposed to everything to that point.  I recall us

13   asking to be pro- -- asking the field to provide us

14   records dealing with some period in time, but I don't

15   recall what that time was or even the -- necessarily

16   the impetus -- the impetus for that request.

17       Q.    And what do the records reflect was being

18   said to people who complained about air quality or

19   formaldehyde?

20            What -- what kind of response was being

21   given to those types of complaints?

22       A.    I would -- as I recall, different types of

David Edward Garratt                                    July 7, 2009
Washington, DC

Page 95

1    responses were being provided to individuals, but

2    those responses were generally related to what it was

3    that was being reported.

4           For example, air quality issues:  my unit

5    has an odor to it, or, my eyes are watering.  And I'm

6    not saying that these are specific things that they

7    reported at the time.

8           I don't recall for most of the complaints

9    that I saw prior to -- and my memory is vague here --

10   that formaldehyde was mentioned.  It was typically

11   air -- general air quality issues that were

12   mentioned.  It was characterized that way.

13          It wasn't really formaldehyde being

14   reported as the problem until after this became a

15   public issue.

16      Q.    Yes, sir.

17          But my question was, if you can tell me

18   what types of responses were being given to those who

19   called about things like air quality, smell, watery

20   eyes, et cetera?

21          MR. MILLER:  Objection, foundation.

22          BY MR. MEUNIER:

1      Q.     According to the records that you

2   reviewed.

3      A.     I recall imperfectly different responses.

4             In some cases, individuals were told to

5   try and ventilate their units or air it out and then

6   (phonetic) call back.  In some cases, people went out

7   to the units to check on them themselves.  In some

8   cases, a determination was made they needed to swap

9   out a unit.

10            It depends, but different responses.

11     Q.     Now, again, in your declaration, and this

12   is at page 3, you talk about Mr. Souza making a

13   recommendation in late June, which you authorized

14   and -- and supported that FEMA both prepare and issue

15   a safety notice and proceed with testing.

16            Correct?

17     A.     Correct.

18     Q.     You then in late June of '06 as the acting

19   deputy administrator of FEMA had the authority

20   whether or not to approve safety notices, whether or

21   not to approve testing of these trailers.

22            Correct?

David Edward Garratt                                                July 7, 2009
                        Washington, DC

                                                              Page 100
1    quote, number of these safety notices to occupants.

2         A.    Correct.

3         Q.    How many?

4         A.    Don't recall.

5         Q.    Less than a dozen, more than a dozen, 5,

6    6?

7               Can you give me some idea?

8         A.    Well, less than a dozen.

9         Q.    Less than 10, less than 5?

10        A.    I honestly don't know, because not all

11   safety notices were necessarily generated or directed

12   by FEMA headquarters.  The TROs, regions, had the

13   authority to do this on their own.

14        Q.    Who would know the total number of safety

15   notices that were directed to occupants regard- --

16   specifically regarding the formaldehyde concerns in

17   these units?

18        A.    You'd have to talk to whoever was heading

19   up the individual transitional recovery offices at

20   the time.

21        Q.    Well, there's no one person, then, you're

22   saying, at FEMA who had the kind of oversight who

David Edward Garratt                                        July 7, 2009
Washington, DC

Page 101

1    could tell us officially how many safety notices

2    issued to occupants?

3         A.    I think it depends on what it is that you

4    want to talk -- consider a safety notice.

5              For example, we --

6         Q.    Using your term.

7         A.    Right.

8              We approved a safety notice during this

9    period of time, and we directed that this notice be

10   provided to all occupants of all units at that

11   particular time.

12             Now, that does not mean that a TRO on

13   their own could not have gone in and reprovided

14   followup versions of these if they changed a phone

15   number, for example, and wanted to provide new

16   notices to all of the occupants with the new phone

17   numbers on them.  They changed maintenance and

18   deactivation contractors, so they're going out and

19   they're reproviding.  I don't know that they -- that

20   could have happened.

21             The bottom line is, what I know is what

22   headquarters directed, but that does not mean that --

David Edward Garratt                                          July 7, 2009
Washington, DC

Page 102

1   that our field guys didn't on their own also do some

2   distribution of notices.

3       Q.    All right.  Let's just talk about what

4   headquarters directed.

5             Who had input into the language of the

6   safety notice?

7       A.    Our directorate, Office of Chief Counsel.

8   I think our safety office was involved.  The office

9   of health affairs was involved.  We consulted CDC and

10  the Department of Health and Human Services.

11            And I think either Admiral Johnson and/or

12  Chief Paulison were likely involved in that, and it's

13  possible that higher headquarters at the department

14  level was involved as well, but I don't have any

15  specific memory of that.

