```
                                                                    1

 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF LOUISIANA

 3                    NEW ORLEANS DIVISION

 4    In Re:   FEMA Trailer    )

 5    Formaldehyde Products    ) MDL No. 1873

 6    Liability Litigation     )

 7

 8                                    Washington, D.C.

 9                                    Wednesday, July 8, 2009

10    Videotape Deposition of DAVID LAWRENCE PORTER, called

11    for examination by counsel for Plaintiffs in the

12    above-entitled matter, the witness being duly sworn

13    by CHERYL A. LORD, a Notary Public in and for the

14    District of Columbia, taken at the offices of NELSON

15    MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16    Avenue N.W., Suite 900, Washington, D.C., at

17    9:17 a.m., and the proceedings being taken down by

18    Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22
```

56

1   and the telephone systems were down, so you had to --

2   if I can get through, I would call D.C., if I can get

3   through and let them know, or sometimes Brad would

4   have meetings with the different IA/TACS there, and

5   so they would hear what the priorities are, and if

6   they needed to get resources there, then they got

7   resources to those areas.

8       Q.   All right.  So you didn't -- you didn't

9   actually take part -- during that month or so, you

10  didn't take part in setting up units or seeing units

11  set up --

12      A.   No.

13      Q.   -- going in units, airing them out, none

14  of that?

15      A.   No.

16      Q.   Okay.  Do you remember the identities of

17  any manufacturers or vendors for the setup of units

18  that you became aware of during that --

19      A.   For vendors that were setting up units,

20  when I got there, you had -- you had Fluor, Bechtel,

21  CH2M Hill, and Shaw.  They were the primary.

22      Q.   M-hm.  What -- again, we're just talking

David Lawrence Porter  
Washington, DC  
July 8, 2009

76

1  whoever you saw, you asked them how they were doing
2  and that kind of thing?
3      A.   Yeah, yeah.
4      Q.   You didn't go door to door, do any kind of
5  formal survey of the people?
6      A.   No, no, I didn't do that.
7      Q.   Just whoever you happened to see, you
8  would ask them how they were doing?
9      A.   Yeah.
10     Q.   In this visit of just a couple days to
11 Baton Rouge in dealing with Miller, DeBlasio, trailer
12 occupants, anyone, did the subject of formaldehyde
13 levels in the units ever come up?
14     A.   Not that I remember.
15     Q.   Were you aware at the time of that visit
16 that there had been concerns expressed about
17 formaldehyde levels in the housing units?
18     A.   No.
19     Q.   All right.  Then you said you made a
20 second field visit to New Orleans.
21     A.   Yes.
22     Q.   Where in New Orleans did you go?

77

1    A.    There was a joint field office with the
2    ships. The cruise ships were close by, so I don't
3    know where that is.
4    Q.    All right. That was in the city of New
5    Orleans, on the river?
6    A.    Yeah, on the river.
7    Q.    Okay. And who at that field office did
8    you see or meet with?
9    A.    I don't -- I don't remember the names.
10   They were -- I was just going to encourage people, so
11   I don't remember their names.
12   Q.    When you say, encourage people, are you
13   talking about FEMA staff?
14   A.    You have FEMA staff, state staff --
15   Q.    Okay.
16   A.    -- you know.
17   Q.    Okay. Did you go anywhere else besides
18   the field office in New Orleans?
19   A.    No, I didn't go for no visits there.
20   Q.    How long was your visit to New Orleans?
21   A.    A couple days.
22   Q.    Couple days.

David Lawrence Porter                                    July 8, 2009
Washington, DC

78

1           In that visit, do you remember the subject
2   of formaldehyde in the travel trailers coming up in
3   any way?
4       A.   I don't remember that coming up.
5       Q.   Were you aware at the time of that visit
6   that concerns had been raised about formaldehyde in
7   the units?
8       A.   No.
9       Q.   Do I take it from your testimony that on
10  neither one of these followup field visits that you
11  made, first to Baton Rouge, then to New Orleans, did
12  you have any interaction or dealing with vendors or
13  contractors?
14           Is that true?
15      A.   Did I see them and say hello or --
16      Q.   Communicate with them, talk to them, meet
17  with them, anything like that.
18      A.   I probably did say hello, you know, be
19  cordial.
20      Q.   Okay.  But no discussion that you can
21  remember with contractors about problems with the
22  units or formaldehyde in the units or anything like

David Lawrence Porter  
Washington, DC  
July 8, 2009

93

```
 1              When you say, the notice is usually pasted
 2     in a visible area, are you referring to the notice
 3     from the manufacturers that you talked about in the
 4     first sentence?
 5         A.   Yes, yes.
 6         Q.   And you already described for us that
 7     sometimes you would see notices sometimes pasted,
 8     sometimes not, but in different units, and that's the
 9     same kind of notice you're talking about here?
10         A.   Yeah.
11              That's what I think I'm talking about.
12         Q.   Okay.  And just so I'm clear:  Today you
13     have no recollection that any of those notices dealt
14     with formaldehyde.
15              True?
16              MR. BONE:  Objection.
17              BY MR. MEUNIER:
18         Q.   Today.
19         A.   I do not know what was on the notices.
20         Q.   Okay.  Now, the second part of the
21     sentence here says, prior to the units being
22     considered RFO -- and that's ready for occupancy.
```

David Lawrence Porter
Washington, DC
July 8, 2009

94

1      A.    M-hm.

2      Q.    -- the contractor has already aired the
3  unit out.

4            Tell me on what basis you were saying to
5  Mary Martinet that the contractor would have aired
6  the unit out before it was ready for occupancy?

