UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER FORMALDEHYDE                  MDL NO. 1873
PRODUCTS LIABILITY LITIGATION

                                                                         SECTION N(5)

                                                                         JUDGE ENGELHARDT

                                                                         MAGISTRATE CHASEZ

THIS DOCUMENT RELATES TO:
Anthony Bartel v. Gulf Stream Coach, Inc, et al,
and
Leslie Kujawa, et al v. Keystone RV Company and Bechtel National, Inc.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF BECHTEL NATIONAL, INC.'S RULE 12(b)(6) MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

Table of Contents.................................................................................................i

Table of Authorities ..........................................................................................iii

Introduction .......................................................................................................1

I.    The Allegations of the Complaint ...............................................................2

II.   Background Facts .........................................................................................3

      A.    The Government's Umbrella Contract Contained Requirements for Bechtel's Work .............................................................................4

             1.    Installation Requirements and PWS Exhibit Seven .................................5

             2.    Maintenance Requirements and PWS Exhibit Ten .................................6

             3.    Inspection Requirements and PWS Exhibit Two.....................................7

      B.    The Government Issued Task Orders for Bechtel's Installation, Inspection, and Maintenance Work ..........................................................8

             1.    Task Orders Under the Umbrella Contract...............................................8

             2.    Task Order Three – Installation and Inspection Work .............................9

             3.    Task Order Four – Maintenance Work......................................................9

      C.    The Government Supervised, Controlled, and Inspected Its Contractor's Performance.............................................................................................10

      D.    The Government Continued Using Bechtel's Work Even After Learning of the Risk of Formaldehyde in the Government-Provided Temporary Emergency Housing .......................................................................12

Argument...........................................................................................................13

III.   This Motion Meets the Rule 12(b)(6) Standard..........................................13

IV.   The Government Contractor Defense Displaces State Law Claims Arising From the Work that the Government Hired Its Contractor to Perform ...................14

      A.    The Government Contractor Defense is a Well Established Affirmative Defense.......................................................................................14

      B.    The Government, in Its Discretion, Approved Reasonably Precise Specifications for Bechtel's Work.........................................................16

             1.    Burden for the Government Contractor Defense's First Condition.........16

             2.    The Government Approved Reasonably Precise Specifications .............17

      C.    The Government, in Its Discretion, Determined Bechtel's Work Conformed to the Government's Approved Specifications.................................19

# TABLE OF CONTENTS
(continued)

**Page**

1.    Burden for the Government Contractor Defense's Second
      Condition ................................................................. 19

2.    Bechtel's Work Met the Government Approved Specifications ............. 20

D.    Bechtel Warned the Government About Dangers Associated With Its
      Work About Which Bechtel Had Actual Knowledge ......................... 23

1.    Burden for the Government Contractor Defense's Third Condition ....... 23

2.    The Defense's Third Condition is Met .................................. 24

V.    Conclusion ................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ............................................................................................... 15

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ................................................................................ 13, 18, 22

*Atherton v. F.D.I.C.*,
519 U.S. 213 (1997) ............................................................................................... 15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................................... 13, 14

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ....................................................................................... passim

*Guile v. United States*,
422 F.3d 221 (5th Cir. 2005) ............................................................................ 1, 14

*Carbe v. Lappin*,
492 F.3d 325 (5th Cir. 2007) ................................................................................ 14

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000) ................................................................................ 13

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001) ...................................................................................... 1, 3, 16

*Harduvel v. Gen. Dynamics Corp.*,
878 F.2d 1311 (11th Cir. 1989) ............................................................................ 16

*In re Agent Orange*,
517 F.3d 76 (2d Cir. 2008) ................................................................................... 15

*In re Air Disaster*,
81 F.3d 570 (5th Cir. 1996) ............................................................................ passim

*In re Katrina Canal Breaches Consol. Litig.*,
Civ. A. No. 05-4182, 2007 WL 763742 (E.D. La., Mar. 9, 2007) .................. 13, 16

*In re Katrina Canal Breaches Litig.*,
Civ. A. No.  05-4182, 2008 WL 5234369 (E.D. La., Dec. 15, 2008)........................ 16, 23, 24

*In re Katrina Canal Breaches Litig.*,
   495 F.3d 191 (5th Cir. 2007) ........................................................................ 3, 13

*Jones v. Bock*,
   549 U.S. 199 (2007) ............................................................................................ 14

*Kerstetter v. Pac. Sci. Co.*,
   210 F.3d 431 (5th Cir. 2000) .................................................................... passim

*Miller v. Diamond Shamrock Co.*,
   275 F.3d 414 (5th Cir. 2001) ........................................................... 17, 20, 22, 23

*Nabors Drilling U.S.A. L.P. v. Twister Exploration, L.L.C.*,
   Civ. A. No. 01-2109, 2002 WL 287728 (E.D. La. Feb. 26, 2002) .......................... 3

*Skyline Air Serv., Inc. v. G.L. Capps Co.*,
   916 F.2d 977 (5th Cir. 1990) (per curiam) ........................................ 16, 20, 22, 23

*Smith v. Xerox Corp.*,
   866 F.2d 135 (5th Cir. 1989) .................................................................. 16, 20, 22

*Stout v. Borg-Warner Corp.*,
   933 F.2d 331 (5th Cir. 1991) .......................................................................... 16, 23

*United States v. Gaubert*,
   499 U.S. 315 (1991) ............................................................................................ 14

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*),
   467 U.S. 797 (1984) ................................................................................ 1, 14, 15, 24

*Xavier v. Belfor USA Group, Inc.*,
   Civ. A. Nos. 06-491, 06-7084, 2007 WL 4224320 (E.D. La. Nov. 26, 2007) ......... 3

*Yearsley v. W.A. Ross Constr. Co.*,
   309 U.S. 18 (1940) .............................................................................................. 14

**STATUTES**

28 U.S.C. § 2674 .................................................................................................... 14

**OTHER AUTHORITIES**

48 C.F.R. § 16.603 .................................................................................................. 3

48 C.F.R § 16.603-1 ................................................................................................ 3

48 C.F.R. § 16.603-2(a) .......................................................................................... 4

48 C.F.R. § 16.603-3 ............................................................................................... 4

48 C.F.R. § 52.243-2 ................................................................................................ passim

48 C.F.R. § 52.246-5 ...................................................................................................... 6

48 C.F.R. § 52.246-5(b) ............................................................................................... 21

48 C.F.R. § 52.246-5(c) ........................................................................................... 6, 21

48 C.F.R. § 52.246-5(d) ........................................................................................... 6, 21

48 C.F.R. § 52.246-5(e) ........................................................................................... 6, 21

## INTRODUCTION

In August 2005, even before Hurricane Katrina made landfall, the Federal Emergency Management Agency and other federal agencies ("the Government") undertook planning to address the housing needs of the hundreds of thousands of Gulf Coast residents that the Government feared would be rendered homeless as a result of the coming storm. To address these needs, the Government hired numerous contractors, including Bechtel National Inc. ("Bechtel"), to install and maintain emergency housing. That very same work is now the subject of Plaintiffs' tort claims. The Court, however, may not let Plaintiffs maintain a suit against the Government's contractor merely because the contractor answered the Government's call for help to carry out this emergency mission. Finding liability for a government contractor in these circumstances would be tantamount to allowing Plaintiffs to collaterally attack the Government's protected discretionary decisions about how best to get the Government's work done.

