UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER FORMALDEHYDE          MDL NO. 1873
PRODUCTS LIABILITY LITIGATION

SECTION N(5)

JUDGE ENGELHARDT

MAGISTRATE CHASEZ

THIS DOCUMENT RELATES TO:
Anthony Bartel v. Gulf Stream Coach, Inc, et al,
and
Leslie Kujawa, et al v. Keystone RV Company and Bechtel National, Inc.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# BECHTEL NATIONAL, INC.'S
# RULE 12(b)(6) MOTION TO DISMISS

## EXHIBIT 2

**COMPLAINT FOR DAMAGES, *KUJAWA V. KEYSTONE RV COMPANY*,
CIV. A. NO. 1:09CV282 (S.D. MISS. APR. 29, 2009)**

Case 2:09-cv-00282-HSO-JMR   Document 2   Filed 04/29/2009   Page 1 of 31

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
APR 29 2009
J.T. NOBLIN, CLERK
BY_____ DEPUTY

| | |
|---|---|
| Leslie Kujawa, Richard Kujawa, Leslie and Richard Kujawa on behalf of their minor child B. K., and Leslie and Richard Kujawa on behalf of their minor child D. K. | Civil Action No. 1:09cv282 HSO-JMR |
| | Section: _____ |
| | Magistrate: _____ |
| versus | |
| Keystone RV Company and Bechtel National, Inc. | |

## COMPLAINT FOR DAMAGES

This Complaint of certain persons of the full age of majority, on behalf of themselves and, in two instances, on behalf of individuals who lack the capacity to sue individually (hereinafter, "Plaintiffs"), through undersigned counsel, respectfully represent that:

## I. PARTIES

1.    Each Named Plaintiff is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the states in which Defendants are citizens.

2.    Plaintiffs are Leslie Kujawa, Richard Kujawa, Leslie and Richard Kujawa on behalf of their  minor child B. K., and Leslie and Richard Kujawa on behalf of their minor child D. K.

3.    Defendant Keystone RV Company (hereinafter, "Keystone")  is, upon information and belief, a Delaware corporation with its principle place of business in Indiana,

1

which conducts business in the State of Mississippi, and which manufactured and supplied FEMA travel trailers as defined below pursuant to contracts with FEMA for use in the State of Mississippi.

4.    Bechtel National, Inc. (hereinafter, "Bechtel"), a Nevada corporation with its principal place of business in San Francisco, California, licensed to do business in the State of Mississippi and in good standing, received a No-Bid contract from FEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the travel trailer provided by FEMA to Plaintiffs, who were displaced by Hurricane Katrina.

## II. JURISDICTION AND VENUE

5.    Each plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

6.    Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the Defendants with citizenship other than that of Plaintiffs, because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.    Keystone is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

8.    Bechtel is subject to the *in personam* jurisdiction of this Court because it does

sufficient business in the State of Mississippi and within this federal district to

confer same, and at all relevant times hereto engaged in commerce both in this

federal district and in the State of Mississippi with respect to the activities and

claims which are the subject of this litigation.

9.     Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C.

§1391, as the emergency housing unit was provided to the Plaintiffs in this

district, and Plaintiffs' injuries were sustained in this district.

## III. FACTS AND GENERAL ALLEGATIONS

10.     Plaintiffs resided in an emergency housing unit (travel trailer) in the State of

Mississippi provided by FEMA after the landfall of Hurricane Katrina on August

29, 2005.

11.     The housing unit at issue, a "travel trailer" is wheel-mounted and generally no

larger than 8 feet wide and 40 feet long, for an average area of less than 320

square feet.  It is designed to provide temporary living quarters and is generally

considered a vehicle, regulated by state transportation authorities rather than

housing authorities. *See* Center for Disease Control and Prevention, INTERIM

FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK

MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at*

http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_ findings.pdf.

12.     Plaintiffs' residence was rendered unhabitable following Hurricane Katrina,

leaving Plaintiffs homeless and in need of housing assistance.

13.     FEMA contracted with Keystone to purchase thousands of  housing units,

primarily travel trailers, for provision to the Plaintiffs and other Gulf Coast

residents as temporary housing.

14.    On information and belief, Keystone expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the travel trailer occupied by Plaintiffs containing higher than normal levels of formaldehyde.

