1

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF LOUISIANA

 3                 NEW ORLEANS DIVISION

 4    -------------------------------X

 5    In Re:  FEMA Trailer          :

 6    Formaldehyde Products         :   MDL No. 1873

 7    Liability Litigation          :

 8

 9    -------------------------------X

10                        Washington, D.C.

11                        Tuesday, July 28, 2009

12          Videotaped deposition of Michael E. Ginevan,

13    Ph.D., a witness herein, called for examination by counsel

14    for Plaintiffs in the above-entitled matter, pursuant to

15    notice, the witness being duly sworn by DENNIS A. DINKEL, a

16    Notary Public in and for the District of Columbia, taken at

17    the offices of Nelson Mullins Riley & Scarborough LLP, 101

18    Constitution Avenue, N.W., Washington, D.C. at 10:06 a.m.,

19    Tuesday, July 28, 2009, and the proceedings being taken down

20    by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed

21    under his direction.
```

22

2

1    APPEARANCES:

2

3         On behalf of the Plaintiffs:

4              MIKAL C. WATTS, ESQ.

5              Watts Guerra Craft

6              4 Dominion Drive, Building 3, Suite 100

7              San Antonio, TX 78257

8              210-447-0500

9

10        On behalf of Gulf Stream Coach Inc.:

11             JOSEPH G. GLASS, ESQ.

12             Duplass Zwain Bourgeois Morton Pfister &

13              Weinstock

14             Three Lakeway Center

15             3838 North Causeway Boulevard

16             Metairie, LA 70002

17             504-832-3700

18

19

20

21

22

3

1   APPEARANCES - continued:

2

3        On behalf of the United States of America:

4                ADAM BAIN, ESQ.

5                U.S. Department of Justice

6                P.O. Box 340, Ben Franklin Station

7                Washington, DC 20044

8                202-616-4209

9

10       On behalf of Fluor Enterprises Inc.:

11               RICHARD A. SHERBURNE, JR., ESQ.

12               Middleberg Riddle & Gianna

13               450 Laurel St., Suite 1101

14               Baton Rouge, La. 70801

15               225-381-7700

16               (Appearing via telephone)

17

18

19

20

21

22

4

1   APPEARANCES - continued:

2

3         On behalf of Shaw Environmental, Inc. And CH2M HILL

4         Constructors, Inc.:

5             David Kurtz

6             Baker, Donelson, Bearman, Caldwell &

7              Berkowitz, PC

8             201 St. Charles Ave., Suite 3600

9             New Orleans, LA 70170

10            504-566-5259

11            (Appearing via telephone)

12

13        On behalf of Jayco and Starcraft RV, Inc.:

14            THOMAS L. COUGILL, ESQ.

```
15              WILLINGHAM FULTZ & COUGILL LLP

16              808 Travis, Suite 1608

17              Houston, Texas 77002

18              713.333.7600

19              (Appearing via telephone)

20

21

22
```

5

```
 1   APPEARANCES - continued:

 2

 3        On behalf of Bechtel National, Inc.:

 4             A.J. KROUSE, ESQ.

 5             Frilot L.L.C.

 6             1100 Poydras Street, Suite 3700

 7             New Orleans, LA 70163-3700

 8             504-599-8060

 9             (Appearing via telephone)

10

11        On behalf of Project Resources, Inc. of California:
```

12          GREGORY F. ROUCHELL, Esq.

13          Adams and Reese LLP

14          4500 One Shell Square

15          New Orleans, LA 70139

16          504-585-0285

17          (Appearing via telephone)

18

19

20

21

22

1   APPEARANCES - continued:

2

3          On behalf of Keystone RV Company, Thor California,

4          Thor Industries, Dutchmen Manufacturing, DS Corp

5          (d/b/a CrossRoads RV), KZ RV, LP:

6              JAMES C. PERCY, ESQ.

7              Jones Walker

8              8555 United Plaza Boulevard

9              Baton Rouge, Louisiana 70809

```
10          225-248-2130

11          (Appearing via telephone)

12

13      On behalf of Heartland Recreational Vehicles:

14          LORI A. DAIGLE, ESQ.

15          Allen & Gooch Law Corporation

16          3900 North Causeway Boulevard, Suite 1450

17          Metairie, LA 70002

18          504-836-5200

19          (Appearing via telephone)

20

21

22
```

```
1   APPEARANCES - continued:

2

3       On behalf of Recreation by Design, LLC, TL Industries,

4       Inc., Frontier RV, Inc., and Play'Mor Trailers, Inc.:

5           RANDALL C. MULCAHY, ESQ.

6           Garrison, Yount, Forte & Mulcahy, LLC
```

```
 7          909 Poydras Street

 8          New Orleans, LA 70112

 9          504-527-0680

10          (Appearing via telephone)

11

12     Also Present:

13          Dan Reidy, Videographer

14

15

16

17

18

19

20

21

22
```

8

```
 1                    C O N T E N T S

 2     WITNESS
PAGE

 3      MICHAEL E. GINEVAN, Ph.D.
```

```
           4

           5          EXAMINATION BY COUNSEL FOR PLAINTIFFS
  11

           6

           7      AFTERNOON SESSION
  94

           8

           9                               EXHIBITS

          10    GINEVAN EXHIBIT NO.          DESCRIPTION
PAGE

          11       1      Letter from The Buzbee Law Firm, July 24,
  12

          12              2009

          13       2      Letter from Andrew Weinstock to Mikal
  15

          14              Watts, et al., July 21, 2009

          15       3      CD-ROM, Michael E. Ginevan, Ph.D.,
  15

          16              reliance file

          17       4      Report of Michael E. Ginevan, Ph.D.
  20

          18       5      Supplement to report of Michael E.
  21

          19              Ginevan, Ph.D., re: Air exchange rates, et

          20              seq.

          21       6      ATSDR study, October 2007
  23

          22       7      CDC interim finding, February 29, 2008
```

23

9

1      8      Formaldehyde Facts, Formaldehyde in        23

2             Breath:  The Untold Story and Why It

3             Matters, October 8, 2008

4      9      Chapter: Correlation and Regression,       24

5             Statistical Tools For Environmental

6             Quality Measurement, pages 81 to 87

7      10     Report of Mary C. DeVany                   24

8      11     Report of Paul Hewett                      24

9      12     Report of Marco Kaltofen                   24

10     13     Report of William D. Scott                 25

11     14     Report of Damien Serauskas                 25

12     15     Mass spectrometric profile of exhaled      117

13            breath -- field study by PTR-MS (Moser, et

14            al.)

15

16

17

18

19

20

21

22

10

1              P R O C E E D I N G S

2          THE VIDEOGRAPHER:  This begins tape number

3  1 in the video deposition of Dr. Michael Ginevan

4  taken by the plaintiff in the matter of the FEMA

5  Trailer Formaldehyde Products Liability Litigation,

6  filed in the U.S. District Court, Eastern District of

7  Louisiana, number MDL 1873.

8         Today's deposition is being held at the

9  law offices of Nelson Mullins, 101 Constitution

10  Avenue, Northwest.  We're in the Washington

11  Conference Room on the eighth floor, in Washington,

12  D.C., 20001.

13              For identification purposes, I am Dan

14      Reidy, the video operator.  The stenographer is

15      Dennis Dinkel, and we are both with Alderson Court

16      Reporting.

17              Today's date is July 28, 2009.  The time

18      on the video is 10:06 a.m.  We are on the record.

19              At this time, will all counsel please

20      introduce yourself and whom you represent, starting

21      with the plaintiffs' counsel, please.

22              MR. WATTS:  I'm Mikal Watts, I represent

                                                        11

1       the plaintiffs.

2               MR. BAIN:  Adam Bain for the United

3       States.

4               MR. GLASS:  Joe Glass representing Gulf

5       Stream Coach, Inc.

6               THE VIDEOGRAPHER:  Will the court reporter

7       please swear in the witness?

8       Whereupon,

9                   MICHAEL E. GINEVAN, Ph.D.,

10      was called as a witness by counsel for PLAINTIFFS,

11   and having been duly sworn by the Notary Public, was

12   examined and testified as follows:

13          EXAMINATION BY COUNSEL FOR PLAINTIFFS

14          BY MR. WATTS:

15   Q.    What is your name?

16   A.    Michael Edward Ginevan.

17   Q.    Dr. Ginevan, my name is Mikal Watts.  I

18   represent the plaintiffs in the Alana Alexander

19   versus Gulf Stream, Fluor and FEMA case.

20          Have you been designated as an expert

21   witness by Gulf Stream in that case?

22   A.    Yes, I have.

                                                        12

1    Q.    You understand that I'm here to take your

2    deposition to learn what it is that you might say at

3    trial and to probe the bases therefor?

4    A.    Yes, I do.

5    Q.    You've given your deposition on many

6    occasions in the past?

7    A.    A number.

8    Q.    You know what we're doing here.  I don't

9  need to go through the procedural blah, blah, blah,

10  if you will, about what we're doing.

11    A.    Don't feel obliged on my account.

12    Q.    Good enough.  For the record, I'm going to

13  mark as Exhibit 1 to your deposition, the second

14  amended notice of the oral and videotape deposition

15  of Michael Ginevan Ph.D. with subpoena duces tecum.

16          Have you seen that document before?

17    A.    Yes, I have.

18                    (A document was marked for

19                     identification as

20                     Exhibit No. 1.)

21          BY MR. WATTS:

22    Q.    Now, attached to that document is a

                                                    13

1  subpoena duces tecum asking you to bring certain

2  materials with you.  Have you brought any materials

3  with you?

4    A.    No, I did not bring materials with me.  I

5  made sure that you were --

6      Q.    You made sure I was given your reliance

7   files a week ago; is that right?

8      A.    Okay.  Well, I don't have any objects.

9            I don't have any test data.  I don't have

10  any photographs or videotapes.

11           I provided a list of the materials that I

12  examined, which you should have; and I had assumed

13  that they were going to be delivered to you by Joe.

14     Q.    And they were.  I'm not complaining.  Tell

15  me what you don't have and what I got.

16     A.    All right.  All standards published -- I

17  believe there were the two government reports that

18  were on the list of materials that I examined.

19           Articles.  Okay.  That's in my curriculum

20  vitae.

21           I could not give a list of all the

22  speeches that I have given.  If there's an abstract

14

1   or something -- there's a great many.

2      Q.    I couldn't do it either.

3        A.     Copies of published articles or others --

4    yes.  You have those.

5               Yes.  We provided the list of cases in

6    which I have participated.  Yes.  You have the

7    reports.

8               Yes.  I believe that you have everything

9    that you've asked for.

10       Q.     All right.  Let's go through that real

11   briefly.

12              First of all, I'll mark as Exhibit 2 a

13   letter written to me on July 21 by Andy Weinstock.

14   Enclosed is a CD containing Michael E. Ginevan's

15   reliance file.  If you have any questions, please do

16   not hesitate to contact me.

17              And the disk that was attached, I have

18   marked as Exhibit 3 to the deposition.

19              When you say I have been given stuff, you

20   understand we have a procedure in place where about a

21   week before the deposition whoever was tendering the

22   materials would provide reliance materials.

15

1      A.    Yes.

2                        (Documents were marked for

3                        identification as Exhibit

4                        Nos. 2 and 3.)

5           BY MR. WATTS:

6      Q.    And you attempted prior to those materials

7  being given to me to give me the responsive documents

8  that would qualify as reliance materials, sir?

9      A.    Yes, I did.

10      Q.    Now, as I open up that disk, let me tell

11  you what I see in it.  Let's just go through that

12  real quick.

13           First, is an article entitled An Update

14  and Revision of ATSDR's February 2007 Health

15  Consultation, Formaldehyde Sampling of FEMA Temporary

16  Housing Trailers in Baton Rouge, Louisiana

17  September-October 2006, and the study is dated

18  October 2007.

19           Is that one of the materials that is one

20  of your reliance materials, if you will?

21      A.    Yes.

22      Q.    Second is CDC Interim Findings on

1    Formaldehyde Levels in FEMA-Supplied Travel Trailers,

2    Park Models, and Mobile Homes from the Centers for

3    Disease Control and Prevention, dated February 29,

4    2008.

5            Is that one of the materials that you rely

6    upon?

7        A.    Yes.  It is.

8        Q.    The third is an article in Formaldehyde

9    Facts, News and Notes from the Formaldehyde Council

10   Incorporated, or FCI, dated Wednesday, October 8,

11   2008.  The article is entitled Formaldehyde in

12   Breath:  The Untold Story and Why It Matters.

13           Is that one of the articles upon which you

14   rely?

15       A.    Yes.

16       Q.    And the fourth article -- actually I think

17   is a book chapter.  It says Ginevan chapter 4?

18       A.    Yes.

19       Q.    That chapter goes from page 81 down to

20   page 87 in a book.

21          Did you write that chapter?

22     A.    Yes, I did.

                                                    17

1      Q.    What's the title of the book in which that

2  chapter is?

3      A.    Statistical Tools For Environmental

4  Quality Measurement, I believe.

5      Q.    Okay.  When was that book published?

6      A.    2004.

7      Q.    All right.

8      A.    Is that right?  To be honest, I'm --

9      Q.    I think you have it right.  I don't have a

10 copy of the book with me.  That's fine.

11     A.    Okay.

12     Q.    And the chapter that you wrote is entitled

13 Correlation and Regression?

14     A.    Yes.

15     Q.    Were you the sole author of that chapter?

16     A.    No.

17     Q.    Who else were your coauthors?

18     A.    It was jointly authored with a gentleman

19   named Douglas Splitstone, and essentially the whole

20   book is a cooperative effort, but I would say I wrote

21   the majority of that chapter.

22        Q.    So that is one of the four articles that's

                                                         18

1   included within the disk that is part of the reliance

2   materials upon which you rely?

3        A.    Yes.

4        Q.    In addition to those four articles, the

5   other things I found in this disk are five expert

6   reports from Mary DeVany, Paul Hewett, Marco

7   Kaltofen, William Scott, and a Mr. Serauskas -- Im

8   knew I was going to butcher that.  How do I pronounce

9   that last name?  Damien Serauskas, S-e-r-a-u-s-k-a-s.

10           Now, as opposed to the articles which are

11  articles upon which you rely, are those five expert

12  reports things that you reviewed or that you rely

13  upon?

14       A.    I reviewed them in some detail, and I did

15  use some of the factual presentations which I knew to

16    be correct in putting together my own opinion.

17         Q.    Fair enough.  Are there any other

18    materials besides the four articles that we read into

19    the record and the five expert reports that you

20    reviewed that would serve as reliance materials in

21    this case?

22         A.    Subsequent to that list, I did look at

                                                          19

1    Ms. Alexander's deposition.

2         Q.    That would be Alana Alexander?

3         A.    Yes.

4         Q.    Anything else that you reviewed prior to

5    today?

6         A.    No.

7         Q.    In fact, I think somewhere in your report,

8    you refer to Mrs. Alexander saying from time to time

9    she'd open the windows.  Did you get that from her

10   deposition?

11        A.    Yes.

12        Q.    I'll go through that in more detail with

13   you; but you reviewed her deposition for purposes of

14   air exchanges, this kind of thing?

15       A.    I reviewed the deposition to get a feeling

16   for what the trailer -- how they lived in the trailer

17   essentially.

18       Q.    Did you get the feeling -- did you get

19   enough information to get that feeling?

20       A.    I believe so, yes.

21       Q.    Okay.  Good enough.  And then finally, I'm

22   going to mark as Exhibit 4, my copy with highlighting

                                                        20

1    of your report but when we copy it, it will take my

2    highlighting out of it.  And Mr. Glass has provided

3    you with his copy that's got his notes in it.  And

4    I'm not going to mark those --

5            MR. GLASS:  Actually, I had his reliance

6    file printed out.  And so you can actually use the

7    Bates labeling, I think it's ALX-GINE 00001 through

8    whatever the last number is in his report.

9            MR. WATTS:  What's the last number on that

10   report?

11                              (A document was marked for

12                              identification as

13                              Exhibit No. 4.)

14              MR. GLASS:  Page 23 is Bates labeled

15      ALX-GINE 000024.

16              It does not include the addendum with the

17      Alana Alexander information.

18              BY MR. WATTS:

19      Q.    Do you have a copy of the addendum so I

20      can mark it?

21              MR. WATTS:  Are you okay if I take this

22      blue thing off?

                                                        21

1              MR. GLASS:  Yes.  I have it here

2       somewhere.

3              MR. WATTS:  Is Exhibit 4 a true and

4       correct copy of your original report in this case?

5              MR. GLASS:  I believe that's printed off

6       of what we e-mailed to you, even though it says

7       attorney-client privilege at the top.

8              THE WITNESS:  Yes, it is.

```
9              BY MR. WATTS:

10      Q.    Is Exhibit 5 a computer copy of the

11  addendum report that was provided to me a couple of

12  days ago?

13                        (A document was marked for

14                         identification as

15                         Exhibit No. 5.)

16              THE WITNESS:  Yes, it is.

17              BY MR. WATTS:

18      Q.    Do you have -- I hate to ask you -- do you

19  have those four studies that we read into the record.

20              MR. GLASS:  I've given you all the stuff

21  -- yes.

22              MR. WATTS:  Let me go ahead and mark them
```

```
1   so we have a clean set.  I think it helps.  I

2   apologize, Joe, for mooching on your file.

