**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | 07-md-1873 |
| | FORMALDEHYDE | * | |
| | PRODUCTS LIABILITY | * | |
| | | * | |
| | | * | JUDGE: ENGELHARDT |
| | | * | |
| | | * | MAG: CHASEZ |

This document is related to:
    *Charlie Age, et al. v. Gulf Stream Coach, Inc., et al., No. 09-2892*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**MEMORANDUM IN SUPPORT OF**</u>
<u>**FLUOR ENTERPRISES, INC.'S MOTION FOR SUMMARY JUDGMENT**</u>
<u>**BASED ON THE GOVERNMENT CONTRACTOR DEFENSE**</u>

Dominic J. Gianna, La. Bar No. 6063
Sarah A. Lowman, La. Bar No. 18311
201 St. Charles Avenue, Suite 3100
New Orleans, Louisiana 70170
Telephone: (504) 525-7200
Facsimile: (504) 581-5983

Charles R. Penot, Jr. (La. Bar No. 1530 &
Tx. Bar No. 24062455)
717 North Harwood, Suite 2400
Dallas, Texas 75201
Tel: (214) 220-6334; Fax: (214) 220-6807
cpenot@midrid.com

Richard A. Sherburne, Jr., La. Bar No. 2106
450 Laurel Street, Suite 1101
Baton Rouge, Louisiana 70801
Telephone: (225) 381-7700
Facsimile: (225) 381-7730

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................... i.

TABLE OF EXHIBITS ..................................................................... ii.

PRELIMINARY STATEMENT ........................................................ 1.

BACKGROUND ............................................................................. 4

STATEMENT OF FACTS ............................................................... 4

    1.    FEMA Hires FEI As A Government Contractor ......................... 4

        A.    The Individual Assistance – Technical Assistance
            Contract (IA/TAC) ............................................................ 4

        B.    Exhibit 7 To The IA/TAC Specifically Directs FEI How
            To Install The Travel Trailers........................................... 5

        C.    Exhibit 10 To The IA/TAC Specifically Directs FEI's
            Maintenance Of The Travel Trailers **.**............................... 7

        D.    Task Order 20 Under The IA/TAC .................................. 8

    2.    FEI's Work Conformed To The Government's Precise Specifications ........ 9

    3.    The Government's Superior Knowledge Of Formaldehyde Claims
        Preceded FEI's Actual Knowledge Of Claims ............................................. 15

ARGUMENT AND APPLICABLE LAW ............................................................. 16

    A.    Summary Judgments Are Favored .............................................. 17

    B.    The Government Contractor Defense Bars Plaintiffs' Claims
        Against FEI ...................................................................... 19

        1.    FEI Meets The Three Conditions For Dismissal Under
            The Government Contractor Defense ............................... 24

            a.    The Government provided reasonably precise
                specifications for FEI's work .................................. 24

i

**Page**

b.     FEI's work conformed to FEMA's specifications ................. 26

c.     FEI had no actual knowledge not otherwise
known to the Government about alleged
formaldehyde problems ........................................................ 30

CONCLUSION ............................................................................................... 31

## TABLE OF AUTHORITIES

**Page**

### CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505,
    91 L. Ed. 2d 202 (1986) ..................................................................... 17,18

Askir v. Brown & Root Servs. Corp., 1997 WL 598587, at *2, 5-7
    (S.D.N.Y. Sept. 23, 1997) ....................................................................  22

Bailey v. McDonnell Douglas Corp., 989 F.2d 784 (5th Cir. 1993) ....................................  29

Beaver Valley Power Co. v. Nat'l. Eng'g. & Contracting Co., 883 F.2d 1210,
    (3d Cir. 1989) ....................................................................  27

Boyle v. United Tech. Corp., 487 U.S. 500 (1988) ......................... 19,20,21,22,24,25,27,28

Carley v. Wheeled Coach, 991 F.2d 1117 (3d Cir. 1993) ....................................  25

Correctional Services Corp. v. Malesko, 534 U.S. 61 (2001) ......................................... 22,28

Davis v. Chevron U.S.A., Inc., 14 F.3d 1082 (5th Cir. 1994) ..............................................  18

Harduvel v. General Dynamics Corp., 878 F.2d 1311 (11 Cir. 1989) .................................  27

Hill v. Raytheon Aircraft Company, 470 F. Supp. 2d 1214 (D. Kan. 2006) ...................... 22, 25

Hopper v. Frank, 16 F.3d 92 (5th Cir. 1994) .......................................................................  18

Hudgens v. Bell Helicopters, 328 F.3d 1329 (11th Cir. 2003) ..............................................  18

In re Air Disaster at Ramstein Airbase, Germany,
    81 F.3d 570 (5th Cir. 1996) ...........................................................18,24,27,28,30,31

In re Hanford Nuclear Reservation Litigation, 534 F.3d 986 (9th Cir. 2008) ......................  20

In re Katrina Canal Breaches Consol. Litig., Civ. A. No 05-4182,
    2008 WL 5234369 at *20 (E.D. La. Dec. 15, 2008) ........................... 18,22,23,26,30

In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169 (2d Cir. 2008) ...................... 21,22

Kerstetter v. Pac. Sci. Co., 210 F.3d 431 (5th Cir. 2000) .................... 18,24,26,27,28,29,30,31

Kleemann v. McDonnell Douglas Corp., 890 F.2d 698 (4th Cir. 1989) ........................... 26,27

**Page**

Lambert v. B.P. Prods. N. Am., Inc., 2006 U.S. Dist. Lexis 16756 (S.D. Ill. 2006) .......... 25

Lewis v. Babcock Indus., Inc., 985 F.2d 83 (2d Cir. 1993) ............................................. 22,23

Little v. Liquid Air Co., 37 F.3d 1069 (5th Cir. 1994) ......................................................... 18

Lujan v. Nat'l. Wildlife Fed., 497 U.S. 871 (1990) ............................................................. 18

Matsushita Electric Industrial Corp. v. Zenith Radio Co.,
       475. U.S. 574, 106 S. Ct. 1348, 89 L.Ed. 2d 538 (1986) .................................... 17,18

McKay v. Rockwell Int'l. Corp., 704 F.2d 444 (9th Cir. 1983) .............................................21

Miller v. Diamond Shamrock Co., 275 F.3d 414 (5th Cir. 2001) ..................... 14,26,28,30,31

Nielsen v. George Diamond Vogel Paints Co., 892 F.2d 1450(9th Cir. 1990) .................... 21

Richland-Lexington Airport Dist. V. Atlas Prop., Inc. 854 F. Supp. 400, (D.S.C. 1994) ... 22

Smith v. Xerox Corp., 866 So.2d 135 (5th Cir. 1989) ...................................................... 24,25

Snell v. Bell Helicopter Textron, Inc., 107 F.3d 744 (9th Cir. 1997) .................................. 23

Stout v. Borg-Warner Corp., 933 F.2d 331 (5th Cir. 1991),
       cert denied, 502 U.S. 981 (1991) ........................................................................ 18,25

Tate v. Boeing Helicopters, 55 F.3d 1150 (6th Cir. 1995) ................................................... 26

Trevino v. Gen. Dynamics, 865 F.2d 1474 (5th Cir. 1989) .................................................. 24

Yearsley v. W. A. Ross Construction, 309 U.S. 18 (1940) ............................................. 19,20

**FEDERAL STATUTES**

Robert T. Stafford Disaster Relief and Emergency Assistance Act,
       42 U.S.C. §5121, et. seq. (2000) .............................................................................. 1

Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-80 (FTCA) ............................. 20,21

48 C.F.R. § 52.246-5(c), (d) and (e) ............................................................................... 14,15

**Page**

## **FEDERAL RULES**

Fed.R.Civ.P. 56 ....................................................................................................................... 13

This memorandum is submitted on behalf of Fluor Enterprises, Inc. (**FEI**) in support of its motion for summary judgment based on the government contractor defense.

## PRELIMINARY STATEMENT

Katrina and Rita hurricane recovery has poignantly illustrated the need for federal agencies to be able to seamlessly and productively coordinate their efforts with private contractors. Failing to extend federal government contractor immunity to private contractors such as FEI would frustrate the purpose of the Stafford Act[1] and hamper the nation's ability to most effectively respond to future crises. FEI meets the three conditions for dismissal from this case under the government contractor defense. Pursuant to a Government contract with FEMA, FEI faithfully performed its work in compliance with reasonably precise specifications provided and mandated by the Government for installation of the trailer trailers, and FEI had no actual knowledge not otherwise known to the Government about alleged formaldehyde dangers. There is no evidence that FEI deviated from the scope of work that it was mandated to do by the Government. FEI is therefore entitled to immunity from plaintiffs' state law tort claims, and summary judgment as a matter of law.

