UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER  MDL NO. 07-1873
FORMALDEHYDE PRODUCTS
LIABILITY LITIGATION  SECTION "N" (5)
JUDGE ENGELHARDT
MAG. JUDGE CHASEZ

THIS DOCUMENT RELATES TO:
*Age, et al. v. Gulf Stream Coach, Inc., et al.*, No. 09-2892
Alana Alexander, individually and OBO minor Christopher Cooper

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEFENDANT UNITED STATES' STATEMENT OF FACTS IN SUPPORT OF ITS
MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION
BASED UPON NO ANALOGOUS PRIVATE LIABILITY

Defendant, the United States of America, hereby submits the following statement of facts in support of its motion to dismiss Plaintiffs' (Alexander/Cooper) Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346(b)(1), 2671-80, claims for lack of subject-matter jurisdiction based upon no analogous private liability.

STATEMENT OF FACTS

1.  On August 29, 2005, Hurricane Katrina devastated the Gulf Coast of the United States. Three days before the storm struck, on August 26, 2005, the Governor of Louisiana issued Proclamation No. 48 KBB 2005, declaring a state of emergency for the State of Louisiana due to Hurricane Katrina. U.S. Ex. 1 (48 KBB 2005). On August 28, 2005, the Governor sent a letter to the President requesting that the President declare an expedited major disaster for the State of Louisiana in anticipation of Hurricane Katrina. U.S. Ex. 2 (Blanco Letter). On August 29, 2005, the day Hurricane Katrina made landfall, the President issued a declaration of a major disaster for the State of Louisiana (FEMA-1603-DR) based upon the

damage caused by Hurricane Katrina. U.S. Ex. 3 (Fed. Reg. Notice).  This legally allowed FEMA to provide "any . . . forms of assistance . . . deem[ed] appropriate." *Id*.

      2.      The Governor of Louisiana renewed Proclamation No. 48 KBB 2005 on numerous occasions "to extend the state of emergency due to the extreme damage caused by Hurricane Katrina and the continuing disaster and emergency conditions in the most affected areas." *See, e.g.*, U.S. Ex. 4 (37 KBB 2006) (extending the state of emergency through July 22, 2006).  As recently as August 6, 2009, the Governor again extended Proclamation No. 48 KBB 2005 (declaring a state of emergency for the State of Louisiana due to Hurricane Katrina) in limited form, through September 5, 2009. U.S. Ex. 5 (50 BJ 2009).  This was done "to further extend the state of emergency due to the continuation of emergency/disaster conditions." *Id*.

      3.      In addition, on August 30, 2005, the State of Louisiana Department of Environmental Quality, pursuant to its authority under La. R.S. 30:2001, *et seq.*, issued a "Declaration of Emergency and Administrative Order," finding that an emergency existed as a result of Hurricane Katrina. U.S. Ex. 6 (Decl. of Em.).  This declaration of emergency was amended and extended numerous times. *See, e.g.*, U.S. Ex. 7 (11th Am. Decl. of Em.) (finding that the emergency conditions regarding Hurricane Katrina and its aftermath continue to exist and extending the declaration of emergency and administrative order through September 30, 2007).  In its "Fourth Extension of Twelfth Amended Declaration of Emergency and Administrative Order" regarding "The Matter of Hurricane Katrina and its Aftermath," the State of Louisiana found that "the emergency conditions [as amended and limited by recent declarations] . . . will continue to exist until at least March 31, 2009 in [certain parishes]." U.S. Ex. 8 (4th Ext. of 12th Am. Decl. of Em.).

4. The Stafford Act, 42 U.S.C. § 5121, *et seq*., was enacted by Congress in recognition that "disasters often cause loss of life, human suffering, loss of income, and property loss and damage . . . [and] . . . adversely affect individuals and families with great severity." 42 U.S.C. § 5121. The Federal Emergency Management Agency ("FEMA") cannot provide any assistance under the Stafford Act in the absence of a request from a state's governor that the President declare the existence of a "major disaster" or emergency in the area. 42 U.S.C. § 5170. A Governor's request does not mandate Federal assistance. Based upon such a request, the President "may declare . . . that a major disaster or emergency exists," thus allowing FEMA to exercise its discretion to make assistance available.

5. The Executive, through FEMA, retains full discretion to determine and designate both the types of assistance that will be made available and who will be eligible for such assistance. 42 U.S.C. § 5170(b) ("Federal agencies may on the direction of the President, provide assistance . . . [including] . . . (B) search and rescue, emergency medical care, emergency mass care, emergency shelter . . . "). This assistance may be provided for as long as it is "essential to meeting immediate threats to life and property resulting from a major disaster." *Id*. In addition, the Stafford Act allows, but does not mandate, that the Executive ***"may provide financial or other assistance*** . . . to respond to the disaster-related housing needs of individuals and households who are displaced from their predisaster primary residences or whose predisaster primary residences are rendered uninhabitable . . . as a result of damage caused by a major disaster." 42 U.S.C. § 5174(b)(1) (emphasis added).

6. What type of housing assistance, if any, to be provided can be "based on considerations of cost effectiveness, convenience to the individuals and households, and such

other factors as the President may consider appropriate." 42 U.S.C. § 5174(b)(2)(A).  Pursuant to this authority, FEMA is allowed, but not required, to provide direct housing assistance to disaster victims. *See* 42 U.S.C. § 5174(c)(1)(B)(i).  The Stafford Act provides that FEMA "may provide temporary housing units, acquired by purchase or lease, directly to individuals or households." 42 U.S.C. § 5174(c)(1)(B)(i).

