# Transcript of the Testimony of
# Videotaped Deposition of Alana Alexander

### Date taken: June 29, 2009

### In Re: FEMA Trailer Formaldehyde Products Liability Litigation

**\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a **Username** and **Password**.

## Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

EXHIBIT 16

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF LOUISIANA
 3
 4
 5
 6   IN RE:  FEMA TRAILER            MDL NO. 1873
 7   FORMALDEHYDE PRODUCTS           SECTION "N"(4)
 8   LIABILITY LITIGATION            JUDGE ENGELHARDT
 9
10                     *   *   *
11
12         VIDEOTAPED DEPOSITION OF ALANA
13   ALEXANDER, 1619 MIRABEAU AVENUE, NEW
14   ORLEANS, LOUISIANA 70122, TAKEN AT THE
15   OFFICES OF LAMBERT & NELSON, 701 MAGAZINE
16   STREET, NEW ORLEANS, LOUISIANA 70130, ON THE
17   29TH DAY OF JUNE, 2009.
18
19   REPORTED BY:
20       CATHY RENEE´ POWELL, CCR
         PROFESSIONAL SHORTHAND REPORTERS
21       (504)529-5255
22   VIDEOGRAPHER:
23       MICHAEL BERGERON
         PROFESSIONAL SHORTHAND REPORTERS
24       (504)529-5255
25
```

Page 2

```
 1  APPEARANCES:
 2  HILLIARD MUÑOZ GUERRA
       (BY:  ROBERT HILLIARD, ESQUIRE
 3         REYNALDO A. PEÑA, ESQUIRE)
       719 S. SHORELINE BLVD # 500,
 4     CORPUS CHRISTI, TEXAS 78401
 5         ATTORNEYS FOR THE PLAINTIFFS
 6  MIDDLEBERG, RIDDLE & GIANNA
       (BY:  LEZLE PETROVICH, ESQUIRE)
 7     201 ST. CHARLES AVENUE
       NEW ORLEANS, LOUISIANA  70170
 8
           ATTORNEYS FOR FLUOR ENTERPRISES,
 9         INC.
10  DUPLASS, ZWAIN, BOURGEOIS,
       PFISTER & WEINSTOCK
11     (BY: JOSEPH G. GLASS, ESQUIRE)
       3838 NORTH CAUSEWAY BOULEVARD
12     SUITE 2900
       METAIRIE, LOUISIANA  70002
13
           ATTORNEYS FOR DEFENDANT,
14         GULF STREAM COACH, INC.
15  U.S. DEPARTMENT OF JUSTICE
       (BY: ADAM M. DINNELL, ESQUIRE)
16     CIVIL DIVISION
       1331 PENNSYLVANIA AVENUE, N.W.
17     ROOM 8210-N
       WASHINGTON, D.C. 20004
18
           ATTORNEYS FOR DEFENDANT, UNITED
19         STATES OF AMERICA
20
21
22
23
24
25
```

Page 4

```
 1  APPEARANCES CONTINUED:
 2
    GIEGER, LABORDE & LAPEROUSE, LLC
 3     (BY: CARSON STRICKLAND, ESQUIRE)
       701 POYDRAS STREET
 4     SUITE 4800
       NEW ORLEANS, LOUISIANA  70139
 5         (VIA TELEPHONE)
 6         ATTORNEYS FOR DEFENDANT, FOREST
           RIVER, INC.
 7
 8
 9  GARRISON, YOUNT, FORTE &
       MULCAHY, L.L.C.
10     (BY: RANDALL C. MULCAHY, ESQUIRE)
       909 POYDRAS STREET
11     SUITE 1800
       NEW ORLEANS, LOUISIANA  70112
12         (VIA TELEPHONE)
