UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION:  N(5) |
| | * | |
| This Document Relates to: | * | |
| *Charlie Age, et al. v.* | * | JUDGE: ENGELHARDT |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | |
| | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF GULF STREAM COACH, INC.'S
MOTION *IN LIMINE* TO EXCLUDE
EXPERT TESTIMONY OF JAMES P. KORNBERG, M.D., SC.D.**

**MAY IT PLEASE THE COURT:**

Gulf Stream Coach, Inc. respectfully submits the following Memorandum in Support of

its Motion *in Limine* to Exclude Expert Testimony of James P. Kornberg, M.D., SC.D.

## I.      BACKGROUND

**A.      Nature of Case**

In the interest of judicial efficiency, Gulf Stream Coach, Inc. ("Gulf Stream") adopts and

urges the same factual background and "nature of the case" that was provided in Gulf Stream's

Motion in Limine to Exclude Expert Testimony of Marco Kaltofen.  (Rec. Doc. 2271-2).

**B.      Alexander's Environmental Medical Causation Expert –
James P. Kornberg, M.D., SC.D.**

Alexander provided twenty (20) written expert reports, including the report of James P.

Kornberg, M.D., SC.D ("Kornberg"), as an environmental medical causation expert in this

case.  Exhibit "A," Kornberg's May 19, 2009 Affidavit.  Kornberg was retained to perform a

comprehensive environmental medical causation analysis regarding the claims of Chris

Cooper ("Cooper") related to his alleged exacerbation of preexisting childhood asthma and the creation of new medical problems since May 2006. *Id.* at p. 2. Kornberg was also charged with considering the need and cost for medical monitoring and early cancer detection. Exhibit "A," at p. 2.

### C.    Basis of Kornberg's Opinions

Kornberg claims to have based his opinions on "training, experience, and the medical and scientific literature." *Id.* Kornberg conducted an interview with Cooper and Alana Alexander to evaluate Cooper's environmental history, family history, social history, habits, and review of systems. *Id.* at pp. 2-4; 15-19. Kornberg also relied upon the "field notes" of Mr. Kenneth A. Henson, plaintiff's "construction expert," who inspected Cooper's trailer on May 6-7, 2009,[1] to further assess Cooper's environmental history. *Id.* at pp. 4-8. Concerning Cooper's medical history, Kornberg examined medical records prepared by Cooper's primary care physician, Dr. Janet D. Barnes (pediatrician), Children's Hospital Emergency Room records, and the expert report prepared by Dr. Karin Pacheco (prepared in anticipation of litigation). *Id.* at pp. 8-14. Notably, Kornberg ***did not*** physically examine Cooper, although Kornberg admits that he "could have certainly examined him." Exhibit "B," Deposition of Kornberg dated 7/9/09, pp. 24-25.

The specific literature that Kornberg relied upon to support his opinions of ***general causation*** were: (1) the affidavit of Kenneth Paris, MD, M.P.H., (2) the affidavit and report of Patricia M. Williams, Ph.D., (3) report of Children's Health Fund, Columbia University Mailman School of Public Health, (4) statement of Christopher DeRosa, MS, Ph.D., (5) report of Judd Shellito, M.D., (6) testimony of Scott Needle, MD, (7) CDC Final Report on Formaldehyde

---

[1]    Kenneth A. Henson was part of Plaintiffs' third wave of experts to inspect the Alexander EHU on May 6-7, 2009. This Court ordered that the results of those tests would not be allowed.

Levels in FEMA-Supplied Travel Trailers, Park Models and Mobile Homes, (8) Toxicology Profile for Formaldehyde, (9) report of Stephen King, Ph.D., and (10) the report of Gerald McGwin, Jr., MS, Ph.D.  *Id.* at pp. 18-19.

In addition to the aforementioned literature, Kornberg's ***specific causation*** opinions are based on his review of certain "agency recommended exposure levels," including, (1) the National Institute of Occupational Safety and Health (NIOSH) Recommended Exposure Limits (REL) and (2) ATSDR Minimum Risk Levels (MRL).  Exhibit "A," at pp. 20-21.  Kornberg's specific causation analysis also references Dr. Paul Hewett's report.  *Id.* at p. 20.  Kornberg generally relied upon the reports of other experts retained by plaintiffs in this case to opine about general causation and patient-specific causation.

### D.    Kornberg's Opinions

Kornberg's general causation opinions are twofold: (1) the "weight of scientific and epidemiological evidence supports the probable conclusion that exposure to formaldehyde can permanently aggravate preexisting childhood asthma to such an extent that the natural history of the underlying condition is changed on a permanent basis," and (2) that it has been "medically established that formaldehyde exposure can cause the development of mucosa hyper-reactivity to chemically unrelated substances that would otherwise not be a problem for the affected individual."  Exhibit "A," at pp. 19-20; 26.

Kornberg's first specific causation opinion is that exposure to formaldehyde at airborne time weighted average levels comparable to those which Cooper was exposed caused Cooper's "substantive and permanent aggravation of his pre-existing childhood asthma."  *Id.* at 26. Kornberg's second specific causation opinion is that Cooper's exposure to formaldehyde caused the development of formaldehyde sensitization, which in turn caused mucosa hyper-

reactivity to chemically unrelated substances that would otherwise not be a problem for Cooper.  Exhibit "A," at p. 26.  Based on these opinions, Kornberg opines that Cooper's "overall condition has become chronic and probably will not remit over time."  *Id.*  "It will probably be manageable only with medications and judicious avoidance of environmentally disadvantageous situations, such as unnecessary exposure to irritants that will provoke hyper-reactivity" in Cooper.  *Id.*  Kornberg claims that Cooper's condition puts him at risk for nasal cancer or nasopharyngeal cancer.  *Id.*  Kornberg therefore planned a medical monitoring program, based on the EPA risk assessment, to monitor the possible outcome of these cancers.  *Id.* at 26-28 and Exhibit "B," at pp. 153-55.

