UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  FEMA TRAILER | *     MDL NO. 1873 |
| FORMALDEHYDE PRODUCTS | * |
| LIABILITY LITIGATION | *     SECTION "N" (5) |
| | * |
| | *  JUDGE ENGELHARDT |
| | *  MAGISTRATE CHASEZ |
| | * |
| THIS DOCUMENT IS RELATED TO | * |
| | * |
| *Charlie Age, et al v. Gulf Stream Coach* | * |
| *Inc., et al*, Docket No. 09-2892; | * |
| Alana Alexander, individually and on behalf of | * |
| Christopher Cooper | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## AFFIDAVIT OF JAMES P. KORNBERG, M.D., SC.D.

STATE OF COLORADO
COUNTY OF BOULDER

**BEFORE ME**, the undersigned authority, on this day, personally appeared:

James P. Kornberg, M.D., Sc.D.

Who, first being sworn, upon his oath deposed and stated that the information
contained in the attached report is true and accurate to the best of his knowledge.

*James P. Kornberg MD*

James P. Kornberg, M.D., Sc.D.

Sworn to and subscribed
before me this 19th day of May, 2009.

*Diana M. Bara*                    #: _____
NOTARY PUBLIC

My commission expires ___8/8/09_____

```
DIANA M. BARA
NOTARY PUBLIC
STATE OF COLORADO
```
My Commission Expires 08/08/2009

# ENVIRONMENTAL MEDICAL CAUSATION REPORT

## INCLUDING CONSIDERATION FOR THE NECESSITY AND COST OF MEDICAL MONITORING AND EARLY CANCER DETECTION

### Christopher James Cooper

**James P. Kornberg, MD, Sc.D.**

**May 19, 2009**

ALX-EXP-32-000002

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 2

## Christopher James Cooper

**Date of Birth**: December 18, 1996, New Orleans, Louisiana

## ENVIRONMENTAL MEDICAL CAUSATION ANALYSIS
### INCLUDING CONSIDERATION FOR THE NECESSITY AND COST OF MEDICAL MONITORING AND EARLY CANCER DETECTION[1]

## Introduction

The first purpose of this report is to perform a comprehensive environmental medical causation analysis regarding the claims of Mr. Chris Cooper related to his developing exacerbation of preexisting childhood asthma and the creation of new medical problems since May 2006.

As a corollary effort to the preceding endeavor, the next purpose of this report is to consider the need and cost for medical monitoring and early cancer detection.

The need for both analyses have evolved as a direct result of Chris Cooper's having lived in a Gulf Stream travel trailer with his mother and sister between late May 2006 and late December 2007 (19 months). This trailer was supplied by the United States Federal Emergency Management Agency (FEMA) and was installed and maintained by Fluor Corporation and its wholly-owned subsidiary, following the family's dislocation after Hurricane Katrina on August 28 and 29, 2005.

In performing these tasks, in addition to reliance upon my training, experience and the medical and scientific literature, I have reviewed and considered the following information:

## I. Environmental History and Exposure Information

### I A. Environmental History

**Interview with JPK on 5/13/09[2]**

Prior to his dislocation, Chris lived with his mother[3] (Alana Alexander) and older sister, Erika,[4] in a single family dwelling in New Orleans East built by his maternal grandfather

---

[1] Information in brackets [ ] or parentheses ( ) are mine unless otherwise specified.
[2] JPK (James P. Kornberg, MD, Sc.D.) interview of Chris Cooper and Alana Alexander (Chris' mother) on Wednesday May 13, 2009.
[3] Ms. Alexander was born 8/12/66
[4] Erika was born 7/31/94

ALX-EXP-32-000003

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 3

in the early 1950s. The house had a central heating system. Chris' mother indicated that the system was properly maintained. There were tile and wood floors throughout the home and carpet in Chris' bedroom.

After Hurricane Katrina at the end of August 2005, the family was displaced and lived part of the time in Houston, Texas and in Jacksonville, Florida. While living in Jacksonville and before returning to New Orleans, Ms. Alexander indicated that she had spent several weeks applying for housing assistance for her family.

In May 2006, Chris, his sister Erika and their mother, returned to occupy the Gulf Stream manufactured, FEMA provided travel trailer that was supported on cinder blocks on the driveway of their formerly flooded home. This trailer was supplied with domestic cold water from the spigot of their former home. Sewer and electric service were connected to municipal sources. Along with a roof-mounted air conditioning unit, there was a wall-vented heating system that provided forced hot air through under mounted ductwork. Propane provided fuel for the heating system and the kitchen stove.

Upon first entering the trailer, Ms. Alexander indicated that she noticed a powerful "chemical smell," that caused throat ("tickle") and eye irritation. Ms. Alexander noted that she contacted the representative of the installer who advised her to open the windows and turn on the air conditioning to air out the trailer.

When Ms. Alexander first entered the "master" bedroom[5] located at the south end of the trailer, she noted that the paneling had separated on the east wall of the room. Protruding from this separation was fiberglass insulation. She did not discern any vapor barrier or facing material over this insulation. Ms. Alexander indicated that she completed a temporary repair of this separation with silver duct tape. In the same manner, at a later time, she also repaired another subsequent separation of paneling behind the toilet in the small bathroom located along the north portion of the east wall.

When it rained Ms. Alexander noted that she found water leaking from the overhead fixture in the master bedroom. Chris stated that there was also a water leak point that emanated from a wall mounted reading light next to Erika's and his bunk beds along the north portion of the west wall of the trailer.

In Fall, 2006, Ms. Alexander indicated that she noticed mold growing around the kitchen window. The mold was gray in color with some black spots present as well. She cleaned

---

[5] All references to trailer orientation will be made looking down at a drawing of the trailer from above with the tongue of the trailer (that part that would be connected to a towing vehicle) pointing to the bottom of the page. In this orientation the tongue is pointing south, and the part of the trailer farthest from the towing vehicle would be north. Part of the information regarding orientation and location of descriptors of the trailer was based upon the notes (Henson inspection notes) and discussion (May 8 and 15, 2009) with construction expert, Mr. Kenneth Henson who inspected the trailer on May 6 and 7, 2009.

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 4

this mold with "bleach water." The mold returned after about a month and was cleaned away in the same manner.

Ms. Alexander indicated that the propane heater in the trailer became dysfunctional in the winter of 2006; so she bought an electric heater to heat the trailer. She had other problems with the trailer including accessibility to the interior of the trailer by mice that were able to enter through the sewer pipe in the floor. Apparently the area surrounding the pipe was not tight. She remedied the situation by stuffing steel wool around the pipe.

During June and July 2007, the family was temporarily moved from their trailer to a motel for two days while their former house was torn down.

Ms. Alexander indicated that in December 2007, seeing Chris' medical problems and hearing about the formaldehyde exposure issue, she made the decision to move out of her trailer because she was concerned about the health of her children and herself.

At the present time, the patient and his family live on the second floor of his mother's sister's house. The house does not have any carpeting anywhere throughout the house including Chris' room. Chris' five medications are carefully monitored by his pediatrician, Dr. Janet Barnes (see VIII). Because he is under adequate medical control at the present time Chris is able to enjoy his hobbies of reading magazines and playing the saxophone and touch football.

## I B.  **Environmental History**

### **Notes of Mr. Kenneth A. Henson – construction expert[6] - 5/6 and 5/7/09**

"Observations and Opinions"

The family lived in FEMA trailer #1041407, now situated in a government-secured area in Lottie, Louisiana.

The trailer is a "Gulf Stream Cavalier" manufactured on December 13, 2004.

The trailer is 28 feet 4 inches long and 8 feet wide. It is a dual axle; all four tires were installed on the unit.

The trailer was noted to be "pretty dirty and mildewy" on the exterior; but no worse than other trailers around it.

---

[6] Information is abstracted from the field notes of Mr. Henson, who inspected the patient's trailer on 5/6 and 5/7/09. I discussed his notes with him on 5/8/09 and interviewed him again by telephone on 5/15 and 5/17/09.

ALX-EXP-32-000005

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 5

The exterior siding was noted to be "very thin metal." Without disassembly, it was unclear how it was fastened to the walls. Mr. Henson guessed that the metal siding pieces were attached by concealed fasteners in what he called a "Pittsburgh lap." He noted that there were "a few screws missing in some [of] the trim pieces. The screw pattern appeared to be on 6" to 8" on center. He did not think that these missing screws were "that big of a problem." He noted that pictures were taken of these missing screws. About 30" from the bottom on the east exterior wall, there was a broken exterior electrical receptacle with wires exposed. Henson noted that the wires appeared to be 14 gauge.

Mr. Henson crawled under the trailer. He noted that the "protective under framing barrier" appeared to be a reinforced black plastic (Tyvek-like) material. He stated that "this material has water trapped between it and the floor joists and insulation." He stated that the material was definitely a water barrier but he was uncertain whether it was "breathable."

Floor joist construction was 2 ½ by 1 ½ inch pine. He found these joists spaced between 14 and 16 inches apart. 11/16 inch particle board was used for the sub floor everywhere that he could see.

He was unable to determine the precise material used for roof covering. He concluded that it was either a TPO or EPDM rubberized material stretched over thin (about ¼ inch) luan (plywood) sheeting. He was not certain about the composition or size of the ceiling joists or the nature of the insulation because he was not permitted to take any of these structures apart for inspection. He said "There were no viewing points to determine this."

He noted that the rubber roof material did not seem to be glued down very well. He could tell that it was loose on top of the sheeting. It appeared that on the north and south ends of the roof there were exterior rounded trim pieces that were adhered to the roof membrane with a material like a double stick "ice and water shield" product. Screws then penetrated the trim pieces, the double stick material, the membrane and the underlayment. Mr. Henson indicated that the underlayment roofing material was easily flexible by pushing on it. He thinks that it must have been luan plywood, no more than 1/8 - ¼ inches thick. Mr. Henson concluded that an average sized man could not walk on the roof of the trailer without risking damage to it.

He noted that all windows and seams were caulked and that there was no evidence of additional repairs or maintenance except what was done at the factory. No caulking appeared newer than any other.

He noted that at the point where the roofing met the front and back walls, the caulking failed and permitted water to enter the walls.[7] He noted that the joints were "real

---

[7] My history is consistent with the claim that there were interior leaks in the trailer – one from the ceiling light in Ms. Alexander's bedroom (south portion of roof) and another through the wall mounted reading light by Erika's bed (bunk beds along the northern portion of the west wall).

P.007                                                          1ST BANK        16:39   MAY-19-2009

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 6

spongy." He stated that the "caulk job" on the joints was pretty sloppy. There was no effort to clean-up or remove excess sealant.

He noted that there was no obvious abuse of the exterior of the trailer.

The horizontal exterior trim along the bottom of the trailer had exposed screws. The vertical exterior trim had covered screws, and this was the area where a few screws were missing. He noted that they appeared to have never been installed because the paint was not scratched at all around the screw holes.[8]

At the roof penetrations there was a putty type sealant used that did not seem to be adhering to the rubberized roofing material very well. Mr. Henson concluded that this may be a possible leaking point.

Upon entering the trailer, from the west side (right hand out-swing door), Mr. Henson reported[9] that the floor directly east of the threshold appeared poorly supported, by possible deterioration of the sub floor particle board. This problem was so concerning that blue tape was placed over the linoleum to avoid placing weight on the affected area.

Per his observation, the wall construction was metal exterior sheeting on 1 ½ by 1 ½ inch pine studs on 16 inch centers with a "white batting type insulation,"[10] The insulation was unfaced and no vapor barrier was between the insulation and the wall.

The inside sheeting was a very thin luan material with joints between sheets taped together with only a "sticky tape" that matched the wall sheeting color and pattern. He was unable to discern the grade of lumber used. His guess was #2 or lower by observing a few knots in the studs.[11]

The interior ceiling of the trailer was also covered with luan interior sheeting of the same color and pattern as the walls. The seam tape used on the interior luan joints was loose and bubbled in places.

There were major taped seams and joint failures inside the trailer. Mr. Henson concluded that these appeared to be caused by "jacking of trailer and stressing the shearing ability of the interior sheeting." The joints in the master bedroom (south end) and bath (north portion of east wall) were repaired by using (silver) duct tape. He notes "I should say

---

[8] Had the screws been installed and then backed out and lost, the screw hole would have probably shown evidence of scratching from the initial installation of the missing screws. These screw holes may have been skipped during factory construction of the trailer.
[9] Telephone interview with Mr. Henson, May 17, 2009
[10] In my experience white insulation may be formaldehyde free.
[11] Mr. Henson informed me that the "rule of thumb" in determining lumber grade is that if the studs are knot free or if the knots are smaller than a dime, the lumber is probably grade #1.

ALX-EXP-32-000007

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 7

attempted repair. They re-opened." In fact he indicated that these openings afforded him his construction viewing points.

