Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER          *          MDL NO. 1873
        FORMALDEHYDE         *
        PRODUCTS LIABILITY   *          SECTION: N(5)
        LITIGATION           *
                             *
Charlie Age, et al., v.      *
Gulf Stream Coach Inc, et al. *
Docket No. 09-2892           *


VIDEOTAPE ORAL DEPOSITION OF
JAMES PHILIP KORNBERG, M.D., Sc.D.
July 9, 2009


        VIDEOTAPE ORAL DEPOSITION OF JAMES PHILIP
KORNBERG, M.D., Sc.D., produced as a witness at the
instance of Gulf Stream Coach, Inc., and duly sworn, was
taken in the above-styled and numbered cause on the 9th
of July, 2009, from 9:40 a.m. to 5:55 p.m., before Carla
D. Capritta, RPR, in and for the State of Colorado,
reported by machine shorthand, at the conference room of
Fairfield Inn Denver Airport, 6851 Tower Road, Denver,
Colorado  80249, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

Dr. James Phillip Kornberg
July 9, 2009

Page 24

1    Page 18 of my report.   And there actually were -- there

2    should be a couple of additions to that.

3         Q.   Okay.  Let me -- let me -- let me back up.

4         A.   Okay.

5         Q.   That's what you reviewed, correct, Page 18 and

6    some more things?

7         A.   A few things, yes.

8         Q.   Some more publications?

9         A.   Yes.

10        Q.   Okay.

11             MR. PINEDO:  I believe it carries on to 19.

12             MR. WEINSTOCK:  Yes, yeah, and I'm just --

13             THE DEPONENT:  And 19, correct.

14        Q.   (By Mr. Weinstock)  Other than reviewing those

15   reports, those publications, the medical records, and

16   the interview, what else did you do or consult prior to

17   formulating your opinions?

18        A.   I -- I think it's all included there.

19        Q.   Did you physically examine Christopher Cooper?

20        A.   No.  I -- I requested that he be evaluated at

21   National Jewish.  I could have certainly examined him,

22   but the decision was made, I think, that they had

23   slightly better resources than I could offer at that

24   time.

25        Q.   Okay.

Dr. James Phillip Kornberg
July 9, 2009

Page 25

1      A.    So he was referred to Dr. Pacheco at National

2    Jewish.

3      Q.    Maybe it's easier to do it this way:

4    Section A, you did a -- an envi- -- you took an

5    environmental history, correct?

6      A.    Yes.

7      Q.    Okay.  Section B, you took a history of

8    the medical -- I'm sorry, Section 2, you took a history

9    of the medical problem.  I said Section A.  It was

10   actually Section 1, is the environmental history.

11     A.    Are you referring --

12     Q.    Page --

13     A.    Where on my report, if I may ask?

14     Q.    Page 8.

15     A.    Oh, okay.  We're back there.  Yes.

16     Q.    Okay.  That brings us to, you took a family

17   history as well?

18     A.    Yes.

19     Q.    Social history?

20     A.    Um-hmm.

21     Q.    You reviewed his medications?

22     A.    Yes.

23     Q.    Review of systems.  What are -- what are

24   systems?

25     A.    Well, it -- in medicine, systems include most

Dr. James Phillip Kornberg
July 9, 2009

Page 26

1    of the coherent organ systems; the gastrointestinal

2    system; the neurological system; the ear, nose, and

3    throat.  We kind of cluster them together and -- and ask

4    questions about specific problems that may occur in each

5    system; cardiovascular, pulmonary system.

6         Q.   That was just a function of -- additional

7    function of your interview with Mrs. Alexander,

8    Mr. Cooper, and a review of the medical reports; is that

9    correct?

10        A.   That's right.  This is similar to what was

11   reported by Dr. Pacheco, because she -- she, of course,

12   took a review of systems as well.  So basically you get

13   a concept of symptoms and complaints.

14        Q.   Then you -- you did a -- you did a patient-

15   specific causation analysis?

16        A.   It -- first, I did a general causation

17   assessment to -- as part of my -- my overall job, which

18   was to do a patient-specific causation analysis.  I -- I

19   began, first, looking at general causation issues and

20   then sought, to the extent to which, if any, they could

21   apply to this particular patient.

22        Q.   Okay.  You did -- and you did a -- well, I

23   guess you did -- I'm sure you did it that way, but you

24   reported it in reverse order in your -- in your report,

25   because here we have the general causation --

Dr. James Phillip Kornberg
July 9, 2009

Page 27

1    A.   Right.  I -- I decided --

2    Q.   -- on Page 18.

3    A.   I decided to present the clinical information

4  that I obtained; and then, rather than recounting all of

5  Dr. Pacheco's report, I harvested the relevant

6  information and put that in my causation analysis.

7    Q.   Then you discussed all those factors on

8  Page -- beginning on Page 23?

9    A.   Right.  On -- beginning on Page 21, I actually

10  began a discussion regarding the diagnosis and -- and, I

11  might add, the differential diagnosis; based, to a great

12  extent, on -- on pertinent negatives that were

13  discovered in this particular case.  And then, on

14  Page 22, looked at the relationship between this

15  probable -- what -- what at that time I had established

16  as probable exposure and what was identified as a

17  probable diagnosis by Dr. Barnes and by Dr. Pacheco.

18    Q.   Okay.

19    A.   And on Page 23, I discuss them.

20    Q.   Okay.  Then on Page 26, you gave a summary of

21  your environmental-medical causation opinion?

22    A.   That's correct.  With -- with the foundation

23  that I established on Page 25.

