I–3.

## Austin Bradford Hill: The Environment and Disease: Association or Causation?
## Proceedings of the Royal Society of Medicine 1965; 58:295–300.

Hill's "The Environment and Disease: Association or Causation" may be a good example of an article that has been read in quotations and paraphrases more often than in its original form. In it, Hill offered a list of nine aspects of an empirical association to consider when deciding whether an association is causal. This was not the first list of "causal criteria" to be offered, but it was perhaps the most popular. It is unfortunate that in the ensuing decades, this list or similar ones have been presented in textbooks as "criteria" for inferring causality of associations, often in such a manner as to imply that all the conditions are necessary. A careful reading of Hill shows that he did not intend to offer a list of necessary conditions; on the contrary, on page 299 he warned against laying down "hard and fast rules of evidence that *must* be obeyed before we accept cause and effect." As noted later [Rothman, 1982], Hill's only real mistake was to say that *none* of his nine aspects could be considered necessary if the association were indeed causal; in fact, temporality (No. 4) is obviously necessary, as cause must precede effect.

Perhaps the most neglected portion of the article (also on page 299) is his comment on the misuse of significance testing by both scientists and statisticians. Despite his warning against equating statistical and scientific significance, I fear that decades later the situation is little better, and so I would give this section special emphasis in any educational setting.

Reference:

Rothman KJ. Causation and causal inference. Chapter 2 in Schottenfeld D and Fraumeni JF, eds. *Cancer Epidemiology and Prevention.* Philadelphia: WB Saunders, 1982.

*Meeting January 14 1965*

# President's Address

## The Environment and Disease: Association or Causation?

by Sir Austin Bradford Hill CBE DSC FRCP(hon) FRS
(*Professor Emeritus of Medical Statistics,
University of London*)

Amongst the objects of this newly-founded Section of Occupational Medicine are firstly 'to provide a means, not readily afforded elsewhere, whereby physicians and surgeons with a special knowledge of the relationship between sickness and injury and conditions of work may discuss their problems, not only with each other, but also with colleagues in other fields, by holding joint meetings with other Sections of the Society'; and, secondly, 'to make available information about the physical, chemical and psychological hazards of occupation, and in particular about those that are rare or not easily recognized'.

At this first meeting of the Section and before, with however laudable intentions, we set about instructing our colleagues in other fields, it will be proper to consider a problem fundamental to our own. How in the first place do we detect these relationships between sickness, injury and conditions of work? How do we determine what are physical, chemical and psychological hazards of occupation, and in particular those that are rare and not easily recognized?

There are, of course, instances in which we can reasonably answer these questions from the general body of medical knowledge. A particular, and perhaps extreme, physical environment cannot fail to be harmful; a particular chemical is known to be toxic to man and therefore suspect on the factory floor. Sometimes, alternatively, we may be able to consider what *might* a particular environment do to man, and then see whether such consequences are indeed to be found. But more often than not we have no such guidance, no such means of proceeding; more often than not we are dependent upon our observation and enumeration of defined events for which we then seek antecedents. In other words we see that the event B is associated with the environmental feature A, that, to take a specific example, some form of respiratory illness is associated with a dust in the environment. In what circumstances can we pass from this observed *association* to a verdict of *causation*? Upon what basis should we proceed to do so?

I have no wish, nor the skill, to embark upon a philosophical discussion of the meaning of 'causation'. The 'cause' of illness may be immediate and direct, it may be remote and indirect underlying the observed association. But with the aims of occupational, and almost synonymously preventive, medicine in mind the decisive question is whether the frequency of the undesirable event B will be influenced by a change in the environmental feature A. *How* such a change exerts that influence may call for a great deal of research. However, before deducing 'causation' and taking action we shall not invariably have to sit around awaiting the results of that research. The whole chain may have to be unravelled or a few links may suffice. It will depend upon circumstances.

Disregarding then any such problem in semantics we have this situation. Our observations reveal an association between two variables, perfectly clear-cut and beyond what we would care to attribute to the play of chance. What aspects of that association should we especially consider before deciding that the most likely interpretation of it is causation?

(1) *Strength.* First upon my list I would put the strength of the association. To take a very old example, by comparing the occupations of patients with scrotal cancer with the occupations of patients presenting with other diseases, Percival Pott could reach a correct conclusion because of the *enormous* increase of scrotal cancer in the chimney sweeps. 'Even as late as the second decade of the twentieth century', writes Richard Doll (1964), 'the mortality of chimney sweeps from scrotal cancer was some 200 times that of workers who were not specially exposed to tar or mineral oils and in the eighteenth century the relative difference is likely to have been much greater.'

To take a more modern and more general example upon which I have now reflected for over fifteen years, prospective inquiries into smoking have shown that the death rate from cancer of the lung in cigarette smokers is nine to ten times the rate in non-smokers and the rate in heavy cigarette smokers is twenty to thirty times

as great. On the other hand the death rate from coronary thrombosis in smokers is no more than twice, possibly less, the death rate in non-smokers. Though there is good evidence to support causation it is surely much easier in this case to think of some features of life that may go hand-in-hand with smoking – features that might conceivably be the real underlying cause or, at the least, an important contributor, whether it be lack of exercise, nature of diet or other factors. But to explain the pronounced excess in cancer of the lung in any other environmental terms requires some feature of life so intimately linked with cigarette smoking and with the amount of smoking that such a feature should be easily detectable. If we cannot detect it or reasonably infer a specific one, then in such circumstances I think we are reasonably entitled to reject the vague contention of the armchair critic 'you can't prove it, there *may* be such a feature'.

Certainly in this situation I would reject the argument sometimes advanced that what matters is the absolute difference between the death rates of our various groups and not the ratio of one to other. That depends upon what we want to know. If we want to know how many extra deaths from cancer of the lung will take place through smoking (i.e. presuming causation), then obviously we must use the absolute differences between the death rates – 0·07 per 1,000 per annum in non-smoking doctors, 0·57 in those smoking 1–14 cigarettes daily, 1·39 for 15–24 cigarettes daily and 2·27 for 25 or more daily. But it does not follow here, or in more specifically occupational problems, that this best measure of the effect upon mortality is also the best measure in relation to ætiology. In this respect the ratios of 8, 20 and 32 to 1 are far more informative. It does not, of course, follow that the differences revealed by ratios are of any practical importance. Maybe they are, maybe they are not; but that is another point altogether.

We may recall John Snow's classic analysis of the opening weeks of the cholera epidemic of 1854 (Snow 1855). The death rate that he recorded in the customers supplied with the grossly polluted water of the Southwark and Vauxhall Company was in truth quite low – 71 deaths in each 10,000 houses. What stands out vividly is the fact that the small rate is 14 times the figure of 5 deaths per 10,000 houses supplied with the sewage-free water of the rival Lambeth Company.

In thus putting emphasis upon the strength of an association we must, nevertheless, look at the obverse of the coin. We must not be too ready to dismiss a cause-and-effect hypothesis merely on

the grounds that the observed association appears to be slight. There are many occasions in medicine when this is in truth so. Relatively few persons harbouring the meningococcus fall sick of meningococcal meningitis. Relatively few persons occupationally exposed to rat's urine contract Weil's disease.

(2) *Consistency:* Next on my list of features to be specially considered I would place the *consistency* of the observed association. Has it been repeatedly observed by different persons, in different places, circumstances and times?

This requirement may be of special importance for those rare hazards singled out in the Section's terms of reference. With many alert minds at work in industry today many an environmental association may be thrown up. Some of them on the customary tests of statistical significance will appear to be unlikely to be due to chance. Nevertheless whether chance is the explanation or whether a true hazard has been revealed may sometimes be answered only by a repetition of the circumstances and the observations.

Returning to my more general example, the Advisory Committee to the Surgeon-General of the United States Public Health Service found the association of smoking with cancer of the lung in 29 retrospective and 7 prospective inquiries (US Department of Health, Education & Welfare 1964). The lesson here is that broadly the same answer has been reached in quite a wide variety of situations and techniques. In other words we can justifiably infer that the association is not due to some constant error or fallacy that permeates every inquiry. And we have indeed to be on our guard against that.

Take, for instance, an example given by Heady (1958). Patients admitted to hospital for operation for peptic ulcer are questioned about recent domestic anxieties or crises that may have precipitated the acute illness. As controls, patients admitted for operation for a simple hernia are similarly quizzed. But, as Heady points out, the two groups may not be *in pari materia*. If your wife ran off with the lodger last week you still have to take your perforated ulcer to hospital without delay. But with a hernia you might prefer to stay at home for a while – to mourn (or celebrate) the event. No number of exact repetitions would remove or necessarily reveal that fallacy.

We have, therefore, the somewhat paradoxical position that the different results of a different inquiry certainly cannot be held to refute the

original evidence; yet the same results from precisely the same form of inquiry will not invariably greatly strengthen the original evidence. I would myself put a good deal of weight upon similar results reached in quite different ways, e.g. prospectively and retrospectively.

Once again looking at the obverse of the coin there will be occasions when repetition is absent or impossible and yet we should not hesitate to draw conclusions. The experience of the nickel refiners of South Wales is an outstanding example. I quote from the Alfred Watson Memorial Lecture that I gave in 1962 to the Institute of Actuaries:

'The population at risk, workers and pensioners, numbered about one thousand. During the ten years 1929 to 1938, sixteen of them had died from cancer of the lung, eleven of them had died from cancer of the nasal sinuses. At the age specific death rates of England and Wales at that time, one might have anticipated one death from cancer of the lung (to compare with the 16), and a fraction of a death from cancer of the nose (to compare with the 11). In all other bodily sites cancer had appeared on the death certificate 11 times and one would have expected it to do so 10–11 times. There had been 67 deaths from all other causes of mortality and over the ten years' period 72 would have been expected at the national death rates. Finally division of the population at risk in relation to their jobs showed that the excess of cancer of the lung and nose had fallen wholly upon the workers employed in the chemical processes.

'More recently my colleague, Dr Richard Doll, has brought this story a stage further. In the nine years 1948 to 1956 there had been, he found, 48 deaths from cancer of the lung and 13 deaths from cancer of the nose. He assessed the numbers expected at normal rates of mortality as, respectively 10 and 0·1.

'In 1923, long before any special hazard had been recognized, certain changes in the refinery took place. No case of cancer of the nose has been observed in any man who first entered the works after that year, and in these men there has been no excess of cancer of the lung. In other words, the excess in both sites is uniquely a feature in men who entered the refinery in, roughly, the first 23 years of the present century.

'No causal agent of these neoplasms has been identified. Until recently no animal experimentation had given any clue or any support to this wholly statistical evidence. Yet I wonder if any of us would hesitate to accept it as proof of a grave industrial hazard?' (Hill 1962).

In relation to my present discussion I know of no parallel investigation. We have (or certainly had) to make up our minds on a unique event; and there is no difficulty in doing so.

(3) *Specificity:* One reason, needless to say, is the specificity of the association, the third characteristic which invariably we must consider. If, as here, the association is limited to specific workers and to particular sites and types of disease and there is no association between the work and other modes of dying, then clearly that is a strong argument in favour of causation.

We must not, however, over-emphasize the importance of the characteristic. Even in my present example there is a cause and effect relationship with two different sites of cancer – the lung and the nose. Milk as a carrier of infection and, in that sense, the cause of disease can produce such a disparate galaxy as scarlet fever, diphtheria, tuberculosis, undulant fever, sore throat, dysentery and typhoid fever. Before the discovery of the underlying factor, the bacterial origin of disease, harm would have been done by pushing too firmly the need for specificity as a necessary feature before convicting the dairy.

Coming to modern times the prospective investigations of smoking and cancer of the lung have been criticized for not showing specificity – in other words the death rate of smokers is higher than the death rate of non-smokers from many causes of death (though in fact the results of Doll & Hill, 1964, do not show that). But here surely one must return to my first characteristic, the strength of the association. If other causes of death are raised 10, 20 or even 50% in smokers whereas cancer of the lung is raised 900–1,000% we have specificity – a specificity in the magnitude of the association.

We must also keep in mind that diseases may have more than one cause. It has always been possible to acquire a cancer of the scrotum without sweeping chimneys or taking to mule-spinning in Lancashire. One-to-one relationships are not frequent. Indeed I believe that multi-causation is generally more likely than single causation though possibly if we knew all the answers we might get back to a single factor.

In short, if specificity exists we may be able to draw conclusions without hesitation; if it is not apparent, we are not thereby necessarily left sitting irresolutely on the fence.

(4) *Temporality:* My fourth characteristic is the temporal relationship of the association – which is the cart and which the horse? This is a question which might be particularly relevant with diseases of slow development. Does a particular diet lead to disease or do the early stages of the disease lead to those peculiar dietetic habits? Does a

particular occupation or occupational environment promote infection by the tubercle bacillus or are the men and women who select that kind of work more liable to contract tuberculosis whatever the environment – or, indeed, have they already contracted it? This temporal problem may not arise often but it certainly needs to be remembered, particularly with selective factors at work in industry.

(5) *Biological gradient:* Fifthly, if the association is one which can reveal a biological gradient, or dose-response curve, then we should look most carefully for such evidence. For instance, the fact that the death rate from cancer of the lung rises linearly with the number of cigarettes smoked daily, adds a very great deal to the simpler evidence that cigarette smokers have a higher death rate than non-smokers. That comparison would be weakened, though not necessarily destroyed, if it depended upon, say, a much heavier death rate in light smokers and a lower rate in heavier smokers. We should then need to envisage some much more complex relationship to satisfy the cause-and-effect hypothesis. The clear dose-response curve admits of a simple explanation and obviously puts the case in a clearer light.

The same would clearly be true of an alleged dust hazard in industry. The dustier the environment the greater the incidence of disease we would expect to see. Often the difficulty is to secure some satisfactory quantitative measure of the environment which will permit us to explore this dose-response. But we should invariably seek it.

(6) *Plausibility:* It will be helpful if the causation we suspect is biologically plausible. But this is a feature I am convinced we cannot demand. What is biologically plausible depends upon the biological knowledge of the day.

To quote again from my Alfred Watson Memorial Lecture (Hill 1962), there was

'. . . no biological knowledge to support (or to refute) Pott's observation in the 18th century of the excess of cancer in chimney sweeps. It was lack of biological knowledge in the 19th that led a prize essayist writing on the value and the fallacy of statistics to conclude, amongst other "absurd" associations, that "it could be no more ridiculous for the stranger who passed the night in the steerage of an emigrant ship to ascribe the typhus, which he there contracted, to the vermin with which bodies of the sick might be infected". And coming to nearer times, in the 20th century there was no biological knowledge to support the evidence against rubella.'

In short, the association we observe may be one new to science or medicine and we must not dismiss it too light-heartedly as just too odd. As Sherlock Holmes advised Dr Watson, 'when you have eliminated the impossible, whatever remains, *however improbable*, must be the truth.'

(7) *Coherence:* On the other hand the cause-and-effect interpretation of our data should not seriously conflict with the generally known facts of the natural history and biology of the disease – in the expression of the Advisory Committee to the Surgeon-General it should have coherence.

Thus in the discussion of lung cancer the Committee finds its association with cigarette smoking coherent with the temporal rise that has taken place in the two variables over the last generation and with the sex difference in mortality – features that might well apply in an occupational problem. The known urban/rural ratio of lung cancer mortality does not detract from coherence, nor the restriction of the effect to the lung.

Personally, I regard as greatly contributing to coherence the histopathological evidence from the bronchial epithelium of smokers and the isolation from cigarette smoke of factors carcinogenic for the skin of laboratory animals. Nevertheless, while such laboratory evidence can enormously strengthen the hypothesis and, indeed, may determine the actual causative agent, the lack of such evidence cannot nullify the epidemiological observations in man. Arsenic can undoubtedly cause cancer of the skin in man but it has never been possible to demonstrate such an effect on any other animal. In a wider field John Snow's epidemiological observations on the conveyance of cholera by the water from the Broad Street pump would have been put almost beyond dispute if Robert Koch had been then around to isolate the vibrio from the baby's nappies, the well itself and the gentleman in delicate health from Brighton. Yet the fact that Koch's work was to be awaited another thirty years did not really weaken the epidemiological case though it made it more difficult to establish against the criticisms of the day – both just and unjust.

