UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION:  N(5) |
| | * | |
| This Document Relates to: | * | |
| *Charlie Age, et al. v.* | * | JUDGE: ENGELHARDT |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | |
| | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF GULF STREAM COACH, INC.'S
MOTION *IN LIMINE* TO EXCLUDE
EXPERT TESTIMONY OF ALEXIS MALLET, JR.**

**MAY IT PLEASE THE COURT:**

Gulf Stream Coach, Inc. respectfully submits the following Memorandum in Support of

its Motion *in Limine* to Exclude Expert Testimony of Alexis Mallet, Jr.

**I. ALEXIS MALLET, JR. ADMITS LACK OF EXPERTISE**

Plaintiffs designate the subject matter of Mallet's expertise as "Expert-Trailer

Constuction." "Doc. 2613-2, p. 3 (Exhibit "A" to Joint Trial Plan, Doc. 2613).  Mallet should be

wholly excluded due to his candid confession as follows:

> **Q.** **Okay.  Do you consider yourself an expert in the
> construction of travel trailers?**
>
> **A.** **No, sir.**
>
> **\*     \*     \***
>
> **Q.** **Do you have an specialization or expertise in the
> design of travel trailers?**
>
> **A.** **In the design? No, sir.**

Ex. "A", Depo. Mallet, pp. 39-40, 44.[1]

---

[1]     Mallet also admitted that he has never seen a travel trailer manufactured.  *Id.* p. 217.

1

The various opinions of Mallet and arguments for exclusion of same follow in this Memorandum at Section V; however, Mallet has admitted that he is not an expert in the very subject matter in which plaintiffs tender him.  An expert's admitted lack of expertise in the area in which he is tendered requires the exclusion of that expert's testimony.  *See Brookshire Brothers Holdings, Inc. v. Total Containment, Inc.*, 2007 W.L. 249 1807, *7 (W.D. La. 8/30/07).  As such, Mallet should be precluded from offering any opinions regarding the construction or design of the Alexander trailer unit.

## II.      BACKGROUND

### A.      Nature of Case

As the Court and parties are familiar with the factual/procedural background of this matter, reference is made here to the background as set forth in Gulf Stream Coach, Inc.'s Memorandum in Support of Motion *in Limine* to Limit Expert Testimony of Stephen Smulski, Ph.D. (Doc. 2349-2, pp. 1-2).

### B.      Alexander's "Building Science" Expert – Alexis Mallet, Jr.

Alexander provided twenty (20) written expert reports, including the 101-page "Affidavit" with fifteen (15) opinions of Mallet Ex. "B," Aff. Mallet.  Mallet claims the following areas of expertise: general construction, estimating, construction defects and failures, remediation, building science and thermography.  Ex. "A," Depo. Mallet, p. 35.  Mallet's opinions cover areas including medical opinions, toxicology, design, HVAC, materials, formaldehyde, manufacturing practices, warnings, warranties, emergency response, installation and alternative construction.   To the extent that Mallet offers opinions that he is not qualified to give, such opinions must be excluded.   In addition, many of Mallet's opinions are purely

duplicative of opinions offered by others and, as such, should be excluded.  Finally, there exist opinions offered by Mallet that either do not require expert opinion testimony or suffer from unreliable methodology and, as such, are of no assistance to the trier of fact.

### C.      Mallet's Background and Qualifications – or Lack Thereof

Mallet proclaims himself an expert "building scientist."[2] Mallet's only degree is in pre-law political science. Ex. "A," Depo. Mallet, p. 22.  While he maintains licenses in the fields of general contracting, residential construction and real estate (dormant) and certifications in mold remediation and manufactured housing installation, the main focus of his work is as an insurance repair specialist for First General Services of the South, Inc. handling insurance claims. *Id.* pp. 25, 30.[3]  When asked what, specifically, it is that he does, Mr. Mallet testified as follows:

> Q.     Okay.  What is it that you specifically call yourself, I guess, if I asked you what you do?
>
> A.     I guess I'm head of the administration of the company.  I do the – I oversee all of our projects.  I do inspection, perform inspections.  I work on insurance claims, estimating, identifying problems or areas of issues on insurance claims, provide scope of damages.  *Id.* pp. 31-32.

The field of "building science" has no national or state board, licensing committee, accreditation process or certification standards.  *Id.* pp. 36-37.  There are no continuing education requirements for one to be a "building scientist."   *Id.* p. 38.  In essence, one is a "building scientist" whenever one says he or she is. This makes it somewhat difficult to question one's professed expertise as a "building scientist" given that there exist no standards or qualifications by which to measure or define such expertise.  Thus, the nature of the opinions proffered by a

---

[2]      Mallet defines "building science" as the study of the relationship between buildings, air, moisture and temperature. *Id.* p. 36.  Mallet has no idea where this definition came from. *Id.*

[3]      Mallet also has a construction business (Royal Construction Co.) but admits that all of the work is farmed out to subcontractors and none is done by himself.  *Id.* pp. 27-29.

tendered "building scientist" must be examined to determine whether the "building scientist" has the requisite qualification to render such opinion(s).

