## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |

THIS DOCUMENT IS RELATED TO

*Charlie Age, et al v. Gulf Stream Coach Inc., et al*, Docket No. 09-2892;
Alana Alexander, individually and on behalf of Christopher Cooper

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## AFFIDAVIT OF ALEXIS MALLET, JR

### STATE OF LOUISIANA
### PARISH OF LAFAYETTE

**BEFORE ME,** the undersigned authority, on this day, personally appeared:

### Alexis Mallet, Jr.

Who, first being sworn, upon her oath deposed and stated that the information contained in the attached report is true and accurate to the best of his knowledge.

Alexis Mallet, Jr.

Sworn to and subscribed
before me this 19th day of May, 2009.

#: _2/5605_

NOTARY PUBLIC

My commission expires _at death_

ALX-EXP-44-000001

# First General Services of the South, Inc.

*Insurance Repair Specialists*

P. O. Box 80857, Lafayette, LA 70598-0857 Phone: (337) 988-3556

103 Bradbury Crossing, The Village of River Ranch, Lafayette, LA 70508 Fax: (337) 988-1264

May 19, 2009

Re:   FEMA Trailer Formaldehyde Products Liability Litigation
      United States District Court
      Eastern District of Louisiana

Aldridge, et al. V. Gulf Stream          MDL No. 1873 Section N(5)
      Coach, Inc., et al.
                                         Judge Engelhardt
No. 07-9228

## PREAMBLE

In accordance with your request, this organization made onsite inspections, observations and an evaluation to determine the following:

1.   Was the use of the trailer by the Alexanders, as it was set up by FEMA and its contractors, a reasonably anticipated use, such that Gulf Stream should have reasonably expected it to be used in this manner given its alterations made by FEMA and others and its deployment to the gulf coast of Louisiana?

2.   Were the elevated levels of formaldehyde recorded and documented in the trailer occupied by Alena Alexander, Erica Alexander and Christopher Cooper arising from an unreasonably unsafe condition as a result of its design, construction, inadequate warnings and/or the trailer's failure to conform to an express warranty of Gulf Stream, the manufacturer?

3.   Could the trailer have been designed or constructed differently by Gulf Stream, such that it would have served the same purpose and posed less danger to the occupants?

ALX-EXP-44-000002

4.      Did Gulf Stream provide any warnings about the dangers of formaldehyde?

5.      Did Gulf Stream provide any instructions with the trailer as to the mitigation of formaldehyde emissions?

6.      Gulf Stream had a policy of using some low formaldehyde risk products. Did they have a quality control policy or quality assurance policy or procedure in place to ensure their suppliers of wood products were actually providing them with the specified low formaldehyde emission products?

7.      Did Gulf Stream learn of the source of formaldehyde levels in their FEMA trailers after the manufacture and setup?

8.      Assuming Gulf Stream obtained the knowledge of excessive formaldehyde levels in their trailers occupied by Hurricanes Katrina and Rita victims, did they warn Ms. Alexander of the issue and provide her any instructions as to how to mitigate formaldehyde emissions in her trailer?

9.      Have changes been made in the specifications for the procurement of FEMA temporary housing units?

The parameters of this report are limited to onsite observations, review of documents provided, review of documents researched, review of the FEMA trailer in question and interviews with various individuals.

## BACKGROUND INFORMATION

It is understood that the Alexander's family home located at 4415 Dale Street, New Orleans, Louisiana 70126 was severely damaged by flooding and tornadic/hurricane wind forces on or about August 29, 2005 with the passage of Hurricane Katrina subsequently making the house unliveable.

1.      The house was occupied at the time of Hurricane Katrina by Alana M.

Page -2-

ALX-EXP-44-000003

Alexander, Erica M. Alexander and Christopher Cooper. The house subsequently had to be demolished.

2. Slightly over a week after Hurricane Katrina destroyed their home, the Alexanders applied for disaster assistance on September 8, 2005.

3. Her FEMA application was declined on October 2, 2005.

4. Ms Alexander appealed the FEMA decision on November 28, 2005.

5. The appeal was declined on December 30, 2005.

6. A second appeal to FEMA was declined on February 3, 2006.

7. It appears that Ms. Alexander appealed the decision again and assistance was approved on April 6, 2006.

8. FEMA approved living accommodations for the Alexander family. The accommodations came in the form of a FEMA model travel trailer known as a temporary housing unit (THU).

9. The temporary housing unit furnished by FEMA was one that FEMA contracted with Best Buy RV for travel trailers to be occupied as housing units on December 9, 2004.

10. According to the data plate located on the tongue side of the trailer near the front right corner, the trailer was manufactured by Gulf Stream Coach, Inc. The date the trailer was manufactured was December 13, 2004. The vehicle I.D. number is 1NL1GTR2551021783. The vehicle type is an MPV CVDH. The Gulf Stream serial number is 57-5-T-CVDH-21783.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph Nos. 19, 20 and 21.

11. According to information on the tongue side of the trailer, the following identification marks were noted and documented:

Page -3-

a.   1041407 - the identifying dealer for the trailer is Best Buy RV's of Richmond, Indiana;

b.   1041407;

c.   G52;

d.   L 11 53;

e.   FG103012 (This is a bar code.);

f.   The tongue of the trailer had the numbers 1041407;

g.   A stamped identification mark was noted on the tongue of the trailer (That stamp number appeared to be 57-5-T-CVDH-21783);

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 14, 15, 16.

h.   The only other identifying name noted on the tongue end of the trailer is the name Cavalier.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph No. 23.

i.   Other labels were observed on the front of the trailer at the left of the exterior door.  The first label is an electrical plumbing, heating and fire safety certification for travel trailer and fifth wheel. The label states the "**manufacturer certifies compliance with standards for recreational vehicles ANSI A119.2 and Recreational Vehicle Association RVI**." (Emphasis added.) The identification number S1517151 is stamped on the label.  The manufacturer is certifying that their produce has been built in compliance with the ANSI codes and standards.  This will be discussed further in the report.

Please see Enclosure 1a, First General Services of the South, Inc.'s

Page -4-

Photograph No. 27.

j.   On the left license plate end of the trailer the identifying numbers 1041407 were noted.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs No. 46 and 47.

12.   The FEMA temporary housing units were apparently constructed as per the minimum procurement specifications for FEMA Model Travel Trailers, dated August 12, 2004.

The standards state that "the travel trailers being procured under this contract are for the purpose of providing temporary housing. The units are subjected to continuous road travel, multiple installations and deactivations, and various weather conditions. The standards shall not be considered restrictive in that the supplier may provide equal or better units considering that the competitive price and delivery requirement can be met."

The construction outfitting standards identify minimum square footage of living space, floor plan configuration, finishes, finishing and environmental living conditions necessary to provide emergency housing for disaster relief operations. All exterior openings, such as windows, doors, drain pipes, etc...will be caulked with a clear, non-hardening waterproof sealant to prevent air and moisture penetration.

The units shall meet industry standards except where identified.

The specifications establish the minimum standards for travel trailer construction and outfitting to meet FEMA contract requirements. "The manufacturer shall design and construct all units under this contract within a superior grade quality of workmanship."

On page two of four of the Procurement Specifications, the trailer occupied by the Alexander family was to be constructed without a holding tank and the sewer lines were to be extended for external

Page -5-

hookup. The indications are this trailer was specified to be constructed for long-term use and not for recreational short-term use.

Please see Enclosure 2, FEMA Model Travel Trailer Procurement Specifications, dated August 12, 2004, page four of four, Bate Stamped: Forest-0002505, 0002506, 0002507 and 0002508.

13.    The Alexander trailer was delivered to Best Buy R.V. in Punta Gorda, Florida on or about December 14th or 15th, 2004 per the delivery inspection report.

It is believed that the trailer remained in storage in Florida for approximately 1 1/2 years until called into service for the Alexander family.

