In the hot, humid temperature zone in which New Orleans, Louisiana is located, temperatures are in the 90° range for most of the late spring through early autumn. This begins somewhere in May and continues through the months of June, July, August, and September. Along with the rise in temperature, South Louisiana also experiences a significant rise in relative humidity. The higher the relative humidity, the more "muggy or sticky" the contents inside your home and your body feels. What the owner's manual is stating is that is that as the relative humidity goes up, the cooling difference between the temperature of the trailer and the temperature of the air produced by the air-conditioning system is no longer 18° to 22°. The manual states that the cooling could take several hours to reach the desired temperature. Dropping temperatures down from 100° or more degrees on the interior of the trailer down to 70° to 75° which is the normal comfort level would take quite a number of hours to obtain. While the cooling is not the issue and the number of hours it actually takes to cool is not the issue, the real issue is the air-conditioning system running for many hours under negative pressure sucking in the contaminated, hot, humid air from the exterior to the interior of the trailer.

As the temperature gets colder on the interior of the trailer, vapor pressure differentials become a factor. The colder, drier air will attract the hotter, wetter air from the exterior drawing it in towards the interior. So there are two major factors working that are detrimental to the trailer and the occupants of that trailer. First, the negative air pressure is sucking in the hot, humid, contaminated air from the outside, and secondly, the vapor pressure is also assisting in the transportation of the hot, humid, contaminated air from the outside into the wall, ceiling and floor cavities and eventually into the interior of the trailer where the occupants are living. An example to explain how the wet, hot air of the exterior is driven into the colder, drier air on the interior of the trailer, we can use the example of a small

Page -50-

amount of water spilled on the floor. If we take a dry sheet of paper towel and place it flat on the floor and just place one corner of the paper towel connecting with the spilled water, the water will be attracted to the sheet of dry paper.

v.  On page 22 of the owner's manual, the instructions regarding Fan-Tastic fan operation is included. It is unknown if this fan operation system is in conjunction with the air-conditioning system or this is a separate unit. The manual states that when used in the exhaust mode, the fan pulls hot air from the high inside of the coach and will pull fresh air from an open window. Because this unit operates on a separate thermostat, it is our belief that this system is not included in this model of travel trailer. A separate thermostat was not noted for that system.

It appears the Fan-Tastic type system that was installed in the Alexander housing unit is in the bathroom area. There were no other ventilation type mechanisms observed in this trailer.

Please see Enclosure 7, Fan-Tastic Vent Information Sheet from the manufacturer.

Regardless, the fact that the manufacturer is stating that this unit will draw in air from an open window indicates a lack of understanding by the manufacturer as to the temperature and humidity issues and problems that evolve around this procedure. Once again, even though the air would be pulled in through an open window, in the Gulf Coast region of the hot, humid temperature zone, hot, moist, unfiltered, contaminated air would be brought into the system.

vi. Dometic Duo-Therm A/C unit:

1.  As is mentioned earlier in the report, the air-conditioning system installed in the Alexander

Page -51-

trailer is a Dometic Duo-Therm 595 QUICK COOL.
The installation instructions were downloaded from
Dometic.

Please see Enclosure 5, Dometic Duo-Therm HP
595 QUICK COOL Instruction Manual.

On the first page of the Dometic document, a
warning stating, "This manual must be read and
understood before installation, adjustment, service,
or maintenance is performed. This unit must be
installed by a qualified service technician.
Modification of this product can be extremely
hazardous and could result in personal injury or
property damage."

Along the lines of this warning, further
modifications that could fall into this warning
category can be the failure to properly install the
ductwork system. This will be discussed further in
this section of the report and is part of the Dometic
standards. As we discussed earlier, failure to install
the ducts properly can and does cause negative air
pressure drawing in the hot, humid, contaminated air
into the trailer. In addition, drawing moist air into
wall, ceiling and floor cavities can cause conditions
conducive electrical shorts and fires. As the humid
air is drawn into walls, ceiling and floor cavities,
they come in contact with the metal components of
electrical devices and appliances. The high moisture
content of the air interacting with the metals of the
electrical devices causes corrosion through
oxidation. This corrosion or rust then creates a
pitting of the metal parts of the device. This pitting
or eating away of the metal can caus arcing or a
jumping of the electrical charge between the various
metal components, it can raise the temperature of the
metal components and the sparks created by the

Page -52-

ALX-EXP-44-000053

arcing can cause fires.[1]

2.    Under Section 1C, page 2, the manufacturer states, "The ability of the air-conditioner to maintain the desired inside temperature depends on the heat gain of the R.V." Some of the recommendations made by the manufacturer to reduce the heat gain is to keep windows and doors shut or minimizing usage.

The heat gain is a measurement of heat absorption and gain in temperature as a result of various conditions. The position of a unit or building; the number and size of doors and windows; the types of doors and windows and their insulating value and their ability to resist heat and air penetration; the types walls, ceilings and floors and the thickness of those systems; and the types of insulation and the thickness of insulation in the walls, ceiling and floor areas. The higher the resistance values of the walls, ceilings and floors and the greater the ability to resist heat transferring from the outside to the inside of the trailer, the smaller the heat gain is. The lower the heat gain, the quicker and easier it is to cool the interior of the temporary housing unit. As we will discuss shortly, the type of wall, ceiling and floor construction did not permit a low heat gain transfer.

Part of the calculations performed by Lagrange Consulting included the BTU gain per hour and per year. According to Figure 5 of the report, the walls had net BTU gain of approximately 1,262 BTUs per hour.

The total BTU gain in the ceiling is approximately

_____

[1] "The Effects of Smoke & Moisture on Residential and Commercial Electrical Systems" by Alexis Mallet, Jr.

Page -53-

ALX-EXP-44-000054

385 BTUs per hour. The total of 1,647.687 BTUs of heat gain per hour

3.    As noted earlier, the air-conditioning manufacturer recommends to keep the windows and doors shut and / or minimizing usage. As we have discussed briefly and will discuss further in this report, Gulf Stream has recommended the opening of windows and doors for ventilation to reduce cooking odors and humidity within the unit. FEMA and Fluor both advised residents to merely open windows and doors to reduce odor levels. The recommendations are in contradiction to the manufacturer's specifications.

Please see the Owner's Manual, page 6 under the second warning of the left column. Again on page 20, under Range, the manufacturer suggests it is always best to use the range exhaust hood with a window open slightly.   The reason for the recommendation for opening the window is to balance the pressure in a normally air-tight unit. The air exhaust has to be made up by some introduction of outside air.  The problem is that opening windows introduces hot, humid, unfiltered air in hot, humid climates.

The operation of the Fan-Tastic ceiling fan is recommended by the trailer manufacturer.   The trailer manufacturer again states on page 22, under Fan-Tastic Fan Operation, that when used in exhaust mode, the fan pulls hot air from high inside the coach and will pull fresh air from an open window.

In miscellaneous documents reviewed by this writer, it appears that both FEMA and the manufacturer of the temporary housing unit instructed users to

Page -54-

recommend the use of ventilation by opening windows and doors. As is noted once again, this is contradiction to the air-conditioning manufacturer's recommended operational procedures.

4.     Under Section 1D, Condensation, on page 2, the manufacturer has written, "**Note**: The manufacturer of this air-conditioner will not be responsible for damage caused by condensed moisture on ceilings or other surfaces.   Air contains moisture and this moisture tends to condense on cold surfaces. When air enters the R.V., condensed moisture may appear on ceilings, windows, metal parts, etc.   **The air-conditioner removes this moisture from the air during normal operations.  Keeping doors and windows closed when the air conditioner is in operation will minimize condensed moisture on cold surfaces.**" (Emphasis added)

The importance of this statement as it relates to the issues at hand with this temporary housing unit is that in a short paragraph, it explains what is occurring in the walls, ceilings and potentially floors of the Alexander unit. It states that "the air contains moisture and the moisture tends to condense on cold surfaces."     Because   of   the   failure   of   the manufacturer to construct a unit that prevents heat transfer from the exterior to the interior surfaces and the construction of the temporary housing unit is such that air is being transferred from the outside atmosphere to the walls, ceilings and floor areas and then to the interior surfaces, the dew point is reached the walls, ceiling and possibly floor areas.

It further states in Section D, "the air-conditioner removes the moisture from the air during normal operations."   Normal operation is not meant to include the transfer of hot, humid air from the

Page -55-

ALX-EXP-44-000056

exterior to the interior raising the heat gain of the unit. The reason the air-conditioning manufacturer is directing to keep the windows and doors closed when the air-conditioning system is in operation is because the fenestration or openings in the exterior walls in the form of windows and doors will cause the hot, humid air to come into the unit and cause condensation on the cold interior surfaces. With the doors and windows closed, the air is drawn into the air leaks in the envelope of the unit and the condensation occurs inside the wall, ceiling and possibly floor system behind the finished vinyl or plastic covering of the wall and ceiling panels.

5.    Once again on page 6 of the Dometic installation instructions, the manufacturer warns that improper installation may damage equipment, could endanger life, or cause serious injury and / or property damage.

We reiterate this because the air-conditioning system was not properly installed because of the air duct leakage. The manufacturer requires the ducts and their joints to be sealed to prevent condensation.

