# Transcript of the Testimony of

# **JAMES SHEA**

Date: July 24, 2008

FEMA Trailer Formaldehyde Products Liability Litigation
v.

```
 1       the Congress about that?
 2    A  Oh, sure.  Yeah, it was just a couple weeks ago.
 3    Q  Just to kind of put it in the frame of reference
 4       here.
 5    A  Uh-huh.
 6    Q  Your testimony is, is that what you guys did in
 7       March/April of '06 was screening, not testing.
 8       Right?
 9    A  Correct.  Yeah.
10    Q  And tell us why you were screening your trailers.
11    A  We had -- certainly the involvement early on
12       because of this sudden issue, as it came to fore in
13       March, mid-March, we had discussed the situation
14       quite soon after that with our counsel, counsel
15       that we've historically had.  And one of the things
16       they advised us to do was, you know, during the
17       course of their counsel --
18           MR. SCANDURRO:  Excuse me.  Don't reveal any
19       of the specifics of what your counsel advised you.
20       You can certainly testify that you spoke with your
21       counsel.
22    A  Well, we spoke with our counsel.  But our purpose,
23       primary purpose was to understand the performance
24       of the inherent ventilation devices, or the
25       ventilation devices that we had provided with the
```

1    unit and their performance and as well as some
2    optional devices that we were looking at for
3    assistance with -- assistance with for sensitive
4    people.
5  Q  So the purpose of the screening was to test the
6    performance of some fans that you were trying to
7    sell FEMA?
8  A  No, no, no, no.
9  Q  What was the purpose of the screening?
10 A  Purpose was to understand how the units ventilated
11   and to advise them and give best response to them
12   in terms of how the unit performed in a ventilation
13   standpoint.  And -- and we had -- we had some other
14   devices that we had -- were looking at as far as
15   augmented ventilation.
16 Q  The purpose of the screening was to check the air
17   quality within the units?
18 A  To check how the air changed with respect to the
19   use of the natural ventilation elements that we
20   provided with the trailers and some optional
21   devices.
22 Q  So you didn't do this what you call screening
23   because you anticipated litigation?
24 A  No.
25 Q  You did not do the screening because you thought

```
 1      you might be sued.
 2   A  No.
 3   Q  Okay.  Do you remember the testimony you gave to
 4      the Congress?
 5   A  Yes.
 6   Q  Do you remember the written statement you gave?
 7   A  Yes.
 8   Q  Let's take a look at it.  Exhibit 9.  No Bates
 9      number.
10          (Gulf Stream Exhibit 9 was marked for
11      identification.)
12   A  Okay.  What's -- where are we going here?
13   Q  Exhibit 9 is the statement of Jim Shea that was
14      given to the Oversight and Government Reform
15      Committee.
16          On page 10, you told the Congress, under oath,
17      that we offered to share with FEMA the results of
18      some informal formaldehyde screenings of occupied
19      travel trailers that one of our employees had
20      performed in March and April of 2006 in
21      anticipation of litigation, didn't you?
22   A  Well --
23   Q  Is that what you told the Congress?
24   A  That's the statement here, yes.
25   Q  And that was given to the Congress as to be true;
```

1      right?
2   A  Correct.
3   Q  And the truth is, the reason that the screening --
4      this screening was done is because you anticipated
5      litigation, isn't it?
6   A  What our purpose was, was to go into the field,
7      understand what -- part of our response was to
8      understand what issues people were facing in the
9      field, and we did canvass certain persons and -- in
10     St. Bernard Parish.  And as part of that discussion
11     in talking with the persons, the individual did
12     deploy this device.
13  Q  Formaldemeter.
14  A  Correct.
15  Q  Now, I'm going to ask you again, because I've asked
16     you three times now.  Did you or did you not
17     anticipate litigation in March and April of 2006?
18  A  We anticipated the potential litigation when this
19     issue became -- came to the fore in March.
20  Q  Okay.  So in March of 2006, Gulf Stream -- Gulf
21     Stream Coach anticipated litigation.  True
22     statement?
23  A  We anticipated the potential of litigation.
24  Q  Right.  And so you --
25  A  I mean, that's one of the reasons we would have

