# Transcript of the Testimony of

# ELIZABETH GANIERE - GULF STREAM COACH 30(b)(6)

Date: June 1, 2009

FEMA Trailer Formaldehyde Products Liability Litigation
v.

1  Q  And there are none.

2  A  You're quite correct. With exception of there are
3     POs with signature lines from the purchasing
4     agents. They had them actually come up on the POs
5     as a part of their ordering of certain part orders
6     from wood product manufacturers.

7  Q  Another, what I think is a, you know -- sometimes
8     when I'm in a lawsuit, I kind of get a red flag
9     goes up when I see a real lack of documents in
10    various areas. And one of the areas that I saw,
11    maybe you can help me with, is correspondence
12    either to or from Adorn, for instance, regarding
13    formaldehyde and the use of LFE wood products.

14        I know for a fact that one of the other
15    manufacturers has produced in this case a document,
16    correspondence from Adorn, that's not even
17    specifically addressed to that competitor, but is
18    just to Dear Valued Customer.

19        Can you explain to me why that document wasn't
20    produced from Gulf Stream?

21 A  Probably because we don't have it. Honestly, I'm
22    astounded at how thorough they were before I
23    arrived of the documents that they produced for the
24    subpoena from DHS and then continuing with
25    Congress. I mean, I'm stunned and amazed at how

1    many documents that they were able to create up and
2    to and continuing through the e-mails that were
3    produced without such electronic requests being
4    made.
5         So, I mean, I beg to differ that -- there
6    probably doesn't exist a document like that, that
7    we have come across anyways. I mean, I can tell
8    you that. I have not gone through every single
9    purchase order and invoice, because there were just
10   thousands upon thousands and thousands of
11   documents. I mean, I have boxes and boxes all
12   over.
13        So I personally, I've gone through a lot of
14   them, probably at least half, but I have not gone
15   through every single solitary paper.
16 Q  Okay. But I just want to be specific.
17   Communications either to or from Adorn in the last
18   five years, have you searched for those?
19 A  Oh, certainly. Yes.
20 Q  And you've come up with nothing other than what's
21   been produced.
22 A  Right. Right.
23 Q  And so if other defendants in this case have
24   produced, in fact, correspondence with Adorn, your
25   response to that would be, look, we just don't have

13

1        throughout the deposition, so...
2    Q   So some of these individuals whom we've identified,
3        you may, in fact, go to them and make sure that
4        they've collected and searched for documents that
5        may be relevant.
6    A   Yes.
7    Q   Okay. Specifically, Jeff --
8    A   Yes.
9    Q   -- Zumbrun. Is that his name?
10   A   Yes. Yes. I will ask him specifically.
11   Q   I also -- I can take it you disagree. I think that
12       there is a very -- there's very few e-mails
13       relative to the amount of e-mails I see in other
14       litigation. Have you specifically asked the three
15       brothers, the Shea brothers, as well as other
16       members of management for e-mails, nonprivileged
17       e-mails, relating to formaldehyde or their wood
18       products?
19   A   Yes. Matter of fact, I've searched their
20       computers. And most of their computers store the
21       e-mails on their computers because there's a no
22       delete. So I've personally searched their
23       computers, so...
24           And we've had a preservation company preserve
25       the data.