**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE:      **FEMA TRAILER**           *      **07-md-1873**
            **FORMALDEHYDE**           *
            **PRODUCTS LIABILITY**     *      **JUDGE: ENGELHARDT**
                                       *
                                       *      **MAG: CHASEZ**

This document is related to:   *Charlie Age, et al. v. Gulf Stream Coach, Inc., et al., No. 09-2892*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN SUPPORT OF
## FLUOR ENTERPRISES, INC.'S MOTION FOR SUMMARY JUDGMENT
## BASED ON THE GOVERNMENT CONTRACTOR DEFENSE

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................... i.

TABLE OF AUTHORITIES................................................................ ii.

PRELIMINARY STATEMENT .......................................................... 1.

BACKGROUND ................................................................................ 1

STATEMENT OF FACTS ................................................................. 2

    1.      FEMA Hires FEI As A Government Contractor .......................... 3

          A.    The Individual Assistance – Technical Assistance
               Contract (IA/TAC) ............................................................ 3

          B.    Exhibit 7 To The IA/TAC Specifically Directs FEI How
               To Install The Travel Trailers.......................................... 4

          C.    Exhibit 10 To The IA/TAC Specifically Directs FEI's
               Maintenance Of The Travel Trailers **.**............................. 4

          D.    Task Order 20 Under The IA/TAC ................................. 5

i

**Page**

    2.    FEI's Work Conformed To The Government's Precise Specifications ........ 6

    3.    The Government's Superior Knowledge Of Formaldehyde Claims
          Preceded FEI's Actual Knowledge Of Claims ............................................ 11

ARGUMENT AND APPLICABLE LAW ........................................................................... 12

    A.    Summary Judgments Are Favored ................................................................. 13

    B.    The Government Contractor Defense Bars Plaintiffs' Claims
          Against FEI ..................................................................................................... 13

        1.    FEI Meets The Three Conditions For Dismissal Under
             The Government Contractor Defense ............................................. 18

            a.    The Government provided reasonably precise
                specifications for FEI's work ................................... 18

            b.    FEI's work conformed to FEMA's specifications ................. 20

            c.    FEI had no actual knowledge not otherwise
                known to the Government about alleged
                formaldehyde problems ........................................ 23

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>CASES</u>

Askir v. Brown & Root Servs. Corp., 1997 WL 598587, at *2, 5-7
    (S.D.N.Y. Sept. 23, 1997) ......................................................................... 16

Bailey v. McDonnell Douglas Corp., 989 F.2d 784 (5th Cir. 1993) .................................. 22

Beaver Valley Power Co. v. Nat'l. Eng'g. & Contracting Co., 883 F.2d 1210,
    (3d Cir. 1989) ........................................................................................... 21

Boyle v. United Tech. Corp., 487 U.S. 500 (1988) ...................................................... passim

Carley v. Wheeled Coach, 991 F.2d 1117 (3d Cir. 1993) .................................................... 19

Correctional Services Corp. v. Malesko, 534 U.S. 61 (2001) ...........................................17 22

Harduvel v. General Dynamics Corp., 878 F.2d 1311 (11 Cir. 1989) ................................. 20

Hill v. Raytheon Aircraft Company, 470 F. Supp. 2d 1214 (D. Kan. 2006) .................. 16,19

Hudgens v. Bell Helicopters, 328 F.3d 1329 (11th Cir. 2003) ........................................... 13

In re Air Disaster at Ramstein Airbase, Germany,
    81 F.3d 570 (5th Cir. 1996) ..................................................................... passim

In re Hanford Nuclear Reservation Litigation, 534 F.3d 986 (9th Cir. 2008) ..................... 14

In re Katrina Canal Breaches Consol. Litig., Civ. A. No 05-4182,
    2008 WL 5234369 at *20 (E.D. La. Dec. 15, 2008) ....................................... passim

In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169 (2d Cir. 2008) .......................... 16

Kerstetter v. Pac. Sci. Co., 210 F.3d 431 (5th Cir. 2000) ................................................. passim

Kleemann v. McDonnell Douglas Corp., 890 F.2d 698 (4th Cir. 1989) ........................... 20,21

Lambert v. B.P. Prods. N. Am., Inc., 2006 U.S. Dist. Lexis 16756 (S.D. Ill. 2006) ........... 19

Lewis v. Babcock Indus., Inc., 985 F.2d 83 (2d Cir. 1993) ............................................. 16,17

**Page**

McKay v. Rockwell Int'l. Corp., 704 F.2d 444 (9th Cir. 1983) ...............................15

Miller v. Diamond Shamrock Co., 275 F.3d 414 (5th Cir. 2001) ................................... passim

Nielsen v. George Diamond Vogel Paints Co., 892 F.2d 1450(9th Cir. 1990) ..................... 15

Richland-Lexington Airport Dist. V. Atlas Prop., Inc. 854 F. Supp. 400, (D.S.C. 1994) ... 22

Smith v. Xerox Corp., 866 So.2d 135 (5th Cir. 1989) ...................................................... 18,19

Snell v. Bell Helicopter Textron, Inc., 107 F.3d 744 (9th Cir. 1997) ................................... 17

Stout v. Borg-Warner Corp., 933 F.2d 331 (5th Cir. 1991),
      cert denied, 502 U.S. 981 (1991) ..................................................................... 13, 19,25

Tate v. Boeing Helicopters, 55 F.3d 1150 (6th Cir. 1995) .................................................... 20

Trevino v. Gen. Dynamics, 865 F.2d 1474 (5th Cir. 1989) .................................................18,24

Yearsley v. W. A. Ross Construction, 309 U.S. 18 (1940) ........................................... 14,15

**FEDERAL STATUTES**

Robert T. Stafford Disaster Relief and Emergency Assistance Act,
      42 U.S.C. §5121, et. seq. (2000) ................................................................................ 1

Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-80 (FTCA) ............................ 14,15

48 C.F.R. § 52.246-5(c), (d) and (e) ..................................................................... 10

**FEDERAL RULES**

Fed.R.Civ.P. 56 ...................................................................................................... 13

## PRELIMINARY STATEMENT

Katrina and Rita hurricane recovery has poignantly illustrated the need for federal agencies to be able to seamlessly and productively coordinate their efforts with private contractors.  Failing to extend federal government contractor immunity to private contractors such as FEI would frustrate the purpose of the Stafford Act and hamper the nation's ability to most effectively respond to future crises.  FEI meets the three conditions for dismissal from this case under the government contractor defense.  Pursuant to a Government contract with FEMA, FEI faithfully performed its work in compliance with reasonably precise specifications provided and mandated by the Government for installation of the travel trailers, and FEI had no actual knowledge not otherwise known to the Government about alleged formaldehyde dangers.  There is no evidence that FEI deviated from the scope of work that it was mandated to do by the Government.  FEI is therefore entitled to immunity from plaintiffs' state law tort claims, and summary judgment as a matter of law.

