UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION:  N(5) |
| | * | |
| This Document Relates to: | * | |
| *Charlie Age, et al. v.* | * | JUDGE: ENGELHARDT |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | |
| | * | MAG: CHASEZ |

*******************************************************************************

**MEMORANDUM IN SUPPORT OF GULF STREAM COACH, INC.'S
MOTION *IN LIMINE* TO EXCLUDE
EXPERT TESTIMONY OF PAUL HEWETT, Ph.D.**

**MAY IT PLEASE THE COURT:**

Gulf Stream Coach, Inc. respectfully submits the following Memorandum in Support of its Motion *in Limine* to Exclude Expert Testimony of Paul Hewett, Ph.D.

**I.  BACKGROUND**

**A.      Nature of Case**

This Multi-District Litigation is the consolidation of over one hundred-twenty state and federal toxic tort suits in which thousands of named plaintiffs claim to have inhabited emergency housing units ("EHUs") that were provided to them by the Federal Emergency Management Agency ("FEMA") as a result of the alleged uninhabitability of their residences due to Hurricanes Katrina and Rita.  Following denial of class certification, several plaintiffs, including bellwether plaintiffs Alana Alexander and Christopher Cooper (hereinafter collectively referred to as "Alexander"), filed suit against Gulf Stream Coach, Inc., alleging that it manufactured the EHUs used by the specific plaintiffs.  (*Age, et al v. Gulf Stream Coach, Inc., et al*, 09-2892, Doc. No. 1).  Moreover, plaintiffs have named as defendants the United States Government through

FEMA and Fluor Enterprises, Inc. (*Age,* Doc. No. 1), and plaintiffs seek recovery for alleged physical and mental pain and suffering, physical impairments and disability, medical expenses, loss of earnings capacity, loss of enjoyment and quality of life, loss of consortium, travel expenses, out-of-pocket expenses, and the loss of use and/or opportunity to use safe and adequate shelter allegedly resulting from the purported exposure to formaldehyde. (*Age*, Doc. No. 1, ¶ 117). Specifically, the *Age* plaintiffs claim exposure to the allegedly dangerous levels of formaldehyde (or threat thereof) in those EHUs. (*Age*, Doc. No. 1, at ¶ 23). Alexander itemized the theories of recovery against Gulf Stream Coach, Inc., in part, as follows:

1. Failing to design the EHU so as to not emit allegedly dangerous levels of formaldehyde;

2. Manufacturing an allegedly unreasonably dangerous EHU;

3. Providing an EHU that did not conform to express warranties allegedly made by Gulf Stream Coach, Inc.; and

4. Failing to warn of the allegedly excessive levels of emissions of formaldehyde and hazards associated with the allegedly excessive levels of formaldehyde emissions in the EHU.

(*Age*, Doc. No. 1, at ¶ 102).

### B.    Alexander's Statistical Analysis Expert – Paul Hewett, Ph.D.

Alexander provided twenty (20) written expert reports, including the report of Paul Hewett, Ph.D. ("Hewett"), as a statistical analysis expert in this case. Exhibit "A," Hewett's May 18, 2009 Affidavit. Hewett and his wife are the sole owners of Environmental Assessment Solutions, Inc. ("EAS"). Exhibit "B," Depo. Of Paul Hewett p. 14-15 (July 10, 2009). Hewett has a Ph.D. and a Master's Degree in Industrial Hygiene. *Id.* at 97. Hewett, in fact, has a history of developing protocols for the sampling, measurement, and testing of contaminants in an occupational workplace. *Id.* at 94. Hewett was retained in this case to "do a

statistical analysis of the Gulf Stream Coach, Inc. (Gulf Stream) formaldehyde exposure dataset, with special attention to the data obtained from Cavalier Model THUs.  Exhibit "A," p. 1. Hewett supposedly performed a statistical analysis intended to accomplish four specific tasks: (1) compare the exposures – both for Gulf Stream as a whole and for the Cavalier Model in particular – to the ATSDR 0.008 ppm exposure limit and the NIOSH occupational exposure limit of 0.016 ppm; (2) evaluate the dataset for a relationship of the exposures to season (and temperature); (3) evaluate the dataset for evidence that exposures tend to decline with the age of the THU; and (4) address the question: "would exposures in the plaintiffs' THU after moving in May 2006 likely to have been higher than the 0.05 ppm measured on January 28, 2008?" *Id.*

