Paul Hewett
July 10, 2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | ) | MDL NO. 1783 |
| FORMALDEHYDE PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | |
| | ) | SECTION N(5) |
| This Document Relates to: | ) | |
| Charlie Age, et al. v. Gulf | ) | |
| Stream Coach, Inc., et al., | ) | JUDGE:  ENGELHARDT |
| Docket No. 09-2892 | ) | MAG:    CHASEZ |

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF

PAUL HEWETT, PH.D.

JULY 10, 2009

*******************************************

ORAL AND VIDEOTAPED DEPOSITION of PAUL HEWETT, PH.D.,
produced as a witness at the instance of the Defendant,
and duly sworn, was taken in the above-styled and
numbered cause on the 10th of July, 2009, from 9:39 a.m.
to 5:44 p.m., before Wendi Broberg, CSR in and for the
State of Texas, reported by machine shorthand, at the
Law Offices of Reich & Binstock, L.L.P., 4265
San Felipe, Suite 1000, Houston, Texas 77027, pursuant
to the Federal Rules of Civil Procedure.

Paul Hewett
July 10, 2009

1              Can we have an agreement that all

2     objections by the -- any defendant are valid for all

3     defendants?

4                  MR. PINEDO:   That's fine.

5                  MR. REICH:   That's fine.

6        A     My credit card or my -- excuse me -- my license

7     number --

8                  MR. REICH:   He wants your Amex number,

9     too, right.

10       Q     (By Mr. Percy)   Mr. Hewett, I assure you I'm

11    not going to ask for any of your credit card numbers.

12       A     My license number is -- and I'll let you verify

13    this -- C, as in Charlie, 527688 issued in the state of

14    West Virginia.

15       Q     Does it have an expiration date?

16       A     If it does, you can find it.

17       Q     I don't see one.  I see an issue date of --

18       A     Oh, there has to be an expiration date on it.

19       Q     -- February 4th, 2008.

20       A     Well, it says expires 2013, 02/03/2013.

21       Q     And what -- what is your date of birth,

22    Mr. Hewett?

23       A     February 3rd, '53.

24       Q     Where are you currently employed?

25       A     I'm currently employed by myself.  I am an

Paul Hewett
July 10, 2009

Page 15

1   employment of Exposure Assessment Solutions,

2   Incorporated which is an S corporation owned by myself

3   and my wife, owned by me and my wife.

4       Q    How many other employees are there of -- is --

5   is the entity known as EAS?

6       A    Yes.

7       Q    How many other employees, other than you and

8   your wife -- and I'm not suggesting that you and your

9   wife are employees.  Let me make sure that I am clear.

10  How many employees does EAS have?

11      A    Well, zero excluding us.

12      Q    So when your report refers to EAS, is it fair

13  to say that you're actually referring to yourself?

14      A    Pretty much.

15      Q    Well, when you say "pretty much," are there any

16  exceptions in your report when you refer to EAS that

17  you're referring to someone other than yourself?

18      A    No, when I refer to EAS I'm referring to

19  myself, yes.

20      Q    It's kind of like the royal "we"?  Would that

21  be fair?

22      A    I don't think it has quite their imprimatur,

23  but, nonetheless, it's close to it, I guess.

24      Q    All right.  Did you actually review the notice

25  of deposition which contained a request for you to

Paul Hewett
July 10, 2009

Page 64

1   more data than just Gulf Stream data?

2       A     Yes.  I think, as you well know -- in fact, you

3   were provided a copy of that entire dataset, the dataset

4   as of May 19th or so.

5       Q     I was going to ask you about that when we

6   ultimately got to your report, but this may be a good

7   time to ask you.  Are you the one that extracted from

8   that database, which included test data from --

9       A     Uh-huh.

10      Q     -- a number of manufacturers' models, are you

11  the one that extracted the Gulf Stream specific data

12  from that larger database?

13      A     Yes.  One of the variables in that database is

14  manufacturer.  It is a trivially easy task to simply

15  identify all of the Gulf Stream records and copy them

16  out of the database.

17      Q     Did you make any effort to verify in any way,

18  shape or form the validity of the identifying

19  information in this large database with regard to who

20  the manufacturer of a particular unit was?

21      A     No, I did not --

22            MR. REICH:  Objection to the form.

23            THE WITNESS:  I'm sorry?

24            MR. REICH:  Objection to the form.

25      Q     (By Mr. Percy)  Did you?

Paul Hewett
July 10, 2009

Page 65

1    A    No, I did not.

2    Q    You just relied on the database that was

3    provided to you, correct?

4    A    Exactly.

5    Q    Now, did you in any way perform any of the

6    tests that formed the data that was included in the

7    database?

8    A    No, I didn't.

9         MR. REICH:  Objection to the form.

10   Q    (By Mr. Percy)  Did you?

11   A    I'm going to have to put a five-second delay on

12   my responses.

13        No, I did not.  I did not collect any of

14   the data.

15   Q    Now, I asked you a moment ago if you had

16   verified the manufacturers' identifying information on

17   the database.  Did you make any effort to -- to verify

18   any information of any sort in the database that you

19   were provided?

20        MR. REICH:  Objection to the form.

21   A    The answer is yes.

22   Q    (By Mr. Percy)  Okay.  What information in that

23   database that you were provided did you make an effort

24   to verify?

