UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER FORMALDEHYDE          MDL NO. 1873
PRODUCTS LIABILITY LITIGATION

                                                          SECTION N(5)

                                                          JUDGE ENGELHARDT

                                                          MAGISTRATE CHASEZ

THIS DOCUMENT RELATES TO:
Anthony Bartel v. Gulf Stream Coach, Inc, et al,
and
Leslie Kujawa, et al v. Keystone RV Company and Bechtel National, Inc.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# BECHTEL NATIONAL, INC.'S
# RULE 12(b)(6) MOTION TO DISMISS


## EXHIBIT 1

**COMPLAINT FOR DAMAGES, *BARTEL V. GULF STREAM COACH, INC.,*
CIV. A. NO. 1:09CV281 (S.D. MISS. APR. 29, 2009)**



SOUTHERN DISTRICT OF MISSISSIPPI
FILED

APR 2 9 2009

J.T. NOBLIN, CLERK
BY_____DEPUTY

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| Anthony Bartel and Sherry Bartel | * | Civil Action No. $l.09cv20116$ RTW |
| | * | |
| versus | * | Section: _____ |
| | * | |
| Gulf Stream Coach, Inc., Bechtel | * | Magistrate: _____ |
| National, Inc., and CH2M Hill | * | |
| Constructors, Inc. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### COMPLAINT FOR DAMAGES

This Complaint of certain persons of the full age of majority, on behalf of themselves (hereinafter, "Plaintiffs"), through undersigned counsel, respectfully represent that:

### I. PARTIES

1. Each Named Plaintiff is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the states in which Defendants are citizens.

2. Named Plaintiffs are Anthony Bartel and Sherry Bartel.

3. Defendant Gulf Stream Coach, Inc. (hereinafter, "Gulf Stream") is, upon information and belief, an entity incorporated in the State of Indiana with its principle place of business in Indiana, which conducts business in the State of Mississippi, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Mississippi.

1

4.     Bechtel National, Inc. (hereinafter, "Bechtel"), a Nevada corporation with its

       principal place of business in San Francisco, California, licensed to do business

       in the State of Mississippi and in good standing, received a No-Bid contract from

       FEMA and was tasked with, amongst other things, performing significant

       functions in the transportation, delivery, installation, maintenance and repair, de-

       installation and refurbishment of the temporary housing units provided by FEMA

       to persons displaced by hurricanes Katrina and Rita.

5.     CH2M Hill Contractors, Inc. (hereinafter "CH2M"), a Delaware corporation with its

       principal place of business in Colorado, licensed to do business in the State of

       Mississippi and in good standing, received a No-Bid contract from FEMA and

       was tasked with, amongst other things, performing significant functions in the

       transportation, delivery, installation, maintenance and repair, de-installation and

       refurbishment of the temporary housing units provided by FEMA to persons

       displaced by hurricanes Katrina and Rita.

## II.  JURISDICTION AND VENUE

6.     Each plaintiff alleges to have suffered damages in an amount in excess of

       $75,000.00, exclusive of interest and costs.

7      Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the

       claims asserted herein against the Defendants with citizenship other than that of

       Plaintiffs, because of diversity of citizenship and because the amount in

       controversy exceeds $75,000.00, exclusive of interest and costs.

8.     Gulf Stream is subject to the *in personam* jurisdiction of this Court because it

       does sufficient business in the State of Mississippi and within this federal district

to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

9.    Bechtel is subject to the *in personam* jurisdiction of this Court because it is licensed to do business in the State of Mississippi and does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

10.    CH2M is subject to the *in personam* jurisdiction of this Court because it is licensed to do business in the State of Mississippi and does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

11.    Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C. §1391, as the emergency housing units were provided to the Plaintiffs in this district, and Plaintiffs' injuries were sustained in this district.

