UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER FORMALDEHYDE                    MDL NO. 1873
PRODUCTS LIABILITY LITIGATION

                                                     SECTION N(5)

                                                     JUDGE ENGELHARDT

                                                     MAGISTRATE CHASEZ

THIS DOCUMENT RELATES TO:
Anthony Bartel v. Gulf Stream Coach, Inc, et al,
and
Leslie Kujawa, et al v. Keystone RV Company and Bechtel National, Inc.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## BECHTEL NATIONAL, INC.'S
## RULE 12(b)(6) MOTION TO DISMISS


### EXHIBIT 5

**DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF
ITS MOTION TO DISMISS PLAINTIFFS' REMAINING FTCA CLAIMS FOR LACK
OF SUBJECT MATTER JURISDICTION (REC. DOC. 1545-2)**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

IN RE: FEMA TRAILER                     MDL NO. 1873
FORMALDEHYDE
PRODUCTS LIABILITY LITIGATION           SECTION N-5
                                        JUDGE ENGELHARDT
                                        MAG. JUDGE CHASEZ

**THIS DOCUMENT RELATES TO ALL CASES**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


**DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM**
**IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' REMAINING**
**FTCA CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.    The Stafford Act And The FTCA Discretionary Function
        Exceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    II.   Part One Of The Discretionary Function Exception – Discretionary
        Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.    FEMA's Conduct Was Discretionary Unless A Statute, Regulation,
              Or Policy Specified A Mandatory "Specific Direction" That FEMA
              Employees Were Required To Follow . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.    FEMA's Response To Formaldehyde In EHUs Was Discretionary . . . . 8

    III.  Part Two Of The Discretionary Function Exception – An Objective Legal
        Analysis Of The Alleged Wrongful Conduct . . . . . . . . . . . . . . . . . . . . . . . 9

        A.    Operational Acts That Implement Agency Programs Are
              Susceptible To Policy Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.    Negligence Is Irrelevant To The Determination Of Whether
              FEMA's Response To Formaldehyde Concerns Is Considered
              Susceptible To Policy Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C.    Even If OCC's E-mails Delayed Testing Or Altered FEMA's
              Response To Formaldehyde In EHUs, The Conduct At Issue –
              Determination Of The Appropriate Response Action And The
              Extent Of Such Action – Is Susceptible To Policy Analysis . . . . . . . . . 16

        D.    FEMA's Operational Responses To Formaldehyde Concerns
              Were Susceptible To Policy Analysis . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## FEDERAL CASES

**CASE**                                                                    **PAGE**

*ALX El Dorado, Inc., v. Southwest Sav. & Loan Ass'n*,
  36 F.3d 409 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Andrade v. Chojnacki*,
  338 F.3d 448 457(5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Armstead v. Nagin*,
  2006 WL 3861769 (E.D. La. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 10, passim

*Autery v. United States*,
  992 F.2d 1523 (11th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Baldassaro v. United States*,
  64 F.3d 206, 208 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 10, passim

*Berkovitz v. United States*,
  486 U.S. 531 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Brewer v. HUD*,
  508 F. Supp. 72 (S.D. Ohio 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Buchanan v. United States*,
  915 F.2d 969 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*City of San Bruno v. FEMA*,
  181 F. Supp. 2d 1010 (N.D. Cal. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cope v. Scott*,
  45 F.3d 445 (D.C. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Dalehite v. United States*,
  346 U.S. 15 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

*Drive Financial Services, L.P. v. Jordan*,
  521 F.3d 343 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Elder v. United States*,
  312 F.3d 1172 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**CASE**                                                                 **PAGE**

*Fisher Bros. Sales, Inc. v. United States*,
    46 F.3d 279 (3d Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19

*Freeman v. United States*,
    556 F.3d 326 (5th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4, 6-8, passim

*Garza v. United States*,
    161 Fed. Appx. 341, 346, 2005 WL 3478009 (5th Cir. 2005).. . . . . . . . . . . . . . . . . . . . 29

*Gaubert v. United States*,
    499 U.S. 315 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 8, passim

*Gaubert v. United States*,
    885 F.2d 1284 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Guile v. United States*,
    422 F.3d 221 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 29

*Hix v. Army Corps. of Engineers*,
    155 Fed. Appx. 121 (5th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Katrina Canal Breaches Consol. Litigation*,
    2009 WL 799976 (E.D. La.  2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Katrina Canal Breaches Consol.*,
    2008 WL 2186400  (E.D. La. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 24, passim

*In Re Katrina Canal Breaches*,
    471 F. Supp.2d 684 (E.D. La. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Indian Towing Co., Inc. v. United States*,
    350 U.S. 61 (1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Irving v. United States*,
    162 F.3d 154 (1st Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Johnson v. FEMA*,
    2007 WL 1592978 (E.D. La. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24, 25

*Kelly v. United States*,
    241 F.3d 755 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**CASE**                                                                                     **PAGE**

*Kiehn v. United States,*
     984 F.2d 1100 (10th Cir.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lesoeur v. United States,*
     21 F.3d 965 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Macharia v. United States,*
     334 F.3d 61 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*McNeily v. United States,*
     6 F.3d 343 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Moon v. CIA,*
     514 F. Supp. 836 (S.D. N.Y. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Murphy v. Army,*
     613 F.2d 1151 (D.C. Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rich v. United States,*
     119 F.3d 447 (6th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Richardson v. United States,*
     943 F.2d 1107 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Rockwell Inter'l Corp. v. U.S. Dept. of Justice,*
     225 F.3d 598 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rosebush v. United States,*
     119 F.3d 438 (6th Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

*Shansky v. United States,*
     164 F.3d 688 (1st Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Shea Homes Ltd. v. United States,*
     397 F.Supp.2d 1194 (N.D. Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Smith v. Johns- Manville Corp.,*
     795 F.2d 301 (3d Cir. 1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*St. Tammany Parish v. FEMA,*
     556 F.3d 307 (5th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 7

**CASE**                                                                        **PAGE**

*Sunrise Village Mobile Home Park, L.C. v. United States,*
   42 Fed. Cl. 392 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. American Tel. & Tel. Co.,*
   567 F.2d 121 (D.C. Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. S.A. Empresa De Viacao Rio Grandense ("Varig Airlines"),*
   467 U.S. 797 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 15, passim

*Whisnant v. United States,*
   400 F.3d 1177 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 29

*Wiggins v. Army,*
   799 F.2d 962 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Williamson v. U.S. Dept. of Agric.,*
   815 F.2d 368 (5th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## FEDERAL STATUTES

28 U.S.C. §1346(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

28 U.S.C. §2680(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 16, passim

28 U.S.C. §2680(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. §5148. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. §5164. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. §5174. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. §5174(b)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 6, passim

## FEDERAL RULES

Fed. R. Civ. P. 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

Fed. R. Civ. P. 12(h)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

Fed. R. Civ. P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

v

**FEDERAL REGULATIONS**

**REGULATION**                                                                                  **PAGE**

44 CFR Part 206.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

44 CFR §206.110(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

206 CFR §101(g)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## INTRODUCTION

The Court in its October 2008 decision ruled that the discretionary function exception bars Plaintiffs' Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346(b)(1), 2671-80, claims challenging the Federal Emergency Management Agency's ("FEMA") decisions to: (1) purchase and use as temporary emergency housing for Katrina and Rita disaster victims, travel trailers, park model trailers, and mobile homes ("EHU"), *see* October 3, 2008, Order at 43-44 [Dkt. 717] ("Order at __"), and (2) contractually delegate the responsibility for hauling, installing and maintaining EHUs to Individual Assistance/Technical Assistance Contractors ("IA/TAC"). *Id.* at 44.[1]/  The Court further ruled that FEMA's response actions to formaldehyde concerns in EHUs were not constrained by any mandatory and specific statute or regulations. *Id.* at 44-45. However, the Court concluded that there exists "at least a colorable claim" that, from March 2006 to approximately June 2006, FEMA's response actions may not be considered susceptible to policy analysis because FEMA's Office of Chief Counsel ("OCC") – as opposed to a decision-maker responsible for making policy decisions – may have determined FEMA's response actions, including whether to test. *Id.* at 39.  Furthermore, the Court stated that OCC's decision may have been subjectively motivated by impermissible litigation-related policy concerns, and that such decisions would be inconsistent with general statements and public pronouncements that its FEMA's policy to supply "safe, habitable alternative housing to disaster victims." *Id.* at 40.  The Court further reserved judgment as to whether the second prong of the discretionary function exception applies to the time period, March 2006 (when FEMA received its first formaldehyde

---

[1]/      The Court also ruled that the discretionary function exception bars all claims arising from alleged exposure to formaldehyde in manufactured housing, i.e., mobile homes. *Id.* at 21 n.9.

complaint), until June 2006 (when FEMA took programmatic action towards all EHU occupants).[2]/ The Court also stated that once FEMA learned that formaldehyde was an issue in occupied EHUs, if FEMA simply decided to "ignore health concerns associated with this alternative housing," a health and safety problem, such a decision might have involved "matters of scientific and professional judgment – particularly judgments concerning safety which are rarely considered to be susceptible to social, economic, or political policy." *Id*. at 40. Through this memorandum, the United States demonstrates that the Court's previously-voiced concerns do not impede application of the discretionary function exception, and that the evidence shows that OCC was not the decision-maker and that FEMA did not "ignore" health and safety concerns surrounding formaldehyde.

