UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER FORMALDEHYDE                MDL NO. 1873
PRODUCTS LIABILITY LITIGATION

                                             SECTION N(5)

                                             JUDGE ENGELHARDT

                                             MAGISTRATE CHASEZ

THIS DOCUMENT RELATES TO:
Anthony Bartel v. Gulf Stream Coach, Inc, et al,
and
Leslie Kujawa, et al v. Keystone RV Company and Bechtel National, Inc.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## BECHTEL NATIONAL, INC.'S
## RULE 12(b)(6) MOTION TO DISMISS


### EXHIBIT 16


**DECLARATION OF KEVIN SOUZA, ATTACHED AS EXHIBIT 8 TO DEFENDANT
UNITED STATES OF AMERICA'S MOTION TO DISMISS PLAINTIFFS'
FTCA AND CONTRACT CLAIMS FOR LACK OF SUBJECT
MATTER JURISDICTION (REC. DOC. 196-12)**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | |
|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION | MDL NO. 1873 SECTION "N-4" JUDGE ENGELHARDT MAG. JUDGE ROBY |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEFENDANT UNITED STATES OF AMERICA'S EXHIBITS
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FTCA AND
CONTRACT CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION

U.S. EXHIBIT NO. 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: FEMA TRAILER       *      CIVIL ACTION 2:07-MD-1873
FORMALDEHYDE PRODUCTS
LIABILITY LITIGATION       *

                           JUDGE ENGLEHARDT –DIV. N

      *

                           MAGISTRATE ROBY – MAG. 4

*****************************************************************

### DECLARATION OF KEVIN SOUZA

I, Kevin Souza, state and declare as follows:

1.     Until May 2008, I was the Acting Deputy Director of the Individual Assistance

Division of the Federal Emergency Management Agency (FEMA), a component agency of the

Department of Homeland Security (DHS). As Acting Deputy Director, I managed and had

oversight responsibility for the Individual Assistance Division as authorized by the Robert T.

Stafford Disaster Relief and Emergency Assistance Act. As a result of my duties and

responsibilities at FEMA, I have personal knowledge concerning FEMA's decision to provide

Emergency Housing Units ("EHUs") to Hurricanes Katrina and Rita disaster victims and

FEMA's response to concerns that EHUs contain formaldehyde.

2.     Hurricane Katrina made landfall on August 29, 2005, and on that same day,

President Bush declared that a Stafford Act disaster exists in the States of Louisiana, Mississippi,

and Alabama. The overall destruction wrought by Katrina vastly exceeded that of any other

major disaster that FEMA had previously responded to and resulted in well over a million people

being evacuated from impacted areas and destroyed or made uninhabitable hundreds of

thousands of homes, leaving hundreds of thousands of families homeless and without shelter.

3.     On September 24, 2005, Hurricane Rita made landfall along the Texas –
Louisiana border and the President declared that a Stafford Act disaster exists in the States of
Louisiana and Texas.  Rita destroyed and made uninhabitable thousands of more homes in Texas
and Louisiana, and forced the evacuation of many Katrina victims who had sought refuge in the
areas impacted by Rita.

4.     Consistent with the Stafford Act, FEMA has provided Individual Assistance to the
Hurricane Katrina and Rita disaster victims.  FEMA administers four distinct Individual
Assistance Programs: (1) Individual and Household Assistance; (2) Crisis Counseling; (3)
Disaster Unemployment Assistance; and (4) Legal Services.  The Individual and Household
Program (IHP) provides both housing assistance and other needs assistance, and IHP is the
primary mechanism to assist individuals and households recover from damages or losses
sustained as a direct result of a disaster.  IHP assistance includes financial aid to repair and
replace property lost or destroyed, rental assistance to renters and homeowners whose homes are
uninhabitable, and when housing resources are not available within an affected area, direct
assistance such as mobile homes and travel trailers.

5.     Before Katrina made landfall, the Housing Area Command was activated and
FEMA commenced planning to address potential shelter and housing shortfalls.  The short-term
plan was to put displaced disaster victims into emergency shelters, hotels, motels, cruise ships,
tents, with friends and relatives, and any other available housing resources.  Then, after initial
disaster response, transfer the disaster victims to EHUs, and as rebuilding and recovery efforts
progressed, transfer them from EHUs into more permanent housing.

