# Exhibit 4

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION


IN RE:   FEMA TRAILER
FORMALDEHYDE PRODUCT
LIABILITY LITIGATION

                         MDL NO. 1873

                         SECTION "N-5"

                         JUDGE ENGELHARDT

                         MAG. JUDGE CHASEZ




ORAL AND VIDEOTAPED DEPOSITION OF

CHRISTOPHER T. DE ROSA M.S., Ph.D.

July 6, 2009

9:25 a.m.

201 17th Street

Suite 1700

Atlanta, Georgia


Maureen S. Kreimer, RPR, CCR-B-1379

1    through lifetime.

2         Q.    Well, when you say that's the Agency's

3    reference for those terms, from your experience

4    working in the Federal Government, would the

5    definition of short term have a common

6    across-the-board definition among government

7    scientists, or not?

8         A.    It probably would --

9              MR. MILLER:  Objection, foundation.

10        A.    It probably varies greatly.  I know that,

11   for example, there was a cross-governmental committee

12   formed to develop acute exposure guidelines during

13   the Clinton Administration, and those were from, say,

14   one hour to two hours and three hours, and they were

15   subdivided in various ways.

16              There are a number of different guidelines

17   that have been established both occupationally and

18   otherwise to guide limits of exposure, or to serve as

19   screening levels for exposures that might be

20   substantive and of health concern.

21        Q.    Well, what's the longest calendar duration

22   you've ever seen referenced in your work for short

23   term, quote, unquote, exposure?

24        A.    I would say the 14-day duration.

25        Q.    And the Fact Sheet that FEMA's

Page 34

1    representative asked you to review in the spring of

2    2006, you say only referred to the effects of a short

3    term exposure to formaldehyde?

4        A.    Correct.

5        Q.    What effects do you remember the Fact

6    Sheet referring to?

7        A.    Irritation of the eyes, mucosa, nasal

8    mucosa, throat.

9        Q.    Did you know at the time you were asked to

10   look at this Fact Sheet anything about the duration

11   of occupancy or residency for these FEMA trailers?

12       A.    My assumption there would be that it was a

13   matter of months at that point.

14       Q.    But even looked at as a trailer residency

15   for a matter of months, you felt that the Fact Sheet

16   should refer to exposure greater than short term

17   exposure?

18       A.    I did.

19       Q.    Why is that?

20       A.    There are a number of reasons.  One is

21   that as a matter of Federal Government policy, there

22   is no safe level of exposure to a recognized

23   carcinogen.  That's based on a theoretical term, and

24   it's a policy position.  It's not necessarily a

25   scientific position on my part, although, I

Page 70

1    formaldehyde, specifically the carcinogenic nature of

2    formaldehyde, in that paragraph under the caption

3    "Background of Formaldehyde"?

4        A.    In part, yes, I do.  In part, I do not,

5    because IARC is not cited in terms of its most recent

6    conclusions regarding formaldehyde, because it is now

7    classified as a known carcinogen, as opposed to

8    probable.

9        Q.    IARC, again, stands for?

10       A.    The International Agency for Research on

11   Carcinogens.

12       Q.    When did -- is that a government agency?

13       A.    That is a subdivision in Lyons, France of

14   the World Health Organization.

15       Q.    And when did IARC classify formaldehyde as

16   a known carcinogen?

17       A.    I believe the original draft came out in

18   2004, and it was final in 2005.

19       Q.    Looking again at Tab A in the table given

20   for Adverse Health Effects of Intermediate Exposure

21   to Formaldehyde, do you see a listing of health

22   effects from inhalation?

23       A.    Yes, I do.

24       Q.    Do you, based on your knowledge and

25   experience, agree with the content of that table?

1          MR. WEINSTOCK:  Object to the form of the

2    question.  Again, he did not review it at the time.

3          MR. MILLER:  Objection, calls for the

4    witness's testimony to be beyond the scope of his

5    duties and responsibilities.

6     A.     It is customary for me to review such

7    information, and in the context of the statements

8    made regarding cancer above, that there is by way of

9    policy, as I mentioned earlier, no safe level of

10   exposure to a carcinogen irrespective of the time or

11   duration of exposure.

12          Based on insights regarding the mechanism

13   of toxic action of formaldehyde in the environmental

14   health community, it's quite conceivable that even a

15   short term exposure to elevated levels of

16   formaldehyde may result in a carcinogenic effect.

17   BY MR. MEUNIER:

18    Q.     Yes, sir.  I was referring, though, to the

19   Table 1 that sets forth reported adverse effects from

20   the inhalation of formaldehyde, separate and apart

21   from the carcinogenic nature of the chemical.

