Exhibit 5

# Department of Homeland Security
# Office of Inspector General

# FEMA Response to Formaldehyde in Trailers

# (Redacted)



Notice: The Department of Homeland Security, Office of the Inspector General, has redacted this report for public release.

OIG-09-83                                                                 June 2009



*Office of Inspector General*

U.S. Department of Homeland Security
Washington, DC 25028

June 26, 2009

Preface

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Public Law 107-296) by amendment to the *Inspector General Act of 1978*. This is one of a series of audit, inspection, and special reports prepared as part of our oversight responsibilities to promote economy, efficiency, and effectiveness within the department.

This report addresses the strengths and weaknesses of the Federal Emergency Management Agency's decision making, policy, and procedures related to the issue of formaldehyde in trailers purchased by the agency to house victims of the 2005 Gulf Coast hurricanes. It is based on interviews with employees and officials of relevant agencies and institutions, direct observations, and a review of applicable documents.

The recommendations herein have been developed to the best knowledge available to our office, and have been discussed in draft with those responsible for implementation. We trust that this report will result in more effective, efficient, and economical operations. We express our appreciation to all of those who contributed to the preparation of this report.

*Richard L. Skinner*

Richard L. Skinner
Inspector General

## Effects of Formaldehyde

Regardless of the level of exposure, formaldehyde exposure can be a health threat. One of the possibilities is the risk of cancer. As the CDC reported in the July 2, 2008, study of FEMA trailers:

> "The carcinogenicity of formaldehyde has been extensively studied during the last 30 years. In June 2004, the International Agency for Research on Cancer (IARC) reclassified formaldehyde from 'probably carcinogenic to humans' to 'carcinogenic to humans.' IARC has concluded that formaldehyde exposure causes nasopharyngeal cancer. However, the National Institutes of Health Toxicology Program has not adopted IARC's classification change and continues to classify formaldehyde as 'reasonably anticipated to be a carcinogen in humans' and states that 'How to quantitatively relate measured air levels of formaldehyde to cancer risk is uncertain. Because many other factors play a role in the development of cancer and because formaldehyde is ubiquitous in the environment, no definitive level can be established that places humans in a "high-risk" category. The safest way to reduce risk for cancer is to limit exposure.'"

CDC officials told us that the risk of cancer from formaldehyde is not a threat that has a plateau below which one is safe and above which one is vulnerable; rather, it is a threat that just steadily increases with exposure.

One CDC official has been quoted as saying that there is no safe level of exposure to formaldehyde in trailers:

> *"Any level of exposure to formaldehyde may pose a cancer risk, regardless of duration."*

However, given the ubiquitous nature of formaldehyde in an industrialized nation, such a warning statement only lets people know that there is no residence, and in fact no place, where they can be guaranteed safe from formaldehyde's potential long-term effects. While accepting the above warnings, we have had to focus this review on the more quantifiable acute health effects of formaldehyde.

The shorter-term acute health effects of formaldehyde exposure vary by individual, but overall are more definable than the chronic risk of cancer. CDC described these risks in its July 2, 2008, report of formaldehyde in FEMA trailers:

> "Symptoms from acute exposure to formaldehyde commonly manifest as irritation of the throat, nose, eyes, skin, and upper respiratory tract. This upper respiratory tract irritation can exacerbate symptoms of asthma and other respiratory illnesses.... Acute and chronic health effects of exposure to formaldehyde vary by individual. At 800 ppb, nearly everyone develops some acute irritative symptoms; however, formaldehyde-sensitive persons have reported symptoms at levels around 100 ppb. Additional studies have found health effects at 100 ppb in sensitive persons chronically exposed to formaldehyde."

The CDC report also said that most individuals detect the odor of formaldehyde only when concentrations reach 500 ppb; therefore, some individuals can experience symptoms without being able to detect the odor of formaldehyde.

Some experts believe that 300 ppb is another possible decision point in the evaluation of formaldehyde in residences. In trailers that are above that level, the CDC director stated *"even people without vulnerability might experience some respiratory symptoms if they spent time in those homes."*

## Formaldehyde Standards

Although workplace standards and recommendations for allowable exposures to formaldehyde have been implemented to protect workers who are exposed to formaldehyde, there is far less guidance as to what levels should be avoided in residences. The only federal standard for formaldehyde is the Occupational Safety and Health Administration (OSHA) "allowable time-weighted average" for allowable exposure to formaldehyde in workplaces, which is 750 ppb for 8 hours.

