**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: FEMA TRAILER FORMALDEHYDE  MDL No. 1873
PRODUCTS LIABILITY LITIGATION

             SECTION N(5)

             JUDGE ENGELHARDT

THIS DOCUMENT IS RELATED TO:
*Lyndon Wright v. Forest River, Inc., et al.*
*Case No. 09-2977 (E.D. La.)*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
### <u>FILED BY SHAW ENVIRONMENTAL, INC.</u>

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff Lyndon Wright,

("Plaintiff" or "Wright"), who respectfully submits this Opposition to Shaw Environmental,

Inc.'s ("Shaw"), Motion for Summary Judgment on the issue of prescription.  Based upon the

arguments submitted below, Wright contends that: (1) *American Pipe* tolling does apply to

Shaw, both as an unnamed manufacturing defendant and as a joint tortfeasor, (2) the prescriptive

period did not begin to run based upon the notion of *contra non valentum*, (3) Shaw is a

manufacturer under the LPLA, and any claim for failure to warn has not prescribed; and (4) any

arguments by Shaw against Wright's claims as untimely brought under the concept of joint

tortfeasor are premature until an imposition of liability at trial.  Plaintiff contends these

arguments are sufficient to defeat the Motion for Summary Judgment filed by Shaw, and upon a full review, prays that this Honorable Court will deny Shaw's Motion.

I.      **Background**

In the immediate aftermath of Hurricane Katrina, the United States, through the Federal Emergency Management Agency ("FEMA"), engaged Shaw in a no-bid contract to provide a number of tasks to assist with the implementation of the Disaster Housing response.[1]   The contract between FEMA and Shaw tasked Shaw with a number of areas of disaster response implementation,[2] including but not limited to: (1) hauling and transportation of Emergency Housing Units ("EHU"), (2) installation and make-ready of EHU's, (3) inspecting the EHU's, and (4) maintaining the EHU's once they had been installed.  Shaw was one of three contracting entities in Louisiana charged with the implementation of FEMA's disaster housing response, the others being Fluor Enterprises, Inc. and CH2M Hill Constructors, Inc. (collectively Shaw, Fluor and CH2m Hill are the "No-Bid Contractors").

Included in the thousands of EHU's assigned to Shaw pursuant to its contract, was a Forest River, Inc. ("Forest River") travel trailer, VIN # 4X4TSMH296C008992 (the "Trailer"). The Trailer was designed by Forest River as a recreational vehicle not intended for long term habitation.[3]  The Trailer was to be moved to 2315 Seminole Lane, New Orleans, Louisiana.  It had been assigned to a Ms. Bobbie Wright, who in turn granted her son, the Plaintiff, power of attorney to sign on her behalf and occupy the unit.[4]  In early to mid-February, 2006, the trailer was delivered to the address and jacked up onto concrete piers.  However, installation and make-ready preparations were not completed until March, 2006 as Shaw failed to connect the unit to

---

[1] See Initial Contract Communications between Shaw and FEMA, attached as Exhibit "A".
[2] See Excerpts from Shaw Scope of Work attached as Exhibit "B".
[3] See excerpt of Forest River Owner's Manual attached as Exhibit "C".
[4] This is attached hereto as Exhibit "D".

the electrical grid.[5]  Wright, despite a willingness and desire to move into the unit upon delivery, was not able to do so until the unit was handed over to him.

Lyndon Wright had evacuated to Houston, Texas in the aftermath of Hurricane Katrina. He actively worked to move back to New Orleans as quickly as possible.  At the time of his evacuation, Wright was working two jobs, one as a facility engineer at the Hyatt Regency and the other as a facility/HVAC engineer for the City of New Orleans at the Civil District Court Building.[6]  Wright originally returned to work at the Hyatt Regency in early October, 2005.  Due to the extensive damage to the hotel, Wright was scaled back, and was forced to live out of his car for a period of time.[7]  Shortly thereafter, a superior at the Civil District Court was able to arrange for Wright to stay on the Carnival Cruise ship as temporary housing.[8]

One day in February, 2006, while driving past his home (which had sustained severe storm damage), Wright noticed that the Trailer had been delivered.  Shaw had not contacted he or his mother prior to that.  Despite the signing of a "Ready for Occupancy" Inspection form on or about February 13, 2006, Wright was unable to move into the trailer because it had not been hooked up to the electrical grid.  Interestingly, the electricity was not connected until the last day Wright could occupy the Carnival Cruise Ship, and he was able to move in sometime in early March, 2006.[9]  While Shaw may contend in its Motion for Summary Judgment that Wright was considered "Leased-In" to the trailer as of February 2006, Wright stated that he was not given the keys to move in until the electricity was connected.[10]

