UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | SECTION:  N(5) |
| LITIGATION | * | |
| | * | JUDGE: ENGELHARDT |
| This Document Relates to: | * | |
| *Charlie Age, et al. v.* | * | MAG:  CHASEZ |
| *Gulf Stream Coach, Inc. et al.,* Docket No. 09-2892 | * | |
| | * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### MEMORANDUM IN SUPPORT OF GULF STREAM COACH, INC.'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF PATRICIA M. WILLIAMS, PH.D., DABT

**MAY IT PLEASE THE COURT:**

Defendant, Gulf Stream Coach, Inc., respectfully submits the following Memorandum in Support of its Motion *in Limine* to Exclude Expert Testimony of Patricia M. Williams, Ph.D., DABT.[1]

## I. OPINIONS OF PATRICIA WILLIAMS, PH.D., DABT – TOXICOLOGY

Patricia Williams, Ph.D., DABT, offers the following unreliable opinions relative to this matter:  (1)  a cause-effect relationship exists between formaldehyde and upper respiratory tract damage and cancer; and (2) a cause-effect relationship exists between formaldehyde and bronchoconstriction/asthma.  Ex. "A,"  Aff. Williams, p. 35; Ex. "B,"  Depo. Williams, pp. 43-44, 47, 263-264.[2]  The opinions rendered above should be excluded as Williams lack the requisite qualification(s) to render them and, moreover, they are premised upon unreliable methodology.  Williams' lack of qualification (in general) is discussed at Section II (*infra*), her

---

[1]    As the Court and parties are well aware of the factual and procedural background of this matter, reference is made herein to the background as set forth in Gulf Stream Coach, Inc.'s Memorandum In Support of Motion *in Limine* to Limit Expert Testimony of Stephen Smulski, Ph.D. (Doc. 2349-2, pp. 1-2).

[2]    Williams confirmed that these are her only two opinions and that she is offering no further or additional opinions other than those.  Ex. "B," pp. 43-44.  Any other opinions by Williams should not be permitted.

cancer opinions are discussed at Section IV (*infra*) and her asthma opinions are discussed at Section V (*infra*). Each Section sets forth several bases that warrant the exclusion of her testimony on each topic.

## II.  WILLIAMS IS NOT QUALIFIED TO RENDER HER OPINIONS

The qualification of a witness as an expert, separate and apart from the witness' opinion, is a determination that is a discreet, independent and important requirement in considering the admissibility of an expert's testimony.  *See U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).  This analysis, as well as that pertaining to the reliability of an expert's opinion, is especially sensitive in cases "where the plaintiff claims that exposure to a toxic substance caused his injury, [because a] jury may blindly accept an expert's opinion that conforms with their underlying fears of toxic substances without carefully understanding or examining the basis for that opinion".  *See O'Conner v. The Commonwealth Edison Co*., 807 F.Supp. 1376, 1391(C.D.Ill. 1992).  *See also Whiting v. Boston Edison Co.,* 891 F.Supp. 12, 24 (D. Mass. 1995) (excluding proffered medical expert's opinion based on lack of knowledge and experience in analyzing causation of injury by radiation).

It has been held that a toxicologist is not qualified to offer an expert opinion regarding a chemical's ability to cause alleged damages where the toxicologist is not a licensed medical doctor and lacks experience in the study of exposures to the subject chemical.  *See Wintz by and through Wintz v. Northrop Corp.* 110 F.3d 508, 514 (7th Cir. 1997) (excluding expert's opinion based upon lack of qualification where the proffered toxicologist was not a physician and, despite acquiring generalized knowledge of the chemical at issue [bromide], the expert did not have experience in analyzing causation of injury by way of exposure to the chemical).

Courts have routinely refused to admit a proffered expert's testimony where the proffered expert, even despite a generalized or professed knowledge of issues arguably relevant to the subject matter, nevertheless lacked experience with the specific nature of the claims being litigated.  *See e.g. Kassim v. City of Schenectady,* 415 F.3d 246 (2nd Cir. 2005) (lack of knowledge of Arabic translation); *Adams v. Teck Cominco Alaska, Inc.,* 399 F.Supp.2d 1031 (D. Alaska 2005) (expert lacked experience with total dissolved solids technology at issue); *Morales v. E.D. Etnyre & Co.,* 382 F.Supp.2d 1252 (D.N.M. 2005) (lack of experience in distribution, sales and marketing practices); *In Re: Rezulin Products Liability Litigation*, 309 F.Supp.2d 531 (S.D.N.Y. 2004) (expert's opinion not based on qualification or experience but on subjective views of ethical standards at issue); *Lippe v. Bairnco Corp.,* 288 B.R. 678 (S.D.N.Y. 2003) (expert's opinion on business valuation excluded where expert had never performed a business valuation); *Montefiore Medical Center v. American Protection Ins. Co.,* 2003 WL 2110 8232 (S.D.N.Y. 2003) (expert lacked specific experience with building deterioration issues despite generalized expertise in field of construction); and *Teska v. Potlatch Corp.,* 184 F.Supp.2d 913 (D.Minn. 2002) (lack of current knowledge and experience with respect to crane operation).

