UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE PRODUCTS | * | |
| | LIABILITY LITIGATION | * | SECTION "N" (5) |
| | | * | |
| | | * | JUDGE ENGELHARDT |
| | | * | MAGISTRATE CHASEZ |
| | | * | |
| THIS DOCUMENT IS RELATED TO | | * | |
| | | * | |
| *Charlie Age, et al v. Gulf Stream Coach* | | * | |
| *Inc., et al*, Docket No. 09-2892; | | * | |
| Alana Alexander, individually and on behalf | | * | |
| of Christopher Cooper | | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |

**THIS DOCUMENT IS RELATED TO**

*Charlie Age, et al v. Gulf Stream Coach Inc., et al*, Docket No. 09-2892;
Alana Alexander, individually and on behalf of Christopher Cooper

* * * * * * * * * * * * * * * * * * * * * * * *

## AFFIDAVIT OF ALEXIS MALLET, JR

**STATE OF LOUISIANA**
**PARISH OF LAFAYETTE**

**BEFORE ME**, the undersigned authority, on this day, personally appeared:

**Alexis Mallet, Jr.**

Who, first being sworn, upon her oath deposed and stated that the information contained in the attached report is true and accurate to the best of his knowledge.

_____
Alexis Mallet, Jr.

Sworn to and subscribed
before me this 19th day of May, 2009.

_____  #: 21560/
NOTARY PUBLIC

My commission expires _____

ALX-EXP-44-000001

# First General Services of the South, Inc.

*Insurance Repair Specialists*

P. O. Box 80857, Lafayette, LA 70598-0857 Phone: (337) 988-3556
103 Bradbury Crossing, The Village of River Ranch, Lafayette, LA 70508 Fax: (337) 988-1264

May 19, 2009

Re:   FEMA Trailer Formaldehyde Products Liability Litigation
United States District Court
Eastern District of Louisiana

Aldridge, et al. V. Gulf Stream
Coach, Inc., et al.

MDL No. 1873 Section N(5)

Judge Engelhardt

No. 07-9228

## PREAMBLE

In accordance with your request, this organization made onsite inspections, observations and an evaluation to determine the following:

1.   Was the use of the trailer by the Alexanders, as it was set up by FEMA and its contractors, a reasonably anticipated use, such that Gulf Stream should have reasonably expected it to be used in this manner given its alterations made by FEMA and others and its deployment to the gulf coast of Louisiana?

2.   Were the elevated levels of formaldehyde recorded and documented in the trailer occupied by Alena Alexander, Erica Alexander and Christopher Cooper arising from an unreasonably unsafe condition as a result of its design, construction, inadequate warnings and/or the trailer's failure to conform to an express warranty of Gulf Stream, the manufacturer?

3.   Could the trailer have been designed or constructed differently by Gulf Stream, such that it would have served the same purpose and posed less danger to the occupants?

ALX-EXP-44-000002

4.    Did Gulf Stream provide any warnings about the dangers of formaldehyde?

5.    Did Gulf Stream provide any instructions with the trailer as to the mitigation of formaldehyde emissions?

6.    Gulf Stream had a policy of using some low formaldehyde risk products. Did they have a quality control policy or quality assurance policy or procedure in place to ensure their suppliers of wood products were actually providing them with the specified low formaldehyde emission products?

7.    Did Gulf Stream learn of the source of formaldehyde levels in their FEMA trailers after the manufacture and setup?

8.    Assuming Gulf Stream obtained the knowledge of excessive formaldehyde levels in their trailers occupied by Hurricanes Katrina and Rita victims, did they warn Ms. Alexander of the issue and provide her any instructions as to how to mitigate formaldehyde emissions in her trailer?

9.    Have changes been made in the specifications for the procurement of FEMA temporary housing units?

The parameters of this report are limited to onsite observations, review of documents provided, review of documents researched, review of the FEMA trailer in question and interviews with various individuals.

## BACKGROUND INFORMATION

It is understood that the Alexander's family home located at 4415 Dale Street, New Orleans, Louisiana 70126 was severely damaged by flooding and tornadic/hurricane wind forces on or about August 29, 2005 with the passage of Hurricane Katrina subsequently making the house unliveable.

1.     The house was occupied at the time of Hurricane Katrina by Alana M.

Page -2-

ALX-EXP-44-000003

Alexander, Erica M. Alexander and Christopher Cooper.  The house subsequently had to be demolished.

2.  Slightly over a week after Hurricane Katrina destroyed their home, the Alexanders applied for disaster assistance on September 8, 2005.

3.  Her FEMA application was declined on October 2, 2005.

4.  Ms Alexander appealed the FEMA decision on November 28, 2005.

5.  The appeal was declined on December 30, 2005.

6.  A second appeal to FEMA was declined on February 3, 2006.

7.  It appears that Ms. Alexander appealed the decision again and assistance was approved on April 6, 2006.

8.  FEMA approved living accommodations for the Alexander family. The accommodations came in the form of a FEMA model travel trailer known as a temporary housing unit (THU).

9.  The temporary housing unit furnished by FEMA was one that FEMA contracted with Best Buy RV for travel trailers to be occupied as housing units on December 9, 2004.

10.  According to the data plate located on the tongue side of the trailer near the front right corner, the trailer was manufactured by Gulf Stream Coach, Inc. The date the trailer was manufactured was December 13, 2004. The vehicle I.D. number is 1NL1GTR2551021783. The vehicle type is an MPV CVDH.  The Gulf Stream serial number is 57-5-T-CVDH-21783.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph Nos. 19, 20 and 21.

11.  According to information on the tongue side of the trailer, the following identification marks were noted and documented:

Page -3-

a.   1041407 - the identifying dealer for the trailer is Best Buy RV's of Richmond, Indiana;

b.   1041407;

c.   G52;

d.   L 11 53;

e.   FG103012 (This is a bar code.);

f.   The tongue of the trailer had the numbers 1041407;

g.   A stamped identification mark was noted on the tongue of the trailer (That stamp number appeared to be 57-5-T-CVDH-21783);

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 14, 15, 16.

h.   The only other identifying name noted on the tongue end of the trailer is the name Cavalier.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph No. 23.

i.   Other labels were observed on the front of the trailer at the left of the exterior door.   The first label is an electrical plumbing, heating and fire safety certification for travel trailer and fifth wheel. The label states the "**manufacturer certifies compliance with standards for recreational vehicles ANSI A119.2 and Recreational Vehicle Association RVI**." (Emphasis added.) The identification number S1517151 is stamped on the label.   The manufacturer is certifying that their produce has been built in compliance with the ANSI codes and standards.   This will be discussed further in the report.

Please see Enclosure 1a, First General Services of the South, Inc.'s

Page -4-

Photograph No. 27.

    j.      On the left license plate end of the trailer the identifying numbers 1041407 were noted.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs No. 46 and 47.

12.    The FEMA temporary housing units were apparently constructed as per the minimum procurement specifications for FEMA Model Travel Trailers, dated August 12, 2004.

The standards state that "the travel trailers being procured under this contract are for the purpose of providing temporary housing. The units are subjected to continuous road travel, multiple installations and deactivations, and various weather conditions. The standards shall not be considered restrictive in that the supplier may provide equal or better units considering that the competitive price and delivery requirement can be met."

The construction outfitting standards identify minimum square footage of living space, floor plan configuration, finishes, finishing and environmental living conditions necessary to provide emergency housing for disaster relief operations. All exterior openings, such as windows, doors, drain pipes, etc...will be caulked with a clear, non-hardening waterproof sealant to prevent air and moisture penetration.

The units shall meet industry standards except where identified.

The specifications establish the minimum standards for travel trailer construction and outfitting to meet FEMA contract requirements. "The manufacturer shall design and construct all units under this contract within a superior grade quality of workmanship."

On page two of four of the Procurement Specifications, the trailer occupied by the Alexander family was to be constructed without a holding tank and the sewer lines were to be extended for external

Page -5-

ALX-EXP-44-000006

hookup.  The indications are this trailer was specified to be constructed for long-term use and not for recreational short-term use.

Please see Enclosure 2, FEMA Model Travel Trailer Procurement Specifications, dated August 12, 2004, page four of four, Bate Stamped: Forest-0002505, 0002506, 0002507 and 0002508.

13.     The Alexander trailer was delivered to Best Buy R.V. in Punta Gorda, Florida on or about December 14th or 15th, 2004 per the delivery inspection report.

It is believed that the trailer remained in storage in Florida for approximately 1 1/2 years until called into service for the Alexander family.

14.     The Alexanders moved into the temporary housing unit on May 26th or May 27th, 2006.  Upon moving into the temporary housing unit, Ms. Alexander stated she noticed an odor; however, she did not know the origin of the odor.  She did notify her contact person with the housing unit of this condition.  She was told to air out the trailer.

She also asked about a dislodged wall panel in the bedroom and was told to duct tape it shut.

She did so.

15.     A request for maintenance was made by Ms. Alexander approximately five months after moving in regarding roof leaks in the bedroom.  Ms. Alexander states that service people were dispatched to the trailer to repair the roof leak.  Servicemen informed her that they did not think the repairs they made were going to be sufficient to prevent further roof leaks and that they would probably have to return.

16.     After moving in the trailer, it was noticed that the walls in the rear bathroom began to buckle.

17.     The next recorded event was a request by Ms. Alexander to move the

Page -6-

temporary housing unit from the property onto the street to effect the demolition of their residence. The temporary housing unit was moved from the property on July 9, 2007.

18. On July 10, 2007, demolition of the Alexander house was completed and the temporary housing unit was returned to the site and readied for occupancy.

19. Ms. Alexander stated her son was having increased asthma-related issues and she had been taking him to the doctor for these issues. After her son required an emergency room admission, she mentioned this to a friend at church about the problems her son was having with his health. The friend told her about the issues that she had become aware of regarding formaldehyde in the FEMA trailers. The Alexanders moved out of the temporary housing unit within weeks of learning this information.

20. The Alexanders moved away from the FEMA temporary housing unit on or about December 29, 2007.

21. A review of documents produced by FEMA, indicated that FEMA began to receive complaints from those living in the temporary housing units within two months of their occupancy.

22. The temporary housing unit was returned to the Baton Rouge (Lottie), Louisiana storage site on February 11, 2008.

23. The Lottie Receiving Inspection Checklist indicates there is damage to the floor in front of the doorway. There are also indications the carpet is stained in the unit.

24. The FEMA temporary housing unit occupied by the Alexander family is presently located at 5310 Old State Highway, Lottie, Louisiana 70756, at the FEMA temporary housing unit storage site.

25. Inspections by the First General Services of the South, Inc. group began at 4:00 p.m. on Wednesday, May 6, 2009 and concluded at

Page -7-

approximately 7:00 p.m. that evening. Inspections and testing resumed at 9:00 a.m. on Thursday, May 7, 2009 and concluded around 5:00 p.m. that afternoon.

26.    The inspection and testing methods were limited to visual only. No destructive testing methods or procedures could be implemented for in-depth observations with the exception of removing and resetting items that would not cause damage or alteration to the unit.

## PURPOSE AND SCOPE

It is not the purpose of our investigation, inspection or observations to render opinions regarding the presence or the quantity of formaldehyde in the Alexander temporary housing unit. Our purpose, involvement and expertise is in the field of construction and design means and methods and the comparison of those means and methods to those of industry standards and / or codes; the proper functioning of the structure, units or materials involved in this or any other particular case; and the application of building sciences as they affect the overall function of the building, structure , unit or components that make up those structures. We therefore limit our involvement in this matter to the component parts of the temporary housing unit; the construction means, methods and materials of this unit; the ability of these components to function as a unit; the building sciences regarding the air, moisture and temperature interactions with the unit as a whole and with its various components; the proper functioning of the envelope to properly seal the unit or the structure from air, moisture and temperature infiltration; the proper functioning of the HVAC units as it relates to the proper production of negative or positive air pressure or the determination of improper functioning creating negative air pressures in the structure; how the air, moisture and temperatures interact with the various components of the structure and those problems related to and with the air, moisture and temperature interaction.

The purpose of the inspections, observations and testing was for the rendering of opinions regarding the following issues:

1.    Did jacking the trailer from its wheels cause damage to the unit?  (See Conclusions #11 and #12.)

Page -8-

ALX-EXP-44-000009

2.     Was the design of the trailer a substantial cause of the unsafe levels of formaldehyde?  (See Conclusions #1, #2, and #3.)

3.     Did the manufacturer fail to take into account the intended use of its product?  (See Conclusion #4.)

4.     Did the manufacturer know, or should it have known, that the use of formaldehyde emitting materials in the construction of their units could become a potential problem for the occupants? (See Conclusions #5 and #6.)

5.     Did the manufacture know or should it have known that the construction means, methods and materials utilized would contribute to the elevated levels of formaldehyde?  (See Conclusions #7 and #8.)

6.     Did the quality of the workmanship relating to the installation of the air-conditioning duct system contribute to the elevated levels of formaldehyde inside the temporary housing unit?  (See Conclusion #9.)

7.     Is it more probable than not that the quality of the workmanship relating to the installation of the furnace duct system contributed to unsafe re-entry of fumes from the furnace system?  (See Conclusion #10.)

8.     Did the manufacturer place warnings regarding potential formaldehyde emissions inside the temporary housing unit or in the owner's manual? (See Conclusion #13.)

9.     Did the manufacturer fail to conform to an expressed warranty?  (See Conclusion #14.)

10.    Did the manufacturer fail to comply with the applicable NFPA and ANSI codes and the requirements set forth in the FEMA Model Travel Trailer Procurement Specifications dated August 12, 2004, and its own warnings in the owner's manual and in both the air-conditioning and furnace system's installation instructions?  (See Conclusion #15.)

11.    Were there materials and techniques available at the time of the

Page -9-

ALX-EXP-44-000010

manufacture of the Alexander temporary housing unit in 2004 that would have met today's FEMA requirements?  There are new FEMA Procurement Specifications that have been published that require the following:

a.   Each unit must test below 16 parts per billion (16 ppb) for formaldehyde. This is comparable to levels found in conventional U.S. homes.

     i.   The CD states that indoor air concentrations of formaldehyde typically range from 10 ppb to 30 ppb. Please see Enclosure 3, "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels in Mobile Homes and Park Models."

b.   Remove products that release elevated levels of formaldehyde and other volatile organic compounds (VOCs) such as Medium Density Fiber products, and all Urea-formaldehyde materials and high formaldehyde emitting insulation products.

c.   Comply with HUD's requirements for .35 air changes per hour in the ventilation system.

d.   See Conclusion #16.

12.   Do the risks that are avoided by using the safer alternative designs and materials exceed any burden to Gulf Stream in switching to these alternative designs?  (See the end of the Conclusion Section.)

The scope of our review, inspections, observations and testing included the following:

1.   Inspection of the Alexander temporary housing unit;

2.   Interviews with Kenneth Henson with High Country Homes in association with Dr. James Kornberg regarding the construction of the Alexander temporary housing unit;

Page -10-

ALX-EXP-44-000011

3.  Interviews with Dr. Stephen Smulski, wood scientist, to gather further data regarding the products utilized in the construction in the Alexander unit and to gather further data regarding alternative products usage to eliminate or significantly lower formaldehyde emissions in the Alexander temporary housing unit;

4.  An interview with Gary Bunzer, R.V. specialist and consultant, to gather further data on his observations regarding the set-up issues with the Alexander unit;

5.  An interview with Ervin Ritter, P.E., mechanical and environmental engineer, to review notes, calculations and findings regarding our inspection of the FEMA unit;

6.  An interview with William Scott of W. D. Scott Consultants regarding the findings of previous formaldehyde tests performed in FEMA temporary housing units;

7.  An interview Marco Kaltofen, P. E., to compare observations of our inspection of the Alexander temporary housing unit;

8.  A review of notes from interviews with Ms. Alana Alexander, former occupant of the specific FEMA temporary housing unit involved in this litigation;

9.  Detail measurements of the temporary housing unit;

10. Photographic documentation of pertinent observations;

11. Written documentation of pertinent observations;

12. Infrared thermographic anomaly survey of the Alexander unit;

13. Performance of blower door testing of the unit for envelope air leakage;

14. Performed air leakage testing on the air-conditioning duct system;

Page -11-

ALX-EXP-44-000012

15.   Performed an air leakage test on the furnace duct system;

16.   Observations of all construction detail through the open panels in the bedroom and bathroom walls;

17.   Observations of any and all warning notices or labels on the interior and exterior of the unit;

18.   Observations of penetrations and sealants in the floor, wall and roof systems of the unit;

19.   Observations of entrapped water in the bellyboard of the unit;

20.   Assessment of the conditions of the temporary housing unit;

21.   Observations and notations of the design, construction materials, means and methods utilized in the production of the unit; and

22.   Preparation of this report to present the results of our findings and to render a statement of opinion.

## INSPECTIONS, OBSERVATIONS AND STUDY

Inspections were conducted on Wednesday, May 6, 2009 and Thursday, May 7, 2009 in the presence of attorneys and employees representing FEMA and defendants in this matter along with Mr. Kenneth Henson in association with Dr. James Kornberg; Mr. Gary Bunzer, R.V. specialist and consultant; Mr. Ervin Ritter, P.E., mechanical and environmental engineer; Mr. William Scott with W. D. Scott, environmental consultants; Mr. Marco Kaltofen, P.E., environmental engineer; Mr. David Moore, P. E., civil engineer; and Mr. Clark Thibodeaux, draftsman; Mr. Dalton Toups, field technician for First General Services of the South, Inc.; Mr. Scott Johnson, photographer / videographer; Reagan Johnson, animator; Mr. Chris Pinedo, attorney; and Mr. Hugh Lambert, attorney.

