**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE:  FEMA TRAILER          *    **MDL NO. 1873**
        FORMALDEHYDE PRODUCTS    *
        LIABILITY LITIGATION        *    **SECTION "N" (5)**
                                      *
                                      *    **JUDGE ENGELHARDT**
                                      *    **MAGISTRATE CHASEZ**
                                      *
**THIS DOCUMENT IS RELATED TO**    *
                                      *
*Charlie Age, et al v. Gulf Stream Coach*   *
*Inc., et al*, Docket No. 09-2892;      *
Alana Alexander, individually and on behalf of   *
Christopher Cooper               *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S RESPONSE TO DEFENDANT GULF STREAM'S MOTION FOR**
**SUMMARY JUDGMENT ON GOVERNMENT CONTRACTOR DEFENSE**

     Plaintiff Alana Alexander, individually and on behalf of her son, Christopher Cooper

("Ms. Alexander" or "Plaintiff"), responds to Defendant Gulf Stream Coach, Inc.'s ("Gulf

Stream") Motion for Summary Judgment regarding its government contractor defense (Docket

Entry No. 2410) and, in support, would show:

**FACTUAL BACKGROUND**

     FEMA apparently set forth a four page set of some type of specifications regarding travel

trailers, on August 12, 2004.  *See* Gulf Stream Brief, Exhibit B.

     Gulf Stream has presented no evidence that FEMA sent these to Gulf Stream or how Gulf

Stream became aware of these specifications.[1]

---

[1] Gulf Stream's motion says that, "[a]fter FEMA drafted its 2004 specifications, it supplied the information to Gulf Stream" and cites the Court to deposition testimony.   Gulf Stream Brief, at page 2.  However, a review of that deposition testimony shows that it does not say that at all, and Gulf Stream offers no evidence as to how it obtained these specifications.

Gulf Stream presents no evidence that it provided one bit of input into these specifications, or that FEMA solicited Gulf Stream's input.

Indeed, Gulf Stream presents no evidence that _any_ travel trailer manufacturer provided any input to FEMA in FEMA's preparation of these specifications.

Gulf Stream presents no evidence that the subject trailer was built to the FEMA specifications.

These very basic specifications do not address what kind of components parts that a manufacturer must use, or the quality of such parts, that the trailer must test below a certain level for formaldehyde emissions or that the trailer contain any warnings about the dangers of formaldehyde. The specifications contain no requirements about testing of trailers for formaldehyde emissions.

Gulf Stream sold the subject trailer to "Best Buy RV" a now-defunct recreational vehicle dealer. _See_ Deposition of Gulf Stream's Philip Savari, at page 8, line 8 to page 9, line 7, relevant portions attached as **Exhibit A**. Gulf Stream did not contract with FEMA or any federal agency with respect to the Alexander trailer. Gulf Stream contracted with Best Buy RV, not with FEMA. _See_ Exhibit 18 to P. Savari Deposition, at page 1, attached as **Exhibit B**. In fact, Gulf Stream offers no evidence that it contracted with FEMA with respect to this trailer.

Although Gulf Stream says that a FEMA inspector "signed off" on the trailer at delivery, the documents clearly demonstrate that this "acceptance" just shows that the trailer was not damaged, not that it complied with these "specifications" _See_ Exhibit 18 to P. Savari Deposition, at pages 5-6.

2

As for Gulf Stream's knowledge, Gulf Stream has known about the "formaldehyde issue" since the 1980's:

Deposition of Gulf Stream's Jim Shea, relevant portions attached as **Exhibit C**:

- During the 1980s, there was a lot of controversy and claims regarding formaldehyde.  Page 91, lines 15 to page 93, line 1.

- He has a lot of experience, and intimately familiar, with the issue of formaldehyde in the 1980s.  Page 94, line 19 to page 95, line 2 ("I was familiar with it [the formaldehyde issue in the 1980's], yes, quite familiar.")

Deposition of Gulf Stream's Scott Pullin, relevant portions attached as **Exhibit D**:

- He had an issue with formaldehyde when he first started working at Gulf Stream and that is when Jim Shea, Sr. issued a requirement that the company only use low formaldehyde emitting ("LFE") wood.  Page 36, lines 2-21; page 201, line 20 to page 202, line 24.

