CONFIDENTIAL

DRAFT

PROPOSED WHITE PAPER FOR INDIANA LEGISLATURE

MANUFACTURED HOUSING
FORMALDEHYDE PRODUCT LIABILITY IN INDIANA

A.  The Problem -- Formaldehyde Litigation Has An Adverse Impact On Indiana's Economy

The problem which this paper addresses is product liability litigation resulting from the presence of formaldehyde vapor in the indoor environment of manufactured housing and recreational vehicles. From the outset it must be recognized that formaldehyde occurs both naturally and synthetically and has been a growing chemical building block for American industry for more than sixty (60) years, including use in wood products, plastics, chemicals, clothing, cosmetics, medicines, and as a germicide. Litigation and settlements based on formaldehyde have adversely affected the manufactured housing and recreational vehicle industry in Indiana since early in 1981.

Until 1981, the manufactured housing/recreational vehicle industry (hereinafter referred to as MHRVI) in northern Indiana had built millions of manufactured homes and recreational


PLAINTIFF'S EXHIBIT G

vehicles and shipped them throughout the country without any claims or notice of any problems experienced by occupants due to formaldehyde vapor emissions in homes or vehicles. Subsequently, however, the product liability phenomenon began its transformation from a curiosity into a crisis. Formaldehyde is introduced into the products of the MHRVI industry through the industry's use of building products, commonly used in the construction industry such as plywoods and fibre board and furnishings, such as carpeting, furniture, and draperies.

The manufactured housing industry is in the midst of a recession. Some manufactured housing companies have had their product liability insurance cancelled, large deductibles enforced, and coverage for formaldehyde lawsuits eliminated entirely. The importance of manufactured housing to the State of Indiana cannot be ignored. In 1985, Indiana ranked _____ in production of manufactured houses. Many of the large national companies have their origin in Indiana. Eight of the fifteen ranking manufacturers have plants in Indiana. In Elkhart County alone manufactured housing producers and suppliers accounted for _____ % of employment. The Indiana Manufactured Housing Association composed of manufacturers, suppliers and dealers estimates that _____.

The industry in Indiana believes that the formaldehyde scare has affected both the export (interstate) market and the internal market (Indiana) and is one of the reasons why the industry has not grown in recent years. The industry believes that the institutions and the Indiana individuals who are

B.  Formaldehyde Litigation Is Unsupported By Facts

An assault on our industry has continued despite the following:

1.  Historical facts concerning the lack of evidence of any complaints concerning formaldehyde over many, many years in the workplace and home, as well as in schools and commercial institutions, including hospitals and doctors' offices.

2.  The warnings of the prestigious Royal Academy of Toxicology of the United Kingdom noted as early as 1980 that an unwarranted attack on formaldehyde was gathering force, not with its genesis in science or medicine, but was politically motivated and could cause unwarranted and very substantial economic losses to the western democracies.

3.  Studies that were completely objective in nature and exceedingly thorough by highly competent pulmonary doctors of medicine at the Mayo Clinic with excellent scientific and medical instrumentation that determined that airborne formaldehyde vapors at levels found in manufactured homes were not a cause of pulmonary medical problems and did not cause asthma, did not contribute to asthma and further, that the trace level amounts found in manufactured homes in an objective test did not cause upper respiratory irritation or even eye irritation.

4.  In the opinion of three (3) judges of the Fifth Circuit Court of Appeals after a review of the same material relied upon by the Indiana expert witness, formaldehyde had not been shown to be carcinogenic and did not have any significant

deleterious health effect on home inhabitants. This Fifth Circuit opinion was attributed by the Indiana professor to the conservatism not the analytical capability of the Court.

It would appear from the foregoing that in the insurance field a plaintiff claiming formaldehyde injury can seek joint and several liability from the manufacturer of the home or vehicle, plus all of the dealer suppliers of wood products and furnishings, and potentially the chemical resin suppliers. Thus, the very multiplicity of costs involved are such that plaintiffs have found the defendant willing to settle on a cost-of-litigation basis wherein the sum of all the costs of litigation involved provides a tidy settlement in highly questionable liability cases.

There is also a significant public health consideration in the modus operandi involved because creating hysteria in an inhabitant of a manufactured home can lead the sufferer to ignore real health problems and falsely attribute them to formaldehyde. In some instances, such persons provide incorrect information to their physician so that the physician does not have the opportunity to correctly diagnose the problem. The home owner may also fail to obtain proper medical treatment because of being misled as to the origin of his problems.

There is a classic case where the owner of a home died of aplastic anemia caused by lead poisoning after having her home tested for trace levels of formaldehyde, while she and the chemist ignored the fact that lead caused by her ceramic kiln

provoked thermal lead precipitation on many objects in the home from the lead-saturated atmosphere of her home.

    C.    The Peculiar Role of Indiana Educational Institutions In Enlarging the Problem

In the face of the importance of manufactured housing in the State of Indiana, the vagueness of medical proof of harm, and the effect upon the product liability coverage for manufacturers, the activities of members of the academic community at Ball State University and the University of Indiana are notable.

