UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | SECTION:  N(5) |
| LITIGATION | * | |
| | * | JUDGE: ENGELHARDT |
| This Document Relates to:  *Charlie Age, et al. v.* | * | |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | MAG: CHASEZ |

*************************************************************************

**MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO LIMIT
EXPERT TESTIMONY OF JANET BARNES, M.D.**

**MAY IT PLEASE THE COURT:**

Defendant, Gulf Stream Coach, Inc. ("Gulf Stream"), respectfully submits the following

Memorandum in Support of its Motion *in Limine* to Limit the Expert Testimony of Janet Barnes,

M.D. Dr. Barnes has not provided reliable or relevant opinions as to the cause of plaintiff

Christopher Cooper's alleged physical symptoms.

### I.      BACKGROUND

#### A.      Nature of the Case

As this Court is well aware, this Multi-District Litigation is the consolidation of several

state and federal toxic tort suits in which an estimated thirty thousand named plaintiffs claimed

to have inhabited emergency housing units ("EHUs") that were provided to them by the Federal

Emergency Management Agency ("FEMA") as a result of the alleged uninhabitability of their

residences due to Hurricanes Katrina and Rita and were allegedly contaminated with

formaldehyde. (Doc. No. 109, at ¶ 96). One of the plaintiffs was Alana Alexander, who

originally filed suit on February 27, 2009. (*Age, et al. v. Gulf Stream Coach, Inc., et al.*, 09-2892,

Doc. No. 1). In April, she was selected as the bellwether plaintiff in a trial against Gulf Stream.

(Doc. No. 1299).

### B.      Dr. Janet Barnes, Treating Doctor of the Plaintiff's Minor Child

In this case, the Plaintiff has offered Dr. Janet Barnes as an expert witness who will offer opinions regarding her treatment of Christopher Cooper, the Plaintiff's minor child. (Rec. Doc. 2613-2, p. 4). Dr. Barnes has rendered a report concerning plaintiff Cooper's formaldehyde exposure and its effect on his asthma and allergy-related illnesses. *See* Narrative Report of Janet Duncan Barnes, M.D., M.B.A., dated May 15, 2009, attached as Exhibit "A." In that report, Dr. Barnes noted that she treated plaintiff Cooper prior to Hurricane Katrina, "lost" him after the storm, and resumed her treatment on October 4, 2007. *Id.* at 2.

Dr. Barnes' report documented plaintiff Cooper's past and present condition. His past medical history included pneumonia and asthma, which he was diagnosed with before the hurricane. *See id.* at 2, 3. Dr. Barnes noted that after moving into the EHU, plaintiff Cooper began to experience increased sinusitis, shortness of breath and wheezing. *Id.* Asthma attacks that had been occasional progressed to once or twice per week. *Id.* Though she would have expected plaintiff Cooper's asthma condition to improve as he aged, Dr. Barnes stated that the increase of allergy symptoms and asthma exacerbations showed that plaintiff Cooper's condition had actually worsened. *Id.* at 3—4. Further, after plaintiff Cooper moved out of the unit, his shortness of breath and wheezing continued, but with less frequency and severity. *Id.* at 3.

Dr. Barnes then submitted various opinions as to the role formaldehyde played in plaintiff Cooper's increased symptoms. She stated that the trailers were small with poor ventilation and substandard insulation, often allowing for increased moisture and the overgrowth of mold, mildew and dust mites. *Id.* at 4. She also recognized formaldehyde as a known irritant that increases a child's susceptibility to allergens, "particularly [children] with a genetic disposition to atopy." *Id.* In her opinion, even acceptable levels of formaldehyde in a home could trigger

severe upper and lower respiratory distress, or "greater" effects in a child with asthma. *Id*. Inhalation of the chemical due to chronic exposure could cause inflammation and permanent epithelial damage to the airways. *Id*. Thus, Dr. Barnes opined, "[T]he exposure to formaldehyde in the FEMA trailer, within a reasonable degree of medical probability, will cause permanent epithelial damage, with subsequent acute exacerbations of asthma, recurrent rhinosinusitis, and chronic atopic dermatitis for the rest of [plaintiff Cooper's] life." *Id*. Gulf Stream now asks this Court to exclude Dr. Barnes' opinions as to the cause of plaintiff Cooper's medical condition.

## II.    ADMISSIBILITY OF EXPERT OPINIONS

### A.    This Court's Gate-keeping Role Regarding Opinions of Dr. Barnes

Under Federal Rule of Evidence 702, a witness who through her expertise has the knowledge, skill, experience, training or education to offer scientific, technical, or other specialized knowledge may testify regarding that knowledge if it will assist the trier of fact to understand the evidence or to determine a fact in issue. FED. R. EVID. 702 (2009). However, such testimony is only admissible if it is based upon sufficient facts or data, it is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case. *Id*.

As this Honorable Court has recognized, "The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals* provides the analytical framework for determining whether expert testimony is admissible under Rule 702." (Rec. Doc. 2181, p. 3) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002)). "Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment to determine whether the expert testimony is both reliable and relevant." *Id*.

With respect to the issue of reliability, several nonexclusive factors may be considered, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. (Rec. Doc. 2181, p. 4). "The reliability inquiry must remain flexible, however, as not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Id.* With respect to the issue of relevance, the expert testimony must be relevant not only in the way that all testimony must be relevant under FRE 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. *Id.*

*Daubert* also cautions against admitting expert testimony in a case when the application of the expert's methodology to the facts of the case involves an impermissible leap of faith. The Supreme Court in *General Electric v. Joiner* acknowledged, "[t]rained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to the existing data only by the *ipse dixit* of the expert." 522 U.S. 136, 146 (1997). If there exists too great an analytical gap between the data and the opinion offered, the testimony is not reliable. *Id. Joiner* reminds district courts that they must review the reasoning used by an expert in applying a given methodology to the expert's ultimate opinion. *See id.* at 144. Ultimately, when the evidence does not "fit" the conclusion, the testimonial evidence is not reliable. *Cavallo v. Star Enterprises*, 892 F. Supp. 756, 761-63 (E.D. Va. 1995).

