UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION:  N(5) |
| | * | |
| This Document Relates to: | * | |
| *Charlie Age, et al. v.* | * | JUDGE: ENGELHARDT |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | |
| | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF GULF STREAM COACH, INC.'S
MOTION *IN LIMINE* TO EXCLUDE
THE OPINIONS OF MARY DEVANY**

**MAY IT PLEASE THE COURT:**

Gulf Stream Coach, Inc. respectfully submits the following Memorandum in Support of its Motion *in Limine* to Exclude the opinions of Mary C. DeVany.

**I.      BACKGROUND**

**A.      Nature of Case**

This Multi-District Litigation is the consolidation of over one hundred-twenty state and federal toxic tort suits in which thousands of named plaintiffs claim to have inhabited emergency housing units ("EHUs") that were provided to them by the Federal Emergency Management Agency ("FEMA") as a result of the alleged uninhabitability of their residences due to Hurricanes Katrina and Rita.  Following denial of class certification, several plaintiffs, including bellwether plaintiffs Alana Alexander and Christopher Cooper (hereinafter collectively referred to as "Alexander"), filed suit against Gulf Stream Coach, Inc., alleging that it manufactured the EHUs used by the specific plaintiffs.  (*Age, et al v. Gulf Stream Coach, Inc., et al*, 09-2892, Doc.

No. 1).  Moreover, plaintiffs have named as defendants the United States Government through FEMA and Fluor Enterprises, Inc. (*Age,* Doc. No. 1), and plaintiffs seek recovery for alleged physical and mental pain and suffering, physical impairments and disability, medical expenses, loss of earnings capacity, loss of enjoyment and quality of life, loss of consortium, travel expenses, out-of-pocket expenses, and the loss of use and/or opportunity to use safe and adequate shelter allegedly resulting from the purported exposure to formaldehyde. (*Age*, Doc. No. 1, ¶ 117).  Specifically, the *Age* plaintiffs claim exposure to the allegedly dangerous levels of formaldehyde (or threat thereof) in those EHUs. (*Age*, Doc. No. 1, at ¶ 23).  Alexander itemized the theories of recovery against Gulf Stream Coach, Inc., in part, as follows:

> 1. Failing to design the EHU so as to not emit allegedly dangerous levels of formaldehyde;
>
> 2. Manufacturing an allegedly unreasonably dangerous EHU;
>
> 3. Providing an EHU that did not conform to express warranties allegedly made by Gulf Stream Coach, Inc.; and
>
> 4. Failing to warn of the allegedly excessive levels of emissions of formaldehyde and hazards associated with the allegedly excessive levels of formaldehyde emissions in the EHU.

 (*Age*, Doc. No. 1, at ¶ 102).

## B.    Alexander's "industrial hygiene expert – Mary C. DeVany

Alexander provided twenty (20) written expert reports, including the report of Mary C. DeVany.  Exhibit "A," DeVany's May 18, 2009 Affidavit.  DeVany claims to be an occupational and community health safety engineer for the past 30 years.  DeVany has an undergraduate degree in biology, and a Master of Science degree in biology, according to her report.[1]  She

---

[1] She testified under oath in another case that she had two other masters' degrees, one in biochemistry and one in human physiology, but now says that testimony was "technically incorrect."  Depo. of Mary DeVaney, pp. 288-293, attached hereto as Exhibit "B."

claims to be a practicing industrial hygienist, though she failed the examination to become a certified industrial hygienist at least once. Exhibit "B," pp. 289-90. DeVany could not recall whether she sat for the exam a second time, and she testified that she would need to check her records to see if she failed more than once. *Id.* DeVany does not have a degree in industrial hygiene. *Id.* at 56. DeVany is not certified by any organization as an industrial hygienist. *Id.* at 54.

**B.      Basis of DeVany's Opinions**

Despite relatively limited credentials as discussed further below, the Plaintiffs' expert witness, Mary DeVany, offers opinions of astounding scope and breath. Her opinions cover everything from toxicology, to epidemiology, to psychology, to medical causation, to duty to warn, to disaster response, to travel trailer design, and to what she calls "the spirit of the law." DeVany's involvement in this matter began with her role as a member and technical advisor to the Sierra Club, whose member Paul Stewart essentially kicked off this contest in March 2006 when he went on television to complain about his travel trailer. As a result of her involvement with the Sierra Club testing of trailers in Mississippi in 2006, DeVany received an invitation from Henry Waxman to appear before his Congressional committee in 2008. There, she testified as a self-styled "independent" industrial hygienist regarding formaldehyde in travel trailers.

