Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 1

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3                       NEW ORLEANS DIVISION

4

5    IN RE: FEMA TRAILER        *    MDL NO. 1873
             FORMALDEHYDE        *
6            PRODUCTS LIABILITY  *
             LITIGATION          *    SECTION: N(5)
7                                *
     This Document Relates to:   *    JUDGE: ENGELHARDT
8    Charlie Age, et al. v.      *    MAG: CHASEZ
     Gulf Stream Coach Inc.,     *
9    et al., Docket No. 09-2892  *

10

11

12

13    VIDEOTAPED DEPOSITION OF MARY C. DeVANY, MS, CSP, CHMM

14               Taken on behalf of Defendants

15                    Portland, Oregon

16                     July 31, 2009

17                       --oOo--

18

19

20

21

22

23

24

25

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 30

1      Loyola University of Chicago, it would reflect that

2      you took a graduate level course in statistics for

3      scientists at Loyola University of Chicago?

4  A.  I'm not sure.  It would say probably the name of the

5      course, "Statistics," but it would reflect that,

6      yes.

7  Q.  All right.  So you've mentioned one.  Any other

8      statistics courses at the graduate level that you've

9      taken?

10  A.  You know, I don't remember all the courses I took in

11      grad school.

12  Q.  How about graduate level mathematics courses?

13  A.  No.

14  Q.  You have not taken any?

15  A.  Not -- not as -- not in graduate school.

16  Q.  And you don't have a degree in mathematics?

17  A.  I do not.

18  Q.  We may get back to talking some more about your

19      husband's participation, but let me go ahead right

20      now -- this may be a time -- let's go ahead and talk

21      about exactly what it is you do and what your

22      expertise is.  And I want to do this early on so

23      that we can then get into the guts of the report.

24      But, number one, you're not a physician,

25      correct?

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 31

1  A.  No, sir.

2  Q.  You never attended medical school, have you?

3  A.  Yes, I have.

4  Q.  You've attended medical school?

5  A.  Yes, I have.

6  Q.  Did you graduate from medical school?

7  A.  No.  I quit.

8  Q.  All right.  Now I understand the answer.

9        You are not an expert in medical diagnosis, are

10      you?

11  A.  No.  But I finished a lot of medical courses as a

12      medical student.

13  Q.  But just to make sure, with that qualification, you

14      are not an expert in medical diagnosis, are you?

15  A.  I am not a physician, no.

16  Q.  All right.  Are you an expert in taking medical

17      histories?

18  A.  You know, this is -- this is a very difficult line

19      of questioning.  In the field of industrial hygiene,

20      we have to take medical histories.  We have to -- we

21      have to evaluate medical complaints, differentiate

22      between medical symptoms and medical signs, review

23      medical records, and try to figure out someone's

24      actual medical profile, and then determine what it

25      is that might be causing it as an occupational or

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 42

```
 1              MR. PERCY:  Move to strike everything after
 2         "that's an interesting question" as non-responsive.
 3    BY MR. PERCY:
 4    Q.   All I asked was:  When you take a medical history,
 5         based upon this training at the OSHA Institute, do
 6         you write the information down that the person gives
 7         you?
 8    A.   Yes.  And that's not the only training I've
 9         gotten --
10    Q.   Okay.
11    A.   -- by the way.
12    Q.   Let me ask:  Did you do a medical -- did you take a
13         medical history from Alana Alexander in this case?
14    A.   I did not.  I reviewed the medical history taken by
15         others for Christopher.  As I stated at the
16         beginning, I didn't look at any medical histories
17         for Alana.  I looked at her described symptoms, but
18         my focus was more Christopher.
19    Q.   So let's make sure I get the answer to my question.
20    A.   Okay.
21    Q.   Did you take a medical history from Alana Alexander?
22    A.   Personally, no.  I have never spoken with her.
23    Q.   You have never spoken with Alana Alexander?
24    A.   I have not.
25    Q.   Let me ask you:  Did you take a medical history from
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

```
 1        report.  I'm just talking about your expertise right
 2        now.
 3             But as long as you're talking about that, what
 4        did you rule out for Christopher Cooper's symptoms?
 5   A.   I ruled out that he had -- oh, goodness, that's a
 6        really broad question.
 7   Q.   I'm merely asking what you were talking about.  You
 8        said you ruled some things out.  What did you rule
 9        out?
10   A.   I was able to rule out things like a deviated septum
11        that can cause breathing issues.
12   Q.   How did you rule that out?
13   A.   There's no -- there's nothing in his record that
14        shows that he ever received trauma to his nose,
15        trauma to his throat, like being hit or being in a
16        car accident where he fractured his nose.  And this
17        is the nasal -- this bone, there's a septum, a bone
18        that divides the two nostrils.  If that septum is
19        deviated, pushed to one side or another from a
20        fracture, it can cause a lot of breathing issues.
21        It can also cause chronic infections.  So I was able
22        to rule that out.  That's just an example.
23   Q.   But you didn't do a physical exam of Christopher
24        Cooper?
25   A.   No, sir.
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 48

1    Q.   You've never met Christopher Cooper.

2    A.   I've never met Christopher Cooper.

3    Q.   Are you a psychologist?

4    A.   No, sir.

5    Q.   Are you an expert in psychology?

6            MR. TAAFFE:   Object to form.

7            THE WITNESS:   From a workplace point of view.

8        I have actually authored -- co-authored a chapter on

9        psychological stressors in the workplace, and --

10   BY MR. PERCY:

11   Q.   Are you -- I'm sorry.   I thought you were finished.

12   A.   And from that point of view, I've done a lot of

13       research on -- on the psychology of the worker and

14       stressors that impact someone who is working.

15   Q.   Have you published any studies on the psychology of

16       stressors in the workplace?

17   A.   I have not.

18   Q.   In fact, have you ever published any peer reviewed

19       study?

20   A.   Yes.

21   Q.   Do you know what peer reviewed study is?

22   A.   Yes, sir.

23   Q.   Okay.   What peer reviewed studies have you

24       published?

