UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE PRODUCTS | * | |
| | LIABILITY LITIGATION | * | SECTION "N" (5) |
| | | * | |
| | | * | JUDGE ENGELHARDT |
| | | * | MAGISTRATE CHASEZ |
| | | * | |
| THIS DOCUMENT IS RELATED TO | | * | |
| | | * | |
| *Charlie Age, et al v. Gulf Stream Coach* | | * | |
| *Inc., et al*, Docket No. 09-2892; | | * | |
| Alana Alexander, individually and on behalf | | * | |
| of Christopher Cooper | | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

# EXHIBIT D

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF LOUISIANA
 3                   NEW ORLEANS DIVISION
 4      IN RE: FEMA TRAILER       *    MDL NO. 1873
                                  *
 5      FORMALDEHYDE PRODUCT       *    SECTION "N-5"
                                  *
 6      LIABILITY LITIGATION       *
                                  *
 7                                 *
                                  *
 8      THIS DOCUMENT RELATES TO   *
                                  *
 9      Charlie Age, et al vs.     *
                                  *
10      Gulf Stream Coach, Inc.,   *
                                  *
11      Et al., Docket No.         *
                                  *
12      09-2892                    *
13
14
15
16      ********************************************************
17              ORAL AND VIDEOTAPED DEPOSITION OF
18                      DWIGHT DURHAM
19                     JULY 16TH, 2009
20      ********************************************************
21
22
23
24
25
```

1    account for the people or to help the Red Cross and --

2    and the Astrodome in Houston, that was the mission we

3    had to do that.  And so contractually we would look at

4    that mission, if it's within our scope of work, well,

5    then is it within our capability?  Is it within our risk

6    tolerance?  Can we -- can we do that and succeed at

7    doing that?  And then do it.

8        Q.    Okay.  I appreciate that answer.  I'm trying

9    to determine something more specific, and I'm going to

10   give you a hypothetical -- and I'm going to have you fix

11   your chair first.

12       A.    Thank you.

13       Q.    So hypothetically you're hauling -- I felt the

14   same way too.  I blushed a little bit too when it

15   happened to me.  I blushed with the TAC comment

16   actually.

17                 Hypothetically you're hauling and

18   installing these travel trailers because you

19   contractually agree with FEMA that they tell you what to

20   do and you do it.  The folks that you have working for

21   you, either directly or through subcontracts, begin to

22   experience symptoms as a result of being exposed to the

23   formaldehyde in the trailers.  And they report back to

24   you through some reporting chain, but the information

25   gets to Fluor.  What happens then -- and if you can

1     answer the question with regards to the policies and

2     procedures of Fluor -- if this contingency of

3     formaldehyde exposure is affecting the people who are

4     actually hauling them and installing them and that

5     information makes it way up to Fluor, what happens then

6     to make sure that -- that the safety issues are at least

7     evaluated and addressed?

8                    MR. PENOT:  Objection, form.  I just want

9     to be clear.  This is a hypothetical question?

10                   MR. HILLIARD:  It is.

11                   MR. PENOT:  Okay.  You understand that?

12                   MR. HILLIARD:  Based on truth and

13    reality, but...

14         A.   And -- and -- the truth and reality --

15                   MR. PENOT:  Objection, sidebar.

16         A.   And -- and let's get to the truth and reality

17    first.  I never heard of any formaldehyde while I was

18    with the FEMA contract, period.

19         Q.   (BY MR. HILLIARD)  When was the first time you

20    heard of it?

21         A.   I don't know.  I guess on the news.

22         Q.   Okay.

23         A.   Okay.  And now the -- the hypothetical, I

24    think we would call in our health and safety folks and

25    our environmental folks and -- and say we've got a

1    situation here, let's look at it.  Let's get the facts

2    of the situation.  Does it exist?  What -- what is

3    the -- what is -- what is reality?  What's -- what's

4    really going on here?

5        Q.   Okay.

6        A.   And then -- and then, of course, bring this up

7    through management and...

8        Q.   All right.  So...

9        A.   I mean...

10            MR. PENOT:  Were you finished?

11            THE WITNESS:  Yeah, I'm finished.

12            MR. HILLIARD:  I apologize.

13        A.   It's hard -- it's hard to deal with a

14    hypothetical.  I mean, you know, I'm not -- I'm not

15    accustom to speculation or whatever.

16        Q.   (BY MR. HILLIARD)  The intent of a

17    hypothetical is to get you to address the reality of the

18    company's policies and procedures, which you just did

19    for me.

