1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  FEMA TRAILER        MDL NO. 1873

FORMALDEHYDE PRODUCTS       SECTION "N"(5)

LIABILITY LITIGATION        JUDGE ENGELHARDT


* * *


Videotaped Deposition of ALEXIS MALLET,

JR., P.O. Box 80857, Lafayette, Louisiana

70598, taken at the offices of Lambert &

Nelson, 701 Magazine Street, New Orleans,

Louisiana 70130, on Friday, the 17th day of

July, 2009.


REPORTED BY:

JAMES T. BRADLE, CCR

PROFESSIONAL SHORTHAND REPORTERS

(504)529-5255

VIDEOGRAPHER:

KYM HAWKINS

PROFESSIONAL SHORTHAND REPORTERS

(504)529-5255

# EXHIBIT F

2

                          APPEARANCES:

T. CHRISTOPHER PINEDO
ATTORNEY AT LAW
4550 JERICHO ROAD
CORPUS CHRISTI, TEXAS 78413


LAMBERT & NELSON
(BY: HUGH P. LAMBERT, ESQUIRE)
701 MAGAZINE STREET
NEW ORLEANS, LOUISIANA 70130
        ATTORNEY FOR THE PLAINTIFFS
MIDDLEBERG, RIDDLE & GIANNA
(BY: CHARLES R. PENOT, JR., ESQ.)
717 NORTH HARWOOD, SUITE 2400
DALLAS, TEXAS 75201


        ATTORNEYS FOR DEFENDANT,
        FLUOR ENTERPRISES, INC.
DUPLASS, ZWAIN, BOURGEOIS,
  PFISTER & WEINSTOCK
(BY: KEVIN R. DERHAM, ESQUIRE)
3838 NORTH CAUSEWAY BOULEVARD
SUITE 2900
METAIRIE, LOUISIANA  70002


        ATTORNEYS FOR DEFENDANT,
        GULF STREAM COACH, INC.
U.S. DEPARTMENT OF JUSTICE
(BY: ADAM M. DINNELL, ESQUIRE)
CIVIL DIVISION
1331 PENNSYLVANIA AVENUE, N.W.
ROOM 8210-N
WASHINGTON, D.C. 20004


        ATTORNEYS FOR DEFENDANT, UNITED
        STATES OF AMERICA

```
APPEARANCES CONTINUED:
     LEAKE & ANDERSSON
     (BY: JERRY L. SAPORITO, ESQUIRE
       AND AMANDA VONDERHAAR, ESQUIRE)
     1700 ENERGY CENTRE
     1100 POYDRAS STREET
     NEW ORLEANS, LOUISIANA  70163


        ATTORNEYS FOR DEFENDANT,
        FLEETWOOD ENTERPRISES, INC.
     ALLEN & GOOCH
     (BY: LORI A. DAIGLE, ESQUIRE -
       VIA TELEPHONE)
     3900 N. CAUSEWAY BOULEVARD
     SUITE 1450
     METAIRIE, LOUISIANA 70002


        ATTORNEYS FOR DEFENDANT,
        HEARTLAND RECREATIONAL VEHICLES,
        LLC


     FRILOT LLC
     (BY: JOHN J. HAINKEL, III, ESQUIRE)
     1100 POYDRAS STREET
     3700 ENERGY CENTRE
     NEW ORLEANS, LOUISIANA 70163


        ATTORNEYS FOR DEFENDANT,
        BECHTEL NATIONAL, INC.
     BAKER DONELSON
     (BY: WADE M. BASS, ESQUIRE -
       VIA TELEPHONE)
     3 SANCTUARY BOULEVARD, SUITE 201
     MANDEVILLE, LOUISIANA 70471
        ATTORNEYS FOR DEFENDANTS,
        CH2M HILL CONSTRUCTORS, INC. AND
        SHAW ENVIRONMENTAL, INC.
```

4

```
APPEARANCES CONTINUED:
     WILLINGHAM, FULTZ & COUGILL
     (BY: THOMAS L. COUGILL, ESQUIRE -
       VIA TELEPHONE)
     NIELS ESPERSON BUILDING
     808 TRAVIS, SUITE 1608
     HOUSTON, TEXAS  77002


         ATTORNEYS FOR DEFENDANTS,
         JAYCO, INC. AND STARCRAFT
         RV, INC.

     JONES, WALKER, WAECHTER, POITEVENT,
       CARRERE & DENEGRE, LLP
     (BY: RYAN E. JOHNSON, ESQUIRE -
       VIA TELEPHONE)
     FOUR UNITED PLAZA
     8555 UNITED PLAZA BOULEVARD
     BATON ROUGE, LOUISIANA 70809


         ATTORNEYS FOR DEFENDANTS,
         KEYSTONE RV COMPANY, THOR
         CALIFORNIA, THOR INDUSTRIES,
         DUTCHMEN MANUFACTURING, DS CORP
         (d/b/a CROSSROADS RV) AND KZ RV,
         LP
     TAYLOR, PORTER, BROOKS & PHILLIPS,
       L.L.P.
     (BY: JOHN STEWART THARP, ESQUIRE -
       VIA TELEPHONE)
     CHASE TOWER SOUTH, 8TH FLOOR
     451 FLORIDA STREET
     BATON ROUGE, LOUISIANA 70801
         ATTORNEYS FOR DEFENDANTS,
         COACHMEN INDUSTRIES, INC.,
         COACHMEN RECREATIONAL VEHICLE
         COMPANY, LLC, COACHMEN
         RECREATIONAL VEHICLE CORPORATION
         OF GEORGIA, LLC AND VIKING
         RECREATIONAL VEHICLE COMPANY, LLC
```

APPEARANCES CONTINUED:

    GARRISON, YOUNT, FORTE &

     MULCAHY, L.L.C.

    (BY: RANDALL C. MULCAHY, ESQUIRE -

     VIA TELEPHONE)

    909 POYDRAS STREET

    SUITE 1800

    NEW ORLEANS, LOUISIANA  70112

       ATTORNEYS FOR DEFENDANTS,

       RECREATION BY DESIGN, LLC, TL

       INDUSTRIES, INC., FRONTIER

       RV, INC. AND PLAY'MOR TRAILERS,

       INC.


ALSO PRESENT:

    CHARLES "AL" WHITAKER, P.E. - FLUOR

    CAROLYN SINNOCK - LAW CLERK

6

\*   \*   \*

EXAMINATION INDEX

Page

EXAMINATION BY MR. DERHAM ...........11

EXAMINATION BY MR. PENOT ...........218

EXAMINATION BY MR. DINNELL .........350

EXAMINATION BY MR. PINEDO ..........379

\*   \*   \*

INDEX OF EXHIBITS

Page

Exhibit No. 1 .......................12

Notice of Video-Taped Deposition of Al
Mallet

Exhibit No. 2 .......................13

Curriculum Vitae of Alexis Mallet, Jr.

Exhibit No. 3 .......................13

Alexis Mallet, Jr. List of Trial Testimony
and/or Depositions

Exhibit No. 4 .......................13

Fee Schedule 100101 First General Services
of the South, Inc.

Exhibit No. 5 .......................13

Affidavit of Alexis Mallet, Jr., dated
5-19-09 (ALX-EXP-44-000001 through 000102)

Exhibit No. 6 .......................57

First General Services of the South, Inc.
statement, time logs and invoice

7

Exhibit No. 7 ......................217

Mr. Mallet's handwritten notes dated 5-6-09

and 5-7-09

Exhibit No. 8 ......................281

Two color photographs (ALX-EXP-44-000583 and

582)

Exhibit No. 9 ......................307

"Warning" language regarding jack

(previously marked J. Shea Exhibit 9)

Exhibit No. 10 ......................319

Document entitled "Tool Box Training, Proper

Jacking Techniques" (FL-FCA-007306)

Exhibit No. 11 ......................335

Fluor Specification, Standard Civil Details,

Typical Travel Trailer Pier Construction

(FL-FCA-003786 and ALX-EXP-44-000269)

Exhibit No. 12 ......................357

FEMA Model Travel Trailer Procurement

Specifications dated August 12, 2004

(FOREST-0002505 through 2508)

Exhibit No. 13 ......................358

Color photograph of a seal on the Alexander

travel trailer

Exhibit No. 14 ......................369

Page 9 of 17 of Paul LaGrange's report

(ALX-EXP-36-000009)

Exhibit No. 15  .....................414

Color photograph, Image 0142.JPG of the

Alexander trailer dated 5-7-2009

Exhibit No. 16  .....................415

Color photographs, Image 0073.JPG and

0074.JPG of the Alexander trailer dated

5-6-2009

Exhibit No. 17  .....................424

Ernest Orlando Lawrence Berkeley National

Laboratory, Aldehyde and Other Volatile

Organic Chemical Emissions in Four FEMA

Temporary Housing Units - Final Report dated

November, 2008

Exhibit No. 18  .....................433

Color photograph of a thermographic image

dated 5-7-09 (Infrared #6)

Exhibit No. 19  .....................437

Color photograph of a thermographic image

dated 5-7-09 (Infrared #10)

Exhibit No. 20  .....................438

Color photograph of a thermographic image

dated 5-7-09 (Infrared #2)

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken for all purposes allowed under the Federal Rules of Civil Procedure, in accordance with law, pursuant to notice;

That the formalities of reading and signing are specifically not waived;

That the formalities of filing, sealing, and certification are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

\*   \*   \*

JAMES T. BRADLE, CCR, Certified Court Reporter, officiated in administering the oath to the witness.

10

THE VIDEOGRAPHER:

        Today is the 17th day of July,

2009.  The time is approximately 9:20 a.m.

This is the videotaped deposition of Al

Mallet taken at the law offices of Lambert &

Nelson located at 701 Magazine Street, New

Orleans, Louisiana, 70130, for the case

entitled "FEMA Trailer Formaldehyde Products

Liability Litigation."

        Would counsel please identify

themselves and which party they represent.

    MR. PINEDO:

        Chris Pinedo on behalf of the

plaintiffs.

    MR. LAMBERT:

        Hugh Lambert on behalf of the

plaintiffs.

    MR. SAPORITO:

        Jerry Saporito representing

Fleetwood.

    MR. HAINKEL:

        John Hainkel on behalf of Bechtel

National, Inc.

    MR. DINNELL:

        Adam Dinnell for defendant United

States.

    MR. PENOT:

        Charles Penot representing Fluor
Enterprises, Inc., and attending with me is
Mr. Al Whitaker of Fluor Enterprises, Inc.

    MR. DERHAM:

        Kevin Derham on behalf of Gulf
Stream, and with me is Carolyn Sinnock.

          *    *    *    *

        ALEXIS MALLET, JR.,
after having been first duly sworn by the
above-mentioned court reporter, did
testify as follows:

EXAMINATION BY MR. DERHAM:

    Q    Mr. Mallet -- Did I pronounce the
last name correctly?

    A    Yes, sir.

    Q    -- my name is Kevin Derham, and I
represent Gulf Stream in the FEMA trailer
formaldehyde case that we're here for today.

        Before we get started, can you
just give us your name and address for the
record, please?

    A    Alexis Mallet, Jr., Post Office
Box 80857, Lafayette, Louisiana, 70598.

12

Q     Okay.  And I know that you're kind
of soft-spoken, I'm gathering.  We got some
people on the phone, so we will get the
phone a little closer to you.  And the court
reporter here, obviously, has to take down
everything that we say, so I'm kind of
naturally loud-mouthed anyways, but if you
can do your best --

A     Yes.

Q     -- to speak up, so the people on
the phone and court reporter can get us.

      I know you have given plenty of
depositions in the past, correct?

A     Yes, sir.

Q     Okay.  So I don't need to go over
all the ground rules?  You understand the
process?

A     Yes, sir.

Q     What is your date of birth?

A     November 9th, 1951.

Q     Okay.  I'm sorry.  That's on your
CV.

      Before we get started, let me just
do a few housekeeping matters, and attach as
Exhibit 1 the notice of your deposition, and

13

ask you if you have seen this?

     A     Yes, sir.

     Q     When was the first time you saw

that?  You can just leave it right there.

     A     I don't know.

     Q     Okay.  And we will go over these

things in some more detail in a minute, but

as Exhibit 2, I'm going to give you what I

believe is a current copy of your CV; is

that correct?

     A     Yes, sir.

     Q     Okay.  And Exhibit 3 -- Why don't

we do them this way, so they stay in

numerical order.  No. 3 is a current listing

of -- A list of trial testimony and/or

depositions I'm going to put as Exhibit 3.

     A     Yes, sir.

     Q     Okay.  And then Exhibit 4 is what

I believe is your current rate and fee

schedule, if you could just confirm that?

     A     Yes, sir.

     Q     Okay.  And Exhibit 5 is a copy of

your -- Well, we have been calling it a

report.  You actually titled it "Affidavit."

101-page affidavit of Alexis Mallet, Jr.,

14

dated May 19th, 2009?

    A    Yes, sir.

    Q    Okay.  Why don't we go -- Oh, the
other thing was I know about a week or so
ago you had produced to us or your attorneys
had produced to us what we have been
referring to as your "reliance file."

        It looks like we might have the
same documents, although yours looks a
little thicker than mine.  Is what's in the
folder in front of you -- I see.  You have
your report in that, also?

    A    This is the report with
photographs.

    Q    And is that also your reliance
documents you provided to us?

    A    Some of them maybe.  They may not
all be in there.

    Q    Okay.

    A    This is just the report.

    Q    That's just your report?

    A    So there may be duplication.

    Q    Okay.  So that's just your report.
What all is attached to it?

    A    The enclosures.

Q    The other six inches?

A    Well, there's printed photographs,
which takes much of the --

MR. PINEDO:

        His report had some extensive
enclosures or attachments, so he has those
attached.

EXAMINATION BY MR. DERHAM:

Q    So you've got the full attachments
that you referenced in your report?

A    Yes, sir.

Q    I got you.  Do we have all those?

MR. PINEDO:

        Yes.  That was originally produced
back on May 19th.

EXAMINATION BY MR. DERHAM:

Q    Oh, so that's everything that came
with your report when it was originally
produced?

A    Electronically.  I think we sent
it electronically --

Q    You did.

A    -- and never produced the paper
copy.

Q    Okay.  I got you.  And then in

16

addition, we have what's called your

reliance file.  Do you have anything

separate with you here today or is this all

you've got?

     A     I have other documents.  Our

reliance file would probably be on disk.

     Q     Did you bring those with you

today?

     A     Yes, sir.

     Q     And are they printed out or are

they on disk?

     A     They're on disk.

     MR. DERHAM:

          Is that all stuff that we have?

     MR. PINEDO:

          Well, we need to make a

distinction here.  His reliance materials

you do have.

EXAMINATION BY MR. DERHAM:

     Q     Okay.  What about, what else is on

the disk?  Do you know what's on the disk

aside from the report and the reliance

materials?

     A     I didn't segregate the printout, a

separate file for reliance material.

Q    Okay.

A    The girls just put it on the disk
of what they sent to you, my office, and the
rest of my data are my files that you
requested.

Q    And is that also on the disk?

A    No, sir.

Q    That's a separate hard copy?

A    Yes, sir.

Q    So do we have everything?

A    The reliance material would be --

Q    That's what I'm trying to figure
it out.

MR. PINEDO:

        Let's draw a distinction here.
The reliance materials for his report were
previously produced.  To the extent that he
has his file, he has also brought his file
with him today.  That is not all on disk.

MR. DERHAM:

        Okay.

MR. PINEDO:

        After he issued his report, he
continued to accumulate documents.  For
example, he has the defense expert reports.

18

EXAMINATION BY MR. DERHAM:

     Q    Sure.  And that's what would be in the hard copy of your file you're referring to?

     A    Yes, sir.

     Q    Okay.

     A    And there may be other documents that I didn't rely upon, but I reviewed, that are in that file.

     Q    Okay.  Is that in the room here?

     A    It's just in the hall.

     Q    Okay.  Can we get it?

    MR. LAMBERT:

     Sure.  Hold up.

    MR. DERHAM:

     I'm not going to spend time going through the whole thing, but I'm probably just going to say I just want a copy of it.

    MR. PINEDO:

     Off the record.

(Discussion off the record.)

EXAMINATION BY MR. DERHAM:

     Q    Okay.  So what has been brought into the room is it looks like four large plastic boxes, a leather folder, and a

19

suitcase, which is that --

        A     The suitcase is --

        Q     That's your clothes?

        A     Actually, it's my laptop and

printer and things.

        Q     Okay.

        A     And the leather is my daytime.

The plastic boxes are my data gathered on

this, for this file.

        Q     Okay.  Do you know, are they in

those boxes in any particular order?  You

know, do you know, is each box something

different or is it just everything that you

had put into four boxes?

        A     It's everything that I have in

four boxes.

        Q     Okay.  So how do I --

        MR. LAMBERT:

            You have it.

        MR. DERHAM:

            I have everything that's in those

four boxes?  Because I don't want to sit

here and go through those boxes.

        MR. LAMBERT:

            No, you got it.

20

MR. DERHAM:

It looks like there's a whole lot
more in there than what I have here and in
his the report.

MR. PINEDO:

There's a distinction again.  The
subpoena duces tecum asked for his file.  It
asked for something beyond his file.

The reliant materials were
produced previously, prior to the deposition
when the report was produced on May 19th.

If you want to see, quote/unquote,
the "entirety" of his file, because you're
aware that experts continue to accumulate
information --

MR. DERHAM:

Right.  Sure.

MR. PINEDO:

-- after they render their report,
and also, they have reviewed information
that they did not rely upon, but is part of
this file, that is what we have in these
four boxes behind us here today.

EXAMINATION BY MR. DERHAM:

Q    Okay.  Do you have an index?  Do

21

you have a list of everything that's in

there, that comprises your file?

    A    No, sir.

    Q    Okay.  Well, I guess what I will

do is there's a pretty good chance that we

probably have everything that's in there in

terms of other experts, but I know you said

you continued to do work since you wrote

your report?

    A    Yes, sir.

    Q    So maybe at a break or something,

we will just open those up and see what's in

them.

    MR. PINEDO:

        Or perhaps --

    MR. DERHAM:

        Go from there?

    MR. PINEDO:

        Yes.  Fine.

    MR. DERHAM:

        That might be the best way to do

it.

    MR. PINEDO:

        Or one of the other attorneys can

take a look at it as opposed to having a

22

long break where we go through the file.

        MR. DERHAM:

                I don't want to walk out of here

with four boxes of stuff, I can tell you

that.

EXAMINATION BY MR. DERHAM:

        Q     All right.  Let's go to your CV

first, if you don't mind.  Do you have that

there in front of you?

        A     Yes, sir.

        Q     Okay.  It looks like you have New

Iberia Senior High School, and you got a

Bachelor of Arts from USL, and your degree

is in -- Is it political science?

        A     Yes, sir.

        Q     Okay.  I thought I saw somewhere

in one of your papers, it was prelaw,

political science.  Is that actually what it

was called?

        A     The sub-category was prelaw.

        Q     Okay.  So there are different

branches of political science?

        A     I guess it was a specific branch

of political science --

        Q     Okay.

A    -- that I studied.

Q    Okay.  Did you want to be a lawyer?

A    I did, and then I came to my senses.

Q    Do you have any degrees beyond your Bachelor of Arts Degree?

A    Not degrees, no, sir.

Q    Okay.  So no graduate school?

A    No, sir.

Q    Okay.

A    Just certification trainings and so forth.

Q    And when did you obtain your degree from USL in political science?

A    I finished in December of 1974 and received a degree in the spring of 1975.

Q    Okay.  And just generally, take me from the spring of 1975 to what it is you do today.  Just take me through your history there from going from a political science graduate to what you do now sort of in the construction field.

A    Well, actually, it would start before that.

24

Q     Okay.

A     My father and grandfather were
both in the construction business.  I worked
with my dad in summertimes in college -- in
high school, and in between high school and
college, I worked for an appliance,
refrigeration and electronics company, and
then I went to college, and during college,
I worked for an industrial supply and
engineering company.  And while I was in
college, I went into my construction
business.

Q     So you started your own
construction business in college?

A     In my senior year, yes.

Q     And what was the name of that?

A     Royal Construction Company.

Q     Royal?

A     Yes, sir.

Q     Okay.  And how long did you --
Have you worked for yourself since then?

A     Yes, sir.

Q     Is Royal Construction still in
business?

A     Yes, sir.

25

Q    What type of construction does it
do?

A    Now, it doesn't do very much.  We
have distinction between two companies.
Royal does commercial construction, and our
First General company deals mostly with
insurance companies and defective
construction type construction work.  We
focus more on that now than any type of new
construction.

Q    And is that -- What was the name
of that company?

A    First General Services.

Q    First General Services.  Did you
start that business?

A    Yes, sir.

Q    When did you start that business?

A    1985.

Q    And you said that company is more
involved in handling basically repairs,
claims, estimates, appraisals, rebuilding
for insurance claims?

A    Yes, sir.

Q    Okay.  Is there a particular
insurance company that it's affiliated with

or is it an independent?

    A    We're independent.

    Q    Okay.  So you don't just
exclusively do work for like Allstate or
something like that?

    A    No, sir.

    Q    Do you get hired by the insurance
companies or by adjusters or by home or
building owners?

    A    On the construction work,
typically it's the building owner that hires
us.  Rarely do we work in the construction
end for the insurance companies, because
that's just not how they work.

    Q    Are you talking about for First
General Services?

    A    First General, yes, sir.  Our
contracts are almost always with the
insured.

    Q    Okay.

    A    Only a few times have we worked
directly for the insurance company.

    Q    Okay.

    A    In the consulting, it could be for
either.

27

Q    How many employees does First
General Services have?

A    Only three or four.

Q    So when it does work -- Does First
General Services actually do construction
and rebuild?

A    Yes, sir.  Right.  We have a set
of subcontractors that we use --

Q    That's what I was going to ask.

A    -- exclusively.

Q    Okay.

A    Some of them only work for us.

Q    So it operates more in the
capacity of a general contractor?

A    Yes, sir.

Q    On rebuild and repair type jobs?

A    Yes, sir.

Q    And what about Royal Construction,
how many employees does that have?

A    The same.  The same.  We act as
generals.

Q    I'm sorry.  But how many
employees?  Is it the same three or four?

A    Yes.

Q    Is it same three or four that are

First General Services?

A    Yes.  The only distinction is non-insurance or non-defective construction versus new general construction projects.

Q    Royal Construction does primarily new construction?

A    New or renovation, non-insurance.

Q    Okay.  And who are the three or four employees of -- You said it's the same three or four, correct?

A    Yes.

Q    Who are the three or four besides yourself?

A    Dalton Toups, Charlene Stroud, Jennifer Porter, and then we have a couple of part-time people that just work for us every now and again.

Q    And what does Dalton Toups do?

A    He's a construction supervisor.

Q    And what does Charlene Stroud do?

A    She's my sister and she bosses me around most of the time.

Q    Is she administrative?

A    Yes, she runs the office.

Q    Okay.  And what about Jennifer

Porter?

A    She's an assistant.

Q    To your sister?

A    To both of us.

Q    So she's administrative?

A    Yes, administrative.  And then myself.

Q    Okay.  And the group of subcontractors that you said you use exclusively, is it the same set of subcontractors used by First General Services as Royal Construction?

A    For the most part.

Q    Okay.

A    We interchange with another set of subs that we use on larger projects, only because of their capacity to perform the work.

Q    Okay.  And do you sub out for either of those companies all phases of the work that's going to be done for any particular project?

A    Most of the time, except for the restoration work, we will hire cleaning people directly.

Q     Okay.

A     Like on the fire projects or mold remediation work.

Q     Okay.  I see in, I guess, Page 7 of your CV, you're a licensed state general contractor in Louisiana?

A     Yes, sir.

Q     As well as a licensed residential building contractor in Louisiana?

A     Yes, sir.

Q     You're a licensed real estate agent?

A     Yes, sir.  Dormant.

Q     Dormant?

A     Dormant.

Q     Okay.  You're a licensed state mold remediation contractor?

A     Yes, sir.

Q     And a licensed Manufactured Housing Commission/manufactured housing installer --

A     Yes, sir.

Q     -- for the State of Louisiana? Have any of those licenses ever been subject to suspension or revocation or any kind of

31

investigative action or anything like that?

    A    One was technically revoked for a short period of time when they failed to realize that we had multiple companies listed on the insurance policy.  They, I guess, technically revoked our license until we said, "Look at the bottom.  All of the companies are listed."

    Q    Which one had a revocation put on it?

    A    I couldn't really tell you.  I don't know.  I don't know which policy -- which company shows up first on the policy.

    Q    Okay.  So it was more of an administrative error on the Board's part?

    A    Only administrative, correct.

    Q    Okay.  You said your real estate agent license is dormant.  Are the other licenses I went over all still active and current?

    A    Yes, they are.

    Q    Okay.  What is it that you specifically call yourself, I guess, if I asked you what you do?

    A    I guess I'm head of the

32

administration of the company.  I do the --

I oversee all of our projects.  I do

inspection, perform inspections.  I work on

insurance claims, estimating, identifying

problems or areas of issues on insurance

claims, provide scope of damages.

    Q    Do you -- I'm sorry.  I didn't

mean to cut you off.

    A    I think that's very general in

what I do.

    Q    Okay.  I understand what you're

saying.  I guess what I'm asking is do you

consider yourself any particular, you know,

type of profession?

    MR. PINEDO:

        Objection, form.

EXAMINATION BY MR. DERHAM:

    Q    You know what I'm saying?  You

know, some people would, you know, "I'm an

engineer," "I'm a lawyer," "I'm a doctor."

Do you consider yourself to be sort of

categorized into any particular professional

group?

    MR. PINEDO:

        Objection, form.  You can go ahead

and answer, if that's possible.

    THE WITNESS:

        Other than a general contractor, a
construction consultant.

EXAMINATION BY MR. DERHAM:

    Q    Okay.  You are not -- You don't
have any training or expertise as a medical
doctor?

    A    No, sir.

    Q    Or as a chemist?

    A    No, sir.

    Q    Or a toxicologist?

    A    No, sir.

    Q    Or an architect?

    A    No, sir.

    Q    An engineer?

    A    No, sir.

    Q    Industrial hygiene, industrial
hygienist?

    A    No, sir.

    Q    Indoor air quality?

    A    I have training in that.

    Q    Okay.  Are you certified as an
indoor air quality specialist?

    A    Indoor air quality remediator,

34

supervisor.

    Q    Is there a certification that you can have as an indoor air quality specialist?

    A    Yes, sir.

    Q    Do you have that?

    A    No, sir.

    Q    And you are -- When I said engineering earlier, that covers everything. You're not an industrial engineer, correct?

    A    Correct.

    Q    Any kind of engineer, mechanical engineer, civil engineer?

    A    Correct.

    Q    Okay.  You don't have any expertise in psychology, correct?

    A    No, sir.

    Q    Okay.  You don't have any expertise in -- Okay.  I asked you that.  Do you know what field or fields of expertise you are being offered for in this case?

    A    I have not been asked --

    Q    Okay.

    A    -- or told.

    Q    Okay.  What field or fields do you

consider yourself to be an expert in?

    MR. PINEDO:

        Objection.  Asked and answered.

    MR. DERHAM:

        I didn't ask him that.

    THE WITNESS:

        General construction, estimating,

various types of construction defects and

failures, and remediation.

EXAMINATION BY MR. DERHAM:

    Q    Is that mold remediation or any

kind?

    A    Excluding toxic materials or

hazardous materials.  Building science,

thermography.

    Q    Thermography?

    A    Yes, sir.

    MR. LAMBERT:

        Al, you need to speak up just a

little bit.

EXAMINATION BY MR. DERHAM:

    Q    I know you have been told that

before.

    A    Never mind him.

    Q    Thermography.  Anything else?

36

      A    I think that's the main fields.

      Q    Okay.  What is building science?

      A    That's the study of the relationship between buildings and air, moisture and temperature.

      Q    The study of the relationships --

      A    Between buildings and air, moisture and temperature.

      Q    Between buildings, air, moisture and temperature?

      A    Yes, sir.

      Q    Okay.  Is there a body that gives us this definition or is this sort of, you know, what would commonly be accepted as a definition of what a building scientist does?

      A    I don't know that answer.

      Q    Okay.  Is there any kind of -- Is there any kind of national board of licensure to be a building scientist?

      A    Not that I'm aware of.

      Q    Or any kind of national accreditation or national certification program for a building scientist?

      A    Not that I'm aware of.

37

Q     Is there any kind of Louisiana
state accreditation or licensure or
certification you can get as a building
scientist?

A     No.

Q     So you can't be a licensed
building scientist or a certified building
scientist?

A     Not that I'm aware of.

Q     Okay.  Is there anything you have
to do to maintain your status as an expert
in building science?  Is there any kind
of -- Do you understand that?

A     Yes.

Q     Okay.

A     Actually, it's just the ongoing
study of the relationship or the effects of
temperature, moisture and air as it relates
to buildings, whether it's identifying
moisture-related problems with a building,
if it deals with air infiltration, if it
deals with actual bulk water, if it's a
temperature issue.  It's just the whole body
of those relationships.  So dealing with
water, dealing with air, dealing with

temperature or moisture vapor.

    Q    Is there any kind of continuing education requirements or anything like that to maintain your status as a building scientist?

    A    No, other than just general courses or conferences, seminars that you can attend to expand on the knowledge of those relationships.

    Q    Do you have to be licensed or certified to design an HVAC system in the State of Louisiana for use, you know, in a residence or a building or anything?

    A    Not a residence.

    Q    What about a commercial building?

    A    A commercial building.

    Q    Okay.

    A    I think it's over $50,000, you have to have a license to do that.

    Q    To design and install an HVAC system?

    A    Yes, sir.

    Q    Okay.  There's no requirement, so if I wanted to go build a house myself, a 2,000 square foot house, or let's just say a

39

small house, an 800 square foot one-bedroom

condo and I wanted to put an HVAC system in,

if it didn't exceed $50,000, I could design

and install that myself?

    A    Well, for yourself, it wouldn't

matter what the cost was.

    Q    Okay.  So I could design and

install that myself?

    A    Yes.

    Q    Would I have to get a permit for

that?

    A    Depending on your geographical

area, more than likely, yes.

    Q    Okay.  And I wouldn't have to have

any kind of licensure or certification in

HVAC design or installation or engineering

to do that?

    A    Not for yourself, no, sir.

    Q    I was looking through the list

of -- You don't have any specialization or

certification in the design or installation

of HVAC systems, do you?

    A    No, sir.

    Q    Do you have any specialization or

expertise in the design of travel trailers?

A     In the design?  No, sir.

Q     You never designed one?

A     Not designed, no.

Q     You never built one?

A     Not from scratch.

Q     You built part of a travel trailer?

A     We have handled numerous insurance claims over the years dealing with travel trailers.

Q     Okay.

A     I was involved with an RV dealership some years back as a consultant and assisted in all phases of that operation.

Q     And describe that more in detail for me.  When was that?

A     Probably about 12 or 14 years ago.

Q     Just describe it for me.

A     I consulted with a friend who owns it, an RV dealership and a Ford dealership, and just worked with her on all the facets of the company.

Q     Okay.  And what specifically did you do with regard to the design or

construction of travel trailers in that

capacity?

    A    Well, not the design and

construction, but the repairs of travel

trailers.

    Q    And what type of travel trailers

were these?

    A    Just any different kind.  The

service department handled whichever type.

    Q    From little pop-ups to double

axle?

    A    It could have been a pop-up to a

motor home actually.

    Q    Okay.  Did you ever do any repair

work on any Gulf Stream trailers?

    A    No, I couldn't tell you -- I

didn't physically do the work, but oversaw

what went on in the service department.

    Q    Did you ever oversee any work on a

Gulf Stream travel trailer?

    A    I couldn't tell you.

    Q    How long did you do this?

    A    It was about a year, I guess, or

so.

    Q    And is that the extent of your

42

experience in the repair of travel trailers?

    A    No.  Through our construction claims, insurance claims, we have done that over the years.

    Q    Approximately -- Do you understand the difference between a travel trailer and a mobile home or a manufactured home?

    A    Yes, sir.

    Q    Okay.  And what is your appreciation of what a travel trailer is?

    A    It's typically used for recreational use.  It could be towable on a regular basis versus a mobile home or a manufactured home that's usually only moved once, set up in a permanent state for permanent occupancy.

    Q    And how many travel trailers have you been involved in any way with repair work?

    A    I couldn't tell you.  I have been doing this since '85, so 20 plus years.  I couldn't tell you the number.

    Q    Would it be more than 100?

    A    No, I would think less than 100.

    MR. PINEDO:

43

Are you making a distinction
between travel trailers and mobile homes?

MR. DERHAM:

I'm specifically referring to
travel trailers.

THE WITNESS:

Travel trailers?

EXAMINATION BY MR. DERHAM:

Q     Did you understand that?

A     Yes, I did.

Q     Okay.

A     Mobile homes would be far more
than that.

Q     Right.  And I know from your
background and other materials that you got
more extensive experience with mobile homes
and manufactured housing; is that correct?

A     Yes, sir.

Q     Okay.  As well as other types of
structures, buildings, houses, whatever?

A     Yes, sir.

Q     The types of repairs that you have
been involved in travel trailers over these
past 20 years, can you give me a description
of the general nature of the types of

44

repairs you can recall being involved in?

    A    Yes.  The majority of them dealt with some sort of accident.

    Q    You mean like a towing accident or something?

    A    A towing accident or vehicle running into a travel trailer and damaging the --

    Q    Like a casualty scenario?

    A    A casualty.

    Q    Okay.

    A    Fire, doing the repairs as a result of a fire.  We have handled a few where trees, limbs have fallen and done extensive damage to it.  I think we have handled a few water-related losses.

    Q    Like water intrusion?

    A    Yes.

    Q    Leaks?

    A    Yes, leaks.  Right.

    Q    Okay.  Do you consider yourself an expert in the construction of travel trailers?

    A    No, sir.

    Q    Do you consider yourself a

45

warnings expert?

    A    No, sir.

    Q    Aside from this case, have you ever been involved in any capacity in the evaluation of a travel trailer in regard to formaldehyde being an issue?

    A    I have been asked previously, but I don't think the attorneys took the case.

    Q    So this is your first time?

    A    Yes.

    Q    What about any other type of structure with regard to formaldehyde, have you had any involvement in any other type of structure aside from travel trailers where formaldehyde was the reason or something you were looking into or an issue involved?

    A    In strictly litigation?

    Q    Well, no, in any.

    A    We have had over the years -- As a matter of fact, we have a mobile home now that there's complaints about formaldehyde that we're getting ready to do some testing on.

    Q    Is that case in litigation?

    A    No, it is not.  That's why I was

46

asking you.  I didn't have any cases that I

have testified to regarding formaldehyde.

Q     Okay.  You have never been -- You

don't consider yourself an expert in

formaldehyde?

A     No, sir.

Q     Any kind of formaldehyde issues?

A     No, sir.

Q     Do you know the molecular formula

for formaldehyde?

A     HCHO?

Q     HCHO?

A     I think so.

Q     Besides the mobile home that you

said you're getting ready to do some work on

that has a formaldehyde issue and this

travel trailer case that we're here for

today, anything else, or are those the only

two?

A     Those are the only two.

Q     Okay.  Do you know the molecular

weight of formaldehyde?

A     No, I don't.

Q     Do you know the evaporation rate

of formaldehyde?

47

A     No, sir, I don't.

Q     Turning to your list of trial

testimony and depositions -- Are you there?

A     Yes.

Q     What exhibit is that, No. 3?

A     Yes, sir.

Q     Oh, let me ask you, you're not an

expert in material science, are you?

A     No, sir.

Q     Okay.  Your list of testimonies,

is this everything you have ever done or is

this the past, you know, four or five years?

A     When we were asked originally a

few years ago to put together a list, we

just assembled that.  The time frame, I

couldn't tell you.

Q     You don't consider yourself an

expert in the design of HVAC systems, do

you?

A     No, sir.

Q     And these cases that you have

listed here, about three pages --

A     Yes, sir.

Q     -- do you know how many of those

cases you were retained on behalf of the

48

plaintiffs?  If not a number -- Is it all of
them?  Have you ever been retained on behalf
of a defendant?

     A     Oh, I would say probably 50/50.

     Q     Okay.  That was going to be my
next question.  Could you break down for me
when you have been retained in litigation,
is there a percentage?  Can you give me the
time that you have been retained by the
plaintiffs versus times you have been
retained by defendants?

     A     I think it's probably half and
half.

     Q     Okay.  What percentage of your
business or your income, I guess, because I
know you have a couple -- Does Royal
Construction, do they do any -- When you do
legal work, do you do it as yourself or do
you do it under the auspices of one of your
companies?

     MR. PINEDO:

          Objection, form.

     THE WITNESS:

          Under the auspices of First
General Services of the South.

49

EXAMINATION BY MR. DERHAM:

Q    Okay.  And what percentage of your
income would you say is derived from your
work as an expert or as a consultant in
matters in litigation?

A    I would say it's probably about
10 percent of First General's or less.  It
just varies from year to year.

Q    But it would average about
10 percent?

A    It would probably average less
than.

Q    Okay.  This list of cases that you
have here, do any of those cases involve a
travel trailer?

A    No, sir.

Q    You have never designed or
installed an HVAC system for a travel
trailer, correct?

A    No, sir.  Well, in some of our
repairs, we have.  Not as a new travel
trailer.

Q    You have repaired existing?

A    Yes, sir.

Q    Would that be for some of the ones

that were damaged in these accidents, these
casualties?

    A    Or fires, yes, sir, tree limbs.

    Q    I'm sorry.  And that -- I'm sorry.
I didn't mean to interrupt.

    A    I'm sorry.  Just tree limbs
falling on the top of a camper and damaging
the HVAC system that would have to be
repaired or replaced.

    Q    Okay.  In the fashion that they
were originally designed and installed?

    A    Yes, sir.

    Q    You were just doing repairs on
them?

    A    Yes, sir.

    Q    Okay.  And I take it -- And I
apologize if this was covered.  I take it
that none of the cases you have provided
here under your list of testimony and
depositions involves any kind of
formaldehyde issues?

    A    No, sir.

    Q    Okay.  In how many cases that you
have listed on this list of testimony -- Of
which I think you said maybe about half of

51

them were for plaintiffs and half were for
defendants?

     A    I think so.

     Q    Okay.  Do you know in how many of
those cases you had an opinion that there
was a negative pressure situation in the
structure at issue?

     A    Could you ask the question again,
please.

     Q    Do you know in how many of the
cases that you have listed on your trial
testimony here that it was your opinion that
negative pressure was a cause or a factor at
issue?

     A    Oh, how many?  No, sir, I
wouldn't.

     Q    Would it be -- I mean, can you
look through them and tell me if you
remember if any of them that was the issue?

     A    Sure.  Yeah, I think so.  The
Aucoin case.

    MR. SAPORITO:

        What is he looking for right now?

    MR. DERHAM:

        Going through the cases where it

52

was his opinion that negative pressure was a

cause or factor at issue.

    THE WITNESS:

       The Ford case.

EXAMINATION BY MR. DERHAM:

    Q    Which one, Ford?  Oh, on the

bottom?

    A    Yes, sir.  Gotte, G-O-T-T-E.  No,

I'm sorry.  Not the Gotte.

    Q    Okay.

    A    Winski.  And some of these are

just where they were issues within the case.

It wasn't necessarily the issue.

    Q    I understand.  Right.

    A    Gradney.  Guillet.  Beasley.

Gidman.  Vincent.

    MR. SAPORITO:

       What was the last one?

    MR. DERHAM:

       Vincent.

    THE WITNESS:

       Vincent.  Broussard.  Fontenot.

Kallenberger.  And Carr.

EXAMINATION BY MR. DERHAM:

    Q    Carr went to trial before a jury,

didn't it?

    A    Yes, sir.

    Q    And the defendants prevailed in that case?

    A    Yes, sir.

    Q    Do you have a list somewhere that would identify the jurisdiction or actual case caption, docket, court, jurisdiction that any of these cases are in?

    A    No, sir.

    Q    Did you give depositions in all of these cases?

    A    No, sir.

    Q    Did you give trial testimony?

    A    Or either deposition.

    Q    That's what I meant.  In all of these cases, you either gave a deposition or trial testimony?

    A    Or both.

    Q    Or both?

    A    Yes, sir.

    Q    Do you keep copies of all of that, of your depositions you have given or copies of your trial testimony you have given?

    A    No, sir.

54

Q     So you don't have copies of any of
the depositions you have ever given?

A     I wouldn't say I don't have any,
but if I did, I couldn't tell you which ones
I do.

Q     Would there be a way for you to
look and find out?

A     We would have to go in the
warehouse and open each one of these boxes,
if they're still in there.

Q     There's a box for each one of
these cases?

A     Box or boxes or portions of boxes.

Q     In the cases in which you gave an
opinion that negative pressure was, you
know, at least a factor in what was going
on, do you know if you gave a deposition or
trial testimony or both or one or the other
in those cases?

A     I might be able to tell you one or
the other.  I may not be able to tell you if
I did both.

Q     Okay.  I think what I will do, I
would ask -- I know you're going to object,
Chris, but I will ask that for the cases in

which you have identified where you rendered

an opinion that negative pressure was either

a cause or the cause or a factor at issue,

that you identify for us the court and

jurisdiction and provide us a copy of the

deposition or trial testimony if you have

it.

     MR. PINEDO:

      We're not agreeing to that at this

time.

     MR. DERHAM:

      Is that an objection?

     MR. PINEDO:

      That's an objection.

EXAMINATION BY MR. DERHAM:

    Q   Do you have a billing statement or

a time log, invoices that you have generated

in this case?

    A   Yes, sir.

    Q   Okay.  Is that something that you

have with you here today?

    A   It's in the boxes.

    Q   Would you be able to get it

easily?

    A   Yes, sir.

56

Q    Okay.  Do you think you can get a
copy of that right now?

A    Yes, sir.

MR. DERHAM:

        Can we just take a second?

MR. LAMBERT:

        Has it been provided before?

THE WITNESS:

        No.  I think we just sent our
first.

MR. LAMBERT:

        Do you want to go off the record?

MR. DERHAM:

        Yes, just for a minute.  If you
can just grab your invoices or billing
sheets, time logs, however you record your
time and expenses and fees.

MR. LAMBERT:

        Off the record.

THE WITNESS:

        It's just the invoices.

MR. DERHAM:

        Whatever you have that would
reflect the work you have done.

MR. LAMBERT:

57

We will go off the record.

MR. DERHAM:

Yes.

THE VIDEOGRAPHER:

We're going to go off the record.
The time right now is 10:14.

(Discussion off the record.)

THE VIDEOGRAPHER:

We are currently back on the
record.  The time as of right now is 10:17.

EXAMINATION BY MR. DERHAM:

Q     Did you find it, sir?

A     Yes, sir.

Q     Can I take a look at it real
quick?

And I think what I will do is just
ask for a copy of this and we will attach it
as an exhibit.  We will attach it as
Exhibit 6.  When he comes back with the
copy, then we can both have it.  I should
have had him make a copy for you.  I'm
sorry.

Without it in front of you, do you
know what your total invoice, total fees in
this case have been?

A     No, sir.

Q     Okay.  Would you need that to tell
me when you were first contacted in this
case, or do you know?

A     The specific date, yes.  In
general, I think it was in March of this
year.

Q     Okay.  Who was it that first
contacted you?

A     Aaron Ahlquist.

Q     And do you know who that is?

A     He's an attorney with the D'Amico
Law Firm.

Q     Okay.  And what was it that you
were -- What was the nature of that
conversation?

A     He asked what we did and if I was
involved in any litigation with the
formaldehyde with anyone.  Asked if we were
interested in becoming involved with them.

Q     Okay.

A     It was kind of a general -- just a
general conversation about this case and
what we did.

Q     Okay.  Did he tell you that there

were people who resided in the trailer who

were plaintiffs in a lawsuit?

    A    Yes.

    Q    Did he tell you what they were

alleging?

    A    Not that I recall.

    Q    You came to learn that at some

point?

    A    At some point, I did.  I don't

know that we got into any of the issues.  It

was more of a general conversation back

then.

    Q    Okay.  And what was it that you

were ultimately asked to do in this case?

    A    To assist them with the litigation

and helping to identify the issues with the

travel trailer that would, I guess, be in

conjunction with the formaldehyde issues

that were being posed or that were raised.

    Q    And since you didn't have any

expertise in formaldehyde, how did you feel

you were qualified to help them out in that

regard?

    MR. LAMBERT:

        Objection.

60

MR. DERHAM:

Too late.

MR. LAMBERT:

No, it's not.  Here's his

original, which you should give him back,

and I have two copies.

EXAMINATION BY MR. DERHAM:

Q     I will just mark as Exhibit 6 the

copy of your statements and I guess time

logs and invoices.

A     Yes, sir.

Q     We will get to that in just a

second.  If you could, finish the question

that I asked.

A     My involvement is not necessarily

in the formaldehyde issue itself, but taking

from the assumption that formaldehyde

existed, what were the factors with the

travel trailer that would have compounded

issues regarding the presence of

formaldehyde.

Q     And what experience did you have

in addressing factors that could compound

issues if you assumed the presence of

formaldehyde in a structure?

A     Well, the other experts identified
the presence of formaldehyde and what
elements would affect the activity of
off-gasses, off-gassing of formaldehyde.

My job was to see what elements
regarding the construction or function of
the travel trailer that would contribute to
the activation of formaldehyde based on what
they said activates it and how did that work
in conjunction with the building and how the
various components with the building come
into play with that, of what they said was
occurring.

Q     Well, what experience do you have
in evaluating or determining what could
contribute to the activation of
formaldehyde?

A     Well, again, the other experts
identified what could activate the
formaldehyde.  What I did was to identify
how those elements could come in contact
with or interact with those products with
formaldehyde and how that interacted with
the travel trailer itself.

Q     So you don't personally have or

profess any expertise in the factors that
actually activate or off-gas formaldehyde?

    A    No, sir.

    Q    Okay.

    A    I was asked to take the assessment
of others and go forward with that.  For
instance, they state that temperature and
humidity activate formaldehyde, and from
that point, I took it forward of the
components of the trailer and the function
of the trailer.

    Q    You don't actually know in which
way temperature or humidity correlates with
formaldehyde activation or off-gassing, if
at all?

    MR. LAMBERT:

        Objection.

    MR. PINEDO:

        Objection, form.

    THE WITNESS:

        Well, the two factors --

EXAMINATION BY MR. DERHAM:

    Q    Let me clear that up.  Other than
what you read from the other experts?

    A    And from the research that I have

63

had.

    Q    For this case?

    A    No, we have had some other

information on formaldehyde, because we deal

with a number of mobile home cases.

    Q    Okay.

    A    So dealing with the HUD

regulations and so forth, I'm quite aware of

what needs to be -- what the components have

to be to produce a manufactured house.  And

the information that they provided and that

I was aware of was temperature and humidity

interact with or activate the gases.

    Q    Is it your belief that increased

humidity increases the off-gassing of

formaldehyde?

    A    That's my understanding.

    Q    And that understanding is based on

what?

    A    Well, on data that I have and the

data provided by the experts in that field.

    Q    And I take it you would defer to

them in terms of the actual mechanisms that

make that occur?

    A    That's correct.  My knowledge is

64

that temperature and humidity are causes for

activation or assist in the activation of

formaldehyde.  Beyond that, I have no

involvement in that end of this litigation.

Q    Okay.  So you don't know, for

example, how increased humidity would

increase off-gassing of formaldehyde?

MR. PINEDO:

Objection, form.

EXAMINATION BY MR. DERHAM:

Q    Go ahead.

A    Well, I do to some extent, but I

wouldn't profess to state that that's what I

would testify to.  I know that interaction

with moisture releases the formaldehyde gas,

but that's just a general understanding.  I

have no knowledge of how that interworking

occurs.

Q    That's what I was going to ask.

The actual mechanism or why increased

humidity, if at all, increases off-gassing

takes place?

A    No, sir.  And that was not my

involvement.

Q    Okay.  Back to your invoice that

65

we attached as Exhibit 6, I'm looking at the

top page, and it appears that this is an

invoice -- I mean, a statement dated

July 15th, 2009, total due, $109,676.70.  Is

that your current balance due?

    A    I think this is the only invoice

we have produced.

    Q    I was going to ask you, do you

know if there have been any invoices prior

to this?

    A    No, sir.

    Q    Have you been paid at all?

    A    No.  We just produced this and

sent this out the day before yesterday.

    Q    Okay.  And as I understand it,

once you were contacted, you underwent

contacting Mr. LaGrange and Mr. Ritter to do

some of the underlying testing and

engineering work?

    A    Mr. Moore and Mr. Hicks, yes.

    Q    Mr. Moore and Mr. Hicks as well.

Was that left to your discretion or were you

told to contact those individuals?

    A    It was left to my discretion.  I

was asked if I had engineers or if -- The

66

question was, was I aware of any engineers

that they could contact, and I stated

that -- I told them that I worked with a

group of engineers on all of our -- on our

projects, and then I contacted those people

who I thought should become involved in the

project.

     Q    What did you do in preparation for

your deposition here today?

     A    I reviewed documents in the file.

I read most of the depositions that were

provided to me.

     Q    Do you know which ones those were?

     A    No, I couldn't give you the list.

They're in my box here.  I could tell you

which ones I didn't review.

     Q    Okay.

     A    I did not review Ervin Ritter,

Paul LaGrange and Alana Alexander, of those

that I have.

     Q    Okay.

     A    Oh, I'm sorry.  And there was one

deposition of Mr. Shea, I believe, that I

did review, but there was a subsequent

deposition; is that correct?

67

Q    Yes.

A    And I didn't review that one.

Q    Is there a reason you didn't
review Mr. Ritter's or Mr. LaGrange's
deposition?

A    I didn't have time.

Q    You didn't have time.

A    The other Fleetwood case started
hopping real quickly.  I just didn't have
the time to.

Q    Which case was that?

A    The Dubuclet case.

Q    Have you worked with Mr. LaGrange
or Mr. Ritter before?

A    Yes, Mr. LaGrange has done
projects for us.  Not before this -- Well,
once before this case.  Mr. Ritter and I
worked on numerous cases together, as well
as non-litigation matters.

Q    In the litigation cases you worked
on with Mr. Ritter, were you working on
behalf of the plaintiffs or defendants?

A    I couldn't tell you.

Q    Mr. LaGrange I know does duct
blaster testing, blower door testing.

A     Yes, sir.

Q     Have you ever done a blower door test or duct blaster test?

A     Not personally.  I have overseen them, but not -- I'm a pointer.

Q     You hire that out to other folks?

A     Yes.  I point.

Q     You point?

A     Yes.

Q     You point and tell them what to do, where to do it?

A     To some extent.

Q     Do you consider yourself an expert in blower door testing or duct blaster testing?

A     No, I wouldn't say an expert.

Q     Did you meet with any of the attorneys in preparation for your deposition today?

A     I met with Mr. Pinedo for a little while on Monday.

Q     Of this week?

A     Yes, sir.

Q     A few days ago.  Was that here in Louisiana?

69

A     It was in Houston.

Q     And how long did you guys meet?

A     Well, we were together from about
11:15 to 3:30, but actually meeting on the
case, maybe an hour or so.

Q     What was the rest of the time
spent doing?

A     I was dealing with other issues.
We were trying to get depositions sent of
some of the people who had been taken,
lunch, problems getting the Internet hooked
up for us to be able to get data sent to us.

Q     What was the -- Do you recall the
nature or the substance of any conversations
you and Mr. Pinedo had on Monday?

A     He asked me a few questions, asked
me what my response would be, asked me what
data that I had, what research that I had,
what did I do independent of what was given
to me.  We reviewed -- Most of the time was
spent reviewing the things that I had
outside of the, I guess, documents that were
sent to me by others.

Q     Did he provide you with any
information or data that you hadn't seen

yet?

    A    Ms. Alexander's deposition.  I think there was one other thing that got e-mailed, but not printed, and I think it got forwarded to my office.  I don't remember what document that was.

    Q    You stated that he asked you a few questions and you gave him some answers.  Do you recall what questions he asked you?

    A    No, no specific questions that come to mind.

    Q    Did he bring to light for you any information that you felt requires you to change any of the opinions or any things in your report?

    A    No, sir.

    Q    Let's go to your report, if you would.  Is that the only time you met before today with Mr. Pinedo since Monday or any of the other lawyers?

    A    Oh, since Monday?

    Q    Yes.

    A    That's the only time.

    Q    Okay.  Any other of the lawyers, have you met with any of them to prepare for

today's deposition?

    A    No, sir.

    Q    Okay.  Did you meet with any other experts to talk about your deposition or call them or talk to them in any way?

    A    Well, David Moore and Ervin Ritter and I have had conversations throughout the whole week, but that's been dealing with the production of the report in the "Dubuclet."

    Q    Not about this case?

    A    And I'm not certain I'm saying that correctly.  The "Dubuclet" case.

    Q    Okay.  But not about this case?

    A    No, sir.

    Q    Did Mr. Ritter talk to you about his deposition that he gave in this case?

    A    Immediately -- Well, I say "immediately."  I think that evening we spoke, because we were preparing the report on another case, and I asked him how it went, and we just talked in general, you know, about how long it was, how many attorneys there were.  I mean, not the number, but that there were a number of attorneys and what time it finished.

Q    How nice a guy I was?

A    He didn't go over that, no, sir.

MR. PINEDO:

Are you ready to take a break,

since you're such a nice guy?

MR. DERHAM:

We can take a break.

THE VIDEOGRAPHER:

The time as of right now is 10:39.

We're off the record.

(Discussion off the record.)

THE VIDEOGRAPHER:

We're on the record.  The time as

of right now is 10:55.

EXAMINATION BY MR. DERHAM:

Q    Okay.  Mr. Mallet, I'm going to go

to your report, which we have attached as

Exhibit 5, and the exhibit we -- Is that

right?

A    Yes.

Q    Exhibit 5 we have attached, and we

haven't attached the full, entire stack of

photos and everything else.  We have just

attached the written component, which I'm

going to go to now.  Do you have that in

front of you?

    A    Yes, sir.

    Q    Okay.  Let me ask you, if you would, first, please, to go to Page 100.

    A    Okay.

    Q    And in the conclusion paragraph just above your signature, you see it says -- the sentence, the paragraph starting with "Conclusions drawn in this report"?

    A    Yes, sir.

    Q    Okay.  The second sentence says, "The writer reserves the right to make corrections of any errors discovered after the release of this report or upon the receipt of new data."

    Have you discovered any errors of your report that you need to make any corrections to?

    A    Well, the only thing that I did notice when I was reading through the report yesterday or last night was that evidently the last edit or the edit that I did on the report didn't save and it got sent out differently.

    Q    What is that?

74

A     Well, it was just different things that I just kind of remembered changing wording to that --

Q     Is there any substantive component of your conclusions that I think are conclusions one through whatever, 15 or so, 16?

A     No, sir.

Q     15.  Go ahead.

A     Excuse me.  I'm sorry.

Q     No, is there any substantive changes other than grammatical, typo, rewording things?  Any substantive changes that you need to make?

A     It didn't change my conclusions.

Q     Okay.

A     It just doesn't read the way I edited it.

Q     Okay.  Do you have that version saved anywhere?

A     No, sir.  It was on our laptops that subsequently, after I wrote the report, we had to change our computer system out completely.

Q     Do you have any prior drafts of

this report?

    A    No, sir.  It was on the laptop.

    Q    Okay.

    A    But I just remembered when I read it, it was like, "Well, I made this change." All right.  You know, "I clarified this better," you know.  It read like I dictated it rather than the way I read it and make my corrections.

    Q    Okay.  But the substance of your opinions are still the same?

    A    The substance is the same.

    Q    Okay.  Have you done any work we referenced earlier, have you done any work since you drafted this report in this case?

    A    I read a number of depositions.

    Q    Have you written any kind of amended or supplemental report or commentary or anything like that?

    A    No, sir, I have not given any additional reports.

    Q    Has anything in the materials you reviewed led you to the conclusion that you would like to go back in and change anything in your report?

A     No, sir.  As a matter of fact,
some of what I have read actually solidified
what my opinions were.

Q     Okay.  Have you been asked to do
any further work on this case?

A     I have continued to participate in
some other phases of it.  It doesn't involve
additional opinions.

Q     Do you have any e-mail
correspondence or letter correspondence back
and forth between you and any of the other
experts in this case or the plaintiffs or
the plaintiffs' attorneys regarding anything
in this case?

A     Yes.

Q     E-mails, faxes, letters, those
kinds of things, or notes of phone calls?

A     Yes, sir.

Q     Okay.  Do you keep those in a
particular file folder, like a
correspondence folder or anything like that?

A     They would be in individual
folders, depending upon who I spoke with or
who I received what from.

Q     Okay.

A    I do have a notes folder, but it doesn't necessarily contain all of the information that would be involved in some correspondence of some sort between an individual.

Q    Well, you have a notes folder?

A    I have a notes folder.

Q    And what is in the notes folder?

A    Handwritten notes about some observations, reviews of depositions, conversation notes.  And I guess I didn't do a good job of explaining that.  That would not be the only file that I would have notes in.

Q    Okay.  You have other files that you have handwritten notes in?

A    I believe so, yes.

Q    And what would those files be called?

A    It would just depend on the file. It may have been something dealing with Mr. Ritter or Mr. Moore or it may have been something I was researching.

Q    Okay.  I guess what I would ask for a copy of is a copy of all of the

e-mails, letters, faxes between you and the
experts in this case, you and any of the
plaintiffs' attorneys or any attorneys, or
any of the plaintiffs themselves, along with
a copy of any handwritten notes you have
made in this case.

     A    Let me write this down.

     Q    Go ahead.

     A    Copies of notes?

     Q    Yes, the notes folder.

    MR. PINEDO:

       He has his handwritten notes with
him today.

    MR. DERHAM:

       Okay.  Well, I just don't want to
go -- With the time constraints we have, I
don't want to go through four boxes.

    MR. PINEDO:

       If you prefer, we can attach them
at the end of the deposition.

    MR. DERHAM:

       That might just be the easiest way
to go.

    MR. PENOT:

       I may have a different view of

that.

    MR. DERHAM:

        Okay.  Well, that's fine.

    MR. PENOT:

        Can I start looking through them?

    MR. PINEDO:

        That's fine.

    MR. DERHAM:

        That would help actually.

    MR. LAMBERT:

        Let's do this.  Let's go off the
record just for a second.  Maybe you can
identify where the notes are in these boxes,
so he doesn't have to go through them.

    MR. DERHAM:

        Well, he said there's a notes
folder, but he also could have notes in
any --

    THE WITNESS:

        In any of the other files.

    MR. PINEDO:

        The handwritten notes?

    THE WITNESS:

        Yes.

    THE VIDEOGRAPHER:

We're off the record as of right now.  The time right now is 11:02.

(Discussion off the record.)

THE VIDEOGRAPHER:

We're on the record.  The time as of right now is 11:05 a.m.

EXAMINATION BY MR. DERHAM:

Q    Okay.  The other thing I wanted to get a copy of was any of the e-mails or letter correspondence, you know, faxes, that kind of thing, between and among you and any other experts in this case, the plaintiffs' attorneys, the plaintiffs themselves, or with anyone else you may have communicated with in regard to your work in this case.

MR. PENOT:

Is that also in these boxes?

THE WITNESS:

Some of it is.  I couldn't tell you that they're all there.  I don't know how much the girls printed out as the e-mails came in and attached it to the files.

EXAMINATION BY MR. DERHAM:

Q    Okay.  Let's go into your report,

if you would, on the first page.  It's the
one with the preamble.

    A    Yes, sir.

    Q    The first -- This isn't addressed
to anyone specifically.  It just says, "In
accordance with your request."  Who is the
"your" you're referring to?

    A    The attorneys.

    Q    In general?

    A    In general, yes.

    Q    Okay.  And it said your
"organization made on-site inspections,
observations and an evaluation to determine
the following," and there are nine specific,
I guess, categories or items.

    Are those -- You know, was that a
list that was specifically given to you by
someone to look into or where did this list
of nine items come from?

    A    It was a list that I was asked to
address.

    Q    And who do you recall specifically
asked you to address these nine items?

    A    One or more of the attorneys.  I
think it's probably an accumulation of

questions that I was asked to address.

Q    Okay.  Was this list of nine items, was this sent to you by anyone, you know, in written form or a letter or a fax or e-mail that said, "Hey, Mr. Mallet, we need you to look at the following one through nine"?

A    No.  I think there were just phone conversations.  There were phone conversations.

Q    So this is, I guess, a synthesis by you of what your understanding was that you were being asked to look at?

A    Yes, sir.

Q    Okay.  And in response to any of these nine items, did you feel that any of them were not particularly within your field of expertise?

A    No.

Q    Okay.  So you felt you were expert enough in these nine, to address these nine areas or the nine specific points that are set forth in it?

A    Yes, sir.  And some of those evaluations were based on information by

83

others that I formulated the opinion.

     Q    Okay.  You said you worked with
four individuals, Mr. Ritter, Mr. LaGrange,
Mr. Moore --

     A    Mr. Hicks.

     Q    Mr. Hicks.  And have they all
furnished you with copies of reports?

     A    No, sir.  Mr. Hicks didn't become
involved, because I think we had a
limitation of persons that we could have in
the inspection.

     Q    Okay.

     A    So I felt Mr. Hicks was -- I
wanted Mr. Moore and Mr. Ritter and
Mr. LaGrange there.

     Q    Okay.  What was Mr. Hicks's role
going to be?

     A    He's an electrical engineer.

     Q    Okay.  So you were provided then
with reports of Mr. LaGrange, Mr. Ritter and
Mr. Moore?

     A    Yes, sir.

     Q    Okay.  And I guess, generally
speaking, what is it that your opinions add
that are not covered by the opinions and

84

work done by Mr. Moore, Mr. Ritter and/or

Mr. LaGrange?

    A    Also, some of the interactions

with the moisture and temperature, how those

issues came into play with the trailer, the

construction of the trailer, the

alternatives, alternative methods of

construction, alternative methods of jacking

and how the various testings or observations

of the others came into being or came

together.

        Because I'm a licensed general

contractor and I'm capable of evaluating and

overseeing things that are going on on

construction projects, our consulting

projects, when there's a need for a more

technical end of perhaps calculations

performed that would require engineering

expertise to perform those calculations,

such as the stress on steel or something of

that nature, that's when I bring in

Mr. Moore or Mr. LaGrange in the blower door

and duct blasting test, but I oversee

everything that goes on on all of the

projects that we're involved in.

85

And to the extent that I direct, I look at and formulate what I assess is the issue with a particular project and bring those people in that I think I need to have to back up the assessments that I make.

Q     You don't hold yourself out or consider yourself an expert in the jacking, set-up, installation of travel trailers, do you?

A     Not in travel trailers specifically, but my background is that we have performed both jacking and moving and set-up of numerous type of buildings and structures over the years.

My background in that begins or goes back to moving antebellum homes or homes that have some sort of historical significance.  I jacked up and put on barges buildings in the past.  We have jacked up drilling rigs.

I specifically designed the hydraulic system for the unified hydraulic -- unified lifting of a drilling rig.

I designed a system of lifting and

support shoring of two different antebellum
homes where the beams from the columns had
to be removed and replaced.  The tolerances
were less than one-quarter inch in movement,
that we had to lift the upper sections of
those columns, those two-story homes.

I have designed and received an
award, an international award for the
jacking stabilization and stabilization of
the roof system on a shopping center theater
that required the removal of the wall
systems, but we had to support the roof
system not only from collapse, but from wind
uplift.

We have moved, jacked and shored
mobile homes, moved, jacked and shored
houses.

So my expertise goes far beyond
just a travel trailer set-up, putting some
cement blocks underneath a travel trailer.

Q    Have you ever jacked up, set up
and installed a travel trailer?

A    Not a travel trailer, but mobile
homes, we have.  Now, we haven't blocked
mobile homes -- travel trailers as this, but

I have set up travel trailers.

Q     You mean installed them to utilities, power, that kind of thing?

A     Correct.

Q     But you never actually jacked one up and set it up on blocks?

A     No, but I would have done it the same way that I would have done any other structure that I would have moved or needed to elevate.

Q     Do travel trailers and mobile homes have the same performance criteria?

MR. PINEDO:

Objection, form.

THE WITNESS:

I would have to look at the performance criteria of the two side by side to tell you if they're identical or not.

EXAMINATION BY MR. DERHAM:

Q     Okay.  Moving down on Page 2, "The parameters of this report are limited to the on-site observations," that sentence.

A     Yes, sir.  That sentence, right.

Q     When did you go to observe the --
When I talk about "the travel trailer,"

unless I tell you otherwise, I will be

talking about the Alexanders' trailer at

issue in this case.

     A     Yes, sir.

     Q     When did you go observe that

trailer?

     A     May 8th.

     Q     And if you need to look at your

sheet --

     A     Okay.  I think it's May 8th and

9th of 2009.

     Q     Did you go once or twice or more

times?

     A     Twice.

     Q     Okay.

     A     Excuse me.  Could we go off the

record for a moment?

     MR. DERHAM:

          Sure.

     THE VIDEOGRAPHER:

          We're off the record.  As of right

now, the time is 11:17.

(Discussion off the record.)

     THE VIDEOGRAPHER:

          We're back on the record.  The

89

time as of right now is 11:20.

EXAMINATION BY MR. DERHAM:

    Q    Mr. Mallet, I had asked you about when you had gone out to see the trailer. Do you know what those dates were and for how long you were there each time?

    A    It's May 7th and 8th.

    Q    2009?

    A    2009.  And May 6th, 2009.

    Q    And do you know how long you were out there on May 6th?

    A    I think on May 6th, we were there from 4:00 to 7:00 p.m.

    Q    Three hours?

    A    Approximately, yes, sir.

    Q    Okay.  And how about May 7th?

    A    May 7th was from 9:00 a.m. to right around 3:00 p.m.

    Q    Okay.

    A    Somewhere between 2:00 and 3:00 p.m.

    Q    Did you break for lunch?

    A    Yes, we did.

    Q    Okay.  So about how much time did you spend out there on the unit on May 7th?

A    About five hours.

Q    Okay.  And you didn't personally
do any of your own testing, correct?

A    The only -- No.  The only testing
we were allowed to do was blower door and
duct blasting.

Q    Okay.

A    And visual.

Q    Are you aware that Mr. LaGrange
did some of his own air testing while he was
out there?

MR. PINEDO:

    Objection, form.

THE WITNESS:

    Air testing meaning?

EXAMINATION BY MR. DERHAM:

Q    That's just what he told us in his
deposition.  That's what he told us in his
deposition.  I'm just wondering if you're
aware that he did any?

MR. PINEDO:

    Objection, form.

THE WITNESS:

    The only air would be the air
leakage testing.

EXAMINATION BY MR. DERHAM:

     Q   Okay.

     A   When I'm told "air testing,"
usually it means taking samples of air.
That's why I was asking.

     Q   And that's what I'm referring to.

     A   No, sir, I'm not aware he took any
air samples.

    MR. PINEDO:

       Mr. LaGrange didn't take any air
samples.

    MR. DERHAM:

       Was it Mr. Ritter?  Someone told
us they did in their deposition.  Maybe it
was Mr. Ritter.  The depositions will speak
for themselves.

    MR. PINEDO:

       Indeed.

EXAMINATION BY MR. DERHAM:

     Q   Okay.  But, correct, you didn't do
any of your own testing of any kind?

     A   Well, I did test for air leakage,
the thermographic imaging.

     Q   You did your own?

     A   Yes.

92

Q    Okay.  Did Mr. LaGrange also do
that?

A    I think he did.

Q    So you did yours independent of
his?  In other words, he didn't use yours
and you didn't use his?

A    No, sir.

Q    Okay.  Where did you do your
thermographic imaging?

A    In the trailer.

Q    Well, yeah.  Where in the trailer
specifically?

A    Well, all of the rooms of the
trailer.

Q    Okay.  And are there images of
that thermographic testing that you did?

A    Yes, sir.

Q    That was attached to your report?

A    Yes, sir.

Q    So you did thermographic imaging
in every room in the trailer?

A    Yes, sir.

Q    Okay.  Where in each room did you
do the testing?

A    At the wall/ceilings -- the walls

and ceilings.

Q    Was that the only location you did the thermographic imaging in each room, at the wall/ceiling interface?

A    No, sir, walls and ceilings.

Q    Okay.  So where?  Did you do them at the wall/ceiling and wall/floor?

A    Well, I scanned the whole wall and the ceiling of each room.  It's more like a video camera than a 35-millimeter camera in scanning.  I can scan like I'm scanning with a video camera.

Q    Okay.  But it produces still images?

A    It can produce both, but I did stills.  But it can produce both.

Q    Do you have a video of it?

A    No, sir, I didn't do video.

Q    Okay.  Did you do the floors?

A    I'm sure I went over the floors with the camera.  There was nothing of any significance.  I didn't take any photographs of the floors, so nothing -- I'm sure I scanned the floors, but --

Q    Okay.  Are you aware how long

this -- You inspected the trailer out at the

Lottie field, right?

    A    Yes, sir.

    Q    Are you aware how long it had been

out at the Lottie field before you had the

opportunity to go inspect it in May of 2009?

    A    I think it was maybe a year and

two months.

    Q    And do you know if it was ever

activated, meaning was it ever -- was the

HVAC system ever turned on and operated

while it was out there at the field?

    A    I do not know.  Other than during

our testing.

    Q    Right.  Correct.

    A    I'm not aware of it.

    Q    Okay.  Where was it when you

looked at it in the field?

    A    It seems like it was about

six miles from the front gate.

    Q    It was a long ride back?

    A    And it was stuck between other

trailers in a field of some sort.

    Q    You had to take a long drive over

the open field to go find it?

A     Yes, sir.

Q     You don't consider yourself an expert in any maintenance of travel trailers, do you?

A     A travel trailer is just another building, except when they got left out in the rain and shrunk.  It's a building.  And, yes, I mean, maintaining a travel trailer, I owned a travel trailer for probably 12 years.  It's no different than maintaining a mobile home or maintaining any other building.

Q     I guess just so we're clear, specifically, my question is, do you consider yourself an expert in travel trailer maintenance?

A     Specifically travel trailer maintenance?

Q     Yes, sir.

A     No, but I would say that I'm an expert in the maintenance of all types of buildings and structures, including travel trailers.

Q     So you do consider yourself an expert in maintenance of travel trailers?

96

    A    Yes, I know how to maintain them and we do maintain them.  Or I do work on them.

    Q    Do you know where the trailer was manufactured?

    A    Indiana.

    Q    Do you know when it was manufactured?

    A    Excuse me?

    Q    Do you know when it was manufactured?

    A    When?  December 13th of 2004, I believe.

    Q    And do you know how the trailer came to be in the Lottie field?  Do you know its history?

    MR. PINEDO:

        Objection, form.

    THE WITNESS:

        I think I know -- I know what I have reviewed.

EXAMINATION BY MR. DERHAM:

    Q    Okay.  What's your understanding as to how the trailer got from Indiana in December of 2004 to the field in Lottie in

May of 2009?

    MR. PINEDO:

       Let me object.  Are you asking for
like a four and a half year history of his
understanding?

EXAMINATION BY MR. DERHAM:

    Q    If you know where it has been.

    A    Just where it has been?

    Q    Sure.

    A    Not how it was towed or anything?

    Q    Yes.

    A    I think it went from Indiana to
Punta Gorda, Florida, I think is how you
pronounce it.  Then from there, it was
brought to Georgia.  And then from Georgia,
it came to Louisiana.  I don't remember if
it went to the Baton Rouge location first or
if it went to a Dow -- one of the Dow
Chemical locations.  And then shortly
thereafter moved to another Dow Chemical
location.  And then I don't recall if it
went to Baton Rouge or it went to New
Orleans from there.

    Q    Okay.  Do you know how it was
transported to any of those places?

98

A    My understanding, based on some of
the delivery documents, was it was pulled by
truck or some sort of a vehicle as opposed
to rail.

Q    Or put up on a trailer?

A    Or up on a trailer.  Well, then --
I haven't considered that.  By truck, either
being pulled or on the trailer or, you know,
off the ground.

Q    Do you know under what conditions
it was kept stored while it was down in
Florida?

A    No, sir, I don't.

Q    Do you know how long it stayed
down in Florida after it was manufactured?

A    I think it was a year.  Let's see.
2004.  About 10 months.

Q    So in your report, where you had
it remained in storage in Florida for one
and a half years, that's not technically
correct?

A    Correct.

Q    Because that would put it after
Katrina?

A    That's correct.  And that would

have been information that I received after

my report.

     Q    Okay.  And do you know when the

Alexanders moved into the trailer?

     A    I believe it was May of 2006.

     Q    Okay.  And you never saw or

observed the trailer at any time prior to

your seeing it in the Lottie field in May of

2009, right?

     A    No, sir, that was my only

experience with the trailer.

     Q    Okay.  And do you know when the

Alexanders moved out of the trailer?

     A    December of 2006.

     Q    Maybe 2007?

     A    Seven, yes.  I'm sorry.

     Q    That's okay.

     A    I'm getting hurricanes confused.

     Q    It's easy down here, isn't it?

     A    Yeah.

     Q    And then do you know when it was

put out at the lot in Lottie, when it was

put out to pasture?

     A    I believe it was February of 2008.

     Q    Okay.  Did you review the Lottie

Receiving Inspection Checklist?

    A    Yes, sir, I did.

    Q    Okay.  Does that checklist
indicate that there is any mold visible on
the unit?

    A    I'm sorry.  The Lottie checklist?
That I'm not certain.  Oh, wait.  Yes.  The
Lottie checklist.  Yes, I did see that.  I
don't recall anything stating mold.

    Q    Okay.  Did it indicate that there
was any kind of damage or irregularities
with any of the wall covering in the unit?

    A    I would have to look at the
report.  One thing I remembered was a
stained carpet, but I don't recall what else
was on the report.

    Q    I'm looking at Page 7 of your
report, if that would help.

    A    Yes, that would help.

    Q    It's not a memory quiz.  You can
go to your report when you need to.

    A    Okay.

    Q    No. 23, you said the inspection
checklist indicates there is damage to the
floor in front of the doorway and that the

carpet is stained in the unit?

    A    Correct.

    Q    And you don't recall any other --

    A    No, sir.

    Q    -- indications of damages or irregularities from that checklist?

    A    No, sir.

    Q    All right.  Did you take any notes while you were out at the field in May of 2009?

    A    I think so, yes.

    Q    Okay.  Would those be contained in the materials that Mr. Penot is looking through right now?

    A    Yes, sir.

MR. PENOT:

    Do you want them?

MR. DERHAM:

    You found them?

MR. PENOT:

    Not at the moment.  Well, the 6th and 7th?

MR. DERHAM:

    May 6th and May 7th.

MR. PENOT:

Yes, here's the 6th.  Do you want them?

MR. DERHAM:

If you got them.

MR. PENOT:

There's the 6th.

EXAMINATION BY MR. DERHAM:

Q    Are these your May 6th, 2009 field notes?

A    Yes.

MR. PINEDO:

Do you think there might be some additional ones there?

THE WITNESS:

No, I was just looking to see that they were not combined with something else.

Yes, this is the 6th and the 7th.

EXAMINATION BY MR. DERHAM:

Q    Oh, the 7th is attached to that, also?

A    It's attached, also.

Q    Do you know if there's more of the 7th, or would that be everything from the 6th and 7th?

A    That should be everything, unless

it got detached.

        MR. PENOT:

            Do you want them?

        THE WITNESS:

            Unless there's a date on it.

That's the only way I would identify it.

EXAMINATION BY MR. DERHAM:

        Q    You can look just to see

(handing).

        A    (Reviewing documents).

            That's all of them.

        Q    Okay.  I'm going to hold these.

I'm not going to go into your notes yet.

I'm going to wait for a little while.  I

will get us to a point where it makes sense.

            No. 26, which is on Page 8, it

reads, "The inspection and testing methods

were limited to visual only."

            Do you see that?  I'm just asking

if you're there?

        A    Yes, sir.

        Q    But there were blower door tests

and duct blaster tests allowed to be

performed, correct?

        A    Yes, sir.  What I meant by that,

there was no destructive testing.

    Q    Okay.

    A    We did testing, but only that we
could view our results.

    Q    Okay.  Did you go inside of the
trailer?

    A    Yes, sir.

    Q    You did.  Did you notice the
separated wall panel in what I will call the
master bedroom in the front of the trailer?

    A    Yes, sir.

    Q    Did you notice a separated wall
panel in the bathroom of the unit?

    A    Yes, sir.

    Q    Was the panel in the bedroom
actually separated when you were there or
was it held together, meaning was it in a
popped out or was it stuck back in place
kind of?

    A    When I saw it, it was popped out.

    Q    Okay.

    A    However --

    Q    Go ahead.

    A    I'm sorry.  I went into the
trailer after others had been in, so I don't

105

know what position it was in.

Q    That's fine.  But you saw it

popped out away?

A    In an open position, yes.

MR. LAMBERT:

Okay.  Now, you guys need to talk

one at a time, because I want to make sure

this court reporter has got it accurately.

MR. DERHAM:

Jim is really good.

MR. LAMBERT:

I know he's good.

EXAMINATION BY MR. DERHAM:

Q    Did you pull -- Did you look

behind it?  Did you pull out that panel at

all and look behind it?

A    To the extent that I could, yes.

Q    Okay.  Did you observe anything

out of the ordinary behind that wall panel

or in the space you were able to observe?

MR. PINEDO:

Objection, form.

THE WITNESS:

What I noticed was that there was

inch and a half unfaced batt insulation that

was stuck to the back of the wall panel.  I
noticed some oxidation on the staple or the
fastener, the head end of the fastener that
held the one and a half inch by one and a
half inch wall frame in place.

I noticed that the staples were
pulled from the wall framing.  I noticed
that the trim material at the upper part of
the panel -- of the wall was still intact
and undamaged, but the panel was pulled away
from the wall.  And that's all that I noted.

MR. DERHAM:

Okay.  We're going to stop,
because he's at the end of the tape, so we
will stop and do an hour break and come
back.  Try to be back by 12:30.

THE VIDEOGRAPHER:

We're off the record.  The time
right now is 11:42.

(Discussion off the record.)

(Whereupon, a lunch break was taken.)

THE VIDEOGRAPHER:

We're back on the record.  The
time as of right now is 12:38.

EXAMINATION BY MR. DERHAM:

Q     Mr. Mallet, when we had broke, I had asked you about observations you had made behind the wall panel in the bedroom. Do you recall that?

A     Yes.

Q     Okay.  You didn't notice any mold growing behind the wall panel, did you?

A     No, I didn't notice any mold. What I found peculiar was the insulation sticking to the back side of the paneling. That gave indications to me that there was some sort of a moisture issue going on there that was causing the insulation to stick to the panel.

I have seen that on a number of occasions with our water infiltration jobs and other analysis that we performed on other buildings, where if you have high relative humidity, the insulation will stick to the back of paneling or Sheetrock.

Q     Do you know what the relative humidity was out on that field for the year and two months it sat out there before you had to inspect it?

A     No, I don't.

108

Q     Would you expect it to be fairly
typical of south Louisiana?

A     Yes, probably typical as when
Ms. Alexander lived in it.  It's pretty
constant.

Q     What about in the wall panel in
the bathroom, did you notice anything out of
the ordinary?

A     That one was closed and couldn't
really be opened for observation.

Q     Okay.  Under "Purpose and Scope"
on Page 8, you start off with a sentence, it
says, "It is not the purpose of our
investigation, inspection or observations to
render opinions regarding the presence or
the quantity of formaldehyde in the
Alexander temporary housing unit."

      Did I read that correctly?

A     Yes, sir.

Q     Okay.  And there are numerous
areas of your report that you mentioned
"excessive formaldehyde," "elevated
formaldehyde."  Those are not determinations
that you made, that they were excessive or
elevated, correct?

A     That is correct.

Q     You're reciting what you have read
or heard from others, correct?

A     From others, from the testing that
I reviewed, from other studies.  So my
limitation was this was meant to -- what I
explained earlier -- not to opine as to
those areas, but what happens.

My experience, my expertise in
forensics analysis is in what's happening
with that building and why it's happening,
whether it's a 30-story building or a travel
trailer.  A building is a building.  The
science doesn't change.  So I'm looking at
what's going on with that, but not the
chemical reaction that's happening.

Q     You can go to Page 10.  It's item
little -- Well, the items little "a" through
little "d," it appears that you're
discussing some of the new FEMA procurement
specifications?

A     Yes, sir.

Q     What date are you referring to?
What new FEMA procurement specifications are
you referring to when you say the ones that

have been published?

     A    Yes.  Enclosure No. 3, the "new

FEMA procurement specifications require

significantly reduced formaldehyde levels in

mobile homes and park models," and that's

dated April 11th, 2008.

     Q    Okay.  And this trailer was

constructed in December of 2004, right?

     A    That's correct, it was

manufactured in 2004, but I think the

components that are presented in the new

procurement standards were all available in

2004.

     Q    But it's not a defect in the

trailer that it doesn't comply with

standards that are issued in 2008, correct?

     MR. PINEDO:

          Objection, form.

     THE WITNESS:

          No, it is not.  It is just -- The

observation is that the changes that were

made coincide with the recommendations that

we provided in our report of alternative

methods that would have significantly

lowered the impact of the moisture,

temperature and air infiltrations and

reactions with the building components.

EXAMINATION BY MR. DERHAM:

Q    Item little "c" says, "Comply with

HUD's requirements for .35 air changes per

hour in the ventilation system"?

A    Yes, sir.

Q    Do you know if this is natural air

changes per hour or is this at 50 Pascal?

MR. PINEDO:

Objection, form.

THE WITNESS:

No, it is not at 50 Pascals.  50

would be significantly more than .35.

EXAMINATION BY MR. DERHAM:

Q    Right.  Do you know what this is?

A    This is air changes, and it is

inclusive of passive and mechanical.

Q    Okay.  So as the unit is sitting

operating with the air conditioning system

either on or off, windows opened or closed,

that kind of situation?

A    Well --

MR. PINEDO:

Objection, form.

EXAMINATION BY MR. DERHAM:

Q    Well, in other words, do you know
under what condition the .35 air changes per
hour is supposed to be achieved in?

A    No.  They don't state that.
However, the ASHRAE standards, which we work
by under air conditioning functions, how
they're functioning, how they're filtering
in hot, humid climates, and the studies,
like Florida Solar Energy, National
Institute of Technology, ASTM, American
Society of Testing Materials, is that the
ventilation should be controlled
ventilation, should be filtered to remove
the heat, moisture and other contaminants
before it enters the envelope of the
building.

Q    Are you referring to 62.2?

A    62.2 is one, yes.

Q    Is that the one you're referring
to?

A    One, yes.

Q    Okay.  Are you referring to it in
general?

A    In general.

113

    Q     Okay.  Does ASHRAE 62.2 allow for
infiltration, air, as an acceptable means of
ventilating a living space without
mechanical means?

    A     That is correct.  However --

    Q     Do you -- I'm sorry.

    A     However, you have to take a look
at the building as a whole, and that's where
the majority of the failures that I see when
we're doing the forensics analysis on the
buildings, the defects and the failures, is
how that building interacts as a whole.

          The mechanical engineer is
designing an air conditioner.  The electric
engineer is designing the electrical.  The
architect is making it pretty, and the
structural engineer is making it strong.
But nobody for the most part looks at the
building of how it is going to interact as a
whole, and that's what we do.

    Q     That's what a building scientist
does?

    A     That's what that phase of what we
do is, that's correct, where we take the
basics, the very basics of physics, which

you learn in elementary school, that hot
goes to cold, wet goes to dry, high pressure
moves to low pressure.

That's basic, whether we're
building a multi-story building or the
travel trailer.  It all falls within the
same scientific principles of building
pressures.

If you're building a building in
the northern states, you will build it for
negative pressure, but you can't apply that
same principle to the southern states, not
the hot, humid regions of the other states.

So you can't pull a single item
out of a standard to apply to an entire
building or a system.

Q     What was the air changes per hour
in the Alexander unit?

A     1.6 something changes per hour.

Q     Under what kind of state?

A     That would be natural air change.

Q     Have you seen any plans and
specifications for the design and
construction of this trailer unit?

A     I have seen some plans, some

specifications, but I'm not certain that
they apply specifically to this trailer.
Those that I have seen were dated 2005.
Whether they're just revisions of the old,
which appear to be what they are, because
the floor plans appear to be the same, to
the extent that we could observe anything
else -- Because we could not do any
destructive testing.  We were prohibited
from doing anything that would mar or damage
the building -- what we did look at seemed
consistent with the plans dated, I think,
2005.

        Q    Okay.  So you haven't seen any
plans that would have been in effect for the
design and construction of this unit in
2004?

        MR. PINEDO:

            Objection, form.

        THE WITNESS:

            No, I haven't, but if you provide
them to me, I will be glad to review them.
EXAMINATION BY MR. DERHAM:

        Q    Are you familiar with any articles
or studies that conclude that leakage in the

ductwork or the envelope of the building do
not contribute to moisture problems in the
building?

     A   Do not contribute to moisture
problems?

     Q   Yes.

     A   No, I'm not aware of any studies
of that nature.  As a matter of fact, all of
the studies that I have seen, including
several that have been done specifically on
the type of buildings, like manufactured
housing, mobile homes, every indication is
that negative air pressure in hot, humid
climates is detrimental to the building.

       If you're looking at a study that
is performed for or information that's
performed for the frigid or cold climates,
those will show you that the negative air is
a good thing.

       In fact, it's required to have
negative air, because of the pressure
differentials in the northern climates are
reversed from the southern, coastal
climates.  The air is colder and drier in
those other climate zones compared to the

climate zone that we live in here in south
Louisiana.  So the reverse has to occur in
those zones.

        So, yes, there are those studies,
but none that say that for the hot, humid
climates.

        Q     Okay.  Go to Page 23, if you
would, please.  Are you there?

        A     Yes, sir.

        Q     The middle paragraph, "These items
are only mentioned to make note of the
observations."

        Do you see that?

        A     Yes, sir.

        Q     And I think you're talking about
during some of the testing you observed, you
had made some requests that doors and
windows not be opened or people come in and
out during the testing?

        A     Yes, sir.

        Q     The paragraph ends with "the
opening of the door system on three
occasions may have some effect on the test
results."

        Do you see that?

118

A     Yes, sir.

Q     Do you believe that the test
results that were obtained during the
testing are not reliable because of that
occurring?

A     No, sir.  I just made the
observations, because it was requested that
the doors remain closed, and my observation
was people were going in and out of the
trailer.  The effects of it, I couldn't tell
you, because I wasn't taking the test, and I
actually don't even know what test they were
taking.

Q     Okay.  Is it your opinion that
this -- Do you know what I mean by a leaky
building -- I mean a leaky structure?

A     Oh, yes.  That is mostly what I
deal with.

Q     Right.

A     A good part of what I deal with on
an ongoing basis is problems with buildings.

Q     Is the Alexander trailer unit too
leaky, in your opinion?

MR. PENOT:

          Object to form.

119

          MR. PINEDO:

                  Objection, form.

          THE WITNESS:

                  What he said.

EXAMINATION BY MR. DERHAM:

      Q     Okay.  Well, what's your opinion

of the condition of the --

      A     What's your definition of "too"?

      Q     "Too leaky," is there excessive

air moving in and out of the trailer unit

that shouldn't be?

          MR. PENOT:

                  Just the same objection about time

frame.

EXAMINATION BY MR. DERHAM:

      Q     Well, as of the date you inspected

it?

          MR. PENOT:

                  Okay.

          THE WITNESS:

                  If you're comparing it to the

ASHRAE standards of .35 air changes per

hour, yes, the building was excessively

leaky.  But unless you give me another

comparison to go against, that would be my

120

answer.

EXAMINATION BY MR. DERHAM:

    Q    You wouldn't agree that the Alexander trailer unit when you inspected it was too airtight, would you?

    A    It was not airtight.

    Q    Or -- Go ahead.

    A    Too airtight to me would be below .35 air changes per hour.  That would be my interpretation of what too airtight would be.

        Too leaky, my interpretation would be over or some -- not just slightly over, but significantly over .35 air changes per hour naturally.

    Q    Okay.  I'm on Page 25.  Do you see where it says little "b"?

    A    Yes, sir.

    Q    Are you talking about the underbelly lining?

    A    Yes, sir.

    Q    You said, "It was observed that the underbelly contains water presumably from condensation and possible roof leaks"?

    A    Yes, sir.

Q     And that sagging from the weight
of the water being retained in it?

A     Yes, sir.

Q     Is it at all possible for the
water that was in that underbelly to have
been due to condensation when you inspected
it in May of 2009?

A     It's possible.  Not the quantity
of the water that I saw, but it is possible
that it contained some condensation.

Q     From what means?

A     Merely temperature and vapor
differentials.  And if the water was in
there over a long period of time, being
withheld inside the fiberglass insulation,
that's within the belly of that.  It can't
go off the bottom, because the bottom is
sealed.  It appears to be an impermeable
material.

It would have had difficulty going
out the top, because the top was also sealed
with an impermeable material.

So it was quite possible that some
of that moisture that was in there was still
there from condensation.

Q     Did you do anything to determine
whether the water that was in that
underbelly was due to condensation or roof
leak or more likely than not one of the
other causes?

A     No, there was nothing that I would
have known to be able to do and make that
distinction, other than the fact that we did
see roof leaking -- we saw evidence of the
roof leaking in the bedroom area at the
light over the bed, the mattress, the
paneling that supported the bed and on the
floor under the bed.

Q     You say further down in there that
"the water in the underbelly contributes to
active formaldehyde emissions and to the
decay of the floor sheeting which increases
the release of formaldehyde."

Do you see that?

A     Yes, sir.

Q     What is that based on?

A     Well, it's based on the other
experts and the data that the more access
that a product containing urea-formaldehyde
has in contact with moisture, the release of

that vapor, the formaldehyde gases
increases.

        So based on their studies and
their opinions, that here is an access point
for moisture, that it could come in contact
with the formaldehyde-containing materials.

    Q    Do you believe that the unit was
still -- there was still active formaldehyde
emissions taking place while you were there
in May of 2009?

    A    Well, based on the tests performed
by Mr. Scott and maybe Mr. Kaltofen, those
readings I think were at or in excess of 50
parts per billion.

        So just based on the data that
they -- in conversations with them, that
would have been an elevated reading.  I'm
not stating that I'm interpreting that, but
it's just what they informed me, that.

    Q    Did the back of the wall panels
have any kind of adhesive?

    A    We could not tell.  There was only
one panel that was exposed.  And you did say
wall panels, right?

    Q    Yes.

A    There was only that one that was
exposed, and there was very little of it
that the plywood actually was exposed.  The
rest of it, the insulation was stuck to the
back of it.

I mean, just knowledgeable of how
paneling is made, it would be made with an
adhesive, but are you asking is the back
sealed with an adhesive?

Q    I'm just wondering if you know if
the wall panels had any kind of adhesive on
the back of them?  If you don't know, you
don't know.

A    No, I don't know.

Q    I think what I would like to do is
jump to your conclusions that start on
Page 95, I think, or the bottom of -- Well,
I guess technically they start on the bottom
of Page 94, but it appears that your
conclusion No. 1 starts at the top of
Page 95.

A    Okay.

Q    Are you there?

A    Yes, sir.

Q    Okay.  You start -- Okay.  No. 1,

your opinion starts with "the unsafe levels

of formaldehyde are partially a consequence

of the design of the travel trailer"?

        A    Yes, sir.

        Q    Do you know what materials inside

the Alexanders' unit contained formaldehyde?

        A    I think based on Dr. Smulski's

report, I think he identified them.  I don't

recall off the top of my head.  I believe

the wall panels did, but I would have to

refer to his report.

        Q    Do you know the quantity of

formaldehyde in any of the materials that

may have contained it?

        A    No, sir.  Again, the statement

here, I'm not stating it's an unsafe level.

I'm taking from that point forward and

stating that here's how the interaction

occurred between the air, water -- air,

moisture and temperature and how it got to

that, how it got to that material.

        Q    Okay.  And when you say "the

unsafe levels of formaldehyde," again,

that's not you making that determination?

That's just reciting what you saw or was

told by another expert?

    A    Correct.

    Q    Okay.

    A    And the reports that are in the enclosure along with other data that I reviewed, just repeating their or taking their position in how the building affected it.

    Q    No. 2, "The vapor barrier on the temporary housing unit was designed and placed on the cold side of the exterior wall."  And then you talk about studies which have looked at this kind of application.

        What are the typical signs of condensation in a wall cavity resulting from this application of vinyl wall covering?

    A    Actually, the problem with vinyl wall covering being on the cold side is that you can't tell the condensation occurring in the system.

        The wood and other cellulose-based products can actually be decaying before you would actually find the damage or the panels would be deteriorating on the wall.

Q     Were the wood studs behind the
wall panel that is popped out in the master
bedroom deteriorating?

A     No, they were not.

Q     The bathroom one you said was
closed, wasn't it?

A     The bathroom was sealed.

Q     Okay.  Do you know what the perm
rating was on the vinyl wall covering of the
unit?

A     I do not.  That information --
There is very little information that has
been provided to us on this particular
trailer.  But it appeared to be the vinyl
plastic, and if that's the case, then it
would have a very low perm rating.

Q     Okay.  But you don't know that?

A     I don't know that, but from my
experience of seeing these types of
coverings on the panels and Dr. Smulski's
identification of it being a vinyl type
gives indication that it would be a low perm
material.

Q     Did Dr. Smulski tell us what the
perm rating was?

128

A    No, he didn't.  The only way we

could do that is by destructive testing, and

we were not -- I think Gulf States didn't

allow any of that to happen.  We could have

told that.  We would have been able to tell

that perm rating.

Q    You weren't able at any place in

the unit to see the back side of any of the

vinyl wall covering, correct?

MR. PINEDO:

Objection, form.

THE WITNESS:

No, sir.

EXAMINATION BY MR. DERHAM:

Q    Did you observe any blistering of

the vinyl wall covering anywhere in the

unit?  Do you know what I mean by that?

A    Yes, sir.  No.  And that typically

wouldn't be what I would see as an effect of

moisture intrusion into a wall system.

Q    Blistering?

A    On a vinyl wall, especially not a

structure that has been in commission such a

short time.

Q    You wouldn't expect if there was a

moisture intrusion problem for there to be
areas where the vinyl wall covering was
separating from the panels applied to it?

     A    Typically, I don't see that, no.
We will see the wall deteriorate, just
literally start to fall apart before we see
any signs on the vinyl.

     Q    What about any mold or water
stains on or apparent through any of the
vinyl wall covering?

     A    We wouldn't see mold stains on
vinyl or water stains for certain through
the vinyl.  Especially if it had a low perm
rating, the water would not make it through
the vinyl.

     Q    What about mold?

     A    The mold, we would see -- If it
was there long enough, we would see, start
to see some indications of the by-product
from the mold, the waste from the mold, but
again, that usually is in an advanced state
of deterioration when we would start to see
that indication.

     Q    How -- Were you done?

     A    Yes, sir.

Q    How long would that take?

A    Well, it's indeterminate.  It depends on the amount of time and negative air pressure or moisture that the panel is exposed to.

Typically, we don't see these things occur on very new buildings, in this case, a structure that was not in commission for very long, because the negative air pressure is drawing in moisture in small amounts in vapor form.

What happens with the deterioration of building material is when they're exposed to water, especially continual wetting and drying, wetting and drying, it starts off very slow, and then increases in deterioration exponentially.

Q    Is it your opinion that it's defective, per se, to have vinyl wall covering in this unit?

A    With an air conditioning system operating in that unit, yes.

Q    Do you know what the outside of this unit was made of?

A    Aluminum.  Aluminum sheeting

131

material, I believe it was.

     Q   Are there any studies regarding
the application of vinyl wall covering in
travel trailers?

     A   No, but there are numerous of
those with structures and mobile homes.  I'm
not aware of any with a travel trailer, but
the principles are the same.

        Regardless of what the exterior
construction is, if it's constructed in this
fashion with a vapor barrier on the interior
of the wall, the results are the same,
whether I have brick, whether I have stucco,
vinyl siding, aluminum siding, wood.  The
results are the same.

     Q   Is it your opinion that in the
negative pressure state or in a negative
pressure state, that this unit would draw
air in through the vinyl wall covering?

     A   No, sir.

     Q   Especially if it's a low perm
rating?

     A   That's correct.  What would -- I'm
sorry.

     Q   Well, I was going to say if it's a

vapor barrier, it's a pretty good air

barrier as well; is it not?

    A    That's correct.  What would happen

is as the negative pressure is drawing the

hot, moist air from the outside in, when it

gets to the vapor barrier, it stops there.

    Q    All right.

    A    And the moisture then is absorbed

into the wooden material, the backing of the

paneling, or into the stud walls or into the

insulation, and that's where it stays until

such time as something causes it to

exfiltrate.

    Q    Were there any formaldehyde-

containing materials in the wall cavity, I

guess between the back side of the vinyl

wall covering and the exterior of the

trailer?

    A    Not that I am aware of.  The

backing of the paneling would have been

the -- As I understand it from Dr. Smulski

and others, the backing of the paneling

would have been the material exposed that

contained the formaldehyde.

    MR. PINEDO:

Let's take a break here.

THE VIDEOGRAPHER:

The time as of right now is 13:09.

We're off the record.

(Discussion off the record.)

THE VIDEOGRAPHER:

The time as of right now is 1:11.

Going on the record.

EXAMINATION BY MR. DERHAM:

Q    I meant to ask you this earlier.

Did you have to move into a trailer unit at

all as a result of any of the hurricanes we

had?

A    Me?

Q    Yes.

A    No.  One of my people did, but I

didn't.

Q    One of your people, someone who

works for you?

A    Yes.

Q    And where was that?

A    Abbeville, Louisiana.

Q    Okay.  Do you know what kind of

unit they moved into?

A    I don't.

134

Q     Are they a plaintiff in the
lawsuit?

A     They're not.  They did move out of
the trailer, though, within about two weeks
or so.

Q     They didn't file a lawsuit for any
injuries that you're aware of?

A     Not that I'm aware of, but I
didn't ask.

Q     Did you do any testing on their
unit?

A     No, actually not.

Q     Going back to what we were talking
about, I gather that from what you're saying
is there wouldn't be a way for, if there was
any type of formaldehyde-containing air in
the wall cavity, if this was in a negative
pressure state, it wouldn't be drawn in
through the wall paneling, vinyl wall
covering?

A     Not through the panel itself.  Not
through the vinyl wall covering itself.

Q     Okay.

A     But at all of the edge
materials --

Q     Yes, I understand.

A     Yes, but not --

Q     I'm just talking about solely from basically floor to ceiling of the wall and wall covering, it's not going to get through there?

A     No.

Q     It's got to find other places?

A     Yes, that's correct.

Q     Okay.

A     But that makes the situation even more detrimental, because it can't dry out. You see, from what I understand from formaldehyde, it correlates, it tracks parallel to all of the conditions that are favorable for mold and mold growth, and we deal with that almost on an everyday basis.

       What I understand causes activation of the formaldehyde gases is the exact same thing, exact conditions, exact building construction, means, methods, materials that relates to the manifestation of mold.

Q     Okay.  And you didn't find any mold in what you were able to observe?

A    Again, I saw probably about a two square foot area of the back side of the paneling, and that was about it.

Q    Okay.  So, "no"?

A    Sorry.  No.

Q    How much air was -- If we assume this was in a negative pressure state, how much air was having to be pulled in from the outside into the unit as make-up air?

A    Let's see.  There was about -- I think it's 246 cfm's.

Q    That's drawn in from the outside?

A    Yes.  Total.

Q    That's the heating and AC?

A    Yes.

Q    What about just the AC system?

A    Just the AC system was a total of 76 cubic feet per minute.

Q    Okay.  And that's what the duct was leaking total, correct?

A    Totally, yes.

Q    Okay.  Now, part of that leaks to the inside and part of that leaks to the outside, correct?

A    Well, that's correct.

Q    Go ahead.  How much of it was it
losing to the outside?

A    To the outside was 29 cubic feet
per minute.

Q    Okay.  So does it have to pull in
29 cfm's from the outside to make that up?

A    Well, actually, it's leaking into
the ceiling cavity, so it's pulling in from
the inside envelope of the house, the travel
trailer, 76 cubic feet per minute.  It's
bringing back in, it just happens to be
captured in the attic -- well, the ceiling
cavity, which is unconditioned air space, so
it's bringing back into the building 76
square feet -- cubic feet per minute.

Q    47 cfm, are you looking at
LaGrange's material?

A    I am, yes.

Q    Okay.  And that's what you're
basing these answers on, right?

A    Yes, sir.

Q    The 47 cfm that's leaking is
leaking to -- I think you said it's leaking
to the inside?

A    It's leaking into that ceiling

cavity.

Q    Okay.

A    And they call it the inside,
because it was within the envelope, outer
envelope of the building.

Q    And then I'm talking about the 29
cfm that he says is leaking to the outside.

A    Yes.

Q    Where is that going to?  That's
outside the trailer, right?

A    Right.  It's just dispersing into
the atmosphere.

Q    So that 29 cfm has to come back
in, correct, has to be made up from
somewhere?

A    Yes.

Q    Where does it get made up from?

A    Well, it's being pulled through
outlets, joints at the ceilings and walls,
plumbing openings, anything that's not
sealed in the building.  It's pulling those
from outside the building atmosphere.

Q    Did you read -- You didn't read
LaGrange's deposition, did you?

A    I did not.

Q      Or Mr. Ritter's deposition?

A      No, sir.

Q      Okay.  Are you aware that at some
point during his testing, Mr. LaGrange had
the HVAC unit running with the doors and
windows and exhaust fans closed and measured
the pressure state?

A      Yes, sir.  I was inside.

Q      Do you know what his measurement
was?  This is without any of the blower door
testing or duct blaster testing going.  This
is just with the HVAC unit running.

A      The duct leakage are you talking
about?

Q      No, the pressure differential of
the trailer versus the outside.

A      I don't recall that.

Q      I will help you out.  It's not in
his report.

A      Well, that's why I was not
recalling.

Q      You can look, but it's not in
there.

A      Right.  Because the pressure
differentials between the exterior and the

interior without the air conditioning system
should be at static -- should be static.

Q    With the air condition system
running?

A    With the AC system running?

Q    Right.  Are you aware of whether
he measured a pressure differential between
the inside of the trailer and the outside of
the trailer?  If you're not aware, that's
fine.  I'm just asking if you know.

A    Well, I'm trying to think if I can
answer that.  I don't know that I can answer
that right off the top of my head.

Q    Okay.

A    Are you asking did he measure the
pressure differentials with the air
conditioning system --

Q    Running and the windows shut and
the doors shut.

A    No, I don't know that, because
typically we use a hand-held manometer to do
that, and then we would have broken seal on
the walls or the ceilings to have done that.

Q    Okay.  You don't know if he did
that or not?

141

A     I don't think he did.

Q     Okay.

A     I don't believe either of the
three of us pulled our manometers out.

Q     Okay.  And you defer to his
deposition testimony if it was different?

A     It depends.  What did he say?

Q     Well, if I say what he said, Chris
is going to object, so I will just let you
read it when you read it.

A     Let him object.

Q     Well, I believe what he told us
was when he had the HVAC system running, he
was able to measure a minus three to minus
five pressure differential or minus three to
minus five pressure state inside of the
unit.

A     Okay.  Which would be indicative
of negative air pressure.

Q     Correct.

A     Right.

MR. LAMBERT:

     Chris didn't object.

MR. DERHAM:

     He didn't object.  I thought that

he would.

    MR. PINEDO:

       I thought I would make you happy
for once.

EXAMINATION BY MR. DERHAM:

    Q   At a minus three to minus five
state, you're going to pull in a lot less
air than you would at a minus 25 or minus 50
Pascal state, correct?

    A   You will.  However, even as small
as a one negative Pascal can create problems
in a building.  It is enough to create
conditions conducive to mold growth and
parallel that to moisture entering the
building products.

    Q   Okay.  In a unit like this, if you
were at a minus three to minus five pressure
state, where is the air going to be drawn in
from?

    A   Any opening in the cavity, in the
envelope.

    Q   Now, that situation compared to a,
say, minus 50 Pascal state is going to draw
in air from -- The air is always going to
come in through the path of least

resistance, right?

A    Correct.

Q    Just openings would be the easiest
way to get in, correct?

A    Correct.

Q    Without having to be pulled
through any kind of material, right?

A    Yes.

Q    So if there were openings,
penetrations to the outside that were
unsealed, that's going to be the easiest way
for the air to get in, right?

A    That would be the easiest way, and
depending upon the -- In real life, real
time situations, it's going to depend on
wind, position of the building, whether it's
in shade or not, the outside temperature.
So the path of least resistance may not be
that hole, it may be somewheres else,
depending upon other circumstances.

Q    Do you know how many cfm's -- I
just say that easier, so I don't say square
footage, which it's cubic feet.  I just say
cfm's -- would pass through the bathroom
exhaust vent with the cover down?

          MR. PINEDO:

                With the cover down?

          MR. DERHAM:

                Yes.

          MR. PINEDO:

                And you're talking about cubic

feet per minute?

          MR. DERHAM:

                Yes.  I just say "cfm," because if

I try to say the words, I always do what he

just did and say "square feet."

          THE WITNESS:

                I'm not sure if the data that I

have gives that indication of how much, if

any, would be drawn through there.

EXAMINATION BY MR. DERHAM:

     Q    Okay.

     A    If you have that data, I would

like to look at it.

     Q    I don't.

     A    But typically that --

     Q    I'm just asking if you know what

it was.

     A    That unit is sealed to prevent air

and moisture penetration.

Q     Do you know if this bathroom vent
was an airtight seal when it was down?

A     When we did it, no, I don't.

Q     In this negative pressure state,
are you able to tell us where the air was
being drawn in from?

A     No, because it's going -- Well,
yes and no.  By the thermography, we were
able to identify the areas of temperature
anomalies, which usually equates to the
ability for air to infiltrate in those
areas.

They're not sealed; therefore, you
have a movement of heat from the inside
to -- the outside to the inside.  That we
could quantify any particular area, no, we
couldn't, because we didn't do those
specific type tests.

Q     That's basically my question, was
did you do those tests to determine where
the air was coming from?

A     No.  I don't know that we could
have even performed those in that little
bitty -- in such a small area.

Q     Okay.  If you're pulling in this

146

hot, humid air, would there be evidence of

mold at those areas?

    A    No, especially if they're

concealed in the wall systems and the floor

systems and the ceiling.

    Q    Well, would there be mold in those

cavities?

    A    There could very well be.

    Q    Okay.

    A    But we weren't allowed to test for

mold either.  So what we have is the

limitations that were placed upon us in our

inspection.  We weren't able to do any

destructive testing.  We weren't able to do

any mold testing.  We were limited to

visual.

    Q    Let's move on to your third

conclusion, "An effectively designed vapor

barrier was not placed on the exterior side

of the wall framing just below the exterior

skin of the housing unit."

    A    Go ahead.

    Q    You're referring to the underbelly

there, aren't you?  Is that what you're

talking about?

     A    Let me get to that.  I don't think
so, but let me -- No. 3?

     Q    No. 3.

     A    No, sir.

     Q    What are you referring to there?

     A    I'm referring to a vapor barrier
placed on the outside of the framing of the
exterior walls under the aluminum siding
or -- For lack of a better word, I will just
call it siding or sheeting for the envelope.

     Q    At the bottom of the trailer?

     A    No, sir, the walls.

     Q    "On the exterior side" -- Oh, so
when you say "below the exterior skin,"
you're talking about -- Is this the same
as -- Is this just more elaboration on
No. 2?

     A    It's an extension of -- No. 2
tells -- is telling us that the vapor
barrier is present.  It's just in the wrong
place.

     Q    I got you.

     A    No. 3 is telling us that it should
be on the opposite side of the wall --

     Q    Okay.

148

A     -- for it to be effective.

Q     I got you.  I thought that might be a possibility, but with the word "below," I was thinking below versus on the interior side of the skin or the exterior side of the skin.

A     Yes, sir.

Q     You're still dealing in the vertical plane?

A     Only in the vertical.

Q     Okay.  That's fine.  What would be an effectively designed vapor barrier to be placed on the exterior side of the wall framing just below the exterior skin of the housing unit on this type of travel trailer?

A     Something like a Tyvek air barrier, moisture barrier.

Q     Did you see a Tyvek barrier out there?

A     No, sir, I did not.

Q     Did you read Mr. Ritter's report?

A     Yes, I did.

Q     Okay.  You don't recall him saying in his report that there was an opening through the Tyvek barrier?

A     Yes, sir.

Q     Well, that indicated there was a
Tyvek barrier?

A     Not on the walls.

Q     Not where?

A     He's referring to the underbelly
of the mobile home has a Tyvek barrier.

Q     Do you know where it was he saw
the Tyvek barrier?

A     On the underside of the mobile
home.

Q     That's what he's talking about?

A     Yes, sir.

Q     Do you know where the electric
converter was on this travel trailer?

A     Yes, sir.

Q     Was it underneath the trailer?

A     No, sir.

Q     It was on the side of the trailer,
right?

A     No, sir.

Q     Where was it?

A     Inside the trailer.

Q     But it has to go to the outside;
does it not?

A     Yes, sir.

Q     Okay.  Was there any Tyvek barrier
around that penetration?

A     I think that's the penetration
that had duct tape on it.

Q     Okay.

A     The penetration -- I mean, the
penetration goes through the Tyvek barrier.
And I usually don't use the phrase "Tyvek
barrier."  It's a plastic or some other type
of material.  I guess that was his method of
explaining what it was he was observing.
But you typically have the wiring or piping
goes through the barrier, and then that
should be sealed.

Q     If Mr. Ritter said that he
observed a Tyvek barrier at the location
where the electrical converter was going
through to the outside, do you have any
reason to believe that there wasn't a Tyvek
barrier?

MR. PINEDO:

        Objection, form.

THE WITNESS:

        Well, it's not that I don't

believe there was a Tyvek barrier, but the
converter wiring penetrated the underside of
the travel trailer, and he's calling the
underbelly the Tyvek barrier.

EXAMINATION BY MR. DERHAM:

Q     Okay.  Well, we will just --

A     You see, the converter doesn't
penetrate the wall.

Q     The converter itself?

A     Well, neither does the wiring.
The converter is inside the closet behind
the bathtub and the wiring goes down through
the floor.

Q     Okay.  Do you know where he saw
daylight through?

A     Yes, sir.

Q     Where was it?

A     In the closet of the converter.

Q     Looking down to the ground or out
to the side?

A     Down to the ground.  He and I were
photographing it at the same time.

Q     So you think he's calling that
underbelly skin Tyvek?

A     No, I know he's calling it Tyvek.

152

Q     Do you know if a Tyvek barrier is
mandated or required in this type of travel
trailer construction in the area where
you're saying it should be?

A     I have not seen the specifications
for this trailer.  However, in all buildings
utilized in this temperature zone or climate
zone, a vapor barrier should be on the
exterior side of the exterior walls.

Q     What about the climate zone in
Indiana?

A     Different.  Totally different.

Q     Let's go to No. 4.

A     In fact, most of the --

Q     I'm sorry.

A     I'm sorry.  Most of the problems
that I see with some of the travel trailers
we have dealt with and mobile homes
especially is they're built for the wrong
type of climate zone, and they send them
down here and expect them to operate the
same way that they do in frigid or cold
climates, and they don't.  Science doesn't
allow it to.

The physics remains the same.  The

movement of the air is the opposite down

here than it is in the northern climates.

It's trying to escape from the inside in the

northern climates, and the vapor barrier,

the wallpaper vapor barrier is meant to keep

it from going into the wall systems, just

like the barrier on the outside down in the

hot, humid climates is made to keep it from

going into the wall systems, because that's

where the damage occurs, whether it's in the

cold climates or in the hot climates, the

damage occurs in the cavities where the

dewpoints are met.

     Q     Let's go to No. 4, your conclusion

No. 4.

     A     Yes, sir.

     Q     "The designer of the temporary

housing unit failed to take into account the

intended use of their product."

          And then you go on to explain sort

of your appreciation of what the housing

situation, I guess, was going to be after

the hurricanes?

     A     Yes, sir.

     Q     Is housing needs of those affected

by the devastation that would last more than just a few weeks or months, is that something that a building scientist would typically contemplate?

A    It would be something that someone who's not blind or deaf could contemplate, but especially someone who's in the construction industry could contemplate, as dealing with major catastrophes since -- really since Hurricane Audrey.  My daddy stuck me on the roof when I was seven years old.

The amount of devastation that was evident after Hurricanes Katrina and Rita, the number of houses, there were over 600,000 homes that were damaged or destroyed after Hurricanes Katrina -- Katrina especially.

There's no way, there is no physical way, short of a miracle, that people could get back into housing in this area within a few months.  That is in response to, I think, a statement by Mr. Shea, who states that the units are not made for long-term, but anyone who just

witnessed the news would know that the
devastation was so wide -- It covered 90,000
square miles of land, 600,000 homes.  I
forgot how many other homes were damaged
beyond repair.  And there's no way to absorb
that many people into the marketplace and
find residency for them.

      And as I explained further along
in the report, the shortage of materials
alone was incredible, the lack of Sheetrock,
the lack of insulation.

      As a matter of fact, Gulf Stream
themselves experienced those types of
shortages and were not able to provide
according to the specifications they
originally sold the units under, and they
wrote a letter to FEMA stating that there
was a shortage of air conditioning units,
there was a shortage of paneling, a shortage
of flooring.

    Q    This is after Katrina?

    A    This was after Katrina, yes, sir.

    Q    Okay.  This trailer was made in
December of 2004, though, right?

    A    That's correct, but --

Q     So those particular issues you're not saying somehow jeopardized the construction of this particular trailer unit?

A     That -- Well, okay.  Let's go to that particular trailer unit.  The year before, when the trailer unit was made, there were four hurricanes that hit Florida, where that trailer was sent.

When Hurricane Katrina hit -- There were originally 16,000 people who were displaced and put in temporary housing units, I believe, after the storm.  When Katrina hit, there were still 50 percent or so of those people who were still living in the housing units a year and some months after the event.

And there's a long history of people living in temporary housing units more than a few weeks and a few months.  I mean, it goes back to the 1970's, that when people were having to be put up after major catastrophes, that a few weeks and a few months is not going to be a sufficient time for housing of those victims.

Q    And I guess just to cut through
everything, what I'm really asking is, you
don't have any evidence or documents that
you have seen that would indicate that these
substitute materials were used in the
construction of this travel trailer unit in
December of 2004 because of shortages of
other supplies that would have otherwise
been specified?

A    No, sir, but it's irrelevant,
because --

Q    It's irrelevant?

A    It's irrelevant, because the issue
is whether it was short-term or long-term,
whether it was permanent or temporary.  As
Mr. Shea's position was, is that "we made
these for temporary housing.  They were
never meant to be lived in."

Well, if you look at the history
of catastrophic losses and the usage of
temporary housing units -- And by the way,
that was furnished by your all's own
expert -- that to expect that these units
were going to be lived in only a few weeks
or a few months is far beyond that which is

realistic, and one only needed to watch the
news to know that.  They didn't need to be a
contractor.  Especially someone who's in the
temporary housing business.  But certainly
from my standpoint, it doesn't take an
expert to know that it wasn't going to
happen in a week or months.

    Q    Okay.  But again, you don't have
any evidence or documents that indicate that
for some reason in the construction of this
travel trailer unit in December of 2004
these substitute materials, for lack of a
better word, were used as opposed to ones
that otherwise would have been specified?

    MR. PINEDO:

        Objection.

EXAMINATION BY MR. DERHAM:

    Q    That's just the question right
there.

    MR. PINEDO:

        Objection to the form.

    THE WITNESS:

        The answer is "no," and it's
really a moot point, because it's not the
reason for that item being included.

159

EXAMINATION BY MR. DERHAM:

Q    Okay.  Well, I understand that,
but I'm not asking if it's a moot point.
I'm just asking if you have any evidence
that says that happened with this trailer?

A    No, sir.

Q    Okay.  Let's go to -- Well, I
guess while we're on that topic, what
experience or expertise do you have in
determining a manufacturer's intended use of
a product?

A    I didn't have to go very far,
other than Mr. Shea's own statement to
Congress, I think, where he stated those
houses weren't meant for long-term usage.

Q    Have you ever manufactured
anything?

A    Well, every time we build a
building, we manufacture it.

Q    Have you ever manufactured tens of
thousands of something at once?

A    No, sir.

Q    Or designed a product to be
manufactured tens of thousands at once?

A    No, sir.

160

Q     Let's go to No. 5 on Page 96,
where you state that "the manufacturer knew
or should have known that the use of
formaldehyde-emitting materials would be a
problem for the occupants."

          Do you see that?

A     Yes, sir.

Q     Okay.  What is your source for
that statement?

A     Well, the people who
manufacture -- The Gulf Stream people are
also in the mobile home manufacturing
industry, and they have known since actually
the 1970's or maybe earlier that
formaldehyde was an issue in mobile homes.

          And, in fact, in 1986, I believe,
HUD passed regulations governing the
emittance of formaldehyde and made it part
of Part 3280, the manufactured housing
standards.

          So the manufacturer, being in the
manufacturing of manufactured housing -- you
got all those "manufactured" down -- had to
be aware that those conditions existed and
that formaldehyde was an issue in smaller,

closed type of buildings using those

products.

     Q    Does HUD 3280 apply to travel

trailers?

     A    It does now, I believe.

     Q    Did it in December of 2004?

     A    It doesn't.  However, the

awareness of the information, that they were

aware that these were issues, just because

it wasn't governed, they were aware, and I

think that's what it says, they "knew or

should have known," and my position is that

they knew.

     Q    Does Gulf Stream manufacture

manufactured housing?

     A    One of the sister companies does.

Gulf Stream, as I understand it, is the

travel trailer branch of another company,

and I can't remember the name right off,

that manufactures housing, manufactured

housing.

     Q    In 2004, did HUD require the use

of low formaldehyde-emitting materials in

the construction of travel trailers?

     A    No, HUD didn't govern travel

trailers.

Q    Did anything require the use of
low formaldehyde-emitting materials in
travel trailers in December, 2004?

MR. PINEDO:

        Objection, form.

MR. LAMBERT:

        Yes, vagueness.  "Anything."
Common sense?  Science?

EXAMINATION BY MR. DERHAM:

Q    Anything.  Anything?

A    I'm sorry.  Could you repeat it?

Q    It's a vague question on purpose.

A    Can you repeat it?

Q    I'm just asking, is there anything
you know of that required the use of low
formaldehyde-emitting materials in the
construction of travel trailers in December
of 2004?

MR. PINEDO:

        Objection, form.

MR. LAMBERT:

        The same objection.

EXAMINATION BY MR. DERHAM:

Q    Any codes, any standards, any

articles, any studies, any authorities?

        A    No, there's no written standard
specifically stated regarding travel
trailers, but I think the procurement
document states that the manufacturer should
be producing products that are
environmentally -- Let's see.  How does it
say it?  Yes, regarding the environmental
living conditions necessary to provide
emergency housing.

        Q    Do those specifications mention
anything about low formaldehyde-emitting
materials?

        A    It says here "environmental."
"Environmental" takes care of everything
dealing with the indoor air quality.

        Q    Aren't formaldehyde or low
formaldehyde-emitting materials permitted to
be used in the construction of all types of
buildings and structures?

        A    That's correct.  However, in the
case of the travel trailers, we have a
disproportionate amount of material, that my
understanding from the experts increases
the -- the confines of the air space are

164

smaller, therefore, the effects are

different.

        Q     I think you said earlier you're

not qualified to say what levels of

formaldehyde would cause problems --

        A     No, sir.

        Q     -- in persons?

        A     No, sir.  And I prefaced that just

now, that the experts say.

        Q     Okay.  And just so we're clear,

the answer to my question is nothing in

those specifications you just read mentions

anything at all about formaldehyde?

        A     No.  It didn't mention mold, it

didn't mention any other toxins, any other

kind of contaminants either.  It said

"environmental."

        Q     The last sentence of that

conclusion says, "Even low amounts of

formaldehyde emissions from each of the

building products will create a higher

concentration of emissions in such a small

unit," correct?

        A     I'm sorry.  Where are you?

        Q     The last sentence of No. 5.  "Even

low amounts," do you see that?

     A     Yes, sir.  Again, that's based on

the opinions of the experts.

     Q     Okay.  That's fine.  I can move

on.

          So you didn't do any kind of

testing or conduct any formulas or anything

to make any of those kinds of calculations?

     A     No, sir.  I merely took their

information --

     Q     Okay.  You're -- I'm sorry.

     A     -- as it related to the confines

of this trailer space and did calculations

based on average size homes, and the

quantity of materials of average size homes

to the quantity of materials in travel

trailers, you have disproportionate amount

of materials in the travel trailer based on

square footage.

     Q     And you're reciting here what was

told to you or reported by the other

experts, Smulski and those guys?

     A     Well, them and a number of

other -- I think even Lawrence Berkeley

reported that, Lawrence Berkeley Labs, when

they did the testing.  That was part of

their conclusions.

Q    No. 6 conclusion says, "All of the

wall panels, ceiling panels, cabinets,

built-in furniture, floor sheeting and roof

sheeting are constructed with materials that

emitted formaldehyde," correct?

A    Yes, sir.

Q    Okay.  What is that based on?

A    I think Dr. Smulski's inspection

and report.

Q    Okay.  Do you know what in the

materials contains formaldehyde?

MR. PINEDO:

    Objection, form.

THE WITNESS:

    From my understanding, it's

typically the glue.

EXAMINATION BY MR. DERHAM:

Q    Okay.

A    But, you know, I don't know if

that's the only.

Q    Do you know what makes something a

low formaldehyde-emitting product versus one

that would not be?

A    Well, the types of adhesive for
one.  You could use a phenol formaldehyde or
you can use a soy-based adhesive that
doesn't emit formaldehyde gases or it's
very, very low in the emissions or is absent
totally.

Q    And I guess is it the nature of
your opinion that because these all emit
formaldehyde, that somehow this formaldehyde
was put into the living space, or are you
just making the observation that simply all
these materials contain formaldehyde?

MR. PINEDO:

Objection, form.

THE WITNESS:

In the first paragraph, it's just
that the experts reported that those
materials were formaldehyde-emitting
materials.

EXAMINATION BY MR. DERHAM:

Q    Okay.  So you're not drawing a
further conclusion that this formaldehyde
that may have been in those materials is
going someplace or doing something in this
paragraph?  You're just making the

observation that these materials were manufactured with formaldehyde-containing components?

A   Yes, sir.

Q   Okay.  Moving on to No. 7, "The construction means, methods and materials utilized in the unit contributed to the elevated formaldehyde levels."

Do you see that?

A   Yes, sir.

Q   And that's based on what you got from the other experts?

A   Well, that and my knowledge and experience and background in how various components of the buildings function.

Q   Well, I thought you -- I'm sorry.

A   Go ahead.

Q   Were you finished?

A   Yes, sir.  Ask the question.  I will just continue.

Q   I thought you told us that you weren't -- that you didn't have expertise in determining the off-gassing, the activation and off-gassing of formaldehyde in these scenarios?

          MR. PINEDO:

               Objection, form.

          THE WITNESS:

               That's correct.  However, what
this statement means and the rest of what I
have to state in the report is that taking
the information provided by the consultants,
CDC, Lawrence Berkeley, that these products
give off formaldehyde.

               Then that's where my expertise, my
background, my training, my construction
knowledge, having engineers work for me on
an ongoing basis comes in, is that I can now
identify if we have a contaminant, how does
that contaminant get inside of that building
and what are the functions.

               I'm not a mechanical engineer.  I
don't design air conditioning systems.  But
I can tell you when an air conditioning
system is malfunctioning and creating
negative air pressure.  I know how to go
about testing it.  I know what issues it's
going to create with the building.  I know
what issues it's going to create with the
environment in that building.

170

I don't design structures, but I can tell you when the structure itself is not going to be sufficient.  I can't do the calculations, but my experience is going to allow me to identify, far better in my experience than most engineers, what the issues are going on.

I usually don't need engineers to formulate an opinion.  I need engineers to do calculations that I'm not qualified by law to make.

When engineering calculations are made, the State requires that I have a license to make those.  I can't do that, so I bring engineers in.  I choose not to buy every instrument that there is to do testing on buildings, so I bring people in like Mr. LaGrange to do those.

My experience, my background, my training, all of the education that I have obtained over the years dealing with how buildings react to moisture, to air, to temperature, how they interact with one another, that's where it takes over, from that point, how does that gas, if what

they're saying is accurate, that there's
off-gassing, then how does that gas get into
that trailer.

It's the same building science,
the same forensics analysis no matter what
type of structure it is.  The science is the
same.  The physics is the same.

EXAMINATION BY MR. DERHAM:

Q    Have you ever done any kind of
testing to determine how formaldehyde is
activated and off-gassed from building
products?

A    Have I done that?

Q    Yes.

A    No, sir.

Q    Have you done any testing to
determine or evaluate how formaldehyde that
may be off-gassed moves through the air or
through building materials?

A    Have I done what?

Q    Any kind of testing to determine
how formaldehyde that may be off-gassed
moves through the air or through building
materials?

A    I have not done -- And that would

be a perm test, and I don't do perm tests.
However, I have had testing performed on
buildings, analyzed buildings and done
pressure and moisture surveys, thermographic
infrared surveys and analysis that tell me
how that gas, that moisture, whether it's
water in the vapor state, whether it's
formaldehyde, whether it's xylene, whether
it's some other type of gas or gaseous
material, can enter into the envelope of a
building.  That I have done repeatedly, time
and time and time again on numerous cases
and numerous files that are not involved in
litigation.

     Q     But you have never done that
specifically for formaldehyde?

     A     Well, the answer, again, is "no,"
because it's an ASTM that's done in a lab,
so that lab has to be qualified to do that.
I think it's a C94 test to test for the
permeability of a material.

     Q     Why does increased humidity, in
your opinion, result in an increase in
off-gassing of formaldehyde, or do you feel
qualified to give that opinion?

A    Well, I can tell you what I know.

Q    Well, do you feel that you're qualified as an expert to give that opinion?

MR. LAMBERT:

     What was the question again?

MR. PINEDO:

     Objection to form.

EXAMINATION BY MR. DERHAM:

Q    It was what is it about increased humidity levels that causes an increase in the off-gassing of formaldehyde?

     Do you feel you're qualified to give that opinion?

MR. LAMBERT:

     Based on experience?

EXAMINATION BY MR. DERHAM:

Q    Whatever would make you feel qualified.  Or would you rely on other specialists?

A    Well, I would rely on the other specialists and the data that has been provided, the other research information that has been provided.

Q    Let me ask you this.  The second part of that says that "the wall-to-floor

intersection, the wall-to-ceiling
intersection, and other openings in the
walls, floor, and ceiling systems were not
sealed to prevent unfiltered air filtration
or movement to the Alexanders' housing
unit."

       Did I read that right?

A   Yes, sir.

Q   Okay.  Are you talking about
outside air being brought in?

A   Yes, anything behind the vinyl
face of those panels.

Q   Okay.  So this could be air
straight from outside?

A   It could be air straight from
outside.

Q   Coming in through unsealed seams
or openings?

A   Yes.  Actually, the entire
exterior skin of that travel trailer is not
sealed, with the exception of the roof and
the floors.  But the exterior wall skin is
not sealed; therefore, passage of air and
moisture from the atmosphere can happen
quite readily.

Q     If air is coming in from the
outside, wouldn't it act to decrease any
concentrations of formaldehyde or whatever
else may be in the air on the inside?

A     No, not necessarily.

Q     Why not?

A     Well, because if you're bringing
in hot, humid air, you're exposing the
panels to increased amounts of moisture, and
as I understand it, again, from the experts,
that the more moisture the formaldehyde-
containing material is exposed to, the more
the activation of the material.

So if the gas was a steady state
and didn't change in volume and your air
changes or ventilation was steady state,
then that would have been a true statement.
But any increase in the volume of gas with
the steady state of air ventilation is not
going to -- that wouldn't hold true.

Q     Let's go to No. 8 on Page 96.  It
starts with "the air conditioning duct
system is not properly sealed" --

A     Yes, sir.

Q     -- "to prevent uncontrolled air

leakage into the ceiling cavity and exterior

of the housing unit"?

    A    Yes, sir.

    Q    Okay.  Do you know what the

pressure classification of the AC ductwork

in this unit was?

    A    The static pressure

classification?

    Q    Yes.

    A    No, I don't.  There's no

information provided on the duct system for

that.

    Q    Do you know what -- I presume then

from that, you wouldn't know what allowable

leakage rates there are for ductworks for

this kind of system?

    A    Well, actually, it's to be

airtight.  The manufacturer of the air

conditioning system requires that the duct

system be constructed airtight.  "Airtight"

then means no duct leakage.  Because of

the -- And it states it in the installation

instructions of the manual that duct leakage

will lead to problems with the building,

deterioration of the building because of

condensation.

            Any air leakage coming out where
your air is anywhere colder than
approximately 78 degrees hitting the hot,
humid air that's going to be in the confines
of the attic space, condensation is going to
occur.

            As a matter of fact, in this
particular trailer, when we ran the air
conditioning system, that's exactly what
took place.  Condensation began to form, not
only in the ceiling, but on the ceiling
surface.  We have numerous pictures of
condensation on the ceiling.

     Q     Do you know if that was before or
after Mr. LaGrange did his duct blaster
test?

     A     I think my picture sequence, I
think it was before.  Let me check.  It's
before Mr. --

     Q     It's before?

     A     Before he did his duct blaster
test.

     Q     That's fine.

     A     So whatever pressurization that he

placed on the ductwork had no bearing on the
leakage of the duct system.

        As a matter of fact, the leakage
of the duct system is in excess, I believe,
of 10 percent of the amount of volume of air
that is produced by this air conditioning
system.

     Q    Well, there was no calculation of
duct leakage while the air conditioning
system was running, though, correct?

     A    Well, no.  I don't think that's
the way you calculate duct leakage.

     Q    Right.  You run your tests to
calculate duct leakage?  You run the duct
blaster?

     A    You run the test, that's correct.
However, the manufacturer produces the
information of how many cfm's the unit is
producing on high and low speeds.

        At high speeds, the duct leakage
is in excess of 10 percent, which is really
significant, especially given the light
that -- how hot that unit gets in especially
the ceiling cavities.

        The roof in May, we recorded

179

120-degree temperatures on the roof in
May during our inspection.  The cavity is
only four and a half inches in depth at its
deepest location, and there was only
two inches, an R-7, if I'm not mistaken,
value in the ceiling.  So heat transfer, the
heat gain is significant.

So if just above the duct we have
a 120-degree temperature and that duct is
expelling 60 or lower degree air, then we're
going to have a significant opportunity for
condensation to occur.

Q    What did the air conditioning
manufacturer require by way of insulation
value around the air conditioning ductwork?

A    An R-7.

Q    And it's not your opinion that
that wasn't achieved, is it?

A    We weren't provided -- The answer
is I don't know, because we weren't provided
the information as to what the ducts were
made of, but based on our observations, the
amount of space that there was for duct
construction or duct placement and the
probable R-values of the materials that we

saw, we do not believe that that value was
achieved.

Q    What R-value -- What materials did
you see around the ductwork that would give
you an indication as to what the R-values
were?

A    The foam board that the ducts
appeared to be constructed -- I mean, we
were limited to maybe a four-inch diameter
hole to observe, but what we could see
appeared to be styrofoam board or duct
board.

Q    Where did you see a duct?

A    At the air conditioning registers.

Q    Well, Mr. Ritter says he couldn't
see any of the ductwork, so I'm wondering
where it was and how it was you saw it?

A    Well, you could see the duct
through the opening of the -- We couldn't
see the --

Q    You could see the inside of the
duct?

A    We could see the inside of the
duct.  We couldn't see the thickness of the
material.  But based on what we have been

able to find, the thickness of the duct foam

board material doesn't -- and the amount of

space that is in the attic or the ceiling

system, we don't know how they could have

achieved an R-7 value.

    Q    Were you able to touch any of the

ductwork?

    A    Just like that (indicating).

    MR. LAMBERT:

        Wait a minute.  Inside?  Outside?

    MR. DERHAM:

        Inside the air conditioning --

inside the ceiling cavity.

    MR. LAMBERT:

        No, but inside of the ductwork or

the outside of the duct?

EXAMINATION BY MR. DERHAM:

    Q    Did you touch the outside of the

ductwork?

    A    No.

    Q    "No."  You touched the inside?

    A    No.

    Q    "No."  Okay.

    A    We measured the opening, but we

just visually saw the interior of the duct.

MR. LAMBERT:

    We weren't able to do any disassembling.

MR. DERHAM:

    Don't talk to me.  Talk to him.

MR. LAMBERT:

    I'm just saying.

THE WITNESS:

    We were significantly hampered by our inability to open areas to investigate and a lack of data provided on the design and construction of that travel trailer.

EXAMINATION BY MR. DERHAM:

Q     You said that "the air conditioning duct system is not properly sealed" and you said because the manufacturer's installation required it to be airtight.

    Are there any other authorities that you're relying on to say they weren't properly sealed?

A     Well, that they were leaking.

Q     I know.  Well, I assume that's what you mean by they weren't properly sealed?

A     Correct.

Q     What I'm saying is what tells you
that they weren't properly sealed aside from
the manufacturer's installations, in your
opinion, saying they should be airtight?
Are there any other --

MR. PINEDO:

Objection.

EXAMINATION BY MR. DERHAM:

Q     Well, let me finish.  Are there
any other codes or standards or what have
you that govern the air conditioning
ductwork systems in this travel trailer?

MR. PINEDO:

Objection, form.

THE WITNESS:

Not in this travel trailer, but
just govern air conditioning ductwork.  I
mean, there's no specific separate set of
standards for travel trailer ductwork.  Just
like there's no separate set of standards
for the electrical used in there.  It's the
National Electrical Code.

But if you have a set of standards
for this travel trailer, I would be more

than happy to accept them and review them.
But to date, we haven't seen much of any
kind of standards or specifications or how
this trailer was built and what it was
supposed to meet.

EXAMINATION BY MR. DERHAM:

    Q    What air conditioning ductwork
standards would be applicable in the design
and construction of this trailer?

    A    Well, ASHRAE and SMACNA has
standards governing the construction of
ductwork.

          Outside of that, it is the various
studies performed over the years stating
that the air leakage in ducts creates
negative pressures in the buildings that
they operate within, and that in hot, humid
climates, the pressurization in the building
should be positive and not negative.

    Q    What --

    A    So it's --

    Q    I'm sorry.

    A    It's the contribution or the cause
of the negative pressure is the duct
leakage.

185

Q     What ASHRAE standard applies to
ductwork construction?

A     I don't remember the number.

Q     What SMACNA standard applies to
the ductwork construction?

A     I don't recall the number.

Q     Do you know what the shape of the
ducts was?

A     I believe they were rectangular
based on what we could see.

Q     Do you know what the surface area
of the ducts was?

A     No, we do not.  Again, we couldn't
open anything to observe anything.  We were
severely hampered from being able to make
observations that would have been quite
beneficial to us in formulating our
opinions.

Q     Further on in Paragraph 8 on the
next page, on Page 97 -- Are you ready?

A     Yes.  Where?

Q     The fourth -- fifth line, it says,
"This contributed to the additional release
of formaldehyde."

A     Under which number, please?

186

Q    Still the top paragraph.  Still
under conclusion No. 8.

A    Okay.

Q    This has created a negative air
pressure situation.  Air was sucked in from
the outside.  "This contributed to the
additional release of formaldehyde."

A    Yes, sir.

Q    Now, that, you're taking that from
the statements and opinions made of others,
correct?

A    That's correct.

Q    Okay.

A    Always on the cause of the release
of formaldehyde --

Q    I got you.

A    -- my opinion is always based on
those of others.

Q    I got you.  Going to No. 10, and
I'm actually more concerned -- There is
someone else here in the room who is going
to ask you a lot of questions about the
jacking and installation of the trailer, but
the last paragraph of your opinion No. 10.

A    Yes, sir.

Q    Where it says, "Either the
manufacturer, FEMA, or Fluor should have
devised a safe means of jacking the unit by
either increasing the rigidity of the metal,
using a unified hydraulic jacking system,"
and I'm paraphrasing a little bit, "or
should have devised a plan including sound
engineering practices."  The top of the next
page.

A    Oh, okay.

Q    It's your last paragraph of
opinion 10?

A    I'm sorry.  I was --

Q    I got you.

A    I didn't think it went over.

Q    The top of 98.

A    Yes, sir.  I'm there.

Q    Okay.  Have you ever designed a
jacking system for a travel trailer?

A    Not for a travel trailer, but for
numerous other structures.  Whether I'm
jacking up a travel trailer or I'm jacking
up an oil rig, the principles are the same.

Q    Okay.  My question is just have
you ever designed a jacking system?

A     No, but my experience is that I have repeatedly designed systems to jack up structures of all different sorts.

Q     Have you done any work in research or development of jacking systems for travel trailers?

A     No, sir, and I'm not aware that there are jacking systems specific to travel trailers.  If you show me those, I would be glad to review those.

Q     You mentioned increasing the rigidity of the metal frame?

A     Yes, sir.

Q     Do you know what type of steel was used in this metal frame?

A     I think it was a mild steel. Maybe A36.  Maybe.

Q     Do you know the tensile strength of it?

A     A36?  No, not -- No, I don't remember the specific.

Q     You didn't do any testing on the metal?

A     We weren't allowed to.

Q     You're assuming it was A36?

A    Well, yes, I'm assuming, because
it appeared to be just standard steel.

        Again, if the manufacturer has the
data, we would be more than happy to review
it, but we were given really almost nothing
on this travel trailer.

    Q    And are you aware of the special
needs that have to be taken into
consideration for a travel trailer so that
it can be transported in terms of the metals
used?

    A    Well, yes.  I mean, it has to have
some flexing to be able to travel down the
road and absorb the shock.  It's the same as
with a mobile home, except on a much smaller
basis.

    Q    Okay.

    A    But --

    MR. PINEDO:

        Kevin, if you want to take a break
any time you're ready.

    MR. DERHAM:

        Let me finish this, and we can do
that.

    MR. PINEDO:

Were you finished with your
answer?

THE WITNESS:

No.  It's the same principle as a
mobile home.  Mobile homes are designed and
constructed for multiple movements, multiple
conditions, road conditions; therefore,
there is -- The rigidity of a travel trailer
and a mobile home is less than the rigidity
of a conventionally built structure.

EXAMINATION BY MR. DERHAM:

Q    Did you do any research as to what
effects increasing the rigidity of the metal
frame may have on the weight of the unit or
the axles of the unit or the ability of the
unit to flex in transport?  Did you
undertake any of that kind of work?

A    No, we didn't.

Q    Okay.

A    But the simple answer, the bottom
line is if they would have jacked it up
properly, we wouldn't need to have that
discussion.  If they would have had a
unified jacking system of some sort, there
would be no disproportional movement in the

building.

Q     Were there jacks on the unit?

A     Yes, there were.

Q     How many?

A     Four.

Q     Could they not be raised
simultaneously by four people?

A     Yes, they could.

Q     So it doesn't actually lack a
unified hydraulic jack -- I mean -- Well,
it's not a hydraulic system, is it?

A     It's not a hydraulic system.

Q     Does it have to be a hydraulic
system?

A     No, it does not.  But what it does
lack is a proper jacking system to pick it
up off the ground.

Q     How high do the jacks that are on
it right now get it?

A     I don't know, but the jacking --
The specifications on the jacks that are on
the mobile home now -- on the travel trailer
now specifically state not to use the jacks
for lifting purposes.  They're for
stabilizing purposes only.  And that if the

unit is raised off the ground, that twisting

or damage to the frame and doors may occur,

I think is how it's stated.  That might not

be exact wording.

        Q    And did you do any research into

what effects the installation of the unified

hydraulic jacking system may have on the

performance criteria of the trailer?

        MR. LAMBERT:

            Objection.

        MR. PINEDO:

            Objection, form.  That's not what

he's talking about.

        MR. LAMBERT:

            He's talking about installing.

        MR. DERHAM:

            What?

        MR. LAMBERT:

            Nothing.  Never mind.  Objection.

EXAMINATION BY MR. DERHAM:

        Q    You can answer the question.

        A    I don't remember the question now.

        Q    Well, I'm just asking, is it your

opinion that it should have had a hydraulic

jacking system on it?

193

A    On the trailer?

Q    Yes.

A    No, sir.

Q    Oh, okay.  Is that what you're
talking about?

MR. PINEDO:

Are you ready to take a break?

MR. DERHAM:

Let me just ask him one more, so I
can finish with this conclusion.

No, we can take a break.  That's
fine.

THE VIDEOGRAPHER:

The time right now is 2:18 p.m.
(Discussion off the record.)

THE VIDEOGRAPHER:

We're on the record.  The time as
of right now is 2:38.

EXAMINATION BY MR. DERHAM:

Q    Okay, Mr. Mallet.  Getting back
into your opinions --

A    Let me say --

Q    Oh, I'm sorry.  Go ahead.

A    Before I was interrupted.

Q    Not by me?

194

        A     No.  I wasn't quite --

        Q     Okay.  Go ahead.  We were talking

about the hydraulic jacking system?

        A     Yes, sir.  You were asking me if

there's a hydraulic jacking system

specifically designed for travel trailers --

        Q     Well, I think what I was asking

you -- I read this to mean a hydraulic

jacking system should have been mounted,

should have been part of the trailer itself.

        From what I understood from our

conversation, you were actually saying that

the use of a unified hydraulic jacking

system should have been used, not

necessarily that it should have been a

component part of the trailer?

        A     Right.

        Q     Is that correct?

        A     That is correct.

        Q     Okay.

        A     Or some jacking system should have

been used to raise that building, that it

could have been raised in one piece.

        I really could take and design a

jacking system to raise a million eggs and

not break an egg, so whether it's this trailer, an oil rig or whatever, there exists systems out there that you can raise them up at one time.

As a matter of fact, this system here didn't even have to be a hydraulic jacking.  There are inexpensive screw jacks that two guys could have used basically to raise this trailer up in a more uniform method than picking it up one end of the trailer at a time.

Five-ton jacks for 30, 40, $50 could have accomplished this.  You could have used six inexpensive jacks, and two guys could have raised this thing, and that has been my experience.

I mean, we own these kind of jacking systems and use them on a regular basis.

Q    Okay.  And I know there's an attorney here from Fluor who is going to ask you some more questions about that.

A    Oh, okay.

Q    So I will defer that part of the opinion to him.

A     Okay.  It was just as I was
getting ready to do this (indicating) and it
was time for break, I needed to stand, I
just wanted to finish clarifying my answer.

Q     Sure.  Yes, and I guess I just
want to make sure that we were clear that
your opinion in that regard is actually not
so much that it should have been a component
part of the trailer, but that's a system
that in your opinion should have been used?

A     Separate and apart, right.

Q     Fair enough.

A     I don't think that Gulf States --

MR. PINEDO:

        Gulf Stream.

THE WITNESS:

        "Stream."  Sorry.

        -- Gulf Stream should install
jacks on all of their units to jack them up.

EXAMINATION BY MR. DERHAM:

Q     Yes, I see.  I see where you are.

A     Although, you do have a framing
system that would probably allow that.  I
think Gulf Stream has a system used for
railcars that maybe is a tubular, if I

remember reading correctly, that's for rail

transportation, which would take a lot of

movement.

    Q    And the last part of that opinion

says or they "should have designed a plan

including sound engineering practices for

the application of readying the temporary

housing unit for occupancy."

        I'm not trying to be flip, but

what are you trying to say right there?

    A    It's one of those "what you

talking about" questions?

    Q    Yes.

    A    There is no written protocol on

jacking, at least not that I have seen or

that anybody has produced.  All of the data

that I have been presented to date only

shows how to block the unit, what materials

to use, how many blocks to place, but

there's an enormous void between delivering

that trailer and placing the blocks in

place.

        It's left to the discretion of two

guys who deliver the trailer as to how

they're going to jack it up, what sequence

of events, what equipment they're going to
use, how high they're going to bring it.

       There is no data that I have been
presented to date that has any kind of
protocol that the installers were required
to follow.

    Q   Have you ever designed or authored
an owner's manual for any type of product?

    A   No, sir.  We follow numerous
owner's manuals in what we do.  I have never
designed one.

    Q   And again, you're not an engineer
and don't have an engineering background,
correct?

    A   I'm not.  I have extensive
background in both outside, post-college
certifications and education through
seminars, conferences, schools, working with
my own engineering people, and 35 years of
construction and designing and building all
kinds of complexes that affords me an
incredible amount of knowledge from training
in the field.

    Q   But you're not qualified to give
engineering opinions?

MR. LAMBERT:

          Look, Counsel, asked and answered,
and he just told you.  And I think the judge
decides who can give opinions.

          MR. DERHAM:

          Well, that's fine.

          THE WITNESS:

          Well, actually, I'm able to give
those opinions, because that has been
brought up to the engineering board in the
past, and they found that the opinions that
I give dealing with litigation are at the
discretion of the courts and not under the
auspices of the engineering board.

EXAMINATION BY MR. DERHAM:

     Q    Have you ever been recognized by a
court of law as an expert in any field of
engineering?

     A    Not in engineering, but in the
implementation.  Again, what I don't do is
calculations or I don't do them for
presentation purposes, but the opinions that
I have rendered in the past, which are
parallel and in some cases identical to the
information that I have gathered and written

200

about in my report, are identical to those
that I have rendered in courts over and over
again on numerous occasions.

    Q    Have you ever been recognized by a
court of law -- Well, have you ever been
offered in any court of law as a warnings
expert?

    A    No, sir.

    Q    Have you ever been recognized by a
court of law as a warnings expert?

    A    I have never been tendered in that
field.

    Q    Some people call it human factors.
Are you aware of that phrase?

    A    No, sir.

    Q    Okay.  So I take it then you have
never -- you don't consider yourself a human
factors expert if you're not aware of the
phrase?

    A    No, sir.

    Q    Okay.  No. 13, you comment on "the
manufacturer failed to conform to its
express warranty," and then you go on to
cite the August 12th, 2004 FEMA Travel
Trailer Procurement Specifications?

A    Yes, sir.

Q    Okay.  What, in your opinion,
constitutes an express warranty?

A    Where a person is expressing what
they're going to provide as far as a
warranty or what their limitations are in
ways of the warranty.

Q    So --

A    As it --

Q    I'm sorry.

A    As it relates to warranty.

Q    Have you ever been tendered as an
expert in warranties or compliance or
conformance with warranties?

A    Yes.  Actually, in cases, I'm
oftentimes -- I oftentimes testify in
building codes and standards, and in those
building codes and standards, the warranty
issue comes up on numerous occasions, how
the code or standard applies to the
particular instance and does it fall with or
outside of the warranty period for that
item.

Q    By that, you're talking about
particular products or --

A     Actually, it could be systems, more systems than products, but sometimes products, yes.

Q     Okay.  What expertise do you have in the conformance with a warranty of a product?

A     Well, for -- Okay.  I'm sorry.

Q     No, go ahead.

A     Let's use this trailer and this air conditioning system, for instance.  I think the warranty states that the installer has to comply with the terms of the installation.  Otherwise, the warranty is voided.

I'm qualified to assess, because of my background in dealing with buildings and the sciences in buildings to assess that that air conditioning duct system does not conform to the requirements of the warranty of that dometic system, because it leaks, and that damages occurring or injury occurring from that would fall outside of the coverage of that warranty.

Q     This might help me a little bit. What express warranty is it, what is the

express warranty document that you are

saying Gulf Stream failed to conform to?

        A     Well, when the Government set the

specifications on the FEMA trailer and they

provided the bid and the trailer, the

express warranty is what FEMA is requiring

the manufacturers to provide.

        Q     Okay.  So it's your opinion that

the FEMA Travel Trailer Procurement

Specifications are the express warranty that

Gulf Stream did not conform to?

        A     Yes.

        Q     Okay.  The last sentence of that

opinion states, "The condition of the

Alexander trailer as delivered breached Gulf

Stream's express warranty."

             Do you see that?

        A     Yes, sir.

        Q     That last sentence?

        A     Yes, sir.

        Q     I think it's the last sentence.

13, yes.

        A     Yes, sir.

        Q     When you say the "trailer as

delivered," as delivered when or to whom?

204

What time frame are you talking about?

      A    At the time of manufacture.

      Q    How do you know what condition the trailer was in at the time of manufacture?

      A    Well, because of the conditions that it was in when we inspected it, especially the air conditioning system.

         The FEMA specifications require that it be constructed to be transported, activated and deactivated on repeated occasions and that the product that FEMA is producing is constructed to a superior workmanlike manner.

         The duct system would have been installed in that manner, because it's an enclosed system.

      Q    What's a "superior grade quality of workmanship"?  Do you know what FEMA's definition of that is?

      A    I would need to have Gulf Stream give me the standards that they were working by, because they were the ones that were producing this product, and to produce it based on a superior quality of workmanship, they would have had to have had standards in

place to know what they were building their

product to.

        So I would need Gulf Stream to

produce those standards to which they were

constructing that travel trailer.

    Q     Okay.  Just so we're clear, it's

your opinion that the condition of the air

conditioning system as you observed it in

May of 2009 is the condition that the air

conditioning system was in at the date of

manufacture in December of 2004?

    A     Yes.

    Q     And that nothing in that four and

a half year period could have caused or

contributed or otherwise affected the

condition of the air conditioning system?

    MR. LAMBERT:

        Objection.

    THE WITNESS:

        There was nothing that gave me

indication to any other cause for the duct

leakage, because if they built it with holes

in the duct, that would have been done at

the time of the manufacture.

        If they built it with materials

that didn't withstand the conditions placed

upon it by the temperatures and humidities

it was subjected to, then that was required

by FEMA in their standards.

          Any deterioration that would have

occurred with that duct system would have

been from less than superior quality of

workmanship/materials used.

EXAMINATION BY MR. DERHAM:

     Q     Materials, not methods?

     A     Well, the method would have been

if -- Let me use an example, that if they

used duct tape to seal the ducts, that would

have been less than superior quality

workmanship.

          Now, I don't know what they did.

That's only an example.  But the fact that

they used a product that was less than --

that would produce less than superior

quality workmanship is where that breach

comes in.

     Q     Can rodents cause damage to air

conditioning ductwork?

     A     They can.  However, I think the

standards also deal with the environmental

issues and having it sealed properly, so
that those conditions don't occur.

     Q     Can the transportation of the unit
off road cause -- jeopardize the ductwork
connections?

     A     It's possible.  However, the
standards state that -- the FEMA standards
state that the manufacturer is to design and
construct a unit that will withstand
repeated activations and deactivations and
transportation.

          So the manufacturer knew that this
unit was going to be subject to various
conditions, various movements, various
set-ups and take-downs, so they should have
used products and methods that withstand
that condition to which FEMA was setting in
their procurement specifications and
standards.

     Q     Did the manufacturer know that the
unit was going to be pulled back and forth
repetitively across a field like the one in
Lottie?

     MR. PINEDO:

          Objection, form.  It assumes facts

not in evidence.

     THE WITNESS:

        The field in Lottie was a road,

albeit it was dirt.

EXAMINATION BY MR. DERHAM:

     Q    You drove six miles back in the

field in Lottie to get to the trailer?

     MR. PINEDO:

        Objection, form.

     THE WITNESS:

        Well, I --

EXAMINATION BY MR. DERHAM:

     Q    Isn't that what you said?

     A    No, I didn't.  One of the

attorneys said that.

     Q    I thought you said it?

     A    No.  Six miles --

     Q    From the gate I thought is what

you said.

     A    From the gate, I may have said

six miles.

     Q    Okay.

     A    I don't know how far it is, but --

I don't know how far it is.

     Q    Right.

209

A    But the fact is, is that the unit was supposed to be constructed for multiple applications and multiple installations and movements.

Q    How long was your ride from the gate back to where the trailer was?

A    I don't know.  I didn't time it.

Q    Was it on a paved road?

A    It was not.

Q    Was the field perfectly flat?

A    It was not.

Q    Let's move on to No. 14.  "The manufacturer failed to comply with the required NFPA and ANSI codes regarding the construction of recreational vehicles and the manufacturer's guidelines regarding duct leakage of the furnace and air conditioning systems."

        Did I read that correctly?

A    Yes, sir.

Q    What is the NFPA code you were referring to regarding the construction of air conditioning ducts in travel trailers?

A    I think it's 1192.

Q    Any particular provision of 1192?

A     I don't recall the specific number.

Q     What about the ANSI code, the same question regarding the air conditioning ductwork in travel trailers?

A     That would have been 119.2.

Q     Is that the same as NFPA 1192? Does it say the same thing?

A     They may.  I haven't read the codes throughout to see if they're identical.

Q     Are you aware of anything in the NFPA 1192 that discusses duct leakage for air conditioning systems?

A     Furnace systems, I believe it is.

Q     Furnace systems are different than air conditioning systems, correct?

A     That's correct.  But --

Q     What -- I'm sorry.

A     But if you're asking specifically air conditioning, I don't recall.

Q     I am.

A     I specifically remember duct furnace systems.

Q     Forced air heating systems?

A     Forced air heating, yes.

Q     And in what way did the
manufacturer fail to comply with the
provision of NFPA 1192 that you feel is
applicable?

A     In the air conditioning -- in the
duct system, if I recall correctly, it
states to follow the air conditioning
manufacturer's guidelines for installation,
and the manufacturer's guidelines for
installation requires airtight ducts.

Q     Okay.  And what specifically did
the manufacturer fail to comply with in the
ANSI code 119.2 as regards the air
conditioning ductwork?

A     The same thing.

Q     Failing to comply with the air
conditioning manufacturer's instructions?

A     Yes, sir, I think that's how it's
worded.

Q     No. 15, "The manufacturer produced
a product that was unreasonably dangerous
because it failed to apply and use
techniques, technology, materials and
workmanship available in 2004 to achieve the

new FEMA procurement specification of .016

ppm for formaldehyde emissions."

          Did I read that correctly?

     A     I think so.

     Q     Okay.  You're not saying that in

2004 a manufacturer should have achieved the

new and current FEMA procurement

specifications, are you?

     A     No, but that the products were

available in 2004 to have achieved that.

     Q     But was it required in 2004 to

achieve that?

     A     No, but it was required to provide

an environmentally safe product.

     Q     In 2004, was the use of

formaldehyde-containing components permitted

in the construction of stick-built homes or

site-built homes?

     A     Formaldehyde-containing materials?

     Q     Yes.

     A     Yes.

     Q     Mobile homes?

     A     Yes.

     Q     Manufactured housing?

     A     Yes.

213

Q     And I guess beneath that opinion
15, you do kind of a risk/benefit, I guess,
analysis, correct?

A     Yes.

Q     And is this in connection with
No. 15 or is this something entirely
different?

A     I think it's basically just a
general -- a general statement based on all
of the findings of the experts and our
findings as to the functioning of the travel
trailer.

Q     Okay.  What experience do you have
in the design or manufacture of products on
a mass scale, thousands of units at a time?

A     None.

Q     Have you done any kind of research
or work to determine the amount of research
and development that would have been
required in this context of mass production
in a short time frame to implement the items
you suggest could have been implemented?

MR. LAMBERT:

        Objection.

THE WITNESS:

I don't think I would have had to do any types of testing.  The information was available when this travel trailer was made, and they were manufacturing mobile homes at the time with some of the products that they're now stating should have been used.

EXAMINATION BY MR. DERHAM:

Q    If all of these items you suggest should have been done, did you do any determination as to what the per unit cost would be to the units?

A    Yes, I did.

Q    What was that number?

A    I didn't have that.  I can give you a total.  I would have to total it up, get it from my files, but I broke it down by various units.

Q    Did you do any research to determine the amount of time it would have taken to implement the ideas you suggested should have been implemented?

A    I didn't do any research, but based on my own experience as a contractor building and utilizing these products, I

incorporated the time necessary to implement
those items.  Some of them was no time
additions at all, some of them were quite
minor in time additions.

     Q    What were these in connection
with, like what kind of products or items or
things are you talking about you have done
that?

     A    Well, for this particular trailer,
actually.

     Q    I thought I just asked you if you
did, and you said not specifically to this,
but in other scenarios you had?

     A    Okay.  Ask the question again,
please.  Maybe I'm not answering it.

     Q    What did I ask, Jim?

          I may have asked unclearly, so let
me see what I said.

          Did you do any research to
determine the amount of time it would have
taken to implement the ideas you suggested
should have been implemented?

     A    And my answer is "yes," that -- I
didn't actually have to do research, because
most of this stuff was already available and

216

already, to my knowledge, what needed to be
done or what could be done to implement
these changes.  Part of dealing with the
building science end of what I do, sometimes
I will give lectures on some of these
subjects.

As a matter of fact, this coming
November, I have been invited to give a
lecture, a three-hour lecture to forensic
engineers on building science and the
products and the interactions of how all of
these components work together with
temperature, moisture, air infiltration,
water infiltration, what kind of products
you can use to avoid when they're making
their recommendations to clients, when
they're finding these issues with buildings,
what type of products they can recommend to
their clients to avoid further problems with
air, water and temperature infiltration from
whatever source, whether it's negative air
or just direct intrusion or poor designs,
the use of the specific types of panels,
insulation systems, ventilation systems.

That's all information that I use

on an ongoing basis that I inspect, test

for, testify to, write reports on, and give

lectures on.

    Q   Have you ever seen a travel

trailer manufactured?

    A   No, sir.  I haven't seen them

being manufactured, but I know how they're

manufactured, and, of course, each

manufacturer builds some product differently

than the others.

        But by taking them apart to do any

repairs and restorations on them, we

certainly see how they were made, how they

were manufactured.  I don't need to see the

process.  All I need to see is the end

product.

    MR. DERHAM:

        Before I tender, I was going to

attach his notes as Exhibit 7, but this is

your original.  I don't want to put a

sticker on it.  So we can maybe have someone

make a copy of it.  We will attach your May

6th and May 7th.  I will just make them as

one.

        And before I pass, I will just

enter an objection to any opinions that are

not set forth in his report or outside the

areas of his expertise.

          And at this time, Mr. Mallet, I

thank you for your time and cooperating with

me, and I'm going to pass you on to some

other lawyers who are going to ask you some

questions.

          THE WITNESS:

               Thank you.

          MR. DERHAM:

               Thank you.

          MR. PINEDO:

               Off the record.

          THE VIDEOGRAPHER:

               The time as of right now is 3:09.

We're off the record.

(Discussion off the record.)

          THE VIDEOGRAPHER:

               We're on the record.  The time

right now is 3:25.

EXAMINATION BY MR. PENOT:

     Q    Mr. Mallet, my name is Charles

Penot.  I represent Fluor Enterprises, Inc.,

in this matter.

Did you personally interview
Ms. Alana Alexander?

    A    No, sir.

    Q    So anywhere in your report where
it says "Ms. Alexander says" or
"Ms. Alexander reported," someone else told
you what Ms. Alexander said?

        MR. PINEDO:

            Objection, form.

EXAMINATION BY MR. PENOT:

    Q    Is that correct?

    A    That's correct.

    Q    Okay.  Was it any one single
person who did that?  In other words, was it
always Mr. Pinedo who told you what
Ms. Alana Alexander said or was it always
Peter Taaffe or did a number of people?

    A    As I recall, I think mostly
Mr. Pinedo.  And I'm saying "mostly."  I
don't think anybody else said, provided me
information, and it was prefaced with, even
when we talked about interviewing
Ms. Alexander, that "her deposition is going
to be taken shortly.  You can just get the
information or verify the information from

220

her deposition."

Q    And you now have the transcript.
You just haven't had a chance to read it; is
that what I understood?

A    Yes, sir.  I think her deposition
was just taken maybe like within the week
maybe as I'm understanding.

Q    No, it was a couple of weeks back,
on a Friday, but I think we're just getting
the final transcripts today and had a rough
a week or so ago.

A    Okay.

Q    But in any event, you haven't read
her transcript?

A    No, sir, I didn't.

Q    And certainly to the extent that
any fact that's important to your opinions,
to the extent that you're relying for your
opinions on any facts that come from
Ms. Alexander, certainly you would rely on
her sworn testimony taken down verbatim as
opposed to what Mr. Pinedo or any of the
other lawyers told you; is that right?

A    Yes, unless there was some
information, factual information to the

contrary.

Q    Like give me an example of what
you mean.

A    If she misspoke about something,
but there's a document that says to the
contrary, then I would probably have to
take -- Let's just say she said her trailer
was delivered in June, but I have a document
from FEMA that says it was delivered in
February.  Obviously, she didn't remember
correctly and I have the document to show
that.

Q    Who designed the Alexander travel
trailer?

A    I don't know.

Q    Well, in your report, when you
refer to the "designer" -- a couple of times
you say the "designer this" or whatnot,
"designer that" -- who are you referring to?

A    Whomever drew and put the
specifications and engineering data together
to produce drawings and specifications for
Gulf Stream to build the travel trailer.

        Now, that may be more than one
person.  It may be a group of people, and it

may be just one person.  I don't know.  I
don't have any information.

     Q    But whoever it is, you're talking
about somebody who did work before Gulf
Stream constructs that particular trailer?

     A    I would hope so, yes, sir.

     Q    Okay.  In a number of instances in
your report, you refer to the
"manufacturer," the manufacturer of this,
the manufacturer of that?

     A    Yes, sir.

     Q    Who are you referring to when you
say the "manufacturer" in your report?

     A    The company that built the
trailer, whichever that -- As I understand
it, there are several companies under one
maybe umbrella company or something of that
nature.  The Sheas own a number of
companies, all dealing with travel trailers
and manufactured housing.  So that's the
company.

     Q    But when you say the
"manufacturer" in your report, you mean one
of the Shea's companies, one of the Gulf
Stream affiliated companies?

223

A     Yes, sir, that is correct.

Q     Now, I take it from your testimony
earlier today, the first time you saw this
trailer was May 6 and 7, 2009, in Lottie,
Louisiana, correct?

A     Yes, sir.

Q     Okay.  So certainly you were not
there when this trailer was installed on
Dale Street on Ms. Alexander's property?

A     That is correct.

Q     All right.  You do not have
firsthand knowledge of how it was jacked up
and put on a blocking system, a system of
blocks at all, correct?

A     Not firsthand, no.

Q     Okay.  Do you have secondhand?
Did somebody tell you who purported to be
the person who had firsthand knowledge of
how it was jacked up?  Did someone tell you
that?

A     The deposition of Mrs. Alexander's
mother, and I don't remember her name, gave
a description of what her observations were
when the trailer was delivered.

Q     Okay.  Now, that deposition took

224

place last Friday, so that was not what you

had when you drafted your report, correct?

     A    No, sir, it's not.

     Q    So when you drafted your report,

did you have any information that had been

provided to you about how this trailer was

jacked up when it was installed on

Ms. Alexander's property?

     A    No, sir.  There's no data

available, to my knowledge.

     Q    Do you have an opinion, have you

offered an opinion either in your report or

are you prepared to offer an opinion today

and at the trial of this matter that you

know how it was jacked up, that is to say

what procedure was used by the installers?

     A    Well, based on -- And this is

Mrs. Alexander, also?  Is that her name?

     Q    You're talking about Ms. Alana

Alexander's mother?

     A    Mother.

     MR. PINEDO:

        Shirley.

EXAMINATION BY MR. PENOT:

     Q    I believe her name to be Shirley

Alexander.

     A    Shirley Alexander, yes.  Based upon what she says and some of the physical evidence of the trailer kind of coincide with one another as to how the jacking occurred.  And I think I lost my train of thought.  Is that your question?

     Q    Yes, that was precisely the question.

     A    Yes.

     Q    Okay.  And I'm going to want to talk about that in greater detail, but what I hear you telling me -- tell me if I got this right -- what I hear you telling me is, when you put together Shirley, Ms. Shirley Alexander's deposition testimony with some of the physical evidence that you looked at at the trailer in May of 2009 in Lottie, Louisiana, you believe that you can tell how it was jacked up?

     A    Yes.

     Q    Okay.  And tell me what you believe, what you think, what your -- Would you call that an opinion, that it's an opinion?

226

A     Yes.

Q     Okay.

A     My assessment.

Q     Well, what is your opinion as to
how the trailer was jacked up?  Well, excuse
me.  I need to back up.

      When you related the history of
this trailer, you are aware that it was put
on blocks we know for sure twice, correct,
sir?

A     Yes, sir.

Q     It was put on blocks in February
of '06, right?

A     Yes, sir.

Q     It was taken off of blocks in
approximately July of '07?

A     July 9th, yes, sir.

Q     And then it was put back on the
blocks all on Dale Street again on July
10th?

A     10th, yes.

Q     2007, right?

A     I'm not -- I don't remember the
date, the year.

Q     It's not a memory --

A     Yes, sir.

Q     Excuse me.  It's not a memory
test.  The FEMA records show when she moved
out.

A     Right.  I just don't remember if
it was 2006 or 2007 that it occurred.

Q     I think the paperwork will show
that it was 2007.

A     Seven.  Okay.

Q     Okay.  So now we got it moved on,
off, on, and then, of course, it is moved
off in the end when it's deactivated to be
taken to Lottie, right?

A     Yes, sir.

Q     Okay.  Do you have any information
that tells you who moved it off the blocks
and back on the blocks in July, 2007?

A     No, sir, I don't have any data.

Q     Okay.  Now, when you say based on
Ms. Shirley Alexander's testimony,
deposition testimony, and your view of the
physical evidence in May of 2009, you can
tell, you believe, how the trailer was
jacked, which jacking are we talking about?

A     Well, the original jacking,

228

because I think that's the one she testified

to is the February, 2006 jacking,

installation.

    Q   All right.  And do you know

whether the trailer was jacked up at all

prior to that?

    A   I do not.

    Q   Are travel trailers meant to be

taken off road by the manufacturer of Gulf

Stream?

    MR. LAMBERT:

        Objection.  Off road?  I don't

know what you mean.

EXAMINATION BY MR. PENOT:

    Q   You can answer.

    A   Well, I would think --

    MR. PENOT:

        Excuse me one second.  Which one

of you is defending this deposition?

    MR. LAMBERT:

        Both of us.

    MR. PINEDO:

        I'm defending it and he's

appearing here for the PSC.

    MR. PENOT:

229

Is that the way this is typically,
the PSC has a representative separate from
the trial team?

MR. PINEDO:

We have been doing that.

MR. PENOT:

There's nothing normal about the
procedures of this MDL that I can tell, so
I'm certainly not in a position to dispute
that.

MR. DERHAM:

I think if they both objected,
it's a stronger objection.

MR. PENOT:

Okay.

MR. PINEDO:

That is unless we --

MR. LAMBERT:

Sometimes I try to get it first,
and, you know -- Never mind.

MR. PENOT:

Deduct five minutes from my time.
I don't know where we were.  Do we have a
question and do we have an answer?  What was
the last question before the side bar?

(Whereupon, the court reporter read back the

requested testimony as follows:

    THE COURT REPORTER:

       Question:  "Are travel trailers

meant to be taken off road by the

manufacturer of Gulf Stream?"

EXAMINATION BY MR. PENOT:

    Q    There was an objection, and I said

you could answer.

    A    I would think that there's -- I

mean, based on what I know about the usage

of travel trailers when I was involved in

the dealership, I mean, they use them for

hunting camps, transporting back and forth

for weekend stays for hunting, for fishing

expeditions off road.  Some of the highways

we have in Lafayette -- in Louisiana are far

worse than what I saw in Lottie.  I mean,

they're pretty bad.

       So I would have to say that, yes,

they would have to be -- there would have to

be some design criteria that as part of the

design criteria that it's not going to

always be on a smooth interstate highway

that the camper travel trailer, you know,

would be utilized on.

Q    Okay.  So -- I'm sorry.  Were you
finished?

A    And I was just going to say that I
don't have anything to that, you know, I
don't have a paperwork that says that they
engineered it that way.  Just on my
experience of usage, I would think they
would almost have to have designed it
accordingly.

Q    Okay.  So you think -- Let me make
sure I understand what you're telling me.
You think that the manufacturer designed the
Alexander travel trailer strong enough to
withstand various types of transportation
loads?  You know what I mean when I say
that?

A    Yes, to the extent --

Q    How do you understand that phrase,
"transportation loads"?

A    Well, the stresses that will be
applied to that unit as it is transported,
whether it's rail or whether it's by road,
that the shocks, the twists, the turns along
the roads, that it should be able to absorb

those.

Q    So I stopped mid sentence, but you believe that the trailer, the Alexander trailer in particular, the chassis -- And I will call it the box.  I don't know what you call it.  The building that sits on the chassis, what do you call it?

A    "Box" is fine, yes.

Q    Okay.  Let's call it the box.  You know what I mean when I say the "box"?

A    Yes.

Q    That that's strong enough to be taken off road and to hunting camps, fishing camps, to be transported by rail, you said?

A    Not that particular unit, but units that they were making.  If you're referring only to Alexander, no, not rail.

Q    Okay.

A    So it's got a lesser degree -- the framing, as I appreciate it, is not as sturdy as the rail ready units.

Q    When you say framing, are you referring to what I call the chassis?

A    The chassis.

Q    The metal thing?

A     Right.  When they buy it, it says
"framed."  They buy it framed, but, yes,
sir, it's the chassis.

Q     I just want to make sure we're
using the same language.

A     Yes, sir.

Q     Are you aware of whether when the
Alexander trailer was built, what sort of
fasteners or what sort of system was used to
attach the wall studs to the flooring system
and to the ceiling system?

A     No, sir, I don't.  None of that
information was provided.  Just on account
of my knowledge and what I saw, they
probably had to use adhesives, but I'm not
certain, because what I did see was limited
to fasteners that were not framing fasteners
from what I could tell.

Q     Explain to me what you mean by
"not framing fasteners."

A     It looks like they may have
used -- not a staple, but a -- All that I
could see was one -- I think one fastener at
the top of the framing.  I will call it a
stud, but it's not a stud.  One and a half

234

by one and a half.  And I can't imagine that
that one fastener or even two fasteners like
that could possibly be used to hold the
framing together on a permanent basis.

    Q    So you think that in addition to
what you saw, there was some other type of
fastening system that fastened --

    A    The box together.

    Q    -- the box together, the wall
framing to the ceiling structure or roof
structure and the wall framing to the floor
structure?

    A    Yes, sir.

    Q    Okay.

    A    But again, I couldn't see it.

    Q    And the better that system is,
that would be -- The better that system is,
the harder it would be for various types of
loads to cause this type of racking that you
talked about in your expert reports,
correct?

    A    No.  The connection between the
wall frame to the floor and the wall frame
to the ceiling would be an independent --
would be independent of the wall frame to

the plates at the top and/or bottom.

The fastening to the plate at the
top was what was readily accessible to us,
and I could have as rigid of a frame
structure for my roof as I wanted, I could
have as rigid of a structure as I wanted for
the floor framing, but if the intermediate
connections between the walls and the floors
are not rigidly connected, then I'm going to
have racking that can occur (indicating), a
hinging effect at either the top or the
bottom.

Q    I think maybe we're not
communicating, and I'm sure it's me, because
I'm trying to speak your language and you
speak your language as your first language.

But what I thought I said was just
that.  In other words, what I thought was
the better the system for tying the wall
studs -- I know you don't want to call them
studs, but the wall studs to the roof
structure and to the floor structure, the
stronger the unit is going to be and the
harder it's going to be to rack it?

A    Yes, sir.  The other more

important element would be what system that
they design and engineer for racking.

    In other words, the studs by
themselves will support a certain amount of
motion, but as in a house, where you see the
corners where they place plywood or some OSB
sheathing within so many feet of the corners
and within so many feet of the walls, there
needs to be a stiffener to keep it from
racking, moving in this direction
(indicating), up and down, so that the
framing alone wouldn't take care of all of
that.

    Q     Okay.  But do you know what sort
of systems were used, for example, on just
that kind of issue in the Alexander trailer?

    A     The only thing that I saw was the
5/32nds thick paneling, I think that's what
the -- or 3.6-millimeter paneling, very
thin, used with staples randomly, randomly
installed.

    Part of the stiffening of a
structure, one of the very important
elements of stiffening a structure is the
exact fasteners and spacing of fasteners and

the location of the fasteners on the
stiffening member.

       If they were utilizing paneling,
the fasteners were just randomly placed and
there were staples to hold it in place.

Q    Okay.  And when you say the
paneling and you're talking about the
staples, it was staples in the paneling that
you noticed to have come loose in that front
bedroom or what some people have called the
master bedroom?

A    Yes, sir, in the suite.  Not just
in that -- not just in that one panel, but
there were some other panels, mostly in that
bedroom, but in the kitchen area I saw two,
two fasteners reversed.

Q    Is that noted in your report?  If
it is, we will get to it.

A    It's photographed, I believe.

Q    Okay.

MR. LAMBERT:

       Was there one by the door
entrance, too?

MR. PENOT:

       You will get your chance.

238

MR. LAMBERT:

      I just don't want to leave anything out.

MR. PENOT:

      Object to the side bar.

EXAMINATION BY MR. PENOT:

Q    Now, did I understand you to say you own a travel trailer personally?

A    Well, I did up until about two years ago.

Q    Okay.  Who was the manufacturer? Did he ask you that?

A    He didn't.  It was an Aljo.

Q    I'm sorry?

A    Aljo.  The manufacturer I couldn't tell you, but that was like Cavalier.

Q    Okay.

A    That was the brand name.

Q    Could you spell it?

A    A-L-J-O.

Q    Okay.  And it was -- You know, we have sort of spoken differently in this case about travel trailers, park models and manufactured housing or mobile homes.

A    Yes, sir.

239

Q    This is a travel trailer as the
Alexander trailer was a travel trailer?

A    Yes, sir.

Q    How long did you have it?

A    I think somewheres around 12
years.

Q    Okay.

A    I think my youngest son was one or
so when I got it, and I got rid of it a
couple of years ago, and he's 16 now, so
about 12.

Q    Did you take that -- First of all,
how long was it?

A    24 feet.

Q    And how wide, just roughly?

A    I would have to say about the size
of the Alexander trailer.  Seven, eight
feet, something like that.

Q    And did it have two axles?

A    As a matter of fact, it had to be
over six feet, because the bed that I laid
on, and I'm 6'3", 6'4", I could lay on the
bed.

Q    Okay.

A    It had two axles.

Q     Two axles a little bit aft of the
center point, just as in the Alexander
trailer?

A     Yes, sir.

Q     Okay.  And do you know what kind
of chassis it had?  I mean, was it two long
I-beams like the Alexander trailer?

A     Yes, sir.

Q     Okay.  Do you know on the
Alexander trailer, were the cross members
welded or bolted, the cross members on the
chassis, what I call the chassis or frame?

A     I don't recall.  I may have
photographs of it, but I don't recall.

Q     If I use the term "fixed" or
"pinned," you would understand that to be
what I just asked, correct?

A     Yes.

Q     "Fixed" being welded, "pinned"
being some sort of bolts?

A     Yes, sir.

Q     Okay.  What would be a stronger
chassis in terms of resistance to this
racking process you have described, a fixed
or a pinned chassis?

A    That would depend.

Q    On what?

A    That would depend on the type of
welding rod that was utilized, the size of
the bead, whether they fillet weld, whether
they solid weld, whether they weld to
flanges, whether they welded the foot and
the head, whether -- how many pins were
utilized, the size of the pins, whether the
pins were tight, how much were they torqued.
Because everything in racking depends on
tightness.  The tighter any structure is,
the less likely it is to move.

Q    Okay.  So we can say that the
tighter it is, the less likely it is to
move, but you don't have enough facts if I
just say "fixed" versus "pinned"?

A    No, sir.  Maybe if I looked at the
photographs, I might be able to tell you.
Maybe we picked up on which one it is, but I
couldn't give you an opinion which is
better, because I don't have -- The factory
would actually have to give us the
inspection reports on the welds if it's
welded and the pin types, whether it's grade

242

five, whether it's grade three, whether it's
just standard grade, the diameter.  All of
those types of things would matter into how
tight they could keep that chassis together.

Q    Did you ever in the 12 to 14 -- I
forget what you said -- years you had that
travel trailer of yours, did you ever take
it off road?

A    Yes.  Not often, but I took it off
road a few times hunting.

Q    Okay.  Like what kinds of places
did you take it off road?

A    Just out to a deer, you know --

Q    A deer camp?

A    A deer camp.

Q    When you say "off road," I know
you made a distinction, it wasn't a road,
but it was shells or a dirt road at Lottie?

A    Yeah.

Q    Did the places you took it, did it
have either shell or dirt roads?

A    I think both.

Q    "Both" what?

A    Oh, like gravel, and then just
dirt, and like where the other campers were,

sometimes it's just a pathway that was cut
where --

Q    But certainly you didn't -- I'm
sorry.  I'm sorry.

A    I was just saying where the -- you
know, where everyone was assembling their
campers, that sort of thing.

Q    But certainly when you drove your
personal travel trailer off road, you drove
it very carefully off road, you drove it
very slowly off road?  You didn't drive it
like you were on a road, did you?

A    No, sir.

Q    Because you didn't want to damage
it, right?

A    Right.

Q    Did your travel trailer have
stabilizer jacks on it like the Alexander
trailer does?

A    Yes, sir.

Q    Four?

A    Yes, sir, four.  In each corner.

Q    And did you ever set it up by
yourself?

A    Always by myself.  My kids were

244

very small.  They were four and one when I

bought it.  I was divorced.  And I would

take them camping, so it was just me.

     Q    So you always -- You said you

always set it up by yourself?

     A    Well --

     Q    Virtually always?

     A    Virtually always.

     Q    I'm not going to say I found

somebody who said they set it up with you.

Don't worry.

     A    Right.

     Q    All right.  So did you use the

stabilizer jacks when you did that, when you

would set it up?

     A    Yes, when I unhooked it from the

truck, I used the stabilizer jacks.

     Q    Okay.  So when you unhooked it

from the truck, it's resting on the tongue

jack; is that right?

     A    The tongue.

     Q    And the two axles or four wheels?

     A    Yes, sir.

     Q    Did you ever have a flat while you

owned that travel trailer?

A    Yes.

Q    Did you change it?

A    No.

Q    What did you do?

A    I called a towing facility to come
and change it, road service.

Q    And did you watch it, watch the
tires being changed?

A    Yeah.  It was on a highway.  We
pulled on the side.

Q    Okay.  How did they change it?

A    I think they used a screw jack --
a scissors jack.  Not screw.  A scissors
jack and placed it right underneath the
connection of the axle and the frame and
just screwed it up enough to take the tire
off.

Q    So how many jacks did they use?

A    Just one.  There was only one
tire.

Q    Okay.  But they lifted that tire
up off the ground with a scissors jack?

A    Yes.  Yes.

Q    All right.

A    And it was --

246

Q     And the pressure point -- I'm
sorry.  You go ahead and clear your throat
and finish.

A     The other tire was right next to
it, so it was supporting.  We just needed to
pick it up just enough to take it off for
where the bolts would align with the tire,
with the rim.

Q     Well, with the fully inflated new
tire put on there, right?

A     That's correct.

Q     All right.

A     But again, it's right next to the
other.  For instance, last weekend I had to
change a tire on my boat trailer.  The same
scenario.  We picked it up just enough to
get the tire off and put the new one on, but
I have double axles on my trailer.

Q     Okay.  But the jacking took place
by the axle.  You're saying you believe the
other tire remained in contact with the
ground, but the one tire that was flat was
lifted high enough to put a new inflated
tire on?

A     Yes, sir.  As long as I got a

247

quarter of an inch of clearance, I can put a

tire on, a rim on a hub.

     Q     So you believe that travel

trailers are built strong enough to

withstand some of the transportation loads

that they take, including if they're taken

off road, but apparently if you drive

carefully and slowly, right?

     MR. PINEDO:

          Objection, form.

     THE WITNESS:

          Yeah, I would think that they can.

Like anything else, if you don't abuse it,

it will -- there are some tolerances for it.

EXAMINATION BY MR. PENOT:

     Q     Okay.  And it's strong enough to

be lifted with one pressure point of a jack,

at least if you do it right by the axle,

right?

     A     Yes, sir.

     MR. LAMBERT:

          Objection.  "Right by the axle"?

He said --

     MR. PENOT:

          Could you just make your objection

248

without giving a speaking objection,

Mr. Lambert?

    MR. LAMBERT:

        No, I'm going to do it the way I

want to.

    MR. PENOT:

        Okay.

    MR. LAMBERT:

        I object.  I object.

    MR. PENOT:

        If it keeps up, okay, we will get

the judge on the line.

    MR. LAMBERT:

        Object, because you're being

ambiguous when you say "right by the axle."

He said that he jacked it up where the axle

was connected to the frame, which is at the

axle.  So there's a difference.

EXAMINATION BY MR. PENOT:

    Q    You can answer.

    A    The question again, please.

    MR. PENOT:

        Read the question back, please.

        And I'm telling you, Mr. Lambert,

if you make speaking objections, we will get

Judge Engelhardt on the phone.   Okay?

     MR. LAMBERT:

        You can do whatever you want.

     MR. PENOT:

        One more and we're going to do
that.

     MR. LAMBERT:

        You can do whatever you like.

     MR. PENOT:

        Okay.

     MR. LAMBERT:

        And you should do whatever you
like.  And I will do what I think is
appropriate.

     MR. PENOT:

        All right.  I'm just telling you,
one more speaking objection, I'm calling the
Magistrate.

(Whereupon, the court reporter read back the
requested testimony as follows:

     THE COURT REPORTER:

        Question:  "And it's strong enough
to be lifted with one pressure point of a
jack, at least if you do it right by the
axle, right?"

Answer:  "Yes, sir."

THE WITNESS:

And the frame, is that what it --

MR. PENOT:

Apparently, you already answered.
I didn't hear it because of the objection.

MR. PINEDO:

Let the witness speak for himself.

EXAMINATION BY MR. PENOT:

Q    But you do believe that jacking --
Well, let me back up.  If I'm driving my
travel trailer down the road and I cut a
corner too short and I run that tire up, the
two tires on whatever side, let's say the
left side, I run it up on a curb, where is
the load being -- where is the load of the
trailer at that moment when it's hitting up
on the curb?

MR. LAMBERT:

Objection.

THE WITNESS:

Where is the load?  On the
trailer.

EXAMINATION BY MR. PENOT:

Q    Where is the load being carried?

MR. PINEDO:

Objection, form.

EXAMINATION BY MR. PENOT:

Q    What part of the question do you
not understand?  Do you not understand the
question?

A    No, sir, I don't, and I'm trying
to --

Q    Okay.  Tell me what you don't
understand about it.

A    If we have the trailer tires on
curb (indicating), the load is still -- the
weight loads are still being carried by the
tires on the axles.

Q    Just like that.  I'm glad you did
that.  That's exactly what I mean.  Are they
carried -- Are they being carried by the
tires and the axles the same way they are
carried, at the same distribution when --
Take your hand off of that and put it down
on the table.

A    (Indicating).

Q    Now, are the weight loads of that
trailer being carried the same way in those
two different circumstances?

MR. PINEDO:

        Objection, form.

THE WITNESS:

        Unless the -- Unless the weight
shifts on it or you have less tire area.
And even less tire area, you would just have
more weight load on a smaller bearing point
on the tire, unless the weight load shifts.

EXAMINATION BY MR. PENOT:

    Q    Okay.  I would like to go to -- I
would like to go through some specifics of
your report now, Mr. Mallet.

        Your report, I think, is
Exhibit 5, huh?  Do you have that handy?

    A    I have the report here.

    Q    Now, if you turn to Page 6,
Paragraph 14, the first sentence in
Paragraph 14, "The Alexanders moved into the
temporary housing unit on May 26th or 27th."

        Where did you get those particular
dates; do you know?

    A    I don't remember.

    Q    The last two paragraphs, "She did
notify her contact person with the housing
unit of this condition."  Excuse me.  And

that refers to the prior paragraph, I think

some odor in the trailer, correct?

    A    Yes, sir, I think so.

    Q    Okay.  And do you know -- Who are

you referring to when you say "her contact

person"?

    A    I think it was her FEMA

representative.

    Q    And where did you get that

information?

    A    I'm not sure if it's in the FEMA

dialogue file maybe.

    Q    "She also asked about a dislodged

wall panel in the bedroom and was told to

duct tape it shut."

        How did you learn that?

    A    From one of the attorneys, and I

don't recall if it was Mr. Pinedo or

Mr. Taaffe.

    Q    Paragraph 15, "A request for

maintenance was made by Ms. Alexander

approximately five months after moving in

regarding roof leaks in the bedroom."

        Again, where did you get that

information?

A    I don't recall if it was from the
FEMA dialogue or from one of the attorneys.

Q    When you say "the FEMA dialogue,"
are you talking about the document that
looks like a --

A    Or maybe a FEMA log maybe is
better.

Q    Oh, okay.  It's got date and time
and seems to record her contacts with them?

A    Correct, or whatever transpired
with that trailer.  Some log of some sort is
what I'm meaning.

Q    And these service people who were
dispatched, do you know who they worked for?

A    No, sir.

Q    And, of course, you say it was
approximately five months after moving in,
but that would be one of those things where
you would defer either to the log or to
Ms. Alexander's sworn testimony, correct?

A    Yes, sir.

Q    So it wasn't immediately?  I saw
in one of your notes in your file something
about a leak in the bedroom within a week of
moving in.  But when you wrote your report,

that's not what you understood?  You

understood it was about five months later?

    A    That's correct.

    Q    Okay.  "After moving in the

trailer, it was noticed that the walls in

the rear bathroom began to buckle."

        You don't know about when that

happened?  You weren't told?

    A    No, sir, I wasn't.

    Q    Okay.  And, of course, that would

be something where you would defer either to

a written record or to her sworn testimony?

    A    Sure.  For instance, if Fluor had,

you know, the documents or the logs or what

went on with maintenance or whomever, then

that certainly would probably log the, you

know, whoever was handling --

    Q    Why do you say Fluor maintenance

records?

    A    I'm just saying whomever.  Whoever

has the maintenance records, those records

would, you know, document or probably

document when those issues actually occurred

rather than someone's memory.

    Q    Okay.  But you don't know -- You

said Fluor's maintenance records.  You don't
know if at this point in time that you're
talking about that Fluor had any maintenance
obligations with respect to this trailer, do
you?

    A    No, sir.  And I think I said Fluor
or whomever's, because my understanding, I
think, was Fluor set it up, but I don't know
what transpired from there.  That's why I
clarified quickly.

    Q    Well, but I want to make sure.  I
want to understand your understanding, and I
want the record to be clear.  You said Fluor
set it up.  But we're talking here about
maintenance, right?  Those are two different
things, correct?

    A    That's correct.  And my memory
just went to, okay, who set it up, and
that's why I quickly caught myself and
elaborated "or whomever," because I wasn't
trying to say Fluor.  It was whomever.

    Q    Okay.  Do you know when Fluor's
contractual obligation to do maintenance on
any of these trailers came to an end?

    A    No, sir, I don't have any -- I

have not seen any agreements or whatever the

maintenance were for those, for this

trailer.

     Q   On the top of Page 7, the

carryover of Paragraph 17 and Paragraph 18,

I assume the source of those dates is that

FEMA log we're talking about, correct?

     A   That's correct.  That I'm

almost -- Well, I'm pretty sure that came

from the FEMA log.  I believe I remember

reading that.

     Q   Did you prepare a draft of this

report, and then revise it in a fashion that

resulted in you dropping a numbered

conclusion from the conclusion section of

the report?

     A   I revised it, but are you

asking -- Are you asking me if I have a

copy?

     Q   No, sir.

     A   Or did I just revise it?

     Q   I think you testified that you

don't have a copy, correct?

     A   Correct.

     Q   Okay.

258

    A    I made revisions, and to be honest with you, I can't tell you.  In reading it yesterday, it was like, you know, I knew I made changes to it, because I could tell that the way I speak and the way I write are two totally different ways.

        I speak like I'm from New Iberia and I write like I'm from someplace else, so when I'm reading, I know if it's still the way that I speak, that I didn't edit it correctly.

    Q    And you believe this is still the spoken Al Mallet?

    A    Oh, yeah.

    Q    Okay.  No, the only reason I say that is at the bottom of Page 8, you say, "Did jacking the trailer from its wheels cause damage to the unit?  (See Conclusions 11 and 12)."

    A    That's one of the things that's all messed up.  The conclusions, we renumbered the conclusions.

    Q    Who's "we"?

    A    I did.  I renumbered the conclusions, because when I dictated, I lost

my place.  My sister transcribed it.  She
didn't pick up that the numbers didn't
correlate, but that's what I do when I edit,
but when I sent the edits back, they didn't
take.

Q    On Page 11, you talk about an
interview with Gary Bunzer.  When did that
occur?  This is, I think, a listing, if I'm
correct, of your various sources, huh?

A    Yes, sir.  That occurred the date
of the inspections.  Mr. Bunzer was at the
FEMA facility in Lottie.

Q    And how long did it last, this
interview with Mr. Bunzer by you?

A    Well, we were inspecting the -- I
call it an interview, but it was our
conversations while we were making the
inspections, looking at the various
components of the trailer.

Q    Well, what did you -- Did you turn
to Mr. Bunzer for any particular expertise
that you felt he had that you didn't?

A    I think the discussions ran more
of, "Well, these areas are concealed.  Let's
try to figure out how to determine the depth

of the framing members," that kind of --

    Q    Did you take from this interview
any opinions, conclusions, or facts provided
to you by Mr. Bunzer that were important to
your conclusions --

    MR. PINEDO:

        Objection.

EXAMINATION BY MR. PENOT:

    Q    -- and opinions?

    MR. PINEDO:

        Objection, form.

    THE WITNESS:

        No, there's nothing that I recall.

EXAMINATION BY MR. PENOT:

    Q    I had something I wanted to ask
you there, and it just slipped away.  You
know, it's one of those --

    A    Senior moments.

    Q    -- senior moments.  You did review
Mr. LaGrange's report?

    A    Yes, sir, I did.

    Q    Do you have any concerns with the
manner in which his data was collected, his
testing process?

    MR. PINEDO:

Objection, form.

THE WITNESS:

No, not nothing that comes to

mind.

EXAMINATION BY MR. PENOT:

Q    It is his testing that is the

basis for your conclusions about the

negative pressure of the unit, correct?

MR. PINEDO:

Objection, form.

THE WITNESS:

Well, that and some of our

observations led us to conclude that we had

negative air, that we had duct leakage

independent of his duct testing.

In fact, I think our photographs

show that we already began to make those

conclusions before he set us his testing

equipment.

EXAMINATION BY MR. PENOT:

Q    Explain that to me.  How do your

photographs exhibit that?

A    Well, we have condensation

occurring in areas where we shouldn't have

condensation.  Typically, you would not have

cold air escaping in some of those areas
that we witnessed just by touch, by sense,
by feel.

Q    Wait a minute.  Duct leakage
doesn't equal negative pressure, right?

A    Duct leakage is a major cause of
negative pressure.

Q    Okay.  But I thought you just ran
those two together.  I thought you said --
Okay.  In other words, you saw what you
thought was evidence of duct leakage, and
that duct leakage was condensation around on
the ceiling inside of the trailer?

A    On the ceiling inside the trailer,
but some of it was around the return air
system, which indicated to me we had bleed
going on there, and to the extent that I
have one cubic foot of air leaking out of
the duct, I have one cubic foot of negative
air pressure occurring, so it's equal and --
It's equal.

Q    Just to make sure I understand
what you're saying is if there's one cubic
foot -- If we have an envelope, what you
call an envelope --

A     Yes, sir.

Q     And you roughly by that mean the living area of this trailer, right?

A     Yes, sir.

Q     And if you have the air conditioner running, this air conditioner was pulling air from inside the trailer and cooling it and recirculating it, correct?

A     Yes, sir.

Q     All right.  And it did that in the space between the ceiling and the roof?

MR. PINEDO:

     Objection, form.

THE WITNESS:

     Yes, sir.

EXAMINATION BY MR. PENOT:

Q     Okay.  And you're saying to the extent that one cubic foot of air is lost in that space where the ducts run between the ceiling and the roof, then there's one less cubic foot of air inside what you call the envelope?

A     Right.  It has to return as much as it produces.  The system has to return as much as it produces.

Q    What is the function of the air
blower test, the door blower test?

A    That depressurizes the unit,
whatever it is that we're testing, and tests
for leakage, air leakage to determine the
tightness, the lack of leaking of the
envelope of the building.

Q    Okay.  So do you rely on that test
for any of your conclusions, the blower door
test?

A    Well, partially.  I mean, the
infrared thermography certainly verified
what the blower door tests were telling us
was that there was -- we had temperature and
air leakages.  As a matter of fact, the
infrared thermography showed the -- clearly
showed some of the duct leakage, air leakage
in the ceiling space.

Q    But can the thermography purport
to measure the amount of that?

A    It can't, but again, it's equal
and opposite.

Q    All right.  But it's the blower
door test that does, right?

A    That measures it.  I mean, we

265

could have done hand-held manometers to test

for negative pressure, but his instruments

were there and that's the purpose of doing

the pressurization test on the unit.

    Q    Did you notice in his report any

what you found to be errors in the procedure

he used, that is Mr. LaGrange, for the

blower door test?

    A    Nothing that comes to mind.

    Q    Okay.

    A    Maybe if you -- I mean, I would be

glad to answer if there was something, but

I'm not recalling anything.

    Q    There's a standard that he was

relying on, was he not, for how to conduct

the blower door test?

    A    Yes, sir.  It was an ASTM

standard, I believe it was.

    Q    And part of that standard is to

insure that the floor drains and plumbing

traps are filled, correct?

    MR. PINEDO:

        Objection to form.

    THE WITNESS:

        No, I think the -- I would have to

look at the standard again, but I believe it

states that we're just to notate anything of

that nature.  We don't know or there's an

unknown.

        Because he called me specifically

on that and asked me, he said, "You know,

the drains were open.  How do I handle it?"

        And I said, "Well, we put it in

the report is how we handle it."  I said, "I

don't care one way or another what the

report says.  That's of no consequence to

me.  That we state what's there is what's of

consequence to me" --

EXAMINATION BY MR. PENOT:

        Q    So if --

        A    -- "or the court."  Sorry.

        Q    My fault.  Are you finished?

        A    Yes, sir.

        Q    And, in fact, his report states

that he didn't know whether the drains and

the plumbing traps were filled, correct?

        A    No, sir.

        Q    And if, in fact, they were not,

that would overstate the apparent air

leakage in that unit, correct?

MR. PINEDO:

Objection, form.

THE WITNESS:

It would overstate it, but quite mildly.  Two things was that we were at the drains when the testing was being performed.  When we placed the house trailer under the first set of tests at 50 Pascals negative, we were drawing in air at 20 miles an hour.  There was no indications -- And you can feel air passage if it's localized, under 20 miles an hour, you can feel air passage.

Then we then dropped the pressure to 75 Pascals, which is 30 miles per -- the equivalent of 30 miles per hour wind.  We again had no air passage or felt anything unusual.  And with that amount of air passing through two inch and a quarter pipes, those pipes would have been whistling.

EXAMINATION BY MR. PENOT:

Q    Okay.  So what I hear you saying is you believe that they were filled?

A    No, what I believe is that they were not of significant impact on the test

results.

Q     And what you're also telling me --
You're right.  You're telling me that there
wouldn't be a significant impact, but you
would feel the wind blowing through them and
you would hear it over the fan in the door?

A     Oh, yes.

Q     Okay.

A     Absolutely.  We were standing
right next to the sink, or actually Ervin
Ritter was standing right next to the sink
when this was occurring.  I was on the
opposite side photographing.

        At one point, I went to the
bathroom while we were testing to
double-check the seal at the bottom of the
tank of the tub to make sure that it hadn't
come undone, and we heard nothing -- I heard
nothing in the bathroom and felt nothing.

Q     Do you know what the term
"winterization" is?

A     Yes, sir.

Q     Does that usually involve removing
water from the pipes?

A     It does, but it also involves the

placement of an antifreeze type material.
Typically, that's how it would occur.

Q    To fill the traps?

A    To fill the traps and to fill the
bowls, yes.  So --

Q    Do you know if this -- I'm sorry.

A    Excuse me.  And I'm okay.  I know
we kind of think the other is finished
sometimes.

That would also be a reason why we
would not have, if the units were
winterized, if the traps were filled, then
the passage of air would not have gone
through.

Q    But do you know whether this unit
was winterized?

A    No, sir, I don't.  Just because
you brought it up, I'm saying that that's a
possibility.

Q    But you believe -- And you
certainly don't know if it was winterized
what the procedure called for and whether it
called for filling the traps with
antifreeze?

A    No, sir, I don't.

270

Q     Okay.  What about the supply

lines, that is the supply, you know, water

supply lines that go into the trailer, were

they closed during the blower door test?

A     I believe the outside area was

closed.

Q     The outside was closed?

A     Yes.

Q     Who closed it?  Or you simply

observed it closed is what you're saying?

A     I think, yes, I observed it as

closed, because I checked the vents on the

exterior before we did the test.

Q     Did you photograph that?

A     I don't remember.

MR. PENOT:

Could we go off the record for a

moment, please.

THE VIDEOGRAPHER:

We're off the record.  The time

right now is 4:27.

(Discussion off the record.)

THE VIDEOGRAPHER:

We're on the record.  The time

right now is 4:45.

EXAMINATION BY MR. PENOT:

Q    Mr. Mallet, on Page 33 of your report -- I don't know what number this is. I think it's "e" -- Well, I'm not going to try to do that.  There's a lot of levels of outline here.

We're on Page 33 of your report, and it is the section called "Roof."  "F," "Roof," and then little Roman Numeral i.

"As noted earlier in the report, the roof was inspected."  And you noted a separation in the sealant material around the perimeter of the roof.  Water was apparently penetrating there, it said, or at least through some of the separations.

Can you tell when that leak started?

A    No, sir, I can't.

Q    Do you have an opinion or belief as to when that started?

A    Well, there were a number of areas around the perimeter that had some apparent openings to it.  Based on just what I understand, it appears that sometime after Mrs. Alexander moved in, she began having a

roof leak problem in the bedroom.  As far as for the others, other openings, there's nothing that I saw regarding roof issues.

Q    Okay.  So let me see if I understood that.  With respect to the separation near the front bedroom or the master bedroom, you believe it happened sometime after she moved in, about coinciding with when she started complaining about the leak?

A    Yes, sir.

Q    And that's just based not on any testing you did or any methodologies that you applied for building science, just that "I see a crack and Ms. Alexander said under her sworn testimony" -- it said actually "in March, April or May of 2007, I started having a leak in the front bedroom," right? That's all it's based on?

A    Yes.

MR. PINEDO:

        Objection, form.

EXAMINATION BY MR. PENOT:

Q    So can you tell what caused that sealant to separate?

         A    No.  It wasn't -- Well, there was

more than one area of opening.  The roof

membrane separated.  The sealant membrane --

the sealant material was cracking, which

could certainly lead to water infiltration

in those areas, because that's what the

caulking was meant to do, was to seal that.

              I think I lost your question.

         Q    Yes, I don't think you answered

it.  Can you tell what caused the sealant to

separate or do you have an opinion or are

you offering or intend to offer an opinion

that you believe you know what caused the

sealant to separate?

         A    No, sir, I don't know what caused

the sealant to separate.

         Q    And you're not offering an opinion

on that?

         A    No, sir.

         Q    The same thing on the next page,

about the roof penetrations, on Page 34.

You talk about, you know, where the bathroom

exhaust vent hood and the plumbing vent went

through, some of that sealant material was

also cracking or coming loose.

The same answers as you just gave
me?

    A     Yeah.  The only indication I can
see there which could kind of relate to the
front area is they either used a material
that was not conducive to or compatible to
the roof membrane or they didn't clean the
roof membrane properly before they put the
sealant material on it, because it was
actually separated from the membrane itself.

    Q    When you say "they," of whom are
you speaking?

    A    Whoever installed the membrane --
No.  I'm sorry.  The sealant.  I would
assume it's at the factory, because there's
no boot on -- there's no other type of boot
or method of sealing the cap on the vent
pipes other than caulking or some form of
adhesive.

    Q    Okay.  On Page 35, "Observations
of the walls in the bedroom revealed a
buckling or bowing in the walls in at least
two places.  One of the panels on the rear
wall was buckled and detached from the wood
framing member.  According to information

gathered, this occurred prior to the

occupancy" -- "prior to the occupancy of the

Alexander family."

        When you say "information

gathered," what information?  By whom do you

have it?  What are you talking about?  Are

you just talking about Ms. Alexander said,

"It was there when I moved in"?

    A    I think I was repeating what I

learned that Ms. Alexander stated dealing

with that buckled wall area there.  And I'm

not sure -- Let's see.  There's buckling

that's occurring in one other area, and I

have photographs.

    Q    Which photograph?  Were you trying

to tell me something?  I'm not

understanding.

    A    Yes, I was reading here, when you

were asking about the buckling and bowing of

the wall system, I was looking to see if the

one that I had in the kitchen area was in

the report, but it looks like that's one

that didn't make the edit -- didn't go

through the edit, but I have the photographs

showing buckling of those walls, also.

Q    Okay.  I want to focus on this one
here for a minute.  You said, according to
the information, you said you think you just
were relying on Ms. Alexander's recollection
and her statement that this separation in
the bedroom was there when she moved in.

You don't know and you can't tell
and you're not offering an opinion as to
when before?  Just before she moved in; is
that right?

A    Before she moved in, yes.  But
going back on the FEMA records, there's no
indication that that was in place between
the time it arrived, I think, in Baton Rouge
on maybe January 14th or something like that
and the inspection, I think, after the
trailer was set up.  There's no indications
of any damage in the inspection.

I think all of the items were
checked off about walls, ceilings, roof,
floors.  So it appears to me that subsequent
to the installation, that occurred, because
of the lack of observations by the
inspectors of those issues.

Q    Okay.  So you are telling me you

think you know when it happened, and you

think it happened between installation and

when she moved in?

     A     Yes, sir, based on what I remember

seeing.

     Q     Okay.  And again, though, you're

not telling us that based on principles of

building science or your experience as a

general contractor?  You're just doing that

by reading some documents, right, and you

didn't see damage, and then you had a lady

who said there's damage; is that right?

          MR. PINEDO:

               Objection.

          THE WITNESS:

               When it occurred?

EXAMINATION BY MR. PENOT:

     Q     Right.

     A     That's correct.

     Q     Okay.  Now, you said there was no

indication of damage before.  You looked at

the Fluor inspection report at the staging

area when it received it back from Union

Carbide?

     A     I think so, yes, sir.

278

Q     And you didn't see any notations
that might indicate there was damage then?

A     Not that I recall.

Q     This paragraph goes on on Page 35
to talk about "it appears the stress on the
frame of the floor and wall system caused
stress releasing the panel from the framing
member."

      Why is it or how is it that it
appears to you that it was stress on the
frame of the floor and the wall system that
caused this release as opposed to -- Let me
back up.  Could there be other causes?

A     Yes, sir.

Q     Okay.  What could some of the
other causes be?

A     Well, as it relates to this
particular panel -- as it relates to that
panel, I was going to say possibly moisture,
but I saw no indications of water damage.
Moisture in and of itself, it would take an
awful long time to have that condition
occur.  It appeared to me that -- And why I
focused in mostly on the -- Which one are we
on?  I want to get the word.

          Q     On Page 35, "j," "bedroom,"

Roman i, "Walls," Arabic 1.

               "It appears the stress on the

frame of the floor and wall system caused

stress releasing the panel from the framing

member."

          A     Okay.  The other reason why it

appeared to me that it was stress-related

was because at the ceiling line, the little

trim that was in place along with the

fasteners and the condition of the back side

of the panels, it appeared that the panel

popped out of place rather than just had

some sort of a deterioration that caused

that movement over time.

          Q     I want to understand that.  When

you looked at the ceiling line, the trim was

still in place?

          A     The trim was still in place.

          Q     And the trim would have laid over

the top of the wall panel is what you're

saying?

          A     Over the wall panel.

          Q     So part of the wall panel was

still under the trim or was out?

280

A    It was all out.  I say "all."  It
was out.  The top that was open, that was
out.

Q    And which --

A    The --

Q    I'm sorry.  Go ahead.

A    The fasteners appeared to be
pulled through the panel or forcing, because
the layers of ply on the back of the panel
were pulled in towards the wall system, and
the fasteners were still in place on the
side, so indications to me was that it
popped.  It was an event.  It may have had
stress built up, but it gave at one time.

Q    Do you know if there had been any
inspections of the trailer before your
inspection?

MR. PINEDO:

Objection, form.

THE WITNESS:

If I'm remembering correctly, I
think there was a FEMA inspection, where
they inspected, but I'm not quite sure.

EXAMINATION BY MR. PENOT:

Q    You guys when you were there, you

guys pulled that panel out, so you could see

as much as you could into the wall there,

didn't you?  Don't I have a picture of that?

    A   I don't know.  That panel was out.

    MR. DERHAM:

       We're on eight.

    MR. PINEDO:

       Do you have another copy of that,

Mr. Penot?

    MR. PENOT:

       No, I sure don't.  It's from his

file.  You provided it.

    MR. LAMBERT:

       Let me see.

    MR. PENOT:

       I didn't expect to hear that

response or I would have had copies of it.

EXAMINATION BY MR. PENOT:

    Q   Why don't you read the Bates

numbers for the folks on the phone.

    A   Sure.  It's ALX-EXP-44-000583 and

582.

    Q   Is that that wall?

    A   That's that wall.  And that is --

    Q   It's pulled out from the -- It's

pulled out a substantial bit; is it not?

A     That's correct.

Q     And somebody's hand is

photographed on that, pulling?

A     That's Mr. Lambert's hand.

Q     Okay.  So Mr. Lambert pulled the

wall out.  Okay.

MR. PINEDO:

Objection.  Side bar.

THE WITNESS:

Well, he was holding the wall.

EXAMINATION BY MR. PENOT:

Q     Excuse me.  I will make it a

question.  When you were there and taking

those photographs, Mr. Lambert, counsel for

the plaintiffs, pulled the wall open, so you

could take that picture, correct?

MR. PINEDO:

Objection, form.

THE WITNESS:

Mr. Lambert held the wall panel

open for me, so that I could photograph it,

but the panel was already out and taped.

EXAMINATION BY MR. PENOT:

Q     It was already out and taped?  I'm

not sure what you mean by that.

    A    There was duct tape.

    Q    But it wasn't -- What you're saying is when you guys walked in on that first inspection, it was open, it wasn't taped together, the two panels?

    MR. PINEDO:

        Objection, form.

    THE WITNESS:

        The panel had duct tape on it, like at some point in time someone tried to seal the two sides, but the tape was folded back to the back side of the panel.

        I asked Mr. Lambert -- he was the closest human next to me -- to hold the panel back, so that I could photograph it, because I couldn't hold it here and turn my camera to the side (indicating) to photograph it.

EXAMINATION BY MR. PENOT:

    Q    Got it. What I'm asking you --

    A    The panel was already dislodged when we got there.

    Q    Got it. I'm not suggesting that you guys were the ones that did it, but is

not that kind of motion, of pulling of the

panel out, the kind of popping you would be

talking about that would also yield what

you're talking about, wouldn't it?

    MR. PINEDO:

        Objection, form.

    MR. LAMBERT:

        Objection.

    THE WITNESS:

        If someone could get behind the

panel to grab it to pull it out.

EXAMINATION BY MR. PENOT:

    Q    Oh, they couldn't with duct tape?

That would be impossible?

    A    Well, if it was sealed.

    Q    The duct tape --

    A    They would have to take --

    Q    I know duct tape is good, but you

can't pull it open when it's taped?

    A    Well, they would have to take the

duct tape off to get between the two -- the

joint of the two panels.

    Q    What does moisture do to adhesive

on tape?

    A    It dissolves moisture -- I mean,

the adhesive.  But if you look at the duct

tape that's on here, it's still stuck to the

panel.  As a matter of fact, it's stuck to

the front and the back of the panel.

        Q     Do you know, can you swear, can

you look the jury in the eye and tell them

that you know that somebody prior to your

inspection didn't grab that panel and pull

it out just like you guys did?  Do you know

that?

        A     There would have had to have been

some marking on the panel where something

was used to pry the panel off the wall

and --

        Q     If it was my fingernail?

        A     No.

        Q     It couldn't happen?

        A     No.

        Q     It could never happen that way,

Mr. Mallet?  It could never happen that way;

that's your testimony?

        A     More likely than not, that would

not happen.

        Q     More likely than not.  It's not

possible --

    A    Unless you had steel fingernails.

    Q    Can I finish my question?

MR. PINEDO:

        Let him finish his answer.

MR. PENOT:

        No, I was asking a question.

MR. PINEDO:

        He had not finished his answer.

EXAMINATION BY MR. PENOT:

    Q    Is that correct, Mr. Mallet?

    A    I'm sorry.  Yes.

    Q    Okay.  More likely than not, you,
with your experience in building science,
know that it is impossible or it's more
likely than not that someone could not have
removed tape and pulled the wall back?

    A    Not just with their hand.

    Q    No.  That would have been
impossible?

MR. PINEDO:

        Objection, form.

EXAMINATION BY MR. PENOT:

    Q    That's your testimony?

MR. PINEDO:

        Objection, form.

287

THE WITNESS:

          That unless that panel -- Unless
that panel had been popped loose before or
someone used a mechanism, a device to pop
that panel loose, a properly fastened panel
would not have -- you could not have just
grabbed in between the joints and pulled
that panel off.

EXAMINATION BY MR. PENOT:

     Q     I want to make sure we're talking
about the same thing, Mr. Mallet.  I'm
talking about the taped panels.  Okay.
They're taped --

     A     Right.

     Q     -- together?

     A     Right.

     Q     And what I want to make sure I
understand that you're telling the jury is
that it is virtually impossible for someone
to have removed the tape, pulled the tape
back along that seam, and pulled the wall
out?

     A     Just with their hand?

     Q     With anything.

     A     Well, that's what I'm trying to

288

tell you, sir.

        MR. LAMBERT:

             Let me just object.

        MR. PENOT:

             Object.  Okay.  I got your

objection.  That's it.  Form, right?

EXAMINATION BY MR. PENOT:

        Q    You can answer the question.

        MR. PINEDO:

             I'm going to object to the form.

EXAMINATION BY MR. PENOT:

        Q    Okay.

        A    Just utilizing their hand, a

properly installed sheet of paneling --

        Q    I'm not talking about a properly

installed sheet of paneling.

        A    That sheet of paneling --

        MR. PINEDO:

             Mr. Penot, let him finish his

answer.  All right?

        MR. PENOT:

             But he's not answering my

question.

        MR. LAMBERT:

             But let him finish, and then you

289

can --

EXAMINATION BY MR. PENOT:

    Q    All right.  Answer the question

you want to answer.

    MR. PINEDO:

        Hang on.  Mr. Penot, he is

answering your question the way he

understands it.  Once he finishes his

answer, if you believe that he did not

answer the question as you were asking him,

please clarify for him.

        Please continue, Mr. Mallet.

    THE WITNESS:

        Let me tell you what I'm

understanding you to ask me, and maybe I'm

not understanding what you're asking me and

I'm not answering your question.

        As I understand it, you're saying

that -- You're asking me if it's possible or

not for someone to have removed the tape

from the paneling.  No?

EXAMINATION BY MR. PENOT:

    Q    Go ahead.  Go ahead.  Answer

whatever question you think I'm asking you.

    A    Well, I'm not going to answer.

290

Q     Okay.

A     I'm asking you just to --

Q     It's very simple.  We walk in.
There's two panels.  They're taped together.

THE VIDEOGRAPHER:

We only have two minutes left.

MR. PENOT:

Go ahead.  Change the tape.

THE VIDEOGRAPHER:

We're off the record.  The time
right now is 5:07.

(Discussion off the record.)

THE VIDEOGRAPHER:

We're on the record.  The time
right now is 5:10.

EXAMINATION BY MR. PENOT:

Q     Let me try this again, Mr. Mallet.
I'm sure it's me.

Let's assume, like Ms. Alexander
said, she taped the -- that a panel was
popped out in that front bedroom and she
taped it with duct tape, right?

A     Yes, sir.

Q     Okay.  And what you said, I
believe, is those pictures I put in front of

you, which we probably ought to mark now,

which we will on some break as Exhibit 8,

the two of them together as Exhibit 8.

            Now, those demonstrate Mr. Lambert

holding the wall back somewhat, so you can

take a picture of what's behind it, right?

        A    Yes, sir.

        Q    My question is really very simply

this:  Assume for me that the wall was

indeed taped with duct tape.  Okay?

        MR. LAMBERT:

            At what point in time?

        MR. PENOT:

            If you got an objection, make your

objection.

        MR. LAMBERT:

            Objection, vague.

        MR. PENOT:

            Okay.  That's good.

        MR. LAMBERT:

            I'm trying to help.

EXAMINATION BY MR. PENOT:

        Q    The walls were indeed taped; okay?

        A    Uh-huh (affirmative response).

        Q    Before you guys ever set foot in

Lottie?

    A    Okay.

    Q    Okay.  Before you even got there.

Is it your testimony that it's extremely

unlikely that a person could have done

precisely what we see Mr. Lambert doing

there, holding the panel back?

    MR. LAMBERT:

        Well, objection.

    MR. PENOT:

        If you have an objection, just say

"objection," please.

    MR. LAMBERT:

        I'm objecting, because you have in

there "exactly what Mr. Lambert was doing

there."

    MR. PENOT:

        Please just object.

    MR. LAMBERT:

        No, I understand, but the point

is, is that the condition of the wall when

we got there is as the witness said, you

know, we --

EXAMINATION BY MR. PENOT:

    Q    Do you understand my question?

MR. LAMBERT:

          Objection.  It's multiple in

nature.  It assumes facts not in evidence.

Go ahead.

     THE WITNESS:

          That if the wall panel was taped,

could somebody with their hand remove the

panel?

EXAMINATION BY MR. PENOT:

     Q    I didn't say that.  I said could

someone have taken the panel, somehow

dislodged the tape, and held the wall open?

     A    Yes, sir.

     Q    Okay.

     A    I was understanding that the panel

was in place attached to the stud and with a

tape over it.

     Q    Now, aren't there a variety of

ways, besides stress and this popping, that

this panel could have come loose?  Or you

have told me that.  You believe it's more

likely than not that it was stress; is that

correct?

     MR. PINEDO:

          Objection, form.

EXAMINATION BY MR. PENOT:

     Q     Well, what was it?  What's your

opinion as to why?  Your report says it was

stress, correct?

     A     Yes, sir.  There could have been

other things, but those conditions didn't

appear to be evident at what I was looking

at.

     Q     Okay.  And one reason you said is

there was not moisture, it was not wet,

right?  I thought earlier today you told us

that there was evidence that the batt

insulation was wet and stuck to the wall?

     MR. PINEDO:

          Objection, form.

     THE WITNESS:

          Stuck to the wall, but from

moisture vapor, not from liquid form.  What

I would -- I will explain it.

EXAMINATION BY MR. PENOT:

     Q     Okay.  Explain how you know it was

moisture vapor, not liquid form moisture

that stuck the batt insulation material.

     A     Well, I saw no indications of

water marks on the panel.  Had water, bulk

water, liquid form water created enough

stress to have that panel buckle, the panel

in itself would be damaged and delaminated.

There were no signs of that, especially at

the top where I had a very clear view of

that and photographs to show.

    Q    How about something as simple as

the guy who put those few staples the way

you described it earlier missed the stud?

Did you check that?  Did you check that

every staple in that wall panel matched up

with a hole in the stud; and if so, did you

note it anywhere?

    A    That would not have caused a

popping effect.  It would have made the

panel loose, but not popping.  Not with

enough force to break the back side of the

paneling.

    Q    Break the back side of the panel?

    A    Yes.

    Q    The back side of the panel was

broken?

    A    At the top where it was adhered to

the top plates, yes, sir.

    Q    And it's your testimony that that

could not have happened from transportation
loads, hitting a bump?

    A    Again, there was no evidence of
that having occurred.

    Q    That would be a popping motion,
though, right?

    A    Yes.

    Q    On Page 36, are we still in the
bedroom here?  I think so, huh?  Up at the
top, "Walls bowed - Front:  Observation of
the front wall of the bedroom revealed a
bowing area under the window system."

        I have been in this trailer twice,
so that's what I'm trying to understand.
The front wall didn't have a window, right?

    A    Yes, sir, the front wall would be
the one adjacent to the interior -- exterior
door.

    Q    Oh, okay.  All right.  Front is
not towards the tongue?

    A    Right.  I used the wrong
nomenclature by describing, not using the
trailer as the front.

    Q    All right.  That's fine.  That's
not really the point of this question, but

"observation of the front wall of the
bedroom revealed a bowing area under the
window system.  It appears the stress has
caused bowing in this area, which is similar
to the occurrence on the rear wall."

Again, why stress?  Are there
other possible causes and how is it that you
exclude them as not likely?

MR. PINEDO:

Objection, form.

THE WITNESS:

When you take the whole system of
what I inspected into context, we have more
than one panel pop, pop loose in the
bedroom, one in the bedroom -- in the
bathroom.  We have multiple other areas
where the walls themselves were bowed and
where the roof was bowed.

EXAMINATION BY MR. PENOT:

Q    Could I press "pause" right there
without him jumping on me?

A    Sure.

Q    The bathroom and the bedroom,
those are on the same side of the trailer,
what you called --

A     The rear.

Q     -- the rear.  This window that we're talking about right now is on what you call the front, the opposite side?

A     The opposite side.

Q     Now, what about the kitchen one?

A     The kitchen is along the -- Almost the entire wall between the bedroom and the wall at the refrigerator, I believe it is, the wall on the other side of the window. If you're looking at --

Q     Which wall, front or back?

A     At the entrance door.  If you're looking at the entrance door from the outside --

MR. PINEDO:

        Can I suggest a diagram perhaps?

THE WITNESS:

        Sure.  Or if I'm looking at the entrance door from the inside of the kitchen, to the left, next to the bedroom, master bedroom suite, and to the right of the entrance door, from the door almost to the refrigerator wall.

EXAMINATION BY MR. PENOT:

299

Q     Okay.  Now, this one that we're

talking about on Page 36 in the master

bedroom on what you called the front wall

under the window, you said that's stress?

A     Yes, sir.

Q     And the one on the back wall in

the master bedroom you said you believe is

more than likely stress, correct?

A     Right.  They're about even with

one another across.

Q     Okay.  But the ones in the kitchen

you don't necessarily say are

stress-related, right?  You couldn't

determine the difference between stress or

moisture, correct?

A     No, there was no moisture

indications in those walls.  I mean, the

wall itself was bowed.

Q     Well, take a look at Page 30 of

your report.  Is this the same wall we're

talking about?

MR. PINEDO:

        Maybe we should just look at a

diagram.

EXAMINATION BY MR. PENOT:

Q     On Page 30, Paragraph 8, "Noted observations:  Window gaskets"?

A     Yes.

Q     Okay.

A     That's the same wall.

Q     Okay.  But look at your conclusion here.  "However, the interior wall is bowing, indicating either water intrusion or high moisture presence in the wall system."

It doesn't say anything about stress.  Now, why is that one moisture and the other ones you know to be stress?  How do you distinguish those two events?

A     Well, I was giving credence to the bottom panels of this area, because it was below a window, that the gasket appeared to be out of place.

However, the left side of the wall near the bedroom and the upper wall area between the door and the window and on the other side had no relationship to the potential water leak below it, and it was not just a panel bow.  It was the framing. The panels were tight to the framing system, and they were bowed significantly.  Maybe as

much as a half inch.

    Q    There was a water source when you
saw this trailer, a substantial water
source, was there not, in that front bedroom
along the front wall?

    A    Yes.

    Q    In fact, the report says --

MR. LAMBERT:

    Well, can I just make a
suggestion?

MR. PENOT:

    No, I really would rather you not.
I would rather you make an objection.

MR. LAMBERT:

    Well, you just --

MR. PENOT:

    I don't care what I just did.  I
would like an objection, and then my answer.

MR. LAMBERT:

    You say the front wall, and you're
using a different term.  He has been using
the term as the front wall where the door is
and you're using the one to the right, and
you just got to get your terms straight or
we will be here all frickin' night.

EXAMINATION BY MR. PENOT:

        Q     Mr. Mallet, there was a
substantial water source in the front
bedroom when you looked at that trailer in
May of 2009, right?

        A     At the ceiling and the floor and
in the closet.

        Q     And, in fact, the little light
fixture had water in it, right?

        A     Water stains, yes.

        Q     Let's go to your conclusions.  Let
me ask you something.  Could you damage the
Alexander trailer by jacking it up using the
tongue jack, jacking that tongue jack up?
Would that cause stresses and flexing?

        MR. PINEDO:

              Objection, form.  It's two
questions, damage and stresses.

        MR. PENOT:

              He's a smart guy.  He can handle
it.

        THE WITNESS:

              It can cause stress.  I don't know
what the capacity of that jack is, whether
it has the capacity of lifting that trailer

303

or not.  But it certainly could -- If it had

enough capacity, it could stress it.

EXAMINATION BY MR. PENOT:

     Q    How high would you have to jack it

before that happened?

        MR. PINEDO:

            Objection, form.

        THE WITNESS:

            Well, I would think you would have

to put it under a fair amount of stress

before you -- And ask the question again,

please.

EXAMINATION BY MR. PENOT:

     Q    How high would you have to jack it

using the tongue jack to do damage?

        MR. LAMBERT:

            Objection.

        THE WITNESS:

            I would think you would have to

put it in a considerable amount of stress.

EXAMINATION BY MR. PENOT:

     Q    What does that mean?

     A    Well, I don't know the capacity of

that jack.  But I would think it would have

to --

MR. PINEDO:

      Mr. Penot, you're talking about
damage to the jack or damage to the unit?

MR. PENOT:

      He's answering.

EXAMINATION BY MR. PENOT:

    Q    You understand I'm talking about
damage to the unit, right?

    A    Yes, sir.

    Q    We have been talking about damage
to the unit for six hours, talking about
damage to the unit.

    A    You would have to -- I'm not sure
the shaft is high enough to do that or long
enough, because what you would probably have
to do is lift the -- probably have enough
tension on that frame to lift at least the
front tires.  You would have to put a fair
amount of stress on it, and I'm not sure
that that jack would be capable of doing
that.

    Q    What methodology or what
engineering principles are you using to tell
me how high it's got to go before that
happens?

A    You just asked me how high I
thought it would have to go, and that's my
opinion.

Q    That's your thought?

A    Based on the fact that we have two
I-beams holding that structure together, and
I deal with steel a lot, and I'm just not
sure that that little jack could do that to
that trailer.

Q    But what my question is -- You're
telling me you think that.  I hear that.  I
hear that you're telling me you think that.
What I want to know is what principles are
you relying on to tell me that?  Are there
any engineering principles, any calculations
you have done or could be done?

MR. LAMBERT:

Objection.

EXAMINATION BY MR. PENOT:

Q    What are you relying on to tell me
that?

MR. LAMBERT:

Objection.  I don't think that's
what he said.

THE WITNESS:

There are calculations that could be done.  I could ask David Moore to calculate the amount of stress that that jack, knowing the capacity of the jack, could put on that frame and could that jack put that type of stress on that frame to cause it to bend.

EXAMINATION BY MR. PENOT:

    Q     Right.  And what's David Moore that you're not?

    A     A civil engineer.

    Q     Okay.

    A     He can do the calculations.

    Q     Paragraph 10 from your conclusion at Page 97, "The temporary housing unit was placed on blocks during the installation on the Alexanders' property.  The instructions found on the scissor jacks of the trailer states that the weight of the unit should not be taken off the wheels."

    Could you show me where that's on this, which we will mark as Exhibit No. 9?  And I'm going to represent to you that that is a picture that Mr. Buzbee used at the deposition of Jim Shea, conveniently enough

also Exhibit No. 9, and said that that's the
picture of the jack, the warning on the
jack.

     A    Correct.

     Q    So could you show me where the
instructions found on the scissors jack
state that the weight of the unit should not
be taken off the wheels?

     A    Well, it says, "Do not use the
scissor jack to lift excessive weight or
lift tires off of the ground."

     Q    Right.  And I'm asking you -- Your
report says, "The instructions found on the
scissors jack of the trailer states that the
weight of the unit should not be taken off
the wheels."

       Is that the same thing?  You're
saying that that sentence is the same thing,
they're saying the same thing?

     A    Yes, because if you read the next
sentence, it says, "Vehicle frame and door
jamb damage may result."

       Whether you're using a scissors
jack or any other kind of jack, the
instructions are clear that jacking the

trailer off of its wheels will cause damage

to the frame and the door jamb.

     Q     Will?  It will do that?

     A     "Vehicle frame and door jamb may

result."

     Q     Excuse me.

     A     The possibility, yes.

     Q     All right.  It's a possibility?

     A     Right.

     Q     But I just want to be clear.  You

think that this statement means that there's

an instruction on the jack saying "do not

lift the wheels off the ground"?  Because

that's not what it says.  It says don't use

this scissors jack to lift the wheels off

the ground?

     MR. PINEDO:

          Objection, form.

EXAMINATION BY MR. PENOT:

     Q     Isn't that what it says?

     MR. PINEDO:

          Objection, form.

EXAMINATION BY MR. PENOT:

     Q     Sir?

     A     That's exactly what it says.  And

in addition, for further clarification, it

says the "vehicle frame and door jamb damage

may result."

Q    Are you finished?

A    Yes.

Q    Okay.  So you disagree with the

opinion of the Government's expert,

Mr. Polk, who says that that instruction

just relates to use of that jack?  You just

disagree with him, correct?

A    Well, it says what it says.

Q    Okay.  Indeed.

A    So whether I'm jacking with a

scissors jack or I'm using hydraulic jacks

to convert this trailer, travel trailer into

a temporary housing unit, the results are

the same.

       It says the vehicle frame and door

jamb may be damaged.  And our assessment is

that in the conversion, when the blocking

and jack -- when the jacking and blocking

occurred, that this is exactly what occurred

with this unit.

Q    Okay.  And let's go to the next

sentence.  "In jacking the unit and not

sufficiently supporting the frame, the
installation contractor created a condition
conducive to the interior panels warping in
the bedroom on the front and rear walls" in
the bedroom.

    A    I'm sorry.  Where are you again,
please?

    Q    Right in that same paragraph, the
very next sentence.

    A    Are we in the first one?

    Q    Paragraph 10 on Page 97, right
after the one about the scissors jack.

    MR. PINEDO:

        I'm going to object.  It was not
read properly by counsel.

EXAMINATION BY MR. PENOT:

    Q    Well, it says what it says.  Can
we agree to that?

    A    The last paragraph, is that where
you are?

    Q    Pardon?

    A    The last paragraph, is that where
you are?

    Q    No, sir.  Paragraph 10, right
after the sentence we had just been

311

discussing, namely, the scissors jack.

"In jacking the unit and not

sufficiently supporting the frame, the

installation contractor created a condition

conducive to the interior walls warping in

the bedroom on the front and rear walls and

in the bathroom."

MR. PINEDO:

I'm going to object to the

improper reading by counsel.

MR. PENOT:

Where?

MR. PINEDO:

You said "walls" and it says

"interior panels."

EXAMINATION BY MR. PENOT:

Q     You can answer, Mr. Mallet.

MR. PINEDO:

I'm going to object to the form of

the question.

THE WITNESS:

That's what it says.

EXAMINATION BY MR. PENOT:

Q     Okay.  Now, are you saying that it

is your opinion or that you know, which one,

that the installation contractor jacked this

without sufficiently supporting the frame?

That's your opinion or do you know that as a

fact or what?

     A    Well, based on what I was told

about how it was jacked up, the weight of

the building was taken off of the wheels,

and that certainly could have caused that

condition, the walls to bow.

     Q    Okay.  You were told by whom?

     A    Well --

     Q    By Ms. Shirley Alexander's

deposition?

     A    Yes.  But before that, that there

was only two-man crews installing these, and

unless they had a unified hydraulic system,

there was no way that they could have lifted

this unit, two men could have lifted this

unit, or screw jack systems, in a unified

manner.

     Q    Didn't you say -- So is it your

opinion that the only way, the only way this

trailer could be lifted would be with a

unified hydraulic jacking system?

     MR. PINEDO:

313

Objection, form.

EXAMINATION BY MR. PENOT:

Q    I thought I understood you to say
before you could do it other ways, too?

A    No, I also said screw jack.  But
the problem that comes in is that nobody
knows how this was placed other than now
Ms. Alexander's testimony.

There's a large gap of one of the
most important facets of the installation.
The Fluor documents do not indicate how this
trailer was to be lifted, blocked and
converted to a temporary housing unit.

If there was documentation to show
that this is how they did it and this is the
equipment that was to be used -- There's no
specifications on this.  The specifications
by Fluor are quiet.  They're null.  There's
nothing, unless you have something to show
me differently.

Q    Let me ask you this.  Mr. Moore
testified that in addition to a unified
jacking system, which he said would be quite
expensive -- Do you agree or disagree with
Mr. Moore, the guy, the fellow you hired on

that point?

    MR. PINEDO:

        Objection, form.

    THE WITNESS:

        Well, it depends on the jacking system that you use.  You certainly could have an expensive one, but you can use an Enerpac, small Enerpac jacks.

        I mean, this trailer only weighs 6700 pounds, I think it is.  That's of no moment for a hydraulic jack.  You could take inexpensive Enerpac jacks and connect them to one pump and raise that trailer.

    Q    Okay.

    A    There are far more expensive systems, I grant, but just to pick up the weight of this.

    Q    Mr. Moore went on to say that an alternative would be just use hydraulic jacks that aren't necessarily unified or coordinated -- What's the right word?  What's the word you used?

    A    Unified?

    Q    Unified.  But you could use cribbing, just lift a bit and then crib.

Could you do that?  Would that be a good way

to do it?  Or an acceptable way to do it, a

way that would support the frame?

    A   You could crib, yes.

    Q   And, in fact, I mean, manufactured

housing, I mean, how long have unified jacks

been used?

    A   I have been in business for 35

years, and when I went into business, they

were being used then.

    Q   Did you always use them to do

these building movings that you talked about

probably this morning or did you use

cribbing sometimes?

    MR. PINEDO:

       Objection, form.

    THE WITNESS:

       The only time we used cribbing was

when we were going to move a structure

completely from where it was.

EXAMINATION BY MR. PENOT:

    Q   But you agree it would be

acceptable and be an adequate form, correct?

    A   Yes.  But if you take the

testimony of Mrs. Alexander, I think she

stated that she didn't see any type of

cribbing, that they just used jacks on two

sides at a time.

    Q    And you believe that testimony is

clear?  You know exactly how it was jacked

based on Ms. Shirley Alexander's testimony?

    MR. LAMBERT:

        Objection.

    MR. PINEDO:

        Objection, form.

    THE WITNESS:

        That's what it appears she was

saying.  That's what it appeared to me she

was saying.

EXAMINATION BY MR. PENOT:

    Q    You know, you can't be faulted for

not having seen this, because I only

produced it to Mr. Hillyard yesterday.

    MR. PINEDO:

        So you're asking the witness to

comment on a document he has never seen

before?

    MR. PENOT:

        Yes, I sure am.

    MR. PINEDO:

Entitled "Proper Jacking

Techniques"?  Is that the title of the

document?

    MR. PENOT:

        It is.

    MR. PINEDO:

        And this is a document that Fluor

has had in their possession for over three

years?

    MR. PENOT:

        Yes.  And it's had it for those

three years before you guys sued us in

January of this year and I learned I was

going to trial in April.

    MR. PINEDO:

        And you're just turning it over

today?

    MR. PENOT:

        No, I turned it over yesterday.

    MR. PINEDO:

        Okay.

    MR. PENOT:

        And your pal, Mr. Hillyard, had

it.

    MR. PINEDO:

Less than 60 days prior to trial?

MR. PENOT:

That's right.  And there's more to come.  You sued me six or eight months before going to trial.  You're lucky if you don't get some stuff the day of trial.

MR. PINEDO:

I object to the side bar.

MR. PENOT:

So do I.

MR. PINEDO:

And do you have a question pending on this document?

MR. PENOT:

No.  I figured you might want some time to read it, since this is the first time you're seeing it.

MR. LAMBERT:

Well, let's go off the record for a second.  Well, actually, no.  We will just sit here and run the camera.

MR. PENOT:

No, we will go off the record.

MR. DERHAM:

Off the record.

319

          THE VIDEOGRAPHER:

               We're off the record.  The time

now is 5:38.

(Discussion off the record.)

          THE VIDEOGRAPHER:

               We're back on the record.  The

time is 5:59.

EXAMINATION BY MR. PENOT:

     Q     Mr. Mallet, have you had a chance

to study what we have marked -- we will

mark, I believe, what would be Exhibit 10, I

think?

     A     Yes, sir.

     Q     Have you had a chance to study it?

I understand that you just got it, it looks

to me like about 25 minutes ago we took on

that break.  Have you had in that 25 minutes

a chance to study it?

     A     Yes, sir.

     Q     Okay.  You have said that you

believe that there's a total lack of any

guidance on how to jack.  I understand

you're just seeing this.  I'm going to

represent to you that it was part of a

training program for jacking trailers for

320

Fluor subcontractors.

          Do you find the system described
here to be adequate to avoid this racking or
twisting that you have been talking about
about the frame --

     MR. LAMBERT:

          Objection.

EXAMINATION BY MR. PENOT:

     Q    -- and chassis?

     MR. LAMBERT:

          Objection.

EXAMINATION BY MR. PENOT:

     Q    You can answer.

     A    No, sir.

     Q    Okay.  Tell me what's inadequate
about it.  I didn't think that was going to
be a surprise, Mr. Mallet, especially after
a 25-minute break with your lawyers.

          First of all, tell me about what
you discussed with your lawyers.

     MR. PINEDO:

          Objection to the side bar.

          Do you know when this came into
existence, Mr. Penot?

     MR. PENOT:

I'm not under oath.  Okay?

MR. LAMBERT:

No, but do you know what's
amazing?  What's amazing is when the pot
calls the kettle black, okay, because what
happens is you go give us a document, which,
by the way, is wonderful and I thank you for
it, but then don't pretend like that we have
done something that's weird in terms of
looking at the document for a few minutes
that you have had for obviously quite some
time if it was used years ago in a training
program.

So let's just ask questions and
forget the colloquy and the innuendo and all
that other stuff.

EXAMINATION BY MR. PENOT:

Q    Mr. Mallet, can you answer the
question?

MR. LAMBERT:

What was the question?

MR. PENOT:

Read it back.

THE WITNESS:

Yes, I know the question.

MR. PENOT:

    Okay.

MR. LAMBERT:

    Cool.

THE WITNESS:

    I did most of the talking.

EXAMINATION BY MR. PENOT:

    Q   Okay.

    A   They did most of the listening.

    Q   Okay.

    A   I read the document and I gave
them feedback on what my assessment was of
it.

    Q   Okay.  Give me -- What did they
say?

    A   "Great."

    Q   No.  That's it?  In the 25
minutes, they said "great"?

    A   I don't know if it was 25 minutes,
but --

MR. LAMBERT:

    One thing I said was, "What's an
STA?"

THE WITNESS:

    "What's an STA?"  They asked me a

few questions of clarification about the --

What is it, cribbing?

EXAMINATION BY MR. PENOT:

    Q    Cribbing or catch piers?

    A    Catch piers, right.

    Q    What's cribbing and catch piers?

    A    Well, cribbing is the wood
blocking that's used to set the trailer
frame on or the jack, depending on what they
used, and the catch -- the catch -- What's
the word, "catch pier"?  Yes.  It's probably
the safety mechanism used in case the jack
slips.  I didn't draw this up, so --

    Q    Right.  Okay.  So tell me why you
think this is inadequate.  In other words, I
take it to mean -- I take your answer to me
to mean that even if this is followed to the
"T," all of your opinions are still the
same?

    MR. PINEDO:

        Objection, form.

    THE WITNESS:

        Well, yes.  I mean, some of this
even confirms my position, my opinion,
because you state -- or they state that if

the jacking is performed improperly, that it

has the potential to cause property damage,

injury or even death.

          I don't know what other property

if you're jacking up a trailer there could

be other than the trailer itself, although

it could be inclusive of that.

EXAMINATION BY MR. PENOT:

     Q    Okay.  Well, tell me how it's

going to damage the trailer if you do it

this way.

     MR. PINEDO:

          Objection, form.

     THE WITNESS:

          Well, it will be explanatory as I

go down here.

EXAMINATION BY MR. PENOT:

     Q    Okay.  Well, now, I have limited

time, and can we agree that the only items

that deal with jacking -- Because I really

don't want you to talk about the stuff

that's about human safety.

     A    Okay.

     Q    So we're going to talk about four,

six, seven, eight, 13; is that right?

A     Yes.  Let's start with four.

Q     Okay.

A     Four says to "use proper size and
number of jacks.  Minimum of six ton for
travel trailers, 12 ton for park and mobile
homes."

      That doesn't tell me how many to
use, where to use them, where to place them,
what sequence to use them in.  It tells me
nothing.  There's nothing down the rest of
the way that does any clarity to that.

Q     Okay.  What do you think No. 7
means, "Work from end to end.  Never side to
side"?  "Utilize cribbing" -- No. 6,
"Utilize cribbing or 'catch' piers."

A     End to end, side by side -- "Never
side to side."

      "End to end" means or could be
interpreted as setting it up on one side
with two guys, jacking it up, moving it, and
bringing it to the other side or the other
end and jacking it up.

Q     All the way?  That's how you
interpret this?

MR. PINEDO:

Objection, form.

THE WITNESS:

It doesn't give you any -- Yes, it does, and it gives no further clarification than that.

EXAMINATION BY MR. PENOT:

Q    Okay.  Can I ask you, can we press "pause" and I can ask you a question?

MR. PINEDO:

Let him finish his answer.

EXAMINATION BY MR. PENOT:

Q    Okay.  Go ahead.  He was fine with it, but go ahead.

MR. PINEDO:

Let him finish his answer.

THE WITNESS:

The jacking end to end or side to side, not never side to side appears to be -- "never side to side" appears to be the exact explanation that Mrs. Alexander gave in her testimony, that they went from one side, the side facing her house, the door side, jacked it up, and then went to the other side, where she couldn't see from her porch, and then jacked that up.

Then I think what they did, based
on what I could understand, was they went
diagonally to level it from that point.

So this tells me what not to do,
and Ms. Alexander said they did exactly what
this paper says not to do.

EXAMINATION BY MR. PENOT:

Q    Okay.  But then you didn't
understand my question.  Okay.  My question
was, this procedure, is it adequate to
prevent the type of racking of the frame
that you have been talking about and you
talked about in your report?

A    No.  Because there is no
indication of where to place these jacks,
how many jacks to use, and what sequence to
do it in.

Q    And it doesn't tell you where?

A    "End to end" doesn't tell you to
do it -- Actually, it would tell me quite
the opposite, to do one end, and then the
other end.  How else --

Q    Okay.  So that's how you're
interpreting it?

A    That's correct.

Q    Okay.  All right.  Let me give you

an interpretation that's not as strained.

A    Okay.

Q    Suppose it means two jacks on one

end and you lift those two jacks as

uniformly as possible with two men and you

never allow more than one inch -- see

No. 13 -- you never allow more than one

inch, okay, and you put your piers and

cribbing, and you go to the other end and

you use two and you jack as evenly as

possible, and then you crib, and you go back

and forth until you get the trailer up to

whatever height you need it.

Is there something wrong with that

procedure?

MR. PINEDO:

Object to the side bar.  Object to

the form of the question.

THE WITNESS:

It depends on how far you jack in

one interval.  And --

EXAMINATION BY MR. PENOT:

Q    I'm saying if you follow this --

MR. PINEDO:

Let him finish his answer.

EXAMINATION BY MR. PENOT:

Q     -- one inch --

MR. PINEDO:

Let him finish his answer.

THE WITNESS:

Well, if you only jacked it up one

inch at a time?

MR. LAMBERT:

One inch from what?  Objection.

MR. PENOT:

It states it, if you read it,

Mr. Lambert, "one inch clearance between the

beam and the pier or cribbing."

THE WITNESS:

Okay.

MR. LAMBERT:

Well, you can just add cribbing

all day long an inch at a time and you would

never violate the principle, or at least not

the principle --

EXAMINATION BY MR. PENOT:

Q     Can I have your answer,

Mr. Mallet?

A     If they moved jacks back and forth

front to back an inch at a time, that would

probably be proper.

    Q    Okay.  But you don't believe

that's what happened on the Alexander

trailer, and that is based on the testimony

of Ms. Shirley Alexander, correct?

    A    Well, it's based on her

deposition, but if you look at the results,

what I was trying to explain earlier, that

there's bowing, bulging of the frame, the

side wall frames of the trailer on both

sides and of the roof, which is indicative

of some of that.

    Q    That's interesting you said "the

roof."  So you believe that the jacking

caused the separation in the roof, huh?

    A    No, sir, I didn't say that.

    MR. PENOT:

        Well, can we read back that last

answer?

(Whereupon, the court reporter read back the

requested testimony as follows:

    THE COURT REPORTER:

        "Well, it's based on her

deposition, but if you look at the results,

what I was trying to explain earlier, that

there's bowing, bulging of the frame, the

side wall frames of the trailer on both

sides and of the roof, which is indicative

of some of that."

EXAMINATION BY MR. PENOT:

     Q    There's bulging on the roof?

     A    Yes, sir.

     Q    Bulging on the roof?

     A    Yes, sir.

     Q    And that's caused by jacking,

bulging on the roof?

     A    Yes.

     MR. LAMBERT:

         Objection.

EXAMINATION BY MR. PENOT:

     Q    Explain to me what "bulging on the

roof" means and how jacking causes it.

     A    Well, if you're jacking up --

Let's say you're doing it end to end, like

you said, and you're only using one

(indicating).

     Q    Only using one what?

     A    One end.  I'm sorry.  One end.

Then as you're putting the stress on the

center of that trailer (indicating),

something has to give somewheres.  The walls

have to give, the roof has to give.

      You can't put an excessive amount

of stress on a structure in moving it and

not have something give, and that's what

it's indicative of.  Either one way or the

other, you have the bulging of the walls

here (indicating), you have the bulging of

the walls here (indicating), buckling of the

panels, and on this side (indicating), you

have the bulging of the roof panel.

    Q    You know, you mentioned the

bulging in all the different places.  Is it

your opinion that that bulging was caused by

jacking and you can tell me precisely which

jacking it was, February, '06 versus July,

'07?

    MR. PINEDO:

       Objection, form.

    THE WITNESS:

       No, I can't.

EXAMINATION BY MR. PENOT:

    Q    You can't tell me that.  You're

only telling me, in fact, that the

separation of the wall in the master bedroom

you believe to be from the February, '06

one, because, two reasons, you didn't see

any damage report prior to that jacking,

right?

    A    Correct.

    Q    And Ms. Alexander says it was

there when she moved in?  Those are the two

facts, right?

    A    Correct.  And the bathroom

occurred after.

    Q    How does that support that it

happened with that jacking in February of

'06, that the bathroom happened after?

    A    Well, I don't think that that was

in place when she moved in.  I think it was

said that she witnessed that after she moved

in.

    Q    Right.  I'm sure it's just me.

I'm just not following how that supports the

logical conclusion that the separation of

the wall or the popping out of the wall in

the front bedroom occurred due to the

jacking on February of '06?

    A    Well, there was no other damage

reports involved.  I mean, you have trim

molding actually popping off the walls of

the house on the front wall of the trailer.

Q     Okay.  But --

A     She duct taped or somebody duct

taped that.

Q     That's not the front wall of the

trailer?  That's what you call the back wall

of the trailer?

A     Well, I'm just going to keep -- It

would be the entry door side of the trailer.

Q     She put tape on the entry door

side of the trailer?

A     Somebody put tape, because the

moldings are popping off the walls.

Q     On the entry door side of the

trailer?

A     Yes, sir.  We have photographs.

Q     All right.  I'm running out of

time.  But I want to be clear.  You have

told me that you are not able to give an

opinion that the bulging of the panels on

that entry wall side was caused by -- which

jacking it was caused by?  You are not able

to tell us that?

335

A    No.

Q    Okay.  Then, lastly -- or lastly,
I hope --

MR. LAMBERT:

     Don't get me excited.

EXAMINATION BY MR. PENOT:

Q    Did you see -- In rendering your
opinion -- It's in your reliance materials,
but did you look at or study -- You refer to
Exhibit 7 of Fluor's installation manual,
but you don't refer to the drawings, and I
have put in front of you ALX-EXP-44-0000269,
which we're going to mark as Exhibit 11, and
this was in your reliance file.

     Did you see it and study it before
you rendered your report?

A    Yes, sir.

MR. LAMBERT:

     While we're on that document,
Exhibit No. 11, Counsel, if you have any
more of these little ditties -- Did we mark
this toolbox thing?

MR. DERHAM:

     That's marked 10.

MR. PENOT:

Yes, 10.

MR. LAMBERT:

If you have any more of these
little, you know --

MR. PENOT:

I've got 1.5 terabytes of data,
Mr. Lambert.  If you would have sued me
earlier, we could have gone through stuff in
a more organized fashion and we wouldn't be
in this circumstance, but this is where we
are.

I've got something like 9,000
documents I'm still working my way through
of hard paper and I've got 1.5 terabytes --
I love that word.  I never got to use it
before this case -- of electronic data.

MR. LAMBERT:

I'm glad you like it.  Why don't
you push the button in your terabyte storage
unit and ask it for engineering drawings
regarding travel trailers.

MR. PENOT:

I'm happy to do that as soon as we
talk about costs.

MR. LAMBERT:

Good.  Well, as soon as you get a
chance to push that button and let it spit
out those engineering drawings, I will be so
happy, I won't be able to stand it, and we
can take some of the weight off your
shoulder.

MR. HAINKEL:

Or your friend.

MR. LAMBERT:

Or your friend.

EXAMINATION BY MR. PENOT:

Q    You're concerned with what can
happen, are you not, Mr. Mallet, that when
this frame, with whatever jack, is raised to
some level that raises the wheels off the
ground, correct?

A    Yes, sir.

MR. LAMBERT:

Can I make another suggestion?

EXAMINATION BY MR. PENOT:

Q    And does not Exhibit 11 -- I'm
sorry.  Do you have an objection?

MR. LAMBERT:

No, I want to make a suggestion
about the terabytes.

MR. PENOT:

Not on my time in the deposition,
okay, Mr. Lambert.

EXAMINATION BY MR. PENOT:

Q    Does not this note suggest that
the wheels are not supposed to leave the
ground, the note on the bottom right-hand
corner of this Exhibit 11?

A    Yes, sir.

Q    Finally --

A    So my question then would be how
did they put the blocks underneath the
tires?

Q    If they raised it only an inch at
a time, it's safe enough, it's safe enough
to lift that tire off the ground a quarter
inch for Mr. Mallet to change a tire, but
you add another three-quarters of an inch,
that thing is going to pop apart; is that
what you're telling us?  Is that what you're
telling the jury?

MR. LAMBERT:

Objection.

MR. PINEDO:

Object to the form.

THE WITNESS:

What I'm telling the jury is if you pick up one tire, that most of the weight -- most of the weight is resting on the tire that is not damaged, and you pick that up a quarter of an inch is different than what this says of not picking the wheels off of the ground.

EXAMINATION BY MR. PENOT:

Q    Let me ask you this.

A    And if you pick the whole unit up at one time, like you're suggesting they did, then you had to pick all of the wheels up at the same time off of the ground.

Q    Let me ask you this.  Did your travel trailer have independent suspension?

A    I don't remember.

Q    On your report at the bottom of Page 97 -- Excuse me.  The top of Page 98, the paragraph -- the last paragraph, the third and last paragraph of -- I don't know what you call it -- Section 10, it says, "Either the manufacturer, FEMA, or Fluor should have devised a safe means of jacking the temporary housing units by either

increasing the rigidity of the metal frame,
using a unified hydraulic jacking system to
evenly lift the entire travel trailer at the
same time and without putting abnormal
stresses on the unit, or should have devised
a plan including sound engineering practices
for the application of readying the
temporary housing unit for occupancy."

My question to you is, you said
"abnormal stresses," so I take that to mean
you believe that the procedures called for
for jacking these trailers put abnormal
stresses on these trailers?

MR. PINEDO:

Objection, form.

EXAMINATION BY MR. PENOT:

Q     Is that a fair statement?

A     These procedures don't give me
enough information to know how they -- in
and of itself, to know exactly how they did
jack it up or how they were instructed to
jack it up.

Q     I thought I understood where you
were on that.  The procedure itself in
Exhibit No. 10, I thought you told me if it

341

was followed, if the procedure was followed,

that would probably be okay.  No?

     MR. LAMBERT:

          Objection.  You gave him a

hypothet that interpreted Exhibit No. 10.

     MR. PENOT:

          Right.

     MR. LAMBERT:

          He didn't say at all in Exhibit

No. 10 --

     MR. PENOT:

          Please take a minute off of my

time.

     MR. LAMBERT:

          I'm not finished talking.

     MR. PENOT:

          Or two minutes.

     MR. LAMBERT:

          I'm not finished making my

objection.  Okay?  That's not what he said.

Objection.

EXAMINATION BY MR. PENOT:

     Q   Mr. Mallet, you can answer the

question.  After he talks like that, you can

answer the question.

        MR. LAMBERT:

            Objection.

EXAMINATION BY MR. PENOT:

        Q     Do you need it read back?

        A     Yes, please.   I'm not quite sure

exactly what the question was.

(Whereupon, the court reporter read back the

requested testimony as follows:

        THE COURT REPORTER:

            Question:   "The procedure itself

in Exhibit No. 10, I thought you told me if

it was followed, if the procedure was

followed, that would probably be okay.   No?"

        MR. PINEDO:

            Object to the form.

        MR. LAMBERT:

            Object to the form of the

question.

        THE WITNESS:

            If your explanation of jacking it

up one inch at a time was followed, that

would probably be an adequate method, the

way you described it of moving jacks front

to back.

EXAMINATION BY MR. PENOT:

343

     Q     So that would not put abnormal stresses on these trailers?

     MR. LAMBERT:

         "That" meaning -- Objection. "That" meaning the way you described it, not the 10, not Exhibit 10.  Correct.  Look, you can't do it like that.  You got to make sure --

     MR. PENOT:

         Are you the judge, also?  Okay. You make an objection at a deposition.

     MR. LAMBERT:

         That's what I just did.

     MR. PENOT:

         Man, just let me -- Could I finish?

     MR. LAMBERT:

         Yes.

     MR. PENOT:

         Okay.  Well, then make an objection and that's all you need to say.

     MR. LAMBERT:

         Okay.  Ambiguous.

EXAMINATION BY MR. PENOT:

     Q     All right.  And that procedure,

344

according to Exhibit 10, as clarified by

me --

     MR. LAMBERT:

          Whoa.

     MR. PINEDO:

          Are you testifying now?  I'm going

to object.

     MR. PENOT:

          Let's go off the record.

     THE VIDEOGRAPHER:

          We're off the record.  The time is

6:22.

     MR. PINEDO:

          I object to that last question.

(Discussion off the record.)

     THE VIDEOGRAPHER:

          We're on the record.  The time is

6:23.

EXAMINATION BY MR. PENOT:

     Q    Mr. Mallet, at Page 98, the last

paragraph, you talk about abnormal stresses.

Do you believe that the way the Alexander

trailer was jacked up put abnormal stresses

on the Alexander travel trailer?

     A    Yes.

        Q    Tell me, please, what calculations

or testing you did or someone for you did --

Let me start over.  Please tell me any

calculations, empirical testing or stress

analysis was done by you or anyone and any

one of the other experts in this case to

determine or support that conclusion, that

abnormal stresses were put on this unit.

        MR. LAMBERT:

            Objection.

        THE WITNESS:

            According to Mr. Moore's

observations and opinion and the

observations of -- my observations of the

buckling of the wall and roof panels, that

gives indication to me that -- and I

don't -- Excuse me.  I'm not answering your

question.

EXAMINATION BY MR. PENOT:

        Q    No, you're not.

        A    I'm sorry.  I do not have

calculations and I did not perform

calculations.

        Q    And you didn't perform any

empirical testing either, did you?

346

A     We were not allowed to do any
types of testing other than visual.

Q     And you did not do any stress
analysis?

MR. LAMBERT:

        Objection.

THE WITNESS:

        That, again, would have required
destructive testing.

EXAMINATION BY MR. PENOT:

Q     Finally, didn't you tell me
earlier in your questioning that you could
not say what exactly caused the roof
separation in the front of the trailer?

A     Yes, sir.

Q     Then what does Paragraph 11 mean,
"The placing of the temporary housing unit
on blocks apparently created at least one
known roof leak that was never effectively
repaired"?  What does that mean?

A     Ask the question again, please.  I
was reading.

Q     I thought I had understood you in
your testimony today to tell me you're not
offering an opinion that the jacking caused

that separation of the roof along -- I want
to say front, but you know what I mean?

     A     Right, the jacking.  The jacking.

     Q     I thought you told me earlier you
cannot offer an opinion that the jacking
caused that separation of the sealant?

     A     That's correct, of the sealant
material.  But my understanding is that that
sealant material was installed in an effort
to stop the leak in the roof, that the
maintenance people went and applied
materials to prevent the roof leak, so I
can't tell you that the jacking caused the
separation of the sealant material.

     Q     Okay.  So you are offering an
opinion that the jacking caused the roof
leak -- a roof leak in the front room, in
the master bedroom, and not only that, that
the jacking in February of '06 was the
jacking that caused it; is that right?

     MR. PINEDO:

          Objection, form.

     THE WITNESS:

          Yes, because there were no
indications of water infiltration.  The

answer is "yes," because there was no
indication of water infiltration in the
inspections prior to, and from my
understanding, again, I was told that the
service people did not know where the leak
was coming from.

EXAMINATION BY MR. PENOT:

Q    But if Ms. Alexander testified the
leak didn't occur until March, April or
May of 2007, almost eight or nine months
after, she testified to that in her
deposition, how can you tell me it caused a
roof leak when it was installed in February
of '06?

MR. PINEDO:

Objection, form.

THE WITNESS:

Well, I'm not certain, because my
understanding was the roof leak occurred
sooner than that.

EXAMINATION BY MR. PENOT:

Q    Okay.  So you would be -- You
couldn't draw that conclusion if indeed the
roof leak did not occur until some
substantial period of time after she moved

349

in?

    A    Right.

    MR. PINEDO:

        Objection, form.

    THE WITNESS:

        I would have to look at the
maintenance records to see when the
complaint was filed and when the maintenance
was done.

EXAMINATION BY MR. PENOT:

    Q    Or her deposition, right?

    A    Or her deposition.  But certainly
the maintenance records in the FEMA log.

    MR. PENOT:

        Thank you.  I apologize for my
overzealousness at times this evening.

    THE WITNESS:

        Thank you.

    MR. PENOT:

        And I appreciate your ability and
admire your ability to keep your cool in the
face of that.  Thank you.

    THE WITNESS:

        Thank you.

    MR. DINNELL:

350

Let's go off the record for a
minute.

        THE VIDEOGRAPHER:

        We're off the record.  The time is
6:29.

(Discussion off the record.)

        THE VIDEOGRAPHER:

        We're on the record.  The time is
6:38 p.m.

EXAMINATION BY MR. DINNELL:

    Q    Mr. Mallet, my name is Adam
Dinnell, and I represent the United States
in this case.

        Just for the record, we will ask
that the witness read and sign his
deposition transcript once it's provided to
him.

        Mr. Mallet, have you seen any
documents from Gulf Stream in this case that
prohibit units from being put up on blocks?

    A    Absolutely none.

    Q    Have you seen any documents that
prohibit units from being blocked up off of
their wheels?

        MR. PINEDO:

Objection, form.

THE WITNESS:

Oh, I'm sorry.  From Gulf Stream?

EXAMINATION BY MR. DINNELL:

Q    Yes.

A    No, sir.

Q    Prior to Hurricane Katrina, had
you ever seen a travel trailer put up on
blocks or piers?

A    I can't say one way or another,
because I have been through so many
hurricanes.  I couldn't tell you.

Q    Well, I believe you said earlier
that you're -- let me get the exact
language -- you're a certified installer of
manufactured housing, correct?

A    Yes, sir.

Q    And when you install manufactured
housing, you put those up on blocks, right?

A    They are stabilized by blocks.
They're not set up on the blocks themselves.

Q    Why is manufactured housing
stabilized on blocks?

A    Because the frame is in and of
itself not adequate to support the loads.

You would get bounce movement, shifting of
the unit without the blocking underneath the
frame.

Q    The blocks allow you to stabilize
the manufactured housing unit, correct?

A    They transfer the load down to the
ground, yes.

Q    When you were in the Alexander
travel trailer, I assume you looked up at
the air conditioning unit when you were
inside of the unit?

A    Yes, sir.

Q    And do you remember there being a
switch on the air conditioning unit that
diverted the air from the ducts directly to
the main grill of the air conditioner?

A    I don't recall that.

Q    Okay.  So you don't know one way
or another whether there was a switch that
would divert all of the cold air from the
air conditioner directly into the unit
through the central grate and not through
the ducts that are spread out through the
unit?

MR. LAMBERT:

Let me just object.  Go ahead.

THE WITNESS:

I don't know if there was -- I
don't recall a switch, but what I do recall
was that the air was blowing through the
duct system.

EXAMINATION BY MR. DINNELL:

Q    Okay.  When you tested it, the air
was blowing through the duct system?

A    No, sir.  When we had the air
conditioning system on.

Q    Okay.  Right in the "Preamble" of
your report, which we have marked in this
deposition as Exhibit 5, there's a line that
says "such that Gulf Stream" -- And I'm in
"Preamble" Paragraph 1, if you can get
there.

A    Yes, sir.

Q    In Paragraph 1, you say, "such
that Gulf Stream should have reasonably
expected it to be used in this manner given
its alterations made by FEMA."

When you say "alterations made by
FEMA," are you referring to the procurement
specifications that we have referenced at

other times during this deposition?

A     Yes, sir.  That the Government was
asking -- the United States was asking, FEMA
was asking them to make it more of a
residential unit than a travel trailer or a
residential unit.  That it was being
converted from travel trailer status to a
housing unit, whether temporary or
permanent.  I mean, it says temporary, but
that's what occurred.

Q     The specifications list a number
of options that FEMA was interested for the
purposes of using these units as emergency
housing, correct?

A     Yes, sir.

Q     And you reference these
specifications throughout your report.  I
remember you noting that the specifications
established the minimum standards that FEMA
was looking for for travel trailer
construction and outfitting to meet FEMA
requirements, correct?

A     Yes, sir.

Q     The specifications actually say
what you just mentioned, "Travel trailers

being procured under this contract are for

the purpose of providing temporary housing,"

right?

    A    Yes, sir.

    Q    They're "subjected to continuous

road travel, multiple installations and

deactivations, and various weather

conditions."

        Do you remember that?

    A    Yes, sir.

    Q    And your understanding is that's

what FEMA was asking for in the units that

it would purchase for emergency housing,

right?

    A    That, along with the rest of the

two or three pages of the document, yes,

sir.

    Q    Right.  Like no holding tanks, a

larger refrigerator?

    A    Yes, sir.

    Q    Stuff like that that would make it

easier to live in one of these units after a

disaster?

    A    Yes, sir.

    Q    And the specifications stated that

these FEMA specifications were not to be
considered restrictive; do you remember that
language?

    A    That's correct.

    Q    It said that "the supplier may
provide 'equal or better' units" in these
specifications, right?

    A    Absolutely.  Yes.

    Q    And then, again, you have
referenced this last line on the
specifications, "The manufacturer shall
design and construct all units under this
contract within a superior grade quality of
workmanship," correct?

    A    Yes, sir.

    Q    And from reading this document,
that's what you understood that the United
States was requesting when they purchased
these units from various manufacturers,
correct?

    A    Yes, sir.  That was the
specifications put out for bidding purposes.

    Q    Okay.  And whether or not, I
guess, in this case Gulf Stream's
manufacturer met some of these

specifications is the subject of some of

your other opinions in your report, right?

    A    Yes, sir.

    Q    I'm going to mark the 2004

specifications as Exhibit 12.

    MR. PINEDO:

        I see Exhibit 12, mine is a little

bit hard to read that.

    MR. DINNELL:

        Mine is hard to read, too.

    MR. PINEDO:

        Mr. Dinnell, do you have a better

copy, such that we can read the section

that's on the lower right-hand side of the

page?

    MR. DINNELL:

        I do not with me, but I know that

that document has been produced and everyone

should have a cleaner copy of that.  That's

just the one that I have with me today, and

that's actually the one that he had in his

file.

    MR. LAMBERT:

        The ones I have seen look like

this.  Could you when you get back just make

358

an effort to give us one we can read?

    MR. DINNELL:

        Yeah, we will see.

    MR. LAMBERT:

        Fine.  Okay.  But for the record,
it's FOREST-0002505 and 2507.  Okay.

    MR. DINNELL:

        Okay.

    MR. LAMBERT:

        Oh, it's two-sided.  05 through
08.  And we will make that request.

    MR. DINNELL:

        Yes.

EXAMINATION BY MR. DINNELL:

    Q    All right.  Mr. Mallet, when you
were out at the trailer, you took a
photograph that I'm marking as Exhibit 13,
and Exhibit 13 depicts a seal on the
Alexander travel trailer.  Do you remember
seeing that seal?

    A    Yes, sir.

    Q    What is your understanding of what
that seal on the Alexander travel trailer
means?

    A    That the manufacturer was

359

certifying to be in compliance with the

Standards for Recreational Vehicles ANSI

A119.2.

Q    Is that seal a representation from

the manufacturer to any purchaser that the

unit is in compliance with those standards?

A    Yes, sir.

MR. DERHAM:

I'm just going to object to the

form.

MR. LAMBERT:

Can I see it, please.

THE WITNESS:

Oh, I'm sorry.  Yes.  And the

questions was -- Could you just repeat it

again, because I was reading it.

MR. PINEDO:

Could we just have the record

clear this is double-sided.

MR. DINNELL:

That's right.

MR. PINEDO:

The only one we're talking about

being marked as Exhibit 13 is the one that

is consistent with the sticker "Exhibit 13"

and it says "RVIA."  Thank you.

    MR. DINNELL:

        The exhibit side has the exhibit
sticker on it.

    THE WITNESS:

        What's the question?  Was the
question that it's indicating that it's
certifying that it's meeting the --

EXAMINATION BY MR. DINNELL:

    Q    The seal that is depicted in
Exhibit 13, to your understanding, that seal
is certifying from the manufacturer to any
purchaser or user of the unit that that
particular unit with that seal is in
compliance with the standards required by
the RVIA?

    A    Yes, sir.

    MR. DERHAM:

        Object to the form.

    THE WITNESS:

        Yes.

EXAMINATION BY MR. DINNELL:

    Q    At Page 6 of your report,
Mr. Penot asked you about this a little bit
earlier.

You referenced that Ms. Alexander came into contact with someone and was told to air out the trailer, and you also referenced that Ms. Alexander discussed the wall panel with someone, and was told to tape it shut.

Do you remember that discussion?

A     Yes, sir.

Q     And I believe what you said is from your review of the documents, you believe that person that Ms. Alexander contacted was a FEMA contact person; is that correct?

A     Yes, I think that's what I read on the logs, and I'm strictly going from memory right now.

Q     Okay.  And by "logs," you mean there was a set of FEMA documents that referenced or listed contacts between FEMA and Ms. Alexander, the applicant of the trailer?

A     That's correct.

Q     But you defer to those actual documents as to whether or not Ms. Alexander actually made these particular contacts with

FEMA, correct?

    A    That's correct.  At this time, I'm

just -- I'm thinking that's where it was,

but I could have been told that.

    Q    Okay.  So if that's not reflected

in those documents, Ms. Alexander could have

made that contact with FEMA, it could have

been with a contractor, it could have been

with some other person that was dealing with

the unit, correct?

    A    Yes, sir.  If they're not there, I

would assume that the logs are -- I mean,

the logs say what they say.

    Q    All right.  On Page 10 of your

report, you begin a list of the number of

individuals that played a role in your work

on this case, and I'm going to start with --

Are you on Page 10 of your report?

    A    Yes, sir.

    Q    I'm going to start with

Mr. Henson.  In forming your opinions on

this case, you relied in part on a

conversation with Mr. Henson, correct?

    A    Well --

    MR. PINEDO:

Objection, form.

THE WITNESS:

That is the same -- The response
is the same as with Mr. Bunzer.  He and
Mr. Bunzer and I were walking around looking
at the trailer, having conversation about
what we were looking at, how maybe we could
obtain information, framing size and so
forth, so that's the extent of the
interview, but it was part of what I did.

EXAMINATION BY MR. DINNELL:

Q    It helped you formulate your
opinions in this case; is that a fair
statement?

A    No, sir.  It only assisted me in
trying to identify framing member sizes,
which really I don't think played a part in
the opinions.  It just helped me to try to
put together how the trailer was built.

Q    Okay.  So if I take out
"opinions," is it correct that that
discussion with Mr. Henson in part helped
you during your work on this case?

A    Yes.  I mean, to the extent that
we were looking at the same thing at the

same time, trying to obtain the same
information.

        Q    Okay.  And on the next page, you
list Dr. Stephen Smulski, and you had a
conversation with him, correct?

        A    Yes, sir.

        Q    Did that conversation with
Mr. Smulski help you in forming your
opinions in this case?

        A    The conversations that I had with
him were consistent with the information
that I read from other sources, other
studies about temperature and humidity
activating the formaldehyde, gassing.  The
discussion was from my perspective, is I'm
taking it from -- not from the beginning,
but from some point in the middle of this
investigation, so getting the data of, okay,
there's formaldehyde.

        Q    I believe you said earlier that's
one of the areas that you would consider
outside your expertise, so you wanted to
speak with someone who's actually in that
area of expertise, correct?

        A    Yes, sir.

Q     The same with Mr. Bunzer, the next
person listed that you had a conversation
with, he's an expert in RV's and travel
trailers, and that's not necessarily in your
area of expertise, so you wanted to speak
with him, correct?

A     Well, Mr. Henson, Mr. Bunzer and I
walked around together trying to identify
the components.

Q     Okay.

A     I know how these things are put
together, but because they were sealed
elements, we were trying to figure out,
well, how do we get the information that we
need.

Q     Okay.  And then you list some
other people you had conversations with,
Mr. Ritter, Mr. Scott, Mr. Kaltofen?

A     Yes, sir.

Q     Did your conversations with all
those people help you in working on this
case and reaching your opinions?

A     Only Mr. Ritter.  Mr. Scott and
Mr. Kaltofen's information was that their
assessment was that there was elevated

levels of formaldehyde based on their

testing and their experience.

    Q    Let me ask you, you just

referenced humidity, and I assume that as

someone in the construction business,

humidity comes up a lot in a lot of the work

that you do; would that be fair?

    A    In what I do, it's almost a daily

issue.

    Q    Is there a guideline or ideal

relative humidity level that you want to

achieve inside of a dwelling space?

    A    Yes, sir.

    Q    What is the target level of

relative humidity?

    A    The target level is between 30 and

60 percent, I think it is, by ASHRAE

standards and by other standards as the

comfort level.

        I think the governmental

hygienists' association also has established

very similar guidelines, because of at

levels between 30 and 60, the retardation of

mold growth occurs.  There's not enough

moisture to allow for manifestation of

mold -- of most molds.  80 percent and above
in relative humidity is enough moisture
vapor to support some microorganisms.

    Q   Now, when Mr. Ritter was in the
unit conducting his tests, the air
conditioning was on for varying periods of
time while he was doing his testing; is that
right?

    MR. PINEDO:

       Objection, form.

    THE WITNESS:

       I don't know.  I don't know.

EXAMINATION BY MR. DINNELL:

    Q   Do you remember -- Well, let me
ask it this way.  The air conditioning or
the HVAC system was operated in the unit at
some point in time during your inspection of
the unit?

    MR. PINEDO:

       Objection, form.

    THE WITNESS:

       Yes, sir.  At some point in time,
it was not on, and then it was turned on.

EXAMINATION BY MR. DINNELL:

    Q   Okay.  And while the air

conditioning was on, do you remember whether
or not Mr. Ritter took temperature and
humidity measurements in the unit?

    A   Yes, sir.  We had data loggers
placed in the unit -- or he had data loggers
placed in the unit.

    Q   And in Mr. -- Well, actually, I
believe it was both Mr. Ritter and
Mr. LaGrange also took measurements in the
unit; is that right?

    A   Yes, sir.

    Q   And you have referenced
Mr. LaGrange's report in forming your own
report and conclusions in this case; is that
right?

    A   Yes, sir.

    Q   Do you remember what the relative
humidity level inside the former Alexander
trailer unit was with the air conditioning
running inside the unit?

    A   No, sir, I don't.  I don't recall.

    Q   We would have to look to
Mr. LaGrange's report for that data?

    A   Right.  I just don't remember.

    Q   And you have no reason to think

that the data that he measured would in any

way be incorrect?

    A    No, sir.

    Q    Because you were observing him

taking his readings and measurements while

he was in the unit; is that right?

    A    Yes, sir.

    Q    I'm going to just mark Exhibit 14

as Page 9 of Mr. LaGrange's report, and in

Figure 3.0, there was a relative humidity

and temperature reading taken inside the

unit.  Could you read what those figures

were?

    A    Beginning at --

    Q    At 1:19.

    A    Just the inside, sir?

    Q    Yes, please.

    A    Yes.  Beginning at 1:19 p.m.,

42 percent; 1:46 p.m., 43 percent;

1:46 p.m., 43 percent; 4:35 p.m.,

72 percent.

    Q    Okay.  And you don't remember at

what times the air conditioning was being

turned on and off in the unit, do you?

    A    I think, if I remember correctly,

it was somewheres around 1:30 or 2:00 where
we shut it off for the blower door test.

     Q    Okay.  And if we spoke with
Mr. LaGrange about this at his deposition,
you would defer to whatever notes he took
about that?

     A    Right.  I didn't clock in and out,
on and off times.

     Q    But when the air conditioning was
on in the unit, the relative humidity inside
of the unit was measured at 42 percent; is
that correct?

     A    Yes, that's correct.

     Q    And at the same time, the outdoor
relative humidity was what?

     A    70 percent, 70 percent, and 69
percent.

     Q    Okay.  You referenced the
instructions from the air conditioning
manufacturer on this unit, and specifically
their line that states, "Keeping doors and
windows closed when the air conditioner is
in operation will minimize condensed
moisture on cold surfaces."

          Do you remember that?

A     Yes, sir.

Q     Is it your opinion that the
windows and doors should never be used to
ventilate a space?

A     Not on a continuing basis.

Q     Would you consider outdoor air
brought into a space as contaminated air?

A     Unconditioned, yes, sir.

Q     Okay.  So if we were to go and
open the window in this room and let air
flow into this space, in your mind, that
would be considered contaminated air,
because we're not conditioning it?

A     Correct, for an ongoing basis.
Not just for a short period of time.
Because we spend 60 plus percent of our time
inside.  Most average, I believe, is
67 percent in our homes.  And if you're just
breathing in whatever is out there,
depending on where you're located, that
could just not be good.

Q     Do you know if they make these
travel trailers without air conditioning at
all?  Are those available to the public?

A     I couldn't tell you "yes" or "no,"

but it wouldn't surprise me if they made
them without air conditioning, because there
are areas of the country where air
conditioning is just not necessary.

Q    And certainly you can still live
in a house or building, there are houses and
buildings that still don't have air
conditioning, correct?

A    That's correct.

Q    Even in this portion of Louisiana,
there may still be some homes or buildings
without air conditioning?

A    That's correct.

Q    Correct?

A    That's correct.

Q    And those spaces rely on natural
ventilation through doors and windows?

A    That's correct.

Q    You mentioned something earlier
about in your opinion, because when you
measured this unit, it had negative
pressure, that this unit wasn't appropriate
for use in this part of the country, in the
south; is that right?

A    That's correct.

373

Q    Do you know if when these units
were built, they were specifically going to
be used for the south or for disasters all
across the country?

A    As I appreciate it, disasters all
across the country.  Which is the same way
that they build what they call manufactured
houses, mobile homes, and it gets them in
the same trouble that the conditions are
with this travel trailer.

Q    Okay.  But do you know why travel
trailers were used in response to this
disaster rather than other alternatives?

MR. PINEDO:

Objection, form.

THE WITNESS:

I believe because of the speed in
which they were able to produce them and
move them potentially by rail.

EXAMINATION BY MR. DINNELL:

Q    Do you know why travel trailers
were used, say, instead of tent cities to
house disaster victims?

A    No, sir, I couldn't tell you that.

Q    Do you know who developed the

concept of using travel trailers as disaster

housing?

     A    Travel trailers?  No, I don't.

     Q    I'm running out of time, so I just

have one minute left here.

        I saw a note in your invoice log

about "prepared 1442 deposition questions."

Do you have any idea what that refers to?

     A    Yes, sir.

     Q    What was that?

     A    Questions -- I developed a set of

questions that were to be asked of the Gulf

Stream people to try to get information that

we didn't -- I didn't have available.

     Q    And you also had an entry on

June 9th that you reviewed an animation; is

that correct?

     A    Yes, sir.

     Q    What did that animation look like?

Was it just the trailer or did it have some

other component to it?

     A    Just the trailer.

     Q    Just the trailer without anything

going on inside of it?

     A    I was reviewing it for the --

what's the word -- accuracy of the layout

and the components as we understood them to

be.

    Q    You mentioned in your report that

the ATSDR recommends ventilation as a way to

reduce levels of formaldehyde?

    A    Yes, sir.

    Q    Do you disagree with that

statement?

    A    No, sir.

    Q    And that ventilation could include

natural ventilation, such as opening doors

and windows?

    A    Yes, it could.  It doesn't state

what type of ventilation.

    MR. PINEDO:

        Mr. Dinnell, I believe we are over

time now.

    MR. DINNELL:

        I believe we are, too.  Just for

the record -- Well, before you begin your

direct, we will just put, if you will give

us a continuing objection on any mention of

testing that was done in May, 2009.  I know

there's some disagreement as to what the

Court's order has excluded or not excluded,
but we would like to put an objection on the
record to any reference to testing in May of
2009.

MR. PINEDO:

And you're making an objection to
testing beyond formaldehyde testing; is that
the nature of your objection?

MR. DINNELL:

That's right.

MR. PINEDO:

And that's the way you, the United
States, views the Court's order?

MR. DINNELL:

Whether the Court's use of the
term "testing" means formaldehyde testing or
does it include blower door testing, duct
blaster testing, ventilation testing.

MR. PINEDO:

You can certainly have whatever
objection you want in that regard.

MR. DINNELL:

And we would view all of that
testing as covered by the Court's in limine
order, but you probably disagree with that.

MR. PINEDO:

I think it's a gross
misinterpretation of the Court's order, but
you're entitled to labor under such a
misinterpretation.

MR. DERHAM:

Gulf Stream joins the objection.

MR. PENOT:

Yes, and Fluor joins the
objection, just to avoid making objections
throughout your direct.

MR. PINEDO:

The ability for Fluor and Gulf
Stream to labor under the same misimpression
is totally theirs.

MR. DERHAM:

And this is not a question.  I'm
just going to put on the record that we have
agreed that you all would give us copies of
Mr. Mallet's folders marked Nos. 37 through
55, and also 82 from his file.

MR. PINEDO:

Those were represented by you as
being related to this matter, as being his
file materials for this matter.  Assuming

that's true, that is so, but I have not

cross-checked to make sure that 37 through

55 and 82 are part of his file related to

this matter.

       For example, to the extent that

there might be something from a different

case, like Dubuclet or Wright or whatever,

we are not agreeing to produce anything

that's not related to this case.

       Assuming you have accurately

stated that all the materials are there, we

will produce them at the conclusion of this

deposition.

   MR. DERHAM:

       That's fine.

   MR. LAMBERT:

       In short, we have your request of

37 through 55 and 82.  We will look at them.

We will produce them.  If we don't produce

them, we will tell you why, and we can

discuss it.  Okay?

   MR. DERHAM:

       Agreed.

   MR. PINEDO:

       Let's take a break.

THE VIDEOGRAPHER:

We are currently off the record.

The time as of right now is 7:07.

(Discussion off the record.)

THE VIDEOGRAPHER:

We're on the record.  The time is

7:18.

EXAMINATION BY MR. PINEDO:

Q    Sir, could you please state your

full name?

A    Alexis Mallet, Jr.

Q    Mr. Mallet, are you a licensed

general contractor in the State of

Louisiana?

A    Yes, sir.

Q    Are you also a licensed

residential building contractor?

A    Yes, sir.

Q    Are you also licensed as a

Louisiana Manufactured Housing

Commission/Manufactured Housing Installer?

A    Yes, sir.

Q    And what are the procedures in

installing manufactured housing?

A    Well, the very first thing is to

survey the site, check the soils for proper

compaction and make sure that the site

drains properly, that the pads -- the pad

that the site -- the manufactured house is

going to sit on is proper to receive the

home, and that there's access to the site

without damage to the unit.

Q    Have you installed manufactured

housing before?

A    Yes, sir.

Q    Have you also installed mobile

homes before?

A    Yes, sir.

Q    And have you also worked with

travel trailers in the past?

A    Yes, sir.

Q    In repairing them?

A    Repairing.

Q    In the process of repairing travel

trailers, did you become familiar with some

of the building materials and the building

methods and styles of travel trailers?

A    Yes, sir.

Q    Did you examine the

Alexander/Cooper travel trailer?

381

A     Yes, sir.

Q     Have you been involved in the
building industry for over 30 years?

A     Approximately 35 years in my own
business, and before that, I worked for my
father, who was in the construction
business, on projects when I was young.

Q     Are you a member of the National
Association of Homebuilders?

A     Yes, sir.

Q     Are you a member of the Louisiana
Homebuilders Association?

A     Yes, sir.

Q     Are you a member of the Acadiana
Builders Association?

A     Yes, sir.

Q     Are you also a member of the
Indoor Air Quality Association?

A     Yes, sir.

Q     Did you make an examination of the
Gulf Stream travel trailer that Christopher
Cooper and Alana Alexander lived in?

A     Yes, sir.

Q     And did you render a report in
this case reflecting your opinions, your

observations and reflections regarding the

Alexander/Cooper travel trailer?

     A    Yes, sir.

     Q    And have we previously marked your

report in this case as Exhibit No. 5?

     A    Yes, sir.

     Q    And we were talking about some of

your experience, training and background.

Have we marked your curriculum vitae as

Exhibit No. 2 in this case?

     A    Yes, sir.

     Q    Now, in addition to your work with

construction and building and travel

trailers, have you also done some work

related to hurricanes in the past?

     A    Extensive work on hurricanes.

Probably nine, 10 or 12 different hurricanes

or major catastrophes.

     Q    And could you name some of those

hurricanes and tell us briefly what you did?

     A    Well, Katrina, Rita, Ike, Gustav,

Danny, Juan.  Let's see.  Lili, Allison,

Andrew, of course, Hugo, and to a lesser

extent, back years younger, when I was

younger with my father.

383

Q     And what kinds of things have you done related to the building industry or the construction industry regarding those hurricanes, generally speaking?

A     Well, we would accept looking at claims, estimating claims, producing scopes of damages, repairing damages from the storms, acted as consultants to analyze the damages to the storms, whether it were commercial, residential, mobile home, travel trailer, or any other kind of structure.  We would analyze, estimate and repair those facilities or those buildings.

Q     And when you made an examination of the Alexander/Cooper travel trailer, did you use some of those same methods and procedures that you had used when you were involved in other hurricane issues where you examined damage to a structure or examined a structure after it had been exposed?

MR. DINNELL:

        Objection, form.

MR. DERHAM:

        Object to form.

MR. PENOT:

384

                Join.

        THE WITNESS:

                Yes, sir.

    EXAMINATION BY MR. PINEDO:

        Q    In addition to being a licensed

    homebuilder, do you also own a construction

    company?

        A    Yes, sir.  I'm a licensed general

    contractor.

        Q    And have you worked on travel

    trailers and mobile homes in the past?

        A    Yes, sir.

        Q    Could you briefly tell the ladies

    and gentlemen of the jury what type of work

    you have done on mobile homes and travel

    trailers?

        A    Well, everything from analysis of

    defects and failures, analyzing the moisture

    issues, negative air pressure issues,

    comparison of the construction to the codes

    and standards under which they're built to

    determine if they're in compliance with

    those codes and standards, infrared

    thermography, indoor air quality testing,

    repairs to those facilities from either fire

damage, water damage, mold damage, windstorm
damage or some other event, such as a
casualty, an accident, where a car may have
run into a mobile home or into a camper,
things of that nature.  We would take them
apart and put them back together.

     Q    In addition to your work as a
homebuilder, do you have an organization
that you're president by the name of First
General Services of the South?

     A    Yes, sir.

     Q    And what type of work does First
General Services of the south do?

     A    We do actually the insurance end
of construction, which would deal mainly
with the catastrophic losses, the casualty
losses, and we perform consulting services
to insurance companies, individuals,
architects, engineers, organizations, the
Federal Government, State, City.

     Q    As part of that work, do you
routinely analyze, for example, water leaks
and what might be causing water leaks in a
structure?

     A    Yes, that is one of the major

parts of our operation is dealing with

moisture in some shape, whether it's in

moisture vapor or in liquid form.

    Q    In addition to that work relating

to either moisture or water, do you do some

work related to heating and air conditioning

systems either with your construction

company or with First General Services of

the South?

    A    Yes.  Starting with the

construction company, we regularly installed

air conditioning systems.  We were

responsible for air conditioning entire

school facilities some years back.

        We worked in conjunction with the

architects and the engineers in the actual

design of the facility, the equipment and

facility that would be utilized and how to

properly install that equipment in those

schools.

        We regularly analyzed air

conditioning systems and ductwork for proper

performance, because as workmanship changed

and products changed, so did the quality of

that product that was put out.  We find more

and more duct leakage issues with mechanical

systems, more plenum issues, the connections

to the actual unit, and the return air

systems.

So on a regular basis we review

the installation, either on our own

projects, we review whether the codes and

manufacturer's installation standards or

requirements were met.

I oversee all of our construction

projects, even though I have a supervisor

below me that does that.  Many times we

place the specifications on our projects

ourselves or in conjunction with one of our

engineers.

So I regularly am involved with

air conditioning systems, heating,

ventilation and air conditioning systems.

Q     In addition to work with heating

and ventilation systems, do you also at

times analyze failure modes or stresses on

buildings and what might be causing a

failure in those buildings?

A     Yes.  We regularly deal with

foundation failures, the stresses of those

foundation failures on the structure,

inadequate construction means and methods on

materials that were used putting together

facilities, determine whether their size,

type of material, connecting methods meet

the codes and standards, the reason for

foundation movement, foundation failures.

We have soil analysis done on both

projects that we're involved in and on

consulting projects to determine the

load-bearing capacities of the soils, if

it's going to support the buildings that

we're going to construct, or if it's a

building that we're analyzing for defects or

failures, whether the soils can support the

structure that's placed upon them and

whether the foundation was designed to

either meet the minimum codes or that type

of soil condition on that site.

     Q     Are you a licensed engineer in the

State of Louisiana?

     A     I am not.

     Q     Are you a member of the

Investigative Engineers Association?

     A     Yes, I am.  The last I knew, I was

the only non-engineer member of the

Investigative Engineers organization.

Q    Have you ever given any speeches

or talks or presentations at the

Investigative Engineers Association?

A    Yes, I have given several lectures

over the years to that organization.

Q    And what kinds of things have you

lectured to engineers or instructed

engineers on?

A    Types of defects and failures,

building sciences, which is the working of

or the interworkings of moisture, air and

temperature and how they relate to the

building as a whole and how not to focus on

individual components, but look at the

systems as a whole, what types of testing to

perform, what to look for, what various

types of damages look like, what may look

like water damage may, in fact, be a result

of moisture vapor and not a water leak, how

the negative air pressures come about in the

buildings, what's the effect of that, what

to look for around windows and doors, around

enclosures, how to test and investigate to

see if those were done based on the building

codes and standards, things of that nature.

      Q    When you have done those

examinations in the past, is there certain

routines you follow with regard to looking

for leaks or looking for stress points in

structures?

      A    Yes.  First it's visual, make

visual examinations.  We document what's

there, and then perform some research on is

that -- are the methods used and the

materials used consistent with the codes or

standards.

           Sometimes I bring in engineers to

assist me with calculations, mathematical

calculations to determine the stresses, to

determine proper functioning of a mechanical

unit itself, to determine if the size of the

steel members are proper for the particular

loads that are carried or asked to be

carried by any particular member of a

building or the unit as a whole.

      Q    Is it that you are familiar with

various engineering principles, but at times

you consult with engineers on construction

defects or construction projects?

    A    Yes, that's correct.

    Q    And you examined the
Alexander/Cooper trailer?

    A    And vice versa.

    Q    And vice versa?

    A    Engineers and architects call me
in on projects to consult with me on
problems either with buildings that they are
involved in or that they have been brought
in to analyze, or in some cases I have been
asked to review their plans and
specifications to see if they're consistent
with and work in conjunction with other
parts of the building.

    Q    And you have rendered advice to
engineers in the past?

    A    Yes.

    Q    Have you rendered advice to
architects in the past?

    A    Yes.

    Q    When you examined the
Alexander/Cooper trailer, when was that?

    A    May of 2009.

    Q    Did you ask any engineers to

assist you in that examination as part of
your work?

    A    Yes, sir.

    Q    And who did you ask to assist you
in that work?

    A    David Moore, Charles David Moore,
a structural engineer, a civil engineer.  I
have worked with David's firm since the
19 -- early 1980's.  I produced projects
under their firm and they have produced
projects for me.

        I asked Ervin Ritter, who is a
mechanical and environmental engineer.  I
initially asked him to become involved from
the environmental end, because I was unaware
of already the participance of Mr. Scott and
Mr. Kaltofen in performing -- that they were
performing indoor air quality testing or
formaldehyde testing.

        Mr. Freyou is, as I mentioned
earlier, also an environmental engineer.

    Q    And did Paul LaGrange assist,
also, in your examination?

    A    Yes.  Mr. LaGrange is known
throughout the state for performing blower

door and duct leakage tests, envelope
leakage tests.  He is part of the LSU "ag"
building science promotion or production of
how to build buildings in Louisiana, under
the Louisiana conditions, environmental
conditions.

        He worked alongside of probably
the most well known authority in the United
States that I'm aware of, Joseph Lstiburek,
if I pronounced his name right, who has
written numerous books and publications on
building science.  And Mr. LaGrange also
gives talks on the building science in the
blower door air leakage portions of a
building.

        Q    Were you satisfied that Paul
LaGrange, Ervin Ritter and Charles David
Moore had the expertise and skills to assist
you in the technical areas in which you
sought their assistance?

        A    Yes, I did.

        Q    And how many days were you out
there examining the Alexander/Cooper travel
trailer?

        A    On one afternoon was from 4:00 to

7:00.  The next day, it was from 9:00 to

between 2:00 and 3:00.

     Q     And did you observe Charles David

Moore, Ervin Ritter and Paul LaGrange doing

their examinations and procedures on the

Alexander/Cooper travel trailer?

     A     Yes.  One of the things that I do

when I call in an engineer is to participate

in that investigation with them.

     Q     And how would you describe what

your examination was, the purpose of your

examination of the Alexander/Cooper travel

trailer?

     A     Well, we began on the outside

documenting the trailer, what we saw, what I

saw, either through written notes or

photographic documentation.

          Around the perimeter, I inspected

the roof system, photographed it, inspected

the underside of the trailer, the vapor

barrier, the steel structure, how it was put

together with I-beams, outriggers, the

penetrations through the vapor barrier.  In

this particular case, the water that had

collected in the underbelly of the travel

trailer.

          Once we -- once I completed the
majority of what I was doing on the
exterior, then I moved to the interior and
began making observations of walls,
ceilings, floors, how the travel trailer was
put together, the various building materials
that were put together, that were used in
the construction of the travel trailer to
form an opinion as to the construction of
that, how it was constructed.

     Q     And did you set forth those
opinions in your report?

     A     Yes, sir.

     Q     Did you make an assessment of the
heating and cooling system of this travel
trailer?

     A     Yes, I did.

     Q     Did you make an assessment of the
structural frame or the chassis, the metal
chassis on which this travel trailer was
mounted?

     A     I made an assessment of that.

     Q     And through Paul LaGrange, did you
also participate in assessment of the

leakage of air inside and outside of this

travel trailer?

     MR. DERHAM:

        Object to form.

     THE WITNESS:

        In conjunction with and

independent of his testing, yes.

EXAMINATION BY MR. PINEDO:

     Q   And "his testing," you're

referring to Paul LaGrange?

     A   Paul LaGrange, his envelope

leakage test and his duct leakage test.

     Q   Now, we have talked about air

leakage. Did you also try to make some kind

of assessment as with regard to water

leakage in the Alexander/Cooper travel

trailer?

     A   Yes.

     MR. DERHAM:

        Object to form.

     THE WITNESS:

        Yes.

EXAMINATION BY MR. PINEDO:

     Q   Was it your understanding that

Alana Alexander had some type of problem in

this travel trailer with water leaking

inside?

     A    Yes, sir.

     Q    Did you make any type of

assessment or examination of the wood

materials that were used or did you observe

or record what kind of wood materials were

used in this travel trailer?

     A    Yes.  I think only in the wall

system were we able to visually observe

those.

     Q    Did you make some recommendations

as to an improvement in this travel trailer

for using it on a long-term basis?

     A    Yes, I did.

     Q    Do you have a general

understanding of the Alexander and Cooper

complaints with regard to formaldehyde in

this travel trailer?

    MR. DINNELL:

        Objection, form.

    THE WITNESS:

        Ask it again, please.

EXAMINATION BY MR. PINEDO:

     Q    Do you have a general

understanding of the complaints of Alana

Alexander and Christopher Cooper with regard

to this travel trailer.

    MR. DINNELL:

        The same objection.

    THE WITNESS:

        I do.

EXAMINATION BY MR. PINEDO:

    Q    And what are they?

    A    Well, that they experienced eye

and respiratory irritations, that

Christopher Cooper appeared to have

increases in asthma attacks while living in

the trailer, and that on one or more

occasions that he went to the emergency room

as a result of asthma-related problems.

    Q    Let me ask you, for your 35 plus

years involved in the building industry, has

formaldehyde ever been an issue that you're

aware of in the building industry?

    A    Yes.

    MR. DERHAM:

        Object to form.

EXAMINATION BY MR. PINEDO:

    Q    And what is your understanding of

that, the concern with regard to
formaldehyde?

        A    That mainly the manufactured home
industry, the mobile home industry
experienced significant problems in the
seventies and early eighties with
formaldehyde issues in travel trailers.

            There were studies done to figure
out what could be done to eliminate that
problem.  HUD became involved, because HUD,
Housing and Urban Development, oversees the
construction of, the design -- sets some
standards for the construction of mobile
homes, and formaldehyde was an issue that
HUD addressed specifically.  Formaldehyde
was an issue that HUD addressed specifically
in the Part 3280 standards.

        Q    How long are you aware that
formaldehyde has been an industry -- Excuse
me.  How long are you aware that
formaldehyde has been an issue in the
building industry?

        A    The earliest report that I saw was
1978 performed by RADCO on behalf of
Fleetwood Manufactured Homes.  I don't think

that's the exact title, but it's Fleetwood.

    Q   And do you have a general understanding as to what types of issues are raised when people are living in a structure with formaldehyde?

    MR. DERHAM:

       Object to form.

    MR. PENOT:

       I join in the objection.

    THE WITNESS:

       The types of issues are nose irritation, eye irritation, skin irritation, breathing, respiratory issues.  I think that's all I recall.

EXAMINATION BY MR. PINEDO:

    Q   And how did you become aware that there are health issues regarding the building industry and formaldehyde?

    MR. DINNELL:

       Objection, form.

    MR. PENOT:

       Objection, form.

    MR. DERHAM:

       I join in the objection.

    THE WITNESS:

Well, through information given to
me and by independent research by myself
with the formaldehyde issues -- issue.

EXAMINATION BY MR. PINEDO:

Q    Did you make some recommendations
or suggestions as to ways to reduce the
formaldehyde that would have been in the
Alexander/Cooper travel trailer?

A    Yes, sir, I did.

Q    Did you make some recommendations
with regard to the wood or wood materials
that were used in the Alexander/Cooper
travel trailer?

A    Yes, sir.

Q    Did you make some recommendations
with regard to ventilation, as to how it
might reduce the amount of formaldehyde that
would gather in the Alexander/Cooper travel
trailer?

A    Yes, sir.

Q    Did you make some recommendations
with regard to vapor barriers regarding the
Alexander/Cooper travel trailer?

A    Yes, sir.

Q    Did you make some recommendations

with regard to roof cavities and how they're
filled or what is used for insulation in the
Alexander/Cooper travel trailer?

    A    Yes, sir.

    Q    Did you make some recommendations
with regard to sealants that might be used
on the Alexander/Cooper travel trailer?

    A    Yes, sir.

    Q    And those recommendations, are
they contained in your report that has
previously been marked as Exhibit 5 to this
deposition?

    A    Yes, sir.

    Q    Let's talk about each one of those
areas in a little bit more detail, and I am
turning to your report --

    MR. DERHAM:

        You have five minutes on the tape.

EXAMINATION BY MR. PINEDO:

    Q    I'm turning to your report, on
Page 96.  Are your conclusions contained
starting about Page 95, 96?

    A    Yes, sir.

    Q    On Page 96, you reference in
Paragraph 6 some of the wood products.  Let

me ask, do you have that page in front of
you, sir?

    A    Yes, sir.  What item?

    Q    In addition to the work that you
did with Mr. Ervin Ritter and Charles David
Moore and Paul LaGrange, did you talk to an
expert by the name of Stephen Smulski in
regard to your examination of this travel
trailer?

    A    Yes, sir.

    Q    Do you have an understanding,
based upon your discussions with Mr. Smulski
and your experience as a building
contractor, as to some of the wood products
in this travel trailer that would have
contained formaldehyde?

    A    Yes, sir.

    MR. DERHAM:

        Objection.

EXAMINATION BY MR. PINEDO:

    Q    And is that contained in your
report?

    A    Yes, sir.  Dr. Smulski and I were
doing our inspections at the same time.  I
actually assisted him in part of the

inspections that he was making and
identifying some of the products in the
trailer.

    Q    Did the wall panels in this
Alexander/Cooper travel trailer contain
formaldehyde?

    A    It is my understanding from
Dr. Smulski that they did.

    Q    Did the ceiling panels in this
Alexander/Cooper trailer contain
formaldehyde?

    A    That is my understanding.

    Q    Did the cabinets, the wood in the
cabinets in the Alexander/Cooper travel
trailer contain formaldehyde?

    A    That's my understanding.

    Q    Did the built-in furniture in the
Alexander/Cooper travel trailer contain
formaldehyde?

    MR. DINNELL:

        I will just object to this being
outside the scope of this witness.  Go
ahead.

    MR. PENOT:

        I join in the objection.

405

MR. DERHAM:

        We will join.

    THE WITNESS:

        That's my understanding.

EXAMINATION BY MR. PINEDO:

    Q    And did the flooring, the sheeting

used for the flooring, did it contain

formaldehyde in the Alexander/Cooper travel

trailer?

    MR. PENOT:

        The same objection.

    MR. DERHAM:

        The same objection.

    THE WITNESS:

        That's my understanding.

EXAMINATION BY MR. PINEDO:

    Q    And have you reflected that in

your report on Paragraph 6 on Page 96?

    A    Yes, sir.

    MR. PINEDO:

        Let's take a break to change the

tapes.

    THE VIDEOGRAPHER:

        We're off the record.  Right now

the time is 7:47.

(Discussion off the record.)

THE VIDEOGRAPHER:

We're on the record.  The time as of right now is 7:51.

EXAMINATION BY MR. PINEDO:

Q    Mr. Mallet, in your work in the building and construction industry for the last 35 years, have you become familiar with what types of wood products contain formaldehyde?

A    Yes.  In our repairs and renovations and damage issues with mobile homes, I have to be cognizant of what materials to place in mobile homes, because I need to meet the HUD code, so I can't put any types of materials back in a mobile home during repair.

Q    And what happens if too many wood products with formaldehyde are used in a mobile home?

MR. DERHAM:

Objection.

MR. DINNELL:

Objection.

MR. PENOT:

I join in the objection.

THE WITNESS:

Well, if I put formaldehyde-emitting products and there's an issue, then I haven't met the code, then I have a liability issue to deal with, particularly if there's a claim from the owners or occupants of the house that involved a formaldehyde-emitting material that we may have used.

EXAMINATION BY MR. PINEDO:

Q    In your experience in the building industry for the last 35 years, have you become familiar with the properties of wood and wood products that are used in construction projects?

A    Yes.  We use wood products extensively.

Q    And do you have knowledge of what happens to formaldehyde-containing wood products when they're exposed to moisture or water?

MR. PENOT:

Object to the form.  Objection.

THE WITNESS:

It is my understanding that water activates the formaldehyde in the product, whether it's in liquid or vapor form.

EXAMINATION BY MR. PINEDO:

Q     Does moisture or water increase the off-gassing of formaldehyde from wood products containing formaldehyde resins?

MR. DERHAM:

Objection.

MR. DINNELL:

Objection.

MR. PENOT:

Objection.

THE WITNESS:

That is my understanding, yes.

EXAMINATION BY MR. PINEDO:

Q     And what is your recommendation with regard to either changing or altering the wood products that were used in the Alexander/Cooper travel trailer?

A     What are my recommendations?

Q     Yes.

A     To change the paneling from a hardwood material to a hard board type material that did not use a

urea-formaldehyde based adhesive.

Those products have been on the market and they actually use them in mobile homes in wall and ceiling construction.

One of the recommendations was to install a vapor barrier on the exterior of the home, like a Tyvek type material that you see on homes today and commercial buildings to prevent the movement of moisture in vapor form, like relative humidity, from the exterior of the building towards the interior of the building, because that can happen both in relative humidity -- in negative air pressure conditions or, as I was questioned earlier about the relative humidity on the interior of this travel trailer, the relative humidity was much lower than the exterior relative humidity.

What happens then is we have a condition -- we have diffusion that occurs through the building materials as a result of vapor pressure differentials that draw the high vapor pressure on the outside with high relative humidity in towards the drier

air on the interior of the travel trailer.

So we have two events occurring, one from air infiltration carrying moisture into the trailer, and then diffusion through vapor pressure differentials.

MR. DERHAM:

I'm just going to object to the responsiveness.

MR. PINEDO:

Okay.  So let me ask the question over again.

MR. DERHAM:

Well, I got a little bit -- I thought the question was just what recommendations he made to change the materials in the unit.  It just seemed like it strayed.

MR. PINEDO:

I understand your observation.

EXAMINATION BY MR. PINEDO:

Q    Sir, let me ask you, did you make any recommendation of replacing some of the wood products containing formaldehyde in the Alexander/Cooper travel trailer to Masonite type products?

A     Yes.

Q     Do Masonite products emit
formaldehyde?

A     There are Masonite products that
do not.

Q     What are some of the structures in
the Alexander/Cooper travel trailer that you
are suggesting to change over to Masonite?

A     The components would be cabinetry,
doors, door frames, things of that nature.

Q     If the cabinets and door frames
were made out of Masonite, would that then
reduce the amount of formaldehyde emitted in
the Alexander/Cooper travel trailer?

A     Yes.  It would basically eliminate
the emissions of formaldehyde, because the
product is not made with formaldehyde.

Q     Do you have any recommendations as
to what could be done with the ceiling
panels or wall panels to reduce formaldehyde
or eliminate formaldehyde emissions in the
Alexander/Cooper travel trailer?

A     As mentioned earlier, the --

MR. DERHAM:

        I'm sorry.  Objection.

THE WITNESS:

The panels could be replaced with
a hard board panel made with either phenol
formaldehyde or a soy-based adhesive or some
other non-urea-formaldehyde adhesive.

EXAMINATION BY MR. PINEDO:

Q    In your knowledge in the building
industry, have those products as you have
just explained to us, soy-based or other
products that you're suggesting, were they
available as of December, 2004?

A    Yes, sir.

Q    Had they been available for a
number of years?

A    Yes, sir.

Q    With regard to the Masonite
paneling or Masonite structures that you're
suggesting as replacements for use in the
Gulf Stream travel trailer that was supplied
to Alana Alexander and Christopher Cooper,
were they available in 2004?

A    Yes, sir.

Q    Have they been available for a
number of years?

A    Yes, sir.

Q     Are there any other wood products
besides what we have talked about with the
Masonite or the soy-based wood products that
you are suggesting as replacements in the
Alexander/Cooper travel trailer to reduce
the amount of formaldehyde?

A     Yes.  In addition to that, the use
of, I believe, OSB board, oriented strand
board, is made with either very low
formaldehyde emissions or adhesives or is
absent of formaldehyde-containing adhesives.

Q     When you were examining the
Alexander/Cooper travel trailer, did you
have the opportunity to observe the
underside of the Alexander/Cooper travel
trailer?

A     Yes, sir, I did.

Q     Did you notice anything unusual
about the underside of the Alexander/Cooper
travel trailer?

A     Well --

MR. DERHAM:

        Objection.

THE WITNESS:

        What I noticed was the underside,

the belly board was sagging, bulging, like a
balloon.

EXAMINATION BY MR. PINEDO:

    Q    I'm going to show you what has
been marked as Mallet 15.  This is a photo,
and it also has Image No. 0142.  Could you
tell us what that particular photo depicts?

    A    That is the front -- This is the
hitch end right side of the underside of the
travel trailer with the bulging vapor
barrier.

    Q    Could you just please put that in
front of your notebook here, and I'm going
to ask the videographer to zoom in on this,
if you could just almost like an easel put
it down.

    Does that represent somebody
laying on their back, looking up toward the
underside of the Alexander/Cooper travel
trailer?

    A    Yes, sir, it is.

    Q    And the bulge there, what is that
bulge?

    A    That is water in the -- That is
water in the cavity, the floor cavity.

Q     Are you convinced that that was
accumulated water underneath the
Alexander/Cooper travel trailer?

A     Yes, sir.

Q     I'm going to show you what's
marked as Exhibit No. 16, which also bears
JPEG Images 73 and 74.  Could you please
tell us what those depict?

A     These are photographs within a
series of photographs documenting the water
pouring out of the belly board of the travel
trailer as someone presses on the -- presses
upward on the bulge in the belly board.

Q     Are they pressing up on the bulge
such as we see in Mallet Exhibit No. 15?

A     Yes, they're pressing up towards
the floor.

Q     Could you please hold that up, so
the videographer can focus in.  Does that
depict a hand and some water flowing out?

A     Yes, it does.

Q     And is that after somebody had
pushed underneath, that the water flowed out
from underneath the Alexander/Cooper travel
trailer?

416

A    Yes, sir, it does.

Q    And what is your understanding of
what happens when water comes in contact
with the floorboard in this Alexander/Cooper
travel trailer?

MR. DERHAM:

    Objection.

MR. PENOT:

    Objection.

THE WITNESS:

    Well, there's a source of moisture
available to the products to intermingle
with the adhesive and activate the
urea-formaldehyde material.

EXAMINATION BY MR. PINEDO:

Q    And when the urea-formaldehyde
material comes in contact with water, does
more formaldehyde gas get released from the
wood product?

MR. DERHAM:

    Objection.

MR. DINNELL:

    Outside the scope.

MR. PENOT:

    I join.

417

THE WITNESS:

     That is my understanding from documents that I have read, conversations that I have had with those people and consultants in that area.

EXAMINATION BY MR. PINEDO:

    Q   And did you include that in your report?

    A   Yes, I did.

MR. PINEDO:

    May I suggest one objection is good for all?

MR. DERHAM:

    That's fine.

MR. DINNELL:

    That's fine.

MR. PENOT:

    I can object.

MR. LAMBERT:

    I kind of like the chorus.

EXAMINATION BY MR. PINEDO:

    Q   Did you include a discussion on low-emitting formaldehyde wood products in your report?

    A   Yes, I did.

Q    With regard to the

Alexander/Cooper travel trailer?

A    Yes, I did.

Q    If a manufacturer uses

low-emitting formaldehyde wood products in a

travel trailer, for example, could there

still be some type of problem with

formaldehyde build-up?

MR. DERHAM:

        Objection.

MR. PENOT:

        Objection.

THE WITNESS:

        Yes, there could be, based on the

research that I have done and conversations

that I have had with experts in the field.

EXAMINATION BY MR. PINEDO:

Q    Explain that to us.  How could you

still have a problem even if low-emitting

formaldehyde wood products are used in a

travel trailer?

MR. DERHAM:

        Objection.

MR. PENOT:

        Objection.

THE WITNESS:

As pointed out in the Lawrence Berkeley Laboratory investigation, the size of the travel trailer is much smaller than a typical house and the ratio, the relationship of the size of the travel trailer versus the amount of urea-formaldehyde containing materials, the ratio, the percentage of that material is greater in a travel trailer than it is in the standard size house.

EXAMINATION BY MR. PINEDO:

Q    Did you use some type of example in your report about making gumbo or a roux that's related to that?

A    Yes, I did.  I used two different examples.  One was that of placing a fish in a bucket and leaving it in the corner in a travel trailer.

The decay and odor would be far stronger in a travel trailer with 200 or so square feet of floor area and a lower ceiling than it would be in the standard size house that has either an eight, nine, 10-foot or so ceiling with much more area

420

for that odor to disperse.

Once the odor quits dispersing,
the gases are going to form -- are going to
come into equilibrium and the odor would be
less pungent in a house than it would be in
the smaller travel trailer.

The gumbo example that I used is
if I'm making a two-quart pot of gumbo with
a chicken and some sausage, I will have a
certain flavor with that gumbo or a certain
degree of intensity with those ingredients,
but if I take that two-quart pot of
ingredients and put it in a 10-gallon pot
and add water to it, the effects are going
to be quite different, the taste is going to
be quite different.

As one LSU professor put it, the
only way he could make his students
understand about that issue is you take a
can of beer and you pour half of it out and
you put water in the other half that you
just dumped out.  That beer is going to
taste different now.

Q    And in your example, is the
two-quart pot analogous to a travel trailer

and the 10-gallon is analogous to a house?

A    Yes, sir.

Q    And is that the same principle,
where the formaldehyde gas would be
concentrated in a smaller area as opposed to
a larger area?

MR. DERHAM:

Object.

MR. PENOT:

Objection.

THE WITNESS:

Yes, sir.

EXAMINATION BY MR. PINEDO:

Q    Did you also review some Gulf
Stream documents in preparing your report?

A    Yes, sir.

Q    Did you see anything in those
documents that Gulf Stream knew some of the
units they were building were manufactured
with wood that was not low-emitting
formaldehyde wood?

A    Yes, sir.

Q    Tell us what you recollect about
those particular documents.

A    Those documents, and I believe the

testimony of one of the persons with Gulf
Stream, stated that there was a delivery of
material that was not stamped "low-emitting
formaldehyde" on the product, and they did
not know how much of that material was
delivered or how much of that material was
installed in their travel trailers.

    MR. PENOT:

      Objection.

    MR. PINEDO:

      You have your objection.

    MR. PENOT:

      Huh?

    MR. PINEDO:

      You have your objection.

EXAMINATION BY MR. PINEDO:

    Q   And so is it your opinion that
even if the entire unit had low-emitting
formaldehyde in the wood products, that
still may not be sufficient to reduce the
formaldehyde levels?

    MR. DERHAM:

      Objection.

    THE WITNESS:

      That's correct.

EXAMINATION BY MR. PINEDO:

    Q    You had mentioned that Lawrence Berkeley report.  Did the United States Government sanction Lawrence Berkeley to do some type of examination of travel trailers after Hurricane Katrina?

    MR. DINNELL:

        Objection, form.

    THE WITNESS:

        Yes.  Yes, they did.

EXAMINATION BY MR. PINEDO:

    Q    Did you read that report?

    A    Yes, I did.  The interim and the final.

    Q    And what relevance does that report have to your opinions in this case?

    A    Well, my opinions coincide with Lawrence Berkeley's opinion about the size of the travel trailer, the intensity of the formaldehyde, the activation of the formaldehyde by temperature rising and the exposure of the formaldehyde material to moisture.

    Q    I'm going to show you what has been marked as Exhibit No. 17.

Is this the Lawrence Berkeley report that you're referring to?

A     Yes, this is the final report. There was an interim produced before this.

Q     And did you read both of them?

A     Yes, I did.

Q     You had mentioned something from that Lawrence Berkeley report that is also in your own report.  Could you explain to us about the relationship between temperature and wood containing low-emitting formaldehyde?

MR. DERHAM:

Objection.

THE WITNESS:

Yes.  In my report, I reported that others have stated that temperature causes an increase in formaldehyde, the release of formaldehyde emissions, and that it doubles approximately every 12 degrees in rise in temperature.

EXAMINATION BY MR. PINEDO:

Q     And is that something you became familiar with by doing research in this case as well as reading the Lawrence Berkeley

425

report?

     A    Yes, sir.

     Q    Is that an opinion just that you

hold, that temperature increases the amount

of formaldehyde that's released from wood

products?

     A    No, my opinion is --

    MR. PENOT:

        Objection.

    THE WITNESS:

        My opinion is based upon the

studies that were performed, the testimony

or the reports of experts in the field, and

then I take and extrapolate that to my

investigation.

EXAMINATION BY MR. PINEDO:

     Q    Did you do a careful examination

of the Alexander/Cooper travel trailer?

    MR. DERHAM:

        Objection.

    THE WITNESS:

        Yes, sir.

EXAMINATION BY MR. PINEDO:

     Q    Did you read the owner's manual of

the Alexander/Cooper travel trailer?

A     Yes, sir.

Q     Did you see anything either on the
trailer or in the owner's manual regarding a
warning with regard to formaldehyde that may
be emitted from the Gulf Stream travel
trailer that the Alexanders and Coopers
lived in?

A     No, sir, I saw no such warning,
and there were numerous warnings both in the
owner's manual and on the trailer itself,
and according to one of the experts in this
case, I think there are over 500 warnings
that extend to travel trailers.

Q     Did you see anything in the
purchase orders for some of the wood
products that were used in Gulf Stream
travel trailers with regard to formaldehyde
emissions?

A     Yes, I did.

Q     And please relate to us what you
saw in that regard.

A     Some of the invoices that I
reviewed had their product designated as low
formaldehyde emitting materials.

Q     Did you also see some MDS sheets

427

with regard to some of the wood products

that were used in the Gulf Stream travel

trailers?

A    Yes, sir.

Q    And could you explain what an MDS

sheet is for the ladies and gentlemen of the

jury?

A    MDSD is the material safety data

sheet, and every product, to my knowledge,

to my understanding, every product that's

manufactured requires a material safety data

sheet to contain a description of the

materials, the make-up of that material, any

harmful -- any harmful components of that

material or chemicals or any part of the

make-up of that material that's harmful,

what it is, to thoroughly identify it, and

that is to put the public on notice.

When I buy materials, I'm given

the safety data sheet for whatever materials

I'm purchasing, even something as simple as

a two-by-four stud, the effects of the

sawdust on the workers.  I'm responsible for

the safety and health of the workers that

are in my employ, of the subcontractors, and

also the people for whom I build my

products.  So I cannot utilize a product or

a chemical without a safety data sheet.

Q     And I think I referred to it as

MDS, but the proper acronym is MSD?

A     Right.

MR. LAMBERT:

MSDS.

EXAMINATION BY MR. PINEDO:

Q     MSDS.  And did you see anything

with regard to MSDS sheets for Gulf Stream

travel trailers regarding formaldehyde and

wood products?  Do you remember anything in

that regard?

A     There was a safety -- a material

safety data sheet.  I don't remember

specifically what it was attached to.

Q     But you being involved in the

building industry, you have become familiar

with the material safety data sheets?

A     It's required of me to have those

in my vehicles, available to my employees

and my clients.

Q     Assuming that Gulf Stream used

wood products containing formaldehyde, would

they have seen and come in contact with

material safety data sheets talking about

formaldehyde in those wood products?

    MR. DERHAM:

        Objection.

    MR. PENOT:

        Objection.

    THE WITNESS:

        They should have been provided the

material safety data sheets.

EXAMINATION BY MR. PINEDO:

    Q    About how many structures have you

either built or been involved with as a

builder in your 35-year career?

    A    Well over 1,000.

    Q    And in your opinion, as a builder,

if a unit contains several products that

have formaldehyde emissions, do you think as

a builder that you would have a

responsibility to inform the occupants of

that house about those formaldehyde

emissions?

    MR. DERHAM:

        Objection.

    MR. PENOT:

Objection.

THE WITNESS:

I'm required to provide them the
data of the materials that I'm using in the
house, even down to the cleaning materials
that were used.

EXAMINATION BY MR. PINEDO:

Q    Did you see any reference that
Gulf Stream had put the Alexanders or the
Coopers on notice of formaldehyde-containing
wood products in the travel trailer that
they occupied?

MR. DERHAM:

Objection.

THE WITNESS:

No, sir.

EXAMINATION BY MR. PINEDO:

Q    And you as a builder, with your 35
years of experience, would you consider it
incumbent upon the manufacturer to inform
the occupants of the formaldehyde wood
containing products in the residence that
they were living?

MR. DERHAM:

Objection.

MR. PENOT:

          Objection.

THE WITNESS:

          Yes.

EXAMINATION BY MR. PINEDO:

     Q     And why is that?  Why would it be
important as a builder to inform somebody of
formaldehyde being emitted from the wood
products in the house or structure that
they're living in?

     MR. PENOT:

          Objection.

     THE WITNESS:

          Well, because I have to be
concerned with the safety and health of both
the workers and the people who are going to
occupy the facilities or homes that I build,
or have built.

EXAMINATION BY MR. PINEDO:

     Q     You also examined the ventilation
system in the Alexander/Cooper travel
trailer?

     A     Yes.

     Q     And did Ervin Ritter and Paul
LaGrange assist you in the examination of

the ventilation system?

     A    Well, there wasn't a ventilation system other than the -- I guess the answer is "yes."  It was in the form of a bathroom vent and a kitchen vent, hood vent.

     Q   Did you find that there was air leakage outside of the Alexander/Cooper travel trailer?

     MR. DERHAM:

        Objection.

     MR. PENOT:

        Objection.

EXAMINATION BY MR. PINEDO:

     Q   There is an objection.  Let me ask a different question.

        Did you find any evidence that there was unfiltered air entering into the Alexander/Cooper travel trailer?

     A   Into, yes.

     Q   Did you contain those findings in your report?

     A   Yes, I did.

     Q   Did you also conduct what's called thermographic imaging of the Alexander/Cooper travel trailer?

A    Yes, a thermographic survey of the trailer.

Q    Does a thermographic survey bear any relation to unfiltered air entering into a travel trailer or a unit?

MR. DINNELL:

Objection, form.

MR. PENOT:

Objection.

THE WITNESS:

Yes.

EXAMINATION BY MR. PINEDO:

Q    Did you include a discussion of thermographic imaging in your report?

A    Yes.

Q    I'm going to show you what has been marked as Mallet 18.

Could you please tell us what this photo or what this document represents.  And in a minute, I'm going to ask you to hold it up for the videographer, so he can focus in on it, but please describe it first.

A    This is a photograph of the ceiling in the kitchen area.  Part of the image is showing voids in the insulation

system in the ceiling and part of it is

showing voids in the field of the ceiling in

the kitchen area, and also, at the wall to

ceiling connections or intersections, the

intrusion of heat in those areas.

          Also, to the far left of the

photograph, you start to pick up images of

detection of moisture from cold spots in the

attic system.

     Q    If you could hold that up, similar

to the previous ones you did, and could you

please describe in a little bit more detail.

We got some shadows.  If you would just hold

your hand in the lower corner, please.

     MR. LAMBERT:

          And you can use this to point to

the various features.

EXAMINATION BY MR. PINEDO:

     Q    My first question is, Exhibit

No. 18, is that a thermographic image of the

Alexander/Cooper travel trailer?

     A    Yes, it is.

     Q    And briefly describe for the

ladies and gentlemen of the jury, what is a

thermographic image?

A      A thermographic image is a --
Well, this photograph is of the images of
radiation being given off by whatever I'm
pointing the lens of the camera towards.

All objects radiate energy, and
the camera picks up the waves, the infrared
rays that are radiating from whatever I'm
pointing the camera towards, and the imaging
gives off various colors, if you will, or
shades, depending upon the temperature of
what I'm looking at.

Q      For example, here, we have some
purplish or pinkish colors.  What do those
represent running left to right?

A      Those are the ceiling joists, the
ceiling trusses.

Q      And is that hot or cold areas?

A      That is cold.

Q      And then we have some lighter or
white and yellowish.  What do those
represent?

A      Right.  These areas here
(indicating) represent a void in the
insulation in the ceiling.

Q      Is this taken inside of the

Alexander/Cooper trailer looking up towards

the ceiling?

    A    Yes, it is.

    Q    And then on the lower left-hand

side, there's a very bright white line.

    MR. LAMBERT:

        Well, it's actually the lower

right as far as the camera is concerned.

EXAMINATION BY MR. PINEDO:

    Q    Correct.  As the camera is

concerned, looking at this, on the lower --

    MR. LAMBERT:

        Right-hand side.

EXAMINATION BY MR. PINEDO:

    Q    -- right-hand side, there's a

bright line.  What does that represent?

    A    That represents temperature

differentials, hot spots of air leakage into

the trailer between the -- at the

intersection between the walls and the

ceiling.

    Q    Does this photo in any way show

you where air or heat would be radiating

into the Alexander/Cooper travel trailer?

    A    Yes.

Q     And could you identify those areas
for us?

A     From the outside in would be the
white spots where it's radiating from the
interior -- the exterior.  The center
sections would be voids in the insulation.

We talked earlier that our
temperature readings were upwards of 120
degrees in May.  That heat was radiating
through the roof system and showing up on
the ceiling of that trailer.

Q     I'm going to show you what's been
marked as Mallet No. 19.  Could you please
identify what this thermographic image
depicts.

MR. LAMBERT:

Just turn it around and do it once
for the camera.

THE WITNESS:

This is the intersection of the
wall and ceiling area over the -- over the
upper cabinet unit in the kitchen, I believe
it is.  But it's the wall and ceiling area
intersection, and it's indicating air and
temperature differentials, infiltration into

the envelope of the trailer.

EXAMINATION BY MR. PINEDO:

    Q    And for somebody living in New
Orleans, Louisiana, in the summertime, would
that be hot air infiltrating there at the
section where it's white?

    A    That would be heat, heat radiating
through the envelope of the building.

    Q    Would it also include air?

    A    Yes.

    Q    I'm going to show you what has
been marked as Mallet No. 20.

    Similarly, could you describe for
the ladies and gentlemen of the jury what
this thermographic image represents?

    A    This is the center part of the
kitchen area near the air conditioning
system, the dark purple and almost black
areas indicating cold areas in relation to
the hotter areas of the ceiling.

    These areas are the roof frame,
the framing around the air conditioning
system, and it's indicating to me air
leakage into the cavity of the ceiling,
because it's making the -- the air

conditioning duct leakage is causing the
wood framing that is not insulated to be
much cooler than the surrounding areas.

Q      Okay.  You can put that down.

Did you make an assessment as to
the adequacy of the seals where the various
cross members or structures came together in
the Alexander/Cooper travel trailer?

A      Based on visual observation, it
didn't appear to have a sealant material,
and even if it did, there's no method of
preventing the heat, air and moisture from
coming into the building, because the
outside is merely wrapped with an aluminum
skin, an aluminum sheeting material.

There's nothing to prevent
moisture vapor or air from penetrating below
that exterior sheeting.

Q      Did you find any evidence of
sealants with regard to the wall and the
floor where they came together?

A      Yes.  Indications of air
infiltration along the very edge of the
carpet, the carpet acting as a filter,
shadowing along the edges of the wall,

shadowing along the edges of the ceiling was
noted in the bedroom, the kitchen area --
and the kitchen area.

Q    And describe for the ladies and
gentlemen of the jury what you mean by
"shadowing."

A    Shadowing is a discoloration of an
area as a result of some element, such as
dust or smoke that collects in an area
that's attracted to it because of a
temperature differential.

Q    Does shadowing also give evidence
of air infiltration?

A    In those areas, it does, yes.

Q    Did you notice any air
infiltration on the joints or the area where
the wall came together with the ceiling of
the Alexander/Cooper travel trailer?

A    Yes.

Q    And is that on the interior?

A    Yes.

Q    Is it your opinion that there was
air infiltration where the wall and ceiling
came together on the Alexander/Cooper travel
trailer?

A    Yes.  One of the things that we're trained to look for are those shadowing effects at intersections of the base of the wall and the ceiling, like the crown of the wall.

Q    Does FEMA have any specifications for exterior openings and weather-proofing with regard to this particular unit?

A    FEMA's procurement specifications require the units to be sealed against penetration for air and moisture.

Q    And in your opinion, were the exterior openings sealed to prevent air and moisture infiltration in the Alexander/Cooper travel trailer?

A    No, sir.

Q    If hot air enters into, from the exterior enters into the Alexander/Cooper travel trailer and it has formaldehyde-based wood products, what effect would that have on formaldehyde release from those wood products?

MR. DERHAM:

    Objection.

MR. PENOT:

Objection.

MR. DINNELL:

Objection.

THE WITNESS:

As I understand the activation of

formaldehyde, when moisture rises, as the

moisture is coming in from the hot, humid

air on the exterior, it's absorbing into the

wood material, because it's being trapped

behind the wallpaper on the interior side of

the mobile home -- the trailer, and as I

understand it, the moisture is activating or

will activate or increase the activation of

off-gassing of the formaldehyde.

EXAMINATION BY MR. PINEDO:

Q    Will heat have the same effect?

MR. DERHAM:

Objection.

MR. PENOT:

Objection.

THE WITNESS:

Heat has a greater effect than

moisture does according to the studies that

I read.

EXAMINATION BY MR. PINEDO:

443

Q     And is that included in the
Lawrence Berkeley report?

A     Yes, it is.

Q     That heat increases off-gassing of
formaldehyde from wood products?

A     And moisture.

Q     And if we look, for example, at
the thermographic image that's No. 20, did
you notice some type of effect that it would
have for the leakage of the air conditioning
unit if it's leaking into the walls?  Is
that what's happening here in Exhibit
No. 20?

MR. DINNELL:

        Objection, form.

MR. DERHAM:

        Objection.

THE WITNESS:

        Exhibit 20 is air leakage into the
ceiling cavity.

EXAMINATION BY MR. PINEDO:

Q     Assume with me that there's a
build-up of formaldehyde gas in the ceiling
cavity.  What effect would it have if
there's air leakage such as we see in the

thermographic evidence of the thermographic

image No. 20?

    MR. DERHAM:

       Objection.

    MR. DINNELL:

       Objection, foundation.

    THE WITNESS:

       With the negative air condition

situation in the trailer, it's going to draw

the air back into the trailer through

openings in the ceiling, bring it back into

the living space of the trailer.

EXAMINATION BY MR. PINEDO:

    Q   Did FEMA have any standards with

regard to the quality of workmanship for

these travel trailers?

    A   Yes, they did.

    Q   And what were their standards?

    A   Superior quality workmanship.

    Q   In your opinion, did the

Alexander/Cooper travel trailer exhibit that

superior grade of quality of workmanship?

    MR. DERHAM:

       Objection.

    THE WITNESS:

Not against the standards that we identified them against.

EXAMINATION BY MR. PINEDO:

Q     Did you along with Ervin Ritter and Paul LaGrange make an examination of the heating and cooling system in the Alexander/Cooper travel trailer?

A     Yes, we did.

Q     Did you notice anything unusual about the heating and air conditioning system in the Alexander/Cooper travel trailer?

A     In our examination?

Q     In your review of the heating and cooling system in the Alexander/Cooper travel trailer?

A     Well, during the testing phase of the duct leakage, both the -- both the air conditioning system and the furnace system's ductwork leaked.

Q     And I saw a report, a discussion in your report about negative air pressure. Does that relate to leaking?

A     It directly relates to the leaking. As we spoke earlier, the air

446

conditioning unit produces or puts out so
many cubic feet of air per minute.  In this
case, the maximum is 250 or 225 cubic feet
of air a minute.

          To the extent that the ducts are
leaking, for every cubic foot of air that
the duct leaks, it creates a negative
condition that the unit has to bring back
that cubic foot of air into the return
system.

          So what happens is the air
conditioning system creates a sucking effect
in the trailer, drawing the moisture and
heat and any other contaminants in the air
into the trailer and they're not filtered,
they're just coming in from random locations
instead of being funneled into a particular
filtered location.

     Q    And as that hot air and that
moisture is pulled in because of the leaks
in the air conditioning system and the
heating system, what effect would that have
on the formaldehyde-containing wood-based
products?

     MR. DERHAM:

       Objection.

MR. DINNELL:

       Objection.

MR. PENOT:

       Objection.

THE WITNESS:

       It gives the wood products a source of moisture for activation, either through direct contact and absorption of the water vapor or condensation when the temperatures in the summertime fell below the dewpoint.

EXAMINATION BY MR. PINEDO:

    Q   And based upon the Lawrence Berkeley report, is it your understanding that that additional heat and moisture would have what effect on formaldehyde off-gassing?

MR. DINNELL:

       Objection.

MR. DERHAM:

       Objection.

THE WITNESS:

       It would increase the off-gassing.

EXAMINATION BY MR. PINEDO:

448

Q    Did you also make some
recommendations with regard to vapor
barriers?

A    Yes, sir, I did.

Q    And what recommendations did you
make for a vapor barrier with regard to the
Alexander/Cooper travel trailer?

A    To install a Tyvek type of paper,
of a barrier to prevent the movement of air
and moisture from the exterior to the
interior of the trailer.

Q    And what effect would that have on
reducing the formaldehyde emissions in the
Alexander/Cooper travel trailer?

MR. DERHAM:

    Objection.

MR. DINNELL:

    Objection.

THE WITNESS:

    Well, to the extent that it
lessens the availability of moisture, there
would be less moisture available to interact
with the adhesives and the moisture releases
those adhesives.

EXAMINATION BY MR. PINEDO:

Q    And is that something you have
included in your report?

A    Yes, I did.

Q    Did you also make some
recommendation with regard to insulation to
be used in the Alexander/Cooper travel
trailer to reduce the formaldehyde
emissions?

A    Yes, I did.

Q    And please tell us about that.

A    Well, the recommendation was that
they could use a closed cell sprayed
polyurethane foam insulation that has --
that would serve a number of purposes.

No. 1, it would increase the
R-value in the wall system, and the R-value
is the resistance of the heat from passing
through the material and coming into the
building.

Secondly, closed cell insulation
has a very low permeability rating, which
means that it will significantly lessen, if
not almost completely stop the passage of
moisture vapor through that insulation as
opposed to the fiberglass insulation that's

in there now that has no means of preventing
the moisture from passing through it, and it
would add to the rigidity of the wall
system.

      Q    In your opinion, if this
insulation that you're talking about, closed
cell spray polyurethane foam, was used,
would that have reduced the emission of
formaldehyde from the wood --

      MR. DERHAM:

         Objection.

EXAMINATION BY MR. PINEDO:

      Q    -- products in the
Alexander/Cooper travel trailer?

      MR. DERHAM:

         Sorry.  Go ahead.  Objection.

      THE WITNESS:

         Yes, it would.  Based on my
findings and understanding of the experts
and the research, lessening the exposure of
those adhesives to moisture, lessens the
emissions.

EXAMINATION BY MR. PINEDO:

      Q    Let me ask the question over,
because there was an objection.  Why don't I

ask the question, and then you do your

objection.

    MR. DERHAM:

        I'm sorry.  I'm sorry.  I thought

you were done.

EXAMINATION BY MR. PINEDO:

    Q    Mr. Mallet, is it your opinion --

Let me start over.

        Do you have an opinion as to

whether or not if closed cell spray

polyurethane foam insulation was used in the

Gulf Stream trailer that the Alexanders and

Coopers were living in, if that would have

reduced the formaldehyde emissions from the

wood products?

    A    Yes.

    MR. DERHAM:

        Object.

    THE WITNESS:

        Sorry.  Excuse me.

    MR. DERHAM:

        That time you didn't give me a

chance to object.

EXAMINATION BY MR. PINEDO:

    Q    Did you also render some opinions

on jacking in your report?

    A    Yes, I did.

    Q    Did you notice anything about what the scissor jacks that this vehicle was equipped with said?

    A    It stated not to lift the trailer utilizing the scissors jack.

    Q    And what would happen if you lifted the trailer using the scissors jack?

    A    That damage to the frame and door may occur.

    Q    If a vehicle, a travel trailer is not jacked up properly, could that cause racking or twisting of the frame?

    MR. PENOT:

        Objection.

    THE WITNESS:

        It certainly can.

EXAMINATION BY MR. PINEDO:

    Q    Did you ask Mr. David Moore, who is a registered engineer, to assist you in your evaluation of the chassis or frame of the Alexander/Cooper travel trailer?

    A    Yes, sir.

    Q    And when you examined the Gulf

Stream trailer that was jacked up by Fluor,

did you notice any evidence of racking or

twisting of the frame?

    MR. PENOT:

       Objection.

    MR. DINNELL:

       Objection to the form.

    THE WITNESS:

       Yes.

EXAMINATION BY MR. PINEDO:

    Q    And could you please tell the

ladies and gentlemen of the jury as to what

you mean by racking or twisting of the

frame?  What is occurring in the unit?

    A    By twisting, the frame of the unit

can twist just like alternating pressure on

this sheet of paper (indicating), this

photograph.  It will affect the structure

from the bottom to the top.

       The racking, as the trailer is

jacked, it will create a racking condition

or a tilting (indicating) of the structure,

the wall structure of the trailer.

    Q    And what evidence did you see that

this trailer was either racked or twisted

454

when it was being jacked up?

    A    Paneling that was popped off the wall in the bedroom, in the bathroom, bulging of the wall in the bedroom underneath the window and bulging of the wall system in the kitchen area on the bedroom side of the exterior door, and on the refrigerator side of the bedroom door -- of the entrance door.

    Q    Would racking or twisting of the frame bear any relation to water leaks or roof leaks?

    A    Yes.

    Q    Did Alana Alexander relate anything about a leak in the roof of this travel trailer?

    MR. PENOT:

        Objection.

    THE WITNESS:

        It is my understanding she reported a leak in the roof system.

EXAMINATION BY MR. PINEDO:

    Q    Could racking or twisting as well affect the sealants used in the roof on a travel trailer?

         A     It can.

     MR. PENOT:

          Objection.

     THE WITNESS:

          It can also affect the membrane

and its connection.

EXAMINATION BY MR. PINEDO:

     Q     Do you have any suggestions as to

the proper way to jack up a travel trailer

such as the Gulf Stream travel trailer that

the Alexanders and Coopers lived in?

     MR. DINNELL:

          Objection to the form.

     MR. PENOT:

          Objection.

     THE WITNESS:

          Yes.  The trailer should be lifted

on all points simultaneously and not in any

differential manner, meaning not one side,

then the other, or one corner, then another

corner, then another corner.  It should be

lifted all at the same time.

EXAMINATION BY MR. PINEDO:

     Q     Do you have an understanding as to

how the Alexander/Cooper travel trailer was

456

lifted up and put in position?

    MR. PENOT:

        Objection.

    MR. DINNELL:

        Objection.  No foundation.

    THE WITNESS:

        Yes, sir.

EXAMINATION BY MR. PINEDO:

    Q   And what is that understanding?

    A   It's my understanding that the
trailer was jacked up on the long side, with
the exterior door side of the trailer first,
and then the other side, the other long side
the trailer was jacked up after.

    Q   And would that cause twisting or
racking of the frame?

    MR. PENOT:

        Objection.

    THE WITNESS:

        Yes, according to the Fluor
documents, that that would cause damage to
the building.

EXAMINATION BY MR. PINEDO:

    Q   You had stated previously that you
had been involved in work after several

hurricanes?

    A    Yes, sir.

    Q    And do you have an opinion as to
what the intended use of this travel trailer
was with regard to the Alexander/Cooper
family?

    MR. DERHAM:

        Objection.

    THE WITNESS:

        It was to be used as a temporary
housing facility for individuals.

EXAMINATION BY MR. PINEDO:

    Q    And did it appear to you that this
was being used as a travel trailer or was it
being converted into something different
from a travel trailer?

    MR. DINNELL:

        Objection.

    MR. DERHAM:

        Objection.

    THE WITNESS:

        No, it was definitely converted
from a recreational vehicle to a housing
unit.

EXAMINATION BY MR. PINEDO:

Q     And what is your opinion based
upon that it was converted from a
recreational vehicle to a housing unit?

A     Well, because the unit was
blocked, the framing was blocked off the
ground, the unit contained a residential
refrigerator, it did not have water holding
tanks for the sewerage, for the black water,
for the gray water, or for the fresh water.
It was plumbed.  The plumbing was
constructed to be hooked up to the city
sewerage or to an outside sewerage system.
The water was to utilize the city water
system.  And as a whole, it met the
standards of a residential home.

Q     In your opinion, were the
construction means and methods sufficient to
use it for a long-term residence?

MR. DERHAM:

        Objection.

THE WITNESS:

        No, sir.

EXAMINATION BY MR. PINEDO:

Q     And why is that?

A     Well, because of the heat gain

condition, the lack of insulation in the
wall, the lack of ventilation without having
to open windows and doors in the hot, humid
temperatures in Louisiana, the lack of
insulation increased both the temperature
inside of the building, but also in the wall
and ceiling cavities, increasing the release
of the formaldehyde materials that those
panels were made of or made with.

     Q     And did you include those opinions
in your report?

     A     Yes, sir.

     MR. PINEDO:

          Let's take a break.

     THE VIDEOGRAPHER:

          We're going on break.  The time
right now is 8:42.

(Discussion off the record.)

     THE VIDEOGRAPHER:

          We're on the record.  The time is
8:48.

EXAMINATION BY MR. PINEDO:

     Q     Mr. Mallet, is there a cavity
between the exterior skin of this travel
trailer, the Gulf Stream travel trailer, and

the interior wall of the travel trailer?

    A    Yes, there is.

    Q    And about how wide is that
dimension between the exterior skin and the
interior wall of the Alexander/Cooper travel
trailer?

    A    Approximately an inch and a half
to an inch and three-quarters.

    Q    And assume with me that there is a
higher level of formaldehyde gas in that
cavity between the interior wall and the
exterior wall.  What effect would a leaking
air conditioning system have on that type of
situation?

    MR. DINNELL:

        Objection, foundation.

    MR. PENOT:

        Objection.

    THE WITNESS:

        As we spoke about earlier, the
leaking air ducts creates a sucking effect
on the building, and any contaminants, any
air that's in the walls is drawn into the
building through any opening or void in the
wall system, such as light switches,

receptacles, joints at the ceiling, joints

at the floor, any unsealed opening.

EXAMINATION BY MR. PINEDO:

    Q    Is there also a cavity between the

ceiling and the exterior skin of the

Alexander/Cooper travel trailer?

    A    Yes, there is.

    Q    And would there be a similar

effect or a different effect in that cavity

assuming that there is a higher level of

formaldehyde gas in that cavity above the

ceiling and inside the exterior skin?

    MR. PENOT:

        Objection.

EXAMINATION BY MR. PINEDO:

    Q    What effect would a leaking air

conditioning system have?

    MR. DERHAM:

        Objection.

    MR. DINNELL:

        Objection, foundation.

    THE WITNESS:

        It would create the same sucking

effect, drawing in whatever contaminants and

moisture is in that ceiling cavity through

any opening in that ceiling around the air

conditioning registers, the return air, the

vent in the bathroom, any opening in the

ceiling panel.

EXAMINATION BY MR. PINEDO:

    Q    And that opinion that you have

about sucking in the air between those

cavities, whether it be the wall or in the

ceiling, is that an opinion that is also

held by Ervin Ritter, who is a registered

engineer?

    MR. DERHAM:

        Objection.

    MR. PENOT:

        Objection.

    THE WITNESS:

        Yes, sir.

EXAMINATION BY MR. PINEDO:

    Q    And what effect would a low

R-value have with regard to the build-up of

moisture in the cavities, whether it's in

the ceiling cavity or the wall cavity?

    A    Well, there would be two different

types of effects.  One, a low R-value has

less resistance to heat moving through that

insulation.  It would make the back sides of
the wall panels hotter, coming in contact
with the colder face side or inside part of
the wall panel, and at some point in time
condensation would occur.  And even if
condensation --

Q     Please continue.

A     And even if condensation doesn't
occur, the build-up of moisture in the
panels would create conditions conducive to,
as I understand it, the activation or
increased activity of the formaldehyde vapor
emissions.

In the ceiling, we have two
conditions with the R-value, is that, one,
we have the same situation where the
resistance is low, the ceiling is hotter
than it should be, because there's less
resistance to the heat coming through the
attic or the ceiling cavity, but in
addition, with the release of the cold air
in the cavity, in the ceiling cavity, and
the condensation occurring, the movement of
the air through the insulation voids the
dead space in the fiberglass insulation, and

creates a thermal bridge between the roof
and the ceiling.

In other words, fiberglass
insulation, the insulation is not the
fiberglass.  It's the air entrapped in the
very tiny cells of the fiberglass of the
insulation itself.  That only works if the
air is dead, it doesn't move, because air is
a very poor conductor of heat, so it's
relying on the air in the pockets of the
insulation to prevent or to resist the
temperature movement.

When the air circulates, it
disturbs or moves that air and lowers the
resistance of the insulation and adds
moisture that creates a thermal bridge.

Q     Lowering the resistance of the
insulation by virtue of moisture, is that
similar to a shirt might keep you warm, but
a wet shirt would make you cold?  Is it
similar to that?

MR. DINNELL:

Objection.

MR. PENOT:

Objection.

465

THE WITNESS:

It's the approximate principle
that Under Armour has about keeping the heat
either close to your body or away from your
skin, so you're not as hot.  It works just
the opposite.

EXAMINATION BY MR. PINEDO:

Q     And you talked about the interior
paneling.  Would you expect the interior
paneling, the side of the paneling that is
adjacent to the exterior skin of the
Alexander/Cooper travel trailer to be hotter
or colder -- Let me start over.  We have a
wall panel in the Alexander/Cooper travel
trailer?

A     Yes, sir.

Q     And there's going to be an inside
to the wall paneling where the residents
live and there's going to be an outside to
the wall paneling.  Does that face the
cavity side of the travel trailer there?

A     Yes, sir.

Q     The cavity in the wall?

A     Yes, sir.

Q     And are you telling us there's

about an inch and a half space in that
cavity?

    A    Yes, sir.

    Q    So could we call that wall
paneling the back side of the wall paneling?

    A    Yes, sir.

    Q    And what you're talking about is
because of the heat differential, is there a
build-up in the insulation of moisture
against that back side of the wall paneling?

    MR. DERHAM:

        Objection.

    MR. PENOT:

        Objection.

    THE WITNESS:

        Yes, there is.

EXAMINATION BY MR. PINEDO:

    Q    And based upon your research and
what you have read in the Lawrence Berkeley
report, if that moisture is affecting the
back side of that wall paneling and that
wall paneling is made out of a
formaldehyde-based resin, will that increase
the amount of formaldehyde that is released
from that wood?

MR. DERHAM:

        Objection.

MR. DINNELL:

        Objection, scope, foundation.

MR. PENOT:

        Objection.

THE WITNESS:

        Yes.

EXAMINATION BY MR. PINEDO:

    Q    And likewise, when we talk about

the R-value, that's the insulation value?

    A    The resistance of heat movement

through that material.

    Q    And due to the low R-value of this

travel trailer, would you expect the wood,

the back side of that wood panel on the

travel trailer to heat up more rapidly?

        MR. DERHAM:

        Objection.

        THE WITNESS:

        Yes.

EXAMINATION BY MR. PINEDO:

    Q    And as it heats up more rapidly,

would you also expect it to reach higher

temperatures?

468

A     Yes.

Q     And based upon what you have read
in the Lawrence Berkeley report and the
research that you have read, would that
increasing temperature on the back side of
that wood panel increase the amount of
formaldehyde that is released from that wood
panel?

MR. DINNELL:

Objection, scope, foundation.

MR. DERHAM:

Objection.

THE WITNESS:

Yes.

EXAMINATION BY MR. PINEDO:

Q     And then would the moisture, the
additional moisture on the back side of that
wood panel, due to the effects that you have
described as well as the increased
temperature, would that act in an additive
fashion to release more formaldehyde from
the wood panel based upon your research and
what you have read in the Lawrence Berkeley
report?

MR. DINNELL:

The same objection.

MR. DERHAM:

Objection.

THE WITNESS:

Yes.

EXAMINATION BY MR. PINEDO:

Q     And since more formaldehyde gas is being released in that cavity, would the air conditioning unit when it was being run and leaking out air into the cavities, would the air conditioning unit then function to flush out or to send some of that higher formaldehyde gas/air into the interior of the Alexander/Cooper travel trailer?

MR. DERHAM:

Objection.

MR. DINNELL:

Objection, foundation.

MR. PENOT:

Objection.

THE WITNESS:

It would act as a sucking effect, drawing it into the inside area of the trailer.

EXAMINATION BY MR. PINEDO:

Q     So the air conditioning system
would be pulling, by virtue of the leaks in
the air conditioning system, would it be
pulling air from the cavities between the
exterior wall and the interior wall panel,
that cavity, would it be pulling it to the
interior of the Alexander/Cooper travel
trailer?

MR. DINNELL:

The same objection.

MR. PENOT:

Objection.

THE WITNESS:

Yes.

EXAMINATION BY MR. PINEDO:

Q     And based upon the dynamics of
temperature and moisture, you would expect
that air in that cavity to be a higher rate
of formaldehyde in that air than in the
interior of the unit itself?

MR. DINNELL:

Objection, scope.

MR. DERHAM:

Objection.

THE WITNESS:

471

            Yes.

    MR. PINEDO:

        I pass the witness.

    MR. LAMBERT:

        Done, done, done?

    MR. DERHAM:

        We're done.

    MR. PENOT:

        I thought we were out of time.

    MR. LAMBERT:

        You're out of time.

    THE VIDEOGRAPHER:

        This concludes the deposition of

Mr. Al Mallet.  Today's date is the 17th day

of July, 2009, and the time is 8:58.

            *      *      *      *

472

WITNESS' CERTIFICATE

I have read or have had the
foregoing testimony read to me and hereby
certify that it is a true and correct
transcription of my testimony with the
exception of any attached corrections or
changes.

_____
(Witness' signature)

PLEASE INDICATE

( )  NO CORRECTIONS

( )  CORRECTIONS; ERRATA SHEET(S) ENCLOSED

REPORTER'S CERTIFICATE


I, James T. Bradle, Certified
Court Reporter, do hereby certify that the
above-named witness, after having been first
duly sworn by me to testify to the truth,
did testify as hereinabove set forth;

That the testimony was reported by
me in shorthand and transcribed under my
personal direction and supervision, and is a
true and correct transcript, to the best of
my ability and understanding;

That I am not of counsel, not
related to counsel or the parties hereto,
and not in any way interested in the outcome
of this matter.




_____

JAMES T. BRADLE

Certified Shorthand Reporter