UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER            )
FORMALDEHYDE PRODUCTS           )
LIABILITY LITIGATION,           )    MDL NO. 1873
                                )
                                )    SECTION "N"(5)
THIS DOCUMENT IS RELATED TO     )
                                )    JUDGE ENGELHARDT
Charlie Age, et al. v. Gulf     )    MAGISTRATE CHASEZ
Stream Coach, Inc., et al.,     )
Docket No. 09-2892; Alana       )
Alexander, individually and on  )
behalf of Christopher Cooper.   )
-------------------------------  )

        The Videotaped Deposition of WILLIAM DUDEK

        Date:      Friday, July 17, 2009

        Time:      10:04 a.m.

        Place:     Midwest Reporting, Inc.
                   1448 Lincolnway East
                   South Bend, Indiana 46613


Called as a witness by the Plaintiffs in

accordance with the Federal Rules of Civil

Procedure for the United States District

Court, Eastern District of Louisiana, pursuant

to Notice.



Reported by
Angela J. Galipeau, RPR, CSR
Notary Public, State of Indiana
         MIDWEST REPORTING, INC.
           1448 Lincolnway East
         South Bend, Indiana 46613
            (574) 288-4242


PLAINTIFF'S
EXHIBIT
A

1    A.   Yes.

2    Q.   Okay.  Tell me when you worked for Gulf Stream.

3    A.   I started working as the document says in 2001.

4    Q.   Okay.

5    A.   I believe it was 2001.

6    Q.   And just so you know, I mean, I'm going to continue to ask

7         you questions until at some point you stop answering them.

8    A.   I will.

9    Q.   Okay.  What was your job for Gulf Stream?

10   A.   I was the -- started off as the quality control manager.

11        And as the document says, I held that position through the

12        end of the FEMA program.  At which point after that ended,

13        I took a position as the national -- regional sales

14        manager for one of their divisions.  I had a hip and knee

15        surgery done, so I was off work for about five months.  I

16        came back, and then I was purchasing agent.

17   Q.   Which plant -- during your tenure at Gulf Stream, which

18        plant did you work for, at or for?

19   A.   I started off at Plant 59.  I moved to Plant 57 when we

20        started the FEMA project, which is in Etna Green.

21   Q.   Which FEMA project?

22   A.   The 50,000 unit trailers.

23   Q.   Were you also involved in other FEMA projects as well?

24   A.   I was the quality control manager, and that was basically

25        my responsibilities during FEMA.

Page 10

```
 1   Q.  Okay.  Were you involved in the production of FEMA
 2       trailers during 2004, trailers that ultimately became FEMA
 3       trailers?
 4   A.  Yes.
 5   Q.  Okay.  So you would have knowledge as to the quality and
 6       the way in which those trailers were manufactured, even as
 7       far back as 2004, trailers that ultimately went to
 8       displaced residents?
 9   A.  Absolutely.
10   Q.  Okay.  What were the circumstances under which you leaving
11       Gulf Stream?
12   A.  Well, the position that I came back to was a position --
13       I'd been a manager my whole life practically.  I was a
14       manager up until the time that I came back from my
15       disability leave when I had my knee and my hip replaced.
16           When I got back, I guess there was some question as
17       to what my position would be ultimately.  They put me in a
18       position as an assistant purchasing manager or purchasing
19       agent, perhaps, whatever the title was.  I don't know.
20       I'm not exactly sure what they would determine the title
21       was, but it was purchasing.  Purchasing was at Plant 67.
22   Q.  Right.  So you did, in fact, in 2004 work at Plant 57?
23   A.  Yes, yes.
24   Q.  In quality control?
25   A.  Quality control manager.
```

1  Q.  That's fine.  And no one expects you to come here with a

2      rote --

3  A.  Exactly.

4  Q.  -- memorization of every -- where you were at every

5      particular date.

6  A.  Right.

7  Q.  And no one's going to try to hold you to that.

8  A.  I understand.

9  Q.  Best you can do here, Mr. Dudek -- am I saying Dudek

10     correctly?

11 A.  Dudek, yeah.

12 Q.  Dudek.  The best you can do is testify about what you

13     remember.  And if you don't remember, it's okay to say

14     that.  All right.

