UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER FORMALDEHYDE | § | MDL No. 1873 |
| PRODUCTS LIABILITY LITIGATION | § | |
| | § | SECTION N(5) |
| | § | |
| THIS DOCUMENT IS RELATED TO: | § | JUDGE ENGELHARDT |
| *Charlie Age, et al. v.* | § | |
| *Gulf Stream Coach, Inc., et al.* | § | MAGISTRATE CHASEZ |
| *Civil Action No. 09-2892 (Severed Claims of* | | |
| *Alana Alexander & Christopher Cooper only)* | § | |

_____

**MEMORANDUM IN SUPPORT OF
FLUOR ENTERPRISES, INC.'S MOTION TO EXCLUDE
EXPERT TESTIMONY OF CHARLES DAVID MOORE, PE, PLS**

This memorandum is submitted on behalf of Fluor Enterprises, Inc. (FEI) in support of its Motion *In Limine* to Exclude Expert Testimony of Charles David Moore, PE, PLS with respect to the Alexander Plaintiffs' (Plaintiffs) claims against FEI.

**BACKGROUND**

This multi-district litigation (MDL) is the consolidation of several state and federal toxic tort suits in which Plaintiffs claim to have inhabited EHUs that were provided to them by FEMA, because their residences were rendered uninhabitable by Hurricanes Katrina and Rita.[1] After selecting and purchasing these EHUs, FEMA provided them to Plaintiffs by contracting with certain companies, like FEI, to deliver the EHUs, set them up, and make them ready for

___
[1] Rec. Doc. 109, par. 96.

residential use.² Plaintiffs generally claim to have been exposed to formaldehyde contained in these EHUs and to have suffered damages as a result. Plaintiffs sued the manufacturers of the EHUs, the United States Government and the government contractors, like FEI, who delivered and set up these EHUs. These EHUs consist of travel trailers, park models or manufactured homes.³

Plaintiffs joined the MDL on February 27, 2009.⁴ Thereafter, Alexander and her minor child were selected as the bellwether plaintiffs in a trial scheduled to commence on September 14, 2009, against the USA, Gulf Stream (the manufacturer of the travel trailer in which Plaintiffs resided) and FEI, the government contractor who was responsible for having the travel trailer delivered and installed. Plaintiffs generally assert products liability claims and, alternatively, negligence claims against FEI based upon the installation of the travel trailer at their residence and that this installation caused or contributed to the effects of formaldehyde in the trailer thereby causing them to suffer damages.⁵

**A. Plaintiffs' Trailer Structural Condition Expert – Charles David Moore, PE, PLS**

Plaintiffs' provided twenty written expert reports, including the report of Charles David Moore, PE, PLS ("Moore"), as a structural condition assessment expert in this case. Exhibit "A," Moore's May 18, 2009 Structural Condition Assessment. Moore is a professional, licensed engineer in the State of Louisiana.

Moore intends to offer expert opinions and testimony regarding the condition of the FEMA travel trailer assigned to the Plaintiffs, which he did not inspect until May of 2009. Ex.

---

² Court's Order, Rec. Doc. 717, p. 22.
³ Rec. Doc. 1629, n. 1.
⁴ In <u>Age, et al v. Gulf Stream Coach, Inc., et al</u>, 09-2892; Rec. Doc. 1.
⁵ Rec. Doc. 1 (Age's original complaint, counts 3 and 4); Rec. Doc. 1636 (Alexander's first supplemental and amended complaint, pars. 13 and 14); and Rec. Doc 1686 (Alexander's third supplemental and amended complaint pars. 13 and 14).

"A," Report of Moore, pp 4-5.  The opinions of Moore, as discussed below should be excluded because they have no bases in fact and are merely speculations on the part of Moore.

In his report, Moore opines that:

> The blocking of the unit also leads to several questions regarding the performance of the trailer.  As noted, the photos provided after the unit was re-installed in July 2007 indicate that the unit was blocked up in accordance with the Fluor installation document.  However, nothing is known as to the original installation.  Any deviations from the blocking requirements would cause problems with the load carrying capacity of the trailer.  Also, even though we were unable to analyze the structural capacity of the entire shell of the living unit, it is a concern that blocking and anchoring of the trailer frame would cause problems in structure of the shell.

