# Transcript of the Testimony of
# Videotaped Deposition of Charles David Moore, PE, PLS

Date taken: June 30, 2009

In Re: FEMA Trailer Formaldehyde Products Liability Litigation

**Note**
All **electronic deposition & exhibit files** are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a **Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com



EXHIBIT B
Blumberg No. 5118

**Page 37**

1  level, even though that pier is slightly
2  leaning as it appears in the photograph.
3      Q   Okay. But again, and I just want
4  the record to be clear when we go some other
5  places here, that nowhere in this report
6  when you wrote it before you came here today
7  did you say more likely than not it was
8  caused by -- the damages you saw were caused
9  by improper jacking.
10     MR. PINEDO:
11         Objection. Asked and answered.
12     MR. PENOT:
13         I didn't ask anything.
14     MR. PINEDO:
15         Okay. I object to the side bar.
16 EXAMINATION BY MR. PENOT:
17     Q   "The separation of the" -- at
18 Page 6, Paragraph 5.2, "The separation of
19 the paneling noted in the bathroom and
20 bedroom areas are consistent with the
21 effects of uneven movement of the trailer
22 that would occur with improper jacking
23 techniques." They're consistent with it?
24     A   That's correct.
25     Q   It doesn't say more likely than

**Page 38**

1  not that's what caused them, does it?
2      A   It does not say that in those
3  words. When I say that it's "consistent
4  with" there, that means that that tells --
5  that's what I mean as being that that
6  appears to be the reason for those panels
7  being moved in there.
8      Q   Well, couldn't it be consistent
9  with many other things? Consistent doesn't
10 mean more likely than not it's that, does
11 it?
12     MR. PINEDO:
13         Objection to the form.
14     THE WITNESS:
15         No, it does not mean exactly that,
16 no.
17 EXAMINATION BY MR. PENOT:
18     Q   A number -- We look at some given
19 phenomenon, some event or some thing, and
20 that could be consistent with tons of
21 explanations, couldn't it?
22     A   It could be.
23     Q   That doesn't mean, to say that
24 it's consistent with that explanation, it
25 doesn't mean that it's more likely than not

**Page 39**

1  that any one of those was the cause, does
2  it?
3      MR. PINEDO:
4          Objection to the form.
5      THE WITNESS:
6          The things -- If I had thought or
7  if it was my opinion that it was caused by
8  something else, then I would have put those
9  things in there.
10 EXAMINATION BY MR. PENOT:
11     Q   Okay.
12     A   And again, say that it's
13 consistent. Now, you know, like you say, I
14 did put in there the part about the leaning
15 pier, that there could be some problems with
16 that, that could have caused some of those,
17 so, you know, my opinion really is that
18 there are other things that could cause
19 these damages, you are correct.
20         But I did put in there that it is
21 consistent with the improper jacking
22 techniques that were most likely used there.
23         And, in fact, since I wrote the
24 report, we did have occasion to speak with
25 the mother of the lady that had the trailer

**Page 40**

1  here, which I believe her name is Shirley
2  Alexander, and she lived next door, as I
3  understand it. And she was there, watching
4  them jacking up the trailer, and she
5  described to us the method of how they did
6  that.
7      Q   Okay. Now, Mr. Moore, maybe I
8  didn't ask the question right, but I thought
9  I started by asking you, I wanted you to
10 tell me everything that you did, studied,
11 examined, considered, that had some effect
12 on your opinions.
13         Now, you didn't tell me that you
14 talked to her mother, did you?
15     A   At the very first, no, I did not
16 tell you that.
17     Q   All right. Now, I want to make
18 sure I know everything that -- Wait. Let me
19 finish. I want to know everything that you
20 did, looked at, considered, studied that
21 goes into your opinion. I don't want you to
22 leave anything out. Please tell me
23 everything.
24         So in addition to those things you
25 told me at the beginning, you also talked to

**Page 57**

1  construction of the structure, the
2  construction methods, how RV's are put
3  together, other ways to handle that that
4  might be more appropriate, the Fluor
5  procedures did not discuss jacking and that
6  may be a problem, you said.  It was after
7  that phone call that you talked to
8  Ms. Shirley Alexander; is that right?
9      A    That's correct.
10     Q    Okay.  And it is now your opinion
11 as you sit here today, but not expressed
12 anywhere in Moore No. 1, that it was more
13 likely than not or more probably improper
14 jacking that caused the damage you saw?
15     MR. PINEDO:
16         Objection to the form.
17     THE WITNESS:
18         Again, yeah, when I talked about
19 it in my report, I probably never put down
20 those specific words "it is more likely than
21 not," and even today, I don't know if I
22 would use those exact words, but that the
23 improper jacking techniques are in my mind
24 and in my opinion probably the most likely
25 culprit, if you will, as far as what

