UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
|     FORMALDEHYDE PRODUCTS | * | |
|     LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |
| THIS DOCUMENT IS RELATED TO | * | |
| | * | |
| *Charlie Age, et al v. Gulf Stream Coach* | * | |
| *Inc., et al*, Docket No. 09-2892; | * | |
| Alana Alexander, individually and on behalf of | * | |
| Christopher Cooper | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S RESPONSE TO DEFENDANT GULF STREAM'S PARTIAL MOTION FOR SUMMARY JUDGMENT (DUTY TO WARN)**

Plaintiff Alana Alexander, individually and on behalf of her son, Christopher Cooper ("Ms. Alexander" or "Plaintiff"), responds to Defendant Gulf Stream Coach, Inc.'s ("Gulf Stream") "Partial Motion for Summary Judgment" (Doc. 2719) regarding Plaintiff's duty to warn claim and, in support, would show:

**BACKGROUND**

**I.**     **Basis of Gulf Stream's Motion**

In her Complaint Plaintiff claims that Gulf Stream violated the Louisiana Products Liability Act ("LPLA"):

> in providing housing units which, by virtue of a lack of adequate warning(s), were unreasonably dangerous under reasonably anticipated use; … [and]
>
> in failing to warn each Named Plaintiff of the unreasonably dangerous nature of the housing unit occupied by the Plaintiff, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit.

*Age, et al. v. Gulf Stream Coach, Inc., et al*, 09-2892, Docket Entry No. 1, at ¶¶ 102(iii) & (vii).

Plaintiff later amended her complaint to further allege that Gulf Stream's:

> duty to warn her and her family about the dangers and risks of formaldehyde in this travel trailer was continuing in nature and legally was owed to plaintiff by the defendant manufacturer during the entire period that plaintiff and her family occupied this travel trailer.

Plaintiff's Third Supplemental and Amended Complaint, (Docket Entry No. 1686), at ¶ 12.

Now, Gulf Stream seeks summary judgment on Plaintiff's duty to warn claim, arguing that, as a matter of law, 1) it had no duty to provide FEMA or Plaintiff a warning or 2) it was excused from providing a warning for various reasons. The Court should deny the motion.

## II. Gulf Stream's Knowledge of Formaldehyde Dates to the 1980s

First, there is substantial evidence that Gulf Stream knew of the dangers of formaldehyde in trailers in the mid-1980's:

Deposition of Gulf Stream's James Shea, relevant portions attached as **Exhibit A**:

- During the 1980s, there was a lot of controversy and claims regarding formaldehyde. Pages 91-93.

- He has a lot of experience, and intimately familiar, with the issue of formaldehyde in the 1980s. Pages 94-95 ("I was familiar with it [the formaldehyde issue in the 1980's], yes, quite familiar.")

Deposition of Gulf Stream's Scott Pullin, relevant portions attached as **Exhibit B**:

- He had an issue with formaldehyde when he first started working at Gulf Stream and that is when James Shea, Gulf Stream's founder, issued a requirement that the company only use low formaldehyde emitting ("LFE") wood. Pages 36-37 and pages 201-02.

Deposition of Gulf Stream's Burl Keel, relevant portions attached as **Exhibit C**.

- In 17 years working at Gulf Stream, has learned the scent of formaldehyde, knows it is in the wood and expects to smell it in trailers. Pages 33-34.

- First heard about formaldehyde when wife asked him about it about 15 years ago – learned shortly thereafter that formaldehyde was in wood products used by Gulf Stream.  Pages 98-100.

Deposition of Gulf Stream's Brian Shea, relevant portions attached as **Exhibit D.**

- Was present at Gulf Stream around during the formaldehyde issues of the 1980s.  Page 18 and pages 68-69.

