# Transcript of the Testimony of

# JAMES F. SHEA - GULF STREAM COACH 30(b)(6)

Date: May 28, 2009

FEMA Trailer Formaldehyde Products Liability Litigation
v.



PLAINTIFF'S EXHIBIT A

| | | |
|---|---|---|
| 1 | | is the Manufactured Housing Association for |
| 2 | | Regulatory Reform. |
| 3 | Q | Okay.  Is your sister company that produces |
| 4 | | manufactured housing a member of those two groups? |
| 5 | A | No. |
| 6 | Q | Neither group? |
| 7 | A | It's a member of one of them. |
| 8 | Q | Which group? |
| 9 | A | The latter. |
| 10 | Q | How long has your sister company been a member of |
| 11 | | that particular trade association? |
| 12 | A | Since it was formed. |
| 13 | Q | When? |
| 14 | A | It was formed in the early '80s, I believe. |
| 15 | Q | And so you were telling me why this policy -- why |
| 16 | | you guys came up with this LFE policy at your |
| 17 | | company.  Tell me about that. |
| 18 | A | Sometime in the mid '80s, and, of course, there was |
| 19 | | a lot of controversy, involvement of lawyers, |
| 20 | | claims, complaints relating to the manufactured |
| 21 | | housing industry and the use of materials that had |
| 22 | | adhesives that contained formaldehyde, |
| 23 | | urea-formaldehyde resins. |
| 24 | | And as an answer to that, the agency that |
| 25 | | regulates manufactured housing, the Department of |

```
 1     Housing and Urban Development, decided to proceed
 2     to rulemaking to establish some rules for using
 3     those kinds of products in manufactured homes as
 4     part of their more general regulations that relate
 5     to manufactured housing products.
 6  Q  When you say "those products," do you mean wood
 7     products?
 8  A  These -- they were specifically addressing certain
 9     wood products containing urea-formaldehyde resins.
10  Q  What type of wood products?
11  A  Specifically hardwood plywood.
12  Q  Like lauan?
13  A  Sometimes referred to as lauan.  And composite wood
14     products, specifically particleboard.
15  Q  Uh-huh.  So HUD had a proposed rulemaking.  Keep
16     going, please.
17  A  So they went through the proposed rulemaking.
18     Eventually they took comments and so forth, went
19     through the process.  Eventually regulations were
20     put forth and adopted, and manufactured housing
21     from there forward was required to use specifically
22     hardwood plywood products that met a certain
23     emissions rate and particleboard products that met
24     a certain emissions rate.
25  Q  When did that happen?
```

| | | |
|---|---|---|
| 1 | A | In the mid '80s. |
| 2 | Q | And what was your position in the company when that |
| 3 | | occurred? |
| 4 | A | I was president of a division, of Fairmont. |
| 5 | Q | What is it called, Fairmont Homes? |
| 6 | A | Correct. |
| 7 | Q | You were president of one of the divisions? |
| 8 | A | Yes. |
| 9 | Q | And who was the CEO at that time? |
| 10 | A | My father was the CEO. |
| 11 | Q | Were you involved in that particular issue with |
| 12 | | your father as regards to the HUD -- |
| 13 | A | There was -- well, we were involved in the sense |
| 14 | | that, you know, we had complaints.  We had to deal |
| 15 | | with concerns and claims and opposing lawyers and |
| 16 | | so forth.  So, yes, I was involved in trying to |
| 17 | | resolve people's concerns and doing various things |
| 18 | | to do so.  But as far as an involvement with the |
| 19 | | regulatory process, I don't recall having any |
| 20 | | involvement with the regulatory process. |
| 21 | Q | What division were you president of? |
| 22 | A | It's called the Friendship division. |
| 23 | Q | Tell me, Fairmont Homes, how many divisions then |
| 24 | | did it have? |
| 25 | A | In the mid '80s it had about four or five |

