Transcript of the Testimony of

# DANIEL SHEA

Date: June 1, 2009

FEMA Trailer Formaldehyde Products Liability Litigation
v.



PLAINTIFF'S
EXHIBIT

1   A  For many years.  And of course, Gulf Stream has

2       different divisions and -- but I would think that

3       back in the '90s, that Gulf Stream would have been

4       buying product from Adorn for travel trailers.

5   Q  And your testimony is, is that for the first time

6       ever, you learned what that designation REG means

7       in March of 2006.

8         MR. MILLER:  Objection.  Mischaracterizes the

9       witness's testimony.

10   A  I had learned sometime in March or April of 2006

11      that Adorn has this term, "REG," that meant that

12      the product didn't necessarily meet the HUD

13      requirement.

14   Q  How did you learn that?

15   A  I was at one of our manufacturing facilities and I

16      was walking down the line with our production

17      manager, Jeff Zumbrun.

18   Q  Which plant?

19   A  That would have been our Plant 57 -- or I'm sorry,

20      it would have been Plant 75 in Etna Green.  And we

21      were walking through that plant and it was just

22      toward the end of building FEMA units and we were

23      looking at starting our fifth wheel production in

24      there, and as that meeting was done, I started

25      looking at all the different wood products with

1    Jeff and --

2  Q  Jeff Zumbrun?

3  A  With Jeff Zumbrun.  And we looked at a number of

4     the wood products that were in the plant, and we

5     were reading the labels --

6  Q  Why?

7  A  -- on the side.

8         This was either a week or week and a half

9     after this concern had come up.

10  Q  After you had gotten complaints of people being

11     exposed to formaldehyde in these trailers you had

12     sold the Government?

13  A  It was -- I believe there was a news report with

14     Mr. Stewart the week before, and we were in the

15     plant and I was asking -- we were looking at all

16     the wood products, and we had walked the line and

17     looked at a number of the different labels that

18     were on the wood products, and there were several

19     different manufacturers of these products that we

20     had wood there for, and I was trying to look at the

21     labels to see what the labels had said relative to

22     this.

23         And some companies, it would say LFE on the

24     label.  Some might not say LFE, but somewhere it

25     might say this meets the HUD requirement.

1   Q   Right.

2   A   Others, there was nothing in the label that said

3       one way or the other, but there was a part number,

4       and in that part number it had an LE, so -- and

5       then we ran across this one from Adorn and we

6       really didn't see one thing, one way or the other,

7       whether it was LE or LFE, and I asked Jeff what he

8       knew about this, and he wasn't sure.

9   Q   He was the purchasing manager for the --

10  A   He was the purchasing manager and this term "REG,"

11      he wasn't familiar with.  And we looked at it and

12      then he contacted Adorn and later reported back to

13      me that this REG meant that it didn't necessarily

14      meet that HUD emission requirement.

15  Q   And that's how you learned what REG means.

16  A   Yes.

17  Q   You just so happened to be -- you had in the back

18      of your mind this news story where somebody was

19      complaining, or alleging formaldehyde exposure, so

20      you're walking through the plant looking at the

21      wood to see if you could figure out what was going

22      on.

23  A   Yeah.

24  Q   And you saw this term "REG" and you didn't know

25      what it meant, and the purchasing manager for the

Page 58

1  generally about 10 percent more in price.  Isn't

2  that right?

3  A  You know, I'm not sure of that.  Lauan's kind of a

4  commodity and the price goes up and down, but

5  10 percent could be a number, 10 to 15, 20 percent.

6  Probably 10 percent, but that's something I really

7  wouldn't have a memory of.

8  Q  You wouldn't have a memory of that?

9  A  Of the exact difference, no.  It's something that

10  would depend on the vinyl that would go on the

11  product.  When you buy something, you're not only

12  buying the lauan but you're buying the vinyl that

13  goes on it.  LFE would be more, but I'm not sure

14  how much more.

15  Q  Okay.  So just so we're clear, LFE would be more.

16  A  Yeah, I think -- I think it would be more.

17  Q  Okay.  LFE costs more.

18  A  They would charge us more.

19  Q  Yes.  Okay.  Now, I'm trying to figure out, you

20  figured that at least of the FEMA order of 2005,

21  Adorn provided 5 percent of the wood products.

22  A  That was my understanding back then in March or

23  April of 2006.

24  Q  Is that still your understanding?

25  A  No.  We later found out that, I think the number is

Page 59

1      as much as 15 percent.

