# Transcript of the Testimony of

# JAMES F. SHEA - GULF STREAM COACH 30(b)(6)

Date: May 28, 2009

FEMA Trailer Formaldehyde Products Liability Litigation
v.



PLAINTIFF'S EXHIBIT A

1    is the Manufactured Housing Association for
2    Regulatory Reform.
3  Q  Okay. Is your sister company that produces
4    manufactured housing a member of those two groups?
5  A  No.
6  Q  Neither group?
7  A  It's a member of one of them.
8  Q  Which group?
9  A  The latter.
10 Q  How long has your sister company been a member of
11    that particular trade association?
12 A  Since it was formed.
13 Q  When?
14 A  It was formed in the early '80s, I believe.
15 Q  And so you were telling me why this policy -- why
16    you guys came up with this LFE policy at your
17    company. Tell me about that.
18 A  Sometime in the mid '80s, and, of course, there was
19    a lot of controversy, involvement of lawyers,
20    claims, complaints relating to the manufactured
21    housing industry and the use of materials that had
22    adhesives that contained formaldehyde,
23    urea-formaldehyde resins.
24       And as an answer to that, the agency that
25    regulates manufactured housing, the Department of

Page 92

1       Housing and Urban Development, decided to proceed
2       to rulemaking to establish some rules for using
3       those kinds of products in manufactured homes as
4       part of their more general regulations that relate
5       to manufactured housing products.
6    Q  When you say "those products," do you mean wood
7       products?
8    A  These -- they were specifically addressing certain
9       wood products containing urea-formaldehyde resins.
10   Q  What type of wood products?
11   A  Specifically hardwood plywood.
12   Q  Like lauan?
13   A  Sometimes referred to as lauan. And composite wood
14      products, specifically particleboard.
15   Q  Uh-huh. So HUD had a proposed rulemaking. Keep
16      going, please.
17   A  So they went through the proposed rulemaking.
18      Eventually they took comments and so forth, went
19      through the process. Eventually regulations were
20      put forth and adopted, and manufactured housing
21      from there forward was required to use specifically
22      hardwood plywood products that met a certain
23      emissions rate and particleboard products that met
24      a certain emissions rate.
25   Q  When did that happen?

1  A  In the mid '80s.
2  Q  And what was your position in the company when that
3     occurred?
4  A  I was president of a division, of Fairmont.
5  Q  What is it called, Fairmont Homes?
6  A  Correct.
7  Q  You were president of one of the divisions?
8  A  Yes.
9  Q  And who was the CEO at that time?
10 A  My father was the CEO.
11 Q  Were you involved in that particular issue with
12    your father as regards to the HUD --
13 A  There was -- well, we were involved in the sense
14    that, you know, we had complaints.  We had to deal
15    with concerns and claims and opposing lawyers and
16    so forth.  So, yes, I was involved in trying to
17    resolve people's concerns and doing various things
18    to do so.  But as far as an involvement with the
19    regulatory process, I don't recall having any
20    involvement with the regulatory process.
21 Q  What division were you president of?
22 A  It's called the Friendship division.
23 Q  Tell me, Fairmont Homes, how many divisions then
24    did it have?
25 A  In the mid '80s it had about four or five

```
 1       divisions, as I recall.
 2  Q    And what was Friendship Homes?
 3  A    It was -- it manufactured a certain model series,
 4       kind of larger dual section units.
 5  Q    And so you were the president of one of the
 6       divisions that had this issue with regard to
 7       complaints, concerns, lawsuits regarding
 8       formaldehyde exposure?
 9  A    Some of the issues of the '80s related to some of
10       the products that we produced.
11  Q    And that's why Fairmont Homes joined this trade
12       association?
13  A    We joined the trade association because there's
14       hundreds and hundreds of issues relative to the
15       federal regulations.  This was just one.
16  Q    It was a very big one, though, was it not, back in
17       the '80s?
18  A    Well, yes, it was an important one.
19  Q    And so you had a lot of experience in the '80s with
20       this issue of formaldehyde exposure as the
21       president of one of these manufactured housing
22       divisions within Fairmont Homes?
23  A    Yes.
24  Q    And you were intimately familiar with this
25       formaldehyde issue as it -- specifically
```

