UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION, | ) ) ) MDL NO. 1873 ) ) SECTION "N"(5) |
| THIS DOCUMENT IS RELATED TO | ) ) JUDGE ENGELHARDT |
| Charlie Age, et al. v. Gulf Stream Coach, Inc., et al., Docket No. 09-2892; Alana Alexander, individually and on behalf of Christopher Cooper. | ) MAGISTRATE CHASEZ ) ) ) ) ) |

The Videotaped Deposition of WILLIAM DUDEK

Date:   Friday, July 17, 2009

Time:   10:04 a.m.

Place:  Midwest Reporting, Inc.
        1448 Lincolnway East
        South Bend, Indiana 46613

Called as a witness by the Plaintiffs in accordance with the Federal Rules of Civil Procedure for the United States District Court, Eastern District of Louisiana, pursuant to Notice.

Reported by
Angela J. Galipeau, RPR, CSR
Notary Public, State of Indiana
         MIDWEST REPORTING, INC.
           1448 Lincolnway East
          South Bend, Indiana 46613

              (574) 288-4242

```
 1       to deal with this subpoena that was given to you more than
 2       17 days ago?
 3   A.  I talked to him this morning, actually.
 4   Q.  That's the first time?
 5   A.  First time.
 6   Q.  Okay.  You make it clear here that you're not concerned
 7       with self-incrimination?
 8   A.  No.
 9   Q.  So it's not that.  That's not your issue?
10   A.  No, that's not the issue.
11   Q.  Your issue is something else?
12   A.  There are some facts that I need to find out about before
13       I can present, I think, what would be an accurate
14       assessment of what I know to be true about the situation.
15   Q.  If we proceed here, what would be your response?  What do
16       you intend to do, just refuse to answer?
17   A.  That's true, yeah.
18   Q.  Okay.  So if I begin to question you substantively because
19       you've been validly subpoenaed, because you just for the
20       first time ever raised this issue as you walked in here,
21       you're telling me that you will refuse to answer any
22       questions?
23   A.  Yes, that's true.
24   Q.  And you refuse on what basis?  On the basis set forth in
25       Exhibit 1?
```

1   A.  Yes.
2   Q.  Okay.  Tell me when you worked for Gulf Stream.
3   A.  I started working as the document says in 2001.
4   Q.  Okay.
5   A.  I believe it was 2001.
6   Q.  And just so you know, I mean, I'm going to continue to ask
7       you questions until at some point you stop answering them.
8   A.  I will.
9   Q.  Okay.  What was your job for Gulf Stream?
10  A.  I was the -- started off as the quality control manager.
11      And as the document says, I held that position through the
12      end of the FEMA program.  At which point after that ended,
13      I took a position as the national -- regional sales
14      manager for one of their divisions.  I had a hip and knee
15      surgery done, so I was off work for about five months.  I
16      came back, and then I was purchasing agent.
17  Q.  Which plant -- during your tenure at Gulf Stream, which
18      plant did you work for, at or for?
19  A.  I started off at Plant 59.  I moved to Plant 57 when we
20      started the FEMA project, which is in Etna Green.
21  Q.  Which FEMA project?
22  A.  The 50,000 unit trailers.
23  Q.  Were you also involved in other FEMA projects as well?
24  A.  I was the quality control manager, and that was basically
25      my responsibilities during FEMA.

Page 10

1  Q. Okay. Were you involved in the production of FEMA
2     trailers during 2004, trailers that ultimately became FEMA
3     trailers?
4  A. Yes.
5  Q. Okay. So you would have knowledge as to the quality and
6     the way in which those trailers were manufactured, even as
7     far back as 2004, trailers that ultimately went to
8     displaced residents?
9  A. Absolutely.
10 Q. Okay. What were the circumstances under which you leaving
11    Gulf Stream?
12 A. Well, the position that I came back to was a position --
13    I'd been a manager my whole life practically. I was a
14    manager up until the time that I came back from my
15    disability leave when I had my knee and my hip replaced.
16       When I got back, I guess there was some question as
17    to what my position would be ultimately. They put me in a
18    position as an assistant purchasing manager or purchasing
19    agent, perhaps, whatever the title was. I don't know.
20    I'm not exactly sure what they would determine the title
21    was, but it was purchasing. Purchasing was at Plant 67.
22 Q. Right. So you did, in fact, in 2004 work at Plant 57?
23 A. Yes, yes.
24 Q. In quality control?
25 A. Quality control manager.

