# Transcript of the Testimony of
# Videotaped Deposition of Alana Alexander

### Date taken: June 29, 2009

### In Re: FEMA Trailer Formaldehyde Products Liability Litigation

***Note***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

## Professional Shorthand Reporters, Inc.
Phone:  504-529-5255
Fax:  504-529-5257
Email:  reporters@psrdocs.com
Internet:  www.psrdocs.com

1      A.    I worked the fryers, the stove.

2      Q.    Did you ever have any problems

3   while you were working in the kitchen for

4   Soul Food Express?

5      A.    No.

6      Q.    Never felt any eye irritation?

7      A.    No.

8      Q.    Did you ever feel any tickling in

9   your throat?

10     A.    No.

11     Q.    And after Soul Food Express, did

12  you hold any other jobs before you came back

13  to New Orleans?

14     A.    No.

15     Q.    When you went back to New Orleans,

16  you ultimately went back to work for the

17  school -- I'm sorry.

18     A.    Orleans Parish School District at

19  first when we came back that summer.

20     Q.    Are you still employed with the

21  Orleans Parish School District?

22     A.    No, I work for KIPP NOLA now.

23     Q.    Are you a plaintiff in any other

24  lawsuit?

25     A.    Yeah. They did a -- we did a --

1  they did a class action for wrongful
2  termination from Orleans Parish School
3  Board.
4      Q.  What's the status of that case?
5      A.  The last time I heard an update,
6  it was supposed to be going to court.
7      Q.  Who's your attorney in that suit?
8      A.  I don't know.  It's a class
9  action.
10     Q.  Is that the "Oliver versus Orleans
11 Parish School Board" case pending in Civil
12 District Court?
13     A.  Yes, I think.
14     Q.  Does Clarence Roby sound familiar?
15     A.  Yes.
16     Q.  You think he might be an attorney
17 or one of them?
18     A.  Probably one of them.
19     Q.  Do you know if you signed a
20 contract with any attorney in that case?
21     A.  I probably did.  Since my name is
22 on it, I would say yes.
23     Q.  You are an actual named plaintiff
24 in that lawsuit?
25     A.  Well, I don't know if my name is

1   exactly on it, but it was listed under
2   paraprofessionals.
3       Q.   Do you have a copy of a contract
4   that you signed with the attorney in that
5   lawsuit?
6       A.   No, not right --
7       Q.   If you were to call somebody to
8   find out what's going on in that lawsuit,
9   who would you call?
10      A.   Probably would go online to -- let
11  me try to think.  I think it's opsb.com.  I
12  think that's what it is.
13      Q.   Do you go to that Web site
14  periodically or look at that Web site
15  periodically?
16      A.   Not really.
17      Q.   Do you have an understanding of
18  what you're suing for in that lawsuit?
19      A.   For wrongful termination, yes.
20      Q.   You're claiming economic loss
21  because you're no longer employed by the
22  Orleans Parish School Board?
23      A.   Correct.
24      Q.   Are you claiming mental anguish or
25  emotional distress in that lawsuit?

1       A.      I'm sure I did.

2       Q.      Do you know any other specifics
3    about the allegations in that lawsuit?

4       A.      I don't know any specifics.  Just
5    basically the wrongful termination.

6       Q.      Did you actually suffer mental
7    anguish or emotional distress from being let
8    go by Orleans Parish School Board?

9       A.      Yes.  Right after the storm, to be
10   told you're fired.

11   MR. HILLIARD:

12           OPSB, is that what you said?

13   THE WITNESS:

14           Orleans Parish School Board, yes,
15   OPSB.

16   EXAMINATION BY MR. GLASS:

17      Q.      How soon after you were let go
18   from the Orleans Parish School Board did you
19   start working for KIPP NOLA?

20      A.      That wasn't until I came back to
21   New Orleans in -- when I came back to New
22   Orleans in May of '06, we were terminated
23   roughly September, I think or October of
24   '05.  So I came back in 2006 and I
25   started -- excuse me.

