UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |
| THIS DOCUMENT IS RELATED TO | * | |
| | * | |
| *Charlie Age, et al v. Gulf Stream Coach* | * | |
| *Inc., et al*, Docket No. 09-2892; | * | |
| Alana Alexander, individually and on behalf of | * | |
| Christopher Cooper | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S RESPONSE TO DEFENDANT GULF STREAM'S MOTION IN LIMINE TO EXCLUDE CERTAIN WITNESS TESTIMONY**

Plaintiff Alana Alexander, individually and on behalf of her son, Christopher Cooper ("Ms. Alexander" or "Plaintiff"), responds to Defendant Gulf Stream Coach, Inc.'s ("Gulf Stream") Motion in Limine to Exclude Certain Witness Testimony (Doc. 2836), in support, would show:

**BACKGROUND**

This is one of the twenty-plus motions that Gulf Stream has filed over the past few days. In this Motion, Gulf Stream moves to exclude certain witness testimony pursuant to FED. R. EVID. 401 and 403, claiming that the testimony is irrelevant or, if it is relevant, such relevance is outweighed by its prejudicial effect.

This Motion marks Gulf Stream's third attempt at keeping out these former employees' testimony. First, Plaintiff attempted to take these witnesses' depositions in Indiana (where they live). Gulf Stream objected and the Court refused to grant Plaintiff leave to take most of the depositions.

Next, although these witnesses had been disclosed to Gulf Stream as trial witnesses in early July and although its counsel acknowledged as such in a hearing, Gulf Stream objected to the witnesses because they were inadvertently left off a court-filed witness list. The Court overruled the objection and allowed Plaintiff to supplement her witness list.

In this third attempt, Gulf Stream moves to exclude several of their former employees, who Gulf Stream callously refers to as "runny nose/headache" witnesses. Each witness's expected testimony is discussed below:

> **Don Freiberger**. Mr. Freiberger worked for Gulf Stream from 2003 to 2005, building partition and end walls for travel trailers. He will testify that the wood he used had an odor, which created irritation in his eyes and nasal passages. He worked during the production of FEMA trailers in 2004 (when Plaintiff's trailer was made) and 2005. He will describe that the FEMA trailers that Gulf Stream made were substandard and utilized badly-maintained materials. He will testify that when he entered completed trailers, the interior of the trailer had odors that would take his breath away and burned his eyes. He and other workers complained and were told to air the trailer out. He worked for a time as a supervisor and received worker complaints about these odors. He now suffers from repeated bouts of bloody nose, sinus infections, respiratory infections and shortness of breath.
>
> **Karen Freiberger**. Mrs. Freiberger worked for Gulf Stream from 1998 to 2009 in a variety of jobs related to the construction of travel trailers. When entering a completed trailer, she would encounter a strong odor that would burn her eyes. When she complained, she was told to air out the trailer. During her time at Gulf Stream, she encountered repeated headaches and sinus infections.
>
> **Don Shaffer**. Mr. Shaffer worked for Gulf Stream from 2001 to 2005 in the "FEMA area" on FEMA trailers and has knowledge of the manufacturing processes and material used to make FEMA trailers. When using wood products to manufacture the trailers, he encountered a strong formaldehyde smell. When he entered completed trailers, the interior had on odor that would take his breath away and had an effect similar to tear gas. When he complained, he was told to air out units. This mitigated the smell and its effects but not completely. He now suffers from repeated bouts of blurry vision and sinus problems.
>
> **Michael Urbanski**. Mr. Urbanski worked at Gulf Stream and sister companies

from 1994 to August 2006.  He ran the cabinet shop, which involved building cabinets (made with wood products), and interior walls.  He encountered wood products with an odor on a daily basis.  The products caused him to suffer from eye irritation, a chronic cough and shortness of breath.  He was involved with building FEMA units and would generally use the same type of wood products with the same type of odor and which caused the same symptoms.  Sometimes they would use cheaper wood on FEMA trailers.  When he entered completed trailers, the interior had on odor that would cause him eye irritation and breathing difficulty.  He and co-workers would complain about the symptoms.

**Alan Davis**.  Mr. Davis worked at Gulf Stream from 1990 to 2004 and worked with wood products at Gulf Stream on a daily basis.  The wood products had a toxic fume that irritated his eyes and throat, and caused him breathing difficulty.  All of his co-workers experienced similar symptoms.   When he entered completed trailers, the interior had on odor that would cause him eye and throat irritation.  He was advised to air out trailers before entering them.  He was written up for throwing away wood products that were in bad condition.  He is expected to talk about the speed required to build trailers and how that affected their quality.

