UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |
| THIS DOCUMENT IS RELATED TO | * | |
| | * | |
| *Charlie Age, et al v. Gulf Stream Coach* | * | |
| *Inc., et al*, Docket No. 09-2892; | * | |
| Alana Alexander, individually and on behalf of | * | |
| Christopher Cooper | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S RESPONSE TO DEFENDANT GULF STREAM'S MOTION *IN LIMINE*
TO EXCLUDE EVIDENCE OF CERTAIN FORMALDEHYDE SCREENING DEVICES**

Plaintiff Alana Alexander, individually and on behalf of her son, Christopher Cooper ("Ms. Alexander" or "Plaintiff"), responds to Defendant Gulf Stream Coach, Inc.'s ("Gulf Stream") Motion *in Limine* to Exclude Evidence of Certain Formaldehyde Screening Devices (Docket Entry No. 2881) and, in support, would show:

**BACKGROUND**

This is one of the twenty-plus motions that Gulf Stream has filed over the past few days. In this Motion, Gulf Stream moves to exclude "all evidence of test results obtained through the use of a 'Formaldemeter'" pursuant to FED. R. EVID. 401, 402 and 403, claiming that these test results are irrelevant to this lawsuit or, if they are relevant, such relevance is outweighed by its prejudicial effect. These test results are relevant and they are not prejudicial in the least.

In March 2006, FEMA and Gulf Stream were alerted resident complaints about air quality in trailer trailers in Louisiana. *See* Deposition of Scott Pullin, at pp. 196-97, relevant portions attached as **Exhibit A**. All told, Gulf Stream received between 30-40 resident

complaints, from mid-March 2006 to the end of May 2006. *Id*. On March 21, 2006, in response to a request from FEMA, Dan Shea told FEMA's Stephen Miller that Gulf Stream would "send a person down to Baton Rouge on Friday to test units in your staging area." *See* March 21, 2006 E-Mail from Dan Shea to Stephen Miller, attached as **Exhibit B.** In March 2006, Gulf Stream senior management sent one of its vice presidents, Scott Pullin, and another employee, Burl Keel, to test travel trailers for formaldehyde to "see what was going on." *See* Pullin Depo., at pp. 8-9 ("The news had surfaced about some concerns, and we just wanted to get down and see what was going on, get some samples and see what the conditions were.")   Gulf Stream's President Dan Shea provides the following reasoning for the testing:

> Q. What led to sending Mr. Pullin down to New Orleans to do some screening of these trailers?
>
> A. Well, there was obviously the concern brought up in the press, and we wanted to do whatever we could to learn more about formaldehyde and any complaint that may be out there.  And we had gone out of our way to follow up on any complaints that were out there to see if we could provide any assistance.  And part of this information collecting was to have Scott go down and -- I believe he was already going down to, what is it, St. Bernard? And to collect information, talk to people, and give us feedback whether there were people that had complaints, because we really weren't -- we had seen the report in the press and we wanted to learn as much as we could about this.

Deposition of Dan Shea, at pp. 130-131, relevant portions attached as **Exhibit C**.

To perform these tests, Gulf Stream used a Formaldemeter 400. *See* Pullin Depo., at pp. 10-12.   And the results of these tests yielded extremely high readings. *See* Test Results from March 28, 2006 to April 22, 2006, attached as **Exhibit D**. Mr. Keel even experienced burning eyes while changing out wood materials in a trailer in Louisiana around this same time. *See* Deposition of Burl Keel, at pp. 15-17, relevant portions attached as **Exhibit E**.

However, despite its pre-existing knowledge of the dangers of formaldehyde in trailers,[1] discovering that it was producing FEMA trailers with non-HUD certified material[2] and the knowledge it gained from these March 2006 test results, Gulf Stream provided no warning to FEMA, Plaintiff or any of the other residents living in Gulf Stream travel trailers.

## ARGUMENT AND AUTHORITIES

### I.     The Test Results are Relevant and Admissible.

Gulf Stream's first argument is that the test results are not relevant to the claims or defenses made in this case and should be excluded under FED. R. EVID. 401 and 402.  Rule 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Rule 402 provides:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority.  Evidence which is not relevant is not admissible.

Thus, we must look to the claims and defenses asserted in this case to determine if the witness testimony makes any fact at issue more or less probable.

