# DEPARTMENT OF HOMELAND SECURITY

## Office of Inspector General

# Hurricane Katrina Temporary Housing Technical Assistance Contracts



OIG-08-88



EXHIBIT "A"

August 2008

*Office of Inspector General*

U.S. Department of Homeland Security
Washington, DC 20528



Homeland Security

August 20, 2008

Preface

The Department of Homeland Security, Office of Inspector General, was established by the *Homeland Security Act of 2002* (Public Law 107-296) by amendment to the *Inspector General Act of 1978*. This is one of a series of audit, inspection, and special reports prepared as part of our oversight responsibilities to promote economy, efficiency, and effectiveness within the department.

This report, prepared for us by Williams, Adley & Company, LLP, addresses contract costs incurred by the Federal Emergency Management Agency for the four Individual Assistance Technical Assistance Contracts for Hurricane Katrina Relief Efforts. These contracts tasked the contractor to provide and coordinate comprehensive project management services for temporary housing solutions in the aftermath of the hurricane. It is based on interviews with employees and officials of relevant agencies, direct observations, and a review of applicable documents.

The recommendations herein have been developed to the best knowledge available to our office and have been discussed in draft with those responsible for implementation. It is our hope that this report will result in more effective, efficient, and economical operations. We express our appreciation to all of those who contributed to the preparation of this report.

*Richard L. Skinner*

Richard L. Skinner
Inspector General



March 20, 2008

Mr. Matthew Jadacki
Deputy Inspector General
Office of Inspector General
Department of Homeland Security
Washington, DC 20528

Dear Mr. Jadacki:

Williams, Adley & Company LLP performed a review of costs incurred by the Federal Emergency Management Agency (FEMA) on temporary housing units for the Hurricane Katrina relief effort during the period September 1, 2005 through June 30, 2006. The review was performed in accordance with our Task Order TPD-FIG-06-K-00029, dated January 9, 2006. This report presents the results of our review and offers recommendations to improve FEMA operations.

Our review was conducted in accordance with applicable *Government Auditing Standards*, 2003 revision. The review was an attestation engagement as defined by Chapter 2 of the *Standards* and it included a review and report of costs incurred, with a compliance element. Although the review report comments on costs incurred by FEMA, we did not perform a financial audit, the purpose of which would be to render an opinion on the agency's financial statements.

We appreciate the opportunity to have conducted this review. If you have any questions, or if we can be of further assistance, please call me on 202.371.1397.

Sincerely,

WILLIAMS, ADLEY & COMPANY, LLP

Jocelyn Hill, CPA
Partner


*Williams, Adley & Company, LLP*

# Table of Contents/Abbreviations

Executive Summary ........................................................................ 1

Background .................................................................................. 2

Results ....................................................................................... 4

Conclusions ................................................................................ 10

Recommendations ...................................................................... 11

Management Comments and Auditor Evaluation ....................... 12

## Figures

Figure 1: Total FEMA Contract Obligations ................................ 1

Figure 2: IA – TAC Contract Obligations for Hurricane Katrina .... 3

Figure 3: Task Order Funding Increase ........................................ 3

Figure 4: Task Order Timeline ...................................................... 6

## Appendices

Appendix 1 – Objectives, Scope, & Methodology

Appendix 2 – FEMA Official Comments

Appendix 3 – Questioned Costs

Appendix 4 – Results of Trailer Site Location Review

Appendix 5 – Report Distribution

## Abbreviations

| | |
|---|---|
| COTR | Contracting Officer's Technical Representative |
| DCAA | Defense Contract Audit Agency |
| DHS | Department of Homeland Security |
| FAR | Federal Acquisition Regulation |
| FEMA | Federal Emergency Management Agency |
| FRRATS | FEMA Response & Recovery Applicant Tracking System |
| IA-TAC | Individual Assistance – Technical Assistance Contract |
| LIMS | Logistics Inventory Management System |
| OIG | Office of Inspector General |
| WA&Co | Williams Adley & Company LLP |



*Williams, Adley & Company, LLP*

# Executive Summary

In 2005, the Federal Emergency Management Agency (FEMA) issued noncompetitive Individual Assistance – Technical Assistance Contracts (IA-TACs) to four large contractors: Fluor Enterprises, Inc., Shaw Group, CH2M Hill Constructors, Inc., and Bechtel National, Inc. These contractors were tasked to provide and coordinate comprehensive project management services. This report describes the results of Williams, Adley & Company, LLP's review of the contractor costs incurred by the Department of Homeland Security – FEMA for temporary housing solutions for the Hurricane Katrina relief effort. Tasks performed under the IA-TACs include: the design and construction of temporary housing unit group sites on property such as parking lots and farmland; the purchase of a base camp; and, the primary focus of this review, the delivery, installation and maintenance of temporary housing units on group, commercial and private sites. A detailed explanation of the scope of this review is provided in Appendix 1. The objectives of the review were to determine whether:

- FEMA performed effective price reasonableness determinations;
- FEMA developed definitive statement of work requirements and specifications, and implemented control procedures to ensure contractor compliance with those requirements and specifications to minimize the risk of fraud, waste, and abuse;
- FEMA effectively inspected, accepted, and paid for services rendered; and
- The contractors complied with statement of work requirements and specifications.

