

*Williams, Adley & Company, LLP*

The following table summarizes the task orders reviewed under Fluor, Bechtel, Hill, and Shaw's IA-TACs. The task orders were selected by DHS-OIG, in conjunction with WA&Co, based on dollar amount of the task orders, the type of services provided, and potential risk.

| Task Orders Reviewed | | | | |
|---|---|---|---|---|
| Contractor | Contract Number | Task Order Number | Dollar Amount of Task Order | Description of Services |
| Fluor | HSFEHQ-05-D-0471 | HSFEHQ-06-J-0002 | $ 31,008,517 | track temporary housing units |
| | | HSFEHQ-06-J-0011 | $ 875,108,859 | haul & install |
| | | HSFEHQ-06-J-0013 | $ 158,474,869 | construction, materials, labor and equipment to support temporary housing |
| | | HSFEHQ-06-J-0019 | $ 99,774,978 | identify temporary housing sites |
| | | HSFEHQ-06-J-0008 | $ 20,212,867 | purchase base camp |
| Bechtel | HSFEHQ-05-D-0572 | HSFEHQ-05-J-0003 | $ 334,935,403 | haul & install |
| Hill | HSFEHQ-05-D-0592 | HSFEHQ-06-J-0020 | $ 133,768,875 | haul & install |
| Shaw | HSFEHQ-05-D-0573 | HSFEHQ-05-J-0015 | $ 464,176,452 | haul & install |

**Methodology**

We performed our reviews under the authority of the *Inspector General Act of 1978*, as amended, and according to Generally Accepted Government Auditing Standards. We conducted our work in accordance with agreed-upon procedures and standards, and executed tests; conducted interviews; made observations; and performed examinations as appropriate. During our site visits and testing activities we:

- Interviewed FEMA and contractor personnel to obtain an understanding of policies and procedures followed and to identify potential internal control weaknesses and their causes.

- Obtained copies of task order files from FEMA personnel. We reviewed each task order and modifications available in the files, and identified the government specifications in the statement of work and other documentation providing work specifications to determine whether FEMA clearly specified and documented the task orders' work requirements for the contractor.

- Reviewed task order files to determine whether the contractor was in compliance with the performance work statement specifications in the contract (for Fluor we also reviewed initial strike team site assessments, work plans, and group site designs).


*Williams, Adley & Company, LLP*

- Tested expenditures invoiced by the contractor and paid by FEMA, and determined whether proper controls were in place to ensure the allowability and allocability of costs incurred by the contractor for each task order reviewed.

- Conducted group site, private site, and commercial site visits and performed physical verification of temporary housing units reported by FEMA.

- Performed a temporary housing unit location verification to determine whether FEMA properly tracked and monitored government furnished temporary housing units (for Fluor, also ensured contractor was properly tracking government furnished temporary housing units from staging area to the locations where units were installed).

- Reviewed the contractor's maintenance service guidance system and work order system, and performed tests to determine whether any compliance violations had occurred and the resolution of such violations (Fluor only).

The following table identifies locations where testing was performed for each of the IA-TAC reviews:

| Contractor | Testing Locations |
|---|---|
| Fluor | <ul><li>DHS and FEMA headquarters – Washington, DC</li><li>JFO – Baton Rouge, LA</li><li>FEMA Distribution Center – Baton Rouge, LA</li><li>Fluor Staging Area – New Orleans, LA</li><li>St. Bernard, Orleans, and Plaquemines parishes, LA</li></ul> |
| Bechtel | <ul><li>DHS and FEMA headquarters – Washington, DC</li><li>TRO – Biloxi, MS</li><li>FEMA Distribution Center – Purvis, MS</li><li>Hancock, Harrison, and Jackson counties, MS</li></ul> |
| Hill | <ul><li>DHS and FEMA headquarters – Washington, DC</li><li>TRO – Biloxi, MS</li><li>FEMA Distribution Center – Purvis, MS</li><li>Hancock, Harrison, and Jackson counties, MS</li></ul> |
| Shaw | <ul><li>DHS and FEMA headquarters – Washington, DC</li><li>FEMA staging area – Baton Rouge, LA</li><li>Jefferson, Orleans, and Baton Rouge parishes, LA</li></ul> |

*Williams, Adley & Company, LLP*

# Appendix 2 – FEMA Official Comments

U.S. Department of Homeland Security
Washington, DC 20472



June 26, 2008

MEMORANDUM FOR: Richard L. Skinner
Inspector General

FROM: Marko Bourne
Director
Office of Policy & Program Analysis

SUBJECT: FEMA Response to OIG Draft Audit Report, *Hurricane Katrina Temporary Housing Technical Assistance Contracts*

This memorandum provides FEMA's response to the Subject Office of the Inspector General Draft report.

