UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
|       FORMALDEHYDE PRODUCTS | * | |
|       LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |
| THIS DOCUMENT IS RELATED TO | * | |
| | * | |
| *Charlie Age, et al v. Gulf Stream Coach* | * | |
| *Inc., et al*, Docket No. 09-2892; | * | |
| Alana Alexander, individually and on behalf | * | |
|  Of Christopher Cooper | * | |

**PLAINTIFF'S RESPONSE TO DEFENDANT GULF STREAM COACH, INC.'S
MOTION *IN LIMINE* TO EXCLUDE
<u>EXPERT TESTIMONY OF JAMES P. KORNBERG., M.D., SC.D.</u>**

Plaintiff, Alana Alexander, individually and on behalf of Christopher Cooper, files this response to Defendant Gulf Stream Coach, Inc.'s Motion *in Limine* to Exclude Expert Testimony of James P. Kornberg, M.D., SC.D (Doc. No. 2769).

**I.
<u>EXHIBITS</u>**

Exhibit A.        CV of Dr. Kornberg

Exhibit B.        Affidavit of James P. Kornberg, M.D., Sc.D.

Exhibit C.        Excerpts from the deposition of James P. Kornberg, M.D., Sc.D.

1

## II.
## BACKGROUND

James P. Kornberg, M.D., Sc.D., is an expert in occupational medicine and environmental science. *See* Exhibit A., p. 4. He originally studied engineering, obtaining a masters degree in aeronautical engineering from MIT, and a Sc.D. in environmental health science and engineering from Harvard prior to attending medical school. *See* Exhibit A., p. 1. He is a licensed physician, board certified in occupational medicine by the American Board of Preventive Medicine, and is a diplomat of the National Board of Medical Examiners and a Fellow of the American Academy of Preventative Medicine. *See* Exhibit A., p. 4. He has written a series of books on occupational medicine and has published numerous articles on medical causality related to chemical exposure. *See* Exhibit A, pp. 9-12.

For this litigation, Dr. Kornberg performed comprehensive environmental medical causation analysis. This kind of analysis goes far beyond the scope of a medical diagnosis, and is necessary to identify the underlying etiology of a diagnosed disease. His analysis included a review of the testing results on the FEMA trailers and the toxicology of formaldehyde. Using his background in both engineering and medicine, Dr. Kornberg then reviewed Christopher's social history, his environmental history, and most importantly, his medical history. When necessary, he consulted with Christopher's treating pediatrician, and eventually referred Christopher to the National Jewish Hospital in Denver for testing by a pulmonologist. His was then able to identify the etiology of Christopher's asthmatic exacerbation, and prescribe an appropriate medical monitoring protocol for not only his asthma, but also an increased risk of nasopharyngeal cancer.

Dr. Kornberg's methodology was scientifically stringent. His background materials and sources were all medically, scientifically, and technologically reliable. Dr. Kornberg's opinions, therefore, are admissible in their entirety.

## III.
## ARGUMENT AND AUTHORITIES

1. <u>The standard for admission of expert testimony is a liberal one.</u>

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise." F.R.C.P. 702. Expert testimony need only be based on a reliable and scientifically valid methodology that fits the facts of a case. *See* <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 592-93 (1993). The inquiry into the expert's testimony must be flexible. *See* <u>Id.</u> at 594 & n. 12. The factors listed by *Daubert* and its progeny serve as useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted. <u>Heller v. Shaw</u>, 167 F.3d 146, 152 (3d Cir. 1999). The court's role as gatekeeper, however, should not replace the adversary system. <u>Pipitone v. Biomatrix, Inc.</u>, 288 F.3d 239, 250 (5th Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert</u>, 509 U.S. at 595.

2. <u>Dr. Kornberg's testimony on general causation should be admitted because it was reliably grounded in science.</u>

*Daubert* requires expert testimony to be reliably grounded in science. <u>Daubert</u>, 509 U.S. at 592-93. Because Dr. Kornberg's opinions as to general causation were demonstrably and

3

coherently based on the medical and scientific literature relating to formaldehyde, his testimony should be admitted. *See* Id.

  a. *Dr. Kornberg's basic general causation opinions are uncontested.*

General causation examines whether a substance is capable of causing a particular injury in the general population. Knight v. Kirby Inland Marine Inc.**,** 482 F.3d 347, 351-52 (5th Cir. 2007). Dr. Kornberg's opinions as to general causation are as follows:

(1) "[F]ollowing sufficient exposure, formaldehyde is a chemical that will aggravate pre-existing asthma in humans and children, in particular; and

(2) "[A]ggravation of pediatric asthma is a foreseeable and probable outcome in some children who have been exposed to formaldehyde."

