Dr. James Phillip Kornberg
July 9, 2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER   *  MDL NO. 1873
   FORMALDEHYDE   *
   PRODUCTS LIABILITY *  SECTION: N(5)
   LITIGATION    *
          *
Charlie Age, et al., v.  *
Gulf Stream Coach Inc, et al. *
Docket No. 09-2892   *

VIDEOTAPE ORAL DEPOSITION OF
JAMES PHILIP KORNBERG, M.D., Sc.D.
July 9, 2009


   VIDEOTAPE ORAL DEPOSITION OF JAMES PHILIP
KORNBERG, M.D., Sc.D., produced as a witness at the
instance of Gulf Stream Coach, Inc., and duly sworn, was
taken in the above-styled and numbered cause on the 9th
of July, 2009, from 9:40 a.m. to 5:55 p.m., before Carla
D. Capritta, RPR, in and for the State of Colorado,
reported by machine shorthand, at the conference room of
Fairfield Inn Denver Airport, 6851 Tower Road, Denver,
Colorado 80249, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

# Dr. James Phillip Kornberg
## July 9, 2009

---

Page 2

1
2    A P P E A R A N C E S
     FOR GULF STREAM COACH, INC.:
3        ANDREW D. WEINSTOCK, ESQ.
         Duplass Zwain Bourgeois Pfister & Weinstock
         3838 N. Causeway Boulevard
         29th Floor
         Metairie, Louisiana 70002
5
     FOR FLUOR ENTERPRISES, INC.:
6        RICHARD A. SHERBURNE, JR., ESQ.
         Middleberg Riddle & Gianna
7        450 Laurel Street
         Suite 1101
8        Baton Rouge, Louisiana 70801
9    FOR U.S. DEPARTMENT OF JUSTICE:
         ADAM M. DINNELL, ESQ.
10       Environmental Torts Section
         Ben Franklin Station
11       P.O. Box 340
         Washington, D.C. 20044
12
13   FOR FLEETWOOD ENTERPRISES:
         RICHARD K. HINES, V, ESQ.
14       Nelson Mullins Riley & Scarborough, L.L.P.
         201 17th Street NW
15       Suite 1700
         Atlanta, Georgia 30363
16
     FOR RECREATION BY DESIGN, LLC; TL INDUSTRIES, INC.;
17   FRONTIER RV, INC.; and PLAY'MOR TRAILERS, INC.:
         KELLY M. MORTON, ESQ.
18       Garrison, Yount, Forte & Mulcahy, L.L.C.
         909 Poydras Street
19       Suite 1800
         New Orleans, LA 70112
20       (Appearing Telephonically)
21   FOR COACHMEN ENTITIES:
         JOHN STEWART THARP, ESQ.
22       Taylor Porter, Attorneys at Law
         8th Floor - Chase Tower South
23       451 Florida Street
         Baton Rouge, LA 70801
24       (Appearing Telephonically)
25

---

Page 3

1
2    A P P E A R A N C E S (Continued)
     FOR BECHTEL NATIONAL, INC.:
3        A.J. KROUSE, ESQ.
         Frilot L.L.C.
4        1100 Poydras Street
         3700 Energy Centre
5        New Orleans, Louisiana 70163
         (Appearing Telephonically)
6    FOR CH2M HILL CONSTRUCTORS, INC.:
         WADE M. BASS, ESQ.
7        Baker, Donelson, Bearman, Caldwell &
         Berkowitz, P.C.
8        3 Sanctuary Blvd,
         Suite 201
9        Mandeville, Louisiana 70471
         (Appearing Telephonically)
10
     FOR DESTINY INDUSTRIES, LLC; LEXINGTON HOMES, LLC; and
11   TOWNHOMES, LLC:
         JOSHUA G. KELLER, ESQ.
12       755 Magazine St.
         New Orleans, LA 70130
13       (Appearing Telephonically)
14
15   FOR PLAINTIFFS:
         CHRIS PINEDO, ESQ.
16       4550 Jericho
         Corpus Christi, Texas 78413
17
18
19   ALSO PRESENT:
20       Paula Wolff, Videographer
21
22
23
24
25

---

Page 4

1                    INDEX
2    Appearances.................................... 2, 3
3    Stipulations..................................... 285
4
5    JAMES PHILIP KORNBERG, M.D., Sc.D.
         Examination by Mr. Weinstock..........7, 217, 281
6        Examination by Mr. Dinnell............. 187, 217
         Examination by Mr. Pinedo................239,283
7
8    Signature and Changes........................ 285
9    Reporter's Certificate........................... 286
10
11
12               EXHIBITS
     NO.        DESCRIPTION        PAGE
13   1  Environmental Medical Causation Report........... 73
14   2  Study: "Raised Exhaled Nitric Oxide in
         Healthy Children Is Associated with Domestic
15       Formaldehyde Levels".......................... 115
16   3  Study: "Domestic exposure to formaldehyde
         significantly increases the risk of asthma in
17       young children".............................. 139
18   4  Study: "Incidence of asthma diagnosis and
         self-reported allergy in relation to the school
19       environment - a four-year follow-up study in
         schoolchildren".............................. 140
20
     5  Study: "Airway Response to Formaldehyde Inhalation
21       in Asthmatic Subjects With Suspected Respiratory
         Formaldehyde Sensitization".................... 168
22
     6  Study: "Bronchial Challenge With Formaldehyde
23       Gas: Lack of Bronchoconstriction in 14 Patients
         Suspected of Having Formaldehyde-Induced Asthma"
24       Asthma"...................................... 176
25

---

Page 5

1               EXHIBITS
2    NO.        DESCRIPTION        PAGE
3    7  Study: Formaldehyde asthma - Rare or
         overlooked?".................................. 178
4
     8  Study: "Effects of Formaldehyde on the Mucous
5        Membranes and Lungs".......................... 178
6    9  Second Amended Notice Of Video-Taped
         Deposition................................... 184
7
8
     10 FEMA report.................................... 187
9
     11 Curriculum Vitae............................... 188
10
     12 Regional Screening Level (RSL) Table Master...... 223
10       April 2009
11   13 Risk-Based Concentration Table.................. 236
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Stratos Legal Services
800-971-1127

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

# Dr. James Phillip Kornberg
## July 9, 2009

**Page 22**

1  time I had -- we had a physician -- when I say "we," I
2  mean our group -- had a physician who was actually part
3  of a contractual agreement with the plant, and we took
4  care of all kinds of problems: Orthopedic problems,
5  carpal tunnel. There were infectious issues that were
6  of concern. And, of course, the sanitation of the
7  animal beds was -- was one thing that came up, because
8  there were individuals who developed rashes and -- and
9  they had some obstructive lung problems, some asthmatic
10  effects because of the concentrations of the
11  formaldehyde that were -- or glutaraldehyde, in that
12  case, that were being used.
13      Q.  How were you -- how'd you first get involved
14  in this case?
15      A.  I was asked, in the beginning of May, to -- or
16  actually it was -- no, forgive me, that -- that's not
17  correct. I -- I began discussing this case with several
18  attorneys, Dennis Reich in particular, and Mr. DiMicco's
19  firm, probably in January and February.
20      And we simply discussed the matter in general
21  detail, and I provided advice to them on the matter of
22  formaldehyde, and in particular some basic understanding
23  of -- of mobile homes and -- and the ventilation issues
24  and all sorts of things that are relevant to this case.
25      And that began at the beginning of this year,

**Page 23**

1  actually. But active involvement started towards the
2  end of April and the beginning of May.
3      Q.  I'm aware you -- you interviewed Alana
4  Alexander and Chris Cooper. Is that correct?
5      A.  Yes, sir, that's right.
6      Q.  You reviewed their medical -- or his medical
7  records, Chris Cooper's medical records?
8      A.  Yes, I did.
9      Q.  There's a list of expert reports and -- well,
10  let's start with that. There's a list of expert
11  reports, from other experts in this case, that you
12  reviewed, correct?
13      A.  Yes.
14      Q.  I've noticed all the ones you listed were
15  reports of the -- of the other plaintiff experts. Have
16  you reviewed any defense expert reports?
17      A.  Not yet.
18      Q.  What else did you do prior to formulating your
19  opinions?
20      A.  I -- outside of what -- what's listed here
21  and -- and my reliance information?
22      Q.  We can go through what's listed here. If that
23  makes it easier, that's fine.
24      A.  Actually, I'd be happy to go through each one.
25  These were all listed, I believe, in -- beginning on

**Page 24**

1  Page 18 of my report. And there actually were -- there
2  should be a couple of additions to that.
3      Q.  Okay. Let me -- let me -- let me back up.
4      A.  Okay.
5      Q.  That's what you reviewed, correct, Page 18 and
6  some more things?
7      A.  A few things, yes.
8      Q.  Some more publications?
9      A.  Yes.
10      Q.  Okay.
11      MR. PINEDO:  I believe it carries on to 19.
12      MR. WEINSTOCK:  Yes, yeah, I'm just --
13      THE DEPONENT:  And 19, correct.
14      Q.  (By Mr. Weinstock)  Other than reviewing those
15  reports, those publications, the medical records, and
16  the interview, what else did you do or consult prior to
17  formulating your opinions?
18      A.  I -- I think it's all included there.
19      Q.  Did you physically examine Christopher Cooper?
20      A.  No. I -- I requested that he be evaluated at
21  National Jewish. I could have certainly examined him,
22  but the decision was made, I think, that they had
23  slightly better resources than I could offer at that
24  time.
25      Q.  Okay.

**Page 25**

1      A.  So he was referred to Dr. Pacheco at National
2  Jewish.
3      Q.  Maybe it's easier to do it this way:
4  Section A, you did a -- an envi- -- you took an
5  environmental history, correct?
6      A.  Yes.
7      Q.  Okay. Section B, you took a history of
8  the medical -- I'm sorry, Section 2, you took a history
9  of the medical problem. I said Section A. It was
10  actually Section 1, is the environmental history.
11      A.  Are you referring --
12      Q.  Page --
13      A.  Where on my report, if I may ask?
14      Q.  Page 8.
15      A.  Oh, okay. We're back there. Yes.
16      Q.  Okay. That brings us to, you took a family
17  history as well?
18      A.  Yes.
19      Q.  Social history?
20      A.  Um-hmm.
21      Q.  You reviewed his medications?
22      A.  Yes.
23      Q.  Review of systems. What are -- what are
24  systems?
25      A.  Well, it -- in medicine, systems include most

7 (Pages 22 to 25)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 62

1 really recent. I -- I don't believe that she's changed
2 her mind on that matter.
3     Q. Am I correct that -- well, strike that.
4     It is your opinion that the asthma he suffers
5 from today is not IgE-mediated from formaldehyde; is
6 that correct?
7     A. We don't know if it's IgE-mediated from
8 formaldehyde. The -- the -- the asthma that he has
9 today is -- is a different disease than he had prior to
10 his living in the trailer, in my opinion.
11     We -- from all the history that -- that we can
12 reconstruct, even notwithstanding some of the problems
13 that he had after he left the trailer, he has a -- a
14 disease which is -- puts him at higher risk for
15 provocation to irritants that -- that would -- that
16 would create a -- a -- a larger reaction, if you will,
17 than he did prior to his exposure. And the -- the
18 workup of Dr. Pacheco was very important in drawing that
19 conclusion.
20     Q. How would you characterize the condition he
21 has today versus the condition he had on August 28,
22 2005?
23     A. Based upon what we -- what we know in the
24 record, and the -- the opinions of Dr. Barnes, who is
25 his clinical physician, and Dr. Pacheco, he has a -- and

