1                UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF LOUISIANA

3

4

5

6    IN RE:  FEMA TRAILER        MDL NO. 1873

7    FORMALDEHYDE PRODUCTS       SECTION "N"(4)

8    LIABILITY LITIGATION        JUDGE ENGELHARDT

9

10                       *   *   *

11

12        Videotaped Deposition of CHARLES DAVID

13   MOORE, PE, PLS, 1833 East Main Street, New

14   Iberia, Louisiana 70560, taken at the

15   offices of Lambert & Nelson, 701 Magazine

16   Street, New Orleans, Louisiana 70130, on

17   Tuesday, the 30th day of June, 2009.

18

19   REPORTED BY:

20        JAMES T. BRADLE, CCR

          PROFESSIONAL SHORTHAND REPORTERS

21        (504)529-5255

22   VIDEOGRAPHER:

23        MICHAEL BERGERON

          PROFESSIONAL SHORTHAND REPORTERS

24        (504)529-5255

25



EXHIBIT
"A"

1    here, which I believe her name is Shirley

2    Alexander, and she lived next door, as I

3    understand it.  And she was there, watching

4    them jacking up the trailer, and she

5    described to us the method of how they did

6    that.

7         Q    Okay.  Now, Mr. Moore, maybe I

8    didn't ask the question right, but I thought

9    I started by asking you, I wanted you to

10   tell me everything that you did, studied,

11   examined, considered, that had some effect

12   on your opinions.

13        Now, you didn't tell me that you

14   talked to her mother, did you?

15        A    At the very first, no, I did not

16   tell you that.

17        Q    All right.  Now, I want to make

18   sure I know everything that -- Wait.  Let me

19   finish.  I want to know everything that you

20   did, looked at, considered, studied that

21   goes into your opinion.  I don't want you to

22   leave anything out.  Please tell me

23   everything.

24        So in addition to those things you

25   told me at the beginning, you also talked to

```
 1    Ms. Shirley Alexander, and she told you how

 2    the trailer was -- that she observed

 3    installation of the trailer and she relayed

 4    that to you, correct?

 5         A    That's correct.

 6         Q    Okay.

 7         A    Let me just back up and tell you

 8    that in order to give you a full chronology

 9    of everything that's happened since I wrote

10    this report, I don't think I could do that

11    off the cuff, and I definitely don't have

12    any specific notes about that.  I don't have

13    a log of that.  So if I --

14         Q    Did you bill your time?

15    MR. PINEDO:

16         Will you let him finish his

17    answer, please?

18    THE WITNESS:

19         So if I leave -- If I leave things

20    out, forgive me if I do.  If things come up

21    as I'm remembering, you know, things that I

22    have looked at to help clarify this, I will

23    tell you that.  And the things with talking

24    with Ms. Shirley Alexander, that is a

25    particular instance as I'm sitting here
```

1    construction methods.  We talked about how

2    the RV was put together.  Those are the

3    particulars of things that I can recall.

4        Q    What did you talk about the

5    jacking?  What do you recall about being

6    discussed in those telephone conversations

7    about jacking?

8        A    The things that we discussed

9    really is we talked about some of the Fluor

10   documents that were issued, I guess, as a

11   blocking installation method or technique.

12   We talked about if those were appropriate

13   for this type of a structure.  We talked

14   about if there were other procedures, other

15   ways of handling that that would be more

16   appropriate.  And so those would be the

17   things in general.

18            In particular, we talked about how

19   the Fluor document really did not give a

20   procedure of jacking and blocking as much as

21   it gave us a picture of how it was supposed

22   to look, if you will, after the jacking and

23   blocking procedures were done, so which in

24   my mind is probably something that is a

25   problem here, in that there wasn't, from

1 what I saw, there wasn't a particular method

2 or procedure that was supposed to be used.

