UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE:      FEMA TRAILER            *      MDL NO. 1873
            FORMALDEHYDE PRODUCTS   *
            LIABILITY LITIGATION    *      SECTION "N" (5)
                                    *
                                    *      JUDGE ENGELHARDT
                                    *      MAGISTRATE CHASEZ
THIS DOCUMENT IS RELATED TO         *
                                    *
*Charlie Age, et al v. Gulf Stream Coach*   *
*Inc., et al*, Docket No. 09-2892;          *
Alana Alexander, individually and on behalf *
of Christopher Cooper               *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

<u>MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT GULF
STREAM COACH, INC.'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY
OF PATRICIA M. WILLIAMS, PH.D., DABT</u>

**MAY IT PLEASE THE COURT:**

Plaintiff Alana Alexander ("Plaintiff") respectfully submits the following

Memorandum in Support of its Response to Defendant Gulf Stream Coach, Inc.'s

Motion *In Limine* to Exclude Expert Testimony of Patricia M. Williams, Ph.D., DABT.[1]

## I.    STANDARD OF ADMISSIBILITY FOR EXPERT TESTIMONY.

Gulf Stream seeks to exclude the expert testimony of Dr. Patricia M. Williams. As will be discussed *infra*, Dr. Williams is more than qualified to render the opinions she has offered, the science supporting her opinions is sound, and her opinions are reliable.

The admission of expert testimony in federal court is government by Federal Rule of Evidence 702, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), a Rule 702 determination is a question of law for the district court that imposes a special obligation on the trial judge. *Id.* at 579, 592. This special obligation requires that the trial judge act as a gatekeeper to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 583-84.

---

[1] Please note that Plaintiff objects to the extremely brief response date and seeks a continuance of time to respond in more detail, but has endeavored to provide the most comprehensive response possible in this short deadline. The subject motion was filed on August 25, 2009. It was not set for hearing. However, the Court ordered Plaintiff to respond by August 31, 2009. The subject motion raises significant issues. It is unfair and prejudicial to compel Plaintiff to respond to this substantial motion within 4 business days. Further, such a short response date violates Local Rule 7.2.

Under a Rule 702 inquiry, the first step is to determine whether the expert is qualified to testify. *Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741 (3d Cir. 1994). The United States Supreme Court in *Daubert* emphasized that a Rule 702 inquiry was "a flexible one" where the individual factors are neither exclusive nor dispositive. *Daubert*, 509 U.S. at 594-95. As such, this Court essentially considers whether the expert retains a broad range of knowledge, skills and training. *Id*.

The second step of the Rule 702 inquiry requires the expert testimony to be reliably based upon scientific methods. *Paoli*, 35 F.3d at 742. "*Daubert* explains that the language of Rule 702 requiring the expert to testify to scientific knowledge means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Id*. (citing *Daubert*, 509 U.S. at 590). Although not inclusive, these following concepts have been articulated as factors to guide the Court's assessment of reliability: (1) whether the theory or technique can be tested, (2) whether the theory or technique has been subjected to peer review, (3) whether there is a high rate of known or potential error, (4) whether there are standards controlling the technique's operation, and (5) whether the theory enjoys "general acceptance". *Daubert*, 509 U.S. at 593-94; *see also Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998).

Dr. Williams testimony is not only qualified to provide her opinions, but her opinions are indeed reliable — not result oriented — and provide information that will undoubtedly assist the trier of fact in developing a reasoned decision. In a faulty attempt to exclude Dr. Williams's testimony, Gulf Stream embarks on a crusade to

misconstrue Dr. Williams's representations and twist her statements to reflect an opinion she clearly does not provide.

## II.    DR. WILLIAMS IS QUALIFIED TO TESTIFY.

The first step in a Rule 702 inquiry is to determine whether the expert is qualified. As discussed below, Dr. Williams is clearly qualified by knowledge skill, experience, training and education to offer the testimony she presents in this case.  Furthermore, Gulf Stream's attempts to refute Dr. Williams's qualifications lack foundation as they are based on inapplicable case law and attempts to "spin" the opinions to which Dr. Williams is to testify.

### A.    Dr. Williams Retains the Requisite Qualifications.

Dr. Williams holds a Masters Degree in microbiology from Louisiana State University, and a Ph.D. in anatomy with a doctoral minor in biochemistry from Tulane Medical Center. *See* **Exhibit A**, Patricia M. Williams, Ph.D., DABT Curriculum Vita, p.1; *see also* **Exhibit B**, Affidavit of Patricia M. Williams, Ph.D. DABT in the Trial of Alana Alexander and Christopher Cooper, p.1-2.  She is board certified by the American Board of Toxicology and licensed by the State of Louisiana as a Clinical Laboratory Scientist and Laboratory Director. *See* **Exhibit A**, p.1; **Exhibit B**, p. 1-2.  She currently serves as a tenured Associate Professor and Coordinator for Toxicology Research Laboratories of the Pontchartrain Institute for Environmental Sciences at the University of New Orleans., where she also teaches graduate and undergraduate classes in toxicology. *See* **Exhibit A**, p.1; **Exhibit B**, p.1-2.  She has lectured to second-year medical students on the "Environmental Etiology of Disease," and has served as Principal Investigator for medical surveillance research projects funded by the State of Louisiana.

