# Transcript of the Testimony of
# **Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.**

**Date taken: July 6, 2009**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation**

*\*\*Note\*\**
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# **Professional Shorthand Reporters, Inc.**
**Phone:    504-529-5255**
**Fax:    504-529-5257**
**Email:    reporters@psrdocs.com**
**Internet:    www.psrdocs.com**



EXHIBIT
tabbies

In Re: FEMA Trailer Formaldehyde Products Liability Litigation        Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1  APPEARANCES CONTINUED:
2  On behalf of the Defendants
   Morgan Buildings and Spas:
3
4       DAN E. WEST (Via telephone)
        Attorney at Law
5       McGLINCHEY STAFFORD, PLLC
        301 Main Street
6       14th Floor
        Baton Rouge, Louisiana 70802
7
8
9  On behalf of the Defendant
   Fluor Enterprises, Inc.:
10
        RICHARD A. SHERBURNE, JR. (Via telephone)
11      Attorney at Law
        MIDDLEBERG, RIDDLE & GIANNA
12      Suite 1101
        450 Laurel Street
13      Baton Rouge, Louisiana 70801
14
15 On behalf of the Defendant
   Fleetwood Enterprises:
16
        RICHARD K. HINES IV
17      Attorney at Law
        NELSON MULLINS RILEY & SCARBOROUGH, LLP
18      Atlantic Station
        201 17th Street
19      Atlanta, Georgia 30363
20
21 On behalf of the Defendants
   Jayco, Inc., and Starcraft RV:
22
        HAL L. ROACH, JR. (Via telephone)
23      Attorney at Law
        WILLINGHAM FULTZ & COUGILL, LLP
24      Niels Esperson Building
        808 Travis, Suite 1608
25      Houston, Texas 77002

Page 9

1  APPEARANCES CONTINUED:
2
3  On behalf of the Witness:
4       JAMES E. RADFORD, JR.
        Attorney at Law
5       PARKS, CHESIN & WALBERT P.C.
        26th Floor
6       75 Fourteenth Street
        Atlanta, Georgia 30309
7
8
   Videographer: Mr. Peter Ausburn
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 10

1       THE VIDEOGRAPHER:  Stand by.  This will be
2  the videotaped deposition of Dr. Christopher De Rosa
3  in regards to the FEMA trailer.  Today's date is
4  July 6th, 2009, and the time is 9:19 a.m.  You are
5  now on video record.  You may now swear the witness.
6       CHRISTOPHER DE ROSA, M.S., Ph.D.,
7  having been first duly sworn, was examined and
8  testified as follows:
9            EXAMINATION
10 BY MR. MEUNIER:
11     Q.   Good morning, Dr. De Rosa.
12     A.   Morning.
13     Q.   My name is Gerry Meunier.  I represent the
14 Plaintiffs in this matter.
15     MR. MEUNIER:  This deposition is being
16 noticed and taken for all purposes including use at
17 trial.  And I will mark as De Rosa No. 1 the Notice
18 of the Oral and Videotaped Deposition Of Christopher
19 De Rosa.
20     (Exhibit-1 was marked.)
21 BY MR. MEUNIER:
22     Q.   And Dr. De Rosa, you were asked by
23 subpoena to bring certain documents with you to this
24 deposition; is that correct?
25     A.   That is correct.

Page 11

1       MR. MEUNIER:  Now I will mark as De Rosa
2  Number 2 the deposition subpoena asking that the
3  witness bring any documents regarding health issues
4  and concerns related to formaldehyde in FEMA-provided
5  emergency housing units, and any communications
6  regarding formaldehyde exposure in FEMA-supplied
7  emergency housing units.  That will be De Rosa No. 2.
8       (Exhibit-2 was marked.)
9  BY MR. MEUNIER:
10     Q.   Dr. De Rosa, did you attempt to put
11 together and bring with you those documents?
12     A.   I did, and I actually provided those prior
13 to the deposition today to my attorney.
14     Q.   And it's my understanding that some of
15 those documents are the subject of a privilege claim
16 by the United States, and are not today going to be
17 looked at --
18     MR. MEUNIER:  Is that correct, Counsel?
19     MR. MILLER:  There are three documents
20 that have been withheld on the grounds of privilege,
21 yes.
22     MR. MEUNIER:  Other than those three,
23 though, all the documents produced by the witness
24 have been made available; is that correct?
25     MR. MILLER:  Yes, they have.

Page 12

3 (Pages 9 to 12)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation     Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

BY MR. MEUNIER:
1
2  Q.   Dr. De Rosa, what documents have you
3  personally reviewed specifically in order to get
4  ready for this deposition?
5  A.   I reviewed my files that I had provided to
6  your firm and others via my attorney.  I also
7  reviewed some additional files since that point, and
8  identified two literature searches dealing with
9  reproductive developmental effects.  There are some
10  abstracts of those studies here that I have to share.
11       I did not provide those, because I had not
12  been able to locate them prior to the deposition.
13  Q.   Do you have extra copies of those
14  documents?
15  A.   Those are my only copies.
16  Q.   All right.  Any other documents that
17  you've looked at to prepare for the deposition?
18  A.   I reviewed a number of recent articles,
19  and some of the summary statements from the hearings
20  held in April of 2008, but I have not -- I believe it
21  was April of 2008, yes, it was, in 2008.  But I have
22  not reviewed anything other than those things that I
23  have provided to you.
24  Q.   And you are here today represented by your
25  own counsel; correct?

Page 13

1  A.   Yes, I am.
2  Q.   Have you had meetings with anyone other
3  than your counsel in order to prepare for this
4  deposition?
5  A.   I have not.
6  Q.   And you and I have never met before, have
7  we?
8  A.   Not to my knowledge.
9  Q.   What is your occupation?
10  A.   My occupation is as an environmental
11  health scientist.
12  Q.   Are you currently employed?
13  A.   I'm self-employed.
14  Q.   What is the extent of your formal
15  education?
16  A.   Well, I've had a B. A. degree from Ohio
17  Wesleyan University, a Master's degree in Ecology
18  from Miami University of Ohio, a doctoral degree from
19  the same institution in Biology, and a post-doctoral
20  appointment at the University of Virginia in
21  Molecular Biology.
22  Q.   Would you summarize your employment
23  history, starting with the first employment following
24  the conferral of your Ph.D.?
25  A.   That would be with the University of

Page 14

1  Virginia, as I mentioned, as a post-doctoral
2  appointment that I had a practicum.  I was appointed
3  as assistant professor there for a number of years,
4  and then had an opportunity to join EPA in the late
5  Seventies, early Eighties, where I was employed as a
6  staff scientist and as a team leader.
7       Following that, I was employed by the
8  University of Maine in the early Eighties, and then
9  returned to EPA in approximately 1984 where I was
10  then branch chief, and following that acting director
11  of the Environmental Criteria and Assessment Office
12  within the Office of Research and Development in
13  Cincinnati, Ohio.
14       At that time, following the time spent as
15  acting director, I came to CDC, ATSDR in '91.
16  Q.   Just so the Jury understands, what do the
17  initials CDC and ATSDR stand for?
18  A.   Centers for Disease Control and Prevention
19  and the Agency for Toxic Substances and Disease
20  Registry.
21  Q.   And these are agencies of the Federal
22  Government?
23  A.   They are, within the Department of Health
24  and Human Services.
25  Q.   What positions did you hold there?

Page 15

1  A.   I was the Deputy Associate Administrator
2  for Science initially.  I then became the acting
3  Director for the Division of Toxicology within ATSDR,
4  which was later, following the reorganization, the
5  Division of Toxicology and Environmental Medicine.
6       I held that position until October of
7  2007.
8  Q.   And was that your last position with
9  ATSDR?
10  A.   No, it was not.  Following my removal of
11  the position, I was reassigned as the Assistant
12  Director for Toxicology and Risk Analysis within the
13  Office of the Director of the Agency for Toxic
14  Substances Disease Registry and the National Center
15  for Environmental Health, which are both within the
16  Centers for Disease Control and Prevention, Health
17  and Human Services.
18  Q.   And was that your last position with the
19  Federal Government?
20  A.   It was.
21  Q.   When did that position end?
22  A.   I resigned my position effective June 17th
23  of this year, 2009, although that's still subject of
24  some discussion.
25  Q.   So you were the Director of the Division

Page 16

4  (Pages 13 to 16)

Case 2:07-md-01873-KDE-MBN   Document 2988-2   Filed 08/31/09   Page 4 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

| | |
|---|---|
| 1   of Toxicological and Environmental Medicine at ATSDR | 1      Q.   I notice in the material that you had |
| 2   for how long? | 2   brought in response to the subpoena this document, |
| 3      A.   Roughly 16 years. | 3   which has a heading Division of Toxicology and |
| 4      Q.   And what was your responsibility in that | 4   Environmental Medicine, and then under it the word |
| 5   position? | 5   "vision" and some language after that. |
| 6      A.   They were fairly broad responsibilities. | 6      Do you recognize that document that was in |
| 7   I oversaw a staff of approximately 70 individuals, | 7   your materials? |
| 8   perhaps 10 onsite contractors, and a budget of around | 8      A.   Yes. This was a function when I joined |
| 9   $10 million annually in research and development. | 9   the Division, I convened an all-hands retreat. And |
| 10      I represented the Department on the | 10   we were charged by our then administrator Barry |
| 11   Executive Committee of the National Toxicology | 11   Johnson with developing an internationally recognized |
| 12   Program, the Agency, I should say. | 12   program of excellence in toxicology. And I |
| 13      I also represented the Department on the | 13   determined that the only way to do that is to pursue |
| 14   National Response Team, which is comprised of the 16 | 14   excellence. |
| 15   member Agencies responsible for responses to | 15      And because leading scientists is like |
| 16   emergency events under the National Contingency Plan. | 16   herding cats in some respects, but if one develops a |
| 17      Other responsibilities included | 17   record of recognized excellence, and it's linked to |
| 18   representing the Agency as a member of the Science | 18   the legislative mandates of the Agency, as outlined |
| 19   Advisory Board for the International Joint | 19   here, in the areas of assessment, and dissemination |
| 20   Commission. | 20   of information based on credible science, and to do |
| 21      I was also a member of the Steering | 21   that in the interest of public service, that that |
| 22   Committee on Risk Assessment for the World Health | 22   will eventually develop that followership. |
| 23   Organization, and provided expertise in broad areas | 23      Q.   So does that document more or less state |
| 24   of toxicology, environmental medicine, including | 24   what you understood to be the mission of your |
| 25   health education materials, and the development of a | 25   Division of Toxicological and Environmental Medicine |
| Page 17 | Page 19 |
| 1   series of documents addressing the public health | 1   within ATSDR? |
| 2   hazards pose by the chemicals most frequently | 2      A.   This was a part of the strategic plan that |
| 3   encountered at Superfund or National Priority List | 3   we developed. The actual mission of the division |
| 4   sites, and was responsible for a range of scholarship | 4   mirrors this to a large extent, but in some more |
| 5   activities in concert with my staff to establish the | 5   explicit detail. |
| 6   credibility of the Agency and the Division as an | 6      Q.   So summarizing what the mission statement |
| 7   authoritative resource in health information on the | 7   there is, tell us what that document says in its core |
| 8   impacts of hazardous substances on human health. | 8   principles? |
| 9      Q.   Now, the ATSDR is a division of CDC? | 9      A.   The core principles -- |
| 10      A.   No. Actually, it's one of eight | 10      MR. MILLER: Objection, vague. Go ahead. |
| 11   independent agencies of the Public Health Service. | 11   BY MR. MEUNIER: |
| 12   It was the -- it is the primary Agency charged with | 12      Q.   Tell us in your own words what the |
| 13   implementing the health mandates of the Comprehensive | 13   document represents, and says about the vision of |
| 14   Emergency Response Compensation and Liability Act of | 14   that division. |
| 15   1984 as amended by the Superfund Amendments and | 15      A.   I think, simply stated, to follow where |
| 16   Reauthorization Act of 1984. | 16   the science leads and recognize what we know, what we |
| 17      Q.   Well, how would you distinguish between | 17   don't know, try to address the latter to the best we |
| 18   the mission and purpose of the ATSDR and the CDC? | 18   can, and then to do that in the interest of getting |
| 19      A.   The CDC is a broadly structured | 19   the information out to the general public so that |
| 20   organization generally associated with programs in | 20   they can make informed decisions about their health. |
| 21   disease prevention, including immunization, including | 21      MR. MEUNIER: Thank you, sir. I'll mark |
| 22   vessel sanitation. There is a large program dealing | 22   that as De Rosa Number 3. |
| 23   with AIDS. There is also an injury prevention | 23      (Exhibit-3 was marked.) |
| 24   program, generally addressing the broad spectrum of | 24   BY MR. MEUNIER: |
| 25   public health issues confronted by the U. S. public. | 25      Q.   Doctor, based on your education, training, |
| Page 18 | Page 20 |

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1  and your work experience, have you developed
2  expertise with regard to the health effects and
3  exposure risks associated with toxic chemical and
4  substances?
5       A.  Yes, I have.
6       Q.  What is the EPA Bronze Medal?
7       A.  It's a recognition given to employees that
8  have been identified as making perhaps above and
9  beyond contributions to the mission of the Agency.
10      Q.  Have you been the recipient of that medal?
11      A.  I have been.
12      Q.  On how many occasions?
13      A.  Four times.
14      Q.  Have you served on advisory committees for
15  various federal agencies?
16      A.  I have.
17      Q.  Which federal agencies?
18      A.  The National Institute for Environmental
19  Health Sciences, EPA. I have; DOD, DOE, NASA. A
20  number of different agencies that have broad interest
21  in the area of risk assessment and health effects of
22  chemicals commonly associated with human exposures in
23  the environment.
24      Q.  And you indicated that you served on a
25  risk assessment committee for the World Health

Page 21

1  Organization?
2       A.  Yes. This was established as an outgrowth
3  of the Rio Treaty of 1993. It was established in
4  '94. I served as a charter member of that committee,
5  and I still am a member of that committee.
6       Q.  Have you consulted or worked with foreign
7  countries in the area of environmental health
8  science?
9       A.  Yes. I have consulted with the
10  governments of the Netherlands, South Africa,
11  Vietnam, the Seychelles Republic in the Indian Ocean.
12  The Faroe Islands, part of the Kingdom of Denmark.
13  England, China, India, Ecuador. A number of
14  different countries. I mean, it's just...
15      Q.  What are the professional organizations or
16  societies that you belong to?
17      A.  Well, I'm an elected Fellow of the
18  Collegium Ramazzini, one of 180 individuals
19  worldwide.
20      Q.  What is the Collegium Ramazzini?
21      A.  It is an organization that was founded in
22  memory of Bernardino Ramazzini, who is considered the
23  father of occupational environmental medicine in the
24  16th century, and is an organization dedicated to
25  serving as a conduit of reliable information to the

