UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |
| THIS DOCUMENT IS RELATED TO | * | |
| | * | |
| *Charlie Age, et al v. Gulf Stream Coach* | * | |
| *Inc., et al*, Docket No. 09-2892; | * | |
| Alana Alexander, individually and on behalf | * | |
| Of Christopher Cooper | * | |

**PLAINTIFF'S RESPONSE TO DEFENDANT GULF STREAM COACH, INC.'S
MOTION *IN LIMINE* TO EXCLUDE
EXPERT TESTIMONY OF JANET BARNES., M.D.,**

Plaintiff, Alana Alexander, individually and on behalf of Christopher Cooper, files this response to Defendant Gulf Stream Coach, Inc.'s Motion *in Limine* to Exclude Expert Testimony of Janet Barnes, M.D.

**I.     Standard for Admissibility for Expert Testimony from Treating Doctors**

Dr. Janet Barnes, M.D. is Christopher Cooper's treating doctor.  She has been treating Christopher Cooper since he was three years of age. *See* Exhibit C, page 53. Dr. Barnes continued to see and treat Christopher Cooper up to the time he left due to Hurricane Katrina in 2005 and then began treating him again after he returned to Louisiana.  Dr. Barnes opinions have not been formed solely for litigation, but are part of her normal routine in treating patients.

1

Defendants[1] allege that Dr. Barnes' opinions are not admissible under FRE 702. In that regard they allege that she has not used the proper analysis, she has relied upon scientific studies that did not establish statistical significance and that she has not performed the proper analysis. As will be seen below, each of these arguments fails. Dr. Barnes' opinions regarding causation and Christopher Cooper should not be excluded. It is widely accepted that a "physician may be asked to testify about the physical condition of a plaintiff, diagnosis, treatment, causes of the plaintiff's condition, or prognosis." Fed. Jud. Ctr., Reference Manual on Scientific Evidence 439 (2d Ed.). Furthermore, "[i]n the field of clinical medicine, courts generally agree that, under *Daubert*, the methodology and data that diagnosing and treating physicians reasonably consider good grounds for opinions or inferences in medical practice are sufficiently reliable to form the basis of a qualified medical expert's testimony in court." *Moore v. Ashland Chemical, Inc.*, 126 F.3d 679, 703 (5th Cir. 1997), *vacated on other grounds*, 151 F.3d 269 (5th Cir. 1998); *see also In re Ephedra Products Liability Litigation*, 393 F.Supp.2d 181, 189 (S.D.N.Y., 2005) ("*Daubert* was designed to exclude 'junk science.' It was never intended to keep from the jury the kind of evidence scientists regularly rely on in forming opinions of causality simply because such evidence is not definitive.").

In *Westbury v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir 1999), the Fourth Circuit affirmed the district court's decision to admit the opinion testimony of a treating physician that workplace exposure to a talcum powder caused a sinus problems. In allowing the physician's testimony, the court noted:

> [T]he court should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence. . . And, the

---

[1] The Moving party herein shall be referred to as "Defendants". Although Gulf Stream Coach, Inc. filed the Motion in Limine with regard to Janet Barnes, M.D., other defendants have joined in the various motions in limine.

> court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. . .As with all other admissible evidence, expert testimony is subject to being tested by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. . .[W]hile precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation.

*Id*. at 261. It is important to note that the court admitted the treating physician's opinion although not based on the analysis of epidemiological studies, peer-reviewed published studies, animal studies, or laboratory data. *Id*. Here, Dr. Barnes not only crafted her opinion based on the years she has spent treating Cooper, but she also analyzed numerous patients who were exposed to formaldehyde while living in FEMA trailers. *See* Exhibit C, p.264. Dr. Barnes' place in this litigation is similar to that found in *Flowers v. Wal-Mart*, 2005 WL 2787101, where the Middle District of Georgia held:

> It is significant in this case that Dr. Dicks is Mr. Flowers's treating physician, not simply an expert who makes a living providing opinion testimony or one retained for purposes of litigation to provide an opinion based on facts presumed to be in evidence. His examination and diagnosis were part of his routine activities as a doctor, which should not be subject to an extensive analysis under *Daubert* and *Kumho Tire*. Though *Daubert* and Rule 702 require district courts to exercise a "gatekeeper" role as to expert testimony, it is generally appropriate to avoid unnecessary reliability proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted. This is just such an ordinary case in which a treating physician offers a medical opinion that a fall from a ladder onto a concrete floor aggravated a back injury.

