UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |
| THIS DOCUMENT IS RELATED TO | * | |
| | * | |
| *Charlie Age, et al v. Gulf Stream Coach* | * | |
| *Inc., et al*, Docket No. 09-2892; | * | |
| Alana Alexander, individually and on behalf of | * | |
| Christopher Cooper | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S RESPONSE TO DEFENDANT GULF STREAM COACH, INC.'S**
**MOTION TO STRIKE OPINIONS AND TESTIMONY OF ALEXIS MALLET**

Plaintiff, Alana Alexander, individually and on behalf of Christopher Cooper ("Plaintiff or "Ms. Alexander"), responds to Defendant Gulf Stream Coach, Inc.'s ("Defendant" of "Gulf Stream") Motion to Strike Opinions and Testimony of Alexis Mallet, Jr. (Docket Entry No. 2273) and, in support, would show the following:

I.    **Legal Background.**

Defendant's Motion to Strike is one to exclude evidence, specifically expert testimony.

Therefore, the Federal Rules of Evidence should govern the Court's analysis of the motion.

FED. R. EVID. 401 provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

FED. R. EVID. 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

FED. R. EVID. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Expert testimony need only be based on a reliable and scientifically valid methodology that fits the facts of a case. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The inquiry into the expert's testimony is "a flexible one" where the individual factors are neither exclusive nor dispositive. *See Id.* at 594-95. As such, this Court essentially considers whether the expert retains a broad range of knowledge, skills and training. *Id*.

In analyzing the reliability of proposed expert testimony, the role of the Court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions. *See Kumho Tire Co., Ltd. v. Carmichael,* 526

U.S. 137, 153 (1999). While extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony whose knowledge is based on experience.  *See Smith v. Ford Motor Co*., 215 F.3d 713 (7th Cir. 2000)(citing *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000), *Walker v. Soo Line R.R. Co*., 208 F.3d 581, 590 (7th Cir. 2000); *Kumho*, 526 U.S. at 156 ("No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.")

The court's role as gatekeeper should not replace the adversary system. *Pipitone v. Biomatrix, Inc*., 288 F.3d 239, 250 (5th Cir. 2002).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 595.   It is certainly not the trial Court's role to determine whether the expert's conclusions are actually correct.  *Id.,* at 595.  So long as the testimony rests upon "good grounds" it should be tested by the adversary process -- competing expert testimony and active cross-examination – rather than excluded from juror's scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.  *See Ruiz-Trioche v. Pepsi Cola of Puerto Rico Bottling Co*., 161 F.3d 77, 85 (1st Cir. 1998)(citing *Daubert*, at 596).

## II.   Mr. Mallet is Qualified to Give an Expert Opinion.

Mr. Mallet has been involved in the building industry for over thirty-five (35) years.  *See* Deposition of Alexis Mallet, Jr. at p. 381, relevant portions attached as **Exhibit A.**  He is licensed as a general contractor, residential building contractor and manufactured housing installer.  *Id*. at 379.  As can be seen on his CV, Mr. Mallett has an impressive list of

certifications, licenses, recognitions and education experiences.  CV of Alexis Mallet, Jr., attached as **Exhibit B**.  The last he knew, Mr. Mallet is also the only non-engineer member of the Investigative Engineers Association.  Mallet Depo., at pp. 388-89.  In fact, he was recently invited to give a lecture to the Investigative Engineers Association on the topic of air temperature, moisture, water management, mechanical systems and how they interrelate with building design, construction and materials.  *See* Declaration of Alexis Mallet, Jr., at ¶ 3, attached as **Exhibit C**.

In addition to his extensive involvement in the building industry, Mr. Mallet has also served as an expert in over 45 cases.  *See* Alexis Mallet's List of Trail Testimony and/or Depositions, attached as **Exhibit D**; *see* Declaration of Alexis Mallet, Jr., at ¶ 2.  Recently, he served as an expert of building design and construction defects and failures.  *See Aucoin v. Southern Quality Homes, LLC*, 2008 WL 498668 (La. 2/26/08).  Despite serving as an expert witness on numerous occasions, Mr. Mallet has never been excluded.  Mallet Declaration, at ¶ 2.

