Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS DIVISION


IN RE: FEMA TRAILER          *     MDL NO. 1873
        FORMALDEHYDE          *
        PRODUCTS LIABILITY    *
        LITIGATION            *     SECTION: N(5)
                              *
This Document Relates to:    *     JUDGE: ENGELHARDT
Charlie Age, et al. v.       *     MAG: CHASEZ
Gulf Stream Coach Inc.,      *
et al., Docket No. 09-2892   *



VIDEOTAPED DEPOSITION OF MARY C. DeVANY, MS, CSP, CHMM

Taken on behalf of Defendants

Portland, Oregon

July 31, 2009

--oOo--

Exhibit
B

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 31

1   A.   No, sir.

2   Q.   You never attended medical school, have you?

3   A.   Yes, I have.

4   Q.   You've attended medical school?

5   A.   Yes, I have.

6   Q.   Did you graduate from medical school?

7   A.   No.  I quit.

8   Q.   All right.  Now I understand the answer.

9        You are not an expert in medical diagnosis, are

10       you?

11  A.   No.  But I finished a lot of medical courses as a

12       medical student.

13  Q.   But just to make sure, with that qualification, you

14       are not an expert in medical diagnosis, are you?

15  A.   I am not a physician, no.

16  Q.   All right.  Are you an expert in taking medical

17       histories?

18  A.   You know, this is -- this is a very difficult line

19       of questioning.  In the field of industrial hygiene,

20       we have to take medical histories.  We have to -- we

21       have to evaluate medical complaints, differentiate

22       between medical symptoms and medical signs, review

23       medical records, and try to figure out someone's

24       actual medical profile, and then determine what it

25       is that might be causing it as an occupational or

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 292

1      expert?

2   A.   It is.

3   Q.   You were asked under oath at line 17:

4           "Question:  Would you tell the Judge, uhh, your

5        education starting with your graduation from

6        college?"

7           And if you look at your answer, in the second

8        sentence of your answer, you say, "I then went to

9        Loyola University in Chicago and had Master's

10       Degree -- Master's Degrees in biochemistry and human

11       physiology."

12          Did I read that correctly?

13  A.   That is what it says, yes.

14  Q.   And that is not in fact true, is it?

15  A.   You know, I haven't had a chance to review this or

16       make any corrections to this testimony, and this

17       is --

18  Q.   Are you suggesting --

19  A.   No, this is not technically true.  No, it's not.

20  Q.   But you said this under oath, ma'am.  Are you

21       suggesting that you said something different at the

22       trial, or were you mistaken or --

23  A.   It was a hearing, it wasn't a trial, so -- so -- if

24       you want to be very technical.  And it also says I

25       have Master's degrees, not Master of Science

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 329

1          With that noted, I say that the government

2      would have to get leave of Court to extend the

3      deposition unless an agreement could be made with

4      the counsel to deal with that.

5          MR. PERCY:  And we make the same reservation.

6      And just so we don't all need to parrot, I believe

7      all the other defense counsel present would

8      reiterate what Mr. Miller just said.

9          MR. TAAFFE:  And on behalf of my client, I

10     won't necessarily agree or disagree with anything

11     you said, other than to say I hear what he's saying.

12     And those will be excellent arguments for the judge

13     if you do it.

14         Okay.  I have a couple questions.  We can go

15     back on the record.

16              (Discussion off the record.)

17

18                    EXAMINATION

19  BY MR. TAAFFE:

20  Q.   Okay.  Ms. DeVany?

21  A.   Yes.  I'm just hooking up here.

22  Q.   The whole set of questions that we just had about

23     those equations, what are those equations?  What are

24     you trying to do when you're running those

25     equations?

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 330

1   A.   Those equations represent a wide diversity of

2        scientific articles, bases, many different types of

3        organizations that -- that are trying to attempt to

4        development a formula to approximate formaldehyde

5        concentrations when a test wasn't performed to

6        extrapolate back in time or forward in time.

7             And these are formulas that were put forth by

8        forest products industry, wood products industry,

9        the Center For Disease Control, Lawrence laboratory,

10       and then the fifth one was our own data we used.

