# EXHIBIT A

```
 1              MR. WEINSTOCK:  I think it's Ganiere.

 2              MR. BUZBEE:  Ganiere, oh, sorry.

 3              MR. WEINSTOCK:  That's all right.  She wasn't in

 4         the room, so you don't have to apologize.

 5  BY MR. BUZBEE:

 6  Q.  You have, in fact, met with Gulf Stream attorneys though,

 7      haven't you?

 8  A.  Yes.

 9  Q.  You met with Gulf Stream -- or at least attorneys

10      purporting to be working on behalf of Gulf Stream?

11  A.  Better said, yes.

12  Q.  Okay.  Not with Mr. Weinstock?

13  A.  No.  I don't believe so.

14  Q.  Right.  But you have met -- and this is Ms. Ganiere right

15      here.

16  A.  Okay.

17  Q.  Did you meet with her?

18  A.  It's possible that we've met, but I don't recall.  I can't

19      say yes.

20  Q.  Okay.  You met with lawyers in the presence of Mr. Shea;

21      is that correct?

22  A.  I met with lawyers -- I don't think Mr. Shea was there.  I

23      met with lawyers in the presence of the purchasing manager

24      at the time, Jeff Zumbrun.

25  Q.  Okay.
```

1      subpoena with you here today?

2   A.   No.

3   Q.   Okay.  But you do have such documents?

4   A.   I do.

5   Q.   Again, let me ask you, did you ever give a written or

6        recorded statement to anyone from Gulf Stream?

7   A.   Assuming -- I was assuming, although I'm not absolutely

8        sure, that during your conversation with the attorneys

9        present that it might have been recorded.  But I can't say

10       with absolute certainty that it was.  As far as a written

11       documentation, did I sign off on anything or did I come up

12       with any conclusions about anything?  I don't believe I

13       did that, no.  If they have something like that, then it's

14       only that I'm not remembering that I did that.  So it's

15       not to be deceitful.

16   Q.   So you had told my investigator that you gave a statement,

17       and now you're saying that you have not given a formal

18       statement?

19   A.   I also told the investigator that I wasn't -- at first I

20       was thinking back on it as a deposition, but --

21            MR. WEINSTOCK:  I told you I didn't have a

22            statement.  You could have saved him a lot of e-mails

23            to me, but go ahead.

24   A.   Okay.  I talked to him basically -- he asked me basically

25       what you did, did you ever sit with the attorneys from --

Page 20

1     and I said yes, I did.  And did you give a written

2     statement or verbal statement, and I said basically just

3     what I said to you.  I don't know if they recorded it.  I

4     don't know if there was any document that they made me

5     sign afterwards.  I don't recall that.

6  BY MR. BUZBEE:

7  Q.  Okay.  But so you met with some attorneys purporting to

8      represent Gulf Stream.  You don't know whether they

9      recorded what you were telling them?

10 A.  That's true.  I don't know if they have -- I don't know if

11     they have documents regarding that.

12 Q.  But what you do know is that you weren't altogether

13     truthful with them?

14 A.  With who?

15 Q.  The lawyers representing Gulf Stream.

16 A.  I don't understand the question, and I won't answer that

17     one.

18 Q.  That's one that you're not going to answer right now?

19 A.  Right.

20 Q.  Maybe later?

21 A.  Right.  I don't understand it, and I'll answer it later.

22 Q.  Okay.  You told the investigator that you were -- there

23     were quality control issues with the FEMA order, the

24     50,000 trailer FEMA order, specifically regarding

25     formaldehyde.  Tell me about that.

Page 21

1          MR. WEINSTOCK:  Object to the form of the

2          question, unless the investigator is going to produce

3          his report.  Otherwise you can answer.

4   BY MR. BUZBEE:

5   Q.  Go ahead.

6   A.  I think that -- I won't answer that one right now.

7   Q.  Okay.  You were an individual who was involved in, quote,

8       dealing with the formaldehyde issue.

9   A.  To some extent, yes.

10  Q.  To what extent?

11  A.  That's as far as I'll go right now.

12  Q.  Okay.  You were -- let me make sure I get my words

13      correct.  Make sure I say this exactly the right way.  You

14      reported mostly to Dan Shea?

15  A.  Well, as far as the organizational chart goes.  It was

16      exactly -- it was kind of difficult to say exactly who I

17      reported to in that position.  There were, you know -- I'm

18      sure you guys, you probably know the organizational

19      structure better than I.

20          But as far as a direct report, you know, they had a

21      gentleman there.  They still have a gentleman there, Mark

22      Smith, who is I think or was at one time director of

23      quality.  But I can't say that I've had much dealing with

24      him.

