# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER      *     MDL NO. 1873
        FORMALDEHYDE PRODUCTS   *
        LIABILITY LITIGATION     *     SECTION "N" (5)
                                   *
                                   *     JUDGE ENGELHARDT
                                   *     MAGISTRATE CHASEZ
                                   *

THIS DOCUMENT IS RELATED TO          *
                                   *
*Charlie Age, et al v. Gulf Stream Coach*    *
*Inc., et al,* Docket No. 09-2892;         *
Alana Alexander, individually and on behalf of    *
Christopher Cooper                 *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## AFFIDAVIT OF ALEXIS MALLET, JR

**STATE OF LOUISIANA**
**PARISH OF LAFAYETTE**

**BEFORE ME,** the undersigned authority, on this day, personally appeared:

### Alexis Mallet, Jr.

Who, first being sworn, upon her oath deposed and stated that the information contained in the attached report is true and accurate to the best of his knowledge.

_____
Alexis Mallet, Jr.

Sworn to and subscribed
before me this 19th day of May, 2009.

_____ #: 2/56 4/
NOTARY PUBLIC

My commission expires _G / ciferish_

ALX-EXP-44-000001

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #322 through #330, #336 through #355 for test procedures of sealing furnace and duct system and return air grills.

Please Enclosure 14, Suburban Manufacturing Company.

s.   Infrared Thermography Survey:

    i.   To the extent possible, an infrared thermographic survey was performed on the interior of the building during the envelope air leakage tests and the furnace and air-conditioning duct leakage testing. Not all areas were easily accessible to perform a survey utilizing a BS20 CHECK MODEL NUMBER Flir Infrared camera. The survey was performed for the purposes of identifying anomalies in the walls, ceilings and floors of the Alexander temporary housing unit. Air and moisture leaks or condensation would show as temperature differentials noted by the variations of color during the survey. A number of these anomalies were photographed using both the Flir BS20 infrared camera and a digital camera photographing the areas corresponding to the infrared photographic images.

    ii.   The infrared photographic images can be found in Enclosure 1c, Infrared Thermographic Images by First General Services of the South, Inc. dated May 7, 2009. The digital photographs can be found in Enclosure 1a, First General of the South, Inc.'s Photographs. The corresponding images / photographs are noted below:

        1.   Infrared Photograph #1 - Digital Photograph #357

            a.   This is the rear, right corner area of the bedroom indicating moisture.

        2.   Infrared Photograph #2 - Digital Photograph #358

Page -66-

ALX-EXP-44-000067

    a.    This is the area of the air-conditioning unit in the kitchen / living room area. This is toward the front of the housing unit.

3.    Infrared Photograph #3 - Digital Photograph #359

    a.    This is the rear side of the air-conditioning unit located in the kitchen / living room area. For an overview of that location, please see First General Services of the South's Photograph #361.

4.    Infrared Photograph #4 - Digital Photograph #360

    a.    This is the area below the window in the living room / kitchen area.

5.    Infrared Photograph #5 - Digital Photograph #369

    a.    This is in the kitchen / living room area. Indications are considerable heat gain in the corners and cold spots at various areas possibly indicating gaps in the insulation near the framing.

6.    Infrared Photograph #6 - Digital Photograph #370

    a.    Further indications of cold and hot areas in the ceiling and ceiling to wall connection. Air infiltration is occurring in these areas. The envelope is apparently not well sealed for air infiltration. The area is also has some gaps in insulation creating hot spots in the ceiling.

7.    Infrared Photograph #7 - Digital Photograph #371

ALX-EXP-44-000068

a.    This is the area around the bunkbeds. Heat infiltration was noted at the roof to wall intersection. There also appears to be inadequate insulation covering this area.

8.    Infrared Photograph #8 - Digital Photograph #371

a.    This is in the lavatory area. Separation in the insulation as well as air infiltration at the roof to wall connection was noted.

9.    Infrared Photograph #9 - Digital Photograph #372

a.    This is at a different angle of the ceiling and wall area of the lavatory area.

10.   Infrared Photograph #10 - Digital Photograph #373

a.    This is the area in the bathroom lavatory over the mirror.

11.   Infrared Photograph #11 - Digital Photographs #374 and #375

a.    This is the converter cabinet. Heat is projecting from the cabinet as a result of a breach in the belly and the hole in the floor in the converter closet.

12.   Infrared Photograph #12 - Digital Photographs #376 and #377

a.    This is right wall at the bunkbed area.

13.   Infrared Photograph #13 - Digital Photograph #379

a.    This is the front wall of the bunk area.

Page -68-

ALX-EXP-44-000069

14. Infrared Photograph #14 - Digital Photograph #380

    a. This is the bathroom area.

15. Infrared Photograph #15 - Digital Photograph #381

    a. This is the rear, left corner of the bathtub.

16. Infrared Photograph #16 - Digital Photograph #382

    a. This is the area of the right, rear corner over the bathtub.

17. Infrared Photograph #17 - Digital Photographs #383, #384, #385, and #386

    a. This is the area inside the converter cabinet where the penetration in the floor was observed.

t. Warnings:

    i. Noted throughout our study and review of documents was repeated warnings related to various items regarding the operation and the use of the Gulf Stream housing unit. The warnings are as follows:

        1. Warnings regarding cooking and the use exhaust vents and a reminder the occupant must provide and adequate supply of fresh air for combustion. It also states, "Unlike homes, the amount of air in an RV is less due to its limited size (volume). Proper ventilation when using cooking appliances will avoid the dangers of asphyxiation."

