UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
|     FORMALDEHYDE | * | |
|     PRODUCTS LIABILITY | * | |
|     LITIGATION | * | SECTION:  N(5) |
| | * | |
| This Document Relates to: | * | |
| *Charlie Age, et al. v.* | * | JUDGE: ENGELHARDT |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | |
| | * | MAG: CHASEZ |

*******************************************************************************

**MEMORANDUM IN SUPPORT OF GULF STREAM COACH, INC.'S
MOTION *IN LIMINE* TO EXCLUDE
<u>EXPERT TESTIMONY OF WILLIAM D. SCOTT</u>**

**MAY IT PLEASE THE COURT:**

Gulf Stream Coach, Inc. respectfully submits the following Memorandum in Support of its Motion *in Limine* to Exclude Expert Testimony of William D. Scott.

### I.   BACKGROUND

**A.   Nature of Case**

This Multi-District Litigation is the consolidation of over one hundred-twenty state and federal toxic tort suits in which thousands of named plaintiffs claim to have inhabited emergency housing units ("EHUs") that were provided to them by the Federal Emergency Management Agency ("FEMA") as a result of the alleged uninhabitability of their residences due to Hurricanes Katrina and Rita.  Following denial of class certification, several plaintiffs, including bellwether plaintiffs Alana Alexander and Christopher Cooper (hereinafter collectively referred to as "Alexander"), filed suit against Gulf Stream Coach, Inc., alleging that it manufactured the EHUs used by the specific plaintiffs. (*Age, et al v. Gulf Stream Coach, Inc., et al*, 09-2892, Doc. No. 1).  Moreover, plaintiffs have named as defendants the United States Government through

FEMA and Fluor Enterprises, Inc. (*Age,* Doc. No. 1), and plaintiffs seek recovery for alleged physical and mental pain and suffering, physical impairments and disability, medical expenses, loss of earnings capacity, loss of enjoyment and quality of life, loss of consortium, travel expenses, out-of-pocket expenses, and the loss of use and/or opportunity to use safe and adequate shelter allegedly resulting from the purported exposure to formaldehyde. (*Age*, Doc. No. 1, ¶ 117). Specifically, the *Age* plaintiffs claim exposure to the allegedly dangerous levels of formaldehyde (or threat thereof) in those EHUs. (*Age*, Doc. No. 1, at ¶ 23). Alexander itemized the theories of recovery against Gulf Stream Coach, Inc., in part, as follows:

1. Failing to design the EHU so as to not emit allegedly dangerous levels of formaldehyde;

2. Manufacturing an allegedly unreasonably dangerous EHU;

3. Providing an EHU that did not conform to express warranties allegedly made by Gulf Stream Coach, Inc.; and

4. Failing to warn of the allegedly excessive levels of emissions of formaldehyde and hazards associated with the allegedly excessive levels of formaldehyde emissions in the EHU.

(*Age*, Doc. No. 1, at ¶ 102).

## II.   ADMISSIBILITY OF EXPERT OPINIONS

### A.   Rules 702, 703, *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and Its Progeny

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony. The trial judge serves as a gatekeeper to keep out expert testimony that is based solely on speculation or unsupported conclusion. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-590 (1993). In *Daubert*, the Supreme Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but it is also reliable. *See, Kumho Tire Co. v. Carmichael*, 526 U.S. 137

2

(1999). A party seeking to admit expert testimony bears the burden of demonstrating that the expert's findings and conclusions are based on the scientific method, and therefore, is more reliable. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). And where such testimony's factual basis, data, principles, methods, or their application are called into question, the trial judge is required to determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. *Kumho Tire*, 526 U.S. at 149. This requires an objective, independent validation of the expert's methodology. *Moore*, 151 F.3d at 276. The expert's mere assurance that he has used generally accepted scientific methodology is insufficient. *Id*. The proponent of the expert's testimony must prove to the judge by a preponderance of the evidence that the testimony is reliable. *Id*. Thus, the goal of the court is to ensure that that expert's opinion is based on sufficient data and an appropriate methodology such that the opinion is connected to the facts by more than conclusory assertions of the expert.

