UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE PRODUCTS | * | |
| | LIABILITY LITIGATION | * | SECTION "N" (5) |
| | | * | |
| | | * | JUDGE ENGELHARDT |
| | | * | MAGISTRATE CHASEZ |
| | | * | |
| THIS DOCUMENT IS RELATED TO | | * | |
| | | * | |
| *Charlie Age, et al v. Gulf Stream Coach* | | * | |
| *Inc., et al*, Docket No. 09-2892; | | * | |
| Alana Alexander, individually and on behalf | | * | |
| of Christopher Cooper | | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S BRIEF IN SUPPORT OF JAMES P. KORNBERG'S, M.D., SC.D.**
***DAUBERT* HEARING**

Plaintiff Alana Alexander ("Ms. Alexander" or "Plaintiff") respectfully provides this Court a "Brief In Support of James P. Kornberg's, M.D., Sc.D. *Daubert* Hearing," regarding Dr. Kornberg's Risk Assessment and Medical Monitoring Opinions.

**Background**

In Gulf Stream Coach, Inc.'s ("Gulf Stream") "Motion in *Limine* to Exclude Expert Testimony of James P. Kornberg, M.D., SC.D.", Gulf Stream argues that Dr. Kornberg's opinions should be excluded on the grounds that (1) Dr. Kornberg's general causation opinion is unreliable as he fails to demonstrate that formaldehyde is capable of causing Christopher Cooper's illnesses; (2) Dr. Kornberg's internal and external causation opinions fail to satisfy *Daubert* standards; (3) Dr. Kornberg's use of regulatory risk assessment is inappropriate as it is unreliable methodology; and (4) Dr. Kornberg's medical monitoring opinion is unreliable as based on risk and is harmful to Christopher

1

Cooper's health.  Rec. Doc. 2769-2.  Subsequent Plaintiff's response, Rec. Doc. 2984, this Court ultimately denied Gulf Stream's motion in *limine* with respect to Dr. Kornberg's causation opinions finding reliability, but has requested a brief *Daubert* hearing to discuss Dr. Kornberg's risk assessment and medical monitoring opinion.  Dr. Kornberg's *Daubert* hearing is scheduled for Monday, September 21, 2009 of which this memorandum serves as a brief supplement.

**I.      The *Daubert* Analysis.**

The *Daubert* analysis requires expert testimony to be reliably based upon scientific methods. *Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994). "*Daubert* explains that the language of Rule 702 requiring the expert to testify to scientific knowledge means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Id*. (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590 (1993)).  Although not inclusive, these following concepts have been articulated as factors to guide the Court's assessment of reliability: (1) whether the theory or technique can be tested, (2) whether the theory or technique has been subjected to peer review, (3) whether there is a high rate of known or potential error, (4) whether there are standards controlling the technique's operation, and (5) whether the theory enjoys "general acceptance".  *Daubert*, 509 U.S. at 593-94; *see also Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998).

**II.     Dr. Kornberg's Risk Assessment of Christopher Cooper is Reliable.**

This Court has raised concerns regarding the reliability of Dr. Kornberg's risk assessment opinion. Although Gulf Stream claims otherwise, risk assessment has gained acceptability amongst all branches of government and provides a reliable means to calculate carcinogenicity.[1]

### A.   EPA Risk Assessment Satisfies *Daubert.*

The United States Supreme Court's plurality decision in *Industrial Union Dep't, ALF-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980), recognized the reliability of risk assessment and established a solid legal foundation for its practice. As noted in Exhibit A, Dr. Kornberg's September 17, 2009 Affidavit, the methodology for regulatory risk assessment is recognized and relied upon by the Environmental Protection Agency (EPA) and the Agency for Toxic Substances and Disease Registry (ATSDR), and as such, Dr. Kornberg uses the risk assessment variables established by the EPA. Exhibit A, September 17, 2009 Affidavit of James P. Kornberg, M.D.,Sc.D., p. 2-5. Moreover, the EPA describes risk assessment as a process that generates "scientific information" in a manner that is "credible, objective, realistic and balanced" without consideration of "non-scientific factors." EPA Risk Assessment Council, Guidance for Risk Assessment 4 (Nov. 1991); *see also* William D. Ruckelshaus, *Science, Risk, and Public Policy*, 221 Science 1026, 1027-28 (1983) (noting a pledge by EPA's then-administrator that "risk assessment at EPA must be based only on scientific evidence and scientific consensus.

