## AFFIDAVIT OF JAMES P. KORNBERG, M.D., SC.D.
## SEPTEMBER 17, 2009

In the State of Colorado
County of _OURAY_ :

BEFORE ME, the undersigned authority, on this day, personally appeared:

### JAMES P. KORNBERG, M.D., SC.D.

Who, first being sworn, upon his oath deposed and stated that the information contained in the attached is true and accurate to the best of his knowledge.

James P. Kornberg, M.D., Sc.D.

Sworn to and subscribed before me this 17th day of September.

NOTARY PUBLIC

# 20074028205

7/23/2011
My commission expires

In response to this Court's concerns regarding my risk assessment and medical monitoring opinions, I, James P. Kornberg, respectfully provide the methodology and support for such opinions. My primary objectives after performing an environmental medical causation analysis for Mr. Christopher Cooper are, first, to address, scientifically, his risk for future illness and next to identify a medical plan to reduce the risk for future adverse, disease-related consequences.  My medical management objectives are directed specifically to his potentially recurring asthma and upper airway problems and to his risk for the development of nasopharyngeal and/or sinonasal cancer.

### Risk Assessment Methodology

My quantitative analysis of Mr. Cooper's risk is based upon the core toxicological paradigm that the dose of a toxin is calculated by multiplying a biologically available exposure level times a duration of exposure.  This premise is explained in Patty's Industrial Hygiene and Toxicology where "[w]ith data on the degree of exposure it is possible for the epidemiologist to detect dose-response relationships that can aid in confirming a causal relationship between an agent and a disease. If the degree of exposure is accurately known over time, a dose-response relationship, which can be used to estimate safe levels of exposure, may be calculated."[1]

I take this premise and Residential Air Screening Levels established by the EPA to determine the risks resulting from Mr. Cooper's 19 month exposure to

---

[1] Lynch, Jeremiah R., "Measurement of Worker Exposure, " Chapter 2, in Harris, Robert L, et. al, Patty's Industrial Hygiene and Toxicology, Volume 3, Part A, 3rd edition, John Wiley and Sons, New York, 1994, p33-34.

formaldehyde.  Based upon EPA modeling for Residential Air Screening Levels, risk-based concentrations (RBCs) for various chemical exposures establish the concentration level necessary to increase one's lifetime risk of developing cancer by one additional chance in a million ($10^{-6}$).  "Generic SLs [screening levels - RBCs] are based upon default exposure parameters and factors that represent Reasonable Maximum Exposure (RME) conditions for long-term/chronic exposures and are based on the methods outlined in EPA's <u>Risk Assessment Guidance for Superfund, Part B Manual</u> (1991) and <u>Soil Screening Guidance documents</u> (1996 and 2002)."[2]  As established in the <u>EPA Risk Assessment Guidance for Superfund, Part B Manual</u> "[f]or carcinogenic effects, a concentration is calculated that corresponds to a $10^{-6}$ incremental risk of an individual developing cancer over a lifetime as a result of exposure to the potential carcinogen from all significant exposure pathways for a given medium."  The calculated RBC for airborne formaldehyde exposure is 0.155 ppb.  If one is exposed to this level of formaldehyde residentially for 30 years (conservatively 24 hours/day for 350 days/year), one will incur the (70 year) lifetime target risk of one additional chance in a million ($10^{-6}$) of developing cancer.[3]

This calculation provides the basis in which to determine the risk associated with durational exposure to formaldehyde, and as noted in the

[2] EPA RBC User's Guide, Mid-Atlantic Risk Assessment, 9/18/08, http://www.epa.gov/reg3hscd/risk/human/rb-concentration_table/usersguide.htm.
[3] EPA Risk Assessment Guidance for Superfund: Volume 1 – Human Health Evaluation Manual (Part B, Development of Risk-based Preliminary Remediation Goals) Interim, EPA/540/R-92/003, Publication 9285.7-01B, December 1991, p 14.

