UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
|     FORMALDEHYDE | * | |
|     PRODUCTS LIABILITY | * | |
|     LITIGATION | * | SECTION: N(5) |
| | * | |
| This Document Relates to: | * | |
| *Charlie Age, et al. v.* | * | JUDGE: ENGELHARDT |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | |
| | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**GULF STREAM COACH, INC.'S BRIEF RELATED TO
THE *DAUBERT* HEARING TO EXCLUDE
EXPERT TESTIMONY OF JAMES P. KORNBERG, M.D., SC.D.**

**MAY IT PLEASE THE COURT:**

Gulf Stream Coach, Inc. respectfully provides this Court a Brief related to the *Daubert* Hearing to Exclude Expert Testimony of James P. Kornberg, M.D., SC.D. Gulf Stream also reiterates the same arguments previously cited in its Motion *in Limine* to exclude the expert testimony of James P. Kornberg.

  A.  **EPA Risk Assessment does not satisfy *Daubert***

It is disconcerting that Plaintiffs have suggested to this Court that *Industrial Union Dep't ALF-CIO v. Am. Petroleum Inst.* is the Supreme Court's recognition of the **reliability** of risk assessment and the establishment of a "solid legal foundation for its practice." (Rec. Doc. 3442 at p.3). The Supreme Court in *Industrial Union* was concerned that Congress might have unconstitutionally delegated legislative power to the Secretary of Labor by granting the Secretary sweeping authority to set permanent health standards under section 6(b)(5) of the Occupational Safety and Health Act

("OSHA"). 29 U.S.C. s 655(b)(5). *Industrial Union Dep't ALF-CIO v. Am. Petroleum Inst.,* 448 U.S. 607 (1980). The Court ultimately affirmed the Fifth Circuit's holding which limited the Secretary's power by construing section 6(b)(5) as implicitly requiring the Secretary to make a threshold finding that "significant" occupational risks are present before promulgating any permanent health standard. *Id.* at 642. *Industrial Union* chiefly examined the scope of the Secretary's rulemaking authority under section 6(b)(5), not the reliability of risk assessment for purposes of *Daubert.*

The Supreme Court's plurality decision interpreting the powers afforded to the Secretary of Labor under OSHA has nothing to do with the reliability of EPA risk assessment or whether they satisfy *Daubert.* That is the issue before this Court; an issue that correctly should raise concern when an expert relies on those regulatory risk assessments as an appropriate methodology when opining about specific causation and medical monitoring.

Plaintiffs have repeatedly argued that Gulf Stream is attempting to "restrict the applicability of regulatory risk assessments." (Rec. Doc. 3442 at p.4). But, in fact, Plaintiffs are making every attempt to broaden the applicability of regulatory risk assessments, which are largely developed for regulatory purposes only. Risk assessments do not provide information about actual risk or causation. *See* Bernard D. Goldstein & Mary Sue Henifin, *Reference Guide on Toxicology in Federal Judicial Center Reference Manual on Scientific Evidence* 413 (2d ed. 2000). "Because of their use of appropriately prudent assumptions in areas of uncertainty and their use of default assumptions when there are limited data, risk assessments intentionally encompass the upper range of possible risks." *Id.; see also Sutera v. Perrier Group of Am. Inc.*, 986

F.Supp. 655, 664 (D.Mass.1997) (rejecting regulatory standards as a measure of causation because the purpose of regulatory standards is to reduce public exposure to harmful substances); *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir.1996)); *O'Neal v. Dep't of the Army*, 852 F.Supp. 327, 333 (M.D.Pa.1994) (determining that risk figures based on the EPA's upper-bound estimates for another chemical are appropriate for regulatory purposes in which the goal is to be particularly cautious but overstate the actual risk and so, are inappropriate for use in determining whether medical monitoring should be instituted.).

B.  **Kornberg's medical monitoring opinion is unreliable because it does not satisfy the criteria outlined by *Bourgeois v. A.P. Green Indus., Inc.* and his opinion is admittedly "discretionary" and "not absolute."**

Plaintiffs claim that Gulf Stream "attempts to exaggerate Dr. Kornberg's medical monitoring opinion as excessive and potentially dangerous to Christopher Cooper." (Rec. Doc. 3442 at p.8).  Plaintiffs' argue that Kornberg "recognizes the importance of leaving discretion to the treating physician and has not provided an absolute prescription for medical monitoring." *Id.*  Plaintiffs continue, "Kornberg…reasonably prescribes that the treating physician determine the appropriate testing based on ongoing evaluations." *Id.* at p. 9.  Plaintiffs' comments support Gulf Stream's position that Kornberg cannot offer a reliable medical monitoring opinion.

