**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE PRODUCTS | * | |
| | LIABILITY LITIGATION | * | SECTION "N" (5) |
| | | * | |
| THIS DOCUMENT IS RELATED TO | | * | JUDGE ENGELHARDT |
| *Charlie Age, et al v. Gulf Stream Coach* | | * | MAGISTRATE CHASEZ |
| *Inc., et al*, Docket No. 09-2892; | | * | |
| Alana Alexander, individually and on behalf | | * | |
| of Christopher Cooper | | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL OR, ALTERNATIVELY, FOR RELIEF FROM JUDGMENT

**MAY IT PLEASE THE COURT:**

Pursuant to the provisions of Rule 59 and/or Rule 60 of the Federal Rules of Civil Procedure (FRCP), plaintiff Alana Alexander, individually and on behalf of her minor son Christopher Cooper, respectfully moves for a new trial and/or for relief from judgment as to all claims presented in the September 14-24, 2009 jury trial of plaintiff's case against the defendants Gulf Stream Coach, Inc. and Fluor Enterprises, Inc.  The instant motion is necessary and appropriate in response to the jury verdict of September 24, 2009 and resulting judgment in favor of defendants (Doc. 4757).

**I.    Grounds for Post-Judgment/Verdict Relief**

FRCP 59(a)(1) provides that a district judge may grant a new jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."[1] Under the governing jurisprudence of the Fifth Circuit, "when the ends of justice require it, a federal trial judge has the power and the duty to set aside a jury's verdict, to

---

[1] Fed. R. Civ. P. 59(a).

grant a new trial, or to grant a judgment notwithstanding the verdict."[2]   More specifically, the case law under FRCP 59 recognizes grounds for a new trial which are directly implicated herein:

In *Garrison v. U.S.*, a new trial was deemed appropriate based upon the trial judge's "duty to exercise his power over the proceedings before him to prevent a miscarriage of justice."[3]   In the instant motion, plaintiff avers that jurors in this case were systematically excluded on the basis of race (in clear violation of *Batson v. Kentucky*[4] and its progeny).   Hence, a new trial must be granted to prevent the "miscarriage of justice" that would result if this jury verdict were allowed to stand.

In *Houston v. Herring*, the Fifth Circuit found that a new trial was necessary when jury instructions in a product liability case erroneously required a finding of negligence as a prerequisite to a verdict.[5]   The Court concluded that the erroneous instruction gave rise to the prospect of jury confusion.   Here, as in *Houston,* a new trial is sought on the ground that the jury rendered its verdict based upon erroneous and confusing instructions regarding the Government Contractor Defense.   Similarly, relief is sought on the ground that the Court failed to instruct the jury that compliance with industry standards does not preclude a finding that the defendant product was defective in design.   The failure to give this instruction to the jury created a significant opportunity for confusion, and contributed to an erroneous verdict regarding plaintiff's defective design claim.

---

[2] *Stewart v. Gilmore*, 323 F.2d 389, 391, (C.A.La. 1963).
[3] 62 F.2d 41, 42 (4th Cir. 1932).
[4] 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[5] 562 F.2d 347, (C.A.5 Miss. 1977).

Lastly, Ms. Alexander requests a new trial on the ground that the Court's pre-trial dismissal of her Louisiana Product Liability Act [LPLA] case against Fluor Enterprises, Inc. was erroneous and prejudicial.  A federal court granted a new trial on comparable grounds in *Rush v. Virginia Dept. of Transp.*, where evidence of a supervisor's sexist comments and actions was erroneously excluded in a Title VII action, affecting plaintiff's substantial rights.[6]  Here, plaintiff's substantial rights' likewise were affected by the wrongful exclusion of all evidence regarding her claims against Fluor as a "manufacturer" under the LPLA.

 Alternatively, if plaintiff is not granted a new trial pursuant to Rule 59, plaintiff moves for Relief from Judgment pursuant to FRCP 60(b)(6).[7]  This Rule provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" for a number of reasons, including "any other reason that justifies relief."[8]

Federal courts repeatedly have held that "errors of law are cognizable under Rule 60(b)."[9]  Accordingly, to the extent that the giving of a jury instruction regarding the Government Contractor Defense, and/or the failure to give a jury instruction regarding industry standards, resulted in a jury verdict based upon legal error, plaintiff is entitled to Relief from Judgment pursuant to FRCP 60(b)(6).

Additionally, Rule 60(b)(6) provides courts with authority to vacate a judgment when it is appropriate to accomplish justice.[10]  Because the jury in this case was

---

[6] 208 F.Supp.2d 624 (W.D.Va. 2002).

[7] Fed. R. Civ. P. 60(b)(6).

[8] *Id.*

[9] *In Re International Fibercom, Inc.*, 503 F.3d. 933, 940 (C.A.9 Ariz. 2007) (citing *Liberty Mutual Ins. Co. v. EEOC*, 691 F.2d 438, 441 [9th Cir. 1982].

[10] *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 864, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *See also In Re VEC Farms, LLC*, 395 B.R. 674, 684, (Bkrtcy.N.D.Cal. 2008).

improperly chosen on the basis of race, and because plaintiff was not allowed to introduce a meritorious case against Fluor under the LPLA, relief from judgment is essential to achieve justice in this matter.

## II. Defendants' Peremptory Strikes Violated *Batson* And The Court's Subsequent Remedy Was Improper and Insufficient

During voir dire proceedings,[11] counsel for Alana Alexander, an African-American plaintiff proceeding individually and on behalf of Christopher Cooper, her African-American son, challenged defendants' use of all five of their peremptory strikes to remove African Americans from the jury, in violation of the United States Supreme Court's holdings in *Batson*[12] and *Edmonson*.[13] In response, defendants provided pretextual, allegedly race-neutral, explanations.[14] However, plaintiff challenged those alleged race-neutral explanations as insufficient under the guidelines of *Batson* and *Miller-El v. Dretke*.[15]

---

[11] Federal Courts are required to locate and summon jurors in a manner that provides a "fair cross section of the community. *Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 622, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). Studies reveal that post-Hurricane Katrina and Rita, FEMA trailers were primarily occupied by African-Americans. Verderber, S., *Emergency Housing in the Aftermath of Hurricane Katrina: An Assessment of the FEMA Travel Trailer Program*, 23 J. HOUS. BUILT ENVIRON. 367, 373 (2008). As a result, this Court's pre-trial decision excusing individuals who lived in FEMA trailers dramatically limited the pool of prospective African-American jurors. Thus, Defendants' improper use of peremptory strikes, which were accepted by this Court, effectively removed any opportunity for a fair, representative trial.

[12] Defendants chose to use all of their five peremptory strikes on the following prospective African-American venire members: (1) Mr. Ronald Franklin (Prospective Juror No. 11); (2) Ms. Anita Brown (Prospective Juror No. 19); (3) Ms. Nedra Hookfin (Prospective Juror No. 16); (4) Ms. Denia Ellis (Prospective Juror No. 20); and (5) Ms. Rachel Morris (Prospective Juror No. 9). Exhibit A, Trial Transcript, Sept. 14, 2009, p. 92, l. 19-p. 93, l. 12. After Plaintiffs' *Batson* challenge as to all five of their strikes, Defendants voluntarily withdrew their peremptory strike with respect to Prospective Juror No. 9, Ms. Rachel Morris. Exhibit A, p. 96, l. 20-21.

[13] *Edmonson,* 500 U.S. at 622 (applying Batson to civil litigation).

[14] Exhibit A, p. 94, l. 2-p. 96, l. 3.

[15] *(Miller-El II)*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Exhibit A, p. 107, l. 6-p. 110, l. 1.

As established in *Batson*, the Equal Protection Clause of the United States Constitution prohibits racial discrimination in the exercise of peremptory challenges.[16] To determine whether a peremptory challenge was based on purposeful racial discrimination, the United States Supreme Court in *Batson* provided a three-part test:

> First, a party must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the opposing party must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.[17]

Thus, once a prima facie showing is made, the striking party "must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenge."[18] "The trial court then will have the duty to determine if the [movant] has established purposeful discrimination."[19]

In presenting her *Batson* motion at trial, plaintiff demonstrated: (1) that of the first twenty-one venire persons who were eligible to be selected after potential jurors were excused for cause, i.e., those remaining in the "strike zone" for the jury, only five were African-Americans; (2) that plaintiff and her son were African-American; (3) that Juror Nos. 9, 11, 16, 19 and 20 were the only African-Americans available within the strike zone, making up 20% of eligible prospective jurors; and (4) that the defendants employed all five of their peremptory challenges to strike all five available African-Americans within the strike zone.[20]   Plaintiff thus made a prima facie case under Step

---

[16] *Batson*, 476 U.S. at 96-97.
[17] *Miller-El II*, 545 U.S. at 277(Thomas, J., dissenting) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 328-29, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)).
[18] *Batson*, 476 U.S. at 98, n. 20.
[19] *Id.* at 98.
[20] Exhibit A, p. 92, l. 21-p. 93, l. 4.

