1    own bath?
2        A.   They will have to share a bath.
3    MR. HILLIARD:
4        Whenever you get to a good place
5    to stop, the food is here.
6    THE VIDEOGRAPHER:
7        Off the record; it is 11:59.
8    (Lunch Recess.)
9    THE VIDEOGRAPHER:
10        Back on record; it is 12:49.
11   EXAMINATION BY MR. GLASS:
12       Q.   Ms. Alexander, before we get
13   started, I'm going to go through a couple of
14   things.
15        First off, I want to make sure I
16   attach the A. Alexander 1 and the A.
17   Alexander 2, the two Plaintiff Fact Sheets
18   that you actually reviewed during a break
19   and then there were some notations made on
20   each of those documents and those are the
21   corrections that you directed, correct?
22       A.   Yes, sir.
23       Q.   Okay.  So I'm going to attach both
24   of those.
25        I've also placed in front of you

Page 201

1    you have specific concerns or a specific
2    question or answer, I would ask out of
3    courtesy to the witness, I would ask that
4    you show that to her instead of having a
5    blanket request for an affirmation as to the
6    whole thing, just because we had not enough
7    time -- no fault of yours, because you asked
8    us to do it -- we did not have enough time
9    to go through every single answer.
10        But she did the best she could, as
11   did we, during the short lunch break.
12   MR. GLASS:
13        Okay.  I don't know if I can
14   accept that characterization.  I know during
15   the depositions of Gulf Stream Coach that
16   witnesses were requested to review documents
17   and breaks were taken to review the
18   documents in excess of a half an hour.
19        I would ask that the witness take
20   whatever time is necessary to look at the
21   documents to verify that the information in
22   those documents is accurate, and we can go
23   off the record and do whatever --
24   MR. HILLIARD:
25        She's not going to do that.  If

Page 203

1    some documents that I believe you reviewed
2    during the lunch break.  I'm going to run
3    through this very quickly.  They're marked
4    as A. Alexander 3 through A. Alexander 10.
5    And I will represent to you that these are
6    discovery responses that were provided to
7    Gulf Stream by your counsel.
8        Did you have an opportunity to
9    review all those documents?
10       A.   I would say yes.
11   MR. HILLIARD:
12        Well, no.  For the record, to be
13   fair to her and to be fair to you, during
14   the lunch break, you provided me with those
15   documents and asked me to have her review
16   those.
17        As I told you at the time and as
18   in fact did happen, while she was eating
19   lunch, we went through those as best we
20   could with her, however, please don't
21   interpret that to mean that every single
22   answer was discussed and that she reviewed
23   every single answer just because of the time
24   constraints.
25        The reason I'm saying that is, if

Page 202

1    you have a specific answer you want her to
2    talk about, show it to her.  She will look
3    at it and she will be happy to answer any
4    question you have about it.  But we still
5    have to get to Chris today.  It's already 10
6    till 1:00, and it doesn't seem appropriate
7    to me for you to just say, well, take a
8    break and look at it as long as you want.
9        A better way to have done it would
10   have been before the deposition to have sent
11   me an e-mail or have Andy send me an e-mail
12   saying, Look, would you go ahead and spend a
13   couple of hours with her tomorrow afternoon,
14   making sure she refreshes her memory, which
15   I would have been happy to do.
16        It's a little too early in the day
17   to get real sideways with one another, but
18   what I request you consider doing is, if
19   there's an issue that you really want to
20   talk to her about, get to it, and if you
21   really do need a blanket affirmation of all
22   the answers that she has, if that's what you
23   are really shooting for, then, that's the
24   representation that I made on the record
25   about the restriction in time and the

Page 204

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Alana Alexander

1  general review is going to be part of her
2  affirmation.
3       MR. GLASS:
4       Okay, Mr. Hilliard.  The problem I
5  have is, I cannot --
6       MR. HILLIARD:
7       Call me Bob.
8       MR. GLASS:
9       Okay.  I can't go through every
10 single one of these questions in the time
11 that I'm allowed by the Court.  These are
12 pleadings that were filed on her behalf.  I
13 will ask some general questions, but I will
14 not take up any more time on the record
15 fighting this.
16      At the next break, I will figure
17 out how we want to address this, and if we
18 have to get the Court involved, we will get
19 the Court involved.
20      MR. HILLIARD:
21      That's fine.  But I don't think we
22 are fighting.  What I'm trying to say -- not
23 that that may not happen, but what I'm
24 trying to get you to reflect on is, if there
25 are specific questions, that's the quickest

Page 205

1  way.  If there's not, if it's just --
2       MR. GLASS:
3       I'm going to have specific
4  questions as well, but I do not have time to
5  go through every single one of these
6  questions in the --
7       MR. HILLIARD:
8       Well, then, you can feel her pain
9  because she didn't either.
10      MR. GLASS:
11      Well, then, we can take the time.
12      MR. HILLIARD:
13      On the record, because I'm not
14 going to take the time off the record.
15      MR. GLASS:
16      Okay.  I want to refresh your
17 recollection that every witness in every
18 single deposition has been requested to look
19 at documents off the record, including Gulf
20 Stream Coach, and that multiple periods of
21 time were taken to read documents off the
22 record.  And that we'll definitely go to the
23 Court on.
24      MR. HILLIARD:
25      And your suggestion, because you

Page 206

1  allowed your client to do that, that now I
2  have to allow --
3       MR. GLASS:
4       Off the record.  I don't want this
5  time we're talking to count.  We're going
6  off the record right now and we'll deal with
7  it now.
8       THE VIDEOGRAPHER:
9       Off the record; it is 12:54.
10 (Discussion off the record.)
11      THE VIDEOGRAPHER:
12      Back on record; it is 12:57.
13 EXAMINATION BY MR. GLASS:
14      Q.  Ms. Alexander, in front of you are
15 several discovery responses that we
16 previously marked as A. Alexander 3 through
17 A. Alexander 10.
18      Incorporated in that discovery are
19 interrogatories and requests for admissions.
20 I would ask that you verify that the
21 interrogatories contained in these exhibits
22 are accurate as presented to us.
23      MR. HILLIARD:
24      The interrogatory answers?
25      MR. GLASS:

Page 207

1       Yes.
2       MR. HILLIARD:
3       Because we can't verify the
4  accuracy of the interrogatories.  You mean
5  her responses?
6       MR. GLASS:
7       Yes, I'm sorry.
8       MR. HILLIARD:
9       You can answer that.
10      THE WITNESS:
11      Yes.
12 EXAMINATION BY MR. GLASS:
13      Q.  Okay.  So the answers that have
14 been provided in Exhibits 3 through 10,
15 insofar as the interrogatories are
16 concerned, are accurate as presented in
17 these documents?
18      A.  To the best of my knowledge, yes.
19      Q.  Did you review these interrogatory
20 responses before they were provided to us,
21 Gulf Stream Coach?
22      A.  I actually do not remember if I --
23 I have read over so many papers, I really
24 don't know if these are the particular ones
25 that I've read.

Page 208

52  (Pages 205 to 208)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Alana Alexander

1      Q.   Under the Federal Rules of Civil
2    Procedure, I think we're entitled to a
3    verification as to the accuracy of the
4    interrogatories by you as the plaintiff.
5         So are you certifying that to the
6    best of your knowledge today, the responses
7    contained in any interrogatory propounded
8    upon you are accurate?
9         MR. HILLIARD:
10         Excuse me.  I'm going to object as
11   to form and you still have the right to
12   answer it, if you remember.
13         Two objections.  My first
14   objection is as to form in regards to the
15   Federal Rules of Civil Procedure.  And if
16   you'll read back the question before I make
17   my next objection.
18         (Requested portion of transcript read
19   back, as follows):
20         "Q.   Under the Federal Rules of Civil
21   Procedure, I think we're entitled to a
22   verification as to the accuracy of the
23   interrogatories by you as the plaintiff.
24         So are you certifying that to the best
25   of your knowledge today, the responses

Page 209

1         MR. GLASS:
2         I'm not going to have it count
3    against my --
4         MR. HILLIARD:
5         No, none of this is counting
6    against your time as of this point.  What I
7    want off the record is to understand what
8    you are requesting.
9         MR. GLASS:
10         Okay.  I'm requesting that she
11   reviews, No. 1, the request for admissions
12   that are contained in Exhibits 3 through 10,
13   and her responses and that she reviews the
14   interrogatories and her responses in
15   Exhibits 3 through 10, so that when she
16   represents that they are accurate to the
17   best of her knowledge, she actually has a
18   basis of knowledge.
19         MR. HILLIARD:
20         Okay.
21         THE VIDEOGRAPHER:
22         Off the record; it is 1:02.
23         (Recess.)
24         THE VIDEOGRAPHER:
25         Back on record; it is 1:14.

Page 211

1    contained in any interrogatory propounded
2    upon you are accurate?"
3         MR. HILLIARD:
4         If you can, you may answer that
5    question.
6         THE WITNESS:
7         I don't understand the question,
8    to be honest.
9    EXAMINATION BY MR. GLASS:
10         Q.   Have you reviewed the
11   interrogatory responses contained in
12   Exhibits 3 through 10?
13         A.   I would say I could have, but I
14   don't know the specifics in here.  So I
15   would say I could have at one point.
16         MR. GLASS:
17         Okay.  Off the record.  I'm going
18   to request that the witness review the
19   interrogatory responses so that she can say
20   that she has reviewed them before certifying
21   their accuracy.
22         MR. HILLIARD:
23         You are -- we're not off the
24   record right now -- you're saying you want
25   to go off the record?

Page 210

1    EXAMINATION BY MR. GLASS:
2         Q.   Ma'am, it's my understanding that
3    during the break, you had an opportunity to
4    look at the A. Alexander Exhibits 3 through
5    10; is that correct?
6         A.   Yes.
7         MR. HILLIARD:
8         If you had to guess how much time
9    we spent quibbling about it, ten minutes?
10         MR. GLASS:
11         That's good.
12         MR. HILLIARD:
13         I'm going to add ten minutes to
14   your time, unless there's an objection from
15   the defendants.  Go for the objection.
16         MR. GLASS:
17         Thank you very much.
18   EXAMINATION BY MR. GLASS:
19         Q.   Okay.  After you reviewed these
20   documents regarding the requests for
21   admissions and the responses thereto for
22   both yourself and your son, did you see
23   anything that you considered inaccurate?
24         A.   No.
25         Q.   The information provided in the

Page 212

53  (Pages 209 to 212)

1  responses to requests for admissions were
2  accurate?
3      A.  Yes, to the best of my knowledge.
4      Q.  Did you have an opportunity to
5  review the interrogatories directed both to
6  you and to your son in multiple sets?
7      A.  Yes.
8      Q.  Did you see any information in
9  those responses that you considered to be
10  inaccurate?
11      A.  No.
12      Q.  Is it your testimony that the
13  answers provided in response to the
14  interrogatories directed to both you and
15  your son are accurate?
16      A.  Yes.
17      Q.  As part of the request, there was
18  some discovery directed to you seeking
19  electronic discovery for any electronic
20  accounts you may have had or computer
21  accounts you may have had, and specifically,
22  the information sought related to either
23  formaldehyde or the trailer in which you
24  resided.
25          Did you have any information that

Page 213

1  computer and looked up anything that had to
2  do with formaldehyde?  Is that what you're
3  asking?
4      Q.  What this interrogatory and
5  request for production was seeking was any
6  information -- I'm sorry, any electronically
7  stored information relating to your lawsuit,
8  the THU formaldehyde, that you might have
9  sent or e-mailed to somebody else, that type
10  of information.
11      A.  Then my answer would be no, I sent
12  nothing.
13      Q.  Did you go back and look in these
14  e-mail accounts to see if there was any
15  responsive information?
16      A.  No, I did not.
17      Q.  Okay.  You just know there was no
18  information regarding formaldehyde, your
19  exposure, damages, and all the things listed
20  in item No. 9?
21      A.  Yes.
22      Q.  Okay.  Do you maintain any
23  accounts other than the two e-mail accounts
24  I just referenced from your discovery
25  responses?

