1    Q.  Let's take a look at what I'm
2  going to mark next in order, which I believe
3  should be Exhibit 23.
4         Take a look at what I'm marking as
5  Exhibit 23 here.  Have you had a chance to
6  look at it?
7    A.  Yes.
8    Q.  All right.  Exhibit 23 is entitled
9  "Emergency Shelter Agreement Rules of
10 Occupancy."
11        And about halfway down, it says,
12 "Name of person assigned the shelter unit,
13 Aiana M. Alexander," and then there's a
14 signature there.
15        Is that your signature?
16   A.  Yes.
17   Q.  Did you sign this document?
18   A.  Yes.
19   Q.  It's dated 3-20-06.
20        Were you back in New Orleans in
21 March of '06?
22   A.  No, I wasn't.
23   Q.  Do you know how you were able to
24 sign this document?
25   A.  If I'm not mistaken, I think this

Page 301

1    Q.  But there was nothing available?
2    A.  Correct.
3    Q.  I just want to pick up a few
4  things.
5         Has Chris always lived with you
6  throughout his whole life?
7    A.  Yes.
8    Q.  When you were living at 4415 Dale
9  Street before the storm, did you have to pay
10 any rent to your parents?
11   A.  Yes.
12   Q.  How much, do you remember?
13   A.  $250.
14   Q.  Did Debra Austin have to pay any
15 rent?
16   A.  Yes.
17   Q.  The same amount?
18   A.  I don't know.
19   Q.  Talking about Chris's health for a
20 moment, when you have used different
21 cleaning sprays and cleaned areas of your
22 house, have you ever seen Chris have an
23 asthmatic response to you doing that?
24   A.  No.
25   Q.  Have you ever seen him have a

Page 303

1  was one of the ones we faxed.
2    Q.  Now, you see up above the
3  signature, the No. 4?  Actually, I will go
4  up.
5         The document says, "I have been
6  informed and understand any violation of any
7  of the rules listed below may result in my
8  leaving the unit immediately.  I agree that
9  I," and then down below No. 4, it says,
10 "must accept other housing options when they
11 become available."
12        Do you see that?
13   A.  Yes.
14   Q.  Now, throughout the entire time
15 you were in the trailer, there were no other
16 housing options available?
17   A.  Not to me.  Like I say, they were
18 way too expensive.
19   Q.  All right.  So you abided by the
20 No. 4 in this document, correct?
21   A.  I would say yes.
22   Q.  So if something would have become
23 available for you, you would have moved out
24 of the trailer?
25   A.  Yes.

Page 302

1  response to you cooking or frying anything?
2    A.  No.
3    Q.  When Chris first walked into the
4  travel trailer unit, did he immediately have
5  any kind of asthmatic response?
6    A.  No.
7    Q.  He didn't have any of the "itching
8  of the chest"?
9    A.  He had that.  I mean, the itching
10 of the throat and the runny eyes and the
11 sneezing.
12   Q.  Did he have to use his inhaler
13 right after he walked into the unit for the
14 first time?
15   A.  No.
16   Q.  Now, earlier there was an issue
17 where we were talking about your
18 applications for FEMA assistance and there
19 was an issue with your brother.
20        Do you remember that?
21   A.  Yes.
22   Q.  Do you know if your brother had to
23 return money to FEMA or the government?
24   A.  Yes.  I told you that.  I said he
25 returned the check.

Page 304

76 (Pages 301 to 304)

1    Q.  Do you know why?
2    A.  He returned the check because he
3  did not live at 4415 Dale Street, so he gave
4  the check back.
5    Q.  Do you remember there being an
6  issue with your FEMA application where you
7  may have answered a question incorrectly?
8    A.  Yes.  It had to do with the
9  address.  I'm not exactly -- I don't
10  remember exactly what it was right now.  But
11  I did write letters to them often to try to
12  explain the mistake that was made.
13    Q.  Did you call them often?
14    A.  As often as I could.  Pretty much
15  every day.
16    Q.  And you knew FEMA's telephone
17  number, right?
18    A.  It was programmed into my phone.
19    Q.  And you knew the address where you
20  should send letters?
21    A.  The address at the time, the
22  address and a fax number.
23    Q.  Do you remember your cell phone
24  number at the time?
25    A.  It has always been the same,
Page 305

1  (504)577-0737.
2    MS. PETROVICH:
3      Who is your provider?
4    THE WITNESS:
5      Right now, it's AT&T, but I think
6  it was Sprint at that time.
7  EXAMINATION BY MR. DINNELL:
8    Q.  And you wrote a few letters to
9  FEMA trying to explain your situation and
10  your appeal of getting disaster benefits,
11  right?
12    A.  Yes.
13    Q.  I'll just show you Exhibit 24,
14  what we have marked as Exhibit 24.
15      24 is dated November 2, '05, and
16  it's titled "Attention:  FEMA Individuals
17  and Households Program."
18      Is that right?
19    A.  Correct.
20    Q.  Is that your signature at the
21  bottom?
22    A.  Yes, it is.
23    Q.  And in this document, you explain
24  that you may have filled out your
25  application for assistance incorrectly; is
Page 306

1  that right?
2    A.  Correct.
3    Q.  And then you tried to explain the
4  situation?
5    A.  Correct.
6    Q.  All right.  Okay.
7    A.  To no avail.
8    Q.  In fact, you sent another
9  letter --
10    A.  Sure did.
11    Q.  -- and I will mark this one,
12  Alexander Exhibit 25.
13      Again, Alexander Exhibit 25 is
14  dated March 29, 2006.  It says, "Attention:
15  FEMA."
16      And is that your signature at the
17  bottom of Exhibit 25?
18    A.  Yes.
19    Q.  And in this one you're explaining
20  to FEMA that there was an issue with both
21  your sister and your brother being listed at
22  the same address as you, right?
23    A.  Correct.
24    Q.  Now, in addition to you sending
25  letters to FEMA, FEMA would occasionally
Page 307

1  send you letters, right?
2    A.  Yes.
3    Q.  Do you remember how many letters
4  you received from FEMA?
5    A.  I don't know totally.
6    Q.  Did you receive letters when you
7  were in Houston from FEMA?
8    A.  I want to say yes, I probably did.
9    Q.  Did you receive letters from FEMA
10  when you were in Florida?
11    A.  Yes.
12    Q.  And I assume you received letters
13  from FEMA when you were in New Orleans back
14  at the Dale Street address, correct?
15    A.  I would assume, yes.
16    Q.  What kind of things would those
17  letters say?
18    A.  Some of them had to do with the
19  appeal process, the ones in Florida.  The
20  ones in New Orleans, basically, had to do
21  with the trailer.
22    Q.  Do you remember a letter about
23  having things near the furnace exhaust vent
24  of the trailer?
25    A.  I don't really remember that one.
Page 308

77  (Pages 305 to 308)

| | |
|---|---|
| 1    Q.  Okay.  Do you remember a letter | 1    Q.  And you said that you talked about |

1    Q.   Okay.  Do you remember a letter
2  about extending the temporary housing
3  program for people in trailers?
4    A.   I do remember that one.
5    Q.   Is it fair to say that you were
6  receiving a lot of letters from FEMA about
7  the trailer and about your assistance?
8    A.   I guess you could say yes.
9    Q.   Did you keep all those letters
10  that you received?
11    A.   Not everything.
12    Q.   This would be like the things that
13  would be left on the outside of the trailer,
14  you would just read it and just throw it
15  away afterwards?
16    A.   I guess you could say yes.
17    Q.   "Yes"?
18    A.   Yes.
19    Q.   At one point, and I apologize for
20  jumping around with a bunch of stuff here,
21  but at one point, your house was demolished,
22  right?
23    A.   Yes.
24    Q.   Did FEMA put you up in a hotel
25  while the house was demolished?

Page 309

1    Q.   And you said that you talked about
2  those odors and smells with a person who was
3  there with you in the unit; is that correct?
4    A.   Yes.
5    Q.   And that was somebody who was
6  walking you through the unit for the first
7  time?
8    A.   Yes.
9    Q.   After that conversation, did you
10  ever call anyone about the odors or smells?
11    A.   No.
12    Q.   Do you remember there being a
13  telephone number listed inside of the unit?
14    A.   Not in the unit, I think it was in
15  the book.
16    Q.   There was a number you understood
17  to be a number for maintenance calls?
18    A.   Yes.
19    Q.   Okay.  And you never called that
20  maintenance number about odors or smells?
21    A.   No.
22    Q.   In addition, there's a separate
23  FEMA phone number that you knew about to
24  call about getting assistance from FEMA,
25  right?

Page 311

1    A.   Yes.
2    Q.   At the Super 8 on Chef Menteur
3  Highway?
4    A.   Yes.
5    Q.   You didn't have to pay for that
6  hotel room?
7    A.   No.
8    Q.   FEMA paid for it?
9    A.   Yes.
10    Q.   And you may have said this
11  earlier, but the Dale Street address is
12  about two blocks away from Chef Menteur
13  Highway?
14    A.   It's the third block.
15    Q.   Third block away?
16    A.   Yes.
17    Q.   And on the other side of Chef
18  Menteur Highway, it's kind of an industrial
19  area right there, right?
20    A.   Yes, some housing and mostly
21  industrial.
22    Q.   Now, you said earlier that when
23  entering the unit, there were some odors and
24  smells in the unit, right?
25    A.   Yes.

Page 310

1    A.   Yes.
2    Q.   Did you ever call FEMA about any
3  odors or smells in the unit?
4    A.   No.
5    Q.   I will ask a slightly different
6  question now, and I think I know your answer
7  because you said you first heard about
8  formaldehyde in December of 2007.  That's
9  what you said?
10    A.   Yes.
11    Q.   So you would have never made any
12  complaints specifically about formaldehyde
13  to anyone on that maintenance phone number,
14  right?
15    A.   Correct.
16    Q.   And you've never made any
17  formaldehyde complaints to FEMA using the
18  FEMA telephone number?
19    A.   That's correct.
20    Q.   Did you ever visit the FEMA Web
21  site?
22    A.   I probably did.
23    Q.   For what purpose, do you remember?
24    A.   Sometimes it was -- well, now,
25  this was prior to me getting the trailer

