1

 1        COMPUTER UNCERTIFIED ROUGH DRAFT ONLY
 2            THIS DRAFT CANNOT BE QUOTED
 3            IN ANY PLEADINGS OR FOR ANY
 4           OTHER PURPOSE AND MAY NOT BE
 5               FILED WITH ANY COURT.
 6          This transcript draft is uncertified and
 7   may contain untranslated stenographic symbols, an
 8   occasional reporter's note, a misspelled proper
 9   name, and/or nonsensical word combinations.  All
10   such entries will be corrected on the final
11   certified transcript.
12          Due to the need to correct entries prior
13   to certification, you agree to use this realtime
14   draft only for the purpose of augmenting counsel's
15   notes and not to use or cite it in any court
16   proceeding.
17          Please keep in mind that the final
18   certified transcript's page and line numbers will
19   not match the rough draft, due to the addition of
20   title pages, indices, appearances of counsel,
21   paragraphing and other changes.
22
23
24
25


23     Q    And are you critiquing the National
24   Toxicology Program in any regard?
25     A    Yes, I think that would be a fair statement.

                                   76

24   BY MR. PINEDO:
25     Q    I'm going to show you a document from a --

                                   77

 1   from your deposition in Alexander Cooper et al.  We'll
 2   mark it as Cole Exhibit Number 6.  Could you please
 3   identify that document for me?
 4     A    This is a document that I referred to as my
 5   task list, and it lists tasks that are outstanding at
 6   the time.  May I ask where you got this?
 7     Q    I got it from the Alexander Cooper
 8   deposition.
 9          What is -- that's where I recollect I got it
10   from.  What's that first task there CC NTP, what's
11   that?
12     A    Well, CC simply refers to a location in my
13   office where I would find the file.  NTP stands for
14   National Toxicology Program.  Refine tables and texts
15   is a reminder to me of what stage I am in producing a
16   manuscript for publication on that topic.
17     Q    So you're doing work for the National
18   Toxicology Program?
19     A    No, not for them, about them.
20     Q    At whose direction are you doing an article
21   about the National Toxicology Program?
22     A    No one's.  My own.

                                   78

 1     Q    And what are you critiquing?
 2     A    Well, this is a work in progress, and I'm
 3   not going to be able to discuss it.
 4     Q    Well, you understand you're here to discuss
 5   your opinions; is that right?
 6     A    Yes.
 7     Q    Okay.  What are you critiquing about the
 8   National Toxicology Program?
 9     A    This is an ongoing work.  My opinions are
10   still being formulated.
11     Q    And what are currently your opinions about
12   the National Toxicology Program?
13     A    I'm not prepared to discuss opinions that
14   are still in the formative stage.  This -- go ahead.
15     Q    Are you refusing to answer questions about
16   your opinions in the National Toxicology Program?
17          MS. HINES:  Let me just object to the
18   form.  I think he's already stated that he can't,
19   too early, but, anyway, he can answer.
20     A    I am declining to describe some of my
21   ongoing research, yes.
22   BY MR. PINEDO:
23     Q    Now, why are you declining to describe your
24   ongoing research?
25     A    It is conventional that ongoing research is

79

```
 1   kept confidential until it is ready for publication
 2   or, in fact, published.
 3        Q    Well, you've offered sworn testimony in the
 4   past that you've written articles funded by the -- by
 5   the Formaldehyde Council, and you sent them
 6   manuscripts ahead of time before it was published,
 7   didn't you?
 8             MS. HINES:  Object to the form.
 9        A    I'm not sure I have.  I don't know of any
10   manuscript that is a document that was in the process
11   of being prepared for publication that has been
12   supported by the Formaldehyde Council, so I don't
13   think there is any paper or document of the type that
14   you're referring to.
15   BY MR. PINEDO:
16        Q    You have no recollection of writing papers
17   where the research was funded by the Formaldehyde
18   Council?
19        A    May I take a minute to look at something
20   before I respond to that?
21        Q    Certainly.
22        A    Did we hand in my CV?  Has someone got that?
23        Q    We've got it marked as Exhibit Number 2.
24        A    Do you -- would you like to restate the
25   question or would you like me to try to answer it as I
```

