**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER FORMALDEHYDE | § | **MDL No. 1873** |
| **PRODUCTS LIABILITY LITIGATION** | § | **SECTION N(5)** |
| | § | **JUDGE ENGELHARDT** |
| **This Document Is Related To:** | § | **MAGISTRATE CHASEZ** |

*Civil Action No. 07-9228*
*Aldridge, et al v. Gulf Stream Coach, Inc., et al (Elisha Dubuclet o/b/o Timia Dubuclet)*

<u>**MEMORANDUM IN SUPPORT OF FLUOR ENTERPRISES, INC.'S MOTION FOR SUMMARY JUDGMENT BASED ON THE GOVERNMENT CONTRACTOR DEFENSE**</u>

<u>**PRELIMINARY STATEMENT**</u>

Katrina and Rita hurricane recovery has poignantly illustrated the need for federal agencies to be able to seamlessly and productively coordinate their efforts with private contractors.  Failing to extend federal government contractor immunity to private contractors such as FEI would frustrate the purpose of the Stafford Act and hamper the nation's ability to most effectively respond to future crises.  FEI meets the three conditions for dismissal from this case under the government contractor defense.  Pursuant to a Government contract with FEMA, FEI faithfully performed its work in compliance with reasonably precise specifications provided and mandated by the Government for installation of the travel trailers, and FEI had no actual knowledge not otherwise known to the Government about alleged formaldehyde dangers.  There is no evidence that FEI deviated from the scope of work that it was mandated to do by the Government.  FEI is therefore entitled to immunity from plaintiffs' state law tort claims, and summary judgment as a matter of law.[1]

---

[1]   This motion is substantively the same as FEI's MSJ based on the government contractor defense filed in the Alexander suit (bellwether 1), except for substitution of the Dubuclet plaintiff and the specific details concerning the Dubuclet travel trailer.

## BACKGROUND

The Dubuclet plaintiffs joined the MDL on 11/30/07.[2]  Plaintiff, Timia Dubuclet, a minor represented by her mother, Elisha Dubuclet, was selected as the bellwether plaintiff in the second trial, against the USA, Fleetwood (the alleged manufacturer of the travel trailer) and FEI, the government contractor who allegedly delivered and installed the travel trailer.  FEI is as an IA/TAC contractor.  Plaintiff asserts claims against FEI under the LPLA, contending that FEI somehow qualifies as a "manufacturer" because FEI installed the travel traveler on concrete blocks in accordance with FEMA's specific instructions.  In particular, plaintiff alleges that FEI's "blocking" of the trailer created stress and distortion that allowed increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell.[3]  Alternatively, plaintiff alleges state law negligence claims against FEI if FEI is not found to be a "manufacturer" under the LPLA.[4]  Specifically, plaintiff alleges:

1. The Dubuclet travel trailer was installed and hooked to utilities for residential purposes by FEI pursuant to a specific Government contract;[5]

2. The Government provided reasonably precise specifications for installation of the unit with which FEI conformed;[6] and

3. The Government knew of the potential harmful effect of formaldehyde exposure to the Dubuclet plaintiff in this travel trailer.[7]

This court ruled that the discretionary function exception bars plaintiffs' FTCA claims challenging FEMA's decision to (1) purchase and use travel travelers as temporary emergency housing for Katrina disaster victims (EHUs), *and* (2) contractually delegate the responsibility for

---

[2]  In Aldridge, et al v. Fleetwood, et al, 07-9228; Rec. Doc. 1, art. II.
[3]  Rec. Doc. 1064, pars. 23-25.
[4]  Rec. Doc. 1064, sixth cause of action.
[5]  Rec. Docs. 1064, pars. 14-15, 18; 5394-3 (plaintiff's proposed 4th supplemental & amending petition, par. 8).
[6]  Rec. Docs. 1064, pars. 2, 14, 18-24, 26, 28, 29, 31, 32, 52, 59; 5394-3, par. 8.
[7]  Rec. Doc. 1064, pars. 39-49 (plf's allegations of Gov't's knowledge).

hauling, installing and maintaining EHUs to IA/TACs.[8] The court found plaintiffs' claim that the Government was involved in making contractual arrangements for the contractors to follow in the field, regarding the delivery and set-up of EHUs, was a discretionary function. This finding covers the precise installation "defect" alleged by plaintiff and corresponding Government specification mandating that FEI – install the travel trailer in a precise manner by placing it on concrete blocks.[9] In short, plaintiff alleges that FEI did exactly what the Government's specifications required FEI to do.

## STATEMENT OF FACTS

The essential facts are set forth in the attached Statement of Uncontested Material Facts. Dubuclet alleges following Hurricane Katrina she received emergency housing assistance from FEMA, pursuant to the Stafford Act and applicable federal regulations. It is undisputed FEMA selected and ordered the travel trailer provided to plaintiff from the manufacturer, Fleetwood. Plaintiff contends she lived in the travel trailer from 6/06 until 9/07.[10] Plaintiff alleges her travel trailer was installed and hooked to utilities for residential purposes by FEI, pursuant to a contract between FEI and FEMA.[11]

1. **FEMA Hires FEI As A Government Contractor**

   A. **The Individual Assistance – Technical Assistance Contract (IA/TAC)**

   On 7/12/05, FEMA awarded an IA/TAC contract to FEI to be prepared to mobilize to provide general contractor services for disaster relief anywhere in the U.S., pursuant to

---

[8] October 3, 2008 Order, Rec. Doc. 717, p. 43-44.
[9] See Ct's Order, Rec. Doc. 717, p. 22-23 & 44, in response to plaintiffs' contention some travel trailers were set up off their wheels improperly and that FEMA was responsible for making "those arrangements with the companies they hired to deliver and install" the travel trailers. Rec. Doc. 1064, par. 23.
[10] Rec. Doc. 5394-3, par. 9.
[11] Rec. Doc. 5394-3, par. 8.

