Exhibit D

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
 2                    NEW ORLEANS DIVISION
 3   IN RE:  FEMA TRAILER        )   MDL NO. 1783
     FORMALDEHYDE PRODUCTS       )
 4   LIABILITY LITIGATION        )
                                 )   SECTION N(5)
 5   This Document Relates to:   )
     Charlie Age, et al. v. Gulf )
 6   Stream Coach, Inc., et al., )   JUDGE:  ENGELHARDT
     Docket No. 09-2892          )   MAG:    CHASEZ
 7
 8
 9       *****************************************
10            ORAL AND VIDEOTAPED DEPOSITION OF
11                   PAUL HEWETT, PH.D.
12                      JULY 10, 2009
13       *****************************************
14
15
16   ORAL AND VIDEOTAPED DEPOSITION of PAUL HEWETT, PH.D.,
     produced as a witness at the instance of the Defendant,
17   and duly sworn, was taken in the above-styled and
     numbered cause on the 10th of July, 2009, from 9:39 a.m.
18   to 5:44 p.m., before Wendi Broberg, CSR in and for the
     State of Texas, reported by machine shorthand, at the
19   Law Offices of Reich & Binstock, L.L.P., 4265
     San Felipe, Suite 1000, Houston, Texas 77027, pursuant
20   to the Federal Rules of Civil Procedure.
21
22
23
24
25
```

1   come from Mary DeVany?

2        A    I don't recall speaking with Mary that week

3   other than Sunday where she asked me to look at a

4   decline and try to quantify or estimate the rate of

5   decline.  That had to come from the conversation with

6   Linda Nelson and Mikal Watts.

7        Q    Does your report in any way attempt to express

8   an expert opinion on a quantification of the rate of

9   decline that you've just described?

10       A    Not that I'm aware -- I don't recall.  What I

11  did opine on or conclude is that it's highly likely that

12  exposures earlier in the life of a trailer were higher

13  than exposures later in the life of a trailer.  It's a

14  common-sense notion, but it seems -- it -- it fell out

15  of the data analysis as well.

16       Q    You've actually referred to common sense a

17  couple of times in your report, and I was going to ask

18  you about that.  When you say referring to this specific

19  analysis that we're addressing at this moment it's a

20  common sense analysis or conclusion, what do you mean by

21  that?

22       A    Well, I think anybody that's bought a new

23  product, an automobile, for example -- and I use that, I

24  think, as an example in the report -- notice the decline

25  in new car smell, the new car smell being a product of

```
 1   the emissions from all the new materials in a car.  But
 2   that declines over time.  Anybody that's bought a new
 3   home that is freshly painted and so the faint paint
 4   smell, fresh paint smell that you have in a new home
 5   declines over time.  It's a common-sense notion.
 6        Q    And would someone who's impaneled as a juror in
 7   this case be qualified to make that conclusion?
 8             MR. REICH:  Objection.  Form.
 9        A    I cannot say since I don't know who's going to
10   be impaneled.
11        Q    (By Mr. Percy)  But that's what I'm --
12        A    And even if I did, I don't know how much common
13   sense they have individually or collectively.
14        Q    The average man on the street who has common
15   sense, would he be able to come to that same conclusion
16   in your estimation?
17             MR. REICH:  Objection.  Argumentative.
18   Speculative.
19        A    Are you suggesting I extrapolate from the
20   general to the specific?
21        Q    (By Mr. Percy)  What I'm trying to do is when
22   you use common sense -- and you've actually used it a
23   couple of times in your report -- are you expressing an
24   expert opinion or are you suggesting that anyone with
25   common sense would reach the same conclusion?  That's
```

1    what I'm trying to find out.
2         A    I think anyone with common sense would reach
3    the same conclusion.
4         Q    They don't need your expertise.  Would that be
5    fair?
6         A    I would say that, yeah.
7         Q    Okay.
8                   THE VIDEOGRAPHER:  Four minutes.
9                   MR. PERCY:  This is probably --
10                  MR. REICH:  Do you want to take a break?
11                  MR. PERCY:  Yeah, this is probably --
12                  MR. REICH:  Yeah, let's take a break.
13                  MR. PERCY:  -- a good time.  Thank you.
14                  THE VIDEOGRAPHER:  Off the record at
15   10:58, end of Tape 1.
16                  (Recess from 10:58 a.m. to 11:16 a.m.)
17                  THE VIDEOGRAPHER:  We're on the record at
18   11:16, beginning of Tape 2.
19        Q    (By Mr. Percy)  Dr. Hewett, the break was
20   helpful in that now that I've gone through those first
21   items I've eliminated a whole bunch of them afterwards
22   because I think you've answered about those.  But let me
23   try to speed this up for the remainder because I think
24   I've gotten the bulk of what I need to on the documents
25   that you're producing here today.