```
 1              UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF LOUISIANA

 3    ----------------------------X

 4    IN RE: FEMA TRAILER          :  MDL NO. 1873

 5    FORMALDEHYDE PRODUCTS        :  SECTION "N"

 6    LIABILITY LITIGATION.        :  JUDGE ENGELHARDT

 7                                 :  MAGISTRATE CHASEZ

 8                                 :

 9    ----------------------------X

10                         Washington, D.C.

11                         Friday, October 16, 2009

12             Deposition of BELLANCE "FAYE" GREEN, a

13    witness herein, called for examination by counsel for

14    Plaintiffs in the above-entitled matter, pursuant to

15    notice, the witness being duly sworn by ANDREA P.

16    HUSTON, a Notary Public in and for the District of

17    Columbia, taken at the offices of Nelson Mullins

18    Riley & Scarborough LLP, 101 Constitution Avenue,

19    N.W., Washington, D.C., at 9:00 a.m., Friday, October

20    16, 2009, and the proceedings being taken down by

21    stenotype by ANDREA P. HUSTON, RPR, CRR, and

22    transcribed under her direction.
```

EXHIBIT
1

Bellance "Faye" Green                                                      October 16, 2009
                                 Washington, DC

|                                                           |                                                            |
| Page  2                                                   | Page  4                                                    |
| 1   APPEARANCES:                                          | 1   APPEARANCES (Continued):                               |
| 2                                                         | 2                                                          |
| 3       On behalf of the Plaintiffs:                      | 3       APPEARANCES BY TELEPHONE (Continued):              |
| 4           JUSTIN I. WOODS, ESQ.                         | 4                                                          |
| 5           Gainsburgh Benjamin David Meunier &           | 5       On behalf of Defendant Keystone RV                 |
| 6           Warshauer LLC                                 | 6       Company, et al:                                    |
| 7           2800 Energy Centre                            | 7           RYAN JOHNSON, ESQ.                             |
| 8           1100 Poydras                                  | 8           Jones Walker                                   |
| 9           New Orleans, LA  70163-2800                   | 9           Four United Plaza                              |
| 10          Tel:  (504) 522-2304                          | 10          8555 United Plaza Boulevard                    |
| 11                                                        | 11          Baton Rouge, LA  70809                         |
| 12      On behalf of the United States:                   | 12          Tel: (225) 248-2080                            |
| 13          JONATHAN R. WALDRON, Trial Attorney           | 13          rjohnson@joneswalker.com                       |
| 14          Environmental Torts Section                   | 14                                                         |
| 15          ADAM BAIN, Senior Trial Counsel               | 15      On behalf of Defendant Liberty Mutual Insurance    |
| 16          1331 Pennsylvania Avenue, N.W., Rm 8214N      | 16      Corporation:                                       |
| 17          National Place Building                       | 17          KRISTOPHER M. REDMANN, Esq.                    |
| 18          Washington, DC 20004                          | 18          Lugenbuhl Wheaton Peck Rankin & Hubbard        |
| 19          TEL: (202) 307-2091                           | 19          601 Poydras Street, Suite 2775                 |
| 20          jonathan.waldron@usdoj.gov                    | 20          New Orleans, LA  70130                         |
| 21                                                        | 21          Tel: (504) 568-1990                            |
| 22                                                        | 22          kredmann@lawla.com                             |

|                                                           |                                                            |
| Page  3                                                   | Page  5                                                    |
| 1   APPEARANCES (Continued):                              | 1   APPEARANCES (Continued):                               |
| 2                                                         | 2                                                          |
| 3       On behalf of Defendant Heartland Recreational     | 3       APPEARANCES BY TELEPHONE (Continued):              |
| 4       Vehicles:                                         | 4                                                          |
| 5           BRENT M. MAGGIO, ESQ.                         | 5       On behalf of Defendant Bechtel National Inc.:      |
| 6           Allen & Gooch                                 | 6           PETER R. TAFARO, ESQ.                          |
| 7           3900 N. Causeway Boulevard                    | 7           Frilot LLC                                     |
| 8           Suite 1450                                    | 8           1100 Poydras Street, Suite 3700                |
| 9           Metairie, LA 70002                            | 9           New Orleans, LA  70163-3700                    |
| 10          Tel: (504)836-5200                            | 10          Tel: (504) 599-8060                            |
| 11                                                        | 11          ptafaro@frilot.com                             |
| 12      APPEARANCES BY TELEPHONE:                         | 12                                                         |
| 13                                                        | 13      On behalf of Defendant Manufacturers               |
| 14      On behalf of Defendant Fluor Enterprises:         | 14      Through Defense Liasion Counsel:                    |
| 15          LEZLY L. PETROVICH, ESQ.                      | 15          BEN DiPALMA, ESQ.                              |
| 16          Middleberg Riddle & Gianna                    | 16          Duplass Zwain Bourgeois Pfister & Weinstock    |
| 17          201 St. Charles Avenue, Suite 3100            | 17          3838 North Causeway Boulevard                  |
| 18          New Orleans, LA 70170-3100                    | 18          Three Lakeway Center, Ste 2900                 |
| 19          Tel: (504) 207-7350                           | 19          Metairie, LA  70002                            |
| 20                                                        | 20          Tel: (504)832-3700                             |
| 21                                                        | 21          bdipalma@duplass.com                           |
| 22                                                        | 22                                                         |

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                                October 16, 2009
Washington, DC

|  | Page 6 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | APPEARANCES BY TELEPHONE (Continued): |
| 4 | |
| 5 | On behalf of Manufacturing Homes |
| 6 | Defendants Liason Counsel: |
| 7 | KATI COX WEAVER |
| 8 | Fowler Rodriguez Valdes-Fauli |
| 9 | 400 Poydras Street |
| 10 | 30th Floor |
| 11 | New Orleans, LA  70130 |
| 12 | Tel: (504) 595-5190 |
| 13 | kcox@frfv-law.com |
| 14 | |
| 15 | On behalf of Fleetwood Enterprises, Inc.: |
| 16 | AMANDA N. SHELTON, ESQ. |
| 17 | Nelson Mullins Riley & Scarborough LLP |
| 18 | Atlantic Station |
| 19 | 201 17th Street NW, Suite 1700 |
| 20 | Atlanta, GA  30363 |
| 21 | Tel: 404-322-6233 |
| 22 | |

|  | Page 7 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | APPEARANCES BY TELEPHONE (Continued): |
| 4 | |
| 5 | On behalf of Defendant Recreation by Design, |
| 6 | LLC, TL Industries, Inc., Frontier RV, Inc., |
| 7 | Play'Mor Trailers, Inc., Cruiser RV, LLC: |
| 8 | RANDY C. MULCAHY, ESQ. |
| 9 | Garrison Yount Forte & Mulcahy LLC |
| 10 | 909 Poydras Street, Suite 1800 |
| 11 | New Orleans, LA  70112 |
| 12 | Tel: (504) 527-0680 |
| 13 | |
| 14 | On behalf of Defendants Jayco, Inc., and |
| 15 | Starcraft RV, Inc.: |
| 16 | THOMAS L. COUGILL, ESQ. |
| 17 | Willingham Fultz & Cougill LLP |
| 18 | Niels Esperson Building |
| 19 | 808 Travis, Suite 1608 |
| 20 | Houston, TX  77002 |
| 21 | Tel: 713-333-7600 |
| 22 | TomC@willingham-law.com |

|  | Page 8 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | APPEARANCES BY TELEPHONE (Continued): |
| 4 | |
| 5 | On behalf of Defendant Shaw Environmental, Inc., |
| 6 | and CH2M HILL Constructors, Inc.: |
| 7 | KAREN K. WHITFIELD, ESQ. |
| 8 | Baker Donelson Bearman Caldwell & |
| 9 | Berkowitz, PC |
| 10 | 201 St. Charles Avenue, Suite 3600 |
| 11 | New Orleans, LA  70170 |
| 12 | Tel: (504) 566-5216 |
| 13 | kwhitfield@bakerdonelson.com |
| 14 | |
| 15 | On behalf of Defendant Forest River, Inc.: |
| 16 | CARSON STRICKLAND, ESQ. |
| 17 | Geiger Laborde & Laperouse LLC |
| 18 | One Shell Square, Suite 4800 |
| 19 | 701 Poydras Street |
| 20 | New Orleans, LA  70139 |
| 21 | Tel:  (504)654-1324 |
| 22 | cstrickland@glllaw.com |

|  | Page 9 |
|---|---|
| 1 | CONTENTS |
| 2 | WITNESS        EXAMINATION BY COUNSEL FOR |
| 3 | BELLANCE "FAYE" GREEN  PLAINTIFFS STEERING COMMITTEE |
| | By Mr. Woods        10, 141 |
| 4 | |
| 5 | THE UNITED STATES |
| 6 | By Mr. Waldron        75, 145 |
| 7 | |
| 8 | EXHIBITS |
| 9 | GREEN EXHIBIT NO.            PAGE NO. |
| 10 | No. 1 - Notice of deposition        57 |
| 11 | No. 2 - Declaration            74 |
| 12 | No. 3 - Application/Registration for |
| 13 | Disaster Assistance of Bobbie Wright 84 |
| 14 | No. 4 - document FEMA 124-000002-000035    89 |
| 15 | No. 5 - document FEMA 124-000036-000054    90 |
| 16 | No. 6 - FEMA 124-000055-000065        91 |
| 17 | No. 7 - FEMA 124-000066-000070        91 |
| 18 | No. 8 - FEMA 124-000071-000073        92 |
| 19 | No. 9 - List of Plaintiffs names, 109 pages 102 |
| 20 | No. 10 - Privacy Act Release of Lyndon Wright 112 |
| 21 | END OF EXHIBITS |
| 22 | |

3 (Pages 6 to 9)

Bellance "Faye" Green                                          October 16, 2009
Washington, DC

---

**Page 10**

1         P R O C E E D I N G S
2    Whereupon,
3              BELLANCE "FAYE" GREEN,
4    residing at 132 Farm Road Aberdeen, Maryland 21001,
5    was called as a witness by counsel for Plaintiffs,
6    and, having been duly sworn by the Notary Public, was
7    examined and testified as follows:
8              MR. WOODS:  We will go around and I will
9    ask all counsel to make appearances for the record.
10   My name is Justin Woods on behalf of the Plaintiffs
11   Steering Committee.
12             MR. WALDRON:  I'm Jonathan Waldron on
13   behalf of the Defendant United States America.
14             MR. BAIN:  Adam Bain for the United
15   States.
16             MR. MAGGIO:  Brent Maggio for Heartland
17   Recreational Vehicles.
18             MR. WOODS:  Thank you.
19             EXAMINATION BY COUNSEL FOR
20             PLAINTIFFS STEERING COMMITTEE
21   BY MR. WOODS:
22        Q.   Good morning, Ms. Green.  Again, my name

---

**Page 11**

1    is Justin Woods.  I am Plaintiffs' counsel for this
2    matter entitled in re: FEMA Trailer Formaldehyde
3    Products Liability Litigation.  And today you are
4    scheduled to give your deposition or for us to take
5    your deposition concerning what we all know as the
6    Individual Assistance Disaster File and all of the
7    information pertaining to that.  First off, could you
8    please state your name and address for the record?
9         A.   Bellance, B-E-L-L-A-N-C-E, Green,
10   G-R-E-E-N, 132 Farm Road, Aberdeen, Maryland 21001.
11        Q.   All right.  Ms. Green, have you ever given
12   a deposition before?
13        A.   No.
14        Q.   Never.  This is your first one?
15        A.   Yes.
16        Q.   Okay.  Well, just to give you some ground
17   rules, in order for the court reporter to take down
18   everything that's said, please wait until I complete
19   my question before you provide an answer.  I will
20   wait until you give me your complete answer before I
21   try to ask the next question.  It's always a
22   challenge to try not to do this in a conversational

---

**Page 12**

1    manner wherein we are all basically kind of talking
2    over each other and at the same time.  But it's
3    important for the record to be clear on that.  Who is
4    your current employer, Ms. Green?
5         A.   The Federal Emergency Management Agency,
6    which is part of the Department of Homeland Security.
7         Q.   And how long have you been employed by
8    FEMA?
9         A.   About eleven-and-a-half years.
10        Q.   And what is your current job title?
11        A.   My current job title is Center Manager,
12   Supervisory Program Manager for the Maryland National
13   Processing Service Center.
14        Q.   That's a pretty long title.  Again, center
15   Manager?
16        A.   I am known as Center Manager.  The
17   official title was Supervisory Program Manager.
18        Q.   And how long have you held that position?
19        A.   Approximately two years.
20        Q.   And prior to that position, what position
21   did you hold?
22        A.   Prior to that I was the Applicant Services

---

**Page 13**

1    Manager.
2         Q.   And how long did you hold that position?
3         A.   Approximately one year.
4         Q.   What did your duties involve as an
5    Applicant Services Manager?
6         A.   As the Applicant Services Manager, I
7    supervised the Applicant Services Section, which was
8    responsible for taking registrations from disaster
9    victims, answering help line questions and processing
10   cases for disaster assistance.  And I also supervised
11   the Training Department.
12        Q.   When you say "Training Department," what
13   training was going on in that department?
14        A.   The training of our Human Services
15   Specialists, the employees who staffed our
16   Registrations, Help Line and Casework offices.
17        Q.   Prior to that position, what position did
18   you hold?
19        A.   I was the Supervisory Program Specialist
20   in charge of the Records Management and Mail
21   Operations Section.
22        Q.   Records Management and Mail Operations?

---

4 (Pages 10 to 13)

Bellance "Faye" Green                                                    October 16, 2009
Washington, DC

Page 14

1    A.  Yes.
2    Q.  And how long did you hold that position?
3    A.  Eight years.
4    Q.  Is that the position you started off with
5    in FEMA?
6    A.  Yes.
7    Q.  So that's the total of your
8    eleven-and-a-half years.  Now, Center Manager or
9    Supervisory Program Manager, the position that you
10   hold now, you have held for the past two years.  So
11   you have held that since about 2007?
12   A.  Yes.
13   Q.  And the Applicant Services Manager was
14   what, 2006 to 2007?
15   A.  Yes.
16   Q.  And so from maybe 1998 to 2006 you were
17   the Supervisory Program Manager with Records
18   Management and Mail?
19   A.  Yes.
20       MR. WALDRON:  I'm sorry, did you say
21   "Manager" or "Specialist."
22       THE WITNESS:  "Specialist."

Page 15

1    BY MR. WOODS:
2    Q.  "Specialist."
3        So in that -- that Supervisory Program
4    Specialist position was the position that you held
5    when Hurricane Katrina struck on August 29, 2005,
6    correct?
7    A.  Yes.
8    Q.  At that time and in this particular
9    position after Hurricane Katrina struck on August 29,
10   2005, and then Rita a short time after that, what
11   were your specific duties, if any, in response to
12   those disasters?
13   A.  My specific duties would have been my
14   normal duties for any disaster, and that was
15   processing all of the incoming mail from disaster
16   victims, mailing out letters to disaster victims and
17   responding to any request for copies of files as well
18   as archiving the disaster records.
19   Q.  Okay.  And "archiving disaster records,"
20   was that the last thing you said?
21   A.  Yes.
22   Q.  What is involved in archiving disaster

Page 16

1    records?
2    A.  In archiving them, just the hard copies,
3    once they are scanned in, just shipping those to the
4    Federal Records Center, once the temporary storage
5    period has expired.
6    Q.  Okay.  Let's -- if you don't mind, let's
7    walk through it step-by-step, how and what happens.
8    You get a letter in from a disaster victim, and I'm
9    assuming that it's some sort of a request or
10   something that needs a response, to process that
11   letter from the disaster victim, correct?
12   A.  Usually.
13   Q.  Okay.  So then does it get routed to a
14   particular department for response action?
15   A.  It's scanned, and then it's associated
16   with the applicant's file, the electronic image, and
17   at that point gets routed to a process to be reviewed
18   by a caseworker.
19   Q.  Okay.  Once it's routed to that
20   caseworker, is that your last involvement with that
21   particular document?
22   A.  Normally it -- it is.  Once that is put in

Page 17

1    for a caseworker to review, that ends the Records
2    Management part of it from my section, yes.
3    Q.  Okay.  So anything that comes in from any
4    disaster is exposed to a process of being scanned,
5    and an electronic version of that document is saved
6    somewhere?
7    A.  Yes.
8    Q.  Okay.  Or archived somewhere and then
9    routed to the appropriate individual for response
10   activity?
11   A.  Yes.
12       MR. WALDRON:  Objection, compound.
13   BY MR. WOODS:
14   Q.  What system is used to keep track or to --
15   strike that.  Is there a system that exists that
16   gives you the opportunity to develop any sort of
17   abstract of that document?
18       MR. WALDRON:  Objection, vague.
19   BY MR. WOODS:
20   Q.  If you don't understand the question,
21   please --
22   A.  I don't.

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                          October 16, 2009
Washington, DC

---

Page 18

1    Q.   I'm trying to find out whether or not,
2  when that document comes in, how is it actually
3  archived?  What is the process of archiving it and
4  then forwarding it on to someone for a response
5  action?
6    A.   When the document comes in, it's scanned.
7  An electronic image is created within NEMIS, which is
8  National Emergency Management Information System.
9  It's our data base that we use to process.  That's
10 the application.  Once that image is created, we have
11 a specialist that will look at the image, try to
12 determine whose letter or whose document it belongs
13 to, the actual disaster registration number if it's
14 not provided when the applicant, you know, writes in.
15 Once that's determined, then that is associated with
16 the applicant's electronic file within NEMIS, and at
17 that point it's available for the caseworker to
18 review.
19   Q.   Does the person who is doing the scanning
20 and putting it into NEMIS, do they write some sort of
21 -- or is there a field which they complete that gives
22 the subject matter of that particular letter from the

---

Page 19

1  disaster applicant?
2         MR. WALDRON:  I would object, a
3  mischaracterization.
4  BY MR. WOODS:
5    Q.   It's a question.
6    A.   The indexer, as we call it, once the image
7  is in the electronic form, will review the document
8  and will attempt to -- we have a select number -- a
9  fixed number of items that you can pick from to enter
10 that image and to kind of categorize it.  And they
11 will attempt to try to decide what kind of document
12 it is.  It may be an appeal letter, or it could be a
13 repair receipt or whatever kind of document that it
14 is.  It's a definitive list that we use to try to
15 place -- to categorize the items.
16   Q.   You mentioned in your -- in one of your
17 earlier responses "NEMIS."  And "NEMIS" again stands
18 for what?
19   A.   National Emergency Management Information
20 System.
21   Q.   Do you know how long that system has been
22 in use by FEMA?

---

Page 20

1    A.   Since 1988.
2    Q.   And so you in your first position with
3  FEMA in 1998, is that when you began your use of the
4  system, NEMIS?
5    A.   Yes.  We were using another system before
6  NEMIS.  We were using a system called -- another
7  management information system before -- NEMIS, we
8  started shortly after I came to FEMA.
9    Q.   And NEMIS is a system that was -- or a
10 program that was specifically developed for FEMA for
11 disaster response issues?
12   A.   Yes.
13   Q.   Is it a program that's run on an ordinary
14 PC?
15   A.   I'm not sure that the IT platform is
16 loaded on the individual user's PC, but since it's a
17 pretty significant system, it's probably run on
18 servers that are a lot bigger than a PC.
19   Q.   What are the different -- and I don't know
20 whether or not they are considered modules or what
21 have you, but what are the different sections of
22 NEMIS?  Do you understand that question?

---

Page 21

1    A.   I'm not quite sure what --
2    Q.   Okay.  In your affidavit, for example,
3  there was a reference to sections called "Financial/
4  Insurance Information.  So would that be a particular
5  module of NEMIS or --
6    A.   It would be within a module of NEMIS.  The
7  module that we use in the Processing Service Center
8  primarily is the individual assistance module, which
9  is one part of NEMIS; and within that module would be
10 where the individual assistance file would be
11 maintained for applicants.  And actually a
12 correction:  It's called the Assistance Processing
13 Client, where we access the individual assistance
14 files.
15   Q.   Assistance --
16   A.   Processing Client.
17   Q.   And, again, if you could give me a
18 description of the type of information that is
19 tracked by NEMIS in this Assistance Processing Client
20 module?
21   A.   It contains the information related to an
22 individual assistance file that contains insurance

---

6 (Pages 18 to 21)

Bellance "Faye" Green                                          October 16, 2009
                        Washington, DC

Page 22

1   information reported to us by the applicant, payments
2   that were made under the individuals and household
3   program.  It would contain correspondence sent to the
4   applicant, correspondence that we receive from the
5   applicant.  It contains a record of conversations
6   when the applicant calls us, caseworker notes as
7   they're processing the case, as well as information
8   related to the inspection, if one was conducted on
9   the home.
10      Q.   Does NEMIS contain any information
11  particularly as it relates to disaster victims and
12  the south region after Hurricanes Katrina and Rita
13  regarding the emergency housing units that were
14  provided to them?
15      A.   It would contain that information.  It may
16  contain a copy of the agreement between FEMA and the
17  applicant that was sent to us by the field office.
18      Q.   Does it -- would it contain, for example,
19  particular complaints from a disaster victim about
20  the EHU in which they were residing?
21      A.   Only if the applicant had written in that
22  information so it would have been contained in

Page 23

1   correspondence sent to us by the applicant.  So it
2   may.
3       Q.   Would it contain information regarding the
4   particular information about the EHU an applicant was
5   residing in, for example, the VIN number and the
6   manufacturer and model of the EHU?
7       A.   Possibly, only if it was within a document
8   sent to us by either the field office or the
9   applicant.
10      Q.   Now, what we are here to discuss are the
11  steps and the components that make up an individual
12  assistance file.  And I guess what I need to ask you
13  is:  You are aware that there have been requests made
14  on the Federal Government, on FEMA, to produce what
15  we consider to be individual assistance files or
16  disaster files for certain victims of Hurricanes
17  Katrina and Rita, correct?
18      A.   Yes.
19      Q.   And I'm going to assume that NEMIS is just
20  one part of what FEMA produces that's part -- or what
21  they consider a part of the individual assistance
22  disaster file; is that correct?

Page 24

1       MR. WALDRON:  Objection, confusing as to
2   whether you are asking -- I'm not going to give you a
3   speaking objection.  I am just going to object.  It's
4   confusing.
5       THE WITNESS:  Well, I'm not sure.  I only
6   deal with the NEMIS part of it.  So I'm not sure if
7   you have gotten information from some other source.
8   We maintain the individual assistance file.  So I'm
9   not sure I understand what you are asking.
10  BY MR. WOODS:
11      Q.   My specific question is what actually
12  makes up an IAF file, an individual assistance file?
13      A.   The file that we produce is composed of a
14  copy of the registration, a copy of the assistance
15  that has been provided to the applicant, the
16  incoming/outgoing correspondence, the summary of the
17  contacts between FEMA and the applicant or anyone
18  that had written on behalf of the applicant.  It
19  would contain the caseworker notes and the inspection
20  summary as well as any finance information in terms
21  of payments, as well as applicant information related
22  to Social Security numbers, household members, et

Page 25

1   cetera.
2       Q.   And all of that is somehow -- it may be
3   individual papers, for example, correspondence sent
4   in from an applicant, but all of this information is
5   tracked in NEMIS, correct?
6       A.   Yes.
7       Q.   And so anything related to an applicant's
8   involvement with FEMA is tracked in NEMIS; is that
9   correct?
10      A.   To the best of my knowledge, yes, it
11  should be.
12      Q.   Ms. Green, what I brought along with me
13  is -- let me ask you this question first:  To date,
14  how many individual assistance or disaster files have
15  been produced by FEMA to Plaintiffs, if you know?
16      A.   Well, I'm not exactly sure if you mean for
17  this particular -- we have received requests from
18  FEMA and DOJ.  It's been, I think, a little over 100.
19  It may have been more.  We haven't kept track.  I
20  mean we respond to the requests as we receive them.
21  So I don't know the exact number.
22      Q.   You don't know the exact number as it

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                                        October 16, 2009

Washington, DC

Page 26

1    relates to this litigation?
2        A.   Right.
3        Q.   Okay.  What I brought along was just one
4    of the ones.  I believe we have received, as you
5    said, a little bit over 100 individual assistance
6    files.  This one is the individual assistance file of
7    a Carrie Smith, and Ms. Smith is a Plaintiff in the
8    litigation, and her claims against the manufacturer
9    of her EHU and the installer of her EHU and FEMA are
10   scheduled to go to trial in May of 2010.
11           What I simply wanted to do was to go
12   through and see if this was a good exemplar of a
13   disaster file and to go through the different -- and
14   if you could, tell me what characterizes the
15   different sections of this disaster file.  Let's do
16   that.
17           Now, the first page -- let's see.  It is,
18   as you said -- and I think you have already testified
19   to this -- is the -- a copy of the registration of
20   the application for disaster assistance.  So that is
21   -- that's what gets the IA file started, correct?
22       A.   Yes.

Page 27

1        Q.   And the reason why I am not going to mark
2    it as an exhibit to this deposition is because it
3    also has some personal information regarding
4    Ms. Smith that will be covered later in her own
5    deposition.  So that's why we don't need to attach it
6    to this one.  All right.
7            If you go three pages back -- I'm sorry --
8    four pages back, there is a letter from Carrie Smith,
9    and it's dated November 4, 2005, "to whom it may
10   concern."  So, again, this would be a letter that
11   would be received, and it would get scanned into the
12   system and then appropriately routed to someone for a
13   response, correct?
14       A.   Yes.
15           MR. WALDRON:  Justin, do you have an extra
16   copy of the IA file?
17           MR. WOODS:  I don't.  I was traveling
18   light.
19   BY MR. WOODS:
20       Q.   The next document, for example -- and we
21   are not going to go through all of them.  I just want
22   to see if we can hit some highlights.  But the next

Page 28

1    couple of pages deal with, I guess, receipts that
2    Ms. Smith sent in for reimbursement of hotel stays
3    and receipts for the medications that she received.
4    So, again, these would be documents that would come
5    to FEMA and then would be scanned into the NEMIS
6    system -- I mean scanned in and then in some way
7    noted in the NEMIS system, correct?
8            MR. WALDRON:  I'm going to object to lack
9    of foundation and compound.
10           THE WITNESS:  Yes, they would be received,
11   scanned in the system and routed to a caseworker.
12   BY MR. WOODS:
13       Q.   And, again, these are the types of
14   documents that would be received by FEMA when they
15   make requests.  When individuals make requests for
16   financial assistance, FEMA requires certain
17   documentation to be received before payments are
18   made, correct?
19       A.   Yes.
20       Q.   And so, again, those documents would come
21   into FEMA, be scanned and in some way noted in the
22   NEMIS system, correct?

Page 29

1        A.   Yes.
2        Q.   If you could turn to -- it's a Bates
3    label, and it says FEMA 161-000036.  If you look at
4    the bottom of the pages -- and actually if you turn
5    to the next page, FEMA 161-000037, and it appears to
6    be sort of, I guess, an estimate that Ms. Smith sent
7    in that relates to the damage that her home received
8    following the hurricane.  And not that I -- that's
9    not a question for you.  I don't need you to verify
10   that.  All I wanted to ask you is:  Again, it's a
11   sample type document that, if asked, an applicant
12   would send in an estimate of damages to FEMA, and it
13   would again be scanned into the system and then noted
14   in the NEMIS system, correct?
15       A.   This would --
16           MR. WALDRON:  Object as compound, but go
17   ahead.
18           THE WITNESS:  This would be an example,
19   but actually -- I mean this is like an estimate from
20   their insurance adjuster of possibly what their
21   insurance settlement might be.  But this would be a
22   sample of the type of document an applicant would

8 (Pages 26 to 29)

Page 30

1　send to us.
2　BY MR. WOODS:
3　　Q.　Okay.　If you would turn then to FEMA
4　161-000049, and, again, we are going through the
5　documents in the order in which we received this
6　file, and this is the order in which the government
7　or FEMA produced these documents.　And this appears
8　to be the beginning of a section of correspondence
9　from FEMA to the applicant, Ms. Carrie Smith, at this
10　point.　And it seems to go from -- I want you to
11　please take -- on this particular section pay close
12　attention because I have a very specific question
13　about it.
14　　　　It seems to begin at FEMA 161-000049 to
15　FEMA 161-000083.　And it appears to be a section just
16　dealing with correspondence from FEMA to Ms. Smith
17　regarding her request for financial assistance
18　following the disaster.　And please take your time
19　and look at the documents.　And if there is not a
20　document that does not deal with her disaster
21　assistance, financial disaster assistance, please let
22　me know.

