UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE | * | |
| | PRODUCTS LIABILITY | * | |
| | LITIGATION | * | SECTION:  N(5) |
| | | * | |
| This Document Relates to: | | * | |
| *Dubuclet v. Fleetwood Enterprises, Inc.* | | * | |
| | | * | JUDGE: ENGELHARDT |
| Case No. 07-9228 | | * | |
| | | * | |
| | | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FLEETWOOD ENTERPRISES, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO EXCLUDE
THE TESTIMONY OF PLAINTIFF'S EXPERT, MARY DEVANY**

**MAY IT PLEASE THE COURT:**

Defendant, Fleetwood Enterprises, Inc. ("Fleetwood"), respectfully submits this

memorandum of law in support of its motion to exclude the testimony of Plaintiff's expert, Mary

DeVany, and respectfully shows this Court as follows.

### I.    BACKGROUND

This Court is already familiar with Plaintiff's proffered expert and the subject of this

motion, Mary C. DeVany, who was also a designated expert in the *Alexander* bellwether case.[1]

On July 17, 2009, DeVany submitted her expert report in the *Dubuclet* bellwether case,[2] which is

substantially similar to her report issued in *Alexander*.[3]  On August 8, 2009, this Court issued its

---

[1] *See* Affidavit of Mary C. DeVany, submitted May 18, 2009, attached hereto as Exhibit A.
[2] Timia Dubuclet was a named plaintiff in the *Aldridge* case (*Aldridge, et al. v. Fleetwood Enterprises, Inc., et al.*, Member Case No. 07-9228, filed November 30, 2007).  On June 15, 2009, the Court ordered that plaintiff Elisha Dubuclet on behalf of her minor daughter, Timia Dubuclet ("Plaintiff"), would serve as the bellwether plaintiff against Fleetwood. (Rec. Doc. 1760).  On August 13, 2009, this Court Ordered that Timia Dubuclet's claims be severed from the other plaintiffs in the *Aldridge* Complaint.  (Rec. Doc. 2623).
[3] *See* Affidavit of Mary C. DeVany, submitted July 17, 2009, attached hereto as Exhibit B.
~ Doc #1038535.01 ~

Order and Reasons (Rec. Doc. 3083) on Gulf Stream Coach, Inc's Motion in Limine to Exclude the Opinions of Mary DeVany (Rec. Doc. 2895).  As this Court explained in its Order, DeVany's opinions may not depart from the particular area of expertise for which she has been offered: industrial hygiene.  (Rec. Doc. 3083).  Even assuming that DeVany were to be accepted as an expert in the field of industrial hygiene, this Court cautioned that it would carefully monitor her opinions to ensure they were confined to this singular area.  *Id.* at pp. 1-2.

More troubling to this Court were DeVany's false representations made while under oath in the State of Washington, which triggered this Court' Order which expressly urged Plaintiffs' counsel to "reconsider whether DeVany's testimony is critical to the trial of this matter; and if so, which narrowly-tailored opinions might survive the crucible of cross examination such that they might be useful to the jury."  *Id.* at 3824.  Following the issuance of this Order, Plaintiffs elected not to call DeVany as a witness in the *Alexander* bellwether trial.  This Court later took up the issue of DeVany's prior testimony in the State of Washington.  In an Order and Rule to Show Cause, this Court concluded that DeVany's prior statements made under oath were "self-aggrandizing" and "not just inaccurate" but also "patently false" and ordered DeVany to correct her misrepresentations.  (Rec. Doc. 3824, pp. 8-9).[4]

Because it is unclear whether DeVany would even be permitted to testify in the *Dubuclet* bellwether trial before the resolution of this Court's Order and Rule to Show Cause, and because Plaintiff's counsel has not withdrawn DeVany as a designated expert in this matter, Fleetwood now moves *in limine* to exclude the expert testimony of DeVany.[5]

---

[4] On October 2, 2009, DeVany filed her Notice of Appeal of this Order and Rule to Show Cause.  (no record docket number was assigned to this Notice).

[5] Because Fleetwood fully expected Plaintiff's counsel to withdraw DeVany from Plaintiff's Designation of Experts, and in order to conserve resources, Fleetwood did not separately depose DeVany in the *Dubuclet* matter.  Therefore, for the purposes of this Motion, Fleetwood will rely in part on the deposition of DeVany taken in the *Alexander* matter.

