Exhibit B

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER      \*     **MDL NO. 1873**
       **FORMALDEHYDE PRODUCTS**    \*
       **LIABILITY LITIGATION**      \*     **SECTION "N" (5)**
                                    \*
                                    \*     **JUDGE ENGELHARDT**
                                    \*     **MAGISTRATE CHASEZ**
                                    \*

**THIS DOCUMENT IS RELATED TO**     \*
                                    \*

*Aldridge, et al. v. Gulf Stream Coach*    \*
*Inc., et al*, Docket No. 07-9228;      \*
Elisha Dubuclet obo Timia Dubuclet

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AFFIDAVIT OF MARY C. DEVANY

**STATE OF TEXAS**
**COUNTY OF HARRIS**

**BEFORE ME,** the undersigned authority, on this day, personally appeared:

**Mary C. DeVany, MS, CSP, CHMM**

Who, first being sworn, upon her oath deposed and stated that the information contained in the attached report is true and accurate to the best of her knowledge.

*Mary C. DeVany*

Mary C. DeVany, MS, CSP, CHMM

SWORN TO AND SUBSCRIBED BEFORE ME this the 17th day of July 2009.

DEANN BROWN
MY COMMISSION EXPIRES
MARCH 25, 2013

*Dean Brown*
Notary Public

My Commission Expires:
3/25/2013

# I. INTRODUCTION

## A. Professional Credentials

1. I am a Certified Safety Professional (CSP) in Comprehensive Practice and a Certified Hazardous Materials Manager at the Master Level (CHMM).   I hold an M.S. from Loyola University of Chicago in biology – areas of concentration: biochemistry and human physiology.  I have completed numerous post-graduate courses in chemical toxicology, occupational and community environmental safety and health, chemical exposure assessment, indoor air quality, air contaminant sampling methodology, statistical analysis, risk assessment, and methods of exposure recognition, evaluation and control.

2. Currently I am the president of the community and occupational environmental health and safety firm of DeVany Industrial Consultants, which I founded twenty-three years ago.  This company provides consulting services to the public and private sectors, including exposure assessments, technical training, written compliance programs, site hazard evaluations, and exposure elimination/control in the areas of community and occupational health, safety, and environmental affairs.  A copy of my résumé, fee schedule, and lists of my recent expert testimony and publication highlights are attached.

## B. Overview of This Report and Study

1. Counsel for the Plaintiff has retained me to: evaluate the facts of this case and determine if the Fleetwood travel trailer issued by FEMA to Plaintiff, Timia Dubuclet, had excessive levels of formaldehyde, and to discuss the health effects related thereto.

   Specifically, I have been asked to do the following:

   a. Survey current formaldehyde exposure limits and explain their basis, application, and limitations;

   b. Survey and review the adverse health effects from formaldehyde exposure, and explain these effects;

   c. Develop the sampling methodology and measurement strategy for determining formaldehyde contamination in the trailer FEMA issued to the Dubuclet family;

   d. Review the collected sampling data, analyze the sampling results, and interpret the findings in this and other Fleetwood trailers;

   e. Review the related FEMA and Fleetwood documents for disclosures and

warnings about the presence of formaldehyde and its adverse effects, and their efforts to mitigate these exposures,

f. Review the related FEMA and Fleetwood documents for disclosures and warnings about the presence of formaldehyde and its adverse effects, and their efforts to mitigate these exposures, and

g. Relate my conclusions and recommendations, including the limitations of the study.

2. The remainder of this report, in addition to the description in # 1 above, gives an overview of the information relied upon to develop my opinions, the reasons and bases for them, and an overview of the resources, documents, technical research and references considered in forming these opinions.


# II. BACKGROUND OVERVIEW ON FORMALDEYDE; SURVEY OF CURRENT FORMALDEHYDE EXPOSURE LIMITS AND THE BASIS, APPLICATION, AND LIMITATIONS OF THESE STANDARDS

## A. Formaldehyde: Definition and Uses

Formaldehyde is a colorless, flammable, acrid, pungent-smelling gas often mixed with water at ~ 37% to make a liquid formaldehyde solution (formalin). It is an important industrial chemical used to manufacture building materials and to produce many commercial, industrial and household products.

Formaldehyde is commonly used as an industrial fungicide, germicide, and disinfectant, and as a preservative in mortuaries, in medical applications for tissue preservation, and to preserve biological specimens.

It is also a common material used in the manufacture of pressed wood products such as particleboard, plywood, plywood paneling, and medium-density fiberboard; the manufacture of urea-formaldehyde resins, melamine and polyacetal resins; as a component of many glues and adhesives; is the durable permanent press treatment for fabrics and textiles; and in paper product coatings, molded plastic products, decorative laminates, and certain insulation materials. It is found in construction components, carpet adhesives, and panels.

DUB000605

## B.   Formaldehyde Standards – Application Overview

Many standards exist – because they are developed to protect different segments of the population and to protect these populations for varying durations of exposures.  In general, the longer the duration, the lower the exposure level must be to avoid adverse effects.  Also, the healthier the target population, the higher the allowable level can be.

Since standards set to protect the <u>adult working population at work</u> are designed for only 40 hours per week of exposure and a healthier segment of the population, higher levels can be tolerated.

Standards set by the military, representing a selected very healthy population screened to exclude any medically compromised soldiers/sailors, are allowed to be even higher.

On the other hand, standards set to protect the general population in a residential setting must be lower, not only to safeguard the more vulnerable segments of the population but to protect them during extended, residential-type exposure durations.  These standards, by necessity, must be the most restrictive.

## C.   Specific Standards

**1.  OSHA** (Occupational Safety and Health Administration), U.S. Department of Labor:

After extensive rulemaking more than 20 years ago, OSHA issued a then-comprehensive regulation covering occupational exposure to formaldehyde, 29 CFR 1910.1048. This rule reduced the permissible exposure limits (PELs) to 0.75 ppm (0.75 part formaldehyde per million parts of air) as an 8-hour time-weighted average ($TWA_8$), and a short-term exposure limit (STEL) of 2 ppm for a 15-minute time period.

In addition, an "Action level" of only 0.5 ppm was established.  This means that if an employer finds formaldehyde levels of 0.5 ppm or more as a time-weighted average, action must be taken to ensure protection for employees.  These include posting formaldehyde exposure warning signs, restricting entry into those exposure areas, conducting specially-designed training for workers, and evaluating personal protective equipment worn by workers when doing job tasks that involve potential formaldehyde exposures, among other "worker protection action" items.

OSHA recognizes formaldehyde as a potential occupational carcinogen and regulates formaldehyde for its irritating, sensitizing and toxic effects.  The rule was based on a wide range of evidence including animal bioassays and epidemiological evidence.   This rule is designed to protect most workers, *but not those already sensitized or with pre-existing medical conditions*, from cancer and other harmful health effects.  This standard also does not protect workers from discomfort and transient irritation from formaldehyde.

DUB000606

OSHA's standard was promulgated with the understanding that *workers will only be exposed for 8 hours/day and no more than 40 hours/week,* and that the time outside these 40 hours will have no formaldehyde exposures (this time period is called *exposure recovery time*). Note that the adult population able to work a 40-hour workweek is, as a group, much healthier and able to endure exposure levels that the elderly, the very young, and the medically compromised cannot.

Again, this standard only allows 40 hours of exposure at this level. If shifts longer than 8 hours are worked, calculations must be performed that reduce the permissible exposure limit. For example, for 12-hour work shifts, not only is the exposure time four hours longer but the recovery time is four hours less.

Accordingly, the permissible exposure limit for 12-hour shift workers is only 0.375 ppm. The action level is also proportionately lower. *Note that this only holds true for 40 hours of exposure during any given 7-day work week. When extrapolating to 24 hours of exposure, the level would be significantly lower and dependent upon recovery time, toxicological mechanism, and other factors.*

In addition, care must be taken not to apply these standards to the segments of the working population that are chemically sensitized to formaldehyde or to those that have pre-existing medical conditions, such as asthma, that may be exacerbated by formaldehyde exposures.

Note that other countries have established workplace exposure standards as well. For example, The Japan Society for Occupational Health has a workplace Occupational Exposure Limit (OEL 8-hour time weighted average, 40 hour workweek) of 0.1 ppm. However they also state that, "Exposure above OEL-M (mean) should be avoided even where duration is short or work intensity is light."

**2. ACGIH** (American Conference of Governmental Industrial Hygienists):

Workplace Threshold Limit Value (TLV) for a never-to-be-exceeded ceiling exposure level in the workplace: 0.3 ppm.

This level is designed to protect most but not all members of the full-time adult working population but not the general public. The ACGIH is an independent body of scientists that reviews the research studies on various airborne contaminants and other workplace stressors, publishes documentations of their reviews, and makes recommendations for workplace Threshold Limit Values based upon consensus of their findings and conclusions.

**3. NIOSH** (National Institute of Occupational Safety and Health), U.S. Department of Health and Human Services, Center for Disease Control and Prevention (CDC):

NIOSH develops Recommended Exposure Levels designed to protect workers, but not the general public. These standards are:
10-hour Time Weighted Average ($TWA_{10}$) with 14 hours of non-exposure recovery time):

DUB000607

0.016 ppm

Ceiling Level (never to be exceeded, even for a moment): 0.1 ppm
IDLH (Immediately Dangerous to Life and Health): 20 ppm

4. **ATSDR** (Agency for Toxic Substances and Disease Registry), U.S. Department of Health and Human Services, Center for Disease Control and Prevention (CDC):

The ATSDR has established inhalation minimal risk levels (MRL's) designed to protect the general population, including its more vulnerable segments such as children, the elderly, and the medically compromised.  These levels are not limited to a routine 40-hour work week exposure, such as OSHA, ACGIH and NIOSH have.  Rather, the ATSDR standards are set for extended daily exposures that could exist under normal housing/living conditions.  Their adopted recommended levels are as follows:
**Acute** MRL: 0.04 ppm (1-14 days of exposure)
**Intermediate duration** MRL: 0.03 ppm (>14-364 days of exposure)
**Chronic duration** MRL: 0.008 ppm (365 or more days of exposure)

This agency, also a branch of the CDC as is NIOSH (above), has set these MRL's based upon the respiratory effects in humans.  These exposure limits are designed to protect the general population at large.  *"The MRL is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse non-cancer health effects over a specified duration of exposure."*

5. **Council Subcommittee on Emergency and Continuous Exposure Guidance Levels for Selected Submarine Contaminants:**

These standards are set for sailors screened for excellent physical fitness that will be stationed on submarines for a limited duration.

As can be seen from the values below, including the standards under revision established to account for current research and health effects knowledge, these levels are proposed to be even lower than those for the American workforce:

Current level for 1-hour exposure: 3 ppm; proposed: 0.4 ppm
Current level 24-hour exposure: 1 ppm; proposed: 0.1 ppm.
These levels are not designed to protect any vulnerable segment of the population.

