Exhibit C

Mary DeVany
July 31, 2009

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS DIVISION


IN RE: FEMA TRAILER          *     MDL NO. 1873
        FORMALDEHYDE          *
        PRODUCTS LIABILITY    *
        LITIGATION            *     SECTION: N(5)
                              *
This Document Relates to:    *     JUDGE: ENGELHARDT
Charlie Age, et al. v.       *     MAG: CHASEZ
Gulf Stream Coach Inc.,      *
et al., Docket No. 09-2892 *




VIDEOTAPED DEPOSITION OF MARY C. DeVANY, MS, CSP, CHMM

Taken on behalf of Defendants

Portland, Oregon

July 31, 2009

--oOo--

Mary DeVany
July 31, 2009

1      Loyola University of Chicago, it would reflect that

2      you took a graduate level course in statistics for

3      scientists at Loyola University of Chicago?

4   A. I'm not sure.  It would say probably the name of the

5      course, "Statistics," but it would reflect that,

6      yes.

7   Q. All right.  So you've mentioned one.  Any other

8      statistics courses at the graduate level that you've

9      taken?

10  A. You know, I don't remember all the courses I took in

11     grad school.

12  Q. How about graduate level mathematics courses?

13  A. No.

14  Q. You have not taken any?

15  A. Not -- not as -- not in graduate school.

16  Q. And you don't have a degree in mathematics?

17  A. I do not.

18  Q. We may get back to talking some more about your

19     husband's participation, but let me go ahead right

20     now -- this may be a time -- let's go ahead and talk

21     about exactly what it is you do and what your

22     expertise is.  And I want to do this early on so

23     that we can then get into the guts of the report.

24          But, number one, you're not a physician,

25     correct?

Mary DeVany
July 31, 2009

1    A.   No, sir.

2    Q.   You never attended medical school, have you?

3    A.   Yes, I have.

4    Q.   You've attended medical school?

5    A.   Yes, I have.

6    Q.   Did you graduate from medical school?

7    A.   No.  I quit.

8    Q.   All right.  Now I understand the answer.

9         You are not an expert in medical diagnosis, are

10        you?

11   A.   No.  But I finished a lot of medical courses as a

12        medical student.

13   Q.   But just to make sure, with that qualification, you

14        are not an expert in medical diagnosis, are you?

15   A.   I am not a physician, no.

16   Q.   All right.  Are you an expert in taking medical

17        histories?

18   A.   You know, this is -- this is a very difficult line

19        of questioning.  In the field of industrial hygiene,

20        we have to take medical histories.  We have to -- we

21        have to evaluate medical complaints, differentiate

22        between medical symptoms and medical signs, review

23        medical records, and try to figure out someone's

24        actual medical profile, and then determine what it

25        is that might be causing it as an occupational or

Mary DeVany
July 31, 2009

Page 51

1      Association -- I think late this fall or early

2      winter is when it's scheduled to be published.

3      Whether it's still on track for that date, I'm not

4      sure.  But, yes, I did.

5   Q.  All right.  Has any of the research that you've done

6      on the diagnosis of psychological conditions that

7      you've just outlined, has any of it been peer

8      reviewed research?

9   A.  No.

10  Q.  Now, I'm hopeful that this will go a little quicker

11     because you've actually already been asked these

12     questions and answered these questions in the class

13     cert.  I just want to make sure there's no change.

14         You're not a toxicologist, are you?

15  A.  I am not a toxicologist.

16  Q.  And you're not an epidemiologist, are you?

17  A.  I am not an epidemiologist.

18  Q.  Now, have you had any graduate level courses in

19     epidemiology?

20  A.  Yes, I have.

21  Q.  All right.  Where?

22  A.  From the University of Illinois in Champaign,

23     Illinois.

24  Q.  Were they residence -- in-residence courses, or were

25     they correspondence?

