# First General Services of the South, Inc.

*Insurance Repair Specialists*

P. O. Box 80857, Lafayette, LA 70598-0857 Phone: (337) 988-3556
103 Bradbury Crossing, The Village of River Ranch, Lafayette, LA 70508 Fax: (337) 988-1264

July 17, 2009

Re:   FEMA Trailer Formaldehyde Products Liability Litigation
      United States District Court
      Eastern District of Louisiana

Aldridge, et al. V. Gulf Stream         MDL No. 1873 Section N(5)
      Coach, Inc., et al.
                                        Judge Engelhardt
No. 07-9228

Subject: FEMA Dubuclet Report

## PREAMBLE

In accordance with your request, this organization made onsite inspections, observations and an evaluation to determine the following:

1.      Was the use of the trailer by the Dubuclet family, as it was set up by FEMA and its contractors, a reasonably anticipated use, such that Fleetwood should have reasonably expected it to be used in this manner given its alterations made by FEMA and others and its deployment to the gulf coast of Louisiana?

2.      Were the elevated levels of formaldehyde recorded and documented in the trailer occupied by Ms. Elisha Picot Dubuclet, Timia Dubuclet, Timothy Dubuclet and Ms. Leslie Picot arising from an unreasonably unsafe condition as a result of its design, construction, and the trailer's failure to conform to an express warranty of Fleetwood, the manufacturer?

3.      Could the trailer have been designed or constructed differently by

DUB000683

Fleetwood, such that it would have served the same purpose and posed less danger to the occupants?

4.      Did Fleetwood provide any warnings about the dangers of formaldehyde?

5.      Did Fleetwood provide any instructions with the trailer as to the elimination / mitigation of formaldehyde emissions?

6.      Did Fleetwood learn of the source of formaldehyde levels in their products before or after the manufacture and setup?

7.      Assuming Fleetwood obtained the knowledge of excessive formaldehyde levels in their products, did they warn the Dubuclet family of the issue and provide them any adequate instructions as to how to eliminate / mitigate formaldehyde emissions in their trailer?

8.      Have changes been made in the specifications for the procurement of FEMA temporary housing units?

The parameters of this report are limited to review of documents provided, review of documents researched, review and observations of the FEMA trailer in question and interviews with various individuals.

## BACKGROUND INFORMATION

It is understood that the Dubuclet's family home located at 6046 Dorothea, New Orleans, Louisiana was severely damaged on or about August 29, 2005 with the passage of Hurricane Katrina through the New Orleans area subsequently making the house unliveable.

1.      The house was occupied at the time of Hurricane Katrina by Ms. Elisha Picot Dubuclet, Timia Dubuclet, Timothy Dubuclet and Ms. Leslie Picot.

2.      FEMA provided living accommodations for the Dubuclet family.  The accommodations came in the form of a FEMA model travel trailer known as a temporary housing unit (THU).

DUB000684

3.    According to information provided, the trailer was manufactured by Fleetwood Travel Trailers of Texas, Inc.  The date the trailer was manufactured was March 2006.  The vehicle I.D. number is 4GJ1F322764015272.  The vehicle type is an 32 FSH travel trailer.  The FEMA number is 1373963.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph Nos. 1, 2, 7 and 11.

4.    One of the labels observed on the left side of the trailer at the left of the exterior door states, the "**MANUFACTURER CERTIFIES COMPLIANCE WITH FEMA SPECIFICATIONS. EMERGENCY LIVING UNIT.  NOT INTENDED FOR RECREATIONAL PURPOSES**." (Emphasis added.)  The identification number 1015188 is stamped on the label.  The manufacturer is certifying that their product has been built in compliance with FEMA specifications.  This will be discussed further in the report.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photograph Nos. 73 and 74.

5.    The Fleetwood FEMA temporary housing unit was apparently constructed as per the minimum procurement specifications for FEMA Model Travel Trailers, dated August 12, 2004.  Other than a FEMA Procurement Specification dated April 2006, no other was provided by Fleetwood.

The standards state that "the travel trailers being procured under this contract are for the purpose of providing temporary housing.  The units are subjected to continuous road travel, multiple installations and deactivations, and various weather conditions.  The standards shall not be considered restrictive in that the supplier may provide equal or better units considering that the competitive price and delivery requirement can be met."

The construction outfitting standards identify minimum square footage of living space, floor plan configuration, finishes, finishing and

DUB000685

environmental living conditions necessary to provide emergency housing for disaster relief operations.  All exterior openings, such as windows, doors, drain pipes, etc...will be caulked with a clear, non-hardening waterproof sealant to prevent air and moisture penetration.

The units shall meet industry standards except where identified.

The specifications establish the minimum standards for travel trailer construction and outfitting to meet FEMA contract requirements.  "The manufacturer shall design and construct all units under this contract within a superior grade quality of workmanship."

On page two of four of the Procurement Specifications, the trailer occupied by the Dubuclet family was to be constructed without a holding tank and the sewer lines were to be extended for external hookup.  The indications are this trailer was specified to be constructed specifically for long-term use and not for recreational short-term use.

Please see Enclosure 2, FEMA Model Travel Trailer Procurement Specifications, dated August 12, 2004, page four of four, Bate Stamped: FLE-00006914-6917.

6.     The Dubuclet family moved into the temporary housing unit on or about June 2, 2006.  Upon moving into the temporary housing unit, Ms. Dubuclet stated she noticed an odor; however, she did not know the origin of the odor.

7.     Ms. Dubuclet stated her son began having increased asthma-related issues and she took him to the doctor for these issues.

8.     The Dubuclets moved away from the FEMA temporary housing unit on or about September 2007.

9.     A review of documents produced by FEMA, indicated that FEMA began to receive complaints from those living in the temporary housing units within two months of their occupancy.

DUB000686

10.     The temporary housing unit was returned to the Lottie, Louisiana storage site.

11.     The FEMA temporary housing unit occupied by the Dubuclet family is presently located at 5310 Old State Highway, Lottie, Louisiana 70756, at the FEMA temporary housing unit storage site.

12.     Inspections by the First General Services of the South, Inc. group began at 7:30 a.m. on Wednesday, July 8, 2009 and concluded at approximately 11:00 a.m. that morning.  Inspections and testing resumed at 7:30 a.m. on Thursday, July 9, 2009 and concluded around 2:00 p.m. that afternoon.

13.     The inspection and testing methods were limited to visual air, measurements and photographing only.  No destructive testing methods or procedures could be implemented for in- depth observations with the exception of removing and resetting items that would not cause damage or alteration to the unit.

## PURPOSE AND SCOPE

Our purpose, involvement and expertise is in the field of construction and design means and methods and the comparison of those means and methods to those of industry standards and / or codes; the proper functioning of the structure, units or materials involved in this or any other particular case; and the application of building sciences as they affect the overall function especially but not exclusively by air, moisture, and temperature of the building, its structure , unit or components that make up those structures.   We therefore limit our involvement in this matter to the component parts of the temporary housing unit; the construction means, methods and materials of this unit; the ability of these components to function as a unit; the building sciences regarding the air, moisture and temperature interactions with the unit as a whole and with its various components; the proper functioning of the envelope to properly seal the unit or the structure from air, moisture and temperature infiltration; the proper functioning of the HVAC units as it relates to the proper production of negative or positive air pressure or the determination of improper functioning creating negative air pressures in the structure; how the air, moisture and temperatures interact with the various components of the structure and those problems related to and with the air, moisture and temperature interaction.

Page -5-

It is not the purpose of our investigation, inspection or observations to render scientific opinions regarding the presence or the quantity of formaldehyde in the Dubuclet temporary housing unit.

The purpose of the inspections, observations and testing was for the rendering of opinions regarding the following issues:

1.   Was it more probable than not that jacking the trailer from its wheels cause damaged the frame and structure of the trailer unit to twist creating pathways for air intrusion?  (See Conclusions #10 and #11.)

2.   Was the design of the trailer a substantial cause of the unsafe levels of formaldehyde?  (See Conclusions #1, #2, and #3.)

3.   Did the manufacturer fail to take into account the intended use of its product?  (See Conclusions #4 and #5.)

4.   Did the manufacturer know, or should it have known, that the use of formaldehyde emitting materials in the construction of their units could become a potential problem for the occupants?  (See Conclusions #6 and #7.)

5.   Did the manufacture know or should it have known that the construction means, methods and materials utilized would contribute to the elevated levels of formaldehyde?  (See Conclusions #8 and #9.)

6.   Did the quality of the workmanship relating to the installation of the air-conditioning duct system contribute to the elevated levels of formaldehyde inside the temporary housing unit?  (See Conclusion #8.)

7.   Did the manufacturer place adequate warnings regarding potential formaldehyde emissions inside the temporary housing unit or in the owner's manual?  (See Conclusion #12.)

8.   Did the manufacturer fail to conform to an expressed warranty?  (See Conclusion #13.)

Page -6-

DUB000688

9.   Were there materials and techniques available at the time of the manufacture of the Dubuclet temporary housing unit in 2004 that would have met today's FEMA requirements?   There are new FEMA Procurement Specifications that have been published that require the following:

   a.   Each unit must test below 16 parts per billion (ppb) or .016 parts per million (ppm) for formaldehyde.  This is comparable to levels found in conventional U.S. homes.

      i.   The CDC states that indoor air concentrations of formaldehyde typically range from 10 ppb to 30 ppb (or .01 ppm to .03 ppm).  Please see Enclosure 3, "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels in Mobile Homes and Park Models."

   b.   Remove products that release elevated levels of formaldehyde and other volatile organic compounds (VOCs) such as Medium Density Fiber products, and all Urea-formaldehyde materials and high formaldehyde emitting insulation products.

   c.   Comply with HUD's requirements for .35 air changes per hour in the ventilation system.

   d.   See Conclusion #14.

10.   Do the risks that are avoided by using the safer alternative designs and materials exceed any burden to Fleetwood in switching to these alternative designs?  (See Conclusion #15.)

