Exhibit C

# Transcript of the Testimony of
# **Alexis Mallet, Jr.**

## **Date taken: October 28, 2009**

## **In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Dubuclet)**

## **_\*\*Note\*\*_**
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# **Professional Shorthand Reporters, Inc.**
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:      www.psrdocs.com**

Page 89

```
 1   designer or a manufacturer of a travel

 2   trailer?

 3        A.   No, sir.

 4        Q.   Have you ever been involved in a

 5   consultation, prior to this FEMA litigation,

 6   involving a claim of formaldehyde in a

 7   travel trailer?

 8        A.   No, sir.

 9        Q.   You are not a mechanical engineer,

10   are you?

11        A.   I am not.

12        Q.   Do you hold any engineering

13   degrees in any discipline?

14        A.    I don't, but I have a lot of

15   experience working with our engineers, and

16   35 years of construction experience in

17   design build, and having engineers and

18   architects working underneath me.

19        Q.   And you have never worked as a

20   designer or manufacturer of an HVAC system

21   or air-conditioning system specifically for

22   a travel trailer, have you?

23        A.   No, sir.  Although we have had to

24   specify or replace air-conditioning units

25   and ductwork systems in travel trailers when
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Dubuclet)                    Alexis Mallet, Jr.

Page 96

```
 1         A.    Not in the off-gassing, no.

 2         Q.    And you don't consider yourself an

 3   expert in any medical issue that may or may

 4   not be related to formaldehyde, do you?

 5         A.    No.

 6         Q.    Prior to being involved in this

 7   litigation, have you ever testified relative

 8   to a negative pressure situation in a travel

 9   trailer?

10         A.    Not a travel trailer.  I have

11   testified numerous times regarding

12   pressurization of buildings of various

13   types.

14         Q.    Residential, like site-built

15   homes, or commercial or institutional

16   site-built homes?

17         A.    Or mobile homes.

18         Q.    Manufactured housing?

19         A.    Yes.

20         Q.    But never a travel trailer?

21         A.    Never a travel trailer.

22         Q.    How were you contacted in this

23   litigation?

24         A.    Well, let's see.

25               Ask that question again.
```

Page 105

 1   expert and give opinions on location or

 2   adequacy of warnings?

 3        A.    No, sir.  I am not an expert in

 4   that field, nor was it my intention to give

 5   testimony in that field, other than the

 6   observation.

 7        Q.    Of what you observed while you

 8   were inspecting the travel trailer?

 9        A.    That is correct.

10        Q.    All right.

11              Tell me what your role is in the

12   Dubuclet case.  We know there is Mr. Moore

13   out there, we know there is Mr. Ritter out

14   there, we know there are others out there.

15   What is your role?  What is the area of your

16   opinions and expertise in the Dubuclet case?

17        MR. PINEDO:

18              Objection, form.

19        THE WITNESS:

20              I basically lead the team,

21   disseminate who is going to look at what,

22   and have them to either -- if there are

23   calculations involved, perform the

24   calculations that will back up or that will

25   tell me whether a position that we have

Page 106

 1   taken is accurate or inaccurate.

 2            They're the more technical end of

 3   the team, but, in general, I see and

 4   understand how the whole package fits

 5   together, how the parts and system works or

 6   doesn't work together, and how -- if it

 7   doesn't function, why it doesn't function

 8   properly.

 9   EXAMINATION BY MR. SAPORITO:

10       Q.   Are you saying Mr. Moore and

11   Mr. Ritter, in their particular fields,

12   cannot see how the whole package fits

13   together; and, therefore, they should defer

14   to your testimony in that area?

15       MR. PINEDO:

16            Objection, form.

17       THE WITNESS:

18            They are not brought in to perform

19   that function.  They can have opinions, they

20   can have observations, but my overall

21   function is to put the whole package

22   together.

23   EXAMINATION BY MR. SAPORITO:

24       Q.   Are you saying that Mr. Ritter and

25   Mr. Moore cannot verify their own

```
                                             Page 111

 1         Q.   So basically, I asked you the

 2   wrong question.  I should have asked you,

 3   which ones can we exclude, and the answer is

 4   none of them because they are all your

 5   opinions.  Is that right?

 6         A.   Yes.

 7         Q.   Based upon your work and your

 8   expertise?

 9         A.   My expertise and my observations,

10   correct.

