Exhibit A

# Structural Condition Assessment

# For

# FEMA Travel Trailer
# Dubuclet/Fleetwood Trailer
# Lottie, Louisiana

Prepared for

First General Services of the South

July 16, 2009

Prepared by:



Charles David Moore, PE, PLS
1833 East Main Street
New Iberia, LA  70560

Phone:  (337) 365-9535
FAX:  (337) 367-8131



DUB001121

1. INTRODUCTION

A visual inspection of a FEMA travel trailer in Lottie, Louisiana, was performed on July 9, 2009. This inspection was conducted to provide a structural condition assessment of the trailer for First General Services of the South as part of litigation procedings. This report provides the details of the inspection and the conclusions and recommendations resulting from the visit.

   1.1. PURPOSE – The purpose of this structural condition assessment is to form a portion of litigation proceedings regarding the trailer.

   1.2. SCOPE OF INVESTIGATION AND ASSESSMENT – The scope of work was to provide visual observations of the structural systems present and assess their current condition and load carrying capabilities. Basic floor plans and elevations were prepared by others involved in the assessment of the trailer. Conditions at the time of the investigation were documented with the use of digital photography by others.

   No testing of the structural materials present has been performed to date.

   This investigation does not cover issues related to either electrical or mechanical systems in the building. These systems are being reviewed by qualified personnel as part of the overall assessment of the trailer.

2. DESCRIPTION OF STRUCTURE

   2.1. GENERAL – The trailer is a recreational vehicle manufactured by Fleetwood Travel Trailers of Texas, Inc. in March 2006. It is approximately 8'x28'6" in plan dimension with an additional slide-out section measuring approximately 12'6"x4'. The manufacturer's tag on the trailer identifies it as vehicle ID number 4CJ1F322764015272. The unit also has a tag on the rear of the unit marked "UNIT 12843". An additional tag near the entry door identifies this unit as "Emergency Living Unit 1015188 Not Intended For Recreational Purposes."

   The trailer is constructed with two longitudinal steel beams. These beams are connected with cross members of light gage steel "C", "Z", and angle sections. The two beams are also connected to two 6" channels in a vee configuration to form the tongue of the trailer. The longitudinal steel support beams are mounted on two axles to carry the load during transport.

   The slide out section of the trailer is supported on two slide rails that are 2½" square tubes. The tubes have toothed gear drive sections welded to the bottom to use in sliding the unit in and out. The tubes travel in larger tube sections mounted to the two main frame beams to support the cantilevered slide in the extended position.

   The shell of the trailer is constructed with wall studs of $1½"x1^{1}/_{8}"$ members at 16" on center. The studs are infilled with batt insulation. The interior faces of the walls are

Structural Condition Assessment                                                                                       Page 2
FEMA Travel Trailer, Dubuclet/Fleetwood, Lottie, Louisiana
July 16, 2009

DUB001122

    covered with 3.6mm plywood and the exterior is covered with metal sheeting. The ceiling/roof utilizes tapered wood rafters of 1½"x4½" members. These rafters taper down from 4½" at the center to 1½" at the ends. The rafters have 5/32" luaun plywood for the ceiling and 3.6mm plywood on the top to support the rubber roof system.

2.2. HISTORY – This travel trailer was manufactured for FEMA to be utilized as temporary housing after a natural disaster. As noted above, it was manufactured in March 2006 and was put into service in the New Orleans area for people who needed housing after hurricane Katrina damage. The unit is now in storage at a FEMA site located in Lottie, Louisiana.

3. COLLECTED DATA

   3.1. AVAILABLE DRAWINGS – Drawings utilized to formulate this assessment report included framing drawings from Fleetwood Recreational Vehicle Group. Also, basic floor plans, elevations, mechanical and electrical plans were produced from dimensions measured during the on-site investigation by others.

   3.2. PHOTOGRAPHS – Digital photography was used to document existing conditions. These photographs were taken by others during the on-site investigation.

   3.3. TECHNICAL DOCUMENTS – Several documents were used in the preparation of this assessment. A copy of the Fleetwood Enterprises, Inc. 2006 Owner's Manual for the Pioneer travel trailers and fifth wheels was consulted. Also, a document entitled "Exhibit 7 – Travel Trailer Installation" that was reported to be a portion of the Fluor contract, was reviewed.

