UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE | * | |
| | PRODUCTS LIABILITY | * | |
| | LITIGATION | * | SECTION:  N(5) |
| | | * | |
| This Document Relates to: | | * | |
| *Dubuclet v. Fleetwood Enterprises, Inc.* | | * | |
| | | * | JUDGE: ENGELHARDT |
| *Case No. 07-9228* | | * | |
| | | * | |
| | | * | MAG: CHASEZ |

*****************************************************************************

**FLEETWOOD ENTERPRISES, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION TO LIMIT ERVIN L. RITTER, P.E.'S TESTIMONY**

Defendant, Fleetwood Enterprises, Inc. (hereinafter "Fleetwood") and moves this Court

to limit the testimony of Erwin L. Ritter, P.E.  Plaintiff has disclosed Ervin L. Ritter, P.E., who

visually inspected the Dubuclet unit, and Fleetwood is seeking to limit his testimony and to

exclude the following opinions:

1)      a negative pressure condition draws contaminants into the living space,

2)      the ductwork does not meet construction and insulation standards, and

3)      opinions on alternative designs and design deficiencies.

His negative pressure opinion has no reliable basis or quantifiable measurements because there is

no testing done on the supposed duct leakage that he claims lead to this condition.  He has not

identified any specific construction or insulation standard that applies to this unit.  And he has

opined that even if there are no applicable government standards for the design and construction

of Dubuclet travel trailer, the trailer was not designed to keep in mind the "health and welfare of

the public."  However, Ritter does not provide any specific alternative design that he deems appropriate and feasible.

## I.     Factual Background

### A.     Timia Dubuclet's allegations

Timia Dubuclet has brought a product liability action against Fleetwood under the Louisiana Products Liability Act.  Plaintiff has alleged that the unit she resided in was "in a defective condition, and [was] unreasonably dangerous under normal use at the time the products and equipment left [Fleetwood's] control."[1]

### B.     Ritter's opinions

Plaintiff has disclosed Ervin L. Ritter, P.E. as a proposed expert in the area HVAC/ heating system and mechanical engineering, ventilation, air infiltration, moisture's role in elevating formaldehyde exposure, and related trailer construction and design issues, and a visual inspection of the Dubuclet Emergency Housing Unit ("EHU").[2]  Fleetwood addresses three opinions that should be excluded below.

#### 1.     *A negative pressure condition draws contaminants into the living space.*

Ritter has testified that a negative pressure condition exists in the unit, and that that condition causes contaminants to be drawn into the living space.

> In the summer time, the duct leakage will cause condensation to occur in the envelope cavities (wall cavity and ceiling cavity) by lowering the dew point in this space.  This negative pressure condition, high summer time humidity levels, and leakage in the envelope will contribute to elevated moisture levels in the trailer envelope cavities and elevated humidity levels in the trailer.  The air inside the trailer would feel warm and moist. This leaking humid air will allow water vapor to move through and into the envelope cavity since there is no vapor barrier in the wall located in the exterior side of the wall.[3]

---

[1] Aldridge Nov. 30, 2007 Compl. at 25 (paragraphs are unnumbered).
[2] Pl.'s Designation of Expert Witnesses, dated July 17, 2009, at 6 (Ex. A).
[3] Ritter Rep. at 8 (Ex. B).

He then concludes that where there exists the combination of moisture in the envelope cavity and the interior of the trailer is in a negative pressure state, "any contaminants in the building materials or in the cavity of the envelope will be drawn into the interior of the trailer."[4] Critically, this duct leakage that he claims will create condensation was never quantified: "Since the duct systems were not tested the rate of leakage is not known for this report."[5]  Ritter only notes his observation that:

> The air conditioning ducts located in the ceiling were found to leak.  The cooling ductwork was not tested to determine the exact rate of air leakage. The ducts were found to be leaking in the ceiling cavity noted by the cool air from the ceiling cavity where a TV cable outlet connection was removed.[6]

Ritter can only state that "there was air coming out of that hole, a pretty good velocity of air coming out of it," but that he was not permitted to test it.[7]  Ritter admits that blower door testing is one method that air duct leakage could be measured.[8]  He also notes that a "simple manometer" could "take the differential pressure from outside to inside."[9]

