UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE | * | |
| | PRODUCTS LIABILITY | * | |
| | LITIGATION | * | SECTION:  N(5) |
| | | * | |
| This Document Relates to: | | * | |
| *Dubuclet v. Fleetwood Enterprises, Inc.* | | * | |
| . | | * | JUDGE: ENGELHARDT |
| *Case No. 07-9228* | | * | |
| | | * | |
| | | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DEFENDANT FLEETWOOD ENTERPRISES INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION IN LIMINE TO LIMIT TESTIMONY OF MARCO KALTOFEN, P.E.**

Defendant, Fleetwood Enterprises, Inc. (hereinafter "Fleetwood"), respectfully submits

this memorandum of law in support of its motion to limit the testimony of Marco Kaltofen, P.E.

Kaltofen is not a statistician, yet has offered statistical opinions.  Fleetwood is seeking to exclude

three opinions, as detailed below.  First, his opinion regarding the mean level of formaldehyde in

the dataset is now inaccurate and outdated due to Paul Hewett's revised affidavit.  Second, his

opinion that his database shows with a 95% of the data exceeds the ATSDR's MRL, is

cumulative of Hewett's testimony, and should not be permitted because it does not account for

actual living conditions.  Finally, his attempt to "correct" formaldehyde levels is not based on

reliable science and should be excluded.

This Court has ruled on Kaltofen's testimony previously, and Fleetwood requests that this

Court apply the same limitations to the nearly identical opinions in this case.

## I.   BACKGROUND

### A.   Ms. Dubuclet has disclosed Marco Kaltofen, PE as a Civil Engineering Expert.

Marco Kaltofen is a Massachusetts Registered Professional Civil Engineer and he is the

President and owner of the Boston Chemical Data Corporation (BCD), an engineering consulting

practice.[1]  Plaintiffs asked Kaltofen to find a protocol for testing the EHUs:

> I was asked to find a way to test FEMA housing units for formaldehyde
> in the air; to agree with some of the experts that had already been hired
> on a protocol that would allow this testing to be done in a reproducible,
> comparable manner.
>
> And I was asked, once an individual and her trailer were identified, to
> look at the data that applied to that particular trailer, in light of the entire
> data set that had been put together on the other emergency housing units.
> Also, to make a visit to that trailer and write a report about my
> opinions.[2]

As the Court knows, Kaltofen was also an expert in the *Alexander* case.  This Court

entered an order regarding his opinions,[3] and Fleetwood is assuming that Plaintiffs would

identify the same six opinions in this case as they did in Gulf Stream.[4]  Those opinions are as

follows:

1.   Although formaldehyde can come from sources unrelated to EHUs, these units
have higher levels of formaldehyde than outdoor air or air in site-built homes.
Outdoor air in unpopulated areas can be expected to have 0.2 parts per billion,
(ppb), of formaldehyde.  Suburban areas may have 2 to 6 ppb.  Heavily populated
or industrial areas may have 10 to 20 ppb.  (Reference: ATSDR 1999)[5]

2.   Indoor formaldehyde concentration is related to temperature and humidity.  As
interior temperatures increase within these housing units, the amount of
formaldehyde released into indoor air likewise increases.  Researchers found that

---

[1] Kaltofen Aff. at 1 (DUB000567) (Ex. 1). This exhibit is annotated based on comparison with email from Justin Woods dated Aug. 20, 2009 in Att. A to Order (Ex. 3).

[2] Kaltofen Dep. at 32:16-33:3 (deposition taken June 16, 2009, testimony in *Alexander*), excerpts attached as Ex. 5.

[3] *See* Order dated August 24, 2009 (Rec. Doc. 2816), including Att. A.  Attachment A is attached as Ex. 3 to the motion for Court's convenience.

[4] The Court had asked the parties to segregate his opinions, and Plaintiffs responded by email. Fleetwood attaches an annotated copy of Kaltofen's Affidavit that highlights the six opinions that correspond to the same six opinions in *Alexander*.  (Ex. 2).  Should Plaintiffs now wish to include additional opinions, Fleetwood will seek leave of the Court to challenge Kaltofen's qualification and bases for those additional opinions.

