## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER FORMALDEHYDE | § | MDL No. 1873 |
| PRODUCTS LIABILITY LITIGATION | § | |
| | § | SECTION N(5) |
| | § | |
| THIS DOCUMENT IS RELATED TO: | § | JUDGE ENGELHARDT |
| *Civil Action No. 07-9228* | § | |
| *Aldridge, et al v. Gulf Stream Coach, Inc., et al* | § | MAGISTRATE CHASEZ |
| *(Elisha Dubuclet o/b/o Timia Dubuclet)* | § | |

## EXCERPTS FROM THE DEPOSITION OF
## CHARLES DAVID MOORE

# Exhibit "D"

Transcript of the Testimony of
# Charles David Moore, PE, PLS

## Date taken: August 11, 2009

## In Re: FEMA Trailer Formaldehyde Products Liability Litigation

### **Note**
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER          MDL NO. 1873

FORMALDEHYDE PRODUCTS         SECTION "N"(5)

LIABILITY LITIGATION          JUDGE ENGELHARDT
                              MAGISTRATE CHASEZ

*   *   *

(RE:  DUBUCLET)

Deposition of CHARLES DAVID MOORE, PE,
PLS, 1833 East Main Street, New Iberia,
Louisiana 70560, taken at the offices of
Lambert & Nelson, 701 Magazine Street, New
Orleans, Louisiana 70130, on Tuesday, the
11th day of August, 2009.

REPORTED BY:

JAMES T. BRADLE, CCR
PROFESSIONAL SHORTHAND REPORTERS
(504)529-5255

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Charles David Moore, PE, PLS

Page 2

```
 1    APPEARANCES:

 2         T. CHRISTOPHER PINEDO
           ATTORNEY AT LAW
 3         4550 JERICHO ROAD
           CORPUS CHRISTI, TEXAS 78413
 4
           FORMALDEHYDE TRAILER CLAIMS OFFICE
 5         (BY: CYNTHIA M. WALLACE, ESQUIRE)
           ATTORNEY AT LAW
 6         4731 CANAL STREET
           NEW ORLEANS, LOUISIANA 70119
 7
                ATTORNEY FOR THE PLAINTIFFS
 8
           MIDDLEBERG, RIDDLE & GIANNA
 9         (BY: CHARLES R. PENOT, JR., ESQ.)
           717 NORTH HARWOOD, SUITE 2400
10         DALLAS, TEXAS 75201

11              ATTORNEYS FOR FLUOR ENTERPRISES,
                INC.
12
           U.S. DEPARTMENT OF JUSTICE
13         (BY: MICHELE S. GREIF, ESQUIRE)
           CIVIL DIVISION
14         1331 PENNSYLVANIA AVENUE, N.W.
           ROOM 8022S, NAT'L PLACE
15         WASHINGTON, D.C. 20004

16              ATTORNEYS FOR DEFENDANT, UNITED
                STATES OF AMERICA
17
           LEAKE & ANDERSSON
18         (BY: JERRY L. SAPORITO, ESQUIRE)
           1700 ENERGY CENTRE
19         1100 POYDRAS STREET
           NEW ORLEANS, LOUISIANA  70163
20
                ATTORNEYS FOR DEFENDANT,
21              FLEETWOOD ENTERPRISES, INC.

22

23

24

25
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Charles David Moore, PE, PLS

Page 3

```
 1    APPEARANCES CONTINUED:

 2          FRILOT LLC
            (BY: PETER R. TAFARO, ESQUIRE -
 3            VIA TELEPHONE)
            1100 POYDRAS STREET
 4          3700 ENERGY CENTRE
            NEW ORLEANS, LOUISIANA 70163
 5
                  ATTORNEYS FOR DEFENDANT,
 6                BECHTEL NATIONAL, INC.

 7          BAKER DONELSON
            (BY: DAVID KURTZ, ESQUIRE -
 8            VIA TELEPHONE)
            201 ST. CHARLES AVENUE, SUITE 3600
 9          NEW ORLEANS, LOUISIANA 70170

10                ATTORNEYS FOR DEFENDANTS,
                  CH2M HILL CONSTRUCTORS, INC. AND
11                SHAW ENVIRONMENTAL, INC.

