UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | § § § § § § § § | MDL No. 1873 SECTION N(5) JUDGE ENGELHARDT MAGISTRATE CHASEZ |
| THIS DOCUMENT IS RELATED TO: *Civil Action No. 07-9228* *Aldridge, et al v. Gulf Stream Coach, Inc., et al* *(Elisha Dubuclet o/b/o Timia Dubuclet)* | | |

# EXCERPTS FROM THE DEPOSITION OF ALEXIS MALLET

# Exhibit "E"

```
                                  1
 1  UNITED STATES DISTRICT COURT
 2     EASTERN DISTRICT OF LOUISIANA
 3
 4  IN RE: FEMA TRAILER      MDL NO. 1873
 5  FORMALDEHYDE PRODUCTS    SECTION N(4)
 6  LIABILITY LITIGATION     JUDGE ENGELHARDT
 7  (This document relates to
    "DUBUCLET V. FLEETWOOD
 8   ENTERPRISES, INC.,"
    Case No. 07-9228)
 9
10            * * *
11
12       DEPOSITION OF ALEXIS MALLET, JR.,
13  103 BRADBURY CROSSING, LAFAYETTE, LOUISIANA
14  70508, TAKEN AT THE OFFICES OF LAMBERT &
15  NELSON, 701 MAGAZINE STREET, NEW ORLEANS,
16  LOUISIANA 70130, ON THE 28TH DAY OF OCTOBER,
17  2009.
18
19
20  REPORTED BY:
21    CATHY RENEE´ POWELL, CCR
    PSR
22    (504)529-5255
23
24
25
```

```
                                  2
 1  APPEARANCES:
 2
 3    CHRIS PINEDO, ESQUIRE
      4550 JERICHO ROAD
 4    CORPUS CHRISTI, TEXAS 78413
 5     (ATTORNEYS FOR PLAINTIFFS)
 6
      BENCOMO & ASSOCIATES
 7     (BY: RAUL R. BENCOMO, ESQUIRE)
      639 LOYOLA AVENUE, SUITE 2110
 8    NEW ORLEANS, LOUISIANA  70113
       (Attended via telephone)
 9
       (ATTORNEYS FOR THE PSC)
10
```

11    DUPLASS, ZWAIN, BOURGEOIS,
      PFISTER & WEINSTOCK
12    3838 NORTH CAUSEWAY BOULEVARD
      SUITE 2900
13    METAIRIE, LOUISIANA  70002
      (Not Present)
14
      (ATTORNEYS FOR DEFENDANTS
15     GULF STREAM COACH, INC.)
16
     GIEGER, LABORDE & LAPEROUSE
17    (BY: CARSON W. STRICKLAND, ESQUIRE)
      701 POYDRAS STREET
18    SUITE 4800
      NEW ORLEANS, LOUISIANA  70139
19     (Not Present)
20    (ATTORNEYS FOR DEFENDANTS FOREST
      RIVER)
21
22
23
24
25

                       3

1   APPEARANCES CONTINUED:
2
     JONES, WALKER, WAECHTER, POITEVENT,
3     CARRERE & DENEGRE
     (BY: WILLIAM LAMPTON, ESQUIRE)
4    8555 UNITED PLAZA BOULEVARD
     BATON ROUGE, LOUISIANA  70809
5     (Attended via telephone)
6   (ATTORNEYS FOR DEFENDANTS PILGRIM,
      KEYSTONE, MONACO, R-VISION, THOR
7     CALIFORNIA, KZRV, DS/
     CROSSROADS AND DUTCHMEN)
8
9   LEAKE & ANDERSSON
     (BY:  JERRY L. SAPORITO, ESQUIRE)
10   1700 ENERGY CENTRE
      1100 POYDRAS STREET
11   NEW ORLEANS, LOUISIANA  70163
12   (ATTORNEYS FOR DEFENDANTS
      FLEETWOOD ENTERPRISES, INC.,
13    ET AL.)

```
14    MIDDLEBERG, RIDDLE & GIANNA
      (BY:  CHARLES PENOT, ESQUIRE)
15      450 LAUREL STREET
      SUITE 1101
16    BATON ROUGE, LOUISIANA 70801
17      (ATTORNEYS FOR FLUOR ENTERPRISES,
        INC.)
18
      GARRISON, YOUNT, LORMAND, FORTE &
19      MULCAHY
      909 POYDRAS STREET
20    SUITE  1800
      NEW ORLEANS, LOUISIANA  70112
21       (Not Present)
22    (ATTORNEYS FOR DEFENDANTS
        RECREATION BY DESIGN, LLC, TL
23      INDUSTRIES, INC., AND FRONTIER
        HOMES, INC.)
24
25
                          4
1  APPEARANCES CONTINUED:
2
   TAYLOR, PORTER, BROOKS & PHILLIPS
3    8TH FLOOR - CHASE TOWER SOUTH
   451 FLORIDA STREET
4    BATON ROUGE, LOUISIANA  70801
       (Not Present)
5
   (ATTORNEYS FOR DEFENDANTS
6      COACHMEN INDUSTRIES)
7   VOORHIES & LABBE'
   (BY:  LAMONT P. DOMINGUE, ESQUIRE)
8    700 ST. JOHN STREET
   LAFAYETTE, LOUISIANA  70502
9      (Not Present)
10   (ATTORNEYS FOR DEFENDANTS CAVALIER
      HOME, WAVERLEE HOMES, REDMAN HOMES,
11     DUTCH HOUSING, PATRIOT HOMES AND
      RIVER BIRCH)
12
   WILLINGHAM, FULTZ & COUGILL
13    (BY: HAL ROACH, ESQUIRE)
   NIELS ESPERSON BUILDING
14    808 TRAVIS, SUITE 1608
```

```
      HOUSTON, TEXAS  77002
15       (Attended via telephone)
16       (ATTORNEYS FOR DEFENDANTS
         JAYCO AND STARCRAFT)
17
      McGLINCHEY STAFFORD
18     643 MAGAZINE STREET
      NEW ORLEANS, LOUISIANA  70130
19       (Not present)
20       (ATTORNEYS FOR MORGAN BUILDINGS AND
         SPAS, INC., AND MORGAN BUILDING
21         SYSTEMS, INC.)
22
23
24
25
```

