UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE | * | |
| | PRODUCTS LIABILITY | * | |
| | LITIGATION | * | SECTION:  N(5) |
| | | * | |
| This Document Relates to: | | * | |
| *Dubuclet v. Fleetwood Enterprises, Inc., et al.* | | * | |
| Case No. 07-9228 | | * | JUDGE: ENGELHARDT |
| | | * | |
| | | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DEFENDANT FLEETWOOD ENTERPRISES, INC.'S MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION TO
EXCLUDE DR. PATRICIA WILLIAMS'S TESTIMONY**

Defendant, Fleetwood Enterprises, Inc. (hereinafter "Fleetwood") moves this Court to

limit the testimony of Dr. Patricia Williams.  Plaintiff has proposed Dr. Patricia Williams as her

expert on general causation in her effort to link her skin condition and other symptoms to

formaldehyde exposure.[1]  Dr. Williams also is providing a general causation opinion on cancer to

support Plaintiff's fear of cancer claim.[2]  Dr. Williams is not qualified to offer expertise on

formaldehyde or skin conditions.  Not knowing the order the Court will consider the various

motions Fleetwood is filing on the medical issues presented in this case, it is important for the

Court to understand that it is Fleetwood's medical position that it has been well established in the

world's medical literature that formaldehyde in solid (cosmetics, textiles) and aqueous (formalin)

states is a skin contact allergen.  However, it is Fleetwood's very strong position -- supported by

---

[1] Although of utterly no evidentiary weight, counsel for Fleetwood notes in passing that although he has been associated in formaldehyde-related litigation for more than 32 years, this is the first case that he is aware of in which it has been alleged that formaldehyde in the ambient indoor air either caused or exacerbated atopic dermatitis.

[2] In order to preserve its record for appeal, Fleetwood joins in and adopts as it the motion in limine of Gulf Stream Coach, Inc.'s to exclude Williams's testimony filed August 25, 2009 (Rec. Doc. 2834), and abides this court's order dated Sept. 8, 2009 (Rec. Doc. 3094) that allowed the plaintiffs to present Dr. Williams at a Daubert hearing to further examine her opinions. The Court also conducted a Rule 104 hearing in *Alexander* on September 14, 2009, allowing her to testify to general causation on her cancer opinion.

the expert opinion of Dr. Howard Maibach, one of the world's leading dermatologists and researchers (who, among other things, is the patent holder on the patch test administered to Timia) -- that it has never been established in the world's medical literature that formaldehyde in its gaseous state either causes or exacerbates atopic dermatitis (eczema and related skin disorders).

The three principal studies that Dr. Williams relies on to show a causal link between gaseous formaldehyde and Ms. Dubuclet's pre-existing skin conditions do not provide any valid scientific support for her opinions.  Neither is her general causation opinion on cancer reliable or based on sound science.[3]  Therefore, Dr. Williams's testimony should be excluded.

## I.     Factual Background

The Court is well familiar with Dr. Williams because she was also an expert in the *Alexander* case tried in September.  Indeed, the Court has already conducted a Rule 104 hearing and entered orders regarding her testimony in that case.[4]  Fleetwood understands that the Court has considered another motion to exclude testimony, but notes that in *Alexander*, Dr. Williams was offering an opinion on asthma.  Asthma is not at issue in this case.  Further, in *Alexander*, the plaintiffs had separately designated an epidemiologist as an expert; but, in this case, Plaintiff has not identified any epidemiologist as an expert.

Although it is understood that Dr. Williams, a toxicologist (board certified in 2006), is only offering general causation opinions that formaldehyde gas both causes and exacerbates underlying atopic dermatitis, it is important to understand that it is undisputed in this case that

---

[3] Fleetwood has also moved separately for summary judgment on Plaintiff's mental anguish claims, including fear of cancer. If the Court grants that motion, then Dr. Williams's cancer opinions should also be excluded on grounds that there is no proper evidentiary foundation for her cancer opinions. *See Smith v. A.C. & S., Inc.*, 843 F.2d 854, 859 (5th Cir. 1988) (holding that district court erred in admitting expert testimony on reasonableness of fear of cancer without proper foundation).
[4] Order dated Sept. 8, 2009 (Rec. Doc. 3094); Rule 104 hearing in *Alexander* on Sept. 14, 2009.

the 11 year old plaintiff has been suffering from atopic dermatitis since the condition was first reported in her medical records at approximately six weeks of age.[5]

### A.  Dr. Williams's general causation opinion.

Dr. Williams's affidavit, after quoting from several studies, concludes with the following general causation opinions:

- A cause-effect relationship exists between formaldehyde and upper respiratory tract damage and cancer.

- A cause-effect relationship exists between formaldehyde and eczema.[6]

In the plaintiff's most recent attempt to amend the complaint, they are seeking to add a fear of cancer claim.  The plaintiff has not made any claim for cancer itself.

Although Dr. Williams's affidavit goes beyond these two areas -- particularly into DNA damage and asthma opinions -- those issues are not in this matter.  Regarding DNA damage, she is only discussing DNA damage as it relates to her cancer opinion, and not as a separate type of "injury."[7]  Dr. Williams's affidavit also purports to offer opinions about asthma, but Ms. Dubuclet's counsel has conceded that asthma is not a condition at issue in this case.[8]

---

[5] Before moving in to the EHU, Timia presented to a medical provider more than 15 times complaining of skin-related conditions, including a visit to a doctor approximately a week before moving in her trailer. *See* Medical Records, compiled in Ex. A; Timia Dubuclet Timeline, attached as Ex. B (Exs. 8 and 9 to Elisha Dubuclet's Dep. dated Oct. 7, 2009).  Yet after moving into the EHU, she did not complain to a medical provider about her skin condition until ten months after moving in.  Medical Records (Ex. A). She presented only one more time six months later, and only received one prescription for a skin medication during the entire time that she lived in the EHU. Indeed, she uses that prescription for almost a year and does not get another prescription until six months after moving out of the trailer. *Id.*

[6] Williams Aff. at 40 (DUB000245), attached as Ex. C.  Dr. Williams did not offer an eczema opinion in the *Alexander* case. *See, e.g.*, Order dated Sept. 8, 2009 (Rec. Doc. 3094).

