UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * * * | MDL NO. 1873 |
| | | | SECTION: N(5) |
| This Document Relates to: | | * | |
| *Dubuclet v. Fleetwood Enterprises, Inc., et al.* | | * | |
| Case No. 07-9228 | | * | JUDGE: ENGELHARDT |
| | | * | |
| | | * | MAG: CHASEZ |

*********************************************************************************

**DEFENDANT FLEETWOOD ENTERPRISES, INC.'S MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION TO EXCLUDE
DR. LAWRENCE G. MILLER'S TESTIMONY**

Defendant, Fleetwood Enterprises, Inc. (hereinafter "Fleetwood") moves this Court to limit the testimony of Dr. Lawrence G. Miller. Plaintiff has disclosed Dr. Lawrence G. Miller as an expert to support her theory that formaldehyde exposure in the EHU exacerbated her pre-existing atopic and allergic rhinitis.[1] It is important that the Court understand that Dr. Miller is not saying that the eczema, with which the now 11 year old Timia Dubuclet has been diagnosed since she was six weeks old in 1998, was caused by her exposure in the EHU.[2] Rather, his opinion is limited to that of exacerbation, and exacerbation only while she was living in the EHU, not after she moved out. Not knowing the order the Court will consider the various motions Fleetwood is filing on the medical issues presented in this case, it is important for the

---

[1] Dr. Miller agrees that Ms. Dubuclet has suffered from eczema since she was two months old. *See, e.g.*, Miller Dep. at 74:6-11, excerpts attached as Ex. A.

[2] Not knowing the order the Court will consider the various motions Fleetwood is filing on the medical issues presented in this case, it is important for the Court to understand that it is Fleetwood's medical position that it has been well established in the world's medical literature that formaldehyde in solid (cosmetics, textiles) and aqueous (formalin) states is a skin contact allergen. However, it is Fleetwood's very strong position -- supported by the opinion of Dr. Howard Maibach, one of the world's leading dermatologists and researcher (who, among other things, is the patent holder on the patch test administered to Timia) -- that it has never been established in the world's medical literature that formaldehyde in its gaseous state either causes or exacerbates atopic dermatitis (eczema and related skin disorders).

Court to understand that it is Fleetwood's medical position that it has been well established in the world's medical literature that formaldehyde in solid (cosmetics, textiles) and aqueous (formalin) states is a skin contact allergen. However, it is Fleetwood's very strong position -- supported by the expert opinion of Dr. Howard Maibach, one of the world's leading dermatologists and researchers (who, among other things, is the patent holder on the patch test administered to Timia) -- that it has never been established in the world's medical literature that formaldehyde in its gaseous state either causes or exacerbates atopic dermatitis (eczema and related skin disorders).

Fleetwood is seeking to exclude his testimony because he is not qualified to offer the exacerbation opinions on formaldehyde and Ms. Dubuclet's claimed conditions, and because he has no scientific or other reliable basis for reaching his conclusions.

**I.      Factual Background**

   **A.      Dr. Miller's background and experience.**

Dr. Miller is not a dermatologist;[3] rather, he is board certified in Internal Medicine, Pulmonary Disease, and Clinical Pharmacology.[4] He also has an M.P.H. degree in Environmental Health.[5] Dr. Miller, a venture capitalist, is president of Mediphase, a company that invests primarily in biotech companies, and has not worked with patients in the past four years.[6] Since the early 1990s, 80-90% of his work has been on the business side -- not the clinical side of medicine.[7] In the 1990s, the clinical side of his work was limited to teaching

---

[3] Miller Dep. at 35:23-24 (Ex. A).
[4] Miller Aff. at 1 (DUB000596), attached as Ex. B.
[5] *Id.*(Ex. B).
[6] Miller Dep. at 14:7-18 (Ex. A); *id.* at 12:18-25 (describing Mediphase).
[7] *Id.* at 16:18-21 (Ex. A); *id.* at 14:19-15:18 (in early 1990s, clinical work encompasses 10-20% of his time); *id.* at 18:11-19:9 (around 1996, the clinical side of his work remained at 10-20%, and the other part was decision support for physicians); *id.* at 23:19-24:7 (in 1997, his clinical work remained constant at 10-20%).

medical students internal medicine, usually just one afternoon a week.[8] He has not published regularly since the early 1990s.[9] When he did publish, it was primarily pharmacology publications.[10] He has not written any articles on formaldehyde and has not had any experience in reviewing formaldehyde-related diseases, stating, "I don't recall dealing with formaldehyde in the past."[11]

