Page 172

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION * Docket MDL 1873 "N"
* New Orleans, Louisiana
THIS DOCUMENT IS RELATED TO: * September 22, 2009
CHARLIE AGE, ET AL V GULF STREAM COACH, INC., ET AL, DOCKET NO. 09-2892; ALANA ALEXANDER, INDIVIDUALLY AND ON BEHALF OF CHRISTOPHER COOPER * 1:30 P.M.

* * * * * * * * * * * * * * * *

DAY 7
AFTERNOON SESSION
JURY TRIAL PROCEEDINGS BEFORE THE
HONORABLE KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:

Gainsburgh, Benjamin, David, Meunier & Warshauer
BY: GERALD E. MEUNIER, ESQ.
1100 Poydras Street
Suite 2800
New Orleans, Louisiana 70163

The Buzbee Law Firm
BY: ANTHONY G. BUZBEE, ESQ.
JP Morgan Chase Tower
600 Travis, Suite 7300
Houston, Texas 77002

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

between living in a tent and moving into more permanent housing?

A. Yes.

Q. Mr. Souza, my name is Henry Miller and I represent the United States, which is a defendant in this litigation.

You were just asked some questions about FEMA's plan at the time of the response and how this included sort of a three-prong approach.

Were travel trailers FEMA's initial choice for the temporary emergency housing, or were there alternative housing methods that were considered?

A. We had talked about using manufactured homes or mobile homes as -- as the initial going-in position.

Q. Was a decision made -- well, what was decided?

A. The decision was made to use travel trailers as opposed to mobile homes.

Q. Were you involved with that decision-making process? Actually, let me rephrase it.

Do you have -- did you -- do you have knowledge of that decision-making process?

A. Yes.

Q. And how do you have that knowledge?

A. As part of the housing area command, there were discussions about what types of units we could use and where we could place them.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

13:58 Q. And what is your understanding why the decision was made to use travel trailers as opposed to manufactured housing or mobile homes as the primary temporary emergency housing response for Hurricane Katrina victims and Hurricane Rita disaster victims?

13:58 A. My recollection was that we were going to use mobile homes. But because of the size of the mobile homes and the quantity in which we needed them, the areas available to us to put those mobile homes were outside of the impacted areas.

13:59 In other words, they were outside of the areas of New Orleans, and really not even a practical solution in the immediate vicinity of Baton Rouge. They would have to be probably even further north than that.

13:59 And when we made this proposal to the State, concerns were raised that people wanted to live closer to their impacted homes, if they were homeowners, so that they could begin making immediate repairs. There were concerns that rebuilding the community in terms of businesses and economic stability and reinvigorating the economy, that putting people that far away from those impacted areas would not be a preferrable solution.

13:59 Q. Were there discussions about the effects that this may have on the future demographics of New Orleans? Population makeup of New Orleans?

14:00 A. There were discussions about demographics, but I don't specifically recall whether or not they were in regards to the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

mobile home or travel trailer discussion versus people moving out of the state discussion.

Q. Was there a concern that if you used mobile homes as opposed to travel trailers, that many of the people, because they'd have to be placed farther away from New Orleans or Baton Rouge, that they may not eventually move back to New Orleans?

A. Yes, there were those concerns.

THE COURT: Is that it, Counsel?

MR. MEUNIER: Your Honor, may we approach the bench?

THE COURT: Yes, please.

(WHEREUPON, the following proceedings were held at the bench.)

MR. WEINSTOCK: About the Henry Miller introduction would you just make an announcement that this deposition was taken in another case.

THE COURT: We have two problems. The first one was maintenance, which the second one was the Henry Miller thing. And you-all were picking these segments.

MR. MEUNIER: I know. And I don't think it was done intentionally, Your Honor.

What I would suggest is that Henry says, "A defendant in the litigation." Could you instruct the jury that while the United States may be a defendant in other litigation involving FEMA trailers, that it is not a defendant in this case.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

14:28 never, to my knowledge, got a complaint back from them again.
14:28 Q. And the older units would be, for example, units from the 2004 hurricanes in Florida?
14:28 A. Or from any other disasters. But prior to Katrina-type units, yes.
14:28 Q. So some of the swapout units were, in fact, from the 2004 hurricanes in Florida; is that right?
14:28 A. That's probably true, yes.
14:28 Q. And you're not aware of any follow-up problems in those 2004 units once they were swapped out, from a formaldehyde standpoint?
14:28 A. I'm not aware of any, that's correct.
14:28 Q. Also in McNeese 7 you refer under No. 3 to the fact that: "It is a given that the materials used in the construction of mobile homes and travel trailers, in addition to other residential structures, contain formaldehyde."
14:29 Do you see that?
14:29 A. I do.
14:29 Q. It was no surprise to you that there was some formaldehyde in these travel trailers, was it?
14:29 A. No, it was not.
14:29 Q. And, in fact, you're generally aware that there is also formaldehyde not only in travel trailers, but in mobile homes and in stick-built residential structures; is that right?
14:29 A. That's correct.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

