UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION:  N(5) |
| | * | |
| This Document Relates to: *Charlie Age, et al. v* | * | JUDGE: ENGELHARDT |
| *Gulf Stream Coach Inc., et al*, Docket No. 09-2892 | * | |
| | * | |

**\*This Pleading Relates Only to**: Severed Claims of Alana Alexander      *      MAG: CHASEZ
individually and on behalf of the minor child Christopher Cooper      *
********************************************************************************

### GULF STREAM COACH, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR NEW TRIAL, OR ALTERNATIVELY, MOTION FOR RELIEF FROM JUDGMENT

**MAY IT PLEASE THE COURT:**

On Sept. 24, 2009, the eight-person jury selected for the trial of the above-captioned matter rendered a verdict in favor of defendants Gulf Stream Coach, Inc. ("Gulf Stream") and Fluor Enterprises, Inc. ("Fluor"). This Honorable Court issued a final judgment on October 6, 2009 incorporating the jury's verdict and dismissing with prejudice all claims of Plaintiff Alana Alexander, individually and on behalf of the minor child Christopher Cooper, in favor of Gulf Stream and Fluor. (Rec. Doc. 4757). In response to the jury's verdict and the Court's judgment, Plaintiff filed a Motion for New Trial and/or Motion for Relief from Judgment. (Rec. Doc. 5609). In the Plaintiff's Motion, she asserts that she is entitled to relief because: 1) the defendants peremptory strikes allegedly violated the Equal Protection Clause of the United States Constitution; 2) the jury purportedly rendered its verdict based upon erroneous and confusing instructions regarding the government contractor defense; 3) the Court failed to give the jury an instruction regarding the effect of compliance with industry regulations on Plaintiff's defective design allegations; and 4) the Court allegedly improperly dismissed Plaintiff's claims against

Fluor under the Louisiana Products Liability Act ("LPLA"). Gulf Stream now opposes Plaintiff's Motion and respectfully submits that the Court's final judgment was validly and properly entered.

## I.   STANDARD FOR MOTION FOR NEW TRIAL

In her Motion for New Trial, Plaintiff spends little to almost no time addressing the actual burden that she must satisfy to present a satisfactory case for new trial. It has long been observed that a motion for new trial is generally not regarded with favor and is granted "only with great caution." *U.S. v. Perea*, 458 F.2d 535, 536 (10th Cir. 1972). Indeed, so hesitant are courts to indulge in granting new trials following jury verdicts that it has been routinely held that, when considering a motion for new trial, the trial court "must abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result." *Marley v. City of Allentown*, 774 F.Supp. 343, 345 (E.D.Pa. 1991). *See also Smith v. Carpenter,* 316 F.3d 178, 183 (2nd Cir. 2003), *Sedgwick v. Giant Food, Inc.,* 110 F.R.D. 175, 176 (D.D.C. 1986), and *Ruhlman v. Hankinson*, 461 F. Supp. 145, 147 (D.Pa. 1978). This standard applies even when the grounds for the motion for new trial are premised upon the argument that the trial court erred in instructing the jury. *See e.g. Smith v. Lightening Bolt Prods., Inc.,* 861 F.2d 363, 370 (2d Cir.1988) and *Sergeant v. Serrani*, 866 F.Supp. 657, 662 (D.Conn. 1994). The burden on the moving party in this regard "therefore is substantial." *Strobl v. New York Mercantile Exch.,* 582 F.Supp. 770, 777 (S.D.N.Y.1984). This "burdensome standard" has evolved so as to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury. *See Young v. Lukens Steel Co*., 881 F.Supp. 962, 968 (E.D.Pa. 1994).[1]

---

[1]     Plaintiff alternatively moves under Federal Rule of Civil Procedure 60. The showing for relief under this Rule is similarly stringent and justified under the "catchall" provision relied upon by Plaintiff only under a satisfactory showing of "exceptional circumstances."  *See, e.g., Louisville Bedding Co. v. Pillowtex Corp*., 455 F.3d 1377, 1380 (Fed. Cir. 2006); *Shoen v. Shoen*, 933 F.Supp. 871, 875 (D. Ariz. 1996).  Gulf Stream opposes Plaintiff's

In this case, Plaintiff's Motion for New Trial nowhere demonstrates that such a showing has been made and, in fact, nowhere even cites to the burden imposed upon her to justify the relief sought under either Federal Rule of Civil Procedure 59 or 60. On this basis alone, as well as for the reasons set forth in further detail herein, Plaintiff's Motion should be denied.

## II.    PLAINTIFF'S *BATSON* CLAIMS

### A.    *Applicable Law*

It is a well-established principle of law that the deliberate exclusion of persons from jury service on the sole basis of their race is a violation of the Equal Protection Clause of the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 84 (1986); *see Miller-El v. Dretke*, 545 U.S. 231, 237—38 (2005). In the seminal case of *Batson*, the U.S. Supreme Court set forth a three-part test to determine whether a party has used a peremptory strike in a racially discriminatory manner. *Woodward v. Epps*, 580 F.3d 318, 334 (5th Cir. 2009). First, the challenger must make a prima facie showing that the striking party exercised his peremptory challenges on the basis of race; then, the burden shifts to the striking party to articulate a race-neutral reason for striking the juror in question; and finally, the trial court must determine whether the challenger carried his burden of proving purposeful discrimination. *Id*. In the instant case, both Plaintiff and the defendants agree that the first two steps of the evaluation have been satisfied. (Rec. Doc. 5609-2, p. 9). Thus, the relevant inquiry herein will be whether this Honorable Court believes that Plaintiff has carried her burden of proving purposeful discrimination.

Under the third prong of the *Batson* evaluation, the relevant inquiry is whether the challenger's proof, when weighed against the striking party's proffered race-neutral reasons, is

---

requested relief under Rule 60 for the same reasons as set forth in opposition to Plaintiff's request for new trial under Rule 59.

sufficient to persuade the trial court that such discriminatory intent is present. *Parker v. Cain*, 2008 WL 4534096, at *10 (E.D. La. Oct. 7, 2008). In other words, "whether [the challenger] has carried his burden under *Batson*'s third step to prove purposeful discrimination is based on the persuasiveness and credibility of the [striking party's] justification for his exercise of the peremptory strike." *Woodward*, 580 F.3d at 336. Thus, implausible or fantastic justifications for the strikes will not suffice. *See id.* When the Court engages in its analysis under the third prong, it looks to the striking party's justification, statistical data, and juror comparisons. *See id.* at 336, 338—39 (citing *Miller-El v. Dretke*, 545 U.S. 231, 237—38 (2005)). With respect to juror comparisons, the fact that the striking party excluded a minority juror rather than a non-minority juror with the same characteristics is evidence that the exclusion was discriminatory. *Miller-El*, 545 U.S. at 241. However, the evidence must be weighed against, and can be outweighed by, the striking party's justification for the exclusion. *See Parker*, 2008 WL 4534096 at *10.

B.   *The Defendants' Peremptory Challenges did not Violate* Batson

In this case, Plaintiff argues that the defendants' use of peremptory challenges violated *Batson* because the defendants struck several African-American jurors on the basis of their race. At the outset, Gulf Stream and Fluor wish to state unequivocally that they did not strike a single juror on the basis of skin color. As counsel for Gulf Stream stated at trial, "There's a valid reason for every single person we asked to be excused, and it's not based on race." (Rec. Doc. 5609-3, p. 12). As shown below, the facts completely bear out counsel's statement. Because Plaintiff's challenge involves five jurors, the defendants will discuss each of the five individually.

### 1.   Ronald Franklin, Juror No. 11.

Plaintiff spends a majority of her brief discussing the exclusion of Ronald Franklin, a carpenter by trade and widower. During voir dire, the defendants exercised a peremptory

challenge on Mr. Franklin, citing several reasons for his exclusion – the recent death of his wife would make him unduly sympathetic to Plaintiff's case, his personal exposure to chemicals, his opinion that companies put profit above ethics, his opinion that the government should pay for injury even if there is no proof, and his opinion that the average company's safety testing is very inadequate before the company markets its products. *Id*. at 14. In her Motion for New Trial, Plaintiff critiques the defendants' proffered reasons for dismissing Mr. Franklin and argues that the reason was because Mr. Franklin is black. Each of Plaintiff's critiques is baseless.

