Page 172

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER        *   Docket MDL 1873 "N"
FORMALDEHYDE PRODUCTS       *
LIABILITY LITIGATION        *   New Orleans, Louisiana
                            *
THIS DOCUMENT IS RELATED TO: *  September 22, 2009
                            *
CHARLIE AGE, ET AL V        *   1:30 P.M.
GULF STREAM COACH, INC.,    *
ET AL, DOCKET NO. 09-2892;  *
ALANA ALEXANDER, INDIVIDUALLY *
AND ON BEHALF OF            *
CHRISTOPHER COOPER          *
* * * * * * * * * * * * * * * *

                      DAY 7
                AFTERNOON SESSION
        JURY TRIAL PROCEEDINGS BEFORE THE
          HONORABLE KURT D. ENGELHARDT
          UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Plaintiffs:        Gainsburgh, Benjamin, David,
                             Meunier & Warshauer
                           BY:  GERALD E. MEUNIER, ESQ.
                           1100 Poydras Street
                           Suite 2800
                           New Orleans, Louisiana 70163


                           The Buzbee Law Firm
                           BY:  ANTHONY G. BUZBEE, ESQ.
                           JP Morgan Chase Tower
                           600 Travis, Suite 7300
                           Houston, Texas  77002


        JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
            UNITED STATES DISTRICT COURT

Page 191

13:57  1   between living in a tent and moving into more permanent

13:57  2   housing?

13:57  3   A.   Yes.

13:57  4   Q.   Mr. Souza, my name is Henry Miller and I represent the

13:57  5   United States, which is a defendant in this litigation.

13:57  6        You were just asked some questions about FEMA's plan

13:57  7   at the time of the response and how this included sort of a

13:57  8   three-prong approach.

13:57  9        Were travel trailers FEMA's initial choice for the

13:57  10  temporary emergency housing, or were there alternative housing

13:57  11  methods that were considered?

13:57  12  A.   We had talked about using manufactured homes or mobile

13:57  13  homes as -- as the initial going-in position.

13:57  14  Q.   Was a decision made -- well, what was decided?

13:57  15  A.   The decision was made to use travel trailers as opposed to

13:58  16  mobile homes.

13:58  17  Q.   Were you involved with that decision-making process?

13:58  18  Actually, let me rephrase it.

13:58  19        Do you have -- did you -- do you have knowledge of

13:58  20  that decision-making process?

13:58  21  A.   Yes.

13:58  22  Q.   And how do you have that knowledge?

13:58  23  A.   As part of the housing area command, there were

13:58  24  discussions about what types of units we could use and where we

13:58  25  could place them.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

Page 192

```
13:58  1   Q.   And what is your understanding why the decision was made
13:58  2   to use travel trailers as opposed to manufactured housing or
13:58  3   mobile homes as the primary temporary emergency housing
13:58  4   response for Hurricane Katrina victims and Hurricane Rita
13:58  5   disaster victims?
13:58  6   A.   My recollection was that we were going to use mobile
13:58  7   homes.  But because of the size of the mobile homes and the
13:58  8   quantity in which we needed them, the areas available to us to
13:59  9   put those mobile homes were outside of the impacted areas.
13:59  10            In other words, they were outside of the areas of New
13:59  11  Orleans, and really not even a practical solution in the
13:59  12  immediate vicinity of Baton Rouge.  They would have to be
13:59  13  probably even further north than that.
13:59  14            And when we made this proposal to the State, concerns
13:59  15  were raised that people wanted to live closer to their impacted
13:59  16  homes, if they were homeowners, so that they could begin making
13:59  17  immediate repairs.  There were concerns that rebuilding the
13:59  18  community in terms of businesses and economic stability and
13:59  19  reinvigorating the economy, that putting people that far away
13:59  20  from those impacted areas would not be a preferrable solution.
13:59  21  Q.   Were there discussions about the effects that this may
14:00  22  have on the future demographics of New Orleans?  Population
14:00  23  makeup of New Orleans?
14:00  24  A.   There were discussions about demographics, but I don't
14:00  25  specifically recall whether or not they were in regards to the
```

