# Transcript of the Testimony of
# Videotaped Deposition of Heath Allen

**Date taken: August 5, 2009**

In Re: FEMA Trailer Formaldehyde Products Liability Litigation

**\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

EXHIBIT 13

### Page 1

```
            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER          MDL NO. 1873
        FORMALDEHYDE PRODUCTS  SECTION N(4)
        LIABILITY LITIGATION   JUDGE ENGELHARDT

                     *   *   *

          VIDEOTAPED DEPOSITION OF HEATH
ALLEN, NO. 21 RED BIRD, ANGOLA, LOUISIANA
70712, TAKEN AT THE OFFICES OF MIDDLEBERG,
RIDDLE & GIANNA, 450 LAUREL STREET, SUITE
1101, BATON ROUGE, LOUISIANA 70801, ON THE
5TH DAY OF AUGUST, 2009.


REPORTED BY:
    CATHY RENEE' POWELL, CCR
    PROFESSIONAL SHORTHAND REPORTERS
    (504)529-5255
VIDEOGRAPHER:
    MICHAEL BERGERON
    PROFESSIONAL SHORTHAND REPORTERS
    (504)529-5255
```

### Page 2

```
 1   APPEARANCES:
 2
     HILLIARD MUÑOZ GUERRA
 3   (BY: REYNALDO A. PEÑA, ESQUIRE)
     719 S. SHORELINE BLVD., # 500
 4   CORPUS CHRISTI, TEXAS 78401
 5       (ATTORNEYS FOR THE PLAINTIFFS)
 6
     SCANDURRO & LAYRISSON
 7   (BY: TIMOTHY D. SCANDURRO, ESQUIRE)
     607 ST. CHARLES AVENUE
 8   NEW ORLEANS, LOUISIANA  70130
 9       (ATTORNEYS FOR DEFENDANTS
          GULF STREAM COACH, INC.)
10
11   U.S. DEPARTMENT OF JUSTICE
     (BY: ADAM M. DINNELL, ESQUIRE)
12   500 C STREET, SW
     WASHINGTON, D.C.  20472
13
         (ATTORNEYS FOR DEFENDANTS UNITED
14        STATES AND FEMA)
15
     JONES, WALKER, WAECHTER, POITEVENT,
16    CARRERE & DENEGRE
     (BY: WILLIAM LAMPTON, ESQUIRE)
17   8555 UNITED PLAZA BOULEVARD
     BATON ROUGE, LOUISIANA  70809
18       (Attended via telephone)
19       (ATTORNEYS FOR DEFENDANTS PILGRIM,
          CALIFORNIA, KZRV, DS/
20        CROSSROADS AND DUTCHMEN)
```

### Page 3

```
 1   APPEARANCES CONTINUED:
 2   LEAKE & ANDERSSON
     (BY: JERRY L. SAPORITO, ESQUIRE)
 3   1700 ENERGY CENTRE
     1100 POYDRAS STREET
 4   NEW ORLEANS, LOUISIANA  70163
         (Attended via telephone)
 5
         (ATTORNEYS FOR DEFENDANTS
 6        FLEETWOOD ENTERPRISES, INC.,
          ET AL.)
 7
 8   BAKER DONELSON
     (BY: DAVID KURTZ, ESQUIRE)
 9   201 ST. CHARLES AVENUE
     SUITE 3600
10   NEW ORLEANS, LOUISIANA  70170
         (Attended via telephone)
11
         ATTORNEYS FOR DEFENDANTS,
12        CH2M HILL CONSTRUCTORS, INC. AND
          SHAW ENVIRONMENTAL, INC.
13
14   WILLINGHAM, FULTZ & COUGILL
     (BY: MARC B. JOHNSON, ESQUIRE)
15   NIELS ESPERSON BUILDING
     808 TRAVIS, SUITE 1608
16   HOUSTON, TEXAS  77002
         (Attended via telephone)
17
         (ATTORNEYS FOR DEFENDANTS
18        JAYCO AND STARCRAFT)
19
     MIDDLEBERG, RIDDLE & GIANNA
20   (BY:  SONIA MALLETT, ESQUIRE)
     450 LAUREL STREET
21   SUITE 1101
     BATON ROUGE, LOUISIANA 70801
22
         (ATTORNEYS FOR FLUOR ENTERPRISES,
23        INC.)
```

### Page 4

```
 1   APPEARANCES CONTINUED:
 2
     ALLEN & GOOCH
 3   (BY: BRENT MAGGIO, ESQUIRE)
     3900 N. CAUSEWAY BOULEVARD
 4   SUITE 1450
     METAIRIE, LOUISIANA  70002
 5
         (ATTORNEYS FOR HEARTLAND
 6        RECREATIONAL VEHICLES, LLC)
 7
 8
     LOBMAN, CARNAHAN
 9   (BY: HEATHER CHEESBRO, ESQUIRE)
     400 POYDRAS STREET
10   TEXACO CENTER - SUITE 2300
     NEW ORLEANS, LOUISIANA  70130
11       (Attended via telephone)
12       (ATTORNEYS FOR CRUM & FORSTER)
13
     DEGAN, BLANCHARD & NASH
14   (BY:  DREW BERNARD, ESQUIRE)
     6421 PERKINS ROAD
15   BUILDING C, SUITE B
     BATON ROUGE, LOUISIANA  70808
16
         (ATTORNEYS FOR TKTMJ, INC.)
```

## Page 5

\* \* \*

### EXAMINATION INDEX

EXAMINATION BY MS. MALLETT: .............8
EXAMINATION BY MR. DINNELL: ............76
EXAMINATION BY MR. MAGGIO: ............102
EXAMINATION BY MR. SCANDURRO: .........105
EXAMINATION BY MR. BERNARD: ...........116
EXAMINATION BY MR. PEÑA: ..............116
EXAMINATION BY MS. MALLETT: ...........151
EXAMINATION BY MR. SCANDURRO: .........155

\* \* \*

### INDEX OF EXHIBITS

Exhibit No. 1 .........................151
    Notice of Deposition, subpoena and
    attachment Exhibit A.

## Page 6

### STIPULATION

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken for all purposes allowed under the Federal Rules of Civil Procedure, in accordance with law, pursuant to notice;

That the formalities of reading and signing are specifically waived;

That the formalities of filing, sealing, and certification are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

\* \* \*

CATHY RENEE' POWELL, CCR, Certified Court Reporter, officiated in administering the oath to the witness.

