Page 172

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER          *   Docket MDL 1873 "N"
FORMALDEHYDE PRODUCTS         *
LIABILITY LITIGATION          *   New Orleans, Louisiana
                              *
THIS DOCUMENT IS RELATED TO:  *   September 22, 2009
                              *
CHARLIE AGE, ET AL V          *   1:30 P.M.
GULF STREAM COACH, INC.,      *
ET AL, DOCKET NO. 09-2892;    *
ALANA ALEXANDER, INDIVIDUALLY *
AND ON BEHALF OF              *
CHRISTOPHER COOPER            *
* * * * * * * * * * * * * * * *

DAY 7
AFTERNOON SESSION
JURY TRIAL PROCEEDINGS BEFORE THE
HONORABLE KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Plaintiffs:          Gainsburgh, Benjamin, David,
                                Meunier & Warshauer
                             BY:  GERALD E. MEUNIER, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163


                             The Buzbee Law Firm
                             BY:  ANTHONY G. BUZBEE, ESQ.
                             JP Morgan Chase Tower
                             600 Travis, Suite 7300
                             Houston, Texas  77002


JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

Page 191

13:57 1    between living in a tent and moving into more permanent

13:57 2    housing?

13:57 3    A.   Yes.

13:57 4    Q.   Mr. Souza, my name is Henry Miller and I represent the

13:57 5    United States, which is a defendant in this litigation.

13:57 6              You were just asked some questions about FEMA's plan

13:57 7    at the time of the response and how this included sort of a

13:57 8    three-prong approach.

13:57 9              Were travel trailers FEMA's initial choice for the

13:57 10   temporary emergency housing, or were there alternative housing

13:57 11   methods that were considered?

13:57 12   A.   We had talked about using manufactured homes or mobile

13:57 13   homes as -- as the initial going-in position.

13:57 14   Q.   Was a decision made -- well, what was decided?

13:57 15   A.   The decision was made to use travel trailers as opposed to

13:58 16   mobile homes.

13:58 17   Q.   Were you involved with that decision-making process?

13:58 18   Actually, let me rephrase it.

13:58 19              Do you have -- did you -- do you have knowledge of

13:58 20   that decision-making process?

13:58 21   A.   Yes.

13:58 22   Q.   And how do you have that knowledge?

13:58 23   A.   As part of the housing area command, there were

13:58 24   discussions about what types of units we could use and where we

13:58 25   could place them.

13:58  1    Q.   And what is your understanding why the decision was made

13:58  2    to use travel trailers as opposed to manufactured housing or

13:58  3    mobile homes as the primary temporary emergency housing

13:58  4    response for Hurricane Katrina victims and Hurricane Rita

13:58  5    disaster victims?

13:58  6    A.   My recollection was that we were going to use mobile

13:58  7    homes.  But because of the size of the mobile homes and the

13:58  8    quantity in which we needed them, the areas available to us to

13:59  9    put those mobile homes were outside of the impacted areas.

13:59  10         In other words, they were outside of the areas of New

13:59  11   Orleans, and really not even a practical solution in the

13:59  12   immediate vicinity of Baton Rouge.  They would have to be

13:59  13   probably even further north than that.

13:59  14         And when we made this proposal to the State, concerns

13:59  15   were raised that people wanted to live closer to their impacted

13:59  16   homes, if they were homeowners, so that they could begin making

13:59  17   immediate repairs.  There were concerns that rebuilding the

13:59  18   community in terms of businesses and economic stability and

13:59  19   reinvigorating the economy; that putting people that far away

13:59  20   from those impacted areas would not be a preferrable solution.

13:59  21   Q.   Were there discussions about the effects that this may

14:00  22   have on the future demographics of New Orleans?  Population

14:00  23   makeup of New Orleans?