16      Q.    Did you mention legal counsel?

17      A.    I did.

18      Q.    Who -- which legal counsel had input into

19  the language of the safety notices?

20      A.    I don't recall.

21      Q.    What did the safety notices tell occupants

22  regarding the effects of long-term exposure to

David Edward Garratt                                        July 7, 2009
Washington, DC

Page 157

1    necessarily made any awards on that contract at this

2    stage of the game, just that we had a protocol for

3    going forward to execute the new contracts using

4    these specs and this testing protocol.

5         Q.    Did the new contract protocol extend to

6    each and every manufacturer that was a source of

7    emergency housing units?

8         A.    Yes.

9         Q.    Prior to that change, did -- was it the

10   prevailing view, at least your view, that the con- --

11   that the manufacturers were in fact providing units

12   that complied with the required safety standards for

13   formaldehyde?

14        A.    It was our understanding that the

15   manufacturers were -- if they were producing mobile

16   homes or manufactured housing, producing units that

17   complied with HUD standards.

18        Q.    M-hm.

19        A.    For those who were not producing

20   manufactured housing, they were producing park models

21   or travel trailers, which were recreational vehicles

22   that met or exceeded industry standards since there

David Edward Garratt                                    July 7, 2009
                     Washington, DC

                                              Page 158

1    were no federal standards that applied -- there were

2    no HUD standards that applied to their construction

3    at the time that those units were purchased for

4    Hurricane Katrina.

5         Q.    Well, how did the new specifications for

6    travel trailer manufacturing change what you refer to

7    as the industry standards?

8         A.    Well, our new specifications for park

9    models and mobile homes require that the units test

10   at point- -- what they ended up requiring is that

11   below .016 PPM.

12              Now, how the manufacturers and what the

13   manufacturers did to achieve that level in terms of

14   reducing components, materials, glues, et cetera,

15   that emit formaldehyde was up to them.  We were

16   interested in the outcome, which was a unit that

17   emitted no more than this amount of formaldehyde.

18              For travel trailers, we faced a different

19   or additional concern, and that was, they don't have

20   the ventilation systems that a park model or a mobile

21   home has.

22              So even if they use reduced formaldehyde,

David Edward Garratt                                      July 7, 2009
                        Washington, DC

Page 178

1    2007, firstly an email from you to Mary Margaret

2    Walker.

3              Who is that?

4       A.    She's a member of our external affairs

5    staff.

6       Q.    I'm sorry.

7              At the bottom, Mary Margaret Walker had

8    sent a timeline that she wanted you to look at.

9              Correct?

10      A.    Correct.

11      Q.    And then at the top, Gil Jamieson emails

12   you June 4, and Mary Margaret Walker, expressing some

13   concerns about the timeline.

14              True?

15      A.    Correct.

16      Q.    And the concern that Gil Jamieson

17   expresses about the timeline -- and I'm sorry.  I

18   don't have the actual timeline here, but he refers to

19   the first paragraph referring to, quote, initial

20   applicant complaint, close quote.

21              He wants that deleted he says, because it

22   sounds like the first time we ever heard of the

David Edward Garratt                                              July 7, 2009
Washington, DC

Page 179

1    problem was on March 16, 2006.  This issue has been

2    around a long time, and as I recall, surfaced in

3    previous disasters.  Has anyone researched this.

4            Now, did you know what Gil Jamieson was

5    referring to there?

6        A.    No.

7        Q.    Did you research it or have anyone else

8    research it?

9        A.    Yes.

10       Q.    And what was the result of the research?

11       A.    Inconclusive, anecdotal, no one was able

12   to provide any written documentation that there were

13   prior formaldehyde issues.

14       Q.    From prior disaster responses --

15       A.    Correct.

16       Q.    -- in particular.

17       A.    Gil was one individual who raised this

18   issue in this email.  I'm also aware and I don't

19   remember who the individual was, but somebody from

20   our logistics organization, had also suggested that

21   they had recalled dealing with formaldehyde problems

22   or a formaldehyde issue in a previous disaster, and I

David Edward Garratt                                    July 7, 2009
                    Washington, DC

                                                    Page 180

1   asked staff to look into that and find out what the

2   background was on that, but came back and no one

3   could find anything, and all they were able to

4   identify were these anecdotal beliefs of some people

5   that this existed.

6            Don't have anything more on that.

7       Q.    So there was nothing in the re- -- in the

8   research of that issue to indicate that prior to

9   choosing travel trailers to use for example in

10  connection with this disaster that FEMA, the federal

11  government had any experience from prior disasters

12  suggesting that that would be a formaldehyde problem?