7      A.    It's consistent with what I told you
8  earlier.

9            When I went into the units or when I was
10 on the staging, the units -- would open the windows,
11 walk through the unit, and even when they're set up,
12 turn on the air condition, open all the windows, and
13 things like that, and, you know, when you leave it,
14 you turn it off, let the unit breathe.

15     Q.    Yes, sir.

16           You -- you told me about before when you
17 would do that on occasion.

18           My question is, on what basis are you
19 telling Mary Martinet in March of '06 that the
20 contractor would have aired the unit out before it
21 was made ready for occupancy?

22     A.    I was doing it -- I was answering this on

```
                                                              95

 1   the way that I did RFOs.
 2        Q.    Are you the contractor?
 3              MR. BAIN:  Objection as to form.
 4              BY MR. MEUNIER:
 5        Q.    My question is, you're saying here, the
 6   contractor would air the unit out.
 7        A.    M-hm.
 8        Q.    Were there occasions when you saw the
 9   contractor air a unit out?
10        A.    For Katrina or for other disasters?
11        Q.    For any disasters.
12        A.    For any disasters, a lot of them would see
13   me, and they would do the same thing.
14        Q.    "They" be the contractors?
15        A.    Right.
16        Q.    The contractors who deliver the units and
17   set them up?
18        A.    Right, because that was also when they
19   checked air -- you had to check the ACs, so --
20        Q.    All right.  So when you told Mary Martinet
21   in March of '06 that before being considered ready
22   for occupancy, the contractor has already aired the
```

David Lawrence Porter
Washington, DC
July 8, 2009

115

1   with that mail.

2       A.   M-hm.

3       Q.   -- that you were not involved with and

4   have no information about new specs that went into

5   effect regarding travel trailers for Katrina victims,

6   specifically on the subject of testing for

7   formaldehyde?

8       A.   For this email, I did not write the specs.

9       Q.   My question was broader than that.

10          Whether you wrote them or not, were you

11  aware of new specs being put into place specifically

12  to allow for testing for formaldehyde levels?

13      A.   I do not recall those specs. I don't

14  remember them.

15      Q.   You see, then, Garratt responds to Ryan

16  Buras, and again, he copies you on the email, and

17  because Buras has been talking about HUD standards --

18      A.   M-hm.

19      Q.   -- which you know that HUD standards for

20  formaldehyde emissions at this point in time were

21  only applied to manufactured housing and not to

22  travel trailers?

1          Were you aware of that?

2     A.   The HUD standards?

3     Q.   HUD standards for -- for formaldehyde.

4     A.   I know the HUD regulations here?

5     Q.   Yes.

6     A.   HUD regulates anything related to the
7  manufactured homes.

8     Q.   Right.

9          But not travel trailers?

10    A.   Not travel trailers and not park models.

11    Q.   Okay. So Garratt in this email response
12 to Buras copied to you says: So did any TT, slash,
13 PM -- and we can assume that refers to travel
14 trailer, park model -- manufacturers voluntarily
15 comply with HUD standards?

16         Let me stop there.

17         Were you aware of there ever being an
18 occasion on which travel trailer or park model
19 manufacturers voluntarily set out to comply with HUD
20 formaldehyde emission standards even though those
21 standards did not apply to travel trailers and park
22 models?

David Lawrence Porter
Washington, DC
July 8, 2009

161

1   represent Fleetwood Enterprises in this lawsuit.

2               You were asked earlier today about an

3   exhibit 7 that was an email stream that included some

4   information from somebody named Ryan Buras asking,

5   has any manufacturer voluntarily constructed travel

6   trailers to the HUD standards relating to

7   formaldehyde.

8               Do you remember that discussion this

9   morning?

10      A.   I don't think they asked did anybody do

11  that.  It said -- it asked, did anybody voluntarily

12  comply with the HUD standards.

13      Q.   Okay.  And your answer this morning was

14  that you were not aware of a manufacturer that had

15  voluntarily complied with the HUD standards relative

16  to formaldehyde?

17      A.   I didn't remember the discussion.  I don't

18  remember anybody that complied -- I don't remember

19  that stuff.

20      Q.   Okay.  So my next question is, do you have

21  any information that no manufacturers in fact did

22  comply with HUD standards for formaldehyde emissions

David Lawrence Porter
Washington, DC
July 8, 2009

162

1    for travel trailers?
2        A.    That no manufacturers did comply.
3        Q.    In other words, do you have any
4    information that you can give us that you believe
5    confirms that any given manufacturer failed to comply
6    with HUD standards for formaldehyde in the
7    construction of their travel trailers that were used
8    in Katrina?
9        A.    They wasn't required to go by the HUD, so
10   I don't see how they could fail it when they wasn't
11   required to do that.
12       Q.    Okay.  And my ques- --
13       A.    I don't have any information regarding
14   that.
15       Q.    You don't have any information one way or
16   the other --
17       A.    I don't --
18       Q.    -- about whether they complied or didn't
19   comply?
20       A.    I don't recall any of that information.
21       Q.    All right.
22       A.    I don't remember it.