To thwart that precise effect, the Supreme Court recognized an affirmative, federal common law "government contractor defense." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 511-12 (1988). The Court held that if plaintiffs could sue the Government's contractors, federal courts would become a venue for "second-guessing" the exercise of federal discretion. *Id.* (citing *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797, 814 (1984)); *c.f. Guile v. United States*, 422 F.3d 221, 228-31 (5th Cir. 2005) (holding "[s]upervision of a contractor's work . . . is *inherently* a discretionary function") (emphasis added). The Court has since reaffirmed the government contractor defense. "Where the government has directed a contractor to do the very thing that is the subject of the claim, we have recognized this as a special circumstance where the contractor may assert a defense." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) (citing *Boyle*, 487 U.S. at 500).

As is shown below, Bechtel satisfies the government contractor defense's three conditions. *First*, the Government provided reasonably precise specifications for Bechtel's work. *Second*, the Government inspected, approved, and extensively used Bechtel's work. *Third*, Bechtel warned the Government about dangers associated with Bechtel's work about which Bechtel had actual knowledge. Thus, the defense applies and displaces entirely Plaintiffs' state law tort claims.

## I.    THE ALLEGATIONS OF THE COMPLAINT

Plaintiffs claim that the emergency housing they were provided by the Government had levels of formaldehyde that caused them injuries. (Bartel Compl. at ¶ 22 (attached as Ex. 1); Kujawa Compl. at ¶ 17 (attached as Ex. 2).) Additionally, Plaintiffs allege that the Government had actual knowledge of the risk of formaldehyde in the emergency housing. Ex. 1 at ¶¶ 57-66; Ex. 2 at ¶¶ 48-57. Plaintiffs sued Bechtel, the Government's contractor, alleging that the Government tasked Bechtel with installing, inspecting, and maintaining the Government-provided temporary emergency housing. Ex. 1 at ¶ 33; Ex. 2 at ¶ 28. Plaintiffs assert various allegations related to work that Plaintiffs believe the Government "should have" required Bechtel to perform.

Plaintiffs contend that, even though the Government directed that the travel trailers serve as temporary emergency housing, Bechtel "knew or should have known" of "the actual and intended use of the travel trailer by Plaintiffs." Ex. 1 at ¶ 102; Ex. 2 at ¶ 92. Plaintiffs claim that Bechtel breached tort duties arising from this alleged knowledge in two ways. Ex. 1 at ¶ 103; Ex. 2 at ¶ 93. *First*, Plaintiffs assert that under Mississippi law Bechtel should have warned Plaintiffs of the danger of long-term occupancy of the trailers that the Government provided as temporary housing. Ex. 1 at ¶ 103.a; Ex. 2 at ¶ 93.a. *Second*, Plaintiffs assert that under Mississippi law Bechtel should not have put the emergency housing on blocks. Ex. 1 at ¶ 103.b;

2

Ex. 2 at ¶ 93.b.  Both alleged grounds for Plaintiffs claims, however, arise from the very same

installation, inspection, and maintenance work that the Government directed Bechtel to perform.

As such, neither alleged basis for Plaintiffs' claims overcomes the government contractor

defense.  *Malesko*, 534 U.S. at 74 n.6 (holding a "contractor may assert a defense" if "the

government has directed a contractor to do the very thing that is the subject of the claim").

## II.   <u>BACKGROUND FACTS</u>

This Court's October 3, 2008 Order and Reasons explored the arduous circumstances

under which the Government labored when responding to the devastation caused by Hurricanes

Katrina and Rita.  (Order and Reasons at 2-6, Rec. Doc. 717 (attached as Ex. 3).)[1]  As this Court

found, the Government selected the emergency housing, *id.* at 20, and provided it "to Plaintiffs

by making arrangements in the field and by contracting . . . to deliver the [travel trailers], set

them up, and make them available and ready for residential use," *id.* at 22.

The Government hired Bechtel using a "letter contract" even as Hurricane Katrina closed

in on the Gulf Coast.  Contract HSFEHQ-05-D-0572, at BNIF 00000001-06, 00000285-88  ("the

Umbrella Contract") (attached as Ex. 4); *see also* 48 C.F.R. § 16.603 (letter contracts).  The

Federal Acquisition Regulations define letter contracts as a "preliminary contractual instrument."

48 C.F.R § 16.603-1.  The letter contract lets the Government task its contractor immediately,

*see, e.g.*, Ex. 4 at BNIF 00000223, 00000238, but still reserve the right to negotiate a definitized

---

[1] The Court may properly consider exhibits attached to this motion consisting of orders and pleadings filed in this MDL, the inspection packages for both named plaintiffs' emergency housing, and the contract upon which Plaintiffs' claims rely.  *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (court may consider exhibits attached to a motion to dismiss that the complaint references and that are central to the Plaintiffs' claims); *Xavier v. Belfor USA Group, Inc.*, Civ. A. Nos. 06-491, 06-7084, 2007 WL 4224320, *1-2 (E.D. La. Nov. 26, 2007) (court may take judicial notice of pleadings because they are matters of public record); *Nabors Drilling U.S.A. L.P. v. Twister Exploration, L.L.C.*, Civ. A. No. 01-2109, 2002 WL 287728, *1 (E.D. La. Feb. 26, 2002) ("the court may take into account matters of public record, orders, items appearing on the record of the case").

contract later.[2]   Indeed, the Government definitized an indefinite-delivery/indefinite-quantity (ID/IQ) contract with Bechtel in December 2005.  Ex. 4 at BNIF 00000001-06.

### A.   THE GOVERNMENT'S UMBRELLA CONTRACT CONTAINED REQUIREMENTS FOR BECHTEL'S WORK.

The Government's Umbrella Contract provided requirements for Bechtel's anticipated work and specified the means by which the Government retained control over its contractor's performance.  The Government, for example, required that:

> Final inspection and acceptance shall be by the Contracting Officer or his/her duly authorized representative at the FEMA JFO to be specified in individual task orders.  For the purpose of this clause, the COTR named in the Designation of Contracting Officer's Technical Representative [i.e., COTR] clause in this contract is the representative of the Contracting Officer.

Ex. 4 at BNIF 00000296 at ¶ E.2.  Bechtel could not deviate from the Government approved specifications without the Government's "review and approval."  *Id.* at BNIF 00000006 at ¶ 26 ("The Contractor's requests for technical variances from the standards . . . shall be submitted, in writing, to the COTR and CO for review and approval."); *id.* at BNIF 00000301-302 at G.6(a) ("the Contracting Officer's Technical Representative (COTR) [may] perform functions under the contract such as review or inspection" of "services").