15.    On information and belief, the Plaintiffs' travel trailer, whether manufactured prior to Hurricane Katrina or later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

16.    Plaintiffs submit that the travel trailer at issue herein, whether manufactured prior to Hurricane Katrina or later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the travel trailer pertinent to formaldehyde levels.

17.    Plaintiffs submit that the travel trailer at issue, whether manufactured prior to Hurricane Katrina or later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Keystone's use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the travel trailer as a temporary residence for at least 18 months, but that Keystone failed to warn the Federal Government about these dangers.

18.    Named Plaintiffs submit that Keystone ignored, or concealed and/or condoned the concealment of, the fact that the travel trailer at issue contained dangerous

4

levels of formaldehyde due to Keystone's use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the travel trailer as a temporary residence for at least 18 months, all in order to sell Keystone's product, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

19. Plaintiffs spent significant time in the FEMA-provided travel trailer manufactured by Keystone and provided to Plaintiffs by the Federal Government. As a result, Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the travel trailer.

20. Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant to federal law, the defendants are required to display a "Health Notice" in manufactured homes about exposure to formaldehyde which reads:

### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered

with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

21. According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

22. Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly, pregnant women and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In

6

1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 parts per million (ppm) to1 ppm.  In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

23.    HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes).  HUD has far stricter exposure limits for residential formaldehyde emissions.  By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...".  *See* 24 C.F.R. §3280.308.

24.    Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA travel trailer at issue was intended to be occupied for up to a year and a half by Plaintiffs. *See* 44 C.F.R. § 206.110(e).

7

Case 2:09-cv-03942-KDE-ALNR   Document 22   Filed 07/28/2009   Page 8 of 31

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental

Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19,

2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-

trailers.html.

25.    Keystone  knew or should have known of the health hazards inherent in the

products it constructed, by familiarity with industry standards, the material safety

data sheets in its possession, and published medical studies.

26.    FEMA's disaster response obligations are delineated in the Robert T. Stafford

Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, *et seq.* (the

"Stafford Act").  The Stafford Act outlines two types of temporary housing

assistance to be made available to eligible, displaced applicants: financial

assistance and direct services. This aid is sometimes referred to as Section 408

assistance. This provision was enacted as Public Law 93-288, Title IV, § 408

(1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through

FEMA, may provide "direct assistance" in the form of temporary housing units,

acquired by purchase or lease, directly to individuals or households who,

because of a lack of available housing resources, would be unable to make use

of the alternative "financial assistance"  provided under subparagraph (c)(1)(A).

8

27.   In order to implement and manage its disaster response obligation and
temporary housing mandate under the Stafford Act, FEMA engaged Bechtel with
a No-Bid contract, eventually amounting to more than half a billion dollars.  The
Federal Government also relied on the expertise and knowledge of Bechtel to
provide information and advice on, among other things, the conversion of mobile
travel trailers into temporary housing units for periods up to, and potentially
exceeding, eighteen months in duration.

28.   Bechtel was tasked with the transportation, installation, site identification and
preparation of locations and group sites, preparation of infrastructure to handle
the units, inspection of the temporary housing units, maintenance and repair,
refurbishment and restoration, and the eventual de-installation and removal of
the units.

29.   Under the terms of their contract, Bechtel was obligated to adhere to all warnings
and instructions relating to the temporary housing units as provided and
indicated by the manufacturers of same.  Further, under their No-Bid contract
with FEMA, Bechtel was obligated to advise and instruct FEMA regarding the
implementation of their contract.  Bechtel failed to properly fulfill either of these
tasks.

30.   Bechtel contracted with FEMA to pick-up and transport the temporary housing
units from FEMA-controlled staging areas and deliver them to areas which
Bechtel was tasked with operating.  These new areas included staging areas to
be managed and maintained as assigned to Bechtel and/or individual locations
and addresses where Bechtel assigned that temporary housing unit would have

9

an obligation to manage and maintain it.

31.     To accomplish their contractual obligations with FEMA, in addition to the use of

subsidiary companies, Bechtel entered into numerous sub-contracts, but at all

times retained supervisory capacity and responsibility under their individual

contracts with FEMA.

32.     Bechtel was tasked under their contract with FEMA to identify and prepare the

infrastructure for the various group site locations.  This included, amongst other

things, ensuring there would be adequate water, sewage, electricity, etc.  Bechtel

knew or should have known that these preparations were for long-term

occupancy of the temporary housing units.