3              MR. GLASS:  You're doing a better job -- I

4   always just do what you did, attach the disk, but I

5   don't mind that.
```

6              What are the four studies?

7              MR. WATTS:  The 2007 ATSDR studies.  Let's

8    go off the record for a second.

9              (Discussion off the record.)

10              THE VIDEOGRAPHER:  We're going off the

11    record.  The time on the video is 10:18 a.m.

12              (Discussion off the record.)

13              THE VIDEOGRAPHER:  We're back on the

14    record.  The time on the video is 10:22 a.m.

15              MR. WATTS:  Dr. Ginevan, we have marked

16    half your lawyer's file here.  So what I'm going to

17    do is rip through it, so we've got it in the record.

18              1 is the notice of deposition as we said

19    before.

20              2 is the correspondence sent to me

21    transmitting the reliance file.

22              3 is the disk with the reliance file.

23

1              4 is Bates page numbers ALXGINE-000001

2    through 26, which is the report.

3              Exhibit 5 is the addendum to the report

4     provided to me a couple of days ago.

5            Exhibit 6 is the ATSDR 2007 paper dated

6     October 2007.

7                         (A document was marked for

8                         identification as

9                         Exhibit No. 6.)

10           MR. WATTS:  Exhibit 7 is the CDC interim

11    findings dated February 29, 2008.

12                        (A document was marked for

13                        identification as

14                        Exhibit No. 7.)

15           MR. WATTS:  Exhibit 8 is the Formaldehyde

16    Facts article entitled Formaldehyde in Breath:  The

17    Untold Story and Why It Matters dated October 8,

18    2008.

19                        (A document was marked for

20                        identification as

21                        Exhibit No. 8.)

22           MR. WATTS:  Exhibit 9 is the Ginevan

24

1    chapter entitled Correlation and Regression inside of

2    the book entitled Statistical Tools For Environmental

3    Quality Measurement from pages 81 to 87.

4                              (A document was marked for

5                              identification as

6                              Exhibit No. 9.)

7         MR. WATTS:  Exhibit 10 is the report of

8    Mary DeVany.

9                              (A document was marked for

10                             identification as

11                             Exhibit No. DeVany. 10.)

12        MR. WATTS:  Exhibit 11 is the report of

13   Paul Hewett.

14                             (A document was marked for

15                             identification as

16                             Exhibit No. 11.)

17        MR. WATTS:  Exhibit 12 is the report of

18   Marco Kaltofen.

19                             (A document was marked for

20                             identification as

21                             Exhibit No. 12.)

22        MR. WATTS:  Exhibit 13 is the report of

1    William Scott.

2                              (A document was marked for

3                              identification as

4                              Exhibit No. 13.)

5              MR. WATTS:  And Exhibit 14 is the report

6    of Damien Serauskas.

7                              (A document was marked for

8                              identification as

9                              Exhibit No. 14.)

10             Does Exhibits 1 through 14 comprise the

11   totality of your file materials in this case.

12             THE WITNESS:  Yes, it does.

13             BY MR. WATTS:

14        Q.    All right.  One last issue that has not

15   come up, not complaining about it -- there's not a

16   billing record in here.

17             What is the amount of money that you have

18   billed for your time thus far in this case?

19             MR. GLASS:  Talking about specifically the

20   Age case or going back to class cert?

21             MR. WATTS:  Since class cert for the Age

22   case.

26

1              MR. GLASS:  Just for the Age case.

2              THE WITNESS:  I think probably I billed --

3    there's been one invoice.  I think it is about

4    $9,500.

5              BY MR. WATTS:

6         Q.    How much are you billing per hour for your

7    time?

8         A.    $330.

9         Q.    And how much time have you spent since you

10   sent that $9500 bill?

11        A.    Well, probably -- I probably have a couple

12   more days since then.  So say 16 hours.

13        Q.    All right.  So 9500, 330 an hour, about 29

14   hours, add 16 to that, we're in the ballpark?

15        A.    Yes.

16        Q.    Good enough.

17        A.    It's about a week's work, yeah, I believe.

18        Q.    Not that I really care, but do you bill

19    the same amount for your deposition and trial time?

20         A.    Yes, I do.

21         Q.    Good enough.

22               All right.  Dr. Ginevan, what I would like

                                                                27

1     to do is start working through your report.  I will

2     hand you back Exhibit 4.  And let me just ask you a

3     few questions about it.

4               On page 2 of your report, you talk about

5     your background within the U.S. Department of Energy

6     where you managed the Occupational Health

7     Surveillance System?

8               Tell the members of the jury what that

9     system is and what you did with it?

10         A.    Well, to be honest, I couldn't tell you

11    what it is.  I can tell you that we were trying to

12    build.

13         Q.    Tell me what you were trying to build.

14         A.    Basically, the Department of Energy has a

15    great many facilities scattered around the country.

16    And in each of those facilities is a workforce that

17    has its own -- it's maintained by a contractor, and

18    the contractor might be a university, it might be an

19    industrial entity; and each of these provides health

20    records.

21         Q.    Right.

22         A.    And the program that I joined was designed

28

1    to pull these health records together into a coherent

2    information base, so that people could understand

3    what if any adverse health effects might be occurring

4    in the overall worker population.  And the reason for

5    this, of course, was that the people were saying

6    well, the Department of Energy isn't exercising

7    appropriate oversight on the health of its workers.

8              Now, you can argue whose workers they

9    really are because as I say they're employed by

10    contractors; but the program -- the office of

11    epidemiology and health surveillance was really

12    created to address that criticism; and we were trying

13    to bring together all the health records, all the

14    health surveillance activities across the Department

15    of Energy's system into one coherent whole.

16         Q.    When was that department created?

17         A.    The Department of Energy?

18         Q.    No.

19         A.    The office of epidemiology and health

20    surveillance?

21         Q.    Yes, sir.  I'm sorry.

22         A.    Let's see.  When did -- when did -- it was

                                                              29

1     a couple of years before I got there.  So -- I don't

2     know.  '88?

3          Q.    Late '80s?

4          A.    Late '80s, yeah.

5          Q.    Who was the director of that office?

6          A.    Robert Goldsmith.

7          Q.    And how long did you work in that office

8     as the deputy director?

9          A.    About two years, actually.

10         Q.    Did you work under -- I don't mean that

11    pejoratively -- did you work in that period of time

12    with Dr. Goldsmith being the director during the

13    entire time?

14         A.    Excuse me?

15         Q.    Was Dr. Goldsmith the director during the

16    entire time that you were there?

17         A.    Yes, he was.

18         Q.    Okay.  So building a database, in effect,

19    gathering together all the health data for the

20    workers in various facilities that were funded by the

21    Department of Energy?

22         A.    Yes.

                                                        30

1          Q.    In addition to the health records being

2     put into a database, were the industrial hygiene

3     records of those different facilities loaded into the

4     database?

5          A.    That was our hope.

6          Q.    Okay.  Sounds like something that was

7     meant to be done, but didn't get done?

8          A.    Well, as I say, I was there for two years.

9    The first two years of a 10-year program doesn't

10   always tell you the whole story.  But one of the

11   problems that was encountered in going across the

12   various facilities is that the quality of both the

13   worker health data and the exposure data varied

14   markedly from facility to facility because, again,

15   these are actually different entities with different

16   policies, procedures, what have you.

17            But that -- we were trying very hard to

18   get as comprehensive a set of exposure data as we

19   could for the workers, yes.

20   Q.    Okay.  At the time you left after two

21   years, had your office succeeded in collecting all of

22   the exposure data for the workers in the different

31

1    DOE facilities?

2    A.    No.

3    Q.    How many different DOE funded facilities

4    are there across the United States where these

5    300,000 people work?

6    A.    I used to know that number off the top of

7    my head.  I want to say something like two dozen.

8    There's a great many of them.

9         Q.    Okay.  So we call it 24?

10        A.    I would say 24 is a good guess.

11        Q.    To be fair, if it is 20, 28, it is no big

12   deal.

13        A.    It is somewhere in that number.

14        Q.    All right.  There are 24 different

15   facilities employing some 300,000 workers?

16        A.    Yes.

17        Q.    And again, in fairness, they're not

18   employed directly by the Department of Energy.  They

19   are employed by contractors paid by the Department of

20   Energy?

21        A.    That's correct.

22        Q.    Okay.  So your task and your office's task

                                                          32

1    was to, in effect, load into a database that had to

2    be designed the health records for these 300,000

3    people?

4      A.     Yes.  And also to harmonize the record

5   collection and recordkeeping practices in the various

6   facilities so that it was easier to merge the data.

7      Q.     Okay.  Did that harmonization take place

8   before the data was merged?

9      A.     Well, we were in the process of working

10  with the various facilities to try to harmonize the

11  procedures across the different facilities.  And that

12  was really an ongoing task when I left the scene.

13     Q.     Would it be fair -- I'm not saying there's

14  anything inappropriate about this, the harmonization

15  before you start collecting data sounds like a good

16  idea to me -- but would it be fair before you left

17  after those two years, that harmonization process was

18  still ongoing.

19     A.     It was still ongoing, yes.

20     Q.     And had the data collection process begun

21  at the time that you left since the harmonization

22  process had not been completed?

33

1      A.     We were getting some data from a number of

2    facilities at the time that I left, because I believe

3    there was one report out on the health status of the

4    DOE workers; and I think that that came out right

5    about the time that I left the agency.

6              So we were doing a limited subset of data

7    from a majority of the facilities.

8         Q.    Was the data, the health records data

9    computerized from these facilities?

10        A.    That -- in some instances, it was very

11   well computerized.  In other instances, we confronted

12   paper records with very minimal indexing systems.

13        Q.    Okay.  Did your office -- was part of its

14   responsibility to code in or to key in

15   non-computerized records?

16        A.    No.  That was something that we were

17   working with the contractors to assist them and

18   advise them in how to go about that.

19        Q.    Did your office have statutory authority

20   to do so?  Was it created by statute?  Or was it

21   somebody's idea within the Department of Energy as an

22   administrative action?

1      A.     There was not a -- well, we had mandates

2   but we didn't have procedures.   In other words, we

3   were told that it would be wonderful if we had a

4   system which would tell people about the health of

5   DOE workers.   But we had no guidance.   We had

6   mandates.

7      Q.     Were the mandates from Congress or from

8   people within the DOE?

9      A.     The initial mandate was from Congress; and

10   then that was basically moved down through the

11   bureaucracy and modified in process.

12      Q.     Did Congress provide funding with its

13   mandate?

14      A.     No.   This is where I learned the meaning

15   of the term unfunded mandate, yes.

16      Q.     Okay.   What was the budget that your

17   office had between 1988 and 1990 to perform this

18   task?

19      A.     Gosh.   Well, I think our office -- I think

20   our office budget was something like $250 million.

21             But that's misleading because we also had

22   under the office things like the U.S. contribution to

1    the atom bomb survivors health surveillance.  So

2    that's not -- we might have had 15 or 20 million

3    dollars to devote to the health surveillance

4    activities.

5         Q.    In other words, to the specific project

6    that you told me about?

7         A.    Well, to that and there was one other

8    project that absorbed a fair number of dollars where

9    we were trying to do a comprehensive database of all

10   the data from the epidemiologic studies of DOE

11   workers that had been conducted.

12        Q.    Okay.

13        A.    That was called the Comprehensive

14   Epidemiologic Data Resource.

15        Q.    So in other words, your office was doing

16   two primary projects, one was to synchronize, if you

17   will, the data being collected by contractors at DOE

18   facilities --

19        A.    Right.

20      Q.      So that you could monitor the data within

21   the facilities?

22      A.      Correct.

36

1       Q.      The second was to take epidemiological

2    studies that had already been conducted on DOE or

3    contractor employees to see what the published data

4    already said; is that right?

5       A.      Well, and to allow people to actually take

6    the data and if they wanted, to do epidemiologic

7    studies that spanned more than one facility; and that

8    turned out to be fairly challenging, because again

9    people -- different people conduct different studies

10   with slightly different purposes and they don't

11   always have exactly the same data definitions.

12              And those had to be -- again, before you

13   can combine information, you have to be able to

14   harmonize it so that you have common understandings.

15      Q.      Now, let me take the project that we're

16   talking about first.  You said the two projects had a

17      funding of about 15, $20 million; is that right?

18          A.    That's my recollection, yes.

19          Q.    How much of that was spent on the project

20      that we've already discussed versus the gathering of

21      all of the previously published epidemiological

22      studies on DOE employees?


                                                              37


1                 MR. GLASS:  You trying to figure out where

2       your tax dollars went in the late '80s.

3                 MR. WATTS:  Just trying to get an answer

4       to the question.

5                 THE WITNESS:  I'm -- recall, this is all

6       stuff that I'm picking out of my memory from quite

7       some time ago.

8                 BY MR. WATTS:

9           Q.    Give me a best estimate.

10          A.    I would say probably 70 percent was spent

11      on the health surveillance system and 30 percent was

12      spent on the CEDRs system.

13          Q.    Now, let me just see if we can take the

14      300,000 employees as our discussion baseline.  How

15   many of those 300,000 people did your office have

16   health records collected for at the time that you

17   left?  As opposed to just getting a beta set, if you

18   will, and figuring out they're not harmonized and

19   needing to harmonize them first before you collect?

20        A.    I would say probably we had what I would

21   characterize as good health records for maybe 75

22   percent of the workers.

                                                    38

1         Q.    Okay.  And among the two dozen different

2    DOE facilities, how many of those facilities did you

3    feel like you had good health records from at the

4    time that you left?

5         A.    Maybe half.

6         Q.    Okay.

7         A.    The large ones were often better than the

8    small ones.

9         Q.    All right.  And the large ones were

10   probably more computerized than the small ones?

11        A.    Yes.

12      Q.      Okay.  And is that the primary factor that

13   made them good versus bad is that they were already

14   loaded into a database somewhere?

15      A.      Excuse me?  Say that again?

16      Q.      Your distinction between we had good

17   records and bad records.  Was the primary factor in

18   that distinction whether they had been computerized

19   or not?

20      A.      No.  Actually, we had some situations

21   where facilities had maintained very comprehensive

22   paper records, but they weren't in a form that would

                                                        39

1   allow -- in other words, if I wanted to pull a chart

2   for worker X, I could do that; but if I wanted to

3   know the changes in health status of the worker

4   population over time, I couldn't do that, because the

5   data resided in file cabinets.

6      Q.      Sure.

7      A.      We had some records that were very well

8   computerized, but the quality assurance was not

9   really what we would have liked to see.

10      Q.      Right.  I assume that by 2009, the process

11   that was begun in its infancy by the Office of

12   Epidemiology and Health Surveillance during the time

13   that you were there in the late '80s, that that

14   process has been completed and all the records have

15   been harmonized and computerized such that they can

16   be analyzed?

17      A.      To be honest, I don't know.  I mean, I

18   really have not -- it is not a process that I

19   followed, because I just moved on.

20      Q.      You told me that this was a 10-year

21   project?

22      A.      Well, that was -- we felt like we would

                                                          40

1   probably have a good handle on it by then.  But I

2   think there's -- I know there's been some, you know,

3   bureaucratic changes.  Obviously, when you have a

4   program of this magnitude and it was not universally

5   hailed as an advance.  And you know, so you have

6   administrations changing and priorities change and,

7      you know, the Secretary and a couple of the -- and a

8      number of the Undersecretaries are political

9      appointees.

10            So I mean, I think probably progress has

11     been made, but I really couldn't tell you the status

12     of the program.

13        Q.    Okay.  What was the status of the program

14     at the time that you left?

15        A.    Well, as I say, we had some data coming in

16     from some of the facilities.

17            We were working with some of the

18     facilities whose recordkeeping systems were deficit

19     from either a computerization or quality assurance

20     standpoint.

21            And my recollection is we published one

22     report describing some of the health status data from

41

1      the facilities where we had reporting that we thought

2      was of reasonable accuracy.

3        Q.    Okay.  And what did the report deal with?

4        A.    What?

5      Q.    You said you published one report.  What

6   did it deal with?

7      A.    Well, it was essentially, you know, kind

8   of an analysis of rates.  At this facility, we had so

9   many people who were reporting lung problems or we

10  had so many cancers reported, and so on and so forth.

11          As I say, I know it was produced about the

12  time I was leaving, but -- and I know I looked at it,

13  but, as I say, 17 years is a long time.

14     Q.    Go to page 17 through 23 of your report?

15     A.    Sure.  Yeah.

16     Q.    By the way, Exhibit 4, just so we have a

17  good record, it actually is an eight-page report,

18  pages 1 through 8.

19          Pages 9, 10, 11, 12, 13, 14, 15, 16 is,

20  for lack of a better word, your CV?

21     A.    Yes.

22     Q.    Pages 17 through 23 is a bibliography

                                                        42

1   which is a list of publications that you've done; is

2    that right?

3         A.    Yes.

4         Q.    And then page 24, appendix B is the list

5    of materials that you reviewed to support your report

6    in this case?

7         A.    Yes.  Well, no.  24 in my copy -- oh.

8    Well, no.  If we're going by the ALX numbers.

9         Q.    Go ahead.

10        A.    24 is the last page of my --

11        Q.    I wasn't going by the ALX numbers.  I was

12   going by the pagination on the middle bottom.

13        A.    Oh.

14        Q.    The last two pages don't have it.  Go to

15   the third to the last page.  Third to the last page.

16        A.    The last page I have --

17        Q.    Third to the last page.

18        A.    Oh, oh, oh.

19        Q.    Third to the last page?

20        A.    Go to the last page?  Okay.  Two, three.

21        Q.    Okay.  That's it.

22        A.    Yeah.

```
 1        Q.    Okay.  What's --

 2        A.    I end on page 23.

 3        Q.    I'm glad we did this.  I have a page 24.

 4   It has a list of the materials reviewed?

 5              MR. GLASS:  Appendix B?

 6              MR. WATTS:  Yes.

 7              THE WITNESS:  And I end on page 23.  The

 8   next one is the testimony.

 9              MR. WATTS:  Tell you what -- tell you

10   what, since we're kind of gerrymandering this

11   together, slip that page 24 in before the last two

12   pages and we'll be good to go.

13              MR. GLASS:  Here's another appendix B with

14   markings on it.

15              MR. WATTS:  That's okay.  All right.

16              THE WITNESS:  Yes.

17              BY MR. WATTS:

18        Q.    Now we have page 24?

19        A.    Now I'm not confused anymore.

20        Q.    Which is an appendix B, documents reviewed

21   to support Ginevan affidavit, correct?