## BACKGROUND

As this court is well aware, this multi-district litigation (MDL) is the consolidation of several state and federal toxic tort suits in which an estimated 30,000 named plaintiffs claim to have inhabited emergency housing units (EHUs) that were provided to them by the Federal Emergency Management Agency (FEMA), as a result of the alleged uninhabitability of their residences due to Hurricanes Katrina and Rita.[2] Beyond selecting these EHUs, FEMA provided them to plaintiffs by contracting with certain companies to deliver the EHUs, set them up, and

---

[1]  Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §5121, et. seq. (2000).
[2]  Rec. Doc. 109, par. 96.

make them ready for residential use.[3]   Plaintiffs generally claim to have been exposed to formaldehyde contained in these EHUs and to have suffered damages as a result.  Plaintiffs sued the manufacturers of the EHUs, the United States Government and the government contractors who delivered and set up these EHUs.  These EHUs consist of travel trailers, park models or manufactured homes.[4]

Plaintiff, Alexander, joined the MDL on February 27, 2009.[5]   Thereafter, she and her minor child were selected as the bellwether plaintiffs in a trial scheduled to commence on September 3, 2009, against the USA, Gulf Stream (the alleged manufacturer of the travel trailer in which plaintiffs resided) and FEI, the government contractor who allegedly delivered and installed the travel trailer.[6]  FEI is classed in this litigation as an Individual Assistance/Technical Assistance Contractor (IA/TAC).[7]   Plaintiffs generally assert claims against FEI under the Louisiana Products Liability Act (LPLA), contending that FEI somehow qualifies as a "manufacturer" because FEI installed the travel traveler on concrete blocks in accordance with FEMA's specific instructions.  In particular, plaintiffs allege that FEI's "blocking" of the travel trailer created stress and distortion that allowed for increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell.[8]  Alternatively, plaintiffs allege state law negligence claims against FEI in the event FEI is not found to be a "manufacturer" under the LPLA.[9]

---

[3]  Court's Order, Rec. Doc. 717, p. 22.
[4]  Rec. Doc. 1629, n. 1.
[5]  In Age, et al v. Gulf Stream Coach, Inc., et al, 09-2892; Rec. Doc. 1.
[6]  Rec. Docs. 1, 1686, par. 8.
[7]  Other IA/TAC contractors named in the MDL litigation, but not named in the Alexander suit, are Shaw Environmental, Inc. (Shaw), CH2M Hill Constructors, Inc. (CH2M Hill), and Bechtel National, Inc. (Bechtel).
[8]  Rec. Doc. 1 (Age's original complaint, count 3); Rec. Doc. 1686 (Alexander's third supplemental and amended complaint, par. 13).
[9]  Rec. Doc. 1, count 4; Rec. Doc. 1686, par. 14.

Specifically, plaintiffs allege that:

1. The Alexander travel trailer was installed and hooked to utilities for residential purposes by FEI pursuant to a specific Government contract;[10]

2. The Government provided reasonably precise specifications for installation of the unit with which FEI conformed;[11] and

3. The Government knew of the potential harmful effect of formaldehyde exposure to the Alexander plaintiffs in this travel trailer.[12]

This court ruled that the discretionary function exception bars plaintiffs' Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-80 (FTCA) claims challenging FEMA's decision to (1) purchase and use travel travelers as temporary emergency housing for Katrina and Rita disaster victims (EHUs), *and* (2) contractually delegate the responsibility for hauling, installing and maintaining EHUs to IA/TACs.[13]   Specifically, the court found plaintiffs' claim that the Government was involved in making contractual arrangements for the contractors to follow in the field, regarding the delivery and set-up of the EHUs, was a discretionary function.   This finding covers the precise installation "defect" alleged by plaintiffs and corresponding Government specification mandating that FEI – place the travel trailer on concrete blocks in a precise fashion.[14]   In short, plaintiffs allege that FEI did exactly what the Government's

---

[10]  Alexander's third supplemental and amended complaint, Rec. Doc. 1686, par. 8.

[11]  Rec. Doc. 1, count 3, par. 104, par. 32-38, 43-44, 46-47, 52, count 4, par. 11.

[12]  Third supplemental and amended complaint, Rec. Doc. 1686, par. 11; see also complaint, Rec. Doc. 1, par. 53-79, for the plaintiffs' general allegations of the Government's knowledge of the alleged risks of formaldehyde exposure in EHUs, including travel trailers.

[13]  October 3, 2008 Order, Rec. Doc. 717, p. 43-44.  However, the court reserved judgment as whether the second prong of the discretionary function exception applied to insulate FEMA for the time period March 2006 (when FEMA received its first formaldehyde complaint) until June 2006 when FEMA took programmatic action toward all EHU occupants, and noted that the discretionary function exception may not bar claims for conduct prior to March 2006 if FEMA knew that formaldehyde off-gassing in EHUs would injure occupants.  Rec. Doc. 717, p. 28 n. 13.

[14]  See Court's Order, Rec. Doc. 717, p. 22-23 & 44, in response to plaintiffs' contention that some travel trailers were set up off of their wheels improperly (contrary to the Fleetwood and Pilgrim manufacturer's manuals) and that FEMA was responsible for making "those arrangements with the companies they hired to deliver and install" the travel trailers.

specifications required FEI to do – install the travel trailer in a precise manner by placing it on concrete blocks.[15]

## STATEMENT OF FACTS

The essential facts are set forth in the attached Statement of Uncontested Material Facts and may be summarized as follows.[16]

The Alexander plaintiffs allege that following Hurricane Katrina they received emergency housing assistance from FEMA, pursuant to the Stafford Act and applicable federal regulations.   FEMA provided plaintiffs with a travel trailer manufactured by Gulf Stream.  It is undisputed that FEMA selected and ordered the travel trailer from the trailer manufacturer, Gulf Stream.  Plaintiffs contend that they began living in the travel trailer on May 27, 2006 and stopped living in it on December 30, 2007.[17]  Plaintiffs allege that their travel trailer was installed at their location and hooked to utilities for residential purposes by FEI, pursuant to a contract between FEI and FEMA.[18]

1.     **FEMA Hires FEI As A Government Contractor**

A.     **The Individual Assistance – Technical Assistance Contract (IA/TAC)**

On July 12, 2005, FEMA awarded an individual assistance – technical assistance (IA/TAC) contract, No. HSFEHQ-05-D-0471, to FEI to be prepared to mobilize to provide general contractor services for disaster relief anywhere in the United States, pursuant to individual task orders to be issued by FEMA.[19]  The original contract term extended through

---

[15]  Rec. Doc. 1, par. 38.
[16]  Although some of the facts in this section of the memorandum are not material or relevant to this motion for summary judgment, this information is provided to give the court the background of FEI's contract with FEMA for this project and the context of plaintiffs' claim.
[17]  Rec. Doc. 1686, par. 9.
[18]  Rec. Doc. 1686, par. 8.
[19]   A copy of portions of the IA/TAC between FEMA and FEI is attached as Exhibit 1, and the entirety of Task Order 20, as modified and amended, is attached as Exhibit 1-A; see FL-FCA-1, 10, (section F, F.3 (principal place of performance), part III, section J, attachment A. (scope of work) FL-FCA-60, 74.

January 15, 2006.[20]  This umbrella contract provided the general requirements for all of FEI's

anticipated work "at [v]arious disaster sites to be determined" by FEMA anywhere in the United

States, with the condition that FEMA would prepare a specific Statement of Work (SOW) for

each individual task order it later issued.[21]  The contract award generally required FEI to

"provide the necessary personnel, materials, services, equipment, and facilities, and otherwise do

all things necessary to provide temporary shelters and related services as described in the Scope

of Work, Attachment A."[22]  The contract terms generally provided for FEI to perform contractor

services in the event of a disaster on a project by project basis, as assigned by FEMA including,

but not limited to: "supporting staging areas for units, installation of units, maintenance and

upkeep, site inspections ... restorations, group site designs, ... construction, site assessment,

property and facility management, and unit deactivation and removal."[23]  The contract also

generally provided, inter alia, that FEI "personnel shall perform professional, technical, clerical,

and field work as assigned by the task order."[24]  These general contractual requirements mirror

the plaintiffs' broad allegations of FEI's duties pursuant to the IA/TAC.[25]

###    B.    Exhibit 7 To The IA/TAC Specifically Directs FEI How To Install The Travel Trailers

The Government's contract with FEI sets forth precise specifications dictating the exact

manner for FEI to install the travel trailers, including detailed requirements for delivery,

blocking and leveling, anchoring and straps, utilities hook-ups (i.e., sewer line, water line,

electrical wiring) steps, winterization, handicapped ramps/platform steps, and numerous minor

---

[20]  The contract, Exhibit 1, section F, F.2 term of contract, FL-FCA 10.
[21]  The IA/TAC is like an umbrella contract or a master services contract containing general conditions for all work performed under the contract, whereas each task order is like a work order specific to the disaster and work required by FEMA of the contractor for that disaster.  See the Contract, Exhibit 1, attachment A (scope of work) FL-FCA-60-74; Declaration of Charles A. Whitaker, FEI's Program Manager with respect to the IA/TAC, attached hereto.
[22]  The Contract, Exhibit 1, FL-FCA-1.
[23]  The Contract, Exhibit  1, attachment A. § 2.1.7, FL-FCA-62.
[24]  The Contract, Exhibit 1, attachment A. § 2.2.6, FL-FCA-63.
[25]  See Complaint, Rec. Doc.1, p. 9-14.