7. When FEMA provided a free emergency housing unit to a victim of Hurricanes Katrina or Rita, the victim would sign an "Emergency Shelter - Agreement to Rules of Occupancy." *See, e.g.,* U.S. Ex 9 (Agr. to Rules of Occ.).  Ms. Alexander signed such a document prior to moving into a FEMA unit. *Id*.  The document required Ms. Alexander, as the person who was being provided the "Shelter Unit" to "acknowledge and understand that FEMA is providing this unit as a temporary shelter because the President declared a major disaster or emergency in the area and I am not able to live in my residence due to this event." *Id.*  The agreement required the disaster victim to "accept other housing options, when they become available." *Id*.

8. FEMA continues to consider Hurricane Katrina (FEMA-1603-DR) to be an "active" major disaster. U.S. Ex. 10 (FEMA Disaster Sheet).  FEMA's provision of free emergency housing for the victims of Hurricanes Katrina and Rita concluded on May 1, 2009. U.S. Ex. 11 (FNF-09-009).  This allowed FEMA to exercise its discretion to provide direct housing assistance to qualified disaster victims for up to 44 months. *Id.*  The FEMA-provided emergency housing units, by their very nature, were only made available to victims displaced by the storms because of the "major disaster or emergency" and only continued to be made available based upon a finding that they were necessary to respond to the immediate threats from

an emergency or disaster. *See supra* at ¶5.

    9.    Ms. Alexander lived her entire life in New Orleans. U.S. Ex. 16, Alexander Depo. 297-98/13-13.  Prior to Hurricane Katrina, Ms. Alexander resided with her parents at 4415 Dale Street, New Orleans, LA, and paid them $250 a month in rent. U.S. Ex. 16, Alexander Depo. 303/8-13.   All that Ms. Alexander had was destroyed by the storm. U.S. Ex. 16, Alexander Depo. 250-51/25-2.   It was important to Ms. Alexander that she return to New Orleans because it was home – she did not like living in Florida. U.S. Ex. 16, Alexander Depo. 297-98/13-13. FEMA issued her a trailer. U.S. Ex. 16, Alexander Depo. 298/22-24.  During the entire time she lived in the trailer there was no other available affordable housing in New Orleans. U.S. Ex. 16, Alexander Depo. 298-99/22-20.  She wanted to find someplace else to live, but there was not much housing available and if there had been any available affordable housing she would have moved out of the trailer. U.S. Ex. 16, Alexander Depo. 300/6-25; 00.302-03/14-2.  Ms. Alexander never paid any money or rent to FEMA for use of the Government-owned trailer. U.S. Ex. 16, Alexander Depo. 298/22-24.

    10.    The FEMA trailers were installed by the Government's contractor, or second/third tier sub-contractors. Ex. 15, Blanchard Depo. 15-18/16-19.  The trailers were installed raised off the ground on six piers/blocks and anchored to the ground by four straps. U.S. Ex. 13, H. Allen Depo. 90-92/18-16; 143-45/22-18; U.S. Ex. 14, T. Allen Depo. 30-34/6-7; 85/2-15; U.S. Ex. 15, Blanchard Depo. 21-22/24-10; 62-65/12-16; 69-71/13-5; 77-78/18-1.  The straps were anchored to concrete using special bolts. U.S. Ex. 15, Blanchard Depo. 69-71/13-15. The plumbing was tied into the public sewer system and water line. U.S. Ex. 13, H. Allen Depo. 77-78/2-14; 147-48/22-12; U.S. Ex. 14, T. Allen Depo. 34-35/19-19; 40-41/6-14; 68/1-11; U.S.

Ex. 15, Blanchard Depo. 75-77/14-17; 88-89/11-7; 121- 22/11-24. Wooden steps were built for the trailers and they were also anchored to the ground. U.S. Ex. 13, H. Allen Depo., 71/5-18; U.S. Ex. 14, T. Allen Depo. 30-34/6-7; 34-35/19-19; U.S. Ex. 15, Blanchard Depo. 7/2-18; 88-89/11-7. The trailers were also connected to the public electric grid. U.S. Ex. 13, H. Allen Depo. 147-48/22-12; U.S. Ex. 14, T. Allen Depo. 27-28/18-22; 40-41/6-14; 68/1-11; U.S. Ex. 15, Blanchard Depo. 75-77/14-17; 88-89/11-7. The actual installation of a trailer took between one to four hours depending on the site – and the trailer was not moveable once installed. U.S. Ex. 13, H. Allen Depo., 90-92/18-16; U.S. Ex. 14, T. Allen Depo. 99/5-23; U.S. Ex. 15, Blanchard Depo. 238-40/24-3.

Dated:  August 17, 2009                                           Respectfully Submitted,

TONY WEST
Assistant Attorney General, Civil Division

J. PATRICK GLYNN
Director, Torts Branch, Civil Division

DAVID S. FISHBACK
Assistant Director

HENRY T. MILLER
ADAM BAIN
Senior Trial Counsel

*s/ Adam M. Dinnell*
ADAM M. DINNELL (TX No. 24055405)
MICHELE GREIF
JONATHAN WALDRON
Trial Attorneys
United States Department of Justice
Civil Division, Torts Branch
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20004
Telephone:  (202) 616-4211

## CERTIFICATE OF SERVICE

      I hereby certify that on August 17, 2009, the foregoing document was filed via the U.S. District Court's CM/ECF electronic filing system and a copy thereof was served upon Liaison Counsel.

                                      *s/ Adam M. Dinnell*
                                      ADAM M. DINNELL (TX No. 24055405)