13         ATTORNEYS FOR DEFENDANTS,
           RECREATION BY DESIGN, LLC, TL
14         INDUSTRIES, INC., FRONTIER
           RV, INC. AND PLAY'MOR TRAILERS,
15         INC.
16
17
    JONES, WALKER, WAECHTER, POITEVENT,
18     CARRERE & DENEGRE, LLP
       (BY: RYAN E. JOHNSON, ESQUIRE)
19     FOUR UNITED PLAZA
       8555 UNITED PLAZA BOULEVARD
20     BATON ROUGE, LOUISIANA 70809
           (VIA TELEPHONE)
21
           ATTORNEYS FOR DEFENDANTS,
22         KEYSTONE RV COMPANY, THOR
           CALIFORNIA, THOR INDUSTRIES,
23         DUTCHMEN MANUFACTURING, DS CORP
           (d/b/a CROSSROADS RV) AND KZ RV, LP
24
25
```

Page 3

```
 1  APPEARANCES CONTINUED:
 2  NELSON MULLINS
       (BY: AMANDA N. SHELTON, ESQUIRE)
 3     201 17TH STREET NW, SUITE 1700
       ATLANTA, GEORGIA 30363
 4         (VIA TELEPHONE)
 5     ATTORNEYS FOR DEFENDANT,
           FLEETWOOD ENTERPRISES, INC.
 6
    ALLEN & GOOCH
 7     (BY: LORI A. DAIGLE, ESQUIRE)
       3900 N. CAUSEWAY BOULEVARD
 8     SUITE 1450
       METAIRIE, LOUISIANA 70002
 9
       ATTORNEYS FOR DEFENDANT,
10         HEARTLAND RECREATIONAL VEHICLES,
           LLC
11
12  BAKER DONELSON
       (BY: WADE BASS, ESQUIRE)
13     3 SANCTUARY BOULEVARD, SUITE 201
       MANDEVILLE, LOUISIANA 70471
14         (VIA TELEPHONE)
15     ATTORNEYS FOR DEFENDANTS,
           CH2M HILL CONSTRUCTORS, INC. AND
16         SHAW ENVIRONMENTAL, INC.
17  WILLINGHAM, FULTZ & COUGILL
       (BY: THOMAS L. COUGILL, ESQUIRE)
18     NIELS ESPERSON BUILDING
       808 TRAVIS, SUITE 1608
19     HOUSTON, TEXAS  77002
           (VIA TELEPHONE)
20
       ATTORNEYS FOR DEFENDANTS,
21         JAYCO, INC. AND STARCRAFT
           RV, INC.
22
23
24
25
```

Page 5

```
 1
 2              * * *
 3          EXAMINATION INDEX
 4  EXAMINATION BY MR. GLASS: ..............12
 5  EXAMINATION BY MR. DINNELL: ...........277
 6  EXAMINATION BY MS. PETROVICH: .........340
 7  EXAMINATION BY MR. GLASS: .............375
 8              * * *
 9          INDEX OF EXHIBITS
10  Exhibit No. 1 .........................107
11    Plaintiff Fact sheet for Alana
12    Alexander.
13  Exhibit No. 2 .........................107
14    Plaintiff Fact Sheet for Chris J.
15    Cooper.
16  Exhibit Nos. 3-10 .....................207
17    Discovery responses incorporating
18    interrogatories and requests for
19    admissions.
20  Exhibit No. 11 ........................242
21    Notice of Videotaped Deposition of
22    Alana Alexander.
23  Exhibit No. 12 ........................242
24    "Charlie Age vs. Gulf Stream Coach,
25    Inc., Complaint for Damages,
```

Page 6

1   February 27, 2009.
2   Exhibit No. 13  .......................244
3      Document 1143 in MDL litigation,
4      First Supplemental and Amended
5      Complaint, March 3, 2009.
6   Exhibit No. 14  .......................245
7      Document 1313, Second Supplemental
8      and Amended Complaint, re: "Age,"
9      April 9, 2009.
10  Exhibit No. 15  .......................245
11     Document 1686, Third Supplemental
12     and Amended Complaint, Charlie Age,
13     June 15, 2009.
14  Exhibit No. 16  .......................278
15     Photograph of room Erika and
16     Christopher share.
17  Exhibit No. 17  .......................280
18     Photograph of the "blue room."
19  Exhibit No. 18  .......................281
20     Photograph of the backyard of the
21     Mirabeau address.
22  Exhibit No. 19  .......................282
23     Photograph depicting backyard at
24     the Mirabeau house.
25  Exhibit No. 20  .......................282

Page 7

1      Photograph depicting deck being
2      torn down at Mirabeau address.