## II.   ADMISSIBILITY OF EXPERT OPINIONS

### A.  Rules 702, 703, *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and Its Progeny

Gulf Stream, in the interest of judicial efficiency, adopts and urges the same law and jurisprudence cited by this Court in its order and reasons granting Gulf Stream's motion to exclude the testimony of Lila Laux., as it pertains to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and its progeny.  (Rec. Doc. 2181).

### B.  Applicable law regarding causation

Causation is an essential element of Plaintiffs' claims and it must be proven by expert testimony.  *Bourgeois v. A.P.  Green Industries, Inc.,* 716 So.2d 355 (La. 1998). Causation opinions that are not based on scientific knowledge will not assist the trier-of-fact and should be excluded.  *Moore v. Ashland Chemical, Inc.,* 95-20492 (5 Cir. 8/14/98), 151 F.3d 269, 279. There is two-step process to determining admissibility of causation evidence in toxic tort cases. *Knight v. Kirby Inland Marine Inc*., 06-60134 (5 Cir. 3/19/07), 482 F.3d 347, 351-52.   First, the district court must determine whether there is general causation, i.e., whether a substance is capable of causing a particular injury or condition in the general population.  *Id.*  Second, if the

4

district court concludes that there is admissible general causation evidence, it must then determine whether there is admissible specific causation evidence, i.e., evidence that the substance caused a particular individual's injury." *Knight v. Kirby Inland Marine Inc*., 06-60134 (5 Cir. 3/19/07), 482 F.3d 347, 351-52.

> **1.)    Kornberg's general causation opinion is unreliable because Kornberg fails to demonstrate that formaldehyde is capable of causing the illnesses allegedly suffered by Cooper.**

To establish general causation, a plaintiff in a toxic tort action must prove that the substance to which he or she was exposed is capable of causing the injury for which the plaintiff is seeking compensation. *In re Joint E. & S. Dists. Asbestos Litig.*, 52 F.3d 1124, 1131 (2d Cir. 1995). General causation is established upon the correct application of certain well-recognized principles known as the Bradford-Hill Standards. *Knight v. Kirby Inland Marine Inc*., 4:01 CV 223-P (N.D.Miss. 3/14/05), 363 F.Supp.2d 859, 863. These standards are used to determine whether the reasoning and methodology underlying an expert's testimony is scientifically valid. *Id.* The Hill Standards comprise "nine different viewpoints from all of which we should study association before we cry causation." Exhibit "C," Sir Austin Bradford Hill, *The Environment and Disease: Association or Causation?* 295-300, 299 (Proc. Royal Soc. Med. 58; 1965). These criteria were designed to answer the "fundamental question" – "is there any other way of explaining the set of facts before us, is there any other answer equally, or more, likely than cause and effect?" *Id.*

Kornberg begins his causation analysis by recognizing that general causation can only be met after a "careful examination" of the scientific literature with consideration of the Hill criteria. Exhibit "A," at p. 17. The Hill criteria ensure the reliability of expert testimony through nine considerations: strength of association, consistency, specificity, temporality, biological

gradient, plausibility, coherence, experiment, and analogy.  Exhibit "C."  The science relied upon by Kornberg purportedly recognizes an association between formaldehyde and the aggravation of preexisting asthma in some children.  Exhibit "A," at pp. 18-19.  This is not the same association that Kornberg wants this Court to observe.

Kornberg opines that formaldehyde ***permanently aggravates*** preexisting childhood asthma in such a way that the underlying condition actually transforms into a ***new asthmatic illness.***  *Id.* at p. 19.  Kornberg referred to this diagnosis during his deposition as "permanent epithelial damage from formaldehyde exposure that resulted in exacerbation of asthma."  Exhibit "B," at pp. 73-74.  As a result, Cooper supposedly suffers from formaldehyde sensitization, which in turn caused mucosa hyper-reactivity to chemically unrelated substances.  Exhibit "A," at p. 26.  This diagnosis is noticeably different from the basic aggravation of preexisting asthma.  Kornberg's general causation opinions are not consistent with the epidemiological studies that he relied upon to establish an association between formaldehyde and Cooper's alleged illnesses.

Kornberg admits that there is no scientific study that supports his "diagnostic end result."  Exhibit "B," at pp. 73-75.  He specifically testified that "there just isn't any study out there."  *Id.* at p. 74.  Instead, Kornberg's diagnosis is "a composite of many different factors, ***which are customized to this specific case.***"  *Id.* at pp. 73-74.  Kornberg cannot dissect multiple studies, pick and choose data, and then reanalyze the data to fit his diagnosis of Cooper.  Kornberg essentially concedes that science has not identified a cause and effect relationship between formaldehyde and asthma.  *Id.* pp. 102-06.  There is even less of an association, or a greater analytical gap, between reliable science and Kornberg's much broader general causation opinion.  Kornberg professes to have utilized the Hill criteria, but in actuality, he failed to do so.