Corner trim and molding was a PVC type material on the walls and the ceilings on the interior of the trailer. "In field" seams were all taped. Wall sheeting was stapled onto the studs using narrow crown (very thin[12]) short staples. ¼ inch crown – ½ inch long and appeared to be less than 1/16 inch gauge wire staples. Wall sheeting thickness was 1/8 – 3/16 inch as estimated by tape measure. He measured a little over 1/8th inch.

The flooring was carpet and linoleum. The linoleum covered the entire floor as best as he could tell, "even under the carpet, cabinets, beds, in closets, etc." Mr. Henson removed registers that were not fastened down – just set in place. There were no holes pre-drilled or made in the register. Upon removing the register, he found that the linoleum was not glued down. It was just laid in place and held in place by the wall construction and other fixed structures in the trailer such as the beds and cabinets. Mr. Henson slid the 24 inch end of a framing square under the linoleum to try to see if it was glued in place. He did this by two different registers in the living area and in front of the bathroom. It was not glued down.

By using a two-foot level, Mr. Henson determined that the floor was heaved or risen up behind the toilet (north part of east wall), in front of the sink (south of toilet on east wall) and under the bunk beds (north part of west wall). He noted that the luan sheeting behind the toilet was open and had been duct taped. He thought that the particle board on the floor may have become wet, swelled up, caused the observed floor heaving, and may have also contributed to the separation of the luan wall sheeting.

When trying to inspect the sub-floor, he was very restricted because he could not deconstruct the floor. By lifting one area and looking with a flashlight in a limited space, he could see one screw used as a fastener for the sub floor to the floor joists. He was unable to determine the screw pattern of particle board to floor joists (how many, how far apart). He was also not sure how long the floor screws were, although he did note that the screw heads were designed for a square drive.

He noted that the floor insulation thickness was 2 ½ inches – white –unfaced and the wall insulation was 1 ½ inches thick, as mentioned, also white and unfaced.

Mr. Henson indicated that the axles (axis is east-west) and frame (axis is north-south) appeared to be pre-load stressed. The frame (north-south) was slightly bowed in the center. He estimated that it was bowed up in the middle about 3/8 inches in the center. When inspecting the frame, he noted that there seemed to be locations of blocking or jacking of the trailer. He noted these by looking at the lack of discoloration, lack of dirt

---

[12] By "very thin," Mr. Henson meant as thin or thinner than a paper staple. This method of construction may have permitted luan interior sheeting to separate from the studs, thus stressing an unattached monolithic assembly of luan sheets that was only taped together at the seams.

ALX-EXP-32-000008

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 8

and rust. One area was 24 inches from the front of the frame on the trailer frame itself (axis runs north-south). The width of this undisturbed spot where blocking may have occurred was 3 ½ inches – the same as dimensional lumber like a 2 by 4 or a 1 by 4. It is also possible that there was another area of blocking or jacking of the trailer on the rear of the frame 13 inches to 16 ½ inches from the rear (again spacing would fit dimensional lumber). In this area there were also very faint markings.

Mr. Henson stated, "Construction methods and practices, in my opinion, were done as cheap as possible – not gluing floor down, using smallest cheapest fasteners, using luan wall sheeting, using thin insulation, using particle board sub-flooring, using particle board cabinets (overlaid with oak looking paper). The bath tub, toilet and bath sink looked to be made of a plastic (PVC) type material.

He noted finally that there was a gas-fired [propane] stove and that the gas-fired [propane] heater was forced air. There was an air conditioning unit on the roof. The position of the exterior waste water venting was indicated by a loose strap on the exterior of the trailer. He confirmed this observation by noting the position of identical straps in the same location on the exterior of other trailers in the vicinity of the one he was inspecting. There were two other roof penetrations, a plumbing vent and a vent over the bathroom area.

## II. History of Present Medical Problem

### Current Physicians:

- Primary Physician – Janet D. Barnes, MD, MBA, (Pediatrician) New Orleans, Louisiana

### 12/18/96 – May 2006[13]

In winter 1999, when Chris was age 3, he experienced the onset of cough and trouble breathing. He was taken by his mother to University Hospital where he was diagnosed with pneumonia and admitted for treatment. He was treated with antibiotics, oxygen and respiratory therapy. He remained in the hospital for seven days.

In late 2001, Chris had a repeat episode of breathing difficulties that required hospitalization for two days at LSU University Hospital. On this occasion, he was diagnosed with asthma and left lower lobe pneumonia and was treated again with antibiotics and oxygen. He was also treated with prednisone on this occasion and was provided with a home nebulizer unit. His mother continued with home treatments, using

---

[13] Some medical records are unavailable at the time I completed this report.

P.010                                                        1ST BANK        MAY-19-2009  16:39

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 9

albuterol for about seven days post hospitalization. He was also prescribed an albuterol inhaler, in case he experienced episodic problems.

After 2001, Chris never required re-hospitalization for pulmonary asthmatic problems. He did continue to experience limited asthmatic episodes about two to three times per year when the weather changed with winter being the worst season. On these occasions, he was treated at home with his nebulizer and his albuterol inhaler. On other occasions, he estimated that he may have required no more than about two puffs of his inhaler every week.

By the time that he and his family entered the FEMA supplied trailer, Chris' mother indicated that his condition was clinically stable and managed without difficulty. He was under the care of Dr. Janet Barnes, pediatrician at the time of Hurricane Katrina at the end of August 2005.

After the family was displaced, while living in Texas and Florida, Chris was followed intermittently by local physicians in these locations. His medication needs were apparently limited.

## May 2006 – October 2007

During the first 17 months of occupancy, Chris' mother described a somewhat insidious onset of escalating symptoms and problems. These included exercise[14] and temperature change induced chest tightness, along with Chris' more frequent need for medication. When noticing chest tightness, Chris would tell his mother that his chest "itched." This communication preceded his need for his albuterol inhaler.

Episodes that had occurred two to three times per month and were treatable with two puffs of albuterol were occurring weekly and were found to be refractory to as many as six puffs or more. His episodes were manageable at home with medication. By October 2007, however, Chris had run out of medication. His mother made an appointment to see his pediatrician, Dr. Barnes.

## 10/4/07 – Primary Healthcare Associates[15]

### Dr. Janet Barnes - pediatrician

Initial Screening – The patient presented with need for more asthma medication, specifically a refill for his albuterol inhaler.

---

[14] Chris had developed a hobby of playing touch football and became symptomatic when he ran hard or moved from an indoor environment to cooler temperatures outside.
[15] Medical records of Janet D. Barnes, MD, 10/4/07

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 10

On physical examination, he was found to have "boggy nasal turbinates" and eczema on his right arm. This eczema involved the lateral anterior forearm and extended into the antecubital fossa[16] (customary area on the anterior arm where blood is drawn).

He also was noted to have failed a hearing screening test at 1000 Hz bilaterally. He had no evidence of impairment to subjective voice response, delayed speech development or recurrent otitis media.

**Dr. Barnes' assessment was that the patient had "sinusitis, atopic dermatitis and asthma, along with the comment that he was "overweight for [his] height."**

Dr. Barnes' prescribed:

Clarinex D-12 (desloratadine [H1 antihistamine antagonist] and pseudoephedrine [decongestant]) [oral preparation taken every 12 hours].

Singulair (montelukast sodium [leukotriene receptor antagonist]) – 10mg po qd (by mouth daily)

Flovent Inhaler (fluticasone [corticosteroid]) qhs (every night)

Elocon Ointment (mometasone furoate [0.1% fluorinated steroid])

She ordered the following laboratory:[17]

---CMP [comprehensive metabolic panel] – abnormalities:

---Total cholesterol = 202 mg/dL (125-170); LDL-cholesterol = 113 mg/dL (<110 calc);

---Hemoglobin A1 =55.9% (>96%); Hemoglobin C = 40.9% (not found) - The laboratory reported that hemoglobin electrophoresis results are consistent with Hemoglobin C trait.

---The remainder of the laboratory results, including urinalysis was within normal limits.

---ABO group results = AB+

The patient was requested to return to Dr. Barnes' clinic in two weeks time.

---

[16] JPK telephone interview with Dr. Barnes, 5/15/09
[17] Normal ranges are placed in parentheses.

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 11

## 10/18/07 - Primary Healthcare Associates[18]

Dr. Barnes saw the patient and reported that his physical examination was within normal limits.  Her assessment was that the patient had hypercholesterolemia. She provided dietary counseling. She recommended a return to the clinic in three months or as needed.

## 12/4/07 – Children's Hospital Emergency Room

The patient was referred for evaluation and treatment by Dr. Barnes.

**Nurse's name was illegible:[19]**

The patient presented with "coughing fits:" It was noted that his past medical history was "asthma." It was noted that the patient was taking Singulair (montelukast) and Clairitan D (24 hour – desloratadine and pseudoephedrine).

He had decreased breath sounds in his lower lobes. He was assigned to a bed by the triage area and placed on a continuous (?) pulse monitor. His O2 saturation was initially 94% then increased to 96%. Orapred (prednisolone) 50mg was given orally.

**Physician's name is illegible:[20]**

The patient was noted to have been a 10 year old male with a history of asthma who complained of chest tightness and a cough since the previous night. He denied treatment at home. The doctor reported that his "Last episode of wheezing was one year ago."[21] He denied fever and had cough without rhinorrhea. He was noted to have decreased breath sounds on the right. The patient was treated by nebulizer with a total of 15mg of albulterol, 500mg of atrovent and 50 mg of prednisone over a 1.5 hour period. The patient's diagnosis was **"Asthma Exacerbation."**

---

[18] Medical records of Janet D. Barnes, MD, 10/18/07
[19] Children's Hospital ER nursing screening and assessment record, 12/4/07
[20] Children's Hospital Emergency Department Record, 12/4/07
[21] This language is confusing and misleading. I spoke to Dr. Barnes about this comment in great detail. As reported by the ER physician on 12/4/07, the patient had not had significant episodes of asthma flare-up since 12/06. This was accurate because the patient had been under good medical control with the judicious use of his medications. His mother, however, did indicate that the patient had had increasing problems and need for increasing medication during the period from 5/06 until 12/06. During the time period from 12/06 until 10/07, although he had had no major flare-ups, he was probably wheezing because he had used up his medications, thereby, prompting his need to see Dr. Barnes on October 4, 2007, for a checkup and medication prescription. Importantly, at that time, the patient showed objective evidence of swelling in his nasal turbinates, consistent with irritant and/or allergic etiology

ALX-EXP-32-000012

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 12

The patient was discharged with instructions to see his family physician in two to three days. He was also instructed to continue with his albuterol inhaler, taking 2 puffs as needed and to take prednisone for four days.

Although not mentioned in this record, the patient's mother indicated that the patient had developed eczema on the back of his legs at the level behind his knees (popliteal fossa).[22]

### 4/17/08 – Primary Healthcare Associates[23]

**Dr. Janet Barnes – pediatrician**

The patient presented complaining of "red, itchy, runny eyes." His mother reported that the patient had awakened with itchy red eyes, was given some benadryl and improved. He was also noted to be "out of Clarinex D."

His physical examination was within normal limits except for "nasal stuffiness, boggy turbinates; sclera mildly irritated and dark lower lids."

Dr Barnes' assessment was "Allergic conjunctivitis."

She prescribed:

Patamol Eye drops (Olopatadine [H1 receptor antihistamine])

Clarinex D-12 (desloratadine [H1 antihistamine antagonist] and pseudoephedrine [decongestant]) [oral preparation taken every 12 hours].

Bendadryl (diphenhydramine – anti-histamine) 2 teaspoons 6h

The patient was instructed to return to the clinic on an as-needed basis.

### 6/2/08 – Dr. Pacheco's report[24] - "Children's Hospital emergency room visit for asthma exacerbation, in part as the patient had run out of his medications. He reported chest hurting and chest tightness with rhinorrhea and cough. He had run out of inhaled albuterol. He was treated with nebulized albuterol, and albuterol and Pulmicort were reportedly continued on discharge."

---

[22] JPK interview of Chris Cooper and Alana Alexander (Chris' mother) on Wednesday May 13, 2009
[23] Medical records of Janet D. Barnes, MD, 4/17/08
[24] Report of Dr. Karin Pacheco, National Jewish Health, 5/18/09, p. 5

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 13

**7/30/08 – Dr. Pacheco; report**[25] – "Children's Hospital emergency room visit for left eye swelling for about three hours. On exam the sclera was injected and the conjunctiva was swollen. The patient was diagnosed with an allergic reaction and treated with Patanol. Medications included Benadryl as needed, and an albuterol inhaler last used one month prior."

## 4/24/09 – Primary Healthcare Associates[26]

### Dr. Janet Barnes – pediatrician

The patient's mother noted that the patient was complaining of a sore throat, watery red eyes, congestion, and a runny nose. She indicated that she would like to have some lab work performed.

Dr. Barnes noted that Chris and his family lived in Jacksonville, Florida after Hurricane Katrina until May 2006. She noted that they moved back to New Orleans in May 2006 and lived in a "FEMA trailer" from 5/06 until 12/07.