24    Q.   Going back to medical records, as opposed to

25  the reports, did you review the medical records from

Dr. James Phillip Kornberg
July 9, 2009

Page 28

1    National Jewish?

2         A.    Yes.

3         Q.    Okay.  Did you review --

4         A.    Mainly -- mainly Dr. Pacheco's report.

5         Q.    Okay.

6         A.    And I -- I did receive that before I wrote my

7    opinion.

8         Q.    Subsequent to issuing her report, Dr. Pacheco,

9    I believe, circulated to me the medical records she

10   generated, the PF -- pulmonary function test and things

11   like that.  Were those available to you before you wrote

12   your report?

13        A.    Not -- not in their entirety, no, no.

14        Q.    Okay.

15        A.    And I -- I've looked at those but haven't

16   examined it as closely as I have her report.

17        Q.    She also asked for a CAT scan, CT scan, of the

18   nasal --

19        A.    Yes.

20        Q.    -- area?  And she reported that in her report.

21        A.    I'd have to go back and look.

22        Q.    Okay.

23        A.    But I recall it, yes.

24        Q.    Did you ever review the films from that CAT

25   scan?

Dr. James Phillip Kornberg
July 9, 2009

Page 33

1    I had a master's from MIT already, so I -- I

2    didn't pick up their master's.  I had to pay some extra

3    money and didn't have it at the time.  That's actually

4    true.

5    And so and then I went into the -- actually,

6    the general practice of occupational medicine, the

7    specialty, in the -- in the about 1978, '79 time frame.

8    But as time went on, I found that my engineering

9    training was more and more valuable.  And I found that

10   my colleagues often ignored matters related to exposure,

11   that most of causation is driven by exposure.  And

12   without it, oftentimes a physician may spend 6 hours on

13   a diagnosis and 6 minutes on an exposure-related issue.

14   I've seen it over and over again.

15   So I actually did a fair amount of defense

16   work in my earlier years, because a lot of the causation

17   analyses which were provided by physicians were not well

18   done.

19   In this case, and in cases like this, the

20   first thing I look at is the exposure issue.  Without

21   it, causation is an -- is -- is absolutely -- an

22   absolute impossibility.  You can't take a diagnosis and

23   invent an exposure that fits the diagnosis.  So in the

24   time frame of this case, or any one like it, I would

25   have, and I did, spend time on the trailers and the

Dr. James Phillip Kornberg
July 9, 2009

Page 41

1      Q.    Except for the --

2      A.    Well, King's -- King's report does mention

3   them.

4      Q.    Okay.

5      A.    And that was part of my report.

6      Q.    King's report was not attached to your report,

7   correct?

8      A.    It -- it should have been.

9            MR. PINEDO:  It's attached.

10           THE DEPONENT:  Yeah.

11           MR. HINES:  It is, it's Exhibit D.

12     A.    Yeah.  I mean, I --

13     Q.    (By Mr. Weinstock)  Okay.

14     A.    -- requested --

15     Q.    Fair enough.

16     A.    -- that that be prepared, under my direction.

17     Q.    (By Mr. Weinstock)  And it's based on that

18   report and based on that information that you reached

19   the conclusion that at times the unit would be as high

20   as 300 parts per billion; is that correct?

21     A.    Right.  I -- I estimated -- I've had a lot of

22   experience doing this sort of thing, and -- and over the

23   years my best estimate was that it was -- it was in a

24   range that could have -- and I said that episodically.

25   I'm not suggesting that there was a necessarily

Dr. James Phillip Kornberg
July 9, 2009

Page 42

1    continuous exposure at that level.  But I did all of my

2    analysis, especially related to his medical monitoring

3    requirements, based upon a level 50, which, I felt, was

4    quite conservative.

5         Q.   That was for the medical monitoring.  But for

6    the causation, you accepted that episodically he would

7    have been exposed to 250 to 300 parts per billion,

8    correct?

9         A.   That --

10             MR. PINEDO:  Objection, form.

11        A.   That's correct.

12        Q.   (By Mr. Weinstock)  Okay.  And that figure of

13   250 to 300 billion is, in part, based on the work done

14   by Dr. King, correct?

15        A.   That's in -- in part correct, yes.

16        Q.   And that's based on the information you just

17   gave me about testing them by Mr. Shea, Mr. Pullen,

18   Lawrence Berkeley, and CDC; is that correct?

19        A.   And the EPA.

20        Q.   And the EPA.  I'm correct?

21        A.   Let me look, make sure.  I -- I think you're

22   right.

23        Q.   Okay.

24        A.   That's -- that includes them all.

25        Q.   Let me ask you a question.  Of all those units

Dr. James Phillip Kornberg
July 9, 2009

Page 66

1   effects, you know, the thickening of the epithelium; the

2   discharge from his -- his nose, and what was more than

3   one would, I think, expect to find in his methacholine

4   challenge, and his pulmonary function studies, is, this

5   is a signature, it's a biological thumbprint of an event

6   which is -- would not have been expected, but -- but for

7   which we now have a good environmental medicine

8   explanation.  And that's the time that he spent in this

9   trailer for 19 months, under the environmental

10  conditions that I've discussed.

11       Q.   Are there any other possible explanations?

12       A.   Yes.  In a differential diagnosis, which is

13  what is a prerequisite to doing this, what I think

14  applies here is, in fact, the pertinent negative issues

15  of his not being found to be markedly atopic.

16           Things you would take into consideration would

17  be mold allergies, having pets that could provoke the

18  asthma, a number of things along those lines.  And so

19  those do not seem to apply to his condition.  In other

20  words, we don't have -- we don't have an explanation for

21  why he would continue to have what is intermittent, but

22  a latent disorder, which would -- which manifests itself

23  rather dramatically on methacholine challenge.