(8) *Experiment:* Occasionally it is possible to appeal to experimental, or semi-experimental, evidence. For example, because of an observed association some preventive action is taken. Does it in fact prevent? The dust in the workshop is reduced, lubricating oils are changed, persons stop smoking cigarettes. Is the frequency of the associated events affected? Here the strongest

support for the causation hypothesis may be revealed.

(9) *Analogy:* In some circumstances it would be fair to judge by analogy. With the effects of thalidomide and rubella before us we would surely be ready to accept slighter but similar evidence with another drug or another viral disease in pregnancy.

Here then are nine different viewpoints from all of which we should study association before we cry causation. What I do not believe – and this has been suggested – is that we can usefully lay down some hard-and-fast rules of evidence that *must* be obeyed before we accept cause and effect. None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*. What they can do, with greater or less strength, is to help us to make up our minds on the fundamental question – is there any other way of explaining the set of facts before us, is there any other answer equally, or more, likely than cause and effect?

*Tests of Significance*

No formal tests of significance can answer those questions. Such tests can, and should, remind us of the effects that the play of chance can create, and they will instruct us in the likely magnitude of those effects. Beyond that they contribute nothing to the 'proof' of our hypothesis.

Nearly forty years ago, amongst the studies of occupational health that I made for the Industrial Health Research Board of the Medical Research Council was one that concerned the workers in the cotton-spinning mills of Lancashire (Hill 1930). The question that I had to answer, by the use of the National Health Insurance records of that time, was this: Do the workers in the card-room of the spinning mill, who tend the machines that clean the raw cotton, have a sickness experience in any way different from that of other operatives in the same mills who are relatively unexposed to the dust and fibre that were features of the cardroom? The answer was an unqualified 'Yes'. From age 30 to age 60 the cardroom workers suffered over three times as much from respiratory causes of illness whereas from non-respiratory causes their experience was not different from that of the other workers. This pronounced difference with the respiratory causes was derived not from abnormally long periods of sickness but rather from an excessive number of repeated absences from work of the cardroom workers.

All this has rightly passed into the limbo of forgotten things. What interests me today is this: My results were set out for men and women separately and for half a dozen age groups in 36 tables. So there were plenty of sums. Yet I cannot find that anywhere I thought it necessary to use a test of significance. The evidence was so clear-cut, the differences between the groups were mainly so large, the contrast between respiratory and non-respiratory causes of illness so specific, that no formal tests could really contribute anything of value to the argument. So why use them?

Would we think or act that way today? I rather doubt it. Between the two world wars there was a strong case for emphasizing to the clinician and other research workers the importance of not overlooking the effects of the play of chance upon their data. Perhaps too often generalities were based upon two men and a laboratory dog while the treatment of choice was deduced from a difference between two bedfuls of patients and might easily have no true meaning. It was therefore a useful corrective for statisticians to stress, and to teach the need for, tests of significance merely to serve as guides to caution before drawing a conclusion, before inflating the particular to the general.

I wonder whether the pendulum has not swung too far – not only with the attentive pupils but even with the statisticians themselves. To decline to draw conclusions without standard errors can surely be just as silly? Fortunately I believe we have not yet gone so far as our friends in the USA where, I am told, some editors of journals will return an article because tests of significance have not been applied. Yet there are innumerable situations in which they are totally unnecessary – because the difference is grotesquely obvious, because it is negligible, or because, whether it be formally significant or not, it is too small to be of any practical importance. What is worse the glitter of the *t* table diverts attention from the inadequacies of the fare. Only a tithe, and an unknown tithe, of the factory personnel volunteer for some procedure or interview, 20% of patients treated in some particular way are lost to sight, 30% of a randomly-drawn sample are never contacted. The sample may, indeed, be akin to that of the man who, according to Swift, 'had a mind to sell his house and carried a piece of brick in his pocket, which he showed as a pattern to encourage purchasers'. The writer, the editor and the reader are unmoved. The magic formulæ are there.

Of course I exaggerate. Yet too often I suspect we waste a deal of time, we grasp the shadow and

Case 2:07-md-01873-KDE-MBN   Document 2769-4   Filed 08/19/09   Page 7 of 49

lose the substance, we weaken our capacity to interpret data and to take reasonable decisions whatever the value of P. And far too often we deduce 'no difference' from 'no significant difference'. Like fire, the $\chi^2$ test is an excellent servant and a bad master.

### The Case for Action

Finally, in passing from association to causation I believe in 'real life' we shall have to consider what flows from that decision. On scientific grounds we should do no such thing. The evidence is there to be judged on its merits and the judgment (in that sense) should be utterly independent of what hangs upon it – or who hangs because of it. But in another and more practical sense we may surely ask what is involved in our decision. In occupational medicine our object is usually to take action. If this be operative cause and that be deleterious effect, then we shall wish to intervene to abolish or reduce death or disease.

While that is a commendable ambition it almost inevitably leads us to introduce differential standards before we convict. Thus on relatively slight evidence we might decide to restrict the use of a drug for early-morning sickness in pregnant women. If we are wrong in deducing causation from association no great harm will be done. The good lady and the pharmaceutical industry will doubtless survive.

On fair evidence we might take action on what appears to be an occupational hazard, e.g. we might change from a probably carcinogenic oil to a non-carcinogenic oil in a limited environment and without too much injustice if we are wrong. But we should need very strong evidence before we made people burn a fuel in their homes that they do not like or stop smoking the cigarettes and eating the fats and sugar that they do like. In asking for very strong evidence I would, however, repeat emphatically that this does not imply crossing every 't', and swords with every critic, before we act.

All scientific work is incomplete – whether it be observational or experimental. All scientific work is liable to be upset or modified by advancing knowledge. That does not confer upon us a freedom to ignore the knowledge we already have, or to postpone the action that it appears to demand at a given time.

Who knows, asked Robert Browning, but the world may end tonight? True, but on available evidence most of us make ready to commute on the 8.30 next day.

REFERENCES

Doll R (1964) In: Medical Surveys and Clinical Trials. Ed. L J Witts. 2nd ed. London; p 333
Doll R & Hill A B (1964) *Brit. med. J.* i, 1399, 1460
Heady J A (1958) *Med. World, Lond.* 89, 305
Hill A B (1930) Sickness amongst Operatives in Lancashire Spinning Mills. Industrial Health Research Board Report No. 59. HMSO, London
(1962) *J. Inst. Actu.* 88, 178
Snow J (1855) On the Mode of Communication of Cholera. 2nd ed. London (Reprinted 1936, New York)
US Department of Health, Education & Welfare (1964) Smoking and Health. Public Health Service Publication No. 1103. Washington

Dr. Karin Ann Pacheco
July 15, 2009

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER        *        MDL NO. 1873
        FORMALDEHYDE       *
        PRODUCTS LIABILITY *        SECTION: N(5)
        LITIGATION         *
                           *
Charlie Age, et al., v.    *
Gulf Stream Coach Inc, et al. *
Docket No. 09-2892         *


            VIDEOTAPE ORAL DEPOSITION OF
    KARIN ANN PACHECO, M.D., M.S.P.H. - VOLUME I
              July 15, 2009



            VIDEOTAPE ORAL DEPOSITION OF KARIN ANN
PACHECO, M.D., M.S.P.H., produced as a witness at the
instance of Gulf Stream Coach, Inc., and duly sworn, was
taken in the above-styled and numbered cause on the 15th
of July, 2009, from 3:41 p.m. to 6:41 p.m., before Carla
D. Capritta, RPR, in and for the State of Colorado,
reported by machine shorthand, at the conference room of
National Jewish Hospital 1400 Jackson Street, Denver,
Colorado 80206, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

Dr. Karin Ann Pacheco
July 15, 2009

Page 55

1    completely reverses with inhaled bronchodilator."

2          Is that correct?

3    A.    Yes.

4    Q.    So that you believe he had airway remodeling

5    and scarring based on suboptimally treated asthma?

6    A.    In part, yes.

7    Q.    Okay.  I think I asked, but I don't know that

8    we got to an answer.  On the CAT scan, there's no way to

9    see permanent epithelial damage you would have actually

10   had to get a biopsy, correct?

11   A.    Of the sinuses.

12   Q.    Where else would you have permanent epithelial

13   damage?

14   A.    Well, in -- in the lungs.  And the chest CT

15   described mild central bronchial wall thickening; with

16   patchy areas of air trapping; scarring, or atelectasis.

17   Means a little bit of collapse of the right middle lobe.

18   So it's possible that the bronchial wall thickening

19   reflected epithelial scarring.

20   Q.    From his asthma?

21   A.    Yes.

22   Q.    Okay.  What would a pulmonary function test

23   flow loop look like if somebody had vocal cord

24   dysfunction?

25   A.    Typically, classically, the -- the expiratory

Dr. Karin Ann Pacheco
July 15, 2009

Page 67

1  papers on IgE-mediated asthma related to formaldehyde,

2  correct?

3      A.   You know, he was never tested for formaldehyde

4  IgE, but it's not commercially available.  His history

5  most strongly suggests that he had an irritant effect

6  from the formaldehyde, rather than an allergy to it.

7      Q.   And, in fact, isn't formaldehyde too light to

8  run IgE tests on, to do skin-prick tests on?  You need a

9  a heparin, don't you, Doctor?

10     A.   I don't know if you need heparin for

11  formaldehyde.  I don't know the answer to that.

12     Q.   Doctor, in your reliance file, you had a copy

13  of a report from Dr. Shellito at LSU.  Did you review

14  that report?  I don't think it's in that file, but I'm

15  going to give it to you here.

16     A.   Okay, good.

17     Q.   I'm going to read it, what I want you to look

18  at, and then I'm going to let you read anything you

19  like.

20         It's under the section "Duration of Adverse

21  Health Effects from Formaldehyde Exposure."  "Unlike" --

22  well, for the record, it's -- the report is No. 143

23  through 148.

24         "Unlike some other pulmonary toxics, there is

25  no latent interval between first exposure and the

Dr. Karin Ann Pacheco
July 15, 2009

Page 68

1    development of nonmalignant disease related to

2    formaldehyde.  Thus in adults, new onset asthma or the

3    aggravation of pre-existing lung, sinus, or heart

4    disease should be detectable among the present

5    residents, and new cases resulting from formaldehyde

6    exposure are not likely to occur in the future (assuming

7    the exposure has been terminated)."

8             Here's the part I want to ask you about:

9    "Removal of the resident from the housing unit (and the

10   formaldehyde) should result in a lessening of asthma

11   symptoms and a return of pre-existing disease to

12   baseline."

13            Do you agree with that statement from

14   Dr. Shellito?

15       A.   Wait.  I agree that removal of the resident

16   from the housing unit and the formaldehyde should result

17   in a lessening of asthma symptoms and return of the

18   preexisting disease to baseline, with formaldehyde

19   acting purely as an irritant, and, again, depending on

20   the level of exposure.

21       Q.   Doctor, thank you.  You did answer my

22   question.

23            MR. WEINSTOCK:  We're going to go ahead and

24   attach Dr. Shellito's report as Exhibit 7.

25            MR. DINNELL:  8?

Dr. Karin Ann Pacheco
July 16, 2009

Page 95

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER          *        MDL NO. 1873
       FORMALDEHYDE          *
       PRODUCTS LIABILITY    *        SECTION: N(5)
       LITIGATION            *
                             *
Charlie Age, et al., v.      *
Gulf Stream Coach Inc, et al. *
Docket No. 09-2892           *


VIDEOTAPE ORAL DEPOSITION OF
KARIN ANN PACHECO, M.D., M.S.P.H. - VOLUME II
July 16, 2009


          VIDEOTAPE ORAL DEPOSITION OF KARIN ANN
PACHECO, M.D., M.S.P.H., produced as a witness at the
instance of Gulf Stream Coach, Inc., and duly sworn, was
taken in the above-styled and numbered cause on the 16th
of July, 2009, from 10:02 a.m. to 3:27 p.m., before
Carla D. Capritta, RPR, in and for the State of
Colorado, reported by machine shorthand, at the
conference room of National Jewish Hospital 1400 Jackson
Street, Denver, Colorado 80206, pursuant to the Federal
Rules of Civil Procedure and the provisions stated on
the record or attached hereto.

Dr. Karin Ann Pacheco
July 16, 2009

Page 191

1      A.    Yes.

2      Q.    Okay.   And what I've marked as Exhibit 29 is

3  an attorney agreement from your file.   And there's a

4  line in there that I believe reflects what you just

5  said, that part of your assignment was to provide

6  appropriate medical treatment for Christopher Cooper.

7  Is that right?

8      A.    Yes.   We actually have a policy to not -- to

9  not be expert witnesses in cases where we have not seen

10  the patient, and where we cannot see and treat the

11  patient for all the relevant medical diagnoses, whether

12  or not they're related to the exposure.

13      Q.    And before you offered any opinions regarding

14  Christopher Cooper, it certainly would have been

15  important for you to examine Christopher Cooper.   Is

16  that fair?

17      A.    Yes.

18      Q.    All right.   And why is that important, to

19  examine the patient before forming those opinions?

20      A.    Because that's almost the entire basis of --

21  of medical care.

22      Q.    Okay.

23      A.    And perhaps one of the things that I like very

24  much about medicine is that it can't -- it can't be

25  outsourced.   You have to see the patient.

Dr. Karin Ann Pacheco
July 16, 2009

Page 192

1    Q.   So you would have to actually see the patient

2    to reach any opinions, as opposed to just looking at

3    medical records, correct?

4              MR. PINEDO:   Objection, form.

5    A.   Well, in my estimation, yes.   I -- I would

6    want and have to see the patient, and not just review

7    medical records, to formulate my opinions.

8    Q.   (By Mr. Dinnell)   We've talked about the

9    various tests that were done on Christopher Cooper at

10   National Jewish, and one of those was the laryngoscopy,

11   correct?

12   A.   Yes.

13   Q.   How often should a patient undergo a

14   laryngoscopy?

15   A.   Only when it's necessary --

16   Q.   Okay.

17   A.   -- to establish a diagnosis.

18   Q.   How often should this patient, Christopher

19   Cooper, undergo a laryngoscopy in the future?

20   A.   Only if he develops unusual throat or vocal

21   cord or even upper chest symptoms that can't otherwise

22   be explained.

23   Q.   And that would require the judgment call of

24   whatever physician is treating Christopher Cooper at

25   that point in time, correct?

Dr. Karin Ann Pacheco
July 16, 2009

Page 214

1    before it was issued.  I have some slightly different

2    questions for you in that area.  Did you discuss the

3    contents of your report or your examinations of Chris

4    Cooper with anyone before your report was issued?

5         A.    No.

6         Q.    Before May 15th, 2009, did you speak to any of

7    the attorneys representing the plaintiffs in this case?

8         A.    No.  Not to my knowledge, no.

9         Q.    Have you spoken with any other persons who are

10   experts in this case, such as Dr. Kornberg or Dr.

11   Barnes?

12        A.    Oh, right.  No, I actually haven't.  Dr.

13   Kornberg wanted to have a conversation about this

14   patient, but I never did discuss it with him.

15        Q.    Why not?

16        A.    Because, again, my charge is to be as

17   objective as possible.  Regardless of who using me, I

18   was concerned that Dr. Kornberg was heavily vested in

19   the plaintiffs, and I didn't want to hear his point of

20   view.

21        Q.    Fair enough.  Earlier today, you had discussed

22   the -- and I'm going to use a generic term -- the skin

23   problems Chris Cooper had on the back of his knees.  And

24   would it be fair to say that you were -- because you did

25   not see it, you were not sure whether it was, in fact,

...

Dr. Karin Ann Pacheco
July 16, 2009

Page 221

1    better worse or stay the same?  Is there any test you

2    could run?

3        A.   Well, you can -- you can look to see what

4    their status of their asthma is, for example, or the

5    status of their sinuses.  Are you --

6        Q.   Okay.  Let me rephrase.

7        A.   Well, actually, ask me the question again.

8        Q.   Yeah, let me -- let me ask the question more

9    precisely.  Is there any way, when an individual is,

10   say, 14 and has asthma, to predict whether that asthma

11   will get better, worse, or stay the same after they pass

12   through puberty?