Mallet has no expertise in the design and construction of travel trailers, design and installation of HVAC systems, warnings, formaldehyde issues, materials, and mass production of products. *Id.* pp. 39-40, 44-45, 46, 47, 49-50, 159, 217. Also, Mallet admittedly lacks expertise, specialized knowledge and qualification in the following areas: medical issues, chemistry, toxicology, architecture, engineering, industrial hygiene, indoor air quality and psychology. *Id.* pp. 33-34. Mallet similarly concedes having absolutely no expertise regarding "any kind of formaldehyde issues," including no expertise in materials containing formaldehyde or factors that promote off-gassing of formaldehyde (in fact, he expressly defers to other experts regarding mechanisms that may cause off-gassing of formaldehyde). *Id.* pp. 46, 61-64, 125, 163-168, 171-173, 185.

### III.    RELIANCE UPON EXCLUDED MATERIAL

This Court has ordered that "expert opinions based on plaintiffs' re-testing of the Emergency Housing Unit ('EHU') in this case will not be admitted." Doc. 2062, p. 2. The Court also ordered that "plaintiffs cannot, now, attempt to offer expert opinions on that testing, which the Court has excluded. Moreover, any data collected as a result of this testing, and opinions based solely on such testing, shall also be excluded." *Id.* Many of the opinions offered by Mallet rely exclusively upon testing and data performed at the travel trailer on May 6-7, 2009 through his retention of Ervin Ritter and Paul LaGrange (other experts proffered by plaintiffs). In addition, many of Mallet's opinions rely solely upon thermographic image testing that Mallet himself performed at the travel trailer on those dates. Ex. "A," pp. 91-92, 145, 432-470. Particular opinions (each of which are described in detail in the following section) offered by

Mallet that rely on this testing are opinions 1, 7, 8, 13 and 15.  Per the Court's Order above, these opinions should be excluded.[4]

## IV.    MALLET'S OPINIONS ARE DUPLICATIVE

A real limitation to Mallet's opinions may come by way of a look at how Mallet explained just what exactly it was he did in this case:

Q.    Okay.  And what was it that you were ultimately asked to do in this case?

A.    To assist them with the litigation in helping to identify the issues with the travel trailer that would, I guess, be in conjunction with the formaldehyde issues that were being posed or that were raised.

Q.    And since you didn't have any expertise in formaldehyde, how did you feel you were qualified to help them out in that regard?

* * *

A.    My involvement is not necessarily in the formaldehyde issue itself, but taking from the assumption that formaldehyde existed, what were the factors with the travel trailer that would have compounded issues regarding the presence of formaldehyde.

Q.    And what experience did you have in addressing factors that could compound issues if you assumed the presence of formaldehyde in a structure?

A.    Well, the other experts identified the presence of formaldehyde and what elements would affect the activity of off-gases, off-gassing of formaldehyde.

My job was to see what elements regarding the construction or function of the travel trailer that would contribute to the activation of formaldehyde based on what they said activates it and how did that work in conjunction with the building and how the various components with the building come into play with that, of what they said was occurring.

Q.    Well, what experience do you have in evaluating or determining what could contribute to the activation of formaldehyde?

---

[4]    These opinions will be noted in this Memorandum with an "*."

> A.      Well, again, the other experts identified what could activate the
>         formaldehyde.  What I did was to identify how those elements could
>         come in contact with or interact with those products with
>         formaldehyde and how that interacted with the travel trailer itself.
>         Ex. "A," Depo. Mallet, pp. 59-61.

Ultimately, Mallet admitted that, in reference to plaintiffs' other experts relative to his scope of work, he was "**...just repeating their and taking their position in how the building affected it.**" *Id.* p. 126 (emphasis added).[5]  Mallet has simply taken the opinions of plaintiffs' other experts on issues involving formaldehyde, materials and engineering (none of which he has expertise in) and given his "cumulative appreciation of other experts' testimony" – a tact disfavored by this Court.  Doc. 2181, p. 3.[6]  For example, Mallet admits no expertise in formaldehyde issues; nevertheless, his 101-page Affidavit is replete with liberal usage of the words "excessive formaldehyde," "elevated formaldehyde" and "unsafe levels of formaldehyde." Ex. "B," pp. 9 (items 2,5-7), 22 (item 2), 48 (item no. i), 95 (item no. 1), 96 (items 5, 7) and 97 (item no. 8).[7]  If the "presence" or "quantity" of formaldehyde were not within the intended scope of Mallet's work, as defined by him, the word "formaldehyde" or any of its qualifiers should not have even appeared in his report, opinions or testimony.

---

[5]      This Court has already ruled that "No duplicative testimony will be allowed.  Multiple opinions on the same subject will generally not be admitted, absent prior consent of the Court based on a showing of compelling reasons." Doc. 2062, p. 1.

[6]      Plaintiffs identified their experts, all of whom encompass what Mallet has offered, to wit:
         Paul LaGrange:  Blower door testing for air leakage of thermal envelope, Duct blaster testing for air leakage of supply and return duct work, and calculations related to BTU gain (air infiltration), and R-value of the wall and ceiling assemblies, Ventilation, Inspection of the unit (only LaGrange's report/affidavit and file/testing results are designated by plaintiffs) (Doc. 2023, pp. 158-160, 204).
         Ervin Ritter: HVAC/heating system engineering, Ventilation, Air infiltration, Role with moisture and mold, and moisture's role in elevating formaldehyde exposures, Indoor air quality, Related trailer construction and design issues, Inspection of the unit. Doc. 1705, p.7.