14.    The Alexanders moved into the temporary housing unit on May 26th or May 27th, 2006. Upon moving into the temporary housing unit, Ms. Alexander stated she noticed an odor; however, she did not know the origin of the odor. She did notify her contact person with the housing unit of this condition. She was told to air out the trailer.

She also asked about a dislodged wall panel in the bedroom and was told to duct tape it shut.

She did so.

15.    A request for maintenance was made by Ms. Alexander approximately five months after moving in regarding roof leaks in the bedroom. Ms. Alexander states that service people were dispatched to the trailer to repair the roof leak. Servicemen informed her that they did not think the repairs they made were going to be sufficient to prevent further roof leaks and that they would probably have to return.

16.    After moving in the trailer, it was noticed that the walls in the rear bathroom began to buckle.

17.    The next recorded event was a request by Ms. Alexander to move the

Page -6-

ALX-EXP-44-000007

temporary housing unit from the property onto the street to effect the demolition of their residence. The temporary housing unit was moved from the property on July 9, 2007.

18. On July 10, 2007, demolition of the Alexander house was completed and the temporary housing unit was returned to the site and readied for occupancy.

19. Ms. Alexander stated her son was having increased asthma-related issues and she had been taking him to the doctor for these issues. After her son required an emergency room admission, she mentioned this to a friend at church about the problems her son was having with his health. The friend told her about the issues that she had become aware of regarding formaldehyde in the FEMA trailers. The Alexanders moved out of the temporary housing unit within weeks of learning this information.

20. The Alexanders moved away from the FEMA temporary housing unit on or about December 29, 2007.

21. A review of documents produced by FEMA, indicated that FEMA began to receive complaints from those living in the temporary housing units within two months of their occupancy.

22. The temporary housing unit was returned to the Baton Rouge (Lottie), Louisiana storage site on February 11, 2008.

23. The Lottie Receiving Inspection Checklist indicates there is damage to the floor in front of the doorway. There are also indications the carpet is stained in the unit.

24. The FEMA temporary housing unit occupied by the Alexander family is presently located at 5310 Old State Highway, Lottie, Louisiana 70756, at the FEMA temporary housing unit storage site.

25. Inspections by the First General Services of the South, Inc. group began at 4:00 p.m. on Wednesday, May 6, 2009 and concluded at

Page -7-

ALX-EXP-44-000008

approximately 7:00 p.m. that evening. Inspections and testing resumed at 9:00 a.m. on Thursday, May 7, 2009 and concluded around 5:00 p.m. that afternoon.

26.    The inspection and testing methods were limited to visual only. No destructive testing methods or procedures could be implemented for in-depth observations with the exception of removing and resetting items that would not cause damage or alteration to the unit.

## PURPOSE AND SCOPE

It is not the purpose of our investigation, inspection or observations to render opinions regarding the presence or the quantity of formaldehyde in the Alexander temporary housing unit. Our purpose, involvement and expertise is in the field of construction and design means and methods and the comparison of those means and methods to those of industry standards and / or codes; the proper functioning of the structure, units or materials involved in this or any other particular case; and the application of building sciences as they affect the overall function of the building, structure , unit or components that make up those structures. We therefore limit our involvement in this matter to the component parts of the temporary housing unit; the construction means, methods and materials of this unit; the ability of these components to function as a unit; the building sciences regarding the air, moisture and temperature interactions with the unit as a whole and with its various components; the proper functioning of the envelope to properly seal the unit or the structure from air, moisture and temperature infiltration; the proper functioning of the HVAC units as it relates to the proper production of negative or positive air pressure or the determination of improper functioning creating negative air pressures in the structure; how the air, moisture and temperatures interact with the various components of the structure and those problems related to and with the air, moisture and temperature interaction.

The purpose of the inspections, observations and testing was for the rendering of opinions regarding the following issues:

1.    Did jacking the trailer from its wheels cause damage to the unit?  (See Conclusions #11 and #12.)

Page -8-

2.    Was the design of the trailer a substantial cause of the unsafe levels of formaldehyde?  (See Conclusions #1, #2, and #3.)

3.    Did the manufacturer fail to take into account the intended use of its product?  (See Conclusion #4.)

4.    Did the manufacturer know, or should it have known, that the use of formaldehyde emitting materials in the construction of their units could become a potential problem for the occupants? (See Conclusions #5 and #6.)

5.    Did the manufacture know or should it have known that the construction means, methods and materials utilized would contribute to the elevated levels of formaldehyde?  (See Conclusions #7 and #8.)

6.    Did the quality of the workmanship relating to the installation of the air-conditioning duct system contribute to the elevated levels of formaldehyde inside the temporary housing unit?  (See Conclusion #9.)

7.    Is it more probable than not that the quality of the workmanship relating to the installation of the furnace duct system contributed to unsafe re-entry of fumes from the furnace system?  (See Conclusion #10.)

8.    Did the manufacturer place warnings regarding potential formaldehyde emissions inside the temporary housing unit or in the owner's manual? (See Conclusion #13.)

9.    Did the manufacturer fail to conform to an expressed warranty?  (See Conclusion #14.)

10.    Did the manufacturer fail to comply with the applicable NFPA and ANSI codes and the requirements set forth in the FEMA Model Travel Trailer Procurement Specifications dated August 12, 2004, and its own warnings in the owner's manual and in both the air-conditioning and furnace system's installation instructions?  (See Conclusion #15.)

11.    Were there materials and techniques available at the time of the

Page -9-

manufacture of the Alexander temporary housing unit in 2004 that would have met today's FEMA requirements? There are new FEMA Procurement Specifications that have been published that require the following:

a.   Each unit must test below 16 parts per billion (16 ppb) for formaldehyde. This is comparable to levels found in conventional U.S. homes.

     i.   The CD states that indoor air concentrations of formaldehyde typically range from 10 ppb to 30 ppb. Please see Enclosure 3, "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels in Mobile Homes and Park Models."

b.   Remove products that release elevated levels of formaldehyde and other volatile organic compounds (VOCs) such as Medium Density Fiber products, and all Urea-formaldehyde materials and high formaldehyde emitting insulation products.

c.   Comply with HUD's requirements for .35 air changes per hour in the ventilation system.

d.   See Conclusion #16.

12.   Do the risks that are avoided by using the safer alternative designs and materials exceed any burden to Gulf Stream in switching to these alternative designs? (See the end of the Conclusion Section.)

The scope of our review, inspections, observations and testing included the following:

1.   Inspection of the Alexander temporary housing unit;

2.   Interviews with Kenneth Henson with High Country Homes in association with Dr. James Kornberg regarding the construction of the Alexander temporary housing unit;

Page -10-

3.  Interviews with Dr. Stephen Smulski, wood scientist, to gather further data regarding the products utilized in the construction in the Alexander unit and to gather further data regarding alternative products usage to eliminate or significantly lower formaldehyde emissions in the Alexander temporary housing unit;

4.  An interview with Gary Bunzer, R.V. specialist and consultant, to gather further data on his observations regarding the set-up issues with the Alexander unit;

5.  An interview with Ervin Ritter, P.E., mechanical and environmental engineer, to review notes, calculations and findings regarding our inspection of the FEMA unit;

6.  An interview with William Scott of W. D. Scott Consultants regarding the findings of previous formaldehyde tests performed in FEMA temporary housing units;

7.  An interview Marco Kaltofen, P. E., to compare observations of our inspection of the Alexander temporary housing unit;

8.  A review of notes from interviews with Ms. Alana Alexander, former occupant of the specific FEMA temporary housing unit involved in this litigation;