6.    Air distribution system:

a.    On page 7 of the Dometic installation instructions of the Dometic manual, directions for the air distribution system are given. They state as follows:

"The installer of this air-conditioner / heat pump system must design the air distribution for their particular application. Several requirements for this system **MUST** be met for the air-conditioner / heat pump to operate properly. These requirements are as follows:

Page -56-

a.   The duct material must neither exceed any agency or RVIA standard that may be in existence at the time of production.

b.   All discharge air ducts must be properly insulated to prevent condensation from forming on their surfaces or adjacent surfaces during operation of the air-conditioner / heat pump. This insulation must be R-7 minimum.

c.   Ducts and their joints must be sealed to prevent condensation from forming on adjacent surfaces during operation of the air-conditioner / heat pump."

There is a caution block below the sizing information near the center of the page. It states, "**CAUTION**. It is the responsibility of the installer to insure the ductwork will not collapse or bend during or after the installation. Dometic Corporation will not be liable for roof, structural or ceiling damage due to improperly insulated, sealed or collapsed ductwork."

It is clear by the instructions given by Dometic that the joints and ducts must be sealed to prevent air leakage and condensation. It is also very clear that Dometic is informing the installer of the air-conditioning system that structural or ceiling damage due to improperly sealed ductwork is a distinct possibility. This is directly on point with the information that we have provided regarding hot, humid air infiltration from the

Page -57-

ALX-EXP-44-000058

exterior into the wall and ceiling cavities and that the duct leakage will result in negative air pressure and that negative air pressure will suck in the hot, humid air from the exterior into the ceiling and wall cavities and that severe damage to the unit as well as potential harm to the occupants are a very distinct possibility.

7. Prevention of Air Leakage:

    a. Page 8 of the Dometic manual, Section 5b(4) under Air Distribution System Installation instructs the installer to provide adequate support and prevent air from being drawn into the roof cavity during the installation of the air conditioning unit on the roof. Once again, this coincides with our presentation that air infiltration bring in hot, humid contaminated unfiltered air is harmful to the building and the occupants.

    Please see Enclosure 5, Dometic Duo-Therm HP 595 QUICK COOL Instruction Manual.

vii. A review of the Standard on Recreational Vehicles 2002 Edition produced by ANSI and NFPA was performed. The particular standards that govern the design, construction and operation of recreational vehicles under these organizations are ANSI A119.2 and NFPA 1192. The particular edition that would govern the Alexander temporary housing unit would be the 2002 Edition.

1. The standard on page 8 gives the definition of recreational vehicles, camping trailers and travel trailers that are governed under this standard. The Alexander temporary housing unit falls within the definition of this standard.

Page -58-

2.  Section 5.6.2.5, Special Requirement for Forced - Air Heating Appliances, states, "A forced-air heating appliance and its return-air system shall be designed and installed so that negative pressure created by the air circulating fan cannot effect its or another appliance's, combustion air supply or act to mix products of combustion with circulating air."

The standard is very clear that negative air pressure has the potential for a detrimental effect as a result of the operations of the furnace. Contaminated air and fumes from the forced-air system can re-enter the home as a result of the negative air situation sucking those fumes back into the housing unit.

3.  Section 5.6.3.1 (3), Venting, Ventilation and Combustion Air, Installation of Venting and Combustion Air Systems requires that every joint of a vent, vent connector, exhaust duct, and combustion air intake shall be secure and in alignment. This is to prevent air leakage into the interior living space of the housing unit. Because the malalignment of joints and ducts cause leakage, the intent of the code is to prevent re-entry of the fumes from the forced-air system into the living space.

4.  Section 5.6.9.3, Prevention of Negative Pressure in Recreational Vehicles, found on page 19, specifically deals with fuel burning clothes dryers. While there is no clothes dryer designed for or installed in the Alexander unit, it is clear that prevention of negative air pressure is the intent of the code and on every section involving areas of potential re-entry of contaminants and moist air, the code is designed to prevent such events from occurring.

Page -59-

5. Section 5.7.1, Supply System Ducts, directs the manufacturer to use durable construction that can be demonstrated to equally resist fire and deterioration. The call for ducts that are resistant to deterioration is once again to prevent air leakage into non-air-conditioned spaces which cause negative air situations to occur which is conducive to potential deterioration to the building's components and unwanted contamination that may effect the occupants of the housing unit.

6. Section 5.7.7, Return Air Duct Permanent Unclosable Openings, page 21, requires some mechanism to prevent areas from being closed off to the return air of the furnace system. This is meant to prevent imbalanced air pressures in various areas of the house. By closing areas off from one room or one area to another preventing air return to the forced-air furnace system creates a negative air pressure condition within the housing unit. If air from a room that is closed off cannot be returned to the unit, the unit will then draw from other openings in the envelope of the trailer drawing in unconditioned, unfiltered, contaminated air.

7. Section 5.7.8, Air Duct Joints and Seams can be found on page 21 of the code. The code requires that joints and seams of ducts shall be securely fastened and made substantially air-tight. Noted in that section of the code is the permissible use of tape or caulking compounds to force mechanically sealing the joints and seams of the ductwork. It is also noted that within that portion of the code that the use of tape and caulking compounds shall not be subject to long exposure to conditions of high humidity, excessive moisture or mildew.

Exposure to tapes such as duct tape or other similar

Page -60-

type adhesive compounds do not stick under high moisture, high humidity or when mildew is present. Negative air pressure drawing in humid air from the exterior of the building will attack these sealants.

8.   Section 5.8.1, General Requirements - Air-Condition Appliances, can be found on page 21 of the code. This portion of the code requires every air-conditioning appliance or combustion air-conditioning and heating appliance to be installed in accordance with the terms of its listing and the manufacturer's instructions.

9.   Section 5.8.2.1, Installation of Air-Condition Appliances, reiterates the requirement to conform with the manufacturer's installation instructions.

It is a requirement of the code to follow the installation instructions of the air-conditioning manufacturer. It has been well documented earlier in this report that duct leakage and negative air conditions as a result of improper installation of the system not only fails to follow the instructions of the manufacturer of the air-conditioning system but in fact is a code violation.

10.  Section 7.3.3.3, Damage, on page 28 of the code states that "all exterior openings around piping shall be sealed to prevent the entrance of rodents." As discussed earlier in the report in the section referring to the underbelly of the housing unit, it was noted in our discussion and are documented by photographs that there are openings in the underbelly of the Alexander housing unit that was in violation of this code. Areas such as water lines, drain pipes and wiring penetrations were in violation of the code and were photographed for documentation.

Page -61-

ALX-EXP-44-000062

viii.   As previously stated, the manufacturer has made an issue regarding a lack of ventilation in these temporary housing units. As has been discussed in different ways and cross-referenced by other documents such as by the Dometic air-conditioning manufacturer's installation instructions, the method of ventilation suggested by Gulf Stream simply was not proper for the occupants to perform in the hot, humid climate zone of New Orleans, Louisiana. Opening the windows on an on-going basis to ventilate the contaminants such as formaldehyde is simply not an option in the months of May through September.

ix.   Unfortunately, the issue of exfiltration of the formaldehyde gases within the Alexander temporary housing unit is not limited to a matter of simply opening windows and doors for ventilation or the addition of a Fan-Tastic vent to introduce fresh air or expel the formaldehyde within the housing unit.

x.   Gulf Stream has either overlooked or ignored the probability of condensation occurring in the walls, ceiling and possibly the floor systems of these temporary housing units. It has long been established by studies at least in the early 1980s and before regarding condensation occurring in cavities of a structure as a result of temperatures reaching the dew point and condensation occurring as a result of temperature and materials reaching the dew point in these cavities. The manufacturer is associated with a manufacturing company. HUD has required the control and management of air, water, temperature and moisture infiltration into the cavities and envelopes of mobile homes. The science is not new science. It has been known for many years and is taught at either the elementary or middle school level. A brief explanation of condensation occurring in a wall system is the placement of a glass filled with water and ice cubes on a countertop or outside of a building. Soon water droplets collect on the outside face of the glass. This is an example of the temperature on the

Page -62-

outside of the glass reaching the dew point and condensation occurring. The droplets of water on the exterior of the glass is condensation. It is the transforming water that is in a vapor or gaseous state into a liquid.