Page 13

```
 1      consulted counsel on this matter when it came to
 2      the fore.
 3   Q  And that's the reason you told the Congress, under
 4      oath, that this screening -- this informal
 5      screening was performed in anticipation of
 6      litigation.  Isn't that right?
 7   A  It was incidental to our collection of information.
 8   Q  You anticipated litigation even before you
 9      delivered the last trailer, didn't you?
10   A  We anticipated the potential for litigation, yes.
11   Q  Okay.
12   A  I told you when, didn't I?
13   Q  Right.  You delivered the last trailer on
14      April 15th of '06; is that true?
15   A  Correct.
16   Q  You received your last payment when?
17   A  You know, I don't know the exact date.  I think you
18      have that in the record.
19   Q  It would be net 30, wouldn't it?  That's what your
20      guy, your executive vice president, told us.
21   A  I do recall, though, that, you know, there was -- I
22      don't know that we necessarily received it in --
23      that last payment net 30.  I don't know that we
24      received that last payment net 30.
25   Q  Do you know that you didn't receive it net 30?
```

Page 14

1   A   We received the payment but I don't know -- I don't
2       know that we did or that we didn't.
3   Q   Okay.  So you don't know -- I mean, bottom line,
4       you don't know when you received your last payment.
5   A   No, I don't.
6   Q   But you do know that the last trailer was delivered
7       April 15th of 2006, don't you?
8   A   It was in mid-April, yeah.
9   Q   And you do know that the contract says that you're
10      supposed to be paid 30 days after you deliver the
11      trailer.  Isn't that right?
12  A   Correct.
13  Q   Okay.  So if the contract was -- if the Government
14      conformed its conduct to this contract, it would
15      have paid you on May 15th of '06.  True?  Or by May
16      15th, '06; right?
17  A   Correct.  Well, you know, roughly.  I don't
18      remember how many days are in April.  I think
19      there's 30, you know, but roughly.
20  Q   You sat here when your executive vice president
21      testified.
22  A   Correct.
23  Q   And he said he can't recall there ever being an
24      untimely payment.  Right?
25  A   That's what he said, but I don't know that that's

```
 1     true.
 2  Q  Okay.  So he may have testified untruthfully.
 3         MR. MILLER:  Objection.
 4  A  He didn't make a --
 5         MR. MILLER:  Hold on.  Hold on.
 6  A  He didn't make a --
 7         MR. MILLER:  Hold on.  Objection.
 8         THE WITNESS:  Sorry.
 9         MR. MILLER:  You're requesting the witness to
10     comment on the veracity of another witness and
11     that's objectionable.
12         MR. WEINSTOCK:  I'll join in the objection and
13     it calls for -- argumentative question.
14  Q  Let's just say this.  If the contract had been
15     carried out pursuant to its terms, the last payment
16     would have been -- for the last batch of trailers
17     would have been received at or around May 15th of
18     2006.  Is that true?
19  A  Correct.
20  Q  Okay.  So what's May 15th?
21         MR. WEINSTOCK:  I'm going to object, Counsel.
22     You keep saying 2002.
23         MR. BUZBEE:  Did I?  2006, I think I said,
24     didn't I?
25         MR. WEINSTOCK:  You said 2002.
```