## BACKGROUND

Plaintiff, Alexander, joined the MDL on 2/27/09.[1]  She and her minor child were selected as bellwether plaintiffs in the first trial, against the USA, Gulf Stream (the alleged manufacturer of the travel trailer) and FEI, the government contractor who allegedly delivered and installed the travel trailer.[2]  FEI is as an IA/TAC contractor.  Plaintiffs assert claims against FEI under the LPLA, contending that FEI somehow qualifies as a "manufacturer" because FEI installed the travel traveler on concrete blocks in accordance with FEMA's specific instructions.  In particular, plaintiffs allege that FEI's "blocking" of the trailer created stress and distortion that allowed

---

[1]  In <u>Age, et al v. Gulf Stream Coach, Inc., et al</u>, 09-2892; Rec. Doc. 1.
[2]  Rec. Docs. 1, 1686, par. 8.

increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell.[3]

Alternatively, plaintiffs allege state law negligence claims against FEI if FEI is not found to be a

"manufacturer" under the LPLA.[4]  Specifically, plaintiffs allege:

1. The Alexander travel trailer was installed and hooked to utilities for residential purposes by FEI pursuant to a specific Government contract;[5]

2. The Government provided reasonably precise specifications for installation of the unit with which FEI conformed;[6] and

3. The Government knew of the potential harmful effect of formaldehyde exposure to the Alexander plaintiffs in this travel trailer.[7]

This court ruled that the discretionary function exception bars plaintiffs' FTCA claims

challenging FEMA's decision to (1) purchase and use travel travelers as temporary emergency

housing for Katrina disaster victims (EHUs), *and* (2) contractually delegate the responsibility for

hauling, installing and maintaining EHUs to IA/TACs.[8] The court found plaintiffs' claim that the

Government was involved in making contractual arrangements for the contractors to follow in

the field, regarding the delivery and set-up of EHUs, was a discretionary function.  This finding

covers the precise installation "defect" alleged by plaintiffs and corresponding Government

specification mandating that FEI – install the travel trailer in a precise manner by placing it on

concrete blocks.[9]   In short, plaintiffs allege that FEI did exactly what the Government's

specifications required FEI to do.

## STATEMENT OF FACTS

---

[3]  Rec.Doc. 1, Age's orig. complt. ct. 3; Rec. Doc. 1686; Alexander's 3d supp. & amended complt., par. 13 (3d SAP).
[4]  Rec. Doc. 1, count 4; Rec. Doc. 1686, par. 14.
[5]  Alexander's 3d SAP, Rec. Doc. 1686, par. 8.
[6]  Rec. Doc. 1, count 3, par. 104, par. 32-38, 43-44, 46-47, 52, count 4, par. 11.
[7]   3d SAP, Rec. Doc. 1686, par. 11; Rec. Doc. 1, par. 53-79 (plaintiffs' general allegations of the Government's knowledge of alleged risks of formaldehyde exposure in travel trailers).
[8]  October 3, 2008 Order, Rec. Doc. 717, p. 43-44.
[9]  See Ct's Order, Rec. Doc. 717, p. 22-23 & 44, in response to plaintiffs' contention some travel trailers were set up off their wheels improperly (contrary to Fleetwood & Pilgrim manufacturer's manuals) and that FEMA was responsible for making "those arrangements with the companies they hired to deliver and install" the travel trailers. Rec. Doc. 1, par. 38.

The essential facts are set forth in the attached Statement of Uncontested Material Facts. The Alexander plaintiffs allege following Hurricane Katrina they received emergency housing assistance from FEMA, pursuant to the Stafford Act and applicable federal regulations.  It is undisputed FEMA selected and ordered the travel trailer provided to plaintiffs from the manufacturer, Gulf Stream.  Plaintiffs contend they lived in the travel trailer from 5/27/06 until 12/30/07.[10]  Plaintiffs allege their travel trailer was installed and hooked to utilities for residential purposes by FEI, pursuant to a contract between FEI and FEMA.[11]

1.      **FEMA Hires FEI As A Government Contractor**

A.      __The Individual Assistance – Technical Assistance Contract (IA/TAC)__

On 7/12/05, FEMA awarded an IA/TAC contract to FEI to be prepared to mobilize to provide general contractor services for disaster relief anywhere in the U.S., pursuant to individual task orders to be issued by FEMA.[12]  This umbrella contract provided the general requirements for all of FEI's anticipated work "at [v]arious disaster sites to be determined" by FEMA, with the condition that FEMA would prepare a specific Statement of Work (SOW) for each individual task order it later issued.[13]  The contract required FEI to "provide the necessary personnel, materials, services, equipment, and facilities, and otherwise do all things necessary to provide temporary shelters and related services as described in the Scope of Work, Attachment A."[14]  The contract provided for FEI to perform contractor services on a project by project basis, as assigned by FEMA including: "supporting staging areas for units, installation of units,

---

[10]  Rec. Doc. 1686, par. 9.
[11]  Rec. Doc. 1686, par. 8.
[12]  Portions of the IA/TAC between FEMA & FEI and Task Order 20 are att. as Ex. 1; see FL-FCA-1, 10 (§ F.3), part III, § J, att. A. (scope of work) FL-FCA-60, 74.
[13]   The IA/TAC is like an umbrella or a master services contract containing general conditions for all work performed, whereas each task order is like a work order specific to the disaster and work required by FEMA of the contractor for that disaster.  See Ex. 1, att.  A (scope of work) FL-FCA-60-74; Declaration of Charles Whitaker, FEI's Program Manager with respect to the IA/TAC, attached hereto.
[14]  The Contract, Ex.1, FL-FCA-1.

3

maintenance and upkeep, site inspections ... restorations, group site designs, ... construction, site assessment, property and facility management, and unit deactivation and removal." The contract provided, inter alia, that FEI "personnel shall perform professional, technical, clerical, and field work as assigned by the task order."[15]   These general contractual requirements mirror the plaintiffs' broad allegations of FEI's duties pursuant to the IA/TAC.[16]

### B.   Exhibit 7 To The IA/TAC Specifically Directs FEI How To Install The Travel Trailers

The Government's contract with FEI sets forth precise specifications dictating the exact manner for FEI to install the travel trailers, including detailed requirements for delivery, blocking/leveling, anchoring and straps, utilities hook-ups (sewer line, water line, electrical wiring) steps, winterization, handicapped ramps/steps, and minor tasks to make the trailers RFO.[17]   In Exhibit 7, the Government directed FEI to install the travel trailers on six piers constructed in a precise fashion.[18]  It is undisputed that this precise specification for blocking the travel trailer was completely formulated, designated and drafted by the Government and provided to FEI by the Government.  FEI had no role in developing, testing or engineering any aspect of Ex. 7, or any other aspect of FEMA's installation specifications.[19]

### C.   Exhibit 10 To The IA/TAC Specifically Directs FEI's Maintenance Of The Travel Trailers

FEMA's maintenance specifications in Ex. 10 provide similar detailed instructions that FEI had to follow,[20] confirming FEMA's extensive control over the maintenance aspects of the Program.  For example, Ex. 10 requires FEI, inter alia, to:

---

[15]  The Contract, Ex.1, attachment A. § 2.1.7, FL-FCA-62 & § 2.2.6, FL-FCA-63, respectively.
[16]  See Complaint, Rec. Doc.1, p. 9-14.
[17]  [Ex. 1] the Contract, Ex.7, § 2 (basic travel trailers set-up) FL-FCA-113-122; Decl. of Whitaker, art. 9.
[18]  **Please view [Ex. 1] the Contract, Exhibit 7, § 2.1.2 Blocking and Leveling, FL-FCA-113-114.**
[19]  Decl. of Charles A. Whitaker, art. 9.
[20]  [Ex. 1] the Contract, Ex. 10 (Maintenance), FL-FCA-135-144 & 147-149 (travel trailers); § 2.10 of the PWS (FL-FCA-66-67; 135-149) specifically incorporates Ex. 10 to the PWS, Decl. of Whitaker, art. 7.