### C.    Basis of Hewett's Opinions

The scope of Hewett's work ***did not*** consist of gathering any of the data that he analyzed, nor did he verify the validity of the information that he analyzed.  Exhibit "B," p. 65. Instead, plaintiffs' counsel provided Hewett an Excel spreadsheet categorizing a Gulf Stream-specific dataset containing 1,191 formaldehyde measurements from Gulf Stream EHUs. Exhibit "A," p. 1.   The information contained in the dataset was collected by a variety of sources including, Sierra Club, Centers for Disease Control ("CDC"), Texas Parks and Wildlife Department, Devany Industrial Consultants ("DeVany"), Boston Chemical Data, TES, W.D. Scott Group, and the THU occupants.  *Id.* at 1-2.  From these 1,191 cases, Hewett extracted 1,185 "valid" cases – 876 of which was Cavalier model EHUs.  *Id.*  Hewett then imported the data into two separate computer programs to summarize the data graphically, to do

goodness-of-fit tests, and calculate the normal and lognormal distributions.  Exhibit "B," pp. 164-65.[1]

Hewett used descriptive statistics to describe the main features of the Gulf Stream dataset in quantitative terms – sample size, median, sample mean, etc.  Exhibit "A," p. 3.  Hewett's review of the descriptive statistics led to his decision to employ a lognormal distribution assumption because he determined that the Gulf Stream data were not distributed symmetrically about the sample mean.  *Id.*  Hewett therefore decided that the lognormal statistics better described the underlying distribution of the Gulf Stream dataset.  *Id.* at 3.  Still, Hewett includes the normal distribution statistics for reference.  *Id.* at 8-9.

Hewett then calculated various statistics to determine whether the Gulf Stream EHUs were in "compliance" with the ATSDR formaldehyde exposure limit of 0.008 ppm; i.e., compliance statistics.[2]  *Id.* at 3.  Hewett also calculated the percentage of Gulf Stream data that exceeded the ATSDR formaldehyde exposure limit of 0.008 ppm.  *Id.*  Hewett began this analysis by estimating the "true mean exposure" for the Gulf Stream dataset as a whole and the Cavalier Model in particular.  Exhibit "A," p. 3.  The true mean exposure was estimated in two ways.  First, Hewett calculated the simple arithmetic mean.  *Id.*  Second, Hewett calculated the Minimum Variance Unbiased Estimator (MVUE), a method Hewett describes as "superior" to the true mean when the data are not normally distributed.  *Id.*  Hewett then calculated the confidence intervals for both the arithmetic mean and the MVUE.  *Id.*

---

[1]      Summary statistics were produced using Systat and IHDataAnalyst (designed by Hewett) – computer software designed to analyze data.  Exhibit "A," pp. 8-19.

[2]      Hewett agrees that the term "compliance" in no way suggests that ATSDR has required that formaldehyde measurements in travel trailers "comply" with the limits set by ATSDR.

### D.  Hewett's Opinions

Hewett offers several opinions about data analysis, statistics, and formaldehyde. Hewett's first opinion is that the MVUE provides the best estimate of the true mean for a particular manufacturer.  Exhibit "A," p. 3.  Hewett's second opinion is that descriptive statistics show that the Gulf Stream dataset as a whole, and the Cavalier Model in particular, had a ***median*** (50th percentile) exposure greater than the ATSDR and NIOSH limits.  *Id.* at 5.  Hewett's third opinion is that 90% of the formaldehyde measurements for Gulf Stream EHUs (regardless of the data source) were greater than the ATSDR limit of 0.008 ppm and the NIOSH occupational limit of 0.016 ppm.  *Id.*  Hewett's fourth opinion is that descriptive statistics show that the Gulf Stream dataset as a whole, and the Cavalier Model in particular, had a ***mean*** exposure greater than the ATSDR and NIOSH limits, regardless of whether the mean was estimated using the normal distribution assumption or the lognormal distribution assumption.  *Id.* Hewett's fifth opinion is that the "true mean" for the Gulf Stream dataset was greater than the ATSDR and NIOSH limits because the 99% lower confidence limit was also greater than the ATSDR and NIOSH limits.  *Id.*

Hewett also offered several opinions based on the Gulf Stream data that was summarized graphically.  Hewett opined that season and temperature should affect formaldehyde exposures. Hewett also opined that formaldehyde exposures tend to decline with the age of the EHU. Exhibit "A," p. 6.  And based on these opinions, Hewett opined that plaintiffs' formaldehyde exposures when they first moved in during May 2006 would have likely been higher than the 0.05 ppm measured on January 28, 2008.  *Id.*

## II.    ADMISSIBILITY OF EXPERT OPINIONS

**A.    Rules 702, 703, *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and Its Progeny**

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony. The trial judge serves as a gatekeeper to keep out expert testimony that is based solely on speculation or unsupported conclusion. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-590 (1993).  In *Daubert*, the Supreme Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but it is also reliable.  *See, Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  A party seeking to admit expert testimony bears the burden of demonstrating that the expert's findings and conclusions are based on the scientific method, and therefore, is more reliable.  *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).  And where such testimony's factual basis, data, principles, methods, or their application are called into question, the trial judge is required to determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline.  *Kumho Tire*, 526 U.S. at 149.  This requires an objective, independent validation of the expert's methodology.  *Moore*, 151 F.3d at 276.  The expert's mere assurance that he has used generally accepted scientific methodology is insufficient.  *Id*.  The proponent of the expert's testimony must prove to the judge by a preponderance of the evidence that the testimony is reliable.  *Id*.  Thus, the goal of the court is to ensure that that expert's opinion is based on sufficient data and an appropriate methodology such that the opinion is connected to the facts by more than conclusory assertions of the expert.