25   A    Well, the first thing I do with any database is

Paul Hewett
July 10, 2009

1    basically look at the relevant variables; do sorts, both

2    attending and descending, to look at what is in the

3    file.  For example, if you have a variable that is

4    supposed to be entirely numeric, then if you have

5    alphanumeric characters, letters, other characters in

6    that column, you have to question, well, what are they

7    doing there.  So for the concentration column -- I think

8    it's identified as f-o-r-m underscore c-o-n-c for

9    formula -- formaldehyde concentration -- there were

10   sel -- several alphanumeric entries -- I think this --

11   I'm just going from memory here -- like an NA for not

12   available or an ND for nondetect, maybe some zeros,

13   maybe some -- there probably were some blanks.  There

14   were two, as I recall, less thans that was a less-than

15   symbol .00 something or another, very low numbers.  And

16   they were very low.  And so I called Jim Stiles to ask

17   are these actual measurements, or are they blank

18   samples.  And he checked and came back to me and said

19   those actually were field blanks.  So that's why they

20   were nondetects and why they were so low.  And those two

21   measurements I took out of the database.

22            But the ones I try to verify are ones that

23   are just blatantly odd.  Like, for example, if a

24   measurement was in there at a hundred parts per million,

25   I would have to question that because it's inconsistent

Paul Hewett
July 10, 2009

Page 67

1    with the other data.  Now, what it could very well have

2    been was some data misentry where somebody put in parts

3    per billion rather than parts per million.  That wasn't

4    the case with the Gulf Stream data, but we did have a

5    single instance of that last year -- in last year's

6    database.

7         Q    Let me go back and -- I asked you what

8    information did you verify --

9         A    Uh-huh.

10        Q    -- in the database, and you first gave me a

11   description of the concentration column and what

12   entries --

13        A    Uh-huh.

14        Q    -- might have appeared.

15        A    Yes.

16        Q    And then you told me that you called Jim Stiles

17   and asked that were these NAs, NDs, zeros or less-than

18   figures, were they, in fact, measurements, actual

19   measurements or field blanks --

20        A    Uh-huh.

21        Q    -- correct?

22        A    Well, not all of them.  It was only -- only

23   those two that I was -- I asked about.

24        Q    Okay.

25        A    The -- the --

Paul Hewett
July 10, 2009

Page 69

1    column that have a -- that are Gulf Stream units that

2    identify a less than --

3        A    That have a less than in front of --

4        Q    -- and then a -- an alphanumeric --

5        A    -- in front of the number.

6        Q    Okay.  And Mr. Stiles told you that those were

7    field blanks?

8        A    Yes, sir.

9        Q    Did you attempt to verify any of the, as you've

10   identified them, NAs or NDs that were in the

11   concentration columns?

12              MR. REICH:  Objection.  Form.

13       A    Not that I recall.  I mean, those were the only

14   two that I really -- really remember.  Blanks, you know,

15   there's many cases -- you know, you've got all this

16   information but then when you get to the concentration

17   column, there's nothing there so they end up getting

18   deleted from the analysis.  But there was only a

19   handful, I think, in the report -- if we can we go to

20   report.  Is it premature to do that?

21       Q    (By Mr. Percy)  No, if -- if you need to refer

22   to anything in order to answer the question --

23       A    Uh-huh.

24       Q    -- please feel free to do so.

25       A    Okay.  Let me find the report.

Paul Hewett
July 10, 2009

1    Okay. We started off with 1,191 cases, I

2 started off, and we end up with 1185 cases. Now, I

3 probably should have put a footnote there saying, well,

4 we had two blanks -- and, in fact, here's my note to

5 myself in my own annotated version of this for -- to

6 anticipate. You may have a copy of this.

7    Q    And we would like one. Thank you.

8    A    Okay. I have a note to myself add footnote

9 idiot. Okay. The idiot actually isn't written there.

10 Deleted cases were two were blanks per Jim Stiles.

11   Q    What page are you on again? I'm sorry.

12   A    This is Page 1 --

13   Q    Okay.

14         MR. REICH: First page.

15   A    -- Paragraph 1.

16   Q    (By Mr. Percy) All right.

17   A    This would be a footnote at the end of the

18 first paragraph.

19         Two are blanks. The rest had missing

20 concentration values. So there's nothing there. So

21 those were deleted leaving 1185 cases. So we're talking

22 about six cases were deleted, two nondetects and four

23 that had missing concentration values. The remainder

24 had numbers representing concentrations.

25   Q    On those that had missing concentration

Paul Hewett
July 10, 2009

Page 71

1    numbers --

2        A    Uh-huh.

3        Q    -- did you attempt to verify that information?

4        A    No, I did not.  I mean, let me respond, yes, I

5    looked at the cell in the spreadsheet, and the number

6    was missing.  So I did verify the number was missing.

7        Q    Now --

8        A    But why it was missing I did not check into.

9        Q    And you didn't ask Jim Stiles or anyone about

10   the missing information on those records, correct?