### III.  FACTS AND GENERAL ALLEGATIONS

12.    Plaintiffs resided in a Gulf Stream travel trailer, installed by Bechtel, from December 2005 to August 2007, and a Fleetwood Enterprises, Inc. (hereinafter "Fleetwood") mobile home, installed by CH2M,  from September 2007 to October 2008 (hereinafter, "housing units") in the State of Mississippi and were provided

3

these housing units by FEMA after the landfall of Hurricane Katrina in August 2005.

13. Fleetwood is not a Defendant in this action because it, and its subsidiaries, filed for Bankruptcy under chapter 11 in the United States Bankruptcy Court for the Central District of California (Case No. 09-14254-MJ) on March 10, 2009, and the commencement of a judicial proceeding by the Plaintiffs against Fleetwood is automatically stayed.

14. Plaintiffs have filed  Proof of Claims forms with the United States Bankruptcy Court for the Central District of California to protect their claims against Fleetwood.

15. Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet. They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

16. Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet.  They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. *Id.*

17. The residence of Plaintiffs was rendered unhabitable following Hurricane Katrina, leaving Plaintiffs homeless and in need of housing assistance.

18. FEMA contracted with Gulf Stream to purchase thousands of the housing units, primarily travel trailers, for provision to the Plaintiffs and other displaced Gulf Coast residents as temporary housing.

19. On information and belief, Gulf Stream expedited production of these travel trailers, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the travel trailers occupied by Plaintiffs containing higher than normal levels of formaldehyde.

20. On information and belief, Plaintiffs' travel trailer, whether manufactured prior to Hurricane Katrina or later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

21. Plaintiffs submit that the travel trailer at issue herein, whether manufactured prior to Hurricane Katrina or later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the travel trailer pertinent to formaldehyde levels.

22. Plaintiffs submit that the travel trailer at issue, whether manufactured prior to Hurricane Katrina or later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Gulf Stream's use of certain materials in its construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the travel trailer as a temporary residence for at least 18 months, but that Gulf Stream failed to

5

warn the Federal Government about these dangers.

23.    Plaintiffs submit that Gulf Stream ignored, or concealed and/or condoned the

concealment of, the fact that the travel trailer at issue contained dangerous

levels of formaldehyde due to Gulf Stream's use of certain materials in their

construction, and/or posed the threat of producing dangerous levels of

formaldehyde due to the Federal Government's intended use of the housing

units as temporary residences for at least 18 months, all in order to sell Gulf

Stream's products, and/or avoid the costs of safety precautions/inspections,

and/or avoid litigation by persons injured by formaldehyde emissions.

24.    Plaintiffs spent significant time in their travel trailer manufactured by Gulf Stream

and provided to Plaintiffs by the Federal Government through FEMA.  As a

result, Plaintiffs unknowingly were exposed to dangerously high concentrations

of the formaldehyde emitted from products used in the manufacture of the

subject travel trailer.

25.    Formaldehyde is found in construction materials, such as particle board,

fiberboard and plywood, as well as glues and adhesives used in the manufacture

of the housing units.  Pursuant to federal law, the defendants are required to

display a "Health Notice" in manufactured homes about exposure to

formaldehyde which reads:

IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde.
Eye, nose and throat irritation, headache, nausea, and a variety of
asthma-like symptoms, including shortness of breath, have been reported
as a result of formaldehyde exposure.  Elderly persons and young
children, as well as anyone with a history of asthma, allergies, or lung

6

problems, may be at greater risk.  Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels.  When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels.  Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

See 24 C.F.R. §3280.309.

26.     According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA").  Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

27.     Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work

week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to 1 ppm. In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

28.   HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". *See* 24 C.F.R. §3280.308.

29.   Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|--------|----------|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental

Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19,

2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-

trailers.html.

30. Gulf Stream knew or should have known of the health hazards inherent in the

    products they constructed, by familiarity with industry standards, the material

    safety data sheets in their possession, and published medical studies.