The Court should grant this motion for two reasons. First, consistent with the Fifth Circuit's recent decision in *Freeman v. United* States, 556 F.3d 326 (5th Cir. 2009), even if OCC had been the decision-maker responsible for determining FEMA's response actions (which it was not) and OCC's decisions were subjectively motivated by litigation concerns, the decisions at issue are ***susceptible*** to policy analysis as a matter of law and thus are protected by the discretionary function exception. The Court should modify that portion of its analysis reflected in its October 2008 Order because it runs afoul of the Supreme Court's instruction in *Gaubert v. United States*, 499 U.S. 315, 325 (1991), and recent Fifth Circuit decisions interpreting and

---

[2]/ The Court noted that the discretionary function exception may not bar claims for conduct prior to March 2006 if FEMA knew before that date that formaldehyde off-gassing in EHUs would injure occupants. Order at 28 n.13. Furthermore, after June 2006, the discretionary function exception bars PSC's claims because FEMA's implement a programmatic response and issued a safety notice to all occupants and tasked the Environmental Protection Agency ("EPA") and Centers for Disease Control/Agency for Toxic Substances and Disease Registry ("ATSDR") to test EHUs shows FEMA was not "ignoring" the problem and was motivated by permissible policy concerns. Order at 41.

2

applying *Gaubert.  See Freeman*, 556 F.3d at 340 n.15; *see also St. Tammany Parish v. FEMA*, 556 F.3d 307 (5th Cir. 2009).  Specifically, neither the identity of the decision-maker, nor the decision-maker's subjective intent, is relevant to whether the exception applies.  This is especially true so with respect to FEMA's decisions regarding temporary emergency housing decisions, because Congress vested the President and FEMA with broad discretionary authority as to what factors may be considered.  42 U.S.C. §5174(b)(2)(A).  Moreover, even if the identity of the FEMA decision-maker and the decision-maker's subjective intent were relevant to the second part of the test, the evidence shows that OCC was not the decision-maker and that neither a centralized programmatic response action nor the testing of EHUs was delayed or altered by OCC's litigation-related concerns.  Instead, these decisions were made by non-OCC officials, having heard the advice of OCC and other sources, and the decision in the Summer of 2006 regarding what to test was made by EPA (using their expertise), with the analysis of those test results to be conducted by ATSDR.

Second, while FEMA did not ignore formaldehyde complaints, the question of whether FEMA should have issued a safety warning to all occupants or implemented a testing program prior to June 2006 in response to a certain number of individualized complaints is susceptible to policy analysis.  The Court has acknowledged that FEMA's decision to use EHUs must be considered susceptible to policy analysis, in part because that decision allowed the government to place disaster victims back into their damaged neighborhoods, which would promote recovery by allowing people to return and rebuild.[3]/  Order at 40 n.18, 43.  Those same policy concerns

---

[3]/      In addition, the Court has acknowledged that the mere presence of formaldehyde in EHUs, in and of itself, should not have immediately set off an alarm.  As the Court has recognized, "exposure to formaldehyde (in certain levels) is fairly common in today's society."  Dec. 29, 2008, Order at 25 [Dkt.

remained even after FEMA became aware that formaldehyde was a potential issue of concern.
The discovery that formaldehyde might be an issue simply added an additional policy factor that
FEMA had to consider in determining an appropriate way to implement its emergency housing
program. Furthermore, even if the Court were to ignore the context of emergency response and
treat formaldehyde concerns as a separate and discrete matter of policy, the evidence shows that,
from October 2005 to June 2006, the government did address, and did not ignore formaldehyde
concerns. This required FEMA to balance a variety of concerns, including competing
safety-related concerns, in formulating and adapting its ongoing response to a fluid situation in
the absence of any clear standards. While Plaintiffs' Steering Committee ("PSC") and the Court
may in hindsight disagree with the discretionary actions taken between October 2005 and June
2006, the law is clear that courts may not second-guess such decisions. In the context of a
disaster response, determining what actions to take and the extent of such actions inherently
requires the providers of such services to weigh and balance policy concerns. *See Freeman*, 556
F.3d at 340.[4]/ Even if the Court believes FEMA abused its discretion in this instance, its

---

1014].

[4]/       The following line of cases all involve claims for injunctive relief or damages under the FTCA, arising out of FEMA's alleged negligent or wrongful discretionary decisions under the Stafford Act made after Hurricane Katrina. All of these courts dismissed the claims under Fed. R. Civ. P. 12(b)(1) ruling that FEMA's discretionary decisions under the Stafford Act are inherently susceptible to policy analysis and invoke the discretionary function exception. *See St. Tammany Parish*, 556 F.3d at 325 (decisions related to the extent of actions necessary to protect public health are "exactly the type" of policy considerations that the discretionary function exception shields from judicial scrutiny); *Freeman*, 556 F.3d at 333, 340 (allocation of limited resources in the aftermath of Katrina are the types of decisions the discretionary function exception was designed to protect); *In re Katrina Canal Breaches Consol.,* 2008 WL 2186400 *5 (E.D. La. 2008) (Duval, J.) (FTCA claims for alleged failure to competently respond to Hurricane Katrina barred by discretionary function exception because the Stafford Act imposes no mandatory requirements and Government "shall not be liable for any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function"); *Johnson v. FEMA*, 2007 WL 1592978 * 2 (E.D. La. 2007) (Vance, J.) (same); *Hillard v. United States*, Civ. Action No. 06-2576,

decisions cannot form a basis for liability under the FTCA.  See 28 U.S.C. § 2680(a).

## STANDARD OF REVIEW

The United States moves to dismiss for lack of subject-matter jurisdiction pursuant to

Fed. R. Civ. P. 12(b)(1) and 12(h)(3).  In the alternative, the United States moves under Rule 56

for a summary judgment dismissing this action for lack of subject matter jurisdiction.

The Court, in its October 2008 Order, addressed the applicable standards of review under

Rule 12(b)(1) and Rule 56, and decided the United States' motion under Rule 56 because the

facts relevant to the discretionary function exception appeared to be intertwined with the merits.

Order at 6-9.  Notwithstanding the Court's October 2008 Order, the Court should resolve this

motion under Rule 12(b)(1).  The only remaining issue with regard to application of the

discretionary function exception issue is whether FEMA's responses to formaldehyde concerns

from approximately mid-March 2006 (or earlier) to approximately June 2006 are considered to

be susceptible to policy analysis.  Order at 41, 43-45.  Resolution of this second prong of the

discretionary function analysis requires the Court to engage in an objective legal inquiry

regarding whether the alleged negligent action – FEMA's failure to issue a warning to all

occupants or implement some other centralized programmatic response is legally susceptible to

policy analysis; resolution of this remaining issue simply does not require the Court to resolve

any factual disputes.  *See infra* at 8-10.  The sole question is whether  the **nature of the conduct**

is considered **susceptible to policy considerations.**  In other words, the Court need only

determine whether FEMA's conduct in deciding if, when, and to what extent it should issue a

---

Order at 5 (E.D. La.) (Lemon, J.) (same) [Dkt. 138]; *Armstead v. Nagin*, 2006 WL 3861769 * 6 (E.D. La. 2006) (Duval, J., approving and adopting, in relevant part, the Report and Recommendation of Magistrate Judge Wilkinson) (same).

warning or implement a centralized programmatic response – a decision that Congress explicitly

delegated to FEMA with the discretion to consider the "appropriate types of housing assistance . .

. based on considerations of cost effectiveness, convenience to the individuals and households,

and such other factors as . . . [it] may consider appropriate" 42 U.S.C. §5174(b)(2)(A) – could be

grounded in policy considerations.[5]/  Consistent with the Fifth Circuit's recent decision in

*Freeman*, 556 F.3d at 343, this remaining issue does not involve the weighing of any facts and

thus should be resolved under Rule 12(b)(1).[6]/

---

[5]/    Congress has delegated this discretionary authority to the President and has authorized the President to delegate "any power or authority conferred" by the Stafford Act to a federal agency.  42 U.S.C. §5164.  The President's authority under the Stafford Act for providing disaster relief has been delegated to FEMA.  *See* Exec. Order Nos. 12,148 (July 20, 1979) and 12,656 (Nov. 18, 1988).  *See* 44 CFR Part 206, *et. seq*.