6.     The massive damage to housing stock in the Gulf Coast region created an urgent
and immediate need for an unprecedented number of temporary housing units.  Initially, the plan

2

was to rely primarily on mobile homes and locate disaster victims in mobile home cities that contractors would set up throughout the Gulf Coast region. State and local officials objected to this plan. They wanted a temporary emergency housing plan that placed disaster victims in, or as close as possible, to their devastated communities to ensure political and social stability and promote rebuilding and recovery efforts. In response to their concerns, FEMA modified its response plan and agreed to rely primarily upon travel trailers which could be placed in or closer to the devastated communities.

      7.      To satisfy the unprecedented demand for temporary housing units, FEMA commenced purchasing EHUs, primarily travel trailers, but also park model trailers and mobile homes, soon after Hurricane Katrina made landfall. Ultimately FEMA spent more than $2.5 billion dollars and purchased more than 140,000 new EHUs. These EHUs were purchased both "off the lot" from existing inventories and directly from manufacturers. FEMA relied upon the vendors and manufacturers standard specifications to provide FEMA with safe habitable housing units, housing units that complied with industry standards and all applicable regulatory requirements. Since FEMA had previously relied upon EHUs to respond to disasters, FEMA purchased these EHUs believing that they would provide safe and habitable temporary emergency housing. 8.       FEMA relied upon its contractors to install, maintain, and retrieve EHUs from disaster victims. Initially, FEMA relied upon Individual Assistance/Technical Assistance Contractors (IA/TAC) to provide these services and then transitioned to Maintenance and Deactivation Contractors (MDC) and Group Site Maintenance Contractors. When an EHU was assigned to a household or individual disaster victim, a contractor retrieved the unit from a FEMA staging area, transported the unit to the installation site, and installed the unit. The contractors were also responsible for conducting scheduled maintenance and repairing the units

if something broke. When the disaster victim vacated the unit, the contractor was responsible for retrieving the unit, deactivating the unit, and returning it to FEMA. These contractors have been paid in excess of $3 billion to complete these tasks.

9.     FEMA's contractors started moving disaster victims from short-term shelters to EHUs as soon as EHUs became available. Approximately 140,000 new EHUs were issued to disaster victims and as the construction and rebuilding efforts has progressed the disaster victims have been moved into more permanent long-term housing. Without EHUs, many, if not most, disaster victims who returned to the devastated communities to rebuild would have had no place to live.

10.     On or about March 2006, FEMA received the first reported concerns of formaldehyde fumes by a Gulf Coast trailer occupant and that occupant's unit was switched out and replaced with a different unit.

11.     On or about April or May 2006, FEMA learned that the Sierra Club had tested trailers and detected formaldehyde in most of the tested units.

12.     In May 2006, a class action lawsuit was filed against the Government and EHU Manufacturers.

13.     By mid-June 2006, FEMA had received notice that several trailer occupants in both Louisiana and Mississippi had complained about formaldehyde fumes in their trailer. Various response actions were considered, such as testing individual units and installing vent fans. Determining what action, if any, to take in response to these complaints involved assessment of numerous factors including, but not limited to (1) absence of any residential formaldehyde standards, (2) FEMA's past history of successful use of trailers for temporary emergency housing, (3) EHUs at issue were almost all new, under warranty and purchased from

4

commercial vendors and manufacturers whose business involved sale and manufacture of safe, habitable temporary housing units, (4) small number of formaldehyde complaints in comparison to the total number of occupied EHUs, (5) the disruption and inconvenience to occupants, cost and expense, and potential health and safety risks associated with requiring occupants to vacate EHUs and move to distant hotels/motels or into temporary emergency shelters; and (6) risk that testing individual occupied units and determining what actions to take in response to any such test results – an ability and expertise FEMA did not possess – in absence of a residential standard, would not provide a program-wide solution .