22    A.     Mm-hmm.

23    Q.     And my question was, based on your

24   knowledge and experience, and your review of this, do

25   you concur with what is set forth in that figure

1     Q.    And it then says:  Although formaldehyde

2  levels in new trailers may remain above the threshold

3  for symptoms in sensitized people for as long as

4  three years, nonsensitized people are unlikely to

5  experience anything other than transient irritation.

6          Do you agree with that statement?

7     A.    No, I don't.

8     Q.    Why not?

9     A.    Because people who are previously

10  nonsensitized can become sensitized by repeated

11  exposure to gases such as formaldehyde.

12          Further, it's not clear that transient

13  irritation would be the only effect, based on my

14  earlier comments regarding reproductive and

15  developmental effects, as well as cancer.

16     Q.    And then the final statement about that

17  study of the 96 unoccupied trailers is that the long

18  term health effects of formaldehyde exposure cannot

19  be determined from this analysis.  Would you agree

20  with that?

21     A.    I would say that this analysis did not

22  address long term health effects.  But I certainly

23  think that one would be able to draw scientifically

24  robust inferences from the information regarding

25  longer term health effects.

1   trailers for 10 or 20 years.  What is your response
2   to that?
3                MR. WEINSTOCK:  Object to the form.
4                MR. MILLER:  Same objections as earlier.
5       A.    Would you repeat the question, please.
6   BY MR. MEUNIER:
7       Q.    Mr. Little, in sworn testimony in
8   reference to his analysis of this EPA data, has
9   testified that in terms of the cancer risk associated
10  with formaldehyde exposure it involves, quote:
11  "Many, many years of exposure", close quote, and
12  specifically 10, 20 years.  And for that reason, he
13  did not consider it applicable here because people
14  had not lived in these trailers that long.
15               MR. WEINSTOCK:  Object to the form.  Go
16  ahead.
17  BY MR. MEUNIER:
18      Q.    What is your response to that?
19      A.    I think Mr. Little is confusing the
20  latency period for most cancers with the time
21  required for exposure to elicit a carcinogenic
22  response.  With the exception of leukemias, a latency
23  period of 10 to 20 years is not unheard of, and is
24  typical, in fact.
25               However, again, the prevailing policy of

1   -- the Federal Science Policy of the Federal

2   Government is that there is no safe level of exposure

3   to a carcinogen, irrespective of the duration of

4   exposure.

5           This is based on the premise of a study

6   done with ionizing radiation in the late Seventies

7   and early Eighties where they exposed large numbers

8   of rodents to doses of radiation and were unable to

9   find a dose at which a carcinogenic response was not

10  elicited. It's called the Mega-Mouse Study, for

11  those who are interested.

12          But at any rate, that has formed the

13  backbone of science policy within the U. S. Federal

14  Government since that time. And it's the premise of

15  all cancer risk assessments done by the Federal

16  Government.

17      Q.   Let me refer you once again to the Toxic

18  Trailers, Toxic Lethargy, Majority Staff Report of

19  September '08. It's DEROSA-00 -- it's DEROSA-7,

20  and...

21      A.   I have two 060's here.

22      Q.   I'm sorry. This is it.

23      A.   Okay. I see it.

24      Q.   Yes. And turn to the next Bates numbered

25  page DEROSA-10. And in the top paragraph the

Page 255

1    what you do.

2            THE WITNESS:  Hopefully.

3            MR. REICH:  As part of your work.

4            MR. RADFORD:  Expert witness as a

5    legal term is different.

6            THE WITNESS:  Okay.

7    BY MR. HINES:

8        Q.    You've discussed earlier today that

9    formaldehyde is a recognized carcinogen.  The

10   recognition comes from the 2004 press release, and in

11   a later release by the International Agency for

12   Research on Cancer; correct?

13       A.    Well, precisely stated, it would be a

14   recognized human carcinogen; by EPA, it's classified

15   as a probable human carcinogen, and by the Department

16   of Health and Human Services, it's reasonably

17   anticipated to be a human carcinogen.

18       Q.    But insofar as being the general category

19   of "known" as opposed to "probable", or "likely", or

20   whatever the adverb might be that precedes the word

21   carcinogen, the only Agency that has come out and

22   declared formaldehyde a carcinogen is IARC; is that

23   correct?

24       A.    The only Agency that has come out and

25   called it a known human carcinogen is IARC.

Page 256

1    Q.    Correct.  And that's only with respect to
2    one form of cancer, which is nasopharyngeal cancer;
3    is that correct?