There are no standards for formaldehyde exposure in residences. A standard that is acceptable in the workplace could be inappropriate for a residential setting, where there are more likely to be children, the elderly, and persons who are not healthy, and where most individuals spend more hours each day than in their workplace. HUD standards governing the materials that are acceptable in mobile homes had a 1984 target of keeping formaldehyde exposures in mobile homes below 400 ppb. However, HUD standards do not apply to travel trailers or park models, and a 400 ppb level is far higher than many experts currently recommend. Apart from these limited standards, there are some recommendations and guidance from federal agencies but they tend to vary widely.

In another email, 7 days later, the same official noted:



By May 16, 2006, some FEMA officials were notified of the dangers and potential consequences of excessive formaldehyde exposure. On that day, a FEMA safety officer sent out an email to regional officials in Alabama with a 1½-page information sheet titled "Formaldehyde" from the Environmental Health Center of the National Safety Council. The information sheet noted that formaldehyde in excess of 100 ppb can cause "*watery eyes; burning sensations in the eyes, nose and throat; nausea; coughing; chest tightness, wheezing; skin rashes; and other irritating effects.*" It further noted that sensitive people can experience effects below 100 ppb and that the World Health Organization recommends that exposure should not exceed 50 ppb. The information also included a warning that: "*Formaldehyde has caused cancer in laboratory animals and may cause cancer in humans; there is no known threshold level below which there is no threat of cancer. The risk depends upon amount and the duration of exposure.*"

On June 13, 2006, a Mississippi Sierra Club official wrote the Acting Assistant Administrator, Disaster Assistance Directorate, to warn him:

> "*...94 percent of FEMA trailers tested by Sierra Club recently in Mississippi had formaldehyde levels over the safety limits set by EPA.*"

She recommended that:

> "*...since FEMA consistently denies there is a problem, FEMA should undertake testing to prove that formaldehyde levels are not a concern.*"

Before the Sierra Club results were announced, some Mississippi FEMA officials had already attempted to establish a formaldehyde-testing program. By May 4, 2006, Mississippi FEMA officials had announced that:
> "*The JFO* [Joint Field Office] *here in Mississippi is instituting a formaldehyde testing program and we will be testing for formaldehyde fumes in our trailers.*"

The Mississippi FEMA officials had submitted a contract request to institute such a program but it was going slowly because the contracting

establish a baseline formaldehyde level and then be retested after ventilation or air-conditioning steps were completed. By October 19, 2006, EPA Region 6 reported that the EPA contractor had all of the agreed-upon data, but that problems in the analysis would delay delivery of the data from the contractor to EPA for approximately 1 week. EPA expected to deliver the database to FEMA around November 13, 2006.

## Analysis of Formaldehyde Tests of Unoccupied Units

CDC/ATSDR agreed to analyze the data package provided by EPA and its contractor and offer recommendations based on the data set. Since there was no existing interagency agreement between FEMA and the CDC under which this analysis could be performed, the responsible program office started working on all of the necessary documents, including a possible acquisition plan, on October 26, 2006. However, by November 4, 2006, CDC/ATSDR officials concluded that they could "*complete the task before an IAA* [interagency agreement] *could go through the approval process*," and agreed to interpret the test results without an established IAA. FEMA had designated an attorney to be responsible for the class action litigation alleging personal injuries related to formaldehyde in FEMA trailers. In that capacity he received the raw data during Thanksgiving week from EPA. Thereafter, the data was forwarded by FEMA officials to CDC/ATSDR and arrived December 1, 2006. FEMA officials initially stated that they expected a final analysis from CDC/ATSDR around December 11, 2006, but once CDC/ATSDR officials received the EPA packet they told FEMA that it would take longer than anticipated to complete the analysis.