---

[5] See selected excerpts from the Lyndon Wright deposition attached hereto as Exhibit "E", see p. 94.
[6] See Exhibit "E" at p. 75
[7] See Exhibit "E" at p. 70
[8] *Id.* at p. 72
[9] *Id.* at p. 73
[10] *Id.* at p. 95

Shortly after moving in to the Trailer, Wright began to feel sick.  He did, in fact, voice a concern to his mother in early April of 2006 that he was worried the Trailer was making him sick.[11]   However, on April 10, 2006, Wright went to his doctor and was told that he had "seasonal allergies."[12]   As such, and believing his doctor, he did not again think that it was the trailer making him sick until much later.   In fact, it was not until a conversation with an individual about formaldehyde and this litigation, that Wright realized his physical symptoms were in fact caused by living in the Trailer.[13]

Within days of moving in to the Trailer, the heater stopped working.  Shaw sent out a maintenance team to repair the heater on or about March 19, 2006, but they were unable to do so.[14]   Despite additional complaints that the Heater was still not working, Shaw never took additional action to repair it.[15]

Shaw contends that on May 18, 2006, Shaw began discussions with C. Martin Company to begin a sequenced hand over of "Maintenance and Deactivation" for the EHUs originally tasked to Shaw.  This included Wright's EHU, and Shaw contends that the transfer/hand-off of Wright's Trailer was to take place on or about June 1, 2006.  However, also on May 18, 2006, *Hilliard, et al. v. United States of America, et al.*, 06-cv-2576 was filed in the Eastern District of Louisiana, and brought class allegations against identified and unidentified manufacturers based upon negligence and strict liability (including failure to warn), as well as breach of warranty.[16]

---

[11] *Id.* at p. 171
[12] See April 10, 2006 medical record attached as Exhibit "F".
[13] See Exhibit "E" at p.217
[14] See Exhibit E of the Shaw Motion for Summary Judgment which is the March 19, 2006 Call Center Maintenance Request Form.
[15] It is interesting to note that Shaw's Motion for Summary Judgment discusses the hand-off between Shaw and C. Martin was facilitated by a Preventative Maintenance Inspection form (attached to the Hansen Affidavit on Shaw's MSJ).  This form states that there were "no defects" at the time of transfer.  This is simply not true based upon the contention that Wright's heater was non-functional at that time.
[16] The *Hilliard* filing was to be followed by multiple additional suits in the following months asserting class allegations as well.

While Shaw claims that it had nothing else to do with the Trailer subsequent to June 1, 2006, a major impact of their involvement only manifested several months later.  As the piers of the Trailer settled over the months following the installation and make ready, the frame began warping out of true, and a gap formed between the door and the door jamb.  As this developed, water began to pour in through the door whenever it would rain. Additionally, the warping of the frame caused by Shaw's jacking and installing the unit on concrete piers created a break in the seal above one of the bedroom windows, also causing water to leak in there.[17]

This moisture exposure caused the development of mold and to the increased off-gassing of formaldehyde.[18]  At his deposition, Wright spoke of the mold that built up around the window and door frame and that he was constantly forced to clean the build-up.[19]  Further, not only did the moisture contribute to the off-gassing of formaldehyde, but to the breakdown of the Trailer's component wood products and, thus, also lead to increased formaldehyde release.[20]  Plaintiff contends that the warping and flexing of the frame was a direct result of Shaw's failure to properly install, construct and make ready for use the Trailer in February/March 2006.

Wright continued to reside in the Trailer from his March 2006 move-in until July 2008.[21] During this time, his physical condition continued to deteriorate, and he began noticing the presence of blood in his sputum every day.[22]  He saw Dr. Knight Worley for this bleeding, and at no point did Dr. Worley give him an indication that it was caused by living in the Trailer, rather he was told he had sinusitis and was prescribed anit-biotics (which did not work).[23]  In October,

---

[17] See Exhibit "E" pps 264-266.
[18] See the August 21, 2009 Affidavit of Dr. Stephen Smulski attached as Exhibit "G".
[19] See Exhibit "E" p. 122
[20] See Exhibit "G".
[21] Exhibit "E" p. 299
[22] *Id.* at p. 148
[23] *Id.* at p. 147

2008, Wright's Trailer was tested for formaldehyde and a level of .048 ppm was found by the WD Scott Group.[24]

On or about December 29, 2008, this Honorable Court issued its Order and Reasons denying class certification. The *Aldridge* case was amended on January 21, 2009 which specifically named Shaw and the other No-Bid Contractors, but was not able to specifically match the Plaintiffs to No-Bid Contractors, because this information was exclusively in the possession of FEMA and the No-Bid Contractors themselves. The Plaintiffs' Steering Committee ("PSC") was only provided with this information in or about February 2009.