In the present case, Williams is not qualified to render expert opinions regarding the plaintiffs' alleged exposure to formaldehyde and resultant damages therefrom. Williams is a toxicologist.  Ex. "B," pp. 250-253.  She has recently been precluded from offering medical opinions in *Ballard v. Bunge North America, Inc.,* 2008 WL 2185385, *3 (E.D. La. 5/22/08) (Barbie, J.)(rejecting Patricia Williams, Ph.D.'s opinion and granting defendants' Motion for Summary Judgment, stating that, "no other expert has made any diagnosis of occupational asthma, and no other expert has linked medical conditions to any inhalation of phosphine gas."). She is not a medical doctor, nor is she an epidemiologist or oncologist.  Ex. "C," Depo. Williams

(Class Certification), pp. 45-46. Her doctoral degree is an anatomy.  Id. p. 181.  Prior to her retention in this case, Williams had never rendered any opinions pertaining to formaldehyde exposure.  Ex. "C," pp. 30-31.

Williams has never authored any publications regarding health effects of formaldehyde exposure.  Id. p. 32.  Her "extensive experience" with formaldehyde is that, as an "anatomist," she has used formaldehyde in the past.  Id. p. 30.  Moreover, nowhere in her 42-page Affidavit does Williams recite any experience pertaining to the evaluation of health effects due to formaldehyde exposure.  Ex. "A," (in toto).  All that Williams has done to "qualify" herself as an expert in this case is review some published literature discussing formaldehyde and, from that, proclaim generalized theories of damage and causation.[3]  This exercise falls far short of that required to establish the qualification of Williams as an expert under Federal Rule of Evidence 702 sufficient to allow the admissibility of her opinions and testimony in this case.

## IIi.  <u>TRIAL COURT'S GATE-KEEPING ROLE REGARDING WILLIAMS' OPINIONS</u>

Federal Rule of Evidence 702 provides:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

In considering the admissibility of expert opinion and testimony, the trial judge must act as a gate-keeper to determine whether the expert's reasoning and methodology underlying the testimony is scientifically valid and whether that reasoning and methodology has been properly

---

[3]  In fact, Williams has not even read the plaintiffs' deposition transcripts or interviewed any of the plaintiffs. Ex. "B," pp. 224-226.

applied to the present case.  *See Daubert v. Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 593-595 (1993).  The general considerations guiding this role are: (a) whether the theory or technique can or has been tested; (b) whether the theory or technique has been subjected to peer review or publication; (c) the known or potential rate of error; (d) the existence and maintenance of standards and controls; and (e) whether the theory or technique is generally accepted by those who work in the field of expertise at issue.  Id. *See also Moore v. Ashland Chemical, Inc*., 151 F.3rd 269, 275-276 (5th Cir. 1998) (*en banc*).  The focus of the trial judge is to determine whether the testimony and opinions are not only relevant, but reliable.  *See Daubert*, 509 U.S. at p. 589.

In addition to the guiding principles set forth in *Daubert*, other factors relevant to the consideration of whether an expert's testimony and opinions are sufficiently reliable so as to allow their admission are as follows: (1) whether the expert is proposing to testify about matters growing naturally and directly out of the expert's research conducted independent of the litigation or whether the expert has developed the opinion expressly for the purpose of testifying in the litigation; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as she would be in her regular professional work outside of her paid litigation consulting; and (5) whether the field of expertise claimed by the expert is known to reach reliable results consistent with the type of opinion the expert is giving.  *See e.g. Kumho  Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore v. Ashland Chemical, Inc*., 151 F.3d 269 (5th Cir. 1998) (*en banc)*; *Sheehan v. Daily Racing Form, Inc.,* 104 F. 3d 940, 942 (7th Cir. 1997); *Daubert v. Merrill Dow Pharmaceuticals, Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*); and *Claar v. Burlington N.R.R.,* 29 F.3d 499 (9th Cir. 1994).

The opinions and testimony of Williams fail to exhibit such hallmarks of reliability and, as such, should not be admitted.  **Not only is she not qualified to render the opinions she has offered, her methodology is demonstrably result-oriented and geared solely for purposes of this litigation.**  To wit, Williams has brazenly and without justification run afoul of the recommended methodology of sanctioning bodies that she bases her opinions upon (i.e. the World Health Organization's International Agency for Research on Cancer ("IARC")), run afoul of plaintiffs' own (and arguably better-qualified) medical experts' proclamations regarding the state of knowledge pertaining to formaldehyde exposure and disease causation and has premised her opinion(s) upon the "linear-no safe level, no threshhold" methodology that has been rejected consistently in alleged toxic exposure cases.

## IV.  WILLIAMS' CANCER OPINIONS ARE UNRELIABLE

### A.  "No safe-level/linear no-threshhold" Damage Models Are Unreliable

Despite having testified under oath in a prior matter that smoking ten (10) cigarettes a day (half-pack a day) over an extended period would have no association with development of lung cancer, Williams offers the opinion that exposure to just one molecule of formaldehyde can cause damage at the body's molecular level that has the *potential* to develop into sinonasal, nasal, nasopharyngeal and/or upper respiratory tract cancer.  Ex. "B," pp. 47-50, 98-99.[4]  This opinion is unreliable for several reasons.