In the course of our study and analysis, following pertinent data was reviewed:

ALX-EXP-44-000013

1.      Review of FEMA Accessible One Bedroom Park Model (RP) Procurement Specifications Dated: April 25, 2006;

2.      Review of fax from ESCO Industries of Indiana Inc. regarding LFE luan dated April 24, 2007;

3.      Review of correspondence to Mr. Jonathan Gibb with FEMA from James F. Shea, Vice President of Gulf Stream Coach, Inc. dated October 13, 2005 referencing products used by manufacturer (A/C and Luan);

4.      Review of FEMA10-000463, IAQ Screening Testing Procedures for FEMA Temporary Housing Units;

5.      Review of "FEMA to Introduce New Type of Manufactured Home," Release date: December 18, 2008, Release Number: 1791-343;

6.      Review of "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels In Mobile Homes and Park Models," Release Date: April 11, 2008, Release Number: HQ-08–56;

7.      Review of "FEMA Awards Contracts For Low Emissions Travel Trailers," Release Date: April 7, 2009, Release Number: HQ-09-034b;

8.      Review of ASHRAE 62 - Indoor Air Quality;

9.      Review of Installation Instructions for Dometic 595 Series QUICK COOL;

10.     Review of Exhibit 7, Travel Trailer Installation;

11.     Review of ANSI A119.2 NFPA 1192, Standard on Recreational Vehicles, 2002 Edition;

12.     Review of ANSI A119.4 NFPA 1194, Standard on Recreational Vehicle Parks and Campgrounds, 2002 Edition;

13.     Review of complaints from occupants to FEMA;

ALX-EXP-44-000014

14. Review of ASTM Designation: E: 1827 - 96 (Reapproved 2007) - Standard Test Methods for Determining Airtightness of Buildings Using an Orifice Blower Door;

15. Review of ASTM Designation: E-779-03 - Standard Test Method for Determining Air Leakage Rate by Fan Pressurization;

16. Review of ASTM Designation E 1186 - 03 - Standard Practices for Air Leakage Site Detection in Building Envelopes and Air Barrier Systems;

17. Review of ASTM Desgnation: E 1554 - 03 - Standard Test Methods for Determining External Air Leakage of Air Distribution Systems by Fan Pressurization;

18. Review of International Standard 6781, Thermal insulation - Qualitative detection of thermal irregularities in building envelopes - Infrared method;

19. Review of Delivery Inspection Report dated 12/15/04;

20. Review of photographs emailed to First General Services of the South, Inc. from Linda Nelson dated May 12, 2009 regarding the Alexander Unit taken by Scott Johnson;

21. Review of the Transcript of the Testimony of Mary C. DeVany, MS, CSP, CHMM, Date taken: October 7, 2008, in reference to FEMA Trailer Formaldehyde Products Liability Litigation;

22. Review of "The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued to Hurricane Disaster Victims, and Recommended Action Items - Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform U.S. House of Representatives July 19, 2007";

23. Review of "Testimony before the House Committee on Oversight and Government Reform - Statement of Jim Shea, Chairman, Gulf Stream Coach, Inc." Dated July 9, 2008;

Page -14-

24.    Review of the deposition James Shea - Gulf Stream Coach 30(b)(6) dated July 24, 2008;

25.    Review of Application / Registration for Disaster Assistance for Alana M. Alexander;

26.    Review of Documents Produced by Defendants, Parts 1 through 4 of 4;

27.    Review of June 15, 2006 letter from Ann C. Benjamin, Office Manager with Samling USA, L.L.C. regarding definitions of codes used to identify different glue types in their plywood products;

28.    Review of Table 3 - ATSDR Health Guidance Values for Formaldehyde Exposure (Reference 1,2) and Table 4 - Occupational Exposure Levels for Formaldehyde (reference 9);

29.    Review of Indoor Air Quality Guideline No. 1 dated August 2004, "Formaldehyde in the Home";

30.    Review of Lottie Travel Trailer (Receiving) Inspection Check List dated February 11, 2008;

31.    Review of Plaintiffs' Original Complaint dated November 2007;

32.    Review of Plaintiffs' First Supplemental And Amending Complaint dated January 13, 2009;

33.    Review of correspondence from Gulf Stream Coach, Inc. to R. David Paulison, Acting Director of FEMA dated October 10, 2005 regarding their history with manufactured homes;

34.    Review of Weyerhaeuser "Weekly Pricing," Effective Date: August 29, 2005 and "Monthly Pricing," Effective Date: August 29, 2005;

35.    Review of miscellaneous formaldehyde documents;

36.    Review of Environmental Health's publication, "What You Should

ALX-EXP-44-000016

Know about Formaldehyde in Mobile Homes;"

37.   Review of photographs of Alexander property taken by Gary Bunzer;

38.   Review of photographs of Alexander GS Unit taken by Scott Johnson / Lambert - Nelson;

39.   Review of photographs taken by others;

40.   Review of photographs taken by others sent by Magan Ennis;

41.   Review of photographs taken by Ritter Consulting Engineers;

42.   Review of Plans;

43.   Review of plywood quotations and purchase order;

44.   Review of Gulf Stream Coach, Inc.'s Travel Trailers and Fifth Wheels Owner's Manual;

45.   Review of "An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary - Housing Trailers, Baton Rouge, Louisiana, September - October, 2006, dated October 2007 by U.S. Separtment of Health and Human Services;

46.   Review of report from David P. Barnes, Jr. and Dr. Lee E. Branscome (meteorologist) dated August 21, 2008;

47.   Review of "The Use of Blower-Door Data" by Max Sherman dated March 13, 1998;

48.   Review of CDC's "Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes" dated July 2, 2008;

49.   Review of Composite Panel Association's Technical Bulletin, "VOC Emission Barrier Effects of Laminates, Overlays and Coatings for Particleboard, Medium Density Fiberboard (MDF) and Hardboard";

ALX-EXP-44-000017

50.   Review of report prepared by Freyou, Moore and Associates dated May 18, 2009, "Structural Condition Assessment for FEMA Travel Trailer, Lottie, Louisiana;

51.   Review of report by Lagrange Consulting, "Blower Door and Duct Leakage Test Results for Trailer #1041407, received May 19, 2009;

52.   Review of report by Stephen Mullet (travel trailer manufacturing consultant) dated August 20, 2008;

53.   Review of Ritter Consulting Engineers' report dated May 15, 2009;

54.   Review of Dr. Stephen Smulski's report dated May 18, 2009;

55.   Review of Affidavit of Mary C. DeVany Concerning IN RE: FEMA Trailer Formaldehyde Products Liability Litigation, "Overview of Formaldehyde Exposure Standards; Toxicological Effects; Airborne Formaldehyde Sampling Strategy, Methodology and Selection Basis; Air Sampling Results; and Bibliography/References," dated August 2008;

56.   Review of Analytical Communications' March 1998 report "Effect of relative humidity on the determination of formaldehyde with NIOSH 3500 method (chromatropic acid method);

57.   Review of report, "Formaldehyde CAS number: 50-00-0;"

58.   Review of report, "Formaldehyde Indoors," by Stephen Smulski;

59.   Review of report by Anne V. Baughman and Edward A. Arens, "Indoor Humidity and Human Health - Part I:  Literature Review of Health Effects of Humidity-Influenced Indoor Air Pollutants";

60.   Review of Exposure Assessment Solutions, Inc.'s Chapter 16: Industrial Hygiene Exposure Assessment - Data Analysis and Interpretation";

61.   Review of "Interim Findings on Formaldehyde Levels in FEMA-

ALX-EXP-44-000018

Supplied Travel Trailers, Park Models, and Mobile Homes" from the CDC dated February 29, 2008;

62. Review of <u>Affidavit of Marco Kaltofen, PE (Civil, Mass.)</u> dated August 20, 2008;

63. Review of <u>Affidavit of Marco Kaltofen, PE (Civil, Mass.)</u> dated May 19, 2009;

64. Review of Earnest Orlando Lawrence, Berkeley National Laboratory's "Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units - Final Report," dated November 2008;

65. Review of 1991 NIST's MOIST program data;

66. Review of 1993 ASHRAE study, "A Computer Analysis of Moisture Accumulation in the Walls of Manufactured Housing";

67. Review of February 1994 ASTM study, "Moisture Control in Buildings";

68. Review of January 1995 U.S. Department of Commerce report, "Manufactured Housing Walls that Provide Satisfactory Moisture Performance in all Climates";

69. Review of 1999 ASTM book, <u>Water Problems in Building Exterior Walls: Evaluation, Prevention, and Repair;</u>

70. Review of 2000 Manufactured Housing Research Alliance study, "Moisture Problems in Manufactured Homes";

71. Review of September 2003 MHRA publication, "Minimizing Moisture Problems in Manufactured Homes Located in Hot, Humid Climates";

72. Review of CDC Summary of Lawrence Berkeley National Labortory Final VOC Report and Interim VOC Report;

Page -18-

ALX-EXP-44-000019

73.   Review of "Mechanisms of Formaldehyde Release from Bonded Wood Products" published by American Chemical Society, 1986;

74.   Review of the Florida Solar Energy Center Publication Number: FSEC-GP-212-01, "Moisture Problems in Manufacture Housing: Probable Cause and Cures";

75.   Review of "Evaluation of Formaldehyde Levels in Occupied Federal Emergency Management Agency-Owned Temporary Housing Units" dated 12/13/07;

76.   Review of Formaldehyde Passive Monitoring Data - EMA Housing Units by W.D. Scott Group, Inc.;

77.   Review of test results dated 5/18/09 by W.D. Scott Group, Inc.;

78.   Review of "Volatile Organic Compound Concentrations and Emission Rates Measured over One Year in a New Manufactured House" by Alfred T. Hodgson, Steven J. Nabinger and Andrew K. Persily;

79.   Review of "Wood Adhesives 2005" edited by Charles R. Frihart dated November 2005;

80.   Review of FEMA Model Travel Trailer Procurement Specifications dated August 12, 2004;

81.   Review of Gulf Stream Coach, Inc. Statement dated April 27, 2006 regarding formaldehyde levels;

82.   Review of the Air Resources Board study, "Air Quality Modeling of Emissions from Composite Wood Products";

83.   Review of Air Resources Board's "Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated March 9, 2007;

84.   Review of Air Resources Board's " Staff Report: Initial Statement of Reasons for Rulemaking - Public Hearing to Consider Adoption of the

Page -19-

ALX-EXP-44-000020

Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated April 26, 2007;

85.   Review of Air Resources Board's " Final Statement of Reasons for Rulemaking Including Summary of Comments and Agency Responses - Public Hearing to Consider Adoption of the Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated April 26, 2007;

86.   Review of Ritter Consulting Engineers' report regarding test temperature and relative humidity;

87.   Review of the following internet articles:

   a.   http://www.rvbusiness.com/tag/tl-industries/

   b.   http://www.chemicaldesigncorp.net/ClosedCellFoam.htm

   c.   http://www.robertlordbuilders.com/press_releasr1.htm

   d.   http://www.envirofoaminsulation.com/faq.html

   e.   http://www.suburbanmanufacturing.com/   (RV Products)

88.   A review of the pamphlet by Bayseal CC for Residential Builders, "Insulation that Adds Value";

89.   A review of Bayseal CC Division 7 - Thermal and Moisture Protection Closed-Cell Insulation Technical Data Sheet 06/10/08;

90.   A review of a fax from Wyatt Rankin with SPI-Dallas dated May 19, 2009 regarding formaldehyde foams;

91.   A review of Suburban, Dynatrail Installation Instructions for Models NT-24SP, NT-30SP, and NT-34SP; and

92.   A review of Suburban, Dynatrail Installation Instructions for Models SF-20F, SF-25F, SF-30F and SF-35F.

Page -20-

ALX-EXP-44-000021

Definitions:

1. Important words used to describe or imply conditions are applicable to situations with the Alexander temporary housing unit are either used in this report, its enclosures or in the codes or standards that apply are defined below for clarity and the understanding of usage as it applies to this unit:

    1. Recreational vehicle - NFPA, page 8

    2. Travel trailer - NFPA, page 8

    3. Acceptable indoor air quality - ASHRAE 62 - 1999, page 2

    4. Air exhaust - ASHRAE 62 - 1999, page 2

    5. Air makeup - ASHRAE 62 - 1999, page 2

    6. Air, outdoor - ASHRAE 62 - 1999, page 2

    7. Air, return - ASHRAE 62 - 1999, page 2

    8. Air, supply - ASHRAE 62 - 1999, page 2

    9. Air ventilation - ASHRAE 62 - 1999, page 2

    10. Exfiltration - ASHRAE 62 - 1999, page 2

    11. Infiltration - ASHRAE 62 - 1999, page 2

    12. Natural ventilation - ASHRAE 62 - 1999, page 2

    13. Ventilation - ASHRAE 62 - 1999, page 4

In addition to the items reviewed in the course of our study and analysis, the following pertinent data was collected and observations made:

ALX-EXP-44-000022

2.      It is understood the common issue regarding the occupancy of the FEMA temporary housing units is the exposure of its occupants of to varying elevated levels of formaldehyde. A large quantity of testing performed on these temporary housing units by various organizations and individuals have confirmed and reported above normal levels of formaldehyde exist in the a large quantity of the units tested.

3.      The numerous rounds of testing for formaldehyde in the FEMA trailers began after occupants began filing complaints with FEMA regarding problems they were experiencing with their units. Occupants informed FEMA that they were having issues with strong odors, burning or irritated eyes, skin irritations, sinus problems and headaches shortly after occupying their homes or during the course of their occupancy.

4.      A review of reports by Lawrence Berkely Laboratory, the National Center for Environmental Health, and a report by Dr. Stephen Smulski among other documents reviewed, give indication of the following:

      a.      Of all of the studies reviewed, persons interviewed, and test reports and data gleaned in preparation of our assessment, the following factors appear to be held in common:

            i.      As temperature rises, the rate of release of formaldehyde increases.

            ii.      As humidity rises, so does the release of formaldehyde from materials that are manufactured using formaldehyde.

            iii.      Adequate ventilation is required to exfiltrate formaldehyde released into the envelope of the travel trailers.

4.      Upon arrival at the Alexander unit, the various parties began to unload equipment, prepare cameras for inspections and meet to gather notes on the upcoming inspection of the interior and exterior of the unit. It was noted and photographed that the representatives from the FEMA party opened the trailer door prior to the testing performed by W.D. Scott Group. The door was not opened for a long period of time when this

ALX-EXP-44-000023

writer observed that occurrence and requested the door be closed.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph #1.

Prior to the commencement of testing by Mr. William Scott, it was requested the doors and windows remained closed during the formaldehyde tests. During the tests, a member of the FEMA party, I believe, opened the door and requested entry by one of their members. The door was closed and reopened again to allow the entry of that member of the party.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #33 and #35.

These items are only mentioned to make note that of the observations. Because it was requested the testing occur before anyone else entered the unit, the opening of the door system on three occasions may have some effect on the test results.

From a review of the W. D. Scott Group, Inc. Formaldehyde Emissions Report from a test taken in the Alexander unit in both January 2008 and May 2009, indications are the formaldehyde emissions are above those determined by FEMA and the CDC as being the average in a U. S. home.

Please see Enclosure 4, W. D. Scott Group, Inc. Formaldehyde Sampling Report dated May 18, 2009.

Please see Enclosure 15, Analysis of the Gulf Stream Coach, Inc. Formaldehyde Exposure Data Set by Paul Hewett, Ph.D., CIH, dated May 18, 2009.

Please see Enclosure 17, Affidavit of Marco Kaltofen, P.E. dated May 19, 2009.

5. A review of the temperature and humidity tests performed by Ritter Consulting, May 7, 2009 between 1:00 p.m. and 4:00 p.m., indicates the

Page -23-

ALX-EXP-44-000024

outdoor temperature during the inspection by our group remained fairly constant throughout the day. Temperatures on the roof of the Alexander trailer range from approximately 110°F to just slightly over 120°F for the entire day. It was noted that during the majority of the day, the skies were cloudy. Please note also, roof temperatures were above 120°F in early May of 2009. Temperatures can be expected to rise much higher in the summer.

The interior temperature recorded by Ritter's equipment ranged from approximately 78°F to about 92°F.

The relative humidity spiked and dropped at numerous times during the testing. This can be attributed to the entry and exiting of testing personnel and attorneys in attendance. In addition, at one point the air-conditioning system was turned off and the building air leakage and duct leakage tests were performed. This affected both the temperature and the humidity of the interior of the building. This report does however give a fairly good indication of the types of temperatures that are affecting the envelope of the building. It is also interesting to note that even with the air-conditioning system running from earlier in the morning, the lowest relative humidity readings were approximately 55%. Relative humidity increased between 75% and 90% for a majority of the testing time.