Deposition of Gulf Stream's Burl Keel, relevant portions attached as **Exhibit E**.

- In 17 years working at Gulf Stream, has learned the scent of formaldehyde, knows it is in the wood and expects to smell it in trailers.  Page 33, line 19 to page 34, line 9.

- First heard about formaldehyde when wife asked him about it about 15 years ago – learned shortly thereafter that formaldehyde was in wood products used by Gulf Stream.  Page 98, line 24 to page 100, line 8.

Deposition of Gulf Stream's Brian Shea, relevant portions attached as **Exhibit F.**

- Was present at Gulf Stream around during the formaldehyde issues of the 1980s. Page 18, lines 13 to 25; page 68, line 4 to page 69, line 5.

Most telling of Gulf Stream's knowledge of formaldehyde is from a "White Paper" drafted by Gulf Stream's founder, James Shea, Sr. (attached as **Exhibit G**), which stated:

- "Litigation and settlements based on formaldehyde have adversely affected the manufactured housing and recreational vehicle industry in Indiana since early in 1981." (p. 1)

3

- "Formaldehyde is introduced in to the products of the [manufactured housing/recreational vehicle] industry through the industry's use of building products, commonly used in the construction industry such as plywoods and fibre board and furnishings, such as carpeting, furniture, and draperies." (p. 2)

- Provides various arguments on how to defend formaldehyde exposure cases and how to influence legislation relating to formaldehyde.  (pp. 5-15).

On the other hand, the overwhelming evidence shows that FEMA did not know about formaldehyde issues in housing units until March 2006.[2]

Deposition of FEMA's Kevin Souza (2008) relevant portions attached as **Exhibit H**

- FEMA first became aware of formaldehyde health hazard in March 2006.  Page 22, line 5 to 17

- FEMA was not aware of formaldehyde-related complaints until March 2006.  Page 26, line 13 to 16.

Deposition of FEMA's Kevin Souza (2009), relevant portions attached as **Exhibit I.**

- Believed trailers were safe at time of purchase.  Page 30, line 17 to page 31, line 16.

- First heard of formaldehyde concerns in March 2006. Page 42, line 16 to page 43, line 12.

Deposition of FEMA's Bryan McCreary, relevant portions attached as **Exhibit J.**

- Not aware of formaldehyde as an issue during trailer procurement. Page 15, line 3 to 22.

- Not aware of formaldehyde complaints pre-Katrina. Page 29, line 8 to 11.

Deposition of FEMA's David Garratt, relevant portions attached as **Exhibit K.**

---

[2] Indeed, in Gulf Stream's motion, Gulf Stream cannot decide if FEMA knew about formaldehyde before March 2006 or if FEMA knew about it long before then.  *See* Gulf Stream's Brief at pages 12-13 ("FEMA's personnel testified, there was no evidence or documentation that showed problems with formaldehyde prior to Katrina"; "It was no surprise [to FEMA] that the travel trailers contained formaldehyde.")

- First became aware of formaldehyde complaint via Sierra Club report from K. Souza. Page 38, line 1 to 10.

- No formaldehyde claims from residents of trailers from previous disasters.  Page 208, line 7 to 16.

Deposition of FEMA's Martin McNeese, relevant portions attached as **Exhibit L**.

- Prior to Katrina, not aware of any formaldehyde complaints associated with trailers. Page 101, line 15 to 21.

Deposition of FEMA's Guy Bonomo, relevant portions attached as **Exhibit M**.

- With regard to FEMA's knowledge of formaldehyde, "We were as surprised as the applicants, you know.  We had no idea." Page 19, line 16 to 18.

Expert Report of FEMA expert Michael Lindell, relevant portions attached as **Exhibit N**.

- FEMA Emergency Managers had no forewarning about formaldehyde in THUs from its experience providing temporary housing after previous disasters. Pages 6-9.

Gulf Stream has offered no evidence that it advised FEMA about the dangers of formaldehyde emissions in FEMA trailers, either prior to delivering the subject trailer to Best Buy RV in 2004 or before Plaintiff moved into her trailer in May 2006.