Indiana institutions, unlike educational establishments in Texas, another state with large manufactured housing production, have failed to examine the complaints from inhabitants of mobile homes with appropriate methodology nor have they initiated epidemiological studies to check the incidence of harm among inhabitants of housing contrasted with others exposed to formaldehyde such as doctors and morticians. These steps were highly appropriate given the importance of the industry to Indiana as it is to Texas. Texas, a major manufactured housing state, spent more than $1,000,000 and 18 months to study the problem and concluded in 1983 that there was no relation between formaldehyde vapor levels and the personal injuries alleged to occur in manufactured homes.

Ball State University has sponsored the growth of a network of "experts" in contact with county health departments, all contributing grist to the mill of litigation. One such Ball State expert, a Ph.D. in plant biology, testified under oath that

he has been involved in 80-100 "formaldehyde" claims and lawsuits, 50% of them involving inhabitants of manufactured housing.

While acknowledging the right of free speech and the rights of academic freedom, one must recognize that opinions of experts can have disproportionate weight on medical claims. The thoroughness with which expert opinion is achieved is therefore extremely important.

The following is taken from testimony given in a deposition of one such Indiana expert while under oath:

The witness offered opinions which give encouragement to those with litigation more traditional scientists and doctors would refuse to support.

> Q: Doctor, based on a reasonable degree of scientific certainty, do you have an opinion as to whether formaldehyde causes physical symptoms of illness in humans when that formaldehyde is found in the home?
>
> MR. TONNER: Let me show the same standing objection at this time especially to any testimony as it relates to causation between formaldehyde and physical symptoms.
>
> A: Yes, I do have an opinion.
>
> Q: What is that opinion?
>
> A: My opinion is that formaldehyde concentrations that are found in homes, particularly concentrations on the order of 0.05 and higher, are high enough to cause a variety of irritating symptoms in sensitive individuals as the air exposed in indoor environments.
>
> Q: What would those symptoms be?
>
> A: There's a variety of symptoms. For instance: eye irritation, sore throat, runny nose, cough, sinus irritation, sinus infection, headaches, dizziness, fatigue, depression, problems in sleeping, rashes,

bloody nose, diarrhea. Those I feel very confident with.

Also metaplasia, squamous metaplasia of the nose.

Q: What is that, Doctor?

A: Squamous metaplasia of the nose, irritating symptoms in which there are physical changes. Physical changes in the cells inside the lining of the nose. Phlegm production, unusual thirst. I think those all I feel very confident with.

There are others that have been proposed, but I feel very confident with those.

Therefore, this Indiana expert is willing to testify on medical effects of formaldehyde despite lack of medical credentials. A jury might not be able to distinguish a "scientific" opinion from a traditional medical opinion.

D. Regulatory Actions

Although the matter has been litigated for ten years, there has never been any evidence produced anywhere of a causal relationship between formaldehyde vapor at the levels found in housing and any individual plaintiff's medical harm. On the contrary, the few studies that have been made have shown total absence of any proof of damage to individuals from trace levels of formaldehyde vapor. When the evidence available has been seriously analyzed the courts have unanimously rejected it.

Minnesota and Wisconsin in the late 1970's began to investigate complaints about formaldehyde vapor. Both state governments through state agencies promulgated indoor formaldehyde vapor standards for housing. The regulations were challenged and never went into effect. Both the Supreme Court of

Case 2:07-md-01873-KDE-MBN   Document 2890-8   Filed 08/26/09   Page 8 of 13
10

Minnesota and the Supreme Court of Wisconsin rejected indoor air quality standards. In Minnesota an extensive administrative hearing was held before a technically trained hearing officer. Both the administrative hearing officer and the Minnesota Supreme Court agreed that the evidence accumulated by the State of Minnesota was not sufficient to substantiate the regulation which had set a standard for formaldehyde vapor concentration in housing at .5 parts per million ("ppm"), a trace level.

The Wisconsin Supreme Court rejected the state regulation because the U.S. Department of Housing and Urban Development had set a different level by regulation for the control of formaldehyde emissions in housing.

The U.S. Consumer Product Safety Commission banned urea formaldehyde foam insulation. That decision likewise was reversed and the ban abolished by the U.S. Court of Appeals for the Fifth Circuit at New Orleans, Louisiana. The Court rejected the fears of cancer which CPSC had advanced based on one study of rats subjected to near lethal doses, and stated that all the evidence in the record proved exactly nothing about irritation and alleged sensitivity to formaldehyde.

One of the most difficult issues in formaldehyde vapor cases is the fact that universally the symptoms are subjective. They depend entirely on the patient's self-assessment. The complaints commonly are headache, nausea, tiredness, fatigue, depression, and other symptoms which cannot be checked by independent means. There are no observable tissue changes, there are no evidences of infection, there are no antigens which would

be evidence of allergic reactions nor any other symptoms which can be verified independently.