### B.     Dr. Barnes Causation Opinions are not Based on Reliable Methodology and Provide No Assistance to the Trier-of-Fact

Barnes' causation opinions are inadmissible under FRE 702 for the following reasons:

*1. Dr. Barnes has Not Performed the Proper Analysis in order to Conclude that Formaldehyde Caused Plaintiff Cooper's Symptoms.*

As the United States Court of Appeals for the Fifth Circuit has held, the admissibility of causation evidence in toxic tort cases is contingent upon the introduction of sufficient general and specific causation evidence. *See Knight v. Kirby Inland Marine Inc*., 482 F.3d 347, 351 (5th Cir. 2007). "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Id*.

Specific causation is established when the medical expert isolates an external factor as the cause of internal disease. *Id.*; *Pearce v. Zurich Am. Ins. Co.*, 2009 WL 2046514, *2 (E.D.La. July 13, 2009); *Lassiegne v. Taco Bell Corp.*, 202 F.Supp.2d 512, 524 (E.D.La. 2002). Medical experts can prove specific causation through differential diagnosis – a process of elimination that physicians routinely use to identify the "most likely" cause of a particular individual's illness. *Henricksen v. ConocoPhillips Co*., CV-07-224-JLQ (E.D. Wash. 2/11/09), 605 F.Supp.2d 1142, 1157-58. But, the ability to diagnose medical conditions (internal cause) is not remotely the same as the ability to deduce, delineate, and describe, in a scientifically reliable manner, the causes of those medical conditions (external cause). *Wynacht v. Beckman Instruments, Inc.,* 4:98-CV-007 (E.D. Tenn. 9/15/00), 113 F.Supp. 2d 1205, 1209. External causation is generally determined by a methodology referred to as differential *etiology*, whereby experts conduct tests to eliminate other external causes of a disease. *See Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 280 n. 1 (5th Cir. 1998) (Dennis, J., dissenting). External causation opinions must be based on an objective  validation of the expert's methodology. *See id*. at 279 (*en banc* majority opinion).

The Fifth Circuit correctly recognizes the distinction between differential diagnosis and differential etiology.  In *Moore v. Ashland Chemical, Inc.,* the plaintiff developed a respiratory

disorder shortly after being exposed to toluene fumes at work. *Id.* at 272. Plaintiff was ultimately diagnosed with reactive airways dysfunction syndrome (RADS), a condition his doctors attributed to his exposure to toluene fumes. *Id.* The plaintiff's causation expert examined the plaintiff on three separate occasions, performed a series of tests, and reviewed plaintiff's medical records. *Id.* at 273. Based on his examination and tests, the expert opined that plaintiff's RADS had been caused by his exposure to the toluene vapors at work. *Id.* However, the Fifth Circuit affirmed the district court's decision to exclude the causation expert's opinion as to RADS. *Id.* at 279. The Court concluded that the expert offered no information regarding the necessary level of exposure required to cause specific injuries, had no reliable evidence of the dose to which the plaintiff was actually exposed, and failed to offer any scientific support for the general theory that exposure to toluene at any level would cause RADS. *Id.* at 278-79. Thus, the expert failed to satisfy *Daubert* standards regarding his methodology when determining the etiology. *See id.*

The *Moore* decision is directly applicable to this case. Much like the expert in that case, Dr. Barnes has offered no information regarding the necessary level of formaldehyde exposure required to cause permanent epithelial damage with subsequent acute exacerbations of asthma, recurrent rhinosinusitis, and chronic atopic dermatitis. *See* Deposition Testimony of Janet Barnes, taken on June 4, 2009, p. 114—15, attached as Exhibit "B." In fact, Dr. Barnes testified that the level to which plaintiff Cooper was exposed "doesn't matter." *Id.* This establishes that Dr. Barnes' causation opinions are not based on reliable evidence of the level of formaldehyde to which plaintiff Cooper was exposed. *See id.* Further, as will be shown below, Dr. Barnes fails to offer any scientific support for her opinion that exposure to formaldehyde at concentrations experienced by plaintiff Cooper causes permanent epithelial damage with subsequent acute exacerbations of asthma, recurrent rhinosinusitis, and chronic atopic dermatitis.

*2. The Scientific Evidence Does not State that Formaldehyde's Effects are Permanent.*

In addition to her other opinions, Dr. Barnes has opined that plaintiff Cooper's exposure to formaldehyde caused him to suffer permanent airway damage. *See* Exhibit A, at 4. However, much like her other opinions, those on formaldehyde's permanent effects are also unreliable.

In her report, she opined, "[T]he exposure to formaldehyde in the FEMA trailer, within a reasonable degree of medical probability, will cause permanent epithelial damage, with subsequent acute exacerbations of asthma, recurrent rhinosinusitis, and chronic atopic dermatitis for the rest of [plaintiff Cooper's] life." *Id.* Epithelial damage in this context means damage to the tissue that lines plaintiff Cooper's air pathways. *See* Deposition of Karin Pacheco, taken on July 15, 2009, p. 53, attached as Exhibit "C." Dr. Barnes likened formaldehyde's role in creating permanent epithelial damage to a chemical burn – "once you get it, it's permanent." *See* Exhibit B, at 94—95. She did not consider the effects of formaldehyde to be transient. *Id.* at 259.