Later, under oath in another proceeding in the State of Washington, she characterized her involvement in this litigation as stemming from the Court's personal request for "one expert witness" that the Court could "work with to help him evaluate the science behind formaldehyde, how formaldehyde is measured, its toxic effects, how it got into the trailer in the first place, and one he could rely upon to produce affidavits to, umm, evidentiary hearings before him, and explain the chemistry, physiology and toxicology of formaldehyde and these law firms along the

coast got together and decided I should be the one." Exhibit "B," Deposition, pp 295-97. Although she professed not to clearly remember how she learned of the expansive, special "uber-expert" role she understood the Court desired, this may help explain the vast, galaxy-like scope of her multiple opinions.

     C.     **DeVany's Opinions**

DeVany's opinions, like Kaltofen's opinions, "were not segregated out as opinions usually are in ordinary expert reports." (Rec. Doc. 2816). Therefore, this Court will likely experience similar problems identifying what exactly DeVany intends to offer as expert opinions. DeVany provided an outline in the overview section of her report and study. Exhibit "A," p. 3. This outline does not offer any ultimate conclusions, but it does provide some insight, at least, about why plaintiffs' counsel retained her in this case. With that being said, DeVany does have a "conclusions" section to her final report. That section identifies what appears to be her opinions pertaining to Gulf Stream:

> Gulf Stream has been one of the largest manufacturers in the U.S. of portable housing. For many years they have had to comply with the HUD limits for formaldehyde emissions from wood products in their mobile homes. Although the thousands of travel trailers provided to FEMA would be occupied for extended periods of time as living quarters for individuals and families, no effort was made to ensure that the emissions were reduced accordingly. Gulf Stream showed negligence in not testing or taking other prudent measures to ensure that formaldehyde concentrations were on par with those required by law for prolonged housing.

Exhibit "A," pp. 24-25.

Because DeVany's conclusion section is so vague, Gulf Stream is forced guess what DeVany is opining about and segregate out as many potential opinions as possible. The first section identified by DeVany in the overview section of her report was a survey of current formaldehyde exposure limits and the basis, application, and limitations of each of those limits.

Exhibit "A," pp. 4-9.  Next, DeVany claims to have surveyed and reviewed the adverse health effects from formaldehyde exposure, and she also purports to explain those effects.[2]  Exhibit "A," pp. 9-11.  Then, DeVany developed a sampling methodology and measurement strategy for determining formaldehyde contamination in the trailer FEMA issued to the Alexander family. *Id.* at 12-13.  After that, DeVany claims that she reviewed the collected data, analyzed the sampling results, and interpreted the findings in this and other Gulf Stream Cavalier trailers. This section is not clearly identified, so Gulf Stream assumes that DeVany is referring to Section V in general, including the section where DeVany calculated the "approximate" concentration range on the date that plaintiffs first moved into the EHU.  *Id.* at 14-22.  Next, DeVany claims that she assisted in determining the extent to which the adverse health effects experienced by Alexander and Cooper are attributable to formaldehyde exposure from their travel trailer.  This "opinion" seems to be scattered throughout her report - Section III; Section V(A); and Section VI(A).  Then, DeVany reviewed the FEMA and Gulf Stream Cavalier documents for disclosures and warnings about the presence of formaldehyde and its adverse effects, and their efforts to mitigate these exposures - seemingly the remainder of Section VI pertains to these "opinions." *Id.* at 22-24.

Gulf Stream can only assume that DeVany intends to offer opinions in each of the various fields of expertise that she has randomly identified in the overview of her report. Presumably, DeVany is offering general medical causation opinions, specific medical causation opinions, statistical analyses, toxicological opinions, negligence opinions, warnings opinions, industrial hygiene opinions, epidemiological opinions, etc.  As if this wasn't enough, DeVany waits until the last page of her report to weigh-in on "the spirit of the law," a concept DeVany

---

[2]     Because of the similarities, Gulf Stream addressed this section in conjunction with DeVany's opinions about the adverse health effects experienced by Alexander and Cooper, which she attributed to formaldehyde exposure from their EHU.

coined to opine about Gulf Stream's supposed non-compliance with inapplicable HUD regulations. Exhibit "A," p. 24. Gulf Stream, in the spirit of the federal rules of evidence, moves to exclude all of DeVany's opinions because she is wholly unqualified, and her opinions find no support in the scientific literature, are not based upon a reliable, demonstrated methodology, are not reasonably based upon facts, and would not be of assistance to the trier of fact.