25   A.   I published a study on the effects of laetrile as

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 51

```
 1        Association -- I think late this fall or early
 2        winter is when it's scheduled to be published.
 3        Whether it's still on track for that date, I'm not
 4        sure.  But, yes, I did.
 5   Q.   All right.  Has any of the research that you've done
 6        on the diagnosis of psychological conditions that
 7        you've just outlined, has any of it been peer
 8        reviewed research?
 9   A.   No.
10   Q.   Now, I'm hopeful that this will go a little quicker
11        because you've actually already been asked these
12        questions and answered these questions in the class
13        cert.  I just want to make sure there's no change.
14             You're not a toxicologist, are you?
15   A.   I am not a toxicologist.
16   Q.   And you're not an epidemiologist, are you?
17   A.   I am not an epidemiologist.
18   Q.   Now, have you had any graduate level courses in
19        epidemiology?
20   A.   Yes, I have.
21   Q.   All right.  Where?
22   A.   From the University of Illinois in Champaign,
23        Illinois.
24   Q.   Were they residence -- in-residence courses, or were
25        they correspondence?
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 52

1   A.   I took a correspondence course, a graduate level

2        course in epidemiology from the University of

3        Illinois when I was in graduate school at Loyola

4        University because Loyola didn't have any good

5        offerings in epi, and the University of Illinois has

6        a very rigorous program, and I wanted to take it

7        from there.  But logistically I couldn't take it

8        on-site, so it was correspondence.

9   Q.   So that's one course, correspondence --

10  A.   One course.

11  Q.   -- course that you took, graduate level

12       epidemiology, correct?

13  A.   When I was in grad school, yes.  I've taken

14       others -- I've studied epidemiology in other

15       seminars, courses, and short courses since that

16       time.

17  Q.   Seminars given by whom?

18  A.   Oh, organizations as widespread as Berkeley --

19       University of California Berkeley, George Washington

20       University, Harvard, American Industrial Hygiene

21       Association, University of Chicago, those sorts

22       of -- National Library of Medicine.  Various courses

23       over the years.  I've been practicing for a long

24       time.

25  Q.   Now, you're not an engineer, are you?

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 53

1    A.   No.

2    Q.   You don't have an engineering degree, do you?

3    A.   No, I don't have an engineering degree.

4    Q.   You don't have any professional certifications or

5         licenses in engineering, do you?

6    A.   No.  Can I elaborate on that, though, please?

7    Q.   Well, unless it's responsive, I would ask you to

8         only answer the question so I don't have to move to

9         strike it.

10   A.   Okay.

11   Q.   But if you've got something that --

12   A.   My first job after grad school was as an engineer in

13        loss control, so I got special training from Mutual

14        Engineering in loss control engineering.  So I do

15        not have -- I'm not a professional engineer,

16        certified, but special advanced training in

17        engineering, loss control engineering.

18   Q.   Okay.  You do not have a degree in statistics or

19        quantitative methods, do you?

20   A.   No, sir.

21   Q.   You do not have a degree in mathematics, do you?

22   A.   No.

23   Q.   Have you ever worked as an employee of a

24        manufacturing facility?

25   A.   Yes.

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 54

1    Q.   Where?

2    A.   Union Carbide Corporation in East Chicago, Indiana,

3         is one of the locations.

4    Q.   Okay.  I'm sorry.  I thought you were finished.

5    A.   I also worked for Union Carbide Corporation, two of

6         their facilities in Washougal, Washington, after I

7         spent two years in East Chicago, Indiana.

8    Q.   What were the jobs in the Union Carbide facilities?

9    A.   In the Union Carbide facility in East Chicago, I was

10        responsible for occupational safety, occupational

11        health, industrial hygiene, environmental affairs,

12        employee training, and all engineering operations

13        and training for all aspects of the facility.

14            It was the world's largest industrial specialty

15        gas plant.  We dealt with flammable, corrosive,

16        poisonous, and toxic gases and liquids in huge

17        quantities.  Like I said, it was the world's largest

18        specialty gas plant.  Anything that is a gas, we did

19        it there.

20   Q.   Now, I need to ask you this question.  Do you

21        consider yourself an industrial hygienist?

22   A.   I do.

23   Q.   Are you certified by any organization as an

24        industrial hygienist?

25   A.   No.

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 56

1      examinations and pass every aspect in the field to
2      become certified.
3   Q.   You don't have a degree in industrial hygiene, do
4      you?
5   A.   No.
6   Q.   And there are universities that offer degree
7      programs specifically in industrial hygiene,
8      correct?
9   A.   There are some, yes.
10  Q.   And you've already indicated you don't have a degree
11      in engineering.  There are some universities that
12      offer degrees in the field of safety engineering,
13      correct?
14  A.   There are a few, right.
15  Q.   But you don't hold such a degree, correct?
16  A.   No.
17  Q.   Now, you're also indicating that you are a certified
18      hazardous materials manager at the master level,
19      correct?
20  A.   Yes.
21  Q.   What organization gives you that certification?
22  A.   The Institute of Hazardous Materials Management.
23  Q.   And you indicated that this is at the master level,
24      correct?
25  A.   Yes.

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 64

1       right -- and it doesn't seem to be working right, so

2       I will go in and I will evaluate the ventilation

3       system, and perhaps, if that's what the company

4       wants me to do, or the organization, design a

5       retrofit.

6           I will go in and evaluate ventilation systems

7       in various buildings and see if they're functioning

8       properly, what the air exchange rate is, how the

9       duct work is set up, what kind of friction loss we

10      have, what kind of air intake and air exchange rates

11      are involved in that, whether we have enough makeup

12      air, whether we have enough exhaust air, how tight

13      the building is.  Those sorts of things, yes.

14  BY MR. PERCY:

15  Q.  Okay.  Let me ask you:  All of that that you just

16      described about ventilation --

17  A.  Fan design.

18  Q.  -- all of that, you were not called upon to do that

19      in this case, were you?

20  A.  No, sir.

21  Q.  And you have not done that with regard to any

22      analysis of the ventilation systems in this case,

23      have you?

24  A.  I have looked at the expert reports of people who

25      did do that, because to me that was important, and I

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 65

```
 1        wanted to be able to evaluate that.  If we go back

 2        to your questions about causation, I wanted to see

 3        how the ventilation system was working.

 4             So, in that regard, when the ventilation system

 5        was evaluated and they were looking at negative

 6        pressure, positive pressure, how tight the trailer

 7        was, those things were all important to me.  From

 8        that point of view, I did evaluate them.  I have

 9        never been in that particular trailer, though, and I

10        didn't evaluate it personally.

11   Q.   That's what I'm trying to get at.

12   A.   Right.

13   Q.   You were not asked to evaluate the ventilation

14        system with regard to the Alexander case, and you

15        have not; isn't that correct?

16   A.   Not on-site.  Just read reports and reviewed it,

17        yes, sir.

18   Q.   You haven't rendered any opinions with regard to the

19        ventilation system in the Alexander trailer based

20        upon any analysis that you have done; would that be

21        correct?

22             MR. TAAFFE:  Objection, form.

23             THE WITNESS:  I think so.  I don't think I

24        have, but I'm not sure.  Sorry.  I don't think

25        that's -- I don't think I put any opinions in my
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

```
 1        report about the ventilation system.  The

 2        information I had I think I got after I wrote my

 3        report, so I do not believe my report addresses the

 4        ventilation system.

 5             And I really don't mean to hedge.  I just -- I

 6        don't think I did in my report have the information

 7        available at the time.

 8   BY MR. PERCY:

 9   Q.   So it wouldn't have been appropriate for you to

10        express any opinions in your report about the

11        ventilation system if you didn't have the

12        information, correct?

13   A.   No, sir, because I didn't have information to

14        evaluate it, and I have never been there personally.

15   Q.   Okay.  You've never designed an RV or a trailer,

16        have you?

17   A.   No.

18   Q.   Are you familiar with a field of study called wood

19        science?

20   A.   Yes.

21   Q.   Are you an expert in wood science?

22             MR. TAAFFE:  Objection, form.

23             THE WITNESS:  No.  Actually, there's a lot of

24        things encompassing wood science, though.  But we

25        won't go there.
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

1   BY MR. PERCY:

2   Q.   Have you ever done a study on the availability of

3        materials for the production of RVs in this country

4        at or about the time that Hurricane Katrina hit?

5             And make sure you understand.  My question is:

6        Have you ever done a study of the availability of

7        materials used in the manufacture of RVs in this

8        country at the time that Hurricane Katrina hit?

9   A.   No, sir.

10  Q.   Before we get into the guts of your report, you

11       indicated previously, I think, that you've never

12       spoken to Alana Alexander, correct?

13  A.   That's correct.

14  Q.   There is a whole lot of information, I think you

15       would agree, in this report involving Ms. Alexander

16       and her family's style of living, certain behavioral

17       activities in the trailer.  If you had never spoken

18       to Ms. Alana Alexander, where did that information

19       come from?

20  A.   You are -- that's my report you're looking at,

21       right?

22  Q.   Yes.

23  A.   I just want to clarify that.

24            Where did that information come from?  It came

25       from the documents in my reliance file and

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 68

1          discussions with counsel.

2     Q.   Okay.  I'm curious:  Have you been provided a copy

3          of Ms. Alana Alexander's deposition?

4     A.   I have recently, yes.

5     Q.   Have you had an opportunity to compare what

6          Ms. Alana Alexander said in her deposition with some

7          of the information that you've reported here in your

8          report?

9     A.   I did.  And I have a couple areas -- or at least one

10         for sure that I know of -- that was enlightening to

11         me when I read her report, because it gave me a

12         chance to hear in her own words, you know, what she

13         swears was the case.

14              And are you going to ask me now what in

15         particular?

16    Q.   I'm going to ask you right now:  What discrepancies

17         did you note in the information you put in your

18         report and what you actually read Ms. Alexander's

19         testimony to be?

20    A.   One thing that really stood out in my mind was the

21         fact that I had -- prior to reading her deposition,

22         I did not realize that she used her air conditioning

23         system on a routine basis in hot weather.  I thought

24         that because -- I thought money was tight, and as a

25         result, she only used her air conditioner when

Mary C. DeVany MS, CSP, CHMM
7-31-2009

```
 1        weather got really intolerably hot.  And in her
 2        deposition, she said that's not the case, that she
 3        kept her trailer at a more comfortable 75 degrees
 4        when they were home.
 5             I got the impression from her deposition that
 6        they turned it off during the day when everybody was
 7        at school and she was at work, but that when they
 8        were there, the air conditioner was on if it was hot
 9        outside.
10   Q.   Well, Ms. DeVany --
11   A.   Does that answer your question?  That's the
12        discrepancy.
13   Q.   Up to this point -- and I'll ask a couple more to
14        follow up on that.  I asked you:  Where did you get
15        this information?  You told me two sources.  You
16        told me documents -- you read it in documents.  That
17        would have been in your reliance file?
18   A.   Yes.
19   Q.   And then you told me, talking to counsel.
20   A.   Yes.
21   Q.   I do recall where you said in here that Ms. Alana
22        Alexander didn't run the air conditioner because
23        money was tight.
24             Now, you -- in your testimony just now, you
25        said "I thought" that was the case.  Well, how did
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

1    you come by that thought?  Is that anywhere in any

2    of the documents in the reliance file?