20        A.   Yeah.

21        Q.   And I apologize, you sometimes pause a lot

22    before you finish.  And I don't mean to talk over you,

23    but I'm learning about you that sometimes as you're

24    thinking about things, there's -- there's a little pause

25    and I'll do better.  But if you do not finish your

1    answer and I start to talk and, you know, Charlie is

2    busy on his blackberry, just tell me I'm not done,

3        A.   Okay.

4        Q.   All right.  So --

5             MR. PENOT:  Object to the sidebar, the

6    blackberry sidebar.

7             MR. HILLIARD:  It's an Iphone.

8        Q.   (BY MR. HILLIARD)  The -- I need to go back to

9    the hypothetical to explore more of how it would have

10   happened.  So you're in your office and Al calls you and

11   tells you that some of the haul and install

12   subcontractors are complaining that the travel trailers

13   have some sort of fumes or chemicals that are making

14   them sick and causing their eyes to water, and it comes

15   to your attention.  And I'm not going to suggest it was

16   severe or -- but it -- but it comes to your attention to

17   where you have decided that it needs to at least be

18   addressed.  What would you do?  Within the Fluor company

19   makeup, where would you go and what would you do if you

20   got that information from Al?

21            MR. PENOT:  Objection, form, asked and

22   answered.

23            But go ahead.

24       A.   If people -- if people were getting sick, I

25   would say stop.  Okay?  If somebody reported a sickness

 1     for some -- some reason, okay?  Stop.  That's -- that's

 2     -- let's keep the people away from there.  Anything that

 3     -- that would harm anyone or -- or life or limb, this is

 4     -- stop immediately.  And then in this case find the

 5     facts out about the case, get factual information from

 6     -- from first party, not second or third or fourth

 7     party, but first-party information, establish what the

 8     facts of the incident was.  Was it one person?  Was it

 9     two people?  Is it 100,000 people?  Present the facts,

10     develop a course of action, immediately -- immediately

11     contact the senior management -- the management of our

12     operation.

13          Q.   (BY MR. HILLIARD)  Who would that be?

14          A.   That would -- that would be the president of,

15     in this case, Fluor Federal Services.

16          Q.   And who is that?

17               MR. PENOT:  Who was that then?

18               MR. HILLIARD:  Yeah.

19          A.   Then?  That would have been James Cartnar, I

20     believe.

21          Q.   (BY MR. HILLIARD)  Spell his last name.

22          A.   C-A-R-T-N-A-R.

23          Q.   Thank you.

24          A.   And -- and establish the facts, get all the

25     facts together, get our HSE, Health Environmental Safety

```
 1    people involved.  If -- if, in fact, it was as you
 2    portrayed some unknown substance and in some unknown
 3    location -- so you're dealing -- you would bring in
 4    those folks.  That may bring in an industrial hygienist
 5    or something that would be able to help with collecting
 6    the facts around that -- that incident.  There would be
 7    an incident report filed up through the chain of
 8    command, if you will.
 9        Q.   And why would that procedure be implemented,
10    based on this hypothetical?
11        A.   Fluor has standard operating procedures.  We
12    would exercise those standard operating procedures, the
13    -- anyway, those -- those are outlined in Fluor's
14    management processes.
15        Q.   And in the situation of hauling and installing
16    trailers for victims of the -- of Hurricane Katrina,
17    would those standard operating procedures still be in
18    place in that -- even though you're trying to put --
19    place victims into trailers, if you become aware of this
20    hypothetical issue that I described for you, you would
21    stop everything until you made sure that the safe issue
22    was at least examined?
23        A.   Again, you're making a hypothetical on a -- on
24    a case.  Was -- you know, explain the hypothetical.  Was
25    it one person that came in and had a complaint?  Fluor
```

1     had a -- had a 1-800 number.  Anybody that made a

2     complaint could call that 1-800 number, and I generally

3     reviewed some of those logs.  I didn't -- I didn't see

4     any of those.  I mean, that -- that's --

5          Q.   Mr. Durham, I not suggesting Fluor did or did

6     not do anything wrong.  I apologize if you think that.

7          A.   All right.

8          Q.   What I'm trying to do is understand what the

9     mechanism is should someone decide we've got to at least

10    examine it to satisfy ourselves there's no safety

11    issues.  Keep in mind for the purpose of this I'm trying

12    to explore the hierarchy of how it happens --

13         A.   Okay.

14         Q.   -- should you decide to --

15         A.   Well, you said shut everything down.  That's

16    -- that's a stop work order, and that would be everybody

17    ceases work on this program.

18         Q.   Well, I said it because you told me you would

19    have said stop to Al.

20         A.   Well, if it's -- if it's one trailer or if

21    it's ten trailers or if it's one subcontractor or...