15 A.  And I want to be -- I want to make it clear.  I want to be

16     as amenable as possible.  There are situations that have

17     occurred recently, and I can't go into detail, that are

18     very important to what I'm saying right now.  And, you

19     know, I know this sounds silly and I know this is not the

20     most professional way to do this.  But, you know, based on

21     my conversation with my counsel --

22 Q.  Don't tell me about those conversations, obviously.

23 A.  This is why I'm in the position that I'm in.

24 Q.  Okay.

25 A.  And it'll be clear in time.

Page 29

1          MR. WEINSTOCK:  Thank you.  Go ahead.

2   BY MR. BUZBEE:

3   Q.   So just is it fair to say that if I wanted to talk to you

4        about your tenure at Gulf Stream from 2001 up until the

5        FEMA order, you can talk -- you want to talk freely about

6        that, or you're willing to talk freely about that?

7   A.   Absolutely.

8   Q.   But what you don't want to talk about or what you refuse

9        to talk about is what occurred and what involvement you

10       had at Gulf Stream once the issue arose during the FEMA

11       order, the 2005 large FEMA order?  You don't want to talk

12       about that?

13  A.   Can you repeat that, please?

14  Q.   Yeah, it was kind of convoluted.  You'll freely talk about

15       your work at Gulf Stream from 2001 up until sometime in

16       2005?

17  A.   Ultimately I will talk about every question -- I'll answer

18       every question that you pose to me today.

19  Q.   And what is it that you have to do, check documents or

20       what is it that you need to do to get yourself prepared?

21  A.   I refuse to answer that question.

22  Q.   So you refuse to tell me why you can't answer it; is that

23       right?

24  A.   That's right.

25  Q.   Okay.  How did you start working at Gulf Stream?

Page 30

1    A.   Well, let's see.  I was in the metal finishing industry

2         for about 15 years.  It was a dying industry, contracting.

3         So I thought I would get involved -- I wanted to change

4         careers and get into an industry that was growing.  And I

5         was under the assumption it would always continue to grow.

6         And I have -- I contacted one of the vice presidents

7         initially.

8    Q.   Who?

9    A.   Claude Donati.  I contacted another vice president, Phil

10        Sarvari and ultimately interviewed for a couple jobs and

11        finally got the quality control manager job.

12   Q.   And that was in 2001?

13   A.   I believe it was 2001.

14   Q.   And you've already described your quality control job at

15        Gulf Stream, yeah?

16   A.   Yes.

17   Q.   Okay.  Who was it that you went to at Gulf Stream and

18        asked for your job back when you got this subpoena?

19   A.   When I got the subpoena?

20   Q.   Uh-huh.

21   A.   Nobody.

22   Q.   Okay.  Did you once you got the subpoena ever attempt to

23        contact Gulf Stream?

24   A.   Well, I sent an e-mail to -- I refuse to answer that.  Not

25        for any particular reason other than it will be more

Page 31

1       important at another time.  I refuse to answer the

2       question.

3   Q.  You refuse to answer that.  So you refuse to tell me

4       whether you contacted Gulf Stream after June 29th of 2009

5       when you got this subpoena?

6   A.  Yes.  I refuse to answer that.

7   Q.  Now, would you answer the question as to what you told my

8       investigator you wanted in order to testify in this case?

9   A.  Absolutely refuse to answer that.

10  Q.  So you didn't tell my investigator, quote, "What's in it

11      for me?  What am I going to get paid?"

12  A.  I refuse to answer that question.

13  Q.  Is it true that you also told Gulf Stream, or you also

14      made that same request to Gulf Stream that, hey, what's in

15      it for me, can I get my job back, can I get something for

16      testifying?

17  A.  Refuse to answer that question.

18  Q.  So there are e-mails that you have that are responsive to

19      this subpoena that were sent after you received the

20      subpoena; is that right?