Ex. "A," Report of Moore, p 7.

Also, within his report, Moore relates that when he viewed the trailer in May of 2009, the seam where two wall panels meet were separated in the front or master bedroom, and in the bathroom. He also makes the broad conclusory statement that the separation of the paneling noted in the bathroom and bedroom areas are consistent with the effects of uneven movement of the trailer that would occur with improper jacking techniques, even though, as he stated above, that he knew nothing as to the original installation.  Ex. "A," Report of Moore, pp 6 and 7.

Moore then gave opinion testimony at his deposition on June 30, 2009, although it is found no where in his report, that the popping of the panels on the interior walls, both in the bedroom and in the bathroom of Plaintiffs' FEMA travel trailer was probably caused on February 17, 2009 (the date of the initial installation of the trailer on Plaintiffs' property on Dale Street in New Orleans East) by improper jacking techniques of the FEI subcontractor that . Exhibit "B," Excerpt from Depo. of Charles David Moore p. 59 (June 30, 2009).  This, notwithstanding a long history of this trailer that took it from manufacture in Indiana, highway travel to storage in Punta Gorda, Florida, highway travel to Georgia for further storage, highway

travel to the New Orleans area in the wake of Katrina, delivery to Union Carbide/Dow Chemical, highway travel to FEI's storage yard in New Orleans, delivery and installation on Plaintiffs' property in February 2006, removal from installation of piers and placement curbside for two days (by some one other than FEI) in July 2007 when Plaintiff demolished her house, reinstallation on piers on Plaintiffs' property (by some one other than FEI) after demolition, deactivation of the trailer in early 2008 (by some one other than FEI), highway travel from New Orleans East to Lottie, Louisiana for storage in the FEMA "travel trailer graveyard," hauled offroad into the FEMA storage yard where it sat unmaintained for over a year before it was inspected by Mr. Moore.  Ex. D, Deposition of Moore, pgs 82-91, 173-174.

**B.  Bases of Moore's Opinions**

The bases of Moore's opinions are two-fold:  from a visual inspection on May 7, 2009 of the FEMA travel trailer assigned to Plaintiffs' and from an alleged conversation with Shirley Alexander.

When Moore inspected the trailer it had already been deactivated and removed from Plaintiffs' residential lot and was in a FEMA lot in Lottie, Louisiana.  Ex. "A," Report of Moore, p 2.  Moore, within his written report stated that he knew nothing as to the original installation of the trailer.  Ex. "A," Report of Moore, p 7.

After rendering his written report, Moore, while meeting with Plaintiffs' counsels the evening before his June 30, 2009 deposition, participated in a telephone conversation with Shirley Alexander, Plaintiff Alexander's mother.  Ex. "B," Excerpt from Depo. of Moore, p. 124 - 127.  The basis of Moore's opinion that the popping of the panels on the interior walls was probably caused by improper jacking techniques is from his memory of Shirley Alexander's

statements in this phone conversation. Ex. "B," Excerpt from Depo. of Moore, pp 57-59, and p 147.

Moore testified in his deposition that Shirley Alexander told him that she was present watching the workers jacking up the trailer and that she described the method of how they did it. Ex. "B," Excerpt from Depo. of Moore, pp. 39 and 40.  Moore, testified that he relied upon these statements made by Shirley Alexander in a telephone conference to substantiate his opinion that the popped panels of the interior walls was probably caused by improper jacking techniques used on Plaintiffs' trailer.  Ex. "B," Excerpt from Depo. of Moore, p. 124 - 127.  As discussed more fully below, there is no such evidence from Shirley Alexander.

### C.  Moore's Opinions Subject to Exclusion and/or Limitation

In his written report, while opining that the jacking and blocking of the trailer may have an impact on the performance of the trailer, Moore stated that he knew **nothing** in regards to the original installation.  Ex. "A," Report of Moore, p 6.  Within his report, Moore made the following broad conclusory statement regarding jacking techniques:

> The separation of the paneling noted in the bathroom and bedroom areas are consistent with the effects of uneven movement of the trailer that would occur with improper jacking techniques.

Ex. "A," Report of Moore, p 6.