**Page 58**

1  happened there and what's going on with some
2  of the damage that we saw.
3  EXAMINATION BY MR. PENOT:
4      Q    Okay.  But that's not stated in
5  the report, "most likely"?
6      A    No.  And just to go back through
7  the chronology of how my involvement in this
8  went, like I said, we went out there and
9  looked at the structure on May 7th, and we
10 were asked to issue the report within just a
11 very few days, and so, as you see, the
12 report was issued on May 15th.  So, a very
13 short time to look at and digest all the
14 information.
15     Q    Okay.  But it was after these
16 conversations with the lawyers and the other
17 experts that now you are willing to say --
18 and I want to understand what you say -- you
19 are willing to say it is -- You tell me.
20 I'm not going to put words in your mouth.
21     A    Okay.  Good.
22     MR. PINEDO:
23         Objection to the form.
24     THE WITNESS:
25         My opinion, and I guess in a

**Page 59**

1  nutshell to summarize, is that the damage
2  that we see with the popping of the panels
3  on the walls, both in the bedroom and in the
4  bathroom at the other end of the trailer,
5  was probably caused by improper jacking
6  techniques.
7  EXAMINATION BY MR. PENOT:
8      Q    Okay.  "Probably caused by."  And
9  you came to that after these calls with the
10 lawyers and the other experts and talking
11 to Ms. -- then talking to Ms. Alexander,
12 right?
13     MR. PINEDO:
14         Objection to the form.
15     THE WITNESS:
16         Well, again, it solidified my
17 opinion.  As you pointed out in my report, I
18 very clearly said that those types of damage
19 was very consistent with improper jacking
20 techniques.
21 EXAMINATION BY MR. PENOT:
22     Q    You said it was "consistent."  You
23 never said it was "probably caused by."  It
24 wasn't until you talked to the lawyers and
25 the other experts that you came to this

**Page 60**

1  conclusion, correct?
2      MR. PINEDO:
3          Objection to form.
4      THE WITNESS:
5          No.  Like I said, that solidified
6  my opinion.
7  EXAMINATION BY MR. PENOT:
8      Q    So it was your opinion and you
9  didn't put it in the report?  It was your
10 opinion before?
11     MR. PINEDO:
12         Objection to the form.
13 EXAMINATION BY MR. PENOT:
14     Q    Probably?
15     A    I put in there that it was
16 consistent with that, which means to me,
17 that means that that's the most likely
18 cause, it is consistent with that type of
19 operation.  If I had thought that it was
20 caused by some other operation, then I would
21 have put that.
22     Q    Okay.  Well, you did put other
23 ones.  Didn't we just look at that?
24 Differential settling, et cetera, right?
25     A    Right.

**Page 121**

1  being driven to Georgia because the guy put
2  "no driver damage"? Why is it you discount
3  this?
4     A   Well, because, again, this has the
5  same guy that wrote this, Daryl Lemieux,
6  it's got the same date, February 17th, and
7  it has the notation "wall in bedroom," so to
8  me, what probably happened, and this is,
9  again, an assumption --
10    Q   An assumption?
11    A   Because I wasn't there.
12        -- is that they went through,
13 check, check, check, check, check.
14 "Everything okay?" "Yeah, yeah, yeah, yeah,
15 yeah," and everybody is going through,
16 "Yeah, it's good."
17        And then someone noticed that
18 "wait a minute, there is something in the
19 wall in bedroom," and so on this report,
20 which may have occurred later, it may have
21 occurred before. I don't know.
22    Q   You don't know?
23    A   I don't know.
24    Q   You don't know how these forms
25 were used?

**Page 122**

1     A   That's correct.
2     Q   You're putting together a story
3  just totally on your assumptions?
4     A   Based on what's written here.
5     Q   No, you don't know how the forms
6  are used, you're putting together a story
7  totally based on your assumptions. You
8  don't know when Moore 5 was filled out, you
9  don't know when "wall in bedroom" was put on
10 Moore 5, do you?
11    A   No.
12    MR. PINEDO:
13        Objection to the form.
14    THE WITNESS:
15        No, I do not, because they could
16 have been written yesterday for all anybody
17 knows and dated -- and back-dated there. I
18 don't think that happened, because we have
19 had these for quite a few months.
20        So I would have to really go by
21 the dates that's written on there. I would
22 assume that this form was started on January
23 14th, '06, and then you would assume that
24 the guy that actually signed off on it was
25 February the 17th, '06.