Most telling of Gulf Stream's knowledge of formaldehyde is from a "White Paper" drafted by Gulf Stream's founder, James F. Shea, relevant portions attached as **Exhibit E**, which stated:

- "Litigation and settlements based on formaldehyde have adversely affected the manufactured housing and recreational vehicle industry in Indiana since early in 1981." (p. 1)

- "Formaldehyde is introduced in to the products of the [manufactured housing/recreational vehicle] industry through the industry's use of building products, commonly used in the construction industry such as plywoods and fibre board and furnishings, such as carpeting, furniture, and draperies." (p. 2)

- Discusses how the rise of product liability cases has killed other companies and entire industries and actions some states have taken (pp. 3-4)

- Provides various arguments on how to defend formaldehyde exposure cases and how to influence legislation relating to formaldehyde.  (pp. 5-15).

**III.** **FEMA's Knowledge Begins in March 2006.**

Second, we know that FEMA did not learn about the dangers of formaldehyde in trailers until March 2006:

Deposition of FEMA's Kevin Souza (2008) relevant portions attached as **Exhibit F.**

- FEMA first became aware of formaldehyde health hazard in March 2006.  Page 22, line 5 to 17

- FEMA was not aware of formaldehyde-related complaints until March 2006.  Page 26, line 13 to 16.

3

Deposition of FEMA's Kevin Souza (2009), relevant portions attached as **Exhibit G.**

- Believed trailers were safe at time of purchase. Page 30, line 17 to page 31, line 16.

- First heard of formaldehyde concerns in March 2006. Page 42, line 16 to page 43, line 12.

Deposition of FEMA's Bryan McCreary, relevant portions attached as **Exhibit H.**

- Not aware of formaldehyde as an issue during trailer procurement. Page 15, line 3 to 22.

- Not aware of formaldehyde complaints pre-Katrina. Page 29, line 8 to 11.

Deposition of FEMA's David Garratt, relevant portions attached as **Exhibit I.**

- First became aware of formaldehyde complaint via Sierra Club report from K. Souza. Page 38, line 1 to 10.

- No formaldehyde claims from residents of trailers from previous disasters. Page 208, line 7 to 16.

Deposition of FEMA's Martin McNeese, relevant portions attached as **Exhibit J**.

- Prior to Katrina, not aware of any formaldehyde complaints associated with trailers. Page 101, line 15 to 21.

Deposition of FEMA's Guy Bonomo, relevant portions attached as **Exhibit K**.

- With regard to FEMA's knowledge of formaldehyde, "We were as surprised as the applicants, you know. We had no idea." Page 19, line 16 to 18.

Expert Report of FEMA expert Michael Lindell, relevant portions attached as **Exhibit L**.

- FEMA Emergency Managers had no forewarning about formaldehyde in THUs from its experience providing temporary housing after previous disasters. Pages 6-9.

4

## IV.     Gulf Stream's Lack of Any Warning.

Third, we know (and it is not disputed) that Gulf Stream provided no warning labels in the subject trailer, and the Gulf Stream Owner's Manual contains no mention of formaldehyde, much less any warning about its health effects. *See* Gulf Stream Owner's Manual, attached as **Exhibit M**.

We also know (and it does not appear to be disputed) that Gulf Stream did not ever provide any other type of warning to Plaintiff or FEMA.

We also know that, when Plaintiff took residence in the trailer, she asked a person who she believed to be a Gulf Stream representative about a chemical smell. This person told her the smell was nothing to worry about. *See* Alexander Declaration, attached as **Exhibit N**.

## V.     Resident Complaints to FEMA and Gulf Stream

Fourth, we know that, in March 2006, FEMA and Gulf Stream began learning of resident complaints. *See* Paragraph III above, regarding FEMA; *see* Pullin Depo., at pp. 196-97, regarding Gulf Stream. All told, Gulf Stream received between 30-40 complaints, between mid-March 2006 to the end of May 2006. Plaintiff moved into her trailer at the end of May 2006, but again, Gulf Stream provided her no warning.