1     divisions, as I recall.
2  Q  And what was Friendship Homes?
3  A  It was -- it manufactured a certain model series,
4     kind of larger dual section units.
5  Q  And so you were the president of one of the
6     divisions that had this issue with regard to
7     complaints, concerns, lawsuits regarding
8     formaldehyde exposure?
9  A  Some of the issues of the '80s related to some of
10    the products that we produced.
11 Q  And that's why Fairmont Homes joined this trade
12    association?
13 A  We joined the trade association because there's
14    hundreds and hundreds of issues relative to the
15    federal regulations.  This was just one.
16 Q  It was a very big one, though, was it not, back in
17    the '80s?
18 A  Well, yes, it was an important one.
19 Q  And so you had a lot of experience in the '80s with
20    this issue of formaldehyde exposure as the
21    president of one of these manufactured housing
22    divisions within Fairmont Homes?
23 A  Yes.
24 Q  And you were intimately familiar with this
25    formaldehyde issue as it -- specifically

```
 1       complaints, exposure, lawsuits, etc.?
 2   A   I was familiar with it, yes, quite familiar.
 3   Q   All right.  And Fairmont Homes was a member of
 4       this -- what was the name of the trade association?
 5   A   The Manufactured Housing Association for Regulatory
 6       Reform.
 7   Q   And did you attend those meetings when that group
 8       would have meetings?
 9   A   I attended meetings, yes.
10   Q   Were you the individual from Fairmont Homes who was
11       designated to interface with the trade association?
12   A   I was the primary interface.
13   Q   Okay.  So you would have been aware of the
14       discussions, the memos that went back and forth
15       within the trade association about formaldehyde
16       rulemaking, that sort of thing?
17   A   Frankly, I don't remember that we spent a lot of
18       time on that subject at MHARR.  Of course, it was
19       24 years ago or so.  But I remember more that had
20       to do with a lot of other HUD programs that were
21       creating, you know, issues and difficulties for the
22       manufacturers.  But that one, I don't remember much
23       input that we made on that subject.
24           I mean, certainly this regulatory aspect was a
25       positive thing, I think, for the industry and for
```

Page 160

1  A  They assisted us in our relations with the press,
2     including public statements.
3  Q  Very, very important that whatever statement was
4     provided to the public be absolutely truthful;
5     isn't that right?
6  A  That's true.
7  Q  Tell me about the firm that you retained to do
8     destructive testing, Progressive Engineering.
9  A  I don't think -- Progressive Engineering is a
10    engineering testing inspection firm in Goshen,
11    Indiana.
12 Q  And what did you retain them to do?
13 A  I don't know that we retained them exactly.  We
14    gave them a sample of material to --
15 Q  You paid them, didn't you?
16 A  I think we did pay them, yeah.
17 Q  They didn't do it for free, did they?
18 A  No.
19 Q  Okay.
20 A  But retaining means something other than -- to me,
21    retaining is something different.  Retaining is you
22    can pay money or you agree to pay money even if you
23    don't get services, which is something that's done
24    in the legal profession.  But I don't think of that
25    relative to PEI.

1  Q  Okay. You hired them to do some work for you?
2  A  Right. Okay.
3  Q  All right. I've got to be very careful which words
4     I use.
5         All right. When you hired Progressive
6     Engineering to do some work for your company, what
7     did you hire them to do?
8  A  We had some material, some Adorn material, and we
9     asked them to submit it to the kind of testing that
10    would be required by the HUD standard.
11 Q  So you had them test some interior decorative --
12    the stuff that's used on the walls?
13 A  Correct.
14 Q  Did you have them test anything else other than
15    the --
16 A  No.
17 Q  Just the wall --
18 A  It was interior wall panel.
19 Q  Okay. And when did that happen?
20 A  It happened between -- when did it happen? When
21    did we give the material to them?
22 Q  Yes.
23 A  I think we gave the material to them in early
24    April, as I recall.
25 Q  Of '06?

1   A  Yes.

2   Q  And when did they give you their response?

3       MR. WEINSTOCK: I'm sorry, I just need to

4   check something with counsel. Stop the clock.