2  Q  Okay.  So now, since you've done further

3      investigation, you've determined that for the 2005

4      FEMA order, the 50,000 trailer order, that Adorn

5      provided approximately 15 percent of the wood

6      products that went into those trailers.

7  A  Yes, that's my understanding today.

8  Q  And you don't know for sure, but you're just

9      assuming that those -- that 15 percent of the wood

10     products were not HUD certified.

11  A  The 15 percent were not certified to meet the HUD

12     standard, but that doesn't necessarily mean that

13     they didn't.

14  Q  It doesn't necessarily mean they did either.

15     Right?

16  A  Correct.

17  Q  Okay.  So what you're telling me today is that

18     15 percent of the products, the wood products that

19     went into the 50,000 trailer order were not HUD

20     certified.

21        MR. MILLER:  Objection.  Mischaracterizes the

22     witness's testimony.

23  A  Could you repeat that, please?

24  Q  Yeah.  What you're saying is, the 15 percent of the

25     wood products that went into these 50,000 trailers,

Page 60

1    based on as best as you can calculate, those wood

2    products were not, quote, HUD certified.

3         MR. MILLER:   Same objection.

4  A  Well, my statement would be that Adorn, it's my

5    understanding, is roughly 15 percent of the

6    products that we purchased, the lauan products with

7    the interior, the vinyls, and that that product

8    that we purchased, Adorn did not certify that those

9    met the HUD emission standard.

10 Q  Okay.  Now, did you determine that other wood

11   products from other vendors were also not HUD

12   certified?

13 A  Yes, that did come up.  That did come up later.

14 Q  Tell me how that came up later and what came up.

15 A  I believe it was in July, August, or September of

16   2007, and we had been through the invoices and

17   paperwork and so forth, purchase orders that we

18   had, and our purchasing department had

19   double-checked things, and we felt confident that

20   we had gone through everything.

21        And after -- I think there was a hearing, I

22   think that's when there was a hearing in D.C., in

23   2007, and we went back and we wanted to

24   double-check everything and we were looking at the

25   letters we had, invoices, everything, and there

Page 61

1     was, oh, some purchase orders from Weyerhaeuser and

2     Samling.

3          And the purchase orders clearly stated that

4     the -- the purchase orders clearly stated that the

5     material was to meet the HUD standard.  And we

6     looked at the invoices and there was, again, some

7     variation between those manufacturers that --

8     whether the material was specifically noted; that

9     they had used several different, oh, indicators or

10    numbers and so forth, so it was really hard to tell

11    from looking at the invoices to confirm that they

12    were LFE products.

13         And we had, at that point, decided we should

14    contact them and ask them, you know, if these

15    products had met the HUD standard.

16  Q  And did you do that?

17  A  Yes.

18  Q  Who did that?

19  A  I think Jim had those conversations.

20  Q  Jim Shea?

21  A  Yeah.

22  Q  Your brother?

23  A  Yeah.

24  Q  What did he learn?

25  A  He learned from Samling and Weyerhaeuser that there

1      was some product that, it was my understanding,

2      that was certified to the HUD standard and some

3      that was not certified to the HUD standard.

4    Q  In what percentages?

5    A  You know, I don't recall the specific percentages.

6    Q  Approximate?

7    A  I think it was probably two-thirds or more -- or

8      wait a minute.  I would -- my recollection is that

9      it was probably approximately a third had -- they

10     were indicating to us were HUD certified, and about

11     two-thirds, perhaps, were not.

12   Q  Okay.  And Weyerhaeuser and Samling, you said?

13   A  Yes.

14   Q  They provided the roof underlayment?

15   A  Yes.

16   Q  Did they provide any of the decorative hardwood

17     plywood panels on the inside?

18   A  Not to my knowledge.

19   Q  Did they provide any of the subflooring?

20   A  Samling I don't think did.  I'm pretty sure they

21     didn't.  I know that -- again, of course, we're

22     talking 2005 now.

23   Q  Yes, we are.

24   A  Not 2004; right?

25   Q  That's right.

Page 64

```
 1      have that -- those numbers.

 2   Q  You realize your brother testified in front of

 3      Congress?

 4   A  Yes, I do.

 5   Q  You realize that you've sent letters to the United

 6      States Government affirming the types of products

 7      you use in your trailers?

 8   A  We've sent letters to the Government.

 9   Q  Show me the letter where you told the Government

10      that 15 percent of the products you put, from

11      Adorn, into your trailers were not HUD certified?

12   A  I did have a conversation with Steve Miller --

13   Q  I didn't ask that.

14   A  -- regarding that.

15   Q  When?

16   A  In, it would have been April or May of 2007.

17   Q  After you were sued.

18   A  It was -- it would have been after we had done this

19      further look into the amount of material that came

20      from the various companies.

21   Q  Can you tell me any -- show me any letter where you

22      sent to correct your prior letters and e-mails?

23   A  No, it was a discussion we had had.

24   Q  Now, who within your company would know the exact

25      percentage of roof underlayment that was put in
```

Page 154

1      single day?  The smell won't go away?