1    complaints, exposure, lawsuits, etc.?
2  A I was familiar with it, yes, quite familiar.
3  Q All right. And Fairmont Homes was a member of
4    this -- what was the name of the trade association?
5  A The Manufactured Housing Association for Regulatory
6    Reform.
7  Q And did you attend those meetings when that group
8    would have meetings?
9  A I attended meetings, yes.
10 Q Were you the individual from Fairmont Homes who was
11   designated to interface with the trade association?
12 A I was the primary interface.
13 Q Okay. So you would have been aware of the
14   discussions, the memos that went back and forth
15   within the trade association about formaldehyde
16   rulemaking, that sort of thing?
17 A Frankly, I don't remember that we spent a lot of
18   time on that subject at MHARR. Of course, it was
19   24 years ago or so. But I remember more that had
20   to do with a lot of other HUD programs that were
21   creating, you know, issues and difficulties for the
22   manufacturers. But that one, I don't remember much
23   input that we made on that subject.
24        I mean, certainly this regulatory aspect was a
25   positive thing, I think, for the industry and for

Page 154

1       fact says, but if you want to ask him before that
2       date, I can get you the actual date.
3   A   Okay.  Repeat the question.
4   Q   You were well aware as the chairman of Gulf Stream
5       that you had had complaints about air quality in
6       your trailers before Miss Alexander took possession
7       of her trailer, assuming she took possession in May
8       of '06?
9   A   We had had complaints, yeah, starting with this
10      one, and we had several between then and May
11      of '06.  But we didn't have 12 that I recall.
12  Q   You knew that there was an issue or potential issue
13      with regard to formaldehyde exposure, didn't you?
14  A   Well, we knew that this controversy had come to the
15      fore.  We knew that there was issues on
16      formaldehyde, yes.
17          MR. BUZBEE:  Let's take a little break.  I
18      want to make sure I get my dates right, because
19      I've been told several different dates.
20          THE VIDEOGRAPHER:  Please stand by.  We are
21      going off the video record at 12:44:49.
22          (At this time a short break in the proceedings
23      was had.)
24          THE VIDEOGRAPHER:  We are now back on our
25      video record at the time of 13:04:51.

1  A  They assisted us in our relations with the press,
2     including public statements.
3  Q  Very, very important that whatever statement was
4     provided to the public be absolutely truthful;
5     isn't that right?
6  A  That's true.
7  Q  Tell me about the firm that you retained to do
8     destructive testing, Progressive Engineering.
9  A  I don't think -- Progressive Engineering is a
10    engineering testing inspection firm in Goshen,
11    Indiana.
12 Q  And what did you retain them to do?
13 A  I don't know that we retained them exactly.  We
14    gave them a sample of material to --
15 Q  You paid them, didn't you?
16 A  I think we did pay them, yeah.
17 Q  They didn't do it for free, did they?
18 A  No.
19 Q  Okay.
20 A  But retaining means something other than -- to me,
21    retaining is something different.  Retaining is you
22    can pay money or you agree to pay money even if you
23    don't get services, which is something that's done
24    in the legal profession.  But I don't think of that
25    relative to PEI.

```
 1   Q   Okay.  You hired them to do some work for you?
 2   A   Right.  Okay.
 3   Q   All right.  I've got to be very careful which words
 4       I use.
 5           All right.  When you hired Progressive
 6       Engineering to do some work for your company, what
 7       did you hire them to do?
 8   A   We had some material, some Adorn material, and we
 9       asked them to submit it to the kind of testing that
10       would be required by the HUD standard.
11   Q   So you had them test some interior decorative --
12       the stuff that's used on the walls?
13   A   Correct.
14   Q   Did you have them test anything else other than
15       the --
16   A   No.
17   Q   Just the wall --
18   A   It was interior wall panel.
19   Q   Okay.  And when did that happen?
20   A   It happened between -- when did it happen?  When
21       did we give the material to them?
22   Q   Yes.
23   A   I think we gave the material to them in early
24       April, as I recall.
25   Q   Of '06?
```