1  Q. That's fine. And no one expects you to come here with a
2     rote --
3  A. Exactly.
4  Q. -- memorization of every -- where you were at every
5     particular date.
6  A. Right.
7  Q. And no one's going to try to hold you to that.
8  A. I understand.
9  Q. Best you can do here, Mr. Dudek -- am I saying Dudek
10    correctly?
11 A. Dudek, yeah.
12 Q. Dudek. The best you can do is testify about what you
13    remember. And if you don't remember, it's okay to say
14    that. All right.
15 A. And I want to be -- I want to make it clear. I want to be
16    as amenable as possible. There are situations that have
17    occurred recently, and I can't go into detail, that are
18    very important to what I'm saying right now. And, you
19    know, I know this sounds silly and I know this is not the
20    most professional way to do this. But, you know, based on
21    my conversation with my counsel --
22 Q. Don't tell me about those conversations, obviously.
23 A. This is why I'm in the position that I'm in.
24 Q. Okay.
25 A. And it'll be clear in time.

```
 1   Q.  Okay.  You mention in your statement here that you feel
 2       like you would be available next week once you've had
 3       time -- make sure I -- to perform an investigation,
 4       resolution of these issues.
 5   A.  I need legal counsel on this.  And based on my
 6       conversation with that person today --
 7   Q.  Yeah.  Don't tell me what you told -- is this person
 8       representing you?
 9   A.  No, not yet.
10   Q.  Can you tell me the identity of your lawyer?
11   A.  You just said -- why would you ask me that when you just
12       said don't tell you.
13   Q.  Because I don't get to know what you told him, but I can
14       know who he is so I contact him or her.
15   A.  I refuse to answer that question.
16   Q.  You refuse to --
17   A.  Respectfully.
18   Q.  Everything you've done so far has been respectful.  I know
19       you feel like you're caught between a rock and a hard
20       place here.  I can see that.
21           What I need to know is who your lawyer is so I can
22       contact him or her and help you work through these
23       problems.
24   A.  I don't have a lawyer yet.
25   Q.  So you technically do not have anyone representing you, do
```

Page 41

1  A. Yes.
2  Q. It was not in years before that that was an issue, to your
3     knowledge, correct?
4  A. As I mentioned earlier, yes.
5  Q. Okay. And to your knowledge, there was no unit for FEMA
6     or anybody else that had a formaldehyde issue before the
7     big FEMA run in 2005; is that correct?
8  A. To the best of my knowledge, I was not aware of that.
9  Q. You were asked some questions about meeting with an
10    attorney. That was -- when you met with the Gulf Stream
11    attorney, I think you said with Jeff Zumbrun, that was
12    while you were still employed at Gulf Stream; is that
13    correct?
14 A. Yes.
15 Q. Okay. Since you were employed by Gulf Stream, have you
16    met with any -- I'm sorry, strike that.
17       Since you left Gulf Stream's employ, have you been
18    contacted by or met with any lawyer from Gulf Stream?
19 A. No.
20 Q. Have you been contacted by or met with any private
21    investigator who claimed to be representing Gulf Stream?
22 A. No.
23 Q. You have been contacted by a number of people since you
24    left Gulf Stream, correct?
25 A. I have.

Case 2:07-md-01873-KDE-MBN   Document 2924-1   Filed 08/27/09   Page 9 of 14

Page 42

```
 1  Q.  Is it correct that some of those people have offered you
 2      money for your testimony?
 3  A.  Yes.
 4  Q.  Did they identify who they were representing?
 5  A.  No.
 6  Q.  But they were not representing Gulf Stream, correct?
 7  A.  No.
 8  Q.  They were clearly representing some of the victims or some
 9      of the people suing Gulf Stream?
10  A.  Yes.
11  Q.  Did you get names of any of those people?
12  A.  No.  I generally hung up.  And, you know, to use the term
13      money, I'm certain it might have been not money.  Money
14      might not have been approached, but it might have been
15      compensation or something.  But the exact term money I
16      wouldn't say.
17  Q.  You understood --
18  A.  Yes, yes.
19  Q.  You understood they were offering you something more than
20      just a handshake for your time, correct?
21  A.  Yes.
22  Q.  They were offering you something that they felt you would
23      want?
24  A.  Yes.
25  Q.  Some form of remuneration?
```