1       Yeah, I came back in '06, and I
2  started back at that summer program, seems
3  like to me the summer program started in
4  June.  So that would have been June of '06.
5       Q.   Have you filed any other lawsuits
6  on your own behalf?
7       A.   No.
8       Q.   Do you recall any lawsuits against
9  your home insurer?
10      A.   My house wasn't insured prior to
11 the storm.  My mother and daddy owned it.
12      Q.   Do you ever remember filling out
13 any other Form 95s, like in the back of
14 Exhibits 1 and 2?
15      A.   I think I did one for the MRGO
16 project.
17      Q.   Why did you fill that form out?
18      A.   Because the MRGO was the thing
19 that flooded out in the Mississippi River
20 Gulf outlet, it flooded out and it flooded
21 out the Ninth Ward in the area of New
22 Orleans East.
23      Q.   So it's your understanding that
24 you have made a claim in the MRGO
25 litigation?

1    A.   Yes, but I think that was thrown
2  out because they say we couldn't sue the
3  Army Corps of Engineers.
4    Q.   Who was your attorney in that
5  case?
6    A.   I don't remember who it was.
7    Q.   Was it Mr. Woods' firm?
8    A.   It could be. I really don't
9  remember.
10   Q.   How did you come to know that you
11 needed to fill out a Form 95 for the MRGO
12 litigation?
13   A.   We were having neighborhood
14 meetings, and the neighborhood trying to
15 start a neighborhood organization. Right
16 after the storm, a lot of people were coming
17 around trying to see, you know, about
18 lawsuits and stuff like that.
19        So they would just give us papers
20 and, basically, we would just fill it out.
21   Q.   Who set up these neighborhood
22 organizations?
23   A.   I'm not exactly -- the
24 neighborhood. It was in the general
25 neighborhood where we were.

1    Q.   Was there a specific person who
2  set up these organizations?
3    A.   Not really.  It was just everybody
4  who lived in the neighborhood prior to the
5  storm, we got together and, you know, had
6  meetings to try to get organizations set up
7  because at the time, when you first came
8  back, the city pretty much wouldn't listen
9  to you unless you had an organization formed
10 in your neighborhood.
11   Q.   You were a member of the
12 neighborhood organization?
13   A.   Yes, I guess you could say I went
14 to the meetings.
15   Q.   Did they have a specific
16 organization charter?
17   A.   That, I don't know.
18   Q.   Can you tell me who were the kind
19 of spokespeople when you would go to these
20 meetings with the neighborhood organization?
21   A.   We had people come in from --
22 ACORN came in and different other people
23 came in about how to rebuild in your
24 neighborhood and what things to plan in the
25 neighborhood, stuff like that.

1    Q.   I'm more interested in the person
2    in the neighborhood who made sure, like, who
3    went around and talked to you, for instance,
4    hey, we're having a meeting, this person is
5    coming in.  Was there somebody who was like
6    a figurehead?
7    A.   I can't remember the lady's name.
8    It was a lady in the neighborhood.
9    Q.   It was somebody you were familiar
10   with before the storm?
11   A.   I wasn't, but my family was.
12   Q.   If you needed to find out what her
13   name is, how would you go about doing that?
14   A.   I would probably ask somebody in
15   my family.
16   Q.   Who would be the most likely
17   person in your family that would know the
18   name?
19   A.   My momma.
20   Q.   Is it your understanding that your
21   mom knows exactly who this person is?
22   A.   I wouldn't say exactly, but I
23   believe she will probably remember her name.
24   Q.   When did you first hear about this
25   neighborhood organization that was talking

```
 1   about potential lawsuits following the
 2   hurricane?
 3        A.   I would say actually after I came
 4   back.
 5        Q.   So sometime in May of 2006?
 6        A.   Yes.
 7        Q.   Did you actually attend some of
 8   the organization events?
 9        A.   A few of the meetings.
10        Q.   Was that during the summer of
11   2006?
12        A.   I would say yes.
13        Q.   Was there any discussion at these
14   meetings concerning the actions of FEMA in
15   providing trailers to the neighborhood?
16        A.   No, we didn't really talk about
17   FEMA and the trailers.  We talked everything
18   else about FEMA.
19        Q.   What types of things did you talk
20   about about FEMA?
21        A.   How FEMA was late responding to
22   everything after the storm, and how
23   difficult it was to get any kind of
24   compensation for anything.  And how they
25   sent you through the wringer, about if you
```