**Patrick McCreary**.  Mr. McCreary worked at Gulf Stream and sister companies from 1987 to 2005, building travel trailers for retail and for use by FEMA.  He and his co-workers encountered odors from wood products, which caused watery, itchy eyes.  He and his co-workers complained to supervisors but was told that the wood was "wet" because they were building for disaster relief.   Supervisors responded that they would look into the complaint, but did nothing.   When he entered completed trailers, the interior had on odor that would cause him breathing difficulty.  He says that, with FEMA units, building quality would suffer.

**Frank Jacquez**.  Mr. Jacquez worked at Gulf Stream from 1997 to 2000 as a plumber.   In that job, he worked with wood products (cutting holes to run pipes through various parts of the trailer and installing pipes).  He worked on FEMA units. The wood products he worked with had a bad smell.  He was later told that the smell was from formaldehyde. When he complained about it, he was told that it was because it was cheaper wood.  While working at Gulf Stream, he and his co-workers experienced sinus and bronchial infections, breathing difficulty and eye irritation.  Since leaving Gulf Stream, his eye, bronchial and sinus problems have persisted.

The following two witnesses were deposed (under strict time limits) so we know more about their testimony:

3

**Linda Esparza**: Ms. Esparza worked at Gulf Stream from November 2005 to April 2006.  *See* Deposition of Linda Esparza, at pp. 5, 18, relevant portions attached as **Exhibit A**.  She worked in a variety of jobs by Gulf Stream.  *Id*. at pp. 5-6, 9-10, 18.  The wood that she worked with had a strong chemical odor that could be smelled throughout the entire plant.  *Id*. at pp. 13-14.  One of Ms. Esparza's bosses informed her that the odor was because Gulf Stream had to get new suppliers since its regular ones could not meet demand.  *Id*. at p. 15.

Ms. Esparza endured significant health problems while working at the Gulf Stream facility.  After spending a few minutes in a trailer, she would get headaches, her eyes would tear up, her nose, eyes and lungs would burn and she would have difficulty with her sinuses.  *Id*. at pp. 22-23.  Ms. Esparza went to her family doctor at least once for what she thought was a chronic sinus infection.  *Id*. at p. 26.  She also vomited on at least one occasion after spending an extended period of time in the trailer.  *Id*. at pp. 23-23.  Many of her co-workers complained that their noses and eyes burned and that they were constantly coughing and suffering from other illnesses as well.  *Id*. at pp. 32-34.  She was never given any way warnings about formaldehyde nor advised on how to protect herself from it.  *Id*. at p. 25.

While she was working as a final inspector, Ms. Esparza was instructed by her bosses to air out the trailers about two hours before the FEMA inspectors arrived.  *Id*. at pp. 27-28.  This policy began sometime after she became a final inspector.  *Id*. at p. 30.  The only time a FEMA inspector entered the plant was when a female FEMA inspector needed to use the restroom and she was escorted to and from the restroom by Mss. Esparza.  *Id*. at p. 28.  Other than that one time, FEMA inspectors never entered the actual plant.  *Id*.

**Terry Slone**:  Mr. Slone worked at Gulf Stream from September 2005 until June 2006.  *See* Deposition of Terry Slone, at p. 5, relevant portions attached as **Exhibit B**.  During this time, he worked in floor decking department.  *Id*. at p. 7.  Mr. Slone never saw LFE stamped on the Norbord flooring that used in its trailers.  *Id*. at pp 14-15.  Based on his experience in the construction industry, Mr. Slone felt that the material they were using was of a lower grade quality.  *Id*. at p. 15.  Additionally, both the flooring stunk and the wood paneling stunk.  *Id*. at pp. 16-17, 30-31.

Mr. Slone endured significant health problems while working at Gulf Stream.  He experienced difficulty breathing and suffered from headaches and nosebleeds, all caused by odor.  *Id*. at pp. 16- 17.  Mr. Slone's nosebleeds occurred about once every other day toward the end of his time at Gulf Stream.  *Id*. at p. 19.  His headaches were constant and overwhelming, and at one point, his ear drums ruptured and bled.  *Id*. at pp 23-24.  Mr. Slone was never told about

formaldehyde by any Gulf Stream nor was he advised how to protect himself from formaldehyde exposure. *Id*. at p. 31. Mr. Slone continues to suffer from headaches and nosebleeds. *Id*. at p. 60.

With respect to Gulf Stream's relationship with FEMA investigators, Gulf Stream kept doors closed at all times to keep FEMA out of the factory and Mr. Slone never saw a FEMA inspector inside the actual plant. *Id*. at pp. 34-36. Gulf Stream would also vent the trailers that were outside the plant prior to FEMA's inspection. *Id*. at pp. 49-50.