---

[1] Gulf Stream's pre-existing knowledge of formaldehyde dating back to the 1980s has been fully briefed by Plaintiff in several recent motions.  *See* Docket Entry No. 2892, at pp. 4-5; Doc. 2901, at pp. 2-3.

[2] As previously briefed by Plaintiff in recent motions, Gulf Stream knew that it was using non-HUD certified products in its trailers before Plaintiff moved into her trailer and one of Gulf Stream's major wood product suppliers testified that it likely supplied Gulf Stream with non-low formaldehyde emitting (LFE) wood products in 2004.  *See* Docket Entry No. 2901, at pp. 7-9.  Jim Shea also testified before Congress that there were few to no differences between trailers built in response to the 2004 hurricanes and trailers built in response to Hurricanes Katrina and Rita.  *Id*. at pp. 7-8.

3

**A. Plaintiff's Claims and Gulf Stream's Defenses**

Plaintiff makes a claim under the Louisiana Products Liability Act ("LPLA") against Gulf Stream. Specifically, Plaintiff claims (in relevant part) that:

> 101.   Gulf Stream's product, equipment and supplies used by each Named Plaintiff were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left Gulf Stream's control. Each Named Plaintiff was an intended and foreseeable user of the alleged defective products and damages and losses to each Named Plaintiff reasonably could have been anticipated by Gulf Stream.
>
> 102.   The defects in Gulf Stream's housing units are the result of and/or include, but are not limited to, the following:
>
> ii.   In providing housing units which, by virtue of their design and/or manufacture and/or composition, were unreasonably dangerous under reasonably anticipated use;
>
> iii.   In providing housing units which, by virtue of a lack of an adequate warning(s), were unreasonably dangerous under reasonably anticipated use;
>
> vi.   In failing to properly test the housing units to properly evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;
>
> vii.   In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the housing unit occupied by the Plaintiff, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit;
>
> viii.   In failing to ensure that the housing units it manufactured and provided to each Named Plaintiff were suitable for their intended use;
>
> x.   In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde.

*Age, et al. v. Gulf Stream Coach, Inc., et al*, 09-2892, Docket Entry No. 1.

Plaintiff later amended her complaint to further allege that Gulf Stream's:

> duty to warn her and her family about the dangers and risks of formaldehyde in this travel trailer was continuing in nature and legally was owed to plaintiff by the defendant manufacturer during the entire period that plaintiff and her family occupied this travel trailer.

Plaintiff's Third Supplemental and Amended Complaint, (Docket Entry No. 1686), at ¶ 12.

Gulf Stream has denied each of these claims. It has raised several defenses which are relevant here: government contractor defense (which looks to Gulf Stream's knowledge); sophisticated user defense (same), and that it had no duty to warn because it did not know about the formaldehyde "issue" (same).

### B. The LPLA

The LPLA imposes liability on a manufacturer "for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product." LA.REV.STAT. ANN. § 9:2800.54(A). The LPLA states that a product may be unreasonably dangerous in one of four ways: (1) construction or composition, (2) design, (3) inadequate warning, and (4) nonconformity to an express warranty. *See id.,* at § 9:2800.54(B).

With respect to warnings, the LPLA provides that:

> A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

*See id*. at § 9:2900.57(A).

In the context of a manufacturer's duty to warn of dangers inherent in the use of a product, a manufacturer is obligated to anticipate the environment in which the product will be used and give

5

notice of potential risks arising from foreseeable uses or misuses in the foreseeable environment. *Johnston v. Hartford Insurance Co.*, 623 So.2d 35, 36-37 (La. App. 1st Cir 1993), *writ denied*, 626 So.2d 1170 (La. 1993); *Johnson v. Chicago Pneumatic Tool Co.*, 607 So.2d 615, 617 (La. App. 1st Cir. 1992), *writ denied*, 608 So.2d 1009 (La. 1992). A manufacturer has a duty to warn of any danger inherent in the normal use of its product which is not within the knowledge of an ordinary user. *Winterrowd v. The Travelers Indemnity Co., et al.*, 462 So.2d 639, 642 (La. 1985).

Finally, even after a product has left the control of the manufacturer, there is a duty to warn owners and operators of any dangers of which the manufacturer subsequently learns. La. R.S. 9:2800.57(C). A manufacturer of a product who, after the product has left its control, acquired knowledge of a characteristic of the product that may cause damage must act reasonably to provide an adequate warning of such characteristic and its danger to users. La. R.S. 9:2800.57(C); *Our Lady of the Lake Hosp., Inc. v. Carboline Co.*, 632 So.2d 339, 343 (La. App. 1 Cir. 1993), *writ denied*, 635 So.2d 228 (La. 1994), *writ denied*, 637 So.2d 1052 (La. 1994).