The effectiveness of controls, and the ability to ensure accountability when controls fail, is critical to any organization. We determined that the combination of deficiencies in acquisition planning and contract oversight led to waste of government funds and questioned costs of $45.9 million of the $3.2 billion contract obligation. Although no instances of fraud were uncovered by our limited review, we observed a correlation between deficient procurement practices and contract management procedures, and uncontrolled growth in the amount of funds obligated and expended under the contracts. FEMA's ability to properly inspect and accept goods and services was hampered because of (1) the number and complexity of contractor invoices it received, (2) inadequate FEMA staffing, and (3) unclear contractor invoices. Of the $45.9 million of questioned costs, $37.2 million or 81% related to inspection and acceptance of goods and services.

As of early December 2006, FEMA had obligated approximately $3.2 billion for the IA-TACs for the Hurricane Katrina relief effort, which represented 30% of the total $10.7 billion that FEMA had obligated for all contracts awarded in that time period as shown in the graphic. We reviewed task orders totaling $2.1 billion or 67% of the value of all task orders obligated for the

**Figure 1: Total FEMA Contract Obligations**

$10.7 billion

IA-TAC Contract Obligation
$3.2 billion - 30%

Other Contract Obligations
$7.5 billion - 70%

Source: Federal Procurement Data System - Next Generation


*Williams, Adley & Company, LLP*

period September 30, 2005, through September 30, 2006. See Appendix 1, Objectives, Scope and Methodology, for additional information.

We recognize that FEMA has already begun the process of improving its operation and controls. New competitively bid contracts were awarded in August 2006 and FEMA has been working to improve policy and procedures. It is well understood that one of FEMA's biggest challenges during disaster relief efforts is to balance the need to quickly provide assistance to victims while ensuring accountability to protect against waste, fraud, and abuse. However, contracts, if not in place prior to an event, should be finalized quickly and cost/price analysis should be completed in a timely manner. FEMA should enforce terms of the contracts and perform more contract oversight to ensure contractor compliance with statement of work requirements and specifications. Although there were established procedures to inspect goods and services, and perform invoice reviews, amounts invoiced by the contractors needed to include adequate cost details to allow FEMA to link invoices to specific contractor activities under the statement of work. We question how FEMA determined that the amounts invoiced were allowable and reasonable.

Overall, an adequate number of staff should be employed to 1) sufficiently plan acquisitions; 2) monitor contracts and hold contractors compliant to the terms of the contract; and 3) inspect and accept services rendered. Additionally, we recommend that FEMA recover the unsupported or excessive charges.

## Background

On August 29, 2005, Hurricane Katrina devastated the Gulf Coast regions of Louisiana, Mississippi, and Alabama. During early September 2005, the FEMA human capital resources were not sufficient to coordinate the massive and urgent logistical response effort without substantial assistance. FEMA awarded contracts to four contractors, issued on a sole-source basis based on urgent and compelling need, to provide immediate assistance[1].

The urgent need for housing pressured FEMA to act quickly. No-bid contracts were awarded to Fluor Enterprises, Inc. (Fluor), Shaw Group (Shaw), CH2M Hill Constructors, Inc. (Hill), and Bechtel National, Inc. (Bechtel). These contracts tasked the contractors to provide and coordinate comprehensive project management services for temporary housing, to include all phases of design, planning, budgeting, construction, destruction, and site restoration from project beginning through completion and closeout. The scope of these contracts encompassed numerous support functions including the transportation, storage, installation, and subsequent deactivation of temporary housing units. In addition, the contractors were tasked with identifying and confirming appropriate housing sites based on feasibility analyses, performing temporary housing group site designs and site preparation work, and providing ongoing maintenance and security for each of the sites. One contractor's task order included the purchase of a base camp as a housing solution. As

---

[1] FEMA awarded the four contracts as Indefinite Delivery Indefinite Quantity contracts. These definitive contracts allowed for cost type and time and materials task orders primarily related to temporary housing efforts. FEMA issued sole source task orders based on geographic area and the capacity of the prime contractor.