We sincerely appreciate the opportunity to provide updated status in our effort to respond to the OIG's recommendations in this report. As FEMA works toward refining its programs, the Office of the Inspector General's independent analysis of program performance greatly benefits our ability to continuously improve our activities. We look forward to continuing this partnership in the future. Questions concerning the attached document should be addressed to Brad Shefka, Chief, FEMA GAO/OIG Audit Liaison Office, 202-646-1308.

Attachment:
FEMA Response

Hurricane Katrina Temporary Housing Technical Assistance Contracts

A2-1



*Williams, Adley & Company, LLP*

# FEMA Response to Draft DHS Office of the Inspector General Report --*Hurricane Katrina Temporary Housing Technical Assistance Contracts*, May 2008

**Cost/Price Reasonableness**

- **Recommendation #1:** Develop a detailed statement of work, perform timely cost analysis, and negotiate reasonable terms and conditions during the acquisition planning process to ensure that contract terms are in the best interest of the government.

  <u>Response</u>: Concur. The subject OIG report audited the IA-TAC I contract. FEMA has since re-competed the acquisition using a performance-based statement of work. These newer contracts are referred to as IA-TAC II. A revised Source Selection Plan and Acquisition Plan were developed for IA-TAC II. FEMA performed a cost analysis on each cost proposal and awarded six contracts on a "best value" to the Government basis in IA-TAC II. Additionally, the Contract Administration Plans sets forth a competitive task order proposal process under which each IA-TAC II contractor is alerted of a need and asked to compete for the resulting task order based on a detailed statement of the particular requirements. FEMA believes that these actions with respect to IA-TAC II meet this recommendation, which should be considered closed.

- **Recommendation #2:** Recover the $8,686,175 in questioned costs associated with the base camp purchase, and determine if the equipment is needed by FEMA; and if it is unnecessary, develop a strategy to recover costs, including options to sell it.

  <u>Response</u>: Concur. The costs questioned by the DHS OIG arose under a cost reimbursable contract. FEMA has asked the Defense Contract Audit Agency (DCAA) to determine which costs claimed by a contractor are in fact allowable and allocable for reimbursement under relevant procurement regulations and cost principles. DCAA is to not only audit the overall IA-TAC I contracts, but to also conduct task order-specific audits on all task orders issued. FEMA took this unusual additional action to ensure that all costs to be paid by the Government are allowable and allocable under the costs principles and contracts. Given these actions, FEMA believes this recommendation has been met, and that it should be considered closed.

**Inspection and Acceptance of Goods and Services**

- **Recommendation #3:** Recover unsupported or excessive charges identified as questioned costs totaling $37,226,491 related to inspection and acceptance of goods and services, as noted in Appendix 3.

  <u>Response</u>: Concur. As noted in Response to Recommendation #2, above, FEMA has contracted with DCAA to audit the costs charged under the IA-TAC I contracts as well as costs charged under specific task orders. DCAA will help determine which costs claimed by a


*Williams, Adley & Company, LLP*

contractor are in fact allowable and allocable for reimbursement purposes under the cost principles. FEMA and DCAA will pursue efforts to recover unallowable, unallocable, and unreasonable charges. Given these actions, FEMA believes this recommendation has been met, and that it should be considered closed.

- **Recommendation #4:** Develop a standard invoicing format so that the COTR can reasonably determine the type of service performed, the price or unit cost of the service, and the location or unit for which the service was provided. FEMA should also establish a risk-based review process such that invoices receive a thorough review to ensure that the government does not pay for goods and services not received or in excess of the agreed upon amount.

  **Response:** Concur. FEMA now requires contractors to use Standard Form 1034 as the standard invoicing form. In addition, the Contracting Officer's Technical Representative (COTR) Program has been revamped. In August 2007, FEMA issued a "COTR Handbook" that provides guidance on establishing and using a COTR administration plan, the performance of the contractor, inspection and acceptance of deliverables, and the identification of corrective actions to take in the event the contractor fails to perform as required in the contract. FEMA also has placed increased emphasis on COTR training and certification. As of June 18, 2008, FEMA has 947 DHS-certified COTRs. Given these actions, FEMA believes this recommendation has been met, and that it should be considered closed.

- **Recommendation #5:** Establish a system of checks and balances to minimize the risk of fraud, waste, and abuse of government funds by holding individuals accountable for accepting goods and services, accounting for performance deficiencies, accounting for noncompliance with contract requirements, and avoiding authorization and payment of invoices without proper inspection.