*See* Exhibit B, p. 19. His opinions are based on references that included (1) the report of Dr. McGwin, an epidemiologist, entitled "Formaldehyde Exposure and Asthma in Children, A Systematic Review," (2) a literature review by Dr. Stephen King, a toxicologist, (3) the ATSDR's Toxicology Profile for Formaldehyde, (4) the CDC's Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models and Mobil Homes, and (5) Dr. Scott Needle's testimony on behalf of the American Academy of Pediatrics to the Committee on Oversight and Government Reform. *See* Exhibit B, p. 19. Dr. Kornberg's foundation materials far exceed what the Fifth Circuit has described as "generous support for his general causation theory," and was held to be sufficient for admissibility. *See* Curtis v. M&S Petroleum, Inc., 174 F.3d 661, 669, 670 (5th Cir. 1999). Significantly, Defendant raises no criticism of Dr. Kornberg's references, his reasoning from the references, or these two opinions. Since reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid," Defendant has provided no evidence that Dr. Kornberg's basic general

causation opinions are not reliable. *See* Daubert, 509 U.S. at 592-93.  Dr. Kornberg's basic general causation opinions should therefore be admitted. *See* Id.

    b. *Dr. Kornberg's opinions as to the general causation relating to a new asthmatic illness are reliably based on an acceptable scientific basis.*

Defendant attacks Dr. Kornberg's opinion that formaldehyde exposure can change the natural history of the underlying condition [asthma] on a permanent basis.  Defendant's sole argument is that no single study actually states Dr. Kornberg's conclusion. *See* Defendant's Memo, p. 6.  It is well-settled that published studies unequivocally supporting an expert's opinions are not mandatory and are not necessarily fatal to general causation. Knight**,** 482 F.3d at 354; *see also* Clausen v. M/V New Carissa, 339 F.3d 1049 (9th Cir. 2003) (finding for plaintiff and explaining that general causation evidence can still be reliable even if there are no epidemiological studies); Kudabeck v. Kroger Co., 338 F.3d 856, 862 (8th Cir. 2003) (Admitting plaintiff's expert's testimony and explaining that "there is no requirement 'that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness'"); Rider v. Sandoz Pharms. Corp., 295 F.3d 1194, 1198 (11th Cir. 2002) (noting that "while epidemiological studies may be powerful evidence of causation, the lack thereof is not fatal to a plaintiff's case"); Bonner v. ISP Tech., Inc., 259 F.3d 924, 929 (8th Cir. 2001) (finding that there is no requirement for supporting published epidemiological studies before an expert's opinion can be admitted); Heller, 167 F.3d at 155 ("we do not believe that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness").  Lack of textual support goes to the weight, not the admissibility of the expert's testimony. Knight**,** 482 F.3d at 354.

Dr. Kornberg looked to the "overall weight of the [scientific] evidence" in developing his opinion that formaldehyde exposure can create a new asthmatic illness. *See* Exhibit A, p. 19. His opinions originated from his review and interpretation of numerous published and peer-reviewed scientific studies, some of which were attached as exhibits to his deposition. *See* Exhibit C, pp. 4, 129-30, 164-65. He explained the details of the studies, acknowledging that none actually concluded that formaldehyde causes asthma, but many showed a relationship between formaldehyde and exacerbation of asthma. *See* Exhibit C. pp. 110-11, 256. He also found the studies valuable as insight into the mechanism by which formaldehyde manifests changes at the cellular level. *See* Exhibit C, pp. 106-11, 116. The studies on which he relied utilized surrogates for formaldehyde exposure, such as the existence of the by-products of formaldehyde metabolism; and for the development of asthma, such as histophatholigic changes, epithelial damage, and decreases in peak expiratory flow rate. *See* Exhibit C, pp. 106-11, 116. Some of the studies exhibited a dose response. *See* Exhibit C, p. 137. All of the studies were of the type normally relied on by environmental scientists. Dr. Kornberg's foundational materials were thus reliable. *See* Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3rd Cir. 2002) (Experts may rely on facts of the type normally relied on by experts in their field.)