Page 63

1 what he demonstrated in particular with vocal cord
2 dysfunction and his reaction to methacholine, he has a
3 disease which would probably not have occurred but for
4 the exposure to formaldehyde. I think he is -- is at
5 higher risk today for -- and -- and -- and I've seen
6 this in other patients, under other conditions, for the
7 development of a -- a different type of problem with --
8 with exposures that he not otherwise would have been
9 reacting to.
10     And they primarily, from what I can -- not
11 guess, but from what I can opine, based upon what I know
12 about the case right now, these would be irritant based,
13 as opposed to antigenically based.
14     I don't know if I -- that answers your
15 question, but I -- I think that I would have to say that
16 I don't have any basis for suggesting that it's IgE-
17 mediated at this time.
18     Q. And that's what you said on Page 26, "In Chris
19 Cooper's case, I do not think that this hyper-reactivity
20 is antigenically mediated."
21     A. That's right.
22     Q. And you stand by that?
23     A. I do.
24     Q. So if he's got some condition or some
25 exacerbation of his asthma, in your opinion, it's

Page 64

1 irritant related, correct?
2     A. It -- it would be -- it would become
3 editorial, but it would be primarily not IgE-mediated.
4     Q. And therefore primarily irritant related?
5     A. That -- that's the other major category of
6 provocation, yes.
7     Q. He has been removed from the trailer, correct?
8     A. Yes. Yes, of course.
9     Q. So whatever irritant effects there are that
10 made his condition worse, in your mind, are permanent,
11 correct?
12     A. Well, they're very long-lasting. I -- you
13 know, the word "permanent" is -- I would have to say his
14 disease, he's now changed. The natural course of his
15 underlying disease is now permanently changed. Whether
16 he can recover over the next 30 or 40 years, remains to
17 be seen. But he doesn't have the same disease, in my
18 opinion, now, that he had back in -- in August.
19     Q. Physically, what's different?
20     A. He --
21     MR. PINEDO: Objection, form.
22     A. The -- he continues to have physical findings
23 which were seen prior to the -- his living in -- well,
24 actually, were seen at the time he was living in the
25 trailer. I'm relating primarily to the October of 2007

Page 65

1 visit with -- with Dr. Barnes, when she noted that he
2 had problems with turbinate enlargement, what he -- what
3 she called boggy turbinates. This condition has -- has
4 remained and been documented by Dr. Pacheco.
5     What I think is compelling about this case is
6 his testing, to the extent that he is in worse shape
7 than -- than I -- I think, even Dr. Barnes agreed,
8 would -- would -- he would be in, but for this exposure.
9 He -- this type of asthma often does not get worse with
10 time in a young kid like this; that it -- it tends to,
11 you know, become more dormant or latent.
12     In -- in his case, his reaction, in particular
13 the vocal cord dysfunction under provocation with
14 methacholine, plus his really terrible results from the
15 methacholine challenge, are signatures, I think, of a --
16 of a disease which is far worse than it would have been,
17 but for what we now know to have been his 19 months that
18 he spent in the trailer.
19     Q. (By Mr. Weinstock) So if I understood your
20 answer, physical -- the physical change is his turbinate
21 enlargement?
22     A. He -- he -- no -- well, he had the -- the
23 turbinate enlargement when he was in the trailer.
24 That's one finding that's -- that's persistent. And
25 these boggy turbinates and the increased epithelial

17  (Pages 62 to 65)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 66

1  effects, you know, the thickening of the epithelium; the
2  discharge from his -- his nose, and what was more than
3  one would, I think, expect to find in his methacholine
4  challenge, and his pulmonary function studies, is this
5  is a signature, it's a biological thumbprint of an event
6  which is -- would not have been expected, but -- but for
7  which we now have a good environmental medicine
8  explanation. And that's the time that he spent in this
9  trailer for 19 months, under the environmental
10  conditions that I've discussed.
11      Q.  Are there any other possible explanations?
12      A.  Yes. In a differential diagnosis, which is
13  what is a prerequisite to doing this, what I think
14  applies here is, in fact, the pertinent negative issues
15  of his not being found to be markedly atopic.
16          Things you would take into consideration would
17  be mold allergies, having pets that could provoke the
18  asthma, a number of things along those lines. And so
19  those do not seem to apply to his condition. In other
20  words, we don't have -- we don't have an explanation for
21  why he would continue to have what is intermittent, but
22  a latent disorder, which would -- which manifests itself
23  rather dramatically on methacholine challenge.
24      Q.  If he were exposed to a sufficient quantity of
25  dust mites, would that be sufficient to trigger a

Page 67

1  response?
2      A.  It could, but there's no history where he's
3  now living, for example. I asked him about that, about
4  one of the harbors of dust mites is carpeting, and he --
5  he doesn't have -- he doesn't live around a lot of
6  carpeting.
7          So that would -- you're -- you're bringing up
8  another point. That certainly would enter in the
9  differential diagnosis, and could be a contradicting be
10  factor. But it doesn't -- all of these can be
11  contributing factors, but you can't ignore what is
12  the -- in the metaphor of a signal-to-noise phenomenon.
13  Are you familiar with that? The signal is this latent
14  yet clinically identifiable asthmatic condition and a
15  cholinergically facilitated condition that showed up on
16  methacholine challenge.
17      Q.  Were there dust mites in the trailer?
18      A.  I'm -- oh, I'm certain they were there. There
19  are dust mites are everywhere.
20      Q.  Was there carpet in the trailer?
21      A.  There was some, yes.
22      Q.  How did you rule out the dust mites in the
23  trailer as being the cause of these conditions?
24      A.  Well, you -- you can't -- you can't simply --
25  it's not that black and white. I mean, to the extent

Page 68

1  that were there dust mites, yes. He was allergic to
2  dust mites. Could those contribute, to some degree?
3  Undoubtedly. But that doesn't eliminate the -- and
4  again, what I -- in the signal-to-noise metaphor that I
5  was using, what I consider to be the most important
6  factor in the development of his condition, as we see it
7  today. And that was the exposure to formaldehyde.
8      Q.  Just so I'm clear, though, what you said was,
9  in his current environment, there are no dust mites --
10  there are limited dust mites, because there's no carpet;
11  also in his current environment, there's limited
12  formaldehyde, because he's out of the trailer, correct?
13      A.  Yes, that's correct, yes.
14      Q.  Okay.  So if I'm understanding you correctly,
15  this permanent damage occurred when he was in the
16  trailer, correct?
17      A.  That's correct.
18      Q.  Okay.  And so what I'm asking is, how did you
19  determine it was formaldehyde, versus dust mites, while
20  living in the trailer?
21      A.  Well, the -- that's another good question.
22  The -- the determination of the -- the injury, the
23  epithelial injury, in my opinion, is -- is not -- you
24  know, I use the term "signature," the biological
25  thumbprint of -- of simple atopy, which would -- would

Page 69

1  be relevant to the dust mite issue, or, for that matter,
2  other things, you know, hickory or whatever the other
3  things he was allergic to, doesn't show up like the --
4  the kind of injury that we're -- we're seeing, which --
5  which was -- you know, demonstrated under provocation
6  but nevertheless, in fact, was the correct way to
7  diagnose this.
8          These problems are not typical of a dust mite
9  allergy. The -- this -- this is more typical of -- of
10  an irritant-based injury to a young child, who has now
11  a -- probably a dysfunctional epithelial condition in
12  his -- in his upper airway, and his lower airways, for
13  that matter, as a result of the formaldehyde exposure.
14          This -- this has the signature, I've seen this
15  before in my -- in my career, of an irritant-based
16  effect that -- that, along with the irritant-based
17  effect, was epithelial injury. And the dramatic
18  reaction that he had during methacholine challenge is
19  not typical, in my experience, of someone who simply has
20  an atopic allergy to dust mites.
21      Q.  Several questions on what you just said.
22      MR. PINEDO:  And we need to change tape, if
23  you want to start those several questions, or --
24      MR. WEINSTOCK:  Let me get two questions in,
25  and then I'm going to ask him to look for something at

18 (Pages 66 to 69)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 106

1   Q.  I don't want to leave Franklin just yet.
2   A.  Oh, absolutely, go ahead.
3   Q.  But Franklin -- in Franklin, there was no
4   indication that asthma had been caused, correct?
5   A.  No.  Again, you're not going to find any of
6   these studies that -- that state that -- that
7   formaldehyde causes asthma.  The one statement that is
8   made on Page 1758, for example, if I may quote it, it
9   says:  Our data suggests that in children inflammation
10  may extend beyond the upper airways, into the lower
11  airways, as a result of chronic exposure to domestic
12  levels of formaldehyde.
13      Man, that's an important comment.  It -- it
14  doesn't prove anything, but what it's basically saying
15  is that -- that this surrogate, so to speak, of the
16  inflammation, which is nitric oxide, is -- is a very
17  important finding, in this author's conclusion.
18      He also states on Page 1758 --
19  Q.  Hold on.  I don't want to leave
20  the first question.
21  A.  Okay.  You bet.
22  Q.  As you said, it suggests it, but it does not
23  prove it, correct?
24  A.  That's right.
25  Q.  Okay.  Now, what else did he say?

Page 107

1   A.  All right.  He also says:  We have
2   demonstrated that exposure to formaldehyde at levels
3   typically found in homes is associated with raised
4   expiratory nitric oxide levels in healthy children,
5   suggesting that chronic exposure to low levels of
6   formaldehyde may induce an inflammatory response in the
7   airways.
8       What's interesting about this also is that
9   once -- we haven't discussed the Hill criteria, but when
10  you -- when you begin to piece together the components
11  and look at a mechanism, he also suggests that the
12  inflammatory response was caused by the induction of
13  what's called inducible nitric oxide synthetase and
14  the -- the action of the inflammatory cytokines.
15      I mean, this is important.  It goes a little
16  beyond the scope of what I was asked to do, but -- but
17  this is something I look for in -- in an article.
18      The -- the other -- this is an interesting
19  thing, and I -- I think this relates to Mr. Cooper.  It
20  says:  The majority of inhaled formaldehyde is absorbed
21  in the upper respiratory tract, and histopathologic
22  changes in the nasal cavity are well documented.  And
23  we'll get to those.  Inflammatory cellular changes have
24  been observed in the upper respiratory tract in both
25  animals and humans.

Page 108

1       And what I think is important here, which
2   is -- and I -- frankly, at this moment, I can't remember
3   which article it is, but I can -- I can find it -- as a
4   clinician, as someone who is not actively at this moment
5   a clinician but was for many, many years, one of the
6   things that you often see in a child like this is that
7   he didn't breathe through his nose.  He breathes through
8   his mouth.  And that's very important.
9       Now, the --
10  Q.  Doctor, if I can stop you right there.
11  A.  Yes.
12  Q.  If you can tell me that you made that
13  observation, that's fine.  If it's just theoretical, I'm
14  not that interested.
15  A.  Okay.  I -- I -- I concede that it's a
16  theoretical issue.  But it's -- it's something that's --
17  that --
18  Q.  It certainly could be, but it's not something
19  you found anywhere in his medical records, correct?
20  A.  That's right.
21  Q.  Okay.  Going back to the NO2 Franklin study.
22  A.  It's NO.
23  Q.  Yeah.
24  A.  There's a big difference.
25  Q.  All nitric oxide?