3    They gave the subcontractor or

4 whoever the team actually went out to

5 install the trailer, they gave them, okay,

6 this trailer has to be blocked up on six

7 piers and those piers have to be constructed

8 with a plywood base, solid blocking on the

9 plywood, enough hollow blocks to build up to

10 the right height, a solid block on top,

11 timber shims in order to make it level.  But

12 they didn't go into the procedure of how to

13 get it to that point.

14    And I think that that is a problem

15 in this particular case, because that leaves

16 it wide open to whoever is actually doing

17 the installation to come up with his best

18 method of doing that.  And probably the best

19 method of doing that is to go jack up one

20 corner, put a block under it, go jack up the

21 next corner, put a block under it, go jack

22 up the next corner, put a block under it

23 until you work your way all the way around

24 the trailer, measure how level it is at that

25 point and install shims as necessary to get

1   it to the right levelness.

2            That would probably in my

3   experience as an engineer, looking at not so

4   much travel trailers, but other structures

5   that have to be jacked and blocked, that

6   would be the easiest way for someone to go

7   out there and install this trailer.

8            It would be the -- And it would

9   also be consistent with after we talked

10   about that, then we did talk to Ms. Shirley

11   Alexander, and she relayed her memories of

12   how it happened.

13            Again, I would like to use the

14   word "consistent," that that would be

15   consistent with what she described as what

16   she saw there.  I think she saw that there

17   were probably two men that were there to

18   install.

19            They used jacks that she described

20   as using a pumping motion, so I would

21   probably think that that was probably

22   hydraulic jacks.  She said that she thought

23   that they used two different jacks and

24   jacked up one side as opposed to one corner

25   at a time.  But just because there were two

1    separate jacks, that would indicate to me

2    that there wasn't really a whole lot of

3    effort in picking up the entire side all at

4    once and keeping it somewhat level there.

5    But it would indicate that they picked up

6    one side, blocked it up, and then went over

7    to the other side, picked it up and blocked

8    it up.

9              As I mentioned, I think that that

10   is probably a problem in these cases,

11   because those types of procedures lead us to

12   having some improper loading done on these

13   trailers.  These trailers by nature are very

14   light-weight members, construction-wise,

15   both from the steel frame that supports it

16   underneath to the wood members that form the

17   shell, form the exterior of the trailer, in

18   that if one side or one corner is picked up

19   without the other, then it will definitely

20   cause this trailer to be racked or cause

21   some torsional temporary deformations.

22             Those deformations could then lead

23   to problems, such as what we see with the

24   paneling, in that the paneling has buckled.

25   The way that it is popped or buckled has

1    been described in some of the different

2    reports as very consistent with the two

3    sides moving separately in different

4    directions, which would indicate that the

5    frame has twisted.

6           There are other methods of jacking

7    a trailer that would keep it from doing

8    that.  They are probably more expensive.

9    They are probably more intensive, labor and

10   material-wise.

11          What is typical for some of these

12   types of issues is that you use multiple

13   jacks that are all tied together with the

14   same hydraulic system, so that you create

15   even pressure over the entire structure and

16   you lift the structure as one total unit.

17          That would certainly lower the

18   amount of torsional movement there, if not

19   completely get rid of those movements

20   altogether.  That would probably be the high

21   end of how you would do that.

22          In my experience as a civil

23   engineer, that's very typically done with

24   houses, with structures that are built for

25   the oil field, packages that go offshore,

```
 1    those kinds of things, to where they do lift

 2    the entire unit as a unit as opposed to

 3    individual corners or one side versus the

 4    other side.

 5           Does that make sense?  Did I

 6    answer your question?

 7      Q    I think you went far beyond

 8    answering my question, but you have given me

 9    in my judgment a new report and I will be

10    happy to talk to you for the next few hours

11    about that.

12      MR. PINEDO:

13           Objection to side bar.

14    EXAMINATION BY MR. PENOT:

15      Q    We're going to go through that in

16    some detail as the day wears on, but for

17    now, let's go back to where this started,

18    which was making sure I know everything that

19    you have considered.

20           You told me some things at the

21    beginning of the deposition, which were work

22    order histories on the trailer, other expert

23    reports, which you said were Polk and Bunzer

24    and a guy named Mullet that you went out and

25    found on your own.
```

1          Objection to form.

2       THE WITNESS:

3          I have not been asked to prepare

4   another report at this point.