*See* **Exhibit B**, p. 3.    Her experience also includes performing health profiles and epidemiologic studies to identify the evolution of disease in association with chemical exposure. *See* **Exhibit B**, p. 3.  In as recent as July 30, 2009, other courts have found her to be qualified.   *See* **Exhibit C,** Opinion from the Twenty Fourth Judicial District Court, Parish of Jefferson, July 30, 2009, p. 3, 8; **Exhibit D**, Opinion from the Northern District of Mississippi, July 23, 2007, p. 10 (finding Dr. Williams "clearly and indisputably well-qualified").

Dr. Williams is also particularly qualified as to the testimony she provides.  The methodology for her opinions originates from techniques published in the Reference Manual for Scientific Evidence of the Federal Judiciary Center.  Her opinions derive in part from the existence and concentration range of formaldehyde in the FEMA trailers available from the direct analysis of air concentrations performed by the Center for Disease Control and Prevention (CDC), which published its Final Report on July 2, 2008. *See* **Exhibit B**, p. 25; **Exhibit E**, Deposition of Patricia M. Williams, Ph.D., DABT, taken on July 7, 2009, p. 232.   Dr. Williams conducted an extensive review of the scientific literature, which she summarizes in her affidavit.  *See* **Exhibit B**, p. 8-24.  Her references include such venerated sources as the World Health Organization (WHO), International Agency for Research on Cancer (IARC), Cassarett & Doull's, the Agency for Toxic Substances and Disease Registry (ATSDR), and Patty's Toxicology.  *See* **Exhibit B**, p. 8-24.  Her testimony obviates that her education, research, and work experience qualify her to identify and interpret patterns of disease development in association with toxic exposures to determine the etiology of environmental diseases

using the tools, data, and resources she used as the basis of her expert testimony for her opinions regarding general causation. *See* **Exhibit B**, p. 5.

  **B.** <u>**Gulf Stream's Challenges to Dr. Williams's Qualifications Do Not Relate to the Purpose of Her Opinions.**</u>

  Gulf Stream's challenges to Dr. Williams's qualifications fail because Gulf Stream misconstrues her opinions. Gulf Stream misrepresents Dr. Williams's testimony as seeking to establish specific, medical causation by referencing numerous cases precluding testimony relating to specific causation.[2] *See* Rec. Doc. 2834-2, p. 2-3. However, specific, medical causation is neither the purpose nor the thrust of her testimony. As she states numerous times in her Affidavit and deposition, her opinions relate only to general causation. *See* **Exhibit B**, p. 5; **Exhibit F**, p. 104. As noted in *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661 (5th Cir. 1999) and *Perry v. Novartis Pharmaceutical*, 456 F. Supp. 2d 678 (E.D. Pa. 2006), a qualified toxicologist can testify as to general causation.

  Gulf Stream also attempts to challenge Dr. Williams's qualifications on the basis that she has no previous experience with formaldehyde. *See* Rec. Doc. 2834-2, p. 3-4. Her relevant experience is with the <u>methodology</u> involved in identifying the evolution of disease in association with chemical exposure. *See* **Exhibit B**, p. 5 (emphasis added). The methodology can then be applied to whatever chemical is at issue. This would be analogous to a differential diagnosis that includes a diseases or condition the physician has never before encountered, or a scientist applying the scientific method in testing a novel hypothesis.

---

[2] Dr. Williams herself states that she does not diagnose patients. *See* **Exhibit F**, Deposition of Patricia M. Williams, Ph.D. DABT, taken on Oct. 16, 2008, p. 44.

In addition, Gulf Stream states that Dr. Williams has been previously precluded from providing an expert opinion and relies on *Ballard v. Bunge North America, Inc.*, 2008 WL 2185385 (E.D. La. May 22, 2008), for support.  Rec. Doc. 2834-2, p. 3.  Gulf Stream's allegation is spuriously incorrect.  *Ballard* is a summary judgment case distinguishable on the grounds that the primary issue dealt with specific causation.  *Id.* at *1.  As noted above, Dr. Williams has made clear that she does not offer an opinion with regard to specific causation. *See* **Exhibit B**, p. 5; **Exhibit F**, p. 104.   Furthermore, even though summary judgment had been granted, the court implicitly found Dr. Williams qualified to provide testimony with regard to general causation.  *Id.* at 3.  More notably, in Louisiana state court, Dr. Williams's qualifications survived a *Daubert* type attack in which the court noted "[Dr. Williams] is qualified to render an opinion as to general causation.  If the *Ballard, Curtis and Perry* cases agree on little else, they agree that a Ph.D. toxicologist can render an opinion as to general causation; other cases agree."

Thus, Dr. Williams is unquestionably qualified by knowledge, skill, experience, training, and education to offer the testimony she presents in this case. *See* FED. R. EVID. 702.   As she has repeatedly testified, her opinions deal only with general causation, and thus Gulf Stream's repeated assertion that she is not qualified to establish specific causation is irrelevant.

### III.    DR. WILLIAMS'S TESTIMONY IS RELIABLE.[3]

---

[3]    Gulf Stream begins its discussion of reliability by citing to testimony where Dr. Williams purportedly states there is no relation between smoking and cancer.  As is a notable pattern of Gulf Stream, the testimony cited is irrelevant as regarding the specific cause of pancreatic cancer, not the general cause of cancer.  Rec. Doc. 2834-2, p.6.