Page 22

1  centers of social and political powers within and
2  throughout the world in the interest of promoting the
3  precautionary principle that it is better to prevent
4  than cure.
5       Q.  What other professional organizations do
6  you belong to?
7       A.  American College of Toxicology, American
8  Association for the Advancement of Science,
9  Ecological Society of America, those are some that
10  come to mind.
11      Q.  Have you authored or coauthored any
12  peer-reviewed publications dealing with the human
13  health effects and exposure risks associated with
14  toxic substances?
15      A.  Yes, I have.
16      Q.  How many?
17      A.  It depends on how one counts, but roughly
18  200 peer-reviewed journal articles. Another number
19  of peer-reviewed abstracts published in literature,
20  as well as book chapters and several texts.
21      Q.  Have you served on the editorial boards of
22  any professional journals?
23      A.  Yes, approximately 10 or more professional
24  journals.
25      Q.  Doctor, based on your scientific

Page 23

1  education, training, and experience, have you formed
2  opinions specifically regarding the potential health
3  effects of exposure to formaldehyde?
4       MR. WEINSTOCK: Object to the form.
5       A.  Yes, I have.
6  BY MR. MEUNIER:
7       Q.  Does the ATSDR maintain a toxicological
8  profile on various toxic chemicals, and on
9  formaldehyde in particular?
10      A.  Yes.
11      Q.  When you were at the ATSDR, were your
12  opinions about the potential health effects of
13  formaldehyde articulated in the Agency's
14  toxicological profile on formaldehyde?
15      MR. WEINSTOCK: Object to the form.
16      A.  The opinions proffered in the document
17  represented the result of a two-year effort to review
18  the world's literature in the broad areas of exposure
19  to toxicology and epidemiology. It was peer-reviewed
20  independently, and also open to public comment.
21  Those comments are all part of a public record in
22  formal disposition of those comments as provided
23  there.
24      My responsibility was to assume authority,
25  or responsibility, for the final signoff on all the

Page 24

6 (Pages 21 to 24)

Case 2:07-md-01873-KDE-MBN Document 2988-2 Filed 08/31/09 Page 6 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation     Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1 toxicological profiles since I became director in
2 1991, it's a delegated authority from the department
3 to the administrator to the assistant administrator,
4 and then that was delegated to me.
5     So it was my responsibility to provide the
6 final approval of all the conclusions both
7 qualitatively and quantitatively presented in the
8 documents generated by the Division of Toxicology and
9 Environmental Medicine.
10     MR. WEINSTOCK: Object to responsiveness.
11 BY MR. MEUNIER:
12     Q. Have you served, Dr. De Rosa, as an expert
13 witness on behalf of the Federal Government?
14     A. Yes, I have.
15     Q. How many times?
16     A. Well, I believe formally, depending on
17 what one considers to be an expert witness, at least
18 three times, four times.
19     Q. And on those occasions, did you testify as
20 an expert in the field of environmental health
21 science?
22     A. I did.
23     MR. MEUNIER: On Plaintiff's behalf and
24 for purposes of potentially presenting this witness's
25 testimony at trial, we will ask the Court to
                     Page 25

1 recognize Dr. Christopher De Rosa as an expert in the
2 field of environmental health science with specific
3 expertise as to the human health effects, exposure
4 risks associated with formaldehyde.
5     MR. MILLER: United States would note its
6 objection in the sense that we believe that
7 Dr. De Rosa has qualifications in the field of
8 toxicology, but he is not being offered as an expert
9 witness in this case by any party. He is a fact
10 witness, I think more than anything, and any use of
11 that witness for any purposes beyond that, United
12 States objects to it.
13     MR. WEINSTOCK: Additionally, manufacturer
14 -- well, Andy Weinstock for Gulf Stream Coach. We
15 join in that objection. Further, we would point out
16 to the Court that you've known about this witness's
17 involvement for quite some time, and we received no
18 expert report from him by the cutoff date of
19 February 19th. I don't believe he was asked to
20 produce one, and I don't believe he has consistent
21 with the Court guidelines. With that, you can go
22 ahead.
23     MR. MEUNIER: And we just, to respond to
24 that, we believe that it's clear in this case there
25 will be retained experts, and there will be
                     Page 26

1 non-retained experts, and this witness will be a
2 non-retained expert.
3 BY MR. MEUNIER:
4     Q. Dr. De Rosa, I have given you some
5 material that's been Bates stamped at the bottom
6 right-hand corner, and I'll refer to those numbers in
7 order to direct your attention to the document.
8     I'd like to first identify your April 1st,
9 2008, written statement to the Subcommittee on
10 Investigations and Oversight Committee of Science and
11 Technology in the United States House of
12 Representatives, which is Bates stamped DEROSA-49
13 through 59. Do you see that?
14     A. I do.
15     Q. And are you familiar with that written
16 statement?
17     A. I am.
18     MR. MEUNIER: I will ask that it be marked
19 for identification purposes for this deposition as
20 De Rosa Number 4.
21     (Exhibit-4 was marked.)
22 BY MR. MEUNIER:
23     Q. You were given a chance by Congressman
24 Brad Miller, the Chairman of that particular
25 Committee, to make corrections in the transcript of
                     Page 27

1 your statement; is that true?
2     A. That is correct.
3     Q. Do I understand that the corrections you
4 made then were to this written document that we've
5 just referred to, this written statement?
6     A. They were to my oral testimony.
7     Q. Oral testimony. So can we assume that the
8 written statement I've just referred to by you is
9 correct and accurate in all respects?
10     A. To the best of my knowledge, it is.
11     Q. During your tenure at the ATSDR, were
12 there programs or activities which were specifically
13 established to protect public health?
14     A. Yes.
15     Q. What were those programs and activities?
16     A. They included a range of programs, a range
17 that included an assessment of the hazards posed by
18 Superfund or National Priorities List sites, or sites
19 that had been petitioned for review by the public.
20 It included consultations on both time-sensitive and
21 emergency response-related activities, consultations
22 on specific chemicals, or public health issues of
23 concern that may not necessarily be linked to
24 specific chemicals, but things such as the emissions
25 from tire fires and cement kilns and that type of
                     Page 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation        Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1     A.   I see that in the third full paragraph
2   about five -- four lines down, where there is a quote
3   from Mr. Preston addressed to the subcommittee staff
4   saying:  I put the March letter in my file and did
5   not share it with anyone.
6          Everything in that letter was already
7   known to FEMA, he went on to say.
8          MR. MILLER:  Objection.  Move to strike.
9   Nonresponsive.
10  BY MR. MEUNIER:
11    Q.   If you'd turn to the top of the next page,
12  it's DEROSA-29.  Do you see what else Preston is
13  reported to have told the Committee regarding that
14  letter, namely that he lost interest in it because he
15  was leaving FEMA, moving to New Mexico the following
16  month, and because FEMA had been dropped from the
17  formaldehyde class action suit.  Do you see that?
18         MR. WEINSTOCK:  Object to the form of the
19  question.  And let me make my objection specific as
20  opposed to other sections that are in quotes and,
21  therefore, presumably direct testimony.  This is not
22  in quotes, and presumably somebody's interpretation
23  of Mr. Preston's testimony.  But you can answer, sir.
24         MR. MILLER:  I don't think Mr. Preston
25  testified also.

Page 65

1   BY MR. MEUNIER:
2     Q.   Do you see the reference to what Preston,
3   according to this staff report to Congress, told the
4   Committee?
5     A.   Yes, I do.
6     Q.   Let me just ask you, after the letter of
7   concern about the Health Consultation Report of
8   February '07, was sent to Preston, did you ever hear
9   any response given by Preston specifically to the
10  letter?
11    A.   I did not.
12    Q.   Did you ever become aware of any response
13  by Preston to the letter?
14    A.   No, I did not.
15    Q.   Did any official with FEMA, other than
16  Preston, ever make it known to you that your letter
17  had been read and reviewed and taken into
18  consideration?
19    A.   The letter that was sent was sent by Mark
20  Keim, so it would have been Dr. Keim's letter.  But I
21  never heard further about the letter from FEMA.
22    Q.   Now, do you recall, Dr. De Rosa, that in
23  February of '07, Congressman Gene Taylor wrote to CDC
24  requesting that it initiate an investigation into
25  whether formaldehyde in the FEMA trailers had caused

Page 66

1   an outbreak of respiratory illness?
2     A.   Yes.
3     Q.   I want to refer you to the document that's
4   Bates numbered DEROSA-76, which appears to be an
5   e-mail to you from Sascha Fielding.
6     A.   Yes.
7     Q.   She's at CDC?
8     A.   She is.
9     Q.   And she makes reference here to the need
10  to respond to Representative Taylor; true?
11    A.   She asked that -- she references that they
12  had had a meeting regarding a response that had been
13  drafted to Mr. Taylor, and that Mike Allred asked
14  that I review it -- asked for me to take a look at
15  the response to verify or correct the science issues
16  discussed.
17    Q.   Please refer to DEROSA-75, Bates stamped
18  75, and tell me if you reviewed, or ever saw this
19  February 22, '07, letter from Congressman Taylor to
20  Dr. Julie Louise Gerberding?
21    A.   I did see this letter.
22    Q.   And that was a letter requesting that CDC
23  investigate the formaldehyde issue?
24    A.   Yes.
25    Q.   Was a response ultimately written by

Page 67

1   Dr. Gerberding to Congressman Taylor?
2     A.   Yes, it was.
3     Q.   And did you provide input to the
4   scientific principles, or material, in that response?
5     A.   I commented on the content, and I
6   indicated that there was still no mention of the
7   longer term health effects made in the response.
8     Q.   If you will look at what is Bates numbered
9   DEROSA-77.  I ask you if that is a letter dated
10  May 29, '07, sent to Congressman Taylor by
11  Dr. Gerberding in response to Congressman Taylor's
12  letter?
13    A.   Yes.
14    Q.   And Tab A, which is Bates numbered 79, do
15  you recognize that?
16    A.   Yes.
17    Q.   Dr. Gerberding in her letter references
18  scientific-related information about formaldehyde at
19  Tab A.  So was this Tab A part of her letter to the
20  Congressman?
21    A.   It was.
22    Q.   And is this tab setting forth information
23  that you provided advice and input about?
24    A.   I don't believe I reviewed the tab.
25    Q.   Does the discussion in Tab A state in the

Page 68

17  (Pages 65 to 68)

1  first full paragraph that the Department of Health
2  and Human Resources has determined that formaldehyde
3  may reasonably be anticipated to be a human
4  carcinogen based on limited evidence in humans and
5  sufficient evidence in lab animals?
6      A.  Yes, it does.
7          MR. WEINSTOCK:  Object to the form of the
8  question.  The witness said he did not review it.
9  The document speaks for itself.
10     A.  I didn't review the tab at the time the
11 letter was drafted.
12         MR. MILLER:  I'm going to object, then,
13 that your need to elicit expert testimony from this
14 witness is beyond the scope of his duties and
15 responsibilities when he was at the CDC.
16     A.  I reviewed it thereafter.
17 BY MR. MEUNIER:
18     Q.  So you reviewed this Tab A attachment to
19 the letter after it was made an attachment for the
20 letter?
21     A.  Right, yes.  The only thing I had reviewed
22 prior to the letter being sent out was the letter
23 itself.
24     Q.  Do you, based on your knowledge and
25 experience, agree with the statements about
                                    Page 69

1          MR. WEINSTOCK:  Object to the form of the
2  question.  Again, he did not review it at the time.
3          MR. MILLER:  Objection, calls for the
4  witness's testimony to be beyond the scope of his
5  duties and responsibilities.
6      A.  It is customary for me to review such
7  information, and in the context of the statements
8  made regarding cancer above, that there is by way of
9  policy, as I mentioned earlier, no safe level of
10 exposure to a carcinogen irrespective of the time or
11 duration of exposure.
12         Based on insights regarding the mechanism
13 of toxic action of formaldehyde in the environmental
14 health community, it's quite conceivable that even a
15 short term exposure to elevated levels of
16 formaldehyde may result in a carcinogenic effect.
17 BY MR. MEUNIER:
18     Q.  Yes, sir.  I was referring, though, to the
19 Table 1 that sets forth reported adverse effects from
20 the inhalation of formaldehyde, separate and apart
21 from the carcinogenic nature of the chemical.
22     A.  Mm-hmm.
23     Q.  And my question was, based on your
24 knowledge and experience, and your review of this, do
25 you concur with what is set forth in that figure
                                    Page 71

1  formaldehyde, specifically the carcinogenic nature of
2  formaldehyde, in that paragraph under the caption
3  "Background of Formaldehyde"?
4      A.  In part, yes, I do.  In part, I do not,
5  because IARC is not cited in terms of its most recent
6  conclusions regarding formaldehyde, because it is now
7  classified as a known carcinogen, as opposed to
8  probable.
9      Q.  IARC, again, stands for?
10     A.  The International Agency for Research on
11 Carcinogens.
12     Q.  When did -- is that a government agency?
13     A.  That is a subdivision in Lyons, France of
14 the World Health Organization.
15     Q.  And when did IARC classify formaldehyde as
16 a known carcinogen?
17     A.  I believe the original draft came out in
18 2004, and it was final in 2005.
19     Q.  Looking again at Tab A in the table given
20 for Adverse Health Effects of Intermediate Exposure
21 to Formaldehyde, do you see a listing of health
22 effects from inhalation?
23     A.  Yes, I do.
24     Q.  Do you, based on your knowledge and
25 experience, agree with the content of that table?
                                    Page 70