*Id*. at *7 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (internal quotations omitted)). The purpose of *Daubert* and its progeny is not to exclude the opinions of witnesses

3

having garnered true and unique knowledge of the Plaintiff.  As noted in *In re Ephedra Products Liability Litigation*, 393 F.Supp.2d 181 (S.D.N.Y., 2005):

> *Daubert* was designed to exclude "junk science." It was never intended to keep from the jury the kind of evidence scientists regularly rely on in forming opinions of causality simply because such evidence is not definitive. The legal standard, after all, is preponderance of the evidence, i.e., more-probable-than-not, and that applies to causality as to any other element of a tort cause of action. Rule 702, a rule of threshold admissibility, should not be transformed into a rule for imposing a more exacting standard of causality than more-probable-than-not simply because scientific issues are involved.

*Id*. at 190.  Thus, Dr. Barnes should not be precluded from providing an opinion.  Based on her many years spent treating Cooper, Dr. Barnes should not be subject to the rigors of *Daubert*.

In addition, the treating physician need not "demonstrate a familiarity with accepted medical literature or published standards in [an area] of specialization in order for his testimony to be reliable in the sense contemplated by Federal Rule of Evidence 702." *Dickenson v. Cardiac & Thoracic Surgery of Eastern Tenn., P.C.*, 388 F.3d 976, 980 (6th Cir. 2004).  Rather, as noted in *Dickenson*, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." *Id.*

## II.     Dr. Barnes is Qualified to Testify

The first step in a Rule 702 inquiry is to determine whether the expert is qualified. As discussed below, Dr. Barnes's is clearly qualified by knowledge skill, experience, training and education to offer the testimony she presents in this case.  Furthermore, Gulf Stream's attempts to refute Dr. Barnes's qualifications lack foundation as they are based on inapplicable case law and attempts to "spin" the opinions to which Dr. Barnes is to testify.

4

Janet Barnes, M.D., is a pediatrician. *See* Exhibit A., p. 1. She received her medical degree from Louisiana State University School of Medicine in 1978. She did a residency in Pediatrics at Louisiana State University from 1979 to 1982 has been involved in Pediatric Medicine for 30 years now. Dr. Barnes has been practicing medicine in New Orleans for 27 years. See Exhibit C, p. 274. She is the Co-Owner of Primary Health Associates. She is also the Chief Clinical Researcher for New Orleans Clinical Management. See Exhibit A. She formerly served as on the Orleans Parish School Board Medical Department. See Exhibit A. She received a Bachelor of Arts in Chemistry from Grambling State University in 1974 and graduated Summa Cum Laude. Exhibit A. Before going to Medical School, she worked as a chemist for Dow Chemical Company. See Exhibit A. She has been president of the New Orleans Medical Association since 2004 to the present. See Exhibit A.

Dr. Barnes has seen hundreds if not thousands of patients like Christopher Cooper who had childhood asthma. *See* Exhibit C, page 291. Dr. Barnes treated before after and during the time he lived in the FEMA trailer. *See* Exhibit C, pp. 279-280. She also treated him after he moved out of the FEMA trailer. *See* Exhibit C, p. 312. She is familiar with the signs, symptoms and course of treatment for childhood asthma. *See* Exhibit C, p. 291. She is also familiar with normal progression of illness for children diagnosed with asthma while they are young. *See* Exhibit C, p. 288. They typically grow out of it. *See* Exhibit C, p. 288-9. "There is a marked improvement by age six or severe. *See* Exhibit C, p. 291. This is the pattern she has seen in thousands of patients over the years. *See* Exhibit C, p. 291. He was doing well when they were not living in Florida. *See* Exhibit C, p. 295. When he moved to New Orleans he started doing worse. *See* Exhibit C, p. 296. It is her opinion that his asthma worsened after the storm and he moved back to New Orleans. *See* Exhibit C, p 300-301.