Specifically, Mr. Mallet has worked on nearly one hundred (100) travel trailers, and many more mobile homes, since 1985.  Mallet Depo., at 42-43.  As a result of this work, he has become familiar with the materials used in these units, as well as the building methods and styles of travel trailers.  *Id*. at 380.  When asked what kind of work he has done on mobile homes and travel trailers, Mr. Mallet replied:

> Well, everything from analysis of defects and failures, analyzing the moisture issues, negative air pressure issues, comparison of the construction to the codes and standards under which they're built to determine if they're in compliance with those codes and standards, infrared thermography, indoor air quality testing, repairs to those facilities from either fire damage, water damage, mold damage, windstorm damage or some other event, such as a casualty, an accident, where a car may have run into a mobile home or into a camper, thing of that nature.  We

would take them apart and put them back together.

*Id*. at 384-85.  He has a long history of doing work related to hurricanes related to all sorts of structures, including trailers.  *Id*. at 382-83.

Louisiana courts have consistently held that general contractors may testify as experts related to building defects.  *Mitchell v. Popiwchak*, 95-1423 (La.App. 4 Cir. 6/26/96), 677 So.2d 1050, 1054-55; *Cruz v. Bertuc*ci, 95-200 (La.App. 5 Cir. 11/15/95), 665 So.2d 460, 463.

This wealth of personal experience in the building industry allows Mr. Mallet to give expert opinions on the construction of, and materials used in, Plaintiff's trailer.

Despite Gulf Stream's claims that Mr. Mallet purely relies on the expert opinions of others, Mr. Mallet also performed his own inspection of the trailer.  Mallet Depo., at pp. 380-81. Regardless, an expert may give opinions, "based, in part, upon report of others which are not in evidence but which the expert customarily relies upon in the practice of his profession." *Jenkins v. U.S.*, 307 F.2d 637, 641 (C.A.D.C. 1962); *see also Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F.Supp.2d 908, 934 (W.D. Wis. 2007)(experts may rely on the reports of others); *In re Lake States Commodities, Inc.*, 272 B.R. 233, 242 (Bkrtcy. N.D. Ill. 2002)(an expert can rely on another expert's report, even if it is inadmissible hearsay).  Mr. Mallet stated that, in the course of his business, he will consult with engineers.  Mallet Depo., at pp. 390-91.

**III.   Only Formaldehyde Tests from May 6/7, 2009 Have Been Excluded.**

As set forth in Plaintiff's Responses (Docket Entry Nos. 2954 and 2956) to Gulf Stream's Motions to Exclude Paul LaGrange and Ervin Ritter, Plaintiff respectfully submits that the Court only excluded the formaldehyde test results from the May 6/7, 2009 inspection.  Gulf Stream's Brief acknowledges as much when it notes that the Court excluded "re-testing" of the trailer.

Prior to May 6/7, 2009, the only testing that had been done of the trailer was for formaldehyde. Therefore, the only issue of "re-testing" was the May 6/7, 2009 formaldehyde test.   Mr. Mallet's opinions do not rely on that test.   Further, Mr. Mallet conducted his own visual inspection of the trailer on May 6/7, 2009.

IV.    **Mallet Opinions.**

Gulf Stream attacks all but one of Mr. Mallet's opinions.   Candidly, some of those opinions provide background facts, upon which Mr. Mallet rests his other opinions.   As the Court has noted previously, experts may (and in fact are expected to) provide the background for their opinions.   In sum, Mr. Mallet has the experience and training to provide his expert opinions.

**A.   Statement No. 1**

Mr. Mallet is also aware the trailer tested at 0.050 ppm and generally aware that adverse health effects will occur at that exposure level.   He had access to reports from various other experts involved in this litigation.

As discussed above, Mr. Mallet has experience in the construction industry and has built hundreds of housing units.   Based on this experience, he is familiar with wood products containing formaldehyde and is therefore qualified to opine that the design that this relatively small structure with limited ventilate would have the possibility the raise level of formaldehyde to an "unsafe level."

**B.   Statement No. 2**

Mr. Mallet has the experience to know which building materials are most appropriate for the hot and humid climate in Southern Louisiana, a point Gulf Stream apparently concedes.   Mr. Smulski identified the material used in the trailer as vinyl paneling.   Mallet Depo., at pp. 126.

Based on his own experience with vinyl type panels, Mr. Mallet testified that the material used in the trailer "would have a very low perm rating." *Id*.; *see also* Mallet Declaration at ¶ 7. As Mr. Mallet testified, it would be unlikely that there would be any blistering or mold due to the age of the trailer. Mallet Depo., at pp. 128-30. Again, due to the fact that vinyl has a low PERM rating, there would not be any water stains in the event of water intrusion. *Id*. at 129. However, this does not mean that not water vapor intrusion or a build-up of moisture in the wall cavity in the form of water vapor.