11  Q.   And just to be clear, in your report you cited the

12       five bases, and then for --

13  A.   Yes, sir.

14  Q.   -- for each one you went through and said, here is

15       what I interpret that study to say I'm supposed to

16       do, right?

17  A.   Yeah.  And that's why I actually explained exactly

18       which article, the author, and the date, so that you

19       could all go back and see how those -- where those

20       formulas came from and walk through it.

21  Q.   And then at the end of the discussion there's a

22       summary where you say -- applying those five tests,

23       you come up with a conclusion of X, correct?

24  A.   Yes, sir.

25  Q.   So you give --

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 331

1    A.   A range, the range of the five.

2    Q.   And the range is 1.6 ppm to 0.10 ppm?

3    A.   Correct.  And that would be at the time the

4         Alexanders moved into the trailer, which is an

5         extrapolation back in time.

6    Q.   You say that's when they moved in, or the entire

7         period they were living at the trailer?

8    A.   That's at the 17 month point after manufacture of

9         the trailer.

10   Q.   Which was approximately May '06?

11   A.   Yes, sir.

12   Q.   Okay.  Back to this exhibit that Mr. Scandurro asked

13        you about, this Exhibit 16, your testimony from this

14        In re: Steven Vaughn case.

15   A.   Yes.

16   Q.   I want you to look at the last page.  And is there a

17        signature on the affidavit form for the court

18        reporter that says this is a true and correct copy

19        of the --

20   A.   No, there isn't.

21   Q.   Did you ever -- okay.

22             And is there anything on there where you signed

23        it and said, yes, this is a true and accurate copy

24        of what I said on this day?

25   A.   I have never seen it before.  No, there's nothing on

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 332

1        here.

2   Q.   So, since the day you gave testimony in the Steven

3        R. Vaughn matter until 30 minutes ago when

4        Mr. Scandurro provided you with a copy of this

5        transcript, you had never seen this -- the

6        transcript before?

7   A.   No, sir.

8   Q.   And I want to -- the part where you discussed

9        your -- in the examination when you discussed your

10       educational background, do you remember that?

11  A.   This?  This exam?

12  Q.   Yes, this examination.

13  A.   Yes.

14  Q.   And this transcript says Master's degrees in

15       biochemistry and human physiology.

16            Is it true that if you were given a copy of

17       this transcript to review it for accuracy, that you

18       would have marked it to make it correct?

19  A.   Yes, sir.

20  Q.   Okay.  And to continue on this exhibit, you're not a

21       lawyer?

22  A.   Oh, no, sir.

23  Q.   And you're not a litigator?  I mean, these are silly

24       questions, but I've got to ask them.

25  A.   No.  I'm not even sure what that is.

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 333

1   Q.  You don't practice trial law like all of these --

2   A.  No, sir.

3   Q.  -- smart lawyers in here?

4           And you certainly don't practice mass tort or

5       class action litigation; is that right?

6   A.  Mass what?

7   Q.  Mass tort.

8   A.  Mass tort.  No, of course not.

9   Q.  So, when you were giving this, were you talking to

10      an administrative law judge?

11  A.  I was.  It was a hearing.  It wasn't a trial.

12  Q.  And do you know one way or the other if the

13      administrative law judge that you were talking to

14      was a licensed attorney?

15  A.  I don't know.

16  Q.  Do you know what kind of background that

17      administrative law judge had?

18  A.  (Shakes head.)  No, sir.

19  Q.  So you were -- and then Mr. Scandurro asked you

20      about this discussion where you were telling the

21      judge about what you perceived your role was in this

22      litigation as of July 2008.  Do you remember that?