25          They had some other people that are responsible for

Page 22

1      checking on quality issues throughout, plant to plant; but

2      certainly wouldn't say that I report to him.  I don't

3      think I reported to the plant manager by any means.  So

4      it's a gray area that I cannot -- I can't tell you exactly

5      who my exact boss was at that point.

6   Q.  You reported mostly to Dan Shea?

7   A.  Those are your words; those are not mine.

8   Q.  So that would not be true?

9   A.  Going back to what I said, I'm not exactly sure who I was

10      a direct report to.

11  Q.  Were you quality control manager for all the Gulf Stream

12      plants?

13  A.  No.  Never said that.

14  Q.  Were you essentially the number 3 man in the company?

15  A.  Never said that.

16  Q.  Were you part of strategy sessions on how to deal with

17      formaldehyde?

18  A.  No reply.

19  Q.  You refuse to answer?

20  A.  Refuse to answer.

21  Q.  Okay.  There were, in fact, strategy sessions; were there

22      not?

23  A.  Refuse to answer.

24  Q.  Okay.  You were an integral part of these strategy

25      sessions, weren't you?

Page 23

```
 1   A.   Refuse to answer.

 2   Q.   These strategy sessions took place even before the last

 3        trailer was manufactured; isn't that right?

 4   A.   Refuse to answer.

 5   Q.   This issue was well known within Gulf Stream in the

 6        strategy sessions before the last trailer ever left the

 7        production line; isn't that true?

 8             MS. PETROVICH:  Object to the form.

 9             THE WITNESS:  Pardon?

10             MR. WEINSTOCK:  You can answer.

11   A.   No answer.

12   BY MR. BUZBEE:

13   Q.   Refuse to answer?

14   A.   Refuse to answer.

15   Q.   You would agree with me that you -- that Gulf Stream was

16        well aware of this issue of formaldehyde before it ever

17        produced and delivered the last FEMA trailer in the 2005

18        FEMA order; isn't that right?

19             MR. WEINSTOCK:  Object to the form of the

20        question.  You can answer or refuse to answer,

21        whatever your answer would be.

22   A.   I will answer that because I read many of the documents

23        that were available on the Internet related to this

24        situation.  So based on multiple --

25             MR. WEINSTOCK:  I'm going to let you answer.  I'm
```

Page 27

1    Q.   Okay.  You knew that the wood used in the trailers

2         contained formaldehyde?

3    A.   Yes.

4    Q.   Is that the extent of what you knew before the 50,000

5         order or did you know more?

6    A.   I would say that would be the extent of what I knew

7         before.  I was never aware of any problems with that

8         product.

9    Q.   Okay.

10   A.   Prior to the 50,000 unit order.

11   Q.   Okay.  But at some point during the 50,000 unit order, you

12        were not only aware of the formaldehyde in the wood

13        products, but you were aware that it was a problem?

14   A.   An issue, yes.

15   Q.   An issue that had to be addressed?

16   A.   Yes.

17   Q.   And you had some involvement, whether it was an integral

18        part or a small part, but you had some involvement in the

19        addressing of that issue?

20   A.   No reply.

21   Q.   No reply.  You were involved in testing the end product,

22        weren't you?

23             MR. WEINSTOCK:  Object to the form.

24   A.   Testing what?  Testing for what?

25

Page 28

```
 1    BY MR. BUZBEE:

 2    Q.   For formaldehyde levels inside the end product?

 3    A.   No.  I never tested formaldehyde products.

 4    Q.   Okay.  You were involved in reviewing or analyzing test

 5         results?

 6                   MR. WEINSTOCK:  Object to the form.

 7    Q.   Of the end product?

 8    A.   No response.

 9    Q.   You were involved or you were aware of testing that had

10         been done for formaldehyde in the end product before FEMA

11         ever received its last trailer from the 50,000 trailer

12         order?

13                   MR. WEINSTOCK:  Object to the form.  After you

14              answer, I want to say something.  Go ahead.

15    A.   No response.

16    Q.   Not just no response, you refuse to answer?

17    A.   I refuse to answer.

18                   MR. BUZBEE:  Okay.

19                   MR. WEINSTOCK:  To the extent you're discussing

20              test results that we consider work product, can we

21              agree that by letting you ask these questions I'm not

22              further waiving any work product or privilege

23              exception?  If it's already waived, so be it.

24                   MR. BUZBEE:  I can agree that you have a running

25              objection to it.
```

1          MR. WEINSTOCK:  Thank you.  Go ahead.

2    BY MR. BUZBEE:

3    Q.   So just is it fair to say that if I wanted to talk to you

4         about your tenure at Gulf Stream from 2001 up until the

5         FEMA order, you can talk -- you want to talk freely about

6         that, or you're willing to talk freely about that?