        2. One of issues that has not been presented to any extent in this report thus far is the overall size of this housing unit. This housing unit measures

Page -69-

ALX-EXP-44-000070

it should not have come as any surprise to anyone listening to the news reports that the temporary housing needs for the multitudes of people left homeless would last for years.

5.   The manufacturer knew or should have known that the use of formaldehyde-emitting materials would be a problem for the occupants.  Even the use of low-formaldehyde emitting materials would create a problem because of the disproportionate ratio of low formaldehyde emitting wood and other building products in relationship to the relatively small, box-style, temporary housing unit.  Even low amounts of formaldehyde emissions from each of the building products will create a higher concentration of emissions in such a small unit.

6.   All of the wall panels, ceiling panels, cabinets, built-in furniture, floor sheeting and roof sheeting are constructed with materials that emitted formaldehyde. Some of the materials such as the roof sheeting are regular panels that were not manufactured to reduce formaldehyde-emitting levels.

The manufacturer's representative admitted in his deposition that some units were manufactured with regular panels, not of the low-formaldehyde emission type, because of a lack of quality control in one of the plants.  Materials that previously were ordered as low formaldehyde emission materials were sent and being used even though they did not meet the low formaldehyde standards.

7.   The construction means, methods and materials utilized in the Alexander family's temporary housing unit contributed to the elevated formaldehyde levels. The wall-to-floor intersection, the wall to ceiling intersection, and other openings in the walls, floor, and ceiling systems were not sealed to prevent unfiltered air filtration or movement to the Alexander's housing unit.  The FEMA Model Travel Trailer Procurement Specifications required that "All exterior openings... will be weatherproof sealed to prevent air and moisture penetration."  The language goes on to state again that these are minimum standards and it (the FEMA trailer) **shall be constructed with superior grade quality of workmanship**. (Emphasis added.)

8.   The air-conditioning duct system is not properly sealed to prevent uncontrolled air leakage into the ceiling cavity and exterior of the housing unit.  As the supply side of the air-conditioning system is emptied air into the ceiling cavity and the outside atmosphere, the return air side of the unit is drawing or pulling

Page -96-

ALX-EXP-44-000097

air into the wall and ceiling cavities and into the living space from the exterior to make up for the air that being expelled as a result of poor workmanship and a lack of proper supervision on the part of Gulf Stream. This has created a negative air pressure in the Alexander's unit. Air was sucked into the unit from the outside without filtration or conditioning. This contributed to the additional release of formaldehyde into the envelope of the unit especially when the temperature and humidity on the exterior were elevated above the interior temperatures and humidity of the Alexander unit. The negative air pressure pulled in hot, humid, contaminated air into the wall and ceiling system. The hot, moist air contributed to the release of formaldehyde from the unsealed backs and edges of the materials containing formaldehyde. This is a code violation and it is not superior grade quality workmanship.

9.   The furnace duct system is also not properly sealed. The same conditions described above with the air-conditioning ducts are occurring regarding the creation of negative air pressure from the furnace duct system. In this situation, however, the leaking ducts create a condition conducive to drawing in fumes from the furnace and the stove hood vent. The furnace exhaust and fresh air intake are very near the entry door of the temporary housing unit. It is a code violation to have a condition that is conducive to drawing the exhaust fumes of the furnace and is not superior quality grade workmanship.

10.  The temporary housing unit was placed on blocks during its installation on the Alexander's property. The instructions found on the scissor jacks of the trailer states that the weight of the unit should not be taken off the wheels. In jacking the unit and not sufficiently supporting the frame, the installation contractor created a condition conducive to the interior panels warping in the bedroom on the front and rear walls and in the bathroom. It was reported by Ms. Alexander that this warping was noted when she moved into the temporary housing unit. It is understood Ms. Alexander spoke with her contact person at FEMA and was told to place duct tape over the seam of the buckled wall panel.

Fluor, the installation contractor, failed to give adequate directions to its employees of how to jack all of the corners and centers of the temporary housing unit. A review of Exhibit 7 failed to disclose and directions provided to the field people on how to jack up these units. It appears the units were jacked up on the corners one or two at a time and then the blocking was placed to support those areas. This apparently placed unnecessary stress on the

Page -97-

ALX-EXP-44-000098

14.     The manufacturer failed to comply with the required NFPA and ANSI codes regarding the construction of recreational vehicles and the manufacturer's guidelines regarding duct leakage of the furnace system and air-conditioning system.

15.     The manufacturer produced a product that was unreasonably dangerous because it failed to apply and use techniques, technology, materials and workmanship available in 2004 to achieve the new FEMA procurement specification of 0.016 ppm for formaldehyde emissions.

The benefits to the manufacturer that would be achieved to switching to alternative design and construction practices as it relates to the Alexander family's housing unit would be:

1.      Avoiding health related issues concerning the Alexander family;

2.      Avoidance or reduction of litigation costs; and

3.      The probable avoidance of loss of hundreds of millions of dollars paid by the taxpayers, occupants and manufacturers if temporary housing units have to be destroyed.

The burden to the manufacturer in switching to alternative design and construction methods would be:

1.      The cost of installing a vapor barrier on the exterior side of the walls;

2.      The cost of additional sealants at the top and bottom plates;

3.      In the alternative, the replacement of fiberglass insulation with a closed cell spray polyurethane foam insulation that would seal the walls, prevent air and moisture passage through the wall and ceiling cavities, add strength to the structure, and prevent condensation from form in the wall, keep the A/C ducts sealed, and ceiling systems when temperatures reach the dew point.

4.      The cost of adding fresh air ventilation to the unit (This item may well be eliminated had the Alexander's unit been manufactured with closed cell SPF insulation. No more air exchanges would probably have been enough to

Page -99-

ALX-EXP-44-000100