Rule 703 focuses on the data underlying the expert's opinion. *In Re TMI Litigation*, 193 F.3d 613, 697 (3rd Cir. 1999). As part of its gatekeeper role, the trial court must ensure that the underlying facts and/or data upon which a proffered expert's opinion is based are in and of themselves reliable. If an expert's opinion is based on unreliable facts, the opinion must be excluded. *See In Re TMI Litigation*, 193 F.3d at 697. That is, Rule 703's reliability standard is similar to Rule 702's reliability requirement in that there must be good grounds on which to find the data reliable. *Id*. Rule 703 permits an expert to rely on hearsay, so long as that hearsay is of the kind normally employed by experts in the field. *Id*. (*citing In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1245 (E.D. N.Y. 1985)).

In *Daubert*, the Supreme Court enunciated a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the expert's methodology is scientifically

valid or reliable. *Moore*, 151 F.3d at 275 (*citing Daubert*, 509 U.S. at 593-595). These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id*.

In addition to the guiding principles set forth in *Daubert*, other factors relevant to the consideration of whether an expert's testimony and opinions are sufficiently reliable so as to allow their admission are as follows: (1) whether the expert is proposing to testify about matters growing naturally and directly out of the expert's research conducted independent of the litigation or whether the expert has developed the opinion expressly for the purpose of testifying in the litigation; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as she would be in her regular professional work outside of her paid litigation consulting; and (5) whether the field of expertise claimed by the expert is known to reach reliable results consistent with the type of opinion the expert is giving. *See e.g. Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998) (*en banc)*; *Sheehan v. Daily Racing Form, Inc.*, 104 F. 3d 940, 942 (7th Cir. 1997); *Daubert v. Merrill Dow Pharmaceuticals, Inc.* 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*); and *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994).

1.      Scott's Predicted Formaldehyde Concentration is Based on Flawed Methodology and is Insufficiently Reliable to Satisfy the *Daubert/Kumho* Threshold.

Scott tested the Alexander EHU on two separate occasions. The "initial sampling event" took place on January 28 and 29, 2008. Exhibit "A," Affidavit of William D. Scott (May 18, 2009) at pp. 5-8. Scott reported a formaldehyde concentration of 0.05 ppm. *Id.* Scott's "second sampling event" occurred on May 6 and 7, 2009. *Id.* at pp. 5-6; 8. The Court ordered that Plaintiffs will not be allowed to use the May 2009 test results. (Doc. Nos. 1547 and 2062).

Scott, nevertheless, attempts to explain why the results from his second sampling event differed from the result obtained during his initial sampling event. *Id.* at 8. Ignoring the fact that this opinion is entirely dependent on the inadmissible May 2009 testing, Scott's only support for this opinion is the ASTM International (ASTM) standard test method for determining formaldehyde concentration in air and emission rates from wood products using a large chamber. *Id.* and Exhibit "B," ASTM E 1333-96 (2002), *Standard Test Method for Determining Formaldehyde Concentrations in Air and Emission Rates from Wood Products Using a Large Chamber.*

Scott's reliance on the ASTM test method when opining about the effect that temperature and humidity have on formaldehyde is the same "illustration" that plaintiffs' civil engineering expert, Marco Kaltofen, attempted to demonstrate in his report. Notably, when this Court asked Kaltofen to specifically identify his "opinions," the calculations based on the ASTM correction formulas were not offered. (Rec. Doc. 2816, Ex. "A"). This is likely because the equations referenced in ASTM E 1333-96 (2002) are not reliable when measuring formaldehyde concentrations in indoor air. The ASTM correction formulas are based on the Berge equation to

5

"correct" formaldehyde concentrations inside of a large chamber and cannot reliably be used to correct actual temperature and humidity conditions inside of an EHU.

The ASTM test method referenced by Scott was not designed to measure formaldehyde levels for indoor air. Exhibit "B." Rather, ASTM E 1333-96 (2002) was designed to provide a standard means of testing, under strict conditions (inside of a chamber), certain building products that have formaldehyde emission limitations. *Id.* Also, the Berge equation was specifically created as a mathematical model to describe the influence of various parameters on formaldehyde concentration in *the atmosphere of a chamber* containing *particleboard*. Exhibit "C," A. Berge, Mellegaard, *Formaldehyde Release from Particleboard- Evaluation of a Mathematical Model* 251-55 (Holz als Roh-und Werkstoff, 38, 1980). Even Berge himself recognized that the mathematical relations used in the chamber testing are of model character only, and therefore, they cannot be transferred uncritically to every board system. *Id.*

Scott used the ASTM correction equations (based on the Berge formula) and reached the same conclusion that Kaltofen reached regarding temperature - that a 5° Fahrenheit rise in temperature yields a 36% "correction factor." Exhibit "A," at p. 8. Scott therefore concludes that the ASTM temperature correction factor increases the formaldehyde concentration inside the Alexander EHU to 0.068 ppm. *Id.* This was the same temperature correction "illustrated" by Kaltofen.