---

[1]   Executive Order No. 12,866, 58 Fed. Reg. 51,735, 51,736 (1993); Risk Assessment Improvement Act of 1994, H.R. 4306, 103d Cong., 2d Sess. (1994); *Natural Resources Defense Council v. EPA*, 824 F.2d 1146 (D.C. Cir. 1987); *see also* Exhibit C, Deposition Testimony of James P. Kornberg, M.D.,Sc.D., p. 156.

Nothing will erode public confidence faster than suspicion that policy considerations have been allowed to influence the assessment of risk.").

In an attempt to restrict the applicability of regulatory risk assessments, Gulf Stream misconstrues *Allen v. PE Eng'g. Corp.*,102 F.3d 194 (5th Cir. 1996), as rejecting EPA risk assessment.  *Allen* involved the exclusion of experts who used a "weight of the evidence" analysis *similar* to those employed by regulatory agencies.  However, contrary to Gulf Stream's implications, the Fifth Circuit did not affirm the exclusion of experts based on their use of risk assessment.  The Fifth Circuit precluded the use of the experts on the grounds that no studies existed supporting an association between the toxin and the claimed injury.  Here, Dr. Kornberg established, upon clearly peer-reviewed medical literature, that there exist an excess risk of developing nasopharyngeal and/or sinonasal cancers or pre-cancerous nasal epithelial changes in persons exposed to formaldehyde at levels comparable to those sustained by Christopher Cooper. [2] [3] [4] [5] *See also* Exhibit C, p. 152-54.  Furthermore, in *Allen*, the Fifth Circuit dealt with a causation analysis in a traditional tort case, where, as in this case, Dr. Kornberg's risk assessment serves as the preliminary basis used to determine whether a need for medical monitoring exists for those risks of cancer.  *See* Exhibit C,

---

[2]     Vaughn, T. et al, *Occupational exposure to formaldehyde and wood dust and nasopharyngeal carcinoma*, OCCUP. ENVIRON. MED. 2000 (57) 376-384.

[3]     Shahan, J., et. al, *DNA-protein cross-links and p53 protein expression in relation to occupational exposure to formaldehyde*, OCCUP. ENVIRON. MED. 2003 (60) 403-409.

[4]     Holmstrom, M., et. al., *Histological Changes in the Nasal Mucosa in Persons Occupationally Exposed to Formaldehyde Alone and in Combination with Wood Dust*, ACTA OTOLARYNGOL (STOCKH), 1989 (107) 120-129.

[5]     Edling, C., *Occupational exposure to formaldehyde and histopathological changes in the nasal mucosa,"* British Journal of Industrial Medicine, 1988 (45) 761-765.

4

p. 162 ("So consequently, when you compare the risk that – that this young man has incurred, under – under these exposure experiences, and it turns out to be 17 times what the EPA has identified, that – that was the go/no-go decision, in my opinion, for deciding whether there was a medical monitoring program.").

Furthermore, in 1997, the United States Supreme Court again noted the reliability of risk assessment in *General Electric Co. v. Joiner*, 522 U.S. 136 (1997).  Although the Court upheld the exclusion of experts under an abuse of discretion standard, the Supreme Court stated:

> It is not intrinsically "unscientific" for experienced professionals to arrive at a conclusion by weighing all available scientific evidence-this is not the sort of "junk science" with which *Daubert* was concerned. After all . . . the Environmental Protection Agency (EPA) uses the same methodology to assess risks. . . And using this methodology, it would seem that an expert could reasonably have concluded that the study of workers at an Italian capacitor plant, coupled with data from Monsanto's study and other studies, raises an inference that [polychlorinated biphenyl]'s promote lung cancer.

*Id*. at 153-54.  Thus, as implicitly recognized by the Supreme Court, Dr. Kornberg's use of EPA risk assessment, based on published toxic associations of formaldehyde, is a sound and reliable science.

### B. MRL or IRIS Values Are Not Applicable to Risk Assessment.

In a seeming attempt to confuse the rather basic calculation of risk assessment, Gulf Stream asserts that Dr. Kornberg's calculations are unreliable because of the minimum risk level (MRL) for chronic exposure and EPA's integrated risk information system's (IRIS) values.  However, both MRL and IRIS values do not apply to Dr. Kornberg's risk assessment.  ATSDR explicitly states that "MRLs are based on