Principles of Risk Assessment,[4] a standard textbook for the field of Environmental and Occupational Medicine, **"[t]he EPA is mandated to set a maximum contaminant level at which the risk of cancer is increased by only one in a million over a human lifetime of 70 years. This is over and above the background risk of 250,000 in a million."** The Principles of Risk Assessment is an established reference resource in the field of Environmental and Occupational Medicine.   It is, for example, a reference textbook used in the MPH (Master of Public Health) program at the Medical College of Wisconsin.[5]

Furthermore, the Agency for Toxic Substance and Disease Registry (ATSDR) in a Public Health Assessment, defines its Cancer Risk Evaluation Guides (CREGs) as "estimated contaminant concentrations that would be expected to cause no more than one excess cancer in a million ($10^{-6}$) persons over their lifetime.   ATSDR's CREGs are calculated from US EPA's cancer potency factors (CPFs)."[6]  This is further noted by the ATSDR:

> To determine whether the level of contaminants could pose a health threat, ATSDR screens the concentrations of contaminants against health based comparison values (CVs) and researches scientific literature which may document health effects caused by exposure to contaminants.… CREGs are estimated contaminant concentrations expected to cause no more than one excess cancer in a million persons over a lifetime and are calculated from EPA's cancer slope factors (SFs) using default values for exposure rates.[7]

---

[4] Dalefield, Rosalind R., Oehme, Frederick W. and Kreiger, Gary R., Chapter 6, "Principles of Risk Assessment," in Sullivan, John, B. and Krieger, Gary R., Clinical Environmental Health and Toxic Exposures, Second Edition, Lippincott, Williams and Wilkins, Philadelphia, 2001, p. 88 (ISBN 0-683-08027-X).
[5] http://www.mcw.edu/mphprogram/CurrentStudents/Textbooks.htm .
[6] ATSDR Public Health Assessment, Mallard Bay Landing Bulk Plant, Grand Cheniere, Cameron Parish, Louisiana, 7/23/02, prepared by the Louisiana Department of Health and Hospitals/Office of Public health Under a Cooperative Agreement with the ATSDR.
[7] ATSDR Health Consultation, Washington County Air Quality (a/k/a Marietta Air Emissions), Marietta, Washington County, Ohio, March 2003.

Thus, relating the above paragraphs regarding the guidelines established by EPA and ATSDR to the toxicological paradigm of "the dose of a toxin is calculated by multiplying a biologically available exposure level times a duration of exposure," Mr. Cooper's "dose" has the mathematical units of "ppb" (parts per billion in air) times "duration of exposure" (years) or **ppb-years**. Because there are defined consequences of sustaining a specific level of dose, one can certify the existence of a dose response relationship.

My analysis of Mr. Cooper's risk, therefore, embodies the notion recognized by EPA and ATSDR[8] that there are toxicological consequences to his sustaining an airborne exposure to formaldehyde (conservatively 50 ppb) over the 19 months (i.e. - 1.58 years) that he spent living in his converted trailer. His "dose" was 50 ppb times 1.58 years or **79 ppb-years.** As noted above, the EPA calculated RBC for an airborne formaldehyde dose associated with this target risk is 0.155 ppb time 30 years or **4.65 ppb-years.**  Mr. Cooper, **as a child age 10-11,** sustained an airborne dose of formaldehyde that was **17 times (79 ppb-years/4.65 ppb-years)** the EPA 70 year lifetime target risk level in just 19 months (1.58 years).

### Medical Monitoring Methodology

Before reaching a medical monitoring decision for Mr. Cooper, as an individual patient, I adhered to the prerequisite criteria and scientific methodology

---

[8] Branch of the US Department of Health and Human Services

that governs such a decision when addressing the needs of an exposed group of individuals.

Under its "Phase I Exposure Criteria for Considering Medical Monitoring," the ATSDR states:

- "A. There should be evidence of contaminant levels in environmental media that would suggest the high likelihood of environmental exposure to a hazardous substance and subsequent adverse health outcomes.[9]

- "B. There should be a well-defined, identifiable target population of concern in which exposure to a hazardous substance at a sufficient level has occurred...."[10]

The prerequisite of "high likelihood," in Part A is exceeded in Mr. Cooper's case where the term "high probability," could be substituted.   In Part B, Mr. Cooper himself is the identifiable target person in whom, as previously established,   "exposure to a hazardous substance at a sufficient level has occurred."