The court in *Bourgeois*, as cited in Plaintiff's brief, requires that a medical monitoring procedure be "prescribed" by a qualified physician.  *Bourgeois v. A.P. Green Indus., Inc.,* 716 So.2d 355, 361 (La. 1998); citing, *Hansen v. Mountain Fuel Supply Co.* 858 P.2d at 970, 980 (Utah 1993).  Kornberg, however, has admittedly not provided an absolute prescription for medical monitoring.  (Rec. Doc. 3442 at p.8) and

(Rec. Doc. 3442-2 at p.8). Kornberg's monitoring regime "might be of theoretical value, but if a reasonable physician would not prescribe it for a particular plaintiff," then recovery should not be allowed. *Hansen,* 858 P.2d at 980. There may be several reasons why the physician will not prescribe a medical monitoring program. *Id.* For instance, "the benefits of the monitoring would be outweighed by the costs, which may include, among other things, the burdensome frequency of the monitoring procedure, its excessive price, or its risk of harm to the patient." *Id.*

Gulf Stream argues that the benefits of Kornberg's "discretionary" and "non-absolute" medical monitoring opinion are greatly outweighed by several factors. First, the burdensome frequency of Kornberg's monitoring procedure. Kornberg estimates that Cooper, for the rest of his life, will have to **annually** see his primary care MD, a specialist MD, report to a laboratory, undergo a pulmonary function test, undergo respiratory therapy, and take medications. (Rec. Doc. 3442-3 at p.32). Kornberg then estimates that Cooper, for the rest of his life, every three years will have to undergo a CT scan and an MRI. *Id.* Kornberg further estimates that Cooper, for the rest of his life, every five years will have to undergo x-rays, nursing care, contingency referral and treatment (including a dermatologist), and home care (including nebulizer). *Id.* Kornberg then estimates that Cooper, for the rest of his life, every ten years will require an estimated three or four days of hospitalization. *Id.* Kornberg then estimates that Cooper, over the course of forty years, every five years will require an endoscopy and biopsy. *Id.* Kornberg also estimates that Cooper, for the rest of his life after age forty, every twenty years will require physical and rehabilitative services. *Id.*

The second factor that outweighs Kornberg's "discretionary" and "non-absolute" medical monitoring opinion is the recommended $617,495.00 that it will cost to fund such a program. (Rec. Doc. 3442-3 at p. 29). Since Kornberg admits that he has not prescribed an absolute program, it follows, then, that the cost of that program is also not absolute. Kornberg's entire opinion is mere speculation. Kornberg's speculation is especially troublesome in light of the fact that the American Cancer Society **does not recommend** routine testing for cancers of the nasal cavity and paranasal sinuses, these cancers are simply too rare. (Rec. Doc. 2769-2 at p. 21). Kornberg not only recommends routine testing for these cancers, he recommends it for "at least" the next forty years, at a grand total of $617,495.00.

The third and most important factor that outweighs Kornberg's "discretionary" and "non-absolute" medical monitoring opinion is the risk of harm to Christopher Cooper. Gulf Stream explained in its motion *in limine* to exclude Kornberg's opinions that each CT scan and chest x-ray recommended by Kornberg as a monitoring/screening test poses a cancer risk to Cooper. (Rec. Doc. 2769-2 at p. 22-23). Each CT scan, for example, poses a cancer risk 2.56 times greater than Cooper's alleged risk from formaldehyde in his EHU. *Id.* The total cancer risk from multiple CT scans over Cooper's remaining lifetime (assuming the life expectancy for black males is 69.7 years)[1] is a 48.7 times greater risk than his alleged risk from formaldehyde in his EHU. *Id.* If Cooper were monitored only for 40 years - Kornberg's latency interval for nasal cancer[2] - Cooper's CT risk would still be 33.3

---

[1] Melonie Heron, Ph.D., et al., *National Vital Statistics Report,* Vol. 57 No. 14 (April 17, 2009.)

[2] Kornberg's Table in Appendix "B" of his report states CT scans for a lifetime, while his report twice states 40 years or more because Kornberg assumed a 40 year latency interval.

times greater than his alleged risk from formaldehyde in the EHU.  (Rec. Doc. 2769-2 at p. 22-23).  Kornberg has proposed a medical monitoring program that will pose a greater cancer risk than the incident leading to medical monitoring.

Plaintiffs' only opposition to this argument is that  "Cooper will not receive a single x-ray or CT scan," unless determined by Cooper's *evaluating* specialist. (Rec. Doc. 3442 at p. 8).  Plaintiffs' own statement reaffirms Dr. Pacheco's prior testimony that the examination of a patient "cannot be outsourced" when formulating medical opinions.  (Rec. Doc. 2769-5 at p. 13).  Kornberg has never evaluated Cooper; therefore, he is not in a reliable position to speculate about the necessity of medical monitoring in this case.