One of *Batson* by showing that defendants' peremptory challenges had been exercised on the basis of race.[21]

This Court then appropriately requested that defendants comply with the nominal requirements of Step Two.[22]  In response, counsel for defendants enumerated so-called race-neutral reasons for their five strikes of five African-Americans,[23] thereby requiring

---

[21] *See Johnson v. California*, 545 U.S. 162, 169, 125 S.Ct. 2410, 2416, 162 L.Ed.2d 129 (2005)("[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race."). Applying such, the Fifth Circuit in *Price v. Cain*, 560 F.3d 284 (5th Cir. 2009) held that a prima facie case can be established by permissively showing "that the facts of circumstances of [the] case gave rise to an inference that [counsel] exercised peremptory challenges on the basis of race." *Id.* at 287.  Here, given that Defendants struck 100% of prospective African Americans, an inference can be drawn that Defendants struck with racial intent.  In so holding, the Fifth Circuit interpreted *Johnson* to mean that Step One is to be "a light burden," one that is "simple and without frills," and one that can be met with statistics. *Id.*  Other courts have held that statistics alone meet this prima facie burden of Step One. *McGahee v. Alabama Department of Corrections*, 560 F.3d 1252, 1264 (11th Cir. 2009)("There can be no clearer "pattern" than the total removal of all African-American jurors from the venire by the State."); *Paulino v. Harrison*, 542 F.3d 692, 703 (9th Cir. 2008)("The prosecutor also used five of her six, or 83% of her peremptory challenges to strike African-American jurors. The district court noted that these statistics 'are even more troubling when viewed in light of the pattern in which the prosecutor exercised her peremptory challenges.'"); *Williams v. Runnels*, 432 F.3d 1102, 1007 (9th Cir. 2006)("We have held that a defendant can make a prima facie showing based on a statistical disparity alone."); *United States v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005)("Such a pattern can be evident where a prosecutor uses peremptory challenges to eliminate all, or nearly all, members of a particular race."); *Paulino v. Castro*, 371 F.3d 1083, 1091 (9th Cir. 2004)("[T]here was an inference of bias where the prosecutor had used five out of six peremptory challenges to strike African-Americans."); *Holloway v. Horn*, 355 F.3d 707, 712 (3rd Cir. 2004)(finding that 11 of 12 strikes against African-Americans "was certainly strong enough to suggest an intention of keeping blacks off the jury"); *Tolbert v. Page*, 182 F.3d 677, 681 (9th Cir. 1999)("[T]here was a prima facie showing of discrimination where the prosecutor exercised peremptory challenges to exclude five out of a possible nine African-Americans."); *Harrison v. Ryan*, 909 F.2d 84, 87 (3d Cir. 1990) (finding prima facie case where prosecutor used six of eight peremptory challenges against African-Americans); *U.S. v. Clemons,* 843 F.2d 741, 747 (holding that the striking of "a single black juror could constitute a prima facie case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks.").

[22] Exhibit A, p. 93, l. 25-p. 94, l. 1. Once counsel facing a *Batson* challenge offers reasons in accordance with Step Two, the Step One prima facie requirement is mooted, and the only focus of the Court is Step Three.  *See U.S. v. Webster*, 162 F.3d 308, 349 (5th Cir. 1998)("The court called on the government to provide race-neutral justifications for the use of its peremptory strikes. Once a court has taken that step, we no longer examine whether a *prima facie* case exits."). In this case, because Defendants proposed race-neutral reasons at this Court's request, the Step One requirement had either already been met, or at the very least, had been mooted.

[23] Exhibit A, p. 94, l. 2-p. 97, l. 18.  The Court acknowledged that Step two had been complied with, stating "there were race-neutral reasons cited for all five of the individuals."  Exhibit A, p. 113, l. 18.

the Court to engage in a Step Three determination of whether purposeful discrimination existed.

In Step Three, the Court found that defendants had stated race-neutral reasons for the three peremptory challenges as to Prospective Jurors No. 16 (Ms. Nedra Hookfin), No. 19 (Ms. Anita Brown) and No. 20 (Ms. Denia Ellis),[24] but failed to find whether or not such challenges were exercised with purposeful discrimination.[25]  With respect to Prospective Juror No. 9 (Ms. Rachel Morris), defendants withdrew their peremptory challenge.[26]  As a result, the Court awarded defendants an additional challenge,[27] and Ms. Morris was temporarily returned to the jury, only to be excused over plaintiff's objection a day later.[28]  With respect to Prospective Juror No. 11 (Mr. Ronald Franklin), however, the Court's improper remedy to address the *Batson* violation allowed defendants to choose between keeping Mr. Franklin (whom it had already improperly struck), or else keep either one of two African-American prospective jurors from outside the strike zone.[29]

Plaintiff objected to this remedy because it did not appropriately remedy the violation of *Batson*.[30]  "The Constitution forbids striking even a single prospective juror

---

[24] Exhibit A, p. 113, l. 20-p. 113, l. 21 ("Certainly the first three at a minimum were excused for race neutral reasons.").

[25] Plaintiffs respectfully argue herein that such challenges were in fact exercised with purposeful discrimination, thus violating Step Three of *Batson.*

[26] Exhibit A, p. 96, l. 15-18 (Defendants' withdrawal of peremptory challenge of Ms. Rachel Morris).

[27] Exhibit A, p. 110, l. 24-p. 111, l. 1 ("Here's what I would propose to do: Number 1, return a challenge to the Defendants and put Ms. Morris on the jury as Defendants have offered.").

[28] Exhibit A, p. 113, l. 25-p. 114, l. 1 (Court's acceptance of Defendants' withdrawal of peremptory challenge). However, Prospective Juror No. 9, after the Court spoke with her in chambers, failed to return to jury service the following day.  The Court elected not to solicit the Marshal's Service to retrieve the missing juror. Exhibit. B, p. 9, l. 1-p. 10, l. 1. Plaintiffs objected to the absence of Ms. Morris going forward, noting the resultant effect of reducing the value of the Court's attempted *Batson* remedy. Exhibit B, p. 10, l. 22-p. 11, l. 8.

[29] Exhibit A, p. 111, l. 19-20 ("[T]hey will choose between Mr. Franklin, Mr. Bacchus and Ms. Hamilton").

[30] Exhibit A, p. 113, l. 9-14 ("We understand that the Court has attempted to fashion a remedy, but we object to that remedy as being insufficient and not undoing the damage caused by the Defendants

for a discriminatory purpose."[31]   Yet, this Court's remedy permitted defendants to maintain their improper strike of Mr. Franklin in violation of the Equal Protection Clause of the United States Constitution, or else choose from among others outside the strike zone solely on the basis of race.[32]   Having implicitly determined that defendants' strike of Mr. Franklin was improper, the Court in this way put both plaintiff's and Mr. Franklin's constitutional rights at risk, by permitting the defendants to "dine" from a "buffet" of available African-American prospective jurors, either from inside the restaurant's strike zone or as "take-out" selections from outside the established strike zone.   Plaintiff objected to this improper remedy.[33]

---

wholesale exclusion of five out of five African-Americans, and we don't think that giving us back one or two fixes it, but that's my objection, but thank you, your Honor.").

[31] *McGahee*, 560 F.3d at 1268 ("As this Court has stated, 'under *Batson,* the striking of one black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when valid reasons for the striking of some black jurors are shown.' *United States v. David*, 803 F.2d 1567, 1571 (11th Cir. 1986).");   *Boyd v. Newland*, 455 F.3d 897, 909 (9th Cir. 2006) ("We have held that, '[t]o establish a prima facie case, [a petitioner does] not need to show that the prosecution ha[s] engaged in a pattern of discriminatory strikes against more than one prospective juror' because 'the Constitution forbids striking even a single prospective juror for a discriminatory purpose.'");   *Currie v. Adams*, 149 Fed.Appx. 615, 619 (9th Cir. 2005) (not designated for publication) ("Because the 'striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors,' *Turner[ v. Marshall],* 121 F.3d [1248,] 1255 n. 4 [9th Cir. 1997], we are required to reverse the district court.");   *Hardcastle v. Horn*, 368 F.3d 246, 258 (3rd Cir. 2004) ("[T]he fact that the prosecutor had enough peremptory strikes to remove the two remaining African-American venirepersons, but chose not to do so, cannot demonstrate the absence of discriminatory intent in the striking of the other twelve African-Americans from the venire.");   *Jones v. Ryan,* 987 F.2d 960, 972-73 (3d Cir.1993) (noting that "[w]e doubt the significance of including a single black on the panel if, at the same time, the government used most of its peremptory challenges to strike blacks with backgrounds similar to the white jurors ultimately selected.").

[32] Exhibit A, p. 111, l. 17-20.

[33] Exhibit A, p. 113, l. 5-14:

> Mr. Watts:    Just very briefly.   Your honor, respectfully, we understand the court's ruling.   We, again, for the record object to the exclusion of Juror Number 16, Juror Number 20, Juror Number 19 and Juror Number 11 under the *Batson* and the *Miller-El II* decisions.   We understand that the Court has attempted to fashion a remedy, but we object to that remedy as being insufficient and not undoing the damage caused by the Defendants wholesale exclusion of five out of five African-Americans, and we don't think that giving us back one or two fixes it, but that's my objection, but thank you, your Honor.

The Court overruled Ms. Alexander's objection, and the trial proceeded without a single African-American from the original strike zone, and with only one "chosen" by the defendants and able to serve, from outside the strike zone.  The verdict rendered by the resulting verdict should be set aside under FRCP 59 and/or 60, because (1) defendants' racially-improper exclusion of prospective jurors violated *Batson*, and (2) the Court's remedy violated established precedent concerning the Equal Protection Clause.

<u>ARGUMENT AND AUTHORITIES</u>

As established *supra*, plaintiffs and defendants fulfilled the requirements of *Batson* Steps One and Two.[34] Of import to this case, however, is *Batson*'s Third Step, as well as the Court's purported remedy of a clear *Batson* violation.  The United States Supreme Court recently has reaffirmed and extended the application of *Batson* to include "broader patterns of practice during the jury selection."[35]  As noted by the Louisiana Supreme Court, "*Miller-El [II]* expanded upon the type and quantum of evidence considered in *Batson*'s third step."[36]  Specifically, in determining whether purposeful discrimination exists, trial courts now consider:

(a)    The totality of circumstances by referencing the statistical analysis of jurors struck;

(b)    Whether the proffered reasons are justifiable reasons related to the case;

(c)    A comparative juror analysis of African-Americans struck versus jurors not struck;

(d)    Whether the proffered reasons are pretextual, as is evidenced by the striking party's decision not to question a prospective juror before exercising its peremptory strike; or

---

[34] *See supra* notes 11-13.
[35] *Miller-El II*, 545 U.S. at 253.
[36] *Alex v. Rayne Concrete Services*, 951 So.2d 138, 151 (La. 2007).