Page 215

1  was responsive to that request?
2      A.  Wait.
3  MR. HILLIARD:
4          Would you mind showing her what
5  you're talking about?
6  EXAMINATION BY MR. GLASS:
7      Q.  For example, if you look on A.
8  Alexander 3 on page 9 -- I'm sorry, page 13,
9  item 9, it requests "All electronically
10  stored information held and sent to or sent
11  from any e-mail account referenced in
12  interrogatory No. 19," which in 19 you
13  referenced aalexander@mcdonough15.org, and
14  skillsqueen@yahoo.com, that pertains to your
15  THU, the allegations in your petition, your
16  alleged exposure to formaldehyde, medical
17  conditions you allege to suffer from as a
18  result of living in the THU, and
19  psychological conditions you allege to
20  suffer from as a result of living in the THU
21  and the scope of your damages.  Your
22  response was "None in plaintiff's
23  possession, custody or control."
24          Is that accurate?
25      A.  Are you asking me if I went on the

Page 214

1      A.  No, I do not.
2      Q.  Chris also has an e-mail account
3  that you've provided in response to his
4  discovery; is that correct?
5      A.  Yeah.
6      Q.  When did you set up your e-mail
7  accounts?
8      A.  A. Alexander was set up when I
9  first got the job at McDonough 15 because
10  that's a work-related one.  And I would say
11  skillsqueen was shortly thereafter.
12      Q.  When did you get your job at
13  McDonough 15?
14      A.  I started in '06.
15      Q.  Did you also maintain an e-mail
16  account, aalexander6404@bellsouth.net?
17      A.  Yes, that was prior to the storm,
18  if I'm not mistaken.
19      Q.  Okay.  Do you still maintain that
20  account?
21      A.  No.
22      Q.  When did you -- strike that.
23          Did you ever receive a request to
24  hold any accounts or electronic data that
25  was potentially related to this litigation?

Page 216

54  (Pages 213 to 216)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation        Videotaped Deposition of Alana Alexander

1    A.   No.
2    Q.   Did you ever go back to look at
3  your Alexander6404 account with
4  bellsouth.net to determine if there were any
5  responsive electronic data concerning
6  formaldehyde, FEMA trailers and your
7  lawsuit?
8    A.   No.
9    Q.   Do you recall ever sending any
10 e-mails to anyone concerning formaldehyde
11 from the Alexander6404 account?
12   A.   No.
13   Q.   Do you recall sending any e-mails
14 from the Alexander6404 account concerning
15 your FEMA trailer?
16   A.   No.
17   Q.   When did you close the
18 Alexander6404 account?
19   A.   To my knowledge, it's still open,
20 because I never -- I don't think I ever
21 closed it.  Because I -- yeah.
22   MR. HILLIARD:
23     Just don't use it?
24   THE WITNESS:
25     Right.  Just don't use it.
                                    Page 217

1    EXAMINATION BY MR. GLASS:
2    Q.   Chris's e-mail is
3  chriscop@ymail.com?
4    A.   Yes.
5    Q.   Are you aware of any other
6  accounts that you held for you -- e-mail
7  accounts that are held for you or Chris?
8    A.   No.
9    Q.   Do you have a FaceBook account?
10   A.   No.
11   Q.   Do you have a MySpace account?
12   A.   No.
13   Q.   Are you a member of any other
14 electronic Web site organization?
15   A.   No.
16   MR. HILLIARD:
17     Do you Twitter?
18   THE WITNESS:
19     No.
20 EXAMINATION BY MR. GLASS:
21   Q.   That was my next question.  Are
22 you Linked?  Are you part of Linked or
23 anything like that?
24   A.   No.
25   Q.   Do you maintain a blog on the
                                    Page 218

1  Internet concerning any activities that you
2  do on a daily basis?
3    A.   No.
4    Q.   Does Chris maintain a FaceBook
5  account?
6    A.   You would have to ask him.
7    Q.   Do you monitor Chris's e-mail --
8  excuse me, computer activity?
9    A.   For the most part, yes.
10   Q.   Do you know if he has a MySpace
11 account?
12   A.   I don't think he does, no.
13   Q.   Does he maintain any blogs that
14 you're aware of?
15   A.   No.  The only thing I know, he
16 goes on his video games.
17   Q.   The first set of admissions and
18 interrogatories and requests for production
19 propounded to you that is indicated in
20 Exhibit 3 there, item No. 7 for
21 interrogatories on page 7, it asks you to
22 "Please describe each and every injury
23 and/or medical condition you claim you've
24 sustained for which you claim that Gulf
25 Stream Coach, Inc., is responsible, giving
                                    Page 219

1  the extent and duration of each injury
2  and/or medical condition and state which, if
3  any, of the injuries and/or medical
4  conditions are claimed to be permanent."
5    There are several objections, and
6  then without waiving the objections, you
7  refer us to the Plaintiff Fact Sheet for
8  Alana Alexander, including responses to
9  questions in Section 3.
10   Is it your testimony that the
11 Plaintiff Fact Sheets that you provided to
12 us are accurate representations of the
13 claims that you're making?
14   A.   Yes.
15   Q.   There is a similar interrogatory
16 in Chris's discovery, and I believe they
17 also refer to Christopher's responses.
18 That's on page 7 of Exhibit 8.  Question
19 No. 6.
20   A.   What page did you say again?
21   Q.   Page 7.
22   A.   And No. 8?
23   Q.   No.  I'm sorry.  On page 7,
24 question No. 6.  It asks the same questions
25 and there is, again, objections, and then
                                    Page 220

55 (Pages 217 to 220)

1   "Subject to and without waiving objections,
2   Plaintiff refers Gulf Stream Coach to the
3   Plaintiff Fact Sheet for Christopher Cooper,
4   including those responses to questions in
5   Section 3."
6          And the Plaintiff Fact Sheet would
7   be marked as A. Alexander 2.
8          Is it your testimony that it is an
9   accurate representation that plaintiffs are
10  making contained in response to questions in
11  Section 3?
12     A.  Yes.
13     MR. HILLIARD:
14          And for clarification, Joe, we
15  don't deal with our objections right now,
16  but your question isn't meant to imply that
17  that's inclusive of all the injuries because
18  of the amount of experts that we have in
19  regards to Chris's potential for medical
20  issues, which were part of the objections to
21  the answer.
22          All you're asking there is to the
23  extent that you list them, they're accurate.
24  You're not asking her to say that's it in
25  regards to every expert that has spent time

Page 221

1   medically reviewing Chris, his X-rays, his
2   breathing restrictions, et cetera, et
3   cetera.
4          I just want to make sure that you
5   are on the same page with this witness and
6   that you're just asking her to affirm that
7   her Plaintiff Fact Sheet is accurate, but
8   you're not asking her to restrict experts
9   that may know things about her son that even
10  she doesn't know just because of the
11  testing.
12     MR. GLASS:
13          Fair enough.  I appreciate the
14  clarification.  I'm not opposed to telling
15  you where I'm actually going with this.
16          The Plaintiff Fact Sheets
17  represent that they are not making certain
18  claims, and then when we get to the
19  complaint, you're going to see you are
20  making those claims, and I am trying to
21  reconcile the two, especially since the
22  discovery responses refer us to Plaintiff
23  Fact Sheets which say that you are not
24  making certain claims.  So --
25     MR. HILLIARD:

Page 222

1          Not that you need me to, but you
2   may proceed.
3   EXAMINATION BY MR. GLASS:
4      Q.  You moved out of the trailer on or
5   about December of 2007 or January of 2008;
6   is that accurate?
7      A.  More December of '07.
8      Q.  December 2007, I'm sorry.  I
9   probably was messing it up with one of the
10  earlier residences.
11          When you moved out, did you ever
12  go back to the trailer?
13     A.  Only to clean it because they said
14  it had to be cleaned before they picked it
15  up.
16     Q.  When did you clean it?
17     A.  I would say the following day
18  after I moved out.  Day or two after I moved
19  out.
20     Q.  After you cleaned it, did you ever
21  go back to the trailer?
22     A.  No.
23     Q.  Were you at the trailer later when
24  it was tested?
25     A.  Only, I think I had only opened

Page 223

1   the door -- unlocked the door.
2      Q.  So I will represent to you the
3   testing was done on January 28, 2007?  I'm
4   sorry, 2008.
5          Did you go back and just open the
6   door and then left?
7      A.  Yes.  She put the -- yeah.  She
8   put it in there and I locked the door back.
9      Q.  Okay.  Describe for me exactly
10  what you did when you went to the trailer
11  for the testing in 2008.
12     A.  I unlocked the door, the lady went
13  in.  She put whatever she needed to put in
14  there and then I locked the door back after
15  she came out.
16     Q.  How long was the lady in the
17  trailer?
18     A.  I don't know.  It wasn't long.  I
19  won't say long.
20     Q.  Was the door open the whole time
21  she went in and then when she went out or
22  did they have that closed?
23     A.  That I really don't remember.
24     Q.  You said "not long."  Are we
25  talking a matter of minutes or 15-minute

Page 224

56 (Pages 221 to 224)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation     Videotaped Deposition of Alana Alexander

1   increments?  Can you give me an idea?
2       A.  I would say it wasn't as long as
3   half an hour.
4       Q.  Did you see what she did inside
5   the trailer?
6       A.  No.
7       Q.  Were any windows open?
8       A.  I really don't recall any windows
9   being open.
10      Q.  Did you open any windows?
11      A.  No, because I never went in.
12      Q.  Was the air-conditioning on?
13      A.  No.
14      Q.  Was there any power to the unit?
15      A.  I think the power had already been
16  shut off.
17      Q.  Between the time that you cleaned
18  the trailer and the date of the test, had
19  anybody been in the trailer?
20      A.  No.
21      Q.  It had been closed up the entire
22  time?
23      A.  Yes.
24      Q.  At any time between your cleaning
25  of the trailer and the date of the test, was