Page 312

78  (Pages 309 to 312)

```
 1   because I didn't have Internet access when I
 2   got into the trailer.  When we were in
 3   Florida, I probably did in order to get the
 4   telephone numbers or something.  Because
 5   every now and then, you know, I wouldn't
 6   have it for whatever reason.
 7        Q.   And you're saying that you didn't
 8   have any Internet access throughout the time
 9   when you lived in the trailer?
10        A.   Only when I was at work.
11        Q.   Could you access the Internet from
12   your parents' house?
13        A.   No, because they don't have that.
14        Q.   Is the only time you could access
15   the Internet throughout the time you were in
16   the trailer when you were at work?
17        A.   Yes, sir.
18        Q.   Now, you said these odors and
19   smells in the unit were there from the first
20   moment you walked into the unit?
21        A.   Yes.
22        Q.   And those odors and smells
23   irritated you at the first moment you walked
24   into the unit?
25        A.   Yes.
                                        Page 313
```

```
 1        Q.   And to your knowledge, they
 2   irritated Chris the first moment he walked
 3   into the unit?
 4        A.   Yes.
 5        Q.   Did you ever talk with anyone
 6   about moving out of the unit because of
 7   those odors and smells?
 8        A.   No.
 9        Q.   Did you ever ask anyone if you
10   could be moved somewhere else because of the
11   odors and smells in the unit?
12        A.   No.
13        Q.   And eventually, you moved out of
14   the unit into your sister's house, which is
15   the Mirabeau address, correct?
16        A.   Correct.
17        Q.   Now, had you discussed the
18   possibility of moving into her house as
19   early as November of 2007?
20        A.   I might have had the discussion,
21   but I doubt it seriously.
22        Q.   Why?
23        A.   Because prior to that, I was
24   trying to find a way to build a house on the
25   lot itself.
                                        Page 314
```

```
 1        Q.   When did she move back to New
 2   Orleans from New York?
 3        A.   She moved back, I would say, in
 4   June of '06.  Because I think she came back,
 5   like, right after we got back home.
 6        Q.   In June of '06?
 7        A.   Yes.
 8        Q.   Did she live in a trailer?
 9        A.   Yes.
10        Q.   Do you know when she moved out of
11   the trailer?
12        A.   I don't remember exactly when she
13   moved out.
14        Q.   Was her trailer parked at the
15   Mirabeau address?
16        A.   No, her trailer was at the lot my
17   daddy had on Reynes Avenue.
18        Q.   Do you know when she acquired the
19   Mirabeau address house?
20        A.   I don't know the exact dates on
21   that.
22        Q.   I believe you said earlier that
23   you had gotten a prescription for Chris's
24   inhaler while you were in Jacksonville; is
25   that right?
                                        Page 315
```

```
 1        A.   Correct.
 2        Q.   And there were a certain number of
 3   refills on that prescription?
 4        A.   Yes.
 5        Q.   And you don't know how many
 6   refills there were?
 7        A.   No, I don't remember exactly.
 8        Q.   That would probably be in the
 9   Walgreens records, right?
10        A.   Yes.
11        Q.   Do you know the next time it was
12   that Chris went and had to get a new
13   prescription for inhalers?
14        A.   We were already back here in New
15   Orleans and we eventually found Dr. Barnes
16   again, and when we found her, then we went
17   to the doctor.
18        Q.   So the next time he got a
19   prescription for an inhaler was when he saw
20   Dr. Barnes for the first time after the
21   storm?
22        A.   Yes.  I would say yes.  I think
23   so.
24        Q.   Do you remember, was that around
25   October of 2007?
                                        Page 316
```

79 (Pages 313 to 316)

1    A.  I think it was.
2    Q.   Okay.  So between seeing the
3  doctor in Florida and seeing Dr. Barnes for
4  the first time after the storm in October of
5  2007, Chris went through however many
6  inhalers he could get refills for from that
7  one prescription, right?
8    A.  Yes.
9    Q.   However many inhalers that is?
10   A.  Yes.
11   Q.   He didn't need a new prescription
12  for refills between Florida and that visit
13  with Dr. Barnes in October of 2007?
14   A.  Yes.
15   Q.   Okay.  You mentioned earlier that
16  you had a few problems with the unit in
17  terms of the heater and some other items?
18   A.  Yes.
19   Q.   Who would you call to deal with
20  those problems?  Would that be the number
21  inside that manual that you talked about?
22   A.  Yes.  The maintenance number that
23  they gave us.
24   Q.   When you first noticed that smell
25  when you went into the trailer, you said you

Page 317

1  reflection of your resumé up until 2005; is
2  that right?
3    A.  Yes.
4    Q.   So this would have been your
5  accurate and correct resumé prior to
6  Hurricane Katrina hitting?
7    A.  Yes.
8      Minus Dillard, because -- no, I
9  did start Dillard before the storm.  Yes.
10   Q.   In connection with this case, you
11  met with a psychologist, do you remember
12  that?
13   A.  Yes.
14   Q.   And that was a Dr. Shwery?
15   A.  Yes.
16   Q.   And Chris did too, right?
17   A.  Yes.
18   Q.   Did Dr. Shwery ask you about any
19  other sources of emotional distress that you
20  may have aside from anything related to
21  formaldehyde in trailers?
22   A.  You mean outside of the whole
23  trailer situation?
24   Q.   And by "trailer situation," I mean
25  formaldehyde in trailers, yes.

Page 319

1  knew it was irritating you, right?
2    A.  Yes.
3    Q.   And you knew it was irritating
4  Chris?
5    A.  Yes.
6    Q.   Or he told you it was irritating
7  him?
8    A.  Yes.
9    Q.   Did you know that the smell was
10  coming from the trailer?
11   A.  Yes.  Because we were in the
12  trailer and we smelled it when we walked in
13  the trailer.
14   Q.   So you figured out that that smell
15  that you were smelling, the irritating
16  smell, was coming from this trailer that you
17  were in?
18   A.  Yes.
19   Q.   I'll just throw this in there
20  while I have it out and mark this as
21  Exhibit 26.
22      I believe this is an outdated
23  resumé for you?
24   A.  Oh, yeah.
25   Q.   But this was an accurate

Page 318

1    A.  Right.  Did he ask -- wait.  Say
2  your question again, please.
3    Q.   Did he ask you if there were any
4  other sources of psychological issues or
5  emotional distress, aside from trailers and
6  formaldehyde?
7    A.  Yes, he asked me.
8    Q.   Did he ask you whether the ordeal
9  of the storm affected you?
10   A.  Yes, he did.
11   Q.   Did he ask you whether the ordeal
12  of the storm permanently affected you?
13   A.  I don't remember if he said
14  "permanently."
15   Q.   As we sit here today, do you think
16  that the storm has caused you any kind of
17  permanent emotional distress?
18      And by "the storm," I mean the
19  destruction of your house and, subsequently,
20  evacuation, not trailers and formaldehyde.
21   A.  I would say yes, the storm has
22  adjusted me permanently.
23   Q.   Okay.  What about for Chris?
24   A.  I would have to say yes.
25   Q.   So in addition to any kind of

Page 320

80  (Pages 317 to 320)

1  emotional distress that may have resulted
2  from formaldehyde in trailers, you think you
3  have permanent emotional distress from the
4  storm and the evacuation?
5      A.  You keep using the word
6  "permanent."  I would say I had a lot of
7  stress due to the storm and everything, yes.
8      Q.  And the same goes for Chris?
9      A.  I would say yes.
10     THE VIDEOGRAPHER:
11         Off the record; it is 3:12.
12     (Recess.)
13     THE VIDEOGRAPHER:
14         Back on the record; it is 3:18.
15  EXAMINATION BY MR. DINNELL:
16     Q.  Ms. Alexander, I'm going to hand
17  you what I have marked as Exhibit 27.  Would
18  you take a look at that document?
19         Exhibit 27 is entitled "FEMA,
20  Important Formaldehyde Information for FEMA
21  Housing Occupants."
22         Have you ever seen this document
23  before?
24     A.  I could have.  I really don't
25  know.

Page 321

1  about to reduce any levels of formaldehyde
2  in the unit, you should ventilate the unit?
3      A.  I would say probably yes.
4      Q.  And from the first day you moved
5  into this unit, you ventilated the unit,
6  correct?
7      A.  Yes, yes.
8      Q.  Let's take a look at a document
9  that was referenced earlier as a part of
10  your Plaintiff Fact Sheet.  I'm going to
11  attach it separately as Exhibit 28.
12         Do you remember seeing this
13  document earlier during today's deposition?
14     A.  Yes.
15     Q.  And Exhibit 28 is entitled "Claim
16  for Damage, Injury or Death," correct?
17     A.  Yes.
18     Q.  Now, on the first page of
19  Exhibit 28, down at the bottom, that's not
20  your signature, right?
21     A.  No, it's not.
22     Q.  The signature looks like it's the
23  signature of Justin Woods, right?
24     A.  Correct.
25     Q.  Did you authorize Justin Woods to

Page 323

1      Q.  Okay.  Do you know if this is one
2  of the documents that was stuck on the
3  outside of your unit?
4      A.  I really can't say yes or no.
5      Q.  When you received whatever it was
6  that you received about formaldehyde in
7  travel trailers stuck to your unit, do you
8  remember what it told you?
9      A.  It told me basically about that
10  the irritant -- irritating eyes and
11  everything could possibly be one -- some of
12  the symptoms that you get and it's because
13  of the formaldehyde in the trailer.
14         And that the -- that if somebody
15  already had respiratory or asthmatic
16  problems, that it would either make it more
17  severe or cause them to have more problems,
18  and the fact that you could get some other
19  skin-irritating diseases from it and
20  possibly long-term effects of cancer and
21  stuff maybe.
22     Q.  Do you remember it saying anything
23  about if you have problems, go see a doctor?
24     A.  I don't remember that part.
25     Q.  Do you remember it saying anything

Page 322

1  sign this form on your behalf?
2      A.  I don't think so.  I don't know.
3      Q.  Well, let's look at the other one
4  for Chris.  I'll mark this one as
5  Exhibit 29.
6         Again, Exhibit 29 is entitled
7  "Claim for Damage, Injury or Death."  This
8  one says "Alana Alexander o/b/o Christopher
9  Cooper."
10         Do you see that?
11     A.  Yes.
12     Q.  And you are Christopher Cooper's
13  legal guardian and you're his parent,
14  correct?
15     A.  Yes.
16     Q.  Down at the bottom where it says,
17  "Signature of claimant," on Chris Cooper's
18  form, that's not your signature again,
19  right?
20     A.  Correct.
21     Q.  That's Justin Woods' signature,
22  correct?
23     A.  Correct.
24     Q.  Now, do you remember specifically
25  authorizing Justin Woods to sign this form?

Page 324

81 (Pages 321 to 324)

1    A.  I don't remember specifically.
2    Q.  And you don't remember
3  specifically authorizing Justin Woods to
4  sign Exhibit 28, the other form that's for
5  Alana Alexander?
6    A.  No, I don't remember.
7    Q.  All right.  Now, look at 28 first,
8  okay?
9    A.  Okay.
10   Q.  28, in box 2, it says, "Name and
11  address of claimant," and then it says,
12  "Alana Alexander" and "4415 Dale Street."
13       That's your name and your address,
14  right?
15   A.  That's correct.
16   Q.  And down at the bottom, Justin
17  Wood's signature is dated 2-15-08, right?
18   A.  Right.
19   Q.  And the amount of claim, it says
20  "Property damage, $10,000," right?
21   A.  Yes.
22   Q.  Okay.  And earlier you said that
23  it was your understanding that $10,000 would
24  be for the things that you lost in the
25  hurricane, right?

Page 325

1    A.  Yes.
2    Q.  And then next to it, it says,
3  "Personal Injury, $100,000."
4       Right?
5    A.  Yes.
6    Q.  Now, is it your understanding that
7  some of that $100,000 would be for your
8  emotional distress that you suffered from
9  the destruction of your house in the
10  hurricane?
11   A.  I don't know.  I can't say I
12  understood that, but that's what it seems to
13  be.
14   Q.  Because you didn't sign this form,
15  right?
16   A.  Yes.  Right.  I did not sign the
17  form.
18   Q.  Do you know if that -- so you
19  don't know -- is the $100,000 personal
20  injury for formaldehyde exposure or for
21  damage to your house?
22   A.  I don't know.
23   Q.  And is it fair to say that on
24  Exhibit 29, the form for Christopher, the
25  same thing holds true?