80

```
 1   understood it?
 2        Q    I'd look an answer to my question.
 3        A    You'd like me to answer your question?
 4        Q    Yes.
 5        A    Well, all I can do then is answer it as I
 6   understood it.  I have never submitted a manuscript
 7   that was -- that it was my intention to submit for
 8   publication to the Formaldehyde Council for review.  I
 9   have never prepared a manuscript that was supported by
10   the Formaldehyde Council with the exception of one,
11   and whether or not that was submitted to them or not I
12   do not know.
13        Q    That's your sworn testimony?
14        A    Yes.
15        Q    What is the nature of your ongoing research
16   about the National Toxicology Program?
17        A    I'm not prepared to discuss ongoing
18   research.
19        Q    Are you refusing to answer questions about
20   ongoing research with the National Toxicology Program
21   that you're doing?
22        A    It's not with them, it's about them.
23        Q    Are you refusing --
24        A    And the answer is yes.
25        Q    You're refusing to answer questions about
```

81

```
 1   ongoing research you're doing on the National
 2   Toxicology Program?
 3        A    Yes.
 4        Q    And the National Toxicology Program has may
 5   pronouncements with regard to formaldehyde; is that
 6   right?
 7        A    I'm not sure what you mean by "made
 8   pronouncements," but they have evaluated formaldehyde,
 9   yes.
10        Q    Is anybody else involved with you on this
11   ongoing research that you're doing with the National
12   Toxicology Program?
13        A    Yes.
14        Q    Who else?
15        A    His name is Dr. Brad Rodu, R-O-D-U.
16        Q    And what is his specialty?
17        A    He is an oral pathologist and
18   epidemiologist.
19        Q    Do you plan to publish the research that
20   you're doing on the National Toxicology Program?
21        A    That's a decision that hasn't been made yet.
22        Q    But at least you have some kind of draft
23   that you plan to submit to somebody because you have
24   tables and texts to refine; isn't that right?
25        A    There is no draft.
```

82

```
 1        Q    You have some tables and texts to refine,
 2   don't you?
 3        A    There are -- there are isolated tables and
 4   isolated texts, yes, but they are not combined in any
 5   way into what I would call a draft of a manuscript.
 6        Q    And what do the tables discuss?
 7        A    I'm not going to discuss this material with
 8   you.
 9        Q    And what do the -- does the text discuss?
10        A    Same response.
11        Q    What is Smith Butz?
12        A    That's a law firm.
13        Q    And what kind of cases are you preparing
14   reports on for Smith Butz?
15        A    These are cases of railroad workers.
16   Different cases relate to different malignancies.
17        Q    And you're offering testimony for the
18   defendants in those cases; is that right?
19             MS. HINES:  Object to the form.
20        A    I need some clarification.  Is a report --
21   does a report qualify as testimony?
22   BY MR. PINEDO:
23        Q    Let me ask a different question.  The
24   reports that you're preparing are on behalf of the
25   defendants in those railroad cases; is that right?
```

83

```
1    A    The answer differs depending upon the
2    plaintiff.
3    Q    I'm talking about for Smith Butz.
4    A    Yes, but there are several plaintiffs.
5    Q    Quester/Belman, what's, that the third item
6    on Exhibit 6?
7    A    Yes, I see it.  Quester is the name of a
8    plaintiff in a case, and Belman is the name of the
9    attorney that I'm working with on that case.
10   Q    And what kind of case is that?
11   A    I'm not at liberty to tell you that.
12   Q    What do you mean?
13   A    What do I mean?
14   Q    Yes.
15   A    I mean that that is a case in which I do not
16   believe I have been designated as an expert.  I'm not
17   sure whether I have or not, so I'm going to assume
18   that I have not.
19   Q    Well, it's going to trial in late 2009; is
20   that right?
21   A    Actually, no.  It was true at the time this
22   was written, but it has been postponed.
23   Q    You're going to have an opportunity to read
24   and sign your deposition in this case?
25   A    You mean in the case we're here for today?
```