individual task orders to be issued by FEMA.[12]  This umbrella contract provided the general requirements for all of FEI's anticipated work "at [v]arious disaster sites to be determined" by FEMA, with the condition that FEMA would prepare a specific Statement of Work (SOW) for each individual task order it later issued.[13]  The contract required FEI to "provide the necessary personnel, materials, services, equipment, and facilities, and otherwise do all things necessary to provide temporary shelters and related services as described in the Scope of Work, Attachment A."[14]  The contract provided for FEI to perform contractor services on a project by project basis, as assigned by FEMA including: "supporting staging areas for units, installation of units, maintenance and upkeep, site inspections ... restorations, group site designs, ... construction, site assessment, property and facility management, and unit deactivation and removal." The contract provided, inter alia, that FEI "personnel shall perform professional, technical, clerical, and field work as assigned by the task order."[15]  These general contractual requirements mirror the plaintiffs' broad allegations of FEI's duties pursuant to the IA/TAC.[16]

**B.** **Exhibit 7 To The IA/TAC Specifically Directs FEI How To Install The Travel Trailers**

The IA/TAC sets forth precise specifications dictating the exact manner for FEI to install the travel trailers, including detailed requirements for delivery, blocking/leveling, anchoring and straps, utilities hook-ups (sewer line, water line, electrical wiring) steps, winterization, handicapped ramps/steps, and minor tasks to make the trailers RFO.[17]   In Exhibit 7, the

---

[12]  Portions of the IA/TAC between FEMA & FEI and Task Order 20 are att. as Ex. 1; see FL-FCA-1, 10 (§ F.3), part III, § J, att. A. (scope of work) FL-FCA-60, 74.
[13]   The IA/TAC is like an umbrella or a master services contract containing general conditions for all work performed, whereas each task order is like a work order specific to the disaster and work required by FEMA of the contractor for that disaster.  See Ex. 1, att.  A (scope of work) FL-FCA-60-74; Declaration of Charles Whitaker, FEI's Program Manager with respect to the IA/TAC, attached hereto.
[14]  The Contract, Ex.1, FL-FCA-1.
[15]  The Contract, Ex.1, attachment A. § 2.1.7, FL-FCA-62 & § 2.2.6, FL-FCA-63, respectively.
[16]  See Rec. Doc.1064, pars. 2, 18.
[17]  [Ex. 1] the Contract, Ex.7, § 2 (basic travel trailers set-up) FL-FCA-113-122; Decl. of Whitaker, art. 9.

Government directed FEI to install the travel trailers on six piers constructed in a precise fashion.[18]   It is undisputed that this precise specification for blocking the travel trailer was completely formulated, designated and drafted by the Government and provided to FEI by the Government.  FEI had no role in developing, testing or engineering any aspect of Ex. 7, or any other aspect of FEMA's installation specifications.[19]

### C. Exhibit 10 To The IA/TAC Specifically Directs FEI's Maintenance Of The Travel Trailers

FEMA's maintenance specifications in Ex. 10 provide similar detailed instructions that FEI had to follow,[20] confirming FEMA's extensive control over the maintenance aspects of the Program.  For example, Ex. 10 requires FEI, inter alia, to:

- "Provide maintenance services of units **assigned by FEMA** ... and/or **identified by FEMA**."
- "Perform other tasks **as required by the COTR [Contracting Officers' Technical Representative]** ... ."
- "Operate and supply the resources for a maintenance call center … ."
- "Make repairs **identified by FEMA**." [21]

Furthermore:

- FEMA reserves the right to perform maintenance through its own forces (or through other contractors, which actually happened), and maintenance will be assigned to the contractor only after the unit is installed.
- FEMA directed that the contractor could only replace major material items after prior inspection and approval by the COTR or CO.
- FEMA established the frequency of routine maintenance: monthly.
- FEI was required to warrant any maintenance work for a period of 90 days, which period began upon acceptance of the work by FEMA. [22]

---

[18]  **Please view [Ex. 1] the Contract, Exhibit 7, § 2.1.2 Blocking and Leveling, FL-FCA-113-114.**
[19]  Decl. of Charles A. Whitaker, art. 9.
[20]  [Ex. 1] the Contract, Ex. 10 (Maintenance), FL-FCA-135-144 & 147-149 (travel trailers); § 2.10 of the PWS (FL-FCA-66-67; 135-149) specifically incorporates Ex. 10 to the PWS, Decl. of Whitaker, art. 7.
[21]  [Ex. 1] the Contract, Ex. 10, §§ 1(a), (c), (g, 3.1 & 3.2 delineating between routine & emergency maintenance) & (h), respectively (emphasis added).
[22]  [Ex. 1] the Contract, Ex. 10, §§ 4, 3.4, 4, & 5.7, respectively.

The <u>only</u> maintenance performed by FEI on the Dubuclet EHU was replacement of the microwave on 5/17/06.[23]   The maintenance work that FEI performed conformed to FEMA's specifications.[24]   In <u>Alexander</u>, this court determined: "Exhibit 10 the IA/TAC . . . set[s] forth with reasonable specificity Fluor's maintenance obligations under the contract . . .," and dismissed plaintiffs' negligent maintenance claims against FEI.[25]   Dubuclet's negligent maintenance claims against FEI should also be dismissed.

### D.   Task Order 20 Under The IA/TAC

In response to Hurricane Katrina, FEMA issued Task Order (TO) 20 to FEI to provide staging support, haul/install and installation construction activities, maintenance and deactivation to further FEMA's operational objective of providing temporary housing solutions for displaced people.[26]   TO 20 directed "[FEI] shall execute these tasks to the requirements and specifications identified in this task order, in accordance with the Performance Work Statements and applicable Exhibits."[27]

FEI's chart [attached to] the Contract provides a chronological history of FEMA's TO modifications and SOW revisions to FEI.[28]   Prior to the actual award of TO 20, FEI operated under FEMA's Pre-Authorization Notices (PAN).   The PANs authorized FEI "to begin work based on urgency."[29]

The first PAN was issued by FEMA to FEI on 9/10/05.   On 9/26/05, FEMA issued a SOW to FEI to haul and install travel trailers.   On 10/9/05, FEMA issued a RFP and SOW

---

[23]   Ex. 4, Dubuclet installation package, FEI 33-34; Decl. of Whitaker, art. 20.
[24]   Decl. of Charles A. Whitaker.
[25]   Rec. Doc. 3205, p. 3 n.1, p. 12.
[26]   Ex. 1, Task Order HSFEHQ-05-J-0020, SOW for disaster 1603 in LA, FL-FCA-219-222; 224; Decl. of Whitaker.
[27]   The Contract, Ex. 1, General Provisions (3), FL-FCA-219.
[28]   The Contract, Ex. 1, FL-FCA-207-212.
[29]   The Contract, Ex. 1, FL-FCA-16.