Page 31

1　　　　MR. WALDRON:　I object as confusing and
2　the double use of "not there."　And I'm not sure
3　about exactly what it is you are asking.　I'm sorry.
4　I was going to say if you understand his question,
5　you can go ahead and answer it.
6　　　　THE WITNESS:　The correspondence contains
7　information sent to her about payments that would
8　also contain information if we were requesting
9　additional information from her or asking her for
10　documentation as well, but it would be information
11　related to her application for disaster assistance.
12　BY MR. WOODS:
13　　Q.　Okay.　But what I'm trying to verify,
14　though, is that this particular section -- and I am
15　going to call it a section -- from 49 to 83 deals
16　only with her financial disaster assistance.　It has
17　nothing whatsoever to do with anything regarding her
18　request for any emergency housing unit or any
19　complaints about the emergency housing unit or any
20　information regarding any emergency housing unit.
21　　A.　I would have to look at each one to
22　determine --

Page 32

1　　Q.　All right.
2　　A.　-- just to see, because there may have
3　been a decision to mail a letter related to that.　So
4　I would have to look through the file actually to see
5　if there were anything related to her housing unit.
6　　　　MR. WALDRON:　Not to interrupt, but if
7　there's anybody on the phone, could you please mute
8　your phone.　We are getting odd noises coming through
9　there.
10　　　　THE WITNESS:　It seems like there are two
11　letters related to travel trailers that may not be
12　specific for Ms. Smith but just general information,
13　54 and 55, as well as No. 60.
14　BY MR. WOODS:
15　　Q.　Okay.　54 appears to be regarding furnace
16　exhaust and the possibility of potential fire
17　hazards, correct?
18　　A.　Yes.
19　　Q.　55 appears to be concerning the
20　possibility of multiple trailers having identical
21　lock sets.
22　　A.　Yes.

Page 33

1　　Q.　And 60 -- did you say 60?
2　　A.　60, yes.
3　　Q.　What do you think 60 has anything to do
4　with?
5　　A.　Well, 60 is just a notice and status
6　that's given when someone is in a FEMA-supplied
7　dwelling.　So a "readily fabricated dwelling" would
8　indicate that they were living in either a FEMA-
9　supplied mobile home or a travel trailer.
10　　Q.　I'm sorry.　I'm not seeing where you see
11　that reference.
12　　A.　Under the -- the assistance block category
13　it says -- under "rental assistance" it says
14　"eligible readily fabricated dwelling."
15　　Q.　So at that point does that appear to say
16　that at this point Ms. Smith was eligible for an
17　emergency housing unit?
18　　A.　It means that she is in a housing unit and
19　would no longer be eligible for regular rental
20　assistance.
21　　Q.　Any other document in that particular
22　section?

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green

October 16, 2009

Washington, DC

---

**Page 34**

1    A.   I don't see anything else in that section
2  related to mobile homes or travel trailers.
3    Q.   Thank you.  So that would be 54, 55, 60
4  and 61?
5    A.   Yes.
6    Q.   Okay.  Now, could you explain to me what
7  FEMA 161-000084 represents?
8    A.   This is a screen print from NEMIS to
9  capture information that is not available other than
10  going to a screen-shot copy of what's in the data
11  base.
12    Q.   And this particular screen shot, take us
13  through it and tell us what we are looking at here,
14  what is not available any other way besides the
15  screen shot?
16    A.   This gives a general overview of the
17  applicant's file.  It has an SBA status at the top,
18  the identification verification, whether or not she
19  has passed or failed; whether she is an owner or
20  renter.  Flood-zone information would be in the
21  insurance information.  If there had been any
22  additions since she had registered would be indicated

---

**Page 35**

1  here, and it just gives us whether or not she
2  actually signed the name, 69-B, and how many
3  inspections she may have had.
4    Q.   "Inspections," would that be inspections
5  at the damaged property?
6    A.   Yes.
7    Q.   And anything else on this screen -- strike
8  that.  Anything on this screen relating to her
9  occupancy of an emergency housing unit?
10    A.   Not this particular page, but this is just
11  one part of the information that's contained in the
12  overview tab.  So 685 would be where we had to scroll
13  down and do another screen shot of the same tab, and
14  it would indicate that status of ERFD, eligible
15  regularly fabricated dwelling, that I talked about in
16  that particular letter.  So it's annotated there.
17    Q.   So are you saying that 84 is one
18  particular tab of NEMIS?  This is a different screen
19  than what 85 is?
20    A.   It is the same screen, but since you can't
21  get all of the information, it requires you to scroll
22  down if there is additional information.  So in order

---

**Page 36**

1  to capture all of it, we needed to make two copies.
2  So some of the information is duplicated from 84 to
3  85.  But we had to do two screen shots to ensure that
4  we had a complete copy.
5    Q.   And could you point that out for me, what
6  the differences are between 84 and 85?
7    A.   If you look in the HA assistance section
8  --
9    Q.   Yes.
10    A.   -- the first part stops at the rental
11  assistance at 10/1/2005.
12    Q.   Okay.
13    A.   But we needed to show the additional
14  information.
15    Q.   Oh, okay.  Okay.  Tell me this:  Is it a
16  report generator that is attached to NEMIS?  Is there
17  any way to generate reports of this information from
18  NEMIS?
19    A.   No.
20    Q.   There is no report generator?
21    A.   We have a few things that we can generate
22  from reports, but all of the information in NEMIS,

---

**Page 37**

1  there is not a report to generate that information.
2    Q.   So if someone came to you and said, I'd
3  like to get all of the information on Ms. Carrie
4  Smith concerning her HA assistance status, you could
5  not generate that in a report?
6    A.   No.
7    Q.   If someone comes and says, I want all of
8  the information on Ms. Carrie Smith's insurance
9  policy, you could not generate that in one report?
10    A.   There is no report available to generate
11  that information, no.
12    Q.   So if anyone within FEMA wants to discover
13  that information or has questions about that
14  information, they have to go directly to a computer
15  and to NEMIS to read or see that information?
16    A.   Yes.
17    Q.   Have you ever asked anyone if there's a
18  possibility of generating reports from the NEMIS
19  data?
20    A.   Not for all of the information.  There
21  have been some reports developed, and we have asked
22  to -- to look at a way -- a better way to generate a

---

10 (Pages 34 to 37)

## Page 38

1  copy of a file, and so we have been able to do some
2  efficiencies and generate some reports for some data,
3  but not for all of it.
4       Q.  Okay.  So what you are saying is that on
5  occasion there have been requests for specific data
6  from NEMIS, and someone was able to develop, for lack
7  of a better term, a report generated to get that
8  information out, extract that information?
9       A.  Well, for certain information.  For
10  instance, for a particular applicant for the call
11  log, for instance, you know, we have been able to
12  generate a report for that.  And so that's probably
13  been one of the few things, the inspection, the
14  caseworker notes, and the contact log.
15       Q.  So wait.  Those are reports that are
16  available is what you are saying?
17       A.  Right.
18       Q.  And what are they, again?
19       A.  The contact log, the comments or the
20  caseworker notes, the inspection report.
21       Q.  Do you have any -- strike that.
22            Do you know why those particular reports

## Page 39

1  can be generated?
2       A.  I don't.
3       Q.  And all of that information that can
4  generate a report on contact logs, the comment notes
5  and inspection reports, all of that information is
6  stored in NEMIS, correct?
7       A.  Yes.
8       Q.  And you now have the capability of
9  producing those reports from that data stored in
10  NEMIS?
11       A.  Yes.
12       Q.  And how long does it take to generate a
13  contact log report, for example?
14       A.  It depends on, you know, the file, of
15  course, how much information is in the file.  But for
16  the comments and contacts, it takes approximately ten
17  minutes per file, you know, just to access the
18  different program, enter the information, the
19  registration number.  And then, of course, it needs
20  to be a report generated and still saved into a file.
21       Q.  Are those reports a part of an individual
22  assistance file that is being produced as part of

## Page 40

1  this litigation; do you know?
2       A.  Do you mean all those reports included in
3  the files we have given?
4       Q.  Yes.
5       A.  Yes.
6       Q.  Okay.  If you would turn to 86, and is
7  this a different screen shot from NEMIS than what
8  we've looked at already, 84 and 85?
9       A.  It is different.  This is the applicant
10  information tab that just contains the information
11  related to their current contact information, mailing
12  information, and would include any changes that have
13  been made to the file since the applicant registered.
14       Q.  On this particular screen do you see any
15  reference to the emergency housing unit which the
16  applicant was granted?
17       A.  No.
18       Q.  On this particular screen would there be
19  any place that might possibly reference the emergency
20  housing unit in which the applicant was residing?
21       A.  No.
22       Q.  Okay.  Page 87, this is a different

## Page 41

1  screen?
2       A.  It's still part of the applicant info tab,
3  but this one opens up the area for the financial
4  information for electronic funds transferred, the EFT
5  information.
6       Q.  So that's the difference between this:  It
7  is this pop-up screen that has the financial
8  institution name, account number and account type,
9  and routing number?
10       A.  Yes.
11       Q.  Correct.  On page 88, what screen is this?
12       A.  This is the housing assistance screen that
13  just shows the payments that have been made and would
14  also show how much total assistance the applicant had
15  received and any additional assistance if they were
16  under the max grant that could be received.  So it's
17  just a general overview.
18       Q.  Does this screen in any way reference the
19  emergency housing unit in which the applicant,
20  Ms. Carrie Smith, resided?
21       A.  It would only include any housing
22  assistance status updates, like the ERFD status would

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                                    October 16, 2009
Washington, DC

Page 42

1   be on this screen, and then it's shown on the second
2   page of that particular --
3       Q.   Which is 89?
4       A.   89, yes.
5       Q.   And so that would be under HA assistance,
6   the fourth line, rental assistance, FEMA reviewed,
7   SUPP 1 and then ERFD-eligible?
8       A.   Yes.
9       Q.   That is the only reference to the
10  emergency housing unit for Ms. Carrie Smith; is that
11  correct?
12      A.   Yes.
13      Q.   And that again is because this same
14  snapshot of the same -- a snapshot of the same page
15  but because this information -- you have to scroll
16  down to pick up the rest of the information.  That's
17  why -- that's the only difference between these two
18  pages?
19      A.   Yes.
20      Q.   And page 90?
21      A.   This shows the -- this is the finance tab
22  that shows the eligible payments, the dates they were

Page 43

1   made, how much -- the schedule and, you know, the
2   disbursement information.
3       Q.   Okay.  And it has -- does it have anything
4   or reference in any way the emergency housing unit
5   within which Ms. Carrie Smith resided?
6       A.   No.
7       Q.   Page 91.
8       A.   This is the other assistance, other needs
9   assistance screen.  And it would cover any assistance
10  the applicant received for transportation, medical,
11  personal property, dental, and other miscellaneous
12  items.
13      Q.   But, again, does this particular screen
14  have anything to do with, or reference in any way,
15  the emergency housing unit within which the
16  applicant, Ms. Carrie Smith, resided?
17      A.   No.
18      Q.   It appears as if 92 is a snapshot of -- or
19  screen shot of the same as 91, but apparently, again,
20  because there was a need to scroll down and --
21  because some information was left off of the first
22  screen shot, that this picks up the remaining

Page 44

1   information?
2       A.   Yes.
3       Q.   Okay.  Page 93.
4       A.   This is the inspection summary for real
5   property, and it shows the actual damage that was
6   recorded by the inspector.  And it would include the
7   amount and how much the award would have been for
8   real property.
9       Q.   Okay.  And this is for the damaged
10  property, the flooded or hurricane-damaged property?
11      A.   Yes, the damage to the dwelling.
12      Q.   Okay.  This screen shot, does it have --
13  in any way reference the EHU in which the applicant,
14  Ms. Carrie Smith, resided?
15      A.   No.
16      Q.   All right.  Page 94, what is this screen
17  shot of?
18      A.   This is a screen shot also of the personal
19  property inspection and the damage recorded by the
20  inspector.
21      Q.   At the damaged dwelling?
22      A.   At the damaged dwelling, yes.

Page 45

1       Q.   Yes.  And it has nothing whatsoever to do
2   with the EHU within which the applicant was residing?
3       A.   No.
4       Q.   No information regarding the EHU is
5   recorded in this screen?
6       A.   No.
7       Q.   And page 95, was that just a continuation
8   again of what was 94, that screen shot, and it listed
9   additional items that were damaged?
10      A.   Yes.
11      Q.   At the damaged dwelling?
12      A.   Yes.
13      Q.   Page 96, what is this screen shot of?
14      A.   This is just a summary of the inspection,
15  and it contains information related to which
16  contract -- which contract company conducted the
17  inspections and a summary of the information recorded
18  by the inspectors.
19      Q.   And, again, regarding the damaged
20  dwelling, correct?
21      A.   Yes.
22      Q.   Is there any place on this particular

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                              October 16, 2009
Washington, DC

---

Page 46

1    screen that there is any reference to, or information
2    recorded regarding, the emergency housing unit within
3    which the applicant resided?
4        A.   No.
5        Q.   Page 97, does that begin another situation
6    where it is basically the same screen but captures
7    additional information?
8        A.   Yes.
9        Q.   And page 98, what is this a screen shot
10   of?
11       A.   Page 98 is a screen shot of just any
12   previous assistance, if they received assistance
13   through the American Red Cross for lodging. It's
14   under the special tab. If they were linked with
15   someone elsewhere -- they registered and gave
16   duplicate information -- the registrations would be
17   linked as duplicates. So that would be included in
18   this tab if that were the case.
19       Q.   Now, if you look at this and kind of put
20   this in its own section from FEMA 161-84 through FEMA
21   161-98, and this is part of an IA file and these
22   represent in this particular file all of the screen

---

Page 47

1    shots from NEMIS, correct?
2        A.   Yes. I'm sorry, start again, please?
3        Q.   84 through 98?
4        A.   Yes.
5        Q.   Could you give me an estimate as to how
6    long it would take to generate these screen shots?
7        A.   It takes approximately ten minutes on
8    average depending on how much you have to scroll
9    over, scroll down and verify that you have captured
10   all of the information.
11           Then they have to be, you know, saved to a
12   Word document to produce the hard copy.
13       Q.   And what is the total of that? You said
14   that's ten minutes or just ten minutes to do the
15   screen shot?
16       A.   Ten minutes to do the screen shot and save
17   them to the Word file.
18       Q.   One question before we move on?
19           How many different screens are there in
20   NEMIS and can you give me a description or title of
21   each screen?
22       A.   Sure. There are 12 tabs. There is the

---

Page 48

1    overview tab, applicant info -- information; the real
2    property, personal property, inspection summary,
3    correspondence. The special tab.
4        Q.   Special tab?
5        A.   That would be the one that includes the
6    duplicate registrations.
7        Q.   Okay.
8        A.   Insurance, housing assistance tab, the
9    other needs assistance tab, then the inspection
10   summary and the comment -- comments and contacts tab.
11           And there is an info -- information
12   control tab that is used only for internal
13   processing, which is normally not included in the
14   file. It just shows how the -- just some mechanical
15   information that the caseworker has to use to
16   actually process with FEMA.
17       Q.   Out of all 12 tabs can you tell me which
18   tabs would relate or record information concerning
19   the emergency housing unit within which an applicant
20   had been residing?
21       A.   The overview might contain that status
22   for, that shows the unit dwelling or a mobile --

---

Page 49

1    emergency unit. The HA tab might show that as well.
2            And of course under the correspondence it
3    also would contain that information within any
4    correspondence received or sent to the applicant.
5        Q.   What about the comments or contacts
6    section?
7        A.   And it would -- as well might contain
8    information.
9        Q.   So what I have is 4 out of the 12 tabs
10   might contain information?
11       A.   Yes.
12       Q.   About the EHU an applicant was residing
13   in. Okay?
14           Now at FEMA 161-99 is a document entitled
15   "Comments Report." Is this the report that you
16   were -- that you mentioned earlier that can be
17   generated from NEMIS?
18       A.   Yes.
19       Q.   And again how long would it take, give me
20   an estimate, to generate this particular report?
21       A.   Probably -- this report as well as two
22   other reports are generated using a different

---

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                                          October 16, 2009

Washington, DC

| Page 50 | Page 52 |
|---|---|

**Page 50**

1  software program called Business Objects, and to
2  complete all three of the reports takes approximately
3  on average ten minutes.
4      Q.  Does this represent all three reports if
5  you look at FEMA 161-99 through FEMA 161-104?
6      A.  And it would also include 105 through
7  107 -- or 109.
8      Q.  Okay.  So again, the first report, the
9  comments report, and that goes from FEMA 161-99
10  through FEMA 161-102, correct?
11      A.  Yes.
12      Q.  And the next report is the contact report
13  which would be FEMA 161-103 through FEMA 161-104; is
14  that correct?
15      A.  Yes.
16      Q.  And the third report, the inspection
17  damage report, would be FEMA 161-105 through
18  FEMA-161-109, correct?
19      A.  Yes.
20      Q.  And it takes approximately ten minutes to
21  generate all three reports?
22      A.  Correct.

**Page 51**

1      Q.  Now you said earlier that it would take
2  ten minutes on average to do all screen shots that
3  are saved to Word, assuming that would be of all 12
4  tabs in NEMIS, correct?
5      A.  Right but the correspondence tab, which --
6  that's the one that takes actually the longest
7  time -- is not included in that ten minutes, so --
8      Q.  The correspondence tab?
9      A.  Correct.
10      Q.  Why is that not included?
11      A.  Because all of that correspondence we went
12  through earlier, the documents that the applicant
13  sent in as well as the letters that we sent to the
14  applicant actually represents the longest part of
15  completing the file.
16      Because you have to verify all the
17  documents belong to the applicant which -- just as a
18  double check, and the way we have to print them out
19  tends to take longer.  So on average that takes
20  probably the longest, around 30 minutes.
21      Q.  So in addition to the ten minutes, an
22  additional 30 minutes on correspondence?

**Page 52**

1      A.  Correct.
2      Q.  Is there any way to cull through the
3  correspondence -- strike that.
4      As correspondence goes through the system,
5  is it in any way categorized as to relating to
6  financial assistance, housing assistance, or
7  complaints concerning emergency housing, just to give
8  an example?
9      A.  It's categorized.  There would be -- there
10  is a category that says mobile home travel trailer
11  documentation.  So there is an item that relates to
12  that, but there wouldn't be one specifically if a
13  person were writing in to complain about it.
14      You would have to actually go through all
15  of the correspondence to actually read it to see
16  exactly what the applicant was asking for.
17      Q.  In NEMIS do you know which screen would
18  record the VIN of an emergency housing unit that has
19  been provided to an applicant?
20      A.  To my knowledge in NEMIS the VIN number
21  wouldn't be recorded as a separate entry.  It would
22  only be contained probably in a document that we

**Page 53**

1  might have received.
2      Q.  So there is no place in NEMIS that would
3  record that?
4      A.  Not that I'm aware of, no.
5      Q.  Is it your testimony that where any
6  information -- strike that.
7      If you would turn to FEMA 161-11.  This
8  particular document which is the emergency shelter
9  agreement to rules of occupancy, where would this
10  document be stored?
11      A.  It would be in the incoming
12  correspondence.
13      Q.  So this again would be, as it relates to
14  NEMIS, this would be generated, be a part of the
15  generation of information in the correspondence
16  section?
17      A.  Yes.
18      Q.  Again, that's primarily -- the
19  correspondence section is primarily in your
20  experience where you would see any information
21  regarding emergency housing that the applicant
22  resided in, correct?

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                                October 16, 2009
Washington, DC

Page 54

1      MR. WALDRON: Objection, mischaracterizes
2  prior testimony.
3      THE WITNESS: It would be the place that
4  would house the specifics about the housing unit.
5  BY MR. WOODS:
6      Q.  So when -- the over hundred or so
7  individual assistance files that have been produced
8  thus far, the first step is to go through these 12
9  tabs in NEMIS?
10     A.  That would be the first step, yes.
11     Q.  Okay. And from there is where we talked
12 about the correspondence tab that, taking
13 approximately 30 minutes, is probably where the bulk
14 of additional paper comes from, correct?
15     A.  Yes.
16     Q.  Is there any place else or is there any
17 other component of an IA file that is outside of what
18 we discussed already?
19     A.  Not that I'm aware of. I mean there may
20 have been information stored at the field, but our
21 file only includes what's actually in NEMIS that
22 we've talked about.

Page 55

1      Q.  All right. And then once that information
2  is generated, you sign a certificate -- if you look
3  at FEMA 161-110. And that's your signature there at
4  the bottom, correct?
5      A.  Yes.
6      Q.  And it's a certificate of authenticity of
7  office records. And what you're stating here is, you
8  are making a statement that all of the records
9  concerning this -- in this particular instance Carrie
10 Smith have been produced, and it's all the records
11 that FEMA has concerning this particular applicant,
12 correct?
13     MR. WALDRON: Object on the best evidence.
14 But you can answer.
15     THE WITNESS: It's all the information
16 that I am aware of that we have in NEMIS for this
17 particular applicant.
18 BY MR. WOODS:
19     Q.  Okay. So you say that all the information
20 that you have in NEMIS on this particular applicant?
21     A.  Right.
22     MR. WALDRON: Object. The document speaks

Page 56

1  for itself.
2  BY MR. WOODS:
3      Q.  Are you aware that there may be other
4  information that may exist within FEMA concerning
5  this particular applicant?
6      A.  Well, I know we have -- for the mobile
7  home travel trailer programs they do keep some
8  information related to the units in DARAC -- and I'm
9  not sure what the acronym stands for -- that may
10 house some information.
11     Q.  Now DARAC, I know you said you don't know
12 what the acronym stands for but give me your general
13 understanding of what DARAC is?
14     A.  It's a -- where the data for the mobile
15 home travel trailer information is stored, where they
16 track the issuance of the mobile homes to applicants.
17     Q.  Do you know who is the custodian of that
18 information?
19     A.  I don't.
20     Q.  Do you know whether or not that is
21 information that is kept here in the D.C. area or in
22 field offices?

Page 57

1      A.  I don't. I believe it's maintained in the
2  field offices, but I'm not certain.
3      Q.  Do you know why that's not produced as
4  part of an IA file?
5      A.  I'm not sure -- you know, the sheltering
6  agreement that we mentioned is the part that comes to
7  us to go in the IA file.
8      So, I'm not sure why other information
9  isn't provided but that part that shows that they are
10 in the mobile home or travel trailer is sent to us to
11 go in their IA file.
12     Q.  Before we go any further, I do want to
13 mark as Exhibit 1 to this deposition, the Notice of
14 Deposition.
15     (Green Exhibit No. 1 was
16        marked for identification.)
17 BY MR. WOODS:
18     Q.  Ms. Green, do you have a copy of your
19 declaration? If not, I do have extra copies of that.
20 And it's a declaration that you completed on
21 August 21, 2009. That is your signature on page 4 of
22 this document?

15 (Pages 54 to 57)

Bellance "Faye" Green                                                    October 16, 2009
Washington, DC

---

Page 58

1      A.   It is.
2      Q.   Okay.  Can you tell me for what reason was
3    this document drafted?
4      A.   It was drafted to explain how the files --
5    the IA files are assembled, and to just give an
6    overview of what it would take to assemble the file
7    and as well as our ability to respond to a large
8    request.
9      Q.   And at that time that you completed this
10   deposition, there was a request of 4,791 -- yes, at
11   the time you completed the affidavit, there was a
12   request for 4,791 IA files.  That number, that number
13   has not been a formal request but we shortly will
14   make a request in the neighborhood of I believe 8,500
15   IA files to be produced.
16          MR. WALDRON:  Just a minute.  Could we
17   please have whoever hasn't muted their button on the
18   phone, to please mute that?  We are still getting a
19   lot of feedback on the phone.
20   BY MR. WOODS:
21     Q.   And we talked about and your declaration
22   basically reiterates what we generally talked about,

---

Page 59

1    that to generate the IA files means going through
2    NEMIS and the different tabs and screens of NEMIS and
3    the generation of paper because it is not -- an IA
4    file is not kept as we would consider a regular file,
5    that we could go to a file cabinet and pull out and
6    look at, correct?
7      A.   Correct.
8      Q.   And currently -- I think it's in your
9    affidavit or it may actually be in a pleading that
10   was filed by the Department of Justice -- how many
11   individuals are tasked with working on producing IA
12   files?
13     A.   There are currently four people in the
14   section right now.
15     Q.   And are these four people that you
16   supervise?
17     A.   I'm not their direct supervisor but they
18   are in my facility, yes.
19     Q.   How many employees are in your facility?
20     A.   We have approximately 350.
21     Q.   And how many do you supervise?
22     A.   Well, they all work for me.  I'm the

---

Page 60

1    center manager.
2      Q.   So you have 350 employees at -- that are
3    available for tasks in your facility?
4      A.   Yes.
5          MR. WALDRON:  Objection.
6    BY MR. WOODS:
7      Q.   And again, your facility is the facility
8    that is responsible or the central repository of
9    information relating to each individual that receives
10   assistance following a disaster, correct?
11     A.   Yes.  We are the only ones that handle the
12   file copy requests.
13     Q.   We have been going for about an hour and a
14   half.  Do you need a break?
15     A.   I'm fine.
16          MR. WOODS:  Take just five minutes.
17          (Recess 10:36 a.m. - 10:50 a.m.)
18   BY MR. WOODS:
19     Q.   I want to go back to your declaration and
20   I don't know if you are aware and you tell me whether
21   or not you are, that to date -- or at the time your
22   declaration was completed, plaintiffs had served upon

---

Page 61

1    the government 4,791 what we call Plaintiff Fact
2    Sheets, and attached to those Plaintiff Fact Sheets
3    is a Privacy Act waiver.
4          First, are you aware of that situation,
5    that we had turned over to the government 4,791
6    Plaintiff Fact Sheets with a Privacy Act waiver
7    attached to each one?
8          MR. WALDRON:  Object to -- refers to facts
9    not in evidence.  But go ahead.
10          THE WITNESS:  I was aware that there was a
11   number for the requests but not that there was a fact
12   sheet and a waiver, just that there was a request for
13   4,761 files.
14   BY MR. WOODS:
15     Q.   What is your understanding as to why a
16   Privacy Act waiver would be necessary for an
17   applicant or registrant to complete?
18     A.   The Privacy Act waiver is important -- we
19   need it to ensure that we have the proper authority
20   to release the information.
21     Q.   When and how did you become aware that
22   there had been a request made for over 4,700 IA

---

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                         October 16, 2009

Washington, DC

Page 62

1   files?
2      A.   I don't specifically recall how I was
3   notified, probably by e-mail but I'm not sure.
4      Q.   In your experience, what information would
5   be necessary to produce an IA file?
6      A.   I'm not sure exactly what you mean.
7      Q.   Okay.  For a particular individual, we
8   just went through the IA file pertaining to Carrie
9   Smith.  What information would be necessary in order
10  for that particular file to be produced?
11     A.   Before we would produce the file?
12     Q.   Yes.
13     A.   We would -- we would need the Privacy Act
14  waiver.  We would also need some information about
15  the file, how to identify the file.
16     Q.   And that's what I'm asking, what
17  information would you need to identify the file?
18     A.   Well, ideally we would need the
19  applicant's name, the disaster number, and the
20  registration number.
21     Q.   And registration number, would that be the
22  FEMA ID number?