## II.       FACTS

Plaintiff Timia Dubuclet ("Timia") claims injury as a result of exposure to allegedly
dangerous levels of formaldehyde in her emergency housing unit ("EHU") manufactured by
Defendant Fleetwood.  Specifically, Timia is claiming injuries for alleged exacerbation of
dermatitis/eczema, allergic rhinitis, and mental anguish, including anxiety and fear of cancer or
other disease.[6]

### A.       Plaintiff's industrial hygiene expert – Mary C. DeVany

In support of her claims, Timia provided fourteen written expert reports, including the
report of Mary C. DeVany.  Exhibit B, DeVany's July 17, 2009 Affidavit.  DeVany claims to be
an occupational and community health safety engineer for the past 30 years.  She has an
undergraduate degree in biology, and a Master of Science degree in biology, according to her
report.[7]  She claims to be a practicing industrial hygienist, though she failed the examination to
become a certified industrial hygienist at least once.  Exhibit C, pp. 289-90.  DeVany could not
recall whether she sat for the exam a second time, and she testified that she would need to check
her records to see if she failed more than once.  *Id.*  DeVany does not have a degree in industrial
hygiene.  *Id.* at 56.  DeVany is not certified by any organization as an industrial hygienist.  *Id.* at
54.

Despite relatively limited credentials as discussed further below, the Plaintiff's expert
witness, Mary DeVany, offers opinions of astounding scope and breadth.  Her opinions cover

---

[6] *See* Proposed Fourth  Supp. & Amd. Aldridge Compl. at ¶ 12 (Rec. Doc. 5394-3); Aldridge Nov. 30, 2007 Compl.
at 27 (paragraphs are unnumbered).  While this complaint has been amended, the complaint currently in effect, the
Second Supplemental and Amended Complaint, maintains these allegations.  Fleetwood has filed an objection to the
Fourth Supplemental and Amended Complaint being filed.  (Rec. Doc. 5688). Plaintiff's motion for leave to file the
Third Supplemental and Amended Complaint was denied. (Rec. Doc. 2323).
[7] She testified under oath in another case that she had two other masters' degrees, one in biochemistry and one in
human physiology, but now says that testimony was "technically incorrect."  Deposition of Mary DeVany, taken
July 31, 2009, attached hereto as Exhibit C, pp. 288-93.

everything from toxicology, to epidemiology, to psychology, to medical causation, to duty to warn, to disaster response, to travel trailer design.[8] DeVany's involvement in this matter began with her role as a member and technical advisor to the Sierra Club, whose member Paul Stewart essentially kicked off this contest in March 2006 when he went on television to complain about his travel trailer. As a result of her involvement with the Sierra Club testing of trailers in Mississippi in 2006, DeVany received an invitation from Henry Waxman to appear before his Congressional committee in 2008. There, she testified as a self-styled "independent" industrial hygienist regarding formaldehyde in travel trailers.

**B.      DeVany's Opinions**

As noted in the *Alexander* matter, DeVany's opinions, like those of Plaintiff's expert Marco Kaltofen, "were not segregated out as opinions usually are in ordinary expert reports." (Rec. Doc. 2816). Following 20 pages of sweeping overviews and inapplicable standards and definitions, DeVany does have a "conclusions" section to her final report. That section identifies what appears to be her opinions pertaining to Fleetwood:

> Fleetwood has been one of the largest manufacturers in the U.S. of recreational vehicles. For many years they have had to comply with the HUD limits for formaldehyde emissions from wood products in their mobile homes. Although the thousands of THU's provided to FEMA would be occupied for extended periods of time as living quarters for individuals and families, no effort was made to ensure that the emissions were adequately reduced accordingly. And Fleetwood's conduct fell below the appropriate standard of care in not testing or taking other prudent measures to ensure that

---

[8] Not knowing the order the Court will consider the various motions Fleetwood is filing on the medical issues presented in this case, it is important for the Court to understand that it is Fleetwood's medical position that it has been well established in the world's medical literature that formaldehyde in solid (cosmetics, textiles) and aqueous (formalin) states is a skin contact allergen. However, it is Fleetwood's very strong position -- supported by the opinion of Dr. Howard Maibach, one of the world's leading dermatologists and researcher (who, among other things, is the patent holder on the patch test administered to Timia) -- that it has never been established in the world's medical literature that formaldehyde in its gaseous state either causes or exacerbates atopic dermatitis (eczema and related skin disorders).

formaldehyde concentrations were on par with those required by law for prolonged housing.  Exhibit B, pp. 20-21.