6. **TCEQ** (The Texas Commission on Environmental Quality):

The Effects Screening Levels (ESL's) of 2003 are chemical-specific air concentrations set to protect human health and welfare.  Short-term ESL's are based on data concerning acute health effects, the potential for odors to be a nuisance, and for effects on vegetation, while long-term ESL's are based on data concerning chronic health and vegetation effects.  ESL's are as follows:

DUB000608

Short-Term ESL (1 hour): 0.012 ppm
Long-Term ESL (1 year): 0.0012 ppm

7. **California Environmental Protection Agency;** Office of Environmental Health Hazard Assessment:

Exposure levels are to be as low as possible, assuming levels below the local background are not achievable.  Recommended Exposure Limits (REL):

Acute REL --> 0.076 ppm for one hour
Intermediate REL --> 0.027 ppm for eight hours
These levels are set to protect the population at large for exposures up to 8 hours with exposures at background levels afterwards.

8. **HUD** (Housing and Urban Development):

For more than 20 years HUD has regulated the production of manufactured homes to reduce the associated hazards to future occupants.  Included are regulations limiting formaldehyde emissions in plywood materials to no more than 0.2 ppm and in particleboard materials to no more than 0.3 ppm.  *The production facility must also establish procedures to identify potential increases in formaldehyde emissions from other sources* and have an independent testing laboratory observe or conduct the emissions testing.

These standards were developed to protect the general public from health effects of exposures to formaldehyde in their living quarters.  These levels, mixed in the general air of the manufactured home, will normally keep emissions below 0.01 ppm even in areas such as the kitchen.

HUD also monitors state plans and third party inspection agencies to ensure their oversight is adequate and is authorized to take administrative action against them for violations.

9. **FEMA** (Federal Emergency Management Agency) **Established Standards for Temporary Housing Units**

Temporary housing units purchased by FEMA after August, 2008 (constructed for the 2008 hurricane season) and for the duration of the three-year contract need to have formaldehyde levels below 0.016 ppm.

10. **WHO** (World Health Organization), and **Health Canada:**

These organizations have standards designed to protect the general population against cancer -- the threshold exposure level at which there is a negligible risk of upper respiratory tract cancer in humans due to cytotoxic (cellular) damage to the nasal mucosa. These standards are for short-term exposures only, with subsequent zero (negligible)

DUB000609

levels of exposure for recovery:

**WHO:** 30-minute average: 0.08 ppm (0.1 mg/m$^3$)

**Health Canada:** Residential Indoor Air Quality Guidelines:
1-hr exposure limit: 0.1 ppm and 8-hour exposure limit: 0.04 ppm

Refer to **Appendix A: Published Levels of Concern for Formaldehyde** for a summary of the above-described exposure standards.

# III. AN OVERVIEW OF THE ADVERSE HEALTH EFFECTS FROM FORMALDEHYDE EXPOSURE

## A. Overview and Introduction

Formaldehyde causes many acute health effects because of its ability to cause extreme irritation to the mucous membranes, skin, and other potentially exposed tissues. When formaldehyde gas comes into contact with water or moisture, including that found in the human respiratory tract or on the surface of the skin, it can produce formalin, the basic component of embalming fluid, and formic acid.

**Odor Threshold**

The average airborne concentration at which the normal person can detect formaldehyde by smell, the Odor Threshold, is 0.83 ppm (830 ppb), with a range of 0.05 to 1.0 ppm. As a result, at levels widely recognized to cause adverse health effects, most people are unable to detect it in the air.

**At Risk Populations**

The very young (children, infants), the elderly, those with compromised immune systems, people with chronic skin diseases, such as eczema and cheilitis, and individuals that have allergic sensitivity reactions to formaldehyde, and those with respiratory and other chronic diseases – such as asthma, chronic bronchitis, and emphysema – are much more susceptible to the effects of formaldehyde. These individuals experience adverse symptoms at much lower concentrations than those that would affect the general/workplace population of normal, healthy adults.

NOTE that what follows only highlights some of the acute and chronic health effects of formaldehyde exposures.

DUB000610

## B. Acute (short-term) Health Effects

### 1. Skin and Eye Effects

Because of its highly irritating properties and its reaction with water, formaldehyde causes watering, stinging, redness, and/or burning of the eyes. It can also cause intense irritation, itching, dermatitis, and burning of the skin, especially when there is high relative humidity in the air or if perspiration is present on the skin. These symptoms have been demonstrated to result when formaldehyde is present in the air at levels of 0.1 ppm. Pre-existing dermatitis, skin rashes, eczema, acne, and other skin disorders can be severely aggravated by very low levels of formaldehyde. Higher levels can result in skin ulcerations and blackening of exposed tissue, especially the fingers.

### 2. Respiratory System Effects

Overexposure to formaldehyde can cause acute irritation and inflammation of the respiratory system, from the nares (nostrils) to the lungs. Symptoms include sore throat, coughing, mucous membrane irritation, runny and bloody noses, sinus irritation, respiratory irritation, wheezing, and chest congestion. The symptoms of sinus irritation, sore throat, cough, nasal irritation and tissue inflammation can cause individuals to be much more susceptible to colds and other respiratory diseases caused by microbial exposures. These infections can progress to severe sinus congestion and sinusitis, asthmatic changes in the airways, pharyngitis, laryngitis, bronchitis, and pneumonia if exposures are not abated.

### 3. Neurological Effects

Acute central nervous system symptoms of overexposure to formaldehyde include headache, dizziness, nausea, and fatigue. Other symptoms include weakness and lethargy.

## C. Intermediate and Chronic Exposure Health Effects

### 1. Sensitization

Sensitization results from tissue changes, includes changes in nasal and skin cells that make the susceptible individual more sensitive to the irritating effects of formaldehyde.

Sensitized people experience adverse health effects at concentrations that others would not normally react to. In addition, some individuals can develop allergic sensitivity skin and/or respiratory system reactions, and be much more susceptible to the effects of other airborne contaminants including airborne chemical irritants, molds, and other airborne allergens and chemicals. Sensitized individuals are also more susceptible to carcinomas of the nasopharynx. Skin sensitization results in allergy-induced skin rashes and dermatitis.

### 2. Tissue and Systemic Changes

Formaldehyde exposure can induce changes in cells in human tissue, including permanent changes to the respiratory system and the skin. Susceptible individuals, especially those

DUB000611

with respiratory diseases, also can develop immune system changes as a result of formaldehyde exposures.

Reproductive effects and metabolic changes also result from formaldehyde exposures. Some of these changes can resolve when the exposure is removed, but others are permanent. Hepatotoxicity (toxic effects to the liver) has been demonstrated in animal studies after only 6 months of formaldehyde exposure at 3 ppm. Formation of benign polyps in the airways has also been observed.

### 3. Cancer-Causing Potential

Although the short-term health effects of formaldehyde exposure are well known, less is known about its potential long-term health effects. Nearly 30 years ago, in 1980, laboratory studies showed that exposure to formaldehyde could cause nasal cancer in rats. This finding raised the question of whether formaldehyde exposure could also cause cancer in humans.

In 1987, the U.S. Environmental Protection Agency (EPA) classified formaldehyde as a probable human carcinogen under conditions of unusually high or prolonged exposure. Since that time, some studies of industrial workers have suggested that formaldehyde exposure is associated with nasal cancer, nasopharyngeal cancer, and possibly with leukemia. In 1995, the International Agency for Research on Cancer (IARC) concluded that formaldehyde is a probable human carcinogen.

Following a re-evaluation of the new and existing data, in June of 2004 the IARC reclassified formaldehyde as a known human carcinogen.

### 4. Other Effects

Formaldehyde has been demonstrated to be mutagenic in a variety of test systems. Other research done recently points to potential links of formaldehyde to brain cancer, adverse reproductive effects, birth defects, and Lou Gehrig's disease. Formaldehyde has also been reported to cause menstrual disorders and secondary sterility in women. In fact, formaldehyde is so well known for its ability to induce cross-linking of DNA-associated proteins, that it is widely accepted in cellular and molecular biology as a classic research method to produce this effect reliably and effectively.

# IV. SAMPLING METHODOLOGY FOR DETERMINING FORMALDEHYDE CONTAMINATION IN THE FLEETWOOD TRAVEL TRAILER ISSUED BY FEMA WITH FEMA BAR CODE ID # 1373963 AND SAMPLING RESULTS

In order to evaluate the causation of the adverse health effects being experienced by Timia Dubuclet, specifically to help determine if they have been caused by levels of formaldehyde known to cause

DUB000612

adverse health effects in her family's FEMA-issued Fleetwood travel trailer, formaldehyde levels needed to be scientifically measured.

## A. Sampling Protocol

*Formaldehyde Sampling: Active and Passive Sampling Protocols -- Procedures for Evaluating Formaldehyde Levels in FEMA Temporary Housing Units* was developed to result in sample collection procedures that would reliably yield results representative of the true exposures that occupants experienced when living in FEMA-issued THU(s). Significant data were collected in Fleetwood travel trailers, and specifically in this particular Fleetwood trailer to ensure that the sampling results represent with a reliable degree of accuracy the approximate true exposure levels.

Active sampling involves the use of a small pump that draws a known volume of surrounding air through the appropriate medium. Each specific medium is made of a filter or other material designed to capture or react with the specific contaminant. By calibrating the exact pump flow in liters/minute, and noting the time the pump is in operation, the air volume in liters can be calculated. Once the medium is analyzed in the laboratory and the exact quantity of the contaminant (in this case, formaldehyde) is determined, its concentration in the air can be calculated.

The active sampling methods for airborne formaldehyde measurements only allow a small amount of air volume to be pulled through the specific medium. Because of this, active samples cannot be taken continuously for many hours or days like passive samples can. As a result, formaldehyde active sampling methods typically sample the air for only 15-60 minutes.

Passive sampling uses a small badge (dosimeter), typically about the size of a large coin. This dosimeter contains a treated medium that collects the airborne contaminant with passive air movement. The total time the dosimeter is exposed to air, and the exact quantity of formaldehyde found on the medium, are used to calculate the total airborne concentration.

Active and passive sampling was conducted in this THU. Results were compared and no significant differences were found between the two classifications of methods.

Vapors and gases such as formaldehyde are usually reported by volume – in parts per million parts of air (ppm). NIOSH and OSHA have approved several methods for active sampling and several badges for passive sampling. The *Protocol* explains these methods in detail.

These sampling data were used scientifically to evaluate the formaldehyde concentrations Timia Dubuclet experienced while living in this Fleetwood trailer.