Mary DeVany
July 31, 2009

Page 52

1   A.   I took a correspondence course, a graduate level

2        course in epidemiology from the University of

3        Illinois when I was in graduate school at Loyola

4        University because Loyola didn't have any good

5        offerings in epi, and the University of Illinois has

6        a very rigorous program, and I wanted to take it

7        from there.  But logistically I couldn't take it

8        on-site, so it was correspondence.

9   Q.   So that's one course, correspondence --

10  A.   One course.

11  Q.   -- course that you took, graduate level

12       epidemiology, correct?

13  A.   When I was in grad school, yes.  I've taken

14       others -- I've studied epidemiology in other

15       seminars, courses, and short courses since that

16       time.

17  Q.   Seminars given by whom?

18  A.   Oh, organizations as widespread as Berkeley --

19       University of California Berkeley, George Washington

20       University, Harvard, American Industrial Hygiene

21       Association, University of Chicago, those sorts

22       of -- National Library of Medicine.  Various courses

23       over the years.  I've been practicing for a long

24       time.

25  Q.   Now, you're not an engineer, are you?

Mary DeVany
July 31, 2009

Page 53

1   A.  No.

2   Q.  You don't have an engineering degree, do you?

3   A.  No, I don't have an engineering degree.

4   Q.  You don't have any professional certifications or

5       licenses in engineering, do you?

6   A.  No.  Can I elaborate on that, though, please?

7   Q.  Well, unless it's responsive, I would ask you to

8       only answer the question so I don't have to move to

9       strike it.

10  A.  Okay.

11  Q.  But if you've got something that --

12  A.  My first job after grad school was as an engineer in

13      loss control, so I got special training from Mutual

14      Engineering in loss control engineering.  So I do

15      not have -- I'm not a professional engineer,

16      certified, but special advanced training in

17      engineering, loss control engineering.

18  Q.  Okay.  You do not have a degree in statistics or

19      quantitative methods, do you?

20  A.  No, sir.

21  Q.  You do not have a degree in mathematics, do you?

22  A.  No.

23  Q.  Have you ever worked as an employee of a

24      manufacturing facility?

25  A.  Yes.

Mary DeVany
July 31, 2009

Page 54

1   Q.   Where?

2   A.   Union Carbide Corporation in East Chicago, Indiana,

3        is one of the locations.

4   Q.   Okay.  I'm sorry.  I thought you were finished.

5   A.   I also worked for Union Carbide Corporation, two of

6        their facilities in Washougal, Washington, after I

7        spent two years in East Chicago, Indiana.

8   Q.   What were the jobs in the Union Carbide facilities?

9   A.   In the Union Carbide facility in East Chicago, I was

10       responsible for occupational safety, occupational

11       health, industrial hygiene, environmental affairs,

12       employee training, and all engineering operations

13       and training for all aspects of the facility.

14            It was the world's largest industrial specialty

15       gas plant.  We dealt with flammable, corrosive,

16       poisonous, and toxic gases and liquids in huge

17       quantities.  Like I said, it was the world's largest

18       specialty gas plant.  Anything that is a gas, we did

19       it there.

20   Q.   Now, I need to ask you this question.  Do you

21       consider yourself an industrial hygienist?

22   A.   I do.

23   Q.   Are you certified by any organization as an

24       industrial hygienist?

25   A.   No.

Mary DeVany
July 31, 2009

Page 56

1    examinations and pass every aspect in the field to

2    become certified.

3 Q.  You don't have a degree in industrial hygiene, do

4    you?

5 A.  No.

6 Q.  And there are universities that offer degree

7    programs specifically in industrial hygiene,

8    correct?

9 A.  There are some, yes.

10 Q.  And you've already indicated you don't have a degree

11    in engineering.  There are some universities that

12    offer degrees in the field of safety engineering,

13    correct?