The scope of our review, inspections, observations and testing included the following:

1.   Inspection of the Dubuclet temporary housing unit;

2.   Interviews with Dr. Stephen Smulski, wood scientist, to gather further data regarding the products utilized in the construction in the Dubuclet

Page -7-

unit and to gather further data regarding alternative products usage to eliminate or significantly lower formaldehyde emissions in the Dubuclet temporary housing unit;

3. Discussions with Ervin Ritter, P.E., mechanical and environmental engineer, to review notes, calculations and findings regarding our inspection of the FEMA unit;

4. Detail measurements of the temporary housing unit;

5. Photographic documentation of pertinent observations;

6. Written documentation of pertinent observations;

7. Infrared thermographic anomaly survey of the Dubuclet unit;

8. Observed and documented air leakage from the A/C duct system;

9. Observations of visible construction details;

10. Observations of any and all warning notices or labels on the interior and exterior of the unit;

11. Observations of penetrations and sealants in the floor, wall and roof systems of the unit;

12. Assessment of the conditions of the temporary housing unit;

13. Observations of the design, construction materials, means and methods that were visible and utilized in the production of the unit; and

14. Preparation of this report to present the results of our findings and to render a statement of opinion.

## INSPECTIONS, OBSERVATIONS AND STUDY

Inspections were conducted on Wednesday, July 8, 2009 and Thursday, July 9, 2009

Page -8-

DUB000690

in the presence of attorneys and employees representing FEMA and other defendants in this matter along with some of their experts; Mr. Ervin Ritter, P.E., mechanical and environmental engineer; Mr. William Scott with W. D. Scott, environmental consultants; Mr. Marco Kaltofen, P.E., environmental engineer; Mr. David Moore, P. E., civil engineer; and Mr. Clark Thibodeaux, draftsman; Mr. Dalton Toups, field technician for First General Services of the South, Inc.; Mr. Scott Johnson, photographer / videographer; Mr. Raul Bencomo, attorney; and Mr. Hugh Lambert, attorney.

In the course of our study and analysis, following pertinent data was reviewed:

1.  Review of FEMA Accessible One Bedroom Park Model (RP) Procurement Specifications Dated: April 25, 2006;

2.  Review of FEMA10-000463, IAQ Screening Testing Procedures for FEMA Temporary Housing Units;

3.  Review of "FEMA to Introduce New Type of Manufactured Home," Release date: December 18, 2008, Release Number: 1791-343;

4.  Review of "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels In Mobile Homes and Park Models," Release Date: April 11, 2008, Release Number: HQ-08–56;

5.  Review of "FEMA Awards Contracts For Low Emissions Travel Trailers," Release Date:  April 7, 2009, Release Number: HQ-09-034b;

6.  Review of ASHRAE 62 - Indoor Air Quality;

7.  Review of a Coleman Mach A/C unit;

8.  Review of Exhibit 7, Travel Trailer Installation;

9.  Review of ANSI A119.2 NFPA 1192, Standard on Recreational Vehicles, 2002 Edition;

10. Review of ANSI A119.4 NFPA 1194, Standard on Recreational Vehicle

DUB000691

Parks and Campgrounds, 2002 Edition;

11.     Review of complaints from occupants to FEMA;

12.     Review of International Standard 6781, Thermal insulation - Qualitative detection of thermal irregularities in building envelopes - Infrared method;

13.     Review of photographs emailed to First General Services of the South, Inc. from Lambert and Nelson dated July 7, 2009 regarding the Dubuclet unit taken at the Dubuclet homesite;

14.     Review of the Transcript of the Testimony of Mary C. DeVany, MS, CSP, CHMM, Date taken: October 7, 2008, in reference to FEMA Trailer Formaldehyde Products Liability Litigation;

15.     Review of "The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued to Hurricane Disaster Victims, and Recommended Action Items - Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform U.S. House of Representatives July 19, 2007";

16.     Review of Documents Produced by Defendants;

17.     Review of Table 3 - ATSDR Health Guidance Values for Formaldehyde Exposure (Reference 1,2) and Table 4 - Occupational Exposure Levels for Formaldehyde (reference 9);

18.     Review of Indoor Air Quality Guideline No. 1 dated August 2004, "Formaldehyde in the Home";

19.     Review of miscellaneous formaldehyde documents;

20.     Review of Environmental Health's publication, "What You Should Know about Formaldehyde in Mobile Homes;"

21.     Review of photographs and video photo documentation of the Dubuclet

DUB000692

Fleetwood unit taken by Scott Johnson / Lambert - Nelson;

22.    Review of photographs taken by Ritter Consulting Engineers;

23.    Review of Plans and Specifications by Fleetwood;

24.    Review of plans by First General Services of the South, Inc. and Ritter Consulting;

25.    Review of Fleetwood's Owner's Manual;

26.    Review of "An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary - Housing Trailers, Baton Rouge, Louisiana, September - October, 2006, dated October 2007 by U.S. Separtment of Health and Human Services;

27.    Review of report from David P. Barnes, Jr. and Dr. Lee E. Branscome (meteorologist) dated August 21, 2008;

28.    Review of Affidavit of Patricia M. Williams, Ph.D. DABT in the Trial of Timia Dubuclet dated July 9, 2009;

29.    Review of report from Dr. Lee E. Branscome (meteorologist) dated July 9, 2009;

30.    Review of CDC's "Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes" dated July 2, 2008;

31.    Review of Composite Panel Association's Technical Bulletin, "VOC Emission Barrier Effects of Laminates, Overlays and Coatings for Particleboard, Medium Density Fiberboard (MDF) and Hardboard";

32.    Review of report prepared by Freyou, Moore and Associates dated July 16, 2009, "Structural Condition Assessment for FEMA Travel Trailer, Dubuclet / Fleetwood, Lottie, Louisiana;

DUB000693

33.   Review of report by Stephen Mullet (travel trailer manufacturing consultant) dated August 20, 2008;

34.   Review of Ritter Consulting Engineers' report dated July 16, 2009;

35.   Review of Dr. Stephen Smulski's report dated July 10, 2009;

36.   Review of Affidavit of Mary C. DeVany Concerning IN RE: FEMA Trailer Formaldehyde Products Liability Litigation, "Overview of Formaldehyde Exposure Standards; Toxicological Effects; Airborne Formaldehyde Sampling Strategy, Methodology and Selection Basis; Air Sampling Results; and Bibliography/References," dated August 2008;

37.   Review of Analytical Communications' March 1998 report "Effect of relative humidity on the determination of formaldehyde with NIOSH 3500 method (chromatropic acid method);

38.   Review of report, "Formaldehyde CAS number: 50-00-0;"

39.   Review of report, "Formaldehyde Indoors," by Stephen Smulski;

40.   Review of report by Anne V. Baughman and Edward A. Arens, "Indoor Humidity and Human Health - Part I:  Literature Review of Health Effects of Humidity-Influenced Indoor Air Pollutants";

41.   Review of Exposure Assessment Solutions, Inc.'s Chapter 16: Industrial Hygiene Exposure Assessment - Data Analysis and Interpretation";

42.   Review of "Interim Findings on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes" from the CDC dated February 29, 2008;

43.   Review of Affidavit of Marco Kaltofen, PE (Civil, Mass.) dated July 17, 2009;

44.   Review of Earnest Orlando Lawrence, Berkeley National Laboratory's "Aldehyde and Other Volatile Organic Chemical Emissions in Four

DUB000694

FEMA Temporary Housing Units - Final Report," dated November 2008;

45.     Review of 1991 NIST's MOIST program data;

46.     Review of 1993 ASHRAE study, "A Computer Analysis of Moisture Accumulation in the Walls of Manufactured Housing";

47.     Review of February 1994 ASTM study, "Moisture Control in Buildings";

48.     Review of January 1995 U.S. Department of Commerce report, "Manufactured Housing Walls that Provide Satisfactory Moisture Performance in all Climates";

49.     Review of 1999 ASTM book, Water Problems in Building Exterior Walls: Evaluation, Prevention, and Repair;

50.     Review of 2000 Manufactured Housing Research Alliance study, "Moisture Problems in Manufactured Homes";

51.     Review of September 2003 MHRA publication, "Minimizing Moisture Problems in Manufactured Homes Located in Hot, Humid Climates";

52.     Review of CDC Summary of Lawrence Berkeley National Labortory Final VOC Report and Interim VOC Report;

53.     Review of "Mechanisms of Formaldehyde Release from Bonded Wood Products" published by American Chemical Society, 1986;

54.     Review of the Florida Solar Energy Center Publication Number: FSEC-GP-212-01, "Moisture Problems in Manufacture Housing: Probable Cause and Cures";

55.     Review of "Evaluation of Formaldehyde Levels in Occupied Federal Emergency Management Agency-Owned Temporary Housing Units" dated 12/13/07;

56.     Review of Formaldehyde Passive Monitoring Data - EMA Housing Units

DUB000695

by W.D. Scott Group, Inc.;

57.     Review of test results dated July 9 and July 10, 2009 by W.D. Scott Group, Inc.;

58.     Review of "Volatile Organic Compound Concentrations and Emission Rates Measured over One Year in a New Manufactured House" by Alfred T. Hodgson, Steven J. Nabinger and Andrew K. Persily;

59.     Review of "Wood Adhesives 2005" edited by Charles R. Frihart dated November 2005;

60.     Review of FEMA Model Travel Trailer Procurement Specifications dated August 12, 2004;

61.     Review of the Air Resources Board study, "Air Quality Modeling of Emissions from Composite Wood Products";

62.     Review of Air Resources Board's "Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated March 9, 2007;

63.     Review of Air Resources Board's " Staff Report: Initial Statement of Reasons for Rulemaking  - Public Hearing to Consider Adoption of the Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated April 26, 2007;

64.     Review of Air Resources Board's " Final Statement of Reasons for Rulemaking Including Summary of Comments and Agency Responses - Public Hearing to Consider Adoption of the Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated April 26, 2007;

65.     Review of Ritter Consulting Engineers' And First General Services of the South's data logger data on temperature and relative humidity data July 8 and July 9, 2009;

DUB000696

66.     Review of the following internet websites:

     a.     http://www.rvbusiness.com/tag/tl-industries/

     b.     http://www.chemicaldesigncorp.net/ClosedCellFoam.htm

     c.     http://www.robertlordbuilders.com/press_releasr1.htm

     d.     http://www.envirofoaminsulation.com/faq.html

88.     A review of the pamphlet by Bayseal CC for Residential Builders, "Insulation that Adds Value";

89.     A review of Bayseal CC Division 7 - Thermal and Moisture Protection Closed-Cell Insulation Technical Data Sheet 06/10/08;

90.     A review of a fax from Wyatt Rankin with SPI-Dallas dated May 19, 2009 regarding formaldehyde foams;

91.     Review of RADCO Test Report, RAD 138 - July 1978; and

92.     Review of email dated July 9, 2009 from Mike Zieman with RADCO to Jordan Dentz, with MHRA regarding formaldehyde (HCHO) test data.