11         Q.   All right.

12              Go to conclusion No. 1 on page 51.

13   In conclusion No. 1, you state, "The design

14   is responsible for the manifestation of

15   condensation in the wall and roof cavities."

16              Did you, yourself, observe any

17   condensation in the wall or roof cavities of

18   the Dubuclet unit?

19         A.    I did not.  Based on the testimony

20   of Ms. Dubuclet and Ms. Picot, and the

21   construction of the wall system, any time

22   that the interior temperature fell in the

23   summertime months, based on the construction

24   of that wall system, the air in that wall

25   system would fall below the dewpoint and
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Dubuclet)                    Alexis Mallet, Jr.

Page 113

 1   water stain in the ceiling and perhaps a

 2   water leak on the bed and floor that would

 3   have come from condensation.  Is that

 4   correct?

 5        A.   That is correct.

 6        Q.   Did you see any water stains on

 7   any ceiling or water stains on any of the

 8   furniture in the Dubuclet trailer?

 9             Very simple question.  Did you see

10   it?

11        A.   Yes.

12        Q.   You did?  Water stains on the

13   ceiling?

14        A.   Signs of moisture, yes.

15        Q.   Did you see any water stains on

16   the ceiling or the furniture of the Dubuclet

17   trailer?

18        A.   No.  And the reason I didn't see

19   that is, more likely than not, because

20   Ms. Dubuclet stated that she cleaned the

21   trailer down maybe two or three times a week

22   or very frequently because of the mold,

23   which would have eliminated any water

24   stains.

25        Q.   You think the cleaner that she was

Page 126

```
 1   deterioration, it is going to cause mold

 2   issues.  It is not the proper method of

 3   construction of a housing unit.

 4        Q.   So it is your opinion that if two

 5   identical travel trailers come out of a

 6   manufacturer's assembly plant, and one of

 7   them goes to a family, like yours, to use

 8   for recreational purposes and one of them

 9   goes to FEMA to be used by FEMA as it sees

10   fit, the one that goes to the family for

11   recreational purposes is not defectively

12   designed with the air conditioner, the

13   insulation, or the vinyl wall covering.

14   That wouldn't be defectively designed for

15   that family for recreational purposes?

16        A.   For that use, that is correct.

17             However, the intended purpose of

18   the FEMA units, it is absolutely the wrong

19   design to use for that in the hot, humid

20   climates.

21        Q.   But the duplicate unit, not

22   Dubuclet but duplicate, the exact same

23   duplicate unit that I was talking about that

24   comes out of that assembly plant that goes

25   to FEMA for FEMA to use as it sees fit, for
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Dubuclet)                    Alexis Mallet, Jr.

Page 141

 1   of your client has stated that the way the

 2   wall systems are manufactured leads to -- is

 3   problematic.

 4         MR. SAPORITO:

 5             All right.  We will take our

 6   break.  Thank you, Chris, for allowing me to

 7   finish my line of questioning.

 8         (Recess.)

 9   EXAMINATION BY MR. SAPORITO:

10         Q.   All right, Mr. Mallet, going

11   through the rest of your opinions that

12   started on page 51 of your report, going to

13   opinion No. 9, "The air-conditioning duct

14   system is not reasonably sealed," can you

15   tell me what that opinion means?  What are

16   you stating there?

17         A.   There was cold air leakage from

18   the duct system into the ceiling cavity.

19         Q.   Now, as I understand it, you did

20   not take any of the ceiling cavity apart,

21   did you?

22         A.   No, I did not.

23         Q.   And you did not personally inspect

24   any of the ductwork, did you?

25         A.   Some of it at the opening of a

Page 142

1  supply register.

2      Q.   Are you talking about when you

3  took the supply register off of the ceiling

4  you were able to see that portion of the

5  ductwork?

6      A.   I didn't take it off, but when it

7  was taken off.

8      Q.   Well, whoever took it off?

9      A.   Right.

10     Q.   That is the portion of the

11 ductwork you could see?

12     A.   The part that was on the ceiling,

13 right.  I mean, just above the ceiling.

14     Q.   You didn't inspect any of the

15 other ductwork, and you didn't find any

16 leaks in the duct system, did you?

17     A.   I didn't have to.  It was

18 measured.

19     Q.   Let's just do this one piece at a

20 time.

21          You didn't inspect any of the

22 ductwork and find any leak in the ductwork,

23 did you?

24     A.   No, I did not find the area of

25 leakage.

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Dubuclet)                                  Alexis Mallet, Jr.

Page 145

 1      A.   Yes.

 2      Q.   You don't believe that to have

 3   been a manufacturer installation, do you?

 4      A.   No.

 5      Q.   Did you measure or attempt to

 6   quantify in any way this amount of cold air

 7   that you felt was leaking through the cable

 8   outlet or any of the other outlets in the

 9   travel trailer?

10      A.   I didn't, but one of your experts

11   did.

12      Q.   They quantified it?

13      A.   They quantified it.

14      Q.   Do you know what that number is?

15      A.   530 feet per minute.

16      Q.   That is how much was leaking?

17      A.   Yes.

18      Q.   530 feet per minute, cubic air?

19      A.   530 feet per minute.

20      Q.   I thought you measured air as a

21   volume.  You don't?

22      A.   You can.  The amount of air

23   velocity coming out of that hole.

24      Q.   So the velocity of air coming out

25   was 530 --

Page 152