   Other technical documents utilized included general engineering reference manuals. These were "The Manual of Steel Construction" from the American Institute of Steel Construction, "The Timber Construction Manual" from the American Institute of Timber Construction, and "ASCE 7-05 – Minimum Design Loads for Buildings and Other Structures". Excerpts from a HUD document concerning specifications for manufactured housing (Part 3280) were also consulted.

4. DISCUSSION OF SITE VISIT

   4.1. OVERVIEW – The on-site investigation of this travel trailer occurred on July 9, 2009. This assessment focuses on the structural aspects of the travel trailer. Other personnel also were on-site on July 8, 2009 as part of the overall investigation of the unit to observe the existing condition of the mechanical and electrical features of the unit.

   4.2. OBSERVATIONS AND THEIR SIGNIFICANCE

4.2.1. General, Exterior – This unit is currently in a FEMA storage lot located in Lottie, Louisiana, along with other similar travel trailer units. The unit had been moved to a location near the office building to allow access to the unit by the inspection team. It was sitting on its wheels with an attached jack stand supporting the unit at the tongue of the trailer. It is not leveled and blocked in its current position. The unit appears to be intact with no major structural damage visible.

4.2.2. General, Interior – The interior of the unit is also basically intact with no major structural damage noted. The structural members of the walls, ceiling and floor were not visible and could not be verified during the inspection. A description of the structural members appears in section 2 of this report, which was derived from drawings from Fleetwood.

4.2.3. Trailer Frame – The frame of the trailer is constructed with steel elements. The main load carrying members are 8" deep steel "I" beams. These beams have $2^3/_{16}$" flanges that are approximately 1/8" thick. There are two of these beams running the total length of the trailer. They are positioned approximately 5'8" apart. The beams are identified in the Fleetwood drawings as I 8 – 6.5 lb/lf. Based on the dimensions measured in the field and the notation on the Fleetwood drawings, it appears that the longitudinal beams are M8x6.5.

The longitudinal beams have lateral bracing consisting of 7" "Z" shaped steel members, 8" "C" shaped steel members, and 3" angle steel members. All cross members can be classified as light gage steel and are identified in the Fleetwood documents as 14 gage. The lateral braces were placed at approximately 4' spacing.

The tongue of the trailer consisted of 6" channel steel sections that were connected to the longitudinal beams. The tongue channel sections were identified in the Fleetwood documents as C6x8.2. The trailer was supported on 2 axles for transporting the unit.

The trailer was fitted with four scissor jacks located on the longitudinal beams near each corner of the unit. The front jacks were located approximately 18" from the front edge of the trailer. The rear jacks were mounted approximately 12" from the rear of the unit. A warning sticker was observed on each of the jacks that said do not lift tires off of the ground with these jacks. The sticker warned that vehicle frame damage and door jamb damage could occur.

5. ANALYSIS

5.1. LOAD COMPUTATION ANALYSIS – The manufacturer's tag for the trailer indicated a GVWR of 7400 lb and a GAWR of 4300 lb for each axle. GVWR is defined as the maximum permissible weight of the vehicle when fully loaded. It includes all weight at the trailer axle(s) and tongue or pin. GAWR is defined as the maximum weight a

Structural Condition Assessment                                                                                         Page 4
FEMA Travel Trailer, Dubuclet/Fleetwood, Lottie, Louisiana
July 16, 2009

specific axle is designed to carry. An additional tire loading information tag indicates "weight of cargo should never exceed 691 kg or 1522 lbs."

The load carrying capacity of the trailer frame beams was analyzed using steel properties of standard carbon steel complying with ASTM A-36. The load carrying capacity of the slide out support beams was analyzed using steel properties complying with ASTM A-500 Grade B. These ASTM specifications for steel are common for most structural steel shapes and tube sections readily available throughout the country. Analysis of the beams also assumed that the trailer was leveled and blocked in accordance with the Fluor contract documents, including the use of six (6) concrete block piers with three piers evenly spaced along each side. The documents reviewed do not contain any reference to additional supports for slide-out sections. Therefore, the slide-out section was analyzed as a cantilever unit supported on the main frame beams.