As noted above, Ritter opines that the negative pressure condition is not only related to the duct leakage, but to moisture in the wall cavity.  Ritter admits that he could not see inside the wall cavities and that he could not examine the insulation in the wall cavities.[10]  He did not see

---

[4] Ritter Rep. at 8 (Ex. B).  The protocols for the testing of the Dubuclet unit were agreed upon by the parties. Although Ritter testified -- upon examination by Plaintiff's attorney -- that he also used Alexis Mallet, Jr.'s thermography to support his findings, Ritter Dep. (Oct. 13, 2009) at 273:11-24, that support is limited to "[t]he knowledge that [Mallet] had hot spots around the top plate of the unit." *Id.* at 171:11-172:11 (Ex. C).
[5] Rittter Rep. at 8 (Ex. B).
[6] Ritter Rep. at 8 (Ex. B).
[7] Ritter Dep. (Oct. 13, 2009) at 162:10-163:5 (Ex. C).
[8] *Id.* at 177:23-178:14 (Ex. _).
[9] *Id.* at 178:16-179:9, 187:12-188:2 (Ex. C).  Ritter's firm owns a manometer and he could have measured the pressure inside and outside the EHU.  *Id.* at 231:15-19, 233:21-234:3 (Ex. C).  But that measurement was not taken. Fleetwood reminds this Court that in *Alexander*, Paul LaGrange did blower door and duct blaster testing, but Plaintiff did not designate Mr. LaGrange as an expert in this case, and no such testing was performed in this case.
[10] *Id.* at 187:2-188:2 (Ex. C).

3

any condensation or moisture on the walls of the EHU.[11]  He did not do any testing on the

Dubuclet unit.[12]  Ritter also states that the amount of condensation "would be even greater"

based on his opinion that "the air conditioning ductwork leaks cold conditioned air into the roof

cavity."[13]

### 2. *The ductwork does not meet construction and insulation standards.*

Ritter states that the ducts do not meet ASHRAE or SMACNA standards:

> The ducts for the heating and the air conditioning systems do not meet the
> ASHRAE or SMACNA published standards for duct construction and
> insulation.  There are not any known standards for constructing air ducts
> using foil faced foam board approximately ¼" thick with an R-value=1.[14]

Ritter does not identify any specific standards that are allegedly not met.  Ritter also states that

"the travel trailer industry does not have a specific code or standard for construction of

recreational travel trailers and recreation vehicles."[15]  He opines that the travel trailers should

meet standards that are used in residential housing.[16]  But he also states that NFPA 1192 is the

primary code that can be applied to this EHU and that the "duct installation for the air

conditioning systems and heating systems do not comply."[17]  He does not specific how the

ductwork does not meet this standard.[18]  He admits that he could not see the ductwork: "The

---

[11] *Id.* at 171:8-10 (Ex. C).

[12] *Id.* at 83:12-14 (Ex. C).  Interestingly, upon an agreed testing protocol with Plaintiff, Fleetwood's expert Thomas
W. Fribley, did test for moisture.  He used a moisture meter to test in over 50 locations inside the unit, "with all
readings in a normal area of 0 to 1%," with the exception being the floor at the entry door, showing 97%.  Fribley
Aff. at ¶ 5, attached as Ex. D; *see also* Fribley Dep. at 133:6- 134:16, excerpts attached as Ex. E.  Fribley stated that
the high reading at the entry door indicates a pool of water at that location.  Fribley Aff. at ¶ 5 (Ex. D).  Certainly
nothing in Fribley's testing supports Ritter's opinion on moisture in the wall cavities.

[13] Ritter Rep. at 12 (Ex. B).

[14] *Id.* at 12 (Ex. B).

[15] *Id.* at 14 (Ex. B).

[16] *Id.* (Ex. B).

[17] *Id.* (Ex. B).