[5] Kaltofen Aff. at 3, para. 3 (DUB000569).  (Ex. 1).

formaldehyde loss from particle boards increased by a factor of 2.3 times with a 10 degree Celsius rise in temperature.  The increase was a factor of 3.5 times for medium density fiber board.  (Zhang 2007, page 3209, starting at 30 deg. C or 86 deg. F.)[6]

3.      . . . steady state formaldehyde concentration is proportional to formaldehyde generation divided by volumetric airflow of ventilation. (Cair = G/Q)[7]

4.      Of the 17,980 records fully reviewed at the time of this affidavit, 1,518 units were Fleetwood units.  The mean result was 0.146 parts per million, (ppm), of formaldehyde in indoor air.  (ref. Expert Report of P. Hewett)[8]

5.      CDC produced a table, (Table 2. Formaldehyde Levels by Brand), in the report which noted that the geometric mean of formaldehyde in all 44 sampled Fleetwood travel trailers was 0.039 parts per million (ppm or 39 ppb, and a range of 0.003 to 0.140 ppm, (3 to 140 ppb).  CDC qualified its results saying, "Our study was done in the winter months of December 2007 through January 2008, when people had already lived in the trailers and mobile homes for two years. The formaldehyde level was probably higher in newer trailers and mobile homes and when the weather was warmer."[9]

6.      Given the time and temperature considerations, the active tube sample, conducted by Plaintiffs expert William Scott, which was the lower of the two tests done at the trailer bedroom nightstand, (0.34 ppm formaldehyde by passive badge, and 0.23 ppm by active tube), is the more conservative value of her actual exposure during the time Ms. Dubuclet resided in this Fleetwood unit.[10]

There are two additional opinions that plaintiffs did not identify in *Alexander*, but

because they are still included in Kaltofen's Affidavit, Fleetwood includes them here:

7.      Overall, based on the May 15, 2009 state of the BCD electronic database, the 5th percentile data point exceeded the ATSDR MRL of 0.008 PPM.  That is, 95 percent of the data was higher than the MRL, (Minimum risk level, 0.008 PPM). This is despite the fact that the EHUs were often sampled after residencies had ended, with an associated decline in EHU age and formaldehyde concentration.[11]

He expanded upon this statement in the deposition in the *Alexander* case:

Q.      All right.  You've tested 10,500 units and now we're going to test the 10,501st unit.  You have all of your database right here.  Tell me what level I'm going to find when I walk in there and test Unit 10,501.

---

[6] Kaltofen Aff. at 4, para. 2 (DUB000570).
[7] Kaltofen Aff. at 5, para. 4 (DUB000571).
[8] Kaltofen Aff. at 7, para. 1 (DUB000573).
[9] Kaltofen Aff. at 10, para. 1 (DUB000576).
[10] Kaltofen Aff. at 12, para. 2 (DUB000578).
[11] Kaltofen Aff. at 9, para. 1 (DUB000575).

A.      Well, given a certain set of conditions, we have a very good probability, probably 95 percent or greater, of knowing what the result is for that trailer.

Q.      Is the result going to be below the detection limit?

A.      There's probably a probability associated with that. I would bet if someone worked out the statistics, you know, compared to the data set we actually have, that's probably a very low probability. I would say it is less than 5 percent probability.

Q.      But it could be?

A.      And that's just off the top of my head without being able to do the statistics for it.

Q.      It could be below all of the MRLs that you've actually talked about, couldn't it?

A.      There's a positive probability for almost any number within the range that we have.[12]

        ****************

Q.      But, for me, working as an engineer, 95 percent probability is a very good workable precision. I'm happy with that. That's generally accepted. If you want to know beyond a 95 percent certainty, that probably takes a larger number of samples, and I don't know if we have that many.[13]

The final opinion that Fleetwood seeks to exclude is Kaltofen's attempts to "correct"

temperature and humidity conditions:

8.      A standard method exists for correcting actual temperature and humidity conditions to standard temperatures. The average temperature and humidity during the period Ms. Dubuclet resided in the unit was larger than the range of values used in this formula, which is only 5 deg. F.[14]

Note that these opinions do not relate to the protocol for testing. Although Kaltofen

testified that this is what he was hired to do, his opinions do not relate to the protocols.

---

[12] Kaltofen Dep. June 16, 2009 at 87:8-88:6.
[13] Kaltofen Dep. June 16, 2009 at 88:24-89:5; *see also* Kaltofen Aff. at 14 (last paragraph citing CDC study) (DUB000580).
[14] Kaltofen Aff. at 15 (DUB000581) (Ex. 1).

4

**B.      The Court's Previous Ruling Regarding Kaltofen.**

      **1.      *Previous limitations on testimony that are applicable here.***

In *Alexander*, this Court placed certain conditions on Kaltofen's Opinions 1 through 5:

*Opinion Nos. 1, 2, and 5*: Kaltofen was to be "clear that this testing was not done by him and is not his opinion, but rather is available information that he considered in forming his ultimate opinions."[15]

*Opinion No. 3*: To the extent that he relies on the research of others, "he must attribute it to others and explain why it is applicable herein in formulating his ultimate opinions."[16]

Fleetwood is requesting that the Court place these same limitations on Kaltofen's testimony in this case[17] and that the Court's previous order on Kaltofen be in effect here to the extent that it is applicable.[18]