12          WILLINGHAM, FULTZ & COUGILL
            (BY: THOMAS L. COUGILL, ESQUIRE -
13            VIA TELEPHONE)
            NIELS ESPERSON BUILDING
14          808 TRAVIS, SUITE 1608
            HOUSTON, TEXAS  77002
15
                  ATTORNEYS FOR DEFENDANTS,
16                JAYCO, INC. AND STARCRAFT
                  RV, INC.
17
            LOBMAN, CARNAHAN, BATT, ANGELLE & NADER
18          (BY: HEATHER F. CHEESBRO, ESQUIRE -
              VIA TELEPHONE)
19          400 POYDRAS STREET, SUITE 2300
            NEW ORLEANS, LOUISIANA 70130
20
                  ATTORNEYS FOR DEFENDANT,
21                CRUM & FORSTER

22

23

24

25
```

Page 4

```
 1    APPEARANCES CONTINUED:

 2         JONES, WALKER, WAECHTER, POITEVENT,
             CARRERE & DENEGRE, LLP
 3         (BY: RYAN E. JOHNSON, ESQUIRE -
             VIA TELEPHONE)
 4         FOUR UNITED PLAZA
           8555 UNITED PLAZA BOULEVARD
 5         BATON ROUGE, LOUISIANA 70809

 6             ATTORNEYS FOR DEFENDANTS,
               KEYSTONE RV COMPANY, THOR
 7             CALIFORNIA, THOR INDUSTRIES,
               DUTCHMEN MANUFACTURING, DS CORP
 8             (d/b/a CROSSROADS RV) AND KZ RV,
               LP
 9
           GIEGER, LABORDE & LAPEROUSE, L.L.C.
10         (BY: CARSON STRICKLAND, ESQUIRE -
             VIA TELEPHONE)
11         48TH FLOOR, ONE SHELL SQUARE
           701 POYDRAS STREET
12         NEW ORLEANS, LOUISIANA 70139

13             ATTORNEYS FOR DEFENDANT,
               FOREST RIVER, INC.
14

15    ALSO PRESENT:

16         CHARLES "AL" WHITAKER, P.E. - FLUOR

17

18

19

20

21

22

23

24

25
```

Page 5

```
1                    *    *    *

2                EXAMINATION INDEX

3                                  Page

4   EXAMINATION BY MR. SAPORITO ...........8
    EXAMINATION BY MR. PENOT ...........117
5   EXAMINATION BY MS. GREIF ...........158
    EXAMINATION BY MR. SAPORITO .........162
6

7                    *    *    *

8                INDEX OF EXHIBITS

9                                  Page

10  Exhibit No. 1 .......................32

11  Notice of Deposition of Charles D. Moore and

12  Schedule A

13  Exhibit No. 2 .......................33

14  CD disk labeled "Moore Reliance File"

15  Exhibit No. 3 .......................35

16  Page 12 from ASCE 7-05 entitled "Table 4-1,

17  Minimum Uniformly Distributed Live Loads and

18  Minimum Concentrated Live Loads"

19  Exhibit No. 4 .......................44

20  Various Fleetwood documents printed up by

21  Mr. Moore

22  Exhibit No. 5 .......................48

23  FEMA Accessible Model Travel Trailer

24  Procurement Specifications dated April 21,

25  2006
```

Page 6

1   Exhibit No. 6  ......................56

2   E-mail from Jennifer H. Porter to David

3   Moore dated July 15, 2009, with attached

4   plans

5   Exhibit No. 7  ......................88

6   Handwritten notes by Mr. Moore dated 7-9-09,

7   7-15-09 and 7-16-09 and Wind Load Design

8   Pressures Calculated From Standard Building

9   Code (94) Chapter 16

10  Exhibit No. 8  ......................88

11  Structural Condition Assessment for FEMA

12  Travel Trailer, Dubuclet/Fleetwood Trailer

13  prepared for First General Services of the

14  South and prepared by Charles David Moore,

15  PE, PLS dated July 16, 2009

16

17

18

19

20

21

22

23

24

25

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Charles David Moore, PE, PLS

Page 7

1                S T I P U L A T I O N

2

3        It is stipulated and agreed by and

4    between counsel for the parties hereto that

5    the deposition of the aforementioned witness

6    is hereby being taken for all purposes

7    allowed under the Federal Rules of Civil

8    Procedure, in accordance with law, pursuant

9    to notice;

10       That the formalities of reading and

11   signing are specifically not waived;

12       That the formalities of filing,

13   sealing, and certification are specifically

14   waived;

15       That all objections, save those as to

16   the form of the question and the

17   responsiveness of the answer, are hereby

18   reserved until such time as this deposition,

19   or any part thereof, may be used or sought

20   to be used in evidence.

21

22                 *   *   *

23       JAMES T. BRADLE, CCR, Certified Court

24   Reporter, officiated in administering the

25   oath to the witness.

Page 8