                                5
```
 1         * * *
 2         EXAMINATION INDEX
 3  EXAMINATION BY MR. SAPORITO: ..........9
 4  EXAMINATION BY MR. PENOT: .............255
 5  EXAMINATION BY MR. PINEDO: ............259
 6  EXAMINATION BY MR. SAPORITO: ..........266
 7  EXAMINATION BY MR. PINEDO: ............272
 8  EXAMINATION BY MR. SAPORITO: ..........273
 9         * * *
10         INDEX OF EXHIBITS
11  Exhibit No. 1  ........................28
12   Notice of Deposition and
13   Schedule A.
14  Exhibit No. 2  ........................67
15   List of testimony given by Mr.
16   Mallet.
17  Exhibit No. 3  ........................75
18   Mr. Mallet's curriculum vitae.
19  Exhibit No. 4.  .......................78
20   Mr. Mallet's fee schedule.
21  Exhibit No. 5  ........................162
22   Report issued by Al Mallet.
23  Exhibit No. 6  ........................180
24   In globo exhibit, photographs.
25
```

                                6
```
 1  Exhibit No. 7  ........................193
```

2   In globo exhibit, photographs.
3   Exhibit No. 8A ........................198
4   Photograph of two stickers, weight
5   information and moisture notice;
6   also marked as Ritter Exhibit 16,
7   Bates RITTER 1788.
8   Exhibit No. 9 ..........................199
9   In globo exhibit, photographs.
10  Exhibit No. 10 ........................253
11  Group of thermographic images taken
12  by Mr. Mallet, 1 through 15.
13
14
15
16
17
18
19
20
21
22
23
24
25

7

1        S T I P U L A T I O N
2
3        It is stipulated and agreed by and
4   between counsel for the parties hereto that
5   the deposition of the aforementioned witness
6   is hereby being taken for all purposes
7   allowed under the Federal Rules of Civil
8   Procedure, in accordance with law, pursuant
9   to notice;
10       That the formalities of reading and
11  signing are specifically not waived;
12       That the formalities of filing,
13  sealing, and certification are specifically
14  waived;
15       That all objections, save those as to
16  the form of the question and the
17  responsiveness of the answer, are hereby
18  reserved until such time as this deposition,
19  or any part thereof, may be used or sought
20  to be used in evidence.

21            * * *
22      CATHY RENEE' POWELL, CCR, Certified
23   Court Reporter, officiated in administering
24   the oath to the witness.
25

                                              8
1        ALEXIS MALLET, JR.,
2   having been first duly sworn as a witness,
3   was examined and testified as follows:

                                            151
14   EXAMINATION BY MR. SAPORITO:
15      Q. Opinion No. 10 talks about blocks
16   and jacking of the unit. Do you have any
17   opinion on the blocking and jacking of this
18   unit, or is that something that is left to
19   the civil engineer, or structural engineer,
20   Mr. Moore?
21      A. The calculations of strength of
22   the floor unit were left to Mr. Moore. The
23   actual jacking of the unit, or the adequacy
24   of the jacking system, was my opinion.
25      Q. In the first paragraph of No. 10,

                                            152
1   the last sentence, "It created a condition
2   conducive to twisting the frame of the
3   unit."
4         Is it your belief that the frame
5   of the unit was twisted?
6         Not only your belief, I'm sorry,
7   is it your opinion that the frame of this
8   unit was twisted?
9      A. Based on the understanding of how
10   they jacked the units, it had no choice but
11   to twist. Whether it did permanent damage
12   to the frame or not is another issue.
13      Q. Do you know if there was any -- do
14   you have an opinion as to whether or not any
15   damage was done to the interior of the unit
16   as a result of what you believed to be
17   twisting of the frame of the unit when it
18   was jacked?
19      A. None that I could identify without
20   taking the wall system apart.