[7] *See* Williams Aff. at 26-27 (DUB000231-232) (Ex. C).  DNA damage is not included in the plaintiff's most recent pleading seeking to amend the complaint. *See* Rec. Doc. 5394.  Neither has Dr. Williams set forth any type of medical monitoring plan for this type of claim, so Fleetwood is proceeding on the reasonable assumption that this element of "damages" is only at issue in this case because of its purported relationship to her general causation opinion on cancer. If plaintiff, however, argues at trial that DNA damage is a separate injury, Fleetwood reserves the right to address Dr. Williams's lack of expertise in this area, and whether it is even an injury for which damages could be awarded.

[8] Williams Dep. at 138:6-19, excerpts attached as Ex. D.  Therefore, her opinions on asthma are not addressed in this motion, and Fleetwood reserves the right to address Dr. Williams's lack of expertise in this area as well.

3

**B.      The three studies principally relied on by Dr. Williams for her eczema opinion.**

Williams cites to three papers that discuss gaseous formaldehyde, and she relies on these three, testifying that they are the ones that have statistically significant findings: Matsunaga, Takahashi, and Eberlein-König.[9]  While Dr. Williams certainly cites other medical articles in her affidavit, these are the only three directly discussing *gaseous* formaldehyde.  None of the other studies purport to deal directly with the issue of whether gaseous formaldehyde causes -- or exacerbates -- atopic dermatitis, even though Ms. Dubuclet is only claiming to be exposed to gaseous formaldehyde.[10]  Dr. Williams cites other studies where the formaldehyde is coming from a material in close contact with the skin, the "textile studies,"[11] but that is not the case here. Plaintiffs are clear they are looking at formaldehyde in the ambient air and not at formaldehyde-containing products touching Ms. Dubuclet's skin.  Dr. Williams also admits that the route of administration between formaldehyde in cosmetics and formaldehyde in ambient air is different.[12]

**1.      *Matsunaga: cross-sectional study does not find causation.***

In her affidavit, Dr. Williams cites this study[13] because "[f]ormaldehdye levels of 47 ppb or more were independently associated with an increased prevalence of atopic eczema."[14]  She

---

[9] Williams Dep. at 10:23-11:20 (Ex. D).

[10] *See, e.g.*, Aldridge Nov. 30, 2007 Compl. at 20 (paragraphs are unnumbered) (alleging that plaintiffs have been exposed to "formaldehdye fumes").

[11] Williams Dep. at 136:18-137:13 (Ex. D).

[12] Williams Dep. at 79: 24-80:6 (Ex. D). Despite that admission, she insists that the "mechanisms of action" are the same. *Id.* at 79:15-23.

[13] This study is one of five "studies" done on the same cohort of pregnant women at the same time. The studies range from the effect of eating seaweed on the prevalence of allergic rhinitis to the effect of cigarette smoke on IgE levels. Ichiro Matsunaga, et al., *Ambient Formaldehyde Levels and Allergic Disorders Among Japanese Pregnant Women: Baseline Data From the Osaka Maternal and Child Health Study*, 18 Ann. Epidemiol. 78, 84 (2008) (references 19-22 regarding the Osaka Maternal and Child Health Study), attached as Ex. E.

[14] Williams Aff. at 22 (DUB000227) (Ex. C).

4

testifies that this is statistically significant.[15]  But, contrary to the assertion of Dr. Williams, the authors of the Matsunaga study themselves state: "we could not establish a cause and effect relationship for the associations under study.  Further evaluations in prospective studies are needed to draw a conclusion regarding whether [formaldehyde] exposure increases the likelihood of atopic eczema."[16]  The Matsunaga study was a cross-sectional study that purports to be the first epidemiological study in the world to look at the "association between FA [gaseous formaldehyde] and atopic eczema all over the world."[17]  It looked at a group of pregnant women that—self-reported—had received medical treatment, which the authors did not document, for an allergic disorder during the previous 12 months.[18]  Once enrolled in the study, the women were then requested to wear a passive air sampling tube for 24 hours to test the ambient air for formaldehyde.[19]  The authors admit they did not find causation.

## 2.   *Takahashi: no statistical significance.*

In the Takahashi study, the authors looked at two cohorts of medical students: 1) a group of medical students currently taking an anatomy course, and 2) a group of medical students that had taken an anatomy course two to four years previously.[20]  The authors conclude, "formaldehyde induces skin irritation in students with atopic background, which *may* in turn worsen atopic dermatitis."[21]  It clearly points out that all it is addressing is irritation and not "cause" of atopic dermatitis by stating that "[t]his condition is distinct from allergic contact

---

[15] Williams Dep. at 15:10-17 (Ex. D).
[16] Matsunaga at 83 ( Ex. E).
[17] Id. at 79 (Ex. E).
[18] Id. at 78 (Ex. E).
[19] *Id.* at 79 (Ex. E). Curiously, the protocol called for the wearing of the monitor after they completed the questionnaire on prior symptoms.
[20] Sachiko Takahashi, Prospective Study of Clinical Symptoms and Skin Test Reactions in Medical Students Exposed to Formaldehyde Gas, 34 J. Dermatology 283, 284 (2007), attached as Ex. F.
[21] *Id.* at 288 (emphasis added).

dermatitis."[22]   But critically, for those already suffering from atopic dermatitis, this study shows there is no statistically significant increase in the symptomatology for those students who already have atopic dermatitis based on the number of symptoms reported at the beginning of the anatomy course and the number of symptoms reported at the end of the two-month anatomy course.[23]   Thus the study's alleged conclusion is belied by its own findings.