### B. Dr. Miller's opinions.

Dr. Miller's affidavit in this case closes with his opinion on exacerbation of dermatitis and allergic rhinitis:

> In summary, it is my professional opinion that, within a reasonable degree of medical probability, the exposure to formaldehyde emissions in the FEMA trailer significantly exacerbated Ms. Timia Dubuclet's eczema/dermatitis and allergic rhinitis.[12]

He is only providing the opinion that formaldehyde exposure exacerbated her eczema/dermatitis and allergic rhinitis; he is not offering the opinion that the dermatitis is caused by formaldehyde, only that formaldehyde has exacerbated the pre-existing conditions.[13] Moreover, his opinion on exacerbation is limited to the period of time that she was living in the trailer, and does not apply to the period of time after she moved out.[14]

---

[8] *Id.* at 19:25-21:13 (Ex. A).
[9] *Id.* at 22:20-23:3 (Ex. A).
[10] *Id.* at 23:4-10 (Ex. A).
[11] *Id.* at 23:11-18, 45:11-12 (Ex. A). He does clarify that as a medical student he worked with formaldehyde, as every medical student does, but that it was not vaporous formaldehyde. *Id.* at 48:9-49:13.
[12] Miller Aff. at 6 (DUB000601) (Ex. B).
[13] Miller Dep. at 191:13-193:22 (Ex. A); *see also* Miller Aff. at 6 (DUB000601) (Ex. B) ("The causes of Ms. Dubuclet's eczema/dermatitis and allergic rhinitis prior to residing in the FEMA trailer cannot be stated with certainty.").
[14] Miller Dep. at 193:23-194:5 (Ex. A); *see also id.* at 74:15-75:17. While he thinks that it is "likely" that the immune reaction triggered by the formaldehyde continued after she moved out of the EHU, he admits that there is "limited evidence to support that, and I will be the first to say that." *Id.* at 75:18-76:6.

### C. Dr. Miller's opinion is not based on the weight of the medical literature.

Dr. Miller is not aware of a single article in the world's medical literature that draws a causal connection between exposure to gaseous formaldehyde and atopic dermatitis.[15] Despite that admission, he states that he bases his opinion on associations and correlations and he "bring[s] the evidence together:"

> [P]erhaps I wasn't as clear as I might have been before, it's not a single paper, nor do you expect any single paper to say X causes Y. Frankly, it would be hard to get that published. The editors usually force you to be a little more circumspect than that.
>
> But you got papers that establish associations, establish correlations, and then you bring the evidence together. So it's the balance of the evidence that creates the causative inference rather than just a single paper saying X causes Y. You just don't find many of those.[16]

He also asserts that "[s]everal studies directly address the relative risk for the development of dermatitis/eczema in individuals exposed to formaldehyde."[17] His affidavit continues, "exposure to formaldehyde is strongly *associated* with the development of dermatitis/eczema, with relative risk levels for illness substantially exceeding the 2.0 level."[18] Dr. Miller cites two studies dealing with relative risk levels and formaldehyde's purported association with development of dermatitis/eczema[19]: 1) Held (1999) and 2) Mirshahpanah and Maibach (2007).[20] Critically,

---

[15] *Id.* at 131:9-132:3 (Ex. A).
[16] Miller Dep. at 241:10-16 (Ex. A).
[17] Miller Aff. at 4 (DUB000599) (Ex. B).
[18] Miller Aff. at 5 (DUB000600) (Ex. B) (emphasis added); *see also* Miller Dep. at 243:16-244:13 (Ex. A) (addressing this portion of his affidavit).
[19] The full names of the two studies are: 1) Held E, Juhansen JD, Agner T, Menne T., *Contact allergy to cosmetics: testing with patients' own products.* Contact Dermatitis 1999 40:310 (cited in Miller Aff.); and 2) Mirshahpanah P, Maibach HI, *Relationship of patch test positivity in a general versus an eczema population.* Contact Dermatitis 2007 56:125 (both cited in Miller Aff.).
[20] Miller Dep. at 243:16-244:16 (Ex. A); Miller Aff. at 4-5 (DUB000599-600) (Ex. B).

although it is gaseous formaldehyde that Ms. Dubuclet was allegedly exposed to,[21] neither study deals with gaseous formaldehyde:

> Q. All right. Your study and your relative risks do not come from studies dealing with gaseous formaldehyde, do they?
>
> A. That's correct. They come from studies dealing with formaldehyde exposure.
>
> Q. Formaldehyde exposure, and formaldehyde either in solid form, in a cosmetic, or in an aqueous form as studied by Maibach and his assistant there at the University of San Francisco?
>
> A. Well, again, I can look back at the Maibach paper. I don't believe it specifically talks about which form it's in, but again, you may have more information than I do about that, and it would be interesting for me to know, but it would not change my statement. My statement relates to exposure—specifically relates to exposure to formaldehyde.[22]

Dr. Miller admits that the Held study "specifically addresses cosmetics."[23] Outside of studies dealing with relative risks and formaldehyde, he states that there are "certainly studies that show that people exposed to formaldehyde vapor have an increased . . . problem with dermatitis. Let's just put it broadly. Now, can I tell you was that due to the gas, inhalation of the gas or the vapor on the skin? I can't differentiate that."[24]

He further uses the ATSDR report to explain why he cannot answer questions regarding the distinction between exposure to gaseous formaldehyde and formaldehyde in its solid form:

---

[21] *See, e.g.*, Aldridge Nov. 30, 2007 Compl. at 20 (paragraphs are unnumbered) (alleging that plaintiffs have been exposed to "formaldehyde fumes").

[22] Miller Dep. at 245:10-246:3 (Ex. A); *see also id.* at 234:15-235:5 (stating that in dealing with cosmetics, it is not gaseous formaldehyde; formaldehyde is part of the cosmetic substance). For the convenience of the Court, a copy of the Maibach paper is attached as Ex. C. As readily seen, the paper deals with a patch-test-positive population versus a nonpatch-test-positive population and has nothing whatever to do with formaldehyde disease or its cause. The Court may be interested to note that Dr. Howard Maibach, one of the leading dermatologists in the United States, if not the world, will testify for the defendant Fleetwood to the effect that formaldehyde neither causes nor aggravates atopic dermatitis (eczema). Indeed, if asked, Dr. Maibach will explain fully what the paper that Dr. Miller relies on says.

[23] Miller Dep. at 244:9-10 (Ex. A) ("Held" incorrectly transcribed as "health").

[24] *Id.* at 149:16-24 (Ex. A); *see also* Miller Aff. at 4 (DUB000599) (Ex. B) (addressing articles that he cites as "indicat[ing] that formaldehyde is among the most common allergens associated with contact dermatitis").

> [T]he report very specifically states that we can't tell whether the effect was caused by the gaseous, the vaporous form or the dermal form. The data simply don't allow one to differentiate those two.[25]

Recognizing that the ATSDR suggests that the dermal route of exposure is the more important sensitizing route, he reiterates:

> And again, they suggest the dermal [route] is more important, but again, the evidence doesn't allow one to differentiate those two, and it's certainly my contention that in the last 10 years, additional evidence has not clarified that.[26]

In discussing the exposure route for formaldehyde, the ATSDR found that the lack of case-specific exposure information "precludes the determination of the degree to which sensitization may have been caused by direct dermal contact to formaldehyde in liquids or by contact with formaldehyde gas in air."[27] But the report continues and states that the common use of formaldehyde or formaldehyde-releasing chemicals in cosmetics and cleaning agents "suggest[s] that the dermal route of exposure may be the more important sensitizing route."[28]

His opinion on exacerbation is based on studies addressing exposure to both gaseous formaldehyde and formaldehyde in its solid form and on studies that only find associations. He then claims to "bring the evidence together" to create the "causative inference" and reach his conclusions.

---

[25] Miller Dep. at 132:23-133:18 (Ex. A).
[26] *Id.* at 144:11-16 (Ex. A) ("route" is likely incorrectly transcribed as "word").
[27] Toxicological Profile for Formaldehyde, U.S. Dep't of Health & Human Servs., Public Health Service, Agency for Toxic Substances & Disease Registry (July 1999) at 69, available at http://www.atsdr.cdc.gov/toxprofiles/tp111.pdf, excerpt attached as Ex. D.
[28] *Id.* at 69 (Ex. D).