14:29 Q. In some of the documents that we looked at this morning, I noted that you made references to the fact that there were no standards -- residential indoor air standards that FEMA could look to for guidance.

14:29 Do you recall having that concern at the time?

14:29 A. I do --

14:29 Q. Could you --

14:29 A. -- recall that.

14:30 Q. -- elaborate on what -- what your reaction was to learning that there were, in fact, no standards that FEMA could look to regarding residential indoor air quality and formaldehyde?

14:30 A. Well, it was quite a while ago. But the main challenge -- that's your word -- the main challenge we had was that it didn't give us a baseline for determining what was good and what was bad. So that was one of the reasons we had to do the EPA testing, was so that we could at least establish what is a baseline of what is in the units, you know.

14:30 But it's not really FEMA's job to set an indoor air quality standard for anyone or an external air quality standard since we're not a standard-making company.

14:30 Q. Was that something that you wished you had had when this whole business started, was a standard that you could look to and evaluate these trailers against?

14:31 A. Well, it would at least have given us a gauge of whether the units were in compliance with something or not. Whereas,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

14:31 today they're totally in compliance with voluntary standards at this point in time.

14:31 Q. Were you generally aware then that the specifications to which these travel trailers were built didn't say anything about formaldehyde or formaldehyde levels or formaldehyde testing?

14:31 A. In general that's correct, yes.

14:31 Q. And the reason I'm asking these questions is, I think what I heard you to say -- and I may be wrong about this -- but you indicated that if there was a problem in one unit, you thought it was a problem possibly in all units.

14:31 And at this point in time, was it your understanding or belief that you had a formaldehyde problem in all of these 118,000 units that were out there?

14:31 A. No, that's not true.

14:32 Q. Did they ask to -- did the representatives of Gulf Stream Coach ask to participate in this testing?

14:32 A. Yes, they did.

14:32 Q. And are you aware that that happened?

14:32 A. I am aware, yes.

14:32 Q. Were they allowed to participate in the testing?

14:32 A. No.

14:32 Q. Do you have any idea following Hurricanes Katrina and Rita how many individuals were transitioned through the federal government through evacuation processes to other cities or

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

14:35 What is the significance of that statement in this declaration?

14:35 A. Other than, again, painting the picture of -- of how we provide these units and the conditions under which they're provided to disaster victims.

14:35 Q. So, in your mind, is it important to note that the victims have received something at cost -- at no cost to them, and they've not been required to pay any costs associated with the installation, maintenance, or removal of the units?

14:35 Does that mean that they should have no right to complain about what they received?

14:35 A. No. What it means is these units are our responsibility.

14:35 Q. So this statement, basically, means -- what you're trying to convey -- is that this is FEMA's responsibility. It has no other -- no other meaning besides that?

14:35 A. That's correct.

14:35 Q. I'm trying to get to -- this -- this particular statement, and you've just testified -- is this to say that FEMA has the authority due to the Stafford Act, to provide and to -- to respond to disasters, in this particular instance, to provide temporary emergency housing assistance to victims?

14:36 A. Yes.

14:36 Q. What was your understanding in June of 2006 of how the Gulf Coast recovery office was responding to air quality complaints?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

A. My under- -- my understanding is that the maintenance and deactivation contractors were, in general, doing a pretty good job of responding to the slew of complaints or concerns that occupants were calling in, this being one among many.

And I have, at least to this date, no reason to believe that they were not executing the provisions of the contract in meeting their performance requirements.

Q. This statement says that: "As a result, FEMA has been committed to providing applicants and consumers with information on health and safety issues regarding manufactured housing units, including formaldehyde levels in these units.

Do you know specifically what was the communication given to Alana Alexander and the unit that she occupied?

A. I don't -- I don't know who Alana Alexander is.

Q. So that through this change in strategy, again, informed by the experience of Katrina, FEMA does not plan to rely on travel trailers, for example, as a primary means of providing emergency assistance for housing?