From the outset, Plaintiff inadvertently misrepresents to the Court the facts in support of her groundless claims that the defendants improperly struck the jurors at issue. Plaintiff asserts that the defendants' concern that the recent death of Mr. Franklin's wife would render him incredibly sympathetic was pre-textual. Indeed, Plaintiff incorrectly argues:

> However, defendants ignored Mr. Franklin's juror questionnaire, wherein he indicated that he was <u>not</u> an overly sympathetic person.

(Rec. Doc. 5609-2, p. 12) (emphasis in original). To the contrary, **<u>Mr. Franklin did not even answer Question 35 in the questionnaire</u>**,[2] which was the very question Plaintiff cited as support that Mr. Franklin is not overly sympathetic. (Rec. Doc. 5609-2, p. 12). Rather, Mr. Franklin left Question 35 blank. He responded "No" to question 36. *Id.*

Setting aside Plaintiff's erroneous citation, Plaintiff's other argument regarding Mr. Franklin is likewise unavailing. Plaintiff suggests that Mr. Franklin's loss of his spouse and resulting sympathy is irrelevant because this is not a wrongful death case. However, the defendants need not show that this trial involved a decedent to exclude Mr. Franklin for being overly sympathetic. The defendants only had to offer a reason related to the particular case. *Purkett v. Elem*, 514 U.S. 765, 768—69 (1995). That Mr. Franklin would be overly sympathetic

---

[2]      (Rec. Doc. 5609-17, p. 11).

certainly relates to a case involving the alleged personal injury <u>of a child</u> and his mother, who were both Mr. Franklin's fellow New Orleanians. (Rec. Doc. 5609-17, p. 1) (showing Mr. Franklin's place of birth). It is not as if this case involves strictly monetary damages, such as a contract dispute between large companies. The case involved issues that resonate with everyday individuals, including the alleged harming of a child, corporate profits over personal safety, the victimization of those displaced during Hurricane Katrina, etc. Sympathy certainly plays a role in this matter, and that is precisely what defendants contemplated when they dismissed Mr. Franklin. This is an acceptable, non-discriminatory basis for a peremptory exception, as recognized on several occasions by the U.S. Court of Appeals for the Fifth Circuit.[3]

Further supporting the defendants' concerns about Mr. Franklin's sympathies are Mr. Franklin's own comments during *voir dire*. During Mr. Franklin's introduction, wherein he was asked to identify himself, his spouse, and their professions, he stated, "Ronald Franklin. I'm a carpenter. I **just** lost my wife." *See* Ex. "A," Trial Transcript 9/14/09 (emphasis added). This suggested that the loss still weighed heavily on Mr. Franklin, and it reaffirmed the defendants' concern about his ability to remain impartial. While Plaintiff makes the argument that Mr. Franklin's wife died just over a year prior to trial, and thus the defendants could not truly have been worried about Mr. Franklin's potential for undue sympathy, it was <u>Mr. Franklin</u> who spoke of the loss as recent. His own words – which were completely voluntary and spontaneous – showed that the loss of his wife was still fresh in his mind, despite Plaintiff's implication that he should be over the loss thirteen months later. Simply put, the defendants felt that Mr. Franklin's situation might cause an undue amount of sympathy towards Plaintiff, and Mr. Franklin's own statements buttressed this belief. His exclusion had nothing to do with his race.

---

[3]     *See U.S. v. Collins*, 972 F.2d 1385 (5th Cir. 1992); *U.S. v. Clemons*, 941 F.2d 321 (5th Cir. 1991); *U.S. v. Moreno*, 878 F.2d 817 (5th Cir. 1989); *see also Williams v. Rader*, 1992 WL 54728 (E.D. La. March 9, 1992).

Additionally, there were issues other than sympathy that caused the defendants to strike Mr. Franklin. He provided several answers in his questionnaire that also caused the defendants to identify him as an adverse juror before he ever entered the courtroom. These included prior chemical exposure in his home, his unfavorable opinion of corporate ethics, and his statement that the government should be held liable without proof of wrongdoing. Plaintiff generally combats those arguments with juror comparisons, but drops a parenthetical about the last issue, arguing that the statement about the government is irrelevant because the government was not a defendant.[4] That is nonsensical because <u>the government was a defendant at the time Mr. Franklin filled out his Questionnaire</u>, so as far as Mr. Franklin knew, he was answering a question about an active defendant in this litigation. (Rec. Doc. 5609-17). More importantly, at the conclusion of the evidence, the jury was asked to consider the fault of the United States Government and (if necessary) assign fault to the government. Thus, the response reflected a potential bias against the defendants, and it was a valid reason to strike Mr. Franklin.

With respect to the Plaintiff's alleged juror comparisons, Plaintiff again mistakenly cites the Court to incorrect facts when she argues that other non-African American prospective jurors also felt that the government should be held liable without proof of wrongdoing. (Rec. Doc. 5609-2, p. 12-13). Plaintiff cites the Court to the Juror Questionnaires of Bert St. Romain (Rec. Doc. 5609-9, p. 26), Craig Naquin (Rec. Doc. 5609-10, p. 26), and Maxine Bourg (Rec. Doc. 5609-11, p. 26). An examination of the questionnaires establishes that Mr. Naquin and Mrs. Bourg both responded to the question by marking "Not Sure," rather than "Agree," as Mr. Franklin responded. (Rec. Doc. 5609-17, p. 26). Indeed, other than Mr. Franklin, Mr. St. Romain was the sole potential juror in the strike zone who responded affirmatively for this question. But

---

[4]     Plaintiff's FTCA claims against the government were dismissed on the government's 12(b)(6) Motion. (Rec. Doc. 2789)

this comparison is immaterial because the defendants eventually struck Mr. St. Romain.[5] Interestingly, Plaintiff did not cite the comparisons on question 83, one that is inextricably linked to the question about the need for proof when determining the liability of the government. Question 83 asked the potential jurors whether they could fairly decide a lawsuit between an individual and the government. Exactly three jurors in the strike zone responded that they could not fairly decide such a case: Mr. Franklin, Ms. Rachel Morris, and Mr. James Vicknair. *See* Ex. "B," Juror Questionnaire of Rachel Morris, p. 27; (Rec. Doc. 5609-17, p. 27); and (Rec. Doc. 5609-13, p. 27). Mr. Vicknair, the only non-African American of the three, was struck by the defendants and replaced by Mr. Emile Bacchus, an African-American prospective juror, in response to Plaintiff's *Batson* challenge.

Additionally, several other "comparisons" cited by Plaintiff are inapposite, unpersuasive, and in several instances nonexistent. Very important to the defendants was a series of Juror Questionnaire inquiries (specifically, Questions 74 to 77 on the questionnaire) pertaining to the potential jurors' respective views on corporations. Citing the Juror Questionnaires of Mitzi Aucoin (Rec. Doc. 5609-6, p. 24), Samantha Robichaux (Rec. Doc. 5609-7, p. 24), Michael Wetzel (Rec. Doc. 5607-8, p. 24), Bert St. Romain (Rec. Doc. 5609-9, p. 24) and Craig Naquin (Rec. Doc. 5609-10, p. 24), Plaintiff argues that several nonblack jurors answered these questions similarly to Mr. Franklin. Yet, Plaintiff again mistakenly misrepresents to the Court the facts. Indeed, a close examination of the questionnaires shows that Mr. Franklin and Ms. Morris stood alone on a few key issues.