| | | |
|---|---|---|
| 14:00 | 1 | mobile home or travel trailer discussion versus people moving |
| 14:00 | 2 | out of the state discussion. |
| 14:00 | 3 | Q.   Was there a concern that if you used mobile homes as |
| 14:00 | 4 | opposed to travel trailers, that many of the people, because |
| 14:00 | 5 | they'd have to be placed farther away from New Orleans or Baton |
| 14:00 | 6 | Rouge, that they may not eventually move back to New Orleans? |
| 14:00 | 7 | A.   Yes, there were those concerns. |
| 14:00 | 8 | THE COURT:  Is that it, Counsel? |
| 14:00 | 9 | MR. MEUNIER:  Your Honor, may we approach the bench? |
| 14:00 | 10 | THE COURT:  Yes, please. |
| 14:00 | 11 | (WHEREUPON, the following proceedings were held at |
| 14:00 | 12 | the bench.) |
| 14:01 | 13 | MR. WEINSTOCK:  About the Henry Miller introduction |
| 14:01 | 14 | would you just make an announcement that this deposition was |
| 14:01 | 15 | taken in another case. |
| 14:01 | 16 | THE COURT:  We have two problems.  The first one was |
| 14:01 | 17 | maintenance, which the second one was the Henry Miller thing. |
| 14:01 | 18 | And you-all were picking these segments. |
| 14:01 | 19 | MR. MEUNIER:  I know.  And I don't think it was done |
| 14:01 | 20 | intentionally, Your Honor. |
| 14:01 | 21 | What I would suggest is that Henry says, "A |
| 14:01 | 22 | defendant in the litigation."  Could you instruct the jury that |
| 14:01 | 23 | while the United States may be a defendant in other litigation |
| 14:01 | 24 | involving FEMA trailers, that it is not a defendant in this |
| 14:01 | 25 | case. |

14:28  1   never, to my knowledge, got a complaint back from them again.

14:28  2   Q.   And the older units would be, for example, units from the

14:28  3   2004 hurricanes in Florida?

14:28  4   A.   Or from any other disasters.  But prior to Katrina-type

14:28  5   units, yes.

14:28  6   Q.   So some of the swapout units were, in fact, from the 2004

14:28  7   hurricanes in Florida; is that right?

14:28  8   A.   That's probably true, yes.

14:28  9   Q.   And you're not aware of any follow-up problems in those

14:28 10   2004 units once they were swapped out, from a formaldehyde

14:28 11   standpoint?

14:28 12   A.   I'm not aware of any, that's correct.

14:28 13   Q.   Also in McNeese 7 you refer under No. 3 to the fact that:

14:29 14   "It is a given that the materials used in the construction of

14:29 15   mobile homes and travel trailers, in addition to other

14:29 16   residential structures, contain formaldehyde."

14:29 17               Do you see that?

14:29 18   A.   I do.

14:29 19   Q.   It was no surprise to you that there was some formaldehyde

14:29 20   in these travel trailers, was it?

14:29 21   A.   No, it was not.

14:29 22   Q.   And, in fact, you're generally aware that there is also

14:29 23   formaldehyde not only in travel trailers, but in mobile homes

14:29 24   and in stick-built residential structures; is that right?

14:29 25   A.   That's correct.

14:29  1    Q.    In some of the documents that we looked at this morning, I

14:29  2    noted that you made references to the fact that there were no

14:29  3    standards -- residential indoor air standards that FEMA could

14:29  4    look to for guidance.

14:29  5              Do you recall having that concern at the time?

14:29  6    A.    I do --

14:29  7    Q.    Could you --

14:29  8    A.    -- recall that.

14:30  9    Q.    -- elaborate on what -- what your reaction was to learning

14:30 10    that there were, in fact, no standards that FEMA could look to

14:30 11    regarding residential indoor air quality and formaldehyde?

14:30 12    A.    Well, it was quite a while ago.  But the main challenge --

14:30 13    that's your word -- the main challenge we had was that it

14:30 14    didn't give us a baseline for determining what was good and

14:30 15    what was bad.  So that was one of the reasons we had to do the

14:30 16    EPA testing, was so that we could at least establish what is a

14:30 17    baseline of what is in the units, you know.