## Page 7

THE VIDEOGRAPHER:

We're on the record. The time is approximately 2:16 p.m. Today's date is August 5, 2009. This is the videotaped deposition of Mr. Heath Allen, taken at the offices of Middleberg, Riddle & Gianna, located at 450 Laurel Street, Baton Rouge, Louisiana, in the case entitled "FEMA Trailer Formaldehyde Products Liability Litigation."

Would counsel please introduce themselves and which parties they represent.

MS. MALLETT:

Sonia Mallett on behalf of Fluor Enterprises, Inc.

MR. DINNELL:

Adam Dinnell for defendant United States.

MR. MAGGIO:

Brent Maggio for Heartland Recreational Vehicles.

MR. SCANDURRO:

Tim Scandurro for Gulf Stream Coach.

## Page 8

MR. PEÑA:

Reynaldo Peña for the plaintiffs.

MR. BERNARD:

Drew Bernard for TKTMJ.

EXAMINATION BY MS. MALLETT:

Q. Can you give us your name and address for the record.

A. Yes, ma'am. My name is Heath Allen, but my address has changed since the last time I did the other deposition. You want that address?

Q. I need to know where you live.

A. Right now? Okay. Post Office Box 151, Angola, Louisiana 70712, and the physical address is No. 21 Red Bird.

Q. And do you have a telephone?

A. Yes, ma'am.

Q. What's your number?

A. (225)301-5203.

Q. Basically, what we're going to do today is I'm going to ask you a whole bunch of questions, and I'm going to need you to answer those questions out loud, okay?

A. Yes, ma'am.

1  Q. I'm going to ask you to wait until
I finish asking my question before you start
answering the question, okay? And the
reason we need do that is because the court
reporter is taking everything down, okay, as
we speak.
    So if you don't understand what
I'm asking, ask me to repeat it, rephrase
it, you know, whatever the case may be,
okay?
 A. (Witness nods head affirmatively.)
 Q. And I need you to be sure that you
answer out loud instead of shaking your head
yes or no. Okay?
 A. Yes, ma'am.
 Q. All right. What is your date of
birth?
 A. 4-11-1979.
 Q. And that makes you how old?
 A. Thirty.
 Q. Are you married?
 A. Yes, ma'am.
 Q. And your wife's name?
 A. Brittney Allen Giroir. Or
Brittney Giroir Allen, I guess. I'm sorry.

Page 9

 Q. And how long have you been
married?
 A. Since December 13, 2008.
 Q. Do you have any children?
 A. Yes, ma'am.
 Q. How many?
 A. One.
 Q. And how old is your child?
 A. He will be three August 29th of
this year, 2009.
 Q. And prior to living at Post Office
Box 151, Angola, No. 21 Red Bird, where did
you live?
 A. 5396 Rosemound Loop,
St. Francisville, Louisiana.
 Q. And is this your parents' address?
 A. Yes, ma'am.
 Q. And prior to living with your
parents, did you live anywhere else?
 A. No, ma'am. I mean, I have lived
off and on, like, in apartments and stuff
like that, but no staying for a year, no.
Not permanently.
 Q. Who are you employed with right
now?

Page 10

 A. The Louisiana State Penitentiary.
 Q. And what position do you hold with
them?
 A. HVAC foreman.
 Q. How long have you worked at
Angola?
 A. This stint, I have worked there
for almost two and a half years, but
previously, I worked there for seven years
before I went to New Orleans working for
FEMA and all that down there.
 Q. Okay. So when did you start your
most recent employment?
 A. I don't remember the exact date,
but August -- man. Two and a half years
ago. I can't --
 Q. Okay. And when you started
working for them two and a half years ago,
what position did you hold then?
 A. Maintenance foreman.
 Q. So prior to that, when did you
work at Angola?
 A. Prior to that from 2000 to 2006.
I quit -- I resigned in January 2006.
 Q. And what position did you hold

Page 11

during 2000 to 2006? Was it one position or
did you hold several?
 A. Just one.
 Q. What was that?
 A. Security Master Sergeant.
 Q. And you quit your job to go and do
what?
 A. To install trailers in New
Orleans.
 Q. And who did you go to work for
installing the trailers?
 A. Paul Blanchard.
 Q. Did you become an employee of
Mr. Blanchard's?
 A. No, ma'am. We just -- he called
me and asked me if I wanted to go to work
with him. We just kind of worked together.
    I never was an employee. We
worked under a guy -- the only name I know
of him, the guy -- the contractor we worked
for was Kilcrest. I think that was his last
name. I don't know what his first name is.
 Q. Do you know where Mr. Kilcrest is?
 A. No, ma'am. I have never met him.
I just knew his last name, is all. He's

Page 12

3 (Pages 9 to 12)

PROFESSIONAL SHORTHAND REPORTERS, INC   (800) 536-5255                         (504) 529-5255
New Orleans * Baton Rouge * Covington * Shreveport