14:00  24   A.   There were discussions about demographics, but I don't

14:00  25   specifically recall whether or not they were in regards to the

Page 193

```
14:00  1    mobile home or travel trailer discussion versus people moving
14:00  2    out of the state discussion.
14:00  3    Q.   Was there a concern that if you used mobile homes as
14:00  4    opposed to travel trailers, that many of the people, because
14:00  5    they'd have to be placed farther away from New Orleans or Baton
14:00  6    Rouge, that they may not eventually move back to New Orleans?
14:00  7    A.   Yes, there were those concerns.
14:00  8              THE COURT:  Is that it, Counsel?
14:00  9              MR. MEUNIER:  Your Honor, may we approach the bench?
14:00 10              THE COURT:  Yes, please.
14:00 11              (WHEREUPON, the following proceedings were held at
14:00 12    the bench.)
14:01 13              MR. WEINSTOCK:  About the Henry Miller introduction
14:01 14    would you just make an announcement that this deposition was
14:01 15    taken in another case.
14:01 16              THE COURT:  We have two problems.  The first one was
14:01 17    maintenance, which the second one was the Henry Miller thing.
14:01 18    And you-all were picking these segments.
14:01 19              MR. MEUNIER:  I know.  And I don't think it was done
14:01 20    intentionally, Your Honor.
14:01 21              What I would suggest is that Henry says, "A
14:01 22    defendant in the litigation."  Could you instruct the jury that
14:01 23    while the United States may be a defendant in other litigation
14:01 24    involving FEMA trailers, that it is not a defendant in this
14:01 25    case.
```

                JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

14:28  1    never, to my knowledge, got a complaint back from them again.

14:28  2    Q.   And the older units would be, for example, units from the

14:28  3    2004 hurricanes in Florida?

14:28  4    A.   Or from any other disasters.  But prior to Katrina-type

14:28  5    units, yes.

14:28  6    Q.   So some of the swapout units were, in fact, from the 2004

14:28  7    hurricanes in Florida; is that right?

14:28  8    A.   That's probably true, yes.

14:28  9    Q.   And you're not aware of any follow-up problems in those

14:28 10    2004 units once they were swapped out, from a formaldehyde

14:28 11    standpoint?

14:28 12    A.   I'm not aware of any, that's correct.

14:28 13    Q.   Also in McNeese 7 you refer under No. 3 to the fact that:

14:29 14    "It is a given that the materials used in the construction of

14:29 15    mobile homes and travel trailers, in addition to other

14:29 16    residential structures, contain formaldehyde."

14:29 17                   Do you see that?

14:29 18    A.   I do.

14:29 19    Q.   It was no surprise to you that there was some formaldehyde

14:29 20    in these travel trailers, was it?

14:29 21    A.   No, it was not.

14:29 22    Q.   And, in fact, you're generally aware that there is also

14:29 23    formaldehyde not only in travel trailers, but in mobile homes

14:29 24    and in stick-built residential structures; is that right?

14:29 25    A.   That's correct.

```
14:29  1   Q.   In some of the documents that we looked at this morning, I
14:29  2   noted that you made references to the fact that there were no
14:29  3   standards -- residential indoor air standards that FEMA could
14:29  4   look to for guidance.
14:29  5        Do you recall having that concern at the time?
14:29  6   A.   I do --
14:29  7   Q.   Could you --
14:29  8   A.   -- recall that.
14:30  9   Q.   -- elaborate on what -- what your reaction was to learning
14:30 10   that there were, in fact, no standards that FEMA could look to
14:30 11   regarding residential indoor air quality and formaldehyde?
14:30 12   A.   Well, it was quite a while ago.  But the main challenge --
14:30 13   that's your word -- the main challenge we had was that it
14:30 14   didn't give us a baseline for determining what was good and
14:30 15   what was bad.  So that was one of the reasons we had to do the
14:30 16   EPA testing, was so that we could at least establish what is a
14:30 17   baseline of what is in the units, you know.
14:30 18        But it's not really FEMA's job to set an indoor air
14:30 19   quality standard for anyone or an external air quality standard
14:30 20   since we're not a standard-making company.
14:30 21   Q.   Was that something that you wished you had had when this
14:30 22   whole business started, was a standard that you could look to
14:31 23   and evaluate these trailers against?
14:31 24   A.   Well, it would at least have given us a gauge of whether
14:31 25   the units were in compliance with something or not.  Whereas,
```

14:31   1    today they're totally in compliance with voluntary standards at

14:31   2    this point in time.