13      A.    Well, I can only speak for myself, and

14  that is that -- and let's keep in my mind, I'd been

15  in this particular job for about 5 months, so it's

16  not like I had a lot of corporate experience with

17  direct housing missions prior to that point.  There's

18  certainly other people in the agency who do.

19            I have no prior knowledge of that.  As I

20  indicated, asked folks to look into it.  I cannot

21  tell you what kind of a job was done in terms of

22  looking into that, how thorough, how comprehensive,

David Edward Garratt                                          July 7, 2009
Washington, DC

Page 181

1    who was talked to.

2              All I know at the end result of that was

3    that weren't -- was unable to validate that there was

4    any systemic issue that existed prior to this.

5        Q.    In the final paragraph of this email to

6    you of June 4, '07, Jamieson says he remains

7    concerned that we seem to be putting ourselves at the

8    tip of the spear on this issue.  We are, quote,

9    consumer of these products, close quote.  The

10   messaging in my view should emphasize our

11   understanding, compassion, and extensive efforts to

12   find ways to mitigate but shift the issue to

13   standards-making groups and the industry.

14             I'm not sure that's a complete sentence.

15             But did you agree with Jamieson's apparent

16   suggestion that FEMA indeed ought to be viewed as the

17   consumer of these products?

18       A.    Well, I think he's technically correct.

19   We are a consumer of those products in that we

20   purchase those from the commercial sector to deliver

21   to end-users, but that doesn't mean that we don't

22   have a responsibility, certainly an inherent

David Edward Garratt                                      July 7, 2009
                        Washington, DC

Page 204

1      Q.      Okay.  And certainly some of those natural
2  disasters were hurricanes.
3              Correct?
4      A.      Correct.
5      Q.      And some of those hurricanes hit -- maybe
6  a lot of them hit on the Gulf Coast in the hot and
7  humid area where a lot of us live.
8              Fair?
9      A.      Fair.
10     Q.      Okay.  I believe you -- you testified
11  earlier that you undertook an investigation to try to
12  determine whether or not there had been any systemic
13  formaldehyde problem prior to Hurricane Katrina with
14  FEMA travel trailers.
15              Right?
16     A.      I think "investigation" is probably too
17  strong a word.
18              I became aware that there was anec- --
19  anecdotally suggestions that this was a problem that
20  existed prior or that people were aware that we'd had
21  formaldehyde issues prior to this.  I was aware of
22  that from at least 2 sources, one being Gil Jamieson

David Edward Garratt                                                        July 7, 2009
Washington, DC

Page 205

1    and one somebody from our logistic staff who I just

2    don't remember who it was.

3            I had asked our staff to go and see if

4    there was -- what was behind this, look into this,

5    come back and tell me, were there in fact instances

6    or formaldehyde problems prior to this.  And the

7    staff was unable to validate that, so --

8        Q.    You turned up nothing concrete in the way

9    of an actual person who had made a formaldehyde claim

10   to FEMA prior to Hurricane Katrina?

11       A.    To be -- again, to characterize this

12   absolutely correctly, asked staff at some point, what

13   was the status of your looking into these prior

14   reports of formaldehyde problems.  And the answer

15   was, we've gone all over the place, we have not been

16   able to find that there have been any -- we have not

17   been able to validate these anecdotal reports of

18   formaldehyde issues.  Had people talk about it that

19   they've heard about it, but we've been unable to find

20   that there are actual formaldehyde-related issues

21   prior to this.

22               So I'm not saying that there were not.

David Edward Garratt                                           July 7, 2009
Washington, DC

Page 206

1    I'm saying that whatever research was done by my

2    staff into this, they were unable to uncover anything

3    that would prove that that was the case.

4         Q.    Okay.  You're not personally aware today

5    of any claims against FEMA based on pre-Hurricane --

6         A.    I'm not.

7         Q.    -- Katrina formaldehyde claims.

8               (Discussion off the record.)

9               BY MR. SCANDURRO:

10        Q.    As we sit here today, based on whatever

11   investigation that you're aware of that FEMA has

12   done, you're not aware of any single formaldehyde

13   claim presented to FEMA based on travel trailers put

14   out into the public prior to Hurricane Katrina?

15        A.    I have no direct knowledge of that.

16              Again, there is anecdotal reports of that.

17   Nothing that has been confirmed that I'm aware of.

18        Q.    As of September the 1st, 2005, when you

19   walked into the Katrina situation, did you have any

20   reason to believe that travel trailers were going to

21   be a problem?