The Umbrella Contract has as Attachment A to Section J, a Performance Work Statement ("PWS"), which sets forth requirements for the work that the Government expected Bechtel to perform in the Scope of Work ("SOW").  Ex. 4 at BNIF 00000288, 00000291 at ¶ B.1, 00000294 at ¶ C.1, 00000341-361.  Although the PWS represented the Government's known or anticipated requirements for Bechtel's work, the Government provided additional specifications in "Task Orders" and through other means.  *Id.*

---

[2] The Government's use of a letter contract underscores the urgency of the Government's need.  The Government may only use a letter contract if work must "start immediately and [ ] negotiating a definitive contract is not possible in sufficient time to meet the requirement."  *Id.* at §§ 16.603-2(a), 16.603-3.

1.      **Installation Requirements and PWS Exhibit Seven**

In the SOW and in Exhibit Seven to the PWS, the Government specified how Bechtel

should install travel trailers.  Ex. 4 at BNIF 00000348-49, 00000383-392.  For example, in

paragraph 2.9 of the SOW, the Government instructed as follows:

> The Contractor shall transport and install mobile/temporary structures to be ready
> to occupy in a safe and sanitary condition.  A Task order may require the
> contractor to transport and install mobile or temporary structure(s) at designated
> locations.  The Contractor shall be responsible for returning mobile and temporary
> structures to FEMA Designated facilities as specified in the Task Orders.  NOTE:
> The Exhibits that are provided are an example of installation requirements,
> manufacture recommendations should be followed when ever possible.
> Additional Exhibits may be provided in accordance with disaster specific
> requirements.

*Id*. at BNIF 00000348-349.

In Exhibit Seven to the PWS, the Government provided explicit instructions for Bechtel's

installation work.  *Id*. at BNIF 00000383-384.  Exhibit Seven instructed Bechtel that:

> Travel trailers shall be set-up on concrete piers and after the weigh [sic] of the
> travel trailer is transferred to the piers, *if the unit is not leveled properly the
> contractor will reinstall the unit at no additional cost to the government*.  The
> travel trailer set-up will also include a minimum of six piers (three on each side)
> evenly spaced.  The end piers should not be directly on the end of the unit, but
> approximately six inches off the edge of the unit.  The Contractor shall provide a
> base for each pier.  The base will be ¾"x24"x24" exterior grade plywood.  The
> piers will have at a minimum two solid cap blocks on the base and two solid cap
> blocks at the top of the piers.
>
> The space between the top of the pier's solid cap blocks and the bottom of the
> travel trailer I-beam frame shall not exceed seven inches (7").  Up to four inches
> (4") of this space may be filled with a solid concrete block laid parallel to the
> travel trailer steel I-beam frame.  Up to three inches (3") of this space may be
> filled with blocking timber and wedges laid perpendicular to the travel trailer steel
> I-beam.  No more than one inch (1") of this area shall be shimmed with wedges.
>
> After the weight of the travel trailer is transferred to the concrete piers, the piers
> must be vertically aligned and tightly shimmed with wooden wedges.  *If the piers
> are not vertical at the time of final inspection, they shall be removed and
> reinstalled by the Contractor at no additional cost.  The Contractor will be
> responsible for all necessary re-leveling and reblocking of the travel trailer for a
> period of 90 days after final inspection.*

*Id.* (emphasis added).

Upon definitization, the Government made Exhibit Seven and the other exhibits to the PWS subject to "the applicable inspection clause contained in the [umbrella] contract in Section E." *Id.* at BNIF 00000005 at ¶ 26.  Section E incorporated 48 C.F.R. § 52.246-5 by reference. *Id.* at BNIF 00000296.  Section 52.246-5 reserved to the Government "the right to inspect and test all services" and "[i]f any of the services performed do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, for no additional fee."  48 C.F.R. § 52.246-5(c), (d).  If "defects in services cannot be corrected," or, "[i]f the Contractor fails to promptly perform the services again or take the action necessary to ensure future performance in conformity with contract requirements, the Government may . . . terminate the contract."  *Id.* at § 52.246-5(e).

Additionally, the Government could change the scope of Bechtel's work unilaterally.  Ex. 4 at BNIF 00000391 ("The contractor shall complete miscellaneous tasks assigned by the FEMA COTR or designee, which are not addressed by the above descriptions."); 48 C.F.R. § 52.243-2 (reserving the Government's authority to "at any time, by written order . . . make changes" to the contract's specifications); *see also* Ex. 4 at BNIF 00000315-318, 317 (incorporating § 52.243-2).

## 2.    Maintenance Requirements and PWS Exhibit Ten

In SOW paragraph 2.10 and Exhibit Ten of the PWS, the Government provided instructions for Bechtel's maintenance work.  Ex. 4 at BNIF 00000349-350, 00000404-418. Specifically, the paragraph 2.10 directed Bechtel to "resolve maintenance issues"; "provide . . . refurbishment as required by FEMA"; "operate a toll free maintenance telephone number for occupants of structures to call and report maintenance problems"; "maintain maintenance records"; "provide . . . a copy of [Bechtel's] maintenance log . . . address[ing] such topics as

issues identified, time of call, how and if issue was remedied, cost, time to repair and final disposition." *Id.* at BNIF 00000349-50. Exhibit Ten, moreover, directed Bechtel to perform additional maintenance tasks. *See generally* Ex. 4 at BNIF 00000404-418.

The Government retained control over its contractor's maintenance work through the Government's designated COTR. Ex. 4 at BNIF 00000404-405. Under Exhibit Ten, Bechtel serviced only "units assigned by FEMA." *Id.* at BNIF 00000404, at ¶ 1.a. Bechtel had to keep "records pertaining to tasks assigned . . ." and "make those records available for review upon request." *Id.* at ¶ 1.b. Bechtel had to "[p]erform other tasks as required by the COTR and / or the COTR's designee." *Id.* at ¶ 1.c. Bechtel could only "[c]ontact the manufacturer . . . as approved by FEMA." *Id.* at ¶ 1.f. The Government required that Bechtel "[m]ake repairs identified by FEMA," *id.* at ¶ 1.h, as well as "[o]btain approval from the COTR prior to performing any miscellaneous or unusual requirements," *id.* at ¶ 1.i. The Government controlled repairs of "Major Material Items," meaning any item "valued at over $250." *Id.* at BNIF 00000407 ("The Contractor may replace [Major Material Items] only after prior inspection and approval by the COTR or CO."); *see also id.* at BNIF 00000406 ("**For items and materials considered as Major Material Items the contractor must notify and obtain approval from the COTR prior to performing the work.**") (emphasis in original).

### 3.    Inspection Requirements and PWS Exhibit Two

In SOW paragraphs 2.2.9 and 2.5.1 as well as in Exhibit Two of the PWS, the Government specified how Bechtel had to perform inspections to ensure quality control and compliance with contract requirements. Ex. 4 at BNIF 00000346-347, 00000363-64. In paragraph 2.2.9, the Government required Bechtel to draft proposed performance and quality control plans for the Government to "incorporate[ ] into the contract upon its approval." *Id.* at BNIF 00000346. The Government regarded Bechtel's quality control plans as "a living

document . . . subject to annual updates and submitted for COTR approval." *Id.* In paragraphs 2.5.1, the Government directed that its "contractor shall meet with FEMA representatives to plan and coordinate disaster specific response, deployment, and implementation activities." *Id.* at BNIF 00000347. Similarly, in Exhibit Two, the Government required Bechtel to explain how Bechtel would inspect and monitor "contract deliverables" as well as how Bechtel would "manage and perform all tasks" and create "systems for planning  and control of all activities" performed on behalf of the Government. *Id.* at BNIF 00000363.