33.     Once the travel trailer occupied by Plaintiffs was transported and delivered to

Plaintiffs in Gautier, Mississippi, Bechtel  had the responsibility for installing that

travel trailer.  Bechtel installed the travel trailer by "blocking" the travel trailer.

This meant raising the Plaintiffs' travel trailer several feet into the air and off of its

wheel base, and setting it on concrete blocks.

34.     By blocking the Plaintiffs' travel trailer, Bechtel created stress and flexing on the

frame of the unit as it was not designed to be lifted off of its wheel base.  In fact,

the manufacturers of the travel trailers warned in the various owners' manuals

provided with the units, that travel trailers should not be jacked so that the

vehicle's weight is no longer supported by the wheels.

35.     The stress and flexing of the travel trailers' frame caused by Bechtel "blocking" it

with weight off of the wheels created distortion in the travel trailers' shell allowing

increased moisture intrusion which contributed to increased formaldehyde

10

exposures.

36.    The travel trailer occupied by the Plaintiffs was provided by FEMA. Travel
trailers are, by definition, mobile. They are designed for and intended for
periodic, recreational use and not for long-term habitation. By installing the travel
trailer on concrete blocks for extended occupancy, Bechtel knowingly and
intentionally modified the design and the actual use of the travel trailer occupied
by Plaintiffs by converting it into a temporary housing unit to be used as a
residence for long-term occupancy exceeding 18 months.

37.    Bechtel failed to consult with Keystone, with regard to the installation, warnings,
warranty issues or advisability of using travel trailers for long-term residence and
occupation.  Bechtel took actions which voided the warranties of Keystone and
directly created or contributed to unsafe and hazardous living conditions in the
Plaintiffs' travel trailer.

38.    Once Bechtel completed the transportation, delivery and installation of the travel
trailer occupied by the Plaintiffs, Bechtel was tasked with inspecting the unit to
ensure that it was safe and habitable, prior to occupancy by the Plaintiffs.  Upon
information and belief, Bechtel  failed to adequately inspect the travel trailer
occupied by the Plaintiffs to ensure that the unit was safe and suitable for its
intended use – the long-term occupancy by individuals and families displaced by
Hurricane Katrina.  This failure to properly inspect the travel trailer for unsafe or
hazardous conditions directly contributed to the adverse health effects suffered
by Plaintiffs.

39.  In addition to transportation, site identification, installation and inspection, the travel trailer occupied by Plaintiffs and provided by FEMA in response to Hurricane Katrina was also managed, maintained and repaired by Bechtel, or their various subcontractors over whom they maintained direct oversight and responsibility.  Upon information and belief, Bechtel failed to adequately manage, maintain and repair the travel trailer which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects of the Plaintiffs.

40.  Parallel to their duty to manage, maintain and repair each temporary housing unit Bechtel failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the occupants of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

41.  Following the Plaintiffs' occupancy of their travel trailer, Bechtel was tasked with its de-installation.  Upon discovering the deteriorated condition of the travel trailer at the time of de-installation and removal, Bechtel failed to identify the unsuitability of the travel trailer for long-term occupancy.

42.  In addition to de-installation of the temporary housing units, Bechtel was tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to hurricanes Katrina and Rita or for use in the future.  By restoring and refurbishing these temporary housing units, Bechtel warranted that the units were fit for their intended use, long-term occupancy in response to disaster related displacement.  By restoring and refurbishing these temporary

12

housing units, Bechtel created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units. Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

43.   Bechtel, at every stage of their involvement, failed to warn the Plaintiffs and other occupants of travel trailers of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but not limited to the advent of childhood asthma and the onset of adult asthma in some of the Plaintiffs.

44.   Through their actions and omissions, Bechtel created and perpetuated a situation wherein Plaintiffs were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Bechtel negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of travel trailers; (2) the installation and set-up of the travel trailer; and (3) the warning that the travel trailer contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

45.   Bechtel failed to warn the Plaintiffs of the hazardous conditions created by the elevated levels of formaldehyde in the travel trailer.

13

46. By restoring and refurbishing the trailer for future habitation, Bechtel improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

47. Finally, despite these failures, Bechtel received millions of dollars in contracts from FEMA and the United States government, at the expense of the health of the Plaintiffs and other occupants of temporary housing units who simply had nowhere else to go and who were relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

48. The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith. *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

49. Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including Plaintiffs' travel trailer, and specifically was aware of the published

14

dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

50.     In fact, the Federal Government was conducting initial formaldehyde air sampling of housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels.  *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff in a related matter, November 16, 2007.