22        A.    Yes.
```

44

1       Q.     The last two pages, second to the last

2  page is Ginevan testimony in deposition?

3       A.     Yes.

4       Q.     And then the last page, your fee schedule

5  saying you charge $330 per hour plus expenses, right?

6       A.     Yes.

7       Q.     Now, if I could, where I was going before

8  we got lost on page 24 is page 17 through 23, that's

9  a list of all the publications that you have done?

10      A.     Yes, it is.

11      Q.     All right.

12             First question:  Do any of them deal with

13  exposure to formaldehyde?

14      A.     Do any of them deal with exposure to

15  formaldehyde?

16             No.  I don't believe so.  No.

17      Q.     Earlier on in your CV -- actually, on page

18  2 of your report, you say you are a biostatistician.

19  What is the difference between a biostatistician and

20   an epidemiologist?

21        A.    Well, biostatisticians typically analyze

22   biological data.  And biological data can be human

1   data either from clinical studies or from

2   observational studies, which is epidemiology.

3            It can also be focused on animal studies

4   where you are doing -- or for that matter, other

5   organisms.  I mean, you can be studying plants and it

6   is still really biostatistics because you are doing

7   statistics on living organisms, so that's really the

8   focus.

9        Q.    So am I to take that last answer to mean

10   that epidemiology in your mind is a subset of

11   biostatistics?

12        A.    It is -- practitionally, for -- from a

13   practitioners standpoint in statistics, yes.

14   Epidemiologists would generally object to their field

15   as a subset of biostatistics, but a great amount of

16   inference in epidemiology hinges on biostatistical

17   issues, so that it is certainly a very important part

18    of epidemiology.

19         Q.    Okay.  Let me just ask you about your role

20    in this case.

21              While you obviously have a background in

22    biostatistics and, therefore, epidemiology, I notice

                                                                46

1    that you have not reviewed the work of Dr. McGeehan

2    in this case?

3         A.    No.  I haven't.  The name is not familiar

4    to me.

5         Q.    So can I take -- again, you understand

6    what I'm doing up here, you know, flew, cost my

7    clients money to come find out what you were going to

8    say at trial, although you are qualified in the field

9    of epidemiology, you're not going to comment or

10    critique Dr. McGeehan's work in this case as you have

11    done some of the others; is that right?

12        A.    I would say no.  Because no one has asked

13    me to review any epidemiologic studies or material.

14        Q.    You would say yes, that's right, no I'm

15    not going to do that?

16        A.    No, I'm not going to do that.

17        Q.    Okay.  Second day in a row I've asked a

18    question with a double negative and gotten the

19    appropriate answer.

20              Let's go back to paragraph 2 on page 2 of

21    your report, Doctor.

22        A.    Uh-huh.

                                                          47

1         Q.    You say specifically, this is on line 2,

2     specifically I was asked to review the statistical

3     bases of plaintiffs' expert reports regarding

4     sampling.

5               Who asked you to do that?

6         A.    I guess I was retained by --

7         Q.    Mr. Weinstock?

8         A.    Andy Weinstock, yes.  He asked me to do

9     that.

10        Q.    And so you said you reviewed the reports

11    and affidavits submitted by four plaintiffs' experts,

12    Paul Hewett, William Scott, Mary DeVany, and Marco

13    Kaltofen.

14         A.    Right.

15         Q.    The fact that you reviewed those four

16    plaintiffs' reports and none other, that was the

17    result of a specific request by Andy Weinstock?

18         A.    It was a result of the materials that were

19    furnished to me for review; and in all honesty, I

20    would point out that I did, in fact, look at Damien

21    Serauskas; but his was mainly constructional details

22    of the trailers; and didn't play much part in my

48

1    opinion, which is why he wasn't listed.

2         Q.    So my impression is both by virtue of

3    which reports of the plaintiffs you looked at and

4    which ones you didn't that you are not dealing with

5    epidemiology in this case, you are dealing more with

6    air transfers and exposure type issues; would that be

7    fair?

8         A.    Environmental sampling and exposure

9    assessment, yes.

10      Q.    Good enough.  If we could, I'd like to go

11   to paragraph 3 on page 2, the CDC and the ATSDR.  You

12   have reviewed both of those reports and you comment

13   extensively on them; is that right?

14      A.    It is.  Yes.

15      Q.    As an expert, were you satisfied with all

16   aspects of the work done by the CDC and the report

17   that was generated?

18           MR. GLASS:  Object to the form.

19           THE WITNESS:  I would say that the reports

20   were adequate to their purpose.

21           BY MR. WATT:

22      Q.    Okay.

                                                        49

1       A.    It's always difficult to say, well, is

2    this what you would have done; and the answer to that

3    is almost invariably no.

4       Q.    I guess -- I think you gave me a fair

5    answer.  Maybe the question was a little loaded.  So

6    let me see if I can go about it this way.

7                 When I show up at trial and cross-examine

8    you, will I do so immediately after hearing you

9    criticize the methodology of the CDC report in any

10   way?

11        A.    Well --

12              MR. GLASS:  Object to the form.

13              BY MR. WATTS:

14        Q.    In other words, if you have a beef with

15   the CDC report, I want to hear it now as opposed to

16   trial.

17        A.    I don't know that I have a specific point

18   to make to say that these are terrible reports.

19        Q.    Okay.

20        A.    I don't think they are.

21        Q.    All right.

22        A.    You asked me earlier was it what I would

                                                        50

1    have done; and the answer is probably not exactly.

2         Q.    Okay.  Were there any deficiencies in the

3    studies that you identified?

4         A.    Well, again, deficiencies?

5             It's really very difficult to -- I don't

6      think the studies were deficient for their purpose.

7      Q.    Okay.  Did you identify in your report any

8      deficiencies of the CDC study?

9             MR. GLASS:  Objection.

10            THE WITNESS:  I don't believe I did in my

11     report, no.

12            BY MR. WATTS:

13     Q.    Do you believe that the CDC methods -- the

14     formaldehyde sampling methods were appropriate?

15            MR. GLASS:  Object.

16            THE WITNESS:  Well, again, I think from

17     a -- you know, certainly the CDC study was a total --

18     was a stratified random sampling design, which is

19     well accepted in statistics.

20            The ATSDR study was an effort to obtain

21     information on the effects of varying ventilation

22     scenarios on formaldehyde levels; and you know, I

51

1      didn't look at them and say, well, this is -- these

2      are glaringly bad studies.  So I would say that,

3      again, they're reasonably well done; and you know, do

4      a reasonable job of addressing the purpose of the

5      study.

6            BY MR. WATTS:

7      Q.      Were the CDC methods of formaldehyde

8      sampling appropriate for estimating the exposure for

9      a single trailer that was not specifically sampled?

10     A.      Given the amount of variability that they

11     identified, it would be certainly difficult to say

12     that they would be appropriate to identifying the

13     formaldehyde level in a specific trailer.

14     Q.      Okay.  Let me spin that question around a

15     little bit and ask it this way:  Were the CDC methods

16     of formaldehyde samplings appropriate for estimating

17     typical exposures for all trailers?

18     A.      I don't think either of these studies is

19     really relevant to the question of exposure

20     estimation because the -- one of the things that's

21     really important in indoor exposure assessment is to

22     sample spaces as occupied, as used; and I don't think

1  either study really made a concerted effort to

2  address that part of the question.

3      Q.    Because they did the sampling when the

4  trailers were not occupied and, therefore, sealed up?

5      A.    Well, I think it is more than that.  I

6  think you really have to try and get at samples in

7  houses as occupied; and I don't believe any of the

8  trailers that they looked at were occupied.

9      Q.    Other than the occupied/non-occupied

10 issue, were there any other problems with the

11 formaldehyde sampling methods done by the CDC that

12 would prevent you from estimating typical exposures

13 for all trailers?

14     A.    Well, again --

15     MR. GLASS:  Object.

16     THE WITNESS:  -- the largest variable that

17 comes to mind is ventilation.  Ventilation rate is an

18 enormous problem in any exposure evaluation.

19         I think also in some cases, they were

20 sampling the trailers with -- well, certainly the

21 ATSDR was sampling the trailers with a variety of

22 ventilation scenarios; but the temperature in the

53

1    trailers is also a very large issue, because any time

2    you have evolution of a material -- of a gas from

3    some solid material, it is generally more -- you

4    know, it comes out faster if the temperature is

5    higher.

6                    BY MR. WATTS:

7         Q.    You used a good phrase.  I think you said

8    it better than anybody I've heard say it in this

9    case.  The evolution of the material to gas from a

10   solid material.

11        A.    Yes.

12        Q.    Is that what is happening to the

13   formaldehyde in these trailers?

14        A.    Well, the formaldehyde is dissolved, if

15   you will, in some of the materials that are used to

16   manufacture, things like Fiberboard.

17        Q.    Sure.

18        A.    And as in any case, when you have one

19   material dissolved in another, over time, it can

20   migrate out.  And that's really what's happening.

21   The formaldehyde is not being produced.  It is just

22   dissolved as part of the manufacturing process and

54

1   then gradually makes its way out of the materials.

2        Q.    So let's follow up on that for a second.

3   As part of the manufacturing process that Gulf Stream

4   utilized for the Alexander trailer, the Cavalier,

5   they utilized formaldehyde and dissolved it into

6   certain wood products?

7             MR. GLASS:  Object to form.

8             THE WITNESS:  I think we're going outside

9   of the sphere of my expertise.  I'm not a wood

10   products guy.

11            BY MR. WATTS:

12       Q.    Just generally.  I'm trying to do a step.

13            Gulf Stream -- I don't think there's any

14   dispute about that -- there's formaldehyde in these

15   wood products, fair?

16       A.    Yes.

17       Q.    Okay.  And the way the formaldehyde got in

18    there is Gulf Stream utilized some process -- you're

19    not specific as to what -- to dissolve formaldehyde

20    into the product?

21              MR. GLASS:  Object.  Outside his area of

22    expertise.  Also -- let me finish, please.


                                                            55


1              THE WITNESS:  Okay.

2              MR. GLASS:  And also object as to

3    foundation and form.

4              BY MR. WATTS:

5         Q.    Go ahead.

6              MR. GLASS:  You may answer now.

7              BY MR. WATTS:

8         Q.    Go ahead.

9         A.    As I say, to be honest, I do not -- you

10   know, if you're asking me about the construction of

11   Fiberboard, I know there was formaldehyde in the

12   materials in the trailer; and I -- I don't know to

13   what extent it is a contaminant and to what extent it

14   is an actual design aspect of the materials.  I just

15   -- you know, I mean, is it a contaminant, is it a

16    solvent?  I don't know.

17        Q.    All right.  But it is dissolved into the

18    materials before the trailers leave Gulf Stream,

19    right?

20            MR. GLASS:  Object to the form and also

21    the other objections.

22            THE WITNESS:  It is included in the

                                                        56

1     materials as a part of the manufacturing process.

2     Whether it -- but that's all I can say.

3            BY MR. WATTS:

4        Q.    Okay.  And to get back to where I was

5     trying to head with this, at the time that it leaves

6     Gulf Stream, it is included in the materials in a

7     solid state?

8            MR. GLASS:  Object.

9            THE WITNESS:  It is dissolved in the

10    materials and you can have gases dissolved in water

11    and they're not a liquid, they're dissolved in water.

12            BY MR. WATTS:

13      Q.      I'm talking about dissolved in Fiberboard?

14      A.      Well, there's formaldehyde present in the

15   Fiberboard and over time it can come out.

16      Q.      When it is present in the Fiberboard, it

17   is in a solid state?

18      A.      Oh, my goodness.

19              MR. GLASS:  Object.

20              THE WITNESS:  That's not quite right.

21              BY MR. WATTS:

22      Q.      Why is it not right?

                                                          57

1       A.      Well, it is -- it is -- if you dissolve

2    one material in another -- I mean, certainly the

3    material as put forward -- the stumbling block here

4    is physics.  That basically, you know, you can say,

5    well, this material is included, it is dissolved.

6    I'm not sure technically it is right to say that it

7    is a solid.  It is certainly present in the solid.

8    Whether -- and -- in what phase, I couldn't say.

9       Q.      Okay.  You told me earlier that

10   temperature affects the transition of a material from

11    a solid state to a gas?

12         A.    Well, it affects the rate of, in this

13    case, diffusion because basically when you warm

14    anything up, you're basically making the molecules of

15    the material move faster.

16              And if part of that movement results in

17    their coming out of another material, then that will

18    also occur faster.  That's kind of --

19         Q.    All right.  Let's move our discussion from

20    something that clearly concerns you and your lawyer

21    about specifics, and let's just talk hypothetically

22    for a second.

                                                          58

1          A.    Okay.

2          Q.    If there are a hundred units of

3     formaldehyde in a piece of Fiberboard, the point I

4     think you were making is the higher the temperature,

5     the faster those units of formaldehyde will emit from

6     the formaldehyde into a gaseous state in the air,

7     true?

8       A.      True.

9       Q.      And what is it about higher temperature

10  that accelerates the emission of formaldehyde from

11  Fiberboard into a gaseous state into the air?

12      A.      Well, as I said, basically, when one --

13  when materials are diffusing, it is because gas

14  molecules are in motion; and if you warm a material,

15  you are actually making the molecules in the material

16  move faster; and so the -- by making the molecules

17  move faster, you make things like diffusion of the

18  material out of another material go faster.

19          That's sort of kind of physics 101.

20      Q.      And physics 101 says that if you have a

21  low temperature, the emission of formaldehyde gas

22  from Fiberboard will take place at a lower rate than

59

1   if you have a higher temperature?

2       A.      That is correct.

3       Q.      And therefore, the volume of formaldehyde

4   emitted into the atmosphere as a gas will be higher

5   with higher temperatures than with lower

6    temperatures?

7         A.    Yes.

8         Q.    All right.  I asked you a bunch about the

9    CDC methods.  Let me just ask you generally, the

10   ATSDR study, am I going to hear about any

11   deficiencies of the ATSDR study?

12               MR. GLASS:  Object.

13               THE WITNESS:  No.

14               BY MR. WATTS:

15        Q.    Did you put in your report any criticism

16   of the formaldehyde sampling methods by the ATSDR in

17   its study?

18        A.    No.

19        Q.    Were the ATSDR sampling methods

20   appropriate for estimating exposure for a single

21   trailer?

22               MR. GLASS:  Object.

                                                    60

1                THE WITNESS:  I would say no.

2                BY MR. WATTS:

3       Q.      Because?  Not occupied?

4       A.      Not occupied is the chief criticism.

5       Q.      Yes.  I'm asking all the same questions

6   for the ATSDR, but I had to get this in the record.

7               Were the ATSDR formaldehyde sampling

8   methods appropriate for estimating typical exposures

9   for all trailers?

10              MR. GLASS:  Object.

11              THE WITNESS:  No.  Again, because the

12  ATSDR study was not really focused on estimating

13  human exposure.  And I believe they said that in the

14  study.

15              BY MR. WATTS:

16      Q.      And again, the reason you say it is not

17  appropriate is because they took samples while people

18  were not occupying the trailers?

19      A.      Yeah.  And some of the sampling was done

20  in ways which would be antithetical to sampling

21  trailers as occupied.  I mean, first they closed them

22  all up.  And then they gradually opened them more and

61

1    more to see what happened to the levels.

2         So it's really the -- that's not a

3    scenario which is relevant to estimating exposure in

4    occupied trailers.

5    Q.    To put it in laymen's terms, your position

6    is that sampling of unoccupied trailers is apples to

7    oranges versus what people would have been seeing

8    while they were occupying a trailer?

9    A.    I think it's very far away from the

10   situation in sampling occupied trailers, yes.  I

11   don't think that measurements made in closed trailers

12   is informative to estimating exposures in trailers as

13   occupied.

14   Q.    If you could pull out the affidavit of

15   Mary DeVany, which I think we had marked as Exhibit

16   10.

17        What is your understanding as to how many

18   trailers she sampled?

19   A.    Boy.  That's something I'm going to have

20   to go back and look up.  I don't have that at the top

21   of my head.  I know there was a number, but I don't

22   know the number.

1          MR. GLASS:  While he's looking through her

2    affidavit, do you want to switch tapes?

3          THE WITNESS:  Well, the sampling results,

4    going from page EXP 16 are all from the Alexander

5    trailer.  I know that she sampled others, but

6    presumably this report is based on the numbers that

7    are reported under sampling results.

8          BY MR. WATTS:

9     Q.    If you go to the bottom of page 16.  See

10   where it says DeVany Industrial Consultants

11   evaluation?

12    A.    Page 16?

13    Q.    Very bottom.

14    A.    Ah, yes.  Sampling more than 5,000

15   FEMA-owned temporary housing was conducted by DeVany

16   Industrial Consultants and supervised by -- well,

17   yes.  Okay.  So clearly she did do sampling in 5,000

18   trailers; or at least that's what she said she did.

19    Q.    Okay.  My question is, do you know of

20   those 5,000 trailers that she sampled, how many were

21    occupied at the time she sampled them?

22         A.    I do not off the top of my head.  I do

63

1    know that some occupied trailers were sampled.

2         Q.    And the criticism -- not the criticism,

3    but the remarks that you have with respect to the CDC

4    and the ATSDR is primarily that you cannot project

5    those results into what an occupied trailer would

6    have seen because they were not occupied, right?

7              MR. GLASS:  Objection.

8              THE WITNESS:  Well, more than -- yes.

9    They were not occupied, and they were sampled in ways

10    that were in large part not relevant to assessing

11    exposure to a person living in that trailer.

12              BY MR. WATTS:

13         Q.    All right.  But do you have any specific

14    understanding as to DeVany's sampling of occupied

15    trailers?  Do you know what she did and how she did

16    it?

17         A.    I had reviewed some of her work earlier;

18    and I know that they had a variety of sampling

19    protocols.  They had people come in to the trailers;

20    they handed out samplers to some other people and

21    they got a bunch of numbers.

22         Q.    Okay.  Is that as specific as you can get

                                                          64

1     in terms of what DeVany did and how she did it?

2          A.    Excuse me?

3          Q.    Is that as specific as you can get as to

4     your knowledge of what DeVany did and how she did it?

5          A.    Yeah.  Right now.  It is.

6          Q.    Okay.

7                MR. WATTS:  Let's take a break.  We're out

8     of tape and I have to go to the rest room.

9                THE WITNESS:  That sounds like a good

10    idea.

11               THE VIDEOGRAPHER:  This concludes tape

12    number 1 in the video deposition of Dr. Michael

13    Ginevan.  The time on the video is 11:07 a.m.

14               We are off the record.

15               (Recess.)

16          THE VIDEOGRAPHER:  This begins tape number

17     2 in the video deposition of Dr. Michael Ginevan.

18     The time on the video is 11:15 a.m.

19          BY MR. WATTS:

20     Q.    Dr. Ginevan, we were going through your

21     report.  I think we had talked about the CDC and the

22     ATSDR studies and your comments about how they were

65

1     not occupied.

2          The truth of the matter is on page 3 of

3     your report you say that all of the trailers sampled

4     were occupied units, right?

5     A.    Right.  I misspoke earlier.

6     Q.    Okay.  Putting aside that misstatement --

7     and again, I'm not saying it was intentional -- let's

8     go down to the bottom of that next paragraph or the

9     bottom of that paragraph where you say one particular

10    finding of interest which is discussed below was that

11    in 19 percent of the trailers, smoking had occurred

12    within three hours of the sampling event.

13          Is that a statement that applies to both

14    the CDC and the ATSDR study or just the ATSDR study?

15         A.    The CDC study.

16         Q.    Does that statistic apply to the ATSDR

17    study or is it specific to the CDC study?

18         A.    It is specific to the CDC study.

19         Q.    Okay.  In terms of the CDC study, that

20    means that 81 percent of the sampled trailers did not

21    have smoking occurring within three hours of the

22    test, right?

66

1          A.    Correct.

2          Q.    Secondarily -- again, I'm not arguing the

3     point with you, but when you laid Alana Alexander's

4     deposition, you got a very clear understanding that

5     there had never been smoking in that trailer?

6          A.    Yes.

7          Q.    Okay.  And I'm not indicting your

8     completeness for putting in the comment about

9     smoking; but would you agree with me at least with

10    respect to the Alana Alexander case, smoking had

11    nothing to do with that case?

12        A.    Yes.

13        Q.    Okay.  Now, I want to ask you a question,

14    in your addendum report, you make the point that

15    Scott talks about the length and width of the trailer

16    being 28 feet by 8 feet; and assuming ceiling height

17    of 8 feet, you get a total volume of the trailer of 8

18    feet by 8 feet by 28 which is 1792 cubic feet.

19              And then you reference that DeVany points

20    out because you have a small volume with the trailer

21    you get elevated formaldehyde levels because there's

22    not a whole lot of air volume.

                                                          67

1              Do you remember saying that with respect

2    to DeVany?

3        A.    Yes.

4        Q.    But your point is the flip side is if you

5    have air exchange, you can move out a higher

6    percentage of the air quicker than if you had more

7    air volume; is that right?

8        A.    Yes.

9        Q.    Here's my question:  If you go back to