5

tasks to make the travel trailers ready for occupancy (RFO).[26]  Specifically, in Exhibit 7 to the

Contract, the Government directed FEI to install the travel trailers on six piers constructed in a

precise fashion:

> **2.      BASIC TRAVEL TRAILER SET-UP**
>                  \* \* \*
> **2.1.2  Blocking and Leveling**
>
>> The Contractor shall clean away all grass roots, loose dirt, rocks or debris where at the base of the piers.  Travel trailers shall be set-up on concrete piers and after the weigh of the travel trailer is transferred to the piers, if the unit is not leveled properly the contractor will reinstall the unit at no additional cost to the government.  The travel trailer set-up will also include a minimum of six piers (three on each side) evenly spaced.  The end piers should not be directly on the end of the unit, but approximately six inches off the edge of the unit.  The Contractor shall provide a base for each pier.  The base will be ¾" x 24" x24" exterior grade plywood.  The piers will have at a minimum two solid cap blocks on the base and two solid cap blocks at the top of the piers.
>>
>> The space between the top of the pier's solid cap blocks and the bottom of the travel trailer I-beam frame shall not exceed seven inches (7").  Up to four inches (4") of this space may be filled with a solid concrete block laid parallel to the travel trailer steel I-beam frame.  Up to three inches (3") of this space may be filled with blocking timber and wedges laid perpendicular to the travel trailer steel I-beam.  No more than one inch (1") of this area shall be shimmed with wedges.
>>
>> After the weight of the travel trailer is transferred to the concrete piers, the piers must be vertically aligned and tightly shimmed with wooden wedges.  If the piers are not vertical at the time of final inspection, they shall be removed and reinstalled by the Contractor at no additional cost.  The Contractor will be responsible for all necessary re-leveling and re-blocking of the travel trailer for a period of 90 days after final inspection.[27]

---

[26]  [Ex. 1] the Contract, Exhibit 7, § 2 (basic travel trailers set-up) FL-FCA-113-122; Decl. of Charles A. Whitaker, art. 9.

[27]  [Ex. 1] the Contract, Exhibit 7, FL-FCA-113-114.

6

It is undisputed that this precise specification for blocking the travel trailer was completely formulated, designated and drafted by the Government and provided to FEI by the Government. FEI had no role in developing, testing or engineering any aspect of Exhibit 7, or any other aspect of FEMA's specifications for installation of EHUs.[28]

### C.   Exhibit 10 To The IA/TAC Specifically Directs FEI's Maintenance Of The Travel Trailers

FEMA's maintenance specifications in Exhibit 10 to the IA/TAC provide similar detail.[29] Exhibit 10 provides detailed instructions to FEI that had to be followed; the specifications confirm FEMA's extensive control over the maintenance aspects of the Emergency Housing Program.[30] For example, Exhibit 10 requires FEI, inter alia, to:

- "Provide maintenance services of units **assigned by FEMA** ... and/or **identified by FEMA**."[31]

- "Perform other tasks **as required by the COTR [Contracting Officers' Technical Representative]** ... ."[32]

- "Operate and supply the resources for a maintenance call center operating on a 24/7 daily basis and capable of responding to emergency calls within six hours and routine calls within 48 hours."[33]

- "Make repairs **identified by FEMA**."[34]

Furthermore:

- FEMA reserves to itself the right to perform maintenance through its own forces (or through other contractors, which actually happened here), and it

---

[28] Decl. of Charles A. Whitaker, art. 9.

[29] [Ex. 1] the Contract, Exhibit 10 (Maintenance-Temporary Housing Units), FL-FCA-135-144 & 147-149 (pertain to travel trailers); Section 2.10 of the PWS (FL-FCA-66-67; 135-149) specifically incorporates Exhibit 10 to the PWS, Decl. of Charles A. Whitaker, art. 7.

[30] FEI urges the Court to view the maintenance specifications in their entity, to obtain a full appreciation for their scope and detail.

[31] [Ex. 1] the Contract, Exhibit 10, § 1(a)(emphasis added).

[32] [Ex. 1] the Contract, Exhibit 10, § 1(c)(emphasis added).

[33] [Ex. 1] the Contract, Exhibit 10, § 1(g, 3.1 and 3.2) (delineating between routine and emergency maintenance).

[34] [Ex. 1] the Contract, Exhibit 10, § 1(h) (emphasis added).

further states that maintenance will be assigned to the contractor only after the unit is installed.[35]

- FEMA directed that the contractor could only replace major material items after prior inspection and approval by the COTR or CO.[36]

- FEMA established the frequency of routine maintenance: monthly.[37]

- FEI was required to warrant any maintenance work for a period of 90 days, which period began upon acceptance of the work by FEMA.[38]

FEMA's maintenance specifications were detailed and specific and the maintenance work that FEI performed conformed to FEMA's specifications.[39]

### D.   Task Order 20 Under The IA/TAC

In response to Hurricane Katrina, FEMA issued Task Order 20 to FEI to provide staging support, haul/install and installation construction activities, maintenance and deactivation to further FEMA's operational objective of providing temporary housing solutions for people displaced because of Hurricane Katrina.[40]   Task Order 20 directed "[FEI] shall execute these tasks to the requirements and specifications identified in this task order, in accordance with the Performance Work Statements and applicable Exhibits."[41]   The period of performance for Task Order 20 was eighteen months.[42]

FEI's chart [attached to] the Contract provides a chronological history of FEMA's Task Order modifications and SOW revisions issued to FEI in conjunction with this project.[43]   Prior

---

[35]  [Ex. 1] the Contract, Exhibit 10, § 4.
[36]  [Ex. 1] the Contract, Exhibit 10, § 3.4.
[37]  [Ex. 1] the Contract, Exhibit 10, § 4.
[38]  [Ex. 1] the Contract, Exhibit 10, § 5.7.
[39]  Decl. of Charles A. Whitaker.
[40]  The Contract, Exhibit 1, Task Order HSFEHQ-05-J-0020, Statement of Work, for disaster No. 1603 in Louisiana, FL-FCA-219-222; 224; Decl. of Charles A. Whitaker.
[41]  The Contract, Exhibit 1, General Provisions (3), FL-FCA-219.
[42]  The Contract, Exhibit 1, FL-FCA-222.
[43]  The Contract, Exhibit 1, FL-FCA-207-212.

to the actual award of Task Order 20, FEI operated under FEMA's Pre-Authorization Notices (PAN). The PANs authorized FEI "to begin work based on urgency."[44]

The first task order PAN was issued by FEMA to FEI on September 10, 2005. On September 26, 2005, FEMA issued a Statement of Work (SOW) to FEI to haul and install travel trailers (and MH units). On October 9, 2005, FEMA issued a Request for Proposal (RFP) and SOW Revision No. 1 to FEI, requiring FEI to submit a written technical and business proposal for services required in the revised SOW.[45] The RFP required FEI's technical proposal to be in the form of a Work Plan, which must specify the contractors' proposed technical approach for performing the specific task required within the time frame specified, identify key personnel, deliverables and due dates. The Work Plan was subject to approval by the COTR.[46] FEI's Work Plan was approved by FEMA and the Task Order thereafter issued.[47]

On November 10, 2005, FEMA officially awarded Task Order 20 to FEI, which was an undefinitized task order award for haul and install, minor installation and construction activities, maintenance, deactivation and removal of travel trailers and mobile homes.[48] At that time, Task Order 20 also became referenced as Task Order 11.[49]

## 2.    FEI's Work Conformed To The Government's Precise Specifications

FEI hired subcontractors to install the majority of the travel trailers, including the Alexander plaintiffs' travel trailer. Subcontractor MLU Services, Inc. (MLU) installed the Alexanders' trailer.[50] MLU is not a party to this litigation. The Government's specifications for FEI's work were mandatory. The contract did not allow FEI to change any of the specifications.

---

[44]  The Contract, Exhibit 1, FL-FCA-16.

[45]  The Contract, Exhibit 1, RFP, FL-FCA-228; plaintiff's reference to FEI as a "no-bid" contractor defendant and the government's contract with FEI as a "no-bid" contract is therefore a misnomer and incorrect.

[46]  FL-FCA 236-240.

[47]  The Contract, Exhibit 1, FL-FCA 235-240; and 16.

[48]  FL-FCA-236-240.

[48]  The Contract, Exhibit 1, FL-FCA-236, 249-254.

[50]  See FL-FCA 4623, attached as Exhibit 2.

9

FEI could not deviate from the Government's specifications without the Government's review and approval.