3   Exhibit No. 21  .......................285
4      Request for Rental Assistance from
5      FEMA document dated February 20,
6      2008.
7   Exhibit No. 22  .......................292
8      Flier.
9   Exhibit No. 23  .......................301
10     Document entitled "Emergency
11     Shelter Agreement Rules of
12     Occupancy."
13  Exhibit No. 24  .......................306
14     Document entitled "Attention:  FEMA
15     Individuals and Households
16     Program," dated November 2, 2005.
17  Exhibit No. 25  .......................307
18     Document entitled "Attention:
19     FEMA," dated March 29, 2006.
20  Exhibit No. 26  .......................318
21     Resumé for Alana Alexander.
22  Exhibit No. 27  .......................321
23     Document entitled "FEMA, Important
24     Formaldehyde Information for FEMA
25     Housing Occupants."

Page 8

1   Exhibit No. 28  .......................323
2      Document entitled "Claim for
3      Damage, Injury or Death."
4   Exhibit No. 29  .......................324
5      Document entitled "Claim for
6      Damage, Injury or Death."
7   Exhibit No. 30  .......................331
8      Photograph of Alexander unit being
9      tested in January of 2008.

Page 9

                 S T I P U L A T I O N

       It is stipulated and agreed by and
between counsel for the parties hereto that
the deposition of the aforementioned witness
is hereby being taken for all purposes
allowed under the Federal Rules of Civil
Procedure, in accordance with law, pursuant
to notice;
       That the formalities of reading and
signing are specifically not waived;
       That the formalities of filing,
sealing, and certification are specifically
waived;
       That all objections, save those as to
the form of the question and the
responsiveness of the answer, are hereby
reserved until such time as this deposition,
or any part thereof, may be used or sought
to be used in evidence.
                      * * *
       CATHY RENEE' POWELL, CCR, Certified
Court Reporter, in and for the State of
Louisiana, officiated in administering the
oath to the witness.

Page 10

Page 11

1  THE VIDEOGRAPHER:
2      Today is the 29th day of June,
3  2009. The time is approximately 8:21.
4      This is the videotaped deposition
5  of Ms. Alana Alexander, taken at the offices
6  of Lambert & Nelson, for the case entitled
7  "FEMA Trailer Formaldehyde Products
8  Liability Litigation."
9      Will counsel please identify
10 themselves and which parties they represent.
11 MR. HILLIARD:
12     I'm Bob Hilliard. I'm the
13 attorney for Alana Alexander, Christopher
14 Cooper and Erika, who will be deposed
15 tomorrow.
16 MR. GLASS:
17     Joe Glass representing Gulf Stream
18 Coach, Inc.
19 MR. DINNELL:
20     Adam Dinnell for the defendant,
21 United States.
22 MS. PETROVICH:
23     Lezle Petrovich for Fluor
24 Enterprises, Inc.
25 MR. PENA:

Page 12

1      Reynaldo Peña for Ms. Alexander
2  and Mr. Cooper.
3           ALANA ALEXANDER
4  having been first duly sworn as a witness,
5  was examined and testified as follows:
6  EXAMINATION BY MR. GLASS:
7      Q.  Good morning, ma'am.
8      A.  Good morning.
9      Q.  You heard me introduce myself a
10 minute ago. My name is Joe Glass and I
11 represent Gulf Stream Coach. I'm here to
12 ask you some questions today about the claim
13 that's been brought on your behalf and on
14 behalf of your son.
15     Have you ever given a deposition
16 before?
17     A.  No.
18     Q.  I'm sure your attorney has gone
19 through the process, but I'm just going to
20 ask you some questions and you're going to
21 provide those answers to me.
22     You are under oath. Do you
23 understand that?
24     A.  Yes.
25     Q.  If you don't understand a question

Page 13

1  that I ask, please ask me to rephrase it.
2  I'm going to assume that if you respond, you
3  understood my question.
4      If you need a break at any point,
5  just let me know and we'll go ahead and try
6  and accommodate that. This is not an
7  endurance contest or anything like that, and
8  we'll try and accommodate you as best we
9  can.
10     When I ask you a question, if you
11 will please allow me to finish asking that
12 question, please, before you answer, I would
13 greatly appreciate that. You may think you
14 know where I'm going with the question, but
15 I prefer you let me finish it, and that way
16 it will be much more clear on the record and
17 you will know exactly what I am asking.