**2.)**   **Kornberg's specific causation opinion is unreliable because his internal causation opinions and his external causation opinions both fail to satisfy Daubert standards**

Specific causation is established when the medical expert isolates an external factor as the cause of internal disease.  *Knight*, 482 F.3d at 351-52.  Expert evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence.  *Knight*, 482 F.3d at 351; citing, *Raynor v. Merrell Pharm.*, 104 F.3d 1371, 1376 (D.C.Cir.1997).  Medical experts can prove specific causation through differential diagnosis - a process of elimination that physicians routinely use to identify the "most likely" cause of a particular individual's illness. *Henricksen v. ConocoPhillips Co*., CV-07-224-JLQ (E.D. Wash. 2/11/09), 605 F.Supp.2d 1142, 1157-58.   This methodology is generally considered an acceptable source of data on specific causation.  *Id.*

But, the ability to diagnose medical conditions (internal cause) is not remotely the same as the ability to deduce, delineate, and describe, in a scientifically reliable manner, the causes of those medical conditions (external cause).  *Wynacht v. Beckman Instruments, Inc.*, 4:98-CV-007 (E.D. Tenn. 9/15/00), 113 F.Supp. 2d 1205, 1209.   Medical practitioners are generally qualified to use a process of elimination to determine the single disease responsible for a particular patient's symptoms (differential diagnosis).  For example, a patient that presents with respiratory complaints could suffer from any number of potential diseases: common cold, pneumonia, infection, asthma, etc.   A physician, through the process of differential diagnosis, may be qualified to determine which of those diseases is responsible for causing that patient's symptoms. Differential diagnosis, however, is not the same methodology used to determine the external cause of that particular disease.  The distinction is internal causation (what disease caused the symptoms) versus external causation (what external factors caused the disease).   External

7

causation is generally determined by a methodology referred to as differential *etiology* – whereby experts conduct tests to eliminate other external causes of plaintiff's disease. External causation opinions must also be based on an objective, independent validation of the expert's methodology. *Moore,* 151 F.3d 269, 279.

Courts oftentimes mistake differential diagnosis as being synonymous with differential etiology.[2] The two methodologies are not the same. This misinterpretation is described in the Federal Judicial Center Reference Manual on Scientific Evidence at 443 (2nd ed. 2000):

> Perhaps because medical testimony is so common and yet not entirely accessible to the lay public, courts have come to use certain medical terms, such as *differential diagnosis* and *differential etiology* in ways that differ from their common usage in the medical profession. For example, although environmental and occupational health physicians may use the term "differential diagnosis" to include the process of determining whether an environmental or occupational exposure caused the patient's disease, most physicians use the term to describe the process of determining which of several *diseases* is causing the patient's *symptoms.*
>
> Expert witnesses and courts, however, frequently use the term "differential diagnosis" to describe the process by which causes of the patient's condition are identified, particularly causes external to the patient. Additionally, courts sometimes characterize causal reasoning as "differential etiology," a term not used in medical practice, but one that more closely suggests the determination of cause."

Fortunately, the Fifth Circuit correctly recognizes the distinction between differential diagnosis and differential etiology. In *Moore,* the plaintiff developed a respiratory disorder shortly after being exposed to toluene fumes at work. *Moore,* 151 F.3d 269, 272. Almost immediately, the plaintiff began experiencing dizziness, watery eyes, and breathing trouble. *Id.* He sought treatment, but the problems persisted, and within weeks he was forced to quit his job. *Id.* Plaintiff was ultimately diagnosed with reactive airways dysfunction syndrome (RADS), a

---

[2]   *Heller v. Shaw,* 167 F.3d 146, 156 (3d Cir. 1999) (allowed a physician to testify about external causation as part of the differential diagnosis methodology simply because the physician relied on some fact or circumstance that indicated the substance could cause the disease.); *Raynor v. Merrell Phar., Inc.,* 104 F.3d 1371 (D.C. Cir. 1997) (using the terms "differential diagnosis" and "differential etiology" interchangeably).

condition his doctors attributed to his exposure to toluene fumes. *Id.* Dr. Daniel Jenkins (plaintiff's causation expert) examined the plaintiff on three separate occasions, performed a series of tests, and reviewed plaintiff's medical records. *Id.* at 273. Based on his examination and tests, Dr. Jenkins opined that plaintiff's RADS had been caused by his exposure to the toluene vapors at work. *Moore,* 151 F.3d 269, 273. In support of his causation opinion, Dr. Jenkins referenced (1) a Material Safety Data Sheet warning that exposure to toulene fumes could cause injury to the lungs, (2) the onset of plaintiff's symptoms shortly after exposure, (3) a case study involving a clerk exposed to toluene in a small enclosed room for two and one-half hours, (4) his training and expertise, and (5) his examination and test results. *Id.* The defendants filed a motion in limine to exclude Dr. Jenkins' causation opinions.

The Fifth Circuit, sitting *en banc*, affirmed the district court's decision to exclude Dr. Jenkins' opinion that toluene vapors caused plaintiff's RADS. *Id.* at 279. The Court concluded that  (1) Dr. Jenkins offered no information regarding the necessary level of exposure required to cause specific injuries, (2) he had no reliable evidence of the dose to which the plaintiff was actually exposed, and (3) he failed to offer any scientific support for the general theory that exposure to toluene at any level would cause RADS. *Id.* at 278-79. In arriving at its decision, the Court referenced a quote from an amicus brief filed by Professor Alvan R. Feinstein, who stated that "determining the etiology of a disease – its cause – involves the same scientific exercise, whether the decision is made by a clinician, an epidemiologist, or other scientist." *Id.* at 275. The Court seemingly adopted this position when it found that a medical expert's opinion as to the causal relationship between a chemical and a plaintiff's disease (external causation) is subject to an objective, independent validation under Daubert. *Id.* at 279. Dr. Jenkins, although qualified to testify about what disease caused plaintiff's symptoms (differential diagnosis), had

failed to satisfy Daubert standards regarding his methodology when determining the etiology of the disease.   The Fifth Circuit affirmed the district court's exclusion of Dr. Jenkins external causation opinion that exposure to toluene caused plaintiff's RADS.