She indicated that the patient had asthma and sinusitis prior to the hurricane and was followed at her Bullard Avenue office until the patient was 8 years old when the hurricane hit. She stated that the chart from that office was lost[27] and that the patient also lost the pulmonary nebulizer in his home during the storm. She noted that the patient had been receiving albuterol inhalation and Pulmicort (budesonide – corticosteroid ) solutions from the nebulizer in his home before the hurricane hit. He was prescribed an albuterol inhaler for school and Claritin Reditabs (chewable - Loratadine – H1 antihistamine antagonist) for his sinuses. Dr. Barnes indicated that all of the patient's medications were lost during the storm.

She noted that she had been told that a physician in Florida had prescribed Advair (fluticasone [corticosteroid] and salmeterol [bronchodilator]) for maintenance and an albuterol inhaler for emergencies. The patient's mother did not provide the Advair "due to side effects and warnings." The patient used the inhaler only "on occasion." For his sinuses, he used over the counter Claritin.

Dr. Barnes stated that while living in the trailer, the patient "experienced increasing episodes of sinusitis and was eventually given Claritin daily. She indicated that his "asthma symptoms followed his sinus symptoms." He complained of shortness of breath and wheezing and an occasional asthma attack progressed to a 1-2 times/week event. The

---

[25] Ibid.
[26] Medical records of Janet D. Barnes, MD, 4/24/09
[27] Dr. Barnes told me that the chart may be missing, not necessarily lost during the storm. JPK interview with Dr. Barnes, 5/15/09.

ALX-EXP-32-000014

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 14

patient eventually ran out of the albuterol inhaler that had been prescribed by his Florida physician.

Dr. Barnes noted that the patient's first visit to her office was in 10/06[28] (should be 10/07). The patient received refills for his meds for asthma, sinusitis and some ointment for his eczema. The patient was noted to have been seen at the Children's Hospital ER in 12/06[29] (should be 12/07), "when the inhaler failed to control his attack." She noted that the patient moved out of the trailer at the end of 12/06[30] (should be 12/07) and his attacks of shortness of breath and wheezing "progressively decreased." She noted further that the patient "continues to have attacks; but there is significant improvement in frequency and severity."

On physical examination, Dr. Barnes indicated:

Within normal limits except for nasal congestion, boggy nasal turbinates, glassy eyes – sclera slightly irritated (but better than when awakened this am); productive cough, small amount of post nasal drip and red pharynx.

Specifically, his pulmonary and skin examination were within normal limits.

Dr. Barnes' assessment was:

**Rhinosinusitis**

**Conjunctivitis**

**Allergic asthma history**

**Formaldehyde exposure FEMA Trailers**

She prescribed:

Albuterol inhaler (bronchodilator); Flovent inhaler (fluticasone [corticosteroid]); Singulair (montelukast) 10mg po qd; Clarinex D-12; and Patanol eyedrops.

She ordered laboratory tests (results not available at the time of this report); and asked the patient to return to the clinic in two weeks

---

[28] Dr. Barnes corrected this date. It was 10/07 (JPK phone interview with Dr. Barnes, 5/16/09)
[29] Dr. Barnes corrected this date. It was 12/07 (JPK phone interview with Dr. Barnes, 5/16/09)
[30] Dr. Barnes corrected this date. It was 12/07 (JPK phone interview with Dr. Barnes, 5/16/09)

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 15

## III. Past Medical History

See II. History of Present Medical Problem

## IV. Allergies

See II. History of Present Medical Problem

**5/18/09 - Dr. Pacheco's report**[31] - Prick skin testing to aeroallergens present on the gulf coast showed a positive reaction to pecan/hickory tree with negative reactions to other trees, grasses and weeds. Skin testing was negative to cockroach but positive to dust mites, D. farinae and D. pterynnisinus. Skin testing was negative to cat and dog, and negative to all molds tested." She also reported that the patient has "no known drug allergies."[32]

## V. Family History[33]

- He has a sister, Erica, born on 7/31/94. She was reported by her mother to have problems with nasal allergy for which she uses a nasal inhaler.

- His father, Darren Cooper's current medical condition is unknown. He and Chris's mother never married. Chris' mother indicated that she thinks that Chris' father may have had asthma as a child. His father was born on 12/1/66 and has worked in the past as a cook.

- Maternal grandmother is age 79 and does not have asthma. His maternal grandfather is age 78 and does not have asthma.

- Chris' mother, Alana Alexander was born on August 12, 1966 and has reported that she is basically healthy except for occasional headaches. She does not have asthma and did not have this disorder in the past.

- Chris' mother has four living brothers and one living sister. She lost one brother who died at age 45 from a bleeding ulcer. Her brothers' are ages 54, 50, 46 and 44 and her sister is age 41. Two of her brothers work in the construction trades as plasterers; another works for a collection agency and the other works in electronics. Her sister is a social worker.

---

[31] Report of Dr. Karin Pacheco, National Jewish Health, 5/18/09, p. 6, item 4
[32] Ibid., p.3
[33] JPK interview of Chris Cooper and Alana Alexander (Chris' mother) on Wednesday May 13, 2009

ALX-EXP-32-000016

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 16

Only one of Chris' uncles smokes but he does not do so whenever he is around Chris or is in the house in which Chris lives.

## VI. Social History

See II. History of Present Medical Problem

The patient's mother, Alana Alexander currently works for the New Orleans school system as a skills coordinator, or as she stated, a "disciplinarian." She is also trained as an EMT and has worked in an occupational and emergency medical setting.

## VII. Habits[34]

- Chris does not smoke or use other than prescribed medications.

- Both mother and father (not present) are non-smokers. None of Chris' other immediate family members are smokers except for one uncle, who has never smoked in Chris' home.

## VIII. Medications[35]

- Albuterol inhaler (bronchodilator);

- Flovent inhaler (fluticasone [corticosteroid])

- Singulair 10mg po qd (montelukast sodium [leukotriene receptor antagonist])

- Clarinex D-12 (desloratadine [H1 antihistamine antagonist] and pseudoephedrine [decongestant]) [oral preparation taken every 12 hours].

- Patanol eye drops (Olopatadine [H1 receptor antihistamine]).

---

[34] JPK interview of Chris Cooper and Alana Alexander (Chris' mother) on Wednesday May 13, 2009
[35] Medical records of Janet D. Barnes, MD, 4/24/09; confirmed during JPK interview of Chris Cooper and Alana Alexander (Chris' mother) on Wednesday May 13, 2009

ALX-EXP-32-000017

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 17

# IX. Review of Systems[36]

- While living in the trailer, Chris' asthmatic condition gradually worsened from its well-controlled pre-trailer status. Chris would often complain of eye, throat and lung irritation. Before the onset of an asthmatic episode, he would tell his mother that his "chest itched."

- Since the time of his departure from the trailer and at present, Chris has episodic flare-ups of his asthma requiring the use of a home nebulizer treatment about two to three times per month. About once per week, he also needs to use his albuterol inhaler often requiring up to six puffs per day.

- Chris complains of dull bilateral substernal pain that comes on about twice per week and lasts about 30 seconds. He could not describe any inciting or ameliorating factors.

- Chris develops frontal headaches about twice per week for which his mother treats him with one 200mg ibuprophen tablet, given with food. He thinks that these headaches come on when he is tired, "weak," or under stress. His headaches improve and disappear with rest.

- Chris does not react to detergents or soaps. His mother stated that they use liquid detergent, either Arm and Hammer or Gain. Chris uses Right Guard roll on deodorant daily and liquid body soap when he bathes.

# X. Patient-Specific Causation Analysis

*Introduction – Methodology:*

*General Causation as a Prerequisite to Patient Specific Causation*

When embarking upon the performance of a patient-specific causation analysis, one must commit to a rational methodology that involves two prerequisite endeavors.

The first step is to determine by careful examination of the scientific literature with consideration of the Hill[37] criteria whether general causation can be met. General causation is simply to show, if possible, to a reasonable degree of scientific certainty, whether the hazardous agent(s) in question, have the capacity to cause, in the general

---

[36] JPK interview of Chris Cooper and Alana Alexander (Chris' mother) on Wednesday May 13, 2009
[37] Hill, AB, "The Environment and Disease: Association or Causation?" Proc. Royal Soc Med 58, 1965, 295-300

ALX-EXP-32-000018

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 18

population, those same adverse health consequences which one is proposing may occur in the individual under consideration in the patient-specific causation analysis.

The second step is the performance of a patient-specific environmental medical causation analysis. Having established general causation, the goal of this step is to determine, to a reasonable degree of medical certainty, whether the adverse effect, now established in the general population, has occurred in the specific patient under consideration.

This latter analysis involves a rational clinical and analytical process in which three primary criteria must be met:

- There must have occurred a probable, toxicologically significant exposure to a suspected, scientifically qualified, offending agent(s) that was biologically available to the patient at a credible exposure level and over a credible and scientifically acceptable time frame.

- There must have occurred a probable, capably diagnosed, qualified effect(s) in the patient within a credible and scientifically acceptable time frame.

- There must be demonstrated a probable relationship between said exposure and diagnosed effect(s) which has been substantiated scientifically and/or clinically.

## X. A. General Causation - Medical and Scientific Literature

*Regarding the relationship between exposure to formaldehyde and the exacerbation of pediatric asthma:*

*The following reports were considered within the scope of determining matters of general causation:*

- Affidavit of Kenneth Paris, MD, M.P.H.[38]

- Affidavit and report of Patricia M. Williams, Ph.D.[39]

- Report of Children's Health Fund, Columbia University Mailman School of Public Health[40]

---

[38] Kenneth Paris, MD, M.P.H., Pediatric Allergy/Immunology, 8/20/08
[39] Patricia M. Williams, Ph.D., Toxicologist, Louisiana State University, 8/21/08
[40] "Legacy of Shame, The Ongoing Public Health Disaster of Children Struggling in Post-Katrina Louisiana," Columbia University Mailman School of Public Health, National Center for Disaster Preparedness, 11/4/08

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 19

- Statement of Christopher T. DeRosa, MS, Ph.D.[41]

- Report of Judd E. Shellito, MD[42]

- Testimony of Scott Needle, MD[43]

- CDC Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models and Mobile Homes[44]

- Toxicology Profile for Formaldehyde[45]

- Report of Stephen King, Ph.D.[46]

- Report of Gerald McGwin, Jr., M, Ph.D.[47]

The weight of scientific and epidemiological evidence firmly establishes that during or following sufficient exposure, formaldehyde is a chemical that will aggravate pre-existing asthma in humans and children, in particular.[48] [49]

It has been medically established that the aggravation of pediatric asthma is a foreseeable and probable outcome in some children who have been exposed to formaldehyde.

*Taken, in total, it is my environmental medical opinion that the weight of scientific and epidemiological evidence supports the probable conclusion that exposure to formaldehyde can permanently aggravate preexisting childhood asthma to such an extent that the natural history of the underlying condition is changed on a permanent basis. In other words, exposure to formaldehyde at airborne time weighted average levels comparable to those to which Chris Cooper was exposed can create a new asthmatic illness that would not have occurred but for his sustaining this adverse*

---

[41] Christopher, T. DeRosa, MS, Ph.D., Statement before the Subcommittee on Investigations and Oversight, Committee on Science and Technology, United States House of Representatives, Hearing on "Toxic Trailers: Have the Centers for Disease Control Failed to Protect the Public," 4/1/08
[42] Judd E. Shellito, MD Pulmonary/Critical Care specialist, Louisiana State University, report 8/18/08
[43] Scott Needle, MD, Testimony on Behalf of the American Academy of Pediatrics, Committee on Oversight and Government Reform, 7/19/07
[44] CDC Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models and Mobile Homes, 7/2/08
[45] Toxicology Profile for Formaldehyde, US Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry (ATSDR), 7/99
[46] Stephen King, Ph.D., report, 5/19/08
[47] Gerald McGwin, Jr. MS, Ph.D., "Formaldehyde Exposure and Asthma in Children: A Systematic Review," 5/18/09
[48] Ibid.
[49] Report of Dr. Stephen King, 5/19/09, pp 6-8

ALX-EXP-32-000020

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 20

*exposure.*

## X. B Patient- Specific Causation

### *X.B.1. Discussion Regarding Exposure*

#### *Formaldehyde as an irritant and allergen:*

The collective modeled and measured data-base clearly demonstrates that Chris Cooper probably sustained airborne exposure to formaldehyde at levels of between 50 and 100 ppb or more on a time-weighted average while living in his Gulf Stream Cavalier travel trailer over 19 months from May 2006 until December 2007.[50][51]

This data-base also predicts that he sustained probable formaldehyde exposure excursions up to 250-300 ppb or more for short periods of time when he entered the trailer after it had been closed or while living in the trailer without adequate ventilation under various weather and temperature conditions.[52]

These residential exposure levels should be compared to selected agency recommended exposure levels in order to place them into proper context:

**2009 NIOSH REL**[53] = 16 ppb TWA

**2009 NIOSH STEL/CEIL** (C)[54] = 100 ppb for 15 minutes

**ATSDR Minimal Risk Levels (MRLs) for Hazardous Substances**[55] = 8 ppb for exposure periods exceeding 365 days.

---

[50] Report of Paul Hewitt, PhD, CIH, "Analysis of the Gulf Stream Coach Inc., Formaldehyde Exposure Dataset," 5/18/09
[51] Air Sampling Laboratory Report, Lab Sample ID 2008003984 (0.05 ppm formaldehyde), 2/5/08.
[52] Report of Dr. Stephen King, 5/19/09, p. 2
[53] National Institute of Occupational Safety and Health (US Dept. of HHS) Recommended Exposure Limit, ACGIH, "Guide to Occupational Exposure Values," p. 88 [This REL is an occupational limit for workplace, not residential, exposure settings. It is a recommended limit that is not to be exceeded in the workplace. It is based upon measuring over a 10 hour workday and a 40 hour work week.], p. 88, xiv
[54] The NIOSH Ceiling is a workplace exposure limit, not a residential limit. NIOSH specifies "The exposure shall not be exceeded during any part of the workday. If instantaneous monitoring is not feasible, the ceiling shall be assessed as a 15 minute TWA [time weighted average] exposure (unless otherwise specified) that shall not be exceeded at any time during the workday."
[55] ATSDR Minimal Risk Levels (MRLs) for Hazardous Substances, http://www.atsdr.cdc.gov/mrls/: "MRLs are based on noncancer health effects only and are not based on a consideration of cancer effects....MRLs are intended to serve as a screening tool to help public health professionals decide what to look for more closely."