24       Q.   If he were exposed to a sufficient quantity of

25  dust mites, would that be sufficient to trigger a

Dr. James Phillip Kornberg
July 9, 2009

1           (Recess taken from 11:07 to 11:47 a.m.)

2           (Exhibit 1 marked.)

3           THE VIDEOGRAPHER:  This is the beginning of

4   Tape No. 2 in the deposition of James Kornberg.  The

5   time is 11:47.

6       Q.  (By Mr. Weinstock)  Dr. Kornberg, as a

7   housekeeping matter, I'm going to go ahead and attach a

8   clean copy of your report as Exhibit 1, okay?

9       A.  Okay.

10      Q.  Now, just before the break, off -- while we

11  were off the record, I asked you to pull -- and I hope

12  this is what I asked you for -- those studies that

13  you've reviewed or that you're familiar with, that

14  demonstrate permanent epithelial damage from

15  formaldehyde exposure that resulted in exacerbation of

16  asthma.  Is that what you understood me to ask you?

17      A.  I -- I think that's --

18      Q.  Okay.

19      A.  -- what you asked, yes.

20      Q.  All right.  And if we can -- and you've pulled

21  some of those.  If we can start discussing them.  What's

22  the first one you pulled?

23      A.  Well, before we begin, I -- I'd like to make

24  it clear that the -- the conclusion that you

25  articulated, which is consistent with the diagnosis that

Dr. James Phillip Kornberg
July 9, 2009

Page 74

1    I provided, is a composite of many different factors,

2    which are customized to this specific case, which was

3    my -- my duty to perform a -- a -- an individual

4    causation analysis.

5            There is no study, and typically in science

6    this is the case, that -- that -- that fits that

7    description that you've asked for, although it -- it

8    would be great if there were.  There -- there just isn't

9    anything out there that is customized specifically to

10   the diagnostic end result we see in -- in Chris Cooper.

11           All right.  However, if you break it into

12   parts, that is, looking at epithelial injury to

13   individuals who are exposed to formaldehyde, and then

14   you look at the -- the ability of formaldehyde to cause

15   asthma or to aggravate asthma, then I think we can -- we

16   can get to the -- what you're asking, in -- in more --

17   in a -- as a composite by looking at individual factors.

18   There just isn't any study out there.

19           And typically, there's -- you know, there's no

20   study that proves anything.  There are studies that --

21   that -- that either subtract or add to the weight of

22   evidence that allow to you draw certain conclusions.

23       Q.   I appreciate your -- your response and the

24   completeness of it, and I just want to make sure I

25   understand correctly.  Am I correct that it is your

Dr. James Phillip Kornberg
July 9, 2009

Page 75

1    opinion that Chris Cooper's exposure to asthma --

2        A.    To formaldehyde.

3        Q.    I'm sorry, to formaldehyde.

4        A.    Yeah.

5        Q.    Let me start again.  Chris Cooper's exposure

6    to formaldehyde caused permanent epithelial damage,

7    which has exacerbated his asthma, correct?

8        A.    It -- that he has -- he has evidence of

9    permanent epithelial injury, or -- or persistent, for

10   certain; and he has evidence of what I think is -- is

11   probably worse asthma than he would have had, but for

12   the exposure.

13       Q.    And I want to make sure it's -- whether it's

14   just coincidental or if it's a chicken-and-an-egg thing.

15   Does he have an exacerbation of asthma that's evidenced

16   by the permanent epithelial damage or an exacerbation of

17   the asthma caused by the permanent epithelial damage?

18       A.    Well, they're just findings that are

19   consistent with each other.  They're -- they're

20   contemporaneous findings.  There's not -- I -- I -- I

21   don't think you can call -- assign a cause of those two

22   together.

23            I mean, these are physical findings, one which

24   demonstrated itself under provocation, in the form of

25   the methacholine challenge.  But the other is a

Dr. James Phillip Kornberg
July 9, 2009

Page 76

1    persistent physical finding.  All -- all factors weigh

2    in; his history, his medication use, and so on.

3        Q.   And just so we're clear, you keep referring to

4    the methacholine challenge that Dr. Pacheco

5    administered.  That is the first methacholine challenge,

6    that you're aware of, Chris Cooper has ever had,

7    correct?

8        A.   Yes.

9        Q.   So we have no idea what he -- how he would

10   have performed on a methacholine challenge in 2003,

11   correct?

12       A.   Of course not.  I mean, we don't -- we don't

13   have that data, but --

14       Q.   All we have -- I'm sorry.

15       A.   No, I'm -- I -- I think that it's certainly a

16   possibility that he would have had a positive

17   methacholine challenge then as well.  But I think the --

18   the -- the description, the clinical description -- and

19   we go into that, if you want -- that was provided by Dr.

20   Pacheco, along with the vocal cord dysfunction, which is

21   relatively rare -- I mean, I've sent patients over for

22   methacholine challenges on many occasions.  You know,

23   I -- several dozen.  And -- or a histamine challenge.

24   I've sent them to National Jewish or I've sent them over

25   to the hospital in Boulder.  And the finding of vocal

Dr. James Phillip Kornberg
July 9, 2009

1    cord dysfunction, although it's not a totally uncommon

2    thing, is something you wouldn't necessarily expect in

3    this kind of a setting.

4           Nor would you expect the -- the diagnosis that

5    Dr. Pacheco indicated, which, I -- I believe I'd have to

6    go and look precisely, but it was the severe bronchial

7    hyper-reactivity, that -- that -- that she diagnosed.

8        Q.    Other than formaldehyde, what are the other

9    causes, or potential causes, of the epithelial damage

10   seen in Chris Cooper?