13       A.   Not to my knowledge.

14       Q.   You would have to wait and see?

15       A.   Yes.

16       Q.   And the best way to know, with Christopher

17   Cooper, whether any exposure he had to formaldehyde

18   effects that natural course that you would expect, would

19   be to wait and see?

20       A.   Yes, although I don't think you would have to

21   wait till he's 18.  You'd want to see what he's doing at

22   14, because he ought to be better.  His methacholine

23   reactivity ought to get better.  His symptoms ought to

24   get better.

25            MR. DINNELL:  We're going to make it.  I

Janet D. Barnes
June 4, 2009

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS DIVISION

IN RE: FEMA TRAILER        *   MDL NO. 1873
FORMALDEHYDE PRODUCTS      *
LIABILITY LITIGATION       *   SECTION:  N(5)
                           *
This Document Relates      *   JUDGE: ENGELHARDT
to:  Charle AGe, et        *
al. v. Gulf Stream         *   MAG: CHASEZ
Coach Inc., et al,         *
Docket No. 09-2892         *
**************************

        Videotaped deposition of JANET DUNCAN
BARNES, M.D., M.B.A., 3600 Prytania Street,
Suite 50, New Orleans, Louisiana 70128,
taken at the offices of Lambert & Nelson,
701 Magazine Street, New Orleans, Louisiana
70130, on Thursday, the 4th, of June, 2009.

APPEARANCES:

        CHRIS PINEDO
        ATTORNEY AT LAW
        4550 Jericho
        Corpus Christi, Texas  78413
            (Representing the Plaintiffs)

        BUZBEE LAW FIRM
        (BY:  Peter K. Taaffe, Esquire)
        600 Travis, Suite 7300
        Houston, Texas  77002
            (Representing the Plaintiffs)

Janet D. Barnes
June 4, 2009

Page 34

1      Q.     Was he having boggy nasal

2   turbinates in his nose prior to the storm

3   that he needed -- what's the word?  I'm

4   sorry.

5      A.     Turbinates.

6      Q.     Turbinates.

7      A.     It just means your -- your nasal

8   passages are swollen.

9      Q.     And was he having that?  So you

10  prescribed the RediTabs?

11     A.     Probably he was having some

12  postnasal drainage then.

13     Q.     But you don't recall for sure?

14     A.     Well, if I gave him some

15  Claritin -- if I gave him some Claritin

16  RediTabs, he was having some postnasal

17  drainage.

18     Q.     As we sit here today, can you

19  tell me, since we don't have the records,

20  from memory whether he was having boggy

21  nasal turbinates prior to the storm?

22     A.     I can't tell you that from

23  memory.

24     Q.     So it's possible he could; it's

25  possible he couldn't?

Janet D. Barnes
June 4, 2009

Page 35

1          A.     Right.

2          Q.     All right.  When is the next

3    time you saw him?

4          A.     After October the 4th?

5          Q.     Correct.

6          A.     October the 18th.

7          Q.     What did you see him for October

8    the 18th?

9          A.     To review his labs that I had

10   drawn and to see how he was doing on -- on

11   his medicines.

12         Q.     How did his labs look?

13         A.     His cholesterol was elevated,

14   and he also had a hemoglobin electrophoresis

15   which showed that he had hemoglobin C trait,

16   which, you know, you tell them about it, but

17   my concern at that time was more about his

18   cholesterol.  He was an overweight child for

19   his age with asthma who had elevated

20   cholesterol.

21         Q.     Would he have been able to play

22   sports with asthma?

23         A.     Yes.  With -- with treatment for

24   sure.

25         Q.     What about --

Gerald McGwin Jr.
July 27, 2009

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS DIVISION


IN RE: FEMA TRAILER          )

FORMALDEHYDE PRODUCTS   )

LIABILITY LITIGATION,   ) MDL NO. 1873

CHARLIE AGE, et al.,   ) SECTION N(5)

    Plaintiffs,          ) JUDGE: ENGELHARDT

V.                            ) MAG: CHASEZ

GULF STREAM COACH,       )

INC., et al.,            ) DOCKET NO. 09-2892

    Defendants.          )


CONCURRENT VIDEO RECORD

Deposition of GERALD McGWIN, JR. M.S. Ph.D.

July 27, 2009

9:38 a.m.

Gerald McGwin Jr.
July 27, 2009

Page 15

1      Q.   And let me state it in a different

2   way because I think Mr. Pinedo's objection is

3   well-founded.

4            When we last spoke at your first

5   deposition, the only cancer you could say more

6   probable than not you believe was associated

7   with formaldehyde exposure was nasopharyngeal

8   cancer; is that correct?

9            MR. PINEDO:  Objection to form.

10     A.   I believe what I said -- at least

11  what I wrote here was that my expert opinion

12  was that formaldehyde can cause nasopharyngeal

13  cancer and that with respect to other cancers

14  there was evidence to suggest that

15  formaldehyde played an etiologic role.

16     Q.   But you could not say more probable

17  than not that it would cause those other

18  cancers, correct?

19     A.   More probable than not.  I'm

20  struggling with the phrase more probable than

21  not.

22            I would say it would be difficult

23  at this point for me to attach a probability

24  to the evidence related to those cancers.  I

25  would have to spend more time reviewing

Gerald McGwin Jr.
July 27, 2009

Page 16

1    that -- those manuscripts to either agree or

2    disagree with your statement.

3         Q.  Let me ask you this.  I'm going to

4    show you -- I'm going to read it and then show

5    it to you.

6              My question to you last time on

7    page forty-three was, question:  What you mean

8    in your opinion that leukemia, lung,

9    pancreatic and brain cancer, there is evidence

10   to suggest formaldehyde plays an etiological

11   role.  Does that mean there's some association

12   there but not enough to say it causes it as

13   you said with nasopharyngeal?

14              Answer:  That would be accurate,

15   yes.

16              Is that your testimony today, sir?

17        A.  Yes, sir.

18        Q.  So it plays an etiological role,

19   but you couldn't say it causes leukemia, lung,

20   pancreatic, or brain cancer, correct?

21        A.  It plays an etiological role, but

22   the evidence isn't as strong for those cancers

23   as it is for nasopharyngeal.

24        Q.  And therefore, you cannot say more

25   probable than not it causes it?

Gerald McGwin Jr.
July 27, 2009

Page 17

1      A.   I'm reluctant to agree to the use

2   of the word probably than not.

3      Q.   I think you agreed to it last time,

4   but we'll look it up.

5           MR. PINEDO:  The record will

6   reflect what he said last time.

7      Q.   On page forty-five:  And based on

8   your review of these studies, you just told me

9   you couldn't say one way or another whether it

10  is more probable than not that leukemia, lung,

11  pancreatic, and brain cancer were caused by

12  exposure to formaldehyde; is that correct?

13          MR. PINEDO:  Would you show him the

14  testimony, please.

15          MR. WEINSTOCK:  Absolutely.

16     Q.   Answer:  Say that question one more

17  time.  I had it read back.  And you said:

18  That is correct, I apologize.

19          That's all the good highlighted

20  stuff.

21     A.   Yes, I believe my answer at that

22  time is consistent now.

23          You stated I couldn't say one way

24  or the other it's more probable than not.  And

25  that's what I'm saying now, because I can't

Gerald McGwin Jr.
July 27, 2009

Page 18

1    say now based on any probability.

2            MR. PINEDO:  And that's with regard

3    to leukemia, lung cancer, pancreatic cancer,

4    and brain cancer.

5            MR. WEINSTOCK:  Correct.

6        Q.  That was my question then and that

7    is my question now, correct?  That's how you

8    understood it?

9        A.  That's correct.

10       Q.  Now, Mr. Pinedo raises a valid

11   point, there are more than five cancers in the

12   world.  But those are the only ones you gave

13   opinions on in your report, correct, those

14   four and nasopharyngeal or sinonasal cancers?

15       A.  Those four and naso -- yes, sir.

16       Q.  So there may be other cancers out

17   there and they may be related to formaldehyde,

18   but you have not given those opinions?

19       A.  Yes, sir.

20       Q.  I knew we could do this quickly.

21       A.  I'm a very minimal guy.

22       Q.  If we can get to nasopharyngeal.

23   We had a long discussion, as you recall about

24   the Hauptmann paper.  I think you were sick of

25   it, and I know I was.

Gerald McGwin Jr.
July 27, 2009

Page 21

1   analyses, the one that dealt with peak

2   exposure?

3          A.   Yes, sir.

4          Q.   As opposed to some more over time

5   exposure?

6          A.   That's correct.  Yes, sir.

7          Q.   But you would agree with me that

8   according -- at least according to the

9   Hauptmann paper, to see an association between

10  formaldehyde exposure and nasopharyngeal

11  cancer, you needed to see peak exposure of

12  four thousand parts per billion?

13         A.   Based on that one paper.

14         Q.   Correct?

15         A.   Correct.

16         Q.   And speaking of that one paper, if

17  I understood your report, your -- you base

18  your association or your opinion on

19  nasopharyngeal cancer --

20              MR. PINEDO:  Which report are we

21  talking about?

22              MR. WEINSTOCK:  He only gives a

23  cancer opinion in the last fall report.

24         Q.   Let me start again.  In last

25  August's report, you based your association

Gerald McGwin Jr.
July 27, 2009

Page 131

1   are looking at are generally people who are

2   exposed to formaldehyde by their work, their

3   job title, excuse me, most likely.

4        Q.  And --

5        A.  And we don't know that it was X

6   number of parts per million, whereas the CDC

7   study tells us these are the exposure levels.

8   We just don't have those.

9             That's how I understand the

10  question.

11       Q.  Correct.  And at the levels the CDC

12  found, from three parts per billion to 590

13  parts per billion, you can't give an opinion

14  that that level is associated with

15  nasopharyngeal cancer because the epidemiology

16  just does not provide that to you?

17       A.  That's right.  None of the

18  epidemiologic studies that I'm aware of

19  actually provide formaldehyde exposure

20  levels.

21            And that doesn't mean that one

22  couldn't, through some sort of job exposure

23  matrix, link that CDC data or any exposure

24  data to those cancer cases.

25            But as the evidence exists today,

Gerald McGwin Jr.
July 27, 2009

Page 132

1    nobody has done that.

2            Q.   And you have not done that?

3            A.   I have not done that, no, sir.

4            Q.   And you have not been asked to do

5    it?

6            A.   No, not to my knowledge.

7            Q.   As we sit here today, at the levels

8    that people were exposed to in the FEMA

9    trailers, the 519 that we talked about, from

10   three parts per billion to 590 parts per

11   billion, you cannot say more probably than not

12   that would be associated with nasopharyngeal

13   cancer?

14           A.   Sitting here today, no, sir.

15   Although, again, it could be done.

16           Q.   It's possible it just has not been

17   done?

18           A.   That's correct.

19           Q.   When you said no, sir, you were

20   actually agreeing with my statement, correct?

21                Sometimes it's the way I ask

22   questions.  I tend to lead.  So the correct

23   answer is yes, but let me ask it again.

24           A.   Sure.

25           Q.   As we sit here today, at the levels

Gerald McGwin Jr.
July 27, 2009

Page 223

1    where a primary outcome was asthma.

2         Q.  Did any of them involve

3    formaldehyde?

4         A.  I'm almost certain none of them

5    included formaldehyde.

6              MR. SHERBURNE:  Thank you.  I think

7    that's all the questions I have, Doctor.

8              MR. WEINSTOCK:  I'm sorry.  You

9    know how I am.

10

11              FURTHER EXAMINATION

12   BY MR. WEINSTOCK:

13        Q.  I found something I didn't ask you

14   about before.  It's on page six of your --

15        A.  Cancer?

16        Q.  Yes.  It says, Formaldehyde is

17   classified as a known carcinogen by the

18   International Association for Research on

19   Cancer, IARC, with specific reference to

20   nasopharyngeal cancer.  I asked you about that

21   before and we couldn't find it in your

22   report.

23              You may or may not know this, but

24   is it my understanding that is primarily due

25   to the Hauptmann paper?  Is that your

Gerald McGwin Jr.
July 27, 2009

Page 224

1    understanding as well?

2         A.   That is my understanding.

3              MR. WEINSTOCK:   Thank you, doctor.

4              MR. PINEDO:   A couple more

5    questions.

6

7                   FURTHER EXAMINATION

8    BY MR. PINEDO:

9         Q.   Doctor, I'd like to ask you to turn

10   to your report again, page three, figure two.

11   I think previously I misstated what the parts

12   per million were for the upper levels that you

13   have reported there.  So let me ask you a

14   different question.

15             It appears to me that the highest

16   level which you have reported an odds ratio

17   and a confidence interval equates with .106

18   parts per million; is that right?

19        A.   That's correct.

20        Q.   And so the odds ratio of asthma for

21   those who have been exposed to formaldehyde at

22   .106 parts per million is 7.1; is that right?

23             MR. WEINSTOCK:   Object to the form.

24        A.   That is correct.

25        Q.   There's an objection so let me ask

Gerald McGwin Jr.
July 27, 2009

Page 225

1    you:  For people who have been exposed to

2    formaldehyde at .106 parts per million, based

3    upon the meta analysis you did wherein you

4    looked at seven published studies including

5    Garrett, Rumchev, Mi, Smedje 1997, Smedje

6    2001, Zhao and Krzyzanowski, what was the odds

7    ratio for people who had been exposed to

8    formaldehyde at .106 parts per million?

9         A.   7.10.

10        Q.   And what is the 95 percent

11   confidence interval for people who have been

12   exposed to asthma at .106 parts per million if

13   we were talking about 95 percent -- or your 95

14   certain that the true odds ratio falls between

15   those two numbers.  What would it be?

16             MR. WEINSTOCK:  Object to the form.

17             MS. GRIEF:  Object to the form.

18        A.   6.08 to 8.29.

19             MR. PINEDO:  What's the basis of

20   your objection, Mr. Weinstock.

21             MR. WEINSTOCK:  It's purely

22   speculative.  Those aren't observed -- I'm

23   answering your question.  Those are not actual

24   observed data points.

25             MR. PINEDO:  I understand.

Gerald McGwin Jr.
July 27, 2009

Page 226

1    Q.  Based upon your meta analysis that

2  you did, are you able to make some predictions

3  as to what the odds ratio would be for

4  exposure levels beyond which was reported in

5  the literature?

6    A.  It is certainly possible to

7  extrapolate beyond the range of the observed

8  data.  But as I have indicated and the reason

9  why it's in gray here is that that is much

10  more speculative than making calculations for

11  data that you've actually observed.

12    Q.  Well, let me ask you:  The odds

13  ratios that you have reported here for

14  exposure levels from 0 to .106 parts per

15  million, does there seem to be a consistent

16  trend?

17    A.  Well, there is a trend.  It's a

18  by-product of the meta analysis.

19    Q.  And is it a upward trend that the

20  higher the exposure level and parts per

21  million the higher the odds ratio?

22    A.  That's correct, increasing response

23  with increasing exposure.

24    Q.  And the lowest odds ratio that you

25  have reported here is what?

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION


IN RE:   FEMA TRAILER
FORMALDEHYDE PRODUCT
LIABILITY LITIGATION

                              MDL NO. 1873

                              SECTION "N-5"

                              JUDGE ENGELHARDT

                              MAG. JUDGE CHASEZ




          ORAL AND VIDEOTAPED DEPOSITION OF

        CHRISTOPHER T. DE ROSA M.S., Ph.D.

                  July 6, 2009

                   9:25 a.m.

                201 17th Street

                  Suite 1700

                Atlanta, Georgia


        Maureen S. Kreimer, RPR, CCR-B-1379

In Re: FEMA                    Christopher De Rosa, Ph.D.                    7/6/2009

Page 256

1          Q.    Correct.  And that's only with respect to

2    one form of cancer, which is nasopharyngeal cancer;

3    is that correct?

4          A.    That's primarily based on nasopharyngeal

5    cancers, but it also references leukemias as well.

6          Q.    With respect to leukemia, and I can quote

7    you the language, it does not declare leukemia as a

8    known human carcinogen, does it?

9          A.    Leukemia is a disease, not a carcinogen.

10         Q.    Excuse me.  Formaldehyde is not declared

11   in that 2004 press release as a known human

12   carcinogen causing leukemia; correct?