[7]      This also proves Mallet's advocacy as his Affidavit recites "it is not the purpose of our investigation, inspection or observation to render opinions regarding the presence of formaldehyde or the quantity of formaldehyde in the Alexander temporary housing unit." Ex. "A," p. 108; Ex. "B."

Even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403 (2008).  Several courts have excluded experts who planned to offer cumulative testimony. In *Miley v. Delta Marine Drilling Co.*, the plaintiff appealed the district court's exclusion of an expert witness who planned to address the loading and unloading of anchor chains. 473 F.2d 856, 858 (5th Cir. 1973). The U.S. Fifth Circuit Court of Appeals rejected the appeal, holding that the plaintiff had qualified two other experts who testified to the proper on-loading procedure. *Id.* Similarly, an Eastern District of Louisiana case would not allow one of the plaintiff's two retained experts to discuss common truck driving practices because the other was already speaking to that issue. *See Young v. Am. Reliable Ins. Co.*, 1999 WL 600393, *3 (E.D.La. Aug. 9, 1999). A Western District of Louisiana decision blocked, as cumulative, two products liability experts from discussing the warnings included in the owners' manual of a rifle that malfunctioned and caused injury, as well as the cause of that injury. *Matthews v. Remington Arms Co.*, 2009 WL 1220541, *2 (May 4, 2009).

Generally speaking, based upon Mallet's admission that all he has done is repeat and cumulatively summarize plaintiffs' other experts' work and opinions regarding possible interactions of the unit's building dynamics with formaldehyde, he has, by his own words, rendered his opinions purely duplicative of other experts.  Specific opinions of Mallet that are purely duplicative of other experts (as described further in Section V(B)) are Opinions 1, 6-8, 10-11 and 14.

# V.   MALLET'S OPINIONS SHOULD BE EXCLUDED

## A.   Qualification of an Expert

The qualification of a witness as an expert, separate and apart from the witness' opinion, is a determination that is a discreet, independent and important requirement in considering the admissibility of an expert's testimony.  *See U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004). Courts have routinely refused to admit a proffered expert's testimony where the proffered expert, despite a generalized or professed knowledge of issues arguably relevant to the subject matter, nevertheless lacked expertise with the specific nature of the claims being litigated.  *See e.g. Kassim v. City of Schenectady,* 415 F.3d 246 (2nd Cir. 2005) (lack of knowledge of Arabic translation); *Adams v. Teck Cominco Alaska, Inc.,* 399 F.Supp.2d 1031 (D. Alaska 2005) (expert lacked experience with total dissolved solids technology at issue); *Morales v. E.D. Etnyre & Co.,* 382 F.Supp.2d 1252 (D.N.M. 2005) (lack of experience in distribution, sales and marketing practices); *In Re: Rezulin Products Liability Litigation*, 309 F.Supp.2d 531 (S.D.N.Y. 2004) (expert's opinion not based on qualification or experience but on subjective views of ethical standards at issue); *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003) (expert's opinion on business valuation excluded where expert had never performed a business valuation); *Montefiore Medical Center v. American Protection Ins. Co.,* 2003 WL 2110 8232 (S.D.N.Y. 2003) (expert lacked specific experience with building deterioration issues despite generalized expertise in field of construction); and *Teska v. Potlatch Corp.*, 184 F.Supp.2d 913 (D.Minn. 2002) (lack of current knowledge and experience with respect to crane operation).

### B.      Mallet's Opinions Subject to Exclusion[8]

### 1.      Opinion No. 1*:

Mallet states that "unsafe levels of formaldehyde are partially a consequence of the design of the travel trailer." Ex. "A," pp. 124-125; Ex. "B," p. 95.  This opinion is duplicative and not based on requisite qualifications.

First, this opinion is duplicative of those offered by plaintiffs' experts Paul LaGrange and/or Ervin Ritter (*See* FN 6).  This opinion is based upon alleged dynamics in the trailer causing condensation in the roof and wall cavities from an analysis of dew points in the cavities, use of fiberglass insulation and R-values. Ex. "A," pp. 124-126; Ex. "B," p. 95. Plaintiffs' expert, LaGrange (also a proclaimed "building science" and "energy efficiency" expert), who conducted most of the testing relied upon by Mallet, performs this very analysis and devotes several pages of a seventeen (17) page affidavit/report to these exact issues. Ex. "C," Report of LaGrange, pp. 5-7, 11-13; Ex. "D," Depo. LaGrange, pp. 168-172, 241-256, 265-269, 275-279 (discussion of LaGrange's opinions regarding condensation, thermodynamics, insulation, heat gain and R-value).  Moreover, plaintiffs' expert HVAC/ mechanical engineer, Ervin Ritter, devoted his opinions and testimony to these exact topics – i.e. effects of wall cavity size, insulation, dew points in the wall cavity, condensation and R-values.  Ex. "E," Report of Ritter, pp. 4-5, 7-8 (including drawings and diagrams depicting wall/roof cavities, insulation, condensation and dew point processes); and Ex. "F," Depo. Ritter, pp. 62-65, 85, 93-94, 124-129, 137-143, 149, 190-191, 228-231, 238-243 (discussion of Ritter's opinions regarding thermodynamics, insulation, wall and roof cavities, condensation, dew points and R-values).  If plaintiffs' "energy efficiency" expert (LaGrange) and

---

[8]      Opinions  noted with an "*" are  based upon testing  done May 6-7, 2009 and are inadmissible.  Doc. 2062, p. 2.