9.  Detail measurements of the temporary housing unit;

10. Photographic documentation of pertinent observations;

11. Written documentation of pertinent observations;

12. Infrared thermographic anomaly survey of the Alexander unit;

13. Performance of blower door testing of the unit for envelope air leakage;

14. Performed air leakage testing on the air-conditioning duct system;

Page -11-

ALX-EXP-44-000012

15.   Performed an air leakage test on the furnace duct system;

16.   Observations of all construction detail through the open panels in the bedroom and bathroom walls;

17.   Observations of any and all warning notices or labels on the interior and exterior of the unit;

18.   Observations of penetrations and sealants in the floor, wall and roof systems of the unit;

19.   Observations of entrapped water in the bellyboard of the unit;

20.   Assessment of the conditions of the temporary housing unit;

21.   Observations and notations of the design, construction materials, means and methods utilized in the production of the unit; and

22.   Preparation of this report to present the results of our findings and to render a statement of opinion.

## INSPECTIONS, OBSERVATIONS AND STUDY

Inspections were conducted on Wednesday, May 6, 2009 and Thursday, May 7, 2009 in the presence of attorneys and employees representing FEMA and defendants in this matter along with Mr. Kenneth Henson in association with Dr. James Kornberg; Mr. Gary Bunzer, R.V. specialist and consultant; Mr. Ervin Ritter, P.E., mechanical and environmental engineer; Mr. William Scott with W. D. Scott, environmental consultants; Mr. Marco Kaltofen, P.E., environmental engineer; Mr. David Moore, P. E., civil engineer; and Mr. Clark Thibodeaux, draftsman; Mr. Dalton Toups, field technician for First General Services of the South, Inc.; Mr. Scott Johnson, photographer / videographer; Reagan Johnson, animator; Mr. Chris Pinedo, attorney; and Mr. Hugh Lambert, attorney.

In the course of our study and analysis, following pertinent data was reviewed:

Page -12-

ALX-EXP-44-000013

1.    Review of FEMA Accessible One Bedroom Park Model (RP) Procurement Specifications Dated: April 25, 2006;

2.    Review of fax from ESCO Industries of Indiana Inc. regarding LFE luan dated April 24, 2007;

3.    Review of correspondence to Mr. Jonathan Gibb with FEMA from James F. Shea, Vice President of Gulf Stream Coach, Inc. dated October 13, 2005 referencing products used by manufacturer (A/C and Luan);

4.    Review of FEMA10-000463, IAQ Screening Testing Procedures for FEMA Temporary Housing Units;

5.    Review of "FEMA to Introduce New Type of Manufactured Home," Release date: December 18, 2008, Release Number: 1791-343;

6.    Review of "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels In Mobile Homes and Park Models," Release Date: April 11, 2008, Release Number: HQ-08–56;

7.    Review of "FEMA Awards Contracts For Low Emissions Travel Trailers," Release Date: April 7, 2009, Release Number: HQ-09-034b;

8.    Review of ASHRAE 62 - Indoor Air Quality;

9.    Review of Installation Instructions for Dometic 595 Series QUICK COOL;

10.   Review of Exhibit 7, Travel Trailer Installation;

11.   Review of ANSI A119.2 NFPA 1192, Standard on Recreational Vehicles, 2002 Edition;

12.   Review of ANSI A119.4 NFPA 1194, Standard on Recreational Vehicle Parks and Campgrounds, 2002 Edition;

13.   Review of complaints from occupants to FEMA;

Page -13-

14.   Review of ASTM Designation: E: 1827 - 96 (Reapproved 2007) - Standard Test Methods for Determining Airtightness of Buildings Using an Orifice Blower Door;

15.   Review of ASTM Designation: E-779-03 - Standard Test Method for Determining Air Leakage Rate by Fan Pressurization;

16.   Review of ASTM Designation E 1186 - 03 - Standard Practices for Air Leakage Site Detection in Building Envelopes and Air Barrier Systems;

17.   Review of ASTM Desgnation: E 1554 - 03 - Standard Test Methods for Determining External Air Leakage of Air Distribution Systems by Fan Pressurization;

18.   Review of International Standard 6781, Thermal insulation - Qualitative detection of thermal irregularities in building envelopes - Infrared method;

19.   Review of Delivery Inspection Report dated 12/15/04;

20.   Review of photographs emailed to First General Services of the South, Inc. from Linda Nelson dated May 12, 2009 regarding the Alexander Unit taken by Scott Johnson;

21.   Review of the Transcript of the Testimony of Mary C. DeVany, MS, CSP, CHMM, Date taken: October 7, 2008, in reference to FEMA Trailer Formaldehyde Products Liability Litigation;

22.   Review of "The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued to Hurricane Disaster Victims, and Recommended Action Items - Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform U.S. House of Representatives July 19, 2007";

23.   Review of "Testimony before the House Committee on Oversight and Government Reform - Statement of Jim Shea, Chairman, Gulf Stream Coach, Inc." Dated July 9, 2008;

ALX-EXP-44-000015

24.   Review of the deposition James Shea - Gulf Stream Coach 30(b)(6) dated July 24, 2008;

25.   Review of Application / Registration for Disaster Assistance for Alana M. Alexander;

26.   Review of Documents Produced by Defendants, Parts 1 through 4 of 4;

27.   Review of June 15, 2006 letter from Ann C. Benjamin, Office Manager with Samling USA, L.L.C. regarding definitions of codes used to identify different glue types in their plywood products;

28.   Review of Table 3 - ATSDR Health Guidance Values for Formaldehyde Exposure (Reference 1,2) and Table 4 - Occupational Exposure Levels for Formaldehyde (reference 9);

29.   Review of Indoor Air Quality Guideline No. 1 dated August 2004, "Formaldehyde in the Home";

30.   Review of Lottie Travel Trailer (Receiving) Inspection Check List dated February 11, 2008;

31.   Review of Plaintiffs' Original Complaint dated November 2007;

32.   Review of Plaintiffs' First Supplemental And Amending Complaint dated January 13, 2009;

33.   Review of correspondence from Gulf Stream Coach, Inc. to R. David Paulison, Acting Director of FEMA dated October 10, 2005 regarding their history with manufactured homes;

34.   Review of Weyerhaeuser "Weekly Pricing," Effective Date: August 29, 2005 and "Monthly Pricing," Effective Date: August 29, 2005;

35.   Review of miscellaneous formaldehyde documents;

36.   Review of Environmental Health's publication, "What You Should

ALX-EXP-44-000016

Know about Formaldehyde in Mobile Homes;"

37.     Review of photographs of Alexander property taken by Gary Bunzer;

38.     Review of photographs of Alexander GS Unit taken by Scott Johnson / Lambert - Nelson;

39.     Review of photographs taken by others;

40.     Review of photographs taken by others sent by Magan Ennis;

41.     Review of photographs taken by Ritter Consulting Engineers;

42.     Review of Plans;

43.     Review of plywood quotations and purchase order;

44.     Review of Gulf Stream Coach, Inc.'s Travel Trailers and Fifth Wheels Owner's Manual;

45.     Review of "An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary - Housing Trailers, Baton Rouge, Louisiana, September - October, 2006, dated October 2007 by U.S. Separtment of Health and Human Services;

46.     Review of report from David P. Barnes, Jr. and Dr. Lee E. Branscome (meteorologist) dated August 21, 2008;

47.     Review of "The Use of Blower-Door Data" by Max Sherman dated March 13, 1998;

48.     Review of CDC's "Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes" dated July 2, 2008;

49.     Review of Composite Panel Association's Technical Bulletin, "VOC Emission Barrier Effects of Laminates, Overlays and Coatings for Particleboard, Medium Density Fiberboard (MDF) and Hardboard";

ALX-EXP-44-000017

50. Review of report prepared by Freyou, Moore and Associates dated May 18, 2009, "Structural Condition Assessment for FEMA Travel Trailer, Lottie, Louisiana;

51. Review of report by Lagrange Consulting, "Blower Door and Duct Leakage Test Results for Trailer #1041407, received May 19, 2009;