This condition can occur in the cavities of the housing unit anytime during May, June, July, August or September in the New Orleans area. The manufacturer's failure to account for or address this probability is a manufacturer's defect in design.

xi.   In addition, the manufacturer has utilized a vinyl or plastic type of covering on the wall and ceiling panels. While the perm rating (a material's ability to resist or allow moisture vapor or water to pass through that material) is unknown, any material with a perm rating low enough to prevent or slow the passage of the moisture vapor from the exterior to the interior for drying purposes will create a problem in the wall, ceiling and floor cavities of the housing unit. Once the vinyl or plastic face of the wall and ceiling panels prevents or retards the moisture from passage through to the interior, the moisture vapor collects on the interior of the wall cavity and as the surfaces on the interior of the temporary housing unit gets colder and falls below the 75° range on the interior of the housing unit, the water vapor in the wall cavity of the trailer begin to condensate. The manufacturer failed to provide for management of water and water vapor intrusion into the wall, ceiling and floor cavities. This failure to provide for management of water or water vapor introduced into the cavities of the building and for its exfiltration or expulsion is a design defect.

xii.   The manufacturer also failed to properly design the wall, ceiling and floor cavities to manage moisture entry as a result of any potential negative air pressures with the trailer unit. We have discussed the causes and avenues for moisture passage into the trailer unit repeatedly earlier in this report. Repeated studies have indicated the potential

Page -63-

ALX-EXP-44-000064

for damage to living units and the potential harmful effects to the occupants of living units when negative air conditions are present. The failure of the manufacturer to account for and prevent negative air conditions in the Alexander temporary housing unit is a defect in design.

r.   Furnace - Duct leakage:

i.   The information provided by the HUD Procurement Specifications indicated a 34,000 BTU unit was to be provided with this housing unit. Examination of the Alexander housing unit revealed that it was a Suburban Manufacturing Company forced-air heating unit.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph #30.

ii.   The model number and exact BTU capacity of the unit is unknown. The unit was housed within the seating area nearest to the entry door.

iii.   The furnace is believed to operate on LP gas. The source of the LP gas is two LP tanks located at the tongue end of the trailer.

iv.   The exhaust vent for the furnace is located immediately outside the door of the Alexander temporary housing unit.

v.   Part of Lagrange Consulting's charge was to test the heating duct system for air leakage.

vi.   The results of the heat system duct leakage tests indicated the following:

1.   Leakage of 87 cubic feet per minute of air and duct leakage to the inside of 65 cubic feet per minute of air for a total duct leakage of the heating system of 152 cubic feet per minute.

Page -64-

2.      The air loss at the maximum cfm output of the duct system leaking to the outside is 26.8%.

3.      The percentage of duct leakage to the outside at the minimum cfm on this system is 34.8% duct leakage to the outside.

4.      The percentage of duct leakage to the inside at maximum output of the unit is 20%.

5.      The air leakage of the duct to the interior at minimum output is 26%.

6.      The total amount of duct leakage at maximum output of the furnace is 46.8%.

7.      The percentage of total duct leakage at minimum output is 60.8%.

The furnace duct leakage has been extensively discussed in other areas of the report. The same conditions apply regarding the manufacturer's failure to properly design and / or construct a duct that:

a.      Does not leak air

b.      Does not create a negative air pressure condition in the temporary housing unit

c.      Does not create unsafe conditions by the potential of drawing the fumes from cooking and operations of the furnace back into the living area of the trailer.

Please see Enclosure 8, Lagrange Consulting, L.L.C.'s inspection report dated May 7, 2009.

Page -65-

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #322 through #330, #336 through #355 for test procedures of sealing furnace and duct system and return air grills.

Please Enclosure 14, Suburban Manufacturing Company.

s.    Infrared Thermography Survey:

i.    To the extent possible, an infrared thermographic survey was performed on the interior of the building during the envelope air leakage tests and the furnace and air-conditioning duct leakage testing. Not all areas were easily accessible to perform a survey utilizing a BS20 CHECK MODEL NUMBER Flir Infrared camera. The survey was performed for the purposes of identifying anomalies in the walls, ceilings and floors of the Alexander temporary housing unit. Air and moisture leaks or condensation would show as temperature differentials noted by the variations of color during the survey. A number of these anomalies were photographed using both the Flir BS20 infrared camera and a digital camera photographing the areas corresponding to the infrared photographic images.

ii.   The infrared photographic images can be found in Enclosure 1c, Infrared Thermographic Images by First General Services of the South, Inc. dated May 7, 2009. The digital photographs can be found in Enclosure 1a, First General of the South, Inc.'s Photographs. The corresponding images / photographs are noted below:

1.    Infrared Photograph #1 - Digital Photograph #357

a.    This is the rear, right corner area of the bedroom indicating moisture.

2.    Infrared Photograph #2 - Digital Photograph #358

Page -66-

a.    This is the area of the air-conditioning unit in the kitchen / living room area.  This is toward the front of the housing unit.

3.    Infrared Photograph #3 - Digital Photograph #359

a.    This is the rear side of the air-conditioning unit located in the kitchen / living room area. For an overview of that location, please see First General Services of the South's Photograph #361.

4.    Infrared Photograph #4 - Digital Photograph #360

a.    This is the area below the window in the living room / kitchen area.

5.    Infrared Photograph #5 - Digital Photograph #369

a.    This is in the kitchen / living room area. Indications are considerable heat gain in the corners and cold spots at various areas possibly indicating gaps in the insulation near the framing.

6.    Infrared Photograph #6 - Digital Photograph #370

a.    Further indications of cold and hot areas in the ceiling and ceiling to wall connection. Air infiltration is occurring in these areas. The envelope is apparently not well sealed for air infiltration.  The area is also has some gaps in insulation creating hot spots in the ceiling.

7.    Infrared Photograph #7 - Digital Photograph #371

ALX-EXP-44-000068

a.    This is the area around the bunkbeds.  Heat infiltration was noted at the roof to wall intersection.   There also appears to be inadequate insulation covering this area.

8.    Infrared Photograph #8 - Digital Photograph #371

a.    This is in the lavatory area.  Separation in the insulation as well as air infiltration at the roof to wall connection was noted.

9.    Infrared Photograph #9 - Digital Photograph #372

a.    This is at a different angle of the ceiling and wall area of the lavatory area.

10.    Infrared Photograph #10 - Digital Photograph #373

a.    This is the area in the bathroom lavatory over the mirror.

11.    Infrared Photograph #11 - Digital Photographs #374 and #375

a.    This is the converter cabinet.   Heat is projecting from the cabinet as a result of a breach in the belly and the hole in the floor in the converter closet.

12.    Infrared Photograph #12 - Digital Photographs #376 and #377

a.    This is right wall at the bunkbed area.

13.    Infrared Photograph #13 - Digital Photograph #379

a.    This is the front wall of the bunk area.

Page -68-

ALX-EXP-44-000069

14. Infrared Photograph #14 - Digital Photograph #380

    a. This is the bathroom area.

15. Infrared Photograph #15 - Digital Photograph #381

    a. This is the rear, left corner of the bathtub.

16. Infrared Photograph #16 - Digital Photograph #382

    a. This is the area of the right, rear corner over the bathtub.

17. Infrared Photograph #17 - Digital Photographs #383, #384, #385, and #386

    a. This is the area inside the converter cabinet where the penetration in the floor was observed.

t. Warnings:

    i. Noted throughout our study and review of documents was repeated warnings related to various items regarding the operation and the use of the Gulf Stream housing unit. The warnings are as follows:

        1. Warnings regarding cooking and the use exhaust vents and a reminder the occupant must provide and adequate supply of fresh air for combustion. It also states, "Unlike homes, the amount of air in an RV is less due to its limited size (volume). Proper ventilation when using cooking appliances will avoid the dangers of asphyxiation."

        2. One of issues that has not been presented to any extent in this report thus far is the overall size of this housing unit. This housing unit measures

Page -69-

approximately 8' x 14' and is approximately 6'4" to 6'5" high. Extensive measurements were taken and recorded. These dimensions were converted to a CADD drawing with notations. The complete layout of the temporary housing with the locations of appliances, bedding, tables, seating, room locations, window and door locations, air-conditioning and electrical outlets, various penetrations through the exterior walls of the unit, lighting, bathroom fixtures, and the location of the air-conditioner and heating unit have all been reduced to drawings.

Please see Enclosure 9, drawings of the floor plan, electrical floor plan, floor elevations, rear elevation, right side elevation, left side elevation, and mechanical plan.

Regarding the overall square footage and cubic footage of the Alexander temporary housing unit, the warning on page 3 of the owner's manual makes note that the manufacturer is well aware that the unit is unlike a residential home and the amount of air in the RV is substantially less because of the volume. The manufacturer is acknowledging the importance of proper ventilation in this small amount of living area.

3. In Dr. Stephen Smulski's report, dated May 18, 2009, there is an in depth analysis of the amount of wood product and formaldehyde containing products that were utilized in the design and construction of the Alexander housing unit. Dr. Smulski goes into great detail regarding each and every wood product, wood containing product, or other formaldehyde products that were utilized in this housing unit. Dr. Smulski enumerates "the subfloor, walls, ceiling, doors, cabinets, dining table, countertops, built-in seating and other furniture, and bed supports are all

Page -70-

constructed from wood base composite products, particle board, medium density fiberboard and hardwood plywood that are all known to release formaldehyde gas after being placed in service." He also observes and notes that the back side and edges of most of these items are exposed with no overlay to prevent infiltration of the formaldehyde emissions from entering into the living area of the trailer. Dr. Smulski goes on to recognize the location of the FEMA temporary housing unit's location in New Orleans, Louisiana and its exposure to the hot, humid climates of this region. He states, "These are the exact conditions that maximize the release of formaldehyde from wood based composite panels including particle board, medium density fiberboard, and hardwood plywood."

Because of the small size of the unit, the formaldehyde emissions are more concentrated in the temporary housing units than they would be in either a normal sized house or a commercial building. The larger the building, the less the concentration of formaldehyde disbursement in the building. The larger the house or the building, the less the formaldehyde that is in that building. An example, to equate this to some every day living example is to consider a cook making a pot of gumbo. He or she uses a certain amount of ingredients to make a roux adding a certain amount of chicken or sausage in that pot, and then filling that pot with water. Let's also visualize the cook is starting out with a two quart pot to make a very small gumbo and the ingredients the cook has fits in that small two quart pot. Now let's take a pot that will hold 10 gallons of water; however, we use the same amount of ingredients seasoning, flour, chicken or sausage that we used in the two part of gumbo and placed that in the 10 gallon pot and filled

Page -71-

that with water. We do not add any extra ingredients or seasoning to the 10 gallon pot of gumbo - only that which was used in the two quart pot. That 10 gallon pot of gumbo is going to have a far weaker flavor in the 10 gallon pot than it will in the two quart pot. The ingredients are disbursed in larger quantity of water in a ten gallon pot than in the two quart pot.