1  Q  Let me try the question again, because this may be
2     important.
3        If the contract was conformed with by the
4     Government, the last payment would have been
5     received on or about May 15th, 2006. Is that true?
6  A  Well, why use a hypothetical? All the numbers can
7     be found out, you know. So whether our last unit
8     was on May six- -- or April 16th or on April 15th,
9     I'm not sure, okay, so... And where 30 days falls,
10    you know. But let's say mid-April. Let's say
11    mid-May, if that's what you want to -- you know.
12       MR. WEINSTOCK: And just for the record,
13    Counsel, I think when you asked the question about
14    five minutes ago about the last unit being produced
15    April 15th or April 16th, you said 2002, but you
16    meant 2006. Is that correct?
17       MR. BUZBEE: I appreciate that, Andy. I did
18    not mean to.
19       THE WITNESS: You tricked me on that one.
20 Q  I'm sorry. Let me ask it again.
21       Do you agree with me that the last trailer was
22    delivered to the Government on or about April 15,
23    2006?
24 A  On or about.
25 Q  Okay. And you agree with me that the contract thus

```
1      would say you would get paid 30 days thereafter.
2   A  Correct.
3   Q  Okay.  Now, who did you send down to do this
4      screening in anticipation of litigation?
5   A  The person that we sent down to canvass several
6      occupants was Scott Pullin.
7   Q  Who is that guy?
8   A  Scott Pullin was a long-term technical specialist
9      and vice president of Gulf Stream.
10  Q  What's a technical specialist?
11  A  He's familiar with the construction of units, the
12     various systems, the elements that would relate to
13     the RVIA standard.  Just a person that is well
14     rounded in understanding the technical aspects of a
15     recreational vehicle.
16  Q  Does he have a degree of some sort?
17  A  I don't know what his degree standing is.  He's
18     been with the company for a long time so I don't
19     really recall that.
20  Q  Okay.  Why did you choose him to go do this
21     screening?
22  A  He had -- has experience in the field and had spent
23     time in the hurricane zone related to, you know,
24     the deployment of units and so forth.
25  Q  Okay.  Did you feel that he was a competent
```

```
 1        individual?
 2   A    He's a competent individual relative to
 3        understanding RV construction and standards.
 4   Q    And you chose him because you wanted to get some
 5        useful information; right?
 6   A    Correct.
 7   Q    You told the Congress that he wasn't a scientist
 8        and had no training or prior experience on the use
 9        of the screening device.
10   A    Correct.
11   Q    Did you know that before you sent him down there?
12   A    Yes.
13   Q    Could you have sent someone down that had training?
14   A    No.
15   Q    You couldn't do that.
16   A    No.
17   Q    Why not?
18   A    We didn't have anybody in the employment of the
19        company that did that.
20   Q    And you told the Congress that he determined that
21        he had failed to follow the operating instructions.
22        What do you mean by that?
23   A    There is some aspects of that piece of equipment
24        that -- that he didn't follow.
25   Q    Like what?
```

```
 1  A  He didn't, as I understand, he didn't necessarily
 2     recalibrate the unit with the frequency that would
 3     have been required.  He didn't observe, as I
 4     understand it, necessarily the amount of time
 5     between uses in certain cases.  And there's some
 6     other things that you can do that he didn't do.
 7  Q  So you felt that his screening was useless?
 8  A  We felt that the screening from given indication of
 9     the changes in indoor air had some value in terms
10     of us being able to communicate with FEMA relative
11     to ventilation aspects of the unit, so we thought
12     that it had some value there.  And so for that
13     purpose, you know, it was better than, quote, a
14     sniff analysis, as somebody might do in a unit to
15     try to determine indoor air quality.
16  Q  When you got the results of the screening, did you
17     believe that there may be a problem with
18     formaldehyde in the trailers that you were selling
19     the Government?
20  A  Well, there was two types of screening that we did:
21     One was occupied units and one type was unoccupied
22     units.
23  Q  Okay.
24  A  And relative to the occupied units, the screenings
25     fell below or proximate to the only two -- the only
```

```
 1      two federal regulatory rules that I was -- that we
 2      were familiar with that might give guidance.  Even
 3      though, as you probably know, there's no such U.S.
 4      Government regulatory rules on formaldehyde for
 5      travel trailers.
 6   Q  So did you or did you not believe, once this
 7      employee had done this screening, that you had
 8      potential problem with formaldehyde in the trailers
 9      you had sold the Government?
10   A  Well, the indication to us was that no.  Because
11      the people that he had spoken to, you know, the
12      approximate dozen people, didn't have health issues
13      or complaints.
14   Q  None of the people he talked to had a complaint?
15   A  Right.  Correct.
16   Q  You're sure of that?  Because that's what you
17      told --
18   A  That's what the reportings were to us from
19      Mr. Pullin, and they weren't people that had
20      registered complaints to our company in any way
21      that we could find, and so those were the -- that
22      experience that he had and that he relayed to us.
23          And I also believe to my knowledge in speaking
24      to him he did some follow-ups with those people
25      just to see what their course over a several-week
```

```
 1       period of time was, and that was -- their initial
 2       response to him was that -- you know, remained the
 3       same.
 4   Q   So as far as you know, no resident of any of the
 5       occupied trailers that you screened were
 6       complaining or had any complaints.
 7   A   Correct.
 8   Q   And if some of the documents show that they did, in
 9       fact, have complaints, you just don't know about
10       it.
11   A   I don't see any -- I haven't seen any documents
12       that would say that they had complaints.
13   Q   Okay.  And you didn't think that the screening that
14       was done was scientific or reliable.
15   A   No.
16   Q   However, you just told us that the readings, only
17       two were -- you know, there's no standard, but from
18       what you could tell with the readings, you weren't
19       concerned about them.  Right?
20   A   Well, I think, you know, you're asking me to make
21       my judgment.  Your earlier question asked me to
22       make a judgment, and I gave you some basis for that
23       judgment.  The most important basis was the people
24       weren't complaining.
25   Q   Okay.  Let's go back.  In this statement you gave,
```