- "Provide maintenance services of units **assigned by FEMA** ... and/or **identified by FEMA**."
- "Perform other tasks **as required by the COTR [Contracting Officers' Technical Representative]** ... ."
- "Operate and supply the resources for a maintenance call center … ."
- "Make repairs **identified by FEMA**." [21]

Furthermore:

- FEMA reserves the right to perform maintenance through its own forces (or through other contractors, which actually happened), and maintenance will be assigned to the contractor only after the unit is installed.
- FEMA directed that the contractor could only replace major material items after prior inspection and approval by the COTR or CO.
- FEMA established the frequency of routine maintenance: monthly.
- FEI was required to warrant any maintenance work for a period of 90 days, which period began upon acceptance of the work by FEMA. [22]

The maintenance work that FEI performed conformed to FEMA's specifications.[23]

### D.   <u>Task Order 20 Under The IA/TAC</u>

In response to Hurricane Katrina, FEMA issued Task Order (TO) 20 to FEI to provide staging support, haul/install and installation construction activities, maintenance and deactivation to further FEMA's operational objective of providing temporary housing solutions for displaced people.[24]  TO 20 directed "[FEI] shall execute these tasks to the requirements and specifications identified in this task order, in accordance with the Performance Work Statements and applicable Exhibits."[25]

FEI's chart [attached to] the Contract provides a chronological history of FEMA's TO modifications and SOW revisions to FEI.[26]  Prior to the actual award of TO 20, FEI operated

---

[21]  [Ex. 1] the Contract, Ex. 10, §§ 1(a), (c), (g, 3.1 & 3.2 delineating between routine & emergency maintenance) & (h), respectively (emphasis added).
[22]  [Ex. 1] the Contract, Ex. 10, §§ 4, 3.4, 4, & 5.7, respectively.
[23]  Decl. of Charles A. Whitaker.
[24]  Ex. 1, Task Order HSFEHQ-05-J-0020, SOW for disaster 1603 in LA, FL-FCA-219-222; 224; Decl. of Whitaker.
[25]  The Contract, Ex. 1, General Provisions (3), FL-FCA-219.
[26]  The Contract, Ex. 1, FL-FCA-207-212.

under FEMA's Pre-Authorization Notices (PAN).  The PANs authorized FEI "to begin work based on urgency."[27]

The first PAN was issued by FEMA to FEI on 9/10/05.  On 9/26/05, FEMA issued a SOW to FEI to haul and install travel trailers.  On 10/9/05, FEMA issued a RFP and SOW Revision 1, requiring FEI to submit a written technical and business proposal,[28] or Work Plan, specifying FEI's technical approach for performing specific tasks within the time frame specified, identifying key personnel, deliverables and due dates.  The Work Plan was subject to approval by the COTR[29] and was approved by FEMA and the Task Order thereafter issued.[30]

On 11/10/05, FEMA officially awarded TO 20 to FEI — an undefinitized task order award for haul and install, minor installation and construction activities, maintenance, deactivation and removal of travel trailers.[31]  TO 20 also became referenced as TO 11.[32]

## 2.    FEI's Work Conformed To The Government's Precise Specifications

FEI hired subcontractors to install the majority of the travel trailers, including the Alexander's trailer, installed by MLU Services, Inc.,[33] which is not a party. The Government's specifications for FEI's work were mandatory.  The contract did not allow FEI to change any of the specifications.  FEI could not deviate from the Government's specifications without the Government's review and approval.

FEI's work conformed to the Government's precise specifications, including the mandatory specifications for installation of the trailers.  There was a "back and forth" between the Government and FEI to ensure that FEI's work conformed to the Government's specifications

---

[27]  The Contract, Ex. 1, FL-FCA-16.
[28]  The Contract, Ex. 1, RFP, FL-FCA-228; plfs' reference to FEI as a "no-bid" contractor incorrect.
[29]  FL-FCA 236-240.
[30]  The Contract, Ex. 1, FL-FCA 235-240; and 16.
[31]  FL-FCA-236-240.
[32]  The Contract, Ex. 1, FL-FCA-236, 249-254.
[33]  See FL-FCA 4623, attached as Ex. 2.

on trailer blocking.  For example, initially, when FEMA gave FEI authorization to proceed with installation of travel trailers, the FEMA Contracting Officer, Nancy Costello, advised FEI <u>not</u> to install the trailers on blocks consistent with Ex. 7 to the IA/TAC, but rather, to install them simply using the tongue jack and stabilizer jack.[34]  Subsequently, on 10/18/05, as the result of electronic mail exchanges regarding "Confirmation of Technical Direction for Fluor in LA: Travel Trailer Blocking Requirement," Kevin McCarthy (the Government's COTR) directed:

> All Trailers installed by Fluor in LA shall be blocked in accordance with the Performance Work Statement and the diagram previously supplied [by the Government].  Trailers previously installed by but not blocked shall be blocked ASAP ... These trailers NEED blocking to preserve their useful lifespan and to ensure the safety of the occupants.  This issue has been brought to the attention of the IA-TAC Program Management in FEMA HQ and they agree 100%.[35]

Thus, FEMA's COTR directed FEI to commence installing travel trailers in strict accordance with FEMA's specifications in Ex. 7 and even required FEI to go back and retrofit all prior travel trailers that had not been installed in accordance with those specifications pursuant to Ms. Costello's earlier directive.[36]   Additionally, when FEI sought clarification of the specifications of Ex. 7, the Government provided FEI with a "blocking diagram that conforms to the [PWS] on trailer blocking" set forth in the Contract.[37]   <u>The Government's diagram for "Typical Travel Trailer Pier Construction"</u> was prepared by Terry Zien (U.S. Army COE) (10/11/05).[38]   Thus, a Government engineer drafted the trailer blocking diagram that was provided to FEI.  FEI was never directed or asked to, and therefore never undertook, to perform any engineering services concerning the Government's blocking diagram.  The Government

---

[34]  Government and FEI email exchange, Ex. 3, FL-FCA-7184-185.
[35]  The Gov't. & FEI emails re:  trailer blocking, att. as Ex. 3, including the Government's diagram, FL-FCA-9521.
[36]  Ex. 3, Government and FEI email exchange, FL-FCA-7180.
[37]  Government and FEI email exchange, Ex. 3, FL-FCA-9634, 9521, 7180-7185.
[38]  Ex. 3, FL-FCA-9521.

never requested any engineering support/expertise from FEI relating to the Government's method for blocking the trailers.[39]

It is undisputed that the Government inspected FEI's final trailer installations to ensure compliance with Ex. 7. FEMA mandated that the performance of FEI's work under the contract would be subject to the QA Surveillance Plan and the Technical Work Plan submitted by FEI and FEMA's COTR. The contract provided "[t]he COTR does not have the authority to, and shall not, issue any technical direction which: ... [c]hanges any of the express terms, conditions, or specifications of the contrac[t] Task Orders ... ," and FEI "shall proceed promptly with the performance of technical directions duly issued by the COTR ... ."[40] This quality control system was established by FEMA to ensure that FEI's work was performed in accordance with contract requirements and with FEMA approval.