Rule 703 focuses on the data underlying the expert's opinion.  *In Re TMI Litigation*, 193 F.3d 613, 697 (3rd Cir. 1999).  As part of its gatekeeper role, the trial court must ensure that the underlying facts and/or data upon which a proffered expert's opinion is based are in and of

themselves reliable.  If an expert's opinion is based on unreliable facts, the opinion must be excluded.  *See In Re TMI Litigation*, 193 F.3d at 697.  That is, Rule 703's reliability standard is similar to Rule 702's reliability requirement in that there must be good grounds on which to find the data reliable.  *Id*.  Rule 703 permits an expert to rely on hearsay, so long as that hearsay is of the kind normally employed by experts in the field.  *Id*. (*citing In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1245 (E.D. N.Y. 1985)).

In *Daubert*, the Supreme Court enunciated a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the expert's methodology is scientifically valid or reliable.  *Moore*, 151 F.3d at 275 (*citing Daubert*, 509 U.S. at 593-595).  These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.  *Id*.

In addition to the guiding principles set forth in *Daubert*, other factors relevant to the consideration of whether an expert's testimony and opinions are sufficiently reliable so as to allow their admission are as follows: (1) whether the expert is proposing to testify about matters growing naturally and directly out of the expert's research conducted independent of the litigation or whether the expert has developed the opinion expressly for the purpose of testifying in the litigation; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as she would be in her regular professional work outside of her paid litigation consulting; and (5) whether the field of expertise

claimed by the expert is known to reach reliable results consistent with the type of opinion the expert is giving. *See e.g. Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998) (*en banc*); *Sheehan v. Daily Racing Form, Inc.*, 104 F. 3d 940, 942 (7th Cir. 1997); *Daubert v. Merrill Dow Pharmaceuticals, Inc.* 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*); and *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994).

**B.     Hewett made no attempts to verify the accuracy or reliability of the compilation of data provided to him by plaintiffs.  A statistical analysis based on unsubstantiated data is nothing more than unreliable skepticism.**

An expert's extrapolations from the raw data behind the expert's opinions to his or her conclusions must be sound, and that any opinions connected to the existing data only by the *ipse dixit* of the expert are not admitted. *General Electric v. Joiner,* 522 U.S. 136, 147 (1977).  An expert who relies on plaintiff's compilations of data, without seeking to verify the information presented to him, gives rise to common sense skepticism, and therefore can make the opinion unreliable. *Munoz v. Orr,* 200 F.3d 291, 301 (5th Cir. 2000); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 111 (5th Cir. 1991), *cert denied,* 503 U.S. 912 (1992), *overruled on other grounds by Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 587 n.5 (1993); see *Sheats v. Bowen,* 318 F.Supp. 640, 644 (D.Del. 1970) (expert fails to seek verification of facts relied upon).

Hewett relied on plaintiff's compilations of data, without seeking to verify the information presented to him.  Hewett just assumed that the data that he was given was "valid." Exhibit "B," p. 183.  Whether the information was actually valid is an issue that Hewett testified was for "somebody else to decide." *Id.*  Hewett's opinions are nothing more than extrapolations from the raw data that plaintiffs' counsel provided him in an Excel spreadsheet.  Hewett, an

8

industrial hygienist, is certainly qualified to collect the sort of data involved in this case. Yet, he

was not called upon to do so. Exhibit "B," p. 65. Instead, plaintiffs retained Hewett after-the-

fact to "analyze" an abundance of data presented to him in an Excel spreadsheet:

> Q.      The first thing you say, "The data were entered into an Excel spreadsheet."
>         When it came to you, it was already in an Excel spreadsheet, correct?
>
> A.      That's true, yes.
>
> Q.      You did not correct the Excel spreadsheet; isn't that correct?
>
> A.      Well, yes and no. It came to me in an Excel spreadsheet. I took the – I
>         copied that data out and pasted it into another spreadsheet.
>
> Q.      And –
>
> A.      So in a sense it was entered, but, you know, to be absolutely pristine
>         precise, no, I did not enter the data.

*Id.* at p. 162.