11       A    I may have, but the thing is is that you have

12   to recognize that this report had to be produced in a

13   very short time frame.  We're dealing with four cases

14   here with missing values out of almost 1200.  It

15   wouldn't make -- probably would not make any difference

16   whatsoever in the analysis.  And if I asked Jim the

17   response would be I'd have to call somebody else.  So...

18       Q    All of this questioning started by me asking

19   you if you had verified information --

20       A    Yes.

21       Q    -- in the database and you told me yes.  And

22   now you've identified that you verified two

23   concentration level entries that showed less-than

24   symbols, and you eliminated them from the database on

25   that basis.

Paul Hewett
July 10, 2009

Page 76

1    come from Mary DeVany?

2        A    I don't recall speaking with Mary that week

3    other than Sunday where she asked me to look at a

4    decline and try to quantify or estimate the rate of

5    decline.  That had to come from the conversation with

6    Linda Nelson and Mikal Watts.

7        Q    Does your report in any way attempt to express

8    an expert opinion on a quantification of the rate of

9    decline that you've just described?

10       A    Not that I'm aware -- I don't recall.  What I

11   did opine on or conclude is that it's highly likely that

12   exposures earlier in the life of a trailer were higher

13   than exposures later in the life of a trailer.  It's a

14   common-sense notion, but it seems -- it -- it fell out

15   of the data analysis as well.

16       Q    You've actually referred to common sense a

17   couple of times in your report, and I was going to ask

18   you about that.  When you say referring to this specific

19   analysis that we're addressing at this moment it's a

20   common sense analysis or conclusion, what do you mean by

21   that?

22       A    Well, I think anybody that's bought a new

23   product, an automobile, for example -- and I use that, I

24   think, as an example in the report -- notice the decline

25   in new car smell, the new car smell being a product of

Paul Hewett
July 10, 2009

1    the emissions from all the new materials in a car.  But

2    that declines over time.  Anybody that's bought a new

3    home that is freshly painted and so the faint paint

4    smell, fresh paint smell that you have in a new home

5    declines over time.  It's a common-sense notion.

6        Q    And would someone who's impaneled as a juror in

7    this case be qualified to make that conclusion?

8                   MR. REICH:  Objection.  Form.

9        A    I cannot say since I don't know who's going to

10   be impaneled.

11       Q    (By Mr. Percy)  But that's what I'm --

12       A    And even if I did, I don't know how much common

13   sense they have individually or collectively.

14       Q    The average man on the street who has common

15   sense, would he be able to come to that same conclusion

16   in your estimation?

17                   MR. REICH:  Objection.  Argumentative.

18   Speculative.

19       A    Are you suggesting I extrapolate from the

20   general to the specific?

21       Q    (By Mr. Percy)  What I'm trying to do is when

22   you use common sense -- and you've actually used it a

23   couple of times in your report -- are you expressing an

24   expert opinion or are you suggesting that anyone with

25   common sense would reach the same conclusion?  That's

Paul Hewett
July 10, 2009

Page 78

1   what I'm trying to find out.

2       A    I think anyone with common sense would reach

3   the same conclusion.

4       Q    They don't need your expertise.  Would that be

5   fair?

6       A    I would say that, yeah.

7       Q    Okay.

8                THE VIDEOGRAPHER:  Four minutes.

9                MR. PERCY:  This is probably --

10               MR. REICH:  Do you want to take a break?

11               MR. PERCY:  Yeah, this is probably --

12               MR. REICH:  Yeah, let's take a break.

13               MR. PERCY:  -- a good time.  Thank you.

14               THE VIDEOGRAPHER:  Off the record at

15  10:58, end of Tape 1.

16               (Recess from 10:58 a.m. to 11:16 a.m.)

17               THE VIDEOGRAPHER:  We're on the record at

18  11:16, beginning of Tape 2.

19       Q    (By Mr. Percy)  Dr. Hewett, the break was

20  helpful in that now that I've gone through those first

21  items I've eliminated a whole bunch of them afterwards

22  because I think you've answered about those.  But let me

23  try to speed this up for the remainder because I think

24  I've gotten the bulk of what I need to on the documents

25  that you're producing here today.

Paul Hewett
July 10, 2009

Page 89

1     Q     What personal information were you provided

2   regarding Ms. Alexander and Mr. Cooper?

3     A     The information that I was provided was

4   contained in the various expert reports on the two disks

5   that we discussed earlier, and insofar as they were

6   discussed by the experts as far as name, age, medical

7   conditions, whatever was there was what was provided to

8   me.  I mean, to be more specific, nothing was provided

9   to me regarding Alexander and Cooper for purposes of

10   analyzing my data.

11     Q     And did you use any personal information

12   regarding Ms. Alexander or Mr. Cooper in the preparation

13   of your report?

14     A     No, I did not.

15     Q     I noticed that your reliance file included

16   testing reports and testing data gathered by CDC and

17   ATSDR, but in your report you also refer to testing data

18   that was collected and ultimately supplied by other

19   groups or entities.  For example, I think you identified

20   one as TES.  Is it fair to say that the information

21   identified in your report as having come from entities

22   or individuals other than CDC and ATSDR came to you in

23   the form of this data spreadsheet?

24     A     Yeah, all of the information I received was in

25   the form of this spreadsheet.

Paul Hewett
July 10, 2009

Page 94

1     developed protocols for the sampling, measurement and

2     testing of contaminants in an occupational workplace,

3     have you not?