31. FEMA's disaster response obligations are delineated in the Robert T. Stafford

    Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, *et seq.* (the

    "Stafford Act").  The Stafford Act outlines two types of temporary housing

    assistance to be made available to eligible, displaced applicants: financial

    assistance and direct services. This aid is sometimes referred to as Section 408

    assistance. This provision was enacted as Public Law 93-288, Title IV, § 408

    (1988). Under the Stafford Act, *at* 42 U.S.C.A. § 5174, the Executive, through

    FEMA, may provide "direct assistance" in the form of temporary housing units,

    acquired by purchase or lease, directly to individuals or households who,

    because of a lack of available housing resources, would be unable to make use

    of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

9

32.   In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Bechtel and CH2M with No-Bid contracts, eventually amounting to over a billion dollars.  The Federal Government also relied on the expertise and knowledge of Bechtel and CH2M to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

33.   Bechtel was tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the Plaintiffs' Gulf Stream travel trailer, inspection of the travel trailer, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the travel trailer.

34.   CH2M was tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the Plaintiffs' Fleetwood mobile home, inspection of the mobile home, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the mobile home.

35.   Under the terms of their contracts, Bechtel and CH2M were obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same.  Further, under their No-Bid contracts with FEMA, Bechtel and CH2M were obligated to advise and instruct FEMA regarding the implementation of those contracts.  Bechtel and CH2M failed to properly fulfill either of these tasks.

36. Bechtel and CH2M contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Bechtel and CH2M were tasked with operating. These new areas included staging areas to be managed and maintained as assigned to Bechtel and CH2M or individual locations and addresses where Bechtel and CH2M assigned that temporary housing unit would have obligations to manage and maintain it.

37. To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Bechtel and CH2M entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under their individual contracts with FEMA.

38. Bechtel and CH2M were tasked under their contracts with FEMA to identify and prepare the infrastructure for the various group site locations. This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc. Bechtel and CH2M knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

39. Once the travel trailer occupied by Plaintiffs was transported and delivered to Plaintiffs in Ocean Springs, Mississippi, Bechtel was responsible for installing the travel trailer. Bechtel installed the travel trailer by "blocking" the unit. This meant raising the Plaintiffs' travel trailer several feet into the air and off of its wheel base, and setting it on concrete blocks.

40. Once the mobile home occupied by Plaintiffs was transported and delivered to 1824 Popps Ferry Road #21 Biloxi, Mississippi, CH2M was responsible for installing the mobile home. CH2M installed the mobile home by "blocking" the

unit. This meant raising the Plaintiffs' mobile home several feet into the air and off of its wheel base, and setting it on concrete blocks.

41.    By blocking the Plaintiffs' travel trailer Bechtel created stress and flexing on the frame of the unit as it was not designed to be lifted off of the wheel base. In fact, the manufacturers of the travel trailer unit warned in the owners' manual provided with the unit, that the unit should not be jacked so that the vehicle's weight is no longer supported by the wheels.

42.    The stress and flexing of the travel trailer's frame caused by Bechtel "blocking" it with weight off of the wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures

43.    Travel trailers are, by definition, mobile. They are designed for and intended for periodic, recreational use and not for long-term habitation. By installing the FEMA-provided travel trailer on concrete blocks for extended occupancy, Bechtel knowingly and intentionally modified the design and the actual use of the unit occupied by the Plaintiffs by converting it into a temporary housing unit to be used as a residence for long-term occupancy exceeding 21 months.

44.    Bechtel failed to consult with the manufacturer of the travel trailer, Gulf Stream, with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long-term residence and occupation. Bechtel took actions which voided the warranties of the manufacturer and directly created or contributed to unsafe and hazardous living conditions in the travel trailer.

45.   Once Bechtel and CH2M had completed the transportation, delivery and
       installation of the temporary housing units occupied by Plaintiffs, Bechtel and
       CH2M were tasked with inspecting each unit to ensure that it was safe and
       habitable, prior to occupancy by the Plaintiffs.  Upon information and belief,
       Bechtel and CH2M failed to adequately inspect the temporary housing units
       occupied by the Plaintiffs to ensure that the units were safe and suitable for their
       intended use – the long-term occupancy by individuals and families displaced by
       Hurricane Katrina.  This failure to properly inspect the units for unsafe or
       hazardous conditions directly contributed to the adverse health effects suffered
       by Plaintiffs.