[6]/    As noted earlier, many lawsuits have been filed challenging FEMA's operational implementation of Hurricane Katrina disaster relief efforts and courts have consistently ruled that whether such claims are barred by the discretionary function exception should be resolved under Fed. R. Civ. P. 12(b)(1), rather than Rule 56.  *See Freeman*, 556 F.3d at 343; *see also supra* cases cited in footnote 2.
This Court, in its October 2008 Order, cited Judge Duval's decision *In Re Katrina Canal Breaches*, 471 F. Supp.2d 684 (E.D. La. 2007), in support of its decision to assess the government's discretionary function exception motion under Rule 56.  Order at 8-9.  *See also In re Katrina Canal Breaches Consol. Litigation*, 2009 WL 799976 *20-23 (E.D. La. March 20, 2009).  At this juncture, continued reliance upon Judge Duval's decision in *In Re Katrina Canal Breaches*, 471 F. Supp.2d 684, would be inappropriate.  In the Canal Breaches case, there are factual disputes regarding whether the Government violated mandatory and specific regulations under prong one of the exception.  In contrast, the lone question now before this Court is whether FEMA's conduct is legally considered susceptible to policy considerations. In the context of a lawsuit challenging FEMA's Katrina emergency response actions under the Stafford Act where the only remaining issue was (as here) the second prong of the discretionary function test, Judge Duval assessed such a motion under Rule 12(b)(1), not 56.  *See In re Katrina Canal Breaches Consol.*, 2008 WL 2186400 *5; *Armstead*, 2006 WL 3861769 * 6.  Moreover, this approach is consistent with and supported by the recent Fifth Circuit decision in *Freeman*.  In *Freeman*, the claimant, like PSC, asserted that the challenged conduct was not susceptible to policy considerations because it involved operational activities.  The claimant had sought discovery to investigate the operational activity to show that the conduct was not policy based and requested that the Court apply the Rule 56 standard of review rather than Rule 12(b)(1) standard.  556 F.3d at 343.  Affirming the district court's denial of the request for discovery, the Fifth Circuit explained that such discovery is not justified because the second part of the discretionary function analysis requires an objective legal determination, not a subjective fact-specific inquiry into operational activities, thus precluding any need for discovery of information such as the identity of the decision-maker and/or the

# ARGUMENT

## I.    The Stafford Act And The FTCA Discretionary Function Exceptions.

In its October 2008 Order, the Court ruled that analysis of the discretionary function

exception is the same under both the Stafford Act and FTCA.[7]/  Order at 12.  *See also St.*

*Tammany Parish,* 556 F.3d at 319.  The discretionary function exception, as set forth in the

FTCA, provides that sovereign immunity will not be waived for:

> [a]ny claim based upon an act or omission of an employee of the Government,
> exercising due care, in the execution of a statute or regulation, whether or not such
> statute or regulation be valid, or based upon the exercise or performance or the
> failure to exercise or perform a discretionary function or duty on the part of a
> federal agency or an employee of the Government, ***whether or not the discretion
> involved be abused.***

28 U.S.C. §2680(a) (emphasis added); *see also* 42 U.S.C. §5148.  The discretionary function

exception excises from the FTCA's waiver of sovereign immunity any claim that challenges

conduct that is (1) discretionary, and (2) "susceptible to policy analysis."  *See* Order at 14-15; *see*

*also Gaubert*, 499 U.S. at 325; *Freeman*, 556 F.3d at 335; *Andrade v. Chojnacki*, 338 F.3d 448,

457(5th Cir. 2003); *Baldassaro v. United States*, 64 F.3d 206, 208, 211 (5th Cir. 1995).  As this

Court has recognized, "[t]he purpose of this statutory reservation of sovereign immunity is to

protect against 'judicial 'second guessing' of legislative and administrative decisions grounded in

social, economic, and political policy through the medium of an action in tort.'"  Order at 13

---

decision-makers' subjective motivations.  *Id.* at 341-43.

[7]/    Although the Stafford Act's discretionary function exception seemingly duplicates the FTCA's
provision, its separate existence hi-lights the inherently discretionary and policy-intertwined nature of
disaster response actions.  *See Sunrise Village Mobile Home Park, L.C. v. United States*, 42 Fed. Cl. 392,
399 (1998) (it is "unquestionable that the disaster relief provided under the Stafford Act is grounded in
social, economic, and political policy"); *City of San Bruno v. FEMA*, 181 F. Supp. 2d 1010, 1015 (N.D.
Cal. 2001) ("allocation of limited resources among disaster victims is clearly a matter involving policy
judgment").

(citing *Gaubert*, 499 U.S. at 323 and *United States v. S.A. Empresa De Viacao Rio Grandense ("Varig Airlines")*, 467 U.S. 797, 814 (1984)).

## II.    Part One Of The Discretionary Function Exception – Discretionary Actions.

### A.    FEMA's Conduct Was Discretionary Unless A Statute, Regulation, Or Policy Specified A Mandatory "Specific Direction" That FEMA Employees Were Required To Follow.

As this Court has ruled, the discretionary function exception covers only acts that "'involv[e] an element of judgment or choice.'"  Order at 12 (citing *Gaubert*, 499 U.S. at 322 and *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *accord Freeman*, 556 F.3d at 337; *Baldassaro*, 64 F.3d at 208.  A government employee exercises discretion *i.e.*, uses judgment, and makes choices, when he or she acts pursuant to a federal statute, regulation, or policy that does not prescribe a specific course of conduct.  Unless the statute, regulation or policy mandates a "specific direction" for the employee to take, the employee's conduct is discretionary.  *Guile v. United States*, 422 F.3d 221, 231 (5th Cir. 2005); *see also Gaubert*, 499 U.S. at 322; *Freeman*, 556 F.3d at 337; *Rich v. United States*, 119 F.3d 447, 450 (6th Cir. 1997); *ALX El Dorado, Inc., v. Southwest Sav. & Loan Ass'n*, 36 F.3d 409, 411-12 (5th Cir. 1994).  Discretion is only removed only by "a 'federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow,'" because in that circumstance, the employee must follow a clearly prescribed course.  *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536); *see also Freeman*, 556 F.2d at 337.

### B.    FEMA's Response To Formaldehyde In EHUs Was Discretionary.

As this Court ruled in its October 2008 Order, the applicable statutes, regulations, and policies imposed no mandatory and specific course of conduct for FEMA in responding to

formaldehyde concerns in EHUs; rather, the applicable provisions provided FEMA with

discretionary authority to determine what action, if any, to take in response to formaldehyde

concerns.[8]/  Order at 24-25, 37.  As the Court noted, Congress, through the Stafford Act, 42

U.S.C. §5174, explicitly vested FEMA with discretionary authority and authorized FEMA to

make discretionary decisions regarding temporary emergency housing assistance "based on

considerations of cost effectiveness, convenience to the individuals and households, and such

other factors as . . . [it] may consider appropriate."  42 U.S.C. §5174(b)(2)(A).  Consistent with

Congress' instruction, the applicable regulations explicitly provide that FEMA may use

"[m]obile homes, travel trailers, and other manufactured housing units," 206 CFR §101(g)(2), as

emergency housing and that, in determining the appropriate assistance,

> FEMA shall determine the appropriate types of housing assistance to be provided
> under this section based on considerations of cost-effectiveness, convenience to
> the individuals and households and the suitability and availability of the types of
> assistance. . . . Temporary housing and repair assistance shall be utilized to the
> fullest extent practicable before other types of housing assistance.

44 CFR §206.110(c).

## III.    Part Two Of The Discretionary Function Exception – An Objective Legal Analysis Of The Alleged Wrongful Conduct.

Whether an act is susceptible to policy considerations is determined by the nature of the

---

[8]/      A variety of regulatory and industry standards dealing with formaldehyde have been discussed at length in other filings with this Court.  While it is clear that none of these standards amount to mandatory and specific directives, it is also important to note that these standards cover a broad spectrum of values. There simply is no current scientific consensus or regulatory bright line standard as to what amount of formaldehyde in a residential setting is unacceptable.  This underscores the extent of FEMA's discretion in responding to the formaldehyde issue, particularly in the context of a disaster response with limited available housing stock.  Not only did FEMA have to decide how many complaints warranted a centralized versus individualized response action, but it also had to wade through a variety of inconclusive health and safety standards through the assistance of other specialized government agencies.