14.     In consideration of these and other factors FEMA made the decision to respond in two ways.  First, for occupants who expressed concerns and/or complained about formaldehyde fumes, their complaints would be addressed on a case-by-case basis, and if further venting of the unit failed to resolve their concern, an offer would be made to switch out the unit for an older previously occupied unit.  It was believed that the older previously occupied units should resolve the occupant's complaints and concern because the older units had not generated a complaint, and as a result of its age and prior use would have lower formaldehyde levels.  Second, to protect persons who had not complained or expressed concern about formaldehyde fumes, FEMA prepared and distributed a formaldehyde brochure to inform occupants about formaldehyde, potential health concerns associated with formaldehyde, actions occupants could take to reduce formaldehyde levels in their EHU, and to encourage occupants to consult their medical care provider if they had health concerns.  Further, FEMA initiated a study to investigate the effectiveness of various methods of ventilation to determine whether or not a potential program-wide engineering solution could be identified that would effectively reduce formaldehyde levels in EHUs.  To implement these decisions, trailers were set aside at one of the FEMA staging

5

areas, on or about July 2006, FEMA commenced distribution of a formaldehyde brochure to trailer occupants, and in, September 2006, at FEMA initiated a study to determine the effectiveness of ventilation.   The document assigned numbers FEMA08-000013- to FEMA08-000014 is a true and accurate copy of the formaldehyde brochure issued to trailer occupants on or about July 2006.

15.    Because FEMA lacked the expertise to test and determine the effectiveness of ventilation in reducing formaldehyde levels in trailers, FEMA relied upon the Environmental Protection Agency and the Center for Disease Control, Agency for Toxic Substances and Disease Registry to conduct that investigation.   In February 2007, ATSDR issued a report and advised FEMA that the tests showed that ventilation reduced the formaldehyde levels to below 0.3 parts per million, a concentration level that ATSDR identified as a level of concern for sensitive individuals.

16.    By July 2007, as additional reports and information had become available, FEMA became concerned that its response may not be sufficiently protective and further actions were taken.  FEMA established a dedicated formaldehyde call center to answer occupant questions about formaldehyde and to assist occupants dissatisfied with their EHU in finding alternate housing.  Since July 2007, FEMA has offered to move to alternate housing any occupant who calls the formaldehyde hotline.  FEMA also prepared and distributed to EHU occupants a Formaldehyde Fact Sheet and engaged ATSDR to test occupied units for formaldehyde and conduct a public health assessment based upon that data.  The document assigned identification numbers FEMA08-000015 is a true and accurate copy of that Formaldehyde Fact Sheet.  Further, FEMA modified its travel trailer specifications for future purchases to require manufacturers to use low emission materials, and also suspended the sale of trailers.

17.     ATSDR commenced testing occupied trailers in December 2007, and reported the initial findings of that testing in February of this year.  In consideration of ATSDR's initial findings, FEMA further modified its response.  FEMA has continued its ongoing effort to relocate occupants to permanent housing as rapidly as possible, and, based upon ATSDR's initial findings, FEMA provides priority relocation to occupants who express health concerns and/or may be more susceptible to formaldehyde fumes such as the elderly, households with young children and those with respiratory problems.  FEMA and CDC also prepared a Flyer detailing CDC's initial findings and distributed it to all trailer occupants.  The document assigned identification numbers FEMA08-000011 to FEMA08-000012 and FEMA08-000016 to FEMA09-000017 is a true and accurate copy of the English and Spanish version of the Flyer.  In addition, FEMA has hired a contractor to test occupied units, and offered to test any occupant's unit for formaldehyde.

18.     Hurricanes Katrina and Rita caused ccatastrophic damage to the Gulf Coast region, and it required a massive and unprecedented response.  The magnitude of the disaster and its unprecedented catastrophic effects required FEMA to provide EHUs in numbers that dwarf any previous disaster response.  Time, infrastructure, and resource limitations provided few, if any, alternatives to using EHUs to provide temporary emergency housing for the disaster victims in impacted areas.  Given FEMA's prior successful use of EHUs, we did not anticipate that formaldehyde fumes in the EHUs would be an issue of concern, and as formaldehyde fumes were eventually identified as an issue of concern we thought that better ventilation of units by occupants would effectively mitigate the problem.

19.     Since FEMA first became aware that formaldehyde was an issue of concern in the trailers, it has responded in the manner that seemed  appropriate to protect occupants and comply

with its regulations that instruct FEMA to determine the appropriate types of housing assistance based upon various considerations including, but not limited to cost-effectiveness, convenience to the individuals and households, and the suitability and availability of the types of assistance.

Pursuant to 28 USC §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this _14th_ day of _May 08_.

**KEVIN SOUZA**
DHS/FEMA

8