4    A.    That's primarily based on nasopharyngeal
5    cancers, but it also references leukemias as well.

6    Q.    With respect to leukemia, and I can quote
7    you the language, it does not declare leukemia as a
8    known human carcinogen, does it?

9    A.    Leukemia is a disease, not a carcinogen.

10   Q.    Excuse me.  Formaldehyde is not declared
11   in that 2004 press release as a known human
12   carcinogen causing leukemia; correct?

13   A.    The classification of known human
14   carcinogen is based primarily on nasopharyngeal
15   cancer; however, the weight of evidence is always
16   considered in those designations.

17         And in fact, I was as I recall, at the
18   consultation in Lyons when that was discussed, and it
19   was reclassified, if I'm not mistaken, I was at that
20   particular consultation.

21   Q.    With respect to the classification of
22   formaldehyde, insofar as nasopharyngeal cancer is
23   concerned, that IARC report is predicated primarily
24   on what paper, do you know?

25   A.    There were a number of studies,

Page 257

1    occupational studies, that were conducted.

2         Q.    The NCI occupational study authored

3    primarily in 2003 by Hauptmann; correct?

4         A.    I believe that's correct, yes.

5         Q.    Have you read that paper?

6         A.    I believe I have.

7         Q.    Do you know the threshold where there was

8    an excess of the standard -- or for the standard

9    mortality ratio, an excess of deaths on which the

10   Hauptmann report concludes that it is a human

11   carcinogen?

12        A.    I believe there was a high exposure group

13   versus a low exposure group in the cohorts that were

14   studied.  I do not recall what the exposure ranges

15   were in that study.

16        Q.    Would it surprise you to know that that

17   exposure range was in excess of four parts per

18   million?

19        A.    No.  It's typically the case that because

20   of difficulty in identifying toxic effects in

21   chemicals, that high dose levels are used.  It's a

22   maximum tolerated dose.  It's a longstanding protocol

23   based on the National Toxicology Bioassay Program,

24   and also on the Bioassay Program of the Ramazzini

25   Institute in Italy that you scale back from the

Page 258

1   maximum tolerated dose on a logarithmic basis so that

2   you have a dose stand that is more likely to

3   illustrate the shape of the dose-response function.

4        Q.    Are you aware of any exposure, chronic

5   exposure, in these FEMA trailers in excess of four

6   parts per million?

7        A.    I would have to go back and check.

8        Q.    As you sit here today, are you aware of

9   any exposure, chronic exposure, of any occupant of

10  any trailer in excess of four parts per million?

11       A.    Again, I would have to go back and check.

12       Q.    Do you remember what the arithmetic mean

13  of exposure within the travel trailers and

14  manufactured houses was in the July 2008 CDC report

15  of the 519 trailers?

16       A.    I believe it was on the order of 150 --

17  well, I'm not going to speculate.  I'm sorry.

18       Q.    If it were 0.078 ppm, would that be far

19  below four parts per million?

20             MR. REICH:  Objection.

21       A.    Yes.

22             MR. REICH:  Assumes facts not in evidence.

23  Incomplete hypothetical.

24       A.    I see values in excess of four parts per

25  million.

Page 259

1   BY MR. HINES:

2        Q.    I'm sorry?

3        A.    I see values in excess of four parts per

4   million.

5        Q.    I'm asking you whether or not you are

6   aware of any exposure in an occupied trailer, chronic

7   exposure in an occupied trailer of any individual --

8        A.    You asked me in reference to the 2008

9   consultation, and that was done on unoccupied

10  trailers.

11       Q.    Not the July 2008 final report.  That was

12  based on 519 occupied trailers --

13       A.    That report?

14       Q.    -- correct?

15       A.    That report?

16       Q.    That report?

17       A.    That's a different report.

18             MR. REICH:  I thought you said 2007

19  earlier.

20       A.    You did.

21  BY MR. HINES:

22       Q.    The final report, July 2008, the 519

23  occupied trailers, are you aware of any finding in

24  that report?

25       A.    I was not involved in that report.

Page 260

1    Q.    Have you read that report?

2    A.    I believe I've seen the report.

3    Q.    That's not my question.  My question is

4    have you read that report?

5    A.    If I've seen the report, that means I have

6    read part of it at least.

7    Q.    Do you recall reading anywhere in that

8    report of chronic exposures exceeding zero -- excuse

9    me -- exceeding four parts per million for the

10   occupants of those occupied trailers?

11   A.    Four parts per million, or .4 parts per

12   million?

13   Q.    Four parts per million?

14        MR. REICH:  Objection.  Assumes facts not

15   in evidence.  Incomplete hypothetical and unfair

16   comparison between two totally different types of

17   issues.