On February 1, 2007, the CDC/ATSDR Health Consultation "Formaldehyde Sampling at FEMA Temporary Housing Units" was sent to FEMA from the Acting Associate Director; Office of Terrorism, Preparedness and Emergency Response; National Center for Environmental Health/ATSDR. The analysis was 14 pages long, and as the cover letter noted:

> "In summary, the opening of windows and vents was effective in reducing formaldehyde concentrations below levels of health concern. Running the heating, ventilation and air conditioning systems did not provide adequate air exchanges to adequately reduce the formaldehyde concentrations. A combination of ventilation methods may be necessary to reduce formaldehyde concentrations below levels of health concern for sensitive individuals. FEMA has not requested ATSDR to evaluate longer term formaldehyde concentrations in trailers or health concerns related to potential exposures."

The FEMA attorney who had received the CDC/ATSDR report sent it to a limited number of FEMA officials. In general FEMA officials interpreted the report to say, as one FEMA official concluded:

> "...*the tests confirmed that we do not have a major issue with the formaldehyde but we are probably too casual in our communications with our applicants* [residents] *regarding proper ventilation.*"

## Problems With the Initial Analysis Report

However, 6 weeks later, on March 17, 2007, the Associate Director; Office of Terrorism, Preparedness and Emergency Response; National Center for Environmental Health/ATSDR sent the FEMA attorney who had received the "Formaldehyde Sampling at FEMA Temporary Housing Units Health Consultation" a letter that expressed concerns with that report as issued. This letter, which was actually signed by the Associate Director, as opposed to the previous letter, which had been signed by an acting official, stated:

> "I am writing in follow-up to my previous correspondence last month on behalf of the CDC National Center for Environmental Health/Agency for Toxic Substances and Disease Registry.
>
> It has just come to my attention that the Health Consultation 'Formaldehyde Sampling at FEMA Temporary Housing Units' has been completed without a policy review by our senior technical staff. I am concerned that this health consultation is incomplete and perhaps misleading.
>
> Formaldehyde is classified as 'reasonably anticipated to be a human carcinogen.' As such, there is no recognized 'safe level' of exposure. Thus, any level of exposure to formaldehyde may pose a cancer risk, regardless of duration. Failure to communicate this issue is possibly misleading, and a threat to public health. I had discussed this issue several months ago in a review of the public statement derived from the Toxicological Profile that FEMA proposed. I specified at that time that this statement contained no mention of the cancer risk and that should be a public health concern.
>
> Thank you for your consideration of this issue and please feel free to contact me. Failure to speak to the long-term cancer risk regarding formaldehyde exposure irrespective of duration is of particular concern."

In October 2007, ATSDR would issue "An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers, Baton Rouge, Louisiana, September-October 2006." This update was approximately three times the length of

the original report and, in addition to reporting the data of the first consultation; it contained a great amount of additional information, including that which was referred to in the second letter.

The CDC/ATSDR letters had both been sent to one FEMA attorney because the CDC/ATSDR officials still understood him to be their contact point at FEMA as he had been for the test results. While the FEMA attorney who received these letters shared the first letter with appropriate FEMA officials, he did not share the second, or revised, letter. According to the FEMA attorney, the cautionary second letter was consistent with previous communications that results from CDC should not be "over read." Not being aware of the second letter, FEMA officials reassured Congress and the public of the safety of FEMA trailers in statements that do not reflect the content of the second letter and that might not have been made if they had been aware of the content of the second letter. For example, on March 23, 2007, the Acting Assistant Administrator, Disaster Assistance Directorate, sent a letter to a congressional committee responding to the committee's questions. In that letter he stated:

> "*At this point, FEMA is not aware of any significant health risks to the residents of these trailers.*"

On May 10, 2007, the Associated Press quoted a FEMA spokesperson as saying:

> "*We have no need, and we see no need, to question the reliability and safety of the trailers....As long as residents can properly ventilate their units, there is no significant health hazard, little if any.*"

On July 3, 2007, the "FEMA Forward" newsletter was quoted as stating that it is a myth that FEMA must remove formaldehyde from travel trailers because:

> "*The agency's study of air samples collected from travel trailers in the Gulf area shows that formaldehyde emission levels in the units can be significantly reduced through adequate ventilation.*"

The FEMA attorney, however, said he was not aware that FEMA officials had made such public statements.