On March 2, 2009, barely two months after the denial of class certification, Wright filed his suit against Forest River, Shaw and the United States. Also in March, Shaw brought Rule 12(B) Motions to Dismiss based upon Prescription, Standing and that it did not come under the Louisiana Products Liability Act ("LPLA"). This Honorable Court, in its June 15, 2009 Order and Reasons (Doc. 1762), granted Shaw's motion only as to those Plaintiffs unmatched, but denied the Motion as to Prescription, Standing and the LPLA.[25]

Throughout the process of this litigation, the Court has instructed that destructive testing was to occur on the Wright Trailer. In June and July, 2009, through pleadings and conversations amongst and between the Court and the Parties, the issue of Mold was discussed and incorporated into the Wright trial and testing process. The testing protocol was very thorough and is ongoing as undersigned counsel composes this Opposition. Further, discovery has been served on Shaw, but no responses received. Depositions were also set, but upon the reordering of the trial schedules, these have been postponed. As such, there is much information still

---

[24] Test Results are attached as Exhibit "H".
[25] The Order and Reasons is attached as Exhibit "I".

outstanding that Wright will incorporate into his understanding and prosecution of his claims against Shaw (as well as Forest River and the United States).

## II.  Standard of Law in Opposing a Motion for Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); see also *Lavespere v. Liberty Mut. Ins. Co*., 910 F.2d 167, 178 (5th Cir. 1990). Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Auguster v. Vermillion Parish School Bd*., 249 F .3d 400, 402 (5th Cir. 2001).

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana*, 294 F.3d 755, 758 (5th Cir.2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare*

*System, L.L.C.*, 277 F.3d 757, 764 (5th Cir. 2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994)(citations omitted). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *See id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir.2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.1994), *cert. denied*, 513 U.S. 871 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little*, 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys,* 298 F.3d 434, 440 (5th Cir.2002).

Finally, in the context of prescription, "Courts should resolve doubts about a prescription question in favor of giving the litigant his day in court." *Orthopaedic Clinic of Monroe v. Ruhl*, 786 So.2d 323, 328 (La.App.2d Cir.), writ denied, 798 So.2d 970 (La.2001), and "Prescriptive

statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished." *Landry v. Blaise, Inc.*, 774 So.2d 187, 190 (La. App. 4th Cir.), writ denied, 776 So.2d (La. 2000).

### III.  *American Pipe* **Tolling Applies to Shaw**

The concept of prescriptive tolling is laid out in *American Pipe and Construction Co., et al. v. State of Utah, et al.*, 414 U.S. 538, 554 (1974), wherein the Supreme Court held:

> [C]ommencement of class actions suspends applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.

The *American Pipe* Court also discussed efficiency and judicial economy being important to this notion and stated:

> A federal class action is no longer an 'invitation to joinder' but a truly representative suit designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions…[T]he claimed members of the class stood as parties to the suit until and unless they received notice thereof and chose not to continue.  Thus, commencement of the action satisfied the purpose of the limitation provision as to all those who might subsequently participate in the suit as well as for the named plaintiffs.  To hold to the contrary would frustrate the principle function of a class suit, because then the sole means by which members of the class could assure their participation in the judgment if notice of the class suit did not reach them until after the running of the limitation period would be to file earlier, individual motions to join or intervene as parties – precisely the multiplicity of activity which Rule 23 was designed to avoid…[26]

In the instant litigation, this prescriptive tolling runs not only against Forest River and the United States, but also against Shaw.  As will be discussed below, there are three reasons that this Honorable Court should read the tolling to apply to Shaw as well as Forest River and the United States: (1) *American Pipe* prescriptive tolling has been held to apply to putative or unnamed defendants as well as plaintiffs, (2) When viewed in the context of judicial efficiency and economy discussed in *American Pipe*, suspension and interruption should be treated as a

---

[26] 414 U.S. at 550-1.

distinction without a difference, as numerous Louisiana courts have done, and (3) the Plaintiff asserts that Shaw is a manufacturer under the LPLA, and thus is tolled in fact by *Hilliard*.

## A. *American Pipe* applies to Unnamed Defendants

While Shaw states that no reported cases have ever extended *American Pipe* to unnamed defendants, this is simply untrue.  In *Appleton Electric Company v. Graves Truck Line, Inc.*, 635 F.2d 603, 609-10 (7 Cir. 1980), the Seventh Circuit discussed this very issue.  The court, very cognizant of the *American Pipe* desire to promote judicial efficiency and economy, and to avoid a multiplicity of actions, stated:

> Unlike the Court in *American Pipe*, supra, we are confronted here with a true conflict between the operation of the statute of limitations and Rule 23.  This conflict can be resolved only by the promotion of one rule at the expense of the other, unless due process considerations require a particular result.  Our reading of the cases convinces us that due process is not offended by the tolling doctrine, even where a defendant has no notice of a suit until after the limitations period has run.  Cf. United States v. Wahl, supra.[27]  The Supreme Court specifically rejected the contention that due process was abridged by the tolling doctrine in *American Pipe*, 414 U.S. at 556-59.