First, Williams testified that formaldehyde causes damage at the molecular level.  Id. pp. 48-49, 110-111, 133, 288.[5]  This "damage" *may* cause the transformation of a cell into a cancerous cell.  Id. pp. 98-99.  Her testimony was as follows:

---

[4]     Williams provided this testimony in deposition in the matter Akers v. Ciba-Geigy Corp., Docket No. 94-07647, District 5, Office of Workers' Compensation, State of Louisiana.  Ex. "D," Depo. Williams, pp. 49, 54.

[5]     In fact, Williams characterized the studies she relied upon for this opinion as "molecular epidemiology."

     A. One molecule at the *theoretical* level can cause the damage. It can also be repaired . . . *we are talking at the molecular level*. So *theoretically*, molecular level, one hit could *theoretically* cause the mutation. . .

          \*     \*     \*     \*

     A. . . . the *theoretical potential* is there, *if* the repair mechanisms fail, *if* the cell cycle timing of the hit is just that it isn't repaired . . . *there is no safe level*. Id. pp. 133-134 (emphasis added).

Suffice it to say, her opinion is not only problematic because it is based on subclinical, subcellular damage *potential*, but by her own words it is, at best, "theoretical" and based on numerous "ifs" and uncertainties.

     Second, she has premised her opinion on the idea that there is "no safe level" of exposure that won't result in such damage potential, regardless of exposure or dose. Id. pp. 134, 201-203. Indeed, Williams was unable and unwilling to even give a threshhold exposure level such that this cancerous progression is set in motion. Id. pp. 97-98, 127-132.[6]

     This "damage" model has been tried before and considered unacceptable. In *Dumontier v. Schlumberger Technology Corp.*, 543 F. 3rd 567, 570 (9th Cir. 2008), the court held:

> We next consider whether the term "bodily injury" in the Act includes subcellular damage. Plaintiffs argue that the slightest exposure to radiation damages cells by denaturing proteins and modifying DNA. This, they argue, qualifies as bodily injury under the Act. But not every alteration of the body is an injury. Thinking causes synapses to fire and the brain to experience tiny electric shocks; fear stimulates the production of chemicals associated with the fight-or-flight response. All life is change, but all change is not injurious. Adopting plaintiffs' interpretation of bodily injury would render the term surplusage, as every exposure to radiation would perforce cause injury.

The court went on to explain that "this damage does not establish that there is or will be pain or interference with bodily functions and thus isn't an injury within the meaning of the Act." Id. at 571. *See also Parker v. Wellman,* 230 Fed. Appx. 878, 882-883 (11th Cir. 2007) (holding that

---

[6]   Id. pp. 106, 110-111.
Williams testified similarly in her class certification deposition –i.e. that damage may occur at only the molecular level, regardless of exposure concentration, and that no symptoms may manifest. Ex. "C," pp. 102, 125, 134, 136, 231-236.

subclinical injury does not constitute actionable "damage"); *Ranier v. Union Carbide Corp*., 402 F.3d 608, 618-622 (6th Cir. 2005); *Schweitzer v. Consol. Rail Corp.,* 758 F.2d 936, 942 (34rd Cir. 1985); *Laswell v. Brown*, 683 F.2d 261, 269 (8th Cir. 1982); and *Eagle-Picher Indus, Inc. v. Liberty Auto Ins. Co*., 682 F.2d 12, 19-20 (1st Cir. 1982).

This "no threshhold/no safe-level" methodology has also been soundly rejected. In fact, it has been held that it "**fails all of the <u>Daubert</u> reliability factors**." *See Whiting v. Boston Edison Co.,* 891 F.Supp. 12, 25 (D.Mass. 1995) (emphasis added). Therein, plaintiff's experts espoused opinions that low dose exposure to radiation could trigger events leading to the development of acute lymphocytic leukemia (ALL) and the court, in excluding such opinions, held as follows:

> I find that the opinion…that low doses of nuclear radiation…can cause ALL is not based on scientific knowledge, but is grounded on speculation shaped by result-oriented biases.  The linear non-threshold model cannot be falsified nor can it be validated.  To the extent it has been subjected to peer review and publication, it has been rejected by the overwhelming majority of the scientific community.  It has no known or potential rate of error.  It is merely an hypothesis.  In sum, it has no capacity to be of assistance to a jury in resolving the ultimate issues in this case.  <u>Id</u>.

Other courts have also precluded such opinions based upon this model providing that opinions based upon it are "flatly rejected as mere hypothesis." *See e.g.  Parker v. Mobil Oil Corp.,* 793 N.Y.S. 2d 434, 438 (2d Dep't 2005); *Willis v. Amerada Hess Corp.,* 2002 WL 140542, *14 (S.D.N.Y. 2002); and *Sutera v. Perrier Group*, 986 F.Supp. 655, 666 (D.Mass. 1997).  All that a "no safe exposure" opinion implies is that any increase in exposure increases the risk of injury – it says nothing at all about how great the increase is nor does it imply that the exposure-related increase is significant when compared to the background risk of injury or injury due to other factors.

As Williams bases the entirety of her opinion regarding formaldehyde's role in the causation of cancer upon "damage" definitions and "non-threshhold/no-safe level" models, all of which have been rejected scientifically and legally, Williams should be precluded from offering any opinions or testimony regarding formaldehyde and causation of cancer.