Please see Enclosure 6, Ritter Consulting Temperature and Humidity Data Logger Graphs dated May 7, 2009.

Please see Enclosure 17, Affidavit of Marco Kaltofen, P.E. dated May 19, 2009.

6.   A review of the testimony of Mary DeVany before Congress gave indications that formaldehyde emissions double for every 12°F increase in temperature.

7.   Discussion of construction issues, defects and damages observed:

   a.   The main frame of the structure supporting the walls and roof is constructed of structural steel and light gauge framing.

Page -24-

ALX-EXP-44-000025

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #142, #143, #145, #146, #147, #148, #149, #150, and #151.    These photographs give indication of construction of the steel frame under-carriage.

Please see Enclosure 12, Freyou Moore Report dated May 15, 2009.

b.    The under bellyboard is installed concealing all of the wood structure, insulation and subflooring of the trailer. It was observed that the underbelly contains water presumably from condensation and possible roof leak(s). The underbelly of the trailer is sagging from the weight of the water being retained in the under-carriage.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #66, #68, #69, #70, #71, #72, #73, #74, #75, #76, #77 and #78. These photographs are of the rear, right corner (the tongue-end side) of the trailer.   As noted above, the underbelly is sagging and a liquid material could be felt in the sag. Openings at the rear side of the underbelly at the floor to wall connection allowed for one of the participants to push up on the underbelly material and forced water to pour out of the underbelly.  These photographs are noting that event.

The water in the underbelly contributes to active formaldehyde emissions and to the decay of the floor sheeting which increases the release of formaldehyde.

Also, please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #142, #144, #145, #151, #152, #153, #154, and #155. These are all indications of water entrapped in the underbelly of the Alexander temporary housing unit.

Please see Enclosure 1b, Photographs by Scott Johnson, #1040, #1041, #1042, #1043, and #1044, of the underbelly sagging below the trailer.

Page -25-

ALX-EXP-44-000026

c.      The floor insulation is approximately 2 1/2" in thickness.

d.      The floor joists are believed to be a nominal 2" x 3" (actual 1 1/2" x 2 1/2"). The data insulation and the floor joists was obtained during the inspection by Kenneth Henson and Gary Bunzer.

e.      The plumbing pipes, LP gas lines, trailer wiring and furnace duct are located in the floor system. This is assumed and based on standard construction of these units. A visual inspection was not possible without destructive testing.

f.      The floor sheathing is 5/8" particle board.

g.      The floor system on the interior of the unit is covered with a vinyl sheeting loosely over the floor sheathing. This does not act as effective of a vapor barrier as a fully glued down vinyl material. The inspectors were able to remove the floor register and use a carpenter's framing square to penetrate the underside of the vinyl flooring without resistance. Wetting of the under-carriage area of unsealed particle board backing and the unsealed areas of the vinyl is a means of infiltration for humidity and volatile organic compounds.

h.      Carpet and pad is installed over the vinyl in the bedroom.

i.      Air-conditioning registers are installed over the finished floor system.

j.      The wall framing is 1 1/2" square wood members (2" x 2" nominal).

k.      A 1/8" overlay hardwood paneling is installed on the interior of the wall system.

l.      Installed in the exterior walls is 1 1/2" fiberglass unfaced batt insulation. The batt insulation is the full height of the wall system.

Page -26-

ALX-EXP-44-000027

m.   The side edges of the wall panels are exposed, raw hardwood paneling. These exposed edges are covered at the seams with matching adhesive tape material.

n.   The rear of the 1/8" overlay hardwood paneling is exposed, raw material.

o.   The wall to ceiling intersections were observed. Indications are the wall and ceiling panels intersect into an "F" type molding. There did not appear to be a method of sealing to prevent air and moisture infiltration into the envelope of the trailer.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #173, #174, #175, #176, #179, #180, #203, #207, and #208.

p.   Dust accumulation was observed at the wall to ceiling intersections. This is typical of corners, crown and base areas where air and moisture infiltration are occurring. The dust particles in the air are attracted to the moist or wet area intersections as a result of the hot, humid air infiltrating through unsealed intersections.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #175, #176, #178, #179, and #180.

q.   The wall intersection at the floor was observed. The walls do not appear to have a termination molding at the base. There does not appear to be a method of air infiltration prevention. Dust accumulation was observed on the carpets at the wall to floor intersections. This is indicative of air and moisture infiltration. The carpeting acts as a filter as the hot, humid, unconditioned air penetrates at the joints of the building. As the humidity collects on the walls and carpet at these intersections, dust accumulation occurs.

r.   The walls of the trailer had four windows, an exterior door, and several other penetrations through the exterior wall for furnace

Page -27-

ALX-EXP-44-000028

ventilators, a hood vent, and water heater access and ventilation panel.

s.    The ceilings were observed to be a 1/8" overlay hardwood paneling.

t.    Air-conditioning registers are installed in the ceiling paneling.

u.    The air-conditioning unit is installed through the ceiling void and the roof. Light fixtures were installed on the ceiling in each room.

v.    The roof framing is a nominal 2" x 3" (1 1/2" x 2 1/2" actual). According to diagrams furnished by the manufacturer, other models have these spaced 16" on center. The assumption has been made that the ceiling framing is of the same spacing with this trailer.

w.    The ceiling void contained an unfaced batt insulation approximately 2 1/2" thick.

x.    The air-conditioning duct system is installed in the ceiling void. The duct system is concealed and could not be accessed for observation as to the size, construction, insulation and connections of the ductwork.

y.    Various built-in units were observed throughout the temporary housing unit. They were as follows:

    i.    Beds with mattresses;

    ii.    Sofa with cushions;

    iii.    Seating with cushions at the kitchen table;

    iv.    The kitchen table;

    v.    Base and upper cabinets in kitchen and bath areas covered with a laminated countertop;

Page -28-

ALX-EXP-44-000029

vi.  Double sink and faucet in the kitchen and lavatory for the bath area;

vii.  Closets (one in the bedroom and one in the bunkbed area);

viii.  The nightstand in the bedroom;

ix.  Interior door and frames;

x.  Appliances - stove, hood, refrigerator, and microwave;

xi.  The bathroom had a tub / shower unit;

xii.  A commode;

z.  The exterior aluminum covering is rolled and crimped material.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #19, #23, #24, #34 and #39.

aa.  Exterior moldings covered the walls at the intersections, windows and doors.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #19, #24, #40, #42, #46, #47, #48, and #60.

cc.  Other miscellaneous penetrations for electrical and water hookups, exhaust vents (stove hood and furnace), and water heater access and exhaust panel were noted. The exhaust panel for the water heater was laying on the ground upon the arrival of the inspectors.

dd.  The roof sheathing is a regular sheeting and is not a low-formaldehyde emitting material as per James Shea. The roof sheathing is believed to be 1/4" hardwood panel; however, this is unverified. Access to the sheathing could not be obtained.

Page -29-

ALX-EXP-44-000030

ee.    There is a sheet membrane covering the entire roof system. It is a membrane similar to or is an EPDM membrane. The perimeter edges of the membrane are sealed with a caulking type material. The caulking material is split and separated in a number of areas inspected by this writer.

Please see Enclosure 1a, First General Services of the South, Inc.'s' Photographs #82, #83, #84, #85, #86, #87, #88, #89, #90, #95, #96 and #97.

ff.    Roof exhaust for the bath and vent pipe caps were noted on the roof system.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #91, #92, #93, and #94.

gg.    Roof top air-conditioning unit:

i.     The cover of the rooftop air-conditioning unit was removed to obtain identification of that unit.

ii.    The unit is a Duo-Therm.

iii.   The model number is 59516.513.

iv.    The unit is a 15,000 nominal BTU unit.

v.     The serial number is 44832607.

Please see Enclosure 1b, Scott Johnson's Photographs #1083 through #1091.

8.    Noted observations:

a.    Window gaskets:

i.     Observations of the window gaskets indicated there are two of the gaskets that were not properly sealed to the

Page -30-

frame and glass.   Potential moisture intrusion and air infiltration can occur at these areas.  Water intrusion was not observed at the kitchen window near the kitchen table to the left side of the exterior door; however, the interior wall is bowing indicating either water intrusion or high moisture presence of the wall system.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #39, #40, #236 - #250, #332, #334, and #335.

b.   Electrical outlet:

   i.   The exterior electrical outlet at the rear, left area of the trailer was observed.  The outlet was damaged and water and air infiltration is occurring in this area.   This is between the water heater and the fresh water inlet.

   Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #54, #55, #56, #161, and #162.

c.   Water heater cover and exhaust area:

   i.   The water heater exhaust area was inspected.  Corrosion was noted on the metal components in this area.  The water heater cover had been removed during the last inspection according to one of the FEMA representatives.  Corrosion to the water heater element was also noted.

   Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #58, #60, #61, #156, #157, #158, #159 and #160.

d.   Kitchen stove hood exhaust:

   i.   The kitchen stove hood exhaust cover was observed on the rear of the trailer.  The exhaust vent is activated by air pressure from the inside wherein the flapper would open as

Page -31-

the air pressure would push against the lid or flapper. This area is noted because under conditions discussed later in this report regarding negative air pressures, the flapper may not open properly during times that the air-conditioning system or the heater is in operation during cooking or heating events.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph #62.

e.   Underbelly:

  i.   Water retention:

    1.   As noted earlier in the report, the underbelly of the trailer is holding water. The underbelly membrane was noted to be sagging during visual observations. One of the inspectors used his hand to mechanically activate the underbelly sheeting giving indication that the underbelly contained a significant amount of water. Upon observations around the perimeter of the travel trailer, an opening was noted at the rear, right corner. The bottom membrane was separated from the wall connection. One of the observers pushed up on the underbelly in this area and water began to pour out of underbelly area. Two observations were made:

    2.   Unsealed penetrations:

      a.   During and inspection of the underside of the trailer it was noted that some of the penetrations in the floors were unsealed. Photographs of those areas were taken. These are leakage points in the envelope of the building that will draw the hot moist air from the exterior into the interior of the building.

Page -32-

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #66 and #68 through #73.

    b.    The underbelly is acting as a water or vapor barrier.

ii.    The water in the underbelly was not a result of moisture vapor from the ground rising and penetrating the underbelly. The water apparently is collecting in the underbelly as a result of leaks in the envelope and condensation in the wall and roof systems.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #66 through #78.

Please see Enclosure 1b, Scott Johnson' Photographs #1043 and #1045 through #1048.

f.    Roof:

i.    As noted earlier in the report, the roof was inspected. Separation in the sealant material around the perimeter of the roof was noted. Water is apparently penetrating into the roof and wall systems from some of these separations. One of the potential moisture problems with this temporary housing unit was a persistent leak in the bedroom. One of the areas of separation in the roof sealant material is along the outer edge of the bedroom.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #82 through #88 and #387 through #390.

g.    Roof membrane:

i.    A rippling effect was noted in the roof membrane over the area of the bedroom and along the outer edge of the roof to

ALX-EXP-44-000034

wall connection. Indications are there is deterioration of the roof decking below the membrane in this area.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #95, #96, and #97.

    ii.    Roof penetrations - seal:

        1.    Inspection of the sealant material around the bathroom exhaust vent hood and the plumbing vent pipe cap was performed. The sealant material is not adhering properly to the roofing membrane. It is not an uncommon practice to utilize only sealant materials to prevent air and moisture transmission from the exterior roof system to the roof cavity or interior of the envelope. According to HUD's "Durability by Design" publication, caulks and sealants should be used as only a second line of defense for moisture and air infiltration. Some other means of sealant should be used as the primary source of air and moisture infiltration on the envelope of a building unit. Because of expansion and contraction of dissimilar materials and weatherization of the adhesives, the caulks or sealants cannot be dependent upon to maintain its weather-tight resistant barrier. In addition, it is not possible to confirm when the sealant is being applied that all of the voids and penetration or holes have been completely and thoroughly sealed.

            Please see Enclosure 1b, Scott Johnson's Photographs #1077 through #1081, #1092 and #1093.

  h.    Damage to exterior skin:

    i.    Observations of a small area of damage to the exterior skin at the rear, left area of the trailer was noted. The damaged

ALX-EXP-44-000035

area was sealed with a caulking material. It did not appear that moisture or air was penetrating through this area at the time of the inspection.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #163 and #164.

i. **Floor** damage at the entry door:

    i.    Moisture damage to the floor at the door entry and floor area between the entry door and the bedroom wall was noted. The underlayment was very soft to the touch. Indications are moisture has been penetrating this area for some time causing the deterioration or decay.

        Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #98 through #122.

j. **Bedroom:**

    i.    Walls:

        1.    Observations of the walls in the bedroom area revealed a buckling or bowing in the walls in at least two places. One of the panels on the rear wall of the bedroom was buckled and detached from the wood framing member. According to information gathered, this occurred prior to the occupancy of the Alexander family. Ms. Alexander advises she was told to duct tape the detached panels ack together, which she did. It appears the stress on the frame of the floor and wall system caused stress releasing the panel from the framing member.

            Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #170, #200 through #214.

ALX-EXP-44-000036

ii.    Walls bowed - Front:

    1.    Observation of the front wall of the bedroom revealed a bowing area under the window system. It appears the stress has caused bowing in this area which is similar to the occurrence on the rear wall.

    Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #171 and #173.

iii.    Wall - Air infiltration:

    1.    As noted earlier in the report, dust particles attached to the wall and ceiling systems at their intersection indicate the penetration of air and moisture from the exterior of the building toward the interior. Observations reveal that there is no sealing of the envelope of the building to prevent air and moisture movement from the outside to the inside. As the hot, moist air comes in contact with the cooler surfaces at the areas of air infiltration, the electronically charged dust particles are attracted to the moist surfaces of the wall and ceiling intersections. This is a manufacturing workmanship issue. These areas should have been sealed properly to have prevented the infiltration of air and moisture as required by the FEMA Procurement Specifications.

    Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #173 through #176, #181 and #215.

iv.    Walls - Fastener reversal:

    1.    Observation of fasteners retaining the wall panels to the wood framing members indicated fastener reversal was occurring. Fastener reversal in this

Page -36-

ALX-EXP-44-000037

manner was either a result of the stress placed upon the framing system from the blocking or an introduction of moisture into the wood framing and continual wetting and drying cycles. As to wetting and drying cycles occurring in the wood framing, the fasteners are forced out of the wood member. The more likely event to have occurred is the wetting / drying cycles of the framing members.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #191 through #195, #201, #202, and #214.

v.    Walls and nightstand - Water infiltration:

1.    Water infiltration was noted and damage occurring from the water infiltration was documented. The nightstand on the rear, right corner of the bedroom indicated growth of a mold-like substance on its interior. This area is in the corner immediately below the areas of sealant separation at the edge of the roof. This area is also below the area of water infiltration noted in the ceiling and will be discussed further in the report.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #187 through 190.

vi.   Closet:

1.    Observations of the closet area in the bedroom indicated moisture and water infiltration and water damage in this area. This is at the right, front corner of the bedroom. This is also below the area of water penetration in the ceiling.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #177 through #179.

Page -37-

ALX-EXP-44-000038

vii.   Ceilings:

1.   Observation of the light over the bed indicated water infiltration into that light fixture. Water retention marks were noted in the fixture. This is at the center between the nightstand and the closet area. This area also is above the bed.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #181 and #182.

viii.   Water damage to the bed:

1.   The area immediately below the light fixture indicating water leakage was inspected. Upon removal of the mattress from the bed area, it was noted the mattress was water-stained. The hardwood platform supporting the mattress for the bed indicated significant water stains. There is a storage compartment below the bed platform that showed of water infiltration.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #196 through #199, #220 and #221.

ix.   Wall construction details:

1.   Because the wall panels were buckled and detached from the wall framing in the bedroom, we were able to observe the construction means, methods and materials utilized in the framing of this particular unit. The wall panels were overlaid 1/8" hardwood paneling. The edges and rear side of the paneling were raw. The wall insulation is 1 1/2" unfaced fiberglass batt. The wood framing members are 2" x 2" nominal (1 1/2" x 1 1/2" actual).

Page -38-

ALX-EXP-44-000039

Noted in our inspection was a lack of a vapor barrier on the exterior side of the exterior wall. The wall system is constructed of an exterior aluminum skin with rolled and crimped joints installed horizontally attached to the 1" x 1" wood framing members. The batt insulation is unfaced and the only material assumed to be a vapor barrier was the interior finish applied to the hardwood panel.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #203 through #210.

x.   Split framing:

    1.   As discussed earlier under the fastener reversal section, splitting of the framing was noted at the connection between the top plate of the wall and the top of the stud. The 1" x 1" framing member is split and observation of the fastener was noted. This gives indication of moisture infiltration causing wetting and drying cycles in the wood framing and oxidation occurring on the metal fastener.

       "Repeated wetting and drying of the wood framing causes great stress on the framing members. These framing members eventually split and fail." This is a quote from a lecture from Dr. Joseph W. Lstiburek, PhD., P.Eng.

       Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #208 through #210.

xi.   Window observations:

    1.   The window unit was opened and closed during the blower door testing for passage of items needed during the blower door tests. The windows were open during periods of inactivation of the air

Page -39-

ALX-EXP-44-000040

pressurization or depressurization of the trailer and / or duct system. It was noted that dirt collected on the framing of the windows especially at the bottom portion of the window. It is also noticed that there was a small gap in the air seal of the window to the frame. Air leakage in those areas was noted during periods of depressurization.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #332 through #335.

k.    Kitchen.

    i.    Floors:

        1.    The finished floor of the kitchen is a vinyl sheet material loose laid over the underlayment. The furnace duct registers were friction fit into the floor and not fastened. A furnace register was removed near the entry door. Using a carpenter's framing square, it was noted the sheet vinyl is not fully adhered to the underlayment. This limits the barrier value of the sheet vinyl material. While the vinyl flooring material acts as a vapor barrier, it is more effective as a barrier when it is fully adhered to the underlayment. Any moisture penetration through the floor system is able to escape around the edges of the openings for the register offset connections.

        Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #227 through #229 and #257 through #265.

    ii.    Floors - Water damage:

        1.    As noted earlier during our observations of the exterior, water damage occurred at the entry door into the kitchen. The area was extremely soft and

Page -40-

one of the inspector or attorneys placed blue tape on the area to avoid foot traffic and possible collapse of the floor in this area. As noted earlier, the water damage extended to the wall of the bedroom.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #230 through #235.

iii.   Walls - Bowing and soft panels:

1.   Bowed panels were noted on both the front and rear walls of the living room and kitchen area. Pressing on the wall panels indicated the panels were soft to the touch. With the use of a 4' carpenter's level, we were able to demonstrate the bowing that was occurring in the wall panels. It appears moisture infiltration is causing a swelling condition and the wall panels to bow.

The front and rear walls of the living room and kitchen are aligned with the air-conditioning return air system. The air-conditioning system is located in the center of the ceiling approximately the center of this area. As discussed earlier and will be fully discussed later in the report, duct leakage in both the air-conditioning and the furnace system is creating a negative air pressure within the envelope of the trailer. The return air is drawing outside air into the wall and ceiling cavities of the trailer unit. These walls are the areas nearest to the air-conditioning return air side.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #236 through #247.

Also noted in the wall panels at the entry door was the detachment of the wall panels and the casing for the door frame. It appears these members are also

Page -41-

ALX-EXP-44-000042

detaching as a result of moisture infiltration.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #243 through #247.

The adhesive material used to cover the joints in the paneling was observed. The tape was detaching from the wall paneling. This appears to be a result of air and moisture infiltration causing the adhesive to release from the panel. This condition was noted in a number of areas throughout the trailer.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph #248.

Other areas of soft, deteriorated walls sheeting was noted. These areas did not reveal bowing but were soft to the touch and displayed some deterioration.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #248 through #256.

iv.  Observations of the ceiling while the air-conditioning system was in operation was performed. It was noted that condensation was occurring on the ceiling and on the face panel of the supply and return air register over the air-conditioning unit. It appears air leakage is occurring in the supply side duct system of the air-conditioning unit. This will be discussed in more detail further in the report; however, this duct leakage is causing the surfaces the dew point wherein the moisture in the air or on the surfaces are condensating. This is a similar situation that is occurring in other areas of the wall and ceiling cavities; however, it is concealed in the wall and ceiling systems.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #276 through #284.

Page -42-

ALX-EXP-44-000043

v.    Moisture in the wall panels at the kitchen sink:

    1.    Moisture staining was observed in the wall panels near the kitchen sink and countertop area.

    Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #285 and #286.

l.    Bunkbed area:

i.    Hardwood panel construction:

    1.    Observation of the bunkbed area revealed the wood support for the mattresses were constructed hardwood panels with unsealed surfaces and edges.

    Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #287, #291 through #301.

m.    Lavatory area:

i.    Pipe seal - Duct tape:

    1.    Examination of the inside of the vanity in the lavatory area revealed the use of duct tape to seal the penetration through the floor of the trailer. Duct tape is not a proper method of sealing for moisture and air penetration. Moisture breaks down the adhesive on the duct tape and air and moisture are allowed to penetrate those areas.

    Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #302, #305 and #306.

n.    Converter cabinet:

i.    Open penetration in the floor:

ALX-EXP-44-000044

1.    Examination of the closet area that contained the converter charger was inspected. During the blower door operation and photographing the interior of the unit, daylight was noted in the separation between the converter cabinet and wall system. Two screws were removed from the converter charger cabinet and the converter charger was removed. An open penetration was noted where the wiring entered and exited the floor to the underside of the trailer. This was one of the few areas we were able to disassemble to observe the communications between the outside and the inside of the building.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #309 through #311, #374, #375, and #383 through #386.

o.    Bath and water closet area:

    i.    Water line penetration:

1.    Examination of the bath and water closet area revealed a water line penetration that was partially unsealed for the commode. It penetrated the face panel of the tub and floor of the bathroom. This is another area of communications with the exterior elements.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #312 through #314.

    ii.    Bath exhaust vent:

1.    Examination of the ceiling of the bath area revealed the presence of an air-conditioning duct register and an exhaust opening and fan in the ceiling. The exhaust fan and air-conditioning supply duct

ALX-EXP-44-000045

opening were within 12" of each other. The exhaust system for the bathroom operated by manually opening the external cover and switching the fan on. The exhaust fan would expel air from the interior of the trailer acting as a fresh air ventilator. However, when the air-conditioning system was activated and the exhaust fan was engaged, the fresh air from the air-conditioning system would then be exhausted into outside atmosphere. This would exacerbate the negative air condition on the interior of the building and expel filtered fresh air to the outside and cause additional contaminated unconditioned, unfiltered air to enter into the envelope of the trailer.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #315 and #317.

iii.   Wall panels:

1.   Observation of the wall panels in the bathroom revealed the area indicated by Ms. Alexander as the area of buckling. The wall panel was detached from the framing system and was sealed with duct tape. It appears the jacking and blocking of the structure caused some distortion in the framing system of the trailer creating excessive stress and the panel detached.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #381 and #382.

iv.   Wall panels - moisture indications:

1.   Close inspection of the wall panels in the bathroom appear to indicate moisture on the wall panels.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #379 and #380.

Page -45-

ALX-EXP-44-000046

p.    Unsealed wood areas:

    i.    Bunkbeds:

        1.    The platforms below the bunkbed areas were unsealed hardwood panels. It appears that both sides of the panels are raw wood.

            Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #136, #138, #287 and #291 through #301.

    ii.    Right bedroom bed:

        1.    Exposed raw wood was observed under the mattress of the bedroom bed. This is the bed that has sustained water damage from the leakage from the ceiling light. Both the top and bottom sides of the wood product is raw material as well as the edges.

            Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #196, #198, #199, #220 and #221.

    iii.    Front bedroom - wall panels:

        1.    As previously noted, the rear side of the wall panels in the trailer as well as the edges of the panels are untreated raw hardwood material. Only the exposed surface is covered with a finished material. It is unknown the perm rating of the panel covering.

            Although the face of the panels is covered and the joints between panels and the area between the ceiling and the walls are overlaid with either an adhesive type product or a molding, these materials are not sealing the moisture and air passage between the air exterior wall cavity and the interior wall

Page -46-

ALX-EXP-44-000047

envelope of the trailer.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #201 through #206.

It is noted the same basic type wall panel is installed throughout the interior of the trailer on not only the walls but the same type panel with a different finish. The same type unsealed air and moisture barrier exists around the perimeter of the entire trailer and on the ceilings.

iv.   Floor - living room:

1.   As mentioned earlier in the report, inspection of a floor register area and the loosely laid vinyl on the floors was investigated. The edges of the floor sheathing at the penetrations of the furnace registers were unsealed as well as the edges around the surface of the floor sheathing and the vinyl floor sheet goods.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #258 and #260 through #265.

q.   Air-conditioning system installation:

i.   Based upon data provided to this writer regarding elevated levels of formaldehyde in the travel trailers, it was decided to perform envelope air leakage tests and HVAC (heating, ventilating and air-conditioning) duct leakage tests on the Alexander temporary housing unit. Mr. Paul Lagrange with Lagrange Consulting, Inc. was contact to perform the air leakage tests on the unit and ductwork. The envelope of the building was first tested for air leakage. The building was depressurized. The natural air change per hour was documented at 1.658. This means that every hour

ALX-EXP-44-000048

the air is exchanged between the exterior and the interior almost 1.7 times. According to the ACH 50 calculations, the air exchange is 10.13 times. This is equivalent to the leakage area of 66.5 square inches or a hole in the building just over 8" x 8" drawing in unfiltered, unconditioned air into the envelope of the building. Prior to that air being pulled into the ambient air of the interior of the building, it is first drawn into the walls, ceiling and floor cavities of the trailer. This hot, moist air comes into contact with the untreated raw surfaces and edges of the formaldehyde emitting wood and wood products. According to the experts, the activity of the formaldehyde release from these formaldehyde emitting products is increased with the rise in temperature and the rise in humidity. This unfiltered, contaminated air filled with moisture and heat is then transported into the living area of the trailer through cracks in the seams, around duct registers, light fixtures, wall receptacles, light switches, and all other penetrations that are sealed to the exterior.

Please see Enclosure 8, Lagrange Consulting Services, L.L.C.'s report dated May 7, 2009.

Please see Enclosure 16, Investigation of FEMA Travel Trailers prepared by Ervin L. Ritter, P.E., dated May 15, 2009.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #322 through #330, #336 through #355 for test procedures of sealing furnace and duct system and return air grills.

ii.    In conjunction with the leakage testing on the trailer, the ductwork for the air-conditioning system was also tested for leaking. The results for that test indicated the air-conditioning ductwork had a leakage rate of 29 cubic feet per minute of air to the outside and 47 cubic feet to the inside. This totals 76 cubic feet of air loss from the

Page -48-

ductwork. More importantly, the air leakage to the exterior of the ceiling and wall cavities creates a negative pressure condition on the interior of the trailer. As the air from the ducts leak into the ceiling and wall cavities from the ductwork supplying the cold filtered air into the trailer, the return air portion of the air conditioner is drawing back into the air-conditioning unit the same quantity of air that it is producing. With the air-conditioning duct leaking 29 cubic feet of air per minute outside of the trailer, the return air system is drawing in or sucking into the wall and ceiling system of the trailer through these various unsealed cracks and joints in the walls, ceiling and floors of the building into the inside of the building. This hot, humid contaminated air is unfiltered. This is the contaminated air that was spoken about in Section q.i. above. This air intermingles with the wood and wood products that are emitting the formaldehyde and is being drawn into the building by the air-conditioning system because of the leaking ducts.

iii.   The ducts for the air-conditioning system are not properly sealed. This is a workmanship issue. Had the ducts been properly installed and sealed at the factory, the duct leakage would not have occurred.

iv.   According to air-conditioning section on page 21 of the owner's manual, the air-conditioning system is capable of cooling air to a maximum of 18°F to 22°F. This will occur at a relative humidity of 50%. The manual goes on to say that "as the humidity goes up, the cooling differences goes down. If temperature inside your coach is 100° when you turn on the air-conditioner, it will only put out 80°. Eventually, the air inside the coach will cool, and as it cools, the air put out by the air-conditioner will also cool. However, when starting out at a 100°, this cooling could take several hours before it reaches your desired temperature."

ALX-EXP-44-000050

In the hot, humid temperature zone in which New Orleans, Louisiana is located, temperatures are in the 90° range for most of the late spring through early autumn. This begins somewhere in May and continues through the months of June, July, August, and September. Along with the rise in temperature, South Louisiana also experiences a significant rise in relative humidity. The higher the relative humidity, the more "muggy or sticky" the contents inside your home and your body feels. What the owner's manual is stating is that is that as the relative humidity goes up, the cooling difference between the temperature of the trailer and the temperature of the air produced by the air-conditioning system is no longer 18° to 22°. The manual states that the cooling could take several hours to reach the desired temperature. Dropping temperatures down from 100° or more degrees on the interior of the trailer down to 70° to 75° which is the normal comfort level would take quite a number of hours to obtain. While the cooling is not the issue and the number of hours it actually takes to cool is not the issue, the real issue is the air-conditioning system running for many hours under negative pressure sucking in the contaminated, hot, humid air from the exterior to the interior of the trailer.

As the temperature gets colder on the interior of the trailer, vapor pressure differentials become a factor. The colder, drier air will attract the hotter, wetter air from the exterior drawing it in towards the interior. So there are two major factors working that are detrimental to the trailer and the occupants of that trailer. First, the negative air pressure is sucking in the hot, humid, contaminated air from the outside, and secondly, the vapor pressure is also assisting in the transportation of the hot, humid, contaminated air from the outside into the wall, ceiling and floor cavities and eventually into the interior of the trailer where the occupants are living. An example to explain how the wet, hot air of the exterior is driven into the colder, drier air on the interior of the trailer, we can use the example of a small

Page -50-

ALX-EXP-44-000051

amount of water spilled on the floor. If we take a dry sheet of paper towel and place it flat on the floor and just place one corner of the paper towel connecting with the spilled water, the water will be attracted to the sheet of dry paper.

v.  On page 22 of the owner's manual, the instructions regarding Fan-Tastic fan operation is included. It is unknown if this fan operation system is in conjunction with the air-conditioning system or this is a separate unit. The manual states that when used in the exhaust mode, the fan pulls hot air from the high inside of the coach and will pull fresh air from an open window. Because this unit operates on a separate thermostat, it is our belief that this system is not included in this model of travel trailer. A separate thermostat was not noted for that system.

It appears the Fan-Tastic type system that was installed in the Alexander housing unit is in the bathroom area. There were no other ventilation type mechanisms observed in this trailer.

Please see Enclosure 7, Fan-Tastic Vent Information Sheet from the manufacturer.

Regardless, the fact that the manufacturer is stating that this unit will draw in air from an open window indicates a lack of understanding by the manufacturer as to the temperature and humidity issues and problems that evolve around this procedure. Once again, even though the air would be pulled in through an open window, in the Gulf Coast region of the hot, humid temperature zone, hot, moist, unfiltered, contaminated air would be brought into the system.

vi.  Dometic Duo-Therm A/C unit:

1.  As is mentioned earlier in the report, the air-conditioning system installed in the Alexander

Page -51-

ALX-EXP-44-000052

trailer is a Dometic Duo-Therm 595 QUICK COOL. The installation instructions were downloaded from Dometic.

Please see Enclosure 5, Dometic Duo-Therm HP 595 QUICK COOL Instruction Manual.

On the first page of the Dometic document, a warning stating, "This manual must be read and understood before installation, adjustment, service, or maintenance is performed. This unit must be installed by a qualified service technician. Modification of this product can be extremely hazardous and could result in personal injury or property damage."

Along the lines of this warning, further modifications that could fall into this warning category can be the failure to properly install the ductwork system. This will be discussed further in this section of the report and is part of the Dometic standards. As we discussed earlier, failure to install the ducts properly can and does cause negative air pressure drawing in the hot, humid, contaminated air into the trailer. In addition, drawing moist air into wall, ceiling and floor cavities can cause conditions conducive electrical shorts and fires. As the humid air is drawn into walls, ceiling and floor cavities, they come in contact with the metal components of electrical devices and appliances. The high moisture content of the air interacting with the metals of the electrical devices causes corrosion through oxidation. This corrosion or rust then creates a pitting of the metal parts of the device. This pitting or eating away of the metal can caus arcing or a jumping of the electrical charge between the various metal components, it can raise the temperature of the metal components and the sparks created by the

Page -52-

ALX-EXP-44-000053

arcing can cause fires.[1]

2.      Under Section 1C, page 2, the manufacturer states,
        "The ability of the air-conditioner to maintain the
        desired inside temperature depends on the heat gain
        of the R.V." Some of the recommendations made by
        the manufacturer to reduce the heat gain is to keep
        windows and doors shut or minimizing usage.

        The heat gain is a measurement of heat absorption
        and gain in temperature as a result of various
        conditions.  The position of a unit or building; the
        number and size of doors and windows; the types of
        doors and windows and their insulating value and
        their ability to resist heat and air penetration; the
        types walls, ceilings and floors and the thickness of
        those systems; and the types of insulation and the
        thickness of insulation in the walls, ceiling and floor
        areas.  The higher the resistance values of the walls,
        ceilings and floors and the greater the ability to
        resist heat transferring from the outside to the inside
        of the trailer, the smaller the heat gain is.  The lower
        the heat gain, the quicker and easier it is to cool the
        interior of the temporary housing unit.  As we will
        discuss shortly, the type of wall, ceiling and floor
        construction did not permit a low heat gain transfer.

        Part of the calculations performed by Lagrange
        Consulting included the BTU gain per hour and per
        year. According to Figure 5 of the report, the walls
        had net BTU gain of approximately 1,262 BTUs per
        hour.

        The total BTU gain in the ceiling is approximately

---

[1] "The Effects of Smoke & Moisture on Residential and Commercial Electrical Systems"
by Alexis Mallet, Jr.