## ARGUMENT AND AUTHORITIES

### I.     SUMMARY JUDGMENT STANDARD.

### A.     Generally

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The materiality of facts is determined by the substantive law's identification of which facts are critical

and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana*, 294 F.3d 755, 758 (5th Cir. 2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.*, 277 F.3d 757, 764 (5th Cir. 2001).

In evaluating evidence to determine whether a factual controversy exists, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.  Instead, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe and should give credence to the evidence favoring the non-moving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached."  *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

**B.     As relates to Government Contractor Affirmative Defense.**

The "government contractor defense" is an affirmative defense, as to which Gulf Stream bears the burden of proof. *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 802 (5th Cir. 1993).  Thus, Gulf Stream must show the absence of a genuine issue of material fact and establish **each element** of the defense as a matter of law. *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002); *Smith v. Xerox Corp.*, 866 F.3d 135, 136-37 (5th Cir. 1989) *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).   If Gulf Stream's

6

motion and evidence fails to meet its "initial burden, the motion must be denied, regardless of the nonmovant's response." *Little* v. *Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

## II.   PLAINTIFF'S CLAIMS AGAINST GULF STREAM

Plaintiff asserts claims under the Louisiana Products Liability Act ("LPLA") against Gulf Stream.  The LPLA imposes liability on a manufacturer "for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product." LA.REV.STAT. ANN. § 9:2800.54(A). The LPLA states that a product may be unreasonably dangerous in one of four ways: (1) construction or composition, (2) design, (3) inadequate warning, and (4) nonconformity to an express warranty. *See id.,* at § 9:2800.54(B).

In her Complaint, Plaintiff complains that the subject Gulf Stream trailer was defective under the LPLA, in the following relevant respects:

99.   The design of the housing units, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to each Named Plaintiff.

100.   Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to each Named Plaintiff.

101.   Gulf Stream's product, equipment and supplies used by each Named Plaintiff were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left Gulf Stream's control.  Each Named Plaintiff was an intended and foreseeable user of the alleged defective products and damages and losses to each Named Plaintiff reasonably could have been anticipated by Gulf Stream.

102.   The defects in Gulf Stream's housing units are the result of and/or include, but are not limited to, the following:

i.      In failing to design their respective products so as not to emit dangerous levels of

7

formaldehyde;

ii.     In providing housing units which, by virtue of their design and/or manufacture and/or composition, were unreasonably dangerous under reasonably anticipated use;

iii.    In providing housing units which, by virtue of a lack of an adequate warning(s), were unreasonably dangerous under reasonably anticipated use;

v.      In manufacturing, testing, marketing, distributing, licensing, and selling of unreasonably dangerous housing units;

vi.     In failing to properly test the housing units to properly evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

vii.    In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the housing unit occupied by the Plaintiff, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit;

viii.   In failing to ensure that the housing units it manufactured and provided to each Named Plaintiff were suitable for their intended use;

x.      In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde,

Now, Gulf Stream claims that the government contractor defense exempts it from state law liability, <u>as a matter of law</u>, in this case.

## III.    GOVERNMENT CONTRACTOR DEFENSE

### A.    *Boyle v. United Technologies Corp*.

In *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), the Supreme Court defined the scope of what it called a common law-created "military contractor defense".  *Boyle* involved a soldier who died when a helicopter escape hatch failed to work because it was designed to open out, rather than inward.  *Id.* at 502.  The plaintiff contended that this was a design flaw, because

8

the decedent was trapped in the cockpit under water and the hatch was rendered inoperable because water pressure prevented the hatch from opening outward.  *Id.* at 503.

The plaintiff filed suit under state law claims. *Id.* The defendant, a government contractor, contended that federal preemption displaced state law and granted the contractor immunity because government specifications called for the design of the hatch in this matter.  *Id.* First, the Court noted the limited nature of federal preemption:

> [i]n most fields of activity, to be sure, this Court has refused to find federal preemption of state law in the absence of either a clear statutory prescription, or a direct conflict between state and federal law.  But we have held that a few areas, involving 'uniquely federal interests' are so committed by the Constitution and the laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts-so-called 'federal common law.'"