Formaldehyde is a constituent of our planet's atmosphere and formic acid (partly formaldehyde) in the blood stream is essential for the DNA ring, the basic building block of life. If formaldehyde vapor is part of the world around and in us, it is difficult to believe that it can also be a major health problem for humans at trace levels. Formaldehyde hundreds of times more concentrated than the vapor in air has been generated in the body for 50 years for the cure of urinary infections.

Some of the cases which have been filed prove that symptoms attributed to formaldehyde can be traced to other causes such as preexisting medical conditions, the lifestyle of the individuals, *e.g.*, smoking, antihistamines, and medicines, all potential sources of the unpleasant symptoms of headache, nausea, and other real, but subjective and ambivalent conditions, claimed to be due to trace levels of formaldehyde vapor. The effect of the lawsuits upon manufactured housing in Indiana has been severe because the lawsuits have occurred in the middle of the insurance coverage crisis.

E. <u>Formaldehyde Vapor Testing -- A Critical Issue</u>

It has been noted previously that the levels of formaldehyde vapor in manufactured housing are at trace concentrations, <u>i.e.</u> less than .4 ppm. HUD which regulates manufactured housing set .4 ppm as a target which was considered to be reasonable and safe. But the measurement tools necessary

for accuracy at such trace levels are sophisticated and sensitive. Even the National Institute on Occupational Safety and Health (NIOSH) which recommends measurement techniques has not fully approved the one most commonly used -- the P & CAM 125 test. That test was originally designed to measure levels scores of times higher than the levels in manufactured housing, i.e., the workplace, where the level is 3.00 ppm. In most of the current lawsuits the alleged measurements are in the range of .1 ppm. Thus despite the fact that most measurements are 1/4 of the target level in the HUD regulation, psuedo experts have uniformly proclaimed harm to every plaintiff who has ever instituted a claim.

Even more unfortunate is the fact that the protocol for the complicated test and wet chemistry processing for the NIOSH method has not been followed carefully. In the case of an expert in another state, it was discovered after his appearance in more than 10 cases that his method was producing results ten times higher than they should have because of his mathematical errors. If the protocol is not followed carefully, the results are inaccurate and the basis of the lawsuit is therefore inflated. In order to have a fair trial of a complaint, the tests should be accurate because the levels involved are almost unmeasurable.

Accuracy and precision in measurement are the only fair bases for litigation and inaccurate imprecise results should be inadmissible in the State of Indiana.

F.   An Equitable Solution to the Problem

Our conclusion from the foregoing is that there are at least seven (7) courses of proper action which are non-exclusive:

1.   Legislation setting forth the methodology to be utilized to qualify as admissible in court, formaldehyde vapor test results in the atmosphere of a home.  This methodology must at the minimum require:

(a)  All contents, furnishings, furniture, and equipment that are movable shall be removed form the home at least 48 hours prior to testing so that the home will be returned to the condition of manufacture;

(b)  The home shall be fully aired out with all windows vented for 48 hours prior to testing to eliminate secondary emissions and those from extraneous sources.  Windows shall be closed as tests begin and remain closed for 2 hours before sampling commences.  Temperature shall be maintained at 78°F or less for the 48-hour period.  If the manufacturer has published instructions to the home owner for use of the home, those instructions shall be followed in testing;

(c) Test results must be certified by a competent, licensed person affirming all conditions have been met.

(d) No extrapolation or formulae shall be used to establish evidence of levels of formaldehyde different from the levels certified in any testing done under the foregoing requirements;

2. Legislation that the cause of any illness or disease claimed to be due to exposure to air-borne formaldehyde shall be based upon competent medical authority and reasonable medical certainty.

3. Legislation that there is a presumption that a manufactured home meeting the requirements of the Department of Housing and Urban Development (HUD) with plans approved by a DAPIA and certified by an IPIA meet all implied warranties under the laws of the State of Indiana.

4. Legislation that there is an irrebuttable presumption that a manufactured home meeting the requirements of HUD regulations concerning formaldehyde and bearing the warning required by HUD, has been properly manufactured and no cause of action shall be allowed against the manufacturer or selling dealer or their agents or employees for personal injury or property damage or other wise by anyone at any time because of the manufacture and or sale of said home.

5. Appointment of a commission of competent medical and scientific authority in the State of Indiana to review all the material available on formaldehyde for the purpose of assessing the work of Ball State University and its merit, and advising all county health officials of the State of Indiana in this regard.

(a) The study group could also recommend whether or not it would be worthwhile for the State of Indiana, or for industry in conjunction with the State of Indiana, to conduct

properly funded medical studies of formaldehyde vapor and preempt the field from non-medical institutions.

6. Start litigation seeking a restraining order against all or part of the activities of Ball State University and requiring its personnel to correct erroneous information by disseminating the report of this commission to the Governor, the legislators, and health officials of the State of Indiana.

7. Legislation exempting distributors, sellers and assemblers from product liability for materials and components supplied by others which are alleged to have caused harm or damage, due to negligence or the hazardous nature of the product, unless distributors, sellers or assemblers contributed to the harm through their willful act or intentional negligence.

Very truly yours,

FAIRMONT HOMES, INC.

James F. Shea
Chairman of the Board