These opinions are not borne out by reliable science. First of all, Dr. Barnes did not conduct the necessary studies to render an opinion as to epithelial damage. Dr. Karin Pacheco, an internal medicine physician, allergist and immunologist retained by the Plaintiff, stated that permanent epithelial damage may only be determined by taking a biopsy of the sinuses. *See* Exhibit C, at 53—55. Dr. Barnes agreed with Dr. Pacheco's assessment, stating that a microscopic evaluation is the proper way in which to measure permanent epithelial damage. *See* Exhibit B, at 94. However, Dr. Barnes could not identify a single scientific study that identified permanent epithelial damage through microscopic evaluation, and there is no indication that she personally took a biopsy in this case. *See id.* Additionally, none of the papers she reviewed conducted a biopsy to evaluate epithelial damage. *See id.* at 97—99. Referencing the studies, Dr. Barnes stated, "They don't say in any of them that there is microscopic damage." *Id.* at 99. Thus,

not a single paper she relied upon actually examined epithelial damage in the manner set forth by Dr. Barnes herself. *See id*. Finally, Dr. Barnes could not recall whether plaintiff Cooper had swollen nasal passages prior to the storm. *Id*. at 34—35. Thus, Dr. Barnes could not state whether the nasal passages were any worse after Katrina than they were before the storm. *See id*.

Additionally, Dr. Judd Shellito, a pulmonologist and internist retained by the Plaintiff, has opined that formaldehyde can result in symptoms such as nasal discharge, nosebleeds, eye irritation and cough. *See* Affidavit of Judd Shellito, dated August 20, 2008, p. 4, attached as Exhibit "D." However, Dr. Shellito stated that "<u>as a rule</u>," these symptoms are transient and resolve <u>completely</u> once the individual removes himself from exposure. *Id*. Thus, the Plaintiff's own expert rejects the theory that formaldehyde can cause permanent damage.

This evidence shows that Dr. Barnes' conclusions about the permanent nature of formaldehyde are unreliable. One of the *Daubert* factors used to evaluate the reliability of an expert's opinions is whether the expert's technique is generally accepted in the relevant scientific community. Clearly, Dr. Barnes' technique and conclusions have been rejected because she did not utilize the proper methodology to opine about permanent epithelial damage. Even the Plaintiff's own expert has explicitly rejected such a conclusion. Thus, Dr. Barnes' opinions on this topic are unreliable.

### *3. Her Opinions are Based on the Wrong Medical History.*

The Fifth Circuit has held that expert opinion based on facts that are indisputably wrong will not advance the goal of assisting the trier of fact, and thus, is not admissible under Rule 702. *Guillory v. Domtar Indus.*, 95 F.3d 1320, 1331 (5th Cir. 1996). In this case, Dr. Barnes stated that while plaintiff Cooper lived in Florida after Hurricane Katrina, his allergies and asthma attacks were completely controlled and seldom needed intervention. Exhibit A, p. 2. She testified

at her deposition that plaintiff Cooper did not have any symptoms in Florida, or at least did not have the same type of symptoms in Florida that he experienced after moving back to New Orleans. *See* Exhibit B, at 182. After he moved back to New Orleans and into the EHU, he began to have wheezing episodes approximately two to three times per week. *Id.* at 80—81. Thus, she opined that plaintiff Cooper's exposure to formaldehyde in the EHU exacerbated his symptoms. *Id.* at 342—43. Her conclusions and opinions in this regard were based on the history of present illness she obtained from the patient's mother, plaintiff Alexander. *Id.* at 182, 186—87.

It appears, however, that Dr. Barnes was misinformed. When plaintiff Cooper was admitted to the Emergency Room on December 4, 2007, for chest tightness and cough, he reported that he had not had a wheezing episode for one year. *See* Children's Hospital Emergency Department Record, dated 12/04/07, attached as Exhibit "E." The records establish that Dr. Barnes' opinions as to plaintiff Cooper's formaldehyde exposure and its effect on his wheezing were based on an incorrect history. Under the Fifth Circuit rule, those opinions are therefore inadmissible. *See* Guillory, 95 F.3d at 1331. In fact, Dr. Barnes herself admitted, "If . . . in January 2008, [plaintiff Cooper] hadn't had any wheezing since he left Florida, then I couldn't relate it to the trailer." *See* Exhibit B, at 189. Thus, even Dr. Barnes admits that her opinions as to formaldehyde's role in causing plaintiff Cooper's wheezing would be undermined if he had no wheezing during the December 2006 to December 2007 timeframe, which he did not.

### *4. She Relied Upon Scientific Studies that did not Establish Statistical Significance*

Additionally, Dr. Barnes has not properly utilized epidemiological studies in formulating her opinions. To understand the problems with Dr. Barnes' testimony in this regard, a brief background on epidemiology is necessary.

9

**a. Epidemiology Background**

According to the U.S. Court of Appeals for the Fifth Circuit, epidemiological studies are the most effective and conclusive type of evidence in cases involving a chemical substance's ability to cause a physical condition. *See Allen v. Pa. Engineering Corp.*, 102 F.3d 194, 197 (5th Cir. 1996). "Epidemiology attempts to define a relationship between a disease and a factor suspected of causing it." *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 311 (5th Cir. 1989). To define that relationship, an epidemiologist examines the general population, comparing the frequency of the disease among those people exposed to the factor to those not exposed. *Id.* The epidemiologist then uses statistical methods and reasoning to draw a biological inference between the factor and the disease's etiology. *Id.* The goal is to produce results that reach "statistical significance," which assesses the probability that a particular outcome is due to chance rather than a true association between the exposure and disease. *See Cook v. Rockwell Intern. Corp.*, 580 F.Supp.2d 1071, 1100 (D.Colo. 2006).