## II.   ADMISSIBILITY OF EXPERT OPINIONS

**A.   Rules 702, 703, *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and Its Progeny**

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony. The trial judge serves as a gatekeeper to keep out expert testimony that is based solely on speculation or unsupported conclusion. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-590 (1993). In *Daubert*, the Supreme Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but it is also reliable. *See, Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). A party seeking to admit expert testimony bears the burden of demonstrating that the expert's findings and conclusions are based on the scientific method, and therefore, is more reliable. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). And where such testimony's factual basis, data, principles, methods, or their application are called into question, the trial judge is required to determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. *Kumho Tire*, 526 U.S. at 149. This requires an objective, independent validation of the expert's methodology. *Moore*, 151 F.3d at 276. The expert's mere assurance that he has used generally accepted scientific methodology is insufficient. *Id*. The proponent of the expert's testimony must prove to the judge by a preponderance of the evidence that the testimony is reliable. *Id*. Thus, the goal of the court is to

ensure that that expert's opinion is based on sufficient data and an appropriate methodology such that the opinion is connected to the facts by more than conclusory assertions of the expert.

Rule 703 focuses on the data underlying the expert's opinion. *In Re TMI Litigation*, 193 F.3d 613, 697 (3rd Cir. 1999). As part of its gatekeeper role, the trial court must ensure that the underlying facts and/or data upon which a proffered expert's opinion is based are in and of themselves reliable. If an expert's opinion is based on unreliable facts, the opinion must be excluded. *See In Re TMI Litigation*, 193 F.3d at 697. That is, Rule 703's reliability standard is similar to Rule 702's reliability requirement in that there must be good grounds on which to find the data reliable. *Id*. Rule 703 permits an expert to rely on hearsay, so long as that hearsay is of the kind normally employed by experts in the field. *Id*. (*citing In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1245 (E.D. N.Y. 1985)).

In *Daubert*, the Supreme Court enunciated a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the expert's methodology is scientifically valid or reliable. *Moore*, 151 F.3d at 275 (*citing Daubert*, 509 U.S. at 593-595). These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id*.

In addition to the guiding principles set forth in *Daubert*, other factors relevant to the consideration of whether an expert's testimony and opinions are sufficiently reliable so as to allow their admission are as follows: (1) whether the expert is proposing to testify about matters growing naturally and directly out of the expert's research conducted independent of the

litigation or whether the expert has developed the opinion expressly for the purpose of testifying in the litigation; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as she would be in her regular professional work outside of her paid litigation consulting; and (5) whether the field of expertise claimed by the expert is known to reach reliable results consistent with the type of opinion the expert is giving. *See e.g. Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998) (*en banc*); *Sheehan v. Daily Racing Form, Inc.*, 104 F. 3d 940, 942 (7th Cir. 1997); *Daubert v. Merrill Dow Pharmaceuticals, Inc.* 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*); and *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994).

**B.      DeVany's "survey" of current formaldehyde exposure limits and the basis, application, and limitations of these standards is nothing more than a recitation of certain definitions and government standards.**

Section II of DeVany's report begins by defining formaldehyde and its uses.  Exhibit "A," pp. 4-9.  This section also describes a "baking-off" procedure employed by manufacturers to "cure" adhesives used in pressed wood products.  *Id.*  DeVany also goes into great detail about certain "formaldehyde standards," including OSHA, ACGIH, NIOSH, ATSDR, HUD, etc. *Id.* DeVany testified that she did not prepare any methodology in response to this task and application of the scientific method was not necessary.  Exhibit "B," pp. 108-09.  DeVany also testified, regarding the formaldehyde standards, that she interpreted the term "exposure limits" broadly – her report therefore only provides "highlights" of each formaldehyde standard, not a "detailed specific description."  *Id.* at 109.  Exposure limits, according to DeVany, could mean emission levels, recommended levels, or "power of the law."  *Id.*  In other words, DeVany has

not performed any expert analysis or "survey" related to "formaldehyde standards." Gulf Stream cannot identify any opinions in this section that are actually being offered by DeVany. [3]  Instead, this appears to be a purely informational section of her report – DeVany admits that the specific data comes from sources other than herself.   Presumably, these sources serve only as a background for DeVany's opinions and are not offered as independent substantive evidence.  Of course, if DeVany is utilizing the research of others to form her "opinions" she must attribute it to others and provide a sufficient explanation of why it is applicable in formulating her ultimate opinions.  (Rec. Doc. 2816).