3         MR. TAAFFE:  Object to form.  Go ahead.

4         THE WITNESS:  Excuse me.  I don't believe it

5    is.  I believe that was an impression I got, and --

6    from -- from --

7  BY MR. PERCY:

8  Q.  Did someone tell you that?

9  A.  I thought so.

10  Q.  Who told you that?

11  A.  Well, I don't recall.  I don't recall.  But I

12    thought I was told that.

13  Q.  Well, you wouldn't have put it in your report if you

14    hadn't been told that or hadn't read it somewhere,

15    would you?

16  A.  I did not read it somewhere, so I must have been

17    told that.

18  Q.  But you -- did you take notes of these conversations

19    when people were telling you things like that?

20  A.  Usually not, which is probably why there's a

21    discrepancy there.  But I was told that money was

22    tight for the Alexander family, and -- and she had

23    applied for aid, and she had -- in various forms,

24    and so perhaps -- perhaps I concluded that on my

25    own.  I actually do not recall.  And I do not want

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 71

1      to speculate on where I got that impression, but I

2      am now correcting it.

3   Q.  You're correcting it in --

4   A.  I'm correcting it because I have more information

5       than I had at the time I wrote the report.  And in

6       my report I said I reserve the right to change my

7       opinion if I got additional information.

8   Q.  Well, this isn't additional information, this is

9       actually correct information, whereas before you

10      were apparently given incorrect information; is that

11      fair?

12          MR. TAAFFE:  Object to form.

13          THE WITNESS:  No, I wouldn't say that's fair,

14      because it's possible I got the impression from the

15      fact that I read information that she -- money was

16      tight, that she needed aid, so it's possible that I

17      drew that conclusion on my own.  And what I'm saying

18      is, I don't want to speculate where I got the

19      information.  I'm sorry.

20  BY MR. PERCY:

21  Q.  But apparently you speculated about whether she was

22      using her air conditioner based upon an impression,

23      is that correct, what you're telling us now?

24          MR. TAAFFE:  Objection, form.

25          THE WITNESS:  No.  I'm saying I don't recall

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 72

1        where I got the information.

2    BY MR. PERCY:

3    Q.  Well, you do understand that when an expert

4        testifies, an expert renders conclusions based upon

5        facts that the expert either observes him- or

6        herself or is provide by someone, correct?

7    A.  Yes.

8    Q.  All right.  And facts are very important, because if

9        the facts are wrong, there's a serious problem with

10       the expert's opinion, correct?

11            MR. TAAFFE:  Objection, form.

12            THE WITNESS:  No, not necessarily.

13   BY MR. PERCY:

14   Q.  Not necessarily?  But often that is the case, isn't

15       it?

16            MR. TAAFFE:  Objection, form.

17            THE WITNESS:  It can be the case, yes.

18   BY MR. PERCY:

19   Q.  And temperature is a significant issue with regard

20       to formaldehyde issues; you would agree with that,

21       wouldn't you?

22            MR. TAAFFE:  Objection, form.

23            THE WITNESS:  It's one of the variables.

24   BY MR. PERCY:

25   Q.  It's an important variable, isn't it, Ms. DeVany?

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 73

1    A.   It is an important variable.

2    Q.   And that is precisely what that particular factual

3         scenario relates to, is the internal temperature of

4         the Alexanders' trailers, correct?

5              MR. TAAFFE:   Objection, form.

6              THE WITNESS:   No.

7    BY MR. PERCY:

8    Q.   No?  Excuse me.  Whether they use or do not use

9         their air conditioner does not relate to the

10        internal temperature of the Alexanders' unit?

11   A.   Let's not twist this.  It will bring the temperature

12        down, but then -- then the unit is sealed up, and so

13        there's -- when you're running your air conditioner,

14        you don't have the windows open, or the air

15        conditioner won't work.  So the temperature might

16        come down, but then there's no ventilation in the

17        unit, so the formaldehyde will build up.  So I think

18        they cancel each other out.

19   Q.   We'll get to all of that.  But I do want to -- when

20        you had conversations with counsel and counsel was

21        providing to you factual information on which you

22        were supposed to base your report -- for example,

23        whether the Alexanders used their air conditioner or

24        didn't use their air conditioner -- are you telling

25        us you didn't take notes of that?

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 103

1           to the best of your knowledge, have you?

2    A.     No.

3    Q.     Okay.  We were talking about things, and I think you

4           were reviewing various other issues.

5                Have you had an opportunity to think of

6           anything else that's in your reliance file that you

7           disagreed with or rejected?

8    A.     In my reliance file, there are some documents

9           published by HUD -- excuse me, by FEMA regarding

10          fact sheets on formaldehyde and warnings and

11          information for trailer occupants that in some cases

12          I thought were overgeneralizations and incomplete

13          information.

14   Q.     I'm not talking about things that FEMA may have

15          published or some other -- I'm talking about

16          scientific studies.

17               Are there any other scientific studies -- is

18          there some scientist out there who did a study that

19          you put in your reliance file and may have relied on

20          for some reason or another, but you recall you

21          disagree with it?

22   A.     Well, I can tell you that many of the studies that

23          were done in the '70s and '80s -- at that time,

24          our -- our ability to sample to very low levels of

25          formaldehyde was technologically not as good as it

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 104

1     is today.  And so we can -- we can rely on lower

2     measurement levels with my reliance.

3         So if we look at a document and it says we --

4     we know we have irritation at .24 parts per million,

5     and that document is from research 20 or 25 or 30

6     years old, I know that the data, you know, maybe --

7     maybe it was actually lower than that level, but we

8     didn't -- we weren't able to quantify it with great

9     precision at that time.  So, in those cases, those

10    kinds of studies, I -- I realized, you know, it's

11    probably not true.

12        Studies that were done on air -- air -- ambient

13    air levels in Louisiana housing, ambient air levels

14    in cities around the country that were it's in the

15    early '80s, you know, those aren't -- those aren't

16    completely accurate anymore --

17  Q.  And you --

18  A.  -- and really don't apply now.

19  Q.  And you disagree with them because of the

20    sophistication of the sampling equipment that was

21    used back then?

22  A.  That's one reason.  And another reason is because I

23    don't think you can compare ambient air levels from

24    what was present in the United States 20 or 30 years

25    ago to what it is today.  It's not really

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 108

1   Q.  Did you apply the scientific method to that
2       particular request?
3   A.  It's not necessary.
4   Q.  Well, let me ask you this, because you specifically
5       use the words "formaldehyde exposure limits," and I
6       notice in your report starting with Section B you
7       talk about formaldehyde standards.
8   A.  What page are you on?
9   Q.  Actually, it's II -- Roman numeral II B.  Okay?  Is
10      that where you are now telling us the results of
11      what you were asked to do in section A on that first
12      page?
13  A.  Yeah.  Keep in mind that this -- these are
14      highlights, and it's not a very detailed specific
15      description.  It's an overview.  All right?  So
16      exposure limits could mean emission levels, it could
17      mean recommended, it could mean power of the law, it
18      could mean guidelines.  Exposure limits is a broad
19      term, so --
20  Q.  You interpreted it as a broad term, correct?
21  A.  Yes, sir.
22  Q.  All right.  Well, let me ask you, because you
23      brought this up:  Are you aware of any -- let me
24      give you a time frame.
25          2005 and prior to 2005, are you aware of any

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 109

```
 1        formaldehyde exposure limits that were mandated on
 2        the RV industry by any public body?
 3             MR. TAAFFE:  Objection, form.
 4             THE WITNESS:  The power of the law?
 5   BY MR. PERCY:
 6   Q.  My question is my question.
 7   A.  Your question is your question.  There -- the State
 8        of California issued -- the Air Resources Board
 9        issued standards, so I think that would apply.
10   Q.  When did they go into effect?
11   A.  Since -- since 2005.  And that was your question?
12   Q.  I said prior to 2005.
13   A.  You said --
14   Q.  Let's make it 2005 and prior.  When did the
15        California standards that you just referred to --
16   A.  Oh, this happened after 2005, those standards.
17   Q.  Did you not understand my time frame?
18   A.  I guess I didn't.
19             THE WITNESS:  Could you read the question back,
20        please?
21             (The reporter read the record.)
22             THE WITNESS:  No, before --
23             MR. MILLER:  Let's just go with a new question.
24   BY MR. PERCY:
25   Q.  Are you aware of any standards that were imposed on
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 116

```
 1   A.   Yes.