22         Q.   All right.

23         A.   I mean, you got to --

24         Q.   I got your -- I got the gist and I -- I

25    respect it.  I'll add to the hypothetical that it gets

```
 1        to a point, whatever that point is, where you decide you
 2        need to at least have more information about whether
 3        there's safety issues involved.  And this is -- and it's
 4        a hypothetical.  I'm not suggesting one way or the other
 5        at this point that Fluor did or did not know.  I'm just
 6        trying to determine your hierarchy once you determine
 7        Dwight Durham up in your office said I got to do more
 8        and get more information.  What do you do and how do you
 9        do it?
10        A.   I think I've outlined that.
11        Q.   All right.  So we're clear then, the outline
12        you gave me about bringing in a different subdivision,
13        whatever you labeled them, is what would occur?
14        A.   Yeah, I think so.
15        Q.   And -- and who notifies FEMA, if FEMA is the
16        one that's telling you to haul the trailers.  What --
17        what -- who at Fluor calls who at FEMA and says look --
18        A.   The -- the folks on the ground where the
19        complaint was started or -- or initiated, would then
20        notify the KOTR of an incident that -- you know, and
21        these are the actions that we approved.  FEMA, can you
22        approve the people -- the additional people that I've
23        talked about, would you approve them to come on the
24        site, I mean, to -- to start this -- to see what
25        happened here?
```

1      Q.   Got it.

2      A.   But -- but that -- that is a requirement -- or

3  that was a requirement to notify the KOTR and if it was

4  serious enough to go up to the contracting officer.

5      Q.   KOTR?

6           MR. PENOT:  Just tell him what a KOTR is.

7      A.   It's contracting officer's technical

8  representative.

9           MR. HILLIARD:  Okay.  Let's take about a

10 five-minute break, we'll get back.

11          THE VIDEOGRAPHER:  We're off the record

12 at 11:18.

13          (Recess held, 11:18 a.m. to 11:26 a.m.)

14          THE VIDEOGRAPHER:  We're back on the

15 record at 11:26.

16     Q.   (BY MR. HILLIARD)  Mr. Durham, should Fluor

17 determine that the travel trailers posed an unreasonable

18 risk of harm because of levels of formaldehyde inside of

19 them, could they refuse to continue to honor their

20 contract with FEMA and stop setting them up?

21          MR. PENOT:  Objection, form.

22          But you can answer as best you can.

23     A.   From a manager of Fluor, I can tell you that

24 Fluor will never put anyone in harm's way or -- or

25 question life or limb for an individual in any

1    configuration of the work we do, we will not do that.

2    It is not in Fluor's culture to -- to put anyone in

3    harm's way.

4         Q.   (BY MR. HILLIARD)  And that trumps government

5    contracts?  At the end of the day, that -- that's the

6    number one policy?

7         A.   Yes.

8         Q.   Can you and I agree with the proposition that

9    decisions are only as good as the information available

10   to make those decisions?

11        A.   That's a fair assumption, yes.

12        Q.   How -- and by what mechanism does Fluor assure

13   itself that its getting the information necessary down

14   in Louisiana while it's hauling and installing to make

15   proper decisions?  What -- what's the -- describe for me

16   the information chain.

17             MR. PENOT:  Objection, form, vague.

18             MR. HILLIARD:  I'm going to be a little

19   more specific because I think Charlie for the first time

20   today is right about that, an objection.

21        Q.   (BY MR. HILLIARD)  Let's say that -- back to

22   my hypothetical -- the haul and installing folks are

23   having problems with the amount of formaldehyde in the

24   trailers when they're setting them up, and it's causing

25   symptoms.  How does information get to you and get up

1    the food chain high enough to where Fluor can implement

2    it's number one policy, and that is we're not going to

3    do this until we're -- until we're sure it's safe?

4         A.   Every day the subcontractor is required to

5    issue to Fluor what they did on a daily report basis.

6    All right?  Fluor has a supervisor that would -- that

7    would take this daily report, and Fluor generates a

8    report.  Factually, I just want to go on the record, to

9    my knowledge there was never any, that I saw, reports of

10   subcontractors having any problems, okay, from my

11   prospective.

12             But you asked how that procedure would

13   work.  On a daily report if there was a problem, he most

14   likely would write that problem down and tell the guy

15   that's supervising him, I've got a problem over here.

16   And if that problem was, in fact, serious or a problem,

17   it would go up the chain of command, okay?  And, you

18   know, the record stands as the record is.  You can see

19   Fluor was very diligent to answering all the questions,

20   investigating all the problems.  If someone called,

21   there was a record of that call.  And -- and, you know,

22   we had a procedure in place to provide or to collect

23   that information and provide it up the chain of command.

24        Q.   All right.

25        A.   And at that level, it would go to FEMA in the