21  A.  Refuse to answer that question.

22  Q.  Okay.  When is the last time you spoke to anyone from Gulf

23      Stream or -- Gulf Stream or purporting to represent Gulf

24      Stream?

25  A.  Refuse.

Page 32

```
 1   Q.   Okay.  You mention in your statement here that you feel
 2        like you would be available next week once you've had
 3        time -- make sure I -- to perform an investigation,
 4        resolution of these issues.
 5   A.   I need legal counsel on this.  And based on my
 6        conversation with that person today --
 7   Q.   Yeah.  Don't tell me what you told -- is this person
 8        representing you?
 9   A.   No, not yet.
10   Q.   Can you tell me the identity of your lawyer?
11   A.   You just said -- why would you ask me that when you just
12        said don't tell you.
13   Q.   Because I don't get to know what you told him, but I can
14        know who he is so I contact him or her.
15   A.   I refuse to answer that question.
16   Q.   You refuse to --
17   A.   Respectfully.
18   Q.   Everything you've done so far has been respectful.  I know
19        you feel like you're caught between a rock and a hard
20        place here.  I can see that.
21            What I need to know is who your lawyer is so I can
22        contact him or her and help you work through these
23        problems.
24   A.   I don't have a lawyer yet.
25   Q.   So you technically do not have anyone representing you, do
```

Page 41

1    A.   Yes.

2    Q.   It was not in years before that that was an issue, to your

3         knowledge, correct?

4    A.   As I mentioned earlier, yes.

5    Q.   Okay.  And to your knowledge, there was no unit for FEMA

6         or anybody else that had a formaldehyde issue before the

7         big FEMA run in 2005; is that correct?

8    A.   To the best of my knowledge, I was not aware of that.

9    Q.   You were asked some questions about meeting with an

10        attorney.  That was -- when you met with the Gulf Stream

11        attorney, I think you said with Jeff Zumbrun, that was

12        while you were still employed at Gulf Stream; is that

13        correct?

14   A.   Yes.

15   Q.   Okay.  Since you were employed by Gulf Stream, have you

16        met with any -- I'm sorry, strike that.

17             Since you left Gulf Stream's employ, have you been

18        contacted by or met with any lawyer from Gulf Stream?

19   A.   No.

20   Q.   Have you been contacted by or met with any private

21        investigator who claimed to be representing Gulf Stream?

22   A.   No.

23   Q.   You have been contacted by a number of people since you

24        left Gulf Stream, correct?

25   A.   I have.

Page 42

1   Q.   Is it correct that some of those people have offered you
2        money for your testimony?
3   A.   Yes.
4   Q.   Did they identify who they were representing?
5   A.   No.
6   Q.   But they were not representing Gulf Stream, correct?
7   A.   No.
8   Q.   They were clearly representing some of the victims or some
9        of the people suing Gulf Stream?
10  A.   Yes.
11  Q.   Did you get names of any of those people?
12  A.   No.  I generally hung up.  And, you know, to use the term
13       money, I'm certain it might have been not money.  Money
14       might not have been approached, but it might have been
15       compensation or something.  But the exact term money I
16       wouldn't say.
17  Q.   You understood --
18  A.   Yes, yes.
19  Q.   You understood they were offering you something more than
20       just a handshake for your time, correct?
21  A.   Yes.
22  Q.   They were offering you something that they felt you would
23       want?
24  A.   Yes.
25  Q.   Some form of remuneration?

1   Q.   Who?

2   A.   I think I answered that one.

3   Q.   Answer it again.  I want to know who they were.

4   A.   I don't know who they were.

5   Q.   Because if somebody offered you remuneration, I think is

6        the word that Andy --

7             MR. WEINSTOCK:  Remuneration.

8             MR. BUZBEE:  What did you call it?

9             MR. WEINSTOCK:  Remuneration.

10  BY MR. BUZBEE:

11  Q.   Remuneration.

12  A.   Although, it is enumeration.

13  Q.   If a lawyer did that, I want to know who that is so I can

14       deal with that?

15  A.   I couldn't imagine a lawyer doing that.

16  Q.   Me neither.  Are you sure it was a lawyer?

17  A.   Actually, that was facetious.  I can imagine many a

18       lawyers doing that.

19  Q.   Okay.  Which lawyers did that?

20  A.   I have no idea.

21  Q.   Do you not have caller ID?

22  A.   Actually I do -- no, I don't.

23  Q.   You do or your don't?

24  A.   I don't.  I didn't then, but I do now.

25  Q.   Okay.  What phone number did they contact you on?

Page 51

1   A.   I've got calls to my phone home.   I actually got calls on

2        my cell phone unexpectedly by one of your investigators.

3   Q.   But not to offer you any money?

4   A.   No.   They all seem to be pretty -- what's the word I'm

5        looking for?