In his deposition testimony, Moore expounded upon his broad conclusory statement regarding jacking techniques, when he testified to the following:

> My opinion, and I guess in a nutshell to summarize, is that the damage that we see with the popping of the panels on the walls, both in the bedroom and in the bathroom at the other end of the trailer, was probably caused by improper jacking techniques.

Ex. "B," Excerpt from Depo. of Moore, p. 59.

## ADMISSIBILITY OF EXPERT OPINIONS

**A.  Rules 702, 703, Daubert v. Merrell Dow Pharmaceuticals, Inc. and Its Progeny**

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony. The trial judge serves as a gatekeeper to keep out expert testimony that is based solely on speculation or unsupported conclusion.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-590 (1993).  In Daubert, the Supreme Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but it is also reliable.  See, Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).  A party seeking to admit expert testimony bears the burden of demonstrating that the expert's findings and conclusions are based on the scientific method, and therefore, is more reliable.  Moore v. Ashland Chemical, Inc., 151 F.3d 269, 276 (5th Cir. 1998).  And where such testimony's factual basis, data, principles, methods, or their application are called into question, the trial judge is required to determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline.  Kumho Tire, 526 U.S. at 149.  This requires an objective, independent validation of the expert's methodology.  Moore, 151 F.3d at 276.  The expert's mere assurance that he has used generally accepted scientific methodology is insufficient.  Id.  The proponent of the expert's testimony must prove to the judge by a preponderance of the evidence that the testimony is reliable.  Id.  Thus, the goal of the court is to ensure that that expert's opinion is based on sufficient data and an appropriate methodology such that the opinion is connected to the facts by more than conclusory assertions of the expert.

Rule 703 focuses on the data underlying the expert's opinion.  In Re TMI Litigation, 193 F.3d 613, 697 (3rd Cir. 1999).  As part of its gatekeeper role, the trial court must ensure that the underlying facts and/or data upon which a proffered expert's opinion is based are in and of

themselves reliable. If an expert's opinion is based on unreliable facts, the opinion must be excluded. See, In Re TMI Litigation, 193 F.3d at 697. That is, Rule 703's reliability standard is similar to Rule 702's reliability requirement in that there must be good grounds on which to find the data reliable. Id. Rule 703 permits an expert to rely on hearsay, so long as that hearsay is of the kind normally employed by experts in the field. Id. (citing In re "Agent Orange" Product Liability Litigation, 611 F.Supp. 1223, 1245 (E.D. N.Y. 1985)).

In Daubert, the Supreme Court enunciated a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the expert's methodology is scientifically valid or reliable. Moore, 151 F.3d at 275 (citing Daubert, 509 U.S. at 593-595). These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. Id.

In addition to the guiding principles set forth in Daubert, other factors relevant to the consideration of whether an expert's testimony and opinions are sufficiently reliable so as to allow their admission are as follows: (1) whether the expert is proposing to testify about matters growing naturally and directly out of the expert's research conducted independent of the litigation or whether the expert has developed the opinion expressly for the purpose of testifying in the litigation; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he would be in his regular professional work outside of his paid litigation consulting; and (5) whether the field of expertise

claimed by the expert is known to reach reliable results consistent with the type of opinion the expert is giving. See e.g. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999); General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997); Moore v. Ashland Chemical, Inc., 151 F.3d 269 (5th Cir. 1998) (en banc); Sheehan v. Daily Racing Form, Inc., 104 F. 3d 940, 942 (7th Cir. 1997); Daubert v. Merrill Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995) (Daubert II); and Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994).

**B.  Moore Testified to Relying Upon Statements of Shirley Alexander for his Opinions**

In Moore's written report, he opined that the jacking and blocking of the trailer may have an impact on the performance of the trailer.  Moore rendered this opinion without any facts to support the opinion.  In fact he went so far as to say in his written report of May 18, 2009, that "he knew nothing in regards to the original installation."  Ex. "A," Report of Moore, p 6.

However, less than 45 days later when Moore was deposed regarding his opinions rendered in his written report, he opined that the popped panels of the interior walls was probably caused by improper jacking techniques used on Plaintiffs' trailer.  Ex. "B," Excerpt of Depo. of Moore, pp. 59 and 125.  In his deposition, Moore relied upon statements made by Shirley Alexander in a telephone conference the evening before his deposition, to substantiate his opinion that the popped panels of the interior walls was probably caused by improper jacking techniques used on Plaintiffs' trailer.  Ex. "B," Excerpt from Depo. of Moore, p. 124 - 127.