**Page 123**

1  At some point between those two
2  dates, I would assume, again, that they
3  wrote this in here, that something is going
4  on with that wall in the bedroom.
5  EXAMINATION BY MR. PENOT:
6     Q   Okay. Those are all assumptions.
7  You know nothing about these forms. You
8  haven't talked to Ms. A. Babst or Baker, who
9  dated her signature 1-14-06? You don't
10 know?
11    A   I don't know that, no.
12    Q   You don't know at all?
13    A   No.
14    Q   All right.
15    MR. PINEDO:
16        Give us her address and we will
17 talk to her.
18    MR. PENOT:
19        You better not, because she works
20 for us.
21    MR. PINEDO:
22        I will notice her up.
23 EXAMINATION BY MR. PENOT:
24    Q   Let's go back to this conversation
25 you had with Shirley Alexander,

**Page 124**

1  Ms. Alexander's mother.
2     A   Okay.
3     Q   By phone or in person?
4     A   By phone.
5     Q   When?
6     A   Last night.
7     Q   Last night?
8     A   Yes, sir.
9     Q   So this was when that four-hour
10 meeting with Mr. -- with your lawyers?
11    A   I don't think --
12    Q   Excuse me. I mean the Alexanders'
13 lawyers.
14    A   I don't think anybody said
15 anything about a four-hour meeting. I said
16 several hours, but, yes.
17    Q   Okay. Well, we can quibble about
18 that, but we will do it when we get the
19 transcript.
20    A   Okay.
21    Q   Okay. So you're here, and that
22 was preparation for this deposition, huh?
23    A   Yes.
24    Q   Okay. So that's when you talked
25 to Ms. Shirley Alexander, with the lawyers?

31 (Pages 121 to 124)

```
 1    A   Yes, sir.
 2    Q   Okay. So you all put her on the
 3  speakerphone?
 4    A   Yes, sir.
 5    Q   Who was in the room?
 6    A   Mr. Chris here and Skip was in
 7  there during part of that conversation, and
 8  Peter and myself.
 9    Q   Okay. Tell me everything you can
10  recall about who said what through this
11  conversation that just happened last night.
12  How long did it last to start?
13    A   Probably 10 minutes.
14    Q   Okay. Tell me everything you
15  recall that Chris said, that Peter said,
16  that Skip said and that you said and that
17  Ms. Alexander said.
18    A   Okay. During the conversation, I
19  don't recall Peter saying anything as far as
20  actually participating directly in the
21  conversation, other than listening.
22        I don't think I said anything
23  specifically directed to Ms. Alexander as
24  part of the conversation.
25        I think that the conversation from
                                       Page 125
```

```
 1  what I recall occurred directly from Chris
 2  and Skip with Ms. Alexander. They asked her
 3  if she remembered when the unit was
 4  installed, if she remembered being there and
 5  seeing that. They asked --
 6    Q   Can I interrupt you right there?
 7  Just because it's going to be long, and I'm
 8  going to have to go back and try to --
 9    A   Go ahead.
10    Q   Okay. Did they say that? Is that
11  what they said? They said, "Do you remember
12  if you saw it"?
13    A   I would be lying to you if I told
14  you exactly what they said, because I don't
15  remember exactly what they said, no.
16    Q   Did they say, "You saw him
17  installing the trailer, didn't you,
18  Ms. Alexander"? Did they say that?
19    A   Again, I would be lying to you if
20  I told you exactly what they said, no.
21    Q   All right. So go ahead.
22    A   Okay. So they asked her about if
23  she saw the installation of the trailer.
24  They asked her if they -- how many people
25  they used.
                                       Page 126
```

```
 1    Q   How many did she say?
 2    A   She said that she remembered there
 3  being two men there. They asked her if she
 4  remembered how many jacks were being used.
 5  She said she didn't remember that. They
 6  asked her what type of jacks that were being
 7  used, and specifically they asked her if
 8  when she saw them jacking it up, did they
 9  use an up-and-down motion or did they use a
10  circular motion to try to determine whether
11  it was a hydraulic type of jack or the
12  scissor type jack that were installed on the
13  unit.
14        They asked her did they have
15  enough jacks to jack up the whole unit or
16  did they go from one corner to the next, and
17  she said she remembered them mostly working
18  on one side of the unit, putting the piers
19  underneath there, and then working on the
20  other side of the unit and putting the piers
21  underneath there. And that's basically the
22  whole conversation.
23    Q   All right.
24    A   And again, I'm saying "basically,"
25  because I don't recall the exact words. You
                                       Page 127
```

```
 1  know, we didn't transcribe it or anything,
 2  so I don't remember exactly.
 3        THE VIDEOGRAPHER:
 4            Charlie, I need to change the
 5        tape.
 6        MR. PENOT:
 7            Okay.
 8        THE VIDEOGRAPHER:
 9            We're off the record. It's 11:46.
10  (Discussion off the record.)
11        THE VIDEOGRAPHER:
12            We're back on the record. It's
13        11:49.
14  EXAMINATION BY MR. PENOT:
15    Q   Do you recall which side
16  Ms. Shirley Alexander told you the jacking
17  was performed on first?
18    A   She did not remember which side
19  they performed it on first, no.
20    Q   Okay. Do you have some assumption
21  or reason to believe you know which side
22  they jacked it on first?
23    A   No.
24    Q   And I want to understand this now.
25  You understood her to be telling you this,
                                       Page 128
```