## VI.    Gulf Stream's Response to Complaints

Fifth, we know that, in response to these complaints, Gulf Stream did testing of trailers in Louisiana in March/April 2006. *See* Pullin Depo., at pp. 8-9; J. Shea Depo., at, at pp. 160-62. On March 21, 2006, Dan Shea told Stephen Miller that Gulf Stream would "send a person down to Baton Rouge on Friday to test units in your staging area." March 21, 2006 E-Mail from Dan

Shea to Stephen Miller, attached as **Exhibit O**. The results of these tests yielded extremely high readings *See* Test Results from March 28, 2006 to April 22, 2006, attached as **Exhibit P**. These test results were never shared with FEMA or with the trailer residents, including the residents of the trailers that were actually tested. *See* J. Shea Depo., at p. 193.

Gulf Stream also tested certain wood products after it learned that its suppliers had not been providing "low formaldehyde emitting" or LFE wood. *See* Deposition of Dan Shea, at pp. 154, 161, 163-64, 168, relevant portions attached as **Exhibit Q**. We do not know what these test results yielded because Gulf Stream has refused to produce them, claiming "anticipation of litigation."[1] Suffice it to say that, if these results had been good for Gulf Stream, there is no doubt they would have produced them. In any event, Gulf Steam did not share the results of these tests with either FEMA or the residents of the trailers. *See id.,* at pp. 163-64, 171-72.

Instead of notifying FEMA or residents about these results (or the formaldehyde dangers that Gulf Stream knew about dating to the 1980's) or any type of warning, Gulf Stream anticipated litigation and hired a public relations firm. *See* Jim Shea Depo., at pp. 261-62. Gulf Stream carefully drafted press releases and letters to FEMA defending its behavior, but did not warn residents. Plaintiff moved into her trailer in late May 2006—well after Gulf Stream learned of these results, but again, Gulf Stream provided no warning to her.

One of Gulf Stream's many tactics (no doubt directed by attorneys) was to "confirm" with FEMA that FEMA did not want Gulf Stream to deal with residents. In support of this claim, Gulf Stream offers only a self-serving letter from one of its officers to a FEMA representative. However, that FEMA representative (David Porter) does not even remember the

---

[1] Plaintiff has moved to compel these results; that motion has been briefed, argued and is pending.

conversation referenced in this letter. *See* Deposition of David Porter, at pp. 103-04, relevant portions attached as **Exhibit R**. Gulf Stream offers no other "evidence" in support of this alleged "directive" from FEMA.

### VII.   Gulf Stream Misleads FEMA

Sixth, we know that Gulf Stream misled FEMA with respect to its use of "LFE" wood products. On March 17, 2006, Dan Shea, President of Gulf Stream, sent an email to a FEMA employee stating that Gulf Stream "uses material that meets the HUD specification of low formaldehyde emissions for manufactured housing" and that lauan, floor decking, bed tops, dinette bases and cabinet doors all meet HUD requirements. *See* March 17, 2006 E-Mail from Dan Shea to Stephen Miller, attached as **Exhibit S**. In March or April 2006, Dan Shea later learned that this statement was not true when he discovered non-HUD certified wood products from Adorn in one of Gulf Stream's facilities that manufactured FEMA units. D. Shea Depo., at pp45-47. Gulf Stream learned that approximately 15 percent of the wood products that went in to the FEMA units were not HUD certified. *Id*. at pp. 58-60. Other than Adorn, Gulf Stream later learned that other suppliers of wood products also supplied non-HUD certified materials. *Id*. at pp. 61-62. However, Gulf Stream never sent a letter to FEMA informing it of these facts. *Id*. at p. 64. Instead, it was not until April or May of 2007, when Dan Shea said he had a conversation with Stephen Miller, a FEMA employee, and notified him of the presence of non-HUD certified wood products in its trailers. *Id*.