5       THE VIDEOGRAPHER: Please stand by. We're off

6   the video at 13:13:33.

7       (At this time a short break in the proceedings

8   was had.)

9       THE VIDEOGRAPHER: We are now back on the

10   video record at the time of 13:14:01.

11       MR. WEINSTOCK: I'm going to object to you

12   asking questions about Progressive Engineering in

13   that we did not produce these documents. We

14   maintain a privilege to them. It's my

15   understanding you did get some of these documents

16   through Mr. Waxman's committee.

17       And if you will agree that by asking these

18   questions I'm not waiving anything that has not

19   already been waived, I will let him answer these

20   questions. But if you contend by my letting him

21   answer it I am further waiving a privilege, I will

22   not let him answer these questions.

23       MR. BUZBEE: I contend that it's already been

24   waived, but in response to your request, I will not

25   contend that continuing to answer these questions

1  A  He didn't do scientific testing, no.
2  Q  He wasn't accurate when he told FEMA that he was
3     going to do some testing?
4  A  Correct.
5  Q  The results of this testing or what you call
6     screening were never shared with FEMA?
7  A  We -- no, we did not share results.  They did
8     not -- no, we did not.
9  Q  And you did not share the results with the trailer
10    residents, did you?
11 A  We did not share any screening results with trailer
12    residents.
13 Q  You didn't even share the results with the
14    residents who were in the trailers you screened,
15    did you?
16 A  We didn't share any screening results with the
17    people that the unit was deployed in, was used in.
18 Q  Let's make sure we're all clear.  The people in
19    whose trailer that you guys screened, you didn't
20    even bother to tell them what the result was, did
21    you?
22 A  We didn't give any screening information to
23    residents.
24 Q  You guys used a -- who actually did the testing or
25    the screening?  I want to be precise.  I called it

1  trailers and what you would run into using travel
2  trailers in the field for that purpose, FEMA had
3  the most expertise.
4 Q FEMA had more expertise than Gulf Stream with
5  regard to the use of the travel trailers?
6 A As temporary housing for disaster relief, the pure
7  use of the unit, what went on out in the field.
8 Q Last time we talked about when you anticipated
9  litigation. You told me that was in March of '06;
10  is that right?
11 A Certainly when this occurred, because of my
12  background in the '80s in manufactured housing, we
13  discussed the situation with our counsel.
14 Q You said "when this occurred." I think, if I'm not
15  mistaken, that's a pronoun. What are you talking
16  about, "when this occurred"?
17 A The beginning circumstance of this formaldehyde
18  issue in March of 2006.
19 Q Okay. So --
20 A We at that time certainly began to discuss the
21  situation with our legal counsel.
22 Q So just so we're clear, because it's important when
23  you actually anticipated litigation, your testimony
24  is that after the first complaint in March of 2006,
25  which would have been March 10th, I believe, that's

1    when you anticipated litigation?

2  A  I think we certainly understood potential for

3    litigation and certainly because of our experiences

4    in the '80s -- or my experience in the '80s in

5    manufactured housing.

6  Q  So March 10, 2006?

7  A  Well, proximate to that time, yes.

8  Q  Okay.  And you told me previously you anticipated

9    litigation with residents living in the trailers.

10  A  Well, you know, I think there is a variety of

11    litigation that we recognize could have transpired,

12    and one of them would have been on behalf of

13    residents.

14  Q  You anticipated litigation regarding the trailers

15    before Miss Alexander and her family ever moved

16    into one of your trailers; isn't that right?

17  A  Well, I'm not exactly sure when Mrs. Alexander

18    moved in, but I've told you that we did speak to

19    our counsel relative to this matter proximate to

20    that mid-March time period.

21  Q  Let's assume -- and I think we finally agreed on

22    this; at least me and Mr. Weinstock have -- that

23    Miss Alexander moved into her FEMA-provided Gulf

24    Stream trailer either May 26th or 27th, 2006.  All

25    right?