2  A  I don't -- as far as these occupants here that he

3      had visited, I don't recall him telling me that.

4  Q  Didn't tell you.  If he had told you that, what

5      would you have done?

6  A  I would have said, Hey, is there something we can

7      do to assist this occupant.

8  Q  At the same time this testing, or informal testing

9      was being done by Scott, were you also doing some

10     testing of some of your component parts, or

11     component woods, for instance, from Adorn?

12  A  Our attorneys, in Indiana, were looking into the --

13     some material that we had received from -- from

14     Adorn.

15  Q  Why did you choose Adorn?  Adorn only provided you

16     15 percent of your woods, but you chose Adorn for

17     some reason.  Explain why.

18  A  Well, it was the idea that we had found this

19     material that was designated as REG, and the fact

20     that it may or may not have complied to the --

21         MR. WEINSTOCK:  I'm sorry.  What was the

22     question?  I apologize.

23         MR. BUZBEE:  Why did you choose Adorn to have

24     the product tested.  He was telling me that, well,

25     we -- we're walking through the facts.

1    A   Meaning our -- it was our legal counsel that had

2        choosed Progressive.

3            Is that --

4            MR. WEINSTOCK:   Okay.   Don't explain to him

5        anything your legal counsel told you or suggested

6        to you.   If you can answer his question without

7        discussing what you've discussed with your lawyers,

8        what your lawyers discussed or recommended to you,

9        go ahead and do so; but if you can't, don't answer

10       that question.

11   A   This was work that had been done by our legal

12       counsel.

13   Q   Who was your legal counsel?

14   A   Brian Hoffer.   Kindig & Sloat.

15   Q   What time frame was this?

16   A   This was in March, late March or -- 2006.   Late

17       March, early April, in that time frame.

18   Q   Okay.   So several things were happening at once.

19       You had Scott -- you sent Scott down to Louisiana

20       to do some informal testing.   Right?

21   A   Uh-huh.

22   Q   Yes?

23   A   Scott went down there to gather information and do

24       informal testing.

25   Q   You were trying to get approval for the funding for

```
 1      your two contracts.
 2   A  That was already done by the time -- by the time
 3      this activity was going on, from my understanding.
 4   Q  Thank goodness.
 5         MR. WEINSTOCK:  Object to the commentary.
 6      Next question.
 7   Q  You, at the same time -- I mean, your company paid
 8      for Progressive Engineering, isn't that right?  For
 9      the testing?
10   A  You know, I don't know.  I don't know.  I believe
11      it was something that our legal counsel had done.
12   Q  And was that information shared with anyone, this
13      Progressive Engineering testing?
14   A  I believe it was shared with -- I believe it --
15      well, it was something that Congress ultimately
16      obtained.
17   Q  Okay.  So it was shared with members of Congress.
18   A  I don't know if shared; I think they -- I'm not
19      sure what the --
20   Q  I'm not a wordsmith like your brother.  I just mean
21      you provided it to Congress.  Right?
22   A  They had worked with our legal counsel and obtained
23      it.
24   Q  Okay.  You provided that information to other third
25      parties, for instance, experts, wood experts, did
```

Page 157

1      you not?

2   A  I don't recall -- I don't recall who looked at

3      that.

4   Q  Well, you showed it to Dr. Golden, didn't you?

5   A  I didn't personally, no.

6   Q  Someone did.

7   A  I'm not -- I'm not certain of that.

8   Q  What did the testing reveal to you?  This testing

9      where you took some lauan and provided it to

10     Progressive Engineering and testing was done.  What

11     did you learn from that testing?

12  A  It was my recollection that it took some time to

13     get the results.

14  Q  I appreciate that, but that's not my question.

15  A  And there were conversations -- our legal counsel

16     has another lawyer that has more of an

17     understanding of chemistry, and he had looked at it

18     and --

19         Is this a --

20         MR. WEINSTOCK:  Yes.  To the extent it's

21     something that was done by your legal counsel, that

22     is work product; to my knowledge, has never been

23     disclosed to anybody and is not coming out today.