1       waives something that wasn't already waived.
2           MR. WEINSTOCK:  Go on with your questions
3       then.
4           MR. BUZBEE:  Thank you.
5   Q   All right.  You --
6           MR. DINNELL:  Same for me because I'm going to
7       ask him that.
8   Q   Okay.  You guys hired Progressive Engineering and
9       sent to them some of this interior decorative wall
10      covering?
11  A   Correct.
12  Q   From Adorn?
13  A   Well, we asked our attorney to hire them.
14  Q   Don't tell me anything that you said to your
15      attorney.
16          MR. WEINSTOCK:  That one, there's no question
17      we haven't waived that.
18  Q   I'm not even interested in knowing.  I'm sure that
19      you said a lot of mean stuff about me, probably all
20      of it unfair and untrue.
21          But let's just talk about what Progressive
22      Engineering did and what they told you and what you
23      learned.
24  A   Progressive Engineering subjected the material to a
25      testing protocol and ultimately gave us some

1    results.
2  Q  What were those results, Mr. Shea?
3  A  They were some numerical results that related to a
4     desiccator test that they did.
5  Q  What was the results -- what was the result that
6     you got?  What did you learn?
7  A  We learned that they didn't have the capacity to do
8     a large chamber test, which is the type of test
9     that's utilized in the HUD regulation.
10 Q  So what was the result of the test?
11 A  They gave us some numbers in -- oh, what would you
12    describe it as, a unit of measure that we didn't
13    recognize.
14 Q  What was that unit of measure?
15 A  I think it was mu milligrams per liter or something
16    like that.
17 Q  And what did they tell you that meant?
18 A  They really weren't -- didn't tell us it really
19    meant anything.
20 Q  What did you conclude from the test that
21    Progressive Engineering did on your behalf?
22 A  I concluded that, contrary to our understanding,
23    they did not have the capacity to do a large
24    chamber test.
25 Q  You concluded the test was worthless?

1  A  No.

2  Q  Okay. Let me ask you --

3  A  I'm just being forthright.

4  Q  Right. I can tell. Let me ask you again. Did you receive a written report from Progressive Engineering?

7  A  There was a written report that had values and numbers on it, yes.

9  Q  Did you read it?

10  A  I remember reading the report, yes.

11  Q  Did you consult with any other scientists or engineers other than the people from Progressive Engineering when you were perusing and reading the report?

15  A  I -- you know, we had various conversations with scientists during that time period that we were trying to educate ourselves on the whole issue. I'm sure I had other conversations with other scientists during that period.

20  Q  Who?

21  A  Well, I know Robert Golden was one of the people that we were talking to.

23  Q  Who else?

24  A  It's just a little bit hard for me to remember. We spoke to various scientists over the course of this

1  A  Could you repeat that question again.

2  Q  You were unhappy with the results of the test,
3     weren't you?

4  A  I was unhappy that they didn't give us what we
5     thought we were going to get, which was a large
6     chamber test which would have some kind of
7     meaningful values.

8  Q  And your testimony would be that you concluded,
9     without input from Dr. Golden or any other
10    scientist, that the test was inconsequential and of
11    no merit because it wasn't a large chamber test?

12 A  No.  We had input from other people.

13 Q  Who?

14 A  Golden -- I think we discussed this with Golden, as
15    I recall.  But it's pretty obvious that it's not
16    the testing methodology that's in the HUD code.
17    It's obvious to a layman.