Page 43

1   A.   Yes.
2   Q.   Am I correct, any questions I ask you specifically about
3        the units for the FEMA project, you're not willing to
4        answer at this time regarding formaldehyde in the FEMA
5        units?
6   A.   That would be correct, other than what I've already
7        touched upon.
8   Q.   Mr. Buzbee said something -- well, strike that. You're
9        not going to answer it.
10            MR. WEINSTOCK: Thank you. I'm sorry. I'm going
11        to let these other people question you. And, again,
12        please have your lawyer call me as soon as --
13            MS. PETROVICH: Can we take a quick break?
14            MR. WEINSTOCK: That's fine with me.
15            MS. PETROVICH: Let's take a quick break.
16            VIDEOGRAPHER: Off the record.
17            (Recess taken.)
18            VIDEOGRAPHER: Please continue.
19   By MR. WEINSTOCK:
20   Q.   There was some confusion earlier in your deposition about
21        2004, 2005. Did I understand correctly that you were not
22        in Plant 57 until the big FEMA ordered started?
23   A.   No. I think actually that was my original recollection,
24        but I did actually move from Plant 59 to Plant 57 while
25        they were building units.

Page 51

1  A.  I've got calls to my phone home.  I actually got calls on
2      my cell phone unexpectedly by one of your investigators.
3  Q.  But not to offer you any money?
4  A.  No.  They all seem to be pretty -- what's the word I'm
5      looking for?
6  Q.  Friendly?
7  A.  No, ambitious.  They have ways of getting numbers that
8      they want.
9  Q.  But I'm talking -- okay.  They're resourceful in finding
10     people.
11 A.  Resourceful is a good word.
12 Q.  Okay.  I'm not talking about that.  Of course that's what
13     investigators get paid to do.
14 A.  The answer is I have no idea who they were.
15 Q.  Okay.  You're not saying that Tony Buzbee offered you
16     anything?  That's me.
17 A.  Is that a question?
18 Q.  Yeah, that's a question?
19 A.  No.
20 Q.  Okay.  You're not saying anybody working on my behalf
21     offered you anything?
22 A.  Who did say that?
23 Q.  No one.  I'm just trying to establish that.
24 A.  So is that a question or is that a --
25 Q.  That is a question.

Page 52

1  A.  Is that a rhetorical question?
2  Q.  No. It's a question I'm asking you to answer. Did anyone
3      working on my behalf, at least that you knew was working
4      on my behalf, offer you anything?
5  A.  No.
6  Q.  Okay. You're saying, you told Mr. Weinstock that multiple
7      people called you. They didn't outright offer you money,
8      but they made it clear, at least in your mind, that they
9      were willing to give you something for testifying?
10 A.  That's absolutely true.
11 Q.  How many people did that?
12 A.  Three or four. I didn't take it seriously, so it wasn't
13     something that was very important to me.
14 Q.  Okay. And when was the last time that happened?
15 A.  Probably about six weeks ago or so. I mean, is it beyond
16     the realm of imagination that somebody would do that?
17 Q.  Again, I don't know. I'm trying to find out from you what
18     happened.
19 A.  Okay. That was my answer.
20 Q.  See, the way I got you to come here is I just subpoenaed
21     you.
22 A.  Right.
23 Q.  That's how it's supposed to be done. But let me explore
24     this because you've suggested that individuals working on
25     behalf of victims, is what Andy called them, offered you

Page 54

1   of.
2  Q.  So not lawyers, but someone working on behalf of lawyers?
3  A.  Or on, you know, this particular formaldehyde issue.  So
4      it was -- they didn't leave much to the imagination.  And
5      I don't know who they were and I don't have documentation.
6      So it was not anything that I was going to consider.
7  Q.  All right.  And had you -- you had told someone from Gulf
8      Stream about this?
9  A.  I refuse to answer that question at this time.
10          MR. BUZBEE:  Right.  Okay.  I'm going to defer
11      the rest of my questions, and specifically the
12      questions that you refuse to answer until such time
13      as either we work on an agreement to take your
14      deposition with this lawyer that you intend to hire.
15      And if we can't do that, then I'm going to ask the
16      Court to force you to continue with your testimony.
17          THE WITNESS:  I understand that.
18          MR. BUZBEE:  Okay.  And with that, I'll suspend
19      this deposition.
20          MR. WEINSTOCK:  I think I'll leave it where it
21      is.
22          VIDEOGRAPHER:  Off the record.
23          (The deposition concluded and witness excused at
24      11:05 a.m.)
25                      *   *   *