1   called somebody on the phone, then you had
2   to make sure you got everybody's names and
3   numbers. And if you didn't have that to
4   speak to the next person, they more than
5   likely didn't listen to what you had to say.
6        Q.   Did you have to sign a sign-in
7   sheet or anything when they had the
8   meetings?
9        A.   I think we did. Not at all of
10  them. I would say not all of them.
11       Q.   Do you know who retained the
12  sign-in sheets?
13       A.   No.
14       Q.   Did lawyers speak at these
15  meetings?
16       A.   No, it was mostly ACORN speaking
17  at a lot of these meetings.
18       Q.   Did you know any of the speakers?
19       A.   No, no, I didn't.
20       Q.   At least at one of the meetings
21  that you attended, did they discuss the MRGO
22  litigation?
23       A.   No.
24       Q.   How did you come about filling out
25  the Form 95 for the MRGO litigation?

1      A.   They dropped a lot of that stuff
2  off at our church.  So -- and usually,
3  whatever church member, if they heard about
4  a litigation going on and it was pertaining
5  to the general neighborhood area that we all
6  lived in, then you passed it off to
7  everybody.
8      Q.   And it's your testimony that
9  nobody in the neighborhood talked about
10 potential litigation against anyone
11 regarding formaldehyde exposure in the
12 trailers that you heard about?
13     A.   Yes.
14     Q.   At least until December 2007?
15     A.   Yes.
16     Q.   So you at least filed a claim
17 against the Corps of Engineers for the MRGO
18 project, correct?
19     A.   Correct.
20     Q.   Any other claims you filed out of
21 Hurricane Katrina?
22     A.   No.
23     Q.   Didn't sue any Louisiana agencies?
24     A.   No.
25     Q.   Have you ever filed any other

1   about to reduce any levels of formaldehyde
2   in the unit, you should ventilate the unit?
3       A.   I would say probably yes.
4       Q.   And from the first day you moved
5   into this unit, you ventilated the unit,
6   correct?
7       A.   Yes, yes.
8       Q.   Let's take a look at a document
9   that was referenced earlier as a part of
10  your Plaintiff Fact Sheet. I'm going to
11  attach it separately as Exhibit 28.
12           Do you remember seeing this
13  document earlier during today's deposition?
14      A.   Yes.
15      Q.   And Exhibit 28 is entitled "Claim
16  for Damage, Injury or Death," correct?
17      A.   Yes.
18      Q.   Now, on the first page of
19  Exhibit 28, down at the bottom, that's not
20  your signature, right?
21      A.   No, it's not.
22      Q.   The signature looks like it's the
23  signature of Justin Woods, right?
24      A.   Correct.
25      Q.   Did you authorize Justin Woods to

Page 324

1  sign this form on your behalf?
2  A. I don't think so. I don't know.
3  Q. Well, let's look at the other one
4  for Chris. I'll mark this one as
5  Exhibit 29.
6       Again, Exhibit 29 is entitled
7  "Claim for Damage, Injury or Death." This
8  one says "Alana Alexander o/b/o Christopher
9  Cooper."
10       Do you see that?
11  A. Yes.
12  Q. And you are Christopher Cooper's
13  legal guardian and you're his parent,
14  correct?
15  A. Yes.
16  Q. Down at the bottom where it says,
17  "Signature of claimant," on Chris Cooper's
18  form, that's not your signature again,
19  right?
20  A. Correct.
21  Q. That's Justin Woods' signature,
22  correct?
23  A. Correct.
24  Q. Now, do you remember specifically
25  authorizing Justin Woods to sign this form?

1      A.    I don't remember specifically.

2      Q.    And you don't remember
3  specifically authorizing Justin Woods to
4  sign Exhibit 28, the other form that's for
5  Alana Alexander?

6      A.    No, I don't remember.

7      Q.    All right. Now, look at 28 first,
8  okay?

9      A.    Okay.

10     Q.    28, in box 2, it says, "Name and
11 address of claimant," and then it says,
12 "Alana Alexander" and "4415 Dale Street."
13         That's your name and your address,
14 right?