Gulf Stream also seeks to exclude Ron Dheaze and Michelle Hoover. Plaintiffs do not intend to call Mr. Dheaze or Ms. Hoover, so this point is moot.

## ARGUMENT AND AUTHORITIES

### I. The Witness Testimony is Relevant.

Gulf Stream's first argument is that the witness testimony is not relevant to the claims or defenses made in this case and should be excluded under FED. R. EVID. 401. Rule 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Thus, we must look to the claims and defenses asserted in this case to determine if the witness testimony makes any fact at issue more or less probable.

### A. Plaintiff's Claims/Gulf Stream's Defenses

Plaintiff makes a claim under the Louisiana Products Liability Act ("LPLA") against Gulf Stream. Specifically, Plaintiff claims (in relevant part) that:

> 101. Gulf Stream's product, equipment and supplies used by each Named Plaintiff were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left Gulf Stream's control. Each Named Plaintiff was an intended and foreseeable user of the alleged defective products and damages and losses to each Named Plaintiff reasonably could have been anticipated by Gulf Stream.

102.   The defects in Gulf Stream's housing units are the result of and/or include, but are not limited to, the following:

ii.   In providing housing units which, by virtue of their design and/or manufacture and/or composition, were unreasonably dangerous under reasonably anticipated use;

iii.   In providing housing units which, by virtue of a lack of an adequate warning(s), were unreasonably dangerous under reasonably anticipated use;

vi.   In failing to properly test the housing units to properly evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

vii.   In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the housing unit occupied by the Plaintiff, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit;

viii.   In failing to ensure that the housing units it manufactured and provided to each Named Plaintiff were suitable for their intended use;

x.   In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde.

Gulf Stream has denied each of these claims. It has raised several defenses which are relevant here: government contractor defense (which looks to Gulf Stream's knowledge); sophisticated user defense (same), and that it had no duty to warn because it did not know about the formaldehyde "issue" (same). Further, Gulf Stream has alleged that, if it is found to have knowledge of problems with 2005/06 model trailers (and thus a duty to warn), then this knowledge does not translate to 2004 model trailers and thus did not trigger a duty to warn 2004 model residents. While this is laughable on its face, Plaintiff will need to show the jury that.

**B.  The LPLA**

6

The LPLA imposes liability on a manufacturer "for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product." LA.REV.STAT. ANN. § 9:2800.54(A). The LPLA states that a product may be unreasonably dangerous in one of four ways: (1) construction or composition, (2) design, (3) inadequate warning, and (4) nonconformity to an express warranty. *See id.,* at § 9:2800.54(B).

With respect to warnings, the LPLA provides that:

> A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

*See id*. at § 9:2900.57(A).

In the context of a manufacturer's duty to warn, a manufacturer is obligated to anticipate the environment in which the product will be used and give notice of potential risks arising from foreseeable uses or misuses in the foreseeable environment. *Johnston v. Hartford Insurance Co.*, 623 So.2d 35, 36-37 (La. App. 1st Cir 1993), *writ denied*, 626 So.2d 1170 (La. 1993); *Johnson v. Chicago Pneumatic Tool Co.*, 607 So.2d 615, 617 (La. App. 1st Cir. 1992), *writ denied*, 608 So.2d 1009 (La. 1992). A manufacturer has a duty to warn of any danger inherent in the normal use of its product which is not within the knowledge of an ordinary user. *Winterrowd v. The Travelers Indemnity Co., et al.*, 462 So.2d 639, 642 (La. 1985).

Finally, even after a product has left the control of the manufacturer, there is a duty to warn owners and operators of any dangers of which the manufacturer subsequently learns. La. R.S. 9:2800.57(C). A manufacturer of a product who, after the product has left its control,

7

acquired knowledge of a characteristic of the product that may cause damage must act reasonably to provide an adequate warning of such characteristic and its danger to users.  La. R.S. 9:2800.57(C); *Our Lady of the Lake Hosp., Inc. v. Carboline Co.*, 632 So.2d 339, 343 (La. App. 1 Cir. 1993), *writ denied*, 635 So.2d 228 (La. 1994), *writ denied*, 637 So.2d 1052 (La. 1994).

### C.  Why the Testimony is Relevant to Claims and Defenses.

The witness is testimony is relevant for several reasons.  First, testimony about Gulf Stream's construction practices and materials-use are relevant to whether the product is defective, by the express terms of the LPLA.

Several of the workers were at Gulf Stream during before December 2004 and later and can testify as to the similarities of construction practices and materials use between 2004 and 2005/06 model trailers.   Gulf Stream is the one who has raised an alleged difference between 2004 and 2005/06 model trailers.