**C. Why the Test Results are Relevant to Claims and Defenses.**

The results of formaldehyde tests performed by Gulf Stream in March and April 2006 are relevant to whether the product is defective, by the express terms of the LPLA.

First, the Formaldemeter is a valid testing device. It is not comparable to a polygraph, a device that is well-known to be a victim to the subjective interpretations of its operator.[3] "The

---

[3] Here, the operators of the Formaldemeter were Gulf Stream employees. The test results were high. Although they now claim that they really didn't know what they were doing, if there was any motive to skew the test results, it would have been to skew them downward, not upward. Had they skewed them downward, then Gulf Stream would no doubt be wanting to offer them into evidence to show that they had no reason to know of the dangers and thus, had no duty to warn.

Formaldemeter is a dependable and accurate formaldehyde sampling instrument that has been used and relied upon for many years across North America." *See* Declaration of Mary DeVany, at ¶ 5, attached as **Exhibit F**. It "has proven to be an easy to use, reliable instrument." *See* Letter from Verne R. Brown, President of ENMET Corporation, distributor of the subject Formademeter, attached as **Exhibit F-1**. The Formaldemeter uses a "well-proven electrochemical sensor" "to monitor levels of airborne formaldehyde." *See* Formaldemeter 400 Brochure, attached as **Exhibit G**. It is used by government agencies, pharmaceutical companies and medical institutions throughout Europe and has been used by "DuPont, Dow Corning, Tyson and Thetford" in the United States. *See* Brown Letter. The "Formaldemeter has a useful detection range of .05 to 10.0 part per million … [and an] accuracy of ±10% at the detection level of 2 ppm." *Id*. "It gives reproducible airborne formaldehyde level readings." *See* DeVany Declaration, at ¶ 5.

> There are multiple valid methods of testing for airborne formaldehyde which include:
>
> wet sampling methods coupled with colorimetric analyses, also called impinger methods, sorbent tube methods, including Method TO-11A, which is coupled with laboratory-based HPLC or GC-MS analyses, and **electrometric real- time monitoring methods**.

*See* Declaration of Marko Kaltofen, at p. 2, attached as **Exhibit H** (emphasis added). Real-time testing devices, such as the Formaldemeter, are "a scientifically accepted method of providing data on environmental conditions, especially for hazardous gases such as formaldehyde." *Id*. at p. 3. Despite Gulf Stream's claims, at least one of Plaintiff's experts does employ real-time testing devices in its regular course of business. *Id*.

Gulf Stream's expert's chief complaint about the Formaldemeter was that "[i]t's not

7

sensitive enough at low concentration," particularly at concentrations below one part per million. *See* Deposition of William Dyson, at pp. 59-60, relevant portions attached as **Exhibit I**. However, as can be seen from the test results, the concentration of formaldehyde in these trailers was anything but low. None of the test results were below 0.1 ppm and one Gulf Stream trailer produced a result of 2.690 ppm. *See* Test Results.[4] This is well within the Formaldemeter's detection range.

Gulf Stream relies on Jim Shea's testimony to prove that the Formaldemeter is "not a scientifically accurate tool" that only "acts as an indicator of airflows and ventilation." Gulf Stream Brief, at p. 3. By his own admission, Mr. Shea does not "pretend to be a scientist." *See* Deposition of Jim Shea., at p. 167, relevant portions attached as **Exhibit K**. In fact, is unclear where Mr. Shea got this information since nowhere on any piece of literature does the manufacturer of the Formaldemeter state that it "acts as an indicator of airflows and ventilation." *See* Formaldemeter Brochure; Brown Letter.

Here, the results from Gulf Stream's tests speak to its knowledge and its duty to warn. In addition to being a valid testing device, the Formaldemeter "can also be used as screening tool to determine if a more sensitive formaldehyde measurement is necessary." *See* DeVany Declaration, at ¶ 5. Gulf Stream's own expert spoke directly to what he would do if the results from a Formaldemeter were high:

> Q. [I]f you had an elevated reading using a Formaldemeter, the reasonable thing
> to do as a manufacturer would be to additional testing?
>
> ---

---

[4] *See also* House Committee on Oversight and Government Reform Majority Staff Analysis, "Trailer Manufacturers and Elevated Formaldehyde Levels," at pp.14-15, relevant portions attached as **Exhibit J**.