*Williams, Adley & Company, LLP*

of early December 2006, FEMA had obligated approximately $1.3 billion for Fluor, $830 million for Shaw, $464 million for Hill, and $517 million for Bechtel. In total, at this time approximately $3.2 billion had been obligated for the Individual Assistance – Technical Assistance Contracts (IA-TACs) for the Hurricane Katrina relief effort, as illustrated in Figure 2.

The initial contracts were executed on the basis of pre-award authorization notices without preaward audits or a defined statement of work. Each contract had an initial ceiling of $100 million. The government was committed to reimbursing the contractors for funds expended without the benefits of the defining terms and conditions associated with a contract or task order. Because of the devastation caused by the hurricane, housing needs exceeded FEMA's capability, and FEMA relied on the contractors who had the ability to quickly provide needed assistance.



**Figure 2: IA-TAC Contract Obligations for Hurricane Katrina**

Total $3.2 Billion
- Shaw - $830 million – 26%
- Fluor - $1.3 billion – 43%
- Bechtel - $517 million – 16%
- Hill - $463 million – 15%

Source: WA&Co analysis of IA-TAC Task Order Summary December 2006, provided by FEMA

Work continued to be tasked to these contractors without FEMA performing cost estimates and negotiating prices. However, it was not until significant costs had been incurred and after the contractors solidified the statements of work that the task orders were finally definitized. The contract ceilings continued to increase without the establishment of the controls needed to contain costs.

Figure 3 depicts the growth in funds of the task orders we reviewed. As modifications were



**Figure 3: Task Order Funding Increase**

Source: WA&Co analysis of IA-TAC Task Order Summary September 2006, provided by FEMA

Hurricane Katrina Temporary Housing Technical Assistance Contracts

3


*Williams, Adley & Company, LLP*

issued, the funding of the cumulative task orders increased significantly, by 3,235%, during the period of performance. When the period of performance ended, FEMA competitively bid the requirements and awarded IA-TAC-II contracts to six contractors in August 2006 for a two-year period.

FEMA is aware that it needs to strengthen its emergency management capabilities in advance of another catastrophic disaster and has taken steps to address previously identified problems, such as increasing staffing. We remain concerned that waste may occur under the current IA-TAC II contracts due to further improvements needed in the areas of oversight, knowledge transfer, and support systems. Prior to issuance of the IA-TAC III contracts in August 2008, it is critical that FEMA implement recommendations not already considered that will reduce the risk of fraud, waste, and abuse during future disaster recovery efforts.

## Results

A combination of problems led to questioned costs of $45.9 million and waste of government funds. FEMA had insufficient trained acquisition staff and inadequate controls in place to:

- Plan these major acquisitions;
- Provide oversight of contractor compliance;
- Review the combination of voluminous and complex invoices to ensure that costs billed to the government were allowable and allocable to the task order being charged; and
- Ensure proper accountability of temporary housing units.

The contracting and technical oversight organizational structure following Hurricane Katrina reflected limited staffing for the size,

---

**Base Camp Case Study**

On August 26, 2005 FEMA contacted Fluor, an existing IA-TAC contractor, to assist with the development and mobilization of an action plan to house an anticipated 300,000 displaced persons pending the arrival of Hurricane Katrina. The task order required Fluor to conduct a site inspection before ordering tents, but Fluor ordered the tents in advance of inspecting the site. FEMA purchased $20.2 million worth of base camp materials (tents) without competition and without analysis to determine if there was a viable use for them. Furthermore, FEMA purchased the base camp after it was determined that the designated site was not suitable for the tents. A price reasonableness analysis was performed after the fact and used questionable assumptions.

We questioned costs totaling $8,686,175 as follows:
- Fluor's negotiated purchase price did not identify the lease cancellation amount of $7,628,079 separately and included the amount as part of the cost of goods purchased;
- The lease cancellation fees should have been waived in lieu of the purchase of the tents and associated equipment;
- Shipping costs of $430,000 were not based on actual expenses; and
- Administrative fees of $628,096 were paid as a result of the lease cancellation figure.

The base camp was never used as intended and remained in storage without being inventoried from the date of delivery in November 2005 to October 2006. FEMA did not provide adequate oversight in the decision making process, and we were not provided with information to indicate that any FEMA employee has been held accountable for the purchase decision, the subsequent lapse in inventorying the items, or for making the payment to Fluor without proper inspection and acceptance of the materials.

Source: WA&Co analysis

---



*Williams, Adley & Company, LLP*

scope, and urgency of the contracting effort from both procurement management and contract monitoring perspectives. The decision making process was decentralized in the field without adequate accountability as a mitigating control.