  **Response:** Concur. See Response to Recommendation 4, above. In addition, in November 2007, FEMA issued a "Contracting Officer Technical Representative (COTR) Interim Policy" that addresses the process of nominating and appointing COTRs who represent the contracting officer in the administration and management of a contract. The policy outlines the responsibility of the COTR to adequately inspect and accept only conforming goods or services; to inform the contractor of performance deficiencies; and to evaluate contractor performance through the use of the Contractor Performance System. Given these actions, FEMA believes this recommendation has been met, and that it should be considered closed.

**Inventory Control**

- **Recommendation #6:** Establish and adhere to inventory control protocols, develop an interface between FEMA FRRATS and the contractors' system of tracking government property, and post to LIMS so that information is maintained on a real-time basis and governmental property is accounted for.


*Williams, Adley & Company, LLP*

**Response:** Technical Non-concur. The Logistics Directorate is replacing the LIMS database system with the Sunflower Asset Management System (SAMS) within the next twelve months, so it does not make sense to link the LIMS systems with FRRATS. SAMS is expected to be fielded by July, 2009. The Property Management Division has the lead action on that project, as a part of the overall upgrade of FEMA Information Management systems being managed by the Office of the CIO. This technical non-concurrence is based on the analysis of the cost of upgrading the current LIMS system to link with the FRRATS system versus adding this requirement to be built in to the SAMS. This requirement will be added to the Sunflower requirements; therefore, the objective of the recommendation will be met, but not through LIMS.

**Recommendation #7:** Account for all temporary housing units to determine actual inventory amounts and ensure proper recordation.

**Response:** Concur. As a result of this recommendation, the Property Management Division of the Logistics Management Directorate is undertaking a 100% physical inventory of all housing units in storage beginning in July 2007. A contract is being awarded for contractors under the direct oversight of the Chief of the Property division to conduct the inventory with government staff from the Inventory Management Branch providing COTR support. This inventory is scheduled to continue through the end of September, 2008. First site to be inventoried will be Hope, Arkansas followed by the other sites, in accordance with a schedule being developed by the contractors and the Property Management Division.

*Williams, Adley & Company, LLP*

## Appendix 3-Questioned Costs

| Contractor | Description | Amount |
|---|---|---|
| FLUOR | Cost/Price Reasonableness<br><br>*Base Camp Purchase:*<br><br>• Lease Cancellation   $7,628,079<br>• Administrative Fees  $628,096<br>• Shipping Costs            $430,000 | $8,686,175 |
| BECHTEL | Inspection and Acceptance of Goods and Services<br><br>• Invoice #513266<br>• Invoice #513418 | $22,511,151<br>$5,229,367 |
| HILL | Inspection and Acceptance of Goods and Services<br><br>• Invoice #5038771<br>• Invoice #5038920 | $2,822,386<br>$4,508,892 |
| SHAW | Inspection and Acceptance of Goods and Services<br><br>• Invoice #140588 | $2,154,695 |
|  | Total Contractor Questioned Costs | $45,912,666 |

Source: WA&Co analysis


*Williams, Adley & Company, LLP*

The following provides a narrative explanation of the questioned costs outlined in the table above.

**FLUOR**

- **Cost/Price Reasonableness** - FEMA authorized Fluor to purchase base camp components totaling $20.2 million, without competition and without sufficient analysis to determine if there was a viable use or requirement for them. We questioned costs totaling $8,686,175 as follows: Fluor's negotiated purchase price did not identify the lease cancellation amount of $7,628,079 separately and included the amount as part of the cost of goods purchased; the lease cancellation fees should have been waived in lieu of the purchase of the tents and associated equipment; shipping costs of $430,000 were not based on actual expenses; and $628,096 for administrative fees paid as a result of the lease cancellation figure.

**BECHTEL**

- **Inspection and Acceptance of Goods and Services** - FEMA was unable to provide complete supporting documentation for invoice #513418, totaling $5,229,367, and for transactions totaling $22,511,151 on invoice #513266. It is unclear as to whether Bechtel provided FEMA with full documentation for all transactions at the time the transactions were billed. We could not confirm how FEMA determined that the amounts invoiced by Bechtel were allowable and reasonable and why payment was approved for the unsupported costs.

**HILL**

- **Inspection and Acceptance of Goods and Services** - We calculated questioned costs of $2,822,386 for invoice #5038771 and $4,508,892 for invoice #5038920 for transactions that were not properly supported. The COTR said that FEMA did not enforce a protocol where the COTRs were required to review 100% of every invoice to determine whether costs billed by the contractor were reasonable and allowable. Therefore, prior to approving the payment of an invoice, the COTR performed a cursory review of billed amounts and proceeded to authorize payment. The summary invoices that the contractor provided itemized the charges according to expense categories, but not by site or unit address. In addition, labor charges were billed at hourly rates but were not identified to the sites where the services were rendered.