Reasoning from the studies and from his clinical evaluation of Christopher, Dr. Kornberg distinguished two separate conditions or illnesses: (1) Christopher's pre-existing asthma, and (2) the injury caused by formaldehyde exposure. *See* Exhibit C, pp. 275-76, 279-280. The fact that both manifest similar, if not identical symptoms, understandably leads clinicians to diagnose the second condition as an exacerbation of the first. Dr. Kornberg, however, points out that the second condition would not have occurred in the absence of formaldehyde exposure. *See* Exhibit C, pp. 275-76, 279-280.

Before moving into the trailer, Christopher's asthma followed the natural and expected course of improving as he got older. *See* Exhibit C, pp. 64-65, 185-86. He had not required hospitalization since late 2001. *See* Exhibit B., p. 8. While living in the trailer, however, his symptoms increased, and he needed to use his medications more often. *See* Exhibit B, p. 11, fn. 21. Finally, on December 4, 2007, his symptoms were so severe that his pediatrician referred him to the Children's Hospital emergency room *See* Exhibit B, p. 11. Although his diagnosis was asthma exacerbation, the December, 2007, hospitalization was not consistent with the natural and expected course of Christopher's asthma. *See* Exhibit B, p. 11, Exhibit C, pp. 65, 185-186. The only explanation for Christopher's 2007 decompensation was his chronic exposure to formaldehyde. *See* Exhibit B, p. 11, Exhibit C, pp. 65, 185-186.

Distinguishing the 2007 attack from Christopher's usual asthma symptoms, Dr. Kornberg explained that the formaldehyde-induced symptoms were a "new disease." The symptoms of both asthma and the new disease are similar in kind, although different in severity; but the etiology is clearly different. *See* Exhibit C. pp. 62-67, 274-75. Dr. Kornberg's explanation flows rationally from the scientific evidence with no analytical gaps. Since his methodology is valid and his reasoning is logical, the fact that his conclusion differed from the ER diagnosis does not justify excluding his testimony. *See* General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); In re Paoli R.R. Yard Litigation, 35 F.3d 717, 746, n. 15 (3d Cir. 1994), cert. denied, 513 U.S. 1190 (1995).

1. <u>Dr. Kornberg's testimony on specific causation should be admitted because his methodology was reliable.</u>

Despite its acknowledgment that a differential diagnosis is an entirely different methodology than that used to determine the external cause of a particular disease, Defendant

7

fails to differentiate between the two methodologies as applied to this case. Dr. Kornberg's task was to determine external causation, not to merely perform a differential diagnosis. Christopher Cooper's diagnosis of asthma is undisputed. It is also undisputed that his asthma had been improving before he moved into the FEMA trailer, and that he suffered a serious decompensation, an acute episode requiring hospitalization, during his 19-month sojourn in the trailer. It was Dr. Kornberg's task to examine this last decompensation, determine if it was merely an expected manifestation of his pre-existing asthma, and if not, to determine its cause. As discussed by Defendant, a clinical differential diagnosis cannot do this. Because he accomplished his task by using the appropriate methodology of an environmental health care scientist, Dr. Kornberg's opinions are reliable. *See* Stecyk, 295 F.3d at 414.

    *a.*    *Dr. Kornberg's opinions are reliable without a physical examination of Christopher Cooper.*

An evaluation of the plaintiff's medical records by a qualified physician is a reliable substitute for a physical examination. In re Paoli R.R. Yard Litigation, 35 F.3d 717, 762 (3d Cir. 1994), cert. denied, 513 U.S. 1190 (1995). The reports and statements of other doctors or medical personnel are also a reliable basis for an expert's opinion. Christophertophersen v. Allied-Signal Corp.,939 F.2d 1106, 1111 (5th Cir. 1991) *overruled on other grounds.* Because he relied on medical records and the reports of Christopher' doctors, Dr. Kornberg's opinions are reliable even absent a physical exam. *See* Id.

Dr. Kornberg's assignment was to provide a comprehensive environmental medical causation analysis relating to Christopher Cooper. *See* Exhibit B, p. 2. A clinical diagnosis is one component of his analysis. Rather than examining Christopher himself, he relied on the medical records from Dr. Janet Barnes, Christopher's treating pediatrician. *See* Exhibit B, pp. 8-

8

15. When he required clarification, he consulted with her as necessary. *See* Exhibit C, p. 248. For testing outside Dr. Barnes's expertise, he referred Christopher to the National Jewish Hospital in Denver, where Dr. Pacheco examined and tested him. *See* Exhibit B, pp. 12-13, 15; Exhibit C, p. 24. Defendants do not question the validity the differential diagnosis performed by either Dr. Barnes or Dr. Pacheco. As a physician himself, Dr. Kornberg is certainly capable of understanding the medical records and diagnoses of other physicians. S*ee* Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000). (The court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area.) No reason exists to question his opinions for doing just that. In re Paoli R.R. Yard Litigation, 35 F.3d at 762.

      b. *Dr Kornberg's opinion concerning specific causation should be admitted because his methodology was reliable.*

The reliability of expert testimony is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid. Knight, 482 F.3d at 352. Dr. Kornberg's specific causation analysis is based on both scientifically valid reasoning and methodology. Dr. Kornberg's opinions are therefore admissible. *See* Id.