Page 109

1   A.  Yeah.  Believe me, one's less soluble than the
2   other.
3   Q.  That's a theory that those increased levels
4   are associated with epithelial damage -- I'm sorry, with
5   airway damage, not epithelial damage but with airway
6   damage, as a result of exposure to formaldehyde,
7   correct?
8   A.  Well, airway damage is epithelial damage,
9   unless you're -- you're dealing with a bronchiectasis
10  problem or some sort of -- trust me, this is true.
11  The -- when you talk about airways, the -- the airway of
12  the respiratory tract is -- is an epithelial airway.
13  Q.  Well, is his problem boggy nasal turbinates or
14  epithelial damage or both?
15  A.  Well, I -- I'm -- I mean, we're not talk -- I
16  thought we were talking about this article.  I mean --
17  Q.  I'm just trying to understand --
18  A.  -- the article, the -- does he have -- does he
19  have evidence of some airway involvement which goes
20  beyond his upper nasal tract?  I'd say, yes, that's part
21  of my diagnosis, in conclusion, relative to his
22  methacholine challenge.
23      And so, but -- but the other signature of this
24  exposure is -- is the persistent evidence of -- of boggy
25  nasal turbinates and epithelial effects.

28  (Pages 106 to 109)

Stratos Legal Services
800-971-1127

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 110

1    Q.   Okay.
2    A.   But in this particular case, this author is --
3  is simply trying to point out that -- that he was able
4  to show a dose response to a -- a -- a surrogate of
5  inflammation that he has labeled as -- as significant in
6  the causing of asthma.
7    Q.   A dose response to formaldehyde exposure and
8  nitrous oxide?
9    A.   No, no, no.  He's -- the nitric oxide is
10 created by the body as -- in response to the
11 formaldehyde exposure.
12   Q.   That's what I mean.
13   A.   Yeah.
14   Q.   So he was able to show a dose response between
15 how much formaldehyde you're exposed to and how much
16 nitric oxide your body created?
17   A.   That's right.
18   Q.   As an indicator of scarring, but not confirmed
19 scarring?
20   A.   Not even scarring.  It's an -- it's just an
21 indication of inflammation.
22   Q.   Of inflammation?
23   A.   Right.
24   Q.   But not a -- I mean, they didn't go in that
25 and -- and do CAT scans or MRIs to see the irritation?

Page 111

1    A.   Not -- not that I saw.  But in medicine, we
2  use -- we use these surrogates all the time.  When
3  the -- if someone's exposed to carbon monoxide, and in
4  many, many, many cases of this, we look for
5  carboxyhemoglobin levels.  I mean, that's a
6  measure of -- we have a dose response curb, and we can
7  actually predict how much CO, and for what duration,
8  someone might have been exposed to, based upon the
9  carboxyhemoglobin level.
10        The carboxyhemoglobin level is somewhat
11 similar to the nitric oxide, although you don't daily
12 measure nitric oxide in -- in patients that come in.
13   Q.   The last question --
14   A.   Question the formaldehyde.
15   Q.   I'm sorry.  Last question on this study:  Are
16 there not numerous studies that don't show a dose
17 response relationship between formaldehyde exposure and
18 nitric oxide?
19   A.   I -- I don't know the answer to that.
20   Q.   Did you look for any of those?
21   A.   I -- I didn't -- let me say this:  The -- I
22 didn't specifically look for that type of a study.  I
23 didn't encounter that type of a study.  I wasn't able to
24 read -- I relied very heavily upon some others, who I --
25 I had assigned to do some of the -- of the work.  But I

Page 112

1  read the studies, and they -- they're -- among the ones
2  that I did come up with, I did not see one like that.
3        But let me make a really important point.  I
4  think what you're getting at is the importance of
5  negative studies.  Most of these studies are negative
6  and positive.  They -- they're not strictly positive
7  studies.  There -- there are caveats, toxicological
8  caveats, if you will, in every doggone study.  So they
9  don't -- you don't ever see them come across as -- as
10 strictly positive.  And -- and we can talk about some of
11 the things they didn't find in this study.
12   Q.   What's the next study you relied on?
13   A.   Okay.
14   Q.   Oh, and while you're turning to that, did you
15 instruct Dr. King to find you positive and negative
16 studies?
17   A.   Yes.
18   Q.   Okay.
19   A.   I did.
20        MR. PINEDO:  At some point, take a lunch
21 break, at some point?
22        MR. WEINSTOCK:  I think she's going to run out
23 of tape shortly.
24        THE DEPONENT:  Can we get through these,
25 first, I think, and then we can go to the mucosa ones?

Page 113

1        MR. PINEDO:  Whatever your pleasure is.
2    Q.   (By Mr. Weinstock)  Let me ask a question.
3  Let's go through this --
4        THE DEPONENT:  Timing-wise, you know, for --
5        MR. WEINSTOCK:  Maybe another 10 minutes.  Is
6  that all right?
7        MR. PINEDO:  Another 10 minutes will be fine.
8    Q.   (By Mr. Weinstock)  What -- some --
9        THE DEPONENT:  I can we can get through a lot
10 of these.
11   Q.   (By Mr. Weinstock)  Do you find negative
12 studies to be important in evaluating cause and effect?
13   A.   Yes, of course.  I mean, you -- you have to
14 look at negative studies.  As I say, there -- there are
15 so many -- these studies are not uniformly positive.  I
16 mean, I -- I -- in -- in my notes that I've taken, I --
17 I -- I have specifically documented where the study
18 didn't come through in a certain area.
19   Q.   And anybody that said that negative studies
20 are meaningless would be a crank, right?
21        MR. PINEDO:  Objection, form.
22   A.   Yeah, you can call them that, if you want.
23   Q.   (By Mr. Weinstock)  Okay.  Let's move on to
24 the next study.
25   A.   The next study --

29 (Pages 110 to 113)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

## Dr. James Phillip Kornberg
## July 9, 2009

### Page 114

1    MR. WEINSTOCK: Couldn't resist. Sorry,
2  Chris.
3    A.   This is -- this is one we -- one we --
4    MR. PINEDO: I'll get my chance.
5    A.   I knew we'd get to this. So I -- I don't know
6  how to pronounce his name, probably no one does. But
7  I'd say it's Krzyzanowski --
8    Q.   Yeah, that one.
9    A.   -- -zyzanowski or -zyzanowski, Michael
10 Krzyzanowski, who actually did his research,
11 interestingly, in Tucson, one of my favorite towns.
12   Q.   I'm going to go ahead -- I did not have a
13 clean copy of Franklin. Again, we can get that later.
14 But I'm going to mark -- it's Krzyzanowski 554, is the
15 Bates label. Is that right?
16   A.   It -- it's Barnes Exhibit No. 7.
17   Q.   Well, but is -- does it have a Bates label at
18 the bottom?
19   A.   Yes, sir. Is it -- it's four zeros and one 8.
20   MR. PINEDO: What year is your Krzyzanowski,
21 1990?
22   THE DEPONENT: Yes.
23   MR. PINEDO: Environmental research, did you
24 say?
25   MR. WEINSTOCK: I'm sorry, I've got the wrong

### Page 115

1  ones. Good thing we didn't mark it yet. Tell you what.
2  I've got a slightly highlighted copy of Franklin that
3  we'll mark as No. 2.
4    MR. PINEDO: And the record will reflect that
5  the highlightings are those of Mr. Weinstock.
6    MR. WEINSTOCK: Well, Mr. Hines, but --
7    MR. HINES: Actually, they're mine.
8    MR. WEINSTOCK: Somebody not of the
9  plaintiffs. How about that?
10   MR. PINEDO: The negative findings were
11 highlighted.
12   MR. WEINSTOCK: Oh, sure.
13   Q.   (By Mr. Weinstock) All right. So I don't
14 have --
15   MR. PINEDO: Off the record, so we can find
16 it.
17   Q.   (By Mr. Weinstock) -- Krzyzanowski in front
18 of me. I'm sorry. I do have a it on the computer. So
19 tell me what -- what you find relevant about --
20   A.   Do you want me to pull it out so you can look
21 at it or --
22   Q.   (By Mr. Weinstock) No, no, I -- I have it on
23 the computer.
24   A.   Right.
25   Q.   Go ahead and tell me why you cited it.

### Page 116

1    A.   This --
2    (Telephonic interruption.)
3    Q.   (By Mr. Weinstock) I'm sorry, that should be
4  off.
5    (Pause in the proceedings.)
6    MR. PINEDO: Nice ring tone, Mr. Weinstock.
7    MR. WEINSTOCK: You know, I had a phone before
8  this, and I changed the ring tone, and it never rang
9  after that. So I vowed I'd never change a ring tone
10 again.
11   Q.   (By Mr. Weinstock) I'm sorry. Go ahead,
12 Doctor.
13   A.   The title of this article is, "Chronic
14 Expiratory Effects of Indoor Formaldehyde Exposure."
15 This is a very interesting study because what -- what
16 what these authors did is they -- they looked at the
17 importance of formaldehyde level and its ability to --
18 to cause decreases in peak expiratory flow rate, which
19 is -- which is a good measure of obstruction.
20   And the -- they found, in summary here -- I'm
21 just looking both at the abstract and my notes -- that
22 there's significantly greater prevalence rates of asthma
23 and chronic bronchitis in children from homes where
24 formaldehyde levels were between 60 and 120 parts per
25 billion, especially in those exposed to ETS, which is

### Page 117

1  environmental tobacco smoke, but it wasn't related -- it
2  said not related to the smoke.
3    Now, they -- I think they looked at some
4  adults here too. These kids were -- 298 kids, between
5  the ages of 6 and 15. There were 630 adults. The --
6  they looked at chronic coughing, phlegm, wheezing,
7  attacks on breathlessness -- attacks of breathlessness,
8  and physician diagnosis of chronic bronchitis and
9  asthma. There was a self-administered questionnaire.
10   Q.   There were some -- I'm sorry.
11   A.   Let me just make one more comment then. The
12 levels of the peak expiratory flow rate did decrease
13 linearly with formaldehyde exposure, and with the
14 conclusion that the decrease due to a 60 part per
15 billion formaldehyde was equivalent to a 22 percent of
16 the peak expiratory flow rate in nonexposed kids.
17 That's -- that's an important finding.
18   Q.   Was the 60 parts per billion -- was that found
19 in the bedroom or the kitchen?
20   A.   There -- they -- the kitchen was -- I have to
21 go back and look, but the kitchen was very important
22 because the -- there were higher levels in the kitchen
23 than in the bedroom.
24   Q.   Which is somewhat inconsistent with a finding
25 that the kids wouldn't have a higher rate in their

30 (Pages 114 to 117)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 126

1    A.  Well, I don't know where.  I -- I -- I -- I
2  can't concede where they spent most of their time.
3    Q.  Okay.
4    A.  They certainly sleep there, hopefully, in the
5  bedroom.
6    Q.  Okay.  With the exception of my comment --
7    A.  Right.
8    Q.  -- "where they spend most of their time."
9  We'll -- we'll let somebody else make that
10  determination.
11      The second thing we saw from this is there was
12  no -- no incidence at all of asthma in houses that
13  didn't have environmental tobacco smoke, correct?  Zero.
14    A.  I -- I would --
15    Q.  Table 4.
16    A.  The -- I -- I -- I -- I'd have to look at the
17  article again.
18    Q.  Okay.
19    A.  I mean --
20    Q.  Well?
21    A.  -- as you know, there's -- there's probably
22  25 correlations in this article, and --
23    Q.  And I -- I don't think we have time to study
24  each article.
25    A.  Absolutely.  And I -- that's not my intention.