5   EXAMINATION BY MR. PENOT:

6       Q    Okay.

7       A    Let me just go back, because I am

8   holding this document here, which you asked

9   for from -- that had the comment about the

10  wall in the bedroom.  This is a Unit

11  Inspection Report.  It's a FEMA report dated

12  January 14th, '06 (handing).

13      Q    So this is marked Bates

14  No. FL-FCA-004614, and again, because it's

15  one of yours, I won't mark your document.  I

16  won't mark it permanently, so we can just

17  make a copy at the end of the day, and I

18  will give you your original back, and we

19  will call this Moore No. 5.

20          It's dated January 14 at the top,

21  '06, and it says "wall in bedroom," correct?

22      A    Correct.

23      Q    Now, in the bottom right-hand

24  corner, there's a different date and a

25  different set of signatures, right?

1        A     That's correct.

2        Q     Okay.  You don't -- What's the

3    date in that right-hand corner?

4        A     There is "Name (Contractor)," it

5    says "receipt to and from" and "print."  It

6    would be "Six Flags."  That would be where

7    it's either going to or coming from.

8        Q     You're not sure with this report

9    where it's going to or coming from, are you?

10        A     That's correct.  It says "dispatch

11    to or from" and "print" the name.  That

12    would be "Daren Lemieux."  And then it would

13    be "receipt to or from," and that would

14    be -- it also says "Daren Lemieux."  It has

15    his signature, and it's dated February 17th,

16    '06.

17        Q     Right.  Now, part of the reason

18    that you have come to the conclusion that it

19    occurred, the damage occurred when the

20    trailer was jacked and put in place in

21    February of '06 was because you read a

22    number of reports before this date, and they

23    indicated no damage?  Like on Moore No. 4,

24    no damage?

25        A     Correct.

1       Q    Right.  Okay.  Now, do you have

2    the installation inspection reports?  I

3    think you do.  I see them right there.

4       A    Yes, I guess that's what this is.

5    "Ready for Occupancy, Acceptance Checklist,"

6    yes.

7       Q    Let's see.  The next page might be

8    part of the same one?

9       A    It very well could be.

10       Q    Okay.  Why don't you hand me those

11    two?

12       A    Okay (handing).

13       Q    And these are, for folks on the

14    phone, FL-FCA-004615 and 4616, and actually

15    I'm going to put them -- Well, I'm going to

16    leave them right in that order, and we're

17    going to mark this as Moore No. 6.  And I

18    will give you these back at the end of the

19    day, Mr. Moore.

20         Now, how many people is that Moore

21    No. 6 signed by?

22       A    We have the same signature of

23    Daryl Lemieux, "Contractor" something or

24    other.  I don't know what that says.  "OC"

25    maybe.  And we have a QA inspector, "Raul

1    Medina" it looks like.

2         Q    Now, is there any indication of

3    damage to the wood panels in the bedroom?

4         A    There's nothing marked on here,

5    no.

6         Q    In fact, isn't there a line that

7    says wall panels installed properly, about a

8    third of the way down, I think on the front

9    sheet?  I think, but I may be wrong.  Do you

10   want me to --

11        A    You can show that to me (handing).

12        Q    "Molding and/or panels installed

13   properly," right about a third of the way

14   down on that top page.

15        A    Okay.

16        Q    Okay.  So there's no indication by

17   two people who signed that form that there

18   was any problem with the wall as of the time

19   it was installed on Dale Street; isn't that

20   right?

21        A    That's correct.

22        Q    Why is it that you, in this

23   logical analysis you did about when the

24   damage must have occurred, you said it

25   couldn't have occurred back when it was

1    being driven to Georgia because the guy put

2    "no driver damage"?  Why is it you discount

3    this?