Under *Daubert* and its progeny, Dr. Williams's methodology is reliable and bears numerous hallmarks of such reliability. *See Ancar v. Murphy Oil, U.S.A., Inc.*, 2007 WL 3270763, *2 (E.D. La. Nov. 2, 2007); *In re Katrina Canal Breaches Consol. Litigation*, 2007 WL 3245438, *12 (E.D. La. Nov. 2, 2007). Dr. Williams's methodology is based on that published in the Reference Manual for Scientific Evidence of the Federal Judiciary Center. *See* **Exhibit B**, p. 5. Her technique, therefore, is not only generally accepted by federal courts nation-wide and by experts in her field, but has also been tested, published, and peer reviewed. These indicia of reliability are sufficient to satisfy the standards set forth in both *Daubert* and *Ancar*. *See Daubert*, 509 U.S. at 589, 593-95; *Ancar*, 2007 WL 3270763 at *2.

Furthermore, Dr. Williams's opinions have developed naturally and directly from her previous research and projects. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150-51 (1999). She has previously conducted government-funded health assessments and medical surveillance projects related to toxic exposures. *See* **Exhibit B**, p. 3. She has served as project administrator for a court-established medical intervention program for asthma sufferers, which included a camp for children suffering from asthma, an adult asthma education program, and an asthma education and management program for pulmonary care clinics. *See* **Exhibit B**, p. 3. The opinions she provides relating to the general causation of cancer and asthma are consistent with the research on which she relies. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). As will be shown below, Gulf Stream's assertions are unfounded; thus, Gulf Stream's motion *in limine* to exclude Dr. Williams's testimony should be denied.

**A.** **Gulf Stream Fails to Assert a Viable Challenge to the Reliability of Dr. William's Cancer Opinions.**

Dr. Williams opines that "[a] cause—effect relationship exists between formaldehyde and upper respiratory tract damage and cancer." **Exhibit B**, p. 35. This opinion applies only to general causation and is irrelevant to any determination of specific causation. Gulf Stream alleges that this opinion is unreliable because it (1) is based on a "no threshold" model, (2) lacks evidentiary and scientific support, (3) fails to consider negative studies and (4) misuses epidemiological data. Gulf Stream's reasons, analyzed singularly or as a whole, fail to show that Dr. Williams's opinion is unreliable.

### 1.  *The "No Threshold" Model Is Reliable and Recognized As Such*.

Gulf Stream attacks Dr. Williams's statements concerning the inevitability of damage caused by formaldehyde by alleging that the "no threshold" damage model is unreliable. *See* Rec. Doc. 2834-2*,* p. 8-9. This model, however, has been recognized as a valid theory by the Reference Manual on Scientific Evidence. REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 407-08  (2nd ed. Federal Judicial Center) (2000).  Thus, to aid in the understanding of the scientific foundation of her opinions, Dr. Williams properly explains the well-documented body of science concerning the no threshold damage model as it pertains to formaldehyde. *See* **Exhibit E**, p. 196-99. The mechanism of formaldehyde damage begins with the chemical structure of the formaldehyde molecule itself. *See* **Exhibit E**, p. 199-205. When molecules in a cell are changed, the cell itself is changed and damaged. *See* **Exhibit E**, p. 288. This description of the no threshold model comports with the explanation provided by the Reference Manual on Scientific Evidence, and is a model that has also been adopted by OSHA. *Pub. Citizen Health Research Group v. Tyson*, 796 F.2d 1479, 1498 (D.C. Cir. 1986).

Furthermore, Gulf Stream's reliance on *Dumontier v. Schlumberger Technology Corp.*, 543 F.3d 567 (9th Cir. 2008) is misplaced. *Dumontier*, which Gulf Stream quotes at length, interprets language of the Price-Anderson Act, which creates a private cause of action for injury arising out of a nuclear explosion or incident. *See Dumontier*, 543 F.3d at 569. The Price-Anderson Act specifically prohibits recovery without a showing of "bodily injury, sickness, disease, or death." *Id.* at 570. Thus, Gulf Stream's own quotation, had they read it carefully, would have informed them that the interpretation dealt only with "an injury <u>within the meaning of the Act</u>." *Id.* (emphasis added); Rec. Doc. 2834-2, p. 7. The case has nothing to offer on the reliability of no threshold damage model or any other subject considered by Dr. Williams.

Similarly, the slew of cases cited by Gulf Stream do not support a finding of scientific unreliability. Gulf Stream first cites to *Parker v. Wellman*, 230 Fed. Appx. 878 (11th Cir. 2007), which interpreted a Georgia law requiring evidence of "actual disease, pain or impairment of some kind." *Id.* at 882. In *Ranier v. Union Carbide Corp.*, 402 F.3d 608 (6th Cir. 2005), the Sixth Circuit provided their "best prediction" as to how the Supreme Court of Kentucky would define a state law regarding "bodily injury," an unsettled question in that jurisdiction. *Id.* at 618. In *Eagle-Picher Industries, Inc. v. Liberty Mut. Inc. Co.*, 682 F.2d 12 (1st Cir. 1982), the issue was the construction of language of an insurance policy. *Id.* at 19-21. Next, in both *Schweitzer v. Consol. Rail Corp.*, 758 F.2d 936 (3rd Cir. 1985), and *Laswell v. Brown*, 683 F.2d 261 (8th Cir. 1982), the issues were whether an injury at the cellular level was sufficient to maintain a cause of action. *See Schweitzer*, 758 F.2d at 942; *Laswell*, 683 F.2d at 269. Similarly, Gulf Stream relies heavily on *Whitin v. Boston Edison, Co.*, 891 F.Supp. 12 (D. Mass.