1  dealing with exposure levels and reported adverse
2  effects?
3          MR. WEINSTOCK:  Objection, leading.
4      A.  The --
5          MR. MILLER:  Hold on, Doctor --
6      A.  -- comment I would --
7          MR. MILLER:  -- I'll object.  Objection.
8  Beyond the scope of what this witness's duties and
9  responsibilities and what actions he took during his
10 employment at the CDC ATSDR.  Go ahead.  I'm sorry.
11     A.  During the deliberations and discussions
12 regarding the health issues associated with
13 formaldehyde, I made it clear that there was a
14 growing body of information that there could be
15 reproductive developmental outcomes associated with
16 exposure to formaldehyde.
17         Again, this is based on more recent
18 understandings, insights, regarding the mechanism of
19 action about stem cells circulating through the
20 nasopharyngeal passages, that although formaldehyde
21 only has a half-life of about a minute to a
22 minute-and-a-half in the body, that it is so highly
23 reactive that it can cause cross-links within the DNA
24 strands, methylation of the DNA strands, that then
25 become permanent within that stem cell, which can
                                    Page 72

                                    18  (Pages 69 to 72)

Case 2:07-md-01873-KDE-MBN Document 2988-2 Filed 08/31/09 Page 9 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1   then be transported to the fetus. And that is the
2   basis on which most theories of not only the
3   reproductive developmental effects of formaldehyde is
4   based, but also the leukemia sometimes reported as a
5   result of exposure to formaldehyde.
6   BY MR. MEUNIER:
7       Q.   And that statement that you've just given,
8   Doctor, is based upon your years of experience, as
9   well as your education and training in the field of
10  environmental health science; correct?
11      A.   Yes. And also the fact that as the issue
12  became increasingly evident, I attempted to review
13  the literature that was available. I provided to my
14  counsel the article by Thrasher and Kilburn, which
15  was an authoritative review of the extant literature
16  at the time, and a statement regarding the mechanism
17  of action that I just relayed to you.
18      Q.   When, then, you reviewed this Tab A,
19  although you indicated you may not have reviewed it
20  in advance of it being sent with this letter to
21  Congress, you did review it at some point in time;
22  correct?
23      A.   Yes, I did.
24      Q.   Did you have any issues, or disagreement,
25  with anything set forth in the content of this
                                                    Page  73

1   discussion about adverse health effects of
2   intermediate exposure to formaldehyde?
3           MR. MILLER: Objection, foundation.
4       A.   I mean, I don't believe I was in a
5   position to provide any comment on this. I saw this
6   after much time had transpired, and many of the
7   issues had already been brought to light through
8   testimony to the Committee and others.
9   BY MR. MEUNIER:
10      Q.   Yes, sir.
11      A.   I just did not see this until, like many
12  other things, until after the fact.
13      Q.   I recognize that you saw it after the
14  fact. My question is whether you, on seeing it, at
15  that time or today, take issue with the accuracy,
16  scientifically, of anything set forth in Tab A that
17  we've looked at?
18          MR. MILLER: Same objection.
19          MR. WEINSTOCK: Object to the form.
20          MR. MILLER: Trying to elicit expert
21  testimony from a witness who is a fact witness in
22  this case, and didn't offer such an opinion in the
23  capacity at the time. Go ahead, Doctor.
24      A.   I had repeatedly raised the issue of
25  reproductive developmental effects, and was
                                                    Page  74

1   criticized for that. I cited the fact that IARC, in
2   their report in 2005, alluded to 11 epidemiologic
3   studies that had been done that reported
4   malformations, fetal malformations, spontaneous
5   abortions, low birth weight, and so on, that were
6   described by IARC as inconsistent.
7           But that is a term of art, scientifically,
8   because of the manner in which reproductive
9   developmental studies are conducted, the exposure
10  regime and protocol may vary widely: They may expose
11  males only, they may expose the dams only, they may
12  expose both, either prior to, during or throughout
13  weaning of the rodent -- rodents involved.
14          More recently -- well, at any rate, that
15  is not necessarily saying that they are
16  contradictory.
17      Q.   Yes, sir.
18      A.   It's saying that you get different results
19  based on what -- exactly how you proceed with the
20  conduct of the study, and what you choose to look
21  for.
22      Q.   And Doctor, I understand and appreciate
23  your concern about the formaldehyde risks with
24  respect to cancer as well as reproductive health.
25          My question right now, though, is looking
                                                    Page  75

1   at Tab A in the letter sent to Congress by
2   Dr. Gerberding, which you have reviewed after the
3   fact, do you, based on your knowledge and experience
4   as an environmental health scientist with specific
5   expertise as to formaldehyde, take issue with the
6   scientific accuracy of what is set forth in Tab A?
7           MR. MILLER: Same objection.
8           MR. WEINSTOCK: Object to the form.
9           MR. MILLER: Same objection, asked and
10  answered.
11      A.   The citation is from the National Research
12  Council 1981. That would indicate to me that it's
13  approximately 30 years out of date.
14          I would, before relying on that document,
15  refer to more recent literature, which I believe will
16  point to -- would point to, does point to, some
17  different exposure levels associated with some of the
18  effects noted.
19  BY MR. MEUNIER:
20      Q.   Different in terms of being lower or
21  higher?
22      A.   Lower.
23      Q.   Look at the paragraph after the table. It
24  states: Inhalation exposure of months to one year or
25  longer is expected to increase the incidence of
                                                    Page  76

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1    symptoms of upper respiratory tract and eye
2    irritation. And there is a reference, ATSDR 1999.
3    Do you see that?
4         A.    I'm --
5         Q.    It's the sentence that follows the box?
6         A.    Oh, yes, I see it. Yes.
7         Q.    First, do you agree with the statement?
8    And second, can you tell us what the ATSDR reference
9    there is?
10           MR. MILLER: Objection, speculation,
11    foundation.
12        A.    I agree with that statement, and the
13    reference is the Agency's Toxicological Profile
14    released in 1999.
15    BY MR. MEUNIER:
16        Q.    In the paragraph that follows, it stated
17    that: Mobile homes are a potential source of
18    relatively high formaldehyde exposures because they
19    are typically constructed of large quantities of
20    particle board bonded with formaldehyde resins.
21    Mobile homes also have lower outdoor air exchange
22    rates than conventionally built housing, which leads
23    to an accumulation of free formaldehyde in living
24    spaces. And there is a reference to Stenton, 1994.
25           Based on your knowledge and experience

Page 77

1    about formaldehyde, do you agree with the statements
2    made there, and can you tell us about the reference
3    to Stenton 1994?
4         MR. MILLER: Objection, foundation,
5    compound.
6         MR. WEINSTOCK: Objection.
7         A.    I don't think there is any doubt that
8    mobile homes are significantly different than
9    traditionally built homes. There are two factors
10    that lead to that; not only the fact that
11    formaldehyde resins are used extensively, but the
12    fact that they are manufactured in closed facilities,
13    and, therefore, are not subject to the off-gassing
14    that would occur during the construction of the home.
15           Furthermore, and I pointed this out in my
16    comments to Sascha Fielding, the headspace, the
17    volume of air above the breathing zone, is much
18    greater in conventionally built homes than it is in
19    mobile homes, and because of that, the levels would
20    tend to be higher as a function of that.
21    BY MR. MEUNIER:
22        Q.    Are you familiar with the reference to
23    Stenton 1994?
24        A.    Not specifically, no.
25        Q.    Turn to the next page, which is Bates

Page 78

1    stamped DEROSA-80.
2         And under the caption: Levels of
3    formaldehyde in, quote, worst case, close quote,
4    unoccupied closed trailers. Is that a discussion,
5    Dr. De Rosa, of what we previously referred to as the
6    study of data collected by the EPA from the 96
7    unoccupied FEMA trailers?
8         A.    Yes.
9         Q.    And do you see the discussion there about
10    the reduction of formaldehyde levels to .4 ppm,
11    according to that analysis when ventilation was
12    provided by running the air conditioner with only the
13    bathroom vents open, then the on-average reduction of
14    levels was .4 ppm. Do you see that?
15        A.    Yes.
16        Q.    In the statement that follows that, it
17    says: This level, .4 ppm, may be high enough to
18    cause symptoms in people who have already become
19    sensitized to formaldehyde. Do you agree with that
20    statement?
21           MR. WEINSTOCK: Object to the form.
22        A.    I think that the .4 parts per million
23    would be of concern for any individuals, whether or
24    not they had been sensitized.
25    BY MR. MEUNIER:

Page 79

1         Q.    And it then says: Although formaldehyde
2    levels in new trailers may remain above the threshold
3    for symptoms in sensitized people for as long as
4    three years, nonsensitized people are unlikely to
5    experience anything other than transient irritation.
6           Do you agree with that statement?
7         A.    No, I don't.
8         Q.    Why not?
9         A.    Because people who are previously
10    nonsensitized can become sensitized by repeated
11    exposure to gases such as formaldehyde.
12           Further, it's not clear that transient
13    irritation would be the only effect, based on my
14    earlier comments regarding reproductive and
15    developmental effects, as well as cancer.
16        Q.    And then the final statement about that
17    study of the 96 unoccupied trailers is that the long
18    term health effects of formaldehyde exposure cannot
19    be determined from this analysis. Would you agree
20    with that?
21        A.    I would say that this analysis did not
22    address long term health effects. But I certainly
23    think that one would be able to draw scientifically
24    robust inferences from the information regarding
25    longer term health effects.

Page 80

20  (Pages 77 to 80)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1      MR. MEUNIER: I will mark for
2  identification as De Rosa 9 the May 29, '07, letter
3  to Congressman Gene Taylor from Dr. Gerberding
4  including Attachment Tab A and Tab B. And let's just
5  identify Tab B. It's DEROSA-81.
6      (Exhibit-9 was marked.)
7  BY MR. MEUNIER:
8      Q.   Do you recognize that as a ATSDR Profile
9  on Formaldehyde, DEROSA-81, bottom right-hand?
10     A.   This is the Fact Sheet. It's a
11 back-and-front synopsis of the health effects of
12 formaldehyde that is abstracted from the
13 Toxicological Profile.
14     Q.   Okay. That's fine. Do you believe,
15 Dr. De Rosa, that one measured ppm level in a living
16 space where formaldehyde is known to be off-gassing
17 can be used to decide all health effects from
18 formaldehyde exposure in that living space --
19     MR. WEINSTOCK: Object to the form.
20 BY MR. MEUNIER:
21     Q.   -- suffered by a particular individual?
22     MR. MILLER: Objection, foundation.
23     A.   Analytic data that are collected on any
24 environment will vary as a function of time,
25 temperature, and ventilation, so that I would suggest
Page 81

1  that to have a reliable sense of what the levels
2  actually are, one should have a time course of
3  sampling that covers different points in the day,
4  different points in the year, and other environmental
5  conditions, whether ventilation is being used
6  extensively, whether it's a closed -- a heating
7  season type of scenario, or whether it's a season in
8  which the windows are open and there is free exchange
9  of air.
10     Q.   Do the health effects of an individual who
11 has inhaled formaldehyde vary with, and depend upon,
12 the particular individual?
13     A.   They do.
14     Q.   Are children, the elderly, and individuals
15 with respiratory problems such as asthmatics,
16 particularly sensitive and susceptible to adverse
17 reactions to relatively low levels --
18     MR. WEINSTOCK: Object to the form.
19 BY MR. MEUNIER:
20     Q.   -- of exposure to formaldehyde?
21     MR. HINES: Objection.
22     A.   It's a generally recognized principle of
23 toxicology that the elderly, the developing fetus,
24 and children, are uniquely sensitive to the effects
25 of any toxic material based on the intrinsic
Page 82

1  sensitivity of the developing organism and the
2  declining physiologic status of organ systems with
3  the onset of aging beginning at the age of 26 at the
4  rate of about one percent a year on average.
5  BY MR. MEUNIER:
6      Q.   Turning back to your statement to Congress
7  at Bates number DEROSA-54 you make the statement in
8  the first or second full paragraph at the top there:
9  "I also recommended", do you see that?
10     A.   Yes.
11     Q.   "I also recommended that ATSDR's health
12 guidance values for short term, intermediate, and
13 long term exposures to formaldehyde be used in
14 assessing the hazards posed by formaldehyde in the
15 FEMA trailers. Dr. Frumkin concurred with my
16 concerns with an e-mail response."
17     A.   Yes, I see.
18     Q.   Where and when -- well, do you have
19 Dr. Frumkin's e-mail in which he concurred with you
20 on that?
21     A.   I believe it might have been on the disk.
22 It should have been on the disk that I shared.
23     Q.   Do you remember --
24     A.   He basically -- Dr. Frumkin basically said
25 Chris made some good points here, we need to be
Page 83

1  cautious in this regard.
2      Q.   And what are the ATSDR health guidance
3  values for short term, intermediate, and long term
4  exposure to formaldehyde?
5      A.   For a long term exposure, it's .008 parts
6  per million; for intermediate exposure, it's .03
7  parts per million; and for acute exposure, it's .04
8  parts per million.
9      Q.   And, again, define long, intermediate, and
10 short term as used by those references?
11     A.   1 to 14 days in the case of short term or
12 acute; longer term or intermediate is greater than
13 14 days and up to 365 days; and longer term is
14 365 days and beyond.
15     Q.   In your interactions in this case in
16 connection with this FEMA trailer formaldehyde issue
17 and your interactions with FEMA, did you ever receive
18 any affirmation from FEMA that it was accepting those
19 health guidance values of the ATSDR in evaluating the
20 formaldehyde concerns about these trailers?
21     A.   No, I did not.
22     Q.   In the analysis of the 96 unoccupied units
23 that was performed, I think you said under the
24 direction of Little and Wright?
25     A.   Yes.
Page 84

21  (Pages 81 to 84)

Case 2:07-md-01873-KDE-MBN Document 2988-2 Filed 08/31/09 Page 12 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation    Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1    Q.    What was the reference value, ppm value
2    used?
3            MR. WEINSTOCK:  Object to the form.
4    A.    My recollection is it was .3 parts per
5    million.
6    BY MR. MEUNIER:
7    Q.    So not .04 for short term, not .03 for
8    intermediate, not .008 for long term, but .3 ppm was
9    used for that study?
10    A.    For that evaluation .3 parts per million
11    was used.  It was a value derived from a series of
12    documents called Managing Hazardous Materials
13    Incidents, intended for first responders and health
14    care providers in emergency events.  It's a level at
15    which sensitized individuals would begin to exhibit
16    symptoms upon entry, and up to three hours after
17    entry into the trailer.
18            MR. MEUNIER:  I think we're at the end of
19    this tape, so let's take a short break before we
20    continue.
21            THE VIDEOGRAPHER:  End of Tape 1, 11:23
22    a.m., off video record.
23            (Recess 11:23-11:37 a.m.)
24            THE VIDEOGRAPHER:  Tape 2, 11:37 a.m.,
25    back on video record.