5

There is more to asthma than wheezing. The mother related that after she moved into the trailer that Cooper was using his inhaler more often. *See* Exhibit C, p. 301 ff. Dr. Barnes noted boggy nasal turbinates. *See* Exhibit C, p. 303-4. He was described as having an asthma attack once or twice a week. *See* Exhibit C, p. 305. Having an asthma attack is not one and the same as having wheezing. Her opinion that his asthma was getting worse after he moved back is also based on the fact that Cooper needed more medication once he moved back. See Exhibit C, p. 308-310.

### III. Assuming Argued that Treating Doctors Must Satisfy Traditional Daubert Factors as Raised in Defendants' Memorandum, Dr. Barnes Qualify

By way of further answer if such answer be necessary, Plaintiff would show, even if one were to accept that Dr. Barnes opinions her opinions satisfy the traditional *Daubert* requirements for retained experts. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise." F.R.C.P. 702. Expert testimony need only be based on a reliable and scientifically valid methodology that fits the facts of a case. *See Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 592-93 (1993). The inquiry into the expert's testimony must be flexible. *See Id.* at 594 & n. 12. The factors listed by *Daubert* and its progeny serve as useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted. *Heller v. Shaw*, 167 F.3d 146, 152 (3d Cir. 1999). The court's role as gatekeeper, however, should not replace the adversary system. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509

U.S. at 595. Defendants criticize Dr. Barnes on several grounds alleging that her opinions are not admissible because she has not performed the proper analysis, scientific evidence does not support her opinions, she relies on an indisputably wrong medical history, she has improper reliance on statistical studies and other reasons. These additional reasons shall be examined below.

### 1. *Dr. Barnes' analysis was appropriate*

Defendants allege that Dr. Barnes has not performed the proper analysis in order to conclude that formaldehyde caused Christopher Cooper's Symptoms. See Rec. Doc. 2891-2, p. 5. They cite *Knight v. Kirby Inland Marine*, 482 F.3d 347 (5th Cir. 2007) for the proposition that the admissibility of causation evidence in toxic tort cases is contingent upon the introduction of sufficient general and specific causation evidence. They do not contest there is general causation that formaldehyde causes respiratory ailments. Their challenge is to specific causation and that Dr. Barnes did not identify a specific formaldehyde level that Christopher Cooper was exposed to.

Specific causation is established with the medical expert isolates an external factor as the cause. Id. In this regard, as stated above, Dr. Barnes is particularly situated to make this causation determination. As stated above, she had been treating Christopher since he was 3 years old, some five years before the storm and she had treated thousands of children who had asthma and was familiar with the general course of childhood asthma

The tests of Plaintiffs' expert William Scott which were discussed and marked as Exhibit 16 during Dr. Barnes Deposition, showed that the formaldehyde level in this trailer was 0.05 parts per million (ppm) one month after Alana Alexander and Christopher Cooper moved out. See Exhibit F. During her deposition, Dr. Barnes affirmed that studies in her file found an

7

exacerbation of asthma symptoms at 0.05ppm and lower levels.  See Exhibit  I, Rumchev 2002, which was also marked as Exhibit  4 to the Barnes deposition[2].