Additionally, the type of structure (e.g. travel trailer, mobile home) has no bearing on the appropriate location of the vapor barrier. *Id*. at p. 131. As Mr. Mallet testified, "regardless of what the exterior construction is, if it's constructed in this fashion with a vapor barrier on the interior of the wall, the results are the same." *Id*. This is a basic tenet of construction in hot, humid climates such as southern Louisiana.

Based on his many years of experience of inspecting structures with vinyl wall covering, moisture problems are inherent with this type of construction in this area. In addition, there are numerous studies relating to the problems related to moisture build-up in housing units with vinyl wall coverings. Mallet Declaration at ¶ 8.

**C.  Statement 3**

Mallet has proposed the vapor barrier that would prohibit the travel of air into the air in an unintended fashion. Vapor barriers are used on many residential structures. Mr. Mallet has merely suggested a construction design and alternative that is used in residential construction and for which there is no prohibition to install in a travel trailer. Mallet Depo., at pp. 152-53. Gulf Stream contends that Mr. Mallet cannot cite to any literature or standard of that requires,

specifies or recommends that use of such a [vapor] barrier." However, when the transcript is examined more closely, he stated that "in all buildings utilized in this temperature zone or climate zone, a vapor barrier should be on the exterior side of the exterior walls." *Id*. at p. 152.

### D.  Statement 4

The summary of Mr. Mallet's fourth conclusion is that, based on the circumstances, these trailers would be used for a long time. Based on the construction means and methods, it was obvious that these trailers were not adequately designed to serve for the period of time for which it was foreseeable that they would be used. Therefore, they should have built for a higher quality and grade of material with a greater attention to workmanship. Mr. Mallet explains this in more detail in his deposition.

### E.  Statement 5

Mallet offers the opinion that Gulf Stream knew or should have known that the use of formaldehyde-emitting materials would be a problem for the occupants. His opinion is based on his prior experience in the construction industry and built a variety of structures. Mr. Mallet has used wood products containing formaldehyde in housing units that he has built in the past. He is further aware that when a structure is small with a lot of formaldehyde-emitting materials, it can raise the level of formaldehyde to unsafe levels. As a manufacturer, Gulf Stream is imputed with knowledge of an expert that they use in their trailers. Therefore, they should have known that since these are small units that have a lot of formaldehyde-emitting products. This is elementary in the building and construction trade.

### F.  Statement 6

Mallet states that Dr. Smulski's opinions are the basis of which he predicates his other

opinions. *Id*. at 166. However, the composition of the wood products is an important factor in his analysis in alternative design. Mallet is not stating this as his independent opinion; he is stating this as a predicate to his analysis on alternative design.

### G.  Statement 7

Mallet offers the opinion that the means and methods, and materials used in the trailer contributed to the elevated levels of formaldehyde. Although Mr. Mallet has never constructed a trailer, he has constructed hundreds of other housing units. He is aware of the means and methods of construction for the same. Mr. Mallet is also aware that formaldehyde based wood products emit more formaldehyde when they are exposed to heat and moisture. Therefore, he is qualified to offer the opinion that if a housing unit is constructed in such a manner that moisture and external air infiltrate the housing structure, it will increase the formaldehyde that the wood products emit. Mr. Mallet does not need to be an engineer to understand the principles of construction that would relate to this matter.

### H.  Statement 8

Gulf Stream criticizes Mallet's ability to render opinions on the air conditioning and heating system. Mr. Mallet offers the opinion to the defect in the duct work in the travel trailer allow for external hot, moist air to be drawn in to the trailer. Mallet is uniquely qualified to offer an opinion because he has supervised the installation of and designed hundreds of heating and air conditioning systems in housing units. Mallet Declaration, at ¶ 9. It is a basic tenet of heating and air conditioning that if there are leaks in the duct work, it will cause negative air pressure and external hot, humid air will be drawn in to the building from the outside environment. This is particularly true in southern climates such as Louisiana.

Additionally, it requires very little technical knowledge to know whether or not a duct system is leaking. It does not involve the design or construction of the entire HVAC system. *Id.* at ¶ 10.

**I.   Statements 10 & 11**

Gulf Stream criticizes Mr. Mallet's opinion that the manufacturer or Fluor should have designed a safe means of jacking the trailer by either increasing the rigidity of the metal frame or using a jacking system that would evenly lift the entire unit. However, when the record is examined, Mr. Mallet has an operational understanding of engineering principles as he has been involved in rehabilitating buildings and houses that have suffered structural damage due to defects. Mallet Declaration, at ¶ 11. In the hundreds of times that he has been involved in these projects, he has become aware of the basic engineering principles that houses and buildings shifting and those forces which are necessary to cause structural damage. Furthermore, in building hundreds of housing units and buildings, he has become intimately familiar with the types of construction materials used, as well as their load bearing characteristics.