23  A.  Would you repeat that?

24  Q.  Mr. Scandurro was asking you about your testimony in

25      this matter where you were explaining to this

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 334

```
 1        administrative law judge what you perceived your

 2        role in the FEMA MDL was as of July 28, 2008.

 3    A.  That's right.

 4    Q.  And I don't think --

 5    A.  Summarized.

 6    Q.  Right.  And do you know where you got the

 7        understanding that you provided to that

 8        administrative law judge?

 9    A.  Well, that would have been information that I -- I

10        got from Plaintiffs' steering committee.

11    Q.  Do you remember, Mr. Meunier or Ms. Nelson?

12    A.  Everybody.  Mainly who I was dealing with at that

13        time, though, was Justin Woods.

14    Q.  Okay.  And you're saying you now understand that

15        that wasn't really, I don't know, accurate?

16    A.  What I do now is -- that's not what I thought I was

17        going to be doing at the time.  What I thought I was

18        going to be doing at the time was that, but our --

19        or something close to that.  I have to read it again

20        to see, but --

21    Q.  But this was during the class certification phase of

22        this case, right?

23    A.  Yes, it was before then.

24    Q.  Because you gave -- you provided a deposition that

25        we've talked about in Ms. Nelson's office and
```

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 338

1        somewhere that I was made a fellow.  Okay, that's my

2        report.  Wait.  Where is the other -- this one has

3        the resume'.

4    Q.  Okay.

5    A.  Here it is.  All right.

6    Q.  Yes?  I believe you.

7    A.  It's right here.

8    Q.  Okay.  All right.  Great.

9            And have you received any awards for your work

10       from the Union of Concerned Scientists?

11   A.  I received recognition -- I don't think it was last

12       year, but the year before, regarding contributions

13       to the field of science and truth in science.

14   Q.  What's the name of the organization?

15   A.  The Union of Concerned Scientists.

16   Q.  And now, I think Mr. Miller discussed your testimony

17       in front of Congress.

18   A.  Yes.

19   Q.  Right?

20   A.  He did.

21   Q.  Who asked you to appear before Congress?

22   A.  Congress -- Congressman Waxman's -- a representative

23       from his office contacted me initially.

24   Q.  Was that unsolicited?

25   A.  Oh, yes.

Mary C. DeVany MS, CSP, CHMM
7-31-2009

Page 339

1   Q.   Meaning, you didn't call Henry Waxman's office and
2        say, "Hey, I'd really like to testify"?
3   A.   No, sir.
4   Q.   And what was the scope of what they wanted you to
5        testify in front of his committee about?
6   A.   They wanted me to discuss adverse health effects of
7        formaldehyde, current exposure limits, and to
8        explain to the committee what the relevance and
9        meaning and why they were all established and who
10       they applied to.  They wanted me to explain how
11       formaldehyde gets into temporary housing units in
12       the first place, and they wanted me to give
13       recommendations to FEMA and -- to their committee,
14       actually, on how -- on actions FEMA could take and
15       should take to help ameliorate the issue.
16  Q.   And you provided responses to those questions in
17       your written testimony?
18  A.   Written and oral, yes.
19  Q.   Yeah, that was my next question.
20  A.   This is the written.
21  Q.   You didn't just submit a report, you actually
22       appeared in front of the committee and they asked
23       you questions and you gave them answers?
24  A.   Precisely.  This was my written report, but I had
25       sworn testimony in person before the committee.

Page 340

```
 1   Q.   Have you testified or been asked to testify in front
 2        of Congress before or after?
 3   A.   No.
 4   Q.   And you sat through that hearing, correct?
 5   A.   Yes.
 6   Q.   And as I understand it, the subject of that hearing
 7        was FEMA's response to the concerns of formaldehyde
 8        in travel trailers.
 9   A.   Yes.
10   Q.   In fact --
11   A.   That was -- that's the nuts and bolts.
12   Q.   The head of FEMA, Mr. Paulson, testified in that
13        hearing, correct?
14   A.   After me, yes.
15   Q.   And you listened to his testimony and the Q and A
16        with Congressmen and -women after he gave his
17        statement?
18   A.   I did.
19   Q.   I can't remember if this was clear or not, but in
20        the CFR, the HUD documents --
21   A.   Sure.
22   Q.   Let's see.
23   A.   This?
24   Q.   Yeah, that's it.  I think Mr. Miller asked you on
25        HUD 6, the sixth page -- these are the Bates
```