7    A.   Absolutely.

8    Q.   But what you don't want to talk about or what you refuse

9         to talk about is what occurred and what involvement you

10        had at Gulf Stream once the issue arose during the FEMA

11        order, the 2005 large FEMA order?  You don't want to talk

12        about that?

13   A.   Can you repeat that, please?

14   Q.   Yeah, it was kind of convoluted.  You'll freely talk about

15        your work at Gulf Stream from 2001 up until sometime in

16        2005?

17   A.   Ultimately I will talk about every question -- I'll answer

18        every question that you pose to me today.

19   Q.   And what is it that you have to do, check documents or

20        what is it that you need to do to get yourself prepared?

21   A.   I refuse to answer that question.

22   Q.   So you refuse to tell me why you can't answer it; is that

23        right?

24   A.   That's right.

25   Q.   Okay.  How did you start working at Gulf Stream?

Page 30

1   A.  Well, let's see.  I was in the metal finishing industry

2       for about 15 years.  It was a dying industry, contracting.

3       So I thought I would get involved -- I wanted to change

4       careers and get into an industry that was growing.  And I

5       was under the assumption it would always continue to grow.

6       And I have -- I contacted one of the vice presidents

7       initially.

8   Q.  Who?

9   A.  Claude Donati.  I contacted another vice president, Phil

10      Sarvari and ultimately interviewed for a couple jobs and

11      finally got the quality control manager job.

12  Q.  And that was in 2001?

13  A.  I believe it was 2001.

14  Q.  And you've already described your quality control job at

15      Gulf Stream, yeah?

16  A.  Yes.

17  Q.  Okay.  Who was it that you went to at Gulf Stream and

18      asked for your job back when you got this subpoena?

19  A.  When I got the subpoena?

20  Q.  Uh-huh.

21  A.  Nobody.

22  Q.  Okay.  Did you once you got the subpoena ever attempt to

23      contact Gulf Stream?

24  A.  Well, I sent an e-mail to -- I refuse to answer that.  Not

25      for any particular reason other than it will be more

1    important at another time.  I refuse to answer the

2    question.

3    Q.  You refuse to answer that.  So you refuse to tell me

4        whether you contacted Gulf Stream after June 29th of 2009

5        when you got this subpoena?

6    A.  Yes.  I refuse to answer that.

7    Q.  Now, would you answer the question as to what you told my

8        investigator you wanted in order to testify in this case?

9    A.  Absolutely refuse to answer that.

10   Q.  So you didn't tell my investigator, quote, "What's in it

11       for me?  What am I going to get paid?"

12   A.  I refuse to answer that question.

13   Q.  Is it true that you also told Gulf Stream, or you also

14       made that same request to Gulf Stream that, hey, what's in

15       it for me, can I get my job back, can I get something for

16       testifying?

17   A.  Refuse to answer that question.

18   Q.  So there are e-mails that you have that are responsive to

19       this subpoena that were sent after you received the

20       subpoena; is that right?

21   A.  Refuse to answer that question.

22   Q.  Okay.  When is the last time you spoke to anyone from Gulf

23       Stream or -- Gulf Stream or purporting to represent Gulf

24       Stream?

25   A.  Refuse.

1   Q.  Okay.  You mention in your statement here that you feel

2       like you would be available next week once you've had

3       time -- make sure I -- to perform an investigation,

4       resolution of these issues.

5   A.  I need legal counsel on this.  And based on my

6       conversation with that person today --

7   Q.  Yeah.  Don't tell me what you told -- is this person

8       representing you?

9   A.  No, not yet.

10  Q.  Can you tell me the identity of your lawyer?

11  A.  You just said -- why would you ask me that when you just

12      said don't tell you.

13  Q.  Because I don't get to know what you told him, but I can

14      know who he is so I contact him or her.

15  A.  I refuse to answer that question.

16  Q.  You refuse to --

17  A.  Respectfully.

18  Q.  Everything you've done so far has been respectful.  I know

19      you feel like you're caught between a rock and a hard

20      place here.  I can see that.

21         What I need to know is who your lawyer is so I can

22      contact him or her and help you work through these

23      problems.

24  A.  I don't have a lawyer yet.

25  Q.  So you technically do not have anyone representing you, do

1     want to do right now.