Scott, however, does not offer any explanation for how the ASTM correction equations support his final "corrected value of 0.084 ppm." *Id.* Presumably, this figure is also based on Scott's calculations using the ASTM equation to correct for relative humidity. If so, then the mathematics employed by Scott are incorrect. Kaltofen performed the same ASTM correction to the standard 50% relative humidity. Kaltofen's calculation yielded a 6% correction factor for

6

relative humidity, so that his corrected temperature value of 0.068 ppm became 0.072 ppm. Exhibit "D," Affidaivt of Kaltofen (May 19, 2009) p. 14.  This is not the same result reached by Scott.  Scott's correction for relative humidity resulted in a corrected value of 0.084 ppm. Exhibit "A," at p. 8.  Gulf Stream suspects that while Scott may have referenced the ASTM correction equations, his relative humidity corrections were not actually calculated using that formula.  This is likely because the correction factors in the ASTM test method only provide for a conversion to the standard 50% relative humidity.  But it appears as though Scott corrected the 46.6% relative humidity reported in the "initial sampling event" to 69.9% relative humidity reported on May 6-7, 2009.  *Id.*  If this is the case, then Scott modified the ASTM correction formula to arrive at his own "corrected value of 0.084 ppm."  Scott's "corrected value" is either a backdoor attempt to introduce the May 2009 test results or Scott's application of the ASTM correction formula is mathematically inaccurate.  Either way, this opinion is inadmissible.

2. <u>Scott's Theories Have Not Been Tested, Are Not Generally Accepted Within the Scientific Community, and Have Not Undergone Peer Review within the Meaning of the Term as Required by *Daubert*</u>

There are no relevant scientific studies supporting the use of temperature and humidity correction factors when conducting passive air sampling to predict formaldehyde concentration of *inside air* from *multiple wood sources.*  There is no indication or evidence to show that Scott's opinion or his "methodology" has been published in any type of scientific journal so that others in the field may assess the scientific validity of Scott's approach.  In addition, the methodology employed in measuring formaldehyde levels for indoor air is not so specific or limited so as to have escaped publication.  The use of correction factors creates too much of an uncertainty when measuring indoor air because of the many variables which influence formaldehyde release.

Without any significant peer review, it goes without saying that Scott's methodology is not one that has been generally accepted in the scientific community.

Gulf Stream asserted this same argument when it filed its motion in *limine* to exclude the expert opinions of Marco Kaltofen. (Rec. Do. 2271-2). Even at that time, plaintiffs, in their response to Gulf Stream's motion, made no attempt to rebut this position. (Rec. Doc. 2484). Plaintiffs did not offer any scientific studies, journals, or publications supporting the use of temperature and humidity correction factors when measuring indoor air. *Id.* The only argument submitted by plaintiffs was that Kaltofen was simply using the ASTM correction factors as an "illustration" of the temperature and humidity dependence of formaldehyde. *Id.* at p. 7. Plaintiffs then stipulated that "nowhere did [Kaltofen] attempt to substitute a 'corrected' result for an actual test result." *Id.* Scott, however, has demonstrated in his report that temperature and humidity correction factors "results in a corrected value of 0.084 ppm." Exhibit "A," at p. 8. This opinion is unreliable and should be excluded. ASTM correction equations were never intended to correct actual temperature and humidity conditions measured in indoor air. Scott's application of the ATSM formulas in his respect has not been tested, is not generally accepted within the relevant scientific community, and has not undergone peer review within the meaning of the term required by *Daubert*.