5

noncancer health effects only and are not based on a consideration of cancer effects." Agency for Toxic Substances and Disease Registry (ATSDR), *Minimal Risk Levels (MRLs) for Hazardous Substances*, http://www.atsdr.cdc.gov/mrls/, *last visited* Sept. 18, 2009. Here, Dr. Kornberg's risk assessment calculation is limited to carcinogenic risks. Furthermore, with regard to IRIS values, Dr. Kornberg does not rely on such values as evidenced in the lack of testimony or mention in Dr. Kornberg's May 19, 2009 Affidavit.[6] Instead, Dr. Kornberg relies on the EPA modeling for Residential Air Screening Levels. Exhibit B, May 19, 2009 Affidavit of James P. Kornberg, M.D.,Sc.D., p. 29. This EPA methodology is specifically designed to establish a risk-based concentration that is irrevocably correlated with the risk of developing cancer or non-cancer endpoints. In the case of formaldehyde, the EPA risk-based concentration is established at 0.155 ppb and is given a designation that indicates that formaldehyde is a carcinogen whose non-cancer screening level is less than 100 times its cancer screening level. Exhibit B, p. 29; Exhibit C, p. 161.

Ultimately, if one is exposed to 0.155 ppb for 30 years, one sustains a formaldehyde dose of 4.65 ppb-years and has an excess risk of one in 10 $E^{-6}$ of developing cancer.[7] *See* Exhibit B, p. 29-30; *see also* Exhibit A, p. 2-6. Christopher

---

[6] It should be noted that Gulf Stream erroneously states that Dr. Kornberg's calculations are based on the linear non-threshold model. The terms were not mentioned once in Dr. Kornberg's May 19, 2009 Affidavit and was briefly discussed to the extent of the EPA's risk assessment. Affidavit C, p. 220.

[7] A perhaps helpful analogy in calculating risk assessment is the basic formula for calculating distance. To calculate distance, one multiplies time and rate (i.e. time X rate = distance). As applied to risk assessment, the variable for rate and distance are replaced with exposure level and yearly dose, respectively (i.e. time X exposure = yearly dose). The EPA states a risk of cancer exists when a yearly dose of formaldehyde equals 4.65 ppb-years. Thus, based on the formula, this yearly dose is calculated from a 0.155 exposure for 30 years: 0.155 X 30 = 4.65 ppb-years.

6

Cooper was exposed to 50 ppb over 1.58 years and thus sustained an airborne dose of formaldehyde of 79 ppb-years. This "dose" of formaldehyde is 17 times greater than the EPA dose establishing risk of cancer. Thus, because the EPA risk assessment of formaldehyde provides a bright line to determine whether a future risk of cancer exists and therefore whether medical monitoring is necessary, the results pertaining to Christopher Cooper warrant and support Dr. Kornberg's prescription of medical monitoring.

### III. Dr. Kornberg's Prescription of Medical Monitoring Is Reliable.

The Louisiana Supreme Court recognizes that the reasonable cost of medical monitoring is a compensable item of damage under LA. CIV. CODE ART. 2315. *Bourgeois v. A.P. Green Indus., Inc.*, 716 So.2d 355 (La. 1998). To recover such costs, a plaintiff must satisfy certain criteria, with proof being offered via competent expert testimony:

> 1) significant exposure to a proven hazardous substance; 2) as a proximate result of this exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease; 3) plaintiff's risk of contracting a serious latent disease is greater than (a) the risk of contracting the same disease had he or she not been exposed and (b) the chances of members of the public at large of developing the disease; 4) a monitoring procedure exists that makes the early detection of the disease possible; 5) the monitoring procedure has been prescribed by a qualified physician and is reasonably necessary according to contemporary scientific principles; 6) the prescribed monitoring regime is different from that normally recommended in the absence of exposure; and, 7) there is some demonstrated clinical value in the early detection and diagnosis of the disease.

*Scott v. American Tobacco Company, Inc.*, 949 So.2d 1266, 1282-83 (La. 4th Cir. 2007). Typically, a medical monitoring expert provides testimony to prove the "other elements-exposure, risk of disease, and the necessity for medical monitoring," and thus must accordingly meet *Daubert* qualifications. *Rhodes v. E.I. du Pont de Nemours and*

7

*Co.*, 2008 WL 2400944, *11 (S.D.W.Va., July 11, 2008).

Based on the risk assessment of Christopher Cooper, Dr. Kornberg prescribes a medical monitoring protocol to address Christopher Cooper's current and future medical conditions.[8]  Exhibit B, p. 27.  As noted above and in the May 19, 2009 Affidavit, Dr. Kornberg's risk assessment opinion is based on reliable, sound science that establishes that Christopher Cooper is at a seventeen times greater risk of developing nasopharyngeal and/or sinonasal cancer.