When considering the need for medical monitoring or surveillance in a community following the probable establishment of threshold exposure and biological availability, several important factors must be considered. As noted in Textbook of Clinical Occupational and Environmental Medicine, "a medical surveillance program must be predicated on the early detection of the effects of an exposure, at a point where intervention can prevent disease or disability.

---

[9] Federal Register: July 28, 1995 (Volume 60, Number 145; Notices; Pages 38840-38844).
[10] Ibid.

Where significant exposure to one or more toxic agents has occurred, medical evaluation can detect pathophysiologic changes."[11]

To the extent that sinonasal cancer is epidemiologically associated with formaldehyde exposures, Schottenfeld[12] clearly indicates that the 1, 5 and 10 year survival rates are all higher for localized versus regional, and distant sinonasal cancers. This establishes that early intervention in the identification and treatment of early stage cancer of the nasal passages is beneficial, thus supporting the efforts of a medical monitoring program for Mr. Cooper.

Furthermore, under its "Phase I Outcome Criteria for Considering Medical Monitoring," the ATSDR states:

- A. There should be documented human health research that demonstrates a scientific basis for a reasonable association between an exposure to a hazardous substance and a specific adverse health effect (such as an illness or change in a biological marker or effect).[13]

- B. The monitoring should be directed at detecting adverse health effects that are consistent with the existing body of knowledge and amenable to prevention or intervention measures…

  In addition, the adverse health effects (disease process, illness, or biomarkers of effect) should be such that early detection and treatment or intervention interrupts the progress to symptomatic disease, improves the quality of life of the individual, or is amenable to primary prevention.[14]

---

[11] Gochfeld, Michael, MD, PhD, "Community Hazardous Waste Exposures," in Rosenstock, L. MD, MPH, <u>Textbook of Clinical Occupational and Environmental Medicine</u>, 2nd edition, Elsevier Saunders, Philadelphia, 2005, p. 1180.
[12] Littman, A. et al., Chapter 30 "Cancers of the Nasal Cavity and Paranasal Sinuses," in Schottenfeld, D. and Fraumeni, J.F., Jr.,ed, <u>Cancer Epidemiology and Prevention</u>, 3rd Edition, Oxford University Press, New York, 2006, p 606 and 611
[13] Federal Register: July 28, 1995 (Volume 60, Number 145; Notices; Pages 38840-38844
[14] Ibid. 38841-42.

The ATSDR requires only a "reasonable association between an exposure to a hazardous substance and a specific adverse outcome."   In Mr. Cooper's case, his exposure and subsequently calculated dose are correlated with not only a "**reasonable association**" but the **probable correlation** between exposure and subsequent dose.

Further, as implied in Section B and noted in my standard operational guidelines, all of the elements of a medical monitoring program must have proven medical and scientific value.[15]   The decision to perform any scheduled invasive tests, whether instrumental (e.g. endoscopy) or de-facto (e.g. x-ray or CT scan), is determined by the examining physician at the time of the clinical examination, and invasive tests should only be ordered if there is a clinical indication for diagnostic purposes.   Generally, early detection and compliance with cancer surveillance will consist of looking in Mr. Cooper's nose, and taking further appropriate diagnostic steps as directed by the "evaluating specialist [physician],[16]" necessary to preserve Mr. Cooper's health.

---

[15] Kornberg, James P., Kornberg's Operational Guidelines in Occupational Medicine; Volume I – the Workplace Walk-Through – Operational Guidelines for the Physician – including "PATHMAX™ – Parametric Approach Toward Health Maximization," – A Methodology upon which Medical Surveillance Programs are Designed and Implemented, and Rational Guidelines for Approaching the Occupational and Environmental Medical Causality Analysis; Lewis Publishers, Inc. (CRC Press), Chelsea, Michigan, 1992.
[16] Kornberg, J.P., "Christopher J. Cooper, Environmental Medical Causation Analysis," 5/19/09, p. 27