**C. Kornberg opines that Cooper needs at least forty years of medical monitoring because of a <u>0.0016%</u> increase in risk from the admittedly conservative EPA risk assessment screening level for indoor air.**

Kornberg's "discretionary" and "non-absolute" medical monitoring opinion is not only misleading to the jury, it is entirely dependent upon the EPA risk-based concentration (screening level) of 0.155 ppb for thirty years. (Rec. Doc. 3442-3 at p. 30-31).  Based on this screening level, Kornberg concludes that the dose of formaldehyde over a thirty-year period of residence that will lead to an excess risk of cancer of **one in a million** is 4.65 ppb-years[3] - EPA's "screening level" for residential air.  *Id.* and (Rec. Doc. 3442-2 at p. 2-5).  Kornberg then attempts to demonstrate how this EPA regulatory screening level relates to Cooper.  *Id.*  Kornberg begins by taking Cooper's alleged "time weighted average exposure" of 50 ppb and multiplying it by the

---

[3] (0.155 ppb) multiplied by (30 years) = 4.65

19 months (1.58 years) that Cooper resided in the EHU.  (Rec. Doc. 3442-3 at p. 30-31).  This number equates to 79 ppb-years.  *Id.*

Kornberg's then calculates the "risk quotient" to compare Cooper's 19-month inhalation dose of 79 ppb-years to the EPA's inhalation dose of 4.65 ppb-years.  *Id.*  The risk quotient is simply calculated by dividing 79 ppb-years by 4.65 ppb-years.  *Id.*  This number totals 16.98, which Kornberg rounded up to an even 17.0.  *Id.*  Kornberg's "risk quotient" value has already been cited to the jury by Plaintiffs' counsel during opening arguments, when it was stated that Cooper has a "17 times more chance, 17 more bullets in the gun, if you will, to get cancer."  Tr. Transcr. vol. 1, 141:20-22 (Sept. 14, 2009).

But Kornberg made no attempt in his report to demonstrate what this number actually represents.  The EPA's position is that 4.65 ppb-years dose of formaldehyde over a thirty-year period of residence will lead to an excess risk of cancer of **one in a million** – a 0.0001% risk.  (Rec. Doc. 3442-3 at p. 30-31).  Kornberg's opinion is that Cooper was exposed to 79 ppb-years dose of formaldehyde over a 19-month period.  *Id.*  The intent of a risk quotient was to compare the difference between Cooper's estimate of exposure and the EPA's "one in a million" excess risk of cancer value of 4.65 ppb-years.   The risk quotient of 17.0 means that Cooper's 79 ppb-years dose of formaldehyde over a 1.58 year period will lead to an excess risk of cancer of **seventeen in a million** – a 0.0017% risk.   This is a **<u>0.0016%</u>** risk difference from the EPA's regulatory screening level for residential air.  Kornberg has therefore recommended "at least" forty-years of medical monitoring for Cooper, at a total cost $617,495.00, based on a 0.0016% alleged increase in the EPA's "target" risk level.

Considering the fact that the EPA risk assessment intentionally encompasses the upper range of possible risks, and is inappropriate for use in determining whether medical monitoring should be instituted, Kornberg's calculated 0.0016% difference from the EPA regulatory screening level is an unreliable and inappropriate benchmark to recommend a forty year medical monitoring program.

## CONCLUSION

Kornberg's medical monitoring opinion is based on EPA's upper-bound estimates for formaldehyde, which are appropriate for regulatory purposes where the goal is to be particularly cautious but overstate the actual risk.  Therefore, the EPA risk assessment values are inappropriate for use in determining whether medical monitoring should be instituted.  The medical monitoring regime implemented by Kornberg is admittedly "discretionary" and "non-absolute" and therefore will be of no assistance to the trier of fact.  This is especially true in light of the fact that Kornberg never examined Cooper.  Finally, Kornberg's entire medical monitoring opinion is based on a **0.0016%** risk difference from the EPA's regulatory risk assessment.

          Respectfully Submitted:

          **DUPLASS, ZWAIN, BOURGEOIS,**
          **PFISTER & WEINSTOCK**

          s/Andrew D. Weinstock
          _____
          **ANDREW D. WEINSTOCK #18495**
          **JOSEPH G. GLASS #25397**
          3838 N. Causeway Boulevard, Suite 2900
          Metairie, Louisiana 70002
          (504) 832-3700
          (504) 837-3119 (FAX)
          andreww@duplass.com
          jglass@duplass.com

and

**SCANDURRO & LAYRISSON**
**Timothy D. Scandurro #18424**
**Dewey M. Scandurro #23291**
607 St. Charles Avenue
New Orleans, LA 70130
(504) 522-7100
(504) 529-6199 (FAX)
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc.**

# C E R T I F I C A T E

I hereby certify that on the 20th day of September, 2009, a copy of the foregoing Gulf Stream Coach, Inc.'s Brief Related to the *Daubert* Hearing to Exclude Expert Testimony of James P. Kornberg, M.D., Sc.D. was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com