(e)     Whether the striking party's proffered reasons are true or false.[37]

A.     Defendants' Peremptory Strikes Excluded 100% of the Prospective African American Jurors.

Here, the statistics reveal purposeful discrimination.  In finding purposeful discrimination, the United States Supreme Court in *Miller-El II* noted that "prosecutors used peremptory strikes to exclude 91% of the eligible black venire panelists, a disparity unlikely to have been produced by happenstance."[38] Here, after two strikes for cause, the percentage of African-Americans available in the strike zone of the venire panel was 23% (5/19).  However, prospective African-American jurors were struck at a rate of 100% (5/5), resulting in an African-American strike rate 77% higher than would be expected if peremptory challenges had been exercised representatively.[39] Similarly, in *Woodward*, the Fifth Circuit recognized the clear significance of striking "100% of the eligible black jurors."[40] Such a statistical disparity cannot be attributed to "happenstance." Pursuant to *Miller-El II*, defendants' decision to strike 100% of prospective African Americans jurors in this case serves as evidence of purposeful discrimination.

B.     The Proffered Reason For Striking Juror No. 11, Mr. Franklin, Is Not A Justifiable Reason Related to the Case.

---

[37] *See Love v. Scribner*, 278 Fed.Appx. 714, 717 (9th Cir. 2008) (not designated for publication) ("A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.").

[38] *Miller-El II*, 545 U.S. at 231 (citing *Miller El v. Cockrell*, 537 U.S. at 342).  Further, as noted by this Court in *Taylor v. Cain*, 2007 WL 734807 *1 (E.D. La. Mar. 5, 2007) (not designated for publication),  "the percentage of African American panelists who were challenged by . . . peremptory strike," is a useful factor in determining purposeful discrimination. *Id.* at *8.  For example, an inference of purposeful discrimination has been found where as little as 57% of the eligible African American prospective jurors have been struck. *Truesdale v. Sabourin*, 427 F.Supp.2d 451, 461 (S.D.N.Y. 2006).

[39] *See generally Truesdale*, 427 F.Supp.2d at 461.

[40] *Woodward v. Epps*, 284 Fed.Appx. 173, 176 (5th Cir. 2008) (not designated for publication) (granting a certificate of appealability "given the State's strike of every potential black juror, and the district court's apparent failure to consider [the] 'totality of the circumstances'").

Upon Plaintiffs' *Batson* challenge, defendants cited one reason for striking Mr. Franklin, Juror No. 11, i.e., that his wife had just passed away.[41]   However, this case is not a wrongful death case, and such a proffered reason had no relation to the issues to be decided at trial.[42]

Defendants nonetheless claimed that Mr. Franklin's wife passing away would make him "incredibly sympathetic."[43]  That this asserted reason is pretext is revealed by comparative juror analysis:  other non-African-American jurors should have been struck as well, had this truly been the defendants' concern regarding Mr. Franklin.

C.   <u>Comparative Juror Analysis Reveals that Defendants' Race-Neutral Reason For Striking Mr. Franklin Would Disqualify Other Non-African American Prospective Jurors.</u>

"More powerful than [the] bare statistics, …are side-by-side comparisons of some black venire panelists who were struck and African-American panelists allowed to serve."[44]   This analysis does not require the comparison of identical jurors, since "potential jurors are not products of a set of cookie cutters."[45] but "[i]f the State asserts that it struck a black juror with the same characteristic, this is evidence that the asserted justification was a pretext for discrimination."[46]

---

[41] Exhibit A, p. 95, l. 3-11 ("Your honor, we remove Mr. Franklin because he just lost his wife; that's the sole reason.  That's the sole reason, because his wife just passed away.").

[42] *See Collins v. Rice*, 348 F.3d 1082, 1092 (9th Cir. 2003) ("*Batson* is clear that the prosecutor's proffered justifications must be reasonably 'related to the particular case to be tried.'" *Batson*, 476 U.S. at 98); *see also United States v. Bishop*, 959 F.2d 820, 825 (stating that a prosecutor's reason for dismissing a potential juror must have some nexus to her "possible approach to a specific trial").

[43] Exhibit A, p. 95, l. 11.

[44] *Reed v. Quarterman*, 555 F.3d 364, 372 (5th Cir. 2009) (quoting *Miller-El II*, 545 U.S. at 241).

[45] *United States v. Williamson*, 533 F.3d 269, 275 (5th Cir. 2008) (quoting *Miller-El II*, 545 U.S. at 247 n.6, that "[a] per se rule that a defendant cannot win a *Batson* claim unless there is an exactly white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.").

[46] *Id.*

In striking Mr. Franklin, defendants argued, as noted, that because his wife had "recently died," this would make him "incredibly sympathetic."[47]   However, defendants ignored Mr. Franklin's juror questionnaire, wherein he indicated that he was <u>not</u> an overly sympathetic person.[48]   Defendants likewise ignored the juror questionnaire responses of those non-African Americans selected to serve on the jury, who indicated that they were in fact "unusually sympathetic."[49]

No doubt realizing that their reasoning as to Mr. Franklin was insufficient,[50] counsel quickly added a further basis for challenging him (other than his race):

> Mr. Glass:    That and that in his questionnaire he said most companies want profits over ethics, safety testing is very inadequate.  The government should pay for injury even if there's no proof.  He had chemical exposure in his own home, so if he thinks his wife's death was a problem with that --[51]

This "supplemental pretext," however, is prevalent among the non-African American prospective jurors in the venire.   Mr. Franklin was hardly alone in his belief that inadequate safety testing by manufacturers occurs, and/or that corporations might sacrifice ethics for profit; in fact, many non-African American jurors selected to serve actually felt the same way on these issues as Mr. Franklin.[52]   In regard to Mr. Franklin's belief that the government should pay even if there is no proof, such a statement was

---

[47] Exhibit A, p. 95, l. 3-11.

[48] Exhibit O, Jury Questionnaire of Ronald Franklin, p. 11.

[49] Exhibit D, Jury Questionnaire of Mitzi M. Aucoin, p. 11; Exhibit E, Jury Questionnaire of Samantha Robichaux, p. 11; Exhibit F, Jury Questionnaire of Michael Wetzel, p. 11; Exhibit G, Jury Questionnaire of Bert St. Romain, III, p. 11; Exhibit H, Jury Questionnaire of Craig Naquin, p. 11; Exhibit I, Jury Questionnaire of Maxine Bourg, p.11.; Exhibit K, Juror Questionnaire of James Vicknair, p. 11.

[50] The United States Supreme Court in *Synder v. Louisiana*, __ U.S. __, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008), noted that the "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." *Id.* at 1208 (citing *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)).  Here, Defense counsel's scramble to proffer a belated race-neutral reason after telling the Court that the previously offered one was "the sole reason" serves as an inference that the plausibility, or truth, of Defendants reasons are lacking. *See id.*

[51] Exhibit A, p. 95, l. 12-18.

[52] *See* Exhibit D, p. 24; Exhibit E, p. 24; Exhibit F, p. 24, Exhibit G, p. 24; Exhibit H, p. 24.

irrelevant with respect to this case (since the Government was not a defendant), but, in any event, other non-African American prospective jurors felt the same.[53]  Oddly, what would seemingly be relevant and beneficial to defendants was Mr. Franklin's belief per his questionnaire that companies should not necessarily be liable; yet, defendants struck him.[54]

Defendants finally threw a "Hail Mary" pass by attempting to rely on the alleged chemical exposure in Mr. Franklin's home as a strained cause for his wife's death.  But they failed to raise this issue with respect to Caucasian Prospective Juror No. 3, Mr. Wetzel, whose brother was exposed to chemicals, and, as a direct result, was lost to cancer.[55]  Such a direct cause of potential juror bias presumably would be of interest to defendants, yet they showed no interest in striking Prospective Juror No. 3; he was seated on the jury.[56]  Such inconsistencies in the case of Mr. Franklin cannot support a race-neutral reason for his being struck by peremptory challenge.  Although defendants' "proffered reason . . . seemed plausible . . ., 'its plausibility [was] severely undercut by the [Defendants'] failure to object to other panel members who expressed views much like [his]."  Ultimately, it is clear from the record that all of the reasons given for the peremptory strike of Mr. Franklin as a potential juror are mere pretext for striking him on the basis of race.

D.  The Proffered Reason To Strike Mr. Franklin Was Pretextual, Evidenced By Defendants Choice Not To Question Him Before Exercising The Strike.

---

[53] Exhibit G, p. 26; Exhibit H, p. 26; Exhibit I, p. 26
[54] Exhibit O, p. 30.
[55] Exhibit F, p. 30-31.
[56] See, e.g., United States v. Brown, 553 F.3d 768 (5th Cir. 2008).  In Brown, the Fifth Circuit found that the prosecution's strike of an African American based on his criminal record was in itself insufficient to survive a Batson challenge "since there were two venire members with criminal records, and only the black member was struck."  Id. at 796.  Unlike the case at bar, counsel in Brown at least provided a secondary, legitimate reason.  Id.

As noted by this Court, defendants failed to question Mr. Franklin regarding his wife's "recent" death, or its other excuse for striking him, prior to executing their peremptory challenge.[57] The failure to challenge a juror for cause, or even question him prior to exercising a peremptory challenge, can serve as evidence of discriminatory intent.[58]  In *Reed,* the Fifth Circuit held that counsel's failure to question a potential juror regarding a specific characteristic of concern, demonstrated that the alleged "concern" about the individual was as a pretext for discrimination.[59]

<u>After</u> defendants struck Mr. Franklin and only <u>after</u> plaintiff lodged a *Batson* objection, did the Court call Mr. Franklin to the bench for questioning.[60]  This "Court-requested- questioning" does not diminish the teaching in *Reed* that defendants' prior failure to even question this juror should serve as evidence of pretext.  Further, as discussed *infra*, Mr. Franklin's answers to questioning at the bench demonstrated that no race-neutral reason possibly existed to strike him.

---

[57] Exhibit A, p. 95, l. 17-18 (The Court:  "When I asked you for cause, nobody called him up here to question him about those answers.").

[58] *See Reed*, 555 F.3d at 376.