Page 225

1   keys for the trailer?
2       A.  No.
3       Q.  That you're aware of?
4       A.  That I'm aware of, no.
5       Q.  Did anybody call to tell you that
6   they were going into the trailer between the
7   time you cleaned it and the time of the
8   test?
9       A.  No.
10      Q.  When you moved out of the trailer,
11  can you describe for me every item of damage
12  that you personally observed in the trailer?
13      A.  Okay.  There was the mold and
14  mildew in the closet, the panel was gone --
15  not gone, I'm sorry, but buckled, and it had
16  the tape on it.
17          The light fixture at that time had
18  started leaking again, because actually,
19  when I went in on one of those days to clean
20  it, it had leaked and the bed was soaked.
21  And also, the paneling under the bed, the
22  water had soaked through and it had gone all
23  the way through the bottom.
24          In the other room, there was more
25  mold on it, on the windows.  There was -- I

Page 227

1   the air-conditioning run in the trailer?
2       A.  I would say no.  There is no
3   power.
4       Q.  When you finished cleaning the
5   trailer, did you leave the windows open?
6       A.  No.
7       Q.  Did you leave the vents open?
8       A.  You talking about the
9   air-conditioning vents?  They were always
10  open.
11      Q.  How about the bathroom vent?
12      A.  No, I probably closed it because I
13  left.
14      Q.  Did you leave the door open as you
15  were cleaning it?
16      A.  No.
17      Q.  The trailer was locked up when you
18  left?
19      A.  Yes.
20      Q.  Did you give the keys to somebody
21  before the testing was done on January 28,
22  2008?
23      A.  No.
24      Q.  Okay.  Would you -- strike that.
25          Was anybody else in possession of

Page 226

1   don't know how you say it, like a piece on
2   the side of one of the chairs in there had
3   fallen off during the time we was there.
4       I'm walking through -- the panel
5   had buckied, it was buckled in the bathroom,
6   and it was mold and mildew on the windows
7   where Erika and them was in the kitchen
8   area.
9       Q.  Anything else that you recall?
10  MR. HILLIARD:
11      Talking inside only right now?
12  MR. GLASS:
13      Inside or outside.
14  THE WITNESS:
15      I'm trying to think of anything
16  else inside.  Well, the heater still wasn't
17  working.
18          So want all the damage that I
19  can think of that was wrong with the trailer
20  at the time we moved out?
21  EXAMINATION BY MR. GLASS:
22      Q.  At the time you moved out, yes,
23  ma'am.
24      A.  Okay.  I would say that was it as
25  far as inside.

Page 228

57  (Pages 225 to 228)

1  As far as outside, I would say
2  there really wasn't any damage that we
3  incurred during the time that we were there
4  on the outside of the trailer.
5     Q.  At the time you vacated the
6  trailer, was there any problem with the door
7  fitting in its frame?
8     A.  No, my door was fine.
9     Q.  It was tight?
10    A.  (Witness nods head affirmatively.)
11    Q.  That's "yes"?
12    A.  Yes, I'm sorry.
13    Q.  Were there any problems with any
14 cracks in the exterior shell of the trailer
15 such that wind or air could come in?
16    A.  No, I would say not -- no.
17    Q.  The only place that you observed
18 water coming in was over the light fixture
19 in the master bedroom?
20    A.  Yes.
21    Q.  Did you see any tears in the skin,
22 the exterior skin of the trailer?
23    A.  There was one where somebody had
24 put, you know, that foam you spray and it
25 swells?
Page 229

1     A.  I would say -- in 2006 -- I would
2  say in that 2006-2007, they would get in
3  from time to time.
4     Q.  So you think it was before
5  Christmas the first year you were in the
6  trailer that you first saw some mice?
7     A.  I'm not sure exactly, but I know
8  the mice were there.
9     Q.  You saw more than one mouse?
10    A.  Oh, yeah.
11    Q.  Once you first saw a mouse, did
12 you continuously see them after that time?
13    A.  Off and on, yes.
14    Q.  Until the time you left?
15    A.  No, until I went up under the
16 trailer and plugged up all the holes that
17 were up underneath the trailer.
18    Q.  Jack-of-all-trades.
19    A.  Can't live with mice.  Not in that
20 little box.
21    Q.  So you went under the trailer and
22 put in some steel wool?
23    A.  I went in and I put in steel wool,
24 and after I placed the steel wool, I got the
25 foaming insulation and sprayed over the
Page 231

1     Somebody had put that on the
2  outside, but that had been there, I didn't
3  do that.
4     Q.  That was before you came -- when
5  you first came to the trailer, that was
6  already there?
7     A.  Yes, that was already there when I
8  first got there.
9     Q.  Where was that located?
10    A.  I want to say it was by a plug-in
11 area where you pull a cord out, you know,
12 there's a cord for the electrical plug that
13 you would plug into the main power.  And it
14 was in that general area there.
15    Q.  Did you ever have any problems
16 with, say, plumbing backing up or anything
17 like that?
18    A.  One time the toilet got plugged, I
19 mean, stopped up, but we plunged it and it
20 flowed.  And we had issues with mice getting
21 in.
22    Q.  You saw mice in the trailer?
23    A.  Oh, yes.
24    Q.  When did you first see mice in the
25 trailer?
Page 230

1  steel wool, and then I took duct tape and
2  taped over that.
3     Q.  What type of insulation did you
4  spray?
5     A.  The canned one where you spray it
6  and it expands and fills the cracks.  I
7  don't remember the name brand.
8     Q.  Once you were finished, nothing
9  was getting in there?
10    A.  Nothing can get in there after
11 that.
12    Q.  Do you remember when you did that?
13    A.  Say again?
14    Q.  Do you remember when you plugged
15 up all those holes?
16    A.  I don't know exactly when, I know
17 it was in -- the weather had changed and it
18 was warmer.
19    Q.  So you think it was in the
20 springtime?
21    A.  It probably was, I would say the
22 springtime.
23    Q.  Springtime of 2007?
24    A.  Yeah, 2007.
25    Q.  You said the panel was loose with
Page 232

58  (Pages 229 to 232)

1   the tape.  Is that the one in the bedroom
2   you're talking about?
3       A.   Yes.
4       Q.   And then you later said the panel
5   in the bathroom?
6       A.   Yes.
7       Q.   What happened with the panel in
8   the bathroom?
9       A.   It basically did the same thing
10  that the other one did.
11      Q.   And you duct taped that as well?
12      A.   Yes.
13      Q.   When you were in the bedroom, did
14  you feel any kind of breeze coming through
15  from the paneling or was it just panels
16  coming off?
17      A.   I felt some breeze and the cold.
18  You could feel the cold coming through.
19      Q.   Would the same be true for the
20  bathroom, you could feel some cold coming
21  through?
22      A.   Some slight -- a slight breeze.
23      Q.   You said a piece on the chair
24  started coming up.  Are you talking about
25  the bench?

Page 233

1   for the test in January of 2008, all you saw
2   was the lady go into the trailer and then
3   she came out a little while later and then
4   you left?
5       A.   Uh-huh.
6       Q.   That's "yes"?
7       A.   Yes.
8       Q.   Were there any other preparations
9   or cleaning or anything like that done to
10  the trailer before the test was taken?
11      A.   No.
12      Q.   Did you ever get a copy of the
13  test results?
14      A.   No.
15      Q.   Regarding the discovery that was
16  propounded about you and Chris, and it's
17  been marked as Exhibits A. Alexander
18  3 through 8 -- excuse me, 10 -- did you
19  provide information to answer those
20  discovery requests?
21      A.   You talking about one of the
22  papers there?
23      Q.   Yes.
24      A.   Yes.
25      Q.   I think when we broke for lunch,

Page 235

1       A.   Yeah, like the bench had, like, a
2   little decorative piece of wood and it had
3   fallen off.
4       Q.   Did you do anything to repair
5   that?
6       A.   I tried to nail it back, but it
7   kept coming loose.  Particle board falling
8   apart.
9       Q.   During the time that you came back
10  to New Orleans, specifically say the first
11  year you were back, did you see any news
12  reports on TV about formaldehyde and FEMA
13  trailers?
14      A.   No.
15      Q.   The first time you heard about
16  formaldehyde and FEMA trailers was during --
17  when you received the brochure?
18      A.   Roughly, yes.
19      Q.   Did you see any advertising
20  anywhere on TV concerning lawsuits that were
21  going on about formaldehyde?
22      A.   Yeah, I did.  Roughly there around
23  the same time I saw the flier and started
24  seeing stuff on the news and everything.
25      Q.   When you went back with the lady

Page 234

1   we were talking about your new house.  What
2   types of floors do you have in there?
3       A.   Carpet.
4       Q.   Do you have any wood floors in
5   there?
6       A.   No.
7       Q.   While Chris was in the trailer, I
8   think you testified that he started using
9   the inhaler more?
10      A.   Yes.
11      Q.   Did he have any attacks that
12  required him to go to the hospital while he
13  was living in the trailer?
14      A.   Yes.
15      Q.   When did that occur?
16      A.   I think it was in that January --
17  excuse me, not January, that December of
18  2007.
19      Q.   When you moved out of the trailer?
20      A.   Just before we moved out of the
21  trailer.
22      Q.   So you were still in the trailer
23  at the time he went to the hospital?
24      A.   Yes.  And we went one other time
25  before because of his eyes.

Page 236

59  (Pages 233 to 236)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                Videotaped Deposition of Alana Alexander

1    Q.  Where did you go for his eyes?
2    A.  Children's Hospital.
3    Q.  Was he having the same problems he
4  had in Florida?
5    A.  Yes.  Conjunctivitis.
6    Q.  Since you moved out of trailer,
7  has Chris been to the emergency room?
8    A.  No.
9    Q.  Has he had any asthma attacks
10  since you moved out of the trailer?
11    A.  You know what?  He did go to the
12  hospital once.  I did think about that.
13  Since we have been by Maria, he did go to
14  the hospital once.
15    Q.  When he went to the hospital in
16  December of 2007, was the information you
17  provided to the doctors at that time
18  accurate?
19    A.  Yes.
20    Q.  When you went to the hospital one
21  time after you moved out of the trailer, was
22  the information you provided to the doctor
23  accurate?
24    A.  Yes.
25    Q.  After Chris moved out of the

Page 237

1    Q.  Okay.  Was that something -- does
2  he currently use the Flovent on a daily
3  basis pursuant to doctor's instructions?
4    A.  Yes.
5    Q.  Which doctor?
6    A.  I got that from the doctor at
7  National Jewish.
8    Q.  Is that Dr. Pacheco?
9    A.  Yes.  Pacheco, yes.  I think it's
10  Pacheco.
11    Q.  Pacheco.  So that was something
12  that was recommended based upon an
13  examination made recently by one of your
14  expert physicians?
15    A.  Yes.
16    Q.  Did she tell you why she wanted
17  Chris to go on Flovent daily?
18    A.  She said it was just to make sure
19  that he stayed maintained, his asthma stayed
20  under control and that he wouldn't have the
21  severe attacks.  He would have an attack,
22  but it wouldn't be as severe.
23    Q.  Did she talk to you about whether
24  Chris had previously been undertreated for
25  his asthma?