Page 326

1    A.  I would have to say yes.
2    Q.  Now, on Christopher's form,
3  Exhibit 29, there is no property damage
4  listed, just $100,000 for personal injury,
5  correct?
6    A.  Correct.
7    Q.  And you don't know how much of
8  that personal injury $100,000 would be for
9  any emotional damage that Chris Cooper
10  suffered from the hurricane or from the
11  formaldehyde exposure that you have alleged?
12   A.  That's correct.
13   Q.  Now, looking back -- I'm sorry to
14  keep going back and forth between the two
15  here -- looking at Exhibit 28, your form,
16  your SF95 form --
17   A.  What is that?  That's this one?
18   Q.  This document, right.  Sorry.
19       It say, "Basis of claim," and then
20  there's a rider attached to it that
21  continues talking about the basis of your
22  claim and what you've suffered and continue
23  to suffer.
24       Have you seen any of that before?
25   A.  To be honest, I can't say I did or

Page 327

1  I didn't because I have read so many papers
2  since this started, I really don't know.
3    Q.  Okay.  We'll just put these down
4  for now.
5       Do you remember how long it was
6  after you saw media reports on TV about
7  formaldehyde in trailers that you had the
8  conversation about formaldehyde in trailers
9  at the church?
10   A.  No.  I really don't know when that
11  was.  No.
12   Q.  Do you remember how long it was
13  after you first saw the media reports about
14  formaldehyde in trailers that you retained
15  Justin Woods as your attorney?
16   A.  No, I don't exactly remember how
17  long it was afterwards.
18   Q.  Do you remember how long after you
19  retained Justin Woods as your attorney that
20  you actually moved out of the travel trailer
21  unit?
22   A.  No.  I don't exactly remember.
23   Q.  Do you remember if you retained
24  Mr. Woods before you moved out of the unit?
25   A.  I'm not sure if it was really

Page 328

82  (Pages 325 to 328)

1  before or after.  I really don't.
2      Q.  About the wall panel in the unit.
3      A.  Okay.
4      Q.  You discussed that with somebody
5  as you were first walking through the unit
6  for the first time?
7      A.  Yes.
8      Q.  While you were doing your
9  walk-through?
10     A.  Yes.
11     Q.  And there was a discussion about
12 duct taping the wall?
13     A.  Yes.
14     Q.  Was this with the same person that
15 you were talking to about the odors in the
16 unit?
17     A.  Yes.
18     Q.  Did you ever call anyone about the
19 wall panel?
20     A.  No.
21     Q.  Okay.  You didn't call the
22 maintenance number that you had --
23     A.  No.
24     Q.  You didn't call the maintenance
25 number that you had about the wall panel?

Page 329

1      Q.  Were there any trees located on
2  the Dale Street property?
3      A.  Yes.
4      Q.  Do you know what kind of trees?
5      A.  Pecan and -- I can't think of that
6  other one.  There's a pecan tree and I think
7  it's called a crepe myrtle.
8      Q.  Let's mark this as Exhibit 30.
9          Exhibit 30 is a photograph, I
10 believe this was taken when your unit was
11 being tested in January of 2008, after you
12 had moved out of the unit?
13     A.  Okay.
14     Q.  You see that?
15     A.  Yes.
16     Q.  Now, there's a tree right near the
17 unit, right?
18     A.  Yes.
19     Q.  Do you know which tree that is?
20     A.  The closest one to it, I think, is
21 the crepe myrtle -- it is the crepe myrtle.
22     Q.  And then the one back by the
23 basketball hoop is the pecan tree?
24     A.  Yes, but that's not actually as
25 close as this picture makes it seem.

Page 331

1      A.  No.
2      Q.  And you didn't call the FEMA
3  number about that wall panel, correct?
4      A.  No.
5      Q.  If I said that you first learned
6  of formaldehyde in trailers from a friend,
7  would that be correct?
8      A.  No.
9      Q.  And just to clarify, your son had
10 asthma before Hurricane Katrina, right?
11     A.  Yes.
12     Q.  And he still has asthma today?
13     A.  Yes.
14     Q.  Your son had sinus problems before
15 Hurricane Katrina?
16     A.  No.
17     Q.  No?
18     A.  (Witness shakes head negatively.)
19     Q.  No sinus problems before Hurricane
20 Katrina?
21     A.  No, just the asthma.
22     Q.  Does he have sinus problems now?
23     A.  If you mean sinus as far as
24 allergies, yes.

Page 330

1  Because, actually, that pecan tree is all
2  the way to the back of the property.
3      Q.  But it's on your property, right?
4      A.  Oh, yes, yes.
5      Q.  When the house was still there,
6  would that be the backyard where the pecan
7  tree was?
8      A.  Yes.
9      Q.  Now, was there an issue where you
10 would clean the trailer a lot because of
11 mold?
12     A.  Yes.
13     Q.  When you were cleaning, did Chris
14 ever have any kind of asthmatic response to
15 the cleaning products you were using?
16     A.  No.
17     Q.  You said earlier you had looked
18 for housing in the New Orleans area in 2006
19 in the spring, but there was nothing
20 available for you?
21     A.  That I could afford, yes.
22     Q.  All right.  Could you still return
23 to New Orleans without having the trailer?
24     A.  I would probably have to say no on
25 that.

Page 332

83  (Pages 329 to 332)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Alana Alexander

1    Q.  There was a warranty phone number
2  in the Gulf Stream manual.  Did you ever
3  call Gulf Stream?
4    A.  The only number I ever called on a
5  consistent basis was the customer service
6  and that was the only one.
7    Q.  The maintenance --
8    A.  The maintenance one, I'm sorry,
9  the maintenance one.
10   Q.  Do you remember when was the first
11 time that you told any doctor about symptoms
12 that you or Chris may have experienced while
13 living in the trailer?
14   A.  Well, when we first found
15 Dr. Barnes and I told her about the symptoms
16 that he was having, I didn't immediately
17 know that had to do with the stuff that was
18 going on in the trailer.  I just went
19 thinking it was, you know, his allergies and
20 asthma.
21   Q.  So at that time, you didn't tell
22 any doctor that you had or any of Chris's
23 doctors, that you had experienced irritation
24 while living in the unit?
25   A.  Correct.

Page 333

1    A.  You said December of 2007?
2    Q.  That's right.
3    A.  Yes.
4    Q.  Do you remember if there was a
5  drop in temperature right before he had to
6  go to the hospital?
7    A.  I don't remember that, if there
8  was a drop in temperature.
9    Q.  On other occasions, can you
10 remember a drop in temperature causing
11 problems with his breathing?
12   A.  Yes.
13   Q.  Does Chris miss much school?
14   A.  Not a lot, but he has missed more
15 than five days, I want to say.
16   Q.  And he gets pretty good grades; is
17 that right?
18   A.  Oh, yes.
19   Q.  Does he sleep through the night
20 okay?
21   A.  For the most part, yes.
22   Q.  Prior to this litigation, had
23 Chris ever had to go see an asthma
24 specialist rather than just a pediatrician?
25   A.  No.

Page 335

1    Q.  Did you ever visit a doctor while
2  you lived in the trailer?
3    A.  The only doctor I ever visited
4  while we lived in the trailer was the
5  dentist.
6    Q.  Was that Dr. Honoré, or something
7  like that?
8    A.  Honoré, yes.
9    Q.  You didn't visit any other doctor
10 while you lived in the trailer?
11   A.  No.
12   Q.  When you moved out into your
13 sister's house on Mirabeau Avenue, was that
14 the first time since you had been in the
15 travel trailer that you had an option to go
16 somewhere else and move out?
17   A.  I would have to say yes.
18   Q.  Has Chris ever had any kind of
19 asthmatic response to any kind of odors or
20 smells in other places other than in the
21 trailer?
22   A.  No.
23   Q.  Chris had to go to the hospital in
24 December of 2007.  Do you remember that
25 incident?

Page 334

1    Q.  When you first walked into the
2  travel trailer unit, were there any signs
3  that the unit had previously been lived in
4  by anyone?
5    A.  Not to my knowledge, no.  I would
6  say no.
7    Q.  Was anything wrapped up in
8  plastic?
9    A.  The microwave and the stove.
10   Q.  You've spoken with a lot of expert
11 witnesses during the course of this case; is
12 that true?
13       Let me ask a different question:
14 Have you spoken with any experts involved in
15 this case?
16   A.  I guess I would have to say, yes,
17 I guess.
18   Q.  Have you read any of their reports
19 in this case?
20   A.  No.
21   Q.  Do you undergo regular physical
22 exams at all?
23   A.  You're asking me if I undergo?
24   Q.  Yes.
25   A.  I would say no.

Page 336

84  (Pages 333 to 336)

1    Q.   Do you have insurance for medical
2  care?
3    A.   For myself, yes.
4    Q.   What about for Chris?
5    A.   Medicaid.
6    Q.   What kind of insurance do you have
7  for yourself?
8    A.   Through work.  Blue Cross/Blue
9  Shield.
10    Q.   But Chris's medical care is
11  covered through Medicaid?
12    A.   Yes.  LaCHIP.
13    Q.   You suffered from or you suffer
14  from hypertension; is that right?
15    A.   No.
16    Q.   Have you ever suffered from
17  hypertension?
18    A.   No.
19    MR. HILLIARD:
20       Not until today.
21  EXAMINATION BY MR. DINNELL:
22    Q.   After the storm, would Chris get
23  anxious at all about changes in the weather
24  or fear of storms?
25    A.   Not a lot, no.  But he would have

Page 337

1  in the trailer.
2    Q.   When you were cleaning in the
3  trailer, he would have some kind of
4  breathing response to you dusting or
5  sweeping?
6    A.   To the dust, yes.
7    MS. PETROVICH:
8       But he sometimes has it now?
9    THE WITNESS:
10       Not as often.
11  EXAMINATION BY MR. DINNELL:
12    Q.   Did you ever file for any kind of
13  Social Security Disability?
14    A.   No.
15    Q.   Have you ever filed a workers'
16  comp claim?
17    A.   Only the one time when I was
18  working on the ambulance.
19    Q.   Have you ever been arrested?
20    A.   Oh, no.
21    Q.   Chris has never been arrested,
22  right?
23    A.   No.
24    Q.   Do you use nail polish at all?
25    A.   Not often.