84

```
1    Q    Yes.
2    A    Am I going to have the opportunity to read
3    and sign it?
4    Q    You are going to have the opportunity to
5    read and sign.  Do you plan on reading and signing
6    your deposition?
7    A    Yes.
8    Q    And at the time you read and sign your
9    deposition, can you -- between now and then can you
10   make a determination as to whether or not you are a
11   designated expert in the Quester/Belman related case?
12   A    Yes.
13   Q    And if you are a designated expert, can you
14   then add in the deposition, I'll ask the court
15   reporter to leave a blank line, as to what type of
16   case that is?
17   A    You may do what you wish within -- you
18   obviously know the law better than I do, but I will
19   probably accept the decision of Dr. Belman -- I mean
20   Ms. Belman as to whether or not I can state anything
21   at all about the case.
22   Q    Your objection to telling me anything about
23   the case at this point is you don't know if you're
24   designated; is that right?
25   A    That's part of it.
```

85

```
1    Q    What else is there?
2    A    I don't know.
3    Q    So you don't have any other objection then.
4    You don't know whether you're a designated expert in
5    that case; is that right?
6    A    Well, I want to be clear that I have two
7    objections.  One is that I do not know whether or not
8    I'm a designated expert, and I do not know what it is
9    that I do not know.
10   Q    If you are a designated expert, can you
11   reveal to us what type of case that is?
12   A    I don't know.
13   Q    With the permission of Ms. Belman would you
14   do that?
15   A    Oh, with Ms. Belman's permission I will be
16   glad to tell you.
17   Q    And what is Ms. Belman's first name?
18   A    Susan.
19   Q    And where are her offices?
20   A    Cleveland, Ohio.
21   Q    And where is the case pending?
22   A    Somewhere in New Jersey.
23        MR. PINEDO:  Let's take a break, the court
24   reporter -- I mean the videographer needs to change
25   the tape.
```

86

```
1         THE VIDEOGRAPHER:  This is the end of tape
2    number 1.  Going off the record at 10:30 a.m.
3         (Recess 10:30-10:41 a.m.)
4         THE VIDEOGRAPHER:  We're back on video
5    record.  This begins tape number 2 at 10:41 a.m.
6    BY MR. PINEDO:
7    Q    Sir, how would you describe 6?  Is that a
8    list of work?  How would you describe this?
9    A    I call it a task list.
10   Q    Now, you took this task list with you during
11   our break that we just got back from that lasted about
12   10 minutes; is that right?
13   A    Yes.
14   Q    Why did you take that with you?
15   A    Why did I take it with me?
16   Q    Yes.
17   A    Because I wanted to ask Mr. Hines some
18   questions about it.
19   Q    And what did you ask Mr. Hines about it?
20   A    I asked him whether or not I had to discuss
21   this.
22   Q    And what did Mr. Hines say?
23   A    He said that was up to me.
24   Q    Did you ask him any other questions?
25   A    No.
```

87

1  Q   Did he say anything else?
2  A   No.
3  Q   Now, we look at item number 2 on the task
4  list, it says review reports.  Waldron depo 7/21 and
5  has asterisk.  You see below the asterisk is Ghysels,
6  Yow, Mellon, Waldron; is that right?
7  A   Yes.
8  Q   So those are some of the other plaintiffs
9  involved in that particular case; is that right?
10 A   No.
11 Q   Who are Ghysels, Yow, Mellon, and Waldron?
12 A   I'm not going to be able to discuss this
13 with you.  It has nothing to do with this case.
14 Q   Sir, this is my opportunity to find out
15 about your opinions in this case and what work you've
16 done.  I'm entitled to be asking you these questions.
17 A   This sheet of paper conveys no such
18 information.  Has nothing to do with my opinions in
19 this case or work that I've done in this case.
20 Q   I'm entitled to ask you about the work that
21 you're doing.
22 A   Item 7 on this list relates to work for the
23 Formaldehyde Council.
24 Q   I didn't ask you about item 7 yet.
25 A   Well, I didn't finish my answer either.