Revision 1, requiring FEI to submit a written technical and business proposal,[30] or Work Plan, specifying FEI's technical approach for performing specific tasks within the time frame specified, identifying key personnel, deliverables and due dates. The Work Plan was subject to approval by the COTR[31] and was approved by FEMA and the Task Order thereafter issued.[32]

On 11/10/05, FEMA officially awarded TO 20 to FEI — an undefinitized task order award for haul and install, minor installation and construction activities, maintenance, deactivation and removal of travel trailers.[33] TO 20 also became referenced as TO 11.[34]

**2.     FEI's Work Conformed To The Government's Precise Specifications**

FEI hired subcontractors to install the majority of the travel trailers, including the Dubuclet's trailer, installed by P2S,[35] which is not a party. The Government's specifications for FEI's work were mandatory. The contract did not allow FEI to change any of the specifications. FEI could not deviate from the Government's specifications without the Government's review and approval.

FEI's work conformed to the Government's precise specifications, including the mandatory specifications for installation of the trailers. There was a "back and forth" between the Government and FEI to ensure that FEI's work conformed to the Government's specifications on trailer blocking. For example, initially, when FEMA gave FEI authorization to proceed with installation of travel trailers, the FEMA Contracting Officer, Nancy Costello, advised FEI <u>not</u> to install the trailers on blocks consistent with Ex. 7 to the IA/TAC, but rather, to install them simply using the tongue jack and stabilizer jack.[36] Subsequently, on 10/18/05, as the result of

---

[30]   The Contract, Ex. 1, RFP, FL-FCA-228; plf's reference to FEI as a "no-bid" contractor is incorrect.
[31]   FL-FCA 236-240.
[32]   The Contract, Ex. 1, FL-FCA 235-240; and 16.
[33]   FL-FCA-236-240.
[32]   The Contract, Ex. 1, FL-FCA-236, 249-254.
[35]   <u>See</u> Ex. 4, FEI 20.
[36]   Government and FEI email exchange, Ex. 2, FL-FCA-7184-185.

electronic mail exchanges regarding "Confirmation of Technical Direction for Fluor in LA:

Travel Trailer Blocking Requirement," Kevin McCarthy (the Government's COTR) directed:

> All Trailers installed by Fluor in LA shall be blocked in accordance with the
> Performance Work Statement and the diagram previously supplied [by the
> Government]. Trailers previously installed by but not blocked shall be blocked
> ASAP ... These trailers NEED blocking to preserve their useful lifespan and to
> ensure the safety of the occupants. This issue has been brought to the attention of
> the IA-TAC Program Management in FEMA HQ and they agree 100%.[37]

Thus, FEMA's COTR directed FEI to commence installing travel trailers in strict

accordance with FEMA's specifications in Ex. 7 and even required FEI to go back and retrofit all

prior travel trailers that had not been installed in accordance with those specifications pursuant to

Ms. Costello's earlier directive.[38]    Additionally, when FEI sought clarification of the

specifications of Ex. 7, the Government provided FEI with a "blocking diagram that conforms to

the [PWS] on trailer blocking" set forth in the Contract.[39]    The Government's diagram for

"Typical Travel Trailer Pier Construction" was prepared by Terry Zien (U.S. Army COE)

(10/11/05).[40]    Thus, a Government engineer drafted the trailer blocking diagram that was

provided to FEI. FEI was never directed or asked to, and therefore never undertook, to perform

any engineering services concerning the Government's blocking diagram. The Government

never requested any engineering support/expertise from FEI relating to the Government's method

for blocking the trailers.[41]

It is undisputed that the Government inspected FEI's final trailer installations to ensure

compliance with Ex. 7. FEMA mandated that the performance of FEI's work under the contract

would be subject to the QA Surveillance Plan and the Technical Work Plan submitted by FEI

---

[37] The Gov't. & FEI emails re: trailer blocking, att. as Ex. 2, including the Government's diagram, FL-FCA-9521.
[38] Ex. 2, Government and FEI email exchange, FL-FCA-7180.
[39] Government and FEI email exchange, Ex. 2, FL-FCA-9634, 9521, 7180-7185.
[40] Ex. 2, FL-FCA-9521.
[41] Decl. of Charles Whitaker, arts. 9, 12.

and FEMA's COTR.  The contract provided "[t]he COTR does not have the authority to, and shall not, issue any technical direction which: ... [c]hanges any of the express terms, conditions, or specifications of the contrac[t] Task Orders ... ," and FEI "shall proceed promptly with the performance of technical directions duly issued by the COTR ... ." [42]  This quality control system was established by FEMA to ensure that FEI's work was performed in accordance with contract requirements and with FEMA approval.

In addition to FEI's own 100% QA/QC checks of its subcontractors installations, the Government had at least three methods of ensuring that FEI complied with the Ex. 7.[43]  First, the Army Corps of Engineers had inspectors in the field on a regular basis, bringing to the attention of all IA/TAC contractors, including FEI, issues they felt did not comply with the installation or other IA/TAC specifications.  Second, the Government performed QA/QC inspections of many of the travel trailers installed by FEI and its subcontractors.  FEMA technical monitors (for the COTR) were in the field every day inspecting FEI's trailer installations to confirm strict compliance with FEMA's detailed specifications.[44]  Third, in the fall of 2005, FEMA retained a QA/QC contractor who inspected all IA/TAC contractor EHU installations to ensure compliance.  Due to the large number of trailers, FEMA's QA/QC subcontractor did not inspect 100% of installed units, but apparently applied sampling or auditing principles in connection with unannounced inspections of EHU installations to ensure IA/TAC compliance.[45]  The FEMA technical monitors and QA/QC inspectors conducted detailed inspections utilizing the "FEMA

---

[42] Contract, Ex. 1, FL-FCA-15, G. 7 Technical Direction & Surveillance; Decl. of Whitaker, arts. 13 and 14.
[43] Decl. of Charles Whitaker, art. 14.
[44] Decl. of Charles Whitaker, arts. 15-16.
[45] Decl. of Charles Whitaker, art. 17.