Page 63

1      A.   Yes, that would be the FEMA ID number.
2      Q.   Do you know if every individual that
3   applied for assistance was assigned a FEMA ID number?
4      A.   Yes.
5      Q.   Now, what I want is for you to give me a
6   total estimate of time that it would take to produce
7   from NEMIS, meaning -- produce, giving the screen
8   shot, any correspondence or documents, paper
9   documents that have been scanned, to produce the
10  overview tab, correspondence tab, the HA or housing
11  assistance tab, the comments/contacts tab, and then
12  to generate those three -- the one report, the
13  comments report?
14     A.   Could you repeat that?
15     Q.   I want a time estimate, the total time
16  estimate to produce the following from NEMIS:  The
17  overview tab, correspondence tab, the housing
18  assistance tab, the comments/contacts tab, and to
19  also generate the comment/contact report?
20     A.   Okay.  Approximately 40 minutes to
21  generate the items that you indicated -- the
22  overview, the HA, comments, contacts, reports and

Page 64

1   correspondence.
2      Q.   40?
3      A.   40, yes.
4      Q.   Now you said earlier that you have
5   approximately 350 employees that work in your
6   facility, correct?
7      A.   Yes.
8      Q.   And all of these individuals have
9   knowledge of operation of NEMIS?
10     A.   They have knowledge of operation of NEMIS
11  within the scope of their specific job, but maybe not
12  all parts of NEMIS, no.
13     Q.   How many of those 350 employees have --
14  would be able to handle the task of doing screen
15  shots of the four tabs that we talked about, the
16  overview, correspondence, housing assistance, and
17  comments/contacts tabs?
18          MR. WALDRON:  Object on vagueness, but you
19  can answer.
20          THE WITNESS:  You say how many of them
21  would --
22  BY MR. WOODS:

Page 65

1      Q.   Have the experience or expertise or
2   knowledge to create screen shots of those four tabs?
3      A.   In addition to the four people in the
4   section, there is approximately another five people
5   that have been actually trained and have occasionally
6   worked in that section.  So the vast majority of our
7   staff aren't familiar with how we compose the IA file
8   copy, but there's another five that have been
9   cross-training from time to time and have assisted in
10  the section.
11     Q.   There's not that much expertise or
12  knowledge that is necessary in doing a screen shot,
13  correct?
14          MR. WALDRON:  Objection, mischaracterizes,
15  argumentative.
16          THE WITNESS:  Well, I think you asked me
17  who has the experience or expertise, and so those are
18  the ones who have done it in the past.  And, it does
19  require attention to detail, and it would require
20  some training.  So, it's not something that we train
21  everyone to do, because we haven't had a need to.
22  BY MR. WOODS:

Alderson Reporting Company
1-800-FOR-DEPO

**Page 66**

1    Q.   Would the training just simply involve
2  telling someone this is the print screen button, when
3  you get to the overview tab, press this button?
4    A.   That would be part of it, but it's a
5  little bit more than that.  We want to teach them,
6  you need to capture all of the information.  When you
7  get to the correspondence, you still have to print it
8  out.  And we ask them to pay a great amount of
9  attention to the details to ensure that we have
10  captured the file and that it is accurate.
11      So I'm not saying it's something that's --
12  that requires a lot of training but it does require
13  training more than just push a button.
14    Q.   How much training would you think that
15  would require to produce an IA file, how much, in
16  time?
17    A.   Probably -- I would say a couple of hours,
18  and of course to get them access to the other
19  programs, I mean, so it's not -- we use another
20  software program to train folks on how to generate
21  the reports.  So -- approximately two to three hours.
22    Q.   And in that approximately two to three

**Page 67**

1  hours of training, they would also be trained on how
2  to generate a comments report and the contacts
3  report?
4    A.   Yes.
5    Q.   And once they received that two to three
6  hours of training, then it would take them
7  approximately 40 minutes to produce each IA file of
8  the tabs that we discussed, the four tabs, the
9  overview, HA, correspondence, comments, and then the
10  comments report and contacts report?
11    A.   Yes.
12    Q.   And so as you sit here today, you say --
13  well, in your -- in your declaration I believe you
14  said -- okay.
15      In paragraph 6 which is on page 3 you said
16  that currently I have five staff members who are
17  dedicated to fulfilling requests and performing
18  searches for information contained in NEMIS.  And you
19  say that it's possible that you can add -- that as we
20  sit here today that there are five additional people
21  who could also work on that task, correct?
22    MR. WALDRON:  Objection, mischaracterizes

**Page 68**

1  prior testimony.  But go ahead.
2    THE WITNESS:  I said there were five other
3  people who were trained to do this that were already
4  trained to do it, and who had done it in the past.
5  BY MR. WOODS:
6    Q.   Okay.  So that's a total of as we sit here
7  today, a total of maybe nine to ten people who have
8  the training necessary to produce an IA file?
9    A.   Yes.
10    Q.   But if need be you could spend
11  approximately two to three hours to train more
12  individuals out of the 350 employees that you oversee
13  in order to produce an IA file?
14    MR. WALDRON:  Object to vagueness.
15    THE WITNESS:  I stated it would take two
16  to three hours to train additional, but even of the
17  350 some of those are our -- that's the total in our
18  facility.  Some are in admin, they are in finance,
19  they are in supply and they have absolutely no
20  knowledge of NEMIS and don't even have access to
21  NEMIS.
22      So -- and then even the ones that are in

**Page 69**

1  our applicant services section, they have other
2  duties and responsibilities.  So I don't know that
3  like I say all 350 could be trained to do this
4  function, because we do have other functions and
5  responsibilities.
6  BY MR. WOODS:
7    Q.   Understandable.  Out of the applicant
8  services area, how many employees are there?
9    A.   We have 280 that are in the applicant
10  services section, approximately.
11    Q.   Would that be where you would get, if you
12  had to get additional employees to work on this
13  project, would they come from that pool of applicant
14  services employees or individuals or would they come
15  from another section?
16    MR. WALDRON:  Objection.  Calls for
17  speculation.
18    THE WITNESS:  If we were, they would come
19  from applicant services section.
20  BY MR. WOODS:
21    Q.   All right.  And applicant services, again,
22  I know you have given me the answer before, but what

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                      October 16, 2009

Washington, DC

---

Page 70

1  are the main duties or responsibilities of the
2  applicant services for lack of a better term --
3  department?
4      A.   The primary function is they staff our
5  call center which means they answer calls for
6  registration or help line and they actually do the
7  case processing.
8      Q.   If an individual wanted to -- for example,
9  if I wanted to find out what my FEMA ID number is, I
10 had filed one during Hurricane Katrina but I can't
11 recall it and I made a call to the 1-800 number -- I
12 think it's 1-800-something, F-E-M-A, would that go
13 through the applicant services department, that
14 question?
15         MR. WALDRON:  Object to vagueness.  You
16 can answer.
17         THE WITNESS:  Staff and applicant services
18 section would be the ones to answer that particular
19 phone call and provide that assistance.
20 BY MR. WOODS:
21     Q.   And do you know at one point applicants
22 were able to call the 1-800 number to inquire about

---

Page 71

1  their FEMA ID number and then at some point that
2  ability was limited, mean that individuals who called
3  that number to inquire about their FEMA ID number and
4  then were told that such a request had to be made in
5  writing?
6          Do you have any information or are you
7  aware of that particular decision?
8          MR. WALDRON:  Objection.  Assumes facts
9  not in evidence.
10         THE WITNESS:  I'm not aware of that.
11 BY MR. WOODS:
12     Q.   So are you aware as you sit here today if
13 an individual called to inquire about their FEMA ID
14 number, is that information that they can still be
15 given over the telephone today?
16     A.   It can be, but in order to give that
17 information out, our agents are required to -- the
18 applicant has to have some information to provide to
19 the agent so that we can verify that we are giving
20 that information out to the proper person.
21         So, you can't just call up and say my name
22 is John Smith, what's my ID number?  So, there is a

---

Page 72

1  verification process to access the file and to give
2  that information out.
3      Q.   What verification information would you
4  need in order for that information to be given out?
5      A.   We would need either their Social, their
6  name, the damaged dwelling address, their current
7  mailing address, their damage telephone number, their
8  current telephone number.  So we would have to go
9  through and be able to verify all of that to access
10 the file and then provide that information.
11     Q.   All of this information would be required
12 before you would give someone that FEMA ID number?
13     A.   Yes.
14     Q.   Pretty funny.  I never had to do that to
15 get my own FEMA ID number.  I only had to give my
16 Social Security Number to get it.
17         MR. WALDRON:  Objection.  Assumes facts
18 not in evidence.
19 BY MR. WOODS:
20     Q.   So is that a recent change to the rules?
21         MR. WALDRON:  Same objection.
22         THE WITNESS:  It hasn't been a recent

---

Page 73

1  change and when we open up the file and you only gave
2  your Social, if they didn't verify your address and
3  your phone numbers then that would have been an error
4  on the part of the agent that you talked to, because
5  those have been our procedures for a number of years.
6  BY MR. WOODS:
7      Q.   Maybe I just got lucky that day.
8          If you would, on page 4 of your
9  declaration, paragraph 8.  This is discussing the
10 production and the creation and production of 4,791
11 IA files, the last sentence says:  "For this work to
12 be completed on such an expedited basis, a contractor
13 would need to be hired."
14         If you have 280 employees that are working
15 in applicant services, why would a contractor need to
16 be hired to produce this?
17     A.   We couldn't dedicate all 280 to this
18 function.  We have other responsibilities and
19 disaster can occur at any time and we would need to
20 dedicate all of our resources.  And from time to time
21 even the four or five people in the section are
22 dedicated to duties that have a higher priority, such

---

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                                October 16, 2009
Washington, DC

---

Page 74

1  as registration intake and answering help line calls.
2  So the whole 282, except for the four or five, they
3  still have specific duties separate from the records
4  management section.
5       Q.   And that's when and if a disaster were to
6  occur, those individuals tasked with --
7       A.   Do you mean the four or five?
8       Q.   No.
9       A.   The whole 282.  No, I mean those are the
10 duties they are currently performing now.  They are
11 staffing our call center and processing cases for
12 active disasters right now.
13      Q.   Okay.  I guess for completeness, I will
14 attach the declaration as Exhibit 2.
15           (Exhibit No. 2 was
16            marked for identification.)
17      MR. WOODS:  Ms. Green, I think I have
18 exhausted what I can possibly ask about this subject
19 at this time.  Thank you.
20      MR. WALDRON:  Do you mind if we take a
21 break?
22           (Recess 11:14 a.m.-11:21 a.m.)

---

Page 75

1       EXAMINATION BY COUNSEL FOR THE UNITED STATES
2  BY MR. WALDRON:
3       Q.   Before we begin the questioning for the
4  United States, I'm Jonathan Waldron, representing the
5  United States.  You stipulated that some of the
6  exhibits we are going to introduce here with
7  Ms. Green are going to be marked confidential,
8  because they contain Privacy Act information and we
9  will supply within a reasonable amount of time after
10 the deposition copies of those same exhibits with
11 Privacy Act information redacted, so that -- if
12 somebody else requests a copy that information isn't
13 released.
14       Good morning, Ms. Green?
15      A.   Good morning.
16      Q.   Could you please state your full name and
17 spell your last name for the record?
18      A.   Bell Lance R. Green G-R-E-E-N.
19      Q.   Do you go by another name?
20      A.   Yes, I'm also known as Faye Green.
21      Q.   Where do you reside?
22      A.   132 Farm Road, Aberdeen, Maryland, 20001.

---

Page 76

1       Q.   You understand that you are under oath
2  today and you are sworn to tell the full and complete
3  truth?
4       A.   Yes.
5       Q.   Ms. Green, are you familiar with how FEMA
6  produces documents referred as individual assistance
7  or IA files?
8       A.   Yes.
9       Q.   And do you understand that's why you are
10 testifying here today?
11      A.   Yes.
12      Q.   Let's discuss your employment a little
13 bit.  Who's your employer?
14      MR. WOODS:  I'm going to just object.
15 Because we have been through all of this on direct.
16 This is not for trial purposes.  I'm just going to
17 enter an objection, I don't see the reason for going
18 through the same questions over again.
19      MR. BAIN:  He has a right to go through
20 this like you did with your expert witnesses and in
21 case this witness can appear at trial.
22      MR. WOODS:  I don't see how Ms. Green

---

Page 77

1  would ever appear at trial but if you want to do it,
2  go for it.
3  BY MR. WALDRON:
4       Q.   Ms. Green, who is your employer?
5       A.   Federal Emergency Management Agency which
6  is part of the Department of Homeland Security.
7       Q.   Is there a subdivision where you work?
8       A.   Yes.  Maryland National Processing Service
9  Center.
10      Q.   Is there an acronym that shortens that?
11      A.   NPSC, NPSC.
12      MS. PETROVICH:  Jonathan, this is Lezly.
13 Can you have the witness speak up, please?
14      MR. WALDRON:  We will move the phone a
15 little closer and also if everyone else can mute
16 their lines, because we continue to receive feedback.
17 BY MR. WALDRON:
18      Q.   Ms. Green, what is the title of your
19 position?
20      A.   The title of my position is center
21 manager.
22      Q.   And are you responsible for supervising

---

Bellance "Faye" Green                                              October 16, 2009
Washington, DC

Page 78

1    employees?
2        A.   Yes, I am.
3        Q.   About how many employees do you currently
4    supervise?
5        A.   Approximately 350.
6        Q.   And where is the NPSC located that you
7    work at?
8        A.   We are located in Hyattsville, Maryland.
9        Q.   And how many employees work at that
10   facility?
11       A.   350.
12       Q.   So you supervise every one of those
13   employees?
14       A.   Yes.
15       Q.   What are the primary functions that the
16   Hyattsville NPSC is responsible for?
17       A.   Our primary responsibilities are to take
18   registrations from disaster survivors, answer help
19   line calls, process cases for disaster assistance,
20   and we have a support section that includes our
21   administrative section.
22       Q.   How much of the time do the primary

Page 79

1    responsibilities take up of your staff?
2        A.   Well, of those that are assigned for
3    registration intake help line and processing,
4    100 percent of their time.
5        Q.   Are there any other NPSCs?
6        A.   There are two other NPSCs.
7        Q.   Where are they located?
8        A.   Winchester, Virginia, and Denton, Texas.
9        Q.   How are those facilities different from
10   the NPSC in Hyattsville?
11       A.   Each of the NPSCs have core functions of
12   registration intake, help line and case processing
13   and each NPSC has specific areas of expertise, so
14   they would also have their own areas of expertise
15   that aren't duplicated at the other NPSCs.
16       Q.   What area of expertise at the Hyattsville
17   facility does your center manager have?
18       A.   Records management, flood mapping and mail
19   operations.
20       Q.   Could you briefly describe what your
21   primary duties are as center manager?
22       A.   My primary duties are to supervise and

Page 80

1    manage the functions of our NPSC, supervise the
2    staff.
3        Q.   How does that repeat to individual
4    assistance files?
5        A.   I supervise the staff that actually
6    produces those files.
7        Q.   Now, where does the term individual
8    assistance file or IA file come from?
9        A.   It arises from the actual program which is
10   the individual assistance program, and the file would
11   include the information that comprises -- or related
12   to that particular program.  Related to the
13   applicant.
14       Q.   How are these files kept?
15       A.   They are all kept electronically within
16   our database.
17       Q.   What database would that be?
18       A.   It's called NEMIS, National Emergency
19   Management Information System.
20       Q.   How familiar are you with the NEMIS
21   system?
22       A.   I'm very familiar with it.

Page 81

1        Q.   How did you become familiar with it?
2        A.   Just from using it on a daily basis for
3    the last 11 years.
4        Q.   And so you have worked for FEMA for the
5    past 11 years?
6        A.   Yes.
7        Q.   Who uses NEMIS?
8        A.   A large group of folks use NEMIS but
9    within the individual assistance community would be
10   the staff at the NPSC, would be people in the field
11   at disaster recovery centers or disaster field
12   offices, is who would use NEMIS.
13       Q.   And what about non-FEMA employees, do they
14   have access to NEMIS?
15       A.   They don't.
16       Q.   And how specifically do FEMA employees
17   whether located in your facility or in the field use
18   NEMIS?
19       A.   On a daily basis.
20       Q.   What's the purpose of NEMIS?
21       A.   It's -- the purpose is to house
22   information related to the applicant's file, as well

21 (Pages 78 to 81)

Bellance "Faye" Green                                           October 16, 2009
Washington, DC

Page 82

1  as we use it to actual make the disaster assistance
2  eligibility determinations.  It stores information
3  about the file, how -- and any assistance that was
4  given to the applicant.  So it's used to store
5  information about the IA files.
6     Q.   Was NEMIS used in response to hurricanes
7  Katrina and Rita?
8     A.   Yes.
9     Q.   And was it used in the same way prior to
10  Katrina?
11     A.   Yes.
12     Q.   Do these, what are known as IA files, do
13  they exist in a paper form outside of the NEMIS
14  database?
15     A.   No, they don't.
16     Q.   What about in an electronic file folder
17  like most people have on their home computer, do they
18  exist in that type of format?
19     A.   No.
20     Q.   Why not?
21     A.   Well, I mean the system, you know, really
22  wasn't designed that way.  It was designed basically

Page 83

1  to track the processing of the file in terms of
2  eligibility determinations.  So the information
3  was -- is just only available electronically.
4     Q.   Can you simply open up a file in NEMIS and
5  print out all the information pretty quickly?
6     A.   No.
7     Q.   Why not?
8     A.   The way the information is contained in
9  NEMIS under various tabs, and so in order to extract
10  the information, it requires you to do screen prints
11  and use other software to actually generate all the
12  data that is contained about the file.
13     Q.   What are screen prints?
14     A.   Screen prints are just pulling up a tab or
15  pulling up information in NEMIS and hit the screen
16  print button, then opening up Microsoft Word and
17  pasting in a copy or -- like taking a picture of what
18  is in your screen and pasting it into Microsoft Word.
19     Q.   Are you saying that an IFL must manually
20  be assembled before it can be produced?
21     A.   Yes.
22     Q.   Is the reason that storing information

Page 84

1  within NEMIS the way it is stored would be more
2  advantageous than keeping it in a file folder, for
3  instance?
4     A.   It is more advantageous.
5     Q.   How so?
6     A.   Well, I will just compare it to pre-NEMIS
7  and we had actual hard copy files, and they are hard
8  to keep track of, you tend to lose pieces of the
9  file, pieces of paper, and basically it's only
10  available to the person who actually has the hard
11  copy file.  And an electronic file can be available
12  for people in various locations, the data's more
13  secure, and easily accessible.  So you are more
14  likely to have a complete file available at all
15  times.
16     Q.   So there is more consistency involved in
17  how data is organized in a database than simply in
18  file folders?
19     A.   Yes.
20     Q.   Ms. Green, I'm going to hand you what I am
21  marking as depo Exhibit 3.
22        (Green Exhibit No. 3 was

Page 85

1        marked for identification.)
2  BY MR. WALDRON:
3     Q.   Do you recognize the document I am handing
4  to you?
5     A.   Yes.
6     Q.   What type of document is that?
7     A.   It's an individual assistance file for an
8  applicant.
9     Q.   And how do you know which applicant that
10  is for?
11     A.   It's on the copy of the registration.
12     Q.   About how many pages is that particular IA
13  file?
14     A.   It looks like it's approximately 80 pages.
15     Q.   And --
16     A.   79 or 78 -- 77, looks like.
17     Q.   Can you tell me the name of the individual
18  whose IA file that is?
19     A.   Bobbie W-r-i-g-h-t.  Bobbie, B-o-b-b-i-e.
20     Q.   I'm looking at the first page.  Do you see
21  a stamp on that first page?
22     A.   Yes.

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                    October 16, 2009
Washington, DC

Page 86

1    Q.   What is that?
2    A.   It says certified to be a true copy of the
3    original.
4    Q.   Who would have put that on there?
5    A.   It would have been the person who actually
6    completed the file copy.
7    Q.   Can you flip to the last page, please?
8    That would be FEMA 1124-000078.
9    A.   Yes.
10   Q.   And what is that?
11   A.   This is the certificate of authenticity of
12   business records just certifying the file.
13   Q.   And whose signature is appearing at the
14   bottom?
15   A.   It's my signature.
16   Q.   What happened to this file after you
17   signed that page?
18   A.   After I signed that page?
19   Q.   Uh-huh.
20   A.   The file is scanned into a PDF file and
21   usually sent down to the requester of the file.
22   Q.   Is it put on a disk or is it e-mailed?

Page 87

1    How is it transferred?
2    A.   It's scanned, saved to a PDF file and then
3    copied to a CD.
4    Q.   Let's talk a little bit about the document
5    that typically makes up an IA file such as this one.
6    Would you consider Exhibit Number 3 to be typical of
7    what the average IA file is made up of?
8    A.   Yes, it is.
9    Q.   In general what categories are contained
10   in the IA file that your office produces?
11   A.   Usually a copy of the registration,
12   outgoing correspondence, letters we mail to the
13   applicant, incoming correspondence would include
14   information or documents that the applicant -- either
15   the applicant sent to us, that was sent to us about
16   the applicant from one of our field offices, or it
17   could have been sent from a third party on behalf of
18   the applicant.  And would be the screen prints that
19   would include information that we weren't able to
20   generate through a report.  And then would be a copy
21   of the comment log, contact sheets and the inspection
22   report.

Page 88

1    Q.   What are the contact reports?
2    A.   That would be just a summary of when the
3    applicant called our help line, and would include
4    just a summary of why the applicant called and the
5    nature of the conversation or the reason for their
6    call.
7    Q.   What about the comments report?
8    A.   That would include comments that were
9    entered into the file, either by the inspection --
10   the inspector who actually conducted the inspection;
11   would also include notes that the caseworker might
12   have entered into the file as they were processing
13   the case to explain why a decision was made, a
14   particular eligibility determination was made, or
15   basically notes about what has happened to the
16   applicant's case.
17   Q.   All right.  Let's go to the different
18   sections here.  The registration I think is the first
19   thing you told us about.  Where is that contained in
20   this packet?
21   A.   It's the first page.
22   Q.   Just the first page?

Page 89

1    A.   Yes.
2    Q.   And what about outgoing correspondence,
3    where would that be?
4    A.   That would be in the second section
5    starting in this case page 2, and it comes under --
6    from the correspondence part of NEMIS.
7    Q.   So they are grouped together within the
8    document, each type of -- whether it be
9    correspondence or contact reports, those are grouped
10   together?
11   A.   Yes.
12   Q.   So if it starts on page 2, can you go
13   ahead and tell me what is the last page of the
14   outgoing correspondence?
15   A.   Looks like it's page 35, 2 through 35.
16        MR. WALDRON:  I'm going to go ahead and
17   mark as a separate exhibit pages 2 through 35 of the
18   FEMA 124 Bates number.  And I will mark that as
19   Exhibit Number 4.
20        (Green Exhibit No. 4 was
21        marked for identification.)
22   BY MR. WALDRON:

Bellance "Faye" Green                                          October 16, 2009
Washington, DC

| Page 90 | Page 92 |
|---|---|

**Page 90**

1    Q.   This next section that starts on page FEMA
2    124000036; what is that?
3        A.   That is the start of the incoming
4    correspondence, information sent to us either from
5    the applicant or from someone else about the
6    applicant's case.
7        Q.   And how far, if you could tell us -- look
8    through and tell us, what would be the last page of
9    that incoming correspondence?
10      A.   It's page 54.
11              MR. WALDRON:  I will mark those pages 36
12   through 54 as Exhibit 5.  That is the incoming
13   correspondence, correct?
14              THE WITNESS:  Yes.
15              (Green Exhibit No. 5 was
16                  marked for identification.)
17   BY MR. WALDRON:
18      Q.   We are up to page 55.  Can you tell us
19   what that is?
20      A.   That is the start of screen print shots
21   from the applicant's file.
22      Q.   And how many screen shots do you see here,

**Page 91**

1    screen prints?
2        A.   This goes through page 65.
3        Q.   And I'll mark that as Exhibit 6.
4              (Green Exhibit No. 6 was
5                  marked for identification.)
6    BY MR. WALDRON:
7        Q.   What's this next document here?
8        A.   It's the contact report, which is a
9    listing of the times that either the applicant called
10   us, could also include we may have called the
11   applicant.  But conversations between either the
12   applicant or someone else on behalf of the applicant
13   about the applicant's case.
14      Q.   Okay.  And where does that end?
15      A.   That's 166 through 770.
16      Q.   That would become Exhibit 7, the contact
17   report.
18      A.   Yes.
19              (Green Exhibit No. 7 was
20                  marked for identification.)
21   BY MR. WALDRON:
22      Q.   71.  What's that?

**Page 92**

1        A.   71 starts with the comments, the
2    caseworker notes, or inspector notes, but just any
3    such information contained about the processing of
4    the applicant's file.
5        Q.   How long does that go on for?
6        A.   Through page 73.
7        Q.   Let's mark that as Exhibit 8.
8              (Green Exhibit No. 8 was
9                  marked for identification.)
10   BY MR. WALDRON:
11      Q.   And what starts on page 74?
12      A.   74 is the inspection damage report of the
13   damaged dwelling.
14      Q.   And how many pages is that?
15      A.   That goes through 77.
16      Q.   So this is all one report, then?
17      A.   Yes.
18      Q.   All right.  And then the final page 78 is
19   your cert of authenticity?
20      A.   Yes.
21      Q.   Do you have a general understanding of how
22   these documents make their way into the NEMIS

**Page 93**

1    database?
2        A.   Yes.
3        Q.   And what is your general understanding of
4    how that process works?
5        A.   All of the documents?  All of them?
6        Q.   Let's take it one by one.  The incoming
7    correspondence.  So Exhibit 4, how would these
8    documents -- this would be outgoing -- Exhibit 4 is
9    outgoing correspondence, how would those get into the
10   NEMIS system?
11      A.   They are either auto generated by the
12   system, occasionally when some eligibility
13   determinations are -- they are auto generated based
14   on the business rules for disaster processing, so the
15   system will automatically generate a letter.
16              They could be manually generated by a
17   caseworker as well.  But it would be generated and
18   then a copy will be stored in the applicant's file.
19      Q.   Have you observed this happening before?
20      A.   Yes.
21      Q.   And have you done it before?
22      A.   Yes.

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                    October 16, 2009
Washington, DC

Page 94

1    Q.   How many times have you seen this process?
2    A.   Of generating letters?
3    Q.   Uh-huh.
4    A.   Numerous times.  You know, in my previous
5    position in the records management mail operations
6    section, if I were helping out I might generate five,
7    six letters a day, where I'm actually doing
8    processing.
9    Q.   Generating these letters so that they are
10   either automatically generated in the NEMIS or
11   manually entered into the NEMIS, are the employees
12   that generate these letters required to do that?
13   A.   Yes.
14   Q.   Why is this information recorded in the
15   NEMIS like this?
16   A.   Um, so, you know, we could have, I guess,
17   a record of all the information related to the
18   applicant's file and the information we sent to
19   the -- what information we sent to the applicant,
20   what information the applicant sent back, so you can
21   have a central repository of the information relating
22   to the applicant's file as much as possible.

Page 95

1    Q.   With regard to outgoing correspondence, I
2    believe what you are saying is that when letters are
3    automatically generated, as soon as they are
4    generated they are immediately put into NEMIS; is
5    that correct?
6    A.   Right.  It's actually generated within
7    NEMIS or if I'm a caseworker generating a letter I'm
8    in the applicant's file where I generate the letter,
9    and then I send it to a process to actually be
10   printed.  So --
11   Q.   Right.  What about those letters that are
12   manually created, how do they -- are those put into
13   the NEMIS by the person who created the letter?
14   A.   Yes.
15   Q.   And when would they do that?
16   A.   It would be as they are processing the
17   actual case.  So in generating the letter actually
18   means that it's a letter that is available to use in
19   an applicant's file.  So someone isn't really writing
20   the letter.  These letters have already been
21   pre-approved and available for caseworkers to use.
22   So if you were processing a case and you

Page 96

1    know that you need to send the applicant a letter,
2    then within the applicant's file you bring up the
3    file, you bring up the category of the letter you
4    wanted to send.
5    For instance, if it's related to housing
6    assistance you would pick that program code or
7    category and select the letter that you want, and any
8    particulars about the letter.  And so at that point
9    when you complete a record of the -- a record of the
10   letter is sent out to the person's file at the same
11   time it is sent out to printing.
12   Q.   So the person who created these files and
13   manually selected the way they would go within NEMIS
14   or how they would be characterized within NEMIS
15   didn't have to have personal knowledge of the facts
16   within that document, right?
17   A.   Yes.
18   Q.   And the information recorded is generally
19   of a factual nature, is that right?
20   A.   Yes.
21   Q.   And the correspondence that is sent out,
22   it generally relates to FEMA's mission of disaster

Page 97

1    response; is that right?
2    A.   Yes.
3    Q.   Would you say that the process of
4    generating correspondence and then making sure it
5    immediately goes into NEMIS is a habit of employees
6    that you oversee?
7    A.   Yes.
8    Q.   And do you believe this procedure was
9    followed with regard to this contact log that is
10   Exhibit 3?
11   A.   Yes.
12   Q.   Let's talk a little bit about the requests
13   for IA files that you receive.
14   Tell me about -- are there any other
15   agencies that make requests for IA files?
16   A.   Yes.  We get requests for -- from a
17   variety of sources in addition to the applicant who
18   requests a copy of their file.  We get requests from
19   the Office of Inspector General.  We occasionally
20   receive FOIA requests from some of our regional
21   offices, and sometimes occasionally we will get
22   requests from, even sometimes the states might ask us

Alderson Reporting Company
1-800-FOR-DEPO

Page 98

1 for a file copy as well.
2     Q.   What about the Office of Inspector
3 General, what type of requests are those?
4     A.   They are usually requests generated from
5 an investigation that may be conducted.
6     Q.   Criminal or civil or do you know?
7     A.   Criminal.
8     Q.   Do any of these different types of people
9 that are entities that request documents within
10 NEMIS, is any priority given to one group over
11 another group?
12     A.   We usually give priority to the Office of
13 Inspector General requests, because they are
14 usually -- because they are criminal investigations
15 and many cases they are working under a deadline in
16 conjunction with the U.S. Attorney's office.
17     Q.   Are those typically an entire file
18 that is requested or just part of a file?
19     A.   Entire.
20     Q.   Are you familiar with FEMA's production of
21 IA files to the Department of Justice or production
22 in this litigation?