Because DeVany's conclusion section is so vague, Fleetwood is forced to guess what she is opining about and segregate out as many potential opinions as possible.  The first section identified by DeVany in the overview section of her report was a survey of current formaldehyde exposure limits and the basis, application, and limitations of each of those limits.  Exhibit B, pp. 2-7.  Next, DeVany claims to have surveyed and reviewed the adverse health effects from formaldehyde exposure, and she also purports to explain those effects.  Exhibit B, pp. 7-9.  Then, DeVany developed a sampling methodology and measurement strategy for determining formaldehyde contamination in the trailer FEMA issued to the Dubuclet family.  Exhibit B, pp. 9-11.  After that, DeVany claims that she reviewed the collected data, analyzed the sampling results, and interpreted the findings in this and other Fleetwood trailers.  *See* Exhibit B, p. 1. This section is not clearly identified, so Fleetwood assumes that DeVany is referring to Section V in general, including the section where DeVany calculated the "approximate" concentration range on the date that plaintiffs first moved into the EHU.  Exhibit B, pp. 11-18.  Then, DeVany reviewed the FEMA and Fleetwood documents for disclosures and warnings about the presence of formaldehyde and its adverse effects, and their efforts to mitigate these exposures - seemingly the remainder of Section VI pertains to these "opinions."  Exhibit B, pp. 18-20.

Fleetwood can only assume that DeVany intends to offer opinions in each of the various fields of expertise that she has randomly identified in the overview of her report.  Presumably, DeVany is offering general medical causation opinions, statistical analyses, toxicological opinions, negligence opinions, warnings opinions, industrial hygiene opinions, epidemiological opinions, etc.  Fleetwood moves to exclude all of DeVany's opinions because she is wholly unqualified, and her opinions find no support in the scientific literature, are not based upon a

reliable, demonstrated methodology, are not reasonably based upon facts, and would not be of assistance to the trier of fact.

### III.     ARGUMENT AND CITATION OF AUTHORITY

**A.     Admissibility of Expert Opinions Pursuant to Rules 702, 703,** *Daubert v. Merrell Dow Pharmaceuticals, Inc.* **and Its Progeny**

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony. The trial judge serves as a gatekeeper to keep out expert testimony that is based solely on speculation or unsupported conclusion. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-90 (1993). In *Daubert*, the Supreme Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but it is also reliable. *See, Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). A party seeking to admit expert testimony bears the burden of demonstrating that the expert's findings and conclusions are based on the scientific method, and therefore, is more reliable. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). And where such testimony's factual basis, data, principles, methods, or their application are called into question, the trial judge is required to determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. *Kumho Tire*, 526 U.S. at 149. This requires an objective, independent validation of the expert's methodology. *Moore*, 151 F.3d at 276. The expert's mere assurance that he has used generally accepted scientific methodology is insufficient. *Id*. The proponent of the expert's testimony must prove to the judge by a preponderance of the evidence that the testimony is reliable. *Id*. Thus, the goal of the court is to ensure that that expert's opinion is based on sufficient data and an appropriate methodology such that the opinion is connected to the facts by more than conclusory assertions of the expert.

Rule 703 focuses on the data underlying the expert's opinion. *In Re TMI Litigation*, 193 F.3d 613, 697 (3rd Cir. 1999). As part of its gatekeeper role, the trial court must ensure that the underlying facts and/or data upon which a proffered expert's opinion is based are in and of themselves reliable. If an expert's opinion is based on unreliable facts, the opinion must be excluded. *See In Re TMI Litigation*, 193 F.3d at 697. That is, Rule 703's reliability standard is similar to Rule 702's reliability requirement in that there must be good grounds on which to find the data reliable. *Id*. Rule 703 permits an expert to rely on hearsay, so long as that hearsay is of the kind normally employed by experts in the field. *Id*. (*citing In re "Agent Orange" Product Liability Litigation*, 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985)).

In *Daubert*, the Supreme Court enunciated a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the expert's methodology is scientifically valid or reliable. *Moore*, 151 F.3d at 275 (*citing Daubert*, 509 U.S. at 593-95). These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id*.