## B. Sampling Location: Various Areas/Rooms and Various Heights

The sample location and the sample height can introduce variables. For representative sampling, it is most desirable to attempt to locate the collection sample as close to the breathing zone height of the resident as possible. It was determined that the area where Timia Dubuclet was every day, (6-8 hours

DUB000613

or more), was lying down in bed.

As a result, height and location were determined to be the bedside table/nightstand. Placing the sampler there gives a very close approximation of the air the residents are breathing for extended period of time each day. However, during waking hours, the kitchen and bathroom are very common living areas with significant occupancy times. Therefore, samples can be taken in these rooms as well, away from cooking odors, and during periods when very high humidity (such as taking a shower or doing dishes) did not occur.

## C.  Sampling Results

Monitoring was not conducted when Timia Dubuclet lived in the trailer. However, sampling was conducted on July 8-9, 2009 at the Lottie, Louisiana staging area. At this time the trailer was unoccupied, closed, and without the ventilation system running. The active and passive monitors were placed on the nightstand by the bed. Formaldehyde results respectively were 0.23 ppm (23 ppb) and 0.34 ppm (34 ppb).

......................................................................

# V.  SUMMARY OF THE CASE FACTS

## A.  Brief History of Where Timia Dubuclet Lived Following Hurricane Katrina

The Dubuclet family was left homeless after Hurricane Katrina. Timia was only 7 years old when the hurricane hit and was just entering 2nd grade. They left their home at 6046 Dorothea, New Orleans, Louisiana 70126 at the time Katrina struck, drove to Houston, and stayed there until the end of the school year of 2005-6. In June 2006, they moved back to New Orleans, to a FEMA-issued travel trailer, which was placed outside their home on Dorothea street.

The travel trailer is a one bedroom Fleetwood travel trailer (VIN 4CJ1F322764015272) and was manufactured by Fleetwood Travel Trailers of Texas, Inc. The trailer was manufactured on 3/27/2006 and shipped from the manufacturer on 3/28/2006. The FEMA Identification Number for this trailer is 940760507 and the FEMA-issued Bar Code is 1373963. The Dubuclet family resided in this trailer for approximately sixteen months, and when repairs had been completed, they moved back into their family home in September 2007.

## B.  Documentation and Summary of the Discovery of the Presence of Formaldehyde in FEMA-Issued Trailers, Formaldehyde Concentrations Found, and Subsequent Actions

### 1.  When FEMA became aware of the potential formaldehyde contamination and subsequent action taken in the first 9 months after the hurricanes

DUB000614

After the hurricanes, FEMA began receiving temporary housing units to house the newly homeless. Workers began setting up these units for residents, including unwrapping cabinetry, unpackaging furniture, setting up bed frames and mattresses, connecting utilities, and the like. Right after these activities began, in early October of 2005, workers began complaining of severe respiratory irritation, headaches, and itchy skin and eyes when they were working with and inside travel trailers.

Complaints were made to OSHA, and OSHA health compliance officers came to Purvis, Kiln, Bay St. Louis, Pass Christian, Gulfport, Waveland, and Ocean Springs. They sampled many workers and work areas in these temporary housing units at these staging areas. More than 175 samples were taken, with OSHA going onto FEMA sites as early as October 11, 2005 to conduct this sampling.

Formaldehyde exposures were significant; many were more than the 0.75 OSHA Permissible Exposure Limit set for healthy adult workers. When overexposures are found, OSHA is mandated to notify the employer and ensure that follow up measures are implemented to protect workers. In addition, OSHA health compliance officers would have had to state their business for being on every FEMA site. Because of this, FEMA must have been aware in the fall of 2005 of excessive formaldehyde levels in these temporary housing units being set up for the hurricane disaster victims. Their own workers were getting sick.

However, although FEMA was aware in the fall of 2005, there is no evidence that FEMA took any action to warn or notify the people moving into these trailers. There is no evidence that FEMA took steps to identify, evaluate, and eliminate or at least control to an acceptable degree, formaldehyde exposures to the incoming residents of these trailers.

No evidence could be found that FEMA initiated testing prior to accepting additional THU's or that they rejected THU's because of indoor air contamination, including formaldehyde, mold and other potential irritants.

In addition, *no evidence could be found that Fleetwood took steps* to comply with the HUD standards that are mandated for mobile homes or to even initiate formaldehyde screening of its completed travel trailers, although they were aware that these trailers would be occupied much longer than a couple of weeks for recreational purposes. Prudent practice would have been to at least screen the finished units for formaldehyde, since their occupancy according to FEMA would be for extended periods, in many cases for more than a year. It is my understanding that Fleetwood included a sticker inside this travel trailer stating that they were not intended for recreational use.

Excess formaldehyde levels were found by The Sierra Club, the non-profit volunteer environmental organization. The Sierra Club started investigating complaints by residents within *weeks* of initial notification and began sampling trailers for formaldehyde shortly thereafter. Sampling continued into the spring of 2006. Nearly all results showed formaldehyde concentrations in excess of the 0.008 ppm limit recommended by the CDC's Agency for Toxic Substances and Disease Registry (ATSDR).

DUB000615

FEMA knew of the wide-spread formaldehyde contamination before May of 2006, yet never investigated the issue or communicated the potential problem to incoming trailer residents.

## 2. Summary of additional sampling

CDC Testing -- Excess formaldehyde emissions were found in the Congressionally mandated study done by the CDC.  Results of 519 units sampled showed an average of seven times the maximum ATSDR recommended exposure level for durations of more than one year, even though the tests were done two years after the travel trailers were manufactured and the testing done was from late December, 2007, to January of 2008, on unheated units during cold weather.

Ernest Orlando Lawrence Berkeley National Laboratory Study – Excess formaldehyde levels were found in the temporary housing units tested by the Ernest Orlando Lawrence Berkeley National Laboratory in their trailer sampling study.  In addition, elevated alpha-pinene (the main component of turpentine), acetic acid and phenol were also found.  Since these three chemicals also cause serious respiratory, eye and skin irritation, the effects of the high levels of formaldehyde are made even worse by their presence.

**DeVany Industrial Consultants Evaluation** – Sampling of more than 5000 FEMA-owned temporary housing units was conducted by DeVany Industrial Consultants and supervised by the writer.  **More than 500 of these were Fleetwood units.**

Of these, only two tested below the ATSDR level of 0.008 ppm (8ppb) for exposures greater than 365 days.  In fact, the mean concentration of 0.277 ppm (277 ppb) was 35 times the ATSDR level of 0.008 ppm.  The Dubuclet THU had an average level of 0.285ppm (285ppb) nearly two years after they had moved out.

It must be noted that most of these samples had to be taken during the summertime.  This was because FEMA restricted access to the travel trailers on their sites to between May 15th and August 29 of 2008.  Only one week before this, notice was given that the sampling was to be allowed to continue – in order to finish the sampling of other manufacturers' travel trailers not yet located.

## C. FEMA's Response to the Potential Formaldehyde Contamination

Although FEMA was aware of the formaldehyde contamination in the fall of 2005, and although many records exist of individuals complaining to FEMA about bad odors/chemical smells in their THU's, FEMA did not conduct sampling or prepare warnings of the potential danger for the trailer occupants at that time.

In fact, one FEMA official advised FEMA staff on June 16, 2006, *against* investigating the complaints.  She stated that this recommendation was based upon the advice from the OGC (Office of the General Counsel).  This states, "Further, OGC has advised that we do not do

DUB000616

testing, which would imply FEMA's ownership of this issue." Accordingly, although records show much internal correspondence regarding formaldehyde contamination in the THU's, almost no action was taken to identify the problem, notify the occupants, and control the exposures.

By the summer of 2007, forced by Congressional intervention and public pressure, FEMA acknowledged that it needed to take steps to address this issue. It wasn't until six months later, in December of 2007, that through the CDC, FEMA began testing their THU's to assess formaldehyde contamination. Notices were issued to occupants and the general public about the potential contamination, how to identify symptoms of overexposures, and steps to take to reduce personal exposure levels. FEMA also reassessed how and to whom they offered alternative housing. The agency developed priority lists to expedite relocating those occupants whose health was at greatest risk. The agency identified the elderly, children, and those with pre-existing medical conditions that could be exacerbated by even low levels of formaldehyde.

*Unfortunately for Timia Dubuclet, this notification took place after she had already spent 16 months in their FEMA-issued Fleetwood trailer and the family had moved back into their home.*

In an effort to eliminate formaldehyde exposures long-term, FEMA developed additional standards for purchasing new THU's. These standards resulted in two critical changes in the RFP's (Requisitions for Procurement/Purchase) issued for the fall of 2008 hurricane season: Testing of every THU before it leaves the factory site to verify that indoor airborne formaldehyde is below 0.016 ppm, and implementing new manufacturing specifications to increase ventilation rates and overall air exchanges in newly purchased THU's. It was feasible and reasonable for these procurement specifications to have been implemented by the late fall of 2005.

Unfortunately, as stated above, FEMA failed to take action and to warn about the potential for serious health effects until *after* the Dubuclet family had lived in their trailer for 16 months and had moved back into their home. According to her deposition, when Ms Dubuclet signed for delivery of her Fleetwood travel trailer, no mention was made of any potential hazard from the indoor air.

## D. Some factors known to increase formaldehyde off-gassing: increased ambient temperature and humidity

As stated indirectly in the previous section, it has been well researched and documented that an increase in ambient temperature causes an increase in formaldehyde off-gassing. Increasing relative humidity is also widely accepted as causing increasing formaldehyde off-gassing. This can create higher formaldehyde levels than would be found in cooler, drier climates.

The relatively high temperature and humidity levels found along the Gulf coast in the

DUB000617

summertime, as shown when the data from the above-described studies are analyzed, cause increased formaldehyde emissions from the construction materials in these travel trailers. The Dubuclets moved into their Fleetwood travel trailer in June of 2006. Timia was 8 years old.

Cooler Temperatures, Lower Humidity – Conversely, when temperatures decrease in the winter months, the formaldehyde off-gassing also decreases, resulting in lower formaldehyde levels. As a case in point, the test results of the CDC study conducted by Bureau Veritas on unoccupied, unheated THU's from the end of December through January of 2008, were analyzed and showed lower, but still very high, concentrations of formaldehyde.

## E. Indoor Air Volume to Wood Surface Area

The first paragraph of the *Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units – Final Report,* 2008, by the Ernest Orlando Lawrence Berkeley National Laboratory, states the following:

> THU's and the associated whole trailer emissions factors were found to be higher, sometimes much higher, than what is typically found in residential environments. The difference between these THUs and other housing appears to be the very high composite wood surface area relative to room volume and the low ventilation rates in terms of low area-specific fresh air flow rates relative to internal surface area in the THU's.

This excerpt explains the underlying reasons why travel trailers have such a high formaldehyde level when compared to conventional homes. When comparisons are made, the internal air volume or inside air space of travel trailers relative to the amount of wood surfaces is very low.