14 A.  There are a few, right.

15 Q.  But you don't hold such a degree, correct?

16 A.  No.

17 Q.  Now, you're also indicating that you are a certified

18    hazardous materials manager at the master level,

19    correct?

20 A.  Yes.

21 Q.  What organization gives you that certification?

22 A.  The Institute of Hazardous Materials Management.

23 Q.  And you indicated that this is at the master level,

24    correct?

25 A.  Yes.

Mary DeVany
July 31, 2009

Page 66

1       report about the ventilation system.  The

2       information I had I think I got after I wrote my

3       report, so I do not believe my report addresses the

4       ventilation system.

5           And I really don't mean to hedge.  I just -- I

6       don't think I did in my report have the information

7       available at the time.

8   BY MR. PERCY:

9   Q.  So it wouldn't have been appropriate for you to

10     express any opinions in your report about the

11     ventilation system if you didn't have the

12     information, correct?

13   A.  No, sir, because I didn't have information to

14     evaluate it, and I have never been there personally.

15   Q.  Okay.  You've never designed an RV or a trailer,

16     have you?

17   A.  No.

18   Q.  Are you familiar with a field of study called wood

19     science?

20   A.  Yes.

21   Q.  Are you an expert in wood science?

22       MR. TAAFFE:  Objection, form.

23       THE WITNESS:  No.  Actually, there's a lot of

24     things encompassing wood science, though.  But we

25     won't go there.

Mary DeVany
July 31, 2009

Page 67

1      BY MR. PERCY:

2      Q.   Have you ever done a study on the availability of

3           materials for the production of RVs in this country

4           at or about the time that Hurricane Katrina hit?

5               And make sure you understand.  My question is:

6           Have you ever done a study of the availability of

7           materials used in the manufacture of RVs in this

8           country at the time that Hurricane Katrina hit?

9      A.   No, sir.

10     Q.   Before we get into the guts of your report, you

11          indicated previously, I think, that you've never

12          spoken to Alana Alexander, correct?

13     A.   That's correct.

14     Q.   There is a whole lot of information, I think you

15          would agree, in this report involving Ms. Alexander

16          and her family's style of living, certain behavioral

17          activities in the trailer.  If you had never spoken

18          to Ms. Alana Alexander, where did that information

19          come from?

20     A.   You are -- that's my report you're looking at,

21          right?

22     Q.   Yes.

23     A.   I just want to clarify that.

24              Where did that information come from?  It came

25          from the documents in my reliance file and

Mary DeVany
July 31, 2009

Page 72

1        where I got the information.

2   BY MR. PERCY:

3   Q.  Well, you do understand that when an expert

4        testifies, an expert renders conclusions based upon

5        facts that the expert either observes him- or

6        herself or is provide by someone, correct?

7   A.  Yes.

8   Q.  All right.  And facts are very important, because if

9        the facts are wrong, there's a serious problem with

10       the expert's opinion, correct?

11            MR. TAAFFE:  Objection, form.

12            THE WITNESS:  No, not necessarily.

13   BY MR. PERCY:

14   Q.  Not necessarily?  But often that is the case, isn't

15       it?

16            MR. TAAFFE:  Objection, form.

17            THE WITNESS:  It can be the case, yes.

18   BY MR. PERCY:

19   Q.  And temperature is a significant issue with regard

20       to formaldehyde issues; you would agree with that,

21       wouldn't you?

22            MR. TAAFFE:  Objection, form.

23            THE WITNESS:  It's one of the variables.

24   BY MR. PERCY:

25   Q.  It's an important variable, isn't it, Ms. DeVany?

Mary DeVany
July 31, 2009

Page 73

1    A.   It is an important variable.

2    Q.   And that is precisely what that particular factual

3         scenario relates to, is the internal temperature of

4         the Alexanders' trailers, correct?

5              MR. TAAFFE:  Objection, form.

6              THE WITNESS:  No.

7    BY MR. PERCY:

8    Q.   No?  Excuse me.  Whether they use or do not use

9         their air conditioner does not relate to the

10        internal temperature of the Alexanders' unit?