Definitions:

Important words used to describe or imply conditions as applicable to situations with the Dubuclet temporary housing unit as either used in this report, its enclosures or in the codes or standards that apply are defined below for clarity and the understanding of usage as it applies to this unit:

     1.     Recreational vehicle - NFPA, page 8

     2.     Travel trailer - NFPA, page 8

     3.     Acceptable indoor air quality - ASHRAE 62 - 1999, page 2

DUB000697

4.      Air exhaust - ASHRAE 62 - 1999, page 2

5.      Air makeup - ASHRAE 62 - 1999, page 2

6.      Air, outdoor - ASHRAE 62 - 1999, page 2

7.      Air, return - ASHRAE 62 - 1999, page 2

8.      Air, supply - ASHRAE 62 - 1999, page 2

9.      Air ventilation - ASHRAE 62 - 1999, page 2

10.     Exfiltration - ASHRAE 62 - 1999, page 2

11.     Infiltration - ASHRAE 62 - 1999, page 2

12.     Natural ventilation - ASHRAE 62 - 1999, page 2

13.     Ventilation - ASHRAE 62 - 1999, page 4

In addition to the items reviewed in the course of our study and analysis, the following pertinent data was collected and observations made:

1.     It is understood the common issue regarding the occupancy of the FEMA temporary housing units is the exposure of its occupants to varying elevated levels of formaldehyde. A large quantity of testing performed on these temporary housing units by various organizations and individuals have confirmed and reported elevated levels of formaldehyde exist in a large quantity of the units tested.

2.     The numerous rounds of testing for formaldehyde in the FEMA trailers began after occupants began filing complaints with FEMA regarding problems they were experiencing with their units. Occupants informed FEMA that they were having issues with strong odors, burning or irritated eyes, skin irritations, sinus problems and headaches shortly after occupying their homes or during the course of their occupancy.

Page -16-

DUB000698

3.    A review of reports by Lawrence Berkely Laboratory, the National Center for Environmental Health, and a report by Dr. Stephen Smulski among other documents reviewed, give indication of the following:

    a.    Of all of the studies reviewed, persons interviewed, and test reports and data gleaned in preparation of our assessment, the following factors appear to be held in common:

        i.    As temperature rises, the rate of release of formaldehyde increases.

        ii.    As humidity rises, so does the release of formaldehyde from materials that are manufactured using formaldehyde.

        iii.    Adequate ventilation is required to exfiltrate formaldehyde released into the envelope of the travel trailers.

4.    From a review of the W. D. Scott Group, Inc. Formaldehyde Emissions Tests Report from tests taken in the Dubuclet unit, indications are the formaldehyde emissions are above those determined by FEMA and the CDC as being the average in a U. S. home.

Please see Enclosure 4, W. D. Scott Group, Inc. Formaldehyde Sampling Reports dated July 9 and July 10, 2009.

Please see Enclosure 10, Affidavit of Marco Kaltofen, P.E. dated July 16, 2009.

5.    A review of the temperature and humidity tests performed by Ritter Consulting and First General Services of the South, Inc., July 8, 2009 between 8:30 a.m. and 10:35 a.m. and July 9, 2009 between 9:00 a.m. and 2:00 p.m., indicates the outdoor temperature during the inspection on those dates. Temperatures on the roof of the Dubuclet trailer were 121°F at 10:25 a.m. when the data logger was removed. The relative humidity was 30% and the dew point was 80.9°F. The highest readings on July 9, 2009 were 126°F, 26% Rh and 80.7°F dewpoint at 12:39 p.m.

The interior temperature recorded by data loggers were:

DUB000699

| Date | Data Logger Number | Temperature in Degrees Farenheit | Relative Humidity | Dewpoint in Degrees Farenheit |
|---|---|---|---|---|
| | | | | |
| 07/08/09 | 2 | 93.0 | 62.0% | 78.0 |
| Highest | 3 | 95.0 | 57.5% | 77.6 |
| Temp | 4 | 99.0 | 51.5% | 78.0 |
| | | | | |
| 07/09/09 | 2 | 77.0 | 70.0% | 66.5 |
| Lowest | 3 | 76.0 | 70.0% | 65.5 |
| Temp | 4 | 77.0 | 69.0% | 66.0 |
| | | | | |
| 07/09/09 | 2 | 97.0 | 58.0% | 79.7 |
| Highest | 3 | 94.0 | 61.0% | 78.5 |
| Temp | 4 | 95.0 | 58.5% | 78.1 |

_____The air-conditioning system was turned on and an infrared thermographic survey was performed.  This report does give a good indication of the types of temperatures and relative humidity that are experienced inside the trailer without the air-conditioner running.  It is also interesting to note that with the air-conditioning system running from mid-morning, the lowest relative humidity reading was 58%.  Relative humidity increased between 58% and 61% for a majority of the testing time with temperatures going up to 97°F inside the trailer.

Please see Enclosure 1a, Photographs by First General Services of the South, Inc., Nos. 8, 9, 158 - 163, 178, 179, 185, 204, and 248.

Please see Enclosure 5, First General Services of the South, Inc.'s Temperature and Humidity Data Loggers #1, #2, #3, and #4 Graphs dated July 8 and July 9, 2009.

Please see Enclosure 10,  Affidavit of Marco Kaltofen, P.E. dated July 17, 2009.

6.  A review of the testimony of Mary DeVany, industrial hygienist, before Congress gave indications that formaldehyde emissions double for every 12°F increase in temperature.

7.  Discussion of construction issues, defects and damages observed:

a.  The main frame of the structure supporting the walls and roof is constructed of structural steel and light gauge framing.

Page -18-

DUB000700

Please see Enclosure 1b, Scott Johnson's Photographs. These photographs give indication of construction of the steel frame under-carriage.

Please see Enclosure 11, Freyou Moore Report dated July 16, 2009.

b.   The under bellyboard is a plastic membrane installed concealing all of the wood structure, insulation and subflooring of the trailer. The underbelly of the trailer could not be removed to inspect the floor cavity.

Please see Enclosure 1b, Scott Johnson's Photographs. These photographs are of the underside of the trailer. These were unsealed openings in the underbelly.

The openings in the underbelly affords available humidity to contribute to formaldehyde emissions and to the decay of the floor sheeting which increases the release of formaldehyde per other consultants.

Also, please see Enclosure 1b, Scott Johnson's Photographs.

c.   The floor insulation is approximately 2" to 2 1/2" in thickness.

d.   The floor joists are believed to be a nominal 2" x 3" (actual 1 1/2" x 2 ½").

e.   The floor sheathing is 5/8" OSB (oriented strand board).

f.   The floor system on the interior of the unit is covered with a vinyl sheeting over the floor sheathing.

g.   The wall framing is thought to be 1 1/2" x 1 1/8" wood members ( 1 ½" thickness) (2" x 2" nominal).

h.   A 3.6 mm overlay hardwood paneling is installed on the interior of the wall system.

DUB000701

i.      Installed in the exterior walls is 1 1/2" R-7 fiberglass unfaced batt insulation.  The batt insulation is the full height of the wall system.

j.      The side edges of the wall panels are exposed, raw hardwood paneling.

k.      The rear of the 3.6 mm overlay hardwood paneling is exposed, raw material.

l.      The wall to ceiling panel intersections were observed.  There did not appear to be a method of sealing to prevent air and moisture infiltration into the envelope of the trailer.

m.      The walls of the trailer had three windows, an exterior door, and several other penetrations through the exterior wall.

n.      The ceilings were observed to be a 3.6 mm overlay hardwood paneling.

o.      Air-conditioning registers are installed in the ceiling paneling.

p.      The air-conditioning unit is installed through the ceiling void and the roof.

q.      Light fixtures were installed on the ceiling in each room.

r.      The roof framing is a 1 ½ x 4 ½ truss.  According to diagrams furnished by the manufacturer, the truss are spaced 16" on center.

s.      The ceiling void contained an unfaced batt insulation R-7.

t.      The air-conditioning duct system is installed in the ceiling void.  The duct system is concealed and could not be accessed for observation as to the size, construction, insulation and connections of the ductwork.  Only approximations could be made.

        Please see Enclosure 1a, Photographs by First General Services of the South, Inc., Nos. 140 - 149, 164, 165, 171, 172, 198, and 229 - 232.

DUB000702

u.  When the supply register was removed, a wasp nest in excess of 2" was built in the duct work.

    Please see Enclosure 1a, Photographs by First General Services of the South, Inc., Nos. 171 and 172.

v.  The return air duct was inspected.  It was observed that it was not sealed and was drawing unfiltered air into the trailer.

    Please see Enclosure 1a, Photographs by First General Services of the South, Inc., Nos. 283 - 292.

w.  Various built-in units were observed throughout the temporary housing unit.  They were as follows:

    i.     A bed with mattress:

    ii.    Sofa with cushions;

    iii.   Base and upper cabinets in kitchen and bath areas covered with a laminated countertop;

    iv.    Sink and faucet in the kitchen and lavatory for the bath area;

    v.     Closets (one in the bedroom and one in the bath area);

    vi.    Nightstands in the bedroom;

    vii.   Interior pocket doors and frame;

    viii.  Appliances - hood, refrigerator, and microwave;

    ix.    The bathroom has a handicap shower unit;

    x.     A commode

x.  The exterior aluminum covering is rolled and crimped material.

DUB000703

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #1, #14, #15, #27 and #46 - 53.

y.    Exterior moldings covered the walls at the intersections, windows and doors.  The sealant gasket was deteriorating on some of the windows. This has a probability of allowing water and air intrusion into the wall cavity.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #16 - #20 and #24 - #26.

z.    Other miscellaneous penetrations for electrical and water hookups and exhaust vent along with joints at the roof to wall sections were noted. Some of these penetrations were not sealed or the seal was deteriorating.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #8, #18 - #20, #24, #25, #32, #38, #39, #54 - #59, #64, #107 - #124 and #133 - #139.

aa.    The roof sheathing is believed to be 5/32" panel; however, this is unverified.  Access to the sheathing could not be obtained.

bb.    There is a sheet membrane covering the entire roof system.  It is a membrane similar to or is an EPDM membrane.  The perimeter edges of the membrane are sealed with a heavy caulking type material.  The caulking material is deteriorating in a number of areas inspected by this writer.

The roof deck is buckled in one section on the right.  This may have been caused during jacking and / or is a result of a roof leak.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #127, #128 and #136.

Please see Enclosure 1a, First General Services of the South, Inc.'s' Photographs #107 - # 124 and #133 - #139.

Page -22-

cc.   Roof exhaust for the bath and vent pipe caps were noted on the roof system.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #118, and #121 - #123.

dd.   Roof top air-conditioning unit:

   i.   The cover of the rooftop air-conditioning unit was removed to obtain identification of that unit.

   ii.   The unit is a Coleman Mach by AirXcel, Inc.

   iii.   The model number is 8335c876.

   iv.   The unit is a 15,000 nominal BTU unit.

Please see Enclosure 1b, Scott Johnson's Photographs.