```
 1   the last sentence, "It created a condition

 2   conducive to twisting the frame of the

 3   unit."

 4             Is it your belief that the frame

 5   of the unit was twisted?

 6             Not only your belief, I'm sorry,

 7   is it your opinion that the frame of this

 8   unit was twisted?

 9        A.   Based on the understanding of how

10   they jacked the units, it had no choice but

11   to twist.  Whether it did permanent damage

12   to the frame or not is another issue.

13        Q.   Do you know if there was any -- do

14   you have an opinion as to whether or not any

15   damage was done to the interior of the unit

16   as a result of what you believed to be

17   twisting of the frame of the unit when it

18   was jacked?

19        A.   None that I could identify without

20   taking the wall system apart.

21        Q.   You didn't see any cracks in any

22   walls or any wall panels or ceiling panels

23   falling off the Dubuclet trailer, did you?

24        A.   I did not.

25        Q.   Number 11 talks about placing the
```

Page 153

 1   unit on blocks.  And, again, I'm asking you

 2   if this is your opinion that it apparently

 3   created stress on the roof membrane, or is

 4   this somebody else's opinion?

 5        A.   No, it's my opinion.

 6        Q.   And it is your opinion that the

 7   way the unit was blocked, it caused some

 8   buckling of the roof decking.  Is that

 9   right?

10        A.   That's correct.

11        Q.   And did that lead to any damage to

12   the unit, in your opinion?

13        A.   None that I could identify without

14   destructive demolition.

15        Q.   And the fact that this sealant on

16   the roof edges, that, in your opinion, did

17   not lead to any leak inside of the unit, did

18   it?

19        A.   That they had sealant?

20        Q.   Well, you say in No. 11, "In

21   addition, there is an unusual amount of

22   sealant on the roof."

23             What I'm asking you is, in your

24   opinion that didn't involve any leaking of

25   the roof, did it?

Page 154

 1      A.   No, not the placement of the

 2   sealant.

 3      Q.   Was there any evidence that there

 4   was any roof leak in this unit?

 5      A.   There was not.  Just what appeared

 6   to be an excessive amount of sealant.

 7      Q.   So there was an excessive amount

 8   of sealant, but it doesn't mean anything?

 9   It wasn't the cause of a leak, or you saw no

10   evidence of a roof leak?

11      A.   Correct.

12      Q.   Number 12 deals with warnings.

13   Again, that is not really your area of

14   expertise, is it?  And you are not really

15   here to talk about warnings?

16      A.   It wasn't to render an opinion.  I

17   was listing observations of what was in the

18   unit and the manual.

19      Q.   Number 13 states that "The

20   manufacturer failed to conform to its

21   express warranty."

22          Then you go on to cite what FEMA's

23   requirements were.  So are you saying the

24   manufacturer failed to comply to its own

25   express warranty, or are you saying the unit

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Dubuclet)                    Alexis Mallet, Jr.

Page 157

1    introduction of any formaldehyde off-gassing

2    that occurred in the wall and ceiling

3    cavities.

4    EXAMINATION BY MR. SAPORITO:

5        Q.   The FEMA spec that you refer to,

6    August 12, 2004, paragraph 13 of your

7    conclusions, is that the FEMA spec that you

8    are comparing the Dubuclet unit to?

9        A.   That was the data that was

10   provided to me, the 2004 and the 2006 FEMA

11   specifications were the only two provided to

12   me, provided to me through Fleetwood.

13           My understanding is that the 2005

14   would have been the specifications that the

15   unit should have been constructed under.

16       Q.   You didn't have the 2005 unit at

17   the time, so it is not in your report?

18       A.   It is my understanding, or the

19   information that was given to me of what

20   Fleetwood produced did not include the 2005,

21   although the specifications are very close,

22   if not almost identical, to the 2004

23   specifications.

24       Q.   Number 14 starts off with a very