Using the manufacturer's tag showing a GVWR of 7400 lb, I first assumed that the load is uniformly distributed to each of the two frame beams. This yields a load of 132.1 pounds per linear foot (lb/ft) of beam or approximately 28.3 pounds per square foot (psf). Being supported as outlined in the Flour installation documents, the beams can safely support up to 402 lb/ft or 100 psf. A similar analysis of the slide-out support beams yields a safe carrying capacity of 303 lb/ft or 48.5 psf. Because the slide-out support beams are cantilevered utilizing the main support beams, it will impose additional loads on these beams. This cantilevered support will impose an additional 753 lbs of weight at each of the 2 support points of the closest main longitudinal beam. It will also impose and uplift load of approximately 202 lbs at each of the 2 support points of the opposite longitudinal beam. These additional loads superimposed on the uniformly distributed load calculated previously do not cause the beams to be in an overloaded condition.

ASCE 7-05 – Minimum Design Loads for Buildings and Other Structures provides standard load cases required for the design of buildings and other structures. This document is referenced by the International Building Code (IBC), which is the code document currently in use in Louisiana. While the IBC and ASCE 7 documents do not strictly apply to recreational vehicles, they are to be consulted for residential construction. The minimum design live loads for residential use are designated to be 30 psf in sleeping areas and 40 psf in all other areas. Live loads are defined as "A load produced by the use and occupancy of the building or other structure that does not include construction or environmental loads, such as wind load, snow load, rain load, earthquake load, flood load, or dead load." The live load is in addition to dead loads which are defined to include the weight of all materials of construction incorporated into the structure.

As shown above, the main longitudinal beams can safely support a total load of 28.3 psf, which is significantly less than the prescribed live loads required for residential structures. As noted above, the manufacturer has limited the weight of cargo to a maximum of 1522 lbs, which calculates to approximately 5.8 psf. Again, this is

significantly less than the prescribed live loads required for residential structures. I substituted the manufacturer's cargo limitation with the ASCE 7 live load requirements and re-analyzed the support beams. This yielded a total load on the structure between 52.5 psf and 62.5 psf. The main longitudinal beams would still safely carry this load, but the slide-out support beams would be in an overloaded condition of 129% over the safe carrying capacity.

Analysis of deflections for the steel trailer was performed using the GVWR of the trailer and also the live load requirements from ASCE 7. Deflections calculated with these loads were found to be within an acceptable range for steel structural components. However, the connections of the wood superstructure to the steel and the connections between the various wood components are not known. Small deflections of the trailer framing could produce problems with the connections of the various structural members.

If the unit were not blocked in accordance with the Fluor installation guidelines, the above loading discussion would be significantly changed. For example, if the unit was only supported at the corners with no middle support pier or tires, the beam carrying capacity would be reduced to approximately 23 pounds per square foot. Using the ASCE 7 live loads as shown above, these beams would then be overloaded to approximately 272% above the carrying capacity and would probably exhibit severe permanent distortions. Since these types of severe permanent distortions of the structural beams were not evident, there were probably more supports than just the four corners.

The consequences would be somewhat less if the middle pier were to be moved forward or backward creating uneven spaces between the piers. If the piers were placed with uneven spacing, the loading would be unbalanced and may cause one section of the supporting structure to become overloaded and deflect more than other sections of the trailer. This unbalanced loading of the supporting structure could cause damage to the interior finishes of the unit, such as separations in the paneling. The differential deflections in the supporting structure could also cause the shell construction to warp and deflect causing air and/or water leaks through the deformations.

The blocking and anchoring procedures also present other problems with the trailer. These procedures only address the stability of the base trailer frame. In other words, the base trailer frame (steel under carriage of the unit) may be structurally sound, but the connections of the shell of the living unit also must be structurally sound to hold it to the steel frame. No information was available from the supplied documentation as to the method and means of attachment of the various structural components.

The wall construction differs from typical manufactured homes and other normal residential units. The walls in this unit are $1\frac{1}{2}"x1\frac{1}{8}"$ whereas the walls in typical manufactured homes and other residential units would be nominal 2"x4" members at either 16" or 24" on center. The additional depth of these members increases the capability of the walls to resist wind loading. The capacity of the trailer wall studs is

approximately 6.2 psf. This compares to hurricane wind loads required for residential construction of approximately 30 psf.