[18] ANSI A119.2, NFPA 1192, Standard on Recreational Vehicles (2002), is attached as Ex. F.  Note that it does not
deal with air conditioning ductwork or insulation.  Section 5.8, "Air Conditioning," states, among other things, that
the installation of air conditioning appliances "shall conform to the terms of its listing and the manufacturer's
installation instructions." *Id.* at 21, § 5.8.

exact size of the ductwork could not be determined due to its concealed location."[19]  Moreover,

he includes heating systems in his opinion, but there is no ductwork for heating: "The heat is

provided by electric baseboard type heaters located on the wall near the floor."[20]

### 3.    Opinions on alternative designs and design deficiencies.

Ritter has stated that, even if there are not standards or regulations governing travel

trailers, that it was not designed to keep in mind the "health and welfare of the public."[21]  He

notes that he believes a vapor barrier should have been part of the design, to be placed on the

exterior side of the insulation.[22]  He also finds fault with the insulation, claiming that the R-value

is low.[23]  He also believes that different ductwork should have been used.[24]

## II.    Argument & Citation to Authority

### A.    This Court's gatekeeping role regarding Ritter's opinions.

Federal Rule of Evidence 702 permits a witness who, through his expertise, has the

knowledge, skill, experience, training, or education to offer scientific, technical, or other

specialized knowledge may testify regarding that knowledge if it will assist the trier of fact to

understand the evidence or to determine a fact in issue.  A proposed expert witness must first be

qualified to testify regarding the issues for which he is offered.[25]  Courts have routinely refused

to admit a proffered expert's testimony where the proffered expert, despite a generalized or

---

[19] Ritter Rep. at 9; *see also id.* 10 ("The condition of the air conditioning ducts could not be inspected due to their concealment in the ceiling cavities.") (Ex. B).
[20] Ritter Rep. at 10 (Ex. B).
[21] Ritter Dep. (Oct. 13, 2009) at 299:1-20 (Ex. C).
[22] *Id.* at 212:19-213:12, 214:5-18 (Ex. C).
[23] *Id.* at 202:4-203:11 (Ex. C)
[24] *Id.* at 203:12-23 (Ex. C).
[25] *See U.S. v. Frazier*, 387 F.3d 1244, 1260-1261 (11th Cir. 2004).

professed knowledge of issues arguably relevant to the subject matter, nevertheless lacked expertise with the specific nature of the claims being litigated.[26]

Even if an expert is qualified, his opinion can be excluded if not reliable.[27]  A qualified expert's testimony is only admissible if it is based upon sufficient facts or data, it is the product of reliable principles and methods, *and* the witness has applied the principles and methods reliably to the facts of the case.[28]  The reliability inquiry is flexible, and several nonexclusive factors may be considered, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, and (4) whether the technique is generally accepted in the relevant scientific community.[29]  The expert testimony must also be relevant -- not only in the way that all testimony must be relevant under Federal Rule of Evidence 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue.[30]

In this case, it is important to note the Louisiana requirements to show an alternative design in a products liability case.  In *Seither v. Winnebago Industries, Inc.*, the court found that the trial judge abused his discretion in failing to grant a directed verdict as to the alternative design issue.[31]  In that case, there was no valid alternative design presented.[32]  The expert "presented merely a concept that was untested, unengineered, and not presented to the jury in

---

[26] *See*, *e.g,*. *Kassim v. City of Schenectady,* 415 F.3d 246, 251 (2nd Cir. 2005) (expert lacked knowledge regarding Arabic translation); *In Re: Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543-544 (S.D.N.Y. 2004) (expert's opinion not based on qualification or experience but on subjective views of ethical standards at issue).
[27] *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).
[28] Fed. R. Evid. 702.
[29] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993) (discussing the four nonexclusive factors); Order dated July 15, 2009 at 4 (Rec. Doc. 2181) (citing *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)).
[30] Order dated July 15, 2009, at 4 (Rec. Doc. 2181) (citing *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003)).
[31] *Seither v. Winnebago Indus., Inc.*, 853 So. 2d 37, 41 (La. Ct. App. 2003).
[32] *Id.*

any fashion more than mere speculation."[33]  The court also noted that the plaintiffs failed to present a risk/utility analysis of the proposed alternative design.[34]  In that case, the expert presented an economic feasibility analysis, but it did not have a material quote or manufacturing labor factor.[35]  Although *Seither* does not address the admissibility of an expert's opinion directly, it certainly shows the factors that an expert must present in order to have relevant and helpful information for the jury.