      **2.      *Previous rulings that are <u>not</u> applicable in this case.***

*Opinion No. 4*: This opinion deals with the mean result for formaldehyde in Fleetwood units, and the Court's corresponding ruling in *Alexander* was that "it must be shown, by properly laid foundation, that this opinion can properly be considered to fall within Kaltofen's expertise."[19]  But Fleetwood notes that Kaltofen's opinion is based on Paul Hewett's original affidavit; while Hewett has substantially modified his opinions and recalculated the mean result for formaldehyde in certain Fleetwood travel trailer units provided to FEMA for use after

---

[15] Order dated Aug. 24, 2009 (Rec. Doc. 2816), at 2 (corresponding to Opinion Nos. 1 and 2 above). Nearly identical language is used for Opinion No. 5 above.  *Id.* For the Court's convenience, an annotated Order, matching the order's language to the corresponding opinions in Kaltofen's Affidavit in the Dubuclet matter, is attached as Ex. 1. *See also* Ex. 2, Annotated Kaltofen Aff. (based on comparison with email from Justin Woods dated Aug. 20, 2009 in Att. A to Order (Att. A is attached as Ex. 3)).

[16] Order dated Aug. 24, 2009 (Rec. Doc. 2816), at 2 (corresponding to Opinion No. 3 above) (Ex. 4).

[17] In order to preserve its record for appeal, Fleetwood joins in and adopts as its own motion in limine of Gulf Stream Coach, Inc.'s to exclude Kaltofen's testimony filed July 23, 2009 (Rec. Doc. 2271).

[18] Order dated Aug. 24, 2009 (Rec. Doc. 2816) (Ex. 4).

[19] *Id.* at 2.

Katrina, reaching a much lower mean and median result.[20]  Kaltofen has not issued a revised affidavit based on Hewett's revised affidavit.  Fleetwood is therefore requesting this opinion also be excluded; given that the underlying basis for his opinions has been substantially modified by Hewett.  Moreover, it is cumulative of the opinions to which Hewett will testify.

*Opinion No. 6*: In *Alexander*, the Court excluded the opinion that corresponds to Opinion No. 6, above, because it related to the May 2009 testing that was inadmissible in *Alexander*[21] -- therefore, this particular ruling is not applicable in this Fleetwood case.  But Fleetwood is requesting this opinion be excluded because it is cumulative.  This opinion only relates to testing numbers, and he did not do this testing -- it was done by the W.D. Scott Group.[22]  Therefore any testimony from Kaltofen is cumulative of other plaintiff experts who can more directly address the testing of the Dubuclet unit.

*Opinion No. 7*: The Court also stated that Kaltofen's statements that 95% of data was higher than the minimum risk level (which Kaltofen puts at .008 ppm), should be excluded because it relates to the May 2009 testing, which had been excluded.[23]  That circumstance is not present in this case, so Fleetwood is requesting that this opinion be excluded on different grounds.  Moreover, the Court did not rule specifically on the "95% confidence" estimate (also part of Opinion No. 7, above).  Rather, the Court stated that the "general opinion" can be offered that EHUs have higher levels of formaldehyde than outdoor air or air in site-built homes, and that the presence of indoor formaldehyde concentration is related to temperature and humidity.[24]  While Fleetwood is not asking the Court to reconsider its ruling on the "general opinion" as stated by the Court in the Order, it is asking the Court to exclude Kaltofen's specific opinion

---

[20] *Compare* Hewett Aff. dated July 16, 2009 (Table 1, DUB000556, showing 0.1466 as mean formaldehyde level for Fleetwood dataset), attached as Ex. 8, *with* Hewett Aff. dated Oct. 26, 2009 (Table 2 showing 0.0635 as mean formaldehyde level for Fleetwood dataset), attached as Ex. 9.
[21] Order dated Aug. 24, 2009 (Rec. Doc. 2816) at 3 (Ex. 4).
[22] Kaltofen Aff. at 10 (DUB000576).
[23] *Id.* at 2 (citing para. 1, pg. 8).

regarding the conclusion of the CDC report and the 95% confidence level.  The testimony reflected in Opinion No. 7 falls outside of Kaltofen's expertise, is not supported by reliable data, and is not helpful to the jury.  Indeed, much of Kaltofen's "opinion" could just as easily be conveyed to the jury by reading the reports upon which he is relying.

   *Opinion No. 8*:  The Court did not previously rule on this opinion.  While the Court stated (in ruling on Opinion No. 2) that "[i]f the general opinion to be offered is that emergency housing units ("EHUs") contain higher levels of formaldehyde than outdoor air or air in site-built homes, and that the presence of indoor formaldehyde concentration is related to temperature and humidity, that is an admissible opinion. . ."[25]  But the Court did not expressly state that Kaltofen could "correct" the data using this equation outlined in Opinion No. 8.  Indeed, this "opinion" was excluded because it was not identified in the previous order.[26]