```
 1            CHARLES DAVID MOORE, PE, PLS,

 2    after having been first duly sworn by the

 3    above-mentioned court reporter, did

 4    testify as follows:

 5    EXAMINATION BY MR. SAPORITO:

 6         Q    Good morning.  Would you state

 7    your name, please.

 8         A    Charles David Moore.

 9         Q    Mr. Moore, my name is Jerry

10    Saporito, and I represent one of the

11    defendants in the case, a company named

12    Fleetwood Enterprises, the alleged

13    manufacturer of the trailer that's involved

14    in the Dubuclet matter.  We will be asking

15    you some questions today.

16            Have you been deposed before?

17         A    Yes, sir.

18         Q    All right.  So you know the

19    process?

20         A    Yes, sir.

21         Q    We're going to ask questions.  You

22    give your answers.  If you don't understand

23    the question or if you don't hear the

24    question, let us know.  We will try to

25    restate it.
```

Page 74

1    there just to the naked eye.  It would be

2    pretty hard, because in various loading

3    conditions that it was in, it's not the

4    loaded condition it was at the site when it

5    was being used, so it would be a little

6    difficult and awkward to determine what's

7    there and what's not there.

8              The analysis that I made said that

9    under loaded conditions, it would deflect,

10   and those deflections would be within an

11   acceptable range for steel components.

12        Q    It would be within an acceptable

13   range?

14        A    Yes.  All structural members

15   deflect and move.  Every structure

16   everywhere has some deflections and has some

17   movements, and it's whether those

18   deflections and movements would affect other

19   things, other components would be the

20   problems that we come into.

21        Q    All right.  Let me see if I can

22   understand what you just said.  When you

23   went to the site, you observed the steel

24   structure, the beams, the longitudinal beams

25   and the cross beams, correct?

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Charles David Moore, PE, PLS

Page 75

1        A     That's correct, yes.

2        Q     And you did not observe with the

3   eye any deflection or deformation of these

4   structural pieces?

5        A     That's correct.

6        Q     Now, if you may want to do

7   something else as far as some other kind of

8   test or some other way of looking at it, you

9   haven't done that as of today?

10        A     That's correct.

11        Q     So as of right now, as you sit

12   here right now in your deposition, you're

13   not aware of any deformation or deflection

14   of the structural steel members of the

15   trailer?

16        MR. PINEDO:

17             Objection, form.

18        THE WITNESS:

19             I don't think I could say that,

20   no.  Like I said, I expected under a loaded

21   condition, it would deflect.

22   EXAMINATION BY MR. SAPORITO:

23        Q     You didn't observe any deflection

24   or deformation with your naked eye?

25        A     Correct.

PROFESSIONAL SHORTHAND REPORTERS, INC  (800) 536-5255
New Orleans * Baton Rouge * Covington * Shreveport                    (504) 529-5255

1    Q    And you would expect that if it

2  was loaded, in a loaded condition, there

3  would be some deflection, but it would be

4  within the acceptable range for this steel

5  structural component?

6    A    Yes, sir.  Not necessarily

7  observable by the naked eye.

8    Q    Right.  But if it did have some

9  deflection, it would be within the

10  acceptable range designed for the steel

11  structural components of this trailer?

12    MR. PINEDO:

13       Objection, asked and answered.

14    THE WITNESS:

15       Yes, sir.

16  EXAMINATION BY MR. SAPORITO:

17    Q    And before I get off the notes,

18  the last document that's attached to your

19  notes is "Wind Load Design Pressures."  Is

20  that something that you prepared on a

21  spreadsheet or is that just something you

22  lifted from somewhere else?

23    A    That's something that I prepared

24  from a spreadsheet.

25    Q    Okay.  And what's its purpose?

Page 102

1        A      No, sir, I did not.

2        Q      And when you inspected the

3   interior of the travel trailer, you didn't

4   find any structural damage on the interior?

5        A      That's correct, I did not.

6        Q      Did you see any visible splitting

7   of any of the walls from each other or the

8   walls from the ceiling or the walls from the

9   floor?

10       A      Not in this unit, no.

11       Q      Not in this unit?

12       A      Not in this unit, that's correct.

13       Q      Did you observe any damage to the

14   exterior or interior of the unit that would

15   indicate that the travel trailer did not

16   perform adequately as it was intended to

17   perform while the Dubuclets were living in

18   it?

19       MR. PINEDO:

20            Objection, form.

21       THE WITNESS:

22            I saw some things there that could

23   have been that.  For instance, seals and

24   sealants that are prevalent around the

25   exterior of the trailer.  There were some

In Re: FEMA Trailer Formaldehyde Products Liability Litigation

Charles David Moore, PE, PLS

Page 103

1   that were either broken or cracked.   Whether

2   those were done while the Dubuclets were

3   living there, I don't know.

4            The flap seal at the slide-out,

5   there were some openings there where you

6   could see daylight through there, which

7   would indicate some problems with that seal.

8   Those are the kinds of things that I

9   observed there.

10           There was also the floor at the

11  entrance to the trailer was very soft and

12  spongy.  In fact, it was noted for everybody

13  coming in and out, don't step on that area,

14  and I think that was similar to the

15  Alexander trailer, also.  But in this

16  trailer, there were some problems with that

17  floor area right in front of the doorway.

18  EXAMINATION BY MR. SAPORITO:

19       Q    Did you note that in your report?

20       A    I don't believe I noted that in my

21  report, no.

22       Q    And you don't know when the floor

23  might have become soft or spongy?