21   Q. You didn't see any cracks in any
22   walls or any wall panels or ceiling panels
23   falling off the Dubuclet trailer, did you?
24   A. I did not.
25   Q. Number 11 talks about placing the

153

1   unit on blocks. And, again, I'm asking you
2   if this is your opinion that it apparently
3   created stress on the roof membrane, or is
4   this somebody else's opinion?
5   A. No, it's my opinion.
6   Q. And it is your opinion that the
7   way the unit was blocked, it caused some
8   buckling of the roof decking. Is that
9   right?
10   A. That's correct.
11   Q. And did that lead to any damage to
12   the unit, in your opinion?
13   A. None that I could identify without
14   destructive demolition.
15   Q. And the fact that this sealant on
16   the roof edges, that, in your opinion, did
17   not lead to any leak inside of the unit, did
18   it?
19   A. That they had sealant?
20   Q. Well, you say in No. 11, "In
21   addition, there is an unusual amount of
22   sealant on the roof."
23       What I'm asking you is, in your
24   opinion that didn't involve any leaking of
25   the roof, did it?

154

1   A. No, not the placement of the
2   sealant.
3   Q. Was there any evidence that there
4   was any roof leak in this unit?
5   A. There was not. Just what appeared
6   to be an excessive amount of sealant.
7   Q. So there was an excessive amount
8   of sealant, but it doesn't mean anything?
9   It wasn't the cause of a leak, or you saw no
10   evidence of a roof leak?
11   A. Correct.

                                              254
25  Q.  Mr. Mallet, Charles Penot for

                                              255
1   Fluor Enterprises.  I want to understand one
2   of your answers earlier today to a question
3   by Mr. Saporito.
4            He was going through your
5   conclusions in your report.  He was on
6   conclusion No. 10, so if you want to have
7   that handy.  That was Exhibit 5, and it is
8   conclusion No. 10.  I believe it is back at
9   page, I want to say, 54 maybe.
10      A.  Yes, sir, I have it.
11      Q.  And I don't have this precisely,
12  but Mr. Saporito asked you about the opinion
13  there about jacking, was it your opinion or
14  was it based on somebody else's.
15           You said it was based on your
16  understanding of how the Dubuclet travel
17  trailer was jacked.  I think that is what
18  you said.  I don't want to put words in your
19  mouth, so correct me if I'm wrong.  But
20  whether that resulted in permanent damage to
21  the structure is another matter, or words to
22  that effect.  Do you recall that?
23      A.  Yes, sir.
24      Q.  Could you explain to me what you
25  meant by that, particularly whether that

                                              256
1   resulted in permanent damage to the
2   structure is another matter?
3       A.  That we didn't identify -- we did
4   not identify any areas where damage was
5   created by the jacking, even though I don't
6   believe that the jacking was done in a
7   manner that wouldn't create twisting or a
8   racking of the frame, but we didn't see any
9   physical manifestation or issues created by
10  that.
11      Q.  I think I understand that.  I just
12  wanted to be clear.
13      A.  Yes, sir.  Because "that's another
14  matter" is no explanation at all.  You were
15  right to clarify.

16   Q.  So if I understand you correctly,
17  you were unable to find any physical
18  manifestations upon your inspection of the
19  Dubuclet trailer that indicates that jacking
20  somehow damaged that trailer.  Is that a
21  fair statement, sir?
22      A.  That is correct.  Based on a
23  limited visual examination, we found no
24  indication of damage to the unit because of
25  the method of jacking and blocking.

                                          257
1      Q.  And, in fact, sir, is it not
2  correct that, while you believe you have an
3  understanding as to how jacking was
4  generally done, as of the time you rendered
5  your report, you did not have any specific
6  information as to how the Dubuclet travel
7  trailer was jacked?
8      A.  That's correct.  The information
9  was garnered from the previous case of our
10  understanding of how Fluor's people were
11  doing the jacking and blocking.
12     Q.  That was your assumption?
13     A.  Yes.  We assumed that that would
14  transfer to this same unit.
15     Q.  At page 22 of your report, "The
16  roof deck is buckled in one section on the
17  right.  This may have been caused by jacking
18  and/or as a result of a roof leak."
19         Is this statement correct, sir,
20  that you cannot offer an opinion today that,
21  more likely than not, any of the buckling in
22  the roof deck was caused by jacking?
23     A.  No, because I give alternatives
24  that it was either/or.  That is correct.


                                          256
16   Q.  So if I understand you correctly,
17  you were unable to find any physical
18  manifestations upon your inspection of the
19  Dubuclet trailer that indicates that jacking
20  somehow damaged that trailer.  Is that a
21  fair statement, sir?
22      A.  That is correct.  Based on a

23  limited visual examination, we found no
24  indication of damage to the unit because of
25  the method of jacking and blocking.

ND: 4811-3492-5573, v. 1