### 3.   *Eberlein-König: no clinical significance.*

In this paper, seven patients with atopic dermatitis and seven control subjects were exposed to nitrogen dioxide, formaldehyde, and room air, at separate times, in order to investigate epidermal barrier function.[24]   Two of the three outcomes that were measured and evaluated were transepidermal water loss (TEWL) and skin roughness.[25]   After exposure to formaldehyde, the authors found that TEWL was significantly increased in patients with atopic dermatitis, but not in the control subjects.[26]   The authors noted that the "known irritant properties of formaldehyde *may* be the cause of this worsened epidermal barrier function."[27]   Importantly, skin roughness -- the measure of clinical significance -- was not changed by exposure to formaldehyde.[28]   Critically, however, the study also measured eosinophil cationic protein (ECP) and soluble interleukin-2 receptor (sIL-2R) levels, which are markers that correlate with the disease activity in atopic eczema.[29]   The authors found that changes in these levels were "unrelated to pollutant exposure."   This means that formaldehyde exposure did not affect disease

---

[22] Id. at 288.
[23] *Id.* at 285 (Table 2); Williams Dep. at 39:13-25.
[24] Bernadette Eberlein-König, et al., *Influence of airborne nitrogen dioxide or formaldehyde on parameters of skin function and cellular activation in patients with atopic eczema and control subjects*, J. Allergy Clin. Immunol. 141 (Jan. 1998), attached as Ex. G.
[25] Eberlein-König paper at 141.
[26] *Id.* at 142-43.
[27] *Id.* at 143 (emphasis added).
[28] *Id.* at 142.
[29] Id. at 141.

activity in the skin of the atopic subjects being studied.[30]  Indeed, this appears to be the only study relied on by Plaintiff to show changes in disease activity based on the critical serum markers.  Since the serum markers did not change, it follows that the same markers would be unchanged in order dermatitis, including Plaintiff.

## II.    Argument & Citation to Authority

### A.    This Court's gatekeeping role regarding Dr. Williams's opinions.

Federal Rule of Evidence 702 permits a witness who, through his expertise, has the knowledge, skill, experience, training or education to offer scientific, technical, or other specialized knowledge may testify regarding that knowledge if it will assist the trier of fact to understand the evidence or to determine a fact in issue.  A proposed expert witness must first be qualified to testify regarding the issues for which he is offered.[31]  Courts have routinely refused to admit a proffered expert's testimony where the proffered expert, despite a generalized or professed knowledge of issues arguably relevant to the subject matter, nevertheless lacked expertise with the specific nature of the claims being litigated.[32]  It has been held that a toxicologist is not qualified to offer an expert opinion regarding a chemical's ability to cause alleged damages where the toxicologist is not a licensed medical doctor and lacks experience in the study of exposures to the subject chemical.[33]  Even if an expert is qualified, his opinion can be excluded if not reliable.[34]

---

[30] Id. at 142.
[31] *See U.S. v. Frazier*, 387 F.3d 1244, 1260-1261 (11th Cir. 2004).
[32] *See, e.g,. Kassim v. City of Schenectady,* 415 F.3d 246, 251 (2nd Cir. 2005) (expert lacked knowledge regarding Arabic translation); *In Re: Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543-544 (S.D.N.Y. 2004) (expert's opinion not based on qualification or experience but on subjective views of ethical standards at issue).
[33] *Wintz v. Northrop Corp.*, 110 F.3d 508, 514 (7th Cir. 1997) (holding district court did not err in finding expert not qualified where the proffered toxicologist was not a physician and, despite acquiring generalized knowledge of the chemical at issue, the expert did not have experience in analyzing causation of injury by way of exposure to the chemical).
[34] *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).

Once the expert is deemed qualified, his testimony is only admissible if it is based upon sufficient facts or data, it is the product of reliable principles and methods, *and* the witness has applied the principles and methods reliably to the facts of the case.[35]   The reliability inquiry is flexible, and several nonexclusive factors may be considered, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, and (4) whether the technique is generally accepted in the relevant scientific community.[36]  The expert testimony must also be relevant -- not only in the way that all testimony must be relevant under Federal Rule of Evidence 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue.[37]

*Daubert* also cautions against admitting expert testimony in a case when the application of the expert's methodology to the facts of the case involves an impermissible leap of faith.  The Supreme Court in *General Electric v. Joiner* acknowledged, "[t]rained experts commonly extrapolate from existing data.  But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to the existing data only by the *ipse dixit* of the expert."[38]  If there exists too great an analytical gap between the data and the opinion offered, the testimony is not reliable.[39]  *Joiner* reminds district courts that they must review the reasoning used by an expert in applying a given methodology to the expert's ultimate

---

[35] Fed. R. Evid. 702.
[36] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993) (discussing the four nonexclusive factors); Order dated July 15, 2009 at 4 (Rec. Doc. 2181) (citing *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).
[37] Order dated July 15, 2009, at 4 (Rec. Doc. 2181) (citing *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003)).
[38] 522 U.S. 136, 146 (1997).
[39] *Id.*

opinion.[40]  Ultimately, when the evidence does not "fit" the conclusion, the testimonial evidence is not reliable.[41]

An expert may attempt to fill that analytical gap with the "weight-of-the-evidence." When an expert testifies that he has analyzed the studies and evidence at issue, has weighed them, and then reaches a conclusion, he is applying what some courts have called the "weight-of-the-evidence" methodology.[42]  While a proposed expert is not required to back his opinion with studies that "unequivocally support" his conclusion, the expert's testimony "must be reliable at each and every step or else it is inadmissible."[43]  When the information relied on by the expert does not provide a relevant link with the facts at issue, the opinion is not based on "good grounds" and should be excluded.[44]  Because each and every step of the expert's testimony must be reliable, so must this weighing process "be based on methods and procedures of science, rather than on subjective belief or unsupported speculation."[45]  Only then can the expert's weighing process fill that analytical gap.

> **B.    Dr. Williams, a toxicologist, is not qualified to render a causation opinion regarding formaldehyde.**

Dr. Williams's opinion is centered on creating a causal link between 1) formaldehyde and eczema, and 2) formaldehyde and cancer.  Dr. Williams is a toxicologist, but that fact alone cannot qualify her as an expert on general causation.  She may have credentials that toxicologists have, but credentials do not substitute for training and experience with both the chemical and disease at issue.

---

[40] *Id.* at 144.
[41] *Cavallo v. Star Enters.*, 892 F. Supp. 756, 761-63 (E.D. Va. 1995).
[42] *See* Manual of Complex Litigation, Fourth, § 23.272; *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 602 (D.N.J. 2002).
[43] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007) (upholding district court's exclusion of proposed expert's testimony on Daubert grounds).
[44] *Knight*, 482 F.3d at 355.
[45] *Magistrini*, 180 F. Supp. 2d at 603.