6

### D. Dr. Miller's reliance on Dr. Farber.

Dr. Miller relied on Dr. George A. Farber, Ms. Dubuclet's treating dermatologist, to interpret the results of the T.R.U.E. Test.[29] On November 2, 2009, plaintiffs' liaison counsel notified the Court and the parties that Dr. Farber's medical license had been revoked by the State of Louisiana. It was Dr. Farber's decision to test Ms. Dubuclet with the patch test.[30] For purposes of this motion, according to Dr. Farber, there are four chemicals that contain formaldehyde that are tested in the T.R.U.E. Test: numbers 13, 14, 21, and 26 in the Standard Data Collection Form.[31] Critically, Chemical 21 is a test for the chemical formaldehyde, and Ms. Dubuclet did *not* react to the formaldehyde test.[32] But the T.R.U.E. Test results show that a positive reaction was triggered for Chemicals 13, 14, and 26.[33] Dr. Farber testified that he does not know whether it was formaldehyde or one of the other constituent elements of the complex chemical being tested that triggered the positive response in Ms. Dubuclet.[34] Neither does Dr. Miller know which constituent element actually triggered the response.[35]

Dr. Miller's reliance on the T.R.U.E. Test seems central to his conclusion, particularly as it relates to his opinion that her pre-existing rhinitis has been exacerbated by formaldehyde, because he cannot tell the difference between allergic rhinitis and rhinitis:

---

[29] Miller Dep. at 52:1-6 (Ex. A) (stating that although he was present with Dr. Farber while he was interpreting the test, he is relying on Dr. Farber to interpret the results); *see also id.* at 52:7-53:2 (restating that he is relying on Dr. Farber to interpret the T.R.U.E. Test). The T.R.U.E. Test is used to test for suspected allergens and is a patch test in the form of cards that are applied to the patient's back for approximately 48 hours. The patient is then evaluated for any skin reaction to the suspected allergens. There are 28 allergens that are included, as well as a negative control. *See, e.g.*, Farber Dep. at 45:8-46:8 (Ex. E) (describing the test); *see also* Standard Data Collection Form (DUB001143, attached to Farber Aff.) (Ex. F) (identifying the allergens and negative control).
[30] Miller Dep. at 51:18-25 (Ex. A).
[31] Farber Dep. at 47:5-10 (Ex. E); Standard Data Collection Form for Ms. Dubuclet (DUB001143, attached to Farber Aff.) (Ex. F).
[32] Farber Dep. at 48:14-16 (Ex. E); Standard Data Collection Form for Ms. Dubuclet (DUB001143, attached to Farber Aff.) (Ex. F) (showing no reaction to formaldehyde, Chemical 21).
[33] Standard Data Collection Form for Ms. Dubuclet (DUB001143, attached to Farber Aff.) (Ex. F).
[34] Farber Dep. at 49:13-51:11, 93:21-94:7 (Ex. E). Fleetwood has also moved to limit Dr. Farber's testimony.
[35] Miller Dep. at 124:17-125:9 (specific as to Chemical 13), 129:15-24 (addressing all three chemicals) (Ex. A).

> Q. Now, the same question [regarding awareness of literature]. Are you aware of exposure to formaldehyde gas and the development of allergic rhinitis?
>
> A. I mean, the issue here is that there are no tests -- Let me put it another way. If I have rhinitis, which I do, in fact, there are no tests that will tell me is that allergic rhinitis or not allergic rhinitis. It's very, very difficult to differentiate, and you can make guesses based on whether it occurs during pollen season and so forth, but those are guesses. So in that sense, the differentiation probably doesn't help you one way or the other.
>
> Q. Because as we talked about much earlier this morning, the clinical presentation of rhinitis and allergic rhinitis are essentially the same?
>
> A. Well, and that's my point. I can't tell you which one you have when you walk into my office. I can tell you you have rhinitis and I can guess that it might be allergic.[36]

### E.  Dr. Miller's opinion on level of exposure.

Dr. Miller's affidavit attempts to connect Ms. Dubuclet's level of exposure to her claimed injuries. He claims that because the levels measured by the W.D. Scott Group were above the MRL level for intermediate and chronic exposure to formaldehyde in the ATSDR, there is a "completed exposure pathway."[37] Dr. Miller is clear in his testimony that he is only using this for noncancerous claims.[38] But in his deposition, he clarified his use of the ATSDR. He agrees with the statement in the ATSDR that "exposure to a level above the MRL does not mean that adverse health effects will occur."[39]

---

[36] Miller Dep. at 173:10-174:9 (Ex. A).
[37] Miller Aff. at 3-4 (DUB00598-99) (Ex. B).
[38] Miller Dep. at 160:4-16 (Ex. A).
[39] Miller Dep. at 164:13-21 (Ex. A). This ATSDR statement is taken from the last sentence on page A-1 of the ATSDR Minimal Risk Levels & Worksheets, Formaldehyde, Appendix A, available at http://www.atsdr.cdc.gov/toxprofiles/tp111-a.pdf (Ex. G).

## II.     Argument & Citation to Authority

### A.     This Court's gatekeeping role regarding Dr. Miller's opinions.

Federal Rule of Evidence 702 permits a witness who, through his expertise, has the knowledge, skill, experience, training, or education to offer scientific, technical, or other specialized knowledge may testify regarding that knowledge if it will assist the trier of fact to understand the evidence or to determine a fact in issue. A proposed expert witness must first be qualified to testify regarding the issues for which he is offered.[40] Courts have routinely refused to admit a proffered expert's testimony where the proffered expert, despite a generalized or professed knowledge of issues arguably relevant to the subject matter, nevertheless lacked expertise with the specific nature of the claims being litigated.[41]

Even if an expert is qualified, his opinion can be excluded if not reliable.[42] A qualified expert's testimony is only admissible if it is based upon sufficient facts or data, it is the product of reliable principles and methods, *and* the witness has applied the principles and methods reliably to the facts of the case.[43] The reliability inquiry is flexible, and several nonexclusive factors may be considered, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, and (4) whether the technique is generally accepted in the relevant scientific community.[44] The expert testimony must also be relevant -- not only in the way that all testimony must be relevant under

---

[40] *See U.S. v. Frazier*, 387 F.3d 1244, 1260-1261 (11th Cir. 2004).
[41] *See*, *e.g,. Kassim v. City of Schenectady,* 415 F.3d 246, 251 (2nd Cir. 2005) (expert lacked knowledge regarding Arabic translation); *In Re: Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543-544 (S.D.N.Y. 2004) (expert's opinion not based on qualification or experience but on subjective views of ethical standards at issue).
[42] *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).
[43] Fed. R. Evid. 702.
[44] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993) (discussing the four nonexclusive factors); Order dated July 15, 2009 at 4 (Rec. Doc. 2181) (citing *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)).

Federal Rule of Evidence 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue.[45]

*Daubert* also cautions against admitting expert testimony in a case when the application of the expert's methodology to the facts of the case involves an impermissible leap of faith. The Supreme Court in *General Electric v. Joiner* acknowledged, "[t]rained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to the existing data only by the *ipse dixit* of the expert."[46] If the analytical gap between the data and the opinion offered is too great, the testimony is not reliable.[47]

An expert may attempt to fill that analytical gap with the "weight-of-the-evidence." When an expert testifies that he has analyzed the studies and evidence at issue, has weighed them, and then reaches a conclusion, he is applying what some courts have called the "weight-of-the-evidence" methodology.[48] While a proposed expert is not required to back his opinion with studies that "unequivocally support" his conclusion, the expert's testimony "must be reliable at each and every step or else it is inadmissible."[49] When the information relied on by the expert does not provide a relevant link with the facts at issue, the opinion is not based on "good grounds" and should be excluded.[50] Because each and every step of the expert's testimony must

---

[45] Order dated July 15, 2009, at 4 (Rec. Doc. 2181) (citing *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003)).
[46] 522 U.S. 136, 146 (1997).
[47] *Id.*
[48] *See* Manual of Complex Litigation, Fourth, § 23.272; *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 602 (D.N.J. 2002).
[49] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007) (upholding district court's exclusion of proposed expert's testimony on Daubert grounds).
[50] *Id.* at 355.

be reliable, so must this weighing process "be based on methods and procedures of science, rather than on subjective belief or unsupported speculation."[51]

### B. Dr. Miller is not qualified to render a causation opinion regarding formaldehyde and the exacerbation of Ms. Dubuclet's alleged injuries.

As detailed above, Dr. Miller is being offered to prove that formaldehyde exposure, in its gaseous form, exacerbated Ms. Dubuclet's skin condition and previous rhinitis. Yet Dr. Miller is not a dermatologist.[52] He does not currently work with patients.[53] Rather, he works for his company, Mediphase, which invests in healthcare companies.[54] Nor has he had any experience in reviewing formaldehyde-related diseases except for his opinion in this case, stating "I don't recall dealing with formaldehyde in the past."[55] He has not published any articles on formaldehyde.[56] He also brings no special expertise to the jury regarding the T.R.U.E. Test because he is clear that he relies on Dr. Farber's opinions for that test.[57] He did not review all literature regarding formaldehyde even when the subject was to study potential allergic responses, responding that it dealt with asthma, not rhinitis.[58] Without the experience, training, or knowledge regarding the claimed injuries or formaldehyde -- much less how they are related -- he is not qualified to offer an expert opinion. While he could read the studies (which he only found while preparing to be an expert in this case) to the jury, he does not have the necessary

---

[51] *Magistrini*, 180 F. Supp. 2d at 603.
[52] Miller Dep. at 35:23-24 (Ex. A).
[53] *Id.* at 14:7-18 (Ex. A).
[54] *Id.* at 14:7-18, 12:18-25 (describing Mediphase) (Ex. A).
[55] *Id.* at 23:11-18, 45:11-12 (Ex. A). He does clarify that as a medical student he worked with formaldehyde, as every medical student does, but that it was not vaporous formaldehyde. *Id.* at 48:9-49:13.
[56] *Id.* at 23:4-13 (Ex. A).
[57] *Id.* at 52:1-53:2 (Ex. A).
[58] *Id.* at 181:23-182:10 (Ex. A). Of course, Plaintiff's attorney offers what *he* views as a helpful study, but *Dr. Miller* did not cite any studies regarding the pathway of gaseous formaldehyde into the body to purportedly cause an allergic reaction. *Id.* at 182:16-183:7.

11

experience or training to translate those studies into any helpful opinion. Therefore, his testimony should be excluded.

### C. Dr. Miller's opinions are not based on any reliable methodology and provide no assistance to the trier-of-fact.

Even if Dr. Miller were qualified to render an exacerbation opinion, his methodology in reaching his opinions that formaldehyde exposure has exacerbated Ms. Dubuclet's eczema/dermatitis is not reliable and should be excluded. First, Dr. Miller cannot show how he reached the "causative inference" simply by "bring[ing] the evidence together." Second, to the extent that Dr. Miller relies on Dr. Farber's opinion regarding Ms. Dubuclet's sensitization to formaldehyde, that reliance is not sound, given Dr. Farber's own lack of knowledge as to any sensitization. Dr. Miller's opinion cannot piggyback on Dr. Farber's faulty conclusion. Without the support of any studies or the results of the T.R.U.E. Test, Dr. Miller has nothing left to support his opinions. Any other testimony regarding Ms. Dubuclet's medical records would be redundant of Dr. Farber's testimony; therefore, his entire testimony should be excluded.

#### 1. *Dr. Miller has no basis for reaching any "causative inference" between exposure to gaseous formaldehyde and exacerbation of dermatitis.*

Dr. Miller appears to applying a "weight-of-the-evidence" methodology:

> But you got papers that establish *associations*, establish *correlations*, and then you bring the evidence together. So it's the balance of the evidence that creates the causative inference rather than just a single paper saying X causes Y.[59]

While the Supreme Court in *Joiner* recognized that experts can extrapolate from evidence, Dr. Miller has extrapolated two unsupported conclusions:

---

[59] *Id.* at 241:10-15 (emphasis added) (Ex. A).

12

> 1) he extrapolates a finding of causation from studies and literature that only claim to find an association; and
>
> 2) he extrapolates a finding of causation from studies and literature that deal with formaldehyde in its solid or aqueous form, despite the fact that this case is about claimed exposure to *gaseous* formaldehyde.

Note that Dr. Miller did not conduct any meta-analysis of the studies he is relying on.[60] In fact, he does not provide any insight as to how he brings the evidence together -- there is no explanation for how he valued and weighed each of the studies. For Dr. Miller's conclusion to be reliable and admissible, he must provide more than a listing of studies. He must methodically and logically evaluate each study, and show how it supports his opinion in this case.[61] He does not identify any criteria that he used to evaluate the literature. How did he decide which medical literature to include in his affidavit? Were there any criteria beyond doing a keyword search for "dermatitis" and "formaldehyde"? Did he consider the exposure level of formaldehyde in each paper? Does he give the same weight to peer-reviewed studies as he does to non-peer-reviewed publications? Why did he not discount papers dealing with formaldehyde in its solid aqueous state?[62] Dr. Miller's opinion cannot be scientifically supported merely by citing to studies with no analysis of how they link to the facts in this case and how he evaluated those studies.[63]

---

[60] For a description of a meta-analysis, see Manual of Complex Litigation, Fourth, § 23.272 (describing it as a formal technique to aggregate several studies that may differ on whether an association is found in order to derive a single figure to represent the totality of the studies reviewed).

[61] For example, how much weight did he give to the Eberlein-König paper, which found no changes in skin roughness and only found an increase in transepidermal water loss. *See* Bernadette Eberlein-König, et al., *Influence of airborne nitrogen dioxide or formaldehyde on parameters of skin function and cellular activation in patients with atopic eczema and control subjects*, J. Allergy Clin. Immunol. 141 (Jan. 1998), attached as Ex. H.

[62] Indeed, he concedes that the relative risk data do not come from studies dealing with gaseous formaldehyde; rather, Dr. Miller ignores the distinction, stating that relative risks "come from studies dealing with formaldehyde exposure." Miller Dep. at 244:19-245:14 (Ex. A).

[63] *See generally Magistrini*, 180 F. Supp. 2d at 600-07 (evaluating how an expert applied the "weight-of-the-evidence" methodology).

Without that scientific explanation, there is "too great an analytical gap" and his opinion should be excluded.

> 2. *Dr. Miller has no basis for relying on Dr. Farber's conclusion regarding sensitization and the T.R.U.E. Test.*

To the extent that Dr. Miller attempts to bolster his own opinion by piggybacking on Dr. Farber's interpretation of the T.R.U.E. Test, such a piggybacking should not be permitted. Dr. Farber has, through his deposition testimony, changed his previous conclusion that the T.R.U.E. Test showed that Ms. Dubuclet is "allergic" to formaldehyde.[64] Dr. Farber does not know if Ms. Dubuclet actually had a reaction to formaldehyde or not.[65] All Dr. Farber could state was that it was a medium that contained a complex chemical that was the sensitizer -- he does not know whether it was formaldehyde or another constituent of the complex chemical that was the sensitizer:

> A. As I understand your question, can I be specific as to those three tests, as to whether or not it was formaldehyde or something else?
>
> Q. Or something else, exactly.
>
> A. I cannot tell you that.
>
> Q. So really, if we look at your next sentence under the paragraph,[66] it simply reads: T.R.U.E. Test report on the second reading, No. 13, No. 26 remained at one plus. Your next paragraph reads: These positive test results indicate that Ms. Dubuclet had been sensitized to formaldehyde and now is allergic to formaldehyde. What you are really saying is she tested positive to 13, 14 and 26, but you do not know what constituent parts of that triggered the positive response; is that correct?
> A. Correct.

---

[64] Farber Dep. at 50:11-51:11 (Ex. E).
[65] *Id.* at 49:13-50:16 (Ex. E).
[66] This question is referring to Dr. Farber's report at page 3. *See* Farber Dep. at 49:5-9 (indicating that the questions are referring to Dr. Farber's report) (Ex. E).

> Q. So that you cannot say whether or not it was formaldehyde or one of the constituent elements that triggered the positive result; is that correct?
>
> A. Correct.[67]

Dr. Miller is clear that he is relying fully on Dr. Farber's interpretation of this test, and that he does not know which constituent chemical triggered Ms. Dubuclet's response.[68] Without Dr. Miller having any independent knowledge of Ms. Dubuclet's sensitization, and with Dr. Farber's own lack of knowledge, the T.R.U.E. Test interpretation provided by Dr. Farber should be removed from the body of evidence that Dr. Miller relies on. It is not reliable for Dr. Miller to rely on an interpretation that Dr. Farber himself has since rejected, and this opinion has no grounds on which to reach the jury.

>    **3.   *Dr. Miller's opinion that uses the ATSDR's MRL as the level above which injury can occur is not reliable and should be excluded.***

Plaintiff has offered Dr. Miller as the expert to connect Ms. Dubuclet's alleged level of exposure to her alleged injuries related to formaldehyde.[69] But he does so attempting to use the ATSDR's MRL, a standard that itself states: "Exposure to a level above the MRL does not mean that adverse health effects will occur."[70] And Dr. Miller has stated that he agrees with that statement.[71] Dr. Miller also seems to suggest that a "sensitive person" could experience adverse health effects at an exposure level lower than the ATSDR's MRL, but concludes that there is insufficient data to know what that level should be.[72] Dr. Miller provides no other testimony on a specific level of exposure that could cause Ms. Dubuclet's alleged injuries. He only relies on a

---

[67] Farber Dep. at 50:11-51:11 (Ex. E).
[68] Miller Dep. at 124:17-125:9 (specific as to Chemical 13), 129:15-24 (addressing all three chemicals) (Ex. A).
[69] Miller Aff. at 3-4 (DUB000598-99) (Ex. B).
[70] This statement is taken from the last sentence on page A-1 of the ATSDR Minimal Risk Levels & Worksheets, Formaldehyde, Appendix A, available at http://www.atsdr.cdc.gov/toxprofiles/tp111-a.pdf ((Ex. G).
[71] Miller Dep. at 164:13-21 (Ex. A).
[72] Miller Dep. at 162:6-163:16, 197:18-199:6 (Ex. A).

standard set for public health, and concludes with no scientific basis that because the alleged level is above the MRL that it caused her injuries. Yet that very public health standard contradicts that way that he is using it. His reliance on the ATSDR's MRL and any opinion based on it should be excluded.

> **4.   Dr. Miller has no other basis for his opinions, and any remaining testimony is redundant of Dr. Farber's testimony; therefore, his entire testimony should be excluded.**

As explained above, Dr. Miller has lost all scientific support for his opinions. He has no experience or training on which to fall back; nor has he done any writing on formaldehyde.[73] He does not even currently treat patients.[74] For the "allergic" rhinitis opinion, he seems to have no other reason to conclude that Ms. Dubuclet has allergic rhinitis, as opposed to rhinitis, other than Dr. Farber's T.R.U.E. Test interpretation: "It's very, very difficult to differentiate [between allergic rhinitis and not allergic rhinitis], and you can make guesses based on whether it occurs during pollen season and so forth, but those are guesses."[75] Dr. Miller has no basis for finding that her rhinitis symptoms were worsened by the formaldehyde and not something else. Indeed, he concedes that it would be a "guess." Because Dr. Miller only bases his "guess" on Dr. Farber's faulty T.R.U.E. Test interpretation, there is nothing else to support his opinions. Therefore, all exacerbation opinions should be excluded.

In addition to all of Dr. Miller's causation testimony being excluded, Fleetwood is requesting that all other testimony be excluded. Dr. Miller has nothing else to add that Dr. Farber -- or whomever may be called to testify as her treating physician -- will testified to. While Dr. Miller also reviewed Ms. Dubuclet's medical records and met with Ms. Dubuclet once

---

[73] Miller Dep. at 23:4-18, 45:11-12 (Ex. A).
[74] *Id.* at 14:7-18 (Ex. A).
[75] *Id.* at 173:19-22 (Ex. A).

16

for purposes of this litigation, he has no other testimony that should be presented to the jury. Any other testimony by Dr. Miller would be needlessly cumulative of Timia's treating physician's testimony, and should be excluded for that reason.[76]

### III. Conclusion

Dr. Miller, who is not a dermatologist and has no experience with formaldehyde-related diseases, is not qualified to offer causation opinions in this matter. Even if he were qualified, he has no reasonable grounds for his opinion. He has not explained how he weighed the publications to reach his conclusion. He leaps from papers addressing associations to causation. He also fails to distinguish between the different forms of formaldehyde, not accounting for the fact that it is gaseous formaldehyde at issue in this case. Dr. Miller cannot bolster his opinion by relying on Dr. Farber's faulty conclusion regarding Ms. Dubuclet's purported sensitization to formaldehyde. And he cannot use the ATSDR's MRL as the basis for his causation opinion.

Dr. Miller's unsupported and unscientific conclusion is not helpful to any jury. The jury needs an expert who can make sense of the various publications and of the T.R.U.E. Test. Dr. Miller is not that expert. His testimony that formaldehyde exposure exacerbated Ms. Dubuclet's pre-existing conditions, and all other testimony, should be excluded.

This 9th day of November 2009.

Respectfully submitted:

 /s/ Richard K. Hines, V
Richard K. Hines, V
GA Bar No. 356300
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA  30363

---

[76] See Fed. R. Evid. 403.

(404) 322-6000 (phone)
(404) 322-6050 (fax)

Jerry L. Saporito
LA Bar No. 11717
LEAKE & ANDERSSON, L.L.P.
1700 Energy Centre
1100 Poydras St.
New Orleans, LA 70163-1701
(504) 585-7500 (phone)
(504) 585- 7775 (fax)

Counsel for Fleetwood Enterprises, Inc.

## **C E R T I F I C A T E OF SERVICE**

  I hereby certify that a copy of the foregoing has this date been serves on all counsel of record in this proceeding by:

( ) Hand Delivery     ( ) Prepaid U.S. Mail

( ) Facsimile       ( ) Federal Express

(X) CM/ECF

  New Orleans, Louisiana, this 9th day of November 2009.

            /s/ Richard K. Hines, V
            Richard K. Hines, V
            Georgia Bar No. 356300
            richard.hines@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW
Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)