A. That's accurate. We do not plan to rely on travel trailers as the primary means. We will still use travel trailers under a unique set of circumstances.

Q. Right.

Much more limited than those which -- under which the travel trailers were used after Katrina, obviously?

A. That is correct. Prior to Katrina, we used all

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

14:56 standards. And they simply were either not available or there were a number of different standards, and no one was able to point at one and say, that is the standard that you need to use.

14:56 Q. Right.

14:56 Prior to that change, did -- was it the prevailing view, at least in your view, that the con- -- that the manufacturers were, in fact, providing units that complied with the required safety standards for formaldehyde?

14:56 A. It was our understanding that the manufacturers were, if they were producing mobile homes or manufactured housing, producing units that complied with HUD standards.

14:57 Q. Uh-huh.

14:57 A. For those who were not producing manufactured housing, they were producing park models or travel trailers, which are recreational vehicles, that met or exceeded industry standards, since there were no federal standards that applied to -- there were no HUD standards that applied to that construction at the time that those units were purchased for Hurricane Katrina.

14:57 Q. But do you agree with the suggestion that the industry sources for these products should also be looked to as -- as sharing in the responsibility for the formaldehyde issues?

14:57 A. Well, I would say anyone involved in -- in this should share responsibility. But let's keep in mind, if what they were producing were units that were built to meet or exceed

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

industry standards, and that that's what your contracts required, and they did, then they were meeting their contract obligations.

So in terms of responsibility, yes, we all share some responsibility. With regard to these particular units, manufacturers share the responsibility for the construction of the units and whatever guidance they provide regarding its use.

But it's our responsibility, as the purchasers and subsequent providers of those units to the disaster population, to be -- to own up to and be responsible for those units from that point on, at least in terms of dealing with the needs and the concerns of the occupants of the units that we own and have provided to them. So I'd say it's a shared responsibility.

Q. And you certainly wanted to -- you wanted to -- you would rely on the manufacturer of a travel trailer, for example, to furnish a product that would be safe for long-term residence knowing that these travel trailers, which as you say are recreational vehicles, were going to be used for long-term residence.

A. I would suggest that the responsibility of the manufacturers would be to meet the terms of whatever performance specifications that we ask them to meet with the contracts that we awarded to them.

Q. Did you specify anything in those contracts that was directed to long-term residence or occupancy of a unit

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

determination." Correct?
A. Correct.
Q. Are you suggesting there that the entities which have the expertise and capability to render authoritative determinations of the safety of those units would be the manufacturers?
A. No.
Q. Who -- who would it be, if not them and if not FEMA?
A. Well, I would -- we believed -- or I believed that this -- establishing federal standards is a federal responsibility, and it belongs within the bailiwick of whatever agency was most appropriate.
I would have voted for EPA and/or CDC to be establishing what are appropriate standards for -- for what is safe in the terms of formaldehyde exposure levels.
I do not think that it's the industry's responsibility to develop federal standards. I think that's a federal responsibility.
Q. As of September the 1st, 2005, when you walked into the Katrina situation, did you have any reason to believe that travel trailers were going to be a problem?
A. From a formaldehyde --
Q. From a formaldehyde standpoint.
A. None whatsoever.
Q. Can you talk a little bit about why FEMA used travel trailers by the thousands, both prior to Hurricane Katrina and

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

during the Hurricane Katrina response?

A. They were the preferred direct temporary housing product because of their -- because of their size, because we could move them in and set them up quickly.

I think 80 percent of the units that we provided in response to Hurricanes Katrina and Rita were on individuals' private property. Typically, we put travel trailers on private property, or often, because we can't fit anything else on that private property. We simply can't accommodate a mobile home on the driveway.

So they were used because, number one, they filled a need that could not be met any other way.

Two, they were inexpensive compared to a mobile home.

Three, they allowed people to stay at their property and rebuild their home, as opposed to relocating them to a community site that might be miles away and might be far more expensive to build.

So a number of reasons, I think, contributed to the use of travel trailers and their popularity, at least within a certain segment of the disaster population on those small properties and wanted to stay on their property and rebuild their home.

Q. Am I also correct that during the prior natural disaster events that we talked about prior to Hurricane Katrina, can we assume that there were young children and elderly people and

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

16:33 In Paragraph 10, five lines from the bottom of Paragraph 10, Mr. Payne makes the statement in his declaration: "Further, I informed him -- and "him" is a Bronson Brown, with the FEMA safety office -- further, I informed him that OSHA had conducted follow-up testing to confirm that ventilation and airing out the units was a sufficient response action.