First, Question 76 of the Juror Questionnaire asked prospective jurors what they thought of the typical American company's safety testing of its products before the products are sold to

---

[5]     As discussed below, upon withdrawal of defendant's strike of Ms. Morris, she was sworn into the seated jury and Mr. St. Romain was excused with the rest of the non-selected venire.

the public. (*See* Rec. Doc. 5609-10, p. 24). While Mr. Franklin found corporate safety testing to be "very inadequate,"[6] which was the most adverse choice available,[7] <u>not a single nonblack juror cited by Plaintiff as comparable selected the same strong answer</u>. (Rec. Doc. 5609-2, p. 12 n. 52). In fact, Mr. Naquin even stated that he thought safety testing was "adequate," so the comparison to Mr. Franklin is totally invalid. (*See* Rec. Doc. 5609-10, p. 24). Interestingly, the only other potential juror in the strike zone to hold the opinion that the typical American company does "very inadequate" safety testing of its products was Ms. Morris. Likewise, in the very next question on the questionnaire (Question 77), the potential jurors were asked if they think that corporations generally try to make their products safe. (*See* Rec. Doc. 5609-17, p. 25). Exactly <u>two</u> of the potential jurors in the strike zone, Mr. Franklin and Ms. Morris, responded "No." (Rec. Doc. 5609-17, p. 25); Ex. "B," p. 25. Considering that a main, if not the main, focus of Plaintiff's theories against the defendants was that the travel trailer at issue was unsafe and not adequately tested, it is not surprising that a strike was used on Mr. Franklin, one of only two potential jurors to give an unfavorable response to both Question 76 and 77.[8]

Second, Plaintiff ignores the fact that Mr. Franklin gave <u>multiple</u> answers that the defendants found unfavorable. Taken in tandem, the collection of Mr. Franklin's adverse answers led the defendants to strike him with one of their peremptory challenges. While Plaintiff cited several nonblack jurors who gave a similar response to Mr. Franklin on a given issue, those same nonblack jurors did not give the same unfavorable answer on the other issues. For instance, although prospective juror Wetzel was similar to Mr. Franklin in terms of identifying prior

---

[6]   (Rec. Doc. 5609-17, p. 24).
[7]   The three choices were adequate, inadequate, or very inadequate. *See* Rec. Doc. 5609-10, p. 24.
[8]   Gulf Stream filed a Motion for Summary Judgment on the "failure to test" issue prior to trial. Long before anyone had set eyes on any juror, the "inadequate testing" issue was front and center in this case.

chemical exposure to a family member,[9] Mr. Wetzel gave a very favorable answer with respect to the government's liability in the absence of proof, [10] and he had no similarity to Mr. Franklin on the issue of undue sympathy. (Rec. Doc. 5609-8, p. 26, 30); Ex. "A," p. 54. Also, unlike Mr. Franklin, Mr. Wetzel owned a recreational vehicle, which he lived in after the hurricane.  (Rec. Doc. 5609-8, p. 31). In his own experience, Mr. Wetzel did not have any safety concerns about the vehicle and he thought that it was "not very" dangerous for someone to be exposed to formaldehyde. (Rec. Doc. 5609-8, p. 32, 39). Contrasted with Mr. Franklin, who did not have these same experiences or views, the defendants had unassailable race-neutral reasons for finding Mr. Wetzel a desirable juror while finding Mr. Franklin undesirable.

Further, the defendants' discussion of the "totality of circumstances" surrounding Mr. Franklin is not meant as an argument that Plaintiff had to find a nonblack juror with identical answers as Mr. Franklin in order to make a comparison. In fact, the defendants recognize that *Miller-El* instructs against this type of burden. 545 U.S. 231, 247 n. 6 (2005). However, it is perfectly acceptable to look at a prospective juror's answers as a whole when considering unfavorable responses. The totality of the responses was the basis for the defendants' challenge of Mr. Franklin, not his skin color.

Regarding the chemical exposure issue, Plaintiff again transparently obfuscates Mr. Franklin's true testimony when she writes:

> Mr. Franklin was <u>not</u> exposed to chemicals in his home, and his wife died of scleroderma, unrelated entirely to chemicals.

---

[9]     Interestingly, when asked about the chemical exposure issue, Mr. Franklin repeatedly denied any chemical exposure in the home until confronted with his actual response in the Jury Questionnaire. (Rec. Doc. 5609-3, p. 18—20). When confronted, he admitted that his and his wife's health had been hurt "Probably because [she had] been exposed." It does not take a lot of time to explain why a juror who felt his wife may have died because of chemical exposure in his home was entirely unsuitable, from the defendants' standpoint.

[10]    Mr. Wetzel was one of only five jurors in the potential strike zone to "Strongly Disagree," and three of those five were excluded by Plaintiff's challenges (Ralph Stricker, Tony Dupre and Darien Farley).

(Rec. Doc. 5609-2, p. 15) (emphasis in original). Yet, when Mr. Franklin was question during *voir dire*, he eventually admitted:

> Mr. Glass: Have you ever experienced any of the following problems in your home? Chemical exposure.
>
> Prospective Juror 11: Well, what we were staying for, we were staying across from chalmette ferry, and they had chemicals, you know, like you smell it. You know, coming from on the other side of the river where i was staying at, we would smell that all the time.
>
> Mr. Glass: Do you think that hurt your health or your wife's health?
>
> Prospective Juror 11: Probably because been exposed, sir, because certain kind of way the wind blow, you can smell it coming from Chalmette.
>
> The Court: Other than the odor, have you any reason to believe that that smell had any impact on your health or the health of your wife?
>
> Prospective Juror 11: I don't think so.
>
> The Court: No one has ever told you that, a doctor or anything?
>
> Prospective Juror 11: No.

(Rec. Doc. 5609-2, pp. 19—20). Mr. Franklin's statements are critical, especially considering a focal point of Plaintiff's claim against defendants was that the ability to detect the "odor" in the travel trailer at issue was itself indicative of a chemical toxicity level that caused her children to suffer serious, carcinogenic harm. Thus, it is easy to understand the race-neutral reasoning behind the defendants' strike.

In response, Plaintiff argues in her Motion that the defendants should have struck Mr. Franklin for cause or questioned him about these issues before striking him. (Rec. Doc. 5609-2, p. 14). However, Plaintiff overlooks several important factors. First, in essence, the defendants <u>had</u> already questioned Mr. Franklin through the use of the questionnaire. The parties compiled these questionnaires because they realized that they could not individually question every juror

on the day of voir dire. The questionnaire was a reasonable and acceptable alternative, and the "questioning" occurred therein. As the Fifth Circuit has recognized, when a questionnaire addresses areas of concern for the striking party, "it does not automatically follow that absence of the questions in *voir dire* is indicative of pretext." *See Woodward v. Epps,* 580 F.3d 318, 340 (5th Cir. 2009). In terms of striking Mr. Franklin for cause, the defendants had sufficient information through the questionnaire. The Court created the questionnaire for that informational purpose, and cautioned the parties pre-trial about the overzealous, time-wasting use of cause challenges and individual juror questioning. As Gulf Stream's counsel stated on the day of voir dire when asked why Mr. Franklin was not challenged for cause, "That's true, Your Honor, but you did not ask us to keep calling the same people up to discuss that question over and over. We made preconceived notions based on what they had written." (Rec. Doc. 5609-3, p. 14). Co-counsel also stated, "We tried to limit [challenges for cause] to a few people." *Id*.

Another important factor in choosing to forego a challenge for cause was the set of answers Mr. Franklin provided that appeared facially favorable to the defendants. (*See* Rec. Doc. 5609-17, p. 24, 30). Despite answers on Questions 76 and 77 that evidenced Mr. Franklin's utter distrust of corporations' safety efforts, he actually answered that he would "Never find the company liable" who exposed consumers to some kind of toxic, disease-causing substance. (Rec. Doc. 5609-17, p. 30). He also answered that he had a great deal of confidence in major companies in the United States. *Id*. at 24. While the defendants cannot deny that they were favorable responses, they are totally nonsensical in light of Mr. Franklin's other responses. Recognizing these inconsistencies, the defendants evaluated all of Mr. Franklin's responses and concluded that he was an overall poor juror for their case. His contradictory answers suggested that he was either confused, wildly unpredictable, and/or disinterested when filling out the

questionnaire. Either way, Mr. Franklin was not the type of juror the defendants wanted to seat. He was exactly the type of juror for which a peremptory challenge is appropriate – unlikely to be struck for cause (especially in light of the limited amount of time provided for such challenges), and unlikely to be an impartial, consistent, and predictable juror. So, the defendants struck him with one of their peremptory challenges, and the strike was justified on completely non-discriminatory bases.

The defendants ask the Court to deny the *Batson* challenge of Mr. Franklin. The defendants in this matter had valid reasons for striking Mr. Franklin, they did not fail to strike similarly situated nonblack jurors, and they committed no violation simply by foregoing questioning on the day of voir dire. For those reasons, Plaintiff's challenge must be rejected.

### 2. Anita Brown, Juror No. 19.

The defendants used a peremptory challenge to exclude Anita Brown, a mother of six and husband to a disabled gentleman who formerly worked as a brick mason. Once Plaintiff's counsel made the *Batson* challenge, counsel for the defendants articulated no less than five separate race-neutral bases for Ms. Brown's exclusion – her former status as a plaintiff, her disabled husband, her opinion that companies do not adequately test products before selling them, her opinion that companies will do anything to make a profit, and her opinion that justice does not limit the amount of damages to right a wrong. (Rec. Doc. 5609-3, p. 14—15). It is notable that the defendants identified these unfavorable aspects in Ms. Brown's questionnaire, well before they arrived at trial and learned her race.[11] As Gulf Stream's counsel stated at trial,

> . . . I just want to point out that these are my notes long before anybody walked into this courtroom. Number 19, I had enough [to strike her] and the jury consultant had enough and Fluor had enough. I didn't see a reason to ask you to bring her up here for

---

[11]    Nowhere on Ms. Brown's Juror Questionnaire was it shown that she was an African-American. (Rec. Doc. 5609-14).

> cause long before I laid eyes on her and knew what color her skin
> was.

(Rec. Doc. 5609-3, p. 29).

Plaintiff, however, does not accept this explanation. She attempts to point out that several other nonblack jurors shared Ms. Brown's characteristics, and the defendants' failure to strike those nonblack jurors is evidence of discriminatory intent. But Plaintiff's argument misses the mark for a number of reasons. The first involves the question of compensation amounts and whether there should be a fixed amount of compensation that a plaintiff can recover. Of those who indicated this response, Ms. Brown was the only one who explicitly wrote that the amount itself should not be capped, and she was the only one who took time to emphasize her comment. (Rec. Doc. 5609-14, p. 22). Unlike the others, Ms. Brown indicated her willingness to award damages that exceeded Plaintiff's alleged damages in the case, and felt so strongly about this answer that she underscored her response. *Id.*

Second, Plaintiff fails to recognize the totality of circumstances with respect to Ms. Brown. While Plaintiff compared Ms. Brown to several nonblack jurors with similar answers, not a single nonblack juror cited by Plaintiff had as many unfavorable aspects of his or her questionnaire as Ms. Brown did. Even the jurors Plaintiff mentions by name did not share all of Ms. Brown's circumstances. Juror No. 1 Ms. Aucoin did state that aggrieved persons should be compensated, but she never acted as a plaintiff in a lawsuit. (Rec. Doc. 5609-6, p. 21—22). Juror No. 7 Mr. Naquin had a disabled spouse, but had never participated in a lawsuit and felt that companies did adequate safety testing of products before they sold them. (Rec. Doc. 5609-10, p. 21, 24). Admittedly, Ms. Aucoin and Mr. Naquin provided unfavorable answers on these topics. However, the defendants' use of peremptory challenges is limited – they could not exclude everyone who gave an unfavorable answer, especially considering that the questionnaire was 129

questions long. It is completely sensible that they would look for jurors with a high number of perceived adverse responses, *in toto*, and strike those jurors.

By referencing the differences between Ms. Brown and the other prospective jurors, the defendants are not suggesting that Plaintiff had to compare Ms. Brown to someone that shared every single one of her unfavorable answers. The defendants only point them out to show that the collection of adverse responses – which, in total, were more than any other juror that Plaintiff compared to Ms. Brown – validates Ms. Brown's exclusion. Taken together, the responses represented non-discriminatory reasons why the defendants chose to strike her from the jury. The Court should therefore overrule Plaintiff's *Batson* challenge on Ms. Brown.

### 3.   Nedra Hookfin, Juror No. 16.

At trial, the defendants exercised a peremptory challenge on Nedra Hookfin, a mother of two who was recently laid off from her job. However, prior to exercising a peremptory challenge, the defendants attempted to challenge Ms. Hookfin for cause on the basis that she had friends who lived in FEMA Emergency Housing Units ("EHUs"), had already formed an opinion on the presence of formaldehyde in residential settings, and had a preconceived notion about the presence of formaldehyde in the EHUs. (Rec. Doc. 5609-3, p. 4—5). When questioned during voir dire, <u>she openly admitted</u> that she had already formed an opinion that formaldehyde should not be used in a place where individuals resided, and an opinion about allowing people to live in trailers that contained formaldehyde. *Id*. at p. 6.

After this questioning, Judge Englehardt denied the challenge for cause, but stated – well before the defendants exercised a peremptory challenge on Ms. Hookfin, and well before anyone mentioned a *Batson* challenge – "**<u>She's a peremptory</u>**." *Id*. at 7 (emphasis added). Thus, the Court recognized immediately that while it would not strike Ms. Hookfin for cause, she was a

prime candidate for a peremptory challenge. Later, after the *Batson* challenge was made, the Court yet again stated, "I said that [defense counsel] could use a peremptory on Hookfin and (Juror No. 20 Denia) Ellis when we reviewed them. That's the grounds for a peremptory challenge." *Id*. at 16. No comparative analysis is necessary to understand the impact of such a statement – the Court clearly realized that the exclusion of Ms. Hookfin through the use of a peremptory challenge was justified on a non-discriminatory basis. Her relationships with people who lived in trailers and her pre-formulated opinions made her unfit for jury service; her race was a non-factor.

If a juror comparison is necessary, however, the defendants assert that Plaintiff has not shown apt comparisons between Ms. Hookfin and other nonblack prospective jurors. With respect to Ms. Brown's familiarity with those who lived in EHUs, Plaintiff misleads the Court by comparing Ms. Hookfin to six nonblack jurors who stated that they knew of family or friends who lived in a travel trailer, park model, or mobile home. (Rec. Doc. 5609-2, p. 18 n. 84). In reality, Ms. Hookfin was quite different because she knew individuals who lived in ***FEMA*** Emergency Housing Units. (Rec. Doc. 5609-5, p. 31). ***None*** of the six nonblack jurors cited by Plaintiff stated that they knew individuals who lived in FEMA EHUs – they simply referenced individuals who had lived in some sort of recreational vehicle, mobile home, park model, or travel trailer of some kind. (*See* Rec. Doc. 5609-5 through 5609-11, all on p. 31). While the defendants reasonably assumed that the connection to those in FEMA EHUs might sway Ms. Hookfin's opinion in a case about FEMA EHUs, they did not foolishly generalize that assumption to all potential jurors whose loved ones had some connection to non-stick-built homes. Further, the dissimilarity between Ms. Hookfin and the other jurors is especially notable for Juror No. 7, Mr. Naquin, who is compared to Ms. Hookfin on the basis that they both had

pre-formulated opinions about formaldehyde. While they did share such an opinion, this similarity is outweighed by Ms. Hookfin's connection to residents of FEMA EHUs. Mr. Naquin had <u>no</u> such connection, and no friends who would be aided by his verdict.

Taken together, these issues make Ms. Hookfin unique. Indeed, the Court recognized on the day of voir dire that her circumstances would make her the proper subject of a peremptory challenge. The defendants simply ask the Court to affirm that recognition and to deny Plaintiff's *Batson* challenge on Ms. Hookfin.

### 4.   Denia Ellis, Juror No. 20.

Denia Ellis' situation was very much like Ms. Hookfin's. At trial, the defendants exercised a peremptory challenge on Ms. Ellis, a single woman who works in the field of accounting. However, prior to making that peremptory challenge, the defendants sought to exclude Ms. Ellis for cause on the basis that she had family who live in FEMA trailers and had formulated an opinion about formaldehyde that would not allow her to be open-minded in this case. (Rec. Doc. 5609-3, p. 7—8). Counsel for the defendants questioned Ms. Ellis, at which point she admitted to having an opinion that the presence of formaldehyde may be a problem for residents of the EHUs. *Id*. at 8. The Court did not explicitly deny the defendants' challenge for cause on Ms. Ellis, but his failure to rule clearly indicated that he denied that challenge. However, the Court indicated his understanding of why the defendants might wish to use a peremptory challenge on Ms. Ellis. He said, "I said that [defense counsel] could use a peremptory on Hookfin and Ellis when we reviewed them. That's the grounds for a peremptory challenge." *Id*. at 16. Thus, the Court accepted the reasoning for this challenge as non-discriminatory and warranted under the circumstances. *See id*.

In terms of Ms. Ellis' similarity to other members of the jury pool who are not black, Plaintiff again confuses a relationship to EHU residents with a relationship to those who have lived in some type of manufactured housing. (Rec. Doc. 5609-2, p. 18 n. 84). That is a gross oversimplification on Plaintiff's part, and it is not a sufficient basis to compare Ms. Ellis with the rest of the nonblack jury pool. The defendants drew a distinction between FEMA EHUs and all manufactured housing, which makes perfect sense in a case about FEMA EHUs. Therefore, the defendants ask the Court to overrule Plaintiff's *Batson* challenge on Ms. Ellis.

### 5.   Rachel Morris, Juror No. 9.

Unlike the four jurors referenced above, the defendants in this case <u>did not strike Ms. Morris using a peremptory challenge</u>. Admittedly, the defendants used a strike on Ms. Morris during voir dire, but they <u>voluntarily</u> withdrew the challenge before the Court ruled on the challenge. They also agreed to seat Ms. Morris on the jury, though she did not return for service the following day. (Rec. Doc. 5609-4, p. 5).

While Plaintiff now alleges in self-serving fashion that this was "an attempt" to moot the issue, her counsel stated quite the opposite at trial. During the *Batson* challenge, counsel for Plaintiff plainly stated, "Okay, so [Gulf Stream's counsel has] offered Number Nine, **which makes it moot**." (Rec. Doc. 5609-3, p. 24) (emphasis added). Additionally, the Court itself noted how the replacement of Ms. Morris mooted the issue with respect to her *Batson* challenge. In discussing the withdrawal of the challenge against Ms. Morris, the Court stated, "She will be returned to the jury, and then I think that the remedy that I'll fashion to the extent that the jury selection process has been alleged by Plaintiffs to have been race motivated in terms of challenges, <u>I think the inclusion of the Ninth Juror remedies that</u> . . ."[12]

---

[12]      *Id*. at 33 (emphasis added). Plaintiff argues that the failure of Ms. Morris to return to the jury further

The Court's decision is in harmony with other federal court decisions involving the withdrawal of a peremptory. In *U.S. v. Marrowbone*, the U.S. Court of Appeals for the Eight Circuit held that there was no *Batson* violation where the striking party withdrew its peremptory challenge on a juror. 211 F.3d 452, 456 (8th Cir. 2000). In *Miller-El v. Dretke*, the U.S. Supreme Court cited the striking party's failure to withdraw the peremptory when ruling that the striking party failed to present a non-discriminatory basis for the peremptory challenge. *See* 545 U.S. 231, 246 (2005). Thus, this Honorable Court's statement at trial that the defendant's withdrawal of the peremptory challenge of Ms. Morris remedied the *Batson* challenge is fully supported by the law and facts.

Finally, the defendants again point out that Plaintiff improperly compares Ms. Morris' situation with that of other nonblack potential jurors. First, Plaintiff compares Ms. Morris to those jurors who stated on their questionnaire that safety testing by manufacturers was inadequate. (Rec. Doc. 5609-2, p. 21 n. 100). Yet, Ms. Morris stated that such testing was "very inadequate," which was a different choice than the one selected by the other jurors Plaintiff identified. Ex. "B," p. 24. Plaintiff conveniently overlooks this "non-racial distinction" when alleging that the defendants possessed a discriminatory motivation. (Rec. Doc. 5609-2, p. 21). Also, as noted above, in the very next question on the questionnaire (Question 77) the potential jurors were asked if they think that corporations generally try to make their products safe. (*See* Rec. Doc. 5609-17, p. 25). Of the entire jury pool, only Mr. Franklin and Ms. Morris selected "No" as their answer. (Rec. Doc. 5609-17, p. 25); Ex. "B," p. 25. Thus, it is not surprising that a

---

undermined the Court's attempts to remedy the alleged *Batson* violation. (Rec. Doc. 5609-2, p. 7 n. 28). However, the parties agreed to split the cost to transport Ms. Morris to trial, as evidenced by counsel's sidebar comments on the second day of trial. (Rec. Doc. 5609-4, p. 5). Thus, the parties did what they could to ensure Ms. Morris' presence. That she did not show is no more an indictment of the defendants than it is of Plaintiff, who ostensibly agreed to pay for Ms. Morris' travel costs. Regardless, Ms. Morris' absence is most certainly not an indictment of the Court's efforts to remedy the alleged violation. The remedy was sufficient, and Ms. Morris' unilateral actions were random in nature and did not retroactively establish purposeful discrimination in the jury selection process.

strike was used on Ms. Morris (albeit, later withdrawn), who was one of only two potential jurors holding these two significantly adverse views.

Second, much like she did with respect to Mr. Franklin and Ms. Brown, Plaintiff fails to consider that the lengthy juror questionnaire responses were evaluated not in isolation, but as a whole. It was Ms. Morris' multitude of perceived bad answers, not a racial bias, that led to the original challenge. Third, Plaintiff cites Juror No. 4, Mr. St. Romain, as a nonblack prospective juror that shares many of the same characteristics of Ms. Morris. (Rec. Doc. 5609-2, p. 20—21). Though the Plaintiff questions why the defendants struck Ms. Morris and not Mr. St. Romain, the Plaintiff fails to remind the Court that the defendants <u>did in fact strike Mr. St. Romain</u> with the peremptory challenge they voluntarily withdrew from Ms. Morris. (Rec. Doc. 5609-3, p. 31). Considering all these facts, the defendants ask the Court to deny the challenge of Ms. Morris.

**6.       Plaintiff's Equal Protection Argument Regarding the Court's Remedy.**

As a final point, the defendants believe Plaintiff's argument about the Court's alleged improper remedy is misplaced. First, the entire argument is premised on the notion that the defendants improperly struck one or more of the jurors. As shown above, <u>none</u> of the jurors at issue were impermissibly struck. Thus, the argument that Mr. Franklin has had his Equal Protection rights violated is groundless.

Nevertheless, the defendants assert that the Court's action to remedy the *Batson* challenge was perfectly appropriate. *Batson* itself noted that an appropriate remedy when a juror is struck improperly was to replace the improperly struck juror back on the **<u>venire</u>**. 476 U.S. 79, 99 n. 24 (1986). *Batson* did not state that the improperly struck juror must be seated in the jury itself, but simply stated that the juror would go back into the pool of eligible jurors. *See id.* The Honorable Court in this case did exactly what *Batson* suggested – it put Mr. Franklin back on the

venire. It is incorrect to argue, as Plaintiff seems to do, that Mr. Franklin should have been reinstated on the jury itself. (Rec. Doc. 5609-2, p. 23). Furthermore, Plaintiff's Louisiana Supreme Court decisions are inapposite to this case. What the Louisiana Supreme Court may say about state-law violations of *Batson* has absolutely no bearing on this federal matter. The reality is that *Batson* gives this Honorable Court discretion to remediate an alleged violation, as Plaintiff recognized in her Motion. (Rec. Doc. 5609-2, p. 24). This Court used that discretion to fashion an appropriate remedy. What state courts may think of that remedy is totally irrelevant.

Based on this argument and the arguments presented above regarding the five jurors at issue, the defendants respectfully assert that Plaintiff's *Batson* challenge is meritless. They ask the Court to reject the Motion for New Trial and/or Motion for Relief for Judgment to the extent it alleges an Equal Protection violation under *Batson* and its progeny.

## III.   ALLEGED ERRORS REGARDING JURY INSTRUCTIONS

In addition to her *Batson* claims, Plaintiff makes the arguments that the jury's verdict, rendered four (4) hours following the eight (8) days of testimony, should be set aside on account of the alleged improper instruction of the jury by the Court on the government contractor defense and the alleged improper refusal of the Court to instruct the jury on the impact of a manufacturer's compliance with industry regulations under the ("LPLA"). Plaintiff fails to present any argument that would justify the relief sought in Plaintiff's Motion for New Trial under either of these theories.

A.   *Government Contractor Defense Instruction*

**1.   Standard for New Trial Based on Erroneous or Confusing Jury Instruction.**

It should be noted that Plaintiff fails to cite to any specific instruction given to the jury in this regard and thus it is presumed that Plaintiff takes issue with the entirety of jury instructions

pertaining to government contractor defense.  Plaintiff states in her Motion that a "new trial is sought on the ground that the jury rendered its verdict upon erroneous and confusing instructions regarding the government contractor defense."  (Rec. Doc. 5609-2, p. 2).  Nowhere in Plaintiff's Motion does Plaintiff actually present an argument that the government contractor instruction(s) that was/were given were actually erroneous in their recital of the law regarding the elements necessary to satisfy the defense.  Rather, it appears that Plaintiff's real argument is simply that the instruction(s) should not have been given based on the evidence presented and that this somehow led to confusion of the jury in rendering its verdict.  While Plaintiff spends several pages devoted to whether evidence and testimony was presented sufficient to justify application of the instruction(s), Plaintiff argues only summarily in three short sentences in her final paragraph on this topic that the giving of the instruction confused or improperly influenced the jury.

Plaintiff's burden on this argument is particularly difficult in light of the general verdict form used for the jury's verdict.  Where the general verdict does not indicate the exact basis of the jury's verdict in a product liability action that the manufacturer is not liable, it must be assumed that the jury could have found for the manufacturer on variety of reasons and not simply on the basis of objected-to evidence or other allegedly improper submissions – particularly where the challenged evidence (or instruction) is not the centerpiece of the manufacturer's defense.  *See Regions Bank v. BMW North America, Inc.*, 406 F.3d 978, 980-981 (8th Cir. 2005). This is an especially important consideration given that, in the jury charge conference held in chambers, Gulf Stream  requested that the government contractor defense be itemized on the jury verdict form; however, Plaintiff counsel objected on the ground that it was an affirmative defense.  The verdict form submitted was in accord with Plaintiff's position and did not have an

itemized entry for a finding on government contractor defense; rather, the form simply asked the jury to determine if Gulf Stream Coach, Inc. was liable for defective design, defective composition and/or failure to warn.[13]

Only if the trial judge's instructions to the jury, taken as a whole, give a misleading impression or inadequate understanding of the law and issues to be resolved is a new trial required. *See e.g. Bass v. International Brotherhood of Boilermakers*, 630 F.2d 1058, 1062 (5th Cir. 1980); and *Scheib v. Williams-McWilliams Co., Inc.,* 628 F.2d 509, 511 (5th Cir. 1980). A challenged instruction should not be considered in isolation but rather as part of an integrated whole. If, viewed in that light, the jury instructions are comprehensive, balanced, fundamentally accurate, and not likely to confuse or mislead the jury, the charge will be deemed adequate. *See Vezina v. Theriot Marine Services, Inc*., 544 F.2d 654 (5th Cir. 1977); s*ee also United States v. Gray*, 626 F.2d 494 (5th Cir. 1980); *Crador v. Louisiana Dept. of Highways*, 625 F.2d 1227 (5th Cir. 1980); and *Hlodan v. Ohio Barge Line, Inc.*, 611 F.2d 71 (5th Cir. 1980).

Even if an erroneous charge is given, a new trial is justified only if the error in giving the charge affected the outcome of the trial. *See First Act Inc. v. Brook Mays Music Co., Inc.*, 429 F.Supp.2d 429, 432 (D. Mass. 2006). Moreover, the error in giving the subject charge must be "so substantial that, viewed in light of the evidence in the case and charge as a whole, the instruction was capable of confusing and thereby misleading the jury." *See Steelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc*., 862 F.Supp. 1361,  1364 (E.D.Pa. 1994) (*affirmed in part, vacated in part on other grounds at* 63 F.2d 1267 (3rd Cir. 1995)). Allegations of an improperly given instruction must be considered with caution, especially where the jury has found for the non-movant on several issues. *See Brady v. Wal-Mart Stores*, Inc., 455 F.Supp.2d 157 (E.D.N.Y. 2006). A new trial should not be granted where plaintiff relies upon conclusory

---

[13]     Ex. "C," Trial Transcript 9/24/09, pp. 123-129.

argument and conclusory characterization of the evidence.  *See Warren v. Thompson*, 224 F.R.D. 236, 239-240  (D.D.C. 2004).

   **2.**    **Plaintiff Fails to Show a New Trial is Warranted for the Giving of a Government Contractor Instruction.**

    (a).   <u>Plaintiff's Argument is Procedurally Improper</u>

   Plaintiff's argument focuses nearly entirely on the assertion that the evidence presented at trial simply did not justify the application of the government contractor defense to Gulf Stream's position.  This was an issue, as Plaintiff recited in her Motion for New Trial, that Gulf Stream moved for by way of summary judgment before trial (unsuccessfully) and the Plaintiff moved for the striking of during trial (unsuccessfully).  As such, dealing with this concern in the context of a challenged jury instruction is not procedurally proper; rather, this is an issue more properly dealt with by Plaintiff on appeal or, at least, by way of reviewing the matter under the governing considerations applicable to summary judgments and/or directed verdicts under which context they were raised previously.  Plaintiff has basically presented this argument in a context that does not support it.  As such, Plaintiff's argument in this regard should fail.

    (b).   <u>Plaintiff Fails to Present Proof of Confusion/Misleading of the Jury</u>

   As is apparent from Plaintiff's Motion for New Trial addressing this argument, Plaintiff is unable to satisfy her substantial burden of proving that the objected-to instructions on the government contractor defense somehow unduly influenced or confused the jury and provided the basis for its verdict.  Plaintiff states in her Motion for New Trial that, based on questions submitted by the jury after deliberation commenced, "it appears they were intent on seeing evidence that FEMA's specifications as to the Alexander unit were violated by Gulf Stream" and that this "interest clearly related to the jury charge on the government contractor defense." (Rec. Doc. 5609-2, p. 33).  Without any citation to any specific questions, Plaintiff concludes that it is

"reasonable to conclude that the jurors considered Gulf Stream's compliance with FEMA specifications to be a key consideration in determining whether the affirmative defense applicable to government contractors was available to exonerate Gulf Stream." *Id.*

Plaintiff's pure speculation as a ground for new trial is completely without jurisprudential or statutory support.  Indeed, there are a variety of reasons that it is "reasonable to conclude" supported the jury's verdict – none of which have anything to do with the government contractor defense.  Both Plaintiff and Gulf Stream presented extensive expert testimony and evidence at trial regarding the sufficiency and safety of the design of the Alexander's travel trailer – separate and apart from issues of compliance with FEMA specifications (i.e. the long history of safe design over the past decades, the lack of personal injury complaints relating to travel trailers prior to this litigation, Plaintiff's actual use of the trailer, Plaintiff's lack of proof of medical causation, credibility determinations made by the jury, etc...).  Moreover, Plaintiff argued repeatedly through her counsel and experts that the "superior grade quality of workmanship" provision of the FEMA Model Travel Trailer Procurement Specifications (Trial Exhibit 165) was violated by Gulf Stream and, in addition, that the specifications contemplated multiple "activations and deactivations" of the trailer that the design failed to account for. *See* Ex. "D," FEMA Model Travel Trailer Procurement Specifications (Trial Exhibit 165). Plaintiff asked this jury to focus on the specifications and Gulf Streams alleged violation of them.

Further, there simply is no way, other than through pure and conclusory speculation, to state that the Plaintiff's verdict in favor of Gulf Stream on the design claim was influenced by the government contractor instruction(s).  The jury was extensively instructed on the duties and obligations of a manufacturer under the LPLA.  The verdict form itself, due to Plaintiff's request, did not have an itemized entry for government contractor defense but was rather a general

verdict form by which any number of defenses presented by Gulf Stream Coach, Inc. at trial could have justified and been the foundation for the jury's verdict.  In any event, the government contractor defense instruction was specifically limited (per Plaintiff's argument in chambers during the charge conference) to the "design defect" claims only and were not made applicable to the other LPLA theories advanced by Plaintiff (composition/construction and inadequate warning).  *See* Ex. "C," Trial Transcript 9/24/09, p. 108.  Gulf Stream prevailed on Plaintiff's claims under both defective composition/construction and inadequate warning without a government contractor defense.  It is therefore not only logical but more "reasonable to conclude" that the jury's verdict in favor of Gulf Stream was because the jury simply found nothing wrong with the travel trailer, not because the jury found applicable and applied the government contractor defense that itself only pertained to one of the three liability theories pursued by Plaintiff.

In fact, the jury also found in favor of co-defendant, Fluor, as to each of the Plaintiff's claims against it as well.  The government contractor defense was not part-and-parcel of Gulf Stream Coach, Inc.'s defense and was not the centerpiece of the defense to Plaintiff's design claim that Gulf Stream Coach, Inc. presented at trial.

(c).      Government Contractor Defense Instructions Were Justified

The Plaintiff also selectively cites portions of *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988), but leaves out those portions that are significant to this case.  In *Boyle*, the Supreme Court addressed the plaintiff's argument that the government contractor defense should apply only if the contractor did not participate, or participated only minimally, in the design of the defective product.  Holding that the plaintiff's proposition might be a reasonable general tort rule, the Court nonetheless noted that it was not sufficient to protect the federal interest involved:

> The design ultimately selected may well reflect a significant policy judgment by Government officials whether or not the contractor rather than those officials developed the design.

487 U.S. at 513.  The *Boyle* Court also noted that such government decisions often involve "judgment as to the balancing of many" factors, specifically including "social considerations". *Id*. at 511.

Here, the jury heard evidence from government officials that the government's initial choice was to deploy manufactured housing.  However, for a variety of social, economic, practical and other reasons, the government selected travel trailers.  *See* Ex. "E," Trial Transcript 9/22/09 (Testimony of Souza, pp. 191-193).  The government made this policy choice with full knowledge that travel trailers, like other forms of new construction, contain formaldehyde.  *See* Ex. "E," Trial Transcript 9/22/09 (Testimony of McNeese, pp. 211-213).

The Supreme Court in <u>Boyle</u> found the Federal Tort Claims Act exemption for "discretionary function" immunity instructive on the scope of the government contractor defense. 487 U.S. at 511.   The Supreme Court explained why the contractor is entitled to the benefits of the government's discretionary function immunity in these circumstances:

> It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.

487 U.S. at 512.  Here, the Court has <u>already determined</u>, in advance of trial and on an extensive record, that the federal government has immunity for its policy decision to use travel trailers. That analysis, as *Boyle* teaches, is directly relevant to the propriety of the government contractor defense asserted by Gulf Stream.

In support of their argument that the government's policy choice is not inconsistent with a separate tort-based duty, the Plaintiffs stretch to the breaking point, at page 30 of their

Memorandum, the *Boyle* court's analogy to the government's purchase of a stock air conditioner with a stated cooling capacity and absolutely no other specifications whatsoever.  In *Stout v. Bourg-Warner Corp.,* 933 F.2d 331 (5th Cir. 1991), the Fifth Circuit characterized the *Boyle* court's air conditioner example as one in which "the government was ***indifferent*** to the challenged design."  933 F.2d at 336, n. 1 (emphasis added)

The specifications here go much, much further.  The government did not indifferently order a stock "travel trailer."  The government issued its own specifications, and these called for a travel trailer "built to industry standards except where identified. . . "  *See* Ex. "D," FEMA Model Travel Trailer Procurement Specifications, p.1 (Trial Exhibit 165).  The specifications then go on for four pages listing a whole series of exceptions, modifications, and design parameters.  These specifically include the precise size of the travel trailer (recall, here, the Plaintiff's repeated emphasis at trial on the alleged design problem created by the "small area of air volume" inside the travel trailer), and specifically dictated that there were to be no "optional accessories," presumably because the government did not want to pay for them.  *Id*.  There was testimony at trial that a powerful ventilation fan offered by Gulf Stream, but specifically declined by the government both as a part of the procurement/specification process and afterwards, was such an "optional accessory."  *See* Ex. "F," Trial Transcript 9/15/09 (Testimony of Scott Pullin, pp. 304-305).

The Plaintiff presented a number of theories of "design defect" including the lack of a mechanical forced-air, fresh-air ventilation system; the use of allegedly available alternative building products, and the removal or replacement of the existing interior vinyl wall covering with an exterior vapor barrier located behind the studs of the travel trailer.

It was established at trial that none of these design modifications were feasible or were part of an industry standard travel trailer.  Any one or all of them might have been specified by the government in its extensive list of modifications to the industry standard design; none of them, in fact, were so specified.   The fatal flaw in the Plaintiffs' argument is that it falsely assumes that "industry standard" is a meaningless term, when in fact it was a carefully chosen term based on FEMA's years of experience with the product, and was made subject to a number of very specific modifications by FEMA.  *See e.g. In Re Air Disaster at Ramstein Air Base, Germany v. Lockheed Corp.*, 81 F.3d 570 (5th Cir. 1996) (history of selection and use of particular product without problems or complaints establishes right to assert government contractor defense); and *Smith v. Xerox Corp.*, 866 F.2d 135 (5th Cir. 1989) (holding similarly and that where, as here, products are returned into service the element of conformance is specifically satisfied under *Boyle*).  *See also* Ex. "E," Trial Transcript 9/22/09 (Testimony of David Garratt, p. 234; and Testimony of Stephen Miller, pp. 296-299).

The Plaintiff argues that the failure of the specifications to overtly reference "formaldehyde" makes the government contractor defense unavailable as a matter of law.  In the case of *In Re: Agent Orange Product Liability Litigation*, 517 F.3d 76 (2nd Cir. 2008), the plaintiffs also asserted that the government contractor defense was unavailable because the contracts contained no specifications with regard to dioxin, the alleged harmful chemical involved in that case.  The court held that this argument "misconceives the nature of what the contracts in question were about and defines the alleged defective design too narrowly."  The court held that the herbicide combination that produced the dioxin as a byproduct was the allegedly defective product, not the dioxin itself.  *Id.* at 517 F.3d at 89.  Similarly, the Plaintiff

contended at trial that the Gulf Stream travel trailer itself was defective, not the formaldehyde off-gassed from its wood products.

The *Agent Orange* court also rejected the plaintiffs' contention, also made here, that the government relied on the manufacturer's expertise. As the *Agent Orange* court pointed out, the Supreme Court's *Boyle* decision "explicitly contemplated government reliance on manufacturers' expertise in making a fully informed decision as to what to order." *Id.* at 91. The *Agent Orange* court held that even if the manufacturers had suggested the specifications or relied on "previously obtained industry expertise in doing so," the government nonetheless "exercises adequate discretion over the contract specifications to invoke the defense if it independently and meaningfully reviews the specifications such that the government remains the "agent[] of decision." *Id.* at 91 (citations omitted). Here, the record clearly established that the government itself issued the specifications to Gulf Stream and that the decision to use industry standard composite wood product-containing travel trailers was the government's decision.

The *Agent Orange* court also noted that where the government specifically assessed the alleged defect and made the decision to continue to order and use the product, the "reasonably precise specification" element of the *Boyle* test was met, concluding that "reordering the same product with knowledge of its relevant defects plays the identical role in the defense as listing specific ingredients, processes, or the like." 517 F.3d at 95-6.

Here, the evidence established that the government had done its own testing of formaldehyde concentrations in travel trailers long before it put the Alexander family into one, and concluded that they were viable temporary emergency housing options, particularly when combined with ventilation. The government recognized that the design specification of EHUs was a <u>government</u> responsibility, and the assessment and response to the formaldehyde issue was

a <u>government</u> responsibility.  *See* Ex. "E," Trial Transcript 9/22/09 (Testimony of David Garratt, pp. 216, 218, 230-231, 233; and Testimony of Stephen Miller, pp. 296-299). The *Agent Orange* court concluded:

> The government made an express determination, based on the knowledge available to it at the time, that Agent Orange as then being manufactured posed no unacceptable hazard for the war time uses for which it was intended, and that the product should continue to be manufactured and supplied to it.  In light of this exercise of discretion, we read <u>Boyle</u> to require displacement of any alleged state law rules to the contrary.

517 F.3d at 96-7.

The Plaintiff doesn't even argue the second and third prongs of the *Boyle* test.  We simply note that there was, at best for the Plaintiff, conflicting evidence on whether or not the Alexander travel trailer met the government specifications, and whether or not the government had an equal or superior awareness of the alleged risks of formaldehyde.

Notably, courts (like the *Agent Orange* court) have often held that the government contractor defense applies to similar fact scenarios as a matter of law.  Here, the Court ruled before trial and during trial that the issue was for the jury to decide.  There was certainly sufficient evidence to go to the jury on each of the elements of the government contractor defense.  Whether those elements were or were not met is a fact issue for the jury.  *See Boyle* (*supra*), 487 U.S. at 514 (". . . whether the facts established the conditions for the defense is a question for the jury.")

Plaintiff has simply failed to demonstrate that the giving to the jury of the instruction(s) pertaining to government contractor defense was either (a) inappropriate or (b) impermissibly influential or confusing to the jury in its deliberation and in rendering the verdict in favor of Gulf Stream Coach, Inc.  As such, Plaintiff's Motion for New Trial on this ground should be denied.

B.   _Failure to Give Jury Instruction on Compliance With Industry Regulations_

   1.          **Standard for New Trial Based on Failure to Give Instruction**

Plaintiff argues that the court erred in failing to give Plaintiff's requested charge that compliance with industry regulations, for the purposes of a defective design claim, does not excuse unreasonable behavior.  Where a plaintiff seeks a new trial on the ground of an asserted error in refusing to give a jury instruction, the court may only grant such a request where the movant "can demonstrate that the jury instructions actually given were fatally flawed and that the requested instruction was proper and could have corrected the flaw."  *See e.g. Biodex Corp. v. Loredan Biomedical, Inc*., 946 F.2d 850, 862 (Fed. Cir. 1991); *LNP Engineering Plastics, Inc. v. Miller Waste Mills, Inc.,* 77 F.Supp.2d 514, 546 (D.Del. 1999) (*affirmed in part, reversed in part on other grounds at* 275 F.3d 1347 (Fed. Cir. 2001)).  Moreover, the simple refusal by the trial court to give a requested charge by the plaintiff will not provide grounds for a new trial where the instructions actually given "fairly presented plaintiff's principal contentions and law applicable thereto" such that it is not necessary that trial judge instruct jury by outlining plaintiff's theory as opposed to issuing allegedly "bare bones" charges.  *See Jackson v. Shell Oil Co.*, 401 F.2d 639, 643 (6th Cir. 1968).  Where the charges given the jury, as a whole, "adequately cover the duty" of the defendant, new trial is not warranted on theory of failure to give a requested charge.  *See Strauss v. Delta Air Lines, Inc*., 266 F.Supp.  559, 564 (D.C.Pa. 1967).

Plaintiff fails in her Motion for New Trial to demonstrate that this Court's refusal to give the single requested jury instruction on compliance or lack thereof with industry regulations somehow impermissibly misled the jury into rendering an improper verdict that was against the

clear weight of the evidence and testimony presented or that the jury's verdict would have somehow been different had her single requested charge been given.

>    2.    **Plaintiff Fails to Show New Trial Warranted for Refusal of Trial Court to Give Requested Charge Regarding Industry Regulations.**

Plaintiff's argument on this issue fails from the outset.  Plaintiff's argument makes it obvious that Plaintiff has not considered the jury instructions given as a whole as required under the jurisprudence cited above.  It is not clear from Plaintiff's Motion for New Trial just how the trial court's refusal to give one singular charge to the jury somehow tainted the jury's deliberation and verdict.  Rather, Plaintiff has made the same purely conclusory argument, completely devoid of citation or support to any proof thereof, that it is "reasonable to conclude that the verdict was based upon a determination that, since no departure from industry standards was established by plaintiff, the Alexander trailer was 'not unreasonably' dangerous for the purposes of the defective design claim." (Rec. Doc. 5609-2, p. 36).  For several reasons, Plaintiff's argument is without merit.

First, it is quite reasonable to conclude, contrary to plaintiff's naked assertion above, that the jury found in favor of Gulf Stream on the defective design claim not due to evidence of compliance with industry standards but, more likely, due to the myriad other evidence presented at trial by Gulf Stream and/or lack thereof presented by Plaintiff on such other items as the travel trailer's safe and reasonable design completely outside the context of industry regulations, the lack of evidence of past problems of this sort despite decades of similar design and manufacture processes, the lack of expert testimony establishing an actual defect in the travel trailer, the lack of testimony or evidence establishing medical causation and/or credibility problems exhibited by

numerous witnesses called at trial by Plaintiff.  Any and/or all of these, or others, solely or in combination are more plausible explanations for the jury's verdict on the defective design claim.

Second, nowhere in the LPLA can be found the charge as Plaintiff has presented it.  This suggested charge of Plaintiff was a charge solely requested in support of one theory pursued by Plaintiff but does not find support in any statutory section under the LPLA.  Plaintiff pursued Gulf Stream under three (3) different sections of the LPLA (design defect, failure to warn and composition/construction defect).  The jury was instructed and charged for approximately eight (8) pages as to the precise duties, obligations and liabilities imposed upon manufacturers (such as Gulf Stream) under all three of the product liability theories pursued by Plaintiff.  *See* Ex. "C," Trial Transcript 9/24/09, pp. 94-101.  It is noteworthy to point out that Plaintiff does not suggest or imply that the charges actually given did not "fairly present plaintiff's principal contentions and law applicable thereto."  Indeed, Plaintiff fails to even assert the threshold requirement that the charges given were "fatally flawed and that the requested instruction was proper and could have corrected the flaw."

In fact, on this point, <u>none</u> of the cases cited by Plaintiff in her Motion for New Trial on this topic (pp. 34-35 thereof) consider the failure of a trial court to give a jury charge on industry regulation compliance in a product liability case governed by the LPLA.  *Southern Natural Gas Co. v. Gulf Oil Corp.*, 320 So.2d 917 (La. App. 3 Cir. 1975), was a non-jury maritime negligence case, long pre-dating the LPLA and did not pertain at all to the giving (or refusal thereto) of jury charges regarding industry regulation compliance and its effect on claims against manufacturers under the LPLA.  *Corley v. Gene Allen Air Service, Inc.*, 425 So.2d 781 (La. App. 3 Cir. 1982), is also a pre-LPLA negligence case that was under consideration in the context of a defendant's motion for summary judgment and had no discussion of the propriety of instructing a jury on

industry regulation compliance and that effect on claims against manufacturers under the LPLA. *Hopper v. Crown*, 646 So.2d 933 (La. App. 1 Cir. 1994), was also a pre-LPLA case and had nothing to do with the propriety of instructing a jury on industry regulation compliance and that effect on claims against manufacturers under the LPLA. *Bonnette v. Conoco, Inc*., 801 So.2d 501 (La. App. 3 Cir. 2001) was a non-LPLA negligence matter decided by the trial court without a jury and so thus clearly gave no discussion of the propriety of instructing a jury on industry regulation compliance and that effect on claims against manufacturers under the LPLA. Plaintiff fails to cite one federal or state case wherein it was held that in a product liability action, such as one against a manufacturer under the LPLA, a jury should be instructed regarding industry regulation compliance and/or that the failure to do so creates reversible error.

Third, Plaintiffs provide no citation for the "questions" submitted by the jury after their deliberations began that would support a new trial under this assigned error. Moreover, there is nothing alleged by Plaintiff that the verdict form utilized by the jury provided a liability exemption for compliance with industry standards (nor is there such itemization on the verdict form). As such, it is simply impossible to discern any support for the Plaintiff's argument that the omission of this singular charge led to a reversible jury verdict.

Plaintiff has failed to demonstrate to this Court that she has satisfied the considerable burden sufficient to warrant a new trial on the ground that this Court refused to instruct the jury on this singular charge as regards her claim against Gulf Stream and, as such, Plaintiff's Motion for New Trial in this respect should be denied.

**IV.   CONCLUSION**

Based upon the foregoing reasons, Gulf Stream Coach, Inc. respectfully submits that

Plaintiff's Motion for New Trial should be denied.

Respectfully Submitted:

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER & WEINSTOCK**

s/Andrew D. Weinstock

_____

**ANDREW D. WEINSTOCK #18495
JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
(504) 832-3700
andreww@duplass.com
jglass@duplass.com

and

**SCANDURRO & LAYRISSON
Timothy D. Scandurro #18424
Dewey M. Scandurro #23291**
607 St. Charles Avenue
New Orleans, LA 70130
(504) 522-7100
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc.**

**C E R T I F I C A T E**

I hereby certify that on the 12th day of November, 2009, a copy of the foregoing Gulf Stream Coach Inc.'s Opposition to Plaintiff's Motion for New Trial, or Alternatively, Motion for Relief from Judgment, was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com