14:30 18              But it's not really FEMA's job to set an indoor air

14:30 19    quality standard for anyone or an external air quality standard

14:30 20    since we're not a standard-making company.

14:30 21    Q.    Was that something that you wished you had had when this

14:30 22    whole business started, was a standard that you could look to

14:31 23    and evaluate these trailers against?

14:31 24    A.    Well, it would at least have given us a gauge of whether

14:31 25    the units were in compliance with something or not.  Whereas,

14:31  1    today they're totally in compliance with voluntary standards at

14:31  2    this point in time.

14:31  3    Q.   Were you generally aware then that the specifications to

14:31  4    which these travel trailers were built didn't say anything

14:31  5    about formaldehyde or formaldehyde levels or formaldehyde

14:31  6    testing?

14:31  7    A.   In general that's correct, yes.

14:31  8    Q.   And the reason I'm asking these questions is, I think what

14:31  9    I heard you to say -- and I may be wrong about this -- but you

14:31  10   indicated that if there was a problem in one unit, you thought

14:31  11   it was a problem possibly in all units.

14:31  12            And at this point in time, was it your understanding

14:31  13   or belief that you had a formaldehyde problem in all of these

14:31  14   118,000 units that were out there?

14:31  15   A.   No, that's not true.

14:32  16   Q.   Did they ask to -- did the representatives of Gulf Stream

14:32  17   Coach ask to participate in this testing?

14:32  18   A.   Yes, they did.

14:32  19   Q.   And are you aware that that happened?

14:32  20   A.   I am aware, yes.

14:32  21   Q.   Were they allowed to participate in the testing?

14:32  22   A.   No.

14:32  23   Q.   Do you have any idea following Hurricanes Katrina and Rita

14:32  24   how many individuals were transitioned through the federal

14:32  25   government through evacuation processes to other cities or

14:35   1            What is the significance of that statement in this

14:35   2    declaration?

14:35   3    A.    Other than, again, painting the picture of -- of how we

14:35   4    provide these units and the conditions under which they're

14:35   5    provided to disaster victims.

14:35   6    Q.    So, in your mind, is it important to note that the victims

14:35   7    have received something at cost -- at no cost to them, and

14:35   8    they've not been required to pay any costs associated with the

14:35   9    installation, maintenance, or removal of the units?

14:35 10            Does that mean that they should have no right to

14:35 11    complain about what they received?

14:35 12    A.    No.    What it means is these units are our responsibility.

14:35 13    Q.    So this statement, basically, means -- what you're trying

14:35 14    to convey -- is that this is FEMA's responsibility. It has no

14:35 15    other -- no other meaning besides that?

14:35 16    A.    That's correct.

14:35 17    Q.    I'm trying to get to -- this -- this particular statement,

14:35 18    and you've just testified -- is this to say that FEMA has the

14:36 19    authority due to the Stafford Act, to provide and to -- to

14:36 20    respond to disasters, in this particular instance, to provide

14:36 21    temporary emergency housing assistance to victims?

14:36 22    A.    Yes.

14:36 23    Q.    What was your understanding in June of 2006 of how the

14:36 24    Gulf Coast recovery office was responding to air quality

14:36 25    complaints?

14:37  1   A.   My under- -- my understanding is that the maintenance and

14:37  2   deactivation contractors were, in general, doing a pretty good

14:38  3   job of responding to the slew of complaints or concerns that

14:38  4   occupants were calling in, this being one among many.

14:38  5          And I have, at least to this date, no reason to

14:38  6   believe that they were not executing the provisions of the

14:38  7   contract in meeting their performance requirements.

14:38  8   Q.   This statement says that:  "As a result, FEMA has been

14:38  9   committed to providing applicants and consumers with

14:38 10   information on health and safety issues regarding manufactured

14:38 11   housing units, including formaldehyde levels in these units.

14:38 12          Do you know specifically what was the communication

14:38 13   given to Alana Alexander and the unit that she occupied?

14:38 14   A.   I don't -- I don't know who Alana Alexander is.

14:38 15   Q.   So that through this change in strategy, again, informed

14:38 16   by the experience of Katrina, FEMA does not plan to rely on

14:39 17   travel trailers, for example, as a primary means of providing

14:39 18   emergency assistance for housing?

14:39 19   A.   That's accurate.  We do not plan to rely on travel

14:39 20   trailers as the primary means.  We will still use travel

14:39 21   trailers under a unique set of circumstances.

14:39 22   Q.   Right.

14:39 23          Much more limited than those which -- under which the

14:39 24   travel trailers were used after Katrina, obviously?

14:39 25   A.   That is correct.  Prior to Katrina, we used all

14:56   1   standards.  And they simply were either not available or there

14:56   2   were a number of different standards, and no one was able to

14:56   3   point at one and say, that is the standard that you need to

14:56   4   use.

14:56   5   Q.   Right.

14:56   6            Prior to that change, did -- was it the prevailing

14:56   7   view, at least in your view, that the con- -- that the

14:56   8   manufacturers were, in fact, providing units that complied with

14:56   9   the required safety standards for formaldehyde?

14:56  10   A.   It was our understanding that the manufacturers were, if

14:56  11   they were producing mobile homes or manufactured housing,

14:57  12   producing units that complied with HUD standards.

14:57  13   Q.   Uh-huh.

14:57  14   A.   For those who were not producing manufactured housing,

14:57  15   they were producing park models or travel trailers, which are

14:57  16   recreational vehicles, that met or exceeded industry standards,

14:57  17   since there were no federal standards that applied to -- there

14:57  18   were no HUD standards that applied to that construction at the

14:57  19   time that those units were purchased for Hurricane Katrina.

14:57  20   Q.   But do you agree with the suggestion that the industry

14:57  21   sources for these products should also be looked to as -- as

14:57  22   sharing in the responsibility for the formaldehyde issues?

14:57  23   A.   Well, I would say anyone involved in -- in this should

14:57  24   share responsibility.  But let's keep in mind, if what they

14:57  25   were producing were units that were built to meet or exceed

                 JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF LOUISIANA

14:57 1  industry standards, and that that's what your contracts

14:57 2  required, and they did, then they were meeting their contract

14:57 3  obligations.

14:57 4         So in terms of responsibility, yes, we all share some

14:58 5  responsibility.  With regard to these particular units,

14:58 6  manufacturers share the responsibility for the construction of

14:58 7  the units and whatever guidance they provide regarding its use.

14:58 8         But it's our responsibility, as the purchasers and

14:58 9  subsequent providers of those units to the disaster population,

14:58 10  to be -- to own up to and be responsible for those units from

14:58 11  that point on, at least in terms of dealing with the needs and

14:58 12  the concerns of the occupants of the units that we own and have

14:58 13  provided to them.  So I'd say it's a shared responsibility.

14:58 14  Q.   And you certainly wanted to -- you wanted to -- you would

14:58 15  rely on the manufacturer of a travel trailer, for example, to

14:58 16  furnish a product that would be safe for long-term residence

14:58 17  knowing that these travel trailers, which as you say are

14:58 18  recreational vehicles, were going to be used for long-term

14:58 19  residence.

14:59 20  A.   I would suggest that the responsibility of the

14:59 21  manufacturers would be to meet the terms of whatever

14:59 22  performance specifications that we ask them to meet with the

14:59 23  contracts that we awarded to them.

14:59 24  Q.   Did you specify anything in those contracts that was

14:59 25  directed to long-term residence or occupancy of a unit

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

15:00  1    determination."  Correct?

15:00  2    A.   Correct.

15:00  3    Q.   Are you suggesting there that the entities which have the

15:00  4    expertise and capability to render authoritative determinations

15:01  5    of the safety of those units would be the manufacturers?

15:01  6    A.   No.

15:01  7    Q.   Who -- who would it be, if not them and if not FEMA?

15:01  8    A.   Well, I would -- we believed -- or I believed that this --

15:01  9    establishing federal standards is a federal responsibility, and

15:01  10   it belongs within the bailiwick of whatever agency was most

15:01  11   appropriate.

15:01  12          I would have voted for EPA and/or CDC to be

15:01  13   establishing what are appropriate standards for -- for what is

15:01  14   safe in the terms of formaldehyde exposure levels.

15:01  15          I do not think that it's the industry's

15:01  16   responsibility to develop federal standards.  I think that's a

15:01  17   federal responsibility.

15:01  18   Q.   As of September the 1st, 2005, when you walked into the

15:01  19   Katrina situation, did you have any reason to believe that

15:02  20   travel trailers were going to be a problem?

15:02  21   A.   From a formaldehyde --

15:02  22   Q.   From a formaldehyde standpoint.

15:02  23   A.   None whatsoever.

15:02  24   Q.   Can you talk a little bit about why FEMA used travel

15:02  25   trailers by the thousands, both prior to Hurricane Katrina and

| | | |
|---|---|---|
| 15:02 | 1 | during the Hurricane Katrina response? |
| 15:02 | 2 | A.   They were the preferred direct temporary housing product |
| 15:02 | 3 | because of their -- because of their size, because we could |
| 15:02 | 4 | move them in and set them up quickly. |
| 15:02 | 5 | I think 80 percent of the units that we provided in |
| 15:02 | 6 | response to Hurricanes Katrina and Rita were on individuals' |
| 15:02 | 7 | private property.  Typically, we put travel trailers on private |
| 15:02 | 8 | property, or often, because we can't fit anything else on that |
| 15:03 | 9 | private property.  We simply can't accommodate a mobile home on |
| 15:03 | 10 | the driveway. |
| 15:03 | 11 | So they were used because, number one, they filled a |
| 15:03 | 12 | need that could not be met any other way. |
| 15:03 | 13 | Two, they were inexpensive compared to a mobile home. |
| 15:03 | 14 | Three, they allowed people to stay at their property |
| 15:03 | 15 | and rebuild their home, as opposed to relocating them to a |
| 15:03 | 16 | community site that might be miles away and might be far more |
| 15:03 | 17 | expensive to build. |
| 15:03 | 18 | So a number of reasons, I think, contributed to the |
| 15:03 | 19 | use of travel trailers and their popularity, at least within a |
| 15:03 | 20 | certain segment of the disaster population on those small |
| 15:03 | 21 | properties and wanted to stay on their property and rebuild |
| 15:03 | 22 | their home. |
| 15:03 | 23 | Q.   Am I also correct that during the prior natural disaster |
| 15:03 | 24 | events that we talked about prior to Hurricane Katrina, can we |
| 15:03 | 25 | assume that there were young children and elderly people and |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

16:33  1    In Paragraph 10, five lines from the bottom of

16:33  2 Paragraph 10, Mr. Payne makes the statement in his declaration:

16:34  3 "Further, I informed him -- and "him" is a Bronson Brown, with

16:34  4 the FEMA safety office -- further, I informed him that OSHA had

16:34  5 conducted follow-up testing to confirm that ventilation and

16:34  6 airing out the units was a sufficient response action.

16:34  7    "That testing confirmed that airing out and venting

16:34  8 units for a short time reduced formaldehyde levels below OSHA

16:34  9 PELs, and those results were shared at regular JFO meetings and

16:34  10 also posted on the OSHA website."

16:34  11    Do you see that?

16:34  12 A. I do see that.

16:34  13 Q. And in Paragraph 11, Mr. Payne says:  "In addition, I

16:34  14 further informed Mr. Brown that formaldehyde levels in units

16:34  15 should be relatively low once they were handed over to the

16:34  16 public.  This is because by the time the unit is issued to a

16:34  17 disaster victim, the unit will have had an opportunity to air

16:34  18 out and vent as a result of contractor making the unit ready

16:34  19 for occupancy."

16:34  20    Do you see that?

16:34  21 A. Yes, sir.

16:34  22 Q. I'm going to mark an e-mail as Miller No. 22 and ask you

16:35  23 to take a look at that.

16:35  24    This is a May 11, 2006, e-mail from Kurtis Melnick to

16:35  25 Marvin Dickerson.  And do you see you're cc'd on that e-mail?

```
16:35   1    A.   Yes, sir.

16:35   2    Q.   Who is Kurtis Melnick?

16:35   3    A.   Kurtis Melnick and I work together.  He is a log chief

16:35   4    down in New Orleans now.

16:35   5    Q.   Looking at the e-mail in the third paragraph, Mr. Melnick

16:35   6    is talking about the procedure for removing formaldehyde odor

16:35   7    from a temporary housing unit that's been sitting in the sun.

16:35   8    Do you see that?

16:35   9    A.   Yes, sir.

16:35  10    Q.   He says:  "The procedure for this is opening the windows

16:35  11    and possibly the door for a day or two, or until the odor is

16:36  12    completely gone.  In Louisiana, this has been the job of the

16:36  13    contractors, or it -- or it has occurred that someone from IA

16:36  14    enters a trailer and notices the odor, then they have also been

16:36  15    opening the windows.  This should, however, be the

16:36  16    responsibility of the contractors."

16:36  17            Do you see that?

16:36  18    A.   Yes, sir.

16:36  19    Q.   Was that your understanding of what the contractors and/or

16:36  20    the IA personnel were doing in the field when they set these

16:36  21    trailers up?

16:36  22    A.   That is pretty much my understanding.

16:36  23    Q.   And if you look down in the last paragraph, Mr. Melnick

16:36  24    says:  "Our current method of having the contractors who make

16:36  25    the units RFO -- is that "ready for occupancy"?
```

Page 298

```
16:36   1    A.   Yes, sir.

16:36   2    Q.   -- seems to be satisfying any concerns from the applicants

16:36   3    we are housing."

16:37   4         Do you see that?

16:37   5    A.   Yes, sir.

16:37   6    Q.   Do you agree with that statement based on your experience

16:37   7    at that time?

16:37   8    A.   I think at -- at that time during early May of 2006, that

16:37   9    the number of complaints and the resolution by airing it out --

16:37   10   by the contractor making it -- was -- was satisfying the

16:37   11   applicants.

16:37   12   Q.   And, again, the contractors we're talking about here are

16:37   13   the contractors who are actually installing the units on-site?

16:37   14   A.   That is correct.

16:37   15   Q.   It would not be a manufacturer like Gulf Stream?

16:37   16   A.   No, sir.

16:37   17   Q.   When you worked the Florida hurricanes in 2004, did you

16:37   18   actually go to Florida at any -- for any of those four storms

16:37   19   you described earlier?

16:37   20   A.   I -- I was -- I was in Florida.

16:37   21   Q.   So you were in Florida at the end of 2004?

16:37   22   A.   Yes, sir.

16:38   23   Q.   Okay.  Were you made aware of any formaldehyde claims by

16:38   24   residents of the THUs in Florida?

16:38   25   A.   I do not recall any formaldehyde claims out of Florida --
```

16:38    1    Q.    Okay.

16:38    2    A.    -- that I'm aware of.

16:38    3    Q.    Are you aware of the fact that Gulf Stream sold

16:38    4    approximately 7,000 travel trailers to FEMA on the Florida

16:38    5    disaster?

16:38    6    A.    I -- I'm not sure of the number, but I do know that they

16:38    7    did sell -- we had quite a number of the spec models.

16:38    8    Q.    And as far as your experience in Florida was concerned,

16:38    9    there was no formaldehyde problem or issue with any of those

16:38   10    Gulf Stream travel trailers in 2004?

16:38   11    A.    That is correct.

16:38   12    Q.    Mr. Miller, we are going to mark the next exhibit as

16:38   13    Miller No. 24.

16:38   14           Mr. Miller, this is an e-mail that appears to be from

16:38   15    a Judith Reilly, to a David Chawaga.  If you look down at the

16:39   16    e-mail, it's dated April 14th of '06, from Judith Reilly to

16:39   17    Bronson Brown.

16:39   18           Again, Bronson Brown is with -- also with FEMA?

16:39   19    A.    Yes, sir.

16:39   20    Q.    Cc'd to David Chawaga, again, dated April 14th, '06.

16:39   21    There's a discussion of formaldehyde test results.

16:39   22           Do you see that?

16:39   23    A.    Yes, sir.

16:39   24    Q.    Do you have any idea what formaldehyde test results these

16:39   25    individuals are referring to in April of 2006?