| | |
|---|---|
| 1   never been down there, I've never laid eyes<br>2   on him.<br>3        Q.   So how were you paid for the work<br>4   that you did with Paul Blanchard?<br>5        A.   Every week they would give him a<br>6   check and he'd go to the American Gateway<br>7   Bank on Perkins, down in Baton Rouge.  I<br>8   guess that's who they had the account<br>9   through.  And he would cash it and pay us<br>10  that way.<br>11       Q.   So did he write you a check or did<br>12  he give you cash?<br>13       A.   Cash.<br>14       Q.   Did you report this income to the<br>15  IRS?<br>16       A.   Yes, ma'am, a 1099 at the end of<br>17  the year.<br>18       Q.   So Paul gave you a 1099?<br>19       A.   Yes, ma'am.<br>20       Q.   Did you bring a copy of that 1099<br>21  with you?<br>22       A.   No, ma'am, I couldn't find it.  I<br>23  done moved so many times I couldn't -- since<br>24  2006, I couldn't tell you where it is.<br>25       Q.   Do you have a copy of your 2006<br>Page 13 | 1   documents with you that you were asked to<br>2   bring on Exhibit A?<br>3        A.   No, ma'am.  I didn't bring none of<br>4   this.<br>5        Q.   Do you have any of the documents<br>6   that we have asked you to bring?<br>7        A.   As far as medical records, I don't<br>8   have -- I mean, I don't have anything like<br>9   that.  Concerning this case right here, I<br>10  don't have anything like that.<br>11            As far as, I mean, what are you<br>12  wanting -- as far as tax return purposes, is<br>13  that what you're asking?<br>14       Q.   Just any -- if you received any<br>15  kind of check stub, tax return?<br>16       A.   I didn't bring anything on this<br>17  paper.  Mostly all the paperwork, Paul has<br>18  got.  He kept the check stubs and he made<br>19  copies of all that, so he's got most of the<br>20  information.<br>21       Q.   You don't have any paperwork at<br>22  all from when you did the job?<br>23       A.   No, ma'am.<br>24       Q.   Other than you remember getting a<br>25  1099?<br>Page 15 |
| 1   tax return?<br>2        A.   No, ma'am.  Not on me.<br>3        Q.   So if I asked you to sign a copy<br>4   of a release for your 2006 tax returns,<br>5   would you have a problem doing that?<br>6        A.   I shouldn't have, no, ma'am.  I<br>7   shouldn't have a problem doing it.<br>8        Q.   You received a subpoena, didn't<br>9   you, to come to this today?<br>10       A.   Yes, ma'am.<br>11       Q.   Do you have a copy of that with<br>12  you?<br>13       A.   Yeah.  I have it out there.<br>14       Q.   Okay.  If I showed you a copy of<br>15  it, can you tell me if this is what you<br>16  received?<br>17       A.   Well, it had the front page and<br>18  everything with my name on it, but yes,<br>19  ma'am, this is it.<br>20       Q.   And if you flip to the last<br>21  page -- let's see.<br>22            Was that attached to the document<br>23  that you received?<br>24       A.   Yes, ma'am.<br>25       Q.   And did you, by chance, bring any<br>Page 14 | 1        A.   Right.<br>2        Q.   How long did you work with Paul<br>3   Blanchard?<br>4        A.   Through a little -- September<br>5   maybe.<br>6        Q.   So you started in --<br>7        A.   January.<br>8        Q.   January of?<br>9        A.   2006.<br>10       Q.   Okay.  And you worked until --<br>11       A.   September, I would say.<br>12       Q.   Same year?<br>13       A.   Same year, 2006.<br>14       Q.   Once you quit doing this job with<br>15  Mr. Blanchard, where did you go to work?<br>16       A.   I went to work for another friend<br>17  of mine down there.  We were building<br>18  wheelchair ramps and steps.<br>19       Q.   And who was this?<br>20       A.   Wayne Sullivan was his name.<br>21       Q.   And how long did you work for<br>22  Mr. Sullivan?<br>23       A.   Not long, about two or three<br>24  weeks.<br>25       Q.   And how were you paid by<br>Page 16 |

4 (Pages 13 to 16)

**Page 73**

1 wasn't, you would just send somebody back
2 real quick to go turn -- pick up the right
3 one and turn the other one back in.
4      Q.   Now what if it was a
5 handicapped-accessible unit, did y'all ever
6 to put those up?
7      A.   No, ma'am.  They would -- if it
8 was ADA, you would either -- when the
9 inspector would come by, they would say it
10 was ADA and they would call the ramp people
11 to come build the ramp for the trailer.
12     Q.   So was the trailer itself
13 identical to the other trailers or were they
14 different?
15     A.   Different.
16     Q.   They were different.
17     A.   Yes, ma'am.  It's got more wider
18 space to turn around in and more open.
19     Q.   But y'all set up some of those
20 trailers?
21     A.   Right.
22     Q.   You just didn't put the ramp into
23 it?
24     A.   Yes, ma'am.
25     MR. PEÑA:

**Page 74**

1          Can we take a five-minute break?
2     THE VIDEOGRAPHER:
3          Off the record; it's 3:28.
4     (Recess.)
5     THE VIDEOGRAPHER:
6          We're back on the record, it is
7 3:38.
8 EXAMINATION BY MS. MALLETT:
9     Q.   Okay, I was on a roll and I got
10 stopped so I have no clue where I was.
11         (Off the record discussion between the
12 court reporter and Ms. Mallett.)
13 EXAMINATION BY MS. MALLETT:
14    Q.   When you were driving back and
15 forth from Lake Rosemound to New Orleans,
16 how long of a trip was it usually for you
17 each day?
18    A.   Two, two and a half hours.
19    Q.   Each way?
20    A.   (Witness nods head affirmatively.)
21    Q.   Yes?
22    A.   It depends on the traffic being
23 bad or not.  Yes, ma'am, it was two and a
24 half hours.
25    Q.   Did y'all ever remove a trailer

**Page 75**

1 from a site?
2     A.   No, ma'am.  As far as talking
3 about picking it up from Jazzland and
4 removing it, or from a residence?
5     Q.   From a residence.
6     A.   No, ma'am.
7     Q.   So everything you did or the work
8 that you were doing with Mr. Blanchard was
9 picking it up from Jazzland or some other
10 lot and then putting on it a residential
11 site?
12    A.   Yes, ma'am.
13    Q.   You didn't take any from a
14 residential site and bring them anywhere?
15    A.   No, ma'am.
16    Q.   Would you ever share in the task
17 of driving the truck?
18    A.   No, ma'am.  It was Paul's truck
19 and he drove it most of the time.  He's that
20 type of individual.
21    Q.   Did anyone ever tell y'all to go
22 in and open the doors and roof vents and
23 anything like that when y'all were setting
24 up the trailers?
25    A.   No, ma'am.

**Page 76**

1     Q.   Do you know who it is that owned
2 the trailers that y'all were hauling?
3     A.   As far as the resident-wise or as
4 far as where they came from?
5          No, I don't know who owned them.
6 We just picked them up in Jazzland.  I'm
7 assuming the residents leased them.  As soon
8 as they were signed off on them, they moved
9 in them.  But as far as who owned them, I
10 don't know.
11    Q.   You don't know?
12    A.   No, ma'am.
13    MS. MALLETT:
14         I'm going to go ahead and tender
15 you to the other attorneys.  Okay?
16    THE WITNESS:
17         Okay.
18 EXAMINATION BY MR. DINNELL:
19    Q.   All right, Mr. Allen.  My name is
20 Adam Dinnell.  I represent the United States
21 in this case.
22         If at any point I ask a question
23 that doesn't make sense to you or you don't
24 understand, please let me know and I will
25 try to clarify it for you, all right?

19 (Pages 73 to 76)

**Page 77**

A. Yes, sir.
Q. What was the period of time in which you hauled and installed trailers after Hurricane Katrina?
A. It would be January of 2006 to September -- the middle, toward the end of September 2006.
Q. So approximately eight months, right?
A. Yes, sir.
Q. And you said that part of your job in installing the trailers would be to set up the plumbing, right?
A. Yes, sir.
Q. And that would be setting up the hard-line plumbing from the trailer unit into the plumbing system in the ground?
A. Yes, sir, the spot they had indicated for us.
Q. And to set up that plumbing, you have to have a certain amount of fall in the plumbing system or in the plumbing line, is that correct?
A. Yes, sir.
Q. And that would be basically, the

**Page 78**

plumbing line has to go from a certain height downward to make the plumbing system work, correct?
A. Yes, sir. It is an inch every foot.
Q. And to get that height on the plumbing system, you would have to raise the trailer unit up off the ground with these blocks, correct?
A. Yes, sir.
Q. And using the blocks, that would get you up to the height where you could set up the plumbing system, correct?
A. Yes, sir.
Q. You said you had no prior experience towing these kinds of travel trailers. I was wondering if you have any prior experience with mobile homes at all?
A. No, sir. As far as, you know, vacation -- I mean, recreational means, you know. I mean, I never hauled it, my parents hauled it. But staying in them, yeah.
Q. And that's the travel trailer that they have?
A. Yes.

**Page 79**

Q. Do you know who made that travel trailer?
A. Zinger, I think is the brand of it.
Q. Going back to something you were asked about earlier, during the time period you were hauling and installing trailers from January of 2006 until September of 2006, you said that you discussed the smell that you would find in the trailers with Mr. Blanchard, right?
A. Yes, sir.
Q. You also discussed the smell with your brother Travis, right?
A. Yes, sir.
Q. And then you mentioned on one occasion you told the inspector about the smell. Is that right?
A. Yes, sir.
Q. Was there just one inspector or were there other inspectors?
A. Just one.
Q. Was the inspector that you told about the smell one of the contractor inspectors?

**Page 80**

A. I don't want to say -- I want to say he wasn't a Fluor. I guess they hired him while they were down there. He, like, rode around in a truck and inspected trailers for them. I don't think he -- he was, like, pretty much like a subcontractor person.
Q. So he worked for some sort of contractor company?
A. Right.
Q. And you had occasion to discuss this smell issue with him at some point, right?
A. Right.
Q. Other than that contractor inspector, your brother and Mr. Blanchard, those are the only three people during the time you were hauling and installing trailers that you mentioned a smell in these trailers, correct?
A. Right.
Q. Now, you talked about earlier how when you would finish up installing a trailer, there would be an inspector that would come out and look at the trailer; is

**Page 89**

1 contaminants in this area?
2     A.  Yes, sir. Mostly in Chalmette,
3 you know, with the oil well that flowed
4 over. They had a bunch of oil and, I mean,
5 there was mold everywhere.
6     Q.  And because it was right after the
7 hurricane, that's the kind of environment
8 that you were working in when you were
9 installing these trailers, right?
10     A.  Yes, sir.
11     Q.  Did you have to clear out debris
12 when you were doing your job hauling and
13 installing the trailers?
14     A.  No, we didn't really have to clear
15 any debris unless like a street sweeper --
16 like I said, they had a trash pick-up guy
17 that would come through there and pick up
18 from one lot and some of it would fall over
19 there just where they had it marked off. We
20 would move, you know, a couple of boards or
21 trash or something out of the way just so we
22 could get the trailer in there.
23     Q.  And I believe you said that the
24 area where you are supposed to put the
25 trailer would be marked off in some manner

**Page 90**

1 when you would arrive at the spot, right?
2     A.  Yes, sir.
3     Q.  But outside of that area, would
4 there still be debris on some of these home
5 sites?
6     A.  Oh, yes, sir. I mean, there would
7 be debris. It wouldn't be in our way, but,
8 you know, around the house would be cars and
9 stuff like that.
10     Q.  Trees?
11     A.  Trees, fences. You know, wood.
12 Out by the road would be Sheetrock, stuff
13 like that.
14     Q.  Basically anything and everything
15 that could have been washed around during
16 the storm would still be there?
17     A.  Yes, sir.
18     Q.  Now, you talked earlier about how
19 the units would be set up on blocks, and I
20 believe you said that you used six blocks to
21 support the travel trailer. Is that
22 correct?
23     A.  Yes, sir. Six columns.
24     Q.  Did you ever set one up that
25 didn't use six columns?

**Page 91**

1     A.  We couldn't set them up unless we
2 put six. That was --
3     Q.  So every unit that you set up, you
4 used six columns?
5     A.  Six columns.
6     Q.  Once the units were set up on the
7 blocks, the unit -- obviously, you would be
8 able to transport it to the home site and
9 then you would go in and install the unit up
10 on blocks, right?
11     A.  Yes, sir.
12     Q.  Once you installed it up on
13 blocks, you wouldn't be able to move that
14 unit unless you uninstalled it. Correct?
15     A.  Correct.
16     Q.  Because the wheels would be off
17 the ground, right?
18     A.  Yes, sir.
19     Q.  So the unit would no longer --
20     A.  Well, in some cases, they would be
21 off the ground. I mean, like in a cement
22 driveway, if it was pretty much level, they
23 would still be touching a little bit. They
24 wouldn't exactly be off the ground.
25     Q.  But once the unit was installed

**Page 92**

1 and set up, the unit would no longer be
2 movable; is that correct?
3     A.  No, sir.
4     Q.  It would no longer be movable. Is
5 that right?
6     A.  Yes, sir.
7     Q.  You said that if the wheels were
8 off the ground, that you would put wooden
9 blocks under the tires. Is that right?
10     A.  Yes, sir.
11     Q.  Why would you do that?
12     A.  Keep the tire from rolling just in
13 case they had little kids running around
14 there or something. Get underneath the
15 tire, it would roll over and spin, you know,
16 with them underneath it.
17     Q.  When you would go and pick up your
18 materials for your unit installation work,
19 would there ever be supply shortages in the
20 materials that you were trying to pick up?
21     A.  Yes, sir.
22     Q.  What kinds of things would not be
23 readily available?
24     A.  Steps, stuff like steps.
25 Sometimes -- we couldn't actually get that

```
 1   kind of stuff around there at the time, so
 2   it was all having to come in from different
 3   areas and you had so many people doing it at
 4   that time, you may even run out on a little
 5   bit of stuff.  You know, like they run out
 6   of anchor bolts and stuff like that.  But
 7   you would always have extra on your truck to
 8   where you could finish, you know, what you
 9   were doing.  As far as steps, steps is
10   mostly what they run low on.
11        Q.   You said there would be a problem
12   actually getting stuff around there at the
13   time.  I assume it was difficult to actually
14   get materials in the New Orleans area
15   because of the hurricane, right?
16        A.   Yes, sir.
17        Q.   There just wasn't a lot of
18   resources available at that time period,
19   right?
20        A.   Everything was having to come in
21   to there.
22        Q.   When you were raising these units
23   to put blocks under them, did you ever
24   notice that your jacking up of the unit
25   caused damage to the unit?
                                    Page 93
```

```
 1        A.   No, sir.
 2        Q.   So as far as you know, you never
 3   damaged a unit while you were jacking it up,
 4   correct?
 5        A.   Correct.
 6        Q.   I believe you said you were
 7   traveling in two, two and a half hours each
 8   way to New Orleans to do this job, right?
 9        A.   Yes, sir.
10        Q.   Did you ever consider staying in
11   New Orleans?
12        A.   No, sir.
13        Q.   Why not?
14        A.   Pretty much the first time we got
15   down there, there wasn't no lights, there
16   wasn't nothing to eat.  There really wasn't
17   nowhere to stay.  After a while, after it
18   started picking back up, you really didn't
19   want to stay down there.  Once you got
20   finished working, you just wanted to go
21   home.
22        Q.   Even months after the hurricane,
23   it was still a bad situation?
24        A.   Well, we had gotten used to it and
25   it was pretty much routine after that so we
                                    Page 94
```

```
 1   just kept doing it.
 2        Q.   Was it your understanding that
 3   there simply weren't houses available for
 4   people in New Orleans?
 5        A.   We pretty much assumed that it
 6   wasn't and we weren't even going to try.  We
 7   were just going to drive.
 8        Q.   During your time hauling and
 9   installing these trailers, did you ever talk
10   with one of the actual trailer occupants
11   when doing your job?
12        A.   Well, there are -- when we would
13   bring the trailer to there, some of the
14   homeowners would be there, you know, at the
15   residence.  They would be like on their
16   yards rummaging go through stuff, you know,
17   as far as that.  And they would want to look
18   in the trailer and we couldn't let them do
19   it, so.  And then, that's pretty much the
20   extent of the residents and me talking.
21        Q.   The conversation with the
22   residents that you remember is them wanting
23   to look into the units and you couldn't let
24   them do that, right?
25        A.   Right.
                                    Page 95
```

```
 1        Q.   To your knowledge, did you ever
 2   install a travel trailer unit that was not
 3   new, a travel trailer that had been
 4   previously used?
 5        A.   Not to my knowledge, I've never.
 6        Q.   When Mr. Blanchard told you about
 7   the possibility of coming and working with
 8   him on this project, you ended up leaving a
 9   previous job that you had in Angola,
10   correct?
11        A.   Yes, sir.
12        Q.   Why did you want to come and work
13   with Mr. Blanchard rather than the old job?
14        A.   Just seemed like you could make a
15   little money, pretty much, and I wasn't
16   locked up behind bars.  I was out free.
17        Q.   And you could make a good amount
18   of money because they needed bodies during
19   that time period after the hurricane, right?
20        A.   Yes, sir.
21        Q.   Workers were in high demand?
22        A.   Yes, sir.
23        Q.   When you guys would tow these
24   units back to their final destination, so to
25   speak, did you ever have any problems towing
                                    Page 96
```

**Page 125**

1  A. We bought them ourselves.
2  Q. And that was part of the deal, you
3  were supposed to supply that kind of
4  equipment?
5  A. Well, we don't know. We just
6  bought them just to make our jobs easier.
7  Q. Is it fair to say that you had a
8  lot of questions when y'all first started
9  working out there as far as what you were
10 supposed to do, how you were supposed to do
11 it?
12 A. Well, by the time I started, Paul
13 had been working there and he showed me
14 pretty much, you know, what I needed to
15 know, as far as --
16 Q. Okay.
17 A. -- you know. And then we never
18 got failed for an inspection, but I guess,
19 like, a lot of people were getting failed.
20 That's why they did the example trailer.
21 Then we learned some from that, as far as
22 the cleanouts and everything. But
23 everything else, we were getting passed on.
24 Q. When you were on-site on
25 somebody's property, setting up their

**Page 126**

1  trailers on their private property, was
2  there ever any Fluor observers or anybody
3  from one of the Fluor subcontractors
4  observing your work?
5  A. No, sir.
6  Q. Did anybody ever go out there
7  before your work and give you any kinds of
8  instructions in writing as far as these are
9  the specs. This is how you do this, this is
10 how you do that, anything like that?
11 A. No, sir.
12 Q. So basically, from Fluor or any of
13 the subcontractors, you had zero input as to
14 how to do your job other than the example
15 trailer?
16 A. Other than the example trailer
17 later.
18 Q. When you were at the example
19 trailer, was there anybody from Fluor
20 talking about the specs or talking about the
21 blocking, giving classes on how to do that?
22 A. No. It was pretty much this is
23 what we want in a nutshell.
24 Q. Okay. So basically, you went out
25 there and they said, "Look at this, this is

**Page 127**

1  how we want it." Is that right?
2  A. Right.
3  Q. And they didn't explain anything,
4  they just said look at it?
5  A. They didn't explain really
6  nothing. They just said, pretty much, "This
7  is what we want right here. This is an
8  ideal trailer."
9  Q. And that occurred at the example
10 trailer on the Fluor headquarters property?
11 A. Right. I don't remember the name
12 of the street it's on.
13 Q. Did anybody from Fluor ever ask
14 you about your work history as far as have
15 you ever set up travel trailers before?
16 A. No.
17 Q. Nobody ever asked you about your
18 experience as far as working with travel
19 trailers, anything like that?
20 A. No, sir.
21 Q. Okay. Did you fill out an
22 application?
23 A. No, sir.
24 Q. Let's talk a little bit about the
25 inspectors. You said that the inspectors

**Page 128**

1  worked for Fluor because they would show up
2  in white Chevy trucks that had Fluor stamped
3  on the side of the truck?
4  A. Yes, sir.
5  Q. Okay. Now, those inspectors, when
6  did they come out, was that after your work
7  was done?
8  A. Yes. After we was through with
9  the trailer and had the blocks level and
10 strapped down, steps on it and everything,
11 they'd show up --
12 Q. When did the Fluor inspectors come
13 out? Was that after you had finished?
14 A. Yes. They would come out after we
15 blocked and leveled and strapped everything
16 down, had the steps, had the inside done.
17 We would call the number on the paper we had
18 and they would come out and inspect it.
19 Q. Okay. And about how long would
20 the Fluor inspectors be out there inspecting
21 your work? In other words, how long did the
22 inspection take?
23 A. About 30, 45 minutes. They would
24 sit down and sign all the papers with Paul.
25 Q. So was part of that 30 to 45

minutes talking or doing paperwork?
A. Yes, sir.
Q. So how much of it was actual visual, physical inspection of the work?
A. It would vary, you know. It depended on the way the trailer was set up. If it was on concrete, it was a lot less to inspect than if it was on ground or on a hill or unlevel.
Q. Did the inspectors ever explain any of the processes as far as setting it up, or were they more "This needs to be" -- I'm giving you dimensions -- for example, "This needs to be 2-foot, this needs to be" --
A. The only time they ever said anything about it was, like, one of them came later on after the example trailer and everything. He was telling us, you know, it can't be a certain height off the ground -- it can only be a certain height off the ground before it gets, you know, too wobbly or anything like that.
Q. Okay. Did the inspectors, in your opinion, seem to be knowledgeable about the

Page 129

trailers?
A. I mean, they knew their job pretty much. I mean, their job was to come in and make sure everything was right. I guess they had a checklist they had to go through.
Q. Okay. Did they ever ask you or your crew -- that being Mr. Blanchard or your brother -- did they ever ask any of y'all, the inspectors, how did y'all -- how y'all jacked the trailer up?
A. No.
Q. What method was used?
A. No.
Q. Did they ever tell what you a preferred method was as far as how to jack a trailer up?
A. No, sir.
Q. To your knowledge, was there any written instructions or protocols or any drawings that explained to either contractors or subcontractors how to do the blocking?
A. Not to my knowledge, there wasn't.
Q. You said that in the summer when things got -- the summer is when the

Page 130

symptoms got worse, that's when it burned your eyes the worst, your nose and all that; is that correct?
A. Right.
Q. And then you started -- you figured out on your own that what you were going to do was open the door, open the vents, open the windows and then start on the outside?
A. Right.
Q. And that basically gave you between an hour and three and a half hours to let it air out?
A. Right.
Q. And then you said at one point that you would have to come back the next day sometimes, like if it got dark on you or you didn't finish the job?
A. Right.
Q. When you came back the next day, would the smell be in there again?
A. Depending on if we come back in the morning or the afternoon. You know, if it was cooler, in the morning, it wouldn't be that bad. Toward the afternoon is when

Page 131

it started heating up.
Q. But even the next morning, would the smell be worse than when you left it?
A. Well, not as bad but, I mean, it was still there.
Q. So it came back?
A. Yes, it came back. I mean, not full force, but it came back.
Q. And usually when that happened -- when you had to come back the next day, that would be first thing you would do in the morning before it got hot?
A. Right. Trying to hurry up and knock it out.
Q. And I think you described the smell in the trailer as ammonia-like?
A. Yeah. Like a burning, you know, burning nose and stuff.
Q. So you're not saying that this was caused by heat, I mean, what you are saying is that you smelled something in there, right?
A. Well, we smelled something in there, but the heat made it worse.
Q. Okay. Let's talk a little bit

Page 132

```
 1      Q.  Okay.  So there were occasions
 2  where you would have to jack up a long side
 3  and then do the other side?
 4      A.  Right.  That's why we used two
 5  jacks, one on both ends.
 6      Q.  And then after you got them on
 7  blocks, did you jack up the corners again so
 8  that you could, I guess, level it?
 9      A.  No, we jacked it up until it was
10  level.  Either way.  That one level going on
11  the tongue and one level -- when we had to
12  do it that way, we put a level on the tongue
13  and a level on the doorway.
14      Q.  Okay.  And I know you said that,
15  to your knowledge, you never damaged a beam
16  or anything like that.  Did you ever see,
17  when you were jacking up, like, let's say
18  you were jacking up on the long side, you
19  were lifting up the whole long side to block
20  under the sides, did you ever feel like
21  there was a little extra stress on some of
22  the beams, even though they didn't bend or
23  damage, did it ever seem like there was a
24  lot of stress on the trailer?
25      A.  No, sir.
                                    Page 137
```

```
 1      Q.  Okay.  And y'all did -- y'all did
 2  some plumbing, right?
 3      A.  Yes, sir.  I did most of the
 4  plumbing.
 5      Q.  And just briefly, I mean, can you
 6  just kind of summarize what you would do?
 7      A.  We would get there.  They would
 8  have a male -- a female adapter we would
 9  glue on there because the normal one had
10  like the cap for the drain, so we had to
11  glue a female on there and screw a male into
12  it and come out of there with a cleanout.
13          We would do a P-trap and they'd
14  run, and if we had to turn, we had to put
15  another cleanout.  And we'd go wherever, you
16  know, the sewer line was.  If we had to go
17  another 10 feet or if we had to make another
18  turn, we had to put another cleanout.
19      Q.  So did some of your work using the
20  pipe go in the ground so that you could
21  connect to the sewer line?
22      A.  Right.
23      Q.  All right.  And then after you
24  would connect that pipe to the city sewer
25  line underground, did you repack the dirt
                                    Page 138
```

```
 1  over the hole?
 2      A.  We didn't repack the dirt over the
 3  hole until the inspector came and looked at
 4  it.  We always left it open for him to see.
 5      Q.  And that would be the Fluor
 6  inspectors would come and inspect that also?
 7      A.  Right.
 8      Q.  Was anybody in your crew, you,
 9  Mr. Blanchard or your brother, a licensed
10  plumber?
11      A.  No, sir.
12      Q.  Did the inspector from Fluor ever
13  ask you, are y'all plumbers, do y'all have
14  licenses, anything like that?
15      A.  No, sir.
16      Q.  You talked a little bit about the
17  fact that your parents have a travel
18  trailer.
19      A.  Yes, sir.
20      Q.  When you walk into that travel
21  trailer, do your eyes burn?
22      A.  No, never have, but then they
23  bought it during the winter months and I
24  ain't been in it during the summer.  So I
25  really can't say and they also keep their
                                    Page 139
```

```
 1  air-conditioner running in it.
 2      Q.  You were asked some questions
 3  about whether or not any doctors have told
 4  you anything about formaldehyde exposure or
 5  used the word formaldehyde.
 6          If, back then, you would have
 7  known that there was possibly some
 8  formaldehyde in trailers that you were
 9  working in, would you have told your doctor,
10  "Hey, I may have been exposed to
11  formaldehyde, could you look into that"?
12      A.  I wouldn't have even have known to
13  tell him, to tell you the truth.  When I
14  think about formaldehyde, I think about dead
15  bodies.  That's the only thing I can come up
16  with.  When they started telling me that,
17  that's the only thing I have ever heard it
18  discussed with.
19      Q.  So when you think of formaldehyde
20  --
21          MR. SCANDURRO:
22              Just for the record, I'm going to
23  object to the comment not being a response
24  to a question.
25  EXAMINATION BY MR. PEÑA:
                                    Page 140
```

35 (Pages 137 to 140)

**Page 141**

1  Q.  So when you think of formaldehyde,
2  you are thinking about preserving some kind
3  of a dead body?
4  A.  Right.
5  Q.  In other words, some kind of a
6  chemical preservative?
7  A.  Right.
8  Q.  Do you know how any of the other
9  subcontractors that were doing the hauling
10 and installing, do you know their method of
11 jacking?
12 A.  No, sir.
13 Q.  So it is possible that if you had,
14 let's say for example, four different crews
15 working on the same type of trailer, that
16 there could be four different methods of
17 jacking that trailer up?
18 A.  I'm pretty sure there was.
19 Q.  Okay. And in your experience with
20 Fluor inspectors, they wouldn't have asked,
21 how did you do it?
22 A.  Right. Never have.
23 Q.  You talk about a difference in
24 quality. I think you said at first you had
25 some nicer trailers, and then they started

**Page 142**

1  getting more, I think what you called the
2  standard FEMA trailers?
3  A.  Yes.
4  Q.  Okay. Was there a difference in
5  workmanship also?
6  A.  I mean, you know, you had the
7  nicer recliners and stuff like that and when
8  the mass-produced ones would come in, there
9  would be trim coming off of them, you know,
10 mini blinds hanging, stuff like that.
11 Q.  Okay.
12 A.  Tables were wobbly, stuff like
13 that.
14 Q.  Was it ever so bad that you saw
15 walls separating or anything like that?
16 A.  Oh, no. I've never seen no walls
17 separating.
18 Q.  What would you think if, after you
19 had jacked up a trailer, you saw the wall
20 separating?
21 A.  We would have to tell somebody
22 when they came around to inspect it for
23 sure. Let them know.
24 Q.  Do you think that Fluor inspector
25 -- is that the type of problem that the

**Page 143**

1  Fluor inspector would have called you and
2  your crew out on?
3  A.  I would have hoped not, but, I
4  mean, we were responsible for them trailers
5  for two years after we put them up. I don't
6  know what kind of responsibility that was.
7  I guess -- I assumed it was the leveling and
8  everything like that.
9  Q.  But again, it was kind of unclear
10 what your duties were; is that right?
11 A.  Right. But every time we had a
12 problem and one of the inspectors would
13 come, we would let them know about. As far
14 as, you know, like mini blinds and wobbly
15 tables and stuff like that.
16 Q.  Would they -- would they help you
17 fix the problem?
18 A.  Well, they would note it.
19 Q.  So you don't know that it ever got
20 fixed. You just know that it got noted?
21 A.  Right.
22 Q.  Now, on the blocks, was it
23 basically just stacking cinder blocks?
24 A.  Well, basically what you did is
25 you had a black pad, standard, they use them

**Page 144**

1  on mobile homes today. It is a black pad
2  that goes down first. You made that pad
3  level underneath the beam of the trailer.
4  Put the level on it to make sure it's level.
5  You went with a flat block first.
6  What I call a flat block is, like, a 4-inch
7  block of solid concrete. Put it down first.
8  Then you took your 6-inch cinder
9  block, put it, depending on how high you had
10 to go, you would cross them over. You go
11 with another flat block on top.
12 Then, depending on the gap, you'd
13 use either a 1 by 6 or a 2 by 6, and if you
14 got it to the frame on that, you would wedge
15 it with a couple of wooden wedges.
16 Q.  Was there any fill inside the
17 cinder blocks, the two holes in the cinder
18 blocks?
19 A.  Well, the 4-inch was solid, but
20 the 6-inch was hollow.
21 Q.  So you didn't fill it with cement
22 or anything like that, or sand or anything?
23 A.  No, sir.
24 Q.  What was your overall impression
25 of the piers? Did you feel the piers were

36 (Pages 141 to 144)

**Page 145**

1 stable?
2    A. To me, they were stable, by the
3 time we got through strapping them down and
4 everything. I wouldn't have stayed in it,
5 though, through no hurricane or nothing, but
6 that's just me.
7    Q. Now, you jacked up -- I'm sorry.
8 You blocked in six points? Right, there
9 were six blocks?
10    A. Six columns.
11    Q. Six piers, whatever they're
12 called. The ones in the center, those are
13 not on the axle, right? Those are on the
14 I-beam, the frame?
15    A. On the I-beam.
16    Q. Okay. So all the weight was taken
17 off the axles?
18    A. Right.
19    Q. And when you were hauling it, I
20 guess it was hitched to the truck?
21    A. Yes.
22    Q. And then when you were doing that,
23 it was obviously rolling on the axles. It
24 was on the wheels on the axle, and then it
25 was connected to the truck at the tongue.

**Page 146**

1 Is that right?
2    A. Right.
3    Q. Do you know if there were ever any
4 problems with those black pads that were put
5 underneath the piers, I guess the foundation
6 of the piers? Do you know if there were any
7 problems with them sinking in the mud or
8 shifting?
9    A. Not to my knowledge, but, I mean,
10 some of the places we put them, it was
11 pretty muddy and stuff. You could pretty
12 much assume that it was going to settle,
13 more than what it had done by the time we
14 left. You know, rain and everything. The
15 water table down there being as high as it
16 is. It gets pretty muddy down there.
17    Q. All right. So you said that you
18 would assume that there is going to be some
19 kind of shifting?
20    A. There would be a settling process,
21 I'm pretty sure.
22    Q. And you were dealing with trailers
23 that hadn't been lived in. Nobody had been
24 sleeping in them, or living in them or
25 walking around in them. Is that right?

**Page 147**

1    A. Right.
2    Q. Do you think that the trailers as
3 set up were sturdy enough or stable enough
4 to be a permanent residence?
5    MR. DINNELL:
6      Object to the foundation.
7    THE WITNESS:
8      I don't think they should have
9 been permanent, no.
10 EXAMINATION BY MR. PEÑA:
11    Q. Why not?
12    A. I mean, it's a travel trailer.
13 It's not meant for -- well, in a state of
14 emergency, I guess it would be okay, but the
15 purpose is for recreational use.
16    Q. You said it is a travel trailer?
17    A. Right.
18    Q. Once you block up a travel trailer
19 to where the wheels are off the ground, it
20 can no longer travel. Is that fair?
21    A. Right.
22    Q. So in your opinion, did they kind
23 of -- did blocking them up, hooking up a
24 sewer line, electric lines and all these
25 things that were connected to the travel

**Page 148**

1 trailer, did that change it from a travel
2 trailer in your mind to something else?
3    MR. SCANDURRO:
4      Objection, speculation and
5 foundation.
6    MS. MALLETT:
7      Objection.
8    MR. DINNELL:
9      Same.
10    THE WITNESS:
11      It made it a residence, if you
12 mean that. A place to live.
13 EXAMINATION BY MR. PEÑA:
14    Q. When you worked on the trailers,
15 whether inside or outside, did you ever see
16 any warning labels or stickers anywhere that
17 may have given some kind of warning about
18 formaldehyde or any other chemicals?
19    A. No, sir.
20    Q. Did you ever see any owner's
21 manual inside the trailers?
22    A. The only owner's manual I recall
23 seeing was the ones in the refrigerators and
24 stuff like that.
25    Q. Was that the warning manual that

```
 1  was specific to that appliance?
 2     A.  Right.
 3     Q.  Okay.  But nothing about the
 4  trailer?
 5     A.  No.  I never seen any about the
 6  trailer.  But like I say, Gator was the
 7  paperwork guy.  He might have got it.  I
 8  don't know.
 9     Q.  You just don't know?
10     A.  I just don't know.
11     Q.  When you found out -- I think you
12  said you found out about the possible
13  formaldehyde or formaldehyde problem in the
14  news.  Is that right?
15     A.  Right.
16     Q.  Did you ever receive anything from
17  Fluor or from FEMA or from any other company
18  or agency, something that says maybe you
19  need to get yourself checked out or that you
20  may have possibly been exposed to
21  formaldehyde, any kind of warning for the
22  people that worked in these trailers day in
23  and day out?
24     MR. DINNELL:
25         Object to the form.
                                   Page 149

 1     MS. MALLETT:
 2         Object to the form of the
 3  question.
 4     THE WITNESS:
 5         No, sir.
 6  EXAMINATION BY MR. PEÑA:
 7     Q.  Would you have had any second
 8  thoughts about doing the type of work you
 9  did if you would have known back then you
10  may have been being exposed to formaldehyde?
11     MR. SCANDURRO:
12         Objection, speculation.
13     MR. DINNELL:
14         Objection, form.
15     THE WITNESS:
16         No, sir, probably not.
17     MR. SCANDURRO:
18         Withdraw the objection.
19  EXAMINATION BY MR. PEÑA:
20     Q.  I think you mentioned earlier that
21  there was a guy that was killed out there
22  that was working on hauling and installing?
23     A.  Right.
24     Q.  Do you know if he worked for
25  Fluor?
                                   Page 150

 1     A.  I don't know.  It was just -- it
 2  was told to us.  It was rumored.  I don't
 3  know if he really got killed or not, but I
 4  know they told us we had to start using
 5  Louisiana One Call.
 6     Q.  And One Call, what was that for,
 7  for the electricity?
 8     A.  Electricity, sewer, anything --
 9  telephone line, anything running
10  underground.
11     MR. PEÑA:
12         Pass the witness.
13  EXAMINATION BY MS. MALLETT:
14     Q.  A little bit of cleanup here.
15         I want to go ahead and mark the
16  subpoena to Mr. Allen that I questioned him
17  on very early on in the deposition as
18  Exhibit 1, the notice along with the
19  attachment, Exhibit A, asking for certain
20  documents.
21         The first time you worked at
22  Angola, I believe you told me you worked as
23  a sergeant in the security section.
24     A.  Yes, ma'am.
25     Q.  Have you ever been sued by an
                                   Page 151

 1  inmate?
 2     A.  No, ma'am.
 3     Q.  You are lucky.
 4     A.  I'm very lucky.
 5     MR. PEÑA:
 6         Object to sidebar.
 7  EXAMINATION BY MS. MALLETT:
 8     Q.  Have you ever sued anyone?
 9     A.  No, ma'am.
10         Can I ask a question?  No?
11         Why is this Exhibit A?  Why is
12  that marked Exhibit A, the subpoena?
13     MS. MALLETT:
14         Let's go off the record for just a
15  second.
16     THE VIDEOGRAPHER:
17         We're off the record, it is 4:59.
18     (Discussion off the record.)
19     THE VIDEOGRAPHER:
20         We're back on the record; it is 5
21  o'clock.
22  EXAMINATION BY MS. MALLETT:
23     Q.  Did you work for Fluor directly at
24  any point that you were doing the hauling
25  and installing of trailers?
                                   Page 152
```