14:31   3    Q.   Were you generally aware then that the specifications to

14:31   4    which these travel trailers were built didn't say anything

14:31   5    about formaldehyde or formaldehyde levels or formaldehyde

14:31   6    testing?

14:31   7    A.   In general that's correct, yes.

14:31   8    Q.   And the reason I'm asking these questions is, I think what

14:31   9    I heard you to say -- and I may be wrong about this -- but you

14:31   10   indicated that if there was a problem in one unit, you thought

14:31   11   it was a problem possibly in all units.

14:31   12            And at this point in time, was it your understanding

14:31   13   or belief that you had a formaldehyde problem in all of these

14:31   14   118,000 units that were out there?

14:31   15   A.   No, that's not true.

14:32   16   Q.   Did they ask to -- did the representatives of Gulf Stream

14:32   17   Coach ask to participate in this testing?

14:32   18   A.   Yes, they did.

14:32   19   Q.   And are you aware that that happened?

14:32   20   A.   I am aware, yes.

14:32   21   Q.   Were they allowed to participate in the testing?

14:32   22   A.   No.

14:32   23   Q.   Do you have any idea following Hurricanes Katrina and Rita

14:32   24   how many individuals were transitioned through the federal

14:32   25   government through evacuation processes to other cities or

14:35  1        What is the significance of that statement in this

14:35  2   declaration?

14:35  3   A.   Other than, again, painting the picture of -- of how we

14:35  4   provide these units and the conditions under which they're

14:35  5   provided to disaster victims.

14:35  6   Q.   So, in your mind, is it important to note that the victims

14:35  7   have received something at cost -- at no cost to them, and

14:35  8   they've not been required to pay any costs associated with the

14:35  9   installation, maintenance, or removal of the units?

14:35  10       Does that mean that they should have no right to

14:35  11   complain about what they received?

14:35  12   A.   No.   What it means is these units are our responsibility.

14:35  13   Q.   So this statement, basically, means -- what you're trying

14:35  14   to convey -- is that this is FEMA's responsibility.   It has no

14:35  15   other -- no other meaning besides that?

14:35  16   A.   That's correct.

14:35  17   Q.   I'm trying to get to -- this -- this particular statement,

14:35  18   and you've just testified -- is this to say that FEMA has the

14:36  19   authority due to the Stafford Act, to provide and to -- to

14:36  20   respond to disasters, in this particular instance, to provide

14:36  21   temporary emergency housing assistance to victims?

14:36  22   A.   Yes.

14:36  23   Q.   What was your understanding in June of 2006 of how the

14:36  24   Gulf Coast recovery office was responding to air quality

14:36  25   complaints?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
14:37  1    A.   My under- -- my understanding is that the maintenance and
14:37  2    deactivation contractors were, in general, doing a pretty good
14:38  3    job of responding to the slew of complaints or concerns that
14:38  4    occupants were calling in, this being one among many.
14:38  5         And I have, at least to this date, no reason to
14:38  6    believe that they were not executing the provisions of the
14:38  7    contract in meeting their performance requirements.
14:38  8    Q.   This statement says that:  "As a result, FEMA has been
14:38  9    committed to providing applicants and consumers with
14:38  10   information on health and safety issues regarding manufactured
14:38  11   housing units, including formaldehyde levels in these units.
14:38  12        Do you know specifically what was the communication
14:38  13   given to Alana Alexander and the unit that she occupied?
14:38  14   A.   I don't -- I don't know who Alana Alexander is.
14:38  15   Q.   So that through this change in strategy, again, informed
14:38  16   by the experience of Katrina, FEMA does not plan to rely on
14:39  17   travel trailers, for example, as a primary means of providing
14:39  18   emergency assistance for housing?
14:39  19   A.   That's accurate.  We do not plan to rely on travel
14:39  20   trailers as the primary means.  We will still use travel
14:39  21   trailers under a unique set of circumstances.
14:39  22   Q.   Right.
14:39  23        Much more limited than those which -- under which the
14:39  24   travel trailers were used after Katrina, obviously?
14:39  25   A.   That is correct.  Prior to Katrina, we used all
```

14:56  1    standards.  And they simply were either not available or there

14:56  2    were a number of different standards, and no one was able to

14:56  3    point at one and say, that is the standard that you need to

14:56  4    use.

14:56  5    Q.   Right.

14:56  6              Prior to that change, did -- was it the prevailing

14:56  7    view, at least in your view, that the con- -- that the

14:56  8    manufacturers were, in fact, providing units that complied with

14:56  9    the required safety standards for formaldehyde?

14:56 10    A.   It was our understanding that the manufacturers were, if

14:56 11    they were producing mobile homes or manufactured housing,

14:57 12    producing units that complied with HUD standards.

14:57 13    Q.   Uh-huh.

14:57 14    A.   For those who were not producing manufactured housing,

14:57 15    they were producing park models or travel trailers, which are

14:57 16    recreational vehicles, that met or exceeded industry standards,

14:57 17    since there were no federal standards that applied to -- there

14:57 18    were no HUD standards that applied to that construction at the

14:57 19    time that those units were purchased for Hurricane Katrina.

14:57 20    Q.   But do you agree with the suggestion that the industry

14:57 21    sources for these products should also be looked to as -- as

14:57 22    sharing in the responsibility for the formaldehyde issues?

14:57 23    A.   Well, I would say anyone involved in -- in this should

14:57 24    share responsibility.  But let's keep in mind, if what they

14:57 25    were producing were units that were built to meet or exceed

14:57  1    industry standards, and that that's what your contracts

14:57  2    required, and they did, then they were meeting their contract

14:57  3    obligations.

14:57  4         So in terms of responsibility, yes, we all share some

14:58  5    responsibility.  With regard to these particular units,

14:58  6    manufacturers share the responsibility for the construction of

14:58  7    the units and whatever guidance they provide regarding its use.

14:58  8         But it's our responsibility, as the purchasers and

14:58  9    subsequent providers of those units to the disaster population,

14:58  10   to be -- to own up to and be responsible for those units from

14:58  11   that point on, at least in terms of dealing with the needs and

14:58  12   the concerns of the occupants of the units that we own and have

14:58  13   provided to them.  So I'd say it's a shared responsibility.

14:58  14   Q.   And you certainly wanted to -- you wanted to -- you would

14:58  15   rely on the manufacturer of a travel trailer, for example, to

14:58  16   furnish a product that would be safe for long-term residence

14:58  17   knowing that these travel trailers, which as you say are

14:58  18   recreational vehicles, were going to be used for long-term

14:58  19   residence.

14:59  20   A.   I would suggest that the responsibility of the

14:59  21   manufacturers would be to meet the terms of whatever

14:59  22   performance specifications that we ask them to meet with the

14:59  23   contracts that we awarded to them.

14:59  24   Q.   Did you specify anything in those contracts that was

14:59  25   directed to long-term residence or occupancy of a unit

Page 233

15:00  1    determination."  Correct?

15:00  2    A.   Correct.

15:00  3    Q.   Are you suggesting there that the entities which have the

15:00  4    expertise and capability to render authoritative determinations

15:01  5    of the safety of those units would be the manufacturers?

15:01  6    A.   No.

15:01  7    Q.   Who -- who would it be, if not them and if not FEMA?

15:01  8    A.   Well, I would -- we believed -- or I believed that this --

15:01  9    establishing federal standards is a federal responsibility, and

15:01 10    it belongs within the bailiwick of whatever agency was most

15:01 11    appropriate.

15:01 12         I would have voted for EPA and/or CDC to be

15:01 13    establishing what are appropriate standards for -- for what is

15:01 14    safe in the terms of formaldehyde exposure levels.

15:01 15         I do not think that it's the industry's

15:01 16    responsibility to develop federal standards.  I think that's a

15:01 17    federal responsibility.

15:01 18    Q.   As of September the 1st, 2005, when you walked into the

15:01 19    Katrina situation, did you have any reason to believe that

15:02 20    travel trailers were going to be a problem?

15:02 21    A.   From a formaldehyde --

15:02 22    Q.   From a formaldehyde standpoint.

15:02 23    A.   None whatsoever.

15:02 24    Q.   Can you talk a little bit about why FEMA used travel

15:02 25    trailers by the thousands, both prior to Hurricane Katrina and

15:02  1   during the Hurricane Katrina response?

15:02  2   A.   They were the preferred direct temporary housing product

15:02  3   because of their -- because of their size, because we could

15:02  4   move them in and set them up quickly.

15:02  5        I think 80 percent of the units that we provided in

15:02  6   response to Hurricanes Katrina and Rita were on individuals'

15:02  7   private property.  Typically, we put travel trailers on private

15:02  8   property, or often, because we can't fit anything else on that

15:03  9   private property.  We simply can't accommodate a mobile home on

15:03  10  the driveway.

15:03  11       So they were used because, number one, they filled a

15:03  12  need that could not be met any other way.

15:03  13       Two, they were inexpensive compared to a mobile home.

15:03  14       Three, they allowed people to stay at their property

15:03  15  and rebuild their home, as opposed to relocating them to a

15:03  16  community site that might be miles away and might be far more

15:03  17  expensive to build.

15:03  18       So a number of reasons, I think, contributed to the

15:03  19  use of travel trailers and their popularity, at least within a

15:03  20  certain segment of the disaster population on those small

15:03  21  properties and wanted to stay on their property and rebuild

15:03  22  their home.

15:03  23  Q.   Am I also correct that during the prior natural disaster

15:03  24  events that we talked about prior to Hurricane Katrina, can we

15:03  25  assume that there were young children and elderly people and

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

Page 296

16:33 1          In Paragraph 10, five lines from the bottom of

16:33 2    Paragraph 10, Mr. Payne makes the statement in his declaration:

16:34 3    "Further, I informed him -- and "him" is a Bronson Brown, with

16:34 4    the FEMA safety office -- further, I informed him that OSHA had

16:34 5    conducted follow-up testing to confirm that ventilation and

16:34 6    airing out the units was a sufficient response action.

16:34 7          "That testing confirmed that airing out and venting

16:34 8    units for a short time reduced formaldehyde levels below OSHA

16:34 9    PELs, and those results were shared at regular JFO meetings and

16:34 10   also posted on the OSHA website."

16:34 11         Do you see that?

16:34 12   A.   I do see that.

16:34 13   Q.   And in Paragraph 11, Mr. Payne says:  "In addition, I

16:34 14   further informed Mr. Brown that formaldehyde levels in units

16:34 15   should be relatively low once they were handed over to the

16:34 16   public.  This is because by the time the unit is issued to a

16:34 17   disaster victim, the unit will have had an opportunity to air

16:34 18   out and vent as a result of contractor making the unit ready

16:34 19   for occupancy."

16:34 20         Do you see that?

16:34 21   A.   Yes, sir.

16:34 22   Q.   I'm going to mark an e-mail as Miller No. 22 and ask you

16:35 23   to take a look at that.

16:35 24         This is a May 11, 2006, e-mail from Kurtis Melnick to

16:35 25   Marvin Dickerson.  And do you see you're cc'd on that e-mail?

16:35  1    A.    Yes, sir.

16:35  2    Q.    Who is Kurtis Melnick?

16:35  3    A.    Kurtis Melnick and I work together.  He is a log chief

16:35  4    down in New Orleans now.

16:35  5    Q.    Looking at the e-mail in the third paragraph, Mr. Melnick

16:35  6    is talking about the procedure for removing formaldehyde odor

16:35  7    from a temporary housing unit that's been sitting in the sun.

16:35  8    Do you see that?

16:35  9    A.    Yes, sir.

16:35 10    Q.    He says:  "The procedure for this is opening the windows

16:35 11    and possibly the door for a day or two, or until the odor is

16:36 12    completely gone.  In Louisiana, this has been the job of the

16:36 13    contractors, or it -- or it has occurred that someone from IA

16:36 14    enters a trailer and notices the odor, then they have also been

16:36 15    opening the windows.  This should, however, be the

16:36 16    responsibility of the contractors."

16:36 17            Do you see that?

16:36 18    A.    Yes, sir.

16:36 19    Q.    Was that your understanding of what the contractors and/or

16:36 20    the IA personnel were doing in the field when they set these

16:36 21    trailers up?

16:36 22    A.    That is pretty much my understanding.

16:36 23    Q.    And if you look down in the last paragraph, Mr. Melnick

16:36 24    says:  "Our current method of having the contractors who make

16:36 25    the units RFO -- is that "ready for occupancy"?

Page 298

16:36  1    A.    Yes, sir.

16:36  2    Q.    -- seems to be satisfying any concerns from the applicants

16:36  3    we are housing."

16:37  4          Do you see that?

16:37  5    A.    Yes, sir.

16:37  6    Q.    Do you agree with that statement based on your experience

16:37  7    at that time?

16:37  8    A.    I think at -- at that time during early May of 2006, that

16:37  9    the number of complaints and the resolution by airing it out --

16:37 10    by the contractor making it -- was -- was satisfying the

16:37 11    applicants.

16:37 12    Q.    And, again, the contractors we're talking about here are

16:37 13    the contractors who are actually installing the units on-site?

16:37 14    A.    That is correct.

16:37 15    Q.    It would not be a manufacturer like Gulf Stream?

16:37 16    A.    No, sir.

16:37 17    Q.    When you worked the Florida hurricanes in 2004, did you

16:37 18    actually go to Florida at any -- for any of those four storms

16:37 19    you described earlier?

16:37 20    A.    I -- I was -- I was in Florida.

16:37 21    Q.    So you were in Florida at the end of 2004?

16:37 22    A.    Yes, sir.

16:38 23    Q.    Okay.  Were you made aware of any formaldehyde claims by

16:38 24    residents of the THUs in Florida?

16:38 25    A.    I do not recall any formaldehyde claims out of Florida --

16:38  1    Q.   Okay.

16:38  2    A.   -- that I'm aware of.

16:38  3    Q.   Are you aware of the fact that Gulf Stream sold

16:38  4    approximately 7,000 travel trailers to FEMA on the Florida

16:38  5    disaster?

16:38  6    A.   I -- I'm not sure of the number, but I do know that they

16:38  7    did sell -- we had quite a number of the spec models.

16:38  8    Q.   And as far as your experience in Florida was concerned,

16:38  9    there was no formaldehyde problem or issue with any of those

16:38 10    Gulf Stream travel trailers in 2004?

16:38 11    A.   That is correct.

16:38 12    Q.   Mr. Miller, we are going to mark the next exhibit as

16:38 13    Miller No. 24.

16:38 14           Mr. Miller, this is an e-mail that appears to be from

16:38 15    a Judith Reilly, to a David Chawaga.  If you look down at the

16:39 16    e-mail, it's dated April 14th of '06, from Judith Reilly to

16:39 17    Bronson Brown.

16:39 18           Again, Bronson Brown is with -- also with FEMA?

16:39 19    A.   Yes, sir.

16:39 20    Q.   Cc'd to David Chawaga, again, dated April 14th, '06.

16:39 21    There's a discussion of formaldehyde test results.

16:39 22           Do you see that?

16:39 23    A.   Yes, sir.

16:39 24    Q.   Do you have any idea what formaldehyde test results these

16:39 25    individuals are referring to in April of 2006?