22        A.    From a formaldehyde --

David Edward Garratt                                    July 7, 2009
                    Washington, DC

Page 207

1        Q.      From a formaldehyde standpoint.

2        A.      None whatsoever.

3        Q.      Can you talk a little bit about why FEMA

4    used travel trailers by the thousands both prior to

5    Hurricane Katrina and during the Hurricane Katrina

6    response?

7        A.      They were the preferred direct temporary

8    housing product because of their -- because of their

9    size, because we could move them in and set them up

10   quickly.  I think 80 percent of the units that we

11   provided in response to hurricanes Katrina and Rita

12   were on individuals' private property.  And typically

13   we put travel trailers on private property or often

14   because we can't fit anything else on their private

15   property.  They simply can't accommodate a mobile

16   home on their driveway.

17              So they were used because, number 1, they

18   filled a need that could not be met any other way.

19   2, they were inexpensive compared to a mobile home.

20   3, they allowed people to stay at their property and

21   rebuild their home as opposed to relocating them to a

22   community site that might be miles away and might be

1    far more expensive to build.

2            So a number of reasons I think contributed

3    to the use of travel trailers and their popularity at

4    least within a certain segment of the disaster

5    population on those small properties and wanted to

6    stay on their property and rebuild their home.

7        Q.    Am I also correct that during the prior

8    natural disaster events that we talked about prior to

9    Hurricane Katrina, can we assume that there were

10   young children and elderly people and stay-at-home

11   moms living in those travel trailers as well?

12       A.    I think that's safe to assume.

13       Q.    And again you're not aware of any

14   formaldehyde claims by any of those people in those

15   prior disasters?

16       A.    I'm not personally aware of any.

17       Q.    When you were working with the CDC after

18   Hurricane Katrina, did you become aware of the

19   results of a study that they did in Hancock County,

20   Mississippi, of children's pre-Katrina and

21   post-Katrina doctor visits?

22       A.    Not by -- not by that reference.

David Edward Garratt                                          July 7, 2009
Washington, DC

Page 225

1    may exist within the contract acquisitions framework,

2    but I'm not familiar with the existence of any such

3    policy.

4        Q.    Was it a FEMA practice to make that

5    recommendation?

6        A.    Yes.

7        Q.    Okay.  And you explained that at some

8    point, FEMA came to the realization that it might

9    have a possible systemic formaldehyde problem.  I

10   think that's the way you described it.

11           Is that a fair way to describe it?

12       A.    Yes.

13       Q.    Okay.  And I'm not trying to dictate a

14   date on that, whatever it turns out to be, but at

15   some point in time around the time of the Sierra Club

16   results, I understand that the problem seemed to be

17   one that needed greater attention than perhaps it was

18   getting.

19           Is that true?

20       A.    Yes.

21       Q.    And as I understand your testimony, FEMA

22   assumed the responsibility for coordinating the

David Edward Garratt                                    July 7, 2009
                    Washington, DC

1   response to this issue at that time, whenever it was.

2              Isn't that fair?

3       A.    That is fair.

4       Q.    And FEMA debated what an appropriate

5   response might be, whether it be testing, warnings,

6   or taking people out of the trailers.

7              Is that true?

8       A.    True.

9       Q.    Okay.  And you would agree with me that

10  the responsibility for determining an appropriate

11  programmatic response to this issue lay within the

12  FEMA organization?

13      A.    Let me caveat my response to that and

14  that -- or let me characterize this carefully.

15             FEMA is delegated responsibility for the

16  disaster environment and coordinating the engagement

17  and application of all federal resources and assets

18  to support that state.  So at the top of that

19  multiorganizational activity is FEMA, who is solely

20  or responsible for what goes on by all of those

21  agencies.

22             So, yes, we are ultimately responsible,

David Edward Garratt                                      July 7, 2009
Washington, DC

Page 227

1    but in terms of expertise and agency responsible --

2    agency responsibility, this was something we believed

3    that we shared.

4         Q.   Okay.  With other agencies?

5         A.   Yes.

6         Q.   Okay.

7              MR. HAINKEL:  That's all the questions I

8    have.

9              Thank you.

10             MR. MILLER:  I've got a couple followup,

11   not many.

12             MR. MEUNIER:  We will have some brief

13   redirect after all the cross-examination is

14   completed.

15             MR. MILLER:  Let's go off the record.

16             THE VIDEOGRAPHER:  We're going off the

17   record.  The time on the video is 3:08 PM.

18             (Discussion off the record.)

19             THE VIDEOGRAPHER:  This begins tape number

20   6 in the video deposition of David Garratt.  The time

21   on the video is 3:38 PM.  We are on the record.

22                   EXAMINATION BY COUNSEL FOR