### B. THE GOVERNMENT ISSUED TASK ORDERS FOR BECHTEL'S INSTALLATION, INSPECTION, AND MAINTENANCE WORK.

#### 1. <u>Task Orders under the Umbrella Contract</u>

The Government provided requirements in the PWS with the understanding that the Government would issue "Task Orders" for each undertaking that the Government assigned. Ex. 4 at BNIF 00000286 ("the Contractor is not authorized to make expenditures or incur obligations exceeding the amount obligated under individual task orders" (quoting 48 CFR 52.216-24)). Paragraph G.9 of the Umbrella Contract allowed the Government to issue Task Orders "at any time." *Id.* at BNIF 00000303-304. The Government only had to issue a pre-authorization to begin the process. *Id.* at BNIF 00000303 at ¶ G.9 A, 00000223, 00000238. Next, "the Contractor and the Government [would] develop a definitive Statement of Work based on the Contractor's preliminary assessment and recommendations." *Id.* The contractor submitted draft technical, cost, and proposed work plans. *Id.*; *see also id.* at BNIF 00000363 at ¶ 1-3. The Government, however, had the final say over the scope of work in the Task Order:

> A Task Order may be issued without negotiations based on acceptability of the Task Order Proposal. If negotiations are required, the Contract Specialist will arrange a meeting or a conference call among the appropriate Government and Contractor personnel.  The Government may request submission of a Revised Proposal and/or Final Work Plan, if required.  If an agreement cannot be reached

> on any aspect of the task, the Government has the right to unilaterally issue the Task Order, and the Contractor is required to perform . . .

Ex. 4 at BNIF 00000303-304.

The Government issued numerous Task Orders under the Umbrella Contract. Bechtel performed the specific features of work that Plaintiffs complain of, i.e., the provision, inspection, and maintenance of emergency housing in Mississippi, under Task Orders Three and Four. Ex. 4 at BNIF 00000066-070 ("Task Order Three"), 000000100-105 ("Task Order Four"). In both Task Orders Three and Four, the Government set forth additional specifications as well as incorporated by reference requirements in the PWS and the Exhibits to the PWS.

### 2.    Task Order Three – Installation and Inspection Work

In Task Order Three, the Government set forth requirements for Bechtel's installation of the emergency housing and Bechtel's inspection quality control work. Ex. 4 at BNIF 00000066, 00000068-69. The Government directed Bechtel to install the emergency housing "as expeditiously as possible" and in accordance with the Government approved specifications. *Id*. The Government told Bechtel to "execute" Task Order Three's tasks, including the installation work, "in accordance with the PWS" requirements described above. *Id*.

The Government, in Task Order Three, also directed Bechtel to "[e]stablish procedures to ensure the quality of the work performed" and "to monitor and track progress and compliance with contract requirements." *Id*. at BNIF 00000069. Here again, the Government directed Bechtel to "execute the below tasks," including the inspection and quality control work, "in accordance with the PWS contained in the contract." *Id*. at BNIF 00000066.

### 3.    Task Order Four – Maintenance Work

Task Order Four instructed Bechtel to "provide a remedy for any maintenance issues in accordance with the contract Performance Work Statement." Ex. 4 at BNIF 00000101 ¶ 3.1.2,

00000349 at ¶ 2.10; *see also* Part II.A *supra*.   Under Task Order Four's terms, Bechtel's maintenance responsibilities ended on June 16, 2006.  Ex. 4 at BNIF 00000105, at ¶ c.

In addition to the specifications in Task Order Four, however, when the issue later arose, the Government provided Bechtel with instructions for dealing with formaldehyde in the emergency housing.   The Government, in its discretion, "determined that venting units for a short time – 15 to 20 minutes – reduced formaldehyde below the regulatory level of concern." (Gov't Mem. Supp. Mot. Dismiss at 21, Rec. Doc. 1545-2 (attached as Ex. 5); Gov't Statement of Facts at ¶ 9; Rec. Doc. 1545-4 (attached as Ex. 6).)   The Government later verified that its "response action was effective and reduced formaldehyde."  Ex. 5 at 26; Ex. 6 at ¶¶ 9-12.

The Government provided Bechtel with directions for responding to an emergency housing occupants' formaldehyde-related complaints.  Ex. 5 at 21; Ex. 6 at ¶¶ 13-18.   If an occupant expressed concern over formaldehyde in a call to the hotline that Bechtel operated under Task Order Four, the Government told Bechtel to tell the occupant to:

> 1 - Attempt to maintain a temperature >75F inside the trailer to encourage off-gassing of the [formaldehyde]; 2 - Open as many windows as possible while maintaining the temperature in order to promote good ventilation; 3 - Ask the caller to keep us informed of the status of the problem.  4 - Keep FEMA advised.

(Gov't Mot. Dismiss Ex. 24 at 2, Rec. Doc. 1545-29 (attached as Ex. 7); Ex. 6 at ¶¶ 13-18.)  The Government instructed Bechtel to refer "any ongoing concerns" to the Government.  Ex. 7 at 2.

## C.   THE GOVERNMENT SUPERVISED, CONTROLLED, AND INSPECTED ITS CONTRACTOR'S PERFORMANCE.

Plaintiffs allege that the Government tasked Bechtel "with inspecting each unit to ensure that it was safe and habitable, prior to occupancy by the Plaintiffs."  Ex. 1 at ¶ 45; Ex. 2 at ¶ 38. In fact, the Government directed its contractor to perform a different kind of inspection.  *See* Part II.B.2 *supra*.   Bechtel's inspection obligations arose under Task Order Three, wherein the Government required that Bechtel "[e]stablish procedures to ensure the quality of the work

performed" and "monitor and track progress and compliance with contract requirements," Ex. 4 at BNIF 00000069, "in accordance with the PWS contained in the contract." *Id.*

Plaintiffs allege that Bechtel failed to adequately perform the Government's inspection requirements. Ex. 1 at ¶ 45; Ex. 2 at ¶ 38. To the contrary, the Inspection Packages for the Plaintiffs show Bechtel developed procedures for ensuring both the quality of Bechtel's work and compliance with the Government approved specifications. Kujawa Inspection Package at 1-2 (attached as Ex. 8); Bartel Inspection Package at 1 (attached as Ex. 9); Hume Aff. (attached as Ex. 10). The Inspection Checklist in the Bartel Inspection Package, for example, shows Bechtel had a quality control process for determining if the installation work had been acceptable and if the emergency housing had been properly "set-up and level on jacks." Ex. 8 at 6-7.

The Government, moreover, inspected Bechtel's work using Standard Form 90-13, Temporary Housing Inspection Report ("SF 90-13"). (Miller Decl. at ¶ 4, Rec. Doc. 196-21 (attached as Ex. 11); *see also* Gov't Mot. Dismiss Ex. 11-A at 2-3, Rec. Doc. 196-22 (attached as Ex. 12).) The SF 90-13 indicates the Government used the form "to document the condition of the mobile home and contents during each transaction that occurs." Ex. 12 at 3. Among the transactions listed, both the "Dispatch from Storage" or "Receipt at DFO Staging" merited inspections. *Id.* Accordingly, the Government inspected the emergency housing to "ensure that the unit was new, contained contracted for amenities [ ] and that it had not been damaged in transit." Ex. 11 at ¶ 4. The Government "required the vendor and/or manufacturer to make the necessary repairs and/or modifications prior to [the Government's] acceptance of the unit." *Id.*

Likewise, the SF 90-13 contemplated additional government inspections for both "RFO (Ready for Occupancy)" or "Move – in" transactions. Ex. 12 at 3 (Blocks 3 and 4). Thus, before a displaced resident took possession of emergency housing, the Government could inspect

11

Bechtel's installation work using a SF 90-13 and certify the emergency housing "ready for occupancy." *Id.* If the Government inspector approved Bechtel's work, the SF 90-13 provided a block for the inspector to declare the emergency housing "Ready for Occupancy." *Id.* (Block 11). The Kujawa Inspection Packet's SF 90-13 shows that during a December 2005 "Ready for Occupancy" and "Move In" inspection, the Government inspected and approved Bechtel's installation work. *See* Ex. 8 at 4 (Block 3, Type of Inspection; Block 11 Ready for Occupancy approval). Likewise, The Bartel Inspection Packet's SF 90-13 shows that during a December 2005 "Ready for Occupancy" and "Move In" inspection the Government inspected and approved Bechtel's installation work. *See* Ex. 9 at 2 (Block 3, Block 11).

> ### D. THE GOVERNMENT CONTINUED USING BECHTEL'S WORK EVEN AFTER LEARNING OF THE RISK OF FORMALDEHYDE IN THE GOVERNMENT-PROVIDED TEMPORARY EMERGENCY HOUSING.

As Plaintiffs allege, the Government knew of the potential for formaldehyde issues at all times material to Plaintiffs' Complaint. Ex. 1 at ¶¶ 57-66; Ex. 2 at ¶¶ 48-57. Bechtel, moreover, warned the Government of "a concern about material off-gasing (possibly formaldehyde) in newly delivered travel trailers" at least as early as October 5, 2005. (Gov't Mot. Dismiss Ex. 16 at 2, Rec. Doc. 1545-22 (attached as Ex. 13); Ex. 5 at 21, 26.) Notwithstanding that the Government could make changes to the contract's specifications at any time, 48 C.F.R. § 52.243-2, even after learning of the formaldehyde risk, the Government continued having Bechtel install the travel trailers and continued using Bechtel's work. Ex. 6 at ¶¶ 13-18; Ex. 1 at ¶¶ 61-63, 61 ("The Federal Government also continued to supply the defective and dangerous housing units to Plaintiffs after March of 2006."); Ex. 2 at ¶¶ 52-54, 54 ("The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even" even after testing "reflected the presence of formaldehyde at twelve times the EPA's value.").

The Government continued to use Bechtel's work while "identif[ying] various methods to deal with" formaldehyde. Ex. 5 at 26. In March 2006, while still using Bechtel's work, the Government "took action to warn occupants that if they had concerns they should air out and vent their units." *Id.* at 21. The Government inspected the not yet installed emergency housing units and found "that all the units [ ] inspected all contained a formaldehyde warning from the manufacturer." (Ex. 6 at ¶ 15; *see also* Gov't Mot. Dismiss Ex. 6, Rec. Doc. 1545-12 at ¶ 9 (attached as Ex. 14); Gov't Mot. Dismiss Ex. 7 at 2, Rec. Doc. 1545-13 (attached as Ex. 15).) Although it very easily could have, the Government never created additional specifications for Bechtel's work. Ex. 4 at BNIF 00000391; 48 C.F.R. § 52.243-2 (the Government could "at any time, by written order . . . make changes" to the Government approved specifications in the contract); *see also* Ex. 4 at BNIF 00000315-318, 317 (incorporating § 52.243-2).

## ARGUMENT

### III.    THIS MOTION MEETS THE RULE 12(b)(6) STANDARD.

Bechtel must show that Plaintiffs cannot "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Bechtel meets that burden by establishing the government contractor defense. *In re Katrina Canal Breaches Consol. Litig.*, Civ. A. No. 05-4182, 2007 WL 763742 (E.D. La., Mar. 9, 2007). To avoid dismissal, Plaintiffs must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). The Court may accept "well-pleaded facts." *Iqbal*, 129 S. Ct. at 1949; *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007). Unwarranted deductions and legal conclusions disguised as factual allegations, however, must be rejected. *Iqbal*, 129 S. Ct. at 1949-50; *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Plaintiffs have to do more than allege a "sheer possibility" of merit in their claims. *Iqbal*, 129 S. Ct. at 1949-50 (holding pleadings that show "facts that are

'*merely consistent with*'" liability fall "short of the line between possibility and plausibility of 'entitlement to relief'" ) (emphasis added).  If Plaintiffs assert insufficient factual allegations to raise more than a speculative right to relief, *Twombly*, 550 U.S. at 555, or if the face of Plaintiffs' complaint evidences an insurmountable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 & n.9 (5th Cir. 2007), the claim must be dismissed.

**IV.   THE GOVERNMENT CONTRACTOR DEFENSE DISPLACES STATE LAW CLAIMS ARISING FROM THE WORK THAT THE GOVERNMENT HIRED ITS CONTRACTOR TO PERFORM.**

**A.   THE GOVERNMENT CONTRACTOR DEFENSE IS A WELL ESTABLISHED AFFIRMATIVE DEFENSE.**

The Federal Tort Claims Act waives the United States' sovereign immunity for tort claims.  28 U.S.C. § 2674.  That waiver, however, has limits.  In particular, the discretionary function exception bars claims against the United States arising from the management or mismanagement of a federal project or contract.  *See Varig Airlines*, 467 U.S. at 809-10; *see also United States v. Gaubert*, 499 U.S. 315, 322 (1991) (holding even low-level operational decisions may be discretionary).  The "[s]upervision of a contractor's work, including the degree of oversight to exercise, is *inherently* a discretionary function."  *Guile*, 422 F.3d at 228-31 (citing *Kirchmann v. United States*, 8 F.3d 1273, 1276-77 (8th Cir. 1993)) (emphasis added).

To guard the United States' immunity and unique interest in managing federal contractors, the Supreme Court in *Boyle v. United Techs. Corp.* recognized an affirmative "government contractor defense."  487 U.S. 500, 512 (1988).  Federal courts had long scrutinized collateral attacks against the United States' discretion through suits against contractors.  *See, e.g.*, *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940).  The *Boyle* decision, however, reconciled a conflict among the circuits by setting forth three express

conditions for the government contractor defense. *See Boyle*, 487 U.S. at 512. The defense

displaces state law claims when the contractor establishes that:

> (1) The Government, in its discretion, approved reasonably precise specifications
>     for the contractor's work;
> (2) The contractor's work conformed to those specifications; and
> (3) The contractor warned the Government of dangers associated with that work
>     about which the contractor had actual knowledge but the Government did not.

*Id*. The first two conditions limit the defense to only those areas that implicate the Government's

discretion. *Id*. The third condition pushes contractors to disclose known risks. *Id*. at 512-13.

The Supreme Court recognized the government contractor defense because, if plaintiffs

could impose liability on a contractor merely for performing a federal contract, federal courts

would become a venue for "second-guessing" a federal official's discretion. *Boyle*, 487 U.S. at

511-12 (citing *Varig Airlines*, 467 U.S. at 814). Moreover, permitting contractors to be sued for

adhering to their contract would cause the United States to suffer serious injury in the form of

costs passed on by contractors or an inability to find willing contractors. *Boyle*, 487 U.S. at 507.

Either circumstance would undermine the United States' unique interest in getting the

government's work done. *Boyle*, 487 U.S. at 512. That injury, rather than an express conflict

between a federal contract's terms and state law, would create a significant conflict between state

law and a federal policy. *See In re Agent Orange*, 517 F.3d 76, 96 (2d Cir. 2008) (holding "[t]he

issues as framed by the *Boyle* Court were not narrowly about duties imposed by contract; they

were more broadly about federal policies and interests and the exercise of federal discretion").

The Supreme Court has affirmed *Boyle's* defense on several occasions. *See Am. Ins.

Ass'n v. Garamendi*, 539 U.S. 396, 420 n.11 (2003) ("In an area of uniquely federal interest,"

"the conflict with federal policy need not be as sharp as that which must exist for ordinary pre-

emption" (quoting *Boyle*, 487 U.S. at 507-508)); *Atherton v. F.D.I.C.*, 519 U.S. 213, 225-26

(1997) (counting *Boyle* among "the few and restricted instances . . . in which this Court has created a federal common law").  The Supreme Court and lower courts recognize that the defense may apply to non-military contractors that provide services to the United States.  *See, e.g.*, *Malesko*, 534 U.S. at 74 n.6; *Boyle*, 487 U.S. at 506 ("The federal interest justifying" the holding in *Yearsley* "surely exists as much in procurement contracts as in performance contracts; we see no basis for a distinction"); *In re Katrina Canal Breaches Consol. Ltig.*, Civ. A. No. 05-4182, 2008 WL 5234369, at *20 (E.D. La., Dec. 15, 2008) (holding remediation contractor immune from state tort claims based on government contractor defense); *In re Katrina*, 2007 WL 763742, at *6 (granting dredging contractors' motion to dismiss based on the government contractor defense).

Lastly, Bechtel must satisfy its burden of proof for each of the defense's three conditions. *See Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 435 (5th Cir. 2000); *Stout v. Borg-Warner Corp.*, 933 F.2d 331, 336 (5th Cir. 1991); *Skyline Air Serv., Inc. v. G.L. Capps Co.*, 916 F.2d 977, 980 (5th Cir. 1990) (per curiam); *Smith v. Xerox Corp.*, 866 F.2d 135, 138-39 (5th Cir. 1989).

## B. THE GOVERNMENT, IN ITS DISCRETION, APPROVED REASONABLY PRECISE SPECIFICATIONS FOR BECHTEL'S WORK.

### 1. Burden for the Government Contractor Defense's First Condition:

Bechtel establishes the defense's first condition by showing "the government approve[d] *reasonably* precise specifications" for the features of Bechtel's work that Plaintiffs complain of. *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1320 (11th Cir. 1989) (quoting *Smith*, 866 F.2d at 138) (Powell, J., by designation) (emphasis in original).  The Government's approved specifications "need not address the specific defect" that Plaintiffs complain of so long as the specifications address the "feature in question."  *See Kerstetter*, 210 F.3d at 435.  Here, that

means the Government approved specifications must address the installation, quality control procedures, and maintenance work that the Government hired Bechtel to perform.

Bechtel may satisfy the defense's first condition in any one of at least three ways. *First*, Bechtel may show that the Government, in its discretion, developed its own specifications for Bechtel's work. *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 420 (5th Cir. 2001). *Second*, Bechtel may establish that the Government substantively reviewed and evaluated suggested specifications for Bechtel's work before finally approving those specifications. *Kerstetter*, 210 F.3d at 438; *In re Air Disaster*, 81 F.3d 570, 575 (5th Cir. 1996). Evidence of substantive review includes "evaluation from time to time, criticism and . . . a 'continuous back and forth' between the contractor and the government." *See Kerstetter*, 210 F.3d at 435; *In re Air Disaster*, 81 F.3d at 574. *Third*, Bechtel may show that the Government inspected or extensively used Bechtel's work upon completion. *See Kerstetter*, 210 F.3d at 438 n.8 ("The length and breadth of the Army's experience with the 540 rotor system—and its decision to continue using it—amply establish government approval of the alleged design defects."); *In re Air Disaster*, 81 F.3d at 575 (holding governmental inspection and supervision of the contractor's work "clearly implicates the Government's discretionary function and approval of reasonably precise specifications").

## 2. The Government Approved Reasonably Precise Specifications.

Through the requirements in the PWS and the specifications in Task Orders Three and Four, the Government provided and approved reasonably precise specifications for the very same installation, quality control, and maintenance work that Plaintiffs challenge. The Government struggled to "respon[d] to a major housing crisis promptly," Ex. 3 at 23, and to procure shelter for "the hundreds of thousands of people who were left homeless or displaced" after the Hurricanes, *id*. at 3. The Government, in its discretion, elected to meet that urgent need by buying emergency housing and contracting with Bechtel and others to deliver and set it up. (Ex.

3 at 22; Souza Decl. at ¶¶ 6-9, Rec. Doc. 196-12 (attached as Ex. 16).)  "Without [the emergency housing], many, if not most, disaster victims who returned to the devastated communities to rebuild would have had no place to live." Ex. 16 at ¶ 9.  The Government provided reasonably precise specifications when it directed Bechtel to install the emergency housing "as expeditiously as possible" in accordance with Task Order Three, paragraph 2.9.1, and in Exhibit Seven's specifications. Ex. 4 at BNIF 00000066 at ¶ 3; *id.* at 00000068-69 at ¶ 3.5.

Additionally, in Task Order Three, the Government provided its approved specifications for Bechtel's work establishing and adhering to "procedures to ensure the quality of the work performed" and "to monitor and track progress and compliance with contract requirements." Ex. 4 at BNIF 00000066, 00000068-69.  Plaintiffs contend otherwise but Plaintiffs' allegations must be rejected for lack of any basis in fact, *Iqbal*, 129 S. Ct. at 1949-50, in light of the clear evidence that Bechtel established quality control inspection procedures.  *See* Ex. 9 at 1, 6-7; Ex. 8 at 1-2.  This is particularly so since Government inspectors not only controlled Bechtel's work but also had complete discretion to impose additional quality control procedures that the Government, in its discretion, deemed necessary.  Ex. 4 at BNIF 00000391 at 2.1.24; 48 C.F.R. § 52.243-2.  Task Order Three's specifications and any that resulted from the Government's inspections, coupled with the Government's decision to continue using Bechtel's quality control work, "clearly implicates the Government's discretionary function and approval of reasonably precise specifications."  *In re Air Disaster*, 81 F.3d at 575; *see also Kerstetter*, 210 F.3d at 438 n.8; Ex. 3 at 23 (holding the Government immune from any claims arising out of the Government's "action or inactions regarding the provision and installation of" emergency housing by contractors).

Lastly, in Task Order Four, the Government approved reasonably precise specifications for Bechtel's maintenance work.  Ex. 4 at BNIF00000100-102.  Task Order Four directed Bechtel to "provide a remedy for any maintenance issues in accordance with the contract Performance Work Statement," i.e., the PWS' SOW and Exhibit Ten.  *Id.* at BNIF00000101 at 31.5.  Thus, by incorporating the SOW's paragraph 2.10 and Exhibit Ten to the PWS by reference, the Government provided and approved reasonably precise specifications for the maintenance work that Plaintiffs complain of.  *Id.*  The Government also provided "venting" specifications for dealing with formaldehyde, Ex. 6 at ¶ 9, and instructed Bechtel in exactly how to address an emergency housing occupants' formaldehyde-related complaints, Ex. 7 at 2.

Thus, since the Government approved reasonably precise specifications for Bechtel's installation, inspection, and maintenance of the Government-provided emergency housing, the features of work Plaintiffs complain of, Bechtel satisfies the defense's first condition.

### C.   THE GOVERNMENT, IN ITS DISCRETION, DETERMINED BECHTEL'S WORK CONFORMED TO THE GOVERNMENT'S APPROVED SPECIFICATIONS.

#### 1.   Burden for the Government Contractor Defense's Second Condition:

Bechtel establishes the defense's second condition by showing Bechtel's work conformed with the Government approved specifications for the features of Bechtel's work that Plaintiffs allege caused their harm.  *See Kerrstetter*, 210 F.3d at 435-36; *see also In re Air Disaster*, 81 F.3d at 575 (holding irrelevant "general" contract terms "for such vagaries as a failsafe, simple or inexpensive" work).  The Court must determine whether Plaintiffs' allegations arise from "nonconformance with" the Government approved specifications or instead attack some perceived defect in the government approved specifications.  *See Kerrstetter*, 210 F.3d at 435-36.  This determination is critical.  The government contractor defense bars claims that rely on alleged defects in the Government approved specifications.  *Kerrstetter*, 210 F.3d at 435-36

19

("The alleged defect must exist independently of the design itself, and must result from a deviation from the required [Government] specifications.").

The Government's inspections, acceptance, and subsequent extensive use of a contractor's work shows conclusively that the contractor's work conformed to the Government's approved specifications. *Miller*, 275 F.3d at 420 (holding the United States' acceptance of the contractor's work proved the work conformed to the Government approved specifications); *Kerrstetter*, 210 F.3d at 435-36 (holding extensive use of the contractor's work may satisfy the second condition); *In re Air Disaster*, 81 F.3d at 575 (holding second condition satisfied if the United States accepted and made extensive use of the contractor's work); *Skyline Air Serv., Inc.*, 916 F.2d at 980 (holding second condition met in part when the United States accepted the contractor's work and the plaintiff could not "present more than a 'metaphysical doubt' about the material facts"); *Smith*, 866 F.2d at 138-39 (holding second element met by evidence showing government inspectors monitored the contractor's performance, inspected the contractor's work, and extensively used the contractor's work upon completion).

### 2.       Bechtel's Work Met the Government Approved Specifications.

Plaintiffs concede that Bechtel installed the Government-provided emergency housing on blocks. Ex. 1 at 39; Ex. 2 at ¶ 33. Moreover, Plaintiffs never dispute that Bechtel's contract with the Government required Bechtel to install the Government-provided emergency housing on blocks as per Exhibit Seven. Instead, Plaintiffs allege Bechtel should have performed that work differently. Ex. 1 at 103; Ex. 2 at 93. The Government's decision to have its contractor install emergency housing by blocking and leveling may not be second guessed by way of a suit against the contractor hired to get the Government's work done. Plaintiffs may not refute Bechtel's evidence for the defense's second condition by alleging that Bechtel should have performed tasks other than those contained in the Government approved specifications. *Kerrstetter*, 210

F.3d at 435-36.  If it were otherwise, Plaintiffs could collaterally attack this Court's Order and Reasons, Ex. 3, merely by proceeding against the Government's contractor.

The need to safeguard against that risk becomes even more prominent when, as here, the Government supervised, controlled, and inspected Bechtel's work.  Ex. 11 at ¶ 4; Ex. 8 at 4; Ex. 9 at 2; Ex. 12 at 2-3.  Bechtel had to "maintain an inspection system *acceptable to the Government*."  48 C.F.R. § 52.246-5(b) (emphasis added).  Section 52.246-5 reserved to the Government a similar "right to inspect and test all services."  48 C.F.R. § 52.246-5(c).  If the Government, in its discretion, determined Bechtel's work failed to "conform with contract requirements," the Government could make Bechtel "perform the services again in conformity with contract requirements" or otherwise "terminate the contract for default."  *Id*. at § 52.246-5(c), (d), (e).  The Government could also change the scope of Bechtel's work unilaterally.  Ex. 4 at BNIF 00000391; 48 C.F.R. § 52.243-2.  For Bechtel's maintenance work, in particular, the Government exercised tight control over what repairs Bechtel could perform and how Bechtel had to respond to formaldehyde related complaints.  *See* Parts II.B.3; II.C *supra*.

Likewise, the SF 90-13 that the Government used to inspect newly delivered units, *see* Ex. 11 at ¶ 4, contemplated government inspections of Bechtel's work.  Ex. 12 at 3 (Blocks 3 and 4).  Both the Kujawa and Bartel Inspection Packages contain completed "Ready for Occupancy" and "Move In" SF 90-13 forms.  Ex. 8 at 3; Ex. 9 at 2.  These inspections satisfy the defense's second condition for two reasons.  *First*, Bechtel had no discretion to deviate from the specifications without the Government's "review and approval."  *See* Ex. 4 at BNIF 00000006, 00000302.  *Second*, the Government could make Bechtel correct deficiencies up to "90 days after final inspection."  *Id.* at BNIF 00000391 at 2.1.24; *see also* 48 C.F.R. § 52.243-2 (giving the Government authority to change its approved specifications "at any time"); Ex. 4 at BNIF

00000317.  The Government's control over Bechtel's work shows that work met the Government approved specifications.  *See Miller*, 275 F.3d at 420-21; *Kerrstetter*, 210 F.3d at 435-36; *In re Air Disaster*, 81 F.3d at 575; *Skyline Air Serv., Inc.*, 916 F.2d at 980; *Smith*, 866 F.2d at 138-39.

Plaintiffs create the specter of nonconformance by claiming erroneously that the Government "tasked [Bechtel] with inspecting. . . to ensure that the units were safe and suitable for . . . *long-term occupancy*."  Ex. 1 at ¶ 45; Ex. 2 at ¶ 38 (emphasis added).  In actuality, the Government made Bechtel perform quality control inspections to ensure conformance with the approved specifications for installing "*temporary* residential structures as expeditiously as possible," Ex. 4 at BNIF 00000068 (emphasis added), rather than to provide for Plaintiffs' long-term occupancy.  As such, Plaintiffs' allegations lack any basis in fact and must be rejected.  *Iqbal*, 129 S. Ct. at 1949-50 (rejecting unwarranted deductions and legal conclusions disguised as factual allegations).  Plaintiffs simply may not thwart the defense by reciting implied specifications that exist nowhere in the Government's agreement with its contractor.  *See Miller*, 275 F.3d at 421 (rejecting plaintiffs "should have" argument when "the alleged defect resulted not from a *deviation from* the required [Government] specifications, but from the defendants' *strict adherence to* them") (emphasis added); *Kerrstetter*, 210 F.3d at 435 ("The alleged defect must exist independently of the design itself, and must result from a deviation from the required [Government] specifications.").

Also, as Plaintiffs concede, the Government made extensive use of Bechtel's work after the Government accepted it.  Indeed, Plaintiffs make much of the Government's continued use of Bechtel's work long after the Government knew of the risk of formaldehyde in the emergency housing.  Ex. 1 at ¶¶ 61-63, 61 ("The Federal Government also continued to supply the *defective* and *dangerous* housing units to Plaintiffs after March of 2006.") (emphasis added); Ex. 2 at ¶¶

52-54, 54 ("The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government . . . conducted formaldehyde testing . . . which reflected the presence of formaldehyde at twelve times the EPA's value."). Standing alone, evidence of extensive use of Bechtel's work after learning of the alleged defect shows that the Government, in its discretion, decided that Bechtel's work conformed to the Government approved specifications. *Miller*, 275 F.3d at 420; *In re Air Disaster*, 81 F.3d 570 at 575.

Thus, the Government's inspections, acceptance, and extensive use of Bechtel's work shows conclusively that Bechtel's work conformed to the Government approved specifications, *Miller*, 275 F.3d at 420; *Kerrstetter*, 210 F.3d at 435-36; *In re Air Disaster*, 81 F.3d at 575; *Skyline Air Serv., Inc.*, 916 F.2d at 980, and Bechtel satisfies the defense's second condition.

### D.     BECHTEL WARNED THE GOVERNMENT ABOUT DANGERS ASSOCIATED WITH ITS WORK ABOUT WHICH BECHTEL HAD ACTUAL KNOWLEDGE.

#### 1.     Burden for the Government Contractor Defense's Third Condition:

Bechtel may satisfy the defense's third condition in two ways. First, Bechtel may show that it warned the Government of dangers associated with Bechtel's work about which Bechtel had actual knowledge. *See In re Katrina Canal Breaches Litig.*, 2008 WL 5234369, at *19 (holding that the test for the defense's third condition "is *not* should [the contractor] have known of the alleged problem created by" performing the contract since the contractor "is **only responsible for warning the government of dangers about which it had actual knowledge**") (emphasis in original). Alternatively, Bechtel may establish the defense's third condition by showing that the Government's knowledge of the risks associated with Bechtel's work equaled or exceeded Bechtel's knowledge. *See Kerstetter*, 210 F.3d at 438, n.9 (third condition met by actual knowledge); *In re Air Disaster*, 81 F.3d at 575 (same); *Stout*, 933 F.2d at 336-37 (same).

2.      **The Defense's Third Condition is Met.**

Bechtel informed the Government of the precise risk that Plaintiffs complain of.  Ex. 5 at 26.  At least as early as October 5, 2005, Bechtel warned the Government of "a concern about material off-gasing (possibly formaldehyde) in newly delivered travel trailers."  Ex. 13 at 2; Ex. 3 at 28.  Bechtel's warning, standing alone, unequivocally satisfies the defense's third condition. *In re Katrina Canal Breaches Litig.*, 2008 WL 5234369, at *19.

Additionally, Bechtel satisfies the defense's third condition because, as Plaintiffs allege, the Government knew of the claimed formaldehyde hazards at all times material to Plaintiffs' Complaint.  Ex. 1 at ¶¶ 57-66; Ex. 2 at ¶¶ 48-57.  The Government admits it had knowledge of a "potential problem."  *See* Ex. 5 at 21, 26.  Indeed, the Government "took action to warn occupants that if they had concerns they should air out and vent their units."  *Id.* at 21.  The Government inspected pre-deployed emergency housing and found "that all the units [ ] inspected all contained a formaldehyde warning from the manufacturer."  Ex. 6 at ¶ 15; *see also* Ex. 14 at ¶ 9; Ex. 15 at 2.  Bechtel had no duty to warn the Government of dangers about which the Government already had knowledge.  *Kerstetter*, 210 F.3d at 438, n.9; *In re Air Disaster*, 81 F.3d at 575; *In re Katrina Canal Breaches Litig.*, 2008 WL 5234369, at *19.

## V.      CONCLUSION

Plaintiffs may opine that the Government should have made different "arrangements for the contractors to follow in the field regarding the delivery and set-up of" emergency housing. Ex. 3 at 23.  Plaintiffs, however, may not use a tort suit to test that opinion or otherwise attack the Government's "action[s] or inactions regarding the provision and installation of" the Government-provided emergency housing.  *Id.*  The government contractor defense precludes it. *Boyle*, 487 U.S. at 511-12 (holding that allowing plaintiffs to impose liability on contractors

merely for performing their contract would make federal courts a venue for "second-guessing" a federal official's discretion (citing *Varig Airlines*, 467 U.S. at 814)).

      The Government would be hard pressed to meet the public's needs in times of disaster without assistance from its contractors, as demonstrated by the massive recovery efforts that followed Hurricanes Katrina and Rita.  The litigation that followed in Katrina and Rita's wake, however, underscores the need for the government contractor defense.  The costs associated with litigating tort claims resulting from merely performing a contract can be staggering.  Few contractors could afford to assist the Government during an emergency if doing so risked incurring tort liability for Government decisions made in the midst of a chaotic and dynamic emergency recovery effort.  Federal courts created the government contractor defense to ensure that contractors like Bechtel would not be so deterred.

      Respectfully submitted,

      **FRILOT, L.L.C.**

         /s/
      _____
      JOHN J. HAINKEL, III – La. Bar No. 18246
      A. J. KROUSE - La. Bar No. 14426
      DAVID P. CURTIS – La. Bar No. 30880 (Ms. Bar - 102092)
      CAROLYN B. HENNESY - La. Bar No. 25089
      PETER R. TAFARO – La. Bar No. 28776
      3700 Energy Centre, 1100 Poydras Street
      New Orleans, Louisiana 70163
      Telephone:    (504) 599-8000
      Facsimile:    (504) 599-8100
      Attorneys for Bechtel National, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing pleading was filed electronically using the CM/ECF system.  Notice of this filing will be forwarded to all known counsel by operation of the court's electronic filing system.  I also certify that I have emailed a copy of this filing to any non-CM/ECF participants on this the 17th day of August, 2009.


                                    /s/
                                    JOHN J. HAINKEL, III