51.     Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Plaintiffs, the Inspector General of the Department of Homeland Security,  testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Gulf Coast residents, including Plaintiffs.  *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S.

15

Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets
/Skinner-021306.pdf.

52. The Federal Government also continued to supply the defective and dangerous
travel trailer to the Plaintiffs after March of 2006.

53. The Federal Government continued to supply the defective and dangerous
housing units to the Plaintiffs even though the Sierra Club publicly announced
the initiation of its own testing of occupied housing units and, in April of 2006,
reported the results which reflected formaldehyde levels above the threshold that
the EPA warns can cause acute health effects in humans in 83% of the trailers
tested. Union of Concerned Scientists, *supra*.

54. The Federal Government continued to supply the defective and dangerous travel
trailer to the Plaintiffs even though the Federal Government, through FEMA, in
March of 2006, conducted formaldehyde testing of unoccupied  housing units at
the Purvis, Mississippi staging area, and tested and obtained the results of an
occupied Mississippi trailer on April 6, 2006, which reflected the presence of
formaldehyde at twelve times the EPA's value.  Union of Concerned Scientists,
*supra,* and Exhibits B (*available at*
http://oversight.house.gov/documents/20070719113015.pdf)  and D (*available at*
http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

55. The Federal Government continued to supply the defective and dangerous travel
trailer to the Plaintiffs even though the Federal Government had been notified on
a number of occasions in May and June 2006 regarding residents' concerns over
formaldehyde emissions in their housing units. Union of Concerned Scientists,

16

*supra*, and Exhibits E (*available at*

http://oversight.house.gov/documents/20070719113322.pdf), I (*available at*

http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at*

http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

56.   While complaints of formaldehyde exposure continued to be reported to the

Federal Government and evidence supporting the existence of dangerous levels

of formaldehyde present in the housing units was uncovered, the Federal

Government intentionally avoided undertaking any comprehensive testing of their

own because it wanted to avoid liability for the problem, as stated in emails from

the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any

testing until we give the OK. While I agree that we should conduct testing, we

should not do so until we are fully prepared to respond to the results. Once you

get results and should they indicate some problem, the clock is ticking on our

duty to respond to them." Another email repeats these concerns, reading "OGC

has advised that we do not do testing, which would imply FEMA's ownership of

the issue." Union of Concerned Scientists, *supra,* and Supplemental A (various

emails *available at* http://oversight.house.gov/documents/20070809120917.pdf)

and Supplemental B (various emails *available at*

http://oversight.house.gov/documents/ 20070809120940.pdf) attached thereto.

57.   Plaintiffs aver that, even as each Plaintiff was being placed at risk in unsafe

temporary housing, the Federal Government had reviewed the results of all

earlier testing and complaints of formaldehyde associated with the housing units

17

and were actively conferring with one or more of the manufacturers concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

58.   FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher.  The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light.  Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at* http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

59.   FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers.  This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months,  were useless for determining a policy to protect trailer residents.  This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists, and Exhibit R attached thereto, *supra*.  *See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available at* http://www.atsdr.cdc.gov/HAC/pha/fema_housing_ formaldehyde/

formaldehyde_report_0507.pdf

60.    This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.  Union of Concerned Scientists, *supra*.

61.    FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units occupied by Gulf Coast residents and supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Plaintiffs herein, and other occupants, as a result of their exposure to formaldehyde.  FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006.  *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

62.    FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review.  FEMA did so in order to

avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

63. FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern," a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this "level of concern," the average sampling results still were higher. *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents/20070719102502.pdf.

64. Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can

20

draw... I think it was a complete violation of our professional code of ethics."

Oral testimony of Mary C. DeVany before the House Committee on Oversight

and Governmental Reform. July 19, 2007 at 107-108 of the full hearing

transcript, *available at* http://oversight.house.gov/

documents/20071114164004.pdf.

65. On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr.

Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the

February Health Consultation was "possibly misleading and a threat to public

health" for failure to disclose the carcinogenic status of formaldehyde and that

there are no safe exposure levels.

66. Despite this information, FEMA and the ATSDR did not revise the original Health

Consultation until October of 2007 to include the warning that the original Health

Consultation "did not sufficiently discuss the health implications of formaldehyde

exposure and included language that may have been unclear, leading to

potentially incorrect or inappropriate conclusions." *See* An Update and Revision

of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of

FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-

October, 2006, *available at*

http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

67. The Federal Government, through FEMA, deliberately ignored and/or rejected

objective, scientific standards in the design and implementation of its testing

procedures, which resulted in the prolongation of the Plaintiffs' exposure to

dangerous levels of formaldehyde in their travel trailer, and causing them serious

injuries.

68.    It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units.  *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC's RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

69.    The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model,

Case 2:09-cv-03392-KDE-ALMR   Document 12   Filed 04/26/2009   Page 23 of 31

and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

70. The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA-provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

71. As a result of this round of testing, the Federal Government implemented a program which essentially entailed removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing. The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

72. The Federal Government's actions with regard to Plaintiffs in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social,

23

Case 2:09-cv-03282-KDE-ALC   Document 12   Filed 06/29/2009   Page 24 of 31

economic, or political policy.  Rather, the Federal Government's actions and

decisions were all made with a view toward avoiding negative publicity and legal

liability.

73.    Additionally and/or in the alternative the Federal Government ignored, avoided

and simply failed to adhere to and apply accepted professional and scientific

standards in addressing and/or removing the health hazards posed by

formaldehyde emissions in the housing units it provided.

## COUNT 1:

## STRICT PRODUCTS LIABILITY
## MS CODE ANNOTATED § 11-1-63
## PRODUCTS LIABILITY: DEFECTIVE MANUFACTURING AND DESIGN BY KEYSTONE

74.    Each Named Plaintiff incorporates the above allegations as if fully repeated

verbatim herein.

75.    Keystone, at the time Plaintiffs' travel trailer left its control, knew or should have

known that the product was defective because it deviated in a material way from

the manufacturers' specifications or from otherwise identical units manufactured

to the same manufacturing specifications.

76.    Keystone knew or should have known that the defective condition rendered the

travel trailer unreasonably dangerous to the user or consumer or others; and

77.    The defective and unreasonably dangerous condition of Plaintiffs' travel trailer

(the failure of the subject housing units to be safely habitable without exposure to

formaldehyde) proximately caused the damages and injuries sustained by each

Plaintiff.

24

Case 2:09-cv-03282-KDE-ALC   Document 22   Filed 04/29/2009   Page 25 of 31

78.    At the time the Plaintiffs' travel trailer left the control of Keystone, the unit did not contain properly selected, prepared and installed components.

79.    At all relative times, each Plaintiff lacked actual or constructive knowledge of the defective condition of their travel trailer and that each defective product was inconsistent with their safety.

80.    At all relevant times, Plaintiffs did not appreciate the danger of their travel trailer's defective condition.

81.    At all relevant times, Plaintiffs did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

82.    Plaintiffs' travel trailer failed to function as expected as a result of its design characteristics.

83.    An alternative design existed at the time that Plaintiffs' travel trailer left the control of Keystone which would have not impaired the product's usefulness or desirability.

84.    The alternative design would have to a reasonable probability prevented the toxic exposure of each Plaintiff.

## COUNT 2:

## PRODUCTS LIABILITY: KEYSTONE'S FAILURE TO WARN PLAINTIFFS

85.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

86.    Plaintiffs' travel trailer was defective because it failed to contain adequate warnings or instructions.

## COUNT 3:

## PRODUCTS LIABILITY: BREACH OF EXPRESS WARRANTY BY KEYSTONE

87.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

88.    Plaintiffs' travel trailer  breached an express warranty and/or failed to conform to
other express factual representations upon which the Plaintiffs justifiably relied in
electing to use this product.

## COUNT 4:

## NEGLIGENCE OF BECHTEL UNDER MISSISSIPPI LAW

89.    Planitiffs' incorporate the above allegations as if fully repeated verbatim herein.

90.    At all relevant times Bechtel was tasked with the transportation, installation, site
identification, preparation, inspection, maintenance and repair, refurbishment
and restoration, and removal of the temporary housing units, which caused the
Plaintiffs' injuries.

91.    Bechtel owed a duty to each Plaintiff to provide, transport, install, inspect,
maintain, repair, refurbish, recondition and restore safe temporary housing units
that did not emit hazardous levels of formaldehyde.

92.    Bechtel  knew or should have known when they provided, transported, installed,
inspected, maintained, repaired, refurbished, reconditioned and restored the
temporary housing units to the general public (thereby modifying and converting
the mobile units into residential installations) the actual and intended use of the
travel trailer by Plaintiffs, and that the travel trailer would be used in the manner
that Plaintiffs herein used it.

93. Bechtel breached their duty to Plaintiffs in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the travel trailer; specifically by:

    a.    Failing to sufficiently warn the Plaintiffs of the inherently dangerous properties or the foreseeable conditions of the travel trailer when used for long-term occupancy; and

    b.    Failing to adhere to the manufacturers' warnings against jacking the travel trailer off its wheel base by "blocking" the unit.

94. Bechtel's actions were the proximate cause of the increased exposure of formaldehyde to the Plaintiffs.

95. Bechtel contributed to and exacerbated the adverse health impacts upon each Plaintiff residing in the travel trailer.

## IV. DAMAGES

### A. COMPENSATORY DAMAGES

96. In addition to and by way of summarizing the compensatory damages prayed for herein, each Plaintiff avers that the Defendants, Keystone and Bechtel, individually and/or jointly are responsible for all damages which each Plaintiff herein has suffered and continues to suffer as a consequence of Defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other

damages and injuries, loss of consortium, and  loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

**B.    PUNITIVE/EXEMPLARY DAMAGES**

97.    Pursuant to Miss. Code Ann. § 11-1-65, inasmuch as the conduct of Keystone, and/or Bechtel and their servant/employees constitutes willful, wanton, egregious and reckless disregard for the rights and safety of the Plaintiffs, an award of punitive damages is appropriate and necessary under these facts.

## V.  REQUEST FOR JURY TRIAL

Each Plaintiff is entitled to and demands a trial by jury.

## VI.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that Keystone and Bechtel be served with a copy of this Complaint, and that, after due proceedings:

1.    there be a judgment herein in favor of each Plaintiff and against Defendants for all compensatory damages and punitive damages together with legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2.    there be specially included in the judgment in each Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

28

    a.    past and future physical injuries,

    b.    past and future mental and physical pain and suffering,

    c.    past and future physical impairments and disability,

    d.    past and future reasonable and necessary medical expenses,

    e.    past and future loss of earning capacity,

    f.    past and future loss of enjoyment and quality of life,

    g.    loss of consortium and/or society,

    h.    compensable out-of-pocket expenses related to defendants' wrongdoing,

    i.    costs of court, and

    j.    punitive damages; and

3.    all other general, equitable, and further relief as the Court may deem just and proper.

Respectfully submitted,

RONNIE G. PENTON, ESQ. (MS Bar #30011)
Trial Counsel for Plaintiffs
PENTON LAW FIRM
209 Hoppen Place
Bogalusa, Louisiana 70427
Phone: (985) 732-5651
Facsimile: (985) 735-5579
fecourtmail@rgplaw.com

*Maryanna Penton*

*with permission*

MARYANNA PENTON, ESQ. (MS Bar #102979)
Trial Counsel for Plaintiffs
PENTON LAW FIRM
209 Hoppen Place
Bogalusa, Louisiana 70427
Phone: (985) 732-5651
Facsimile: (985) 735-5579
fecourtmail@rgplaw.com

OF COUNSEL:
HUGH P. LAMBERT, ESQ. (LA Bar #7933)
LINDA J. NELSON, ESQ. (LA Bar #9938)
LAMBERT & NELSON, PLC
701 Magazine Street
New Orleans, LA 70130
Telephone: (504)581-1750
Facsimile: (504)529-2931
hlambert@lambertandnelson.com
lnelson@lambertandnelson.com

**PLEASE SERVE:**

1.    Keystone RV, Company
      **through its registered agent for service:**
      David G. Thomas
      2642 Hackberry Drive
      Goshen, IN 46526

2.    Bechtel National, Inc.
      **through its registered agent for service:**
      C T Corporation System
      645 Lakeland East Drive, Suite 101
      Flowood, MS 39232

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing pleadings were served on all counsel of record through electronic notification pursuant to the electronic filing in the United States District Court for the Southern District of Mississippi this 30th day of April, 2009.

RONNIE G. PENTON, ESQ.