10   page 3 of your report, when we're talking about the

11   CDC, the second full paragraph, this study showed

12   that formaldehyde levels varied markedly by trailer

13   type with travel trailers having the highest level,

14   geometric mean of 81 parts per billion; followed by

15   mobile homes, geometric mean of 57 parts per billion;

16   and park models, geometric mean of 44 parts per

17   billion.

18            Did I read that correctly?

19        A.    You did.

20        Q.    Now, as a matter of space or air volume,

21   it is true that the travel trailers with the highest

22   geometric mean of 81 parts per billion had the least

                                                              68

1   volume of space, true?

2        A.    That's correct.

3        Q.    Second in terms of volume of space, is

4   mobile homes, right?

5        A.    I believe that's correct also, yes.

6      Q.     And in terms of the models tested with the

7   most space, that was park models, right?

8      A.     Uh-huh.  Yes.

9      Q.     All right.  So with respect to the comment

10  that you made in your addendum report, at least with

11  respect to the CDC, it so happens that the sample

12  data shows that the smaller the trailer, the higher

13  the geometric means of formaldehyde levels that were

14  tested?

15     A.     That's correct.

16     Q.     Now, with respect to the ATSDR, the ATSDR

17  trailers -- unlike the CDC trailers -- were

18  unoccupied, right?

19     A.     That's correct.

20     Q.     With respect to the ATSDR study, was there

21  a stratification in terms of trailer size?

22     A.     I don't believe that there was a

69

1   stratification.  All I have here is that it was new,

2   unoccupied trailers similar to those, and they

3   started with all 96; and essentially what you have

4     here is you're using the same trailers in different

5     scenarios.  So essentially each trailer is its own

6     control.

7          Q.    I agree with you.  So I guess the point

8     I'm trying to make is the ATSDR study of 96 trailers

9     was -- we can assume that was all the same size

10    trailers; right?

11         A.    I don't know that we can assume that.  But

12    they presumably were -- well, they were mostly

13    interested in changing ventilation scenarios; and I'm

14    not sure that the report actually said how large the

15    trailers were.

16         Q.    Okay.  Now, going back up to the CDC

17    report, you say that there was a multi-variant

18    analysis conducted by the CDC that suggested many

19    factors including trailer type, trailer manufacturer,

20    average temperature, relative humidity, ventilation,

21    and the presence of mold in trailers can affect

22    formaldehyde; is that right?

70

1      A.      In a statistical sense, yes.   In other

2  words, those were the factors that the CDC report

3  identified as having a significant association with

4  formaldehyde levels.

5      Q.      If you would, take Exhibit 7 which is the

6  CDC report and find for me where the CDC says that

7  average temperature affects the formaldehyde level.

8      A.      Okay.   Page 10.   And this is -- at least

9  this is one reference.   It is the last paragraph.

10  "Unadjusted comparisons of mobile homes" -- talking

11  about Cavalier now -- but from Cavalier, "unadjusted

12  comparisons of mobile homes from Cavalier show

13  statistically significantly higher levels of

14  formaldehyde compared with the other mobile home

15  stratum.   However, this difference became

16  non-significant after controlling for smoking,

17  windows being open, temperature, and relative

18  humidity."

19          So that's at least one place that I got

20  that.

21      Q.      Okay.   All right.   Anywhere else?

22      A.      Let me see.   Okay.   Page 14.   "Key

1    findings."

2            And then it's bullet 4, "higher indoor

3    temperatures were associated with higher formaldehyde

4    levels in this study independent of unit or type or

5    brand."

6        Q.    Okay.  Stay on page 14 there for a second.

7    But the higher temperatures being associated with

8    higher formaldehyde levels, that makes sense to you

9    because of what you talked about higher temperatures

10   accelerating the diffusion of the formaldehyde from a

11   solid state to a gas, right?

12       A.    That is correct.

13       Q.    I want to ask you the same question:  That

14   is did the CDC conclude that the higher the humidity,

15   the relative humidity, the higher the formaldehyde

16   level?

17       A.    Okay.  Let's see.

18            I think the only reference to humidity is

19   the Cavalier analysis.

20       Q.    Let me ask you this:  Do you agree that

21   from a standpoint of physics that higher humidity

22    would be associated with higher formaldehyde; and if

1    so, why?

2       A.    That's something I'm not really prepared

3    to comment on.  I know that it's been reported that

4    higher humidity levels do elevate formaldehyde

5    levels; but --

6       Q.    Sure.  You know why that would be if it's

7    true?

8       A.    I suspect -- I know formaldehyde interacts

9    with water.  So if you have water in the air, it --

10   it might well change the chemical form which could

11   change concentration gradients and make it come out

12   faster.

13      Q.    I've also seen some documentation that

14   suggests that trailers with mold tend to have higher

15   formaldehyde levels.  That's not a function of mold.

16   That's a function of water; would that be true?

17           MR. GLASS:  Object to the form.

18           THE WITNESS:  I would suspect so, but I

19   have no direct expert knowledge that would really

20   address that.

21            BY MR. WATTS:

22       Q.   Okay.  Putting aside mold for a second,

73

1    what is your understanding as to why higher humidity

2    levels or higher presence of water would elevate

3    formaldehyde levels, all other things being equal?

4            MR. GLASS:  Object.

5            THE WITNESS:  Again, that's not something

6    that I'm -- I mean, temperature and diffusion are a

7    much simpler issue.  I guess that has been what is

8    reported and it does not seem unreasonable but I

9    don't have a mechanistic base for it.

10           BY MR. WATTS:

11       Q.   You don't know why it is true.  You just

12   believe it to be?

13       A.   I do not.

14       Q.   Fair enough.  The other distinctions that

15   were drawn in the CDC was the presence of smoking,

16   cigarette smoke has formaldehyde in it?

17      A.      I would assume that that would be one of

18   the concerns, yes.

19      Q.      Any other thing about smoking that would

20   explain higher formaldehyde rates or levels that you

21   could think of?

22      A.      Again, it is getting into questions of

74

1   physics of things that are acting in the atmosphere.

2   That's really outside my expertise.

3      Q.      Fair enough.  And then the fourth thing

4   that was discussed was whether something is occupied

5   or not; and I assume that the presumption that you're

6   making is occupied trailers have greater air

7   exchanges than unoccupied trailers; is that the

8   point?

9      A.      Fair point, yes.

10      Q.      Are there any other distinguishing factors

11   other than volume of formaldehyde embedded in the

12   wood that would explain differences in formaldehyde

13   samples?

14      A.      Yes.

15      Q.      Okay.  We talked about smoking,

16  temperature, relative humidity, occupancy.

17          What other distinguishing factors do you

18  believe exist?

19      A.      Well, I would imagine that the exact

20  method that you use to take the measurements would

21  make a difference on -- you know, long-term

22  measurements are probably going to be less variable

                                                    75

1   than short-term measurements.

2           Again, this is statistics more than

3   anything else.  It is a variable process.  If you

4   sample it over time, it will become less variable.

5       Q.      In terms of long term measurements, what

6   do you consider a long term measurement versus

7   short-term measurement?

8       A.      That really depends an awful lot on the

9   phenomenon that you are measuring.  For indoor air

10  measurements, I would guess that a short-term

11  measurement would be of the order of hours and a long

12    term measurement could be anywhere from days to

13    months depending upon what you are measuring.

14         Q.    Has anybody at the CDC, the ATSDR, DeVany,

15    any of the consultants in this case done days to

16    months testing that you are aware of?

17         A.    Some of the passive samplers were left in

18    the trailer for days, I believe.

19         Q.    By who?

20         A.    Excuse me?

21         Q.    By who?  Who did the passive sampling?

22         A.    I believe this was some of the sampling

76

1    done by DeVany.

2         Q.    Other than DeVany, has anybody done

3    sampling over the course of multiple days or months

4    that you're aware of?

5         A.    Not off the top of my head.  I'm assuming

6    that there probably longer term measurements done by

7    one or more of the governmental agencies.

8         Q.    Okay.  All right.  Getting back to the CDC

9    results about higher mean or geometric means for

10    smaller trailers as opposed to larger trailers, what

11    do you believe explains the CDC result that travel

12    trailers with the lowest air volume have the highest

13    geometric means of formaldehyde whereas park models,

14    with the greatest air volumes, have the greatest

15    geometric means of formaldehyde?

16            MR. GLASS:  Objection.

17            THE WITNESS:  Am I to answer?

18            BY MR. WATTS:

19    Q.    Yes.

20    A.    Okay.  There's more surface area in a

21    small trailer relative to the volume of the trailer

22    than there is in a large trailer.

77

1    Q.    Therefore because there's more surface

2    area, there's more wood products embedded with

3    formaldehyde?

4            MR. GLASS:  Object to the form.

5            THE WITNESS:  That would be hypothesis,

6    yes.

7          BY MR. WATTS:

8     Q.    Is that a hypothesis that makes sense to

9     you as to why the smaller the trailer, the higher the

10    geometric mean of the formaldehyde levels?

11    A.    Yes.

12    Q.    Okay.  All right.  Let's go to the ATSDR

13    study just for a second, Exhibit 6.

14          On page 4 of your report, you write that a

15    key finding of the ATSDR study is that compared to

16    the mean of 96 baseline formaldehyde measurements,

17    the 852 air conditioning measurements had a mean

18    formaldehyde of about 63 percent lower than baseline,

19    and the 863 "windows open" measurements had a mean

20    formaldehyde level about 91 percent lower than

21    baseline.

22          Did I read that correctly?

                                                        78

1     A.    It is.

2     Q.    With respect to the 852 air conditioning

3     measurements that had a mean formaldehyde of 63

4    percent lower than baseline, do you attribute that

5    difference to the difference in temperature between

6    hot air and air conditioned air?

7        A.    In part, but I believe also the air

8    conditioning ups the air exchange rate in the

9    trailer.

10       Q.    So with respect to air conditioning, there

11   are two reasons why the formaldehyde level would be

12   lower.  Number one, increased exchange rate; and

13   number two, the reduction in the temperature that

14   would lower the formaldehyde emission rate?

15       A.    Yes.

16       Q.    Okay.  With respect to the 863 windows

17   open measurements that had a mean formaldehyde level

18   about 91 percent lower than baseline, is the singular

19   reason to explain that difference the air exchange

20   rate?

21       A.    Yes.

22       Q.    Unless the temperature outside is less

1    than the captured temperature inside before you open

2    a window?

3         A.    Well, the effect of temperature is, you

4    know, going to be smaller than the effect of

5    ventilation with the windows open, because you can

6    get factors of -- you can get an order of magnitude

7    very easily when opening windows; and you can't do

8    that with temperature.

9         Q.    Using the ATSDR study, would you find me

10   where it says what you wrote in your report with

11   respect to the 852 air conditioners and the 863

12   windows open?

13        A.    Okay.  I'm sure I can do that.  I'm

14   assuming that I took it from table 6.

15        Q.    On which page?

16        A.    15.

17        Q.    May I see that for a second?

18        A.    Sure.

19        Q.    Thank you.  With respect to the

20   percentages of what's lower, were you using the

21   mean -- (indicating.)

22        A.    Yeah.  That is correct.

80

1      Q.    Okay.

2      A.    Yeah.

3      Q.    The ATSDR sampling was done in the months

4    of September and October; is that right?  You can see

5    that on the same tables?

6      A.    Yes.

7      Q.    What were the mean temperatures during the

8    ATSDR sampling?

9      A.    If I can find out.  I don't know off the

10   top of my head.

11          Would you like me to look?

12     Q.    Please.

13     A.    Okay.  Here we go.  Well, let's see.  On

14   page 32, there are -- there is a summary of

15   temperature, humidity, and barometric pressure levels

16   by intervention method.

17          Let's see, for the air conditioning, the

18   average temperature was essentially 70 degrees; but

19   the median -- and the median was 70 degrees, but they

20   had maximums of start temperature 94, end temperature

21   97, so apparently at some point things got pretty

22    warm.

1              Windows open, we have a mean of 76, a stop

2    temperature -- start stop are 76 and 78, and then the

3    minimums -- the maximums are 93 and 95, start and

4    stop which is maybe a little odd.

5         Q.    Why is it odd?

6         A.    Oh, I'm just surprised to see with the air

7    conditioning scenario 94 and 97.  That's -- I

8    honestly wouldn't -- the averages are fine; but I

9    think there must have been a trailer whose air

10   conditioning wasn't working quite right.

11        Q.    Okay.  And I apologize for switching back

12   and forth on you.  Go back to the CDC for a second.

13   The differences in geometric means between travel

14   trailers having the lowest air volume and park models

15   having the highest.

16             Find that discussion for me for a second.

17        A.    Hang on.  Here's -- is this CDC.

18        Q.    That's CDC.  Yes, sir.

19        A.    Okay.  The easiest place to see is figure

20   1, which is page 11.

21        Q.    Does the CDC find those differences in

22   geometric means of formaldehyde levels of 81 parts

82

1   per billion in travel trailers, 57 in the mobile

2   homes, and 44 in the park models, are those

3   statistically significant differences?

4        A.    Well, looking at this graph, I would

5   assume so, because they're pretty big differences.

6        Q.    All right.  So the differences are not

7   only large, the sample size is large enough that you

8   can draw a statistically significantly conclusion

9   between a geometric mean of 81 parts per billion in

10   the travel trailers versus the geometric means of 44

11   parts per billion in park models?

12        A.    Yes.  That's correct.

13        Q.    I want to switch gears with you and go to

14   page 4 of your new report, discuss a new subject,

15   decline of emission levels over time?

16        A.    Yes.

17        Q.    You begin with a discussion that

18   formaldehyde levels in trailers will decline after

19   manufacture.

20              Explain for the jury why that is true as a

21   matter of physics?

22        A.    Well, as you lose material, there's less

83

1    there to come out; and essentially, if you're losing

2    a certain fraction per unit time, it follows that as

3    the remaining material, in this case formaldehyde in

4    Fiberboard, is smaller, the amount that's coming out

5    is likewise smaller so it is basically the source is

6    diminishing.

7         Q.    The flip side is if you start with less

8    formaldehyde embedded in your wood products, you have

9    less emission over time as well?

10             MR. GLASS:  Object.

11             THE WITNESS:  All else being equal -- and

12   it's a little bit complicated because it depends on

13   where and how the material is embedded.

14             BY MR. WATTS:

15       Q.    All else being equal, if you embed less

16    formaldehyde in your wood products, you are going to

17    have less formaldehyde emitted into the atmosphere

18    over time?

19       A.    Yes.

20       Q.    Okay.  Now, third full paragraph of that

21    section, you say a travel trailer is, in effect, a

22    mixture of materials which are likely to emit

                                                                84

1    formaldehyde at different rates.  Because of this,

2    trailers will tend to show formaldehyde levels that

3    drop very rapidly at first and then slower

4    thereafter.

5            As a matter of physics, why is that true?

6       A.    Because those materials which emit

7    formaldehyde rapidly will run out of formaldehyde;

8    and as you go out in time, most of the remaining

9    formaldehyde in a trailer is going to be in

10    compartments, if you will, that emit formaldehyde at

11    slower rates.

12          So essentially, you're going to exhaust

13   the material from compartments that emit it rapidly

14   and, thereafter, it will be emitted more slowly

15   because most of it is coming out of the slow

16   compartments.

17       Q.    If you have a trailer that sits in the hot

18   sun, but in a sealed state, what does the fact that

19   it is sealed as opposed to with open windows or air

20   exchanges do to the rate of emission of formaldehyde

21   while it's sitting there?

22          MR. GLASS:  Objection.

85

1          THE WITNESS:  It will tend to slow it

2   somewhat.

3          BY MR. WATTS:

4       Q.    And why does the fact that a trailer is

5   sitting in a sealed state low the emission of

6   formaldehyde somewhat?

7       A.    Because, again, all else being equal, if

8   the formaldehyde -- if it is sealed, the formaldehyde

9   level in air will be higher and there will be less

10   concentration gradient between the material and the

11   air.

12        Q.    If there's less concentration grade yet

13   between the trailer and the air as the trailer sits

14   there in a sealed state, what effect does that have

15   on reducing the emission rate of formaldehyde in the

16   wood?

17        A.    Well, it's -- the best analogy is that

18   water throws more rapidly down a steep slope than a

19   shallow slope; and if we have a lot of formaldehyde

20   in the air relative to the formaldehyde in the

21   material, the diffusion process is such that stuff

22   goes in and stuff comes out.

86

1            And the difference between in and out is

2   lower if you have a lot of formaldehyde in air

3   relative to what's in the material.

4        Q.    Okay.  And in other words, if you have a

5   sealed trailer with a high level of formaldehyde in

6   the air such that the difference between the

7    formaldehyde in the air and the formaldehyde in the

8    wood is reduced, then the emission rate of

9    formaldehyde from the wood to the air is reduced as

10   well?

11       A.    Yes.

12       Q.    All right.  So when we talk about the fact

13   that trailers will show formaldehyde levels that drop

14   very rapidly at first and slower thereafter, that is

15   true in occupied trailers because of the air exchange

16   rate, right?

17       A.    Well, it would be true in any trailer.  It

18   would -- it might -- it would be true in any trailer.

19       Q.    Well, it is more true in occupied trailers

20   than unoccupied trailers that are sealed up?

21            MR. GLASS:  Object to form.

22            THE WITNESS:  Not -- the general point

87

1    that it's going to happen more rapidly in the

2    beginning than further out in time is independent of

3    the -- you know, at one level, it's steady state.  It

4    is going to happen whatever steady state might be.

5   Might be a sealed trailer, might be an occupied

6   trailer.  It is going to happen faster in the

7   beginning, slower at the end.  Having the trailer

8   sealed will probably slow the process down somewhat,

9   but I can't say how much.

10          BY MR. WATTS:

11      Q.    The reason it will slow the process down

12  somewhat is because the difference in the volume of

13  formaldehyde in the wood versus the volume of the

14  formaldehyde in the air is decreased?

15      A.    Yes.

16      Q.    All right.  And I like your example about

17  water flows downhill faster in a steep slope than a

18  shallow slope.  If the slope, if you will, of the

19  amount of formaldehyde in the air is not that great

20  versus that in the formaldehyde in the wood, it is

21  not going to flow out or emit out into the air as

22  fast?

88

1      A.    Well, I think one thing you have -- to put

2   this in perspective, even in a sealed trailer, you're

3   going to have maybe half an air exchange per hour.

4   That is you're losing half of the air in the trailer

5   per hour; and it means that over the course of a day,

6   it's going to turn over essentially entirely.

7           So if you talk on a scale of months, that

8   isn't going to have that large an effect.

9       Q.   Well, let me follow up with you on that.

10  First of all, what is the basis of what you just

11  said, that you're going to have half an air exchange

12  per hour in a sealed trailer?

13      A.   What is the basis?

14          Well, I recall that in looking at air

15  exchange rates -- and this is just going back and

16  kind of thinking about what I know about air exchange

17  rates, I recall that half an air exchange rate --

18  half an exchange per hour is a not unreasonable

19  number.

20      Q.   Well --

21      A.   And I believe -- I think that's where the

22  half an air exchange per hour comes from.  But that

1    is not an unreasonable number.

2         Q.    I think I asked for the basis of that, and

3    you told me, in effect, I can't think of what the

4    basis is, I just know it is not unreasonable.  Really

5    what I'm looking at, and again -- where does it say

6    that?  Where can I go look to probe that?

7         A.    I'm trying to think where I got the half

8    an air exchange per hour from.

9              MR. GLASS:  Refer to your Exhibit B.

10             THE WITNESS:  Maybe it's -- let me go back

11   here.

12             MR. GLASS:  Refer to your Exhibit B on the

13   stuff you reviewed and see if it is in there.

14             THE WITNESS:  Exhibit B may be it.

15             MR. GLASS:  Page 24.

16             THE WITNESS:  I wonder if it was -- can I

17   have a copy of this Serauskas report, please?

18             MR. WATTS:  Exhibit 14.  It's all yours.

19             THE WITNESS:  This might be it.

20             Okay.  This is where I got it from for

21   sure.

22             BY MR. WATTS:

1      Q.      Serauskas's report?

2      A.      Yes.

3      Q.      What page are you referring to?

4      A.      Page 5.

5      Q.      Can I see that for a second?

6      A.      Sure.  It is basically what the -- what

7   the number was that he measured; but that's not

8   unreasonable for a sealed trailer.

9      Q.      Which paragraph are you referring to?

10     A.      Top one, I believe.

11     Q.      Are you referring to where he says this

12  equates to replacing the air in the trailer with

13  outdoor air naturally, with no mechanical means or

14  external wind forces approximately every 118 minutes?

15     A.      Yes.  That sounds right.

16     Q.      Okay.

17     A.      That's a little over half an air exchange

18  per hour.

19     Q.      That's on page 5 of 8 of Serauskas's

20    report?

21         A.    Yes.

22         Q.    Okay.

1          A.    So I'm --

2          Q.    All right.  In your second paragraph on

3     the section that deals with decline in emission

4     levels over time, second sentence, you say,

5     Mr. Kaltofen correctly points out that for fixed

6     temperature and humidity, concentration is a function

7     of air exchange rate and emission rate.

8               Do you see where you said that?  Page 4.

9          A.    Page 4.  I'm getting there.

10         Q.    That's all right.

11         A.    Got it.

12         Q.    Section 2 on declining emission levels

13    with time, second full paragraph, second sentence.

14              "Mr. Kaltofen correctly points out that,

15    for fixed temperature and humidity, concentration is

16    a function of air exchange rate and emission rate."

17         A.    Yes.

18    Q.    Okay.  When you write that, do you mean

19  concentration being a concentration of formaldehyde

20  is a function of air exchange rate and emission rate?

21    A.    Yes.

22    Q.    That's what I thought.  I just wanted to

92

1  make sure.

2         Go to page 5, if you would.

3         You make the point that during the first

4  18 months of this trailer's existence, the trailer

5  was unoccupied and being stored in Punta Gorda,

6  Florida; is that right?

7    A.    Yes.

8    Q.    Do you know what the mean temperature was

9  of the air in Punta Gorda, Florida during those 18

10  months?

11    A.    No, I do not.

12    Q.    Okay.  In terms of the graph that is in

13  figure 1 on page 5, this is the emission rates of

14  agent X from a two compartment system?

15      A.    Uh-huh.  Yes.

16      Q.    Do you believe that the emission rate

17  would have been higher if the trailer had been

18  occupied during those 18 months?

19      A.    Yes, somewhat.

20      Q.    Okay.  With respect to air exchange rates

21  on paragraph 3 -- by the way, it is 12:00 noon.  What

22  do you want to do about lunch?

93

1           MR. GLASS:  What's your preference?

2           MR. WATTS:  I'm good either way.

3           THE WITNESS:  How much longer do you think

4  we'll go?

5           MR. WATTS:  We'll be a while.

6           THE WITNESS:  I think lunch is a good

7  idea, then.

8           THE VIDEOGRAPHER:  We have 19 minutes on

9  this tape.

10          MR. WATTS:  Want to take lunch?

11          MR. GLASS:  People on the phone, we're

12  going to take a break until -- how long do you want

13    to do, 1:00 o'clock?

14            MR. WATTS:  1:00 is fine.

15            THE VIDEOGRAPHER:  This concludes tape

16    number 2 in the video deposition of Michael Ginevan.

17    The time on the video is 11:58 a.m.  We are off the

18    record.

19            (Whereupon, at 12:00 noon, the deposition

20    in the above-entitled matter was recessed, to

21    reconvene at 1:00 a.m., this same day.)

22

                                                    94

1                    AFTERNOON SESSION

2                              (12:57 p.m.)

3    Whereupon,

4            MICHAEL E. GINEVAN, Ph.D.,

5    the witness testifying at the time of recess, having

6    been previously duly sworn, was further examined and

7    testified further as follows:

8                    EXAMINATION BY COUNSEL

9                    FOR PLAINTIFFS (RESUMED)

10          THE VIDEOGRAPHER:  This begins tape number

11   3 in the video deposition of Dr. Michael Ginevan.

12   The time on the video is 12:55 p.m.  We are on the

13   record.

14          BY MR. WATTS:

15          Q.    Dr. Ginevan, I want to talk to you about

16   paragraph 3 on page 5 and 6 of your report dealing

17   with air exchange rates?

18          A.    Yes.

19          Q.    You make the point on the last sentence of

20   that section that the sealed trailer represents an

21   extremely low ventilation scenario compared to the

22   trailer as used by the plaintiffs?

95

1          Do you see that, sir?

2          A.    Page 6?

3          Q.    We're on page 6, last sentence before

4   number 4.

5          A.    Yeah.  I see that.

6          Q.    Okay.  Here's my question:  You are aware

7   of two different sets of testing done on the

8    Alexander trailer by plaintiffs' experts?

9              MR. GLASS:  Object to the excluded test

10   results.

11             BY MR. WATTS:

12      Q.    Go ahead.

13      A.    Yes, I am.

14      Q.    The first one was done in January of 2000

15   and what?

16             MR. GLASS:  2008.

17             THE WITNESS:  I would have to look up the

18   exact numbers.

19             BY MR. WATTS:

20      Q.    January 2008 sound about right?

21      A.    That sounds about right.

22      Q.    Second one was done in May of 2009?

                                                          96

1              MR. GLASS:  Can I have a continuing

2    objection to any reference to the May 6 and 7

3    testing?

4              MR. WATTS:  You can have a running

5   objection.

6            MR. GLASS:  Thank you.

7            BY MR. WATTS:

8       Q.    In May of 2009?

9       A.    Yes.

10      Q.    When did the Alexanders leave the trailer?

11      A.    I would -- again, I do not have the

12  chronology down, and I know it was sometime before

13  then, but I don't know exactly when.

14      Q.    Is it your impression that the trailer was

15  sealed up when they left the trailer?

16      A.    The doors and windows, I believe were

17  closed.

18      Q.    And how long were the doors and windows

19  closed before the first testing was done in January

20  2008?

21      A.    As I say, I don't know exactly when they

22  left the trailer.  I think it was --

                                                    97


1            MR. GLASS:  Can I reference him to the

2   second page of his report?

3          THE WITNESS:  Where?

4          MR. GLASS:  Paragraph 2.

5          Yes.  Paragraph 2, second page of your

6     report.  About halfway in.

7          THE WITNESS:  Oh, I'm sorry.  Okay.

8     December -- December 2007.  Thank you.

9          BY MR. WATTS:

10     Q.    The last week of December of 2007, right?

11     A.    Yes.

12     Q.    And what is the date the testing was done?

13     A.    What is the date?

14          MR. GLASS:  You have it attached as an

15     exhibit, don't you?  Scott's?  I believe you do.

16     Exhibit 13.

17          THE WITNESS:  Thank you.

18          MR. GLASS:  If I'm talking over your

19     deposition too much, just tell me to shut up.

20          THE WITNESS:  Okay.  The initial sampling

21     was January 28, 29 of 2008.

22          BY MR. WATTS:

1      Q.     Here's my question.

2      A.     Yes.

3      Q.     In the 30 days or so from the time that

4   they had moved out, would you get a reduction in the

5   difference between the formaldehyde in the wood and

6   the formaldehyde in the air?

7      A.     The wood level would remain relatively

8   constant and the formaldehyde in the air would go up

9   a lot.  So yes.

10     Q.     Despite the fact that this is three years

11  and a month after the manufacture of the trailer?

12     A.     Yes.

13     Q.     Okay.  When you say that the amount of

14  formaldehyde in the air would go up a lot, it is

15  doing so three years and a month after the

16  manufacture of the trailer.  What causes the

17  formaldehyde in the air to go up a lot between

18  December 27 of 2007 and January 28 of 2008?

19     A.     Well, again, if you have a trailer that's

20  occupied, you're going to have a relatively higher

21  exchange rate.

22            And when you shut the trailer up for a

99

1    period of 30 days, you're essentially allowing it to

2    come to a new steady state.

3             And that's going to have a much higher

4    formaldehyde level than the formaldehyde level that

5    would be present at the time the trailer was

6    occupied.

7        Q.    And the basis of that is the lack of air

8    ventilation in your view?

9        A.    Yes.

10       Q.    Is that the sole basis?

11       A.    Well, I would also guess that the trailer

12   would be somewhat warmer because there's no air

13   conditioner being run.

14       Q.    What was the impression you got from

15   Mrs. Alexander's deposition about the use of the air

16   conditioner while they were there?

17       A.    They used it as often as they needed to to

18   be comfortable.  That was the impression I got.

19       Q.    As opposed to opening windows?

20       A.    She made reference also to opening four

21     windows and a door.

22          Q.     While the air conditioner was on?

100

1          A.     Yes.

2          Q.     What is the effect of opening four windows

3     and a door while the air conditioning is on?  I know

4     at my house it makes me pissed off at my kids.

5               MR. GLASS:  We have the same type of kids.

6               THE WITNESS:  Well, I think the four

7     windows and the door is certainly going to provide a

8     lot of opportunity for ventilation.  The air

9     conditioning is at the very least going to be moving

10    air around the trailer.  If you have air contingency

11    on, you need to move the air around to get mixing.

12              I would expect in a small volume like

13    that, that there's probably much as there is in a

14    automobile, a certain percentage of the air is

15    exchanged.  In other words, it is putting fresh air

16    in.

17              So you know, it is going to up the

18    ventilation rate relative to a trailer simply with

19    the doors and windows open.

20              BY MR. WATTS:

21       Q.    Okay.  Do you have an opinion as to what

22    the formaldehyde level average would have been while

                                                              101

1    the Alexanders and Chris Cooper were in the trailer?

2        A.    No, I don't.

3        Q.    Are you going to give any opinions at the

4    time of trial as to how different from the test level

5    it was?

6        A.    I expect that I would, yes.

7        Q.    What are you going to say?

8        A.    It is not unreasonable that the actual

9    level while they're in residence could have been more

10   than an order of magnitude less than was measured.

11       Q.    I'm sorry.  Say that again.

12       A.    It was not unreasonable that the

13   formaldehyde levels in the trailer at the time the

14   Alexanders were in residence could have been more

15   than an order of magnitude less than what was

16    measured.

17         Q.    What does that mean from the standpoint of

18    --

19         A.    Factor of 10.  In other words, it could be

20    a factor of 10 lower pretty easily.

21         Q.    You think the measured level in January of

22    2008 was 10 times greater than the level you would

102

1    expect for them to have while they were in there?

2              MR. GLASS:  Objection.

3              THE WITNESS:  Well, we don't have any

4    direct measurements which is the ongoing issue.  But

5    given that the trailer was unventilated with no AC at

6    the time of the measurement, and the measurement was

7    sort of taken in a way to minimize ventilation while

8    it was taken, it doesn't seem unreasonable, nor do

9    the calculations that I present make it unreasonable

10    that you could have a level which was on an order of

11    magnitude lower than what was measured.

12              BY MR. WATTS:

13      Q.      Okay.

14      A.      Because of the difference in the air

15  exchange rate and the temperature.

16      Q.      What is the basis of that conclusion in

17  the literature?

18      A.      Well, again, Kaltofen brought up the idea

19  that essentially the level of formaldehyde -- or

20  level of anything in an atmosphere is essentially

21  inversely proportional to the ventilation rate, given

22  that the source stays the same.

103

1           So in other words, if we're evolving the

2  stuff at the same rate and we double the ventilation

3  rate, we'll have half as much material.  And if we up

4  the ventilation rate by an order of magnitude, we

5  would have a tenth as much material.  So that's one

6  part of the equation.

7           The other part of the equation is that it

8  seems reasonable that the temperatures were certainly

9  no higher when the plaintiffs were in residence

10  because we know they were running the AC, we know

11    they wanted to be comfortable.

12              So essentially, we've sealed the trailer.

13    We've let it come to equilibrium for a month.  We've

14    made a measurement.  And now we're trying to go back

15    in time to when the air exchange rate when the

16    trailer was very high.  We don't know how high

17    because again we don't have any direct measurements

18    of the trailer as occupied, and we also know that the

19    air conditioning was running to the extent that the

20    people in the trailer wanted to be comfortable.  And

21    they said they ran it to the extent they needed it to

22    be comfortable.

                                                            104

1         Q.    What is your explanation for the

2    difference in the formaldehyde measured in January of

3    2008 versus May of 2009?

4              MR. GLASS:  Objection.

5              THE WITNESS:  Not really.  Again, I wasn't

6    privy to the details of the measurement, so no, I

7    guess I don't.

8          BY MR. WATTS:

9      Q.    If I told you that the measurements in May

10  of 2009 were 50 percent higher than the measurements

11  in January 2008, what explanations would you give as

12  to why that is, all other things being equal?

13          MR. GLASS:  Objection.  Again, this is --

14          MR. WATTS:  You have a running objection,

15  bud.

16          MR. GLASS:  There's also, in addition to

17  it, the foundation.

18          MR. WATTS:  Okay.  Go ahead.

19          MR. GLASS:  Go ahead.

20          THE WITNESS:  Really I know 50 percent

21  sounds like a lot, but for environmental

22  measurements, having that degree of fluctuation from

                                                    105

1   one measurement to another is not remarkable.

2          BY MR. WATTS:

3      Q.    Okay.

4      A.    Things that vary by 50 percent are kind of

5   in the same ballpark.

6      Q.    Let me see if I could throw in a possible

7   explanation just to get you to comment on it.  If the

8   temperature was higher in May than it was in January

9   the year before, would that be an explanation for

10  formaldehyde level that was higher, for the reasons

11  we talked about earlier?

12     A.    Let me look at the Scott report.  I have

13  so much paper.  Here we go.  I got it.

14     Q.    Okay.

15     A.    See what the temperatures were at the

16  time.

17           MR. GLASS:  I also object that this is

18  outside the scope of his report.

19           THE WITNESS:  Possibly.

20           BY MR. WATTS:

21     Q.    Okay.  In terms of all of the different

22  distinguishing factors, is temperature going to have

                                                          106

1   a greater effect on formaldehyde levels than relative

2   humidity?

3          A.     My sense is that it would.

4          Q.     Okay.

5          A.     Can I call time for just a second?

6                 MR. WATTS:  Watch your mic.

7                 THE VIDEOGRAPHER:  We're going off the

8     record.  The time on the video is 1:09 p.m.

9                 (Recess.)

10                THE VIDEOGRAPHER:  We are back on the

11    record.  The time on the video is 1:12 p.m.

12                BY MR. WATTS:

13         Q.     Go to page 7, paragraph 5 of your report

14    for a moment, formaldehyde exposure standards.

15         A.     Page 7?

16         Q.     Yes, sir.

17         A.     Yes, sir.  Formaldehyde exposure

18    standards.  Yes, sir.

19         Q.     When you were the head of the DOE

20    occupational health surveillance system, did you

21    recommend that DOE and DOE contractors comply with

22    the least stringent exposure limits or the most

1    stringent exposure limits?

2         A.    We did not make recommendations as to

3    exposure limits.

4         Q.    Did the DOE have a policy as to which

5    exposure limits its employees should comply with?

6         A.    It may have, but as I say, that was

7    outside of my purview.

8         Q.    What is the ACGIH?

9         A.    ACGIH?

10             I know what it is, but I don't have the

11   acronym.

12        Q.    American Conference of Governmental

13   Industrial Hygienists?

14        A.    Okay, I believe that.

15        Q.    Are you familiar with what the ACGIH

16   threshold limits are for formaldehyde?

17        A.    Again, I am not.  I do not have the

18   various standards memorized.

19        Q.    Was it the policy of the Department of

20   Energy that the ACGIH threshold limit standards

21   should be complied with in DOE facilities?

22        A.    As I say --

1          MR. BAIN:  Objection.  Form, lack of

2     foundation.

3          BY MR. WATTS:

4     Q.    Go ahead.

5          MR. GLASS:  Join in the objection.

6          THE WITNESS:  Compliance issues were

7     totally outside of my purview.  So I really don't

8     know.

9          BY MR. WATTS:

10    Q.    Okay.  The last sentence or the second to

11    the last sentence of that paragraph, you say the

12    median formaldehyde level in exhaled breath from

13    healthy people is between 4 and 5 parts per billion

14    and that healthy people can exhale as much as 70

15    parts per billion of formaldehyde in their exhaled

16    breath; is that correct?

17    A.    Yes.

18    Q.    And you cite to Formaldehyde Facts dated

19    October 8 of 2008, Formaldehyde in Breath:  The

20    Untold Story, and Why it Matters, is that right?

21      A.      That's correct.

22      Q.      That is Exhibit 8 to your deposition; is

                                                        109

1    that right?

2       A.      Yes.

3       Q.      And Exhibit 8 is a publication produced by

4    the Formaldehyde Council Incorporated, right?

5       A.      That's correct.

6       Q.      And who is the Formaldehyde Council

7    Incorporated?

8       A.      Well, it is a trade association of --

9    their members for various reasons have an interest in

10   formaldehyde.

11      Q.      It is set up -- the Formaldehyde Council

12   was set up by the manufacturers of formaldehyde,

13   right?

14      A.      I believe so, yes.  That's my

15   understanding.

16      Q.      And they publish things that say

17   formaldehyde is not all that dangerous?

18      A.      I don't know that I'd put it that way.

19      Q.     Would you agree with me that they publish

20   things that tend to favor the health outlook of

21   formaldehyde?

22             MR. GLASS:  Object to form.


                                                            110


1              THE WITNESS:  Again, I think that -- you

2    know, any trade association is trying to get their

3    side of the story out.  But I've also spent a lot of

4    time in Washington, and would say that for the most

5    part, they try pretty hard to tell the truth; and

6    this is not unreasonable.

7              BY MR. WATTS:

8       Q.     Just like the cigarette companies did?

9              MR. GLASS:  Objection.

10             THE WITNESS:  Excuse me.

11             BY MR. WATTS:

12      Q.     Just like the cigarette companies did with

13   their industry association.

14             When you said try to tell the truth, were

15   you being specific to trade associations?

16        A.      Most trade associations in my experience

17   are fairly good sources of information about their

18   own products.

19        Q.      Okay.   The members of the Formaldehyde

20   Council, Arclin, formally Dynea.

21              Do you know who they are?

22        A.      No, I do not.

111

1        Q.      Do you know they manufacture formaldehyde?

2        A.      As I say, I don't know that.

3        Q.      Celanese Corporation, you are familiar

4   with that?

5        A.      Am I familiar with Celanese?   I know the

6   name.

7        Q.      Manufacture formaldehyde and other

8   industrial products?

9        A.      Right.

10        Q.      Georgia-Pacific LLC, familiar with

11   Georgia-Pacific?

12        A.      Georgia-Pacific?

13        Q.      Sure.

14          A.    Yes.  Again, I know the company.

15          Q.    Deals in formaldehyde.

16          A.    Again, I hadn't made a study of the makeup

17   of the Formaldehyde Council.

18          Q.    We're going to do one together.  Hexion

19   Specialty Chemicals?

20          A.    No.

21          Q.    Are you familiar with Hexion?  Can you

22   tell by the name they are probably involved in

                                                      112

1    specialty chemicals, including formaldehyde?

2           A.    Again, no, I'm not familiar with that.

3           Q.    Are you familiar with Methanex

4    Incorporated?

5           A.    No.

6           Q.    Never heard of it?

7           A.    Never heard of it.

8           Q.    Methanol Holdings Trinidad Limited?

9           A.    Never heard of it.

10          Q.    CertainTeed Corporation?

11      A.    Yes.  I know CertainTeed.

12      Q.    What do they do?

13      A.    They make building products.

14      Q.    Including products with formaldehyde?

15      A.    Apparently, yes.

16      Q.    E.I. DuPont de Nemours & Co.?

17      A.    Yes.

18      Q.    Chemical manufacturer, manufacturer of

19 formaldehyde?

20      A.    Yes.

21      Q.    Owens Corning?

22      A.    Yes.  I know Owens Corning.

                                                        113

1       Q.    When they're not dabbling in asbestos,

2  they deal with building products with formaldehyde?

3             MR. GLASS:  Objection.

4             BY MR. WATTS:

5       Q.    Right?  Let me fix the question.

6             Owens Corning manufactures building

7  products that you know have formaldehyde in them?

8       A.    Excuse me?

9       Q.    Owens Corning manufactures building

10   products that you know have formaldehyde in them?

11      A.    Yes.

12      Q.    Are you familiar with Agrolinz Melamine

13   International?

14      A.    No, I'm not.

15      Q.    Atlantic Methanol Company?

16      A.    No.

17      Q.    D.B. Western, Inc.?

18      A.    Excuse me?

19      Q.    D.B. Western, Inc.?

20      A.    No.

21      Q.    DSM Melamine Americas, Inc.?

22      A.    No.

                                                    114

1       Q.    Formica Corporation?

2       A.    Yes.

3       Q.    They make building products including

4    formaldehyde?

5       A.    They make countertops.

6        Q.      Countertops come with formaldehyde?

7        A.      Excuse me?

8        Q.      Do countertops come with formaldehyde when

9    they're made of wood products.

10       A.      Yes.  Commonly they do emit formaldehyde,

11   yes.

12       Q.      Panolam Industries International,

13   Incorporated?

14       A.      Excuse me?

15       Q.      Panolam Industries International,

16   Incorporated?

17       A.      No.

18       Q.      You familiar with Troy Chemical

19   Corporation?

20       A.      No.

21       Q.      West Fraser Timber Co. Ltd.?

22       A.      No.

                                                    115


1        Q.      American Forest and Paper Association?

2        A.      Yes.

3        Q.      Kitchen Cabinet Manufacturers Association?

4       A.      I can guess what they do, but I've never

5  had dealings with them.

6       Q.      Can you guess that the cabinets they

7  manufacture come with formaldehyde?

8       A.      To the extent they are made with particle

9  board, yes.

10       Q.      And finally, the National Funeral

11  Directors Association, they've been known to dabble

12  with formaldehyde, right?

13       A.      Yes.  I would expect so.

14       Q.      Let me talk to you about this study.

15  What's the exhibit number again?

16       A.      The exhibit number is 8.

17       Q.      And the point of Exhibit 8 is to say

18  that -- in fact, it starts off saying there's been a

19  lot of discussion about the safety of formaldehyde

20  from this FEMA trailer home issue, right?

21       A.      Yes.

22       Q.      And at the end of the study, they say it

1    can't be that big of a deal because people breathe

2    formaldehyde at certain levels and here they are,

3    right?

4         A.    I don't know that I would characterize it

5    in exactly that way.

6         Q.    Do they talk about levels that people are

7    saying you shouldn't have are inappropriate because

8    in some instances those levels are below what people

9    can breathe?

10        A.    Yes.

11        Q.    And they cite a study by Berthold Moser,

12   right?

13        A.    I believe so, yes.

14        Q.    I asked you at the beginning of this

15   deposition whether you brought Dr. Moser's paper with

16   you?

17        A.    No, I did not.

18        Q.    Let me give you a copy of the Moser paper.

19   Have you read that paper before today?

20        A.    No, I have not.

21        Q.    Let me hand it to you, it is Ginevan

22   Exhibit 15.

117

```
1                           (A document was marked for

2                           identification as

3                           Exhibit No. 15.)

4               BY MR. WATTS:

5         Q.    This is the paper that the Formaldehyde

6    Council cites as its evidence that the standards are

7    too strict because they are below levels where people

8    can breathe it, right?

9               MR. GLASS:  Objection.

10              THE WITNESS:  I don't, as I say -- to my

11   mind, the focus of the paper was what the levels in

12   breath really were.  And that was how I used it.

13              BY MR. WATTS:

14        Q.    What do they say what the levels in breath

15   really were?

16        A.    They say there's a median.

17        Q.    By the way, "they" is the Formaldehyde

18   Council, correct?

19        A.    Yes.

20        Q.    Okay, go ahead.  Median breath is what?

21        A.    Four to five parts per billion.
```

22        Q.    The median would be if you took 344 people

                                                                118

1   and put half of them on one side of a line and half

2   of them on the other, that would be the median,

3   right?

4        A.    Yes.

5        Q.    And if you go to table 2 on page 297 of

6   the Moser study, the median is 4,263 parts

7   per billion in the Moser study; is that right?

8        A.    4.263.

9        Q.    Parts per billion?

10       A.    I believe so, yes.

11       Q.    All right.  So that would be the same

12  thing as about 4.26 parts per million?

13       A.    No.  I think -- given parts per billion --

14  that sounds -- to be honest, that sounds high, but

15  that would say it was 4.2 parts per million.  I'm

16  pretty sure that's wrong.

17       Q.    What they mean to say is 4.2 parts

18  per billion, don't they?

19      A.    I don't believe that that's supposed to be

20  4.2 parts per billion, yes.

21      Q.    What Moser did is they utilized a -- it is

22  a device called, the spectrometric -- do you know?


                                                              119


1      A.    Proton transfer reaction mass

2  spectrometry.

3      Q.    Now if you took 75 percent of the people

4  that were tested of these 344 people, 75 percent of

5  them were below 6.332 parts per billion, right?

6      A.    Yes.

7      Q.    And in your paper -- or in your report,

8  you say healthy people can exhale as much as 70 parts

9  per billion of formaldehyde in their exhaled breath,

10  right?

11      A.    Yes.

12      Q.    And what you are citing to is the

13  Formaldehyde Council, which you are citing to the

14  right column on table 2 on mass 31 formaldehyde which

15  was 72.729 parts per billion, right?  The maximum?

16      A.    Yes.

17    Q.    344 people, one person exhaled that much

18  formaldehyde, right?

19    A.    Correct.

20    Q.    Now, do you know how much formaldehyde is

21  in a pack of cigarettes?

22    A.    Not off the top of my head, no, I do not.

120

1    Q.    Okay.  Do you know how many of these 344

2  people that Moser looked at were smokers?

3    A.    No, I do not.

4    Q.    Look at table 1, if you would.

5          You see how 13.95 percent of the people

6  were smokers?

7    A.    Yes.

8    Q.    That means 48 of 344 people were smokers?

9    A.    Okay.  Yes.

10    Q.    That sound about right?

11    A.    Yes.

12    Q.    Okay.  In the results, Moser writes in the

13  third paragraph that significant difference in

14    exhaled breath composition could be found between

15    smokers and nonsmokers in 32 out of the 179 masses

16    tested.

17            Do you see that?

18    A.    What page are you on?

19    Q.    I'm on page 297, the right column, the

20    third full paragraph under 3, results?

21    A.    Yeah.  Yes.

22    Q.    All right.  In terms of smoking, you would

                                                    121

1    agree that because formaldehyde is contained in

2    cigarette smoke, that if somebody is smoking a pack

3    of cigarettes a day, they're going to have a higher

4    formaldehyde count in their breath than if they're a

5    non-smoker?

6    A.    No, I do not agree.

7    Q.    Okay.  And the reason for that

8    disagreement is what?

9    A.    Well, again, I don't have a specific

10    reference, but I do know that the level of

11    formaldehyde in blood is really not affected by -- I

12   can get references, but you can expose people to

13   formaldehyde and it does not elevate their blood

14   level.

15        Q.    I'm not asking about blood level.  I'm

16   talking about breath.

17        A.    Well, but if I'm -- okay.  Where gases

18   come from.  Gases exhaled from the lung come from

19   blood; and the -- if the blood level stays the same,

20   then the -- as long as you haven't -- you know, as

21   long as you're not exhaling cigarette smoke that you

22   just inhaled, the amount of formaldehyde that you

                                                      122

1   exhale is not going to be necessarily higher.

2        Q.    Wait a minute.

3        A.    In other words --

4        Q.    First of all, to set some context, you

5   have done some work for the tobacco industry, right?

6        A.    Good Lord, 20 plus years ago.  Yes.

7        Q.    Have you done any work on secondhand

8   smoke?

9          A.    Yes, I have.

10          Q.    Okay.  In order for secondhand smoke to

11   have an effect on somebody's health, does it need to

12   be breathed in?

13          A.    Actually, I've offered the opinion that I

14   think that the estimates of the health risk of

15   secondhand smoke are pretty accurate.

16          Q.    What are the estimates of the risk of

17   secondhand smoke that are pretty accurate?

18          A.    Female smokers, married to male -- female

19   nonsmokers married to male smokers have an excess

20   relative risk of somewhere between 15 and 30 percent

21   for lung cancer.

22          Q.    And let's just use those 15 to 20 percent

                                                              123

1    of female nonsmokers who have excess relative risk

2    because they're married to a smoker.

3               In order for that relative risk of that

4    lung cancer increase to happen, they have to breathe

5    in the secondhand smoke from their spouse, right?

6               MR. GLASS:  Objection.

7          THE WITNESS:  Yes.

8          BY MR. WATTS:

9     Q.    When somebody is around somebody that is

10   smoking in order to have an excess relative risk,

11   they have to breathe in the secondhand smoke i.e., be

12   in the vicinity of it, right?

13   A.    Yes.

14   Q.    If somebody is around secondhand smoke

15   that they're not smoking, do you think that somebody

16   who is smoking can be around secondhand smoke from

17   their own cigarette and breathe it in?

18          MR. GLASS:  Objection.

19          BY MR. WATTS:

20   Q.    I guess then it would be firsthand smoke?

21   A.    Almost by definition.

22   Q.    The bottom line is if you are a smoker you

1     can breathe in your own smoke from exhaled air to a

2     higher degree than your wife, who is next to you?

3     A.    Yes.

4          Q.      Okay.  And it is a fact that when you

5     exhale cigarette smoke, it has formaldehyde in it?

6          A.      Well, yeah, but I'm assuming that in this

7     paper they didn't have the people smoking while they

8     were being tested.

9          Q.      But they've already breathed in whatever

10    they did when they took a smoke before they walked

11    out, right?

12              MR. GLASS:  Objection.

13              BY MR. WATTS:

14         Q.      Tell you what, let's see if we can go

15    about it this way:  Did you check to see whether

16    Moser says that there were significant difference in

17    a formaldehyde level of smokers versus nonsmokers?

18    Before you cited the Formaldehyde Council for us to

19    consider?

20         A.      No, I did not.

21         Q.      All right.  Knowing what you know about

22    secondhand smoke, which I would venture to say is

125

1     more than anybody else in this room, what would your

2    prediction be as to whether the level of formaldehyde

3    is statistically significantly different in the

4    breath of smokers versus nonsmokers?

5         A.    That's one that has a "that depends"

6    answer.  Because if you tell me the guy has refrained

7    from smoking for several hours, then I would not a

8    priori expect to see a difference in formaldehyde

9    levels based on the -- I mean, the intake that you're

10   going to -- the intake is -- is not going to effect

11   the blood level.  And if the blood level remains the

12   same, then the exhaled level is not going to change.

13        Q.    Do you know how these 344 people were

14   called up?  Do you think they were put in a

15   laboratory setting and excluded from smoking for

16   several hours?

17        A.    Well, I think that the people were brought

18   into the laboratory because I'm pretty sure that

19   proton transfer reaction mass spectrometry is not a

20   very portable technology.

21        Q.    Let's talk about that.  What if they were

22   at a public health fair and they signed a written

1    consent and all they had to do was rest for five

2    minutes before samples were obtained by them blowing

3    into a bag?

4              Do you see the methods on page 296?

5         A.   I do.

6         Q.   All right.  So they were at a public

7    health fair.  They get 344 people to sign consents.

8    Right?

9         A.   Yes.

10        Q.   Test persons were asked to exhale in a

11   sample bag, right?

12        A.   Uh-huh.

13        Q.   And at least under the methods all they

14   say is a minimum of five minutes of rest before

15   samples were obtained was mandatory, right?

16        A.   Yes.

17        Q.   So you have no basis to say that they

18   quarantined these people away from their cigarettes

19   these 48 people that we know were smokers for any

20   more than five minutes, right?

21        A.   Well, I cannot say that with absolute

22    certainty, no.  Although I would guess that the

1    percentage of people actively smoking at a public

2    health fair might be fairly small.

3        Q.    We know what the percentage is because we

4    have table 1?

5        A.    No.  I mean actively smoking while at the

6    public health fair.

7        Q.    A smoker with a good attitude?

8        A.    Well, I'm guessing that if I was running a

9    public health fair, the first thing I would do is put

10   up a whole bunch of non-smoking signs.

11       Q.    So you think those 48 people that said

12   they were smokers managed to avoid smoking for three

13   hours before they had to wait five minutes?  Aren't

14   we throwing a supposition on a supposition on a

15   supposition here?

16       A.    Well, first of all, you've got a

17   significant difference.  I don't know how big the

18   difference is.

19              But the bottom line is that, you know,

20   whether it is 3 parts per billion or 5 parts

21   per billion, the fact of the matter is you still

22   have -- it is not like smokers are going to exhale 10

128

1   times as much formaldehyde as nonsmokers.

2        Q.    Do you know that or are you guessing?

3        A.    Yes.  I do.

4        Q.    What's the percentage of formaldehyde in

5   each cigarette?

6        A.    I don't know that.

7        Q.    Okay.  And if somebody breathes in

8   firsthand smoke that they've already exhaled, how

9   long does it stay in their lungs?

10       A.    I would say minutes.

11       Q.    What about the substances inside the

12   smoke?  Does it attach to portions of the lung?

13       A.    Attach to portions of the lung?  It would

14   be absorbed in the bronchial epithelium.

15       Q.    Sure.  If it is absorbed to the bronchial

16   epithelium, is it stuck there for good?  Or can it

17    get back out during subsequent breaths?

18         A.    Formaldehyde is most likely going to react

19    with chemical -- with the bronchial epithelium.  It

20    is not going to be exhaled.  It can be absorbed.  It

21    is not going to be exhaled in any great degree.  It

22    is not like formaldehyde in a piece of wood.

                                                        129

1         Q.    The median age of these people was 61.6.

2    Last full paragraph, column 1, on page 299, third

3    line.

4         A.    Okay.

5         Q.    The mean age was 61.6; is that right?

6         A.    That's right.

7         Q.    Here's my question.  Go back to table 2.

8         A.    I'm at table 2.

9         Q.    All right.  Of the 344 people, if we've

10    got 25 percent of those people with a formaldehyde

11    exhale of 6.332 parts per billion?

12         A.    Yes.

13         Q.    Do you know how many of those people were

14    smokers?

15      A.      Smokers were 14 percent of those tested.

16   And what it tells me is there had to be a whole lot

17   of nonsmokers above the 75th percentile.

18      Q.      Let's talk about the 97th percentile.  The

19   difference between 97.5 and the maximum is going to

20   be eight or nine people, right?

21      A.      Yes.

22      Q.      Do you know how many of those eight or

                                                           130

1   nine people were smokers?

2      A.      I do not.

3      Q.      Could you find out?

4      A.      No.

5      Q.      Okay.  All right.  Let's go to your

6   conclusions, first full paragraph?

7      A.      Yes.

8      Q.      Let's go to the second paragraph for a

9   second, Dr. Hewett's analysis, and we'll get into

10   this in more detail.

11            What is the best way to attempt to

12    calculate what the exposure levels were in a trailer

13    if you don't have a test result at the time that the

14    people were in the trailer?

15         A.    It would be very difficult bordering to

16    impossible to predict the level in a given travel

17    trailer by trying to do an exposure reconstruction.

18              Now, what you could do is to try to set up

19    a trailer as much like the trailer that you had and

20    then do an experiment like an exposure reconstruction

21    study to see what the levels were.

22              But that's not what Dr. Hewett got his

131

1    data.  He was sort of opportunistically saying here's

2    some formaldehyde measurements, here's some other

3    formaldehyde measurements, here's the average and

4    that's not very helpful in terms of assessing

5    individual exposure.

6         Q.    Okay.  You said that the data set that

7    Dr. Hewett used to provide a basis for his sample

8    size calculations is flawed because it consists

9    entirely of trailers that were sealed which had no

10    ventilation?

11        A.    That's true.

12        Q.    Do you know where the tests that comprised

13    the data set that Dr. Hewett used came from?

14              Most of them were from Dr. DeVany, weren't

15    they?

16        A.    Yes.  It was a certain number -- can I

17    have Hewett's report?  Do I have Hewett's report?

18        Q.    You do.  I'm sorry, I do.

19        A.    There we go.

20              MR. GLASS:  Michael, that previous

21    question that you were asking him about, is that

22    something you were reading from his report?

                                                      132

1              MR. WATTS:  No.

2              MR. GLASS:  His testimony?  Michael?

3              MR. WATTS:  No.

4              THE WITNESS:  You're in conclusions,

5    right?

6              BY MR. WATTS:

7       Q.      Uh-huh.

8       A.      Could you repeat your question?  I'm

9    sorry.  I got lost in the report.

10              MR. WATTS:  Could you read it back?  I got

11   lost too.

12              THE REPORTER:  "Question:  Do you know

13   where the tests that comprised the data set that

14   Dr. Hewett used came from?

15              "Most of them were Dr. DeVany, weren't

16   they?"

17              THE WITNESS:  And do I know?  He says that

18   he's got 1191 formaldehyde exposure measurements from

19   Gulf Stream THUs was provided in an Excel

20   spreadsheet.  1185 valid cases.  Okay.  Let's see

21   where this came from.

22              Okay.  They were Boston Chemical data,

                                                         133

1    DeVany, FEMA, CDC.  Okay.  So those -- okay -- these

2    are -- it is an amalgam of a whole bunch of different

3    sources.

4              BY MR. WATTS:

5        Q.      What's the largest source?

6        A.      Is DeVany Industrial Consultants.

7        Q.      Would you agree with me that the vast

8    majority of Devany's tests were done in occupied

9    trailers?

10       A.      Were done what?

11       Q.      Done with occupied trailers?

12       A.      I don't know that I would agree with you

13   that the vast majority were.  I can go back and look.

14               But -- hang on.

15               Okay.  I had -- I had seen earlier

16   documents from DeVany that said they were sampling

17   occupied trailers.  I don't really see reference as I

18   go through this report as to whether they were

19   occupied or not.

20       Q.      Read that last answer back to me.

21       A.      But my impression is they sampled a great

22   many unoccupied trailers.

                                                         134

1        Q.      What was the start of that last answer?

2          THE REPORTER:  "Answer:  I don't know that

3    I would agree with you that the vast majority were.

4    I can go back and look.

5          "But -- hang on.

6          "Okay.  I had -- I had seen earlier

7    documents from DeVany that said they were sampling

8    occupied trailers.  I don't really see reference as I

9    go through this report as to whether they were

10   occupied or not.

11         "But my impression is they sampled a great

12   many unoccupied trailers."

13         BY MR. WATTS:

14   Q.    Is your impression that they sampled more

15   occupied trailers than unoccupied trailers?

16   A.    I am not finding that information in this

17   report.

18   Q.    Okay.  It is certainly not true that

19   DeVany's sample set consists entirely of trailers

20   that were sealed and had no ventilation?

21   A.    I knew that.

22   Q.    You knew that it's not true?

135

1      A.    It is certainly true that there were

2   trailers that were sampled when occupied or -- at the

3   time of occupation.

4      Q.    Okay.  So it would certainly be not true

5   that DeVany sampled a set that consists entirely of

6   trailers that were sealed and had no ventilation.

7          That would not be true, right?

8      A.    It is not true that all -- all the

9   trailers were sealed and had no ventilation.

10     Q.    It is not true that half the trailers were

11  sealed and had no ventilation?

12     A.    Half the trailers?  I'm not finding that

13  right here at this time.

14     Q.    Okay.  We know that the CDC trailers were

15  tested when occupied?

16     A.    The CDC trailers were tested when

17  occupied, yes.

18     Q.    In your background, I asked you whether

19  any of your papers dealt with the subject of

20  formaldehyde.

21         Before being hired by Mr. Weinstock in

22  this case, have you ever consulted on the subject of

136

1    formaldehyde before?

2         A.    Yes.

3         Q.    Okay.  For whom?

4         A.    I believe it was a sick building syndrome

5    and one of the issues was formaldehyde.

6         Q.    And for whom did you consult on the sick

7    building syndrome?

8         A.    That was many years ago.  I can't pull up

9    the particulars.

10        Q.    Did you give a deposition?

11        A.    Did I give a deposition?  I don't believe

12   so.  I think I provided a report, but I was never

13   deposed.

14        Q.    And who did you provide a report to?

15        A.    Defense attorneys for the home builder.

16        Q.    Don't remember who they are?

17        A.    I do not.

18        Q.    So one case you provided a report that you

19   were not deposed in on sick building syndrome that

20    included issues of formaldehyde.

21          Any other cases that you consulted on?

22    A.    I don't believe so, no.


137


1     Q.    You told me you couldn't remember all the

2     speeches you'd given.  With the Internet out there,

3     we can search for a lot of them.  Have you ever given

4     a speech or presentation on issues of formaldehyde?

5     A.    No, I have not.

6     Q.    Do you have any formal education that

7     included courses specifically on the physiological

8     effects of formaldehyde?

9     A.    Well, I've had courses in physiology,

10    which is how I happen to know that formaldehyde is

11    produced in the body.  But -- so I guess to that

12    extent, yes, I have.

13    Q.    Okay.  Would you agree with the Moser

14    study that your average exhaled formaldehyde that's

15    produced in the body is about 4.2 parts per billion?

16    Does that number comport with your previous

17    recollection?

18      A.      Yes.

19      Q.      We kind of jumped off Moser for a second.

20   What explanation do you have -- other than smoking --

21   for a spread of 1.23 parts per billion versus 73

22   parts per billion among 344 people?


                                                    138


1       A.      You mean why is there physiological

2    variation among people?  I mean --

3       Q.      Why is there a difference in the amount

4    exhaled among 344 people?

5       A.      Any physiological measurement will vary

6    enormously.  I mean, cholesterol, cholinesterase

7    levels, specifically why do they vary?  Because

8    everybody is different.

9       Q.      Smoking habits are different, too, right?

10      A.      Excuse me?

11      Q.      Smoking habits are different among people,

12   too, right?

13      A.      Yes.

14      Q.      Let me just ask you this.  Maybe I'm

15      carrying the water for somebody in some other case.

16              But do you have an opinion as to whether

17      if people are smoking in a trailer, whether the

18      formaldehyde levels will go up?

19              MR. GLASS:  Objection.

20              THE WITNESS:  I would imagine they would

21      because it's a -- formaldehyde is produced by

22      cigarette smoking.


                                                        139


1               BY MR. WATTS:

2           Q.    So when people inhale from a cigarette and

3       exhale, they are going to exhale formaldehyde, right?

4           A.    Whether they inhaled or not from the

5       cigarette or not, yes.

6           Q.    Because when the cigarette is burned,

7       formaldehyde is released?

8           A.    No.  The -- okay.

9               There is certainly formaldehyde inhaled

10      when you inhale cigarette smoke; but it's not going

11      to have an enormous -- it is not going to have an

12      effect on your blood level.

13          And if you stop smoking cigarettes for

14     half an hour or an hour, certainly your lungs will

15     clear and whatever formaldehyde you're exhaling is

16     stuff that's running -- was being circulated in your

17     blood; and that's not going to be dependent on your

18     smoking status.

19          You cannot distinguish smokers from

20     nonsmokers on the basis of formaldehyde blood levels.

21     Q.   Can you distinguish smokers from

22     nonsmokers based on formaldehyde exhalation levels?

                                                      140

1      A.   Well, again, the paper says there was a

2      significant difference.  It doesn't say how large it

3      was.  And it doesn't say in which direction.

4      Q.   Put aside the paper for a second.  I'm

5      asking you, based upon what you know about exhaled

6      smoke and you've done these studies on secondary

7      smoke risk and everything like that, can you

8      distinguish smokers from nonsmokers based upon the

9      formaldehyde level in their exhaled air?

10          MR. GLASS:  Objection.

11          BY MR. WATTS:

12    Q.    Or do you know?

13    A.    I do not know.

14    Q.    Okay.  Because you don't know whether you

15  can distinguish between smokers and nonsmokers on

16  exhaled air, to what do you attribute the increase in

17  measured levels of formaldehyde if you have smoking

18  in a trailer versus not?

19    A.    Simply because the burning -- the burning

20  tobacco will emit formaldehyde all by itself.

21    Q.    Okay.  And if you have smokers in a

22  trailer, how long will the elevated levels of

                                                    141

1  formaldehyde remain from the burning cigarette

2  itself?

3          MR. GLASS:  Objection.

4          THE WITNESS:  Depends on the air exchange

5  rate.  I mean, I'm talking qualitatively.  I don't

6  know what sort of increment we're talking about.  If

7  the air exchange rate is high, it is obviously not

8      going to persist very long.

9              BY MR. WATTS:

10     Q.    Remember when you looked at the CDC and

11     you said 18 percent of those tests were trailers that

12     had been smoked in within, what was it, three hours

13     before the test?

14     A.    Yes.

15     Q.    If somebody had been smoking in a trailer

16     three hours before a test, what level of increase in

17     formaldehyde level would you expect to see?

18             MR. GLASS:  Objection.

19             THE WITNESS:  I don't have an expectation.

20     I don't know.

21             BY MR. WATTS:

22     Q.    Okay.  Fair enough.


                                                          142


1              MR. WATTS:  Let's change the tape.

2              THE VIDEOGRAPHER:  This concludes tape

3      number 3 in the video deposition of Dr. Michael

4      Ginevan.  The time on the video is 1:56 p.m.  We are

5    off the record.

6              (Recess.)

7              THE VIDEOGRAPHER:  This begins tape number

8    4 in the video deposition of Dr. Michael Ginevan.

9    The time on the video is 2:01 p.m.  We are on the

10   record.

11             BY MR. WATTS:

12   Q.    I want to ask you about your addendum

13   report.

14             You say, "If we take 0.5 air exchanges per

15   hour as a reasonable estimate for a sealed trailer,

16   we see that by our modest ventilation scenario

17   increases air exchange rate relative to a sealed

18   trailer by about 23 fold."

19             Do you recall writing that?

20   A.    Yes, I do.

21   Q.    You say, it follows that if we up air

22   exchange by 23 fold, we reduce formaldehyde levels 23

                                                    143

1    fold.  Right?

2          A.    That's correct.

3      Q.    All right.  Here's my question:

4            Is it your opinion that modest ventilation

5      of the Alexander trailer, as she describes in her

6      deposition, would result in formaldehyde levels that

7      are 23 fold lower than what was tested on January 28

8      of 2008?

9      A.    Well, she said that she opened the door

10     and she opened all four windows.  So that leaves a

11     very, very much larger air for air exchange than I

12     suggested.  And then she also said that to air it

13     out, she started the air conditioning, which is at

14     the very least moving the air around and probably

15     also exhausting air from the trailer.  There's

16     probably some air exchange built in there.

17           So the bottom line is that a reduction of

18     10 to 20 fold would not surprise me.

19     Q.    Here's my next question:  All of the other

20     trailers that were tested with occupied trailers of

21     the same size and dimension as this Cavalier trailer,

22     do the test results show that when you occupy

144

1    trailers and test them, that the results are 23 fold

2    lower than what the plaintiffs' experts got in the

3    Alexander case in January 2008?

4                MR. GLASS:  Objection.

5                THE WITNESS:  No.

6                BY MR. WATTS:

7        Q.    Okay.  Why is it when you look at the

8    results from the occupied trailers, same size, same

9    dimension, same Cavalier, other people, that the mean

10   and median results are, in fact, higher than the

11   results that were determined in January of 2008?

12               MR. GLASS:  Objection.

13               THE WITNESS:  Again, first of all, you

14   know, things vary and we don't always understand why.

15               More importantly, the sampling protocol is

16   important, and I don't know off the top of my head

17   exactly what the sampling protocol was for the

18   occupied trailers.

19               BY MR. WATTS:

20       Q.    Think it was different than this one?

21       A.    I don't know.  That's the whole point.

22       Q.    Assuming it's not different, what could

1   explain the fact that none of the other test results

2   in occupied trailers is 23 fold lower than this one,

3   if you're right?

4              MR. GLASS:  Objection.

5              THE WITNESS:  Again, I can't really

6   comment until -- if I sit down and review the

7   sampling protocol, then maybe they're different.

8   Maybe there's less ventilation when they tested them.

9              I don't know.

10             BY MR. WATTS:

11        Q.    Okay.  If there's no less ventilation, no

12   difference in the size, they're an occupied trailer,

13   if your air ventilation theory is right wouldn't you

14   expect to see 23 fold lower results than what the

15   plaintiffs got in January of 2008?

16             MR. GLASS:  Objection.

17             THE WITNESS:  Again, if -- you know,

18   obviously, if I have a certain level of formaldehyde

19   in a trailer, and the trailer is sealed, and I then

20   proceed to move air through it according to the

21    calculations I did, I'm going to expect to see a

22    substantial drop; somewhere 15, 20 fold.  Absolutely.

                                                                146

1              But you know, why did somebody else make a

2    measurement and get a different value?  I wasn't

3    there.  I don't know.

4              BY MR. WATTS:

5         Q.   Did you do any measurements in this case?

6         A.   Excuse me?

7         Q.   Have you taken any measurements in this

8    case?

9         A.   No, I have not.

10        Q.   Have you done any statistical analyses of

11   the samples that were done?

12        A.   No.

13        Q.   Go back to page 3 of your report.  Here.

14   Trying to keep this organized, Mike.

15        A.   Yes, sir.

16        Q.   In the second full paragraph, starting

17   with this study showed that?

18          A.     Yes.

19          Q.     Four lines down, you say that the levels

20     seen by the CDC are below the 400 parts per billion

21     level referenced by HUD?

22          A.     Yes.


                                                        147


1           Q.     What does the HUD standard say?

2           A.     Well, it is essentially a standard that is

3      for the emanation of material -- of formaldehyde from

4      building material, and it says that basically --

5           Q.     It is not --

6           A.     It shouldn't exceed 400 parts per billion.

7           Q.     It is an emission level from wood

8      products, right?  It is not an air concentration

9      level?

10          A.     But it is supposed to result in an air

11     concentration level below 400 parts per billion.

12          Q.     But it is not an air

13     concentration requirement?

14          A.     No, it isn't.

15          Q.     Page 4, paragraph 2, or part 2.

16          By way of illustration, F6 equals one

17    minus 0.9 to the sixth power equals 0.47?

18          A.    Yes.

19          Q.    All right.  What does F6 stand for?  Or F

20    to the sixth?

21          A.    The fraction remaining at six months.

22          Q.    So in other words, the percentage or

148

1    fraction of the original formaldehyde?

2          A.    This has been lost.  It's the material --

3    fraction of material lost after 6 months.

4          Q.    So that equals 1 minus 0.9 to the sixth

5    power?

6          A.    Yes.

7          Q.    And the 0.9 is the assumption that it lost

8    10 percent of its initial formaldehyde in the first

9    month?

10          A.    Yes.

11          Q.    To the sixth power means you multiply that

12    out six times?

13      A.    Yes.

14      Q.    So you get the fraction remaining of 0.47?

15      A.    Yes.

16      Q.    So 47 percent of the original formaldehyde

17 remained after six months according to your

18 assumption that a piece of material losses 10 percent

19 of its formaldehyde each month?

20      A.    Yes.

21      Q.    Here's my question:  What is the basis for

22 the assumption that if a piece of material loses 10

149

1 percent of its initial formaldehyde per month, is

2 there any studies or documents that you rely upon?

3      A.    No.  No.

4      Q.    That's strictly a hypothetical?

5      A.    That is why I begin the sentence "By way

6 of illustration."  It is not intended to be a

7 theoretical calculation.

8      Q.    It is not intended to represent the fact

9 that you think that formaldehyde -- that a building

10 material loses 10 percent of its initial formaldehyde

11   in the first month?

12        A.    No, it is not.

13        Q.    Okay.  Are there any peer-reviewed studies

14   showing that given types of particle board lose 10

15   percent of their formaldehyde the first month?

16        A.    No.  Actually, I haven't reviewed that

17   literature.  So I can't tell.

18        Q.    Are you aware of any study that matches up

19   with --

20        A.    No.  It is purely hypothetical.  It was

21   not intended to be reality based.

22        Q.    Good enough.  Thank you.


                                                          150


1             Now, go down a couple of paragraphs

2   starting with, however, a travel trailer?

3        A.    Yes.

4        Q.    You say about six lines down, the

5   compartment with the 10 percent emission rate is

6   initially responsible for almost all emissions but by

7   period 40, most emission is from the 1 percent

8    compartment?

9         A.    Yes.

10        Q.    Note also that the drop in emissions is

11   very rapid for the first 25 periods or so.  I note

12   this example of a hypothetical is hardly unrealistic.

13              Did I read that correctly?

14        A.    Yes.

15        Q.    What published research do you rely upon

16   to make that statement?

17        A.    Well --

18        Q.    Any?

19        A.    I think -- okay.

20              I think it is not unrealistic in the sense

21   that you certainly have multiple compartments that

22   can differ that much in the rate at which they lose

                                                           151

1    material; and I think the one thing I would emphasize

2    is that none of these are calibrated in an absolute

3    sense; but the point here is that over a period of

4    time, it's very easy to show situations where the

5    rate of emission drops markedly.

6                    And it drops even more than you would

7       think from a simple exponential process.

8            Q.    What published research do you rely upon

9       to make the statement?

10           A.    This is not based upon published research.

11           Q.    So the answer is there is no published

12      research you are relying upon to make that statement?

13           A.    There is no -- no.

14           Q.    What testing do you rely upon to make that

15      statement?

16           A.    Excuse me?

17           Q.    What testing do you rely upon to make that

18      statement, if any?

19           A.    I'm not relying on any testing at all.

20           Q.    All right.

21                    Go to page 5, the part dealing with air

22      exchange rates?

                                                          152

1            A.    Uh-huh.  Yes.

2            Q.    Second full paragraph, starting with,

3      "Moreover, in her report, page 16"?

4          A.    Yes.

5          Q.    "Ms. DeVany states 'New Orleans is well

6    known for being hot and humid.  However, with their

7    limited income, air conditioning was a luxury the

8    Alexanders would not allow themselves, except during

9    very high temperatures conditions.'

10              "The intention of this section was to show

11   there is high temperature and humidity in the trailer

12   which are factors that do tend to increase

13   formaldehyde emissions rates."

14              Did I read that correctly so far?

15         A.    Yes.

16         Q.    You say, "It also suggests that air

17   exchange rates were very high because windows and

18   possibly doors as well would be open to facilitate

19   cooling.  In this regard, I note that the reports of

20   sampling in the plaintiffs' former trailer showed

21   that when doors and windows were closed even the

22   empty trailer tended to be warmer inside than the

1    outside air.  (Scott affidavit, page 7), and this is

2    without the thermal additions of two people, such

3    additional heat sources as lighting and cooking.  It

4    does not seem credible that the plaintiffs would not

5    have made every attempt to ventilate the trailer,

6    which in turn suggests very high air exchange rates

7    (multiple air exchanges per hour)."

8                Did I read that correctly?

9        A.    Yes.

10       Q.    Would you agree that the attempt to

11   ventilate the trailer would have been made only when

12   they were home?

13       A.    Excuse me?

14       Q.    That attempt would be made only when they

15   were home?  Not when the kids were at school and

16   Mrs. Alexander was at work?

17       A.    It would probably be most acute at those

18   times.  Yes.  I would imagine.  Yes.  And I believe

19   she said in her deposition that she made an effort to

20   ventilate the trailer pretty thoroughly when they

21   came home.

22       Q.    Do you have an opinion as to what

154

1    percentage of each day the trailer was ventilated

2    with windows open?

3        A.    Well, I'm assuming it coincided with

4    occupancy pretty well.

5        Q.    In fact, it was closed when she was

6    working for security purposes, right?  You know that

7    from her deposition, right?

8        A.    Yes.

9        Q.    The trailer was closed mostly at night for

10   security reasons, right?

11       A.    Okay.  Yes.

12       Q.    It was closed during the winter months

13   when they lived there, October, November, December,

14   in order to keep the heat in, right?

15       A.    Okay.  Yes.

16       Q.    You -- in the next paragraph -- let me ask

17   you this:  The next full paragraph after that, from

18   Mr. Scott's report, do you see that, sir?

19       A.    Yes.

20       Q.    Your type set changes about halfway down.

21    Do you see that?

22         A.    Yes.


                                                                            155


1         Q.    Okay.  "The correct number, based on all

2    plaintiffs' measurements, is 5.065 air exchanges per

3    hour.  This is still on the high side of what is

4    normally observed, but the plaintiffs' experts also

5    failed to account for the fact that water and

6    sewerage lines had been disconnected for months and

7    provided a combined and open pathway for air

8    exchange."

9              Do you see that?

10        A.    Yes.

11        Q.    Would those open pathways have increased

12   air exchanges during unoccupied sampling?

13        A.    Probably somewhat, although evidently not

14   very much.

15        Q.    Those air exchanges would not have --

16   those openings, would open pathways, the water and

17   sewage lines, would not have decreased the air

18   exchanges during the sampling, right?

19          A.    No.  They would not have decreased it, no.

20          Q.    If they increased the air exchanges during

21    the sampling, what does that do to the formaldehyde

22    level?  It lowers it, right?

                                                              156

1           A.    Yes.

2           Q.    Go to paragraph 4 on Hewett's report?

3           A.    I'm there.

4           Q.    You talk about the 1390 fold difference

5     between .0023 parts per million and 3.2 parts per

6     million.

7                 You see that?

8           A.    Yes.

9           Q.    What is an outlier as it relates to a

10    statistical study?

11          A.    That's a complicated question.

12                I like extreme values rather than

13    outliers.  Outlier implies that in some sense large

14    values are incorrect; and, in fact, a lot of

15    environmental measurements, you can have some fairly

16    large values and a lot of smaller values.

17            To the extent that you have a

18    distribution, you expect large values, a few large

19    values, then it is really not correct to say they're

20    an outlier.  You can say they are extreme values but

21    they're the biggest thing you saw, but that doesn't

22    necessarily mean they're a bad measurement.

157

1     Q.    Okay.  What is an outlier?

2     A.    What?

3     Q.    What is an outlier?

4     A.    An outlier in a statistical sense would be

5     a number which is larger than you would expect to see

6     on the basis of some known statistical distribution.

7     Q.    Now, at the end of your paragraph 4 on

8     Dr. Hewett's report, the last sentence beginning with

9     page 7, it says, "Moreover, the extreme variability

10    shown across the trailer suggests that an average

11    level for a group of trailers is not helpful in

12    assessing exposure to a specific individual."

13    A.    Yes.

14      Q.      Isn't that kind of statistical method done

15      in every toxicology or epidemiology report?

16      A.      Excuse me?

17      Q.      Isn't that kind of statistical method

18      calculated in every toxicology or epidemiology study?

19      A.      Yes.

20      Q.      Why do you all in an epidemiology study go

21      ahead and do this statistical method?

22      A.      Here's the problem.

158

1       Q.      Answer my question.  Answer my question

2       first and then tell me what the problem is, if you

3       would.

4               Why is it done in epidemiology studies?

5       A.      We routinely use average levels in

6       exposure assessment in epidemiology studies.

7       Q.      Why?

8       A.      Why?  Okay.

9               Because as a person moves through the

10      environment, they are -- they're assumed to contact

11    the environment or breathe the air in an area in kind

12    of -- around -- they're moving around, so they're

13    averaging their environment.

14              So at the end of the day, if I have a set

15    of measurements for an area or workplace, I can say,

16    well, people who are moving through that workplace

17    over time experience the average level in that -- in

18    that workplace or in that field that we believe is

19    contaminated.

20              So it is basically -- it is a good measure

21    of a person averaging their environment by moving

22    around.  That's the idea.

159

1     Q.    Okay.  Go to paragraph 5 of your report,

2    on page 7, formaldehyde exposure standards.

3              I asked you about the Formaldehyde Council

4    thing that you cite to there?

5     A.    Uh-huh.

6     Q.    The fact of the matter is that study is

7    done on adults with a mean age of 61.6, we talked

8    about that, right?

9       A.      Yes.

10      Q.      Has any sort of study been done with

11  respect to children?

12      A.      I don't know.

13      Q.      Okay.  When we're talking about

14  formaldehyde exposure standards, you would agree with

15  me that the lower standards are designed for chronic

16  every day exposure such as what you would live in,

17  right?

18      A.      Yes.

19      Q.      And that chronic every day exposure such

20  as you would live in also includes seeking to protect

21  children against materials that they're going to be

22  chronically exposed to in their living environment,

160

1  right?

2       A.      Certainly we try to promulgate standards

3  which are health protective of children, yes.

4       Q.      All right.  And my question is if Moser

5  did his tests with respect to 344 children, do you

6      have an opinion as to whether the mean or median

7      formaldehyde level would be lower or higher than the

8      344 adults including 48 smokers that he tested?

9            A.    I do not.

10           Q.    Physiologically, do you have any belief

11     that it would be higher or lower, based on the

12     difference between kids and adults?

13                 MR. BAIN:  Objection.

14                 MR. GLASS:  Objection.

15                 THE WITNESS:  Not really, no.

16                 BY MR. WATTS:

17           Q.    Okay.  On paragraph 3 of your conclusions

18     section, you say in the second sentence, I noted

19     earlier exposure standards were set at levels that

20     essentially guarantee safety?

21           A.    Yes.

22           Q.    What is the documented basis for that

                                                              161

1      conclusion?

2            A.    Well, if you read -- if you read documents

3      like the EPA cancer risk assessment guidelines,

4      essentially, it clearly indicates that you're looking

5      for safe levels.  Typically what you do is you find a

6      low effect -- well, for cancer, what you do -- excuse

7      me.

8              For cancer, what you do is you get a lower

9      bound on the dose that can cause some very small

10     effect; and then you apply a safety factor to that

11     lower bound.

12             And then that is deemed a safe or

13     allowable concentration or an allowable intake which

14     is usually phrased in milligrams per kilogram per

15     day; but as I say, it begins with -- actually it

16     begins with picking a data set that is -- quote --

17     adequately sensitive species or, if it is human data

18     set, you want to pick one that's towards the lower

19     end of the concentrations that showed effect levels.

20             Then you take an upper bound on the

21     concentration that you believe can cause some very

22     small effect.  Then you apply a safety factor to

162

1    that.

2           So basically at the end of the day, we've

3    got a big value with a conservative analysis with an

4    upper bound with a safety factor.

5           And that is -- the idea of this is that

6    you're not going to inadvertently set standards that

7    might in some sense be harmful.  And that --

8    basically that's the standard setting process and

9    it's -- it's certainly outlined in the cancer risk

10   assessment guidelines, and I know it is also in

11   places like some of the ATSDR documents.

12        Q.    Let me segue into the ATSDR documents.

13              At the bottom of page 7?

14        A.    Yes.

15        Q.    You call the ATSDR level .3 parts per

16   million?

17        A.    Yes.

18        Q.    Is that the Agency For Toxic Substances

19   and Disease Registry animal risk level for

20   formaldehyde?

21        A.    I don't believe it is.  It is exactly as

22   defined and was actually quoted in the ATSDR report.

1       Q.      Is .3 the level or is .03 the level?

2       A.      Does somebody have the ATSDR report?

3               MR. GLASS:  It is attached as an exhibit.

4               THE WITNESS:  It is .3.  The effect level

5       for previously sensitized individuals from page 10.

6               BY MR. WATTS:

7       Q.      Well, on page 10, there are four different

8       levels quoted by the ATSDR, right?

9       A.      Right.

10      Q.      There's the ATSDR chronic minimum risk

11      level of .008 parts per million; is that right?

12      A.      Yeah.  You're reading from it.  I assume

13      that's correct.

14      Q.      Okay.  Then you have the ATSDR

15      intermediate risk level, which is 15 to 364 days; is

16      that right?

17      A.      Yes.

18      Q.      That's .03, right?

19      A.      Right.

20      Q.      And then you have the ATSDR acute minimum

21      risk level of less than or equal to 14 days, and

22    that's .04, right?

164

1        A.    Okay.  Yes.

2        Q.    And the one you quoted talks about a level

3    of .3 for people who got previously sensitized

4    individuals which may begin immediately or upon

5    exposure up to three to four hours, right?

6        A.    Yes.

7        Q.    Okay.  Now, with respect to the timeframe

8    that Alana Alexander and Chris Cooper were in this

9    trailer, we know they were in there for 19 months,

10   right?

11       A.    Right.

12       Q.    That's greater than 365 days, right?

13       A.    Wait a minute.

14       Q.    Is that true?

15       A.    It is certainly greater than 365 days,

16   yes.

17       Q.    And the ATSDR chronic minimum risk level

18   for greater than 365 days is 0.008, right?

19    A.    That assumes lifetime exposure.  If you

20  dig down, you will find that that's so.

21    Q.    Actually, it assumes exposure of greater

22  than 365 days is what it says?

1    A.    Yeah, I know.  But typically if you said

2  -- you know, do you really mean a year, usually the

3  long term exposure levels if they're taken as greater

4  than a year are looked on as lifetime exposure level.

5    Q.    So the ATSDR doesn't mean what it says?

6          MR. GLASS:  Object to form.

7          BY MR. WATTS:

8    Q.    They say greater than 365 days, right?

9    A.    It is more than 365 days, yes.

10    Q.    And 19 months of exposure is more than 365

11  days, right?

12    A.    Yes.

13    Q.    And the ATSDR chronic minimum risk level

14  for greater than 365 days is 0.008 parts per million,

15  right?

16    A.    Yes.

17      Q.    And to use your own analysis, we know that

18   the testing that was done by the plaintiffs' experts

19   in January of 2008 was 50 parts per million, right?

20      A.    50 -- no.  Not 50 participants per

21   million.

22      Q.    50 parts per billion.  .05.  I'm sorry.


                                                    166


1   Am I right?

2      A.    Yes.

3      Q.    If we take it down 10 times, are you still

4   above the ATSDR chronic minimum risk level?

5      A.    Yes.

6      Q.    Okay.  May I see the rest of that?  Okay.

7   Did you take my clip?

8      A.    Where did the paper clip go?

9            MR. GLASS:  Michael, you said take it down

10   10 times?  Are you saying .005?

11           THE WITNESS:  .05.

12           MR. WATTS:  Yes.  Okay.

13           THE WITNESS:  What -- wait a minute.  What

14     are they measuring?  What was the measurement in the

15     plaintiff trailer?

16                MR. GLASS:  .050 parts per million.

17                THE WITNESS:  .050.  So it would be .005

18     and the standard is .008.  So it would be below the

19     standard.

20                BY MR. WATTS:

21        Q.    Uh-huh.  Is that why you had to jump it 10

22     times below?  The 10 times below, is that from any

                                                        167

1     document, anywhere?

2                MR. GLASS:  Object to the form.

3                THE WITNESS:  Well, first of all, as I

4     said earlier, you're starting in a situation where

5     the trailer -- the trailer is fairly well sealed.

6     Not perfectly sealed, but fairly well sealed.

7                And you're going in and you're taking a

8     measurement, and then you're saying, well, okay,

9     what's the -- you know, what's the relationship of

10    this to the trailer as occupied.

11                And you know, to a first approximation, we

12    don't know.

13          But what we do know is a heck of a lot

14    more ventilation in that trailer while it was

15    occupied than at the time the sample was taken.

16          And I was trying to illustrate my

17    calculation that even a very modest ventilation

18    scenario can, you know, drop concentrations

19    dramatically.  And so it would not surprise me -- I

20    think most people who have looked at indoor exposure

21    to say, okay, it could be a factor of 10, it could

22    even be a factor of 20 lower.

                                                            168

1          BY MR. WATTS:

2    Q.    I guess the problem I'm having is that I

3    have the CDC that's done occupied exposure tests.  I

4    have Mary DeVany that's done them before and after

5    with occupied exposure tests.  Nobody is getting

6    measurements that are 10 times lower than what we got

7    in January of 2008 other than your supposition that

8    that's what it might want to be?

9          MR. GLASS:  Objection.

10          BY MR. WATTS:

11     Q.    I guess my question is, do you have any

12 testing that you can point me to that says when you

13 have occupied trailers, the results are 10 times

14 lower than when you have unoccupied trailers, all

15 other things being equal?

16          MR. GLASS:  Objection.

17          THE WITNESS:  Well, I mean, I think the

18 ATSDR study spoke to that a little bit in the sense

19 that, you know, there you have 91 percent lower;

20 well, that's about tenfold.

21          BY MR. WATTS:

22     Q.    91 -- hold on.  91 percent lower is

                                                        169

1 tenfold?

2     A.    Yes.

3     Q.    So you're relying upon the ATSDR study to

4 talk about your tenfold difference, is that right?

5     A.    No.

6     Q.    Okay.  What are you relying upon as a

7   basis for your statement that if there'd only been

8   people in there when we did our testing, the result

9   would have been tenfold lower?

10        MR. GLASS:  Objection.

11        THE WITNESS:  I'm relying --

12        MR. GLASS:  Go ahead.

13        THE WITNESS:  I'm relying on the idea that

14   if you put people into an environment, there is a lot

15   more ventilation than if you don't have people in the

16   environment.

17        And it's because they're ventilating the

18   space; and quite frankly, it is also because if you

19   get three people moving around in an enclosed space

20   every time somebody walks down the room, they stir

21   the air.  And if the door is open, you know, you can

22   have very, very, very large area exchange rates

                                              170

1   and -- necessarily, that's going to lower

2   concentrations a lot.

3        BY MR. WATTS:

4          Q.     But Mike, come on.  We're in Federal

5     Court.  You know Daubert applies.  Do you have any

6     testing that you can point me to that supports your

7     conclusion that if somebody had just occupied the

8     trailer, the result would have been 10 times lower

9     than the result we got in January of 2008?  Is the

10    answer yes?  Is it no?  And if it is yes, what is it?

11               MR. GLASS:  Objection.

12               THE WITNESS:  The problem is we don't have

13    any tests on the trailer as occupied.  And I do

14    not -- I do not have -- I do not have information

15    because I didn't collect any.  But neither did

16    anybody else.

17               BY MR. WATTS:

18         Q.    So you're saying DeVany said no trailer

19    got tested twice once occupied and once not occupied?

20               MR. GLASS:  Objection.

21               THE WITNESS:  We had a bunch of trailers

22    tested along those lines, and that said if you test

                                                        171

1     them sealed and with the windows open it is about an

2      order of magnitude.

3              BY MR. WATTS:

4      Q.     Who says that?

5      A.     ATSDR.

6      Q.     Okay.  So you point me to ATSDR.  Are

7      there any other published bases for your conclusion

8      that you get a result of 10 times lower if people

9      were occupying it as opposed to not occupying it?

10     A.     I do not have a ready reference.

11     Q.     Okay.

12     A.     I do know that ventilation makes a huge

13     difference.

14     Q.     Now, go to page 3, the first full

15     paragraph of your report.

16             You are talking about the CDC results.

17             And we've established that all the

18     trailers sampled were occupied units; is that right?

19     A.     Yes.

20     Q.     In addition to sampling for formaldehyde,

21     the trailer occupants were questioned about their

22     activities including smoking behavior, cooling and

1    heating practices, cooking practices and issues with

2    the trailer such as water leaks and mold?

3          A.    Uh-huh.  Yes.

4          Q.    Here's my question:  Do you have an

5    opinion as to what percentage of the overall

6    formaldehyde level is due to smoking, cooking, molds,

7    or other non-trailer related sources of formaldehyde?

8          A.    No.

9          Q.    Do you have any sources that you can point

10   me to that would allow us to estimate that overall

11   percentage of formaldehyde level?

12         A.    No.

13         Q.    What percentage of the overall

14   formaldehyde exposure is solely due to the trailer

15   and the products used to build that trailer?

16         A.    I would guess a fairly large percentage.

17         Q.    Would you give me more than 90 percent?

18         A.    Possibly.

19         Q.    Probably, right?

20               MR. GLASS:  Objection.

21               THE WITNESS:  Okay.  I'll say probably.

22          BY MR. WATTS:

173

1        Q.    Okay.   If one wanted to test that, and

2   again I'll accept your answer and believe you're

3   right, if one wanted to test that issue, how would

4   one go about determining the percentage of the

5   overall formaldehyde exposure that is due solely to

6   the trailer and the products used to build the

7   trailer?

8            MR. GLASS:   Objection.

9            THE WITNESS:   How would you go about

10  testing that?   Well, again, that -- you are asking me

11  to design an experiment on the fly which isn't easy.

12            I think, first of all, you really need to

13  have a -- you know, a baseline that's maybe a

14  ventilated trailer less people.   The only problem I

15  have with that, as I think about it, is that you add

16  people, and as I say, even having people move around

17  the room is a source of ventilation, if you will,

18  because people -- you know, we're a large object.

19  You move us through the air, and you can feel a

20    breeze when you move your hand.  So you are stirring

21    the air around.

22             The only thing -- you could certainly

174

1     answer questions like if a person smokes a cigarette

2     in the trailer, how much does the formaldehyde level

3     go up.  That's something we can empirically answer.

4             But you know, more broadly, what does

5     human occupation do?

6             Well, in a -- you might also get identical

7     trailers and fill them with similarly behaved people,

8     smokers and nonsmokers and you might be able to get

9     an answer about smoking.

10            But you're not going to be able to say,

11    you know, what percentage of the exposure is

12    contributed by specific activity X for most

13    activities.  You know, frying fish.  That's going to

14    be a very hard question to answer.

15            BY MR. WATTS:

16       Q.   What kind of tests could one design if

17    they wanted to say that solvents or cleaners stored

18    below the sink would add to the formaldehyde level?

19    How would somebody go about proving that proposition?

20         A.    Well, again, you could try characterizing

21    a baseline on the trailer without solvents and stuff

22    stored under the sink, and then say, okay, now we're

175

1     going to store this material under the sink and see

2     if over the long haul, formaldehyde levels change.

3              Now, that's, again, it is still a very

4     difficult experiment in practice because if, you

5     know, the -- if the weather changes from time to

6     time, I don't -- I don't know that it would have a --

7     you know, a measurable effect, but I suspect that it

8     might well.

9          Q.    How would you go about testing the extent

10    of that fact?

11         A.    Well, again, it is -- it's very -- as I

12    say, you could certainly, you know, get a set of --

13    you know, a set of similar trailers and let's say,

14    okay, we're going to put solvents in or take solvents

15   out under the sink and look at how the formaldehyde

16   levels changed.

17         But in terms of direct measurement, that's

18   likely to be confounded by weather.  It is likely to

19   be confounded by a lot of things.

20        Q.    Right.

21        A.    We're talking about a very inexact system.

22        Q.    If somebody didn't do that kind of testing

                                                          176

1   they would be just speculating as to the effect that

2   solvents would have on formaldehyde levels?

3        A.    Excuse me?

4        Q.    If somebody didn't do that kind of testing

5   that you described, they would just be speculating as

6   to the effect that solvents would have on

7   formaldehyde levels?

8        A.    You could do the test and still be

9   speculating.  It is a very hard question to answer.

10        Q.    Without the tests, you darn sure would be

11   speculating?

12          MR. GLASS:  Objection.

13          BY MR. WATTS:

14     Q.     True?

15     A.     True.

16     Q.     What is your business address and phone

17 number?

18     A.     My address and phone number?

19     Q.     Sure.

20     A.     Let's see.  307 Hamilton Avenue, Silver

21 Spring, Maryland, 20901, and the phone is

22 301-585-4951.

177

1      Q.     Can we have an agreement that if you do

2 any further work or change your opinions in any way

3 or have any additional comments about the plaintiffs'

4 experts' work that you will supplement your report so

5 that I can be informed?

6      A.     Certainly.

7      Q.     That way I have a chance to take a

8 supplemental deposition as opposed to hearing about

9 new opinions on the fly at the time of trial?  Is

10   that fair?

11        A.    Yes.  Fine.

12        Q.    Have I been polite to you today?

13        A.    Excuse me?

14        Q.    Have I been polite to you today?

15        A.    Oh, yes.

16        Q.    And you have to me.  I thank you.

17              MR. WATTS:  Those are all my questions.

18              MR. GLASS:  On the record.  I don't have

19   any questions.  I reserve my right.

20              It is my understanding the government

21   prefers to have the witness read and sign the

22   deposition.  So I'm going to have you get the

                                                    178

1    transcript, and then we'll go ahead and have it taken

2    care of.

3              MR. WATTS:  Can I ask a question about

4    that?  What's the procedure?  Does he have the right

5    to ask for it, or any party can ask for him to read

6    and sign?

7            MR. GLASS:  I don't know.  I never looked

8    it up.  I just know that they always ask, so --

9            MR. BAIN:  I don't know either.

10           THE WITNESS:  I'm really sorry.  I

11   switched medications on me.

12           THE VIDEOGRAPHER:  This concludes the

13   video deposition of Dr. Michael Ginevan.  The time on

14   the video is 2:44 p.m.

15           We are off the record.

16           (Whereupon, at 2:45 p.m., the taking of

17   the instant deposition ceased.)

18

19

20

21

22

                                                   179

1

2

3

4

5

6

7                               _____

8                               Signature of the Witness

9    SUBSCRIBED AND SWORN to before me this _____ day of

10   _____, 20_____.

11

12                              _____

13                              Notary Public

14   My Commission Expires:_____

15

16

17

18

19

20

21

22