FEI's work conformed to the Government's precise specifications, including the mandatory specifications for installation of the travel trailers.  There was a "back and forth" between the Government and FEI to ensure that FEI's work conformed to the Government's specifications on trailer blocking.  For example, initially, when FEMA gave FEI authorization to proceed with installation of travel trailers, the FEMA Contracting Officer, Nancy Costello, advised FEI <u>not</u> to install the trailers on blocks consistent with Exhibit 7 to the IA/TAC, but rather, to install them simply using the tongue jack and stabilizer jack.[51]  Subsequently, on October 18, 2005, as the result of electronic mail exchanges between the Government's representatives and FEI's personnel, regarding "Confirmation of Technical Direction for Fluor in LA: Travel Trailer Blocking Requirement," Kevin McCarthy (the Government's COTR for FEI in Louisiana) directed:

> All Trailers installed by Fluor in LA shall be blocked in accordance with the Performance Work Statement and the diagram previously supplied [by the Government]. Trailers previously installed by but not blocked shall be blocked ASAP ... These trailers NEED blocking to preserve their useful lifespan and to ensure the safety of the occupants.  This issue has been brought to the attention of the IA-TAC Program Management in FEMA HQ and they agree 100%.[52]

Thus, FEMA's COTR, Kevin McCarthy, directed that FEI was now to commence installing travel trailers in strict accordance with FEMA's specifications in Exhibit 7 to the IA/TAC and even required FEI to go back and retrofit all prior travel trailers that had not been

---

[51]  Government and FEI email exchange, Exhibit 3, FL-FCA-7184-185.
[52]  A copy of the electronic mail exchanges between the Government and FEI, regarding trailer blocking, is attached as Exhibit 3, including the Government's diagram provided to FEI, FL-FCA-9521.

installed in accordance with those specifications pursuant to Ms. Costello's earlier directive.[53] Additionally, when FEI sought clarification of the specifications of Exhibit 7 to the IA/TAC, the Government provided FEI with a "blocking diagram that conforms to the Performance Work Statement on trailer blocking" set forth in the base contract.[54] The Government's diagram for "Typical Travel Trailer Pier Construction" was prepared by Terry R. Zien (U.S. Army Corps of Engineers) (dated 10/11/05).[55] Thus, a Government engineer drafted the Government's trailer blocking diagram that was provided to FEI. FEI was never directed or asked to, and therefore never undertook, to perform any engineering services concerning the Government's blocking diagram. Certainly, the Government never requested any engineering support/expertise from FEI relating to the Government's method for blocking the trailers.[56]

It is undisputed that the Government inspected FEI's final trailer installations to ensure compliance with Exhibit 7. FEMA mandated that the performance of FEI's work under the contract would be subject to the Quality Assurance Surveillance Plan and the Technical Work Plan as submitted by FEI and the COTR (FEMA) representative.[57] The contract provided "[t]he COTR does not have the authority to, and shall not, issue any technical direction which: ... [c]hanges any of the express terms, conditions, or specifications of the contrac[t] Task Orders ... ."[58] The contract also provides that FEI "shall proceed promptly with the performance of technical directions duly issued by the COTR ... ."[59] This quality control system was established by FEMA to ensure that FEI's work was performed in accordance with contract requirements and with FEMA approval.

---

[53] Exhibit 3, Government and FEI email exchange, FL-FCA-7180.
[54] Government and FEI email exchange, Exhibit 3, FL-FCA-9634, 9521, 7180-7185.
[55] Exhibit 3, FL-FCA-9521.
[56] Decl. of Charles A. Whitaker, arts. 9, 12.
[57] Contract, Exhibit 1, FL-FCA-15, G. 7 Technical Direction and Surveillance; Decl. of Charles Whitaker, arts. 13 and 14.
[58] Id.
[59] Id.

In addition to FEI's own 100% QA/QC checks of the installations of its subcontractors to ensure strict compliance with Exhibit 7 to the IA/TAC, the Government had at least three methods of ensuring that FEI complied with the Exhibit 7 requirements.[60]  First, the Army Corps of Engineers had inspectors in the field on a regular basis who would bring to the attention of all IA/TAC contractors, including FEI from time to time, issues that they saw in the field that they felt did not comply with the EHU installation or any other IA/TAC specifications.  Second, the Government performed quality assurance or quality control inspections of many of the travel trailers installed by FEI and its subcontractors.  FEMA technical monitors (for the COTR) were in the field every day inspecting FEI's trailer installations to confirm strict compliance with FEMA's detailed specifications.[61]  Third, at some point in the fall of 2005, FEMA retained a QA/QC contractor who inspected all IA/TAC contractor EHU installations to ensure compliance with contract specifications.  Due to the large number of travel trailers being installed, FEMA's QA/QC subcontractor did not inspect 100% of all installed units, but apparently applied some type of sampling or auditing principles in connection with unannounced inspections of EHU installations to ensure IA/TAC compliance.[62]  The FEMA technical monitors and QA/QC inspectors conducted detailed inspections utilizing the "FEMA Travel Trailer Inspections Field Inspector's Guide,"[63] scrutinizing every minute aspect of FEI's (and its subcontractor's) work. FEMA designed the guide for its inspectors as:

> **a visual assist** as you inspect FEMA travel trailers for occupancy… This guidebook is not a substitute for knowing the specifications in the project work statement… the pictorial presentations will help you remember the individual items,

---

[60]  Decl. of Charles A. Whitaker, art. 14.
[61]  Decl. of Charles A. Whitaker, arts. 15-16.
[62]  Decl. of Charles A. Whitaker, art. 17.
[63]  A copy of the FEMA Travel Trailer Inspections Field Inspector's Guide is attached as Ex. 4, FL-FCA06913-40.

> acceptable methods and procedures you should use during your
> review of the contractor's work.[64]

FEMA's Inspector's Guide contains over 10 pages of photographs, with detailed written instructions, showing proper "Blocking and Leveling" methods the contractor's installation must meet to comply with FEMA's contract specifications and for FEMA's approval.[65]  The Guide also contains detailed photographs coupled with instructions for "Anchoring and Straps" (4 pages), sewer and water line placement, RFO checks, steps and ramps.  To ensure that FEI's and its subcontractors were strictly complying with the Contract specifications for travel trailer installations, FEI requested and FEMA gave FEI a copy of the Guide, which FEI used to make sure its installations conformed precisely to FEMA's specifications and would pass FEMA's inspections.[66]

The form that FEI used to inspect trailers at the staging areas (form 90-13) was a <u>FEMA inspection form</u>.[67]   Likewise, the ROF Quality Control/Assurance Checklist used after trailer installation and before occupancy was derived from FEMA's installation specifications.  Thus, FEI and its subcontractors' quality control inspections were performed in strict compliance with FEMA's contract requirements.

Stephen Miller was a supervisor over logistical operations with FEMA on the IA/TAC.  Mr. Miller worked very closely with individuals from FEI and personally observed FEI's performance in the Hurricane Katrina and Rita response.  He made visits to FEI's staging areas and sites where units were installed or in the process of installation.  He did not receive any complaints regarding the performance of FEI's work under the contract and he did not have any

---

[64]  Ex. 4, FL-FCA06940.

[65]  Ex. 4, FL-FCA06914-06920, 925, 926 (& 933 which specifically directs how to determine if the trailer is level).

[66]  Decl. of Charles Whitaker, art. 18.

[67]  <u>See</u> <u>e.g.</u>, Exhibit 5, the Alexander trailer installation package, FL-FCA-004609-4635.  All of the forms used in the package were FEMA inspection forms or, were derived from FEMA's contract specifications to ensure compliance.  <u>See</u> specifically (1) FEMA's unit inspection report form 90-13, FL-FCA-004614 and FEMA's Ready for Occupancy (RFO) QA/QC Acceptance Check List, FL-FCA-004615-4616; Decl. of Charles Whitaker, art. 13.

complaints concerning their performance.  He was satisfied with the performance of FEI's work under the contract.[68]

David Garratt, Deputy Administrator of FEMA, testified it was an explicit FEMA directive to put the travel trailers on blocks.  If the contractor did not put the travel trailers on blocks, they would have been violating their contract with FEMA.  FEMA also required the contractors to hook up the trailers to utilities, and if the contractors did not do that, they would be violating their contract with the federal government through FEMA.[69]  Mr. Garratt also testified that the contractors had to deliver the trailers that FEMA had designated and purchased and to do otherwise or to chose some other form of housing would have been a breach of the contractor's contract with FEMA.[70]  There are no allegations by plaintiffs that FEI deviated from the scope of work that it was mandated to do by the Government.

The Inspection and Acceptance clause of the Contract applied to all work performed under the contract, including Exhibit 7 and the other exhibits to the Performance Work Statement (PWS).[71]  Section E, the Inspection and Acceptance clause, incorporated by reference 48 C.F.R. § 52.246-5.[72]  Section 52.246-5 reserved to the Government "the right to inspect and test all services" and "[i]f any of the services performed do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, for no additional fee."  48 C.F.R. § 52.246-5(c), (d).  If "defects in services cannot be corrected," or "[i]f the Contractor fails to properly perform the services again

---

[68]  The pertinent testimony from the deposition transcript of Stephen Miller is attached as Exhibit 6, p. 200-202.
[69]  The pertinent portions of the deposition transcript testimony of Mr. Garratt are attached as Exhibit 7, p. 218-221.
[70]  Garratt deposition, Exhibit 7, p. 219-200.
[71]  The Contract, Exhibit 1, FL-FCA-9, Section E; Decl. of Charles A. Whitaker, art 7. (Part III, Section "G" of the IA/TAC is a list of attachments to the Contract [FL-FCA-60].  Attachment "A" addresses FEI's "Scope of Work" under the Contract, and is known as a "Performance Work Statement" [FL-FCA-60-74]; the PWS describes the various types of work FEMA may require FEI to execute under the Contract when requested to do so by a specific task order issued by FEMA.  Section 2.9 of the PWS [FL-FCA-66] addresses installation of travel trailers, and specifically incorporates Exhibit 7 to the PWS [FL-FCA-113-122]).
[72]  The Contract, Exhibit 1, FL-FCA-9, Section E.

or take the action necessary ensure future performance in conformity with contract requirements, the Government may ... terminate the contract."  Id. at § 52.246-5(e).

The Inspection and Acceptance clause of the Contract also mandated "[f]inal inspection and acceptance shall be by the Contracting Officer or his ... representative ... ."[73]  At the end of the project, <u>FEMA</u> evaluated and <u>formally accepted as complete all of FEI's work</u> performed pursuant to the Contract.[74]

## 3.     The Government's Superior Knowledge Of Formaldehyde Claims Preceded FEI's Actual Knowledge Of Claims

It is undisputed that the Government's knowledge about formaldehyde claims preceded and exceeded any actual knowledge FEI had of formaldehyde claims.  It is well documented that FEMA knew about formaldehyde concerns in EHUs before FEI ever had any actual knowledge of such concerns.  In ruling on the Government's original motion to dismiss, the court noted: "[i]t was (by FEMA's admission) as early as March 2006 that FEMA reportedly received the first reported concerns of formaldehyde fumes by a Gulf Coast trailer occupant."[75]  The court also noted while FEMA allegedly first became aware of formaldehyde in mid-March of 2006, it perhaps had earlier knowledge.[76]  Plaintiffs allege that FEMA became aware of the safety and health risks and concerns related to formaldehyde exposure in their travel trailer, as early as the fall/winter of 2005.[77]  Moreover, the Government admits that as early as October 2005, Bechtel warned the Government of "a concern about material off-gasing (possibly formaldehyde) in newly delivered travel trailers."[78]  In response, OSHA began testing new, unoccupied EHUs for

---

[73]  The Contract, Exhibit 1, FL-FCA-9, E.2 Inspection and Acceptance.
[74]  FEMA's Acceptance of Task Order Services, FL-FCA-19669-19670, attached as Exhibit 8; Decl. of Charles A. Whitaker, art. 19.
[75]  <u>See</u> Court's Order, Rec. Doc. 717, timeline of relevant facts/events, p. 27-36, <u>see</u> p. 28.
[76]  Court's Order, Rec. Doc. 717, p. 45.
[77]  Rec. Doc. 1686, par. 11.
[78]  <u>See</u> Government Motion to Dismiss, Rec. Doc. 1545-22; Court's Order, Rec. Doc. 717, p. 28 n.13; Bechtel's Motion to Dismiss, p. 24.

formaldehyde and determined that venting units for a short time reduced formaldehyde below the regulatory level of concern.[79]  This testing was disclosed to FEMA in the Mississippi Joint Field Office Situation Report S/TREP 41/FEMA-1604-DR-M5.[80]  Yet, the Government did <u>not</u> tell FEI about these tests.  The chronology of FEMA's knowledge about formaldehyde concerns in EHUs and its discretionary response is also set forth in the Government's motion to dismiss plaintiffs' remaining FTCA claims.[81]  FEI first became aware of the potential for a problem of formaldehyde in the travel trailers in March 2006.[82]  It is undisputed that prior to March 2006, FEI had not received any complaints about formaldehyde concerns in travel trailers.[83]  There are no allegations or evidence that FEI had actual knowledge about formaldehyde concerns in travel trailers not known to the Government.  Plaintiffs have made no allegation that FEI knew of any alleged formaldehyde concerns that were not know to the Government.

## ARGUMENT AND APPLICABLE LAW

FEI is a Government contractor that performed its work according to and in compliance with specifications provided and mandated by the Government through FEMA, rendering it immune from suit and entitling it to summary judgment.  FEMA provided FEI with reasonably precise specifications for installation of the travel trailers.  Exhibit 7 to the IA/TAC specifically directed FEI to install the trailers on six piers constructed in a precise fashion.  Additionally, the Government issued a mandatory technical directive to FEI that all trailers shall be blocked in accordance with FEMA's blocking specification *and* the Government's "Typical Travel Trailer Pier Construction" diagram.   FEMA exercised its discretion and specifically chose the

---

[79]  Rec. Doc. 1545-4, p. 5, IV; Rec. Doc. 717, p.28 n.13; Decl. of Clyde Payne, Rec. Doc. 1545-10, par. 5-6, 3.
[80]  Decl. of Clyde Payne, Rec. Doc. 1545-10, par. 8-10.
[81]  <u>See</u> Rec. Doc. 1545 <u>passim</u>.
[82]  The pertinent deposition transcript excerpts of Robert E. Duckworth, FEI's Senior Site Safety Manager for the IA/TAC, are attached as Exhibit 9, <u>see</u> p. 78 L. 3-25, p. 79, L. 1-6.
[83]  Exhibit 9, deposition of Robert Duckworth, p. 78-79.

installation design for the trailers. There are no allegations and no evidence that FEI deviated from the Government's specifications.  It is undisputed that the Government inspected FEI's final trailer installations to ensure compliance with Exhibit 7, and that FEI's work under the contract was accepted and finally approved by FEMA.  Finally, there is no evidence that FEI had actual knowledge about formaldehyde dangers in travel trailers not known to the Government during the relevant time period.

Plaintiffs' complaint truly lies against the Government for its policy decision on the trailer installation specifications.  However, plaintiffs know that because the Government was within its discretionary function, it is entitled to sovereign immunity.  Instead, plaintiffs sued FEI trying arduously to shift any responsibilities of the Government to FEI, a private contractor.  However, the purpose of the government contractor defense is to give FEI, a government contractor, the same immunity afforded the Sovereign.  The undisputed evidence compels the conclusion that FEI meets the three prerequisites of Boyle, as interpreted by the Fifth Circuit, entitling FEI to that immunity and summary judgment as a matter of law.

**A.      Summary Judgments Are Favored**

Summary Judgment is appropriate under FRCP 56 if the record discloses that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   There is no genuine issue of material fact if the record, taken as a whole, cannot lead a rationale trier fact to find for the non-moving party.  Matsushita Electric Industrial Corp. v. Zenith Radio Co., 475. U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed. 2d 538 (1986).  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The mere existence of

factual disputes will not defeat an otherwise properly supported motion.  Anderson, 477 U.S. at 248.  Further, the court's finding that a rationale jury could not find for the non-moving party may be supported by the absence of evidence needed to establish an essential element of the non-moving party's case.  Id.  Fed.R.Civ.P. 56 would be thwarted if a defendant had "to bear the costs of trying all of the issues in a case when some can and should be resolved on summary judgment."  Little v. Liquid Air Co., 37 F.3d 1069, 1076 (5th Cir. 1994).

After the moving party meets its burden of demonstrating the absence of a genuine issue of material fact, the non-moving party "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  Id. at 1075.  This burden cannot be met merely by pointing to "some metaphysical doubt as to the material facts,' ... by 'conclusory allegations,' [or] by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence."  Id. (citing Matsushita, 475 U.S. at 586; Lujan v. Nat'l. Wildlife Fed., 497 U.S. 871-73 (1990); Hopper v. Frank, 16 F.3d 92 (5th Cir. 1994); Davis v. Chevron U.S.A., Inc., 14 F.3d 1082 (5th Cir. 1994)).

Courts routinely grant summary judgment and hold federal contractors immune from liability under state law based on the government contractor defense.  See e.g., Hudgens v. Bell Helicopters, 328 F.3d 1329, 1344-45 (11th Cir. 2003); Kerstetter v. Pac. Sci. Co., 210 F.3d 431, 437-39 (5th Cir. 2000); In re Air Disaster at Ramstein Airbase, Germany, 81 F.3d 570, 574-76 (5th Cir. 1996); Stout v. Borg-Warner Corp., 933 F.2d 331, 334-37 (5th Cir. 1991), cert denied, 502 U.S. 981 (1991); In re Katrina Canal Breaches Consol. Litig., Civ. A. No 05-4182, 2008 WL 5234369 at *20 (**E.D. La**. Dec. 15, 2008) (holding remediation contractor immune from state tort claim based on government contractor defense); In Re Katrina, 2007 WL 763742 at *6 (granting dredging contractors' motion to dismiss based on the government contractor defense).

**B.**     <u>The Government Contractor Defense Bars Plaintiffs' Claims Against FEI</u>

The Supreme Court has long recognized that private contractors who perform work at the request and direction of the federal government cannot be held liable for damages caused by the contractors' implementation of that work.[84]   This derivative sovereign immunity was first recognized by the United States Supreme Court in <u>Yearsley v. W. A. Ross Construction</u>, 309 U.S. 18 (1940).   In <u>Yearsley</u>, the Court held that a private contractor hired by the federal government to build dikes along the Missouri River was not liable to the property owners whose property had eroded as a result of the contractor's work, because the contractor was acting under the direction of the federal government.  <u>Id</u>. at 22-23.   The level of government direction which served as the basis for immunity in <u>Yearsley</u> was general in nature – the contractor had simply been instructed to build dikes in order improve the navigation of the Missouri River.  <u>Id</u>. at 19. In so doing, the contractor opted to "keep open an adequate channel for navigation between the end of the dike and the shore" and to accomplish this, "had accelerated the erosion by using the paddlewheels of its steamboats to increase the action of the current."  <u>Id</u>. at 20 (internal citations omitted).  The court found that it was this independent decision that had caused the damage to the plaintiff's land.  <u>Id</u>.   Nevertheless, the court held that the contractor's use of methods not entirely specified in the contract for completing the dikes was irrelevant for the purpose of determining whether derivative immunity was available to the contractor.  <u>See</u> <u>Id</u>.  Simply put, in <u>Yearsley</u>, the Court recognized that a private contractor may share in the immunity of a governmental entity where it is (1) working under direction of that entity, and (2) the actions complained of are generally within the scope of such directives.  <u>Id</u>. at 1921.  The Court held "[i]f [the] authority to carry out the project was validly conferred, that is if what was done was

---

[84]   <u>See</u> <u>Yearsley v. W. A. Ross Const</u>., 309 U.S. 18 (1940); <u>Boyle v. United Tech. Corp</u>., 487 U.S. 500 (1988).

within the Constitutional power of Congress, there is no liability on the part of the contractor for executing its will."  Id. at 2021.

Over 20 years later, the Supreme Court in Boyle, 47 U.S. at 500, reaffirmed and elaborated on the Government contractor defense.  "The defense is intended to implement and protect the discretionary function exception of the Federal Tort Claims Act ("FTCA") 28 U.S.C. § 2680(a)."  In re Hanford Nuclear Reservation Litigation, 534 F.3d 986, 999 (9th Cir. 2008). "The defense allows a contractor–defendant to receive the benefits of sovereign immunity when a contractor complies with the specifications of a federal government contract."  Id. (quoting Boyle, 487 U.S. at 511-12).  There is no question that sovereign immunity generally bars claims directly against the United States challenging discretionary decisions.[85]  The federal common law government contractor defense protects that immunity by preventing parties who cannot sue the United States *directly* for its discretionary decisions, from suing the United States *indirectly* by suing private contractors tasked with implementing such decisions.  See, e.g., Boyle, 487 U.S. at 512; Yearsley, 309 U.S. at 2021.  As the Boyle court explained:

> [P]ermitting second-guessing of the [government's] judgments ... through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption.  The financial burden of judgment against the contractors would ultimately be passed through, substantially if not totally, to the United States itself ...  it makes little sense to insulate the government against financial liability for the judgment that a particular feature of military equipment is necessary when the government produces the equipment itself, but not when it contracts for the production ... .

Boyle, 487 U.S. 511-12.   The Boyle Court found that "[t]he imposition of liability on Government contractors will directly affect the terms of Government contracts:   either the

---

[85]  See, e.g., 28 U.S.C. § 2680(a).

contractor will decline to manufacture the design specified by the government, or it will raise its price."  Id. at 507.[86]

The Boyle court referred to two unique federal interests implicated by a contract between a private contractor and the federal government.  The first is the law governing the obligations and rights of the United States under its contracts.  Id. at 504.  The second unique federal interest relates to the scope of civil liability of federal officials for discretionary actions taken in the course of their duties.  Id. at 505.  Although Congress generally waived sovereign immunity for tort claims against the United States under the FTCA, 28 U.S. § 2671 (2000), it specifically exempted from this waiver any claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the party of a federal agency or an employee of the Government.  28 U.S.C. § 2680(a) (the "discretionary function exception").  The court reasoned that "if the federal government could not be sued for performing discretionary acts, neither could a private contractor, and any state law providing for such liability would necessarily give rise to an inherent conflict."  In re World Trade Center Disaster Site Litigation, 456 F.Supp. 2d 520, 561 (S.D.N.Y. 2006) (citing Boyle, 487 U.S. at 500).

Boyle established a three-part test, specific to procurement contracts, to determine when the defense applies: (1) the government approved reasonably precise specifications, (2) the equipment conformed to those specifications, and (3) the supplier warned the United States about any dangers in the use of the equipment that were known to the supplier but not to the government.  Boyle, 487 U.S. at 512.

To prevent state laws from frustrating these important federal interests, federal common law now dictates that a private contractor cannot be liable under state law where: (1) the federal

---

[86]  As a practical matter, regardless of whether the United States is legally obligated to indemnify the contractor, the U.S. ultimately pays the price.  See, e.g., Nielsen v. George Diamond Vogel Paints Co., 892 F.2d 1450-52 (9th Cir. 1990); McKay v. Rockwell Int'l. Corp., 704 F.2d 4444, 449 (9th Cir. 1983).

government approves reasonably precise specifications, (2) the contractor's work conforms to those specifications, and (3) the contractor is not aware of reasons not known to the government why the work product required by the specifications is unsafe or unreasonable.  See Kerstetter, 210 F.3d at 435; Boyle, 47 U.S. at 512; In re Katrina Canal Breaches Consol. Litig., No. 05-4182 2000 W.L. 4219351 at *5 (E.D. La. 11/27/07).  "Displacement of state law occurs under Boyle so long as the three-prong test of that case is met; the three-prong test is itself the definition of when a significant conflict exists between state and federal law." Hill v. Raytheon Aircraft Company, 470 F. Supp. 2d 1214, 1223 (D. Kan. 2006)(citing Boyle, 487 U.S. at 501; Lewis v. Babcock Industr., 985 F.2d 83,86 (2d Cir. 1993));[87] see also In re Katrina Canal Breaches Consolidated Litigation, Civ. A. No. 05-4182, Doc. 67, p. 29-30 (E.D. La. Dec. 15, 2008) (J. Duval).

If the contractor satisfies the government contractor defenses' three conditions, the nature of the contractor's work for the government (i.e., military, non-military, service or procurement) is irrelevant.  The defense applies with equal force to service and maintenance contracts like FEI's contract with the government.[88]  Indeed, where the government has directed a contractor to do the very same thing that is the subject of the claim, the contractor may assert the defense. Correctional Services Corp. v. Malesko, 534 U.S. 61, 74 n.6 (2001) (citing Boyle, 487 U.S. at 500).

---

[87] Cert. denied, 509 U.S. 924 (1993).

[88] See e.g., In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 197 (2d Cir. 2008) (government contractor defense may apply to contractors providing disaster relief and clean-up services to the federal government); Hudgens, 328 F.3d at 1334 (maintenance-service contractor may assert the government contractor defense); In re Katrina Canal Breaches Consol. Litig., No. 05-4182, 2007 WL 763742, at *4 (E.D. La. Mar. 9, 2007) (granting dredging service contractor's motion to dismiss based, in part, on the government contractor defense); Richland-Lexington Airport Dist. V. Atlas Prop., Inc. 854 F. Supp. 400, 421-24 (D.S.C. 1994) (remediation contractor working for the Environmental Protection Agency immune under the 1989) ("[T]he government contractor defense ... is viable with regard to performance contracts"); Askir v. Brown & Root Servs. Corp., 1997 WL 598587, at *2, 5-7 (S.D.N.Y. Sept. 23, 1997) (contractor that provided "logistical, operational, maintenance, and construction services" to the United States is immune from liability under government contractor defense).

The government contractor defense "is based not on a simple economic concern for government procurement costs, but on the government's need to exercise judgment." Snell v. Bell Helicopter Textron, Inc., 107 F.3d 744, 746 (9th Cir. 1997). The defense protects more than just the public fisc; it also protects the government's discretionary decision making. See Snell, 107 F.3d at 746 ("The defense is intended to implement and protect the discretionary function exception under the [FTCA]").

It is axiomatic that it is not a prerequisite for application of the government contractor defense that it must be proven that the government is entitled to discretionary function immunity (or exercised its discretion in accepting a safety risk) for the particular task at issue. In re Katrina Canal Breaches Consolidated Litigation, Civ. A. No. 05-4182, Doc. 67, p.28-29 (E.D. La. Dec. 15, 2008). There, Judge Duval rejected the plaintiffs' assertion of such a prerequisite, stressing that this identical argument was specifically rejected by the United States Court of Appeals for the Second Circuit in Lewis v. Babcock Indus., Inc., 985 F.2d 83, 87 (2d Cir. 1993).[89] Here, of course, this court *has ruled* that the discretionary function exception bars plaintiffs' FTCA claims challenging FEMA's decision to contractually delegate the responsibility for hauling, installing and maintaining EHUs to IA/TACs.[90] More specifically, this court found that plaintiffs' claim that the government was involved in making contractual arrangements for the contractors to follow in the field, regarding the delivery and set-up of the EHUs was a discretionary function. FEI should be extended the same immunity from suit based on its (or its subcontractor's) installation of plaintiffs' travel trailer pursuant to the government's precise specifications.

---

[89] In re Katrina Canal Breaches Consol. Litig., Doc. 67, Court's Order and Reasons granting Washington Group International, Inc.'s motion for summary judgment based on the government contractor defense, p. 28-30.
[90] October 3, 2008 Order, Rec. Doc. 717, p. 43-44.

1.    **FEI Meets The Three Conditions For Dismissal Under The Government Contractor Defense**

      a.    **The Government provided reasonably precise specifications for FEI's work**

The requirement that the government approve reasonably precise specifications was created to "assure that the design feature in question was considered by a government officer and not merely by the contractor itself." Boyle, 487 U.S. at 512. Thus, the government need not prepare the specifications to be considered to have approved them as long as the government provides a substantive review or an evaluation of the contractor's plans, and is not merely a bureaucratic rubber stamp. Kerstetter, 210 F.2d at 435; Trevino v. Gen. Dynamics, 865 F.2d 1474, 1480 (5th Cir. 1989). Evidence of continuous back and forth between the contractor and the government, such as proof that the contractor and government worked closely together on the development of a project from its planning stages through its production generally is sufficient. In re Air Disaster at Remstein Airbase, Germany, 81 F 3d. 570, 575 (5th Cir. 1996). The specifications need not address the specific defect alleged; the government need only evaluate the design feature in question. Kerstetter, 865 F.2d at 1479-1481.[91] The design feature in question here is the Government's own blocking specifications.

Further, "[t]he contractor defense requires only that the government approve reasonably precise specifications." Smith v. Xerox Corp., 866 So.2d 135, 138 (5th Cir. 1989). Though it is necessary only that the government approve, rather than create the specifications, in this case, FEMA created and provided the specifications for installation of the travel trailer. This clearly satisfies the first condition of the defense. See Miller v. Diamond Shamrock Co., 275 F.3d 414, 420 (5th Cir. 2001). In addition to FEMA's precise requirements for blocking and leveling the

---

[91] Citing Boyle, 487 U.S. at 512, 108 S. Ct. at 2510; Trevino, 865 F.2d at 1486 ("The government contractor defense ... protects government contractors from liability for defective designs if discretion over the feature in question was exercised by the government").

trailers, FEMA issued mandatory directives to FEI on how to block the trailers, including a detailed diagram drafted by a U.S. Army Corps of Engineer.[92]

Even assuming arguendo that FEMA's blocking specifications gave FEI any discretion as to how to get the trailer off the ground and onto the piers, FEI is insulated from liability by the government contractor defense. **Boyle does not require that the government issue standards which remove all compliance discretion from the contractor.** Carley v. Wheeled Coach, 991 F.2d 1117, 1125 (3d Cir. 1993); Hill v. Raytheon Aircraft Co., 470 F.Supp. 2d 1214, 1224 (D. Kan. 2006); see also Smith v. Xerox Corp., 866 F.2d 135, 138 (5th Cir. 1989) (government contractor defense requires only that the government approve reasonably precise specifications). In Carley, the court instructed that:

> [T]he government need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply.

To meet the first condition of Boyle, "a contractor need only show governmental approval of **the overall design** of an allegedly defective product." Lambert v. B.P. Prods. N. Am., Inc., 2006 U.S. Dist. Lexis 16756 (S.D. Ill. 2006) (quoting Stout v. Borg v. Warner Corp., 933 F.2d 331 (5th Cir. 1991) (emphasis added)). "The plaintiffs in Stout had argued that specifications for an air conditioning unit were not reasonably precise because they did not specifically prohibit the contractor from installing a safety device. The Fifth Circuit found that the government's thorough review of the overall specifications constituted appropriate approval of reasonably precise specifications." Lambert, 2006 U.S. Dist. Lexis 16756 (citing Stout, 933 F.2d at 336). Thus, to the extent that FEI had any discretion in determining how to raise the trailers onto the blocks, it is nevertheless entitled to the government contractor defense.

---

[92] Exhibit 3, FL-FCA 9521; Decl. of Charles Whitaker, art. 18.

Plaintiffs cannot raise a genuine issue of fact to dispute FEI's satisfaction of condition one of the government contractor defense for any feature of work plaintiffs challenge.[93]

### b.  FEI's work conformed to FEMA's specifications

FEI faithfully followed FEMA's plans and specifications in performing its work.  The government's issuance of a formal report indicating acceptance of the product and/or conformity with all required specifications is compelling evidence that the contractor's work met the government's requirements.  Miller, 275 F.3d at 414.  This condition also may be satisfied by showing that the government supervised and controlled the contractor's implementation of approved specifications, or that the government inspected, accepted as complete or used the contractor's work.  In re Katrina Canal Breaches Consol. Litig., No. 05-4182, 2000 WL 4219351, at *5 (ED LA Nov. 27, 2007); Kerstetter, 210 F.3d at 435-36 ("the Army's experience with the 540 rotor system – and its decision to continue using it – amply established government approval of the alleged designed defect").  Tate v. Boeing Helicopters, 55 F.3d 1150, 1156 (6th Cir. 1995) (second condition satisfied by proof that government "inspected and approved" contractor's work).  Moreover, where there is a continuous exchange between the contractor and the government, the process itself becomes persuasive evidence of product conformity to precise specifications.  Kleemann v. McDonnell Douglas Corp., 890 F.2d 698, 701-02 (4th Cir. 1989).  In all events, absence actual evidence to the contrary, the government's written acceptance of its contractor's work constitutes compelling evidence that the contractor's work conformed to the government's approved specifications.  See, e.g., Miller, 275 F.3d at 420.

Importantly, plaintiffs cannot negate a contractor's showing of conformance with reasonably precise specifications merely by asserting that defendant's work did not comply with some "general admonition against an unwanted condition.'"  Kleemann, 890 F.2d at 703 (quoting

---

[93]  See Infra, p. 28.

Harduvel v. General Dynamics Corp., 878 F.2d 1311, 1319 n.3 (11 Cir. 1989) (precatory contract terms "represent little more than the hopes of the participants that the project on which they are about to embark will turn out well"); In re Air Disaster, 81 F.3d at 575 (holding overly general contract language "'calling for such vaguaries as a failsafe, simple or inexpensive'" work have no role in the government contractor defense analysis)) (quoting Kleemann, 890 F.2d at 703).

Instead, plaintiffs must show an allegedly defective feature – which caused plaintiffs' damages – "result[ed] from" the contractor's departure from reasonably precise specifications. See Kerstetter, 210 F.3d at 435-36 (harmonizing prior decisions); see also Beaver Valley Power Co. v. Nat'l. Eng'g. & Contracting Co., 883 F.2d 1210, 1219 n.9 (3d Cir. 1989) (partially affirming summary judgment because the plaintiff never showed how the contractor's alleged non-conformance with a permitting requirement specified in the contract "caused its damages"[94]).

FEI's work conformed to the specifications required by FEMA. It is undisputed that the government inspected FEI's final trailer installations to ensure compliance with Exhibit 7 of the IA/TAC. FEI's work pursuant to the IA/TAC contract, including installation of the trailers, conformed to FEMA's specifications because FEMA supervised, inspected, used and expressly accepted FEI's work.[95] During the quality assurance (QA) inspections, the inspectors actively ensured adherence to FEMA's specifications and would have noted any deficiencies to be corrected.[96] FEMA's inspections clearly show that FEMA exercised "supervisory judgment"

---

[94] The Third Circuit decided Beaver under Pennsylvania's state government contractor defense, nevertheless, because the elements of the state law defense are nearly identical to the elements of Boyle's defense, 883 F.2d at 1216 and the circuit court referred to Pennsylvania's "government agency defense" as the likely origin of the federal government contractor defense, Id. 1215 n.4, the court's analysis is applicable here.
[95] See In re Air Disaster, 81 F.3d at 575.
[96] Decl. of Charles Whitaker, art. 14-17.

over the "particularities" of the work.  In re Katrina, 2007 WL 24219351 at *5; see also In re Air Disaster, 81 F.3d at 575 (holding 'inspectors ... actively involved' showed conformance).

Throughout the project, FEMA found no non-compliance by FEI.  FEMA evaluated and accepted FEI's work.   See Kerstetter, 210 F.3d at 435-36 (holding acceptance showed conformance); In re Air Disaster, 81 F.3d at 575 (same).   The record shows that in the end FEMA formally accepted as complete all of FEI's work.[97]   Because FEMA made that express determination, FEI's work necessarily conformed with FEMA's specifications.  See Miller, 275 F.3d at 420 (collecting cases).[98]   There is no testimony or evidence which can possibly contest that FEI's work was accepted by FEMA.  The work would not be accepted by FEMA unless the work was in accordance with the contract and in accordance with FEMA's specifications.

Plaintiffs' primary complaint against FEI is that FEI installed the trailers by "blocking" the unit – raising the unit several feet into the air and off of its wheel base and setting it on concrete blocks, allegedly creating distortion in the trailers' shell, allowing increased moisture intrusion which contributed to increased formaldehyde exposures.[99]   But that is exactly what FEMA directed FEI to do – install the trailers by "blocking" them, immunizing FEI from liability under the government contractor defense against this allegation.  Indeed, a more recent Supreme Court case, Correctional Services Corp. v. Malesko, 534 U.S. 61 523 n.6 (2001) (citing Boyle) supports broad application of Boyle and the government contractor defense: "[w]here the government has directed a contractor to do the very thing that is the subject of the claim, we have recognized this as a special circumstance where the contractor may assert a defense."

The Plaintiffs' attempt to separate out of the entire blocking process one discreet function, myopically fixating on how FEI raised the trailers from the ground onto the piers, does not defeat

---

[97]   See Exhibit 8, FEMA's Acceptance of Task Order Services, FL-FCA 19669-19670.
[98]   See also Kerstetter, 210 F.3d at 435-36; In re Air Disaster, 81 F.3d at 575.
[99]   Complaint, Rec. Doc. 1, par. 38-40.

28

application of the government contractor defense to FEI's work.  That FEMA did not explicitly tell FEI how to get the trailer from the ground on two axles and a tongue jack up onto the piers is irrelevant for application of the government contractor defense.  As stated by the Fifth Circuit in Bailey v. McDonnell Douglas Corp., 989 F.2d 784 (5th Cir. 1993), the alleged defect must exist independently of the design itself, and must be from a deviation from the required government specifications.  Even under plaintiffs' argument, there is no testimony or evidence that suggests that FEI deviated from a required "design" specification.  Under the government contractor defense, the issue is not whether the contractor did everything he could to prevent the damage complained – it is whether the contractor complied with the government's specifications.  Any arguments that the plaintiffs may make that FEI could have lifted up [jacked up] the trailers differently onto blocks would be the same arguments the plaintiffs made in Kerstetter, where the Fifth Circuit rejected that argument.  The standard, as stated in Kerstetter, is whether the government approved a specification which did not contain a safer design.  In this case, FEMA drafted and provided the specifications to FEI dictating how to install the trailers, including blocking, and reinforced those specifications with precise directives issued to FEI.  To establish that FEI has not met the second prong of Boyle, plaintiffs must identify a "specification" that FEI deviated from in installing the trailers.  Plaintiffs have not and they cannot.  There is no allegation that FEI deviated from the scope of work that it was mandated to do by the government.

Further, during the project, there was continuous back and forth between FEMA and FEI regarding the trailer installation process, including FEMA's directives on "blocking" the trailers.

Accordingly, the court should find that FEI satisfies the second condition of the government contractor defense for all of the installation features of FEI's work.

### c. FEI had no actual knowledge not otherwise known to the Government about alleged formaldehyde problems

There were no dangers known to FEI of which the Government was not aware.  FEI had no actual knowledge not otherwise known to the Government about how FEMA's plans and specifications might lead to claims of formaldehyde exposure in the travel trailers.

A federal contractor satisfies the government contractor defenses' third condition by proving that it knew of no "reasons not known to the Government why the application" of the approved plans and specifications were "unsafe or unreasonable."  In re Katrina, 2007 WL 4219351, at *5; see also Kerstetter, 210 F.3d at 436; In re Air Disaster, 81 F.3d at 575-76.  Significantly, the contractor has no duty to test for or discover inherent risks that neither the government nor its contractor ever considered to be unsafe.  The purpose of this element is not to create any incentive to discover latent defects in a product designed for the government.  See Kerstetter, 210 F.3d at 436 (citing Boyle, 487 U.S. at 512, 513).  "The government contractor defense does not require a contractor to warn the government of defects about which it only should have known."  Id.; Miller, 275 F.3d at 422.  Rather, "a government contractor is only responsible for warning the government of dangers about which it has actual knowledge,"[100] and not about dangers which, in hindsight, the contractor allegedly *should have* identified.  Trevino, 865 F.2d at 1487 (emphasis added).  This third condition tests only whether the contractor knew of dangers not known to the government.  The Kerstetter court relied on the Boyle court's holding that "it does not seem to us sound policy to penalize, and thus deter, active contractor participation in the design process, placing the contractor at risk unless it identifies all design defects." Kerstetter, 210 F.3d at 436 (quoting Boyle, 487 U.S. at 513).  Both the district court and the Fifth Circuit interpreted this language as "mean[ing] only that the defense applies even

---

[100]  Kerstetter, 210 F.3d at 436 (citing Trevino, 865 F.2d at 1487).

when the contractor did not warn the government of latent defects – in other words, defects that neither the contractor nor the government considered at all." Kerstetter, 210 F.3d at 436.

The third condition tests only whether the contractor knew of dangers "not known to the government." In re Katrina, 2007 WL 4219351, at *5. Thus, FEI also may satisfy this third condition by showing the government's knowledge of potential risk either equaled or exceeded FEI's knowledge. See e.g., Miller, 275 F.3d at 422-23 (affirming summary judgment partly because the United States knew of the dangers by a bi-product of Agent Orange); Kerstetter, 210 F.3d at 438 n.9, (affirming summary judgment partly because the United States "knew at least as much as the contractors"); In re Air Disaster, 81 F.3d at 575 (affirming summary judgment partly because the United States knew of the alleged risks); Stout, 933 F.2d at 336-37 (affirming summary judgment partly because the United States' verbal and written warnings to the plaintiff showed the United States knew of the risks).

Plaintiffs did not allege, and there is no evidence that FEI knew of any danger regarding potential formaldehyde claims that was not known to the Government. In fact, FEMA admits that it had prior and superior knowledge about formaldehyde claims. The test is not should FEI have known of the formaldehyde problem allegedly created by implementation of FEMA's mandatory specifications for trailer installation. **FEI is only responsible for warning the Government of dangers about which it had actual knowledge.** Simply put, there is absolutely no evidence which would demonstrate such knowledge. FEMA in fact did know infinitely more than FEI about alleged formaldehyde complaints beginning in October 2005. FEMA's knowledge about any potential risks to trailer inhabitants associated with FEI's trailer installations, pursuant to FEMA's directives, clearly exceeded that of FEI's knowledge. The

undisputed evidence shows that FEI has met the third and final condition of the government contractor defense, and its motion for summary judgment should be granted.

## CONCLUSION

Because FEI has satisfied each condition of the government contractor defense — showing that the Government provided reasonably precise specifications for FEI's work, that FEI complied with those specifications and that FEI had no actual knowledge not otherwise known to the Government about alleged formaldehyde dangers — FEI asks this Court to grant summary judgment in its favor, dismissing the plaintiffs' claims against FEI.

Respectfully submitted,

**MIDDLEBERG, RIDDLE & GIANNA**

BY:      */s/Sarah A. Lowman*
         Dominic J. Gianna, La. Bar No. 6063
         Sarah A. Lowman, La. Bar No. 18311
         201 St. Charles Avenue, Suite 3100
         New Orleans, Louisiana 70170
         Telephone: (504) 525-7200
         Facsimile: (504) 581-5983
         dgianna@midrid.com
         slowman@midrid.com

         Charles R. Penot, Jr. (La. Bar No. 1530 &
         Tx. Bar No. 24062455)
         717 North Harwood, Suite 2400
         Dallas, Texas 75201
         Tel: (214) 220-6334; Fax: (214) 220-6807
         cpenot@midrid.com

            *-and-*

         Richard A. Sherburne, Jr., La. Bar No. 2106
         450 Laurel Street, Suite 1101
         Baton Rouge, Louisiana 70801
         Telephone: (225) 381-7700
         Facsimile: (225) 381-7730
         rsherburne@midrid.com

**ATTORNEYS FOR FLUOR ENTERPRISES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2009, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sends notice of electronic filing to all counsel of record, including court-appointed liaison counsel, who are CM/ECF participants.

*/s/Sarah A. Lowman*
SARAH A. LOWMAN

ND: 4832-0133-2996, v.  3