18     I will try and afford you the same
19 courtesy and allow you to completely finish
20 your response before I go on to my next
21 question.
22     Is there any reason today why you
23 feel like your ability to testify would be
24 impaired?
25     A.  No.

4 (Pages 10 to 13)

Page 158
1  A.  At that time it was Bowers,
2  B-O-W-E-R-S.
3  Q.  And what is it now?
4  A.  Alexander. My cousin married my
5  cousin.
6  Q.  Where do they live?
7  A.  Where did they live?
8  Q.  Where do they live?
9  A.  No, they are separated now. She
10 still lives in Metairie.
11 Q.  Was there anything that was
12 provided to you by FEMA, either verbally or
13 written, that prompted you to come back to
14 New Orleans specifically to live in the
15 trailer?
16 A.  Yeah. When they said that I was
17 approved for housing assistance and that
18 they would provide a trailer on the lot.
19 Q.  Did you have to make any
20 preliminary plans to get the trailer put on
21 your property?
22 A.  Yes, because my daddy owned the
23 property, and since it wasn't in my name, he
24 had to fill out papers giving permission for
25 them to put a trailer on the lot.

Page 159
1  Q.  So he filled out all the
2  information allowing the trailer to be
3  placed on the property?
4  A.  Yes.
5  Q.  Did he do that while you were in
6  New Orleans or while you were still in
7  Florida?
8  A.  I was still in Florida.
9  Q.  Okay. At some point, were you
10 given ownership in the property?
11 A.  In the property? Yes. Well,
12 afterwards, I acquired the property from my
13 mom and dad. They gave it to me.
14 Q.  Do you remember when you received
15 ownership of 4415 Dale Street?
16 A.  I don't remember the exact date.
17 Q.  Was your dad the person who
18 supervised the placement of the trailer on
19 the property?
20 A.  No, my dad wasn't there, my mom
21 was.
22 Q.  Did she sign your name to any of
23 the documentation?
24 A.  No, not to my knowledge, I don't
25 think she did.

Page 160
1  Q.  Did you have to pay any money to
2  obtain use of the trailer when you came back
3  to New Orleans?
4  A.  No.
5  Q.  So how did you get back to New
6  Orleans?
7  A.  My best friend, Donna, was also in
8  Jacksonville, Florida, by her brother. And
9  when school ended for our children, they had
10 a van and a car, and we drove back with
11 them. Or I should say a car. And we drove
12 back.
13 Q.  Was Donna also provided a trailer
14 on her Dale Street property?
15 A.  Yes.
16 Q.  You both received trailers about
17 the same time?
18 A.  No.
19 Q.  When did she receive her trailer?
20 A.  I really don't know.
21 Q.  Was it before or after you got --
22 A.  It was after me.
23 Q.  So where was Donna staying when
24 she came back?
25 A.  Her husband was in New Orleans and

Page 161
1  had gutted out their house, so she went back
2  to the gutted-out house.
3  Q.  So you came back sometime in May
4  once the school year ended at Sabal Palm?
5  A.  Sabal Palm, yes, for my daughter.
6  Q.  Now, we're back in New Orleans and
7  the travel trailer was on the Dale Street
8  property, correct?
9  A.  Correct.
10 Q.  Okay. When you first came back to
11 the property, had anybody been in the
12 trailer before you got there?
13 A.  I think my daddy went in it just
14 to look around it. Because -- they did go
15 in it because I remember my momma calling me
16 and telling me how it looked on the inside.
17 Q.  I'm sorry, your mom told you what?
18 A.  How it looked on the inside.
19 Q.  What did she tell you?
20 A.  That it was small, that it had a
21 kitchen and everything, a big bed in, I
22 guess you could say the master bedroom area.
23 And you know, that was it. She said it
24 looked like a trailer.
25 Q.  Did she say anything about how it

Page 162

1  smelled or how it looked other than just
2  describing what was in it?
3      A.  No, she didn't.
4      Q.  Do you know if the trailer came
5  with any documentation?
6      A.  I would say yes.
7      Q.  Do you know if any of that
8  documentation was removed before you
9  actually got back to New Orleans?
10     A.  I really don't know.
11     Q.  Did your mom or dad say to you
12 that they had taken anything out of the
13 trailer?
14     A.  No, they didn't take nothing out
15 of the trailer.
16     Q.  When you first got back to New
17 Orleans, the trailer was already set up?
18     A.  Yes.
19     Q.  Okay.  Did it have all of the
20 utilities already attached or hooked up?
21     A.  Yes.
22     Q.  So you had running water?
23     A.  Yes.
24     Q.  You had use of the bathroom
25 facilities?

Page 163

1      A.  Yes.
2      Q.  Okay.  The stove was hooked up?
3      A.  Yes.
4      Q.  Okay.  Did the trailer have an air
5  conditioner?
6      A.  Yes.
7      Q.  What about a heater, did it have a
8  heater?
9      A.  Yes.
10     Q.  When you first got to the trailer,
11 had the trailer been aired out at all?
12     A.  No.
13     Q.  It was still locked up?
14     A.  Yes.
15     Q.  Who gave you the keys to the
16 trailer?
17     A.  My mom.
18     Q.  Did your mom tell you that she had
19 been provided any kind of orientation by
20 anyone regarding the trailer?
21     A.  No.
22     Q.  Were you provided any instructions
23 concerning the trailer?
24     A.  After we got in the trailer.
25     Q.  Somebody came out to see you?

Page 164

1      A.  Yes.
2      Q.  Who came out to see you?
3      A.  I'm not sure.  I don't remember
4  what the lady's name was.
5      Q.  Who was she with?
6      A.  I think she was with Gulf Stream.
7  She said she was with the trailer people.
8      Q.  Okay.  What did she tell you?
9      A.  She explained how to hook up the
10 propane tanks and everything.  She told us
11 how to use the stove, how to use the
12 microwave and everything, and she showed us
13 around.  She said the smell that we were
14 smelling was because the trailer was new and
15 had been closed up and to just air the
16 trailer out.
17         Like I say, when we first got
18 there, nobody was there.  So I pointed out
19 to her that the panel in the main bedroom
20 had buckled.  She told me that was because
21 it was held by tape, and because of the
22 humidity in New Orleans, that the tape had
23 come loose and to put duct tape on it.
24     Q.  Did you raise any issues with her
25 about the condition of the trailer?

Page 165

1      A.  Other than the buckling part, no.
2      Q.  Did you notice any issues with the
3  way the doors or the windows worked in the
4  trailer?
5      A.  No.  After she showed us how, you
6  know, to lift it up and push it out, it was
7  simple enough.
8      Q.  Did it seem like the doors and
9  windows fit appropriately?
10     A.  I would say yes.
11     Q.  Did you see any cracks or warps or
12 buckles, anything like that?
13     A.  I would say, no, I didn't.
14     Q.  Okay.  What did she tell you about
15 the use of the stove?
16     A.  She just said that it was hooked
17 to the propane and everything and how to --
18 because it had the automatic ignition.  So
19 you would have to turn it and it would make
20 the click and then the flame would start.
21     Q.  Were you told anything about other
22 things you had to do if you were going to
23 use the stove?
24     A.  No, that's all I was told.
25     Q.  Were you provided any

42 (Pages 162 to 165)

Page 250

1  training to go work on the Shell Refinery
2  property?
3      A.  Yes.  I did drug testing training,
4  I also did respiratory testing training, I
5  did x-ray training and I had some phlebotomy
6  training.
7      Q.  What did the respiratory training
8  entail?
9      A.  It taught -- I had to fit the
10 contractors to wear the respirator when they
11 went into certain parts of the factory.
12     Q.  That the mask fit?
13     A.  Yes.
14     Q.  Was there any training regarding
15 potentially hazardous substances at the
16 refinery?
17     A.  Yes, we all did HAZMAT training.
18     Q.  Did you have to complete courses
19 on the HAZMAT training?
20     A.  No, it was just basic training
21 that they gave at the refinery itself.
22     Q.  Did you receive certifications for
23 that training?
24     A.  I got certificates for it, yes.
25     Q.  Do you still have those

Page 251

1  certificates?
2      A.  All I had was destroyed in the
3  storm.
4      Q.  To obtain those certificates, did
5  you have to complete computer training?
6      A.  No, we didn't have computer
7  training.
8      Q.  Did you have to go someplace for
9  that training or was it done on the Shell
10 property?
11     A.  It was all done on the property.
12     Q.  Were there any other types of
13 training regarding hazardous materials that
14 were used on the actual premises?
15     A.  No.
16     Q.  Did you receive training dealing
17 with MSDSs?
18     A.  Yes.
19     Q.  So you are aware of what MSDSs
20 are?
21     A.  Uh-huh.
22     Q.  That's a "yes"?
23     A.  Yes.
24     Q.  Was there any discussion about
25 potentially toxic or dangerous substances

Page 252

1  that you might be exposed to at the plant?
2      A.  Yes.  There was a discussion, but
3  where the clinic was, it wasn't -- the Shell
4  property was here and the clinic was
5  actually like outside of the gates.
6      Q.  As part of your duties as the EMT,
7  did you have to go onto the premises or into
8  the gates so you could treat people?
9      A.  Only if it was a dire emergency.
10 For the most part, they brought the
11 contractors to us.
12     Q.  How often do you think you went
13 into the actual facility?
14     A.  I would say during the, what they
15 call a turnaround, I was there every day,
16 depending on how long the turnaround was.
17 But if it wasn't a turnaround, I would only
18 go in maybe once a week, or if they -- like
19 I would say, about once a week.
20     Q.  How often did they do turnarounds
21 where you had to go into the plant daily?
22     A.  Most turnarounds lasted anywhere
23 from two to six weeks.
24     Q.  And how many times a year did they
25 occur?

Page 253

1      A.  Turnarounds happened, like, once a
2  year.
3      Q.  Did you ever feel that you were
4  exposed to any dangerous levels of
5  substances while you were at the Shell
6  plant?
7      A.  No, I don't think so.
8      Q.  Did you ever have any complaints
9  that you voiced to anyone at Shell or to
10 your employer at Industrial Safety and
11 Health?
12     A.  No.
13     Q.  Did you ever file a workers' comp
14 claim?
15     A.  No.
16     Q.  You were never injured on the job?
17     A.  I was injured once when I was
18 working with Medic One.  I sprained my
19 wrist.  That was it.
20     Q.  After you left -- well, I'm sorry.
21         How long were you with Industrial
22 Safety and Health?
23     A.  Up until I got pregnant with Erika
24 in '94.
25     Q.  And when you left in 1994, where

Page 294

1  Q. How many pieces of paper would you
2  say you found stuck to that trailer
3  throughout the entire time you lived in it?
4  A. I don't know. I could not give
5  you a number on that. I think they roughly
6  did an inspection every month, and if they
7  stuck one on there and it didn't rain before
8  I got home from work, I got the inspection
9  paper.
10 Q. So we're talking -- you were there
11 in the unit for 19 months, so we're talking
12 somewhere around 20 documents, you think?
13 A. I guess if you want to say 20.
14 Q. It wasn't just two or three over
15 the time you lived in the trailer?
16 A. No, I wouldn't say it was just two
17 or three.
18 Q. There were a lot of documents and
19 papers being stuck to that unit while you
20 lived there?
21 A. Like I said, it was mostly when he
22 came and he inspected it.
23 Q. Sometimes it would rain?
24 A. Yes.
25 Q. And then that document -- well,

Page 295

1  correct.
2  But sometimes you wouldn't be able
3  to read the documents that had been stuck
4  there on the unit?
5  A. That's correct.
6  Q. Because they would get wet from
7  the rain?
8  A. Yes.
9  Q. And during the days, you would be
10 at work, right?
11 A. Yes.
12 Q. So if somebody came by the trailer
13 to give you something and you were at work,
14 they would probably leave it for you on the
15 trailer?
16 A. Yeah, they would stick it on the
17 trailer. And depending if it didn't blow
18 away too.
19 Q. Your first -- I know Joe asked you
20 about this earlier, I just want to quickly
21 recap. You moved into the unit in what you
22 said was May of '06?
23 A. Yes.
24 Q. And you got a job at where?
25 A. Orleans Parish School Board.

Page 296

1  Q. And then you eventually left
2  Orleans Parish School Board and went to KIPP
3  NOLA?
4  A. I didn't leave them. The job
5  ended. It was only a two-month program, so
6  when it ended, by that time I had gotten on
7  with KIPP NOLA.
8  Q. Were you ever working more than
9  one job at one time?
10 A. No.
11 Q. And were your hours basically the
12 same throughout the time period that you
13 lived in the trailer, whether it was with
14 Orleans Parish or with KIPP NOLA?
15 A. No, because Orleans Parish, it was
16 from, I want to say, 8:00 to 3:00, and KIPP
17 is, I will be at work at 7:30, and it
18 doesn't end until 5:45 -- I mean, 4:45, and
19 I would actually get home roughly about
20 6:00, I'd be getting home.
21 Q. Do either your five brothers or
22 your two sisters have asthma?
23 A. No.
24 Q. When you were living in the
25 trailer at the Dale Street address, was

Page 297

1  there still a mailbox at that address?
2  A. Yes.
3  Q. Was the mailbox right along the
4  street?
5  A. Yes.
6  Q. And that's where you would receive
7  mail?
8  A. Yes.
9  Q. And you said right after you moved
10 into the trailer, there would be problems
11 with mail arriving on time and regularly?
12 A. Yes.
13 Q. Now, you've lived -- you have
14 basically lived in New Orleans your whole
15 life; is that right?
16 A. Yes.
17 Q. Aside from after the storm, being
18 in Houston, Jacksonville, you've been in New
19 Orleans from birth to the present?
20 A. Yes.
21 Q. And that 4415 Dale Street address
22 is where you grew up, right?
23 A. Yes.
24 Q. After the storm, why was it
25 important for you -- well, I'll ask: Was it

Page 298

1  important for you to come back to New
2  Orleans after the storm?
3      A.  Yes.
4      Q.  Why?
5      A.  Because I lived here all my life,
6  my mom and my dad was here and I had roots
7  here.  This is my home.
8      Q.  And why not just stay in
9  Jacksonville?
10     A.  Because I didn't like Florida.
11     Q.  You wanted to come back and be
12 around family that was in New Orleans?
13     A.  Family and my home.  This is where
14 I live.
15     Q.  Now, did you ask FEMA for a travel
16 trailer or some sort of housing unit so you
17 could come back to New Orleans?
18     A.  Yes.
19     Q.  And eventually, you were provided
20 with one, correct?
21     A.  Correct.
22     Q.  Did you pay anything for the
23 travel trailer unit?
24     A.  No.
25     Q.  Did you pay any rent to live in

Page 299

1  the unit?
2      A.  No.
3      Q.  When you were first coming back to
4  New Orleans, did you do a search for
5  apartments in the area?
6      A.  Like I say, I had a cousin who
7  lived here, and I had her looking out for
8  reasonably priced apartments.  But after
9  Katrina, when you came back, there was
10 really no reasonable rental places in the
11 city.
12     Q.  There was nothing available,
13 right?
14     A.  I wouldn't say there was nothing
15 available, I would say there was nothing
16 reasonably priced.
17     Q.  And that's why you lived in the
18 trailer, because you couldn't find something
19 that worked for you, correct?
20     A.  That's correct.
21     Q.  Did you ever think about moving
22 into the barber shop building instead of
23 living in the trailer?
24     A.  My mom and my dad and my sister
25 was in the barber shop.

Page 300

1      MS. PETROVICH:
2          Debra?
3      THE WITNESS:
4          Yes, Debra, I'm sorry.
5  EXAMINATION BY MR. DINNELL:
6      Q.  You were saying earlier, and it
7  doesn't take much to figure this out, when
8  you go in these things, the trailer was
9  small and you didn't have much privacy when
10 you were in it, right?
11     A.  Yes.
12     Q.  Did that make you want to try to
13 find another place to live as soon as
14 possible?
15     A.  Yes.
16     Q.  Did you try to find other places
17 to live while you were in the trailer?
18     A.  Yes.
19     Q.  And you just weren't able to find
20 anything?
21     A.  Yes.
22     Q.  And that's because there just
23 wasn't much housing to go around after the
24 storm; is that right?
25     A.  Correct.

Page 301

1      Q.  Let's take a look at what I'm
2  going to mark next in order, which I believe
3  should be Exhibit 23.
4          Take a look at what I'm marking as
5  Exhibit 23 here.  Have you had a chance to
6  look at it?
7      A.  Yes.
8      Q.  All right.  Exhibit 23 is entitled
9  "Emergency Shelter Agreement Rules of
10 Occupancy."
11         And about halfway down, it says,
12 "Name of person assigned the shelter unit,
13 Alana M. Alexander," and then there's a
14 signature there.
15         Is that your signature?
16     A.  Yes.
17     Q.  Did you sign this document?
18     A.  Yes.
19     Q.  It's dated 3-20-06.
20         Were you back in New Orleans in
21 March of '06?
22     A.  No, I wasn't.
23     Q.  Do you know how you were able to
24 sign this document?
25     A.  If I'm not mistaken, I think this

76 (Pages 298 to 301)

Page 302

1  was one of the ones we faxed.
2     Q.  Now, you see up above the
3  signature, the No. 4? Actually, I will go
4  up.
5         The document says, "I have been
6  informed and understand any violation of any
7  of the rules listed below may result in my
8  leaving the unit immediately. I agree that
9  I," and then down below No. 4, it says,
10 "must accept other housing options when they
11 become available."
12        Do you see that?
13    A.  Yes.
14    Q.  Now, throughout the entire time
15 you were in the trailer, there were no other
16 housing options available?
17    A.  Not to me. Like I say, they were
18 way too expensive.
19    Q.  All right. So you abided by the
20 No. 4 in this document, correct?
21    A.  I would say yes.
22    Q.  So if something would have become
23 available for you, you would have moved out
24 of the trailer?
25    A.  Yes.

Page 303

1     Q.  But there was nothing available?
2     A.  Correct.
3     Q.  I just want to pick up a few
4  things.
5         Has Chris always lived with you
6  throughout his whole life?
7     A.  Yes.
8     Q.  When you were living at 4415 Dale
9  Street before the storm, did you have to pay
10 any rent to your parents?
11    A.  Yes.
12    Q.  How much, do you remember?
13    A.  $250.
14    Q.  Did Debra Austin have to pay any
15 rent?
16    A.  Yes.
17    Q.  The same amount?
18    A.  I don't know.
19    Q.  Talking about Chris's health for a
20 moment, when you have used different
21 cleaning sprays and cleaned areas of your
22 house, have you ever seen Chris have an
23 asthmatic response to you doing that?
24    A.  No.
25    Q.  Have you ever seen him have a

Page 304

1  response to you cooking or frying anything?
2     A.  No.
3     Q.  When Chris first walked into the
4  travel trailer unit, did he immediately have
5  any kind of asthmatic response?
6     A.  No.
7     Q.  He didn't have any of the "itching
8  of the chest"?
9     A.  He had that. I mean, the itching
10 of the throat and the runny eyes and the
11 sneezing.
12    Q.  Did he have to use his inhaler
13 right after he walked into the unit for the
14 first time?
15    A.  No.
16    Q.  Now, earlier there was an issue
17 where we were talking about your
18 applications for FEMA assistance and there
19 was an issue with your brother.
20        Do you remember that?
21    A.  Yes.
22    Q.  Do you know if your brother had to
23 return money to FEMA or the government?
24    A.  Yes. I told you that. I said he
25 returned the check.

Page 305

1     Q.  Do you know why?
2     A.  He returned the check because he
3  did not live at 4415 Dale Street, so he gave
4  the check back.
5     Q.  Do you remember there being an
6  issue with your FEMA application where you
7  may have answered a question incorrectly?
8     A.  Yes. It had to do with the
9  address. I'm not exactly -- I don't
10 remember exactly what it was right now. But
11 I did write letters to them often to try to
12 explain the mistake that was made.
13    Q.  Did you call them often?
14    A.  As often as I could. Pretty much
15 every day.
16    Q.  And you knew FEMA's telephone
17 number, right?
18    A.  It was programmed into my phone.
19    Q.  And you knew the address where you
20 should send letters?
21    A.  The address at the time, the
22 address and a fax number.
23    Q.  Do you remember your cell phone
24 number at the time?
25    A.  It has always been the same,