a.)   <u>Kornberg's specific causation opinion is unreliable because Kornberg's differential diagnosis is nothing more than unsupported speculation.</u>

Kornberg, like Dr. Jenkins, began his causation analysis by determining the potential internal causes of Cooper's symptoms.   But unlike Dr. Jenkins, Kornberg ***did not*** physically examine Cooper.   Exhibit "B," at pp. 24-25.   Kornberg relied on the medical reports of other physicians to make a determination of Cooper's final diagnosis – based on the ***probable*** diagnosis identified by Cooper's examining physicians, Dr. Barnes and Dr. Pacheco.   Exhibit "B," at pp. 26-28.   Dr. Pacheco[3], however, disagrees with Kornberg's methodology.   Pacheco testified that examination of the patient "cannot be outsourced" when formulating medical opinions:

> Q:   And before you offered any opinions regarding Christopher Cooper, it certainly would have been important for you to examine Christopher Cooper.  Is that fair?
>
> A:   Yes.
>
> Q:   All right. And why is that important, to examine the patient before forming those opinions?
>
> A:   Because that's almost the entire basis of -- of medical care.
>
> Q:   Okay.
>
> A:   And perhaps one of the things that I like very much about medicine is that it can't -- it can't be outsourced.  You have to see the patient.
>
> Q:   So you would actually have to see the patient to reach any opinions, as opposed to just looking at medical records, correct?

---

[3]   Dr. Pacheco is an occupational doctor at National Jewish Health in Denver.  She tested and examined Chris Cooper at the **PLAINTIFF'S** request.  Cooper was flown to Colorado for that purpose.

MR. PINEDO: Objection, form.

A:      Well, in my estimation, yes.  I -- I would want and have to see the patient, and not just review medical records, to formulate my opinions.

Exhibit "D," Deposition of Karin Pacheco, M.D. dated 7/15/09, pp. 191-92.

Kornberg cannot possibly predict that Cooper has "substantive and permanent" aggravation of his pre-existing childhood asthma and hyperactive nasal and sinus mucosa without ever examining Cooper.  The examining physician, Dr. Pacheco, cannot even make such a diagnosis:

Q:      Yeah, let me -- let me ask the question more precisely.  Is there any way, when an individual is, say, 14 and has asthma, to predict whether that asthma will get better, worse, or stay the same after they pass through puberty?

A:      Not to my knowledge.

Q:      You would have to wait and see?

A:      Yes.

Q:      And the best way to know, with Christopher Cooper, whether any exposure he had to formaldehyde effects that natural course that you would expect, would be to wait and see?

A:      Yes, although I don't think you have to wait till he's 18.  You'd want to see what he is doing at 14, because he ought to be better.  His methacholine reactivity ought to be better.  His symptoms ought to get better.

Exhibit "D," at p. 221.

Kornberg's diagnosis that Cooper's asthma has been permanently affected is not supported by Dr. Pacheco or Dr. Shellito - who both opine that once a patient is removed from an EHU, asthma symptoms should lessen and the preexisting disease should return to baseline. Exhibit "D" at pp. 67-68.  This position, of course, is not conducive to Kornberg's medical monitoring opinion.  So, Kornberg is forced to contradict plaintiffs' own experts on this point.

But his bias has not gone unnoticed. Pacheco testified about Kornberg's failure to be nonobjective doctor:

> Q;   Have you spoken with any other persons who are experts in this case, such as Dr. Kornberg or Dr. Barnes?
>
> A :   Oh right. No, I actually haven't. Dr. Kornberg wanted to have a conversation about this patient, but I never did discuss it with him.
>
> Q:   Why not?
>
> A:    Because, again, my charge is to be as objective as possible. Regardless of who is using me, I was very concerned that Dr. Kornberg was heavily vested in the plaintiffs and I didn't want to hear his point of view.

Exhibit "D," at p. 214.

Kornberg's lack of objectivity is so obvious that Plaintiff's own expert (Pacheco) did not want to hear his "point of view." Neither should this Court.

Kornberg's opinions are further crippled by his incomplete assessment of Cooper. Kornberg relied heavily on the methacholine challenge performed by Dr. Pacheco to support his position the Cooper suffers from "substantive and permanent" aggravation of his preexisting illness. Exhibit "B" at pp. 66; 75-77. The problem with this approach is that Cooper has not previously undergone any other methacholine challenges. *Id.* at 76. This means that Dr. Pacheco's findings cannot be compared to prior test data to determine if Cooper's preexisting asthma has truly transformed into a "new asthmatic illness":

> Q:   So we have no idea what he -- how he would have performed on a methacholine challenge in 2003, correct?"
>
> A:   Of course not. I mean, we don't -- we don't have that data, but --
>
> Q:   All we have -- I'm sorry.

> A:    No, I'm -- I -- I think that it's certainly a possibility that he would have had a
> positive methacholine challenge then as well….

Exhibit "B," at p. 76-77.

Kornberg also focuses on the "persistence of boggy nasal turbinites" as evidence
supporting his opinion that formaldehyde worsened Cooper's preexisting condition.  *Id.* at p. 82.
Again, Kornberg recognizes the likelihood that Cooper suffered from this condition prior to
residing in the EHU.  *Id.*  But somehow Kornberg still claims that Cooper's condition has
***probably*** gotten worse.  Kornberg primarily relies on the medical records of Dr. Barnes to opine
that Cooper's "boggy nasal turbinates" were aggravated because of formaldehyde exposure.  *Id.*
90-92.  Dr. Barnes' records, however, did not include medical records predating Cooper's
residence in the EHU because of flood damage to her New Orleans East office in Hurricane
Katrina.  Again, there is insufficient evidence to compare Cooper's *new asthmatic illness* to the
asthmatic illness that all doctors agree Cooper was suffering from before residing in the EHU.
Kornberg discounted this problem by suggesting that physicians learn to memorize each
individual patient's condition and are capable of recalling that particular condition, even years
later.  Exhibit "B," at p. 100.  Kornberg testified that based on Dr. Barnes' memory of what
Cooper's nasal turbinites looked like two years earlier, "she can determine that they're worse
now."  *Id.* at 99.  Dr. Barnes does not claim to possess such an infallible memory:

> Q.    As we sit here today, can you tell me, since we don't have the records, from
> memory whether he was having boggy nasal turbinates prior to the storm?
>
> A.    I can't tell you that from memory.
>
> Q.    So it's possible he could; it's possible he couldn't?
>
> A.    Right.

Exhibit "E," Deposition of Dr. Janet Barnes (June 4, 2009) at pp. 34-35 – [Kornberg testified that he read the deposition of Dr. Barnes.  Exhibit "B," at p. 89].

Further, Dr. Pacheco testified that the only way to determine whether there is permanent epithelial damage is with a biopsy, something not even Kornberg claims was done.[4]  The reliability of differential diagnosis is decided on a case-by-case basis and is usually dependent upon the expert's performance of physical examinations, taking of medical histories, and employment of reliable laboratory tests.  *Best v. Lowe's Home Centers, Inc*., 08-5924 (6 Cir. 3/12/09), 563 F.3d 171, 178.  Inadequate consideration of these factors makes it much less likely that a differential diagnosis is reliable.  *Id.*  Kornberg did not examine Cooper and Kornberg did not conduct his own tests of Cooper's medical condition.  Kornberg did not review the CT scan films or the pulmonary function test results, only Dr. Pacheco's report of those results.[5]  Kornberg simply reviewed Cooper's medical records and then made his own diagnosis.  Kornberg's "outsourced" diagnosis is not reliable.

       b.)      <u>Kornberg's external causation opinions are unreliable because he fails to provide a differential etiology due to the fact he does not identify the level of formaldehyde exposure necessary to cause Cooper's alleged illnesses and Kornberg's external causation opinions are not based on the exposure level actually experienced by Cooper.</u>

Kornberg's external causation opinions are unreliable for the same reasons identified by the Fifth Circuit in *Moore*.  First, Dr. Kornberg offered no information regarding the necessary level of formaldehyde exposure required to ***permanently*** aggravate Cooper's preexisting childhood asthma.  Nor does Kornberg offer the necessary level of formaldehyde exposure to cause the development of Cooper's hyperactive nasal and sinus mucosa.  Second, Kornberg's specific causation opinions are not based on reliable evidence of the level of formaldehyde to

---

[4]      Exhibit "D," at p. 55.

[5]      Exhibit "B," at p. 28.

which Cooper was actually exposed while residing in the EHU. Third, Kornberg fails to offer any scientific support for the general theory that exposure to formaldehyde at concentrations experienced by Cooper causes permanent aggravation of pre-existing childhood asthma and hyperactive nasal and sinus mucosa.

Kornberg's specific causation opinions assume that Cooper was "episodically" exposed to formaldehyde concentrations as high as 300 ppb (.3 ppm). Exhibit "B," at pp. 41-42 and Exhibit "A," at p. 20. Kornberg also assumes that Cooper "probably sustained" airborne exposure to formaldehyde at levels as high as 100 ppb or more on a time-weighted average while living in the EHU. Exhibit "A," at p. 20. This information will not assist the trier-of-fact. First, Kornberg's so-called "residential exposure levels" are not actual measured formaldehyde levels. Kornberg, like many of plaintiffs' experts, substituted the actual measured data for his own prediction of the worse-case scenario. The Fifth Circuit's decision in *Moore* prevents Kornberg from offering an external causation opinion which is not based on reliable evidence of the level of formaldehyde to which Cooper was actually exposed while residing in the EHU.

The Fifth Circuit also requires medical experts offering external causation opinions to identify the level of exposure necessary to cause a particular disease. Kornberg's opinion fails to do so. Kornberg has not offered any information regarding the necessary level of formaldehyde exposure required to permanently aggravate pre-existing childhood asthma. Likewise, Kornberg has not identified the level of formaldehyde exposure required to cause formaldehyde sensitization, which leads to hyperactive nasal and sinus mucosa. Kornberg simply compares the predicted "residential exposure levels" to selected agency (NIOSH and ATSDR) recommended exposure levels. Exhibit "A," at p. 20. And based on this comparison,

Kornberg concludes that "Cooper was exposed to levels of formaldehyde in his residential living environment that exceeded those recommended for the workplace and those recommended for long term exposure exceeding one year." *Id.* at p. 20-21. Kornberg's use of agency recommended exposure levels as a baseline suggests that Kornberg agrees that not all levels of formaldehyde cause health effects. This is precisely the reason his external causation opinions are unreliable - "at what level *is* formaldehyde capable of causing asthma?" This is the same fundamental question that Dr. Jenkins failed to answer in *Moore*. Kornberg also cannot identify the level of exposure necessary to cause permanent aggravation of preexisting childhood asthma and hyperactive nasal and sinus mucosa. Kornberg fittingly remarked that "you can't take a diagnosis and invent an exposure that fits the diagnosis." Exhibit "B," at p. 33.

> **3.)** **Kornberg's medical monitoring opinion is unreliable because he has not established an epidemiologic link between cancer and exposure to formaldehyde at the levels experienced by Cooper.**

Kornberg's final opinion attempts to establish the necessity for medical monitoring for cancer of the nasal passages because of Cooper's exposure to formaldehyde. Exhibit "A," at p. 26-28. Kornberg opines that, based on the EPA risk assessment, Cooper is at risk for nasal cancer or nasopharyngeal cancer because of exposure to formaldehyde. Kornberg admittedly cannot offer an opinion on cancer epidemiology and formaldehyde without relying on regulatory agencies:

> Q: So you have not done -- have you done a sufficient review of the literature on cancer epidemiology and formaldehyde to give an opinion that formaldehyde causes cancer, nasopharyngeal, if IARC and EPA did not exist?
>
> A: I -- I have not done enough studies to draw those conclusions. There's not one human being that could -- could draw those conclusions.

Exhibit "B," at pp. 165-66.

"Not one human being" has conclusively established that there is an epidemiologic link between cancer and exposure to formaldehyde at the levels experienced by Cooper. Plaintiff's own epidemiologist and statistician, Dr. Gerald McGwin, confirmed that there is no such association. Dr. McGwin testified that while formaldehyde plays an etiologic role with respect to leukemia, lung cancer, pancreatic cancer, and brain cancer, the only cancer definitively caused by formaldehyde is nasopharyngeal cancer. Exhibit "F," Deposition of Dr. Gerald McGwin, (July 27, 2009), p. 15-18. Dr. McGwin, however, *could not associate* nasopharyngeal cancer to formaldehyde at the level present in Cooper's EHU. *Id.* at p. 131—32 (stating that he could not associate nasopharyngeal cancer to the formaldehyde levels identified in the EHUs by the Center for Disease Control (with levels as high as 590 parts per billion)). Dr. McGwin agreed that at those levels, the epidemiology does not provide for an association with this form of cancer. *Id.*

The evidence further shows that International Association for Research on Cancer (IARC) has not set forth an association between formaldehyde and nasopharyngeal cancer at the level Cooper was exposed. Both Dr. McGwin and Dr. Christopher DeRosa, an environmental health scientist formerly with the ATSDR, have testified that the IARC classification of formaldehyde as a known carcinogen is based primarily on a scientific study from the American Journal of Epidemiology entitled "Mortality from Solid Cancers among Workers in Formaldehyde Industries." Exhibit F, p. 223-24; and Exhibit "G," Deposition of Christopher DeRosa (July 6, 2009), p. 256-57. That study concluded that there was no association between formaldehyde and nasopharyngeal cancer below a peak exposure of four *thousand* parts per billion. Exhibit "H," Michael Hauptmann et al., *Mortality from Solid Cancers among Workers in Formaldehyde Industries*, 159 AM. JOURNAL OF EPIDEMIOLOGY 1117 (2004); Exhibit F, p. 21; Exhibit G, p. 257-58. Furthermore, the median duration of exposure in the study was 35 years.

*Id*. at 1119.  This dose and duration of exposure far exceed the dose and duration experienced by Cooper.[6]  Thus, although the study – and therefore, IARC – concludes that there is an association between this cancer and this substance, there is no basis to conclude the association would exist at the levels observed in Cooper's EHU.  *Id*.

> **4.    Kornberg's reliance on the EPA risk assessment is not an appropriate methodology to merit recovery in the form of medical monitoring.**

Kornberg's medical monitoring opinion is unreliable because his calculations are incorrect and he uses regulatory risk assessments as a baseline for determining that Cooper is at risk for nasal cancer or nasopharyngeal cancer.  *Id*.  This methodology is rejected by the Fifth Circuit.

Regulatory risk assessment is of limited utility in a toxic tort case.  In *Allen*, the Fifth Circuit distinguished between regulatory risk assessments and causation in a particular case. *Allen v. Pennsylvania Eng'g. Corp.,* 102 F.3d 194, 198 (5th Cir.1996).  The Court noted that "regulatory and advisory bodies such as IARC, OSHA, and EPA utilize a 'weight of the evidence' method to assess the carcinogenicity of various substances in human beings and suggest or make prophylactic rules governing human exposure."  *Id.* at 198.  "This methodology results from the preventative perspective that the agencies adopt in order to reduce public exposure to harmful substances."  *Id.* "The agencies' threshold of proof is reasonably lower than that appropriate in tort law, which traditionally make[s] more particularized inquiries into cause and effect, and requires a plaintiff to prove that it is more likely than not that another individual has caused him or her harm."  *Allen,* 102 F.3d at 198; quoting, *Wright v. Willamette Indus., Inc.,* 91 F.3d 1105, 1107 (8th Cir.1996).

---

[6]    The levels noted in the scientific study even exceed the formaldehyde monitoring results obtained in May 2009, which the Court has struck. See Affidavit of William D. Scott, dated May 18, 2009, attached as Exhibit "I." The highest test result obtained at that time was 1100 ppb when the indoor temperature of the EHU was just shy of 92 degrees Fahrenheit. *Id*. at 7.

A risk assessment cannot provide the requisite reasonable certainty required to show a medical monitoring injury. *Rhodes, et al. v. E.I. DuPont De Nemours & Co.,* 06-cv-00530 (S.D.W.Va., 9/30/ 08), 253 F.R.D. 365, 377; see also, *O'Neal v. Dep't of the Army,* 852 F.Supp. 327, 333 (M.D.Pa.1994) (determining that risk figures based on the EPA's upper-bound estimates for another chemical are "appropriate for regulatory purposes in which the goal is to be particularly cautious [but] overstate the actual risk and so, are inappropriate for use in determining whether medical monitoring should be instituted.").

The lack of epidemiological evidence establishing a link between cancer and exposure to formaldehyde at the levels experienced by Cooper forces Kornberg to base his opinion on the EPA risk assessment – a method rejected by the Fifth Circuit. Kornberg's medical monitoring opinion is admittedly "driven by exposure." Exhibit "B," at p. 190. Accordingly, if the theoretical cancer risk per unit of formaldehyde exposure concentration is overstated, because it was intended solely for regulatory purposes, then Kornberg's medical monitoring opinion is also unreliable because the true risk is much lower than he calculates. The MRL risk for chronic exposures is 8 ppb multiplied by 70 years; which totals 560 ppb-years or about 7 to 10 times Kornberg's risk for Cooper. Thus, according to Kornberg, even the ATSDR MRL triggers his medical monitoring program even though the MRL is, according to Kornberg, an acceptable exposure and risk. Kornberg compared Cooper's "19 month inhalation dose" to the EPA model to support his recommendation for **40 years** of medical monitoring. *Id.* The EPA risk assessment, however, cannot provide the requisite reasonable certainty required to show a medical monitoring injury.

Kornberg himself testified that EPA risk assessments are "very conservative equations" designed to "maximize exposure." Exhibit "B," at p. 231. This is precisely why they are useless

for establishing reasonable certainty in tort cases. Kornberg's calculations are admittedly more conservative than the already over-cautious EPA risk-based concentration. *Id.* 230-31. For example, Kornberg recognizes that Cooper did not live in the EHU for 24 hours a day. *Id.* Despite this knowledge, Kornberg still based his calculations on a 24 hour-a-day estimate. Kornberg reasoned that when doing this calculation he was "erring on the safe side." *Id.* But, when the objective is to opine about medical monitoring, erring on the safe side of an already rejected regulatory formula only swings the reliability pendulum one degree further from admissibility.

Kornberg's reliance on the EPA "inhalation unit risk factor" to calculate Cooper's theoretical risk of getting cancer is condemned by the EPA. EPA's integrated risk information system (IRIS)[7] identifies the residential air screening level for a number of substances, including formaldehyde. Kornberg's risk based concentration (0.19 micrograms/cubic meter) was derived from IRIS. The EPA has stated the following about using its values to generate safe environmental exposure levels, and has stated so for more than 10 years:

> **In general IRIS values cannot be validly used to accurately predict the incidence of human disease or the type of effects that chemical exposures have on humans.** This is due to the numerous uncertainties involved in risk assessment, including those associated with extrapolations from animal data to humans and from high experimental doses to lower environmental exposure. The organs affected and the type of adverse effect resulting from chemical exposure may differ between study animals and humans. In addition, many factors besides exposures to a chemical influence the occurrence and extent of human disease. (USEPA IRIS, 1998a; USEPA IRIS, 2006; USEPA IRIS, 2008; emphasis added).

http://www.epa.gov/iris/limits.htm.

---

[7]   IRIS is the EPA's compilation of electronic reports on specific substances found in the environment and their potential to cause human health effects. The information in the IRIS assessment is combined with problem-specific exposure assessments to provide the scientific support for EPA's risk management decisions. http://www.epa.gov/iris/help_ques.htm#whatiris

Kornberg ignores the EPA's instructions not to use its "slope factors or unit risk values" to predict the incidence of human cancer.  Kornberg recklessly opines that, "based upon EPA cancer risk based concentration," Cooper should continue medical monitoring directed toward the early detection of cancer of the nasal passages for *40 years*!  Not only does this opinion ignore EPA directives, it contradicts the commendations of the American Cancer Society (ACS).  The ACS does evaluate the validity of screening for certain cancer types and does recommend the use of specific screening tests where they are useful.[8]   However, the ACS explicitly states that "because cancers of the nasal cavity and paranasal sinuses occur so rarely, routine testing of people without any symptoms **is not recommended**."  *Id.*

Kornberg's reliance on the EPA risk assessment is also unreliable because he admits that his calculations are based on the linear non-threshold model:

> Q:     You would agree that the EPA calculation - - in setting the level you used, used a linear no-threshold model correct?
>
> A:     I'm - - I'm not sure that that -- I'd -- I'd have to go back, but I'm pretty sure that that's correct yes.

Exhibit "B," at p. 220.

The linear non-threshold model is a method rejected by Courts because application of such "**fails all of the *Daubert* reliability factors.**"  *Whiting v. Boston Edison Co.,* 891 F.Supp. 12, 25 (D. Mass. 1995).  (emphasis added).  The Court in *Whiting* excluded plaintiff's expert's opinion that low dose exposure to radiation could trigger events leading to the development of acute lymphocytic leukemia ("ALL").  In excluding such opinions, the Court held as follows:

> I find that the opinion…that low doses of nuclear radiation…can cause ALL is not based on scientific knowledge, but is grounded on speculation shaped by result-oriented biases.  The linear non-threshold model cannot be falsified nor can it be validated.  To the extent it has been subjected to

---

[8] http://www.cancer.org/docroot/CRI/content/CRI_2_4_3X_Can_nasal_cavity_and_paranasal_cancer_be_found_early.asp

peer review and publication, it has been rejected by the overwhelming majority of the scientific community. It has no known or potential rate of error. It is merely a hypothesis. In sum, it has no capacity to be of assistance to a jury in resolving the ultimate issues in this case. *Id.*

Other Courts have also precluded such opinions based upon this model providing that opinions based upon it are "flatly rejected as mere hypothesis." See *Parker v. Mobil Oil Corp.,* 793 N.Y.S. 2d 434, 438 (2d Dep't 2005); *Willis v. Amerada Hess Corp.,* 2002 WL 140542, *14 (S.D.N.Y. 2002); and *Sutera v,Perrier Group,* 986 F.Supp. 655, 666 (D.Mass. 1997).

This defendant, however, will not be the only party affected by Kornberg's unreliable opinions. Cooper stands to pay the ultimate price. Kornberg has proposed a series of CT scans and chest x-rays as part of Cooper's monitoring elements. Exhibit "A," at p. 27. Kornberg estimated that Cooper will require a CT scan once every three years and a chest x-ray once every five years for the rest of his life. Exhibit "A," at attachment "B." Kornberg is exposing Cooper to unnecessary and unwarranted levels of radiation.

For exposure to radiation, the excess cancer risk for the general population due to 1 millirem of radiation would be 0.0000005 or $5 \times 10^{-7}$ per mrem. *Environmental Assessment for Cleanup and Closure of the Energy Technology Engineering Center,* App. C-4 (2003). The radiation dose for a CT of the sinuses would be approximately 0.6 mSv. *Radiological Society of North America – CT of the sinuses* (June 29,2009) (radiologyinfo.org) which is equivalent to 60 mrem. (Exhibit "J," Hanford conversions: 1 mSv=100 mrem, so 0.6 mSv=60 mrem). Likewise, a chest x-ray exposes a male to about 8 mrem per procedure (Eric Hall, *Radiology for the Radiologists* (5th Ed.) pp. 207-210 (2000), and each x-ray session includes two x-rays, so each session would involve 16 mrem of radiation.

By comparison then, each CT scan and chest x-ray recommended by Kornberg as a monitoring/screening test poses a cancer risk to Cooper. Each CT scan, for example, poses a

cancer risk 2.56 times greater than Cooper's alleged risk from formaldehyde in his EHU. The total cancer risk from multiple CT scans over Cooper's remaining lifetime (assuming the life expectancy for black males is 69.7 years)[9] is a 48.7 times greater risk than his alleged risk from formaldehyde in his EHU. If Cooper were monitored only for 40 years - Kornberg's latency interval for nasal cancer[10] - Cooper's CT risk would still be 33.3 times greater than his alleged risk from formaldehyde in the EHU. Thus, Kornberg has proposed a medical monitoring program that will pose a greater cancer risk than the incident leading to medical monitoring. In the end, Kornberg will be looking for a cancer that, if seen, is a cancer his program is more likely to have induced because the radiation risks are real, known risks and are larger than the lower hypothetical risk based on EPA regulatory concentrations. In short, Kornberg's proposal is the very antithesis of a good medical monitoring program. And recall as mentioned earlier, the American Cancer Society does not recommend any type of monitoring for nasal and/or paranasal cancer. So, Kornberg has no reasonable, medical, or scientific basis for suggesting that the plaintiff undergo any type of medical monitoring.

Kornberg's medical monitoring is also obviously wrong because the background risk (incidence) of nasal cancer is 1/1,000 lifetime in men (Emil Popovic, et al., *Brain Tumors* (2 ed.) Ch. 43 - Carcinoma of the Paranasal Sinuses (2001)). Thus, if Kornberg's scientific bases for medical monitoring were correct, all men would already be in a medical monitoring program for nasal cancer. But we are not because the ACS has concluded there are no valid screening tests for this disease. Thus, a far lower risk, like that alleged for Cooper, cannot possibly trigger the need for medical monitoring. Kornberg's opinions are unreliable.

---

[9]     Melonie Heron, Ph.D., et al., *National Vital Statistics Report,* Vol. 57 No. 14 (April 17, 2009.)

[10]    Kornberg's Table in Appendix "B" of his report states CT scans for a lifetime, while his report twice states 40 years or more because Kornberg assumed a 40 year latency interval.

# VI.

## Conclusion

Kornberg fails to cite reliable scientific evidence to establish a cause and effect relationship between formaldehyde and the permanent aggravation of preexisting childhood asthma and hyperactive nasal and sinus mucosa.  Kornberg therefore cannot express specific causation opinions as to whether formaldehyde caused, aggravated, or contributed to Cooper's preexisting asthma or hyperactive nasal and sinus mucosa.  Kornberg has not physically examined Cooper.  Nor has Kornberg attempted to provide scientifically accurate data as to the actual level of Cooper's exposure to formaldehyde.  Kornberg also fails to offer any opinion on the level of formaldehyde necessary to permanently aggravate pre-existing childhood asthma and hyperactive nasal and sinus mucosa.  Kornberg's medical monitoring opinion is also unreliable because he uses overly conservative regulatory risk assessments as a baseline for determining that Cooper is at risk for nasal cancer or nasopharyngeal cancer.  For these reasons, the Fifth Circuit recognizes Kornberg's methodologies as being unreliable.

Respectfully submitted,

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER, & WEINSTOCK**

s/Andrew D. Weinstock

_____

**ANDREW D. WEINSTOCK #18495
JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700
Fax: (504) 837-3119
andreww@duplass.com
jglass@duplass.com

and

**SCANDURRO & LAYRISSON**
**Timothy D. Scandurro #18424**
**Dewey M. Scandurro #23291**
607 St. Charles Avenue
New Orleans, LA 70130
Telephone: (504) 522-7100
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of August,, 2009, a copy of the foregoing

Memorandum in Support of Motion *in Limine* to Exclude Expert Testimony of James P.

Kornberg, MD SCD filed o/b/o Gulf Stream Coach, Inc. was filed electronically with the Clerk

of Court using the CM/ECF system.  Notice of this file will be sent to all known counsel of

record by operation of the court's electronic filing system.


s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495