ALX-EXP-32-000021

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 21

It is clear and probable that Chris Cooper was exposed to levels of formaldehyde in his
residential living environment that exceeded those that are recommended for the
workplace and those recommended for long term exposure exceeding one year.

By patient history there appears to have been mold present in the patient's environment.
Mr. Henson noted construction deficits that permitted water infiltration in the trailer.
These problems would have created an environment that was conducive both to mold
growth and increased formaldehyde emissions from particle board sources.

The amount and species are unknown. To those persons who are allergic, mold spores are
capable of aggravating pre-existing asthma.

### X.B.2 Discussion Regarding Diagnosis

**Asthma and related adverse health outcomes:**
Mr. Chris Cooper has been diagnosed with **probable asthma** that had been reasonably
controlled until 12/4/07. At that time, he presented to the Children's Hospital emergency
room for evaluation and treatment of "coughing fits" and "chest tightness." There he was
diagnosed with "**Asthma Exacerbation**."

He was also diagnosed on 10/4/07 by Dr. Barnes with **probable "sinusitis" and "atopic
dermatitis."** He was noted on physical examination to have "boggy nasal turbinates" and
"eczema" on his right arm that involved the skin creases of his antecubital fossa.

On 4/17/08, he was diagnosed with **probable "allergic conjunctivitis."** At that time he
was also noted to have "nasal stuffiness and boggy turbinates."

He was also diagnosed with **"Mild chronic allergic rhinosinusitis"** by Dr. Karin
Pacheco at National Jewish Health on 5/18/09.[56] Dr. Pacheco also noted that the patient
had "Childhood asthma, Allergy to hickory trees and dust mites, Vocal cord dysfunction,
and Irritant symptoms during occupancy of a FEMA trailer, now improved out of
exposure."[57] Dr. Pacheco's physical examination revealed "Nasal mucosa was pale and
boggy with some clear drainage.

**Testing also demonstrated a positive methacholine challenge significant "for severe
bronchial hyper-responsiveness..." "Laryngoscopy performed following the
methacholine challenge, showed both inspiratory and expiratory vocal cord
dysfunction."[58]**

---

[56] Report of Dr. Karin Pacheco, National Jewish Health, 5/18/09, page 7, item 2
[57] As of the date of this report, Chris Cooper has been "out of exposure" for about 16.5 months," with
continuing evidence of mucosal injury.
[58] Report of Dr. Karin Pacheco, National Jewish Health, 5/18/09, p.6, item 3

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 22

*The patient's positive methacholine challenge test and especially his demonstration of vocal cord dysfunction following provocation with methacholine are both significant clinical findings*

*Once provoked by a cholinergic agent, this young man evokes a latent pathological predisposition that expresses one part of that probable disorder that is a foreseeable consequence of his formaldehyde exposure. This reaction has occurred and been clinically documented 16.5 months after he left the trailer environment.*

*Diagnostically, it is also important to emphasize that vocal cord dysfunction following formaldehyde exposure has been described in the literature at levels comparable to those sustained by Chris Cooper while occupying his FEMA-provided trailer.*

*I have personally seen and diagnosed this disorder in a few occupationally exposed workers in the past who have been exposed to formaldehyde in the setting of embalming and laboratory work.*

Dr. Barnes, the patient's primary provider and pediatrician concluded in her summary report, on 5/15/09:[59]

**"Therefore, the exposure to the formaldehyde in the FEMA trailer, within a reasonable degree of medical probability, will cause permanent epithelial damage, with subsequent acute exacerbations of asthma, recurrent rhino-sinusitis, and chronic atopic dermatitis for the rest of his life."**

*At the present time, there is no evidence in the medical record that this patient is allergic to molds of any kind. To re-emphasize, Dr. Pacheco noted: " Skin testing was negative to cat and dog, and negative to all molds tested."[60]*

*As a pertinent negative in considering this patient's differential diagnosis, there is also no history, at this time that the patient is continuing to be exposed to any chronic irritants, including secondary cigarette smoke.*

*X. B. 3 The relationship between probable exposure and probable diagnosis.*

*Formaldehyde exposure and the worsening of pre-existing childhood asthma:*

It has been medically established that substantive permanent aggravation of childhood asthma is a foreseeable and probable outcome in some individuals who have been exposed to formaldehyde.

---

[59] Janet Duncan Barnes, MD, "Narrative Report, Formaldehyde Exposure to Christopher Cooper," 5/15/09
[60] Report of Dr. Karin Pacheco, National Jewish Health, 5/18/09, page 6, item 4

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 23

The application of this conclusion with respect to Mr. Chris Cooper depends upon the probable demonstration that the level of his exposure as modeled and/or measured by his time-weighted average exposure rate is adequate to include him in those categories described in the literature that are associated with excess risk for the genesis and/or aggravation of asthma. This task has been performed successfully as referenced above.[61]

Next, it is necessary to evaluate the specific diagnostic aspects of the patient's condition and his clinical course to make sense of the real and potential impact of his exposure upon his current health and his future risk of disease.

### Discussion:

As noted earlier, it is probable that while living in his travel trailer between May 2006 and December 2007, the patient was exposed to time weighted average concentrations of formaldehyde ranging between 50 and 100 ppb or more. These levels are from three to six times the NIOSH REL level (16 ppb) recommended to limit workplace not residential exposure and, more importantly, to limit adult not pediatric morbidity. These levels are also from six to 12 times the ATSDR long term (>365 days) MRL (8 ppb).

Dr. Barnes, with no knowledge,[62] of the patient's home environment objectively diagnosed the patient as having inflammatory changes in his nasal passages ("boggy nasal turbinates"). He was also found to have skin eczema near the antecubital fossa of his right arm. Later, in December, the patient's mother told me[63] that the patient developed further patches of pruritic eczema in the popliteal fossae behind his knees. In my clinical experience with patients exposed to formaldehyde and glutaraldehyde, these areas are "classic" presentations for the development of formaldehyde-induced dermatitis. The lesions develop either through the mechanism of irritation and/or contact allergy. Commonly affected areas are those where there are skin folds such as the inguinal area near the groin, the skin of the neck and those where the patient was affected, namely, the antecubital fossa and the popliteal fossa. These are areas that can trap moisture and perspiration, in a manner that facilitates manifestation of the adverse effects of formaldehyde exposure.

It is medically probable that these objective, contemporaneously documented findings are a result of formaldehyde exposure. The patient is a member of a sensitive subpopulation that is at higher risk for morbid outcome following exposure to formaldehyde. This type of population has been specifically identified by agencies, including FEMA and the EPA that have recognized the amplified risk and the adverse foreseeable consequences that children such as this patient face after elevated levels of formaldehyde exposure.[64]

---

[61] Report of Dr. Stephen King, 5/19/09, p 7
[62] JPK telephone interview with Dr. Barnes, 5/15/09
[63] JPK interview of Chris Cooper and Alana Alexander (Chris' mother) on Wednesday May 13, 2009
[64] Report of Dr. Stephen King, 5/19/09, p. 10

ALX-EXP-32-000024

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 24

In my clinical experience, over the past 33 years, I have treated and/or evaluated, both acutely and chronically, about 25,000 – 30,000 patients, including probably over two hundred exposed specifically to formaldehyde and/or glutaraldehyde, among other chemicals. Some were children who had lived in houses in Massachusetts that had been insulated with urea-formaldehyde foam in the late 1970s. As an overall group, these patients were exposed to a very wide range of exposure levels and duration. In the pediatric group, it was not uncommon for individuals to have lived in an environment where there was considerable individual susceptibility with respect to symptoms and tolerance, especially in relation to the development of odor attenuation (olfactory fatigue) and perception of irritation.

Among adults in the workplace, my experience was similar. Whether it was a mortician in his embalming room, technicians in a hospital path lab, nurses in a dialysis unit, medical assistants in an endoscopy suite, or agricultural workers caring for turkeys, I have witnessed the phenomenon of individual susceptibility below those exposure levels that are capable of causing almost all persons to react.[65][66]

From a clinical standpoint, therefore, it does not surprise me that Chris Cooper reacted, often subtly but persistently, while his mother and sister were less affected. For this precise reason, the contaminated home/trailer environment was particularly insidious to this young man. Instead of benefiting from the traditional expectation that his home was safe, Chris' home/trailer environment has caused him permanent harm. His chronic exposure to formaldehyde, for 19 months, at levels that greatly exceeded NIOSH and ATSDR limits recommended for adults in the workplace, has created a substantive, not self-limited, aggravation of his pre-existing asthmatic condition.

Although he has expressed some symptomatic improvement, he continues to require multiple medications to avoid relapse. It appears that this young patient has developed formaldehyde-related sensitization, that has created mucosal overreaction to what are otherwise non-antigenic, irritant sources.

<u>I do not think that he is suffering from any form of multiple chemical sensitivity (MCS).</u>

I have diagnostically concluded that at the present time, he is suffering from a formaldehyde-induced, non-specific mucosal hyper reactivity that is not mediated antigenically. It appears that Dr. Barnes agrees with my diagnosis; and, in my opinion, the work-up and results by Dr. Pacheco at National Jewish Health support my conclusions.

---

[65] In my experience, I estimate that virtually all persons will react acutely to the irritant effects of formaldehyde at levels exceeding 3 ppm in air.
[66] Report of Dr. Stephen King, 5/19/09, p. 9

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 25

Chris Cooper has a new disease, one that, for the foreseeable future, has demoted him to a lower level of overall functioning than that level where he would have been, but for his formaldehyde exposure between May 2006 and December 2007.

## XI. Concern Regarding Long-Term Adverse Health Effects

*Regarding the relationship between exposure to formaldehyde and the development of cancer of the nasal passages:*

The weight of scientific and epidemiological evidence firmly establishes that formaldehyde is probably a human carcinogen, capable of causing cancers of the nasal passages.[67]

*Formaldehyde as a Carcinogen:[68]*

The following are the agency classifications of formaldehyde as a human carcinogen:

**EPA B1** – "Probable Human Carcinogen." [US Environmental Protection Agency].

**IARC 1** – "Carcinogenic to humans." [International Agency for Research on Cancer, Lyon, France]

**MAK 4** – "Substances with carcinogenic potential for which genotoxicity plays no or at most a minor role." [Federal Republic of Germany maximum concentration values in the workplace.]

**NIOSH Ca** – Potential occupational carcinogen, with no further categorization." [National Institute of Occupational Safety and Health].

**NTP R** – "Known to be a human carcinogen." [US National Toxicology Program]

**OSHSA Ca** – "Carcinogen defined with no further categorization." [US Occupational and Health Administration.]

**TLV A2** – "Suspected Human Carcinogen," [American Conference of Governmental Industrial Hygienists]

---

[67] Report of Dr. Stephen King, 5/19/09, p. 6
[68] 2009 "Guide to Occupational Exposure Values," ACGIH, Cincinnati, Ohio, p 88 and v-xii

ALX-EXP-32-000026

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 26

### Summary Environmental Medical Causation Opinion:

#### Aggravation of pre-existing asthma and the establishment of hypereactive nasal and sinus mucosa:

*It has been medically established that the aggravation of childhood asthma is a foreseeable and probable outcome in some individuals who have been exposed to formaldehyde.*

*Taken in their entirety, the exposure and diagnostic databases firmly support the conclusion to a reasonable degree of environmental medical certainty, that Mr. Cooper's probable exposure to formaldehyde while he lived in his FEMA-provided Gulf Stream travel trailer between approximately May 2006 and December 2007, created a personal exposure and overall dose of formaldehyde that probably caused the substantive and permanent aggravation of his pre-existing childhood asthma.*

*It has also been medically established that formaldehyde exposure is capable of causing the development of formaldehyde sensitization. Such sensitization can cause the development of mucosa hyper-reactivity to chemically unrelated substances that would otherwise not be a problem for the affected individual. In Chris Cooper's case, I do not think that this hyper-reactivity is antigenically mediated. Instead it results from a lowered threshold of irritation in formaldehyde damaged tissue. Mr. Cooper probably suffers from this condition as a direct result of his exposure to formaldehyde while living in his trailer between 5/06 and 12/07.*

*Coupled with the consistent clinical findings of inflammation and mucosal disease that have persisted and been documented by different clinicians since 10/4/07, it is probable that his overall condition has become chronic and probably will not remit over time. It will probably be manageable only with medication and judicious avoidance of environmentally disadvantageous situations, such as unnecessary exposure to irritants that will provoke hyper-reactivity in this patient.*

#### Medical monitoring for cancer of the nasal passages:

*Given the extent, amount and duration of Chris Cooper's exposure to formaldehyde, the probable adverse effects upon his pre-existing asthma condition and his status as a child when the exposure occurred, it is my environmental medical opinion that Chris Cooper should be afforded medical monitoring directed toward the early detection of cancer of the nasal passages. This opinion is supported by my analysis in Attachment A that illustrates the risk quotient (RQ) that compares Chris Cooper's 19 month formaldehyde inhalation dose to that inhalation dose based upon EPA cancer risk based concentration*

ALX-EXP-32-000027

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 27

*In my analysis RQ = 17.0. This number simply means that over the 19 month period that Chris Cooper was exposed in his FEMA- supplied trailer, he endured an exposure to formaldehyde that was 17 times the 30 year residential inhalation dose of formaldehyde that the EPA recognizes is associated with an increased lifetime cancer risk of 1E-6.*

*Given the above considerations and reasonable estimates of cancer latency, it my environmental medical opinion that this monitoring should continue for about 40 years and should be overseen by a primary care physician in conjunction with an otolaryngologist. His monitoring should include at least a semi-annual check-up, once with a primary care physician and once with his attending specialist.*

*The elements of the intervention beyond a clinical evaluation would include the obtaining of MRI, CT scan, x-ray, endoscopy, biopsy and appropriate laboratory tests, as determined by the evaluating specialist.*

### *Medical treatment for formaldehyde-induced aggravated asthma, chronic sino-nasal mucosal inflammation and hyper-reactivity*

*The patient should be provided lifetime evaluation and treatment for his probable formaldehyde-induced medical conditions. He should be provided at least semi-annual evaluation by his primary care physician and one or more specialists, depending upon his condition at the time of his evaluation.*

*It is anticipated that interventions beyond basic clinical assessment would include but not be limited to: x-ray, CT scan, MRI, endoscopy and biopsy, laboratory testing, pulmonary function testing, respiratory therapy, medication, nursing care, home care (if impairments resulting in disability ensue) and rehabilitation and vocational services. The specification of monitoring elements, estimated frequency, duration, unit costs and estimated annual costs are illustrated in Attachment B*

*As noted, combining the program elements for medical treatment with those elements for cancer screening will result in overlap. Procedures to evaluate and treat the patient for chronic illnesses are also inherently valuable for cancer screening. The monitoring program outlined in Attachment B is designed to eliminate any redundancy in cost or effort. In the final analysis a comprehensive monitoring and treatment program for Chris Cooper can be created in a cost-effective manner. The final program will be designed to avoid any overlap and redundancy of cost or program objectives by combining the clinical and preventive medicine elements of both programs.*

*The reasonable and necessary recurring lifetime costs per year for Chris Cooper's future medical monitoring have been provided to Dr. Thomas Mayor, economist, who*

ALX-EXP-32-000028

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 28

*has estimated the present value of the total cost of Chris Cooper's medical monitoring in Attachment C to this report.*

*These costs arise from medical evaluation and monitoring that are necessary as a result of formaldehyde exposure in his FEMA-supplied trailer. Utilizing Dr. Mayor's opinions in conjunction with mine, the total cost of Chris Cooper's future necessary medical expenses will probably be approximately $617,495 over his lifetime.*

*The above conclusions, observations, and analysis have been performed within the scope of the exposure and medical databases provided and obtained. Any or all of the preceding analysis, observations, and opinions is subject to modification and/or withdrawal upon the receipt or discovery of substantive new information.*

Respectfully Submitted,

James P. Kornberg, MD, Sc.D.
Certified Specialist – Occupational and Environmental Medicine
Environmental Health Scientist and Engineer

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 29

## ATTACHMENT A

### Chris Cooper's Trailer Residence-Derived Inhalation Dose of Formaldehyde Over 19 months Compared to EPA's 30 Year Residential Inhalation Dose Based Upon the Inhalation Cancer Risk-Based Concentration (RBC)

Based upon EPA modeling for Residential Air Screening Levels, there has been established the concept of the cancer risk based concentration (RBC). The RBC for inhaled carcinogens is that airborne level below which one may be exposed in a residential setting over a 30 year period without incurring an additional lifetime risk of greater than one in a million (above background) of developing a specific cancer.  In the case of formaldehyde, the RBC is 0.19 micrograms/cubic meter[69] and the morbid outcome is cancer of the nasal passages.

To convert this RBC to parts per billion in air (ppb), the following formula is used[70]

Let X = the RBC in micrograms per cubic meter

Let Y = the RBC expressed in parts per billion (ppb)

Let MW = the molecular weight of the RBC compound, in this case formaldehyde)

Then:

$X/Y = MW/24.45$

Let us solve for Y (the RBC for formaldehyde in residential air expressed in ppb)

$Y = (X) 24.45/MW$

Since formaldehyde is $COH_2$, then MW = (12 + 16 2[1]) = 30

X = 0.19

Then Y = (0.19)(24.45)/30 = 0.155 ppb

---

[69] US EPA Risk Based Concentrations published by Region III EPA dated 9/11/08
<www.epa.gov/reg3hwmd/risk/human/rb_concentration_table/Generic_Tables/pdf/composite_sl_table_run April2009.pdf>
[70] 2009 TLVs and BEIs Based on the Documentation of the Threshold Limit Values for Chemical Substances and Physical Agents & Biological Exposure Indicies, ACGIH, Signature Publication, Cincinnati, Ohio, p.8 [the formula has been modified to convert micrograms per cubic meter to parts per billion instead of converting milligrams per cubic meter to parts per million]

ALX-EXP-32-000030

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 30

Exposure in residential air to a formaldehyde RBC of 0.155 ppb for 30 years leads to the conclusion that the dose of formaldehyde (D-RBC) over a 30 year period of residence that will lead to an excess risk of cancer of one in one million (1 E-6) would be:

(D-RBC) = (0.155 ppb)(30 years) = 4.65 ppb-years

Chris Cooper lived in a trailer with a conservatively estimated time weighted average exposure to formaldehyde of 0.05 ppm or 50 ppb. He lived in this trailer for 19 months or (19/12) or 1.58 years. Chris Cooper's estimated inhalation dose of formaldehyde (D-Chris) is:

(D-Chris) = (50 ppb) (1.58 years) = 79 ppb-years

The risk quotient (RQ) that compares Chris Cooper's formaldehyde 19 month inhalation dose to that inhalation dose that will increase his risk of cancer by 1E-6 is:

**RQ = (D-Chris)/(D-RBC) = 79/4.65 = 17.0**

This comparison, in conjunction with documented persistent clinical evidence of formaldehyde induced injury, supports my recommendation for the need for at least a 40 year medical monitoring for Chris Cooper, with the goal of early detection of cancer of the nasal passages.

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 31

## ATTACHMENT B

## ESTIMATED MEDICAL MONITORING COSTS FOR CHRISTOPHER JAMES COOPER (BORN 12/18/96) FOR FORMALDHEYDE INDUCED AGGRAVATED ASTHMA, CHRONIC RHINO-SINUSITITS, MUCOSAL INFLAMMATION AND CANCER PREVENTION

James P. Kornberg, MD ScD
Certified Specialist – Occupational and Environmental Medicine
May 18, 2009

| MONITORING ELEMENT | ESTIMATED FREQUENCY (Q = EVERY) | DURATION | ESTIMATED UNIT COST (2009 $) | ESTIMATED ANNUAL COST (2009 $) | DURATION YEARLY AVERAGE (2009 $) |
|---|---|---|---|---|---|
| Primary care MD | Q 1 year | lifetime | 100 | 100 | |
| Specialist MD | Q 1 year | lifetime | 300 | 300 | |
| Laboratory | Q 1 year | lifetime | 250 | 250 | |
| Pulmonary Function Tests | Q 1 year | lifetime | 250 | 250 | |
| Respiratory Therapy | Q 1 year | lifetime | 200 | 200 | |
| Medications | Q 1 year | lifetime | 3600 | 3600 | |
| CT SCAN | Q 3 years | lifetime | 1200 | 400 | |
| MRI | Q 3 years | lifetime | 2400 | 800 | |
| X-ray | Q 5 years | lifetime | 600 | 120 | |
| RN CARE | Q 5 years | lifetime | 2400 | 480 | |
| Contingency referral and treatment, including dermatologist | Q 5 years | lifetime | 3000 | 600 | |
| Home Care including nebulizer | Q 5 years | lifetime | 3600 | 720 | |
| Hospitalization (estimate 3-4 days) | Q 10 years | lifetime | 12000 | 1200 | |
| Lifetime Tests – Yearly Average | | | | | 9020 |
| Endoscopy and Biopsy | Q 5 years | 40 years | 2400 | 480 | 480 |
| Physical and/or Rehabilitation Services | Q 20 years | Lifetime after age 40 | 16000 | 800 | Depends upon life expectancy |

P.033          1ST BANK      16:44   MAY-19-2009

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 32

## ATTACHMENT C

## Dr. Thomas H. Mayor

## Economist

ALX-EXP-32-000033

MAY-19-2009 09:29A FROM:MAYOR          7135521522          TO:2817544229          P.2

### DR. THOMAS H. MAYOR

May 18, 2009

Mr. Dennis C. Reich
Reich & Binstock
4265 San Felipe, Suite 1000
Houston, Texas 77027

Re: Chris Cooper

Dear Mr. Reich:

I have completed an evaluation of the present value required to fund future medical monitoring expenses for Chris Cooper as recommended by Dr. James P. Kornberg (copy of recommendations in current prices attached). That present value is $617,495 over a normal life expectancy (58.8 years at age 12 according to the attached U. S. government Life Table). The calculations underlying this conclusion are summarized in the attached Table 1. Table 1 assumes that medical care costs will continue to escalate at 1.75% per year over the general rate of inflation -- the rate of increase which actually occurred since 1960 according to the attached U. S. government table of price indexes. Thus Column (4) in Table 1 shows medical costs rising at that 1.75% per year rate. Column (5) discounts those future medical costs at the rate of 1.5% per year over inflation and over taxes on interest income, the approximate average annual rate on U. S. Treasury Bills since 1960 (See attachments).

Please let me know if you have any questions or if you need any further analysis. Pursuant to Federal Rule 26 I attach a resume and a list of prior testimony. My fees are based on an hourly rate of $250 for all work performed.

Thomas H. Mayor, Ph.D.

5555 DEL MONTE, SUITE 1306
HOUSTON, TEXAS 77056
713-552-1522

ALX-EXP-32-000034

Christopher J. Cooper
Environmental Medical Causation Analysis
May 19, 2009
p. 33

## ATTACHMENT D

## Dr. Stephen King

## Toxicologist and Epidemiologist

ALX-EXP-32-000035

Attachment "D"
# REPORT ON FORMALDEHYDE EXPOSURES IN A FEMA SUPPLIED GULF STREAM COACH, INC., CAVALIER TRAVELTRAILER IN LOUISIANA IN RELATION TO THE DEVELOPMENT OF CHRISTOPHER COOPER'S SYMPTOMS AND MEDICAL CONDITIONS

A Review of Germane Scientific Literature
By Stephen King, Ph.D., M.P.H, Toxicologist & Epidemiologist
May 19, 2009

## INTRODUCTION

I am a toxicologist and epidemiologist. I have a B.S. degree, a M.P.H. in Occupational Health with a concentration in toxicology, and a Ph.D., in Environmental Sciences, with a concentration in toxicology, and a minor in Epidemiology. As part of my practice, I regularly perform toxicological investigations and assessments on individuals environmentally exposed to toxic substances in relation to the development of exposure-induced biological markers of exposure and effects, as well as exposure-related signs, symptoms, and illnesses.

## BACKGROUND

As a result of the devastation caused Hurricane Katrina in Louisiana, Alana Alexander and her children, Christopher Cooper and Erika Copper, were displaced. In 2006, the Federal Emergency Management Agency (FEMA) provided a Gulf Stream Coach, Inc, Cavalier travel trailer to Ms. Alexander and her children to live in for the next several months (Kornberg JP 2009). The trailer was identified as FEMA trailer number 1041407, manufactured by Gulf Stream Coach, Inc., in 2004. The dimensions of the trailer were 20 feet and 4 inches long and 8 feet wide (Kornberg JP 2009). From May 2006 through late December 2007, Ms. Alexander and her children lived in the FEMA trailer (Kornberg JP 2009). During this period of time, Mr. Copper experienced and/or was diagnosed with several symptoms and medical conditions that included chest tightness; eczema on his right arm and on the back of his legs at the level behind his knees; cough; coughing fits; decreased breath sounds; red, itchy, runny eyes; nasal stuffiness; boggy turbinates; sclera mildly irritated and dark lower lids; allergic conjunctivitis; vocal cord dysfunction; asthma; and wheezing (Kornberg JP 2009).

During 2006, FEMA and manufacturers of FEMA supplied housing units (trailers) received a number of complaints from trailer occupants reporting poor air quality and odors within the trailers (Congress 2009b). The first such complaint received by Gulf Stream Coach, Inc. ("Gulf Stream") was on March 10, 2006 (Smith J 2006). Moreover, FEMA and trailer manufacturers received reports of symptoms and illnesses developing among persons living in trailers who had been heretofore essentially symptom and illness free (Congress 2009b). Because of these complaints, FEMA, as well as other agencies, entities, and travel trailer manufacturers initiated a series of investigations in order to determine the source(s) and/or cause(s) responsible for the complaints (Congress 2009b). Since 2006, several assessments have been performed that examined air quality in FEMA supplied trailers (Congress 2009b). Formaldehyde was identified as the air contaminant that was found in the trailers (Pullin S 2006; Bonner MS 2006; Shea D 2006; Brown B 2006; ATSDR 2007; CDC 2008a; CDC 2008b; Maddalena R et al. 2008).

Results of air quality studies of FEMA supplied trailers and mobile homes reported a wide range of formaldehyde concentrations. Reported formaldehyde levels were found to have ranged between 3.0

1

ALX-EXP-32-000036

to 4,480 parts per billion (ppb) (CDC 2006b; Pullin S 2006a; Pullin S 2006b; Shea D 2006). Gulf Stream found elevated concentrations of formaldehyde in travel trailers (Pullin S 2006a; Pullin S 2006b; Shea D 2006). Scott Pullin, Vice President of Operations for Gulf Stream Coach, Inc., performed tests between March 26, 2006 and May 15, 2006, in order to determine formaldehyde levels within occupied and unoccupied travel trailers manufactured by Gulf Stream and other companies (Congress 2008b). During this period of time, over 200 separate formaldehyde measurements were taken within approximately 50 travel trailers (Congress 2008b).

The results of Mr. Pullin's tests revealed that formaldehyde concentrations were at or above 100 ppb within all of the occupied travel trailers that he had assessed (Congress 2008b). Overall, Mr. Pullin's tests found that formaldehyde levels ranged between 100 and 620 ppb (Pullin S 2006a). Of the 11 occupied trailers that were tested, four of the trailers had formaldehyde levels that were above 500 ppb (Pullin S 2006), the OSHA action level for mandatory medical monitoring (Congress 2008b). In addition, Mr. Pullin tested over 35 new travel trailers that had not been deployed for hurricane displaced residents (Congress 2008b). Of the trailers tested, over 25 were manufactured by Gulf Stream and 7 were manufactured by other companies (Congress 2008b). The results of Mr. Pullin's tests demonstrated that at least 10 of the trailers that had been manufactured by Gulf Stream contained formaldehyde concentrations in excess of 900 ppb (Pullin S 2006). One of the Gulf Stream trailers had a formaldehyde level of 2,690 ppb (2.69 parts per million – "ppm") (Pullin S 2006b). Formaldehyde levels of 900 ppb were found in each trailer manufactured by other companies, and one trailer had a formaldehyde concentration of 4,480 ppb (4.48 ppm) (Shea D 2006). Similar levels of formaldehyde were detected in a travel trailer that had been assessed in Mississippi (Bonner 2006).

## FORMALDEHYDE TOXICITY

Exposure to formaldehyde primarily affects the eyes and mucous membranes of the upper airways. Symptoms of formaldehyde exposure include burning, redness and tearing of the eyes; nose and throat irritation and burning; runny nose; allergic rhinitis; epistaxis; cough; asthma; exacerbation of asthma; pharyngeal irritation; hoarseness; redness and swelling of vocal cords; vocal cord dysfunction; aphonia; headaches; tiredness; decrements in pulmonary function; chest tightness; deep airway discomfort; sensitization; hypersensitivity; immunological effects; skin rash; and eczema (Kerfoot EJ and Mooney TE 1975; Alexandersson R et al. 1982; Olsen JC and Dossing M 1982; Nordman H et al. 1985; Ritchie IM and Lehnen RG 1987; Thrasher JD et al. 1987; Broder et al. 1988; Holmstrom M and Wilhelmsson B 1988; Horvath et al. 1988; Alexandersson R and Hedenstierna G 1988; Alexandersson R and Hedenstierna G 1989; Kilburn KH et al. 1989; Thrasher JD et al. 1990; Liu KS et al. 1991; Wilhelmsson B and Holmstrom M 1992; Kriebel D et al. 1993; Matsunaga I et al. 2008).

Exposure to formaldehyde can increase the risk of certain types of cancer and/or mortality from cancer. Several epidemiological studies have examined the relationship between formaldehyde exposure and the risk of cancers of the nasal cavity, paranasal sinuses, nasopharynx, and hypopharynx; lung; larynx; and other sites (breast, pancreas). Some studies have assessed the risk of lymphohematopoietic malignancies (leukemia, non-Hodgkins lymphoma) from formaldehyde exposure.

For the purposes of this report, set forth below are certain studies which are germane to Christopher Cooper's exposures to formaldehyde while living in the Gulf Stream travel trailer in relation to the development of his past and/or current symptoms and illnesses that have been described in the report prepared by James P. Kornberg, M.D., Sc.D. (Kornberg JP 2009).

2

Ritchie IM and Lehnen RG (1987) assessed the effects of formaldehyde exposure among 2,000 residents living in 397 mobile homes and 494 conventional homes. The study found a dose-dependent increase in health complaints, such as eye and throat irritation, and headaches. Complaints by residents of symptoms of irritation were observed at formaldehyde concentrations of 0.1 ppm (100 ppb) or above (Ritchie IM and Lehnen RG 1987). In another study of formaldehyde-induced symptoms in persons living in mobile homes, Liu KS et al.(1991) reported that exposure to formaldehyde at a level of 0.09 ppm (0.135 mg/m$^3$) exacerbated chronic respiratory and allergy problems. Kerfoot EJ and Mooney TE (1975) reported that estimated exposures to formaldehyde that ranged from 0.25 to 1.39 ppm resulted in a number of complaints of upper respiratory tract and eye irritation among seven embalmers at six different funeral homes. Three of the seven embalmers assessed in the study were reported to have had asthma.

Olsen JC and Dossing M (1982) evaluated symptoms and illnesses among 66 employees of mobile daycare centers exposed for the three months to a mean formaldehyde concentration of 0.29 ppm (0.43 mg/m$^3$) (range = 0.24 - 0.55 mg/m$^3$), compared with a control group of 26 individuals employed in different institutions exposed to a mean formaldehyde level of 0.05 ppm (0.08 mg/m$^3$). The study reported an increased incidence in eye, nose and throat irritation, unnatural thirst, headaches, abnormal tiredness, menstrual disorders, and an increased use of analgesics among the daycare workers compared to the control group of workers (Olsen JC and Dossing M 1982).

Broder I et al. (1988) assessed subjective measures of formaldehyde-related symptoms among 1,726 occupants of houses insulated with urea-formaldehyde foam insulation (UFFI) and compared them with a control group of 720 formaldehyde-exposed individuals. The mean length of time of exposure to UFFI was 4.6 years, and the mean concentration of formaldehyde among the UFFI-exposed group was 0.043 ppm. The 720 members of the control group were exposed to a formaldehyde level of 0.035 ppm (Broder I et al. 1988). A significant increase in symptoms, such as eye, nose, and throat irritation was observed in individuals from UFFI homes compared with the control group.

Roto P and Sala E (1996) assessed a case of occupational formaldehyde exposure-related laryngitis in a non-smoking dairy foreman who was exposed for 9 years to formaldehyde that was emitted from a milk packing machine located under his office. The study reported that the formaldehyde concentrations varied considerably and that under normal process conditions, the measured formaldehyde level was 0.03mg/m$^3$ (Roto P and Sala E 1996). The man complained of prolonged hoarseness and chest tightness, with symptoms developing immediately after he entered his office. He developed episodes of aphonia in conjunction with pharyngeal irritation. Hoarseness, reddening of the laryngeal mucosa, redness and swelling of the vocal cords were increased after the man had been administered a formaldehyde provocation test and the symptoms were still observed 8 hours later (Roto P and Sala E 1996). The man had to retire from his job due to the seriousness of his laryngitis and his condition continued to deteriorate during 3 years of follow-up. During the follow-up

period, the man reacted strongly to tobacco smoke and to other formaldehyde containing substances (Roto P and Sala E 1996).

Strivastava AK et al. 1992 investigated symptoms among 22 workers exposed to formaldehyde at concentrations estimated to be 0.025 ppm (0.038 mg/m$^3$) for duration of greater

3

than 6 years, and compared them with a control group of 27 unexposed workers. The study found that the exposed group of workers complained of respiratory, gastrointestinal, musculoskeletal, and cardiovascular problems, and that they had elevated formic acid excretion in urine (Srivastava *et al.*, 1992). A significantly higher incidence of abnormal chest x-rays was also observed in the formaldehyde-exposed workers compared with the unexposed control group.

Holmstrom M and Wilhelmsson B (1988) evaluated 70 chemical plant workers exposed to a mean formaldehyde concentration of 0.17 ppm (0.26 mg/ m$^3$) and compared them with a control group of 36 workers not exposed to formaldehyde. The study reported that the workers exposed to formaldehyde exhibited a higher incidence in eye, nose, and deep airway discomfort. Additionally, the exposed workers exhibited diminished olfactory ability, delayed mucociliary clearance, and decreased FVC. Alexandersson R and Hedenstierna G (1988) assessed the symptomatology, lung function, and total IgG and IgE levels in serum from 38 workers exposed to formaldehyde at concentrations that ranged from 0.11 to 2.12 ppm (mean = 0.33 ppm) for a mean duration of exposure of 7.8 years. The exposed group was compared to a control group of 18 unexposed individuals. The study reported significant decrements in pulmonary function (FVC and FEV$_1$) among the formaldehyde-exposed workers, compared with the control group (Alexandersson R and Hedenstierna G 1988). In addition, eye, nose, and throat irritation was also reported more frequently by members of the exposed group, compared to the control group. No correlation was found between duration of exposure, or formaldehyde concentration, and the presence of IgE and IgG antibodies.

Malaka T and Kodama AM (1990) examined the effects of exposure to formaldehyde among 93 plywood workers exposed on average to a concentration of 1.13 ppm (range = 0.28-3.48 ppm) for a period of 26.6 years and compared them with a control group of 93 individuals. There were 53 smokers present in both study groups. Formaldehyde exposure levels were divided into three categories: high (> 5 ppm), low (< 5 ppm), and none (control group) (Malaka T and Kodama AM 1990). The study found significantly increased respiratory symptoms of irritation among exposed individuals compared with the control group. Pulmonary function tests revealed that the formaldehyde-exposed group exhibited significantly reduced FEV$_1$, FEV$_1$/FVC, and FEF$_{25-75,}$ compared with the control group (Malaka T and Kodama AM 1990).

Alexandersson R et al. (1982) assessed the irritant symptoms and pulmonary function of 47 carpentry workers exposed to a mean formaldehyde concentration 0.36 ppm (range = 0.04-1.25 ppm) and compared them with an unexposed control group of 20 individuals. The average length of employment for the formaldehyde exposed workers was 5.9 years. Symptoms of eye and throat irritation, and airway obstruction were more common among the exposed workers. A significant reduction in FEV$_1$, FEV$_1$/FVC, and MMF was also observed in the exposed workers, compared with the control group (Alexandersson R et al.1982). In a later study, Alexandersson R and Hedenstierna G (1989) evaluated symptoms of irritation, spirometry test results, and immunoglobulin levels in 34 wood workers exposed to formaldehyde over a 4-year period of time. Significant decreases in FVC, FEV$_1$, and FEF$_{25-75}$ were observed among workers exposed to formaldehyde concentrations that ranged between 0.4 to 0.5 ppm.

Horvath EP Jr et al. (1988) compared subjective irritation and pulmonary function in 109 workers exposed to formaldehyde at a concentration of 0.69 ppm (1.04 mg/m$^3$) with similar measures in a control group of 254 individuals exposed to a formaldehyde level of 0.05 ppm (0.08 mg/m$^3$). Study participants were evaluated pre- and post work-shift and were compared with the

4

control group. Significant differences in symptoms of irritation and in pulmonary function, with decrements in $FEV_1$, $FEV_1$/FVC ratio, $FEF_{50}$, $FEF_{25}$, and $FEF_{75}$ were found when the exposed group's pre- and post work-shift values were compared (Horvath EP Jr et al. 1988). In another study, Kilburn KH et al. (1989) reported reduced pulmonary function, as measured by FVC, $FEV_1$, $FEF_{25-75}$, and $FEF_{75-85}$ among 280 histology technicians exposed to 0.2 to 1.9 ppm of formaldehyde that had volatilized from a formalin preservation solution, compared to a control group of 486 individuals.

Thrasher JD et al (1987) reported that chronic exposure to formaldehyde has been associated with immunological hypersensitivity as measured by elevated circulating IgG and IgE autoantibodies in human serum albumin. A decrease in the proportion of T-cells was also observed, which indicated altered immunity. In a later study, Thrasher JD et al (1990) found that long-term exposure to formaldehyde was associated with autoantibodies, immune activation, and formaldehyde albumin adducts in occupationally exposed patients, or among residents of mobile homes or of homes containing particleboard sub-flooring. The authors of the study suggested that the hypersensitivity induced by formaldehyde may account as a mechanism for inducing asthma and other health complaints associated with exposure to formaldehyde.

Matsunaga I et al. (2008) examined the relationship between ambient formaldehyde and the prevalence of allergic disorders among Japanese pregnant women. The study found that exposure to formaldehyde at levels of 47 ppb or more were independently associated with an increase prevalence of atopic eczema, representing an adjusted odds ratio (OR) = 2.25 (95% CI: 1.01-5.01, p<0.05). According to the authors of the study, the positive association between exposure to formaldehyde and atopic eczema was more pronounced in women without a family history of allergy than in those with a positive family history of allergy (Matsunaga I 2008).

Edling C et al (1988) assessed the cytogenetic effects of formaldehyde on the nasal mucosa among 75 men with occupational exposures to formaldehyde or to formaldehyde and wood dust, and compared them to a control group of 25 individuals with no industrial exposure to formaldehyde. The exposed group of workers were exposed to formaldehyde concentrations (TWA) in air that ranged between 0.1 and 1.1 $mg/m^3$, with peaks up to 5.0 $mg/m^3$, for a mean duration of 10.5 years (range = 1 - 39 years). The study reported a high incidence of nasal symptoms, primarily runny nose and crusting, which was related to exposure to formaldehyde in 60% of the men. Seventy-five percent of the men complained of running eyes when exposed to formaldehyde, and twelve (16%) men mentioned a history of upper airway allergy. Only three of the exposed men had normal nasal mucosa; and the remainder had a loss of cilia and goblet cell hyperplasia (11%), and squamous metaplasia (78%); and in six workers (8%), mild dysplasia was present (Edling C et al 1988). The histological grading showed a significantly higher score for nasal lesions when compared with unexposed contents (2.9 versus 1.8).

Holmstrom M et al. (1989b) examined histological changes in the nasal mucosa in 70 workers in a chemical factory mainly exposed to formaldehyde and among 100 employees in five different furniture factories exposed to formaldehyde and wood dust. The exposed workers were compared with a control group that consisted of 36 individuals. In the chemical factory, workers were exposed to concentrations of formaldehyde that ranged from 0.05 to 0.50 $mg/m^3$ (median 0.30 $mg/m^3$). Short peaks of exposure to formaldehyde frequently occurred at a level over 1 $mg/m^3$. The mean duration of exposure was 10.4 years (SD: 7.3, range 1-36 years). Formaldehyde levels in the furniture factories were mostly between 0.2 and 0.3 $mg/m^3$ and were seldom higher than 0.5 $mg/m^3$ (Holmstrom M et al.1989). The mean duration of exposure among the furniture workers was 9.0

5

years (SD: 6.3, range 1-30 years). The control group was exposed to environmental formaldehyde concentrations that ranged from 0.09 to 0.17 mg/m$^3$, and the mean level over the year was 0.09 mg/m$^3$. The study reported significant histological changes in nasal mucosa in the formaldehyde exposed group and not in the furniture workers. The nasal biopsy score was 2.16, p<0.05 in the formaldehyde exposed workers. Loss of cilia, goblet cell hyperplasia, and cuboidal and squamous cell metaplasia replacing epithelium were more frequent in the formaldehyde exposed group of workers (Holmstrom M et al. 1989).

Boysen M et al. (1990) assessed nasal mucosa in 37 workers exposed to formaldehyde for more than five years, and compared them with a 37 age matched control group without overt nasal disease or occupations with known or a suspected relationship to nasal cancer. Airborne concentrations of formaldehyde ranged from 0.5 to 2.0 ppm for 29 workers and >2.0 ppm for 8 workers. The study reported a higher degree of metaplastic alterations in the formaldehyde exposed group. Three cases of epithelial dysplasia were observed among the exposed group (Boysen M et al. (1990).

With respect to the carcinogenicity and the risk of cancer from exposure to formaldehyde, the International Agency for Research on Cancer (IARC) has classified formaldehyde as Group 1, carcinogenic to humans (IARC 2006). Some studies have investigated the risk of the nasal cavity, paranasal sinuses, nasopharynx, and hypopharynx. For example Hayes RB et al. (1986) reported statistically significant elevations in cancers of the nasal cavity and accessory sinuses among workers with any exposure to formaldehyde for "Assessment A," relative risk (RR) = 2.50 (90% CI:1.5-4.3, p<0.10), and for "Assessment B," RR = 1.90 (90% CI:1.2-3.0, p<0.10). Partanen T (1993) performed a meta-analyses on respiratory cancer and exposure to formaldehyde, and reported a statistically significant increased risk in nasopharynx cancer with any exposure to formaldehyde, RR = 2.00 (95% CI:1.36-2.90, p<0.05), and with substantial exposure to formaldehyde, RR = 2.74 (95% CI:1.36-5.55, p<0.05). In a meta-analyses performed by Blair A et al. 1999, substantial exposure to formaldehyde was associated with a statistically significant elevated risk in cancer of the nasopharynx, RR = 2.10 (95% CI:1.1-3.5, p<0.05).

**Formaldehyde Effects in Children**

Children have been shown to be more sensitive to toxic substances than adults (Wantke F et al. 1996). Krzyzanowski M et al. (1990) assessed chronic respiratory effects associated with exposure to indoor formaldehyde and found that children are more sensitive than adults to formaldehyde toxicity. A number of studies have examined the effects of formaldehyde exposure on the health of children (Krzyzanowski M et al. 1990; Wantke F et al. 1996; Smedje G et al. 1997; Garrett MH et al. 1999; Franklin P et al. 2000; Smedje G and Norback D 2001; Rumchev KB et al. 2002; Zhao Z et al. 2008). Of these cited studies, a few are reviewed herein. For example, Krzyzanowski M et al. assessed chronic respiratory effects from indoor exposure to formaldehyde among 298 children 6 to 15 years of age and 163 adults in 202 households. Formaldehyde concentrations were measured in 202 homes in Pima County, Arizona. The study reported that the average level of formaldehyde in the 202 households was 26 ppb and only in a few cases did the formaldehyde concentration exceed 90 ppb (Krzyzanowski M et al.1990).

The overall results of the study indicated that there was an increased prevalence rate of physician diagnosed chronic bronchitis and asthma in children from 6 to 15 years of age exposed to formaldehyde at concentrations between 60 and 140 ppb in their homes (Krzyzanowski M et al.1990). There was no threshold level found for formaldehyde concentrations affecting ventilatory

6

function.  A 10% decrement in peak expiratory flow rates was observed for formaldehyde levels as low as 30 ppb, "with an even greater effect in asthmatic children" (Krzyzanowski M et al.1990).  The effects in asthmatic children exposed to concentrations of formaldehyde below 50 ppb were greater than in healthy children.  The study reported that the effects of formaldehyde exposure in adults were less evident and decrements in peak expiratory flow rates due to formaldehyde levels over 40 ppb were only seen in the morning, and primarily among smokers (Krzyzanowski M et al. 1990).

Wantke F et al. (1996) evaluated whether IgE-mediated sensitization and symptoms in school children were associated with formaldehyde exposures at school. They studied assesses 62, 8-year old children attending a primary school in Vienna, Austria. None of the children had asthma or wheezy bronchitis.  Indoor formaldehyde concentrations were measured in classrooms of two buildings. One of the buildings was of frame construction with particleboard used extensively as paneling and the other building was of brick construction. Also, the window frames were embedded with urea foam in the frame constructed building. A radioallergosorbent test (RAST) was utilized to assess formaldehyde-specific IgE levels in all children while attending the paneled classrooms and 3 months after transfer to the brick building.  Symptoms were evaluated in all children by the using a questionnaire before and 3 months after changing classrooms (Wantke F et al.  (1996). The study reported elevated formaldehyde-specific IgE was detected in children exposed to formaldehyde concentrations that ranged from 43 to 75 ppb.  Two of the three children with pathologically high RAST readings (>2.0) were in classrooms with a formaldehyde concentration of 75 ppb.  An additional 21 children had elevated RAST readings (1.3-1.9).  Symptoms reported among the exposed children were headache, epistaxis, rhinitis, fatigue, cough, dry nasal mucosa, and burning eyes.  The authors indicated that aside from the irritant action of formaldehyde, it leads to the development of IgE-mediated sensitization (Wantke F et al.  (1996).

Garrett MH et al. (1999) investigated formaldehyde exposures in relation to chronic respiratory symptoms and allergic responses to aeroallergens among 148 children from 7 to 14 years of age.  Of the total group, 53 children were asthmatic and were distributed among 43 homes. Formaldehyde levels were measured with passive samplers on four occasions over the course of a year in 80 homes in the Latrobe Valley, Victoria, Australia (Garrett MH et al. 1999).  The median indoor formaldehyde concentration in the homes was 15.8 $\mu g/m^3$, (12.6 ppb), with a maximum level of 139 $\mu g/m^3$ (111 ppb).  The mean outdoor formaldehyde concentration was 0.7 $\mu g/m^3$, with a range from 0.3 to15.3 $\mu g/m^3$.  The study reported an association between formaldehyde exposure and atopy in children.  Parental asthma and parental allergy were found to be associated with current exposure to formaldehyde (Garrett MH et al. 1999).  Thus, the association of atopy in children and formaldehyde was confirmed in those homes with parents that had no asthma history.  More severe allergic sensitization was observed with increases in exposure to formaldehyde.  There was also a marked jump in positive skin prick tests among children exposed to 20-50 $\mu g/m^3$ (16- 41 ppb) (Garrett MH et al. 1999).

Franklin P et al. (2000) assessed the possible inflammatory effects of formaldehyde at levels typically found in the home. The study recruited 224 healthy children from 6 to 13 years of age, of which, 116 were girls.  Formaldehyde in homes was monitored using a passive sampling technique. As an indicator of respiratory inflammation, exhaled nitric oxide was measured directly into a fast response chemiluminescence nitric oxide analyzer.  Lung function tests and skin prick tests for seven common allergens were performed on the children.  The study reported that exhaled nitric oxide levels were significantly elevated in children living in homes with average formaldehyde

7

concentrations of ¤    50 ppb (p=0.02).  Exhaled nitric oxide levels were 15.5 ppb (95% CI: 10.5 to 22.9 ppb) (geometric mean) for children residing in homes with formaldehyde levels of ¤    50 ppb compared with 8.7 ppb (7.9 to 9.6) (Franklin P et al. 2000).

**CONCLUSIONS**

Based on my review of relevant scientific literature on the toxicity and health effects associated with exposure to formaldehyde, and a reasonable degree of toxicological probability, the symptoms and medical conditions that Christopher Cooper experienced as outlined in the report prepared by James P. Kornberg, M.D., Sc.D. (Kornberg JP 2009), during the period between May 2006 to the present time are more likely than not directly related to and/or were exacerbated by his exposure to formaldehyde from living in the Gulf Stream Coach, Inc., Cavalier travel trailer from May 2006 through late December 2007.

Respectfully Submitted,

*Stephen King, Ph.D., M.P.H.*

Stephen King, Ph.D., M.P.H.
Toxicologist & Epidemiologist

**REFERENCES**

Alexandersson R, Hedenstierna G, Kolmodin-Hedeman B.  Exposure to formaldehyde: Effects on pulmonary function. Arch Environ Health, 37:279-284, 1982.

Alexandersson R, Hedenstierna G. Respiratory hazards associated with exposure to formaldehyde and solvents in acid-curing paints.  Arch Environ Health, 43:222-227, 1988.

Alexandersson R, and Hedenstierna G.  Pulmonary function in wood workers exposed to formaldehyde: A prospective study. Arch Environ Health, 44:5-11, 1989.

ATSDR 1999.  Toxicological Profile for Formaldehyde.  U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, Atlanta, GA, 1999.

ALX-EXP-32-000043

ATSDR 2007.   An Update and Revisions of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers, Baton Rough, Louisiana, September-October 2007..   U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, Atlanta, GA, 2007.

Barratt MR, Pool SL.   Formaldehyde.   In: Barratt MR, Pool SL (eds), Principles of Clinical Medicine for Space Flight.   Elsevier, New York, NY, 433, May 2008.

Blair A, Saracci R, Stewart PA, et al.   Epidemiological evidence on the relationship between formaldehyde exposure and cancer.   Scand J Work Environ Health, 16:381-393, 1990.

Bonner MS.   Michael S. Bonner, Ph.D., Bonner Analytical Testing Company, Hattiesburg, MS, April 6, 2006.

Boysen M, Zadig B, Digernes V, et al.   Nasal mucosa in workers exposed to formaldehyde: a pilot study.   Br J Ind Med, 47:116-121, 1990.

Broder I, Corey P, Cole P, et al.   Comparison of health of occupants and characteristics of houses among control homes and homes insulated with urea formaldehyde foam: Parts I (methodology), II (initial health and house variables and exposure response relationships), and III (health and house variables following remedial work).   Environ Res, 45:141-203, 1988.

Brown B.   Memorandum, From: Bronson Brown, Chief, Occupational Safety and Health; To: John Crowley, Chief of Staff, JFO, Biloxi, Mississippi; Subject: Formaldehyde Air Sampling, FEMA Trailer Staging Area, Purvis, Mississippi; Corrective Action: Specific Recommendations are Provided.   Federal Emergency Management Agency, U.S. Department of Homeland Security, Washington, DC, May 31, 2006.

CDC 2008a.   Formaldehyde Levels in FEMA-Supplied Trailers. Preliminary Findings from the Centers for Disease Control and Prevention.   U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, Atlanta, GA, February 14, 2008.
CDC 2008b.   Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes.   Centers for Disease Control and Prevention.   U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, Atlanta, GA, July 2, 2008.

Congress 2008a.   Interim Staff Analysis, Formaldehyde and FEMA Trailers.   House Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, DC, July 2008.

Congress 2008b.   Trailer Manufacturers and Elevated Formaldehyde Levels.   Majority Staff Analysis. Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, DC, July 9, 2008.

DeVany MC.   The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued to Hurricane Disaster Victims, and Recommended Action Items. Tstimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007.

ALX-EXP-32-000044

Doi S, Suzuki S, Morishita M, Yamada M, et al.  The prevalence of IgE sensitization due to formaldehyde exposure in homes.  Allergy, 54:330-337, 1999.

Edling C, Hellquist H, Odkvist L.  Occupational exposure to formaldehyde and histopathological changes in the nasal mucosa.  Br J Ind Med, 45:761-765, 1988.

Franklin P, Dingle P, Stick S.  Raised exhaled nitric oxide in healthy children is associated with domestic formaldehyde levels.  Am J Respir Crit Care Med, 161:1757-1759, 2000.

Garrett MH, Hooper MA, Hooper BM, et al.  Increased risk of allergy in children due to formaldehyde exposure in homes.  Allergy, 54:330-337, 1999.

Hayes RB, Raatgever JW, de Bruyn A, et al.  Cancer of the nasal cavity and paranasal sinuses, and formaldehyde exposure.  Int J Cancer, 37:487-492, 1986.

Hewett P.  Analysis of the Gulf Stream Coach, Inc. Formaldehyde Exposure Dataset.  Exposure Assessment Solutions, Inc.,

Holmstrom M, Wilhelmsson B.  Respiratory symptoms and pathophysiological effects of occupational exposure to formaldehyde and wood dust.  Scand J Work  Environ Health, 14:306-311, 1988.

Holmstrom M, Wilhelmsson B, Hellquist H.  Histological changes in the nasal mucosa in persons occupationally exposed to formaldehyde alone and  in combination with wood dust.  Acta Otolaryngol, 107:120-129, 1989.

Holmstrom M, Wilhelmsson B, Hellquist H.  Histological changes in the nasal mucosa in rats after long-term exposure to formaldehyde and wood dust.  Acta Otolaryngol, 108:274-283, 1989.

Holmstrom M, Lund VJ.  Malignant melanomas of the nasal cavity after occupational exposure to formaldehyde.  Br J Ind Med, 48:9-11, 1991.

Horvath EP Jr, Anderson H Jr, Pierce WE, et al. Effects of formaldehyde on the mucous membranes and lungs: A study of an industrial population.  JAMA, 259:701-707, 1988.

IARC 2006.  IARC Monograph on the Evaluation of Carcinogenic Risks to Humans.  Vol. 88.  Formaldehyde, 2-Butoxyethanol, and 1-tert-Butoxypropan-2-ol.  International Agency for Research on Cancer, World Health Organization, Lyon, France, 39-325, 2006.

Kerfoot EJ, Mooney TE. 1975. Formaldehyde and paraformaldehyde study in funeral homes.  Am Ind Hyg Assoc J, 36:533-537, 1975.

Kilburn KH, Warshaw R, Thornton JC. 1989. Pulmonary function in histology technicians compared with women from Michigan: effects of chronic low dose formaldehyde on a national sample of women.  Br J Ind Med, 46:468-472, 1989.

Kornberg JP.  Environmental Medical Causation Report, Including Consideration for the Necessity and

10

Cost of Medical Monitoring and Early Cancer Detection, Christopher James Cooper.  James P. Kornberg, M.D., Sc.D., Boulder, CO, May 19, 2009.

Krzyzanowski M, Quackenboss JJ, Lebowitz MD.  Chronic respiratory effects of indoor formaldehyde exposure.  Environ Res, 52:117-125, 1990.

Kriebel D, Sama SR, Cocanour B. Reversible pulmonary responses to formaldehyde:
A case study of clinical anatomy students.  Am Rev Respir  Dis, 148:1509-1515, 1993.

Liu KS, Huang FY, Hayward SB, et al.  Irritant effects of formaldehyde exposure in mobile homes. Environ Health Perspect, 94:91-94, 1991.

Maddalena R, Russell M, Sullivan DP, et al.  Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units – Final Report.  LBNL-254E.  Indoor Air Department, Environmental Energy Technologies Division, Ernst Orlando Lawrence Berkeley National Laboratory, Berkeley, CA, November 2008.

Matsunaga I, Miyake Y, Yoshida T, et al.  Formaldehyde levels and allegic disorder among Japanese pregnant women: baseline data from the Osaka Maternal and Child Health Survey.  Ann Epidemiol, 18:78-84,

McGeehin M.  Testimony on CDC Reports on Level of Formaldehyde in FEMA Temporary Housing Units Supplied to Katrina Victims in the Gulf Coast, before the Committee on Oversight and Government Reform, U.S. House of Representatives.  Michael McGeehin, M.D., M.S.P.H., Director, Division of Environmental Hazards and Health, National Center for Environmental Health, Centers for Disease Control and Prevention, Public Health Service, U.S. Department of Health and Human Services, Washington, DC, July 9, 2008.

McGwin G Jr.  Formaldehyde Exposure and Asthma in Children: A Systemic Review.  Birmingham, AL, May 18, 2009.

Mendell M.  Indoor Residential Chemical Emissions as Risk Factors for Children's Respiratory Health. Indoor Environment Department, Lawrence Berkeley National Laboratory, Berkeley, CA, July 31, 2006.

Mi YH, Norback D, Tao J, et al.  Current asthma and respiratory symptoms among pupils in Shanghai, China: influence of building ventilation, nitrogen dioxide, ozone, and formaldehyde in classrooms. Indoor Air, 16:454-464, 2006.

Nordman H, Keskinen H, Tupparainen M.  Formaldehyde asthma - Rare or overlooked.  J Allergy Clin Immunol, 75:91-99, 1985.

Olsen JC, Dossing M.  Formaldehyde induced symptoms in day care centers.  Am Ind Hyg Assoc J, 43:366-370, 1982.

Partanen T, Kauppinen T, Luukkonen R, et al.  Malignant lymphomas and leukemias, and exposures in the wood industry: An industry-based case-referent study.  Int Arch Occup Environ Health, 64:593-596, 1993.

ALX-EXP-32-000046

Pullin S 2006a.  Formaldehyde Testing.  Activated Trailer Records.  Scott Pullin, Vice President of Operations, Gulf Stream Coach, Inc., Happanee, IN, March 28, 2006 – April 22, 2006.  Cited in: Trailer Manufacturers and Elevated Formaldehyde Levels.  Majority Staff Analysis, Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, DC, July 9, 2008.

Pullin S 2006b.  Formaldehyde Testing.  Handwritten Notes of Scott Pullin.  Scott Pullin, Vice President of Operations, Gulf Stream Coach, Inc., Happanee, IN, March 26, 2006 – March 30, 2006.

Ritchie IM, Lehnen RG.  Formaldehyde-related health complaints of residents living in mobile and conventional homes.  Am  J Public Health, 77:323-328, 1987.

Rumchev KB, Spickett JT, Bulsara MK, et al.  Domestic exposure to formaldehyde significantly increases the risk of asthma in young children.  Eur Respir J, 20:403-408, 2002.

Shea D.  Stored Unit Report.  Daniel Shea, Co-President, Gulf Stream Coach, Inc., Happanee, IN, April 24, 2006.  Cited in: Trailer Manufacturers and Elevated Formaldehyde Levels.  Majority Staff Analysis, Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, DC, July 9, 2008.

Smedje G, Norback D, Edling C.  Asthma among secondary schoolchildren in relation to the school environment.  Clin Exp Allergy, 27:1270-1278, 1997.

Smedje G, Norback D.  Incidence of asthma diagnosis and self-reported allergy in relation to the school environment-a four-year follow-up study in schoolchildren.  Int J Tuberc Lung Dis, 27:1059-1066, 2001.
Smith J.  Internal Gulf Stream E-mail From: John Smith, To Dan Shea, Phil Savari, and Scott Pullin. Gulf Stream Coach, Inc., Happanee, IN, March 10, 2006.

Soto P, Sala E.  Occupational laryngitis caused by formaldehyde: A case report.  Am J Ind Med, 29:275-277, 1996.

Srivastava AK, Gupta BN, Bihari V, et al.  Clinical studies of employees in a sheet-forming process at a paper mill. Vet Human Toxicol, 34:525-527, 1992.

Tavernier G, Fletcher G, Gee I, et al.  IPEADAM study: Indoor endotoxin exposure, family status, and some housing characteristics in English children. J Allergy Clin Immunol, 117:656-662, 2006.

Thrasher JD, Wojdani A, Cheung G, et al.  Evidence for formaldehyde antibodies and altered cellularity immunity in subjects exposed to formaldehyde in mobile homes.  Arch  Environ Health, 42:347-350, 1987.

Thrasher JD, Broughton A, Madison R.  Immune activation and autoantibodies in humans with long-term inhalation exposure to formaldehyde.  Arch Environ Health, 45:217-223,1990.
Wantke F, Demmer CM, Tappler P, et al.  Exposure to gaseous formaldehyde induces IgE-mediated sensitization to formaldehyde in school-children.  Clin Exp Allergy, 26(3):276-80, 1996.

WHO 1989.  Environmental Health Criteria 89, Formaldehyde.  World Health Organization, Geneva

12

ALX-EXP-32-000047

Switzerland, 1989.

Wilhelmsson B, Holmstrom M.  Possible mechanisms of formaldehyde-induced discomfort in the upper airway.  Scand J Work Environ Health,18:403-407, 1992.

Williams NR.  Occupational voice disorders due to workplace exposure to irritants-review of the literature.  Occup Med, 52:99-101, 2002.

Williams PM.  Affidavit of Patricia M. Williams, Ph.D. DABT in the Trial of Alana Alexander and Christopher Cooper.  Environmental Toxicology Experts, New Orleans, New Orleans, LA, May 18, 2009.

Wilmer JW, Wouterson RA, Appelman LM, et al.  Subchronic (13-week) inhalation toxicity study of formaldehyde in male rats: 8-hour intermittent versus 8-hour continuous exposures.  Toxicol Lett, 47:287-293, 1989.

Woutersen RA, van Garderen-Hoetmer A, Bruijntjes JP, et al.  Nasal tumours in rats after severe injury to the nasal mucosa and prolonged exposure to 10 ppm formaldehyde.  J Appl Toxicol, 9:39-46, 1989.

Wouterson RA, Appelman LM, Wilmer JW, et al. Subchronic (13-week) inhalation toxicity study of formaldehyde in rats.  J Appl Toxicol, 7:43-49, 1987.


Zhao Z, Zhang Z, Wang Z, et al.  Asthmatic symptoms among pupils in relation to winter indoor and outdoor air pollution in schools in Taiyuan, China.  Environ Health Perspect, 116:90-97, 2008.

Zwart A, Woutersen RA, Wilmer JWGM, et al.  Cytotoxic and adaptive effects in rat nasal epithelium after 3-day and 13-week exposure to low concentrations of formaldehyde vapour.  Toxicology, 51:87-99, 1988.

ALX-EXP-32-000048