11       A.    You mean, what -- what could cause something

12   like that?

13       Q.    Yes.

14       A.    You could have a chronic epithelial damage

15   in -- in individuals who are exposed to you, know high,

16   concentration of irritants.  You know, for example, I've

17   seen, again, in -- largely in the occupational setting,

18   individuals who are exposed to chlorine gas and chlorine

19   leaks or ammonia leaks.  You can see it in some patients

20   who are consistently exposed to isocyanates in Instapak

21   operations.  I saw these at Hewlett Packard

22   occasionally.  You could see it in a whole assortment of

23   different -- a smoke inhalation case, for example.

24           I mean, these are more the -- more the

25   catastrophic kinds of exposures.  But in terms of

Dr. James Phillip Kornberg
July 9, 2009

1      Q.    You said its irritant effect, and I guess my

2    question is, could having asthma cause that same effect?

3      A.    No, not -- not in this case.  I don't think

4    you can explain this overall clinical presentation on

5    this basis.

6      Q.    What is it about this methacholine challenge

7    that tells you it's irritant based and not IgE-mediated

8    based?

9      A.    You can't -- you can't demonstrate the

10   specific difference entirely.  What I think stands out

11   in this -- in this examination was the persistence of

12   the -- the boggy turbinates, the swelling and the

13   edematous effect, frankly, probably in absence of any

14   stimulating antigen, because notwithstanding the fact

15   that he might have a few dust mites where he lives,

16   he -- he still has a reaction, which a -- a -- a

17   persistent physical finding, which wouldn't necessarily

18   go away if it were just dust mites or -- or -- or -- or

19   hickory, but is -- is there, in my opinion, again, is a

20   signature of an irritant effect.

21          Plus he has a reaction to cholinergic agents

22   like methacholine, which was -- which was diagnosed --

23   I -- I'd like to get the precise language, but as I

24   recall, was a severe reaction to methacholine, where

25   they -- you know, he -- he demonstrated marked effects

Dr. James Phillip Kornberg
July 9, 2009

Page 89

1    if we picked up a record and he had some boggy nasal

2    turbinates, maybe Dr. Barnes would maybe even have

3    commented on that.

4            But I have to rely on her now.  I mean, she is

5    his personal doctor, his pediatrician, who has seen him

6    and drawn these conclusions.  I didn't look in his nose,

7    and that's okay, because -- because I have qualified

8    people that did it instead.  And -- and I'm relying on

9    their opinion.

10       Q.   So just so I -- I want to understand what

11   you're relying on.  You're relying on Janet Barnes'

12   opinion that the boggy nasal turbinates that he has

13   today did not exist before Katrina hit New Orleans?

14       A.   Well, didn't exist to that degree.  I mean,

15   you know --

16       Q.   Fine.

17       A.   -- you think about it, when you -- when you

18   come right down to it, what better -- we don't have this

19   kind of an opportunity in environmental medicine most of

20   the time.  And we've got a -- a fully qualified licensed

21   woman.  She's -- I -- I -- I -- reading her deposition,

22   I didn't know that she was the president of the

23   New Orleans Medical Society.  She's a qualified doctor.

24   She -- she's a very good clinician.  And she's a good --

25   she observed this condition.  And we've got the same

Dr. James Phillip Kornberg
July 9, 2009

Page 90

1    woman who saw him before Hurricane Katrina.  So you have

2    to ask yourself, what compelled her to draw those

3    clinical conclusions?

4              And then, in addition to that, you have the

5    workup at the finest respiratory hospital in the

6    country, and -- and in the same condition as is -- is

7    observed and remarked upon.

8         Q.   But that workup is -- is in 2009, by

9    Dr. Pacheco.

10        A.   Yes.

11        Q.   We don't know when those turbinates started to

12   look like that.

13        A.   If I had a time machine and I could go back

14   and visit him, and I examined this young boy and -- and

15   you said to me, "Doctor what's the chances that he had

16   some boggy nasal turbinates," it wouldn't surprise me

17   that he -- that I would find that.  I've looked in

18   enough noses in my life, okay?  It's not an unusual

19   finding.

20             What's concerning here is, is all these

21   factors in combination.  You have to look at the --

22   at -- at them in combination.  You can't look at them as

23   isolated components.  That's the best I can do in trying

24   to explain it.

25        Q.   Well, I understand what you're saying, but

Dr. James Phillip Kornberg
July 9, 2009

1  it's not explaining it, because I just don't understand

2  objectively what you're looking at to say it's worse and

3  more persistent today than it was in 2004.

4         MR. PINEDO:  Objection, form, asked and

5  answered.

6     A.   I -- the best I can rely upon is the young

7  man's personal physician, who, I think, drew conclusions

8  which no other person had the opportunity to draw.

9     Q.   (By Mr. Weinstock)  So I think this is where I

10 started.  So you're relying on Dr. Barnes for this

11 analysis of his turb- -- boggy nasal turbinates are

12 worse now, today, than they were before the storm?

13    A.   Yes, and the fact that -- that someone as --

14 as specialized as Dr. Pacheco took note of it and

15 recorded the epithelial issue, which, I think, is -- you

16 know, can it be seen in asthmatic?  Yes, it can.  But --

17    Q.   Go ahead.

18    A.   I think her conclusions are consistent with

19 those that Dr. Barnes drew.

20         Do you want me to turn to --

21    Q.   I think its good time to turn to Dr. Barnes --

22 Pacheco's --

23    A.   Let me see where that is.

24    Q.   -- report.

25    A.   I think we're looking at the same thing.  Is

Dr. James Phillip Kornberg
July 9, 2009

Page 92

1    this what you're looking at here?

2         Q.   Yes.  Where in this report do you read that

3    Dr. Barnes found persistent boggy nasal turbinates

4    related to formaldehyde exposure?

5         A.   That Dr. Barnes did --

6         Q.   I'm sorry, Dr. Pacheco.

7         A.   -- or Dr. Pacheco?  No, I -- I said that

8    Dr. Pacheco -- let's see.  On Page 4, on her physical

9    examination, she says, in no uncertain terms:  Nasal

10   mucosa was pale and boggy with some clear drainage.

11        Q.   And you interpret that to be persistent boggy

12   nasal turbinates?

13        A.   Well, we know it's persistent, because it was

14   observed as early as October of '07.

15        Q.   Fair enough.  Do you have the emergency room

16   report from December of '07?

17        A.   I -- I do have that, yeah.

18        Q.   Does that comment on the bossy -- boggy nasal

19   turbinates?

20        A.   I -- I -- I need to look, but --

21        Q.   Please do.

22        A.   Don't forget, that's an emergency room doctor,

23   who, having worked the emergency room a long time,

24   either didn't -- didn't do it or didn't record it.

25             But, let's see, where are we here?  Oh, this

Dr. James Phillip Kornberg
July 9, 2009

Page 99

1   certification of what the heck was happening.  And

2   that's why her -- her -- her testimony and what she said

3   is very important.

4       Q.    (By Mr. Weinstock)  Except Dr. Barnes had no

5   pre-storm records to compare it to.

6       A.    But she saw the young man.  She -- she --

7   she -- she had examined him.  She was the family doctor

8   for this young man.

9       Q.    Let me -- let me understand what you're

10  saying.  She saw him at some point in time before

11  August 2005, for which she has no records, correct?

12      A.    Well, she's here.  I mean, that's a record.

13  Yeah, she has no written records.

14      Q.    She has no written records?

15      A.    That's right.

16      Q.    And she sees him two years later, correct?

17      A.    Yes.

18      Q.    And based on her memory of what his nasal

19  turbinates looked like, you're telling me that she can

20  determine that they're worse now?

21      A.    Absolutely.

22      Q.    Okay.

23      A.    I mean, that's why -- that's why you go to

24  medical school for as long as you do and you see tens of

25  thousands of people.  You get good at what you're doing

Dr. James Phillip Kornberg
July 9, 2009

Page 100

1    usually.

2       Q.    And you can memorize what all their turbinates

3    look like?

4       A.    You know, something I can -- I hate to say

5    this, but I'm not really good with names, but when I see

6    a patient, I -- I -- I can remember what somebody's

7    elbow looked like, years later.  And it's just a fact,

8    because that's what your -- that's what impressing to

9    you.  It's not an infallible memory, but it's one of

10   those things that you work to achieve when you're --

11   when you're a clinical doctor.

12      Q.    But didn't you tell me, he never had boggy

13   nasal turbinates before the storm?  So how would she

14   know what they looked like?

15      A.    No, I didn't say -- I -- I said I didn't know.

16   I said -- if I go back to my testimony, I said that it

17   wouldn't surprise me if he did.  But I don't have any

18   recollection, as I sit here right now, of a record that

19   says he did or he didn't.  But if -- but if I had a time

20   machine -- remember, that was any response -- and went

21   back and looked, it wouldn't surprise me that -- that he

22   would have boggy nasal turbinates.

23      Q.    But certainly not boggy nasal turbinates to

24   the point where she would have had to prescribe

25   antihistamines.  He was sufficient with over-the-

Dr. James Phillip Kornberg
July 9, 2009

Page 102

1   let me start with the harder one first.  And that --

2   that is the notion that formaldehyde can aggravate

3   asthma, and -- and can cause asthma.  And the -- as I

4   said, I -- I don't -- in the field of environmental

5   medicine, you can't expect that a particular study is

6   going to say it proves anything.  I mean, writer -- you

7   know, authors are cautious, correctly cautious, about

8   drawing firm causation conclusions.

9       Q.   (By Mr. Weinstock)  Can I ask you one question

10  about that?

11      A.   Yes.

12      Q.   There is a group of studies that kind of can

13  do that, and those are experimental studies on humans,

14  aren't they?

15      A.   I -- I know what you're getting at, and -- and

16  the -- there is -- there are mixed results on issues of

17  hyper-responsiveness to formaldehyde challenges.  And

18  the answer is, yes, there -- you -- but they're not --

19  even those studies I don't think are sufficient, as

20  individual studies, to prove or not prove causation.

21          The -- in order -- in order to have a -- an

22  opinion on general causation, you have to look at the

23  overall weight of the evidence, you have to look at

24  everything together and -- and try to contemplate all of

25  these factors that now -- as we know now, have shown up

Dr. James Phillip Kornberg
July 9, 2009

1    in this particular young man.

2         Q.   But some of these studies are stronger and

3    tell us more than others, correct?

4         A.   It --

5              MR. PINEDO:  Objection, form.

6         A.   They can.

7         Q.   (By Mr. Weinstock)  Okay.

8         A.   You know, you -- you can have studies that are

9    important.

10        Q.   And generally speaking, experimental studies

11   are stronger than observational studies, correct,

12   generally speaking?

13        A.   I -- I -- I -- I can't -- I don't want to

14   generalize with that.

15        Q.   Okay.

16        A.   I mean, I -- I -- the answer is, experimental

17   studies, where you take a group of students and you

18   expose them to formaldehyde for a certain amount of

19   time, you take suspected individuals who are

20   formaldehyde sensitive and test them, those are

21   important studies.  No question about it.  But they

22   don't make or break an opinion necessarily, unless

23   that's all you have to rely upon.

24        Q.   What's the first study --

25        A.   Well --

Dr. James Phillip Kornberg
July 9, 2009

1   Q.   -- we should talk about?

2   A.   -- the -- this -- this is an area related to

3   the actual ability of formaldehyde to cause asthma.  And

4   this study by Franklin, I think, is an important study

5   in that regard.  The -- the conclusions that were drawn

6   in the Franklin study, using oxide -- nitrogen oxide as

7   a surrogate -- this Franklin study is the year 2000 --

8   Q.   Right.

9   A.   -- 2007 -- as a surrogate for a lower

10  inflammatory effects from oxides of nitrogen

11  demonstrated that -- that in children living in homes

12  above 50 parts per billion -- and I'm going to always

13  talk about parts per billion -- you can take your

14  micrograms per cubic meter, divide by 1.23, and we're

15  talking about parts per billion.

16  Q.   Okay.

17  A.   And this study is -- is significant because it

18  tends to show that the expired levels of nitric oxide at

19  levels greater than 50 parts per billion, namely

20  15.5 parts per billion, are statistically greater than

21  expired oxides of nitrogen at levels lower than 50 parts

22  per billion.  That is a signature, again, of lower

23  inflammatory effects which are -- which are consistent

24  with the development of asthma.

25         The -- it doesn't prove that -- that this

Dr. James Phillip Kornberg
July 9, 2009

Page 105

1    is -- that formaldehyde causes asthma.  But it's an

2    important study, in any mind, in -- in determining --

3    in -- in -- in that assignment, if you will, to

4    determine whether formaldehyde is capable of causing

5    asthma.

6            Let me just say this:  That what's easy to do

7    in this case, to go back to the occupational studies

8    that were historically obtained at much higher levels,

9    and for that matter, I can tell you, I -- I've seen it

10   myself, clinically, on several occasions of the

11   development of asthma, in particular in a mortician and

12   in one -- you know, somebody spraying glutaraldehyde,

13   which, admittedly, is a different compound, but it's

14   very similar, and in laboratory personnel that have

15   worked around formaldehyde.

16           So it -- it -- it -- in my own clinical

17   experience, I've seen this capability, but in the

18   levels -- we didn't always have the levels at which

19   those exposures occurred.

20   Q.    But you would expect them to be much higher?

21   A.    They -- they were higher.  They -- they were

22   higher.  The -- the level that -- all we can say from

23   Franklin is that there was a demarcation between the

24   50 ppb and less than 50 ppb.

25           The -- the second study is --

Dr. James Phillip Kornberg
July 9, 2009

Page 106

1     Q.   I don't want to leave Franklin just yet.

2     A.   Oh, absolutely, go ahead.

3     Q.   But Franklin -- in Franklin, there was no

4  indication that asthma had been caused, correct?

5     A.   No.  Again, you're not going to find any of

6  these studies that -- that state that -- that

7  formaldehyde causes asthma.  The one statement that is

8  made on Page 1758, for example, if I may quote it, it

9  says:  Our data suggests that in children inflammation

10  may extend beyond the upper airways, into the lower

11  airways, as a result of chronic exposure to domestic

12  levels of formaldehyde.

13          Man, that's an important comment.  It -- it

14  doesn't prove anything, but what it's basically saying

15  is that -- that this surrogate, so to speak, of the

16  inflammation, which is nitric oxide, is -- is a very

17  important finding, in this author's conclusion.

18          He also states on Page 1758 --

19     Q.   Hold on.  I don't want to leave

20  the first question.

21     A.   Okay.  You bet.

22     Q.   As you said, it suggests it, but it does not

23  prove it, correct?

24     A.   That's right.

25     Q.   Okay.  Now, what else did he say?

Dr. James Phillip Kornberg
July 9, 2009

Page 153

1    Q.    Okay.   What cancers are you -- are you -- do

2    you believe are associated with exposure to formaldehyde

3    at 50 parts per billion for 19 months?

4    A.    We're -- we're talking here about risk, and

5    the answer --

6    Q.    Okay.   You answer any way you want, and then

7    I'll follow you.   Go ahead.

8    A.    The answer -- the answer to that is that in

9    the -- the end point and the concern in this particular

10   child is the risk of nasal cancer that he has -- has

11   sustained over the period of time that he was in the

12   trailer, at the levels that we predicted were there, we

13   think were certainly there.

14          And the issue is not his cancer.   The -- the

15   issue is our responsibility to put in place a monitoring

16   program to make sure that if there is any -- there are

17   any changes, they're caught early enough, and to

18   anticipate the -- the realistic outcome that cancer

19   could occur in this child.   That's -- that's what

20   we're -- we're looking at there.   It has nothing to do

21   with his having cancer at this point in time.

22   Q.    Okay.   First of all, what's the latency for

23   nasal cancer?

24   A.    The latency for nasal cancer can -- can be at

25   least 25 years or more.   And in the -- in the case of

Dr. James Phillip Kornberg
July 9, 2009

Page 154

1   the -- some of the occupational studies have identified

2   individuals who have been -- who worked for that length

3   of time.  The latency of -- of greater than 25 years is

4   based, to a great extent, on the -- the length of time

5   which, I think, is -- is fair for a child, under these

6   conditions, to be under surveillance in order to -- to

7   pick up the possibility of this cancer.

8        Q.   I -- I asked a poor question.  What is the

9   shortest latency period you're familiar with for the

10  onset of nasopharyngeal cancer or nasal cancer after

11  exposure?

12            MR. PINEDO:  To what?

13       Q.   (By Mr. Weinstock)  Exposure to formaldehyde.

14       A.   Okay.  The -- some of the -- the latencies are

15  in a -- in a -- in a matter of -- I -- as I recollect

16  from the literature, are the matter of just a few years.

17  Some of them can be as -- as early as seven or eight

18  years or even shorter.

19            But these are estimates of latency because

20  this is very hard to pinpoint specifically in a -- in a

21  case, in -- in a cancer like this.

22       Q.   Now, are you saying that he's at risk for any

23  nasal cancer or nasopharyngeal cancer?

24       A.   In this particular case, the outcome, it could

25  be either one.  And what -- what we -- we we're really

Dr. James Phillip Kornberg
July 9, 2009

Page 155

1    planning, in his medical monitoring program, is to -- is

2    to be vigilant for either type of cancer.

3         Q.   And that's based on the EPA risk assessment

4    you did?

5         A.   Yes.

6         Q.   Okay.  But have -- have you reviewed the

7    epidemiology on formaldehyde exposure and cancer?

8              MR. PINEDO:  Objection, form.

9         A.   Have I reviewed it?  Yes, I've looked at some

10   of it, yes.

11        Q.   (By Mr. Weinstock)  All right.  Getting away

12   from your EPA risk estimate, what cancers are associated

13   with formaldehyde exposure?

14        A.   Well, the most powerful association is --

15   is -- is nasopharyngeal cancer.

16        Q.   And is there any other cancer, where you're

17   familiar with, that the epidemiological literature says,

18   you know, this cancer, more probably than not, can be

19   caused by exposure to formaldehyde?

20        A.   Not at this time.  There are other cancers

21   that have been associated with it, but not -- not at

22   this time.

23        Q.   Associated but not proven, correct?

24        A.   That's right.

25        Q.   And the nasopharyngeal cancer is primarily

Dr. James Phillip Kornberg
July 9, 2009

Page 165

1   effect, asthma to formaldehyde, from formaldehyde

2   exposure sure, correct?

3      A.   That's right.

4      Q.   You did not do that exercise for cancer.  For

5   cancer you, accepted formaldehyde as a carcinogen based

6   on EPA and IARC, correct?

7      A.   No, no, that's not correct.  I -- I did look

8   at -- at some of the literature on cancer, especially in

9   terms of the -- what was particularly disturbing about

10   the literature, you know, the precancerous effects which

11   we're -- we're seen in individuals who were at levels

12   that weren't very different, if any, from Mr. Cooper's.

13   So consequently, the -- the need for medical monitoring

14   became -- it was -- it was just not strictly on the

15   basis of the EPA assessment.

16      Q.   I haven't asked you about medical monitoring,

17   have I?  You keep bringing it up, and I have yet to ask

18   you a question about medical monitoring, have I?

19      A.   Go ahead.

20      Q.   So you have not done -- have you done a

21   sufficient review of the literature on cancer

22   epidemiology and formaldehyde to give an opinion that

23   formaldehyde causes cancer, nasopharyngeal, if IARC and

24   EPA did not exist?

25      A.   I -- I have not done enough studies to draw

Dr. James Phillip Kornberg
July 9, 2009

Page 166

1    those conclusions.  There's not one human being that

2    could -- could draw those conclusions.

3         Q.   That wasn't what you were asked to do in this

4    case, correct?

5         A.   Well, it's -- it's -- it's like asking a

6    cardiologist, Have you looked at all those studies?  I

7    mean, you can't do it.  I mean, there's not enough days

8    in the week or hours in the day --

9         Q.   So if Gerald --

10        A.   -- to review them all.

11        Q.   If Gerald McGwin says he's reviewed the

12   studies and come to the conclusions I talked about

13   earlier, he's wrong, he didn't do it, right?

14             MR. PINEDO:  Objection, form.

15        A.   I didn't say he was wrong.  I -- I -- as an

16   epidemiologist, he may have ways of doing it that I'm

17   not aware.  I'm not an epidemiologist.  I mean, I -- I

18   certainly am -- am not a specialist in epidemiology.  I

19   understand epidemiology in great detail, but --

20        Q.   You've reviewed Gerald McGwin's report?

21        A.   I have.

22        Q.   Did you review his deposition?

23        A.   No.

24        Q.   Leaving out IARC and EPA, would you -- would

25   you agree that he has done a more thorough investigation

Dr. James Phillip Kornberg
July 9, 2009

Page 190

1      A.    Yes.

2      Q.    On the front page of the expert report, you

3   specify that your opinions are regarding Christopher

4   James Cooper.  You have offered no opinions regarding

5   his mother, Alana Alexander, or any other occupant of a

6   travel trailer, correct?

7      A.    That's right.

8      Q.    All right.  Regarding the necessity of medical

9   monitoring, is it correct that having a significant

10   exposure is at the core of your methodology for

11   determining the necessity of medical monitoring?

12      A.    That's one of the key things, yes.

13      Q.    Okay.  You must have what you deem to be a

14   significant -- significant exposure before you would

15   advocate proceeding with medical monitoring, correct?

16      A.    Yes.  Medical monitoring is driven by

17   exposure, that's right.

18      Q.    And, in fact, not only medical monitoring, but

19   you said that exposure is the key to determining

20   causation as well?

21      A.    It -- it's one of the pedestals upon which

22   causation is -- is supported.

23      Q.    Okay.  Now, at some level, there's a threshold

24   between what would be considered significant exposure

25   and nonsignificant exposure, correct?

Dr. James Phillip Kornberg
July 9, 2009

Page 191

1           MR. PINEDO:  Objection, form.

2      A.    There -- there often is a gray area, but

3  there's no -- as a matter of fact, based -- most of the

4  federal regulations are based upon the indoctrination,

5  and you go through this in training, that there is no

6  cutoff; that there -- there is what is known as

7  individual susceptibility.  So if we're talking about

8  predictions of effects or protection from effects, then

9  one would consider all factors, including individual

10  susceptibility.

11          When it comes to the analysis that I performed

12  here, it was strictly based upon estimations of an

13  acceptable risk based upon his exposure while he was in

14  the trailer.

15      Q.    (By Mr. Dinnell)  Okay.  And outside of Chris

16  Cooper, you can't tell me what you would consider a

17  significant threshold level of formaldehyde that would

18  require medical monitoring, versus a nonsignificant

19  level?

20      A.    Well, actually, I have.  Because I identified,

21  in my appendix, the -- if I may look at it for a moment?

22      Q.    Go ahead.

23      A.    On -- on Page 30 --

24      Q.    This is on Attachment A to your report?

25      A.    Yes.  It -- it turns out, they were all

Dr. James Phillip Kornberg
July 9, 2009

Page 192

1    sequentially paginated.  The -- based upon the

2    risk-based concentration that he was -- is shown by the

3    EPA -- and I've got the chart to show you, if you need

4    it -- it is, basically, we're talking about a dose of

5    4.65 parts per billion years as that dose of

6    formaldehyde which, in air, above background, which

7    would be responsible for leading to an excess cancer

8    risk of one in a million.  That's -- that's the EPA.

9    That's what they say.

10        Q.   And using what the EPA has provided, would you

11   deem an exposure above 4.65 parts per billion years as

12   significant exposure for the purposes of needing medical

13   monitoring?

14        A.   I would.  And -- and especially, I might add,

15   in -- in sustaining that exposure in as little as

16   19 months; whereas, the calculation is originally based

17   on 30 years.

18             So what hasn't been factored in, but -- but

19   is -- is, I think, important, is the concept of, if you

20   smoke, if you have a 20 pack-year history of smoking,

21   what's the difference between smoking 20 packs a day for

22   one year and smoking one pack a day for 20 years?

23   There's -- there's -- there's a clinical difference.

24             I mean, so what -- what was particularly

25   important in doing this analysis in this young man was

Dr. James Phillip Kornberg
July 9, 2009

Page 220

1    a population.  I wasn't asked to -- to make

2    recommendations for medical monitoring for every

3    individual who lived in these trailers.  We're talking

4    about this specific young man.

5        Q.   You would agree that the EPA calculating -- in

6    setting the level you used, used a linear no-threshold

7    model, correct?

8        A.   I'm -- I'm not sure that that -- I'd -- I'd

9    have to go back, but I'm pretty sure that that's correct

10   yes.

11       Q.   Mr. Dinnell asked you questions about whether

12   the radiation that accompanies x-ray, CAT scan, or -- is

13   ionizing radiation, yes?

14       A.   It -- yes, for CT a scan --

15       Q.   You said there were very --

16       A.   -- and x-ray.

17       Q.   -- very close levels, though, correct?

18       A.   Well, there -- there -- it depends on the type

19   of method, the screens that they use, and -- and the

20   equipment.  But they're -- they are relatively low

21   levels, yes.

22       Q.   The ones you've recommended for Chris Cooper,

23   the screening techniques, CAT scan?

24       A.   Well, the CT scan and the -- and an x-ray,

25   which -- which would occur depending upon what the

Dr. James Phillip Kornberg
July 9, 2009

1      Q.   What about over a six-year period?

2      A.   I --

3      Q.   It would be five times higher, yes?

4      A.   I -- I'd have to -- let me take a look at how

5 the -- the child numbers are included.  I -- I'd need to

6 take a minute to do this.

7      Q.   Okay.

8      A.   Rather than just answering, off the top of my

9 head.  It's in the -- it's not -- it's a bit tricky, and

10 I think what you need to do is take a look.  You asked

11 what these equations were.  Here they are.

12      Q.   Fair enough.

13      A.   They're very conservative equations.  If

14 anything, for a child, you -- you would be much more

15 conservative than -- than what's published here.  So I

16 mean, if any -- if this requires a -- you -- I don't

17 want to venture too far into this, but if -- if the

18 relationship between a child and an adult is 6 --

19 6 years versus 30, then your number would be more

20 conservative and not -- not higher.

21      Q.   When you calculated Chris Cooper's --

22      A.   Oh, wait, you need these here.

23      Q.   Yes, I do.  When you calculated Chris Cooper's

24 parts per billion years, that was based on 24 hours a

25 day, correct?

Dr. James Phillip Kornberg
July 9, 2009

Page 231

1      A.    It -- it -- it is -- it is based on a -- on an

2    estimate of 24 hours a day, which is -- which is a

3    conservative estimate.

4      Q.    Did Chris Cooper live in the FEMA trailer

5    24 hours a day?

6      A.    Probably not.  But again, the -- the answer to

7    that is, when you do these calculations, you can --

8    you're erring on the safe side when you make the

9    determination.  The --

10     Q.    Doctor --

11     A.    These -- these are the numbers -- look, these

12   are the numbers that -- for example, I'll give you an

13   illustration.  When -- when you look at residency in --

14   in the EPA models, they don't confine you to your house

15   24 hours a day --

16     Q.    Of course not.

17     A.    -- you know, 52 weeks a year.  It doesn't even

18   factor in.  What they do is take the conservative

19   approach that would maximize exposure, so that you would

20   make decisions which are going to minimize risk.

21     Q.    But if you were talking to a jury, you would

22   be overstating that risk because you're trying to be

23   conservative, correct?

24     A.    Well, I'm not overstating it.  I'm -- I'm

25   using the numbers that are there.  It's -- it's not me