13         A.    The classification of known human

14   carcinogen is based primarily on nasopharyngeal

15   cancer; however, the weight of evidence is always

16   considered in those designations.

17              And in fact, I was as I recall, at the

18   consultation in Lyons when that was discussed, and it

19   was reclassified, if I'm not mistaken, I was at that

20   particular consultation.

21         Q.    With respect to the classification of

22   formaldehyde, insofar as nasopharyngeal cancer is

23   concerned, that IARC report is predicated primarily

24   on what paper, do you know?

25         A.    There were a number of studies,

In Re: FEMA                Christopher De Rosa, Ph.D.                7/6/2009

Page 257

1    occupational studies, that were conducted.

2        Q.    The NCI occupational study authored

3    primarily in 2003 by Hauptmann; correct?

4        A.    I believe that's correct, yes.

5        Q.    Have you read that paper?

6        A.    I believe I have.

7        Q.    Do you know the threshold where there was

8    an excess of the standard -- or for the standard

9    mortality ratio, an excess of deaths on which the

10   Hauptmann report concludes that it is a human

11   carcinogen?

12       A.    I believe there was a high exposure group

13   versus a low exposure group in the cohorts that were

14   studied.  I do not recall what the exposure ranges

15   were in that study.

16       Q.    Would it surprise you to know that that

17   exposure range was in excess of four parts per

18   million?

19       A.    No.  It's typically the case that because

20   of difficulty in identifying toxic effects in

21   chemicals, that high dose levels are used.  It's a

22   maximum tolerated dose.  It's a longstanding protocol

23   based on the National Toxicology Bioassay Program,

24   and also on the Bioassay Program of the Ramazzini

25   Institute in Italy that you scale back from the

In Re: FEMA            Christopher De Rosa, Ph.D.            7/6/2009

Page 258

1    maximum tolerated dose on a logarithmic basis so that

2    you have a dose stand that is more likely to

3    illustrate the shape of the dose-response function.

4         Q.    Are you aware of any exposure, chronic

5    exposure, in these FEMA trailers in excess of four

6    parts per million?

7         A.    I would have to go back and check.

8         Q.    As you sit here today, are you aware of

9    any exposure, chronic exposure, of any occupant of

10   any trailer in excess of four parts per million?

11        A.    Again, I would have to go back and check.

12        Q.    Do you remember what the arithmetic mean

13   of exposure within the travel trailers and

14   manufactured houses was in the July 2008 CDC report

15   of the 519 trailers?

16        A.    I believe it was on the order of 150 --

17   well, I'm not going to speculate.  I'm sorry.

18        Q.    If it were 0.078 ppm, would that be far

19   below four parts per million?

20             MR. REICH:  Objection.

21        A.    Yes.

22             MR. REICH:  Assumes facts not in evidence.

23   Incomplete hypothetical.

24        A.    I see values in excess of four parts per

25   million.

American Journal of Epidemiology
Copyright © 2004 by the Johns Hopkins Bloomberg School of Public Health
All rights reserved

Vol. 159, No. 12
Printed in U.S.A.
DOI: 10.1093/aje/kwh174

# Mortality from Solid Cancers among Workers in Formaldehyde Industries

Michael Hauptmann, Jay H. Lubin, Patricia A. Stewart, Richard B. Hayes, and Aaron Blair

From the Division of Cancer Epidemiology and Genetics, National Cancer Institute, Department of Health and Human Services, Bethesda, MD.

Received for publication December 1, 2003; accepted for publication March 16, 2004.

In industrial workers, formaldehyde exposure has been associated with cancer of the nasal cavities, nasopharynx, prostate, lung, and pancreas; however, these associations are inconsistent and remain controversial. Animals exposed to formaldehyde show excesses of nasal cancer. In an extended follow-up of a large cohort of formaldehyde-exposed workers, the authors evaluated mortality from solid cancers (1,921 deaths) among 25,619 workers (865,708 person-years) employed in 10 US formaldehyde-producing or -using facilities through 1994. Exposure assessment included quantitative estimates of formaldehyde exposure. Standardized mortality ratios and relative risks were calculated. Compared with that for the US population, mortality from solid cancers was significantly lower than expected among subjects exposed and nonexposed to formaldehyde (standardized mortality ratios = 0.91 and 0.78, respectively). Relative risks for nasopharyngeal cancer (nine deaths) increased with average exposure intensity, cumulative exposure, highest peak exposure, and duration of exposure to formaldehyde ($p$-trend = 0.066, 0.025, <0.001, and 0.147, respectively). Formaldehyde exposure did not appear to be associated with lung (744 deaths), pancreas (93 deaths), or brain (62 deaths) cancer. Although relative risks for prostate cancer (145 deaths) were elevated for some measures of formaldehyde exposure, the trend was inconsistent. In this cohort of formaldehyde-industry workers, some evidence was found of an exposure-response relation with mortality from nasopharyngeal cancer (based on small numbers) but not for cancers of the pancreas, brain, lung, or prostate.

carcinogens; cohort studies; formaldehyde; lung; mortality; nasopharynx; neoplasms; occupational health

Abbreviations: CI, confidence interval; SMR, standardized mortality ratio.

The flammable and colorless gas formaldehyde ($CH_2O$) is used in the production of resins, molding compounds, photographic film, decorative laminates, and plywood and as a bactericide and tissue preservative. Approximately 1.5 million workers in the United States were exposed to formaldehyde in 1981 (1). Formaldehyde irritates the eye and upper airway mucosa at concentrations exceeding 0.5–1 ppm (2). In rats and mice, inhalation exposure has caused squamous cell carcinomas of the nasal cavity (3, 4).

In 1995, the International Agency for Research on Cancer found sufficient evidence for the carcinogenicity of formaldehyde in animals but only limited evidence for carcinogenicity in humans (2). Some studies of industrial workers or embalmers, pathologists, and anatomists have associated formaldehyde exposure with cancer of the nasal cavities (5–7), nasopharynx (5, 7–14), prostate (10, 15), lung (16–18),

pancreas (19), brain (10, 15, 20–24), and lymphohematopoietic system (8, 10, 15, 17, 20, 23, 25, 26). However, these associations were inconsistent and remain controversial.

In this study, we assessed the relation between formaldehyde and selected solid cancers in an extended follow-up of the largest known cohort to date of industrial workers in formaldehyde industries. In a separate analysis of these data (27), we observed a significant association between mortality from leukemia, particularly myeloid leukemia, and peak and average exposure to formaldehyde.

## MATERIALS AND METHODS

### Cohort design and follow-up

Details of the original study design (5) and extended follow-up (27) have been described previously. In brief,

Correspondence to Dr. Michael Hauptmann, Division of Cancer Epidemiology and Genetics, National Cancer Institute, 6120 Executive Boulevard, Bethesda, MD 20892 (e-mail: hauptmann@nih.gov).

25,619 US workers employed at 10 plants prior to January 1, 1966, were enrolled in the cohort (878 workers of unknown sex or race and 64 workers who started work after January 1, 1966, were excluded). Subjects were followed from the year of initial plant identification (i.e., the year in which employment records were thought to be complete; range, 1934–1958) or first employment at a plant, whichever was later, through December 31, 1994. The Social Security Administration, the Health Care Financing Administration, the Veterans Administration, credit bureaus, motor vehicle departments, and telephone directories were used to determine vital status before 1980, and a National Death Index Plus search was used thereafter. Information on underlying cause of death was obtained for 8,486 deceased workers. For 866 subjects (3.4 percent) lost to follow-up prior to 1980, person-year accumulation ended at the last date known alive. These data were the basis for this analysis and for the evaluation of mortality from lymphohematopoietic malignancies reported separately (27), and they represent 15 years of additional mortality follow-up (resulting in a doubling of the number of deaths) compared with the previous analysis (5, 28).

On the basis of information from secondary sources other than death certificates, it was found that one of the nasopharyngeal cancer subjects had been misclassified on the death certificate and in fact had cancer of the tonsillar fossa (29). For this subject, nasopharyngeal cancer was used as the cause of death to calculate standardized mortality ratios, since population reference rates are based on death certificates, but cancer of the oropharynx, of which the tonsillar fossa is a part, was used to estimate relative risks.

### Exposure assessment

We estimated exposure to formaldehyde from work histories through 1980 based on job titles, tasks, visits to the plants by study industrial hygienists, discussions with workers and plant managers, and monitoring data. Peak exposures were defined as short-term excursions (generally less than 15 minutes) that exceeded the 8-hour, time-weighted average formaldehyde intensity. Peak exposures in the workplace occurred from routine (e.g., hourly, daily, or weekly) or nonroutine performance of high-exposure tasks or from working in areas where nonroutine, unusual upsets or events, such as spills, occurred. Since no measurements of peak exposure were available in this study, peaks and their frequency (hourly, daily, weekly, or monthly) were estimated by an industrial hygienist from knowledge of the job tasks and a comparison with the 8-hour time-weighted average. We assessed the presence of particulates to represent formaldehyde as a solid (e.g., paraformaldehyde or trioxane), formaldehyde-containing resins, molding compound particulates, or particulates onto which formaldehyde gas could be adsorbed. Exposures to 11 suspected carcinogens and other widely used chemicals in the plants were evaluated (antioxidants, asbestos, carbon black, dyes and pigments, hexamethylenetetramine, melamine, phenol, plasticizers, urea, wood dust, and benzene). We also identified workers employed as chemists or laboratory technicians because of their potential exposure to various other chemicals. The exposure assessment is described in detail elsewhere (5, 30, 31). For the extended follow-up, no information on formaldehyde exposure after 1980 was obtained.

### Statistical analysis

The following formaldehyde exposure metrics were calculated as time-dependent variables: cumulative exposure (ppm-years), average exposure intensity (ppm), duration of exposure (years), highest peak exposure category (nonexposed, >0–<0.5 ppm, 0.5–<2.0 ppm, 2.0–<4.0 ppm, ≥4.0 ppm), exposure to formaldehyde-containing particulates (ever/never), duration of exposure to each of 11 other substances (years), and duration of working as a chemist or laboratory technician (years). Workers contributed person-time to the nonexposed category until they were exposed. Then, they contributed person-time to the appropriate exposure categories depending on their levels of exposure. For each worker, we collapsed jobs in adjacent time periods of exposure for which all of the estimated exposure variables were identical. However, for the description of exposure levels in these jobs, nonadjacent periods with identical estimated exposures were counted separately.

Standardized mortality ratios and relative risks were estimated by using standard methods (32). Relative risks were based on Poisson regression models and were adjusted for calendar year, age, sex, race, and pay category (32). The low-exposure category was used as the reference to minimize the impact of any unmeasured confounding variables, since nonexposed workers may differ from exposed workers with respect to socioeconomic characteristics. However, workers in the low-exposure category were exposed to very low levels of formaldehyde. We evaluated confounding for exposure to other substances and for working as a chemist or laboratory technician. Tests of trend for categorical variables were based on the estimated slope of the corresponding continuous variable, except for peak exposure, where categorical ranks were used. Heterogeneity among risk estimates was assessed by likelihood ratio tests. Tests were two-sided at a 5 percent significance level. For details of the statistical analysis, refer to the separate report by Hauptmann et al. (27).

We calculated all exposures by using a 15-year lag interval to account for latency for solid cancers. Lag intervals from 2 to 20 years were evaluated, but no substantial differences for model fit from the 15-year lag were found for solid cancers of primary interest. The 15-year lag interval was eventually chosen because 15 years is commonly regarded as a minimum latency time for solid tumors and because it conforms to the lack of exposure information for the extension of the follow-up (1980–1994).

Since plant was correlated with exposure, we do not present relative risk estimates adjusted for plant in this paper. However, adjusting for plant did not substantially change the results.

**TABLE 1.   Demographic characteristics (no. of subjects) of the cohort of workers in US formaldehyde industries analyzed regarding mortality from solid cancers**

| Characteristic | Plant identification no. and year of cohort identification[*] | | | | | | | | | | Total[†] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Plant 1, 1943 | Plant 2, 1945 | Plant 3, 1949 | Plant 4, 1958 | Plant 5, 1957 | Plant 6, 1951 | Plant 7, 1938 | Plant 8, 1934 | Plant 9, 1956 | Plant 10, 1941 | |
| Race and sex | | | | | | | | | | | |
| White men | 3,663 | 781 | 1,324 | 1,606 | 564 | 3,965 | 3,574 | 1,365 | 1,516 | 2,300 | 20,658 (81) |
| Black men | 184 | 0 | 969 | 8 | 38 | 120 | 157 | 0 | 67 | 292 | 1,835 (7) |
| White women | 413 | 3 | 81 | 78 | 133 | 1,151 | 496 | 313 | 349 | 83 | 3,100 (12) |
| Black women | 1 | 0 | 1 | 0 | 9 | 12 | 1 | 1 | 1 | 0 | 26 (<1) |
| Year of entry into the cohort | | | | | | | | | | | |
| ≤1945 | 572 | 43 | 0 | 0 | 0 | 0 | 1,295 | 486 | 0 | 709 | 3,105 (12) |
| 1946–1955 | 2,339 | 522 | 774 | 0 | 0 | 3,261 | 1,961 | 795 | 0 | 1,548 | 11,200 (44) |
| 1956–1965 | 1,350 | 219 | 1,601 | 1,692 | 744 | 1,987 | 972 | 398 | 1,933 | 418 | 11,314 (44) |
| Age at entry (years) | | | | | | | | | | | |
| ≤30 | 2,657 | 532 | 1,650 | 921 | 306 | 3,358 | 3,047 | 1,052 | 1,521 | 1,833 | 16,877 (66) |
| 31–40 | 942 | 201 | 457 | 446 | 178 | 1,066 | 727 | 303 | 242 | 560 | 5,122 (20) |
| 41–50 | 473 | 48 | 216 | 284 | 172 | 549 | 336 | 206 | 111 | 198 | 2,593 (10) |
| 51–60 | 169 | 3 | 44 | 33 | 72 | 199 | 97 | 91 | 52 | 78 | 838 (3) |
| ≥61 | 20 | 0 | 8 | 8 | 16 | 76 | 21 | 27 | 7 | 6 | 189 (1) |
| Duration of follow-up (years) | | | | | | | | | | | |
| ≤30 | 1,370 | 181 | 1,076 | 490 | 188 | 1,890 | 1,119 | 562 | 676 | 721 | 8,273 (32) |
| 31–35 | 702 | 116 | 736 | 528 | 156 | 903 | 519 | 263 | 918 | 251 | 5,092 (20) |
| 36–40 | 811 | 132 | 341 | 674 | 400 | 1,035 | 616 | 148 | 339 | 613 | 5,109 (20) |
| ≥41 | 1,378 | 355 | 222 | 0 | 0 | 1,420 | 1,974 | 706 | 0 | 1,090 | 7,145 (28) |
| Vital status[†] | | | | | | | | | | | |
| Alive | 2,401 | 500 | 1,514 | 1,236 | 611 | 3,254 | 2,906 | 915 | 1,489 | 1,441 | 16,267 (64) |
| Deceased | 1,679 (39) | 260 (33) | 754 (32) | 437 (26) | 130 (17) | 1,821 (35) | 1,179 (28) | 706 (42) | 350 (18) | 1,170 (44) | 8,486 (33) |
| Unknown | 181 (4) | 24 (3) | 107 (5) | 19 (1) | 3 (<1) | 173 (3) | 143 (3) | 58 (3) | 94 (5) | 64 (2) | 866 (3) |
| Total | 4,261 | 784 | 2,375 | 1,692 | 744 | 5,248 | 4,228 | 1,679 | 1,933 | 2,675 | 25,619 |

[*] Year in which employment records were thought to be complete.
[†] Numbers in parentheses, percent.

## RESULTS

### Demographic description of the cohort

A total of 25,619 subjects entered the cohort between 1934 and 1966; 75 percent entered before 1960. Duration of follow-up ranged from a few days to 58 years, with a median duration of 35 years. The total number of person-years accrued was 865,708. The median ages at entry and exit were 26 and 64 years, respectively. The cohort consisted predominantly of White men (81 percent) and White women (12 percent) (table 1).

### Exposure to formaldehyde

In jobs involving formaldehyde exposure, the median 8-hour time-weighted average formaldehyde intensity was 0.45 ppm (range, 0.01–4.25 ppm), and 16.6 percent of all jobs involved no exposure to formaldehyde. Average intensity was 2 ppm or higher for 2.6 percent of the jobs; for 14.3 percent of the jobs, peak exposures were 4 ppm or higher. Among exposed workers, median values for duration of jobs involving exposure to formaldehyde, average intensity of exposure, and cumulative exposure were 2 years (range, 0–46 years), 0.3 ppm (range, 0.01–4.25 ppm), and 0.6 ppm-years (range, 0.0–107.4 ppm-years), respectively. Of all workers in the cohort, 17.5 percent were never employed in jobs involving exposure to formaldehyde, 4.7 percent were ever employed in jobs in which average intensities were 2 ppm or higher, and 22.6 percent were ever employed in jobs involving peak exposures of 4 ppm or higher. Time-weighted average estimates were generally similar to or slightly higher than those from other reports on occupational exposures in the literature (33).

### Cancer mortality and exposure to formaldehyde

Compared with that for the US population, mortality from solid cancers was significantly decreased in nonexposed

**1120**  Hauptmann et al.

TABLE 2.   Numbers of observed deaths and standardized mortality ratios with 95% confidence intervals for selected cancers and other major causes of death among US workers nonexposed and exposed to formaldehyde, mortality follow-up through 1994

| Cause of death (ICD-8* code(s)) | Nonexposed | | | Exposed† | | |
|---|---|---|---|---|---|---|
| | Observed (no.) | SMR* | 95% CI* | Observed (no.) | SMR | 95% CI |
| All causes (001–999) | 1,991 | 0.85 | 0.81, 0.89 | 6,495 | 0.96 | 0.94, 0.98 |
| All cancer (140–209) | 376 | 0.76 | 0.69, 0.84 | 1,723 | 0.90 | 0.86, 0.95 |
| Solid cancer (140–199) | 341 | 0.78 | 0.70, 0.86 | 1,580 | 0.91 | 0.87, 0.96 |
| Benign/unspecified neoplasms (210–239) | 6 | 0.70 | 0.31, 1.55 | 21 | 1.14 | 0.74, 1.74 |
| Circulatory system (390–458) | 815 | 0.77 | 0.72, 0.83 | 3,030 | 0.88 | 0.85, 0.91 |
| Respiratory diseases (460–519) | 84 | 0.59 | 0.48, 0.73 | 460 | 0.82 | 0.75, 0.90 |
| Cancer | | | | | | |
| Buccal cavity (140–149) | 13 | 0.99 | 0.58, 1.71 | 49 | 1.01 | 0.77, 1.34 |
| Nasopharynx (147) | 2 | 1.56 | 0.39, 6.23 | 8 | 2.10 | 1.05, 4.21‡ |
| Digestive system (150–159) | 97 | 0.74 | 0.61, 0.91 | 420 | 0.89 | 0.80, 0.97 |
| Liver (155–156) | 8 | 0.75 | 0.38, 1.51 | 23 | 0.68 | 0.45, 1.03 |
| Pancreas (157) | 14 | 0.59 | 0.35, 0.99 | 79 | 0.83 | 0.67, 1.04 |
| Respiratory system (160–163) | 110 | 0.80 | 0.66, 0.96 | 668 | 0.97 | 0.90, 1.04 |
| Nose and nasal cavity (160) | 0 | 0.00 | 0.00, 2.01 | 3 | 1.19 | 0.38, 3.68 |
| Larynx (161) | 6 | 1.05 | 0.47, 2.35 | 23 | 0.95 | 0.63, 1.43 |
| Lung (162) | 103 | 0.79 | 0.65, 0.96 | 641 | 0.97 | 0.90, 1.05 |
| Bone (170) | 0 | 0.00 | 0.00, 0.66 | 7 | 1.57 | 0.75, 3.29 |
| Skin (172–173) | 5 | 0.48 | 0.20, 1.15 | 29 | 0.82 | 0.57, 1.18 |
| Breast (174) | 16 | 0.66 | 0.41, 1.08 | 19 | 0.59 | 0.38, 0.92 |
| Female genital (180–184) | 16 | 1.00 | 0.61, 1.63 | 14 | 0.74 | 0.44, 1.25 |
| Prostate (185) | 14 | 0.59 | 0.35, 0.99 | 131 | 0.90 | 0.75, 1.06 |
| Bladder (188) | 6 | 0.56 | 0.25, 1.25 | 31 | 0.68 | 0.48, 0.97 |
| Kidney (189) | 11 | 1.00 | 0.56, 1.81 | 37 | 0.81 | 0.58, 1.11 |
| Brain and central nervous system (191–192) | 19 | 1.09 | 0.70, 1.71 | 43 | 0.92 | 0.68, 1.23 |
| Person-years | 409,074 | | | 456,634 | | |

\* ICD-8, *International Classification of Diseases*, Eighth Revision; SMR, standardized mortality ratio; CI, confidence interval.

† Exposure status was calculated by using a 15-year lag interval.

‡ The exact 95% confidence interval is 0.91, 4.14.

(standardized mortality ratio (SMR) = 0.78) and exposed (SMR = 0.91) workers (table 2). Significant deficits occurred for cancers of the digestive system, pancreas, lung, bone, and prostate in the nonexposed and for cancers of the digestive system, breast, and bladder in the exposed. Excesses among exposed workers were observed for cancers of the nasopharynx, nose and nasal cavity, and bone. On the basis of the relative risks, no consistent evidence of increasing risks was found for mortality from all solid cancers combined with any measure of formaldehyde exposure (tables 3, 4, 5, and 6).

Extension of the follow-up (1980–1994) added 466 lung cancers to the 278 cases from the original follow-up (1960–1980). On the basis of the relative risks, there was no evidence of an association between formaldehyde exposure and lung cancer mortality (tables 3, 4, 5, and 6). We found no association between lung cancer mortality and average, peak, and cumulative formaldehyde exposure within subgroups of age, pay category, or exposure to formaldehyde-containing particulates (table 7) (data for peak and cumulative exposure not shown). To evaluate risk of lung cancer by cumulative exposure in more detail, we divided the highest exposure category into additional categories: 5.5–7.9, 8.0–11.9, 12.0–15.9, and ≥16.0 ppm-years. The respective relative risks for these categories, compared with those for workers exposed to low levels (>0–<1.5

**TABLE 3.   Relative risks and numbers of deaths for selected cancers and other major causes of death by average intensity of exposure to formaldehyde, United States, mortality follow-up through 1994**

| Cause of death (ICD-8* code(s)) | Average intensity of exposure (ppm)† | | | | | | | | *p*-trend‡ | *p*-trend§ |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | | >0–<0.5¶ | | 0.5–<1.0 | | ≥1.0 | | | |
| | Relative risk# | No. of deaths | Relative risk# | No. of deaths | Relative risk# | No. of deaths | Relative risk# | No. of deaths | | |
| All causes (001–999) | 1.01 | 1,991 | 1.00 | 3,640 | 1.12** | 1,405 | 1.04 | 1,450 | 0.608 | 0.733 |
| All cancer (140–209) | 0.99 | 376 | 1.00 | 953 | 1.17** | 383 | 1.10 | 387 | 0.183 | 0.217 |
| Solid cancer (140–199) | 1.01 | 341 | 1.00 | 880 | 1.15** | 349 | 1.07 | 351 | 0.432 | 0.439 |
| Benign/unspecified neoplasms (210–239) | 0.43 | 6 | 1.00 | 12 | 0.72 | 3 | 1.31 | 6 | 0.052 | 0.075 |
| Circulatory system (390–458) | 0.99 | 815 | 1.00 | 1,709 | 1.13** | 670 | 0.98 | 651 | −0.156 | −0.101 |
| Respiratory diseases (460–519) | 0.92 | 84 | 1.00 | 260 | 1.11 | 102 | 0.96 | 98 | −0.908 | −0.814 |
| Cancer | | | | | | | | | | |
| Upper respiratory tract†† (142, 144, 145, 147, 160, 161) | 1.47 | 11 | 1.00 | 18 | 1.69 | 11 | 2.21** | 15 | 0.158 | 0.122 |
| Buccal cavity (140–149) | 2.42** | 13 | 1.00 | 18 | 2.41** | 16 | 1.89 | 15 | 0.791 | 0.504 |
| Salivary gland (142) | NA* | 0 | NA | 0 | NA | 4 | NA | 0 | 0.592 | 0.641 |
| Nasopharynx‡‡ (147) | 1.00§§ | 2 | NA | 0 | 0.38 | 1 | 1.67 | 6 | 0.126 | 0.066 |
| Digestive system (150–159) | 0.92 | 97 | 1.00 | 257 | 0.93 | 82 | 0.84 | 81 | −0.215 | −0.237 |
| Liver (155–156) | 1.54 | 8 | 1.00 | 12 | 0.82 | 3 | 2.05 | 8 | 0.584 | 0.219 |
| Pancreas (157) | 0.76 | 14 | 1.00 | 48 | 0.72 | 12 | 1.05 | 19 | 0.998 | −0.889 |
| Respiratory system (160–163) | 1.03 | 110 | 1.00 | 362 | 1.14 | 146 | 1.16 | 160 | 0.873 | 0.726 |
| Nose and nasal cavity (160) | NA | 0 | 1.00 | 2 | 1.48 | 1 | NA | 0 | −0.802 | −0.562 |
| Larynx (161) | 1.09 | 6 | 1.00 | 11 | 1.00 | 4 | 2.02 | 8 | 0.284 | 0.263 |
| Lung (162) | 1.04 | 103 | 1.00 | 348 | 1.15 | 141 | 1.14 | 152 | 0.760 | 0.843 |
| Bone (170) | NA | 0 | 1.00 | 2 | 2.91 | 2 | 4.37 | 3 | 0.109 | 0.189 |
| Skin (172–173) | 0.29 | 5 | 1.00 | 15 | 1.63 | 8 | 1.31 | 6 | 0.328 | 0.673 |
| Breast (174) | 1.27 | 14 | 1.00 | 14 | 0.49 | 2 | 0.65 | 3 | −0.183 | −0.492 |
| Female genital (180–184) | 1.18 | 16 | 1.00 | 16 | 1.30 | 3 | 1.21 | 3 | 0.901 | 0.804 |
| Prostate (185) | 0.67 | 14 | 1.00 | 72 | 1.27 | 31 | 1.18 | 28 | 0.031 | 0.065 |
| Bladder (188) | 1.06 | 6 | 1.00 | 14 | 1.76 | 9 | 1.42 | 8 | 0.596 | 0.634 |
| Kidney (189) | 1.39 | 11 | 1.00 | 20 | 1.48 | 10 | 0.91 | 7 | 0.992 | 0.842 |
| Brain and central nervous system (191–192) | 1.84 | 19 | 1.00 | 23 | 1.07 | 9 | 1.19 | 11 | 0.819 | 0.631 |
| Person-years | 409,074 | | 279,992 | | 88,074 | | 88,568 | | | |

* ICD-8, *International Classification of Diseases*, Eighth Revision; NA, not applicable (a relative risk estimate for this category of exposure was not available because there was no death in this category or in the reference category).

† Exposure was calculated by using a 15-year lag interval.

‡ Likelihood ratio test (1 df) of zero slope for continuous formaldehyde exposure for nonexposed and exposed person-years; −, negative slope estimate.

§ Likelihood ratio test (1 df) of zero slope for continuous formaldehyde exposure for exposed person-years only; −, negative slope estimate.

¶ Reference for all categories.

# Relative risk from Poisson regression analysis stratified by calendar year, age (both in 5-year intervals), sex, and race (Black/White) and adjusted for pay category (salary/wage).

** 95% confidence interval does not include 1.00.

†† Cancer of the salivary gland, floor of the mouth, other mouth, nasopharynx, nasal cavity, larynx.

‡‡ Cause of death corrected from cancer of the nasopharynx to that of the oropharynx for one death based on information from secondary sources other than death certificates (29).

§§ Reference for this site because of no cases in the low-exposure category.

**1122**  Hauptmann et al.

TABLE 4.    Relative risks and numbers of deaths for selected cancers and other major causes of death by peak exposure to formaldehyde, United States, mortality follow-up through 1994

| Cause of death (ICD-8* code(s)) | Peak exposure (ppm)† | | | | | | | | p-trend‡ | p-trend§ |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | | >0–<2.0¶ | | 2.0–<4.0 | | ≥4.0 | | | |
| | Relative risk# | No. of deaths | Relative risk# | No. of deaths | Relative risk# | No. of deaths | Relative risk# | No. of deaths | | |
| All causes (001–999) | 1.05 | 1,991 | 1.00 | 2,554 | 1.21** | 1,945 | 1.07** | 1,996 | 0.013 | 0.014 |
| All cancer (140–209) | 1.04 | 376 | 1.00 | 655 | 1.28** | 534 | 1.09 | 534 | 0.078 | 0.114 |
| Solid cancer (140–199) | 1.04 | 341 | 1.00 | 612 | 1.24** | 487 | 1.04 | 481 | 0.346 | 0.372 |
| Benign/unspecified neoplasms (210–239) | 0.61 | 6 | 1.00 | 6 | 1.47 | 6 | 2.22 | 9 | 0.043 | 0.143 |
| Circulatory system (390–458) | 1.04 | 815 | 1.00 | 1,191 | 1.21** | 918 | 1.04 | 921 | 0.202 | 0.251 |
| Respiratory diseases (460–519) | 0.92 | 84 | 1.00 | 188 | 1.05 | 132 | 0.98 | 140 | 0.776 | 0.864 |
| Cancer | | | | | | | | | | |
| Upper respiratory tract†† (142, 144, 145, 147, 160, 161) | 1.32 | 11 | 1.00 | 14 | 1.24 | 12 | 1.65 | 18 | 0.302 | 0.142 |
| Buccal cavity (140–149) | 2.08 | 13 | 1.00 | 15 | 1.07 | 11 | 1.83 | 23 | 0.433 | 0.072 |
| Salivary gland (142) | NA* | 0 | NA | 0 | 1.00‡‡ | 2 | 0.97 | 2 | 0.102 | 0.125 |
| Nasopharynx§§ (147) | 1.00‡‡ | 2 | NA | 0 | NA | 0 | 1.83 | 7 | 0.044 | <0.001 |
| Digestive system (150–159) | 0.95 | 97 | 1.00 | 178 | 0.92 | 102 | 1.05 | 140 | 0.626 | 0.485 |
| Liver (155–156) | 1.94 | 8 | 1.00 | 7 | 1.54 | 6 | 2.18 | 10 | 0.481 | 0.045 |
| Pancreas (157) | 0.78 | 14 | 1.00 | 33 | 0.93 | 20 | 1.00 | 26 | 0.710 | –0.920 |
| Respiratory system (160–163) | 1.06 | 110 | 1.00 | 249 | 1.43** | 236 | 0.93 | 183 | –0.813 | –0.572 |
| Nose and nasal cavity (160) | NA | 0 | 1.00 | 1 | 1.55 | 1 | 1.47 | 1 | 0.414 | 0.779 |
| Larynx (161) | 0.86 | 6 | 1.00 | 10 | 1.19 | 8 | 0.64 | 5 | –0.645 | –0.514 |
| Lung (162) | 1.08 | 103 | 1.00 | 237 | 1.45** | 227 | 0.94 | 177 | –0.874 | –0.669 |
| Bone (170) | NA | 0 | 1.00 | 2 | 0.70 | 1 | 2.55 | 4 | 0.063 | 0.256 |
| Skin (172–173) | 0.30 | 5 | 1.00 | 10 | 1.85 | 12 | 0.96 | 7 | 0.145 | 0.924 |
| Breast (174) | 1.28 | 16 | 1.00 | 12 | 0.52 | 4 | 1.00 | 3 | –0.282 | 0.865 |
| Female genital (180–184) | 1.32 | 16 | 1.00 | 6 | 1.29 | 5 | 1.89 | 3 | 0.687 | 0.296 |
| Prostate (185) | 0.73 | 14 | 1.00 | 47 | 1.61** | 42 | 1.14 | 42 | 0.170 | 0.568 |
| Bladder (188) | 1.18 | 6 | 1.00 | 9 | 1.63 | 10 | 1.74 | 12 | 0.247 | 0.304 |
| Kidney (189) | 1.34 | 11 | 1.00 | 15 | 1.23 | 12 | 0.89 | 10 | –0.585 | –0.791 |
| Brain and central nervous system (191–192) | 1.64 | 19 | 1.00 | 18 | 1.06 | 14 | 0.74 | 11 | –0.162 | –0.405 |
| Person-years | 409,074 | | 209,815 | | 121,729 | | 125,090 | | | |

* ICD-8, *International Classification of Diseases*, Eighth Revision; NA, not applicable (a relative risk estimate for this category of exposure was not available because there was no death in this category or in the reference category).

† Exposure was calculated by using a 15-year lag interval.

‡ Likelihood ratio test (1 df) of zero slope for continuous formaldehyde exposure for nonexposed and exposed person-years; –, negative slope estimate.

§ Likelihood ratio test (1 df) of zero slope for continuous formaldehyde exposure for exposed person-years only; –, negative slope estimate.

¶ Reference for all categories.

# Relative risk from Poisson regression analysis stratified by calendar year, age (both in 5-year intervals), sex, and race (Black/White) and adjusted for pay category (salary/wage).

** 95% confidence interval does not include 1.00.

†† Cancer of the salivary gland, floor of the mouth, other mouth, nasopharynx, nasal cavity, larynx.

‡‡ Reference for this site because of no cases in the low-exposure category.

§§ Cause of death corrected from cancer of the nasopharynx to that of the oropharynx for one death based on information from secondary sources other than death certificates (29).

ppm-year), were 0.91, 0.99, 0.84, and 0.64. Similarly, dividing the highest exposure category for exposure intensity—1.0–1.4, 1.5–1.9, 2.0–2.4, and ≥2.5 ppm—resulted in relative risks of 1.26, 0.86, 1.42, and 0.77, respectively, compared with >0–<0.5 ppm. These results were similar when the analysis was restricted to wage workers only. No

TABLE 5.  Relative risks and numbers of deaths for selected cancers and other major causes of death by cumulative exposure to formaldehyde, United States, mortality follow-up through 1994

| Cause of death (ICD-8* code(s)) | Cumulative exposure (ppm-year)† | | | | | | | | p-trend‡ | p-trend§ |
| | 0 | | >0–<1.5¶ | | 1.5–<5.5 | | ≥5.5 | | | |
| | Relative risk# | No. of deaths | Relative risk# | No. of deaths | Relative risk# | No. of deaths | Relative risk# | No. of deaths | | |
|---|---|---|---|---|---|---|---|---|---|---|
| All causes (001–999) | 0.97 | 1,991 | 1.00 | 3,951 | 0.96 | 1,324 | 1.03 | 1,220 | −0.574 | −0.271 |
| All cancer (140–209) | 0.94 | 376 | 1.00 | 1,038 | 0.95 | 352 | 1.02 | 333 | 0.942 | −0.865 |
| Solid cancer (140–199) | 0.97 | 341 | 1.00 | 950 | 0.97 | 328 | 1.01 | 302 | −0.852 | −0.725 |
| Benign/unspecified neoplasms (210–239) | 0.40 | 6 | 1.00 | 13 | 0.63 | 3 | 1.22 | 5 | 0.808 | 0.967 |
| Circulatory system (390–458) | 0.97 | 815 | 1.00 | 1,804 | 0.98 | 640 | 1.05 | 586 | −0.496 | −0.335 |
| Respiratory diseases (460–519) | 0.89 | 84 | 1.00 | 267 | 0.93 | 96 | 0.99 | 97 | −0.631 | −0.454 |
| Cancer | | | | | | | | | | |
| Upper respiratory tract** (142, 144, 145, 147, 160, 161) | 1.24 | 11 | 1.00 | 23 | 1.92 | 15 | 0.86 | 6 | 0.744 | 0.765 |
| Buccal cavity (140–149) | 1.98 | 13 | 1.00 | 25 | 1.59 | 12 | 1.74 | 12 | 0.422 | 0.365 |
| Salivary gland (142) | NA* | 0 | 1.00 | 1 | 3.10 | 1 | 5.98 | 2 | 0.448 | 0.473 |
| Nasopharynx†† (147) | 2.40 | 2 | 1.00 | 3 | 1.19 | 1 | 4.14 | 3 | 0.029 | 0.025 |
| Digestive system (150–159) | 0.95 | 97 | 1.00 | 250 | 0.92 | 84 | 1.08 | 86 | −0.454 | −0.457 |
| Liver (155–156) | 1.43 | 8 | 1.00 | 13 | 1.04 | 5 | 1.23 | 5 | −0.664 | −0.812 |
| Pancreas (157) | 0.70 | 14 | 1.00 | 53 | 0.67 | 13 | 0.74 | 13 | −0.111 | −0.073 |
| Respiratory system (160–163) | 0.93 | 110 | 1.00 | 422 | 0.92 | 136 | 0.82 | 110 | −0.099 | −0.076 |
| Nose and nasal cavity (160) | NA | 0 | 1.00 | 2 | 1.32 | 1 | NA | 0 | −0.855 | −0.715 |
| Larynx (161) | 0.97 | 6 | 1.00 | 13 | 1.81 | 9 | 0.23 | 1 | −0.043 | −0.027 |
| Lung (162) | 0.93 | 103 | 1.00 | 407 | 0.88 | 125 | 0.84 | 109 | −0.165 | −0.138 |
| Bone (170) | NA | 0 | 1.00 | 3 | 1.91 | 2 | 2.53 | 2 | 0.024 | 0.032 |
| Skin (172–173) | 0.21 | 5 | 1.00 | 20 | 0.41 | 3 | 1.07 | 6 | 0.926 | −0.808 |
| Breast (174) | 1.45 | 16 | 1.00 | 14 | 0.90 | 4 | 0.81 | 1 | 0.892 | 0.616 |
| Female genital (180–184) | 1.33 | 16 | 1.00 | 8 | 1.80 | 4 | 2.67 | 2 | 0.511 | 0.601 |
| Prostate (185) | 0.65 | 14 | 1.00 | 66 | 0.87 | 26 | 1.31 | 39 | 0.096 | 0.146 |
| Bladder (188) | 1.18 | 6 | 1.00 | 13 | 1.98 | 10 | 1.73 | 8 | −0.922 | −0.846 |
| Kidney (189) | 1.38 | 11 | 1.00 | 22 | 1.39 | 10 | 0.81 | 5 | −0.954 | −0.913 |
| Brain and central nervous system (191–192) | 1.71 | 19 | 1.00 | 27 | 1.02 | 9 | 0.86 | 7 | −0.964 | 0.886 |
| Person-years | 409,074 | | 319,418 | | 82,630 | | 54,586 | | | |

* ICD-8, *International Classification of Diseases*, Eighth Revision; NA, not applicable (a relative risk estimate for this category of exposure was not available because there was no death in this category or in the reference category).

† Exposure was calculated by using a 15-year lag interval.

‡ Likelihood ratio test (1 df) of zero slope for continuous formaldehyde exposure for nonexposed and exposed person-years; −, negative slope estimate.

§ Likelihood ratio test (1 df) of zero slope for continuous formaldehyde exposure for exposed person-years only; −, negative slope estimate.

¶ Reference for all categories.

# Relative risk from Poisson regression analysis stratified by calendar year, age (both in 5-year intervals), sex, and race (Black/White) and adjusted for pay category (salary/wage). The 95% confidence intervals for the estimated relative risks shown all included 1.00.

** Cancer of the salivary gland, floor of the mouth, other mouth, nasopharynx, nasal cavity, larynx.

†† Cause of death corrected from cancer of the nasopharynx to that of the oropharynx for one death based on information from secondary sources other than death certificates (29).

association with formaldehyde exposure was observed for pneumonia, emphysema, and all benign diseases of the respiratory system.

Sites of direct contact with formaldehyde upon inhalation include the nasopharynx, mouth, salivary gland, nasal cavity, and larynx. Cancers at these sites as a group (denoted here as upper respiratory tract) exhibited increasing relative risks with increasing average intensity and peak exposure but not with cumulative exposure and duration of exposure. Relative risks for an average exposure intensity of 0.5–<1.0

TABLE 6. Relative risks and numbers of deaths for selected cancers and other major causes of death by duration of exposure to formaldehyde, United States, mortality follow-up through 1994

| Cause of death (ICD-8* code(s)) | Duration of exposure (years)† | | | | | | | | p-trend‡ | p-trend§ |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 0 | | >0–<5¶ | | 5–<15 | | ≥15 | | | |
| | Relative risk# | No. of deaths | Relative risk# | No. of deaths | Relative risk# | No. of deaths | Relative risk# | No. of deaths | | |
| All causes (001–999) | 0.96 | 1,991 | 1.00 | 4,007 | 0.95 | 1,391 | 0.94 | 1,097 | –0.209 | –0.010 |
| All cancer (140–209) | 0.92 | 376 | 1.00 | 1,046 | 0.95 | 372 | 0.92 | 305 | –0.295 | –0.092 |
| Solid cancer (140–199) | 0.94 | 341 | 1.00 | 961 | 0.94 | 340 | 0.92 | 279 | –0.296 | –0.135 |
| Benign/unspecified neoplasms (210–239) | 0.43 | 6 | 1.00 | 13 | 1.42 | 6 | 0.40 | 2 | 0.978 | 0.575 |
| Circulatory system (390–458) | 0.97 | 815 | 1.00 | 1,807 | 0.97 | 676 | 1.01 | 547 | 0.645 | –0.809 |
| Respiratory diseases (460–519) | 0.90 | 84 | 1.00 | 263 | 1.03 | 101 | 0.91 | 96 | –0.799 | –0.385 |
| Cancer | | | | | | | | | | |
| Upper respiratory tract** (142, 144, 145, 147, 160, 161) | 0.96 | 11 | 1.00 | 29 | 1.00 | 11 | 0.46 | 4 | –0.206 | –0.159 |
| Buccal cavity (140–149) | 1.87 | 13 | 1.00 | 27 | 1.74 | 16 | 0.95 | 6 | 0.850 | 0.589 |
| Salivary gland (142) | NA* | 0 | 1.00 | 1 | 3.29 | 1 | 5.42 | 2 | 0.213 | 0.243 |
| Nasopharynx†† (147) | 1.77 | 2 | 1.00 | 4 | 0.83 | 1 | 4.18 | 2 | 0.206 | 0.147 |
| Digestive system (150–159) | 0.96 | 97 | 1.00 | 247 | 0.98 | 93 | 1.03 | 80 | 0.832 | 0.848 |
| Liver (155–156) | 1.32 | 8 | 1.00 | 14 | 0.95 | 5 | 0.87 | 4 | –0.566 | –0.618 |
| Pancreas (157) | 0.70 | 14 | 1.00 | 52 | 0.69 | 14 | 0.76 | 13 | –0.207 | –0.082 |
| Respiratory system (160–163) | 0.88 | 110 | 1.00 | 434 | 0.79‡‡ | 129 | 0.77‡‡ | 105 | –0.017 | –0.008 |
| Nose and nasal cavity (160) | NA | 0 | 1.00 | 2 | 1.08 | 1 | NA | 0 | –0.477 | –0.250 |
| Larynx (161) | 0.65 | 6 | 1.00 | 18 | 0.62 | 5 | NA | 0 | –0.008 | –0.002 |
| Lung (162) | 0.90 | 103 | 1.00 | 414 | 0.80‡‡ | 123 | 0.80 | 104 | –0.045 | –0.028 |
| Bone (170) | NA | 0 | 1.00 | 4 | 1.13 | 2 | 1.27 | 1 | 0.420 | 0.727 |
| Skin (172–173) | 0.25 | 5 | 1.00 | 17 | 0.85 | 5 | 1.47 | 7 | 0.259 | 0.719 |
| Breast (174) | 1.44 | 16 | 1.00 | 15 | 0.55 | 2 | 2.03 | 2 | 0.898 | 0.658 |
| Female genital (180–184) | 1.11 | 16 | 1.00 | 10 | 0.83 | 2 | 2.14 | 2 | –0.942 | 0.779 |
| Prostate (185) | 0.68 | 14 | 1.00 | 60 | 1.31 | 37 | 0.98 | 34 | 0.486 | 0.877 |
| Bladder (188) | 0.96 | 6 | 1.00 | 16 | 1.35 | 9 | 1.02 | 6 | 0.533 | 0.769 |
| Kidney (189) | 1.29 | 11 | 1.00 | 23 | 0.77 | 6 | 1.40 | 8 | –0.789 | –0.716 |
| Brain and central nervous system (191–192) | 1.68 | 19 | 1.00 | 28 | 1.08 | 10 | 0.61 | 5 | –0.184 | –0.368 |
| Person-years | 409,074 | | 324,912 | | 90,046 | | 41,676 | | | |

* ICD-8, *International Classification of Diseases*, Eighth Revision; NA, not applicable (a relative risk estimate for this category of exposure was not available because there was no death in this category or in the reference category).

† Exposure was calculated by using a 15-year lag interval.

‡ Likelihood ratio test (1 df) of zero slope for continuous formaldehyde exposure for nonexposed and exposed person-years; –, negative slope estimate.

§ Likelihood ratio test (1 df) of zero slope for continuous formaldehyde exposure for exposed person-years only; –, negative slope estimate.

¶ Reference for all categories.

# Relative risk from Poisson regression analysis stratified by calendar year, age (both in 5-year intervals), sex, and race (Black/White) and adjusted for pay category (salary/wage).

** Cancer of the salivary gland, floor of the mouth, other mouth, nasopharynx, nasal cavity, larynx.

†† Cause of death corrected from cancer of the nasopharynx to that of the oropharynx for one death based on information from secondary sources other than death certificates (29).

‡‡ 95% confidence interval does not include 1.00.

and ≥1.0 versus >0–<0.5 ppm were 1.69 (95 percent confidence interval (CI): 0.80, 3.59) and 2.21 (95 percent CI: 1.10, 4.44), respectively, with a nonsignificant trend for exposed workers (*p* = 0.122) (table 3). Nine deaths from

nasopharyngeal cancer occurred, seven among exposed and two among nonexposed workers. Four exposed cases had cumulative exposures of <5.5 ppm-years, while the other three exposed cases had cumulative exposures of 12.5, 21.7,

and 52.3 ppm-years. All exposed cases had maximum peak exposures of ≥4.0 ppm. Three deaths were added with the extended follow-up (2.5 expected), with two deaths added to the highest cumulative exposure category. Nasopharyngeal cancer mortality was elevated compared with that in the general population (SMR = 1.56 for nonexposed, SMR = 2.10 for exposed; table 2). Among the exposed, the relative risk increased with all exposure measures except duration of exposure and was two- to fourfold for workers exposed to the highest levels of formaldehyde (tables 3, 4, 5, and 6). Specifically, relative risks for 1.5–<5.5 and ≥5.5 versus >0–<1.5 ppm-years of cumulative exposure were 1.19 (95 percent CI: 0.12, 11.50) and 4.14 (95 percent CI: 0.83, 20.70), respectively, with a significant trend for exposed workers ($p = 0.025$). Three workers died from cancer of the nose or the nasal cavity. All three were exposed to formaldehyde, with cumulative exposures and peak exposures of 5.35, 0.09, and 0.13 ppm-years and ≥4.0, ≥4.0, and >0–<2.0 ppm. The standardized mortality ratio for exposed subjects was slightly elevated (SMR = 1.19; table 2), and relative risks compared with those for subjects exposed to low levels were increased for subjects exposed to higher levels of formaldehyde, even though the 95 percent confidence interval included 1.0 (tables 3, 4, 5, and 6). For salivary gland cancer (four deaths), relative risks were threefold and five- to sixfold higher for the medium- and high-exposure categories of cumulative exposure and duration of exposure, respectively, compared with low exposure. However, the confidence intervals were wide, and no association was seen for peak exposure and average intensity (tables 3, 4, 5, and 6).

Other cancer sites of a priori interest were the pancreas, prostate, and brain. Mortality from cancer of the pancreas was not associated with any of our measures of formaldehyde exposure in the total cohort (tables 3, 4, 5, and 6). Relative risks increased with average exposure intensity only for the subgroup of older subjects (aged ≥65 years), but the trend was not statistically significant (table 7). For prostate cancer, a significantly elevated relative risk of 1.61 (95 percent CI: 1.04, 2.47) occurred for workers with peak formaldehyde exposure of 2.0–<4.0 ppm (42 deaths), but the trend with peak exposure was not statistically significant (table 4). Relative risks for categories of average exposure intensity were slightly elevated, and the trend was borderline significant ($p = 0.065$) for exposed subjects (table 3) and significant or borderline significant for the subgroups of White workers ($p = 0.053$), older workers (aged ≥65 years, $p = 0.086$), wage workers ($p = 0.067$), and workers never exposed to formaldehyde-containing particulates ($p = 0.021$) (table 7). No association was observed for mortality from malignant brain tumors (62 deaths) (tables 3, 4, 5, and 6).

Some associations were observed for cancers not of a priori interest. There were seven deaths from bone cancer among exposed workers (SMR = 1.57 among exposed) and none among nonexposed workers (2.9 expected). Relative risks increased with exposure, particularly for cumulative exposure. The relative risks for workers exposed for 1.5–<5.5 and ≥5.5 ppm-years were 1.91 (95 percent CI: 0.31, 11.64) and 2.53 (95 percent CI: 0.40, 16.03), respectively, compared with workers exposed to low levels (>0–<1.5 ppm-years) of formaldehyde, with a significant trend for

exposed workers ($p = 0.032$) (table 5). For liver cancer (31 deaths), we found an association with peak exposure. When we compared workers exposed to peak levels of 2.0–<4.0 ppm and ≥4.0 ppm with workers exposed to low peak levels of formaldehyde (>0–<2.0 ppm), the relative risks were 1.54 (95 percent CI: 0.50, 4.73) and 2.18 (95 percent CI: 0.80, 5.99), respectively, with a significant trend for exposed workers ($p = 0.045$) (table 4). However, no association was observed for other exposure measures (tables 3, 5, and 6).

### Exposure to substances other than formaldehyde

Forty-seven percent of the subjects were ever occupationally exposed to at least one of the following substances: antioxidants (22 percent), asbestos (14 percent), carbon black (11 percent), dyes and pigments (16 percent), hexamethylenetetramine (15 percent), melamine (28 percent), phenol (14 percent), plasticizers (20 percent), urea (27 percent), wood dust (10 percent), and benzene (2 percent). Relative risks for various cancers and formaldehyde exposure categories did not change substantially when adjusted for duration of exposure to these substances, except for nasopharyngeal cancer and melamine exposure. For that site, relative risks for the highest exposure categories of peak and average intensity of formaldehyde exposure declined when the analysis was adjusted for melamine exposure (data not shown). However, relative risks were still elevated for cumulative exposure and duration of exposure after adjustment for melamine exposure, and trend tests remained significant for peak ($p < 0.001$), average ($p = 0.021$), and cumulative ($p = 0.006$) exposure. We repeated the analyses for all cancers of interest by excluding the 586 subjects exposed to benzene and found no substantial differences. Only 8 percent of all workers were employed as chemists or laboratory technicians, and only 2 percent worked in such jobs for 5 or more years. Adjusting for duration of working as a chemist or laboratory technician did not substantially change the observed associations.

### DISCUSSION

When the follow-up was extended, we found no evidence that lung cancer is associated with formaldehyde exposure. This finding is consistent with results based on the initial follow-up (5, 28, 34), where workers exposed to formaldehyde had slight excesses of mortality from lung cancer, but these excesses were not consistently related to duration of or average, cumulative, or peak formaldehyde exposure levels. Other investigators reanalyzed our original data from the initial follow-up and interpreted elevated risks for exposed subjects compared with nonexposed subjects as evidence for a causal relation (35–37), or they found an association between lung cancer mortality and cumulative exposure to formaldehyde only in the presence of several coexposures (38).

Risk estimates for lung cancer from formaldehyde exposure could have been confounded by other occupational exposures and smoking. Confounding from exposure to 11 other substances is less likely since there was no evidence of an association between lung cancer mortality and these

**TABLE 7.  Effect modification of average formaldehyde intensity for selected cancer sites, United States, mortality follow-up through 1994**

| Effect modifier | Average intensity[*] | | | | | | | | p-trend[†] | p-heterogeneity[‡] |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | | >0–<0.5[§] | | 0.5–<1 | | ≥1 | | | |
| | Relative risk[¶] | No. of deaths | Relative risk[¶] | No. of deaths | Relative risk[¶] | No. of deaths | Relative risk[¶] | No. of deaths | | |
| *Pancreas (157#)* | | | | | | | | | | |
| Age (years) | | | | | | | | | | |
| <50 | 0.89 | 3 | 1.00 | 3 | 0.94 | 1 | 0.96 | 1 | −0.729 | |
| ≥50–<65 | 0.66 | 6 | 1.00 | 24 | 0.12 | 1 | 0.67 | 6 | −0.214 | |
| ≥65 | 0.85 | 5 | 1.00 | 21 | 1.38 | 10 | 1.49 | 12 | 0.423 | 0.315 |
| Pay category | | | | | | | | | | |
| Wage | 0.78 | 10 | 1.00 | 38 | 0.63 | 9 | 1.11 | 19 | 0.975 | |
| Salary | 0.33 | 2 | 1.00 | 9 | 1.17 | 3 | NA[††] | 0 | −0.411 | 0.416 |
| Exposure to formaldehyde-containing particulates | | | | | | | | | | |
| Never | 0.72 | 14 | 1.00 | 20 | 0.64 | 4 | 1.34 | 5 | 0.301 | |
| Ever | NA | 0 | 1.00 | 28 | 0.78 | 8 | 1.02 | 14 | −0.320 | 0.149 |
| *Lung (162#)* | | | | | | | | | | |
| Age (years) | | | | | | | | | | |
| <50 | 1.17 | 14 | 1.00 | 22 | 1.64 | 11 | 0.76 | 5 | −0.516 | |
| ≥50–<65 | 0.91 | 51 | 1.00 | 173 | 1.12 | 69 | 0.95 | 64 | −0.296 | |
| ≥65 | 1.16 | 38 | 1.00 | 153 | 1.12 | 61 | 1.39[**] | 83 | 0.148 | 0.164 |
| Pay category | | | | | | | | | | |
| Wage | 1.02 | 67 | 1.00 | 293 | 1.12 | 125 | 1.12 | 145 | 0.978 | |
| Salary | 0.99 | 28 | 1.00 | 44 | 1.19 | 15 | 1.62 | 7 | 0.352 | 0.362 |
| Exposure to formaldehyde-containing particulates | | | | | | | | | | |
| Never | 0.91 | 98 | 1.00 | 145 | 1.16 | 55 | 0.81 | 22 | −0.262 | |
| Ever | 1.17 | 5 | 1.00 | 203 | 1.15 | 86 | 1.30[**] | 130 | 0.218 | 0.101 |

**Table continues**

exposures, and adjusting the analysis for duration of exposure to these 11 substances did not change the results. We lacked information on tobacco use for most of the cohort, but evidence suggests that smoking is not a confounder since there was no consistent excess or deficit for other tobacco-related diseases, for example, bladder cancer, emphysema, and ischemic heart disease. Information on smoking habits obtained from medical records for a small sample of workers from two plants (63 subjects with cancer and 316 age-matched controls) revealed no major differences in smoking prevalence by level of cumulative formaldehyde exposure (28). Pay category, which correlates with socioeconomic status and smoking prevalence, was included as an adjustment factor in the analysis. Our null finding for formaldehyde exposure and lung cancer is consistent with several recent studies (26, 39–41), although other studies of industrial populations have suggested increased lung cancer mortality (16–18).

The factor plant was taken into account in our analysis. We directly addressed potential confounding by plant-related factors by adjusting for 11 potentially confounding substances. Directly adjusting for plant may result in overadjustment. However, to address the potential effect of unmeasured confounders associated with plant, we performed analyses adjusted for plant. Although some of these analyses were based on small numbers, and, as a consequence, estimates had large variances, associations observed for cancers of the upper respiratory tract, nasopharynx, salivary gland, nose or nasal cavity, and bone remained after we adjusted for plant. In the adjusted analysis, no clear association was seen for cancers of the pancreas, brain, lung, or prostate.

Inhaled formaldehyde is deposited almost entirely in the upper respiratory tract of rats (42) and is rapidly incorporated into DNA, RNA, and proteins (43). Therefore, the upper respiratory tract is the site of direct exposure for inhaled formaldehyde. Despite the small numbers of deaths from cancers of the upper respiratory tract, the positive association for this site as a group with average intensity and peak exposure in our analysis is consistent with the carcinogenicity of formaldehyde at the site of first contact. Several epidemiologic (7–12, 14, 24, 44) and animal (3, 4) studies support these results for specific sites in the upper respira-

**TABLE 7.   Continued**

| Effect modifier | Average intensity* | | | | | | | | p-trend† | p-heterogeneity‡ |
| | 0 | | >0–<0.5§ | | 0.5–<1 | | ≥1 | | | |
| | Relative risk¶ | No. of deaths | Relative risk¶ | No. of deaths | Relative risk¶ | No. of deaths | Relative risk¶ | No. of deaths | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *Prostate (185#)* | | | | | | | | | |
| Race | | | | | | | | | | |
| White | 0.80 | 13 | 1.00 | 61 | 1.24 | 26 | 1.24 | 26 | 0.053 | |
| Black | 0.04 | 1 | 1.00 | 11 | 1.41 | 5 | 0.69 | 2 | −0.861 | 0.541 |
| Age (years) | | | | | | | | | | |
| <50 | 0.11 | 1 | 1.00 | 1 | NA | 0 | NA | 0 | −0.366 | |
| ≥50–<65 | 1.19 | 3 | 1.00 | 9 | 0.70 | 2 | 1.32 | 4 | 0.389 | |
| ≥65 | 0.62 | 10 | 1.00 | 62 | 1.36 | 29 | 1.18 | 24 | 0.086 | 0.580 |
| Pay category | | | | | | | | | | |
| Wage | 0.61 | 7 | 1.00 | 52 | 1.31 | 26 | 1.17 | 26 | 0.067 | |
| Salary | 0.69 | 6 | 1.00 | 16 | 1.07 | 5 | 1.51 | 2 | 0.697 | 0.975 |
| Exposure to formaldehyde-containing particulates | | | | | | | | | | |
| Never | 0.72 | 13 | 1.00 | 24 | 1.35 | 9 | 1.51 | 6 | 0.021 | |
| Ever | 0.54 | 1 | 1.00 | 48 | 1.22 | 22 | 1.09 | 22 | 0.616 | 0.133 |
| | *Brain and central nervous system (191–192#)* | | | | | | | | | |
| Age (years) | | | | | | | | | | |
| <50 | 0.53 | 8 | 1.00 | 3 | 1.93 | 2 | 2.54 | 3 | 0.717 | |
| ≥50–<65 | 4.84 | 9 | 1.00 | 10 | 1.35 | 5 | 0.99 | 4 | 0.935 | |
| ≥65 | 1.23 | 2 | 1.00 | 10 | 0.54 | 2 | 0.93 | 4 | 0.659 | 0.950 |
| Pay category | | | | | | | | | | |
| Wage | 2.00 | 15 | 1.00 | 19 | 1.26 | 9 | 1.31 | 11 | 0.621 | |
| Salary | 1.23 | 4 | 1.00 | 4 | NA | 0 | NA | 0 | −0.956 | 0.896 |
| Exposure to formaldehyde-containing particulates | | | | | | | | | | |
| Never | 2.02 | 18 | 1.00 | 7 | 0.86 | 2 | 1.52 | 2 | 0.229 | |
| Ever | 9.80** | 1 | 1.00 | 16 | 1.14 | 7 | 1.07 | 9 | −0.828 | 0.267 |

\* Exposure was calculated by using a 15-year lag interval.

† Likelihood ratio test of zero slope for continuous formaldehyde intensity for exposed person-years only; −, negative slope estimate.

‡ Likelihood ratio test of heterogeneity of relative risks for intensity between levels of the effect modifier.

§ Reference for all categories.

¶ Relative risk from Poisson regression analysis stratified by calendar year, age (both in 5-year intervals), sex, and race (Black/White) and adjusted for pay category (salary/wage).

# *International Classification of Diseases*, Eighth Revision code(s).

\*\* 95% confidence interval does not include 1.00.

†† NA, not applicable (a relative risk estimate for this category of exposure was not available because there was no death in this category or in the reference category).

tory tract, while other studies (16, 20, 26, 39, 45–47) provide little support.

Some cohort studies (10), including ours, and some case-control studies (9, 11–14) reported a positive association between formaldehyde exposure and nasopharyngeal cancer, whereas others (16, 20, 26, 39, 45–47) did not. One study found a positive association for hypopharyngeal cancer (48). The excess for nasopharyngeal cancer reported previously in this cohort persisted, although only three additional deaths occurred in the extended follow-up. We observed exposure-response patterns for nasopharyngeal cancer for average,

cumulative, and peak exposure to formaldehyde. Because five of the nine deaths from nasopharyngeal cancer occurred at one plant (plant 1; table 1), we performed analyses adjusted for plant and found increasing relative risks with increasing exposure categories for all four exposure metrics. Specifically, adjusted relative risks for the categories shown in tables 3, 4, 5, and 6 were, respectively, 1.00, (not applicable), (not applicable), and 9.07 for peak exposure (p-trend among exposed = 0.008); 1.00, (not applicable), 8.51, and 23.54 for average intensity (p-trend among exposed = 0.404); 2.18, 1.00, 1.34, and 5.32 for cumulative exposure

(*p*-trend among exposed = 0.007); and 1.76, 1.00, 1.21, and 8.59 for duration of exposure (*p*-trend among exposed = 0.043). These results are consistent with increasing standardized mortality ratios with increasing cumulative exposure and duration of exposure to formaldehyde found in an independent investigation of workers at this plant (including all workers hired between 1941 and 1984 and followed through 1998) (49).

Of the nine workers who died from nasopharyngeal cancer, two were not exposed to formaldehyde and were never exposed to particulates, whereas seven workers were exposed to formaldehyde and to particulates. This complete colinearity of exposure to formaldehyde and particulates prevented us from evaluating formaldehyde exposure separately for those workers exposed and not exposed to particulates. However, nasopharyngeal cancer risk increased with formaldehyde exposure for those exposed to particulates, and formaldehyde intensities and peak exposures ranged from low to high in the jobs involving and not involving particulate exposure held by the nine workers who died from nasopharyngeal cancer. This finding provides evidence that the association seen for formaldehyde may not be entirely due to particulates.

Workers could contribute person-time and deaths to high peak exposure categories based on infrequent peaks because peaks may have occurred in jobs of short duration or occurred less often than daily or weekly, or both. We created several alternative maximum peak exposure metrics, ignoring peaks in jobs of short duration (<6 or <12 months) or rare peaks (less often than daily or weekly), and found two- to sevenfold increased risks for nasopharyngeal cancer in the highest peak exposure category (≥4.0 ppm) compared with the nonexposed category.

Wood dust is a potential confounder for formaldehyde exposure and nasal and nasopharyngeal cancer (2, 47, 50); however, none of our nasal and nasopharyngeal cancer cases had been identified as being exposed to wood dust. For nasopharyngeal cancer, some confounding was observed by duration of exposure to melamine. Exposure to melamine occurred at six plants, mainly in the manufacture of synthetic resins with formaldehyde. Although exposure to high doses of melamine produced urinary bladder and ureteral carcinomas in rats, there is inadequate evidence for the carcinogenicity of melamine in humans (51). Therefore, the observed association between melamine exposure and nasopharyngeal cancer and subsequent confounding of the formaldehyde-nasopharyngeal cancer association may be spurious. No information was available on the presence of antibodies to Epstein-Barr virus, another major risk factor for nasopharyngeal cancer (52).

Inhaled formaldehyde causes nasal cavity tumors in mice (3), and some epidemiologic studies have reported a positive association between formaldehyde exposure and cancer of the nasal cavity (44, 53, 54). A meta-analysis found an increased risk in 11 case-control studies but not in nine cohort studies of industrial workers (39), although many of the studies that did not show an association had generally low power because of small numbers of cases, uncertainties in the exposure assessment, or both. The association for cancer of the nasal cavity found in the current analysis is consistent with an effect, but the number of deaths was too limited to enable a firm conclusion.

In a cohort of workers exposed to formaldehyde in the garment industry, Stayner et al. (55) found a significant excess of cancer of the buccal cavity (3 observed, 0.4 expected), with the three observed deaths attributed to cancer of the parotid gland, which is part of the salivary gland. Although our numbers were also small regarding cancer of the salivary gland (four deaths), we did see increasing relative risks with categories of cumulative exposure and duration of exposure. This finding is consistent with recent data from a death-certificate-based case-control study including 2,405 salivary gland cancer deaths and showing an increased risk with occupational exposure to formaldehyde (56).

Our finding of no association between formaldehyde exposure and pancreatic cancer is consistent with a recent review and meta-analysis of 14 studies; no elevated risk was found for industrial workers, although a slightly elevated risk was found for embalmers, pathologists, and anatomists (19).

The association between formaldehyde exposure and prostate cancer has been mixed, with weakly positive associations (10, 15), no associations (16, 20, 21), and protective effects (24, 45) reported. In the initial report on this cohort (5), a slight excess was confined largely to salaried workers, suggesting that the association was due to socioeconomic factors rather than occupational exposures. The moderate positive association between formaldehyde exposure and prostate cancer observed in the current analysis, especially for wage workers and older workers, is suggestive, but the absence of a clear exposure-response gradient and internal inconsistencies among wage and salaried workers do not provide much evidence for a causal relation.

Most studies of embalmers or pathologists have reported nonsignificantly elevated standardized mortality ratios for brain cancer (10, 15, 20–22). One study of anatomists found significantly elevated standardized mortality ratios that increased with duration of membership in the anatomists' association (23). For industrial workers, no association (6, 16, 26, 45, 46) or small excesses (24) have been reported. The previous analysis of this cohort (5) found no link between brain cancer and formaldehyde exposure, and we found no association after the extended follow-up.

The excess mortality from bone cancer is interesting, but, to our knowledge, this site has not been linked with formaldehyde exposure in previous experimental or epidemiologic investigations. Interpretation of the finding is problematic because of the small number of deaths (*n* = 7) and because the bone is a common site of metastases. However, the size of the relative risk and occurrence among only the exposed suggest that further consideration is warranted. As far as we know, liver cancer has not been linked to formaldehyde exposure, and the observed association may be a chance finding.

Our study has limitations. Extension of mortality follow-up from 1980 through 1994 utilized only the National Death Index Plus to determine vital status. Subjects not identified as deceased by this source were assumed to be alive. Although the National Death Index Plus is quite complete, it

is possible that there was some underascertainment of deaths. However, it is unlikely that this factor would bias relative risk estimates because missing deaths are unlikely to be related to formaldehyde exposure. Exposure misclassification is always a concern in epidemiologic investigations. The detailed quantitative assessment of time-weighted average exposure intensity in this study used monitoring data provided by the companies, monitoring in each plant by study investigators (33), visits to the plants by study industrial hygienists, and discussions with plant managers and long-time workers (30). Therefore, this process should minimize misclassification for average and cumulative exposure and duration of exposure. Assessment of peak exposure could have been more susceptible to misclassification since peak levels were estimated from job tasks and the time-weighted average exposure. However, since any misclassification of formaldehyde exposure most likely was nondifferential, the potential effect would be an attenuation of risk estimates. Therefore, exposure misclassification could explain a lack of association, but the exposure assessment procedure was sufficient to yield an exposure-response relation with nasopharyngeal cancer and leukemia (27), lending support to the null findings for lung cancer and other a priori sites.

The study also has a number of strengths. Follow-up was as long as 60 years, and there was extensive information on formaldehyde exposure. The long follow-up yielded 8,486 deaths, which provided adequate power to detect relatively small effects for common cancer sites. We had at least 80 percent power to detect a 1.3-fold lung cancer relative risk for workers exposed to high versus low levels of formaldehyde for cumulative exposure, peak exposure, and average intensity. We were able to assess formaldehyde exposure according to several measures that characterize different aspects of exposure, thereby diminishing the chances that a true association was missed because an inappropriate exposure metric was chosen. Biases from exposure misclassification, confounding, or other factors may have influenced results for one exposure measure but are less likely to have affected all measures equally (57), thus allowing for a more robust interpretation of the data. We were able to control for possible confounding from a number of other workplace chemicals. Availability of information on tobacco use for a small subset of workers indicates that smoking was not related to formaldehyde exposure and thus should not have been a confounder. In addition, we did not rely on external comparisons (SMRs), which are subject to a healthy worker bias (58), but instead focused on internal analyses comparing similar subjects.

In summary, analysis of this cohort of workers in the formaldehyde industry, which included additional years of follow-up, supports a possible causal association with mortality from cancer of the nasopharynx and possibly other upper respiratory tract sites. The association with prostate cancer could be a chance finding since there was no exposure-response gradient. Because bone is a common metastatic site, the observed excess of bone cancer is difficult to interpret. No association was seen with cancers of the pancreas, the brain, or the lung.

*Am J Epidemiol* 2004;159:1117–1130

## ACKNOWLEDGMENTS

The authors thank Dr. Robert Hoover for his review and helpful suggestions. They shared the manuscript with participating companies and unions and appreciate their comments.

## REFERENCES

1. National occupational exposure survey (1981–1983). Cincinnati, OH: National Institute for Occupational Safety and Health, 1990.
2. Wood dust and formaldehyde. IARC monographs on the evaluation of carcinogenic risks to humans. Vol 62. Lyon, France: International Agency for Research on Cancer, 1995.
3. Kerns WD, Pavkov KL, Donofrio DJ, et al. Carcinogenicity of formaldehyde in rats and mice after long-term inhalation exposure. Cancer Res 1983;43:4382–92.
4. Sellakumar AR, Snyder CA, Solomon JJ, et al. Carcinogenicity of formaldehyde and hydrogen chloride in rats. Toxicol Appl Pharmacol 1985;81:401–6.
5. Blair A, Stewart P, O'Berg M, et al. Mortality among industrial workers exposed to formaldehyde. J Natl Cancer Inst 1986;76:1071–84.
6. Gardner MJ, Parmett B, Winter PD, et al. A. cohort study of workers exposed to formaldehyde in the British chemical industry: an update. Br J Ind Med 1993;50:827–34.
7. Partanen T. Formaldehyde exposure and respiratory cancer—a meta-analysis of the epidemiologic evidence. Scand J Work Environ Health 1993;19:8–15.
8. Blair A, Saracci R, Stewart PA, et al. Epidemiologic evidence on the relationship between formaldehyde exposure and cancer. Scand J Work Environ Health 1990;16:381–93.
9. Roush GC, Walrath J, Stayner LT, et al. Nasopharyngeal cancer, sinonasal cancer, and occupations related to formaldehyde: a case-control study. J Natl Cancer Inst 1987;79:1221–4.
10. Hayes RB, Blair A, Stewart PA, et al. Mortality of U.S. embalmers and funeral directors. Am J Ind Med 1990;18:641–52.
11. West S, Hildesheim A, Dosemeci M. Non-viral risk factors for nasopharyngeal carcinoma in the Philippines: results from a case-control study. Int J Cancer 1993;55:722–7.
12. Vaughan TL, Stewart PA, Teschke K, et al. Occupational exposure to formaldehyde and wood dust and nasopharyngeal carcinoma. Occup Environ Med 2000;57:376–84.
13. Vaughan TL, Strader C, Davis S, et al. Formaldehyde and cancers of the pharynx, sinus and nasal cavity: I. Occupational exposures. Int J Cancer 1986;38:677–83.
14. Hildesheim A, Dosemeci M, Chan CC, et al. Occupational exposure to wood, formaldehyde, and solvents and risk of nasopharyngeal carcinoma. Cancer Epidemiol Biomarkers Prev 2001;10:1145–53.
15. Walrath J, Fraumeni JF Jr. Cancer and other causes of death among embalmers. Cancer Res 1984;44:4638–41.
16. Coggon D, Harris EC, Poole J, et al. Extended follow-up of a cohort of British chemical workers exposed to formaldehyde. J Natl Cancer Inst 2003;95:1608–15.
17. Bertazzi PA, Pesatori AC, Radice L, et al. Exposure to formaldehyde and cancer mortality in a cohort of workers producing resins. Scand J Work Environ Health 1986;12:461–8.
18. Stone RA, Youk AO, Marsh GM, et al. Historical cohort study of US man-made vitreous fiber production workers: IV. Quantitative exposure-response analysis of the nested case-control study of respiratory system cancer. J Occup Environ Med 2001;43:779–92.

19. Collins JJ, Esmen NA, Hall TA. A review and meta-analysis of formaldehyde exposure and pancreatic cancer. Am J Ind Med 2001;39:336–45.

20. Walrath J, Fraumeni JF Jr. Mortality patterns among embalmers. Int J Cancer 1983;31:407–11.

21. Levine RJ, Andjelkovich DA, Shaw LK. The mortality of Ontario undertakers and a review of formaldehyde-related mortality studies. J Occup Med 1984;26:740–6.

22. Harrington JM, Oakes D. Mortality study of British pathologists 1974–80. Br J Ind Med 1984;41:188–91.

23. Stroup NE, Blair A, Erikson GE. Brain cancer and other causes of death in anatomists. J Natl Cancer Inst 1986;77:1217–24.

24. Hansen J, Olsen JH. Formaldehyde and cancer morbidity among male employees in Denmark. Cancer Causes Control 1995;6:354–60.

25. Harrington JM, Shannon HS. Mortality study of pathologists and medical laboratory technicians. BMJ 1975;4:329–32.

26. Pinkerton LE, Hein MJ, Stayner LT. Mortality among a cohort of garment workers exposed to formaldehyde: an update. Occup Environ Med 2004;61:193–200.

27. Hauptmann M, Lubin JH, Hayes RB, et al. Mortality from lymphohematopoietic malignancies among workers employed in formaldehyde industries. J Natl Cancer Inst 2003;95:1615–23.

28. Blair A, Stewart PA, Hoover RN. Mortality from lung cancer among workers employed in formaldehyde industries. Am J Ind Med 1990;17:683–99.

29. Lucas LJ. Misclassification of nasopharyngeal cancer. J Natl Cancer Inst 1994;86:1556–8.

30. Stewart PA, Blair A, Cubit DA, et al. Estimating historical exposure to formaldehyde in a retrospective mortality study. Appl Indust Hyg 1986;1:34–41.

31. Blair A, Stewart PA. Correlation between different measures of occupational exposure to formaldehyde. Am J Epidemiol 1990; 131:510–16.

32. Breslow NE, Day NE, eds. Statistical methods in cancer research. Vol 2. The design and analysis of cohort studies. Lyon, France: International Agency for Research on Cancer, 1987. (IARC scientific publication no. 82).

33. Stewart PA, Cubit DA, Blair A. Formaldehyde levels in seven industries. Appl Indust Hyg 1987;2:231–6.

34. Blair A, Stewart PA. Comments on the Sterling and Weinkam analysis of data from the National Cancer Institute formaldehyde study. Am J Ind Med 1994;25:603–6.

35. Sterling TD, Weinkam JJ. Reanalysis of lung cancer mortality in a National Cancer Institute study on mortality among industrial workers exposed to formaldehyde. J Occup Med 1988;30: 895–901.

36. Sterling TD, Weinkam JJ. Mortality from respiratory cancers (including lung cancer) among workers employed in formaldehyde industries. Am J Ind Med 1994;25:593–602.

37. Sterling TD, Weinkam JJ. Comments on the Blair and Stewart comments on the Sterling and Weinkam analysis of data from the National Cancer Institute formaldehyde study. Am J Ind Med 1995;27:301–5.

38. Marsh GM, Stone RA, Henderson VL. A reanalysis of the National Cancer Institute study on lung cancer mortality among industrial workers exposed to formaldehyde. J Occup Med 1992;34:42–4.

39. Collins JJ, Acquavella JF, Esmen NA. An updated meta-analysis of formaldehyde exposure and upper respiratory tract cancers. J Occup Environ Med 1997;39:639–51.

40. Marsh GM, Youk AO, Stone RA, et al. Historical cohort study of US man-made vitreous fiber production workers: I. 1992 fiberglass cohort follow-up: initial findings. J Occup Environ Med 2001;43:741–56.

41. Youk AO, Marsh GM, Stone RA, et al. Historical cohort study of US man-made vitreous fiber production workers: III. Analysis of exposure-weighted measures of respirable fibers and formaldehyde in the nested case-control study of respiratory system cancer. J Occup Environ Med 2001;43:767–78.

42. Dallas CE, Theiss JC, Harrist RB, et al. Effect of subchronic formaldehyde inhalation on minute volume and nasal deposition in Sprague-Dawley rats. J Toxicol Environ Health 1985; 16:553–64.

43. Casanova-Schmitz M, Starr TB, Heck HD. Differentiation between metabolic incorporation and covalent binding in the labeling of macromolecules in the rat nasal mucosa and bone marrow by inhaled [14C]- and [3H] formaldehyde. Toxicol Appl Pharmacol 1984;76:26–44.

44. Olsen JH, Plough Jensen S, et al. Occupational formaldehyde exposure and increased nasal cancer risk in man. Int J Cancer 1984;34:639–44.

45. Andjelkovich DA, Janszen DB, Brown MH, et al. Mortality of iron foundry workers: IV. Analysis of a subcohort exposed to formaldehyde. J Occup Environ Med 1995;37:826–37.

46. Dell L, Teta MJ. Mortality among workers at a plastics manufacturing and research and development facility: 1946–1988. Am J Ind Med 1995;28:373–84.

47. Armstrong RW, Imrey PB, Lye MS, et al. Nasopharyngeal carcinoma in Malaysian Chinese: occupational exposures to particles, formaldehyde and heat. Int J Epidemiol 2000;29:991–8.

48. Laforest L, Luce D, Goldberg P, et al. Laryngeal and hypopharyngeal cancers and occupational exposure to formaldehyde and various dusts: a case-control study in France. Occup Environ Med 2000;57:767–73.

49. Marsh GM, Youk AO, Buchanich JM, et al. Pharyngeal cancer mortality among chemical plant workers exposed to formaldehyde. Toxicol Ind Health 2002;18:257–68.

50. Demers PA, Boffetta P, Kogevinas M, et al. Pooled reanalysis of cancer mortality among five cohorts of workers in wood-related industries. Scand J Work Environ Health 1995;21:179–90.

51. Some chemicals that cause tumours of the kidney or urinary bladder in rodents, and some other substances. IARC monographs on the evaluation of carcinogenic risks to humans. Vol 73. Lyon, France: International Agency for Research on Cancer, 1999.

52. Yu MC, Henderson BE. Nasopharyngeal cancer. In: Schottenfeld D, Fraumeni JF Jr, eds. Cancer epidemiology and prevention. 2nd ed. New York, NY: Oxford University Press, 1996: 603–18.

53. Olsen JH, Asnaes S. Formaldehyde and the risk of squamous cell carcinoma of the sinonasal cavities. Br J Ind Med 1986;43: 769–74.

54. Hayes RB, Raatgever JW, de Bruyn A, et al. Cancer of the nasal cavity and paranasal sinuses, and formaldehyde exposure. Int J Cancer 1986;15:487–92.

55. Stayner L, Smith AB, Reeve G, et al. Proportionate mortality study of workers in the garment industry exposed to formaldehyde. Am J Ind Med 1985;7:229–40.

56. Wilson RT, Moore LE, Dosemeci M. Occupational exposures and salivary gland cancer mortality among African American and White workers in the United States. J Occup Environ Med 2004;46:287–97.

57. Blair A, Stewart PA. Do quantitative exposure assessments improve risk estimates in occupational studies of cancer? Am J Ind Med 1992;21:53–63.

58. Fox AJ, Collier PF. Low mortality rates in industrial cohort studies due to selection for work and survival in the industry. Br J Prev Soc Med 1976;30:225–30.