HVAC/mechanical engineering expert (Ritter) are offering and discussing, at length, these very opinions, it is duplicative and cumulative for Mallet also to do so.  Mallet is **"...just repeating their and taking their position in how the building affected it."** Ex. "A," Depo. Mallet, p. 126.

Second, Mallet is not qualified to offer this opinion.  Mallet admitted he has no expertise in the determination of "safe" versus "unsafe" levels of formaldehyde and that evaluating same was not within the scope of his work.  Ex. "A," pp. 46, 61-64, 108, 164-165; Ex. 'B," p. 8.  Mallet also confessed no expertise in determining factors that cause off-gassing of formaldehyde – thus he cannot offer an opinion that any levels of formaldehyde, if at all, inside the unit where "a consequence of" the design of the trailer. Ex. "A," pp. 33-34, 46, 61-64, 125-126, 163-165, 173, 185.  In fact, Mallet did not even know what materials in the unit may have contained formaldehyde and, if so, what quantities of formaldehyde they contained. *Id.* pp. 125-126.

Finally, insofar as his opinion is tied to the design of the trailer, such is impermissible.  Mallet has no expertise in the fields of architecture or engineering.  *Id.* pp. 33-34.  He further admitted that he has no expertise in the design of travel trailers, construction of travel trailers, materials used or design and installation of HVAC systems (either in general or in travel trailers specifically).  *Id.* pp. 39-40, 44, 47, 49-50.  Lacking even one of these areas of expertise would seriously call into question any opinion Mallet has to offer regarding the design of the trailer and its effects, if any, on levels of formaldehyde – lacking all of these areas of expertise shows that Mallet is acting only as an advocate.[9]

---

[9]     Further revealing his real role here, Mallet frankly testified that although he is not an engineer (of any kind), he can nevertheless offer engineering opinions. *Id.* pp. 198-199.

Any opinion by Mallet that there existed unsafe levels of formaldehyde in the trailer due to the design of the trailer must be excluded.

### 2.       Opinion No. 2:

Mallet states that the trailer was defective due to the presence of vinyl wall-covering on the interior (living space) side of the unit's exterior walls.  Ex. "A," pp. 126, 130; Ex. "B," p. 95.  This is simply a recitation by Mallet of his longstanding belief that vinyl wall-covering is never acceptable in this application in a south Louisiana climate.  *Id.*  This opinion suffers not so much from lack of qualification but from the methodology upon which the opinion is based.

Mallet states that this application is a problem because it allows for the formation of condensation of water vapor in the wall space behind the wall-covering. Ex. "A," p. 126.  Signs that such condensation are occurring include the deterioration of wood and cellulose-based products in the wall space. *Id.* Mallet admitted that, in the wall spaces he observed (behind the wall panel that was loose in the front bedroom), there were no signs of deterioration and he could not observe the back-side of any wall-covering to determine if there had been condensation.  *Id.* pp. 127-128.   He did not note any observations of mold, blistering or separation of the wall-covering anywhere in the trailer.  *Id.* pp. 128-129, 135-136.  Importantly, Mallet testified that he had no idea what the PERM rating was of the wall-covering.  *Id*. p. 127.[10]   Not knowing the PERM rating of the wall-covering, combined with no evidence of condensation in the wall cavity, means only one thing – Mallet is simply speculating.  Mallet even admitted that he was aware of no literature or studies that supported his opinion that the use of vinyl wall-covering (regardless of its PERM rating) is contraindicated in travel trailers (in any location).  *Id.* p. 131.

---

[10]       High PERM ratings allow more moisture and air to pass through the wall covering (thus producing the potential for condensation) whereas low PERM ratings prevent moisture and air from passing through the wall covering.

Any opinion by Mallet regarding the use of vinyl wall-covering in the trailer unit as a cause of any condition affecting formaldehyde levels must be excluded as not based upon sound methodology and/or as pure conjecture.

### 3.     Opinion No. 3:

Mallet states that an effective vapor barrier was not placed in the exterior space of the interior wall.  Ex. "A," pp. 146-148; Ex. "B," p. 95. This is an extension of Opinion 2 and, for the same reasons that Opinion 2 should be excluded, so to should Opinion 3.  The proper vapor barrier that Mallet envisions is a Tyvek air/moisture barrier.  Ex. "A," p. 148.  Nevertheless, Mallet cannot cite to any literature or standard that requires, specifies or recommends the use of such a barrier as he suggests for travel trailers.  *Id.* p. 152.

Any opinion by Mallet as to the need or propriety of a vapor barrier on the exterior side of the interior wall (or the interior side of the exterior skin of the trailer) should be excluded as pure speculation.

### 4.     Opinion No. 4:

Mallet states that the designer of the trailer failed to take into account the intended use of its product.  Ex. "A," pp. 153-155; Ex. "B," p. 95.  The opinion discusses the devastation caused by Hurricanes Katrina and Rita as well as resulting shortages in materials and resources for housing needs.  *Id.*  The opinion concludes stating that "it should not have come to a surprise to anyone...that the temporary housing needs...would last for years. Ex. "B," p. 96. This opinion, to the extent that it is an opinion, is subject to exclusion for several reasons.

First, Mallet alleges that Gulf Stream Coach, Inc. experienced a shortage in materials and resources due to Hurricanes Katrina and Rita.  Ex. "B," p. 95.  The import of this is to support Mallet's opinion that, due to an alleged shortage, Gulf Stream Coach, Inc. "....was not

able to provide according to specifications they had originally sold the units under..."  Ex. "A," p. 155.[11]  Fatally, Mallet admits that he has absolutely no evidence, information or knowledge that such a shortage was experienced or that substitute materials had to be used by Gulf Stream Coach, Inc. in the design and manufacture of the Alexander's trailer, which occurred in 2004 long before any of the subject Hurricanes even took place.  Ex. "A," pp. 157-159.  In fact, there has been no evidence or testimony that there was a shortage of any component products in 2004.

Second, expert testimony is not required for this statement by Mallet – he says so himself.  When asked why this is something that requires the opinion of a "building science" expert, Mallet responded that "....it would be something that someone who was not blind or deaf could contemplate..." and that "...it doesn't take an expert to know that it wasn't going to happen in a week or months."  Ex. "A," pp. 154, 158.  Finally, Mallet is not an expert in the fields of emergency response, mass production or manufacturing of products, or design or construction of travel trailers.  *Id*. pp. 33-35, 39-40, 44, 159, 218.  As such, a travel trailer manufacturer's intention is far beyond any expertise of Mallet.  His only source for perceiving the manufacturer's intent is his understanding of Jim Shea's testimony (Gulf Stream Coach, Inc.'s chairman) on this topic.  *Id.* p. 154, 157.  The only reliable source for the manufacturer's intent is from the manufacturer itself – not from another party's expert's interpretation of same.

Any opinions by Mallet regarding Gulf Stream Coach, Inc.'s intended use of the travel trailers, devastation and housing needs following Hurricanes Katrina and Rita and Gulf Stream Coach, Inc. failing to meet FEMA specifications must be excluded as devoid of evidentiary support (Gulf Stream Coach, Inc.'s use of substitute materials for the Alexanders' trailer), of

---

[11]      Further analysis of Mallet's opinions regarding compliance with FEMA specifications is set forth at Sec. 13 (*infra*) (addressing Mallet's opinion no. 15).

no assistance to the trier of fact (devastation and housing needs spawned by Hurricanes Katrina and Rita) and outside of Mallet's expertise (manufacturer's intended use).

 5. Opinion No. 5:

Mallet states that the manufacturer knew or should have known that the use of formaldehyde-emitting materials would be a problem for occupants and, moreover, that even low amounts of formaldehyde emissions from the building products would create a higher concentration of emissions in the trailer. Ex. "A," pp. 160-161; Ex. "B," p. 96.   For several reasons, Mallet should be precluded from offering this opinion.

First, Mallet has no expertise in the design or construction of travel trailers. Ex. "A," pp. 39-40, 44, 218.   Second, Mallet has no knowledge or expertise regarding any formaldehyde issues, including what factors cause off-gassing of formaldehyde or at what levels formaldehyde can cause health concerns. *Id.* pp. 46, 61-64, 126, 164, 195.   Third, Mallet has no knowledge as to what, if any, products used in the trailer contained formaldehyde and, if so, what quantities of formaldehyde they contained.   *Id.* p. 125.   Fourth, Mallet has no expertise in the fields of toxicology, industrial hygiene or indoor air quality.   *Id.* pp. 33-34.   Finally, Mallet did not do any testing or calculations to confirm or otherwise corroborate this opinion.   *Id.* p. 165.   Lacking these areas of expertise and any scientific testing, Mallet cannot be permitted to offer opinions regarding the use of formaldehyde-containing materials and the effects of same, if any, on air concentrations in the trailer or on the health of occupants in the trailer.   In fact, Mallet stated that he is simply, again, reciting what the other experts have said. *Id.* pp. 164-165.[12]

---

[12]  In addition to lacking the expertise required to render this opinion, Mallet opines that HUD3280 sets the standard for formaldehyde emissions in travel trailers.  *Id.* pp. 160-161.  However, he admits that, in December 2004 (when the Alexander trailer was manufactured), this standard was not applicable to travel trailers nor was he aware of any standards, codes or guidelines that addressed formaldehyde levels or formaldehyde-containing products in travel trailers.  *Id.* pp. 161-163.

Any opinion by Mallet that the manufacturer knew or should have known that the use of formaldehyde-emitting materials would create a problem for occupants and that even low amounts of formaldehyde emissions from the building products would create a higher concentration of formaldehyde emissions in the trailer should be excluded as such opinions are beyond his qualifications, are duplicative of other experts and/or are based upon unsound methodology.

**6.      Opinion No. 6:**

Mallet states that all of the trailer's wall panels, ceiling panels, cabinets, furniture, floor and roof sheeting were constructed with materials emitting formaldehyde and that materials were used that were supposed to be low formaldehyde emitting but were not.  Ex. "A," p. 166; Ex. "B," p. 96.  Mallet is not only not qualified to give this opinion but he is also simply repeating other experts.

First, Mallet admits that he is simply reciting what other experts, namely Dr. Smulski, have already offered.  Ex. "A," pp. 165-167. Second, Mallet admitted that he had no idea what products in the trailer contained formaldehyde and, if any, what quantities of formaldehyde they contained.  *Id.* p. 125.  Finally, Mallet admitted that he has no expertise in the fields of material science or formaldehyde issues (including factors that may cause off-gassing of formaldehyde). *Id.* pp. 46-47, 61-64, 164, 185.

Any opinions by Mallet regarding the materials used in the Alexander trailer should be excluded as they are purely duplicative and cumulative of other experts offered by plaintiffs and, moreover, are not based upon requisite expertise.

7.      **Opinion No. 7\*:**

Mallet states that the construction means, methods and materials utilized in the Alexander trailer contributed to elevated formaldehyde levels and that the wall/floor intersection, wall/ceiling intersection and other wall, floor and ceiling systems were not sealed to prevent air infiltration or movement into the unit. Ex. "A," p. 168; Ex. "B," p. 96.  For several reasons Mallet should be precluded from offering this opinion.

First, Mallet has no expertise in the design or construction of travel trailers, materials used or formaldehyde issues (including factors that may cause off-gassing of formaldehyde).  Ex. "A," pp. 39-40, 44, 46-47, 61-64, 125, 185.  Second, Mallet admitted that he is not qualified, nor was it within his scope of work, to offer opinions or comment on levels of formaldehyde in the trailer. Ex. "A," pp. 46, 61-64, 108, 164; Ex. "B," p. 8.  Third, Mallet is not an engineer and cannot perform the calculations necessary to determine formaldehyde concentrations nor has he any expertise in how formaldehyde is off-gassed from building products or how off-gassed formaldehyde moves or concentrates in the air.  Ex. "A," pp. 170-173.  Finally, this opinion is purely duplicative of those offered by plaintiffs' experts LaGrange and Ritter (*See* FN 6; and Section (8) *infra.*)

Lacking expertise in several fundamental core areas that would be required to support this opinion, Mallet should be precluded from offering any opinions that the "construction means, methods and materials utilized" in the Alexanders' trailer "contributed to elevated formaldehyde levels."[13]

---

[13]   A portion of his opinion regarding air infiltration was the result of thermographic image testing done in the trailer by Mallet on May 6-7, 2009.  This Court has precluded any expert testimony based upon this testing as discussed in Section III of this Memorandum.

8.      **Opinion No. 8\*:**

Mallet states that the air conditioning duct system is not properly sealed and creates a negative pressure system in the trailer that acts to bring in warm, humid outside air, thus contributing to the release of formaldehyde in the trailer. Ex. "A," pp. 175-176, 185; Ex. "B," pp. 96-96.  Mallet should be precluded from offering this opinion for several reasons.

First, Mallet has no expertise in the design and installation of HVAC systems and, specifically, no such expertise in travel trailer HVAC systems.  Ex. "A," pp. 39, 47, 49-50.  Second, and more obviously, this opinion is nearly word-for-word duplicative of the opinions offered by plaintiffs' experts LaGrange and/or Ritter (*See* FN 6).    LaGrange (plaintiffs' proffered energy efficiency" expert) authored a seventeen (17) page report and offered opinions detailing the condition of the trailer's HVAC system, duct work, sealants, negative pressure and duct/building leakage. Ex. "C," pp. 2-4, 8-11; Ex. "D," pp. 69-72, 98-101, 102-174, 232-234, 242-244, 246-247, 252-275, 301-304.  Ritter (plaintiffs' HVAC/mechanical engineering expert) authored a ten (10) page report and offered opinions detailing the dynamics and standards of HVAC-system design, installation and operation as well as duct leakage, negative pressure, building leakage, and compliance with codes, standards, instructions and/or guidelines. Ex. "E," Report of Ritter, pp. 4-10; Ex. "F," Depo. of Ritter, pp. 39-44, 51-249 (the entirety of Ritter's deposition and opinion testimony focused on the HVAC system and its operating condition including design and operation standards, duct leakage, negative pressure and building leakage).

Third, Mallet bases at least some of this opinion on the notion that the trailer's HVAC system did not meet standards promulgated by ASHRAE and/or SMACNA. Ex. "A," pp. 183-185.[14]  Yet, Mallet admitted that (a) that these standards are not specifically applicable to travel

---

[14]      "ASHRAE" stands for the American Society of Heating, Refrigeration and Air Conditioning Engineers. "SMACNA" stands for Sheet Metal and Air Conditioning Contractors National Association.

trailer HVAC systems and (b) he could not state what ASHRAE or SMACNA standard would apply to air conditioning duct work construction, thus rendering his opinion of no real value or usefulness.  *Id*. pp. 183-185.

Finally, Mallet again states the opinion that the trailer's HVAC system's condition contributed to the release of formaldehyde.  Mallet is not qualified to render this opinion as he admits having no expertise in factors that may cause off-gassing of formaldehyde. *Id.* pp. 46-47, 61-64, 164, 185.  Further, Mallet has no expertise in the fields of industrial hygiene, engineering or materials – each or some of which would be required to render the opinion he has given above.  *Id.* pp. 33-34, 47.

Any opinions by Mallet regarding the design, construction, operation or condition of the trailer's HVAC system, duct leakage, building leakage, negative pressure and/or release of formaldehyde in the trailer should be excluded as duplicative of other experts' opinions, beyond his qualification and not based on sound methodology.

9.      **Opinion Nos. 10-11:**

Mallet states that "either the manufacturer, FEMA or Fluor should have devised a safe means of jacking the temporary housing unit by either increasing the rigidity of the metal frame, using a unified hydraulic jacking system...or devised a plan including sound engineering practices." Ex. "A," pp. 186-190; Ex. "B," p. 98.  The portion of this opinion that implicates Gulf Stream Coach, Inc. – "increasing the rigidity of the metal frame" – should be excluded as it is not based upon requisite expertise or sound methodology.[15]

Mallet has no expertise in the fields of engineering or materials. Ex. "A," pp. 33-34, 47. Mallet admitted that he did not know the type of steel that was used on the trailer nor did he

---

[15]      This opinion is also duplicative of plaintiffs' expert Charles Moore. Ex. "G," Report of Moore.  Further analysis of Mallet's "alternative construction" opinion is set forth at Sec. 13 (*infra*).

know the steel's tensile strength (thus, he cannot opine if it needs more rigidity). *Id.* p. 188. In any event, Mallet does not, and cannot, offer the opinion that increased rigidity would have prevented the problem or that the steel's current rigidity caused or contributed to the problem (thus his opinion is of no assistance to the trier of fact). Finally, Mallet admitted that he had no knowledge (i.e. by way of testing, research, etc.) as to how increasing the steel frames' rigidity would affect the performance characteristics of the trailer. *Id.* pp. 189-190.

Any opinion by Mallet that Gulf Stream Coach, Inc. should have increased the rigidity of the steel frame should be excluded as not based on requisite expertise and/or not based upon sound methodology or, alternatively, as duplicative.

**10.     Opinion No. 12:**

Mallet states that there was a lack of warnings in the Owner's Manual or in the trailer regarding potential exposure to formaldehyde. Ex. "A," pp. 198-200; Ex. "B," p. 98. This opinion (or statement) should be excluded for several reasons.

First, this Court has already excluded from trial proffered "warnings" or "human factors" expert opinions. Doc. 2181 (excluding plaintiffs' warnings/human factors expert Lila Laux, Ph.D.). Second, that there were no warnings does not require expert testimony and is thus of no assistance to the trier of fact. Either there was a warning or there was not – the trier of fact can determine that without an expert through the factual evidence put on at trial. Third, Mallet does not offer the opinion that a warning was required so whether one was present or not is irrelevant. Finally, Mallet admitted that he is not an expert in the field of warnings or human factors. Ex. "A," pp. 44-45, 200.

Any opinions by Mallet regarding the presence of and/or necessity of warnings about formaldehyde should be excluded not based upon requisite expertise and/or of no assistance to the trier of fact.

**11.     Opinion No. 13*:**

Mallet offers the opinion that Gulf Stream Coach, Inc. "failed to conform to its express warranty." Ex. "A," pp. 200-203; Ex. "B," p. 98.  On August 19, 2009, this Court entered an Order dismissing plaintiffs' claims for breach of express warranty.  Doc. 2764, p. 10 (Order Granting Gulf Stream Coach, Inc.'s Motion for Partial Summary Judgment).  Accordingly, any opinions of Mallet (or any other expert) regarding alleged non-conformance with or breach of an express warranty must be excluded as these claims have been removed from this litigation.

**12.     Opinion No. 14:**

Mallet states that Gulf Stream Coach, Inc. failed to comply with NFPA (National Fire Protection Association) and ANSI (American National Standards Institute) standards and the air conditioning manufacturer's guidelines regarding air conditioning duct construction. Ex. "A," p. 209; Ex. "B," p. 99.  This opinion should be excluded for several reasons.

First, this opinion is entirely duplicative of the opinions offered by plaintiffs' "energy efficiency" expert (LaGrange) and HVAC/mechanical engineer expert (Ritter) (*See* FN 6 and Sec. 8 *(supra))*.  Mallet's opinion is that Gulf Stream Coach, Inc. failed to comply with the NFPA and ANSI requirement that a manufacturer comply with the air conditioning manufacturer's installation guidelines and that because of the duct leakage measured in the trailer, this was not accomplished. Ex. "A," pp. 210-211.  This is nearly *verbatim* the opinion(s)

offered by Ervin Ritter.[16]  Second, Mallet has no expertise in the design or installation of HVAC systems (and, in particular, HVAC systems in travel trailers) nor in the design or construction of travel trailers.  Ex. "A," pp. 39-40, 44, 47, 49-50.

Any opinions by Mallet regarding compliance with NFPA, ANSI and/or air conditioning manufacturer guidelines or standards should be excluded as duplicative of other experts (LaGrange and Ritter) and/or beyond Mallet's qualifications.

### 13.    Opinion No. 15*:

Mallet states that the trailer was "unreasonably dangerous because it failed to achieve the **new** FEMA Procurement Specifications of .016 ppm for formaldehyde emissions."  Ex. "A," pp. 211-212; Ex. "B," p. 99 (emphasis added).[17]  A plaintiff, to prove a design defect, must prove that (1) there existed an alternative design for the product that was capable of preventing the claimant's damage and (2) the likelihood that the product's design would cause the damage and the gravity of the damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.  La. Rev. Stat. §9:2800.56.

The plaintiff in a design defect claim must present specific evidence of an actual design that existed when the product left the manufacturer's control (i.e. technical drawings, calculations, scientific study, publication of engineering principles, etc...)  *See e.g. Morgan v. Gaylord Container Corp.* 30 F.3d 586, 590 (5th Cir. 1994); and *Seither v. Winnebago Industries, Inc.*, 2002-2091 (La. App. 4 Cir. 7/2/03), 853 So.2d 37, 41.  It is stated that such plaintiffs must

---

[16]    See generally the discussion of LaGrange and Ritter's expert reports and deposition testimony previously cited in this Memorandum at Section 8.  See specifically also Ex. "F," pp. 133-153 (discussion of air conditioning manufacturer's guidelines and standards).

[17]    Mallet's declaration that the trailer was "unreasonably dangerous" is an ultimate legal conclusion and, thereby, beyond his qualifications and constitutes an impermissible invasion of the province of the jury.

produce evidence regarding the frequency of similar accidents/damage, economic costs entailed by same, extent of reduction in frequency of such accidents/damages had the alternative design been used.  *See Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 183 (5th Cir. 1990) *abrogated on other grounds*, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (n. 14) (5th Cir. 1994).  Mallet's opinions regarding alternate construction are unreliable and purely conjecture.

First, the opinion is fundamentally untenable.  Mallet is faulting Gulf Stream Coach, Inc. for not achieving **current** FEMA Procurement Specifications when it designed and manufactured the subject trailer in 2004 - nearly five (5) years earlier.  A manufacturer cannot be at fault for not achieving standards that were non-existent; thus, Mallet's opinion is based upon a faulty premise and, therefore, inadmissible.  Further in this regard, FEMA's deputy administrator (David Garratt) testified that the travel trailer manufacturers who were providing units under the 2004 FEMA specifications were meeting or exceeding industry standards.  Ex. "H," Depo. Garratt, pp. 157-158.  Moreover, Garratt confirmed that there were no applicable federal (i.e. HUD) standards that applied to trailer construction nor were there any applicable formaldehyde specifications applicable to trailers at that time. *Id.* pp. 158, 183-184 (*See* also FN 12 *(supra)).*[18]

Second, Mallet offers various suggested alternative means of construction that he states would have cured the problem and met this then non-existent standard. Ex. "B," pp. 99-100. This notwithstanding, Mallet has no expertise in the design or construction of travel trailers, mass production manufacturing processes, materials, engineering, industrial hygiene, HVAC systems (in general and in travel trailers) or any issues regarding formaldehyde (including factors that may cause off-gassing of formaldehyde).  Ex. "A," pp. 33-34, 39-40, 44, 46-47, 49-50, 61-64, 185, 213.

---

[18]     Garratt stated that the new FEMA specification of .016 ppm for formaldehyde emissions after 2007 was for "brand-new units that were at levels that are far below any living environment any place."  *Id.* p. 192.

Finally, Mallet offered no "specific evidence of an actual design that existed when the product left the manufacturer's control." Mallet was unable to offer an opinion on the cost or feasibility that would be involved if his suggestions were implemented. *Id.* p. 214. In addition, Mallet cannot and does not offer the opinion that the suggested alternative methods would actually have the desired effect - thus his suggestions amount to nothing more than pure speculation. In fact, there has been no showing that alternative materials were even available in 2004 in sufficient quantities for this application or that had such been utilized, the current specification would have been met. Mallet also admitted that he had not performed any testing or research and development of his suggested alternatives. *Id.* pp. 213-216. Mallet actually characterized this section of his report as just a "general statement" based upon the findings of the other experts. *Id.* p. 213.

Any opinion by Mallet that the trailer was unreasonably dangerous or defective, or as to alternative design(s) or construction, should be excluded as based upon then non-existent standards, beyond his qualifications and premised upon unsound methodology.

## V.    CONCLUSION

Gulf Stream Coach, Inc. respectfully requests that this Court enter an Order precluding all opinions of Alexis Mallet, Jr. as cited herein. It is requested that Mallet be precluded from offering any opinion that the design, construction and/or materials used in the design or construction of the Alexander unit and/or that the design, installation, operation or condition of the trailer unit's HVAC system were defective, unreasonable and/or caused or contributed to levels of formaldehyde inside the trailer unit. In addition, it is requested that Mallet be precluded from offering any opinion regarding alternative design or construction of the Alexander trailer

unit.   Finally, it is requested that Mallet be precluded from offering any opinion regarding

warnings as well as conformance with or breach of express warranties.

Respectfully submitted,

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER, & WEINSTOCK**

s/Andrew D. Weinstock

_____

**ANDREW D. WEINSTOCK #18495
JOSEPH G. GLASS #25397
KEVIN R. DERHAM #27163**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700
Fax: (504) 837-3119
andreww@duplass.com
jglass@duplass.com
kderham@duplass.com

and

**SCANDURRO & LAYRISSON
Timothy D. Scandurro #18424
Dewey M. Scandurro #23291**
607 St. Charles Avenue
New Orleans, LA 70130
Telephone: (504) 522-7100
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc.**

**C E R T I F I C A T E**

I hereby certify that on the 20th day of August, 2009, a copy of the foregoing

Memorandum in Support of Gulf Stream Coach, Inc.'s Motion in Limine to Exclude Expert

Testimony of Alexis Mallet, Jr. was filed electronically with the Clerk of Court using the

CM/ECF system.  Notice of this file will be sent to all known counsel of record by operation of

the court's electronic filing system.


s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com