52. Review of report by Stephen Mullet (travel trailer manufacturing consultant) dated August 20, 2008;

53. Review of Ritter Consulting Engineers' report dated May 15, 2009;

54. Review of Dr. Stephen Smulski's report dated May 18, 2009;

55. Review of Affidavit of Mary C. DeVany Concerning IN RE: FEMA Trailer Formaldehyde Products Liability Litigation, "Overview of Formaldehyde Exposure Standards; Toxicological Effects; Airborne Formaldehyde Sampling Strategy, Methodology and Selection Basis; Air Sampling Results; and Bibliography/References," dated August 2008;

56. Review of Analytical Communications' March 1998 report "Effect of relative humidity on the determination of formaldehyde with NIOSH 3500 method (chromatropic acid method);

57. Review of report, "Formaldehyde CAS number: 50-00-0;"

58. Review of report, "Formaldehyde Indoors," by Stephen Smulski;

59. Review of report by Anne V. Baughman and Edward A. Arens, "Indoor Humidity and Human Health - Part I: Literature Review of Health Effects of Humidity-Influenced Indoor Air Pollutants";

60. Review of Exposure Assessment Solutions, Inc.'s Chapter 16: Industrial Hygiene Exposure Assessment - Data Analysis and Interpretation";

61. Review of "Interim Findings on Formaldehyde Levels in FEMA-

ALX-EXP-44-000018

Supplied Travel Trailers, Park Models, and Mobile Homes" from the CDC dated February 29, 2008;

62. Review of <u>Affidavit of Marco Kaltofen, PE (Civil, Mass.)</u> dated August 20, 2008;

63. Review of <u>Affidavit of Marco Kaltofen, PE (Civil, Mass.)</u> dated May 19, 2009;

64. Review of Earnest Orlando Lawrence, Berkeley National Laboratory's "Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units - Final Report," dated November 2008;

65. Review of 1991 NIST's MOIST program data;

66. Review of 1993 ASHRAE study, "A Computer Analysis of Moisture Accumulation in the Walls of Manufactured Housing";

67. Review of February 1994 ASTM study, "Moisture Control in Buildings";

68. Review of January 1995 U.S. Department of Commerce report, "Manufactured Housing Walls that Provide Satisfactory Moisture Performance in all Climates";

69. Review of 1999 ASTM book, <u>Water Problems in Building Exterior Walls: Evaluation, Prevention, and Repair;</u>

70. Review of 2000 Manufactured Housing Research Alliance study, "Moisture Problems in Manufactured Homes";

71. Review of September 2003 MHRA publication, "Minimizing Moisture Problems in Manufactured Homes Located in Hot, Humid Climates";

72. Review of CDC Summary of Lawrence Berkeley National Labortory Final VOC Report and Interim VOC Report;

Page -18-

ALX-EXP-44-000019

73.     Review of "Mechanisms of Formaldehyde Release from Bonded Wood
        Products" published by American Chemical Society, 1986;

74.     Review of the Florida Solar Energy Center Publication Number: FSEC-
        GP-212-01, "Moisture Problems in Manufacture Housing: Probable
        Cause and Cures";

75.     Review of "Evaluation of Formaldehyde Levels in Occupied Federal
        Emergency Management Agency-Owned Temporary Housing Units"
        dated 12/13/07;

76.     Review of Formaldehyde Passive Monitoring Data - EMA Housing
        Units by W.D. Scott Group, Inc.;

77.     Review of test results dated 5/18/09 by W.D. Scott Group, Inc.;

78.     Review of "Volatile Organic Compound Concentrations and Emission
        Rates Measured over One Year in a New Manufactured House" by
        Alfred T. Hodgson, Steven J. Nabinger and Andrew K. Persily;

79.     Review of "Wood Adhesives 2005" edited by Charles R. Frihart dated
        November 2005;

80.     Review of FEMA Model Travel Trailer Procurement Specifications
        dated August 12, 2004;

81.     Review of Gulf Stream Coach, Inc. Statement dated April 27, 2006
        regarding formaldehyde levels;

82.     Review of the Air Resources Board study, "Air Quality Modeling of
        Emissions from Composite Wood Products";

83.     Review of Air Resources Board's "Proposed Airborne Toxic Control
        Measure to Reduce Formaldehyde Emissions From Composite Wood
        Products" dated March 9, 2007;

84.     Review of Air Resources Board's " Staff Report: Initial Statement of
        Reasons for Rulemaking  - Public Hearing to Consider Adoption of the

Page -19-

ALX-EXP-44-000020

Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated April 26, 2007;

85.    Review of Air Resources Board's " Final Statement of Reasons for Rulemaking Including Summary of Comments and Agency Responses - Public Hearing to Consider Adoption of the Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated April 26, 2007;

86.    Review of Ritter Consulting Engineers' report regarding test temperature and relative humidity;

87.    Review of the following internet articles:

    a.    http://www.rvbusiness.com/tag/tl-industries/

    b.    http://www.chemicaldesigncorp.net/ClosedCellFoam.htm

    c.    http://www.robertlordbuilders.com/press_releasr1.htm

    d.    http://www.envirofoaminsulation.com/faq.html

    e.    http://www.suburbanmanufacturing.com/   (RV Products)

88.    A review of the pamphlet by Bayseal CC for Residential Builders, "Insulation that Adds Value";

89.    A review of Bayseal CC Division 7 - Thermal and Moisture Protection Closed-Cell Insulation Technical Data Sheet 06/10/08;

90.    A review of a fax from Wyatt Rankin with SPI-Dallas dated May 19, 2009 regarding formaldehyde foams;

91.    A review of Suburban, Dynatrail Installation Instructions for Models NT-24SP, NT-30SP, and NT-34SP; and

92.    A review of Suburban, Dynatrail Installation Instructions for Models SF-20F, SF-25F, SF-30F and SF-35F.

Page -20-

Definitions:

1. Important words used to describe or imply conditions are applicable to situations with the Alexander temporary housing unit are either used in this report, its enclosures or in the codes or standards that apply are defined below for clarity and the understanding of usage as it applies to this unit:

    1. Recreational vehicle - NFPA, page 8

    2. Travel trailer - NFPA, page 8

    3. Acceptable indoor air quality - ASHRAE 62 - 1999, page 2

    4. Air exhaust - ASHRAE 62 - 1999, page 2

    5. Air makeup - ASHRAE 62 - 1999, page 2

    6. Air, outdoor - ASHRAE 62 - 1999, page 2

    7. Air, return - ASHRAE 62 - 1999, page 2

    8. Air, supply - ASHRAE 62 - 1999, page 2

    9. Air ventilation - ASHRAE 62 - 1999, page 2

    10. Exfiltration - ASHRAE 62 - 1999, page 2

    11. Infiltration - ASHRAE 62 - 1999, page 2

    12. Natural ventilation - ASHRAE 62 - 1999, page 2

    13. Ventilation - ASHRAE 62 - 1999, page 4

In addition to the items reviewed in the course of our study and analysis, the following pertinent data was collected and observations made:

ALX-EXP-44-000022

2. It is understood the common issue regarding the occupancy of the FEMA temporary housing units is the exposure of its occupants of to varying elevated levels of formaldehyde. A large quantity of testing performed on these temporary housing units by various organizations and individuals have confirmed and reported above normal levels of formaldehyde exist in the a large quantity of the units tested.

3. The numerous rounds of testing for formaldehyde in the FEMA trailers began after occupants began filing complaints with FEMA regarding problems they were experiencing with their units. Occupants informed FEMA that they were having issues with strong odors, burning or irritated eyes, skin irritations, sinus problems and headaches shortly after occupying their homes or during the course of their occupancy.

4. A review of reports by Lawrence Berkely Laboratory, the National Center for Environmental Health, and a report by Dr. Stephen Smulski among other documents reviewed, give indication of the following:

   a. Of all of the studies reviewed, persons interviewed, and test reports and data gleaned in preparation of our assessment, the following factors appear to be held in common:

      i. As temperature rises, the rate of release of formaldehyde increases.

      ii. As humidity rises, so does the release of formaldehyde from materials that are manufactured using formaldehyde.

      iii. Adequate ventilation is required to exfiltrate formaldehyde released into the envelope of the travel trailers.

4. Upon arrival at the Alexander unit, the various parties began to unload equipment, prepare cameras for inspections and meet to gather notes on the upcoming inspection of the interior and exterior of the unit. It was noted and photographed that the representatives from the FEMA party opened the trailer door prior to the testing performed by W.D. Scott Group. The door was not opened for a long period of time when this

Page -22-

ALX-EXP-44-000023

writer observed that occurrence and requested the door be closed.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph #1.

Prior to the commencement of testing by Mr. William Scott, it was requested the doors and windows remained closed during the formaldehyde tests. During the tests, a member of the FEMA party, I believe, opened the door and requested entry by one of their members. The door was closed and reopened again to allow the entry of that member of the party.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #33 and #35.

These items are only mentioned to make note that of the observations. Because it was requested the testing occur before anyone else entered the unit, the opening of the door system on three occasions may have some effect on the test results.

From a review of the W. D. Scott Group, Inc. Formaldehyde Emissions Report from a test taken in the Alexander unit in both January 2008 and May 2009, indications are the formaldehyde emissions are above those determined by FEMA and the CDC as being the average in a U. S. home.

Please see Enclosure 4, W. D. Scott Group, Inc. Formaldehyde Sampling Report dated May 18, 2009.

Please see Enclosure 15, Analysis of the Gulf Stream Coach, Inc. Formaldehyde Exposure Data Set by Paul Hewett, Ph.D., CIH, dated May 18, 2009.

Please see Enclosure 17, Affidavit of Marco Kaltofen, P.E. dated May 19, 2009.

5.    A review of the temperature and humidity tests performed by Ritter Consulting, May 7, 2009 between 1:00 p.m. and 4:00 p.m., indicates the

Page -23-

outdoor temperature during the inspection by our group remained fairly constant throughout the day. Temperatures on the roof of the Alexander trailer range from approximately 110°F to just slightly over 120°F for the entire day. It was noted that during the majority of the day, the skies were cloudy. Please note also, roof temperatures were above 120°F in early May of 2009. Temperatures can be expected to rise much higher in the summer.

The interior temperature recorded by Ritter's equipment ranged from approximately 78°F to about 92°F.

The relative humidity spiked and dropped at numerous times during the testing. This can be attributed to the entry and exiting of testing personnel and attorneys in attendance. In addition, at one point the air-conditioning system was turned off and the building air leakage and duct leakage tests were performed. This affected both the temperature and the humidity of the interior of the building. This report does however give a fairly good indication of the types of temperatures that are affecting the envelope of the building. It is also interesting to note that even with the air-conditioning system running from earlier in the morning, the lowest relative humidity readings were approximately 55%. Relative humidity increased between 75% and 90% for a majority of the testing time.

Please see Enclosure 6, Ritter Consulting Temperature and Humidity Data Logger Graphs dated May 7, 2009.

Please see Enclosure 17, Affidavit of Marco Kaltofen, P.E. dated May 19, 2009.

6.    A review of the testimony of Mary DeVany before Congress gave indications that formaldehyde emissions double for every 12°F increase in temperature.

7.    Discussion of construction issues, defects and damages observed:

      a.    The main frame of the structure supporting the walls and roof is constructed of structural steel and light gauge framing.

Page -24-

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #142, #143, #145, #146, #147, #148, #149, #150, and #151.   These photographs give indication of construction of the steel frame under-carriage.

Please see Enclosure 12, Freyou Moore Report dated May 15, 2009.

b.   The under bellyboard is installed concealing all of the wood structure, insulation and subflooring of the trailer. It was observed that the underbelly contains water presumably from condensation and possible roof leak(s). The underbelly of the trailer is sagging from the weight of the water being retained in the under-carriage.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #66, #68, #69, #70, #71, #72, #73, #74, #75, #76, #77 and #78. These photographs are of the rear, right corner (the tongue-end side) of the trailer.  As noted above, the underbelly is sagging and a liquid material could be felt in the sag.  Openings at the rear side of the underbelly at the floor to wall connection allowed for one of the participants to push up on the underbelly material and forced water to pour out of the underbelly.  These photographs are noting that event.

The water in the underbelly contributes to active formaldehyde emissions and to the decay of the floor sheeting which increases the release of formaldehyde.

Also, please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #142, #144, #145, #151, #152, #153, #154, and #155.  These are all indications of water entrapped in the underbelly of the Alexander temporary housing unit.

Please see Enclosure 1b, Photographs by Scott Johnson, #1040, #1041, #1042, #1043, and #1044, of the underbelly sagging below the trailer.

Page -25-

c.   The floor insulation is approximately 2 1/2" in thickness.

d.   The floor joists are believed to be a nominal 2" x 3" (actual 1 1/2" x 2 1/2"). The data insulation and the floor joists was obtained during the inspection by Kenneth Henson and Gary Bunzer.

e.   The plumbing pipes, LP gas lines, trailer wiring and furnace duct are located in the floor system. This is assumed and based on standard construction of these units. A visual inspection was not possible without destructive testing.

f.   The floor sheathing is 5/8" particle board.

g.   The floor system on the interior of the unit is covered with a vinyl sheeting loosely over the floor sheathing. This does not act as effective of a vapor barrier as a fully glued down vinyl material. The inspectors were able to remove the floor register and use a carpenter's framing square to penetrate the underside of the vinyl flooring without resistance. Wetting of the under-carriage area of unsealed particle board backing and the unsealed areas of the vinyl is a means of infiltration for humidity and volatile organic compounds.

h.   Carpet and pad is installed over the vinyl in the bedroom.

i.   Air-conditioning registers are installed over the finished floor system.

j.   The wall framing is 1 1/2" square wood members (2" x 2" nominal).

k.   A 1/8" overlay hardwood paneling is installed on the interior of the wall system.

l.   Installed in the exterior walls is 1 1/2" fiberglass unfaced batt insulation. The batt insulation is the full height of the wall system.

Page -26-

m.  The side edges of the wall panels are exposed, raw hardwood paneling. These exposed edges are covered at the seams with matching adhesive tape material.

n.  The rear of the 1/8" overlay hardwood paneling is exposed, raw material.

o.  The wall to ceiling intersections were observed. Indications are the wall and ceiling panels intersect into an "F" type molding. There did not appear to be a method of sealing to prevent air and moisture infiltration into the envelope of the trailer.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #173, #174, #175, #176, #179, #180, #203, #207, and #208.

p.  Dust accumulation was observed at the wall to ceiling intersections. This is typical of corners, crown and base areas where air and moisture infiltration are occurring. The dust particles in the air are attracted to the moist or wet area intersections as a result of the hot, humid air infiltrating through unsealed intersections.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #175, #176, #178, #179, and #180.

q.  The wall intersection at the floor was observed. The walls do not appear to have a termination molding at the base. There does not appear to be a method of air infiltration prevention. Dust accumulation was observed on the carpets at the wall to floor intersections. This is indicative of air and moisture infiltration. The carpeting acts as a filter as the hot, humid, unconditioned air penetrates at the joints of the building. As the humidity collects on the walls and carpet at these intersections, dust accumulation occurs.

r.  The walls of the trailer had four windows, an exterior door, and several other penetrations through the exterior wall for furnace

Page -27-

        ventilators, a hood vent, and water heater access and ventilation panel.

s.      The ceilings were observed to be a 1/8" overlay hardwood paneling.

t.      Air-conditioning registers are installed in the ceiling paneling.

u.      The air-conditioning unit is installed through the ceiling void and the roof.  Light fixtures were installed on the ceiling in each room.

v.      The roof framing is a nominal 2" x 3" (1 1/2" x 2 1/2" actual).  According to diagrams furnished by the manufacturer, other models have these spaced 16" on center.  The assumption has been made that the ceiling framing is of the same spacing with this trailer.

w.     The ceiling void contained an unfaced batt insulation approximately 2 1/2" thick.

x.      The air-conditioning duct system is installed in the ceiling void.  The duct system is concealed and could not be accessed for observation as to the size, construction, insulation and connections of the ductwork.

y.      Various built-in units were observed throughout the temporary housing unit.  They were as follows:

        i.      Beds with mattresses;

        ii.     Sofa with cushions;

        iii.    Seating with cushions at the kitchen table;

        iv.    The kitchen table;

        v.     Base and upper cabinets in kitchen and bath areas covered with a laminated countertop;

Page -28-

ALX-EXP-44-000029

vi.     Double sink and faucet in the kitchen and lavatory for the bath area;

vii.    Closets (one in the bedroom and one in the bunkbed area);

viii.   The nightstand in the bedroom;

ix.     Interior door and frames;

x.      Appliances - stove, hood, refrigerator, and microwave;

xi.     The bathroom had a tub / shower unit;

xii.    A commode;

z.      The exterior aluminum covering is rolled and crimped material.

        Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #19, #23, #24, #34 and #39.

aa.     Exterior moldings covered the walls at the intersections, windows and doors.

        Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #19, #24, #40, #42, #46, #47, #48,  and #60.

cc.     Other miscellaneous penetrations for electrical and water hookups, exhaust vents (stove hood and furnace), and water heater access and exhaust panel were noted.  The exhaust panel for the water heater was laying on the ground upon the arrival of the inspectors.

dd.     The roof sheathing is a regular sheeting and is not a low-formaldehyde emitting material as per James Shea.  The roof sheathing is believed to be 1/4" hardwood panel; however, this is unverified.  Access to the sheathing could not be obtained.

Page -29-

ALX-EXP-44-000030

ee.   There is a sheet membrane covering the entire roof system. It is a membrane similar to or is an EPDM membrane. The perimeter edges of the membrane are sealed with a caulking type material. The caulking material is split and separated in a number of areas inspected by this writer.

Please see Enclosure 1a, First General Services of the South, Inc.'s' Photographs #82, #83, #84, #85, #86, #87, #88, #89, #90, #95, #96 and #97.

ff.   Roof exhaust for the bath and vent pipe caps were noted on the roof system.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #91, #92, #93, and #94.

gg.   Roof top air-conditioning unit:

i.   The cover of the rooftop air-conditioning unit was removed to obtain identification of that unit.

ii.   The unit is a Duo-Therm.

iii.   The model number is 59516.513.

iv.   The unit is a 15,000 nominal BTU unit.

v.   The serial number is 44832607.

Please see Enclosure 1b, Scott Johnson's Photographs #1083 through #1091.

8.   Noted observations:

a.   Window gaskets:

i.   Observations of the window gaskets indicated there are two of the gaskets that were not properly sealed to the

Page -30-

frame and glass.  Potential moisture intrusion and air infiltration can occur at these areas.  Water intrusion was not observed at the kitchen window near the kitchen table to the left side of the exterior door; however, the interior wall is bowing indicating either water intrusion or high moisture presence of the wall system.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #39, #40, #236 - #250, #332, #334, and #335.

b.    Electrical outlet:

i.    The exterior electrical outlet at the rear, left area of the trailer was observed.  The outlet was damaged and water and air infiltration is occurring in this area.  This is between the water heater and the fresh water inlet.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #54, #55, #56, #161, and #162.

c.    Water heater cover and exhaust area:

i.    The water heater exhaust area was inspected.  Corrosion was noted on the metal components in this area.  The water heater cover had been removed during the last inspection according to one of the FEMA representatives.  Corrosion to the water heater element was also noted.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #58, #60, #61, #156, #157, #158, #159 and #160.

d.    Kitchen stove hood exhaust:

i.    The kitchen stove hood exhaust cover was observed on the rear of the trailer.  The exhaust vent is activated by air pressure from the inside wherein the flapper would open as

Page -31-

the air pressure would push against the lid or flapper. This area is noted because under conditions discussed later in this report regarding negative air pressures, the flapper may not open properly during times that the air-conditioning system or the heater is in operation during cooking or heating events.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph #62.

e.   Underbelly:

    i.   Water retention:

       1.   As noted earlier in the report, the underbelly of the trailer is holding water. The underbelly membrane was noted to be sagging during visual observations. One of the inspectors used his hand to mechanically activate the underbelly sheeting giving indication that the underbelly contained a significant amount of water. Upon observations around the perimeter of the travel trailer, an opening was noted at the rear, right corner. The bottom membrane was separated from the wall connection. One of the observers pushed up on the underbelly in this area and water began to pour out of underbelly area. Two observations were made:

       2.   Unsealed penetrations:

          a.   During and inspection of the underside of the trailer it was noted that some of the penetrations in the floors were unsealed. Photographs of those areas were taken. These are leakage points in the envelope of the building that will draw the hot moist air from the exterior into the interior of the building.

Page -32-

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #66 and #68 through #73.

b.    The underbelly is acting as a water or vapor barrier.

ii.    The water in the underbelly was not a result of moisture vapor from the ground rising and penetrating the underbelly. The water apparently is collecting in the underbelly as a result of leaks in the envelope and condensation in the wall and roof systems.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #66 through #78.

Please see Enclosure 1b, Scott Johnson' Photographs #1043 and #1045 through #1048.

f.    Roof:

i.    As noted earlier in the report, the roof was inspected. Separation in the sealant material around the perimeter of the roof was noted. Water is apparently penetrating into the roof and wall systems from some of these separations. One of the potential moisture problems with this temporary housing unit was a persistent leak in the bedroom. One of the areas of separation in the roof sealant material is along the outer edge of the bedroom.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #82 through #88 and #387 through #390.

g.    Roof membrane:

i.    A rippling effect was noted in the roof membrane over the area of the bedroom and along the outer edge of the roof to

Page -33-

wall connection. Indications are there is deterioration of the roof decking below the membrane in this area.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #95, #96, and #97.

ii.   Roof penetrations - seal:

1.   Inspection of the sealant material around the bathroom exhaust vent hood and the plumbing vent pipe cap was performed. The sealant material is not adhering properly to the roofing membrane. It is not an uncommon practice to utilize only sealant materials to prevent air and moisture transmission from the exterior roof system to the roof cavity or interior of the envelope. According to HUD's "Durability by Design" publication, caulks and sealants should be used as only a second line of defense for moisture and air infiltration. Some other means of sealant should be used as the primary source of air and moisture infiltration on the envelope of a building unit. Because of expansion and contraction of dissimilar materials and weatherization of the adhesives, the caulks or sealants cannot be dependent upon to maintain its weather-tight resistant barrier. In addition, it is not possible to confirm when the sealant is being applied that all of the voids and penetration or holes have been completely and thoroughly sealed.

Please see Enclosure 1b, Scott Johnson's Photographs #1077 through #1081, #1092 and #1093.

h.   Damage to exterior skin:

i.   Observations of a small area of damage to the exterior skin at the rear, left area of the trailer was noted. The damaged

Page -34-

area was sealed with a caulking material. It did not appear that moisture or air was penetrating through this area at the time of the inspection.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #163 and #164.

i.    Floor damage at the entry door:

    i.    Moisture damage to the floor at the door entry and floor area between the entry door and the bedroom wall was noted. The underlayment was very soft to the touch. Indications are moisture has been penetrating this area for some time causing the deterioration or decay.

    Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #98 through #122.

j.    Bedroom:

    i.    Walls:

        1.    Observations of the walls in the bedroom area revealed a buckling or bowing in the walls in at least two places. One of the panels on the rear wall of the bedroom was buckled and detached from the wood framing member. According to information gathered, this occurred prior to the occupancy of the Alexander family. Ms. Alexander advises she was told to duct tape the detached panels ack together, which she did. It appears the stress on the frame of the floor and wall system caused stress releasing the panel from the framing member.

        Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #170, #200 through #214.

Page -35-

ii.   Walls bowed - Front:

1.   Observation of the front wall of the bedroom
revealed a bowing area under the window system.
It appears the stress has caused bowing in this area
which is similar to the occurrence on the rear wall.

Please see Enclosure 1a, First General Services of
the South, Inc.'s Photographs #171 and #173.

iii.   Wall - Air infiltration:

1.   As noted earlier in the report, dust particles attached
to the wall and ceiling systems at their intersection
indicate the penetration of air and moisture from the
exterior of the building toward the interior.
Observations reveal that there is no sealing of the
envelope of the building to prevent air and moisture
movement from the outside to the inside. As the
hot, moist air comes in contact with the cooler
surfaces at the areas of air infiltration, the
electronically charged dust particles are attracted to
the moist surfaces of the wall and ceiling
intersections. This is a manufacturing workmanship
issue. These areas should have been sealed properly
to have prevented the infiltration of air and moisture
as required by the FEMA Procurement
Specifications.

Please see Enclosure 1a, First General Services of
the South, Inc.'s Photographs #173 through #176,
#181 and #215.

iv.   Walls - Fastener reversal:

1.   Observation of fasteners retaining the wall panels to
the wood framing members indicated fastener
reversal was occurring. Fastener reversal in this

Page -36-

manner was either a result of the stress placed upon the framing system from the blocking or an introduction of moisture into the wood framing and continual wetting and drying cycles. As to wetting and drying cycles occurring in the wood framing, the fasteners are forced out of the wood member. The more likely event to have occurred is the wetting / drying cycles of the framing members.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #191 through #195, #201, #202, and #214.

v.    Walls and nightstand - Water infiltration:

1.    Water infiltration was noted and damage occurring from the water infiltration was documented. The nightstand on the rear, right corner of the bedroom indicated growth of a mold-like substance on its interior. This area is in the corner immediately below the areas of sealant separation at the edge of the roof. This area is also below the area of water infiltration noted in the ceiling and will be discussed further in the report.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #187 through 190.

vi.    Closet:

1.    Observations of the closet area in the bedroom indicated moisture and water infiltration and water damage in this area. This is at the right, front corner of the bedroom. This is also below the area of water penetration in the ceiling.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #177 through #179.

Page -37-

vii.   Ceilings:

    1.   Observation of the light over the bed indicated water infiltration into that light fixture. Water retention marks were noted in the fixture. This is at the center between the nightstand and the closet area. This area also is above the bed.

       Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #181 and #182.

viii.   Water damage to the bed:

    1.   The area immediately below the light fixture indicating water leakage was inspected. Upon removal of the mattress from the bed area, it was noted the mattress was water-stained. The hardwood platform supporting the mattress for the bed indicated significant water stains. There is a storage compartment below the bed platform that showed of water infiltration.

       Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #196 through #199, #220 and #221.

ix.   Wall construction details:

    1.   Because the wall panels were buckled and detached from the wall framing in the bedroom, we were able to observe the construction means, methods and materials utilized in the framing of this particular unit. The wall panels were overlaid 1/8" hardwood paneling. The edges and rear side of the paneling were raw. The wall insulation is 1 1/2" unfaced fiberglass batt. The wood framing members are 2" x 2" nominal (1 1/2" x 1 1/2" actual).

Page -38-

ALX-EXP-44-000039

Noted in our inspection was a lack of a vapor barrier on the exterior side of the exterior wall. The wall system is constructed of an exterior aluminum skin with rolled and crimped joints installed horizontally attached to the 1" x 1" wood framing members. The batt insulation is unfaced and the only material assumed to be a vapor barrier was the interior finish applied to the hardwood panel.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #203 through #210.

x.   Split framing:

1.   As discussed earlier under the fastener reversal section, splitting of the framing was noted at the connection between the top plate of the wall and the top of the stud. The 1" x 1" framing member is split and observation of the fastener was noted. This gives indication of moisture infiltration causing wetting and drying cycles in the wood framing and oxidation occurring on the metal fastener.

"Repeated wetting and drying of the wood framing causes great stress on the framing members. These framing members eventually split and fail." This is a quote from a lecture from Dr. Joseph W. Lstiburek, PhD., P.Eng.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #208 through #210.

xi.   Window observations:

1.   The window unit was opened and closed during the blower door testing for passage of items needed during the blower door tests. The windows were open during periods of inactivation of the air

Page -39-

pressurization or depressurization of the trailer and / or duct system. It was noted that dirt collected on the framing of the windows especially at the bottom portion of the window. It is also noticed that there was a small gap in the air seal of the window to the frame. Air leakage in those areas was noted during periods of depressurization.

**Please see Enclosure 1a**, First General Services of the South, Inc.'s Photographs #332 through #335.

k.   Kitchen.

   i.   Floors:

      1.   The finished floor of the kitchen is a vinyl sheet material loose laid over the underlayment. The furnace duct registers were friction fit into the floor and not fastened. A furnace register was removed near the entry door. Using a carpenter's framing square, it was noted the sheet vinyl is not fully adhered to the underlayment. This limits the barrier value of the sheet vinyl material. While the vinyl flooring material acts as a vapor barrier, it is more effective as a barrier when it is fully adhered to the underlayment. Any moisture penetration through the floor system is able to escape around the edges of the openings for the register offset connections.

      Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #227 through #229 and #257 through #265.

   ii.   Floors - Water damage:

      1.   As noted earlier during our observations of the exterior, water damage occurred at the entry door into the kitchen. The area was extremely soft and

Page -40-

one of the inspector or attorneys placed blue tape on the area to avoid foot traffic and possible collapse of the floor in this area. As noted earlier, the water damage extended to the wall of the bedroom.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #230 through #235.

iii.   Walls - Bowing and soft panels:

1.   Bowed panels were noted on both the front and rear walls of the living room and kitchen area. Pressing on the wall panels indicated the panels were soft to the touch. With the use of a 4' carpenter's level, we were able to demonstrate the bowing that was occurring in the wall panels. It appears moisture infiltration is causing a swelling condition and the wall panels to bow.

The front and rear walls of the living room and kitchen are aligned with the air-conditioning return air system. The air-conditioning system is located in the center of the ceiling approximately the center of this area. As discussed earlier and will be fully discussed later in the report, duct leakage in both the air-conditioning and the furnace system is creating a negative air pressure within the envelope of the trailer. The return air is drawing outside air into the wall and ceiling cavities of the trailer unit. These walls are the areas nearest to the air-conditioning return air side.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #236 through #247.

Also noted in the wall panels at the entry door was the detachment of the wall panels and the casing for the door frame. It appears these members are also

Page -41-

detaching as a result of moisture infiltration.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #243 through #247.

The adhesive material used to cover the joints in the paneling was observed. The tape was detaching from the wall paneling. This appears to be a result of air and moisture infiltration causing the adhesive to release from the panel. This condition was noted in a number of areas throughout the trailer.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph #248.

Other areas of soft, deteriorated walls sheeting was noted. These areas did not reveal bowing but were soft to the touch and displayed some deterioration.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #248 through #256.

iv.  Observations of the ceiling while the air-conditioning system was in operation was performed. It was noted that condensation was occurring on the ceiling and on the face panel of the supply and return air register over the air-conditioning unit. It appears air leakage is occurring in the supply side duct system of the air-conditioning unit. This will be discussed in more detail further in the report; however, this duct leakage is causing the surfaces the dew point wherein the moisture in the air or on the surfaces are condensating. This is a similar situation that is occurring in other areas of the wall and ceiling cavities; however, it is concealed in the wall and ceiling systems.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #276 through #284.

Page -42-

v.    Moisture in the wall panels at the kitchen sink:

    1.    Moisture staining was observed in the wall panels near the kitchen sink and countertop area.

    Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #285 and #286.

l.    Bunkbed area:

    i.    Hardwood panel construction:

        1.    Observation of the bunkbed area revealed the wood support for the mattresses were constructed hardwood panels with unsealed surfaces and edges.

        Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #287, #291 through #301.

m.    Lavatory area:

    i.    Pipe seal - Duct tape:

        1.    Examination of the inside of the vanity in the lavatory area revealed the use of duct tape to seal the penetration through the floor of the trailer.  Duct tape is not a proper method of sealing for moisture and air penetration.  Moisture breaks down the adhesive on the duct tape and air and moisture are allowed to penetrate those areas.

        Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #302, #305 and #306.

n.    Converter cabinet:

    i.    Open penetration in the floor:

Page -43-

1.  Examination of the closet area that contained the converter charger was inspected. During the blower door operation and photographing the interior of the unit, daylight was noted in the separation between the converter cabinet and wall system. Two screws were removed from the converter charger cabinet and the converter charger was removed. An open penetration was noted where the wiring entered and exited the floor to the underside of the trailer. This was one of the few areas we were able to disassemble to observe the communications between the outside and the inside of the building.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #309 through #311, #374, #375, and #383 through #386.

o.  Bath and water closet area:

i.  Water line penetration:

1.  Examination of the bath and water closet area revealed a water line penetration that was partially unsealed for the commode. It penetrated the face panel of the tub and floor of the bathroom. This is another area of communications with the exterior elements.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #312 through #314.

ii.  Bath exhaust vent:

1.  Examination of the ceiling of the bath area revealed the presence of an air-conditioning duct register and an exhaust opening and fan in the ceiling. The exhaust fan and air-conditioning supply duct

Page -44-

opening were within 12" of each other. The exhaust system for the bathroom operated by manually opening the external cover and switching the fan on. The exhaust fan would expel air from the interior of the trailer acting as a fresh air ventilator. However, when the air-conditioning system was activated and the exhaust fan was engaged, the fresh air from the air-conditioning system would then be exhausted into outside atmosphere. This would exacerbate the negative air condition on the interior of the building and expel filtered fresh air to the outside and cause additional contaminated unconditioned, unfiltered air to enter into the envelope of the trailer.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #315 and #317.

iii.   Wall panels:

1.   Observation of the wall panels in the bathroom revealed the area indicated by Ms. Alexander as the area of buckling. The wall panel was detached from the framing system and was sealed with duct tape. It appears the jacking and blocking of the structure caused some distortion in the framing system of the trailer creating excessive stress and the panel detached.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #381 and #382.

iv.   Wall panels - moisture indications:

1.   Close inspection of the wall panels in the bathroom appear to indicate moisture on the wall panels.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #379 and #380.

Page -45-

p.     Unsealed wood areas:

   i.     Bunkbeds:

       1.     The platforms below the bunkbed areas were unsealed hardwood panels. It appears that both sides of the panels are raw wood.

              Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #136, #138, #287 and #291 through #301.

   ii.    Right bedroom bed:

       1.     Exposed raw wood was observed under the mattress of the bedroom bed. This is the bed that has sustained water damage from the leakage from the ceiling light. Both the top and bottom sides of the wood product is raw material as well as the edges.

              Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #196, #198, #199, #220 and #221.

   iii.   Front bedroom - wall panels:

       1.     As previously noted, the rear side of the wall panels in the trailer as well as the edges of the panels are untreated raw hardwood material. Only the exposed surface is covered with a finished material. It is unknown the perm rating of the panel covering.

              Although the face of the panels is covered and the joints between panels and the area between the ceiling and the walls are overlaid with either an adhesive type product or a molding, these materials are not sealing the moisture and air passage between the air exterior wall cavity and the interior wall

Page -46-

envelope of the trailer.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #201 through #206.

It is noted the same basic type wall panel is installed throughout the interior of the trailer on not only the walls but the same type panel with a different finish. The same type unsealed air and moisture barrier exists around the perimeter of the entire trailer and on the ceilings.

    iv.   Floor - living room:

        1.   As mentioned earlier in the report, inspection of a floor register area and the loosely laid vinyl on the floors was investigated. The edges of the floor sheathing at the penetrations of the furnace registers were unsealed as well as the edges around the surface of the floor sheathing and the vinyl floor sheet goods.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #258 and #260 through #265.

  q.   Air-conditioning system installation:

    i.   Based upon data provided to this writer regarding elevated levels of formaldehyde in the travel trailers, it was decided to perform envelope air leakage tests and HVAC (heating, ventilating and air-conditioning) duct leakage tests on the Alexander temporary housing unit. Mr. Paul Lagrange with Lagrange Consulting, Inc. was contact to perform the air leakage tests on the unit and ductwork. The envelope of the building was first tested for air leakage. The building was depressurized. The natural air change per hour was documented at 1.658. This means that every hour

Page -47-

the air is exchanged between the exterior and the interior almost 1.7 times. According to the ACH 50 calculations, the air exchange is 10.13 times. This is equivalent to the leakage area of 66.5 square inches or a hole in the building just over 8" x 8" drawing in unfiltered, unconditioned air into the envelope of the building. Prior to that air being pulled into the ambient air of the interior of the building, it is first drawn into the walls, ceiling and floor cavities of the trailer. This hot, moist air comes into contact with the untreated raw surfaces and edges of the formaldehyde emitting wood and wood products. According to the experts, the activity of the formaldehyde release from these formaldehyde emitting products is increased with the rise in temperature and the rise in humidity. This unfiltered, contaminated air filled with moisture and heat is then transported into the living area of the trailer through cracks in the seams, around duct registers, light fixtures, wall receptacles, light switches, and all other penetrations that are sealed to the exterior.

Please see Enclosure 8, Lagrange Consulting Services, L.L.C.'s report dated May 7, 2009.

Please see Enclosure 16, Investigation of FEMA Travel Trailers prepared by Ervin L. Ritter, P.E., dated May 15, 2009.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #322 through #330, #336 through #355 for test procedures of sealing furnace and duct system and return air grills.

ii.   In conjunction with the leakage testing on the trailer, the ductwork for the air-conditioning system was also tested for leaking. The results for that test indicated the air-conditioning ductwork had a leakage rate of 29 cubic feet per minute of air to the outside and 47 cubic feet to the inside. This totals 76 cubic feet of air loss from the

Page -48-

ductwork. More importantly, the air leakage to the exterior of the ceiling and wall cavities creates a negative pressure condition on the interior of the trailer. As the air from the ducts leak into the ceiling and wall cavities from the ductwork supplying the cold filtered air into the trailer, the return air portion of the air conditioner is drawing back into the air-conditioning unit the same quantity of air that it is producing. With the air-conditioning duct leaking 29 cubic feet of air per minute outside of the trailer, the return air system is drawing in or sucking into the wall and ceiling system of the trailer through these various unsealed cracks and joints in the walls, ceiling and floors of the building into the inside of the building. This hot, humid contaminated air is unfiltered. This is the contaminated air that was spoken about in Section q.i. above. This air intermingles with the wood and wood products that are emitting the formaldehyde and is being drawn into the building by the air-conditioning system because of the leaking ducts.

iii.    The ducts for the air-conditioning system are not properly sealed. This is a workmanship issue. Had the ducts been properly installed and sealed at the factory, the duct leakage would not have occurred.

iv.    According to air-conditioning section on page 21 of the owner's manual, the air-conditioning system is capable of cooling air to a maximum of 18°F to 22°F. This will occur at a relative humidity of 50%. The manual goes on to say that "as the humidity goes up, the cooling differences goes down. If temperature inside your coach is 100° when you turn on the air-conditioner, it will only put out 80°. Eventually, the air inside the coach will cool, and as it cools, the air put out by the air-conditioner will also cool. However, when starting out at a 100°, this cooling could take several hours before it reaches your desired temperature."

Page -49-