Another example would be if we had a fish placed in bucket and placed that bucket inside one of the FEMA temporary housing unit trailers and then we placed the sized bucket with the same sized fish in a house that has approximately 2000 SF of floor area verses the FEMA trailer with approximately 226 SF of living area. The bacteria will create the same amount of odor in either case; however, in the small, highly concentrated closed in area of the FEMA trailer, the odor will be far greater because of the higher concentration of odor than that which would be found in the much larger 2000 SF conventional house.

Dr. Smulski opines that the FEMA unit furnished to Ms. Alexander was not suitable for long-term housing because "the travel trailer supplied by FEMA to Ms. Alexander was not suitable for use as long-term housing because it was foreseeable and predictable that formaldehyde gas would be released from the wood based composite panels including particle board, medium fiber density fiberboard and hardwood plywood used in the trailer and that Ms. Alexander and son, Christopher Cooper, would potentially suffer adverse health effects from chronic exposure to the formaldehyde gas."

Please see Enclosure 10, Affidavit of Stephen Smulski, Ph.D., Consulting Wood Scientist, dated

Page -72-

May 18, 2009.

4.     Continued review of the warnings on page 3 of the owner's manual reveals warnings against use of portable burning equipment such as grills and stoves. The manual warns not to bring or store LP gas containers, gasoline or flammable liquids inside the unit. The manual warns not to fill the LP containers to more than 80% of their capacity. Page 3 also contains procedures of what to do if you smell gas. Under the fire safety section, the manufacturer warns not to smoke in bed, not to overload electrical systems, not to permit children near the LP gas controls or container, and again not to store flammable liquids inside the unit. Fire safety data also includes suggestions to educate everyone regarding the location of emergency exits and the location of the fire extinguisher. Information is given to check the extinguisher on a regular basis to ensure it is properly charged.

Page 3 of the manual continues to give information regarding the smoke detector equipment in the unit and instructions to check its operation on a regular basis. It informs the occupant that if it does not check out properly to get the smoke detector serviced or replaced.

5.     Page 4 contains warnings regarding carbon monoxide safety. It explains what carbon monoxide is. It informs the occupant to carefully read the instructions regarding the CO detector and how to clean and what methods not to use in cleaning the CO detector.

The manual states the effects of carbon monoxide emissions and the events which will trigger the CO detector to sound an alarm. If the alarm is sounded,

Page -73-

ALX-EXP-44-000074

instructions are given to the occupant of procedures to take at that time.

There is also a note regarding only travel trailers and fifth wheels with generator set ups will have CO detectors.

6.     Page 4 once again contains information on the safe use of the LP gas system.

7.     Page 5 contains information regarding the safety chains, safety breakaway switch and the positioning of the hitch ball.

8.     Page 7 contains warnings regarding the rated load of the RV and tips on loading.  There are four warnings noted on page 7 regarding the carrying capacity and loading of the RV.

9.     Page 10, once again, there is a repeat of the dangers of overloading the unit.

10.    Page 11 contains numerous items regarding safety tips including emergency windows, fire extinguishers, smoke detectors, LP gas detectors, and carbon monoxide detectors.

11.    Page 20 contains warnings once again providing adequate ventilation when using the range and oven. It informs the occupant to use the exhaust and open the windows slightly.

12.    Page 21 discusses to have unobstructed air flow from all of its vents including the interior and exterior vents.

13.    Page 22 discusses the effects of long-term occupancy.  We will discuss this further in the report

Page -74-

under the heading of Foreseeable Issues - Ttemporary versus Long-Term Housing.

14. Photographic documentation of the warning labels around the interior and exterior of the Alexander travel housing unit was made. Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #12, #13, #22, #26, #28, #29, #30, #31, #32, #38, #44, #45, #50, #51, #53, #56, #57, #59, #61, #66, #67, #125 through #135 and #272, #273 and #310 and #311.

ii. It is interesting to note that not only did Gulf Stream have knowledge of formaldehyde and issues of danger to occupants of buildings with materials that emit formaldehyde; that the subject of formaldehyde has been extensively researched; authoritative writings on the subject of formaldehyde on building products and buildings been produced; HUD has issued warnings and directives in manufactured housing area of which a sister company of Gulf Stream produces; and the owner of Gulf Stream had personal knowledge of issues with formaldehyde emissions in products since the mid 1990s, Gulf Stream has continued to specify low formaldehyde emitting products and formaldehyde producing products for use in the production of their travel trailers. There are no warnings published, listed, eluded to, directives on or any such information provided to the end user of the Alexander FEMA temporary housing unit in all of the documents, literature, statements, testimony, etc. reviewed by this writer.

There has been no explanation to date of why a notice or information regarding formaldehyde content of the building products in the FEMA housing units produced by Gulf Streams was not provided other than the statement by Gulf Stream that there are not requirements that they provide such a notice or meet any criteria regarding the

Page -75-

levels of formaldehyde emissions in their products.

u.  Details of installation:

i.  Repeated review of the owner's manual was performed attempting to obtain any details or instructions on the proper set up of the temporary housing unit or travel trailer. Nowhere in the owner's manual was this writer able to find any instructions, illustrations, documentation of anything else regarding the method of proper set up of the Alexander temporary housing unit.

ii.  The only information that was obtained and reviewed regarding installation of the travel trailer is in the form of written basic set up details listed in Exhibit 7, Travel Trailer installation, Bates Stamp Number FLFCA-000113 through 000122.

iii.  The travel trailer installation guidelines are deficient in its directive regarding the blocking of the trailer. It does not spell out the exact procedures for the jacking up of the unit. Other than the final product, the blocking and the jacking up of the unit appears to left to the discretion of the installer. Unless there are other installation guidelines not available to this writer, each installer would appear to have been left to their own discretion as to how he would lift the trailer for blocking and where the pressure points would be placed in lifting the trailer. In addition, protection of the framing while the jacking was occurring was not spelled out in the guidelines. Putting pressure points on too small of an area will cause distortion in the framing and other components of the trailer.

Please see Enclosure 1a, FGS photographs #32, #37, #38, #44, #45, #53, #56, #57, #58, #59, #60, #61 and #67.

Please see Enclosure 1d, Photographs by W.D. Scott taken January 28, 2008 after the temporary housing unit had been

Page -76-

ALX-EXP-44-000077

removed and reset on location.

iv.    Section 2, Basic Travel Trailer Set Up, pages 1 and 2,
describe the actual blocking and leveling procedures under
Section 2.1.2. The standards state that the installation
contractor will degrass the site and remove any loose
materials at the base of the piers to be installed. The
standards state, "Travel trailers shall be set-up on concrete
piers and after the weigh (sic) of the travel trailer is
transferred to the piers, if the unit is not leveled properly,
the contractor will reinstall the unit at no additional cost to
the government." The standard goes on to state the travel
trailer will be installed on a minimum of six piers with a
minimum of three sets of piers on each side evenly spaced.
The piers on the end of the trailer should not be set at the
very end of the unit but set back approximately 6" off the
edge. The standard says the base will be constructed of a
3/4" x 24" x 24" exterior grade plywood and that solid
capping wedging will be installed.

v.    On page 2, the standard goes on to state, after the weight of
the travel trailer is transferred to the concrete piers, the
piers must be vertically aligned and tightly shimmed with
wooden wedges. If the piers are not vertical at the time of
final inspection, they will be removed and reinstalled by
the contractor at no additional cost. The contractor will be
responsible for all necessary releveling and reblocking of
the travel trailer for a period of 90 days after final
inspection.

vi.    It is unknown how the travel trailer was jacked up onto the
blocks. This writer was informed by either one of the
attorneys or one of the consultants involved in this
litigation that the trailer was lifted one corner at a time and
blocked. This writer has extensive experience in designing
and constructing lifting and leveling devices and moving
small and large structures short and long distances. Any
method of raising the travel trailer other than a unified

Page -77-

jacking effort where the same amount of pressure is applied uniformly at the same time around the entire perimeter of the travel trailer and in locations of the corners and closely aligned with the wheels and axles will cause distortion in the steel framing, wall system, and roof system of the travel trailer. Unequal pressures placed on the frame of this or most structures will cause damage and / or stresses and / or distortion to occur. This will allow air, moisture and water to enter into the envelop of the trailer.

vii.    It is also unknown whether the piers under the travel trailer remain level after their installation.

viii.    Lifting the temporary housing units off of the wheels and jacks were never discussed between the manufacturer and the government. Any and all blocking means, methods and specifications appear to have come from FEMA or the contractor in charge of setting up of the units.

ix.    It is documented that the travel trailer was moved from the site on Dale Street, New Orleans, Louisiana for purposes of demolishing the home that the Alexander family occupied after Hurricane Katrina. Once again, it is unknown how the unblocking and reblocking of the travel trailer was effected. Any abnormal stresses with the unblocking and reblocking would cause unwanted stresses in the framing and interior and exterior surfaces of the travel trailer.

x.    Close observations of the scissor jacks located at the four corners of the Alexander housing unit reveal warning stickers on all four of the scissor jacks. The warning states not to attempt to lift the trailer from the ground with the scissor jacks and that the weight of the unit should not be taken off of the tires. It appears at least the instructions not to take the weight of the trailer off of the tires was not followed as a set up instruction.

Page -78-

Please see Enclosure 11, Installation Guide for Travel Trailers.

    v.    James Shea with Gulf Stream testified that he saw no problems with the method of FEMA's installation of the trailers. His comment was directed toward the block up of the temporary housing units on piers.

Please see Enclosure 11, Installation Guide for Travel Trailers.

    w.    Gulf Stream had Scott Pullin spending time in the hurricane zone related to the deployment of units. It would appear he would have had knowledge of the method of installation and set up being utilized by FEMA and would have notified the manufacturer of not only the conditions of the set up and blocking but also the widespread devastation and need for long-term occupancy of more than just a few weeks of these units.

Please see Enclosure 11, Installation Guide for Travel Trailers.

9.    Industry Awareness of Construction and Formaldehyde Issues:

    a.    Since the 1980s, there have been numerous studies regarding issues with the use of low perm or impermeable coverings on wall and ceiling finishes in the hot, humid climate zones; proper air exchange per hour ventilation; duct leakage; the consequences of duct leakage including negative air pressure; and negative air pressure and the problems with drawing in hot, humid, unfiltered, contaminated air from the exterior in the hot, humid climate zone. No one in the industry should be able to claim a lack of knowledge of these items. The data has been available and printed in many forms such as books, magazine articles, and trade publications.

    b.    There is the same level of awareness regarding formaldehyde emitting products and their use in construction. It should come as no surprise to anyone in the building industry that formaldehyde emitting materials are problematic at best and a known carcinogen at worse.

Page -79-

ALX-EXP-44-000080

c.   It also has been known through research by others that formaldehyde emissions double for every 12°F increase in temperature. Including other industry researchers, Mary DeVany testified before Congress and gave indications of the formaldehyde rate of increase of doubling for every 12°F increase in temperature.

d.   ASTDR recommends ventilation, temperature control, air exchange, and no smoking in temporary housing units. One missing component regarding the ASTDR recommendation is that in addition to ventilation, the temporary housing units should be operated under positive pressure. In other words, interior air should be blowing contaminants away from the unit when opening the door or window from the outside of a temporary housing unit, especially in the summertime. One should feel a slight puff of cold air from the air conditioner blowing out of the temporary unit as opposed to opening a window or door from the interior and feeling a puff of or a rush of hot, humid air from the exterior entering into the interior of the building.

e.   James Shea stated in his deposition that since the mid 1990s his company specified low formaldehyde emitting products; however, he does not know if those specifications were followed. Having in place a policy or procedure without followup, or someone being able to hold a party responsible for not fulfilling the standards and specifications set is second only to not having those specifications set at all. If there is no way to verify or no procedure in place for verifying that low formaldehyde emitting products are being designed and supplied to Gulf Stream, then it cannot be confirmed whether materials being delivered are in fact low or no formaldehyde emitting materials.

f.   At least on one occasion, Gulf Stream noted that a supplier, Adorn, was not supplying low formaldehyde emitting wall and panels. This may also have applied to the cabinets. This was information provided by James Shea.

g.   Mr. Shea gave information indicating roof underlayment plywood is not low formaldehyde emitting material. He stated that most of their underlayment is purchased from Weyerhaeuser. The surfaces of the roof underlayment would be unsealed or uncoated materials. The top part of

Page -80-

the underlayment would be covered by an impervious roof membrane. Any activated formaldehyde vapor could not escape through the roof membrane and would be emitting in the ceiling cavity and eventually into the living space.

A review of the invoices that were produced and available to this writer for inspection indicated the Weyerhaeuser products were in fact not stamped or marked on the purchase order or invoice as low formaldehyde emitting products.

h.      Exhibit 10 attached to Mr. Shea's deposition regarding the purchase order to Adorn indicates, "All products must be approved and comply with HUD requirements for manufactured housing."

As was discussed earlier in the report, Gulf Stream and its sister company appear to be well aware of the HUD requirements for manufactured housing.   Manufactured housing requires low formaldehyde emitting product usage in the manufacture of homes that are built under Part 3280 of the HUD regulations.  It appears that Gulf Stream had the information, knowledge and ability to produce temporary housing units to FEMA that would have met the HUD requirements but merely chose not to perform to that level of construction and design excellence.

i.      Gulf Stream released a statement dated April 27, 2006 wherein they state they specify low formaldehyde emitting products from their suppliers.  They state they informed the public that formaldehyde levels quickly dissipate by opening windows, vents and doors and normal use of exhaust fans and air conditioning units.

j.      That information is misleading.  Opening the windows and doors are contrary to the instructions of the air-conditioning manufacturer.  In addition, Gulf Stream is again failing to address two major issues regarding formaldehyde emissions in their product.  First, they fail to properly test to ensure the FEMA temporary housing units were operating under positive pressure.  Second, they are failing to take into account that the Alexander housing unit as well as the majority of the temporary housing units produced for FEMA were located in the hot,

Page -81-

humid temperature zone. Opening windows and doors merely introduces very moist, very hot, and contaminated unfiltered air into trailer. Leaving the windows and doors open in addition creates a condition of equilibrium of moisture vapor and temperature between the inside and the outside. As is noted in the owner's manual and the air-conditioning manufacturer's manual, it takes much longer to lower the temperature in a FEMA trailer after windows and doors are left open and the temperature and humidity are allowed to rise and become equal to or greater than that of the exterior environment.

k.   Gulf Stream states they have a designated employee to check in materials and they supposedly check materials for formaldehyde emission verification; however, information provided by Gulf Stream personnel themselves have:

   a.   Identified Adorn as supplying more than 10% of the ceiling and wall panels for their product. As noted, this may also have applied to the cabinets placed in their units.

   b.   There is no documentation the person receiving the materials is looking for verification of low formaldehyde stamps or marks.

   c.   There was accidental discovery of products in the manufacturing plant that did not meet the low formaldehyde emission requirement placed upon the suppliers

   d.   It is unknown the quantity of materials actually utilized in the manufacture of the Gulf Stream units that did not meet the low formaldehyde emission designation.

l.   Gulf Stream states they specify low formaldehyde emitting materials. We in fact have reviewed documents indicating they have specified to their supplier of certain items to be low formaldehyde emitting materials. Mr. Shea has also stated they were aware of two federal regulatory rules that they were familiar with that might give guidance regarding formaldehyde emissions. Mr. Shea also states there is no government regulatory rules on formaldehyde for travel trailers.

Page -82-

m.   It was also stated it would be difficult to identify what vendors supplied what materials on any particular travel trailer that Gulf Stream manufactured. This would make it very difficult to backtrack based on invoices or purchase orders for materials to see what materials were purchased for what travel trailer and if they were non-formaldehyde emitting materials or not.

n.   Mr. Shea confirmed the bottom board is a woven polymer product that reduces the likelihood of the entry of moisture into the bottom of the housing unit. Therefore, it is apparently safe to assume that most of the moisture in the walls and ceiling cavities are a result of air infiltration from the exterior or leaks in the outside skin of the travel trailer.

o.   It appears that Gulf Stream has set standards for at least some of the products requiring low formaldehyde emissions materials from their suppliers. While there are no regulatory requirements for Gulf Stream to provide any particular level of formaldehyde emissions within the living area of the temporary housing unit, Gulf Stream has set the standard for their own work product by requiring these low formaldehyde emitting materials to be supplied. In setting the standards for their products requiring low formaldehyde emissions, it is unknown why Gulf Stream failed to follow through with the other conditions that are conducive to the activation of formaldehyde in the materials used in their product.

It is unknown why Gulf Stream failed to properly construct the air-conditioning duct system; the furnace duct system; properly seal the walls, ceiling and floor systems; and prevent negative air pressure from burdening the materials with elevated temperature and relative humidity that are known to activate the formaldehyde emissions. It is also unknown why the design and construction of their temporary housing units were not properly designed and constructed to prevent the manifestation of condensation by the temperatures reaching the dew point in the cavities of their housing unit.

p.   According to Mr. Shea, Gulf Stream understood the government expected them to provide a safe product. Mr. Shea states his company was concerned with safety and took measures to provide a safe product

Page -83-

including the use of additional testing. He does not state what additional testing Gulf Stream undertook to ensure a safe product; however, it appears testing for formaldehyde levels was not one of the test procedures employed by Gulf Stream. Mr. Shea reiterated that Gulf Stream had to be safe. He also understood that if his product was not safe that Gulf Stream would have to remedy that condition.

q.      Gulf Stream did not instruct the government to "air out" their temporary housing units.

r.      Gulf Stream did not test the air of the finished product for formaldehyde emissions.

s.      Gulf Stream is aware there is no language in the owner's manual regarding formaldehyde.

t.      In 2007, Gulf Stream adopted the California Air Resources Board Standard. They adopted the standard for formaldehyde emissions after litigation in this matter was brought about.

u.      Gulf Stream realized the unit would be exposed to heat and humidity and that heat and humidity can effect the levels of formaldehyde. No documents have been reviewed or statements taken to explain the lack of action to notify the occupants or to give warning of the potential issues that could arise as a result of formaldehyde. Representatives of Gulf Stream have stated they were aware that formaldehyde was an issue, that formaldehyde caused problems, that heat and humidity effect the level of formaldehyde emissions, and that the units they were constructing, especially that unit constructed for the Alexander family, were constructed and dispatch for use and occupation in the hot, humid temperature zones where temperature and humidity is much higher than other areas of the country, but they give no explanation other than it was not a government regulation.

v.      Gulf Stream has furnished temporary housing units to FEMA since Hurricane Andrew in 1992.

w.      Mr. Shea states you can have "an accumulation of indoor, chemical

Page -84-

constituents, including formaldehyde and other things that you would air
out the unit prior to taking residency." It appears Gulf Stream not only
knew that these units could have an accumulation of indoor
contaminants including formaldehyde but also was aware of conditions
such as rising temperatures and rising humidity that can also effect the
activity of formaldehyde released into the interior of the residence.

x.    It appears Gulf Stream was informed of odors within the travel trailers
that would not go away and that burning sensation and headaches were
occurring by its occupants. Gulf Stream's response was to "advise them
how the ventilation effects worked or systems worked and so forth and
what he could do to improve the indoor air quality of the unit."

10.   Discussion of Foreseeable Issues - Temporary Housing Verses Long-Term
Housing:

a.    Mr. Shea states that his definition of temporary housing is measured by
a period of residency that would be "measured, the period of residency
would be measured in weeks or months and not years." He further
states, "They would have been provided - would have been used for a
matter of months."

b.    The definition of temporary according to Black's Law Dictionary is
"that which is to last for a limited time only, as distinguished from that
which is perpetual or indefinite, in its duration."

c.    In Mr. Shea's testimony to Congress, he states the travel trailers were
neither designed nor intended for permanent or long-term housing.

d.    It appears Gulf Stream never discussed length of time of usage for their
product with anyone with the government.  Mr. Shea said that
throughout the history of his company supplying FEMA with temporary
housing that duration of occupancy was never a subject.

e.    On page 22 of the owner's manual, there is a section on the effects of
long-term occupancy.  While this section is pointed toward motor
homes, it still is a reference to recreational vehicles. It states, "more and
more of today's motor homes are being used for than just recreational

Page -85-

ALX-EXP-44-000086

vehicles." It informs the occupants they must be prepared to deal with condensation and humid conditions that may be encountered. The manufacturer acknowledges that "the normal activities of even a small number of occupants in the relatively small volume of a modern recreational vehicle with its tight construction will lead to rapid saturation of the air inside the vehicle and the appearance of visible moisture especially during cold weather." The manual goes on to state, "Unless this vapor is carried outside by ventilation or removed from the air by dehumidifier, it will condense on the inside the windows and walls as moisture. It may also condense in the walls and ceilings and appear as stains on the paneling. This will increase the heating load on the furnace somewhat but it will greatly reduce condensation." The manufacturer was aware that recreational vehicles have become more than just a week-long means of vacation and excursions. The manufacturer acknowledges internal problems with condensation; however, what the manufacturer is directing its attention to is the use of these recreational vehicles in frigid and cold climate zones. The warnings given regarding humid conditions are directed to internal living activities inside the recreational vehicle. As with the manufactured housing (mobile home) industry, the design of these units have been for cold climates and not for the hot, humid climate of the gulf coast regions. Addressing condensation on the inside of the living area is a frigid or cold climate condition. The long-term occupancy in the south has little to nothing to do with the moisture inside the housing unit attempting to force itself out of the unit and condensing on the cold surfaces. These surfaces are cold because the air on the exterior side of the unit is colder than the air on the interior side therefore the moisture inside the unit is attempting to escape toward the outside. This is when condensation would occur in other climates but not in the Gulf Coast region.

f.     The Standard on Recreational Vehicle Parks and Campgrounds, 2002 Edition, the ANSI A119.4 and NFPA 1194, discusses the various lengths of time people are now utilizing their recreational vehicles. Page 15, Appendix D, Section C.18.3 **Fulltimers**, states "Individuals that have opted, because of the benefits of a recreation - oriented RV lifestyle or for economic reasons to use their camping units for their only or primary residence." This is one of many usages that people are

Page -86-

electing to use their recreational vehicles. Some usages are for traveling, daily or overnight usage, extended stay, seasonal, or full-time occupancy. It therefore should not be considered an unusual event to have occupants utilize a recreational vehicle for extended stays but also as permanent housing.

g.   The Alexander FEMA trailer was ordered on December 9, 2004 and was built on December 13, 2004. It was for a different set of hurricane losses in Florida. Hurricanes Katrina and Rita devastated the coast line of Mississippi, Louisiana, and Texas in August and September of 2005 respectively. The widespread devastation quickly became known internationally. Tens of thousands of homes were completely destroyed; hundreds of thousands of homes were damaged by flooding or windstorm; and thousands of commercial and governmental buildings, public facilities, and roadways were damaged or destroyed. Within a short period of time, the news media was reporting that the rebuilding of New Orleans alone would take some five to ten years. Labor, materials, equipment and hardware very rapidly became in enormous demand. It became common knowledge that an enormous amount of houses that had not been completely destroyed immediately by the wind and water were unable to be occupied as a result of the flooding or water damage caused by the rain, which in turn caused mold damage throughout the home or structure. In addition, once the flood waters receded, it was found that thousands of homes could not be restored as they were contaminated with chemicals from nearby refineries.

With this information disseminated to the public, it was well known that people would be out of their homes for in excess of a year or years as a result of these events.

h.   Gulf Stream itself became acutely aware of the shortage of materials for its own manufacturing process. Once they received their order for the temporary housing units, they began to experience shortage themselves. In a letter from James F. Shea with Gulf Stream to Jonathan Gibb with FEMA, Mr. Shea outlines to Mr. Gibb the difficulties in obtaining frames, lauan plywood materials, flooring and other miscellaneous goods such as air-conditioning units necessary to construct the FEMA trailers.

Page -87-

ALX-EXP-44-000088

i.    Alternative methods and materials available for the construction of the temporary housing units:

a.    There were materials and methods available at the time of construction of the FEMA temporary housing units that could have been utilized in the construction of these units to have lowered or removed the issues with elevated formaldehyde concentrations within the envelopes of the units. In Dr. Smulski's report, he itemizes and enumerates the various wood products that were available at the time of construction of the Alexander temporary housing unit that would have eliminated this problem. Items such as hardboard paneling in lieu of hardwood paneling, OSB board using non-formaldehyde materials, and other products using non-formaldehyde releasing materials were also available at that time.

Please see Enclosure 10, Affidavit of Stephen Smulski, Ph.D., Consulting Wood Scientist, dated May 18, 2009.

b.    One of the construction methods that were available at the time of construction of the Alexander was the use of an air seal barrier below the exterior skin of the exterior walls. This air barrier would have eliminated or severely reduced the amount of air and moisture penetration through the wall system and become available to raw materials that contained formaldehyde. This is a common practice utilized in the hot, humid temperature region of the country.

This method of construction has been researched and written about in various books and publications for approximately twenty years.

c.    The alternative use of a hardboard paneling with a permeable finish (a finish that would allow the wall system to breathe and not retain moisture within the panel material or in the cavity of the wall) could have been used. Hardboard panels have been used in the manufactured homes (mobile homes) for a number of years. This is not new technology nor is it new to the industry.

Page -88-

ALX-EXP-44-000089

This materials could be used on both the walls and ceiling areas.

d.    The use of a higher density insulation could have been utilized for the thin wall system used in the construction of these housing units. Either the wall systems could have been thickened using a deeper framing member or the alternative of a thicker or more dense insulation material such as a closed cell foam or an insulation board could have been utilized. This would have not only assisted in limiting the penetration of moisture from the exterior to the interior of the temporary housing unit but would have also helped to addressed the issues with condensation occurring as a result of dew point temperatures being reached in the wall and ceiling cavity.

Please see Enclosure 13, Closed-Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation.

e.    While this is not an alternative method of construction, it is one of absolute necessity in the prevention of negative air pressure occurring and drawing hot, humid unfiltered contaminated air into the living area of the Alexander trailer. This item is simply to have performed the work in which they were commissioned to do in a superior workmanlike manner according to the FEMA Procurement Standards. Simply having taken the time to properly install the air-conditioning ductwork and insuring it was sealed air-tight would have been a major improvement in lowering the amount of formaldehyde concentration inside the living area. The manufacturer either failed to properly train the installers of the air-conditioning and heating duct system in this housing unit and / or the manufacturer failed to properly supervise the workers installing the air-conditioning and heating system in this unit. The manufacturer failed to not only fulfill the requirements of the FEMA Procurement Standards, Gulf Stream also failed to follow the manufacturer's installation instructions and the NFPA and ANSI codes and standards that apply to this unit.

Positive pressure inside the unit pushing the hot, humid

Page -89-

contaminated air away from the wall, ceiling and floor cavities would have helped to significantly reduce the possibility of the introduction of the formaldehyde vapors into the living area of the unit.

f.      The workmanship of the overall construction of the FEMA trailer could have also prevented the majority of the air leaks into this housing unit. Because of the lack of superior workmanship and the failure by the manufacturer's employees and manufacturer's failure to properly supervise the installation of not only the duct system but the sealing of the envelope has produced pathways for the hot, humid, unfiltered air to penetrate into the living area. Once again, the requirements of the specifications for procurement regarding air and moisture sealing of the unit failed to be adhered to by the manufacturer by Gulf Stream.

g.      In addition to the above mentioned quality control methods, the manufacturer could have tested the ductwork for air leakage. Instruments are readily available and are reasonably inexpensive for the testing of duct installation for air leakage. The cost per unit of production to purchase the equipment to test for duct leakage is estimated at $.14 per unit.

h.      Testing of the housing unit could also have been performed by the manufacturer. Similar equipment to the air duct leakage and in conjunction with the air duct leakage equipment is all that is required to test these units. Again, based upon an initial order of 25,000 units for FEMA, the above mentioned cost of $.14 per unit is inclusive of that equipment necessary to test for the air leakage into the trailer from both the air-conditioning ducts and the envelope of the trailer. The only other item necessary to include in that cost would be the labor of one trailed employee to perform those tests.

i.      The manufacturer recommends the use of a fresh air venting system known as Fan-Tastic vents. The air exchange rate would be increased by the use of that ventilating system. However, this would be in lieu of the fresh air system tied into this air-

Page -90-

ALX-EXP-44-000091

conditioning system itself.

i.     The cost to install the air barrier on the retail market would have been in today's cost terms $117.26 per unit.

ii.    The use of alternative wall panels, floor and roof sheeting, ceiling panels and other wood products or wood-type products cannot be calculated to give an increase of cost over the products that were used in 2004 to construct the Alexander unit. Comparable materials were made in full sheets or in sheet sizes unique to the RV industry and are not commonly purchased on the retail market.

iii.   The use of a lower BTU capacity air-conditioning system should be a cost savings rather than an expense. The additional expense would be in adding the fresh air system to this unit. In lowering the BTU capacity of the system, dehumidification would be increased on the interior of the building making it drier and cooler to the senses. The drier the air on the interior of the unit, the less need to have the air-conditioning system cycle on and off; therefore, the thermostat can be set at a higher temperature and the comfort level of the occupants would remain satisfactory.

iv.   One of the most significant changes or alternative methods that could have been utilized in the construction of the Alexander unit is the replacement of the 1 1/2" fiberglass unfaced insulation with a closed cell spray foam polyurethane insulation. If we achieve an R-14 insulating value in the wall system and approximately R-18 in the ceiling system, we will eliminate the material in the wall system from reaching a dew point. Each inch of closed cell SPF insulation has an R- value of 7. Two inches of closed cell SPF insulation would give us the needed R-14 rating. At least as important as the R- value is the perm rating of the closed cell SPF insulation. The perm rating is 1 or less which means it is classified as a water and vapor barrier. This would accomplish several different challenges. With

Page -91-

the SPF closed cell insulation, the designer of the housing unit could achieve the R-14 value desired and have a vapor barrier installed in one function.  As a precaution, we would want to also include the air and moisture barrier wrap around the perimeter of the exterior walls.  This would then carry over the separation in the SPF insulation at the wall framing and prevent thermal shorting from occurring.

One added bonus to the use of the closed cell insulation is the additional strength this product adds to the framing system.  The closed cell material attaches to the framing wall and also creates a solid unit within the cavity of the wall increasing the strength of the wall.  This would help to address some of the concerns that were expressed by Charles David Moore, a structural engineering expert, in the report attached in our enclosures.

Enclosure 13, Closed-Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation.

Addressing the ceiling cavity, we want to achieve somewhere around an R-18 value.  Using 2 1/2" of SPF insulation gives the 17 1/2 to 18 R- value we are looking to accomplish.  In addition to the EPDM type roof membrane, the SPF material would prevent any water or water vapor from transmitting from the exterior to the interior through the roof or attic system.

The additional benefits of added strength to the roof system would be applicable with the SPF material in the ceiling cavity.

The use of the SPF insulation material also has the benefit of sealing the areas of air leakage in the exterior surfaces of the wall system in conjunction with the Tyvek -type air barrier covering.

Page -92-

ALX-EXP-44-000093

There are major benefits to the use of the closed cell SPF insulation material:

1.      We achieve the R-value necessary to prevent the dew point from being reached in the wall and ceiling cavities of the unit which in turn prevents the manifestation of condensation.

2.      The air leaks in the envelope are sealed to prevent the passage or movement of hot, humid air from the exterior of the unit to the interior living space and filtering any contaminates.

3.      The SPF insulation adds strength to the structure assisting the structure as it pertains to wind loads as discussed by our engineer.

4.      The increase of R- value in the wall and ceiling systems will assist in retaining the cold air-conditioned air in the living unit.  The occupant would have a more comfortable temporary housing unit; housing unit that has a lower cost of operation of air-conditioning and heating; and a heathier, safer environment for the family.

What we have basically done with this material and this system is to build an ice chest in which to live in Louisiana.  We have an interior and exterior finish of which heat and moisture are significantly eliminated from transmitting from the outside to the inside.  The colder or warmer air on the interior as the case may be in a particular season acts the walls, bottom and lid of a strong ice chest.  Equating the construction of an ice chest to this unit, remember an ice chest is just a foam center with a plastic interior and plastic exterior to hold the form together.  We have all seen numerable times when an adult has sat on an ice chest, a child has jumped up and down on

Page -93-

an ice chest, we have loaded ice chests full of beverages and food, or we have stacked items of various sizes, shapes and weights on top of an ice chest. In each instance, an ice chest is able to support weight of these objects. This is the strength and insulation value that could have been added had the designer of the Alexander temporary housing unit utilized this system.

Another benefit of the usage of the spray foam insulation is it would seals the ducts in the attic and prevent air leakage from the ducts add to the R-value of the duct system thereby preventing a condensation occurring around the ducts.

The cost of this system would be approximately $1,700 to $1,800 or less with employee installation.

5.  The other alternative method the designer could have chosen was to increase the frame size of the walls and ceilings and increase the insulation thickness increasing the R-value of this unit. If the closed cell SPF insulation is used the framing could remain the same thickness as it presently has.

j.  New FEMA Trailers:

i.  FEMA now requires its travel trailers to emit less than 16 ppb of formaldehyde, and manufacturers have built travel trailers that meet this standard. The alternative designs and materials selected to meet this standard are not new; rather, they were both feasible and available designs, existing well before the date of manufacturer of the Alexander trailer. The choice to use these designs would not have significantly burdened Gulf Stream and would have significantly lowered the risk to Christopher Cooper.

## CONCLUSIONS

Page -94-

According to various industry standards and indoor air quality testing, the formaldehyde emissions in the Alexander family's temporary housing unit were elevated above a reasonable level of safety. The unreasonably unsafe conditions in the Alexander family temporary housing is because:

1.  The unsafe levels of formaldehyde are partially a consequence of the design of the travel trailer. The designer is responsible for the manifestation of the condensation in the wall and roof cavities. The 1 1/2" wall cavity as designed is such that the temperature dew point can be reached within that cavity. The 1 1/2" thick unfaced fiberglass insulation batt has an R- value that is insufficient to prevent condensation from occurring in the wall cavity.

2.  The vapor barrier on the temporary housing unit was designed and placed on the cold side of the exterior wall. Studies have long indicated this type of construction is ideal for cold and frigid temperature zones but is unacceptable in the hot, humid zone of which the Alexander unit was located in New Orleans, Louisiana.

3.  An effectively designed vapor barrier was not placed on the exterior side of the wall framing just below the exterior skin of the housing unit.

4.  The designer of the temporary housing unit failed to take into account the intended use of their product. Widespread devastation of the gulf coast from two major hurricanes left tens of thousands of people homeless. Many more homes and businesses incurred significant damage. In addition, churches, government facilities, roads, bridges and municipal operations were also damaged or destroyed. The rebuilding effort would be massive - straining materials, resources, manpower and equipment. Housing needs of those affected by this devastation would obviously last more than just a few weeks or months.

    Gulf Stream experienced these shortages of materials and resources also. In a communication between Gulf Stream and FEMA, the manufacturer outlined the numerous problems they were encountering in ordering and receiving materials for the housing units they were constructing for FEMA. They were experiencing difficulty in obtaining wall and ceiling panels, aluminum panels, flooring, air-conditioning units, and other miscellaneous items.

Page -95-

it should not have come as any surprise to anyone listening to the news reports that the temporary housing needs for the multitudes of people left homeless would last for years.

5. The manufacturer knew or should have known that the use of formaldehyde-emitting materials would be a problem for the occupants. Even the use of low-formaldehyde emitting materials would create a problem because of the disproportionate ratio of low formaldehyde emitting wood and other building products in relationship to the relatively small, box-style, temporary housing unit. Even low amounts of formaldehyde emissions from each of the building products will create a higher concentration of emissions in such a small unit.

6. All of the wall panels, ceiling panels, cabinets, built-in furniture, floor sheeting and roof sheeting are constructed with materials that emitted formaldehyde. Some of the materials such as the roof sheeting are regular panels that were not manufactured to reduce formaldehyde-emitting levels.

The manufacturer's representative admitted in his deposition that some units were manufactured with regular panels, not of the low-formaldehyde emission type, because of a lack of quality control in one of the plants. Materials that previously were ordered as low formaldehyde emission materials were sent and being used even though they did not meet the low formaldehyde standards.

7. The construction means, methods and materials utilized in the Alexander family's temporary housing unit contributed to the elevated formaldehyde levels. The wall-to-floor intersection, the wall to ceiling intersection, and other openings in the walls, floor, and ceiling systems were not sealed to prevent unfiltered air filtration or movement to the Alexander's housing unit. The FEMA Model Travel Trailer Procurement Specifications required that "All exterior openings... will be weatherproof sealed to prevent air and moisture penetration." The language goes on to state again that these are minimum standards and it (the FEMA trailer) **shall be constructed with superior grade quality of workmanship**. (Emphasis added.)

8. The air-conditioning duct system is not properly sealed to prevent uncontrolled air leakage into the ceiling cavity and exterior of the housing unit. As the supply side of the air-conditioning system is emptied air into the ceiling cavity and the outside atmosphere, the return air side of the unit is drawing or pulling

Page -96-

ALX-EXP-44-000097

air into the wall and ceiling cavities and into the living space from the exterior to make up for the air that being expelled as a result of poor workmanship and a lack of proper supervision on the part of Gulf Stream. This has created a negative air pressure in the Alexander's unit. Air was sucked into the unit from the outside without filtration or conditioning. This contributed to the additional release of formaldehyde into the envelope of the unit especially when the temperature and humidity on the exterior were elevated above the interior temperatures and humidity of the Alexander unit. The negative air pressure pulled in hot, humid, contaminated air into the wall and ceiling system. The hot, moist air contributed to the release of formaldehyde from the unsealed backs and edges of the materials containing formaldehyde. This is a code violation and it is not superior grade quality workmanship.

9.    The furnace duct system is also not properly sealed. The same conditions described above with the air-conditioning ducts are occurring regarding the creation of negative air pressure from the furnace duct system. In this situation, however, the leaking ducts create a condition conducive to drawing in fumes from the furnace and the stove hood vent. The furnace exhaust and fresh air intake are very near the entry door of the temporary housing unit. It is a code violation to have a condition that is conducive to drawing the exhaust fumes of the furnace and is not superior quality grade workmanship.

10.    The temporary housing unit was placed on blocks during its installation on the Alexander's property. The instructions found on the scissor jacks of the trailer states that the weight of the unit should not be taken off the wheels. In jacking the unit and not sufficiently supporting the frame, the installation contractor created a condition conducive to the interior panels warping in the bedroom on the front and rear walls and in the bathroom. It was reported by Ms. Alexander that this warping was noted when she moved into the temporary housing unit. It is understood Ms. Alexander spoke with her contact person at FEMA and was told to place duct tape over the seam of the buckled wall panel.

Fluor, the installation contractor, failed to give adequate directions to its employees of how to jack all of the corners and centers of the temporary housing unit. A review of Exhibit 7 failed to disclose and directions provided to the field people on how to jack up these units. It appears the units were jacked up on the corners one or two at a time and then the blocking was placed to support those areas. This apparently placed unnecessary stress on the

Page -97-

framing system that the unit was incapable of resisting. This caused the warping of the wall panels and the roof leak, increasing formaldehyde emissions.

Either the manufacturer, FEMA, or Fluor should have devised a safe means of jacking the temporary housing unit by either increasing the rigidity of the metal frame, using a unified hydraulic jacking system to evenly lift the entire travel trailer at the same time and without putting abnormal stresses on the unit, or should have devised a plan including sound engineering practices for the application of readying the temporary housing unit for occupancy.

11.   The placing of the temporary housing unit on blocks apparently created at least one known roof leak that was never effectively repaired by the installation / maintenance company and buckling of the wall panels in the bathroom. According to Ms. Alexander, the repair personnel sent out to address her roof leak issues reported to her that they did not believe their efforts repaired the leak. In fact, the leak was not repaired and it was reported to this writer that water leaked inside the temporary housing unit each time it rained.

12.   There is a lack of warnings either in the owner's manual or inside the temporary housing unit regarding the potential for formaldehyde emissions. The manufacturer was well aware of the potential presence of formaldehyde in their product. In fact, the manufacturer made a point to state on some of its purchase orders that it required low formaldehyde emissions material. There are no warnings or documents found anywhere that show the manufacturer alerted the Alexander family to the potential exposure of formaldehyde and the potential risk for exposure.

13.   The manufacturer failed to conform to its express warranty. In the Model Travel Trailer Procurement Specifications, dated August 12, 2004, FEMA stated, "the construction and outfitting standards identify minimum... environmental living conditions necessary to provide emergency housing..." "The manufacturer shall design and construct all units...within a superior grade quality of workmanship." By submitting it to FEMA, the manufacturer has expressed a warranty and has warranted to the purchaser and user of their product. The condition of the Alexander trailer as delivered breached Gulf Stream's express warranty.

Page -98-

ALX-EXP-44-000099

14.    The manufacturer failed to comply with the required NFPA and ANSI codes regarding the construction of recreational vehicles and the manufacturer's guidelines regarding duct leakage of the furnace system and air-conditioning system.

15.    The manufacturer produced a product that was unreasonably dangerous because it failed to apply and use techniques, technology, materials and workmanship available in 2004 to achieve the new FEMA procurement specification of 0.016 ppm for formaldehyde emissions.

The benefits to the manufacturer that would be achieved to switching to alternative design and construction practices as it relates to the Alexander family's housing unit would be:

1.    Avoiding health related issues concerning the Alexander family;

2.    Avoidance or reduction of litigation costs; and

3.    The probable avoidance of loss of hundreds of millions of dollars paid by the taxpayers, occupants and manufacturers if temporary housing units have to be destroyed.

The burden to the manufacturer in switching to alternative design and construction methods would be:

1.    The cost of installing a vapor barrier on the exterior side of the walls;

2.    The cost of additional sealants at the top and bottom plates;

3.    In the alternative, the replacement of fiberglass insulation with a closed cell spray polyurethane foam insulation that would seal the walls, prevent air and moisture passage through the wall and ceiling cavities, add strength to the structure, and prevent condensation from form in the wall, keep the A/C ducts sealed, and ceiling systems when temperatures reach the dew point.

4.    The cost of adding fresh air ventilation to the unit (This item may well be eliminated had the Alexander's unit been manufactured with closed cell SPF insulation.  No more air exchanges would probably have been enough to

Page -99-

ALX-EXP-44-000100

accommodate the air exchanges required.) ;

5.   Increasing the size of the steel frame to allow for the jacking up of the housing unit to avoid unwarranted stress on the unit.

6.   The cost of switching to non- formaldehyde emitting materials such as masonite wall panels and ceilings, masonite doors, floors and roof sheeting constructed of non-formaldehyde emitting OSB, plastic type cabinets or MDF materials that do no emit formaldhyde.

7.   The cost to actually train workers and supervisors to work in a manner that would produce the superior work product required by FEMA's Procurement Specifications.

This concludes this report.  Should there be any questions regarding the content of this report, please do not hesitate to contact this writer.

Conclusions drawn in this report are based on observations and information available known and declared at the date of the investigation and / or the time of the preparation this report. The writer reserves the right to make corrections of any errors discovered after the release of this report or upon the receipt of new data.

With kindest regards,

Alexis Mallet, Jr.
President

AMJ:cms

Enclosure 1a:  Photographs by First General Services of the South, Inc.
Enclosure 1b:  Photographs by Scott Johnson
Enclosure 1c:   Infrared Thermographic Images by First General Services of the South, Inc. dated May 7, 2009.
Enclosure 1d:   Photographs by W.D. Scott taken January 28, 2008 after the temporary housing unit had been removed and reset on location
Enclosure 2: FEMA Model Travel Trailer Procurement Specifications, dated August

Page -100-

12, 2004

Enclosure 3:   "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels in Mobile Homes and Park Models"

Enclosure 4:  W. D. Scott Group, Inc. Formaldehyde Sampling Report dated May 18, 2009

Enclosure 5:  Dometic Duo-Therm HP 595 QUICK COOL Instruction Manual

Enclosure 6: Ritter Consulting Temperature and Humidity Data Logger Graphs dated May 7, 2009

Enclosure 7:  Fan-Tastic Vent Information Sheet from the manufacturer

Enclosure 8:  Lagrange Consulting Services, L.L.C.'s report dated May 7, 2009.

Enclosure 9: Drawings of the floor plan, electrical floor plan, floor elevations, rear elevation, right side elevation, left side elevation, and mechanical plan.

Enclosure 10: Affidavit of Stephen Smulski, Ph.D., Consulting Wood Scientist, dated May 2009

Enclosure 11: Travel Trailers Installation Guide

Enclosure 12: Freyou Moore Report dated May 15, 2009

Enclosure 13:   Closed-Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation

Enclosure 14:  Suburban Manufacturing Company

Enclosure 15: Analysis of the Gulf Stream Coach, Inc. Formaldehyde Exposure Data Set by Paul Hewett, Ph.D., CIH, dated May 18, 2009

Enclosure 16: Investigation of FEMA Travel Trailers prepared by Ervin L. Ritter, P.E., dated May 15, 2009

Enclosure 17: Affidavit of Marco Kaltofen, P.E. dated May 19, 2009

ALX-EXP-44-000102