In addition to FEI's own 100% QA/QC checks of its subcontractors installations, the Government had at least three methods of ensuring that FEI complied with the Ex. 7.[41] <u>First</u>, the Army Corps of Engineers had inspectors in the field on a regular basis, bringing to the attention of all IA/TAC contractors, including FEI, issues they felt did not comply with the installation or other IA/TAC specifications. <u>Second</u>, the Government performed QA/QC inspections of many of the travel trailers installed by FEI and its subcontractors. FEMA technical monitors (for the COTR) were in the field every day inspecting FEI's trailer installations to confirm strict compliance with FEMA's detailed specifications.[42] <u>Third</u>, in the fall of 2005, FEMA retained a QA/QC contractor who inspected all IA/TAC contractor EHU installations to ensure compliance. Due to the large number of trailers, FEMA's QA/QC subcontractor did not inspect 100% of

---

[39] Decl. of Charles Whitaker, arts. 9, 12.
[40] Contract, Ex. 1, FL-FCA-15, G. 7 Technical Direction & Surveillance; Decl. of Whitaker, arts. 13 and 14.
[41] Decl. of Charles Whitaker, art. 14.
[42] Decl. of Charles Whitaker, arts. 15-16.

installed units, but apparently applied sampling or auditing principles in connection with unannounced inspections of EHU installations to ensure IA/TAC compliance.[43]   The FEMA technical monitors and QA/QC inspectors conducted detailed inspections utilizing the "FEMA Travel Trailer Inspections Field Inspector's Guide,"[44] scrutinizing every minute aspect of FEI's (and its subcontractor's) work.   FEMA designed the guide for its inspectors as:

> **a visual assist** as you inspect FEMA travel trailers for occupancy… This guidebook is not a substitute for knowing the specifications in the project work statement… the pictorial presentations will help you remember the individual items, acceptable methods and procedures you should use during your review of the contractor's work.[45]

FEMA's Guide contains over 10 pages of photographs, with detailed written instructions, showing proper "Blocking and Leveling" methods the contractor's installation must meet to comply with FEMA's contract specifications and for FEMA's approval.[46]   The Guide also contains photographs with instructions for "Anchoring and Straps" (4 pgs.), sewer and water line placement, RFO checks, steps and ramps.   To ensure that FEI's and its subcontractors were strictly complying with the Contract specifications for trailer installations, FEI requested and FEMA gave FEI a copy of the Guide, which FEI used to make sure its installations conformed precisely to FEMA's specifications and would pass FEMA's inspections.[47]

The form that FEI used to inspect trailers at the staging areas (form 90-13) was a FEMA inspection form.[48]   Likewise, the RFO QC/QA Checklist used after trailer installation and before occupancy was derived from FEMA's installation specifications. Thus, FEI and its

---

[43]  Decl. of Charles Whitaker, art. 17.
[44]  A copy of the FEMA Travel Trailer Inspections Field Inspector's Guide is attached as Ex. 4, FL-FCA06913-40.
[45]  Ex. 4, FL-FCA-06940.
[46]  Ex. 4, FL-FCA-06914-06920, 925, 926 (& 933 which specifically directs how to determine if the trailer is level).
[47]  Decl. of Charles Whitaker, art. 18.
[48]  See e.g., Ex. 5, Alexander trailer installation package, FL-FCA-004609-4635. See FEMA's unit inspection rept. 90-13, FL-FCA-004614 & FEMA's (RFO) QA/QC Check List, FL-FCA-004615-4616; Decl. of  Whitaker, art. 13.

subcontractors' quality control inspections were performed in strict compliance with FEMA's contract requirements.

Stephen Miller was a supervisor over logistical operations with FEMA on the IA/TAC. Mr. Miller worked closely with individuals from FEI, personally observing FEI's performance. He made visits to FEI's staging areas and sites where units were installed or in the process of installation.   He did not receive any complaints nor have any complaints concerning the performance of FEI's work.  He was satisfied with FEI's work under the Contract.[49]

David Garratt, Deputy Administrator of FEMA, testified it was an explicit FEMA directive to put the travel trailers on blocks.  If the contractor did not put the trailers on blocks, or failed to hook up the trailers to utilities, they would have violated their FEMA contract.[50]  The contractors had to deliver the trailers that FEMA designated and purchased and to do otherwise or to chose some other form of housing would have been a breach of the FEMA contract.[51] There are no allegations by plaintiffs that FEI deviated from the scope of work that it was mandated to do by the Government.

The Inspection and Acceptance clause applied to all work performed under the contract, including Ex. 7 and the other exhibits to the PWS.[52]  This clause incorporated by reference 48 C.F.R. § 52.246-5,[53] which reserved to the Government "the right to inspect and test all services" and "[i]f any of the services performed do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, for no additional fee." § 52.246-5(c), (d).  If "defects in services cannot be corrected," or "[i]f the Contractor fails to properly perform the services again or take the action

---

[49] The pertinent testimony from the deposition transcript of Stephen Miller is attached as Ex. 6, p. 200-202.
[50] The pertinent portions of the deposition transcript testimony of Mr. Garratt are attached as Ex. 7, p. 218-221.
[51] Garratt deposition, Ex. 7, p. 219-200.
[52] The Contract, Ex. 1, FL-FCA-9, Section E; Decl. of Charles A. Whitaker, art. 7.
[53] The Contract, Ex. 1, FL-FCA-9, Section E.

necessary ensure future performance in conformity with contract requirements, the Government may ... terminate the contract."  Id. at § 52.246-5(e).

The clause also mandated "[f]inal inspection and acceptance shall be by the Contracting Officer or his ... representative ... ."[54]  At the end of the project, FEMA evaluated and formally accepted as complete all of FEI's work performed pursuant to the Contract.[55]

### 3.    The Government's Superior Knowledge Of Formaldehyde Claims Preceded FEI's Actual Knowledge Of Claims

It is undisputed that the Government's knowledge about formaldehyde claims preceded and exceeded any actual knowledge FEI had of formaldehyde claims.  It is well documented that FEMA knew about formaldehyde concerns in EHUs before FEI ever had any actual knowledge of such concerns.  The court noted: "[i]t was (by FEMA's admission) as early as March 2006 that FEMA reportedly received the first reported concerns of formaldehyde fumes by a Gulf Coast trailer occupant."[56]  The court found while FEMA allegedly first became aware of formaldehyde in mid-March 2006, it perhaps had knowledge, "beginning in late 2005."[57]  Plaintiffs allege that FEMA became aware of the health concerns related to formaldehyde in their trailer, as early as the fall/winter of 2005.[58]   Moreover, the Government admits that as early as October 2005, Bechtel warned the Government of "a concern about material off-gasing (possibly formaldehyde) in newly delivered travel trailers."[59]  In response, OSHA began testing new, unoccupied EHUs for formaldehyde and determined that venting units for a short time reduced formaldehyde below the regulatory level of concern.[60]  This testing was disclosed to FEMA in the Mississippi Joint

---

[54]  The Contract, Ex. 1, FL-FCA-9, E.2 Inspection and Acceptance.
[55]  FEMA's Acceptance of Task Order Services, FL-FCA-19669-19670, att. as Ex. 8; Decl. of  Whitaker, art. 19.
[56]  See Court's Order, Rec. Doc. 717, timeline of relevant facts/events, p. 27-36, see p. 28.
[57]  Court's Order, Rec. Doc. 717, p. 45; Rec. Doc. 2621, p.2.
[58]  Rec. Doc. 1686, par. 11.
[59]  See Gov't  Motion, Rec. Doc. 1545-22; Ct's Order, Rec. Doc. 717, p. 28 n.13; Bechtel's Motion to Dismiss, p. 24.
[60]  Rec. Doc. 1545-4, p. 5, IV; Rec. Doc. 717, p.28 n.13; Decl. of Clyde Payne, Rec. Doc. 1545-10, par. 5-6, 3.

Field Office Situation Report S/TREP 41/FEMA-1604-DR-M5.[61]  Yet, the Government did <u>not</u> tell FEI about these tests.  The chronology of FEMA's knowledge about formaldehyde concerns in EHUs and its discretionary response is set forth in the Government's motion.[62]  FEI first became aware of a potential issue concerning formaldehyde in the travel trailers in March 2006.[63]  It is undisputed that prior to March 2006, FEI had not received any complaints about formaldehyde concerns in travel trailers.[64]  There are no allegations or evidence that FEI had actual knowledge about formaldehyde concerns in travel trailers not known to the Government. Plaintiffs have made no allegation that FEI knew of any alleged formaldehyde concerns that were not know to the Government.

## <u>ARGUMENT AND APPLICABLE LAW</u>

FEI is a Government contractor that performed its work in compliance with specifications provided and mandated by the Government, rendering it immune from suit and entitling it to summary judgment.  FEMA provided FEI with reasonably precise specifications for installation of the trailers.  Ex. 7 to the IA/TAC specifically directed FEI to install the trailers on six piers constructed in a precise fashion.  Additionally, the Government issued a mandatory technical directive to FEI that all trailers shall be blocked in accordance with FEMA's blocking specification *and* the Government's "Typical Travel Trailer Pier Construction" diagram.  FEMA exercised its discretion and specifically chose the installation design for the trailers. There are no allegations and no evidence that FEI deviated from the Government's specifications.  It is undisputed that the Government inspected FEI's final trailer installations to ensure compliance with Ex. 7, and that FEI's work under the contract was accepted and finally approved by FEMA.

---

[61]  Decl. of Clyde Payne, Rec. Doc. 1545-10, par. 8-10.
[62]  <u>See</u> Rec. Doc. 1545 <u>passim</u>.
[63]  Depo. of Robert Duckworth, FEI's Senior Site Safety Manager, attached as Ex. 9, p. 78 L. 3-25, p. 79, L. 1-6.
[64]  Ex. 9, deposition of Robert Duckworth, p. 78-79.

Finally, there is no evidence that FEI had actual knowledge about formaldehyde dangers in travel trailers not known to the Government during the relevant time period.

Plaintiffs' allegations are really against the Government for its policy decision on the trailer installation specifications.  However, plaintiffs know that because the Government was within its discretionary function, it is entitled to sovereign immunity.  Instead, plaintiffs sued FEI trying arduously to shift any responsibilities of the Government to FEI, a private contractor.  However, the purpose of the government contractor defense is to give FEI, a government contractor, the same immunity afforded the Sovereign.  The undisputed evidence compels the conclusion that FEI meets the three prerequisites of Boyle, as interpreted by the Fifth Circuit, entitling FEI to that immunity and summary judgment as a matter of law.

**A.      Summary Judgments Are Favored**

Courts routinely grant summary judgment and hold federal contractors immune from liability under state law based on the government contractor defense.  See e.g., Hudgens v. Bell Helicopters, 328 F.3d 1329, 1344-45 (11th Cir. 2003); Kerstetter v. Pac. Sci. Co., 210 F.3d 431, 437-39 (5th Cir. 2000); In re Air Disaster at Ramstein Airbase, Germany, 81 F.3d 570, 574-76 (5th Cir. 1996); Stout v. Borg-Warner Corp., 933 F.2d 331, 334-37 (5th Cir. 1991), cert denied, 502 U.S. 981 (1991); In re Katrina Canal Breaches, No. 05-4182, 2008 WL 5234369 at *20 (**E.D. La**. 2008) (remediation contractor immune from state tort claim based on gov't. contractor defense); In Re Katrina, 2007 WL 763742 at *6 (granting dredging contractors' motion based on gov't. contractor defense).

**B.      The Government Contractor Defense Bars Plaintiffs' Claims Against FEI**

The Supreme Court has long recognized that private contractors who perform work at the direction of the federal government cannot be held liable for damages caused by the contractors'

implementation of that work.[65] This derivative sovereign immunity was first recognized in Yearsley v. W.A. Ross Constr., 309 U.S. 18 (1940).  The Court held that a private contractor hired by the federal government to build dikes along a river was not liable to owners whose property eroded as a result of the contractor's work, because the contractor was acting under the direction of the government. Id. at 22-23.  The level of government direction which served as the basis for immunity was general – the contractor had simply been instructed to build dikes in order improve river navigation. The contractor opted to "keep open an adequate channel for navigation between the end of the dike and the shore" and "accelerated the erosion by using the paddlewheels of its steamboats to increase … the current." Id. at 19-20. It was this independent decision that caused the damage to the plaintiff's land. Nevertheless, the court held that the contractor's use of methods not entirely specified in the contract for completing the dikes was irrelevant for determining whether there was derivative immunity. The Court recognized that a private contractor may share in the immunity of a governmental entity where it is (1) working under direction of that entity, and (2) the actions complained of are generally within the scope of such directives. Id. at 1921. The Court held "[i]f [the] authority to carry out the project was validly conferred, that is if what was done was within the Constitutional power of Congress, there is no liability on the part of the contractor for executing its will." Id. at 2021.

Over 20 years later, the Court in Boyle, 47 U.S. at 500, reaffirmed and elaborated on the Government contractor defense.  "The defense is intended to implement and protect the discretionary function exception of the FTCA, 28 U.S.C. § 2680(a)."  In re Hanford Nuclear Reservation Litigation, 534 F.3d 986, 999 (9th Cir. 2008).  "The defense allows a contractor–defendant to receive the benefits of sovereign immunity when a contractor complies with the specifications of a federal government contract."  Id. (quoting Boyle, 487 U.S. at 511-12).  There

---

[65]   See Yearsley v. W. A. Ross Const., 309 U.S. 18 (1940); Boyle v. United Tech. Corp., 487 U.S. 500 (1988).

is no question that sovereign immunity generally bars claims directly against the U.S. challenging discretionary decisions.[66]  The federal government contractor defense protects that immunity by preventing parties who cannot sue the U.S. *directly* for its discretionary decisions, from suing the U.S. *indirectly* by suing private contractors tasked with implementing such decisions. See, e.g., Boyle, 487 U.S. at 512; Yearsley, 309 U.S. at 2021.  As the Court explained:

> [P]ermitting second-guessing of the [government's] judgments ... through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption.  The financial burden of judgment against the contractors would ultimately be passed through, substantially if not totally, to the United States itself ...  it makes little sense to insulate the government against financial liability for the judgment that a particular feature of military equipment is necessary when the government produces the equipment itself, but not when it contracts for the production ... .

Boyle, 487 U.S. 511-12.  "The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the government, or it will raise its price."  Id. at 507.[67]

The Boyle court referred to two unique federal interests implicated by a contract between a private contractor and the federal government.  The first is the law governing the obligations and rights of the U.S. under its contracts. The second relates to the scope of civil liability of federal officials for discretionary actions taken in the course of their duties.  Id. at 504-05. Although Congress generally waived sovereign immunity for tort claims against the U.S. under the FTCA, 28 U.S. §2671 (2000), it specifically exempted from this waiver claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. §2680(a) (discretionary function exception). Thus, "if the federal government could not be sued for

---

[66] See, e.g., 28 U.S.C. § 2680(a).
[67] Regardless of whether the U.S. is legally obligated to indemnify the contractor, the U.S. ultimately pays the price. See, e.g., Nielsen v. George Diamond, 892 F.2d 1450-52 (9th Cir. 1990); McKay v. Rockwell Int'l. Corp., 704 F.2d 444, 449 (9th Cir. 1983).

performing discretionary acts, neither could a private contractor, and any state law providing for such liability would necessarily give rise to an inherent conflict." In re World Trade Ctr. Disaster Site Lit., 456 F.Supp.2d 520, 561 (S.D.N.Y. 2006)(citing Boyle, 487 U.S. at 500).

Boyle established a three-part test, specific to procurement contracts, to determine when the defense applies.  Boyle, 487 U.S. at 512.  To prevent state laws from frustrating these important federal interests, federal common law now dictates that a private contractor cannot be liable under state law where: (1) the federal government approves reasonably precise specifications, (2) the contractor's work conforms to those specifications, and (3) the contractor is not aware of reasons not known to the government why the work product required by the specifications is unsafe or unreasonable.  See Kerstetter, 210 F.3d at 435; Boyle, 47 U.S. at 512; In re Katrina Canal Breaches, 2000 W.L. 4219351 at *5 (E.D. La. 11/27/07).  "Displacement of state law occurs under Boyle so long as the three-prong test of that case is met; the three-prong test is itself the definition of when a significant conflict exists between state and federal law." Hill v. Raytheon Aircraft, 470 F. Supp.2d 1214, 1223 (D. Kan. 2006)(citing Boyle, 487 U.S. at 501; Lewis v. Babcock, 985 F.2d 83,86 (2d Cir. 1993));[68] see also In re Katrina Canal Breaches, No. 05-4182, Doc. 67, p. 29-30 (E.D. La. 12/15/08).

If the contractor satisfies the government contractor defenses' 3 conditions, the nature of the contractor's work (military, non-military, service or procurement) is irrelevant.  The defense applies with equal force to service and maintenance contracts like FEI's contract with the Government.[69]  Indeed, where the government has directed a contractor to do the very same

---

[68]  Cert. denied, 509 U.S. 924 (1993).

[69]  See e.g., In re World Trade Ctr.Litig., 521 F.3d 169, 197 (2d Cir. 2008)(gov't contractor defense applies to contractors providing disaster relief & clean-up services to federal gov't); Hudgens, 328 F.3d at 1334 (maintenance-service contractor may assert gov't contractor defense); In re Katrina Canal Breaches Consol. Litig., No. 05-4182, 2007 WL 763742, at *4 (E.D. La. 3/9/07)(granting dredging service contractor's motion to dismiss on gov't contractor defense); Richland-Lexington Airport v. Atlas Prop., 854 F.Supp. 400, 421-24 (D.S.C. 1994)(remediation contractor working for EPA immune under the defense); Askir v. Brown & Root, 1997 WL 598587 at *2, 5-7

thing that is the subject of the claim, the contractor may assert the defense. Correctional Services

Corp. v. Malesko, 534 U.S. 61, 74 n.6 (2001)(citing Boyle, 487 U.S. at 500).

The government contractor defense "is based not on a simple economic concern for government procurement costs, but on the government's need to exercise judgment." Snell v. Bell Helicopter Textron, 107 F.3d 744, 746 (9th Cir. 1997). The defense protects more than just the public fisc; it also protects the government's discretionary decision making. See Snell, 107 F.3d at 746 (the defense is intended to implement and protect the discretionary function exception under the FTCA).

It is not a prerequisite for application of the defense that it must be proven that the government is entitled to discretionary function immunity (or exercised its discretion in accepting a safety risk) for the particular task at issue. In re Katrina Canal Breaches, No. 05-4182, Doc. 67, p.28-29 (E.D. La. 12/15/08). There, Judge Duval rejected the plaintiffs' assertion of such a prerequisite, stressing that this identical argument was specifically rejected by the Second Circuit in Lewis v. Babcock Indus., 985 F.2d 83, 87 (2d Cir. 1993).[70] Here, this court has ruled that the discretionary function exception bars plaintiffs' FTCA claims challenging FEMA's decision to contractually delegate the responsibility for hauling, installing and maintaining EHUs to IA/TACs.[71] Specifically, this court found plaintiffs' claim that the government was involved in making contractual arrangements for the contractors to follow in the field, regarding the delivery and set-up of the EHUs, was a discretionary function. FEI should be extended the same immunity based on its (or its subcontractor's) installation of plaintiffs' trailer pursuant to the government's precise specifications.

---

(S.D.N.Y. 1997)(contractor that provided "logistical, operational, maintenance, and construction services" to the U.S. is immune from liability under government contractor defense).

[70] In re Katrina Canal Breaches, Doc. 67, Ct's Order granting WGI's MSJ on the gov't contractor defense, p. 28-30.

[71] October 3, 2008 Order, Rec. Doc. 717, p. 43-44.

**1.**      **FEI Meets The Three Conditions For Dismissal Under The Government Contractor Defense**

      **a.**      **The Government provided reasonably precise specifications for FEI's work**

The requirement that the government approve reasonably precise specifications was created to "assure that the design feature in question was considered by a government officer and not merely by the contractor itself."  Boyle, 487 U.S. at 512.  Thus, the government need not prepare the specifications to be considered to have approved them as long as the government provides a substantive review or an evaluation of the contractor's plans, and is not merely a bureaucratic rubber stamp.  Kerstetter, 210 F.2d at 435; Trevino v. Gen. Dynamics, 865 F.2d 1474, 1480 (5th Cir. 1989).  Evidence of continuous back and forth between the contractor and the government, where the contractor and government worked closely together on the development of a project from its planning stages through its production is sufficient.  In re Air Disaster at Remstein Airbase, Germany, 81 F 3d. 570, 575 (5th Cir. 1996).  The specifications need not address the specific defect alleged; the government need only evaluate the design feature in question.  Kerstetter, 865 F.2d at 1479-1481.[72] The design feature in question here is the Government's own blocking specifications.

Further, "[t]he contractor defense requires only that the government approve reasonably precise specifications."  Smith v. Xerox Corp., 866 So.2d 135, 138 (5th Cir. 1989).  Though it is necessary only that the government approve, rather than create the specifications, FEMA created and provided the specifications for trailer installation.  This clearly satisfies the first condition of the defense.  See Miller v. Diamond Shamrock Co., 275 F.3d 414, 420 (5th Cir. 2001).  In addition to FEMA's precise requirements for blocking and leveling the trailers, FEMA issued

---

[72] Citing Boyle, 487 U.S. at 512; Trevino, 865 F.2d at 1486 ("The government contractor defense ... protects government contractors from liability for defective designs if discretion over the feature in question was exercised by the government").

mandatory directives to FEI on how to block the trailers, including a detailed diagram drafted by a U.S. Army Corps Engineer.[73]

Even assuming arguendo that FEMA's blocking specifications gave FEI any discretion as to how to get the trailer off the ground and onto the piers, FEI is insulated from liability by the government contractor defense. **Boyle does not require that the government issue standards which remove all compliance discretion from the contractor.** Carley v. Wheeled Coach, 991 F.2d 1117, 1125 (3d Cir. 1993); Hill v. Raytheon Aircraft Co., 470 F.Supp. 2d 1214, 1224 (D. Kan. 2006); see also Smith v. Xerox Corp., 866 F.2d 135, 138 (5th Cir. 1989)(government contractor defense requires only that the government approve reasonably precise specifications). In Carley, the court instructed that:

> [T]he government need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply.

To meet the first condition of Boyle, "a contractor need only show governmental approval of **the overall design** of an allegedly defective product." Lambert v. B.P. Prods. N. Am., Inc., 2006 U.S. Dist. Lexis 16756 (S.D. Ill. 2006)(quoting Stout, 933 F.2d at 331)(emph. added)). "The plaintiffs in Stout had argued that specifications for an air conditioning unit were not reasonably precise because they did not specifically prohibit the contractor from installing a safety device. The Fifth Circuit found that the government's thorough review of the overall specifications constituted appropriate approval of reasonably precise specifications." Lambert, 2006 U.S. Dist. Lexis 16756 (citing Stout, 933 F.2d at 336). Thus, to the extent that FEI had any discretion in determining how to raise the trailers onto the blocks, it is nevertheless entitled to the government contractor defense. Plaintiffs cannot raise a genuine issue of fact to dispute FEI's

---

[73] Ex. 3, FL-FCA 9521; Decl. of Charles Whitaker, art. 18.

satisfaction of condition one of the government contractor defense for any feature of work plaintiffs challenge.[74]

**b.   FEI's work conformed to FEMA's specifications**

FEI faithfully followed FEMA's plans and specifications in performing its work.  The government's issuance of a formal report indicating acceptance of the product and/or conformity with all required specifications is compelling evidence that the contractor's work met the government's requirements.  Miller, 275 F.3d at 414.  This condition also may be satisfied by showing that the government supervised and controlled the contractor's implementation of approved specifications, or that the government inspected, accepted as complete or used the contractor's work.  In re Katrina Canal Breaches, 2000 WL 4219351, at *5 (E.D. La. 11/27/07); Kerstetter, 210 F.3d at 435-36 ("the Army's experience with the 540 rotor system – and its decision to continue using it – amply established government approval of the alleged design defect").  Tate v. Boeing Helicopters, 55 F.3d 1150, 1156 (6th Cir. 1995)(second condition satisfied by proof that gov't "inspected and approved" contractor's work).  Moreover, where there is a continuous exchange between the contractor and the government, the process itself becomes persuasive evidence of product conformity to precise specifications.  Kleemann v. McDonnell Douglas Corp., 890 F.2d 698, 701-02 (4th Cir. 1989).  In all events, absence actual evidence to the contrary, the government's written acceptance of its contractor's work constitutes compelling evidence that the contractor's work conformed to the government's approved specifications.  See, e.g., Miller, 275 F.3d at 420.

Plaintiffs cannot negate a contractor's showing of conformance with reasonably precise specifications merely by asserting that defendant's work did not comply with some "general admonition against an unwanted condition.'"  Kleemann, 890 F.2d at 703 (quoting Harduvel v.

---

[74] See Infra, p. 22.

General Dynamics, 878 F.2d 1311, 1319 n.3 (11 Cir. 1989)(precatory contract terms "represent little more than the hopes of the participants that the project on which they are about to embark will turn out well"); In re Air Disaster, 81 F.3d at 575 (holding overly general contract language "'calling for such vaguaries as a failsafe, simple or inexpensive'" work have no role in the government contractor defense analysis))(quoting Kleemann, 890 F.2d at 703).

Instead, plaintiffs must show an allegedly defective feature – which caused plaintiffs' damages – "result[ed] from" the contractor's departure from reasonably precise specifications. See Kerstetter, 210 F.3d at 435-36; see also Beaver Valley Power Co. v. Nat'l. Eng'g., 883 F.2d 1210, 1219 n.9 (3d Cir. 1989)(partially aff'g summary judgment because plaintiff never showed how the contractor's alleged non-conformance with a contractual permitting requirement "caused its damages").

FEI's work conformed to the specifications required by FEMA.  It is undisputed that the government inspected FEI's final trailer installations to ensure compliance with Ex. 7 of the IA/TAC.  FEI's work pursuant to the Contract, including installation of the trailers, conformed to FEMA's specifications because FEMA supervised, inspected, used and expressly accepted FEI's work.[75]  During the QA inspections, the inspectors actively ensured adherence to FEMA's specifications and would have noted any deficiencies to be corrected.[76]  FEMA's inspections clearly show that FEMA exercised "supervisory judgment" over the "particularities" of the work. In re Katrina, 2007 WL 24219351 at *5; see also In re Air Disaster, 81 F.3d at 575 (holding 'inspectors ... actively involved' showed conformance).

Throughout the project, FEMA found no non-compliance by FEI.  FEMA evaluated and accepted FEI's work.  See Kerstetter, 210 F.3d at 435-36 (holding acceptance showed

---

[75]  See In re Air Disaster, 81 F.3d at 575.
[76]  Decl. of Charles Whitaker, art. 14-17.

conformance); In re Air Disaster, 81 F.3d at 575 (same).  The record shows that in the end FEMA formally accepted as complete all of FEI's work.[77]  Because FEMA made that express determination, FEI's work necessarily conformed with FEMA's specifications.  See Miller, 275 F.3d at 420 (collecting cases).[78]  There is no testimony or evidence which can possibly contest that FEI's work was accepted by FEMA.  The work would not be accepted by FEMA unless the work was in accordance with the contract and FEMA's specifications.

Plaintiffs' primary complaint against FEI is that FEI installed the trailers by "blocking" the unit – raising the unit several feet into the air and off of its wheel base and setting it on concrete blocks, allegedly creating distortion in the trailers' shell, allowing increased moisture intrusion which contributed to increased formaldehyde exposures.[79]  But that is exactly what FEMA directed FEI to do – install the trailers by "blocking" them, immunizing FEI from liability under the government contractor defense against this allegation.  Indeed, a more recent Supreme Court case, Correctional Services Corp. v. Malesko, 534 U.S. 61 523 n.6 (2001)(citing Boyle) supports broad application of Boyle and the government contractor defense: "[w]here the government has directed a contractor to do the very thing that is the subject of the claim, we have recognized this as a special circumstance where the contractor may assert a defense."

The Plaintiffs' attempt to separate out of the entire blocking process one discreet function, myopically fixating on how FEI raised the trailers from the ground onto the piers, does not defeat application of the government contractor defense to FEI's work.  That FEMA did not explicitly tell FEI how to get the trailer from the ground on two axles and a tongue jack up onto the piers is irrelevant for application of the government contractor defense.  As stated by the Fifth Circuit in Bailey v. McDonnell Douglas Corp., 989 F.2d 784 (5th Cir. 1993), the alleged defect must exist

---

[77]  See Exhibit 8, FEMA's Acceptance of Task Order Services, FL-FCA 19669-19670.
[78]  See also Kerstetter, 210 F.3d at 435-36; In re Air Disaster, 81 F.3d at 575.
[79]  Complaint, Rec. Doc. 1, par. 38-40.

independently of the design itself, and must be from a deviation from the required government specifications.  Even under plaintiffs' argument, there is no testimony or evidence that suggests that FEI deviated from a required "design" specification.  Under the government contractor defense, the issue is not whether the contractor did everything he could to prevent the damage complained – it is whether the contractor complied with the government's specifications.  Any arguments plaintiffs may make that FEI could have lifted up the trailers differently onto blocks would be the same arguments the plaintiffs made in <u>Kerstetter</u>, where the Fifth Circuit rejected that argument.  The standard, as stated in <u>Kerstetter</u>, is whether the government approved a specification which did not contain a safer design.  In this case, FEMA drafted and provided the specifications to FEI dictating how to install the trailers, including blocking, and reinforced those specifications with precise directives issued to FEI.  To establish that FEI has not met the second prong of <u>Boyle</u>, plaintiffs must identify a "specification" that FEI deviated from in installing the trailers.  Plaintiffs have not and they cannot.  There is no allegation that FEI deviated from the scope of work that it was mandated to do by the government.  Further, during the project, there was continuous back and forth between FEMA and FEI regarding the trailer installation process, including FEMA's directives on "blocking" the trailers.

Accordingly, the court should find that FEI satisfies the second condition of the government contractor defense for all of the installation features of FEI's work.

### c. FEI had no actual knowledge not otherwise known to the Government about alleged formaldehyde problems

There were no dangers known to FEI of which the Government was not aware.  FEI had no actual knowledge not otherwise known to the Government about how FEMA's plans and specifications might lead to claims of formaldehyde exposure in the travel trailers.

A federal contractor satisfies the government contractor defenses' third condition by proving that it knew of no "reasons not known to the Government why the application" of the approved plans and specifications were "unsafe or unreasonable."  In re Katrina, 2007 WL 4219351, at *5; see also Kerstetter, 210 F.3d at 436; In re Air Disaster, 81 F.3d at 575-76. Significantly, the contractor has no duty to test for or discover inherent risks that neither the government nor its contractor ever considered to be unsafe.  The purpose of this element is not to create any incentive to discover latent defects in a product designed for the government.  See Kerstetter, 210 F.3d at 436 (citing Boyle, 487 U.S. at 512, 513).  "The government contractor defense does not require a contractor to warn the government of defects about which it only should have known."  Id.; Miller, 275 F.3d at 422.  Rather, "a government contractor is only responsible for warning the government of dangers about which it has actual knowledge,"[80] and not about dangers which, in hindsight, the contractor allegedly *should have* identified.  Trevino, 865 F.2d at 1487 (emph. added).  This third condition tests only whether the contractor knew of dangers not known to the government.  The Kerstetter court relied on the Boyle court's holding that "it does not seem to us sound policy to penalize, and thus deter, active contractor participation in the design process, placing the contractor at risk unless it identifies all design defects." Kerstetter, 210 F.3d at 436 (quoting Boyle, 487 U.S. at 513).  Both the district court and the Fifth Circuit interpreted this language as "mean[ing] only that the defense applies even when the contractor did not warn the government of latent defects – in other words, defects that neither the contractor nor the government considered at all."  Kerstetter, 210 F.3d at 436.

The third condition tests only whether the contractor knew of dangers "not known to the government."  In re Katrina, 2007 WL 4219351, at *5.  Thus, FEI also may satisfy this third condition by showing the government's knowledge of potential risk either equaled or exceeded

---

[80] Kerstetter, 210 F.3d at 436 (citing Trevino, 865 F.2d at 1487).

FEI's knowledge.  See e.g., Miller, 275 F.3d at 422-23 (aff'g summary judgment partly because the U.S. knew of the dangers by a bi-product of Agent Orange); Kerstetter, 210 F.3d at 438 n.9, (aff'g summary judgment partly because the U.S. "knew at least as much as the contractors"); In re Air Disaster, 81 F.3d at 575 (aff'g summary judgment partly because the U.S. knew of the alleged risks); Stout, 933 F.2d at 336-37 (aff'g summary judgment partly because the U.S.' verbal and written warnings to plaintiff showed the U.S. knew of the risks).

Plaintiffs did not allege, and there is no evidence that FEI knew of any danger regarding potential formaldehyde claims that was not known to the Government.  In fact, FEMA admits that it had prior and superior knowledge about formaldehyde claims.  The test is not should FEI have known of the formaldehyde problem allegedly created by implementation of FEMA's mandatory specifications for trailer installation.  **FEI is only responsible for warning the Government of dangers about which it had actual knowledge.**  Simply put, there is absolutely no evidence which would demonstrate such knowledge.  FEMA in fact did know infinitely more than FEI about alleged formaldehyde complaints beginning in October 2005.   FEMA's knowledge about any potential risks to trailer inhabitants associated with FEI's trailer installations, pursuant to FEMA's directives, clearly exceeded that of FEI's knowledge.  The undisputed evidence shows that FEI has met the third and final condition of the government contractor defense, and its motion for summary judgment should be granted, dismissing the plaintiffs' claims against FEI.

**MIDDLEBERG, RIDDLE & GIANNA**
BY:  _____/s/Sarah A. Lowman_____
Dominic J. Gianna, La. Bar No. 6063
Sarah A. Lowman, La. Bar No. 18311
Charles R. Penot, Jr. (La. Bar No. 1530 &
Tx. Bar No. 24062455)
201 St. Charles Avenue, Suite 3100
New Orleans, Louisiana 70170

Phone: (504)525-7200; Fax: (504)581-5983
**ATTORNEYS FOR FLUOR**
**ENTERPRISES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2009, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sends notice of electronic filing to all counsel of record, including court-appointed liaison counsel, who are CM/ECF participants.

*/s/Sarah A. Lowman*
SARAH A. LOWMAN

ND: 4825-1210-5220, v. 1