Hewett then extracted the Gulf Stream-specific data and entered it into a separate Excel

spreadsheet. *Id.* at p. 163. Hewett admittedly did not attempt to verify the accuracy or reliability

of the data provided to him by plaintiffs' counsel:

> Q.      Did you make any effort to verify in any way, shape or form the validity
>         of the identifying information in this large database with regard to who the
>         manufacturer of a particular unit was?
>
> A.      No, I did not –
>
>                                 *   *   *
>
> Q.      (By Mr. Percy) Did you?
>
> A.      No, I did not.
>
> Q.      You just relied on the database that was provided to you, correct?
>
> A.      Exactly.
>
> Q.      Now, did you in any way perform any of the tests that formed the data that
>         was included in the database?

A.      No, I didn't.

MR. REICH:  Objection to the form.

Q.      (By Mr. Percy) Did you?

A.      I'm going to have put a five-second delay on my responses.
        No, I did not.  I did not collect any of the data.

Exhibit "B," pp. 64-65.

A.      And as we went through extensively earlier this morning, I did not
        validate every data point, every cell in that spreadsheet other than those
        two numbers that turned out to be concentrations derived from the analysis
        of blank samples.

                                    *     *     *

*Id.* at p. 125.

A:      Yes I did.  I think I mentioned that earlier this morning that I considered
        the data that was given to me valid.  Now, valid for what purposes,
        somebody else has to decide that.

                                    *     *     *

*Id.* at 183.

In fact, the only information that Hewett verified was a couple of measurements that

indicated low readings.  *Id.* at 64-65.  Those measurements were later removed from the dataset

because Jim Stiles told Hewett that they were "field blanks."  *Id.* at 66-67.  Hewett made no

attempts to verify whether Mr. Stiles' assertions were accurate – Hewett simply removed the

data from the set without question.[3]  *Id.* at 69.

Hewett then imported the Gulf Stream-specific data into two separate computer programs

to summarize the data graphically, to do goodness-of-fit tests, and calculate the normal and

lognormal distribution.  Exhibit "B," pp. 164-65.  The first program was Systat, which Hewett

---

[3]     Four other THUs were removed from the dataset because plaintiffs' Excel spreadsheet had "missing
        concentration" values.  Exhibit "B," at 70.  Hewett did not attempt to verify this information either.  *Id.* at
        71.

used to create a variety of graphs summarizing the data visually.  *Id.* at 165.  The second

program was IHDataAnalyst (software developed by Hewett), which Hewett used to generate

various statistics about the Gulf Stream-specific data.  Exhibit "B," at p. 165.  Hewett admits that

"its well within anybody's capabilities" to run these software programs.  *Id.* at 171.  The data

entered into the programs generate a report showing the true mean and the minimum variance

unbiased estimator ("MVUE") of the Gulf Stream-specific database under the normal and

lognormal distributional models.  Exhibit "A," at 9.  Based on these calculations, Hewett made

several "statistical" conclusions about the Gulf Stream dataset when compared to the ATSDR

and NIOSH limits.  Overall, Hewett's opinion is that "one could be 99% confident that the true

mean formaldehyde measurements for the Gulf Stream dataset as a whole, and the Cavalier

Model in particular, was greater than both the ATSDR and NIOSH limits.  *Id.* at 6.

Hewett's failure to verify the accuracy and reliability of the data imported into the

computer programs immediately calls his opinions into question.  Unreliable data input into a

computer program will undoubtedly produce nonsensical output. The methodology used by

Hewett is more artfully described in *Munoz* as, "common sense skepticism."

**C.     Hewett's opinions are not based on science or methodology but instead are based upon his intuition and, admittedly, "common sense" – a trait which experts have no particular skill in assessing.**

A review of Hewett's opinions and testimony demonstrate an admittedly rushed and

incomplete methodology, oftentimes resulting in "common sense" conclusions.  Hewett's

statistical analysis was intended to accomplish four specific tasks.  Exhibit "A," p. 1.  Each

task was identified on the first page of Hewett's report and marked with a "bullet point."

Hewett's statistical analysis of the Gulf Stream "formaldehyde exposure" dataset resulted in a

conclusion for each of those four bullet pointed tasks.  For purposes of clarity, Gulf Stream

will identify the specific task charged to Hewett and then individually address Hewett's opinions:

>    1.    Compare the exposures – both for Gulf Stream as a whole and for the Cavalier Model in particular – to the ATSDR 0.008 ppm exposure limit and the NIOSH occupational exposure limit of 0.016 ppm.

Hewett employed a "hypothesis testing" approach to determine if the "formaldehyde exposures" for the Gulf Stream-specific dataset exceeded the ATSDR and/or NIOSH exposure limits. Exhibit "A," p. 5.  Hewett began his "hypothesis testing" by stating the relevant null and alternative hypotheses to be tested. *Id.*  Choosing a reliable hypothesis is important because failure to do so will affect the rest of the analysis.  This is true because statistical analysis is used to test the "null hypothesis.[4]"  *Good v. Fluor Daniel Corp.*, 00-5021-EFS (E.D. Wash., 9/11/2002) 222 F.Supp.2d 1236, 1242.

Hewett actually used two null hypotheses in his statistical analysis.  The first null hypothesis is the assumption that the true mean of the Gulf Stream dataset is equal to or less than the ATSDR limit of 0.008 ppm.  Exhibit "A," at 5.  The second null hypothesis is the assumption that the true mean of the Gulf Stream dataset is equal to or less than the NIOSH limit of 0.016 ppm.  *Id.*  Based on this information, Hewett sought to determine if the null hypotheses was "wrong or incorrect." *Id.*  In other words, Hewett analyzed whether the true mean of the Gulf Stream dataset was greater than the NIOSH and/or ATSDR limits; i.e. the alternative hypotheses.

Hewett has not done any research on how the ATSDR arrived at the level used in his null hypothesis. Exhibit "B," at 100.  He simply relied upon an "ATSDR document" which showed how the minimum risk level was calculated.  *Id.*  Hewett's report even stipulates that he "is not aware of any official guidance on how the ATSDR chronic exposure limit should be statistically

---

[4]    The null hypothesis assumes that any kind of difference or significance you see in a set of data is due to chance, unless statistical evidence nullifies it for an alternative hypothesis.

interpreted." Exhibit "A," at 2. The NIOSH limit, on the other hand, is an occupational exposure limit that Hewett is familiar with because he actually worked for NIOSH setting recommended exposure limits (REL).[5] Exhibit "B," at 250. Hewett testified that the NIOSH limit is "not even appropriate" for evaluating exposure levels to formaldehyde in trailers. *Id.* Hewett further testified that the purpose of his report is "not to say that the NIOSH limit is an appropriate limit." *Id.*

Even more troubling is the fact that Hewett played no role in arriving at the null hypotheses. Instead, Hewett was instructed by plaintiffs' counsel to use regulatory risk assessment variables as part of his null hypotheses:

> Q:     (omitted text) One of the things I want to ask you is a little while ago you told us – and –and I actually wrote this down as a quote – that they – and I asked you and you specifically referenced Linda Nelson and Mikal Watts – specified the two limits that you were to use in your report; is that correct?
>
> A:     That's correct.
>
> Q:     All right. Meaning Linda Nelson and Mikal Watts specified the use of NIOSH level and ATSDR level, correct?
>
> A:     I think you just asked that, and the answer again is yes.
>
> *     *     *
>
> Q:     All right. Did someone instruct you not to use the .03 less than 365-day exposure level for your analysis in the most recent report?
>
> A:     Nobody instructed me not to use it. These are the two levels that I was instructed to use.
>
> Q:     Did you engage in any discussion with Ms. Nelson and Mr. Watts about why they only wanted you to look at those levels that they instructed you to use?
>
> A:     No, I did not.

---

[5]     Hewett has not done any research on how NIOSH arrived at setting its recommended exposure limits. Exhibit "B," p. 99.

Exhibit "B," at 100-102.

Hewett's statistical analysis is unreliable because it tests a null hypothesis based on variables rejected by the Fifth Circuit. The ATSDR and NIOSH limits are regulatory risk levels, which are of limited utility in a toxic tort case. *Allen v. Pennsylvania Eng'g. Corp.,* 102 F.3d 194, 198 (5th Cir.1996). The Court found that "regulatory and advisory bodies such as IARC, OSHA, and EPA utilize a 'weight of the evidence' method to assess the carcinogenicity of various substances in human beings and suggest or make prophylactic rules governing human exposure." *Id.* at 198. "This methodology results from the preventative perspective that the agencies adopt in order to reduce public exposure to harmful substances." *Id.* "The agencies' threshold of proof is reasonably lower than that appropriate in tort law. *Allen,* 102 F.3d at 198; quoting, *Wright v. Willamette Indus., Inc.,* 91 F.3d 1105, 1107 (8th Cir. 1996).

Hewett correctly identified the NIOSH and ATSDR limits used in his null hypotheses as "risk management tools." Exhibit "B," at 249. The limits used by Hewett in his null hypothesis serve a regulatory purpose, not a compliance limit for EHUs. Hewett's use of the ATSDR and NIOSH limits does not amount to scientific reliability in the courtroom. Nor will it assist the trier of fact.

Because Hewett's statistical analysis tested an unreliable "null hypothesis," Hewett's conclusions derived from that analysis are equally unreliable. Hewett's entire opinion is dependent upon the null hypothesis. Change the null hypothesis, and Hewett has to change each of his opinions about how the Gulf Stream dataset is statistically interpreted in relation a different "exposure limit." Although the scientific language seems very technical, a fifth grader can perform the actual analysis. Hewett described how:

> A:     That's correct.  Now, let me just – I mean, I know I shouldn't waste time doing this, but I will.  If you have access to a ruler or a piece of paper and you bend it over to give you a straight edge, you can do this analysis yourself.  In all of the graphs, which we haven't got to yet, we have two reference lines: One is at 0.008, one is at 0.016.  You can draw a reference line to .03 and do your own analysis.  I mean, the data is here, the statistics are displayed.  Anybody can compare those statistics, those graphs to any number you want to.  The question is **is it a valid limit, is it an appropriate limit.**  But you can compare them to any number you wish… (emphasis added).

Exhibit "B," at 105.

Hewett's own testimony posed this question: Are the ATSDR and NIOSH limits appropriate limits in this case?  No.  The ATSDR and NIOSH limits are not appropriate limits because they are "reasonably lower than that appropriate in tort law."  *Allen,* 102 F.3d at 198.

This Court should understand exactly what Hewett has done in this case.  Plaintiffs provided Hewett a bunch of data in an Excel spreadsheet - data that was collected by a variety of different sources (not Hewett), including EHU occupants.  Hewett admitted that he did not have the time to verify the validity or reliability of the information that he was provided.  Hewett then extracted the Gulf Stream-specific data and used computer programs to calculate numbers and display that data in a series of tables and graphs.  Plaintiffs' counsel then instructed Hewett to consider two regulatory baselines: one at 0.008 and one at 0.016.  Hewett did this without understanding the statistical significance of the ATSDR limit and knowing that the NIOSH limit was an inappropriate limit under the circumstances of this case.  Hewett then offers several opinions about how the Gulf Stream dataset as a whole, and the Cavalier Model in particular, responded "statistically" to the two reference points indentified by plaintiffs' counsel.  Hewett's methodology is careless, unreliable, and involves little science.  And the Fifth Circuit rejects his use of regulatory risk assessment values.

2.      Evaluate the dataset for a relationship of the exposures to season (and temperature).

Hewett was also asked to evaluate the Gulf Stream dataset for a relationship between formaldehyde exposures and seasons.  Exhibit "A," at p. 1.  The Gulf Stream dataset analyzed by Hewett only reflected a few seasonal cycles.  *Id.* at 6; and Exhibit "B," at 126.  This presented a problem for Hewett because an adequate analysis of seasonal cycles requires "many, many cycles to discern a pattern."  Exhibit "B," at 126.  Hewett acknowledged that he could not offer an expert opinion about the relationship between formaldehyde exposures and seasons:

    Q.     Okay.  And with regard to Bullet Point No. 2, we've generally talked about it, but are you rendering any professional expert opinion with regard to Bullet Point No. 2 other than there appears to be generally be a relationship to higher levels depending on the season?

    A.     Well, I think in my report I don't render much of an opinion at all other than –

    Q.     That's – and that's –

    A.     Yeah.

*Id.* at 125-26.

The second obstacle encountered by Hewett was the limited timeframe he had to perform his analysis:

    Q.     Would it be fair to say in order to put forth, based upon your expertise, an actual analysis and evaluation of the relationship of the exposures to season, you'd have to do – or have to have a lot more information than what you've been provided for?

    A.     Well, I think you'd have to have maybe – the data – the analysis may be possible there.  I mean, let's back up just a little bit and look at the time frame in which I had to put this together:  Called on Monday, produced the report the following Monday.  Okay.  So I didn't have much time to do this.  And – and I wasn't really requested to – to do an in-depth analysis.  It could be there's enough data in that database, there's enough relative humidity data, there's enough sufficient temperature data for somebody to do a bang-up regression analysis.

Q.      But is it fair to say you have not done that?

A.      I have not done that….

Exhibit "B," at 127.

Hewett admits that he did not have the time or the data to perform a sufficient analysis to opine about the relationship of formaldehyde exposures to seasons.  Despite this recognition, Hewett still prepared a series of graphs purporting to show "a cyclic pattern" of formaldehyde exposure and the month and year the measurements were collected.  Exhibit "A," at p. 6, 11-12. Hewett admittedly does not have enough data to offer this opinion.  Graphs are not gateways to introduce Hewett's perceptions or common sense testimony about admittedly inadequate science.

Hewett's perceptions or conclusions about the "cyclic" relationship between formaldehyde exposures and seasons are not expert opinions.  Hewett recognizes that "common sense suggests that season and temperature should affect the exposures."  *Id.* at p. 6.  Common sense does not need to be supported by expert testimony.  Hewett, at his deposition, again referred to the cyclic pattern as common sense:

A.      And – and – and, furthermore, it's a common-sense notion, so why shouldn't the data fall along that – have that wavy nature to it, peaks in the summer, troughs in the – in the winter.

Q.      And again, because I want to make sure that every time you use "common sense" you're talking about average man on the street who has common sense?

A.      I would say so, yes.

Q.      So an average man with common sense in your estimation could look at this and draw the same conclusion that you're drawing?

A.      Excuse me.

Q.      Is that correct?

A.      I would hope so.

Exhibit "B," at 129-30.

Hewett's report also highlights the fact that this is a common sense notion.  Hewett writes, "common sense suggests that season and temperature should affect the exposures." Exhibit "A," at p. 6.  But, experts may not base their opinions on "common sense" where they fail to conduct any research commonly employed by experts in their field, or fail to rely on data that could be subject to testing and verification.  This is considered insufficient data and unreliable methodology.  *IQ Products Co. v. Pennzoil Products, Co.,* 01-20764 (5th Cir. 2002); 305 F.3d 368, 376.  Hewett does not have sufficient data to opine about the relationship between formaldehyde exposures and seasons.  Hewett's common sense is not admissible and Hewett himself testified that he cannot and has not rendered an opinion.

     3.     <u>Evaluate the dataset for evidence that exposures tend to decline with the age of the THU</u>.

Hewett was also retained to evaluate the Gulf Stream dataset for evidence that exposures tend to decline with the age of the THU.  Hewett was confronted with similar problems that he experienced when opining about the relationship between exposures and seasons, namely, lack of data and lack of time.  Hewett admittedly could not perform a formal statistical analysis:

Q:     Did you do a formal statistical analysis of the effects of age?

A:     Well, a formal statistical analysis, in my view, or a complete statistical analysis would be to look at the data as a function of – type of trailer, model of trailer if it was available, temperature, relative humidity, age, the windows opened, windows closed, the variables that CDC collected and the other variables that the other – whatever variables were collected consistently throughout the entire set of data. That would be a complete analysis.  And I haven't done that and didn't have the time frame provided me.

Q:     So I guess my – let's go back and restate my question, if you will, and see if we can get an answer to my question.  Did you do a formal statistical analysis of the effects of age?

A:      Well, define "formal statistical analysis."

Q:      I'm using your term.

A:      I know.  I defined it – and I gave you a definition of it.  Well, the answer is no.  I said I didn't.

Exhibit "B," at 224-25.

Hewett testified that he "attempted to do what [he] could in the time frame involved." *Id.* at 131. Hewett claims that if he had more time, he would "dig into it a bit deeper."  *Id.* Despite the lack of time and data, Hewett thinks his analysis was sufficient to "answer the question" that exposure tends to decline with the age of the THU.  *Id.*  But, his supposed answer does not rise to the level of an expert opinion because his methodology is unreliable. Hewett's report specifically states that "given the different data sources and other factors it was not possible to discern any evidence that the formaldehyde exposures tend to decline with the age of the THU."  Exhibit "A," p. 6.  Similarly, the data provided to Hewett was insufficient for him to offer an opinion quantifying the rate of decline with age.  Again, Hewett was forced to turn to "common sense:"

Q:      Does your report in any way attempt to express an expert opinion on a quantification of the rate of decline that you've just described?

A:      Not that I'm aware of - - I don't recall.  What I did opine on or conclude is that its highly likely that exposures earlier in life of a trailer were higher than exposures later in the life of a trailer.  It's a common-sense notion, but it seems -- it – it fell out of the data analysis as well.

                                        *    *    *

Q:      (By Mr. Percy) What I'm trying to do is when you use common sense – and you've actually used it a couple of times in your report – are you expressing an expert opinion or are you suggesting that anyone with common sense could reach the same conclusion?  That's what I'm trying to find out.

A:      I think anyone with common sense would reach the same conclusion.

19

Q:     They don't need your expertise.  Would that be fair?

A:     I would say that, yeah.

Exhibit "B," at 76-78.

Unfortunately, common sense cannot explain whether or not Hewett has actually offered an expert opinion on this point.  His report indicates that based on the data, it was not possible to discern ***any evidence*** that the formaldehyde exposures tend to decline with the age of the THU. But, his deposition testimony claims that it is "highly likely" that exposures earlier in life of a trailer were higher than exposures later in the life of a trailer.  Hewett again does not support this statement with any credible evidence, but rather on a series of assumptions.

Hewett extracted the DeVany test results collected in July and August of 2008 to force an opinion that could not be derived from the dataset as a whole.   Hewett claimed that the DeVany data was "useful" for addressing this question because those EHUs were unoccupied, subject to roughly identical weather conditions, and stored in similar locations.   Exhibit "A," p. 6. Therefore, it could be "assumed" that any difference in exposures would be related more to the age of the trailers than ***any other factors. Id.***  Hewett then separated DeVany's data by year of manufacture for each Gulf Stream EHU: 106 were manufactured in 2006, 131 were manufactured in 2005, 87 were manufactured in 2004, and only 4 were manufactured in 2003. *Id.*  In this section of his report, Hewett disregards any analysis about sample size.  But earlier in his report Hewett went into great detail about the significance of sample size: "as sample size increases, the point estimate, in principle, approaches the true mean and at the same time the confidence interval narrows, suggesting that the true mean is known with greater and greater certainty."  Exhibit "A," p. 4.  Apparently, sample size is not important when calculating the true

mean exposure for only four (4) results from 2003 to opine "exposures were lower in the older

EHUs." Exhibit "A," p. 4. This is junk science and it is catered to this litigation.

Hewett cannot base his opinions on "common sense" and he cannot offer opinions based

on incomplete data and unreliable methodologies.

> 4. Address the question: "would exposures in the plaintiffs' THU after moving in
> May 2006 likely to have been higher than the 0.05 ppm measured on January
> 28, 2008?"

Hewett's report devoted three sentences to responding to this bullet point:

> "The analysis above strongly suggests that as the THU ages the
> formaldehyde exposures tend to decline. This coincides with our
> **collective common sense** developed, for example, noticing the decline in
> "new car" smell over time. Therefore, it is highly likely that exposures
> closer to the date of manufacture were greater than exposures some years
> afterwards."

Exhibit "A," p. 6.

Hewett is asked to make a specific opinion about the Alexander/Cooper EHU, yet

nothing was provided to Hewett regarding Alexander and Cooper for the purposes of analyzing

his data. Exhibit "B," p. 89. Hewett did not have "any personal information regarding Ms.

Alexander or Mr. Cooper in the preparation of [his] report." *Id.* Anyhow, Hewett cannot

possibly opine that the measurements in a particular Gulf Stream EHU were higher than 0.05

ppm. Hewett did not do this type of statistical analysis. Remember that plaintiffs' counsel only

instructed Hewett to compare the Gulf Stream dataset as a whole to the ATSDR limit of 0.008

ppm and the NIOSH limit of 0.016 ppm. Hewett cannot employ an unsupported back-

extrapolation methodology to offer testimony about how a specific EHU had a different level of

formaldehyde at a given point in time. And even Hewett said that "given the different data

sources and *other factors* it was not possible to discern any evidence that the formaldehyde

exposures tend to decline with the age of the THU." Exhibit "A," p. 6. If Hewett cannot arrive

at this conclusion based on the entire dataset, then Hewett certainly cannot offer a specific opinion about the relationship of formaldehyde exposure and the age of the Alexander/EHU. And Hewett certainly should not be allowed to rely on an incomplete analysis of DeVany's test results.   This is especially true because "nothing was provided" to Hewett about the specifics of the Alexander/Cooper EHU.  This means that Hewett has no information about ***other factors*** that may have influenced the measurement obtained in the Alexander/Cooper EHU.

Hewett did not obtain the sample from the Alexander/Cooper EHU, he did not verify those sample results, and he has no information about ***other factors*** present in the Alexander/Cooper EHU that might have affected those results.  Hewett cannot offer a "common sense" opinion about a particular EHU because he failed to conduct any independent research, he relied on insufficient data, and he has not conducted the necessary analysis of the Alexander/Cooper EHU.  Hewett's methodology is entirely unreliable.

### III.  CONCLUSION

Hewett's statistical analysis based on descriptive and compliance statistics purporting to show that the Gulf Stream dataset as a whole, and the Cavalier Model in particular, were greater than the ATSDR and NIOSH limits are unreliable and have no probative value in this case.  Hewett failed to substantiate the data that he relied upon and the entire basis of Hewett's opinions is dependent upon regulatory risk assessment exposure limits.  The Fifth Circuit rejects the use of these limits.  Hewett's opinions based on the Gulf Stream data that was summarized graphically and in charts are based on insufficient data, unverified data, and are admittedly nothing more than "common sense" notions. Likewise, Hewett's specific opinions about the Alexander/Cooper EHU are unreliable, unsupported, and based on flawed methodologies.

Hewett's factual basis, data, principles, methods, and his application are grossly inadequate and should be excluded.

Respectfully submitted,

**DUPLASS, ZWAIN, BOURGEOIS,**
**PFISTER, & WEINSTOCK**

s/Andrew D. Weinstock
_____
**ANDREW D. WEINSTOCK #18495**
**JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700
Fax: (504) 837-3119
andreww@duplass.com
jglass@duplass.com

and

**SCANDURRO & LAYRISSON**
**Timothy D. Scandurro #18424**
**Dewey M. Scandurro #23291**
607 St. Charles Avenue
New Orleans, LA 70130
(504) 522-7100
(504) 529-6199 (FAX)
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc.**

# <u>C E R T I F I C A T E</u>

I hereby certify that on the 24th day of August, 2009, a copy of the foregoing

Memorandum in Support of Motion in Limine to Exclude Expert Testimony of Paul

Hewett, Ph.D. was filed electronically with the Clerk of Court using the CM/ECF system.

Notice of this file will be sent to liaison counsel by operation of the court's electronic

filing system and all other counsel of record via e-mail and U.S. Mail.

s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com