4          A     Yes, sir, I have.

5          Q     But in this case you were not called upon to do

6     that?

7          A     No, I was not.

8          Q     And you were not called upon in this case to

9     critique the protocol that was actually developed by

10    Devany, Ms. Mary DeVany, have you?

11         A     That is correct.

12         Q     Are you aware of what the elements of that

13    protocol are other than just a casual reading of the

14    protocol as -- as it might have been referred to in

15    other expert reports?

16         A     No, I have not critiqued the protocol.  I mean,

17    I don't think that the protocol actually -- the

18    protocol, whatever it is, whoever wrote it, is contained

19    in the expert reports, just brief summaries, and so I've

20    not read or reviewed any, quote, unquote, real protocol.

21               Well, let's say -- let me back up on that.

22    I have read the CDC report and they do a fairly credible

23    job of describing their particular protocol and I skim

24    read that.  So that looks like a fairly complete

25    protocol, but that's the CDC's protocol.

Paul Hewett
July 10, 2009

1    July 2nd?

2        A    None of the numbers changed, or if they did

3    they changed without my permission.

4        Q    And -- and, please, for the record, was that

5    just a joking comment or --

6        A    That's just a joking comment.  But the way

7    computers are it's possible something may have changed

8    because I told you I did have a hard disk crash and --

9    and it took me awhile to recover from that.  But,

10   anyway, no, the numbers did not change.  The data --

11   neither the data nor the statistics generated from the

12   data changed.

13               MR. MALONE:  We'll object to the extent

14   that it may have accidentally changed or intentionally

15   changed.

16               MR. PERCY:  You'll just object to any

17   change, right?

18               MR. MALONE:  That's correct.

19       Q    (By Mr. Percy)  Okay.  All right.  Let's go

20   ahead and move to your report.  And let me start off by

21   asking you this:  We know that you are a -- you hold a

22   Ph.D. in industrial hygiene, correct?

23       A    Correct.

24       Q    And a Master's Degree in Industrial Hygiene --

25       A    Correct.

Paul Hewett
July 10, 2009

1     Q     Do you hold yourself out or express any

2   opinions with regard to how various agencies may fix

3   levels regarding levels of formaldehyde in an

4   environmental atmosphere?

5     A     Could you rephrase the question?

6     Q     Do you have any professional expertise in how

7   any agency actually fixes levels for formaldehyde?

8     A     Well, as -- as a general proposition, I'm

9   fairly familiar with processes that are used to set

10  occupational exposure limits.

11    Q     Now, who has set occupational exposure limits

12  with regard to formaldehyde that you are aware of?

13    A     Well, that would be OSHA.  NIOSH has set a

14  recommended exposure limit.  The ACGIH, the American

15  Conference of Governmental Industrial Hygienists, has

16  set a threshold limit value for formaldehyde.  And

17  there's probably numerous other organizations.

18    Q     Now, the only level of any of those

19  organizations that you just mentioned that you have

20  actually referred to and used in your report would be

21  the NIOSH level; is that correct?

22    A     That's correct.

23    Q     And have you done any research on how NIOSH

24  arrived at setting that level?

25    A     No, I have not.

Paul Hewett
July 10, 2009

1    Q    Now, you've also referred to a level, and you

2    identified it as an ATSDR level; is that correct?

3    A    Yes, ATSDR exposure limit.

4    Q    Now, have done any research with regard to how

5    the ATSDR arrived at the level that you use in your

6    report?

7    A    Well, what I have done -- I haven't done any

8    research, per se, but I have been provided the -- a

9    report, I guess it's an ATSDR document, on how the --

10   this minimum risk level, I think they call it, was

11   derived or calculated, and I brought it with me.

12   Q    Okay.  Now, it's not -- would it be fair to say

13   that you did not rely on that report in the preparation

14   of your expert opinion in this matter?

15   A    It's not only fair to say, it's dead-on

16   certain.

17   Q    But you did bring it with you?

18   A    Yes, sir, I did.

19   Q    Okay.  We would like to get -- and you have it

20   with you here today?

21   A    Yes.

22   Q    We would like to get a copy of that also.

23         One of the things I want to ask you is a

24   little while ago you told us -- and -- and I actually

25   wrote this down as a quote -- that they -- and I asked

Paul Hewett
July 10, 2009

Page 101

1    you and you specifically referenced Linda Nelson and

2    Mikal Watts -- specified the two limits that you were to

3    use in your report; is that correct?

4        A    That's correct.

5        Q    All right.  Meaning Linda Nelson and Mikal

6    Watts specified the use of the NIOSH level and the ATSDR

7    level, correct?

8        A    I think you just asked that, and the answer

9    again is yes.

10       Q    All right.  Now, the ATSDR actually has a

11   couple of different levels depending on the length of

12   time of a particular exposure, correct?

13       A    That is correct.

14       Q    All right.  One I think you've referred to in

15   your report as a chronic exposure, and you call it

16   level, of .008 parts per million, correct?

17       A    Correct.

18       Q    Now, and I think you identify in your report

19   the chronic exposure you define as in excess of 365

20   days; is that correct?

21       A    I specified that because that's how the ATSDR

22   specified it.

23       Q    All right.  For an exposure of less than 365

24   days, what's the ATSDR level?

25       A    My recollection it's .03 parts per million.

Paul Hewett
July 10, 2009

Page 102

1      Q     Now, you actually used in your analysis of

2    statistical data for class certification purposes, in

3    the expert opinion report that you issued for class

4    certification purposes, you actually used the less than

5    365 days ATSDR level, didn't you?

6      A     I used it and the .008 greater than 365 days

7    level.  So I used both.

8      Q     All right.  Did someone instruct you not to use

9    the .03 less than 365-day exposure level for your

10   analysis in the most recent report?

11     A     Nobody instructed me not to use it.  These are

12   the two levels that I was instructed to use.

13     Q     Did you engage in any discussion with

14   Ms. Nelson and Mr. Watts about why they only wanted you

15   to look at those levels that they instructed you to use?

16     A     No, I did not.

17     Q     We've -- we've talked about the universe of

18   information that you were provided.  Have you been

19   provided information with regard to how long each person

20   whose unit was actually tested -- and I'm referring to

21   the results that you have been provided in the

22   database --

23     A     Uh-huh.

24     Q     -- have you been provided any information with

25   regard to how long those individuals actually resided in

Paul Hewett
July 10, 2009

1    provided, have you?

2        A    I'm not sure where the question is in that, but

3    I did not compare the data or the summary statistics to

4    the .03 limit.

5        Q    Okay.  You purely used the ATSDR level that you

6    were instructed to use by plaintiffs' counsel, correct?

7        A    That's correct.

8             Now, let me just -- I mean, I know I

9    shouldn't waste time doing this, but I will.  If you

10   have access to a ruler or a piece of paper and you bend

11   it over to give you a straight edge, you can do the

12   analysis yourself.  In all of the graphs, which we

13   haven't got to yet, we have two reference lines:  One is

14   at .008, one is at .016.  You can draw a reference line

15   to .03 and do your own analysis.  I mean, the data is

16   here, the graphs are here, the statistics are displayed.

17   Anybody can compare those statistics, those graphs to

18   any number you want to.  The question is is it a valid

19   limit, is it an appropriate limit.  But you can compare

20   them to any number you wish.

21             Now, I don't think that's going to cut us

22   to -- to cut to chase because I know you still have your

23   questions to ask, but you can compare the data, the

24   graphs, the statistics, the confidence levels to any

25   number you -- you can conceive of.  Whether the number

Paul Hewett
July 10, 2009

Page 125

1    concentration column.  That was my definition for

2    validity to enter into my analysis.

3         Q     You --

4         A     And as we went through extensively earlier this

5    morning, I did not validate every data point, every cell

6    in that spreadsheet other than those two numbers that

7    turned out to be concentrations derived from the

8    analysis of blank samples.

9         Q     Let's move on in your report.  We're going to

10   get back to some of this.  I just kind of wanted to ask

11   some general questions at that point.

12              I'm moving down to the four data points

13   and data -- I mean, excuse me, the four bullet points.

14   The Bullet Point No. 1, it just says "Compare the

15   exposures."  Do I understand this that you're merely

16   comparing the exposures that are in the dataset to these

17   limits that you were instructed to use, the NIOSH and

18   ATSDR limits?  Is that all you did with regard to Bullet

19   Point No. 1?

20        A     That's what I did.  Here are the limits, here

21   are where the data fall relative to those limits.

22   Looked at visually with the graphs and analytically

23   through the statistics.

24        Q     Okay.  And with regard to Bullet Point No. 2,

25   we've generally talked about it, but are you rendering

Paul Hewett
July 10, 2009

1    any professional expert opinion with regard to Bullet

2    Point No. 2 other than there appears to generally be a

3    relationship to higher levels depending on the season?

4        A    Well, I think in my report I don't render much

5    of an opinion at all other than --

6        Q    That's -- and that's --

7        A    Yeah.

8        Q    In fairness, that's what I'm trying to get at.

9        A    Because --

10       Q    That's what it appeared like to me also.

11       A    Well, and -- and, you know, we're jumping to

12   Page 6, second paragraph.  There's few seasonal cycles

13   here.  If you're doing some kind of analysis of cycles,

14   you're doing a first order or second order, an order

15   regression analysis, you need many, many cycles to get

16   to discern a pattern.  And what do we have, I think we

17   have maybe a season and a half, you know, of -- of data

18   that -- and so you see a wavy pattern there, but you

19   don't have three or four summers and winters or full

20   year seasons.  So I say, okay, we have few seasonal

21   sample -- cycles in this.  There appears to be a cyclic

22   pattern.  You'd have to be blind not to recognize it.

23   Of course, if you're blind, you can't see it, but it's

24   there if you look at it.  Common sense suggests that.

25   Okay.  Here's one of my common sense statements, and

Paul Hewett
July 10, 2009

1    then I quote several times from the CDC report.  And I

2    think -- I quote from the CDC report because I didn't

3    have anything, you know, because --

4        Q    Would it be fair to say in order to put forth,

5    based upon your expertise, an actual analysis and

6    evaluation of the relationship of the exposures to

7    season, you'd have to do -- or have to have a lot more

8    information than what you've been provided for?

9        A    Well, I think you'd have to have maybe -- the

10   data -- the analysis may be possible there.  I mean,

11   let's back up just a little bit and look at the time

12   frame in which I had to put this together:  Called on

13   Monday, produced the report the following Monday.  Okay.

14   So I didn't have much time to do this.  And -- and I

15   wasn't really requested to -- to do an in-depth

16   analysis.  It could be there's enough data in that

17   database, there's enough relative humidity data, there's

18   enough sufficient temperature data for somebody to do a

19   bang-up regression analysis.

20       Q    But is it fair to say you have not done that?

21       A    I have not done that.  Now, the CDC attempted

22   to do that but their data were collected in December and

23   January so they didn't exactly grab much of a year, let

24   alone multiple years, yet, they attempted it.  So they

25   generate regression coefficients that purport to give

Paul Hewett
July 10, 2009

Page 129

1    look at the individual data sets.  Now, I broke those

2    out.  We haven't go to those yet.  I'm sure we will.

3    But draw your attention to perhaps 15, W.D Scott Group.

4    Their dataset covers possibly I think the widest range

5    of time, and you do see a general trend of higher

6    exposures in the summer, lower exposures in the winter.

7    There's not that many data points in the winter.  You

8    could do some -- calculate some statistics by month

9    there.  I don't know what it would gain you, but it

10   appears to be that there is a seasonal effect.

11       Q    Are you making that determination just by

12   eyeballing, for example, Figure 4 and Figure 15?

13       A    That's what I said.  I was just looking at it.

14   Somebody else -- and I -- I -- I suggested somebody else

15   might not see a pattern there, but that's -- you could

16   take a poll.

17       Q    And any layman can look at the dots and see if

18   there is, in fact, a -- a pattern assuming we remove the

19   Mary DeVany results again?

20       A    With or without the Mary DeVany results, I

21   think you can see a pattern.

22       Q    But any --

23       A    And -- and -- and, furthermore, it's a

24   common-sense notion, so why shouldn't the data fall

25   along that -- have that wavy nature to it, peaks in the

Paul Hewett
July 10, 2009

Page 130

1   summer, troughs in the -- in the winter.

2       Q    And, again, because I want to make sure that

3   every time you use "common sense" you're talking about

4   average man on the street who has common sense?

5       A    I would say so, yes.

6       Q    So an average man with common sense in your

7   estimation could look at this and draw the same

8   conclusion that you're drawing?

9       A    Excuse me.

10      Q    Is that correct?

11      A    I would hope so.

12      Q    And he wouldn't have to have your expertise to

13  draw that conclusion based upon what he or she is

14  looking at on these graphs; is that correct?

15      A    I don't think they would.  The reason I

16  produced the graphs was so that anybody reading the

17  report could arrive at their own opinion.

18      Q    All right.  Let's move to Bullet Point No. 3 on

19  Page 1.

20              MR. PERCY:  How close are we getting?

21              THE WITNESS:  Ten more minutes.

22              MR. PERCY:  Another ten minutes?  Okay.

23      Q    (By Mr. Percy)  The next thing you were called

24  upon to do is evaluate the dataset for evidence that

25  exposures tend to decline with the age of the THU.

Paul Hewett
July 10, 2009

Page 131

1      A     Right.

2      Q     Did you have the same difficulty in performing

3    a, as you described it, bang-up analysis on this issue

4    also?

5      A     I didn't say I performed the bang-up analysis.

6      Q     Fair enough.

7      A     I said that somebody could if they dug into it.

8      Q     All right.  And could somebody also do Bullet

9    Point No. 3 a bang-up analysis if they dug into it?

10     A     Well, they probably could.  I -- I attempted to

11   do what I could in the time frame involved, provided,

12   yes.

13     Q     If you had more time, you'd like to have --

14     A     If I had more time, I probably would dig into

15   it a bit deeper, yeah, but wasn't provided the time and

16   I think that the analysis that I did was sufficient

17   for -- to answer the question.

18     Q     The anal -- you believe the analysis you did

19   was sufficient for the conclusion, whatever it might be,

20   that you render --

21     A     Yes.

22     Q     -- as a result of that, correct?

23     A     Yes, sir.

24     Q     All right.  Let me ask you, moving back to the

25   second paragraph in Section No. 1 just very briefly --

Paul Hewett
July 10, 2009

Page 162

1    point, I'm happy to --

2                    MR. REICH:   Yeah, that's fine.

3                    MR. PERCY:   Okay.

4                    MR. REICH:   Yeah, that's fine.   That's

5    fine.

6        Q     (By Mr. Percy)   Let's move ahead to No. 3.   I'm

7    going to skip anything about NIOSH for right now.   But

8    No. 3 where you talk about your methods, I do have a

9    couple of questions about this.

10       A     Okay.

11       Q     The first thing is you say, "The data were

12   entered into an Excel spreadsheet."   When it came to

13   you, it was already in an Excel spreadsheet, correct?

14       A     That's true, yes.

15       Q     You did not correct the Excel spreadsheet;

16   isn't that correct?

17       A     Well, yes and no.   It came to me in an Excel

18   spreadsheet.   I took the -- I copied that data out and

19   pasted in into another spreadsheet.

20       Q     And --

21       A     So in a sense it was entered, but, you know, to

22   be absolutely pristine precise, no, I did not enter the

23   data.

24       Q     Okay.   And -- and to be clear, you removed it

25   from an Excel spreadsheet that contained data from

Paul Hewett
July 10, 2009

Page 163

1   manufactured units manufactured by entities other than

2   Gulf Stream, you extracted Gulf Stream data, and you

3   placed the Gulf Stream specific data into an Excel

4   spreadsheet that you then created.  Would that be fair?

5        A    Yes, that's fair.  I placed almost all of the

6   Gulf Stream data into another spreadsheet, right.

7   Uh-huh.

8        Q    And we've already talked about how you selected

9   and how you culled --

10       A    Uh-huh.

11       Q    -- any information you may have culled.

12       A    Uh-huh.

13       Q    The next sentence is what I really want to ask

14   you about too.  "Summary statistics were produced by

15   using Systat and IHDataAnalyst --

16       A    Uh-huh.

17       Q    -- (V1.01)," and then you give some more --

18       A    Give a website.

19       Q    Website.  And then it says that "developed by

20   EAS for the analysis of occupational environmental

21   exposure data."  And what I wanted to ask you is:  Did

22   EAS/Paul Hewett develop Systat?

23       A    No, no.

24       Q    Okay.

25       A    That's a commercial program.  You do it the --

Stratos Legal Services
800-971-1127

Paul Hewett
July 10, 2009

Page 164

1    I give you the website there, for goodness sake.  You go

2    to that website, and they'll be happy to sell you as

3    many copies as you wish.

4        Q    And did -- did EAS develop IHDataAnalyst?

5        A    Yes, it did.

6        Q    Okay.

7        A    Yes, I did.

8        Q    That's -- that's what I'm trying to get to

9    here.

10       A    Yes.

11       Q    All right.  Systat is publicly available

12   software?

13       A    IHDataAnalyst is publicly available software.

14       Q    Okay.  Well, then --

15       A    I -- I sell copies of it.  I have numerous

16   companies that have site licenses.

17       Q    Okay.  But you, EAS/Paul Hewett, developed

18   IHDataAnalyst?

19       A    That is correct.

20       Q    All right.  What exactly does IHDataAnalyst do?

21       A    It analyzes IH data.

22       Q    And when you say "analyzes," define analyzes IH

23   data?

24       A    Well, it doesn't do it itself.  That implies

25   some kind of expert system.  But it permits the user to

Paul Hewett
July 10, 2009

Page 165

1    summarize the data graphically, to do various

2    goodness-of-fit tests, calculates statistics both normal

3    and lognormal and generate a report.

4         Q    Is it your software that allowed you to create

5    these figures or graphs at the end of your report?

6         A    No, it is not.  Systat was used for that

7    program --

8         Q    That's --

9         A    -- for those graphs.

10        Q    That's what I'm -- that's what I'm trying to --

11        A    I know where you're going to.  Later in the

12   report --

13        Q    If you do --

14        A    -- I tell you specifically --

15        Q    -- you're doing better than me.  I'm not sure

16   where I'm going, but -- but please go ahead.

17        A    I used IHDataAnalyst for one purpose only, and

18   that was to generate various statistics out of Tables 3

19   and 4.  And this is jumping ahead, but in the interest

20   of time, perhaps this will save us some time.  Tables 3

21   and 4, there are two columns in each table where it says

22   percent above the .008 limit and percent above the .016.

23   Okay?

24                There are three columns at the end of each

25   table -- the mean with a star indicating that this mean

Paul Hewett
July 10, 2009

Page 171

1    crackerjack data analyst.  Just because you have good

2    data in, does not mean the person running the program

3    knows what they're doing.

4         Q     Well, crackerjack data analyst, are you -- are

5    you describing someone who really knows how to operate

6    the software?

7         A     I'm basically referring to a competent

8    professional.

9         Q     Competent professional who knows how to operate

10   the software?

11        A     Knows how to operate the software.

12        Q     Okay.  Who's knowledgeable about what the

13   software can do?

14        A     Well, you know, to be quite frank, you don't

15   have to be a rocket scientist to run these software

16   programs.

17        Q     Do you have to be a pretty good computer

18   operator?

19        A     Well, you have to be knowledgeable.  It's well

20   within anybody's capabilities.

21        Q     Okay.  Let's -- and, incidentally, in

22   Section 3, I -- again, you use occupational and

23   environmental exposure data.

24        A     Uh-huh.

25        Q     And then again in 3.1 you talk about graphs

Paul Hewett
July 10, 2009

Page 183

1    that you've done in this report?

2        A    Yes, I did.  I think I mentioned that earlier

3    this morning that I considered the data that was given

4    to me valid.  Now, valid for what purposes, somebody

5    else has to decide that.

6        Q    Now, at the very least, you -- it was unusual

7    enough how the DeVany Consultants data looked when you

8    saw the dots on the chart to at least make a comment

9    about it in your report, right?

10       A    Well, yes.  And I make comments regarding the

11   other datasets based upon how they looked and how the

12   statistics came out.

13       Q    Well, let's take -- let's take a look at your

14   graphs --

15       A    Okay.

16       Q    -- or at least, perhaps, even a couple of your

17   graphs.  Let me find the one that I actually want you to

18   focus on first.  Go to Figure No. 6.  Are you with me?

19       A    Yes.

20       Q    It's a graph that shows on the left

21   formaldehyde, measurements in parts per million, and

22   then along the bottom axis, it's months and year dates,

23   correct?

24       A    Correct.

25       Q    All right.  And then it shows all the dots,

Paul Hewett
July 10, 2009

Page 224

1   in this little sub-table and that figure, the last five

2   figures of the paper.  And I did not do a formal

3   statistical analysis looking at the effects of

4   temperature.  Didn't have time to do so.

5       Q    Did you do a formal statistical analysis of the

6   effects of age?

7       A    Well, a formal statistical analysis, in my

8   view, or a complete statistical analysis would be to

9   look at the data as a function of -- type of trailer,

10  model of trailer if it was available, temperature,

11  relative humidity, age, the windows opened, windows

12  closed, the variables that CDC collected and the other

13  variables that the other -- whatever variables were

14  collected consistently throughout the entire set of

15  data.  That would be a complete analysis.  And I haven't

16  done that and didn't have time to do it in the time

17  frame provided me.

18      Q    So I guess my -- let's go back and restate my

19  question, if you will, and see if we can get an answer

20  to my question.

21              Did you do a formal statistical analysis

22  of the effects of age?

23      A    Well, define "formal statistical analysis."

24      Q    I'm using your term.

25      A    I know.  I defined it -- and I gave you a

Paul Hewett
July 10, 2009

Page 225

1    definition of it.  Well, the answer is no.  I said I

2    didn't.

3        Q    In order to ultimately make a conclusion,

4    render a professional expert conclusion regarding a

5    statistical analysis of whether these units have

6    formaldehyde levels that decline with age of the THU,

7    you would want to do a formal statistical analysis as

8    you described it a minute ago, wouldn't you?

9        A    Well, it would be nice to do that, but I don't

10   think it's necessary.  You have the evidence right in

11   front of you.  You have various graphs to look at.  You

12   can do a simple linear regression.  You can do an

13   exponential decline -- apply an exponential decline

14   model, which is what you have -- what we basically have

15   in Figure 17, and you're going to find that the

16   regression coefficients are significant.  How many more

17   variables you want to put into the model and how much

18   other data you want to throw into the analysis is --

19   is -- you can do it.  I'm not sure that you're -- I

20   don't think you're going to come to any different

21   conclusion.

22       Q    Well, let me ask you:  Did you -- in the class

23   cert report that you prepared, you actually opined and

24   expressed opinions on what is a statistical -- a

25   sufficient statistical sample --

Paul Hewett
July 10, 2009

Page 249

1    characterize both ATSDR process and NIOSH broad stroke.

2    I'm assuming that both of them were generated by

3    committees.  Both of them were generated by groups of

4    people that have various levels of expertise,

5    epidemiology, statistics, medical, occupational

6    medicine, environmental or whatever, and that a

7    consensus was developed regarding these levels.  So I'm

8    not going to second guess the opinions of the ATSDR

9    committee that generated the MRL or the NIOSH committee

10   that generated the NIOSH limit no more than I would

11   second guess the ACGIH committee or OSHA whenever they

12   come up with their limits.  These are their limits.

13   They're responsible for them.  They're responsible for

14   justifying it.  But they -- I view them as risk

15   management tools.  Here's the risk management tool

16   whether you agree with it or disagree with it.  The

17   speed limit on that road out there is 70 miles an hour.

18   You may believe that you can drive safely 100 miles an

19   hour on that road, but they've set the limit.  You

20   cannot change their limit.  You can disagree with its

21   premises, but you can't change it.  So whether I agree

22   or disagree, I cannot change the ATSDR limit nor can I

23   change the NIOSH limit.  They are risk management tools.

24              What I'm doing with the report here is

25   looking at all of the available data, at least the data

Paul Hewett
July 10, 2009

Page 250

1    that's been made avail -- made available to me and

2    trying to determine does it appear like risk has been

3    properly managed relative to those two limits.  And then

4    one of them is not even appropriate.  The NIOSH limit is

5    an occupational exposure limit.  It's in there for

6    reference -- reference peer -- purposes.  There's no

7    intention here in my report and the intention is not to

8    say that the NIOSH limit is an appropriate limit for

9    evaluating exposure levels to formaldehyde in these

10   trailers.  If it's higher than an occupational limit,

11   I'm going to be very concerned about it.

12        Q    When you were working for NIOSH, did you do any

13   work or review on setting NIOSH RELs?

14        A    Yes, I did.

15        Q    Specific to formaldehyde?

16        A    No.  Let me qualify that.  I participated in

17   the process.  I was part of a multidisciplinary group

18   that covered, I think, 22 or 23 people.  And, in fact,

19   the group I was involved with -- and I've -- I was only

20   involved on one exposure limit, and that was for

21   respirable coal mine dust.  The NIOSH criteria document

22   on respirable coal mine dust was published in 1995.  The

23   group won, just to -- to let you know, the Alice

24   Hamilton award for our efforts.  So I'm part of the

25   team.  I did not come up with the NIOSH limit, but I was