46.   In addition to transportation, site identification, installation and inspection,
       Bechtel or their various subcontractors over whom they maintained direct
       oversight and responsibility also managed, maintained and repaired the travel
       trailer provided to Plaintiffs by FEMA in response to Hurricane Katrina.  Upon
       information and belief, Bechtel failed to adequately manage, maintain and repair
       the temporary housing unit which enabled and contributed to the unsafe and
       hazardous conditions that led to adverse health effects amongst the Plaintiffs.

47.   In addition to transportation, site identification, installation and inspection, CH2M
       or their various subcontractors over whom they maintained direct oversight and
       responsibility also managed, maintained and repaired the mobile home provided
       to Plaintiffs by FEMA in response to Hurricane Katrina.  Upon information and
       belief, CH2M failed to adequately manage, maintain and repair the mobile home
       which enabled and contributed to the unsafe and hazardous conditions that led

to adverse health effects amongst the Plaintiffs.

48.   Parallel to their duty to manage, maintain and repair each temporary housing unit Bechtel and CH2M failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by occupants of temporary housing units in the disaster area to various adverse health effects caused by exposure to elevated levels of formaldehyde.

49.   Following the Plaintiffs' occupancy of their travel trailer, Bechtel was tasked with its de-installation.  Upon discovering the deteriorated condition of the temporary housing unit at the time of de-installation and removal, Bechtel failed to identify the unsuitability of the temporary housing unit for long-term occupancy.

50.   In addition to de-installation of the temporary housing units, Bechtel and CH2M were tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to hurricanes Katrina and Rita or for use in the future.  By restoring and refurbishing these temporary housing units, Bechtel and CH2M warranted that the units were fit for their intended use, long-term occupancy in response to disaster related displacement.  By restoring and refurbishing these temporary housing units, Bechtel and CH2M created and perpetuated existing hazardous conditions which lead to foreseeable adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units.  Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

51.    Bechtel and CH2M at every stage of their involvement, failed to warn the
       Plaintiffs-occupants of each temporary housing unit of the potential risk of
       hazardous and unsafe living conditions due to the presence of elevated levels of
       formaldehyde – a known human carcinogen – which led directly to adverse
       health effects, including but not limited to the advent of childhood asthma and
       the onset of adult asthma in some of the occupants.

52.    Through their actions and omissions, Bechtel created and perpetuated a
       situation wherein Plaintiffs were exposed to elevated levels of formaldehyde and,
       as a result, suffered adverse health effects. Bechtel negligently failed to adhere
       to the manufacturer instructions and warnings related to: (1) the manufacturers'
       intended (short-term) use of the temporary housing units; (2) the installation and
       set-up of the temporary housing units; and (3) the warning that the temporary
       housing units contained urea formaldehyde resin which would release
       formaldehyde gas directly into the intended living space.

53.    Through their actions and omissions, CH2M created and perpetuated a situation
       wherein Plaintiffs were exposed to elevated levels of formaldehyde and, as a
       result, suffered adverse health effects. CH2M negligently failed to adhere to the
       manufacturer instructions and warnings that the mobile home contained urea
       formaldehyde resin which would release formaldehyde gas directly into the
       intended living space.

54.    Bechtel and CH2M failed to warn the occupants of temporary housing units of
       the hazardous conditions created by the elevated levels of formaldehyde in the
       temporary housing units.

55.    By restoring and refurbishing the travel trailer for future habitation, Bechtel improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

56.    Finally, despite these failures, Bechtel and CH2M received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of the Plaintiffs and other occupants of the temporary housing units who simply had nowhere else to go and who were relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

57.    The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith.  *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

58.    Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published

dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

59.    In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels.  *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff in a related matter, November 16, 2007.

60.    Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Plaintiffs and other displaced Gulf Coast residents, the Inspector General of the Department of Homeland Security,  testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Gulf Coast Residents, including Plaintiffs.  *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland

Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

61.   The Federal Government also continued to supply the defective and dangerous housing units to the Plaintiffs after March of 2006.  Plaintiffs resided in their travel trailer until August 2007 and in their mobile home from September 2007 to October 2008.

62.   The Federal Government continued to  supply the defective and dangerous housing units to the Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

63.   The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value.  Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http:// oversight.house.gov/documents/20070719113015.pdf) and D (*available at* http:// oversight.house.gov/documents/20070719113219.pdf) attached thereto.

64.   The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government had been

notified on a number of occasions in May and June 2006 regarding residents'
concerns over formaldehyde emissions in their housing units. Union of
Concerned Scientists, *supra*, and Exhibits E (*available at*
http://oversight.house.gov/documents/20070719113322.pdf), I (*available at*
http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at*
http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

65.   While complaints of formaldehyde exposure continued to be reported to the
Federal Government and evidence supporting the existence of dangerous levels
of formaldehyde present in the housing units was uncovered, the Federal
Government intentionally avoided undertaking any comprehensive testing of their
own because it wanted to avoid liability for the problem, as stated in emails from
the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any
testing until we give the OK. While I agree that we should conduct testing, we
should not do so until we are fully prepared to respond to the results. Once you
get results and should they indicate some problem, the clock is ticking on our
duty to respond to them." Another email repeats these concerns, reading "OGC
has advised that we do not do testing, which would imply FEMA's ownership of
the issue."  Union of Concerned Scientists, *supra*, and Supplemental A (various
emails *available at* http://oversight.house.gov/documents/20070809120917.pdf)
and Supplemental B (various emails *available at*
http://oversight.house.gov/documents/ 20070809120940.pdf) attached thereto.

66.     Plaintiffs aver that, even as they were being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the manufacturers concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

67.     Evidence of communications between Gulf Stream and the Federal Government exists by way of emails emanating from the FEMA Office of General Counsel (OCG).  For example, in June 16, 2006 the same email which states "OGC has advised that we do not do testing," states that "Gulfstream is working closely with FEMA to resolve the formaldehyde problem in smaller travel trailer (Cavalier) units."  A later email reflects relief of the FEMA OCG  at the "good news" that "one of the major manufacturers of national housing units (Gulfstream I think)...wanted to get with External Affairs so they could get on the same page...we may get the benefit of the manufacturer's 'science' and 'public relations' approaches."  *See* U.S. House of Representatives, Committee on Oversight and Government Reform, FEMA'S TRAVEL TRAILERS: LITIGATION CONSIDERATIONS V. HEALTH AND SAFETY CONSIDERATIONS, AND THE WINNER IS?, July 19, 2007, *available at* http://republicans.oversight.house.gov/Media/PDFs/ 20070719 FEMAEmails.pdf.

68.     FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be

20

much lower than previously expected, with anticipated levels being more than 100 times higher.  The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light.  Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at* http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

69.   FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers.  This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months,  were useless for determining a policy to protect trailer residents.  This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists and Exhibit R attached thereto, *supra. See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available at* http://www.atsdr.cdc.gov/HAC/pha/fema_housing_ formaldehyde/formaldehyde_report_0507.pdf.

70.   This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.   Union of Concerned Scientists, *supra*.

21

71.   FEMA and FEMA's lawyers purposefully interfered with the design and
      implementation of the earlier testing of the housing units occupied by the
      Plaintiffs and other displaced residents supplied in the wake of the hurricanes in
      order to avoid legal liability for injuries to Plaintiffs as a result of their exposure to
      formaldehyde.  FEMA's activities, which included hiding, manipulating and
      ignoring the extant science and scientific work and concerns of federal scientists
      in other agencies, commenced immediately after FEMA began to receive
      complaints from trailer residents concerning formaldehyde fumes in 2006.  *See*
      correspondence from U.S. House of Representatives, Committee on Science
      and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland
      Security, January 28, 2008.

72.   FEMA further manipulated the governmental testing by involving a little-known
      office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought
      to ensure that no long-term exposure considerations would be included in the
      health consultation by removing the consultation from the normal ATSDR review
      process so that scientists who had specifically recommended looking at long-
      term exposure effects were excluded from the review.  FEMA did so in order to
      avoid negative publicity and legal liability in connection with the presence of
      formaldehyde in the housing units.  *See* correspondence from U.S. House of
      Representatives, Committee on Science and Technology, to Michael Chertoff,
      January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for
      Environmental Health/Agency for Toxic Substances and Disease Registry,
      January 28, 2008.

73.     FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006.  The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern," a level nearly 400 times the ATSDR's annualized exposure limit.  Yet even applying this "level of concern," the average sampling results still were higher.  *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents/20070719102502.pdf.

74.     Indeed, in testimony before Congress, independent Industrial Hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw… I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/20071114164004.pdf.

75.    On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr.

Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the

February Health Consultation was "possibly misleading and a threat to public

health" for failure to disclose the carcinogenic status of formaldehyde and that

there are no safe exposure levels.

76.    Despite this information, FEMA and the ATSDR did not revise the original Health

Consultation until October of 2007 to include the warning that the original Health

Consultation "did not sufficiently discuss the health implications of formaldehyde

exposure and included language that may have been unclear, leading to

potentially incorrect or inappropriate conclusions." *See* An Update and Revision

of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of

FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-

October, 2006, *available at*

http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

77.    The Federal Government, through FEMA, deliberately ignored and/or rejected

objective, scientific standards in the design and implementation of its testing

procedures, which resulted in the prolongation of the Plaintiffs' exposure to

dangerous levels of formaldehyde in the housing units, and causing them serious

injuries.

78.    It was not until December of 2007 that the Federal Government initiated testing

of occupied housing units.  Apparently, FEMA requested the CDC to conduct

testing of a random sample of 519 housing units in Louisiana and Mississippi

between December 21, 2007 and January 23, 2008, the stated purpose of which

was to assess levels of formaldehyde in indoor air of occupied FEMA-supplied

housing units. *See* Statement of Howard Frumkin, M.D., DrPH, Director,

National Center for Environmental Health/Agency for Toxic Substances and

Disease Registry, Centers for Disease Control and Prevention, U. S. Department

of Health and Human Services, CDC's RESPONSE TO HEALTH CONCERNS RELATED

TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST

REGION, March 4, 2008, at 1, 3-4.

79.   The CDC testing revealed the following important findings: (1) the formaldehyde

levels were higher than typical levels of U.S. indoor exposure in single-family

homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590

ppb, with the average levels in all units measuring 77 ppb, the latter being higher

than U. S. background levels in single-family homes and apartments; (3) the

levels recorded in many of the units could affect the occupants' health; (4) the

contemporary measured levels are likely to under-represent long-term exposures

because formaldehyde levels tend to be higher in newer housing units and

during warmer weather; (5) higher indoor temperatures were associated with

higher formaldehyde levels, independent of unit make or model; and, (6)

formaldehyde levels varied by type of housing unit (mobile home, park model,

and travel trailer), but all types tested had elevated levels compared to the data

on single-family homes and apartments. *Id.* at 4.

80.   The CDC's recommendations as a result of this testing included the following: (1)

move quickly to relocate residents before the weather in the region warms up; (2)

FEMA and the CDC to consider establishment of a registry to conduct long-term

health monitoring of children and others who resided in FEMA-provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

81.  As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing. The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

82.  The Federal Government's actions with regard to these Plaintiffs, and occupants of other units,  in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy. Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

83.  Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific

standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

## COUNT 1:

### STRICT PRODUCTS LIABILITY MS CODE ANNOTATED § 11-1-63 PRODUCTS LIABILITY: DEFECTIVE MANUFACTURING AND DESIGN BY GULF STREAM

84.   Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

85.   Gulf Stream at the time that the travel trailer left its control knew or should have known that the product was defective because it deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications.

86.   Gulf Stream knew or should have known that the defective condition rendered Plaintiffs' travel trailer unreasonably dangerous to the user or consumer or others; and

87.   The defective and unreasonably dangerous condition of the Plaintiffs' travel trailer (the failure of the travel trailer to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by each Plaintiff.

88.   At the time the Plaintiffs' travel trailer left the control of Gulf Stream, it did not contain properly selected, prepared and installed components.

89.   At all relative times, the Plaintiffs lacked actual or constructive knowledge of the defective condition of their travel trailer and that each defective product was inconsistent with their safety.

90.   At all relevant times, Plaintiffs did not appreciate the danger of their travel trailer's defective condition.

91.   At all relevant times, Plaintiffs did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

92.   The travel trailer in question failed to function as expected as a result of its design characteristics.

93.   An alternative design existed at the time that each housing unit left the control of Gulf Stream which would have not impaired the product's usefulness or desirability.

94.   The alternative design would have to a reasonable probability prevented the toxic exposure of each Plaintiff.

## COUNT 2:

## PRODUCTS LIABILITY: GULF STREAM'S FAILURE TO WARN PLAINTIFFS

95.   Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

96.   The travel trailer supplied to Plaintiffs was defective because it failed to contain adequate warnings or instructions.

## COUNT 3:

## PRODUCTS LIABILITY: BREACH OF EXPRESS WARRANTY BY GULF STREAM

97.   Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

98.   The travel trailer breached an express warranty and/or failed to conform to other express factual representations upon which the claimant justifiably relied in

electing to use this product.

## COUNT 4:

## NEGLIGENCE OF NO-BID CONTRACTOR DEFENDANTS

## UNDER MISSISSIPPI LAW

**A.     Bechtel**

99.     Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

100.    At all relevant times Bechtel was tasked with the transportation, installation, site

identification, preparation, inspection, maintenance and repair, refurbishment

and restoration, and removal of the travel trailer, which caused the Plaintiffs'

injuries.

101.    Bechtel owed a duty to Plaintiffs to provide, transport, install, inspect, maintain,

repair, refurbish, recondition and restore safe temporary housing units that did

not emit hazardous levels of formaldehyde.

102.    Bechtel knew or should have known when they provided, transported, installed,

inspected, maintained, repaired, refurbished, reconditioned and restored the

travel trailer for the general public (thereby modifying and converting the mobile

unit into a residential installation) the actual and intended use of the travel trailer

by Plaintiffs, and that the travel trailer would be used in the manner that Plaintiffs

herein used the travel trailer.

103.    Bechtel breached their duty to Plaintiffs in failing to act reasonably in the

provision, installation, inspection, maintenance, repair, refurbishment,

reconditioning and restoration of the travel trailer; specifically by:

a.    Failing to sufficiently warn Plaintiffs of the inherently dangerous properties or the foreseeable conditions of the travel trailer when used for long-term occupancy; and

b.    Failing to adhere to the manufacturers' warnings against jacking the travel trailer off its wheel base by "blocking" the unit.

104.    Bechtel's actions were the proximate cause of the increased exposure of formaldehyde to the each Plaintiff.

105.    Bechtel contributed to and exacerbated the adverse health impacts upon each Plaintiff residing in the travel trailer.

**B.    CH2M**

106.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

107.    At all relevant times CH2M was tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the mobile home, which caused the Plaintiffs' injuries.

108.    CH2M owed a duty to Plaintiffs to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

109.    CH2M knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the mobile home for the general public (thereby modifying and converting the mobile unit into a residential installation) the actual and intended use of the mobile home by Plaintiffs, and that the mobile home would be used in the manner that

30

Plaintiffs herein used the mobile home.

110.   CH2M breached their duty to Plaintiffs in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the mobile home; specifically by failing to sufficiently warn Plaintiffs of the inherently dangerous properties or the foreseeable conditions of elevated levels of formaldehyde in the mobile home.

111.   CH2M's actions were the proximate cause of the increased exposure of formaldehyde to the each Plaintiff.

112.   CH2M contributed to and exacerbated the adverse health impacts upon each Plaintiff residing in the travel trailer.

## IV. DAMAGES

### A.    COMPENSATORY DAMAGES

113.   In addition to and by way of summarizing the compensatory damages prayed for herein, Plaintiff, Anthony Bartel, avers that the defendants Gulf Stream, as well as Bechtel and CH2M, individually and/or jointly are responsible for all damages which Plaintiff has suffered and continues to suffer as a consequence of defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future physical pain and suffering, past and future mental pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of

displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

114.   In addition to and by way of summarizing the compensatory damages prayed for herein, Plaintiff, Sherry Bartel, avers that the defendants Gulf Stream, as well as Bechtel and CH2M, individually and/or jointly are responsible for all damages which Plaintiff has suffered and continues to suffer as a consequence of defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future physical pain and suffering, past and future mental pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and  loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

**B.     PUNITIVE / EXEMPLARY DAMAGES**

115.   Pursuant to Miss. Code Ann. § 11-1-65, inasmuch as the conduct of  Gulf Stream and/or Bechtel and/or CH2M and their servant/employees constitutes willful, wanton, egregious and reckless disregard for the rights and safety of the Plaintiffs, an award of punitive damages is appropriate and necessary under these facts.

**V.  <u>REQUEST FOR JURY TRIAL</u>**

Each Plaintiff is entitled to and demands a trial by jury.

## VI. PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that Gulf Stream, Bechtel and CH2M be served with a copy of this Complaint, and that, after due proceedings:

1. there be a judgment herein in favor of each Plaintiff and against Defendants for all compensatory damages and punitive damages together with legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the Defendants are liable for all applicable damages and thereafter;

2. there be specially included in the judgment in each Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

   a. past and future physical injuries,

   b. past and future physical pain and suffering,

   c. future mental pain and suffering,

   d. past and future physical impairments and disability,

   e. past and future reasonable and necessary medical expenses,

   f. past and future loss of earning capacity,

   g. past and future loss of enjoyment and quality of life,

   h. loss of consortium and/or society,

   i. compensable out-of-pocket expenses related to Defendants' wrongdoing,

   j. costs of court, and

      k.     punitive damages; and

3.     all other general, equitable, and further relief as the Court may deem just

and proper.

Respectfully submitted,

RONNIE G. PENTON, ESQ.
Trial Counsel for Plaintiffs (MS Bar #30011)
PENTON LAW FIRM
209 Hoppen Place
Bogalusa, Louisiana 70427
Phone: (985) 732-5651
Facsimile: (985) 735-5579
fecourtmail@rgplaw.com

MARYANNA PENTON, ESQ.
Trial Counsel for Plaintiffs (MS Bar #102979)
PENTON LAW FIRM
209 Hoppen Place
Bogalusa, Louisiana 70427
Phone: (985) 732-5651
Facsimile: (985) 735-5579
fecourtmail@rgplaw.com

OF COUNSEL:
HUGH P. LAMBERT, ESQ. (LA Bar #7933)
LINDA J. NELSON, ESQ.  (LA Bar #9938)
LAMBERT & NELSON, PLC
701 Magazine Street
New Orleans, LA 70130
Telephone: (504)581-1750
Facsimile: (504)529-2931
hlambert@lambertandnelson.com
lnelson@lambertandnelson.com

**PLEASE SERVE:**

1.   Gulf Stream Coach, Inc.
     **through its registered agent for service:**
     Kenneth C. Brinkler
     503 South Oakland
     Napanee, IN 46550

2.   Bechtel National, Inc.
     **through its registered agent for service:**
     C T Corporation System
     645 Lakeland East Drive, Suite 101
     Flowood, MS 39232

3.   CH2M Hill Constructors, Inc.
     **through its registered agent for service:**
     C T Corporation System
     645 Lakeland East Drive, Suite 101
     Flowood, MS 39232

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing pleadings were served on all

counsel of record through electronic notification pursuant to the electronic filing in the

United States District Court for the Southern District of Mississippi this 30th day of April,

2009.

_____
RONNIE G. PENTON, ESQ.