9

conduct at issue, not the decision-maker's identity, status, or their subjective intent.  *See* Order at 13; *Gaubert*, 499 U.S. at 322, 325; *Freeman*, 556 F.3d at 441.  "'[I]t is the nature of the conduct, *rather than the status of the actor*,' that governs whether the exception applies." Order at 13 (emphasis added) (citing *Gaubert,* 499 U.S. at 325, *Varig Airlines*, 467 U.S. at 813, and *Baldassaro*, 64 F.3d at 211); *see also Freeman*, 556 F.3d at 341 n.15.  "The focus of the inquiry is *not on the agent's subjective intent* in exercising the discretion conferred by statute or regulation, *but on the nature of the actions taken and on whether they are susceptible to policy analysis*." *Gaubert*, 499 at 325 (emphasis added); *see also Freeman*, 556 F.3d at 342-43 (affirming denial of discovery request to "flesh out" evidence to determine whether mistakes resulted from operational negligence).  Indeed, whether the decision-maker *actually* considered any specified policies is irrelevant, because the challenged conduct is analyzed objectively.  This objective legal analysis does not allow for any evaluation of the considerations on which the decision-maker actually based his conduct in any given instance.  *See Gaubert*, 499 U.S. at 325; *Macharia v. United States*, 334 F.3d 61, 67 (D.C. Cir. 2003); *Lesoeur v. United States*, 21 F.3d 965, 968-69 (9th Cir. 1994); ; *Smith v. Johns- Manville Corp.*, 795 F.2d 301, 308-09 (3d Cir. 1986); *Armstead*, 2006 WL 3861769 * 5 (E.D. La. 2006) (Duval, J., approving and adopting, in relevant part, the Report and Recommendation of Magistrate Judge Wilkinson) (the Stafford Act, 42 U.S.C. §5142 "clearly precludes federal governmental liability for its action or inaction in providing disaster relief").  It is not a question of fact. As the Fifth Circuit explained in *Freeman*, an actual decision need not be reviewed; decisions regarding the feasibility, safety, benefits of providing federal aid "in the aftermath of a national disaster are grounded in social, economic, and public policy . . . [and] are 'susceptible to policy analysis', *even if the specific decisions*

*were not the result of such a reasoned analysis*." 556 F.3d at 341 (emphasis added) (citing

*Gaubert*, 499 U.S. at 325; *Shansky v. United States*, 164 F.3d 688, 692 (1ˢᵗ Cir. 1999) ("[t]he

critical question is whether the acts or omissions that form the basis of the suit are susceptible to

a policy-driven analysis, not whether they were the end product of a policy-driven analysis").[9]

Conduct is cordoned off as being susceptible to policy analysis if it is "the kind of

conduct that can be said to be grounded in the policy of the regulatory regime."  *Gaubert*, 499

U.S. at 325.  Decisions that "implicate social, economic, or political policies" or that "were

undertaken for policy reasons of primary concern" to a Government agency are protected from

suit under the FTCA.  *See id.* at 332.  When agency policies, coupled with relevant statutory

provisions, establish governmental policy, that policy "is presumed to have been furthered when"

Government employees "exercised their discretion to choose from various courses of action" in

response to the policy.  *Id.*  "[W]hen established government policy allows a government agent to

exercise discretion, it must be presumed that the agent's acts are grounded in policy when he

exercises that discretion."  *Baldassaro*, 64 F.3d at 211 (citing *Gaubert*, 499 U.S. at 324).

### A.     Operational Acts That Implement Agency Programs Are Susceptible To Policy Analysis.

The discretionary function exception applies to protect FEMA's operational acts taken to

implement emergency housing to the same extent it shields FEMA's initial, decision to use

---

[9]     *See also Rosebush v. United States*, 119 F.3d 438, 444 (6th Cir.1997); *Kiehn v. United States*, 984 F.2d 1100, 1105 (10th Cir.1993) (holding that "it is unnecessary for government employees to make an actual 'conscious decision' regarding policy factors" for it is "irrelevant whether the alleged failure ... was a matter of 'deliberate choice,' or a mere oversight"); *Richardson v. United States*, 943 F.2d 1107, 1111 (9th Cir. 1991) ("[t]he discretionary function exception may apply 'in the absence of a conscious decision'") (quoting *Kennewick Irrig. Dist. v. United States*, 880 F.2d 1018, 1028 (9th Cir. 1989); *accord Harrell v. United States*, 443 F.3d 1231, 1236 (10th Cir. 2006).

EHUs as temporary emergency housing.  *See Freeman*, 556 F.3d at 341 n.15.[10]/  The

discretionary function exception protects more than just "the initiation of programs and

activities."  *Dalehite v. United States*, 346 U.S. 15, 35 (1953)*; see also Freeman*, 556 F.3d at 341

n.15.  "A discretionary act is one that involves choice or judgment; there is nothing in that

description that refers exclusively to policymaking or planning function."  *Gaubert*, 499 U.S. at

325.  "Where there is room for policy judgment and decision there is discretion."  *Dalehite*, 346

U.S. at 35-36.  "It necessarily follows that acts of subordinates in carrying out the operations of

government" that are susceptible to policy analysis cannot be actionable.  *Id*. at 36 (ruling that the

discretionary function exception applied to bar claims based upon a number of actions, ranging

from the Cabinet-level decisions to ship fertilizer to the manner in which the bags of fertilizer

were labeled in the field).  If such were not the case, the discretionary function exception "would

fail at the time it would be needed, that is, when a subordinate performs or fails to perform a

causal step . . . , exercising, perhaps abusing, discretion."  *Id*. at 36 (footnote omitted); *cf.*

*Freeman*, 556 F.3d at 341 n.15; *Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 282 (3d

Cir. 1995) (exception cannot be circumvented by "looking behind" protected decision to

challenge antecedent conduct).

     Prior to the Supreme Court's ruling in *Gaubert*, some courts, including the Fifth Circuit,

concluded that the Supreme Court's decision in *Indian Towing Co., Inc. v. United States*, 350

---

[10]/    The Court has previously ruled that FEMA's decision to provide and issue EHUs is protected,
but suggested that FEMA's implementation of that program may not be protected because once the
decision to issue EHUs was made, FEMA owed a non-discretionary duty to ensure that they were safe.
Order at 40.  As already explained, the operational versus planning dichotomy was expressly rejected by
the Supreme Court in *Gaubert*, and, that rejection was recently reaffirmed by the Fifth Circuit in
*Freeman*, 556 F.3d at 340 n.15.

U.S. 61 (1955) – a case that did not actually address the applicability of the discretionary

function exception – had confined the discretionary function exception to decisions that initiated

programs and projects, categorically excluding "operational level" decisions undertaken by

Government employees to effectuate and implement planning level "policy decisions."  *See*

*Gaubert*, 499 U.S. at 321 (reversing the Fifth Circuit).[11]/  Indeed, Justice Scalia's discussion in

his concurring opinion in *Gaubert*, references that pre-*Gaubert* jurisprudence.  *See* Order at 15,

41.

      The reasoning underpinning the planning versus operational dichotomy line of cases was

expressly rejected by the majority of the Supreme Court in *Gaubert*, and that rejection was most

recently recognized by the Fifth Circuit in *Freeman*, 556 F.3d at 441 n.15 (this argument "has

little functional value," because of "*Gaubert's* express rejection of that dichotomy").  In *Gaubert*,

the Supreme Court expressed its emphatic disapproval in no uncertain terms:

> [T]he Court of Appeals erred in holding that the exception does not reach
> decisions made at the operational or management level . . . . A discretionary act is
> one that involves choice or judgment; there is nothing in that description that
> refers exclusively to policymaking or planning functions. . . . Discretionary
> conduct is not confined to the policy or planning level. "[I]t is the nature of the
> conduct, rather than the status of the actor, that governs whether the discretionary
> function applies in a given case."

499 U.S. at 325 (quoting *Varig Airlines*, 467 U.S. at 813).  *See also Cope v. Scott*, 45 F.3d 445,

449 (D.C. Cir. 1995) (*Gaubert* rejected the premise that *Indian Towing* means that the

"implementation" or "execution" of policy decisions with respect to warning about hazards

---

[11]/     For the analysis rejected by the Supreme Court, *see* the Fifth Circuit's decision in *Gaubert v. United States*, 885 F.2d 1284, 1287 (5th Cir. 1989) ("[*Indian Towing*] did . . . establish the principled distinction between policy decisions and operational actions; this distinction still retains its force today and is dispositive of this case."), *rev'd*, 499 U.S. 326 (1991).

resulting from negligence is not protected under the discretionary function exception).

**B.**   **Negligence Is Irrelevant To The Determination Of Whether FEMA's Response To Formaldehyde Concerns Is Considered Susceptible To Policy Analysis.**

Plaintiffs have alleged that FEMA was negligent in its implementation of the temporary emergency housing program and in its response to concerns surrounding formaldehyde in EHUs. This includes:  (1) an alleged negligent failure to promptly investigate formaldehyde concerns, (2) an alleged negligent response to concerns, (3) an alleged negligent failure to test EHUs in a desired manner, (4) an alleged negligent failure to issue a safety handout more promptly, and (5) an alleged negligent failure to provide handouts with sufficient content, and (6) an alleged negligent failure to provide handouts free of misrepresentations.  These allegations of negligence are all irrelevant to the analysis here because they cannot preclude application of the discretionary function exception.  Whether FEMA acted reasonably and exercised due care is irrelevant to the discretionary function exception analysis.  *See Buchanan v. United States*, 915 F.2d 969, 971 (5th Cir. 1990) (the question at issue is not one of whether the officials acted with due care, but whether their conduct was the result of the performance of a discretionary function); *Wiggins v. Army*, 799 F.2d 962, 966 (5th Cir. 1986) (without the discretionary function exception, every decision of a government official would be subject to second-guessing by a court on the grounds that the decision was negligent).  Focusing on the operational response and the Plaintiffs' allegations that such conduct was negligent – the facts surrounding what FEMA knew about formaldehyde hazards and when it knew it are irrelevant to the second prong of the discretionary function exception inquiry.  Such fact-based inquiry has no place in answering the legal question presented by prong two.  It would only be relevant in prong one assessment of

14

whether mandatory statute, regulation, or policy specified what actions FEMA was required to take in response to such information. The question now before the court is not whether FEMA should have issued a warning earlier, tested earlier, or selected a more conservative action level, but whether these kind of decisions to take action in the context of providing temporary emergency housing are objectively susceptible to social, economic, or political policy concerns.[12]/ *See Rosebush v. United States*, 119 F.3d 438, 443-44 (6th Cir.1997). This calls for a legal rather than a factual assessment. Decisions about what to do or not do in such circumstances are plainly "susceptible to policy analysis." For example, acting in haste could create unnecessary anxiety among EHU occupants, and could jeopardize the larger mission of the program. An immediate decision to expend vast resources testing units could have depleted resources otherwise used to aid the rebuilding effort. Judgments about whether FEMA acted too late or insufficiently would constitute precisely the sort of "judicial second-guessing" that the discretionary function exception was designed to avoid. *Gaubert*, 499 U.S. at 325; *Varig Airlines*, 467 U.S. at 813. Imposing a "reasonableness" requirement based upon what FEMA knew or should have known would collapse the question of whether the discretionary function exception applies into a negligence inquiry. *See id.*; *Autery v. United States*, 992 F.2d 1523, 1528 (11th Cir. 1993). Questions of negligence and culpability must be kept separate from the

---

[12]/      It can certainly be argued that FEMA should have acted sooner and should have acted in a different manner. Even if in hindsight this were true, these actions cannot be the proper subject of suit. As a matter of law, such decisions are inherently policy-based, invoking policy considerations about how to take safety-related action and decide between different ways to address a potential safety concern, whether to handle concerns on an individualized or programmatic basis, how to triage and prioritize various safety concerns, how to assess whether or not a safety-related concern actually exists in the absence of clear standards, when and how to ratchet up a government response action, and how to effectively provide disaster response assistance with limited resources. While such second guessing is appropriate in Congress and in the court of public opinion, the FTCA has specifically disallowed such decisions to be judicially second guessed through the medium of actions in tort.

jurisdictional inquiry of the discretionary function exception. Allowing such matters to intrude would be contrary to the very language that Congress used to express the scope of the exception – that the discretionary function exception applies "whether or not the discretion involved be abused." 28 U.S.C. §2680(a). Inasmuch as "[t]he exercise of discretion could not be abused without negligence or a wrongful act," a consideration of negligence or culpability would be improper and would undermine the very purpose of the exception. *Dalehite*, 346 U.S. at 33. The exception exists to prevent liability from being imposed on account of negligent or wrongful conduct if it (1) involved an element of judgment or choice and (2) is susceptible to policy analysis.

### C. Even If OCC's E-mails Delayed Testing Or Altered FEMA's Response To Formaldehyde In EHUs, The Conduct At Issue – Determination Of The Appropriate Response Action And The Extent Of Such Action – Is Susceptible To Policy Analysis.

The Court has ruled that Plaintiffs have "asserted at least a colorable claim" that FEMA's response actions may not be considered susceptible to policy analysis because some OCC e-mails indicate that (1) OCC in May and mid-June 2006 may have been the decision-maker responsible for determining FEMA's response actions, and (2) OCC's decisions may have been subjectively motivated by litigation-related concerns. Specifically, the Court referenced e-mails cited by Plaintiffs that had been published by Congress in which OCC, or someone at FEMA in contact with OCC, wrote: (1) on May 30, 2006, "OCC has advised that we not do testing, which would imply FEMA's ownership of the issue," Order at 39 (citing Ex. 5 to Rec. Doc. 348; Ex. 6 to Rec. Doc. 348); (2) on June 15, 2006, "[d]o not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results," *id*. (citing Ex. 5 to 348); (3) on June 16, 2006, a FEMA employee wrote that OCC

"has advised that we do not do testing, which would imply FEMA's ownership of this issue," *id.* at 31 (citing Ex. 21 to Rec. Doc. 196, p. 2 of 3); and (4) in October 2006, OCC recited that formaldehyde testing was undertaken because FEMA was sued. *Id.* at 32 (citing Ex. 7 to Rec. Doc. 349, p. 3 of 6). Referencing these factual materials during its previous prong two analysis, the Court relied upon Justice Scalia's concurring opinion in *Gaubert* for the proposition that the discretionary function exception is restricted and only shields decisions made by appropriate decision-level government officials who have actually weighed and balanced appropriate policy factors. Order at 15, 41. Applying Justice Scalia's rationale, the Court concluded that Plaintiffs had made "at least a colorable claim" because OCC was not the appropriate decision-making entity "charged with the discretion to respond to formaldehyde concerns," and OCC in formulating FEMA's response action was subjectively motivated by litigation. Order at 41.[13]/

In *Gaubert*, eight of the nine justices signed onto the Court's opinion, written by Justice White. Consequently, Justice Scalia's approach is entitled to little or no weight in analyzing cases under the discretionary function exception. *Cf. Drive Financial Services, L.P. v. Jordan*, 521 F.3d 343, 349-50 (5th Cir. 2008) (lower courts are bound by *stare decisis* and must apply the rule on which five justices agree). Thus, the Court's reliance upon Justice Scalia's concurrence in *Gaubert* to support its conclusion that FEMA's response action might not have been not

---

[13]/ Underlying the Court's decision, but not specifically addressed, is the proposition that the government may not consider litigation and potential legal liability as a factor in determining government action, even where, as here, Plaintiffs' lawsuit was pending before Judge Lemon at the time OCC issued the referenced e-mails. That lawsuit, seeking class action status, $1 billion in damages, and injunctive relief could have had a dramatic impact on FEMA's entire emergency response program, in that it sought to have the judicial branch impose upon FEMA various prohibitions, restrictions, and constraints on the use of EHUs as temporary emergency housing. Not only was it appropriate for OCC to play a key role in advising and aiding FEMA's in the determination of its response action, but the pendency of that litigation made it absolutely necessary that FEMA's counsel play such a role. *See Hillard,* Civ. Action No. 06-2576 (E.D. La.) (Lemon, J.).

17

susceptible to policy analysis because lawyers in OCC were not the appropriate officials to make policy decisions and because OCC may have been motivated by litigation rather than health and safety concerns.  Indeed, the majority opinion in *Gaubert* and the recent Fifth Circuit opinion in *Freeman*, **reject** Justice Scalia's analysis and the line of cases in accord with his reasoning. *Supra* at 10-12.  Neither the decision-maker's status nor the decision-maker's subjective intent is relevant to the determination of whether challenged discretionary conduct is susceptible to policy analysis as a matter of law.  *See Gaubert,* 499 U.S. at 325*; Freeman* 556 F.3rd at 337, 441 fn.15; *Baldassaro*, 64 F.3d at 211.  The OCC's e-mails might create a "at least a colorable claim" that the response action constituted an abuse of discretion, but they emphatically do not constitute a basis for concluding that Plaintiffs' claims regarding FEMA's discretionary conduct survive the jurisdictional protections of the discretionary function exception..[14]/

---

[14]/     The Court in its October 2008 Order cited OCC e-mails that FEMA produced to Congress and that Congress subsequently published on the Internet.  Order at 31-32, 39.  But for Congress' publication, these e-mails, which were generated by OCC in the context an earlier phase of this litigation, are confidential attorney-client communications and constitute legal advise.
          The Court's October 2008 Order added a subjective analysis to the second prong of the discretionary function exception and placed at issue the question of whether the challenged decisions at issue in this litigation were actually made by a FEMA employee from OCC or from some other FEMA office, as well as the question of what subjective reasons were behind each decision.  As such, all OCC advice relating to this litigation would be potentially be relevant because it might show whether OCC was the actual decision-maker, and show the subjective basis for FEMA's discretionary decisions.  This puts both the United States and Plaintiffs in a rather unique and difficult posture.  On the one hand, Congress' release of privileged and/or confidential government documents does not effect a subject matter waiver of privilege or confidentiality.  *See Rockwell Inter'l Corp. v. U.S. Dept. of Justice*, 225 F.3d 598, 604-05 (D.C. Cir. 2001) (the Executive Branch's production and disclosure of documents to Congress and Congress' public disclosure of documents does not constitute a subject matter waiver of privilege or confidential status); *Murphy v. Army*, 613 F.2d 1151 (D.C. Cir. 1979) (the Executive Branch may provide documents to Congress without surrendering any privileges); *Moon v. CIA*, 514 F. Supp. 836, 840-41 (S.D. N.Y. 1981) (Executive Branch production of a document reflecting legal advice to Congress does not waive privilege or confidential status of the document).  This is because as co-equal branches of government, the Executive Branch and Congress have a constitutional duty to try to accommodate each other's interests and share information.  *See United States v. American Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977).
          Were the identity of the decision-maker or intent of OCC a relevant consideration in the

In any event, any suggestion that OCC may have significantly delayed FEMA's decision

to test – or actually controlled or directed either the testing or some other unspecified response

actions – is inconsistent with the undisputable evidence.  As the records show, OCC's e-mails,

including its June 15, 2006, request that FEMA not test until it gave approval, were issued **prior**

to FEMA having in place the ability to test or ever having made a decision regarding what to test.

On May 16, 2006, FEMA issued a press release reporting that the Sierra Club's testing did not

justify further testing because the levels the Sierra Club detected were all below HUD's ambient

air target level of 0.4 ppm.  Exh. 15, Sierra Club Letter at FEMA123-000012.  Further, between

---

discretionary function policy analysis, the United States would be placed in an untenable position in this case –  as well as all other cases where the discretionary function is at issue  –  of either having to release other OCC potentially privileged and/or confidential materials to place the cited e-mails into proper context, (as one or two suggestions amidst a sea of suggestions), thereby possibly effecting a subject matter waiver of the privilege, or having to allow the Court to rule based upon an incomplete record. Moreover, were PSC to seek to discover the subjective intent of OCC, the Louisiana Rules of Professional Conduct ("LRPC") §1.6, *Confidentiality of Information*, prevents the OCC attorney from revealing any confidential information obtained as a result of his duties and responsibilities.  LRPC §8.4 likewise makes it professional misconduct for a lawyer to "knowingly assist or induce another" to violate LRPC.  Thus, PSC would be at risk of violating the LRPC if they were to depose the OCC attorney and seek to elicit information any "confidential" information.

    These confounding privilege and ethical issues do not, however, need to be addressed to resolve this motion because the Court's October 2008 Order only put the identity of the FEMA decision-maker and his or her subjective reasons for each decision at issue because the Court applied a subjective analysis to the second part of the discretionary function test.  This approach was rejected by the Fifth Circuit in its January 2009 *Freeman* decision.  As the *Freeman* court explained, one of the primary reasons the second part of the discretionary function exception analysis employs an objective, as opposed to a subjective, standard, is to foreclose and prohibit a party from engaging in such discovery.  The objective standard ensures that such decisions need not be pierced.  Whether an actor complied with general policy pronouncements plays no role in the analysis.  "Congress intended the discretionary function exception to shelter the government from the burdens of answering a lawsuit – including those related to intrusive discovery – not just from potential monetary liability."  *Freeman*, 556 F.3d at 343. *See also Fisher Bros. Sales, Inc.*, 46 F.3d at 286 (the use of the "susceptible" standard was intended to foreclose and prohibit discovery of government officials' "subjective" intent).  The subjective intent expressed in the selected OCC materials is not relevant to discretionary function policy analysis, nor is allowing legal counsel a seat at the policy-making table improper.  Moreover, even if this Court were to conclude that the Fifth Circuit's decision in *Freeman* is not applicable and that the identity of the decision-makers and decision-makers' subject motivation remains relevant, the declarations that accompany this motion establish that FEMA's decisions were in fact made by non-OCC FEMA officials.

19

mid-May and June 15, 2006, the e-mails show that FEMA simply did not have a mechanism in

place to test EHUs.  Exh. 38, S. Miller, E-Mail at FEMA17-023196 (May 20, 2006, FEMA

waiting to receive solicitation on contracts to test); Exhibit 44, S. Melton, E-Mail at

FEMA17-022665 (June 1, 2006 "[w]e are still in pursuit of a contract to do testing").  In June

2006, FEMA contacted EPA and requested that it use its expertise to test a percentage of

occupied and unoccupied units.   Exh. 39, Summary of EPA/ATSDR/FEMA Testing Conference

Calls at CDC104-001025; Exh. 40, Dec. Joseph Little ¶4.  OCC did not halt or delay FEMA's

testing inasmuch as FEMA, at the time, had no mechanism in place to test.  This is evidenced by

the fact that just a couple days after OCC sent a June 15, 2006, e-mail suggesting that FEMA

hold off on testing, FEMA conferred with EPA and ATSDR to determine if they could test

EHUs.  Exh. 39, Summary of EPA/ATSDR/FEMA Testing Conference Calls at

CDC104-001025. That OCC was not "in charge" and litigation concerns did not dictate FEMA's

formaldehyde response clearly set forth in a June 28, 2006, e-mail issued to numerous FEMA

officials, including Mr. David Garratt, Acting Director FEMA Recovery Office and Kevin Souza.

> There are a  lot of folks that need to be involved in the travel trailer/formaldehyde
> related efforts – particularly following decisions yesterday . . . to develop
> standardized safety messages for all trailer residents, testing of units for
> formaldehyde safety assessments/recommendations.  As there is active litigation
> related to this issue, OGC must be included in all discussions.  To ensure the
> coordinated and effective handling of this issue, I propose the attached list of team
> members.  Please ensure that you keep this group informed of any and all efforts
> related for formaldehyde in travel trailers.
>
>  Obviously OGC will need to convene separate and distinct calls/meetings to
> address the pending litigation – but I would ask that you keep this team informed
> of the status of that case as appropriate.

SOF, Exh. 42, Proposed Gulf Coast Recovery Travel Trailer/Formaldehyde Issue Team at

FEMA17-002458.

In June and July 2006, after FEMA had made the decision to move forward and test, EPA and ATSDR both advised FEMA that it should **not** test, and FEMA **rejected** that advice.  SOF ¶¶29-31, 34-35, 38.   Moreover, it was EPA –  not OCC – that advised that testing should be restricted to new unoccupied units, and ATSDR was solely responsible for analysis of the data generated by the testing.  SOF ¶31.

Moreover, OCC did not direct FEMA's response, nor did FEMA "ignore" the potential problem.  In March 2006, FEMA took action to warn occupants that if they had concerns they should air out and vent their units.  SOF  ¶¶13-18.  In March 2006, news media reported that FEMA encouraged all occupants who had concerns to air our and vent their unit.  SOF ¶13, 16. As Mr. Jack Hume, Bechtel, Inc.'s Rule 30(b)(6) witness testified:

| | |
|---|---|
| Q: | [Y]ou indicated that there was some information that was distributed on the television relating to formaldehyde? |
| A. | Yes. |
| Q: | What is your recollection of that, sir? |
| A: | My recollection of that, since I was in an RV in Pass Christian at the time, was that there was a toll-free number that people were told to call and that it was – it was on the news quite regularly for a period of time. |
| Q: | Do you recall what time period it was |
| A: | Spring |
| Q: | And by that do you mean Spring 2006? |
| A: | Spring 2006, yes. |

Exh. 25, Bechtel Rule 30(b)(6) Depo. pp.139-140/lines 9-14.

In March 2006, soon after the receipt of the first complaint, FEMA instructed the operator of the maintenance call line to responded to any formaldehyde-type complaints by instructing the occupant to comply with the manufacturers' recommendation to air out and vent the unit.  SOF ¶14.  EHUs were issued with manufacturers' occupancy instructions and most manufacturers included in those materials instructions to air out and vent the unit if the occupant had any

21

concerns about formaldehyde. SOF ¶15. Finally, FEMA responded to occupants who complained to FEMA, and at a minimum instructed each of those persons that they should air out and vent their unit. SOF ¶13. Commencing in mid-June, in the event airing out and venting the occupants concern, FEMA adopted a policy to swap out the unit of concern with an older unit that by virtue of its age was likely to have lower formaldehyde levels if airing out and venting did not resolve the complaint. SOF ¶13. Further, FEMA in June 2006 made the decision supplement the manufacturer's occupancy instruction and issue a formaldehyde safety notice; distribution of that notice commenced in July 2006. SOF ¶18.

The PSC, the Court, Congress, and the news media's focus upon OCC's actions relating to testing is in any event misplaced. Testing is only one of many available potential response actions, and given the absence of any regulatory standard, even for the EPA and ATSDR, testing is an action of last resort because in the absence of a regulatory standard, a test result provides little if any guidance as to what action should be taken. SOF ¶30.

Further, even if there were credible evidence that OCC's provision of legal advice to FEMA decision-makers prevented or substantially delayed testing, and that those decisions were subjectively motivated by litigation strategy relating to the *Hillard* lawsuit that sought injunctive relief and $1 billion in damages – a conclusion that is not supported by the evidence – the challenged action is nevertheless protected by the discretionary function exception. Congress has explicitly instructed that temporary housing decisions shall be "based on considerations of ***cost effectiveness, convenience to the individuals and households, and such other factors as . . . [it] may consider appropriate***." 42 U.S.C. §5174(b)(2)(A) (emphasis added). Congress' instruction to consider ***"such other factors as . . . [it] may consider appropriate"*** would necessarily allow

22

FEMA to consider any number of factors, including legal factors, and directly contradicts

Plaintiffs' argument that OCC's advice – even if it carried the day – would have constituted an

impermissible policy consideration. Congress did not impose any restrictions on the kind of

policy factors FEMA had the discretion to consider in making emergency housing decisions. To

the contrary, it explicitly vested FEMA officials who had to make such decisions – whether they

were representatives on the ground responding to an individual complaint, field office

representatives, or OCC – with the authority and discretion to determine what factors they were

to consider in light of the circumstances. Thus, again, for the Court to "second-guess" and

determine that litigation concerns are not an appropriate factor among many factor would be

precisely the sort of "judicial second-guessing" that the Supreme Court has held barred by the

discretionary function exception. *Gaubert*, 499 U.S. at 325; *Varig Airlines*, 467 U.S. at 813.

### D. FEMA's Operational Responses To Formaldehyde Concerns Were Susceptible To Policy Analysis.

In its October 2008 Order, the Court relied upon *Whisnant v. United States*, 400 F.3d

1177 (9th Cir. 2005), to support for the proposition that the discretionary function exception may

not apply if FEMA, after it acquired knowledge of potential health concerns, "ignored" the

problem for fear that responding would imply its "ownership" of the issue. Order at 40 fn.14.[15]/

---

[15]/     Plaintiffs also appear to contend that the United States is liable because neither FEMA's reliance on ATSDR's February 1, 2007, Health Consultation Report, nor ATSDR's issuance of that report can be considered susceptible to policy analysis. The facts surrounding this issue are not in dispute. On February 1, 2007, in response to FEMA's request, ATSDR issued a Health Consultation Report that analyzed the EPA test data. In that report ATSDR identified 0.3 ppm as the formaldehyde level of concern. This level was identified as a quick rule of thumb under the circumstances at hand to assist FEMA in making a policy decision. SOF ¶¶33-37; Exh. 39, CDC E-Mail at CDC104-001024 ("[a] time-frame of approximately 10 days or less was discussed for our evaluation. FEMA will use ATSDR's evaluation to effect their policy decision."). On March 17, 2007, ATSDR reported to FEMA that the report failed to disclose that formaldehyde is a potential carcinogen and that it was ATSDR's position that there are no safe levels for cancer causing substances. From February 2007 until approximately mid-

The Court concluded that if Plaintiffs could show that FEMA *"ignored potential health problems,"* the discretionary function exception may not apply because ignoring safety concerns is "rarely considered to be susceptible to social, economic, or political policy."  Order at 40 (citing *Whisnant,* 400 F.3d at 1181).

As an initial matter, *Whisnant* is inapplicable in light of the Fifth Circuit's recent decision in *Freeman.  See also In re Katrina Canal Breaches Consol.*, 2008 WL 2186400 *5 (Government not liable for "any claim based upon the *exercise or performance of or the failure to exercise or perform a discretionary function or duty* in carrying out the Stafford Act (emphasis added); *Johnson*, 2007 WL 1592978 * 2; *Hillard,* Civ. Action No. 06-2576, Order at 5 [Dkt. 138]; *Armstead*, 2006 WL 3861769 * 6.  This Court has determined that FEMA's decision to use EHUs was susceptible to policy analysis, in part, because of political and social concerns:

May 2007, FEMA believed that EHUs remained a viable temporary emergency housing option when combined with ventilation.  Exh. 27, Dec. David Garratt ¶¶8-9; Exh. 28, Dec. Kevin Souza ¶¶19-20.  In mid-May 2007, because of reports that children residing in EHUs were presenting with illnesses potentially caused by formaldehyde exposure in EHUs, FEMA engaged the Department of Homeland Security ("DHS") Office of Health Affairs ("OHA"), along with the Department of Health and Human Services, and CDC, to reassess and modify its temporary emergency housing response.  Exh. 27, Dec. David Garratt SOF ¶¶8-9; Exh. 28, Dec. Kevin Souza SOF ¶¶19-20.

The essence of Plaintiff's argument is that FEMA negligently relied upon ATSDR and/or the United States is liable because ATSDR failed to select an appropriate formaldehyde level of concern.  However, as PSC's own expert has acknowledged, the determination of a formaldehyde level of concern inherently requires the decision-maker to weigh and balance competing policy factors.  Exh. 2, Depo. Dr. Williams, pp. 220-21/5-23, pp. 222-26/16-22 (when the government sets values set a target level it must weigh and balance, consider health and safety factors, as well as political factors economic factors, and circumstantial factors).

Moreover, Plaintiff's potential claims premised on ATSDR's representation in the report that 0.3 ppm is an appropriate formaldehyde level of concern for purposes of that report are also barred because the FTCA does not waive sovereign immunity for negligent misrepresentation.  *See* 28 U.S.C. §2680(h); *McNeily v. United States*, 6 F.3d 343, 347 (5th Cir. 1993); *Williamson v. U.S. Dept. of Agric.,* 815 F.2d 368, 377 (5th Cir. 1987); *Brewer v. HUD*, 508 F. Supp. 72, 75-76 (S.D. Ohio 1980) (failure to disclose structural defect that made house unfit for habitation were barred by the misrepresentation exception).  In the instant case, the conduct at issue is ATSDR's representation as to what may be an appropriate level of concern, and FEMA's reliance upon that representation.  Any such claims are barred by the FTCA's discretionary function and  misrepresentation exceptions.  *See* 28 U.S.C §2680(a) & (h).

specifically a need to provide temporary emergency housing that would allow disaster victims to return and participate in the rebuilding efforts. Order at 40 n.18, 43. That FEMA may have learned after making the initial decision to use EHUs that EHUs might pose a potential formaldehyde problem does not negate or supercede the underlying policy concerns that resulted in the initial decision to use EHUs. Rather, the discovery that formaldehyde could be an issue of concern constitutes an additional policy factor that FEMA could consider in its operational implementation of the temporary emergency housing program. Unlike in *Whisnant*, where there existed no potential policy concerns that justified the Navy' simply ignoring a health and safety issue for almost three years, in the instant case, as the Court here has already recognized, the decisions to use EHUs involved numerous policy related factors – ***it is temporary emergency housing program***. Order at 43. To hold that FEMA, in implementing its emergency housing program, must ignore the underlying policy factors for the program simply because, with the hindsight of a Congressional investigation, one might suggest that FEMA should have given more weight to the formaldehyde concerns would be exactly the type of judicial second-guessing that the discretionary function exception is intended to prevent.[16]/ *See Freeman*, 356 F.3d at 343; *In re Katrina Canal Breaches Consol.*, 2008 WL 2186400 *5; *Johnson*, 2007 WL 1592978 * 2; *Hillard*, Civ. Action No. 06-2576, Order at 5 [Dkt. 138]; *Armstead*, 2006 WL 3861769 * 6.

---

[16]/    In contrast with the decision not to clean up mold in Whisnant, there are no accepted professional or scientific standards describing how one should deal with a complex potential health situation of unknown scope involving hundreds of thousands of persons who have nowhere else to live. Inherently, such decisions necessarily implicate social policy and competing safety concerns (If we move people from units, where do we send them?), risk analysis (Is the risk of formaldehyde in trailers greater than the risk presented by other housing options or potential homelessness? At what point is the problem more than just isolated incidents?), economic policy (What percentage of people could be affected by this issue? Does it justify having a centralized versus individualized response?), political policy (Is testing prudent in the absence of bright line standards? At what level of risk should the government remove someone from their current domicile?), and other factors.

Furthermore, even if the Ninth Circuit decision in *Whisnant* were to be read, in this Circuit, to preclude application of the discretionary function exception in the context of a Stafford Act emergency response action *if* Plaintiffs could show that FEMA *simply ignored* concerns about formaldehyde, the evidence shows that FEMA, even in the midst of the largest housing disaster in this country's history, did not ignore such concerns. To the contrary, FEMA identified various methods to deal with these safety concerns, then weighed, balanced, and chose amongst competing safety-oriented responses. For instance, FEMA tried to take action to ensure EHUs were safe by advocating venting. On October 11, 2005, in response to a request from Bechtel, Inc., OSHA tested new, unoccupied EHUs at Bechtel's facility for formaldehyde and determined that venting units for a short time – 15 to 20 minutes – reduced formaldehyde below the occupational regulatory level of concern. SOF ¶¶9-12. OSHA thereafter did further testing and confirmed that the response action was effective and reduced formaldehyde to below OSHA PELs. SOF ¶¶9-12. These results were reported to local FEMA personnel and other emergency responders at regularly held meetings. SOF ¶¶9-12. These units raised concerns because they had not been made ready for occupancy, they were new units, and they were being stored with windows shut, vents closed, no air condition or ventilation, and formaldehyde levels could increase until the units had a chance be aired out and vented. SOF ¶¶9-12; 23-25. Moreover, FEMA's Occupation Safety and Health office determined based upon its March 2006 testing that airing out and venting such units for 2-3 resulted in formaldehyde levels comparable to levels posted on EPA's website for typical levels found from buildings materials off-gassing in trailers and/or manufactured homes. SOF ¶¶23-25; Exh. 46, May 31, OSHSB Memo. at 000164. Exh. 47, Formaldehyde in Trailers at FEMA17-024461; Exh. 48, May 31, Memo. Formaldehyde

26

Air Sampling at FEMA17-000111 -000112; *see also* Exh. 12, EPA Fact Sheet at EPA-000003 ("homes with significant amounts of new pressed wood products, levels can be greater than 0.3 ppm").

In mid-March 2006, FEMA learned through a media news report that an occupant in Mississippi had concerns about formaldehyde. In response, FEMA swapped out and replaced that unit with an older unit; FEMA believed that this older unit, by virtue of its age and past successful use, would have lower formaldehyde levels, thereby resolving the occupant's concern. SOF ¶13. Between mid-March and the end of June 2006, FEMA housing officials continued to respond to individual complaints on a case-by-case basis, and at a minimum (often they did more) instructed the occupant to heed the manufacturers instruction and air out and vent the unit. SOF ¶¶13-27.

After receipt of the initial occupant complaint in mid-March 2006, various actions were taken to inform occupants who had concerns that the appropriate response to such concerns would be to vent and air out the units. In March 2006, the contractor responsible for the operating the Mississippi Maintenance Call line agreed to tell occupants who expressed concerns to vent their units in accordance with manufacturers' occupancy instructions. SOF ¶14. Further, commencing in March 2006, the news media reported that FEMA was encouraging all EHU occupants who had concerns to air out and vent their units. SOF ¶15. In June 2006, FEMA determined that formaldehyde safety brochure should be issued to all occupants, and commenced distribution of that brochure in July 2006. SOF ¶¶17-18.

FEMA also initiated efforts to test units in March/April 2006. FEMA initially tasked an IA/TAC contractor to test a unit; however, after testing one unit using a worst-case scenario –

with the unit closed up, vents closed and turned off, and air conditioner turned off – the contractor refused to do any further tests because it was outside of the scope of the contract. SOF ¶¶20-22. FEMA also contacted a manufacturer, Gulf Stream Coach, Inc., which told FEMA that it would test units. Gulf Stream subsequently tested units and never reported that its results raised any issues of concern. SOF ¶19. As early as May 2006 (approximately two months after the first occupant complaint), FEMA officials were attempting to put in place a contract to test.

While a variety of personnel suggested different approaches, in late June 2006, Mr. David Garratt, Acting Deputy Administrator, FEMA made the decision that FEMA would task EPA to test units to respond to the formaldehyde-related safety concerns.[17]/ SOF ¶¶26-29. FEMA requested a full assessment based upon the testing of both occupied and unoccupied units. SOF ¶31. EPA took lead on the testing and with ATSDR and FEMA concurrence the decision was made to restrict the initial test to new, unused units, to establish a baseline formaldehyde level and determine whether ventilation was in fact an effective solution. SOF ¶31. Occupied testing would have implicated any number of variables and confounders associated with the specific practices and lifestyles of the occupants of the tested units. SOF ¶31. The decision to issue the safety brochure and to conduct testing was made by Mr. Garratt; the decisions regarding what to test and how to test it were made by the EPA, in consultation with ATSDR and FEMA; and the analysis of the test results was conducted by ATSDR. SOF ¶¶29-30, 33-38. All of this was done

---

[17]/  The news media reported in mid-May 2006 that the Sierra Club had tested EHUs and that formaldehyde had been detected at concentrations up to 0.32 ppm. Exh. 15, Sierra Club Letter at FEMA123-000011 to 012. The news media also reported that because those results were all below the HUD target level of 0.4 ppm, and that FEMA did not believe that further testing was appropriate at that time. *Id.* On or about June 13, 2006, the Sierra Club sent to Mr. David Garratt, FEMA, a letter reporting the results of their testing and urged FEMA to test. *Id*, at FEMA123-000001.

with the health and safety of occupants in mind.

As shown, FEMA never simply ignored formaldehyde in EHUs. The essence of Plaintiffs' argument is that FEMA was negligent because, despite the absence of any applicable residential or travel trailer regulatory standard, as soon as it received a complaint, it did not drop all other activities and determined an appropriate action level (a process that took HUD in excess of 5 years). Although Plaintiffs may urge that FEMA's response actions on an individualized or programmatic basis were insufficient, negligent, or constituted an abuse of discretion – in other words, that FEMA should have done more, and done more sooner – FEMA never simply ignored the issue and did not abdicate its responsibility. It took action to address these concerns. As a result, even if this Court continues to find the Ninth Circuit's reasoning in *Whisnant* persuasive after the Fifth Circuit's decision in *Freeman*, FEMA did in fact respond throughout the time period at issue, and did so in the context making a variety of difficult decisions regarding the provision of emergency housing and other services in the aftermath of the largest housing disaster in this country's history. Even under *Whisnant*, this is susceptible to policy analysis and is protected by the discretionary function exception. *See Guile*, 422 F.3d 221; *Garza v. United States*, 161 Fed. Appx. 341, 346, 2005 WL 3478009 *4 (5th Cir. 2005) (duty to keep prisoner "safe and free from harm" imbued government with discretion); *Hix v. Army Corps. of Engineers*, 155 Fed. Appx. 121, 127 (5th Cir. 2005) (what actions to take to ensure public safety are susceptible to policy concerns); *Elder v. United States*, 312 F.3d 1172, 1177-78 (10th Cir. 2002) (determination of what actions to protect safety and health is susceptible to policy analysis); *Irving v. United States*, 162 F.3d 154, 169 (1st Cir. 1998) (day-to-day decisions made to ensure adequate safety with a view towards efficient and effective use of limited enforcement

resources, are grounded in policy).[18]

## CONCLUSION

For all the reasons set forth herein, the Court should grant the United States' motion and dismiss Plaintiffs' claims for lack of subject matter jurisdiction. Alternatively, the Court should grant summary judgment to the United States on all claims.

Dated:

Respectfully Submitted,

TONY WEST
Assistant Attorney General, Civil Division

J. PATRICK GLYNN
Director, Torts Branch, Civil Division

DAVID S. FISHBACK
Assistant Director


OF COUNSEL:
JORDAN FRIED
Associate Chief Counsel

JANICE WILLIAM-JONES
Trial Attorney
FEMA/DHS
Department of Homeland Security
Washington, D.C. 20472

ADAM BAIN
Senior Trial Counsel

ADAM DINNELL
MICHELLE BOYLE
JONATHAN WALDRON
Trial Attorneys

*//S// Henry T. Miller*
HENRY T. MILLER (D.C. Bar No. 411885)
Senior Trial Counsel
United States Department of Justice
Civil Division – Torts Branch
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20004
Telephone No: (202) 616-4223
E-mail: Henry.Miller@USDOJ.Gov

Attorneys for the United States of America

---

[18] Generalized policy goals, statements or aspirational language that is too general to prescribe a specific course of action that do not specify and its functionaries will have to make discretionary judgments about how to apply concretely do not constrain government's discretionary authority in determining what action, if any, it should take to protect health and safety. *See Freeman*, 556 F.3d at 338-39; *see also Kelly v. United States*, 241 F.3d 755, 761 (9th Cir. 2001) (broad mandates do not remove discretion); *Shea Homes Ltd. v. United States*, 397 F.Supp.2d 1194, 1199 (N.D. Cal. 2005) ("protect public health and safety, and the environment" requires government to make discretionary judgments as to the substance and timing of the specific steps).