18   BY MR. HINES:

19   Q.    You may answer the question.

20   A.    I'm going to take a moment to think.  What

21   I do recall about the report was that, and as our

22   former director noted, it demonstrates that the

23   people should be moved out of the trailers as soon as

24   possible, and demonstrated that the exposures were

25   unacceptably high.

1    Agency to demonstrate that they were moving forward

2    and trying to deal with the science on formaldehyde

3    and the impacts of trailer residents.

4        Q.    By 2007, was it your view that the science

5    on formaldehyde, at least with respect to short term

6    effects, was fairly well established?

7        A.    Yes.

8        Q.    Okay.  And with respect to chronic effects

9    by 2007, was it well-recognized that formaldehyde

10   does present a carcinogenic risk?

11       A.    Yes.

12       Q.    You mentioned in response to Mr. Hines'

13   question that concentration is more important than

14   dose, and you gave a reason for that; correct?

15       A.    I said that depending on the

16   circumstances, concentration can be -- dose can be

17   expressed as a concentration, or a level of exposure

18   expressed as per unit body weight.  And typically in

19   inhalation studies, such as this, concentrations are

20   used parts per million, for example.

21            And that is considered to be the delivered

22   dose, or the administered dose.  There is, you know,

23   several different definitions of dose; one is the

24   administered dose, one is the absorbed dose, and then

25   there is the delivered dose at target tissue.

1          And you have to understand the kinetics

2    governing the conversion of the chemicals and the

3    handling biologically by the system to understand

4    what is the dose at target tissue, which is really

5    what one is at the end of the day concerned about.

6          Q.    What is a risk-based concentration?

7          A.    A risk-based concentration would be a

8    concentration associated with a unit risk of either

9    1 in 100,000 excess cancers, or one-in-a-million

10   excess cancers in the population, 10 to the minus 5,

11   10 to the minus 6, 10 to the minus 7.

12         Q.    Have risk-based concentrations been

13   developed for cancer risk from formaldehyde exposure?

14         A.    They have.  And while the ATSDR does not

15   typically engage in linearized low dose extrapolation

16   associated with EPA's risk assessments, we do cite

17   those in the profile; and it's expressed as a range

18   10 to the minus 5 to 10 to the minus 7, typically,

19   because those are the levels at which given

20   regulatory triggers kick in.

21         Q.    What is a cancer slope factor?

22         A.    A cancer slope factor is a estimate of the

23   slope of the dose-response function, the higher the

24   slope, the more potent the carcinogen, the more

25   responses you see, more malignancies you see per unit

Page 303

1  dose, basically.

2          And what is done is to use what is

3  referred to as a linearized multistage model to fit

4  the curve and generate a estimate of the slope that

5  goes through zero below the dose of observed effects

6  because of this science policy position that I cited

7  earlier.  And so the higher the slope of the

8  dose-response curve, the more potent the carcinogen.

9          Q.    Is there a scientific foundation for the

10  use of cancer slope factors?

11          MR. WEINSTOCK:  Object to the form of the

12  question.  This is all way outside the

13  cross-examination.

14  BY MR. REICH:

15          Q.    You can answer the question.

16          A.    Yes.  That's based on the large animal

17  study that was done I mentioned earlier with

18  radiation, and the fact that at any level of

19  radiation given, there was an observed cancer

20  response.  And so that led to the assumption that

21  there was no threshold for carcinogenic response, and

22  that was adopted as a matter of policy around the

23  early 1980 period, '79-80 period.

24          Q.    When you first began to comment during

25  your service as the Director of Toxicology and

1    Environmental Sciences at the ATSDR on cancer issues

2    with respect to FEMA's bulletins and notices that did

3    not mention cancer risk, was there any body of

4    science that you were concerned about that made you,

5    you know, comment and comment negatively about the

6    failure to include the cancer risk information?

7         A.    Yes.  One of the tasks I was assigned

8    after coming to the Agency was to develop the

9    Agency's cancer policy framework.  It has been a

10   well-received document and it has been reprinted in

11   the EPA's Handbook of Carcinogenic Testing, among

12   other places.

13        But it was basically an attempt to

14   articulate the Agency's position on issues of cancer,

15   the relative merits of the different classification

16   systems, and to place in context the conclusions of

17   the different organizations, and perhaps bring

18   clarity to some of the presentation of information in

19   our own documents and consistency in our various

20   efforts to work at sites nationwide.

21        Q.    Ask you a few questions about the ATSDR's

22   dealings with FEMA, and then I'm through.

23        When did you first learn that a trial

24   attorney by the name of Rick Preston who was with the

25   Office of General Counsel at FEMA was interacting