> We are persuaded that implicit in the Supreme Court's *American Pipe* decision was the Court's determination that "effectuation of the purpose of litigative efficiency and economy," (which Rule 23 was designed to perform) transcends the policies of repose and certainty behind statutes of limitations. 414 U.S. at 556. **We are guided by that conclusion in the instant case to hold that where a class action suit is instituted against a class of unnamed defendants, pursuant to Rule 23(b)(3), the statute of limitations is tolled as to all putative members of the defendant class.**  (emphasis added).

The *Appleton* case was originally brought against seventeen named defendants, but was amended to add as defendants "all others similarly situated".  In the *Hilliard* Complaint brought in the instant MDL, the Complaint considers a group of as of yet unidentified manufacturers and styles them "Unnamed Manufacturers".[28]  Wright has contended throughout, and as discussed

---

[27] 583 F.2d 285 (6 Cir. 1978), the Sixth Circuit held that the filing of a complaint within the limitations period tolled the statute, even though the defendant was not served until three years after the limitations period had run.
[28] In filings subsequent to *Hilliard*, the notion of unnamed manufacturers and defendant parties was repeated.

below, that Shaw is a manufacturer under the LPLA.  Because the determination of whether Shaw was a Manufacturer under the LPLA is an issue of material fact, this issue should be decided at trial rather than in this Motion for Summary Judgment.

Wright argues that because of the contention that Shaw is a manufacturer under the LPLA, and in light of the *Appleton* ruling above, *American Pipe* tolling applies directly to Shaw, and that with the filing of *Hilliard*, the prescriptive period against Shaw was tolled.  As such, when *Hilliard* was filed with its class allegations in May 2006, it tolled running of the prescriptive period against Shaw itself.  When class certification was denied on December 29, 2008, Wright would contend there were at least nine or ten months, if not the full one year remaining on the prescriptive period in which he could bring individual claims against Forest River, FEMA and Shaw, regardless of whether tolling had been suspended or interrupted by *American Pipe*.  Wright brought his individual claims on March 2, 2009.

### B.  Interruption and Suspension are a Distinction without Difference in the Context of *American Pipe*.

Should this Honorable Court find the *Appleton* decision non-persuasive, Plaintiff contends that the claims against Shaw as a Joint Tortfeasor are preserved under Article 2324 of the Louisiana Civil Code which provides that interruption of prescription against one joint tortfeasor is effective against all joint tortfeasors.  While Shaw has argued that there is a clear distinction between the concepts of interruption and suspension and, therefore, there was no prescriptive tolling against Shaw under the class action filings as they were not named until March, 2009.  Wright, however, would argue that, in the context of *American Pipe* itself, and class actions generally, that this is a distinction without a difference, and that several Louisiana Courts have held that there is interruption as to joint tortfeasors upon the filing of class actions.

The *American Pipe* Court discussed at length the rationale for the limitations tolling. The Court found "a federal class action is no longer an 'invitation to joinder' but a truly representative suit designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions…" The tolling was based on the concepts of promoting judicial economy and efficiency, and to avoid the filing of a multiplicity of actions that asserted identical claims. Further, federal class actions were 'truly representative suits,' and the Court further stated to this effect:

> A contrary rule allowing participation only by those potential members of the class who had earlier filed motions to intervene in the suit would deprive Rule 23 class actions of the efficiency and economy of the litigation which is the principle purpose of the procedure. Potential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable.[29]

This discussion certainly intends to create a situation where additional filings into the class action are not necessary and avoided by judicial preference. This rationale also de-incentivizes any additional filings by a putative class member during the pendency of the question of class certification.

Further, the focus of the *American Pipe* decision was clearly that the prescriptive period be tolled during the pendency of a class action, rather than a focus on the distinction between suspension and interruption. In *American Pipe* itself, the rationale for using the term suspension may derive from the fact that the Court was considering a class action stemming from Section 5(b) of the Clayton Act, and stated:

> It remains to determine the precise effect the commencement of the class action had on the relevant limitations period. Section 5(b) of the Clayton Act provides that the running of the statutes of limitation be 'suspended' by the institution of a Government anti-trust suit based on the same subject matter.[30]

---

[29] 414 U.S. at 553.
[30] 414 U.S. at 561.

When discussing *American Pipe*, many courts give no distinction between suspension or interruption, and simply refer to the limitations period being tolled during the pendency of the class action.  See, *In re: Katrina Canal Breaches Consolidated Litigation*, 601 F.Supp.2d 809 (ED La. 2009); *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983); *Drumm v. Sizelar Realty Co., Inc.*, 817 F.2d 1195 (5 Cir. 1987).   In addition to these Federal decisions, there are a number of situations where Louisiana courts use the term suspension and interruption interchangeably.

In Louisiana, class action filings and the issue of tolling fall under Article 596 of the Louisiana Code of Civil Procedure.  Article 506 provides in part:

> Liberative prescription on the claims arising out of the transactions or occurrences described in a petition brought on behalf of a class is suspended on the filing of the petition as to all members of the class as defined or described therein.

However, there are a number of cases where Louisiana courts have inserted the term interruption in the context of class action filings.  See *Pitts v. Louisiana Citizens Property Ins. Corp.*, 4 So.3d 107 (La.App. 4 Cir. 2009), which held that prescription was interrupted by the class action filing, and did not begin to run again until denial of certification; *Eastin v. Entergy Corp.*, 971 So.2d 374 (La.App. 5 Cir. 2007), *writ denied*, 972 So.2d 1167 (La. 2008), interestingly in this case the court stated that the prescriptive period was interrupted by the filing of the class action, but also used the term suspension in a different place, reinforcing the lack of distinction in this context; *Williams v. State*, 350 So.2d 151 (La. 1977), held that class action interrupts prescription as to claims of all members of the class.

The purpose of the distinction between suspension and interruption is to avoid delays and abuse.  In the instant litigation, this is a non-issue.  When the *Hilliard* suit was filed in May 2006, Wright was still in his trailer, and was just becoming aware that he was not feeling well.

Further, Shaw still had contractual obligations over his unit, and the damage caused by the jacking and installation would not become obvious for many more months.  As such, no time had run on the prescriptive period against any defendant, and the fact that he filed suit barely two months after certification was denied is an indication that there was no intent to drag out the filing process by Mr. Wright.  Further, Wright refrained from any filing during the class certification pendency as was intended and discussed by the *American Pipe* Court.

Other courts in Louisiana have looked at the distinction between suspension and interruption in the context of class actions and simply found the terms to be interchangeable.  The arguments raised by Shaw attempt to overcomplicate this matter.  Where the courts have held that the purpose of judicial economy and efficiency are best served by avoiding a multiplicity of actions, it would unfairly penalize a putative class member for not bringing an individual claim prior to the determination of the class certification.  In fact, the courts using the term interruption when stating that the prescriptive period would begin running again once class certification was denied is a good indicator that a hybrid term and application is appropriate in this context.

Finally, the Fifth Circuit, in *Richard v. Wal-Mart Stores, Inc.*, 559 F. 3d. 341, 346-47 (5th Cir. 2009) (citing *Lina v. Schmidt*, 595 So. 2d. 624, 629 (La. 1992), stated:

> Louisiana law favors redressability.  The Louisiana Supreme Court has held that "prescription statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished; thus of two possible constructions, that which favors maintaining, as opposed to barring, an action should be adopted."

As such, this Court should find that the filing of *Hilliard* tolled the prescriptive periods against all defendant parties, and that the tolling should satisfy La. C.C. Art. 2324's interruption against one joint tortfeasor counting against all.

C.  **Shaw is a Manufacturer under the LPLA**

While the distinction between suspension and interruption under *American Pipe* goes to Shaw's potential status as a joint tortfeasor, Plaintiff asserts that Shaw is a manufacturer under the Louisiana Products Liability Act, and that the filing of *Hilliard* directly tolled the prescriptive period against Shaw.  The issue of Shaw's classification as a manufacturer under the LPLA has been argued and briefed in previous pleadings.  Further, the classification of Shaw as a Manufacturer goes to an issue of material fact which should be decided at trial.  However, in the interest of clarification and for the benefit of this Honorable Court, Plaintiff briefly articulates his position as follows.[31]

The manufacture of a product is defined by Louisiana Revised Statute 9:2800.53(1) which states "manufacturing a product means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning, or refurbishing a product."  Even if Shaw contends that it had nothing to do with the refurbishment of Wright's Trailer, because Shaw had handed over the contract on that unit.  Shaw still played a pivotal role in the construction of the Trailer for use by Wright.  Not only do the facts support this contention, but prior decisions and this Court's own language support this contention.

This Court, in its June 15, 2009 Order and Reasons, stated:

> This Court finds the case of *Coulon v. Wal-Mart Stores, Inc.,* 734 So.2d 916 (La.App 1 Cir. 1999), *writ denied*, 747 So.2d 1125 (La.1999), cited by Plaintiffs, instructive.  In *Coulon*, Defendant Wal-Mart Stores Inc. ("Wal-Mart") was found liable under the LPLA for injuries caused by a bicycle purchased from Wal-Mart.  The defective bicycle was assembled by either Wal-Mart or by its contractor.  The alleged defect in the bicycle was created in the assembly process.  The Louisiana First Circuit concluded that Wal-Mart would be liable under the LPLA as a

---

[31] The argument has been made and addressed in part by the PSC and this Court in response to the Motions to Dismiss filed by Shaw and CH2M Hill in March of 2009.  See Exhibit "I".

manufacturer for any defects that are created in the assembly process.  That court reasoned:

'Although LSA-R.S. 9:2800.53 does not include the word "assembly" or "assemble" in the definition of "manufacturer" or "manufacturing a product," it does include the term "constructing."  Construct is not defined in the LPLA; however, Black's Law Dictionary, sixth edition, defines construct as follows: "To build; erect; put together; make ready for use.  To adjust and join materials, or parts of, so as to form a permanent whole.  To put together constituent parts of something in their proper place and order."  Accordingly, we conclude that the term "manufacturing a product" indirectly refers to assembling; thus, one who assembles a product for sale is properly deemed a manufacturer of the assembled product under the LPLA.'

It is important to note that the *Coulon* court in continued to state in the very next sentence that: "Accordingly, this entity would be liable under the LPLA as a manufacturer for any defects that are created in the assembly process."  734 So.2d at 919, citing to *Rowell v. Carter Mobile Homes, Inc.*, 500 So.2d 748 (La. 1987); *Marshall v. Truck Equipment, Inc.*, 481 So.2d 1022 (La.App. 1 Cir. 1985).  In addition to this Court's discussion of the LPLA and the *Coulon* case cited therein, the case of *Credeur v. Champion Homes of Boaz, Inc.*, 6 So.3d 339 (La.App. 3 Cir. 2009) is also relevant.  The *Credeur* court held a mobile home installation defendant to be a manufacturer and stated: "If a retailer actively participates in the construction, assembly, or installation of the component parts that are essential for the structure to become useable for its intended purpose…then the retailer is held to the same standards as the manufacturer."

The fact pattern with Shaw as it relates to Wright's unit shows several ways in which Shaw should be considered a manufacturer under the LPLA.  First, Shaw took and converted the Trailer from a recreational vehicle, not to be used for long-term occupancy – the purpose and use for which it had been designed by Forest River – to an installed dwelling to be used for long-term habitation.  This process involved installing the Trailer onto concrete piers, connecting the

16

Trailer to residential water, sewerage and electrical lines, as well as taking other steps in the make-ready for occupancy process.

Second, and closely linked with the make-ready preparations, was the fact that the Trailer was not useable by Wright until Shaw had completed the make-ready for occupancy preparations. This is illustrated by the fact that it took almost a month for electricity to be connected to Wright's Trailer after it had been installed. When asked at deposition why he did not move in earlier, Wright said that he could not move in and that Shaw would not give him the keys until electricity had been connected.[32] This supports the fact that Wright was dependent upon Shaw to complete the make-ready preparations prior to his being able to move in. If the unit could not be used for its converted purpose prior to the completion of the installation and make-ready preparations, Shaw is a manufacturer under the LPLA.

Finally, Shaw created a defect in the Wright Trailer when it jacked the unit off of its wheel based and installed it upon concrete piers. This process led to the warping, flexing and bending of the Trailer frame which caused damage and leaks to form. These became apparent months after the unit had been installed as Wright has alleged that frame continued to warp and the door slowly separated from the door frame, allowing water into the unit, damaging the unit, increasing Wright's exposure to formaldehyde, and creating a situation that led to the development of mold which is also an issue in this litigation. The *Coulon* court found an entity liable under the LPLA for any defects which were created during the assembly process. Shaw created the defect in Wright's unit.

---

[32] See Exhibit "E" at p. 99

For the abovementioned reasons, Shaw should be considered a manufacturer under the LPLA.  Plaintiffs would argue that this puts Shaw directly under the tolling provisions of *American Pipe* and the Seventh Circuit's holding in *Appleton*.  If nothing else, the issue to whether Shaw is a manufacturer based upon the facts of this litigation are a dispute that should be determined at trial, rather than in this Motion for Summary Judgment.

**IV.   *Contra Non Valentem* Applies to Wright's Claims Against Shaw**

In addition to Plaintiff's assertion that the suit was brought against Shaw in a timely manner either as an anticipated unnamed defendant, or through the interruption of prescriptive tolling when the class allegations were asserted in *Hilliard*, the Plaintiff also contends that the doctrine of *contra non valentem* applies to this matter.   *Contra non valentem* is defined by Black's Law Dictionary, seventh edition, as "The rule that limitations or prescriptive period does not begin to run against a plaintiff who is unable to act, usually because of the defendant's culpable act, such as concealing material information that would give rise to the plaintiff's claim."  At issue in the instant litigation is that the information relating to Shaw's role in the manufacturing process and the emergency housing response was entirely in the possession of the United States and Shaw itself, and not available to Wright, unlike the Trailer being labeled a Forest River unit or the obvious connectivity of FEMA in the housing response.[33]

The Louisiana Supreme Court expanded the doctrine from its traditional three situations where it would apply and added a fourth in *Corsey v. State of Louisiana*, 375 So.2d 1319 (La. 1979).  Traditionally, *contra non valentem*:

---

[33] In fact, matching information for Plaintiffs and No-Bid Contractors was not received by the PSC from the Federal Government until early 2009.  Until this, there was no way to match a plaintiff with a no-bid contractor.

[A]pplied to prevent running of liberative prescription as follows: (1) Where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) Where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; and (3) Where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action. [citations omitted]

Modern jurisprudence also recognizes a fourth type of situation where *Contra non valentem* applies so that prescription does not run: Where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.

This is further expounded upon by the Louisiana Fourth Circuit Court of Appeal in *Beth Israel v. Bartley, Inc.*, 579 So.2d 1066 (La.App. 4 Cir. 1991). In *Beth Israel*, the court examined a defect in the installation of a roof on a synagogue. The defect was not known by plaintiff until after the prescriptive period had run, but plaintiff had relied upon a report from the defendant which caused the delay in identification of the problem. The court, relying on *Corsey*, supra, held that "prescription does not run as long as it is reasonable for the victim/plaintiff not to recognize that the condition or problem may be related to the treatment or defect. The focus is on the reasonableness of the tort victim's action or inaction." Citing *Griffin v. Kinberger*, 507 So.2d 821 (La. 1987).

In examining the concept of liberative prescription and *contra non valentem*, the *Beth Israel* court held:

Liberative prescription of one year is also applicable to delictual actions so that a products liability claim is also subject to a one year limitation from the injury or damage or from the date the victim became aware of the defect. La. C.C. Art. 3492…

Prescription does not commence to run until the plaintiff has actual or constructive knowledge of the tortuous act and the damage. *Reed v. General Motors Corp.*, 400 So.2d 919 (La.App. 1 Cir. 1981)…**Mere apprehension that something might be wrong is not sufficient.** *Griffin v. Kinberger*, 507 So.2d at 821. (emphasis added).

Wright had no knowledge of Shaw's capacity as a manufacturer, and as stated in his deposition, the separation between door and door frame did not occur immediately, taking months of warping before any defect due to jacking became apparent.[34]  His claims against Shaw, other than their failure to adequately maintain his unit were not reasonably knowable by Wright until significantly later.

Shaw tries to point at a statement by Wright to his mother in April 2008 to the effect that he was worried the trailer might be making him sick.  However, his worries were put aside after the doctor on April 10, 2006 told him he had seasonal allergies.[35]  The ignorance from that point on was not due to neglect on the part of Wright, rather he had been told (incorrectly) what was affecting him, and he believed his doctor.  As was stated in *Beth Israel*, mere apprehension that something is wrong is not sufficient to trigger prescription.

To complicate matters further, the complexity of the MDL and pending class certification led to fairly restrictive discovery instructions to the Plaintiff and PSC focused on the issues of class certification.  See Pre-Trial Orders 1 and 2, Document Nos. 5 and 87 respectively.  This limited individual plaintiffs, particularly putative members who had not yet brought suit, in their ability to determine the exact identity of additional defendants, particularly the No-Bid Contractors.

Plaintiff asserts that the *American Pipe* tolling during the pendency of the class consideration was intended to avoid additional filing by putative class members, and that this tolling creates a situation under the doctrine of *contra non valentem* where the second factor of *Corsey*, a condition connected with the proceedings which prevented filing, would apply.  The

---

[34] See Exhibit "E" p. 121-122.
[35] See Exhibit "F"

tolling, coupled with the Court's articulated rationale for the tolling, was a disincentive for Wright to bring additional pleadings pursuant to the pendency of the class certification, and, as such, the equitable tolling principle of *contra non valentem* should apply for this reason as well.

**V.      Shaw is a Bad-Faith Manufacturer under the LPLA, and their Failure to Warn does not Prescribe.**

Shaw, in its argument against a continuing tort theory by Wright cites to a case that holds Shaw's failure to warn is incapable of abatement.  This, coupled with a manufacturer's presumption of knowledge of any defect, creates a situation where prescription has not run. Shaw cites to *GHR Energy Corp. v. Carboline Co.*, 744 F.Supp 1405 (ED La. 1990), for the premise that continuing tort cannot apply to failure to warn cases, such as the failure to warn asserted by Wright.  Unfortunately for Shaw, however, the *GHR* case indicate that Shaw's duty to warn does not prescribe, and when taken in the context of their conversion of the trailer from a recreational vehicle to an installed permanent dwelling, argument by Shaw relating to a failure to warn must fail.

The *GHR* court held that "the continuing tort theory of prescription cannot apply to a failure to warn since a failure to warn is not capable of abatement, especially if there is no disclosure."  Id. at 1407.  The court discussed the one year prescriptive period for delictual actions, but stated: "However, there is an exception where there was no knowledge of the fact there was damage, or where, through some act of the party who caused damage, the injured person is kept in ignorance of the of the fact there has been damage or the cause thereof."  Citing *Bunge Corp. v. GATX Corp.*, 557 So.2d 1376 (La. 1990).  In *GHR*, the court found that there were contested issues of material fact as to when the non-moving party knew or should have

known of the existence of the defects.  The Louisiana Third Circuit in *Credeur*, as discussed supra, held that "a manufacturer is conclusively presumed to have knowledge of defects in the object it produces."[36]   The *Credeur* court further states: "where a retailer sells and, as a part of the sale, installs a thing, and that installation is defective, the seller is held to the same standard as a manufacturer and is presumed to have known of the defect in the installation."[37]

While Shaw is presumed to have knowledge of the defect in the Trailer caused by the installation and make-ready practices, they failed to disclose the existence of these defects to Wright.  This failure to warn is "incapable of abatement" as was stated in the *GHR* case, and the question goes to when Wright knew of the defect and that the defect created by Shaw had caused him injury or damage.  This is an issue of material fact only suitable for determination at trial, and Shaw's Motion for Summary Judgement should fail for this reason as well.

## VI.    Shaw's Motion is Premature as a Joint-Tortfeasor

If Shaw's Motion for Summary Judgment is denied for no other reason, it has been brought prematurely.  As a Joint Tortfeasor, even if, for arguments sake, they were untimely added themselves, prescription was interrupted against them so long as a claim was timely brought against either Forest River or the United States.  However, some fault must be attributable to a timely sued defendant in order for recovery to be possible against Shaw as well. If Shaw is the only defendant to be found at fault, then the claims may be dismissed as prescribed at that time, but not before.  As such, because Plaintiff asserts that suit was timely filed against both Forest River and the United States, at the very worst, Shaw's Motion for Summary Judgment is premature pending the outcome of liability allocation at trial.

---

[36] 6 So.3d at 342
[37] *Id.*

## VII. Conclusion

Quite simply, and for the reasons articulated above, Wright brought a timely filed suit against Forest River, FEMA and against Shaw.  Shaw's Motion for Summary Judgment on the issue of prescription attempts to complicate relatively straightforward concepts.   Wright's Complaint was timely asserted against Shaw for the following reasons: (1) *American Pipe* tolling applies directly to Shaw as an unnamed, manufacturing defendant; (2) For the purposes of judicial economy and efficiency, and to avoid a multiplicity of actions, *American Pipe* effectively interrupts prescription against Shaw as a joint tortfeasor; (3) the Doctrine of *Contra non valentem* applies to Wright, and the prescriptive period did not run against Shaw because (a) Wright's ignorance of the defect and injury caused by Shaw's installation and make-ready preparations, and (b) the procedural disincentive by the *American Pipe* tolling during the pendency of class certification; (4) Wright's claim against Shaw for failure to warn is incapable of abatement and, therefore, not prescribed; and (5) Shaw's Motion for Summary Judgment is premature as to Shaw's status as a joint tortfeasor pending a determination and allocation of liability at trial.

WHEREFORE, Plaintiff Lyndon Wright prays that this Honorable Court, for the reasons and arguments articulated above and herein, deny the Motion for Summary Judgment brought by Shaw Environmental, Inc. on the issues of prescription.

Respectfully submitted,

\_\_\_/s/ Frank J. D'Amico, Jr._____
FRANK J. D'AMICO, JR. (Bar No. 17519)
AARON Z. AHLQUIST (Bar No. 29063)
**FRANK J. D'AMICO, JR., APLC**
622 Baronne Street
New Orleans, LA 70113
Telephone:      (504) 525-7272
Fax:               (504) 525-9522
***Counsel for Lyndon Wright and member of the PSC***

**COURT-APPOINTED PLAINTIFFS'**
**STEERING COMMITTEE**
GERALD E. MEUNIER, #9471
JUSTIN I. WOODS, #24713
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
MATT MORELAND, #24567
LINDA NELSON, #9938
MIKAL WATTS, Texas # 20981820
DENNIS REICH, TEXAS #16739600

## CERTIFICATE OF SERVICE

**I HEREVY CERTIFY** that the above and foregoing pleadings were served on all counsel of record through electronic notification pursuant to the electronic filing in the United States District Court for the Eastern District of Louisiana this 24th day of August, 2009.

\_\_\_\_/s/ Frank J. D'Amico, Jr._____
**FRANK J. D'AMICO, JR.**