### B.  Williams' Causation Opinion Lacks Evidentiary and Scientific Support

Williams states that formaldehyde exposure, at any level, has the potential to cause a variety of cancers.  Dr. Christopher DeRosa, MS, Ph.D. (an environmental health scientist for the CDC's Agency for Toxic Substances and Disease Registry ("ATSDR")) (who has not been retained by either plaintiffs or defendants), as well as plaintiffs' own expert epidemiologist and statistician, Dr. Gerald McGwin, MS, Ph.D., both testified that the IARC classification of formaldehyde as a known carcinogen is based primarily on a scientific study from the American Journal of Epidemiology entitled "Mortality from Solid Cancers among Workers in Formaldehyde Industries." Ex. "E," Depo. McGwin, pp. 223-224; Ex. "F," Depo. DeRosa, pp. 256-57.  McGwin testified that while formaldehyde plays an etiologic role with respect to leukemia, lung cancer, pancreatic cancer, and brain cancer, the only cancer confidently associated to formaldehyde is nasopharyngeal cancer.  Ex. "E," p. 15-18.  Significantly, that study concluded that there was **no association** between formaldehyde and nasopharyngeal cancer below a peak exposure of **four thousand parts per billion (4,000 ppb)**. Ex. "G," Hauptmann, M. (et al.), *Mortality from Solid Cancers among Workers in Formaldehyde Industries*, 159 Am. J. Epid. 1117 (2004); Ex. "E," p. 21; Ex. "F," pp. 257-58 (emphasis added).[7] Furthermore, the median duration of exposure in the study was 35 years.  Ex. "G," p. 1119.  This dose and duration of exposure far exceed the dose and duration experienced by Cooper –

---

[7]     Despite Drs. McGwin's and DeRosa's confirmation of the basis of the IARC classification, Williams disagreed that the IARC classification was based on this data.  Ex. "B," p. 51.

indicating clearly that there is a real lack of scientific support for the proposition that formaldehyde exposure at the levels at issue in this case could be associated with cancer.[8]

The above is precisely why plaintiffs' expert epidemiologist and statistician McGwin **could not associate** nasopharyngeal cancer to formaldehyde at the levels allegedly present in Cooper's EHU.  Ex. "E," pp. 131-132 (stating that he could not associate nasopharyngeal cancer to the formaldehyde levels identified in the EHUs by the Center for Disease Control (which measured levels as high as 590 parts per billion)).  McGwin agreed that, even at those levels, the epidemiology does not provide for an association with this form of cancer.  Id.  Indeed, even plaintiffs' environmental medicine expert, Dr. James Kornberg, testified that "not one human being" can draw the conclusion that an epidemiological basis exists to confirm that formaldehyde causes nasopharyngeal cancer at the levels allegedly at issue in this case.  Ex. "I," Depo. Kornberg, pp. 165-166.  Williams herself is unwilling and unable to provide an opinion as to what exposure levels are sufficient to trigger any cancerous process due to formaldehyde exposure.  Ex. "B," pp.  97-98, 127-132.  Such a shortcoming has actually provided the basis for the Fifth Circuit Court of Appeal to affirm the exclusion of general causation opinions offered by toxicology experts.  *See Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 278-279 (5th Cir. 2007).

Thus, plaintiffs' own environmental medicine expert (Dr. Kornbergy) and epidemiology expert (Dr. McGwin), as well as the ATSDR's environmental health scientist (DeRosa), agree that the only cancer to which formaldehyde has been reported on as having an association is nasopharyngeal cancer; however, they further agree that the scientific literature does **not** support the causation of same at the levels measured, at any time, in the plaintiffs' EHU. As the scientific

---

[8]    The levels noted in the scientific study even exceed the formaldehyde monitoring results obtained in May 2009, which the Court has struck. Ex. "H," Aff. of William D. Scott (5/18/09). The highest test result obtained at that time was 1100 ppb when the indoor temperature of the EHU was just shy of 92 degrees Fahrenheit. Id. at 7.

and evidentiary premise upon which Williams bases her opinions regarding formaldehyde exposure and causation of cancer are completely lacking, particularly as applies to the facts of this case, Williams should be precluded from offering any opinions or testimony regarding formaldehyde and causation of cancer.

### C.  Williams Failure to Consider Negative Studies Is A Fatal Error in Methodology

The reason why Williams can't and won't acknowledge what plaintiffs' own environmental medicine and epidemiology experts (McGwin and Kornberg), as well as the ATSDR's environmental health scientist (DeRosa), have proclaimed above (the lack of association between cancer and formaldehyde exposures at levels at issue in this matter) is that **Williams does not and did not consider any negative studies**.  This is fatal to any expert's opinion, particularly where (as here) that opinion is based primarily if not entirely upon a review of the published scientific literature.

Negative studies are studies that show little or no indication of an association between an exposure and cancer (*infra*).  Williams flatly stated that negative studies are "**meaningless**."  Ex. "B," pp. 240-241.  In fact, she testified at the class certification hearing, that:  "If you're looking for epidemiology, you've got to find positive studies. . . I chose were (sic) articles that would prove and showed an association.  Since epidemiology is by design, **negative studies are meaningless**."  Ex.  "J," Class Certification Hearing, pp. 78-79.[9]  Making the point even more clearly, Williams testified that, in regard to negative studies, ". . . when I was going through my stuff**, I pitch them**. . ."  Ex. "B," p. 181.  In her entire 42-page Affidavit, Williams admitted that there is no discussion of even one negative study.  Id. p. 182.  All this despite her repeated

---

[9]     Williams testified in her deposition in this matter that she would change nothing in her testimony given by deposition during the class certification phase or at the class certification hearing of this matter.  Ex. "B," pp. 42-43.

testimony that in rendering a general causation opinion, one must look to "whatever evidence exists," "look at all the data" and that a "causal opinion looks at everything."  Id. pp. 92, 95, 209.

Defending herself on this point, Williams testified at the class certification hearing that IARC agrees with her regarding the non-value of negative studies and that they need not be considered.  Ex. "J," pp. 78-79.  Recall that IARC is the very agency that she relies upon in support of her opinions that there exists an association between cancer and formaldehyde exposure.  Here is what IARC actually says regarding negative studies and their significance:

> "When several epidemiological studies show little or no indication of an association between an exposure and cancer, the judgment may be made that, in the aggregate, they show evidence of lack of carcinogenicity."

Ex. "K," World Health Organization – International Agency for Research On Cancer, IARC Monographs on the Evaluation of Carcinogenic Risks To Humans – Formaldehyde, 2-Butoxyethanol and 1-tert-Butoxypropan-2-Ol (Vol. 88, 2006: Lyon, France), p. 17.

This is the official position of IARC and "represents the views and expert opinions of an IARC Working Group on the Evaluation of Carcinogenic Risks to Humans" as of its publication in 2006.  Id. p. (i).[10]  When confronted with this precise quote, **Williams disagreed and stated further that anybody who adhered to that mandate would be practicing "tragic science."**  Ex. "B," pp. 176-177.  She continued, stating that such a principle is "scientifically not correct" and that it is "not an acceptable, statistical conclusion."  Id.  Putting not too fine a point on the issue, Williams responded to this revelation by not only belittling it as above, but by going the extra step and proclaiming: "I think that's a very dangerous statement . . . so no, I don't agree with that."  Id. pp. 174-175.  Plaintiffs' own environmental medicine expert, Dr. James Kornberg, even agreed that any expert who felt negative studies were meaningless would be a "crank."  Ex. "I," p. 113.

---

[10]    In addition to IARC, epidemiology textbooks discuss the importance of considering negative studies and contain entire sections addressing same.  See e.g. Ex. "K-1," "Interpretation of Data With No Association Between Exposure and Disease," Richard R. Monson, Occupational Epidemiology 89 (2nd Ed. 1990).

The importance of negative studies can not be understated.  It has been observed that:

> . . . to ensure reliable methodology, rather than a mere conclusion-oriented selection process that weighs more heavily those studies that support an outcome, there must be a scientific method of weighting that is used and explained.  *See Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 607 (D.N.J. 2002).

In *Magistrini*, the court discredited the plaintiff's expert, Dr. Ozonoff, who offered the opinion that the plaintiff's leukemia was due to his exposure to PCE.  Dr. Ozonoff based his opinion on his review of the published scientific literature on the subject and concluded that there existed sufficient evidence of association.  Id.  The court excluded Dr. Ozonoff's opinions because it found that he had "not sufficiently discredited other studies that found no association or negative association . . . nor sufficiently explained why he did not accord weight to those studies."  Id.  Dr. Ozonoff provided no basis for completely discounting or failing to consider studies that did not show an association (i.e. negative studies) and the only studies he chose to present and rely upon were those that did suggest an association between leukemia and PCE exposure.  Id. p. 608.

This is exactly what Williams has admitted she did in this case.  In fact, her only rationale for not considering the negative studies that supported the opinions of plaintiffs' own experts McGwin and Kornberg, as well as that of ATSDR's DeRosa (discussed *supra*), was that such studies are "meaningless" - without explanation.  This exercise removes Williams' opinion as one that would be based on reliable methodology and, instead, renders it one of nothing more than "result-oriented judgment."  Id.

As Williams has admittedly failed to employ reliable methodology in conducting her literature review that forms the basis of her opinion, Williams should be precluded from offering any opinions or testimony regarding formaldehyde exposure and causation of cancer.

### D.  Misuse of Epidemiological Data

Another flaw to Williams' methodology is her cavalier approach to using and applying epidemiological data (probably because she is not an epidemiologist).  First, a short background on the proper use of epidemiological papers by various courts is set forth.  The Fifth Circuit has recognized the value of epidemiological studies in cases such as this.  *See Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 311 (5th Cir. 1989).  "Epidemiology attempts to define a relationship between a disease and a factor suspected of causing it."  Id.  To define that relationship, an epidemiologist examines the general population, comparing the frequency of the disease among those people exposed to the factor to those not exposed.  Id.  The epidemiologist then uses statistical methods and reasoning to draw a biological inference between the factor and the disease's etiology.  Id.[11]

One difficulty with epidemiologic studies is that often several factors can cause the same disease.  Id.[12]  Studies incorporate the possibility of these other factors by using a "confidence interval."  Id. at 312.  The confidence interval is a common sense mechanism upon which statisticians rely to confirm their findings and to lend persuasive power within their profession.  *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1353 n.1 (6th Cir. 1992).  It has two components: a percentage and an interval.  Id.  The percentage is often set at 95 percent.  Id.  The interval represents a range of possible values at high and low ends of a scale of "relative risk."  Id.  At a 95 percent interval, the relative risk value will be between the high and low ends of the confidence interval 95 percent of the time.  Id.

---

[11]    *See* A. Lilienfeld & D. Lilienfeld, Foundations of Epidemiology 3 (2d Ed. 1980).

[12]    Indeed, Patricia Williams, Ph.D. admits that each of the symptoms reported by claimants can be caused by something other than formaldehyde.  *See* Exhibit "C," Depo. Williams (class cert. case), at pp. 101-102.

That, of course, begs the question of how to define "relative risk."  The relative risk is a number that describes the increased or decreased incidence of the disease in question in the population exposed to the factor as compared to the control population not exposed to the factor. *See Brock* (*supra*)**,** 874 F.2d at 312.  A relative risk of 1.0 means that the incidence of disease in the two groups was the same.  Id.  A relative risk greater than 1.0 means that there was a higher incidence of disease in the group exposed to the factor.  Id.

Just because an epidemiological study concludes that a relative risk is greater than 1.0, it does not establish that the factor caused the disease.  Id.  If the confidence interval is so great that it includes the number 1.0, then the study will be said to show no statistically significant association between the factor and the disease.  Id.  So, if a study concluded that the relative risk for a disease was 1.30, but the confidence interval was from 0.95 to 1.82, then no statistically significant conclusions could be drawn from this study because the relative risk, when adjusted by the confidence interval, includes 1.0.  Id.

In this case, Williams has not followed the tenets of sound epidemiological science.  For example, one of the Hauptmann studies she relied upon recited an association of formaldehyde exposure with a relative risk of 2.10 (noting at 95% confidence an interval of 1.05 – 4.21).  Ex. "A," p. 28 (Sec. 10.0); Ex. "B," pp. 54-55.  Interestingly, a footnote in this study recites that the exact confidence interval was .91-4.14.  Ex. "B," pp. 56-57.  Being that the confidence level includes the "null," 1.0, it is deprived of statistical signifance.  *See Brock (supra).*  Williams response to that is to simply reduce the confidence interval to 90% from the original (and ideal) standard of 95% so that the interval can be recalculated so as not include the "null" or 1.0.  Ex. "B," p. 57.

Williams approach of simply knocking down the confidence interval so that an interval that does not include anything at 1.0 or below is unacceptable as reliable methodology. Indeed, this very issue was presented in *Brock (supra)*. Her suspect or proposed "re-analysis" of the study's results at a lower confidence interval so that the "null" is avoided (which would otherwise render the study's results not statistically significant) has not been subjected to peer review nor has it been published for analysis. *See Brock (supra)* at p. 313 (citing *Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985). On-the-spot re-analysis of studies has also been rejected in *Richardson by Richardson v. Richardson-Merrell, Inc*., 857 F.2d 823, 831 (D.C. Cir. 1988) and *Lynch v. Merrell National Laboratories*, 830 F.2d 1190, 1194 (1st Cir. 1987). This further demonstrates that Williams is out of her league but willing to do whatever it takes to support her result-oriented opinions.

### E.  Conclusion Regarding Cancer Opinions

Based on the foregoing, Williams should be precluded from offering any opinions or testimony regarding formaldehyde exposure and causation of cancer. Williams is not qualified to render such opinion testimony. Moreover, her opinions on this subject are based upon unsound methodology, are result-oriented and lack scientific or evidentiary bases.

## V.  WILLIAMS' ASTHMA OPINIONS ARE UNRELIABLE

### A.  Nature of Williams Asthma Opinions

Williams 42-page Affidavit and deposition testimony waiver between opinions that formaldehyde exposure *causes* asthma and/or *exacerbates* pre-existing asthma (she appears to use the concepts interchangeably). In any event, Williams' opinions regarding formaldehyde exposure and causation or exacerbation of asthma should be precluded as she lacks qualification

to give them (as discussed at Section II (*supra*)) and/or they are based upon unreliable methodology.

### B.   Opinions Regarding *Causation* of Asthma Should Be Excluded

As an initial matter, any opinions that formaldehyde exposure *causes* onset of asthma are irrelevant and present an unnecessary waste of time and resources and will only lead to jury confusion on collateral issues.  It is not disputed that Christopher Cooper had pre-existing asthma before occupying the subject trailer.  Ex. "L," Depo. Pacheco, pp. 11, 41, 54, 57 (his pre-existing asthma described as "significant," "long-standing," and "poorly treated" – all prior to Hurricane Katrina).[13]  Many of Williams' opinions/testimony and studies she relied upon concern the causation/onset of asthma – not exacerbation.

As this case does not present one in which causation or onset of asthma is at issue (since Cooper had asthma for years before occupying the subject trailer), Williams' opinions and testimony regarding formaldehyde exposure and causation/onset of asthma should be precluded.

### C.   Opinions Regarding *Exacerbation* of Asthma Should Be Excluded

Williams offers the opinion that there are three means by which asthma can be induced in humans: (1) IgE mediated asthma (caused by irritant exposure to trigger IgE sensitization) resulting in bronchoconstriction and airway hyper-reactivity; (2) trigeminal-vagal nerve reflex due to irritant exposure resulting in bronchoconstriction and airway hyper-reactivity; and (3) dysregulation of nitrogen oxide synthase (NOS) due to irritant/formaldehyde exposure resulting in bronchoconstriction and airway hyper-reactivity.  Ex. "B," pp. 144-147, 264-266.[14]  Any

---

[13]     Dr. Pacheco is plaintiffs' expert, licensed and board certified in allergy and immunology, internal medicine and occupational medicine.  Cooper was diagnosed with asthma at age 3, in 1999, six years before Hurricane Katrina. Id. p. 11.

[14]     Williams offers these three mechanisms also apparently as causative of onset of asthma; however, as stated in the prior section, onset of asthma is not an issue in this case.

opinions in this regard should be excluded as either not evidentiary or scientifically based or not based on reliable methodology.

(1).  IgE-mediated Exacerbation of Asthma – No Evidentiary Support

Williams offers the opinion that asthma may be exacerbated by way of IgE sensitization due to an allergic-type response triggered by exposure to an irritant (i.e. formaldehyde) that can lead to bronchoconstriction.  Ex. "B," p. 147.  Plaintiffs' experts and licensed physicians, Dr. James Kornberg and Dr. Karin Pacheco, both testified and agreed that Cooper did not and does not have IgE-sensitized or IgE-mediated asthma (and thus is not prone to IgE-mediated exacerbation of his pre-existing asthma).  Ex. "I," Depo. Kornberg, pp. 60, 62, 64, 82, 270; Ex. "L," Depo. Pacheco, pp.  38, 66.

As it is not disputed that Cooper did not have IgE-mediated asthma, and is thus not susceptible to IgE-mediated exacerbation of asthma, any opinions or testimony by Williams regarding IgE-mediated exacerbation of asthma should be excluded as not based upon evidentiary support and, in addition, likely to result in undue waste of time and resources as well as jury confusion on a collateral matter.

(2).  Trigeminal-Vagal Nerve Reflex and Nitrogen Oxide Synthase Exacerbation of Asthma – Lack of Scientific and/or Evidentiary Support

Williams offers the opinions that asthma may be exacerbated by irritant (i.e. formaldehyde) exposure either (a) innervating the trigeminal nerve (nasal area) and vagal nerve (lower respiratory area) such that bronchoconstriction occurs or (b) dysregulation of nitrogen oxide synthase (NOS – an enzyme) resulting in bronchoconstriction.  Ex. "B," pp. 144-147. These opinions and testimony should be excluded as they are, at best, novel theories not yet proven by accepted scientific study.

For example, when questioned as to the existence of scientific support for the NOS theory, Williams was anything but helpful (referring to what little published literature on the topic there is as "stories"):

> Q.   And in your mind, the increased nitric oxide is beyond the theoretical stage and it has been proven, correct?
>
> A.   There are quite a number of **stories** – journal articles that are documented (sic) the nitric oxide.  The exact step one, two, three, through ten of how it does it is not known.  <u>Id</u>. p. 149 (emphasis added).

Further proof of this unproven theory exists by way of a study, noticeably absent from Williams materials and testimony, done by Franklin (et al.) and discussed by plaintiffs' expert epidemiologist, Dr. McGwin.[15]

The Franklin study looked specifically at nitric oxide levels in children living in homes with various formaldehyde levels. While the study did report an increase in nitric oxide levels in the children, as Dr. McGwin testified, there was no association made between formaldehyde levels and pulmonary function tests. Ex. "E," p. 194. In fact, the study could not conclude the presence of any pulmonary effect or inflammatory response (of which nitric oxide is a marker) in humans at formaldehyde levels lower than 5 ppm (equal to 5,000 ppb) – levels exponentially greater than any at issue in this case.  Ex. "M," p. 1758.

As these theories are just that, theories (or as Williams referred to them, "stories"), that are novel and yet unproven, any testimony or opinions by Williams regarding either mechanisms as possible exacerbating factors for asthma should be excluded.

---

[15]    Ex. "M," Franklin, P. (et al.), <u>Raised Exhaled Nitric Oxide in Healthy Children Is Associated With Domestic Formaldehyde Levels,</u> Am. J. Respir. Crit. Care Med., Vol. 161 (pp.  1757-1759) (2000).

(3).   <u>Williams Failure to Consider and Account for Negative Studies is Unreliable</u>[16]

Williams disregarded and failed to account for several studies that show a lack of association between formaldehyde exposure and asthmatic conditions.  Ex. "B,"  pp.  166-174, 182, 310.  The Court will recall that Williams does and did not consider these studies as they are "meaningless."  Significantly, each of the negative studies Williams refused to consider were experimental studies – considered the "gold standard" of studies by plaintiffs' expert epidemiologist Dr. McGwin – types of studies that Williams herself reveres as "direct science."  Ex. "B," p. 206; Ex. "E," pp. 22-23.  Not surprisingly, not one study offered by Williams to *support* her asthma opinions was an experimental study.

For example, Williams was presented with the Krakowiak study.  Ex. "B," p. 166.  This study was a "controlled chamber" study representing a direct experimental study.  <u>Id</u>.  pp. 166-174, 206.[17]  The results showed that subjects exposed to .410 ppm (410 ppb) of formaldehyde - exponentially higher levels than those at issue herein - did not experience any asthmatic response (subjects were selected as having pre-existing asthma, much as would plaintiff Christopher Cooper).  <u>Id</u>; Ex. "N," pp. 274, 280. While the study was looking for an IgE-mediated exacerbation of asthma (which it did not find), the study found no exacerbation of any asthmatic response (i.e. thus ruling out exacerbation by way of NOS or trigeminal-vagal nerve reflex as well).

Williams also did not consider the Frigas/Reed experimental study.  Ex. "B," p. 174.[18] This study looked for effects, if any, of formaldehyde exposure on subjects with asthma at

---

[16]        Reference is made herein to Section IV(C)(*supra*) for discussion of the importance of an expert's consideration (or lack thereof) of negative studies in rendering a causation opinion.

[17]        Ex. "N," Krakowiak, A. (et al.), <u>Airway Response to Formaldehyde Inhalation in Asthmatic Subjects With Suspected Respiratory Formaldehyde Sensitization</u>, Am. J. Indust. Med., Vol. 33 (274-281) (1998).

[18]        Ex. "O,"Frigas, E. (et al), <u>Bronchial Challenge With Formaldehyde Gas: Lack of Bronchoconstriction in 13 Patients Suspected of Having Formaldehyde-Induced Asthma</u>, Mayo Clin. Proc., Vol. 59 (295-299) (1984).

exposure concentrations of .100 – 3.0 ppm (100 – 3,000 ppb) – exponentially greater than any levels at issue in this case. Ex. "O," p. 295. The study concluded that **"In no case were we able to substantiate that exposure to formaldehyde gas (3.0 ppm or less) was indeed causing or aggravating asthmatic symptoms."** Id. pp. 295, 299 (emphasis added). A very interesting point about this study is that it actually appears just one entry before the Hendrick & Lane (1977) study relied upon by Williams as evidenced by the printout of Williams' INCHEM literature search results. Ex. "P," INCHEM Search Results (p. 112 of 171 – attached as Ex. "20" to Williams' deposition in this matter). She must have missed it.

Williams also did not consider (nor is it cited anywhere in her materials) the Uba study.[19] This experimental study reported on formaldehyde exposures of asthmatic and healthy medical students at exposure levels of .050 ppm to .930 ppm (50 – 930 ppb) over a seven (7) month period (with averages over two months of .600 ppm - .800 ppm (600 ppb – 800 ppb)) – levels much greater than any at issue in this case. Ex. "Q," p. 94. The study reported that **". . . there was no pattern of bronchoconstriction in response to exposure after either 2 weeks or 7 months"** and, that of those subjects with asthma, **". . . they were no more likely to have symptoms of respiratory irritation or changes in pulmonary function than those without such a history. These findings are consistent with previous case reports that indicate exposure to formaldehyde vapor at levels that are commonly encountered in occupational and residential settings do not commonly cause significant bronchoconstriction, even among subjects with preexisting asthma."** Id. p. 91.

Williams ignored, failed to consider and/or failed to account for (or just "pitched") the three experimental studies (the "gold standard") constituting "direct evidence" (her words) of a

---

[19]    Ex. "Q," Uba, G. (et al.), Prospective Study of Respiratory Effects of Formaldehyde Among Healthy and Asthmatic Medical Students, Am. J. Indust. Med., Vol. 15 (91-101) (1989).

lack of association between formaldehyde exposure at even extremely high concentrations and exacerbation of asthma.  Her opinions, therefore, are clearly revealed for what they are: result-oriented judgments designed for a specific courtroom objective.  As her opinions regarding exacerbation of asthma are empirically devoid of scientific and evidentiary support, Williams should be precluded from offering any such testimony.

## VI.  CONCLUSION

Based on the foregoing, Gulf Stream Coach, Inc. respectfully asks that this Court enter an Order precluding Patricia Williams, Ph.D., DABT, from offering the following opinions:

a.  Formaldehyde exposure causes, in any way, any form of cancer, including but not limited to nasopharyngeal, sinonasal, nasal or upper respiratory tract cancer;

b.  Formaldehyde exposure causes or precipitates, in any way, the onset of asthma/broncho-constriction; and

c.  Formaldehyde exposure exacerbates or aggravates, in any way, asthmatic conditions in pre-existing asthma.

Respectfully Submitted:

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER & WEINSTOCK**

s/Andrew D. Weinstock

_____
**ANDREW D. WEINSTOCK #18495
JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
(504) 832-3700
(504) 837-3119 (FAX)
andreww@duplass.com
jglass@duplass.com

and

SCANDURRO & LAYRISSON
Timothy D. Scandurro #18424
Dewey M. Scandurro #23291
607 St. Charles Avenue
New Orleans, LA 70130
(504) 522-7100
(504) 529-6199 (FAX)
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc.**

## C E R T I F I C A T E

I hereby certify that on the 25th day of August, 2009, a copy of the foregoing

Memorandum in Support of Gulf Stream Coach, Inc.'s Motion *in Limine* to Exclude Expert

Testimony of Patricia M. Williams, Ph.D., DABT was filed electronically with the Clerk of

Court using the CM/ECF system.  Notice of this file will be sent to liaison counsel by operation

of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com