Page -53-

ALX-EXP-44-000054

385 BTUs per hour.  The total of 1,647.687 BTUs of heat gain per hour

3.    As noted earlier, the air-conditioning manufacturer recommends to keep the windows and doors shut and / or minimizing usage.  As we have discussed briefly and will discuss further in this report, Gulf Stream has recommended the opening of windows and doors for ventilation to reduce cooking odors and humidity within the unit.  FEMA and Fluor both advised residents to merely open windows and doors to reduce odor levels.  The recommendations are in contradiction to the manufacturer's specifications.

Please see the Owner's Manual, page 6 under the second warning of the left column.  Again on page 20, under Range, the manufacturer suggests it is always best to use the range exhaust hood with a window open slightly.   The reason for the recommendation for opening the window is to balance the pressure in a normally air-tight unit.  The air exhaust has to be made up by some introduction of outside air.  The problem is that opening windows introduces hot, humid, unfiltered air in hot, humid climates.

The operation of the Fan-Tastic ceiling fan is recommended by the trailer manufacturer.   The trailer manufacturer again states on page 22, under Fan-Tastic Fan Operation, that when used in exhaust mode, the fan pulls hot air from high inside the coach and will pull fresh air from an open window.

In miscellaneous documents reviewed by this writer, it appears that both FEMA and the manufacturer of the temporary housing unit instructed users to

Page -54-

ALX-EXP-44-000055

recommend the use of ventilation by opening windows and doors. As is noted once again, this is contradiction to the air-conditioning manufacturer's recommended operational procedures.

4. Under Section 1D, Condensation, on page 2, the manufacturer has written, "**Note**: The manufacturer of this air-conditioner will not be responsible for damage caused by condensed moisture on ceilings or other surfaces. Air contains moisture and this moisture tends to condense on cold surfaces. When air enters the R.V., condensed moisture may appear on ceilings, windows, metal parts, etc. **The air-conditioner removes this moisture from the air during normal operations. Keeping doors and windows closed when the air conditioner is in operation will minimize condensed moisture on cold surfaces.**" (Emphasis added)

The importance of this statement as it relates to the issues at hand with this temporary housing unit is that in a short paragraph, it explains what is occurring in the walls, ceilings and potentially floors of the Alexander unit. It states that "the air contains moisture and the moisture tends to condense on cold surfaces." Because of the failure of the manufacturer to construct a unit that prevents heat transfer from the exterior to the interior surfaces and the construction of the temporary housing unit is such that air is being transferred from the outside atmosphere to the walls, ceilings and floor areas and then to the interior surfaces, the dew point is reached the walls, ceiling and possibly floor areas.

It further states in Section D, "the air-conditioner removes the moisture from the air during normal operations." Normal operation is not meant to include the transfer of hot, humid air from the

Page -55-

ALX-EXP-44-000056

exterior to the interior raising the heat gain of the unit. The reason the air-conditioning manufacturer is directing to keep the windows and doors closed when the air-conditioning system is in operation is because the fenestration or openings in the exterior walls in the form of windows and doors will cause the hot, humid air to come into the unit and cause condensation on the cold interior surfaces. With the doors and windows closed, the air is drawn into the air leaks in the envelope of the unit and the condensation occurs inside the wall, ceiling and possibly floor system behind the finished vinyl or plastic covering of the wall and ceiling panels.

5. Once again on page 6 of the Dometic installation instructions, the manufacturer warns that improper installation may damage equipment, could endanger life, or cause serious injury and / or property damage.

We reiterate this because the air-conditioning system was not properly installed because of the air duct leakage. The manufacturer requires the ducts and their joints to be sealed to prevent condensation.

6. Air distribution system:

a. On page 7 of the Dometic installation instructions of the Dometic manual, directions for the air distribution system are given. They state as follows:

"The installer of this air-conditioner / heat pump system must design the air distribution for their particular application. Several requirements for this system **MUST** be met for the air-conditioner / heat pump to operate properly. These requirements are as follows:

Page -56-

ALX-EXP-44-000057

a.   The duct material must neither exceed any agency or RVIA standard that may be in existence at the time of production.

b.   All discharge air ducts must be properly insulated to prevent condensation from forming on their surfaces or adjacent surfaces during operation of the air-conditioner / heat pump. This insulation must be R-7 minimum.

c.   Ducts and their joints must be sealed to prevent condensation from forming on adjacent surfaces during operation of the air-conditioner / heat pump."

There is a caution block below the sizing information near the center of the page. It states, "**CAUTION**. It is the responsibility of the installer to insure the ductwork will not collapse or bend during or after the installation. Dometic Corporation will not be liable for roof, structural or ceiling damage due to improperly insulated, sealed or collapsed ductwork."

It is clear by the instructions given by Dometic that the joints and ducts must be sealed to prevent air leakage and condensation. It is also very clear that Dometic is informing the installer of the air-conditioning system that structural or ceiling damage due to improperly sealed ductwork is a distinct possibility. This is directly on point with the information that we have provided regarding hot, humid air infiltration from the

Page -57-

ALX-EXP-44-000058

exterior into the wall and ceiling cavities and that the duct leakage will result in negative air pressure and that negative air pressure will suck in the hot, humid air from the exterior into the ceiling and wall cavities and that severe damage to the unit as well as potential harm to the occupants are a very distinct possibility.

7.    Prevention of Air Leakage:

a.    Page 8 of the Dometic manual, Section 5b(4) under Air Distribution System Installation instructs the installer to provide adequate support and prevent air from being drawn into the roof cavity during the installation of the air conditioning unit on the roof. Once again, this coincides with our presentation that air infiltration bring in hot, humid contaminated unfiltered air is harmful to the building and the occupants.

Please see Enclosure 5, Dometic Duo-Therm HP 595 QUICK COOL Instruction Manual.

vii.    A review of the Standard on Recreational Vehicles 2002 Edition produced by ANSI and NFPA was performed. The particular standards that govern the design, construction and operation of recreational vehicles under these organizations are ANSI A119.2 and NFPA 1192. The particular edition that would govern the Alexander temporary housing unit would be the 2002 Edition.

1.    The standard on page 8 gives the definition of recreational vehicles, camping trailers and travel trailers that are governed under this standard. The Alexander temporary housing unit falls within the definition of this standard.

Page -58-

ALX-EXP-44-000059

2.    Section 5.6.2.5, Special Requirement for Forced - Air Heating Appliances, states, "A forced-air heating appliance and its return-air system shall be designed and installed so that negative pressure created by the air circulating fan cannot effect its or another appliance's, combustion air supply or act to mix products of combustion with circulating air."

The standard is very clear that negative air pressure has the potential for a detrimental effect as a result of the operations of the furnace. Contaminated air and fumes from the forced-air system can re-enter the home as a result of the negative air situation sucking those fumes back into the housing unit.

3.    Section 5.6.3.1 (3), Venting, Ventilation and Combustion Air, Installation of Venting and Combustion Air Systems requires that every joint of a vent, vent connector, exhaust duct, and combustion air intake shall be secure and in alignment. This is to prevent air leakage into the interior living space of the housing unit. Because the malalignment of joints and ducts cause leakage, the intent of the code is to prevent re-entry of the fumes from the forced-air system into the living space.

4.    Section 5.6.9.3, Prevention of Negative Pressure in Recreational Vehicles, found on page 19, specifically deals with fuel burning clothes dryers. While there is no clothes dryer designed for or installed in the Alexander unit, it is clear that prevention of negative air pressure is the intent of the code and on every section involving areas of potential re-entry of contaminants and moist air, the code is designed to prevent such events from occurring.

Page -59-

ALX-EXP-44-000060

5.    Section 5.7.1, Supply System Ducts, directs the manufacturer to use durable construction that can be demonstrated to equally resist fire and deterioration. The call for ducts that are resistant to deterioration is once again to prevent air leakage into non-air-conditioned spaces which cause negative air situations to occur which is conducive to potential deterioration to the building's components and unwanted contamination that may effect the occupants of the housing unit.

6.    Section 5.7.7, Return Air Duct Permanent Unclosable Openings, page 21, requires some mechanism to prevent areas from being closed off to the return air of the furnace system. This is meant to prevent imbalanced air pressures in various areas of the house. By closing areas off from one room or one area to another preventing air return to the forced-air furnace system creates a negative air pressure condition within the housing unit. If air from a room that is closed off cannot be returned to the unit, the unit will then draw from other openings in the envelope of the trailer drawing in unconditioned, unfiltered, contaminated air.

7.    Section 5.7.8, Air Duct Joints and Seams can be found on page 21 of the code. The code requires that joints and seams of ducts shall be securely fastened and made substantially air-tight. Noted in that section of the code is the permissible use of tape or caulking compounds to force mechanically sealing the joints and seams of the ductwork. It is also noted that within that portion of the code that the use of tape and caulking compounds shall not be subject to long exposure to conditions of high humidity, excessive moisture or mildew.

Exposure to tapes such as duct tape or other similar

Page -60-

ALX-EXP-44-000061

type adhesive compounds do not stick under high moisture, high humidity or when mildew is present. Negative air pressure drawing in humid air from the exterior of the building will attack these sealants.

8.     Section 5.8.1, General Requirements - Air-Condition Appliances, can be found on page 21 of the code. This portion of the code requires every air-conditioning appliance or combustion air-conditioning and heating appliance to be installed in accordance with the terms of its listing and the manufacturer's instructions.

9.     Section 5.8.2.1, Installation of Air-Condition Appliances, reiterates the requirement to conform with the manufacturer's installation instructions.

       It is a requirement of the code to follow the installation instructions of the air-conditioning manufacturer. It has been well documented earlier in this report that duct leakage and negative air conditions as a result of improper installation of the system not only fails to follow the instructions of the manufacturer of the air-conditioning system but in fact is a code violation.

10.    Section 7.3.3.3, Damage, on page 28 of the code states that "all exterior openings around piping shall be sealed to prevent the entrance of rodents." As discussed earlier in the report in the section referring to the underbelly of the housing unit, it was noted in our discussion and are documented by photographs that there are openings in the underbelly of the Alexander housing unit that was in violation of this code. Areas such as water lines, drain pipes and wiring penetrations were in violation of the code and were photographed for documentation.

Page -61-

ALX-EXP-44-000062

viii.   As previously stated, the manufacturer has made an issue regarding a lack of ventilation in these temporary housing units. As has been discussed in different ways and cross-referenced by other documents such as by the Dometic air-conditioning manufacturer's installation instructions, the method of ventilation suggested by Gulf Stream simply was not proper for the occupants to perform in the hot, humid climate zone of New Orleans, Louisiana. Opening the windows on an on-going basis to ventilate the contaminants such as formaldehyde is simply not an option in the months of May through September.

ix.   Unfortunately, the issue of exfiltration of the formaldehyde gases within the Alexander temporary housing unit is not limited to a matter of simply opening windows and doors for ventilation or the addition of a Fan-Tastic vent to introduce fresh air or expel the formaldehyde within the housing unit.

x.   Gulf Stream has either overlooked or ignored the probability of condensation occurring in the walls, ceiling and possibly the floor systems of these temporary housing units. It has long been established by studies at least in the early 1980s and before regarding condensation occurring in cavities of a structure as a result of temperatures reaching the dew point and condensation occurring as a result of temperature and materials reaching the dew point in these cavities. The manufacturer is associated with a manufacturing company. HUD has required the control and management of air, water, temperature and moisture infiltration into the cavities and envelopes of mobile homes. The science is not new science. It has been known for many years and is taught at either the elementary or middle school level. A brief explanation of condensation occurring in a wall system is the placement of a glass filled with water and ice cubes on a countertop or outside of a building. Soon water droplets collect on the outside face of the glass. This is an example of the temperature on the

Page -62-

ALX-EXP-44-000063

outside of the glass reaching the dew point and condensation occurring. The droplets of water on the exterior of the glass is condensation. It is the transforming water that is in a vapor or gaseous state into a liquid.

This condition can occur in the cavities of the housing unit anytime during May, June, July, August or September in the New Orleans area. The manufacturer's failure to account for or address this probability is a manufacturer's defect in design.

xi. In addition, the manufacturer has utilized a vinyl or plastic type of covering on the wall and ceiling panels. While the perm rating (a material's ability to resist or allow moisture vapor or water to pass through that material) is unknown, any material with a perm rating low enough to prevent or slow the passage of the moisture vapor from the exterior to the interior for drying purposes will create a problem in the wall, ceiling and floor cavities of the housing unit. Once the vinyl or plastic face of the wall and ceiling panels prevents or retards the moisture from passage through to the interior, the moisture vapor collects on the interior of the wall cavity and as the surfaces on the interior of the temporary housing unit gets colder and falls below the 75° range on the interior of the housing unit, the water vapor in the wall cavity of the trailer begin to condensate. The manufacturer failed to provide for management of water and water vapor intrusion into the wall, ceiling and floor cavities. This failure to provide for management of water or water vapor introduced into the cavities of the building and for its exfiltration or expulsion is a design defect.

xii. The manufacturer also failed to properly design the wall, ceiling and floor cavities to manage moisture entry as a result of any potential negative air pressures with the trailer unit. We have discussed the causes and avenues for moisture passage into the trailer unit repeatedly earlier in this report. Repeated studies have indicated the potential

Page -63-

ALX-EXP-44-000064

for damage to living units and the potential harmful effects to the occupants of living units when negative air conditions are present. The failure of the manufacturer to account for and prevent negative air conditions in the Alexander temporary housing unit is a defect in design.

r.    Furnace - Duct leakage:

i.    The information provided by the HUD Procurement Specifications indicated a 34,000 BTU unit was to be provided with this housing unit. Examination of the Alexander housing unit revealed that it was a Suburban Manufacturing Company forced-air heating unit.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph #30.

ii.    The model number and exact BTU capacity of the unit is unknown. The unit was housed within the seating area nearest to the entry door.

iii.    The furnace is believed to operate on LP gas. The source of the LP gas is two LP tanks located at the tongue end of the trailer.

iv.    The exhaust vent for the furnace is located immediately outside the door of the Alexander temporary housing unit.

v.    Part of Lagrange Consulting's charge was to test the heating duct system for air leakage.

vi.    The results of the heat system duct leakage tests indicated the following:

1.    Leakage of 87 cubic feet per minute of air and duct leakage to the inside of 65 cubic feet per minute of air for a total duct leakage of the heating system of 152 cubic feet per minute.

Page -64-

ALX-EXP-44-000065

2.    The air loss at the maximum cfm output of the duct system leaking to the outside is 26.8%.

3.    The percentage of duct leakage to the outside at the minimum cfm on this system is 34.8% duct leakage to the outside.

4.    The percentage of duct leakage to the inside at maximum output of the unit is 20%.

5.    The air leakage of the duct to the interior at minimum output is 26%.

6.    The total amount of duct leakage at maximum output of the furnace is 46.8%.

7.    The percentage of total duct leakage at minimum output is 60.8%.

The furnace duct leakage has been extensively discussed in other areas of the report. The same conditions apply regarding the manufacturer's failure to properly design and / or construct a duct that:

a.    Does not leak air

b.    Does not create a negative air pressure condition in the temporary housing unit

c.    Does not create unsafe conditions by the potential of drawing the fumes from cooking and operations of the furnace back into the living area of the trailer.

Please see Enclosure 8, Lagrange Consulting, L.L.C.'s inspection report dated May 7, 2009.

Page -65-

ALX-EXP-44-000066

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #322 through #330, #336 through #355 for test procedures of sealing furnace and duct system and return air grills.

Please Enclosure 14, Suburban Manufacturing Company.

s.   Infrared Thermography Survey:

i.   To the extent possible, an infrared thermographic survey was performed on the interior of the building during the envelope air leakage tests and the furnace and air-conditioning duct leakage testing. Not all areas were easily accessible to perform a survey utilizing a BS20 CHECK MODEL NUMBER Flir Infrared camera. The survey was performed for the purposes of identifying anomalies in the walls, ceilings and floors of the Alexander temporary housing unit.  Air and moisture leaks or condensation would show as temperature differentials noted by the variations of color during the survey.  A number of these anomalies were photographed using both the Flir BS20 infrared camera and a digital camera photographing the areas corresponding to the infrared photographic images.

ii.   The infrared photographic images can be found in Enclosure 1c, Infrared Thermographic Images by First General Services of the South, Inc. dated May 7, 2009. The digital photographs can be found in Enclosure 1a, First General of the South, Inc.'s Photographs.  The corresponding images / photographs are noted below:

1.   Infrared Photograph #1 - Digital Photograph #357

a.   This is the rear, right corner area of the bedroom indicating moisture.

2.   Infrared Photograph #2 - Digital Photograph #358

Page -66-

ALX-EXP-44-000067

a.     This is the area of the air-conditioning unit in the kitchen / living room area.  This is toward the front of the housing unit.

3.     Infrared Photograph #3 - Digital Photograph #359

a.     This is the rear side of the air-conditioning unit located in the kitchen / living room area. For an overview of that location, please see First General Services of the South's Photograph #361.

4.     Infrared Photograph #4 - Digital Photograph #360

a.     This is the area below the window in the living room / kitchen area.

5.     Infrared Photograph #5 - Digital Photograph #369

a.     This is in the kitchen / living room area. Indications are considerable heat gain in the corners and cold spots at various areas possibly indicating gaps in the insulation near the framing.

6.     Infrared Photograph #6 - Digital Photograph #370

a.     Further indications of cold and hot areas in the ceiling and ceiling to wall connection. Air infiltration is occurring in these areas. The envelope is apparently not well sealed for air infiltration.  The area is also has some gaps in insulation creating hot spots in the ceiling.

7.     Infrared Photograph #7 - Digital Photograph #371

Page -67-

ALX-EXP-44-000068

a.      This is the area around the bunkbeds. Heat infiltration was noted at the roof to wall intersection. There also appears to be inadequate insulation covering this area.

8.    Infrared Photograph #8 - Digital Photograph #371

a.      This is in the lavatory area. Separation in the insulation as well as air infiltration at the roof to wall connection was noted.

9.    Infrared Photograph #9 - Digital Photograph #372

a.      This is at a different angle of the ceiling and wall area of the lavatory area.

10.    Infrared Photograph #10 - Digital Photograph #373

a.      This is the area in the bathroom lavatory over the mirror.

11.    Infrared Photograph #11 - Digital Photographs #374 and #375

a.      This is the converter cabinet. Heat is projecting from the cabinet as a result of a breach in the belly and the hole in the floor in the converter closet.

12.    Infrared Photograph #12 - Digital Photographs #376 and #377

a.      This is right wall at the bunkbed area.

13.    Infrared Photograph #13 - Digital Photograph #379

a.      This is the front wall of the bunk area.

ALX-EXP-44-000069

14. Infrared Photograph #14 - Digital Photograph #380

    a. This is the bathroom area.

15. Infrared Photograph #15 - Digital Photograph #381

    a. This is the rear, left corner of the bathtub.

16. Infrared Photograph #16 - Digital Photograph #382

    a. This is the area of the right, rear corner over the bathtub.

17. Infrared Photograph #17 - Digital Photographs #383, #384, #385, and #386

    a. This is the area inside the converter cabinet where the penetration in the floor was observed.

t. Warnings:

    i. Noted throughout our study and review of documents was repeated warnings related to various items regarding the operation and the use of the Gulf Stream housing unit. The warnings are as follows:

        1. Warnings regarding cooking and the use exhaust vents and a reminder the occupant must provide and adequate supply of fresh air for combustion. It also states, "Unlike homes, the amount of air in an RV is less due to its limited size (volume). Proper ventilation when using cooking appliances will avoid the dangers of asphyxiation."

        2. One of issues that has not been presented to any extent in this report thus far is the overall size of this housing unit. This housing unit measures

Page -69-

ALX-EXP-44-000070

approximately 8' x 14' and is approximately 6'4" to 6'5" high. Extensive measurements were taken and recorded. These dimensions were converted to a CADD drawing with notations. The complete layout of the temporary housing with the locations of appliances, bedding, tables, seating, room locations, window and door locations, air-conditioning and electrical outlets, various penetrations through the exterior walls of the unit, lighting, bathroom fixtures, and the location of the air-conditioner and heating unit have all been reduced to drawings.

Please see Enclosure 9, drawings of the floor plan, electrical floor plan, floor elevations, rear elevation, right side elevation, left side elevation, and mechanical plan.

Regarding the overall square footage and cubic footage of the Alexander temporary housing unit, the warning on page 3 of the owner's manual makes note that the manufacturer is well aware that the unit is unlike a residential home and the amount of air in the RV is substantially less because of the volume. The manufacturer is acknowledging the importance of proper ventilation in this small amount of living area.

3.    In Dr. Stephen Smulski's report, dated May 18, 2009, there is an in depth analysis of the amount of wood product and formaldehyde containing products that were utilized in the design and construction of the Alexander housing unit. Dr. Smulski goes into great detail regarding each and every wood product, wood containing product, or other formaldehyde products that were utilized in this housing unit. Dr. Smulski enumerates "the subfloor, walls, ceiling, doors, cabinets, dining table, countertops, built-in seating and other furniture, and bed supports are all

Page -70-

ALX-EXP-44-000071

constructed from wood base composite products, particle board, medium density fiberboard and hardwood plywood that are all known to release formaldehyde gas after being placed in service." He also observes and notes that the back side and edges of most of these items are exposed with no overlay to prevent infiltration of the formaldehyde emissions from entering into the living area of the trailer. Dr. Smulski goes on to recognize the location of the FEMA temporary housing unit's location in New Orleans, Louisiana and its exposure to the hot, humid climates of this region. He states, "These are the exact conditions that maximize the release of formaldehyde from wood based composite panels including particle board, medium density fiberboard, and hardwood plywood."

Because of the small size of the unit, the formaldehyde emissions are more concentrated in the temporary housing units than they would be in either a normal sized house or a commercial building.  The larger the building, the less the concentration of formaldehyde disbursement in the building. The larger the house or the building, the less the formaldehyde that is in that building.  An example, to equate this to some every day living example is to consider a cook making a pot of gumbo.  He or she uses a certain amount of ingredients to make a roux adding a certain amount of chicken or sausage in that pot, and then filling that pot with water. Let's also visualize the cook is starting out with a two quart pot to make a very small gumbo and the ingredients the cook has fits in that small two quart pot. Now let's take a pot that will hold 10 gallons of water; however, we use the same amount of ingredients seasoning, flour, chicken or sausage that we used in the two part of gumbo and placed that in the 10 gallon pot and filled

Page -71-

ALX-EXP-44-000072

that with water. We do not add any extra ingredients or seasoning to the 10 gallon pot of gumbo - only that which was used in the two quart pot. That 10 gallon pot of gumbo is going to have a far weaker flavor in the 10 gallon pot than it will in the two quart pot. The ingredients are disbursed in larger quantity of water in a ten gallon pot than in the two quart pot.

Another example would be if we had a fish placed in bucket and placed that bucket inside one of the FEMA temporary housing unit trailers and then we placed the sized bucket with the same sized fish in a house that has approximately 2000 SF of floor area verses the FEMA trailer with approximately 226 SF of living area. The bacteria will create the same amount of odor in either case; however, in the small, highly concentrated closed in area of the FEMA trailer, the odor will be far greater because of the higher concentration of odor than that which would be found in the much larger 2000 SF conventional house.

Dr. Smulski opines that the FEMA unit furnished to Ms. Alexander was not suitable for long-term housing because "the travel trailer supplied by FEMA to Ms. Alexander was not suitable for use as long-term housing because it was foreseeable and predictable that formaldehyde gas would be released from the wood based composite panels including particle board, medium fiber density fiberboard and hardwood plywood used in the trailer and that Ms. Alexander and son, Christopher Cooper, would potentially suffer adverse health effects from chronic exposure to the formaldehyde gas."

Please see Enclosure 10, Affidavit of Stephen Smulski, Ph.D., Consulting Wood Scientist, dated

Page -72-

ALX-EXP-44-000073

May 18, 2009.

4.   Continued review of the warnings on page 3 of the
     owner's manual reveals warnings against use of
     portable burning equipment such as grills and
     stoves. The manual warns not to bring or store LP
     gas containers, gasoline or flammable liquids inside
     the unit.   The manual warns not to fill the LP
     containers to more than 80% of their capacity. Page
     3 also contains procedures of what to do if you smell
     gas. Under the fire safety section, the manufacturer
     warns not to smoke in bed, not to overload electrical
     systems, not to permit children near the LP gas
     controls or container, and again not to store
     flammable liquids inside the unit. Fire safety data
     also includes suggestions to educate everyone
     regarding the location of emergency exits and the
     location of the fire extinguisher.   Information is
     given to check the extinguisher on a regular basis to
     ensure it is properly charged.

     Page 3 of the manual continues to give information
     regarding the smoke detector equipment in the unit
     and instructions to check its operation on a regular
     basis.   It informs the occupant that if it does not
     check out properly to get the smoke detector
     serviced or replaced.

5.   Page 4 contains warnings regarding carbon
     monoxide safety. It explains what carbon monoxide
     is.   It informs the occupant to carefully read the
     instructions regarding the CO detector and how to
     clean and what methods not to use in cleaning the
     CO detector.

     The manual states the effects of carbon monoxide
     emissions and the events which will trigger the CO
     detector to sound an alarm. If the alarm is sounded,

Page -73-

ALX-EXP-44-000074

instructions are given to the occupant of procedures to take at that time.

There is also a note regarding only travel trailers and fifth wheels with generator set ups will have CO detectors.

6.     Page 4 once again contains information on the safe use of the LP gas system.

7.     Page 5 contains information regarding the safety chains, safety breakaway switch and the positioning of the hitch ball.

8.     Page 7 contains warnings regarding the rated load of the RV and tips on loading. There are four warnings noted on page 7 regarding the carrying capacity and loading of the RV.

9.     Page 10, once again, there is a repeat of the dangers of overloading the unit.

10.     Page 11 contains numerous items regarding safety tips including emergency windows, fire extinguishers, smoke detectors, LP gas detectors, and carbon monoxide detectors.

11.     Page 20 contains warnings once again providing adequate ventilation when using the range and oven. It informs the occupant to use the exhaust and open the windows slightly.

12.     Page 21 discusses to have unobstructed air flow from all of its vents including the interior and exterior vents.

13.     Page 22 discusses the effects of long-term occupancy. We will discuss this further in the report

ALX-EXP-44-000075

under the heading of Foreseeable Issues - Ttemporary versus Long-Term Housing.

14.   Photographic documentation of the warning labels around the interior and exterior of the Alexander travel housing unit was made. Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #12, #13, #22, #26, #28, #29, #30, #31, #32, #38, #44, #45, #50, #51, #53, #56, #57, #59, #61, #66, #67, #125 through #135 and #272, #273 and #310 and #311.

ii.   It is interesting to note that not only did Gulf Stream have knowledge of formaldehyde and issues of danger to occupants of buildings with materials that emit formaldehyde; that the subject of formaldehyde has been extensively researched; authoritative writings on the subject of formaldehyde on building products and buildings been produced; HUD has issued warnings and directives in manufactured housing area of which a sister company of Gulf Stream produces; and the owner of Gulf Stream had personal knowledge of issues with formaldehyde emissions in products since the mid 1990s, Gulf Stream has continued to specify low formaldehyde emitting products and formaldehyde producing products for use in the production of their travel trailers. There are no warnings published, listed, eluded to, directives on or any such information provided to the end user of the Alexander FEMA temporary housing unit in all of the documents, literature, statements, testimony, etc. reviewed by this writer.

There has been no explanation to date of why a notice or information regarding formaldehyde content of the building products in the FEMA housing units produced by Gulf Streams was not provided other than the statement by Gulf Stream that there are not requirements that they provide such a notice or meet any criteria regarding the

Page -75-

ALX-EXP-44-000076

levels of formaldehyde emissions in their products.

u.   Details of installation:

i.   Repeated review of the owner's manual was performed attempting to obtain any details or instructions on the proper set up of the temporary housing unit or travel trailer. Nowhere in the owner's manual was this writer able to find any instructions, illustrations, documentation of anything else regarding the method of proper set up of the Alexander temporary housing unit.

ii.  The only information that was obtained and reviewed regarding installation of the travel trailer is in the form of written basic set up details listed in Exhibit 7, Travel Trailer installation, Bates Stamp Number FLFCA-000113 through 000122.

iii. The travel trailer installation guidelines are deficient in its directive regarding the blocking of the trailer. It does not spell out the exact procedures for the jacking up of the unit. Other than the final product, the blocking and the jacking up of the unit appears to left to the discretion of the installer. Unless there are other installation guidelines not available to this writer, each installer would appear to have been left to their own discretion as to how he would lift the trailer for blocking and where the pressure points would be placed in lifting the trailer. In addition, protection of the framing while the jacking was occurring was not spelled out in the guidelines. Putting pressure points on too small of an area will cause distortion in the framing and other components of the trailer.

Please see Enclosure 1a, FGS photographs #32, #37, #38, #44, #45, #53, #56, #57, #58, #59, #60, #61 and #67.

Please see Enclosure 1d, Photographs by W.D. Scott taken January 28, 2008 after the temporary housing unit had been

Page -76-

ALX-EXP-44-000077

removed and reset on location.

iv.    Section 2, Basic Travel Trailer Set Up, pages 1 and 2, describe the actual blocking and leveling procedures under Section 2.1.2. The standards state that the installation contractor will degrass the site and remove any loose materials at the base of the piers to be installed. The standards state, "Travel trailers shall be set-up on concrete piers and after the weigh (sic) of the travel trailer is transferred to the piers, if the unit is not leveled properly, the contractor will reinstall the unit at no additional cost to the government." The standard goes on to state the travel trailer will be installed on a minimum of six piers with a minimum of three sets of piers on each side evenly spaced. The piers on the end of the trailer should not be set at the very end of the unit but set back approximately 6" off the edge. The standard says the base will be constructed of a 3/4" x 24" x 24" exterior grade plywood and that solid capping wedging will be installed.

v.    On page 2, the standard goes on to state, after the weight of the travel trailer is transferred to the concrete piers, the piers must be vertically aligned and tightly shimmed with wooden wedges. If the piers are not vertical at the time of final inspection, they will be removed and reinstalled by the contractor at no additional cost. The contractor will be responsible for all necessary releveling and reblocking of the travel trailer for a period of 90 days after final inspection.

vi.    It is unknown how the travel trailer was jacked up onto the blocks. This writer was informed by either one of the attorneys or one of the consultants involved in this litigation that the trailer was lifted one corner at a time and blocked. This writer has extensive experience in designing and constructing lifting and leveling devices and moving small and large structures short and long distances. Any method of raising the travel trailer other than a unified

Page -77-

ALX-EXP-44-000078

jacking effort where the same amount of pressure is applied uniformly at the same time around the entire perimeter of the travel trailer and in locations of the corners and closely aligned with the wheels and axles will cause distortion in the steel framing, wall system, and roof system of the travel trailer. Unequal pressures placed on the frame of this or most structures will cause damage and / or stresses and / or distortion to occur. This will allow air, moisture and water to enter into the envelop of the trailer.

vii.   It is also unknown whether the piers under the travel trailer remain level after their installation.

viii.   Lifting the temporary housing units off of the wheels and jacks were never discussed between the manufacturer and the government. Any and all blocking means, methods and specifications appear to have come from FEMA or the contractor in charge of setting up of the units.

ix.   It is documented that the travel trailer was moved from the site on Dale Street, New Orleans, Louisiana for purposes of demolishing the home that the Alexander family occupied after Hurricane Katrina.   Once again, it is unknown how the unblocking and reblocking of the travel trailer was effected.   Any abnormal stresses with the unblocking and reblocking would cause unwanted stresses in the framing and interior and exterior surfaces of the travel trailer.

x.   Close observations of the scissor jacks located at the four corners of the Alexander housing unit reveal warning stickers on all four of the scissor jacks. The warning states not to attempt to lift the trailer from the ground with the scissor jacks and that the weight of the unit should not be taken off of the tires. It appears at least the instructions not to take the weight of the trailer off of the tires was not followed as a set up instruction.

Page -78-

ALX-EXP-44-000079

Please see Enclosure 11, Installation Guide for Travel Trailers.

v.    James Shea with Gulf Stream testified that he saw no problems with the method of FEMA's installation of the trailers. His comment was directed toward the block up of the temporary housing units on piers.

Please see Enclosure 11, Installation Guide for Travel Trailers.

v.    Gulf Stream had Scott Pullin spending time in the hurricane zone related to the deployment of units. It would appear he would have had knowledge of the method of installation and set up being utilized by FEMA and would have notified the manufacturer of not only the conditions of the set up and blocking but also the widespread devastation and need for long-term occupancy of more than just a few weeks of these units.

Please see Enclosure 11, Installation Guide for Travel Trailers.

9.    Industry Awareness of Construction and Formaldehyde Issues:

a.    Since the 1980s, there have been numerous studies regarding issues with the use of low perm or impermeable coverings on wall and ceiling finishes in the hot, humid climate zones; proper air exchange per hour ventilation; duct leakage; the consequences of duct leakage including negative air pressure; and negative air pressure and the problems with drawing in hot, humid, unfiltered, contaminated air from the exterior in the hot, humid climate zone. No one in the industry should be able to claim a lack of knowledge of these items. The data has been available and printed in many forms such as books, magazine articles, and trade publications.

b.    There is the same level of awareness regarding formaldehyde emitting products and their use in construction. It should come as no surprise to anyone in the building industry that formaldehyde emitting materials are problematic at best and a known carcinogen at worse.

Page -79-

ALX-EXP-44-000080

c.   It also has been known through research by others that formaldehyde emissions double for every 12°F increase in temperature. Including other industry researchers, Mary DeVany testified before Congress and gave indications of the formaldehyde rate of increase of doubling for every 12°F increase in temperature.

d.   ASTDR recommends ventilation, temperature control, air exchange, and no smoking in temporary housing units. One missing component regarding the ASTDR recommendation is that in addition to ventilation, the temporary housing units should be operated under positive pressure. In other words, interior air should be blowing contaminants away from the unit when opening the door or window from the outside of a temporary housing unit, especially in the summertime. One should feel a slight puff of cold air from the air conditioner blowing out of the temporary unit as opposed to opening a window or door from the interior and feeling a puff of or a rush of hot, humid air from the exterior entering into the interior of the building.

e.   James Shea stated in his deposition that since the mid 1990s his company specified low formaldehyde emitting products; however, he does not know if those specifications were followed. Having in place a policy or procedure without followup, or someone being able to hold a party responsible for not fulfilling the standards and specifications set is second only to not having those specifications set at all. If there is no way to verify or no procedure in place for verifying that low formaldehyde emitting products are being designed and supplied to Gulf Stream, then it cannot be confirmed whether materials being delivered are in fact low or no formaldehyde emitting materials.

f.   At least on one occasion, Gulf Stream noted that a supplier, Adorn, was not supplying low formaldehyde emitting wall and panels. This may also have applied to the cabinets. This was information provided by James Shea.

g.   Mr. Shea gave information indicating roof underlayment plywood is not low formaldehyde emitting material. He stated that most of their underlayment is purchased from Weyerhaeuser. The surfaces of the roof underlayment would be unsealed or uncoated materials. The top part of

Page -80-

ALX-EXP-44-000081

the underlayment would be covered by an impervious roof membrane. Any activated formaldehyde vapor could not escape through the roof membrane and would be emitting in the ceiling cavity and eventually into the living space.

A review of the invoices that were produced and available to this writer for inspection indicated the Weyerhaeuser products were in fact not stamped or marked on the purchase order or invoice as low formaldehyde emitting products.

h.   Exhibit 10 attached to Mr. Shea's deposition regarding the purchase order to Adorn indicates, "All products must be approved and comply with HUD requirements for manufactured housing."

As was discussed earlier in the report, Gulf Stream and its sister company appear to be well aware of the HUD requirements for manufactured housing.   Manufactured housing requires low formaldehyde emitting product usage in the manufacture of homes that are built under Part 3280 of the HUD regulations.  It appears that Gulf Stream had the information, knowledge and ability to produce temporary housing units to FEMA that would have met the HUD requirements but merely chose not to perform to that level of construction and design excellence.

i.   Gulf Stream released a statement dated April 27, 2006 wherein they state they specify low formaldehyde emitting products from their suppliers. They state they informed the public that formaldehyde levels quickly dissipate by opening windows, vents and doors and normal use of exhaust fans and air conditioning units.

j.   That information is misleading.  Opening the windows and doors are contrary to the instructions of the air-conditioning manufacturer.  In addition, Gulf Stream is again failing to address two major issues regarding formaldehyde emissions in their product. First, they fail to properly test to ensure the FEMA temporary housing units were operating under positive pressure. Second, they are failing to take into account that the Alexander housing unit as well as the majority of the temporary housing units produced for FEMA were located in the hot,

Page -81-

ALX-EXP-44-000082

humid temperature zone. Opening windows and doors merely introduces very moist, very hot, and contaminated unfiltered air into trailer. Leaving the windows and doors open in addition creates a condition of equilibrium of moisture vapor and temperature between the inside and the outside. As is noted in the owner's manual and the air-conditioning manufacturer's manual, it takes much longer to lower the temperature in a FEMA trailer after windows and doors are left open and the temperature and humidity are allowed to rise and become equal to or greater than that of the exterior environment.

k.   Gulf Stream states they have a designated employee to check in materials and they supposedly check materials for formaldehyde emission verification; however, information provided by Gulf Stream personnel themselves have:

    a.   Identified Adorn as supplying more than 10% of the ceiling and wall panels for their product. As noted, this may also have applied to the cabinets placed in their units.

    b.   There is no documentation the person receiving the materials is looking for verification of low formaldehyde stamps or marks.

    c.   There was accidental discovery of products in the manufacturing plant that did not meet the low formaldehyde emission requirement placed upon the suppliers

    d.   It is unknown the quantity of materials actually utilized in the manufacture of the Gulf Stream units that did not meet the low formaldehyde emission designation.

l.   Gulf Stream states they specify low formaldehyde emitting materials. We in fact have reviewed documents indicating they have specified to their supplier of certain items to be low formaldehyde emitting materials. Mr. Shea has also stated they were aware of two federal regulatory rules that they were familiar with that might give guidance regarding formaldehyde emissions. Mr. Shea also states there is no government regulatory rules on formaldehyde for travel trailers.

Page -82-

ALX-EXP-44-000083

m.  It was also stated it would be difficult to identify what vendors supplied what materials on any particular travel trailer that Gulf Stream manufactured. This would make it very difficult to backtrack based on invoices or purchase orders for materials to see what materials were purchased for what travel trailer and if they were non-formaldehyde emitting materials or not.

n.  Mr. Shea confirmed the bottom board is a woven polymer product that reduces the likelihood of the entry of moisture into the bottom of the housing unit. Therefore, it is apparently safe to assume that most of the moisture in the walls and ceiling cavities are a result of air infiltration from the exterior or leaks in the outside skin of the travel trailer.

o.  It appears that Gulf Stream has set standards for at least some of the products requiring low formaldehyde emissions materials from their suppliers. While there are no regulatory requirements for Gulf Stream to provide any particular level of formaldehyde emissions within the living area of the temporary housing unit, Gulf Stream has set the standard for their own work product by requiring these low formaldehyde emitting materials to be supplied. In setting the standards for their products requiring low formaldehyde emissions, it is unknown why Gulf Stream failed to follow through with the other conditions that are conducive to the activation of formaldehyde in the materials used in their product.

It is unknown why Gulf Stream failed to properly construct the air-conditioning duct system; the furnace duct system; properly seal the walls, ceiling and floor systems; and prevent negative air pressure from burdening the materials with elevated temperature and relative humidity that are known to activate the formaldehyde emissions. It is also unknown why the design and construction of their temporary housing units were not properly designed and constructed to prevent the manifestation of condensation by the temperatures reaching the dew point in the cavities of their housing unit.

p.  According to Mr. Shea, Gulf Stream understood the government expected them to provide a safe product. Mr. Shea states his company was concerned with safety and took measures to provide a safe product

Page -83-

ALX-EXP-44-000084

including the use of additional testing. He does not state what additional testing Gulf Stream undertook to ensure a safe product; however, it appears testing for formaldehyde levels was not one of the test procedures employed by Gulf Stream. Mr. Shea reiterated that Gulf Stream had to be safe. He also understood that if his product was not safe that Gulf Stream would have to remedy that condition.

q.   Gulf Stream did not instruct the government to "air out" their temporary housing units.

r.   Gulf Stream did not test the air of the finished product for formaldehyde emissions.

s.   Gulf Stream is aware there is no language in the owner's manual regarding formaldehyde.

t.   In 2007, Gulf Stream adopted the California Air Resources Board Standard. They adopted the standard for formaldehyde emissions after litigation in this matter was brought about.

u.   Gulf Stream realized the unit would be exposed to heat and humidity and that heat and humidity can effect the levels of formaldehyde. No documents have been reviewed or statements taken to explain the lack of action to notify the occupants or to give warning of the potential issues that could arise as a result of formaldehyde. Representatives of Gulf Stream have stated they were aware that formaldehyde was an issue, that formaldehyde caused problems, that heat and humidity effect the level of formaldehyde emissions, and that the units they were constructing, especially that unit constructed for the Alexander family, were constructed and dispatch for use and occupation in the hot, humid temperature zones where temperature and humidity is much higher than other areas of the country, but they give no explanation other than it was not a government regulation.

v.   Gulf Stream has furnished temporary housing units to FEMA since Hurricane Andrew in 1992.

w.   Mr. Shea states you can have "an accumulation of indoor, chemical

Page -84-

ALX-EXP-44-000085

constituents, including formaldehyde and other things that you would air out the unit prior to taking residency." It appears Gulf Stream not only knew that these units could have an accumulation of indoor contaminants including formaldehyde but also was aware of conditions such as rising temperatures and rising humidity that can also effect the activity of formaldehyde released into the interior of the residence.

x.   It appears Gulf Stream was informed of odors within the travel trailers that would not go away and that burning sensation and headaches were occurring by its occupants. Gulf Stream's response was to "advise them how the ventilation effects worked or systems worked and so forth and what he could do to improve the indoor air quality of the unit."

10.   Discussion of Foreseeable Issues - Temporary Housing Verses Long-Term Housing:

a.   Mr. Shea states that his definition of temporary housing is measured by a period of residency that would be "measured, the period of residency would be measured in weeks or months and not years." He further states, "They would have been provided - would have been used for a matter of months."

b.   The definition of temporary according to Black's Law Dictionary is "that which is to last for a limited time only, as distinguished from that which is perpetual or indefinite, in its duration."

c.   In Mr. Shea's testimony to Congress, he states the travel trailers were neither designed nor intended for permanent or long-term housing.

d.   It appears Gulf Stream never discussed length of time of usage for their product with anyone with the government. Mr. Shea said that throughout the history of his company supplying FEMA with temporary housing that duration of occupancy was never a subject.

e.   On page 22 of the owner's manual, there is a section on the effects of long-term occupancy. While this section is pointed toward motor homes, it still is a reference to recreational vehicles. It states, "more and more of today's motor homes are being used for than just recreational

Page -85-

ALX-EXP-44-000086

vehicles." It informs the occupants they must be prepared to deal with condensation and humid conditions that may be encountered. The manufacturer acknowledges that "the normal activities of even a small number of occupants in the relatively small volume of a modern recreational vehicle with its tight construction will lead to rapid saturation of the air inside the vehicle and the appearance of visible moisture especially during cold weather." The manual goes on to state, "Unless this vapor is carried outside by ventilation or removed from the air by dehumidifier, it will condense on the inside the windows and walls as moisture. It may also condense in the walls and ceilings and appear as stains on the paneling. This will increase the heating load on the furnace somewhat but it will greatly reduce condensation." The manufacturer was aware that recreational vehicles have become more than just a week-long means of vacation and excursions. The manufacturer acknowledges internal problems with condensation; however, what the manufacturer is directing its attention to is the use of these recreational vehicles in frigid and cold climate zones. The warnings given regarding humid conditions are directed to internal living activities inside the recreational vehicle. As with the manufactured housing (mobile home) industry, the design of these units have been for cold climates and not for the hot, humid climate of the gulf coast regions. Addressing condensation on the inside of the living area is a frigid or cold climate condition. The long-term occupancy in the south has little to nothing to do with the moisture inside the housing unit attempting to force itself out of the unit and condensing on the cold surfaces. These surfaces are cold because the air on the exterior side of the unit is colder than the air on the interior side therefore the moisture inside the unit is attempting to escape toward the outside. This is when condensation would occur in other climates but not in the Gulf Coast region.

f.   The Standard on Recreational Vehicle Parks and Campgrounds, 2002 Edition, the ANSI A119.4 and NFPA 1194, discusses the various lengths of time people are now utilizing their recreational vehicles. Page 15, Appendix D, Section C.18.3 **Fulltimers**, states "Individuals that have opted, because of the benefits of a recreation - oriented RV lifestyle or for economic reasons to use their camping units for their only or primary residence." This is one of many usages that people are

Page -86-

ALX-EXP-44-000087

electing to use their recreational vehicles.  Some usages are for traveling, daily or overnight usage, extended stay, seasonal, or full-time occupancy.  It therefore should not be considered an unusual event to have occupants utilize a recreational vehicle for extended stays but also as permanent housing.

g.  The Alexander FEMA trailer was ordered on December 9, 2004 and was built on December 13, 2004.  It was for a different set of hurricane losses in Florida.  Hurricanes Katrina and Rita devastated the coast line of Mississippi, Louisiana, and Texas in August and September of 2005 respectively.  The widespread devastation quickly became known internationally. Tens of thousands of homes were completely destroyed; hundreds of thousands of homes were damaged by flooding or windstorm; and thousands of commercial and governmental buildings, public facilities, and roadways were damaged or destroyed.  Within a short period of time, the news media was reporting that the rebuilding of New Orleans alone would take some five to ten years.  Labor, materials, equipment and hardware very rapidly became in enormous demand.  It became common knowledge that an enormous amount of houses that had not been completely destroyed immediately by the wind and water were unable to be occupied as a result of the flooding or water damage caused by the rain, which in turn caused mold damage throughout the home or structure.  In addition, once the flood waters receded, it was found that thousands of homes could not be restored as they were contaminated with chemicals from nearby refineries.

With this information disseminated to the public, it was well known that people would be out of their homes for in excess of a year or years as a result of these events.

h.  Gulf Stream itself became acutely aware of the shortage of materials for its own manufacturing process.  Once they received their order for the temporary housing units, they began to experience shortage themselves. In a letter from James F. Shea with Gulf Stream to Jonathan Gibb with FEMA, Mr. Shea outlines to Mr. Gibb the difficulties in obtaining frames, lauan plywood materials, flooring and other miscellaneous goods such as air-conditioning units necessary to construct the FEMA trailers.

Page -87-

ALX-EXP-44-000088

i.   Alternative methods and materials available for the construction of the temporary housing units:

    a.   There were materials and methods available at the time of construction of the FEMA temporary housing units that could have been utilized in the construction of these units to have lowered or removed the issues with elevated formaldehyde concentrations within the envelopes of the units. In Dr. Smulski's report, he itemizes and enumerates the various wood products that were available at the time of construction of the Alexander temporary housing unit that would have eliminated this problem. Items such as hardboard paneling in lieu of hardwood paneling, OSB board using non-formaldehyde materials, and other products using non-formaldehyde releasing materials were also available at that time.

       Please see Enclosure 10, Affidavit of Stephen Smulski, Ph.D., Consulting Wood Scientist, dated May 18, 2009.

    b.   One of the construction methods that were available at the time of construction of the Alexander was the use of an air seal barrier below the exterior skin of the exterior walls. This air barrier would have eliminated or severely reduced the amount of air and moisture penetration through the wall system and become available to raw materials that contained formaldehyde. This is a common practice utilized in the hot, humid temperature region of the country.

       This method of construction has been researched and written about in various books and publications for approximately twenty years.

    c.   The alternative use of a hardboard paneling with a permeable finish (a finish that would allow the wall system to breathe and not retain moisture within the panel material or in the cavity of the wall) could have been used. Hardboard panels have been used in the manufactured homes (mobile homes) for a number of years. This is not new technology nor is it new to the industry.

Page -88-

ALX-EXP-44-000089

This materials could be used on both the walls and ceiling areas.

d.   The use of a higher density insulation could have been utilized for the thin wall system used in the construction of these housing units. Either the wall systems could have been thickened using a deeper framing member or the alternative of a thicker or more dense insulation material such as a closed cell foam or an insulation board could have been utilized. This would have not only assisted in limiting the penetration of moisture from the exterior to the interior of the temporary housing unit but would have also helped to addressed the issues with condensation occurring as a result of dew point temperatures being reached in the wall and ceiling cavity.

Please see Enclosure 13, Closed-Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation.

e.   While this is not an alternative method of construction, it is one of absolute necessity in the prevention of negative air pressure occurring and drawing hot, humid unfiltered contaminated air into the living area of the Alexander trailer. This item is simply to have performed the work in which they were commissioned to do in a superior workmanlike manner according to the FEMA Procurement Standards. Simply having taken the time to properly install the air-conditioning ductwork and insuring it was sealed air-tight would have been a major improvement in lowering the amount of formaldehyde concentration inside the living area. The manufacturer either failed to properly train the installers of the air-conditioning and heating duct system in this housing unit and / or the manufacturer failed to properly supervise the workers installing the air-conditioning and heating system in this unit. The manufacturer failed to not only fulfill the requirements of the FEMA Procurement Standards, Gulf Stream also failed to follow the manufacturer's installation instructions and the NFPA and ANSI codes and standards that apply to this unit.

Positive pressure inside the unit pushing the hot, humid

Page -89-

ALX-EXP-44-000090

contaminated air away from the wall, ceiling and floor cavities would have helped to significantly reduce the possibility of the introduction of the formaldehyde vapors into the living area of the unit.

f.   The workmanship of the overall construction of the FEMA trailer could have also prevented the majority of the air leaks into this housing unit. Because of the lack of superior workmanship and the failure by the manufacturer's employees and manufacturer's failure to properly supervise the installation of not only the duct system but the sealing of the envelope has produced pathways for the hot, humid, unfiltered air to penetrate into the living area. Once again, the requirements of the specifications for procurement regarding air and moisture sealing of the unit failed to be adhered to by the manufacturer by Gulf Stream.

g.   In addition to the above mentioned quality control methods, the manufacturer could have tested the ductwork for air leakage. Instruments are readily available and are reasonably inexpensive for the testing of duct installation for air leakage. The cost per unit of production to purchase the equipment to test for duct leakage is estimated at $.14 per unit.

h.   Testing of the housing unit could also have been performed by the manufacturer. Similar equipment to the air duct leakage and in conjunction with the air duct leakage equipment is all that is required to test these units. Again, based upon an initial order of 25,000 units for FEMA, the above mentioned cost of $.14 per unit is inclusive of that equipment necessary to test for the air leakage into the trailer from both the air-conditioning ducts and the envelope of the trailer. The only other item necessary to include in that cost would be the labor of one trailed employee to perform those tests.

i.   The manufacturer recommends the use of a fresh air venting system known as Fan-Tastic vents. The air exchange rate would be increased by the use of that ventilating system. However, this would be in lieu of the fresh air system tied into this air-

ALX-EXP-44-000091

conditioning system itself.

i.    The cost to install the air barrier on the retail market would have been in today's cost terms $117.26 per unit.

ii.   The use of alternative wall panels, floor and roof sheeting, ceiling panels and other wood products or wood-type products cannot be calculated to give an increase of cost over the products that were used in 2004 to construct the Alexander unit. Comparable materials were made in full sheets or in sheet sizes unique to the RV industry and are not commonly purchased on the retail market.

iii.  The use of a lower BTU capacity air-conditioning system should be a cost savings rather than an expense. The additional expense would be in adding the fresh air system to this unit. In lowering the BTU capacity of the system, dehumidification would be increased on the interior of the building making it drier and cooler to the senses. The drier the air on the interior of the unit, the less need to have the air-conditioning system cycle on and off; therefore, the thermostat can be set at a higher temperature and the comfort level of the occupants would remain satisfactory.

iv.   One of the most significant changes or alternative methods that could have been utilized in the construction of the Alexander unit is the replacement of the 1 1/2" fiberglass unfaced insulation with a closed cell spray foam polyurethane insulation. If we achieve an R-14 insulating value in the wall system and approximately R-18 in the ceiling system, we will eliminate the material in the wall system from reaching a dew point. Each inch of closed cell SPF insulation has an R- value of 7. Two inches of closed cell SPF insulation would give us the needed R-14 rating. At least as important as the R- value is the perm rating of the closed cell SPF insulation. The perm rating is 1 or less which means it is classified as a water and vapor barrier. This would accomplish several different challenges. With

Page -91-

ALX-EXP-44-000092

the SPF closed cell insulation, the designer of the housing unit could achieve the R-14 value desired and have a vapor barrier installed in one function. As a precaution, we would want to also include the air and moisture barrier wrap around the perimeter of the exterior walls. This would then carry over the separation in the SPF insulation at the wall framing and prevent thermal shorting from occurring.

One added bonus to the use of the closed cell insulation is the additional strength this product adds to the framing system. The closed cell material attaches to the framing wall and also creates a solid unit within the cavity of the wall increasing the strength of the wall. This would help to address some of the concerns that were expressed by Charles David Moore, a structural engineering expert, in the report attached in our enclosures.

Enclosure 13, Closed-Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation.

Addressing the ceiling cavity, we want to achieve somewhere around an R-18 value. Using 2 1/2" of SPF insulation gives the 17 1/2 to 18 R- value we are looking to accomplish. In addition to the EPDM type roof membrane, the SPF material would prevent any water or water vapor from transmitting from the exterior to the interior through the roof or attic system.

The additional benefits of added strength to the roof system would be applicable with the SPF material in the ceiling cavity.

The use of the SPF insulation material also has the benefit of sealing the areas of air leakage in the exterior surfaces of the wall system in conjunction with the Tyvek -type air barrier covering.

ALX-EXP-44-000093

There are major benefits to the use of the closed cell SPF insulation material:

1.  We achieve the R-value necessary to prevent the dew point from being reached in the wall and ceiling cavities of the unit which in turn prevents the manifestation of condensation.

2.  The air leaks in the envelope are sealed to prevent the passage or movement of hot, humid air from the exterior of the unit to the interior living space and filtering any contaminates.

3.  The SPF insulation adds strength to the structure assisting the structure as it pertains to wind loads as discussed by our engineer.

4.  The increase of R- value in the wall and ceiling systems will assist in retaining the cold air-conditioned air in the living unit. The occupant would have a more comfortable temporary housing unit; housing unit that has a lower cost of operation of air-conditioning and heating; and a heathier, safer environment for the family.

What we have basically done with this material and this system is to build an ice chest in which to live in Louisiana. We have an interior and exterior finish of which heat and moisture are significantly eliminated from transmitting from the outside to the inside. The colder or warmer air on the interior as the case may be in a particular season acts the walls, bottom and lid of a strong ice chest. Equating the construction of an ice chest to this unit, remember an ice chest is just a foam center with a plastic interior and plastic exterior to hold the form together. We have all seen numerable times when an adult has sat on an ice chest, a child has jumped up and down on

Page -93-

ALX-EXP-44-000094

an ice chest, we have loaded ice chests full of beverages and food, or we have stacked items of various sizes, shapes and weights on top of an ice chest. In each instance, an ice chest is able to support weight of these objects. This is the strength and insulation value that could have been added had the designer of the Alexander temporary housing unit utilized this system.

Another benefit of the usage of the spray foam insulation is it would seals the ducts in the attic and prevent air leakage from the ducts add to the R-value of the duct system thereby preventing a condensation occurring around the ducts.

The cost of this system would be approximately $1,700 to $1,800 or less with employee installation.

5. The other alternative method the designer could have chosen was to increase the frame size of the walls and ceilings and increase the insulation thickness increasing the R-value of this unit. If the closed cell SPF insulation is used the framing could remain the same thickness as it presently has.

j. New FEMA Trailers:

i. FEMA now requires its travel trailers to emit less than 16 ppb of formaldehyde, and manufacturers have built travel trailers that meet this standard. The alternative designs and materials selected to meet this standard are not new; rather, they were both feasible and available designs, existing well before the date of manufacturer of the Alexander trailer. The choice to use these designs would not have significantly burdened Gulf Stream and would have significantly lowered the risk to Christopher Cooper.

## CONCLUSIONS

Page -94-

ALX-EXP-44-000095

According to various industry standards and indoor air quality testing, the formaldehyde emissions in the Alexander family's temporary housing unit were elevated above a reasonable level of safety. The unreasonably unsafe conditions in the Alexander family temporary housing is because:

1.  The unsafe levels of formaldehyde are partially a consequence of the design of the travel trailer. The designer is responsible for the manifestation of the condensation in the wall and roof cavities. The 1 1/2" wall cavity as designed is such that the temperature dew point can be reached within that cavity. The 1 1/2" thick unfaced fiberglass insulation batt has an R- value that is insufficient to prevent condensation from occurring in the wall cavity.

2.  The vapor barrier on the temporary housing unit was designed and placed on the cold side of the exterior wall. Studies have long indicated this type of construction is ideal for cold and frigid temperature zones but is unacceptable in the hot, humid zone of which the Alexander unit was located in New Orleans, Louisiana.

3.  An effectively designed vapor barrier was not placed on the exterior side of the wall framing just below the exterior skin of the housing unit.

4.  The designer of the temporary housing unit failed to take into account the intended use of their product. Widespread devastation of the gulf coast from two major hurricanes left tens of thousands of people homeless. Many more homes and businesses incurred significant damage. In addition, churches, government facilities, roads, bridges and municipal operations were also damaged or destroyed. The rebuilding effort would be massive - straining materials, resources, manpower and equipment. Housing needs of those affected by this devastation would obviously last more than just a few weeks or months.

    Gulf Stream experienced these shortages of materials and resources also. In a communication between Gulf Stream and FEMA, the manufacturer outlined the numerous problems they were encountering in ordering and receiving materials for the housing units they were constructing for FEMA. They were experiencing difficulty in obtaining wall and ceiling panels, aluminum panels, flooring, air-conditioning units, and other miscellaneous items.

Page -95-

ALX-EXP-44-000096

it should not have come as any surprise to anyone listening to the news reports that the temporary housing needs for the multitudes of people left homeless would last for years.

5.    The manufacturer knew or should have known that the use of formaldehyde-emitting materials would be a problem for the occupants. Even the use of low-formaldehyde emitting materials would create a problem because of the disproportionate ratio of low formaldehyde emitting wood and other building products in relationship to the relatively small, box-style, temporary housing unit. Even low amounts of formaldehyde emissions from each of the building products will create a higher concentration of emissions in such a small unit.

6.    All of the wall panels, ceiling panels, cabinets, built-in furniture, floor sheeting and roof sheeting are constructed with materials that emitted formaldehyde. Some of the materials such as the roof sheeting are regular panels that were not manufactured to reduce formaldehyde-emitting levels.

The manufacturer's representative admitted in his deposition that some units were manufactured with regular panels, not of the low-formaldehyde emission type, because of a lack of quality control in one of the plants. Materials that previously were ordered as low formaldehyde emission materials were sent and being used even though they did not meet the low formaldehyde standards.

7.    The construction means, methods and materials utilized in the Alexander family's temporary housing unit contributed to the elevated formaldehyde levels. The wall-to-floor intersection, the wall to ceiling intersection, and other openings in the walls, floor, and ceiling systems were not sealed to prevent unfiltered air filtration or movement to the Alexander's housing unit. The FEMA Model Travel Trailer Procurement Specifications required that "All exterior openings... will be weatherproof sealed to prevent air and moisture penetration." The language goes on to state again that these are minimum standards and it (the FEMA trailer) **shall be constructed with superior grade quality of workmanship**. (Emphasis added.)

8.    The air-conditioning duct system is not properly sealed to prevent uncontrolled air leakage into the ceiling cavity and exterior of the housing unit. As the supply side of the air-conditioning system is emptied air into the ceiling cavity and the outside atmosphere, the return air side of the unit is drawing or pulling

Page -96-

air into the wall and ceiling cavities and into the living space from the exterior to make up for the air that being expelled as a result of poor workmanship and a lack of proper supervision on the part of Gulf Stream. This has created a negative air pressure in the Alexander's unit. Air was sucked into the unit from the outside without filtration or conditioning. This contributed to the additional release of formaldehyde into the envelope of the unit especially when the temperature and humidity on the exterior were elevated above the interior temperatures and humidity of the Alexander unit. The negative air pressure pulled in hot, humid, contaminated air into the wall and ceiling system. The hot, moist air contributed to the release of formaldehyde from the unsealed backs and edges of the materials containing formaldehyde. This is a code violation and it is not superior grade quality workmanship.

9.    The furnace duct system is also not properly sealed. The same conditions described above with the air-conditioning ducts are occurring regarding the creation of negative air pressure from the furnace duct system. In this situation, however, the leaking ducts create a condition conducive to drawing in fumes from the furnace and the stove hood vent. The furnace exhaust and fresh air intake are very near the entry door of the temporary housing unit. It is a code violation to have a condition that is conducive to drawing the exhaust fumes of the furnace and is not superior quality grade workmanship.

10.   The temporary housing unit was placed on blocks during its installation on the Alexander's property. The instructions found on the scissor jacks of the trailer states that the weight of the unit should not be taken off the wheels. In jacking the unit and not sufficiently supporting the frame, the installation contractor created a condition conducive to the interior panels warping in the bedroom on the front and rear walls and in the bathroom. It was reported by Ms. Alexander that this warping was noted when she moved into the temporary housing unit. It is understood Ms. Alexander spoke with her contact person at FEMA and was told to place duct tape over the seam of the buckled wall panel.

Fluor, the installation contractor, failed to give adequate directions to its employees of how to jack all of the corners and centers of the temporary housing unit. A review of Exhibit 7 failed to disclose and directions provided to the field people on how to jack up these units. It appears the units were jacked up on the corners one or two at a time and then the blocking was placed to support those areas. This apparently placed unnecessary stress on the

Page -97-

ALX-EXP-44-000098

framing system that the unit was incapable of resisting. This caused the warping of the wall panels and the roof leak, increasing formaldehyde emissions.

Either the manufacturer, FEMA, or Fluor should have devised a safe means of jacking the temporary housing unit by either increasing the rigidity of the metal frame, using a unified hydraulic jacking system to evenly lift the entire travel trailer at the same time and without putting abnormal stresses on the unit, or should have devised a plan including sound engineering practices for the application of readying the temporary housing unit for occupancy.

11.   The placing of the temporary housing unit on blocks apparently created at least one known roof leak that was never effectively repaired by the installation / maintenance company and buckling of the wall panels in the bathroom. According to Ms. Alexander, the repair personnel sent out to address her roof leak issues reported to her that they did not believe their efforts repaired the leak. In fact, the leak was not repaired and it was reported to this writer that water leaked inside the temporary housing unit each time it rained.

12.   There is a lack of warnings either in the owner's manual or inside the temporary housing unit regarding the potential for formaldehyde emissions. The manufacturer was well aware of the potential presence of formaldehyde in their product. In fact, the manufacturer made a point to state on some of its purchase orders that it required low formaldehyde emissions material. There are no warnings or documents found anywhere that show the manufacturer alerted the Alexander family to the potential exposure of formaldehyde and the potential risk for exposure.

13.   The manufacturer failed to conform to its express warranty. In the Model Travel Trailer Procurement Specifications, dated August 12, 2004, FEMA stated, "the construction and outfitting standards identify minimum... environmental living conditions necessary to provide emergency housing..." "The manufacturer shall design and construct all units...within a superior grade quality of workmanship." By submitting it to FEMA, the manufacturer has expressed a warranty and has warranted to the purchaser and user of their product. The condition of the Alexander trailer as delivered breached Gulf Stream's express warranty.

Page -98-

ALX-EXP-44-000099

14.     The manufacturer failed to comply with the required NFPA and ANSI codes regarding the construction of recreational vehicles and the manufacturer's guidelines regarding duct leakage of the furnace system and air-conditioning system.

15.     The manufacturer produced a product that was unreasonably dangerous because it failed to apply and use techniques, technology, materials and workmanship available in 2004 to achieve the new FEMA procurement specification of 0.016 ppm for formaldehyde emissions.

The benefits to the manufacturer that would be achieved to switching to alternative design and construction practices as it relates to the Alexander family's housing unit would be:

1.     Avoiding health related issues concerning the Alexander family;

2.     Avoidance or reduction of litigation costs; and

3.     The probable avoidance of loss of hundreds of millions of dollars paid by the taxpayers, occupants and manufacturers if temporary housing units have to be destroyed.

The burden to the manufacturer in switching to alternative design and construction methods would be:

1.     The cost of installing a vapor barrier on the exterior side of the walls;

2.     The cost of additional sealants at the top and bottom plates;

3.     In the alternative, the replacement of fiberglass insulation with a closed cell spray polyurethane foam insulation that would seal the walls, prevent air and moisture passage through the wall and ceiling cavities, add strength to the structure, and prevent condensation from form in the wall, keep the A/C ducts sealed, and ceiling systems when temperatures reach the dew point.

4.     The cost of adding fresh air ventilation to the unit (This item may well be eliminated had the Alexander's unit been manufactured with closed cell SPF insulation.  No more air exchanges would probably have been enough to

Page -99-

ALX-EXP-44-000100

accommodate the air exchanges required.) ;

5. Increasing the size of the steel frame to allow for the jacking up of the housing unit to avoid unwarranted stress on the unit.

6. The cost of switching to non- formaldehyde emitting materials such as masonite wall panels and ceilings, masonite doors, floors and roof sheeting constructed of non-formaldehyde emitting OSB, plastic type cabinets or MDF materials that do no emit formaldhyde.

7. The cost to actually train workers and supervisors to work in a manner that would produce the superior work product required by FEMA's Procurement Specifications.

This concludes this report. Should there be any questions regarding the content of this report, please do not hesitate to contact this writer.

Conclusions drawn in this report are based on observations and information available known and declared at the date of the investigation and / or the time of the preparation this report. The writer reserves the right to make corrections of any errors discovered after the release of this report or upon the receipt of new data.

With kindest regards,

Alexis Mallet, Jr.
President

AMJ:cms

Enclosure 1a: Photographs by First General Services of the South, Inc.
Enclosure 1b: Photographs by Scott Johnson
Enclosure 1c:  Infrared Thermographic Images by First General Services of the South, Inc. dated May 7, 2009.
Enclosure 1d:   Photographs by W.D. Scott taken January 28, 2008 after the temporary housing unit had been removed and reset on location
Enclosure 2: FEMA Model Travel Trailer Procurement Specifications, dated August

Page -100-

ALX-EXP-44-000101

12, 2004

Enclosure 3:   "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels in Mobile Homes and Park Models"

Enclosure 4:  W. D. Scott Group, Inc. Formaldehyde Sampling Report dated May 18, 2009

Enclosure 5:  Dometic Duo-Therm HP 595 QUICK COOL Instruction Manual

Enclosure 6:  Ritter Consulting Temperature and Humidity Data Logger Graphs dated May 7, 2009

Enclosure 7:  Fan-Tastic Vent Information Sheet from the manufacturer

Enclosure 8:  Lagrange Consulting Services, L.L.C.'s report dated May 7, 2009.

Enclosure 9: Drawings of the floor plan, electrical floor plan, floor elevations, rear elevation, right side elevation, left side elevation, and mechanical plan.

Enclosure 10: Affidavit of Stephen Smulski, Ph.D., Consulting Wood Scientist, dated May 2009

Enclosure 11: Travel Trailers Installation Guide

Enclosure 12:  Freyou Moore Report dated May 15, 2009

Enclosure 13:   Closed-Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation

Enclosure 14:  Suburban Manufacturing Company

Enclosure 15: Analysis of the Gulf Stream Coach, Inc. Formaldehyde Exposure Data Set by Paul Hewett, Ph.D., CIH, dated May 18, 2009

Enclosure 16: Investigation of FEMA Travel Trailers prepared by Ervin L. Ritter, P.E., dated May 15, 2009

Enclosure 17: Affidavit of Marco Kaltofen, P.E. dated May 19, 2009

ALX-EXP-44-000102