*Id.* at 504.

The Supreme Court noted that such "uniquely federal interests" arise only in a few areas, such as: 1) the obligations to, and rights of, the United States under its contracts; and 2) the liability of federal officers for official acts. *Id.* With the opinion in *Boyle*, the Supreme Court added a third--civil liabilities arising out of federal procurement contracts relating to national defense. *Id.* at 505.

As for the Court's reasoning behind the defense, the Court relied on the policy behind immunity granted to government entities and employees for discretionary acts under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) ("FTCA").  *Id.* at 511.  Under the FTCA, government agencies and employees are immune from liability for "discretionary functions" such as

balancing technical, military or social considerations that arise in selecting appropriate designs for military equipment. *Id.* The Court noted that:

> We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically, the trade-off between greater safety and greater combat effectiveness…

*Id.* at 511.

> It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the government produces the equipment itself but not when it contracts for the production…state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a "significant conflict" with federal policy and must be displaced.

*Id.* at 512.

Thus, the Supreme Court said that state law, which would ordinarily render the contactor liable in tort to third parties, will be displaced when: 1) the subject matter involves "uniquely federal interests" and 2) a "significant conflict" exists between an identifiable federal policy of interest and the operation of state law or the application of state law would frustrate specific objectives of federal legislation. *Id.* at 507-08.

If a court does find that a conflict with a "uniquely federal interest", then the Supreme Court provided three factors to determine whether there was a significant conflict and thus where preemption should apply, and to what extent:

(1)    whether the United States approved reasonably precise specifications;

(2)    whether the equipment conformed to those specifications; and

10

(3)    whether the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512.

"[W]hether the facts establish the conditions for the defense is a <u>question for the jury</u>." *Id.* at 514 (emphasis added).  Only when a court finds that a reasonable fact-finder could not help but conclude that all of these elements of the test have been satisfied, should the court grant a motion for summary judgment on the defense. *Id.*

With respect to the facts of that case, the Supreme Court found that a state-imposed tort duty of care was precisely contrary to the military's exact specifications calling for the design at issue—calling for the escape hatch to open outward.  *Id.* at 509.  The Court said that, "here, the state-imposed duty of care that is the asserted basis of the contractor's liability (specifically, the duty to equip helicopters with the sort of escape hatch mechanism petitioner claims was necessary) is precisely contrary to the duty imposed by the government contract (the duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications).  *Id.*  Therefore, the state law did present a "significant conflict" with federal policy and would be displaced. *Id.* at 512.[3]

The Fifth Circuit has noted that the basic purpose of the government contractor defense is to "prevent the contractor from being held liable when the government is actually at fault." *Trevino v. General Dynamics Corp.*, 865 F.2d 1474 (5th Cir.), *cert. denied*, 493 U.S. 935 (1989).

---

[3] To illustrate when there is not a "significant conflict", the Court gave an example: "If, for example, the United States contracts for the purchase and installation of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. **No one suggests that state law would generally be pre-empted in this context**." *Id.* at 509.

11

Further:

> The protective shield in favor of the contractor collapses when the actions of the government contractor — and not those of the Government — produce the damaging defect. In such a situation, fairness dictates that a government contractor should not be permitted to escape liability by asserting the sovereign immunity of the Government.

*Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 245-46 (5th Cir. 2000).

In other words: "[s]tripped to its essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me do it.' *Boyle* displaces state law only when the Government, making a discretionary, safety related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion." *In re Hawaii Federal Asbestos Cases*, 960 F.2d. 806, 813 (9th Cir. 1992)(quoting *In re New York Asbestos Litigation*, 897 F.2d 626, 630-32 (2nd Cir. 1990)).

Finally, although *Boyle* did not involve an alleged failure to warn, courts have held that the government contractor defense applies to these causes of action. Initially, some courts questioned whether *Boyle* even applied to failure-to-warn claims. *See Dorse v. Eagle-Pitcher Indus., Inc.*, 898 F.2d 1487, 1489 (11th Cir. 1990) (the three-part *Boyle* test is "necessarily limited to design defect cases"). However, others have found that it is applicable to failure to warn cases, but the contractor must establish the three elements of *Boyle* with respect to the

failure to warn claim.[4]  *See Tate v. Boeing Helicopters*, 55 F.3d 1150 (6th Cir. 1995); *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 801 (5th Cir. 1993)("label" on claims is irrelevant); *Garner v. Santoro,* 865 F.2d 629, 635-36 (5th Cir.1989)(application of defense may be more difficult in failure to warn cases because it is more difficult to show that state law failure to warn claims present significant conflicts with federal policy.); *Cole v. Northrop Grumman Ship Systems, Inc.*, 2008 WL 2651428, *5 (E.D. La. 2008)(*Boyle* "requires that a federal authority exercise <u>some</u> kind of <u>direct</u> influence over the contractor's activities with respect to warnings".)

## B.   <u>Requirement that Defendant be a Government Contractor</u>

It is a basic premise that, in order to invoke the government contractor defense, one must actually be a government contractor.  Indeed, in *Boyle*, the Supreme Court repeatedly discussed "obligations to and rights of the United States under its contracts", "performance of a [government] contract", "the present case involves an independent contractor performing its obligations under a procurement contract", and "civil liabilities arising out of the performance of federal procurement contracts."  *Boyle*, 487 U.S. at 505-506.

Gulf Stream cites no case in which the government contractor defense served to immunize a party who did not actually contract with the government.  In light of the limited nature of federal preemption (as discussed in *Boyle*), this Court should not be the first to extend the doctrine to non-government contractors. Because it is undisputed that Gulf Stream was not a

---

[4] The same analysis has been applied to a failure to test claim, i.e., a court should look to whether the government considered or required any testing and, if so, if the contractor did test in conformance with those testing specifications.  *See In re Aircraft Crash Litig. Frederick, Md.*. 752 F. Supp. 1326, 1337 (S.D. Ohio 1990).

government contractor with respect to the Alexander trailer, Gulf Stream's motion should be denied.

### C. **Reasonably Precise Specifications.**

Satisfying the first element of *Boyle* is a fact-specific inquiry into the nature of the product's original design and development phase, with a focus on the nature and extent of the interplay between the contractor and responsible government officials.   The first element requires that the government to provide precise specifications leaving no discretion to the contractor.  *Boyle*, 487 U.S. at 513; *Wisner v. Unisys Corp.*, 917 F. Supp. 1501, 1510 (D.C. Kan. 1996)(noting that "virtually microscopic precision" meets the first element).

Post-*Boyle* case law has established that government approval requires proof of "continuous back and forth" collaboration between the contractor and the government with respect to the design of the product supplied to the government. *See Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000) (The government continuously interacted with the contractor over eight years, and the government addressed the design issues specific to this case during the design process.); *Stout v. Bourg-Warner Corp.*, 933 F.2d 331 (5th Cir. 1991)(government contractor defense is available where "review [of the project] involved, inter alia, [the contractor's] submission of detailed drawings at various progressive stages of the design, critical design reviews where [government] engineers critiqued [the contractor's] work, and finally, the production of prototype models tested and evaluated for months by the [government] for its actual performance."); *Smith v. Xerox Corp.*, 866 F.2d 135, 137-38 (5th Cir. 1989)(first element established by government's initial supply of relevant specifications or

14

shoulder-mounted weapon which were incorporated into production contract, and government's subsequent review and approval of contractor's final drawings and specifications.); *see also Harduvel v. General Dynamics Corp.*, 878 F.2d. 1311, 1320 (11th Cir. 1989)(extensive analysis and review by government of fighter aircraft's electrical system establishes government approval.); *Kleeman v. McDonnell Douglas Corp.*, 890 F.2d 698 (4th Cir. 1989)((1) regular discussions between Navy officials and the contractor's employees as to the design, testing, and production of the aircraft, (2) the Navy's large staff presence at the contractor's facility; (3) the Navy's retention and exercise of the power to approve and reject design modifications; (4) the contractor's use of the Navy specifications for the landing gear design; and (5) the Navy's testing of the prototype.)

The Fifth Circuit's opinion in *Trevino v. General Dynamics Corp.*, 865 F.2d 1474 (5th Cir. 1989) is instructive. *Trevino* arose out of the accidental deaths of five U.S. Navy scuba divers in a submarine diving chamber manufactured by the defendant contractor. After examining the design process for the diving chamber, the court concluded that the evidence did not establish that the government did anything other than passively accept the contractor's independently developed design choices and, accordingly, had not exercised sufficient discretion over the design features in question. *Id*. at 1486-87.

In *Trevino,* the Fifth Circuit analyzed *Boyle* in detail, and the Supreme Court's basis for the defense as rooted in the discretionary function provision of the FTCA. The Fifth Circuit noted that:

> The mere signature of a government employee on the 'approval line' of a
> contractor's working drawings, without more, does not establish the government

15

contractor defense.  The **trier of fact** should not evaluate the wisdom or quality of any government decision, but must locate the actual exercise of the discretionary function.  We hold that 'approval' under the *Boyle* defense requires more than a rubber stamp…When the government merely accepts, without any substantial review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion.  A rubber stamp is not a discretionary function; therefore, a rubber stamp is not 'approval' under *Boyle*.[5]

*Id*. at 1480 (emphasis added).

Further, the Fifth Circuit has said that reasonably precise specifications and conformity with those specifications refer to the <u>particular feature of the product</u> claimed to be defective. *Id.* at 1486; *see also Bailey v. McDonnell Douglas Corp.,* 989 F.2d at 794, 799 (5th Cir. 1993) (a court's analysis must focus upon the "particular feature" allegedly defective); *Snell v. Bell Helicopter Textron, Inc*., 107 F.3d 744 (9th Cir. 1997); *Gray v. Lockheed Aeronautical Sy*s. Co., 125 F.3d 1371, 1377-79 (11th Cir. 1997); *Shurr v. A.R. Siegler, Inc*., 70F.Supp. 2d 900, 900 (E.D. Wis. 1999); *Strickland v. Royal Lubricant Co*., 911 F. Supp. 1460, 1467-68 (M.D. Ala. 1995).

Here, all that Gulf Stream has offered is a claim that 1) the government generally issued four pages of very general "specifications", which the government did not even provide to Gulf Stream, but which Gulf Stream obtained in some way; and 2) the government <u>allegedly</u> accepted the trailer.  However, as set forth above, the reality is that this "evidence" does not show that the government accepted the trailer—but a one page form saying that the trailer had no physical damage.    There is not even any evidence that government approved any of Gulf Stream's designs/drawings—which the Fifth Circuit in *Trevino* said does not even meet the test.

---

[5] *See also In re World Trade Ctr. Disaster Site Litig*., 521 F.3d 169, 198 (2d Cir. 2008); *Gray v. Lockheed Aeronautical Sys. Co*., 125 F.3d 1371, 1377 (11th Cir. 1997).

Further, the specifications contain no provision for the selection of component parts, any significant design features, maximum formaldehyde emissions or any warnings[6] of any type. Gulf Stream has failed to show as a matter of law that the four page specifications, coupled with a complete lack of back and forth between the government and Gulf Stream on the specifications, lack of the government's involvement in any design issue, meet the requirements of the governmental contract defense.[6]

Further, Gulf Stream offers no proof that the government engaged in any meaningful review, sufficient to indicate an exercise of judgment over the particular design feature alleged to be defective.  *See Trevino* 865 F.2d at 1480.

Indeed, our set of facts is closely analogous to the example given in *Boyle* of what does not pose a significant conflict between federal and state interests:  "The United States contracts for the purchase … of [a travel trailer], specifying the [basic requirements] but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary.  [Gulf Stream] could comply with both its contractual obligations and the state-prescribed duty of care."  *Boyle*, 487 U.S. at 509.  In such a case, "**No one suggests that state law would generally be pre-empted in this context**."  *Id*. at 509.

In sum, on this classic fact question, Gulf Stream has failed to meet its burden of demonstrating that the first *Boyle* factor applies as a matter of law.

---

[6]  If anything, the evidence shows that, as a matter of law, the defense does not apply here.

17

**D.      Because There are No Specifications, Moot Point on Whether the Trailer
"Conformed" to Those Specifications.**

The four page specifications are not reasonably precise, and in fact contain no references

to the design or warning defect claims in this lawsuit.  Since there are no relevant provisions in

the specifications, it is impossible for Gulf Stream to prove that it complied with these non-

existent specifications.   Gulf Stream cannot meet its burden on this prong of the *Boyle* test

either.

**E.      Fact Questions Abound Regarding Gulf Stream's and FEMA's Knowledge.**

The third *Boyle* element requires proof that the contractor warned the government about possible

dangers in the use of the product known to the contractor but not to the government. *Boyle*, 487

U.S. at 512. The contractor satisfies this element by proving (1) that it lacks knowledge of any

alleged danger relating to the product, or (2) that the government already knew of the alleged

danger or hazard.   *See Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003-04 (7th Cir. 1996).

However, as held in *Strickland v. Royal Lubricant Co.*, 911 F.Supp. 1460, (M.D. Ala. 1995),

where a government contractor, by virtue of being engaged in the business, should have known

as much as, if not more than, the government regarding toxicity, the government contract defense

is weakened. *Id.* at 1468.

As set forth in the background section, there is an abundance of evidence that

demonstrates that Gulf Stream knew of the dangers of formaldehyde emissions long before

December 2004, when it manufactured the subject trailer.  Likewise, there is an abundance of

evidence confirming that FEMA did not know about the risk of elevated formaldehyde levels in

18

travel trailers until resident complaints began in March 2006.    Gulf Stream has failed to meet its burden on this element of the *Boyle* test.

      **F.**    **Gulf Stream's "Studies" are Irrelevant to This Motion**

Gulf Stream offers several studies that discuss formaldehyde levels in homes and human breath.   These studies are not relevant to any of the *Boyle* factors, and are also outdated and involve stick-built homes, not travel trailers.    It is unclear why Gulf Stream attached the studies as support for this motion.   The studies will no doubt be part of Gulf Stream's jury argument, which again, reinforces that fact questions prevent summary judgment on the government contractor defense.

## CONCLUSION

Again, "[w]hether the facts establish the conditions for the [government contractor] defense is a question for the jury." *Boyle*, 487 U.S. at 514.  Gulf Stream has failed to meet its burden of showing an absence of a genuine issue of material fact on the government contractor defense and has failed to establish each element of the defense as a matter of law. *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp*., 310 F.3d 870, 877 (5th Cir.2002); *Fontenot v. Upjohn Co*., 780 F.2d 1190, 1194 (5th Cir. 1986).

## PRAYER

WHEREFORE, Plaintiff Alana Alexander respectfully requests that the Court deny Gulf Stream's Motion for Summary Judgment and for such other relief to which she is entitled.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY: s/Gerald E. Meunier
   GERALD E. MEUNIER, #9471
   **PLAINTIFFS' CO-LIAISON COUNSEL**
   Gainsburgh, Benjamin, David, Meunier &
   Warshauer, L.L.C.
   2800 Energy Centre, 1100 Poydras Street
   New Orleans, Louisiana 70163
   Telephone: 504/522-2304
   Facsimile: 504/528-9973
   gmeunier@gainsben.com

   s/Justin I. Woods
   JUSTIN I. WOODS, #24713
   **PLAINTIFFS' CO-LIAISON COUNSEL**
   Gainsburgh, Benjamin, David, Meunier &
   Warshauer, L.L.C.
   2800 Energy Centre, 1100 Poydras Street
   New Orleans, Louisiana 70163
   Telephone: 504/522-2304
   Facsimile: 504/528-9973
   jwoods@gainsben.com

   **COURT-APPOINTED PLAINTIFFS'
   STEERING COMMITTEE**
   ANTHONY BUZBEE, Texas # 24001820
   RAUL BENCOMO, #2932
   FRANK D'AMICO, #17519
   MATT MORELAND, #24567
   LINDA NELSON, #9938
   MIKAL WATTS, Texas # 20981820
   ROBERT BECNEL
   DENNIS REICH, Texas # 16739600

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

s/Gerald E. Meunier
GERALD E. MEUNIER, #9471