There are several ways in which to measure statistical significance. One is known as the "confidence interval." The Fifth Circuit has noted the difficulty with epidemiological studies is that often several factors can cause the same disease. *Brock*, 874 F.2d at 311. Studies incorporate the possibility of these other factors by using the confidence interval. *Id.* at 312. The interval is a common-sense mechanism upon which statisticians rely to confirm their findings and to lend persuasive power within their profession. *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1353 n.1 (6th Cir. 1992). It has two components: a percentage and an interval. *Id.* The percentage is often set at 95 percent. *Id.* The interval represents a range of possible values at high and low ends of a scale of "relative risk." *Id.* At a 95 percent interval, the relative risk value will be between the high and low ends of the confidence interval 95 percent of the time. *Id.*

That, of course, begs the question of how to define "relative risk." The relative risk, or "odds ratio,"[1] is a number that describes the increased or decreased incidence of the disease in question in the population exposed to the factor as compared to the control population not exposed to the factor. *See Brock*, 874 F.2d at 312. A relative risk of 1.0 means that the incidence of disease in the two groups was the same. *Id.* A relative risk greater than 1.0 means that there was a higher incidence of disease in the group exposed to the factor. *Id.* However, just because an epidemiological study concludes that a relative risk is greater than 1.0 does not establish that the factor caused the disease. *Id.* In fact, the threshold for concluding that an agent more likely than not caused a disease is a relative risk of greater than 2.0. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 n.16 (11th Cir. 1999) (citing Federal Judicial Center, *Reference Manual on Scientific Evidence* 168-69 (1994)). Only risks greater than 2.0 permit an inference that a plaintiff's disease was more likely than not caused by the suspected agent. *Id.* Furthermore, even if the calculated relative risk is greater than 2.0, a study still fails to show a statistically significant association between the factor and the disease if the confidence interval is so great that it includes the number 1.0. *See Brock*, 874 F.2d at 312. For example, if a study concluded that the relative risk for a disease was 1.30, but the confidence interval was from 0.95 to 1.82, then no statistically significant conclusions could be drawn from this study because the relative risk, when adjusted by the confidence interval, includes 1.0. *Id.*

Another important way in which to study statistical significance is through the "p-value." With respect to an epidemiological study, statistical significance involves (i) the calculation of the p-value in determining whether an association exists between an agent and disease <u>and</u> (ii) a comparison of this value to a preselected significance level. *Cook v. Rockwell Intern. Corp.*, 580

---

[1]     The terms "relative risk" and "odds ratio" are essentially synonymous. *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878 (10th Cir. 2005); *Snyder* ex rel. *Snyder v. Secy. of Dept. of Health and Human Serv.*, 2009 WL 332044 (Fed.Cl.Ct. Feb. 12, 2009).

F.Supp.2d 1071, 1100 (D.Colo. 2006). If the p-value for a particular study result is less than the selected significance level, then that result is said to be "statistically significant," which means the probability that the observed association is the result of chance rather than a true association is less than the stated significance level. *Id*. If the p-value is greater than the significance level, then the result is said to be statistically insignificant, which means there is insufficient evidence at the selected significance level to reject the "null hypothesis" of the observed association being a product of chance rather than a true association. *Id*. Dr. Gerald McGwin, the Plaintiff's epidemiologist and statistician, has opined that the significance level is .05, a figure that has been used in this field for hundreds of years. *See* Deposition Transcript of Gerald McGwin, taken on Sept. 24, 2008, p. 25, 63—64, attached as Exhibit "F."

### b. Dr. Barnes' misapplication of epidemiological studies

In this case, Dr. Barnes has relied upon several epidemiological studies as part of her retrospective analysis of formaldehyde's impact on plaintiff Cooper's physical symptoms. *See* Exhibit B, 11—12. The attorneys for the Plaintiff provided the doctor with ten scientific articles regarding formaldehyde. *See id*. Dr. Barnes used these articles and stated that they helped to explain the association between the physical symptoms and formaldehyde. *Id*. at 12. Notably, she did not rely upon any other articles than the ten provided by the Plaintiff's counsel in formulating her opinions. *Id*. at 14.

Though she relied upon these articles as part of her analysis, Dr. Barnes has misunderstood, misinterpreted and misused them. First of all, Dr. Barnes drew no distinction between "statistical significance" in the context of epidemiology and the term "significance" as a part of our common lexicon. In discussing the Krzyzanowski study, Dr. Barnes noted that the study analyzed chronic respiratory evidence of indoor formaldehyde exposure. *Id*. at 130. When

discussing the study's findings as to formaldehyde and asthma, Dr. Barnes showed that she did

not understand the concept of statistical significance:

> Q.    Okay.  Let's start with the first one. Is this -- is this paper about formaldehyde initiating asthma or formaldehyde exacerbating asthma?
> A.   It's about exposure to formaldehyde.
>
> * * *
>
> Q. And it finds only a statistically significant association between formaldehyde exposure and asthma or chronic bronchitis in people who live in houses with smokers, correct?
> A.   Did you say significant or insignificant?
> Q.   Statistically significant.
> A.   Statistically significant prevalent rates of asthma and bronchitis with -- with children exposed to formaldehyde.
> Q.   But only in houses with smokers, correct?
> A.   No.  They said especially in children who are exposed to smoke, not only in smokers' homes.
> **Q.  But the statistically significant findings were only in people exposed to formaldehyde above 60 parts per billion and in houses with smokers, correct?**
> **A.    No.  They also said that asthmatic children exposed below that were greater than in children who were healthy.  So still significant.**
> Q.   Which -- where did that data point come from?
> A.    It's at the beginning. The effects of asthmatic children exposed to formaldehyde below 50 were greater than in healthy ones.  The effects on the adults were less evident.  But what it does show is -- is whether it's smoking along with the formaldehyde that -- that there is a  synergistic effect.
> **Q.   The fact that there may be higher rates does not necessarily make those rates statistically significant, does it?**
> **A.    The fact that there may be higher rates, yes, it makes it -- it makes it significant.**
> **Q.   Any higher rate --**
> **A.   If you have higher rates of formaldehyde exposure, yes, it's significant.**
> Q.   No.  I think what you said was higher rates of asthma.
> A.    No.  I was talking about formaldehyde.  The effects on asthmatic children exposed to formaldehyde below 50. This is -- they're talking about parts per billion were greater than in -- in healthy ones. The effects in an asthmatic child that was exposed to formaldehyde was greater even at below 50 than in those children that were healthy.
> **Q.   But it's still got to be statistically significant even if it's greater?**
> **A.   It is significant.**
> **Q.   Statistically significant?**
> **A.   Statistically significant.**

Q.   Now, you just read to me the commentary.  Where in the paper does it show it's statistically significant?
A.       Respiratory effects of formaldehyde at time, morning, nonasthmatic, morning, asthmatics.
MR. PINEDO: Andy, when you are talking about --
THE WITNESS: Sixty to 80.  **I don't know.** *Id*. at 133—36 (emphasis added).

The testimony shows that Dr. Barnes confuses greater instances of respiratory effects with statistically significant findings that formaldehyde caused those effects. To Dr. Barnes, the greater instances show significance. However, that is not the same concept as "statistical significance," which is a scientific function that assesses the probability that a particular outcome is due to chance rather than a true association between the exposure and disease. Here, the Krzyzanowski study itself could not confirm statistical significance between formaldehyde and respiratory effects except in houses with formaldehyde levels above 60 parts per billion and in houses with smokers. *See id*. That is precisely why Dr. Barnes did not know where in the study the authors identified a statistically significant relationship between formaldehyde and respiratory effects below 60 parts per billion. *See id*. Nevertheless, she was willing to state that there was a statistically significant finding below that level because the findings were "significant." This confusion shows that she does not understand statistical significance.

Furthermore, Dr. Barnes completely discarded any notion of reliable odds ratios. In her opinion, an odds ratio (or relative risk) below 2.0 is statistically significant because "Any exposure in a child is statistically significant." *Id*. at 72. Thus, she had no problem relying on an epidemiological paper with an odds ratio below 2.0, and in fact did so on several occasions. *See id*. at 70—72. She relied on the Mendell study, which included an odds ratio of 1.1 for formaldehyde, as support for her opinion that formaldehyde either initiates or exacerbates asthma. *Id*. at 152—66. Further, even when she admitted that certain studies lacked statistical significance, she still used them in formulating her opinions. The Garrett study included an odds

ratio of 1.0 and was in Dr. Barnes own opinion statistically <u>insignificant</u> as to the question of whether formaldehyde initiated asthma. *Id*. at 124—29. However, she still relied on this article and others as part of her retrospective analysis.

Second, Dr. Barnes had no idea what a p-value was. Her definition of a p-value was "the peak respiratory flow rate." *Id*. at 138. That is clearly not what a p-value means in an epidemiological context. *See Cook*, 580 F.Supp.2d at 1100. Further, she had no idea at what p-value a finding loses its statistical significance. *See* Exhibit B, at 137—41. Her testimony establishes that she does not properly understand epidemiological studies – studies that, according to the Fifth Circuit, constitute the most conclusive type of evidence in cases involving a chemical substance's ability to cause a physical condition. *See Allen v. Pa. Engineering Corp.*, 102 F.3d 194, 197 (5th Cir. 1996). She cannot utilize studies of which she has no understanding as support for her claim that formaldehyde caused plaintiff Cooper to suffer damage.

Finally, Dr. Barnes on several occasions simply misquotes the studies upon which she relied. She stated that in her opinion, it is probable that formaldehyde could actually cause asthma. Exhibit B, 70—72, 77. However, she admitted that the studies she reviewed say that it is only <u>possible</u> that formaldehyde can actually initiate asthma. *Id*. at 72—77. In discussing another paper, she stated that the paper supported the proposition that formaldehyde exposure more probably than not exacerbates asthma. *Id*. at 109—10. Yet, Dr. Barnes then admitted that the study did not say that such a relationship was probable. *Id*. at 113—14. Nevertheless, the study's conclusion as to the <u>possibility</u> of exacerbation was sufficient for Dr. Barnes to conclude that the association between formaldehyde exposure and asthma exacerbation. *See id*. at 121—22.

Thus, Dr. Barnes' misuse and misunderstanding of these studies renders her opinions unreliable because her methodology is completely dubious. In several instances, she makes

conclusions that are not supported by the objective evidence. However, she cannot establish associations simply because she thinks that they exist. *See General Electric v. Joiner,* 522 U.S. 136, 146 (1997). There is too great a gap between the studies upon which she relied and her ultimate conclusions. *See id.* Thus, her conclusions are unreliable and inadmissible.

       *5. Dr. Barnes did not conduct an independent analysis of the relevant literature, and relied upon studies that are in applicable to this case.*

       While it is clear that Dr. Barnes misinterpreted the various epidemiological studies she reviewed, her reliance is also misplaced because the papers discussed topics that have no application in this case. As stated above, the ten papers that Dr. Barnes reviewed and relied upon were provided by the Plaintiff's attorneys. *See* Exhibit B, 11—12. Dr. Barnes did not rely upon any other articles other than these ten. *Id.* at 14.

       Dr. Barnes' failure to conduct an independent investigation calls into question her ultimate opinions. If proffered expert testimony is not based on independent research, the party proffering it must provide other objective, verifiable evidence that the testimony is based on scientifically valid principles. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317—18 (9th Cir. 1995). In *U.S. E.E.O.C. v. Rockwell Intern. Corp.*, the court struck an expert who relied on materials, reports and summaries given to him by counsel, and failed to verify the information from reliable, independent sources. 60 F.Supp.2d 791, 797 (N.D.Ill. 1999); *see Rural Water Dist. No. 4 v. City of Eudora*, 604 F.Supp.2d 1298, 1312 (D. Kan. 2009) (striking an expert who relied on information he received from several engineers involved in the action).

       Applying those cases to the instant lawsuit, it is clear that Dr. Barnes simply relied on the articles provided to her by counsel. While she conducted her own physical examination, her analysis of the relevant literature was limited to the ten articles provided to her by counsel.

Without conducting an independent investigation, however, her reliance on these articles was misplaced. Much like the experts in the cases cited above, Dr. Barnes has provided unreliable opinions because she has not justified her failure to employ her own research.

Additionally, the studies that she did rely upon are inapplicable to this case. The ten studies that Dr. Barnes reviewed were also reviewed by Dr. Gerald McGwin, the Plaintiff's epidemiologist and statistician, as part of his meta-analysis. *See* Formaldehyde Exposure and Asthma in Children: A Systemic Review, Gerald McGwin, M.S., Ph.D., dated May 18, 2009, attached as Exhibit "G." **None** of the studies identified formaldehyde's role in the exacerbation of asthma as its case definition. *See* Deposition Transcript of Gerald McGwin, taken on July 27, 2009, p. 54, attached as Exhibit "H." In fact, Dr. McGwin did not evaluate whether formaldehyde exacerbates asthma. *Id.* at 115.

That Dr. Barnes would rely on these studies is therefore puzzling, considering that plaintiff Cooper had asthma prior to living in the EHU. The central issue in this case is whether the formaldehyde exacerbated his asthma, yet Dr. Barnes relied on studies that did not discuss the central issue. Surprisingly, this made little difference to her. Dr. Barnes stated that whether the studies evaluated the initiation or exacerbation of asthma was of no moment. *See* Exhibit B, 100—01. As long as the papers showed that formaldehyde can initiate asthma, she simply assumed that formaldehyde would exacerbate the illness. *Id.* Without relying on studies that actually discussed the material issue in this case, Dr. Barnes' opinions based on those studies are totally unreliable and irrelevant.

### 6. Dr. Barnes Had no Concept of Dose

Dr. Barnes' opinions are also unreliable because they are predicated on the notion that there is "no safe level" of exposure to formaldehyde. Dr. Barnes stated that although plaintiff

Cooper had chronic exposure to formaldehyde, she did not know – and importantly, did not care – the level to which he was exposed. Exhibit B, at 114—15. She stated:

> Q.   Raised levels --
> A.   This right here is talking about just chronic exposure --
> Q.   Raised levels --
> A.   -- which my patient had, chronic exposure.
> Q.   At what level?
> A.   From May 2006 to December 2007.
> Q.   At what level?
> A.   In a closed box, trailer, filled and built with formaldehyde-laced material.
> Q.   At what level?
> A.   In a humidified and in a high -- **it doesn't matter the level**. *Id.*

Further, she stated that in a lung with potential to wheeze, <u>any amount</u> of formaldehyde exposure could cause damage. *Id.* at 124. Additionally, according to Dr. Barnes, formaldehyde can get into the lower respiratory tract at a certain level, but the level may have no relevance to a child with asthma. *Id.* at 171—73. While she agreed that higher levels of formaldehyde could be more dangerous, Dr. Barnes stated that formaldehyde could still sensitize an asthmatic at any level. *See id.* at 110—12.

Though Dr. Barnes opines that any level of formaldehyde could cause damage in an asthmatic, the "no safe level" methodology has been soundly rejected. In fact, it has been held that it "**fails all of the <u>Daubert</u> reliability factors**." *See Whiting v. Boston Edison Co.,* 891 F.Supp. 12, 25 (D.Mass. 1995) (emphasis added). In *Whiting*, the plaintiff's experts espoused opinions that low-dose exposure to radiation could trigger events leading to the development of acute lymphocytic leukemia (ALL) and the court, in excluding such opinions, held as follows:

> I find that the opinion…that low doses of nuclear radiation…can cause ALL is not based on scientific knowledge, but is grounded on speculation shaped by result-oriented biases. The linear non-threshold model cannot be falsified nor can it be validated. To the extent it has been subjected to peer review and publication, it has been rejected by the overwhelming majority of the scientific community. It has no known or potential rate of error. It is merely an hypothesis. In sum, it has no

capacity to be of assistance to a jury in resolving the ultimate issues in this case. *Id.*

Other courts have also precluded such opinions based upon this model providing that opinions based upon it are "flatly rejected as mere hypothesis." *See, e.g.*, *Parker v. Mobil Oil Corp.,* 793 N.Y.S. 2d 434, 438 (2d Dep't 2005); *Willis v. Amerada Hess Corp.,* 2002 WL 140542, *14 (S.D.N.Y. 2002); *Sutera v. Perrier Group*, 986 F.Supp. 655, 666 (D.Mass. 1997). All that a "no safe level" opinion implies is that any increase in exposure increases the risk of injury – it says nothing at all about how great the increase is nor does it imply that the exposure-related increase is significant when compared to the background risk of injury or injury due to other factors. The impact of these decisions on Dr. Barnes' opinions is clear – the "no safe level" theory is completely unreliable. As such, it should be rejected.

### 7. Dr. Barnes made an impermissible leap regarding the biological mechanism in which formaldehyde affects the lower lungs

Though Dr. Barnes has opined that formaldehyde could affect the lower respiratory tract, the epidemiological studies upon which she relied do not support this conclusion. Asthma is a reaction in the lower lungs, though it can be triggered by what occurs in the upper respiratory tract. Exhibit B, at 42. When asked how formaldehyde can have an impact on the lower airways, Dr. Barnes stated:

> Q.    Okay.  We talked earlier today about the upper airways and asthma being in the lower airways. To you, what is the biological mechanism of injury by which asthma -- I'm sorry, formaldehyde affects the lower airways?
> **A.    To start out in the upper airways.**
> Q.    Okay.  How does it get to the lower?
> **A.    And that -- as a gaseous substance.**
> Q.    Yes.
> A.    And -- and if you already have the potential to wheeze, even something as simple as a cold can trigger asthma in an asthmatic.  And that meaning as a cold that's in your nostrils, airway source in your nostrils, it goes all the way down in your alveoli, and so what affects the nose can also affect the lungs. So by the mere

fact that they're basically studies in the airway respiratory tract and showing that formaldehyde significantly affects the upper airway, ultimately it can affect the lower respiratory tree as well.

Q.   But how?  How does it get down there?  How does it affect it biologically?

A.   Swelling, inflammation, progression as it goes down, as they breathe it in.

Q.   So the formaldehyde actually gets --

A.   Inflammation --

Q.   -- into the lower lungs?

A.   Inflammation, swelling, triggers bronchospasms, hypersensitivity, and they wheeze.

Q.   Okay.  Because the formaldehyde gets into the lower lungs?

A.   **It gets into -- it gets into the upper airway and -- and starts a process that causes allergic reaction.**  Whether it gets into the bloodstream, whether it gets into the respiratory -- upper respiratory tract and it's absorbed, it can trigger wheezing.

Q.   In the lower?

A.   In the lower.

Q.   How?

A.   Same way a viral infection can trigger the lower.  **It -- it's just a progression.  It's all one respiratory trigger.**

Q.   But does the formaldehyde get into the lower tract?

A.   It can get into the lower tract at a certain level, and an asthmatic is going to be more sensitive.  So for sure it can go into the lower tract.

Q.   You said that a certain --

A.   But these articles basically talk about the upper respiratory tract, and what I'm saying is just from my experience with any trigger that starts it in the upper respiratory tract -- in the upper respiratory tract, if that child is sensitized or if that child is an atopic child, they can wheeze.  They can precipitate. *Id.* at 169—72 (emphasis added).

Though Dr. Barnes believes that formaldehyde can get into the lower airways through an allergic progression, other sources – including the Plaintiff's own expert – have rejected that conclusion. The Plaintiff's experts and licensed physicians, Dr. James Kornberg and Dr. Karin Pacheco, both testified and agreed that Cooper did not and does not have IgE-sensitized or IgE-mediated asthma and thus is not prone to allergic exacerbation of his pre-existing asthma. *See* Deposition of James Kornberg, taken on July 9, 2009, p. 60, 62, 64, 82, 270, attached as Exhibit "I"; Exhibit C, p.  38, 66.

Additionally, one of the studies Dr. Barnes relied upon (the Garrett study) explicitly states, "[T]he mechanism by which formaldehyde exposure could affect the lower respiratory tract is unclear." *See* ALX-EXP-77-000363, attached as Exhibit "J." The study concluded that at low levels of formaldehyde, most formaldehyde remains in the upper respiratory tract and "irritant effects on the lower respiratory system are therefore not likely." *Id*. Thus, although there have been "suggestions" regarding the long-term effect of formaldehyde on the lower respiratory system, the results have been inconsistent. *Id*. In this case, however, Dr. Barnes was not given pause by such a conclusion. She still opined that formaldehyde "for sure" can get into the lower tract. Exhibit B, at 172. As discussed above, Dr. Barnes cannot make conclusions that have no basis in objective science. *See General Electric v. Joiner,* 522 U.S. 136, 146 (1997). Thus, her opinions on this issue are inadmissible.

### *8. Lack of Objectivity*

Further calling into question the opinions of Dr. Barnes is the fact that she was not objective in evaluating plaintiff Cooper's history. The Fifth Circuit has upheld the exclusion of an expert when his research and investigation indicated that he lacked necessary objectivity to make his analyses credible. *See Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

In this case, Dr. Barnes does not have the necessary objectivity to render her opinions credible. At her deposition, Dr. Barnes testified that she resided in an EHU after Katrina and plans to file a lawsuit related to her formaldehyde exposure. Exhibit B, p. 358—59. Her children are also plaintiffs in a lawsuit brought against some of the trailer manufacturers in this MDL. *Id*. at 359. This is clear case of bias. Dr. Barnes plans to offer expert opinions favorable to plaintiff Cooper in this case. If the trier of fact believes her opinions and awards damages to plaintiff Cooper because of those opinions, the findings in this bellwether trial could have a positive

impact on future cases brought by EHU residents. Thus, Dr. Barnes and her daughters stand to gain a great deal in their own lawsuits if plaintiff Cooper is successful in this one. This bias could not be more obvious, and the defendants would be prejudiced by such an occurrence. Thus, her opinions on this topic are unreliable and inadmissible.

### 9. Anecdotal Evidence

Dr. Barnes has also based her opinions as to plaintiff Cooper on her treatment of other patients. To the extent the opinions are predicated on the treatment of other patients, they are completely irrelevant in this case. As this Court has recognized, the expert testimony must be relevant not only in the way that all testimony must be relevant under Federal Rule of Evidence 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. (Rec. Doc. 2181, p. 4). Indeed, this concept is at the heart of epidemiology, which seeks to ascertain an actual association between a diseases and its cause. The whole exercise requires the exclusion of random anecdotal incidents.

In her deposition, Dr. Barnes gave numerous responses that involved other asthmatic patients she has treated – responses that had no bearing on plaintiff Cooper's condition. For example, in discussing the formaldehyde levels present in plaintiff Cooper's trailer, she stated, "I'm not an expert on construction and about a site home or a trailer. I formulate a lot of my opinions also with patients coming into my office who have the same complaints and at that time did not know anything about formaldehyde exposure, but it's documented that they were having problems, including nasal, the throat, the eyes, the lungs, and also giving the same complaint that when they opened up the trailer for the first time, they immediately began having eye irritation and difficulty breathing and was told to just air out the trailer." Exhibit B, 263—64 (emphasis

added). According to this testimony, Dr. Barnes admits that she draws her conclusions based on other patients' symptoms. *See id*.

Drawing inferences from other patients does not end there. In discussing permanent epithelial damage, she stated, "Patients with asthma, if not – even if you're not exposed to an irritant like formaldehyde, if not treated properly can have micro damage anyway." *Id*. at 88. When discussing allergic dermatitis, she stated, "[P]atients have come in exposed to airborne allergens have had allergic reactions such as swelling of the hands, swelling of the eyes, swelling of the lips, and surely it can swell the lips, and they can breathe. They can get allergic responses throughout the air – the respiratory tree." *Id*. at 149. When asked about plaintiff Cooper's history, she stated, "I believe in what [plaintiff Alexander] says [about plaintiff Cooper's medical history] because it is consistent with what I have found in other patients." *Id*. at 185.

This testimony shows that Dr. Barnes has based her opinions on information that has no bearing on plaintiff Cooper's case. What others have complained about, what other asthmatics experience and what other micro damage others may have undergone have no bearing on plaintiff Cooper's condition. The only question is whether plaintiff Cooper experienced these things. Dr. Barnes' statements about what others have gone through are completely irrelevant because they do not assist the trier of fact in determining whether plaintiff Cooper experienced physical conditions because of his exposure to formaldehyde. As such, these statements and opinions should be excluded.

Taken together, this evidence shows that Dr. Barnes' opinions and testimony are unreliable because they are not the product of sound methodology. Dr. Barnes' misunderstands the articles on which she relies to make her opinions, she makes impermissible leaps from the objective evidence, she does not properly understand the medical history, she bases her opinions

23

on irrelevant information unrelated to the plaintiff in this case, and she does not possess the requisite objectivity to render an opinion. As such, neither her opinions nor her testimony will assist the trier of fact in this case, and they should therefore be excluded.

### III.    DR. BARNES LACKS QUALIFICATIONS TO SUPPORT HER OPINIONS

A district court is to allow the submission of expert testimony only if the expert is qualified to testify by virtue of his "knowledge, skill, experience, training, or education." FED. R. EVID. 702 (2009). A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods,* 163 F.3d 935 (5th Cir. 1998). The qualification of a witness as an expert, separate and apart from the witness' opinion, is a determination that is a discreet, independent and important requirement in considering the admissibility of an expert's testimony. *See U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).   Applying those rules to this case, Gulf Stream asserts that Dr. Barnes is not qualified to render the general opinions proffered. Dr. Barnes has spent a great deal of time reviewing the ten epidemiological articles sent to her by the attorneys for the Plaintiff, and she has based her opinions in part on the information in those articles. *See* Exhibit B, 11—14. Yet, she fully admits that she is not an expert in epidemiology. *Id*. at 218. Simply put, she does not have the expertise to conduct the type of analysis and render the type of opinion that she has in this case. Furthermore, she is not qualified because she is not a board certified physician. *Id*. at 253. Though she took the board exam, she did not pass the test. *Id*. This further establishes that she is not qualified to render causation opinions, and thus the Court should exclude them.

### IV.    CONCLUSION

Based upon the foregoing, Gulf Stream requests that this Court enter an Order precluding Janet Barnes, M.D., from offering any and all opinions and/or testimony in this case.

Respectfully Submitted:

**DUPLASS, ZWAIN, BOURGEOIS,**
**PFISTER & WEINSTOCK**

s/Andrew D. Weinstock
_____
**ANDREW D. WEINSTOCK #18495**
**JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
(504) 832-3700
(504) 837-3119 (FAX)
andreww@duplass.com
jglass@duplass.com

and

**SCANDURRO & LAYRISSON**
**Timothy D. Scandurro #18424**
**Dewey M. Scandurro #23291**
607 St. Charles Avenue
New Orleans, LA 70130
(504) 522-7100
(504) 529-6199 (FAX)
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc.**

## C E R T I F I C A T E

I hereby certify that on the 26th day of August, 2009, a copy of the foregoing

Memorandum in Support of Motion in *Limine* to Limit Expert Testimony of Janet Barnes, M.D.

was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this file

will be sent to liaison counsel by operation of the court's electronic filing system and all other

counsel of record via e-mail and U.S. Mail.

s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com

25