DeVany claims to have personally observed the "baking off" process ***at manufacturing facilities***, but she refused to identify any facility where this occurred.  Exhibit "B," p. 171-73. She claimed that it is her policy not to disclose clients.  *Id.*  DeVany's personal policy, however, is not aligned with the Federal Rules of Civil Procedure.  Those rules require DeVany to identify in her report all "data or other information" considered by her in forming her opinions.  Fed. Civ Proced. Rule 26 (A)(2)(b)(ii).  DeVany's refusal to identify the source of her opinions about the "baking-off" process prevents Gulf Stream from inspecting the reliability of her conclusions. This is especially true because Gulf Stream has reason to believe that DeVany lacks both the qualification and experience to offer any expert opinion about "baking-off" as it relates to travel trailers.  Discovery has uncovered a March 2008 e-mail correspondence between DeVany and Robert Parks, a building construction expert.  Exhibit "C," E-mail correspondence from Parks to DeVany (March 16, 2008).  In that e-mail, Parks is explaining the "baking off" process to DeVany and is attempting to develop a "more definitive protocol" for baking-off travel trailers. *Id.*  Parks e-mail informs DeVany that he has never performed this baking off process in a travel

---

[3]     DeVany makes one exception with regards to the "baking off" portion this section.  DeVany testified that this is a summary of her experience of visiting different facilities that make particleboard, plywood, fiberboard, cabinetry, and other materials that use formaldehyde-based adhesives.

trailer.  Exhibit, "C."  "Baking-off," in other words, is not a process that has been tested and shown to work at the ***manufacturing level*** of travel trailers.  DeVany's opinions about "baking-off" travel trailers are nothing more than an unsupported, novel theory crafted for this litigation. She therefore cannot opine that Gulf Stream should have "baked-off" the FEMA-issued EHUs.

**C.      DeVany's protocol is unreliable, and therefore inadmissible, because it *does not* "reliably yield results representative of the true exposures that occupants experienced when living in FEMA-issued THUs."**

DeVany purports to show the jury what adverse health effects Alexander and Cooper experienced because of their actual exposure to formaldehyde from their EHU.  Exhibit "B," p. 305.  DeVany's protocol, therefore, ought to be sufficiently similar so as to provide a fair comparison between actual living conditions and the conditions under which testing occurred. *Barnes v. General Motors Corp.,* 547 F.2d 275 (5th Cir. 1977).

As a general rule, the proponent seeking to admit out-of-court experiments into evidence must demonstrate a "'similarity of circumstances and conditions'" between the tests and the subject of litigation. *Jackson v. Fletcher,* 647 F.2d 1020, 1027 (10th Cir.1981) (quoting *Navajo Freight Lines v. Mahaffy,* 174 F.2d 305, 310 (10th Cir.1949)). *See also Robinson v. Audi NSU Auto Union Aktiengesellschaft,* 739 F.2d 1481, 1484 (10th Cir.1984); *Brandt v. French,* 638 F.2d 209, 212 (10th Cir. 1981). "The purpose of this rule is to prevent confusion of the jury." *Robinson,* 739 F.2d at 1484 (citing *Jackson,* 647 F.2d at 1027).

> Evidence of this kind should be received with caution, and only be admitted when it is obvious to the court, from the nature of the experiments, that the jury will be enlightened, rather than confused. In many instances, **a slight change in the conditions under which the experiment is made will so distort the result as to wholly destroy its value as evidence, and make it harmful, rather than helpful.**'

*Navajo Freight Lines,* 174 F.2d at 310 (emphasis added).

DeVany claims that her formaldehyde sampling protocol was designed to "reliably yield results representative of the true exposures that occupants experienced when living in FEMA-issued THUs."   If this were actually the case, then DeVany's protocol would account for Alexander and Cooper's distinct experiences so that a "true exposure" could be assessed.  This should necessarily consider their distinctive lifestyle habits, ventilation habits, time spent in the EHU, etc. - factors that can have a significant effect on the outcome of "true exposure."

DeVany's sampling methodology, however, was not designed to separately assess these variables.  DeVany's protocol was really intended to establish an average concentration for all EHUs, based on a standardized set of procedures.  Exhibit "B," p. 127.  DeVany therefore "arbitrarily" decided to conduct sampling of unoccupied EHUs with the windows closed, the vents closed, and the doors closed."  *Id.* at 129-32.  DeVany did not include this information in her written protocol, but she claimed that it was "standard practice."  *Id.* at 131.  Her objective was to control those variables so as to compare all the samples together.  *Id.*  This is quite different from accepting those variables and considering their individual effects on a person's "true exposure."   Plaintiffs' civil engineering expert, Marco Kaltofen, was responsible for reviewing DeVany's protocol, and even he offered testimony about the important role different variables play when determining actual exposure:

> Q.    So if you wanted to know what a particular resident was exposed to in a particular unit, don't you think it would be important to know whether the HVAC system was operating and/or whether the doors and windows were opened routinely?
>
> A.    That's all part of the same variable [ventilation rate].   And I am very comfortable thinking that we really would like to see that data generally. Ventilation rates, temperature, humidity.   They all impact the formaldehyde concentration.
>
> Q.    You would like to see that data?

A.      That's all part of how that actual concentration is arrived at.

Exhibit "D," Deposition of Marco Kaltofen (6/16/09) pp. 117-18.

DeVany, on the other hand, was totally unaware that Alexander kept her air conditioner operating at a comfortable 75 degrees when it was hot outside.  Exhibit "B," pp. 68-70.  In fact, when DeVany prepared her report, she was under the impression that Alexander could not even afford air conditioning.  Exhibit "A," p. 18; and Exhibit "B," pp. 70-72.  Rather than admit her mistake, DeVany insisted on arguing that facts are "not necessarily" important and that "when you're running the air conditioner, you don't have the windows open…. So, the temperature might come down, but then there's no ventilation in the unit, so the formaldehyde will build up." Exhibit "B," pp. 72-73.  DeVany might have opted to withhold that argument had she actually spoken to Alexander before offering her opinions.  Exhibit "B," p. 42.  Alexander testified that when it was hot outside, the trailer would not have been closed up nor would the air conditioner have been turned off.  Exhibit "E," Deposition of Alana Alexander p.379 (June 29, 2009). She would always try to maintain a comfortable temperature inside the EHU.  *Id.* at 287.  If necessary, this included opening and closing windows, vents, and doors. *Id.* at 287.  Alexander's ventilation habits were especially true when she was cooking inside the trailer (which was generally five times a week) and also on "those very nice days in New Orleans" when temperatures were not extremely hot or extremely cold.  Exhibit "E," at 176-78 and 414-15.

Alexander's testimony is a perfect demonstration why DeVany's "standardized" protocol cannot be used to "reliably yield results representative of the true exposures that occupants experienced when living in FEMA-issued THUs."  The sampling of the Alexander EHU, in accordance with DeVany's protocol, took place when the trailer was closed and without the

ventilation system running.  Exhibit "A," p. 13.  These were not conditions experienced by the occupant.  DeVany knows this – her report specifically reads:

> Conversely, when people are living inside, people open doors and go in and out.  The HVAC system is used.  Windows and vents may be opened from time to time.  Fans may be used to circulate air around the inside. All of this air movement significantly impacts indoor air quality because fresh air is allowed to enter.  Therefore, as a result, unoccupied units can have higher concentrations than occupied ones.

Exhibit "A," p. 20.

Alexander's testimony and DeVany's own report illustrates just how unrepresentative DeVany's "standardized conditions" really are.  Formaldehyde samples obtained in compliance with DeVany's set of conditions are not representative of "true exposures."

Conditions that were not experienced by Alexander and Cooper are not relevant evidence in this case.  "Relevant evidence" means evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence.  Fed. Rule of Evid. 401.  DeVany's protocol (and methodology in general) will not assist the jury in determining the true exposures of Alexander and Cooper because her procedures lack the necessary representation of the actual conditions experienced by Alexander and Cooper.  This is not just a technical flaw in the protocol. DeVany's protocol is *not at all* representative of the legally relevant group in this litigation. Evidence that is not relevant is not admissible.  Fed. Rule of Evid. 402.

For the same reasons, DeVany's protocol should be excluded because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and its potential for misleading the jury.  Fed. Rule of Evid. 403.  This is particularly true in this case because even a slight change in the conditions under which formaldehyde samples are collected will have a great impact on the outcome of the measured formaldehyde concentrations.

DeVany's protocol purporting to explain "true exposures" fails to consider these critical issues. This is precisely the kind of methodology that the *Navajo Freight Lines* court cautioned against. DeVany's protocol is unreliable, and therefore inadmissible, because it ***does not*** "reliably yield results representative of the true exposures that occupants experienced when living in FEMA-issued THUs."

**D.**    **DeVany's extrapolation from one day of air sampling to form an opinion about the likely average level of formaldehyde present in the Alexander EHU over a two-year period is scientifically unreliable.**

Section V(G) of DeVany's report discusses what she calls "approximations" regarding formaldehyde levels over the full range of the travel trailer's use. DeVany makes "many attempts" to approximate the formaldehyde concentration in the indoor air of the Alexander's EHU when they first moved in. And she admittedly made several "assumptions" regarding the constancy of certain variables: ventilation, humidity, temperature, total indoor air volume, quantity of the formaldehyde in the resin/glue/adhesive materials, the ratio of total indoor air volume to wood products surface area, occupancy times, and the manufacturing process itself (DeVany recognizes that these are just some of the variables to consider).

Based on these approximations and assumptions, DeVany calculated a "derived concentration" of formaldehyde in the Alexander travel trailer on the date the Alexander family moved in. As of that date, she concludes: "The concentration ranged from 1.6ppm to .1ppm." Exhibit A, Report, p. 22. This is a **1500%** range. DeVany opines that this was the range at the 17-month point in time after manufacture of the EHU. Exhibit "B," p. 329. Imagine what DeVany's predicted range would have been if she attempted to calculate the concentration range for the entire 19 months that plaintiffs resided in the EHU. DeVany admits that her calculations are "an ***extrapolation back in time***." *Id.* Leaving aside the obvious problems with her

14

methodology, this opinion is completely useless for the trier-of-fact, inherently scientifically unreliable, fraught with wild guesswork, and does not even attempt to take into account the actual ventilation, air-conditioning, and living habits of the Alexanders themselves – all factors that can cause formaldehyde levels to vary dramatically.

Courts consistently reject "back extrapolation" methodologies that attempt to approximate exposure levels over the full range of use as being "highly speculative."  In *Wallace,* the purchasers of a mobile home sued its manufacturer and seller to recover for injuries allegedly caused by high levels of formaldehyde in the home.  *Wallace v. Meadow Acres Manuf. Housing,* 02A03-9907-CV-265 (Ind. App. 6/27/00); 730 N.E. 2d 809.  Plaintiffs retained an industrial hygiene expert, Thad Godish, who collected air samples after Plaintiffs moved out of their home under conditions he deemed near "worst case normal living conditions."  Godish then extrapolated the data back in time five years to conclude that the formaldehyde concentrations in the home were above recommended air guidelines.

The trial court found that formaldehyde levels in mobile homes "can vary dramatically depending upon temperature, humidity, and ventilation rates."  Therefore, unless you are testing a home on a daily basis, you could not know what level existed in the home on any given day in the past, due to the many variables involved.  Additionally, there has been no study that verified formaldehyde's "decay rate" or "half-life", as it is less accurately named.

The Appellate Court affirmed the district court's decision that extrapolation of ambient air formaldehyde levels at earlier points in time through use of an estimated half-life or decay rate was not accepted within the relevant scientific community.  The Court found that this assumption is not supported by any reliable scientific methods or the reliable application of any valid theory.  See also, *Heller v. Shaw Indust., Inc.,* 167 F.3d 146 (3rd Cir. 1999) (environmental

expert's testimony that benzene in the air would have been as high as 1,712 parts per billion at the time of purchase was based on a flawed and unreliable back-extrapolation methodology); *Rhilinger v. Jancsics,* 1997 Mass. Supr. LEXIS 11, *32-35 (Mass. Supp. Ct. Dec. 29, 1997) (industrial hygienist's extrapolation of one day of air sampling to form an opinion about the likely average level of chemicals present over a three-year period of time was scientifically indefensible); *Carroll v. Litton Systems, Inc.,*1995 U.S. App. LEXIS 2015, *13-14 (4th Cir. 1995) *cert. denied,* 116 S.Ct. 70 (1995) (expert hydrologist excluded because there was no scientific support for using the concept of environmental half-life to determine trichloroethane exposure levels fifteen years earlier).

DeVany's proposed opinions are speculative, find no support in the scientific literature, are not based upon a reliable, demonstrated methodology, are not reasonably based upon facts, and would not be of assistance to the trier of fact.  Her opinions should, therefore, be excluded under Rules 702 and 703.

**E.     The remainder of DeVany's opinions are inadmissible because DeVany is not qualified to give the opinions she proffers.**

DeVany has an undergraduate degree in biology, and a Master of Science degree in biology, according to her report.  She claims to be a practicing industrial hygienist, though she failed the examination to become a certified industrial hygienist at least once.  Exhibit "B," pp. 289-90.   DeVany could not recall whether she sat for the exam a second time, and she testified that she would need to check her records to see if she failed more than once.  *Id.*  DeVany does not have a degree in industrial hygiene.  Exhibit "B," p. 56.  DeVany is not certified by any organization as an industrial hygienist. Exhibit "B," p. 54.

Unqualified toxicology opinions

In Section III of her report, DeVany opines about the "acute (short-term) health effects" of formaldehyde exposure, including alleged neurological effects in "at risk" populations.  She then opines about intermediate and chronic exposure health effects including alleged "tissue and systemic changes" and "cancer-causing potential."  DeVany is not a toxicologist Exhibit "B," p.51.  All of her comments about the alleged health effects of formaldehyde are based on third-party source material that she read before writing her report.  The Plaintiffs have listed Patricia Williams, who testified at the class certification hearing, to talk about toxicology.  DeVany's testimony is therefore not only beyond the scope of her expertise, but cumulative of other Plaintiff experts.

Inadmissible Uber-Juror Opinions- Section V

DeVany presents a sweeping series of "uber-juror" statements captioned "Summary of the Case Facts: The History of the Formaldehyde Exposure to the Alexander Family and a Description of Pertinent Facts From the Case Documents and Related Files."  Part A sets forth a "brief history of where Alana Alexander and her son, Christopher Cooper, have lived following Hurricane Katrina, as well as a summary of their medical conditions and treatment."  It includes a recitation of work history and medical history.[4]

DeVany's history of where the Plaintiffs lived and Alana Alexander's work history is fact testimony that can be given by the Plaintiffs.  The physicians that Plaintiffs have retained to testify can provide the medical histories of Cooper and Alexander.  DeVany is not one of them.

---

[4]     It also includes the statement: "The writer found no evidence in any of the information reviewed that Ms. Alexander had any knowledge prior to December of 2007 of possible formaldehyde contamination in her trailer."  The Court has already ruled that the Plaintiffs' "warnings expert" will not be permitted to testify, and the same result follows here.

DeVany had not examined or even spoken to Alexander or Cooper at the time she rendered her report or was deposed. (Exhibit "B," p. 284).

<u>Unqualified Medical Opinions- Section III; Section V(A); and Section VI(A)</u>

DeVany intends to offer an opinion on the extent to which formaldehyde exposure resulted in adverse health effects experienced by Alexander and Cooper.  As is clear from her curriculum vitae, DeVany is not a medical doctor.  This fact is also supported by her deposition testimony.  Exhibit "B," p. 30-31.  Not only is DeVany not a qualified physician, she actually dropped out of medical school.  *Id.*  This fact, however, did not prevent DeVany from opining about the "many acute health effects" of formaldehyde because "of its ability to cause extreme irritation to the mucous membranes, skin, and other potentially exposed tissues."  Exhibit "A," p. 9-11.  DeVany then individually categorized several acute, intermediate, and chronic health (including the cancer-causing potential) effects of formaldehyde exposures.  This is an opinion entirely derived from information that comes from sources other than DeVany.  Exhibit "B," p. 116-117.  DeVany has not done any research or study on the adverse health effects from formaldehyde exposure.  Exhibit "B," p. 117.  DeVany is not an expert in medical diagnosis and should not be allowed to testify to medical causation issues.  Exhibit "B," p. 31.

So as far as the record is concerned, DeVany's only knowledge of the health effects of formaldehyde was obtained from literature she reviewed in connection with her retention as an expert in this litigation.  She did not conduct any epidemiological or toxicological research related to the acute, intermediate, or chronic health effects of formaldehyde.  Exhibit "B," pp. 190-91.  DeVany did not examine Alexander or Cooper.  Exhibit "B," p. 42-43, 47-48.  DeVany, in fact, has never even met Alexander or Cooper.  *Id.* at 42-43, 103-04.  DeVany claims to have reviewed the medical history ***taken by others*** for Cooper, but has not done so for

Alexander. *Id.*  Yet, DeVany's opinions include a medical causation analysis of Alexander.  *Id.* at 44.  This is absurd - DeVany ***did not even look at*** Alexander's medical records.  DeVany's methodology is not only unreliable, it is borderline ridiculous.  DeVany plainly does not meet Rule 702's "qualifications" requirement and cannot, therefore, offer an expert opinion as to formaldehyde-induced medical conditions or adverse health effects of Alexander and/or Cooper.

<u>Unqualified Design Defect Opinions – Section VI(B)</u>

DeVany offers an opinion that the Gulf Stream Cavalier travel trailer, which was successfully deployed by FEMA in a variety of disaster field conditions since 1992, is "unreasonably dangerous in design."  Exhibit "A," p. 23.  DeVany is not a contractor, architect, or engineer.  Exhibit "B," pp. 52-53; 319.  She has never designed or built a travel trailer. Exhibit "B," pp. 317-18.  She is not a wood scientist. Exhibit "B," p. 66.  She made no effort to determine what alternative materials were available at the time the Alexander travel trailer was built in 2004.  Exhibit "B," pp. 67.  DeVany did not study the availability of materials used in the manufacture of recreational vehicles at the time of Hurricane Katrina.  Exhibit "B," p. 67.  She never even inspected the Alexander travel trailer.  Exhibit "B," pp. 227-28.  She never even attempted to analyze or test the actual ventilation or air exchange rate in the trailer based on the manner in which the Alexanders actually lived in it.  Deposition, pp. 64-66; 158-64; 316.  In short, DeVany is neither qualified to give an opinion about "defective design," nor does she have a sufficient factual basis to do so.  Additionally, Plaintiffs have listed several construction experts, wood experts, etc, who were designated to testify about trailer design.  DeVany's testimony is therefore not only beyond the scope of her expertise, but cumulative of other Plaintiff experts.

Unhelpful Inadmissible Negligence Conclusions - Section VI(D)

Paragraph D of Section VI is titled "Gulf Stream's Lack of Action."  It talks about "prudent practice" that allegedly wasn't followed, including practices that would be "aligned with the spirit of the law."  On its face, these "uber-juror" opinions are of no assistance to the trier of fact.  They even invade the Court's province in instructing the jury on what the law is (or what "the spirit of the law is," to use DeVany's term). Expert testimony may not include improper legal conclusions, and in no instance can a witness be permitted to define the law of the case; while an expert may be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms, expert testimony which attempts to define the legal parameters within which the jury must exercise its fact-finding function is impermissible. *Sawyer v. Southwest Airlines, Co.,* (D. Kan. 2003); 243 F.Supp.2d 1257.

In addition, DeVany's statement that "no evidence could be found that Gulf Stream took steps" to comply with the HUD standards is admittedly unfounded, as she didn't even look at the purchase orders Gulf Stream used when it ordered products from its suppliers.  Instead, she talked to Plaintiffs' counsel and looked at the internet.  Exhibit "B," p. 313.  She never even asked to see the 2004 purchase orders, which would have reflected the purchase of HUD-compliant materials.  Exhibit "B," pp. 314-15.

In Section VII of her report, DeVany lays out her "conclusions," which include the statement that Gulf Stream "has been one of the largest manufacturers in the U.S. of portable housing," and that "for many years they have had to comply with the HUD limits for formaldehyde emissions from wood products in their mobile homes."  No support or basis is offered for these statements, not surprisingly.  In fact, Gulf Stream is a recreational vehicle

manufacturer.  It has never manufactured HUD-regulated mobile homes in the course of its history.

DeVany then concludes, "Gulf Stream showed negligence in not testing or taking other prudent measures to ensure that formaldehyde concentrations were on par with those required by law for prolonged housing."  First of all, "negligence" is clearly not the standard under the Louisiana Products Liability Act.  Negligence claims are preempted.  Second, DeVany's opinion that "measures" should have been taken to ensure that formaldehyde concentrations were "on par with those required by law for prolonged housing," is another "uber-juror" opinion, essentially arguing that Gulf Stream had a tort duty to comply with the HUD Code despite the fact that the HUD Code did not apply on its face.  In addition to being unhelpful to the finder of fact, this type of opinion is outside the scope of DeVany's field of biology and industrial hygiene.[5]

## CONCLUSION

For all of the foregoing reasons, the opinions of Mary DeVany do not pass muster under Federal Rules of Evidence 702, 703 and *Daubert* and it progeny.  Also her opinions fail to satisfy the requirements of Federal Rule of Civil Procedure Rule 26, and must be excluded.

Respectfully Submitted:

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER & WEINSTOCK**

s/Andrew D. Weinstock
_____
**ANDREW D. WEINSTOCK #18495
JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
(504) 832-3700

---

[5]  The whole purpose of the HUD Code was to achieve an indoor air formaldehyde target level of .4 ppm, which HUD determined was reasonably safe for manufactured housing occupants.  1984 WL 106759 (49 FR 31966). The measured concentration in the Alexander travel trailer shortly after they moved out and while totally sealed up and unventilated without any utilities running, was eight times lower than that.

(504) 837-3119 (FAX)
andreww@duplass.com
jglass@duplass.com

and

SCANDURRO & LAYRISSON
Timothy D. Scandurro #18424
Dewey M. Scandurro #23291
607 St. Charles Avenue
New Orleans, LA 70130
(504) 522-7100
(504) 529-6199 (FAX)
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc.**

**C E R T I F I C A T E**

I hereby certify that on the 26th day of August, 2009, a copy of the foregoing

Memorandum in Support of Gulf Stream Coach, Inc.'s Motion *in Limine* to Exclude the

Opinions of Mary DeVany was filed electronically with the Clerk of Court using the CM/ECF

system.  Notice of this file will be sent to liaison counsel by operation of the court's electronic

filing system and all other counsel of record via e-mail and U.S. Mail.

s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com