 2   Q.   Is there anything --

 3   A.   In my own words.

 4   Q.   Other than putting it in your own words, the

 5        substance of what's in Roman numeral III comes from

 6        sources other than yourself?

 7   A.   Yes, sir.

 8   Q.   Because you haven't done any research or study on

 9        the adverse health effects from formaldehyde

10        exposure, have you?

11   A.   No, sir.

12   Q.   You rely on research or information that you've

13        gathered from other sources; would that be fair?

14   A.   Yes, it would.

15   Q.   Okay.  Now let's go to number B1(c) on page 1.

16   A.   Yes.

17   Q.   And it says, "Develop the sampling methodology and

18        measurement strategy for determining formaldehyde

19        contamination in the trailer FEMA issued to the

20        Alexander family."

21            All right.  Would that be what's contained in

22        Roman numeral IV?

23   A.   I think IV -- I think (c) and (d) may be under Roman

24        numeral IV, because --

25   Q.   My report does not have a D.
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

1    A.   "Review the collected sampling data" --

2    Q.   Oh, I'm sorry.  I'm sorry.  C and D on page 1.

3    A.   Yeah.

4    Q.   Okay.

5    A.   Because in Section IV it does talk about

6         methodology, but then under Section B and C, we talk

7         about the results.

8    Q.   The actual results.

9    A.   Yeah.

10   Q.   So on page 1, B1(c) and (d), you answer or describe

11        what you did in Roman numeral IV of the report; is

12        that correct?

13   A.   I think, yes, sir.

14   Q.   Now, with regard to the actual sampling methodology,

15        you were the one that developed the sampling

16        protocol that was employed in this case, correct,

17        specifically with regard to the Alexander trailer?

18   A.   As far as the sampling methodology that was used by

19        the Plaintiffs, yes, sir.

20   Q.   Okay.

21   A.   I can't speak -- I don't know if anyone else did

22        sampling, but I just know Plaintiffs' sampling, and

23        developed their methodology.

24   Q.   Was you or anyone affiliated with your company,

25        DeVany Industrial Consultants, present when the

Mary C. DeVany MS, CSP, CHMM
7-31-2009

```
 1        believe that in the section of the protocol dealing

 2        with unoccupied trailers there is a provision that

 3        during the sampling event and the testing event, the

 4        doors and windows are supposed to be closed.  Is

 5        that what you just said?

 6    A.  Well, or if they're not closed, maybe a note of it

 7        on the field note.  Was the trailer sealed?  Yes,

 8        no.  If it's not sealed -- you know, maybe there's a

 9        broken window or --

10    Q.  Okay.  Could you find that section in the sampling

11        protocol for me very quickly?

12    A.  Sure.  Very quickly -- I'm not sure about that "very

13        quickly" part.  Sampling protocol.  Not in this

14        book.

15    Q.  Do you want to take a break?

16    A.  Do you want me to?  Do you want me to go off the

17        record while I find it?

18    Q.  Yeah.

19                    (Recess 11:43-11:52.)

20    BY MR. PERCY:

21    Q.  Ms. DeVany, in an attempt to try to catch back up

22        where we were when we left off, my recollection was

23        that I had asked you to see if you could find in the

24        protocol where you say it says with regard to

25        testing of unoccupied trailers that during the
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

1        "Trailer sealed, yes."

2   Q.   Well, here's what I'm trying to find out.  I asked

3        you, in your protocol -- is there something written

4        in your protocol where the windows and doors should

5        be closed during the sampling or testing event?

6        Your answer -- correct me if I'm wrong -- was, you

7        believed in your written protocol that there was

8        that stipulation or direction to the sampler or

9        tester in the section on unoccupied trailers.

10            Am I understanding now that after -- during the

11       break when you reviewed it, and the break lasted

12       five or ten minutes, and now that you're reviewing

13       it as we're sitting here, that in truth and in fact

14       that is not in your written protocol?  Is that your

15       testimony?

16  A.   My testimony is, in the interest of time, I don't

17       want to sit here and go through 30 pages looking for

18       a specific sentence.

19  Q.   This is very important.  I tell you what.  We'll

20       take another break while you go through it.  I want

21       to find out if your written protocol, as you

22       previously testified, says that during the sampling

23       event -- whether it's an occupied or unoccupied

24       trailer, during the sampling event, the windows and

25       doors should be closed.  That's what I'm trying to

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 130

1        find out.  That was your testimony.  I'm trying to

2        find out if the protocol actually says that.

3            So let's take another break, and we'll give you

4        plenty of time -- take as much time as you need to

5        find that, Ms. DeVany.

6    A.  Is that my testimony?  Did I say it was in the

7        protocol?  I don't believe I said that.

8    Q.  I think you said you -- the record will reflect, but

9        I believe you said you believed it did say that for

10       the testing of unoccupied trailers.

11   A.  I believe I said that was our standard practice, and

12       I think it's in the protocol, but I'm not sure.  So

13       let's -- if you really want me to go through this, I

14       will.

15           MR. PERCY:  Let's take a break.  We'll go off

16       the record and give you time.

17               (Discussion off the record.)

18               (Midday recess 11:57-1:08.)

19   BY MR. PERCY:  (Continuing)

20   Q.  Ms. DeVany, you were looking in your protocol to see

21       if you could find anywhere written in the protocol

22       about requiring for a sampling or testing event to

23       close the windows and doors.

24           Were you able to find anything in the protocol

25       in that regard?

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 131

```
 1   A.   I wasn't.

 2   Q.   Okay.

 3   A.   Just to record, yeah.

 4   Q.   So, is it fair to say that there is nothing in your

 5        protocol, the written protocol that you wrote, you

 6        developed, indicating to the testers or samplers to

 7        make sure that the windows and doors are closed and

 8        remain closed during the sampling event?  Is that

 9        fair?

10   A.   For unoccupied units, for trained people that are

11        doing sampling, that's probably fair, yes.

12   Q.   How about for occupied units?  Is there anything in

13        your protocol, your written protocol, requiring that

14        the windows and doors be closed when testing an

15        occupied unit?

16   A.   I don't think so, no.  Just that they record, you

17        know, what's open, what's not, what's on, what's

18        not.

19   Q.   Well, do you need to go back and look at it again to

20        see if there's anything for occupied units, if you

21        require that, or are you sufficiently well-versed in

22        the protocol that you wrote to tell us right now

23        whether there's anything written in your protocol

24        requiring that the windows and doors be closed

25        during a testing or sampling event with regard to
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 132

1        occupied units?

2              MR. TAAFFE:   Objection.

3              THE WITNESS:   For occupied units, sampling

4        being done by occupants, there is a specific form

5        for them to record the windows being open, closed,

6        how long the ventilation is running, AC is running,

7        etcetera.   For our sampling of occupied units, we

8        ask the residents and -- ask them to keep track of

9        it, and we record it.   There's nothing that says

10       they have to be shut or they have to be open or the

11       air conditioner has to be on or the heater has to be

12       on.

13   BY MR. PERCY:

14   Q.   Okay.   You said with regard to your sampling you ask

15        the occupants.   What does your sampling protocol say

16        in writing that you ask the occupants?

17              MR. TAAFFE:   Objection.

18              THE WITNESS:   That's a very broad question,

19        what we ask the occupants, because that's everything

20        from age of the children to -- so could you cut that

21        down a little for me?

22   BY MR. PERCY:

23   Q.   Well, you do understand that all I'm talking about

24        right now is any requirement that the windows and

25        doors be closed during the sampling event.

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 158

```
 1        were closed because we were there and we could have
 2        control over it.  Those same units also had passive
 3        sampling conducted on them.  Those were 24 hour
 4        samples, and there was ventilation, the units were
 5        open, they were closed, blah, blah, blah.
 6             So we recorded on our field sampling notes
 7        periods of time when units and windows -- I
 8        shouldn't say units -- when windows and other
 9        openings to the trailer were -- had access to
10        outside ventilation.  We also recorded whether there
11        were fans in operation inside besides the roof vent
12        fans.
13   Q.   And you found no appreciable difference between
14        ventilated units with windows and doors open and
15        units with windows and doors closed with no
16        ventilation?
17   A.   We saw differences, but they were nowhere near as
18        significant as some other variables were.
19   Q.   Okay.  Nowhere near as significant.  How significant
20        were the differences?  Did you calculate a
21        percentage?
22   A.   Significance is a scientific term.  We did not run
23        statistical significance.  We did not do that.
24   Q.   But you did a study, you said.
25   A.   I said we did an evaluation.
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 159

1    Q.   Actually, that was your word.

2    A.   I said "study," and then I corrected that.  We did a

3         lot of evaluations of variables.

4    Q.   And none of this is written down anywhere?

5    A.   It is not.

6    Q.   How does that evaluation -- I'll use your corrected

7         term -- how does that compare with the other studies

8         that you actually say you saw of other scientists

9         who tested the effective ventilation on formaldehyde

10        concentration levels in travel trailers?

11   A.   Mostly the ventilation brought -- brought the

12        formaldehyde concentrations down over the course of

13        months, not over the course of days.

14   Q.   And give me your source for that.

15   A.   I told you, I don't know -- I can't tell you off the

16        top of my head.

17   Q.   You just know you read it somewhere, you just don't

18        know where you read it; would that be fair?

19   A.   No, it's not fair.

20   Q.   Okay.  Did you read that somewhere?

21   A.   I'm summarizing studies that I have in my reliance

22        documents, which I told you I don't remember the

23        names of all the scientists that conducted the

24        studies.  I remembered the results of the studies.

25        That was what was important to me.  I wanted to try

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 160

1        to understand what the research of others showed as

2        an impact of air exchange.

3            And in our experience, we didn't see air

4        exchange making all that great of a difference.  It

5        made some, but exposures were still really high and

6        it did not bring them down to acceptable levels.

7   Q.   Well, how much difference did you see?

8   A.   We didn't even see a halving.

9   Q.   Halving, H-A-L-V-I-N-G?

10  A.   Yes.  We didn't typically even see that.

11  Q.   Well, let me ask you:  Did you see a halving of

12       concentration levels when temperatures were reduced?

13  A.   Yes.

14  Q.   You saw as much -- as much as a halving of --

15       H-A-L-V-I-N-G -- of concentration levels when

16       temperatures were reduced?  You did?

17  A.   Or from when temperatures were low continuously to

18       when temperatures were brought up to normal room

19       temperatures, as an average of 24 hours.  We saw

20       significant temperature differences, more than a

21       halving or a doubling.  For example, can we look at

22       this?

23  Q.   I'm not going to go there at the moment.  I want to

24       ask you:  More than a halving or doubling, and

25       you're talking about specifically limited to

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 161

1         temperature; is that correct?

2    A.   Yeah.   If the temperature would have plus or minus

3         30 degrees or more, then we definitely saw more than

4         doubling or halving, depending on which direction

5         you're going.

6    Q.   And it works the same, in your estimation,

7         whether -- if the temperature is increased, it may

8         double concentration levels; if the temperature is

9         decreased, it may halve or more?

10   A.   Average temperatures, averages.

11   Q.   Have you done any study on the measured amount of

12        the difference in an emission level of formaldehyde

13        based upon a temperature increase?

14   A.   An emission level from wood, no, sir.  I've read

15        about them, but I have not -- we have not done -- my

16        company has not done any wood emissions studies in

17        test chambers, no, sir.

18   Q.   All right.  Now, you would agree that the

19        concentration level in a chamber of formaldehyde is

20        related to the rate of emission from the

21        formaldehyde source?  You would agree with that,

22        wouldn't you?

23   A.   I would agree with that in general, yes.

24   Q.   So the rate of emission has a lot to do with the

25        ultimate concentration level of formaldehyde in a

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 162

```
 1        chamber; you would agree with that?
 2    A.  Yes.
 3    Q.  And you would agree that the ventilation of a
 4        chamber, regardless of the emission rate of the
 5        formaldehyde source, has a great deal to do with the
 6        ultimate concentration level within a chamber?
 7        You'd agree with that also, would you not?
 8    A.  Depending upon the extent of ventilation.  If we
 9        could evacuate the test chamber on a continual basis
10        and pull out the internal air and completely turn it
11        over maybe every 30 seconds, we would certainly see
12        formaldehyde levels drop very significantly.
13    Q.  How much?
14    A.  I don't know, because I didn't do any studies like
15        that.
16    Q.  Okay.
17    A.  But from what we've read, it would be significant.
18        However, that was not what we observed in real life
19        inside trailers.  We weren't testing emissions,
20        though.  We were testing airborne concentrations
21        that people are experiencing or that were in the
22        trailers where they may have been living, but were
23        unoccupied.
24    Q.  Have you measured the ventilation rate of a travel
25        trailer?
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 163

1   A.   I have not.  I've read reports of others that have.

2   Q.   And do you have any idea what a ventilation rate of

3        a travel trailer is with its windows and doors open?

4   A.   It's significant.

5   Q.   What is significant?  That's a scientific term, I

6        think you said.

7   A.   You're right.

8   Q.   What is that?

9   A.   And my use of it isn't really fair, is it?

10       Depending on -- I don't have the exact amount -- the

11       exact numbers on top of my head, so I can't really

12       give you an exact answer to that question.

13  Q.   Where do those numbers come from?

14  A.   There were a couple of people that did ventilation

15       testing of the Cooper-Alexander unit.

16  Q.   And did they do testing of ventilation rates with

17       windows and doors open on the Alexander unit?

18       Because you do understand that's what I'm asking

19       you.

20  A.   I can't answer that question without referring back

21       to the report, and I doubt that you want me to do

22       that.

23  Q.   You haven't done that, that sort of testing?

24  A.   Not off the top of my head.  And I have not done

25       that, no, sir.

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 164

1   Q.  Where I left off in my review of what you're

2       responding to in your report -- we're down -- I

3       think you had said (c) and (d) on page 1 of your

4       report at the bottom.

5           Do you still have your report in front of you?

6   A.  No, I don't.  I just put that in front.

7   Q.  You can stick that there.

8   A.  What I have in front of me is my sampling protocol.

9   Q.  If you could find your report, we'll go back to your

10      report.

11  A.  Sure.  No problem.  Expert report.  Okay.  Got it.

12  Q.  Look on page 1.  You had indicated that your

13      discussion in Roman numeral IV of your report was

14      responding to (c) and (d) on page 1.  Do you recall

15      that?

16  A.  Yes, I think so.

17  Q.  Okay.  What I want to ask is:  With regard to

18      section (e) at the bottom of page 1 on your

19      report --

20  A.  Okay.

21  Q.  -- it says, "Assist in determining the extent to

22      which the adverse health effects experienced by

23      Ms. Alana Alexander and Christopher Cooper are

24      attributable to formaldehyde exposures from their

25      travel trailer."

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 171

```
 1        clients.  And I'm really not trying to be difficult.
 2    Q.  And again, I understand.  I just want to make sure
 3        that the record is clear that you refuse to answer,
 4        because this may be our only crack at getting that
 5        information.
 6            MR. TAAFFE:  But if you can clarify, would you
 7        give him information about the details of what you
 8        saw, what was being manufactured, what kind of
 9        products were being used, what the baking off
10        procedure looked like, how they did it, everything
11        but the name of the client?
12            MR. PERCY:  That's not my question and --
13            MR. TAAFFE:  No, I just want to make it clear
14        if we can make that offer -- I'd do it on redirect,
15        but while we're on the subject, give you that
16        opportunity.  And if you refuse to do that, then
17        that's your decision to not ask that question.  But
18        I want to make sure what it is you will give him,
19        aside -- you've already said not the name, but I
20        think you need to be clear about what information
21        you would give him, if he asked.
22            THE WITNESS:  I would give you that information
23        especially in description of processes and how this
24        is done in real life in the industry in the United
25        States.
```

Stratos Legal Services, LP
1-800-971-1127

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 172

1    BY MR. PERCY:

2    Q.   But you won't identify any locations where you have

3         observed anything that forms the basis of this

4         information in Section 2 entitled "Baking Off"?  Is

5         that correct?

6    A.   Jim, I did not anticipate this question.  But I

7         could try to get permission and answer that for you

8         at a later date.

9    Q.   Let me ask you this, Ms. DeVany.  You say you did

10        not anticipate the question.  Did you not anticipate

11        that I was going to be asking you the source of the

12        information in your expert report?

13   A.   Not the actual names of my particular clients where

14        I observed these practices, no.  I thought you were

15        more interested in the practices themselves, not in

16        lists of names.

17   Q.   Well, for example, Ms. DeVany, in the third

18        paragraph of that section you've got some very

19        specific information here, the kilns during

20        production are set at temperatures between 120 --

21   A.   Yes.

22   Q.   You did not understand that I was going to ask you

23        the source of that information?

24   A.   Not the exact names of the companies.  I really

25        don't know any client -- any industrial hygiene

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 173

```
 1        consulting companies that disclose their clients
 2        without permission.  This is a breach of our
 3        professional ethics to maintain confidentiality of
 4        our clients.
 5   Q.   But you're revealing some of their manufacturing
 6        processes here, are you not?
 7   A.   Only to the extent that it did not breach protected
 8        information.  This is -- these are general practices
 9        across the field.
10   Q.   And that's your testimony, and that's apparently
11        what your report is suggesting, that these are
12        general -- but you won't tell me any specific
13        location where I can go see if in fact that is
14        correct, are you?
15   A.   I am not.
16   Q.   Okay.
17   A.   I am not -- actually, I could probably give you
18        some, but I -- your question was will I release my
19        clients where I have personally observed these, and
20        my answer is, I won't do that.  I can't.
21   Q.   Okay.  And again, I understand, and I will take you
22        at your word that you refuse to answer that.
23             MR. TAAFFE:  Object to the form.
24   BY MR. PERCY:
25   Q.   Now, a little while ago you were giving me some
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 190

1        That was my understanding also.

2            Same thing with regard to Intermediate and

3    Chronic Exposure Health Effects, which is subsection

4    C?

5    A.  Yes, sir.

6    Q.  And that takes us through that section, I believe.

7        Let's turn to Roman numeral IV in your report.

8    A.  Okay.

9            MR. PERCY:  And we're back to the protocol, but

10    since we've only got a couple more minutes on the

11    tape, this might be an appropriate time to take a

12    break.

13            Folks on the phone, we're going to take a

14    brief, short recess to change the tape.  We'll be

15    back in about five minutes.

16                    (Recess 2:22-2:50.)

17                    (Deposition Exhibits Nos. 2-5 marked.)

18    BY MR. PERCY:

19    Q.  Ms. DeVany, before I take a break and turn it over

20    to Mr. Miller to ask you some questions, we're going

21    to go ahead and clean up the record by attaching to

22    the deposition some exhibits.

23            We've already had you identify and we're

24    attaching Exhibit DeVany No. 1, which is the page

25    out of your report with your husband's handwritten

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 191

```
 1      notes on it.
 2          The second one that I'm going to ask you to
 3      identify is a copy of the Bates stamped copy or
 4      version of your report.  Have you had a chance to
 5      review that?  Is that correct?
 6  A.  I --
 7  Q.  That appears to be --
 8  A.  Yeah.
 9  Q.  -- your report?  Okay.  That will be attached as
10      No. 2.
11          No. 3 will be the copy of your report that came
12      out of your binder --
13  A.  Yes.
14  Q.  -- today.  And it will also include, I believe, your
15      fee schedule and your CV, correct?
16  A.  (Nods head.)
17  Q.  And if you'll identify that, we'll mark it and
18      attach it to the deposition as Exhibit DeVany No. 3.
19          DeVany No. 4 is a copy of your -- the amended
20      notice of the video deposition today, which included
21      the Exhibit A of documents to produce, as well as
22      the subpoena.  And if you'll just take a look at
23      that and just make sure that that appears to be what
24      you received.
25  A.  Okay.  I actually don't know if I got an amended
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 227

1        said six years you wouldn't know, you'd have to do

2        an analysis -- statistical analysis.  Have you done

3        that?

4    A.  Yeah, my problem isn't with that part of the

5        question.  My problem is with the definition of what

6        "safe" is.  So in order to determine -- to do that

7        statistical analysis, we could find out what the

8        levels are statistically and apply them to those

9        units made in the same place, same time, same

10       materials, similar variables.  But that's -- but we

11       still would have to come to an understanding of what

12       we mean by "safe" and "unsafe."

13   Q.  And when you use the word "safe," what do you mean?

14   A.  When I say "safe" or "unsafe" -- I don't recall

15       using that phrase.  Can you show me where I use it?

16   Q.  No, ma'am.  I want to know what your understanding

17       of the word "safe" means.

18   A.  It would -- it's more than just throwing out a

19       number.  It depends on the individuals and their

20       particular health problems that might -- that are in

21       there.  It also -- I mean, if you and I were living

22       in -- well, that's probably not a good example.  If

23       Wes and I were living in a travel trailer, we don't

24       have health effects as if we had a six-month-old

25       infant in there or an elderly person with

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 228

1     respiratory distress.

2  Q.  Ma'am, all I'm asking you -- the question is:  The

3     word "safe," what does that mean to you?

4  A.  Safe means a level that would not cause adverse

5     health effects acutely or chronically to the people

6     who were exposed to it.

7  Q.  And I --

8  A.  That's what it is.

9  Q.  Okay.

10 A.  I'm sorry.  I thought you were asking me to give you

11    a level, or exposure level.  But that's -- that's

12    it.

13 Q.  Now, ma'am, when did you first get involved testing

14    travel trailers for formaldehyde?

15 A.  In regard to FEMA-issued travel trailers or in the

16    scope of my career?

17 Q.  When was the first time you tested a travel trailer

18    for formaldehyde?

19 A.  I'm not sure.  Long time ago.

20 Q.  What is the last -- what is the most -- or actually,

21    for Katrina-Rita travel trailers, when was the first

22    time you sampled or tested a travel trailer?

23 A.  September of '07.  That's when I physically first

24    did it personally.

25 Q.  Did you have any involvement with the Sierra Club's

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 284

1           THE VIDEOGRAPHER:  Yes, you are on.

2           THE WITNESS:  Okay.  Excuse me, Tim.

3   BY MR. SCANDURRO:

4   Q.   You've never met or spoken with Alana Alexander; is

5        that correct?

6   A.   No, I have not.

7   Q.   Am I also correct that you have never met or spoken

8        with Chris Cooper?

9   A.   Correct.

10  Q.   And you mentioned earlier that you are a technical

11       advisor for the Sierra Club; is that correct?

12  A.   Yes.

13  Q.   Are you also a member of the Sierra Club?

14  A.   I am.

15  Q.   Is your husband a member of the Sierra Club?

16  A.   I don't think so.

17  Q.   How long have you been a member of the Sierra Club?

18  A.   25 years, plus or minus, something like that.

19  Q.   And I think you described the Sierra Club, or at

20       least Ms. Gillette's role, in one of the documents

21       earlier that she was acting as a activist and not a

22       scientist.

23  A.   It may have a poor connotation to it, but that's

24       correct.

25  Q.   I didn't mean a poor connotation, I meant --

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 288

1      sure right now.  It's been a long, long time since I

2      took it.

3  Q.  Well, how many times have you sat and taken the

4      exam?

5  A.  Well, that was your question, and I appreciate your

6      question, but I believe I've only sat for it one

7      time, but I'm not sure.

8  Q.  But there's a possibility that you sat twice?

9  A.  Well, I know that you can't sit for it more than

10     twice without special approval, so I don't know.  I

11     don't know.

12  Q.  Regardless of how many times you sat for the exam,

13     whether it's once or twice, you have not passed the

14     exam?

15  A.  No.  I didn't study for it, I just took it.

16  Q.  Do you have any current plans to take the certified

17     industrial hygiene exam?

18  A.  I have been widely recognized in the field of

19     industrial hygiene by my peers as being a superior

20     industrial hygienist --

21  Q.  Is that a no, you have no current plans?

22  A.  -- and I don't have any need to at this point.

23  Q.  You don't need to become certified, in your opinion?

24  A.  At this point, no, sir.

25  Q.  I note in your report that you have a Master's

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 289

1    degree from Loyola University of Chicago in biology.

2    Is that correct?

3  A.  That's -- that's the degree conferred, yes.

4  Q.  Okay.  Does the Loyola University of Chicago offer a

5    Master's degree in the field of biochemistry

6    specifically?

7  A.  No, and so that's why they have areas of

8    concentration in the biology degree.

9  Q.  Would the same be true of human physiology?

10  A.  Correct.

11  Q.  So Loyola University --

12  A.  At least at that time they didn't.  I'm not sure

13    about right now.

14  Q.  Are there universities in the United States,

15    however, that do offer Master's degrees in

16    biochemistry and/or human physiology?

17  A.  Yes.

18  Q.  There are?  Have you ever held yourself out as

19    actually having a Master's degree in biochemistry as

20    opposed to biology?

21  A.  It's -- my Master's degree is in biology.  My areas

22    of concentration are human physiology and

23    biochemistry, so it's a very fine line there.

24  Q.  I understand.  My question is very narrow.  Have you

25    ever held yourself out as having a Master's degree

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 290

```
 1         in biochemistry or human physiology as opposed to
 2         biology?
 3    A.   I'm not sure.  I -- they're right on top of each
 4         other.
 5    Q.   Well, it would be incorrect, wouldn't it, to assert
 6         that you hold a Master's degree in biochemistry or
 7         human physiology?  Your Master's degree is in
 8         biology, correct?
 9    A.   It would be technically incorrect, yes.  And it
10         would be a Master of Science, not a plain Master's,
11         also, so it's an MS.  It's --
12    Q.   So a Master's of Science?
13    A.   I mean, those are all technical corrections, as
14         well.
15    Q.   All right.  And it's important under your code of
16         ethics, of course, to be accurate in the way in
17         which you present yourself to the public and how you
18         characterize your degrees and your academic
19         achievements?
20    A.   And to portray them in -- in a true light, yes.
21    Q.   Yes.  Okay.
22              Do you recall testifying in a case called, In
23         re: Steven R. Vaughn in Longview, Washington, last
24         summer?
25    A.   Yes.
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

```
 1   Q.   I'm going to pass you down --
 2             MR. SCANDURRO:  I have extra copies of this.
 3        If you could leave one with the witness, please, and
 4        give one to Pete.
 5             THE WITNESS:  Thanks.
 6             MR. SCANDURRO:  I don't know how many I have.
 7             MR. TAAFFE:  Which page?
 8   BY MR. SCANDURRO:
 9   Q.   What I've done, Mrs. DeVany, is I have provided you
10        with a copy of a transcript of what appears to be
11        your testimony in the case of, In re: Steven R.
12        Vaughn.
13             Am I correct that that was a case pending
14        before the Board of Industrial Insurance Appeals in
15        the state of Washington?
16   A.   Yes.
17   Q.   And you testified --
18   A.   To my knowledge.
19   Q.   -- under oath on July 29th, 2008 --
20   A.   I did.  I think that was the date, yes.
21   Q.   And if you could turn to page 48, ma'am, of that
22        transcript, on your direct examination.  It started
23        from a Mr. Colven.  Was that the attorney --
24   A.   Bruce Colven, yes, sir.
25   Q.   Was that the attorney who had retained you as an
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 292

1       expert?

2    A.  It is.

3    Q.  You were asked under oath at line 17:

4            "Question:  Would you tell the Judge, uhh, your

5        education starting with your graduation from

6        college?"

7            And if you look at your answer, in the second

8        sentence of your answer, you say, "I then went to

9        Loyola University in Chicago and had Master's

10       Degree -- Master's Degrees in biochemistry and human

11       physiology."

12           Did I read that correctly?

13   A.  That is what it says, yes.

14   Q.  And that is not in fact true, is it?

15   A.  You know, I haven't had a chance to review this or

16       make any corrections to this testimony, and this

17       is --

18   Q.  Are you suggesting --

19   A.  No, this is not technically true.  No, it's not.

20   Q.  But you said this under oath, ma'am.  Are you

21       suggesting that you said something different at the

22       trial, or were you mistaken or --

23   A.  It was a hearing, it wasn't a trial, so -- so -- if

24       you want to be very technical.  And it also says I

25       have Master's degrees, not Master of Science

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 293

1       degrees.  And so there are --

2  Q.  But, in fact, you have one Master's degree; am I

3       correct?

4  A.  I have a Master's degree in biology -- a Master of

5       Science degree in biology.  The areas of

6       concentration are biology and human physiology, so

7       this is not -- no, it's not.

8  Q.  It's incorrect at two levels, correct?  You have one

9       Master's degree, not two, and your Master's degree

10      in fact is in biology, not in biochemistry and human

11      physiology?

12 A.  No, those are the areas of concentration.  And it's

13      a Master of Science degree, just to clarify.

14      Um-hmm.  There might be some other --

15 Q.  Take a look -- do you recall in that same hearing

16      being asked about your role in this case as an

17      expert?

18 A.  Not really.  I don't remember.  This is like a year

19      ago -- actually, almost exactly a year ago.

20 Q.  Take a look at page 53, ma'am, of that same

21      transcript.  You have a reference to Judge

22      Engelhardt that you made in the middle of page 53.

23      Do you see that answer at line 13 --

24 A.  I do.

25 Q.  -- the reference to Judge Engelhardt?

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 295

1     about this matter?

2  A.  No.

3  Q.  Who gave you the information that the judge wanted

4     one expert witness that he could work with to help

5     him understand the science behind formaldehyde?

6  A.  It was my understanding at this time that these

7     Plaintiffs' steering committee attorneys that --

8     actually, the firms that made up the Plaintiffs'

9     steering committee got together and chose

10    representatives to go before Judge Engelhardt and

11    they would do the pleadings.

12  Q. Well, who told you that Judge Engelhardt himself

13    asked that one person be appointed to help him

14    evaluate the science behind formaldehyde?

15  A.  This is a long time ago.  I don't remember.

16  Q.  You don't remember?

17  A.  No, I don't.

18  Q.  Take a look at page -- my Bates number is 5 of your

19    report.  It may be 6 on your version.

20        I'm off of that document, ma'am.  What we're

21    going to do -- I don't want to attach the whole

22    thing, but I'd like to -- I'll come up at a break

23    and pull out the pages we talked about and attach

24    those as exhibit -- what are we up to?  16?

25        MR. MILLER:  15.

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 296

1          MR. SCANDURRO:  I think we marked 15.

2          MR. TAAFFE:  And I ask that we attach the whole

3     thing.

4          MR. SCANDURRO:  I don't mind attaching the

5     whole thing.  It's sort of large.

6          MR. MILLER:  What are we at, 16?

7              (Deposition Exhibit No. 16 marked.)

8          MR. SCANDURRO:  The copy that is there, when it

9     was copied, has some highlighting on it, and I would

10    suggest if you want the whole thing attached -- I

11    don't have a copy without that on it.  I would be

12    happy to substitute one without the highlighting on

13    it.

14         MR. TAAFFE:  It doesn't bother me.  But I will

15    say that the copy at least that I have ends at 122,

16    and it appears that there's still some testimony

17    that's not in there, So --

18         MR. SCANDURRO:  Yeah.  Yours ends at 122?  The

19    one I have ends at 124, so what I will do is pass

20    this down.  We need to add -- if you'd give me

21    those.

22         MR. MILLER:  We can just add those pages.

23         MR. SCANDURRO:  I'll just give you those.

24         MR. TAAFFE:  Clip?

25    BY MR. SCANDURRO:

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 297

```
 1    Q.   Ms. DeVany, if you could get your report in front of

 2         you which we've spent so much time going through

 3         today.  I'm sure you know it by heart now.

 4              MR. TAAFFE:  She's got the one without the

 5         Bates numbers.

 6              THE WITNESS:  I should get that one.

 7    BY MR. SCANDURRO:

 8    Q.   I'm looking at page 5.

 9    A.   Bates 5?

10    Q.   Yes, ma'am.

11    A.   Okay.

12    Q.   And it's just a quick question on what you talked

13         about earlier when you refused to disclose the names

14         of your clients.  Do you remember that testimony --

15    A.   Yes, sir.

16    Q.   -- about the --

17              I want to focus your attention on 2005 and

18         before, okay?  2005 and before, were any of your

19         clients that you were referring to earlier travel

20         trailer manufacturers in the United States?

21    A.   No.

22    Q.   Okay.  And I presume -- and I'm not going to ask you

23         to name who the people were, but I presume the

24         people you were referring to were suppliers of

25         materials to various industries.
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

1      the more data points you have, the better?

2    A.  Not necessarily.

3    Q.  Not necessarily.  So sometimes the fewer data points

4        you have, the better?

5    A.  That's not necessarily true, either.  But what I'm

6        saying is, depending on whether you're trying to do

7        a statistical analysis of a large number or whether

8        you're trying to do -- it's --

9    Q.  Let me ask it this way.  If you're only doing one

10       trailer, trying to determine one trailer, are you

11       better having one data point or more than one data

12       point if you're trying to estimate exposure?

13   A.  I think what would be great is if you could do it

14       all different seasons of the year.  I mean, what

15       would be really perfect is if we could sample

16       continuously for the entire lifetime of the trailer

17       and the entire residency of the people in there.

18       And then if we knew with accuracy how those samples

19       are analyzed, then we could actually get a

20       representation of what it really is.

21   Q.  And presumably you'd also need a video camera so you

22       could determine what the people were bringing into

23       the unit.

24   A.  You know, I'm afraid we need a lot of things.

25   Q.  What you're telling me is, otherwise it's just

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 313

1    Q.   Isn't the policy itself evidence that Gulf Stream

2         took steps to comply with the HUD standards in terms

3         of wood products in its trailers?

4              MR. TAAFFE:  Objection, form.

5              THE WITNESS:  Not necessarily.  Purchase

6         orders -- purchase orders.

7    BY MR. SCANDURRO:

8    Q.   Purchase orders would convince --

9    A.   Records of tests.  Records of chamber tests that are

10        mandated by HUD.  Those would be helpful.

11   Q.   Yes, ma'am.  Did you ask to see purchase orders from

12        the end of 2004 when the Alexander travel trailer

13        was built?

14   A.   And I would do that through Plaintiff attorneys.

15        No, I did not.

16   Q.   You have not done that?

17   A.   Actually, not sure if I've done that.  I know I have

18        not seen them.  Whether I asked if they had any, I'm

19        not sure about.

20   Q.   But you would agree that would be important to know,

21        wouldn't it?

22   A.   I think it would be useful, yes.

23             MR. SCANDURRO:  Peter, if we could take a

24        ten-second break that you won't hold against me.  I

25        just saw the 15 minute card.  That's 15 minutes with

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 314

1        my five minutes of penalty time?

2              THE VIDEOGRAPHER:  That's to the hard limit.  I

3        adjusted.

4              We're going to go off the record.  The time is

5        approximately 5:56.

6                    (Recess 5:56-6:00.)

7   BY MR. SCANDURRO:

8   Q.  Ms. DeVany, turn to page 23 of your report, please.

9   A.  23, okay.

10  Q.  Now, I thought I heard you say earlier in response

11       to Mr. Miller's testimony that you weren't offering

12       any opinions about Gulf Stream's conduct, but I see

13       here in your report that you have something called

14       Defective Design on page 23.

15             MR. TAAFFE:  I object to the form.

16             MR. SCANDURRO:  The record will speak for

17       itself.

18  BY MR. SCANDURRO:

19  Q.  Your opinion is that the Gulf Stream Cavalier was

20       defectively designed; is that right?

21  A.  Under -- under Section B --

22  Q.  Yes, ma'am.

23  A.  -- Defective Design.

24  Q.  Are you getting that from someone else, or is that

25       your professional expertise and opinion?

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 315

1    A.   This is my opinion based on documents I've read in
2         preparation for the report.
3    Q.   And what are the documents that you've read?
4    A.   Documents that relate to the layout and the design
5         of the Gulf Stream trailer, the small cubic foot
6         area in proportion to the surface area of -- or the
7         small air volume in relation to the --
8    Q.   Yes, ma'am.
9    A.   Do you want me to answer or do you want to say
10        something?
11   Q.   Well, I --
12   A.   It's your time.  It's --
13   Q.   It's my time, and I don't have much of it, and I
14        appreciate your answer, but I had a very specific
15        question.
16             The stuff that you read, was it documents and
17        reports generated by other Plaintiff experts in this
18        case?
19   A.   No.  I'm not sure if we had any other reports;
20        certainly no depositions at this time when my report
21        came out.
22   Q.   So your opinion, if I can boil it down, is that the
23        air volume inside the trailer is too small in
24        relation to the number of wood products that are
25        inside the travel trailer and the ventilation rate

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 316

1      isn't good enough?

2   A.  Those are two important consider -- yes, two.

3   Q.  Yes, ma'am.  That's what's in here under B, so

4       that's why I focussed on it.

5           And the -- the low ventilation rates -- again,

6       I just want to be clear.  You have not attempted to

7       test actual in-use ventilation rates in the

8       Alexander travel trailer, correct?

9   A.  I have not, no.

10  Q.  And you'd agree with me generally that the small air

11      volume or small area inside of a travel trailer

12      compared to a mobile home is in fact a benefit in

13      terms of air exchange and turning the air over when

14      you open the windows and the door?

15  A.  It allows for a faster air exchange, if that's your

16      question.

17  Q.  Yes.

18  A.  I mean, all things being equal -- I mean, with the

19      same cubic foot per minute and movement.

20  Q.  Yes, ma'am.  Do you know if HUD requires

21      formaldehyde ambient air screening of HUD

22      manufactured homes --

23  A.  Ambient air screening --

24  Q.  -- prior to selling?

25  A.  It's my understanding that HUD requires screening of

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 317

```
1        the emissions of the wood products themselves that
2        go in.  And also HUD requires the manufacturers to
3        do an evaluation of other formaldehyde emitting
4        materials that go into the construction of their
5        units to help determine the overall air
6        concentration.  But this is mobile homes.
7    Q.  Right.
8    A.  And this is a travel trailer.  So we have to be
9        careful here.
10   Q.  Right.  And you're not aware of any HUD requirement
11       or other government requirement in 2004 that would
12       have required any travel trailer manufacturer to
13       conduct ambient air formaldehyde testing at the
14       factory?
15   A.  I am not aware of any in the United States, no.
16       Excuse me.  But this argument was a defective
17       design, not were they complying with minimum
18       standards.
19   Q.  Yes, ma'am.  And you're not an architect, are you?
20   A.  No, sir.
21   Q.  And you're not a licensed contractor?
22   A.  No, sir.
23   Q.  And we've already established you're not an
24       engineer -- structural engineer?
25   A.  I am not a licensed structural engineer.
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 318

1    Q.   And you've never designed or built a travel trailer

2         or worked for anyone who did?

3              Let me restate the question.

4              You've never built or designed a travel

5         trailer?

6    A.   Thank you so much for clarifying.  No, I have not.

7              MR. SCANDURRO:  Okay.  Well, I'm going to

8         reserve, just like the other lawyers did, in case we

9         have any other additional questions, but I'm going

10        to give the rest of my time to Mr. Percy.

11             MR. PERCY:  As opposed to switching the mike,

12        can you hear me?  Okay.  I'm trying to hit some

13        areas, but I'm going to make the same reservation

14        that Mr. Miller did.

15

16                    FURTHER EXAMINATION

17   BY MR. PERCY:

18   Q.   Turn to page 20 of your report.  And I'm referring

19        to the Bates stamped --

20   A.   Yes.

21   Q.   -- numbered report.

22   A.   Got it.

23   Q.   And I'm going to talk to you about subsection G on

24        that page.

25   A.   Yes, sir.

Stratos Legal Services, LP
1-800-971-1127

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 319

1   Q.   And this is where you talk about formaldehyde

2        off-gassing decreasing over time, correct?

3   A.   Yes.

4   Q.   All right.

5   A.   And how approximations are made.

6   Q.   Okay.  And I want to talk to you about the

7        approximations which you discuss on page 21 and the

8        top of page 22, correct?

9   A.   21 -- okay.  I don't know if it's correct, but

10       that's what you're going to ask me about, right?  Is

11       that what your question was?

12  Q.   There are one, two, three, four calculations and

13       formula that you have actually listed on pages 21

14       and 22; is that not correct?

15  A.   Actually, there are three formulas, not four.  The

16       fourth one is a statement about Berkeley National

17       Laboratory, how --

18  Q.   Okay.

19  A.   But it's not particularly a formula.

20  Q.   Let's talk about the three formulae.

21  A.   All right.

22  Q.   Are you the source of any of those formulas?

23  A.   No, sir.

24  Q.   This report does not show us the actual calculations

25       that you made of these formulas, does it?  All it