6   Q.   Friendly?

7   A.   No, ambitious.   They have ways of getting numbers that

8        they want.

9   Q.   But I'm talking -- okay.   They're resourceful in finding

10       people.

11  A.   Resourceful is a good word.

12  Q.   Okay.   I'm not talking about that.   Of course that's what

13       investigators get paid to do.

14  A.   The answer is I have no idea who they were.

15  Q.   Okay.   You're not saying that Tony Buzbee offered you

16       anything?   That's me.

17  A.   Is that a question?

18  Q.   Yeah, that's a question?

19  A.   No.

20  Q.   Okay.   You're not saying anybody working on my behalf

21       offered you anything?

22  A.   Who did say that?

23  Q.   No one.   I'm just trying to establish that.

24  A.   So is that a question or is that a --

25  Q.   That is a question.

Page 52

1   A.  Is that a rhetorical question?

2   Q.  No.  It's a question I'm asking you to answer.  Did anyone

3       working on my behalf, at least that you knew was working

4       on my behalf, offer you anything?

5   A.  No.

6   Q.  Okay.  You're saying, you told Mr. Weinstock that multiple

7       people called you.  They didn't outright offer you money,

8       but they made it clear, at least in your mind, that they

9       were willing to give you something for testifying?

10  A.  That's absolutely true.

11  Q.  How many people did that?

12  A.  Three or four.  I didn't take it seriously, so it wasn't

13      something that was very important to me.

14  Q.  Okay.  And when was the last time that happened?

15  A.  Probably about six weeks ago or so.  I mean, is it beyond

16      the realm of imagination that somebody would do that?

17  Q.  Again, I don't know.  I'm trying to find out from you what

18      happened.

19  A.  Okay.  That was my answer.

20  Q.  See, the way I got you to come here is I just subpoenaed

21      you.

22  A.  Right.

23  Q.  That's how it's supposed to be done.  But let me explore

24      this because you've suggested that individuals working on

25      behalf of victims, is what Andy called them, offered you

Page 53

1        something.  In your mind it was clear they were offering

2        you something to testify.

3   A.   Yes.

4   Q.   Okay.  You said that happened three or four times?

5   A.   Yes.

6   Q.   The last time it happened was about six weeks ago?

7   A.   A couple months ago, yeah.  And I don't have -- no, I

8        don't have records of it and I can't -- you know, I can't

9        give you any documented -- I can't give you any

10       documentation of that happening.

11  Q.   Okay.  At the time you did not have caller ID you said?

12  A.   I don't think I did, no.

13  Q.   Okay.  And you don't know even the first name of anyone

14       calling you?

15  A.   I don't, no.

16  Q.   How did you know they were representing victims?

17  A.   Because they were -- I refuse to answer the question.

18  Q.   You refuse to answer.  Okay.  You just -- you won't tell

19       me how you knew they were representing victims.  You just

20       would tell me you believe they were representing victims?

21            MR. WEINSTOCK:  Object to the form.

22  A.   Well, yes.  They implied that they were.

23  BY MR. BUZBEE:

24  Q.   And they had told you they were lawyers?

25  A.   No.  They didn't exactly say lawyers.  Working on behalf

Page 54

1        of.

2    Q.  So not lawyers, but someone working on behalf of lawyers?

3    A.  Or on, you know, this particular formaldehyde issue.  So

4        it was -- they didn't leave much to the imagination.  And

5        I don't know who they were and I don't have documentation.

6        So it was not anything that I was going to consider.

7    Q.  All right.  And had you -- you had told someone from Gulf

8        Stream about this?

9    A.  I refuse to answer that question at this time.

10            MR. BUZBEE:  Right.  Okay.  I'm going to defer

11       the rest of my questions, and specifically the

12       questions that you refuse to answer until such time

13       as either we work on an agreement to take your

14       deposition with this lawyer that you intend to hire.

15       And if we can't do that, then I'm going to ask the

16       Court to force you to continue with your testimony.

17            THE WITNESS:  I understand that.

18            MR. BUZBEE:  Okay.  And with that, I'll suspend

19       this deposition.

20            MR. WEINSTOCK:  I think I'll leave it where it

21       is.

22            VIDEOGRAPHER:  Off the record.

23            (The deposition concluded and witness excused at

24       11:05 a.m.)

25                    *      *      *