The deposition testimony of Shirley Alexander was taken by counsel in this matter on July 10, 2009.  The deposition testimony of Shirley Alexander negates any suggestion she knew how the Alexander trailer was jacked.  In fact, throughout the entire deposition, Shirley Alexander testified to not knowing or remembering how the trailer was placed upon the blocks. Ex. "C," Excerpt from Depo. of Shirley J. Alexander pp 42, 52, 53, 55, 56-58, 59, 62, 67, 68, 88,

93, 200-201, and 211 (July 10, 2009). Shirley Alexander has testified that she does not know what Moore claims he heard from her and which forms the basis of his opinion about improper jacking.

### 1. Shirley Alexander Never Saw the Travel Trailer Being Jacked:

The excerpts that follow are Shirley Alexander testifying to not even seeing the travel trailer being jacked up while it was being installed:

> Q: Do you remember observing the process of them lifting the trailer off of the ground, or the first time you saw it, the tires were already up?
>
> A: The tires and everything was already up when I saw it, but they wasn't completely on the ground.

Ex. "C," Excerpt from Depo. of Alexander p 59.

* * * * *

> Q: And when it initially came off the ground, did you actually see them get it off the ground?
>
> A: No.

Ex. "C," Excerpt from Depo. of Alexander p 62.

* * * * *

> Q: And you don't remember observing the men doing a pumping motion to lift the trailer up, right?
>
> A: I don't remember. I really don't remember.

Ex. "C," Excerpt from Depo. of Alexander p 68.

* * * * *

> Q: But today, as you sit here, you don't remember observing men pumping up –
>
> A: I remember them putting -- bringing in the blocks and putting the blocks up under there. I really don't remember too much.
>
> Q: But that's all you really can remember?

A: Uh-huh (affirmative response).

Ex. "C," Excerpt from Depo. of Alexander p 93.

\* \* \* \* \*

Q: Thank you. And I'm going to move on from this soon. And you don't know whether there were -- You don't know either way whether there were any other jacks supporting the trailer while they worked putting the blocks in, do you?

A: No, because they were – The trailer was on wheels.

Q: Yes, but do you know if there were any other jacks?

A: No, I really don't know what they had on it.

Q: You don't know either way, whether there were jacks at any other point supporting the trailer while they installed the blocks, correct?

A: I don't know.

Ex. "C," Excerpt from Depo. of Alexander pp 200-201.

\* \* \* \* \*

Q: I know. I know. Let me just ask you this. Did you see them do any mechanism to put it back on its wheels or you don't really remember?

A: I really don't remember looking at it.

Q: Okay. And we have talked about it at length. I know. You just remember the process of them stacking the bricks?

A: Uh-huh (affirmative response).

Q: And we talked about it. Okay.

A: Okay.

Q: And so you don't remember the process of them lowering it back?

A: Oh, I wasn't paying -- As far as in my head, I don't remember all of that.

Ex. "C," Excerpt from Depo. of Alexander p 211.

Shirley Alexander also testified to not knowing or remembering what, if anything was placed in the center of the trailer as it was being set up.

> Q: Okay. And do you remember either way whether there were jacks or some type of mechanical device that was in the middle while they were doing these bricks or do you just not remember that?
>
> A: I don't remember. I just don't remember that.

Ex. "C," Excerpt from Depo. of Alexander p 67.

### 2.  Shirley Alexander Testified "I never talked to them on the phone."

Moore's opinion, that the popped panels of the interior walls was, probably caused by improper jacking techniques used on Plaintiffs' trailer, was based upon a telephone conference call he participated in with Plaintiffs' counsels. Ex. "B," Excerpt from Depo. of Moore, p. 124 - 127. The following excerpt is deposition testimony of Shirley Alexander testifying to never having talked to any attorneys on the phone:

> Q: Sure. Okay. So do you think that you were mistaken when you told the attorneys that you saw the men using jacks?
>
> A: They could have. They could have.
>
> Q: But you just don't remember?
>
> A: I just don't remember all of it, because I really didn't put all of that in my mind when I was looking at this outside.
>
> Q: Sure.
>
> A: There are certain things that I do remember, but all of these little bitty things you're coming up with, some of the things I just didn't even pay attention to.
>
> Q: And when did you talk to the attorneys on the phone?
>
> A: I never talked to them on the phone.
>
> Q: You never talked to any of the attorneys on the phone?

> A: They told Alana that they wanted to talk to me, and we went by Maria's house and we talked.

Ex. "C," Excerpt from Depo. of Alexander p 88-89.

The telephone conversation Moore claims to have relied upon never happened according to Shirley Alexander, herself. Facts gleaned from a conversation that never occurred are unreliable.

## C. Moore Relied Upon Unsubstantiated Facts

As part of its gatekeeper role, the trial court must ensure that the underlying facts and/or data upon which a proffered expert's opinion is based are in and of themselves reliable. If an expert's opinion is based on unreliable facts, the opinion must be excluded. See, In Re TMI Litigation, 193 F.3d at 697. That is, Rule 703's reliability standard is similar to Rule 702's reliability requirement in that there must be good grounds on which to find the data reliable. Id.

As evidenced by Moore's own statement in his report, that he knew nothing about the original installation and as evidenced by the above mentioned excepts of Shirley Alexander's deposition testimony, Moore's opinion testimony, that

> the damage that we see with the popping of the panels on the walls, both in the bedroom and in the bathroom at the other end of the trailer, was probably caused by improper jacking techniques

is baseless and lacks facts to support the opinion. Ex. "B," Excerpt of Depo. of Moore, p. 59. Moore's own lack of knowledge and reliance upon the statements of Shirley Alexander to substantiate his opinion, that the popped panels of the interior walls was probably caused by improper jacking techniques, is simply baseless and unreliable and as such should be excluded at the trial of this matter.

## **CONCLUSION**

Moore's 3 opinions:

1. In his written opinion that "The separation of the paneling noted in the bathroom and bedroom areas are consistent with the effects of uneven movement of the trailer that would occur with improper jacking techniques";

2. In his written opinion that "Also, even though we were unable to analyze the structural capacity of the entire shell of the living unit, it is a concern that blocking and anchoring of the trailer frame would cause problems in structure of the shell."; and

3. In his deposition that "the damage that we see with the popping of the panels on the walls, both in the bedroom and in the bathroom at the other end of the trailer, was probably caused by improper jacking techniques."

are unreliable, since they are based on evidence that does not exist as to his deposition opinions and speculatively based on no evidence as to his written opinions. Moore admits in writing that he does not know anything about the original install of the trailer and could not analyze its structure. Shirley Alexander has testified she does not know how the trailer was jacked and denied having the conversation Moore uses as the basis for his deposition opinion. As such Moore's three opinions, and any similar testimony, should be excluded at the trial of this matter.

Respectfully submitted,

**MIDDLEBERG, RIDDLE & GIANNA**

BY:     s/ Richard A. Sherburne, Jr.
Dominic J. Gianna, La. Bar No. 6063
Sarah A. Lowman, La. Bar No. 18311
201 St. Charles Avenue, Suite 3100
New Orleans, Louisiana 70170
Telephone: (504) 525-7200
Facsimile: (504) 581-5983
dgianna@midrid.com
slowman@midrid.com

        Charles R. Penot, Jr. (La. Bar No. 1530 &
        Tx. Bar No. 24062455)
        717 North Harwood, Suite 2400
        Dallas, Texas 75201
        Tel: (214) 220-6334; Fax: (214) 220-6807
        cpenot@midrid.com

          *-and-*

        Richard A. Sherburne, Jr., La. Bar No. 2106
        450 Laurel Street, Suite 1101
        Baton Rouge, Louisiana 70801
        Telephone: (225) 381-7700
        Facsimile: (225) 381-7730
        rsherburne@midrid.com

**ATTORNEYS FOR FLUOR ENTERPRISES, INC.**

## CERTIFICATE OF SERVICE

  I hereby certify that on 26th of August, 2009, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sends notice of electronic filing to all counsel of record, including court-appointed liaison counsel, who are CM/ECF participants.

         s/ Richard A. Sherburne, Jr.
        RICHARD A. SHERBURNE, JR.

ND: 4821-2721-3828, v. 1