### VII.   Gulf Stream's 2004 Models Substantially Identical to 2005/2006 Models.

Seventh, we know that Gulf Stream's 2004 models (like the subject trailer) are virtually

identical to 2005/2006 models. Jim Shea testified before the House Committee on Oversight and Government Reform that, "the FEMA travel trailers we manufactured [in 2005 and 2006] followed the same specification as those we delivered to hurricane victims in 2004." Transcript from the July 9, 2008 Hearing on Manufacturers of FEMA Trailers and Elevated Formaldehyde Levels, at p. 99, attached as **Exhibit T**; *see also* prepared statement by Jim Shea to Congress, July 9, 2008 Hearing, at p. 4, attached as **Exhibit U** (the only differences between the 2004 and 2005/06 trailers was that the latter were "rail ready" and FEMA contacted Gulf Stream directly to purchases the 2005/06 units).

Additionally, Gulf Stream was using the same component products in the FEMA units that they built in 2004 as the ones they built in response to Hurricanes Katrina and Rita. Thus, when Gulf Stream learned (allegedly) for the first time in 2006 that it was not getting LFE wood per its alleged policy, it should have known that this affected 2004 trailers as well.

Scott Bailey, a salesman for Adorn that sold wood products to Gulf Stream during the relevant time period, testified that Gulf Stream had been a customer of Adorn for at least ten years[2] and that he did not remember a year when Gulf Stream did not purchase wood products from Adorn. *See* Deposition of Scott Bailey, at p. 21, attached as **Exhibit V**. Mr. Bailey first learned of Gulf Stream's alleged policy of only purchasing HUD-certified, or LFE, products in the Fall of 2007. *Id.* at pp. 22-23. Prior to that, he had no recollection of anyone from Gulf Stream specifying that the wood products they ordered from Adorn needed to be LFE and, that if Gulf Stream did not specify LFE, Adorn would not ship them LFE wood products. *Id*. at pp. 10-

---

[2] Jim Shea testified that Adorn had been providing decorative hardwood panels to Gulf Stream for approximately twenty years. *See* J. Shea Depo., at p. 55.

8

11; 21-22. Further, Mr. Bailey said that Gulf Stream was "happy to get whatever they can get" when it came to ordering wood products from Adorn. *Id*. at p. 10.

Thus, as Gulf Stream learned that there were problems with trailers provided in Louisiana, Gulf Stream should have been smart enough to know that this would affect 2004 models. Further, Gulf Stream learned in 2006 that, despite its claimed (unwritten) policy of using only "low formaldehyde emitting" or LFE wood, that its major wood suppliers did not know of this alleged policy and had been supplying Gulf Stream with whatever was available.

**VIII.   Gulf Stream Apparently Looked into the Future and Saw that FEMA (now a party to a lawsuit) Would Not Give Trailer Resident Data to Gulf Stream.**

Seventh, Gulf Stream offers no evidence that FEMA refused to provide it with trailer resident information so that Gulf Stream could provide warnings to residents. Instead, Gulf Stream cites FEMA's position, in this litigation, that it will not provide trailer resident information to third parties. Of course, Gulf Stream offers no evidence that it even asked FEMA if it could have this information back in 2006. Gulf Stream offers no evidence that it asked FEMA if it could forward a warning to residents or if it would allow Gulf Stream to forward warnings to residents. Gulf Stream offers no evidence that it tried any other means to warn residents.

**ARGUMENT AND AUTHORITIES**

**I.   Summary Judgment Standard**

The summary judgment has been stated repeatedly in the multitude of summary judgment motions that Gulf Stream has filed and Plaintiff's response to same.

**II.   The LPLA**

9

The LPLA imposes liability on a manufacturer "for damage proximately caused by a characteristic of the product that rends the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product. LA. REV. STATE. ANN. § 9.2800.54(A). The LPLA states that a product may be unreasonably dangerous in one of four ways: (1) construction or composition, (2) design, (3) <u>inadequate warning</u>, and (4) nonconformity to an express warranty. *See id*. at § 9:2900.54(B)(emphasis added).

Relevant to Gulf Stream's Motion is the LPLA provision that provides for a claim against a manufacturer for damages arising from a defect that is unreasonably dangerous because of an inadequate warning. Specifically, the LPLA provides that:

> A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

*See id*. at § 9:2900.57(A). The LPLA defines an adequate warning as:

> a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.

*See id*. at § 9:2900.53(9).

Finally, even after a product has left the control of the manufacturer, there is a duty to warn owners and operators of any dangers of which the manufacturer subsequently learns. La. R.S. 9:2800.57(C). A manufacturer of a product who, after the product has left its control, acquired knowledge of a characteristic of the product that may cause damage must act reasonably to provide an adequate warning of such characteristic and its danger to users. La.

10

R.S. 9:2800.57(C); *Our Lady of the Lake Hosp., Inc. v. Carboline Co.*, 632 So.2d 339, 343 (La. App. 1 Cir. 1993), *writ denied*, 635 So.2d 228 (La. 1994), *writ denied*, 637 So.2d 1052 (La. 1994).

**III.     FEMA is Not a Sophisticated User or, at Least, That is a Fact Question.**

The LPLA includes an exception to the duty to warn if:

> The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.

La. R.S. at 9:2900.57(B)(2). This is more commonly known as the "sophisticated user" defense. "**Whether a user is sophisticated is ordinarily a question of fact for the jury to decide**." *Mozeke v. Int'l Paper Co.*, 933 F.2d 1293, 1297 (5th Cir. 1991), citing *Fincher v. Surrette*, 365 So.2d 860, 863 (La.Ct.App. 1978)(emphasis added). "A sophisticated user possesses more than a general knowledge of the product and how it is used." *Asbestos v. Bordelon, Inc.*, 726 So.2d 926, 955 (La.App. 4 Cir 1998). In *Bordelon*, the shipyard employer was found not be a sophisticated user of asbestos-containing insulation as it "did not manufacture any insulation of its own and did not mine raw materials and construct a final product." *Id*.; *see also Hennegan v. Cooper/T. Smith Stevedoring Co., Inc.*, 837 So.2d 96, 109 (La.App. 4 Cir. 2002) (barge owner found not to be a sophisticated user because "awareness of the hazards of asbestos exposures during … [the 1960s] was less in the stevedoring industry than in shipyards").

In one case, the Fifth Circuit reversed a trial court's finding that an employer was a sophisticated user as a matter of law even though the record showed that the employer had been using the product (ozone) in its manufacturing process for 55 years and this particularly ozone generator for 12-13 years before Plaintiff discovered injuries. *Swope v. Columbian Chemicals*

11

*Co.*, 281 F.3d 185, 206 (5th Cir. 2002). The *Swope* court held that experience with a device does not necessarily equate to knowledge. *Id*. at 208-09.

Gulf Stream has failed to show as a matter of law that FEMA was a sophisticated user of travel trailers. As set forth in the background section, while Gulf Stream had knowledge of formaldehyde dating back to the 1980s, FEMA was first learning on the potential hazards this chemical presents in early 2006. It is clear that FEMA deferred to the expertise of the manufacturers (like Gulf Stream) to provide a safe product to use as housing in disaster situations.

The facts here are clearly distinguishable from *Morgan v. Brush Wellman, Inc.*, 165 F.Supp.2d 704 (E.D. Tenn. 2001). In *Morgan*, the Department of Energy (DOE) and its predecessors, including the Atomic Energy Commission (AEC), had been using beryllium since the Manhattan Project. *Id*. at 710. The AEC first began studying the health effects of beryllium exposure and setting an appropriate standard in the 1949. *Id*. at 710-11. The DOE had known since the early 1950s that beryllium is extremely toxic to humans (it has been described as "per molecule, 'the most deadly substance known to mankind'") but continues to use it because it is essential to the construction of an atomic bomb. *Id*. at 709. Here, FEMA was not aware of the formaldehyde issue related to trailers until March 2006 at the earliest.[3] Additionally, unlike the defendant in *Morgan*, Gulf Stream withheld critical information from FEMA regarding the safety of its product.

IV.     **Gulf Stream Had a Duty to Warn and Could Have Warned FEMA or Residents.**

---

[3] The results from the first testing FEMA asked OSHA to perform were not even formally reported until late May 2006, and was done for occupational, not residential purposes. *See* May 31, 2009 Memo from Bronson Brown to Jesse Crowley, attached as **Exhibit V.**

12

> The LPLA states that:
>
> a manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

LA. REV. STATE. ANN. § 9:2900.57(C).

As Gulf Stream points out, there is a dearth of Louisiana state cases addressing whether a manufacturer owes a duty to warn third party beneficiaries of its product. It appears silent as to a duty to warn third party beneficiaries, such as the trailer residents, of the product. In any event, the cases that address this generally deal with employers who receive warnings from the manufacturer, but do not pass the warning on to the employee. Here, the fact is that Gulf Stream offers no proof that it ever provided a warning to FEMA.

*Adams v. Union Carbide Corp,* 737 F.2d 1453 (6th Cir. 1984) has a very different set of facts than the present case (aside from the fact that it again deals with an employer-employee relationship). In *Adams*, the defendant manufacturer was in contact with the plaintiff's employer, provided information on the respiratory hazards of its product and gave recommendations on how to properly train employees. *Id*. at 1454-54. Here, Gulf Stream did none of this; in fact, as demonstrated above, Gulf Stream withheld information from FEMA regarding the nature of its product, even after Gulf Stream began to prepare for litigation.

Also, relying on Comment n of § 388 of the Restatement (Second) of Torts, the Fourth Circuit held that:

> the fact that an employer possesses knowledge of a product's danger does not

> extinguish the manufacturer's liability unless the manufacturer can also show that it had reason to believe that the employer was or would be acting to protect the employees.

*Willis v. Raymark Industries, Inc.*, 905 F.2d 793, 797 (4th Cir. 1990).

Further, even if the jury were to determine that FEMA is a sophisticated user, Gulf Stream would still not be absolved of its duty to warn the residents of its trailers. A Louisiana court has held that:

> while intended use by sophisticated users might weigh against the need for a warning in some circumstances (at least prior to the enactment of the Louisiana Products Liability Act), we do not believe that it obviates the need for a warning when there is a grave and substantial risk to the public safety at stake.

*In re New Orleans Train Car Leakage Fire Litigation*, 795 So.2d 364, 396 (La.App. 4 Cir. 2001). Here, Gulf Stream manufactured 50,000+ units that were occupied by tens of thousands of people in the Gulf Coast area for several years. The sheer number of people who were exposed to dangerous levels of formaldehyde as a result of residing in a Gulf Stream trailer should qualify as a "grave and substantial risk" to the public safety.

### V. Gulf Stream's Next Excuse.

As further excuse for its failure to warn, Gulf Stream points to the Privacy Act and FEMA's refusal to identify trailer residents (in the context of this litigation). First, this ignores the fact that Gulf Stream knew about formaldehyde problems as early as the 1980's and never placed a warning in their trailers or in their owner's manuals (despite the fact that many other manufacturers do just that). It also ignores the fact that, at minimum, Gulf Stream could have provided a warning to FEMA for transmission to residents.

Second, it is amazing that Gulf Stream would have seen that this would be FEMA's

14

position in this litigation and simply folded up its tent and gone home.

Third, the reality is that Gulf Stream offers no proof that it even tried to warn any residents, whether by asking FEMA if it would let it, or if FEMA would forward a warning to residents. Gulf Stream offers no proof that FEMA denied any such requests.

Fourth, the evidence shows that Gulf Stream did not even provide a warning to residents of trailers that it did test, or any of the residents who lodged complaints with Gulf Stream. As that is the case, it is unconceivable that Gulf Stream desperately wanted to warn residents but was rebuffed by FEMA.

Last, many product recalls are performed (through media and other means) without the manufacturer ever knowing exactly who uses its defective product, but Gulf Stream offers no proof that it made such an effort. Gulf Stream has failed to show as a matter of law that it was prevented from warning Plaintiff. The jury must decide if this "excuse" absolved Gulf Stream's of its LPLA duty to warn.

**V.   Gulf Stream Fails to Show as a Matter of Law that it Was Excused from Warning Residents of 2004 Trailers.**

Finally, Gulf Stream claims that even if it had a duty to warn, then, as a matter of law, it only had a duty to warn residents of 2005/2006 manufactured trailers. Gulf Stream contends that it had no duty to warn residents of trailers manufactured in 2004 (like Plaintiff) because Gulf Stream had never received a complaint from a unit built prior to Hurricanes Katrina and Rita. However, this statement ignores the fact that Gulf Stream knew about formaldehyde issue long before then. It ignores the fact that the differences between the 2004 and 2005/06 units were minimal to none, as set forth above. It ignores the fact that Gulf Stream did receive complaints

15

in 2006 (before Plaintiff moved into her trailer) and its own testing showed elevated levels in 2006 (before Plaintiff moved into her trailer).  It ignores the fact that, even if it really had an alleged unwritten policy of using only LFE wood, that in 2006, it learned that it had not notified its vendors (or even its superintendants) of this policy.   Gulf Stream should have had enough common sense to know that 2004 trailers were at issue here.  But, by that time, Gulf Stream was anticipating litigation and hiring lawyers and press relations firms.  It is quite clear that Gulf Stream had no intent to provide warnings to any residents.

There is ample evidence that preclude a finding, as a matter of law, that Gulf Stream was excused from warning residents of 2004 trailers.  If that is truly Gulf Stream's position, they should make it to the jury and let the jury decide if this fact excused Gulf Stream from warning residents of 2004 trailers, like Plaintiff.

## **CONCLUSION AND PRAYER**

Gulf Stream has failed to meet its burden of showing, as a matter of law, that FEMA was a sophisticated purchaser or that Gulf Stream was excused from providing warnings to Plaintiff.

WHEREFORE, Plaintiff Alana Alexander respectfully requests that the Court deny Gulf Stream's Partial Motion for Summary Judgment and for such other relief to which she is entitled.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:   s/Gerald E. Meunier
      GERALD E. MEUNIER, #9471
      **PLAINTIFFS' CO-LIAISON COUNSEL**
      Gainsburgh, Benjamin, David, Meunier &
      Warshauer, L.L.C.
      2800 Energy Centre, 1100 Poydras Street
      New Orleans, Louisiana 70163
      Telephone:   504/522-2304
      Facsimile:    504/528-9973
      gmeunier@gainsben.com

      s/Justin I. Woods
      JUSTIN I. WOODS, #24713
      **PLAINTIFFS' CO-LIAISON COUNSEL**
      Gainsburgh, Benjamin, David, Meunier &
      Warshauer, L.L.C.
      2800 Energy Centre, 1100 Poydras Street
      New Orleans, Louisiana 70163
      Telephone:   504/522-2304
      Facsimile:    504/528-9973
      jwoods@gainsben.com

      **COURT-APPOINTED PLAINTIFFS'
      STEERING COMMITTEE**
      ANTHONY BUZBEE, Texas # 24001820
      RAUL BENCOMO, #2932
      FRANK D'AMICO, #17519
      MATT MORELAND, #24567
      LINDA NELSON, #9938
      MIKAL WATTS, Texas # 20981820
      ROBERT BECNEL
      DENNIS REICH, Texas # 16739600

**CERTIFICATE OF SERVICE**

    I hereby certify that on August 26, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

                                          s/Gerald E. Meunier
                                          GERALD E. MEUNIER, #9471