24         MR. BUZBEE:  I didn't ask him that.  I mean,

25     that's him doing that.  I'm asking him what he

Page 158

```
 1        learned.  I didn't ask him, Tell me what your

 2        lawyer said, or Tell me what this lawyer thought.

 3        I don't really care.

 4   Q    I want to know what you, the president of the

 5        company, garnered from the testing.  If you're

 6        going to say, Well, I didn't know anything about

 7        it, then say that so we can move on.  But if you're

 8        going to tell me that the results were, I thought

 9        they were unscientific or I didn't this just -- so

10        we can move on.

11             What did you learn?  And just answer the

12        question I ask you.

13   A    I had briefly seen that report sometime later.

14   Q    Okay.

15   A    And it was in a format that I didn't understand.

16        It was in different -- it was a numerous-page

17        report.  I looked at one or two pages of it and I

18        didn't understand.  It was in a format that I had

19        not seen before and wasn't familiar with, so the

20        results didn't mean anything to me.

21   Q    Okay.  So the results meant nothing to you.

22   A    I could not understand the results.

23   Q    And when you discussed it with your brother Jim,

24        what did you decide?

25   A    I don't recall a specific conversation with Jim at
```

```
 1       the time.  I know at one point it came up that they
 2       did not use a large chamber test like would have
 3       been expected; that somebody that was doing work
 4       for HUD would have done a large chamber test.  That
 5       they had done some other test that was not an
 6       accurate test like a large chamber test that is to
 7       be used for HUD testing of products.
 8    Q  Okay.  Continue, please.
 9    A  That's my recollection of discussions with Jim on
10       the Progressive Engineering.
11    Q  So that's all you and Jim -- you guys hired an
12       engineering firm to test some product.
13    A  We did not hire the engineering firm, to my
14       knowledge.
15    Q  Well, your lawyers did.  They work for you.  You
16       realize that, don't you?  You pay lawyers; right?
17    A  Yeah.  I believe we paid them, yes.
18    Q  Okay.  All right.  They didn't just -- I mean --
19       anyway.
20           And your only conversation with Jim that you
21       can recall today is that they didn't use a large
22       chamber test.  Is that what you're telling me?
23    A  And I recall a discussion that these levels were
24       not in a format that we could understand, hadn't
25       seen it before.
```

1          And I do recall at some point trying to get

2      somebody to try to translate these into some

3      numbers that we were more accustomed to working

4      with, and my recollection was that they said that

5      these numbers weren't even applicable to air, that

6      they were applicable to water or -- even somebody

7      that was familiar with it had difficulty

8      translating it into workable data.

9   Q  In other words, you asked somebody to convert the

10      unit of measurement to parts per million or parts

11      per billion.

12  A  That was my recollection, at some point we tried to

13      get somebody to do that.

14  Q  And you don't know, you can't tell me as you sit

15      here, that that's very commonly done and it's not a

16      problem at all, anybody can do that.

17  A  Yeah, it was my understanding that the particular

18      format that these were in were difficult to

19      translate that into a ppm.

20  Q  Difficult to convert to ppm, which is a measurement

21      you could understand and understand the

22      significance of.

23  A  And that also that the HUD standard was written in.

24  Q  But one thing you did understand was that the test

25      results, regardless of the unit of measurement

Page 161

```
 1     used, demonstrated there were elevated levels of

 2     formaldehyde in these two samples.  Isn't that

 3     true?

 4  A  No.

 5  Q  That's not true.

 6  A  No, I don't recall that.

 7  Q  Okay.  So --

 8  A  I recall it was in a format that I couldn't

 9     understand, and it was a format that was difficult

10     to translate.

11  Q  And you're telling me that Progressive Engineering

12     couldn't explain to you the significance of the

13     unit of measurement and the readings that were

14     found?

15  A  I didn't talk to Progressive Engineering on the

16     results.

17  Q  You didn't want -- I mean, could you pick up the

18     phone and call them?

19  A  By the time these results became available, you

20     know, we had been told that there really weren't

21     that many complaints out there, and that FEMA had a

22     procedure in place for assisting occupants and that

23     our assistance wasn't needed.

24  Q  So you just -- you didn't pursue it any further at

25     that point, because you felt that, well, FEMA's got
```

1    in the specifications.

2  Q  And as the president, you knew that meant they

3     didn't want the people they were placing in the

4     trailers to be sick; right?

5  A  No, that is not something that I would read into

6     the term "superior quality."

7  Q  You wouldn't read that into the term?

8  A  No.

9  Q  Okay.  So a trailer could be of superior quality

10    but it could still make a child with asthma sicker.

11         MR. WEINSTOCK:  Object to the form of the

12    question.

13 A  I don't know that.

14 Q  But what you do know, at least as the president of

15    this company, your position is, hey, superior

16    quality of the trailer has nothing to do with

17    whether people who live in it are exposed to

18    formaldehyde and are caused sickness.

19         MR. WEINSTOCK:  Object to the form of the

20    question.  No foundation.

21 Q  Right?

22 A  The specification didn't talk about the level of

23    the wood products, and this product that we're

24    talking about with Adorn would have been what was

25    being supplied by the majority of the industry, is

1    my understanding.

2  Q  Well, let me -- since you brought that up, that

3     basically -- basically it sounds like you're

4     saying, well, FEMA didn't tell us not to poison

5     people, so why can't we poison people.

6        MR. WEINSTOCK:  Object to the form of the

7     question.

8  Q  I mean, that's what you're saying.

9        MR. WEINSTOCK:  Object to the form of the

10    question.

11       Don't answer that question.

12       Please ask a less argumentative question.

13 Q  Let me see if I can figure this out.  Your position

14    is, hey, FEMA didn't tell us to use LFE materials;

15    therefore, the fact that we may have not done so is

16    of no moment.

17 A  Is of no moment?

18 Q  It's insignificant.  We met the standard.  We met

19    their standards.

20 A  We did meet the fine requirement for FEMA.

21 Q  You also have a standard to meet with regard to the

22    people that live in your trailers, too, don't you?

23 A  I'm not sure what standard you're referring to.

24 Q  Do you have any responsibility, in your mind, as

25    the president -- not legal.  I'm not asking you a

Page 168

1        Texas punitive damages till we get to that phase.

2            But other than that, you can answer his

3        question.

4    A   You know, I'm not sure if my salary doubled.  I'm

5        not familiar with the years you're talking about

6        you say it doubled.

7    Q   That's what I'm saying.  You don't know is what

8        you're saying.  Is that what you're saying?  You

9        don't know?

10   A   Yeah.  The way you had asked the question, I'm not

11       sure.

12   Q   You do remember you got a raise in pay?

13   A   I believe I made more in 2005 and 2006 than I did

14       in 2004.

15   Q   Let me show you what I'm going to mark now as

16       Exhibit 11.

17           (Plaintiffs' Exhibit 11 was marked for

18       identification.)

19   Q   It's Bates stamp Gulf Stream 4479.  You remember we

20       were discussing why Mr. Miller was making you privy

21       to --

22   A   Uh-huh.

23   Q   Here's Mr. Miller again forwarding you a string of

24       e-mail traffic.

25   A   Uh-huh.

```
 1       something.

 2   Q   Parts per million?

 3   A   Yeah.

 4   Q   Okay.  So the test results --

 5   A   But I don't know -- I don't know if that -- I'm

 6       sorry, go ahead.

 7   Q   No, go ahead, finish.

 8   A   You know, I don't know how that -- those were

 9       performed or how the -- what the situation with

10       that particular unit was.

11   Q   And so FEMA never provided you the results of any

12       of this Mississippi testing on Gulf Stream

13       trailers?

14   A   No.

15   Q   Do you know whether they tested Gulf Stream

16       trailers?

17   A   I know that they had done some for OSHA.  I know

18       that, in March, they had advised us that FEMA had

19       tested hundreds -- I believe it was over a hundred

20       units for OSHA in November or October of 2005.

21   Q   And do you recall what the results of those tests

22       were?

23   A   I don't -- they didn't really provide us that

24       information, but I think the comment that was made

25       was that there were not concerns, and I think that
```

Page 172

1     it was, like, ten were possibly elevated.

2  Q  Ten trailers?

3  A  Ten to 12 or 15, something like -- a small number

4     of the hundreds had what was told me to be --

5  Q  All right.  Let me see if I understand this.  You

6     were informed that sometime in the fall of 2005 --

7  A  Uh-huh.

8  Q  You learned this after the fact, but you were told

9     that sometime in the fall of '05, that FEMA was

10     doing some trailer testing?

11  A  Yes.

12  Q  When did you learn that?

13  A  Either in March or early April.

14  Q  Of '06.

15  A  Yes.

16  Q  But this was the first time you knew that FEMA had

17     been doing formaldehyde testing on some of these

18     trailers?

19  A  When I first -- when I heard this?

20  Q  Yes.

21  A  Yes.

22  Q  Now, didn't you have technical, or technicians at

23     each of the distribution points?

24  A  Yes, we did.

25  Q  Now, why had you -- why would you just now have