18 Q  Right.  So you disregarded the results of that
19    test; is that true?

20 A  Correct.

21 Q  And that's why you didn't share that test with
22    FEMA?

23 A  The test had no value.

24 Q  I'm asking again, because you disregarded the
25    results of the test as being unscientific, you did

1      not share the results with FEMA; is that true?
2   A  Right.  We didn't share the results with anybody.
3   Q  Right.  I know.  You certainly didn't share it with
4      the people who lived in the trailers?
5   A  It had no meaning.
6   Q  Right.  You did not share --
7   A  No significance that we could see.
8   Q  You did not share the results of that test with any
9      trailer residents, did you?
10  A  Correct.  Like I said, we didn't share those
11     results with anybody because we thought they were
12     meaningless.
13  Q  But you talked about the results of those tests
14     with Adorn, didn't you?
15  A  I don't recall talking to Adorn about them.
16  Q  Are you sure?
17  A  Me personally?
18  Q  Anyone in your company, sir.
19  A  Yeah.  We may have.  I just don't recall.
20  Q  And Adorn told you, Well, of course the stuff we
21     provided you was not HUD certified; that's not what
22     you ordered.  Isn't that true?
23         MR. WEINSTOCK:  Object to the form.
24  A  I don't think that's true, no.
25  Q  I mean, you've had discussions with Adorn, and

Page 193

1  A  He didn't do scientific testing, no.
2  Q  He wasn't accurate when he told FEMA that he was
3     going to do some testing?
4  A  Correct.
5  Q  The results of this testing or what you call
6     screening were never shared with FEMA?
7  A  We -- no, we did not share results.  They did
8     not -- no, we did not.
9  Q  And you did not share the results with the trailer
10    residents, did you?
11 A  We did not share any screening results with trailer
12    residents.
13 Q  You didn't even share the results with the
14    residents who were in the trailers you screened,
15    did you?
16 A  We didn't share any screening results with the
17    people that the unit was deployed in, was used in.
18 Q  Let's make sure we're all clear.  The people in
19    whose trailer that you guys screened, you didn't
20    even bother to tell them what the result was, did
21    you?
22 A  We didn't give any screening information to
23    residents.
24 Q  You guys used a -- who actually did the testing or
25    the screening?  I want to be precise.  I called it

```
 1       trailers and what you would run into using travel
 2       trailers in the field for that purpose, FEMA had
 3       the most expertise.
 4   Q   FEMA had more expertise than Gulf Stream with
 5       regard to the use of the travel trailers?
 6   A   As temporary housing for disaster relief, the pure
 7       use of the unit, what went on out in the field.
 8   Q   Last time we talked about when you anticipated
 9       litigation.  You told me that was in March of '06;
10       is that right?
11   A   Certainly when this occurred, because of my
12       background in the '80s in manufactured housing, we
13       discussed the situation with our counsel.
14   Q   You said "when this occurred."  I think, if I'm not
15       mistaken, that's a pronoun.  What are you talking
16       about, "when this occurred"?
17   A   The beginning circumstance of this formaldehyde
18       issue in March of 2006.
19   Q   Okay.  So --
20   A   We at that time certainly began to discuss the
21       situation with our legal counsel.
22   Q   So just so we're clear, because it's important when
23       you actually anticipated litigation, your testimony
24       is that after the first complaint in March of 2006,
25       which would have been March 10th, I believe, that's
```

Page 262

```
 1      when you anticipated litigation?
 2   A  I think we certainly understood potential for
 3      litigation and certainly because of our experiences
 4      in the '80s -- or my experience in the '80s in
 5      manufactured housing.
 6   Q  So March 10, 2006?
 7   A  Well, proximate to that time, yes.
 8   Q  Okay.  And you told me previously you anticipated
 9      litigation with residents living in the trailers.
10   A  Well, you know, I think there is a variety of
11      litigation that we recognize could have transpired,
12      and one of them would have been on behalf of
13      residents.
14   Q  You anticipated litigation regarding the trailers
15      before Miss Alexander and her family ever moved
16      into one of your trailers; isn't that right?
17   A  Well, I'm not exactly sure when Mrs. Alexander
18      moved in, but I've told you that we did speak to
19      our counsel relative to this matter proximate to
20      that mid-March time period.
21   Q  Let's assume -- and I think we finally agreed on
22      this; at least me and Mr. Weinstock have -- that
23      Miss Alexander moved into her FEMA-provided Gulf
24      Stream trailer either May 26th or 27th, 2006.  All
25      right?
```