15     A.    That's correct.

16     Q.    And down at the bottom, Justin
17 Wood's signature is dated 2-15-08, right?

18     A.    Right.

19     Q.    And the amount of claim, it says
20 "Property damage, $10,000," right?

21     A.    Yes.

22     Q.    Okay. And earlier you said that
23 it was your understanding that $10,000 would
24 be for the things that you lost in the
25 hurricane, right?

```
 1      A.   Yes.
 2      Q.   And then next to it, it says,
 3 "Personal Injury, $100,000."
 4           Right?
 5      A.   Yes.
 6      Q.   Now, is it your understanding that
 7 some of that $100,000 would be for your
 8 emotional distress that you suffered from
 9 the destruction of your house in the
10 hurricane?
11      A.   I don't know.  I can't say I
12 understood that, but that's what it seems to
13 be.
14      Q.   Because you didn't sign this form,
15 right?
16      A.   Yes.  Right.  I did not sign the
17 form.
18      Q.   Do you know if that -- so you
19 don't know -- is the $100,000 personal
20 injury for formaldehyde exposure or for
21 damage to your house?
22      A.   I don't know.
23      Q.   And is it fair to say that on
24 Exhibit 29, the form for Christopher, the
25 same thing holds true?
```

1    A.    I would have to say yes.

2    Q.    Now, on Christopher's form,
3    Exhibit 29, there is no property damage
4    listed, just $100,000 for personal injury,
5    correct?

6    A.    Correct.

7    Q.    And you don't know how much of
8    that personal injury $100,000 would be for
9    any emotional damage that Chris Cooper
10   suffered from the hurricane or from the
11   formaldehyde exposure that you have alleged?

12   A.    That's correct.

13   Q.    Now, looking back -- I'm sorry to
14   keep going back and forth between the two
15   here -- looking at Exhibit 28, your form,
16   your SF95 form --

17   A.    What is that?  That's this one?

18   Q.    This document, right.  Sorry.
19         It say, "Basis of claim," and then
20   there's a rider attached to it that
21   continues talking about the basis of your
22   claim and what you've suffered and continue
23   to suffer.

24         Have you seen any of that before?

25   A.    To be honest, I can't say I did or

1  I didn't because I have read so many papers
2  since this started, I really don't know.
3      Q.  Okay.  We'll just put these down
4  for now.
5          Do you remember how long it was
6  after you saw media reports on TV about
7  formaldehyde in trailers that you had the
8  conversation about formaldehyde in trailers
9  at the church?
10     A.  No.  I really don't know when that
11 was.  No.
12     Q.  Do you remember how long it was
13 after you first saw the media reports about
14 formaldehyde in trailers that you retained
15 Justin Woods as your attorney?
16     A.  No, I don't exactly remember how
17 long it was afterwards.
18     Q.  Do you remember how long after you
19 retained Justin Woods as your attorney that
20 you actually moved out of the travel trailer
21 unit?
22     A.  No.  I don't exactly remember.
23     Q.  Do you remember if you retained
24 Mr. Woods before you moved out of the unit?
25     A.  I'm not sure if it was really

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Alana Alexander

Page 352

```
 1      A.   Yes.
 2      Q.   And would it be fair to say that
 3 Chris went and hung out at their trailer
 4 after they got it?
 5      A.   Yes.
 6      Q.   And he would spend some time at
 7 their trailer?
 8      A.   Yes.
 9      Q.   How many people were at the
10 church, was it -- when Justin came to talk?
11      A.   No, the church that we were at
12 when Justin spoke, it was my church,
13 St. Paul the Apostle.
14      Q.   How many people were there?
15      A.   I don't know.  The little room we
16 were in was full.  I can't even estimate.
17      Q.   Hundreds, thousands?
18      A.   It wasn't thousands.  I would have
19 to say maybe a hundred, I guess.
20      Q.   At some point, you decided to
21 demolish your house, correct?
22      A.   Correct.
23      Q.   Why did you make that decision?
24      A.   Actually, the property was still
25 under my daddy.  He still owned it, so he
```