All of the witnesses will testify about the symptoms they endured while working with these wood products (which are consistent with formaldehyde exposure), their complaints to management and management's response.  For those witnesses who worked at Gulf Stream before 2004, this testimony is relevant to whether Gulf Stream should have been testing trailers for formaldehyde emissions or should have been placing warnings on trailers or in owner's manuals, especially coupled with Gulf Stream's admitted knowledge of the "formaldehyde issue" dating back to the 1980's.  This is also relevant to Gulf Stream's anticipated use of the product—if workers were having problems immediately after entering the trailers and were told

to air the trailers out, then Gulf Stream should have factored this in and provided an appropriate warning.

For those witnesses who only worked at Gulf Stream after 2004, this evidence is relevant to Gulf Stream's continuing duty to warn.

For those witnesses who discuss Gulf Stream's dealings with FEMA, the fact that Gulf Stream was barring FEMA officials from inspecting trailers and that Gulf Stream aired out trailers before allowing FEMA to inspect showed that Gulf Stream knew there was a problem, and thus goes to its continuing duty to warn.  This evidence is also relevant to Gulf Stream's government contractor and sophisticated user defenses.

Plaintiff does not really know how to respond to Gulf Stream's detailed play-by-play as to how it expects Plaintiff to try her case.  The bottom line is that they do not know.  Even assuming Gulf Stream's play-by-play was correct, as set forth above, there are numerous reasons why the testimony is relevant, aside from impeaching Jim Shea.  Further, the issue in which Gulf Stream looks into the future and sees Plaintiff impeaching Jim Shea (alleged lack of any previous formaldehyde complaints by workers) is on a relevant issue, as set forth above.  The case that Gulf Stream cites deals with a party bringing up collateral matters and then impeaching a witness.  Gulf Stream's knowledge of the formaldehyde issue is certainly not collateral to this lawsuit.

In sum, these witnesses have critical information relating to the claims and defenses asserted in this case.

**II.    Testimony is Not Prejudicial.**

Since it is clear that this testimony is relevant, Gulf Stream next contends that it is overly

prejudicial and should be excluded under FED. R. EVID. 403. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

As for witnesses Freiberger, Freiberger, Shaffer, Urbanksi and Davis, Gulf Stream provides just a general reason for the objection (i.e., they will have to do a thorough cross-examination which will take time). Of course, if this were the standard, then no witness -- especially those that hurt the other party -- could ever testify. That is not the rule and not a valid basis to exclude these witnesses. Cross-examining witnesses is what lawyers do.

As for McCreary and Jacquez, Gulf Stream offers no FRE 403 arguments.

As for Esparza and Slone, Gulf Stream contends that testimony about medical issues and plant managers with bullhorns is overly prejudicial. Testimony about medical symptoms consistent with formaldehyde exposure is relevant, as discussed above. Plaintiff does not intend to offer any evidence about plant managers with bullhorns--at least not at this trial. Thus, that point is moot.

The testimony of these former employee witnesses is extremely relevant to the claims made and defenses asserted in this suit. Plaintiff will be prejudiced if she is not allowed to present these witnesses at trial. Also, these witnesses were employed in different areas, in different plants over different periods of time. While some of the testimony may overlap, it is important to show the jury that this was not just one employee at one plant who encountered formaldehyde at high levels, but was a systemic problem at Gulf Stream. This evidence, combined with other evidence, required Gulf Stream to warn residents of trailers. Plaintiff has

no interest in prolonging this trial and will agree to a reasonable time limit on the direct presentation of each witness.

## PRAYER

WHEREFORE, Plaintiff Alana Alexander respectfully requests that the Court deny Gulf Stream's Motion.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION**

BY:   s/Gerald E. Meunier
      GERALD E. MEUNIER, #9471
      **PLAINTIFFS' CO-LIAISON COUNSEL**
      Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
      2800 Energy Centre, 1100 Poydras Street
      New Orleans, Louisiana 70163
      Telephone:   504/522-2304
      Facsimile:    504/528-9973
      gmeunier@gainsben.com

      s/Justin I. Woods
      JUSTIN I. WOODS, #24713
      **PLAINTIFFS' CO-LIAISON COUNSEL**
      Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
      2800 Energy Centre, 1100 Poydras Street
      New Orleans, Louisiana 70163
      Telephone:   504/522-2304
      Facsimile:    504/528-9973
      jwoods@gainsben.com

                                      **COURT-APPOINTED PLAINTIFFS'**
                                      **STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
MIKAL WATTS, Texas # 20981820
ROBERT BECNEL
DENNIS REICH, Texas # 16739600

## CERTIFICATE OF SERVICE

    I hereby certify that on August 28, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

                                        s/Gerald E. Meunier
                                        GERALD E. MEUNIER, #9471