8

> A.  As I said earlier, if I were writing a protocol for a manufacturer, and the protocol included initial screening using a Formaldemeter, and that we would establish a level from that screening above which additional testing would be the next step and that's **reasonable**.

Dyson Depo., at pp.194-95 (objections omitted)(emphasis added).  While Dr. Dyson would not give a level at which additional testing would be reasonable, he did state that if the test results from a Formaldemeter test revealed an elevated level of formaldehyde he would do another test. *Id*. at p. 190.  After dancing around the issue, Dr. Dyson ultimately stated that the most important standard for him was "somewhere in the neighborhood of .1 to .3 parts-per-million." *Id*. at p. 145.  The results from the testing that Gulf Stream performed in March and April of 2006 met or exceeded this standard.

Combined with Gulf Stream's long-standing knowledge of the dangers of formaldehyde, resident complaints, its own employee experiencing symptoms of formaldehyde exposure when entering trailers, and its discovery that its trailers contained non-HUD certified wood products, the test results are yet another piece of information that should have triggered Gulf Stream's continuing duty to warn residents, like Plaintiff.  The jury should be provided this information, so it can decide.  Therefore, the test results from the Formaldemeter are relevant to Plaintiff's claims and Gulf Stream's defenses and Gulf Stream's motion should be denied

**II.     The Test Results are Not Prejudicial.**

Since it is clear that this testimony is relevant, Gulf Stream next contends that it is overly prejudicial and should be excluded under FED. R. EVID. 403.  Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time,

9

or needless presentation of cumulative evidence.

Gulf Stream claims that because Plaintiff's trailer was not tested by the Formaldemeter, the results would be unfairly prejudicial.  By the time that Plaintiff moved in to her trailer, Gulf Stream had more than enough knowledge at its disposal that her trailer contained a dangerous level of formaldehyde.  The fact that Plaintiff's trailer was built in December 2004 does not negate this duty to warn since, by Jim Shea's own testimony, there was little difference between the two model years and one of Gulf Stream's major suppliers was supplying non-LFE wood in both 2004 and 2005/05 (and years prior as well).  These test results were yet another piece of information that indicates Gulf Stream had a duty to warn Plaintiff.  How much weight should be given to the test results is for a jury to decide.

Gulf Stream also states that "the levels shown by the Formaldemeter can be elevated through the presence of various substances, as well as heat and humidity" yet cites no authority for this claim.  *See* Gulf Stream's Brief, at p. 4.  Despite Gulf Stream's implication, this is not an issue unique to the Formaldemeter as all ambient air formaldehyde testing methods are affected by ambient temperature and humidity.  *See* DeVany Declaration, at ¶ 5.  In fact, "for some parameters, such as temperature and humidity, real-time devices are the only practical option." *See* Kaltofen Affidavit, at p. 2.

These test results are neither confusing, misleading nor unduly prejudicial.  Instead, this evidence, combined with the additional knowledge Gulf Stream already had and gained around the same tiamt, is relevant to the jury question on whether Gulf Stream had a duty to warn residents of trailers.  Gulf Stream's lawyers and its experts are free to try to discount the Formaldemeter, and why these test results (combined with other factors) did not trigger their

duty to warn. Therefore, Gulf Stream's motion should be denied.

## PRAYER

WHEREFORE, Plaintiff Alana Alexander respectfully requests that the Court deny Gulf Stream's Motion.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY: s/Gerald E. Meunier
GERALD E. MEUNIER, #9471
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: 504/522-2304
Facsimile: 504/528-9973
gmeunier@gainsben.com

s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: 504/522-2304
Facsimile: 504/528-9973
jwoods@gainsben.com

                                        **COURT-APPOINTED PLAINTIFFS'**
                                        **STEERING COMMITTEE**
                                        ANTHONY BUZBEE, Texas # 24001820
                                        RAUL BENCOMO, #2932
                                        FRANK D'AMICO, #17519
                                        MATT MORELAND, #24567
                                        LINDA NELSON, #9938
                                        MIKAL WATTS, Texas # 20981820
                                        ROBERT BECNEL
                                        DENNIS REICH, Texas # 167396

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that on August 28, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

                                        <u>s/Gerald E. Meunier</u>
                                        GERALD E. MEUNIER, #9471