## *Cost/Price Reasonableness*

An acquisition oversight report dated June 2006 and prepared by the Department of Homeland Security (DHS) Office of the Chief Procurement Officer concluded overall that IA-TAC contract files were so poor that they did not demonstrate that FEMA paid a fair and reasonable price for the services provided. The DHS Office of the Chief Procurement Officer further concluded that:

- The IA-TAC contract documentation was noncompliant;
- The contracting approach did not fully protect the government's interests; and
- Lack of acquisition planning hampered FEMA's ability to provide necessary services.

Among other recommendations, the DHS Office of the Chief Procurement Officer recommended that FEMA develop and use a contract administration plan to train program staff, Contracting Officer's Technical Representatives (COTRs), and contract monitors regarding contract ceilings.

In assessing the conclusions reached by the DHS Office of the Chief Procurement Officer, it is important to understand that the four IA-TAC contracts were awarded on a sole-source basis, based on the urgent and compelling need to provide immediate assistance to hurricane victims. FEMA was not prepared to respond to this catastrophic event and, consequently, they procured services on the basis of pre-award authorization notices without pre-award audits or a defined statement of work.

In general, the results of our review support the conclusions reached by the DHS Office of the Chief Procurement Officer. FEMA did not consistently perform an independent cost/price analysis as required. For example, the Shaw and Hill task orders reviewed, and the purchase of the base camp procured under Fluor's contract did not have independent cost/price analyses performed. Under Federal Acquisition Regulation (FAR) subpart 15.4 the contracting officer is responsible for obtaining information to evaluate the reasonableness of the price. The contract files were missing required documents, and we were unable to trace pricing information and support. Specific examples are described below.

Work had been substantially completed under the Shaw and Hill task orders before the task orders were definitized. Although we requested cost/price proposals during our testing, FEMA officials could not provide sufficient documentation to properly support that the costs billed on the invoices were based on approved rates. With respect to the Shaw IA-TAC, FEMA relied upon Shaw's cost estimates exclusive of any independent pricing data or competition, which is not in compliance with FAR subpart 15.4. For the Hill IA-TAC, the contract files and supporting documentation were incomplete, which made pricing verification unattainable. The timeline of events from contract award through contract closeout for each of the task orders reviewed for the IA-TAC contractors shows the delays in defining the statement of work as shown in Figure 4 below. For many of the task orders presented below, the sequence of events supports our observation and the

conclusion of the DHS Office of the Chief Procurement Officer that the contracting approach did not fully protect the government's interests. One task order was not definitized for seven months, near the end of the contract, and cost/price data was not confirmed until much of the work had been performed.

**Figure 4: Task Order Timeline**

| Contractor | Task Order (1) | Contract Award Date (2) | Preauthorization Notice Issued to Commence Work (3) | Cost Price Proposal Submitted (4) | Task Order Definitized (5) | Performance Period Ending Date (6) | Elapsed Days Column (3) minus Column (5) |
|---|---|---|---|---|---|---|---|
| FLUOR | TO-02 | 9/3/05 | 9/9/05 | 10/4/05 | 10/14/05 | 9/30/06 | 35 |
| | TO-08 | 9/3/05 | 9/5/05 | 11/12/05 | 2/23/06 | 9/30/06 | 171 |
| | TO-11 | 11/10/05 | 9/22/05 | 4/18/06 | 2/28/06 | 10/31/06 | 110 |
| | TO-13 | 9/3/05 | 9/22/05 | 10/25/05 | 2/28/06 | 9/30/06 | 159 |
| | TO-19 | 9/3/05 | 8/31/05 | 10/21/05 | 10/28/05 | 9/30/06 | 58 |
| SHAW | TO-15 | 9/12/05 | 1/13/06 | 5/2/06 | 8/31/06 | 9/30/06 | 230 |
| HILL | TO-20 | 9/30/05 | 9/19/05 | 3/3/06 | 4/27/06 | 9/30/06 | 220 |
| BECHTEL | TO-03 | 9/30/05 | 9/3/05 | 10/18/05 | 12/22/05 | 9/30/06 | 110 |

Source: WA&Co analysis of data provided by FEMA

In addition, the price reasonableness analysis for the $20.2 million base camp purchase, discussed on page 4, was performed after the fact. Without an approved cost/price analysis, FEMA's COTR did not have a basis for determining cost reasonableness and allowability when accepting costs billed for services rendered. FEMA exposed itself to greater risk than warranted because procurement and contract administration activities were not performed as required. Because the Shaw and Hill task orders remained undefinitized for almost the entire contract period, with limited controls over contractor performance or billing practices, there was an increased risk for fraud, waste, and abuse of government resources.

*Monitoring Contract Compliance*

We observed that FEMA's controls over contractor compliance were not sufficient to ensure proper service delivery to temporary housing unit tenants. Fluor, under its maintenance task order, was required to perform 100% maintenance of units, grounds, and facilities, and to notify the COTR of all emergency maintenance requests. The COTR was not aware of emergency maintenance work order requests performed on group sites, nor was he aware that it was a task order requirement for Fluor to provide that information. The frequent turnover of FEMA staff, the absence of redundancy in key positions, and the ineffective transfer of critical information contributed to the COTR's limited understanding of the contract.


*Williams, Adley & Company, LLP*

During our site inspections we spoke to a small number of occupants regarding the maintenance of the temporary housing site and individual units. The most prominent concerns related to repair or replacement of equipment such as air conditioning units, refrigerators, stoves, and propane tanks. While the contractor maintained work orders, neither FEMA nor Fluor officials were able to provide documentation of COTR notifications. Fluor said that there was mutual agreement with a FEMA COTR not to comply with the notification requirements for emergency maintenance work order requests due to the volume of such requests, but evidence of any appropriate authorization to modify the task order was not provided. Also, we questioned how FEMA COTRs were able, without proper documentation, to inspect and accept costs billed for rendering these services.

Our review of a maintenance service task order was limited to one IA-TAC contractor, Fluor. The results of our initial review of Fluor indicated that the performance of hauling and installing temporary housing units posed the greatest risk to FEMA for potential fraud, waste, and abuse; therefore the scope of the remaining IA-TAC audits was limited to these task orders.

## *Inventory Control*

Because FEMA's inventory control procedures were inadequate, at no point in time did FEMA know how many trailers they had available. In addition, the recording and tracking of trailers and the base camp were insufficient to accurately identify the actual location of these assets. Such inadequate inventory tracking increases the risk of misappropriation or cannibalization of government property.

The Office of Management and Budget's revised Circular A-123 – Management's Responsibility for Internal Control, dated December 21, 2004, requires that agency managers incorporate basic management controls in the strategies, plans, guidance and procedures that govern their programs and operations. These standards include:

- Reasonable assurance and safeguards – management controls must provide reasonable assurance that assets are safeguarded against waste, loss, unauthorized use, and misappropriation; and

- Recording and documentation – transactions should be promptly recorded, properly classified, and accounted for in order to prepare timely accounts and reliable financial and other reports.

Even though FEMA had some procedures in place, they were not always followed. Insufficient staffing and inadequate support systems to track and monitor the trailers compounded the problem.

- <u>Trailers</u>

    FEMA did not have a real-time inventory control system or mitigating inventory control procedures to obtain timely updates and reconcile inventory records with IA-TAC contractor data to ensure accurate and timely monitoring of government property. Because such procedures were not in place, FEMA was unaware of the actual number of units or other property installed, and of their location. Many of the temporary housing units were missing from the locations where FEMA records reported they could be found. Overall, 10.3% (467 units out of 4,521) of the units selected for verification were not found at the


*Williams, Adley & Company, LLP*

sites recorded in the FEMA records. Also, 1,152 units were located at the sites visited but were not recorded in FEMA records. Differences existed between the number of temporary housing units recorded in the FEMA Response & Recovery Applicant Tracking System (FRRATS) and the number of units physically verified at the sites selected for review for all four contractors.

During site visits, we observed that FEMA temporary housing unit records were based on projections and did not reflect the actual number of temporary housing units installed at the time. FEMA's *Site Inspection Direct Housing Operations Field Support Guide* states that FEMA must track travel trailers from manufacturers to staging areas and track travel trailers, manufactured homes, and other mobile units from staging areas to installation sites via an automated systematic and program management system to ensure proper tracking of assets. Once units were dispatched to the IA-TAC contractor, FEMA did not keep accurate records of the physical location of the temporary housing units in FRRATS.

During our review of the distribution process, we observed four possible causes for the inaccurate information:

- FEMA did not update information into FRRATS in a timely manner;
- Contractors did not forward information to FEMA in a timely manner;
- FEMA Inspection Form 90-13 may have been incorrectly completed; or
- Information was incorrectly transferred from the FEMA Inspection Form to FRRATS.

Given this weakness in the tracking systems, it is not possible to determine if government property was really missing and possibly stolen, or just had not been properly tracked. Appendix 4 shows the discrepancies between the FRRATS records and the numbers of units that could be verified at the sites visited during the time of our review in July and August 2006, and again in February and April 2007.

FEMA relied on the IA-TAC contractors to maintain control over government assets. At the time Hurricane Katrina struck, FEMA did not have a sufficient number of staff to handle a disaster of that size and proportion. Initially, only one COTR was assigned to oversee disaster recovery efforts in Louisiana. This COTR was responsible for approving sites, coordinating with contractors on site design, verifying work, and approving invoices. Within months, two more COTRs and several technical monitors were sent to support the effort but the workload remained unmanageable given the magnitude of the disaster and the speed with which services were needed.

We observed that the number of units and the geographical area under the purview of the COTR and support staff were so expansive that effective oversight was not possible. For example, in Louisiana where Fluor and Shaw provided services, there were more than 40,000 private temporary housing unit sites located in more than 50 separate parishes. In Louisiana, staff was required to provide 24-hour coverage, 7 days per week. FEMA employees on average worked 12-hour shifts, 7 days a week.


*Williams, Adley & Company, LLP*

- Base Camp

    FEMA inventory policies and procedures were not followed with respect to the purchase of the base camp valued at $20.2 million, which was purchased under Fluor's IA-TAC. During our site visits, we located base camp components at three separate locations in Alabama, Maryland, and California, where the contractor was instructed to deliver the goods. In Selma, Alabama, where 19 truckloads of materials were received, and at the Cumberland, Maryland, site where 29 truckloads of components were received, the transfer of materials forms signed by FEMA did not match the itemized packing lists signed by Fluor, its subcontractor, or the seller.

    FEMA has not provided any evidence of attempts made to reconcile these documents. At one location, Sierra Army Depot, FEMA had no personnel onsite to inspect and accept delivery of the 14 truckloads of base camp components, because of staffing limitations, and did not make arrangements for Sierra Army Depot personnel to perform this function on its behalf. Therefore, FEMA was not able to confirm that all of the components were received and accounted. Instead, FEMA relied on the contractor's certification that the goods were delivered as instructed.

    The base camp purchase was not entered into the Logistics Inventory Management System (LIMS), FEMA's property tracking system, until after we initiated inquiries during our review, almost one year after the November 2005 delivery of the goods. Title 48 of the CFR, §45.505(c)[2] states that official government property records must identify all government property and provide a complete, current, auditable record of all transactions.

Due to the insufficient number of qualified government personnel, FEMA relied heavily on the contractors' to control government assets. FEMA did not properly account for inventory assets, i.e., temporary housing units and the $20.2 million base camp.

## Inspection and Acceptance of Goods and Services

Because of insufficient or missing supporting documentation, proper inspection and acceptance of goods and services totaling $37million could not be confirmed. Each IA-TAC contractor used its own invoice format, which varied with respect to how information was presented and the amount of detail provided. Invoices were voluminous and complex, and often included thousands of pages of support. When reviewing supporting documentation for delivery, installation, and maintenance of temporary housing units, we were unable to determine the breakdown of costs per sites or verify the number of sites billed to FEMA and their locations. With respect to the base camp purchase, items were not inventoried at the locations when received and FEMA did not have signed receiving reports on file detailing the quantity or condition of items shipped and received. As such, reasonable inspection and acceptance of $20.2 million in assets was not performed prior to payment and it is uncertain whether all the items paid for were received.

---

[2] Effective June 14, 2007, Part 45 of Title 48 of the CFR was moved to the Federal Acquisition Circular 2005-17.
Hurricane Katrina Temporary Housing Technical Assistance Contracts

*Williams, Adley & Company, LLP*

Although FEMA stated they had procedures in place to inspect goods and services and authorize payment, FEMA officials could not provide a copy of the procedures and would not have been able to confirm adherence to such procedures due to the insufficient or missing documentation. Therefore, it is unclear how FEMA determined that the amounts invoiced by the contractors were allowable and reasonable, and why payment was approved for the unsupported costs. Further, FEMA did not provide information to indicate that any FEMA employee was held accountable for authorizing payments to contractors without proper inspection and acceptance.

FEMA is responsible for ensuring that the contractor complies with all terms of the agreement and conducts business in the best interest of the government. FEMA is also responsible for inspecting and accepting deliverables and certifying that invoices submitted for payment are reasonable. FAR, Subpart 1.602-2 requires contracting officers to ensure the performance of all necessary actions for effective contracting, to include compliance with the terms of the contract and safeguarding the interest of the United States in its contractual relationships. According to the IA-TACs, the final inspection and acceptance shall be by the contracting officer or his/her duly authorized representative specified in individual task orders.

We determined that unsupported costs totaling $37 million (see Appendix 3 – Questioned Costs) were approved and paid. With limited staffing at FEMA—three COTRs were assigned to Louisiana with hundreds of locations in several parishes to oversee—it was unreasonable to expect FEMA COTRs to accurately account for the costs incurred using the invoice formats provided by the IA-TAC contractors within the time constraints imposed by the *Prompt Payment Act*.

# Conclusions

We recognize that the devastation caused by Hurricane Katrina was monumental and the magnitude of the disaster relief effort required is unprecedented. Since the hurricane, FEMA has implemented many controls to ensure better service delivery to future disaster victims. Additionally, they have engaged the Defense Contract Audit Agency to perform incurred costs audits on each of the IA-TACs. Implementation of our recommendations will serve to address the need for better controls in the areas of oversight, knowledge transfer, and support systems that we noted throughout our reviews of the four IA-TACs. The effectiveness of controls, and the ability to ensure accountability when controls fail, is critical to any organization. The combination of deficiencies led to waste of government funds and, although no instances of fraud were uncovered by our limited review, this environment provided opportunities for fraud and abuse to occur.

These four contracts were the largest written by FEMA during the response to Hurricane Katrina, and the services provided were critical to meeting the needs of displaced residents. Although FEMA replaced the original IA-TAC contracts with six competitively bid contracts in August 2006, these contracts will expire in August 2008. As FEMA begins to plan the next acquisition, there is an opportunity to review all recommendations and analyze contract and program strengths and weaknesses, to assure needed corrective actions have been addressed in the new acquisition plan.

## Recommendations

The following provides a comprehensive list of recommendations based on the results of our review of the four IA-TAC contractors. We recommend that FEMA:

### Cost/Price Reasonableness

- **Recommendation #1:** Develop a detailed statement of work, perform timely cost analysis, and negotiate reasonable terms and conditions during the acquisition planning process to ensure that contract terms are in the best interest of the government.

- **Recommendation #2:** Recover the $8,686,175 in questioned costs associated with the base camp purchase, and determine if the equipment is needed by FEMA; and if it is unnecessary, develop a strategy to recover costs, including options to sell it.

### Inspection and Acceptance of Goods and Services

- **Recommendation #3:** Recover unsupported or excessive charges identified as questioned costs totaling $37,226,491 related to inspection and acceptance of goods and services, as noted in Appendix 3.

- **Recommendation #4:** Develop a standard invoicing format so that the COTR can reasonably determine the type of service performed, the price or unit cost of the service, and the location or unit for which the service was provided. FEMA should also establish a risk-based review process such that invoices receive a thorough review to ensure that the government does not pay for goods and services not received or in excess of the agreed upon amount.

- **Recommendation #5:** Establish a system of checks and balances to minimize the risk of fraud, waste, and abuse of government funds by holding individuals accountable for accepting goods and services, accounting for performance deficiencies, accounting for noncompliance with contract requirements, and avoiding authorization and payment of invoices without proper inspection.

### Inventory Control

- **Recommendation #6:** Establish and adhere to inventory control protocols, develop an interface between FEMA FRRATS and the contractors' system of tracking government property, and post to LIMS so that information is maintained on a real-time basis and governmental property is accounted for.

- **Recommendation #7:** Account for all temporary housing units to determine actual inventory amounts and ensure proper recordation.

*Williams, Adley & Company, LLP*

## Management Comments and Auditor Evaluation

FEMA provided written comments on the draft of this report and concurred with all of our recommendations except for a technical non-concurrence regarding recommendation 6. FEMA's written comments are contained in Appendix 2.

In response to recommendation 1, that FEMA develop a detailed statement of work, perform timely cost analysis, and negotiate reasonable terms and conditions during the acquisition planning process, FEMA concurred on the basis that this review pertained to the IA-TAC I contracts. FEMA concluded that this recommendation has been incorporated into the IA-TAC II contracts through revised Source Selection Plan, Acquisition Plan, and Contract Administration Plans.

FEMA discussed its plans for administering the acquisition, selection and monitoring of contractors with our auditors at a summary level, during the exit briefing, subsequent to the issuance of IA-TAC II contracts. The DHS-OIG will review the effectiveness, compliance, and execution of these revised plans in future FEMA audits.

In response to recommendation 2, that FEMA mitigate the base camp cost to the government, FEMA concurred and asked the Defense Contract Audit Agency (DCAA) to determine which costs claimed by a contractor are in fact allowable and allocable for reimbursement under relevant procurement regulations and cost principles.

We have examined the costs associated with the base camp purchase and determined that the questioned costs should not be allowed. However, DCAA may identify additional costs related to this purchase that should be recovered. At the conclusion of the DCAA audit, FEMA should recover all questioned costs and complete a cost-benefit analysis to determine the disposition of the base camp materials kept in inventory.

In response to recommendation 3, that FEMA recover unsupported or excessive charges identified as questioned costs totaling $37,226,491 related to inspection and acceptance of goods and services, FEMA concurred with the recommendation. According to FEMA, DCAA will help determine which costs claimed by a contractor are in fact allowable and allocable for reimbursement purposes under the cost principles. FEMA will pursue efforts to recover unallowable, unallocable, and unreasonable charges.

In response to recommendation 4, that FEMA develop a standard invoicing format so that the COTR can reasonably determine the type of service performed, the price or unit cost of the service, and the location or unit for which the service was provided and that FEMA establish a risk-based review process, FEMA concurred with the recommendation. FEMA now requires contractors to use Standard Form 1034 as the standard invoicing form, it has revamped its COTR training program and issued a COTR Training Handbook, and FEMA has trained and certified 947 COTRs as of June 18, 2008.

FEMA has taken a number of positive steps to enhance its monitoring capabilities. We conclude that our recommendation has been addressed in part. FEMA should provide additional

*Williams, Adley & Company, LLP*

information on steps taken to identify risk levels and mitigation efforts to diminish the impact of these contractor invoicing risks. The risks include invoicing excessive costs, costs for work that was not completed or services that were not rendered, and using inappropriate rates or service periods. FEMA should assure that the COTR Handbook adequately addresses how to identify such risks and the mitigation techniques for reducing these risks to an acceptable level.

In response to recommendation 5, that FEMA establish a system of checks and balances to minimize the risk of fraud, waste and abuse of government funds, FEMA concurred with the recommendation. In November 2007, FEMA issued a "Contracting Officer Technical Representative Interim Policy" that addresses the process of nominating and appointing COTRs who represent the contracting officer in the administration and management of a contract. The policy outlines the responsibility of the COTR to adequately inspect and accept only conforming goods or services; to inform the contractor of performance deficiencies; and to evaluate contractor performance through the use of the Contractor Performance System. The COTR Interim Policy and the COTR Handbook will be reviewed to determine the effectiveness of these tools in future audits.

In response to recommendation 6, that FEMA establish and adhere to inventory control protocols, develop an interface between FEMA Response & Recovery Applicant Tracking System (FRRATS) and the contractors' system of tracking government property, and post to LIMS, FEMA did not concur from a technical standpoint. According to FEMA, the Sunflower Asset Management System (SAMS) will be replacing LIMS within the next twelve months, and therefore, posting to LIMS is not a value-added endeavor at this time. Linkage to FRRATS will be built into SAMS. As a result, FEMA believes that this recommendation should be closed.

We agree that it is not cost effective to develop an interface of FRRATS data into LIMS since it is being replaced, but suggest FEMA implement mitigating controls in the interim until the new system is in place and functioning.

In response to recommendation 7, that FEMA account for all temporary housing units to determine actual inventory amounts and ensure proper recordation, FEMA concurred with this recommendation and has initiated a 100% physical inventory that should conclude in September 2008.

*Williams, Adley & Company, LLP*

# Appendix 1 – Objectives, Scope & Methodology

Our performance reviews of the four IA-TAC contractors began with our review of Fluor. The scope of our review of Fluor was more extensive than our reviews of Bechtel, Hill, and Shaw, and included selection of five task orders for:

- Acquisition of base camp;
- The delivery, installation, and maintenance of temporary housing units on group, commercial, and private sites;
- Administrative and technical support for tracking temporary housing units; and
- Identification and construction of temporary housing sites.

Because the results of our review of Fluor indicated that the performance of delivery, installation, and maintenance services posed the greatest risk to FEMA for potential fraud, waste, and abuse, we limited the scope of our reviews of Bechtel, Hill, and Shaw to selection of one task order each for the delivery, installation, and maintenance of temporary housing units on group, commercial, and private sites.

## Objectives

The objectives of our reviews were to determine whether:

- FEMA performed effective price reasonableness determinations;
- FEMA developed definitive statement of work requirements and specifications, and implemented control procedures to ensure contractor compliance and to minimize the risk of fraud, waste, and abuse;
- FEMA effectively inspected, accepted, and paid for services rendered; and
- IA-TAC contractors complied with statement of work requirements and specifications.

## Scope

The scope of our review included task order services performed during the period September 1, 2005, through June 30, 2006. We conducted physical site verifications during July and August 2006, and February and April 2007. We conducted visits to distribution centers and the Sierra Army Depot in September and October 2006 to verify base camp inventories. We did not independently test contractor payroll costs or FEMA's adherence to procurement and contracting requirements. We relied on the payroll audits performed by the Defense Contract Audit Agency and the acquisition oversight reviews performed by the DHS Office of the Chief Procurement Officer to separately address these issues.