**SHAW**

- **Inspection and Acceptance of Goods and Services** - We calculated questioned costs of $2,154,695 for invoice #140588 for transactions that were not properly supported. When reviewing supporting documentation, we were unable to determine the breakdown of costs for temporary housing units or verify the number of units billed to FEMA.

*Williams, Adley & Company, LLP*

# Appendix 4 – Results of Trailer Site Location Review

| Contractor | Type of Temporary Housing Site | Total Units issued per FEMA | Units per FEMA records selected for verification | Units counted by auditors | Net difference between FEMA records and counts / Variance % | Explanation of Discrepancies |
|---|---|---|---|---|---|---|
| Fluor | Commercial, Group & Private | 25,186 | 1,811 | 1,698 | 113 | 134 units were not at the addresses FEMA provided. 21 units were at the sites visited but were not recorded in FRRATS for those sites. The net difference is 113 units. |
| | | | | | 6.2% | FEMA contends that the differences were caused by replacement units at the private sites, delayed installation of units while awaiting permits, and unfinished site construction and changes in the design that changed the number of units the site would accommodate. FEMA's records were not updated timely, which accounted for differences between FEMA records and the auditors' physical verifications. |
| Shaw | Commercial, Group & Private | 15,123 | 2,339 | 2,194 | 145 | 317 units were in FEMA's system but were not at the addresses FEMA provided. 172 units were at the sites visited but were not recorded in FRRATS for those sites. The net difference is 145 units. |
| | | | | | 6.2% | FEMA suggests possible causes could be: deactivated units or replacement units not properly recorded in FRRATS; number of units in system based on projected number and not actual installed number; a change in the number of units for the site that was not timely recorded in the system. |
| Bechtel | Commercial, Group, & Private | 5,091 | 108 | 846 | 738 | 2 units were in FEMA's system but were not at the addresses FEMA provided. 740 units were at the sites visited but were not recorded in FRRATS for those sites. The net difference is 738 units. |
| | | | | | 683.3% | FEMA stated that the recorded amounts were estimates and may not have been updated to include actual units installed. Also, for two private site units, a possible cause could have been deactivated or replacement units not properly recorded in FRRATS. The auditors also could not confirm that 26 units were FEMA units, based on the barcode and VIN information. |
| CH2M Hill | Commercial, Group, & Private | 3,589 | 263 | 468 | 205 | 14 units were in FEMA's system but were not at the addresses FEMA provided. 219 units were at the sites visited but were not recorded in FRRATS for those sites. The net difference is 205 units. |
| | | | | | 77.9% | Originally, 14 units were in FEMA's system but were not at the addresses FEMA provided. 423 units were at the sites visited but were not recorded in FRRATS for those sites. The net difference was 409 units. 249 of the 423 units were reverified with FEMA. 204 of those units were verified without exception with updated FEMA information. The remaining 45 units included 24 units that FEMA listed as deactivated, 15 units that could not be verified, and 6 units with a different address. |

Source: WA&Co analysis

Hurricane Katrina Temporary Housing Technical Assistance Contracts

*Williams, Adley & Company, LLP*

# Appendix 5 – Report Distribution

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy Chief of Staff
General Counsel
Executive Secretary
Under Secretary for Management
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Chief Procurement Officer
Director, DHS GAO/OIG Liaison Office
Chief Privacy Officer
FEMA Deputy Administrator
FEMA GAO/OIG Audit Liaison
FEMA Director of Management and Chief Acquisition Officer
FEMA Chief Procurement Officer

### Office of Management and Budget

Chief, Homeland Security Branch
DHS OIG Budget Examiner

### Congress

Congressional Oversight and Appropriations Committees, as appropriate



### Additional Information and Copies

To obtain additional copies of this report, call the Office of Inspector General (OIG) at (202) 254-4199, fax your request to (202) 254-4305, or visit the OIG web site at www.dhs.gov/oig.

### OIG Hotline

To report alleged fraud, waste, abuse or mismanagement, or any other kind of criminal or noncriminal misconduct relative to department programs or operations:

- Call our Hotline at 1-800-323-8603;
- Fax the complaint directly to us at (202) 254-4292;
- Email us at DHSOIGHOTLINE@dhs.gov; or
- Write to us at:
    DHS Office of Inspector General/MAIL STOP 2600,
     Attention:  Office of Investigations - Hotline,
    245 Murray Drive, SW, Building 410
    Washington, DC 20528.

The OIG seeks to protect the identity of each writer and caller.