Dr. Kornberg's opinions on specific causation, or his "differential etiology," as Defendant refers to it, are entirely reliable. His methodology fully complies with *Daubert* and its progeny. His diagnosis of pre-existing asthma is based on the reliable foundation of the records and testimony of two licensed physicians. *See* Stecyk , 295 F.3d at 414. (Experts may rely on facts of the type normally relied on by experts in their filed.) He conducted a thorough medical history, social history, and environmental history using such reliable sources as medical records and interviews with knowledgeable persons. *See* Exhibit B, p. 21. He reviewed the scientific

9

literature on formaldehyde, including such reliable sources as published studies, ATSDR, and the CDC. *See* Exhibit B, p. 21. He was able to estimate the exposure levels to which Christopher was exposed by reviewing the results from the wealth of formaldehyde testing done on the FEMA trailers and comparing them to agency exposure levels. *See* Exhibit B., p. 20. He ruled out potential confounders, such as mold allergy, allergy to pets, and continuing chronic exposure to irritants. *See* Exhibit B, p. 22. He noted Christopher's significant medical findings of a positive methacholine challenge test and his demonstration of vocal cord dysfunction following provocation with methacholine almost a year and a half after he had moved out of his trailer. *See* Exhibit B, p. 22. From this fact and his clinical experience with workers exposed to formaldehyde, Dr. Kornberg concluded that Christopher's "new disease" was permanent. *See* Exhibit B, p. 22. This conclusion was supported Christopher's pediatrician's statement that "the exposure to the formaldehyde in the FEMA trailer, within a reasonable medical probability, will cause permanent epithelial damage, with subsequent acute exacerbations of asthma, recurrent rhino-sinusitis, and chronic atopic dermatitis for the rest of his life." *See* Exhibit B, p. 22. Dr. Kornberg's opinions thus exhibit the requisite scientific validity to support admissibility. *See* Knight, 482 F.3d at 352.

      c. *Moore v. Ashland supports the admissibility of Dr. Kornberg's specific causation opinions.*

Defendant looks to *Moore v. Ashland Chemical Inc.* to support its position that Dr. Kornberg's opinions are unreliable. *Moore,* however, compels the very opposite conclusion. *See* 151 F.3d 269 (5th Cir., 1998).

    Dr. Kornberg's testimony exhibited each factor the *Moore* Court found to be lacking in the testimony of the expert who was ultimately excluded. Dr. Jenkins, the

causation expert in *Moore*, relied only on an MSDS, the close temporal relation between exposure and symptoms, one case study, his training and expertise, and his examination and test results. Id. at 273. Dr. Kornberg, on the other hand, relied on numerous published scientific studies, voluminous medical records, a wealth of formaldehyde testing results, determinations of risk levels from multiple governmental and scientific agencies, interviews with Christopher's mother and pediatrician, the toxicological profile for formaldehyde, and his training and clinical experience. *See supra.* Unlike Dr. Jenkins, who in *Moore* had offered no scientific support for general causation, Dr. Kornberg reliably based his general causation opinions on his extensive review of the scientific literature. *See* Id. at 278; s*ee supra.* In contrast to Dr. Jenkins's total lack of accurate information as to exposure in *Moore*, Dr. Kornberg based his exposure estimates on actual formaldehyde test results of the FEMA trailers. *See* Id. at 278; s*ee supra.* Dr. Jenkins presented no plausible biological mechanism by which the contaminant could cause the disease at issue in *Moore*; Dr. Kornberg gave numerous examples of the mechanism of cellular damage. *See* Id. at 278-79; *see supra.* Where Dr. Jenkins failed to eliminate other potential causes, Dr. Kornberg dealt with the issue effectively. *See* Id. at 279; *see supra.* The abundance of differences between the testimony of Dr. Jenkins in *Moore* and that of Dr. Kornberg, all in Dr. Kornberg's favor, can only support the admissibility of Dr. Kornberg's testimony. *See* Id.

> d. *Defendant's allegation that Dr. Kornberg failed to identify precise exposure levels is incorrect.*

Defendant objects to Dr. Kornberg's lack of specific formaldehyde levels. Precise levels of exposure, however, are not required for a specific causation analysis. Curtis, 174 F.3d at 671. Further, circumstantial evidence is acceptable to prove exposure levels. *See* Id.

Dr. Kornberg determined that Christopher was exposed to formaldehyde on a chronic basis to levels between 50 and 100 ppb; and for short periods, experienced levels up to 200-300 ppb. *See* Exhibit B, p. 20. Dr. Kornberg arrived at these exposure levels by examining the entire database of actual formaldehyde test results augmented by graphical depictions. *See* Exhibit B, p. 20. As an engineer, he is particularly qualified to evaluate such data. Defendant has failed to validly challenge either the reliability of the data set or of Dr. Kornberg's evaluation of it.

On the issue of the level at which formaldehyde can cause the changes Christopher manifested, Dr. Kornberg's clinical experience came into play. From his evaluation of over two hundred patients exposed to various levels of formaldehyde, he estimated that virtually all persons will react acutely to the irritant effects of formaldehyde at 3 ppm. *See* Exhibit B, p. 24, FN 65. He has, however, recognized considerable individual susceptibility to the exposure, noting that children are much more susceptible to formaldehyde than are adults. *See* Exhibit B, p. 24; Exhibit C. pp. 175, 256.

Dr. Kornberg's opinions as to the minimum formaldehyde levels necessary to show health effects are consistent with the levels found in the scientific literature. A 1990 study entitled *Chronic Respiratory Effects of Indoor Formaldehyde Exposure* by Michal Krzynowski found that children with asthma have shown significantly greater prevalence rates of asthma where formaldehyde levels were between 60 and 100 ppb. *See* Exhibit C. p. 116. Additionally,

12

the study concluded that decreases in peak expiratory flow rates, a very significant finding, was attributable to a 60 ppb formaldehyde level. *See* Exhibit C. p. 117. Another peer reviewed study, authored by Rumchev, showed a dose response between increasing exposure to formaldehyde and increasing risk of asthma. *See* Exhibit C, pp. 133, 137. The Rumchev study found that every 8 ppb increase in formaldehyde level resulted in an increased risk of asthma of 3 percent. *See* Exhibit C, pp. 139. Additionally, Dr. Kornberg relied on the affidavit of Patricia Williams, Ph.D., which concluded that a cause-and-effect relationship existed between formaldehyde exposure and upper respiratory cancer, which would include nasopharyngeal cancer[1]. *See* Exhibit B, p. 18, Affidavit of Patricia Williams, Ph.D. at p. 35.

Dr. Kornberg thus not only provided formaldehyde exposure levels to which Christopher was exposed, but also demonstrated that his exposure level was within the parameters that can cause exacerbation of asthma symptoms. Dr. Kornberg thus carried his burden of proving the exposure levels necessary for specific causation. *See* O'Neill v. Seariver Maritime, Inc., 246 Fed.Appx. 278, 280 (5th Cir. 2007); Curtis, 174 F.3d at 670) ("We recognize that scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case.")

---

[1] Patricia Williams's affidavit referenced two studies that established an association of nasopharyngeal cancer at very low levels. Shaham, J., (et al), *DNA-protein crosslinks and p53 protein expression in relation to occupation exposure to formaldehyde*, 60(b) OCCUP. ENVIRON. MED. 403-09 (2003) noted the association to nasopharyngeal cancer at concentrations of 40 ppb.; Vaughn, TL., (et al), *Occupational exposure to formaldehyde and wood dust and nasopharyngeal carcinoma*, INT. J. CANCER 38 677-83 (1986), noted the association to nasopharyngeal cancer at concentrations of 65 ppb.

2. <u>Dr. Kornberg's prescription of medical monitoring should be admitted because it is based on a reliable foundation.</u>

Based on his medical evaluation, Dr. Kornberg prescribed a medical monitoring protocol to address Christopher's asthmatic conditions. *See* Exhibit B, p. 27.  Dr. Kornberg calculated that Christopher was at a seventeen times greater risk of developing nasopharyngeal cancer because of his exposure to formaldehyde. *See* Exhibit B, p. 27.  In Dr. Konrberg's medical judgment, the degree of Christopher's increased risk warranted including a visual cancer screening of Christopher's nose and throat in the protocol. *See* Exhibit B, p. 26-27; Exhibit C, pp. 201, 209-10, 257-58, 263.   Because of his qualifications and the intellectual rigor with which he approached the issue, there is no reason to question the reliability of his prescription. *See* Pipitone, 288 F.3d at 246 (5th Cir. 2002.) (Acknowledging the reliability of a physician's testimony); <u>Skidmore v. Precision Printing and Pkg., Inc.,</u> 188 F.3d 606, 617 (5th Cir. 1999) (Finding no abuse of discretion in admitting the testimony of a physician where he had employed the same level of intellectual rigor that characterized his practice of medicine.)

Dr. Kornberg designed a medical monitoring protocol that addresses specifically Christopher Cooper's individual exposure and resulting medical conditions. *See* Exhibit , pp. 201, 209-10.  The monitoring would first address Christopher's asthma-related conditions, for which Dr. Kornberg prescribed semi-annual exams by Christopher's primary care physician. *See* Exhibit B, p. 27; Exhibit C, pp. 257-58.  An exam by a specialist would follow only if, in the primary physician's medical judgment, it was indicated. *See* Exhibit B, p. 27.  In conjunction with the semi-annual exam, the primary care physician would also conduct a visual cancer screening of Christopher's throat and nasal cavity. *See* Exhibit C, p. 263.  Again, Christopher would only be sent to a specialist if necessary. *See* Exhibit C, p. 263.  The use of appropriate

14

diagnostic tests, such as MRI's, CT's, and biopsies would be ordered only at the discretion of the specialist and only when indicated. *See* Exhibit B, p. 27. Contrary to Defendant's argument, radiographic studies would only be ordered on an as-needed basis. Defendant has presented no valid reason for negating Dr. Kornberg's clinical judgment concerning the proposed medical monitoring program. *See* Id.

3. Dr. Kornberg's use of risk assessment is appropriate.

Dr. Kornberg used the EPA's modeling for Residential Air Screening Levels to calculate that Christopher's risk of developing nasopharyngeal cancer was increased seventeen times the accepted level by his exposure to formaldehyde in his FEMA trailer. *See* Exhibit B, p. 27. It is Dr. Kornberg's clinical opinion that the magnitude of this increased risk warrants medical monitoring. *See* Exhibit B, p. 27.

The risk assessments from scientific and medical agencies can be useful tools in demonstrating causation. *See* Curtis 174 F.3d at 669 (Admitted evidence of a NIOSH standard in proving general causation.) In medical monitoring cases, they are particularly useful.

"Medical monitoring is one of a growing number of non-traditional torts that have developed in the common law to compensate plaintiffs who have been exposed to various toxic substances" In re Paoli R.R. Yard Litigation, 35 F.3d at 849. The *Manual on Scientific Evidence* instructs that medical monitoring requires testimony on the patient's risk of future disease, rather than on the actual "but-for" cause. *See* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, p. 445 (2nd ed. Federal Judicial Center (2000). Defendant's argument against risk assessment fails because the case cited in support of its argument, *Allen v. Pennsylvania Eng'g Corp.,* dealt with a causation analysis in a traditional tort case, not one for medical monitoring.

15

*See* 102 F.3d 194 (5th Cir. 1996). Defendant's motion in liminie should therefore be denied in relation to Dr. Kornberg's risk analysis. *See* Id.

## IV.
## CONCLUSION

As both a physician and an environmental scientist, Dr. Kornberg is particularly qualified to perform a causation analysis in this case. The source materials forming the foundation of his opinions are all of the type used by physicians and environmental scientists, and included medical records; published, peer-reviewed scientific studies; interviews; consults with treating physicians; and actual test results of the formaldehyde levels in the FEMA trailers. His reasoning was rational, comprehendible, and contained no analytical gaps. As a physician, he was able to prescribe an appropriate medical monitoring program for Christopher Cooper. No reason exists to question the reliability of his opinions.

## V.
## PRAYER

For the reasons stated in this Response, Plaintiff respectfully requests that the Court deny Defendant's Motion *in limine*.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION**

BY:  s/Gerald E. Meunier
GERALD E. MEUNIER, #9471
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163

Telephone: 504/522-2304
Facsimile: 504/528-9973
gmeunier@gainsben.com

s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: 504/522-2304
Facsimile: 504/528-9973
jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS' STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
MIKAL WATTS, Texas # 20981820
ROBERT BECNEL
DENNIS REICH, Texas # 16739600

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

s/Gerald E. Meunier
GERALD E. MEUNIER, #9471