Page 127

1  But the conclusion and --
2    Q.  I don't have a question on the table.  If I
3  can ask one, would that be all right?
4    A.  Absolutely.  I -- I -- I just wanted to point
5  out here, though, that, it did say -- I mean, one of the
6  conclusions they drew is the relation of the diagnosed
7  diseases, which is -- which is asthma and chronic
8  bronchitis, to formaldehyde, was seen mainly in children
9  exposed to environmental tobacco smoke.  The ventilatory
10  function decrement, this is -- this is what I -- why I
11  wrote it:  The ventilatory function decrement was not
12  related to this additional exposure.
13      That -- that's -- that's a very -- that's the
14  fine point you were trying to hit.  And so the -- when
15  they say "ventilatory function decrement," they're
16  talking about peak expiratory flow rate.
17      Peak expiratory flow rate is the traditional
18  method -- because I overheard your -- your
19  recommendation to the question.  We can talk about
20  pulmonary function tests for two weeks, if you want.
21  Is -- in this setting, it is -- it is the most
22  appropriate way of testing people who are outside of --
23  let's say, a doctor's office or in -- in a hospital.
24      FEV1 would be better, there's no question
25  about that.  And we'd look at FEV1 forced vital

Page 128

1  capacity.  It depends on what you compare them to.  It's
2  an equation, you name it.  The -- the -- the bottom line
3  is that this is the -- this is how they do it.
4    Q.  Okay.
5    A.  It's not as good as FEV1.
6    Q.  Last question on this study, then we're going
7  do that one.  Nowhere in this study does it indicate
8  that there is an asthmatic component effected by
9  formaldehyde as an irritant; is that correct?
10    A.  All the pieces are there.  It's -- it's hard
11  to get me to concede completely.  I mean, what -- what
12  you say, technically, you're very clever in -- in the
13  way you're able to articulate the question.  But -- so
14  technically, you're -- you're -- you're correct.
15      But when you break it down in -- in -- into
16  its parts, the -- the answer is that, as a clinician,
17  I -- I look at -- when I -- when I send a patient home
18  with -- with a peak expiratory flow rate meter and I
19  asked them to sit in their bedroom and make the
20  measurements, which we've done.  Or you do it as
21  across-shift pulmonary function study in a -- in a
22  factor or where there -- where you -- where you get a
23  pharmaceutical agent.  That's -- that -- it's not
24  unreliable information.  It would always be followed up
25  by a next step.

Page 129

1      But you can't -- you can't live with these
2  peak-run pulmonary function studies.  They -- they just
3  hand them these meters and told them how to use them
4  and -- and measure them.  Actually, I think these were
5  actually administered.  I'd have to go back and look,
6  but they didn't -- they didn't do the full-bore
7  pulmonary function studies.
8    MR. WEINSTOCK:  Well, with that, let's go to
9  lunch.  It's not often people tell me my -- my questions
10  are clever.  Usually Chris tells me my questions are
11  terrible.
12    THE VIDEOGRAPHER:  This marks the end of
13  Tape No. 2 in the deposition of James Kornberg.  The
14  time is 12:58.  We are off the record.
15      (Recess taken from 12:58 p.m. to 2:00 p.m.)
16    THE VIDEOGRAPHER:  This marks the beginning of
17  Tape No. 3 in the deposition of James Kornberg.  The
18  time is 1400.
19    Q.  (By Mr. Weinstock)  Dr. Kornberg, we're back
20  from lunch.  What is the next study you've pulled out?
21    A.  Next study you've identified is the study by
22  Mendel in 2007.
23    Q.  Okay.  And this is a study of --
24    A.  The title is, "Indoor Residential Chemical
25  Emissions as Risk Factors for Expiratory and Allergic

33 (Pages 126 to 129)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 130

1   Effects in Children: a Review."
2       Q.   And does this study demonstrate the irritant
3   effects of formaldehyde -- I'm sorry, formaldehyde's
4   irritant effects and those irritant effects on asthma?
5       A.   It -- it's -- it's not an individual study.
6   It's a review of several studies, 21 in particular.  And
7   it does address, although not only formaldehyde, on
8   Page 261, there are a listed numbered specific
9   associations, as follows:
10      It indicates higher indoor concentrations of
11  formaldehyde or the presence of particleboard where
12  associated with the following alkalines, and they
13  identified diagnosed asthma in three studies.  They talk
14  about the diagnosis of chronic bronchitis; the
15  increase -- increased exhalation of nitric oxide, which
16  we already talked about; the increase of wheezing,
17  expiratory symptoms, adverse effects on lung function,
18  and what they define as atopy and increasing severity of
19  sensitization.
20      So they do talk here about asthma, and
21  there -- there are some studies that we'll -- that are
22  mentioned here, that we'll cover later, which relate, in
23  my opinion, to the aggravation of asthma.
24      Q.   And does he reach a conclusion on formaldehyde
25  and asthma?

Page 131

1       A.   Yes, he does.
2       Q.   What -- what is that conclusion?
3       A.   Bear in mind that the study identifies more
4   than just formaldehyde, but it states here specifically
5   that the studies reviewed long-term formaldehyde
6   exposures from concentrations above levels as low as
7   20 micrograms per cubic meter, which would be 17 or
8   18 parts per billion, or from increased but unmeasured
9   levels caused by particleboard, were associated with a
10  variety of asthma-related and allergy-related health
11  affects, although only levels above 60 micrograms per
12  cubic meter were associated with diagnosed asthma.
13      And, now, 60 micrograms per cubic meter --
14      Q.   Is roughly --
15      A.   -- is --
16      Q.   -- 47 parts per gram?
17      A.   -- is 47.8, roughly 49, parts per billion.
18      Q.   And did that demonstrate the irritant effects
19  of asthma?
20      MR. PINEDO:  Objection, form.
21      Q.   (By Mr. Weinstock) I'm sorry.  Did that
22  represent the irritant effects of formaldehyde?
23      A.   The symptoms that were identified would be
24  consistent with -- for example, the development of
25  wheezing -- the irritant effects; on the basis that

Page 132

1   we've already discussed here, Franklin, namely the
2   exhalation of nitric oxide, is -- and, in fact, I would
3   argue also, chronic bronchitis, would -- would be
4   consistent with the irritant effects.
5       Q.   Okay.  Are they not also --
6       A.   Of asthma.
7       Q.   Are they not also --
8       A.   I mean, of formaldehyde.  Excuse me.
9       Q.   Are they not also consistent with allergy or
10  atopy?
11      A.   They can be.  But in this case particular
12  case, the -- the emphasis was on the source of
13  formaldehyde and the presence of formaldehyde in these
14  studies.  They -- there's many studies that are
15  described here, and we -- we're going to be going over a
16  few of them individually.  I -- I think that -- that
17  what they're doing is they're -- they're stating,
18  unequivocally, that this is consistent with exposures to
19  formaldehyde.
20      Are they consistent with other things, like we
21  discussed earlier?  Yes, it's possible, but not in this
22  context.  They're -- they're -- they're emphasizing, by
23  quoting these studies, the capacity of formaldehyde to
24  cause these -- these types of medical outcomes.
25      Q.   What's the next study you relied on?

Page 133

1       A.   The next one, which had been --
2       MR. PINEDO:  I just want to make clear, you
3   asked which ones he relied upon.  The question
4   originally was based upon earlier --
5       Q.   (By Mr. Weinstock) Let me clarify that.
6       MR. PINEDO:  -- it is broader than his
7   reliance materials.
8       Q.   (By Mr. Weinstock) Chris is correct.  What's
9   the next study -- not the next study you relied on.
10  What is the next study you're going to tell me about
11  regarding my question of formaldehyde causing irritant
12  effects related to asthma?
13      A.   And the capacity to aggravate childhood
14  asthma?
15      Q.   Sure.
16      A.   I think, was part of the question.  And the
17  effects on epithelial changes.
18      Q.   Yes.
19      A.   Okay.  The -- the next one is the study by
20  Rumchev.  It's R-u-m-c-h-e-v.  This is a study from
21  2002.  This is a very long study because, by its very
22  nature, it is -- the title of it is, "Domestic Exposure
23  to formaldehyde significantly increases the risk of
24  asthma in young children."
25      What I found very important about this study,

34  (Pages 130 to 133)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

# Dr. James Phillip Kornberg
## July 9, 2009

**Page 134**

1 before I even state the conclusions, is that the cases
2 in the study were -- were children who developed the
3 diagnosis of asthma or were -- were -- were diagnosed as
4 having asthma when they appeared in the emergency room.
5 And it's almost by definition, if someone shows up with
6 a -- either a new definition of asthma or a worsening
7 one, under those conditions, I think it's fair to say
8 that they're having an episode of aggravation, of some
9 sort that brings them there. They don't -- they don't
10 walk in for a checkup, more or less, into an emergency
11 room.
12        And certainly I -- I've been in that
13 situation. The kid comes in with asthma. He's usually
14 having a problem that brought him to the emergency room,
15 or her to the emergency room.
16        The -- the basic -- one of the basic
17 conclusions in this report is that increasing
18 formaldehyde levels by about 8.1 parts per billion, or
19 as they say, 10 micrograms per cubic meter, tended to be
20 commensurate with an increased risk of asthma by about
21 3 percent.
22   Q.  Can we go to Page 407.
23   A.  Yes.
24   Q.  Okay.  A conclusion is, "the present results
25 confirm that some indoor environmental factors

**Page 135**

1 contribute as risk factors for asthma in early
2 childhood"?
3   A.  Can you show me where you're reading?
4   Q.  I'm sorry.  The last paragraph, "In
5 conclusion."  Page 407, are you sure we're on the same
6 page?
7   A.  I'm sorry.  I was on 406.
8   Q.  I'll start again.  Are you ready?
9   A.  You're --
10   Q.  Last -- I'm sorry, last paragraph before
11 "Implications."
12   A.  Okay.  I'm with you.
13   Q.  "In conclusion, the present" study -- I'm
14 sorry -- "the present results confirm that some indoor
15 environmental factors contribute as risk factors for
16 asthma in early child hood.  Since the quality of the
17 indoor environment is potentially modifiable there might
18 be opportunities for intervention to reduce asthma
19 symptoms.  Furthermore, the observation that exposure to
20 formaldehyde very early in childhood is associated with
21 asthma suggests the possibility that irritants in indoor
22 air might be involved in the initiation phase of
23 asthma."
24        Just to be clear, for Chris Cooper, we're not
25 talking about the very early stage of childhood,

**Page 136**

1 correct?
2   A.  No.  He had asthma before he moved into the
3 trailer.
4   Q.  And we're not talking about the initiation of
5 asthma, correct?
6   A.  In his case, we're not.
7   Q.  Okay.  So I understand that you've given me
8 this study, in answer to my question.  But you would
9 agree, it has a little applicability to Chris Cooper's
10 position --
11        MR. PINEDO:  Objection --
12   Q.  (By Mr. Weinstock) -- or station in life?
13        MR. PINEDO:  Object to form.
14   Q.  (By Mr. Weinstock)  Is that correct?
15   A.  No.  No, I wouldn't agree at all with that.
16 The -- the importance of this study is -- is that the --
17 notwithstanding what you just read, is, this study is
18 full of information that's relevant to this analysis.
19        One of the questions here, they talk about the
20 validity in the study, but they say:  Despite the
21 potential limitations -- this is Page 406 -- children
22 exposed to levels of formaldehyde greater than
23 60 micrograms per cubic meter, or 49 parts per billion,
24 are 39 percent more likely to have asthma compared to
25 those who are not exposed to such levels.

**Page 137**

1        That -- and bear in mind that what they did is
2 the -- they -- they were able to show a dose response
3 and even offer a -- a -- a formula, if you will, for
4 increasing risk with increasing exposure to
5 formaldehyde.
6        These children were people who -- it couldn't
7 have been a better group of individuals to select,
8 because they were actually kids that came into the
9 emergency room, which means that they -- as I say, I
10 don't think -- very few of them would have come in for a
11 checkup.  They came in because they were already in
12 trouble and they were able to demonstrate this dose
13 response in among that population, compared to a
14 controlled group.
15   Q.  Doctor, what is an odds ratio?
16   A.  An odds ratio is the -- in a case control
17 study, is the ratio between the risk of finding exposure
18 in the cases, compared to controls.
19   Q.  Is an odds -- is an odd ratio below 2.0
20 statistically significant?
21   A.  That's a -- if I -- forgive me.  That's a
22 mixed question.  Are there odds ratios below 2.0 that
23 can be statistically significant?  Absolutely.
24   Q.  You don't use 2.0 as a -- as a cut-off for
25 what's a statistically significant odds ratio; is that

35 (Pages 134 to 137)

Dr. James Phillip Kornberg
July 9, 2009

Page 138

1   correct?
2       MR. PINEDO: Objection, form.
3       A.   Please forgive me, but I -- I think you're
4   misapplying. It has -- you're asking me two questions
5   when you ask me that. The -- if you want to ask me, is
6   an odds ratio below 2.0 important, that's one question.
7   The -- the answer, I'll repeat, is that odds -- there
8   are odds ratios that -- the statistical significance of
9   any odds ratio is based upon the establishment of its
10  confidence intervals, and -- and the statistics in
11  creating those confidence intervals. If it arrives at
12  1.3, it can still be statistically significant.
13      But your other question was, if I -- if it's
14  1.3 and statistically significant, and it's below 2.0,
15  is that important? And the answer is yes.
16      Q.   (By Mr. Weinstock) Did Rumchev set out his
17  confidence intervals?
18      A.   You also asked me if I used that as a cutoff,
19  and the answer's no. In his confidence intervals,
20  for -- for what relationship are you referring?
21      Q.   I was going to say, I don't -- I'm not seeing
22  any in the paper, anywhere.
23      A.   Okay.
24      Q.   Do you?
25      MR. PINEDO: His confidence intervals are in

Page 139

1   there?
2       THE DEPONENT: There are.
3       Q.   (By Mr. Weinstock) As long as you're looking
4   at the confidence intervals for the relationship between
5   formaldehyde exposure and asthma?
6       MR. PINEDO: Can you be more specific?
7       A.   The question that he recommends, or the
8   relationship that he recommends, is quite specific.
9   Because it relates an increase in formaldehyde levels by
10  8 parts per billion is associated with a -- an increased
11  risk of asthma of 3 percent. So every -- every increase
12  of 8 ppb is associated with an increase in risk of
13  asthma of 3 percent.
14      This is a dead-on study, among children who
15  were diagnosed with asthma, of demonstrating not only a
16  dose response but -- but it -- it -- it's taken a group
17  of children who have visited an emergency room and walk
18  out of there with a diagnosis of asthma. So this --
19  this study supports not only the -- the relationship
20  between formaldehyde and the diagnosis of asthma, but
21  also the relationship between formaldehyde and the
22  aggravation of asthma.
23      Q.   (By Mr. Weinstock) I'm going to attach that
24  as Exhibit 3. What's the next paper?
25      A.   The next paper is -- I -- pronunciation

Page 140

1   again -- Smedje -- Smedje, which -- and Norback. And
2   this study is -- is from 2001? Let's see.
3       Q.   Yes.
4       MR. PINEDO: There's two Smedjes, so we just
5   want to be clear.
6       A.   This is the follow-up study.
7       Q.   (By Mr. Weinstock) This is --
8       A.   This is what I call Barnes No. 9.
9       Q.   Right. We're going to attach it to yours as
10  No. 4. Doctor, does this paper show the increased -- I
11  apologize -- increased damage to nasal epithelium that
12  results in exacerbation of asthma?
13      A.   Well, I -- I didn't present the study for that
14  purpose. I -- I presented it -- I -- I could look and
15  see to what extent that it addresses that, but I
16  included this one because it involves the relationship
17  with -- for essentially what -- what they define as
18  nonatopics for the development of -- of asthma.
19      These are nonatopic persons with statistically
20  significant odds ratios of -- or odds ratio of 1.7, with
21  confidence intervals between 1.1 and 2.6 per 10 micro-
22  gram per cubic meter increase in formaldehyde exposure;
23  again another -- again, another support for dose
24  response relationship.
25      These were -- this is a follow-up study that

Page 141

1   was performed four years after his original study in
2   1997. And as I said, it -- it indicates, among children
3   without a history of atopy, that is nonatopics, a new
4   asthma diagnosis was more common at higher
5   concentrations of formaldehyde and total molds in the
6   classroom.
7       Q.   And that -- that's the part, is formaldehyde
8   concentrations and total molds, correct?
9       A.   The -- the total molds are included.
10      Q.   Right.
11      A.   And -- and this was important to me because we
12  have no evidence that, although typically we're talking
13  about general causation, but in -- in applying this to
14  any -- any group of patients, but in this case
15  specifically to Mr. Cooper, he is not allergic to molds.
16  So consequently, this study had more significance to me
17  than -- than it would otherwise.
18      Q.   But the conclusion ultimately was, "A school
19  environment with more dust, cat allergen, formaldehyde
20  and moulds may affect the incidence of asthma and
21  sensitivity to furry pets in school children," correct?
22      A.   Yes, that -- that's true. But the -- it --
23  it -- it clearly states, it says, "Among those without a
24  history of atopy in 1993, the new onset of
25  physician-diagnosed asthma was more common at higher

36 (Pages 138 to 141)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 162

1   17 times what the EPA has identified, that -- that was
2   the go/no-go decision, in my opinion, for deciding
3   whether there was a medical monitoring program.
4        I just didn't come up with a medical
5   monitoring program out of the blue.  I -- I went and I
6   said, well, how much exposure did he have?  And I went
7   to an authoritative source, and I made sure that I was
8   convinced that this was indicated from a preventive
9   medicine standpoint.
10       Q.  Will Chris Cooper get cancer, more probably
11  than not?
12       A.  You can't say that.  You can only say that he
13  has -- he has a 17-times higher risk, based upon a
14  conservative estimate of his exposure to, above and
15  beyond, what the EPA has recognized as acceptable risk.
16  The one-in-a-million chance is -- is really what, on top
17  of background, is what is generally considered to be
18  appropriate under the EPA methodology.
19       Q.  Did you subtract background from Chris
20  Cooper's exposure when you did your model?
21       A.  No, no, you don't.  What you do is the -- I
22  would say -- I would say that the -- if you -- the
23  50 part per -- 50-part-per-billion number that I used is
24  so conservative, in my opinion, that I certainly took
25  into account the -- the negligible or very small amount

Page 163

1   of background that he would have otherwise been exposed
2   to.
3        Q.  I want to get to your risk assessment opinions
4   later.  Right now, I want to discuss cause-and-effect
5   opinions on cancer.  You have not undertaken the review
6   of the epidemiological literature on formaldehyde
7   exposure and its implications with cancer, correct?
8        A.  Only to -- some degree, yes, I have looked
9   at some of that literature.  I haven't done the robust
10  millions of pages that were obviously undertaken by
11  many, many agencies; over many, many years.
12       Q.  You certainly haven't done it sufficiently
13  enough to have a cause-and-effect opinion, not based on
14  EPA, just based solely on the review of these papers,
15  correct?
16       MR. PINEDO:  Objection, form.
17       A.  At this stage of the analysis, you -- you --
18  you really don't -- I don't -- I don't have to do that.
19       Q.  (By Mr. Weinstock)  I understand.
20       A.  No, I'm not being defensive.  I'm just saying,
21  you don't -- you don't do that.  You -- let me give you
22  an example.  If you're a cardiologist and you're --
23  you're -- you're contemplating the use of a medication
24  in a patient and -- and -- to reduce the blood pressure,
25  you -- you don't go and then make a decision on looking

Page 164

1   at 5,000 papers that were written on this particular
2   medication and -- and the -- the effect on blood
3   pressure.  You look at other agencies.  You look at the
4   American Heart Association.  You look at other practice
5   protocols and things of this kind which are reliable.
6   The EPA is a reliable source.
7        Q.  If Gerald McGwin opines that the only
8   carcinogen -- I'm sorry, the only cancer that's
9   associated with -- start again.
10       If Gerald McGwin opines that the only cancer
11  that is caused by exposure to formaldehyde and that
12  exposure must reach a peak exposure of 4,000 parts per
13  million, are you in a position to say he's wrong?
14       MR. PINEDO:  Objection, form.
15       A.  I -- I'm not going to say he's wrong or right.
16  I -- I'm going -- what I'm going to do is -- is -- that
17  wasn't my -- my job.  My job was -- my job was to take
18  the data and to make a determination of how it applied
19  to a specific youngster who had a probable exposure
20  experience and had probable medically documented
21  conditions, and decide what to do with them.
22       Q.  (By Mr. Weinstock)  I think we can get to some
23  common ground.  You looked at his asthma and you looked
24  at a whole series of papers, some of which we've talked
25  about today, for purposes of determining cause and

Page 165

1   effect, asthma to formaldehyde, from formaldehyde
2   exposure sure, correct?
3        A.  That's right.
4        Q.  You did not do that exercise for cancer.  For
5   cancer you, accepted formaldehyde as a carcinogen based
6   on EPA and IARC, correct?
7        A.  No, no, that's not correct.  I -- I did look
8   at -- at some of the literature on cancer, especially in
9   terms of the -- what was particularly disturbing about
10  the literature, you know, the precancerous effects which
11  we're -- we're seen in individuals who were at levels
12  that weren't very different, if any, from Mr. Cooper's.
13  So consequently, the -- the need for medical monitoring
14  became -- it was -- it was just not strictly on the
15  basis of the EPA assessment.
16       Q.  I haven't asked you about medical monitoring,
17  have I?  You keep bringing it up, and I have yet to ask
18  you a question about medical monitoring, have I?
19       A.  Go ahead.
20       Q.  So you have not done -- have you done a
21  sufficient review of the literature on cancer
22  epidemiology and formaldehyde to give an opinion that
23  formaldehyde causes cancer, nasopharyngeal, if IARC and
24  EPA did not exist?
25       A.  I -- I have not done enough studies to draw

42 (Pages 162 to 165)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 174

1  standpoint, is different than -- than a 9- or
2  10-year-old child. They're -- they're very different,
3  clinically and -- and I think the -- the data is very
4  clear, from a susceptibility standpoint.
5       I'll make this point on cancer risk, that the
6  cancer risk equations that EPA uses change at about age
7  16. So, you know, you -- once you get -- and, granted,
8  there's one person age 15, but in order -- addressing
9  your 40-year-old lung, there's a very big difference
10  between a 40-year-old lung and a 9-year- or 10-year-old
11  lung.
12       Q.  (By Mr. Weinstock)  And that's what I'm
13  asking.  What is the difference between a 40-year-old
14  lung and a 10-year-old lung that would make the 40-year-
15  old lung less susceptible to the irritant effects of
16  3 parts per million of formaldehyde?
17       MR. PINEDO:  Objection, form.
18       A.  The -- all I can say is that, from a -- I -- I
19  can't give you a precise physiologic explanation.
20       Q.  That's all I'm asking.
21       A.  But I can tell you that -- that when -- when
22  one looks at data or evaluates a child, you -- you -- it
23  is a different story when you're looking at someone
24  exposed to formaldehyde, 3 parts per million, at age 9
25  or 10.

Page 175

1       And the data, for example, is very clear on
2  the -- the less significant effects, even in this --
3  some of these articles that I've referred to, that is
4  seen in adults as compared to children.  Children tend
5  to be more susceptible to these effects than adults are.
6       Q.  Is it your testimony that a 10-year-old child
7  exposed to .050 parts per million would be a greater
8  impact than a 40-year old adult exposed to 3 parts per
9  million, or 60 times more?
10       A.  It depends on the adults.  It depends on the
11  individual.  These people were negative.  So -- so
12  the -- either there was, the diagnosis wasn't correct --
13  you can -- we can read the article, how these people
14  were selected.  They weren't suspected of having these
15  problems, and -- and it wasn't borne out when -- in
16  bronchial challenge.
17       But that -- that -- there's -- there are other
18  studies which indicate that individuals, who have these
19  suspected diagnoses, do show reactivity.  As a matter of
20  fact, one of the studies that I was debating on is
21  Nordman's study, which -- which says just that.  As a
22  matter of fact, the conclusions in Nordman relate to the
23  fact that, although formaldehyde asthma is -- is a -- he
24  considers it a rare event, it's one that he thinks is
25  under diagnosed.

Page 176

1       We can go through this one, if you want, as
2  well.  But this -- this one shows that there were
3  individuals that were tested here by -- by this group of
4  researchers, that did respond to formaldehyde exposures
5  in those levels.  As matter of fact, the levels were
6  right around what you were arguing.  There were
7  2.5 milligrams per cubic meter, and 1.2.  These were
8  higher -- these were much higher levels.
9       But in the -- in the Frigas study, they were
10  let's see, I think -- well, they were at roughly --
11  there were 3 parts per million, 3 parts per million.  So
12  their -- their levels were somewhat in the same range of
13  these, I believe.
14       Q.  And Nordman concluded that formaldehyde-
15  induced asthma is a relatively rare finding, correct?
16       A.  Yes, he -- that's what he said.
17       Q.  At much higher levels than .050, correct?
18       A.  Well, when he did -- when he did the study,
19  he -- he confirmed the levels that he tested, but he --
20  he made it clear that -- that -- that they -- at the
21  time this was written, they hadn't -- hadn't really
22  reported much in the way of domestic exposures.
23       This is an interesting comment he made in the
24  very last comment of the article.  He said, "Although
25  asthma as a result of domestic exposure to formaldehyde

Page 177

1  has not been reported to date, we should be well advised
2  to pay special attention to exposure in the homes of
3  persons suffering from occupational formaldehyde
4  asthma."
5       Q.  Which was induced at much higher levels than
6  .050, correct?
7       A.  In -- in this study, the levels were higher,
8  that's correct.
9       Q.  Okay.  And in industrial 'vironment (sic) --
10  environments, correct?
11       A.  Yes.
12       Q.  Mechanistically, is there any difference in
13  the location of where inhaled formaldehyde is
14  metabolized, between a 10-year-old and a 30-year-old?
15       A.  Is metabolization different or where it's
16  metabolized.
17       Q.  Where.
18       A.  The -- the metabolization of formaldehyde is
19  very rapid.  I -- I couldn't tell you, off the top of my
20  head, whether there's a specific difference in the -- in
21  a child versus an adult.
22       Q.  I gave you a study that I had marked, and I
23  want to --
24       A.  I did.
25       Q.  -- make sure we get it back to the court

45  (Pages 174 to 177)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

**Page 182**

1 Now, is he going to -- is he is going to
2 stabilize and get better? I would certainly hope so.
3 But he doesn't have the same disorder; so consequently,
4 from that standpoint, it is -- it is a permanent change.
5 Q. If he testifies that his asthma is no worse
6 and probably better than it was before Hurricane
7 Katrina, you would dispute that, correct?
8 MR. PINEDO: Objection, form.
9 A. We can dispute it because the -- the -- he --
10 it -- to use your nomenclature, he was experimentally
11 and provocatively tested. If this were another
12 circumstance which this young man were to sustain in the
13 form of exposure, he would develop the severe
14 bronchoconstriction, the impaired airway conductance,
15 all the features, the -- the impaired FEV1 that was
16 described in -- in the -- the methacholine challenge
17 test.
18 That was with an experimental test. I mean,
19 it's a provocation test. You -- you just don't go off
20 and do one of these on people. You have to consider,
21 you abort the test. If you -- if you go through at
22 National Jewish, they didn't -- I don't believe they --
23 they ran the dose of methacholine out as far as they
24 could, because he was showing abnormalities.
25 They then bronchoscoped him, after this test,

**Page 183**

1 immediately thereafter, and found that he had vocal cord
2 dysfunction. That's not -- in my experience, it's not a
3 common finding to -- to see that. So -- so he has a
4 latent propensity to -- this is a kid that could show up
5 in the emergency room with -- with a very severe
6 asthmatic event that, I think, reflects the injury that
7 he has sustained as a result of his exposure. So
8 consequently, it is permanent, in that sense.
9 Now, whether it's well managed or not is -- is
10 something that everyone will -- will try to address.
11 Q. (By Mr. Weinstock) You would agree that --
12 well, strike that.
13 If Chris Cooper said his asthma is no worse
14 and probably better than it was before the storm, you
15 would dispute that?
16 A. No. I would say that's -- that's good. I
17 mean, if he's under good medical care. But -- but
18 the -- are you going to -- are you going to do an
19 experiment with him and put him in a -- you know, get
20 him on an ATV and drive behind a truck in Colorado, in
21 the mountains, for an hour? I don't think he'd do very
22 well under those conditions.
23 As opposed to other people, who -- who would
24 react, or another child, even, who would react, this
25 young man, I think, would react in a much more

**Page 184**

1 significant way and would be much more ill, under those
2 conditions, than he would have been had he not been
3 expose to do formaldehyde.
4 Q. If his sister said that his asthma is better
5 now than it was before the storm, you would disagree
6 with that, correct?
7 MR. PINEDO: Objection, form.
8 A. I'm not going to disagree with that. It --
9 it -- it probably does reflect his use of medications
10 and a better control and the advisement -- advisory that
11 was given to him at National Jewish.
12 Q. (By Mr. Weinstock) I'm going to attach a copy
13 of the deposition notice as Exhibit 9.
14 A. That's mine, right, my deposition notice?
15 Q. Yes.
16 A. Yes.
17 Q. If I can have that?
18 A. You bet.
19 Q. For the court reporter's stack.
20 A. Can I also get a copy of this, please?
21 Q. It's in your reliance materials.
22 A. Okay. I had it. I got to find it.
23 Q. I probably have another one in the box.
24 A. Oh, okay.
25 Q. I'll look for it.

**Page 185**

1 A. All right. Thanks.
2 MR. PINEDO: Andy, three minutes on the tape.
3 MR. WEINSTOCK: I think that's all I'm going
4 to take, and then I'll pass to you.
5 Q. (By Mr. Weinstock) Next question: If
6 hypothetically, on December 4, 2007, Chris Cooper and/or
7 his mother told an emergency room doctor that he had
8 had -- not had an asthma attack in a year, and that was
9 correct, would you agree that he did not have an
10 exacerbation of his asthma due to living in the trailer?
11 MR. PINEDO: Objection, form.
12 A. I -- I -- I addressed that in my report, in a
13 footnote, so I need to stick, and I will stick, to my --
14 what that opinion is.
15 Q. I understand what you're saying. But accept
16 my hypothetical, please, that that statement is entirely
17 accurate. If that statement were entirely accurate, you
18 would agree, he does not have an exacerbation of asthma
19 from living in the trailer, correct?
20 A. No, I wouldn't agree with that.
21 Q. Why?
22 A. I wouldn't agree with it because -- because I
23 believe that he was under medical control during that
24 time. The -- the -- he -- he was using his medications
25 judiciously and -- and was -- was under medical control.

47 (Pages 182 to 185)

Stratos Legal Services
800-971-1127

Dr. James Phillip Kornberg
July 9, 2009

Page 186

1  And it wouldn't surprise me that as a -- as a matter of
2  fact, and I said that in my report, that the doctor
3  would -- would -- would draw that conclusion.
4       I'm not disputing the physician. I'm not
5  saying the physician's wrong. But I certainly would not
6  agree that that would be inconsistent with the
7  conclusions that I drew.
8       Q.  Earlier I asked you some questions about
9  ventilation. And I'm going to hand you the ATSDR
10  October 2007 report and ask you, isn't it correct that
11  with just air conditioning, levels were reduced by as
12  much as 60 percent?
13      A.  I -- I need to -- air conditioning, as we
14  said, very clearly, in my earlier testimony, is either
15  air conditioning with or without makeup air. And I -- I
16  don't know, offhand, whether this air conditioning
17  brought makeup air in.
18      Q.  Okay. Assume for me that it did not, none of
19  the trailers of any manufacturers have makeup air. Just
20  accept that as my hypothetical.
21      A.  I -- I wouldn't -- I would find these results
22  hard to -- hard to interpret because a drop -- you know,
23  air conditioning doesn't remove formaldehyde from the
24  environment. It may reduce the temperature, which --
25  which could be commensurate with a reduction in

Page 187

1  formaldehyde. But I -- I don't think you can -- you can
2  explain this on the basis of any -- in your
3  hypothetical, there would be no dilution, there would be
4  mixing, with an air conditioner.
5       Q.  So you would expect, just on air conditioning,
6  that the levels would not drop?
7       A.  Unless -- unless there was a temperature-
8  related phenomenon that would be -- which would apply.
9       MR. WEINSTOCK:  At this point I'm going to
10  attach this as Exhibit 10, and let the court -- the
11  videographer change tapes. I'm going to pass.
12      THE VIDEOGRAPHER:  This ends Tape No. 3 in the
13  deposition of James Kornberg. The time is 1533. We are
14  off the record.
15      (Recess taken from 3:33 p.m. to 3:37 p.m.)
16      THE VIDEOGRAPHER:  This is the beginning of
17  Tape No. 4 in the deposition of James Kornberg. The
18  time is 1537.
19      MR. WEINSTOCK:  The last document we were
20  discussing was the October 2007 ATSDR health
21  consultation report, and I've identified that as
22  Exhibit 10.
23          EXAMINATION
24  BY MR. DINNELL:
25      Q.  Doctor, my name's Adam Dinnell. I represent

Page 188

1  the United States in this case.
2       MR. DINNELL:  Just for the record, we will ask
3  that the witness read and sign the deposition transcript
4  once it's provided to him.
5       Q.  (By Mr. Dinnell)  Doctor, if at any point I
6  ask you a question that is unclear or you don't
7  understand, please let me know, and I'll try to clarify
8  it for you, all right?
9       A.  Thank you.
10      Q.  I had previously, at the break, placed in
11  front of you what's been marked as Exhibit 11, entitled,
12  James B. Kornberg, Curriculum Vitae. And I'm not going
13  to go through this. I just want you to verify that
14  what's been marked as Exhibit 11 is the most current
15  version of your CV that you have. And this one is dated
16  January 2009.
17      A.  That's correct.
18      Q.  And this is a true and accurate copy of your
19  CV?
20      A.  Yes.
21      Q.  All right. Is it correct that your rate on
22  this case is $780 an hour?
23      A.  That's right.
24      Q.  Do you know how much you've billed, to date,
25  in working on this case?

Page 189

1       A.  I -- I don't. But I've provided, as requested
2  under the federal subpoena, the -- the invoices that
3  reflect the -- up until the time of preparation.
4       Q.  Okay. So we should have those materials?
5       A.  Yes, sir.
6       Q.  Do you know how much time, off the top of your
7  head, ballpark, that you've billed in working on this
8  case?
9       A.  I -- I really don't know, but I can look.
10      Q.  That's all right. All right, Doctor, we have
11  your expert report, which has been marked as Exhibit 1
12  to this deposition. And it's entitled, "Environmental
13  Medical Causation Report," and then it says, "Including
14  Consideration For The Necessity And Cost Of Medical
15  Monitoring And Early Cancer Detection."
16          And it's your opinion in this case that
17  Christopher Cooper needs medical monitoring and
18  procedures for early cancer detection; is that right?
19      A.  Yes.
20      Q.  Okay. And can we use the term "medical
21  monitoring" and "medical surveillance" interchangeably?
22  Is that fair?
23      A.  Yes.
24      Q.  And that is different -- that is different
25  from treatment for a specific disease, correct?

48 (Pages 186 to 189)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 246

1  specific element, if you're looking at a chemical
2  exposure?
3      A.  Yes.
4      Q.  Did you examine any papers, in your work in
5  this case, as to whether or not formaldehyde has been
6  linked or associated with specific illnesses?
7      A.  Yes, I have.
8      Q.  Did you review any papers that link or
9  associate formaldehyde with asthma?
10     A.  Yes.
11     Q.  Did you look or examine any papers that
12  associated the aggravation of asthma with formaldehyde
13  exposure?
14     A.  I have.
15     Q.  Are there -- is the weight of the medical
16  literature that formaldehyde exposure can aggravate
17  preexisting asthma symptoms?
18     A.  Yes, and in children in particular, yes.
19     Q.  Is that generally accepted in the medical
20  field?
21     A.  I think so, yes.
22     Q.  And approximately how long have papers
23  being -- been published, what period of years has there
24  been medical literature, associating or linking
25  formaldehyde exposure to exacerbation or aggravation of

Page 247

1  asthma symptoms?
2      A.  At least 30 years.
3      Q.  Have you also reviewed some papers associating
4  or linking formaldehyde exposure to cancer?
5      A.  Yes.
6      Q.  And is the greater weight of the medical
7  authority and scientific authority, with regard to
8  formaldehyde exposure, that indeed it has been
9  associated or linked to causing cancer?
10     MR. DINNELL:  Objection, form.
11     A.  Yes.
12     Q.  (By Mr. Pinedo)  In your review in this case
13  of Christopher Cooper, did you review also medical
14  records?
15     A.  I did.
16     Q.  What are some of the medical records that you
17  reviewed to render your opinion on causation for
18  Christopher Cooper?
19     A.  I looked at the medical records that
20  Dr. Barnes had provided.  I looked at Dr. Pacheco's
21  records.  I looked at the LSU Hospital records; the
22  Children's Hospital records; and the records from, I
23  think it was called, Kids & Family, which is the -- the
24  treating entity, Dr. Joyce, I think it was, when this
25  young man was evaluated in Florida, in Jacksonville.

Page 248

1      That is pretty much the number of records that
2  were available.  There was one, I think, from a
3  Dr. Burra -- Burrus, I think, that we tried to get.  It
4  was not -- not available.
5      Q.  Dr. Barnes, you mentioned you reviewed her
6  records.  Was she the treating doctor for Christopher
7  Cooper before and during and after his term of living in
8  this Gulf Stream travel trailer that was supplied by
9  FEMA?
10     A.  Yes.  And I -- I -- I -- I -- I believe she is
11  still his treating physician.
12     Q.  And did you -- in addition to reviewing
13  Dr. Pacheco's records -- excuse me, Dr. Barnes' records,
14  did you also interview Dr. Barnes over the telephone?
15     A.  I -- I spoke with Dr. Barnes, yes.  I had some
16  questions that I needed to have clarified about
17  Mr. Cooper.
18     Q.  When you're doing a causation analysis such
19  as you did in this case and you've done in other cases,
20  is it normal and routine for you to examine the medical
21  records providing a history of how the particular
22  patient or person had presented, up to the time that
23  you're trying to do your causation analysis?
24     A.  Yes.
25     Q.  In addition to reviewing the medical records

Page 249

1  that you've told us about, did you also interview the
2  patient or the person in this case?  And that would be
3  Christopher Cooper.
4      A.  Yes.  And I interviewed his mother as well.
5      Q.  And what was the general purpose of your
6  interview?
7      A.  In my opinion, it's -- it's a prerequisite to
8  performing this type of analysis, in conjunction with
9  other clinical inter- -- you know, evaluations, which --
10  which, in fact, had -- had just taken place at National
11  Jewish.
12     And the importance of this is to get a history
13  directly from the patient; to discuss matters of family
14  history, medication usage, allergies, social history,
15  environmental history; to go over, in some detail,
16  what -- what this particular situation involved.
17     The -- what was very compelling about this
18  particular case was not only -- which didn't -- wasn't
19  reflected in my report, was the ordeal that this family
20  went through when they were displaced at that time; and
21  the hopes that they had when they -- when they reentered
22  the travel trailer, which was parked on their driveway
23  of their flooded-out home.  And so that -- that was an
24  important part of this history.
25     And, of course, they returned to the --

63 (Pages 246 to 249)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 254

1 actually some reports among the children who were in the
2 houses in Massachusetts. That -- that was basically two
3 or three families, as I recall. It was 30 years ago.
4 But we also ran into problems with the -- the
5 individuals who were sanitizing the turkey quarters.
6     Q.  Let's talk a little bit about the
7 Massachusetts experience. When -- are you familiar that
8 approximately 20 or more years ago, there was a type of
9 insulation used, urea-formaldehyde insulation, that
10 tended to give off formaldehyde?
11     A.  That's right.
12     Q.  Did you examine some children, in the
13 emergency room context, that were living in homes with
14 urea-formaldehyde insulation?
15     A.  Right.  They weren't brought in, in the
16 emergency room.  I had -- when I was practicing in the
17 Leominster, Massachusetts, area, I worked in the
18 emergency room for a couple of years, but I also had my
19 own office.  So these -- I don't even know how they were
20 referred to me.  I can't recall.  But they were -- the
21 family came in, and we -- we -- we saw them
22 individually.  Well, we saw them as a family first, and
23 then did individual evaluations.
24         They had no idea at that time what the levels
25 were.  There was no industrial hygiene monitoring.  They

Page 255

1 were complaining because of the exposures that had
2 occurred.  They -- oftentimes, because building
3 standards were suboptimal, there was no insulation that
4 was put in the walls.  And even in those days, the cost
5 of fuel oil was going up, so these folks hired
6 contractors to come in and put the urea-formaldehyde
7 insulation into cavities that they couldn't be opened up
8 unless you were to tear the drywall off.
9         And it -- it was thought to be a very
10 effective, and actually, from an insulating standpoint,
11 was an effective insulator.  But the problem is that it
12 continued to cure and -- and involved formaldehyde in
13 the area which got into the living quarters.
14     Q.  When you said "cure," are you talking about
15 that those building materials gave off formaldehyde over
16 time?
17     A.  Yes.  They were -- actually, they went in as a
18 foam, a liquid, so they -- they could travel into the
19 cavity.  And they went in to occupy very small spaces.
20 But unfortunately, some of those very small spaces were
21 communicating directly with the living environment.
22     Q.  And did you make the determination that it was
23 the formaldehyde from the these building materials that
24 was causing these children to have respiratory or
25 asthma-like symptoms?

Page 256

1     A.  Absolutely.
2     Q.  Is it your opinion, based upon your work as an
3 environmental and occupational specialist, as a medical
4 doctor, and based upon your review of literature, that
5 formaldehyde can cause aggravation of asthma?
6     A.  Yes.
7     Q.  Is it your opinion, based upon your work as an
8 occupational and environmental specialist as well as a
9 medical doctor, and the literature that you've read,
10 that asthma can cause a short-term aggravation of
11 preexisting -- excuse me, formaldehyde can cause a
12 short-term aggravation of asthma symptoms?
13     A.  Yes, it can.
14     Q.  Is it your opinion --
15     A.  And in children in particular.
16     Q.  And what is it about children that makes them
17 more susceptible to formaldehyde fumes and aggravation
18 of asthma symptoms?
19     A.  That -- that also is a great question.  It --
20 it's been consistently reported, in -- in the literature
21 that I have seen, that children are more susceptible,
22 adults are -- are less susceptible.
23         Actually, that's also consistent with
24 Mr. Cooper's experience, because there was no de novo
25 development of asthma in his mother, who lived in the

Page 257

1 same environment.  There was, my recollection, in his
2 sister, Erica, some nasal problems, for which she was
3 taking a nasal inhaler, but nothing like what Chris went
4 through.
5     Q.  Is it your opinion, based upon your work and
6 your experience as an occupational and environmental
7 specialist and a medical doctor, and the literature that
8 you have reviewed, that formaldehyde exposure can cause
9 permanent damage to the lungs or cause a permanent
10 damage in someone's respiratory capacity?
11     A.  Well, it can, in -- in -- in -- in a
12 dose-related way.  I mean, at certain doses formaldehyde
13 can be lethal.  But the point I -- I -- I want to make
14 is that the permanency we're talking about here is a
15 change in his disease.  He has a permanent change in his
16 disease.
17         Now, the course, the natural course, of that
18 new disease is to be determined.  But the evidence is
19 that -- the recommendations that I've made, based upon
20 the clinical evidence at this time, is that this
21 requires the medical monitoring that I've prescribed.
22         And also, one thing that hasn't been brought
23 up is that I've also recommended that he undergo medical
24 monitor -- well, medical care, effectively, for this new
25 condition, to minimize the impact on him, that is

65  (Pages 254 to 257)

Stratos Legal Services
800-971-1127

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

**Page 258**

1 unrelated to the cancer surveillance.
2    Now, these two programs overlap, so
3 consequently, if -- if -- if a well-designed and well-
4 executed program to protect his health is implemented,
5 that also will include the monitoring that is required
6 for this cancer early detection.
7    Q.  Well, let's talk about that in a little bit
8 more detail.  In your report in Exhibit B, do you set
9 forth a program of some suggested interventions or
10 examinations that should be taken in the future of
11 Christopher Cooper?
12    A.  I did.  This was a preliminary, as you can see
13 from the title, estimated monitoring cost.  And the
14 quote, the specification of this, was intended to be
15 done at a later time.  This is the estimate that I
16 provided at this point in time.  It will need some
17 refinement.
18    The gentleman from U.S. Government brought up
19 the point of clinical algorithms, which, I think, could
20 apply to -- to this type of a program, and quite
21 appropriately.  But those -- those need to be specified,
22 and they weren't specified at this point.
23    Q.  When you talk about or you listed here in
24 Exhibit B, "Primary care" MB -- "MD Q 1 year,"
25 "Specialist MD Q 1 year," et cetera, what does "Q 1

**Page 259**

1 year" mean?
2    A.  It means every year.
3    Q.  And then there's other items that say, "CT
4 Scan," "MRI" or "x-ray."  "CT Scan," "MRI" say "Q 3
5 years."  What does that mean?
6    A.  That means that we would not expect him to
7 require these any more than every three years.  But it
8 doesn't mean that he would even get them every three
9 years.  It really depends -- again, to this degree, it's
10 my recent testimony, it depends on the doctor who is on
11 the site at that point in time.
12    There will be some core requirements for this
13 exam, but the -- there are not going to be automatic
14 requirements for CT scans and x-rays.  I mean, that's
15 something you would -- you would tend to want to do only
16 when there's an indication for it.
17    Q.  The items you set forth in Attachment B, this
18 is a medical monitoring program as well as expected
19 future costs to treat his asthma-related conditions?
20    A.  That's correct.  It --
21    MR. DINNELL:  Objection.  Sorry.
22    A.  It -- it -- notice that they're -- and I -- I
23 use -- I don't want everybody to focus on just
24 dermatologists.  I -- I use that as an example.  But
25 there is a contingency referral requirement there,

**Page 260**

1 meaning that there -- that at a given point in time,
2 funds should be available for the treating physician to
3 comfortably make a referral and permit it.
4    We -- when I design these programs and I -- we
5 came up with them -- when I say "we," meaning my staff
6 and I -- came up with them for Hewlett Packard, for
7 Ceba-Geigy, you name it, many construction companies,
8 for federal agencies, the department -- you know, the
9 Bureau of Standards, there have been a number of
10 different programs that I've put together -- it's always
11 important to negotiate and set forth to these agencies
12 or entities the realistic expectation that you will need
13 funds for a referral to a doctor, to a cardiologist, you
14 know.
15    Or you might -- let's say, for example, you --
16 Mr. Cooper was examined.  You put a stethoscope on his
17 chest and you hear a new heart murmur.  Well, even if
18 you're pretty good with heart murmers, the best --
19 better part of valor is to say:  You know, I'm going to
20 send him to Dr. XYZ, who -- who is a derma-- a
21 cardiologist, to take a listen to that murmur.  Well,
22 that might cost a hundred fifty dollars.  And -- and
23 you -- you have to have funds in there for that
24 contingency, because that's the realistic -- and that's
25 not necessarily a treatment.  It's a clarification of --

**Page 261**

1 of what -- when you consider the permutation of outcome
2 in something as complicated as even this, you have to
3 have contingency funds available, for laboratory as
4 well.
5    Q.  (By Mr. Pinedo)  Does Exhibit B, Attachment B
6 here to your report, set forth the medical interventions
7 and also the monitoring that you believe that is
8 necessary and appropriate for Christopher Cooper?
9    A.  Yes.  This would cover, as I indicated in my
10 report, both aspects of his -- of what, more or less, is
11 a -- is a prescription for future care that's coming
12 from me directly.
13    Q.  This type of analysis, such that is set forth
14 here in Attachment B for medical monitoring and future
15 medical costs, is that something you have done on many
16 occasions in the past?
17    A.  I -- I -- I don't want to say hundreds, but I
18 would say close to hundreds of times.
19    Q.  And then there --
20    A.  In all ways, shapes, and forms; under all
21 kinds of different circumstances.
22    Q.  And is this type of analysis that is set forth
23 here in Attachment B, is that something that you have
24 testified about and has been accepted in other courts?
25    A.  Yes.

66 (Pages 258 to 261)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 262

1    Q.  And then if we turn at the prior page,
2  Page 30 -- I want to take you back, excuse me, to
3  Page 28.  Does that set forth a cost, over the lifetime,
4  for Christopher Cooper's future interventions such as
5  you have set forth in Exhibit B?
6    A.  That was based on Dr. Mayor's taking of these
7  numbers and then providing an estimate of a lifetime
8  cost.
9    Q.  And --
10   A.  Correct.
11   Q.  -- is Dr. Mayor a economist.
12   A.  Yes, he is.
13   Q.  And what is the number that Dr. Mayor came up
14  for future medical expenses for the medical monitoring
15  program and the interventions that you have set forth
16  for the lifetime, if it's discounted to today's present
17  dollar amount?
18   A.  The number was $617,495.
19   Q.  And you as a doctor and an expert in
20  occupational environmental medicine, do you believe
21  that's necessary and appropriate and reasonable for
22  Christopher Cooper?
23   A.  Yes.  And -- and I think it's important to
24  emphasize that the -- that this may be an
25  underestimation of -- of this lifetime number.  Once we

Page 263

1  refine some of the specifics, it's possible that this
2  number could be higher.
3    Q.  You had said there's two components here.  One
4  is his ongoing treatment for can-- -- excuse me, ongoing
5  treatment for asthma or exacerbation of asthma.  Does
6  this also include an opponent for -- component for
7  monitoring the possible cancer risk for Christopher
8  Cooper in the future?
9    A.  Well, not monitoring the risk, per se, but
10  just monitoring for the early detection.  And clearly,
11  if -- if you're examining this young man on a periodic
12  basis for his condition, and you're looking at his nose,
13  you're not going to ignore a preneoplastic effect.  So
14  consequently, you are combining the efforts on -- on
15  behalf of both objectives.
16   Q.  And Christopher Cooper, he has not been
17  currently diagnosed has having cancer?
18   A.  Of course not.
19   Q.  And, but when people talk about chemical
20  exposures and the formation of a illness in the future,
21  such as cancer, I've heard the term latency.  What does
22  latency mean?
23   A.  Latency is the period of time from the
24  subclinical onset of the disorder to its clinical
25  manifestation.

Page 264

1    Q.  And how would that relate to -- with regard to
2  if somebody's exposed to formaldehyde, what term of
3  years might there be before there would be a
4  manifestation of a cancer, if that cancer is associated
5  with that formaldehyde exposure?
6    A.  Well, I specified the length of the program to
7  be 40 years.  The latency could be shorter than that,
8  and -- and I testified to that earlier.  But given the
9  fact that he is a child, he was a child when he
10  sustained this exposure, and he would have a working
11  lifetime -- OSHA generally defines a working lifetime of
12  40 years -- I decided to -- to err on the conservative
13  side and suggest in this -- or proscribe, in this
14  particular type of program, that 40 years would be
15  appropriate for -- for a child under these conditions.
16   Q.  Is it your --
17   A.  I mean, he'd only be 59 years old at the end
18  of the program.
19   Q.  Is it your opinion that Christopher Cooper
20  should be monitored for the next 40 years?
21   A.  For -- for the cancer-related issues.  The --
22  the determination of the medical care and the -- and the
23  medical fine-tuning of -- of his condition, through
24  proper therapy and proper intervention I have
25  recommended, would occur for a lifetime.

Page 265

1    Now, having said that, he -- he will have
2  therefore accrued the benefit of the exam.  I mean, it
3  was more or less de facto, he will accrue the benefit of
4  a lifetime surveillance for cancer.  But for cancer
5  alone, I -- I would recommend a shorter duration than a
6  lifetime.
7    Q.  And again, if we added up all those costs over
8  his lifetime, such as you were suggesting, and reduced
9  them to today's present dollars, what would the value or
10  the amount of that medical intervention be?
11   MR. WEINSTOCK:  I'm going to object to the
12  form of that one as being outside of his expertise and
13  the expertise of another expert you've obtained.  But
14  you can go ahead and answer.
15   A.  It -- it's simply the number that -- that's
16  reported in my report here, of $678,495.
17   Q.  (By Mr. Pinedo)  Now, we've been talking about
18  cancer.  Are there agencies or organizations that have
19  examined the risk of cancer after formaldehyde exposure?
20   A.  Yes.
21   Q.  And I have heard of an agency by the name of
22  IRAC.  What does that stand for?
23   A.  IARC?
24   Q.  IARC.
25   A.  It's the International Agency for Research on

67 (Pages 262 to 265)

2cfe6088-bf79-42ac-9521-c5d8a4397d2a

Dr. James Phillip Kornberg
July 9, 2009

Page 274

1  dust mites and other related plant antigens is not
2  unimportant. But it -- it -- it only shares the stage
3  with the important player in this -- in this causation,
4  which was his formaldehyde exposure.
5      Q.   What is, in your medical opinion, in your
6  scientific opinion, the most important player, as you
7  used that word, the most important element, causing the
8  aggravation of Christopher Cooper's allergy -- excuse
9  me, asthma symptoms?
10     A.   I think it's his exposure to formaldehyde in
11 his trailer between May of 2006 and December of 2007.
12     Q.   Let me ask the question a different way. What
13 is the primary element that caused the aggravation of
14 Christopher Cooper's asthma when he was living in that
15 Gulf Stream travel trailer?
16     A.   The formaldehyde exposure is the primary cause
17 of the evolution of this man's -- the departure from the
18 natural course of the preexisting condition and the
19 development of the new disease. He has a different
20 disease now than -- from -- to a reasonable degree of
21 medical probability, than he would have had, but for
22 this exposure in this trailer.
23     Q.   And explain, for the ladies and gentlemen of
24 the jury, what you mean by "this new disease."
25     A.   A new disease is -- is one in which the -- his

Page 275

1  function at any time -- at any point in time beyond this
2  duration of exposure, is less than it would have been,
3  but for that exposure. So he is -- he is essentially on
4  a new function/time curve.
5      Its -- its -- its final -- its final course
6  is -- is -- can be managed with good medical care so
7  that he doesn't get a lot worse. But he still has, I --
8  I think, based upon the results of the medical testing,
9  he still will have a propensity and be at risk for
10 decompensations that would be more severe than they
11 would have been but for his exposures.
12     So he -- he has this -- a different type of
13 problem. He's got a continuing problem with these boggy
14 nasal turbinates. He does have, undoubtedly, some
15 exposure to dust mites and -- and other things that
16 would -- that he might be allergic to. But he -- the
17 provocation that was demonstrated, the vocal cord
18 dysfunction that occurred in the face of the cholinergic
19 testing, is -- is essentially a signature that he --
20 he's at risk for very significant decompensations in the
21 future, and needs to be managed very carefully.
22     If you were to continue to manage him the same
23 way you did but for the -- you know, prior to this
24 exposure, it would not -- it would not be good for him.
25 He needs -- he needs to be carefully managed and

Page 276

1  carefully surveyed for the rest of his life.
2      Q.   And that careful management and that careful
3  surveillance for the rest of his life, is that due to
4  the formaldehyde exposure that he had those 19 months as
5  he was living in the Gulf Stream trailer?
6      A.   Yes. He would not be -- you could not
7  explain, in my opinion, the conditions that were --
8  were -- were -- were seen at National Jewish, in the
9  absence of that known fact.
10     Q.   Did you also --
11     A.   And -- and -- and, of course, that fact was
12 the -- the first thing I looked at, as I said, I -- my
13 analysis of -- in an attempt to perform the causation --
14 the individual causation analysis, was and began with an
15 evaluation of this exposure situation, as an independent
16 investigation. I didn't tie it in any way, shape, or
17 form, so I had all the data in front of me.
18     And then the determination was: Well, was
19 there a cause and effect? Yes, there was. And I looked
20 at it not only at the increased risk, but I looked at
21 his -- his clinical appearances, as I said, and said
22 this -- this is a different -- this is a different
23 disease altogether, from what Dr. Barnes had -- had
24 indicated, that would -- would -- was the natural
25 evolution of the disease, based on what she saw.

Page 277

1      And the -- the comments that came out of
2  Dr. Pacheco, the same observations of -- of boggy nasal
3  turbinates discharge from the nose, a very significant
4  reaction to -- you might say, a magnified response to
5  methacholine. And -- and also her -- her determination
6  of the laryngoscopy, after that, of his vocal cord
7  dysfunction.
8      I've sent many, many patients over for a
9  methacholine challenge and the histamine challenges.
10 I've sent them to National Jewish. I've sent them to
11 local providers. And you don't -- you -- you -- I'm not
12 saying I haven't seen vocal cord dysfunction, but you
13 only see it in the more severe cases.
14     Q.   And would you --
15     A.   And I might at one more thing. Because of
16 this, I -- I -- I would -- I would add to this that I
17 think he -- he would be at risk for vocal cord
18 dysfunction, with proper provocation, absent
19 methacholine. And that that -- that is sometimes -- in
20 the workplace, for example, there have been -- I haven't
21 seen a ton of cases like this, but people become very
22 dysphonic, they have problems with their voice, they
23 sometimes -- for example, he would -- he may have more
24 problems using inhalers. Because it's been -- this type
25 of thing's been reported after -- after people use

70  (Pages 274 to 277)

Stratos Legal Services
800-971-1127

2cfe6088-bf79-42ac-9521-c5d8a4397d2a