4         A    Well, because, again, this has the

5    same guy that wrote this, Daryl Lemieux,

6    it's got the same date, February 17th, and

7    it has the notation "wall in bedroom," so to

8    me, what probably happened, and this is,

9    again, an assumption --

10        Q    An assumption?

11        A    Because I wasn't there.

12             -- is that they went through,

13   check, check, check, check, check.

14   "Everything okay?"  "Yeah, yeah, yeah, yeah,

15   yeah," and everybody is going through,

16   "Yeah, it's good."

17             And then someone noticed that

18   "wait a minute, there is something in the

19   wall in bedroom," and so on this report,

20   which may have occurred later, it may have

21   occurred before.  I don't know.

22        Q    You don't know?

23        A    I don't know.

24        Q    You don't know how these forms

25   were used?

1        A       That's correct.

2        Q       You're putting together a story

3    just totally on your assumptions?

4        A       Based on what's written here.

5        Q       No, you don't know how the forms

6    are used, you're putting together a story

7    totally based on your assumptions.  You

8    don't know when Moore 5 was filled out, you

9    don't know when "wall in bedroom" was put on

10   Moore 5, do you?

11       A       No.

12       MR. PINEDO:

13            Objection to the form.

14       THE WITNESS:

15            No, I do not, because they could

16   have been written yesterday for all anybody

17   knows and dated -- and back-dated there.  I

18   don't think that happened, because we have

19   had these for quite a few months.

20            So I would have to really go by

21   the dates that's written on there.  I would

22   assume that this form was started on January

23   14th, '06, and then you would assume that

24   the guy that actually signed off on it was

25   February the 17th, '06.

1          At some point between those two

2    dates, I would assume, again, that they

3    wrote this in here, that something is going

4    on with that wall in the bedroom.

5    EXAMINATION BY MR. PENOT:

6          Q    Okay.  Those are all assumptions.

7    You know nothing about these forms.  You

8    haven't talked to Ms. A. Babst or Baker, who

9    dated her signature 1-14-06?  You don't

10   know?

11         A    I don't know that, no.

12         Q    You don't know at all?

13         A    No.

14         Q    All right.

15         MR. PINEDO:

16              Give us her address and we will

17   talk to her.

18         MR. PENOT:

19              You better not, because she works

20   for us.

21         MR. PINEDO:

22              I will notice her up.

23   EXAMINATION BY MR. PENOT:

24         Q    Let's go back to this conversation

25   you had with Shirley Alexander,

1        A     That's okay.

2        Q     Chris, you took the exhibits.  I

3    need to know where I am.

4              Exhibit 7, does that sound right?

5        A     I believe that's correct, yes.

6        Q     I'm going to mark as Moore No. 7

7    an e-mail, and there are no Bates numbers on

8    this.  It's from Jennifer Porter, apparently

9    associated in some way, based on her e-mail

10   address, with Alex Mallet, to you dated

11   Friday, May 15th at 10:30 a.m.

12             "Please see attached report of

13   Mr." -- "Please see attached report

14   Mr. Mallet mentioned from Stephen Mullet."

15             I'm handing you Moore No. 7.  Is

16   that the report of Mullet that you talked to

17   me about earlier this morning that you said

18   you went and found?

19       A     Yes, sir.

20       Q     So you didn't go look for it, that

21   was sent to you by Mr. Mallet's office; is

22   that right?

23       A     Apparently so, yes.

24       Q     Okay.  And I thought you said that

25   was -- And maybe I was wrong and

1 misunderstood you.  I thought you said that

2 was after you had your report, but that was

3 before you issued your report, correct?

4   A Actually, it was the same date.

5   Q Had you issued your report by

6 10:00 a.m. in the morning or whatever it

7 was?

8   A Maybe, maybe not.

9   Q Well, let's look at some other

10 "docs."  I'm not sure if these two documents

11 go together or not.  You can tell me.  I'm

12 going to put them together for right now.

13    Again, this is from your file that

14 you have shown me this morning, and I am --

15 It's un-Bates stamped.  I'm going to mark it

16 as Moore 8, and it's a facsimile

17 transmission cover sheet, May 15.

18    It says "number of pages," it's

19 typewritten "5," and then somebody has

20 marked through in red pen and said "6," to

21 Mikal Watts from David Moore, and the

22 message says "preliminary report."

23    Take a look at that, Moore No. 8.

24   A Okay.

25   Q Where is the report that went with

1     Q    And then Moore No. --

2     A    Nine.

3     Q    -- 9 is something he thought you

4 should look at in connection with your

5 report?

6     A    Correct.

7     Q    Okay.  What's beyond the -- The

8 e-mail sets out the preamble to the spec,

9 and then there are some pages behind that

10 that are stapled to it.  What are those?

11     A    I'm not even sure that they are

12 the same thing, because this is obviously --

13 Well, I say "obviously."  To me, looking at

14 it, it's some type of scan of some

15 documents.  It's not really identified.

16     Q    Okay.  I didn't put them together.

17 This one is just from your file.

18     A    Right.

19     Q    I'm just trying to understand what

20 it is.

21     A    In fact, it looks like a couple of

22 different documents here.  So if it was part

23 of this e-mail, it would have said that

24 there was an attachment on the e-mail, so I

25 don't think that this e-mail and these go

```
 1    together.  I don't know why they're stapled
 2    together.
 3         Q    Okay.  Stuff happens in an office
 4    file, and I understand that.  But could you
 5    explain to me what they are?
 6         A    They are a couple of different
 7    documents.  It looks like it has, like this
 8    one says -- Well, this one is actually
 9    identified as "Office of Assistant Secretary
10    for Housing, HUD," and it's got the
11    Chapter 3280.302, "Body and Frame
12    Construction Requirements."
13         Q    Is this just research you did?
14    Where did it come from?  What is it?  Why is
15    it in there?
16         A    Probably it was research I did.
17    It may have even been sent by Al, because I
18    notice that in the e-mail, it does refer to
19    "HUD requirements, regulations, standards,
20    and guidance," and so at least part of this
21    is some HUD requirements for body and frame
22    construction.  I believe that's the same
23    chapter that I had sent in as my reliance
24    documents that have the loads and things
25    like that.
```

1        Q    Okay.

2        A    The other document, I really don't

3    know what -- It looks like structural

4    calculation guidelines for in transit

5    conditions in mobile homes.  So it looks

6    like some of the same kind of information on

7    mobile homes, axles, wheels, tires, rims,

8    those kind of things.

9        Q    Did you rely on that in any way in

10   forming the opinions expressed in your

11   original report or your revised opinions

12   that you have given me today?

13       A    I think what happened was the

14   3280, I went to that document in the Federal

15   Register, and I think I actually sent the

16   document from the Federal Register that was

17   at 3280 as opposed to -- This looks like

18   some other publication that included part of

19   that Federal Register.

20       Q    Okay.  I'm not sure I got an

21   answer to my question.  Did you rely on this

22   in any way, the portions of Moore 9 in

23   forming your opinion?

24       A    No.

25       Q    Okay.

1    is?  Because of the light we can see, the

2    space we can see between the I-beam and

3    the -- I will call it the thinner part of

4    the wooden wedges?

5         A    That's correct, yes.

6         Q    So your testimony is this

7    photograph, just to be clear, I want to be

8    sure I understand, it's your testimony that

9    this I-beam is not resting on those shims?

10        A    It certainly does not appear to

11   be, yes.

12        Q    By the way, in your work history

13   and experience as an engineer, have you ever

14   worked with travel trailers?

15        A    Not directly, no.  We have done a

16   lot of work for the parish in putting

17   together parks and facilities for hook-ups,

18   camper hook-ups, travel trailer hook-ups,

19   things like that, but on the structures

20   themselves, not a lot, no.

21        Q    So what would your role be in

22   connection with doing engineering work for

23   the parish that involved use of travel

24   trailers?

25        A    They were installing -- The

1    biggest thing that we actually have done

2    there is they were installing a travel

3    trailer park at a recreation site for the

4    parish, and so we were installing the

5    parking pads, the areas for them to actually

6    park the trailers on, which included the

7    electricity and water hook-ups for these

8    units.

9          We didn't involve direct sewage

10   hook-ups to that, but we did put together a

11   dump station that the campers could hook up

12   to as they would leave the site and dump

13   their holding tanks.

14         A little different from this kind

15   of situation, in that normally travel

16   trailers are equipped with holding tanks.

17   These do not have that, on this type of

18   trailer.

19   Q    So the project that you just

20   described, it's a recreation site where

21   people would come with RV's or travel

22   trailers and camp or stay there for a couple

23   of days and then leave?

24   A    That's correct.  Right.

25   Q    And it was just designing the

1    pads?

2        A    Designing the pads, the driveways,

3    parking area, that kind of thing, the

4    electrical hook-ups, the water hook-ups,

5    that kind of thing.

6        Q    But in your work, you have never

7    had occasion to determine and design a

8    blocking system for a travel trailer?

9        A    Not for a travel trailer, no.

10        Q    Did I understand you to say or did

11    I confuse the project that there was some

12    project that your firm did for the parish

13    that used travel trailers, not this

14    recreational site for people to just come

15    and use on a temporary basis, but did I

16    understand you to say you did some work on

17    some facility where travel trailers were

18    used as part of the design of whatever you

19    were designing, your firm was designing?

20        A    No.  We have done work for

21    customers where modular structures, which

22    are similar, and more to a mobile home, use

23    it as office facilities, things like that,

24    so we have worked with several customers on

25    those kinds of things.

1      Q    You don't know if they hired

2    licensed manufactured housing installers?

3    You don't know that, do you?

4      A    I do not know that.  I'm not

5    testifying to any of that, that's correct,

6    but -- Well, I will leave it there.

7      Q    In your report, which is Moore

8    No. 1, Paragraph 3.2 -- Page 3,

9    Paragraph 3.2, you're talking about

10    collected data, and one thing you mentioned

11    there in Paragraph 3.2 is "other photographs

12    used included FEMA documentation taken after

13    the unit was reinstalled in July, 2007."

14            What FEMA documentation are you

15    referring to there?

16      A    I'm referring particularly to this

17    photograph that we have already looked at,

18    Moore 3, would be the primary thing I'm

19    referring to.

20      Q    Okay.  And why?  Why do you refer

21    to that as "FEMA documentation"?

22      A    I was under the understanding when

23    I wrote this report that that's where it

24    came from.

25      Q    That that photograph, Moore 3,

1     came from FEMA?

2          A     That was the understanding, yeah,

3     I had at the time.

4          Q     And then the sentence goes on,

5     "also, the current condition of the site

6     where the unit was in service."

7               What photographs are you referring

8     to there?

9          A     That, I have a photograph that

10    showed basically this same site

11    (indicating), but the trailer is not on

12    there.  It showed the driveway leading up

13    onto the lot, that kind of thing, that was

14    taken fairly recently, and I apologize, but

15    I don't remember who took that or at what

16    time.  It was after the trailer was removed

17    from the site.

18         Q     And when you said "this," you were

19    talking about Moore No. 3?

20         A     That's correct.

21         Q     And you believe the picture was

22    taken like in the May, June, 2009 time

23    period?

24         A     Probably.

25         Q     When the experts were working on

1    this case?

2         A    Probably, yes.

3         Q    In Paragraph 3.3, and I think we

4    have been over this, The Manual of Steel

5    Construction, The Timber Construction

6    Manual, and ASCE 7-05, Minimum Design Loads

7    for Buildings and Other Structures, and HUD,

8    Part 3280, you are not saying that any of

9    those are applicable by their own terms to

10   travel trailers, are you?

11        A    Not directly to travel trailers.

12   The Manual of Steel Construction would go

13   directly to the design of the steel

14   framework and to determine proper loading

15   and those kinds of things.

16             The Timber Construction Manual,

17   the same kind of thing, is that they don't

18   directly relate to travel trailers

19   specifically, but just to the design of

20   timber members and wood members in general.

21             ASCE 7-05, again, is the standard

22   that we would normally use for buildings and

23   other structures to determine what kind of

24   loads are applicable to everything from

25   warehouses and commercial buildings down to

1    residences.

2         Q    By the way, you used the edition

3    7-05, correct?

4         A    Yes.

5         Q    And does that "05" mean that's the

6    2005 edition?

7         A    That is correct.  Yes.  Right.

8         Q    And this trailer was built in

9    December of 2004; is that right?

10        A    That's correct.

11        Q    So why is this the applicable

12   edition of the ASCE --

13        A    It's the most current that I

14   have --

15        Q    Let me finish.

16        A    Okay.

17        Q    -- ASCE 7-05?

18        A    Okay.  ASCE 7 is the general

19   terminology for that.  That was the edition

20   that I have handy on my computer, is the

21   7-05.  I just happen to know that there's

22   not a huge difference in the documents from

23   7-02, I believe it is, which was the

24   previous version of that, so I just used

25   that one because it was the most handy.

1          Q     So you think what you understood

2     Ms. Alexander, Ms. Shirley Alexander to have

3     described to you was close to the worst way

4     you could do it, that is two jacks, jacking

5     up one side, correct?

6          A     Correct.

7          Q     And what are these interim

8     solutions or procedures to which you refer,

9     between that and the six, what did you call

10     them, six coordinated --

11          A     Jacks.

12          Q     -- jacks?

13          A     I guess alternatively, there could

14     be some incremental, so that you're not

15     jacking up the entire weight on the pier

16     under there.  I think you even mentioned

17     earlier the possibility of using cribbing,

18     so that you jack up a little bit at a time,

19     place the cribbing, so that the unit stays

20     more level as opposed to picking the whole

21     thing up, and then picking the other side

22     up.

23          Q     And could you effectively do that

24     with two jacks?

25          A     It would be hard.  I would think

1    remembering right.

2         Q    Do you know if there was a bed and

3    a sofa?

4         A    I do not know that.

5         Q    And you don't know what the

6    manufacturer says it sleeps, do you?  You

7    didn't see that in the manual?

8         A    I don't remember seeing that

9    anywhere, no.

10        Q    But you don't think it was

11   designed for fewer than three people, do

12   you?

13        A    I don't know that, but, no.

14        Q    And what is the source of this

15   knowledge of yours about how normally travel

16   trailers -- how travel trailers are designed

17   and the purposes and the uses?  I mean, is

18   that within your expertise as a civil

19   engineer?

20        A    Somewhat.  As I mentioned earlier,

21   civil engineers are also -- include

22   transportation and recreation things that we

23   go through schools for those.

24             Part of the things that I have

25   dealt with is travel trailers as far as for

```
 1     travel trailer parks, and so part of those
 2     designs is to determine just how these
 3     travel trailers are used.
 4          MR. PENOT:
 5               Why don't you give me one moment,
 6     please, Chris and Mr. Moore.  I may be close
 7     to done.
 8               I tell you what I'm going to do at
 9     this point.  If it's okay, I'm going to pass
10     the witness, although I would like the
11     opportunity to speak with Mr. Quick and to
12     look at my notes, and I may have a couple
13     more questions after any other defendants
14     ask questions.
15               How much time?
16          THE VIDEOGRAPHER:
17               4:17.
18          MR. DERHAM:
19               I have a few questions, but it's
20     not going to be too long.  Just give me a
21     minute.
22          MR. PINEDO:
23               Adam, do you have any questions?
24          MR. DINNELL:
25               Just a few.
```

1              Back on the record.  It's 4:15.

2    EXAMINATION BY MR. PINEDO:

3        Q    Sir, could you please state your

4    full name?

5        A    It's Charles David Moore.

6        Q    And, Mr. Moore, how are you

7    currently employed?

8        A    I'm a registered civil engineer

9    and land surveyor.

10       Q    And do you have a business that

11   you work with?

12       A    Yes, sir.  I own Freyou, Moore and

13   Associates in New Iberia, Louisiana.

14       Q    Could you tell the ladies and

15   gentlemen of the jury what type of work

16   Freyou, Moore and Associates does?

17       A    We do all forms of civil

18   engineering work, which is a very broad

19   category of engineering, that deals directly

20   with structural work, civil work is

21   typically site, environmental, utilities,

22   drainage, those types of things, and then

23   the other form of work that we do is land

24   surveying.

25       Q    And when did you get your

1    engineering degree?

2         A    I got my engineering degree in

3    1982 from the University of Kentucky.

4         Q    And have you been involved in the

5    engineering field since that time?

6         A    Yes, sir.

7         Q    For the last 27 years?

8         A    Yes, sir.

9         Q    And I'm looking at Moore

10   Exhibit 2.  Is this a copy of your

11   curriculum vitae?

12        A    Yes, it is.

13        Q    And one of the things you include

14   in your curriculum vitae, a description of

15   work, "structural inspection for residential

16   and commercial properties."  Is that right?

17        A    That's correct.

18        Q    Can you tell us briefly what you

19   have done in that regard?

20        A    Briefly, as houses are bought and

21   sold, typically either the buyer or the

22   seller, usually the buyer, has concerns

23   about some structural aspect of the building

24   that they're wanting to buy, and so they

25   will ask me to come and -- or they will ask

1    an engineer to come and look at that and

2    determine whether there's a problem that

3    they're going to have to deal with later or

4    what they're looking at.  So I have done

5    those kind of things for many different

6    types of buildings.

7         Q    And what's the steps you go

8    through for that type of assessment or

9    examination?

10        A    Typically, the first thing is a

11   visual inspection, where I walk through the

12   building, take note of any obvious defects

13   or problems, such as cracks in the finish

14   work, obvious problems that may be

15   deflections or movements in the walls, and

16   just, like I say, note whether there's

17   anything that is completely out of the

18   ordinary.

19             If there's not, then I take a look

20   and make sure that everything looks in

21   general like it would be constructed

22   properly.

23             For instance, most houses use

24   two-by-four studs for construction,

25   two-by-six rafters.  If there's anything

1   there that looks out of the ordinary, then I

2   take a look to make sure that it has been

3   built and constructed properly and actually

4   will meet the loads.

5        Q    In addition to your work with

6   residential properties, have you also done

7   some work with travel trailer parks and

8   mobile home parks?

9        A    Yes, sir.  We have designed quite

10  a few travel trailer parks around the

11  parish.  I live in Iberia Parish.  And we

12  have designed the parking areas, structure

13  paths, the driveways, the utility hook-ups

14  for those travel trailers.

15       Q    In talking about the residential

16  work that you do, do you typically write a

17  report for a client when they ask you to

18  review a house or a home regarding its

19  structure, or is that something you give to

20  them verbally?

21       A    It's a combination of that.

22  Sometimes it's just a verbal report,

23  sometimes it's a written report.

24       Q    Do at times you ever make a

25  suggestion or recommendation that the

1   residence is not livable or it has

2   structural damage?  Is that something you

3   include in your report?

4       MR. PENOT:

5           Object to the form.

6       THE WITNESS:

7           Yes, sir.

8   EXAMINATION BY MR. PINEDO:

9       Q    When you write a report about a

10  house or a residence that you have examined,

11  do you include recommendations in it?

12      A    It depends on how extensive any

13  damage that I would see.  Yes, I would

14  normally give some type of recommendation as

15  to the basic steps to move forward to

16  correct those problems.

17      Q    Now, did you have an occasion to

18  observe the travel trailer that Alana

19  Alexander and Christopher Cooper lived in?

20      A    Yes.

21      Q    And who is the manufacturer of

22  that travel trailer to your understanding?

23      A    To my understanding there was a

24  tag on the trailer itself, Gulf Stream.

25      Q    And do you have an understanding