1995), however, the findings regarding the no threshold model were specific to the exposure to radiation at that time. *Id.* at 25 (emphasis added). Further, the no threshold model was not the basis for precluding the expert's testimony, instead the expert was excluded because of lacking qualifications. *Id.*

As noted by D.C. Circuit, the "no threshold" model has been adopted by the Occupational Safety and Health Administration (OSHA) in its regulation of workplace carcinogens and the fact that these regulations have been upheld in federal in court. *Public Citizen Health Research Group*, 796 F.2d at 1498. In *Public Citizen Health Research Group*, the court relied on the codification of an OSHA rule requiring the application of the no threshold damage model in determining its reliability. *Id.* at 1498 ("Congress has impliedly approved estimation techniques when evidence is unavailable to "prove" the harmful health effects posed by toxins.").

Again, Gulf Stream's cited case law fails to support its argument. Each case cited by Gulf Stream deals with causation of a specific disease in a specific individual. The testimonial problems of Gulf Stream's cited cases range from a total lack of exposure quantification to a lack of a differential diagnosis. Dr. Williams, however, has made it clear that she is not giving an opinion as to specific causation. *See* **Exhibit B**, p. 5; **Exhibit E**, p. 98. Gulf Stream again attempts to cloud the issue at hand by focusing on specific causation when it quotes in its motion "when you theoretically consider the DNA-reactive carcinogens, we know there is no threshold on a molecular level*...*" which was directed at cellular damage, not a specific disease. *See* Rec. Doc. 2834-2, p. 8 (emphasis added); **Exhibit F**, p. 231-36. None of the cases cited by Gulf Stream rejected Dr. Williams's explanation that every completed exposure results in

some damage at a molecular level.  Nor did Defendants challenge the scientific underpinnings of the statement.  Defendants arguments, therefore, fail to cast doubt on the reliability of Dr. Williams's opinions.

### 2.    *Dr. Williams's Opinions Have Evidentiary and Scientific Support.*

Dr. Williams is a toxicologist.  *See* **Exhibit A**, p.1; **Exhibit F**, p. 134.  As such, she looks at damage not only as observable symptoms, but also as the damage occurring at the molecular and cellular levels.  *See* **Exhibit B**, p. 4-5, **Exhibit E**, p. 163-64.   Her job as a scientist is to illuminate the biochemical mechanism involved in producing the observable symptoms. *See* **Exhibit F**, p. 134.  Gulf Stream argues that Dr. Williams's explanation of the molecular formaldehyde damage process is an opinion that formaldehyde exposure can cause cancer at any level.[4]

As this Court noted in its orders regarding the exclusion of Marco Kaltofen, PE and Stephen Smulski, the factual background used by experts is not considered to be their opinion.  Rec. Doc. 2800; Rec. Doc. 2816.  The opinion of an expert consists of the conclusions drawn from the knowledge, experience and skill of the expert coupled with factual background information.   Here, Gulf Stream is attempting to equate Dr. Williams's usage of background information to her opinion.  To aid in the understanding of the scientific foundation of her opinions, Dr. Williams explained the well-documented body of science concerning the mechanism of formaldehyde damage. *See* **Exhibit E**, p. 28-29.  The mechanism of formaldehyde damage begins with the chemical structure of

---

[4]      It should be noted that Gulf Stream failed to provide any citations to Dr. Williams's deposition testimony or Affidavit that would support its assertion that "Williams states that formaldehyde exposure, at any level, has the potential to cause a variety of cancers."  Rec. Doc. 2834-3, p. 9.

the formaldehyde molecule itself. *See* **Exhibit E**, p. 28-9.  The formaldehyde molecule is a reactive electrophile, meaning that its structure is deficient in electrons, and thus has a positive electrical charge. *See* **Exhibit F**, p. 73, 134, 232, 252-53.  The molecule, therefore, seeks to attach to negatively charged molecules, much like a magnet, to cure its electron deficiency. *See* **Exhibit F**, p. 253.  The attachment of the formaldehyde changes the molecule to which it attaches. *See* **Exhibit F**, p. 253.  When molecules in a cell are changed, the cell itself is changed and damaged. *See* **Exhibit F**, p. 134.  The damage at the cellular level can be seen using microscopes to view biopsies in humans and tissue samples in animals. *See* **Exhibit F**, p. 135.

The injury caused by the cellular change depends partially on the dose, and partially on the type of cell that was damaged.  For instance, a change in a DNA molecule can result in a mutant gene. *See* **Exhibit E**, p. 286-87.  If the dose of the toxicant is low, only a few DNA molecules will be changed, and it is likely that the body's defense mechanisms will be able to repair the damage, particularly in healthy adults, with a net result of no observable disease. *See* **Exhibit F**, p.76, 232, 256.  If the dose is high or the exposure prolonged, more cells will be damaged, the likelihood of repair will be lower, and the ultimate result will be a tumor, malignancy, damaged tissue, apoptosis, metaplasia, and dysplasia. *See* **Exhibit E**, p. 286-87; **Exhibit F**, p. 118, 125, 127, 163, 213, 253, 256, 264.  Because formaldehyde is a gas, it will contact and have a similar effect on the cells of the skin and the respiratory system, resulting in observable damage of a type unique to those organs.  *See* **Exhibit F**, p. 118, 121, 263, 272-73.

In attempt to show testimonial conflicts amongst experts, Gulf Stream references the testimony of Dr. Christopher DeRosa, MS, Ph.D and Plaintiff's Expert, Dr. Gerald McGwin, MS, Ph.D, who both state that the IARC classification of formaldehyde as a known carcinogen is based primarily on the Hauptmann study.  Rec. Doc. 2834-2, p. 11; **Exhibit G**, *Mortality from Solid Cancers Among Workers in Formaldehyde Industries*, 159 AM. J. EPID. 1117 (2004).  Although Gulf Stream purports that Dr. Williams does not agree with the other experts, Dr Williams does acknowledge IARC's classification of formaldehyde as a carcinogen and correctly states that instead of relying only on one study, IARC evaluated "the results of epidemiological and experimental studies on cancer" as well as "data relevant to the understanding of mechanism of action." **Exhibit E**, p. 51; World Health Organization, International Agency for Research on Cancer, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 88, p. 11.

Furthermore, Gulf Stream improperly minimizes the significance of the Hauptmann study by only looking at the peak exposures when the study included data observed from cumulative and durational exposures.  **Exhibit G**, p. 1117.  The data not mentioned by Gulf Stream is relevant because parts per million can be calculated various ways:

> A.     When you say someone has -- let's just say someone has a 40 part per million year exposure to benzene.  I will get you to just think differently.  They can have two years at 20 parts per million.  They can have four years at ten parts.  You see what I'm saying?  It's any combination.

**Exhibit E**, p. 88-89.  Thus, because parts per million is not necessarily calculated on a one-time, "peak" interval, Gulf Stream's conclusions are misleading.  Furthermore, Gulf

Stream "spins" the testimony of Dr. McGwin to create the impression that there is no association between nasopharyngeal cancer to formaldehyde levels present in the EHU at issue (590 parts per billion).  Dr. McGwin testified that because epidemiologic studies are looking at people who are generally exposed to formaldehyde by their work, etc and are not provided with an exact formaldehyde exposure level, Dr. McGwin could not provide a conclusive opinion that such levels certainly cause nasopharyngeal cancer. **Exhibit H,** Deposition Testimony of Gerald McGwin, Jr., M.S., Ph.D., taken on July 27, 2009, p. 131-32 ("I just want to get some context here, my answer was because the epidemiologic studies generally don't provide us the formaldehyde levels.  Most of them are occupational studies where it was you work in an embalmers lab, you work in a carpet, factory, et cetera.").  Furthermore, Dr. McGwin had not been charged with providing an expert opinion as to what specific level of formaldehyde causes cancer. **Exhibit O**, Affidavit of Gerald McGwin, May 18, 2009, p. 3; *see also* **Exhibit P**, Affidavit of Gerald McGwin Jr., Ph.D, Aug. 20, 2008, p. 4-6.

However, as a toxicologist understanding the biological basis of the damages caused by formaldehyde, Dr. Williams looked to the molecular epidemiology in two studies that provide an association to nasopharyngeal cancer at 40 and 65 ppb by "looking at the damage done to the cell by the formaldehyde with the DNA-protein crosslinks." **Exhibit E**, p. 64; **Exhibit I**, Shaham, J., (et al), *DNA-protein crosslinks and p53 protein expression in relation to occupation exposure to formaldehyde*, 60(b) Occup. Environ. Med. 403-09 (2003) (noting the association to nasopharyngeal cancer at concentrations of 40 ppb); **Exhibit J**, Vaughn, TL., (et al), *Occupational exposure to formaldehyde and wood dust and nasopharyngeal carcinoma*, Int. J. Cancer 38 677-83

(1986) (noting the association to nasopharyngeal cancer at concentrations of 65 ppb). This association is significant because "formaldehyde hits the p53 gene, which then causes a mutant p53, which then does not suppress the tumor growth," thereby allowing cancer to grow. **Exhibit E**, p. 287.  Dr. Williams's scientific support for her opinions regarding general causation and cancer renders Gulf Stream's points moot. Furthermore, Gulf Stream's reference to *Moore v. Ashland Chemical Inc.*, 151 F.3d 269 (5th Cir. 2007), is irrelevant as Dr. William's has clearly supported her opinion with scientific evidence.  *Id.* at 278 (holding that the expert's lack of scientific support precluded his testimony).

### 3.    *Negative Findings Are Irrelevant to Dr. Williams Opinion.*

A negative finding, or the null hypothesis, occurs when a study does not provide a positive statistical determination of a certain variable.  Gulf Stream argues that Dr. Williams is required to consider the null hypothesis of a study in order to render a reliable opinion. This argument contradicts scientifically founded principles.  A null hypothesis is not typically considered because they are often a statistical starting point as explained in the treatise of *Modern Epidemiology*, 2nd Edition:

> Biologic knowledge about epidemiologic hypotheses is often scant, making the hypotheses themselves at times little more than vague statements of causal association between exposure and disease, such as "smoking causes cardiovascular disease."  To cope with this vagueness, epidemiologists usually focus on testing the negation of the causal hypothesis, that is, the null hypothesis that the exposure does not have a causal relation to disease.  Then, any observed association can potentially refute the hypothesis, subject to the assumption (auxiliary hypothesis) that biases are absent.

Rothman & Greenland, *Modern Epidemiology*, 2d Ed. p. 2 (1998).

It is important to understand that a "null hypothesis" does not mean there is no causal relationship . . . it simply means that it has not been proven otherwise. **Exhibit K**, Bower & Colton, *Why We Don't "Accept" the Null Hypothesis*, AM. SOC. FOR QUALITY 1 (July 2003). In attempting to discredit Dr. Williams, Gulf Stream misconstrues her testimony to promote the conclusion that by not considering the null hypothesis, Dr. Williams's opinion is incomplete and result-oriented. Rec. Doc. 2834-2, p. 11-12. However, as noted by epidemiologists, "the null hypothesis is never proved or established, but is possibly disproved, in the course of experimentation. Every experiment may be said to exist only in order to give the facts a chance of disproving the null hypothesis." **Exhibit K**, p. 2 (quoting Ronald A. Fisher). A perhaps useful analogy in explaining the null hypothesis and understanding why it need not be proved involves the criminal justice system. **Exhibit K**, p. 2. A person is always innocent until proven guilty, and the prosecution bears the burden of building a case to prove guilty beyond a reasonable doubt. **Exhibit K**, p. 2. Likewise, a jury will never find a defendant "innocent"; instead, that person will be either "guilty" or "not guilty". **Exhibit K**, p. 2. As applied to the null hypothesis, a finding of "not guilty" means the jury failed to reject the null hypothesis. **Exhibit K**, p. 2.

Ultimately, a null hypothesis does not prove the existence of a relationship for or against a particular variable. **Exhibit K**, p. 1 (emphasis added). While the IARC does state "when several epidemiological studies show little or no indication of an association between an exposure and cancer, the judgment may be made that, in the aggregate, they show evidence of lack of carcinogenicity," Gulf Stream, however, once again fails to look at the entire statement. IARC makes clear that:

Such a judgment requires firstly that the studies meet, to a sufficient degree, the standards of design and analysis described above. Specifically, the possibility that bias, confounding or misclassification of exposure or outcome could explain the observed results should be considered and excluded with reasonable certainty . . . It is important to note that evidence of lack of carcinogenicity obtained from several epidemiological studies can apply only to the type(s) of cancer studied, to the dose levels reported, and to the intervals between first exposure and disease onset observed in these studies.

World Health Organization, International Agency for Research on Cancer, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 88, Preamble. Thus, had Gulf Stream read the entire statement, Gulf Stream would have recognized that the null hypothesis reported cannot serve as "lack of evidence of carcinogenicity" because the studies provide a unique analysis of the data. Moreover, because Gulf Stream failed to present the entire statement to Dr. Williams, any response elicited cannot reflect an accurate representation of Dr. Williams's IARC criticisms. **Exhibit E**, p. 176-77 (disagreeing to Gulf Stream's incomplete IARC statement).

Furthermore, Gulf Stream's reliance on *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584 (D. N.J. 2002), is also unpersuasive as factually and legally dissimilar to the case at bar. In *Magistrini*, the court acknowledged the expert's failure to look at other studies with negative findings <u>only</u> because "Dr. Ozonoff relied most heavily on his own study, which itself looked at only seven (7) cases of leukemia and had a huge confidence interval, indicating that the results of the study are unstable and imprecise. He neither explained why the confidence interval in that study was not of concern to him." *Id.* at 607 (emphasis added). Here, Dr. Williams is not using a study

conducted by herself, and she has consistently explained the scientific reasoning for not examining the null hypothesis. **Exhibit E**, p. 174, 176, 179-80, 241.

### 4. *Dr. Williams Properly Evaluates Epidemiological Data.*

Gulf Stream self-selects portions of Dr. Wiliams's testimony to supports its faulty conclusion that Dr. Williams misuses epidemiological data. Dr. Williams's has provided a clear statement of her methodology with regard to epidemiological data, "when I'm doing a causal opinion, I'm going to look for studies that are the 2.0 or above, because that is, of course, your gold standard." **Exhibit E**, p. 24.

Additionally, Gulf Stream's statements regarding Dr. Williams's recalculation of a relative risk and confidence intervals in the Hauptmann study are misleading. Dr. Williams clearly explains that "the confidence interval is what you are going to use when you are looking at and judging. You will get various levels, confidence levels, 95 percent, 90 percent, if it's—depending on how it's done, it's going to be 95 percent sure that the signal versus noise is not due to chance. Then you want to look at the confidence interval to see that it does not include unity, which is just one more little step that tells you whether this validates it just one more time." **Exhibit E**, p. 25-26.

Furthermore, Gulf Stream's reliance on a footnote to "change" the reported relative risk is essentially the same act they argue is improper. Rec. Doc. 2834-2, p. 15. Regardless, Dr. Williams has provided ample support of her conclusion beyond the Hauptmann study. As noted in pages 25-28 of Dr. Williams's Affidavit, Dr. Williams provides a complete listing of those studies, including their respective relative risks and confidence intervals, to support her conclusion. **Exhibit B**, p. 25-28. Thus, Gulf

Stream's assertion that Dr. Williams improperly evaluates epidemiological data is unfounded and unpersuasive.

**B.    Dr. Williams's Opinions Regarding Asthma Are Reliable.**

The second opinion proffered by Dr. Williams is with regard to asthma: "[a] cause—effect relationship exists between formaldehyde and bronchoconstriction/asthma."    Gulf Stream first takes issue with the usage of the term "causation" with regard to asthma.    Gulf Stream argues that because Christopher Cooper had pre-existing asthma before occupying the EHU, the usage of the term "causation" and any conclusion drawn thereof should be excluded. Gulf Stream once again forgets that Dr. Williams is not providing an opinion on specific causation. Furthermore, terminology with respect to "causation" or "exacerbation" of asthma is commonly used interchangeably because if a biological component can "cause" asthma, it can typically "exacerbate" asthma.    *See, e.g.,* Adgate, J., *Allergen levels in inner city homes: baseline concentrations and evaluation of intervention effectiveness*, 18 J. Exp. Sci. & Env. Epi.  430 (2008).   Next, Gulf Stream argues that Dr. Williams's opinion regarding asthma should be excluded because the following methods of inducing asthma are not scientifically sound: (1) IgE mediated asthma, (2) trigeminal-vagal nerve reflect, and (3) dysregulation of nitrogen oxide synthase ("NOS").   These methods are based on reliable methodology, and thus testimony relating to such should not be excluded.

**1.    *IgE Sensitization Is a Reliable Method of Inducing/ Exacerbating Asthma.***

Gulf Stream states that "Plaintiffs' experts and licensed physicians, Dr. James Kornberg and Dr. Karin Pacheco, both testified and agreed that Cooper did not and

does not have IgE sensitized or mediated asthma." Rec. Doc. 2834-2, p. 18. This is a completely inaccurate statement. Plaintiffs' experts and physicians have testified that they lack the sufficient data to conclusively determine that Christopher Cooper suffered from IgE sensitized/mediated asthma. **Exhibit L**, Deposition Testimony of James Philip Kornberg, M.D., Sc.D., taken on July 9, 2009, p. 60, 62, 64; **Exhibit M**, Deposition Testimony of Karin Ann Pacheco, M.D., M.S.P.H., taken on July 15, 2009, p. 38, 66. Simply because Dr. Kornberg and Dr. Pacheco are unable to diagnose him during their depositions does not give rise to the conclusion that Christopher Cooper did not suffer from IgE sensitized/mediated asthma. Gulf Stream's statements as such are a gross distortion of Plaintiff's experts' word choice.

Regardless, Dr. Williams is not presenting an opinion on the specific cause of Cooper's asthma, but as stated many times before, Dr. Williams is providing an opinion on general causation. *See* **Exhibit B**, p. 5; **Exhibit F**, p. 104. Thus, it is within the realm of her opinion to provide the various methods in which formaldehyde can exacerbate asthma.

### 2. *Innervating the Trigeminal-Vagal Reflex Is a Reliable Method of Inducing/Exacerbating Asthma.*

Gulf Stream's seemingly primary reason for rejecting Dr. Williams's opinion on trigeminal-vagal reflex is because she refers to studies as "stories." Rec. Doc. 2834-3; *see also* **Exhibit E**, p. 149. It is quite likely that Dr. Wiilams actually intended to say "studies" as opposed to "stories". Regardless, as clearly stated by Dr. Williams, there is published support for innervating the trigeminal-vagal reflex:

> Q.    Has formaldehyde been recognized in the medical and scientific literature as an irritant that causes that type of trigeminal-vagal reflex?
>
> A.    Yes, it is very well published.

**Exhibit E**, p. 266.  Dr. Williams summarizes some of the published findings in her Affidavit.  **Exhibit B**, p. 9, 16-21 ("With concentrations up to 4ppm, formaldehyde showed mainly sensory irritation effects of the upper airways that decrease the respiratory rate from a trigeminal reflect."   Nielsen, GD, *Acute airway effects of formaldehyde and ozone in BALB/c mice*, 18(6) HUM. EXP. TOXICOL. 400 (1999)).   Gulf Stream, however, does not attempt to refute any of the science that Dr. Williams has provided, but instead attacks her findings with what could be a simple mumble of the word "studies."

### 3.    Dysregulation of NOS is a Reliable Method of Inducing/Exacerbating Asthma.

Similar to its trigeminal-vagal argument, Gulf Stream extends its lexicon-based "stories" theory to argue against Dr. Williams's opinion regarding the dysregulation of NOS.  However, as before, Gulf Stream fails to refute any of the studies relied upon by Dr. Williams and implies that Dr. Williams did not review the Franklin study.  Rec. Doc. 2834-2, p. 19 ("[N]oticeably absent from Williams materials and testimony, done by Franklin (et al.) and discussed by plaintiffs' expert epidemiologist, Dr. McGwin."). However, Dr. Williams's Affidavit clearly shows that she evaluated the Franklin study, otherwise known as "Raise Exhaled Nitric Oxide in Health Children is Associated with Domestic Formaldehyde Levels."  **Exhibit B**, p. 19.  Perhaps even more unsettling is Gulf Stream's mischaracterization of the Franklin study.  The Franklin study did not test lower airway and pulmonary responses to formaldehyde as suggested by Gulf Stream,

but instead measured the exhaled nitric oxide levels of children, and found the levels significantly elevated in children living in homes with formaldehyde levels greater than 50 pbb.  *See* **Exhibit N***, Franklin, P., Raise Exhaled Nitric Oxide in Health Children is Associated with Domestic Formaldehyde Levels, 161 Am. J. Respir. Crit. Car. Med. 1757 (2000).  Gulf Stream's assertions misconstrue the purpose and findings of the Franklin study, and are thus not persuasive to prove unreliability.  Furthermore, Gulf Stream's failure to negate, or even mention, any of the findings that Dr. Williams relies upon prevents the exclusion of Dr. Williams's testimony.

### 4.    *Dr. Williams's Opinion Properly Considers Relevant Studies.*

In a last ditch attempt to exclude Dr. Williams's testimony, Gulf Stream uses inciting language to allege that in order to obtain result-oriented conclusions, Dr. Williams "missed" particular negative studies.  Rec. Doc. 2834-2, p. 21.   However, as established *supra*, a null hypothesis would not serve to prove that formaldehyde does not cause asthma.  For example, while the Uba study demonstrates that none of the prior-asthmatics studied developed clinically significant immediate bronchoconstriction, or symptoms showing a late response to exposure, the study clearly notes that "because the number of asthmatics in our study was small and the diagnoses were not verified, the absence of clinically significant bronchoconstriction among them does not provide strong evidence regarding the bronchoconstrictive effects of formaldehyde in asthmatics."  Uba, G., (et al), *Prospective Study of Respiratory Effects of Formaldehyde Among Healthy and Asthmatic Medical Students*, 15 Am. J. Indust. Med. 91, 100 (1989). Similarly, the Frigas/Reed study does not prove that exposure to formaldehyde does not affect asthma as it involved a limited number of individuals, some of which smoked, who

were only exposed to formaldehyde for twenty minutes intervals. Frigas, E., (et al), *Bronchial Challenge With Formaldehyde Gas; Lack of Bronchoconstriction in 13 Patients Suspected of Having Formaldehyde Induced Asthma*, 59 MAYO CLIN. Proc. 295 (1984). Perhaps it is the lack of useful data that Dr. Williams chose not review this study, not that "she must have missed it." Rec. Doc. 2834-2.

In addition, Gulf Stream has failed to show the unreliability of the studies used by Dr. Williams. For example, the Casset study shows that mild exposure (49 ppb) in the home is sufficient to provoke sensitization and also an aggravation of symptoms in patients with allergic asthma. Casset, A., (et al), *The bronchial response to inhaled formaldehyde*, 23(1 Suppl) REV. MAL. RESPIR. 3S25 (2006). In addition, nocturnal breathlessness was reported in relation to formaldehyde with an odds ratio of 12.5 (95% CI 2.0—77.9). *Id.* In another study that studied the effect of formaldehyde on cumulative asthma with an odds ratio of 4.61 (95% CI 1.09-19.5), the authors found associations between indoor levels of formaldehyde and wheeze and nocturnal attacks of breathlessness, and associations between outdoor formaldehyde and daytime attacks of breathlessness. Zhao, Z. (et al), *Asthmatic Symptoms among Pupils in Relation to Winter Indoor and Outdoor Air Pollution in Schools in Taiyuan, China*, 116(1) Env. H. Persp. 90 (2008). All of the supporting studies mentioned *supra* are analyzed by Dr. Williams in her Affidavit of which Gulf Stream had ample opportunity to discuss but did not.

## CONCLUSION

Dr. Williams is a qualified expert. Her many years of experience, training, skill and knowledge warrant that she be allowed to provide an opinion in this matter. Her

opinions are reliable as based on sound methodology recognized by federal courts and other governmental agencies.  Gulf Stream's reasons for excluding Dr. Williams are unpersuasive, invalid, and at times inflammatory.  Dr. Williams has provided ample support and material in which to rely upon, and Gulf Stream has failed to present any cogent argument to state otherwise.  Thus, under *Daubert*, this Court, acting as gatekeeper, should allow the testimony of Dr. Williams to proceed.

## PRAYER

WHEREFORE, Plaintiff Alana Alexander respectfully requests that the Court deny Gulf Stream Coach, Inc.'s Motion *In Limine* to Exclude Expert Testimony of Patricia M. Williams, Ph.D., DABT and for such other relief to which she is entitled.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE**
**PRODUCT LIABILITY LITIGATION**

BY:     s/Gerald E. Meunier
         GERALD E. MEUNIER, #9471
         **PLAINTIFFS' CO-LIAISON COUNSEL**
         Gainsburgh, Benjamin, David, Meunier &
         Warshauer, L.L.C.
         2800 Energy Centre, 1100 Poydras Street
         New Orleans, Louisiana 70163
         Telephone:   504/522-2304
         Facsimile:     504/528-9973
         gmeunier@gainsben.com

         s/Justin I. Woods
         JUSTIN I. WOODS, #24713
         **PLAINTIFFS' CO-LIAISON COUNSEL**
         Gainsburgh, Benjamin, David, Meunier &
         Warshauer, L.L.C.
         2800 Energy Centre, 1100 Poydras Street
         New Orleans, Louisiana 70163
         Telephone:   504/522-2304
         Facsimile:     504/528-9973
         jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS'
STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
MIKAL WATTS, Texas # 20981820
Dennis Reich, Texas #16739600

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing on August 31, 2009.

 s/Gerald E. Meunier
GERALD E. MEUNIER, #9471