Page 85

1    BY MR. MEUNIER:
2    Q.    Dr. De Rosa, I think you indicated you
3    wanted to clarify something for the record.
4    A.    Yes, I mentioned the country, I misnamed
5    it.  It is not Ecuador, it was Uruguay.
6    Q.    It's one of the countries you've consulted
7    with as an expert?
8    A.    Yes.
9    Q.    All right.  We were talking about the use
10    of .3 ppm by Little in the analysis of the EPA data
11    from the 96 unoccupied trailers.
12            And you know that according to Mr. Little,
13    he picked that because it was the lowest actual
14    effect level that he could find in the toxicological
15    literature.  Are you aware of that?
16    A.    That's what he indicated in his testimony.
17    Q.    Do you agree with him that .3 ppm is the
18    lowest actual effect level found in the toxicological
19    literature?
20    A.    No, I don't.
21    Q.    Why not?
22    A.    Because there is extensive documentation
23    about effects occurring below that level, including
24    the underlying effect levels associated with some of
25    the health guidance values that I have mentioned to

Page 86

1    you earlier.
2    Q.    Well, Mr. Little in his sworn testimony in
3    this case has said that the minimum risk levels, or
4    the MRLs, of the ATSDR are screening tools based on
5    effect levels multiplied by several safety factors,
6    factors of 9 to 30, for uncertainty, which brings
7    them much lower than the effect level.  Do you agree
8    with that?
9            MR. WEINSTOCK:  Object to the form.
10    A.    The --
11            MR. MILLER:  Object.  Hold on.  Hold on.
12    I'm going to object to the extent you're requesting
13    this witness to comment on the testimony of another
14    witness.
15            Secondly, you're requesting this witness
16    to render an expert opinion beyond the scope of this
17    witness's -- beyond the scope of the duties and
18    responsibilities when he was at CDC, as a fact
19    witness, that's what he's here for.
20            MR. MEUNIER:  Well, he's here as a
21    non-retained expert.  You can make that a continuing
22    objection.  I'm asking him about ATSDR minimal risk
23    levels here.
24    A.    Well, just to --
25            MR. MILLER:  Hold on.  Hold on.  You're

Page 87

1    asking him to compare what Joseph Little apparently
2    testified to here in his deposition.
3            MR. MEUNIER:  I'm asking him to reference
4    sworn testimony, which is the nature of offered
5    opinion testimony, to which we do object, from Little
6    at Page 121 of his deposition, if you want to read
7    it, in which he expressed, Little expressed, an
8    opinion.  I'm asking him to respond.  Your objection
9    is noted.
10    A.    Okay.  By way of a background, I was with
11    EPA during which time I was responsible for the
12    development of the Risk Assessment Guidelines both
13    for noncancer endpoints and for chemical mixtures.
14            As part of that, the identification of
15    uncertainty factors, and relying rationale,
16    constituted a primary focus of my professional
17    background, and in fact, I was the person who made
18    the final determinations as to whether uncertainty
19    factors were or were not applied appropriately by our
20    interagency work group that developed such guidance
21    values.
22            The values you've referenced were 9 to 30.
23    There were two values of 9 used for the acute and
24    intermediate, I believe, and then a 30 for the longer
25    term; I would have to verify that, but there were two

Page 88

22   (Pages 85 to 88)

Case 2:07-md-01873-KDE-MBN   Document 2988-2   Filed 08/31/09   Page 13 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1  values of 9, one of 30.
2      Those are relatively low uncertainty
3  factors. Typically uncertainty factors range from 10
4  to 1,000 in some instance, depending on the
5  robustness of the database on which they are based.
6      To say that these were unreasonable is
7  very speculative. I think I would cite our
8  experience with lead in children as an example. The
9  standard for lead in children has gone from 50 -- 50
10 micrograms per deciliter down to now 10, and some
11 think it should be at three or lower, because there
12 is no threshold that has been identified with
13 certainty.
14      So what we know and what we don't know is
15 relentlessly circumscribed by evolving insights into
16 science, and to say that something is fully
17 protective, or is not protective, is treacherous
18 territory.
19      MR. WEINSTOCK: Object to the
20 responsiveness of the answer, but you can continue.
21 BY MR. MEUNIER:
22     Q.  Assuming that Doctor -- I mean, or
23 assuming that Mr. Little in his sworn testimony in
24 this case agreed with counsel for Gulf Stream that
25 MRLs, quote: "have got nothing to do", close quote,

Page 89

1      Q.  Do you agree that the potential or known
2  real effects of exposure from formaldehyde have got
3  nothing to do with the MRLs established by the ATSDR?
4      A.  I don't agree with that, no.
5      Q.  Why not?
6      A.  Because the uncertainty factors that are
7  applied are based on effect levels. And the
8  uncertainty factors are determined based on a
9  longstanding protocol of dividing by 10 dating back
10 to the mid-Fifties when first invoked by FDA.
11      It's not based on the fact that we have 10
12 digits. It's based on the fact that most biological
13 phenomenon are logarithmically distributed, so
14 dividing by 10, you encompass 95 percent of the
15 variability of a given parameter.
16      And in the case of uncertainty factors,
17 there are four such values used, typically. One is
18 to extrapolate from an adverse effect level to an
19 effect level that's considered not to be, or
20 construed not to be adverse in terms of its health
21 effect. One is for extrapolating from a subchronic
22 exposure to a chronic exposure. And there is one
23 that's used to extrapolate from animals to humans at
24 factor of 10 on the presumption that humans are most
25 sensitive, and then another factor of 10 based on

Page 91

1  with effect levels of formaldehyde exposure, do you
2  agree with that?
3      MR. WEINSTOCK: Object to the form.
4      MR. MILLER: Object to the form.
5      MR. MEUNIER: And that's at Page 122 of
6  the Little deposition.
7      MR. HINES: Object to the form.
8      MR. MILLER: I would also object to the
9  use of the transcript because I don't think that is
10 the final transcript. I think the transcript
11 explicitly notes that it should not be used for
12 quoting for any purposes.
13      MR. WEINSTOCK: One more objection. I
14 object to you quoting a question from a deposition.
15 You're certainly always welcome to quote an answer.
16 I object to you quoting the question to the
17 deposition.
18      MR. MEUNIER: Would you like the answer?
19      MR. WEINSTOCK: I know the answer because
20 I read it.
21      MR. MEUNIER: Question: And that's what
22 you're talking about before, where do we see real
23 effects, and it's not nothing to do with these MRLs;
24 correct? Answer: Yes.
25 BY MR. MEUNIER:

Page 90

1  interindividual human variability.
2      So that's where I came to the point where
3  they can range typically from 10 on up to 1,000;
4  typically if we have a value of 10,000, we would not
5  use that study if we felt that that much of an --
6  that large an uncertainty factor were needed.
7      But, again, this is -- these are
8  predicated upon the premise that you're accounting
9  for known differences in sensitivity based either on
10 the duration, species of exposure, type of effect,
11 and interindividual human variability.
12      Q.  Mr. Little has explained that he didn't
13 use the ATSDR Chronic MRL as a reference in his
14 analysis of the EPA data because he understood that
15 MRL to be based on average exposure time of about 10
16 years.
17      A.  Yes. That was an exposure study. The
18 workers were exposed on average of 10.8 years.
19      Q.  So do you agree with Mr. Little that the
20 chronic exposure reference in the MRLs is
21 inapplicable in a case such as this for analysis of
22 the formaldehyde levels in these trailers?
23      A.  No, I don't.
24      Q.  Why not? I mean, no one has lived in the
25 trailers for 10 years, why isn't Little correct about

Page 92

23  (Pages 89 to 92)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation      Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1    that?
2        A.   Because it's tied to the concept of
3    physiologic time.  A lifetime study in rodents is
4    considered to be two years, possibly longer,
5    depending upon the protocol that's being used.  The
6    lifetime exposure in humans is typically considered
7    to be 70 years.  But, generally speaking, a two-year
8    study in rodents or other bioassays, would be
9    considered to be consistent with a 70-year life
10   expectancy.
11       Again, there are a lot of assumptions and
12   issues of science that are tied up in that.  But it's
13   the issue of physiologic time, and the fact that a
14   10-year exposure involving workers, a 2-year exposure
15   or a 1-year exposure, or more, could be considered to
16   be adequate for the purposes of a risk assessment.
17       Q.   And a year or more exposure is considered
18   chronic in reference to the MRL levels?
19       A.   That's correct.
20       Q.   Mr. Little said that he believed the
21   carcinogenic effects of formaldehyde require, quote:
22   many, many years of exposure, and specifically 10 or
23   20 years, and that's why the carcinogenic effects
24   were not addressed in this Health Consultation Report
25   of February '07 because no one lived in these

Page 93

1    trailers for 10 or 20 years.  What is your response
2    to that?
3            MR. WEINSTOCK:  Object to the form.
4            MR. MILLER:  Same objections as earlier.
5        A.   Would you repeat the question, please.
6    BY MR. MEUNIER:
7        Q.   Mr. Little, in sworn testimony in
8    reference to his analysis of this EPA data, has
9    testified that in terms of the cancer risk associated
10   with formaldehyde exposure it involves, quote:
11   "Many, many years of exposure", close quote, and
12   specifically 10, 20 years.  And for that reason, he
13   did not consider it applicable here because people
14   had not lived in these trailers that long.
15           MR. WEINSTOCK:  Object to the form.  Go
16   ahead.
17   BY MR. MEUNIER:
18       Q.   What is your response to that?
19       A.   I think Mr. Little is confusing the
20   latency period for most cancers with the time
21   required for exposure to elicit a carcinogenic
22   response.  With the exception of leukemias, a latency
23   period of 10 to 20 years is not unheard of, and is
24   typical, in fact.
25           However, again, the prevailing policy of

Page 94

1    -- the Federal Science Policy of the Federal
2    Government is that there is no safe level of exposure
3    to a carcinogen, irrespective of the duration of
4    exposure.
5            This is based on the premise of a study
6    done with ionizing radiation in the late Seventies
7    and early Eighties where they exposed large numbers
8    of rodents to doses of radiation and were unable to
9    find a dose at which a carcinogenic response was not
10   elicited.  It's called the Mega-Mouse Study, for
11   those who are interested.
12           But at any rate, that has formed the
13   backbone of science policy within the U. S. Federal
14   Government since that time.  And it's the premise of
15   all cancer risk assessments done by the Federal
16   Government.
17       Q.   Let me refer you once again to the Toxic
18   Trailers, Toxic Lethargy, Majority Staff Report of
19   September '08.  It's DEROSA-00 -- it's DEROSA-7,
20   and...
21       A.   I have two 060's here.
22       Q.   I'm sorry.  This is it.
23       A.   Okay.  I see it.
24       Q.   Yes.  And turn to the next Bates numbered
25   page DEROSA-10.  And in the top paragraph the

Page 95

1    statement is made here that:  The ATSDR Health
2    Consultation used an inappropriate 'level of concern'
3    of zero part three -- of 0.3 parts per million, 10
4    times higher than ATSDR's own minimal risk level of
5    up to one year of exposure (.03 ppm) and three times
6    higher than the level of exposure widely accepted by
7    other federal agencies to cause potential ill health
8    effects, (0.1 ppm).
9            Do you agree with that statement?
10           MR. WEINSTOCK:  Object to the form.
11       A.   Yes, I do agree with that statement.
12   BY MR. MEUNIER:
13       Q.   I'm sorry.  Lost the page here.
14           And do you also agree with the sentence
15   that follows that one, which is that the
16   consultation, and again, this is referring to the
17   Health Consultation of February '07 that grew out of
18   that analysis by Little of the data in the unoccupied
19   trailers, that the consultation also failed to
20   address potential long term health effects of
21   formaldehyde exposure including cancer risk, and
22   neglected to mention the fact that formaldehyde is
23   described as a probable or known carcinogen by U. S.
24   government agencies and international health
25   organizations.  Do you agree with that statement?

Page 96

24  (Pages 93 to 96)

Case 2:07-md-01873-KDE-MBN   Document 2988-2   Filed 08/31/09   Page 15 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1     Q.   -- an e-mail from the Health -- first of
2  all, from the Health Network. It's dated July 26,
3  '07, and it's entitled CDC Health Advisory.
4     A.   Yes.
5     Q.   Correct?
6     A.   Yes.
7     Q.   And then there appears to be an e-mail
8  from Rick Preston to you OF July 26, '07. Do you see
9  that?
10    A.   Yes, I do.
11    Q.   And he says: "This comes as a surprise to
12  me." And then you respond to him.
13    A.   Yeah. He said I would like to think that
14  your efforts had something to do with it.
15    Q.   All right. What do you recall about the
16  circumstances of this CDC Health Advisory?
17    A.   That it went out, I saw it after it went
18  out, and I responded to Richard saying that they
19  still don't mention the long term health effects and
20  developmental toxicity.
21    Q.   Now, how does a health advisory like this
22  get distributed through what's called the Health
23  Alert Network? And who does that -- who is the
24  intended audience here?
25    A.   Health care providers, generally speaking.

Page 105

1  It goes to agencies, it goes to individual
2  physicians. It's intended to inform professionals.
3     Q.   And so this would go, for example, to
4  physicians who were treating individuals who might
5  come to them with symptoms that they related to being
6  in these units?
7     A.   Yes. I mean, it points out that
8  clinicians can access more information. It
9  references the website, and then health care
10  providers should contact their local poison control
11  center, there at the bottom. So it's clearly
12  intended for an audience that is likely to encounter
13  people exhibiting clinical signs of toxicity.
14    Q.   And your feeling after reviewing this
15  health advisory in July of '07 was that it did not
16  reference long term health effects and developmental
17  toxicity?
18    A.   Right.
19    Q.   And are you referring here in particular
20  to the risks of cancer and reproductive health
21  issues?
22    A.   I am.
23       MR. MEUNIER: Let me mark as De Rosa 10
24  Bates numbered documents 96 and 97.
25

Page 106

1       (Exhibit-10 was marked.)
2  BY MR. MEUNIER:
3     Q.   I want to refer you now, Dr. De Rosa, to
4  Bates number 92. And, in particular, to your e-mail
5  of July 25th, '07, to Mike McGeehin, and others,
6  including Frumkin and Sinks.
7     A.   Yes.
8     Q.   Was this e-mail, and you refer in it to
9  sampling data provided by FEMA, is that again the
10  data dealing with the 96 unoccupied units?
11    A.   That's correct.
12    Q.   And you state that you were asking what is
13  being done to properly inform the inhabitants about
14  the health effects of formaldehyde; correct?
15    A.   That's correct.
16    Q.   And you say: I have seen no mention of
17  reproductive, developmental hazards in materials
18  distributed to the residents?
19    A.   Correct.
20    Q.   Now, what materials being distributed to
21  residents were you referring to?
22    A.   I just saw the -- some of the materials
23  that I don't recall exactly what they were, I think
24  they were FEMA flyers that I had seen on e-mail or
25  perhaps in other media. I just don't recall where I

Page 107

1  saw that.
2     Q.   But the material that you had looked at
3  purporting to communicate to residents in the units
4  you felt failed to mention all of the things that
5  needed mentioning with respect to formaldehyde risks?
6     A.   That's correct.
7     Q.   If you'd turn to the next Bates numbered
8  page, 93.
9     A.   Yes.
10    Q.   On July 24 you had done an e-mail blast to
11  a number of people in which you state that you were
12  concerned that the reported clinical signs are the
13  harbinger of an impending public health disaster.
14    A.   Correct.
15    Q.   Why did you say that?
16    A.   Because kids were presenting with clinical
17  signs of formaldehyde toxicity. They were being
18  taken to hospitals.
19       MR. WEINSTOCK: I'm sorry?
20    A.   They were being taken to hospitals with
21  asthmatic attacks, and then being returned to the
22  environment which caused them.
23  BY MR. MEUNIER:
24    Q.   And you felt more needed to be done to
25  communicate to those families, Dr. De Rosa?

Page 108

27 (Pages 105 to 108)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1    A.   Yes, I did.
2    Q.   In this same e-mail of July 24, '07 --
3    A.   I need to excuse myself.
4         MR. MEUNIER:  Let's go off the record.
5         THE VIDEOGRAPHER:  12:11, p.m., off video
6    record.
7         (Recess 12:11-12:14 p.m.)
8         THE VIDEOGRAPHER:  12:14 p.m., back on
9    video record.
10   BY MR. MEUNIER:
11   Q.   Yes, sir.  You were about to --
12   A.   My concern here was multiply dimensioned,
13   had multiple dimensions.  It was a concern for the
14   kids and the parents, but it was also a concern that
15   an entire agency of health care professionals could
16   stand by and watch kids being taken to the hospital
17   with an asthmatic attack, which is the same as not
18   being able to breathe, bronchial constriction, they
19   wheeze, they cough, they can't get their breath.
20   And, you know, these people here know that.  And how
21   people could stand by and do the politically
22   expedient thing is beyond me.
23        MR. BONE:  Object to the responsiveness.
24   BY MR. MEUNIER:
25   Q.   The statement you then make in the same
                                          Page 109

1    referring to are the NIOSH limits?
2    A.   I believe that's what I was referring to.
3    It was rather late in the evening, I was not in my
4    office, and I was simply trying to precipitate a
5    response that was consistent with prudent public
6    health practice.
7    Q.   Well, when you say here the data was 300
8    times higher than the health guidance values, the
9    health guidance values are the MRLs of the ATSDR we
10   talked about?
11   A.   Right, yeah.
12   Q.   Now, it was shortly after this in August
13   of '07 that Congressman Waxman's committee in
14   Congress began an investigation into the formaldehyde
15   FEMA trailer matter?
16   A.   Yes, that's correct.
17   Q.   And let me refer you back to your
18   statement to Congress at Bates number 54.  I'm sorry.
19   55.
20   A.   Okay.
21   Q.   When you began -- you had interactions
22   with Congressional staff as part of this August '07
23   investigation?
24   A.   Very limited, yes, I did.
25   Q.   Is this when you first became aware that
                                          Page 111

1    e-mail is you say, "we know based on data provided to
2    us that levels are up to 80 times higher than peak
3    occupational limits, and up to 300 times higher than
4    our guidance values."
5         Now, what exactly were you referring to
6    there?
7    A.   Occupational limits set by NIOSH and our
8    health guidance values, the minimal risk levels that
9    we were referencing earlier.
10   Q.   What is NIOSH, Doctor?
11   A.   It's the National Institute for
12   Occupational Safety and Health.
13   Q.   And what are the levels established by
14   NIOSH for formaldehyde?
15   A.   My recollection is .012 is the recommended
16   -- NIOSH recommendation.
17   Q.   It's .01?
18   A.   It's .012, or perhaps it is .016.  It may
19   well be 0.16.
20   Q.   And that's ppm?
21   A.   That's correct.
22   Q.   So when you say that the data provided to
23   us reflects levels 80 times higher than peak
24   occupational limits, and 300 times higher than our
25   guidance values, the occupational limits you're
                                          Page 110

1    Frumkin had -- and others, had reviewed the data and
2    the analysis that led up to the February '07 Health
3    Consultation Report, although you had --
4    A.   No, it was just about that time because I
5    was, again, trying to protect my staff because I felt
6    they were being made scapegoats, they had been
7    publically assailed by Dr. Frumkin, and I had spoken
8    to them about the need to be cautious and precise in
9    what they said and did.
10   Q.   Well, in this statement to Congress then
11   at page -- at DEROSA-55 you mention senior staff
12   meeting -- a senior staff meeting of August 29, 1987,
13   do you see that?
14   A.   Yes.
15   Q.   And you indicate here that Frumkin at this
16   meeting indicated it was the failure of your
17   Division's Emergency Response Team --
18   A.   Right.
19   Q.   -- to take into account the broader
20   implications of the FEMA request by restricting the
21   review of short term exposures only as directed by
22   FEMA's Office of Legal Counsel.
23        Is this referring back again to the
24   Preston interaction with your Agency?
25   A.   Mm-hmm.  Yes, it is.
                                          Page 112

                              28  (Pages 109 to 112)

Case 2:07-md-01873-KDE-MBN    Document 2988-2    Filed 08/31/09    Page 17 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1  getting sick that they learned of, isn't that right?
2      A.   The FEMA had approached another
3  organization within CDC outside of ATSDR to provide
4  some health guidance.  They had been -- the lead for
5  this had been transferred I think at that point in
6  time to NCEH, and it was Michael McGeehin's group in
7  NCEH that was the recipient of this request, I
8  believe.
9      Q.   Now, in your e-mail and response on the
10  first page of the June 1st, 2007, e-mail issued at
11  6:05 p.m., this is the first time you've referenced,
12  or made reference, to what are called I believe the
13  MRLs; is that right?  The minimum risk levels?
14      A.   Yes.
15      Q.   Those are the health guidance values?
16      A.   It's not the first time I have made
17  reference to them.  I have made reference to them
18  throughout, but...
19      Q.   Well, I apologize.  In the correspondence
20  or the letters or the documents that I've seen
21  relating to formaldehyde in trailers, this was your
22  first reference to them in any writing?
23      A.   No, I don't know the answer to that.
24      Q.   And I think you indicate here that you
25  would suggest the use of those MRLs as a point of

Page 181

1  departure for any deliberative process; is that
2  right?
3      A.   That's correct.
4      Q.   Now, I have a question:  Were you aware
5  that HUD has issued regulations relating to
6  formaldehyde in -- formaldehyde emissions in
7  manufactured housing, mobile homes?
8      A.   Now, that is a difficult question to
9  answer because there may be -- for manufactured
10  housing, mobile homes, may be a different story
11  altogether.
12      Q.   Were you aware that HUD had set an indoor
13  air target level for formaldehyde in manufactured
14  housing of .4 ppm, or 400 parts per billion?
15      A.   I don't believe I was aware of that at the
16  time, no.
17      Q.   You are aware that OSHA has set
18  Permissible Exposure Levels for formaldehyde?
19      A.   Yes.
20      Q.   And the Permissible Exposure Level is .75
21  ppm, or 750 parts per billion, time-weighted average
22  over an eight-hour workday?
23      A.   Those numbers, again, have to be viewed in
24  the context of the duration of exposure and the fact
25  that formaldehyde has a very short half-life, so

Page 182

1  you're talking about a very different scenario; an
2  occupational setting where you have intermittent
3  exposures versus a continued exposure throughout the
4  day, 24 hours a day in some instances.
5          And I would also point out that the status
6  of the Government's regulations and so forth on
7  formaldehyde have been on hold since about 1989 when
8  the last formal assessment was done on the values
9  that are issued by EPA, and which generally drive
10  many of the other agencies' regulatory activities,
11  and that there has to be a distinction made between
12  OSHA's position, and the position of NIOSH.
13          NIOSH is similar to ATSDR in that it
14  serves as an advisory agency to OSHA.  OSHA has the
15  regulatory authorities.  As referenced earlier, NIOSH
16  has a recommended limit of 0.16.
17          So, again, this is all part of the tyranny
18  of numbers that one gets into, and just comparing one
19  number to another is not necessarily an appropriate
20  thing to do, whether it's higher or lower, it has to
21  deal with how long that number is in effect, whether
22  it's for peak value, or as you mentioned, a
23  time-weighted value.
24      Q.   Okay.
25      A.   So those are all things that get into the

Page 183

1  mix.
2      Q.   And, in fact, when someone has to respond
3  to a concern, and you have this tyranny, or tyranny
4  of numbers, in other words, different agencies have
5  issued different numbers, so you had HUD with a
6  target level of .4 ppm, you have OSHA with an
7  occupational PEL of .75 ppm, you have EPA issuing a
8  level of .1 ppm, you have ATSDR issuing health
9  guidance values of .008 ppm, or if it's acute, .04
10  ppm, you have NOAELs, No Observed Adverse Effect
11  Levels.  You have LOAELs, Lowest Observed Adverse
12  Effect Levels.
13          When you have this tyranny of numbers for
14  someone trying to respond to a problem, it can't be
15  resolved just by the numbers, is that what you're
16  saying?
17          MR. MEUNIER:  Objection to the form as
18  vague.
19      A.   I didn't say that.  First, I would not
20  make a comparison between a health guidance value and
21  a Regulatory Value.
22          For example, I would point out that the
23  MCL for carcinogens in drinking water is by policy
24  zero.  But -- the RMCL is zero, that's the
25  Recommended Maximum Contaminant Level.  The Maximum

Page 184

46  (Pages 181 to 184)

| | |
|---|---|
| 1    uses for policy purposes, aren't they? | 1    reproductive developmental toxicity based on |
| 2        A.   I don't believe that they are used for | 2    experience with lead, and there was a Food Quality |
| 3    policy purposes, no. | 3    Protection Act that called for the application or |
| 4        Q.   The next -- if you continue in the next | 4    consideration of the application as phrased by the |
| 5    sentence there:  HGVs represent levels of a chemical | 5    National Research Council of a supplemental |
| 6    or other substances, exposure to which would be | 6    uncertainty factor to account for lack of data on |
| 7    expected to cause no adverse health effects over a | 7    sensitive populations, especially the developing |
| 8    specified period of time, i.e., acute, intermediate, | 8    fetus, children, and women of reproductive age. |
| 9    or chronic.  As such, they represent neither | 9        So, again, the science base may be the |
| 10   threshold values, nor levels predictive of toxicity. | 10   same, but the insights regarding science more |
| 11   That's what you wrote back in 1997, right? | 11   generally may have evolved, and our understanding and |
| 12       A.   Right.  They may not be predictive, and, | 12   the unique sensitivity of children to these |
| 13   in fact, they may be insufficiently protective, | 13   substances resulted in an Executive Order by |
| 14   depending on the scenario.  It's a point of | 14   President Clinton during his Administration that all |
| 15   departure; again, it's not saying that anything above | 15   programs throughout the Federal Government be |
| 16   is bad, and it's not saying anything below is okay. | 16   reviewed and identified for strengthening regarding |
| 17       Q.   Let me ask you to turn to Page 690 of your | 17   the health of children. |
| 18   paper.  And there is a paragraph there, the first | 18       And so, consequently, you can see a shift |
| 19   full paragraph that starts:  "To arrive at the RFD | 19   in perhaps the degree of conservatism, or protected |
| 20   reference dose USEPA used according to science | 20   levels, that are developed based on the growing |
| 21   policy", and then there is a discussion there on | 21   insights of our -- of science.  And the values may |
| 22   about how they reach their results, you see that? | 22   not change.  And a good example would be dioxin.  In |
| 23       A.   The RFD referring to what? | 23   1988, we developed a risk assessment on dioxin and |
| 24       Q.   I believe -- | 24   identified one microgram per kilogram per day as the |
| 25       A.   For what chemical, are we referring to? | 25   MRL for long term exposure.  And it had an |
| Page  193 | Page  195 |

| | |
|---|---|
| 1        Q.   I think if you look at the prior page, | 1    uncertainty factor of probably 100, based on what was |
| 2    it's ethylbenzene? | 2    then a demonstrated effect level. |
| 3        A.   Okay.  Ethylbenzene.  Thank you.  Yeah. | 3        10 years later, when we reevaluated, we've |
| 4    The same study, right. | 4    come up with the same number.  But this time we have |
| 5        Q.   And what it notes is that the reference | 5    a tenfold reduction in the identification of an |
| 6    dose that the EPA came up with versus the MRL that | 6    effect level, but a tenfold increase in our |
| 7    the ATSDR came up with were one quarter of magnitude | 7    confidence in the database.  So there is a dead wash, |
| 8    different from each other. | 8    more data, lower effect level, counterbalancing one |
| 9        A.   Right. | 9    another. |
| 10       Q.   And you write there then:  The resulting | 10       So the point being is that all these |
| 11   difference between the two HDVs is greater than an | 11   things have to be looked at in the context in which |
| 12   order of magnitude.  This may not be great enough | 12   they are derived, how they are meant to be applied. |
| 13   difference to pose a significant problem for an | 13   And I think that's the thrust of this paper. |
| 14   experienced health risk assessor, but may be more | 14       Q.   And my question went to that issue, and |
| 15   than enough to create a problem for a public health | 15   that's that when you have these multiple levels, |
| 16   official trying to communicate this to a group of | 16   reference doses, MRLs, health guidance values, target |
| 17   concerned parents and mothers-to-be.  That's what you | 17   levels from HUD, target levels from EPA, target |
| 18   wrote; is that correct? | 18   levels from OSHA, that creates a real difficulty for |
| 19       A.   That's exactly right. | 19   someone trying to figure out what is the right action |
| 20       Q.   What were you identifying there?  What was | 20   level, isn't that correct? |
| 21   the problem? | 21       MR. REICH:  Objection, argumentative. |
| 22       A.   Well, one point is that one has to | 22       A.   I think that individuals who are charged |
| 23   determine when the value was developed.  The database | 23   with developing determinations of hazard or risk need |
| 24   in this case, it was the same study, but in the | 24   to be informed of those.  That's why within each |
| 25   intervening years there was express concern regarding | 25   toxicological profile, there is a compilation of |
| Page  194 | Page  196 |

49  (Pages 193 to 196)

Case 2:07-md-01873-KDE-MBN   Document 2988-2   Filed 08/31/09   Page 19 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation        Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1 existing standards and criteria, both nationwide and
2 worldwide.
3        There is also a continuous update of our
4 minimal risk level listing of an abbreviated tabular
5 summary of those values, so that people can regularly
6 access, the health practitioner can regularly access
7 the most recent information and perhaps be guided;
8 and as a matter of policy, our programs are to be
9 guided, and as a matter of law, our programs are to
10 be guided by the MRLs.
11        Q.   And FEMA came to you --
12        A.   They didn't come to me.
13        Q.   They came to ATSDR CDC, and what you --
14 what CDC ATSDR told them in February 1st, 2007 was .3
15 ppm was the level of concern.  And to the best of
16 your knowledge --
17        A.   I would have to review the actual verbiage
18 there.
19        Q.   Okay.
20        A.   Maybe it was level of concern.  It is a
21 level of concern.  I would agree with that.  But it's
22 not the only level of concern.
23        Q.   Oh, I understand.  There is a lot of other
24 levels.  There are MRLs, there are NOAELs, LOAELs,
25 there is HUD, there is everything.  But what was
                                              Page 197

1 identified to FEMA in that report, was .3 ppm?
2        A.   As a level of concern.
3        Q.   Yes.  And that was not corrected or
4 altered or amended, to the best of your knowledge,
5 until sometime in the summer of 2007 by the CDC
6 ATSDR?
7        A.   That's -- I don't know when it was
8 amended.
9        MR. MILLER:  I'm going to pass you on.  I
10 might have some additional questions after
11 Mr. Meunier is done with you.  I appreciate very much
12 your patience with me very much, Dr. De Rosa.
13        THE WITNESS:  Thank you for your patience
14 as well.
15        MR. MEUNIER:  Just for the record,
16 Counsel, if you suggest that at the end there after
17 we're done, we're going to object to any recross in
18 this deposition.
19        MR. MILLER:  Of course you will.
20        MR. MEUNIER:  Just for the record.
21        (Off-the-record discussion.)
22        THE VIDEOGRAPHER:  3:16 p.m., off video
23 record.
24        (Recess from 3:16-3:26 p.m.)
25        THE VIDEOGRAPHER:  3:26 p.m., back on
                                              Page 198

1 video record.
2              EXAMINATION
3 BY MR. WEINSTOCK:
4        Q.   Doctor, my name is Andy Weinstock.  I have
5 some questions for you today.  You've touched on
6 something I really want to kind of delve into it a
7 little bit.
8        A.   Sure.
9        Q.   And that is you said there is no absolute
10 threshold for formaldehyde; is that correct?
11        A.   According to science policy, that's
12 correct.
13        Q.   And the policy -- and that's your belief
14 as well; correct?
15        A.   It's not a belief.  It's simply a
16 statement of what the Federal Government's current
17 policy is with respect to exposure to carcinogens.
18        Q.   Well, you certainly said that in terms of
19 no safe level in reviewing the February 2007 report.
20        A.   Right.  And I also referenced the Office
21 of Drinking Water's standards, MCLs for carcinogens,
22 which are in contrast to the recommended MCL for any
23 carcinogen is zero, based on that policy.
24        And this is an example of where you have a
25 recommended level, and then one that's technically
                                              Page 199

1 feasible, or economically, or whatever the societal
2 values that are superimposed upon the regulatory
3 decision maker.  There is a difference between the
4 risk assessment itself, and the regulation that's
5 promulgated based on the risk assessment.
6        Q.   But I want to get back to something you
7 said not in response to the .3 level of concern, but
8 something you said while discussing MRLs.  You said
9 there was no absolute threshold; is that correct?
10 Not in terms of policy, but in terms of injury?
11        A.   For individual, there is no absolute
12 threshold for individuals.  It's a population-based
13 phenomenon.
14        Q.   Any single molecule of that carcinogen can
15 cause cancer in an individual?
16        A.   And, in fact, it can be argued, and it has
17 been used as an illustration, that one additional
18 drop of water can send you into osmotic shock and
19 kill you.
20        Q.   And I appreciate -- I think you're
21 agreeing with me, but you didn't say yes before you
22 added to it.  You would agree that for certain
23 individuals one molecule of carcinogen can lead to
24 cancer; correct?
25        A.   Theoretically speaking, that's what I
                                              Page 200

50  (Pages 197 to 200)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation        Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1      Q.   As we look at those three MRLs, the lowest
2   observable effect was found to be 0.24; correct?
3      A.   Yes. Let's see, let me just check that.
4   Yes, that's correct.
5      Q.   And the MRLs are calculated from those
6   lowest observable, or no observable levels multiplied
7   by risk factors?
8      A.   Divided by.
9      Q.   Divided by. I apologize. Divided by.
10     A.   Correct.
11     Q.   Would you agree that exposure to a level
12   above the MRL does not mean that adverse health
13   effects will occur?
14     A.   For some individuals, it will not make a
15   difference; for others, it may make a profound
16   difference.
17     Q.   Because for certain people, one molecule
18   is enough?
19     A.   No, because certain people are simply
20   hypersensitive for any number of possible reasons; it
21   could be their immune status, it could be prior
22   exposures, it could be other similar types of
23   exposures to chemicals having an irritant effect.
24        The immune system can be primed to respond
25   at increasingly lower levels by virtue of its memory

Page 245

1   capacity more rapidly.
2        And these uncertainty factors are intended
3   to identify what would be a putative effect level in
4   the event that we had complete data on each of these
5   areas of science, that is whether it's a chronic
6   study, subchronic study, an adverse effect, or a
7   human study versus an animal study. And sometimes
8   there is a modifying factor that's added from missing
9   datasets. That's not the case here.
10     Q.   Did I understand you correctly that for
11   some people they are susceptible of injury even below
12   the MRL?
13     A.   It's quite conceivable that they could be,
14   yes. The MRL is defined, and the RFD similarly is
15   defined as an estimate that may span an order of
16   magnitude; that means it could go either direction.
17   So .008 could be .00008, or it could be .08, if it
18   spans an order of magnitude.
19     Q.   Because there are some people that might
20   be injured at .0008? Yes?
21        MR. REICH: ppm?
22        MR. WEINSTOCK: ppm.
23     A.   .008 ppm may be an issue for some
24   individuals. And it may be that our estimate could
25   be off either way by an order of magnitude, that the

Page 246

1   variability with some of these estimates may span an
2   order of magnitude. That's an acknowledgment of the
3   uncertainty in the scientific database.
4        These are sometimes construed as
5   artificially precise numbers, and that's why talking
6   about whether or not you have a concern about this
7   level, or that level, will cause me to hesitate,
8   because I know the inherent plasticity of the
9   database, and the assessments that will be done at
10   different points in time by different individuals
11   looking at different scenarios.
12     Q.   Have you ever met with any of the
13   Plaintiff lawyers in this case?
14     A.   Not to my knowledge. I believe I received
15   a phone call, and I referred them to legal counsel.
16     Q.   Did you meet any of them when you were
17   testifying in Washington?
18     A.   No, I didn't.
19     Q.   You didn't meet the fellow sitting right
20   behind you?
21     A.   Who is that?
22     Q.   Mr. Buzbee?
23     A.   No, I didn't meet Mr. Buzbee, to my
24   knowledge. I remember meeting Harry Milman.
25     Q.   Who?

Page 247

1      A.   Harry Milman.
2      Q.   Anybody else?
3      A.   No. There were a number of reporters, I
4   don't remember their names.
5        MR. WEINSTOCK: With the time
6   consideration we have, I'm going to go ahead and pass
7   you on to Mr. Hines.
8        EXAMINATION
9   BY MR. HINES:
10     Q.   Dr. De Rosa, my name is Richard Hines, I
11   represent one of the defendants in this litigation.
12   A few questions. Is formaldehyde dose dependent, or
13   concentration dependent, in your opinion?
14     A.   In terms of its health effects?
15     Q.   Yes.
16     A.   There is a dose-dependent relationship,
17   yes.
18     Q.   As opposed to concen -- do you draw a
19   distinction between a dose-dependent relationship as
20   opposed to a concentration-dependent relationship?
21     A.   It depends on how -- whether we were
22   talking about a gas, or a particulate. Convention
23   varies among agencies as to whether it's expressed as
24   a concentration or a dose. The dose is usually per
25   unit body weight.

Page 248

62  (Pages 245 to 248)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation        Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1    A concentration is the level exposed in
2 the ambient environment, or the exposure level in the
3 study that's being done.
4    Q.   All right.  Do you draw a distinction
5 between -- when I say concentration level,
6 concentration in terms of short term exposure as
7 opposed to long term exposure, in other words, does
8 the length of exposure to formaldehyde affect its
9 toxicity?
10    A.   It does.  In some fashion, there is a
11 dose-dependent -- what is referred to as a
12 dose-dependent transition intoxicant points.
13    Q.   Can you tell me the distinction between
14 the health effect of one exposed to a certain
15 airborne concentration of formaldehyde for one day,
16 as opposed to that same concentration exposure for a
17 period of two years?
18    A.   The convention would be to look at what is
19 referred to as the area under the curve, which is the
20 plot of dose versus exposure duration.  So as the
21 exposure duration goes out, or it goes up, the area
22 under the curve will change.
23    The rate at which it goes up, and the rate
24 at which it comes down, is also an important
25 consideration because some things are very rapidly
Page 249

1 cleared, and others are not.
2    Q.   And where does formaldehyde --
3    A.   For those that are not rapidly cleared,
4 then you have a cumulative dose.
5    Q.   So that's what I was going to get to.
6 When you address the concept of formaldehyde
7 exposure, you do not talk about cumulative dose, do
8 you?
9    A.   No, you don't.
10    Q.   And why is that?
11    A.   Because it's readily, as I mentioned
12 earlier, its half-life in the body is about
13 one-and-a-half minutes.
14    Q.   Correct.  It's not a bioaccumulate; is
15 that correct?
16    A.   Right.  That's correct.
17    Q.   And you're familiar with studies of
18 individuals who have been challenged with levels of
19 formaldehyde as high as three parts per million, and
20 then their blood levels are studied shortly
21 thereafter, and there's been no elevation of
22 formaldehyde in the bloodstream; is that correct?
23    A.   There may be a transient elevation, it
24 depends on how long after the exposure the analysis
25 was done, within one-and-a-half minutes, half of it
Page 250

1 is going to be gone.
2    And the point being that the damage
3 induced by formaldehyde is not based on its residency
4 time in the body, but upon its intense reactivity
5 with biologic tissues which result in DNA damage, and
6 therefore, an accumulation of hits over time,
7 irrespective of the level of exposure.
8    Q.   We were talking about DNA cross-linking
9 earlier today.  The body -- the studies show that
10 with respect to any damage that may occur with
11 respect to DNA cross-linking as a result of exposure
12 to gaseous formaldehyde, that within a matter of
13 hours that DNA cross-link is repaired; is that
14 correct?
15    A.   Not necessarily.
16    Q.   Have you seen those studies?
17    MR. REICH:  Objection.  Counsel has failed
18 to specify the studies he's discussing.
19    MR. HINES:  I'm going to ask him if he's
20 seen the studies.
21    A.   Which studies are you referring to?
22 BY MR. HINES:
23    Q.   I can go pull them, but can you cite...
24    A.   Go pull them and we can discuss them.  I
25 was asked earlier to cite specific studies, and that
Page 251

1 didn't seem to suffice.  But now you're asking me
2 questions based on unspecified studies and asking me
3 to weigh in on them.
4    Q.   I was just asking you if you were familiar
5 with studies that show that exposure to gaseous
6 formaldehyde insofar as any sort of DNA cross-link
7 exposure is concerned, and any damage caused, or,
8 quote, damage, whether or not that is not repaired
9 within a matter of hours?
10    A.   In some cases it may be, in others, it may
11 not be.  The repair mechanisms within the body
12 induced by -- lesions induced by formaldehyde will
13 vary from one individual to another.
14    And the degree to which the exposure is
15 continuous versus an episodic exposure, will also
16 have an effect.
17    Q.   Okay.  Are you aware of any exposures that
18 show any DNA cross-link damage as a result of
19 exposure to gaseous formaldehyde below levels of
20 exposure of .2 ppm?
21    A.   I believe the Thrasher and Kilburn article
22 cites several studies, but I would have to check.
23    Q.   As you sit here today, you can't tell me
24 what that level is?
25    A.   I would have to check.
Page 252

63 (Pages 249 to 252)

1    Q.   You described earlier today the concept of
2  being sensitized to formaldehyde.  What do you mean
3  by that?
4    A.   That means that by virtue of repeated
5  exposures, one's reaction becomes more pronounced
6  over time.
7    Q.   Are you talking about an immunogenic
8  response?
9    A.   Yes.  I mentioned earlier that the immune
10 system has an inherent capacity called memory, so
11 that, for example, if you're exposed to a bacteria,
12 your response on the second exposure will be much
13 more robust.
14         And the immune system recognizes chemicals
15 as foreign to the body, and as it would a bacteria,
16 and so that in some individuals there will be a more
17 pronounced response upon a secondary exposure, due to
18 the capacity of memory.
19    Q.   Let's talk about that for just a moment.
20 So are you sure that we're talking about the same
21 terminology here?  When you're talking about
22 response, and a sensitized response to exposure to
23 gaseous formaldehyde, and an immunogenic response,
24 are you speaking about either an IgE, an IgG, or an
25 IgM mediated response?

Page 253

1  what you do.
2         THE WITNESS:  Hopefully.
3         MR. REICH:  As part of your work.
4         MR. RADFORD:  Expert witness as a
5  legal term is different.
6         THE WITNESS:  Okay.
7  BY MR. HINES:
8    Q.   You've discussed earlier today that
9  formaldehyde is a recognized carcinogen.  The
10 recognition comes from the 2004 press release, and in
11 a later release by the International Agency for
12 Research on Cancer; correct?
13    A.   Well, precisely stated, it would be a
14 recognized human carcinogen; by EPA, it's classified
15 as a probable human carcinogen, and by the Department
16 of Health and Human Services, it's reasonably
17 anticipated to be a human carcinogen.
18    Q.   But insofar as being the general category
19 of "known" as opposed to "probable", or "likely", or
20 whatever the adverb might be that precedes the word
21 carcinogen, the only Agency that has come out and
22 declared formaldehyde a carcinogen is IARC; is that
23 correct?
24    A.   The only Agency that has come out and
25 called it a known human carcinogen is IARC.

Page 255

1    A.   Those may all be involved.
2    Q.   All right.  Assume, then, you're speaking
3  of an IgE, IgG, or an IgM mediated response to a
4  gaseous formaldehyde, are you aware of a single study
5  that had ever found an antibody specific to such
6  exposure?
7    A.   I am not.
8         MR. REICH:  Are you waiving your objection
9  as defense counsel to calling Dr. De Rosa as an
10 expert witness based on his qualifications now?
11        MR. HINES:  Absolutely not.
12        MR. WEINSTOCK:  For the record, we're not
13 waiving it, but on the chance that the Court agrees
14 with your position, we're certainly going to ask our
15 questions.
16        MR. REICH:  Otherwise, you're not going to
17 ask these questions?
18        MR. WEINSTOCK:  If he is withdrawn as an
19 expert witness, then we won't ask expert questions.
20        THE WITNESS:  I was told I was not an
21 expert witness.
22        MR. WEINSTOCK:  They've tried to qualify
23 you, Doc.
24        MR. REICH:  You are not a retained expert
25 witness.  We recognize that you have expertise in

Page 254

1    Q.   Correct.  And that's only with respect to
2  one form of cancer, which is nasopharyngeal cancer;
3  is that correct?
4    A.   That's primarily based on nasopharyngeal
5  cancers, but it also references leukemias as well.
6    Q.   With respect to leukemia, and I can quote
7  you the language, it does not declare leukemia as a
8  known human carcinogen, does it?
9    A.   Leukemia is a disease, not a carcinogen.
10   Q.   Excuse me.  Formaldehyde is not declared
11 in that 2004 press release as a known human
12 carcinogen causing leukemia; correct?        .
13   A.   The classification of known human
14 carcinogen is based primarily on nasopharyngeal
15 cancer; however, the weight of evidence is always
16 considered in those designations.
17        And in fact, I was as I recall, at the
18 consultation in Lyons when that was discussed, and it
19 was reclassified, if I'm not mistaken, I was at that
20 particular consultation.
21   Q.   With respect to the classification of
22 formaldehyde, insofar as nasopharyngeal cancer is
23 concerned, that IARC report is predicated primarily
24 on what paper, do you know?
25   A.   There were a number of studies,

Page 256

64   (Pages 253 to 256)

Case 2:07-md-01873-KDE-MBN Document 2988-2 Filed 08/31/09 Page 23 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation        Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

| | |
|---|---|
| 1  MR. HINES: Let me just object as being | 1  with clinical signs of formaldehyde toxicity |
| 2  nonresponsive. | 2  including bloody noses, coughing of blood; and that's |
| 3  BY MR. HINES: | 3  not asthmatic response, bronchial constriction is an |
| 4  Q. My question simply is this: Are you | 4  asthmatic response. So it was among a suite of |
| 5  aware -- | 5  symptoms that were presented -- |
| 6  A. I answered your question. | 6  Q. All right. |
| 7  Q. -- of any -- this is my question, are you | 7  A. -- clinically. |
| 8  aware -- | 8  Q. Let's talk about asthma specifically. Are |
| 9  A. I answered your question. | 9  you aware of whether or not the children that |
| 10  Q. No, sir. | 10  presented -- who are occupants of the FEMA trailer, |
| 11  A. I did. | 11  presented at a higher incidence rate than the average |
| 12  Q. Let me just reask the question. | 12  inner-city-dwelling child? |
| 13  MR. RADFORD: Let him ask the question. | 13  MR. REICH: Objection, incomplete |
| 14  BY MR. HINES: | 14  hypothetical. |
| 15  Q. Let me just reask the question. Counsel | 15  A. And the inclusion criteria for whether or |
| 16  can object. Let me just reask the question. Are you | 16  not the residents had a higher rate of asthmatic |
| 17  aware of anything in the July 2008 final report that | 17  response before or after Katrina was that they had |
| 18  shows that there was chronic exposure for those who | 18  asthmatic conditions prior to Katrina. |
| 19  occupied those 519 trailers in excess of four parts | 19  So they did not look at children who did |
| 20  per million? | 20  not present clinically with asthmatic signs prior to |
| 21  MR. REICH: Same objection. Asked and | 21  Katrina, which is how you would assess it to whether |
| 22  answered. | 22  or not there were asthmatic symptoms induced based on |
| 23  A. Chronic exposure defined as? | 23  exposures following Katrina. A fundamentally flawed |
| 24  BY MR. HINES: | 24  study. |
| 25  Q. Long term exposure during the term of | 25  Q. What study did you have reference to? |
| Page 261 | Page 263 |

| | |
|---|---|
| 1  their occupancy? | 1  A. These were the children that were enrolled |
| 2  A. How long were they in there, do you know? | 2  in the study designed by CDC. |
| 3  Q. We know that they were in there for some | 3  Q. Is that the so-called "Mississippi Study"? |
| 4  period of time. | 4  A. Yes. |
| 5  A. Some period of time? | 5  Q. Did you participate in the structure of |
| 6  Q. Yes, sir. | 6  that study? |
| 7  A. Well, weeks would not be chronic, so if | 7  A. No, I did not. |
| 8  you can't specify the period of time, that's an | 8  Q. Did you complain to anyone about the |
| 9  issue. | 9  structure of that study at any time? |
| 10  Q. Let's just -- we'll break it down further. | 10  A. Yes, I did. |
| 11  Are you aware of any reported exposure in any of | 11  Q. Do you know a Caroline De Rosa? |
| 12  those homes, regardless of how short, or regardless | 12  A. Yes. |
| 13  of how long, that exceeded four parts per million? | 13  Q. Who is she? |
| 14  A. I don't believe so. | 14  A. My sister. |
| 15  Q. You were asked earlier this morning a | 15  Q. All right. And is she with the Children's |
| 16  question about an e-mail that you had written that | 16  Health Fund? |
| 17  there were clinical signs, and that there was -- | 17  A. I don't know. |
| 18  these clinical signs are a harbinger of a public | 18  Q. Where does she live? |
| 19  health disaster. | 19  A. She's my sister. And I don't know what |
| 20  And as I recall your testimony, and I | 20  this has to do with this issue. |
| 21  could be wrong, you had reference to the amount of | 21  Q. I'm just asking where she lives. |
| 22  asthma being reported in the children who were | 22  A. And I'm not going to disclose personal |
| 23  occupants of those homes. Is that what your | 23  identifiers. |
| 24  reference was to? | 24  Q. Is she involved in public health? |
| 25  A. My reference was to children presenting | 25  A. You know, you wouldn't allow personal |
| Page 262 | Page 264 |

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1  asthmatic child, say a 12-year old, would you
2  recommend they move out of a site-built home with a
3  level of .3 parts per million formaldehyde?
4        MR. REICH: Objection. Incomplete
5  hypothetical.
6        A.   I think that I would be concerned for the
7  health of anyone living in such a home.
8  BY MR. WEINSTOCK:
9        Q.   How about .2?
10       A.   Yes.
11       Q.   .1?
12       A.   That's where you get into the gray area.
13       Q.   .09?
14       A.   I would say I would -- it depends again,
15  the length of time during which those levels would
16  remain elevated. If they remained above .04 for any
17  significant length of time, I would look much more
18  closely at the issue, and identify ways that you
19  might reduce levels in the home.
20       Q.   Would opening the doors and windows for an
21  hour a day, and running the vents on the bathroom and
22  the stove, be one of the ways you'd suggest to lower
23  those levels?
24       A.   It was shown to be effective in the
25  instance of the study on the 96 trailers, air

Page 281

1        Q.   Dr. De Rosa, my name is Dennis Reich. I'm
2  one of the attorneys representing the Alexander
3  family, and that is the first case that is scheduled
4  for trial. I also am here on behalf of the
5  Plaintiff's Steering Committee.
6        You were asked a question a moment ago
7  about certain types of techniques that might be used
8  to reduce formaldehyde levels in the trailer. One
9  such method was to open the windows and perhaps
10  vents, you said that was somewhat effective.
11       Do you recall whether the level was
12  reduced below the ATSDR minimum risk level for
13  chronic exposures, the level of .008 ppm?
14       A.   No. As I recall, the levels were reduced
15  to between .1 and .2 parts per million.
16       Q.   So would that be above the minimum risk
17  level for chronic exposures to formaldehyde?
18       A.   Yes.
19       Q.   All right. And can you explain to the
20  Ladies and Gentlemen of the Jury how you as a health
21  professional utilize the minimum risk levels in your
22  day-to-day work?
23       A.   I --
24       MR. HINES: Let me just object to it being
25  improperly directed. Go ahead.

Page 283

1  conditioning was less so. And the trouble there is
2  that, of course, that's during the hotter months of
3  the year and the off-gassing would tend to increase.
4        MR. WEINSTOCK: Thank you very much,
5  Doctor.
6        THE WITNESS: You're welcome. Safe travel
7  to everyone.
8        MR. RADFORD: I think there's more from
9  the plaintiff.
10       THE WITNESS: Oh, okay.
11       MR. REICH: My turn.
12       THE WITNESS: I thought you were through.
13       MR. RADFORD: Wishful thinking.
14       MR. WEINSTOCK: And Dennis, let me point
15  out that I wouldn't do it, but some of your
16  colleagues would object to another lawyer stepping in
17  and asking for trial.
18       MR. REICH: I wouldn't do it.
19       MR. WEINSTOCK: I'm going to sit here and
20  let you do it. Oh, yeah, right. They are all
21  angels.
22       MR. REICH: I mean, I don't care who asks
23  questions has always been my philosophy.
24              EXAMINATION
25  BY MR. REICH:

Page 282

1        A.   Okay. In my day-to-day work, I look at
2  issues as they present themselves, recognizing it's
3  the dose that makes the poison, long accepted
4  principle of toxicology, at the weight of
5  evidence and the degree of uncertainty associated
6  with the value.
7        I try to compare the conditions under
8  which the value was developed in terms of the
9  experimental protocol, and look at the relevance of
10  that exposure scenario to that of the one that we're
11  concerned about in terms of public health, actions,
12  recommendations, and work from that point forward.
13       It's a -- and the intent of the article
14  that was referenced earlier by Dr. Risher and myself
15  was to illustrate that these are not bright lines in
16  the sand, and that needing to recognize the
17  limitations of application of those values; again,
18  they are not action levels, they are levels that
19  prompt further evaluation that could precipitate
20  action either above or below those levels.
21       A lot depends on the other types of
22  exposures that may be ongoing, the lifestyle factors
23  associated with the population, you know, whether
24  we're dealing with children that exhibit pica-like
25  behavior where they ingest large quantities of dirt

Page 284

71 (Pages 281 to 284)

Case 2:07-md-01873-KDE-MBN   Document 2988-2   Filed 08/31/09   Page 25 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1 more so than my children did, and they did a pretty
2 good job of doing that in their day, and even
3 populations in Southeast, Georgia, for example, that
4 ingest large amounts of kaolin-containing clay.
5      In the case of mercury, for example,
6 inorganic mercury in some Hispanic populations is
7 used for ritualistic practices, and it's sprinkled
8 about in and around religious icons and associated
9 with other cultural rituals.  And children are risk
10 takers and mercury is a creative hazard.  We had an
11 issue with kids dipping their cigarettes into
12 metallic mercury, one of the only -- the only metal
13 that's liquid at room temperature and inhaling it,
14 and the colors were very attractive until they began
15 hemorrhaging blood.
16      So it is -- the populations are highly
17 variable.  The conditions under which they live are
18 highly variable, and particularly when you're dealing
19 with some underserved communities; and again, one has
20 to be sensitive to aspects of -- that are specific to
21 certain cultures, and Native American and lower SES
22 communities' consumption of subsistence fishing is a
23 common practice, and so there are elevated exposures
24 of those populations that one has to be aware of in
25 looking at any incremental exposure from other

Page 285

1 primary focus at this juncture.
2      But I'm a pretty quick study when I have
3 been through these chemicals, and I have been through
4 a range of these chemicals on behalf of the Office of
5 Science and Technology in the White House ranging
6 from mercury to PCBs to dioxin, and have worked on
7 behalf of the National Research Council and the
8 National Academy of Sciences on a number of different
9 chemicals, and so I quickly come up to speed on the
10 chemical at hand at issue.
11      And it's the overall guiding principles of
12 the science, rather than the quantitation, rather
13 than the specific parameters of a given study.  It's
14 based on what one takes from the body of knowledge
15 over time that is important.
16      The fact that not only is science
17 generalizable from one study to another study, or for
18 -- to another circumstance, it's generalizable from
19 one chemical to another chemical, based on inferences
20 drawn from structure activity relationships, based on
21 our knowledge of the thermodynamic properties of
22 chemicals as they interact with biological surfaces,
23 that will allow us to conduct on many of these
24 studies in a much more precise way in cyberspace
25 rather than in lab space.

Page 287

1 situations that arise.  So it's a bit of art, and
2 it's a bit of science mixed in.
3      But, again, the -- in public health
4 practice, it's the precautionary principle that is
5 the cornerstone of public health.  And that dates
6 back to Bernardino Ramazzini saying it's better to
7 prevent than cure, to the fellow who took the handle
8 off the pump during the epidemics in England.
9      Those are -- that's low-hanging fruit
10 compared to dealing with the consequences of
11 exposure.  And health education is one thing that can
12 be used to great effect, because when people are
13 provided with correct information, they almost always
14 make the right decision, especially if it involves
15 the health of their children or themselves.
16      The bottom line is that I think as a
17 society we are somewhat -- tend to be somewhat
18 arrogant in what we think we know.
19      I know for myself, I know less and less
20 about more and more every day, and I evidenced that
21 here today.  I did not prepare for this testimony
22 today.  I simply gathered materials.  And I looked at
23 them after the last tox profile I read last night --
24 no, I'm just kidding -- well after midnight, because
25 I am engaged in other activities now, this is not my

Page 286

1      The NTP bioassay, considered the gold
2 standard, is a pretty messy situation.  I think
3 physicists would be appalled.  As you get into the
4 hard sciences, the life sciences become more and more
5 ambiguous.  But nevertheless, that is what we're
6 tasked with, providing answers in the absence of
7 perfect information.
8      Q.   You just mentioned the NTP, is that the
9 National Toxicology Program?
10      A.   Yes, sir.
11      Q.   Did the National Toxicology Program make a
12 determination with respect to the carcinogenic
13 classification of formaldehyde?
14      A.   Yes, it did.
15      Q.   And what was the classification?
16      A.   The classification was actually done by
17 the NTP Executive Committee, it's chaired by the
18 National Toxicology Program.  The Executive Committee
19 is comprised of representatives from agencies such as
20 ATSDR.  I was a representative, until about a year or
21 two ago, since about 1993.  And you know, there is a
22 very rigorous review process.  There are a number of
23 different subject matter working groups that then
24 forward their recommendations on up to the Executive
25 Committee, and then it's us for us to determine

Page 288

72  (Pages 285 to 288)

Case 2:07-md-01873-KDE-MBN   Document 2988-2   Filed 08/31/09   Page 26 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1  whether we agree with a recommended classification.
2       In the case of formaldehyde, it's
3  currently listed as reasonably anticipated to be a
4  human carcinogen in the 10th Report on Carcinogen
5  that was released several years ago.
6       And my sense is that while one cannot
7  predict that the lead of IARC will be followed, in
8  the case of EPA and the Department as it reevaluates
9  formaldehyde because of the growing body of
10  information, particularly in light of the recently
11  released NCI bioassay which was specifically designed
12  to address the limitations of the Hauptmann
13  study that was cited earlier, and which is now coming
14  back to me, as I get closer to this.
15       But the limitations of that study were
16  taken into account, that -- there was one particular
17  cohort of workers that really skewed the 2003 report.
18  That was not the case in the most recent
19  evaluation, and it wasn't just one group of workers
20  that showed somewhat skewed or high incidences of
21  nasopharyngeal cancer.
22       So again, the point is that we've become
23  more refined and more focused in terms of the types
24  of issues that are addressed in these studies as the
25  limitations are brought to bear and brought to light,

Page 289

1  reclassified as a known human carcinogen.
2       Q.   So was it in approximately 2004, or before
3  the announcement was made by IARC that formaldehyde
4  is a human carcinogen, that you had provided some
5  input?
6       A.   Yeah. In fact, I just saw our group
7  picture from 2005.
8       Q.   Do you want to take a short break?
9       MR. REICH:  Let's go off the record.
10       THE VIDEOGRAPHER:  6:00 p.m., off video
11  record.
12       (Recess from 6:00-6:06 p.m.)
13       THE VIDEOGRAPHER:  6:06 p.m., back on
14  video record.
15  BY MR. REICH:
16       Q.   Dr. De Rosa, before we took a quick break,
17  I believe I was asking you some questions about your
18  input with respect to both the NTP and IARC regarding
19  classification of formaldehyde as either a reasonably
20  anticipated carcinogen, or in the case of IARC what
21  became in 2004 a classification as a known human
22  carcinogen.
23       Can you describe a little bit about your
24  work with respect to those two institutions, or
25  agencies?

Page 291

1  and that's the strength of the scientific method is
2  it's self-correcting by virtue of repeated testing.
3       Q.   Can you identify the most recent study
4  that you are referencing with respect to cancer risk
5  from formaldehyde?
6       A.   Yes. It was the NCI study. It had a
7  group of high exposed workers versus low exposed
8  workers, and as I mentioned earlier, there was a
9  threefold increase in cancers of the blood,
10  blood-forming tissues, in the high exposed versus the
11  low exposed workers, which address the issue of the
12  healthy worker effect that was associated with the
13  CIIT-sponsored study by industry in which the
14  Formaldehyde Council was instrumental in funding.
15       Q.   During your service as Director of
16  Toxicology and Environmental Medicine at the ATSDR,
17  did you have occasion to provide guidance, or input,
18  or vote, with respect to the cancer classification of
19  formaldehyde either through the NTP program or IARC?
20       MR. HINES:  Object to the form.
21       A.   I did serve on the NTP Review Committee.
22  It was already classified as reasonably anticipated.
23  I did participate in the discussions around
24  formaldehyde with IARC when it was upgrading from --
25  we refer to it as upgraded -- when it was

Page 290

1       A.   Certainly. I have had the opportunity to
2  serve, as I mentioned, on the NTP Executive Committee
3  since shortly after coming to ATSDR in '91.
4       Formerly, I was with the EPA and also
5  dealt with some of the usual suspects, including
6  formaldehyde, and I know that in terms of the
7  functioning of the NTP Executive Committee, I worked
8  with my own staff in their participation in the
9  different working groups assigned as a part of the
10  evaluation process.
11       And as it came time to prepare, to make a
12  determination, I engaged in an extensive review in
13  the half-dozen or so chemicals that were up for
14  review at any particular meeting of the National
15  Toxicology Program, and basically was able to build
16  upon the conclusions of these other informed groups
17  in exercising the judgment technically based on the
18  context of the range of different chemicals and the
19  evidence that had been presented for those chemicals
20  over time with respect to IARC.
21       I served on the group that revised
22  recently the Guidelines for the Assessment of
23  Chemical Carcinogens, and emphasizing the need to
24  focus more fully on other health endpoints, including
25  some emphasis on reproductive developmental toxicity

Page 292

73 (Pages 289 to 292)

Case 2:07-md-01873-KDE-MBN   Document 2988-2   Filed 08/31/09   Page 27 of 28

In Re: FEMA Trailer Formaldehyde Products Liability Litigation        Videotaped Deposition of Christopher T. DeRosa M.S., Ph.D.

1  and immunotoxicity as those chemicals were being
2  evaluated; because it appears that the carcinogenic
3  response, as we all know, is very complex and the
4  effects on other systems are important indicators of
5  what might be involved with respect to carcinogenic
6  risk.
7        Issues such as mutagenicity,
8  teratogenicity, speak directly and inform the
9  decisions regarding other health endpoints in terms
10 of genetically-related phenomenon, genetically-based
11 phenomena such as the proliferation of a cancerous
12 growth within the body, the overall progression from
13 initiation to -- well, proliferation and metastasis
14 are all interrelated and linked to aspects of the
15 cell cycle that are consistent with abnormal cell
16 functioning, abnormal cell cycles, which is what
17 cancer really represents; it's a cell cycle that's
18 gone wild and you have a proliferation of the
19 culminal population of malignant cells to the
20 displacement of other tissues.
21    Q.   You've brought some literature with you
22 dealing with the reproductive and developmental
23 effects associated with exposure to formaldehyde; is
24 that correct?
25    A.   Yes.  I provided this to the Committee.
                                        Page 293

1  I'm sorry, to my legal counsel.  It was part of the
2  hard copy of information that was shared, because I
3  think this was in my -- I don't know that it was in
4  the electronic material.
5     Q.   Could I have those articles, please?
6     A.   Sure.  That's it.  And then these are the
7  other reproductive developmental studies that I had
8  looked at more recently.
9     Q.   Okay.
10    A.   Because it had become an issue.  But
11 Dr. Meryl Karol agreed with my concern --
12       MR. REICH:  Can I have these marked,
13 please.
14    A.   -- at the time of her testimony.
15       MR. REICH:  I think we should put an
16 Exhibit sticker on each one.
17       MR. HINES:  Let me just move to strike the
18 last comment by Dr. De Rosa as being a nonresponsive
19 answer.
20       MR. WEINSTOCK:  Can I just get a
21 clarification?  Other than the Thrasher article, the
22 rest of this stuff was not previously produced, it
23 was just brought today?
24       THE WITNESS:  I just brought it today.
25       MR. WEINSTOCK:  For that reason, I object
                                        Page 294

1  to it being attached.
2     A.   The only reason I brought it today because
3  I was not able to locate it earlier, I just found it
4  last evening.
5       MR. REICH:  I certainly appreciate you
6  bringing the articles.  And marked for identification
7  are Exhibits numbers 24, 25, 26, 27, 28, and 29.
8       (Exhibits-24&25&26&27&28&29 were marked.)
9  BY MR. REICH:
10    Q.   Dr. De Rosa, article marked Number 24
11 captioned "Embryo Toxicity and Teratogenicity of
12 Formaldehyde" by Thrasher and Kilburn.  Is this an
13 animal study, or a human study?
14    A.   It's a review, a critical review article
15 looking at a -- including a metaanalysis of the
16 available human data regarding embryo toxicity and
17 teratogenicity.
18       It also talks about the mechanism that I
19 referred to earlier of mutations being caused by not
20 only the alkylation or methylation, same thing as
21 alkylation, of the DNA, but also damage to the
22 mitochondria of the circulating stem cells resulting
23 in oxidative stress in the developing embryo.  That's
24 the prevailing theory posited by this paper.
25       And it's heretofore little recognized in
                                        Page 295

1  terms of the role of mitochondrial DNA, which is an
2  ordinal within the cell that also contains DNA, and
3  the fact that that DNA is damaged interferes with the
4  energetics, then in the developing fetus, and that is
5  the premise for the mechanism of or mode of action.
6     Q.   During the time that you served as
7  Director of Toxicology and Environmental Medicine at
8  the ATSDR, did you have an opportunity to either
9  express verbally, or in writing, any concerns
10 associated with embryo toxicity resulting from the
11 formaldehyde exposure to mothers in trailers?
12       MR. HINES:  Let me just object to this
13 line.  And I think we're going to have to reserve our
14 right to go back with the doctor on cross, because
15 this was not raised during our cross, or on direct,
16 and I think it's out of order with respect to where
17 we are.  So I will just put that on the record,
18 reserve our right to come back and ask questions.
19 But that's just my objection.  You may answer the
20 question.
21    A.   Sure.  I indicated earlier that in
22 e-mails, my concern about the potential for
23 transgenerational health impacts, referring to
24 impacts on the developing fetus, that would be the
25 next generation, and also the fact that in many
                                        Page 296

74   (Pages 293 to 296)

1   Agency to demonstrate that they were moving forward
2   and trying to deal with the science on formaldehyde
3   and the impacts of trailer residents.
4        Q.   By 2007, was it your view that the science
5   on formaldehyde, at least with respect to short term
6   effects, was fairly well established?
7        A.   Yes.
8        Q.   Okay.  And with respect to chronic effects
9   by 2007, was it well-recognized that formaldehyde
10  does present a carcinogenic risk?
11       A.   Yes.
12       Q.   You mentioned in response to Mr. Hines'
13  question that concentration is more important than
14  dose, and you gave a reason for that; correct?
15       A.   I said that depending on the
16  circumstances, concentration can be -- dose can be
17  expressed as a concentration, or a level of exposure
18  expressed as per unit body weight.  And typically in
19  inhalation studies, such as this, concentrations are
20  used parts per million, for example.
21            And that is considered to be the delivered
22  dose, or the administered dose.  There is, you know,
23  several different definitions of dose; one is the
24  administered dose, one is the absorbed dose, and then
25  there is the delivered dose at target tissue.

Page 301

1            And you have to understand the kinetics
2   governing the conversion of the chemicals and the
3   handling biologically by the system to understand
4   what is the dose at target tissue, which is really
5   what one is at the end of the day concerned about.
6        Q.   What is a risk-based concentration?
7        A.   A risk-based concentration would be a
8   concentration associated with a unit risk of either
9   1 in 100,000 excess cancers, or one-in-a-million
10  excess cancers in the population, 10 to the minus 5,
11  10 to the minus 6, 10 to the minus 7.
12       Q.   Have risk-based concentrations been
13  developed for cancer risk from formaldehyde exposure?
14       A.   They have.  And while the ATSDR does not
15  typically engage in linearized low dose extrapolation
16  associated with EPA's risk assessments, we do cite
17  those in the profile; and it's expressed as a range
18  10 to the minus 5 to 10 to the minus 7, typically,
19  because those are the levels at which given
20  regulatory triggers kick in.
21       Q.   What is a cancer slope factor?
22       A.   A cancer slope factor is a estimate of the
23  slope of the dose-response function, the higher the
24  slope, the more potent the carcinogen, the more
25  responses you see, more malignancies you see per unit

Page 302

1   dose, basically.
2            And what is done is to use what is
3   referred to as a linearized multistage model to fit
4   the curve and generate a estimate of the slope that
5   goes through zero below the dose of observed effects
6   because of this science policy position that I cited
7   earlier.  And so the higher the slope of the
8   dose-response curve, the more potent the carcinogen.
9        Q.   Is there a scientific foundation for the
10  use of cancer slope factors?
11            MR. WEINSTOCK:  Object to the form of the
12  question.  This is all way outside the
13  cross-examination.
14  BY MR. REICH:
15       Q.   You can answer the question.
16       A.   Yes.  That's based on the large animal
17  study that was done I mentioned earlier with
18  radiation, and the fact that at any level of
19  radiation given, there was an observed cancer
20  response.  And so that led to the assumption that
21  there was no threshold for carcinogenic response, and
22  that was adopted as a matter of policy around the
23  early 1980 period, '79-80 period.
24       Q.   When you first began to comment during
25  your service as the Director of Toxicology and

Page 303

1   Environmental Sciences at the ATSDR on cancer issues
2   with respect to FEMA's bulletins and notices that did
3   not mention cancer risk, was there any body of
4   science that you were concerned about that made you,
5   you know, comment and comment negatively about the
6   failure to include the cancer risk information?
7        A.   Yes.  One of the tasks I was assigned
8   after coming to the Agency was to develop the
9   Agency's cancer policy framework.  It has been a
10  well-received document and it has been reprinted in
11  the EPA's Handbook of Carcinogenic Testing, among
12  other places.
13            But it was basically an attempt to
14  articulate the Agency's position on issues of cancer,
15  the relative merits of the different classification
16  systems, and to place in context the conclusions of
17  the different organizations, and perhaps bring
18  clarity to some of the presentation of information in
19  our own documents and consistency in our various
20  efforts to work at sites nationwide.
21       Q.   Ask you a few questions about the ATSDR's
22  dealings with FEMA, and then I'm through.
23            When did you first learn that a trial
24  attorney by the name of Rick Preston who was with the
25  Office of General Counsel at FEMA was interacting

Page 304

76  (Pages 301 to 304)