It is also important to note here that Dr. Barnes is not offering opinions on new or novel science.  The United States Environmental Protection Agency, Occupational Health and Safety Administration have found formaldehyde causes respiratory difficulties.  Further Dr. Barnes had a general awareness of the harmfulness of formaldehyde based upon her degree in chemistry.  Dr. Barnes' opinion that formaldehyde exacerbated Christopher Cooper's asthma is supported by the findings of Dr. Karin Pacheco.  Dr. Pacheco found that Christopher was not allergic to trees, grasses, weeds, all molds, cats and dogs.  *See* Pacheco report, Exhibit D, p. 6.  Further Dr. Barnes' opinion that formaldehyde was the principal aggravating factor in Christopher Cooper's respiratory ailments is supported by a temporal relationship.  She noted that Christopher was noting some remission of asthma symptoms from age 6-7 and then when he returned to New Orleans and began living in a FEMA trailer, his asthma worsened.  *See* Barnes Report Exhibit G.  When he moved out of the trailer, there was an improvement in his symptoms.  *See* Exhibit G.  Therefore there was a temporal relationship between the symptoms and when he was living in the trailer.

Defendants take issue with Dr. Barnes in that she offered "no information regarding the necessary level of exposure to cause permanent epithelial damage with subsequent acute exacerbations of asthma, recurrent rhinosinusits and chronic atopic dermatitis".  During her deposition which started at 2:11 pm and concluded at 9:59 pm, she was never asked this specific

---

[2] The Rumchev Study found that children exposed children exposed to formaldehyde levels of greater than or equal to 60 micrograms per cubic meter were at an increased risk of having asthma.  60 micrograms per cubic meter equates with 48.8 parts per billion. The Alexander trailer was found to contain 50 parts per billion one month after Christopher Cooper moved out.

question. She was asked what level Christopher Cooper was exposed to, and she did not know the precise level, but she knew Cooper was exposed to formaldehyde. Dr. Barnes is a medical doctor and she did not test the Alexander Cooper travel trailer. However, within the context of the questions that were asked that day she referred to a paper by Franklin et al. that found that formaldehyde at low levels typically found in homes formaldehyde exacerbates asthma symptoms. *See* Franklin paper, Exhibit H, which was Exhibit 14 to the Barnes deposition. Dr. Barnes, in part, based her opinions on other patients coming into her office who had some of the same complaints as Christopher Cooper. *See* Exhibit C, p. 264. She considered the amount of formaldehyde in the trailers to be higher than what you would find in a normal home. *See* Exhibit C, p. 265. The Franklin paper she discussed found that formaldehyde may cause a respiratory inflammation. *See* Exhibit H. Furthermore, Dr. Barnes had already opined that in individuals such as Christopher Cooper who have pre-existing asthma, they are more susceptible to environmental hazards such as formaldehyde. *See* Exhibit C, p. 80, 100, 149, 150. This point is also supported by the Rumchev 2002 article that she referenced in her deposition and which was marked as Exhibit 4 to her deposition. *See* Rumchev as Exhibit I attached hereto.

**2.**        *Evidence exits showing formaldehyde can cause permanent effects*

Dr. Barnes opines that Cooper would have permanent epithelial damage. Exhibit G. p.4.   She added clarification to that in her deposition beginning on page 87

In my -- in what I said, and I think you -- permanent epithelial damage with subsequent acute acerbations (sic), exacerbations, that with all consideration, that if it in -- increases sensitization, it gives you some micro damage, can cause some inflammation, and it can directly affect your immune system at an early age. That right there came from indoor residential chemical emissions as risk factors for children's respiratory health. That all probability says that, yes, you could have some permanent epithelial damage.

9

On page 95 of her deposition (Exhibit C), she elaborated further:

Now, you're talking about these articles, but I'm talking about a child who's been exposed to formaldehyde who is more than likely going to have permanent damage because it's an irritant. It's a chemical. It's just like if I had a chemical burn, whether it was superficial, whether it was second-degree burn, third- degree, once you get it, it's permanent. It -- it's a scar there. He has dysfunctional vocal cords.

However then defendants quote Dr. Pacheco who says "epithelial damage in this context means damage to the tissue that lines plaintiff Cooper's airways". *See* Rec. Doc. 2891-2, p. 7. Amazingly, Defendants are using Dr. Pacheco to define what Dr. Barnes means by "epithelial damage" and that Dr. Barnes has no evidence that formaldehyde can cause permanent epithelial damage. Dr. Barnes equated permanent epithelial damage as a chemical burn. The epithelium is a specialized tissue that forms the covering or lining of all internal and external body surfaces. Permanent epithelial damages are not just reserved for the airways as Defendants suppose in their Motion. In addition there are numerous papers which discuss histological (permanent changes) in the nasal passages of people exposed to formaldehyde. The fact that Dr. Barnes had none of these studies ready at hand when she asked about it is of no moment.

It is well-settled that published studies unequivocally supporting an expert's opinions are not mandatory and are not necessarily fatal to general causation. *Knight*, 482 F.3d at 354; *See also Clausen v. M/V New Carissa*, 339 F.3d 1049 (9th Cir. 2003) (finding for plaintiff and explaining that general causation evidence can still be reliable even if there are no epidemiological studies); *Kudabeck v. Kroger Co.,* 338 F.3d 856, 862 (8th Cir. 2003) (Admitting plaintiff's expert's testimony and explaining that "there is no requirement 'that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness'"); *Rider v. Sandoz Pharms. Corp.,* 295 F.3d 1194, 1198 (11th Cir. 2002) (noting that "while epidemiological studies may be

10

powerful evidence of causation, the lack thereof is not fatal to a plaintiff's case"); *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929 (8th Cir. 2001) (finding that there is no requirement for supporting published epidemiological studies before an expert's opinion can be admitted*); Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) ("we do not believe that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness"). Lack of textual support goes to the weight, not the admissibility of the expert's testimony. *Knight***,** 482 F.3d at 354.

Defendants further criticize Dr. Barnes with regard to her opinions alleging that "Dr. Judd Shellito, a pulmonologist and internist *retained by the Plaintiff* has stated formaldehyde symptoms of nosebleeds, eye irritation, nasal discharge and cough "completely resolve once the individual removes himself from exposure. Thus, the Plaintiffs' own expert rejects the theory that formaldehyde can cause permanent damage [*emphasis added*]". *See*. Rec. Doc. 2891, p. 8. Defendant's assertion is incorrect and disingenuous. First, Judd Shellito, M.D. was named as an expert in the Class Certification stage of the travel trailer litigation. Dr. Shellito, has not been named as an expert on behalf of Christopher Cooper or Alana Alexander. Second, Dr. Shellito was talking about a cluster of symptoms "nosebleeds, eye irritation, nasal discharge and cough" that were different than what Dr. Barnes was testifying about when she talked about permanent epithelial damage.

**3.**     *Dr. Barnes' opinions are based on an adequate medical history*

Defendants allege that Dr. Barnes has relied on facts that are "indisputably wrong" and therefore her opinions will not advance the goal of assisting the trier of fact and are not admissible. *See* Rec. Doc. 2891-2, p. 8. Defendants imply that Dr. Barnes' opinions are solely dependent upon Christopher Cooper wheezing while he was living in the travel trailer.

11

Defendants note a medical record from the emergency room in December 2007, which states Cooper had not had any wheezing for a year and that Dr. Barnes "admitted 'if . . . in January 2008, if [plaintiff Cooper] hadn't had any wheezing since he left Florida', then I couldn't relate it to the trailer". *See* Rec. Doc. 2891-2, p. 9.   Defendants misquote and misconstrue the record.

A closer examination of the record is in order.  Defense counsel asked her in the form of a hypothetical beginning on page 189 of her deposition, if Cooper not had any wheezing for a year prior.  Dr. Barnes responded:

A:   "If – he had not had any – if he had – in January 2008, he hadn't had any wheezing since he left Florida, then I couldn't relate it [wheezing]  to the trailer, However he did.

Q:   All right. But were close –

A. He did have wheezing, and his mother complained that – he was progressively getting worse.  And it goes with how much he had to take and how long his inhaler lasted.   Say for instance – I don't know exactly when he say the doctor in Florida, but say if he saw that doctor in April and it lasted from may 12006 to October 2007 and that was the last time that she had gotten an inhaler, apparently it had to get worse because she want' using it that – that much in – initially.  So over time, she used it more and more and more and more and more until by October 2007, she needed an inhaler for her child.

Secondly, asthma presents a cluster of symptoms clinically.   Asthma and wheezing are not synonymous.  You can have bronchio constriction and test tightness, symptoms of asthma, without having full blown wheezing.  Dr. Barnes's opinions are not solely dependent upon the absence or presence of wheezing but also by use of an inhaler and a cluster of symptoms[3].

Thirdly, Dr. Barnes opinions in this matter go beyond wheezing, they go permanent epithelial damage, eczema and asthma in general.   Fourthly Dr. Barnes opinions, even if they were based solely on the presence of wheezing in 2007, which Plaintiffs deny, Dr.

---

[3] See also testimony of Alana Alexander, Exhibit D.

12

Barnes' finding that there was wheezing is not "indisputably wrong". It is not indisputable that the 2007 entry in the emergency room medical record on no "wheezing in the last year" is correct. It is not unusual in the context of an emergency room situation, for mistakes to be made in recording information in the medical record. Compare this to the careful history that Dr. Barnes took from Alana Alexander when he came into the office when there were no pressures of time or immediate treatment where wheezing was noted.

**4.**         ***Defendants Dr. Barnes' reliance on studies***

Defendants allege that Dr. Barnes has not properly utilized epidemiological studies in formulating her opinions and to understand these problems a brief background on epidemiology is necessary. *See* Rec. Doc. 2891-2, pp 9-25. As summary of their critique, is that Dr. Barnes does not understand the statistical studies and how to interpret them. The defendants go on for six pages to discuss epidemiology, various studies the defendants asked her questions about during the deposition and issues regarding those studies. *See* Rec. Doc. 2891-2, pp 10-16. However during the ensuing discussion on epidemiology and statistical studies the Defendants set forth numerous misconceptions with regard to statistical studies and concepts.

Before addressing a sampling of those misconceptions and misperceptions which Defendants set forth, it bears repeating that Dr. Barnes is a treating doctor and was not hired to conduct epidemiological studies or statistical studies. She is aware of certain studies regarding formaldehyde exposure and asthma showing that formaldehyde exacerbates asthma and causes respiratory difficulties.

As an example of the errors in the Defendants' discussion on epidemiology, they state there are several ways in which to measure statistical significance, one of which is the confidence interval. *See* Rec. Doc. 2891-2, p. 10. That is not correct. A confidence interval is

13

not a measure of statistical significance.  The p value is used to determine statistical significance. Importantly, a *confidence interval* should not be confused with a *confidence level*. Statistical significance is measured by the p value and not by a confidence interval.  Generally speaking the when the p value is less than or equal to 0.05 it is deemed to be statistically significant.  However the level of p value used to determine statistical significance is something that is an apriori decision.  Some scientist's use 0.10 as their measure; however in most contexts 0.05 is used.  If the p value is less than or equal to 0.05, then the relationship is said to be statistically significant. Stated another way, if the p value is less than or equal to 0.05, you can determine that 95% of the time the relationship you are observing is not due to chance.

Defendants state the threshold for concluding an agent more likely than not caused a disease is based on relative risk is 2.0, meaning the risk is twice as great for one group as opposed to another.  They go on to state, even if the calculated relative risk is greater than 2.0, a *study still fails to show a statistically significant association* between a factor and the disease if the confidence interval is so great that it includes the number 1.0. *See* Rec. Doc. 2891-2, p. 11. Statistical significance is a separate yet related concept from whether or not the confidence level overlaps 1.0.  You can have a statistically significant relationship, even though the confidence interval can overlap 1.0.  The confidence interval indicates 95% of the time the true measure of that association falls within that range.  The confidence interval is a measure of the precision of the estimate, not a measure of statistical significance.

Another mistaken concept that Defendants espouse relates relative risk and their statement that relative risk and odds ratio are essentially synonymous.  *See* Rec. Doc. 2891-2, p 11.  They are not.  The relative risk and the odds ratio both compare the likelihood of an event between two groups.  The odds ratio compares the relative odds of an event between two groups.

The risk ratio compares the probability of an event in each group rather than the odds. The relative risk is closer to way most people think of when they compare the relative likelihood of events. Hypothetically speaking if the risk of asthma due to formaldehyde exposure is 10% for people who live normal houses and 90% for people who live in travel trailers, the relative risk for asthma for people living in travelers is 9, but the odds ratio is 81. Both of these are legitimate appropriate methods of association but their interpretation is different.

Defendants allege that Dr. Barnes had misapplied statistical studies. As shown above, Dr. Barnes arrived at her opinions separate and apart from the statistical studies that were sent her by attorneys for the Plaintiff. *See* Barnes Affidavit Exhibit B. The articles confirmed for her that formaldehyde had exacerbated Cooper's asthma and affected him and discussed research that had been done on formaldehyde and its affects. *See* Exhibit B. Defendants allege that somehow she did not understand the concept of statistical significance and used the term significance as used in our lexicon. *See* Rec. Doc. 2891-2, p. 12. Be that as it may, although Dr. Barnes did not understand the questioning by counsel regarding statistical significance, one does not need to understand the term statistical significance, all these studies she was questioned about supported the conclusion that formaldehyde causes respiratory and health problems and some showed formaldehyde caused health problems at levels equal to or less than the amount that was found in the Alexander trailer on January 2008, one month after Christopher Cooper had moved out.

**5.**     ***Dr. Barnes did not need to conduct her own research***

Defendants criticize Dr. Barnes for not conducting an independent analysis of the relevant literature. As stated and shown above all of the studies Dr. Barnes reviewed are consistent with her opinions. As further shown above in *Bonner v. ISP Tech., Inc.,* 259 F.3d 924,

15

929 (8th Cir. 2001) there is no requirement for supporting published epidemiological studies before an expert's opinion can be admitted; *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) ("we do not believe that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness".

**6.**         ***Dr. Barnes did have a concept of dose***

Defendant objects to Dr. Barnes's lack of specific formaldehyde levels. Precise levels of exposure, however, are not required for a specific causation analysis. *Curtis v. M&S Petroleum, Inc.*, 174 F.3d at 671. Further, circumstantial evidence is acceptable to prove exposure levels. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 671 (5th Cir. 1999). Moreover, it should be noted that this discussion when Dr. Barnes was asked about the formaldehyde "dose" was in the context of a study that showed even low doses of formaldehyde can cause asthma like symptoms. Furthermore, Dr. Barnes confirmed based on the studies that asthma like symptoms were noted in studies showing doses of 0.05 ppm which was the same level as discovered in the Alexander trailer the month after the moved out. Her testimony was "I said even low concentrations of exposure can cause damage in a healthy lung and surely in a lung that already has the potential to wheeze." *See* Exhibit C, p. 124. Defendants compare this to *Whiting v. Boston Edison* 891 F.Supp. 12. (D.Mass. 1995) where the court excluded testimony of Plaintiffs' expert that low-dose to radiation could trigger leukemia. There is a distinct difference between the *Whiting* case and the case at bar, as Dr. Barnes had identified low doses as those existing in houses, and those doses of 0.50 were observed in the Alexander trailer. *See* Exhibit F. Furthermore, the medical literature supports findings of adverse health effects at

dosages of 0.50 ppm. Moreover the studies in the *Whiting* case had not been peer reviewed. The studies Dr. Barnes were referring to, had been peer reviewed.

**7.**     ***Dr. Barnes did an impermissible leap in rendering her opinion on lower respiratory damage***

Defendants allege Dr. Barnes has made in impermissible leap in expressing an opinion that formaldehyde can cause lower respiratory damage and that none of the studies she referenced suggested the same. See Rec. Doc. 2891-2, p. 19. This is not correct. The Franklin study which Dr. Barnes referenced found that formaldehyde found lower airway and pulmonary effects after exposure to formaldehyde. *See* Exhibit H, page 1758. Moreover, the defendants misconstrue Dr. Barnes testimony saying "Dr. Barnes believes that formaldehyde can get into the lower airways through an allergic progression, other sources – including the Plaintiff's own expert [Pacheco and Kornberg] have rejected that conclusion". *See* Rec. Doc. 2891-2, p. 19. Defendant states that Plaintiffs experts Dr. Kornberg and Dr. Pacheco both testified and agreed that Cooper did not have IgE sensitized or IgE-mediated asthma. *See* Rec. Doc. 2891-2, p. 20. This is a non-sequitor. Formaldehyde is a gas and Dr. Barnes testified the same way it gets into the upper lungs, it gets into the lower airway. *See* Exhibit C, p. 42. Dr. Barnes did not limit the action of formaldehyde in the lower lungs to IgE sensitized or IgE-mediated reactions. *See* Exhibit C, p. 42. Dr. Barnes testified that formaldehyde gets into the lower lungs causing inflammation, swelling, and triggers bronchospasams. *See* Exhibit C, p. 42.

**8.**     ***Dr. Barnes does not lack objectivity to render her opinions***

During her deposition, Dr. Barnes had mentioned that she was contemplating filing a claim regarding her exposure to formaldehyde. Since the time she gave her deposition, she has decided not to pursue a claim. *See* Barnes Affidavit, Exhibit C.

17

**9.**          *Dr. Barnes is not improperly relying anecdotal evidence*

Defendant criticizes Dr. Barnes for improperly relying on "anecdotal evidence". *See* Rec. Doc. 2891-2, p. 22.  Dr. Barnes has been practicing medicine in New Orleans for 27 years. *See* Exhibit C, p. 274.  As noted above Dr. Barnes has hundreds if not thousands of patients like Christopher Cooper who had childhood asthma.  Based upon her work experience and treatment of other children who have had asthma, she is familiar with the signs, symptoms and course of treatment for childhood asthma. *See* Exhibit C, p. 291. She is also familiar with normal progression of illness for children diagnosed with asthma while they are young and she had other patients living in FEMA trailers with similar respiratory complaints.  *See* Exhibit C, p. 263-264 288.   This is exactly the type of expert knowledge that would be of helpful and of interest to an expert trying to make a causation determination.

One could surmise that if Dr. Barnes had never treated a childhood asthmatic in the past they would take issue that she was not qualified to render opinions with regard to childhood asthmatics.  Furthermore, if she had never treated children who had lived in FEMA trailers in the past, they likewise might have taken issue that she does not have the proper experience and qualifications to render opinions about Christopher Cooper who lived in a FEMA trailer.   On the contrary, to what Defendants assert, it is exactly this experience of treating other childhood asthmatics and treating other children in FEMA trailers who had respiratory symptoms similar to Christopher Cooper that makes her particularly situated to render opinions in this case.

**IV.     Conclusion**

As both a physician and an environmental scientist, Dr. Barnes is particularly qualified to perform a causation analysis in this case.  As a treating doctor, her opinions are not subject to the

same type of *Daubert* analysis that would apply to retained experts. Her opinions are admissible under the regimen the courts have established for treating doctors. However, even assuming she were not a treating doctor and she were a retained expert, her opinions are admissible under those traditional standards as well.

V.   **PRAYER**

For the reasons stated in this Response, Plaintiff respectfully requests that the Court deny Defendant's Motion *in limine* on Janet Barnes, M.D.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION**

BY:   s/Gerald E. Meunier
GERALD E. MEUNIER, #9471
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:   504/528-9973
gmeunier@gainsben.com

s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:   504/528-9973
jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS' STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820

19

        ROBERT BECNEL, #14072
        RAUL BENCOMO, #2932
        FRANK D'AMICO, #17519
        MATT MORELAND, #24567
        LINDA NELSON, #9938
        DENNIS REICH, Texas #16739600
        MIKAL WATTS, Texas # 20981820

## **CERTIFICATE OF SERVICE**

  I hereby certify that a true and correct copy of the foregoing document has been served upon counsel of record as indicated below in accordance with the Federal Rules of Civil Procedure on August 31, 200.

        /s/Gerald E. Meunier
        GERALD E. MEUNIER