**J.   Statement 12**

Mr. Mallet, as a licensed a home builder who has constructed hundreds of housing units, is familiar with composite wood products used in structures which emit formaldehyde. It is common knowledge in the building industry that numerous wood products emit formaldehyde. Further, when you take into consideration, as Mr. Mallet opined, the small interior space, it is very foreseeable that there would be a build-up of formaldehyde to a potentially unsafe level. Therefore it stands to reason, that under basic building and construction principles, that a warning should have been issued.

**K.  Statement 14**

To the extent the Mr. Mallet's opinion with regard to NFPA and ANSI standards on the air conditioning are the same the opinions of Paul LaGrange and/or Ervin Ritter, Plaintiff will be offering one expert on the same and final determination as to which expert will be opining has not been determined.   Furthermore, as stated previously, Mr. Mallet has experience in supervising the installation of and designing HVAC systems in hundreds of housing units, and is a licensed builder, therefore he is qualified to state what meets NFPA and ANSI standards with regard to the duct leakage HVAC systems.

**L.  Statement 15 and Alternative Materials Available**

Gulf Stream is critical of Mallet's conclusion that the product was unreasonably dangerous because it did not utilize techniques, technologies, materials and workmanship to meet the new FEMA specification of 0.016 ppm.  Plaintiff concedes that this standard was not in effect in December 2004 when this trailer was manufactured.  However, the methods and means to construct these travel trailers with a significantly reduced formaldehyde level, including, but not limited to 0.016 ppm, existed in 2004.  Mallet Depo., at p. 412; See the Expert Report of Alexis Mallet Report, pp. 88-91, attached to Defendant's Motion as Exhibit B.   This is specifically why Mr. Mallet offers design alternatives for low-emitting and no-emitting wood products to be used in construction of the trailer.  Mallet Report, pp. 88-94 & 99-100; Mallet Depo., at pp. 408-413.  All of this was existing, off-the-shelf technology that existed in 2004.

Furthermore, contrary to what Gulf Stream states, Mr. Mallet did calculate the cost of these new materials.  Gulf Stream has never revealed in discovery, despite repeated requests, the unit cost of the products and structures utilized in the trailer.  Therefore, Plaintiff cannot be

faulted for determining an increased cost, as Gulf Stream has never produced the actual numbers. However, Mr. Mallet did come up with the cost for the alternative materials and structures he suggested.  Mallet Depo., at p. 214.

Additionally, Gulf Stream criticizes Mallet as stating that he had no specific evidence of a design that existed when the trailer left Gulf Stream's control.  The truth of the matter is that, other than using a vapor barrier, what Mr. Mallet has suggested is merely the use of wood products that were either low-emission or non-emitting formaldehyde products which clearly were available and do not constitute a "different design."  It stands to reason that if Gulf Stream had used non-formaldehyde emitting products, this travel trailer would have had a concentration of less than 0.016 ppm.

## CONCLUSION AND PRAYER

Wherefore, Plaintiff respectfully requests that the Court deny Gulf Stream's Motion.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:    <u>s/Gerald E. Meunier</u>
        GERALD E. MEUNIER, #9471
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warshauer, L.L.C.
        2800 Energy Centre, 1100 Poydras Street
        New Orleans, Louisiana 70163
        Telephone:    504/522-2304
        Facsimile:    504/528-9973
        gmeunier@gainsben.com

        <u>s/Justin I. Woods</u>
        JUSTIN I. WOODS, #24713
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warshauer, L.L.C.
        2800 Energy Centre, 1100 Poydras Street
        New Orleans, Louisiana 70163
        Telephone:    504/522-2304
        Facsimile:    504/528-9973
        jwoods@gainsben.com

        **COURT-APPOINTED PLAINTIFFS'
        STEERING COMMITTEE**
        ANTHONY BUZBEE, Texas # 24001820
        RAUL BENCOMO, #2932
        FRANK D'AMICO, #17519
        MATT MORELAND, #24567
        LINDA NELSON, #9938
        MIKAL WATTS, Texas # 20981820
        ROBERT BECNEL
        DENNIS REICH, Texas # 167396

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

s/Gerald E. Meunier
GERALD E. MEUNIER, #9471