2   BY MR. BUZBEE:

3   Q.   So basically you're telling me, look, ask every question

4        you have and I'm just going to refuse to answer the ones

5        that I don't want to answer?

6   A.   I think that was my point originally, yes.

7   Q.   Okay.  Well, let's just keep going then.  You once the

8        formaldehyde issue arose, how did you learn about it?

9   A.   No response.  I refuse to answer.

10   Q.   Who within Gulf Stream were you talking to about it once

11        it arose?

12   A.   Refuse to answer.

13   Q.   When did you become aware of the formaldehyde -- what I

14        think you've called the formaldehyde problem?

15   A.   I called it an issue.  You called it a problem.

16   Q.   Let's call it an issue.  When did you become aware of the

17        formaldehyde issue?

18   A.   Refuse to answer at this time.

19   Q.   What did you do, if anything, once you became aware of the

20        formaldehyde issue?

21   A.   Refuse to answer.

22   Q.   What actions, if any, did you take to address the

23        formaldehyde issue?

24   A.   Refuse to answer it.

25   Q.   What meetings did you attend about the formaldehyde issue

1     once you became aware of it?

2   A.  Refuse to answer.

3   Q.  Tell me -- since we've used this word issue, what was the

4     issue that you became aware of?

5   A.  High levels of formaldehyde in the units, assumed.

6   Q.  What do you mean when you say "assumed"?

7   A.  Potential, possibly, discussions, you know, that high

8     levels were found.  That's basically how I would

9     characterize that.

10  Q.  And who found these high levels, these assumed high levels

11     you said?

12  A.  No response to that one.

13  Q.  Refuse to answer?

14  A.  Refuse.

15  Q.  Did the individual or entity who found these high levels

16     of formaldehyde, was that Gulf Stream people?

17  A.  Refuse to answer.

18  Q.  Okay.  What was the ultimate strategy once the issue

19     arose, the formaldehyde issue, what was the strategy to

20     deal with it?

21  A.  Refuse to answer.

22  Q.  What actions were taken by Gulf Stream to address this

23     formaldehyde issue once it arose?

24  A.  Refuse to answer at this time.

25  Q.  What change in component parts, if any, were made once

1    this formaldehyde issue arose?

2  A.  Refuse to answer.

3  Q.  What contact or communication, if any, did you or people

4    working with you at Gulf Stream have with FEMA about this

5    formaldehyde issue once it arose?

6  A.  Refuse to answer.

7  Q.  Did you have any personal contact with anyone from the

8    government, whether it be FEMA, any of the health

9    organizations, whatnot, once this formaldehyde issue

10    arose?

11        MR. WEINSTOCK:  Can I have a continuing objection

12       to all of this?

13        MR. BUZBEE:  Yes.

14        MR. WEINSTOCK:  Go ahead.  You can respond

15       however you choose, sir.

16  A.  Refuse.

17  BY MR. BUZBEE:

18  Q.  Okay.  What was the ultimate resolution, if any, about

19    this formaldehyde issue once you learned it arose?

20  A.  Refuse to answer.

21  Q.  Who else besides yourself was aware within Gulf Stream of

22    this formaldehyde issue?

23  A.  Refuse to answer.

24  Q.  Can you tell me when any coworkers or people you were

25    working for learned about this formaldehyde issue?

Page 38

1   A.   Refuse.

2   Q.   Now, haven't you previously told me that you learned about

3        this issue before the last trailer was delivered?

4   A.   I did.

5   Q.   Okay.  So you haven't given me the date or you won't give

6        me the approximate date.  But what you will tell me is it

7        was before the last trailer was delivered to FEMA?

8   A.   That I was aware of that, yeah.

9   Q.   Okay.  Were there others within Gulf Stream who were aware

10       of the formaldehyde issue before the last trailer was

11       delivered?

12  A.   Assumably.

13  Q.   Did you discuss that issue with anyone within Gulf Stream,

14       this formaldehyde issue before the last trailer was

15       delivered to FEMA?

16  A.   Refuse to answer at this time.

17  Q.   Okay.  What instructions, if any, were you given by

18       individuals from Gulf Stream as to how to deal with this

19       formaldehyde issue?

20  A.   Refuse.

21  Q.   What instructions were you given by anyone at Gulf Stream

22       as to how to interact or what information to pass to FEMA

23       about this formaldehyde issue?

24  A.   Refuse to answer.

25  Q.   What conversations have you had since you left Gulf Stream

Midwest Reporting, Inc.                                574-288-4242

Page 39

1    about this formaldehyde issue with people from Gulf

2    Stream?

3  A.   Refuse to answer at this time.

4  Q.   What have you been promised, if anything, from Gulf

5    Stream?

6         MR. WEINSTOCK:   Object to the form, specifically

7      to that one.

8  BY MR. BUZBEE:

9  Q.   Regarding your testimony in this case?

10  A.   Nothing.

11  Q.   What requests have you made of Gulf Stream regarding

12    your -- other than this Exhibit 1 -- regarding your

13    testimony in this case?

14  A.   Nothing.

15         MR. BUZBEE:   I may have some more questions, but

16      I'm going to pass the witness for now.

17                    CROSS-EXAMINATION

18  BY MR. WEINSTOCK:

19  Q.   Hi, Mr. Dudek.   I introduced myself to you outside.   I'm

20    Andy Weinstock.   I'm going to give you my card.   At the

21    point in time when you actually retain a lawyer, will you

22    please have him call me right away?

23  A.   Yes.   And it could be as early as this afternoon.

24  Q.   Then let me give you my cell phone number on that card as

25    well.   I want to be clear about this since you are going

Page 40

1      to hire a lawyer.  Don't call me directly.  Have your

2      lawyer call me.

3   A.  I shall.

4   Q.  Going back to 2004, it was my understanding that you had

5      some involvement in quality control, correct?

6   A.  Correct.

7   Q.  But that did not include wood products, correct?

8   A.  That did not include?

9   Q.  Wood products?

10  A.  Wood products.  Well, given that wood products is an

11      essential component of an RV and I was responsible for the

12      ultimate quality of it, I would say the answer was

13      certainly I was responsible for that as well.

14  Q.  Fair enough.  You said that from time to time there were

15      things that required you to get involved with when there

16      was an issue with component parts; is that right?

17  A.  Yes.

18  Q.  Did units go out in 2004 that you felt should not go out

19      of the plant?  Did they leave the plant?

20  A.  No response at this time.

21  Q.  Did -- when Mr. Buzbee was asking you questions about what

22      he called the formaldehyde issue, that arose first in

23      2005, to your knowledge?

24  A.  It arose during the manufacture of the 50,000 units.

25  Q.  Whatever year that was, it was during the 50,000?

Page 52

```
 1   A.   Is that a rhetorical question?

 2   Q.   No.  It's a question I'm asking you to answer.  Did anyone

 3        working on my behalf, at least that you knew was working

 4        on my behalf, offer you anything?

 5   A.   No.

 6   Q.   Okay.  You're saying, you told Mr. Weinstock that multiple

 7        people called you.  They didn't outright offer you money,

 8        but they made it clear, at least in your mind, that they

 9        were willing to give you something for testifying?

10   A.   That's absolutely true.

11   Q.   How many people did that?

12   A.   Three or four.  I didn't take it seriously, so it wasn't

13        something that was very important to me.

14   Q.   Okay.  And when was the last time that happened?

15   A.   Probably about six weeks ago or so.  I mean, is it beyond

16        the realm of imagination that somebody would do that?

17   Q.   Again, I don't know.  I'm trying to find out from you what

18        happened.

19   A.   Okay.  That was my answer.

20   Q.   See, the way I got you to come here is I just subpoenaed

21        you.

22   A.   Right.

23   Q.   That's how it's supposed to be done.  But let me explore

24        this because you've suggested that individuals working on

25        behalf of victims, is what Andy called them, offered you
```

Page 53

1      something.  In your mind it was clear they were offering

2      you something to testify.

3  A.  Yes.

4  Q.  Okay.  You said that happened three or four times?

5  A.  Yes.

6  Q.  The last time it happened was about six weeks ago?

7  A.  A couple months ago, yeah.  And I don't have -- no, I

8      don't have records of it and I can't -- you know, I can't

9      give you any documented -- I can't give you any

10     documentation of that happening.

11 Q.  Okay.  At the time you did not have caller ID you said?

12 A.  I don't think I did, no.

13 Q.  Okay.  And you don't know even the first name of anyone

14     calling you?

15 A.  I don't, no.

16 Q.  How did you know they were representing victims?

17 A.  Because they were -- I refuse to answer the question.

18 Q.  You refuse to answer.  Okay.  You just -- you won't tell

19     me how you knew they were representing victims.  You just

20     would tell me you believe they were representing victims?

21          MR. WEINSTOCK:  Object to the form.

22 A.  Well, yes.  They implied that they were.

23 BY MR. BUZBEE:

24 Q.  And they had told you they were lawyers?

25 A.  No.  They didn't exactly say lawyers.  Working on behalf