        3.      <u>The Berge Formula has a substantial and unquantifiable rate or error.</u>

The Berge formula has no quantifiable rate of error. Even the protocol for ASTM E 1333-96 (2002) notes that "the greater the variance between actual and corrected temperature, the greater the potential error." Exhibit "B," at p. 6. In fact, the temperature conversion table cited by ASTM (based on the Berge formula) does not even attempt to predict corrected formaldehyde concentrations when there is more that a 5° Fahrenheit deviation from the standard

8

temperature. *Id.* The average temperature and humidity during the period Alana Alexander and Christopher Cooper resided in the unit was larger than the range of values used in the ASTM correction formulas, which is only 5° Fahrenheit. Exhibit "D," p. 14. Even Kaltofen admitted that his claculations fell outside the range of values used in the ASTM correction formulas. Scott's calculations, which are based on the same data, are likewise outside of the range of values used in the ASTM correction formulas. If the rate of error for the correction formulas cannot be quantified within a 5° Fahrenheit variance, then Scott's calculations are even less quantifiable and are subject to an even greater potential for error. Not to mention the fact that Scott incorrectly applied the relative humidity correction formula.

Correction equations, such as the Berge formula, are predictors of formaldehyde concentration and are only intended to describe the influence of certain climatic factors when conducting laboratory testing. Scott's opinions based on the temperature and humidity conversion factors for formaldehyde are a prediction at best.

      4.      <u>Other Courts Have Rejected the Berge Formula As Unreliable When Testing Indoor Air.</u>

In *Wallace,* the Court affirmed the trial court's decision excluding the opinions of plaintiff's expert, Thaddeus Godish, Ph.D., concerning the use of the Berge equation to extrapolate formaldehyde concentrations in a manufactured home because the methodology was not generally accepted in the relevant scientific community. *Wallace v. Meadow Acres Manufactured Housing Inc.*, 730 N.E.2d 809 (Ind. Ct. App. 2000), trans. denied, (Ind. Feb. 5, 2001). On October 8, 1994, Dr. Godish tested the air inside of plaintiff's manufactured home by obtaining ambient air samples. *Id.* at 812-13. Dr. Godish reported indoor temperature of 71.5° Fahrenheit and indoor relative humidity of 70%. *Id.* In order to determine the formaldehyde levels that would have been present at 78° Fahrenheit, Dr. Godish applied the Berge equation.

9


*Id.* Using this formula, he determined that formaldehyde levels would have been as high as .17 ppm if the home had been heated to 78° Fahrenheit. *Id.*

The Court in *Wallace* concluded that Dr. Godish's use of the Berge equation was unreliable for several reasons. *Wallace*, 730 N.E.2d at 813-17. First, there is no general acceptance in the relevant scientific community for use of the Berge equation to "correct" ambient air formaldehyde level measurements in a manufactured home and certainly not when only one sample is analyzed. *Id.* at 815. Second, Dr. Godish's theory cannot be empirically tested because he relied on numerous variables which were not preconditioned. *Id.* Third, his theory and methodology lack substantial peer review. *Id.* Finally, his theory and methodology have a substantial and unquantifiable rate of error – Dr. Godish admitted that the Berge equation by itself has a rate of error no less than ± 12%. *Id.* at 816.

### III. CONCLUSION

William Scott does not offer any explanation for how the ASTM correction equations support his final "corrected value of 0.084 ppm." Scott's use of the ASTM correction equations to prove temperature and humidity dependence of formaldehyde concentrations in indoor air is unreliable when testing indoor air and should be excluded as part of the Court's "gatekeeping" function under *Daubert*.

Respectfully Submitted,

**DUPLASS, ZWAIN, BOURGEOIS, PFISTER, & WEINSTOCK**

s/Andrew D. Weinstock
_____
**ANDREW D. WEINSTOCK #18495**
**JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700

        Fax: (504) 837-3119
        andreww@duplass.com
        jglass@duplass.com

        and

        **SCANDURRO & LAYRISSON**
        **Timothy D. Scandurro #18424**
        **Dewey M. Scandurro #23291**
        607 St. Charles Avenue
        New Orleans, LA 70130
        Telephone: (504) 522-7100
        tim@scanlayr.com
        dewey@scanlayr.com
        **Counsel for Defendant, Gulf Stream Coach, Inc.**

## CERTIFICATE OF SERVICE

      I hereby certify that on the 13th day of September, 2009, a copy of the foregoing Memorandum in Support of Gulf Stream Coach, Inc.'s Motion *in Limine* to Exclude Expert Testimony of William D. Scott was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to all known counsel of record by operation of the court's electronic filing system.

                s/Andrew D. Weinstock
                _____
                ANDREW D. WEINSTOCK #18495