Although Gulf Stream attempts to exaggerate Dr. Kornberg's medical monitoring opinion as excessive and potentially dangerous to Christopher Cooper, Dr. Kornberg's methodology for his monitoring recommendations is sound.  Exhibit A, p. 5-8; Rec. Doc. 2769-2, p. 22 ("Cooper stands to pay the ultimate price.  Kornberg has proposed a series of CT scans and chest x-rarys as part of Cooper's monitoring elements.").  As noted in Dr. Kornberg's May 19, 2008 Affidavit, Mr. Cooper will not receive a single x-ray or CT scan unless it is clinically indicated as part of his medical monitoring for his aggravated asthma condition, "[t]he elements of the intervention beyond a clinical evaluation would include the obtaining of MRI, CT scan, x-ray, endoscopy, biopsy and appropriate laboratory tests, as determined by the evaluating specialist."  Exhibit B, p. 27 (emphasis added).  Dr. Kornberg recognizes the importance of leaving discretion to the treating physician and has not provided an absolute prescription for medical monitoring.  Exhibit C, p. 214.

---

[8]   Dr. Kornberg has extensive experience in designing and implementing medical monitoring programs for regulatory agencies and major corporations.  *See*  Exhibit C, p. 15.

Furthermore, while Gulf Stream accurately quotes the American Cancer Society as recommending that "cancers of nasal cavity and paranasal sinus" should not be subject to routine testing, Gulf Stream's statements that Dr. Kornberg's findings would implicate world-wide testing of men is unsupported.   Rec. Doc. 2769-2, p. 21, 23.  The American Cancer Society recommendation is clearly limited to only "those people at average risk for cancer (unless otherwise specified) and without any specific symptoms."  American Cancer Society, http://www.cancer.org/docroot/PED/content/PED_2_3X_Chronological_History_of_ACS_Recommendations_on_Early_Detection_of_Cancer.asp?sitearea=PED, *last visited* Sept. 18, 2009.  Having incurred seventeen times the EPA lifetime target risk increase of $1E^{-6}$ in only nineteenth months of occupancy in his trailer, Christopher Cooper is not at an average risk of developing nasopharyngeal cancer.  As such, Dr. Kornberg's findings do not implicate the mass-prescription of testing to all men.  Instead, Dr. Kornberg provides a reasonable medical management plan tailored to Christopher Cooper's future medical probabilities.

## Conclusion

Therefore, because risk assessment is founded in the overtures of regulatory agencies and has been recognized as *Daubert* sound by the United States Supreme Court, Dr. Kornberg's risk assessment is reliable.  Thus, based on Dr. Kornberg's risk assessment calculations, Dr. Kornberg properly establishes the medical monitoring associated to assessing Christopher Cooper's increased medical risks.  Dr. Kornberg's opinion does not advocate "inevitable irridation," but reasonably prescribes that the treating physician determine the appropriate testing based on ongoing evaluations.  Exhibit B, p. 27.  The opinions proferred by Dr. Kornberg are thus reliable and warrant

inclusion, and any remaining issues are best resolved by the method advocated by Justice Stevens in *Joiner*:

> Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.... Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment, FED. RULE CIV. PROC. 50(a), and likewise to grant summary judgment, FED. RULE CIV. PROC. 56.... These conventional devices, rather than wholesale exclusion under an uncompromising general acceptance test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.

*Joiner*, 522 U.S. 136 at 152 (Stevens, J. concurring and dissenting in part) (citing *Daubert*, 509 U.S. at 596). For these reasons, Plaintiff respectfully submits the foregoing as support for Dr. Kornberg's risk assessment and medical monitoring opinions.

        Respectfully submitted:

        **FEMA TRAILER FORMALDEHYDE**
        **PRODUCT LIABILITY LITIGATION**

        BY: _____
             MIKAL WATTS, Texas # 20981820

        **COURT-APPOINTED PLAINTIFFS'**
        **STEERING COMMITTEE**
        ANTHONY BUZBEE, Texas # 24001820
        RAUL BENCOMO, #2932
        FRANK D'AMICO, #17519
        MATT MORELAND, #24567
        LINDA NELSON, #9938
        DENNIS REICH, Texas #16739600

        <u>s/Gerald E. Meunier</u>
        GERALD E. MEUNIER, #9471

**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:    504/528-9973
gmeunier@gainsben.com

s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:    504/528-9973
jwoods@gainsben.com


## CERTIFICATE OF SERVICE

   I hereby certify that I have served a copy of the above and foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing on August 28, 2009.


 s/Gerald E. Meunier
GERALD E. MEUNIER, #9471