[59] *Id.*  at 377.  In *Reed*, the State peremptorily struck an African American based on her status as a health care professional.  The Court relied on counsel's lack of questions regarding the African American's profession noting "the prosecution's failure to question a potential juror about a characteristic the State asserts is important is evidence that the asserted reason was actually a pretext for discrimination.  *Id.* (internal citations omitted). *See also United States v. Odeneal*, 517 F.3d 406, 420 (6th Cir. 2008) ("[W]e expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike. The failure of the prosecution to inquire regarding a reason purported to be a basis for a juror's dismissal serves as evidence of discrimination. Indeed, failure to ask undermines the persuasiveness of the claimed concern." (internal citations and quotations omitted)); *Kesser v. Cambra*, 465 F.3d 351, 364 (9th Cir. 2006).

> Although he claimed to be concerned about Rindels's attitude, he did not ask her further questions about her work or her interpersonal experiences. For a *Batson* inquiry, we require more than this. '[U]nless he had an ulterior reason for keeping [Rindels] off the jury we think he would have proceeded differently.... [W]e expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike. *Miller-El [II]*, 125 S.Ct. at 2327.  The prosecutor asked Rindels no questions at all.

*Id*; *see also Currie*, 149 Fed.Appx. at 619 ("The prosecutor here, however, asked no questions before striking Juror 210. Instead he simply relied on the one-word answer in her questionnaire that was at best ambiguous.").

[60] Exhibit A, p. 97, l. 11-18.

E.   The Proffered Reason For Striking Mr. Franklin Was False.

While irrelevant in a non-death case, defendants' first claimed they struck Mr. Franklin "because he just lost his wife."[61] However, "the explanation falters upon closer examination," and evidences defendants discriminatory intent.[62] In fact, Mr. Franklin's wife had passed away more than a year before,[63] and he affirmed that "of course" he "could be fair to the parties and hear the evidence in this case, notwithstanding the circumstances of [his] wife's passing."[64]  This type of statement is one recognized by the Fifth Circuit as indicative of impartiality.[65]

Defendants then fell back on a secondary explanation for their strike, i.e., that allegedly "he had chemical exposure in his own home, so if he thinks his wife's death was a problem…"[66]  But counsel for defendants did not even question Mr. Franklin on this issue before striking him.  As the Court noted, "when I asked you for cause, nobody called him up here to question him about those answers."[67]  After the plaintiff's *Batson* challenge to the strike of Mr. Franklin, and the Court's decision to call this individual to the bench for post-strike questioning, the purported rationale for this peremptory excusal quickly evaporated:  Mr. Franklin was not exposed to chemicals in his home,[68] and his wife died of scleroderma, unrelated entirely to chemicals.[69]  The falsity of the reasons cited by defendants in this instance demonstrates the wisdom of the Fifth Circuit's view in *Reed* that counsel's pre-strike failure to question a juror regarding a

---

[61] Exhibit A, p. 95, l. 10.
[62] *Williamson*, 533 F.3d at 275.
[63] Exhibit A, p. 97, l. 23.
[64] Exhibit A, p. 98, l. 14-17.
[65] *Williamson*, 533 F.3d at 275 (relying on a juror's statement that a characteristic of concern would not "color his opinion" in finding that the trial court erred in overruling a *Batson* challenge).
[66] Exhibit A, p. 95, l. 15-16.
[67] Exhibit A, p. 95, l. 17-18.
[68] Exhibit A, p. 99, l. 15-18.
[69] Exhibit A, p. 98, l. 6.

specific characteristic of concern serves as evidence that the alleged "concern" in truth was a pretext for discrimination.[70]

F.   Defendants' Peremptory Strikes of the Other African-American Prospective Jurors Also Violated *Batson.*

Apart from their pretextual reasons for striking Mr. Franklin, the race-neutral reasons supplied by defendants for using all five of their peremptory strikes on the only five African-Americans in the strike zone are either inherently false or apply equally to the non-African Americans selected to serve, thereby evidencing purposeful discrimination based on race.   As the case law recognizes in such instances, "[r]eversal is mandated for even one *Batson* violation."[71]

(1) *Defendants' Peremptory Strike of Ms. Anita Brown (Prospective Juror No. 19).*

Defendants' peremptorily struck Ms. Brown because of her answers to the jury questionnaire.[72]   Specifically, attention was directed to her written statement that "justice does not limit what's wrong or amount." However, Ms. Brown simply followed the questionnaire directive to explain why she believed there should not "be a fixed limit on the amount of compensation a plaintiff may recover,"[73] a position consistent with the law.    Moreover, all but two non-African American jurors selected answered the questionnaire in a way similar to Ms. Brown; and, more importantly, Caucasian Prospective Juror 1, Ms. Mitzy Aucoin (who was not challenged by defendants) wrote that "[p]eople should be compensated for their loss or grievance."[74]

---

[70] *Reed*, 555 F.3d at 376.
[71] *State v. Jacobs*, 13 So.3d 677, 689 n. 58 (La. App. 5th Cir. 2009) (citing *Snyder*, 128 S.Ct. at 1208, 170 L.Ed.2d 175).
[72] Exhibit A, p. 95, l. 25-p. 96, l. 3.
[73] Exhibit L, Jury Questionnaire of Anita Brown, p. 22.
[74] Exhibit D, p. 22; Exhibit F, p. 22; Exhibit H, p. 22, Exhibit I, p. 22; Exhibit K, p. 22; Exhibit N, Jury Questionnaire of Roy Pierce, p. 22; Exhibit M, Jury Questionnaire of Charles Smallwood, p. 22.

In addition, defendants cited to Ms. Brown's prior experience as a plaintiff, her husband's stroke, and her belief as to the inadequacy of safety testing by corporate manufacturers.  However, four out five non-African American selected jurors noted that they had participated in a lawsuit, [75] and other non-African American prospective jurors had experienced similar medical hardships.  For example, Prospective Juror No. 7, Mr. Naquin (a Caucasian), detailed in his questionnaire that his spouse had undergone brain surgery and consequently could not work.[76] Yet, defendants' did not find the brain surgery of Mr. Naquin's spouse as relevant as the stroke suffered by the spouse of Ms. Anita Brown, an African American.  Furthermore, at the time of the *Batson* challenge, four out of nine non-African American prospective jurors also believed safety testing by manufacturers to be inadequate.[77] In fact, three out of nine non-African American prospective jurors stated that companies try to increase profits without respect to safety.[78]

### (2) Defendants' Peremptory Strike of Ms. Nedra Hookfin (Prospective Juror 16).

Defendants initially challenged Prospective Juror No. 16 Nedra Hookfin for cause, based on her family having lived in FEMA trailers and the suffering of those living in the FEMA trailers.[79]  However, Ms. Hookfin did not have any family in trailers,[80] nor did she indicate in her questionnaire an awareness of individuals suffering from illness due to living in FEMA trailers.[81] Determined to remove Ms. Hookfin from the jury,

---

[75] Exhibit F, p. 21; Exhibit G, p. 21; Exhibit N, p. 21; Exhibit M, p. 21.
[76] Exhibit H, p. 19; *see also* Exhibit D, p.10; Exhibit G, p. 19; Exhibit K, p. 19.
[77] *See* Exhibit D, p. 24; Exhibit E, p. 24; Exhibit F, p. 24, Exhibit G, p. 24.
[78] *See* Exhibit F, p. 24, Exhibit G, p. 24, Exhibit H, p. 24.
[79] Exhibit A, p. 85, l. 22-p. 86, l. 4.
[80] Exhibit A, p. 86, l. 21-25; *see also* Exhibit C, Juror Questionnaire of Ms. Nedra Hookfin, p. 31; Exhibit A, p. 86, l. 21 – 25 ("No.  I didn't have any family members.").
[81] *See* Exhibit C, p. 38.

defendants nonetheless struck her ostensibly because she had "friends and relatives" living in FEMA trailers and had a "preconceived notion" that was negative to defendants.[82]

Both reasons are pretextual when an appropriate comparison is made between some black venire panelists who were struck and white panelists who were allowed to serve."[83] First, at the time of the *Batson* challenge, all but two selected non-African American jurors knew of family members living in a travel trailer, park model, or mobile home.[84] Notably, Prospective Juror 3, Mr. Wetzel — a non-African American selected for jury service — lived in a recreational vehicle after Hurricane Katrina and suffered the loss of his brother who was exposed to chemicals and consequently died of cancer.[85]

Second, Prospective Juror No. 7 Naquin, a non-African American, disclosed that he (1) had discussed the topic of formaldehyde exposure with others, (2) had formed an opinion about the overall effects of formaldehyde exposure on a person, and (3) believed that formaldehyde exposure was very dangerous.[86] Yet, Mr. Naquin was neither challenged for cause nor peremptorily struck by defendants.

Ms. Hookfin would have been a fair juror[87] had she not been struck by virtue of the color of her skin.

---

[82] Exhibit A, p. 94, l. 8-11.
[83] *Miler-El II*, 545 U.S. at 241.
[84] *See* Exhibit D, p. 31; Exhibit E, p. 31; Exhibit F, p. 31; Exhibit G, p. 31; Exhibit H, p. 31; Exhibit I, p.31.
[85] Exhibit F, p. 30- 31.
[86] Exhibit H, p. 38-39.
[87] Regardless, Ms. Hookfin clearly states that she is capable of only considering the evidence and does not have a predisposed opinion as to travel trailers.

> The Court:     Ms. Hookfin, you understand that no matter what questions you may have had or discussions you've had with family members or friends that this case will be decided only by the evidence in this courtroom and not by anything else or what somebody told you or what you may think by seeing a news program. You have to decide this case based on the evidence. Do you think you could do that if you're picked as a juror?

### (3) *Defendants' Peremptory Strike of Ms. Denia Ellis (Prospective Juror No. 20).*

Just as in the case of Nedra Hookfin, defendants challenged Ms. Denia Ellis because, allegedly, "she actually had relatives in the trailer," and they sought to determine whether any family members had filed suit.[88]   As with Ms. Hookfin, however, such defendants' challenges were rendered moot after questioning.[89]   Defendants nonetheless sought to peremptorily strike Ms. Ellis because (1) Ms. Ellis's family members resided in FEMA trailers[90] and (2) she was predisposed to an opinion regarding formaldehyde exposure.[91] As noted *supra*, seven of nine prospective jurors named at the time of the *Batson* challenge had family living in some sort of trailer.[92] Furthermore, non-African American Prospective Juror Nos. 3 and 7, Mr. Wetzel and Mr. Naquin, both presented as juror prospects with disclosed information similar to Ms. Ellis, yet neither was challenged for cause or peremptorily struck.[93]

### (4) *Defendants' Peremptory Strike of Ms. Rachel Morris (Prospective Juror No. 9).*

---

Prospective Juror 16:  Yes, I can.

Exhibit A, p. 88, l. 1-9.

[88] Exhibit A, p. 88, l. 13-18.

[89] Exhibit A, p. 89, l. 1-5.

[90] Exhibit A, p. 94, l. 8-11.

[91] It should also be noted that Ms. Ellis, like many other prospective jurors, formed her "opinion" regarding the "possible problem" of formaldehyde through television reports.

> Mr. Glass:        You also indicated that there were some things that would give you trouble being open minded in the case and one of those being that there's a lot of negative comments and that's possible that that won't allow you to be open minded.  What were you indicating in that question?

> Prospective Juror 20:        Just in the sense of seeing a lot of things on television asking people to come forward, and that there is a possibility that you can whether or not there is a problem.

Exhibit A, p. 89, l. 6-14; *see also* Exhibit J, Jury Questionnaire of Denia Ellis, p. 41.  Furthermore, It in describing her opinion she stated "[m]y opinion is that I can't really 'know' without all of the facts."  Exhibit J, p. 39.

[92] *See* Exhibit D; Exhibit E, p. 31; Exhibit F, p. 31; Exhibit G, p. 31; Exhibit H, p. 31; Exhibit I, p.31.

[93] *Synder*, __ U.S. __, 128 S.Ct. at 1212.

Defendants struck Rachel Morris, Prospective Juror No. 9, an African-American, together with four other African-Americans.  However, after Plaintiffs lodged a *Batson* challenge, Defendants withdrew their strike of her in an attempt to moot the issue.  A discussion under *Batson* of their original strike of her is important here for two reasons: first, their illegitimate reasons for striking Ms. Morris serve as evidence of pretext for their other reasons and strikes;[94] and, second, the Court's decision to excuse her after one day of trial compounded the prejudice to plaintiff caused by the defendants' race-based strikes.[95]

In peremptorily striking Ms. Rachel Morris, defendants put forth the race-neutral reason that "[s]he indicated that she would also find the company liable if they exposed the consumer to any kind of toxic substance, always."[96]  Defendants' reasoning is derived from Question 96 of the jury questionnaire, and "applies just as well to an otherwise-similar nonblack who is permitted to serve."[97]  For example, prospective, non-African-American Juror Nos. 4, 7 and 13, all answered just as Ms. Morris did.[98]

---

[94] *Id.* ("[T]he prosecution's proffer of [one] pretextual explanation naturally gives rise to an inference of discriminatory intent," even where other, potentially valid explanations are offered."); *see also Ali v. Hickman*, 571 F.3d 902, 920 (9th Cir. 2009) ("That the other reasons were pretextual raises an inference that this final rationale is also a make-weight."); *Kesser,* 465 F.3d at 360 ("[I]f a review of the record undermines the prosecutor's stated reasons, *or many of the proffered reasons,* the reasons may be deemed a pretext for racial discrimination.") (emphasis added) (internal quotations and citations omitted); *United States v. Chinchilla,* 874 F.2d 695, 699 (9th Cir.1989) ("[T]he fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against [the] sufficiency[of the remaining two reasons].").

[95] *United States v. Leahy*, 82 F.3d 624, 628 (5th Cir.1996) (finding improper discharge of juror "if the juror was discharged without factual support or for a legally irrelevant reason."); *United States v. Huntress*, 956 F.2d 1309, 1312 (5th Cir. 1992)*, cert. denied,* 508 U.S. 905, 113 S.Ct. 2330, 124 L.Ed.2d 243 (1993) (finding that "[p]rejudice occurs in these circumstances when a juror is discharged without factual support or for a legally irrelevant reason"); *United States v. Patel*, 2009 WL 1579526, * 10 (W.D.La June 03, 2009) (holding that District Courts have only the discretion to remove jurors for "just cause").

[96] Exhibit A, p. 94, l. 14-16.

[97] *El Miller II*, 545 U.S. at 241.

[98] Exhibit D, p. 30; Exhibit G, p. 30; Exhibit H, p. 30.

In addition, defendants also averred that Ms. Morris was excluded because she stated in her questionnaire that: "[t]esting was very inadequate.  Most companies try and increase without regard for ethics.  And increased profits without regard to ethics, and how they — profits for companies."[99]  But the record establishes that these same responses would have been reasons to challenge non-African Americans as well.  For example, prospective non-African Americans Juror Nos. 1, 2, 3 and 4 all noted that safety testing by manufacturers is inadequate.[100]  Similarly, prospective Juror Nos. 3, 4 and 7, all non-African Americans, agreed that "companies try to increase profits without respect to ethics."[101] Out of these non-African American prospective jurors, Juror Nos. 1, 2, 3 and 7 ultimately were seated and sworn.[102] The lack of any such non-racial distinction between the African-Americans struck and those seated and sworn non-African Americans, evidences defendants' discriminatory motivation.[103]

"When illegitimate grounds like race are in issue, [counsel] simply has got to state his reasons as best he can and stand or fall on the plausibility of his reasons."[104] Here, based on the commonality of all of defendants' race-neutral explanations with other non-African Americans, defendants' reasoning lacks plausibility, and serves as pretext for racial discrimination. Thus, because "the principle is [] well established that a single strike based upon race supports a *Batson* claim,"[105] "reversal [is required] no matter how ably the State has defended the other strikes."[106] Therefore, the

---

[99] Exhibit A, p. 94, l. 22-25.
[100] *See* Exhibit D, p. 24; Exhibit E, p. 24; Exhibit F, p. 24, Exhibit G, p. 24.
[101] *See* Exhibit F, p. 24, Exhibit G, p. 24, Exhibit H, p. 24.
[102] Exhibit A, p. 112, l. 17-19.
[103] *Brown*, 553 F.3d at 796.
[104] *Miller-El II*, 545 U.S. at 252.
[105] *State v. Elie*, 936 So.2d 791, 796 (La. 2006).
[106] *Id.*

repercussion of defendants' actions requires swift and deliberate corrective, i.e., a new trial.

G. The Court's Remedy Infringed on Mr. Franklin's Equal Protection Rights and Failed to Resolve the *Batson* Problem Created By Defendants.

Because "the Constitution forbids striking even a single prospective juror for a discriminatory purpose," this Court should grant plaintiff's motion for new trial, based on the improper strike of any one of the five African-Americans struck.[107] Furthermore, the Court's attempted remedy — attempting (without success) to reseat an improperly struck juror[108] — effectively afforded the *Batson*-guilty defendants a choice to either maintain their improper strike[109] or choose between two African-Americans available outside the strike zone.[110] This violated not merely the plaintiff's right to both evaluate potential jurors that were within a Court-designated strike zone and select a jury free from racial discrimination, but also Mr. Franklin's rights under the Equal Protection Clause of the United States Constitution.

(1) *The Court's Remedy Violated Mr. Franklin's Equal Protection Rights*

---

[107] *See Synder*, __ U.S. __, 128 S.Ct. at 1208 (citing *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)).

[99] *See, e.g., United States v. Walker*, 490 F.3d 1282 (11th Cir. 2007) ("[R]e-seating the jurors placed Defendants in the position that they would have been in had they not improperly used their strikes, and that giving [the State] their four strikes back would improperly reward them for violating *Batson*."); *People v. Moten,* 603 N.Y.S.2d 940, 947 (N.Y. 1993) (noting that dismissing entire venire upon a successful *Batson* challenge would reward the wrongdoer and rejecting the remedy).

[109] *Cf., Edmonson,* 500 U.S. at 628 ("To permit racial exclusion in this official forum compounds the racial insult inherent in judging a citizen by the color of his or her skin.").

[110] *See Powers,* 499 U.S. at 402 ("[R]acial discrimination in the qualification or selection of jurors offends the dignity of persons and the integrity of the courts."); *Rose v. Mitchell,* 443 U.S. 545, 556, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979) ("Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality."); *see generally Labat v. Bennett*, 365 F.2d 698 (5th Cir. 1966) ("[T]he inclusion of a minimal or token number of Negroes on a jury list does not prevent the systematic exclusion rule from operating.").

In *Batson*, the United States Supreme Court suggested that reinstating an improperly-struck juror is an appropriate remedy.[111]  If a *Batson* challenge is sustained prior to seating a jury panel in Louisiana, the courts often reseat the improperly challenged prospective juror. The Fifth Circuit, in applying Louisiana law, noted such:

> The "timely objection" rule is designed to prevent defendants from "sandbagging" the prosecution by waiting until trial has concluded unsatisfactorily before insisting on an explanation for jury strikes that by then the prosecutor may largely have forgotten. Furthermore, prosecutorial misconduct is easily remedied prior to commencement of trial <u>simply by seating the wrongfully struck venireperson</u>. After trial, the only remedy is setting aside the conviction.  This is an equally important justification for the "timely objection" rule.[112]

Furthermore, the Louisiana Supreme Court in *Rayne Concrete Services* held that "[b]y denying a person participation in jury service on account of his race or gender, the state unconstitutionally discriminates against the excluded juror."[113]  Such discrimination is constitutionally prohibited and deprives an individual of the opportunity to take part in governing.[114]

Thus, given that *Batson* also seeks to protect the rights of the improperly excluded juror, reinstatement of the juror would restore the juror's infringed rights.[115] Here, permitting defendants to select an African-American <u>in lieu</u> of reinstating Prospective Juror 9 Mr. Franklin, did nothing to reinstate his rights and, at a minimum, deprived Mr. Franklin of his right to equal protection of the laws.  Essentially, the Court's

---

[111] *Batson*, 476 U.S. at 99 n. 24.

[112] *United States v. Forbes*, 816 F.2d 1006, 1011 (5th Cir. 1987) (emphasis added); *see also generally United States v. Parsee*, 178 F.3d 374, 382 (5th Cir. 1999).

[113] *Rayne Concrete Services,* 951 So.2d  at 155.

[114] *Powers*, 499 U.S. at 407 ("Jury service preserves the democratic element of the law, as it guards the rights of the parties and ensures continued acceptance of the laws by all of the people.  It "affords ordinary citizens a valuable opportunity to participate in a process of government, an experience fostering, one hopes, a respect for law." Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process.").

[115] *Id.*; *see also Munch v. Backer*, 972 So. 2d 1249, 1252 (La. App. 4th Cir. 2007).

remedy was actually no remedy; the defendants still were able to improperly exclude Mr. Franklin on account of his race.

> ### (2) *This Court's Remedy Exacerbated the Damage Caused By Defendants' Racial Discrimination*

Even though *Batson* leaves some remedial discretion to the lower courts, the United States Supreme Court has enunciated that such remedies cannot offend the Equal Protection Clause.  In *Cassell v. State of Texas*,[116] the United States Supreme Court held that race could not be used in selecting a jury:

> **The basis of selection cannot consciously take color into account. Such is the command of the Constitution.** Once that restriction upon the State's freedom in devising and administering its jury system is observed, the States are masters in their own household. If it is observed, they cannot be charged with discrimination because of color, no matter what the composition of a grand jury may turn out to be.[117]

The Fifth Circuit similarly noted that the use of race as a basis for a juror's inclusion "does not comply with equal protection."[118]

As applied to the case at bar, the remedy fashioned in response to plaintiff's *Batson* challenge violates the Equal Protection Clause as race-based.  Specifically, this Court permitted defendants to select from a pool of three African-American prospective jurors and consequently deprived Mr. Franklin and one other of the excluded jurors of their Constitutional rights.  Such action is inherently violative of *Cassell*, and thus warrants a new trial.

Under the Equal Protection Clause, the United States Supreme Court has noted that "if race stereotypes are the price for acceptance of a jury panel as fair, the price is

---

[116] 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950).
[117] *Id.* at 295 (emphasis added).
[118] *Labat*, 365 F.2d at 712 (internal citations omitted).

too high to meet the standard of the Constitution."[119]   Similarly, the Louisiana Supreme

Court in *State v. Ball,*[120] held that "the 'back accepting' of an already excluded juror on

grounds of his or her race, in substitution for a juror improperly excluded because of his

or her race, is almost certainly one remedy the Supreme Court would reject." Focusing

on the Equal Protection Clause, the Louisiana Supreme Court noted that "[a]n accused

is entitled to have charges against him considered by a jury in the selection of which

there has been neither **inclusion nor exclusion** because of race."[121]

Here, this Court fashioned a remedy **looking only to the race of a prospective

juror**.  This Court required Defendants to select a juror based solely on race.

> The Court:   . . . Here is what I would propose to do:
> Number one, return a challenge to the defendants and put
> Ms. Morris on the jury as defendants have offered.  Number
> two would be to return a second challenge to the defendants
> and put on either Mr. Bacchus or ms. Hamilton onto the jury.
>
> Mr. Weinstock:    And if I can consult with my group, before
> Mr. Franklin.
>
> The Court:  Why don't you pick between one of those two
> since you're already --
>
> Mr. Weinstock:    What about --
>
> The Court:  Or Mr. Franklin.
>
> Mr. Weinstock:    Or Mr. Franklin.
>
> The Court:  Or Mr. Franklin.  You have three choices.  And I
> will return two challenges to you.  That's what I propose to
> do the remedy.
>
> Mr. Watts:   Just for the record, what are those three options
> that you gave him?  I'm sorry, judge.  The juror numbers, I'm

---

[119] *Edmonson*, 500 U.S. at 630.
[120] 824 So.2d 1089 (La. 2002).
[121] *Id.* at 1100 (quoting *Cassell*, 339 U.S. at 295 (emphasis added)).

> sorry.
>
> The Court:   No, I told him that they can choose between Ms. Morris is going to be on the jury, and they will get a challenge back.  They will get another challenge back, but they will choose between Mr. Franklin, Mr. Bacchus and Ms. Hamilton.
> . . .
> Mr. Weinstock:     We will seat Mr. Bacchus.
>
> The Court:    Mr. Bacchus.[122]

As stated above, the three individuals named by this Court as potential replacement jurors are all African-Americans.  In fact, this Court selected Mr. Franklin, Mr. Bacchus and Ms. Hamilton solely because of their race:

> The Court:   Who else out of the top 30?   We have Mr. Bacchus, and are there any other African-Americans in the top --
>
> Mr. Watts:     29.
>
> The Court:    29.   Ms. Hamilton.   Mr. Bacchus and Ms. Hamilton.  Here is what I propose to do: . . . return a second challenge to the defendants and put on either Mr. Bacchus or Ms. Hamilton onto the jury.[123]

Here, by focusing solely on the race of prospective jurors, the Court violated the Equal Protection Clause as defined in *Cassell* and *Ball*.

Further, as noted by the Fifth Circuit in *Collins v. Walker*,[124] "[j]urymen should be selected as individuals, on the basis of individual qualifications, and not as members of a race."[125]   In attempting to cure Plaintiffs' *Batson* challenge, the Court exacerbated the issue by looking only to the race of potential jurors.  Plaintiff objected under *Batson* to

---

[122] Exhibit A, p. 110, l. 23-p. 111, l. 20; p. 112, l. 1-6.
[123] Exhibit A, p. 110, l. 19-p. 111, l. 3.
[124] 335 F.2d 417 (5th Cir.1965).
[125] *Id.* at 419.

proceeding with the jury seated pursuant to the Court's "remedy."[126]   Furthermore, as noted *supra*, the remedial measures with respect to Ms. Morris were essentially nullified by her failure to return to jury service.  Plaintiff timely objected to proceeding without Ms. Morris, in light of Defendants' *Batson* violations.[127]   As such, any remedies to the *Batson* challenge herein were wholly insufficient and fatal, thus warranting a new trial.


## III.   The Jury Should Not Have Received an Instruction Regarding Gulf Stream's Government Contractor Defense

Gulf Stream initially filed a Motion for Summary Judgment (asserting that they were entitled to immunity from state law tort liability because of its status as a government contractor)[128], which was denied by the Court.[129]  Plaintiffs later filed a Motion for Judgment as a Matter of Law[130] regarding several of Gulf Stream's asserted affirmative defenses, including the Government Contractor Defense.  The Court denied that motion during a hearing on the record.[131]

Pursuant to Rule 50(a)[132], Plaintiffs timely (before the case was submitted to the jury) objected on the record to the inclusion of any jury charges related to the Government Contractor Defense.[133]

---

[126] Exhibit A, p. 113, l. 5 – 14.
[127] Exhibit B, p. 10, l. 22 – p. 11, l. 8.
[128] Rec. Doc. 2410.
[129] Rec. Doc. 3076.
[130] Rec. Doc. 3682.
[131] Transcript of Oral Argument, Sept. 23, 2009, p. 189.
[132] Rule 50(a) states that "(1) **In General.** If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  (2) **Motion.** A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.  The motion must

# ARGUMENT AND AUTHORITIES

A. <u>The record contains no evidence that Gulf Stream was a Government Contractor.</u>

The jury should not have been given instruction regarding Gulf Stream's Government Contractor Defense.  Gulf Stream presented absolutely no evidence at trial to support the elements of same, making instruction on the affirmative defense inapplicable, confusing and prejudicial to plaintiff.

The Supreme Court has held that a contractor would be immune from state tort law liability if 1) the subject matter involves "uniquely federal interests,"[134] and 2) a "significant conflict exists between an identifiable federal policy of interest and the operation of state law or the application of state law would frustrate specific objective of federal legislation."[135]   For there to exist a "uniquely federal interest," the Supreme Court requires three criteria to be satisfied, in which event state law liability will be preempted:

   (1)  the United States approved "reasonably precise" specifications;
   (2)  the product conformed to those specifications; and
   (3)  the supplier or manufacturer warned the United States about dangers in the use of the product that were known to it but not to the United States.[136]

The Fifth Circuit has held that, in addition:

---

specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. Proc. 50(a)(1) and (2).

[133] Transcript of Oral Argument, September 23, 2009, p. 170-172.

[134] *Boyle* identified three areas where "uniquely federal interests arise: 1) the obligations to, and rights of, the United States under its contracts; 2) the liability of federal officers for official acts; and 3) civil liabilities arising out of procurement contracts relating to national defense.  *Boyle*, 487 U.S. at 504-05.

[135] *Boyle v. United Technologies Corp.*, 487 U.S. 500, 507-08 (1998).

[136] *Id* at 512.

The protective shield in favor of the contractor collapses when the actions of the government contractor-and not those of the Government-produce the damaging defect.   In such a situation, fairness dictates that a government contractor should not be permitted to escape liability by asserting the sovereign immunity of the Government.[137]

Because the Government Contractor Defense is an affirmative one, Gulf Stream bore the burden of proof at trial, and should have satisfied **each element** of the defense as a matter of law.[138]

## 1. _There Were No Reasonably Precise Specifications_

The first element requires that the government provide precise product specifications, leaving no discretion to the contractor.[139]   Courts have interpreted this element to require "continuous back and forth" collaboration between the contractor and the government with respect to the design of the product supplied to the government.[140] In contrast, when the government passively accepts the contractor's independently developed design choices and, accordingly, does not exercise sufficient discretion over

---

[137] _Mitchell v. Lone Star Ammunition, Inc._, 913 F.2d 242, 245-46 (5th Cir. 2000).

[138] _Terrebonne Parish Sch. Bd. V. Mobil Oil Corp._, 310 F.2d 870, 877 (5th Cir. 2002); _Smith v. Xerox Corp._, 866 F.3d 135, 136-37 (5th Cir. 1989); _Fontenot v. Upjohn Co._, 780 F.2d 1190, 1194 (5th Cir. 1986).

[139] _Boyle_, 487 U.S. at 513; _Wisner v. Unisys Corp._, 917 F. Supp. 1501, 1510 (D.C. Kan. 1996) (noting that "virtually microscopic precision") meets the first element).

[140] _See Kerstetter v. Pac. Scientific Co._, 210 F.3d 431, 435 (5th Cir. 2000) (the government continuously interacted with the contractor over eight years and the government addressed the design issues specific to this case during the process); _Stout v. Bourgh-Warner Corp._, 933 F.2d 331, 336 (5th Cir. 1991) (government contractor defense is available where "review [of the project] involved, inter alia, [the contractor's] submission of detailed drawings at various progressive stages of the design, critical design reviews where [government] engineers critiqued [the contractor's] work, and finally, the production of prototype model tested and evaluated for months by the [government] for its actual performance."); _Smith v. Xerox Corp._, 866 F.2d 135, 137-38 (5th Cir. 1989) (first element established by government's initial supply of relevant specifications for shoulder-mounted weapon which were incorporated into production contract, and government's subsequent review and approval of contractor's final drawings and specifications); _see also Harduvel v. General Dynamics Corp._, 878 F.2d 1311, 1320 (11th Cir. 1989) (extensive analysis and review by government of fighter aircraft's electrical system established government approval); _Kleeman v. McDonnell Douglas Corp._, 890 F.2d 698, 702-03 (4th Cir. 1989)((1) regular discussions between Navy officials and the contractor's employees as to the design, testing and production of the aircraft, (2) the Navy's large staff presence at the contractor's facility; (3) the Navy's retention and exercise of the power to approve and reject design modifications; (4) the contractor's use of the Navy specifications for the landing gear design; and (5) the Navy's testing of the prototype).

the design features in question, the contractor will not be allowed to assert the government contractor defense.[141]  "'[A]pproval' under the *Boyle* defense requires more than a rubber stamp" from the government.[142]

The facts in the present case are closely analogous to the example given in *Boyle* of what does <u>not</u> pose a significant conflict between federal and state interests so as to give rise to the preemptive Government Contractor Defense:

> The United States contracts for the purchase … of [a travel trailer], specifying the [basic requirements] but not the precise manner of construction.  [A] state law imposing upon the manufacturer of such units a duty of care to include certain safety features would not be a duty identical to anything promised by the Government, but neither would it be contrary.  [Gulf Stream] could comply with both its contractual obligations and the state-prescribed duty of care.[143]

In such a case, "No one suggests that state law would generally be pre-empted in this context."[144]

Gulf Stream avers that FEMA did convey 'precise specifications' for the Alexander trailer by calling for compliance with industry standards, and issued a four-page document of general 'specifications' to Gulf Stream.[145]  However, it is abundantly clear from the aforementioned jurisprudence that the specifications relayed by FEMA would have to be *far* more specific than merely calling for industry standards compliance in a four-page document.  In fact, it is clear from the Fifth Circuit's opinion in *Trevino* that such a document is irrelevant as the basis for the asserted defense

---

[141] *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1486-87 (5th Cir. 1989).
[142] *Id.* at 1480.
[143] *Boyle*, 487 U.S. at 509.
[144] *Id.*
[145] Transcript of Oral Argument, September 23, 2009, p. 177.

because it does not refer to formaldehyde levels to be used in the trailers (the very feature and risk of the product at issue herein). In that case, the court held that reasonably precise specifications and conformity with those specifications must refer to the <u>particular feature of the product</u> claimed to be defective. [146]

Mr. Tim Scandurro, counsel for Gulf Stream, in fact acknowledged on the record the absence of reasonably precise Government specifications for formaldehyde levels in the Alexander trailer, stating: "And did [the specifications] say anything about formaldehyde? No. It wasn't specific to formaldehyde…"[147] The fact that these specifications, by admission of the defense, say *nothing* about formaldehyde, clearly distinguish this case from those where the Government exacted precise control over the manufacturing process and with respect to the product danger or risk at issue, making application of the Government Contractor Defense appropriate.

### 2. <u>Because There Were No Reasonably Precise Specifications, Whether The Trailer "Conformed" to Those Specifications is Irrelevant</u>

As neither the document issued to Gulf Stream by FEMA nor the call for compliance with "industry standards" was "reasonably precise" as to the alleged product defect and risk at issue (excess formaldehyde), it is impossible for Gulf Stream to prove that it complied with such specifications in order to establish the second component of the Government Contractor Defense.

---

[146] *Trevino*, supra, at 1486; *see also Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 799 (5th Cir. 1993) (a court's analysis must focus upon the "particular feature" allegedly defective); *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744, 746-47 (9th Cir. 1997); *Gray v. Lockheed Aeronautical Sys. Co.*, 125 F.3d 1371, 1377-79 (11th Cir. 1997); *Shurr v. A.R. Siegler, Inc.*, 70 F. Supp.2d 900, 900 (E.D. Wis. 1999); *Strickland v. Royal Lubricant Co.*, 911 F. Supp. 1460, 1467-68 (M.D. Ala. 1995).
[147] *Id.*

### 3. *Gulf Stream Knew of Formaldehyde Risks but Failed to Warn the United States*

The third *Boyle* element requires proof that the contractor warned the Government about possible dangers in the use of the product known to the contractor but not to the Government.[148]   The contractor also can satisfy this element by proving (1) that it lacked knowledge of any alleged danger relating to the product, and/or (2) that the Government already knew of the alleged danger or hazard.[149]   However, where a Government contractor, by virtue of being engaged in the business, should have known as much as, if not more than, the Government regarding the toxicity at issue in a case such as this, the defense is unavailable.[150]

There is no evidence in this record to the effect that Gulf Stream warned the Government about a formaldehyde risk pertinent to the Alexander trailer.   Neither is there record evidence that the Government, but not Gulf Stream, was aware of the danger of formaldehyde exposure in the Alexander trailer at the time the unit was furnished by Gulf Stream under contract.   To the contrary, there was ample evidence at trial showing that Gulf Stream was very much aware of the issues concerning low formaldehyde-emitting wood in its trailers, and that the Government mistakenly relied on Gulf Stream to furnish a fit and proper unit.

The third and final prong of the Government Contractor Defense simply was not established in the trial of this case.

### B. Plaintiff Should Be Granted a New Trial To the Extent that The Jury Was Confused by the Government Contractor Defense regarding the LPLA Design

---

[148] *Boyle*, *supra*, at 512.
[149] *See Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003-04 (7th Cir. 1996).
[150] *Strickland*, *supra*, at 1468.

<u>Claim, Even if the Verdicts Regarding Composition and Failure to Warn Are</u>
<u>Deemed Not to Have Been Affected by the Jury Instructions</u>

It is well-settled that each theory of recovery under the LPLA is an independent one, i.e., a plaintiff can prevail on a claim under one theory even if not as to another.[151] In this case, therefore, even if the verdict responses regarding whether the trailer was unreasonably dangerous in construction or  composition or based on Gulf Stream's inadequate warning are deemed *not* to have been affected by the jury instruction concerning the Government Contractor Defense, plaintiff is entitled to a new trial to the extent that the unwarranted instruction on this defense influenced the jury as to whether the Alexander's trailer was unreasonably dangerous in design.

From the questions submitted by the jurors after deliberation commenced (and now part of the record), it appears they were intent on seeing evidence that FEMA's specifications as to the Alexander unit were violated by Gulf Stream.  This interest clearly relates to the jury charge on the Government Contractor Defense.  It is reasonable to conclude that the jurors considered Gulf Stream's compliance with FEMA specifications to be a key consideration in determining whether the affirmative defense applicable to Government contractors was available to exonerate Gulf Stream.  Thus, the jury charges with respect to the Government Contractor Defense resulted in,

---

[151] The usage of the word "or" instead of "and" in the language of LSA-R.S. 9:2800.54 clearly indicates that a plaintiff needs to prove only that a product is unreasonably dangerous in *one of* (as opposed to *all of*) the following ways: A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; ***or***
(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58. [emphasis added]; *see also Lozano v. Touro Infirmary*, 778 So.2d 604, 608, (La.App. 4 Cir.,2000) ("…the Lozanos *asserted two distinct causes of action against Precor, both grounded in Louisiana Products Liability Law…*"[emphasis added]).

caused, and/or contributed to, a verdict adverse to plaintiff on the LPLA defective design claim.


## IV.    Plaintiffs' Requested Charge No. 9 Should Have Been Given to the Jury

Plaintiff in this case requested that a charge be given to the jury instructing that "[f]or the purposes of a defective design claim, compliance with industry regulations does not excuse unreasonable behavior."[152]   Pursuant to Rule 51(c)(1) and (2)[153], plaintiff timely objected on the record to the failure to give plaintiffs' requested charge No. 9 to the jury.[154]

The point of law conveyed in plaintiff's proposed jury instruction is well-settled and was set forth in *Southern Natural Gas Co. v. Gulf Oil Corp.*[155] In that case, suit was brought for property damage sustained when the defendants' dredge picked up and ruptured Southern's natural gas pipeline.  The court denied the argument that Southern's own fault was precluded by the absence of the Gas Pipeline Safety Act's extension to the area in question, and held that "…absence of regulation does not excuse unreasonable behavior any more than compliance with existing regulations might excuse such behavior."[156]

---

[152] Plaintiffs' Requested Jury Charge #9.

[153] Rule 51 of the Federal Rules of Civil Procedure explains how a party should make objections to jury instructions: "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. Proc. 51(c)(1).

[154] Transcript of Oral Argument, September 24, 2009, p. 141.  ("We object to the failure to give plaintiffs' requested charge No. 9 because there's evidence here that Gulf Stream either may or may not have conformed to industry standards.  And that's the charge that says: 'Conformance with industry standards is not dispositive of an LPLA case.')

[155] 320 So.2d 917 (La. App. 3 Cir. 1975), *writ denied,* 324 So.2d 812 (La. 1976).

[156] *Id* at 920.

Since *Southern,* a number of other cases have confirmed this important principle of law.  In *Corley v. Gene Allen Air Service, Inc.*, a plane that was not equipped with an emergency locator transmitter crashed, and survivors of the decedents filed suit.[157]   The defendants argued that they had no duty to equip the plane with an E.L.T. pursuant to an exception provided in the Federal Aviation Administration provisions.  The court rejected this argument and, citing *Southern*, stated that "…the defendants failed to take note of the fact that negligence does not solely depend on violation of a statute or rule. Unreasonable conduct is not [excused] when one merely complies with minimum regulatory requirements."[158]

In *Hopper v. Crown*, a warehouse forklift operator who was rendered paraplegic when the forklift's mast struck an overhead door, brought a products liability action against the forklift manufacturer, alleging defective design.[159] The court denied the manufacturer's reliance upon industry standards as a basis for excusing their defective design, holding explicitly that "compliance with industry regulations does not excuse unreasonable behavior."[160]

In *Bonnette v. Conoco, Inc.*, property owners brought an action against a refinery owner for damages arising from exposure to asbestos contained in dirt purchased from a contractor used by the refinery owner to remove and replace soil from the site of demolished houses near the refinery.[161]   Conoco argued that they did not behave

---

[157] 425 So.2d 781 (La. App. 3 Cir. 1982).
[158] *Id* at 784.
[159] 646 So.2d 933 (La. App. 1 Cir. 1994), *rehearing denied, writ denied,* 651 So.2d 275 (La. 1995).
[160] *Id* at 946.
[161] 801 So.2d 501 (La. App. 3 Cir. 2001), *affirmed in part* (property damage award), *reversed in part* (awards for punitive, mental anguish, and fear of contracting disease damages), 837 So.2d 1219 (La. 2003).

unreasonably during the removal and transportation of the soil and debris from the demolition site, as evidenced by their conformity with the Louisiana Department of Environmental Quality requirements.  However, the court maintained that "although Conoco complied [with] and went beyond the DEQ requirements, Conoco's unreasonable and reckless behavior in removing and transporting the soil is not excused.  Unreasonable conduct is not excused when one merely complies with minimum regulatory requirements."[162]

The aforementioned jurisprudence confirmed that mere compliance with industry standards or regulations, therefore, is not legally synonymous with reasonable behavior or the reasonableness of a product's design.  Likewise, whether or not Gulf Stream complied with industry regulations in regard to the Alexander trailer, legally cannot be dispositive of whether the trailer was defective in design under the LPLA.  Plaintiff's proposed jury charge no. 9 makes this relevant point clear to the jurors.  Yet, as noted *supra*, questions submitted by the jury during deliberation indicate a clear emphasis on conformity with FEMA-specified industry standards as an important issue.  It thus is reasonable to conclude that the verdict was based upon a determination that, since no departure from industry standards was established by plaintiff, the Alexander trailer was not 'unreasonably dangerous' for the purposes of the defective design claim.  Had plaintiff's jury charge no. 9 been given, such confusion and misconception as to an established legal principle could, and would, have been avoided.

**V.    The Court Improperly Dismissed Plaintiffs' LPLA Claims Against Fluor**

---

[162] *Id* at 509.

Prior to the Alexander trial, a motion to dismiss LPLA claims was brought by the Individual Assistance/Technical Assistance Contractors ("IA/TACs").[163]   These defendants challenged plaintiff's assertion that the IA/TAC's fall within the definition of manufacturers under the LPLA.   Relying on *Coulon v. Wal-Mart Stores, Inc.*,[164] this Court noted that "[c]aselaw indicates that a 'defect' which manifests itself in the assembly process can impose LPLA manufacturer liability on a party when the defect is created by the assembly process."[165]   The motion was denied on this basis.

Subsequently, Fluor as the defendant contractor in the Alexander case, filed a motion for summary judgment on the same grounds as those presented in the IA/TACs' motion to dismiss.[166]   Although it had relied on *Coulon* to deny the earlier motion to dismiss LPLA claims, the Court reversed its previous position and granted Fluor's motion for summary judgment.[167]   In doing so, Your Honor concluded that, as a matter of law,[168] Fluor was not a manufacturer under the LPLA, thus barring Ms. Alexander's LPLA claims against Fluor from being presented at trial.[169]

The statutory definition of a manufacturer under the LPLA, however, expressly includes those who assemble and refurbish goods.   This Court erroneously dismissed

---

[163] Rec. Doc.  1324.
[164] 734 So.2d 916 (La.App. 1st Cir. 1999).
[165] Rec. Doc. 1762, p. 14.
[166] Rec. Doc. 2802.
[167] Rec. Doc. 3205.
[168] For this court to find that Fluor was not a manufacturer as a matter of law, this Court had to conclude that there were no genuine factual issues that could be resolved only be a finder of fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In reaching this conclusion, this Court was required to "resolve any factual issues of controversy in favor of the non-moving party," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990), and draw all justifiable inferences in favor of the non-movant.  *Anderson*, 477 U.S. at 255; *Gillis v. Louisiana*, 294 F.3d 755, 758 (5th Cir. 2002).
[169] Rec. Doc. 3205.

the LPLA claims against Fluor because it is clear that the FEMA trailer occupied by plaintiff had been both assembled and refurbished by Fluor.

A.    Fluor's Actions Resulted in the "Manufacture" of the Alexander trailer

Louisiana jurisprudence under the LPLA establishes that "for purposes of products liability, [the manufacturer of a product] includes not only the original manufacturer, but also any entity that substantially modifies or materially alters the product after its original manufacture through the use of different components or methods of assembly." *Marshall v. Beno Truck Equip., Inc.* 481 So.2d 1022, 1031 (La. App. 1st Cir. 1985) (citing *Spillers v. Montgomery Ward & Co., Inc.*, 294 So.2d 803 (La. 1974); *LeBouef v. Goodyear Tire & Rubber Co.*, 623 F.2d 985 (La. App. 5th Cir. 1980)). Here, as noted in 'Plaintiffs' Response to Fluor's Motion for Summary Judgment,' Fluor materially altered the travel trailers by "jacking up" the units, and transferring the mobile trailers to concrete piers, thus "blocking" the trailers off their wheels and making the trailers immobile.[170]  Further, as confirmed in the trial testimony of Jim Shea, the original manufacturer Gulf Stream was unaware of the blocking procedures used with respect to the trailers.[171]  Fluor, then, undertook action of assembly with regard to the Alexander

---

[170] Rec. Doc. 2884-2, p. 40-41, 87.
[171] Trial Testimony, Sept. 15, 2009, p. 125, l. 4 - 15.

> Q.   Right.  But the question really is, is would it be improper use to block the trailer or take all the weight off its wheels?
>
> A.   I don't think, you know, to my knowledge, it wouldn't be improper use to block the frame of the unit to stabilize it.

unit that was independent of the fabrication of the unit by the original manufacture. Since a manufacturer under the LPLA is one who "assembles," Fluor was within the ambit of the Act.

      B.    <u>Because of its Contractual Obligation to Refurbish Fluor Was a Manufacturer of the EHU.</u>

In addition to including assembly as a basis for potential liability, the LPLA defines a manufacturer as one "producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or <u>refurbishing</u> a product" [emphasis added].[172]   In granting Fluor's motion for summary judgment, this Court unequivocally held that "Fluor simply is not a "manufacturer" of this EHU within the meaning of the LPLA," since "Fluor did not 'refurbish', 'recondition', or 'remanufacture' the EHU or any of its parts."[173]   But this ignores the evidence that Fluor proceeded under an express contractual obligation to refurbish trailers.  As noted in the IA/TAC contract been Fluor and FEMA,[174] Fluor was charged with "refurbishment" of the EHUs (including the Alexander unit). Specifically, Task No. 6.6.6, describes "[r]efurbishment tasks associated with the repair and refurbishment travel trailer (installed or staging) units."[175]   Thus, the Court's conclusion that Fluor was not a manufacturer because it did not "refurbish" the

---

Q.  And even remove the weight from the wheels would be okay?

A.  I don't know about -- it would depend on how you block the unit.  You know, you need support in the area where the wheels are, as well as other areas, to stabilize the unit.

*Id.*

[172] La. R.S. § 9:2800.53(1)
[173] Rec. Doc. 3205
[174] Trial Exhibit No. 501, p.  147; see also Rec Doc. 2743-6, p. 13
[175] *Id.*  The court "should be sensitive to any evidence which shows that the original trial resulted in a miscarriage of justice and weigh it carefully against the interest in finality and adherence to procedural requirements ."  *U.S. v. Miller*, 277 F.Supp. 200, 206 (D.C.Conn.1967).

Alexander unit is erroneous in light of the undisputed evidence at trial.  Since this erroneous finding precluded presentation of any LPLA claims against Fluor for jury consideration on the theory that the Alexander trailer as assembled and refurbished by Fluor was defective, the verdict in Fluor's favor represents a miscarriage of justice.[176] The Court accordingly should grant the instant motion for new trial and/or relief from judgment on this basis.

## V.     Conclusion

The verdict rendered in this case was influenced by the exclusion of prospective jurors on the basis of race (in violation of *Batson*), by misleading jury instructions regarding Gulf Stream's Government Contractor Defense, by the absence of a jury instruction putting industry standard compliance in proper perspective, and by the Court's improper dismissal of plaintiff's LPLA claims against Fluor.  Plaintiff respectfully prays that this Motion for a New Trial be granted pursuant to Rule 59(a), and/or that Relief from Judgment be afforded pursuant to Rule 60(b)(6).

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:     s/Gerald E. Meunier
         GERALD E. MEUNIER, #9471
         **PLAINTIFFS' CO-LIAISON COUNSEL**
         Gainsburgh, Benjamin, David, Meunier &
         Warshauer, L.L.C.
         2800 Energy Centre, 1100 Poydras Street
         New Orleans, Louisiana 70163
         Telephone:   504/522-2304
         Facsimile:     504/528-9973

---

[176] A motion for new trial should be granted if there is a reasonable probability that there has been a miscarriage of justice. *U.S. v. Smith*, 179 F.Supp. 684, (D.C. 1959), *affirmed*, 283 F.2d 607 (D.C. Cir. 1960), *certiorari denied*, 364 U.S. 938, 81 S.Ct. 387, 5 L.Ed.2d 369 (1961).

gmeunier@gainsben.com

s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:    504/528-9973
jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS'
STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
MIKAL WATTS, Texas # 20981820
DENNIS REICH, Texas #16739600

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing on October 20, 2009.

 s/Gerald E. Meunier
GERALD E. MEUNIER, #9471