Page 239

1  trailer, did his use of the inhaler
2  decrease?
3    A.  Yes.
4    Q.  What is his use of the inhaler
5  currently?
6    A.  He uses his Flovent once every
7  day, in the morning.
8        And he takes his albuterol inhaler
9  when he has a, like, band concert or
10  something like that.
11    Q.  How often is that?
12    A.  Well, he had this past few months,
13  he had like three band concerts, so I would
14  say once a month, I guess.
15    Q.  The one time a month is
16  approximately the same time amount of time
17  that you described for me pre-Hurricane
18  Katrina, correct?
19    A.  Correct.
20    Q.  The Flovent, was that something
21  that he was prescribed before the hurricane?
22    A.  Yes.
23    Q.  He didn't use it?
24    A.  He did use it, but not on a
25  regular basis.

Page 238

1    A.  She said that somewhat because I
2  didn't give him the Flovent on a regular
3  basis.
4    Q.  Did she say that was a good idea?
5    A.  She said she understood why I
6  didn't do it because there's a lot of
7  precautions that go with it, but when she
8  explained everything to me in more definite,
9  I understood why he needed to have the
10  Flovent every day.
11    Q.  Is it your impression that Chris's
12  asthma has returned to the same level it was
13  before the hurricane?
14    A.  I would say yes.
15    Q.  How about his allergies, are his
16  allergies the same as before the hurricane?
17    A.  Actually, his allergies got a
18  little worse after the hurricane, but
19  they're maintained right now.
20    Q.  So you believe that his allergies
21  are currently a little bit worse than they
22  were before Hurricane Katrina?
23    A.  Yes.
24    Q.  And as far as frequency or
25  severity?

Page 240

60  (Pages 237 to 240)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation   Videotaped Deposition of Alana Alexander

```
1       A.  Severity.
2       Q.  Has anybody diagnosed what he's
3   allergic to?
4       A.  Yes.
5       Q.  What is he allergic to?
6       A.  Dust mites, house dust and
7   hickory.
8       Q.  Is he allergic to formaldehyde?
9       A.  I will say no.
10   MR. HILLIARD:
11       Did they test for that?
12   THE WITNESS:
13       I don't think they did.
14   EXAMINATION BY MR. GLASS:
15       Q.  You don't think they tested for
16   whether he had an allergy to formaldehyde?
17       A.  I don't think they did, not to my
18   knowledge.
19       Q.  Did you ever have any pets in the
20   trailer?
21       A.  No.
22       Q.  Were there neighborhood pets that
23   came around?
24       A.  No, there wasn't any pets in the
25   neighborhood.
                                Page 241
```

```
1       A.  Uh-huh.
2       Q.  That's a "yes"?
3       A.  Yes.
4       Q.  Do you have an understanding as to
5   who you have sued in this lawsuit?
6       A.  Yes.
7       Q.  Who have you sued?
8       A.  It would be Gulf Stream, it would
9   be Fluor, and FEMA.
10       Q.  For what reason have you sued Gulf
11   Stream Coach?
12       A.  I would say because of the trailer
13   and the formaldehyde issues.
14   MR. HILLIARD:
15       I'm going to let you ask these
16   questions, but I just want to make sure on
17   the record that we preserve our objections
18   with regard to some of the allegations
19   against Gulf Stream Coach that specifically
20   had to do with the areas that our experts
21   will testify to, areas that Alana may or may
22   not know about.
23       I'm not going to instruct her not
24   to answer any of these questions, but I just
25   want to preserve our objection that some
                                Page 243
```

```
1       Q.  Let me show you a couple more
2   documents and ask you some questions about
3   these.
4       Before we move to the next one, I
5   will move to attach the videotaped
6   deposition notice as A. Alexander 11.
7       The first document I'm going to
8   show to you is document No. 1, "Charlie Age
9   vs. Gulf Stream Coach, Inc.," marked as A.
10   Alexander 12, it was filed on February 27,
11   2009.
12       Did you see a copy of what has
13   been marked as A. Alexander Exhibit 12
14   before it was filed in February?
15       A.  No, I have never seen this before.
16       Q.  Do you understand that you are a
17   plaintiff that's named in this lawsuit,
18   "Charlie Age versus Gulf Stream Coach,
19   Inc."?
20       A.  You asked me if I knew this?  I'm
21   saying no.
22       Q.  On the last page is Exhibit A, or
23   the last two pages, 35 and 36.  On page 35,
24   your name, as well as your name on behalf of
25   your two children is listed, correct?
                                Page 242
```

```
1   areas of the liability issues in regards to
2   Gulf Stream, since that is the only question
3   you asked right now is with regard to Gulf
4   Stream, will be addressed solely by experts.
5   But you knew that.
6   MR. GLASS:
7       I'm just trying to get her
8   understanding of what's going on.
9   MR. HILLIARD:
10       I understand.
11   EXAMINATION BY MR. GLASS:
12       Q.  Okay.  I will come back to the
13   allegations in a second.  I just want to get
14   to the rest of these.
15       I'm going to show you what is
16   Document 1143 in the MDL litigation that was
17   filed on March 3, 2009, and I will mark this
18   as A. Alexander Exhibit 13.
19       I want to ask you if you are aware
20   of the First Supplemental and Amended
21   Complaint filed in this case?
22       A.  I will say no.
23       Q.  Okay.  I'm going to mark as A.
24   Alexander 14, document 1313 filed on
25   April 9, 2009, a Second Supplemental and
                                Page 244
```

61 (Pages 241 to 244)

1  Amended Complaint in Age and ask you if you
2  are familiar with that document?
3      A.  No.
4      Q.  I will mark Document 1686 filed on
5  June 15, 2009, as A. Alexander 15, a Third
6  Supplemental and Amended Complaint in
7  "Charlie Age," and ask you if you are aware
8  of that document.
9      A.  No. I would say no.
10     Q.  Were you shown any of those
11 documents before they were filed?
12     A.  Did I see any of these?
13     Q.  Yes.
14     A.  I would say no on all of these and
15 I would have to say yes on 15.  One of the
16 ones you gave me prior.
17     Q.  So you believe you saw the Third
18 Supplemental and Amended Complaint before it
19 was filed on June 15, 2009?
20     A.  Yes.
21     Q.  Okay.  We will come back to those
22 in a minute.  I want to ask you some more
23 background questions on your employment
24 history.
25         You said you had some EMT

Page 245

1  training; is that correct?
2      A.  Yes.
3      Q.  You went to school for EMT
4  training?
5      A.  Yes.
6      Q.  You graduated from high school,
7  correct?
8      A.  Yes.
9      Q.  Which high school?
10     A.  St. Mary's Academy.
11     Q.  What year?
12     A.  1984.
13     Q.  You went to Dillard's for a little
14 while?
15     A.  No, I went UNO.
16     Q.  I'm sorry, UNO?
17     A.  For one semester.
18     Q.  Was that right after you
19 graduated?
20     A.  Yes.
21     Q.  What did you study there?
22     A.  I was in physical therapy at the
23 time.
24     Q.  Did you continue with your
25 training -- I'm sorry, your education after

Page 246

1  that one semester with UNO?
2      A.  That's when I started with EMT.
3      Q.  Where did you go to the EMT
4  training?
5      A.  Elaine P. Nunez Community College.
6      Q.  Where is that?
7      A.  Chalmette.
8      Q.  I'm sorry, could you say the name
9  of that school again?
10     A.  Elaine P. Nunez.
11     Q.  What year did you go to that
12 community college?
13     A.  I would have to say it probably
14 was in '86, I think it was.
15     Q.  You received your EMT
16 certification?
17     A.  Yes.
18     Q.  How long did it take to receive
19 that certification?
20     A.  It was, I want to say it was a
21 six-month program.
22     Q.  Did you actually work as an EMT
23 thereafter?
24     A.  Yes.
25     Q.  Who did you work for?

Page 247

1      A.  First I worked with -- I can't
2  think of the first one because it
3  immediately merged with a company called
4  Medic One.
5      Q.  Did you travel in the ambulance to
6  accident scenes and things of that nature?
7      A.  Yes.
8      Q.  How long did you work for Medic
9  One?
10     A.  I believe I worked for Medic One
11 for I think it was nine years.
12     Q.  So from 1986 to approximately
13 1991?
14     A.  Yes.
15     Q.  What was your reason for leaving
16 Medic One?
17     A.  I moved to Industrial Safety and
18 Health.
19     Q.  What is Industrial Safety and
20 Health?
21     A.  That was the name of the company,
22 but I started working as an EMT at the Shell
23 Refinery.
24     Q.  Industrial Safety and Health was a
25 subcontractor who performed work at the

Page 248

62  (Pages 245 to 248)

1   Shell Refinery?
2       A.  Yes.
3       Q.  Which Shell Refinery?
4       A.  Out at Norco.
5       Q.  What were your job duties with
6   Industrial Safety and Health?
7       A.  I oversaw the clinic that was on
8   the premises for the -- for the people who
9   worked the turnaround.  For the contractors,
10  I should say.  Yes.
11      Q.  So if somebody had an injury or a
12  complaint that was a contractor working at
13  the refinery, they went to your clinic?
14      A.  Yes.
15      Q.  Did Shell have its own clinic?
16      A.  Yes, but the Shell clinic worked
17  for the Shell Refinery.
18      Q.  What was your exact job title?
19      A.  EMT.
20      Q.  You were the person in charge of
21  the clinic?
22      A.  No, the nurses were in charge of
23  the clinic, but I was -- basically, I worked
24  under the nurses there.
25      Q.  Did you receive any special

Page 249

1   training to go work on the Shell Refinery
2   property?
3       A.  Yes.  I did drug testing training,
4   I also did respiratory testing training, I
5   did x-ray training and I had some phlebotomy
6   training.
7       Q.  What did the respiratory training
8   entail?
9       A.  It taught -- I had to fit the
10  contractors to wear the respirator when they
11  went into certain parts of the factory.
12      Q.  That the mask fit?
13      A.  Yes.
14      Q.  Was there any training regarding
15  potentially hazardous substances at the
16  refinery?
17      A.  Yes, we all did HAZMAT training.
18      Q.  Did you have to complete courses
19  on the HAZMAT training?
20      A.  No, it was just basic training
21  that they gave at the refinery itself.
22      Q.  Did you receive certifications for
23  that training?
24      A.  I got certificates for it, yes.
25      Q.  Do you still have those

Page 250

1   certificates?
2       A.  All I had was destroyed in the
3   storm.
4       Q.  To obtain those certificates, did
5   you have to complete computer training?
6       A.  No, we didn't have computer
7   training.
8       Q.  Did you have to go someplace for
9   that training or was it done on the Shell
10  property?
11      A.  It was all done on the property.
12      Q.  Were there any other types of
13  training regarding hazardous materials that
14  were used on the actual premises?
15      A.  No.
16      Q.  Did you receive training dealing
17  with MSDSs?
18      A.  Yes.
19      Q.  So you are aware of what MSDSs
20  are?
21      A.  Uh-huh.
22      Q.  That's a "yes"?
23      A.  Yes.
24      Q.  Was there any discussion about
25  potentially toxic or dangerous substances

Page 251

1   that you might be exposed to at the plant?
2       A.  Yes.  There was a discussion, but
3   where the clinic was, it wasn't -- the Shell
4   property was here and the clinic was
5   actually like outside of the gates.
6       Q.  As part of your duties as the EMT,
7   did you have to go onto the premises or into
8   the gates so you could treat people?
9       A.  Only if it was a dire emergency.
10  For the most part, they brought the
11  contractors to us.
12      Q.  How often do you think you went
13  into the actual facility?
14      A.  I would say during the, what they
15  call a turnaround, I was there every day,
16  depending on how long the turnaround was.
17  But if it wasn't a turnaround, I would only
18  go in maybe once a week, or if they -- like
19  I would say, about once a week.
20      Q.  How often did they do turnarounds
21  where you had to go into the plant daily?
22      A.  Most turnarounds lasted anywhere
23  from two to six weeks.
24      Q.  And how many times a year did they
25  occur?

Page 252

63  (Pages 249 to 252)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation

Videotaped Deposition of Alana Alexander

1    A.  Turnarounds happened, like, once a
2  year.
3    Q.  Did you ever feel that you were
4  exposed to any dangerous levels of
5  substances while you were at the Shell
6  plant?
7    A.  No, I don't think so.
8    Q.  Did you ever have any complaints
9  that you voiced to anyone at Shell or to
10  your employer at Industrial Safety and
11  Health?
12    A.  No.
13    Q.  Did you ever file a workers' comp
14  claim?
15    A.  No.
16    Q.  You were never injured on the job?
17    A.  I was injured once when I was
18  working with Medic One.  I sprained my
19  wrist.  That was it.
20    Q.  After you left -- well, I'm sorry.
21    How long were you with Industrial
22  Safety and Health?
23    A.  Up until I got pregnant with Erika
24  in '94.
25    Q.  And when you left in 1994, where

Page 253

1  Carlone's?
2    A.  I was the head line cook and the
3  baker.
4    Q.  Was Carlone's a full service
5  restaurant?
6    A.  Yes.
7    Q.  Where was your station in the
8  kitchen?
9    A.  On the line.
10    Q.  Where is that in relation to, say,
11  the fryers and --
12    A.  All of that is on the line.  The
13  line consisted of your oven, your stove,
14  your fryers, your grill.  All of that.
15    Q.  Was there any particular thing
16  that you were responsible for as the head
17  line cook and the baker?
18    A.  Well, I was the first one to get
19  there in the morning.  I set up every day
20  for lunch during the week, and on the
21  weekend, I was in charge of all of the
22  pastries that was on the buffet.
23    Q.  On the weekend, were you also
24  cooking?
25    A.  I was mostly just the pastries,

Page 255

1  did you go?
2    A.  I stayed home for the first six
3  months when Erika was born.
4    Q.  After those six months, where did
5  you go?
6    A.  During that six months, I trained
7  to become a certified cook, and I went to
8  school, Sclafani's Cooking School.
9    Q.  I'm sorry, can you spell that
10  school?
11    A.  S-C-L-A-F-A-N-I-'-S.  I think
12  that's how you spell it.
13    Q.  Where was that located?
14    A.  In Metairie.
15    Q.  How long was that course?
16    A.  That was a, like, it was a
17  six-week, eight-week course.
18    Q.  And you actually received a
19  certificate as a cook?
20    A.  Yes.
21    Q.  Where did you go to work after
22  that training?
23    A.  I worked at Carlone's Restaurant
24  out in Metairie.
25    Q.  What position did you take at

Page 254

1  the baker on the weekend.
2    Q.  During -- strike that.
3    How many hours did you work a week
4  for Carlone's?
5    A.  Thirty-eight to 40.
6    Q.  During the week, you were
7  responsible for cooking?
8    A.  Yes.
9    Q.  Did you do everything in the
10  kitchen, including frying?
11    A.  Yes.
12    Q.  Grilling?
13    A.  Yes.
14    Q.  Baking?
15    A.  Yes.
16    Q.  Is there any -- you cooked any of
17  the entrées that might have been ordered?
18    A.  Yes.
19    Q.  What kind of food does Carlone's
20  have?
21    A.  Italian, mostly Italian.
22    Q.  Who was responsible for cleaning
23  the kitchen?
24    A.  The dishwashers.
25    Q.  You weren't responsible for

Page 256

64  (Pages 253 to 256)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Videotaped Deposition of Alana Alexander

1   cleaning up the kitchen?
2       A.   No.
3       Q.   Were there chemicals that were
4   used to clean the dishes and things like
5   that?
6       A.   I'm sure there was.
7       Q.   You weren't responsible for
8   handling any of those?
9       A.   No.
10      Q.   Were there any MSDSs that you had
11  to review before you worked at Carlone's?
12      A.   No.
13      Q.   What type of ventilation did the
14  kitchen have?
15      A.   It had an overhead vent over the
16  stove and central air and heat.  I guess
17  that's it.
18      Q.   Was it hot in the kitchen?
19      A.   It's always hot in the kitchen.
20      Q.   When did you work at Carlone's?
21      A.   That would have been in --
22      Q.   1994?
23      A.   '94.  No.  Erika was born in July,
24  so that had to have been in '95.
25      Q.   Until when?

Page 257

1       A.   Until -- I want to say '97, I
2   think it was.  '97 or '98.  After Chris.
3       Q.   Did you ever have any problems,
4   health problems, when you were working in
5   the kitchen for Carlone's?
6       A.   No.
7       Q.   Never felt any eye irritation or
8   anything like that?
9       A.   No.  Not unless we burned
10  something.
11      Q.   Were you ever injured on the job
12  at Carlone's?
13      A.   No.
14      Q.   Where did you go to work after
15  Carlone's?
16      A.   That's when I started with the
17  school system, New Orleans Public Schools.
18      Q.   What positions did you hold at the
19  school system?
20      A.   Paraprofessional.
21      Q.   What does a paraprofessional do?
22      A.   I was specifically assigned to one
23  little boy who was a severe/profound,
24  meaning that he was in a wheelchair, tube
25  fed, diapers, everything.

Page 258

1       Q.   And that was in 1997 or 1998?
2       A.   Yes.
3       Q.   How long did you stay with the
4   school system?
5       A.   Up until the storm in 2005.
6       Q.   When you left in 2005, I assume
7   you didn't have a job in Arkansas or
8   Houston, correct?
9       A.   Correct.
10      Q.   When you got to Jacksonville, did
11  you get a job?
12      A.   I worked briefly at a family
13  restaurant out there.
14      Q.   What was the name of the
15  restaurant?
16      A.   Soul Food Express.
17      Q.   What did you do for Soul Food
18  Express?
19      A.   I cooked on their line.
20      Q.   So you were a line cook?
21      A.   Yes.
22      Q.   Who was your supervisor?
23      A.   I can't think of his name.  He was
24  the owner.  I really can't think of his name
25  right now.

Page 259

1       Q.   Where was this restaurant located
2   in Jacksonville?
3       A.   I can't remember -- Main Street,
4   if I'm not mistaken.  I think it was on Main
5   Street.
6       Q.   How many days a week did you work
7   at Soul Food Express?
8       A.   Two.
9       Q.   Did you have any other employment
10  besides these two days a week?
11      A.   No.
12      Q.   How many hours a day did you work?
13      A.   I would say probably ten.
14      Q.   Did you perform all of the cooking
15  obligations --
16      A.   Yes.
17      Q.   -- that would be involved in
18  creating the food for Soul Food Express?
19      A.   Yes.
20      Q.   Do they primarily make fried food?
21  What type of food did they do?
22      A.   Primarily fried food.
23      Q.   Was it a big kitchen?
24      A.   Relatively big, yeah.
25      Q.   And you worked the fryers?

Page 260

65  (Pages 257 to 260)

```
 1      A.  I worked the fryers, the stove.
 2      Q.  Did you ever have any problems
 3  while you were working in the kitchen for
 4  Soul Food Express?
 5      A.  No.
 6      Q.  Never felt any eye irritation?
 7      A.  No.
 8      Q.  Did you ever feel any tickling in
 9  your throat?
10      A.  No.
11      Q.  And after Soul Food Express, did
12  you hold any other jobs before you came back
13  to New Orleans?
14      A.  No.
15      Q.  When you went back to New Orleans,
16  you ultimately went back to work for the
17  school -- I'm sorry.
18      A.  Orleans Parish School District at
19  first when we came back that summer.
20      Q.  Are you still employed with the
21  Orleans Parish School District?
22      A.  No, I work for KIPP NOLA now.
23      Q.  Are you a plaintiff in any other
24  lawsuit?
25      A.  Yeah.  They did a -- we did a --
                                      Page 261
```

```
 1  exactly on it, but it was listed under
 2  paraprofessionals.
 3      Q.  Do you have a copy of a contract
 4  that you signed with the attorney in that
 5  lawsuit?
 6      A.  No, not right --
 7      Q.  If you were to call somebody to
 8  find out what's going on in that lawsuit,
 9  who would you call?
10      A.  Probably would go online to -- let
11  me try to think.  I think it's opsb.com.  I
12  think that's what it is.
13      Q.  Do you go to that Web site
14  periodically or look at that Web site
15  periodically?
16      A.  Not really.
17      Q.  Do you have an understanding of
18  what you're suing for in that lawsuit?
19      A.  For wrongful termination, yes.
20      Q.  You're claiming economic loss
21  because you're no longer employed by the
22  Orleans Parish School Board?
23      A.  Correct.
24      Q.  Are you claiming mental anguish or
25  emotional distress in that lawsuit?
                                      Page 263
```

```
 1  they did a class action for wrongful
 2  termination from Orleans Parish School
 3  Board.
 4      Q.  What's the status of that case?
 5      A.  The last time I heard an update,
 6  it was supposed to be going to court.
 7      Q.  Who's your attorney in that suit?
 8      A.  I don't know.  It's a class
 9  action.
10      Q.  Is that the "Oliver versus Orleans
11  Parish School Board" case pending in Civil
12  District Court?
13      A.  Yes, I think.
14      Q.  Does Clarence Roby sound familiar?
15      A.  Yes.
16      Q.  You think he might be an attorney
17  or one of them?
18      A.  Probably one of them.
19      Q.  Do you know if you signed a
20  contract with any attorney in that case?
21      A.  I probably did.  Since my name is
22  on it, I would say yes.
23      Q.  You are an actual named plaintiff
24  in that lawsuit?
25      A.  Well, I don't know if my name is
                                      Page 262
```

```
 1      A.  I'm sure I did.
 2      Q.  Do you know any other specifics
 3  about the allegations in that lawsuit?
 4      A.  I don't know any specifics.  Just
 5  basically the wrongful termination.
 6      Q.  Did you actually suffer mental
 7  anguish or emotional distress from being let
 8  go by Orleans Parish School Board?
 9      A.  Yes.  Right after the storm, to be
10  told you're fired.
11      MR. HILLIARD:
12          OPSB, is that what you said?
13      THE WITNESS:
14          Orleans Parish School Board, yes,
15  OPSB.
16  EXAMINATION BY MR. GLASS:
17      Q.  How soon after you were let go
18  from the Orleans Parish School Board did you
19  start working for KIPP NOLA?
20      A.  That wasn't until I came back to
21  New Orleans in -- when I came back to New
22  Orleans in May of '06, we were terminated
23  roughly September, I think or October of
24  '05.  So I came back in 2006 and I
25  started -- excuse me.
                                      Page 264
```

66 (Pages 261 to 264)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Alana Alexander

```
 1        Yeah, I came back in '06, and I
 2   started back at that summer program, seems
 3   like to me the summer program started in
 4   June.  So that would have been June of '06.
 5        Q.  Have you filed any other lawsuits
 6   on your own behalf?
 7        A.  No.
 8        Q.  Do you recall any lawsuits against
 9   your home insurer?
10        A.  My house wasn't insured prior to
11   the storm.  My mother and daddy owned it.
12        Q.  Do you ever remember filling out
13   any other Form 95s, like in the back of
14   Exhibits 1 and 2?
15        A.  I think I did one for the MRGO
16   project.
17        Q.  Why did you fill that form out?
18        A.  Because the MRGO was the thing
19   that flooded out in the Mississippi River
20   Gulf outlet, it flooded out and it flooded
21   out the Ninth Ward in the area of New
22   Orleans East.
23        Q.  So it's your understanding that
24   you have made a claim in the MRGO
25   litigation?
                                    Page 265
```

```
 1        Q.  Was there a specific person who
 2   set up these organizations?
 3        A.  Not really.  It was just everybody
 4   who lived in the neighborhood prior to the
 5   storm, we got together and, you know, had
 6   meetings to try to get organizations set up
 7   because at the time, when you first came
 8   back, the city pretty much wouldn't listen
 9   to you unless you had an organization formed
10   in your neighborhood.
11        Q.  You were a member of the
12   neighborhood organization?
13        A.  Yes, I guess you could say I went
14   to the meetings.
15        Q.  Did they have a specific
16   organization charter?
17        A.  That, I don't know.
18        Q.  Can you tell me who were the kind
19   of spokespeople when you would go to these
20   meetings with the neighborhood organization?
21        A.  We had people come in from --
22   ACORN came in and different other people
23   came in about how to rebuild in your
24   neighborhood and what things to plan in the
25   neighborhood, stuff like that.
                                    Page 267
```

```
 1        A.  Yes, but I think that was thrown
 2   out because they say we couldn't sue the
 3   Army Corps of Engineers.
 4        Q.  Who was your attorney in that
 5   case?
 6        A.  I don't remember who it was.
 7        Q.  Was it Mr. Woods' firm?
 8        A.  It could be.  I really don't
 9   remember.
10        Q.  How did you come to know that you
11   needed to fill out a Form 95 for the MRGO
12   litigation?
13        A.  We were having neighborhood
14   meetings, and the neighborhood trying to
15   start a neighborhood organization.  Right
16   after the storm, a lot of people were coming
17   around trying to see, you know, about
18   lawsuits and stuff like that.
19        So they would just give us papers
20   and, basically, we would just fill it out.
21        Q.  Who set up these neighborhood
22   organizations?
23        A.  I'm not exactly -- the
24   neighborhood.  It was in the general
25   neighborhood where we were.
                                    Page 266
```

```
 1        Q.  I'm more interested in the person
 2   in the neighborhood who made sure, like, who
 3   went around and talked to you, for instance,
 4   hey, we're having a meeting, this person is
 5   coming in.  Was there somebody who was like
 6   a figurehead?
 7        A.  I can't remember the lady's name.
 8   It was a lady in the neighborhood.
 9        Q.  It was somebody you were familiar
10   with before the storm?
11        A.  I wasn't, but my family was.
12        Q.  If you needed to find out what her
13   name is, how would you go about doing that?
14        A.  I would probably ask somebody in
15   my family.
16        Q.  Who would be the most likely
17   person in your family that would know the
18   name?
19        A.  My momma.
20        Q.  Is it your understanding that your
21   mom knows exactly who this person is?
22        A.  I wouldn't say exactly, but I
23   believe she will probably remember her name.
24        Q.  When did you first hear about this
25   neighborhood organization that was talking
                                    Page 268
```

67 (Pages 265 to 268)

1    about potential lawsuits following the
2    hurricane?
3        A.   I would say actually after I came
4    back.
5        Q.   So sometime in May of 2006?
6        A.   Yes.
7        Q.   Did you actually attend some of
8    the organization events?
9        A.   A few of the meetings.
10       Q.   Was that during the summer of
11   2006?
12       A.   I would say yes.
13       Q.   Was there any discussion at these
14   meetings concerning the actions of FEMA in
15   providing trailers to the neighborhood?
16       A.   No, we didn't really talk about
17   FEMA and the trailers.  We talked everything
18   else about FEMA.
19       Q.   What types of things did you talk
20   about about FEMA?
21       A.   How FEMA was late responding to
22   everything after the storm, and how
23   difficult it was to get any kind of
24   compensation for anything.  And how they
25   sent you through the wringer, about if you

Page 269

1    called somebody on the phone, then you had
2    to make sure you got everybody's names and
3    numbers.  And if you didn't have that to
4    speak to the next person, they more than
5    likely didn't listen to what you had to say.
6        Q.   Did you have to sign a sign-in
7    sheet or anything when they had the
8    meetings?
9        A.   I think we did.  Not at all of
10   them.  I would say not all of them.
11       Q.   Do you know who retained the
12   sign-in sheets?
13       A.   No.
14       Q.   Did lawyers speak at these
15   meetings?
16       A.   No, it was mostly ACORN speaking
17   at a lot of these meetings.
18       Q.   Did you know any of the speakers?
19       A.   No, no, I didn't.
20       Q.   At least at one of the meetings
21   that you attended, did they discuss the MRGO
22   litigation?
23       A.   No.
24       Q.   How did you come about filling out
25   the Form 95 for the MRGO litigation?

Page 270

1        A.   They dropped a lot of that stuff
2    off at our church.  So -- and usually,
3    whatever church member, if they heard about
4    a litigation going on and it was pertaining
5    to the general neighborhood area that we all
6    lived in, then you passed it off to
7    everybody.
8        Q.   And it's your testimony that
9    nobody in the neighborhood talked about
10   potential litigation against anyone
11   regarding formaldehyde exposure in the
12   trailers that you heard about?
13       A.   Yes.
14       Q.   At least until December 2007?
15       A.   Yes.
16       Q.   So you at least filed a claim
17   against the Corps of Engineers for the MRGO
18   project, correct?
19       A.   Correct.
20       Q.   Any other claims you filed out of
21   Hurricane Katrina?
22       A.   No.
23       Q.   Didn't sue any Louisiana agencies?
24       A.   No.
25       Q.   Have you ever filed any other

Page 271

1    personal injury claims?
2        A.   No.
3        Q.   Have you hired an attorney related
4    to Chinese drywall?
5        A.   No.
6        Q.   Did your sister have to repair her
7    house at all at 1619 Mirabeau?
8        A.   Yes.
9        Q.   What damage did she have at that
10   property?
11       A.   The first floor.
12       Q.   And how was that property
13   repaired?
14       A.   I don't know all the specifics.  I
15   know she had the walls replaced and the
16   floors were redone and the kitchen was
17   redone.
18       Q.   Was that all done before you moved
19   in?
20       A.   Yes.
21       Q.   Was there any work done while you
22   were in the house?
23       A.   No.
24       Q.   Were there any additions made to
25   the house?

Page 272

68  (Pages 269 to 272)

1  A.  No.
2  Q.  You said the walls were replaced.
3  Talking about the drywall?
4  A.  I'm assuming it was the drywall,
5  yes.
6  Q.  Do you know what the Chinese
7  drywall litigation is?
8  A.  I heard about it, but I didn't
9  feel it pertains to me, so --
10  Q.  You didn't check to see if there
11  is any in the 1619 Mirabeau property?
12  A.  I didn't, no.
13  Q.  Do you know if your sister did?
14  A.  That, I don't know.
15  Q.  Has Chris had any additional
16  problems since moving into the 1619 Mirabeau
17  property?
18  A.  No.
19  Q.  I think you already indicated that
20  the frequency of his use of his inhaler has
21  gone down?
22  A.  Yes.
23  Q.  And you believe that his asthma
24  has gone back to the same level as it was
25  before Hurricane Katrina?

Page 273

1  A.  He just has a tendency, he doesn't
2  hold the notes as long as he could, you
3  know, he should sometimes.
4  Q.  Is that something you attribute to
5  his time in the FEMA trailer?
6  A.  I would say yes, in general.  I
7  would say yes.
8  Q.  That's what I'm trying to
9  determine.  If you had not been in the
10  trailer, do you think his preexisting asthma
11  would have caused problems with his playing
12  the baritone saxophone?
13  A.  I would say, I don't think it
14  would.
15  Q.  You don't think his preexisting
16  asthma, if he were playing and not living in
17  the trailer, would have resulted in him not
18  being able to hold notes as long?
19  A.  I don't think so.  I'm not sure.
20  Q.  Chris also plays some football; is
21  that right?
22  A.  Yes.
23  Q.  Was that in the fifth grade?
24  A.  Yes.
25  Q.  Did he have any problems playing

Page 275

1  A.  Yes.
2  Q.  When did Chris start working with
3  the musical instruments?
4  A.  He started -- in the fourth grade,
5  they started him off with the recorder and
6  then he moved up into the instrument that
7  following year, the fifth grade.
8  Q.  What instrument does he currently
9  play?
10  A.  Baritone saxophone.
11  Q.  Does that require him to actually
12  blow into the instrument?
13  A.  Yes.
14  Q.  It requires a lot of lung power?
15  A.  Yes.
16  Q.  Is he pretty good at it?
17  A.  He's very good at it.
18  Q.  In fact, I think I saw that he
19  actually played at Tipitina's; is that
20  right?
21  A.  Yes.
22  Q.  That's fantastic.
23      Does Chris have any problems
24  playing a musical instrument as a result of
25  asthma?

Page 274

1  football?
2  A.  Sometimes he just couldn't run as
3  long and work out as hard as some of the
4  other guys, but for the most part, he was
5  okay.
6  Q.  Is that because of asthma?
7  A.  Yes.
8  Q.  Is that something that you feel
9  was a result of living in a trailer or as a
10  result of his asthma?
11  A.  I'm going to say it might be a
12  combination of both.
13  Q.  Does he still play football?
14  A.  No.
15  Q.  Why not?
16  A.  Football season is over.
17  Q.  Good answer.
18      Is he going to go out next year?
19  A.  I don't know.  We haven't made
20  that determination yet.
21  Q.  Did he just complete the sixth
22  grade?
23  A.  Yes.
24  Q.  Did he play football in the sixth
25  grade?

Page 276

69  (Pages 273 to 276)

1     A.  No, because he was more focused on
2  the band.
3     MR. GLASS:
4        Off the record for a second.
5     THE VIDEOGRAPHER:
6        Off the record; it is 2:20.
7     (Recess.)
8     THE VIDEOGRAPHER:
9        Back on record; it is 2:29.
10  EXAMINATION BY MR. DINNELL:
11     Q.  Ms. Alexander, my name is Adam
12  Dinnell, and I represent the United States
13  in this case.  You understand you're still
14  under oath in this deposition?
15     A.  Yes.
16     Q.  If at any point I ask you any
17  question that you don't understand, please
18  let me know and I'll try to clarify it for
19  you.  All right?
20     A.  Okay.
21     Q.  And just for the record, we will
22  ask that the witness read and sign the
23  deposition transcript when it is provided to
24  her.
25        Ms. Alexander, I believe you
                                          Page 277

1     Christopher share.
2        Q.  And that's the room that they live
3  in currently?
4        A.  Yes.
5        Q.  And they have lived there since
6  you moved into the Mirabeau house in January
7  of 2008?
8        A.  No, not in January.
9        Q.  December of 2007?
10       A.  Yes.
11       Q.  Okay.  There's a big fan in that
12  picture, right?
13       A.  Yes.
14       Q.  Is that right next to where Chris
15  sleeps?
16       A.  Yes.
17       Q.  Did you have that fan inside the
18  trailer?
19       A.  No, not that fan, no.
20       Q.  Did you have any fans inside the
21  trailer that you brought in?
22       A.  Yes.
23       Q.  How big?
24       A.  It was a stand-up fan.  I don't
25  know the dimensions on it.  It was a
                                          Page 279

1  answered this earlier, you have never been
2  deposed before today?
3     A.  That's correct.
4     Q.  Did you suffer any nosebleeds when
5  you were in the trailer?
6     A.  No, I did not.
7     Q.  Did Chris?
8     A.  No, he didn't.
9     Q.  Did you suffer any asthma when you
10  were in the trailer?
11     A.  No.
12     Q.  I want to go through quickly just
13  some photographs taken of your home by
14  various people.
15        I will mark this first one as
16  Exhibit 16, and specifically, I want to ask
17  you about the top left-hand corner picture.
18  You see it?
19     A.  Yes.
20     Q.  And that top left-hand corner
21  picture is a picture of inside your house;
22  is that correct?
23     A.  Yes.
24     Q.  What room is that?
25     A.  That would be the room Erika and
                                          Page 278

1  stand-up fan.
2        Q.  Okay.  Did you have any other fans
3  inside the trailer?
4        A.  No.
5        Q.  By "stand-up fan," do you mean one
6  of those fans that has the legs and then a
7  stand?
8        A.  No.  It stood about this high and
9  it was like, I guess you would call it a
10  pedestal fan.
11       Q.  Like one of those rectangular
12  ones?
13       A.  Yes, it stuck straight out.
14       Q.  Okay.  And there's fans all
15  throughout that --
16       A.  Yes, and it do like that.
17       Q.  Okay.  The next one is going to be
18  marked Alexander 17.  I will hand it to you.
19       Does that look familiar?
20       A.  Yes.
21       Q.  What is that in Alexander
22  Exhibit 17?
23       A.  That would be what we call the
24  blue room.
25       Q.  And there's a set of weights in
                                          Page 280

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                Videotaped Deposition of Alana Alexander

| | |
|---|---|
| 1    there? | 1    correct? |
| 2        A.  Yes. | 2        A.  Yes. |
| 3        Q.  Who uses those weights? | 3        Q.  What is depicted in 19? |
| 4        A.  My sister. | 4        A.  19 is the deck being torn down. |
| 5        Q.  Okay.  Does Chris ever use those | 5        Q.  Okay.  And that deck has been torn |
| 6    weights? | 6    down since you've lived at the house? |
| 7        A.  No. | 7        A.  Yes. |
| 8        Q.  Do you ever use them? | 8        Q.  Since Chris lived at the house? |
| 9        A.  No. | 9        A.  Yes. |
| 10       Q.  The next one is going to be | 10       Q.  And I assume that that deck was |
| 11   Alexander 18, and that is a picture of the | 11   replaced since you lived at the house? |
| 12   backyard of the Mirabeau address, correct? | 12       A.  Yes. |
| 13       A.  Yes. | 13       Q.  And there's a brand-new deck at |
| 14       Q.  And there's a basketball hoop | 14   Mirabeau, correct? |
| 15   there, right? | 15       A.  Yes. |
| 16       A.  Yes. | 16       Q.  And that's depicted in Exhibit 20? |
| 17       Q.  Does Chris ever shoot hoops out | 17       A.  Yes. |
| 18   there? | 18       Q.  You said earlier that a lot of the |
| 19       A.  Yes. | 19   reconstruction work on the Mirabeau house |
| 20       Q.  And that basketball hoop was | 20   was completed before you moved in? |
| 21   located also on the Dale Street address when | 21       A.  Yes. |
| 22   you lived there in the trailer, correct? | 22       Q.  But there has been ongoing |
| 23       A.  Yes. | 23   painting and work on the house throughout |
| 24       Q.  Would he play outside and shoot | 24   the time you've been there; is that correct? |
| 25   baskets at the Dale Street address? | 25       A.  No. |
| Page 281 | Page 283 |
| 1        A.  Yes. | 1        Q.  There hasn't been? |
| 2        Q.  There was a cat at the Mirabeau | 2        A.  Not ongoing, no. |
| 3    house.  Is that your cat? | 3        Q.  But there are paint cans, paint |
| 4        A.  I would say no. | 4    brushes, paint throughout the house, |
| 5        Q.  Did he become your cat? | 5    correct? |
| 6        A.  He just kind of stays there.  He | 6        A.  Yes. |
| 7    is not my cat. | 7        Q.  Okay.  None of that work is |
| 8        Q.  Okay.  Has he been there since | 8    continuing? |
| 9    you-all have been in the Mirabeau house? | 9        A.  I don't understand what you mean |
| 10       A.  No.  He came, like, within a few | 10   when you say "continuing." |
| 11   recent months. | 11       Q.  Has there been any painting in the |
| 12       Q.  Within the past few months? | 12   house since you moved in? |
| 13       A.  Yeah. | 13       A.  No. |
| 14       Q.  Does he ever come inside? | 14       Q.  So if there are still paint cans |
| 15       A.  Oh, heck, no. | 15   and paint brushes sitting out, none of that |
| 16       Q.  And you said you didn't have any | 16   work has been done since December 2007? |
| 17   pets in the trailer at the Dale Street | 17       A.  I would say yes, other than |
| 18   address? | 18   touch-ups. |
| 19       A.  That's correct. | 19       Q.  But touch-ups are still ongoing? |
| 20       Q.  Next one is Alexander 19 and | 20       A.  No.  Not anymore. |
| 21   Alexander 20. | 21       Q.  Recently? |
| 22            I'll give you both of these. | 22       A.  I don't -- I mean, it's a touchup. |
| 23            Now, pictures 19 and 20 were taken | 23   If the paint got chipped, she touched it up. |
| 24   on two separate occasions.  Exhibit 19 | 24       Q.  Who is "she" doing the painting? |
| 25   depicts your backyard at the Mirabeau house, | 25       A.  My sister Maria. |
| Page 282 | Page 284 |

PROFESSIONAL SHORTHAND REPORTERS, INC    (800) 536-5255
New Orleans * Baton Rouge * Covington * Shreveport                                        (504) 529-5255

1   Q.   You mentioned earlier that you are
2   paying how much rent at the Mirabeau house
3   to your sister?
4   A.   $500.
5   Q.   $500?
6        And at some point, you requested
7   rental assistance from FEMA to pay a portion
8   of your rent at the Mirabeau address, but no
9   assistance was provided, correct?
10   A.   Correct.
11   Q.   Take a look at what we're going to
12   mark as Exhibit 21.
13        Is that your signature at the
14   bottom of Exhibit 21?
15   A.   Yes.
16   Q.   And the date is February 20, 2008?
17   A.   Yes.
18   Q.   And Exhibit 21 looks like a
19   document that was faxed.  Did you fax this?
20   A.   Either I did or Maria did, one of
21   us.
22   Q.   And you signed this document,
23   right?
24   A.   Yes.
25   Q.   And the monthly rent listed for
                                         Page 285

1   A.   No, I did ventilate it every day.
2   Q.   Okay.  And that included opening
3   doors and opening windows?
4   A.   Yes.
5   Q.   Would you also use the AC to keep
6   temperatures low inside the unit?
7   A.   Yes.
8   Q.   Did that occur from day one
9   through the end of your time in the unit?
10   A.   Yes.  During the summer months.
11   Q.   Right.  You would always try to
12   maintain a comfortable temperature in the
13   unit when you lived in it, correct?
14   A.   Yes.
15   Q.   Did you ever smoke inside the
16   unit?
17   A.   No.
18   Q.   Have you ever smoked?
19   A.   No.
20   Q.   I assume Chris has never smoked
21   that you know of?
22   A.   No, he doesn't smoke.
23   Q.   You've never seen Chris smoke?
24   A.   He doesn't smoke.
25   Q.   Okay.  You worked as an EMT,
                                         Page 287

1   1619 Mirabeau Avenue was $1100 on this thing
2   that you faxed in, correct?
3   A.   Yes.
4   Q.   All right.  You were asked earlier
5   about airing out the trailer, ventilating
6   the trailer?
7   A.   Yes.
8   Q.   Is it correct that from the first
9   day that you moved into the trailer that you
10   tried to air it out and ventilate it?
11   A.   Yes.
12   Q.   You opened the door and windows to
13   ventilate the trailer?
14   A.   Yes.
15   Q.   And you did that from day one when
16   you arrived until day whatever when you
17   moved out of the unit; is that right?
18   A.   No.
19   Q.   No?  When did you stop venting out
20   the trailer?
21   A.   When we would walk in and you
22   wouldn't smell it.
23   Q.   Okay.  So for the first couple of
24   months you lived in the unit, you tried to
25   ventilate it as much as possible?
                                         Page 286

1   basically, on two separate occasions, is
2   what you were saying earlier, correct?
3   A.   Yes.
4   Q.   And your work as an EMT was for
5   about, what, 14 years; is that right?
6   A.   No.
7   Q.   How long?
8   A.   It was roughly, all together,
9   probably about eight years, eight or nine
10   years.
11   Q.   Okay, I'm sorry.  I assume during
12   your -- you probably knew this before then,
13   but as you worked as an EMT, I assume you
14   knew that it was important that patients
15   coming in provide as much information as
16   possible so the doctor can figure out what's
17   wrong with them, right?
18   A.   Yes.
19   Q.   And I assume whenever you have
20   gone into the doctor with Chris, you've
21   tried to provide as accurate information as
22   possible so that the doctor can help him
23   out, right?
24   A.   Yes.
25   Q.   Whenever he's had a serious
                                         Page 288

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                Videotaped Deposition of Alana Alexander

1   problem, have you tried to take him in to a
2   doctor or nurse?
3       A.  When he did have serious asthma
4   attacks, yes, we always went to the
5   hospital.
6       Q.  Is there any time you can remember
7   when Chris had a serious asthma attack or
8   breathing problems when you didn't take him
9   in to an emergency room or a doctor?
10      A.  Only prior to the storm when we
11  had the nebulizer.
12      Q.  Because you could handle the
13  problem yourself with the nebulizer?
14      A.  Yes.
15      Q.  So after the storm, if there was
16  ever an incident where Chris had breathing
17  problems or an asthma attack, you made sure
18  that he was taken to the ER or to a doctor
19  to figure out what was wrong, right?
20      A.  Yes.
21      MR. HILLIARD:
22          Do you have the rest of this
23  document?
24      MR. DINNELL:
25          The rest of it?

1       Q.  Do you know how much money Debra
2   has received from FEMA?
3       A.  No.
4       Q.  Earlier you were asked about media
5   reports in December of 2007, right?
6       A.  Uh-huh.
7       Q.  And I think you said, correct me
8   if I'm wrong, but I think you said that in
9   December of 2007 was the first time you ever
10  heard a media report about trailers and
11  formaldehyde.
12      A.  Yes.
13      Q.  Right?
14      A.  Yes.
15      Q.  And you said that, normally, you
16  watched WDSU Channel 6 to get your news
17  every day, basically?
18      A.  Pretty much, yes.
19      Q.  But you don't receive the "Times
20  Picayune" every day?
21      A.  No, I don't.
22      Q.  You also talked about how at some
23  point you had a brochure about formaldehyde
24  in trailers stuck in your door?
25      A.  Not a brochure, it was only, like,

1       MR. HILLIARD:
2           Uh-huh.
3       MR. DINNELL:
4           You have it.
5       MR. HILLIARD:
6           Do you have it handy?
7       MR. DINNELL:
8           I could look for it at the break.
9       MR. HILLIARD:
10          If you have it handy.  I don't
11  want you to stop anything.
12      MR. DINNELL:
13          Okay.
14      MR. HILLIARD:
15          Thank you.
16  EXAMINATION BY MR. DINNELL:
17      Q.  I believe you said earlier that
18  you don't think you've -- well, you said
19  earlier that you haven't received any
20  monetary funds from FEMA, correct?
21      A.  Correct.
22      Q.  Do you know how much in the way of
23  assistance monetarily your other family
24  members have received?
25      A.  No.

1   a sheet of paper taped to the door.
2       Q.  Okay.  A sheet of paper was taped
3   to the door.  And I believe you said you
4   don't know when that happened?
5       A.  No, I really don't.  But I would
6   roughly say it was around the same time I
7   started hearing about it over the news.
8       Q.  Was it in black and white?
9       A.  I don't remember what color it
10  was.
11      Q.  I'm going to hand you what we're
12  going to mark as Exhibit 22.  Take a look at
13  that.
14          Have you had a chance to look at
15  it?
16      A.  Uh-huh.
17      Q.  Is this the piece of paper that
18  was stuck on your unit?
19      A.  It could be.  I'm not for sure.
20      Q.  You don't know for sure?
21      A.  I don't know for sure.
22      Q.  Does this document look familiar
23  at all?
24      A.  Yes.
25      Q.  Can you say it's more than likely

1  that's the document you received stuck on
2  your unit?
3       A.  I won't say more than likely, but
4  I will say it's a possibility.
5       Q.   And you think that that document
6  looks somewhat familiar to you?
7       A.  Somewhat familiar, yes.
8       Q.   What other kinds of stuff would
9  you find stuck to the unit in the way of
10  documents or paper?
11      A.  If they did an inspection while I
12  wasn't home, they would put a paper saying
13  that they came and did an inspection.
14      Q.  Did you keep all those pieces of
15  paper?
16      A.  No, I did not.
17      Q.  What would you do with them after
18  you took them off the wall of the unit?
19      A.  I would read them and make sure
20  that it still said everything was okay on
21  the trailer and probably shortly thereafter
22  just tossed them.
23      Q.  After you read it?
24      A.  Made sure everything was still
25  okay.

Page 293

1      Q.  How many pieces of paper would you
2  say you found stuck to that trailer
3  throughout the entire time you lived in it?
4      A.  I don't know.  I could not give
5  you a number on that.  I think they roughly
6  did an inspection every month, and if they
7  stuck one on there and it didn't rain before
8  I got home from work, I got the inspection
9  paper.
10      Q.  So we're talking -- you were there
11  in the unit for 19 months, so we're talking
12  somewhere around 20 documents, you think?
13      A.  I guess if you want to say 20.
14      Q.  It wasn't just two or three over
15  the time you lived in the trailer?
16      A.  No, I wouldn't say it was just two
17  or three.
18      Q.  There were a lot of documents and
19  papers being stuck to that unit while you
20  lived there?
21      A.  Like I said, it was mostly when he
22  came and he inspected it.
23      Q.  Sometimes it would rain?
24      A.  Yes.
25      Q.  And then that document -- well,

Page 294

1  correct.
2          But sometimes you wouldn't be able
3  to read the documents that had been stuck
4  there on the unit?
5      A.  That's correct.
6      Q.  Because they would get wet from
7  the rain?
8      A.  Yes.
9      Q.  And during the days, you would be
10  at work, right?
11      A.  Yes.
12      Q.  So if somebody came by the trailer
13  to give you something and you were at work,
14  they would probably leave it for you on the
15  trailer?
16      A.  Yeah, they would stick it on the
17  trailer.  And depending if it didn't blow
18  away too.
19      Q.  Your first -- I know Joe asked you
20  about this earlier, I just want to quickly
21  recap.  You moved into the unit in what you
22  said was May of '06?
23      A.  Yes.
24      Q.  And you got a job at where?
25      A.  Orleans Parish School Board.

Page 295

1      Q.  And then you eventually left
2  Orleans Parish School Board and went to KIPP
3  NOLA?
4      A.  I didn't leave them.  The job
5  ended.  It was only a two-month program, so
6  when it ended, by that time I had gotten on
7  with KIPP NOLA.
8      Q.  Were you ever working more than
9  one job at one time?
10      A.  No.
11      Q.  And were your hours basically the
12  same throughout the time period that you
13  lived in the trailer, whether it was with
14  Orleans Parish or with KIPP NOLA?
15      A.  No, because Orleans Parish, it was
16  from, I want to say, 8:00 to 3:00, and KIPP
17  is, I will be at work at 7:30, and it
18  doesn't end until 5:45 -- I mean, 4:45, and
19  I would actually get home roughly about
20  6:00, I'd be getting home.
21      Q.  Do either your five brothers or
22  your two sisters have asthma?
23      A.  No.
24      Q.  When you were living in the
25  trailer at the Dale Street address, was

Page 296

74  (Pages 293 to 296)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Videotaped Deposition of Alana Alexander

1  there still a mailbox at that address?
2      A.  Yes.
3      Q.  Was the mailbox right along the
4  street?
5      A.  Yes.
6      Q.  And that's where you would receive
7  mail?
8      A.  Yes.
9      Q.  And you said right after you moved
10 into the trailer, there would be problems
11 with mail arriving on time and regularly?
12     A.  Yes.
13     Q.  Now, you've lived -- you have
14 basically lived in New Orleans your whole
15 life; is that right?
16     A.  Yes.
17     Q.  Aside from after the storm, being
18 in Houston, Jacksonville, you've been in New
19 Orleans from birth to the present?
20     A.  Yes.
21     Q.  And that 4415 Dale Street address
22 is where you grew up, right?
23     A.  Yes.
24     Q.  After the storm, why was it
25 important for you -- well, I'll ask:  Was it

Page 297

1  the unit?
2      A.  No.
3      Q.  When you were first coming back to
4  New Orleans, did you do a search for
5  apartments in the area?
6      A.  Like I say, I had a cousin who
7  lived here, and I had her looking out for
8  reasonably priced apartments.  But after
9  Katrina, when you came back, there was
10 really no reasonable rental places in the
11 city.
12     Q.  There was nothing available,
13 right?
14     A.  I wouldn't say there was nothing
15 available, I would say there was nothing
16 reasonably priced.
17     Q.  And that's why you lived in the
18 trailer, because you couldn't find something
19 that worked for you, correct?
20     A.  That's correct.
21     Q.  Did you ever think about moving
22 into the barber shop building instead of
23 living in the trailer?
24     A.  My mom and my dad and my sister
25 was in the barber shop.

Page 299

1  important for you to come back to New
2  Orleans after the storm?
3      A.  Yes.
4      Q.  Why?
5      A.  Because I lived here all my life,
6  my mom and my dad was here and I had roots
7  here.  This is my home.
8      Q.  And why not just stay in
9  Jacksonville?
10     A.  Because I didn't like Florida.
11     Q.  You wanted to come back and be
12 around family that was in New Orleans?
13     A.  Family and my home.  This is where
14 I live.
15     Q.  Now, did you ask FEMA for a travel
16 trailer or some sort of housing unit so you
17 could come back to New Orleans?
18     A.  Yes.
19     Q.  And eventually, you were provided
20 with one, correct?
21     A.  Correct.
22     Q.  Did you pay anything for the
23 travel trailer unit?
24     A.  No.
25     Q.  Did you pay any rent to live in

Page 298

1      MS. PETROVICH:
2          Debra?
3      THE WITNESS:
4          Yes, Debra, I'm sorry.
5      EXAMINATION BY MR. DINNELL:
6      Q.  You were saying earlier, and it
7  doesn't take much to figure this out, when
8  you go in these things, the trailer was
9  small and you didn't have much privacy when
10 you were in it, right?
11     A.  Yes.
12     Q.  Did that make you want to try to
13 find another place to live as soon as
14 possible?
15     A.  Yes.
16     Q.  Did you try to find other places
17 to live while you were in the trailer?
18     A.  Yes.
19     Q.  And you just weren't able to find
20 anything?
21     A.  Yes.
22     Q.  And that's because there just
23 wasn't much housing to go around after the
24 storm; is that right?
25     A.  Correct.

Page 300

75 (Pages 297 to 300)