Page 339

1  some when -- especially if it pertains to,
2  like, a severe thunderstorm, he would get an
3  anxiety.
4    Q.   Do you drink milk at all?
5    A.   Do I drink milk?
6    Q.   Yes.
7    A.   Yes, I do drink milk.
8    Q.   Do you ever drink beer?
9    A.   Yes, I do drink beer.
10    Q.   Does Chris drink milk?
11    A.   Yes, Chris does drink milk.
12    Q.   I won't ask the latter one for
13  him.
14       Have you ever kept a diary or any
15  kind of log about Chris's asthma symptoms,
16  where you record when he's having symptoms?
17    A.   No.
18    Q.   When you dust or sweep around your
19  house, have you ever seen Chris have an
20  asthma response to you doing that?
21    A.   Not an asthma response, more of an
22  allergy response.
23    Q.   Okay.  And that happens in your
24  current house?
25    A.   Not really as much as when we were

Page 338

1    Q.   Nail hardeners?
2    A.   No.
3    Q.   Air fresheners?
4    A.   Yes, we do.
5    Q.   Antihistamines?
6    A.   Yes, he does.
7    Q.   Cosmetics?
8    A.   Not really.
9    Q.   Shampoo?
10    A.   Yes.
11    MR. DINNELL:
12       All right.  I think I'm done.
13  Let's take a one-minute break.
14    THE VIDEOGRAPHER:
15       Off the record; it is 3:43.
16  (Recess.)
17    THE VIDEOGRAPHER:
18       Back on the record, it is 3:54.
19  EXAMINATION BY MS. PETROVICH:
20    Q.   Ms. Alexander, I'm Lezle
21  Petrovich.
22       Would it be fair to say that Maria
23  first moved into the Mirabeau house when it
24  was ready to be lived in?
25    A.   Yes.

Page 340

85  (Pages 337 to 340)

1    Q.   And that's when she moved out of
2  her trailer?
3    A.   Yes.
4    Q.   Did anybody live at the trailer
5  with Maria?
6    A.   No.
7    Q.   Did y'all visit Maria at her
8  trailer?
9    A.   Not often.
10    Q.   And the first time that you even
11  came to visit New Orleans after the storm
12  was in May of '06?
13    A.   No.  We came one time prior to
14  that.
15    Q.   Okay.  Tell me about that time.
16    A.   It was, like, around -- the storm
17  happened in August.  I would say we came
18  back in -- the first time might have been in
19  October of 2005.  No, I would say -- yeah,
20  it would be about October of 2005.
21    Q.   Did Chris come with you?
22    A.   No, he did not come home with me.
23    Q.   Was the first time that Chris came
24  back after the storm in May of '06?
25    A.   No, he came back one time other time,

Page 341

1  one time before the '06 time.
2    Q.   Okay.  When did he come back
3  before that?
4    A.   I don't remember.  It would have
5  to be sometime around some holiday break
6  from school that they came.
7    Q.   The time that Chris came back
8  sometime during the holiday break, do you
9  think it was Christmas of '05?
10    A.   No, it wasn't Christmas 2005.
11  Because we went to Texas for Christmas '05.
12    Q.   You remember that you went to
13  Texas for Christmas 2005?
14    A.   Yes.
15    Q.   Okay.  How long did y'all stay in
16  New Orleans when you came back for the
17  holiday break?
18    A.   We didn't stay in New Orleans when
19  we came back for that holiday break, like I
20  said, we went to Texas.
21    Q.   I mean, the holiday break when you
22  came back to New Orleans in 2006?
23    A.   We stayed here for, I would say,
24  the weekend.
25    Q.   Where did you-all stay?

Page 342

1    A.   In a hotel across the river.
2    Q.   Did you visit the house on Dale
3  Street?
4    A.   Yes, we did.
5    Q.   Did you go inside the house on
6  Dale Street?
7    A.   Yes, we did.
8    Q.   Tell me about how the house
9  looked.
10    A.   It was, like I say, roughly right
11  after, not too long after the storm itself,
12  so it was pretty messed up.  We had only
13  taken out a few things that first time we
14  came back.
15    Q.   Were the original walls still up?
16    A.   Yes.
17    Q.   Was it moldy in there?
18    A.   Yes.
19    Q.   And my mom lived in the East and
20  hers was the roof.  But you said yours was
21  only up to five feet?
22    A.   Yeah, right by the light switches.
23    Q.   Was there anywhere -- it was right
24  by the light switches?
25    A.   Yes.

Page 343

1    Q.   Which you estimate to be
2  five feet?
3    A.   Yes.
4    Q.   Okay.  Were there any other areas
5  of the house where the ceiling was coming
6  down?
7    A.   Not at that time, but by the time
8  we came back in May of '06, the ceiling had
9  fallen.
10    Q.   Okay.  So when y'all came back in
11  May of '06, the house was still in its
12  original condition when the storm hit?
13    A.   No, it had been gutted prior to --
14  well, I would say all of the trash and
15  everything had been taken out of it.
16    Q.   Okay.  Let's go back to the visit
17  that you came -- you said it was a holiday,
18  do you think it was early 2006 or in 2005?
19    A.   It was 2006.
20    Q.   Okay.  At this time, the house was
21  still in the condition pretty much like it
22  was after the storm?
23    A.   Yes.
24    Q.   Can you describe the smell and the
25  stench in the house?

Page 344

86  (Pages 341 to 344)

1    A.  Well, the smell, it was mold.  To
2  be honest, you still could actually smell
3  that Katrina water smell that they had in
4  there.  Didn't open the refrigerator
5  because, at that time, the refrigerator was
6  still in there, but you could smell the odor
7  seeping out of the refrigerator.
8        At that time, the ground was still
9  kind of crunchy.  When you walked on the
10  ground, it made a crunching noise.
11    Q.  Was it damp still?
12    A.  It wasn't damp; it was pretty dry.
13  It had damp areas, areas in the house were
14  still damp, but the whole house wasn't
15  totally damp.
16    Q.  And the mud was cracked on the
17  bottom?
18    A.  On the floors.  Remember, I told
19  you I had hardwood floors?  All of the
20  hardwood floors had buckled up.
21    Q.  And Chris went through the
22  walk-through with y'all?
23    A.  Yeah, but he had a mask on when he
24  went in.
25    Q.  What kind of mask?

Page 345

1    A.  One of those -- like those dust
2  masks.
3    Q.  Yes.  Did he have a coughing fit?
4    A.  No, he didn't stay in there that
5  long.  I just let him walk in and see what
6  was there.  They went into their rooms and
7  that was it.  I would say there weren't in
8  there more than maybe five minutes.
9    Q.  Did at any time you help gut out
10  that house on Dale Street?
11    A.  Yes, I did.
12    Q.  Did Chris help gut out or remove
13  any items from that house?
14    A.  Not many.  I wouldn't let him do
15  that.  I wouldn't let him or Erika do that.
16    Q.  How many times did he visit the
17  house on Dale Street before y'all took the
18  walls out?
19    A.  The walls never actually came out
20  of that house.
21    Q.  Okay.  They just -- were they
22  plaster walls?
23    A.  Yes.
24    Q.  When did the house get cleaned up
25  to start remodeling it?

Page 346

1    A.  We never started to remodel this
2  house.
3    Q.  Okay.  Well, then, how many times
4  did Chris go inside of the house, can you
5  estimate?
6    A.  I would say probably, at the most,
7  maybe three times.
8    Q.  Okay.  And in those times, he did
9  retrieve some items?
10    A.  Very few, because it was not much
11  that was retrievable.
12    Q.  And you said the Katrina smell,
13  that smell lasted a long time, didn't it?
14    A.  Yes, it did.
15    Q.  When you returned in May of 2006,
16  earlier you said that there was increased
17  pollen and dust everywhere?
18    A.  Uh-huh.  Yes.
19    Q.  How many months did the dust last
20  in New Orleans?
21    A.  I can't speak for when I wasn't
22  here, but as far as when we came back, I
23  would say that first spring that we went
24  through, the pollen was pretty heavy.
25    Q.  And even up until today, can you

Page 347

1  pass areas and still smell the Katrina
2  smell?
3    A.  Depending on where you go in the
4  city, yes.
5    Q.  What other things can you
6  attribute about when you first came back to
7  the city, what else did you notice?
8    A.  Well, like I said, the smell.  I
9  noticed a lot more predatory birds.  Mice
10  everywhere.  Less roaches.  A lot of
11  brownness from the dead trees and things
12  like that.
13    Q.  Did you help gut out anybody
14  else's house in your family?
15    A.  No.
16    Q.  Did Chris go visit your parents'
17  house on Reynes Avenue after it was
18  destroyed?
19    A.  I would say maybe once or twice,
20  at the most.
21    Q.  And was that house in the same
22  condition as your house or worse?
23    A.  It was actually worse because my
24  mom and them got 20 feet.
25    Q.  So the smell must have been

Page 348

87 (Pages 345 to 348)

1  unbearable?
2      A.  Oh, yes.  It was pretty bad back
3  there.
4      Q.  So Chris went to visit it when the
5  damage was pretty evident?
6      A.  Yeah, but my daddy had been back
7  in October of '06, so by the time
8  Christopher saw that house, it wasn't as bad
9  because my daddy had already started
10  cleaning it out.
11      Q.  Were the walls gutted at the time
12  Chris came back or were they still in?
13      A.  I would say they were gutted,
14  actually.
15      Q.  Okay.  Did they still have the mud
16  caked on floor when Christopher went to
17  visit it?
18      A.  No.
19      Q.  Was the barber shop completely
20  renovated and ready to live in when you-all
21  moved back in May of 2006?
22      A.  Yes.
23      Q.  Where was your grandmother living
24  when you came back in May of 2006?
25      A.  She stayed in Texas.

Page 349

1      Q.  With who?
2      A.  My cousin Lauren and her son
3  bought a house, and then she moved in with
4  them.
5      Q.  Why didn't she come back to New
6  Orleans?
7      A.  She was old and she didn't want to
8  have to do that move, she didn't want to
9  have to go back into a house and start all
10  over again.
11          She was just old, because when the
12  storm hit, she was like 95, 96 and she was
13  blind.
14      Q.  Would it be fair to say that
15  health problems prevented her from coming
16  back?
17      A.  No, because Grandma was healthy.
18  I think she was more depressed in the fact
19  that everything was destroyed that my
20  grandfather had built.  She didn't want to
21  go back to it.
22      Q.  And your grandmother died in 2007?
23      A.  Yes.
24      Q.  Was that emotional on Chris?
25      A.  Yes.

Page 350

1      Q.  Who in your family has a current
2  claim in this litigation?
3      A.  In my family?  I want to say no
4  one.
5      Q.  Your sisters don't have claims?
6      A.  My sister Debra never lived in a
7  trailer.  When she came back from Florida,
8  she moved into the barber shop.
9      Q.  What about Maria?
10      A.  Maria does not have a claim.
11      Q.  Okay.  What about Donna Gibson?
12      A.  I don't know if she has a claim or
13  not.
14      Q.  Okay.  And you said you and Donna
15  came back at about the same time, correct?
16      A.  We can.  We came back the same
17  day.
18      Q.  Okay.  How long did Donna live in
19  her gutted house before she got the trailer?
20      A.  I'm not exactly sure.
21      Q.  Can you estimate?
22      A.  If I had to estimate, I would say
23  maybe about two months, a month or two.
24      Q.  And Chris would go hang out with
25  Donna's kids at their gutted house?

Page 351

1      A.  Yes.
2      Q.  And would it be fair to say that
3  Chris went and hung out at their trailer
4  after they got it?
5      A.  Yes.
6      Q.  And he would spend some time at
7  their trailer?
8      A.  Yes.
9      Q.  How many people were at the
10  church, was it -- when Justin came to talk?
11      A.  No, the church that we were at
12  when Justin spoke, it was my church,
13  St. Paul the Apostle.
14      Q.  How many people were there?
15      A.  I don't know.  The little room we
16  were in was full.  I can't even estimate.
17      Q.  Hundreds, thousands?
18      A.  It wasn't thousands.  I would have
19  to say maybe a hundred, I guess.
20      Q.  At some point, you decided to
21  demolish your house, correct?
22      A.  Correct.
23      Q.  Why did you make that decision?
24      A.  Actually, the property was still
25  under my daddy.  He still owned it, so he

Page 352

88  (Pages 349 to 352)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Videotaped Deposition of Alana Alexander

1   decided that it was -- the house was already
2   old, and the storm just made it worse.
3       Q.   Did you hire a contractor for
4   demolition?
5       A.   No, the city was offering a
6   program where if you put your name on a
7   list, they would demolish the house for
8   free.
9       Q.   And your father put his name on
10  the list to get the house demolished?
11      A.   Yes.
12      Q.   Did you help him out with that
13  process?
14      A.   No, I didn't.
15      Q.   Do you know who the city hired to
16  actually demolish the house?
17      A.   No, I really -- no, I don't.
18      Q.   Do you think your father would
19  know that information?
20      A.   He might.  I don't know.
21      Q.   You don't remember any contractor
22  out there that actually demolished the
23  house?
24      A.   Not any names, no.
25      Q.   And you requested from FEMA to
                                    Page 353

1       A.   He backed the truck up and they
2   did the -- the hook?  The hookup on the back
3   of the truck?  They hooked that up to the
4   trailer.  They took loose the propane and
5   they unplugged it and undid the water supply
6   to it.
7            He kind of -- I think they like
8   jacked it up slightly when they put it on
9   the hook and then they removed all of the
10  piling from under it and he pulled it down
11  the street.
12      Q.   Do you know what company did this?
13      A.   That, I'm not exactly sure.
14      Q.   How many people were out there
15  moving the trailer?
16      A.   Two.
17      Q.   And they hooked it up first and
18  then moved the pilings?
19      A.   I think that's the way they did
20  it, yes, they hooked it up first.
21      Q.   And where was the trailer located
22  before it was moved?  And what I mean is, in
23  front of the house on a slab, in the grass,
24  where was it?
25      A.   It was in front of the house on a
                                    Page 355

1   have the trailer moved so you could get the
2   house demolished, correct?
3       A.   Yes.
4       Q.   When was that?
5       A.   I didn't actually do that.  The
6   city knowing that the trailer was there and
7   the contractors, they did all of that work
8   together.
9       Q.   You never had to call FEMA and
10  talk to them about moving the trailer?
11      A.   When the man came out to make sure
12  that the electricity and everything was
13  disconnected and the water, that was the
14  only time I really had spoken to somebody
15  about moving the trailer and that's when he
16  gave me all of information about staying at
17  the hotel and everything.
18      Q.   Okay.  So you never called FEMA to
19  request that the trailer be moved?
20      A.   No, I would say that the
21  contractors did all of that business.
22      Q.   Were you present when the trailer
23  was moved?
24      A.   Yes.
25      Q.   Can you tell me about that?
                                    Page 354

1   slab.
2       Q.   Okay.  And these people moved it
3   into -- where did they move it?
4       A.   They moved it three doors down the
5   street.
6       Q.   Okay.  How long did the process
7   take?
8       A.   What, them moving the trailer or
9   the whole thing of them knocking it down and
10  everything?
11      Q.   Let's take it step by step.
12           How long did it take to move it
13  down the street?
14      A.   I would say it might have took
15  them maybe about an hour.
16      Q.   Okay.  And then was the house
17  demolished immediately after?
18      A.   Yes, they started the next day.
19      Q.   How long did that take?
20      A.   That took all day to demolish the
21  house because the house was so big.  And
22  even the contractors made a comment that
23  they had never really demolished a house
24  that large.
25      Q.   Did they use bulldozers?
                                    Page 356

89  (Pages 353 to 356)

```
 1      A.   They used bulldozers and they had
 2  forklifts and stuff to haul it away and
 3  everything.
 4      Q.   Was Chris present for that?
 5      A.   Yes, he was across the street.
 6      Q.   And he watched the whole process?
 7      A.   Yes.
 8      Q.   And that took a couple of days?
 9      A.   No, it only took one day.  I'm
10  sorry, a day and a half.
11      Q.   And were you there when they moved
12  the trailer from down the street back to
13  your property?
14      A.   No, I was at work.  I think I was
15  at work that day.
16      Q.   Was your mom there?
17      A.   Yes.  Mom doesn't work, she was
18  there.
19      Q.   And did they put the trailer back
20  in the same spot?
21      A.   Yes, relatively.  It was a little
22  further up.  First time it was further back
23  on the property, this time it was a little
24  further up.  They didn't push it back as
25  far.
                                    Page 357
```

```
 1  before the trailer was moved?
 2      A.   You mean the water from the storm,
 3  did it move --
 4      Q.   No, no, I'm sorry.  You said that
 5  you noticed when you put a cup of water --
 6      A.   Oh, before they moved it due to
 7  demolition of the house, you are asking if
 8  it was leaning then?
 9      Q.   Yes.
10      A.   I would have to say no.
11      Q.   Okay.  I'm very conversational,
12  I'm sorry.  I'll try to get my questions
13  more firm.
14           You didn't keep any of the
15  maintenance receipts -- I call them
16  receipts, the maintenance notes from the
17  people that came and left them for you?
18      A.   Like I said, anything that I had
19  that I went through, I gave it to them.
20      Q.   Do you think you gave your
21  maintenance records to them?
22      A.   I'm not sure, to be honest.
23      Q.   And you said the inspection people
24  came about 20 times, correct?
25      A.   I guess you could say once a
                                    Page 359
```

```
 1      Q.   When you talk about further, you
 2  mean toward the street or toward the yard?
 3      A.   Toward the street.
 4      Q.   Was it on a slant when they moved
 5  it back?
 6      A.   After they put the pilings and
 7  stuff, that's what you are asking?
 8      Q.   Yes.
 9      A.   A slight one.  I mean, if we
10  spilled water in the trailer, it would
11  immediately roll to the back of the house,
12  back of the trailer.
13      Q.   And is that because of the way the
14  ground sat?
15      A.   I don't know if it was the way the
16  ground sat or if that was the way it was set
17  up.
18      Q.   Well, is the ground slightly bent
19  where your property is?
20      A.   I think it is.
21      Q.   Was it slightly bent before the
22  trailer was moved?
23      A.   I would -- I really don't know, to
24  be honest.
25      Q.   Do you remember if the water moved
                                    Page 358
```

```
 1  month.
 2      Q.   And sometimes they inspected
 3  inside, correct?
 4      A.   Never inspected inside because I
 5  was never home when they came.
 6      Q.   They never inspected the inside of
 7  the trailer, to your knowledge?
 8      A.   No, they never inspected the
 9  inside.
10      Q.   And you said you always called the
11  same maintenance number.  Where did you get
12  that number from?
13      A.   That was the number the lady
14  originally gave me when she first came.
15      Q.   And when you made calls to
16  maintenance, earlier you said they came
17  pretty quickly, within a day or two?
18      A.   Right.  Sometimes even within a
19  few hours.
20      Q.   When you made those maintenance
21  calls, did you always use your cell phone?
22      A.   Yes.
23      Q.   The cell phone that you rattled
24  off before?
25      A.   Yes.
                                    Page 360
```

90  (Pages 357 to 360)

1    Q.   And you were with Sprint the whole
2    time you were in the trailer?
3    A.   I want to say, yes, I was.
4    Q.   And you said sometimes when the
5    inspection -- the inspection notices were
6    sometimes blown away.  That's because there
7    was windy conditions in New Orleans, right?
8    A.   Yes.
9    Q.   And do you remember being in the
10   trailer when it stormed?
11   A.   Yes.
12   Q.   And the trailer would be pretty
13   windy, wouldn't it?
14   A.   Yes.
15   Q.   Was it kind of scary to Chris?
16   A.   I would say yes.
17   Q.   You said you watched Channel 6.
18   Which is funny.  I don't remember -- do you
19   remember seeing that report when Margaret
20   Orr saved the life of that guy with the
21   tornado?  Do you remember that?
22   A.   I don't remember that one.
23   Q.   Do you remember a tornado coming
24   through New Orleans after Hurricane Katrina?
25   A.   I do remember that.

Page 361

1    Q.   And you were in your trailer?
2    A.   I was in the trailer.  Actually,
3    Donna called me.  It was late at night and
4    she said, You heard that there is a tornado
5    headed our way?"
6        So I immediately left and went
7    next door by my momma's house.
8    Q.   Did you ever write letters to FEMA
9    or the maintenance people about issues
10   regarding the trailer?
11   A.   No.
12   Q.   Did you ever send e-mails to
13   people about maintenance on the FEMA
14   trailer?
15   A.   No.
16   Q.   Did you ever complain about the
17   mold to the maintenance contractor?
18   A.   No.
19   Q.   Would it be fair to say that the
20   mold did not show up until after the leaks?
21   A.   I would have to say yes.
22   Q.   Tell me first, the first time you
23   noticed the leak?
24   A.   I was sleeping in my bed and it
25   started dripping on my forehead.

Page 362

1    Q.   Was the leak just from the light
2    in the --
3    A.   Yes.
4    Q.   Do you remember when that was?
5    A.   I would have to say probably
6    March.  March, April, May.  You know, when
7    it really starts like raining again in the
8    city a lot.
9        So like March, April, May of 2007.
10   Q.   Did you call the maintenance
11   number and report that leak?
12   A.   Oh, yes.
13   Q.   Did they come and fix it?
14   A.   Yes.
15   Q.   The bedroom wall you described,
16   you said you put tape on it, correct?
17   A.   Yes.
18   Q.   Did it come undone?
19   A.   Yes.
20   Q.   How many times?
21   A.   I can't give you a number on that.
22   Just whenever it come undone, I stuck more
23   tape on it.
24   Q.   And you never called and
25   complained about that?

Page 363

1    A.   No.
2    Q.   And do you recall a second leak
3    from the light fixture at some point?
4    A.   Yes, I do.
5    Q.   And when did that happen, was that
6    months later?
7    A.   Yes, it was months later when it
8    happened.
9    Q.   And did the maintenance people
10   come out and fix it again?
11   A.   Yes.
12   Q.   Did you ever have any other leaks
13   when you were living there?
14   A.   No, that was really the only one.
15   Q.   And you had the ability to clean
16   up the mold yourself, correct?
17   A.   Correct.
18   Q.   Okay.  And then outside of the
19   trailer, you said there was foam somewhere,
20   correct?
21   A.   Correct.
22   Q.   When did you first notice that?
23   A.   It was just one of those times I
24   was out there cutting the grass and I
25   noticed it was on the side of the trailer.

Page 364

91  (Pages 361 to 364)

| | |
|---|---|
| 1   Q.  Where was it exactly? | 1   Q.  You're not sure? |
| 2   A.  It was on the side, like I said, | 2   A.  I'm not sure about calling them |
| 3  where the electrical plug was.  It was on | 3  and complaining about the mice because |
| 4  that side of the trailer. | 4  everybody that was living in a trailer had |
| 5   Q.  Did that foam hold up while you | 5  the same issue. |
| 6  lived there? | 6   Q.  Okay.  But you may have called |
| 7   A.  Yes, to the best of my knowledge, | 7  about the mice. |
| 8  it did. | 8   A.  I might have, I'm not sure on that |
| 9   Q.  And tell about the holes -- | 9  one. |
| 10  scratch that.  Strike that. | 10   Q.  Okay.  But I thought you just said |
| 11     You told us about a way that you | 11  there was nothing they could do about it, |
| 12  fixed the underbelly of the trailer so that | 12  but you think that is what people generally |
| 13  mice wouldn't get in? | 13  just said? |
| 14   A.  Correct. | 14   A.  Yes. |
| 15   Q.  Okay.  Describe what you had to | 15   Q.  Then you also talked about a panel |
| 16  fix and what was the problem on the outside | 16  in the bathroom. |
| 17  of the underbelly of the trailer. | 17   A.  Yes. |
| 18   A.  Well, everywhere under the | 18   Q.  Describe that problem. |
| 19  trailer, like where the plumbing went into | 19   A.  They had one of those bath/shower |
| 20  the sink and into the toilet. | 20  combination things in there, and in between, |
| 21     Underneath where the pipe was, it | 21  after that ended, there was paneling all the |
| 22  was almost like the hole was a little too | 22  way up into the other side of the wall, |
| 23  big around where the pipe was, and there was | 23  which would have been behind the toilet. |
| 24  a space in between where the mice got in | 24     Right where the end of the |
| 25  between underneath the floor. | 25  tub/shower combination thing ended and the |
| Page 365 | Page 367 |

| | |
|---|---|
| 1   Q.  So it wasn't torn, it was a hole | 1  paneling started, it started to buckle up. |
| 2  where the plumbing was and stuff? | 2   Q.  What do you mean by "buckle," do |
| 3   A.  Yes.  One of them looked torn and | 3  you mean bubbled? |
| 4  that was the one by the toilet. | 4   A.  It bubbled and it was coming away |
| 5   Q.  And you plugged it up? | 5  from each other.  It was separating. |
| 6   A.  Yes. | 6   Q.  When did you first notice that? |
| 7   Q.  And you never complained to | 7   A.  I would say that would have been |
| 8  anybody with the maintenance department, | 8  maybe mid-2007. |
| 9  correct? | 9   Q.  Did you call and complain about |
| 10   A.  Well, I told them there was mice | 10  that? |
| 11  coming in, but there was like nothing | 11   A.  No, because it looked just like |
| 12  anybody could really do about it because, at | 12  the other one, so I knew what they told me |
| 13  that time, the city was infested with mice. | 13  about the other one, so I just put tape on |
| 14  So you were pretty much on your own. | 14  that one too. |
| 15   Q.  Okay.  When was this, the first | 15   Q.  But the person that you complained |
| 16  instances? | 16  to about the bedroom wall was the person |
| 17   A.  I would say it was around | 17  that walked through with the inspection, |
| 18  springtime of '06.  Yes, 2006. | 18  correct? |
| 19   Q.  You mean 2007? | 19   A.  Yes. |
| 20   A.  That's what I mean, 2007.  Yes, | 20   Q.  And you never talked to anyone |
| 21  I'm sorry. | 21  with maintenance about the bedroom wall? |
| 22   Q.  And you called and reported the | 22   A.  No. |
| 23  mice to the maintenance line? | 23   Q.  Do you think the buckling in the |
| 24   A.  I think I did.  I think I called, | 24  bathroom could have just been from taking |
| 25  but -- | 25  hot showers? |
| Page 366 | Page 368 |

92 (Pages 365 to 368)

```
 1      A.  I don't know, it could be.
 2      Q.  And then you duct taped it and it
 3  was fine, correct?
 4      A.  No, it come loose some more.
 5      Q.  Okay.  So you duct taped it again?
 6      A.  Yes.
 7      Q.  Okay.  And you never called the
 8  maintenance people and asked them to do
 9  anything about it, correct?
10      A.  Correct.
11      Q.  And you also talked about in the
12  bathroom you could feel a slight breeze,
13  correct?
14      A.  Correct.
15      Q.  You think that could have been
16  from the vent being open?
17      A.  No, I seldom had the vent open.
18      Q.  I thought you said you had it open
19  a lot?
20      A.  No, not in the bathroom.
21      Q.  The other one you left open?
22      A.  Yeah.
23      Q.  So where did you think that breeze
24  was coming from?
25      A.  I'm assuming it was coming through
                                        Page 369
```

```
 1      Q.  Was it that pink insulation, do
 2  you remember?
 3      A.  It was gray.
 4      Q.  Gray insulation?
 5      A.  (Witness nods head affirmatively.)
 6      Q.  Do you know when that insulation
 7  was put in?
 8      A.  No, I don't know.
 9      Q.  Do you think it was put in when
10  you were young?
11      A.  Yes, I do remember it was put in
12  when I was very young because I got hit in
13  the head with a bale of it.
14      Q.  It was never changed out since
15  then?
16      A.  Not to my knowledge.
17      Q.  Have you ever heard about the
18  dangers of asbestos?
19      A.  Yes.
20      Q.  Did anyone at Shell ever present
21  to you with an asbestosis claim?
22      A.  Present to me?  I would say no.
23      Q.  Did you ever have to go into an
24  area at Shell where asbestos materials were
25  being removed?
                                        Page 371
```

```
 1  that -- where it buckled in the bathroom.
 2      Q.  But even in the cold months, even
 3  just in the den, didn't a breeze just kind
 4  of come through the trailer, just generally?
 5      A.  When you was by the windows, it
 6  was cold around the windows.
 7      Q.  Did your father ever remodel the
 8  home that you grew up in?
 9      A.  No.
10      Q.  Can you tell me if anybody in your
11  family, including your sisters and niece and
12  nephews and your parents, smokes.
13      A.  My brother.
14      Q.  Which one?
15      A.  Ronald.
16      Q.  Does he smoke at family functions?
17      A.  Yes.
18      Q.  So he smokes around Chris?
19      A.  Outside, never inside.
20      Q.  Does he smoke Kent cigarettes?
21      A.  No.
22      Q.  And going back to when you were in
23  the attic waiting out the storm, did y'all
24  have insulation in the attic?
25      A.  Yes.
                                        Page 370
```

```
 1      A.  No.
 2      Q.  And you said you heard about the
 3  Chinese drywall from the media?
 4      A.  Yes.
 5      Q.  Have you checked on your new home
 6  that you're about to move into to see if
 7  there is Chinese drywall?
 8      A.  When I saw the drywall going up,
 9  it did not say "Chinese" on it at all.
10      Q.  Okay.  Let's talk about that.  The
11  new property that you have, when did you
12  purchase it?
13      A.  I haven't purchased it yet.
14      Q.  Oh, you said that earlier.
15      A.  Correct.
16      Q.  Did you watch the remodeling of
17  this home?
18      A.  This was a brand-new house.  There
19  was no remodeling.
20      Q.  I thought you said that you saw
21  when the drywall was put in, it wasn't
22  Chinese drywall?
23      A.  Yeah.  Because I had access to go
24  to the house whenever -- whenever it was
25  open, I went there and I went in.  One day
                                        Page 372
```

93  (Pages 369 to 372)

1  when I went in, the drywall was sitting
2  right there in the house.  I looked at it
3  and it didn't say anything about Chinese
4  drywall.
5      Q.   Okay.  Did you -- would it be fair
6  to say you and Chris visited the home while
7  it was being renovated?
8      A.   I did.
9      Q.   You never took Chris to it?
10     A.   Maybe once.
11     Q.   Okay.  You said you filled out an
12 inventory of everything that you owned after
13 Katrina.
14     A.   Yes.
15     Q.   Do you think that you did?
16     A.   I more than likely did.  I guess
17 one of those times when I was trying to do a
18 FEMA claim and they will tell you to list
19 everything that you think you lost.
20     Q.   Do you think that you might have
21 that on your computer still?
22     A.   I never used a computer.
23     Q.   Did you handwrite it?
24     A.   Yes.
25     Q.   Do you think you might have a copy

Page 373

1  of it?
2      A.   I don't know.
3      MS. PETROVICH:
4          Let's go off the record while I
5  check my notes.
6      THE VIDEOGRAPHER:
7          Off the record; it is 4:31.
8      (Recess.)
9      THE VIDEOGRAPHER:
10         Back on record; it is 4:34.
11 EXAMINATION BY MS. PETROVICH:
12     Q.   Let me just clarify a couple of
13 things, Ms. Alexander.  I won't take up too
14 much time.
15         Did you sign up for this city
16 demolition or did your father have to?
17     A.   My dad did.
18     Q.   Okay.  So we would have to ask him
19 about that?
20     A.   Yes.
21     Q.   Do you think that he knows who the
22 company was who actually demolished the
23 house?
24     A.   I don't know.  I can't answer
25 that.

Page 374

1      Q.   Were you in Maria's house by
2  Christmas of 2007?
3      A.   I want to say yes.
4      MS. PETROVICH:
5          That's good.  That's it.
6          Well, I do have a question.
7  EXAMINATION BY MS. PETROVICH:
8      Q.   Ms. Alexander, do you know why you
9  sued Fluor?
10     A.   I was under the impression that it
11 was because of the way they set up the
12 trailer.
13     Q.   Okay.  And did you realize this
14 after you first filed suit?  Were you told
15 this after you filed suit?
16     A.   Yeah, that you-all were part of
17 it, yes.
18     MS. PETROVICH:
19         Okay.  Thank you.
20 EXAMINATION BY MR. GLASS:
21     Q.   Ma'am, I'm going to direct you to
22 two exhibits, the first one being
23 Exhibit 12, which is the complaint for
24 damages.
25     A.   Out of the stack you already gave

Page 375

1  me?
2      Q.   Yes, ma'am.  Just go to 12,
3  please.
4          It's my understanding from your
5  earlier testimony that you did not see this
6  document before it was filed; is that
7  accurate?
8      A.   Yes.
9      Q.   And I started to ask you about who
10 were the defendants and you identified
11 Fluor, Gulf Stream Coach and the government,
12 correct?
13     A.   Correct.
14     Q.   FEMA.
15         And you just indicated that it's
16 your understanding that Fluor was sued
17 because of the way they set the trailer up?
18     A.   Yes.
19     Q.   And your understanding of why Gulf
20 Stream Coach was sued?
21     A.   Because they built the trailers.
22     Q.   And what in particular about the
23 trailers would cause them to be liable to
24 you in the lawsuit?
25     A.   Liable to me?

Page 376

94  (Pages 373 to 376)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Videotaped Deposition of Alana Alexander

1    Q.  Yes.
2    A.  I would say because they built the
3  trailers knowing that it had formaldehyde in
4  it and --
5    Q.  It's your understanding that
6  because the trailer --
7    MR. HILLIARD:
8        I know we're in a hurry, but let
9  her finish.
10  EXAMINATION BY MR. GLASS:
11    Q.  Oh, I'm sorry, I thought you were
12  finished.  I apologize.
13    A.  And also that they didn't let us
14  know immediately when we moved in the
15  possibility that the formaldehyde was in the
16  trailer.
17    Q.  Have you gone on any computer Web
18  sites or done any independent research
19  regarding formaldehyde?
20    A.  No.
21    Q.  Do you have any understanding of
22  other -- items in daily life that may
23  contain formaldehyde?
24    A.  Not until after all of this stuff
25  started that I found out about it.
                                    Page 377

1    Q.  What's your understanding of other
2  items of daily life that may contain
3  formaldehyde?
4    A.  I understand now that they have it
5  in particle board, that it's in some
6  plastics, that it's in carpet, and I learned
7  that that new car smell is formaldehyde.
8    Q.  And have you learned that there's
9  potentially formaldehyde in the air in
10  cities?
11    A.  Yes, I've heard that.
12    Q.  Have you heard that you breathe
13  out formaldehyde?
14    A.  I didn't know that I breathe it
15  out.
16    Q.  Have you read anything or learned
17  of any information that formaldehyde is
18  contained in regular homes like the one you
19  currently live in?
20    A.  I did hear that.
21    Q.  Do you know at what levels?
22    A.  No, but I heard that it was at
23  lower levels than considered for trailers.
24    Q.  Do you have any idea of the level
25  of formaldehyde as tested in your trailer?
                                    Page 378

1    A.  No, I do not.
2    Q.  Was there any period of time while
3  you were in the trailer that you stayed in
4  the trailer in hot weather with the
5  air-conditioning off?
6    A.  Off?
7    Q.  Yes.
8    A.  Only if I was cooking.
9    Q.  Okay.  But at that time, you had
10  the trailer open with the windows and door,
11  if I understood correctly?
12    A.  Correct.
13    Q.  Okay.  So there was no time when
14  you lived in the trailer that you closed it
15  up and kept the air-conditioning off when it
16  was hot outside?
17    A.  Oh, no.
18    Q.  It would get too hot inside?
19    A.  Yes, it would.
20    Q.  So if I understood your testimony,
21  and I know it's subject to your earlier
22  objection, that your understanding of why
23  Gulf Stream Coach was sued is because,
24  No. 1, of the potential of exposure to
25  formaldehyde in the trailer; and No. 2,
                                    Page 379

1  because you've alleged that there was no
2  warning regarding formaldehyde being in the
3  trailer?
4    A.  Yes.  When I --
5    MR. HILLIARD:
6        Can I have the same objection
7  without repeating it?
8    MR. GLASS:
9        Yes.
10    THE WITNESS:
11        Yes, without knowing beforehand
12  when I initially moved in.
13  EXAMINATION BY MR. GLASS:
14    Q.  Okay.  And what's your
15  understanding of why FEMA was sued?
16    A.  Because FEMA ordered the trailers.
17  And also, their lack of informing us of the
18  potential hazards, you know, that were in
19  the trailer.
20    Q.  There are a whole bunch of
21  allegations or background information on the
22  first 25 pages or so of the complaint that's
23  been marked as Exhibit 12.
24        Did you have any input as to where
25  this information came from?
                                    Page 380

95 (Pages 377 to 380)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation          Videotaped Deposition of Alana Alexander

1    A.  Of all of this?  I don't know.
2    Q.  You haven't read through this
3  entire document?
4    A.  No.  This is the one I told you I
5  never saw before.
6    Q.  On page 25, there are some causes
7  of action, and I'll represent to you that
8  these counts contained in Count Two, which
9  is contained on pages 25, 26, 27 and 28, are
10  adopted in the Third Supplemental and
11  Amended Complaint marked as Exhibit 15.
12    Specifically, they are adopted in
13  paragraph 12 of your Third Supplemental and
14  Amended Complaint.
15    Did you look at the allegations
16  against Gulf Stream Coach?
17    A.  And you're talking about in which
18  one now?  I don't know where you are.
19    Q.  Well, I'm talking about Count Two
20  on page 25 that was adopted by supplemental
21  complaint No. 3.
22    A.  I have that one.
23    (Discussion off the record.)
24  EXAMINATION BY MR. GLASS:
25    Q.  All of the counts in paragraphs

Page 381

1  97 -- you see 97?
2    A.  Uh-huh.
3    Q.  97 through 28 -- I'm sorry.
4  Paragraph 102.  97 to 102.
5    A.  Okay.
6    Q.  Okay.  I'm going to represent to
7  you that in the Third Supplemental and
8  Amended Complaint, which has been marked as
9  Exhibit 15, that 97 through 102, those
10  paragraphs, are incorporated in paragraph
11  12.
12    It says, "Plaintiff respectfully
13  reiterates and incorporates all of the
14  allegations set forth in the original
15  complaint with respect to the cause of
16  action against the defendant, Gulf Stream
17  Manufacturer, under the Louisiana Product
18  Liability Act, paragraphs 97 through 102 of
19  the original complaint."
20    So I'm just letting you know that
21  that has been carried over into this one
22  that you read.
23    A.  Okay.
24    Q.  Okay.  Regarding paragraph 97 --
25  well, skip that.

Page 382

1    Paragraph 98, "The exposure to
2  each named plaintiff" -- which will include
3  you -- "to formaldehyde fumes from Gulf
4  Stream's products resulted from specific
5  intended use without substantial alteration
6  of the condition in which Gulf Stream sold
7  these housing units."
8    Are you making the allegation that
9  there was no alteration of the unit before
10  you took occupancy?
11    A.  To the best of my knowledge, yes.
12    Q.  Paragraph 99, "The design of the
13  housing units using plywood, pressboard and
14  other composite wood products and other
15  products that contained formaldehyde was
16  defective and imposed an unreasonable risk
17  of harm to each named plaintiff."
18    What is the basis of your
19  information for that allegation?
20    A.  Of the designing of the unit?
21    Q.  Yes, that it contained
22  formaldehyde at unreasonably dangerous
23  levels.
24    A.  You want me to answer this on the
25  information that I have learned so far,

Page 383

1  since then?
2    Q.  Is this based on information that
3  you obtained from your lawyers or did you
4  rely on your lawyers to make these
5  allegations?
6    A.  I would have to say I relied on my
7  lawyers to make this representation.
8    Q.  Under paragraph 102, "The defects
9  in Gulf Stream's housing units are the
10  result of but not limited to the following:
11  Failure to design their respective product
12  so as not to emit dangerous levels of
13  formaldehyde."
14    You've already indicated that you
15  do not know what the levels of formaldehyde
16  were in your unit, correct?
17    A.  Correct.
18    Q.  Under subparagraph 4 of 102, it
19  says, "In providing housing units which do
20  not conform to the express warranties made
21  by Gulf Stream regarding their fitness for
22  use as reasonably anticipated."
23    You testified that the only person
24  you spoke to that you thought was with Gulf
25  Stream was the original person who walked

Page 384

96 (Pages 381 to 384)

1  you through the trailer.
2      A.  Correct.
3      Q.  Okay.  Did you ever contact a Gulf
4  Stream Coach hotline or a number provided in
5  any manual, anything like that?
6      A.  I was given a Gulf Stream manual,
7  but I was under the impression that the
8  customer service number that I was calling
9  was Gulf Stream.
10     Q.  Okay.  When you say, "customer
11 service," you're talking about the
12 maintenance hotline?
13     A.  Maintenance.  I keep saying
14 "customer service," but the maintenance
15 hotline.
16     Q.  If it's shown that that was not
17 Gulf Stream, then you never made a call to
18 another number in the manual, the Gulf
19 Stream manual?
20     A.  I would have to say not -- no.  I
21 would say no, I don't think so.
22     Q.  And you have no basis other than
23 just your assumption that the first person
24 was a Gulf Stream Coach employee?
25     A.  Yes.

Page 385

1      Q.  You have no idea whether that
2  person could have been with the contractor
3  who set up the trailer?
4      A.  I have no idea.
5      Q.  Or that -- I'm mean sorry.  Were
6  you finished?
7      A.  I was just saying I have no idea
8  if they were.
9      Q.  That person could also have been
10 somebody with FEMA?
11     A.  I guess in all possibility, yes.
12     Q.  Do you have any recollection of
13 specifically calling a number where somebody
14 said that -- or identified themselves as a
15 Gulf Stream Coach employee and provided
16 information to you?
17     A.  I don't have any recollection of
18 that.
19     Q.  And the only thing that you
20 remember reading that contains Gulf Stream
21 Coach identifying marks would have been the
22 owner's manual?
23     A.  Yes.
24     Q.  There's an allegation of "Failure
25 to adhere to any and all express warranties

Page 386

1  of fitness and safety of the housing units
2  they," meaning Gulf Stream Coach
3  Manufacturing, "provided."
4      Do you have any recollection of
5  express warranties made to you by Gulf
6  Stream Coach?
7      A.  I would have to say no, not to my
8  recollection.
9      Q.  All right.  Regarding the Third
10 Supplemental and Amended Complaint marked as
11 Exhibit 15.  Paragraph 15 on page 4 of that
12 document itemizes damages and it modifies
13 the damages that were in the original
14 complaint marked as Exhibit 12.
15     A.  You said paragraph 4?
16     Q.  Page 4, paragraph 15.
17     MR. HILLIARD:
18         Joe, if you're going into this
19 line, can you and I agree I can have the
20 same objection to each question, so I don't
21 have to make it each time?
22     MR. GLASS:
23         Absolutely.
24 EXAMINATION BY MR. GLASS:
25     Q.  You want to take a moment to read

Page 387

1  it?
2      A.  Well, I'm on page 4.  Which one
3  did you say?
4      Q.  Paragraph 15.  I'll represent to
5  you that this is a legal paragraph that lays
6  out your claims.
7      Did you have any specific
8  recollection of input regarding what claims
9  you were making in this allegation?
10     A.  As far as this one, yes.
11     Q.  Okay.  The first subparagraph A
12 says, "Plaintiff's physical pain and
13 suffering," which "plaintiff" being you.
14     A.  Okay.
15     Q.  What pain and suffering did you
16 have as a result of living in the trailer?
17     A.  I had headaches, I had the
18 itching, watery eyes, the burning nose, the
19 burning in the back of the throat, the
20 coughing and -- yeah.  That's the physical
21 pain and everything.
22     Q.  You said that when you first came
23 into the trailer, that's when you had the
24 watery eyes, and then after a couple of
25 months, that went away?

Page 388

97  (Pages 385 to 388)

| | |
|---|---|
| 1    A. Yes. | 1    Q. Yes. |
| 2    Q. Was that also true for the | 2    A. Yeah, pretty much. |
| 3 headaches, the itching and the other items | 3    Q. As we sit here today, do you have |
| 4 you just mentioned? | 4 any physical complaints or issues that you |
| 5    A. The itching; the headaches stayed | 5 relate to the -- and I am talking about |
| 6 a little longer. | 6 physically -- that relate to your time in |
| 7    Q. Okay. After they went away, when | 7 the trailer? |
| 8 did they first come back? | 8    A. I would say no. |
| 9    A. After all of these symptoms went | 9    Q. The second subparagraph B is |
| 10 away -- | 10 "Regarding the physical pain and suffering |
| 11    Q. You said after a couple of months, | 11 of her minor son, Christopher Cooper." |
| 12 they went away, and then a little bit longer | 12       What physical pain and suffering |
| 13 for the headaches. Did they come back later | 13 did Chris go through? |
| 14 on? | 14    A. Well, in the trailer, his eyes |
| 15    A. No. | 15 were worse because his eyes constantly |
| 16    Q. Okay. So you had a couple of | 16 stayed watery through the time that we were |
| 17 months of headaches, itching and watery | 17 in there. Even after the odor dissipated, |
| 18 eyes? | 18 he always had the watery eyes. |
| 19    A. Yes. | 19    Q. How did you treat those watery |
| 20    Q. But the itching and the watery | 20 eyes? |
| 21 eyes diminished over those couple of months? | 21    A. That's when he was on the |
| 22    A. Yes. | 22 Claritin, and like I said, I thought it had |
| 23    Q. When you say "diminished," are you | 23 to do with mostly allergies. |
| 24 talking about in frequency or severity? | 24    Q. What other manifestations of |
| 25    A. In severity. | 25 physical symptoms did Chris have in those |
| Page 389 | Page 391 |

| | |
|---|---|
| 1    Q. So you had a constant headache the | 1 first couple months? |
| 2 entire time you were in the trailer for the | 2    A. Like I say, he felt the burning in |
| 3 first couple of months? | 3 the throat and the nose; say again watery |
| 4    A. I would say a constant headache -- | 4 eyes, the itchy eyes and the nose, the |
| 5    MS. PETROVICH: | 5 burning in the nose. And the frequency of |
| 6       Object to the form of the | 6 the inhaler started to increase. |
| 7 question. | 7    Q. Okay. During those first couple |
| 8    MR. HILLIARD: | 8 of months, did his symptoms also decrease |
| 9       What was your objection? | 9 over time? |
| 10    MS. PETROVICH: | 10    A. The itching and the watery eyes -- |
| 11       Form of the question. I don't | 11 not the watery eyes, I'm sorry. The itching |
| 12 think she said she had constant headaches. | 12 of the nose -- I take that back. Not the |
| 13    MR. GLASS: | 13 nose for him. Because he was always doing |
| 14       That's what I asked her. That was | 14 that with his nose, rubbing his nose. |
| 15 the question. | 15    Q. So for the entire 19 months that |
| 16 EXAMINATION BY MR. GLASS: | 16 you were in the trailer, it's your testimony |
| 17    Q. Did you have constant headaches? | 17 that Chris's symptoms from day one in the |
| 18    A. No, it wasn't constant headaches. | 18 trailer were the same until the end when he |
| 19    Q. At any time in those first couple | 19 left the trailer? |
| 20 of months, did you see a doctor about your | 20    A. Yes. |
| 21 complaints? | 21    Q. We've already gone into some of |
| 22    A. No. | 22 the medical records. All of the visits to |
| 23    Q. After those couple of months, did | 23 the doctors have been talked about -- |
| 24 you return to your pre-Katrina health? | 24    A. Yes. |
| 25    A. Me? | 25    Q. -- from the time he was in the |
| Page 390 | Page 392 |

98  (Pages 389 to 392)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                                      Videotaped Deposition of Alana Alexander

| | |
|---|---|
| 1   trailer? | 1       A.  I would say probably, yes, but I |
| 2       A.  Yes. | 2   talked to my sister a lot. |
| 3       Q.  Subpart (c) references plaintiff's | 3       Q.  What emotional problems were you |
| 4   mental anguish and emotional distress, | 4   having that you felt needed to be addressed? |
| 5   including the fear of an increased risk of | 5       A.  It was mostly a feeling of guilt |
| 6   future serious disease, both in your own | 6   about the situation that I had inadvertently |
| 7   case and in the case of your minor son. | 7   put my children in. |
| 8           You actually, in that fact sheet, | 8       Q.  How did the feelings of guilt |
| 9   did raise that you're claiming mental and | 9   affect your daily life? |
| 10   emotional damage as a result of living in | 10       A.  In the beginning, I guess you |
| 11   the trailer, correct? | 11   could say I was a little depressed because I |
| 12       A.  Yes. | 12   would mostly -- when I am depressed, I clean |
| 13       Q.  Okay.  Did you seek any | 13   a lot.  And I was cleaning everything and |
| 14   professional help for your mental anguish or | 14   anything I could get my hands on. |
| 15   emotional distress before April of 2009? | 15           That's what I did a lot.  I talked |
| 16       A.  No. | 16   to them a lot.  I mean, I don't cry in front |
| 17       Q.  Do you remember when you first | 17   of my children, but when they weren't |
| 18   became a bellwether plaintiff? | 18   around, you know, I would have a moment to |
| 19       A.  When I became a what? | 19   cry. |
| 20       Q.  Okay.  Do you understand that your | 20       Q.  When did these feelings of guilt |
| 21   case is going to trial in September? | 21   first arise? |
| 22       A.  Yes. | 22       A.  Oh, they started way -- they |
| 23       Q.  When were you informed that your | 23   started in Katrina, but they escalated a |
| 24   case was going to trial in September? | 24   little more after we got into the trailer. |
| 25       A.  The first time I met Bob. | 25       Q.  Do you remember speaking to |
| Page 393 | Page 395 |
| 1       Q.  Do you remember when that was? | 1   Dr. Ciota? |
| 2       A.  I don't exactly remember the date. | 2       A.  Ciota? |
| 3       Q.  Do you remember whether it was | 3       Q.  Yes.  A psychologist, recently? |
| 4   before Easter? | 4       A.  Yes, I did speak to her. |
| 5       A.  I think it might have been before | 5       Q.  Okay.  Do you remember the things |
| 6   Easter.  I'm not exactly sure. | 6   that you told to her? |
| 7       Q.  Did you seek any treatment after | 7       A.  Not really.  I only talked to her |
| 8   April of this year regarding emotional or | 8   for about 20 minutes. |
| 9   mental issues you might have as a result of | 9       Q.  Do you feel that the concerns you |
| 10   being in the trailer? | 10   had about how you took care of your kids and |
| 11       A.  No. | 11   everything else were normal feelings for a |
| 12       Q.  You did go see Dr. Shwery? | 12   parent? |
| 13       A.  Yes. | 13       A.  No, because normal feelings, I |
| 14       Q.  Who selected him as a treating | 14   wouldn't have felt those feelings had I |
| 15   psychologist for you? | 15   known everything.  Because had I known what |
| 16       A.  I assume my attorneys. | 16   I know now about the trailer, we would not |
| 17       Q.  You were told to go see him? | 17   have been in the trailer because I wouldn't |
| 18       A.  Yes. | 18   knowingly put my children in harm's way. |
| 19       Q.  Did you have any relationship with | 19       Q.  And you're making that |
| 20   Dr. Shwery before you were told to go see | 20   determination based on the assumption that |
| 21   him? | 21   there was a dangerous amount of formaldehyde |
| 22       A.  No. | 22   in the trailer? |
| 23       Q.  Were you having any emotional | 23       A.  I would say yes. |
| 24   problems that you felt like you needed to | 24       Q.  Have you attempted to gather any |
| 25   have addressed by a psychologist? | 25   medical information that might establish or |
| Page 394 | Page 396 |

PROFESSIONAL SHORTHAND REPORTERS, INC    (800) 536-5255
New Orleans * Baton Rouge * Covington * Shreveport                              (504) 529-5255

1  ease your fears about the level of
2  formaldehyde that's present in everyday
3  life?
4      A.  No, I would say I have not looked
5  up anything like that.
6      Q.  If it's established that the
7  levels of formaldehyde in your trailer were
8  similar to the levels of formaldehyde in
9  homes, site-built homes in Louisiana, would
10  that help ease your fears about whether your
11  son was placed in harm's way?
12      MR. HILLIARD:
13          Objection, form.
14  EXAMINATION BY MR. GLASS:
15      Q.  You can answer.
16      MR. HILLIARD:
17          You may answer.
18      THE WITNESS:
19          Okay.  I would say -- wait.  Say
20  the question again because he objected.
21  EXAMINATION BY MR. GLASS:
22      Q.  Sure.  If you were provided
23  information that established that the levels
24  of formaldehyde tested in your trailer that
25  similar to the levels of formaldehyde that
                                    Page 397

1  that the levels would be the same simply
2  because of space.  When you -- everybody
3  knows when you're in a small space, odors
4  are stronger.  When you're in a wider space,
5  there's more air to dissipate odors.
6  EXAMINATION BY MR. GLASS:
7      Q.  I understand that that's your
8  belief, but if you were shown that there is
9  testimony -- excuse me, that there has been
10  research done on houses in South Louisiana
11  where the levels of formaldehyde are much
12  higher than what's shown in your trailer,
13  does that change -- do anything to alleviate
14  your concerns?
15      MR. HILLIARD:
16          Excuse me.  Objection, form and
17  asked and answered.  Last chance.
18      THE WITNESS:
19          You want me to answer?
20      MR. HILLIARD:
21          Yes, when I say "last chance," I'm
22  going to give him one more chance to re-ask
23  the same question of you.  But if he goes
24  too much further, I'm going to instruct you
25  not to answer.
                                    Page 399

1  are in regular homes in South Louisiana,
2  would that do anything to ease your fears or
3  concerns about living in the trailer?
4      A.  You're talking about since the
5  test that happened at the end?
6      Q.  Yes.
7      A.  I would say kind of no, because
8  the fact that we were already in there when
9  initially -- when the odor was at its
10  strongest, I would say no.
11      Q.  If it is shown through medical
12  literature to you that formaldehyde is
13  present in site-built homes such as the one
14  you are currently living in and the one you
15  are about to go into, does that cause you
16  any concern about living in those homes?
17      A.  No, because those houses are a lot
18  bigger than the trailer.
19      Q.  What if the levels of formaldehyde
20  are the same as the levels in the trailer?
21      MR. HILLIARD:
22          Objection.
23          Now you can answer.
24      THE WITNESS:
25          I'm going to say I can't believe
                                    Page 398

1          But you may answer this one.
2      THE WITNESS:
3          I would still have to say no
4  because I cannot believe, with the limited
5  information that I have, that it's the same
6  in the trailer and the house.
7  EXAMINATION BY MR. GLASS:
8      Q.  Where did you obtain the
9  information that there's a fear of future --
10  an increased risk of future disease for you
11  from living in the trailer?
12      A.  I heard that from the news and
13  when they brought -- when we went to
14  National Jewish, she explained that there
15  could be, you know, possible long-term side
16  effects, especially to Erika, you know, than
17  she's young, and her reproductive system,
18  and Christopher as far as his asthma.
19      Q.  Dr. Pacheco told you that?
20      A.  Yes.
21      Q.  Subparagraph D in paragraph 15 is
22  also asserting mental anguish and emotional
23  distress for your son, Christopher Cooper.
24          I believe on Exhibit 2 on page 5,
25  you changed the --
                                    Page 400

100 (Pages 397 to 400)