88

1  Q   Well, once I ask you a question, then you
2  respond.  This is not your first deposition?
3      MS. HINES:  Wait a minute.  Don't
4  interrupt him.  Let him give his answer.  He can
5  answer how he wishes.  You're asking him questions,
6  he is answering your questions.  Let him answer your
7  question.
8      MR. PINEDO:  I didn't ask him a question
9  about item number 7.
10     MS. HINES:  He was answering the question
11 you previously asked.
12     MR. PINEDO:  I would like the court
13 reporter to read back the last question I asked.
14     (The record was read by the reporter as
15 follows:
16     "I'm entitled to ask you about the work
17 that you're doing."
18     MR. PINEDO:  Keep on going back.
19     (The record was read by the reporter as
20 follows:
21     "Sir, this is my opportunity to find out
22 about your opinions in this case" --)
23     MR. PINEDO:  Okay.  So keep going back.
24     (Off-the-record discussion.)
25     MR. PINEDO:  That's it right there.

89

1  BY MR. PINEDO:
2  Q   So let me ask who are Ghysels, Yow, Mellon,
3  and Waldron?
4  A   I am not going to be able to discuss with
5  you any of the information on this sheet with the
6  exception of information that may relate to item
7  number 7 as none of the other items relate to the
8  present case in any way.
9  Q   I'm going to be the one who makes that
10 determination whether or not to relate it once I ask
11 you the questions.
12     MS. HINES:  No, you can ask your
13 questions.  He can answer.  You don't determine
14 anything.  He answers or doesn't answer.  It's up to
15 him what he wants to do.
16     MR. PINEDO:  I have no basis to make a
17 determination whether they are or are not related
18 unless I get answers to my questions.  So I'm going
19 to ask these one by one.
20 BY MR. PINEDO:
21 Q   Who is Ghysels, G-H-Y-S-E-L-S that you have
22 on your task list Exhibit 6?
23 A   I will repeat my answer to the previous
24 question if you like or simply state that I would
25 repeat it.

90

1  Q   Are you refusing to answer any questions to
2  what Ghysels is?
3  A   Yes.
4  Q   Are you refusing to answer any questions on
5  your task list related to what is Yow?
6  A   Yes.
7  Q   Y-O-W?
8  A   Yes.
9  Q   Are you refusing to answer any questions
10 with regard to who is or what is Mellon?
11 A   Yes.
12 Q   Are you refusing to answer any questions
13 with regard to what is Waldron on your task list?
14 A   Yes.
15 Q   What is item number 4 Syngenta/Paraquat?
16 A   That relates to an issue that has nothing to
17 do with the present case.
18 Q   I understand your answer, but what is it?
19 A   I'm not going to describe to you what it is
20 because it has nothing to do with the present case,
21 and I'm going to answer your questions about the items
22 on the list every single one of them in exactly the
23 same way with the exception.
24 Q   Sir --
25 A   Of number 7.

91

1  Q  -- you understand that I can't make any
2  determination of whether or not it's related to this
3  present case without you telling me about it.
4  A  I do understand that.
5  Q  Okay.
6  A  But I can't.
7  Q  Are you refusing to answer any questions
8  about Syngenta or Paraquat?
9  A  Yes.
10 Q  Are you refusing to answer any question
11 about what you mean by new review starts?
12 A  Yes.
13 Q  What is Nicastro and Foster?
14 A  Well, we actually discussed that case.  It
15 was on the list of testimony, but I'm not going to add
16 anything to what we've already discussed about it.
17 This is the case in which I was deposed last week.
18 Q  Who is Foster?
19 A  I'm not going to be able to provide you with
20 any information about that other than beyond what I
21 already have.
22 Q  Are you refusing to answer any questions as
23 to who is Foster?
24 A  Yes.
25 Q  What is OT/BLCA with regard to Nicastro

92

1  Foster?
2  A  It's ortho-toluidine and bladder cancer.
3  Q  Item number 6 on Exhibit 6 is Nitro/Love.
4  What is that?
5  A  I'm going to discuss it with you.
6  Q  Are you refusing to answer any questions
7  regarding Nitro and Love which is item number 6 on
8  Exhibit 6?
9  A  Yes.
10 Q  What is item number 8 Hill/Burnton?
11 A  Do I have to repeat my answer each time or
12 can I say I've already answered?  I've already covered
13 this.
14 Q  You haven't covered Hill and Burnton.
15 A  I've covered the nature of my answer to your
16 questions about Hill and Burnton.
17 Q  Are you refusing to answer any questions
18 regarding hill and Burnton item number 8 on Exhibit 6?
19 A  Yes.
20 Q  Are you refusing to answer any questions on
21 link, item number 9, on Exhibit 6?
22 A  Yes.
23 Q  Are you refusing to answer any questions
24 regarding item number 10, BWH on Exhibit Number 6?
25 A  Yes.

93

1  Q  Are you refusing to answer any questions on
2  Hein/Spac on Exhibit Number 6?
3  A  Yes.
4  Q  Are you refusing to answer any questions on
5  item number 12, Belman, Kovaly, Taylor, Groves on
6  Exhibit Number 6?
7  A  Yes.
8  Q  And this is all pending work that you're
9  working on?
10 A  Some of it may be, some of it may now be
11 concluded because this list is now some I guess four
12 months old.
13 Q  So you are refusing to tell me about the
14 projects that you have worked on on this task list
15 other than number 7?
16 A  Right.
17 Q  But you understand that I am entitled ask
18 you about the projects you are working on?
19    MS. HINES:  Let me object to the form.
20 A  No, I don't understand that you have that
21 entitlement.
22 BY MR. PINEDO:
23 Q  I'm informing you that I have the right to
24 ask you about projects you are working on.  Do you
25 still refuse to answer these questions?

94

1     MS. HINES:  Object to the form.
2  A  As to whether or not the premise of that
3  question is correct, I have no idea.  As to the
4  question itself, the answer is yes.
5  BY MR. PINEDO:
6  Q  And you understand that I'm entitled to file
7  a motion to strike you as an expert in this case based
8  upon your refusal to answer questions during your
9  deposition?
10 A  I don't understand that.
11 Q  You now understand that you continue to
12 refuse to answer my questions about these items?
13    MS. HINES:  Object to the form.
14 A  I don't understand your question now.
15 BY MR. PINEDO:
16 Q  I'm informing you that I have a right to
17 file a motion to strike you as an expert in this case
18 based upon your refusal to answer questions.  Now
19 being informed of that, do you continue to refuse to
20 answer my questions regarding these items on Exhibit
21 6?
22    MS. HINES:  Object to the form.
23 A  I do not consider myself to be informed of
24 that simply because you have asserted it to be true.
25 I have no legal basis, no legal knowledge to evaluate

95

1  your assertions in which you attribute privileges to
2  yourself.
3  BY MR. PINEDO:
4     Q   I'm not asserting any privilege for myself.
5     A   I don't know whether you are or not.
6     Q   I'm informing you that I have a right to
7  strike your testimony as an expert in this case based
8  upon refusal to answer questions.  I have so informed
9  you.  Now that I have informed you, do you continue to
10 refuse to answer my questions on these items?
11    A   Yes.
12    Q   Item number 7 says FCI.  Does that mean the
13 Formaldehyde Council, Incorporated?
14    A   Yes.
15    Q   And it says commentary.  What does that
16 mean?
17    A   Some 20 minutes or so ago I mentioned to you
18 when you were asking me about whether or not I had
19 provided manuscripts to Formaldehyde Council to review
20 I said that there was one that might have been
21 submitted to them for review.  That's that project.
22    Q   What manuscript is that?
23    A   I am not the responsible senior author of
24 that manuscript, and so I will not be able to discuss
25 it with you.

96

1     Q   Sir, I didn't ask you if you were the
2  responsible senior author, I asked you what is that
3  manuscript that you have submitted to the Formaldehyde
4  Council.
5     A   Firstly, I never said that I have submitted
6  it to the Formaldehyde Council.  In fact, I did not
7  submit it to the Formaldehyde Council.  Whether or not
8  it was submitted to the Formaldehyde Council I do not
9  know.
10    Q   What is this commentary identify number 7 to
11 the Formaldehyde Council, what work are you doing for
12 the Formaldehyde Council in that regard related to
13 item number 7?  Tell us.
14    A   You'll have to speak with the senior author
15 of that manuscript if you want to learn what's --
16 what's in it.
17    Q   I didn't ask you what's in that manuscript.
18 I asked you what kind of work are you doing with the
19 Formaldehyde Council that's related to item number 7
20 commentary.
21    A   I've answered your question.
22    Q   Well, tell me again.
23    A   If you want to know what work is encompassed
24 in a manuscript that is referred to here as
25 commentary, you would have to speak with the senior

97

1  author of that.
2     Q   Are you refusing to answer my questions
3  about item number 7 regarding the Formaldehyde
4  Council, Incorporated and your work with them related
5  to this note here commentary?
6     A   I feel that I have answered your question to
7  the extent that I'm able to do so.
8     Q   You don't know anything else about it?
9     A   Oh, I know quite a bit more about it.
10    Q   Please tell me about it.
11    A   I decline.
12    Q   You're saying you know quite a bit more
13 about this work for the Formaldehyde Council and some
14 type of commentary, and you're refusing to answer
15 questions about it?
16    A   Yes.
17    Q   And that's your work on formaldehyde?
18    A   It's my work and the work of others as well.
19    Q   And you're refusing to tell me about it?
20    A   Yes.
21    Q   Who are the others involved in this?
22    A   I'm going to refuse to tell you that as well
23 although I will tell you the name of the responsible
24 author.
25    Q   Why are you refusing to tell me the other

98

1  people who are involved in this?
2     A   I think that's his right whether or not to
3  tell you.
4     Q   What's your basis for that?
5     A   I consider that to be the generally accepted
6  practice by scientists.
7     Q   Well, this is my opportunity to ask about
8  the work that you're doing on formaldehyde, and you're
9  working on something for the Formaldehyde Council
10 regarding formaldehyde and you're refusing to answer
11 questions.
12    A   Well, actually, I'm not working on it.  It's
13 done.
14    Q   Okay.  Tell me the work that you did on
15 that.
16    A   I decline to respond.  I'm going to move now
17 to the smallest number of words that I can use to move
18 your question to the next one when you ask me about
19 the subject matter of this work.
20    Q   And you're refusing to tell me about the
21 subject matter of this work with the Formaldehyde
22 Council that's now completed that regards
23 formaldehyde?
24    A   Yes.
25    Q   And who is the senior author?

99

1  A   The senior author? You are asking me for
2  the name of the senior author of the commentary, I
3  want to be clear about that.
4  Q   Yes. I thought you were going to move with
5  short -- with a restricted number of words.
6  A   His name is Dr. Jack Mandel.
7  Q   And where does he work out of?
8  A   He's the dean of the School of Public Health
9  at the University of Toronto.
10 Q   Are you refusing to tell me anybody else who
11 is involved in that project?
12 A   Yes.
13 Q   When did the project start?
14 A   I decline to answer.
15 Q   When did the project reach its completion
16 stage?
17 A   I decline to answer.
18 Q   What were you specifically asked to do with
19 regard to this project?
20 A   I decline to answer.
21 Q   And this project was for the Formaldehyde
22 Council, Incorporated; is that right?
23 A   I decline to answer.
24 Q   Isn't that what FCI stands for, Formaldehyde
25 Council, Incorporated?

100

1  A   I decline to answer.
2  Q   How much were you paid for your work for the
3  Formaldehyde Council to do this work?
4  A   I decline to answer.
5  Q   How much were you paid on an hourly basis by
6  the Formaldehyde Council for this work?
7  A   I decline to answer.
8  Q   Who did you talk to at the Formaldehyde
9  Council with regard to this work?
10 A   I decline to answer.
11 Q   What did the representative from the
12 Formaldehyde Council tell you with regard to this
13 work?
14 A   I decline to answer.
15 Q   What was the work -- the purpose of this
16 work for the Formaldehyde Council? What were they
17 trying to prove or show?
18 A   I decline to answer.
19 Q   How did you first become involved in this
20 work for the Formaldehyde Council that we have
21 identified here in Exhibit 6?
22 A   No response.
23 Q   Why are you refusing to answer?
24 A   No response.
25 Q   Why are you saying no response?

101

1  A   No response.
2  Q   Who do you know at the Formaldehyde Council?
3      MS. HINES: Are you now beyond this -- let
4  me just ask the question are you now beyond item
5  whatever the number?
6      MR. PINEDO: I'm asking him who he knows
7  at the Formaldehyde Council.
8  A   The person that I know at the Formaldehyde
9  Council is Ms. Betsy Natz.
10 BY MR. PINEDO:
11 Q   What's her position there?
12 A   I'm not sure of her exact title, but she
13 is -- she holds a position that I would describe as
14 director.
15 Q   Do you know anybody else at the Formaldehyde
16 Council?
17 A   Staff people.
18 Q   Who else do you know at the Formaldehyde
19 Council?
20 A   Sarah Pennock, there is another woman there
21 named Sarah, but I have forgotten her last name.
22 There are two Sarahs there.
23 Q   What does Sarah Pennock do for the
24 Formaldehyde Council?
25 A   I think she's a secretary.

102

1  Q   And the other Sarah, what does she do?
2  A   I think she's a administrative assistant,
3  but I may have them reversed.
4  Q   Did you have any discussions with Betsy Natz
5  regarding the work identified here on Exhibit 7 with
6  the Formaldehyde Council?
7  A   No response.
8  Q   Did you have any discussions with Sarah
9  Pennock regarding the work identified that you did for
10 the Formaldehyde Council?
11 A   No response.
12 Q   Did you have any discussions with Sarah, the
13 administrative person, at the Formaldehyde Council,
14 regarding the work that you identified here on Exhibit
15 6 with the Formaldehyde Council?
16 A   No response.
17 Q   Did anybody review the work that you did for
18 Formaldehyde Council such have identified here on
19 Exhibit 6?
20 A   No response.
21 Q   Did anybody disagree with the work that you
22 did for the Formaldehyde Council that we have
23 identified here on Exhibit 6?
24 A   No response.
25 Q   Did you revise in any way the work that you

103

```
 1   did for the Formaldehyde Council that we have
 2   identified here in Exhibit 6?
 3       A    No response.
 4       Q    Do you have any drafts revealing your work
 5   product that you did for the Formaldehyde Council as
 6   identified here in Exhibit 6?
 7       A    No response.
 8       Q    Are you refusing to give me any details on
 9   those questions I just answered --
10       A    Yes.
11       Q    -- asked you?
12       A    Yes.
```

109

```
 3       Q    Do you have any other documents relating to
 4   work that you've done for the Formaldehyde Council?
 5       A    I have a copy of the current version of the
 6   commentary.
 7       Q    And that's the commentary that you're
 8   refusing to answer any questions about?
 9       A    Yes.
```