Travel Trailer Inspections Field Inspector's Guide,"[46] scrutinizing every minute aspect of FEI's (and its subcontractor's) work.  FEMA designed the guide for its inspectors as:

> **a visual assist** as you inspect FEMA travel trailers for occupancy… This guidebook is not a substitute for knowing the specifications in the project work statement… the pictorial presentations will help you remember the individual items, acceptable methods and procedures you should use during your review of the contractor's work.[47]

FEMA's Guide contains over 10 pages of photographs, with detailed written instructions, showing proper "Blocking and Leveling" methods the contractor's installation must meet to comply with FEMA's contract specifications and for FEMA's approval.[48]  The Guide also contains photographs with instructions for "Anchoring and Straps" (4 pgs.), sewer and water line placement, RFO checks, steps and ramps.  To ensure that FEI's and its subcontractors were strictly complying with the Contract specifications for trailer installations, FEI requested and FEMA gave FEI a copy of the Guide, which FEI used to make sure its installations conformed precisely to FEMA's specifications and would pass FEMA's inspections.[49]

The form that FEI used to inspect trailers at the staging areas (form 90-13) was a FEMA inspection form.[50]  Likewise, the RFO QC/QA Checklist used after trailer installation and before occupancy was derived from FEMA's installation specifications. Thus, FEI and its subcontractors' quality control inspections were performed in strict compliance with FEMA's contract requirements.

Stephen Miller was a supervisor over logistical operations with FEMA on the IA/TAC. Mr. Miller worked closely with individuals from FEI, personally observing FEI's performance.

---

[46] A copy of the FEMA Travel Trailer Inspections Field Inspector's Guide is attached as Ex. 3, FL-FCA06913-40.
[47] Ex. 3, FL-FCA-06940.
[48] Ex. 3, FL-FCA-06914-06920, 925, 926 (& 933 which specifically directs how to determine if the trailer is level).
[49] Decl. of Charles Whitaker, art. 18.
[50] See e.g., Ex. 4, Dubuclet trailer installation package, FEI 1-3, 20-45, 47a, 47-51. See FEMA's unit inspection rept. 90-13, FEI 40, 47a, 47 & FEMA's (RFO) QA/QC Check List, FEI 42-43; Decl. of Whitaker, art. 13.

He made visits to FEI's staging areas and sites where units were installed or in the process of installation.  He did not receive any complaints nor have any complaints concerning the performance of FEI's work.  He was satisfied with FEI's work under the Contract.[51]

David Garratt, Deputy Administrator of FEMA, testified it was an explicit FEMA directive to put the travel trailers on blocks.  If the contractor did not put the trailers on blocks, or failed to hook up the trailers to utilities, they would have violated their FEMA contract.[52]  The contractors had to deliver the trailers that FEMA designated and purchased and to do otherwise or to chose some other form of housing would have been a breach of the FEMA contract.[53]  There are no allegations by plaintiffs that FEI deviated from the scope of work that it was mandated to do by the Government.

The Inspection and Acceptance clause applied to all work performed under the contract, including Ex. 7 and the other exhibits to the PWS.[54]  This clause incorporated by reference 48 C.F.R. § 52.246-5,[55] which reserved to the Government "the right to inspect and test all services" and "[i]f any of the services performed do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, for no additional fee." § 52.246-5(c), (d).  If "defects in services cannot be corrected," or "[i]f the Contractor fails to properly perform the services again or take the action necessary ensure future performance in conformity with contract requirements, the Government may ... terminate the contract."  Id. at § 52.246-5(e).

---

[51]  The pertinent testimony from the deposition transcript of Stephen Miller is attached as Ex. 5, p. 200-202.
[52]  The pertinent portions of the deposition transcript testimony of Mr. Garratt are attached as Ex. 6, p. 218-221.
[53]  Garratt deposition, Ex. 6, p. 219-200.
[54]  The Contract, Ex. 1, FL-FCA-9, Section E; Decl. of Charles A. Whitaker, art. 7.
[55]  The Contract, Ex. 1, FL-FCA-9, Section E.

The clause also mandated "[f]inal inspection and acceptance shall be by the Contracting Officer or his ... representative ... ."[56] At the end of the project, <u>FEMA</u> evaluated and <u>formally accepted as complete all of FEI's work</u> performed pursuant to the Contract.[57]

**3**.     **The Government's Superior Knowledge Of Formaldehyde Claims Preceded FEI's Actual Knowledge Of Claims**

It is undisputed that the Government's knowledge about formaldehyde claims preceded and exceeded any actual knowledge FEI had of formaldehyde claims.  It is well documented that FEMA knew about formaldehyde concerns in EHUs <u>before</u> FEI ever had any actual knowledge of such concerns.  The court noted: "[i]t was (by FEMA's admission) as early as March 2006 that FEMA reportedly received the first reported concerns of formaldehyde fumes by a Gulf Coast trailer occupant."[58]  The court found while FEMA allegedly first became aware of formaldehyde in mid-March 2006, it perhaps had knowledge, "beginning in late 2005."[59]  Plaintiffs allege that FEMA became aware of the health concerns related to formaldehyde in their trailer, as early as October 2005.[60]   Moreover, the Government admits that as early as October 2005, Bechtel warned the Government of "a concern about material off-gassing (possibly formaldehyde) in newly delivered travel trailers."[61]  In response, OSHA began testing new, unoccupied EHUs for formaldehyde and determined that venting units for a short time reduced formaldehyde below the regulatory level of concern.[62]  This testing was disclosed to FEMA in the Mississippi Joint Field Office Situation Report S/TREP 41/FEMA-1604-DR-M5.[63]  Yet, the Government did <u>not</u> tell FEI about these tests.  The chronology of FEMA's knowledge about formaldehyde concerns in

---

[56]  The Contract, Ex. 1, FL-FCA-9, E.2 Inspection and Acceptance.
[57]  FEMA's Acceptance of Task Order Services, FL-FCA-19669-19670, att. as Ex. 7; Decl. of Whitaker, art. 19.
[58]  <u>See</u> Court's Order, Rec. Doc. 717, timeline of relevant facts/events, p. 27-36, <u>see</u> p. 28.
[59]  Court's Order, Rec. Doc. 717, p. 45; Rec. Doc. 2621, p.2.
[60]  Rec. Doc. 1064, par. 39-49.
[61]  <u>See</u> Gov't Motion, Rec. Doc. 1545-22; Ct's Order, Rec. Doc. 717, p. 28 n.13; Bechtel's Motion to Dismiss, p. 24.
[62]  Rec. Doc. 1545-4, p. 5, IV; Rec. Doc. 717, p.28 n.13; Decl. of Clyde Payne, Rec. Doc. 1545-10, par. 5-6, 3.
[63]  Decl. of Clyde Payne, Rec. Doc. 1545-10, par. 8-10.

EHUs and its discretionary response is set forth in the Government's motion.[64]  FEI first became aware of a potential issue concerning formaldehyde in the travel trailers in March 2006.[65]  It is undisputed that prior to March 2006, FEI had not received any complaints about formaldehyde concerns in travel trailers.[66]  There are no allegations or evidence that FEI had actual knowledge about formaldehyde concerns in travel trailers not known to the Government.  Plaintiff has made no allegation that FEI knew of any alleged formaldehyde concerns that were not know to the Government.

<u>ARGUMENT AND APPLICABLE LAW</u>

FEI is a Government contractor that performed its work in compliance with specifications provided and mandated by the Government, rendering it immune from suit and entitling it to summary judgment.  FEMA provided FEI with reasonably precise specifications for installation of the trailers.  Ex. 7 to the IA/TAC specifically directed FEI to install the trailers on six piers constructed in a precise fashion.  Additionally, the Government issued a mandatory technical directive to FEI that all trailers shall be blocked in accordance with FEMA's blocking specification *and* the Government's "Typical Travel Trailer Pier Construction" diagram.  FEMA exercised its discretion and specifically chose the installation design for the trailers. There are no allegations and no evidence that FEI deviated from the Government's specifications.  It is undisputed that the Government inspected FEI's final trailer installations to ensure compliance with Ex. 7, and that FEI's work under the contract was accepted and finally approved by FEMA.  Finally, there is no evidence that FEI had actual knowledge about formaldehyde dangers in travel trailers not known to the Government during the relevant time period.

---

[64]  <u>See</u> Rec. Doc. 1545 <u>passim</u>.
[65]  Depo. of Robert Duckworth, FEI's Senior Site Safety Manager, attached as Ex. 8, p. 78 L. 3-25, p. 79, L. 1-6.
[66]  Ex. 8, deposition of Robert Duckworth, p. 78-79.

Plaintiffs' allegations are really against the Government for its policy decision on the trailer installation specifications.  However, plaintiffs know that because the Government was within its discretionary function, it is entitled to sovereign immunity.  Instead, plaintiffs sued FEI trying arduously to shift any responsibilities of the Government to FEI, a private contractor. However, the purpose of the government contractor defense is to give FEI, a government contractor, the same immunity afforded the Sovereign.  The undisputed evidence compels the conclusion that FEI meets the three prerequisites of Boyle, as interpreted by the Fifth Circuit, entitling FEI to that immunity and summary judgment as a matter of law.

## A.      Summary Judgments Are Favored

Courts routinely grant summary judgment and hold federal contractors immune from liability under state law based on the government contractor defense.  See e.g., Hudgens v. Bell Helicopters, 328 F.3d 1329, 1344-45 (11th Cir. 2003); Kerstetter v. Pac. Sci. Co., 210 F.3d 431, 437-39 (5th Cir. 2000); In re Air Disaster at Ramstein Airbase, Germany, 81 F.3d 570, 574-76 (5th Cir. 1996); Stout v. Borg-Warner Corp., 933 F.2d 331, 334-37 (5th Cir. 1991), cert denied, 502 U.S. 981 (1991); In re Katrina Canal Breaches, No. 05-4182, 2008 WL 5234369 at *20 (**E.D. La** 2008) (remediation contractor immune from state tort claim based on gov't. contractor defense); In Re Katrina, 2007 WL 763742 at *6 (granting dredging contractors' motion based on gov't. contractor defense).

## B.      The Government Contractor Defense Bars Plaintiffs' Claims Against FEI

The Supreme Court has long recognized that private contractors who perform work at the direction of the federal government cannot be held liable for damages caused by the contractors' implementation of that work.[67] This derivative sovereign immunity was first recognized in Yearsley v. W.A. Ross Constr., 309 U.S. 18 (1940), and reaffirmed by the Court in Boyle, 47

---

[67]   See Yearsley v. W. A. Ross Const., 309 U.S. 18 (1940); Boyle v. United Tech. Corp., 487 U.S. 500 (1988).

U.S. at 500.  "The defense is intended to implement and protect the discretionary function exception of the FTCA, 28 U.S.C. § 2680(a)."  In re Hanford Nuclear Reservation Litigation, 534 F.3d 986, 999 (9th Cir. 2008).  "The defense allows a contractor–defendant to receive the benefits of sovereign immunity when a contractor complies with the specifications of a federal government contract."  Id. (quoting Boyle, 487 U.S. at 511-12).  Sovereign immunity generally bars claims directly against the U.S. challenging discretionary decisions.[68]  The government contractor defense protects that immunity by preventing parties who cannot sue the U.S. *directly* for its discretionary decisions, from suing the U.S. *indirectly* by suing private contractors tasked with implementing such decisions.  See, e.g., Boyle, 487 U.S. at 512; Yearsley, 309 U.S. at 2021. As the Court explained:

> [P]ermitting second-guessing of the [government's] judgments ... through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption.  The financial burden of judgment against the contractors would ultimately be passed through, substantially if not totally, to the United States itself ...  it makes little sense to insulate the government against financial liability for the judgment that a particular feature of military equipment is necessary when the government produces the equipment itself, but not when it contracts for the production ... .

Boyle, 487 U.S. 511-12.  "The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the government, or it will raise its price."  Id. at 507.[69]  The defense protects more than just the public fisc; it also protects the government's discretionary decision making.  Snell v. Bell Helicopter Textron, 107 F.3d 744, 746 (9th Cir. 1997).

Although Congress generally waived sovereign immunity for tort claims against the U.S. under the FTCA, it specifically exempted claims based upon the exercise or failure to exercise a

---

[68]  See, e.g., 28 U.S.C. § 2680(a).

[69]  Regardless of whether the U.S. is legally obligated to indemnify the contractor, the U.S. ultimately pays the price. See, e.g., Nielsen v. George Diamond, 892 F.2d 1450-52 (9th Cir. 1990); McKay v. Rockwell Int'l. Corp., 704 F.2d 444, 449 (9th Cir. 1983).

governmental discretionary function.  28 U.S.C. §2680(a)(discretionary function exception).  Thus, "if the federal government could not be sued for performing discretionary acts, neither could a private contractor, and any state law providing for such liability would necessarily give rise to an inherent conflict." In re World Trade Ctr. Disaster Site Lit., 456 F.Supp.2d 520, 561 (S.D.N.Y. 2006) (citing Boyle, 487 U.S. at 500).

Boyle established a 3-part test, specific to procurement contracts, to determine when the defense applies.  487 U.S. at 512.  To prevent state laws from frustrating these important federal interests, federal common law now dictates that a private contractor cannot be liable under state law where: (1) the federal government approves reasonably precise specifications, (2) the contractor's work conforms to those specifications, and (3) the contractor is not aware of reasons not known to the government why the work product required by the specifications is unsafe or unreasonable.  See Kerstetter, 210 F.3d at 435; Boyle, 47 U.S. at 512; In re Katrina Canal Breaches, 2000 W.L. 4219351 at *5 (E.D. La. 11/27/07).  "Displacement of state law occurs under Boyle so long as the three-prong test of that case is met; the three-prong test is itself the definition of when a significant conflict exists between state and federal law." Hill v. Raytheon Aircraft, 470 F. Supp.2d 1214, 1223 (D. Kan. 2006)(citing Boyle, 487 U.S. at 501; Lewis v. Babcock, 985 F.2d 83,86 (2d Cir. 1993));[70] see also In re Katrina Canal Breaches, No. 05-4182, Doc. 67, p. 29-30 (E.D. La. 12/15/08).

If the contractor satisfies the government contractor defenses' 3 conditions, the nature of the contractor's work (military, non-military, service or procurement) is irrelevant.  The defense applies to service and maintenance contracts like FEI's contract with the Government.[71]  Indeed,

---

[70]  Cert. denied, 509 U.S. 924 (1993).
[71]  See e.g., In re World Trade Ctr. Litig., 521 F.3d 169, 197 (2d Cir. 2008)(gov't contractor defense applies to contractors providing disaster relief & clean-up services); Hudgens, 328 F.3d at 1334 (maintenance-service contractor may assert defense); In re Katrina Canal Breaches Consol. Litig., No. 05-4182, 2007 WL 763742, at *4

where the government has directed a contractor to do the very same thing that is the subject of the claim, the contractor may assert the defense.  Correctional Services Corp. v. Malesko, 534 U.S. 61, 74 n.6 (2001)(citing Boyle, 487 U.S. at 500).

It is not a prerequisite for application of the defense that it must be proven that the government is entitled to discretionary function immunity (or exercised its discretion in accepting a safety risk) for the particular task.  In re Katrina Canal Breaches, No. 05-4182, Doc. 67, p.28-29 (E.D. La. 12/15/08).  Judge Duval rejected the plaintiffs' assertion of such a prerequisite, stressing that this identical argument was rejected in Lewis v. Babcock Indus., 985 F.2d 83, 87 (2d Cir. 1993).[72]  Here, this court *has ruled* that the discretionary function exception bars plaintiffs' FTCA claims challenging FEMA's decision to contractually delegate the responsibility for hauling, installing and maintaining EHUs to IA/TACs.[73] This court found plaintiffs' claim that the government was involved in making contractual arrangements for the contractors to follow in the field, regarding the delivery and set-up of the EHUs, was a discretionary function.  FEI should be extended the same immunity based on its (or its subcontractor's) installation of plaintiff's trailer pursuant to the government's precise specifications.

1.  **FEI Meets The Three Conditions For Dismissal Under The Government Contractor Defense**

   a.  **The Government provided reasonably precise specifications for FEI's work**

---

(E.D. La. 3/9/07)(granting dredging service contractor's motion on gov't contractor defense); Richland-Lexington Airport v. Atlas Prop., 854 F.Supp. 400, 421-24 (D.S.C. 1994)(remediation contractor working for EPA immune under defense); Askir v. Brown & Root, 1997 WL 598587 at *2, 5-7 (S.D.N.Y. 1997)(contractor that provided "logistical, operational, maintenance, and construction services" to the U.S. immune from liability under defense).
[72] In re Katrina Canal Breaches, Doc. 67, Ct's Order granting WGI's MSJ on the gov't contractor defense, p. 28-30.
[73]  October 3, 2008 Order, Rec. Doc. 717, p. 43-44.

The requirement that the government approve reasonably precise specifications was created to "assure that the design feature in question was considered by a government officer and not merely by the contractor itself."  Boyle, 487 U.S. at 512.  Thus, the government need not prepare the specifications to be considered to have approved them as long as the government provides a substantive review or an evaluation of the contractor's plans, and is not merely a bureaucratic rubber stamp.  Kerstetter, 210 F.2d at 435; Trevino v. Gen. Dynamics, 865 F.2d 1474, 1480 (5th Cir. 1989).  Evidence of continuous back and forth between the contractor and the government, where the contractor and government worked closely together on the development of a project from its planning stages through its production is sufficient.  In re Air Disaster at Remstein Airbase, Germany, 81 F 3d. 570, 575 (5th Cir. 1996).  The specifications need not address the specific defect alleged; the government need only evaluate the design feature in question. Kerstetter, 865 F.2d at 1479-1481.[74]  The design feature in question here is the Government's own blocking specifications.

Further, "[t]he contractor defense requires only that the government approve reasonably precise specifications."  Smith v. Xerox Corp., 866 So.2d 135, 138 (5th Cir. 1989).  Though it is necessary only that the government approve, rather than create the specifications, FEMA created and provided the specifications for trailer installation.  This clearly satisfies the first condition of the defense.  See Miller v. Diamond Shamrock Co., 275 F.3d 414, 420 (5th Cir. 2001).  In addition to FEMA's precise requirements for blocking and leveling the trailers, FEMA issued mandatory directives to FEI on how to block the trailers, including a detailed diagram drafted by a U.S. Army Corps Engineer.[75]

---

[74]  Citing Boyle, 487 U.S. at 512; Trevino, 865 F.2d at 1486 ("The government contractor defense ... protects government contractors from liability for defective designs if discretion over the feature in question was exercised by the government").

[75]  Ex. 2, FL-FCA 9521; Decl. of Charles Whitaker, art. 18.

Even assuming arguendo that FEMA's blocking specifications gave FEI any discretion as to how to get the trailer off the ground and onto the piers, FEI is insulated from liability by the government contractor defense.  **Boyle does not require that the government issue standards which remove all compliance discretion from the contractor.**  Carley v. Wheeled Coach, 991 F.2d 1117, 1125 (3d Cir. 1993); Hill v. Raytheon Aircraft Co., 470 F.Supp. 2d 1214, 1224 (D. Kan. 2006); see also Smith v. Xerox Corp., 866 F.2d 135, 138 (5th Cir. 1989)(government contractor defense requires only that the government approve reasonably precise specifications). In Carley, the court instructed that:

> [T]he government need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply.

To meet the first condition of Boyle, "a contractor need only show governmental approval of **the overall design** of an allegedly defective product."  Lambert v. B.P. Prods. N. Am., Inc., 2006 U.S. Dist. Lexis 16756 (S.D. Ill. 2006)(quoting Stout, 933 F.2d at 331)(emph. added)). "The plaintiffs in Stout had argued that specifications for an air conditioning unit were not reasonably precise because they did not specifically prohibit the contractor from installing a safety device.  The Fifth Circuit found that the government's thorough review of the overall specifications constituted appropriate approval of reasonably precise specifications."  Lambert, 2006 U.S. Dist. Lexis 16756 (citing Stout, 933 F.2d at 336).  Thus, to the extent that FEI had any discretion in determining how to raise the trailers onto the blocks, it is nevertheless entitled to the government contractor defense.  Plaintiffs cannot raise a genuine issue of fact to dispute FEI's satisfaction of condition one of the government contractor defense for any feature of work plaintiffs challenge.[76]

### b.  FEI's work conformed to FEMA's specifications

---

[76] See Infra, p. 22.

FEI faithfully followed FEMA's plans and specifications in performing its work.  The government's issuance of a formal report indicating acceptance of the product and/or conformity with all required specifications is compelling evidence that the contractor's work met the government's requirements.  Miller, 275 F.3d at 414.  This condition also may be satisfied by showing that the government supervised and controlled the contractor's implementation of approved specifications, or that the government inspected, accepted as complete or used the contractor's work.  In re Katrina Canal Breaches, 2000 WL 4219351, at *5 (E.D. La. 11/27/07); Kerstetter, 210 F.3d at 435-36 ("the Army's experience with the 540 rotor system – and its decision to continue using it – amply established government approval of the alleged design defect").  Tate v. Boeing Helicopters, 55 F.3d 1150, 1156 (6th Cir. 1995)(second condition satisfied by proof that gov't "inspected and approved" contractor's work).  Moreover, where there is a continuous exchange between the contractor and the government, the process itself becomes persuasive evidence of product conformity to precise specifications.  Kleemann v. McDonnell Douglas Corp., 890 F.2d 698, 701-02 (4th Cir. 1989).  In all events, absence actual evidence to the contrary, the government's written acceptance of its contractor's work constitutes compelling evidence that the contractor's work conformed to the government's approved specifications.  See, e.g., Miller, 275 F.3d at 420.

Plaintiff's cannot negate a contractor's showing of conformance with reasonably precise specifications merely by asserting that defendant's work did not comply with some "general admonition against an unwanted condition.'"  Kleemann, 890 F.2d at 703 (quoting Harduvel v. General Dynamics, 878 F.2d 1311, 1319 n.3 (11 Cir. 1989)(precatory contract terms "represent little more than the hopes of the participants that the project on which they are about to embark will turn out well"); In re Air Disaster, 81 F.3d at 575 (holding overly general contract language

"'calling for such vaguaries as a failsafe, simple or inexpensive'" work have no role in the government contractor defense analysis))(quoting Kleemann, 890 F.2d at 703).

Instead, plaintiffs must show an allegedly defective feature – which caused plaintiffs' damages – "result[ed] from" the contractor's departure from reasonably precise specifications. See Kerstetter, 210 F.3d at 435-36; see also Beaver Valley Power Co. v. Nat'l. Eng'g., 883 F.2d 1210, 1219 n.9 (3d Cir. 1989)(partially aff'g summary judgment because plaintiff never showed how the contractor's alleged non-conformance with a contractual permitting requirement "caused its damages").

FEI's work conformed to the specifications required by FEMA. It is undisputed that the government inspected FEI's final trailer installations to ensure compliance with Ex. 7 of the IA/TAC. FEI's work pursuant to the Contract, including installation of the trailers, conformed to FEMA's specifications because FEMA supervised, inspected, used and expressly accepted FEI's work.[77] During the QA inspections, the inspectors actively ensured adherence to FEMA's specifications and would have noted any deficiencies to be corrected.[78] FEMA's inspections clearly show that FEMA exercised "supervisory judgment" over the "particularities" of the work. In re Katrina, 2007 WL 24219351 at *5; see also In re Air Disaster, 81 F.3d at 575 (holding 'inspectors ... actively involved' showed conformance).

Throughout the project, FEMA found no non-compliance by FEI. FEMA evaluated and accepted FEI's work. See Kerstetter, 210 F.3d at 435-36 (holding acceptance showed conformance); In re Air Disaster, 81 F.3d at 575 (same). The record shows that in the end FEMA formally accepted as complete all of FEI's work.[79] Because FEMA made that express determination, FEI's work necessarily conformed with FEMA's specifications. See Miller, 275

---

[77] See In re Air Disaster, 81 F.3d at 575.
[78] Decl. of Charles Whitaker, art. 14-17.
[79] See Exhibit 7, FEMA's Acceptance of Task Order Services, FL-FCA 19669-19670.

F.3d at 420 (collecting cases).[80]  There is no testimony or evidence which can possibly contest that FEI's work was accepted by FEMA.  The work would not be accepted by FEMA unless the work was in accordance with the contract and FEMA's specifications.

Plaintiff's primary complaint against FEI is that FEI installed the trailers by "blocking" the unit – raising the unit several feet into the air and off of its wheel base and setting it on concrete blocks, allegedly creating distortion in the trailers' shell, allowing increased moisture intrusion which contributed to increased formaldehyde exposures.[81]  But that is exactly what FEMA directed FEI to do – install the trailers by "blocking" them, immunizing FEI from liability under the government contractor defense against this allegation.  Indeed, a more recent Supreme Court case, Correctional Services Corp. v. Malesko, 534 U.S. 61 523 n.6 (2001)(citing Boyle) supports broad application of Boyle and the government contractor defense: "[w]here the government has directed a contractor to do the very thing that is the subject of the claim, we have recognized this as a special circumstance where the contractor may assert a defense."

The Plaintiffs' attempt to separate out of the entire blocking process one discreet function, myopically fixating on how FEI raised the trailers from the ground onto the piers, does not defeat application of the government contractor defense to FEI's work.  That FEMA did not explicitly tell FEI how to get the trailer from the ground on two axles and a tongue jack up onto the piers is irrelevant for application of the government contractor defense.  As stated by the Fifth Circuit in Bailey v. McDonnell Douglas Corp., 989 F.2d 784 (5th Cir. 1993), the alleged defect must exist independently of the design itself, and must be from a deviation from the required government specifications.  Even under plaintiff's argument, there is no testimony or evidence that suggests that FEI deviated from a required "design" specification.  Under the government contractor

---

[80] See also Kerstetter, 210 F.3d at 435-36; In re Air Disaster, 81 F.3d at 575.
[81] Rec. Doc. 1064, pars. 23-25.

defense, the issue is not whether the contractor did everything he could to prevent the damage complained – it is whether the contractor complied with the government's specifications.  Any arguments plaintiff may make that FEI could have lifted up the trailers differently onto blocks would be the same arguments the plaintiffs made in <u>Kerstetter</u>, where the Fifth Circuit rejected that argument.  The standard, as stated in <u>Kerstetter</u>, is whether the government approved a specification which did not contain a safer design.  In this case, FEMA drafted and provided the specifications to FEI dictating how to install the trailers, including blocking, and reinforced those specifications with precise directives issued to FEI.  To establish that FEI has not met the second prong of <u>Boyle</u>, plaintiffs must identify a "specification" that FEI deviated from in installing the trailers.  Plaintiffs have not and they cannot.  There is no allegation that FEI deviated from the scope of work that it was mandated to do by the government.  Further, during the project, there was continuous back and forth between FEMA and FEI regarding the trailer installation process, including FEMA's directives on "blocking" the trailers.

Accordingly, the court should find that FEI satisfies the second condition of the government contractor defense for all of the installation features of FEI's work.

### c.  FEI had no actual knowledge not otherwise known to the Government about alleged formaldehyde problems

There were no dangers known to FEI of which the Government was not aware.  FEI had no actual knowledge not otherwise known to the Government about how FEMA's plans and specifications might lead to claims of formaldehyde exposure in the travel trailers.

A federal contractor satisfies the government contractor defenses' third condition by proving that it knew of no "reasons not known to the Government why the application" of the approved plans and specifications were "unsafe or unreasonable."  <u>In re Katrina</u>, 2007 WL 4219351, at *5; <u>see also</u> <u>Kerstetter</u>, 210 F.3d at 436; <u>In re Air Disaster</u>, 81 F.3d at 575-76.

Significantly, the contractor has no duty to test for or discover inherent risks that neither the government nor its contractor ever considered to be unsafe.  The purpose of this element is not to create any incentive to discover latent defects in a product designed for the government.  See Kerstetter, 210 F.3d at 436 (citing Boyle, 487 U.S. at 512, 513).  "The government contractor defense does not require a contractor to warn the government of defects about which it only should have known."  Id.; Miller, 275 F.3d at 422.  Rather, "a government contractor is only responsible for warning the government of dangers about which it has actual knowledge,"[82] and not about dangers which, in hindsight, the contractor allegedly *should have* identified.  Trevino, 865 F.2d at 1487 (emph. added).  This third condition tests only whether the contractor knew of dangers not known to the government.  The Kerstetter court relied on the Boyle court's holding that "it does not seem to us sound policy to penalize, and thus deter, active contractor participation in the design process, placing the contractor at risk unless it identifies all design defects."  Kerstetter, 210 F.3d at 436 (quoting Boyle, 487 U.S. at 513).  Both the district court and the Fifth Circuit interpreted this language as "mean[ing] only that the defense applies even when the contractor did not warn the government of latent defects – in other words, defects that neither the contractor nor the government considered at all."  Kerstetter, 210 F.3d at 436.

The third condition tests only whether the contractor knew of dangers "not known to the government."  In re Katrina, 2007 WL 4219351, at *5.  Thus, FEI also may satisfy this third condition by showing the government's knowledge of potential risk either equaled or exceeded FEI's knowledge.  See e.g., Miller, 275 F.3d at 422-23 (aff'g summary judgment partly because the U.S. knew of the dangers by a bi-product of Agent Orange); Kerstetter, 210 F.3d at 438 n.9, (aff'g summary judgment partly because the U.S. "knew at least as much as the contractors"); In re Air Disaster, 81 F.3d at 575 (aff'g summary judgment partly because the U.S. knew of the

---

[82] Kerstetter, 210 F.3d at 436 (citing Trevino, 865 F.2d at 1487).

alleged risks); <u>Stout</u>, 933 F.2d at 336-37 (aff'g summary judgment partly because the U.S.' verbal and written warnings to plaintiff showed the U.S. knew of the risks).

Plaintiff did not allege, and there is no evidence that FEI knew of any danger regarding potential formaldehyde claims that was not known to the Government.  In fact, FEMA admits that it had prior and superior knowledge about formaldehyde claims.  The test is <u>not</u> should FEI have known of the formaldehyde problem allegedly created by implementation of FEMA's mandatory specifications for trailer installation.  **FEI is only responsible for warning the Government of dangers about which it had actual knowledge.**  Simply put, there is absolutely no evidence which would demonstrate such knowledge.  FEMA in fact did know infinitely more than FEI about alleged formaldehyde complaints beginning in October 2005.   FEMA's knowledge about any potential risks to trailer inhabitants associated with FEI's trailer installations, pursuant to FEMA's directives, clearly exceeded that of FEI's knowledge.  The undisputed evidence shows that FEI has met the third and final condition of the government contractor defense, and its motion for summary judgment should be granted, dismissing the plaintiffs' claims against FEI.

BY: _____ */s/Sarah A. Lowman*_____
Sarah A. Lowman, La. Bar 18311
Charles R. Penot, Jr. La. Bar 1530
201 St. Charles Ave., Ste. 3100
New Orleans, La.70170; (504)525-7200

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 9, 2009, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sends notice of electronic filing to all counsel of record, including court-appointed liaison counsel, who are CM/ECF participants.

*/s/Sarah A. Lowman*_____
SARAH A. LOWMAN

ND: 4833-8529-4085, v. 1