Page 99

1     A.   Yes.
2     Q.   How are you familiar with that?
3     A.   With the requests that we received
4 previously, we've received quite a few.
5     Q.   And this Exhibit Number 3 is one of those
6 requests?
7     A.   Yes.
8     Q.   How about the assembly of -- the assembly
9 process.  Who actually creates and assembles these IA
10 files once a request is made?
11     A.   It's usually specialists within our
12 records management section, or the ones who will
13 actually fill in and assemble the file.
14     Q.   How many staff are currently assigned to
15 the process or are assigned to processing these
16 requests?
17     A.   Right now we have four people assigned to
18 this function.
19     Q.   What percentage of those four employees'
20 time is typically dedicated to processing requests of
21 IA files?
22     A.   I would say 80 percent of their time is

Page 100

1 comprised of filling these types of requests from
2 various sources.
3     Q.   How is the other 20 percent spent?
4     A.   They also do case processing, they review
5 late applications for disaster assistance.  They will
6 also review scanned documents.  They also work with
7 our contractor that actually scans our documents so
8 they might review any documents that may be in an
9 error cue.  So they have other functions as well.
10     Q.   In the context of an emergency response
11 would the allocations of time for those four
12 employees change?
13     A.   Right.  When we get a major disaster
14 declaration, where our resources and our applicant
15 and services section have been tapped, we will kind
16 of -- I will put all of our staff in the building on
17 registration intake, so that will become our top
18 priority.  So anyone working in our building as a
19 minimum will be required to be able to take
20 registrations and so they would also be assigned to
21 that function if we needed them.
22     Q.   Would you, in the context of a disaster

Page 101

1 response would you characterize it as an "all hands
2 on deck" type approach?
3     A.   Exactly.
4     Q.   Let's talk about the time it takes to
5 process one of these IA files, not just for this
6 litigation but since you became center manager.
7 About how many requests have you overseen for
8 production of IA files?
9     A.   Probably -- several hundred.  I would say
10 500 to 1,000 or more.
11     Q.   Have you become familiar with the average
12 time it takes to create one of these IA files?
13     A.   Yes.
14     Q.   What is the average amount of time, on
15 average, that it takes FEMA employees to collect the
16 information within NEMIS and actually get it in the
17 form that it can be produced to another party?
18     A.   It takes approximately 50 minutes to
19 actually create the file, if someone only wanted it
20 in a hard copy format.  If they wanted it
21 electronically, then another ten minutes to scan it
22 and, you know through some type of medium, a disk.

26 (Pages 98 to 101)

Bellance "Faye" Green                                          October 16, 2009
Washington, DC

Page 102

1    Q.   So the average time would be about an
2  hour?
3    A.   Yes.
4    Q.   Does this time vary?
5    A.   It varies, depending on the file.  There
6  are some that take less, people that probably have
7  less correspondence in their file, but there are
8  others that could be upwards of a couple of hundred
9  pages, so it does vary.
10   Q.   What factors would affect how large an IA
11 file is?
12   A.   The main factor is the correspondence.  I
13 mean that's the biggest variable in terms of how much
14 time it takes, the most time-consuming part of
15 assembling a file.  And it's the one with the
16 greatest variance of applicants, in terms of how much
17 information is sent to us and how many letters we
18 sent to them and so on.
19          (Green Exhibit No. 9 was
20            marked for identification.
21 BY MR. WALDRON:
22   Q.   Ms. Green, I'm going to hand you what has

Page 103

1  been marked as Exhibit 9.  Can you tell me what that
2  document appears to be?
3    A.   It looks like just a listing of names.
4    Q.   About how many pages is that document?
5    A.   109 pages.
6    Q.   In what type of form is the information
7  produced on that document?
8    A.   It looks like a spreadsheet with two
9  columns completed and looks like Plaintiff L name and
10 Plaintiff F name.
11   Q.   Would that appear to be plaintiffs' first
12 and last names listed there?
13   A.   Yes.
14   Q.   What other information is listed there?
15   A.   That is it, just first and last name.
16   Q.   No middle initials?
17   A.   No.
18   Q.   What about FEMA ID numbers?
19   A.   No FEMA ID numbers.
20   Q.   If I were to represent to you that that is
21 approximately 5,000 names, just short of 5,000 names
22 on this document, and if you received a letter at

Page 104

1  your call center -- or I'm sorry, at your facility
2  that asked you to produce IA files for each one of
3  these individuals, could FEMA do this?
4          MR. WOODS:  Objection.  Assumes facts not
5  in evidence.
6          THE WITNESS:  No, we couldn't.
7  BY MR. WALDRON:
8    Q.   If you received a large list of just
9  names, first and last and other information, why
10 wouldn't you be able to process that request for IA
11 files?
12   A.   Well, I mean we have no way of identifying
13 the file or any information about it.  I mean we
14 would need more than just a first and last name.
15 Some names could be -- we don't know the disaster --
16 we don't know -- we don't have any information to
17 verify whatever file we access, that it's actually
18 the file, the accurate file for this particular
19 person.  So there is no information to verify here.
20   Q.   So, for example, would you turn to page
21 18?
22          Do you see the name Arthur Brown there?

Page 105

1    A.   Yes.
2    Q.   How many times does the name Arthur Brown
3  appear on that page?
4    A.   Four times.
5    Q.   Do you know which Arthur Brown each of
6  those are referring to?
7    A.   I don't.  There is no way to tell.
8    Q.   But you would expect that an approximate
9  listing of 5,000 names, there would be some
10 duplicates, right?
11   A.   Yes.
12   Q.   And how many --
13          MR. WOODS:  Objection.  Assumes facts not
14 in evidence.  They are not random names.
15 BY MR. WALDRON:
16   Q.   If you were given this list, if I were to
17 tell you that this list was produced by plaintiffs in
18 this litigation requesting these individuals' IA
19 files, would you expect that in a list of claimants
20 that there would be several duplicates in a list this
21 large?
22          MR. WOODS:  Objection.  Assumes facts not

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                                October 16, 2009
Washington, DC

Page 106

1    in evidence.  When the list was produced to -- the
2    government has received plaintiffs' fact sheet that
3    was given additional information.
4            MR. WALDRON:  I will object to the
5    continuance of the objection, other than you stating
6    what the objection is.
7    BY MR. WALDRON:
8        Q.   You can go ahead and answer.
9        A.   Based on the information here with just
10   first and last names, I would expect that there would
11   be duplicates.
12       Q.   How many names -- or how many individuals
13   have files within the NEMIS system?
14       A.   It is 11 years old.  There are millions of
15   names in the database.
16       Q.   Why would there be so many different
17   names?
18       A.   Well, we had the system for 11 years, and
19   people apply.  People have, you know, each name is
20   entered individually and even people can have had
21   multiple disasters in different areas, different
22   states and they are all contained in our database.

Page 107

1            So, you know, after 11 years, I mean, we
2    have millions of registrants.
3        Q.   What information would you need in order
4    to accurately identify an individual on this list,
5    perhaps, as being a person whose IA file that you
6    could find in the system?
7        A.   We would need either their disaster number
8    and registration number, or we would need their
9    disaster number plus their Social Security Number
10   and/or date of birth or the damaged dwelling address.
11   But some additional information.
12       Q.   In addition to their full name?
13       A.   Yes.
14       Q.   And what is a disaster number?
15       A.   The disaster number is a number given when
16   there is a presidential declared disaster declaration
17   so it's given.  It usually represents by state.  And
18   for instance, I use Katrina for Louisiana was 1603.
19   So it's unique to an incident period disaster that
20   was declared in a state.
21       Q.   So you are saying for Hurricane Katrina,
22   for instance, there would be a different disaster

Page 108

1    number for each of the states that were affected by
2    Hurricane Katrina?
3        A.   Yes.
4        Q.   And how many different disaster numbers
5    would there be?
6        A.   There were three, 1603, 1604, and 1605.
7        Q.   And what about Hurricane Rita, was that
8    considered a separate disaster?
9        A.   Yes.  They were separate disasters and
10   separate disasters in our NEMIS database, that was
11   1606 for Texas and 1607 which was also Louisiana.
12       Q.   So as I understand it, there is five
13   different FEMA disaster numbers that can be given out
14   for somebody that would be involved in the litigation
15   here?
16       A.   Yes.
17       Q.   How are those organized within NEMIS?  Is
18   there a separate IA file for each disaster?
19       A.   Yes.
20       Q.   In each state?
21       A.   Yes.
22       Q.   Is it possible then that an applicant

Page 109

1    could have more than one disaster file?
2        A.   Yes.  Louisiana, for example, someone,
3    there were some counties that were declared or
4    parishes in Louisiana that were declared for both
5    Katrina and Rita.  So it's possible that people have
6    a file under 1603 and 1607.
7        Q.   In order to produce IA files for an
8    individual, then, without the identifying information
9    you would have to -- tell us how many times you have
10   to search for that person's name?
11       A.   If we were only limiting it just to
12   Katrina and Rita, at least five times.  You know, to
13   ensure that -- to accurately identify the file you
14   would have to start searching at least through all
15   five of those.
16       Q.   That's why you would need a disaster
17   number, to narrow down the number of searches you
18   would do?
19       A.   Yes.
20       Q.   If a person has multiple files, you would
21   have to conduct that whole process of creating one of
22   those IA files and producing it separately, right?

28 (Pages 106 to 109)

Bellance "Faye" Green                                          October 16, 2009
Washington, DC

Page 110

1     A.   Yes.
2     Q.   What is the FEMA ID number?
3     A.   It is a unique number.  During Katrina and
4  Rita it was a nine digit number that was given to
5  that particular registration so it's unique to that
6  particular applicant.
7     Q.   And by disaster, is it across all
8  disasters that the same FEMA number would be used?
9     A.   It wouldn't be duplicated in any other
10 disaster, so it is unique in that sense, but you
11 can't put it in, let's say 1607 is not going to come
12 up.  So you would still need the disaster number even
13 related to that -- you have to have a match in that
14 particular disaster.
15    Q.   Right.  And the Social Security Number and
16 date of birth, how would that be used?
17    A.   If we have a name we could match it with
18 the Social Security Number that is unique and the
19 date of birth would give us additional verification
20 information to insure that you have the right file.
21    Q.   Let me ask you this.  If you have got a
22 name on this list here, Exhibit Number 9, that may

Page 111

1  appear somewhat unique, and you go to NEMIS and you
2  perform a search just on that person's name for each
3  of those five different disaster states or disaster
4  numbers within NEMIS, and you came up with one
5  person, would you be positive that that person is the
6  same person that is listed on this request?
7     A.   No.
8     Q.   Why not?
9     A.   We still don't have enough to even verify
10 a name.  So we still have no way of knowing for
11 certain that the file we pulled up is actually the
12 file that you were requesting or someone was
13 requesting without some additional information to
14 verify that we have access to the correct file.
15    Q.   So if that list also contained -- let me
16 ask you this, why is it important to accurately
17 identify the individual that requested the file with
18 the file that is produced?
19    A.   To ensure that we don't release
20 information to someone, you know, that we haven't
21 been properly authorized to release it to, based on
22 Privacy Act rules and guidelines and laws.

Page 112

1     Q.   Let's mark Exhibit 10 here.
2          (Green Exhibit No. 10 was
3          marked for identification.)
4  BY MR. WALDRON:
5     Q.   Let me hand it to you.  Can you tell me
6  what this appears to be?
7     A.   It says Privacy Act Release Language.
8     Q.   And could you go ahead and looks like,
9  just a paragraph there, would you go ahead and read
10 that for us?
11    A.   Sure.  It says I, Lyndon Wright,
12 understand the information maintained by the Federal
13 Emergency Management Agency (FEMA) and contained in
14 files related to disaster assistance provided to me
15 by FEMA subject to the Privacy Act of 1974, 5 U.S.C.
16 552a.  I hereby authorize FEMA to release to my
17 attorney, plaintiffs liaison counsel Justin Woods,
18 and Gerald E. Meunier, and defense liaison counsel
19 Andrew D. Weinstock, information contained in FEMA's
20 Privacy Act files related to the travel trailer or
21 mobile home unit provided to me by FEMA, dated
22 2-19-09, name Lyndon Wright, and his signature.

Page 113

1     Q.   Is there any other identifiable
2  information besides the name?
3     A.   No.
4     Q.   And so if this were provided along with
5  the list of names, and there is one Lyndon Wright on
6  the list and there was one Privacy Act release
7  provided with the name Lyndon Wright, would that be
8  enough information for you to --
9          MR. WOODS:  Objection, assumes facts not
10 in evidence.
11 BY MR. WALDRON:
12    Q.   -- pull Lyndon Wright's file from NEMIS?
13         MR. WOODS:  Objection, assumes facts not
14 in evidence.
15 BY MR. WALDRON:
16    Q.   You can go ahead and answer.
17    A.   It wouldn't be.  There is nothing to
18 verify Lyndon Wright.  There could be other names in
19 the file, so we would need other information to make
20 sure that Lyndon Wright who signed this Privacy Act
21 release, the file that we access, is actually the
22 correct file.  That he has authorized us, we are

29 (Pages 110 to 113)

Bellance "Faye" Green                                                October 16, 2009
Washington, DC

Page 114

1   releasing information to the right person.
2       Q.   At your Hyattsville facility when someone
3   makes a request for their IA file or an employer
4   request is made for that IA file, what type
5   information do you require that they provide you to
6   verify their identity?
7       A.   Right.  The applicant writes in and
8   requests a file, files a FOIA request with a release.
9   And we ask for their name, their disaster, their
10  registration number, their date of birth or their
11  Social.  So we ask for that identifying information.
12      Q.   Is there any documentation that you ask
13  for as well?
14      A.   A written release, of course.
15      Q.   Okay.  Let's go back a few minutes and
16  talk a little bit more about the document that was
17  within that file -- the IA file, Exhibit 3.
18          We talked about the outgoing
19  correspondence.  And I hand you Exhibit 5, which is
20  the incoming correspondence that you identified.  And
21  tell us how this gets into NEMIS?
22      A.   It would be documents that we either

Page 115

1   receive from the applicant via mail or fax that they
2   might have sent to us.  We also might receive
3   information from one of our field offices related to
4   the applicant's file and the applicant can also have
5   information sent to us on their behalf, for instance,
6   such as insurance information might be sent on behalf
7   of the applicant from a third party.
8       Q.   So those are the different ways that they
9   get to you.  What is the process, who actually puts
10  it into the NEMIS database?
11      A.   When they are received the mail section
12  would actually open the mail, you know, scan in the
13  documents, route them to another process for someone
14  to identify the applicant's information, and then
15  associate it, attach it to the applicant's file and
16  then it's forwarded to a caseworker for review if
17  some action is required.
18      Q.   So this is a process that is in place, has
19  it been in place for a long time?
20      A.   Yes.
21      Q.   Are the employees required to follow this
22  process?

Page 116

1       A.   Yes.
2       Q.   Would you say it's a habit that FEMA has
3   in processing these files?
4       A.   Yes.
5       Q.   You believe that is the case for the file
6   that you had have in front of you?
7       A.   Yes.
8       Q.   Next I'm going to hand you Exhibit 7.
9   This is the contact report.  Can you tell me how that
10  information gets into the file?
11      A.   Either from either the applicant calling
12  us or it could also be someone calling on behalf of
13  the applicant or occasionally we make outbound calls
14  to the applicants and that would also be contained in
15  the contact log.
16      Q.   So who puts these entries into this
17  contact log?
18      A.   It would be one of our human service
19  specialists who works in the call center.
20      Q.   So walk me through the process.  Someone
21  receives a call in your processing center from an
22  applicant, and I assume they have to go through some

Page 117

1   identifying information?
2       A.   Yes.
3       Q.   And what happens at that point?
4       A.   When they call in and they -- for
5   instance, once we verify that we are talking to
6   someone who is authorized to have access to
7   information in the file, we would obviously request
8   the applicant to -- we would ask, you know, for
9   purposes of the call, answer their questions and at
10  the end of the call they would enter a summary of the
11  applicant's call, why they called, and what
12  information was provided to the applicant.  So it
13  would just be a summary of the conversation.
14      Q.   Is this done at the end of the call or
15  sometimes during the middle of the call?
16      A.   It's usually done at the end of the call
17  and usually when the applicant is still on the phone
18  just to verify with them that they have captured
19  accurately the call.
20      Q.   And this is a process that you have
21  observed many times?
22      A.   Yes.

30 (Pages 114 to 117)

## Page 118

1    Q.  Have you ever completed that type of task?

2    A.  Yes.

3    Q.  And this is something that the employees

4  are required to do?

5    A.  Yes.

6    Q.  And the employee that was recording this

7  information would have -- would you had say they have

8  personal knowledge of the facts that they were

9  inputting?

10    A.  Yes.

11    Q.  And this was just a normal business

12  practice at FEMA?

13    A.  Yes.

14    Q.  And you would pretty much say this was a

15  habit that FEMA followed in this case?

16    A.  Yes.

17    Q.  And you believe that procedure would

18  follow with regard to this file that's in front of

19  you?

20    A.  Yes.

21    Q.  I'm going to hand you Exhibit Number 8,

22  the comments report.  Now you have explained what

## Page 119

1  this is already, but how does this report get

2  generated, who enters that information?

3    A.  It's entered either by the inspectors who

4  go out, who -- they may enter information about the

5  inspection that they conducted or it's also entered

6  by one of our human services specialists or another

7  FEMA employee and it's also in -- the field offices

8  would also enter information.  Basically it's just,

9  would be if they took some action on the file, they

10  would enter just a summary of what actually may have

11  occurred.

12    Q.  So if an employee takes action on a file,

13  are they required to input information on what those

14  actions are?

15    A.  Yes.

16    Q.  Why do they do that?

17    A.  So we have a complete record of what has

18  transpired so if the applicant calls back, I mean we

19  have a historical record of what actions have been

20  taken on the file.  So that, you know, they call

21  back, I answer the phone and even though I may not

22  have worked the case, I know what actions were taken

## Page 120

1  and why they were taken.

2    Q.  Have you yourself ever inputted data into

3  a comments report?

4    A.  Yes.

5    Q.  Have you done it many times?

6    A.  Many times.

7    Q.  Have you supervised others doing it?

8    A.  Yes.

9    Q.  Do you believe this is a habit FEMA has in

10  regard to recording this information?

11    A.  Yes, it is.

12    Q.  And you believe the procedure was followed

13  in this individual assistance file?

14    A.  Yes.

15    Q.  And going back to the comments report, the

16  previous exhibit, you would expect that if a call was

17  made to FEMA --

18    MR. BAIN:  You said comments report.  You

19  mean contact report?

20  BY MR. WALDRON:

21    Q.  I'm sorry, the contact report, the one

22  where information is generated after a phone call,

## Page 121

1  right?

2    A.  Yes.

3    Q.  And I think you said that is generally

4  confirmed with the applicant on the phone, these

5  words when the phone call is ended?

6    A.  Yes.

7    Q.  Would you expect that if a call was made

8  and complaint was made about something, that that

9  information would be contained in that contact

10  report?

11    A.  Yes.

12    Q.  Let's talk about the process of actually

13  creating one of these IA files.  We talked about how

14  long it takes, approximately an hour.  I'm going to

15  hand you Exhibit Number 6.  These are the screen

16  shots you identified earlier.

17    Can you tell me where the correspondence

18  information would be located within NEMIS based on

19  that screen shot?

20    A.  That would be under the correspondence

21  tab.

22    Q.  Okay.  Could you go ahead and circle that

Alderson Reporting Company
1-800-FOR-DEPO

Page 122

1    and write an "A" next to it, please?
2          And where would the -- would that be both
3    incoming and outgoing correspondence?
4          A.   Yes.
5          Q.   What about the contact report?
6          A.   It would be where it says comment, it
7    could be one of two places here.  It could be under
8    this tab or it can also be accessed from where it
9    says events.
10         Q.   Can you circle each of those and put a "B"
11   next to it, please?
12         When you access one of those buttons, what
13   comes up?
14         A.   For instance, correspondence, if you
15   access it, it will at the top just show a listing of
16   incoming correspondence and at the bottom it will
17   show a listing of outgoing correspondence.
18         Q.   And what about the contact report?
19         A.   The contact would just show a block where
20   you could enter the actual comment and will also show
21   just a listing of previous comments and contacts as
22   well as some other information.

Page 123

1          Q.   The information on the contact report,
2    does it appear -- does a pop-up appear in the same
3    way that report in exhibits 8 and 9 of the --
4          A.   It doesn't.  It only just shows a listing
5    of just the summary.  If you were looking in NEMIS it
6    would only show a listing of just the summary and the
7    dates, and in order to actually see the full text you
8    would need to then click on it and open up the full
9    box.
10         Q.   Is there any way to just print off once
11   those boxes are open?
12         A.   Well, you would have to do screen prints.
13         Q.   So -- are you saying that each of these
14   entries are separate boxes that have to be pulled up
15   separately?
16         A.   Yes.
17         Q.   So how did this report get generated?
18         A.   We go into another software program called
19   Business Objects but basically it links in with NEMIS
20   and we are able to extract from the tables at least
21   the comments and the contacts reports.
22         Q.   So this is how this report in Exhibit 8

Page 124

1    would be generated?
2          A.   Correct.
3          Q.   And that would be the same for the
4    comments report as well?
5          A.   Yes.
6          Q.   Can you mark on that same Exhibit
7    Number 6 -- or -- it's hard to read upside down --
8    yeah, Exhibit Number 6, can you circle where the
9    comments report is taken from?
10         A.   I'm not sure where.
11         Q.   How would you access the information
12   that's contained in a comments report within the
13   NEMIS database?
14         A.   We would have to go to the events log.
15         Q.   It's the same tab as the contact report?
16         A.   Right, they are both.
17         Q.   Okay.  What about the first page of an IA
18   file that has the general information, where would
19   you access that from?
20         A.   It would be under where it says PRT reg,
21   print reg, which is to print a copy of the
22   registration.

Page 125

1          Q.   Can you circle that and put a C next to
2    it?
3          And when you go into -- assuming you have
4    been able to identify an individual and pull up their
5    file like this, what's the first thing that you do?
6          A.   The first thing would be to print a copy
7    of the registration, since that's usually the first
8    page and contains the information, in most cases
9    given at registration.
10         Q.   What do you do next?
11         A.   Next would go to the correspondence tab
12   and click the outgoing and incoming correspondence
13   and then we would do the screen prints from each of
14   the other tabs in NEMIS.
15         Q.   So, tell me how information is arranged
16   within the NEMIS system?
17         A.   They are normally arranged on a variety of
18   tabs or categories.  As shown here, this, which is a
19   screen print of NEMIS, basically you have information
20   under overview, applicant info, insurance, housing
21   assistance, other needs assistance, personal
22   property, real property, inspection summary.

Bellance "Faye" Green                                    October 16, 2009
Washington, DC

Page 126

1    So it's a variety of tabs of information
2    that reveals additional information when you tab over
3    to those sections.
4        Q.   How many tabs are represented within
5    NEMIS?
6        A.   There are 12 main tabs with information in
7    them.  There is also information, for instance, like
8    the print registration, the DR info and the events
9    log that just has a chronological events of
10   everything that is happening within the file.
11       Q.   So to capture all the information or
12   absence of information that are within these tabs,
13   what would you have to do?
14       A.   You would have to tab over to review the
15   tabs to see if there is information there, and then,
16   of course, do a screen print of what was actually
17   there.  Which means hitting screen print, opening up
18   Microsoft Word and saving each page as you kind of
19   take a copy of it, and saving it to Microsoft Word.
20       Q.   What about information that may require
21   scrolling down or a pop up box?  What do you do in
22   those instances?

Page 127

1        A.   Right.  Most files have information that's
2    not going to be displayed when you go to the tab.  So
3    in order to access all of the information to get a
4    complete copy, you have to either scroll down for
5    additional information or in some cases scroll over
6    to get a complete copy of a file of the screen.
7        Q.   How do you know which -- I know there are
8    several screen shots there.  How do you know which
9    tab is represented on each screen shot?
10       A.   It's usually shown at the top and usually
11   the tab that you are viewing would be in bold.
12       Q.   How many tabs would you say on average, if
13   you were to print screen shots for, not just the
14   information that is in there, but for the tabs that
15   don't have information, to show that they don't have
16   information, how many tabs on average do you think
17   that you would have to -- how many screen shots would
18   you have to take in order to capture all of that
19   information?
20       A.   It varies by applicant, depending on how
21   much you have to scroll down or scroll over, but it
22   could be anywhere from 15 to 20 different screen

Page 128

1    shots that you would need to take.
2        Q.   Assuming 15 to 20 screen shots that you
3    have to take on an average file, how long does the
4    process take from the moment you get into the IA file
5    to start looking for the information, using the print
6    screen function, identifying that there's scrolling
7    that needs to take place, and the traditional screen
8    shot and pasting it on the Word document and printing
9    out that Word document, how long does that process
10   take?
11       A.   On average ten minutes, but that doesn't
12   include the correspondence tab which is done
13   separately.
14       Q.   It also wouldn't include the contact
15   report and comments report?
16       A.   Correct.
17       Q.   For each of the contact and comments
18   reports, that extra database, how long would it take
19   on average to produce all -- each of those type of
20   reports?
21       A.   For the comments, contacts and inspection
22   report that are all generated through the other

Page 129

1    software, it's about ten minutes.  On average.
2        Q.   And how long on average would you say that
3    the correspondence tab takes to print out those
4    documents?
5        A.   30 minutes.
6        Q.   Why would it take so long?
7        A.   It takes longer because even -- you have
8    to access every individual line of correspondence,
9    for instance, for the outgoing mail.  Every letter we
10   send you have to bring it up, view the letter and
11   then print the letter.  And so on average most
12   applicants had at least three to four, and for the
13   Katrina and Rita disasters they had a lot more
14   outbound correspondence.
15       For the incoming correspondence you have
16   to view every piece separately, and because of the
17   limitation of the scanning software we were using
18   during Katrina, when you even bring up an in-bound
19   piece of correspondence, if it has multiple pages,
20   you have to view the page and print the page
21   separately.  So that disaster was a lot more
22   time-consuming because of the way the images were

33 (Pages 126 to 129)

Bellance "Faye" Green                                        October 16, 2009
Washington, DC

|                                                        | Page 130 |
|--------------------------------------------------------|

Page 130

1    stored in NEMIS.
2        Q.  So in order to print off -- somebody sends
3    in a letter that is say, 10 pages long and you wanted
4    to open up the incoming correspondence and print off
5    that document, you are telling me you have to pull up
6    each page separately and hit the print button ten
7    different times in order to get that information?
8        A.  Yes, it brings up all ten pages, but you
9    have to view Page 1, print, and view page 2, and
10   print it out.  So every page requires a different --
11   hitting the print button, for example.
12       Q.  So the size of a person's IA file really
13   does affect how long it will take to print out those
14   documents?
15       A.  Yes.
16       Q.  So after you physically print out these
17   documents, whether it be from the Word print screens
18   or from the comments report that is generated, what
19   happens then?
20       A.  Once we generate all the reports and the
21   screen prints, we, you know, print out, collate the
22   file, and if they have asked for it in some form

Page 131

1    other than hard copy and in this case -- for this
2    case we had to actually scan them into a PDF file and
3    save them to a CD.
4        Q.  So you assemble all the documents before
5    scanning them?
6        A.  Yeah, we verify that all of the pages
7    belong to the applicant, that we pull the file.  We
8    do a quick review of the file, assemble it in the
9    order that we put them in and then actually scan
10   them.
11       Q.  And how long does that whole process take?
12       A.  On average ten minutes.
13       Q.  So I think you said about ten minutes for
14   the contact, comments, inventory reports -- I'm
15   sorry, inspection reports; and 30 minutes on average
16   for the correspondence file and ten minutes on
17   average for the screen shots.  That adds up to
18   50 minutes, right?
19       A.  Yes.
20       Q.  And ten minutes or so to put it in a
21   produceable form?
22       A.  Yes.

Page 132

1        Q.  So that is where we get the hour that it
2    takes to produce each of these files?
3        A.  Yes.
4        Q.  And if a person had multiple IA files, say
5    one for Katrina and one for Rita, you would have to
6    undergo that process two times?
7        A.  Yes.
8        Q.  Has FEMA considered alternatives to this
9    process?  Let me step back for a minute.
10           Do FEMA employees generally need to print
11   out the documents within a person's IA file for their
12   own use?
13       A.  No.
14       Q.  Okay.  Has FEMA considered alternative
15   measures to be able to produce these files more
16   quickly?
17       A.  We have and we have been able to generate
18   some reports, for instance, the inspection report,
19   the contact comment report have been -- you know,
20   we've kind of generated reports that will give us
21   that information and prevent us from having to do the
22   screen prints, and we have looked at the others but

Page 133

1    we haven't really found a way, an efficient way to
2    print those out yet.  So --
3        Q.  What about would there be any problems if
4    third parties other than FEMA employees or a
5    contractor working with FEMA was given access to
6    these files to try to search for individual
7    applicants?
8        A.  Well, it's not an easy process to just
9    bring a contractor in to work on the process or the
10   project.
11       Q.  I'm saying a non-contractor, though.
12       A.  Other FEMA workers?
13       Q.  Non-FEMA employees.  If Plaintiff's
14   Counsel said let me bring my people in and we will
15   search for the files and do this process, would that
16   be a possibility?
17       A.  No.
18       Q.  Why not?
19       A.  Only people that have been -- I mean there
20   are requirements before we allow people to have
21   access obviously to the FEMA network or to any kind
22   of privacy information which would be our IA files.

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                      October 16, 2009
                        Washington, DC

Page 134

1        So not just anyone has access to the file
2   or can have access to the file.  There is a process
3   even for FEMA employees to go through before they are
4   given access.
5        Q.   What do they have to go through before
6   they get access?
7        A.   Well, obviously they have to be
8   fingerprinted, background checks conducted, and they
9   have to at least be cleared to have access to the
10  FEMA network.  And then, of course, they are given
11  rights to access to NEMIS.  So not every employees
12  has access to NEMIS.
13       Q.   Why is that?
14       A.   Because only those folks who actually work
15  in disaster assistance processing have a need to have
16  access to NEMIS or should have access.
17       Q.   What about a contractor?  Is that
18  something that is being considered?
19       A.   That has been considered, you know, that's
20  a lengthy process to get the contractor to have
21  access -- vetted to have access to our database and
22  records as well.

Page 135

1        Q.   What type of records would be necessary to
2   put that in place?
3        A.   Depending on how it was done, let's say if
4   it was done at the contractor's site, you would have
5   to worry, there are physical security requirements,
6   cyber security requirements to access into the FEMA
7   network, and of course there is also your personnel
8   security requirement.
9        Q.   And what about space issues?  Could this
10  be performed at your facility?
11       A.   Not at our facility.  We are right now, I
12  mean we have more people than seats.  So luckily we
13  have no overlapping shifts so our facility seats
14  probably about 300 people and we are at 350 right
15  now.  So space is a premium.
16       Q.   What about the timing of these approvals,
17  how long does it -- do you have any experience with
18  how long it takes to have approvals for say,
19  security, for having NEMIS be offsite or some other
20  type of program offsite?
21       A.   Well, I will just base it on right now, we
22  have a contract for parts of our mail operations, and

Page 136

1   we have one contractor who has been trying for --
2   it's been close to a year to meet all the cyber
3   security and physical security requirements.
4        So it is a lengthy process to get that
5   done and it requires -- inspections by the FEMA
6   security team as well as, you know, if they are using
7   their own software, even our software, then the cyber
8   security folks have to clear them before, you know,
9   we can allow them to do the work.
10       Q.   Would it be considered -- do you have
11  money in your budget to undergo a process like this?
12       A.   We don't.
13       Q.   And would FEMA's involvement as far as
14  training still be something that they would have to
15  undergo if a contractor was hired?
16       A.   Yes.
17       Q.   Why is that?
18       A.   They would have to be trained how to
19  access NEMIS, how to use Business Objects.  They
20  would need to train them on where all the information
21  is, and how to navigate through NEMIS.
22       Q.   Now we know that you supervise 350

Page 137

1   employees.  It's a big responsibility, right?
2        A.   Yes.
3        Q.   Of those 350, how many are in the
4   individual assistance section -- maybe I'm saying
5   that wrong.
6        But what section handles the processing of
7   requests?
8        A.   Handles the file copy requests?
9        Q.   Uhm-hmm.
10       A.   That's our records management and control
11  section, and they are authorized by the people --
12  currently right now we have four.  One position is
13  vacant.
14       Q.   Right.  Are you attempting to fill that
15  position?
16       A.   Yes -- eventually, hopefully.
17       Q.   Of those 350 employees, how many of those
18  employees typically handle phone calls and other
19  types of disaster response activity that go -- that
20  generates information that goes into NEMIS?
21       A.   We have 282 agents who are considered
22  human services specialists and those are the

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green

October 16, 2009

Washington, DC

## Page 138

1  employees who actually work in our call center
2  handling the registration and help line calls and
3  actually processing cases.
4      Q.  Obviously during the time of a disaster
5  response, would you expect -- one would expect that
6  there was increased need for these employees to do a
7  lot of work, right?
8      A.  Yes.
9      Q.  Do they have work to do when there's not
10 an ongoing major disaster response?
11     A.  Well, we always have some type of ongoing
12 disaster response.  Disasters typically last
13 18 months, sometimes it's longer in terms of
14 processing.  So right now we still have people who
15 are responding to Katrina Rita calls, for example.
16 So, you know, there's not a time that a disaster
17 response really ends and we are always available and
18 we answer those calls, but right now we have several
19 relatively new disasters in the registration period
20 such as Georgia and American Samoa.
21     Q.  So the scope of the calls you get, they
22 could be from any U.S. state, including the

## Page 139

1  territories?
2      A.  Yes.
3      Q.  And so would you -- how would you
4  characterize how full of a workload these 280
5  employees have?
6      A.  Well, it varies depending on the level of
7  disaster activity, but you know -- um, we have enough
8  work to keep them busy, and we have ongoing annual
9  training requirements that we have to fulfill as
10 well, and proficiency training in their skill sets.
11     Q.  Now earlier in this deposition you made a
12 comment that it takes 40 minutes to produce an IA
13 file with certain information that was presented to
14 you about certain tabs.  Do you remember that?
15     A.  Yes.
16     Q.  You said it would take 40 minutes.  Were
17 you talking about on average?
18     A.  On average.  And it always depends on the
19 actual particulars of the file and like I say the
20 main part is the correspondence tab and in fact
21 that's what really drives the processing time.
22     Q.  So reducing a couple of numbers of tabs

## Page 140

1  that you would have to access print shots for would
2  reduce the time overall that it would take to produce
3  those files?
4      A.  Correct.
5      Q.  And when you gave that 40-minute figure,
6  were you taking into consideration the amount of time
7  it would take to print, scan and burn to a CD that
8  information?
9      A.  No, that was just the hard copy part of
10 it, just generating of information but not moving it
11 to another medium.
12     Q.  So overall, with the limit -- with the --
13 the list of items that were requested earlier in the
14 deposition when you gave that 40-minute figure, total
15 time it would take to actually produce those, in
16 electronic format to an electronic medium, would be
17 about 50 minutes?
18     A.  Yes.
19     Q.  We also talk a little bit about where
20 documents come from to get into NEMIS, and I think
21 you made some kind of representation regarding most
22 documents should be tracked into NEMIS.  Do you know

## Page 141

1  if there is documents out there that you are not
2  aware of?
3      A.  No.
4      Q.  Is it possible that certain documents are
5  tracked in other databases that wouldn't necessarily
6  be tracked in NEMIS?
7      I should say information, not necessarily
8  documents.
9      A.  There could be, but I'm not aware of that.
10     MR. WALDRON:  Can we take a short break?
11     MR. WOODS:  A quick break.  I have a plane
12 to catch.
13     MR. WALDRON:  All right.
14     (Recess 12:39 to 12:41).
15     FURTHER EXAMINATION BY COUNSEL FOR
16     PLAINTIFFS STEERING COMMITTEE
17 BY MR. WOODS:
18     Q.  Ms. Green, I have just one follow up
19 question.  Actually I want to refer you to Exhibit 9.
20 You said if you received this particular listing that
21 just has Plaintiff L names and Plaintiff F names,
22 that you wouldn't be able to produce an individual

Bellance "Faye" Green                                              October 16, 2009
Washington, DC

| Page 142 | Page 144 |
|---|---|

Page 142

1  assistance file just based upon this list, correct?
2      A.   Right.  We would -- we would need
3  additional information to identify the file.
4      Q.   Right.  You need additional information.
5  Have you seen a document that has been used in this
6  litigation called a Plaintiff Fact Sheet?
7      A.   I have not.
8      Q.   You have not?
9          Are you aware that attached to the
10 Plaintiff Fact Sheet is the Privacy Act waiver that
11 is completed by an applicant?
12         MR. WALDRON:  Objection.  Assumes facts
13 not in evidence.
14         THE WITNESS:  I saw the one that was
15 listed here for Mr. Wright.
16 BY MR. WOODS:
17     Q.   Okay.  And if that Privacy Act is released
18 to what we call a Plaintiff Fact Sheet that details,
19 it's about 30 pages of information for that
20 particular applicant, which would give name, address,
21 damaged property address, Social Security Number,
22 telephone numbers and the like.

Page 143

1          If you had that information, you would
2  then be able to generate an individual assistance
3  file; is that correct?  And assume that would be some
4  of the information?
5      A.   Did you say it had the disaster
6  registration number?
7  BY MR. WOODS:
8      Q.   I didn't say disaster, I said, name,
9  address, Social Security Number --
10         MR. WALDRON:  I will object as vague.
11         THE WITNESS:  Well, we still don't have it
12 narrowed down.
13         And so it -- if they had a Social Security
14 Number, we would still have to kind of search which
15 disaster are we going to find a match with the name
16 and Social Security Number.
17 BY MR. WOODS:
18     Q.   But you testified earlier if you had the
19 damaged property number, that that would be
20 additional information that would aid you in
21 identifying the individual, correct?
22     A.   It would, but we would still have to do --

Page 144

1  without the disaster registration number, we would
2  still have to find which one are we going to find a
3  match.
4          So even if we have the damaged property
5  address and we could get more than one name match --
6  but let's say we have Lyndon and the damage, we would
7  still need to try to -- so we would know that maybe
8  it's Louisiana, but we need to now see, is it 1603 or
9  is it 1607.
10     Q.   Okay.  When you produced the 100-plus IA
11 files earlier in this litigation; what information
12 was provided to you and who did you receive that
13 information from?
14     A.   We received it from my office from counsel
15 and in some cases we only got a name and we weren't
16 able to fill the request without additional
17 information, so in most cases we got additional
18 verifying information.
19     Q.   From the office -- from the General
20 Counsel office?
21     A.   Yes.
22         MR. WOODS:  No further questions.

Page 145

1          MR. WALDRON:  Quick follow-up.
2             FURTHER EXAMINATION BY
3             COUNSEL FOR UNITED STATES
4  BY MR. WALDRON:
5      Q.   If you have a Plaintiff -- if we provided
6  5,000 or 8,000 Plaintiff Fact Sheets and a Privacy
7  Act waiver like you see here at Exhibit Number 10,
8  but this list was produced separately, is there any
9  way to know that the Arthur Brown or the four Arthur
10 Browns that are listed in Exhibit Number 9 the same
11 Arthur Brown that is listed on the fact sheet?
12     A.   No.
13         MR. WALDRON:  Nothing further.
14         MR. WOODS:  That concludes.  And we will
15 get a dirty this evening?
16         THE REPORTER:  Yes.
17         MR. WOODS:  Okay.
18         (Whereupon, at 12:45 p.m., the taking of
19 the instant deposition ceased.)
20
21
22

37 (Pages 142 to 145)

Bellance "Faye" Green                                          October 16, 2009
                    Washington, DC

Page 146

1
2
3
4
5
6        _____
7            Signature of the Witness
8
9
10
11    SUBSCRIBED AND SWORN to before me this _____ day of
12    _____, _____.
13
14
15
16
17
18        _____
19            Notary Public
20
21
22    My Commission Expires:_____

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                    October 16, 2009

Washington, DC

**A**

**Aberdeen** 10:4
  11:10 75:22
**ability** 58:7 71:2
**able** 38:1,6,11
  64:14 70:22
  72:9 87:19
  100:19 104:10
  123:20 125:4
  132:15,17
  141:22 143:2
  144:16
**above-entitled**
  1:14
**absence** 126:12
**absolutely** 68:19
**abstract** 17:17
**access** 21:13
  39:17 66:18
  68:20 72:1,9
  81:14 104:17
  111:14 113:21
  117:6 122:12
  122:15 124:11
  124:19 127:3
  129:8 133:5,21
  134:1,2,4,6,9
  134:11,12,16
  134:16,21,21
  135:6 136:19
  140:1
**accessed** 122:8
**accessible** 84:13
**account** 41:8,8
**accurate** 66:10
  104:18
**accurately**
  107:4 109:13
  111:16 117:19
**acronym** 56:9
  56:12 77:10
**Act** 9:20 61:3,6
  61:16,18 62:13
  75:8,11 111:22
  112:7,15,20

113:6,20
  142:10,17
  145:7
**action** 16:14
  18:5 115:17
  119:9,12
**actions** 119:14
  119:19,22
**active** 74:12
**activity** 17:10
  137:19 139:7
**actual** 18:13
  44:5 80:9 82:1
  84:7 95:17
  122:20 139:19
**Adam** 2:15
  10:14
**add** 67:19
**addition** 51:21
  65:3 97:17
  107:12
**additional** 31:9
  35:22 36:13
  41:15 45:9
  46:7 51:22
  54:14 67:20
  68:16 69:12
  106:3 107:11
  110:19 111:13
  126:2 127:5
  142:3,4 143:20
  144:16,17
**additions** 34:22
**address** 11:8
  72:6,7 73:2
  107:10 142:20
  142:21 143:9
  144:5
**adds** 131:17
**adjuster** 29:20
**admin** 68:18
**administrative**
  78:21
**advantageous**
  84:2,4
**affect** 102:10

130:13
**affidavit** 21:2
  58:11 59:9
**agencies** 97:15
**Agency** 12:5
  77:5 112:13
**agent** 71:19 73:4
**agents** 71:17
  137:21
**agreement**
  22:16 53:9
  57:6
**ahead** 29:17
  31:5 61:9 68:1
  89:13,16 106:8
  112:8,9 113:16
  121:22
**aid** 143:20
**al** 4:6
**Allen** 3:6
**allocations**
  100:11
**allow** 133:20
  136:9
**alternative**
  132:14
**alternatives**
  132:8
**AMANDA** 6:16
**America** 10:13
**American** 46:13
  138:20
**amount** 44:7
  66:8 75:9
  101:14 140:6
**ANDREA** 1:15
  1:21
**Andrew** 112:19
**and/or** 107:10
**annotated** 35:16
**annual** 139:8
**answer** 11:19,20
  31:5 55:14
  64:19 69:22
  70:5,16,18
  78:18 106:8

113:16 117:9
  119:21 138:18
**answering** 13:9
  74:1
**anybody** 32:7
**apparently**
  43:19
**appeal** 19:12
**appear** 33:15
  76:21 77:1
  103:11 105:3
  111:1 123:2,2
**appearances** 2:1
  3:1,12 4:1,3
  5:1,3 6:1,3 7:1
  7:3 8:1,3 10:9
**appearing** 86:13
**appears** 29:5
  30:7,15 32:15
  32:19 43:18
  103:2 112:6
**applicant** 12:22
  13:5,6,7 14:13
  18:14 19:1
  22:1,4,5,6,17
  22:21 23:1,4,9
  24:15,17,18,21
  25:4 29:11,22
  30:9 38:10
  40:9,13,16,20
  41:2,14,19
  43:10,16 44:13
  45:2 46:3 48:1
  48:19 49:4,12
  51:12,14,17
  52:16,19 53:21
  55:11,17,20
  56:5 61:17
  69:1,7,9,13,19
  69:21 70:2,13
  70:17 71:18
  73:15 80:13
  82:4 85:8,9
  87:13,14,15,16
  87:18 88:3,4
  90:5 91:9,11

91:12,12 94:19
  94:20 96:1
  97:17 100:14
  108:22 110:6
  114:7 115:1,4
  115:7 116:11
  116:13,22
  117:8,12,17
  119:18 121:4
  125:20 127:20
  131:7 142:11
  142:20
**applicants** 21:11
  56:16 70:21
  102:16 116:14
  129:12 133:7
**applicant's**
  16:16 18:16
  25:7 34:17
  62:19 81:22
  88:16 90:6,21
  91:13 92:4
  93:18 94:18,22
  95:8,19 96:2
  115:4,14,15
  117:11
**application**
  18:10 26:20
  31:11
**applications**
  100:5
**Application/R...**
  9:12
**applied** 63:3
**apply** 106:19
**approach** 101:2
**appropriate**
  17:9
**appropriately**
  27:12
**approvals**
  135:16,18
**approximate**
  105:8
**approximately**
  12:19 13:3

39:16 47:7
50:2,20 54:13
59:20 63:20
64:5 65:4
66:21,22 67:7
68:11 69:10
78:5 85:14
101:18 103:21
121:14
**archived** 17:8
18:3
**archiving** 15:18
15:19,22 16:2
18:3
**area** 41:3 56:21
69:8 79:16
**areas** 79:13,14
106:21
**argumentative**
65:15
**arises** 80:9
**arranged**
125:15,17
**Arthur** 104:22
105:2,5 145:9
145:9,11
**asked** 29:11
37:17,21 65:16
104:2 130:22
**asking** 24:2,9
31:3,9 52:16
62:16
**assemble** 58:6
99:13 131:4,8
**assembled** 58:5
83:20
**assembles** 99:9
**assembling**
102:15
**assembly** 99:8,8
**assigned** 63:3
79:2 99:14,15
99:17 100:20
**assistance** 9:13
11:6 13:10
21:8,10,12,13

21:15,19,22
23:12,15,21
24:8,12,14
25:14 26:5,6
26:20 28:16
30:17,21,21
31:11,16 33:12
33:13,20 36:7
36:11 37:4
39:22 41:12,14
41:15,22 42:5
42:6 43:8,9,9
46:12,12 48:8
48:9 52:6,6
54:7 60:10
63:3,11,18
64:16 70:19
76:6 78:19
80:4,8,10 81:9
82:1,3 85:7
96:6 100:5
112:14 120:13
125:21,21
134:15 137:4
142:1 143:2
**assisted** 65:9
**associate** 115:15
**associated** 16:15
18:15
**assume** 23:19
116:22 143:3
**assumes** 71:8
72:17 104:4
105:13,22
113:9,13
142:12
**assuming** 16:9
51:3 125:3
128:2
**Atlanta** 6:20
**Atlantic** 6:18
**attach** 27:5
74:14 115:15
**attached** 36:16
61:2,7 142:9
**attempt** 19:8,11

**attempting**
137:14
**attention** 30:12
65:19 66:9
**attorney** 2:13
112:17
**Attorney's**
98:16
**August** 15:5,9
57:21
**authenticity**
55:6 86:11
92:19
**authority** 61:19
**authorize**
112:16
**authorized**
111:21 113:22
117:6 137:11
**auto** 93:11,13
**automatically**
93:15 94:10
95:3
**available** 18:17
34:9,14 37:10
38:16 60:3
83:3 84:10,11
84:14 95:18,21
138:17
**Avenue** 1:18
2:16 3:17 8:10
**average** 47:8
50:3 51:2,19
87:7 101:11,14
101:15 102:1
127:12,16
128:3,11,19
129:1,2,11
131:12,15,17
139:17,18
**award** 44:7
**aware** 23:13
53:4 54:19
55:16 56:3
60:20 61:4,10
61:21 71:7,10

71:12 141:2,9
142:9
**a.m** 1:19 60:17
60:17 74:22,22

──────────
**B**

**B** 122:10
**back** 27:7,8
60:19 94:20
114:15 119:18
119:21 120:15
132:9
**background**
134:8
**Bain** 2:15 10:14
10:14 76:19
120:18
**Baker** 8:8
**base** 18:9 34:11
135:21
**based** 93:13
106:9 111:21
121:18 142:1
**basically** 12:1
46:6 58:22
82:22 84:9
88:15 119:8
123:19 125:19
**basis** 73:12 81:2
81:19
**Bates** 29:2 89:18
**Baton** 4:11
**bdipalma@du...**
5:21
**Bearman** 8:8
**Bechtel** 5:5
**began** 20:3
**beginning** 30:8
**behalf** 2:3,12
3:3,14 4:5,15
5:5,13 6:5,15
7:5,14 8:5,15
10:10,13 24:18
87:17 91:12
115:5,6 116:12
**believe** 26:4

57:1 58:14
67:13 95:2
97:8 116:5
118:17 120:9
120:12
**Bell** 75:18
**Bellance** 1:12
9:3 10:3 11:9
**belong** 51:17
131:7
**belongs** 18:12
**BEN** 5:15
**Benjamin** 2:5
**Berkowitz** 8:9
**best** 25:10 55:13
**better** 37:22
38:7 70:2
**big** 137:1
**bigger** 20:18
**biggest** 102:13
**birth** 107:10
110:16,19
114:10
**bit** 26:5 66:5
76:13 87:4
97:12 114:16
140:19
**block** 33:12
122:19
**Bobbie** 9:13
85:19,19
**bold** 127:11
**bottom** 29:4
55:4 86:14
122:16
**Boulevard** 3:7
4:10 5:17
**Bourgeois** 5:16
**box** 123:9
126:21
**boxes** 123:11,14
**break** 60:14
74:21 141:10
141:11
**Brent** 3:5 10:16
**briefly** 79:20

Bellance "Faye" Green                                                October 16, 2009

Washington, DC

**bring** 96:2,3
129:10,18
133:9,14
**brings** 130:8
**brought** 25:12
26:3
**Brown** 104:22
105:2,5 145:9
145:11
**Browns** 145:10
**budget** 136:11
**building** 2:17
7:18 100:16,18
**bulk** 54:13
**burn** 140:7
**business** 50:1
86:12 93:14
118:11 123:19
136:19
**busy** 139:8
**button** 58:17
66:2,3,13
83:16 130:6,11
**buttons** 122:12
**B-E-L-L-A-N-...**
11:9
**B-o-b-b-i-e**
85:19

_____
**C**
**C** 7:8 10:1 125:1
**cabinet** 59:5
**Caldwell** 8:8
**call** 19:6 31:15
38:10 61:1
70:5,11,19,22
71:21 74:11
88:6 104:1
116:19,21
117:4,9,10,11
117:14,15,16
117:19 119:20
120:16,22
121:5,7 138:1
142:18
**called** 1:13 10:5

20:6 21:3,12
50:1 71:2,13
80:18 88:3,4
91:9,10 117:11
123:18 142:6
**calling** 116:11
116:12
**calls** 22:6 69:16
70:5 74:1
78:19 116:13
119:18 137:18
138:2,15,18,21
**capability** 39:8
**capture** 34:9
36:1 66:6
126:11 127:18
**captured** 47:9
66:10 117:18
**captures** 46:6
**Carrie** 26:7 27:8
30:9 37:3,8
41:20 42:10
43:5,16 44:14
55:9 62:8
**CARSON** 8:16
**case** 22:7 46:18
70:7 76:21
79:12 88:13,16
89:5 90:6
91:13 95:17,22
100:4 116:5
118:15 119:22
131:1,2
**cases** 13:10
74:11 78:19
98:15 125:8
127:5 138:3
144:15,17
**Casework** 13:16
**caseworker**
16:18,20 17:1
18:17 22:6
24:19 28:11
38:14,20 48:15
88:11 92:2
93:17 95:7

115:16
**caseworkers**
95:21
**catch** 141:12
**categories** 87:9
125:18
**categorize** 19:10
19:15
**categorized** 52:5
52:9
**category** 33:12
52:10 96:3,7
**Causeway** 3:7
5:17
**CD** 87:3 131:3
140:7
**ceased** 145:19
**center** 5:18
12:11,13,14,16
14:8 16:4 21:7
60:1 70:5
74:11 77:9,20
79:17,21 101:6
104:1 116:19
116:21 138:1
**centers** 81:11
**central** 60:8
94:21
**Centre** 2:7
**cert** 92:19
**certain** 23:16
28:16 38:9
57:2 111:11
139:13,14
141:4
**certificate** 55:2
55:6 86:11
**certified** 86:2
**certifying** 86:12
**cetera** 25:1
**challenge** 11:22
**change** 72:20
73:1 100:12
**changes** 40:12
**characterize**
101:1 139:4

**characterized**
96:14
**characterizes**
26:14
**charge** 13:20
**Charles** 3:17
8:10
**CHASEZ** 1:7
**check** 51:18
**checks** 134:8
**chronological**
126:9
**CH2M** 8:6
**circle** 121:22
122:10 124:8
125:1
**civil** 98:6
**claimants**
105:19
**claims** 26:8
**clear** 12:3 136:8
**cleared** 134:9
**click** 123:8
125:12
**Client** 21:13,16
21:19
**close** 30:11
136:2
**closer** 77:15
**code** 96:6
**collate** 130:21
**collect** 101:15
**Columbia** 1:17
**columns** 103:9
**come** 28:4,20
69:13,14,18
80:8 110:11
140:20
**comes** 17:3 18:2
18:6 37:7
54:14 57:6
89:5 122:13
**coming** 32:8
**comment** 39:4
48:10 87:21
122:6,20

132:19 139:12
**comments** 38:19
39:16 48:10
49:5,15 50:9
63:13,22 67:2
67:9,10 88:7,8
92:1 118:22
120:3,15,18
122:21 123:21
124:4,9,12
128:15,17,21
130:18 131:14
**comments/con...**
63:11,18 64:17
**comment/cont...**
63:19
**Commission**
146:22
**Committee** 9:3
10:11,20
141:16
**community** 81:9
**company** 4:6
45:16
**compare** 84:6
**complain** 52:13
**complaint** 121:8
**complaints**
22:19 31:19
52:7
**complete** 11:18
11:20 18:21
36:4 50:2
61:17 76:2
84:14 96:9
119:17 127:4,6
**completed** 57:20
58:9,11 60:22
73:12 86:6
103:9 118:1
142:11
**completeness**
74:13
**completing**
51:15
**component**

Bellance "Faye" Green

Washington, DC

October 16, 2009

Page 150

54:17
**components**
23:11
**compose** 65:7
**composed** 24:13
**compound**
17:12 28:9
29:16
**comprised**
100:1
**comprises** 80:11
**computer** 37:14
82:17
**concern** 27:10
**concerning** 11:5
32:19 37:4
48:18 52:7
55:9,11 56:4
**concludes**
145:14
**conduct** 109:21
**conducted** 22:8
45:16 88:10
98:5 119:5
134:8
**confidential**
75:7
**confirmed** 121:4
**confusing** 24:1,4
31:1
**conjunction**
98:16
**consider** 23:15
23:21 59:4
87:6
**consideration**
140:6
**considered**
20:20 108:8
132:8,14
134:18,19
136:10 137:21
**consistency**
84:16
**Constitution**
1:18

**Constructors**
8:6
**contact** 38:14,19
39:4,13 40:11
50:12 87:21
88:1 89:9 91:8
91:16 97:9
116:9,15,17
120:19,21
121:9 122:5,18
122:19 123:1
124:15 128:14
128:17 131:14
132:19
**contacts** 24:17
39:16 48:10
49:5 63:22
67:2,10 122:21
123:21 128:21
**contain** 22:3,10
22:15,16,18
23:3 24:19
31:8 48:21
49:3,7,10 75:8
**contained** 22:22
35:11 52:22
67:18 83:8,12
87:9 88:19
92:3 106:22
111:15 112:13
112:19 116:14
121:9 124:12
**contains** 21:21
21:22 22:5
31:6 40:10
45:15 125:8
**CONTENTS**
9:1
**context** 100:10
100:22
**continuance**
106:5
**continuation**
45:7
**continue** 77:16
**Continued** 3:1

4:1,3 5:1,3 6:1
6:3 7:1,3 8:1,3
**contract** 45:16
45:16 135:22
**contractor**
73:12,15 100:7
133:5,9 134:17
134:20 136:1
136:15
**contractor's**
135:4
**control** 48:12
137:10
**conversation**
88:5 117:13
**conversational**
11:22
**conversations**
22:5 91:11
**copied** 87:3
**copies** 15:17
16:2 36:1
57:19 75:10
**copy** 22:16
24:14,14 26:19
27:16 34:10
36:4 38:1
47:12 57:18
60:12 65:8
75:12 83:17
84:7,11 85:11
86:2,6 87:11
87:20 93:18
97:18 98:1
101:20 124:21
125:6 126:19
127:4,6 131:1
137:8 140:9
**core** 79:11
**Corporation**
4:16
**correct** 15:6
16:11 23:17,22
25:5,9 26:21
27:13 28:7,18
28:22 29:14

32:17 39:6
41:11 42:11
45:20 47:1
50:10,14,18,22
51:4,9 52:1
53:22 54:14
55:4,12 59:6,7
60:10 64:6
65:13 67:21
90:13 95:5
111:14 113:22
124:2 128:16
140:4 142:1
143:3,21
**correction** 21:12
**correspondence**
22:3,4 23:1
24:16 25:3
30:8,16 31:6
48:3 49:2,4
51:5,8,11,22
52:3,4,15
53:12,15,19
54:12 63:8,10
63:17 64:1,16
66:7 67:9
87:12,13 89:2
89:6,9,14 90:4
90:9,13 93:7,9
95:1 96:21
97:4 102:7,12
114:19,20
121:17,20
122:3,14,16,17
125:11,12
128:12 129:3,8
129:14,15,19
130:4 131:16
139:20
**Cougill** 7:16,17
**counsel** 1:13
2:15 5:14 6:6
9:2 10:5,9,19
11:1 75:1
112:17,18
133:14 141:15

144:14,20
145:3
**counties** 109:3
**couple** 28:1
66:17 102:8
139:22
**course** 39:15,19
49:2 66:18
114:14 126:16
134:10 135:7
**court** 1:1 11:17
**cover** 43:9
**covered** 27:4
**COX** 6:7
**create** 65:2
101:12,19
**created** 18:7,10
95:12,13 96:12
**creates** 99:9
**creating** 109:21
121:13
**creation** 73:10
**criminal** 98:6,7
98:14
**Cross** 46:13
**cross-training**
65:9
**CRR** 1:21
**Cruiser** 7:7
**cstrickland@...**
8:22
**cue** 100:9
**cull** 52:2
**current** 12:4,10
12:11 40:11
72:6,8
**currently** 59:8
59:13 67:16
74:10 78:3
99:14 137:12
**custodian** 56:17
**cyber** 135:6
136:2,7

**D**
**D** 10:1 112:19

Bellance "Faye" Green

October 16, 2009

Washington, DC

**damage** 29:7
44:5,11,19
50:17 72:7
92:12 144:6
**damaged** 35:5
44:9,21,22
45:9,11,19
72:6 92:13
107:10 142:21
143:19 144:4
**damages** 29:12
**DARAC** 56:8,11
56:13
**data** 18:9 34:10
37:19 38:2,5
39:9 56:14
83:12 84:17
120:2
**database** 80:16
80:17 82:14
84:17 93:1
106:15,22
108:10 115:10
124:13 128:18
134:21
**databases** 141:5
**data's** 84:12
**date** 25:13 60:21
107:10 110:16
110:19 114:10
**dated** 27:9
112:21
**dates** 42:22
123:7
**David** 2:5
**day** 73:7 94:7
146:11
**DC** 2:18
**deadline** 98:15
**deal** 24:6 28:1
30:20
**dealing** 30:16
**deals** 31:15
**decide** 19:11
**decision** 32:3
71:7 88:13

**deck** 101:2
**declaration** 9:11
57:19,20 58:21
60:19,22 67:13
73:9 74:14
100:14 107:16
**declared** 107:16
107:20 109:3,4
**dedicate** 73:17
73:20
**dedicated** 67:17
73:22 99:20
**Defendant** 3:3
3:14 4:5,15 5:5
5:13 7:5 8:5,15
10:13
**Defendants** 6:6
7:14
**defense** 5:14
112:18
**definitive** 19:14
**dental** 43:11
**Denton** 79:8
**department**
12:6 13:11,12
13:13 16:14
59:10 70:3,13
77:6 98:21
**depending** 47:8
102:5 127:20
135:3 139:6
**depends** 39:14
139:18
**depo** 84:21
**deposition** 1:12
9:10 11:4,5,12
27:2,5 57:13
57:14 58:10
75:10 139:11
140:14 145:19
**describe** 79:20
**description**
21:18 47:20
**Design** 7:5
**designed** 82:22
82:22

**detail** 65:19
**details** 66:9
142:18
**determination**
88:14
**determinations**
82:2 83:2
93:13
**determine** 18:12
31:22
**determined**
18:15
**develop** 17:16
38:6
**developed** 20:10
37:21
**difference** 41:6
42:17
**differences** 36:6
**different** 20:19
20:21 26:13,15
35:18 39:18
40:7,9,22
47:19 49:22
59:2 79:9
88:17 98:8
106:16,21,21
107:22 108:4
108:13 111:3
115:8 127:22
130:7,10
**digit** 110:4
**DiPALMA** 5:15
**direct** 59:17
76:15
**direction** 1:22
**directly** 37:14
**dirty** 145:15
**disaster** 9:13
11:6 13:8,10
15:14,15,16,18
15:19,22 16:8
16:11 17:4
18:13 19:1
20:11 22:11,19
23:16,22 25:14

26:13,15,20
30:18,20,21
31:11,16 60:10
62:19 73:19
74:5 78:18,19
81:11,11 82:1
93:14 96:22
100:5,13,22
104:15 107:7,9
107:14,15,16
107:19,22
108:4,8,13,18
109:1,16 110:7
110:10,12,14
111:3,3 112:14
114:9 129:21
134:15 137:19
138:4,10,12,16
139:7 143:5,8
143:15 144:1
**disasters** 15:12
74:12 106:21
108:9,10 110:8
129:13 138:12
138:19
**disbursement**
43:2
**discover** 37:12
**discuss** 23:10
76:12
**discussed** 54:18
67:8
**discussing** 73:9
**disk** 86:22
101:22
**displayed** 127:2
**District** 1:1,2,16
**document** 9:14
9:15 16:21
17:5,17 18:2,6
18:12 19:7,11
19:13 23:7
27:20 29:11,22
30:20 33:21
47:12 49:14
52:22 53:8,10

55:22 57:22
58:3 85:3,6
87:4 89:8 91:7
96:16 103:2,4
103:7,22
114:16 128:8,9
130:5 142:5
**documentation**
28:17 31:10
52:11 114:12
**documents** 28:4
28:14,20 30:5
30:7,19 51:12
51:17 63:8,9
76:6 87:14
92:22 93:5,8
98:9 100:6,7,8
114:22 115:13
129:4 130:14
130:17 131:4
132:11 140:20
140:22 141:1,4
141:8
**doing** 18:19
64:14 65:12
94:7 120:7
**DOJ** 25:18
**Donelson** 8:8
**double** 31:2
51:18
**DR** 126:8
**drafted** 58:3,4
**duly** 1:15 10:6
**Duplass** 5:16
**duplicate** 46:16
48:6
**duplicated** 36:2
79:15 110:9
**duplicates** 46:17
105:10,20
106:11
**duties** 13:4
15:11,13,14
69:2 70:1
73:22 74:3,10
79:21,22

Bellance "Faye" Green October 16, 2009
Washington, DC

dwelling 33:7,7
33:14 35:15
44:11,21,22
45:11,20 48:22
72:6 92:13
107:10
D.C 1:10,19
56:21

**E**
E 10:1,1 112:18
earlier 19:17
49:16 51:1,12
64:4 121:16
139:11 140:13
143:18 144:11
easily 84:13
EASTERN 1:2
easy 133:8
efficiencies 38:2
efficient 133:1
EFT 41:4
EHU 22:20 23:4
23:6 26:9,9
44:13 45:2,4
49:12
Eight 14:3
either 23:8 33:8
72:5 87:14
88:9 90:4 91:9
91:11 93:11
94:10 107:7
114:22 116:11
116:11 119:3
127:4
electronic 16:16
17:5 18:7,16
19:7 41:4
82:16 84:11
140:16,16
electronically
80:15 83:3
101:21
eleven-and-a-...
12:9 14:8
eligibility 82:2

83:2 88:14
93:12
eligible 33:14,16
33:19 35:14
42:22
emergency 12:5
18:8 19:19
22:13 31:18,19
31:20 33:17
35:9 40:15,19
41:19 42:10
43:4,15 46:2
48:19 49:1
52:7,18 53:8
53:21 77:5
80:18 100:10
112:13
employed 12:7
employee 118:6
119:7,12
employees 13:15
59:19 60:2
64:5,13 68:12
69:8,12,14
73:14 78:1,3,9
78:13 81:13,16
94:11 97:5
99:19 100:12
101:15 115:21
118:3 132:10
133:4,13 134:3
134:11 137:1
137:17,18
138:1,6 139:5
employer 12:4
76:13 77:4
114:3
employment
76:12
ended 121:5
ends 17:1
138:17
Energy 2:7
ENGELHAR...
1:6
ensure 36:3

61:19 66:9
109:13 111:19
enter 19:9 39:18
76:17 117:10
119:4,8,10
122:20
entered 88:9,12
94:11 106:20
119:3,5
Enterprises
3:14 6:15
enters 119:2
entire 98:17,19
entities 98:9
entitled 11:2
49:14
entries 116:16
123:14
entry 52:21
Environmental
2:14 8:5
ERFD 35:14
41:22
ERFD-eligible
42:7
error 73:3 100:9
Esperson 7:18
Esq 2:4 3:5,15
4:7,17 5:6,15
6:16 7:8,16 8:7
8:16
estimate 29:6,12
29:19 47:5
49:20 63:6,15
63:16
et 4:6 24:22
evening 145:15
events 122:9
124:14 126:8,9
eventually
137:16
evidence 55:13
61:9 71:9
72:18 104:5
105:14 106:1
113:10,14

142:13
exact 25:21,22
exactly 25:16
31:3 52:16
62:6 101:3
examination
1:13 9:2 10:19
75:1 141:15
145:2
examined 10:7
example 21:2
22:18 23:5
25:3 27:20
29:18 39:13
52:8 70:8
104:20 109:2
130:11 138:15
exemplar 26:12
exhaust 32:16
exhausted 74:18
exhibit 9:9 27:2
57:13,15 74:14
74:15 84:21,22
87:6 89:17,19
89:20 90:12,15
91:3,4,16,19
92:7,8 93:7,8
97:10 99:5
102:19 103:1
110:22 112:1,2
114:17,19
116:8 118:21
120:16 121:15
123:22 124:6,8
141:19 145:7
145:10
exhibits 9:8,21
75:6,10 123:3
exist 56:4 82:13
82:18
exists 17:15
expect 105:8,19
106:10 120:16
121:7 138:5,5
expedited 73:12
experience

53:20 62:4
65:1,17 135:17
expert 76:20
expertise 65:1
65:11,17 79:13
79:14,16
expired 16:5
Expires 146:22
explain 34:6
58:4 88:13
explained
118:22
exposed 17:4
extends 139:21
extra 27:15
57:19 128:18
extract 38:8
83:9 123:20
e-mail 62:3
e-mailed 86:22

**F**
F 103:10 141:21
fabricated 33:7
33:14 35:15
facilities 79:9
facility 59:18,19
60:3,7,7 64:6
68:18 78:10
79:17 81:17
104:1 114:2
135:10,11,13
fact 61:1,2,6,11
106:2 139:20
142:6,10,18
145:6,11
factor 102:12
factors 102:10
facts 61:8 71:8
72:17 96:15
104:4 105:13
105:22 113:9
113:13 118:8
142:12
factual 96:19
failed 34:19

| | | | | |
|---|---|---|---|---|
| **familiar** 65:7 | 132:8,10,14 | 92:4 93:18 | 114:8 116:3 | **Floor** 6:10 |
| 76:5 80:20,22 | 133:4,5,12,21 | 94:18,22 95:8 | 121:13 127:1 | **Fluor** 3:14 |
| 81:1 98:20 | 134:3,10 135:6 | 95:19 96:2,3 | 132:2,4,15 | **FOIA** 97:20 |
| 99:2 101:11 | 136:5 | 96:10 97:18 | 133:6,15,22 | 114:8 |
| **far** 54:8 90:7 | **FEMA's** 96:22 | 98:1,17,18 | 140:3 144:11 | **folder** 82:16 |
| 136:13 | 98:20 112:19 | 99:13 101:19 | **fill** 99:13 137:14 | 84:2 |
| **Farm** 10:4 11:10 | 136:13 | 102:5,7,11,15 | 144:16 | **folders** 84:18 |
| 75:22 | **FEMA-supplied** | 104:13,17,18 | **filling** 100:1 | **folks** 66:20 81:8 |
| **fax** 115:1 | 33:6 | 104:18 107:5 | **final** 92:18 | 134:14 136:8 |
| **Faye** 1:12 9:3 | **FEMA-161-109** | 108:18 109:1,6 | **finance** 24:20 | **follow** 115:21 |
| 10:3 75:20 | 50:18 | 109:13 110:20 | 42:21 68:18 | 118:18 141:18 |
| **Federal** 12:5 | **field** 18:21 22:17 | 111:11,12,14 | **financial** 21:3 | **followed** 97:9 |
| 16:4 23:14 | 23:8 54:20 | 111:17,18 | 28:16 30:17,21 | 118:15 120:12 |
| 77:5 112:12 | 56:22 57:2 | 113:12,19,21 | 31:16 41:3,7 | **following** 29:8 |
| **feedback** 58:19 | 81:10,11,17 | 113:22 114:3,4 | 52:6 | 30:18 60:10 |
| 77:16 | 87:16 115:3 | 114:8,17,17 | **find** 18:1 70:9 | 63:16 |
| **FEMA** 1:4 9:14 | 119:7 | 115:4,15 116:5 | 107:6 143:15 | **follows** 10:7 |
| 9:15,16,17,18 | **figure** 140:5,14 | 116:10 117:7 | 144:2,2 | **follow-up** 145:1 |
| 11:2 12:8 14:5 | **file** 11:6 16:16 | 118:18 119:9 | **fine** 60:15 | **Forest** 8:15 |
| 19:22 20:3,8 | 18:16 21:10,22 | 119:12,20 | **fingerprinted** | **form** 19:7 82:13 |
| 20:10 22:16 | 23:12,22 24:8 | 120:13 124:18 | 134:8 | 101:17 103:6 |
| 23:14,20 24:17 | 24:12,12,13 | 125:5 126:10 | **fire** 32:16 | 130:22 131:21 |
| 25:8,15,18 | 26:6,13,15,21 | 127:6 128:3,4 | **first** 11:7,14 | **formal** 58:13 |
| 26:9 28:5,14 | 27:16 30:6 | 130:12,22 | 20:2 25:13 | **Formaldehyde** |
| 28:16,21 29:3 | 32:4 34:17 | 131:2,7,8,16 | 26:17 36:10 | 1:5 11:2 |
| 29:5,12 30:3,7 | 38:1 39:14,15 | 132:11 134:1,2 | 43:21 50:8 | **format** 82:18 |
| 30:9,14,15,16 | 39:17,20,22 | 137:8 139:13 | 54:8,10 61:4 | 101:20 140:16 |
| 33:8 34:7 | 40:13 46:21,22 | 139:19 142:1,3 | 85:20,21 88:18 | **Forte** 7:9 |
| 37:12 42:6 | 47:17 48:14 | 143:3 | 88:21,22 | **forwarded** |
| 46:20,20 48:16 | 51:15 54:17,21 | **filed** 59:10 70:10 | 103:11,15 | 115:16 |
| 49:14 50:5,5,9 | 57:4,7,11 58:6 | **files** 15:17 21:14 | 104:9,14 | **forwarding** 18:4 |
| 50:10,13,13,17 | 59:4,4,5 60:12 | 23:15,16 25:14 | 106:10 124:17 | **found** 133:1 |
| 53:7 55:3,11 | 62:5,8,10,11 | 26:6 40:3 54:7 | 125:5,6,7 | **foundation** 28:9 |
| 56:4 62:22 | 62:15,15,17 | 58:4,5,12,15 | **five** 60:16 65:4,8 | **four** 4:9 27:8 |
| 63:1,3 70:9 | 65:7 66:10,15 | 59:1,12 61:13 | 67:16,20 68:2 | 59:13,15 64:15 |
| 71:1,3,13 | 67:7 68:8,13 | 62:1 73:11 | 73:21 74:2,7 | 65:2,3 67:8 |
| 72:12,15 76:5 | 72:1,10 73:1 | 76:7 80:4,6,14 | 94:6 108:12 | 73:21 74:2,7 |
| 81:4,16 86:8 | 80:8,8,10 | 82:5,12 84:7 | 109:12,15 | 99:17,19 |
| 89:18 90:1 | 81:22 82:3,16 | 96:12 97:13,15 | 111:3 | 100:11 105:4 |
| 101:15 103:18 | 83:1,4,12 84:2 | 98:17,21 99:10 | **fixed** 19:9 | 129:12 137:12 |
| 103:19 104:3 | 84:9,11,11,14 | 99:21 101:5,8 | **Fleetwood** 6:15 | 145:9 |
| 108:13 110:2,8 | 84:18 85:7,13 | 101:12 104:2 | **flip** 86:7 | **fourth** 42:6 |
| 112:13,15,16 | 85:18 86:6,12 | 104:11 105:19 | **flood** 79:18 | **Fowler** 6:8 |
| 112:21 116:2 | 86:16,20,20,21 | 106:13 109:7 | **flooded** 44:10 | **Friday** 1:11,19 |
| 118:12,15 | 87:2,5,7,10 | 109:20,22 | **Flood-zone** | **Frilot** 5:7 |
| 119:7 120:9,17 | 88:9,12 90:21 | 112:14,20 | 34:20 | **front** 116:6 |

Bellance "Faye" Green                                                          October 16, 2009

Washington, DC

118:18
**Frontier** 7:6
**fulfill** 139:9
**fulfilling** 67:17
**full** 75:16 76:2
  107:12 123:7,8
  139:4
**Fultz** 7:17
**function** 69:4
  70:4 73:18
  99:18 100:21
  128:6
**functions** 69:4
  78:15 79:11
  80:1 100:9
**funds** 41:4
**funny** 72:14
**furnace** 32:15
**further** 57:12
  141:15 144:22
  145:2,13
**F-E-M-A** 70:12

---

**G**

**G** 10:1
**GA** 6:20
**Gainsburgh** 2:5
**Garrison** 7:9
**Geiger** 8:17
**general** 32:12
  34:16 41:17
  56:12 87:9
  92:21 93:3
  97:19 98:3,13
  124:18 144:19
**generally** 58:22
  96:18,22 121:3
  132:10
**generate** 36:17
  36:21 37:1,5,9
  37:10,22 38:2
  38:12 39:4,12
  47:6 49:20
  50:21 59:1
  63:12,19,21
  66:20 67:2

83:11 87:20
93:15 94:6,12
95:8 130:20
132:17 143:2
**generated** 38:7
39:1,20 49:17
49:22 53:14
55:2 93:11,13
93:16,17 94:10
95:3,4,6 98:4
119:2 120:22
123:17 124:1
128:22 130:18
132:20
**generates**
137:20
**generating**
37:18 94:2,9
95:7,17 97:4
140:10
**generation**
53:15 59:3
**generator** 36:16
36:20
**Georgia** 138:20
**Gerald** 112:18
**getting** 32:8
58:18
**Gianna** 3:16
**give** 11:4,16,20
21:17 24:2
47:5,20 49:19
52:7 56:12
58:5 63:5
71:16 72:1,12
72:15 98:12
110:19 132:20
142:20
**given** 11:11 33:6
40:3 69:22
71:15 72:4
82:4 98:10
105:16 106:3
107:15,17
108:13 110:4
125:9 133:5

134:4,10
**gives** 17:16
18:21 34:16
35:1
**giving** 63:7
71:19
**go** 10:8 26:10,11
26:13 27:7,21
29:16 30:10
31:5 37:14
52:14 54:8
57:7,11,12
59:5 60:19
61:9 68:1
70:12 72:8
75:19 76:19
77:2 88:17
89:12,16 92:5
96:13 106:8
111:1 112:8,9
113:16 114:15
116:22 119:4
121:22 123:18
124:14 125:3
125:11 127:2
134:3,5 137:19
**goes** 50:9 52:4
91:2 92:15
97:5 137:20
**going** 13:13
23:19 24:2,3
27:1,21 28:8
30:4 31:4,15
34:10 59:1
60:13 75:6,7
76:14,16,17
84:20 89:16
102:22 110:11
116:8 118:21
120:15 121:14
127:2 143:15
144:2
**Gooch** 3:6
**good** 10:22
26:12 75:14,15
**gotten** 24:7

**government**
23:14 30:6
61:1,5 106:2
**grant** 41:16
**granted** 40:16
**great** 66:8
**greatest** 102:16
**Green** 1:12 9:3
9:9 10:3,22
11:9,11 12:4
25:12 57:15,18
74:17 75:7,14
75:18,20 76:5
76:22 77:4,18
84:20,22 89:20
90:15 91:4,19
92:8 102:19,22
112:2 141:18
**ground** 11:16
**group** 81:8
98:10,11
**grouped** 89:7,9
**guess** 23:12 28:1
29:6 74:13
94:16
**guidelines**
111:22
**G-R-E-E-N**
11:10 75:18

---

**H**

**HA** 36:7 37:4
42:5 49:1
63:10,22 67:9
**habit** 97:5 116:2
118:15 120:9
**half** 60:14
**hand** 84:20
102:22 112:5
114:19 116:8
118:21 121:15
**handing** 85:3
**handle** 60:11
64:14 137:18
**handles** 137:6,8
**handling** 138:2

**hands** 101:1
**happened** 86:16
88:15
**happening**
93:19 126:10
**happens** 16:7
117:3 130:19
**hard** 16:2 47:12
84:7,7,10
101:20 124:7
131:1 140:9
**hazards** 32:17
**Heartland** 3:3
10:16
**held** 12:18 14:10
14:11 15:4
**help** 13:9,16
70:6 74:1
78:18 79:3,12
88:3 138:2
**helping** 94:6
**higher** 73:22
**highlights** 27:22
**HILL** 8:6
**hired** 73:13,16
136:15
**historical**
119:19
**hit** 27:22 83:15
130:6
**hitting** 126:17
130:11
**hold** 12:21 13:2
13:18 14:2,10
**home** 22:9 29:7
33:9 52:10
56:7,15 57:10
82:17 112:21
**Homeland** 12:6
77:6
**homes** 6:5 34:2
56:16
**hopefully**
137:16
**hotel** 28:2
**hour** 60:13

Bellance "Faye" Green

October 16, 2009

Washington, DC

102:2 121:14
132:1
**hours** 66:17,21
67:1,6 68:11
68:16
**house** 54:4
56:10 81:21
**household** 22:2
24:22
**housing** 22:13
31:18,19,20
32:5 33:17,18
35:9 40:15,20
41:12,19,21
42:10 43:4,15
46:2 48:8,19
52:6,7,18
53:21 54:4
63:10,17 64:16
96:5 125:20
**Houston** 7:20
**Hubbard** 4:18
**human** 13:14
116:18 119:6
137:22
**hundred** 54:6
101:9 102:8
**hurricane** 15:5
15:9 29:8
70:10 107:21
108:2,7
**hurricanes**
22:12 23:16
82:6
**hurricane-da...**
44:10
**HUSTON** 1:16
1:21
**Hyattsville** 78:8
78:16 79:10,16
114:2

—— **I** ——

**IA** 26:21 27:16
46:21 54:17
57:4,7,11 58:5

58:12,15 59:1
59:3,11 61:22
62:5,8 65:7
66:15 67:7
68:8,13 73:11
76:7 80:8 82:5
82:12 85:12,18
87:5,7,10
97:13,15 98:21
99:9,21 101:5
101:8,12
102:10 104:2
104:10 105:18
107:5 108:18
109:7,22 114:3
114:4,17
121:13 124:17
128:4 130:12
132:4,11
133:22 139:12
144:10
**IAF** 24:12
**ID** 62:22 63:1,3
70:9 71:1,3,13
71:22 72:12,15
103:18,19
110:2
**ideally** 62:18
**identical** 32:20
**identifiable**
113:1
**identification**
34:18 57:16
74:16 85:11
89:21 90:16
91:5,20 92:9
102:20 112:3
**identified**
114:20 121:16
**identify** 62:15
62:17 107:4
109:13 111:17
115:14 125:4
142:3
**identifying**
104:12 109:8

114:11 117:1
128:6 143:21
**identity** 114:6
**IFL** 83:19
**image** 16:16
18:7,10,11
19:6,10
**images** 129:22
**immediately**
95:4 97:5
**important** 12:3
61:18 111:16
**incident** 107:19
**include** 40:12
41:21 44:6
50:6 80:11
87:13,19 88:3
88:8,11 91:10
128:12,14
**included** 40:2
46:17 48:13
51:7,10
**includes** 48:5
54:21 78:20
**including**
138:22
**incoming** 15:15
53:11 87:13
90:3,9,12 93:6
114:20 122:3
122:16 125:12
129:15 130:4
**incoming/outg...**
24:16
**increased** 138:6
**indexer** 19:6
**indicate** 33:8
35:14
**indicated** 34:22
63:21
**individual** 11:6
17:9 20:16
21:8,10,13,22
23:11,15,21
24:8,12 25:3
25:14 26:5,6

39:21 54:7
60:9 62:7 63:2
70:8 71:13
76:6 80:3,7,10
81:9 85:7,17
107:4 109:8
111:17 120:13
125:4 129:8
133:6 137:4
141:22 143:2
143:21
**individually**
106:20
**individuals** 22:2
28:15 59:11
64:8 68:12
69:14 71:2
74:6 104:3
105:18 106:12
**Industries** 7:6
**info** 41:2 48:1
48:11 125:20
126:8
**information**
11:7 18:8
19:19 20:7
21:4,18,21
22:1,7,10,15
22:22 23:3,4
24:7,20,21
25:4 27:3 31:7
31:8,9,10,20
32:12 34:9,20
34:21 35:11,21
35:22 36:2,14
36:17,22 37:1
37:3,8,11,13
37:14,15,20
38:8,8,9 39:3,5
39:15,18 40:10
40:10,11,12
41:4,5 42:15
42:16 43:2,21
44:1 45:4,15
45:17 46:1,7
46:16 47:10

48:1,11,15,18
49:3,8,10 53:6
53:15,20 54:20
55:1,15,19
56:4,8,10,15
56:18,21 57:8
60:9 61:20
62:4,9,14,17
66:6 67:18
71:6,14,17,18
71:20 72:2,3,4
72:10,11 75:8
75:11,12 80:11
80:19 81:22
82:2,5 83:2,5,8
83:10,15,22
87:14,19 90:4
92:3 94:14,17
94:18,19,20,21
96:18 101:16
102:17 103:6
103:14 104:9
104:13,16,19
106:3,9 107:3
107:11 109:8
110:20 111:13
111:20 112:12
112:19 113:2,8
113:19 114:1,5
114:11 115:3,5
115:6,14
116:10 117:1,7
117:12 118:7
119:2,4,8,13
120:10,22
121:9,18
122:22 123:1
124:11,18
125:8,15,19
126:1,2,6,7,11
126:12,15,20
127:1,3,5,14
127:15,16,19
128:5 130:7
132:21 133:22
136:20 137:20

Bellance "Faye" Green

October 16, 2009

Washington, DC

139:13 140:8
140:10 141:7
142:3,4,19
143:1,4,20
144:11,13,17
144:18
initials 103:16
input 119:13
inputted 120:2
inputting 118:9
inquire 70:22
71:3,13
inspection 22:8
24:19 38:13,20
39:5 44:4,19
45:14 48:2,9
50:16 87:21
88:9,10 92:12
119:5 125:22
128:21 131:15
132:18
inspections 35:3
35:4,4 45:17
136:5
inspector 44:6
44:20 88:10
92:2 97:19
98:2,13
inspectors 45:18
119:3
installer 26:9
instance 38:10
38:11 55:9
84:3 96:5
107:18,22
115:5 117:5
122:14 126:7
129:9 132:18
instances 126:22
instant 145:19
institution 41:8
insurance 4:15
21:4,22 29:20
29:21 34:21
37:8 48:8
115:6 125:20

insure 110:20
intake 74:1 79:3
79:12 100:17
internal 48:12
interrupt 32:6
introduce 75:6
inventory
131:14
investigation
98:5
investigations
98:14
involve 13:4
66:1
involved 15:22
84:16 108:14
involvement
16:20 25:8
136:13
in-bound 129:18
issuance 56:16
issues 20:11
135:9
item 52:11
items 19:9,15
43:12 45:9
63:21 140:13

—— J ——

Jayco 7:14
job 12:10,11
64:11
John 71:22
JOHNSON 4:7
Jonathan 2:13
10:12 75:4
77:12
jonathan.wald...
2:20
Jones 4:8
JUDGE 1:6
Justice 59:10
98:21
Justin 2:4 10:10
11:1 27:15
112:17

—— K ——

K 8:7
KAREN 8:7
KATI 6:7
Katrina 15:5,9
22:12 23:17
70:10 82:7,10
107:18,21
108:2 109:5,12
110:3 129:13
129:18 132:5
138:15
kcox@frfv-la...
6:13
keep 17:14 56:7
84:8 139:8
keeping 84:2
kept 25:19 56:21
59:4 80:14,15
Keystone 4:5
kind 12:1 19:10
19:11,13 46:19
100:15 126:18
132:20 133:21
140:21 143:14
know 11:5 18:14
19:21 20:19
25:15,21,22
30:22 38:11,22
39:14,17 40:1
43:1 47:11
52:17 56:6,11
56:11,17,20
57:3,5 60:20
63:2 69:2,22
70:21 82:21
85:9 94:4,16
96:1 98:6
101:22 104:15
104:16 105:5
106:19 107:1
109:12 111:20
115:12 117:8
119:20,22
127:7,7,8

130:21 132:19
134:19 136:6,8
136:22 138:16
139:7 140:22
144:7 145:9
knowing 111:10
knowledge
25:10 52:20
64:9,10 65:2
65:12 68:20
96:15 118:8
known 12:16
75:20 82:12
kredmann@l...
4:22
KRISTOPHER
4:17
kwhitfield@b...
8:13

—— L ——

L 3:15 7:16
103:9 141:21
LA 2:9 3:9,18
4:11,20 5:9,19
6:11 7:11 8:11
8:20
label 29:3
Laborde 8:17
lack 28:8 38:6
70:2
Lakeway 5:18
Lance 75:18
Language 112:7
Laperouse 8:17
large 58:7 81:8
102:10 104:8
105:21
late 100:5
laws 111:22
left 43:21
lengthy 134:20
136:4
letter 16:8,11
18:12,22 19:12
27:8,10 32:3

35:16 93:15
95:7,8,13,17
95:18,20 96:1
96:3,7,8,10
103:22 129:9
129:10,11
130:3
letters 15:16
32:11 51:13
87:12 94:2,7,9
94:12 95:2,11
95:20 102:17
let's 16:6,6
26:15,17 76:12
87:4 88:17
92:7 93:6
97:12 101:4
110:11 112:1
114:15 121:12
135:3 144:6
level 139:6
Lezly 3:15 77:12
Liability 1:6
11:3
liaison 112:17
112:18
Liasion 5:14
Liason 6:6
Liberty 4:15
light 27:18
limit 140:12
limitation
129:17
limited 71:2
limiting 109:11
line 13:9,16 42:6
70:6 74:1
78:19 79:3,12
88:3 129:8
138:2
lines 77:16
linked 46:14,17
links 123:19
list 9:19 19:14
104:8 105:16
105:17,19,20

Bellance "Faye" Green

October 16, 2009

Washington, DC

106:1 107:4
110:22 111:15
113:5,6 140:13
142:1 145:8
**listed** 45:8
103:12,14
111:6 142:15
145:10,11
**listing** 91:9
103:3 105:9
122:15,17,21
123:4,6 141:20
**litigation** 1:6
11:3 26:1,8
40:1 98:22
101:6 105:18
108:14 142:6
144:11
**little** 25:18 26:5
66:5 76:12
77:15 87:4
97:12 114:16
140:19
**living** 33:8
**LLC** 2:6 5:7 7:6
7:7,9 8:17
**LLP** 1:18 6:17
7:17
**loaded** 20:16
**located** 78:6,8
79:7 81:17
121:18
**locations** 84:12
**lock** 32:21
**lodging** 46:13
**log** 38:11,14,19
39:13 87:21
97:9 116:15,17
124:14 126:9
**logs** 39:4
**long** 12:7,14,18
13:2 14:2
19:21 39:12
47:6 49:19
92:5 115:19
121:14 128:3,9

128:18 129:2,6
130:3,13
131:11 135:17
135:18
**longer** 33:19
51:19 129:7
138:13
**longest** 51:6,14
51:20
**look** 18:11 29:3
30:19 31:21
32:4 36:7
37:22 46:19
50:5 55:2 59:6
90:7
**looked** 40:8
132:22
**looking** 34:13
85:20 123:5
128:5
**looks** 85:14,16
89:15 103:3,8
103:9 112:8
**lose** 84:8
**lot** 20:18 58:19
66:12 129:13
129:21 138:7
**Louisiana** 1:2
107:18 108:11
109:2,4 144:8
**luckily** 135:12
**lucky** 73:7
**Lugenbuhl** 4:18
**Lyndon** 9:20
112:11,22
113:5,7,12,18
113:20 144:6

—————
**M**
**M** 3:5 4:17
**Maggio** 3:5
10:16,16
**MAGISTRATE**
1:7
**mail** 13:20,22
14:18 15:15

32:3 79:18
87:12 94:5
115:1,11,12
129:9 135:22
**mailing** 15:16
40:11 72:7
**main** 70:1
102:12 126:6
139:20
**maintain** 24:8
**maintained**
21:11 57:1
112:12
**major** 100:13
138:10
**majority** 65:6
**making** 55:8
97:4
**manage** 80:1
**management**
12:5 13:20,22
14:18 17:2
18:8 19:19
20:7 74:4 77:5
79:18 80:19
94:5 99:12
112:13 137:10
**manager** 12:11
12:12,15,16,17
13:1,5,6 14:8,9
14:13,17,21
60:1 77:21
79:17,21 101:6
**manner** 12:1
**manually** 83:19
93:16 94:11
95:12 96:13
**manufacturer**
23:6 26:8
**Manufacturers**
5:13
**Manufacturing**
6:5
**mapping** 79:18
**mark** 27:1 57:13
89:17,18 90:11

91:3 92:7
112:1 124:6
**marked** 57:16
74:16 75:7
85:1 89:21
90:16 91:5,20
92:9 102:20
103:1 112:3
**marking** 84:21
**Maryland** 10:4
11:10 12:12
75:22 77:8
78:8
**match** 110:13,17
143:15 144:3,5
**matter** 1:14 11:2
18:22
**max** 41:16
**MDL** 1:4
**mean** 25:16,20
28:6 29:19
40:2 54:19
62:6 66:19
71:2 74:7,9
82:21 102:13
104:12,13
107:1 119:18
120:19 133:19
135:12
**meaning** 63:7
**means** 33:18
59:1 70:5
95:18 126:17
**measures**
132:15
**mechanical**
48:14
**medical** 43:10
**medications**
28:3
**medium** 101:22
140:11,16
**meet** 136:2
**members** 24:22
67:16
**mentioned**

19:16 49:16
57:6
**Metairie** 3:9
5:19
**Meunier** 2:5
112:18
**Microsoft** 83:16
83:18 126:18
126:19
**middle** 103:16
117:15
**Middleberg**
3:16
**millions** 106:14
107:2
**mind** 16:6 74:20
**minimum**
100:19
**minute** 58:16
132:9
**minutes** 39:17
47:7,14,14,16
50:3,20 51:2,7
51:20,21,22
54:13 60:16
63:20 67:7
101:18,21
114:15 128:11
129:1,5 131:12
131:13,15,16
131:18,20
139:12,16
140:17
**miscellaneous**
43:11
**mischaracteri...**
19:3
**mischaracteri...**
54:1 65:14
67:22
**mission** 96:22
**mobile** 33:9 34:2
48:22 52:10
56:6,14,16
57:10 112:21
**model** 23:6

Bellance "Faye" Green                                      October 16, 2009

Washington, DC

**module** 21:5,6,7
21:8,9,20
**modules** 20:20
**moment** 128:4
**money** 136:11
**months** 138:13
**morning** 10:22
75:14,15
**move** 47:18
77:14
**moving** 140:10
**Mulcahy** 7:8,9
**Mullins** 1:17
6:17
**multiple** 32:20
106:21 109:20
129:19 132:4
**mute** 32:7 58:18
77:15
**muted** 58:17
**Mutual** 4:15

_____
**N**

**N** 1:5 3:7 6:16
10:1
**name** 10:10,22
11:8 35:2 41:8
62:19 71:21
72:6 75:16,17
75:19 85:17
103:9,10,15
104:14,22
105:2 106:19
107:12 109:10
110:17,22
111:2,10
112:22 113:2,7
114:9 142:20
143:8,15 144:5
144:15
**names** 9:19
103:3,12,21,21
104:9,15 105:9
105:14 106:10
106:12,15,17
113:5,18

141:21,21
**narrow** 109:17
**narrowed**
143:12
**National** 2:17
5:5 12:12 18:8
19:19 77:8
80:18
**nature** 88:5
96:19
**navigate** 136:21
**necessarily**
141:5,7
**necessary** 61:16
62:5,9 65:12
68:8 135:1
**need** 23:12 27:5
29:9 43:20
60:14 61:19
62:13,14,17,18
65:21 66:6
68:10 72:4,5
73:13,15,19
96:1 104:14
107:3,7,8
109:16 110:12
113:19 123:8
128:1 132:10
134:15 136:20
138:6 142:2,4
144:7,8
**needed** 36:1,13
100:21
**needs** 16:10
39:19 43:8
48:9 125:21
128:7
**neighborhood**
58:14
**Nelson** 1:17 6:17
**NEMIS** 18:7,16
18:20 19:17,17
20:4,6,7,9,22
21:5,6,9,19
22:10 23:19
24:6 25:5,8

28:5,7,22
29:14 34:8
35:18 36:16,18
36:22 37:15,18
38:6 39:6,10
40:7 47:1,20
49:17 51:4
52:17,20 53:2
53:14 54:9,21
55:16,20 59:2
59:2 63:7,16
64:9,10,12
67:18 68:20,21
80:18,20 81:7
81:8,12,14,18
81:20 82:6,13
83:4,9,15 84:1
89:6 92:22
93:10 94:10,11
94:15 95:4,7
95:13 96:13,14
97:5 98:10
101:16 106:13
108:10,17
111:1,4 113:12
114:21 115:10
121:18 123:5
123:19 124:13
125:14,16,19
126:5 130:1
134:11,12,16
135:19 136:19
136:21 137:20
140:20,22
141:6
**network** 133:21
134:10 135:7
**never** 11:14
72:14
**new** 2:9 3:18
4:20 5:9 6:11
7:11 8:11,20
138:19
**Niels** 7:18
**nine** 68:7 110:4
**noises** 32:8

**non-contractor**
133:11
**non-FEMA**
81:13 133:13
**normal** 15:14
118:11
**normally** 16:22
48:13 125:17
**North** 5:17
**Notary** 1:16
10:6 146:19
**noted** 28:7,21
29:13
**notes** 22:6 24:19
38:14,20 39:4
88:11,15 92:2
92:2
**notice** 1:15 9:10
33:5 57:13
**notified** 62:3
**November** 27:9
**NPSC** 77:11,11
78:6,16 79:10
79:13 80:1
81:10
**NPSCs** 79:5,6
79:11,15
**number** 18:13
19:8,9 23:5
25:21,22 39:19
41:8,9 52:20
58:12,12 61:11
62:19,20,21,22
63:1,3 70:9,11
70:22 71:1,3,3
71:14,22 72:7
72:8,12,15,16
73:5 87:6
89:18,19 99:5
107:7,8,9,9,14
107:15,15
108:1 109:17
109:17 110:2,3
110:4,8,12,15
110:18,22
114:10 118:21

121:15 124:7,8
142:21 143:6,9
143:14,16,19
144:1 145:7,10
**numbers** 24:22
73:3 103:18,19
108:4,13 111:4
139:22 142:22
**Numerous** 94:4
**NW** 6:19
**N.W** 1:19 2:16

_____
**O**

**O** 10:1
**oath** 76:1
**object** 19:2 24:3
28:8 29:16
31:1 55:13,22
61:8 64:18
68:14 70:15
76:14 106:4
143:10
**objection** 17:12
17:18 24:1,3
54:1 60:5
65:14 67:22
69:16 71:8
72:17,21 76:17
104:4 105:13
105:22 106:5,6
113:9,13
142:12
**Objects** 50:1
123:19 136:19
**observed** 93:19
117:21
**obviously** 117:7
133:21 134:7
138:4
**occasion** 38:5
**occasionally**
65:5 93:12
97:19,21
116:13
**occupancy** 35:9
53:9

**occur** 73:19 74:6
**occurred** 119:11
**October** 1:11,19
**odd** 32:8
**office** 22:17 23:8
  55:7 87:10
  97:19 98:2,12
  98:16 144:14
  144:19,20
**offices** 1:17
  13:16 56:22
  57:2 81:12
  87:16 97:21
  115:3 119:7
**official** 12:17
**offsite** 135:19,20
**Oh** 36:15
**okay** 11:16
  15:19 16:6,13
  16:19 17:3,8
  21:2 26:3 30:3
  31:13 32:15
  34:6 36:12,15
  36:15 38:4
  40:6,22 43:3
  44:3,9,12 48:7
  49:13 50:8
  54:11 55:19
  58:2 62:7
  63:20 67:14
  68:6 74:13
  91:14 114:15
  121:22 124:17
  132:14 142:17
  144:10 145:17
**old** 106:14
**once** 16:3,4,19
  16:22 18:10,15
  19:6 55:1 67:5
  99:10 117:5
  123:10 130:20
**ones** 26:4 60:11
  65:18 68:22
  70:18 99:12
**ongoing** 138:10
  138:11 139:8

**open** 73:1 83:4
  115:12 123:8
  123:11 130:4
**opening** 83:16
  126:17
**opens** 41:3
**operation** 64:9
  64:10
**operations**
  13:21,22 79:19
  94:5 135:22
**opportunity**
  17:16
**order** 11:17 30:5
  30:6 35:22
  62:9 68:13
  71:16 72:4
  83:9 107:3
  109:7 123:7
  127:3,18 130:2
  130:7 131:9
**ordinary** 20:13
**organized** 84:17
  108:17
**original** 86:3
**Orleans** 2:9 3:18
  4:20 5:9 6:11
  7:11 8:11,20
**outbound**
  116:13 129:14
**outgoing** 87:12
  89:2,14 93:8,9
  95:1 114:18
  122:3,17
  125:12 129:9
**outside** 54:17
  82:13
**overall** 140:2,12
**overlapping**
  135:13
**oversee** 68:12
  97:6
**overseen** 101:7
**overview** 34:16
  35:12 41:17
  48:1,21 58:6

  63:10,17,22
  64:16 66:3
  67:9 125:20
**owner** 34:19

———————
**P**
**P** 1:15,21 10:1
**packet** 88:20
**page** 9:9 26:17
  29:5 35:10
  40:22 41:11
  42:2,14,20
  43:7 44:3,16
  45:7,13 46:5,9
  46:11 57:21
  67:15 73:8
  85:20,21 86:7
  86:17,18 88:21
  88:22 89:5,12
  89:13,15 90:1
  90:8,10,18
  91:2 92:6,11
  92:18 104:20
  105:3 124:17
  125:8 126:18
  129:20,20
  130:6,9,9,10
**pages** 9:19 27:7
  27:8 28:1 29:4
  42:18 85:12,14
  89:17 90:11
  92:14 102:9
  103:4,5 129:19
  130:3,8 131:6
  142:19
**paper** 54:14
  59:3 63:8
  82:13 84:9
**papers** 25:3
**paragraph**
  67:15 73:9
  112:9
**parishes** 109:4
**part** 12:6 17:2
  21:9 23:20,20
  23:21 24:6

  35:11 36:10
  39:21,22 41:2
  46:21 51:14
  53:14 57:4,6,9
  66:4 73:4 77:6
  89:6 98:18
  102:14 139:20
  140:9
**particular** 15:8
  16:14,21 18:22
  21:4 22:19
  23:4 25:17
  30:11 31:14
  33:21 34:12
  35:10,16,18
  38:10,22 40:14
  40:18 42:2
  43:13 45:22
  46:22 49:20
  53:8 55:9,11
  55:17,20 56:5
  62:7,10 70:18
  71:7 80:12
  85:12 88:14
  104:18 110:5,6
  110:14 141:20
  142:20
**particularly**
  22:11
**particulars** 96:8
  139:19
**parties** 133:4
**parts** 64:12
  135:22
**party** 87:17
  101:17 115:7
**passed** 34:19
**pasting** 83:17,18
  128:8
**pay** 30:11 66:8
**payments** 22:1
  24:21 28:17
  31:7 41:13
  42:22
**PC** 8:9 20:14,16
  20:18

**PDF** 86:20 87:2
  131:2
**Peck** 4:18
**Pennsylvania**
  2:16
**people** 59:13,15
  65:3,4 67:20
  68:3,7 73:21
  81:10 82:17
  84:12 98:8
  99:17 102:6
  106:19,19,20
  109:5 133:14
  133:19,20
  135:12,14
  137:11 138:14
**percent** 79:4
  99:22 100:3
**percentage**
  99:19
**perform** 111:2
**performed**
  135:10
**performing**
  67:17 74:10
**period** 16:5
  107:19 138:19
**person** 18:19
  52:13 71:20
  84:10 86:5
  95:13 96:12
  104:19 107:5
  109:20 111:5,5
  111:6 114:1
  132:4
**personal** 27:3
  43:11 44:18
  48:2 96:15
  118:8 125:21
**personnel** 135:7
**person's** 96:10
  109:10 111:2
  130:12 132:11
**pertaining** 11:7
  62:8
**PETER** 5:6

Bellance "Faye" Green

October 16, 2009

Washington, DC

**PETROVICH**
3:15 77:12
**Pfister** 5:16
**phone** 32:7,8
58:18,19 70:19
73:3 77:14
117:17 119:21
120:22 121:4,5
137:18
**physical** 135:5
136:3
**physically**
130:16
**pick** 19:9 42:16
96:6
**picks** 43:22
**picture** 83:17
**piece** 129:16,19
**pieces** 84:8,9
**place** 2:17 19:15
40:19 45:22
53:2 54:3,16
115:18,19
128:7 135:2
**places** 122:7
**Plaintiff** 26:7
61:1,2,6 103:9
103:10 141:21
141:21 142:6
142:10,18
145:5,6
**plaintiffs** 1:14
2:3 9:3,19 10:5
10:10,20 11:1
25:15 60:22
103:11 105:17
106:2 112:17
141:16
**Plaintiff's**
133:13
**plane** 141:11
**platform** 20:15
**Play'Mor** 7:7
**Plaza** 4:9,10
**pleading** 59:9
**please** 11:8,18

17:21 30:11,18
30:21 32:7
47:2 58:17,18
75:16 77:13
86:7 122:1,11
**plus** 107:9
**point** 16:17
18:17 30:10
33:15,16 36:5
70:21 71:1
96:8 117:3
**policy** 37:9
**pool** 69:13
**pop** 126:21
**pop-up** 41:7
123:2
**position** 12:18
12:20,20 13:2
13:17,17 14:2
14:4,9 15:4,4,9
20:2 77:19,20
94:5 137:12,15
**positive** 111:5
**possibility** 32:16
32:20 37:18
133:16
**possible** 67:19
94:22 108:22
109:5 141:4
**possibly** 23:7
29:20 40:19
74:18
**potential** 32:16
**Poydras** 2:8
4:19 5:8 6:9
7:10 8:19
**practice** 118:12
**premium**
135:15
**presented**
139:13
**presidential**
107:16
**press** 66:3
**pretty** 12:14
20:17 72:14

83:5 118:14
**prevent** 132:21
**previous** 46:12
94:4 120:16
122:21
**previously** 99:4
**pre-approved**
95:21
**pre-NEMIS**
84:6
**primarily** 21:8
53:18,19
**primary** 70:4
78:15,17,22
79:21,22
**print** 34:8 51:18
66:2,7 83:5,16
90:20 123:10
124:21,21
125:6,19 126:8
126:16,17
127:13 128:5
129:3,11,20
130:2,4,6,9,10
130:11,13,16
130:17,21
132:10 133:2
140:1,7
**printed** 95:10
**printing** 96:11
128:8
**prints** 83:10,13
83:14 87:18
91:1 123:12
125:13 130:21
132:22
**prior** 12:20,22
13:17 54:2
68:1 82:9
**priority** 73:22
98:10,12
100:18
**privacy** 9:20
61:3,6,16,18
62:13 75:8,11
111:22 112:7

112:15,20
113:6,20
133:22 142:10
142:17 145:6
**probably** 20:17
38:12 49:21
51:20 52:22
54:13 62:3
66:17 101:9
102:6 135:14
**problems** 133:3
**procedure** 97:8
118:17 120:12
**procedures** 73:5
**proceedings**
1:20
**process** 16:10,17
17:4 18:3,9
48:16 72:1
78:19 93:4
94:1 95:9 97:3
99:9,15 101:5
104:10 109:21
115:9,13,18,22
116:20 117:20
121:12 128:4,9
131:11 132:6,9
133:8,9,15
134:2,20 136:4
136:11
**processing**
12:13 13:9
15:15 21:7,12
21:16,19 22:7
48:13 70:7
74:11 77:8
79:3,12 83:1
88:12 92:3
93:14 94:8
95:16,22 99:15
99:20 100:4
116:3,21
134:15 137:6
138:3,14
139:21
**produce** 23:14

24:13 47:12
62:5,11 63:6,7
63:9,16 66:15
67:7 68:8,13
73:16 104:2
109:7 128:19
132:2,15
139:12 140:2
140:15 141:22
**produceable**
131:21
**produced** 25:15
30:7 39:22
54:7 55:10
57:3 58:15
62:10 83:20
101:17 103:7
105:17 106:1
111:18 144:10
145:8
**produces** 23:20
76:6 80:6
87:10
**producing** 39:9
59:11 109:22
**production**
73:10,10 98:20
98:21 101:8
**Products** 1:5
11:3
**proficiency**
139:10
**program** 12:12
12:17 13:19
14:9,17 15:3
20:10,13 22:3
39:18 50:1
66:20 80:9,10
80:12 96:6
123:18 135:20
**programs** 56:7
66:19
**project** 69:13
133:10
**proper** 61:19
71:20

| | | | | |
|---|---|---|---|---|
| **properly** 111:21 | 11:21 17:20 | 28:3,10,14,17 | **reference** 21:3 | **relate** 48:18 |
| **property** 35:5 | 19:5 20:22 | 29:7 30:5 | 33:11 40:15,19 | **related** 21:21 |
| 43:11 44:5,8 | 24:11 25:13 | 41:15,16 43:10 | 41:18 42:9 | 22:8 24:21 |
| 44:10,10,19 | 29:9 30:12 | 46:12 49:4 | 43:4,14 44:13 | 25:7 31:11 |
| 48:2,2 125:22 | 31:4 47:18 | 53:1 67:5 99:3 | 46:1 | 32:3,5,11 34:2 |
| 125:22 142:21 | 70:14 141:19 | 99:4 103:22 | **referred** 76:6 | 40:11 45:15 |
| 143:19 144:4 | **questioning** | 104:8 106:2 | **referring** 105:6 | 56:8 80:11,12 |
| **provide** 11:19 | 75:3 | 115:11 141:20 | **refers** 61:8 | 81:22 94:17 |
| 70:19 71:18 | **questions** 13:9 | 144:14 | **reg** 124:20,21 | 96:5 110:13 |
| 72:10 114:5 | 37:13 76:18 | **receives** 60:9 | **regard** 95:1 97:9 | 112:14,20 |
| **provided** 18:14 | 117:9 144:22 | 116:21 | 118:18 120:10 | 115:3 |
| 22:14 24:15 | **quick** 131:8 | **Recess** 60:17 | **regarding** 22:13 | **relates** 22:11 |
| 52:19 57:9 | 141:11 145:1 | 74:22 141:14 | 23:3 27:3 | 26:1 29:7 |
| 112:14,21 | **quickly** 83:5 | **recognize** 85:3 | 30:17 31:17,20 | 52:11 53:13 |
| 113:4,7 117:12 | 132:16 | **record** 10:9 11:8 | 32:15 45:4,19 | 96:22 |
| 144:12 145:5 | **quite** 21:1 99:4 | 12:3 22:5 | 46:2 53:21 | **relating** 35:8 |
| **PRT** 124:20 | | 48:18 52:18 | 140:21 | 52:5 60:9 |
| **ptafaro@frilo...** | **R** | 53:3 75:17 | **region** 22:12 | 94:21 |
| 5:11 | **R** 2:13 5:6 10:1 | 94:17 96:9,9 | **regional** 97:20 | **relatively** |
| **Public** 1:16 10:6 | 75:18 | 119:17,19 | **registered** 34:22 | 138:19 |
| 146:19 | **random** 105:14 | **recorded** 44:6 | 40:13 46:15 | **release** 9:20 |
| **pull** 59:5 113:12 | **RANDY** 7:8 | 44:19 45:5,17 | **registrant** 61:17 | 61:20 111:19 |
| 125:4 130:5 | **Rankin** 4:18 | 46:2 52:21 | **registrants** | 111:21 112:7 |
| 131:7 | **read** 37:15 | 94:14 96:18 | 107:2 | 112:16 113:6 |
| **pulled** 111:11 | 52:15 112:9 | **recording** 118:6 | **registration** | 113:21 114:8 |
| 123:14 | 124:7 | 120:10 | 18:13 24:14 | 114:14 |
| **pulling** 83:14,15 | **readily** 33:7,14 | **records** 13:20 | 26:19 39:19 | **released** 75:13 |
| **purpose** 81:20 | **real** 44:4,8 48:1 | 13:22 14:17 | 62:20,21 70:6 | 142:17 |
| 81:21 | 125:22 | 15:18,19 16:1 | 74:1 79:3,12 | **releasing** 114:1 |
| **purposes** 76:16 | **really** 82:21 | 16:4 17:1 55:7 | 85:11 87:11 | **remaining** 43:22 |
| 117:9 | 95:19 130:12 | 55:8,10 74:3 | 88:18 100:17 | **remember** |
| **pursuant** 1:14 | 133:1 138:17 | 79:18 86:12 | 107:8 110:5 | 139:14 |
| **push** 66:13 | 139:21 | 94:5 99:12 | 114:10 124:22 | **rental** 33:13,19 |
| **put** 16:22 46:19 | **reason** 27:1 58:2 | 134:22 135:1 | 125:7,9 126:8 | 36:10 42:6 |
| 86:4,22 95:4 | 76:17 83:22 | 137:10 | 138:2,19 143:6 | **renter** 34:20 |
| 95:12 100:16 | 88:5 | **recovery** 81:11 | 144:1 | **repair** 19:13 |
| 110:11 122:10 | **reasonable** 75:9 | **Recreation** 7:5 | **registrations** | **repeat** 63:14 |
| 125:1 131:9,20 | **recall** 62:2 70:11 | **Recreational** | 13:8,16 46:16 | 80:3 |
| 135:2 | **receipt** 19:13 | 3:3 10:17 | 48:6 78:18 | **report** 36:16,20 |
| **puts** 115:9 | **receipts** 28:1,3 | **Red** 46:13 | 100:20 | 37:1,5,9,10 |
| 116:16 | **receive** 22:4 | **redacted** 75:11 | **regular** 33:19 | 38:7,12,20 |
| **putting** 18:20 | 25:20 77:16 | **REDMANN** | 59:4 | 39:4,13,20 |
| **p.m** 145:18 | 97:13,20 115:1 | 4:17 | **regularly** 35:15 | 49:15,15,20,21 |
| | 115:2 144:12 | **reduce** 140:2 | **reimbursement** | 50:8,9,12,12 |
| **Q** | **received** 25:17 | **reducing** 139:22 | 28:2 | 50:16,17 63:12 |
| **question** 11:19 | 26:4 27:11 | **refer** 141:19 | **reiterates** 58:22 | 63:13,19 67:2 |

Bellance "Faye" Green

October 16, 2009

Washington, DC

67:3,10,10
87:20,22 88:7
91:8,17 92:12
92:16 116:9
118:22 119:1
120:3,15,18,19
120:21 121:10
122:5,18 123:1
123:3,17,22
124:4,9,12,15
128:15,15,22
130:18 132:18
132:19
**reported** 22:1
**reporter** 11:17
145:16
**reports** 36:17,22
37:18,21 38:2
38:15,22 39:5
39:9,21 40:2
49:22 50:2,4
50:21 63:22
66:21 88:1
89:9 123:21
128:18,20
130:20 131:14
131:15 132:18
132:20
**repository** 60:8
94:21
**represent** 46:22
50:4 103:20
**representation**
140:21
**represented**
126:4 127:9
**representing**
75:4
**represents** 34:7
51:14 107:17
**request** 15:17
16:9 30:17
31:18 58:8,10
58:12,13,14
61:12,22 71:4
98:9 99:10

104:10 111:6
114:3,4,8
117:7 144:16
**requested** 98:18
111:17 140:13
**requester** 86:21
**requesting** 31:8
105:18 111:12
111:13
**requests** 23:13
25:17,20 28:15
28:15 38:5
60:12 61:11
67:17 75:12
97:12,15,16,18
97:18,20,22
98:3,4,13 99:3
99:6,16,20
100:1 101:7
114:8 137:7,8
**require** 65:19,19
66:12,15 114:5
126:20
**required** 71:17
72:11 94:12
100:19 115:17
115:21 118:4
119:13
**requirement**
135:8
**requirements**
133:20 135:5,6
136:3 139:9
**requires** 28:16
35:21 66:12
83:10 130:10
136:5
**reside** 75:21
**resided** 41:20
43:5,16 44:14
46:3 53:22
**residing** 10:4
22:20 23:5
40:20 45:2
48:20 49:12
**resources** 73:20

100:14
**respond** 25:20
58:7
**responding**
15:17 138:15
**response** 15:11
16:10,14 17:9
18:4 20:11
27:13 82:6
97:1 100:10
101:1 137:19
138:5,10,12,17
**responses** 19:17
**responsibilities**
69:2,5 70:1
73:18 78:17
79:1
**responsibility**
137:1
**responsible** 13:8
60:8 77:22
78:16
**rest** 42:16
**reveals** 126:2
**review** 17:1
18:18 19:7
100:4,6,8
115:16 126:14
131:8
**reviewed** 16:17
42:6
**Riddle** 3:16
**right** 11:11 26:2
27:6 32:1
38:17 44:16
51:5 55:1,21
59:14 69:21
74:12 76:19
88:17 92:18
95:6,11 96:16
96:19 97:1
99:17 100:13
105:10 109:22
110:15,20
114:1,7 121:1
124:16 127:1

131:18 135:11
135:14,21
137:1,12,14
138:7,14,18
141:13 142:2,4
**rights** 134:11
**Riley** 1:18 6:17
**Rita** 15:10 22:12
23:17 82:7
108:7 109:5,12
110:4 129:13
132:5 138:15
**River** 8:15
**rjohnson@jo...**
4:13
**Rm** 2:16
**Road** 10:4 11:10
75:22
**Rodriguez** 6:8
**Rouge** 4:11
**route** 115:13
**routed** 16:13,17
16:19 17:9
27:12 28:11
**routing** 41:9
**RPR** 1:21
**rules** 11:17 53:9
72:20 93:14
111:22
**run** 20:13,17
**RV** 4:5 7:6,7,15
**RYAN** 4:7

___

### S

**S** 10:1
**Samoa** 138:20
**sample** 29:11,22
**save** 47:16 131:3
**saved** 17:5 39:20
47:11 51:3
87:2
**saving** 126:18
126:19
**saw** 142:14
**saying** 35:17
38:4,16 66:11

83:19 95:2
107:21 123:13
133:11 137:4
**says** 29:3 33:13
33:13 37:7
52:10 73:11
86:2 112:7,11
122:6,9 124:20
**SBA** 34:17
**scan** 101:21
115:12 131:2,9
140:7
**scanned** 16:3,15
17:4 18:6
27:11 28:5,6
28:11,21 29:13
63:9 86:20
87:2 100:6
**scanning** 18:19
129:17 131:5
**scans** 100:7
**Scarborough**
1:18 6:17
**schedule** 43:1
**scheduled** 11:4
26:10
**scope** 64:11
138:21
**screen** 34:8,12
34:15 35:7,8
35:13,18,20
36:3 40:7,14
40:18 41:1,7
41:11,12,18
42:1 43:9,13
43:19,22 44:12
44:16,18 45:5
45:8,13 46:1,6
46:9,11,22
47:6,15,16,21
51:2 52:17
63:7 64:14
65:2,12 66:2
83:10,13,14,15
83:18 87:18
90:20,22 91:1

Bellance "Faye" Green

Washington, DC

October 16, 2009

121:15,19
123:12 125:13
125:19 126:16
126:17 127:6,8
127:9,13,17,22
128:2,6,7
130:21 131:17
132:22
**screens** 47:19
59:12 130:17
**screen-shot**
34:10
**scroll** 35:12,21
42:15 43:20
47:8,9 127:4,5
127:21,21
**scrolling** 126:21
128:6
**search** 109:10
111:2 133:6,15
143:14
**searches** 67:18
109:17
**searching**
109:14
**seats** 135:12,13
**second** 42:1 89:4
**section** 1:5 2:14
13:7,21 17:2
30:8,11,15
31:14,15 33:22
34:1 36:7
46:20 49:6
53:16,19 59:14
65:4,6,10 69:1
69:10,15,19
70:18 73:21
74:4 78:20,21
89:4 90:1 94:6
99:12 100:15
115:11 137:4,6
137:11
**sections** 20:21
21:3 26:15
88:18 126:3
**secure** 84:13

**security** 12:6
24:22 72:16
77:6 107:9
110:15,18
135:5,6,8,19
136:3,3,6,8
142:21 143:9
143:13,16
**see** 26:12,17
27:22 32:2,4
33:10 34:1
37:15 40:14
52:15 53:20
76:17,22 85:20
90:22 104:22
123:7 126:15
144:8 145:7
**seeing** 33:10
**seen** 94:1 142:5
**select** 19:8 96:7
**selected** 96:13
**send** 29:12 30:1
95:9 96:1,4
129:10
**sends** 130:2
**Senior** 2:15
**sense** 110:10
**sent** 22:3,17
23:1,8 25:3
28:2 29:6 31:7
49:4 51:13,13
57:10 86:21
87:15,15,17
90:4 94:18,19
94:20 96:10,11
96:21 102:17
102:18 115:2,5
115:6
**sentence** 73:11
**separate** 52:21
74:3 89:17
108:8,9,10,18
123:14
**separately**
109:22 123:15
128:13 129:16

129:21 130:6
145:8
**served** 60:22
**servers** 20:18
**service** 12:13
21:7 77:8
116:18
**services** 12:22
13:5,6,7,14
14:13 69:1,8
69:10,14,19,21
70:2,13,17
73:15 100:15
119:6 137:22
**sets** 32:21
139:10
**settlement** 29:21
**Shaw** 8:5
**sheet** 61:12
106:2 142:6,10
142:18 145:11
**sheets** 61:2,2,6
87:21 145:6
**Shell** 8:18
**shelter** 53:8
**sheltering** 57:5
**SHELTON** 6:16
**shifts** 135:13
**shipping** 16:3
**short** 15:10
103:21 141:10
**shortens** 77:10
**shortly** 20:8
58:13
**shot** 34:12,15
35:13 40:7
43:19,22 44:12
44:17,18 45:8
45:13 46:9,11
47:15,16 63:8
65:12 121:19
127:9 128:8
**shots** 36:3 47:1
47:6 51:2
64:15 65:2
90:20,22

121:16 127:8
127:13,17
128:1,2 131:17
140:1
**show** 36:13
41:14 49:1
122:15,17,19
122:20 123:6
127:15
**shown** 42:1
125:18 127:10
**shows** 41:13
42:21,22 44:5
48:14,22 57:9
123:4
**sign** 55:2
**signature** 55:3
57:21 86:13,15
112:22 146:7
**signed** 35:2
86:17,18
113:20
**significant**
20:17
**simply** 26:11
66:1 83:4
84:17
**sit** 67:12,20 68:6
71:12
**site** 135:4
**situation** 46:5
61:4
**six** 94:7
**size** 130:12
**skill** 139:10
**Smith** 26:7,7
27:4,8 28:2
29:6 30:9,16
32:12 33:16
37:4 41:20
42:10 43:5,16
44:14 55:10
62:9 71:22
**Smith's** 37:8
**snapshot** 42:14
42:14 43:18

**Social** 24:22
72:5,16 73:2
107:9 110:15
110:18 114:11
142:21 143:9
143:13,16
**software** 50:1
66:20 83:11
123:18 129:1
129:17 136:7,7
**somebody** 75:12
108:14 130:2
**somewhat** 111:1
**soon** 95:3
**sorry** 14:20 27:7
31:3 33:10
47:2 104:1
120:21 131:15
**sort** 16:9 17:16
18:20 29:6
**source** 24:7
**sources** 97:17
100:2
**south** 22:12
**space** 135:9,15
**speak** 77:13
**speaking** 24:3
**speaks** 55:22
**special** 46:14
48:3,4
**specialist** 13:19
14:21,22 15:2
15:4 18:11
**specialists** 13:15
99:11 116:19
119:6 137:22
**specific** 15:11,13
24:11 30:12
32:12 38:5
64:11 74:3
79:13
**specifically**
20:10 52:12
62:2 81:16
**specifics** 54:4
**speculation**

69:17
**spell** 75:17
**spend** 68:10
**spent** 100:3
**spreadsheet**
103:8
**Square** 8:18
**St** 3:17 8:10
**staff** 65:7 67:16
70:4,17 79:1
80:2,5 81:10
99:14 100:16
**staffed** 13:15
**staffing** 74:11
**stamp** 85:21
**stands** 19:17
56:9,12
**Starcraft** 7:15
**start** 47:2 90:3
90:20 109:14
128:5
**started** 14:4
20:8 26:21
**starting** 89:5
**starts** 89:12 90:1
92:1,11
**state** 11:8 75:16
107:17,20
108:20 138:22
**stated** 68:15
**statement** 55:8
**states** 1:1 2:12
9:5 10:13,15
75:1,4,5 97:22
106:22 108:1
111:3 145:3
**stating** 55:7
106:5
**Station** 6:18
**status** 33:5
34:17 35:14
37:4 41:22,22
48:21
**stays** 28:2
**Ste** 5:18
**Steering** 9:3

10:11,20
141:16
**stenotype** 1:21
**step** 54:8,10
132:9
**steps** 23:11
**step-by-step**
16:7
**stipulated** 75:5
**stops** 36:10
**storage** 16:4
**store** 82:4
**stored** 39:6,9
53:10 54:20
56:15 84:1
93:18 130:1
**stores** 82:2
**storing** 83:22
**Street** 4:19 5:8
6:9,19 7:10
8:19
**STRICKLAND**
8:16
**strike** 17:15
35:7 38:21
52:3 53:6
**struck** 15:5,9
**subdivision** 77:7
**subject** 18:22
74:18 112:15
**SUBSCRIBED**
146:11
**Suite** 3:8,17
4:19 5:8 6:19
7:10,19 8:10
8:18
**summary** 24:16
24:20 44:4
45:14,17 48:2
48:10 88:2,4
117:10,13
119:10 123:5,6
125:22
**supervise** 59:16
59:21 78:4,12
79:22 80:1,5

136:22
**supervised** 13:7
13:10 120:7
**supervising**
77:22
**supervisor**
59:17
**Supervisory**
12:12,17 13:19
14:9,17 15:3
**SUPP** 42:7
**supplied** 33:9
**supply** 68:19
75:9
**support** 78:20
**sure** 20:15 21:1
24:5,6,9 25:16
31:2 47:22
56:9 57:5,8
62:3,6 97:4
112:11 113:20
124:10
**survivors** 78:18
**sworn** 1:15 10:6
76:2 146:11
**system** 17:14,15
18:8 19:20,21
20:4,5,6,7,9,17
27:12 28:6,7
28:11,22 29:13
29:14 52:4
80:19,21 82:21
93:10,12,15
106:13,18
107:6 125:16

---

**T**

**tab** 35:12,13,18
40:10 41:2
42:21 46:14,18
48:1,3,4,8,9,10
48:12 49:1
51:5,8 54:12
63:10,10,11,11
63:17,17,18,18
66:3 83:14

121:21 122:8
124:15 125:11
126:2,14 127:2
127:9,11
128:12 129:3
139:20
**tables** 123:20
**tabs** 47:22 48:17
48:18 49:9
51:4 54:9 59:2
64:15,17 65:2
67:8,8 83:9
125:14,18
126:1,4,6,12
126:15 127:12
127:14,16
139:14,22
**TAFARO** 5:6
**take** 11:4,17
30:11,18 34:12
39:12 47:6
49:19 51:1,19
58:6 60:16
63:6 67:6
68:15 74:20
78:17 79:1
93:6 100:19
102:6 126:19
127:18 128:1,3
128:4,7,10,18
129:6 130:13
131:11 139:16
140:2,7,15
141:10
**taken** 1:17,20
119:20,22
120:1 124:9
**takes** 39:16 47:7
50:2,20 51:6
51:19 101:4,12
101:15,18
102:14 119:12
121:14 129:3,7
132:2 135:18
139:12
**talk** 87:4 97:12

101:4 114:16
121:12 140:19
**talked** 35:15
54:11,22 58:21
58:22 64:15
73:4 114:18
121:13
**talking** 12:1
117:5 139:17
**tapped** 100:15
**task** 64:14 67:21
118:1
**tasked** 59:11
74:6
**tasks** 60:3
**teach** 66:5
**team** 136:6
**Tel** 2:10,19 3:10
3:19 4:12,21
5:10,20 6:12
6:21 7:12,21
8:12,21
**telephone** 3:12
4:3 5:3 6:3 7:3
8:3 71:15 72:7
72:8 142:22
**tell** 26:14 34:13
36:15 48:17
58:2 60:20
76:2 85:17
89:13 90:7,8
90:18 97:14
103:1 105:7,17
109:9 112:5
114:21 116:9
121:17 125:15
**telling** 66:2
130:5
**temporary** 16:4
**ten** 39:16 47:7
47:14,14,16
50:3,20 51:2,7
51:21 68:7
101:21 128:11
129:1 130:6,8
131:12,13,16

Bellance "Faye" Green

Washington, DC

October 16, 2009

Page 165

131:20
tend 84:8
tends 51:19
term 38:7 70:2
   80:7
terms 24:20
   83:1 102:13,16
   138:13
territories 139:1
testified 10:7
   26:18 143:18
testifying 76:10
testimony 53:5
   54:2 68:1
Texas 79:8
   108:11
text 123:7
Thank 10:18
   34:3 74:19
thing 15:20
   88:19 125:5,6
things 36:21
   38:13
think 25:18
   26:18 33:3
   59:8 65:16
   66:14 70:12
   74:17 88:18
   121:3 127:16
   131:13 140:20
third 50:16
   87:17 115:7
   133:4
THOMAS 7:16
three 5:18 27:7
   50:2,4,21
   63:12 66:21,22
   67:5 68:11,16
   108:6 129:12
time 12:2 15:8
   15:10 30:18
   51:7 58:9,11
   60:21 63:6,15
   63:15 65:9,9
   66:16 73:19,20
   73:20 74:19

75:9 78:22
79:4 96:11
99:20,22
100:11 101:4
101:12,14
102:1,4,14
115:19 138:4
138:16 139:21
140:2,6,15
times 84:15 91:9
   94:1,4 105:2,4
   109:9,12
   117:21 120:5,6
   130:7 132:6
time-consuming
   102:14 129:22
timing 135:16
title 12:10,11,14
   12:17 47:20
   77:18,20
TL 7:6
today 11:3 67:12
   67:20 68:7
   71:12,15 76:2
   76:10
told 71:4 88:19
TomC@willin...
   7:22
top 34:17 100:17
   122:15 127:10
Torts 2:14
total 14:7 41:14
   47:13 63:6,15
   68:6,7,17
   140:14
track 17:14
   25:19 56:16
   83:1 84:8
tracked 21:19
   25:5,8 140:22
   141:5,6
traditional
   128:7
trailer 1:4 11:2
   33:9 52:10
   56:7,15 57:10

112:20
trailers 7:7
   32:11,20 34:2
train 65:20
   66:20 68:11,16
   136:20
trained 65:5
   67:1 68:3,4
   69:3 136:18
training 13:11
   13:12,13,14
   65:20 66:1,12
   66:13,14 67:1
   67:6 68:8
   136:14 139:9
   139:10
transcribed
   1:22
transferred 41:4
   87:1
transpired
   119:18
transportation
   43:10
travel 32:11
   33:9 34:2
   52:10 56:7,15
   57:10 112:20
traveling 27:17
Travis 7:11
trial 2:13,15
   26:10 76:16,21
   77:1
true 86:2
truth 76:3
try 11:21,22
   18:11 19:11,14
   133:6 144:7
trying 18:1
   31:13 136:1
turn 29:2,4 30:3
   40:6 53:7
   104:20
turned 61:5
two 12:19 14:10
   32:10 36:1,3

42:17 49:21
66:21,22 67:5
68:11,15 79:6
103:8 122:7
132:6
TX 7:20
type 21:18 29:11
   29:22 41:8
   82:18 85:6
   89:8 98:3
   101:2,22 103:6
   114:4 118:1
   128:19 135:1
   135:20 138:11
types 28:13 98:8
   100:1 137:19
typical 87:6
typically 87:5
   98:17 99:20
   137:18 138:12

_____ U _____

Uhm-hmm
   137:9
Uh-huh 86:19
   94:3
um 94:16 139:7
undergo 132:6
   136:11,15
understand
   17:20 20:22
   24:9 31:4 76:1
   76:9 108:12
   112:12
Understandable
   69:7
understanding
   56:13 61:15
   92:21 93:3
unique 107:19
   110:3,5,10,18
   111:1
unit 31:18,19,20
   32:5 33:17,18
   35:9 40:15,20
   41:19 42:10

43:4,15 46:2
48:19,22 49:1
52:18 54:4
112:21
United 1:1 2:12
   4:9,10 9:5
   10:13,14 75:1
   75:4,5 145:3
units 22:13 56:8
updates 41:22
upside 124:7
upwards 102:8
use 18:9 19:14
   19:22 20:3
   21:7 31:2
   48:15 66:19
   81:8,12,17
   82:1 83:11
   95:18,21
   107:18 132:12
   136:19
user's 20:16
uses 81:7
usually 16:12
   86:21 87:11
   98:4,12,14
   99:11 107:17
   117:16,17
   125:7 127:10
   127:10
U.S 98:16
   138:22
U.S.C 112:15

_____ V _____

vacant 137:13
vague 17:18
   143:10
vagueness 64:18
   68:14 70:15
Valdes-Fauli
   6:8
variable 102:13
variance 102:16
varies 102:5
   127:20 139:6

Bellance "Faye" Green

Washington, DC

October 16, 2009

**variety** 97:17
125:17 126:1
**various** 83:9
84:12 100:2
**vary** 102:4,9
**vast** 65:6
**Vehicles** 3:4
10:17
**verification**
34:18 72:1,3
110:19
**verify** 29:9
31:13 47:9
51:16 71:19
72:9 73:2
104:17,19
111:9,14
113:18 114:6
117:5,18 131:6
**verifying** 144:18
**version** 17:5
**vetted** 134:21
**victim** 16:8,11
22:19
**victims** 13:9
15:16,16 22:11
23:16
**view** 129:10,16
129:20 130:9,9
**viewing** 127:11
**VIN** 23:5 52:18
52:20
**Virginia** 79:8

**W**

**wait** 11:18,20
38:15
**waiver** 61:3,6,12
61:16,18 62:14
142:10 145:7
**Waldron** 2:13
9:6 10:12,12
14:20 17:12,18
19:2 24:1
27:15 28:8
29:16 31:1

32:6 54:1
55:13,22 58:16
60:5 61:8
64:18 65:14
67:22 68:14
69:16 70:15
71:8 72:17,21
74:20 75:2,4
77:3,14,17
85:2 89:16,22
90:11,17 91:6
91:21 92:10
102:21 104:7
105:15 106:4,7
112:4 113:11
113:15 120:20
141:10,13
142:12 143:10
145:1,4,13
**walk** 16:7
116:20
**Walker** 4:8
**want** 27:21
30:10 37:7
57:12 60:19
63:5,15 66:5
77:1 96:7
141:19
**wanted** 26:11
29:10 70:8,9
96:4 101:19,20
130:3
**wants** 37:12
**Warshauer** 2:6
**Washington**
1:10,19 2:18
**wasn't** 82:22
**way** 28:6,21
34:14 36:17
37:22,22 41:18
43:4,14 44:13
51:18 52:2,5
82:9,22 83:8
84:1 92:22
96:13 104:12
105:7 111:10

123:3,10
129:22 133:1,1
145:9
**ways** 115:8
**WEAVER** 6:7
**Weinstock** 5:16
112:19
**went** 51:11 62:8
**weren't** 87:19
144:15
**we've** 40:8 54:22
99:4 132:20
**whatsoever**
31:17 45:1
**Wheaton** 4:18
**WHITFIELD**
8:7
**Willingham**
7:17
**Winchester** 79:8
**witness** 1:13,15
9:2 10:5 14:22
24:5 28:10
29:18 31:6
32:10 54:3
55:15 61:10
64:20 65:16
68:2,15 69:18
70:17 71:10
72:22 76:21
77:13 90:14
104:6 142:14
143:11 146:7
**witnesses** 76:20
**Woods** 2:4 9:4
10:8,10,18,21
11:1 15:1
17:13,19 19:4
24:10 27:17,19
28:12 30:2
31:12 32:14
54:5 55:18
56:2 57:17
58:20 60:6,16
60:18 61:14
64:22 65:22

68:5 69:6,20
70:20 71:11
72:19 73:6
74:17 76:14,22
104:4 105:13
105:22 112:17
113:9,13
141:11,17
142:16 143:7
143:17 144:22
145:14,17
**Word** 47:12,17
51:3 83:16,18
126:18,19
128:8,9 130:17
**words** 121:5
**work** 59:22 64:5
67:21 69:12
73:11 77:7
78:7,9 100:6
133:9 134:14
136:9 138:1,7
138:9 139:8
**worked** 65:6
81:4 119:22
**workers** 133:12
**working** 59:11
73:14 98:15
100:18 133:5
**workload** 139:4
**works** 93:4
116:19
**worry** 135:5
**wouldn't** 52:12
52:21 104:10
110:9 113:17
128:14 141:5
141:22
**Wright** 9:13,20
112:11,22
113:5,7,18,20
142:15
**Wright's** 113:12
**write** 18:20
122:1
**writes** 18:14

114:7
**writing** 52:13
71:5 95:19
**written** 22:21
24:18 114:14
**wrong** 137:5
**W-r-i-g-h-t**
85:19

**X**

**X** 1:3,9

**Y**

**yeah** 124:8
131:6
**year** 13:3 136:2
**years** 12:9,19
14:3,8,10 73:5
81:3,5 106:14
106:18 107:1
**Yount** 7:9

**Z**

**Zwain** 5:16

**1**

**1** 9:10 42:7
57:13,15 130:9
**1,000** 101:10
**1-800** 70:11,22
**1-800-somethi...**
70:12
**10** 9:4,20 112:1
112:2 130:3
145:7
**10/1/2005** 36:11
**10:36** 60:17
**10:50** 60:17
**100** 25:18 26:5
79:4
**100-plus** 144:10
**101** 1:18
**102** 9:19
**105** 50:6
**107** 50:7
**109** 9:19 50:7

Bellance "Faye" Green

October 16, 2009

Washington, DC

| | | | | |
|---|---|---|---|---|
| 103:5 | **161-000037** 29:5 | **207-7350** 3:19 | **4,700** 61:22 | 91:3,4 121:15 |
| **11** 81:3,5 106:14 | **161-000049** 30:4 | **21** 57:21 | **4,761** 61:13 | 124:7,8 |
| 106:18 107:1 | 30:14 | **21001** 10:4 | **4,791** 58:10,12 | **60** 32:13 33:1,1 |
| **11:14** 74:22 | **161-000083** | 11:10 | 61:1,5 73:10 | 33:2,3,5 34:3 |
| **11:21** 74:22 | 30:15 | **225** 4:12 | **40** 63:20 64:2,3 | **601** 4:19 |
| **1100** 2:8 5:8 | **161-000084** 34:7 | **248-2080** 4:12 | 67:7 139:12,16 | **61** 34:4 |
| **112** 9:20 | **161-102** 50:10 | **2775** 4:19 | **40-minute** 140:5 | **65** 91:2 |
| **1124-000078** | **161-103** 50:13 | **280** 69:9 73:14 | 140:14 | **685** 35:12 |
| 86:8 | **161-104** 50:5,13 | 73:17 139:4 | **400** 6:9 | **69-B** 35:2 |
| **12** 47:22 48:17 | **161-105** 50:17 | **2800** 2:7 | **404-322-6233** | |
| 49:9 51:3 54:8 | **161-11** 53:7 | **282** 74:2,9 | 6:21 | **7** |
| 126:6 | **161-110** 55:3 | 137:21 | **4800** 8:18 | **7** 9:17 91:16,19 |
| **12:39** 141:14 | **161-84** 46:20 | **29** 15:5,9 | **49** 31:15 | 116:8 |
| **12:41** 141:14 | **161-98** 46:21 | **2900** 5:18 | | **70002** 3:9 5:19 |
| **12:45** 145:18 | **161-99** 49:14 | | **5** | **701** 8:19 |
| **124** 89:18 | 50:5,9 | **3** | **5** 9:15 90:12,15 | **70112** 7:11 |
| **124-000002-0...** | **166** 91:15 | **3** 9:12 67:15 | 112:15 114:19 | **70130** 4:20 6:11 |
| 9:14 | **17th** 6:19 | 84:21,22 87:6 | **5,000** 103:21,21 | **70139** 8:20 |
| **124-000036-0...** | **1700** 6:19 | 97:10 99:5 | 105:9 145:6 | **70163-2800** 2:9 |
| 9:15 | **18** 104:21 | 114:17 | **50** 101:18 | **70163-3700** 5:9 |
| **124-000055-0...** | 138:13 | **30** 51:20,22 | 131:18 140:17 | **70170** 8:11 |
| 9:16 | **1800** 7:10 | 54:13 129:5 | **500** 101:10 | **70170-3100** 3:18 |
| **124-000066-0...** | **1873** 1:4 | 131:15 142:19 | **504** 2:10 3:19 | **70809** 4:11 |
| 9:17 | **1974** 112:15 | **30th** 6:10 | 4:21 5:10 6:12 | **71** 91:22 92:1 |
| **124-000071-0...** | **1988** 20:1 | **300** 135:14 | 7:12 8:12 | **713-333-7600** |
| 9:18 | **1998** 14:16 20:3 | **30363** 6:20 | **504)654-1324** | 7:21 |
| **124000036** 90:2 | | **307-2091** 2:19 | 8:21 | **73** 92:6 |
| **132** 10:4 11:10 | **2** | **3100** 3:17 | **504)832-3700** | **74** 9:11 92:11,12 |
| 75:22 | **2** 9:11 74:14,15 | **35** 89:15,15,17 | 5:20 | **75** 9:6 |
| **1331** 2:16 | 89:5,12,15,17 | **350** 59:20 60:2 | **504)836-5200** | **77** 85:16 92:15 |
| **141** 9:4 | 130:9 | 64:5,13 68:12 | 3:10 | **770** 91:15 |
| **145** 9:6 | **2-19-09** 112:22 | 68:17 69:3 | **522-2304** 2:10 | **77002** 7:20 |
| **1450** 3:8 | **20** 100:3 127:22 | 78:5,11 135:14 | **527-0680** 7:12 | **78** 85:16 92:18 |
| **15** 127:22 128:2 | 128:2 | 136:22 137:3 | **54** 32:13,15 34:3 | **79** 85:16 |
| **16** 1:11,20 | **20001** 75:22 | 137:17 | 90:10,12 | |
| **1603** 107:18 | **20004** 2:18 | **36** 90:11 | **55** 32:13,19 34:3 | **8** |
| 108:6 109:6 | **2005** 15:5,10 | **3600** 8:10 | 90:18 | **8** 9:18 73:9 92:7 |
| 144:8 | 27:9 | **3700** 5:8 | **552a** 112:16 | 92:8 118:21 |
| **1604** 108:6 | **2006** 14:14,16 | **3838** 5:17 | **566-5216** 8:12 | 123:3,22 |
| **1605** 108:6 | **2007** 14:11,14 | **3900** 3:7 | **568-1990** 4:21 | **8,000** 145:6 |
| **1606** 108:11 | **2009** 1:11,20 | | **57** 9:10 | **8,500** 58:14 |
| **1607** 108:11 | 57:21 | **4** | **595-5190** 6:12 | **80** 85:14 99:22 |
| 109:6 110:11 | **201** 3:17 6:19 | **4** 9:14 27:9 49:9 | **599-8060** 5:10 | **808** 7:19 |
| 144:9 | 8:10 | 57:21 73:8 | | **8214N** 2:16 |
| **1608** 7:19 | **2010** 26:10 | 89:19,20 93:7 | **6** | **83** 31:15 |
| **161-000036** 29:3 | **202** 2:19 | 93:8 | **6** 9:16 67:15 | **84** 9:13 35:17 |

Alderson Reporting Company
1-800-FOR-DEPO

Bellance "Faye" Green                                    October 16, 2009
Washington, DC

36:2,6 40:8
47:3
**85** 35:19 36:3,6
40:8
**8555** 4:10
**86** 40:6
**87** 40:22
**88** 41:11
**89** 9:14 42:3,4

**9**

**9** 9:19 102:19
103:1 110:22
123:3 141:19
145:10
**9:00** 1:19
**90** 9:15 42:20
**909** 7:10
**91** 9:16,17 43:7
43:19
**92** 9:18 43:18
**93** 44:3
**94** 44:16 45:8
**95** 45:7
**96** 45:13
**97** 46:5
**98** 46:9,11 47:3