In addition to the guiding principles set forth in *Daubert*, other factors relevant to the consideration of whether an expert's testimony and opinions are sufficiently reliable so as to allow their admission are as follows: (1) whether the expert is proposing to testify about matters growing naturally and directly out of the expert's research conducted independent of the litigation or whether the expert has developed the opinion expressly for the purpose of testifying in the litigation; (2) whether the expert has unjustifiably extrapolated from an accepted premise

to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as she would be in her regular professional work outside of her paid litigation consulting; and (5) whether the field of expertise claimed by the expert is known to reach reliable results consistent with the type of opinion the expert is giving.  *See e.g. Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998) (*en banc)*; *Sheehan v. Daily Racing Form, Inc.*, 104 F. 3d 940, 942 (7th Cir. 1997); *Daubert v. Merrill Dow Pharmaceuticals, Inc.* 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*); and *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994).

**B.     DeVany's "survey" of current formaldehyde exposure limits and the basis, application, and limitations of these standards is nothing more than a recitation of certain definitions and government standards.**

Section II of DeVany's report begins by defining formaldehyde and its uses.  Exhibit B, pp. 2-7.  DeVany also goes into great detail about certain "formaldehyde standards," including OSHA, ACGIH, NIOSH, ATSDR, HUD, etc.  *Id.*  DeVany testified that she did not prepare any methodology in response to this task and application of the scientific method was not necessary. Exhibit C, pp. 108-09.  DeVany also testified, regarding the formaldehyde standards, that she interpreted the term "exposure limits" broadly – her report therefore only provides "highlights" of each formaldehyde standard, not a "detailed specific description."  *Id.* at 109.  Exposure limits, according to DeVany, could mean emission levels, recommended levels, or "power of the law."  *Id.*  In other words, DeVany has not performed any expert analysis or "survey" related to "formaldehyde standards."  Fleetwood cannot identify any opinions in this section that are actually being offered by DeVany.  Instead, this appears to be a purely informational section of her report – DeVany admits that the specific data comes from sources other than herself.

8

Presumably, these sources serve only as a background for DeVany's opinions and are not offered as independent substantive evidence.  Of course, if DeVany is utilizing the research of others to form her "opinions" she must attribute it to others and provide a sufficient explanation of why it is applicable in formulating her ultimate opinions.  (Rec. Doc. 2816).

**C.**     **DeVany's protocol is unreliable, and therefore inadmissible, because it *does not* "reliably yield results representative of the true exposures that occupants experienced when living in FEMA-issued THUs."**

DeVany purports to show the jury what adverse health effects Plaintiff experienced through her actual exposure to formaldehyde in her EHU.  *See* Exhibit C, p. 305.  DeVany's test protocol, therefore, ought to be sufficiently similar so as to provide a fair comparison between actual living conditions and the conditions under which testing occurred.  *Barnes v. General Motors Corp.,* 547 F.2d 275 (5th Cir. 1977).  It isn't.

As a general rule, the proponent seeking to admit out-of-court experiments into evidence must demonstrate a "'similarity of circumstances and conditions'" between the tests and the subject of litigation. *Jackson v. Fletcher,* 647 F.2d 1020, 1027 (10th Cir. 1981) (quoting *Navajo Freight Lines v. Mahaffy,* 174 F.2d 305, 310 (10th Cir. 1949)).  *See also Robinson v. Audi NSU Auto Union Aktiengesellschaft,* 739 F.2d 1481, 1484 (10th Cir. 1984); *Brandt v. French,* 638 F.2d 209, 212 (10th Cir. 1981).  "The purpose of this rule is to prevent confusion of the jury." *Robinson,* 739 F.2d at 1484 (citing *Jackson,* 647 F.2d at 1027).

Evidence of this kind should be received with caution, and only be admitted when it is obvious to the court, from the nature of the experiments, that the jury will be enlightened, rather than confused.  In many instances, "**a slight change in the conditions under which the experiment is made will so distort the result as to wholly destroy its value as evidence, and**

**make it harmful, rather than helpful**." *Navajo Freight Lines,* 174 F.2d at 310 (emphasis added).

DeVany claims that her formaldehyde sampling protocol was designed to "reliably yield results representative of the true exposures that occupants experienced when living in FEMA-issued THUs."  Exhibit B, p. 10.  If this were actually the case, then DeVany's protocol would account for Plaintiff's distinct experiences so that a "true exposure" could be assessed.  This should necessarily consider their distinctive lifestyle habits, ventilation habits, time spent in the EHU, etc. - factors that can have a significant effect on the outcome of "true exposure."  DeVany's sampling methodology, however, was not designed to separately assess these variables.  Instead, DeVany's protocol was really intended to establish an average concentration for EHUs, based on a standardized set of procedures.  Exhibit C, p. 127.  DeVany therefore "arbitrarily" decided to conduct sampling of unoccupied EHUs, with a protocol that required that all of the windows, vents and doors in the unit be closed and no air conditioning be running.  Exhibit C, p. 129-32.  DeVany did not include this information in her written protocol, but she claimed that it was "standard practice."  Exhibit C, p. 131.  Her objective was to control those variables so as to compare all the samples together.  *Id.*  This is quite different from accepting those variables and considering their individual effects on a person's "true exposure."  Plaintiff's civil engineering expert, Marco Kaltofen, was responsible for reviewing DeVany's protocol, and even he offered testimony about the important role different variables play when determining actual exposure:

> **Q.** So if you wanted to know what a particular resident was exposed to in a particular unit, don't you think it would be important to know whether the HVAC system was operating and/or whether the doors and windows were opened routinely?

**A.**      That's all part of the same variable [ventilation rate].  And I am very comfortable thinking that we really would like to see that data generally.  Ventilation rates, temperature, humidity.  They all impact the formaldehyde concentration.

**Q.**      You would like to see that data?

**A.**      That's all part of how that actual concentration is arrived at.

Exhibit D, Deposition of Marco Kaltofen, taken on June 16, 2009, pp. 117-18.

DeVany, on the other hand, has made no attempt to consider the particular living habits of the Dubuclets while they resided in their EHU.  When faced with this shortcoming in the *Alexander* case, rather than admit her mistake, DeVany insisted on arguing that facts are "not necessarily" important and that "when you're running the air conditioner, you don't have the windows open . . . .  So, the temperature might come down, but then there's no ventilation in the unit, so the formaldehyde will build up."  Exhibit C, pp. 72-73.  However, Elisha Dubuclet, Plaintiff's mother, testified that in general, when they were living in their EHU, they would run the air conditioner all day, every day except when they would open the windows.[9]

Ms. Dubuclet's testimony demonstrates perfectly why DeVany's "standardized" protocol simply cannot be used to "reliably yield results representative of the true exposures that occupants experienced when living in FEMA-issued THUs."  The sampling of the Dubuclet EHU, in accordance with DeVany's protocol, took place when the trailer was unoccupied, closed and without the ventilation system running.  Exhibit B, p. 11.  These were not conditions experienced by the occupant.  DeVany knew this -- her report specifically reads:

---

[9] See Deposition of Elisha Dubuclet, taken on October 7, 2009, attached hereto as Exhibit E, p. 143.

> Conversely, when people are living inside, people open doors and
> go in and out.  The HVAC system is used.  Windows and vents
> may be opened from time to time.  Fans may be used to circulate
> air around the inside.   All of this air movement significantly
> impacts indoor air quality because fresh air is allowed to enter.
> Therefore, as a result, unoccupied units can have slightly higher
> concentrations of formaldehyde than occupied ones do.

Exhibit B, p. 15.

In addition, Plaintiff's own statistical expert, Dr. Paul Hewett, who is also an industrial

hygienist, analyzed Fleetwood travel trailers provided to FEMA, of the same or similar models to

the Dubulcet unit, that were tested by eight different testing groups, and concluded that the

median and mean formaldehyde level tested in such units, while occupied, were 0.046 ppm and

0.063 ppm, respectively.  Report of Paul Hewett dated October 26, 2009, p. 18, Table 2, attached

hereto as Exhibit F.  By contrast, Fleetwood travel trailers of the same or similar models to the

Dubulcet unit, that were tested while *not* occupied, had a median and mean formaldehyde level

of 0.27 ppm and 0.31 ppm, respectively.  Exhibit F, at Table 5, page 20.  Interestingly, of 295

Fleetwood travel trailer units analyzed by Dr. Hewett that were tested while not occupied, 285 of

those were tested by DeVany Industrial Consultants. *Id.*  DeVany's range of potential

formaldehyde exposure for the Dubuclets, of up to 0.48 ppm, is not supported by any

information on record in this case.

Dr. Hewett's analysis, which shows that unoccupied unit testing resulted in five fold to

seven fold higher levels than what was found in occupied units that were tested, illustrates

clearly that DeVany's testing, and the conclusions she draws therefrom are not applicable to the

Dubuclet's exposure experience.  Ms. Dubuclet's testimony and DeVany's own report illustrates

just how unrepresentative DeVany's "standardized conditions" really are.  Formaldehyde

samples obtained in compliance with DeVany's set of conditions are not representative of "true

exposures."  Conditions that were not experienced by Plaintiff are not relevant evidence in this case.  "Relevant evidence" means evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence.  Fed. Rule of Evid. 401.  DeVany's protocol (and methodology in general) will not assist the jury in determining the true exposures of Plaintiff because her procedures lack the necessary representation of the actual conditions experienced by Plaintiff.  This is not just a technical flaw in the protocol.  DeVany's protocol is *not at all* representative of the legally relevant group in this litigation.  Evidence that is not relevant is not admissible.  Fed. Rule of Evid. 402.

For the same reasons, DeVany's protocol should be excluded because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and its potential for misleading the jury.  Fed. Rule of Evid. 403.  This is particularly true in this case because even a slight change in the conditions under which formaldehyde samples are collected will have a great impact on the outcome of the measured formaldehyde concentrations.  DeVany's protocol purporting to explain "true exposures" fails to consider these critical issues.  This is precisely the kind of methodology that the *Navajo Freight Lines* court cautioned against.  DeVany's protocol is unreliable, and therefore inadmissible, because it *does not* "reliably yield results representative of the true exposures that occupants experienced when living in FEMA-issued THUs."

**D.     DeVany's extrapolation from one day of air sampling to form an opinion about the likely average level of formaldehyde present in the Dubuclet EHU over a sixteen month period is scientifically unreliable.**

Section V(G) of DeVany's report discusses what she calls "approximations" regarding formaldehyde levels over the full range of the travel trailer's use.  DeVany uses "several

methods" to approximate the formaldehyde concentration in the indoor air of the Dubuclet's

EHU when they first moved in.  And she admittedly made several "assumptions" regarding the

constancy of certain variables: ventilation, humidity, temperature, total indoor air volume,

quantity of the formaldehyde in the resin/glue/adhesive materials, the ratio of total indoor air

volume to wood products surface area, occupancy times, and the manufacturing process itself

(DeVany recognizes that these are just some of the variables to consider).  Exhibit B, pp. 16-17.

Based on these approximations and assumptions, DeVany calculated a "derived

concentration" of formaldehyde in the Dubuclet travel trailer on the date the Dubuclet family

moved in.  As of that date, she concludes: "The concentration ranged from .14 ppm to .48 ppm."

Exhibit A, Report, p. 18.  This is a **342%** range.  Leaving aside the obvious problems with her

methodology, this opinion is completely useless for the trier-of-fact, inherently scientifically

unreliable, fraught with wild guesswork, and does not even attempt to take into account the

actual ventilation, air-conditioning, and living habits of the Dubuclets themselves -- all factors

that can cause formaldehyde levels to vary dramatically.  The 24 hour sample tests performed on

the Dubuclet unit in 2009, one by Plaintiff's expert Scott and one by Fleetwood's expert Watson

(each of which Fleetwood argues are not at all representative of true occupant exposure by the

Dubuclets) were 0.34 ppm and 0.16 ppm, respectively.  In addition, Dr. Hewett's analysis of

occupied Fleetwood travel trailers similar to the Dubuclet unit found a median of 0.046 ppm and

a mean of 0.063 ppm.  Ms. DeVany's range of potential formaldehyde exposure, of up to 0.48

ppm, is not supported by any information on record in this case.

Courts consistently reject such "back extrapolation" methodologies that attempt to

approximate exposure levels over the full range of use as being "highly speculative."  In

*Wallace,* the purchasers of a mobile home sued its manufacturer and seller to recover for injuries

14

allegedly caused by high levels of formaldehyde in the home.  *Wallace v. Meadow Acres Manuf. Housing,* 730 N.E. 2d 809 (Ind. App. 2000).  The Plaintiffs in that case retained an industrial hygiene expert, Thad Godish, who collected air samples after Plaintiffs moved out of their home under conditions he deemed near "worst case normal living conditions."  Godish then extrapolated the data back in time five years to conclude that the formaldehyde concentrations in the home were above recommended air guidelines.  The trial court found that formaldehyde levels in mobile homes "can vary dramatically depending upon temperature, humidity, and ventilation rates."  Therefore, unless you are testing a home on a daily basis, you could not know what level existed in the home on any given day in the past, due to the many variables involved. Additionally, there has been no study that verified formaldehyde's "decay rate" or "half-life", as it is less accurately named.

The Appellate Court affirmed the district court's decision that extrapolation of ambient air formaldehyde levels at earlier points in time through use of an estimated half-life or decay rate was not accepted within the relevant scientific community.  The Court found that this assumption is not supported by any reliable scientific methods or the reliable application of any valid theory.  See also, *Heller v. Shaw Indust., Inc.,* 167 F.3d 146 (3rd Cir. 1999) (environmental expert's testimony that benzene in the air would have been as high as 1,712 parts per billion at the time of purchase was based on a flawed and unreliable back-extrapolation methodology); *Rhilinger v. Jancsics,* 1997 Mass. Supr. LEXIS 11, *32-35 (Mass. Supp. Ct. Dec. 29, 1997) (industrial hygienist's extrapolation of one day of air sampling to form an opinion about the likely average level of chemicals present over a three-year period of time was scientifically indefensible); *Carroll v. Litton Systems, Inc.,*1995 U.S. App. LEXIS 2015, *13-14 (4th Cir. 1995) *cert. denied,* 116 S. Ct. 70 (1995) (expert hydrologist excluded because there was no

scientific support for using the concept of environmental half-life to determine trichloroethane exposure levels fifteen years earlier).

DeVany's proposed opinions are speculative, find no support in the scientific literature, are not based upon a reliable, demonstrated methodology, are not reasonably based upon facts, and would not be of assistance to the trier of fact. Her opinions should, therefore, be excluded under Rules 702 and 703.

**E.      The remainder of DeVany's opinions are inadmissible because DeVany is not qualified to give the opinions she proffers.**

DeVany has an undergraduate degree in biology, and a Master of Science degree in biology, according to her report. She claims to be a practicing industrial hygienist, though she failed the examination to become a certified industrial hygienist at least once. Exhibit C, pp. 289-90. DeVany could not recall whether she sat for the exam a second time, and she testified that she would need to check her records to see if she failed more than once. *Id.* DeVany does not have a degree in industrial hygiene. Exhibit C, p. 56. DeVany is not certified by any organization as an industrial hygienist. Exhibit C, p. 54.

**1.      Unqualified toxicology opinions**

In Section III of her report, DeVany opines about the "acute (short-term) health effects" of formaldehyde exposure, including alleged neurological effects in "at risk" populations. She then opines about intermediate and chronic exposure health effects including alleged "tissue and systemic changes" and "cancer-causing potential." DeVany is not a toxicologist Exhibit C, p. 51. All of her comments about the alleged health effects of formaldehyde are based on third-party source material that she read before writing her report. Plaintiff has designated Patricia Williams, who testified at the class certification hearing, to address the issue of toxicology.

16

DeVany's testimony is therefore not only beyond the scope of her expertise, but cumulative of other Plaintiff experts.

### 2.        Unqualified Medical Opinions- Section III

DeVany intends to offer general causation opinions on the extent to which formaldehyde exposure results in adverse health effects experienced by Plaintiff.  As is clear from her curriculum vitae, DeVany is not a medical doctor.  This fact is also supported by her deposition testimony.  Exhibit C, p. 30-31.  Not only is DeVany not a qualified physician, she actually dropped out of medical school.  *Id.*  This fact, however, did not prevent DeVany from opining about the "many acute health effects" of formaldehyde because "of its ability to cause extreme irritation to the mucous membranes, skin, and other potentially exposed tissues."  Exhibit B, p. 7-9.  DeVany then individually categorized several acute, intermediate, and chronic health (including the cancer-causing potential) effects of formaldehyde exposures.  This is an opinion entirely derived from information that comes from sources other than DeVany.  Exhibit C, p. 116-17.  DeVany has not done any research or study on the adverse health effects from formaldehyde exposure.  Exhibit C, p. 117.  DeVany should not be allowed to testify to medical causation issues.

### 3.        Unqualified Design Defect Opinions – Section VI(A)

DeVany offers an opinion that the Fleetwood travel trailer, which was successfully deployed by FEMA in a variety of disaster field conditions since 1992, is "unreasonably dangerous in design."  Exhibit B, pp. 18-19.  DeVany is not a contractor, architect, or engineer. Exhibit C, pp. 52-53; 319.  She has never designed or built a travel trailer.  Exhibit C, pp. 317-18.  She is not a wood scientist. Exhibit C, p. 66.  DeVany did not study the availability of

materials used in the manufacture of recreational vehicles at the time of Hurricane Katrina. Exhibit C, p. 67.  In short, DeVany is neither qualified to give an opinion about "defective design," nor does she have a sufficient factual basis to do so.  Additionally, Plaintiff has listed several construction experts, wood experts, etc, who were designated to testify about trailer design.  DeVany's testimony is therefore not only beyond the scope of her expertise, but cumulative of other Plaintiff experts.

### 4.        Unhelpful Inadmissible Negligence Conclusions - Section VI(C)

Paragraph C of Section VI is titled "Fleetwood's Lack of Action."  It talks about "prudent practice" that allegedly wasn't followed.  On its face, these "uber-juror" opinions are of no assistance to the trier of fact.  They even invade the Court's province in instructing the jury on what the law is.  Expert testimony may not include improper legal conclusions, and in no instance can a witness be permitted to define the law of the case; while an expert may be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms, expert testimony which attempts to define the legal parameters within which the jury must exercise its fact-finding function is impermissible. *Sawyer v. Southwest Airlines, Co.,* 243 F. Supp. 2d 1257 (D. Kan. 2003).

In Section VII of her report, DeVany lays out her "conclusions," which include the statement that "Fleetwood's conduct fell below the appropriate standard of care in not testing or taking other prudent measures to ensure that formaldehyde concentrations were on par with those required by law for prolonged housing."  DeVany's opinion that "measures" should have been taken to ensure that formaldehyde concentrations were "on par with those required by law for prolonged housing," is another "uber-juror" opinion, essentially arguing that Fleetwood had a

18

tort duty to comply with the HUD Code despite the fact that the HUD Code did not apply on its face.  In addition to being unhelpful to the finder of fact, this type of opinion is outside the scope of DeVany's purported field of biology and industrial hygiene.[10]

## <u>CONCLUSION</u>

For all of the foregoing reasons, the opinions of Mary DeVany do not pass muster under Federal Rules of Evidence 702, 703 and *Daubert* and it progeny.  Also her opinions fail to satisfy the requirements of Federal Rule of Civil Procedure Rule 26, and must be excluded.

This 9th day of November 2009.

Respectfully submitted:

 */s/ Richard K. Hines, V*
Richard K. Hines, V
GA Bar No. 356300
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

Jerry L. Saporito
LA Bar No. 11717
LEAKE & ANDERSSON, L.L.P.
1700 Energy Centre
1100 Poydras St.
New Orleans, LA 70163-1701
(504) 585-7500 (phone)
(504) 585- 7775 (fax)

Counsel for Fleetwood Enterprises, Inc.

---

[10] The whole purpose of the HUD Code was to achieve an indoor air formaldehyde target level of .4 ppm, which HUD determined was reasonably safe for manufactured housing occupants.  1984 WL 106759 (49 FR 31966). The measured concentration in the Dubuclet travel trailer after they moved out and while totally sealed up and unventilated without any utilities running, was substantially lower than that.

# <u>C E R T I F I C A T E OF SERVICE</u>

I hereby certify that a copy of the foregoing has this date been serves on all counsel of record in this proceeding by:

( )    Hand Delivery              ( )    Prepaid U.S. Mail

( )    Facsimile                   ( )    Federal Express

(X)    CM/ECF

New Orleans, Louisiana, this 9th day of November, 2009.

                              */s/ Richard K. Hines, V*

                              Richard K. Hines, V
                              Georgia Bar No. 356300
                              E-mail:  richard.hines@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW
Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)