Relatively the same amount of cabinetry, closets, tables, bed stands, and other wood-based materials are gathered into a much smaller, more compact unit. Therefore, given the same rate of off-gassing, the smaller the air space, the more concentrated the formaldehyde will be.

In addition, the much larger conventional homes also have much more indoor air to dilute the concentration of the formaldehyde gas than travel trailers do. They also, in general, have greater air turn over or a faster rate of air exchanges than travel trailers do. Air exchanges dilute the concentration of formaldehyde with fresh air. So travel trailers not only have a greater amount of formaldehyde emissions per cubic foot of indoor air, the air turn-over is much less. These factors combine to cause travel trailers to have formaldehyde concentrations that significantly exceed those found in conventional homes.

## F. Unoccupied vs Occupied Trailers

Without people going in and out, with doors, windows and vents closed, and with the HVAC (heating, ventilating and air conditioning) system turned off, little fresh air enters the inside of a travel trailer. Travel trailers that are sealed up cause air to slowly become stagnant and tend to accumulate formaldehyde.

DUB000618

Conversely, when people are living inside, people open doors and go in and out. The HVAC system is used. Windows and vents may be opened from time to time. Fans may be used to circulate air around the inside. All of this air movement impacts indoor air quality because more fresh air is allowed to enter. Therefore, as a result, unoccupied units can have slightly higher concentrations of formaldehyde than occupied ones do.

However, over one thousand samples were taken in occupied travel trailers as well. And when comparisons were made, other factors, especially temperature variations, were found to have a much more significant impact than occupancy. Entry into the unit to inspect and test also resulted in air movement and air exchanges. This effect of accumulating formaldehyde due to lessened air movement was also reduced by conducting passive sampling. This is because the lack of air movement caused decreased levels of formaldehyde detection, due to the "starvation" effect of the passive monitors. Lastly, in addition to the above, the limited ventilation in unoccupied travel trailers is cancelled out by the interfering and confounding effects of smoking and cooking, since these activities can also contribute to the measured formaldehyde levels in occupied travel trailers.

## G. Since Formaldehyde Off-Gassing Decreases over Time, How Are Approximations Made As to the Indoor Air Concentration of Formaldehyde over the Range of the Travel Trailer's Use?

Urea-formaldehyde containing resins, glues and adhesives are very commonly used in the manufacturer of fiberboard, plywood and particle board. As these resins, glues and adhesives set and cure, formaldehyde is given off. Because of this, newly made materials emit the highest quantity of formaldehyde and at the highest emission rates. That is because as the materials age, the formaldehyde concentration becomes lower and lower. This results in lower and lower emissions rates and lower total quantities of formaldehyde off-gassed.

Stated another way, it is widely accepted that the rate of off-gassing decreases over time and so does the amount of formaldehyde emitted. Many attempts have been made to approximate this emission rate and total quantity – formulas and extrapolations for determining these values have been submitted by a number of sources. Mathematical regression analysis and logarithm functions are usually used to get the "best fit" curve or line through the data.

From these formulas and curves, we can approximate, for example, what the total quantity of airborne formaldehyde will be in a given travel trailer two years after manufacturer if the level was tested at 4 months and the measured level was "X". Another use for the calculations: if a unit has a level of 0.67 ppm on the date of manufacturer, what will the indoor concentration be after one year? Two years? Three years?... Additionally, if the formaldehyde level three years after manufacture is "X", what was the formaldehyde concentration one year after manufacture?

Variables such as ventilation, humidity, temperature, total indoor air volume, the quantity of formaldehyde in the resin/glue/adhesive in the materials, the ratio of the total indoor air

DUB000619

volume to wood products surface area, occupancy times, and the manufacturing process itself are just some of the factors/variables to consider.

Accordingly, for the purposes of this report, several methods have been used to approximate the formaldehyde concentration in the indoor air of the Dubuclet trailer when they first moved in. These estimations are conservatively based upon the 0.285 ppm concentration measured in July of 2009, or approximately 39 months after its manufacturer in March of 2006. Note that assumptions have to be made regarding the constancy of the variables listed above, as well as others, but these apply to all of the methodologies submitted as follows.

1. In his article, "Decay of the Decrease of Formaldehyde Concentrations or Emissions over Time and UF-bonded Wood Panel Products," from December of 2005, William Groah states that "Controlled studies in unoccupied homes, while limited, suggest a reduction of 25-40% in formaldehyde concentration during the firsts 4-8 weeks, and a half life of 18-25 months." He quotes a study done for the EPA by Versar (1986) whose exposure model for predicting formaldehyde concentration is as follows:

$$Y = 0.504e^{-0.00065x}$$

where $Y$ = formaldehyde concentration in ppm and $x$ = home age in days

This study reported that "the correlation coefficient (r) for the equation is 0.59 and the $R^2$ value is 0.35, implying that home age determines approximately 35% of the home formaldehyde level, while all other factors determine the other 65% of its variability.

2. Zinn, Cline, and Lehmann (June, 1990) published their article, "Long-term Study of Formaldehyde Emission Decay from Particle Board," *Forest Products Journal*, and stated, "The overall ¾ and ½ lives were 38 and 216 days, respectively. The rate at which emission levels decrease is not constant, but decreases with time. Generally, formaldehyde emission levels decrease linearly with respect to the natural log of time."

Their exposure model for predicting formaldehyde emission data is as follows:

$$HCHO = F + G \, X \, ln(t)$$

where $HCHO$ = formaldehyde emission level (ppm) and $ln(t)$ = natural log of time in days

3. In the CDC report (July 2, 2008), "Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes," they report parameter estimates that can be used to calculate predicted formaldehyde levels.

*The natural log of*     $= 0.012 + Mfgr + T(0.052) + 45(RH) + (vent) + M$
*formaldehyde concentration*

where $x$ = formaldehyde concentration of the specific manufacturer
$T$ = temperature (Fahrenheit)
$RH$ = % relative humidity

DUB000620

Vent = ventilation factor
M = mold in a concentration of one square foot or more ($\geq 1$ ft$^2$)

4. In the *Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units – Final Report,* 2008, the Ernest Orlando Lawrence Berkeley National Laboratory cites a study (Oak Ridge National Laboratory) (Matthews, 1995) showing it takes 7.5 years for the formaldehyde concentration to drop to a concentration of 10 ppb.

**Summary:**  Derived concentrations at ~ 3 months after manufacturer, which represents the approximate date when the Dubuclet family moved into the FEMA-issued Fleetwood travel trailer, and at 460 days after its manufacture, the approximate date the family moved out of this trailer, were calculated using the above-summarized methods.  The concentration ranged from 0.14 ppm (140 ppb) to 0.48 ppm (480 ppb).   The average concentration of formaldehyde measured July 7-8, 2009 of 0.285 ppm (285 ppb).

## H. Induction of IgE-Mediated Sensitization to Formaldehyde

Research by F. Wantke, et. al., as far back as 1996 shows that exposure to gaseous formaldehyde could be linked to the induction of IgE-mediated sensitization to formaldehyde in primary school children, at levels of only 0.075 ppm and 0.069 ppm. These levels are nearly four times those levels measured in the empty Dubuclet trailer nearly two years *after* they moved out.

The levels in the Dubuclet trailer, derived by using the several different methodologies described above – designed to approximate formaldehyde concentrations when they first moved in and at the date of manufacturer -- were significantly higher, (approximately four times higher) than those in this study.  In addition, rhinitis, cough, burning eyes, nose bleeding, headache, fatigue and dry nasal mucosa were found in the affected children.  Of interest is the fact that the IgE levels did not correlate with the symptoms.  In other words, immune system changes were occurring in some of the children without any outward symptoms of irritation.  More than 60 children participated in the Wantke study.

# VI. DISCUSSION OF FINDINGS AND OBSERVATIONS

## A. Defective Design

Because the interior air volume relative to the surface area of wood products is so low in travel trailers, formaldehyde gas can build up to high levels.  The interior design, construction practices, and low ventilation rates inherent to the Fleetwood travel trailers demonstrate basic design defects, which renders this THU unreasonably dangerous in

DUB000621

design. Furthermore, travel trailers emitting formaldehyde at levels at or below 0.016 ppm
are now being constructed by the travel trailer industry. These trailers use safer alternative
designs and material choice, all of which existed years before March of 2006, when the
Dubuclet trailer was manufacturer by Fleetwood.

## B. FEMA's Lack of Action

Before the Dubuclets entered their trailer in June of 2006, FEMA, Fleetwood, and Fluor
were well aware that the units contained potentially hazardous levels of formaldehyde, yet
there is no evidence that any notice of this was given to the Dubuclet family.

Once they became cognizant of the issue, FEMA, Fleetwood, and Fluor should have taken
swift action to give appropriate warnings to the Dubuclets about the potentially hazardous
condition. Then, without delay, steps should have been taken to evaluate the
formaldehyde levels. Once identified, FEMA should have acted to eliminate the condition,
attempt to control it, or at least provide immediate alternative housing to those at high risk,
such as Timia Dubuclet.

## C. Fleetwood's Lack of Action

Nothing could be found in the case documents demonstrating that Fleetwood initiated
formaldehyde screening of its completed travel trailers, although it was well-publicized
that these trailers would be occupied much longer than a couple of weeks for recreational
purposes.

Prudent practice would have been to at least screen the finished units for formaldehyde.
This is especially true since, according to FEMA, their occupancy would be for an
extended period, in many cases for more than a year. This testing could have been done
with minimal effort and very low cost. Furthermore, Fleetwood failed to adequately warn
Ms Dubuclet of the consequences of the formaldehyde in trailer.

## D. Fluor's Lack of Action

Health complaints were submitted to Federal OSHA by workers at the staging areas who
were setting up the travel trailers for occupancy. Shortly thereafter, OSHA conducted air
sampling at several staging areas (see above) and reported the results -- including their
findings of airborne contaminants present and the excessive formaldehyde levels found
when doing this work – to FEMA. Fluor would have or should have known about this
sampling by OSHA, since their employees and subcontractors were working side by side
with those from FEMA.

The minimum safety and health requirements of Fluor by Federal OSHA, which would by
law be included in Fluor's basic safety and health program for its workers and
subcontractors, includes a safety and health evaluation of the work performed for FEMA.

DUB000622

Workers for Fluor complained about a strong odor and eye irritation and burning from working in and around these trailers. Some even sought medical help. As early as October of 2005, Fluor was instructing its subcontractors at the staging areas to air out the trailers during preparation for occupancy to reduce the effects of the airborne contaminants. By law, Fluor had a duty to evaluate the source of these adverse health effects to its workers and to take measures to reduce exposures to below allowable OSHA permissible exposure limits. Because of this, Fluor should have known of the presence of excessive formaldehyde exposures to its workers and subcontractors and should have notified FEMA about these exposures and adverse health effects.

Because of this, Fluor should have stopped certifying these travel trailers for occupancy by the general public and advised FEMA that they were unsafe for habitation. Had they done this, Timia Dubuclet would not have been exposed to excessive formaldehyde levels.

No evidence was found that Ms Dubuclet was notified by FEMA, Fleetwood, or Fluor about the potentially hazardous levels of formaldehyde that were present in her trailer or advised of the adverse health effects that could occur as a result of formaldehyde gas exposure. Had she been made aware, via a clear and adequate warning, she could have taken steps to protect her family. Although stickers were to be placed in the medicine cabinets of Fleetwood travel trailers, the writer found no evidence that the sticker was there or that it was there during the occupancy of Timia Dubuclet. At this point the writer defers to the sworn testimony of Ms Dubuclet that she was not aware of any airborne contaminant in the travel trailer while the family was living there.

# VII. CONCLUSIONS

It is a matter of record that the Plaintiff did not move into her Fleetwood travel trailer until June, 2006. FEMA knew of the risk of formaldehyde exposures before this time. Unfortunately, FEMA did not take reasonable steps to warn these trailer occupants. Had the agency done so, the Dubuclet family could have sought medical counsel prior to moving into this trailer. They would have been able to make an informed decision had they known about the serious health risks involved.

FEMA's conduct fell below the appropriate standard of care in failing to warn of the hazards associated with occupying this trailer.

Fleetwood has been one of the largest manufacturers in the U.S. of recreational vehicles. For many years they have had to comply with the HUD limits for formaldehyde emissions from wood products in their mobile homes. Although the thousands of THU's provided to FEMA would be occupied for extended periods of time as living quarters for individuals and families, no effort was made to ensure that the emissions were adequately reduced accordingly. Fleetwood's conduct fell below the appropriate standard of care in not testing or taking other prudent measures to ensure

DUB000623

that formaldehyde concentrations were on par with those required by law for prolonged housing.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I reserve the right to modify or change the opinions in this report if additional information is made known to me.

DUB000624

# APPENDIX A:  BIBLIOGRAPHY – DOCUMENTS AND RESOURCES REVIEWED AND RELIED UPON IN THE PREPARATION OF THIS REPORT

ACGIH. Documentation of Threshold Limit Values and Biological Exposure Indices: Formaldehyde - Suspected Human Carcinogen. 2001.

April 11, 2008, Release number: HQ-08-056, New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels In Mobile Homes And Park Models, from http://www.fema.gov/newsrelease.fema?id=43180

Arts, J.H., Muijser, H., Kuper, C.F., (2008). Setting an Indoor Air Exposure Limit for Formaldehyde: Factors of Concern, *Regulatory Toxicology and Pharmacology, 52,* 189-194

ASTM International. (2002), *Standard Test Methods for Determining Formaldehyde Concentrations in Air and Emission Rates from Wood Products using a Large Chamber* (ASTM Designation: E1333-96 [Reapproved 2002]), West Conshohocken, PA

Bullock, W.H. and Ignacio, J.S.: (editors): A Strategy for Assessing and Managing Occupational Exposures, Third Edition. Fairfax, VA: American Industrial Hygiene Association (2006).

California Environmental Protection Agency Air Resources Board. Indoor Air Quality Guideline - Formaldehyde in the Home. August, 2004. http://www.arb.ca.gov/research/indoor/formaldgl08-04.pdf

California Environmental Protection Agency Air Resources Board. Proposed Airborne Toxic Control Measure To Reduce Formaldehyde Emissions From Composite Wood Products. Sacramento. March 2007.

Caby, S., Pierce, R.J., (2009) Quantitative chromatin immunoprecipitation (Q-ChIP) applied to Schistosoma mansoni, Mol Biochem Parasitol, 166(1), 77-80.

Centers for Disease Control and Prevention. (2008). *Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes.* Retrieved from http://www.cdc.gov/nceh/ehhe/trailerstudy/pdfs/FEMAFinalReport.pdf

DeVany, Mary C., MS, CSP, CHMM. Chemical Toxicology, with Emphasis on the Reproductive System. DeVany Industrial Consultants. Washington Industrial Safety and Health Administration annual meeting; Vancouver, Washington.

DeVany, Mary C., MS, CSP, CHMM. Summary of Formaldehyde Health Effects and Exposures

DUB000625

in FEMA Travel Trailers. Statement for Press Conference, DeVany Industrial Consultants. Vancouver, Washington. May 2007.

DeVany, Mary C., MS, CSP, CHMM. The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued to Hurricane Disaster Victims, and Recommended Action Items.  Testimony before the Committee on Oversight and Government Reform, U.S. House of Representatives; Washington D.C., 19 July 2007.

Dubuclet, Elisha A. o/b/o, Timia Dubuclet, Transcript of the Testimony, In Re: FEMA Trailer Formaldehyde Products Liability Litigation, 17 September 09.

Ernest Orlando Lawrence Berkeley National Laboratory, Environmental Energy Technologies Division, (2008), *Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units – Final Report*, Richmond, CA.: Maddalena. R. Russell, M. Sullivan, D. Apte, M.

Fleetwood Enterprises Inc., Pioneer Owner's Manual 2006, FLE-00006496, 11 November 2005

Federal Emergency Management Agency (2007). *Fact Sheet: Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes*, Washington DC.: U.S. Government Printing Office

Federal Emergency Management Agency (2007). *Formaldehyde and Travel Trailers*. Washington DC.: U.S. Government Printing Office. Retrieved from FEMA Government Web site: http://www.fema.gov/news/newsrelease.fema?id=36730

Federal Emergency Management Agency (2006). *FEMA Job Hazard Analysis, Trailer In-Bound Inspection (New Trailer)*, Washington DC.: U.S. Government Printing Office

Federal Emergency Management Agency (2009). *FEMA Temporary Housing Program Ending for Families of Hurricanes Katrina and Rita*. Washington DC. Release Number: FNF-09-009. Retrieved from FEMA Government Web site: http://www.fema.gov/news/newsrelease.fema?id=47936

Formaldehyde Sampling: Active and Passive Sampling Protocols -- Procedures for Evaluating Formaldehyde Levels in FEMA Temporary Housing Units. DeVany Industrial Consultants; Vancouver, Washington, March, 2008.

Gillette, Becky, "Testimony to House Comm. on Oversight and Government Reform", U.S. House of Representatives, 19 July 07.

Hardwood Plywood and Veneer Association and the Kitchen Cabinet Manufacturers Association. (2005). *Decay or the Decrease in Formaldehyde Concentrations or Emissions over Time and UF-boned Wood Panel Products*. Reston, VA: Groah, W.

Health Canada. Residential Indoor Air Quality Guideline - Formaldehyde. April 2006.

DUB000626

http://www.hc-sc.gc.ca/ewh-semt/alt_formats/hecs-sesc/pdf/pubs/air/formaldehyde-eng.pdf

Hewett, P.: Mean Testing: II. Comparison of Several Alternative Procedures. Applied Occupational and Environmental Hygiene 12:347-355 (1997).

Hewett, Paul: Industrial Hygiene Exposure Assessment - Data Analysis and Interpretation, in Handbook of Chemical Health and Safety. Alaimo, R.J. (editor); American Chemical Society; Oxford University Press (2001).

Hughes, Vernon (Atmospheric Modeling and Support Section Planning and Technical Support Division). California Environmental Protection Agency. Air Quality Modeling of Emissions From Composite Wood Products. Sacramento. June 2006.

International Agency for Research on Cancer. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Overall Evaluations of Carcinogenicity to Humans. Lyon, France. April 2008.  http://monographs.iarc.fr/ENG/Classification/crthgr01.php

International Agency for Research on Cancer. Press Release: IARC Monographs  Programme Finds Cancer Hazards Associated With Shiftwork, Painting And Firefighting. Lyon, France. May 2007.   http://www.iarc.fr/en/Media-Centre/IARC-Press-Releases/Recent-Releases/IARC-Monographs-Programme-finds-cancer-hazards-associated-with-shiftwork-painting-and-firefighting

Koplan, Jeffrey P., DM, MPH (Administrator) U.S. Department of Health and Human Services Public Health Service Agency for Toxic Substances and Disease Registry. Toxicological Profile for Formaldehyde. Chapter 7. July 1999. http://www.atsdr.cdc.gov/toxprofiles/tp111.pdf

Label, Emergency Living Unit, FEMA Spec Trailer, 1015188, Dubuclet

Li LinYing, Delao Andrew, Tasat Webster, Fitz Gibbon Mike. Emission Inventory Branch Planning and Technical Support Division, ARB. Estimation of Formaldehyde Emissions from Composite Wood Products.

Madison Roberta E, Broughton Alan, Thrasher Jack D. Immunologic Biomarkers Associated with an Acute Exposure to Exothermic Byproducts of a Ureaformaldehyde Spill. Environmental Health Perspectives, Vol. 94, pp. 219-223. 1991.

Mathews, T.G. (1985). *Modeling and Testing of Formaldehyde Emission Characteristics of Pressed-Wood Product: Report XVIII to the U.S. Consumer Product Safety Commission,* Oak Ridge National Laboratory, Oak Ridge, TN. ORNL/TM-9867.

Memorandum Narrative Report for Dubuclet, July 7, 2009

National Archives and Records Administration. 24 CFR § 3280.308 - Formaldehyde Emission Controls for Certain Wood Products. August 1984.

DUB000627

http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?type=simple;c=ecfr;cc=ecfr;sid=da536441af330244bf717531615c8c39;region=DIV1;q1=Formaldehyde%20emission%20controls%20for%20certain%20wood%20products;rgn=div8;view=text;idno=24;node=24%3A5.1.3.1.1.4.13.10

National Archives and Records Administration. 24 CFR § 3280.309 - Health Notice on Formaldehyde Emissions. October 1993. http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?type=simple;c=ecfr;cc=ecfr;sid=da536441af330244bf717531615c8c39;region=DIV1;q1=Health%20Notice%20on%20Formaldehyde%20emissions;rgn=div8;view=text;idno=24;node=24%3A5.1.3.1.1.4.13.11

National Cancer Institute. Factsheet - Formaldehyde and Cancer: Questions and Answers. July 2004.  http://www.cancer.gov/cancertopics/factsheet/Risk/formaldehyde

National Center for Environmental Health, Division of Environmental Hazards and Health Effects. (2007). *Evaluation of Formaldehyde Levels in Occupied Federal Emergency Management Agency-Owned Temporary Housing Units.* Washington D.C.:U.S. Government Printing Office.

National Institute for Occupational Safety and Health. NIOSH Pocket Guide to Chemical Hazards.  September 2005. http://www.cdc.gov/niosh/npg/npgd0293.html

National Institute for Occupational Safety and Health. NIOSH Safety and Health Topic: Formaldehyde. August 2008. http://www.cdc.gov/niosh/topics/formaldehyde/

Nelson, L., Formaldehyde Plaintiff Database, *All Plaintiff THU Formaldehyde Sampling Data.* May 15, 2009.

Omae, K. (2008), Recommendation of Occupational Exposure Limits (2008-2009), *Journal of Occupational Health*, 50, 426-443.

Scott, W.D., Formaldehyde Monitoring Data, Field Notes and Sampling Results, W.D. Scott Group, Inc, July 9, 2009

Daniels, S., personal communication, Post Katrina Timeline, May 16, 2009, 12:39 PM

Sharon E Jacob, MD, Tace Steele. Avoiding Formaldehyde Allergic Reactions in Children. U. Miami. Pediatric Annals 36:1. January 2007.

Smulski. S., (2009). Affidavit of Stephen Smulski Ph.D., Wood Science Specialists, Inc., July 10, 2009

Standard Interpretations, United States Department of Labor. 03/13/1998 - OSHA  Rulemaking on Formaldehyde Exposure Limits. 13 March 98. http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATIONS&p_id=22543

DUB000628

State of California Air Resources Board. Resolution 07-14. April 2007.

State of California Air Resources Board. Resolution 07-14 Attachment A: Proposed Regulation
    Order: Airborne Toxic Control Measure to Reduce Formaldehyde Emissions from
    Composite Wood Products (sections 93120 to 93120.12, title 17, California Code of
    Regulations), as set forth in Appendix A to the Initial Statement of Reasons, released
    March 9, 2007. April 2007.

State of California Air Resources Board. Resolution 07-14 Attachment B: Staff's  Suggested
    Modifications to the Original Proposal (Distributed at the Board hearing on April 26,
    2007). April 2007.

State of California Air Resources Board. Supplemental Analysis Supporting the Test for
    Demonstrating Equivalence between Primary and Secondary Methods for Measuring
    Formaldehyde Emissions from Composite Wood Products. January 2008.

Taaffe, P., private communication, Fleetwood Dubucet: A Supplemental Background Memo,
    July 08, 2009, 7:08 PM

Technical Report 07-03 - Industrial Hygiene Exposure Assessment - Data Analysis and
    Interpretation. Exposure Assessment Solutions, Inc. available at www.oesh.com

Texas Department of State Health Services.  Texas Administrative Code, Title 25, Part 1,
    Chapter 297, Subchapter A. May 2007.  http://www.dshs.state.tx.us/iaq/rules.shtm

Thrasher, Jack D. Ph.D. Broughton, Allan M.D., Ph.D. Micevich, Paul Ph.D. Antibodies and
    Immune Profiles of Individuals Occupationally Exposed to Formaldehyde: Six Case
    Reports. American Journal of Industrial Medicine, Vol 14, pp. 479-88.  1988.

Thrasher Jack D, Ph.D. Embryo Toxicity and Teratogenicity of Formaldehyde (FA). Alto, New
    Mexico.

Thrasher Jack D, Ph.D. et al. Evidence for Formaldehyde Antibodies and Altered Cellular
    Immunity in Subjects Exposed to Formaldehyde in Mobile Homes.  Archives of
    Environmental Health, Vol. 42, pp. 347-350. 1987.

Thrasher, Jack D. The Immediate and Long-Term Effects of Formaldehyde. Comments
    Toxicology 1988, Vol. 3, No. 2, pp. 135-153. 1988.

Thrasher Jack D, Ph.D. et al. Immune Activation and Autoantibodies in Humans with Long-Term
    Inhalation. Archives of Environmental Health, Vol. 45, pp. 217-223. 1990.

U.S. Department Of Health And Human Services Public Health Service Agency for Toxic
    Substances and Disease Registry. An Update and Revision of ATSDR's February 2007
    Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers-

DUB000629

Baton Rouge, Louisiana, September-October, 2006. Atlanta, Georgia. October 2007.
http://www.atsdr.cdc.gov/substances/formaldehyde/pdfs/revised_formaldehyde_report_10
07.pdf

U.S. Department Of Health And Human Services Agency for Toxic Substances and Disease
Registry. Minimal Risk Levels (MRLs) for Hazardous Substances. November 2007.
http://www.atsdr.cdc.gov/mrls/index.html

U.S. Department of Health, Education, and Welfare, Public Health Service, Center for Disease
Control, National Institute of Occupational Safety and Health. Criteria for a
Recommended Standard.... Occupational Exposure to Formaldehyde. Washington DC,
December 1976.

U.S. Department of Labor Occupational Safety and Health Administration. OSHA Formaldehyde
Standards. Washington DC. May 2008.
http://www.osha.gov/SLTC/formaldehyde/standards.html

U.S. District Court Eastern District of Louisiana New Orleans Division. (2008). Orders and
Reasons. MDL NO. 1873, Section: N(4), Judge: Engelhardt. FEMA Trailer
Formaldehyde Product Liability Litigation.

U.S. District Court Eastern District of Louisiana New Orleans Division. (2008). Stipulated
Protective Order. MDL NO. 1873, Section: N(4), Judge: Engelhardt. FEMA Trailer
Formaldehyde Product Liability Litigation.

U.S. District Court Eastern District of Louisiana New Orleans Division. (2007). U.S. House of
Representatives Committee on Oversight and Government Reform July 19, 2007 Hearing.
MDL NO. 1873, Section: N (5), Judge: Engelhardt. FEMA Trailer Formaldehyde
Products Liability Litigation.

U.S. District Court Eastern District of Louisiana New Orleans Division. (2008). U.S. House of
Representatives Committee on Science and Technology , Subcommittee on Investigations
& Oversight, April 01, 2008 Hearing. MDL NO. 1873, Section: N (5), Judge: Engelhardt.
FEMA Trailer Formaldehyde Products Liability Litigation.

U.S. District Court Eastern District of Louisiana New Orleans Division. (2008). U.S. House of
Representatives Committee on Oversight and Government Reform July 09, 2008 Hearing.
MDL NO. 1873, Section: N (5), Judge: Engelhardt. FEMA Trailer Formaldehyde
Products Liability Litigation.

U.S. Environmental Protection Agency - Indoor Air Quality. Basic Information - Formaldehyde.
November 2007. http://www.epa.gov/iaq/formalde.html

U.S. Environmental Protection Agency - Integrated Risk Information System. Formaldehyde
(CASRN 50-00-0). January 2008.  http://www.epa.gov/iris/subst/0419.htm

DUB000630

Warning Notice by Wood Product Suppliers, Posted label, Date Unknown

Wantke, F., Demmer, C.M., Tappler, P., et al (1996). Exposure to Gaseous Formaldehyde Induces IgE-Mediated Sensitization to Formaldehyde in School Children, *Clinical & Experimental Allergy, Vol 26, No. 3*, 276-280(5)

Weisskopf, Marc. <u>Formaldehyde Exposure Increases Risk of Lou Gehrig's Disease</u>, Harvard School of Public Health Studies, April 18th, 2008.

World Health Organization, <u>Air Quality Guidelines for Europe</u>. Second Edition. Copenhagen. 2000. <u>http://www.euro.who.int/document/e71922.pdf</u>

World Health Organization. Air Quality Guidelines for Europe. Second Edition.  Chapter 5.8 – formaldehyde. Copenhagen. 2001 http://www.euro.who.int/document/aiq/5_8formaldehyde.pdf

Zinn, T., Cline, D., Lehmann, W.F., (1990). Long-term Study of Formaldehyde Emission Decay from Particleboard, *Forest Products Journal, 40, No. 6*, 15-18

DUB000631

# APPENDIX B:  Published Levels of Concern for Formaldehyde

NOTE: **Outdoor air contains** 0.00012 ppm – 0.00039 ppm formaldehyde

US Department of Labor (US DOL)
Occupational Safety & Health Administration (OSHA)
Permissible Exposure Limit: **(WORKPLACE)**
TWA --> **0.75 ppm**
Short Term Exposure Limit (15 minutes) --> **2 ppm**
Action Level--> **0.50 ppm**

US Department of Health & Human Services (US DHHS)
Centers for Disease Control & Prevention (CDC)
National Institute for Occupational Safety & Health (NIOSH)
Recommended Exposure Limits: **(WORKPLACE)**
Time Weighted Average up to 10-hour work day/40-hour work week (TWA) --> **0.016 ppm**
Ceiling [15-minute] --> **0.1 ppm**
Immediately Dangerous to Life and Health (IDLH) levels --> **20 ppm**

American Conference of Governmental Industrial Hygienists (ACGIH)
Threshold Limit Value - Ceiling Exposure Limit (TLV-CEILING) (1998) **(WORKPLACE)**
Never to be exceeded, even for a moment, in the workplace --> **0.3 ppm**

The Japan Society for Occupational Health, Occupational Exposure Limit: **(WORKPLACE)**
TWA --> **0.1 ppm**

US Department of Health & Human Services
Centers for Disease Control & Prevention (CDC)
Agency for Toxic Substances & Disease Registry (ATSDR)
Minimal Risk Levels (MRL) **(PUBLIC)**
Acute MRL --> **0.04 ppm**
Intermediate duration MRL --> **0.03 ppm**
Chronic duration MRL --> **0.008 ppm**

Federal Emergency Management Agency (FEMA)
Airborne concentration for inside new mobile homes and park homes (for a 3-year contract duration
that began in the summer of 2008)
Measured airborne level --> **0.016 ppm**

California Environmental Protection Agency
Office of Environmental Health Hazard Assessment **(PUBLIC)**
As low as possible, assuming levels below background cannot be achieved, or:
Recommended exposure limits (REL)
Acute REL --> 76 ppb for one hour **(0.076 ppm)**
Intermediate REL --> 27 ppb for eight hours **(0.027 ppm)**

DUB000632

Health Canada
Residential Indoor Air Quality Guidelines **(PUBLIC)**
One hour exposure limit --> 100 ppb **(0.1 ppm)**
Eight hour exposure limit --> 40 ppb **(0.04 ppm)**


World Health Organization
2000, Air Quality Guidelines for Europe, 2nd Edition **(PUBLIC)**
Air Quality Guideline Value, 30 minute average --> 0.1 mg/m3 **(0.08 ppm** at 1 Atmosphere, 25
degrees C)  (NOTE:  25º C = 77º F)


**Exposure Limits Ranked from Highest to Lowest:**

| Name | Concentration | Source/Agency | Exposure Duration | Intended Population |
|------|---------------|---------------|-------------------|---------------------|
| IDLH | 20 ppm | NIOSH | Anytime | Occupational |
| STEL-PEL | 2 ppm | OSHA | 15 minutes | Occupational |
| TWA-PEL | 0.75 ppm | OSHA | 8 hours | Occupational |
| Action Level | 0.50 ppm | OSHA | 8 hours | Occupational |
| TWA-PEL | 0.375 ppm | OSHA | 12 hours | Occupational |
| TLV-CEILING | 0.3 ppm | ACGIH | Never to be exceeded | Occupational |
| Ceiling-REL | 0.1 ppm | NIOSH | 15 min | Occupational |
| OEL-M | 0.1 ppm | JOSH | 8 hours | Occupational |
| REL | 0.1 ppm | Health Canada | Up to 1 hour | Public |
| AQGV | 0.08 ppm | WHO | 30 min | Public |
| Acute REL | 0.076 ppm | Cal EPA | 1 hr | Public |
| REL | 0.04 ppm | Health Canada | Up to 8 hours | Public |
| Acute MRL | 0.04 ppm | ATSDR | 0-14 days | Public |
| Intermed. MRL | 0.03 ppm | ATSDR | >14 days < 1 year | Public |
| Intermed. REL | 0.027 ppm | Cal EPA | 8 hr | Public |
| TWA-REL | 0.016 ppm | NIOSH | 8/10 hrs | Occupational |
| Chronic MRL | 0.008 ppm | ATSDR | 1 year or longer | Public |

ppm = parts per million
IDLH = Immediately Dangerous to Life and Health
STEL = Short Term Exposure Limit
PEL = Permissible Exposure Limit
TWA = Time Weighted Average
TWA-CEILING = Exposure limit never to be exceeded, even momentarily
REL = Recommended Exposure Limit
ELGV = Exposure Limit Guideline Value
AQGV = Air Quality Guideline Value
MRL = Minimal Risk Level
OEL-M = Mean Occupational Exposure Limit

DUB000633

JSOH = Japan Society for Occupational Health
NIOSH = National Institute for Occupational Health and Safety (Federal Agency)
OSHA = Occupational Safety & Health Administration (Federal Agency)
ACGIH = American Conference of Governmental Industrial Hygienists (Professional Association)
WHO = World Health Organization (Coordinating International Health Authority of the United Nations System)
Cal EPA = California Environmental Protection Agency
ATSDR = Agency for Toxic Substances & Disease Registry

DUB000634

# Publications and Presentations List (Previous 10 Years)
# Mary C. DeVany, MS, CSP, CHMM, Vancouver, WA

"Toxic Materials and the Reproductive System," Academy of Certified Hazardous Materials Managers National Conference, August, 2000.

"*Safe Handling of Compressed Gas Cylinders*" 2001, Oregon Governor's Occupational Safety and Health Conference, Session #710; Portland, OR.

CSP/CIH Preparation/Review Course, "*Legal Aspects, Safe Chemical Handling, & Toxicology and Health Effects of the Major Chemical Groups*" 2005, Oregon Governor's Occupational Safety and Health Conference, Sessions #110, 360, & 410, Portland, OR.

"*Confined Space Entry, & Confined Space Exposure Assessment and Control*" 2005, 2007; Oregon Governor's Occupational Safety and Health Conference, Sessions #111 & 307, Portland, OR.

Forum on Emerging Issues in Industrial/Occupational Hygiene: An Overview of the Field I, II III & IV, "*Introduction & Confined Spaces*" 2000, AIHCE, Roundtable #231, 236, 241, & 252.

Confined Spaces, "*Safety and Health Hazards of Confined Spaces*" 2001, AIHCE, Technical Session #4.

Upton Sinclair Award Lecture, "*Best Occupational Safety and Health News Story of 2000*", 2001, AIHCE.

Emerging Issues in Industrial Hygiene: Committee Showcase, "*State-of-the-Art of the Social Concerns Committee*", 2002, AIHCE, Forum #225

Safety and Health in Confined Spaces, Neil McManus, Lewis Publishers, 1998, Editor and Principle Reviewer, Chapter 6, "*Safety Aspects of Confined Spaces/Confined Atmospheres/Confined Energy*" and Appendix G, "*Deactivation, Deenergization, Isolation, and Lockout*", Co-Author

"Controlling Occupation Dematitis from Metal Working Fluids", April, 2008, Eunemclaw, WA

"*Confined Space Gas Detection*", 1999, AIHCE, PDC #301.

Ethics: A Global Challenge, 1999, "*International Ethics: How are Boundaries Defined*", AIHCE, Roundtable #228.

AIHA Confined Space Technical Committee, "*Confined Spaces Entry Protocol Guide*" 1999, Contributing Author.

ASSE Columbia-Willamette Chapter, Portland, OR; "The Ft. Worth Variance Method for Asbestos

DUB000635

Abatement".  Sept., 2003.

U.S. Chemical Safety and Hazard Investigation Board, Washington D.C. "Educational Bulletin on the Hazards of Nitrogen Asphyxiation; June, 2003.

Impact of Toxic Materials on the Reproductive System," Northwest Occupational Health Conference, Fall Conference, 2001, Seaside, OR.

"Oxygen-Deficient And Toxic $CO_2$ Atmospheres Generated By Microbial Growth In Confined Spaces" Mt. St. Helens Section of the ASSE, Longview, WA, 2000.

"Introduction to Industrial Hygiene," March, 2007, March, 2005. Oregon Governor's Occupational Safety and Health Conference, Portland, OR.

"The Industrial Hygiene Code of Ethics," March, 2007; Oregon Governor's Occupational Safety and Health Conference, Portland, OR.

"Confined Spaces And Compressed Gas Systems -- Improving Contractor Safety When Using Nitrogen," Crossover Session # 319; AIHCE, 2004.

"The Hazards of Nitrogen Asphyxiation," ASSE National Conference, Las Vegas, NV; June, 2004.

"The Woman IH in Her Independent Consulting Firm," Women In Industrial Hygiene; Roundtable Session # 235; AIHCE; 2007.

"Ethics Scenario: City Industrial Hygienist Named in Lawsuit," *The Synergist,* AIHA; October, 1999.

"Ethics Scenario: The Pregnant Lab Tech," *The Synergist,* AIHA; May, 2000.

"Staying Safe  in Confined Spaces – A Step by Step Approach," May, 2009, Vancouver, WA

"Ethics Scenario: Hygienist in Transition," *The Synergist,* AIHA; December, 2000.

"PCB's and Mercury: Health Effects," IBEW, September, 2003, Portland, OR

"Safe Drinking Water And Endocrine Disrupters," Sierra Club, Phoenix, AZ  February, 2003.

"Epoxy Resins – Overview, Toxicology and Exposure Control," Washington Employers; May, 2007; Olympia/Tacoma, WA.

"Chemical Toxicology, with Emphasis on the Reproductive System," Washington Industrial Safety and Health Administration annual meeting; Vancouver, Washington.

"Summary of Formaldehyde Health Effects and Exposures in FEMA Travel Trailers," Statement for the press, Vancouver, Washington. May 2007

DUB000636

"The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued to Hurricane Disaster Victims, and Recommended Action Items," testimony before the Committee on Oversight and Government Reform, U.S. House of Representatives; Washington D.C., 19 July 2007.

**DUB000637**

14507 NW 19TH AVE. • VANCOUVER, WA USA 98685-8003
PHONE (360) 546-0999 • FAX (360) 546-0777 • E-MAIL mdevany@earthlink.net

# MARY C. DEVANY

## SUMMARY OF QUALIFICATIONS

1987 Certified Safety Professional in Comprehensive Practice (by examination)
1990 Certified Hazardous Materials Manager at the Master (highest) level (by examination)
1990 Qualified as Instructor for OSHA compliance by the Federal OSHA Training Institute
1995 Certified Lead Paint Construction Site Auditor, Paint & Coatings Manufacturers' Assc.

## ACCOMPLISHMENTS

*Consulting* to organizations in the public and private sectors; throughout North America, Europe, and Asia; in the areas of occupational hygiene, community health, industrial safety, protection of the environment, and product safety/liability

*Corporate policy and program development* for compliance with environmental and occupational safety and health regulations; site/field monitoring and evaluation, implementation, and specification of remediation and corrective actions; liaison work with outside agencies representing environmental and occupational safety and health compliance, enforcement, and legal entities

*All phases of air, water, and hazardous waste* auditing, monitoring, evaluation, control methods, permitting, policies, compliance programs, design, and remediation – including compliance programs and policies, permit applications, education, training, annual reporting, and recordkeeping. Examples include: Solid and Hazardous Waste Minimization Plans; Air Discharge Permit applications and modifications; reporting for conditionally exempt, small, and large quantity hazardous waste generators (RCRA); water quality and discharge evaluation, monitoring, and pretreatment methodology, including industrial and municipal wastewater for POTW's (publicly owned treatment works); Stormwater Pollution Prevention Plans; community noise evaluations; Environmental Impact Statements; and SARA reports, sections 304, 313 Form R (chemical emergency release reporting). Development and implementation of sampling and remediation plans; chemical process environmental engineering design evaluations; and pre-startup safety and environmental engineering reviews

*Preparing construction site specific safety programs and employee training*

*Preparing and delivering health, safety, and environmental training and education,* to: corporate managers, government officials, OSHA compliance personnel, physicians, nurses, industrial hygienists, environmental engineers, safety professionals, union and non-union hourly plant personnel, operations supervisors, and construction workers in various trades

*Conducting in-depth indoor air quality investigations,* including fungal contamination of ventilation ductwork and building materials, carbon monoxide entrainment, inadequate illumination, excess humidity, malfunctioning Carbon Dioxide probes in ventilation systems, poor make-up air, diesel exhaust entrapment, inadequately designed HVAC (heating, ventilating, and air conditioning) systems, and even undiagnosed medical conditions that gave the appearance of being caused by the building's air but were completely unrelated. Sampling and remediation plan development

*Developing and conducting site-specific chemical emergency response certification courses* for personnel at all levels, from first responders to incident commanders -- for the chemical, pulp and paper, grain handling, warehousing, and food processing industries, as well as municipalities and governmental agencies

*Developing and coordinating the professional overview course* for Certified Hazardous Materials Managers Certified Safety Professionals, and Certified Industrial Hygienists: 3-hour sessions once per week for seven months (32-week course) and the 40-hour course during the OR Governor's Occupational S &H Conference.

Comprehensive site safety, health, and environmental auditing

*Experienced in public hearings testimony* for proposed new and modified projects, *OSHA legal testimony and expert witness work*: for plaintiffs and defendants, civil and criminal cases; before hearings boards,

DUB000638

administrative law judges, boards of appeal, and county, state and federal courts: Washington, Oregon, Indiana, Connecticut, California, Pennsylvania, Texas, and Alaska. Prevailed in 40 of the 43 cases. Many cases were settled prior to trial; those that went to trial resulted in awards of various kinds, including monetary awards ranging from $40,000 to $4,900,000. One case resulted in the only criminal conviction (homicide) for an OSHA violation in Alaska state history.  Also testified before the U.S. Congressional Committee on Oversight and Government Reform.

*Environmental Advisor* for post-war environmental remediation efforts in Bosnia and Herzegovina. Reported to the Director of Operations of the OSCE (*Office of Security and Cooperation in Europe*) Bosnian Mission, headquartered in Sarajevo. Includes liaison work and interfacing with the European Union (EU) Stabilization Force and NATO officials.

WORK EXPERIENCE
4/1986 - Present   DeVANY INDUSTRIAL CONSULTANTS, Vancouver, WA, USA; international public and private sector consulting in *occupational safety, industrial hygiene, environmental protection, and community health*

6/1980 - 9/1986  UNION CARBIDE CORPORATION, based at USA facilities in East Chicago, IN and Washougal, WA  Progressive promotions to *Manager of Health, Safety, and Environmental Affairs, and Director of Product Safety and Liability, Electronics Division* internationally.

Responsible for overseeing the safety, health, and environmental affairs of two electronics plants, and product safety and liability for the Electronics Division worldwide. This included 35 plants with 27,000 people throughout North America, Europe, and Asia; and the approximately 70 occupational health physicians, industrial hygienists, environmental engineers, safety professionals, and occupational health nurses located within the Division and its five subsidiaries at these sites.

Work experience after graduate school through spring of 1980, included Factory Mutual Engineering Association, Rolling Meadows, Illinois, USA, as a *Loss Prevention and Control Engineer.*

EDUCATION
- MS   Area of Concentration, Biochemistry, Biology Dept., Loyola Univ. of Chicago, Chicago, Illinois, USA, 1977; *University Fellow*, 1976-1977. Graduated Summa Cum Laude (4.0 gpa/4.0 scale)
- BS  Biology, concentrations/minors in chemistry, physics, math, and human anatomy; Univ. of Illinois, Champaign/Urbana, Illinois, USA, 1975;  graduated with honors

PROFESSIONAL MEMBERSHIPS
- American Society of Safety Engineers (ASSE)
- American Industrial Hygiene Association (AIHA)
- Academy of Certified Hazardous Materials Managers (ACHMM)
- Board of Certified Safety Professionals of the Americas (Board of CSP's)
- Northwest Environmental and Energy Professionals (NEEP)
- American Public Health Association (APHA)

PROFESSIONAL LEADERSHIP POSITIONS (PAST AND CURRENT - HIGHLIGHTS ONLY)
- *Member* and *Chairperson* of the *Washington State Governor's Accident Prevention Panel* (ASSE nominated, Governor confirmed appointment)
- *Executive Board, Chairman* of the Professional Development and Membership Committees, *Secretary*, and *Treasurer* of the Columbia-Willamette (Portland, OR, USA) chapter of the (ASSE)
- Safety Sub-committee *Program Co-Chairman* for the Oregon Governor's Occupational Safety & Health Conference
- *Board of Directors* of the Silicon Forest Safety Professionals
- *Member* of the *Oregon Governor's Occupational Safety and Health Steering Committee*

DUB000639

- *Professional Development Chair* and *Northwest Conference Coordinator* - Semiconductor Safety Association
- *Section Chair* of the Mt. St. Helens Section of the American Society of Safety Engineers
- *Chair* (also secretary and vice-chair) - National Confined Spaces Committee, (AIHA); current member
- *Session Chairperson* and *Arranger* for the Emerging Issues, Joint Industrial Hygiene Ethics Education, Social Concerns, and Confined Spaces national committees for the American Industrial Hygiene Association Annual Conference and Exposition (1993-2002)
- *AIHA representative* on the 10-person *International Joint Industrial Hygiene Ethics Education Committee* (4-year term, 1997-2001)
- *Member* of the 10-person International *Taskforce on Global Sweatshops* (2000-2002)
- *Chair* (also secretary and vice-chair) - National Social Concerns Technical Committee, AIHA (2001); current member
- *Chair* (also secretary and vice-chair) - National Emerging Issues Technical Committee, AIHA (2002); past member
- *Member,* Occupational Health Leadership Committee, American Public Health Association
- *Workplace Environmental Advisor* – Sierra Club, San Francisco, CA

## PROFESSIONAL PRESENTATIONS AND PAPERS (HIGHLIGHTS ONLY)

- *International Occupational Safety and Health Best Practices Forum* - Brisbane, Australia - Hazards of Confined Space Entry
- *Asian-Pacific Occupational Safety and Health Conference* - Seoul, South Korea - Fall Protection/Arrest and Retrieval Systems
- *American Industrial Hygiene Association (AIHA) National Conference and Exposition* -- USA: San Diego, Atlanta, Dallas, Kansas City, Los Angeles, Washington D.C., Philadelphia, New Orleans and others, and Toronto, Canada - on Professional Ethics, Confined Space Atmospheric Hazards Detection (half day seminar), Safe Handling of Compressed Gas Cylinders (half day seminar), Emerging Issues, Environmental Health, and Social Concerns
- *National Academy of Certified Hazardous Materials Managers* - Seattle, Portland, OR – Confined Space Entry; Safe Handling of Compressed Gas Systems; Effects of Hazardous Materials on the Reproductive System
- *Oregon Governor's Occupational Safety and Health Conference* - Portland, OR - Health Effects of Vibration, The Safety and Health Professional as the Expert Witness; Safe Confined Space Entry, Safe Handling of Compressed Gases, Respiratory Protection, Chemical Hazard Communication, Reproductive System Toxicology, Comprehensive CIH and CSP Certification Overview and Preparation Course
- *Washington Governor's Occupational Safety and Health Conference* - Seattle and Spokane - Evaluating and Specifying Personal Protective Equipment, Teaching Your Safety Committee to Conduct Thorough Plant Safety Audits, Hazards of Confined Space Entry, and others
- *Alaska Governor's Occupational Safety and Health Conference* - Anchorage - The Environmental Safety and Health Professional on the Witness Stand, Reproductive System Toxicology
- *Clark County Safety and Environmental Professionals* - Vancouver, WA - The Process Safety Standard - Rules and Requirements; The New Respiratory Protection Standard, Changes in WISHA's Fork Lift Truck Rules; Practical Implementation of the Lockout/Tagout Rules, Chemical Emergency Response and Remediation, and others
- *American Society of Safety Engineers (ASSE)* - Portland, OR and Longview, WA - Bloodborne Pathogens; Reproductive System Toxins and Toxicology; Health Hazards of Cutting, Burning and Welding; Overview of EPA Regulations and Requirements (half day), Health Effects of Ionizing and Non-Ionizing Radiation; Accident Investigation; Implementing the Hazard Communication Standard (full day seminar); and others

## OTHER PROFESSIONAL PUBLICATIONS

- Books, book chapters, and professional journal articles available for review upon request.

DUB000640

## COMMUNITY VOLUNTEER ACTIVITIES AND RECOGNITIONS (HIGHLIGHTS ONLY)

- Clark County, WA, USA, Girl Scout Leader, Daisies, Brownies, Juniors, and Cadettes - 1988-1993
- National Science Olympiad Coach - 1995-2001, Division B (grades 6-9) and Division C (grades 9-12)
- Lewisville Middle School, Outstanding Volunteer, 1996-97
- American Industrial Hygiene Association award of *Fellow*
- Selected by the NW Women's Journal as one of the *100 Most Powerful Women in the Northwest*, August, 2007.

## AWARDS RECEIVED (HIGHLIGHTS ONLY)

- *Safety Professional of the Year*, 1989 - American Society of Safety Engineers (ASSE), Mt. St. Helens Section (Longview, WA, USA), *and* Columbia-Willamette Chapter (Portland, OR, USA)
- *Region Safety Professional of the Year*, 1990 - as selected from the ASSE regional membership of over 3000, representing Oregon, Idaho, Alaska, Hawaii, Montana, and Washington
- *Fellow - American Industrial Hygiene Association, 2008*

DUB000641

# Expert Testimony by Mary C. DeVany

Cases in which the witness has testified at trial or by deposition since July 1, 2004 are listed below.

## Court Testimony

| | |
|---|---|
| October 24, 2005 | State of Oregon, Wasco Circuit Court<br>Cheryl Knapp v. Temple Distributing, Inc. |
| July 19, 2007 | Committee on Oversight and Government Reform<br>U.S. House of Representatives<br>FEMA's Toxic Trailers |
| July 29, 2008 | Board of Industrial Insurance Appeals: Lonview, Washington<br>Steven R. Vaughn v. Noveon Kalama, Inc. |
| March 25-26, 2009 | Sterling Lewis v. Berwind Corporation and CRC Industries, Inc.<br>Philadelphia Court of Common Pleas; September Term 2006, No. 815<br>Philadelphia, Pennsylvania |

## Deposition Testimony:

| | |
|---|---|
| July 29, 2008 | Board of Industrial Insurance Appeals: Lonview, Washington<br>Steven R. Vaughn v. Noveon Kalama, Inc. |
| October 7, 2008 | In re FEMA Trailer Formaldehyde Products Liability Litigation, MDL No. 07-1873, New Orleans, Louisiana |

DUB000642

# FEE SCHEDULE

These prices are effective through 6/1/10

## Personnel:

| | |
|---|---|
| President, legal disputes and litigation support | 205.00/hour |
| Principal Partner, legal disputes and litigation support | 155.00/hour |
| Certified Safety Professional, Certified Industrial Hygienist, Certified Hazardous Materials Manager | $130.00/hour |
| Industrial hygiene or occupational safety technician | 85.00/hour |
| Clerical and secretarial support staff | 60.00/hour |
| Passive air sampling technician | 55.00/hour |

## Equipment:

| | |
|---|---|
| Industrial hygiene personal sampling pump | $25.00/day |
| Industrial hygiene pump calibrator | 35.00/day |
| Detector tube pump | no charge |
| Light meter | 20.00/day |
| Velometer/air velocity meter | 25.00/day |
| Industrial hygiene personal noise dosimeter | 25.00/day |
| Sound level meter with octave band analyzer | 50.00/day |
| Sound/noise decibel calibrator | no charge |
| 4-gas data-logging gas analyzer | 50.00/day |
| Temperature/humidity direct reading instrument | no charge |
| Temperature/humidity data logging instrument | 15.00/day |

DUB000643

## Travel and Other Expenses:

| | |
|---|---|
| automobile mileage | IRS rate |
| Parking, air fare, lodging, meals, and ground transportation | cost plus 10% handling |
| Other expenses, such as phone calls, copies, shipping charges, laboratory analyses, sampling and media | cost plus 10% handling |

A 2% service fee will be assessed for all invoices not paid within 30 days of date of invoice.

DUB000644