11   A.   Let's not twist this.  It will bring the temperature

12        down, but then -- then the unit is sealed up, and so

13        there's -- when you're running your air conditioner,

14        you don't have the windows open, or the air

15        conditioner won't work.  So the temperature might

16        come down, but then there's no ventilation in the

17        unit, so the formaldehyde will build up.  So I think

18        they cancel each other out.

19   Q.   We'll get to all of that.  But I do want to -- when

20        you had conversations with counsel and counsel was

21        providing to you factual information on which you

22        were supposed to base your report -- for example,

23        whether the Alexanders used their air conditioner or

24        didn't use their air conditioner -- are you telling

25        us you didn't take notes of that?

Mary DeVany
July 31, 2009

Page 131

1      event -- whether it's an occupied or unoccupied

2      trailer, during the sampling event, the windows and

3      doors should be closed.  That's what I'm trying to

4      find out.  That was your testimony.  I'm trying to

5      find out if the protocol actually says that.

6           So let's take another break, and we'll give you

7      plenty of time -- take as much time as you need to

8      find that, Ms. DeVany.

9   A.  Is that my testimony?  Did I say it was in the

10     protocol?  I don't believe I said that.

11  Q.  I think you said you -- the record will reflect, but

12     I believe you said you believed it did say that for

13     the testing of unoccupied trailers.

14  A.  I believe I said that was our standard practice, and

15     I think it's in the protocol, but I'm not sure.  So

16     let's -- if you really want me to go through this, I

17     will.

18          MR. PERCY:  Let's take a break.  We'll go off

19     the record and give you time.

20          THE VIDEOGRAPHER:  We're going off the record

21     now.  The time is approximately 11:57.

22               (Discussion off the record.)

23               (Midday recess 11:57-1:08.)

24          THE VIDEOGRAPHER:  We are now going on the

25     record.  The time is approximately 1:08 p.m.

Mary DeVany
July 31, 2009

Page 288

1    analysis specific to the Alexander trailer of the

2    air changes per hour while the Alexanders were

3    residing in the travel trailer?

4  A.  That -- no formal -- yes, that would be correct.  I

5    have not been to the trailer.

6  Q.  You've never seen the trailer?

7  A.  I have not seen it in person.

8  Q.  Okay.  You mentioned earlier that you are a

9    certified safety professional; is that right?

10  A.  Yes, sir.

11  Q.  Who confers the certified safety professional

12    designation?

13  A.  The Board of Certified Safety Professionals of the

14    Americas.

15  Q.  Did you have to take a written exam or a test of

16    some kind to become certified?

17  A.  Two exams.  Two written exams.

18  Q.  Two written exams.

19        And when did you become a certified safety

20    professional?

21  A.  1987 or thereabouts.

22  Q.  Did you pass both exams the first time you sat for

23    them?

24  A.  I did.

25  Q.  And am I correct that the American Board of

Mary DeVany
July 31, 2009

Page 289

1      Industrial Hygiene confers the certified industrial

2      hygienist designation?

3   A.  Yes.

4   Q.  And in order to become a certified industrial

5      hygienist, am I correct that you also need to take a

6      written examination and pass it to become certified?

7   A.  Yes.

8   Q.  And have you ever taken a certified industrial

9      hygienist written examination?

10  A.  Many, many years ago I did sit for it once.

11  Q.  And did you pass or fail that test?

12  A.  I did not pass.

13  Q.  Did you fail the test?

14  A.  Yes, sir.

15  Q.  Do you remember when that was?

16  A.  20 years ago, at least.  A long time ago.

17  Q.  And you've never taken the test since to become a

18      certified industrial hygienist?

19  A.  Not to my recollection.

20  Q.  Is there a possibility that you failed it more than

21      once?

22  A.  You know what?  I could check my records for you and

23      give you a definitive answer on that, but I'm not

24      sure right now.  It's been a long, long time since I

25      took it.

Mary DeVany
July 31, 2009

Page 290

1   Q.   Well, how many times have you sat and taken the
2        exam?
3   A.   Well, that was your question, and I appreciate your
4        question, but I believe I've only sat for it one
5        time, but I'm not sure.
6   Q.   But there's a possibility that you sat twice?
7   A.   Well, I know that you can't sit for it more than
8        twice without special approval, so I don't know.  I
9        don't know.
10  Q.   Regardless of how many times you sat for the exam,
11       whether it's once or twice, you have not passed the
12       exam?
13  A.   No.  I didn't study for it, I just took it.
14  Q.   Do you have any current plans to take the certified
15       industrial hygiene exam?
16  A.   I have been widely recognized in the field of
17       industrial hygiene by my peers as being a superior
18       industrial hygienist --
19  Q.   Is that a no, you have no current plans?
20  A.   -- and I don't have any need to at this point.
21  Q.   You don't need to become certified, in your opinion?
22  A.   At this point, no, sir.
23  Q.   I note in your report that you have a Master's
24       degree from Loyola University of Chicago in biology.
25       Is that correct?

Mary DeVany
July 31, 2009

1    A.   That's -- that's the degree conferred, yes.

2    Q.   Okay.  Does the Loyola University of Chicago offer a

3         Master's degree in the field of biochemistry

4         specifically?

5    A.   No, and so that's why they have areas of

6         concentration in the biology degree.

7    Q.   Would the same be true of human physiology?

8    A.   Correct.

9    Q.   So Loyola University --

10   A.   At least at that time they didn't.  I'm not sure

11        about right now.

12   Q.   Are there universities in the United States,

13        however, that do offer Master's degrees in

14        biochemistry and/or human physiology?

15   A.   Yes.

16   Q.   There are?  Have you ever held yourself out as

17        actually having a Master's degree in biochemistry as

18        opposed to biology?

19   A.   It's -- my Master's degree is in biology.  My areas

20        of concentration are human physiology and

21        biochemistry, so it's a very fine line there.

22   Q.   I understand.  My question is very narrow.  Have you

23        ever held yourself out as having a Master's degree

24        in biochemistry or human physiology as opposed to

25        biology?

Mary DeVany
July 31, 2009

Page 292

1    A.   I'm not sure.  I -- they're right on top of each

2         other.

3    Q.   Well, it would be incorrect, wouldn't it, to assert

4         that you hold a Master's degree in biochemistry or

5         human physiology?  Your Master's degree is in

6         biology, correct?

7    A.   It would be technically incorrect, yes.  And it

8         would be a Master of Science, not a plain Master's,

9         also, so it's an MS.  It's --

10   Q.   So a Master's of Science?

11   A.   I mean, those are all technical corrections, as

12        well.

13   Q.   All right.  And it's important under your code of

14        ethics, of course, to be accurate in the way in

15        which you present yourself to the public and how you

16        characterize your degrees and your academic

17        achievements?

18   A.   And to portray them in -- in a true light, yes.

19   Q.   Yes.  Okay.

20            Do you recall testifying in a case called, In

21        re: Steven R. Vaughn in Longview, Washington, last

22        summer?

23   A.   Yes.

24   Q.   I'm going to pass you down --

25            MR. SCANDURRO:  I have extra copies of this.

Mary DeVany
July 31, 2009

Page 293

1        If you could leave one with the witness, please, and

2        give one to Pete.

3              THE WITNESS:  Thanks.

4              MR. SCANDURRO:  I don't know how many I have.

5              MR. TAAFFE:  Which page?

6    BY MR. SCANDURRO:

7    Q.  What I've done, Mrs. DeVany, is I have provided you

8        with a copy of a transcript of what appears to be

9        your testimony in the case of, In re: Steven R.

10       Vaughn.

11             Am I correct that that was a case pending

12       before the Board of Industrial Insurance Appeals in

13       the state of Washington?

14   A.  Yes.

15   Q.  And you testified --

16   A.  To my knowledge.

17   Q.  -- under oath on July 29th, 2008 --

18   A.  I did.  I think that was the date, yes.

19   Q.  And if you could turn to page 48, ma'am, of that

20       transcript, on your direct examination.  It started

21       from a Mr. Colven.  Was that the attorney --

22   A.  Bruce Colven, yes, sir.

23   Q.  Was that the attorney who had retained you as an

24       expert?

25   A.  It is.

Mary DeVany
July 31, 2009

Page 317

1    Q.   And what are the documents that you've read?

2    A.   Documents that relate to the layout and the design

3         of the Gulf Stream trailer, the small cubic foot

4         area in proportion to the surface area of -- or the

5         small air volume in relation to the --

6    Q.   Yes, ma'am.

7    A.   Do you want me to answer or do you want to say

8         something?

9    Q.   Well, I --

10   A.   It's your time.  It's --

11   Q.   It's my time, and I don't have much of it, and I

12        appreciate your answer, but I had a very specific

13        question.

14             The stuff that you read, was it documents and

15        reports generated by other Plaintiff experts in this

16        case?

17   A.   No.  I'm not sure if we had any other reports;

18        certainly no depositions at this time when my report

19        came out.

20   Q.   So your opinion, if I can boil it down, is that the

21        air volume inside the trailer is too small in

22        relation to the number of wood products that are

23        inside the travel trailer and the ventilation rate

24        isn't good enough?

25   A.   Those are two important consider -- yes, two.

Mary DeVany
July 31, 2009

Page 318

1    Q.  Yes, ma'am.  That's what's in here under B, so
2        that's why I focussed on it.
3            And the -- the low ventilation rates -- again,
4        I just want to be clear.  You have not attempted to
5        test actual in-use ventilation rates in the
6        Alexander travel trailer, correct?
7    A.  I have not, no.
8    Q.  And you'd agree with me generally that the small air
9        volume or small area inside of a travel trailer
10       compared to a mobile home is in fact a benefit in
11       terms of air exchange and turning the air over when
12       you open the windows and the door?
13   A.  It allows for a faster air exchange, if that's your
14       question.
15   Q.  Yes.
16   A.  I mean, all things being equal -- I mean, with the
17       same cubic foot per minute and movement.
18   Q.  Yes, ma'am.  Do you know if HUD requires
19       formaldehyde ambient air screening of HUD
20       manufactured homes --
21   A.  Ambient air screening --
22   Q.  -- prior to selling?
23   A.  It's my understanding that HUD requires screening of
24       the emissions of the wood products themselves that
25       go in.  And also HUD requires the manufacturers to

Mary DeVany
July 31, 2009

Page 319

1    do an evaluation of other formaldehyde emitting

2    materials that go into the construction of their

3    units to help determine the overall air

4    concentration.  But this is mobile homes.

5  Q.  Right.

6  A.  And this is a travel trailer.  So we have to be

7      careful here.

8  Q.  Right.  And you're not aware of any HUD requirement

9      or other government requirement in 2004 that would

10     have required any travel trailer manufacturer to

11     conduct ambient air formaldehyde testing at the

12     factory?

13  A.  I am not aware of any in the United States, no.

14      Excuse me.  But this argument was a defective

15      design, not were they complying with minimum

16      standards.

17  Q.  Yes, ma'am.  And you're not an architect, are you?

18  A.  No, sir.

19  Q.  And you're not a licensed contractor?

20  A.  No, sir.

21  Q.  And we've already established you're not an

22      engineer -- structural engineer?

23  A.  I am not a licensed structural engineer.

24  Q.  And you've never designed or built a travel trailer

25      or worked for anyone who did?