Please see Enclosure 6, Coleman Mach by AirXcel, Inc.

ee.   Electrical outlet:

   i.   The exterior electrical outlet at the rear, left area of the trailer was observed.  The outlet was damaged and water and air infiltration is occurring in this area.  This is on the exterior right side.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #27 - #32.

ff.   Kitchen stove hood exhaust:

   i.   The kitchen stove hood exhaust cover was observed on the rear of the trailer.  This area is noted because under conditions discussed later in this report regarding negative air pressures, the vent may not operate properly during times that the air-conditioning system is in operation during cooking.

DUB000705

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #77 - #78.

gg.   Underbelly:

    i.   Unsealed penetrations:

        1.   During and inspection of the underside of the trailer it was noted that some of the penetrations in the floors were unsealed.  Photographs of those areas were taken.  These are leakage points in the envelope of the building that will draw the hot moist air from the exterior into the interior of the building.

        Please see Enclosure 1b, Scott Johnson's.

        a.   The underbelly is acting as a water or vapor barrier.

hh.   Roof:

    i.   As noted earlier in the report, the roof was inspected.  Separation in the sealant material around the perimeter of the roof  was noted.  Water is possibly penetrating into the roof and wall systems from some of these separations.

ii.   Roof membrane:

    i.   A rippling effect was noted in the roof membrane over the area of the bedroom and along the outer edge of the roof to wall connection.   Indications are there is deterioration of the roof decking below the membrane in this area.

    ii.   Roof penetrations and edges - seal:

        1.   Inspection of the sealant material around the bathroom exhaust vent hood and the plumbing vent pipe cap was performed.  The sealant material is not adhering properly to

DUB000706

the roofing membrane.  It is not an uncommon practice to utilize only sealant materials to prevent air and moisture transmission from the exterior roof system to the roof cavity or interior of the envelope.

According to HUD's "Durability by Design" publication, caulks and sealants should be used as only a second line of defense for moisture and air infiltration.  Some other means of sealant should be used as the primary source of air and moisture infiltration on the envelope of a building unit. Because of expansion and contraction of dissimilar materials and weatherization of the adhesives, the caulks or sealants cannot be dependent upon to maintain its weather-tight resistant barrier.  In addition, it is not possible to confirm when the sealant is being applied that all of the voids, penetration or holes have been completely and thoroughly sealed.

jj.    Damage to exterior:

   i.    Observations of a small area of damage to the exterior rear, right area of the trailer was noted.  Moisture or air penetration through this area is possible.

      Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #41, #44 and #46.

kk.    Floor damage at the entry door:

   i.    Moisture damage to the floor at the door entry and floor area between the entry door and the bedroom wall was noted.  The underlayment was extremely soft to the touch and could not be walked on.  Indications are moisture has been penetrating this area for some time causing the deterioration or decay.

      Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #168 through #170.

DUB000707

ll.   Wall - Air infiltration:

    i.   The wall intersection at the slide out indicates the penetration of air from the exterior of the building toward the interior.  Observations reveal that there is no sealing of the envelope of the building to prevent air and moisture movement from the outside to the inside. This occurred at the base of each side of the slide out.

       Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #21, #190 - #193.

mm.   Ceilings:

    i.   Observation of the television outlet on the bedroom ceiling indicated air infiltration from the A/C unit.  Cold air escaped into the room from the ceiling cavity.  Indications are the supply duct leaks.

       Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #164 and #165.

       Please see Enclosure 12, Ritter Consulting Engineer's Report dated July 16, 2009.

nn.   Wall construction details:

    i.   Noted in our inspection was a lack of a vapor barrier on the exterior side of the exterior wall. The wall system is constructed of an exterior aluminum skin with rolled and crimped joints installed horizontally attached to the 1 1/8" x 1 1/2" wood framing members.  The batt insulation is unfaced and the only material assumed to be a vapor barrier was the interior finish applied to the interior wall panel.

oo.   Kitchen:

    i.   Floors - Water damage:

DUB000708

1.   As noted earlier during our observations of the exterior, water damage occurred at the entry door into the kitchen. The area was extremely soft and this writer stepped on the spot and the sheathing almost collapsed

ii.   Observations of the ceiling while the air-conditioning system was in operation was performed.  It was noted that condensation was occurring on the inside of the face panel of the return air register over the air-conditioning unit.  It appears air leakage is occurring in the supply side and return air side of the duct systems of the air-conditioning unit.  This duct leakage is causing the surfaces to reach the dew point wherein the moisture in the air or on the surfaces are condensating.

Please see Enclosure 1a, First General Services of the South, Inc.'s Photographs #283 through #294.

pp.   Unsealed wood areas:

i.   Bedroom bed:

1.   Exposed raw wood was observed under the mattress of the bedroom bed.  Both the top and bottom sides of the wood product is raw material as well as the edges.

ii.   Front bedroom - wall panels:

1.   As previously noted, the rear side of the wall panels in the trailer as well as the edges of the panels are untreated raw hardwood material.  Only the exposed surface is covered with a finished material.  It is unknown the perm rating of the panel covering.

qq.   Air-conditioning system installation:

i.   We were prohibited from performing envelope or duct leakage testing by blower door and duct blaster methods.  However, cold

Page -27-

DUB000709

air escaping from the ceiling penetration in the bedroom indicated a substantial supply duct leakage was occurring. This places the building in a negative air pressure condition. The negative air pressure is drawing in unfiltered, unconditioned air into the walls and envelope of the building. Prior to that air being pulled into the air of the interior of the building, it is first drawn into the walls, ceiling and floor cavities of the trailer. This hot, moist air comes into contact with the untreated raw surfaces and edges of the formaldehyde emitting wood and wood products. According to the experts, the activity of the formaldehyde release from these formaldehyde emitting products is increased with the rise in temperature and the rise in humidity. This unfiltered, contaminated air filled with moisture and heat is then transported into the living area of the trailer through cracks in the seams, around duct registers, light fixtures, wall receptacles, light switches, and all other penetrations that are sealed to the exterior.

As we witnessed during our investigation, the temperature on the interior of the unit kept rising in spite of the A/C unit set at high cooling fan and thermostat set below 70°F.

Please see Enclosure 12, report prepared by Ervin L. Ritter, P.E., dated July 16, 2009.

ii.    The air leakage into the exterior of the ceiling creates a negative pressure condition on the interior of the trailer. As the air from the ducts leak into the ceiling from the ductwork supplying the cold filtered air into the trailer, the return air portion of the air conditioner is drawing back into the air-conditioning unit the same quantity of conditioned air that it is producing. With the air-conditioning duct leaking outside of the trailer, the return air system is drawing in or sucking into the trailer hot, moist contaminated and unfiltered air through various unsealed cracks and joints in the walls, ceiling and floors of the building into the inside of the building. This hot, humid air comes into contactwith the wood and wood products that contain formaldehyde. It is then drawn into the living space.

Page -28-

iii.     The ducts for the air-conditioning system are not properly sealed. This is a workmanship issue.  Had the ducts been properly installed and sealed at the factory, the duct leakage would not have occurred.

Other evidence of an opening or openings in the supply duct is the presence of a wasp nest in the duct system.

iv.     According to air-conditioning section on page 21 of the owner's manual, the air-conditioning system is capable of cooling air to a maximum of 15°F to 20°F.  The manual goes on to say that "as the temperature goes up, it may become more difficult to cool the trailer.  If temperature inside your coach is 100° when you turn on the air-conditioner, it will only put out 80° air.  Eventually, the air inside the coach will cool, and as it cools, the air put out by the air-conditioner will also cool.  However, when starting out at a 100°, this cooling could take several hours before it reaches your desired temperature."

In the hot, humid temperature zone in which New Orleans, Louisiana is located, temperatures are in the 90° range for most of the late spring through early autumn.  This begins somewhere in May and continues through the months of June, July, August, and September.  Along with the rise in temperature, South Louisiana also experiences a significant rise in relative humidity.  The higher the relative humidity, the more "muggy or sticky" the contents inside a home and your body feels.  Cooling could take several hours to reach the desired temperature.  Dropping temperatures down from 100° or more degrees on the interior of the trailer down to 70° to 75° which is the normal comfort level would take quite a number of hours to obtain.  While the cooling is not the issue and the number of hours it actually takes to cool is not the issue, the real issue is the air-conditioning system running for many hours under negative pressure sucking in the contaminated, hot, humid air from the exterior to the interior of the trailer.

As the temperature gets colder on the interior of the trailer, vapor

DUB000711

pressure differentials become a factor.  The colder, drier air will attract the hotter, wetter air from the exterior drawing it in towards the interior.  So there are two major factors working that are detrimental to the trailer and the occupants of that trailer.  First, the negative air pressure is sucking in the hot, humid, contaminated air from the outside, and secondly, the water vapor pressure is also assisting in the transportation of the hot, humid, contaminated air from the outside into the wall, ceiling and floor cavities and eventually into the interior of the trailer where the occupants are living.  As an example to explain how the wet, hot air of the exterior is driven into the colder, drier air on the interior of the trailer, we can use the example of a small amount of water spilled on the floor.  If we take a dry sheet of paper towel and place it flat on the floor and just place one corner of the paper towel connecting with the spilled water, the water will be attracted to the sheet of dry paper.

As noted on our data logger reports, without the A/C system running, the temperature inside reached 97°F with 58% Rh.  This was with the door and windows closed; however, the white roof was 126°F with 26% Rh near that time.

See Enclosure 5, First General Services of the South, Inc.'s Data logger #1 and #2.

v.    Coleman Mach 8000 Series:

1.    As is mentioned earlier in the report, the air-conditioning system installed in the Dubuclet trailer is a Coleman Mach 8300 Series.  The installation instructions were downloaded from AirXcel, Inc.

Please see Enclosure 6, Coleman Mach 8300 Series Instruction Manual.

On the second page of the document, a warning stating, "==THESE INSTRUCTIONS ARE FOR THE USE OF==

DUB000712

QUALIFIED INDIVIDUALS SPECIALLY TRAINED AND EXPERIENCED IN INSTALLATION OF THIS TYPE EQUIPMENT AND RELATED COMPONENTS. PERSONS NOT QUALIFIED SHALL NOT INSTALL NOR SERVICE THIS EQUIPMENT. WARNING: IMPROPER INSTALLATION...CAN CREATE A HAZARD...THE USE OF COMPONENTS NOT TESTED IN ACCORDANCE WITH THESE UNITS...MAY CREATE A HAZARD."

The failure to properly install the ductwork system will cause a hazard with the indoor air quality, deterioration of building components and can create a fire hazard. This will be discussed further in this section of the report and is part of the standards. As we discussed earlier, failure to install the ducts properly can and does cause negative air pressure drawing in the hot, humid, contaminated air into the trailer. In addition, drawing moist air into wall, ceiling and floor cavities can cause conditions conducive electrical shorts and fires. As the humid air is drawn into walls, ceiling and floor cavities, they come in contact with the metal components of electrical devices and appliances. The high moisture content of the air and condensation interacting with the metals of the electrical devices causes corrosion through oxidation. This corrosion or rust then creates a pitting of the metal parts of the device. This pitting or eating away of the metal can cause arcing or a jumping of the electrical charge between the various metal components, it can raise the temperature of the metal components. The heat and sparks created by the resistance and arcing can cause fires.[1]

2.    Under Section II, page 3, the manufacturer states the ability of the air-conditioner to cool down or maintain the desired

---

[1] "The Effects of Smoke & Moisture on Residential and Commercial Electrical Systems" by Alexis Mallet, Jr.

DUB000713

inside temperature depends on the heat gain of the trailer. One of the recommendations made by the manufacturer to reduce the heat gain is to keep windows and doors shut or minimizing usage.

The heat gain is a measurement of heat absorption and gain in temperature as a result of various conditions. The position of a unit or building; the number and size of doors and windows; the types of doors and windows and their insulating value and their ability to resist heat and air penetration; the types walls, ceilings and floors and the thickness of those systems; and the types of insulation and the thickness of insulation in the walls, ceiling and floor areas. The higher the resistance values of the walls, ceilings and floors and the greater the ability to resist heat transferring from the outside to the inside of the trailer, the smaller the heat gain is. The lower the heat gain, the quicker and easier it is to cool the interior of the temporary housing unit. As we will discuss shortly, the type of wall, ceiling and floor construction did not permit a low heat gain transfer.

The total BTU gain in the ceiling was noted. An observer could feel the heat differences at the ceiling area.

3.     As noted earlier, the air-conditioning manufacturer recommends to keep the windows and doors shut and / or minimizing usage. As we have discussed briefly and will discuss further in this report, Fleetwood has recommended the opening of windows and doors for ventilation to reduce cooking odors and humidity within the unit. FEMA advised residents to merely open windows and doors to reduce odor levels. The recommendations are in contradiction to the manufacturer's specifications if the A/C unit is operating.

The operation of the ceiling exhaust fan is recommended by

Page -32-

the trailer manufacturer.

4.      The air contains moisture and the moisture tends to condense on cold surfaces.  Because of the trailer manufacturer's failure to construct a unit that minimizes heat transfer from the exterior to the interior surfaces and the construction of the temporary housing unit is such that air is being transferred from the outside atmosphere to the walls, ceilings and floor areas and then to the interior surfaces, the dew point is reached the walls, ceiling and possibly floor areas.

The air-conditioner removes moisture from the air during normal operations.  Normal operation is not meant to include the transfer of hot, humid air from the exterior to the interior raising the heat gain of the unit.  The reason the air-conditioning manufacturer is directing to keep the windows and doors closed when the air-conditioning system is in operation is because the windows and doors will allow the hot, humid air to come into the unit and cause condensation on the cold interior surfaces.  However, with the doors and windows closed, the air is drawn into the air leaks in the envelope of the unit and the condensation occurs inside the wall, ceiling and possibly floor system behind the finished vinyl or plastic covering of the wall and ceiling panels.

Please see Enclosure 1c, Infrared Thermographic Images by First General Services of the South, Inc., #01 - #15, Building Air Leakage.

5.      Prevention of Air Leakage:

a.      Page 4 of the Coleman manual, Section 13 under Installing the Roof Top Unit instructs the installer to provide adequate support and seal all gaps to prevent air from being drawn into the roof cavity from the operation of the air conditioning unit.  Once again,

DUB000715

this coincides with our presentation that air infiltration brings in hot, humid contaminated unfiltered air and is harmful to the building and the occupants.

Please see Enclosure 6, Coleman Instruction Manual.

vi.   A review of the Standard on Recreational Vehicles 2002 Edition produced by ANSI and NFPA was performed. The particular standards that govern the design, construction and operation of recreational vehicles under these organizations are ANSI A119.2 and NFPA 1192. The particular edition that would govern the Dubuclet temporary housing unit would be the 2002 Edition.

1.   The standard on page 8 gives the definition of recreational vehicles, camping trailers and travel trailers that are governed under this standard. The Dubuclet temporary housing unit falls within the definition of this standard.

2.   Section 5.8.1, General Requirements - Air-Condition Appliances, can be found on page 21 of the code. This portion of the code requires every air-conditioning appliance or combustion air-conditioning and heating appliance to be installed in accordance with the terms of its listing and the manufacturer's instructions.

3.   Section 5.8.2.1, Installation of Air-Condition Appliances, reiterates the requirement to conform with the manufacturer's installation instructions.

It is a requirement of the code to follow the installation instructions of the air-conditioning manufacturer. It has been well documented earlier in this report that duct leakage and negative air conditions as a result of improper installation of the system not only fails to follow the instructions of the manufacturer of the air-conditioning system but in fact is a code violation.

Page -34-

4.      Section 7.3.3.3, Damage, on page 28 of the code states that "all exterior openings around piping shall be sealed to prevent the entrance of rodents."  As discussed earlier in the report in the section referring to the underbelly of the housing unit, it was noted and documented by photographs that there are openings in the underbelly of the Dubuclet housing unit that was in violation of this code.  Areas such as water lines, drain pipes and wiring penetrations were in violation of the code and were photographed for documentation.

vii.   Fleetwood has either overlooked or ignored the probability of condensation occurring in the walls, ceiling and possibly the floor systems of these temporary housing units.  It has long been established by studies conducted in the early 1980s and before regarding condensation occurring in cavities of a structure as a result of temperatures reaching the dew point and condensation occurring as a result of temperature and materials reaching the dew point in these cavities.  The manufacturer is associated with a manufactured housing manufacturing company.   HUD has required the control and management of air, water, temperature and moisture infiltration into the cavities and envelopes of mobile homes for years.  The science is not new science.  It has been known for many years and is taught at either the elementary or middle school level.

A brief explanation of condensation occurring in a wall system is the placement of a glass filled with water and ice cubes on a countertop or outside of a building.  Soon water droplets collect on the outside face of the glass.  This is an example of the temperature on the outside of the glass reaching the dew point and condensation occurring.  The droplets of water on the exterior of the glass is condensation.  It is the transforming water that is in a vapor  or gaseous state into a liquid.

This condition can occur in the wall and ceiling cavities of the housing unit anytime during May, June, July, August or September

DUB000717

in the New Orleans area.  The manufacturer's failure to account for or address this probability is a manufacturer's defect in design.

viii.    In addition, the manufacturer has utilized a vinyl or plastic type of covering on the wall and ceiling panels. While the permeability rating (a material's ability to resist or allow moisture vapor or water to pass through that material) is unknown, any material with a perm rating low enough to prevent or slow the passage of the moisture vapor from the exterior to the interior for drying purposes will create a problem in the wall, ceiling and floor cavities of the housing unit.  Once the vinyl or plastic face of the wall and ceiling panels prevents or retards the moisture from passage through to the interior, the moisture vapor collects on the interior of the wall cavity and as the surfaces on the interior of the temporary housing unit gets colder and falls below the 75°F - 78°F range on the interior of the housing unit or the wall and ceiling cavities, the water vapor in the cavity of the trailer begins to condensate.  The manufacturer failed to provide for management of water and water vapor intrusion into the wall, ceiling and floor cavities.  This failure to provide for management of water or water vapor introduced into the cavities of the building and for its exfiltration or expulsion is a design defect.

ix.    The manufacturer also failed to properly design the wall, ceiling and floor cavities to manage moisture entry as a result of any potential negative air pressures with the trailer unit.  We have discussed the causes and avenues for moisture passage into the trailer unit earlier in this report.  Repeated studies have indicated the potential for damage to living units and the potential harmful effects to the occupants of living units when negative air conditions are present.  The failure of the manufacturer to account for and prevent negative air conditions in the Dubuclet temporary housing unit is a defect in design.

rr.    Infrared Thermography Survey:

i.    To the extent possible, an infrared thermographic survey was

DUB000718

performed on the interior of the building. Not all areas were easily accessible to perform a survey utilizing a B20HS Flir Infrared camera. The survey was performed for the purposes of identifying temperature anomalies in the walls and ceilings of the Dubuclet temporary housing unit. Air and moisture leaks or condensation would show as temperature differentials noted by the variations of color during the survey. A number of these anomalies were photographed using the Flir B2HS infrared camera.

ii.   The infrared photographic images can be found in Enclosure 1a, Infrared Thermographic Images by First General Services of the South, Inc. dated July 9, 2009.

ss.   Warnings:

i.   Warnings were provided in the owner's manual regarding cooking and the use exhaust vents and a reminder the occupant must provide an adequate supply of fresh air for combustion. Unlike homes, the amount of air in an RV is less due to its limited size (volume). Proper ventilation when using cooking appliances will avoid the dangers of asphyxiation.

When the A/C system is operating, it is creating a negative pressure. This prevents the proper venting or exhausting when cooking and creates a hazard.

ii.   One of issues that has not been presented to any extent in this report thus far is the overall size of this housing unit. This housing unit measures approximately 8' x 28'6" with an approximate 6'6" ceiling height plus the slide out of 4' x 12' x 5'7". Extensive measurements were taken and recorded. These dimensions were converted to a CADD drawing with notations. The complete layout of the temporary housing with the locations of appliances, bedding, seating, room locations, window and door locations, electrical outlets, various penetrations through the exterior walls of the unit, lighting, bathroom fixtures, and the location of the air-conditioner and heating unit have all been reduced to drawings.

DUB000719

Please see Enclosure 8, drawings of the floor plan, electrical floor plan, floor elevations, rear elevation, right side elevation, left side elevation, and mechanical plan by Ritter Consulting Engineers and First General Services of the South, Inc.

The manufacturer is aware that the unit is unlike a residential home and the amount of air in the RV is substantially less because of the volume.

Please see Enclosure 13, Radco Test Report, RAD 138 - July 1978.

Please see Enclosure 9, Report by Stephen Smulski, Ph.D. dated July 10, 2009.

iii.   In Dr. Stephen Smulski's report, dated July 10, 2009, there is an in depth analysis of the amount of wood product and formaldehyde containing products that were utilized in the design and construction of the Dubuclet housing unit.  Dr. Smulski goes into detail regarding each and every wood product, wood containing product, or other formaldehyde products that were utilized in this housing unit.  He also observes and notes that the back side and edges of most of these items are exposed with no overlay to prevent infiltration of the formaldehyde emissions from entering into the living area of the trailer.  Dr. Smulski goes on to recognize the location of the FEMA temporary housing unit's location in New Orleans, Louisiana and its exposure to the hot, humid climates of this region.  He states, "These are the exact conditions that maximize the release of formaldehyde from wood based composite panels including particle board, medium density fiberboard, and hardwood plywood."

Dr. Smulski opines that the FEMA unit furnished to Ms. Dubuclet was not suitable for long-term housing because "the travel trailer supplied by FEMA to her was not suitable for use as long-term housing.  It was foreseeable and predictable that formaldehyde gas would be released from the wood based composite panels including  particle board, medium fiber density fiberboard and

Page -38-

DUB000720

hardwood plywood used in the trailer and that the Dubuclet family would potentially suffer adverse health effects from chronic exposure to the formaldehyde gas."

Please see Enclosure 9, Affidavit of Stephen Smulski, Ph.D., Consulting Wood Scientist, dated July 10, 2009.

iv. The manual discusses the effects of long-term occupancy. We will discuss this further in the report under the heading of Foreseeable Issues -Temporary versus Long-Term Housing.

v. Fleetwood had knowledge of formaldehyde and issues of danger to occupants of buildings with materials that emit formaldehyde; that the subject of formaldehyde has been extensively researched; authoritative writings on the subject of formaldehyde in building products and buildings been produced; HUD has issued warnings and directives in manufactured housing area of which another Fleetwood company produces;  and those running the company had personal knowledge of issues with formaldehyde emissions in products since mid 1978.  Fleetwood has continued to specify formaldehyde producing products for use in the production of their travel trailers.  There are vague warnings published and provided to the end user of the Dubuclet FEMA temporary housing unit.

tt. Details of installation:

i. Repeated review of the owner's manual was performed attempting to obtain any details or instructions on the proper set up or jacking of the temporary housing unit or travel trailer.  Nowhere in the owner's manual was this writer able to locate any instructions, illustrations, or documentation regarding the method of proper jacking of the Dubuclet temporary housing unit.

ii. The only information that was obtained and reviewed regarding installation of the travel trailer is in the form of written basic set up details listed in Exhibit 7, Travel Trailer installation and the Fluor blocking Specifications.

DUB000721

iii.   The travel trailer installation guidelines are deficient in its directive regarding the blocking of the trailer.  It does not spell out the exact procedures for the jacking up of the unit.  Other than the final product, the jacking up of the unit appears to left to the discretion of the installer.  Unless there are other installation guidelines not available to this writer, each installer would appear to have been left to their own discretion as to how he would lift the trailer for blocking and where the pressure points would be placed in lifting the trailer.  In addition, protection of the framing while the jacking was occurring was not spelled out in the guidelines.  Putting pressure points on too small of an area will cause distortion in the framing and other components of the trailer.

iv.   It is unknown how the travel trailer was jacked up and blocked. This writer has extensive experience in designing and constructing lifting and leveling devices and moving small and large structures short and long distances.  Any method of raising the travel trailer other than a unified jacking effort where the same amount of pressure is applied uniformly at the same time around the entire perimeter of the travel trailer and in locations near the corners and closely aligned with the wheels and axles will cause distortion in the steel framing, wall system, and roof system of the travel trailer. Unequal pressures placed on the frame of this or most structures will cause damage and / or stresses and / or distortion to occur. This will allow air, moisture and water to enter into the envelop of the trailer.

Please see Enclosure 11, Report by David Moore, P.E. dated July 16, 2009.

v.   It is unknown whether the piers under the travel trailer remain level after their installation.

vi.   Lifting the temporary housing units off of the wheels and jacks were not allowed per the Fluor Installation Instructions.

vii.   Close observations of the scissor jacks located at the four corners

DUB000722

of the Dubuclet housing unit reveal warning stickers on all four of the scissor jacks.  The warning states not to attempt to lift the trailer from the ground with the scissor jacks and that the weight of the unit should not be taken off of the tires.  It appears at least the instructions not to take the weight of the trailer off of the tires was not followed as a set up instruction.

Please see Enclosure 1a, Photographs by First General Services of the South, Inc., #95 - #104.

8.   Industry Awareness of Construction and Formaldehyde Issues:

a.   Since the 1970s, there have been numerous studies regarding issues with the use of low perm or impermeable coverings on wall and ceiling finishes in the hot, humid climate zones; proper air exchange per hour ventilation; duct leakage; the consequences of duct leakage including negative air pressure; and negative air pressure and the problems with drawing in hot, humid, unfiltered, contaminated air from the exterior in the hot, humid climate zone.  No one in the industry should be able to claim a lack of knowledge of these items.  The data has been available and printed in many forms such as books, magazine articles, and trade publications.

b.   There is the same level of awareness regarding formaldehyde emitting products and their use in construction.  It should come as no surprise to anyone in the building industry that formaldehyde emitting materials are problematic at best and a known carcinogen at worse per the experts in that field.

c.   It also has been known through research by others that formaldehyde emissions double for every 12°F increase in temperature.  Including other industry researchers, Mary DeVany testified before Congress and gave indications of the formaldehyde rate of increase of doubling for every 12°F increase in temperature.

d.   ATSDR recommends ventilation, temperature control, air exchange, and no smoking in temporary housing units.  However, in addition to

DUB000723

ventilation, the temporary housing units should be operated under positive pressure.  In other words, interior air should be blowing contaminants away from the unit when opening the door or window from the outside of a temporary housing unit, especially in the summertime.  One should feel a slight puff of cold air from the air conditioner blowing out of the temporary unit as opposed to opening a window or door from the interior and feeling a puff of or a rush of hot, humid air from the exterior entering into the interior of the building.

e.  As was discussed earlier in the report, Fleetwood was aware of the HUD requirements for manufactured housing.  Manufactured housing requires low formaldehyde emitting product usage in the manufacture of homes that are built under Part 3280 of the HUD regulations.  It appears that Fleetwood had the information, knowledge and ability to produce temporary housing units to FEMA that would have met the HUD requirements and even present FEMA standards but chose not to perform to that level of construction and design excellence.

f.  It is unknown why Fleetwood failed to properly construct the air-conditioning duct system and prevent negative air pressure from burdening the materials with elevated temperature and relative humidity that are known to activate the formaldehyde emissions.  It is also unknown why the design and construction of their temporary housing units were not properly designed and constructed to prevent the manifestation of condensation by the temperatures reaching the dew point in the cavities of their housing unit.

g.  The government expected Fleetwood to provide a safe product.

h.  Fleetwood did not instruct the government to "air out" their temporary housing units based on documents reviewed.

i.  Fleetwood did not test the air of the finished product for formaldehyde emissions based on documents reviewed.

j.  The language in the owner's manual regarding formaldehyde is vague regarding the amount of ventilation or the duration necessary to exfiltrate

DUB000724

the formaldehyde.

k.  Fleetwood was aware the unit would be exposed to heat and humidity and that heat and humidity affect the levels of formaldehyde.

9.  Discussion of Foreseeable Issues - Temporary Housing Verses Long-Term Housing:

a.  The definition of temporary according to Black's Law Dictionary is "that which is to last for a limited time only, as distinguished from that which is perpetual or indefinite, in its duration."

b.  Fleetwood travel trailers were not designed for recreational use.

c.  It appears Fleetwood never discussed length of time of usage for their product with anyone with the government based on documents reviewed.

d.  On page 05-4 of the owner's manual, there is a section on the effects of permanent occupancy.  It informs the occupants they must be prepared to deal with condensation and humid conditions that may be encountered. The manufacturer acknowledges that the normal activities of even a small number of occupants in the relatively small volume of a modern recreational vehicle with its tight construction will lead to rapid saturation of the air inside the vehicle and the appearance of visible moisture especially during cold weather.  The manual goes on to state that unless this vapor is carried outside by ventilation or removed from the air by dehumidifier, it will condense on the inside the windows and walls as moisture.  It may also condense in the walls and ceilings and appear as stains on the paneling.  The manufacturer was aware that recreational vehicles have become more than just a week-long means of vacation and excursions.  The manufacturer acknowledges internal problems with condensation; however, what the manufacturer is directing its attention to is the use of these recreational vehicles in frigid and cold climate zones.  The warnings given regarding humid conditions are directed to internal living activities inside the recreational vehicle.  As with the manufactured housing (mobile home) industry, the design of these units have been for cold climates and not for the hot, humid climate of the gulf

DUB000725

coast regions.  Addressing condensation on the inside of the living area is a frigid or cold climate condition.  The long-term occupancy in the south has little to do with the moisture inside the housing unit attempting to force itself out of the unit and condensing on the cold surfaces.  These surfaces are cold because the air on the exterior side of the unit is colder than the air on the interior side therefore the moisture inside the unit is attempting to escape toward the outside.  This is when condensation would occur in other climates but not in the Gulf Coast region.

e.      The Standard on Recreational Vehicle Parks and Campgrounds, 2002 Edition, the ANSI A119.4 and NFPA 1194, discusses the various lengths of time people are now utilizing their recreational vehicles.  Page 15, Appendix D, Section C.18.3 **Fulltimers**, states "Individuals that have opted, because of the benefits of a recreation - oriented RV lifestyle or for economic reasons to use their camping units for their only or primary residence."  This is one of many usages that people are electing to use their recreational vehicles.   Some usages are for traveling, daily or overnight usage, extended stay, seasonal, or full-time occupancy.   It therefore should not be considered an unusual event to have occupants utilize a recreational vehicle for extended stays but also as permanent housing.

f.      Hurricanes Katrina and Rita devastated the coast line of Mississippi, Louisiana, and Texas in August and September of 2005 respectively. The widespread devastation quickly became known internationally. Tens of thousands of homes were completely destroyed; hundreds of thousands of homes were damaged by flooding or windstorm; and thousands of commercial and governmental buildings, public facilities, and roadways were damaged or destroyed.  Within a short period of time, the news media was reporting that the rebuilding of New Orleans alone would take some five to ten years.  Labor, materials, equipment and hardware very rapidly became in enormous demand.  It became common knowledge that an enormous amount of houses that had not been completely destroyed immediately by the wind and water were unable to be occupied as a result of the flooding or water damage caused by the rain, which in turn caused mold damage throughout the home or structure.  In addition, once the flood waters receded, it was found that thousands of homes  could not be

DUB000726

restored as they were contaminated with chemicals from nearby refineries.

With this information disseminated to the public, it was well known that people would be out of their homes for in excess of a year or years as a result of these events.

g.    Alternative methods and materials available for the construction of the temporary housing units:

i.    There were materials and methods available at the time of construction of the FEMA temporary housing units that could have been utilized in the construction of these units to have lowered or removed the issues with elevated formaldehyde concentrations within the envelopes of the units.  In Dr. Smulski's report, he itemizes and enumerates the various wood products that were available at the time of construction of the Dubuclet temporary housing unit that would have eliminated this problem.  Items such as hardboard paneling in lieu of hardwood paneling, OSB board using non-formaldehyde materials, and other products using non-formaldehyde releasing materials were also available at that time.

Please see Enclosure 9, Affidavit of Stephen Smulski, Ph.D., Consulting Wood Scientist, dated July 10, 2009.

ii.   One of the construction methods that were available at the time of construction of the Dubuclet was the use of an air seal barrier below the exterior skin of the exterior walls.  This air barrier would have eliminated or severely reduced the amount of air and moisture penetration through the wall system and become available to raw materials that contained formaldehyde.  This is a common practice utilized in the hot, humid temperature region of the country.

This method of construction has been researched and written about in various books and publications for approximately twenty years.

iii.  The alternative use of a hardboard paneling with a permeable

Page -45-

DUB000727

finish (a finish that would allow the wall system to breathe and not retain moisture within the panel material or in the cavity of the wall) could have been used.  Hardboard panels have been used in the manufactured homes (mobile homes) for a number of years. This is not new technology nor is it new to the industry.

This materials could be used on both the walls and ceiling areas.

iv.   The use of a higher density insulation could have been utilized for the thin wall system used in the construction of these housing units.  Either the wall systems could have been thickened using a deeper framing member or the alternative of a thicker or more dense insulation material such as a closed cell foam or an insulation board could have been utilized.  This would have not only assisted in limiting the penetration of moisture from the exterior to the interior of the temporary housing unit but would have also helped to addressed the issues with condensation occurring as a result of dew point temperatures being reached in the wall and ceiling cavity.

Please see Enclosure 7, Closed-Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation.

v.   While this is not an alternative method of construction, it is one of absolute necessity in the prevention of negative air pressure occurring and drawing hot, humid unfiltered contaminated air into the living area of the Dubuclet trailer.  This item is simply to have performed the work in which they were commissioned to do in a superior workmanlike manner according to the FEMA Procurement Standards.  Simply having taken the time to properly install the air-conditioning ductwork and insuring it was sealed air-tight would have been a major improvement in lowering the amount of formaldehyde concentration inside the living area.  The manufacturer either failed to properly train the installers of the air-conditioning and heating duct system in this housing unit and / or the manufacturer failed to properly supervise the workers installing the air-conditioning and heating system in this unit.  The

Page -46-

manufacturer failed to not only fulfill the requirements of the FEMA Procurement Standards, Fleetwood also failed to follow the manufacturer's installation instructions and the NFPA and ANSI codes and standards that apply to this unit.

Positive pressure inside the unit pushing the hot, humid contaminated air away from the wall, ceiling and floor cavities would have helped to significantly reduce the possibility of the introduction of the formaldehyde vapors into the living area of the unit.

vi.   The workmanship of the overall construction of the FEMA trailer could have also prevented the majority of the air leaks into this housing unit.  Because of the inadequate workmanship and the failure of the manufacturer to properly supervise the installation of not only the duct system but the sealing of the envelope has produced pathways for the hot, humid, unfiltered air to penetrate into the living area.   Once again, the requirements of the specifications for procurement regarding air and moisture sealing of the unit failed to be adhered to by the manufacturer by Fleetwood.

vii.   In addition to the above mentioned quality control methods, the manufacturer could have tested the ductwork for air leakage. Instruments are readily available and are reasonably inexpensive for the testing of duct installation for air leakage.  The cost per unit of production to purchase the equipment to test for duct leakage is estimated at $.14 per unit.

viii.  Testing of the housing unit could also have been performed by the manufacturer.  Similar equipment to the air duct leakage and in conjunction with the air duct leakage equipment is all that is required to test these units.  Again, based upon an initial order of 25,000 units for FEMA, the above mentioned cost of $.14 per unit is inclusive of that equipment necessary to test for the air leakage into the trailer from both the air-conditioning ducts and the envelope of the trailer.  The only other item necessary to include in

DUB000729

that cost would be the labor of one trailed employee to perform those tests.

ix.    The cost to install the air barrier on the retail market would have been in today's cost terms $117.26 per unit.

x.     The use of alternative wall panels, floor and roof sheeting, ceiling panels and other wood products or wood-type products cannot be calculated to give an increase of cost over the products that were used in 2005 to construct the Dubuclet unit. Comparable materials were made in full sheets or in sheet sizes unique to the RV industry and are not commonly purchased on the retail market.

xi.    The use of a lower BTU capacity air-conditioning system should be a cost savings rather than an expense. The additional expense would be in adding the fresh air system to this unit. In lowering the BTU capacity of the system, dehumidification would be increased on the interior of the building making it drier and cooler to the senses. The drier the air on the interior of the unit, the less need to have the air-conditioning system cycle on and off; therefore, the thermostat can be set at a higher temperature and the comfort level of the occupants would remain satisfactory.

xii.   One of the most significant changes or alternative methods that could have been utilized in the construction of the Dubuclet unit is the replacement of the 1 1/2" fiberglass unfaced insulation with a closed cell spray foam polyurethane insulation. If we achieve an R-14 insulating value in the wall system and approximately R-18 in the ceiling system, we will eliminate the material in the wall system from reaching a dew point. Each inch of closed cell SPF insulation has an R- value of 7. Two inches of closed cell SPF insulation would give us the needed R-14 rating. At least as important as the R- value is the perm rating of the closed cell SPF insulation. The perm rating is 1 or less which means it is classified as a water and vapor barrier. This would accomplish several different challenges. With the SPF closed cell insulation, the designer of the housing unit could achieve the R-14 value desired

Page -48-

DUB000730

and have a vapor barrier installed in one function.   As a precaution, we would want to also include the air and moisture barrier wrap around the perimeter of the exterior walls.  This would then carry over the separation in the SPF insulation at the wall framing and prevent thermal shorting from occurring.

One added bonus to the use of the closed cell insulation is the additional strength this product adds to the framing system.  The closed cell material attaches to the framing wall and also creates a solid unit within the cavity of the wall increasing the strength of the wall.

Enclosure 7, Closed-Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation.

Addressing the ceiling cavity, we want to achieve somewhere around an R-18 value.  Using 2 1/2" of SPF insulation gives the 17 1/2 to 18 R- value we are looking to accomplish.  In addition to the EPDM type roof membrane, the SPF material would prevent any water or water vapor from transmitting from the exterior to the interior through the roof or attic system.

The additional benefits of added strength to the roof system would be applicable with the SPF material in the ceiling cavity.

The use of the SPF insulation material also has the benefit of sealing the areas of air leakage in the exterior surfaces of the wall system in conjunction with the Tyvek -type air barrier covering.

There are major benefits to the use of the closed cell SPF insulation material:

1.      We achieve the R-value necessary to prevent the dew point from being reached in the wall and ceiling cavities of the unit which in turn prevents the manifestation of condensation.

Page -49-

DUB000731

2.     The air leaks in the envelope are sealed to prevent the passage or movement of hot, humid air from the exterior of the unit to the interior living space and filtering any contaminates.

3.     The SPF insulation adds strength to the structure assisting the structure as it pertains to wind loads as discussed by our engineer.

4.     The increase of R- value in the wall and ceiling systems will assist in retaining the cold air-conditioned air in the living unit.   The occupant would have a more comfortable temporary housing unit; housing unit that has a lower cost of operation of air-conditioning and heating; and a heathier, safer environment for the family.

What we have basically done with this material and this system is to build an ice chest in which to live in  Louisiana. We have an interior and exterior finish of which heat and moisture are significantly eliminated from transmitting from the outside to the inside.  The colder or warmer air on the interior as the case may be in a particular season acts the walls, bottom and lid of a strong ice chest.  Equating the construction of an ice chest to this unit, remember an ice chest is just a foam center with a plastic interior and plastic exterior to hold the form together.   We have all seen numerable times when an adult has sat on an ice chest, a child has jumped up and down on an ice chest, we have loaded ice chests full of beverages and food, or we have stacked items of various sizes, shapes and weights on top of an ice chest.  In each instance, an ice chest is able to support weight of these objects.  This is the strength and insulation value that could have been added had the designer of the Dubuclet temporary housing unit utilized this system.

Another benefit of the usage of the spray foam insulation is it would seals the ducts in the attic and prevent air leakage

DUB000732

from the ducts add to the R-value of the duct system thereby preventing a condensation occurring around the ducts.

The cost of this system would be approximately $1,700 to $1,800 using a commercial contractor's services. Using the manufacturer's internal workforce, the cost would be considerably less.

5.    The other alternative method the designer could have chosen was to increase the frame size of the walls and ceilings and increase the batt insulation thickness thus increasing the R-value of this unit. If the closed cell SPF insulation is used the framing could remain the same thickness as it presently has.

xiii.    New FEMA Trailers:

1.    FEMA now requires its travel trailers to emit less than 16 ppb (or .016 ppm) of formaldehyde, and manufacturers have built travel trailers that meet this standard. The alternative designs and materials selected to meet this standard are not new; rather, they were both feasible and available designs, existing well before the date of manufacturer of the Dubuclet trailer. The choice to use these designs would not have significantly burdened Fleetwood and would have significantly lowered the risk to the Dubuclets.

**CONCLUSIONS**

The formaldehyde emissions in the Dubuclet family's temporary housing unit were elevated above a reasonable level of safety according to the opinions of other experts in this matter. The factors leading to the unreasonably unsafe conditions assessed by the experts in the Dubuclet family's temporary housing unit are a consequence of:

1.    The design of the travel trailer. The designer is responsible for the manifestation of the condensation in the wall and roof cavities. The 1 1/2" wall cavity as

Page -51-

designed is such that the temperature dew point can be reached within that cavity. The 1 1/2" thick unfaced fiberglass insulation batt has an R- value that is insufficient to prevent condensation from occurring in the wall cavity.

2.      The vapor barrier on the temporary housing unit was designed and placed on the cold side of the exterior wall. Studies have long indicated this type of construction is ideal for cold and frigid temperature zones but is unacceptable in the hot, humid zone of which the Dubuclet unit was located in New Orleans, Louisiana.

3.      An effectively designed vapor barrier was not placed on the exterior side of the wall framing just below the exterior skin of the housing unit.

4.      The designer of the temporary housing unit failed to take into account the intended use of their product.

5.      Past catastrophic events in the United States which involve the use of temporary housing units indicate the period of time required to provide permanent housing for the victims of natural disasters was in excess of one or more years. The disasters in Pennsylvania; Wichita, Texas; and in 2004, the hurricanes in Florida indicate victims resided in the temporary housing units for in excess of a year. When Hurricanes Katrina and Rita hit the coast of Louisiana, approximately one-half of the victims from the 2004 hurricanes in Florida still remained in their temporary housing units more than a year after those hurricanes devastated their area.

        It should not have come as any surprise to anyone listening to the news reports that the temporary housing needs for the multitudes of people left homeless would last for years.

6.      The manufacturer knew or should have known that the use of formaldehyde-emitting materials would be a problem for the occupants.

        In July of 1978, a report was produced by RADCO regarding formaldehyde in mobile home prepared for Fleetwood Enterprises of Riverside, California.

        It was apparent that Fleetwood was aware of issues with formaldehyde in the

DUB000734

mobile home products and commissioned RACDO to perform research and testing to identify the following:

a.    "To determine which construction materials were responsible for the formaldehyde emission"

b.    "Determine to what relative degree those materials which emitted HCHO are responsible for the total HCHO problem"

c.    "Evaluate sealants, coatings and other systems which are applied directly to the HCHO emitting materials for their ability to reduce HCHO emissions"

d.    "Evaluate air filtration systems for their ability to remove / neutralize airborne HCHO"

e.    "Evaluate airborne HCHO neutralizers for their ability to neutral HCHO in the air"

So it was readily known by Fleetwood that formaldehyde was present in the products they were making, that the components they were utilizing in the manufacture of their mobile homes were the same types of products used in the manufacture of their travel trailers, that these products emitted formaldehyde into the units that they were manufacturing, and that they were attempting to limit or remove the formaldehyde issues within the units they were constructing.

7.    Many of the component panels, cabinets, built-in furniture, and sheathing are constructed with materials that emit formaldehyde.  Some of the materials such as the roof sheeting are regular panels that were not manufactured to reduce formaldehyde-emitting levels.

Dr. Stephen Smulski identified the formaldehyde emitting components in his report enclosed herein.

8.    The construction means, methods and materials utilized in the Dubuclet family's temporary housing unit contributed to the elevated formaldehyde levels.  The wall-to-floor intersection, the wall to ceiling intersection, and other openings in

Page -53-

the walls, floor, and ceiling systems did not appear to be sealed to prevent unfiltered air filtration or movement to the housing unit. The FEMA Model Travel Trailer Procurement Specifications required that "All exterior openings... will be weatherproof sealed to prevent air and moisture penetration." The language goes on to state again that these are minimum standards and it (the FEMA trailer) **shall be constructed with superior grade quality of workmanship**. (Emphasis added.)

9.      The air-conditioning duct system is not substantially sealed to prevent uncontrolled air leakage into the ceiling cavity and exterior of the housing unit. As the supply side of the air-conditioning system is emptied air into the ceiling cavity and the outside atmosphere, the return air side of the unit is drawing or pulling air into the wall and ceiling cavities and into the living space from the exterior to make up for the air that being expelled as a result of poor workmanship and a lack of proper supervision on the part of Fleetwood. This has created a negative air pressure in the Dubuclet's unit. Air was sucked into the unit from the outside without filtration or conditioning. As other experts opined, formaldehyde off-gases existed in the wall and ceiling cavities of the trailer. This contributed to the additional release of formaldehyde into the envelope of the unit especially when the temperature and humidity on the exterior were elevated above the interior temperatures and humidity of the Dubuclet unit. The negative air pressure pulled in hot, humid, contaminated air into the wall and ceiling system. The hot, moist air contributed to the release of formaldehyde from the unsealed backs and edges of the materials containing formaldehyde per other consultants. This is not superior grade quality workmanship and the construction means and methods are not compatible with the hot, humid coastal environment in which the trailer was located.

10.     The temporary housing unit was placed on blocks during its installation on the Dubuclet's property. The instructions found on the scissor jacks of the trailer states that the weight of the unit should not be taken off the wheels. In jacking the unit and not sufficiently supporting the frame, the installation contractor created a condition conducive to twisting the frame of the unit.

        Fluor, the installation contractor, failed to give adequate directions to its employees of how to jack all of the corners and centers of the temporary housing unit. A review of Exhibit 7 failed to disclose and directions provided to the field

DUB000736

people on how to jack up these units. It appears the units were jacked up on the corners one or two at a time and then the blocking was placed to support those areas. This apparently placed unnecessary stress on the framing system that the unit was incapable of resisting. This more likely than not caused openings of the envelope of the unit contributing to infiltration of hot, humid air increasing formaldehyde emissions.

Either the manufacturer, FEMA, or Fluor should have devised a safe means of jacking the temporary housing unit by either increasing the rigidity of the metal frame, using a unified hydraulic or screw jack jacking system to evenly lift the entire travel trailer at the same time and without putting abnormal stresses on the unit, or should have devised a plan including sound engineering practices for the application of readying the temporary housing unit for occupancy.

11.   The placing of the temporary housing unit on blocks apparently created some stress on the roof membrane and buckling of the roof deck on the right side occurred. In addition, there is an unusual amount of sealant on the roof and edges. It appears someone was attempting to prevent roof leakage at the seams.

12.   The warnings in the owner's manual and inside the temporary housing unit regarding the potential for formaldehyde emissions lack clarity. The manufacturer was aware of the potential presence of formaldehyde in their product. The manufacturer made a point to state in the owner's manual and inside the medicine cabinet that the trailer contained formaldehyde emitting materials. The warnings and documents found do not adequately explain to the Dubuclet family the extent of ventilation that is required or the length of time to ventilate to eliminate the exposure of formaldehyde.

There are also no warning regarding the issues that can result from ventilating in the hot, humid climate of south Louisiana, the mold pollen, moisture, etc. that could affect the occupants.

13.   The manufacturer failed to conform to its express warranty. In the Model Travel Trailer Procurement Specifications, dated August 12, 2004, FEMA stated, "the construction and outfitting standards identify minimum... environmental living conditions necessary to provide emergency housing..." "The manufacturer shall design and construct all units...within a superior grade quality of workmanship."

DUB000737

By submitting it to FEMA, the manufacturer has expressed a warranty and has warranted to the purchaser and user of their product.

14. The manufacturer produced a product that was unreasonably dangerous as opined by other experts because it failed to apply and use techniques, technology, materials and workmanship available in 2005 to achieve the new FEMA procurement specification of 0.016 ppm (16 ppb) for formaldehyde emissions. The products available today to meet the current FEMA standards existed in 2005 when the Dubuclet's trailer was manufactured.

15. The benefits to the manufacturer that would be achieved to switching to alternative design and construction practices as it relates to the Dubuclet family's housing unit would be:

    a. Avoiding health related issues concerning the Dubuclet family;

    b. Avoidance or reduction of litigation costs; and

    c. The probable avoidance of loss of hundreds of millions of dollars paid by the taxpayers, occupants and manufacturers if temporary housing units have to be destroyed.

The burden to the manufacturer in switching to alternative design and construction methods would be:

1. The cost of installing a vapor barrier on the exterior side of the walls;

2. The cost of additional sealants at the top and bottom plates;

3. In the alternative, the replacement of fiberglass insulation with a closed cell spray polyurethane foam insulation that would seal the walls, prevent air and moisture passage through the wall and ceiling cavities, add strength to the structure, and prevent condensation from form in the wall, keep the A/C ducts sealed, and ceiling systems when temperatures reach the dew point.

4. The cost of adding fresh air ventilation to the unit;

Page -56-

DUB000738

5.      Increasing the size of the steel frame to allow for the jacking up of the housing unit to avoid unwarranted stress on the unit or just jacking the entire trailer up at one time.

6.      The cost of switching to non- formaldehyde emitting materials such as masonite wall panels and ceilings, masonite doors, floors and roof sheeting constructed of non-formaldehyde emitting OSB, plastic type cabinets or MDF materials and frames that do no emit formaldehyde.

7.      The cost to actually train workers and supervisors to work in a manner that would produce the superior work product required by FEMA's Procurement Specifications.

Enclosed please find the current resume' of the author of this report, the fee schedule including the rates charged for our organization's participation in this matter, and for any deposition and court testimony along with a list of trial and deposition testimony given by the author of this report.

Conclusions drawn in this report are based on observations and information available known and declared at the date of the investigation and / or the time of the preparation this report.  The writer reserves the right to make corrections of any errors discovered after the release of this report or upon the receipt of new data.

DUB000739

## ENCLOSURES

Enclosure 1a:  Photographs by First General Services of the South, Inc.

Enclosure 1b:  Photographs by Scott Johnson

Enclosure 1c:  Infrared Thermographic Images by First General Services of the South, Inc. dated July 9, 2009.

Enclosure 2:  FEMA Model Travel Trailer Procurement Specifications, dated August 12, 2004

Enclosure 3:  "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels in Mobile Homes and Park Models"

Enclosure 4:  W. D. Scott Group, Inc. Formaldehyde Sampling Report dated July 9 and July 10, 2009

Enclosure 5:  First General Services of the South, Inc.'s Temperature and Humidity Data Loggers #1, #2, #3, and #4 Graphs dated July 8 and July 9, 2009

Enclosure 6: Coleman Mach 8300 Series Installation Manual

Enclosure 7:  Closed-Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation

Enclosure 8: Drawings of the floor plan, electrical floor plan, floor elevations, rear elevation, right side elevation, left side elevation, and mechanical plan by Ritter Consulting Engineers and First General Services of the South, Inc.

Enclosure 9: Affidavit of Stephen Smulski, Ph.D., Consulting Wood Scientist, dated July 10, 2009

Enclosure 10:  Affidavit of Marco Kaltofen, P.E. dated July 17, 2009

Enclosure 11: Freyou Moore Report dated July 16, 2009

Enclosure 12: Ritter Consulting Engineers' Report dated July 16, 2009

Enclosure 13: Radco Test Report, RAD 138 - July 1978

Enclosure 14: Resume' of Alexis Mallet. Jr.

Enclosure 15: List of Deposition and Trial Testimony

Enclosure 16: Fee Scedule

AMJ:cms

DUB000740

## AFFIDAVIT OF ALEXIS MALLET, JR.

I reserve the right to submit further affidavits if so deemed necessary.

FURTHER AFFIANT SAYETH NOT.


Thus, signed and sworn on this 17th day of July, 2009

_____
Alexis Mallet, Jr.
P. O. Box 80857
Lafayette, LA 70598-0857

_____
Notary Public Signature

LINDA J. NELSON
_____
Notary Public Name

LA BAR # 9938
_____
Notary Number

with life
_____
Comission Expires

Page -59-

DUB000741