25   interesting sentence to me, "The

Page 158

 1    manufacturer produced a product that was

 2    unreasonably dangerous as opined by other

 3    experts."

 4            Do you have an opinion of your

 5    own, Mr. Mallet, that the Dubuclet unit was

 6    unreasonably dangerous?

 7        MR. PINEDO:

 8            Objection, sidebar.

 9        MR. SAPORITO:

10            Objection, what?

11        MR. PINEDO:

12            Sidebar.

13        MR. SAPORITO:

14            Sidebar?

15        MR. PINEDO:

16            Your statement that "this is a

17    very interesting statement to me," I'm

18    objecting to that.

19        MR. SAPORITO:

20            Okay.

21    EXAMINATION BY MR. SAPORITO:

22        Q.   Number 14, "The manufacturer

23    produced a product that was unreasonably

24    dangerous as opined by other experts."

25            Do you have an opinion of your

Page 159

 1   own, Mr. Mallet, that this Dubuclet travel

 2   trailer was unreasonably dangerous?

 3        A.   No.  That is why I said "by

 4   others," because that was information that

 5   was gathered by me, it was by others --

 6   produced by others.

 7        Q.   Number 15 --

 8        A.   And all that was to lead to was

 9   that the formaldehyde off-gassing, or

10   products made with formaldehyde, were not

11   the only products available to produce the

12   unit at the time of production; that there

13   were other materials available and being

14   used in the construction industry and the

15   manufactured housing industry that either

16   had formaldehyde, the off-gassing was so low

17   as to be negligible and not classified as a

18   formaldehyde-emitting product, or had no

19   formaldehyde emissions whatsoever.

20        Q.   That last statement that you just

21   made, I guess I would object to as being

22   nonresponsive, Mr. Mallet.

23             But the point of my next question

24   is, that statement is based upon information

25   that you received from Mr. Smulski or other

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Dubuclet)                    Alexis Mallet, Jr.

Page 265

 1   quarters.

 2        Q.   You had discussed the issue of

 3   negative air pressure.  Do you recollect

 4   that?

 5        A.   Yes, sir.

 6        Q.   And is that supported by your

 7   thermographic images which counsel for

 8   Fleetwood has questioned you at length on?

 9        A.   Yes, sir.

10        Q.   Is that also supported by the

11   finding of the defense expert, Tony Watson,

12   where he found 530 feet per minute of air

13   coming out of one of the openings on the

14   interior of this emergency housing unit?

15        A.   Yes, sir.

16        MR. PINEDO:

17             Reserve our remaining questions

18   until time of trial.

19   EXAMINATION BY MR. SAPORITO:

20        Q.   Mr. Mallet, the fact that the

21   slide-out was opened by FEMA prior to your

22   testing and that the unit was not level, and

23   indeed you made a note that it was not level

24   by 5 inches toward the tongue, wouldn't that

25   prevent the slide-out from sealing properly

Page 266

```
 1    to manufacturing specifications?

 2         A.   Yes, because I think the owner's

 3    manual requires it to be level.  That was a

 4    statement made by Mr. Quick when he did the

 5    leveling.  I just made a note of it.

 6         Q.   But if the slide-out is not opened

 7    properly and not sealed properly because of

 8    5 inches of the trailer being out of level,

 9    that is going to prevent the seals on the

10    slide-out from operating properly, isn't it?

11         A.   Yes, I would think so.

12         Q.   The FEMA specs that counsel

13    referred to earlier, that you said on

14    occasion FEMA refers to these units as homes

15    or houses, doesn't it also refer to the

16    units as the travel trailers and that these

17    travel trailers are to be built to certain

18    standards?

19         A.   Correct.

20         Q.   It calls them both, doesn't it?

21         A.   It calls them both, but the final

22    intent is for housing, single-family

23    housing, which converts that away from a

24    travel trailer to a housing unit.

25         Q.   I remember that testimony.  But
```