5.2. JACKING – Jacking of the trailer would probably occur without the unit fully loaded (no passengers or other long term cargo). However, the jacks would cause a large differential in the loads applied to the beams if the process were done improperly. This danger is prominently noted on the warning stickers on each jack as discussed above. In addition to frame damage and door jamb damage, other damage could also occur, including damage to the interior finishes (wall paneling, cabinet doors, etc). In addition to visible damage, joint seals and sealant could also be damaged that would not be visible. Damage to the joint seals would then allow air and moisture leaks. The installation documents are silent concerning the method to use to jack up the trailer onto the blocks. This allows the contractor on site to determine how to jack up the unit and place it on the blocks and could vary from one unit to another.

Various methods of jacking could be employed in the raising of a trailer. The preferred methods would be to employ jacks that could lift the structure utilizing the strength of the structure to keep it from significant torsion or twisting. For example, a unified hydraulic jacking system could be employed to maintain a constant pressure/lifting force on the entire unit. Screw jacks could also be used to lift the trailer in small increments with monitoring of the unit to prevent large differential movements in the structure.

6. CONCLUSIONS – Based upon my observations at the site, photographs submitted, and technical documents, this trailer appears to be constructed in accordance with accepted practices for travel trailers. None of the standards consulted specifically pertain to travel trailers. However, considering the use of this trailer for long term residential occupancy, the trailer appears to be inadequate in construction.

First, the structural frame supporting the unit is not designed for the full load of a residence as provided for in ASCE 7. This standard is used for normal load requirements for buildings and other structures, including residential occupancies. Normally, travel trailers are designed for a short term occupancy, which is due to smaller number of people, less cargo, and overall less load requirements for weekend and/or overnight use. Longer term occupancy results in every day use that includes more people (family and friends), more cargo (furniture, clothing, etc.). Emergency use, such as hurricane disaster, can be considered a hybrid of short and long term occupancies. The initial occupancy will probably be lightly loaded due to the extreme need that the family has lost most of their possessions due to the disaster. However, as time proceeds, they will move into a more normal every day pattern of living.

It should be noted that the requirements from ASCE 7 for design loads of 30 – 40 psf are not intended to imply that the residence will actually be loaded with 30 – 40 pounds on every square foot of the residence. These requirements are derived from long term observations and research to provide for structural components that can provide adequate support for the variety of loads that can and will occur within a residence. At any given time one part of the

structure may have no active loads when another part of the structure has a significant concentrated load (i.e. one corner of furniture being placed at a weak point in the structure).

There is also concern due to deflections in the trailer framing. However, the primary structure of a normal residential building is composed of elements that can withstand these deflections of the supporting structure. As noted above, the walls, ceilings, and floor structures are constructed with wood elements much smaller than those normally found in residential construction. Therefore, deflections in the supporting structure can lead to problems with connections between elements, which will affect the performance of air and water resistant joints.

In addition, the lighter structural members of the walls, ceiling/roof, and floor will not withstand normal wind loading requirements for residential structures. While this unit did not need to withstand a large hurricane event while occupied, it did have to withstand smaller storms that consist of high winds and rain. The lighter structure, while strong enough to stand up to the winds experienced, cannot perform like normal residential construction by providing a rigid envelope of protection from the wind and rain. The lighter structure will deflect under normal storm events, which will cause additional problems with the performance of air and water resistant joints.

The blocking of the unit also leads to several questions regarding the performance of the trailer. However, nothing is known as to the original installation concerning methods and procedures or placement of blocks, etc. Any deviations from the blocking requirements would cause problems with the load carrying capacity of the trailer. Also, even though we were unable to analyze the structural capacity of the entire shell of the living unit, it is a concern that blocking and anchoring of the trailer frame would cause problems in the structure of the shell.

Due to these issues, the use of travel trailers for long term residential occupancy cannot be expected to perform adequately. The structure cannot perform to normal air and water resistance requirements under these types of loading.

7. LIMITATIONS – This report is furnished for the exclusive and confidential use of the addressee. Release to any other company, concern or individual is solely the responsibility of the addressee. The opinions and conclusions drawn in this report are based upon observations and information available, known and declared at the date of the investigation and/or the time of the preparation of this report. No warranty is made to the accuracy of data provided by others in the preparation of this report. The right to amend and/or modify the conclusions contained in this report is reserved based upon any new information provided.