*Daubert* also cautions against admitting expert testimony in a case when the application of the expert's methodology to the facts of the case involves an impermissible leap of faith.  The Supreme Court in *General Electric v. Joiner* acknowledged, "[t]rained experts commonly extrapolate from existing data.  But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to the existing data only by the *ipse dixit* of the expert."[36]  If the analytical gap between the data and the opinion offered is too great, the testimony is not reliable.[37]

**B.     Without the available testing to support his opinion, Ritter's opinion that a negative pressure condition draws contaminants into the living space is unreliable and should be excluded.**

Ritter bases his opinion on contaminants being pulled into the living space on duct leakage and condensation:

> In the summer time, the duct leakage will cause condensation to occur in the envelope cavities (wall cavity and ceiling cavity) by lowering the dew point in this space.  This negative pressure condition, high summer time humidity levels, and leakage in the envelope will contribute to elevated moisture levels in the trailer envelope cavities and elevated humidity levels in the trailer.  The air inside the trailer would feel warm and moist.  This leaking humid air will allow water vapor to move through and into

---

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] 522 U.S. 136, 146 (1997).
[37] *Id.*

the envelope cavity since there is no vapor barrier in the wall located in the exterior side of the wall.[38]

But, despite his admission that there are tests available, he has not performed any test to quantify the amount of duct leakage allegedly present.[39]  His firm even has available one of the tests.[40]  His opinion on duct leakage is based on his personal observation and subjective feeling that there was air coming out of a hole: "there was air coming out of that hole, a pretty good velocity of air coming out of it."[41]

Ritter also bases this opinion on there being moisture in wall cavity.  Yet, he admits that he could not see inside the wall cavities and that he could not examine the insulation in the wall cavities.[42]  He did not see any condensation or moisture on the walls of the EHU.[43]  Ritter also states that the amount of condensation "would be even greater" based on his opinion that "the air conditioning ductwork leaks cold conditioned air into the roof cavity."[44]  Ritter did not perform any testing for moisture, so no reliable methodology supports his moisture opinion.[45]  Indeed, it seems that he is of the opinion that there is moisture in the wall cavities only because of the duct leak he observed because, he testifies, that with a duct leak, and cool air being released, a dewpoint will be reached inside the walls and above the ceiling cavity, and then moisture will turn into condensation.[46]  But, again, because this moisture opinion appears to be dependent on the duct leak, and the duck leak has not been quantified, there is no basis for his opinion.

---

[38] Ritter Rep. at 8 (Ex. B).

[39] *Id.* (Ex. B); Ritter Dep. (Oct. 13, 2009) at 177:23-178:14, 178:16-179:9, 187:12-188:2  (Ex. C).

[40] Ritter Dep. (Oct. 13, 2009) at 231:15-19, 233:21-234:3. (Ex. C).

[41] Ritter Dep. (Oct. 13, 2009) at 162:10-163:5 (Ex. C).

[42] *Id.* at 187:2-188:2 (Ex. C).

[43] *Id.* at 171:8-10 (Ex. C).

[44] Ritter Rep. at 12 (Ex. B).

[45] There is a test for moisture, and Fleetwood's expert Thomas W. Fribley performed that test, which shows over 50 readings with 0 to 1% moisture, and only one spot at the entry door that showed moisture.  Fribley Aff. at ¶ 5 (Ex. D).

[46] Ritter Dep. (Oct. 13, 2009) at 172:21-175:14 (Ex. C).

Despite Ritter knowing two methodologies, and admitting that at least of those methods was readily available, the amount of duct leakage was never quantified.  His opinion is based on a subjection observation, and therefore this opinion on the negative pressure condition being creating and that contaminants were drawn into the living space should be excluded.

**C.  Ritter has not identified any standard that the ductwork did not meet, and therefore this opinion is unreliable and should be excluded.**

Ritter should not be permitted to testify that any standards regarding the air conditioning ductwork have been violated.  As a threshold matter, he admits that he could not see the ductwork: "The exact size of the ductwork could not be determined due to its concealed location."[47]

Moreover, he does not identify any standard that has been violated.  While he testifies that NFPA 1192 is the primary code that can be applied to this EHU, and stated that the "duct installation for the air conditioning systems and heating systems do not comply,"[48] he does not specify how any standard has been violated.  Of course, this task would be difficult because NFPA 1192 does not address air conditioning ductwork, and this EHU does not have ductwork for heating.[49]

Ritter then attempts to impose requirements for site-built housing onto this travel trailer.  Indeed, Ritter's entire opinion is premised on his legal conclusion that residential standards should apply.[50]  He appears to be interpreting the FEMA specs as mandating that residential

---

[47] Ritter Rep. at 9 (Ex. B); *see also id.* 10 ("The condition of the air conditioning ducts could not be inspected due to their concealment in the ceiling cavities.")
[48] Ritter Rep. at 14 (Ex. B).
[49] ANSI A119.2, NFPA 1192, Standard on Recreational Vehicles (2002), at 21, § 5.8 (Ex. F).
[50] Ritter Rep. at 14 (Ex. B).

standards apply because of the simple use of the word "home" in the FEMA specifications.[51] And, still, no specific standards are identified that should have been complied with.

Ritter's opinion that standards have been violated is not based on analysis the duct system, and is not tied to any standard.  This vague testimony, part of which is premised on a legal conclusion, cannot provide a basis for an opinion to be presented to the jury.  The jury cannot be expected to sort through standards to determine if any standard has been violated, much less whether it is applicable.  Ritter does not offer any assistance on this task, and his opinion should be excluded.

### D.   Ritter's vague opinion that the EHU should have been designed differently is not supported by any viable alternative design, and so it is unreliable and should be excluded.

Ritter has stated that, even if there are not standards or regulations governing travel trailers, that the EHU was not designed to keep in mind the "health and welfare of the public."[52] In a general manner, he alleges that the vapor barrier should have been moved, that the R-value of the insulation is too low, and that different ductwork should have been used.[53]  But he does not take this opinion to the next level that would be helpful to a jury.  He has not presented any viable alternative design that would meet the requirements of the product that the government needed.  How would the price have been affected? Would it have affected transportability? He has not tested any alternative design, and has not conducted any risk/utility analysis.  He should not be permitted to suggest that the design was improper without offering a viable alternative design, and so these opinions should be excluded.

---

[51] *See* Ritter Dep. (Oct. 13, 2009) at 220:10-13 (identifying the exhibit), 223:1-15 (Ex. C).
[52] Ritter Dep. (Oct. 13, 2009) at 299:1-20 (Ex. C).
[53] Ritter Dep. (Oct. 13, 2009) at 202:4-203:23, 212:19-213:12, 214:5-18 (Ex. C).

### III.     Conclusion

Fleetwood requests that the Court enter an order limiting Ritter's testimony, and not permit him to testify or present evidence regarding 1) a negative pressure condition draws contaminants into the living space, 2) the ductwork does not meet construction and insulation standards, and 3) opinions on alternative designs and design deficiencies.  While Ritter can testify to his inspection, he should not be permitted to offer these conclusions because he does not have a reliable basis for doing so, and has not followed any methodology in reach these opinions.

This 9th day of November 2009.

Respectfully submitted:


 /s/ Richard K. Hines, V
Richard K. Hines, V
GA Bar No. 356300
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

Jerry L. Saporito
LA Bar No. 11717
LEAKE & ANDERSSON, L.L.P.
1700 Energy Centre
1100 Poydras St.
New Orleans, LA 70163-1701
(504) 585-7500 (phone)
(504) 585- 7775 (fax)

Counsel for Fleetwood Enterprises, Inc.

# C E R T I F I C A T E OF SERVICE

I hereby certify that a copy of the foregoing has this date been serves on all counsel of record in this proceeding by:

( )    Hand Delivery                          ( )    Prepaid U.S. Mail

( )    Facsimile                               ( )    Federal Express

(X)    CM/ECF

New Orleans, Louisiana, this 9th day of November 2009.

*/s/ Richard K. Hines, V*
Richard K. Hines, V
Georgia Bar No. 356300
richard.hines@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW
Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)