## II.     Argument & Citation to Authority

### A.     This Court's Gatekeeping Role Regarding Kaltofen's Opinions.

   Federal Rule of Evidence 702 permits a witness who, through his expertise, has the knowledge, skill, experience, training or education to offer scientific, technical, or other specialized knowledge may testify regarding that knowledge if it will assist the trier of fact to understand the evidence or to determine a fact in issue.  A proposed expert witness must first be qualified to testify regarding the issues for which he is offered.[27]  Courts have routinely refused to admit a proffered expert's testimony where the proffered expert, despite a generalized or professed knowledge of issues arguably relevant to the subject matter, nevertheless lacked

---

[24] *Id.* at 3 (citing final paragraph on pg. 13).
[25] Order at 3 (Rec. Doc. 2816).
[26] Order at 2-3 ("To be clear, no other 'opinions', to the extent there are any elsewhere in Kaltofen's affidavit, will be admitted, other than those identified and permitted by the Court in this Order and Reasons.") (Ex. 4).
[27] *See U.S. v. Frazier*, 387 F.3d 1244, 1260-1261 (11th Cir. 2004).

expertise with the specific nature of the claims being litigated.[28]  Even if an expert is qualified,

his opinion can be excluded if not reliable.[29]

Once the expert is deemed qualified, his testimony is only admissible if it is based upon

sufficient facts or data, it is the product of reliable principles and methods, *and* the witness has

applied the principles and methods reliably to the facts of the case.[30]  As this Court has

recognized, "The United States Supreme Court's decision in *Daubert v. Merrell Dow*

*Pharmaceuticals* provides the analytical framework for determining whether expert testimony is

admissible under Rule 702."[31]  The reliability inquiry is flexible, and several nonexclusive

factors may be considered, including: (1) whether the technique has been tested, (2) whether the

technique has been subjected to peer review and publication, (3) the potential error rate, and (4)

whether the technique is generally accepted in the relevant scientific community.[32]  The expert

testimony must also be relevant—not only in the way that all testimony must be relevant under

Federal Rule of Evidence 402, but also in the sense that the expert's proposed opinion would

assist the trier of fact to understand or determine a fact in issue.[33]  *Id.*

## B.   Kaltofen is not qualified to testify regarding statistics, barring his testimony on Opinion Nos. 4 and 7.

Kaltofen states it clearly:

I am not a statistician.[34]

Yet he purports to analyze data in Opinion Nos. 4 and 7:

---

[28] *See, e.g,. Kassim v. City of Schenectady,* 415 F.3d 246, 251 (2nd Cir. 2005) (expert lacked knowledge regarding Arabic translation); *In Re: Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 543-544 (S.D.N.Y. 2004) (expert's opinion not based on qualification or experience but on subjective views of ethical standards at issue).
[29] *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).
[30] Fed. R. Evid. 702.
[31] Order dated July 15, 2009, at 3 (Rec. Doc. 2181) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002)).
[32] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993) (discussing the four nonexclusive factors); Order dated July 15, 2009 at 4 (Rec Doc. 2181) (citing *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir.2004).
[33] Order dated July 15, 2009, at 4 (Rec. Doc. 2181) (citing *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003)).
[34] Kaltofen Dep. at 165:16-18.

4.    Of the 17,980 records fully reviewed at the time of this affidavit, 1,518 units were Fleetwood units.  The mean result was 0.146 parts per million, (PPM), of formaldehyde in indoor air.  (ref. Expert Report of P. Hewitt)[35]

7.    Overall, based on the May 15, 2009 state of the BCD electronic database, the 5th percentile data point exceeded the ATSDR MRL of 0.008 PPM.  That is, 95 percent of the data was higher than the MRL, (Minimum risk level, 0.008 PPM). This is despite the fact that the EHUs were often sampled after residencies had ended, with an associated decline in EHU age and formaldehyde concentration.[36]

When Kaltofen is questioned on the probability of an additional formaldehyde level test being below the detection limit, his response shows that he is not entirely comfortable with offering the statistical opinions that he has offered:

Q.    Is the result going to be below the detection limit?

A.    There's probably a probability associated with that.  I would bet if someone worked out the statistics, you know, compared to the data set we actually have, that's probably a very low probability.  I would say it is less than 5 percent probability.

Q.    But it could be?

A.    And that's just off the top of my head without being able to do the statistics for it.

Q.    It could be below all of the MRLs that you've actually talked about, couldn't it?

A.    There's a positive probability for almost any number within the range that we have.

Q.    So you can't –

A.    But –

Q.    Go ahead.

A.    Sorry.  But we have numbers that are more probable and ones that are less.  So a 95 percent confidence interval is one that I'm fairly comfortable with, and I think we have enough data to show what that 95 percent confidence interval is.[37]

---

[35] Kaltofen Aff. at 7, parA.1 (DUB000573).
[36] Kaltofen Aff. at 9, parA.1 (DUB000575).
[37] Kaltofen Dep. at 87:17-88:16 (Ex. 5).

Kaltofen's testimony goes beyond his expertise and ventures into a statistician's domain.  These two opinions should be excluded because he is not qualified.

>    **C.     Opinion No. 4: Based on outdated information, so there is no reliable, scientific foundation, and it should be excluded.**

Kaltofen's opinion that the mean result is 0.146 ppm is inaccurate and outdated.  Kaltofen himself only referenced Hewett's original report in this case for this opinion, but Hewett has since updated this opinion, finding a mean of  0.0635 ppm and a median of 0.043 ppm in the Fleetwood travel trailer data he analyzed.[38]  Kaltofen has not issued a revised affidavit based on Hewett's revised affidavit.  Kaltofen did not do the calculations himself.  Kaltofen's only basis for this opinion was Hewett's report; that report is no longer in effect.  Therefore this opinion no longer has valid grounds, and should be excluded.

>    **D.     Opinion No. 7: Kaltofen should not be permitted to testify that the statistical sampling gives him a 95% probability of identifying the formaldehyde concentration for any given EHU.**

Kaltofen's opinions that statistical sampling gives him a 95% probability of identifying the formaldehyde concentration for any given EHU is derived through presupposition without consideration of the actual conditions experienced by Ms. Dubuclet.  Likewise, Kaltofen's "observation" that 95% of the EHUs in his database reported formaldehyde concentrations above 0.008 ppm is unreliable.  Many of the samples reported in the database were measured in occupied units or previously occupied units; so, those test results were influenced by independent variables unrelated to the EHUs.

Kaltofen intends to testify to specific, definite information about the Dubuclet EHU by relying on data obtained from a large number of similar units under a "fairly wide range of

---

[38] *Compare* Hewett Aff. dated July 16, 2009 (Table 1, DUB000556, showing 0.1466 as mean formaldehyde level for Fleetwood dataset), attached as Ex. 8, *with* Hewett Aff. dated Oct. 26, 2009 (Table 2 showing 0.0635 mean formaldehyde level for Fleetwood dataset), attached as Ex. 9.

conditions."[39]  Yet Kaltofen claims that there is a "very good probability, probably 95 percent or

greater, of knowing what the [formaldehyde] result is for [any given trailer]."[40]

There is no evidence that the set of conditions considered by Kaltofen accurately

replicated or even approximated those at the time Dubuclets resided in the EHU.  There are a

multitude of independent factors which affect formaldehyde concentration in indoor air.

Kaltofen himself testified about numerous variables which can influence the level of

formaldehyde in individual trailers:

Q.    Now, with regard to Section 4, which begins on page 12, and we
      talked about this in your previous deposition with regard to class
      certification issues.  There are many variables that go into ultimately
      what results in a level of formaldehyde in a trailer when it is tested
      on a particular date.  Correct?

A.    Yes.

Q.    And you would agree that those variations are the level of off-
      gassing of any component parts that contain formaldehyde, correct?

A.    That's one.

Q.    Any other sources other than component parts of the trailer that
      might actually find their way into the interior of the trailer, correct?

A.    Yes.

Q.    What are the rates of ventilation in the trailer?

A.    Yes.

Q.    Interior temperature of the trailer?

A.    Yes.

Q.    Interior humidity levels of the trailer; that would be a factor?

A.    Yes.

---

[39] Kaltofen Dep. at 83:22-84:10. Although Kaltofen's deposition was previously taken in the *Alexander* case, his testimony is equally applicable to his opinions in the Dubuclet matter.
[40] Kaltofen Dep. at 87:8-16.

Q.      Behavioral issues of the actual residents of the trailer also play a role
        in the ultimate level of formaldehyde found in the trailer, correct?

A.      Different from what we have already discussed?  How behaviors
        affect ventilation, other materials and so on?

Q.      And let's just use some examples and make sure we're talking about
        the same thing.  Smoking is a behavioral issue that could, in fact,
        affect the levels of formaldehyde in a resident's trailer?

A.      I assumed you included that in other materials.

Q.      But you would agree, smoking can –

A.      Smoking can affect formaldehyde.

Q.      Cosmetics that may contain formaldehyde?

A.      Again, same answer.

Q.      Permanent press fabrics?

A.      Not as much, but yeah.  Yeah.

Q.      Opening and closing doors?

A.      In that it affects the ventilation, yes.

Q.      Opening and closing of windows?

A.      Yes.

Q.      Cooking?

A.      Cooking.

Q.      How does cooking affect levels of formaldehyde in a particular unit?

A.      Combustion, breakdown of materials that might produce
        hydrocarbons that might form into formaldehyde

Q.      And according to your report, age of the unit affects levels of
        formaldehyde?

A.      All other things being equal, yes.[41]

---

[41] Kaltofen Dep. at 145:14-147:24.

Simply calculating the mean, median, and variance of 10,499 EHU's provides no specific information about any one particular trailer. Yet Kaltofen claims that he can determine within a 95% probability the individual outcome of the formaldehyde test result for any given EHU -- even one that has never been tested.[42] He recognizes the probability that an individual EHU could potentially test below the detection limit.[43] The level of precision (95%) that Kaltofen has offered as his opinion is suspect and unreliable. Kaltofen was questioned whether his 95% calculation has changed as he has accumulated more and more data.[44] He testified that "every new data point is going to make a smaller and smaller difference. That is the nature of this data set."[45] Kaltofen's level of precision is changing (either up or down) each time a new test result is added to the database.

Kaltofen cannot possibly predict the *genuine* formaldehyde concentration in a particular EHU without actually performing a test in that EHU. There are simply too many variables. In addition to those variables, Kaltofen's database is comprised of formaldehyde concentrations collected by a variety of sources.[46] There is no assurance that these tests were performed under the same conditions. Some of the EHU's were occupied at the time of testing, while others were not. Some tests were conducted with the HVAC system running, while some tests were performed in the middle of the summer with no power at all.

Kaltofen's himself has to qualify his "level of probability." Kaltofen says it best when he testified, "[i]f we are talking about a particular trailer, we're not talking about all things being equal. We look at the history of things that can affect the . . . formaldehyde concentration."[47] For instance, HVAC systems:

---

[42] Kaltofen Dep. at 87:8-16
[43] Kaltofen Dep. at 87:17-88:6.
[44] Id. at 169:15-20.
[45] Id. at 169:18-20.
[46] Kaltofen Aff. at 6 (DUB000572) (Ex. 1) (stating that the database was created from, among others, BCD, DeVany, the Scott Group, the Center for Disease Control, The Sierra Club, and individual occupants).

> Q.    So if you wanted to know what a particular resident was exposed to in a particular unit, don't you think it would be important to know whether the HVAC system was operating and/or whether the doors and windows were opened routinely?
>
> A.    That's all part of the same variable [ventilation rate].  And I am very comfortable thinking that we really would like to see that data generally.  Ventilation rates, temperature, humidity.  They all impact the formaldehyde concentration.
>
> Q.    You would like to see that data?
>
> A.    That's all part of how that actual concentration is arrived at.[48]

Kaltofen admits that "it can be helpful" to test the EHU at an indoor temperature where the person who is occupying the trailer was actually living.[49]  Oddly enough, Kaltofen is not even aware whether DeVany Consulting performed its tests with the HVAC systems running.[50]

Kaltofen's scientific opinion is limited to the understanding that formaldehyde release rates rise with rising temperature and humidity.  The remainder of Kaltofen's opinions is based on speculation about worst case formaldehyde concentrations when temperature and humidity are increased.  Kaltofen's opinions have no value when determining actual exposure levels experienced by EHU occupants because he does not consider the actual living conditions experienced by Ms. Dubuclet.  Likewise, his 95% confidence level fails to account for the many independent variables that can influence formaldehyde concentrations.  Kaltofen should not be allowed to opine about possible exposure levels or concentration levels when actual test data is available.

Kaltofen's opinions are constructed to manipulate the actual test result.  In similar fashion, Kaltofen's opinion that CDC's median concentration is a better representation than the

---

[47] Kaltofen Dep. at 107:13-21 (Ex. 5).
[48] Kaltofen Dep. at 113:17-114:5 (Ex. 5).
[49] Id. at 79:11-15 (Ex. 5).
[50] Id. at 105:7-13 (Ex. 5).

actual test data from the Dubuclet EHU is just another attempt to transform the actual formaldehyde concentration obtained by Plaintiff's own expert, W.D. Scott.

**E.    Opinion No. 8: Kaltofen should not be permitted to testify that actual temperature and humidity conditions can be "corrected."**

The correction equations referenced in ASTM E 1333-96 (2002) and used by Kaltofen are based on the "Berge formula" to "correct" formaldehyde concentrations. Kaltofen applies the Berge formula and reaches the conclusion that a 5° Fahrenheit rise in temperature yields a 36% "correction factor" for formaldehyde concentration.[51] Kaltofen does not provide any calculations regarding the Dubuclet unit in his affidavit. When Kaltofen was questioned about a correction calculation he did in the *Alexander* case, he stated that that the "correction" was not his "specific opinion."[52] Instead, it is just another "illustration" that formaldehyde concentrations are higher when temperatures increase.[53]

Even if this illustration would somehow assist the trier-of-fact, the ASTM test method referenced by Kaltofen was not designed to measure formaldehyde levels for indoor air. Rather, ASTM E 1333-96 (2002) was designed to provide a standard means of testing, under strict conditions (inside of a chamber), certain building products that have formaldehyde emission limitations.[54] The Berge formula was specifically created as a mathematical model to describe the influence of various parameters on formaldehyde concentration in *the atmosphere of a chamber* containing *particleboard*.[55] Even Berge himself recognized that the mathematical relations used in the chamber testing are of model character only, and therefore, they cannot be transferred uncritically to every board system.[56] Kaltofen is well aware of this concept:

---

[51] Kaltofen Aff. at 11.
[52] Kaltofen Dep. at 230:15-22.
[53] Id. at 229:15-230.
[54] ASTM E 1333-96 (2002), Standard Test Method for Determining Formaldehyde Concentrations in Air and Emission Rates from Wood Products Using a Large Chamber, § 1.1, attached as Ex. 10.
[55] A. Berge, Mellegaard, *Formaldehyde Release from Particleboard- Evaluation of a Mathematical Model* 251-55 (Holz als Roh-und Werkstoff, 38, 1980) (Ex. 11).
[56] Id. at 251 (Ex. 11).

15

> Q.    But you recognize the Berge calculation is not an appropriate calculation to do on the test results of these trials (*sic*) to try to find out a specific level?
>
> A.    I would not use this calculation.
>
> Q.    And again, just for illustrative purposes, the correcting to 50 percent humidity on a 6 percent factor, where does that come from?
>
> A.    Again, it comes from the same methodology, and it's again designed to allow for inter-laboratory calibration, and it's not something I would do to the data point for the Alexander trailer.[57]

Indeed, it appears he would not rely on this calculation to calculate a specific level (stating "I would not sue this calculation"), yet he cites it in his Affidavit, and actually did calculations in *Alexander*.

By Kaltofen's own admission, the Berge calculation is inappropriate to "correct" formaldehyde levels in this instance. Allowing Kaltofen to present testimony to the jury on this equation, including any calculation he may attempt, would not be based on reliable science.

   **1.    *Kaltofen's theories have not been tested, are not generally accepted within the scientific community, and have not undergone peer review as required by Daubert.***

There are no relevant scientific studies supporting the use of temperature and humidity correction factors when conducting passive air sampling to predict formaldehyde concentration of *inside air* from *multiple wood sources*. There is no indication or evidence to show that Kaltofen's opinion or his "methodology" has been published in any type of scientific journal so that others in the field may assess the scientific validity of Kaltofen's approach. In addition, the methodology employed in measuring formaldehyde levels for indoor air is not so specific or limited so as to have escaped publication. The use of correction factors creates too much of an uncertainty when measuring indoor air because of the many variables which influence

---

[57] Kaltofen Dep. at 231:15-232:2 (Ex. 5).

formaldehyde release.  Without any significant peer review, it goes without saying that Kaltofen's methodology is not one that has been generally accepted in the scientific community.

      **2.**    ***The Berge formula has a substantial and unquantifiable rate or error.***

      The Berge formula has no quantifiable rate of error.  Even the protocol for ASTM E 1333-96 (2002) notes that "the greater the variance between actual and corrected temperature, the greater the potential error."[58]  In fact, the temperature conversion table cited by ASTM (based on the Berge formula) does not even attempt to predict corrected formaldehyde concentrations when there is more that a 5° Fahrenheit deviation from the standard temperature.[59]  Kaltofen's own affidavit stipulates that "[t]he average temperature and humidity during the period Ms. Dubuclet resided in the unit was larger than the range of values used in this formula, which is only 5 deg. F."[60]  Any calculation that Kaltofen could do would fall outside the range of values used in the ASTM correction formulas.  Because the rate of error for the correction formulas cannot be quantified within a 5° Fahrenheit variance, then any calculation by Kaltofen would not be quantifiable and would be subject to an even greater potential for error.

      **3.**    ***Other courts have rejected the Berge formula as unreliable when testing indoor air.***

      In *Wallace,* the Court affirmed the trial court's decision excluding the opinions of plaintiff's expert, Thaddeus Godish, Ph.D., concerning the use of the Berge equation to extrapolate formaldehyde concentrations in a manufactured home because the methodology was not generally accepted in the relevant scientific community.[61]  On October 8, 1994, Dr. Godish

---

[58] ASTM E 1333-96 (Reapp. 2002), Table A1.1 (Ex. 10).
[59] Id. (Ex. 10).
[60] Kaltofen Aff. at 15 (DUB000581) (Ex. 1).
[61] *Wallace v. Meadow Acres Manufactured Housing Inc.*, 730 N.E.2d 809 (Ind. Ct. App. 2000), trans. denied, (Ind. Feb. 5, 2001).

tested the air inside of plaintiff's manufactured home by obtaining ambient air samples.[62]  Dr.

Godish reported indoor temperature of 71.5° Fahrenheit and indoor relative humidity of 70%.[63]

In order to determine the formaldehyde levels that would have been present at 78° Fahrenheit,

Dr. Godish applied the Berge equation.[64]  Using this formula, he determined that formaldehyde

levels would have been as high as .17 ppm if the home had been heated to 78° Fahrenheit.[65]

        The Court in *Wallace* concluded that Dr. Godish's use of the Berge equation was

unreliable for several reasons.[66]  First, there is no general acceptance in the relevant scientific

community for use of the Berge equation to "correct" ambient air formaldehyde level

measurements in a manufactured home and certainly not when only one sample is analyzed.[67]

Second, Dr. Godish's theory cannot be empirically tested because he relied on numerous

variables which were not preconditioned.[68]  Third, his theory and methodology lack substantial

peer review.[69]  Finally, his theory and methodology have a substantial and unquantifiable rate of

error -- Dr. Godish admitted that the Berge equation by itself has a rate of error no less than

±12%.[70]

        Similarly, Kaltofen's opinions are based on speculation and estimation that is subject to

gross error.  Kaltofen's opinions all fail to account for the variables that affect formaldehyde

concentrations in indoor air.  Kaltofen ignores normal temperature and humidity conditions

actually experienced by Alexander and other EHU occupants as a factor that could affect his

"level of precision." Kaltofen makes no effort to identify whether all of the data entries reported

in his database were performed under the same test conditions.  He simply gathered a bunch of

---

[62] *Id.* at 812-13.
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Wallace*, 730 N.E.2d at 813-17.
[67] *Id.* at 815.
[68] *Id.*
[69] *Id*.
[70] *Id.* at 816.

data from an assortment of test takers and plugged it into a database.  Kaltofen's calculations and opinions based on that database are merely several steps of unsupported speculation.  "Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case."[71]

### F.    Opinion Nos. 4 and 7 are cumulative of Hewett's testimony and should be excluded.

Even if Kaltofen were permitted to testify as an expert, Opinion Nos. 4 and 7 are needlessly cumulative of Paul Hewett's opinions, and should be excluded for that reason.[72] Opinion No. 4 provides the mean result of formaldehyde concentration, but that opinion is only supported by Hewett's prior -- and outdated -- affidavit.  Hewett is the one who actually did the calculations, and he has now recalculated the mean.   The jury would be better served by obtaining information directly from Hewett on this point.  Kaltofen adds nothing to the findings from Hewett, particularly because Kaltofen is not a statistician.   Opinion No. 7 addresses Kaltofen's conclusion that a certain percentage of results was above the MRL, but Hewett has provided an opinion on how the dataset compares to both the Agency for Toxic Substances and Disease Registry ("ATSDR") MRL.[73]   Again, Hewett is the statistician, and he actually addresses both the ATSDR MRL and the NIOSH occupational exposure limit, providing more information than Kaltofen.  Hewett's information is also more specific than Kaltofen's because Hewett has now analyzed both an occupied *and* unoccupied Fleetwood "Pioneer" dataset.[74] Hewett's more specific information should be presented to the jury, rather than Kaltofen's outdated and cumulative testimony.

### III.   Conclusion

For these reasons, Fleetwood is requesting that the Court apply its previous rulings on Kaltofen to Kaltofen's Dubuclet opinions.  Fleetwood further requests that the Court exclude

---

[71] *Mitchell v. Gencorp, Inc.,* 165 F.3d 778, 781 (10th Cir. 1999) (citing *Daubert,* 509 U.S. at 2795).
[72] Fed. R. Evid. 403.
[73] Hewett Aff. dated Oct. 26, 2009 at 12, § 5.1.

Kaltofen's Opinion Nos. 4, 7, and 8.  Kaltofen is not a statistician and should not be permitted to present statistical testimony.  Opinion No. 4 is based on outdated information and is not reliable. Kaltofen's Opinion No. 7, regarding how his database shows with a 95% of the data exceeds the ATSDR's MRL, is cumulative of Hewett's testimony, and should not be permitted because it does not account for actual living conditions.  Opinion No. 8 regarding his attempt to "correct" formaldehyde levels is not based on reliable science and should be excluded.  Kaltofen even admits that he would not use that formula.  Therefore, the entirety of Opinion Nos. 4, 7, and 8 should be excluded.

This 9th day of November 2009.

Respectfully submitted:

*/s/ Richard K. Hines, V*
Richard K. Hines, V
GA Bar No. 356300
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

Jerry L. Saporito
LA Bar No. 11717
LEAKE & ANDERSSON, L.L.P.
1700 Energy Centre
1100 Poydras St.
New Orleans, LA 70163-1701
(504) 585-7500 (phone)
(504) 585- 7775 (fax)

Counsel for Fleetwood Enterprises, Inc.

---

[74] Id.

**C E R T I F I C A T E OF SERVICE**

I hereby certify that a copy of the foregoing has this date been serves on all counsel of record in this proceeding by:

( )   Hand Delivery                    ( )   Prepaid U.S. Mail

( )   Facsimile                         ( )   Federal Express

(X)   CM/ECF

New Orleans, Louisiana, this 9th day of November 2009.

_/s/ Richard K. Hines, V_____
Richard K. Hines, V
Georgia Bar No. 356300
richard.hines@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW
Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)