24       A    That's correct.

25       Q    And you don't know when any gap in

Page 104

1    a seal that would allow you to see the

2    outside may have developed?

3        A    That's correct.

4        Q    From a structural standpoint and

5    from your part of this case, I understand

6    what you say the building codes are and what

7    they should apply to, but from your part of

8    this case, do you see anything to indicate

9    that the travel trailer did not perform

10   reasonably, adequately, and as it should

11   have --

12       MR. PINEDO:

13            Objection, form.

14   EXAMINATION BY MR. SAPORITO:

15       Q    -- while the Dubuclets were in the

16   unit?

17       MR. PINEDO:

18            Objection, form.

19       THE WITNESS:

20            I really don't know exactly what

21   you're asking there, so I would like to ask

22   you to explain.

23   EXAMINATION BY MR. SAPORITO:

24       Q    All right.  Let me try again.

25       A    Okay.

Page 105

1        Q     You told us earlier that you were

2    retained as a civil engineer, a structural

3    engineer, and you told us about the building

4    codes and you have told us about in your

5    opinion that the travel trailer should have

6    met those building codes.

7              So what I'm asking you now is, do

8    you see anything from a structural

9    standpoint on this trailer that did not

10   adequately perform, did not reasonably

11   perform, or did not do what it was supposed

12   to do?

13        MR. PINEDO:

14              Objection, form.

15        THE WITNESS:

16              I think, and I put it in my report

17   here, that, yes, there are things there that

18   did not adequately perform from the

19   standpoint of the structure being a very

20   light gauge material in general.  And

21   "gauge" not being a completely proper term.

22   It's more generally speaking for steel

23   structures and things like that.  But "light

24   duty" I guess would be the more proper term.

25   That those things would definitely cause

Page 106

1    issues with seals and openings like I saw

2    with the seals and sealants and the various

3    members around the trailer there, which

4    would then allow air infiltration and

5    possibly even water infiltration, both in

6    the form of water by itself or in air vapor.

7              So from that standpoint, I don't

8    believe that it performed adequately.  I

9    believe that the structure, while it not

10   only is supporting the loads, it also has to

11   perform to keep out the weather and the

12   other elements there, so I think from that

13   standpoint, it did not perform adequately.

14   EXAMINATION BY MR. SAPORITO:

15       Q    Do you have any proof to support

16   any statement that there was any intrusion

17   of water in this unit while the Dubuclets

18   were using the unit?

19       A    Not water itself.  No, I did not

20   see any water staining or anything like

21   that.

22       Q    No water staining anywhere?

23       A    No.

24       Q    Do you have any proof that there

25   was not a seal to prevent air intrusion in

Page 133

1    exactly how the manufacturer designed it?

2        A    Yes, sir.

3        Q    So you are saying that a

4    manufacturer designed a travel trailer -- I

5    mean, the engineers that built the trailer

6    could do this calculation as well as you

7    could do it, right?

8        A    Correct.

9        Q    It came from that manual on steel

10    construction or whatever?

11        A    And timber construction, yes, a

12    combination of those, yes.

13        Q    Okay.  And it is your opinion as a

14    structural engineer that as designed, it is

15    contemplated that there could be this

16    deflection, because that's how the

17    manufacturer rates the vehicle, right, GVWR,

18    7400, that the very way they built it could

19    cause damage to it?

20        A    It could, yes.

21        Q    Maybe I'm misunderstanding you.

22    Are you saying with the load that the

23    manufacturer clearly contemplates,

24    7400 pounds GVWR, that that -- what's the

25    language that you use -- "could," "could

Page 134

1    produce problems with the connections of the

2    various structural members"?

3         A    Yes, sir.  "Could."  We don't know

4    what those connections are, so there's no

5    way to determine if they would indeed or

6    not.

7              Just my experience with small

8    members like that and the possibilities of

9    what those connections are leads me to

10   believe that they could cause some problems

11   with those.

12        Q    And you calculated that -- The

13   calculation you showed me, again, is on

14   Page 1 of 1 dated 7-16, right?

15        A    Yes, sir.

16        Q    And this calculation that says

17   "deflection," you are calculating with the

18   GVWR how much those structural beams will

19   deflect?

20        A    The steel structure, yes.

21        Q    Okay.  But is there a calculation

22   on this page that shows me that a deflection

23   of .065 inches is going to cause problems

24   with other structural members?

25        A    No.

In Re: FEMA Trailer Formaldehyde Products Liability Litigation                    Charles David Moore, PE, PLS

Page 156

1        A     Probably more for the defendant

2   side actually as I'm thinking through the

3   cases I have been involved with.

4        Q     Let's change the question.  Back

5   to Mr. Mallet, but let's change the

6   question.  Litigation work, non-litigation

7   work, just all of your work, what percentage

8   of your work involves working with

9   Mr. Mallet?

10       A     Probably somewhere under

11  10 percent.

12       MR. PENOT:

13           Give me one moment.

14  (Discussion off the record.)

15  EXAMINATION BY MR. PENOT:

16       Q     If I understood your responses to

17  Mr. Saporito's questions earlier today, you

18  really noted no damage to this trailer

19  inside or out; is that correct?

20       A     That's correct.

21       Q     The only thing you mentioned to

22  Mr. Saporito is certain seals on the outside

23  had some cracks in them; is that correct?

24       MR. PINEDO:

25           Objection, form.

Page 157

```
 1          THE WITNESS:
 2                 There were seals on the outside.
 3     There were the flap seals for the slide-out,
 4     and then there was the floor around the
 5     front door.
 6     EXAMINATION BY MR. PENOT:
 7          Q    And you have no opinion as to when
 8     those items that you just listed occurred;
 9     is that correct?
10          A    That's correct.
11          MR. PENOT:
12                 I may be done, but I need about
13     two minutes to look through some things.
14          MS. GREIF:
15                 I will go.  Do you want me to go?
16     I have a few questions.
17          MR. PENOT:
18                 Yes, why don't you do that.  I may
19     be done, but I may just have a few more
20     questions areas for you, Mr. Moore.  Thank
21     you.
22          MR. PINEDO:
23                 This is the attorney for the
24     United States.
25          THE WITNESS:
```

Page 158

1          Okay.

2     EXAMINATION BY MS. GREIF:

3          Q     My name is Michele Greif.   Do you

4     believe that you are qualified to draft

5     jacking instructions?

6          A     Yes, ma'am.

7          Q     And what do you base this on?

8          A     I have been involved with quite a

9     number of projects that included jacking and

10    movement of structures in general, including

11    manufactured homes, including residential

12    homes, regular homes, stick-built homes,

13    including oil field structures.

14         Q     So what has your involvement

15    consisted of?

16         A     Well, we have put together a

17    number of bridges and trailers to transport

18    units like that.   We have put together

19    foundations for homes that have needed to be

20    jacked up.   We have put together foundations

21    for several houses in that area that have

22    been jacked up since the hurricanes.

23         Q     So did you follow jacking

24    instructions?

25         A     I was involved in preparing the