Dr. Williams insists that she has "extensive experience" with formaldehyde.[46]  But this experience is only related to her work as an "anatomist" and having been exposed herself to gaseous formaldehyde in the lab.[47]  She has not published any scientific articles on formaldehyde.[48]  Prior to becoming involved in the formaldehyde litigation, she did not do any research on the adverse health effects of formaldehyde.[49]  She attempts to bolster her experience by noting that when she made personal decisions about cosmetic products, she "looked at" the literature of formaldehyde gas and dermatitis.[50]  But when it comes to professional experience, her experience with formaldehyde is limited outside of working as an anatomist.

Not only is her experience with formaldehyde limited, but she does not have experience with skin disease:

> Q.      My question is how many articles have you -- How many articles on skin disease have you authored?
>
> A.      None.
>
> Q.      Have you done any writing on skin disease?
>
> A.      That is not my area, no.
>
> Q.      Have you done any writing on formaldehyde and skin disease?
>
> A.      That is not my area.  Skin disease is not my area.[51]

In response to questions on her knowledge of formaldehyde and skin disease, she mentions another personal experience, noting that she had to decide whether she would be patch tested, so

---

[46] Williams Dep. at 65:7-10. Indeed, every doctor, having been a medical student in an anatomy class, has worked with formaldehyde. But that personal experience does not automatically qualify every doctor to provide expert testimony on formaldehyde.
[47] *Id.* at 58:5-15.
[48] *Id.* at 65:7-10.
[49] Williams Class Cert. Dep. at 31:1-10.
[50] Williams Dep. at 58:23-59:5.
[51] Williams Dep. at 64:21-65:6.

she "looked at patch testing."[52]  She admits that while she looked for information for personal reasons, that review would not have been adequate to respond to questions about the articles without reviewing them again.[53]

Prior to her retention in the formaldehyde litigation, Dr. Williams had never rendered any opinions on formaldehyde exposure or on skin disease.  While she is credentialed as a toxicologist, she has no expertise on formaldehyde.  She is not a  dermatologist, a medical doctor, or an epidemiologist.[54]  She does not diagnose patients.[55]  Credentials as a toxicologist alone are insufficient to qualify her as an expert on general causation.

## C.   Dr. Williams's general causation opinion regarding eczema is not based on any reliable methodology and provides no assistance to the trier-of-fact.

The three papers primarily relied on by Dr. Williams that address the type of formaldehyde at issue in this case -- gaseous formaldehyde -- and skin conditions question whether formaldehyde exposure can exacerbate certain skin conditions, but not one of the studies finds that it does.  The other studies cited by Dr. Williams deal with a different form of formaldehyde, and a different route of administration.[56]  Formaldehyde in the ambient air is at issue -- not formaldehyde exposure by touching a formaldehyde-containing product.  Therefore, the other studies dealing with a different type of formaldehyde exposure cannot provide a reliable basis for Dr. Williams's general causation opinion.  Permitting Dr. Williams to present these studies turns the jury into scientists, asking the jury to find something that no scientist has ever found.[57]

---

[52] *Id.* at 68:1-18.
[53] *Id.* at 68:19-69:7.
[54] Williams Class Cert. Dep. at 45:8-47:9 (Ex. H).
[55] Id. at 44:21-25 (Ex. H).
[56] Williams Dep. at 79: 24-80:6.
[57] *See, e.g, Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 319 (7th Cir. 1996) (noting "the courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it.").

## 1.    *Matsunaga: cross-sectional study does not find causation.*

In the Matsunaga study, the authors state that "we could not establish a cause and effect relationship for the associations under study.  Further evaluations in prospective studies are needed to draw a conclusion regarding whether [formaldehyde] exposure increases the likelihood of atopic eczema."[58]  The Matsunaga study was a cross-sectional study, a type of observational study.[59]  It looked at pregnant women that had received medical treatment for a self-reported, undocumented allergic disorder during the previous 12 months.[60]  Once enrolled in the study, the women were requested to wear a passive air sampling tube for 24 hours.[61]  This study is based on alleged disease first, exposure second -- turning the temporality requirement of the Bradford-Hill criteria on its head.

Not only is temporality undone, but the authors do not reach any conclusion on exacerbation of atopic eczema, noting that while exposure to formaldehyde "*may* exacerbate atopic eczema symptoms in adults," that the alternative is that "the observed association might be attributed to unrecognized environmental factors associated with [formaldehyde]."[62]  This study does not address causation.  Even the possible exacerbation association is countered with another alternative.

Despite the language and findings in the study, Dr. Williams places importance on this study claiming that the one-day formaldehyde measurement "is an absolute quantitative

---

[58] Matsunaga at 83 (Ex. E).
[59] *See* Ref. Manual Scientific Evidence, Second Ed., *Reference Guide on Epidemiology* (2000), at 343, available at http://www.fjc.gov (describing cross-sectional studies as rarely being used for environmental toxic agents because it is not possible to establish the temporal relations between exposure and disease, but that they can provide valuable leads to further directions for research).
[60] Matsunaga at 78. The authors pointed out that they did not use validated diagnostic criteria for the allergic disorders, so they concluded that the study might not have included pregnant women with milder cases of allergic disorders. *Id.* at 82.
[61] *Id.* at 79.
[62] *Id.* at 82 (emphasis added).

measurement of a representative amount."[63]  In her report, she cites this study because "[f]ormaldehdye levels of 47 ppb or more were independently associated with an increased prevalence of atopic eczema."[64]  She testifies that this is statistically significant.[65]  Yet, in looking at Table 2 of the study at the adjusted odds ratio ("OR"), when the table with the formaldehyde levels subgroups are examined in order to determine the dose -- response curve -- the lower bound for confidence interval (0.92) for the formaldehyde level $\geq$ 47 ppb, includes a relative risk of 1, and the dose-response curve showed non-statistically significant *p*-value, therefore the results of the study are not statistically significant.[66]  For the convenience of the Court in following this discussion, Table 2 is here inserted:

TABLE 2. Crude and adjusted ORs and 95% CIs for current allergic disorders in relation to formaldehyde exposure levels, Osaka Maternal and Child Health Study, Japan, November 2001 to March 2003

| Formaldehyde levels (ppb) | Prevalence (%) | Crude | | Adjusted[a] | |
|---|---|---|---|---|---|
| | | OR (95% CI)[b] | OR (95% CI)[c] | OR (95% CI)[b] | OR (95% CI)[c] |
| **Asthma** | | | | | |
| <18 | 7/298 (2.4) | 1.00 | | 1.00 | |
| 18–27 | 6/299 (2.0) | 0.85 (0.28–2.56) | 1.00 | 0.80 (0.23–2.84) | 1.00 |
| 28–46 | 5/301 (1.7) | 0.70 (0.22–2.24) | | 0.72 (0.19–2.77) | |
| ≥47 | 3/100 (3.0) | 1.29 (0.33–5.07) | 1.51 (0.44–5.23) | 2.15 (0.41–11.28) | 2.65 (0.63–11.11) |
| | | (p for trend = 0.87) | | (p for trend = 0.47) | |
| **Atopic eczema** | | | | | |
| <18 | 15/298 (5.0) | 1.00 | | 1.00 | |
| 18–27 | 15/299 (5.0) | 1.00 (0.48–2.08) | 1.00 | 1.03 (0.47–2.29) | 1.00 |
| 28–46 | 17/301 (5.7) | 1.13 (0.55–2.31) | | 1.11 (0.50–2.42) | |
| ≥47 | 10/100 (10.0) | 2.10 (0.91–4.83) | 2.01 (0.98–4.12) | 2.36 (0.92–6.09) | 2.25 (1.01–5.01) |
| | | (p for trend = 0.08) | | (p for trend = 0.08) | |
| **Allergic rhinitis** | | | | | |
| <18 | 45/298 (15.1) | 1.00 | | 1.00 | |
| 18–27 | 41/299 (13.7) | 0.89 (0.57–1.41) | 1.00 | 1.06 (0.65–1.73) | 1.00 |
| 28–46 | 37/301 (12.3) | 0.79 (0.49–1.26) | | 0.85 (0.51–1.40) | |
| ≥47 | 17/100 (17.0) | 1.15 (0.63–2.12) | 1.29 (0.74–2.25) | 1.17 (0.60–2.28) | 1.22 (0.68–2.20) |
| | | (p for trend = 0.91) | | (p for trend = 0.91) | |

*(handwritten annotations: "Non statistically significant dose response curve" near the crude atopic eczema column; "Same information recalculated and redirection by plaintiffs" near the adjusted atopic eczema column)*

[a] Based on multiple logistic regression controlling for age; gestation; parity; family history of asthma, atopic eczema, and allergic rhinitis; cigarette smoking; current passive smoking at home and work; mold in the kitchen; indoor domestic pets; mite antigen level in house dust; family income; education; and season when data were collected.
[b] Formaldehyde levels were categorized into 4 groups using cut-off points at the 30th, 60th, and 90th percentile values.
[c] Formaldehyde levels were categorized into 2 groups using a cut-off point at the 90th percentile value.

---

[63] Williams Dep. at 18:7-11.
[64] Williams Aff. at 22 (DUB000227)
[65] Williams Dep. at 15:10-17.
[66] *See* Michael D. Green, et al., Reference Guide on Epidemiology, at 389 (Fed. Jud. Ctr. 2000), available at http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf (defining "confidence interval" to state "[w]here the confidence interval contains a relative risk of 1.0, the results of the study are not statistically significant.").

The authors then aggregated the three subgroups of exposure level into one group, thereby calculating a new confidence interval that has a lower bound of 1.01.[67]  It is this recalculated OR that Dr. Williams relies on, even though it supplies less specific information due to the aggregation of the subgroups and is in fact the same non-statistically significant does response cure recalculated in a different format.  And, again, all of those numbers are based on a study that looked at an undocumented, self reported, alleged disease first, then exposure, and which admits in its conclusion that no cause and effect relationship could be established from this study.[68]

Dr. Williams does not explain how this study can support a general causation opinion. Indeed, the study's own language rejects that conclusion.  Moreover, her opinion is not supported by any scientific methodology to explain how a study that suggests an association in pregnant women who first experienced a symptom, and later experienced exposure, could support a general causation opinion in litigation.

### 2.  *Takahashi: no statistical significance.*

In the Takahashi study, the authors looked at two cohorts of medical students: 1) a group of medical students currently taking an anatomy course, and 2) a group of medical students that had taken an anatomy course two to four years previously.[69]  The mean concentration of the indoor formaldehyde in the anatomy classroom at chest level was $2.4 \pm .49$ ppm.[70]  In the first group of students, who were currently taking the course, none tested positive on patch test to formaldehyde at the beginning of the course, and only two, one male student and one female

---

[67] Matsunaga at 81 (Table 2).
[68] Although Table 2 discusses "current" allergic disorders, see Matsunaga at 81, the authors had previously defined "current" disease as present if the subjects had received any self-reported medical treatment for certain allergic disorder during the previous 12 months.  *Id.* at 79.
[69] Takahashi at 284, Ex. F.
[70] *Id.* at 285.

student, had a positive patch test at the end of the course.[71]  The male student who tested positive had developed formaldehyde-induced allergic dermatitis on his hands because of direct contact with the cadaver.[72]  The female student who tested positive had a history of atopic dermatitis, and during the anatomy course she had various symptoms, but they all disappeared after the course.[73]  For that female student, the authors note that no provocation test was performed, so there is "no evidence that her symptoms were caused by an allergic reaction to formaldehyde."[74]  This finding is confirmed by the second group of students, who had previously completed the anatomy course; they all tested negative to the patch test.[75]

The authors conclude that "formaldehyde induces skin irritation in students with atopic background, which *may* in turn worsen atopic dermatitis."[76]  But the study shows there is *no* statistically significant increase in the symptomatology for those students who already have atopic dermatitis based on the number of symptoms reported at the beginning of the anatomy course and the number of symptoms reported at the end of the two-month anatomy course.[77]  Moreover, the authors are clear that this study found no allergic mechanism in these students; rather, the symptoms were due to irritation.[78]  And in the next sentence, the authors state that this irritation is "due to airborne *or* direct contact with formaldehyde,"[79] addressing two distinct types of exposure.

---

[71] *Id.* at 285-86.
[72] *Id.* at 286.
[73] *Id.*
[74] *Id.* at 288.
[75] *Id.* at 286.
[76] *Id.* at 288 (emphasis added).
[77] *Id.* at 285 (see Table 2); Williams Dep. at 39:13-25.
[78] Takahashi at 288.
[79] *Id.*

This study reports on *one* medical school student that had some irritant symptoms while in anatomy class.  It does not show any long-term causal effect or allergic response.[80]  The study itself does not purport to draw any other conclusions.  Yet Dr. Williams relies on this report to support her general causation opinion that gaseous formaldehyde can cause lasting allergic effects.  This study provides no scientific support for Dr. Williams's general causation opinion.  It has no weight, and shows no long-terms causal effect.  It cannot offer any assistance to the trier-of-fact.

### 3. *Eberlein-König: no clinical significance.*

In this paper, seven patients with atopic dermatitis and seven control subjects were exposed to nitrogen dioxide, formaldehyde, and room air, at separate times, in order to investigate epidermal barrier function.[81]  Two of the three outcomes that were measured and evaluated were transepidermal water loss (TEWL) and skin roughness.[82]  After exposure to formaldehyde, the authors found that TEWL was increased in patients with atopic dermatitis, but not in the control subjects.[83]  The authors noted that the "known irritant properties of formaldehyde may be the cause of this worsened epidermal barrier function."[84]  But there was no clinical significance shown: skin roughness was *not* changed by exposure to formaldehyde.[85]  Put another way, although there was purportedly a change in the skin's barrier function, that change did not lead to changes in the skin roughness.  Dr. Williams insists that an increase in the TEWL "allows eczema to develop" based on this study in which there was an increase in the TEWL, but

---

[80] Dr. Williams speculates—based on her personal experience—that it could take "many years" until a sensitization response appears, so she seems to ignore the study's own conclusion that the female medical student no longer complained of clinical symptoms after the anatomy course. Williams Dep. at 33:12-34:10.
[81] Eberlein-König at 141, Ex. G.
[82] *Id.*
[83] *Id.* at 142-43.
[84] *Id.* at 143.
[85] *Id.* at 142.

*no* eczema developed.[86]  Dr. Williams either intentionally -- unintentionally -- failed to address

the third -- and critical -- measure in the study.  Indeed, it was a measure of the markers for skin

disease activity.  As set forth on the first page of the study, the study specifically measured two

markers of skin disease activity (ECP and sIL-2R).  Critically the study demonstrated that the

formaldehyde exposure did not affect disease activity.[87]  How does a study that does *not* show

formaldehyde causes eczema support an opinion that formaldehyde can cause eczema? The

study's measurements of the serum levels ECP and sIL-2R shows that the serum levels were

"unrelated to pollutant exposure."[88]  Such speculation not based in science should not be

presented to the jury as an expert opinion.

> **D.    Dr. Williams's general causation opinion regarding cancer is not based on any reliable methodology and provide no assistance to the trier-of-fact.**

>> **1.    *"Theoretical" damage cannot support a general causation opinion.***

Dr. Williams offers the opinion that exposure to just one molecule of formaldehyde can

cause damage at the body's molecular level that has the *theoretical potential* to develop into

sinonasal, nasal, nasopharyngeal, or upper respiratory tract cancer.[89]  But the fact that a chemical

may have effects on living cells or genes "is the beginning, not the end of the scientific inquiry

and proves nothing about causation without other scientific evidence."[90]  This opinion is

unreliable.  First, Dr. Williams testified that formaldehyde causes damage at the molecular

level.[91]  Her testimony was as follows:

---

[86] Williams Dep. at 40:22-41:5 (Ex. D).
[87] Eberlein-König at 141-42 (Ex. G).
[88] Id. (Ex. G).
[89] Williams Dep. (July 7, 2009) at 47:22-50:25 (Ex. D).
[90] *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996).
[91] Williams Dep. (July 7, 2009) at 48:3-49:5, 110:9-111:4, 132:18-134:15, 288:4-289:3 ( Ex. D).

A. One molecule at the *theoretical* level can cause the damage. It can also be repaired . . . *we are talking at the molecular level.* So *theoretically*, molecular level, one hit could *theoretically* cause the mutation. . .

\*   \*   \*   \*

A. . . . the *theoretical potential* is there, *if* the repair mechanisms fail, *if* the cell cycle timing of the hit is just that it isn't repaired . . . *there is no safe level* of the DNA-reactive carcinogen.[92]

Suffice it to say, her opinion is not only problematic because it is based on subclinical, subcellular damage *potential*,  but by her own words it is "theoretical" and based on uncertainties, exposing a tenuous basis for her opinions.[93]

Second, she has premised her opinion on the idea that there is "no safe level" of exposure that won't result in such damage potential, regardless of exposure or dose.[94]  Indeed, she was unable and unwilling to even give a threshold exposure level such that this cancerous progression is set in motion.[95]

This "no threshold/no safe-level" methodology has been rejected.  In fact, it has been held that it "fails all of the *Daubert* reliability factors."[96]  In *Whiting*, plaintiff's experts espoused opinions that low-dose exposure to radiation could trigger events leading to the development of acute lymphocytic leukemia (ALL), and the district court in Massachusetts, in excluding such opinions, held as follows:

> I find that the opinion. . . that low doses of nuclear radiation. . . can cause ALL is not based on scientific knowledge, but is grounded on speculation shaped by result-oriented biases.  The linear non-threshold model cannot be falsified nor can it be validated.  To the extent it has been subjected to peer review and publication, it has been rejected by the overwhelming majority of the scientific community.  It has no known or potential rate of

---

[92] *Id*. at 133:5-134:15 (emphasis added) (Ex. D).
[93] *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1240-41 (finding that O'Donnell's equivocation on general causation did not lay any reliable groundwork for his opinion and that district court erred in allowing his testimony).
[94] *Id.* at 134:7-15, 201:14-204:7 (Ex. D).
[95] *Id.* at 97:23-99:6, 127:18-132:15 (Ex. D).
[96] *See Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 25 (D. Mass. 1995).

error.  It is merely an hypothesis.  In sum, it has no capacity to be of assistance to a jury in resolving the ultimate issues in this case.[97]

Other courts have also precluded such opinions based upon this model providing that opinions based upon it are "flatly rejected as mere hypothesis."[98]  All that a "no safe exposure" opinion implies is that any increase in exposure increases the risk of injury – it says nothing at all about how great the increase is nor does it imply that the exposure-related increase is significant when compared to the background risk of injury or injury due to other factors.

Dr. Williams bases the entirety of her opinion regarding formaldehyde's role in the causation of cancer on the possibility that one molecule of formaldehyde has the "theoretical potential" to change a cell in such way that could transform the cell into a cancerous cell.  Dr. Williams should be precluded from offering any opinions or testimony regarding formaldehyde and causation of cancer.

## 2. Dr. Williams's causation opinion lacks evidentiary and scientific support.

Dr. Williams states that formaldehyde exposure, at any level, has the potential to cause a variety of cancers.  Dr. Christopher DeRosa, MS, Ph.D. (an environmental health scientist for the CDC's Agency for Toxic Substances and Disease Registry ("ATSDR")) (who has not been retained by either plaintiffs or defendants), has testified that the IARC classification of formaldehyde as a known carcinogen is based primarily on a scientific study from the American Journal of Epidemiology entitled "Mortality from Solid Cancers among Workers in Formaldehyde Industries."[99]  Significantly, that study concluded that there was no association between formaldehyde and nasopharyngeal cancer below a peak exposure of four thousand parts

---

[97] *Id.*

[98] *See, e.g., Parker v. Mobil Oil Corp.,* 793 N.Y.S. 2d 434, 438 (2d Dep't 2005); *Willis v. Amerada Hess Corp.,* 2002 WL 140542, *14 (S.D.N.Y. 2002); *Sutera v. Perrier Group*, 986 F. Supp. 655, 666 (D. Mass. 1997).

[99] DeRosa Dep. at 256-57, excerpts attached as Ex. J.

per billion (4,000 ppb).[100]  Although Dr. Williams is not providing any specific causation opinion in this matter, she must take exposure level into consideration.  When exposure level is below a certain threshold, there is no association, much less causation.  That exposure level -- greater than 4,000 ppb -- is not at issue in this case.  Therefore, it is not a valid scientific method to find association based on this study when that exposure level has not been experienced here.  Moreover, Dr. Williams has not offered any methodology by which she could find that this study -- which only found association at a certain exposure level -- supports her general causation opinion no matter what the exposure level.  Even if Dr. Williams does not want to offer a specific opinion in this case, she could qualify her opinion to be connected to certain exposure levels.  But she does not do so.

Because the scientific and evidentiary premise upon which Dr. Williams bases her opinions regarding formaldehyde exposure and causation of cancer are completely lacking, Dr. Williams should be precluded from offering any opinions or testimony regarding formaldehyde and causation of cancer.

### 3. *Dr. Williams's failure to consider negative studies is fatal.*

Dr. Williams does not and did not consider any negative studies.  This is fatal to any expert's opinion, particularly where (as here) that opinion is based primarily if not entirely upon a review of the published scientific literature.

Negative studies are studies that show little or no indication of an association between an exposure and cancer.  Dr. Williams flatly stated that negative studies are "*meaningless*."[101]  In fact, she testified at the class certification hearing, that:  "If you're looking for epidemiology,

---

[100] Hauptmann, M. (et al.), *Mortality from Solid Cancers among Workers in Formaldehyde Industries*, 159 Am. J. Epid. 1117 (2004), attached as Ex. K; DeRosa Dep. at 257-58 (emphasis added) (Ex. J).
[101] Williams Dep. (July 7, 2009) at 240:24-241:11 (Ex. D)

you've got to find positive studies . . . I chose were (sic) articles that would prove and showed an association.  Since epidemiology is by design, negative studies are meaningless."[102]  All this despite her repeated testimony that in rendering a general causation opinion, one must look to "whatever evidence exists," "look at all the data" and that a "causal opinion looks at everything."[103]

Defending herself on this point, Dr. Williams testified at the class certification hearing that IARC agrees with her regarding the non-value of negative studies and that they need not be considered.[104]  Here is what IARC actually says regarding negative studies and their significance:

> When several epidemiological studies show little or no indication of an association between an exposure and cancer, the judgment may be made that, in the aggregate, they show evidence of lack of carcinogenicity.[105]

When confronted with this quote, Dr. Williams disagreed, stating that anybody who adhered to that mandate would be practicing "tragic science." [106]  She continued, stating that such a principle is "scientifically not correct" and that it is "not an acceptable, statistical conclusion."[107]

The importance of negative studies cannot be understated:

> to ensure reliable methodology, rather than a mere conclusion-oriented selection process that weighs more heavily those studies that support an outcome, there must be a scientific method of weighting that is used and explained.[108]

---

[102] Class Certification Hr'g at 78-79, attached as Ex. L.
[103] Williams Dep. (July 7, 2009) at 92:8-93:5, 95:1-19, 209:17-24 (Ex. D).
[104] Class Certification Hr'g at 78-79 (Ex. L).
[105] World Health Organization – International Agency for Research On Cancer, <u>IARC Monographs on the Evaluation of Carcinogenic Risks To Humans – Formaldehyde, 2-Butoxyethanol and 1-tert-Butoxypropan-2-Ol</u> (Vol. 88, 2006: Lyon, France), p. 17, attached as Ex. M.
[106] Williams Dep. (July 7, 2009) at 175:23-176:11  (Ex. D).
[107] *Id.* at 176:12-18 (Ex. D).
[108] *See Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 607 (D.N.J. 2002).

In *Magistrini*, the court discredited the plaintiff's expert, Dr. Ozonoff, who offered the opinion that the plaintiff's leukemia was due to his exposure to PCE.[109]  Dr. Ozonoff based his opinion on his review of the published scientific literature on the subject and concluded that there existed sufficient evidence of association.[110]  The court excluded Dr. Ozonoff's opinions because it found that he had "not sufficiently discredited other studies that found no association or negative association . . . nor sufficiently explained why he did not accord weight to those studies."  Dr. Ozonoff provided no basis for completely discounting or failing to consider studies that did not show an association.[111]  Moreover, only studies he chose to present and rely upon were those that did suggest an association between leukemia and PCE exposure.[112]

Yet this is exactly what Dr. Williams has admitted she did in this case.  While Dr. Williams believes the studies are meaningless, that declaration does not provide the scientific basis for why she discounted and "pitched" such studies.  Without that rationale, her methodology is not reliable at each and every step of the way.  Therefore, Dr. Williams should be precluded from offering any opinions or testimony regarding formaldehyde exposure and causation of cancer.

### 4.   *Improper reliance on the Hauptmann study.*

Another flaw in Dr. Williams's methodology is her cavalier approach to using and applying epidemiological data.  First, a short background on the proper use of epidemiological papers by various courts is set forth.  The Fifth Circuit has recognized the value of epidemiological studies in cases such as this.[113]  "Epidemiology attempts to define a relationship

---

[109] *Id.*
[110] *Id.*
[111] *Id.* at 608.
[112] *Id.*
[113] *See Brock v. Merrell Dow Pharms., Inc.,* 874 F.2d 307, 311 (5th Cir. 1989).

between a disease and a factor suspected of causing it."[114]  To define that relationship, an epidemiologist examines the general population, comparing the frequency of the disease among those people exposed to the factor to those not exposed.[115]  The epidemiologist then uses statistical methods and reasoning to draw a biological inference between the factor and the disease's etiology.[116]

One difficulty with epidemiologic studies is that often several factors can cause the same disease.[117]  Studies incorporate the possibility of these other factors by using a "confidence interval."[118]  The confidence interval is a common sense mechanism upon which statisticians rely to confirm their findings and to lend persuasive power within their profession.[119]  It has two components: a percentage, which is often set at 95%, and an interval, which represents a range of possible values at high and low ends of a scale of "relative risk."[120]  At a 95% interval, the relative risk value will be between the high and low ends of the confidence interval 95% of the time.[121]  Only when the relative risk is greater than 1.0 is there a higher incidence of disease in the group exposed to the factor.[122]

Just because an epidemiological study concludes that a relative risk is greater than 1.0, it does not establish that the factor caused the disease.[123]  If the confidence interval is so great that it includes the number 1.0, then the study will be said to show no statistically significant

---

[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.* at 312.
[118] *Id.*.
[119] *Turpin v. Merrell Dow Pharms., Inc.,* 959 F.2d 1349, 1353 n.1 (6th Cir. 1992).
[120] *Id.*
[121] *Id.*
[122] *Brock,* 874 F.2d at 312.
[123] *Id.*

association between the factor and the disease.[124]  So, if a study concluded that the relative risk

for a disease was 1.30, but the confidence interval was from 0.95 to 1.82, then no statistically

significant conclusions could be drawn from this study because the relative risk, when adjusted

by the confidence interval, includes 1.0.[125]

 In this case, Dr. Williams has not followed the tenets of sound epidemiological science.

For example, the Hauptmann study she relied on recited an association of formaldehyde

exposure with a relative risk of 2.10 (noting at 95% confidence an interval of 1.05 – 4.21).[126]

Interestingly, a footnote in this study recites that the exact confidence interval was .91-4.14,[127]

removing any statistical significance.  Dr. Williams's response to that is that, with the raw data,

one would recalculate the relative risk with the confidence interval set at 90%.[128]

 Dr. Williams's approach of simply knocking down the confidence interval so that an

interval that does not include anything at 1.0 or below is not a reliable methodology.  Indeed, this

very issue was presented in *Brock*.  Her proposed "re-analysis" of the study's results at a lower

confidence interval has not been subjected to peer review nor has it been published for

analysis.[129]  Such on-the-spot re-analysis of studies has been rejected.[130]  Dr. Williams is not an

epidemiologist or statistician.  She should not venture into an area outside her claimed area of

expertise.  She has not done any recalculation herself.  She did not provide any basis for

arbitrarily choosing a lower confidence internal that the study authors used.  Critically, Plaintiff

has not designated any other expert who has done this re-calculation.

---

[124] *Id.*
[125] *Id.*
[126] Williams Aff. at 33 (DUB000238) (Ex. C)
[127] Williams Dep. (July 7, 2009) at 56:18-57:17 (Ex. D).
[128] Williams Dep. (July 7, 2009) at 57 (Ex. D).
[129] *See Brock* at 313 (citing *Perry v. U.S.*, 755 F.2d 888, 892 (11th Cir. 1985)).
[130] *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 831 (D.C. Cir. 1988); *Lynch v. Merrell Nat'l Labs.*, 830 F.2d 1190, 1194 (1st Cir. 1987).

In the alternative, should the Court permit Dr. Williams to testify at all, Fleetwood argues that she should not be permitted to rely on this particular Hauptmann study given her improper re-analysis and venturing outside her area of expertise. She should not be permitted to provide an epidemiologist's or statistician's opinions. Plaintiff should be held to her burden and introduce proper expert testimony if they wish to re-write a study.

## III.  Conclusion

Dr. Williams's entire testimony should be excluded. She is not qualified. Credentials alone will not suffice. Her "expertise" on formaldehyde derives only from her personal experience as an "anatomist" and in choosing cosmetics. She has no pre-litigation experience with formaldehyde or with skin disease. Even if she were qualified, the studies that she relies on for her eczema opinion carry no weight and cannot be relied on to support her opinion. Neither is her cancer opinion reliable. It is based on a "theoretical possibility" and her rejection of negative studies is not explained. For these reasons, Dr. Williams's testimony should be excluded.

This 9th day of November, 2009.

Respectfully submitted:

 /s/ Richard K. Hines, V
Richard K. Hines, V
GA Bar No. 356300
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

25

Jerry L. Saporito
LA Bar No. 11717
LEAKE & ANDERSSON, L.L.P.
1700 Energy Centre
1100 Poydras St.
New Orleans, LA 70163-1701
(504) 585-7500 (phone)
(504) 585- 7775 (fax)

Counsel for Fleetwood Enterprises, Inc.

<u>**C E R T I F I C A T E OF SERVICE**</u>

I hereby certify that a copy of the foregoing has this date been serves on all counsel of record in this proceeding by:

( )  Hand Delivery                    ( )  Prepaid U.S. Mail

( )  Facsimile                        ( )  Federal Express

(X)  CM/ECF

New Orleans, Louisiana, this 9th day of November 2009.

> */s/ Richard K. Hines, V*
> Richard K. Hines, V
> Georgia Bar No. 356300
> richard.hines@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW
Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)