16:34 "That testing confirmed that airing out and venting units for a short time reduced formaldehyde levels below OSHA PELs, and those results were shared at regular JFO meetings and also posted on the OSHA website."

16:34 Do you see that?

16:34 A. I do see that.

16:34 Q. And in Paragraph 11, Mr. Payne says: "In addition, I further informed Mr. Brown that formaldehyde levels in units should be relatively low once they were handed over to the public. This is because by the time the unit is issued to a disaster victim, the unit will have had an opportunity to air out and vent as a result of contractor making the unit ready for occupancy."

16:34 Do you see that?

16:34 A. Yes, sir.

16:34 Q. I'm going to mark an e-mail as Miller No. 22 and ask you to take a look at that.

16:35 This is a May 11, 2006, e-mail from Kurtis Melnick to Marvin Dickerson. And do you see you're cc'd on that e-mail?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

16:35 A. Yes, sir.
16:35 Q. Who is Kurtis Melnick?
16:35 A. Kurtis Melnick and I work together. He is a log chief
16:35 down in New Orleans now.
16:35 Q. Looking at the e-mail in the third paragraph, Mr. Melnick
16:35 is talking about the procedure for removing formaldehyde odor
16:35 from a temporary housing unit that's been sitting in the sun.
16:35 Do you see that?
16:35 A. Yes, sir.
16:35 Q. He says: "The procedure for this is opening the windows
16:35 and possibly the door for a day or two, or until the odor is
16:36 completely gone. In Louisiana, this has been the job of the
16:36 contractors, or it -- or it has occurred that someone from IA
16:36 enters a trailer and notices the odor, then they have also been
16:36 opening the windows. This should, however, be the
16:36 responsibility of the contractors."
16:36 Do you see that?
16:36 A. Yes, sir.
16:36 Q. Was that your understanding of what the contractors and/or
16:36 the IA personnel were doing in the field when they set these
16:36 trailers up?
16:36 A. That is pretty much my understanding.
16:36 Q. And if you look down in the last paragraph, Mr. Melnick
16:36 says: "Our current method of having the contractors who make
16:36 the units RFO -- is that "ready for occupancy"?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

16:36 A. Yes, sir.
16:36 Q. -- seems to be satisfying any concerns from the applicants we are housing."
16:37 Do you see that?
16:37 A. Yes, sir.
16:37 Q. Do you agree with that statement based on your experience at that time?
16:37 A. I think at -- at that time during early May of 2006, that the number of complaints and the resolution by airing it out -- by the contractor making it -- was -- was satisfying the applicants.
16:37 Q. And, again, the contractors we're talking about here are the contractors who are actually installing the units on-site?
16:37 A. That is correct.
16:37 Q. It would not be a manufacturer like Gulf Stream?
16:37 A. No, sir.
16:37 Q. When you worked the Florida hurricanes in 2004, did you actually go to Florida at any -- for any of those four storms you described earlier?
16:37 A. I -- I was -- I was in Florida.
16:37 Q. So you were in Florida at the end of 2004?
16:37 A. Yes, sir.
16:38 Q. Okay. Were you made aware of any formaldehyde claims by residents of the THUs in Florida?
16:38 A. I do not recall any formaldehyde claims out of Florida --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

16:38 Q. Okay.
16:38 A. -- that I'm aware of.
16:38 Q. Are you aware of the fact that Gulf Stream sold approximately 7,000 travel trailers to FEMA on the Florida disaster?
16:38 A. I -- I'm not sure of the number, but I do know that they did sell -- we had quite a number of the spec models.
16:38 Q. And as far as your experience in Florida was concerned, there was no formaldehyde problem or issue with any of those Gulf Stream travel trailers in 2004?
16:38 A. That is correct.
16:38 Q. Mr. Miller, we are going to mark the next exhibit as Miller No. 24.
16:38 Mr. Miller, this is an e-mail that appears to be from a Judith Reilly, to a David Chawaga. If you look down at the e-mail, it's dated April 14th of '06, from Judith Reilly to Bronson Brown.
16:39 Again, Bronson Brown is with -- also with FEMA?
16:39 A. Yes, sir.
16:39 Q. Cc'd to David Chawaga, again, dated April 14th, '06. There's a discussion of formaldehyde test results.
16:39 Do you see that?
16:39 A. Yes, sir.
16:39 Q. Do you have any idea what formaldehyde test results these individuals are referring to in April of 2006?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT