Exhibit B

**The Report of Dr. Robert C. James**

**Re: FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY**

**LITIGATION**

**MDL No. 1873**

## 1.0    Qualifications

This report is based on my education, training, and more than 30 years of experience as a research scientist and consulting toxicologist. I received my doctorate in Pharmacology from the University of Utah in 1977. From 1977 to 1981, I was a post-doctoral fellow and a research scientist in the Department of Clinical Pharmacology at Vanderbilt University. Between the years of 1982-1989, I was first an Assistant Professor and then Associate Professor in the Interdisciplinary Toxicology Program in the Department of Pharmacology and Toxicology at the University of Arkansas for Medical Sciences. From 1989 to the present, I have been an Associate Scientist in the Center for Environmental and Human Toxicology at the University of Florida. I have also held adjunct professor/scientist positions at Florida State University and the Medical College of Wisconsin. At these universities, I have developed and/or taught undergraduate and graduate level courses in pharmacology, toxicology, xenobiotic metabolism, and risk assessment. I have conducted basic animal and human toxicological research; and I have consulted with the States of Florida, California and Massachusetts in the area of risk assessment and environmental regulation. During this interval, I also developed similar courses for use in continuing education programs sponsored by the USEPA, OSHA, other universities, and several private technical training institutions where I taught toxicology and/or risk assessment.

In addition to my academic career, I have been a consulting environmental toxicologist since 1979. In the early 1980s, I was Director of Toxicology for Ecology & Environment (E&E), an environmental consulting company that provided support for the USEPA FIT and TAT teams, technical teams that responded to chemical spills/releases and identified hazardous waste sites that would require remediation. One of my responsibilities was as a member of the medical surveillance program for USEPA and Ecology & Environment emergency response personnel who worked as subcontractors to the USEPA at chemical spills and hazardous waste sites. Later, I was part of another medical surveillance program for hazardous waste incineration workers. Another primary responsibility at E&E was to the USEPA for toxicology and risk assessment guidance/oversight at major hazardous waste sites throughout the country. For the last 20 or so years, I have been President of TERRA, Inc., which is an environmental consulting

2

firm specializing in toxicology, causation analyses, and risk assessment. As a consulting toxicologist, I have served as an advisor to several agencies of the United States government, including the Department of Agriculture, the Environmental Protection Agency, the Department of Navy, the Department of Justice, and the Occupational Safety and Health Administration. In addition, I have acted as an advisor to the environmental agencies of several states and have provided testimony in state hearings that have dealt with either the toxicological evaluation of chemicals or the risk assessment procedures by which that state sets environmental exposure guidelines for chemicals.

I have more than 70 peer-reviewed publications or book chapters in scientific journals and toxicology textbooks that covered toxicology, causation analysis, and risk assessment, and I have made approximately the same number of scientific presentations at professional meetings. I am an editor of the toxicology textbook PRINCIPLES OF TOXICOLOGY: Environmental and Industrial Applications (2000) published by John-Wiley and Sons. I am a member of the Society of Toxicology, the Society of Environmental Toxicology and Chemistry, and the Society of Risk Analysis. I maintain my own toxicology reference library which now contains more than 75,000 publications, textbooks, and government documents dealing with toxicology and the toxicities of chemicals. A further elaboration of my professional background and credentials is provided in the attached curriculum vita, as well a fee schedule and list of recent testimony.

## 2.0   The Fundamental Methodology for Establishing Causation

## 2.1   The Accepted Principles for Establishing General and Specific Causation

When performing a scientific evaluation of an alleged toxic exposure, two different causation analyses must be performed; i.e., a *general* and a *specific* causation analysis. *General causation* is the scientific determination as to whether or not the chemical in question is capable of causing a particular condition in the general population at some specified dose. It is a determination of what toxicities the chemical is known to produce in humans. *Specific* causation

is a scientific determination as to whether a known, or alleged, chemical exposure an individual may have received, has caused the injuries, diseases, or conditions that individual has.

The objective methodology for proving *general* causation, as currently practiced, is a process that has undergone continual refinement for approximately the last 150 years.  Probably the first effort to formalize this process occurred when scientists and physicians sought to establish the causes of diseases induced by infectious agents whose presence could not easily or readily be identified with the naked eye (Yerushalmy and Palmer, 1959; Evans, 1976).  A similar process was instituted in the 1960s as scientists began to focus on diseases induced by chemicals associated with the workplace, our environment, or lifestyle choices like smoking (USDHEW, 1964; Hill, 1965).  At the present time, a number of different criteria have been proposed by scientists as the basis of the scientific method for establishing general causation (Hill, 1965; Evans, 1976; Hackney and Linn, 1979; Doll, 1984; Gehlbach, 1988; Guidotti and Goldsmith, 1986; Susser, 1977, 1986, and 1991; Guzelian et al., 2005).  These criteria include:

A.  The original Hill Criteria –
   1) The **Strength** of the human association;
   2) The **Consistency** of the human association;
   3) The **Specificity** of the human association;
   4) **Temporality** (do biologically realistic temporal relationships exist);
   5) **Biological gradient** (i.e., the principle of dose-response where within some range of human doses the incidence of the effect increases with increasing dose);
   6) **Biological plausibility** (the response in humans is biologically reasonable as predicted from the known animal toxicology and/or mechanism(s)/mode(s) of action for that toxicity);
   7) **Coherence** (there is an internal and external consistency to all of the evidence);
   8) **Experiment** (the response decreases or increases with corresponding decreases or increases in exposure); and
   9) **Analogy** (structure-activity relationships with other chemicals may suggest the chemical is or is not capable of producing the toxicity of interest).
B.  Plus the additional suggested criterion of –
   10) **Confounders** (i.e., the elimination of alternative confounding disease or risk factors that could possibly explain the results of independent studies; this issue should be covered well in the individual epidemiology studies themselves).

Acceptance of the above criteria as a guide for the determination of general causation is now widespread among the scientific community.  For example, scientific bodies that use most,

or all, of these criteria in their causation analyses include the World Health Organization (WHO), the International Agency for Research on Cancer (IARC), the United States Environmental Protection Agency (USEPA), the American Conference of Governmental Industrial Hygienists (ACGIH), the U.S. Food & Drug Administration (USFDA, 2009), and the National Academy of Sciences (NAS). Furthermore, these causation criteria are discussed in modern textbooks of epidemiology (e.g., Monson, 1980; Mausner and Kramer, 1985; Hernberg, 1992; Rothman and Greenland, 1998), toxicology (Faustman and Omenn, 1996), occupational medicine (Sacks and Schenker, 1990; Eisen and Wegman, 1995), and the Federal Judicial Center's own <u>Reference Manual</u> <u>on</u> <u>Scientific</u> <u>Evidence</u> (2000). Thus, the consensus opinion in the scientific and medical community is that one should utilize the "Hill" or "causation criteria" as the cornerstone of the scientific method for establishing *general* causation (Guzelian et al., 2005).

In any general causation analysis, the judgment as to whether or not a causal relationship has been established for a chemical and a specific toxic effect requires two distinctly different analyses of the literature in question (Hennekens and Buring, 1987). The first analysis involves the *internal consistency* (internal validity) of the reported association. That is, does the scientist performing the causation analysis believe the observed association between the exposure and the reported effect is a valid one? In this assessment, the reported association and the study are evaluated primarily for alternative explanations that arise within the study itself – could *chance*, *bias*, *confounding*, or some other factor related to the design of the study account for the reported finding? For example, studies that divide the exposed individuals into subgroups (based on age, sex, dose, latency, etc.) which then provide contradictory results regarding the potential for a chemical to be associated with the disease of interest is a clear example of a study that lacks *internal consistency*.

The second analysis involves the *external consistency* (external validity) of the reported association. In this analysis, the scientist determines whether or not the totality of the evidence taken from various sources provides a consistent and coherent consensus opinion that would support a conclusion of causality. When determining the external consistency of the reported association, not all studies carry equal weight in the final analysis (Glenny and Harrison, 2003). The experimental design, strength, biologic plausibility, species consistency, statistical analysis,

and external consistency with the literature, are some of the factors inherent to each individual study that may cause a scientist to give one study greater or lesser weight when considering the totality of the evidence; particularly when inconsistent or conflicting results have been reported. Thus, judging whether or not the reported association is causal extends well beyond simply citing or emphasizing the reported findings of a single study or set of studies (e.g., see Guzelian et al., 2005; Reference Manual on Scientific Evidence, 2nd Edition, Federal Judicial Center, 2000). Instead, it consists of a critical review of the validity of the study as well as an evaluation of how well it reflects the remaining epidemiologic literature and how well it satisfies an objective, evidence-based conclusion (Guzelian et al., 2005).

I noted above that not all types of epidemiology studies represent the same weight of evidence in the final causation analysis (Glenny and Harrison, 2003; Guzelian et al., 2005). As predominantly observational studies, the fundamental design of each type of epidemiology study carries with it certain advantages and disadvantages. Some observational study types (e.g., case reports or case series, cross-sectional studies, and ecological studies) provide information relevant only for generating testable hypotheses. Other, more robust study designs are necessary to test the proposed hypothesis (e.g., case-control studies, cohort studies, or experimental studies like randomized clinical trials) to determine if a causal link does in fact exist. In general terms, I believe the different types of epidemiology studies should be ranked according to the relative strength of causal evidence they provide (e.g., see Sackett et al., 1985; Glenny and Harrison, 2003; see Table 8 Guzelian et al., 2005 as shown on the next page in Table 2.1).

I would note, however, that the relative strength or weakness of a particular type of study may be affected by the specific design and execution of that study and the ability of that particular study design to evaluate a particular disease, such that the assessment of the relative strength one might ultimately choose to give a particular study regarding causal inference may be increased or decreased somewhat in the final assessment of a particular causation analysis (e.g., see Szklo, 1987; Marsh, 1992; Blair et al., 1996; Guzelian et al., 2005). For example, for relatively rare diseases, case-control studies may provide stronger evidence than cohort designs. Thus, much like the USFDA's own evidence-based approach, randomized clinical trials and

cohort studies are generally considered to be the strongest forms of evidence, and are necessary for establishing general causation.

**Table 2.1**

**Relative Strengths of Epidemiology Study Types That Contribute To**
**An Evidence-Based Systematic Review of the Medical Literature**

| Study type | Description |
|---|---|
| Randomized clinical trial | Study questions of diagnosis or the effect of a therapy or a test on patients as compared to control groups (no intervention). |
| Quasi-experimental | Investigator-controlled allocation of participants to different intervention groups but the method falls short of genuine randomization and allocation concealment. |
| Cohort study, longitudinal, retrospective (historical) | Studied populations are selected or differentiated on the basis of chemical exposure and followed-up (whether prospectively or historically) for determination of excess frequency of health outcomes over a defined time interval (expressed as relative risks). |
| Nested case-control study (within a cohort study) | Cases and controls are individuals selected from a previously well defined cohort (such as a cohort incidence or mortality study). |
| Case-control study | Participants who have a specific disease (injury) are matched to referents (controls) that do not have the disease. Both are examined for exposure to possible risk factors (e.g., lifestyle factors, medication use) that differ in frequency between case and controls. |
| Proportionate mortality study | Performed by abstracting data from death certificates, and expected deaths are calculated by comparing the reference group cause-specific deaths to the total deaths in the study group; thus, unlike a cohort study, the effects of exposure and effects are not directly sampled. |
| Cross-sectional study | Attempt to relate an exposure and effect in a population at a single point in time. |
| Before and after study | Comparison of findings in study participants before and after an intervention. |
| Ecologic (community) studies | Examine relationships between exposures and adverse health effects for groups but not for individuals in the groups. |
| Case series/case reports | Descriptive studies that serve chiefly to record events, observations and activities. Generally only useful for generating hypotheses. |

Adapted from Guzelian et al. (2005)

In contrast, information suitable for generating hypotheses to test in cohort or randomized clinical trials, might be found in cross-sectional studies (Hennekens and Buring, 1987; Beaglehole, 1993; Greer et al., 2000; Harrison, 2000; Glenny and Harrison, 2003; Khan et al., 2003; Woodward, 2005; Guzelian et al., 2005) or ecological studies (Bang, 1996; dos Santos Silva, 1999; Greenberg et al., 2001; Beaglehole et al., 1993; Woodward, 2005; USFDA, 2009). Cross-sectional studies are ones that are used to determine the frequency of a particular disease, exposure, or other health-related event in a population at a particular point in time. They are hypothesis-generating in nature (e.g., Bang, 1996) and generally cannot be used to conclude causation (e.g., dos Santos Silva, 1999). The major problem with cross-sectional studies is that one does not know whether the disease occurred prior to the exposure (time-sequence of events), which can lead to the problem of *reverse causation*. The limitations of the cross-sectional study design have been pointed out in several epidemiologic texts (dos Santos Silva, 1999; FDA, 2009; Beaglehole et al., 1993; Hennekens and Buring, 1987; Stommel and Wills, 2004), and some key limitations that have been noted include:

> *Cross-sectional surveys are not, however, the appropriate study design to investigate causal relationships because they are based on prevalent rather than incident cases.* (dos Santos Silva, 1999)

And,

> *Cross-sectional studies determine the presence (prevalence) of both exposure and disease in the subjects and do not determine the development of disease or risk of disease (incidence). Moreover, since both exposure and disease are determined in an individual at the same point in time, it is not possible to establish the temporal relation between exposure and disease— that is, that the exposure preceded the disease, which would be necessary for drawing any causal inference.* (Reference Manual On Scientific Evidence, 2nd Edition, Federal Judicial Center, 2000; emphasis added)

And,

> *Since exposure and disease status are assessed at a single point in time, in many cases, it is not possible to determine whether the exposure preceded or resulted from the disease. ... This type of "chicken or egg" dilemma is common to virtually all cross-sectional data.* (Hennekens and Buring, 1987)

And,

> *Clearly, the problem of reverse causation is particularly difficult in cross-sectional studies. Recall that on of the criteria for establishing a casual relationship is the establishment of a temporal sequence: causes occur before their effects. This is inherently more difficult in cross-sectional studies.* (Stommel and Wills, 2004)

Ecologic studies are those studies conducted at the population or group level (rather than at the individual level). This study type is also considered to be hypothesis-generating in nature and is not reliable in assessing causation (e.g., Morgenstern, 1982; Beaglehole, 1993; Bang, 1996; Woodward, 2005; FDA, 2009). The main problem with this type of study is known as the "ecologic fallacy[1]" that can occur when one takes the conclusion from the population level and applies it at the individual level. Shortcomings of ecologic studies are well recognized; for example:

> *Ecological studies and case reports are the least reliable types of observational studies.* (FDA, 2009)

And,

> *Several major reservations exist regarding the use of ecologic studies in occupational epidemiology. In some instances, they may provide a reasonable and inexpensive way of generating hypotheses. Alternatively, ecologic studies are limited by the use of proxy data for exposure and disease and by the unavailability of data necessary to control confounding factors. The general problem of inappropriate inferences from ecologic data has been referred to as the ecologic fallacy.* (Bang, 1996; emphasis added)

And,

> *The association observed between variables at the group level does not necessarily represent the association that exists at the individual level.* (Beaglehole et al., 1993)

And,

> *The major limitation of ecologic analysis for testing etiologic hypotheses is the potential for substantial bias in effect estimation. The central problem, known as the "ecologic fallacy," results from making a causal inference about individual phenomena on the basis of observations of groups.* (Morgenstern, 1982; emphasis added; )

And,

> *Another type of bias that can occur in many types of observation studies is a reversal of the hypothesized cause and effect, i.e., the observed association is due to the direct or indirect influence of the disease on exposure status. What makes ecologic studies particularly vulnerable to this error is that it can occur with prevalence, mortality, or even incidence data.* (Morgenstern, 1982; emphasis added; )

---

[1] Defined as - *the bias that may occur because an association observed between variables on an aggregate level does not represent the association that exists at an individual level* (Last, 2000). An example from Last is that while a correlation has been found between drinking water quality and mortality rates from heart disease, it would be an ecologic fallacy to infer from this alone that exposure to water of a particular level of hardness would influence a particular individual's change of developing or dying from heart disease Last (2000).

To be able to perform a *specific* (individual) causation analysis, a toxicologist must, of course, first complete a general causation analysis to establish which toxicities might be expected under specific conditions of exposure.  To address the related issue of what agent might have caused a specific individual's disease (*specific causation*), the scientist again adapts the general causation criteria to the practical investigative needs relevant to the individual.  However, not all of the criteria used to establish *general* causation are typically relevant or applicable to a specific causation analysis, and so a smaller set of criteria are more frequently analyzed.  It is my opinion that, at a minimum, to establish a cause and effect relationship for any individual's alleged health claim (specific causation), one must show that the following five scientific criteria are fully satisfied:

1.  **Qualitative Toxicity** - the chemical in question is *known* to be capable of producing the alleged effect in humans.  This step is the *general causation* analysis.

2.  **Dose-Response** - the individual had contact with the chemical (*exposure*), and the amount of chemical absorbed into the body (*dose*) was of sufficient magnitude and duration to be capable of producing the alleged effect.

3.  **Temporality** - the chemical exposure must be temporally related to the onset of the individual's clinical condition; that is, the effect cannot precede the alleged exposure.

4.  **Confounders** - all other significant causes (including exposure to other substances, lifestyle, workplace, pre-existing illness or hereditary factors) of the disease for the individual have been controlled for or ruled out.

5.  **Coherence** - all of the evidence is consistent with the conclusion of causation.

I note that my specific causation criteria are equivalent to those proposed by Sackett for determining whether an adverse effect in an individual was induced by their medication (see following, Table 2.2).

**Table 2.2**

**Specific Causation Criteria Comparison**

| Sackett's Specific Causation Criteria for Adverse Effects of Drugs in an Individual | My Specific Causation Criteria |
|---|---|
| 1.  Adverse effect well accepted as adverse (drug) reaction. | 1. **Qualitative Toxicity** (literature precedence; i.e., general causation has been established for some dose) |
| 2.  Drug level provides unequivocal evidence of overdose. | 2. **Exposure/Dose-Response** |
| 3.  Timing as expected for adverse reaction for this drug. | 3. **Temporality** |
| 4.  No good alternative candidate (unexplained exacerbation or recurrence of underlying illness) | 4. **Elimination of confounding alternative causes** |
| 5.  Adverse effect improves suitably if not re-challenged with drug.  Adverse effect unequivocally recurs or exacerbates upon re-challenge. | 5. **Coherence** (All data are consistent with the conclusion and do not contradict or detract from it; biological plausibility is considered; experiments work as predicted, etc.) |

Source: Sackett et al. (1985).

Likewise, Sullivan (1992) has published a similar set of criteria for establishing individual (*specific*) causation for occupational and environmental chemical exposures including:   1) Defining the exposure, 2) Evaluation of dose-response relationships, 3) Evaluation of the temporal relationships, 4) Evaluation of latency periods, 5) Evaluation of known chemical-disease associations, 6) Evaluation of the pathotoxicology, 7) Evaluation of confounding factors and risk modification factors, and 8) Observing the cessation of disease following termination of exposure.  It is readily apparent that the specific causation criteria these authors propose for an evaluation of individual (specific) causation analysis are adaptations of those commonly referred to as the "Hill" or "General Causation" criteria.  I have been using these *general* and *specific* causation criteria in my work as a toxicology consultant and as an expert witness in other cases for approximately two decades.  During this time, it has been my experience, and that of others, that failure to satisfy even one of the five causation criteria necessary to establish *specific* causation for the individual is usually fatal to the proposition that the alleged exposure to a specific chemical caused the observed medical condition (Guzelian et al., 2005).

**3.0    The Focus of this Report**

I was asked to evaluate the irritant properties of formaldehyde and to determine what concentrations of formaldehyde in air would induce irritation and those that would not likely be irritating to the general population.  I was also asked to comment briefly on the proper use of the MRL values that are provided by the ATSDR, on the regulatory risk assessment process, and on the formaldehyde level measured in the trailer used by the plaintiffs.

**4.0    Some Background Information on Formaldehyde**

**4.1    Introduction**

Formaldehyde, like many other VOC compounds[2], is ubiquitous in the general environment (IARC, 2006); and it has been known for decades that air sampling indoors or outdoors with modern methods commonly provides the investigator with a long list of VOCs (e.g., Jarke, 1981; Burton, 1997; or see the USEPA TEAM[3] studies).  As a consequence of the common occurrence of chemicals in our air, we are all exposed to formaldehyde, alcohols, other aldehydes, ketones, terpenes, aromatics, and aliphatics (to name a few) on a daily basis.  These chemicals are off-gassed from many consumer or household products, construction materials, fabrics, and additional items that are found in residences and other indoor air environments (vehicles, offices, businesses, hospitals, etc.).  Formaldehyde is also endogenously generated by the human body, is formed by the oxidation of hydrocarbons in the troposphere and around vegetation when compounds (terpenes and hydroxyl radicals) react (IARC, 2006).  The ATSDR (1999) identified the following sources of exposure to formaldehyde as follows:

> *Consumers can be exposed to formaldehyde gas through its use in construction materials, wood products, textiles, home furnishings, paper, cosmetics, and pharmaceuticals.  Dermal contact with formaldehyde containing materials, including some paper products, fabrics, and cosmetics, may also lead to*

---

[2] The term VOC may be used many times in this report.  This abbreviation stands for Volatile Organic Compound and is generally used to represent hundreds of different chemicals that comprise different, specific families under the classification of aromatic and aliphatic organic chemicals.  For example, alcohols, aldehydes, ketones, esters, carboxylic acids, ethers, and alkenes are just a few of the specific chemical classes that make up the group of organic chemicals known as VOCs.  A number of halogenated aliphatic chemicals are also commonly measured as VOCs.

[3] TEAM Studies = USEPA Total Exposure Assessment Methodology Studies

*consumer exposure. Commuters may be exposed to formaldehyde while riding in automobiles or subways, walking, and biking (Chan et al. 1991).*

IARC (2006) noted the following indoor air sources of formaldehyde emissions in the 1980s:

*Release rates from pressed wood products ranged from below the limit of detection for an exterior plywood to 36,000 $\mu g/m^2$ per day for some panelling. Other release rates were 15-550 $\mu g/m^2$ per day for articles of new clothing that had not previously been washed, 52-620 $\mu g/m^2$ per day for insulation products, 75-1000 $\mu g/m^2$ per day for paper plates and cups, from below the limit of detection to 350 $\mu g/m^2$ per day for fabrics and from below the limit of detection to 65 $\mu g/m^2$ per day for carpets.*

After manufacturing processes were changed, the release rates of a number of products declined, and for 1999 IARC reported the following emission rates for potential sources of formaldehyde (IARC, 2006):

*Release rates of formaldehyde were reported to range typically from 9 to 1,578 $\mu g/m^2/h$ for a variety of bare urea–formaldehyde wood products, from 1 to 461 $\mu g/m^2/h$ for coated urea–formaldehyde wood products, from 42 to 214 $\mu g/m^2/h$ for permanent press fabrics, from 4 to 50 $\mu g/m^2/h$ for decorative laminates, from 16 to 32 $\mu g/m^2/h$ for fibreglass products and from 4 to 9 $\mu g/m^2/h$ for bare phenol–formaldehyde wood products (Kelly et al., 1999). Paper grocery bags and towels had emission rates of < 0.5 and < 0.6 $\mu g/m^2/h$, respectively. For wet products, the emission rates were: latex paint, 326–854 $\mu g/m^2/h$; fingernail hardener, 178,000–354,000 $\mu g/m^2/h$; nail polish, 20,700 $\mu g/m^2/h$; and commercially applied urea–formaldehyde floor finish, 1,050,000 and 421,000 $\mu g/m^2/h$ for base and topcoats, respectively (Kelly et al., 1999).*

Formaldehyde is used as a preservative and disinfectant. So, while it is common knowledge that formaldehyde is used in embalming solutions, it is less commonly known that formaldehyde is a frequently used in cosmetics as an antimicrobial agent.

*Formaldehyde is also the basis for products that are used to manufacture dyes, tanning agents, precursors of dispersion and plastics, extraction agents, crop protection agents, animal feeds, perfumes, vitamins, flavourings, and drugs (WHO, 1989; Reuss et al., 2003).* (IARC, 2006)

Obviously then, any indoor environment in the United States will most probably contain some formaldehyde-releasing products leading Sherman and Hodgson (2003) to state "*Formaldehyde*

*likely is present in all houses as an indoor-generated pollutant.*" These authors also proposed that ventilation standards target a 50 ppb concentration as an acceptable value for formaldehyde in indoor air. This would then constitute a screening value for investigations of building ventilation rates.

As noted earlier, numerous sources of other VOC compounds (including other aldehydes) contribute to the total VOC load in indoor air (for example see Wallace et al., 1991; Levin, 1989; Wilfert et al., 1986; Angle, 1988; Stolwijk, 1990). Each of these other VOC chemicals will also at some concentration produce acute CNS and irritant symptoms similar to those observed with formaldehyde. Thus, indoor air studies, particularly those with an ecological, cross-sectional, or case series design, are not particularly rigorous or useful in objectively determining what specific chemical the reported symptoms might be attributed to. This is especially true since studies of sick building environments have identified particulates (e.g., dust), humidity, stress, low ventilation rates, temperature, and several other factors as sources for complaints and symptoms (Flannigan et al., 2001; AIHA, 1993; ASHRAE, 1991; Bardana and Montanaro, 1996; USEPA, 1991; OSHA, 1991; Fiedler et al., 2005). Consequently, identifying human responses to specific chemicals via experiments performed in chamber studies are the least confounded and the most accurate informative concerning threshold concentrations at which odors and irritation are likely to be reported as the result of exposure to a particular VOC chemical.

## 4.2    Formaldehyde in Indoor Air

That formaldehyde, other aldehydes, and various types of VOCs are identified in indoor residential or work air environments is neither surprising, nor unique, and this information has been available for over two decades. For example, the ATSDR (1999) has summarized ambient formaldehyde data in outdoor air from several studies performed in past decades that identified outdoor concentrations of formaldehyde that showed outdoor urban environments ranges from the low ppb to tens of ppb. A recent EPA outdoor air study from 2006 in Kenner, Louisiana, reported similar findings and identified four maximum values of 14.4, 13.3, 10.6, 9.4, with a mean of 3.63 ppb. Yet the presence of formaldehyde in indoor and outdoor air is not unique to this VOC as Jarke et al. (1981) collected indoor and outdoor air samples at 36 Chicago

metropolitan area homes and identified the presence of over 250 different chemicals including a number of aldehydes and ketones. In fact, since 1981, indoor air quality has become its own industry and area of study, complete with discipline-specific journals (e.g., *Indoor Air*). It should also be noted that in indoor air quality investigations, it is common to compare previously identified values for other existing structures to those reported in the property being investigated:

> *There are few health-based guidelines for VOC concentrations in non-industrial indoor environments. Thus, summaries of indoor VOC concentrations typically measured in houses and offices provide one means for evaluating measured VOC concentrations.* (Hodgson and Levin, 2003)

Many indoor air investigations have focused on aldehyde and VOC emissions, or identified aldehydes and other VOCs, as part of a broad-based indoor air scan and reported their findings in peer-reviewed journal articles. For the sake of brevity, only a relative few are mentioned here. For example, a study of formaldehyde concentrations in fifty-three homes located in Louisiana was published by Lemus et al. (1998[4]). Of these, 74% contained formaldehyde at measureable levels, and 60% had levels exceeding the ASHRAE guideline at the time of 100 ppb (123 $\mu g/m^3$). The single highest value identified was 6,600 $\mu g/m^3$ or about 5.4 parts per million (i.e., 5,400 ppb), and the mean concentration was 375 ppb (0.375 ppm). And yet the authors found no unusual sources of formaldehyde in the homes, stating that:

> *For Southern Louisiana houses, the formaldehyde levels appeared to be associated with low-level sources, such as furniture, paneling rooms,* [sic] *cabinetry, and/or low ventilation rates.*

An earlier study by Stock (1987) measured formaldehyde levels in 43 conventional homes in two Houston, Texas, neighborhoods. Concentrations ranged from 30 to 180 ppb, with a geometric mean of 70 ppb. These levels are similar to those reported earlier by Stock and Mendez (1985) for the Houston area who after a 1980 survey of 78 homes reported formaldehyde levels ranged from <10 to 290 ppb, with a geometric mean of 50 ppb (arithmetic mean 70 ppb). In this study, about 15% of homes had formaldehyde levels greater than 100 ppb. Eight of 13 outdoor measurements resulted in detectable levels, with the average of these being 20 ppb. Gordon et al. (1999) identified formaldehyde in 69% of the samples collected in indoor air as part of the

---

[4] Air measurements were collected in 1997—personal communication, Dr. Abdelghani of Tulane.

National Human Exposure Assessment Survey and reported 332 ppb as their maximum value (the maximum outdoor air value was approximately 50 ppb). Formaldehyde exposure measured via personal monitors by Kinney et al. (2002) in New York yielded a mean of just over 20 ppb formaldehyde.

Hare et al. (1996) reported average indoor air formaldehyde concentrations of 20-45 ppb (with a high of 76 ppb) for newly constructed conventional homes. After examining new site-built and manufactured homes Hodgson et al. (2000) reported mean values of 36 (14-58 ppb) and 34 ppb (21-47 ppb) respectively. And a relatively recent review of indoor air studies from 1992-2002 by Hodgson and Levin (2003) reported a mean concentration of 55 parts per billion (ppb) formaldehyde in existing residences (the authors reported the mean of identified maximum values as being 180 ppb). Hodgson and Levin (2003) also reported values up to 62 ppb in new homes with a mean value of 32 ppb. These authors identified several other ketones and aldehydes as well as other VOCs as being reported in indoor residential and office air including the presence of chemicals such as benzaldehyde, acetaldehyde, acrolein, and propionaldehyde. Gilbert et al. (2005) reported formaldehyde concentrations up to 71 ppb (median, of 24 ppb) in Canadian homes (Prince Edward Island), and indicated that homes built after 1970 had the higher measured formaldehyde values.

The presence of irritant aldehydes has been detected in automobile emissions including: formaldehyde, acetaldehyde, acrolein, propionaldehyde, crotonaldehyde, butyraldehyde, benzaldehyde, o-tolualdehyde, and m-tolualdehyde (Lipari and Swarin, 1982). Given the frequent or common presence of aldehydes in both indoor and outdoor air, and the many possible sources, it is not surprising that the AIHA (2006) made the following statement about background exposures to formaldehyde in their ERPG documentation (emphasis added):

> D. Background Exposures
> Because of its widespread use, exposure to formaldehyde is common in indoor and ambient environments. For example, exposure can occur in newly constructed buildings where off-gassing from modern building and insulating materials can lead to temporary formaldehyde concentrations approaching 1 ppm in the air. In ambient air, emissions from auto exhaust, municipal incinerators, and other sources have produced levels as high as 0.12 ppm.

The USEPA[5] has also noted some of the residential sources of formaldehyde, and some indication of what levels might be found in indoor air environments:

> Sources of formaldehyde in the home include building materials, smoking, household products, and the use of un-vented, fuel-burning appliances, like gas stoves or kerosene space heaters. Formaldehyde, by itself or in combination with other chemicals, serves a number of purposes in manufactured products. For example, it is used to add permanent-press qualities to clothing and draperies, as a component of glues and adhesives, and as a preservative in some paints and coating products.

And,

> In homes, the most significant sources of formaldehyde are likely to be pressed wood products made using adhesives that contain urea-formaldehyde (UF) resins. Pressed wood products made for indoor use include: particleboard (used as sub-flooring and shelving and in cabinetry and furniture); hardwood plywood paneling (used for decorative wall covering and used in cabinets and furniture); and medium density fiberboard (used for drawer fronts, cabinets, and furniture tops). Medium density fiberboard contains a higher resin-to-wood ratio than any other UF pressed wood product and is generally recognized as being the highest formaldehyde-emitting pressed wood product.

And:

> Average concentrations in older homes without UFFI are generally well below 0.1 (ppm). In homes with significant amounts of new pressed wood products, levels can be greater than 0.3 ppm.[6]

Formaldehyde is also common to other media besides the indoor air that we breathe. For smokers, formaldehyde exposure has been measured to be as high as 100 micrograms per cigarette (IARC 2006) with a median yield reported at 49.5 µg (IARC, 2004). IARC reports a daily dose of formaldehyde for smokers as being 0.4-2.0 milligrams daily (mg/day) for a pack a day smoker (IARC, 2006). Similarly, other aldehydes and VOCs in cigarette smoke have been reported for decades and are extensively documented (see Appendix A, and Table 4.2 below):

---

[5] http://www.epa.gov/iaq/formalde.html#Levels%20in%20Homes
[6] http://www.epa.gov/iaq/formalde.html

**Table 4.2**

**Vaporized Aldehydes and Ketones in Cigarette Smoke**

| Aldehydes | Ketones |
|---|---|
| Formaldehyde | Acetone |
| Acetaldehyde | 2-Butanone |
| Propionaldehyde | Butenone |
| Acrolein | 2,3-Butanedione |
| Isobutyraldehyde | 3-Methyl-2-butanone |
| Methacrolein | 2-Pentanone |
| Pivaldehyde | 3-Pentanone |
| Butyraldehyde | |
| Isovalderaldehyde | |
| Valderaldehyde | |
| Crotonaldehyde | |
| 2-Methylvalderaldehyde | |

Source: Newsome et al., 1965.

Commonplace activities can expose individuals to additional formaldehyde. For example, the use of burning insect repellant "coils" produces formaldehyde as well as several other potential physical and chemical respiratory irritants (Liu et al., 2003). In a study measuring personal exposures to toluene and formaldehyde for both customers and workers in a nail salon, McNary and Jackson (2007) reported mean exposure levels of 22-22.5 ppb formaldehyde and concluded:

> *This paired comparison study of workers and consumers exposed to formaldehyde and toluene at the same time from cosmetic nail products clearly demonstrates that both formaldehyde and toluene are safe for use by workers in nail and full service salons and their customers. Consumers at home are also at no risk from using cosmetic nail products containing formaldehyde and toluene*

## 4.3    Formaldehyde in the Body

Formaldehyde is a normal constituent of the human body and is a naturally occurring metabolite in animals and humans (Cascieri and Clary, 1992). Formaldehyde is created endogenously (in the body) via serine, glycine, methionine, and choline metabolism and via the demethylation of N-, S-, and O-methyl compounds (USEPA, 2008), and then re-utilized to make other hydrocarbon-containing molecules in the body (Owen et al., 1990). Endogenous formaldehyde is also a source of methyl units that are transferred via tetrahydrofolate into the one carbon pool. Formaldehyde is found in the blood at concentrations of approximately 2.6

µg/g (equal to 2.6 ppm; Heck et al., 1985). It is an essential metabolic intermediate in all cells for use in the biosynthesis of purines, thymidine, and certain amino acids (Owen, 1990; IARC, 1995). Formaldehyde can also be released into the body by various medications such as codeine, dextromethorphan (e.g., Robitussin[®], which can release up to 6.6 mg of formaldehyde per dose), venlafaxine (Effexor[®], an antidepressant, which can release 8.1-24.3 mg of formaldehyde per dose; Dhareshwar and Stella, 2008). It has been estimated that an adult human produces and metabolizes over 50,000 mg (50,000,000 µg) of endogenous formaldehyde each day (Clary and Sullivan, 2001; Dhareshwar and Stella, 2008). The body can metabolize about 22 mg formaldehyde directly to carbon dioxide every minute, or about 1,320 mg per hour (Clary and Sullivan, 2001).

Formaldehyde, a simple one-carbon molecule, is a highly water soluble compound that reacts at the site of contact and is rapidly metabolized in respiratory tissues, in red blood cells and the liver via formaldehyde dehydrogenase and other enzymes (Franks, 2005). After absorption, formaldehyde is first metabolized to formic acid (which has a longer $t_{1/2}$ of about 80-90 minutes) and then converted to $CO_2$ and water via formyltetrahydrofolate synthetase (Owen et al., 1990). The half-life of formaldehyde in the body is about 1.5 minutes based mainly on primate data, but Clary and Sullivan (2001) state that the available human data are consistent with a very short-half life of formaldehyde in humans. Like others, Waddell has noted:

> *Formaldehyde is absolutely essential in intermediary metabolism. It binds to tetrahydrofolate to provide active carbon which is used in the synthesis of many compounds in the body. The concentration of free and reversibly bound formaldehyde in the blood of normal healthy humans is 2.6 ppm (Heck et al. 1985); furthermore, breathing higher concentrations in the inspired air does not raise the concentration in the blood of man or animals. The formaldehyde utilized daily from food to produce creatinine in normal adult males is estimated at 560 mg (Mudd and Poole 1975). The total formaldehyde utilized in one day by an adult male in intermediary metabolism can be estimated to be 58,000 mg from the half-life and volume of distribution of formaldehyde in humans. Table 9 lists the values of total formaldehyde from intermediary metabolism, that used to produce creatinine, that in one orange, that produced from the metabolism of the caffeine in one cup of coffee, and, that which would be absorbed by the lung assuming 100 absorption at 0.2 ppm for 24 hr.* (Waddell, 1993, emphasis added)

Studies have measured formaldehyde in the breath of "nonexposed" individuals and in human tissues. Moser et al. (2005) measured formaldehyde concentrations in 344 volunteers (smokers and non-smokers) reporting the median formaldehyde concentration to be 4.3 ppb with a range of 1.2-72.7 ppb. Kusch et al. (2008) also recently measured formaldehyde and other volatile organics in the breath of 370 individuals and compared smokers (n=81) to nonsmokers (210 non-smokers; 79 ex-smokers). For all the data (unfiltered data), the median concentration was 4.5 ppb for smokers and 5.2 for non-smokers. In certain cases (e.g., where the inhaled air concentration was higher than the exhaled air or for compounds where the concentration in exhaled air was expected to be higher, i.e., due to the endogenous production of the compound in the body), the data was filtered. For the filtered data, the median concentration for smokers was 9.9 ppb formaldehyde in breath while for nonsmokers it was 10.4 ppb. Kushch et al. (2008) noted that the data they reviewed did not indicate a significant change in values either before or after filtering for formaldehyde in the expired air of humans.

Heck et al. (1985) reported the blood concentration of formaldehyde in humans (n=6) changed little after exposure to 1.9 ppm for 40 minutes via inhalation; as noted above, blood levels were $2.61 \pm 0.14$ μg/g prior to exposure and $2.77 \pm 0.28$ μg/g after exposure[7]. Based on the results of their study, Heck et al. (1985) concluded that inhaled formaldehyde would not be expected to act at sites (e.g., no formation of formaldehyde-DNA adducts) distant from the inhalation site):

> *This investigation has shown that formaldehyde exposure in rats (14.4 ppm) and in humans (1.9 ppm) does not significantly increase the $CH_2O$ concentration in blood when measured immediately after exposure. Inhaled $CH_2O$ would, therefore, not be expected to react with nucleophilic compounds at sites remote from the site of deposition. This conclusion is supported by the observation that inhalation exposure of rats to $[^{14}C]$- and $[^3H]CH_2O$ at concentrations as high as 15 ppm did not result in the formation of covalent adducts or cross-links of $CH_2O$ with DNA, RNA, or proteins in the bone marrow of the animals.*

And,

---

[7] Similar findings were reported in F-344 rats by Heck et al. (1985). Rats (n=8) were exposed to $14.4 \pm 2.4$ ppm formaldehyde for 2 hours and formaldehyde levels in blood were measured. Blood in 8 rats which were unexposed to formaldehyde were used as controls. Formaldehyde concentrations in blood were $2.24 \pm 0.07$ μg/g in the control rats and $2.25 \pm 0.07$ μg/g in the exposed rats (Heck et al., 1985).

> *In addition, the incidence of sister chromatid exchange or chromosome breaks in peripheral blood lymphocytes was not increased in rats exposed in vivo to 15 ppm of $CH_2O$. Therefore, these findings, taken together, strongly indicate that toxicity due to $CH_2O$ exposure is unlikely to occur at distant sites.*

In discussing the experiment by Heck et al. (1985), Dhareshwar and Stella (2008) took this one step farther and stated that if one assumed that these volunteers inhaled 2.5 mg/m$^3$ formaldehyde (which is ~2 ppm) for 24 hours, rather than just 40 minutes (as they did in the experiment by Heck et al., 1985), then the adult male would inhale 35 µg formaldehyde per minute[8] and the total exposure for a 24-hour exposure period would be 50.4 mg.  Assuming that 91% of formaldehyde is metabolized in the respiratory tract as estimated in rats and monkeys, at most, only 9% would be free to be distributed to other tissues, or 4.53 mg.  Dhareshwar and Stella (2008) state that this 4.53 mg formaldehyde would be present in the total human body water (49 L of water), which would equate to a concentration of 0.09 mg/L or 0.003 mM (0.09 mg/L x 1/30 g/mol), which is significantly lower than the background level of formaldehyde in human blood of ~0.1 mM (about 33-fold lower in fact).  Dhareshwar and Stella (2008) then note that because formaldehyde is so quickly metabolized in blood and tissues in humans, this would reduce the concentration of free formaldehyde in total body water even further and stated that: "*inhaling formaldehyde vapors would not increase its concentration in the blood significantly*".

Due to suggestions in the epidemiologic literature of formaldehyde causing cancers distant from the site of exposure/contact, e.g., leukemia, Franks et al. (2005) developed a mathematical model for the absorption and removal of inhaled formaldehyde in the nasal tissue to predict the amount of formaldehyde that would enter the blood using a simulated formaldehyde concentration of 1.9 ppm; however, Franks (2005) noted that because some workers are exposed to higher and lower levels, a range of 0.1 to 10 ppm was also evaluated. Franks (2005) determined that formaldehyde would enter into a steady-state profile within seconds of exposure.   Franks (2005) also found that even at the highest formaldehyde concentration, the amount of formaldehyde was very small compared to levels present in the body prior to any exposure.  Franks (2005) concluded:

---

[8] Assuming a respiratory volume per minute of ~14 L/minute (0.014 m$^3$/min), 0.014 m$^3$/min x 2.5 mg/m$^3$ 1,000 (correction factor) = 35 µg.  0.035 mg/min x 60 min/hr x 24 hr = 50.5 mg/24 hr period.  0.09 x 50.4 mg = 4.53 mg.

*In summary, the thickness of the epithelium and the diffusivities of formaldehyde in the mucus and in the epithelium are the key parameters affecting the concentration of HCOH in the blood for the ranges studied. The sensitivity analysis performed by Georgieva et al. (2003) came to similar conclusions. Even for the worse case scenario, the concentration of formaldehyde entering into the blood is small giving us confidence to conclude that any increases are insignificant compared with endogenous levels.*

And,

*Accounting for the spatial distribution of the formaldehyde concentration and the metabolic activity within the mucosa, the concentration of formaldehyde in the mucus, the epithelium and the blood has been determined and was found to attain a steady-state profile within a few seconds of exposure. The increase of the formaldehyde concentration in the blood was predicted to be insignificant compared with the existing pre-exposure levels in the body, indicating that formaldehyde is rapidly removed in the nasal tissue. The results of the model thus suggest that it is highly unlikely that following inhalation by the nose, formaldehyde itself will cause toxicity at sites other than the initial site of contact in the respiratory tract.*

## 4.4    Formaldehyde and Other Aldehyde Compounds in Foods

Formaldehyde is not uncommon in foods that we ingest since it is a naturally occurring product, and according to IARC (2006) is also present due to grain fumigation, combustion during the cooking process, and release from man-made tableware into foods. Because many aldehydes have pleasant odors, they represent the flavor, or smell, of a number of fruits. Many foods and beverages contain formaldehyde and other aldehydes, including: apples, pineapples, grapefruit, limes, bananas, pears, peaches, lemons, black currants, strawberries, oranges, grapes and raspberries, carrots, tomatoes, beer, soft drinks, coffee, and milk[9].

It is estimated that the daily intake of formaldehyde itself from the diet (not due to the dealkylation of components in foods or methanol, etc.) is in the range of 1.5 to 20 mg/day for adults (Cascieri and Clary, 1992; Dhareshwar and Stella, 2008). Methanol from dietary sources (e.g., fresh fruits and vegetables), which metabolizes in the body to formaldehyde, as well as from endogenous metabolic processes generating methanol, would be an additional source of formaldehyde. Dhareshwar and Stella (2008) estimate that methanol sources probably generate

---

[9] See Appendix A for the following references, and for a more detailed discussion of ambient VOC exposures: NRC, 1981; WHO, 1989; Godish, 1989; Lawrence and Iyenger, 1983; Pickrell et al., 1983; Hayashi et al., 1986; see also Appendix A

0.11 to 0.96 g of formaldehyde per day. Owen et al. (1990) provided a table in their review on formaldehyde that estimated an average yearly intake of formaldehyde based on average intake of various food sources (see Table 4.4) below. The average intake is approximately 3,974 mg or about 4,000,000 µg of formaldehyde per year from food alone.

**Table 4.4**

**Yearly Consumption Rate, Formaldehyde Concentration, and Estimated Yearly Consumption of Formaldehyde from Various Food Groups**

| Item | Food Consumed Per Year (kg/year) | Formaldehyde Concentration (ppm) | Formaldehyde Consumed (mg/year) |
|---|---|---|---|
| Meat | 68.3 | 0.18 | 12.2 |
| Poultry | 29.1 | 4.00 | 116.3 |
| Fish | | | |
|    Shellfish | 1.2 | 0.94 | 1.1 |
|    Other | 4.33 | 1.80 | 7.8 |
| Eggs | 15.1 | 0.70 | 10.6 |
| Fruits and melons | | | |
|    Fresh | 47.9 | 8.13 | 389.2 |
|    Processed | 22.9 | 8.13 | 185.7 |
| Vegetables | | | |
|    Fresh | 68.4 | 8.17 | 559.0 |
|    Canned | 20.7 | 8.17 | 168.9 |
|    Frozen | 4.9 | 8.17 | 39.6 |
| Potatoes | 36.0 | 8.17 | 293.8 |
| Legumes | 7.9 | 8.17 | 64.8 |
| Flour and cereal | 67.8 | 5.60 | 379.7 |
| Sugar and sweeteners | 60.7 | 0.75 | 45.6 |
| Beverages | | | |
|    Coffee | 96.8 | 6.97 | 674.3 |
|    Tea | 44.9 | 6.97 | 313.0 |
| Soft drinks | 61.0 | 8.20 | 500.2 |
|    Juices | 8.8 | 8.13 | 71.1 |
|    Beer | 13.9 | 0.60 | 8.3 |
|    Wine | 3.3 | 0.6 | 2.0 |
| | | **Total** | **3843.2 mg/yr** |

Source: Adapted from Table 2 of Owen et al. (1990).

**5.0     Acute Symptom Studies: Formaldehyde and Related Studies**

In this section of my report, I discuss the numerous chamber experiments that have examined the subjective symptoms, irritant responses, and pulmonary function responses of both healthy and asthmatic subjects.  The measures of irritation assessed in this report include eye, nose, and throat irritation, using both objective and subjective measurements.  In addition, most of these study's investigators performed pulmonary function measurements to determine whether the lower respiratory tract was affected at concentrations that induced irritative responses in the upper respiratory tract of the volunteers.  As these studies provide data from controlled, randomized, and single- or double-blinded experiments, often using each test subject to collect their own control responses, these chamber experiments provide the most reliable information for determining thresholds or No Observable Adverse Effects Levels (NOAELs).

There are numerous ecologic or cross-sectional studies in the formaldehyde literature that were not true experiments; but rather, studies that collected surveyed information regarding complaints relative to formaldehyde levels identified in the workplace or other environments.  As these uncontrolled exposures no doubt included exposures to other indoor VOCs, as well as other chemicals, and possibly contained other, unidentified confounders or biases, these studies were not considered useful for determining the irritation threshold for formaldehyde.  This problem has been noted in other recent reviews of the literature.  For example, Noisel et al. (2007) in their review of the occupational exposure limit of formaldehyde did not consider the occupational studies of individuals exposed to formaldehyde when evaluating odor and irritation.  Noisel et al. (2007) explain:

> *With regard to the occupational studies, they were not included given their limits: large variations in the results between studies, presence of mixed-exposure in most cases, non-systemic control of confounding factors, degree of exposure not always reported with precision and subject to temporal variations, no data on the severity of the effects (only the presence or absence of effect), a different description of the exposure form one study to another (sometimes with a range of values, sometimes with mean or median values, and sometimes with maximum values).*

And,
> *However, the analysis was conducted by considering formaldehyde exposure only, not mixed-exposure.  In occupational settings where formaldehyde is used,*

*other chemical substances and dusts (such as wood dust) are concomitantly present and can produce or exacerbate the irritating effects.*

A similar statement was made by Paustenbach et al. (1997)'s review (emphasis added):

*Because all workplaces contain concentrations of numerous air contaminants, <u>the panel considered workplace studies less definitive than chamber studies</u> where the concentration of formaldehyde is controlled.*

## 5.1     Experimental Formaldehyde Chamber Studies

### 5.1.1    Studies in Nonasthmatic Volunteers

<u>Weber-Tschopp et al. (1977, as discussed in Arts et al., 2006)</u>

This study is available only in German, but was discussed in some detail in the review article by Arts et al. (2006). In Weber-Tschopp et al. (1977) two different experiments were conducted. In the first study, 33 volunteers were exposed to formaldehyde at increasing levels between 0 and 3.2 ppm for 35 minutes. Every 5 minutes, health questionnaires and eye blink frequency were measured. In the second part of the study, 48 individuals were exposed to 0, 1, 2, 3, and 4 ppm for 1.5 minutes at each level with clean air intervals of 8 minutes in between. In the second part of the study, only questionnaires were used (during 1 minute intervals). The authors concluded that average eye and nasal irritation was reported at 1.2 ppm, throat irritation was reported at 2.1 ppm and annoyance (preference to leave the room) at 1.2 ppm. An increase in eye blink was seen at 1.7 ppm. Authors concluded that the irritation threshold was between 1 and 2 ppm.

Arts et al. (2006) state that this is the only study that objectively measured eye irritation[10]. Arts et al. (2006) notes the potential importance of using objective measurements in the setting of irritation thresholds:

*Because in humans sensory irritation can strongly be influenced by subjective feelings and interpretations, in many instances caused by the odour of the*

---

[10] A later study by Lang et al. (2008) also used blink frequency as well as conjunctival redness as objective measures of eye irritation. That study reported a significant increase in blink frequency, an adaptive effect, was seen at 0.5 ppm with peaks to 1.0 ppm.

*compound, it is a difficult job to set occupation exposure limits for odourous, irritating compounds. Like with acetone (Arts et al., 2002), the odour, or the perception of the odour intensity, of formaldehyde may have confounded the report of irritation thresholds and health symptoms as several volunteers reported detection of formaldehyde odour at the 0-ppm condition (Sauder et al., 1986; Schachter et al., 1987; Witek et al., 1987). It would, therefore, seem to be better to base the sensory irritation threshold on objective measurements.* (Arts et al., 2006)

Day et al. (1984)

These authors evaluated responses to formaldehyde among 18 subjects. Nine of the 18 subjects had previously complained of various symptoms reportedly stemming from the urea formaldehyde foam insulation (UFFI) placed in their homes. Pulmonary function was measured before, and 8 hours after, exposure to 1.0 ppm formaldehyde for 90 minutes in the laboratory as well as following exposure to UFFI off-gassing 1.2 ppm formaldehyde for 30 minutes in a fume hood. Subjects breathed room air for 30 minutes prior to the experiment beginning (baseline values). Exposed subjects also recorded their symptoms every 15 minutes. Each subject received 5 methacholine inhalations of 5 mg/ml given via a dosimeter. Skin patch testing was also performed using a 2% formaldehyde solution, but failed to induce any response in persons exposed, or not exposed, to UFFI while at home.

No significant differences were seen in any of the pulmonary function measures (FVC, $FEV_1$, or $FEF_{25\%-75\%}$) immediately following exposure or 8 hours after exposure (see their Table 2). These authors reported that following the methacholine challenge, the mean change in $FEV_1$ for the group originally complaining of UFFI symptoms was a negative 3.2% while those without prior symptoms experienced a positive 0.04% change. The group comparisons identified no individuals that responded to the methacholine challenge with a 10% decrement in $FEV_1$. Patch testing with formalin showed no positive results in either test group. Table 1 lists the reported symptoms by these subjects. Unfortunately, this study reports only the number of symptoms reported and not the severity score for the symptom, and so is relatively uninformative. Their Table 1 shows that subjects reported eye irritation and tearing equally in both groups, and that 15/18 reported eye irritation. Nasal congestion and throat clearing were reported at a much lower rate (about 1/3 of the respondents in each group for both). Cough or chest tightness was reported by only three subjects. However, the authors stated that most

subjects rapidly became tolerant of the eye, nose, and throat irritation, and after considering all of the data concluded:

> There was no evidence that either formaldehyde or UFFI off-gas operates as a lower airway allergen or important bronchospastic irritant in this heterogeneous population.

And:

> The frequency and subjectively reported severity of the symptoms of irritation were also unrelated to changes in FVC, $FEV_1$ or $FEF_{25\%-75\%}$.

Last, the authors' note that 50 other compounds have been isolated from UFFI under different conditions, and so, concentrating on formaldehyde may be overlooking other aspects of UFFI deterioration.


Bender et al. (1983)

This study selected test subjects using earlier test results. About half of the volunteers reported irritation in response to clean air, or were nonresponsive to formaldehyde, and so, were considered unacceptable. However, this is a common feature of other studies and eliminates the baseline response and subject variation. Only subjects who responded to 1.3 and 2.2 ppm formaldehyde were included in this study. Seven to 28 subjects were tested at each exposure concentration. Exposures were limited to only 6 minutes via an aluminum chamber, and the time to first response for eye irritation was used as the symptom measurement. Table 1 of this paper shows that with increasing formaldehyde, the time to report a symptom of eye irritation was increasingly faster than to that induced by clean air. At concentrations of 0.35 ppm and 0.56 ppm of formaldehyde, the median response time was about 3.5 to 4 minutes, but apparently this was not significantly different from that of clean air (see page 464). The initial severity score average for these two concentrations was less than 1.0 (1.0 = slight), not different from each other, and declined over the remainder of the six minute exposure interval. At concentrations of 0.7 and 0.9 ppm, the symptom scores were again nearly the same, but now the median time for reporting the symptom decreased to about 1-2 minutes. At 1.0 ppm formaldehyde the median response time was 78 seconds, and the symptom score was between slight and moderate, indicating some found this concentration bothersome. It would appear from the author's

statements that slight, but not annoying, eye irritation is not different than control air until a level of 0.7 ppm or higher, and that at 1.0 ppm the irritation is moderate for some.

Andersen and Molhave (1983)

These authors exposed 16 healthy volunteers (5 females and 11 males; 5 smokers) to 0.3, 0.5, 1 or 2 mg/m$^3$ formaldehyde (0.24, 0.41, 0.81, 1.63 ppm) for 5 hours per day on four consecutive days. There was no control experiment (0 mg/m$^3$ exposure) was performed on a separate day as is seen in other studies. Instead, these investigators started each experiment with a 2 hour control period during which only clean, charcoal-filtered air was introduced into the chamber. This measured the subjective response rate to formaldehyde (chemical-free) air on each test day before the formaldehyde concentration was introduced into the chamber. Thus, the first two-hour interval of each experiment and some measurements taken prior to the first day (day 0) represent the total control values.

Subjects were asked to express their degree of discomfort throughout the exposure (on a scale of 1 to 100), and at the end of the exposure as well as the day after exposure. Performance tests, nasal mucous flow, and airway resistance were also measured. The subjective symptom voting scale used in this study was as follows:

   (1) no discomfort: 0;
   (2) slight discomfort: 1-33;
   (3) discomfort: 34-66;
   (4) strong discomfort: 67-99; and
   (5) intolerable discomfort: 100.

Thus, this study provides more gradations of the simpler subjective scale than used in other studies. For example, the mild or slight discomfort rating used here may be ranked as a score of 1-33 while in other studies the term mild scored a value of 1.0 (present but not annoying) regardless of how intense the presence of the formaldehyde was judged to be. The subjective symptom scores provided in this study are also limited by the fact that symptoms scale responses by individuals are not specific for eye, nose, or throat discomfort. Because other studies indicate

that subjective complaints at no or low exposures may involve throat/nose complaints unrelated to the exposure, while eye irritation is the first formaldehyde-induced irritant response seen, the scores reported here may include a mixture of unrelated and formaldehyde-induced subjective response scoring.

During the first two hours, the average subjective score for the two lowest formaldehyde concentrations, the 0.3 or 0.5 mg/m$^3$ exposure concentrations (0.24 and 0.41 ppm), was less than that reported for the clean, filtered air on some test days (see Figure 7 in this study). During the last two hours of this exposure, the symptom rating increased minimally and was still at the low end of the ranking scale for the mild or "slight discomfort" ranking. The recorded numerical scores for the 0.3 mg/m$^3$ (0.24 ppm) were somewhat higher than that for 0.5 mg/m$^3$ (0.41 ppm) by the end of the exposure period (a score of about 8 versus about 4 for the range of 1-33 for slight discomfort). However, fewer total individuals reported noticing the presence of formaldehyde at the lower 0.3 mg/m$^3$ level (3/16) compared to the next highest level of 0.5 mg/m$^3$ (5/16 subjects reported mild symptoms). So, although fewer subjects seem to respond to the lowest concentration, their subjective scores for that day were higher than those recorded for the next highest level. So, once again, subjective symptom ranking has both individual and day-to-day variability that should be considered and accounted for. Given the obvious day-to-day variations in clean air responses, the small number of individuals affected, and the small numerical rankings, no meaningful difference can be attached to the small numerical variances reported for the two lowest exposure concentrations.

At the two higher exposure levels (0.81 and 1.63 ppm), symptoms were reported during the first hour and increased for the next two hours (see reproduced figure below), but by the end of the exposure interval, the subject scores were not meaningfully different from the end experiment scoring for the lowest (0.3 mg/m$^3$ = 0.24 ppm). At the 2 mg/m$^3$ (1.63 ppm) exposure level, the average symptoms score level increased to a level of about 3 to 18 during the first three hours, and so, were about half-way through the "slight discomfort" zone. That the average subjective scores then decreased between hours 3-5 suggests that individuals acclimatize to exposure levels of this magnitude. Subjects complained mostly of conjunctival irritation and nose or throat dryness.



During these exposure intervals to 0.3, 0.5, 1 and 2 mg/m$^3$ (0.24, 0.41, 0.81, 1.63 ppm), some 7, 13, 10, and 6 subjects, respectively, had recorded no discomfort during the experiment. On the following morning after exposure, no subjects had any complaints.  The authors noted that the average discomfort level never exceeded 18 scale units, even at the highest concentration (which is in the middle of the "slight discomfort" range).  However, at the concentrations tested, the highest score by an individual volunteer recorded was 30, 20, 40, and 50.  Thus, no one at the two lowest levels experienced reportable discomfort or annoyance, while at the two higher levels, some individuals are reporting discomfort which was most probably eye irritation as only dryness for nose and throat was subjectively reported by these individuals.

To reiterate, note that the above figure indicates that symptoms are routinely reported in response to the clean air exposure as has been seen in a number of other studies.  The authors reported that there were no significant changes observed in the rhinomanometric parameters or in measurements of pulmonary resistance (vital capacity, FEF$_{25\%-75\%}$, or FEV$_1$).  Additionally, no effect on mental performance as measured by the ability to perform addition or multiplication was seen in the subjects.  This study also reported that these formaldehyde exposure levels decrease the mucus flow rate in the anterior two-thirds of the nose, but not in the posterior third of the nose.  Thus, it would appear that levels as low as these would not induce rhinitis, and the authors suggest these data indicate absorption is occurring in the anterior portions of the nose.

Based on earlier studies the authors also suggest the odor threshold is at about 0.05 mg/m$^3$ or 0.04 ppm in some subjects.

Schachter et al. (1986)

This study tested fifteen healthy and nonsmoking adults. The exposure was double-blinded, random, and consisted of exposure to either 0 or 2 ppm formaldehyde for 40 minutes while at rest and while exercising. A subset of six available individuals was also given a methacholine challenge post-exposure to determine any increased responsiveness as a result of the formaldehyde exposure, but none was seen. Questionnaires were given upon entering the chamber, 30 minutes into exposure, and taken home to be filled out at 4, 8, and 24 hours post-exposure. Three subjects were studied for 24 hours to identify any delayed bronchoconstriction, but none was observed. The results are enunciated in the discussion as follows:

> *We have demonstrated in healthy subjects that a short-term controlled exposure to 2 ppm formaldehyde under conditions of rest and exercise did not cause measurable bronchoconstriction. In those three subjects studied for 24 hr, no delayed bronchoconstrictor effects were noted. Additionally, in six subjects, airway sensitivity to methacholine was not altered from the baseline study by pre-exposure to formaldehyde. Subjective symptoms were primarily related to upper airway irritation including unusual odor, taste, sore throat, and nasal discharge. Eye irritation was the most frequent non-respiratory complaint. Subjective complaints were gone shortly after the exposure and were not accentuated by exercise.* (Schachter et al., 1986; emphasis added)

Eye irritation, odor, nasal discharge, and taste symptom scores were highest upon chamber entry and decreased by 30 minutes into the session. In contrast, the score for the symptom of sore throat increased during this interval. The authors state that no symptoms were consistently reported after the exposure ceased, and none of the symptoms were increased by exercise. The rank order of complaints was odor > eye irritation > nasal irritation > sore throat. The severity of the symptom scores is not identifiable in my copy, but I note that none of the subjects reported eye irritation in both formaldehyde exposure sessions indicating the subjective response is unreliable or weak. Symptom diaries of the subjects showed a lack of delayed bronchoconstriction. The authors concluded their study failed to observe any changes in pulmonary function as a result of these exposures.

Schachter et al. (1987)

This study used the study design reported earlier, but examined 15 hospital laboratory workers routinely exposed to formaldehyde (3 were smokers). The exposure was double-blinded, random, and consisted of either 0 or 2 ppm formaldehyde for 40 minutes while at rest and again while exercising for ten minutes. No consistent acute or delayed changes in pulmonary function tests were observed, and the authors stated the lack of acute pulmonary responses suggests these subjects were no more responsive to formaldehyde than healthy, nonexposed individuals.

Based on the copy available to me, the reported symptom scores were restricted to the upper respiratory tract as follows: Three of fifteen subjects reported a taste was present, but two subjects did so in response to clean air as well as formaldehyde. Nine of fifteen subjects complained of an odor that ranged from mild to severe when exposed to clean air; but the intensity of the odor, as reported, increased in response to formaldehyde which became generally moderate to severe. Only one subject reported a symptom of throat irritation. This subject reported a moderate nose and throat irritation to clean air at rest but not to formaldehyde at rest. This same subject reported severe nose irritation from formaldehyde while exercising, but reported no throat or eye symptoms when exposed to formaldehyde while exercising or at rest. Eye irritation was not reported in response to clean air, either while at rest or while exercising. However, after exposure to 2 ppm formaldehyde for 40 minutes, about half of the subjects reported mild to moderate irritation at rest, and 1/15 subjects reported severe eye irritation while exercising. Thus, the eye appeared to be more sensitive to high levels of formaldehyde exposure than did the nose or throat in this study. This study also shows that subjects may report symptoms in response to clean air, and reported symptoms for a target organ less sensitive to irritation while a more sensitive organ is supposedly unaffected.

Sauder et al. (1986)

This study examined the acute pulmonary responses and symptoms of nine, healthy, nonsmoking volunteers exposed for 3 hours to 3 ppm formaldehyde. All subjects denied having

allergies, hay fever, or upper respiratory infections during the six weeks prior to the experiment. Each subject acted as their own control by undergoing the same exposure interval and exercise regimen while exposed to clean air in the chamber. Spirometric measurements were taken 0, 30, 60, 90, 120, 150, and 180 minutes into the exposure. Nonspecific airway reactivity was measured just after the exposure ceased by methacholine challenge. Just two minutes prior to these measurements, each subject completed an eight-minute bicycle exercise. A symptom questionnaire was completed prior to entering the chamber and just after the three-hour exposure period.

The minute-volume for six exercise tests was not significantly different between the exposed and control tests. While statistically significant declines in $FEV_1$ and $FEF_{25-75\%}$ were observed at the 30-minute interval only, these decrements were small, being 2% and 7%, respectively. No significant differences in any other pulmonary measurement were observed including measures of airways resistance, specific airway conductance, and functional residual capacity. Symptoms of odor, eye irritation, and nose/throat irritation were significantly higher when exposed to formaldehyde than when exposed to clean air. Both odor and nose/throat irritation were reported in response to clean air, but no eye irritation was reported during the clean air exposure. The average score for odor and nose irritation was above 1.0 indicating both mild (not annoying) to moderate (annoying) complaints were recorded. The odor was scored as moderate by four subjects while four others perceived no odor. The authors state that 5/9 reported moderate nose/throat irritation, indicating more than half of the subjects scored these symptoms as annoying while the remainder did not. Only 1/9 scored their eye irritation as moderate (annoying). Thus, like other studies, subjects who exercised reported greater irritation to the nose/throat, probably because of the greater rate at which this part of the upper respiratory tract receives an applied dose of formaldehyde. Other symptoms were either not reported (heart palpitations and cough) or only minimally reported as mild (present, but not annoying) in 1/9 subjects (i.e., chest discomfort, headache, and double vision). Heart palpitations and double vision were included in this questionnaire as sham responses. Thus, like other studies, the sham and clean air responses indicate symptoms may be reported even when irritant levels of chemical are not present.

Kulle et al. (1987)

Kulle et al. (1987) divided 19 healthy, nonsmoking volunteers into two groups (9 and 10 subjects) that randomly received five different test intervals. Each testing interval was for a three-hour period. Group 1 (n=10 subjects) was randomly exposed to formaldehyde concentrations of 0, 0.5, 1, and 2 ppm for three hours at rest as well as a 2 ppm exposure test with exercise (8 minutes of bicycling out of every 30 minutes). Group 2 (n=9 subjects) was randomly exposed to formaldehyde concentrations of 0, 1, 2 and 3 ppm for three hours at rest as well as to a 2 ppm exposure with exercise. All subjects had a baseline exercise test to determine the workload necessary to increase minute ventilation to 30-40 L/minute and served as their own control. On the exposure day, spirometry was measured prior to exposure and at time = 0, 30, 60, 90, 120, 150, and 180 minutes of the exposure interval as well as after the exposure + exercise task had been completed. The exercise task was completed 2 minutes before the spirometry measurement. Questionnaires were filled out at zero and 180 minutes of the exposure.

As can be seen in Table 2 (Group 2; n=9) and in Figure 1 (pooled subjects) of the study, both odor sensation and eye irritation were the two most sensitive endpoints. This is in keeping with the expected greater sensitivity of the eye, in general, to irritant gases than the nose or the throat. In contrast, the nose/throat irritant responses were not only typically lower, but they were relatively flat and minor between 0.5 ppm and 3.0 ppm. Additional observations can be gleaned from these data that are also of interest. First, both Figure 1 (which includes all 19 subjects) and the text of this paper indicate minor symptoms were reported when subjects were exposed to just air. For example, on page 921 (emphasis added) the authors state: *With few exceptions, there were no symptoms prior to exposure.* In addition, Figure 1 of this paper indicates some subjective symptoms were reported for the 0 ppm exposure interval. In fact, the average eye and nose/throat irritant responses were slightly lower at 0.5 ppm formaldehyde than that of the control test, exposure to just plain air. Thus, consistent with other studies, this paper demonstrates there is a low incidence of symptoms being reported even when subjects are not exposed to formaldehyde. This observation should be considered when low-response rates are reported, and when background or pre-exposure symptomology are not measured in this kind of study.

Figure 1 of this paper indicates a significant increase in odor detection occurred at 0.5 ppm, well before the most sensitive endpoint, eye irritation, was significantly increased (at 1 ppm and higher).   On average, eye irritation was minor at 2 ppm in this study, with a mean subjective score still less than 1.0 for this endpoint (a score of 1.0 being a symptom that was present but not annoying), and only 2/19 subjects had reported minor nose/throat irritation at 1.0 ppm.   However, some individuals began to report annoying eye irritation at levels of 1 ppm and higher, and only about half of the subjects had reported an odor at levels of 0.5-2.0 ppm.   Nose and throat irritation was barely observable but not annoying at 2 ppm, and no coughs or headaches were reported in Table 1 of this paper for this exposure level, again suggesting the lower respiratory tract is unaffected by exposure to 2.0 ppm.

The exercise testing indicated that light-to-moderate physical activity does not increase the odor or eye irritation of formaldehyde; however, nose and throat irritation was significantly increased to about twice the incidence of symptom reporting.   Still, the symptoms recorded were noticeable but not annoying.   In addition, exposures to 0.5-3.0 ppm formaldehyde at rest, and to 2.0 ppm while exercising, produced no increase in bronchial reactivity (as measured by methacholine challenge) and no significant decrease in measured pulmonary function.   Thus, the lower respiratory tract was unaffected.   Nasal airway resistance did increase at 3.0 ppm but not after exposure to 2.0 ppm.   Furthermore, all symptoms and responses were acute and not reported in the 24 hour follow-up.

Kulle (1993)

Kulle (1993) used data derived during the 1987 Kulle et al. study to statistically explore dose-response relationships to symptomatic responses.   The symptomatic response was considered to be the difference between symptoms reported at no exposure and after 3 hours of exposure.   Responses assessed were to odor sensation, eye irritation, and nose/throat irritation. [Note: *severe* = debilitating; *moderate* = annoying; *mild* = present but not annoying.]   The author stated that: "*All pulmonary function and airway reactivity determinations for this healthy, nonsmoking group of ten males and nine females were within normal ranges*."   No significant

differences were noted in symptom reporting between males and females.  The following tables show the reported responses for all subjects.

As can be seen in Table 5A, some 40% of the test respondents reported observing an odor at the lowest exposure level, 0.5 ppm, indicating the odor threshold is lower than this concentration.  This opinion is consistent with that of the authors on this issue.  Responses to odor ranged from none to mild at this exposure level and at the next higher exposure level of 1 ppm.  This study indicates that up to levels of 1 ppm the odor is not perceptible by all persons, and none found it annoying or bothersome.  The lowest two exposure levels also indicate there can be day to day variations in an individual's subjective perception of a given level of formaldehyde.  At levels of 2 ppm or higher, the odor was bothersome to a small percentage of individuals, but still tolerable to most of the population.

**Table 5.1A**

**Odor Perception**

| Formaldehyde Concentration | Percentage of Subjects Reporting an Odor* | | | |
|---|---|---|---|---|
| | **None** | **Mild** | **Moderate** | **Severe** |
| 0.0 ppm | 95% | 5% | | |
| 0.5 ppm | 60% | 40% | | |
| 1.0 ppm | 74% | 26% | | |
| 2.0 ppm | 42% | 42% | 16% | |
| 3.0 ppm | 22% | 67% | 0% | 11% |

* Based on responses from all 19 subjects.

Based on the data provided in Table 5B, I would anticipate the formaldehyde threshold for mild eye irritation to be between 0.5 and 1.0 ppm, an opinion the authors themselves concurred with.  However, at 1.0 ppm and higher concentrations, the eye irritation may be annoying and unacceptable to a small percentage of individuals; and the annoyance increases with increasing concentrations above 1 ppm.

### Table 5.1B

### Formaldehyde Eye Irritation

| Formaldehyde Concentration | Percentage of Subjects Reporting Eye Irritation* | | |
|---|---|---|---|
| | None | Mild | Moderate |
| 0.0 ppm | 95% | 5% | |
| 0.5 ppm | 100% | 0% | |
| 1.0 ppm | 74% | 21% | 5% |
| 2.0 ppm | 47% | 32% | 21% |
| 3.0 ppm | | 56% | 44% |

\* Based on responses from all 19 subjects.

A threshold for throat and nose irritation was not suggested by this study. Even at 3 ppm, 78% of the subjects still reported no irritation to throat and nose, and the 22% that did respond recorded the severity of the symptom as mild; i.e., the perceived effect was present but not annoying. In contrast to my opinion regarding this particular data set, I note that the authors estimated the threshold for nose/throat irritation to be 1.0 ppm based on their data, but provided no logic or basis for this conclusion. The author's contention for nose/throat irritation makes no sense, as the percentage of subjects reporting mild nose/throat irritation was lower than the percentage reported in control measurements, and even at 3 ppm the nose/throat imitation response severity was "mild" (present but not annoying).

### Table 5.1C
### Formaldehyde Nose/Throat Irritation

| Formaldehyde Concentration | Percentage of Subjects Reporting Nose/Throat Symptoms* | |
|---|---|---|
| | None | Mild |
| 0.0 ppm | 84% | 16% |
| 0.5 ppm | 90% | 10% |
| 1.0 ppm | 95% | 5% |
| 2.0 ppm | 63% | 37% |
| 3.0 ppm | 78% | 22% |

\* Based on responses from all 19 subjects.

Tables 5A and 5C are also consistent in indicating that the subjective perception of none or mild odor or irritation may vary within individuals on a day to day basis. Thus, a more objective physiologic measurement of irritation will likely provide a more reliable identification of the true irritation threshold.

Lang et al. (2008)

This study tested 21 nonsmoking volunteers (11 females + 10 males) between the ages of 21 and 40 years of age for a 10-week period. Each subject was exposed for four hours (240 minutes) to one of ten different exposures tested randomly and in a double-blind manner. Ethyl acetate (EA) at concentrations of 12-16 ppm was used as a masking agent. Subjects were screened to eliminate those with allergies, exposure to formaldehyde at work, excessive alcohol consumption, having had recent infections or airways disease, or being pregnant. Subjects were given a medical exam to ensure they were in good health, a test for positive or negative affect, and their reaction times were measured. The ten exposure values tested were – 0 ppm, 0.15 ppm, 0.3ppm, 0.3 ppm + peak of 0.6 ppm, 0.5 ppm, 0.5 ppm + peak of 1.0 ppm, 0 ppm (EA), 0.3 ppm (EA), 0.5 ppm (EA), 0.5 ppm + peak of 1.0 ppm (EA). The peak exposure was set at 1.0 ppm formaldehyde. Each test day started with a physical examination, pulmonary function testing, the SPES questionnaire, rhinomanometry measurements, and reaction time measurements. Bicycling was performed at the start of the exposure and at 120 and 195 minutes into the exposure period during which conjunctival redness and blink frequency were measured. After exposure, the SPES questionnaire, rhinomanometry and reaction time testing were again performed. The authors combined all responses because they concluded there was no general or consistent gender influence.

Conjunctival redness was significantly increased in the 0.5 ppm + 4 peak exposures without the EA, but only at the 194 minute interval, and so, was not a consistent finding even at this exposure concentration. When EA, an irritant itself, was present this change was not observed, suggesting that this single statistical observation during exposure to formaldehyde only was not real. Blink frequency was significantly increased at 195 minutes after exposure started for formaldehyde concentrations of 0.5 ppm + peaks to 1.0 ppm with or without EA to mask the smell. No nasal resistance was observed that was not also seen in response to clean air, so this

38

response was considered to be unaffected. No pulmonary function changes were observed for any exposure. Decision reaction times to a visual, acoustical, and a visual/acoustical stimulus were reported to be significantly increased by exposure to 0.3 ppm formaldehyde only and not at any other exposure level, or chemical exposure combination; thus, the inconsistency of the data and lack of dose-response undermine this single statistical finding after numerous associations were attempted. Motor reaction times were not affected.

The perception of formaldehyde by smell started at 0.3 ppm. Eye irritation was increased by EA, so comparisons have to be made as separate groups considering EA exposure versus no EA exposure. Eye irritation was higher than that of clean air at 0.3 ppm and 0.5 ppm formaldehyde, but the responses at these two formaldehyde concentrations appear to have been the same. The additional presence of EA increased the irritation at these two formaldehyde concentrations. In fact, EA alone was as irritating as either of these two formaldehyde concentrations. Furthermore, the mean subjective eye irritation rating for formaldehyde alone was less than 1.0 (slight) for both the 0.3 ppm and 0.5 ppm concentrations without peak exposures. Thus, like other studies, the response is more about presence than annoyance. Significantly higher ratings of nose irritation were seen only at 0.5 ppm formaldehyde. However, the subjects did not differentiate between formaldehyde irritation and the perception of EA odor. Olfactory perception was increased by both chemicals. Respiratory irritation was rated between "not at all" and "hardly." Regarding the complaints and the sense of well-being, the mean total score did not show significant differences between the various exposure conditions. Ratings varied between "hardly" and "somewhat."

When the overall score for positive affect was considered, it was found that controlling for negative affect reduced symptom scores in all groups, and many were no longer significant. According to Table 8 of this study, the 0.5 ppm formaldehyde concentration was significantly different for subjective symptoms when EA was present, or when peak exposures occurred. Thus, 0.5 ppm alone would be the NOEL in this study for subjective symptoms. According to the authors, personality factors affect low, but not higher, exposure levels. The symptoms were apparently no longer present 16 hours after exposure (i.e., they were reversible).

The authors conclude that eye irritation was the critical effect, and a significant increase in blink frequency, an adaptive effect, was seen at 0.5 ppm with peaks to 1.0 ppm. Conjunctival redness[11] coincided with this symptom, but apparently was induced by the peak exposures of 1.0 ppm. The authors, after various statistical considerations and covariate analyses, concluded formaldehyde concentrations of 0.5 ppm without peaks, and to 0.3 ppm with peaks to 0.6 ppm, were the NOAEL levels.

Lang et al. (2008) comment that their results are consistent with other studies (e.g., Bender et al., 1983; Andersen and Molhave, 1983; Kulle et al., 1987; Kulle, 1993), with the level of eye irritation being minimal. Lang et al. (2008) add that the severity of eye symptoms reported at levels of ≤1 ppm were rated between none and slight/mild and the response of 'slight/mild' was usually reported as indicative of "present but not annoying." Lang et al. (2008) notes that Arts et al. (2006) concluded that eye irritation ratings at formaldehyde concentrations <1 ppm - *should be translated into perception or awareness rather than an annoying ocular irritation* (Lang et al., 2008, p. 33, emphasis added). Lang et al. (2008) further state their findings are in keeping with those of Paustenbach et al. (1997), who stated that for most persons, eye irritation clearly due to formaldehyde does not occur until at least 1.0 ppm, and that moderate, to severe eye, nose, and throat irritation does not occur for most persons until airborne concentrations exceed 2.0-3.0 ppm.

### 5.1.2   Studies of Asthmatic Volunteers

Witeck et al. (1987)

In this study, 15 asthmatics were exposed to either room air or formaldehyde in air in an environmental chamber in a double-blind, random study. It was reported that none of the subjects had an upper respiratory infection during this study. Pre-exposure values were obtained in a separate lab. In four days, four sessions were reported. During the first 2 sessions, there was exposure in a chamber to formaldehyde at rest. Room air was used as the baseline placebo, and exposure to formaldehyde at 2.0 ppm was given for 40 minutes. The other 2 parts of the process were the same exposure repeated during moderate exercise for 10 minutes. Pulmonary

---

[11] Note: On p. 34 of their study, Lang et al. (2008) comment that increased eye blinking and vasodilatation are protective/reflex mechanisms and not considered as 'adverse' but rather represent adaptive responses.

function tests were conducted 5, 15, 25, and 40 minutes after being in the chamber, with post-exposure studies performed 10 and 30 minutes after leaving the chamber. Comparison to the baseline methacholine inhalation challenge test (MIC) on the screening day was also done. In addition, the study subjects completed a diary rating to assess any symptoms of irritation, ranging from 0=none to 4=incapacitating. The symptoms included: nausea, eye irritation, headache, unusual odor, dizziness, cough, chest soreness, fatigue, muscle soreness, nasal discharge/congestion, shortness of breath, wheezing, and unusual taste. These were done on entering the room, 30 minutes after exposure, then taken home and recorded 4-8 hours, and 24 hours post-exposure. On another day, 12 of the subjects returned for a 40 minute formaldehyde exposure followed by a repeat methacholine challenge test.

Baseline values were the mean of the 1st and 2nd pre-exposure tests; no day-to-day differences were noted. While a few drops in lung function were seen (especially for $MEF_{50\%}$), these occurred randomly on both the control and formaldehyde exposure day. This finding more likely than not represents the airway lability in asthmatics as the authors reported that none of the changes exceeded the Bonferonni-adjusted p-value. Eight of the 12 asthma subjects showed a lower threshold to methacholine inhalation challenge after exposure to 2.0 ppm formaldehyde exposure; however, the mean and median decrements of threshold in methacholine concentration were not significant.

Flow-volume parameters measured no significant airway obstruction or airway resistance during or immediately after exposure. No delayed bronchoconstriction was shown with serial measurements of PEF. Following exposure, sequential measurements of peak flow for 24 hours showed no delayed airway response. This was evident from the PEFR recordings, and matched the diaries.

The symptoms of subjects exposed to formaldehyde were generally in the mild-moderate range but were reported by only a few of the subjects. Rarely, a report was severe, while none were incapacitating. Unusual odor was the most commonly reported complaint to room air, and the mean odor score was higher with formaldehyde exposure. Lower respiratory symptoms (e.g., excess sputum, breathlessness, wheezing, and chest tightness) were absent or mild for both

groups.  Common complaints during exposure to formaldehyde were bad odor, sore throat, and eye irritation.  Symptoms afterward were infrequent.  The authors note their lack of findings:

> *In mild asthmatics short-term exposure to 2.0 ppm HCHO under controlled environmental conditions does not induce acute airway obstruction.  Subjective complaints of asthma results from exposure to HCHO were absent.  As in healthy subjects, complaints were irritation of the eyes, nose, and throat which disappeared following exposure.  No delayed bronchoconstriction was detected with serial measurements of peak expiratory flow.*

Sheppard et al. (1984)

This double-blinded study consisted of seven nonsmoking asthmatics requiring bronchodilator therapy.  Each subject was exposed to either air or 1.0 ppm formaldehyde for 10 minutes.  When the investigators observed no bronchoconstriction in resting asthmatics after exposure to formaldehyde, they investigated the effect of exercise with exposure to 1.0 or 3.0 ppm formaldehyde on the subjects.  The authors stated in their abstract:

> *It is concluded that brief exposure to these concentrations of formaldehyde, even in association with moderate exercise, is unlikely by itself to cause significant bronchoconstriction in most subjects with mild asthma.*

Reed and Frigas (1984)/Frigas et al. (1984)

In this study, Reed and Frigas (1984) evaluated 11 women and 2 men (aged 15 to 70 years; all of whom had been chronically exposed to formaldehyde at levels ranging from 0.1 to 1.2 ppm either at work or home[12]).  Subjects reported symptoms such as nasal congestion, eye irritation, headache, chest tightness, coughing, or wheezing that they attributed to exposure to formaldehyde, symptoms which they say got better or disappeared when they were away from the site of exposure.  All subjects, except two, had been healthy prior to their exposures (although the authors reported that two subjects had a history of mild asthma that required occasional bronchodilator treatment that worsened after their formaldehyde exposure, cases #5 and #7).  Five subjects were being treated with bronchodilators at the time of their evaluation (cases #5, 7, 9, 12, and 13).  Five were smokers (but three had stopped smoking after they became symptomatic).  The rest of the patients had not required treatment for their symptoms but

---

[12] Subjects reported exposure from paneling in home, UFFI in home, particleboard in mobile home, or from occupation (pathology technician, cosmetologist, teacher, or foundry worker).

a few were using nonprescription antihistamines. Eleven of the patients were still living or working in the environment that was suspected of causing their symptomatology. Six of the individuals had begun, or were thinking about, initiating a lawsuit. Baseline pulmonary function tests and bronchial challenge testing was done prior to exposure. The authors tested only one formaldehyde level (0.1, 1 or 3 ppm) or placebo for a 20 minute exposure period each day. Pulmonary function tests were administered before the challenge, immediately after, and 15 minutes, 30 minutes and 1, 3, 6, and 24 hours after the challenge. The study was double-blind and randomized for three patients and for the rest it was single-blind.

Only one patient (subject #7) showed a 20%+ decrease in $FEV_1$ (considered to be a positive response) following exposure to formaldehyde (subject #7 had a -25.7% after formaldehyde exposure); however, in this individual, the placebo challenge caused the same decrease in $FEV_1$ (subject #7 had a -24.3% decrease following placebo exposure). Given this, the response seen when formaldehyde was present cannot be attributed to formaldehyde, and either that individual was responding to something in the air supplied by the Dynacalibrator or the change was induced by some stressor response when the patient believed she was being exposed to a chemical.

Several subjects reported subjective symptoms such as irritation of the eyes, nose, and throat, and tightness of the throat, but these were seen as frequently in the placebo as with the formaldehyde challenges. Three patients underwent methacholine challenge. Two were negative (#1 and #3), while one (#13) was positive. Eight patients were not tested with methacholine (#4, #5, #6, #7, #9, #10, #11, and #12) because they had either unequivocal or convincing histories of asthma. Authors discuss the final diagnoses of their subjects:

- Case #1 - habitual cough;
- Cases #4, 6, 9, and 10 - possible asthma, now inactive and unrelated to formaldehyde;
- Case #11 - history of mild exercise-induced asthma, unrelated to exposure;
- Cases #5, 7, 12, and 13 - mild to moderate asthma of the nonallergic variety, unrelated to formaldehyde;
- Cases #2, 3, and 8 - no respiratory diagnosis;
- Cases #4, 5, 6, 7, 8 and 13 - secondary diagnosis of vasomotor rhinitis and nasal polyps; and
- Cases #4 and 5 - hyperplastic sinusitis.

43

The authors concluded that their study did not induce an asthmatic response at levels up to 3 ppm formaldehyde:

> *In conclusion, testing with a formaldehyde bronchial challenge did not provoke asthma in 13 selected patients with symptoms of asthma and a history of exposure of formaldehyde gas.  If formaldehyde causes asthma, it **does so rarely**.*  [Emphasis Added]

Sauder et al. (1987)

Sauder et al. (1987) studied nine nonsmoking asthmatic subjects aged 27-40 (females n = 5, males n = 4) using an environmentally controlled chamber.  Each exposed subject served as their own control by being exposed to purified air for a three-hour period one week prior to their formaldehyde exposure.  All subjects had a history of hayfever, three had chronic rhinitis, and three had nasal polyps.  Subjects were examined prior to being exposed to both purified air and formaldehyde.  Nonspecific airway reactivity was assessed by methacholine challenge.  Spirometry was performed at t = 0, 15, 30, 60, 120 and 180 minutes.  Symptom questionnaires (completed at t = 0, 2, 15, 30, 60, 120 and 180 minutes) were administered that asked for subjective answers as to the presence and severity of the response.  The authors reported no significant changes in pulmonary function or in airway reactivity amongst the nine subjects at 3.0 ppm exposure.

> *We conclude that individuals with asthma are unlikely to experience significant bronchoconstriction or increased airway hyperreactivity when exposed at rest to 3 ppm HCHO for 3-h; however, most will experience eye and upper respiratory tract irritation.*

The authors indicate their study is consistent with two prior studies of asthmatics (Sheppard, 1984; Frigas, 1984) in showing that 3 ppm up to 3 hours of exposure causes no significant bronchoconstriction.

Table 3 of this paper indicates mild (present, but not annoying) eye irritation was reported at 2 minutes of exposure, and in some had become moderate (annoying) after 30 minutes of exposure.  Nose/throat irritation began at 30 minutes (but was not significant at 60,

120, or 180 minutes). The symptoms scoring for cough[13], chest discomfort, tingling in hands or face, or heart palpitations were unaffected by exposure to 3 ppm formaldehyde.

Green et al. (1987)

This study examined 22 healthy, normal subjects engaged in intermittent heavy exercise and 16 asthmatic subjects engaged in intermittent, moderate exercise who were exposed to 3 ppm formaldehyde for 60 minutes. The symptom questionnaire assessed both the presence and severity of odor, nose/throat irritation, eye irritation, chest discomfort/tightness, cough, and headache. Symptoms were classified as 0 = none, 1 = mild, 2 = mild-moderate, 3 = moderate, 4 = moderate-severe, 5 = severe. Symptoms and pulmonary function were assessed during exposure, and non-specific airway reactivity was assessed by histamine challenge after exposure.

Both groups exhibited similar, significant ($p<0.01$) increases in perceived odor, nose/throat irritation, and eye irritation throughout exposure. While individual scores ranged from none to severe in response to formaldehyde exposure, the incidence of symptoms was similar for both groups, with 19-32% scoring nose/throat irritation and eye irritation as moderate. Still, clean air was apparently scored as a minor objection for both eye and nose/throat irritation. While it is noted that differences between the two groups were reported, the change from the exposed group's own baseline value in response to formaldehyde exposure is the only important comparison to make. The mean $FEV_1$ value for the exposed group did not change at all from time 0 (4.15 ± 0.13) to time 55 minutes (4.15 ± 0.13), and so, formaldehyde had no effect on their pulmonary function tests. While this paper reports their 55-minute value as being significantly different from the control group, this statistical finding stemmed from an increase in the control groups' mean $FEV_1$ after 55 minutes of exposure to clean air. Thus, this difference reported between these two groups is a spurious finding, and one not observed in other studies (i.e., chamber exposure to clean air is not known to increase or improves one's $FEV_1$ value; no changed is the expected response). Similarly, the asthmatic group had no significant decrements in pulmonary function in response to formaldehyde exposure. Whether this difference was repeatable cannot be determined from this study, but is certainly not expected. The authors

---

[13] There actually was a significantly higher *clean air score* at 180 minutes for cough due to two subjects in the clean air group who had an increase in cough and two subjects in the formaldehyde exposure group who had a decrease in cough.

reported no change in the group mean specific conductance of non-specific airway reactivity between control and exposure days for either the normal group or the asthmatic group. They noted that 13% of their study population had an $FEV_1$ change of 10% or greater although a 20% change is the typical response of concern.

Harving et al. (1990)

In this study, 15 asthmatic persons with documented bronchial hyperresponsiveness were exposed for 90 minutes in a climate chamber to clean air containing formaldehyde vapor at levels of 0.008 $mg/m^3$ (0.007 ppm), 0.12 $mg/m^3$ (0.1 ppm), and 0.85 $mg/m^3$ (0.69 ppm). All but one of those tested required bronchodilator therapy regularly. No bronchodilators were used on the day of exposure, or 4 hours preceding exposure. All experiments were carried out in double-blind fashion. The $FEV_1$ was measured at intervals of 30 minutes before and during the exposure. Each participant was asked to rate their asthmatic symptoms (none, light, moderate, severe) every 15 minutes on an analog scale not visible to other subjects before and during exposure. A histamine challenge was performed right after exposure (aerosol ranging from 0.03-2.0 mg/mL for 2 min) until a fall in PEF of 20% or more from baseline was achieved (criterion for hyper-reactivity: 4-8 mg/ml).

These investigators observed no significant changes in $FEV_1$, airway resistance, specific airway resistance, or flow-volume curve measurements during formaldehyde exposure. Similarly, the histamine challenge testing found no evidence of change in bronchial reactivity, and no late reactions were seen in the 14-16 hours following exposure. Thus, the authors concluded that their results indicate residential levels of formaldehyde are of minor importance in the emergence of pulmonary symptoms.

Ezratty et al. (2007)

Twelve non-smoking subjects with intermittent asthma and allergy (grass pollen) were exposed in a double-blind crossover study to either 0.5 $mg/m^3$ (0.41 ppm) formaldehyde or purified air for 60 minutes on two separate days. The order of exposures was randomized, and exposures were separated by two weeks. Lung function was measured via spirometry, and measurements were taken immediately before, during, and 8 hours after the end of the allergen challenge. $FEV_1$ and PEF were measured with a portable combined spirometer every 15 minutes

during the exposure to formaldehyde or air-only in the chamber, and every hour until the methacholine provocation test. An allergen inhalation challenge was administered after each exposure. This challenge involved an automatic nebulizer with the same standard extract of 5 grass pollen allergens as for the skin test. The concentration was doubled every 15 min, the $FEV_1$ was measured after each doubling, and again 10 minutes after inhalations. A questionnaire regarding each subject's perception of odor, eye irritation, nose/throat irritation, chest discomfort/tightness, coughing, shortness of breath, nausea, headache, fatigue, dizziness or other discomfort was also administered.

Only four subjects reported minor complaints during exposure to both air-only and formaldehyde. No major clinical adverse reaction was noted in these subjects. The authors stated that exposing allergic, asthmatic persons at rest to 500 $\mu g/m^3$ (0.41 ppm) formaldehyde for 1 hour had no direct effect on respiratory function either during, or immediately after the exposure session, and that this exposure had no significant deleterious effect on airway allergen responsiveness of patients with intermittent asthma; in fact, if anything they found a slight trend toward a protective effect.

### 5.1.3   Some Related Studies That Were Reviewed

Uba et al. (1989) examined pulmonary function and respiratory symptoms among 103 medical students exposed to formaldehyde over a seven month period during their gross anatomy laboratory studies to determine the incidence of bronchoconstriction and respiratory systems as acute or long-term responses. Two questionnaires were administered, one concerning their prior medical and exposure histories and one concerning the symptoms they experienced while exposed. Pulmonary function testing was performed before their lab studies began, after two weeks of lab studies, and after 7 months of lab studies. Twelve subjects with a history of asthma were evaluated separately from those who did not have asthma. Daily time-weighted average (TWA) formaldehyde exposures ranged from below the lower limit of detection (0.05 ppm) to 0.93 ppm. Monthly TWAs ranged between 0.1 ppm to 0.8 ppm. While students were dissecting, or observing dissection, exposures ranged higher with peak exposures of 5 and 2 ppm, respectively, and mean values of 1.9 and 1.2 ppm.

The number of individuals reporting some type of subjective symptom in responses to formaldehyde exposure was greater than that reported during the control lab experience (see their Table 2). However, the increase in symptoms was limited to those of the upper respiratory tract, and the authors state the small differences in lower respiratory tract symptoms were not statistically different. None of the asthmatics reported lower respiratory tract symptoms during their formaldehyde exposure (i.e., cough, chest tightness, wheezing, or dyspnea). Asthmatics did not differ significantly than the other students in development of respiratory symptoms over the course of the year. In fact, asthmatics tended to report less acute symptoms than the non-asthmatic students except for the categories of burning eyes or watery eyes. In general, the number of subjects reporting a persistent symptom was much lower at the end of the year than at the beginning of the school year (see their Table 3). No pulmonary function measurement showed greater decrement among asthmatics than non-asthmatics on exposed days. None of the asthmatics developed clinically significant immediate bronchoconstriction in response to exposure, or symptoms that suggested a late response to exposure. These findings were stated to be consistent with previous reports that indicate exposure to formaldehyde vapor at levels commonly encountered in occupational and residential settings (2.0-3.0 ppm) do not commonly cause significant bronchoconstriction, even among subjects with preexisting asthma.

A group of investigators from Poland have published two similar studies from what may have been a single investigation that exposed study subjects via a chamber to 0.5 mg/m$^3$ (0.41 ppm) concentrations of formaldehyde (Pazdrak et al., 1993; Krakowiak et al., 1998). Both studies contained 9-10 occupationally exposed individuals and 10-11 healthy subjects. While both are chamber studies, the discussions of subjective symptomatic responses were minimal in both studies. As has been noted by earlier reviewers (Arts et al., 2008), the Pazdrak et al. (1993) study was poorly reported with no information regarding the occupational exposures or the detection method for formaldehyde. The same problems are seen in the Krakowiak et al. (1998) study. Further, I noticed, as have others (Arts et al., 2008), that the authors' statements regarding the exposure levels versus odor and subjective symptoms are completely inconsistent with and contradicted by the rest of the chamber studies reviewed in this section. For example, in both studies these same authors claim the odor of formaldehyde at 0.41 ppm is beyond perception in

most humans. In contrast, others have reported odor thresholds beginning at 0.04 ppm (Molhave and Andersen, 1983, Arts et al., 2006; Arts et al., 2008) with the upper range of odor thresholds falling between 0.18-0.4 ppm (Arts et al., 2006; Arts et al., 2008). Likewise, these authors claim that after two hours exposure to this formaldehyde concentration the exposure induced symptoms not seen or reported in other studies. Thus, they suggest irritative symptoms are seen and reported where the odor was largely not detectable. In fact, in Krakowiak et al. (1998) these authors claim to have used clean air as a placebo because they argue (incorrectly) that 0.41 ppm has no detectable odor for most humans. This is completely contradicted by the rest of the literature. And so, like others (Arts et al., 2008) I gave both studies little or no weight, especially as the study's objectives were not relevant to my evaluation.

## 5.4     Related Issues: Subjective Odor and Irritation Perception

Scientists examining odor and irritation thresholds or intensity responses outside of the formaldehyde literature have long noted and cautioned against the potential misinterpretation of reported subjective symptoms. The mere presence of an odor may affect one's subjective interpretation of what exposure to that odor might represent, especially strong, pungent odors or odors that are strange and novel to the individual. In such situations cognitive interpretations of the odor may raise a biased, subjective interpretation of what harm that odor might pose to the individual, which in turn may cause the individual to subjectively increase their reported intensity of irritation, even in instances where a true irritation response is not likely or possible (e.g., see Dalton, 1996, Dalton et al., 1997; Dalton, 1999, Dalton, 2001a&b; Dalton, 2002; Dalton 2003; Williams and Lees-Haley, 1997; Arts et al., 2002; Arts et al., 2008).

For example, Dalton (1997; 2003) examined the perceived odor and irritation (pungency) intensity ratings of three different chemicals, methylsalicylate (wintergreen scent), isobornyl acetate (balsam scent), and butanol (solvent-and alcohol-like scent) in 180 healthy volunteers. For each chemical, the perceived intensity of the odor was highest when initially exposed to the chemical, and thereafter the recorded odor intensity ranking dropped exponentially as the time of exposure increased (exposure durations for all three chemicals was 20 minutes). The irritation intensity ratings for all three chemicals were lower than that reported for odor and generally did

not change much during the control exposure interval. However, when false negative and false positive information was presented to subjects prior to their exposure, this information bias influenced odor intensity responses in a parallel fashion. Positively biased information resulted in a decrease in the recorded odor and irritant intensity, while negatively biased information tended to increase the recorded odor and irritant intensity even though exposure levels to these chemicals were the same in all experiments. The author concluded that cognitive variables can affect odor and irritancy perception and their respective intensity ratings. Thus, annoyance to an exposure can be increased by perceptions of what the odor and exposure is believed by the individual to represent.

Dalton and coworkers (Dalton et al., 1997; Dalton 2003) observed similar results when they compared the rated perceived odor and irritation intensity workers experienced with acetone exposure against those of persons with no familiarity. The workers' subjective perceptions of the odor and irritation intensity of the tested acetone exposure were substantially less than those recorded by naïve subjects. In contrast, when both groups were exposed to a control odorant, phenylethyl alcohol (PEA, a pleasant smell), the reported intensities for odor and irritation were the same. Experiments assessing the impact of a person's negative affect have similarly shown that individuals with a high negative affect personality report high intensity ratings for the same level of exposure compared to those with a low negative affect (Dalton, 2002 & 2003). In addition, studies using PEA as the odorant, a chemical which stimulates olfactory but not trigeminal verves, have shown that individuals will report irritation in response to a smell even though no irritation exists (Dalton, 2001b & 2003).

## 5.5    Related Issues: Reporting Basis in Environmental or Ecological Studies

As with the odor perception chamber studies scientists have noted that the mere presence of an unfamiliar or unpleasant odor can lead to an increase in the amount of symptoms that are reported by individuals living in an area (e.g., see reports by Smith et al., 1978; Neutra et al, 1991; Knasko, 1992; Shusterman et al., 1993). For example, retrospective data from 2,000 individuals who resided near three different hazardous waste sites were evaluated with regard to self-reported 'environmental worry' and frequency of perceiving environmental odors, especially

petrochemical odors (Shusterman et al., 1993). These authors found significant relationships between symptoms such as headache, nausea, and eye and throat irritation and odor perception and the degree of environmental worry. The authors also found that in neighborhoods with no nearby wastes sites, environmental worry was also associated with symptoms occurrence. These authors commented as to how the individual's cognitive interpretation of the exposure situation biased the results towards a higher reporting of reported symptoms in their study:

> *Headaches, for example, showed a prevalence odds ratio of 5.0 comparing respondents who reported noticing environmental odors frequently versus those noticing no such odors and 10.8 comparing those who described themselves as "very worried" versus "not worried" about environmental conditions in their neighborhood.* (Shusterman et al., 1993; Abstract)

And,

> *In addition to their independent effects, odor perception and environmental worry exhibited positive interaction as determinants of symptom prevalence, as evidenced by a prevalence odds ratio of 38.1 comparing headaches among the high worry/frequent-odor group and the no-worry/no-odor group.* (Shusterman et al., 1993; Abstract)

And,

> *While odor perception and odor-related symptoms may signal exposure to toxicologically significant concentrations of hazardous materials, such is frequently not the case. For example, the common industrial sulfur gases (e.g., hydrogen sulfide, mercaptans, thiophenes) have odor thresholds orders of magnitude lower than levels known to cause symptoms by classical toxicologic or irritative mechanisms, yet are often associated with symptom reporting at levels barely exceeding the odor threshold (11,12).* (Shusterman et al., 1993; p. 28)

And,

> *Based upon our observation that odor and environmental worry are associated both independently and interactively with symptom reporting, we postulate that odors may serve as a sensory cue for the manifestation of autonomic or stress-related symptoms (e.g., headache and nausea) among individuals concerned about the quality of their neighborhood environment (16). Further, the observation that irritative symptoms (throat and eye) are elevated in a similar pattern with respect to these two variables might be interpreted as evidence that odor and worry heighten symptom perception or recall (i.e., result in recall bias).* (Shusterman et al., 1993; p. 29)

Neutra et al. (1991) have made similar comments:

> *We present data from situations where stress alone from environmental anxiety has produced a similar magnitude of excess symptoms in populations. The fact*

*that excess symptoms in waste site neighbors is found primarily in those who complain of odors or who are worried about environmental chemicals suggest that possibility that autonomic, stress-mediated mechanisms or behavioral sensitization are active in the genesis of these symptoms.* (Neutra et al., 1991; Abstract)

It has been determined that bad odors also can negatively affect mood (Knasko, 1992):

*In the present study exposure to a malodor tended to lower mood rating while exposure to pleasant odors had no affect on mood.* (Knasko, 1992; p. 33)

Knasko (1992) also observed individuals who came to expect a malodor in a situation incurred more stress:

*The significant order x odor interaction that appears in the DMS* [dimethyl sulfide; the unpleasant odor used in the experiment] *condition suggests that previous experience and expectations were particularly important in the unpleasant odor condition. Subjects who came to the second test having previously experienced a malodor, had the lowest mood ratings, even thought they did not experience any experimental odor in the second session. Exposure to an unpleasant odor may be somewhat depressing, however, having experienced a malodor and being in the same setting again, not knowing if or when the malodor might reoccur, could be even more stressful.* (Knasko, 1992; p. 33)

An unintended effect of media coverage is reporting bias that might alter the outcomes and incidence of outcomes reported as the result of an exposure (e.g., see studies of Roht et al., 1985; Neutra et al, 1991):

*If we compare a population near a hazardous waste site that believes it is exposed to known amounts of a mixture of chemicals with a distant population that has no such belief, it is not unreasonable that the hazardous waste site neighbors would have a lowered threshold for noticing mild symptoms and for reporting them. In one California study by Baker et al., questionnaire reports of skin cancer were validated by contacting the patients' physicians. Table 5 shows the number of self-reported skin cancer from this study in the "exposed" and control areas, as well as the proportion of the self-reported cases near the dumpsite that withstood the test of confirmation. Apparently the hazardous waste site neighbors were more likely to remember skin lesions that had been investigated for carcinogenicity as if they were really cancers. The residents of the control area had a less "value-laden" recollection. The same process might well be operating*

*with regard to more subjective symptoms. In the more recent California studies, the symptom "toothache" has been included as a dummy question to gauge the degree of recall bias. As can be seen in Table 1, there was a 1.5- to 2-fold excess reporting in two of the three studies in which toothache status was ascertained.* (Neutra et al., 1991 p. 34)

Another issue brought up in the paper by Roht et al. (1985) that might warrant further investigation is the mental and physical effects of natural disasters and the possibility that psychologic symptoms might be occurring as a result of the stressors of dealing with the after-effects of the disaster itself.

## 5.6     Conclusions Regarding the Formaldehyde Chamber Experiments

A number of different experiments have been performed using controlled chamber environments to evaluate the subjective symptoms and objective measures of irritation and pulmonary functioning in both asthmatic and healthy subjects exposed to various formaldehyde concentrations while at rest or while exercising. A consistent finding of these studies is that formaldehyde exposures up to 3.0 ppm, and for exposure durations as long as 5 hours, had no consistent or reproducible effect on any measurement of pulmonary function studied in either healthy or asthmatic individuals while at rest or exercising (Weber-Tschopp et al., 1977; Bender et al, 1983; Andersen and Molhave, 1983; Frigas et al., 1984; Sheppard et al., 1984; Schachter et al., 1986; Sauder et al., 1986; Sauder et al., 1987; Kulle et al., 1987; Green et al., 1987; Witek et al., 1987; Uba et al., 1989; Harving et al., 1990; Pazdrak et al., 1993; Day et al., 1994; Krakowiak et al., 1998; Ezratty et al., 2007; Lang et al., 2008). Pulmonary parameters that were not significantly affected by formaldehyde exposure in these studies included a variety of different spirometry measurements including: bronchoconstriction, increased methacholine or histamine responsiveness, decreases in $FEV_1$, changes in $FEF_{25-75}$, changes in specific airway conductance, decreases in functional residual capacity, or changes in minute volume or minute ventilation. Skin patch testing with a 2% formalin solution showed no positive results in persons previously exposed or not exposed to UFFI (Day et al., 1994).

Various symptoms of odor or upper respiratory tract irritation were recorded in these studies. The only consistent finding was that odor intensity preceded, and was greater than, the

intensity of subjective upper respiratory tract irritant responses, with no symptoms of lower respiratory tract irritation. The latter observation corresponded well with the lack of measureable pulmonary function changes in these studies. In general, the rank order of symptoms experienced by test subjects was odor > eye irritation > nasal irritation > throat irritation. Asthmatics were not more susceptible to the irritant properties of formaldehyde as measured by the incidence and severity of symptoms recorded and by pulmonary function measurements. Importantly, these studies also demonstrated that test subjects have baseline symptom reporting rates for odor and irritative symptoms even when exposed only to clean air (Bender et al., 1983; Schachter et al., 1987; Sauder et al., 1986; Sauder et al., 1987; Andersen and Molhave, 1983; Green et al., 1987), a finding consistent with odor perception studies that show some subjects will report an irritant response when exposed to an odorant with no irritant properties (Dalton, 1996, Dalton et al., 1997; Dalton, 1999, Dalton, 2001a&b; Dalton, 2002; Dalton 2003; Williams and Lees-Haley, 1997; Arts et al., 2008). Consistent with odorant response studies of other chemicals (Dalton, 2002; 2003), one study that controlled for the positive or negative mental affect of the individuals also demonstrated that a negative personality recorded a greater negative interpretation of their environment (Lang et al., 2008). A similar example of this potential confounder was observed in Frigas et al. (1984) where an individual incurred significant pulmonary changes of the same magnitude when exposed to either air or formaldehyde. Thus, there is a clear potential for confounding when subjective symptoms are reported as the mere presence of an odor, especially an undesirable odor where the individual has a belief that the exposure is an undesirable one, can falsely increase the reported subjective odor and irritant intensity of the exposure.

There is evidence to suggest that there may be day-to-day variations in the severity ranking an individual might subjectively score a formaldehyde exposure level (Andersen and Molhave, 1983, Schachter et al. 1986; Schachter et al., 1987). At lower formaldehyde test concentrations, i.e., 0.5 ppm or lower, the potential for confounding influences are such that the incidence/severity of the background clean air symptom reporting rate by that individual, as well as the mood or affect of the individual on a particular day, should be factored into the analysis. Therefore, those studies that based their statistical analysis on symptom scores, after correcting for these possible confounders, represent the strongest experimental design and evidence.

Based on my review of the chamber studies discussed above, I have determined the No Observable Adverse Effect Levels (NOAEL) to be 0.5 ppm for eye irritation (Lang et al., 2008; Kulle et al., 1983; Kulle, 1993; Andersen and Molhave, 1983). Lang et al. (2008) examined eye irritation using objective, physiologic measurements of eye irritation by blink frequency and conjunctival redness. No significant change was seen at exposures levels of 0.5-0.6 ppm, whereas 1.0 ppm peak exposures did induce changes in these objective measurements. In this study, the symptom of eye irritation at 0.5 ppm was not higher than that of clean air after controlling for the adverse impact of negative affect. The severity of the subjective response reported at 0.5 ppm was mild and not annoying, and so, as in other chamber studies it is not considered an adverse response. Other studies are supportive of 0.5 ppm as being the NOAEL for eye irritation (e.g., Kulle et al., 1983; Kulle 1993; Andersen and Molhave, 1983), and none of the studies reviewed provided any evidence that eye irritation was induced at lower concentrations, as measured objectively or by an intolerable severity of reported symptoms.

The eye is the most sensitive endpoint for irritation, and the threshold for eye irritation should be protective of the entire upper airway tract. The studies reviewed clearly indicate much higher levels of formaldehyde are required to induce nose or throat irritation. The studies indicate the NOAEL for meaningful symptomatic (intolerable or annoying) nose or throat irritation requires exposure to levels above 1.0 ppm (e.g., Kulle, 1993; Lang et al., 2008). Given the observed tolerance to initial exposure levels of formaldehyde, and the fact that it is so rapidly metabolized and cleared from the body, it is my opinion that the identified threshold is applicable to chronic exposure situations as well. This conclusion is in keeping with related studies indicating the irritancy of formaldehyde is a function of concentration and not time (Shusterman et al. 2006; Miller et al., 2000; Jarabek, 1995; Arts et al., 2008) as well as the evidence that tolerance or adaption develops to the odor and irritants effects of formaldehyde (Andersen and Molhave, 1983; Paustenbach et al., 1997).

As I noted earlier, chamber studies, as opposed to occupational or residential studies, provide the best evidence for determining NOAEL levels for formaldehyde, and other scientists have noted this as well. For example, Noisel et al. (2007) in their review of a potentially new

occupational exposure limit of formaldehyde did not consider the occupational studies of individuals exposed to formaldehyde to be useful. Noisel et al. (2007) explain:

> *With regard to the occupational studies, they were not included given their limits: large variations in the results between studies, presence of mixed-exposure in most cases, non-systemic control of confounding factors, degree of exposure not always reported with precision and subject to temporal variations, no data on the severity of the effects (only the presence or absence of effect), a different description of the exposure form one study to another (sometimes with a range of values, sometimes with mean or median values, and sometimes with maximum values).*

And,

> *However, the analysis was conducted by considering formaldehyde exposure only, not mixed-exposure. In occupational settings where formaldehyde is used, other chemical substances and dusts (such as wood dust) are concomitantly present and can produce or exacerbate the irritating effects.*

A similar statement was made by Paustenbach et al. (1997)'s review:

> *Because all workplaces contain concentrations of numerous air contaminants, the panel considered workplace studies less definitive than chamber studies where the concentration of formaldehyde is controlled.*

## 6.0    Additional Considerations

## 6.1    Other Reviews Discussing the Irritant Properties of Formaldehyde

Information from the following review articles is provide here because it illustrates other scientists reviewing the data have reached conclusions or opinions similar to those I have reached in the preceding section of this report.

The OECD (2002) reviewed the toxicity of formaldehyde and has concluded: 1) that reversible eye irritation is the most sensitive endpoint , and 2) that the chamber studies represent the best available data for identifying NOAELs and effects levels for formaldehyde exposure:

Regarding the chamber experiments this review states – - *provide the highest quality data for determining the presence of eye, nose, or throat irritation at a known level of formaldehyde*

And,

*It is difficult to differentiate reported irritation in exposed persons from background, especially at levels below 1 ppm, as a 20 to 30% response rate is common in controls (Sauder et al., 1987, Schachter et al., 1987, Witek, 1987, Harving et al., 1990).*

The OECD also notes that eye irritation response does not become significant until approximately 1 ppm and quickly subsides. The OECD (2002), based on its review of the formaldehyde literature, found that moderate to severe eye, nose, and throat irritation does not occur until 2 to 3 ppm.

The USEPA (2008), in its document for the AEGLs for formaldehyde states:

*The discomfort of sensory irritation is difficult to measure with certainty. Studies with controlled human exposures indicate that short-term exposure to 1 to 3 ppm induces eye, nose, and throat irritation that is generally described as slight to mild/moderate by most subjects (Weber-Tschopp et al. 1977; Andersen and Molhave 1983; Bender et al. 1983; Day et al. 1984; Witek et al. 1986; Kulle et al. 1987; ATSDR 1999). Sensory irritation below 1 ppm is difficult to distinguish from the control situation (Bender et al. 1983; 2002). At the upper end of the 1-3 ppm range, a greater number of subjects experience mild irritation, i.e., at 3 ppm most subjects rated eye, nose, or throat irritation mild. The multi-dose clinical studies (Weber-Tschopp et al., 1977; Andersen and Molhave 1983; Bender et al. 1983) show that minimal to no discomfort is observed at levels up to 1 ppm; at 1 ppm and above some subjects show definite signs of discomfort.* (USEPA, 2008; pp. 28-29)

And,

*There were no changes in pulmonary parameters at concentrations between 0.41 and 3 ppm in healthy subjects, asthmatics, or subjects with dermal sensitivity to formaldehyde (Andersen and Molhave 1983; Day et al. 1984; Frigas et al. 1984; Sheppard et al. 1984; Harving et al. 1986; 1990; Witek et al. 1986; 1987; Pross et al. 1987; Sauder et al. 1987). Furthermore, there were no biologically significant differences in pulmonary parameters or symptoms greater than moderate irritation in exercising healthy subjects (Witek et al. 1986; Green et al. 1987; Kulle et al. 1987), asthmatics at rest (Frigas et al., 984; Sheppard et al. 1984), or exercising asthmatics (Sheppard et al. 1984; Witek et al. 1986; Green et al. 1987) exposed to 2 or 3 ppm for up to 3 hours. In all studies, symptoms were related to eye and upper respiratory tract irritation. There was no evidence of these low concentrations having an effect on the lower respiratory tract.* (USEPA, 2008; p. 29)

And,

> *Below 1 ppm many studies show no dose-response relationship. Above 1 ppm, definite symptoms of discomfort are reported. However, even at 3 ppm, the majority of subjects reported only mild-moderate eye and upper respiratory tract irritation (Green et al. 1987; 1989; Kulle et al. 1987; Sauder et al. 1986; 1987; Weber-Tschopp et al. 1977). Of the 180 subjects tested in these latter studies, only one reported severe eye irritation at 3 ppm (Sauder et al. 1987).* (USEPA, 2008; p. 47)

Similarly, the Worker's Compensation Board of British Columbia has a WorkSafe OEL (Occupational Exposure Limit) TWA for formaldehyde of 0.3 ppm (300 ppb) and a Ceiling Limit of 1 ppm (1,000 ppb; WorkSafe, 2007). Relevant findings of the Worker's Compensation Board of British Columbia are as follows -

> *Experimental evidence shows that exposure of asthmatic individuals to formaldehyde does not change the nature or status of the asthmatic condition.* (WorkSafeBC, 2007; p. 5)

And,

> *WorkSafeBC's current Ceiling Limit of 1.0 is at the subjective eye irritation level and below the objective eye irritation level of 1.7 ppm for humans. The current TWA of 0.3 ppm is significantly lower than both the subjective and objective eye irritation levels and below the nasal irritation levels based on the most current experimental information.* (WorkSafeBC, 2007; p. 6)

And,

> *Several reference agencies, including the German MAK Commission and the Working Group on Action to Control Chemicals ("WATCH") Committee of the UK Health and Safety Executive, make the following observations:*
>
> - *Eye irritation - which can be measured and quantified experimentally - unlike nasal irritation, is considered the most appropriate indicator of the irritative nature of formaldehyde and a more objective determinant of an appropriately assigned exposure limit.*
>
> *In another very recently published report, Arts et al. 2006 re-evaluated eye and nasal irritation data and concluded that when minimal/mild/slight irritation is taken as a cut off level, eye and nasal irritation were found at formaldehyde levels of greater than or equal to (>) 1 ppm and > 2 ppm, respectively.* (WorkSafeBC, 2007; pp. 9-10)

And,

- *According to a majority of expert panels, BC's current Ceiling Limit of 1.0 ppm is protective from the irritative properties of formaldehyde, providing an acceptable margin of safety;*
- *WorkSafeBC's current Ceiling Limit of 1.0 ppm is at the subjective eye irritation level and below the objective eye irritation level of 1.7 ppm for humans. The current 8-hour*

*TWA of 0.3 ppm is significantly lower than both subjective and objective eye irritation and below nasal irritation levels based on the most current experimental information.* (WorkSafeBC, 2007; pp. 9-10)

Noisel et al. (2007)

Investigators in Quebec, Canada have recently reviewed the current 2 ppm ceiling value for formaldehyde versus lowering the value to 0.3, 0.75 or 1 ppm based on a request from the Commission for Occupational Safety and Health (Noisel et al., 2007). The authors reviewed a pooled analysis of published controlled human studies[14] that examined effects from acute formaldehyde exposure (e.g., eye, nose, and throat irritation) and applied this data to current formaldehyde exposure in various industrial sectors within Quebec. The authors used a quadratic regression model to predict the theoretical percentage of subjects that would likely show moderate or severe eye, nose, and throat irritation for the different targeted concentrations for the different OELs. It was determined that the greatest gain would be achieved by keeping the OEL at its current level, with any additional gain being negligible below 0.75 ppm. Noisel et al. (2007) concluded that 0.75 ppm level was safe and protected essentially all workers.

*The experimental data show that there was <u>no difference in the proportion of individuals experiencing effects between the control group without occupational exposure and groups exposed to formaldehyde concentrations under 0.75 ppm</u>. For this reason, the theoretical percentage of response attributable to formaldehyde exposure was considered to be zero for the moderate effects on the eyes, nose and throat for all the concentrations below 0.75 ppm. For the severe effects on the eyes, the response percentage appeared also negligible until 1 ppm. According to our analysis of the defined exposure–response relationship, <u>at concentrations below 0.75 ppm, there is thus little probability for formaldehyde-induced irritation to occur.</u>* (Noisel et al., 2007; emphasis added)

Australia Government Department of Health and Ageing (2006)

*Furthermore, although asthmatics are thought to be more sensitive to irritants, studies by Green et al. (1987), Sauder et al. (1986; 1987) and Witek et al. (1987) have demonstrated that at concentrations of 2-3 ppm (2.4 - 3.6 mg/m$^3$) for up to 3 hours, <u>asthmatics were no more sensitive to formaldehyde than nonasthmatics.</u>* (NICNAS, 2006; emphasis added)

---

[14] Noisel et al. (2007) point out the importance of using formaldehyde-only experiments in an analysis such as theirs - *However, the analysis was conducted by considering formaldehyde exposure only, not mixed-exposure. In occupational settings where formaldehyde is used, other chemical substances and dusts (such as wood dust) are concomitantly present and can produce or exacerbate the irritating effects.*

And,

> *The available human and animal data indicate gaseous formaldehyde is unlikely to induce respiratory sensitisation. Lung function tests suggest that asthmatics are no more sensitive to formaldehyde than healthy subjects.* (NICNAS, 2006)

Various investigators were asked to review the formaldehyde literature to derive an occupational limit based on limitation for the Industrial Health Foundation (Paustenbach et al., 1997), including scientists such as Yves Alarie and Tom Kulle. These investigators examined and critiqued 150 articles on formaldehyde. The panel, based on their evaluation, concluded that for most individuals, eye irritation does not occur until at least 1.0 ppm, and that based on data from controlled studies using volunteers, moderate to severe eye, nose, and throat irritation does not appear until levels exceed 2 to 3 ppm. Further, below 1.0 ppm, if irritation is seen, it quickly subsides due to 'accommodation.' Paustenbach et al. (1997) reported that the panel found that individuals exposed to 0.3 ppm reported eye irritation at a rate that was no different than individuals exposed to clean air, and that at exposures of 0.5 ppm (8-hr TWA), eye irritation was not seen in a majority of workers (about 80%). Based on their findings, the Panel recommended an OEL of 0.3 ppm 8-hr TWA, with a ceiling value of 1.0 ppm for irritation. The Panel felt the ACGIH's ceiling value of 0.3 ppm was - *unnecessarily restrictive and that this value may have been based on the TLV Committee's interpretation of the significance of studies involving self-reported responses at concentrations less than 0.5 ppm.* Findings of the Panel are as follows -

> *The panel could not identify a group of persons who were hypersensitive, nor was there evidence that anyone could be sensitized (develop an allergy) following inhalation exposure to formaldehyde. The panel concluded that there was sufficient evidence to show that persons with asthma respond no differently than health individuals following exposure to concentrations up to 3.0 ppm.* (Paustenbach et al., 1997)

And,

> *Third, the panel concluded that based on the weight of the evidence from this analysis, that that of others who have evaluated eye irritation, reports of irritation below 0.3-0.5 ppm formaldehyde were too unreliable to attribute the irritation solely to formaldehyde. The basis for this statement is that there were no data from well-controlled studies that indicate that continuous exposure for 0.5, 3 or 6 h to 0.3 ppm can produce irritation. The panel found support for its view that responses in this range are not reliable since in several studies respondents complained of irritation when exposed to 0.3 ppm at the same frequency as when they were exposed to clean air. These response rates were not unusual compared to data from 3 of the 11 controlled human studies (Kulle, 1993; Sauder et al.,*

*1987; Witek et 1l., 1987) in which irritation was reported at 0 ppm formaldehyde.* (Paustenbach et al., 1997)

And,

*Seventh, the panel concluded that in chamber studies, and probably in other study conditions, some of the irritant responses reported by volunteers exposed to concentrations of 0.3 ppm or less were just as likely to occur during exposure to clean air. This may well explain the bulk of the differences between the panel's interpretation of the published data and that of the TLV Committee. The panel was convinced that results of studies involving formaldehyde, as well as the results of numerous other studies of eye and nose irritants, clearly show that response rates below 20% are very near background level of eye and nasal irritation reported among those in the general population. Consequently, results from volunteer studies at this level of response cannot be attributed to exposure to a specific contaminant. Numerous other studies of other chemical irritants confirm this view.* (Paustenbach et al., 1997)

And,

*Based on the weight of the evidence from chamber studies (Figure 1), the panel concluded that approximately 50% of workers will report eye irritation attributable to formaldehyde at 2.0 ppm, 25% at 1 ppm, and few, if any, will report eye irritation at 0.5 ppm if exposed for periods of 3-8 h.* (Paustenbach et al., 1997)

## 6.2    ATSDR MRLs and Other Regulatory Risk Assessment-Based Exposure Guidelines

The primary objective of the current regulatory risk assessment policy is to provide the regulatory decision-maker with a "conservative or health protective" quantitative or numerical estimate of the potential risks associated with a site-specific exposure. While quantitative estimates of the relative noncancer hazards or cancer risks posed by the exposure in question are generated, it is well-recognized within the scientific community that such risk estimates and the agency exposure guidelines based on them (e.g., MRLs, MCLs) are generated using conservative (protective) assumptions that are likely to cause the actual, or true, human risk to be overstated, often by as much as several orders of magnitude (see Appendix B for more details). That the USEPA and ATSDR risk assessment methodology is, by design, conservative has long been recognized in the scientific community. In addition, the protective nature of this risk assessment methodology, which inflates an equation value in the face of uncertainty, renders them useless for predicting the actual risk of disease an individual might experience from an exposure. All one can reasonably state about such risk calculations is that the true human risk is lower than the numerical estimate they provide, and again, may in fact be as low as zero. This in turn means

that the exposure guidelines based on this methodology are of no use in determining whether or not a concentration that exceeds one of these agency exposure guidelines has induced any harm. In fact, the USEPA, an agency with longer and greater regulatory risk assessment experience than ATSDR, has clearly stated that while the toxicity constants (i.e., reference doses, cancer slope factors) it publishes on its Integrated Risk Information System (IRIS) are to be used in USEPA risk assessments, these values cannot be used to predict the true incidence of human disease (this advice has been available to risk assessors for more than 10 years without changing.):

> *In general IRIS values cannot be validly used to accurately predict the incidence of human disease or the type of effects that chemical exposures have on humans. This is due to the numerous uncertainties involved in risk assessment, including those associated with extrapolations from animal data to humans and from high experimental doses to lower environmental exposure.  The organs affected and the type of adverse effect resulting from chemical exposure may differ between study animals and humans.  In addition, many factors besides exposures to a chemical influence the occurrence and extent of human disease.* (USEPA IRIS, 1998a; USEPA IRIS, 2006; USEPA IRIS, 2008; emphasis added).*

And,

> *'[t]he RfD and RfC can be used to estimate a level of environmental exposure at or below which no adverse effect is expected to occur,' but that '[i]n general IRIS values cannot be validly used to accurately predict the incidence of human disease or the type of effects that chemical exposures have on humans'* (emphasis added) (http://www.epa.gov/iris/limits.htm).

And,

> *Any alteration to an RfD, RfC, slope factor or unit risk as they appear in IRIS (for example, the use of more or fewer uncertainty factors than were applied to arrive at an RfD) invalidates and distorts their application in estimating the potential health risk posed by chemical exposure.* (USEPA IRIS, 2006; USEPA IRIS, 2008)

As the ATSDR MRLs are based on, and adapted from, the same methodology used by the USEPA, it is scientifically incorrect to suggest or presume that merely because someone's exposure exceeded an MRL that that exposure has induced some harm in the exposed person. On this subject the ATSDR has stated the following (ATSDR.  2009.  Minimal Risk Levels (MRLs) for Hazardous Substances http://www.atsdr.cdc.gov/mrls/index.html; emphasis added):

> **ATSDR uses a conservative (i.e., protective) approach to address these uncertainties consistent with the public health principle of prevention**. *Although*

> *human data are preferred, MRLs often must be based on animal studies because relevant human studies are lacking. In the absence of evidence to the contrary, ATSDR assumes that humans are more sensitive than animals to the effects of hazardous substances that certain persons may be particularly sensitive. Thus the resulting MRL may be as much as a hundredfold below levels shown to be nontoxic in laboratory animals.*

And,

> *MRLs are intended to serve as a screening tool to help public health professionals decide where to look more closely.*

And,

> **Exposure to a level above the MRL does not mean that adverse health effects will occur.**

And in particular, the ATSDR Toxicological Profile for Formaldehyde (1999) itself points out the following caveats regarding the use of the formaldehyde MRLs:

> *Exposure to a level above the MRL dose not mean that adverse health effects will occur.* (page A-1)

And,

> *It is important to note that MRLs are not intended to define clean-up or action levels.* (page A-1; emphasis added)

And,

> *ATSDR uses a conservative (i.e., protective) approach to address this uncertainty consistent with the publish health principle of prevention.* (page A-2)

And,

> *MRLs are intended only to serve as a screening tool to help pubic health professionals decide where to look more closely.* (page A-2)

## 7.0    Information Specific to the Plaintiffs

I have reviewed both summaries of the medical records available to me for the plaintiff in this case, Timia Dubuclet (DOB: 09/23/1998), as well as her mother's deposition. According to the Plaintiff Fact Sheet filled out by the plaintiff's mother, Ms. Elisha Dubuclet, the following symptoms were reported by Timia Dubuclet during the time she lived in the FEMA trailer: irritation, burning, and tearing of the eyes; irritation, burning, and bleeding of the nasal membranes; irritation/itching, burning, rashes, and drying/scaling or the skin; irritation/swelling of the eye area; tingling/swelling of the lips or face area; breathing difficulty; wheezing; persistent cough; throat irritation; hoarseness; and worsening of allergies.  I have briefly reviewed the medical records of Timia Dubuclet and note that several of these complaints were

present in the medical records prior to her having ever lived in the FEMA-provided trailed and some were observed after the alleged exposure ceased. For instance, the following conditions were noted on the following dates:

- Skin Rash, Dermatitis, or Eczema: 2/23/99 - rash on forehead; 5/17/99 – rash/eczema on forehead; 4/14/04 - eczema (history of skin allergy noted); dermatitis 5/27/08; dermatitis 3/6/09; dermatitis 3/20/09
- Bronchitis: 10/24/99 (treated with albuterol); 3/7/03
- Cough: 2/10/2000
- Pharyngitis: 10/16/01; 7/14/05; 12/11/08
- Sinusitis: 5/23/02
- Irritated matted eye: 6/23/01

At his deposition Dr. Farber testified that the occurrence of many of her symptoms and conditions were found in her medical records and temporally preceded her living in the trailer (Farber deposition pages 63-94). Dr. Farber also agreed that TRUE test did not identify a specific sensitization to formaldehyde in spite of her reaction to products that contained a mixture of formaldehyde and other components. I further note that the ATSDR (1999) has stated that none of the volunteer studies they reviewed reported skin irritation in response to vapor concentrations as high as 3 ppm (see also ATSDR, 1999; page 69).

The plaintiff, according to information provided on page 9 of the Plaintiff Fact Sheet, moved into the FEMA trailer in June 2006, and later moved out in September of 2007. The Fact Sheet states that the trailer has never had any air quality testing performed on it (page 10). Initial formaldehyde testing in the trailer was conducted by the W.D. Scott Group, Inc. on July 8-9, 2009. Testing was conducted with the HVAC system off and the doors closed. The trailer was tested at the FEMA THU Storage Facility in Lottie, LA. Concentrations of 230 ppb (active tube sample; 84.1° F) 340 ppb (passive badge dosimeter; 87.2° F) were measured near the night stand in the bedroom. This level is lower than the threshold level for eye irritation that I have identified from experimental epidemiologic studies; and exposed individuals would not experience any irritation of the eyes, nose, or throat.

# References

AIHA (American Industrial Hygiene Association). 2001. Emergency Response Planning Guidelines. AIHA (American Industrial Hygiene Association), Fairfax, VA.

AIHA. 2006. Emergency Response Planning Guidelines: 2006 update set. American Industrial Hygiene Association, Fairfax, Va.

Andersen, I. and L. Molhave. 1983. Controlled human studies with formaldehyde. In: Formaldehyde Toxicity. Gibson, J.E. (Ed.); Hemisphere Publishing Corporation. Washington, DC. pp. 154-165.

Arts, J.H., J. Mojet, L.J. van Gemert, H.H. Emmen, J.H. Lammers, J. Marquart, R.A. Woutersen and V.J. Feron. 2002. An analysis of human response to the irritancy of acetone vapors. Crit. Rev. Toxicol. 32:43-66.

Arts, J.H., M.A. Rennen and C. de Heer. 2006. Inhaled formaldehyde: Evaluation of sensory irritation in relation to carcinogenicity. Regul. Toxicol. Pharmacol. 44:144-160.

rts, J.H., H. Muijser, C.F. Kuper and R.A. Woutersen. 2008. Setting an indoor air exposure limit for formaldehyde: Factors of concern. Regul. Toxicol. Pharmacol. 52:189-194.

ATSDR. 1999. Toxicological Profile for Formaldehyde. Final. USDHHS. ATSDR, Atlanta, GA. http://www.atsdr.cdc.gov/toxprofiles/tp111.html.

Bender, J.R., L.S. Mullin, G.J. Graepel and W.E. Wilson. 1983. Eye irritation response of humans to formaldehyde. Am. Ind. Hyg. Assoc. J. 44:463-465.

Chan, C.-C., J.D. Spengler, H. Oezkaynak and M. Lefkopoulou. 1991. Commuter exposures to VOCs in Boston, Massachusetts. J. Air Waste Manage. Assoc. 41:1594-1600.

Clary, J.J. and J.B. Sullivan. 2001. Formaldehyde. In: Clinical Environmental Health and Toxic Exposures. Second Edition. Sullivan, Jr., J.B. and G.R. Krieger (Eds.); Lippincott Williams & Wilkins. Philadelphia, PA. pp. 1006-1014.

Cascieri, T.C. and J.J. Clary. 1992. Formaldehyde-oral toxicity assessment. Comments Toxicol. 4:295-304.

Dalton, P. 1996. Odor perception and beliefs about risk. Chem. Senses 21:447-458.

Dalton, P. 1999. Cognitive influences on health symptoms from acute chemical exposure. Health Psychol. 18:579-590.

Dalton, P. 2001a. Evaluating the human response to sensory irritation: Implications for setting occupational exposure limits. AIHAJ 62:723-729.

Dalton, P. 2001b. Psychophysical methods in the study of olfaction and respiratory tract irritation. Am. Ind. Hyg. Assoc. J. 62:705-710.

Dalton, P. 2003. Upper airway irritation, odor perception and health risk due to airborne chemicals. Toxicol. Lett. 140:239-248.

Dalton, P. and C.J. Wysocki. 1996. The nature and duration of adaptation following long-term odor exposure. Percept. Psychophys. 58:781-792.

Dalton, P., C.J. Wysocki, M.J. Brody and H.J. Lawley. 1997. Perceived odor, irritation and health symptoms following short-term exposure to acetone. Am. J. Ind. Med. 31:558-569.

Day, J.H., R.E. Lees, R.H. Clark and P.L. Pattee. 1984. Respiratory response to formaldehyde and off-gas of urea formaldehyde foam insulation. Can. Med. Assoc. J. 131:1061-1065.

Dhareshwar, S.S. and V.J. Stella. 2008. Your prodrug releases formaldehyde: Should you be concerned? No!. J. Pharm. Sci. 97:4184-4193.

Ezratty, V., M. Bonay, C. Neukirch, G. Orset-Guillossou, M. Dehoux, S. Koscienly, P.-A. Cabanes, J. Lambrozo and M. Aubier. 2007. Effect of formaldehyde on asthmatic response to inhaled allergen challenge. Environ. Health Persp. 115:210-214.

Franks, S.J.. 2005. A mathematical model for the absorption and metabolism of formaldehyde vapour by humans. Toxicol. Appl. Pharmacol. 206:309-320.

Frigas, E., W.V. Filley and C.E. Reed. 1984. Bronchial challenge with formaldehyde gas: Lack of bronchoconstriction in 13 patients suspected of having formaldehyde-induced asthma. Mayo Clin. Proc. 59:295-299.

Godish, T. 1989. Formaldehyde exposures from tobacco smoke: A review. Am. J. Public Health 79:1044-1045.

Green, D.J., L.R. Sauder, T.J. Kulle and R. Bascom. 1987. Acute response to 3.0 ppm formaldehyde in exercising healthy nonsmokers and asthmatics. Am. Rev. Respir. Dis 135:1261-1266.

Guerin, M.R., R.A. Jenkins and B.A. Tomkins. 1992. Properties and measures of environmental tobacco smoke. In: The Chemistry of Environmental Tobacco Smoke: Composition and Measurement. Lewis Publishers. Boca Raton, FL. pp. 63-85.

Harving, H., J. Korsgaard, O.F. Pedersen, L. Molhave and R. Dahl. 1990. Pulmonary function and bronchial reactivity in asthmatics during low-level formaldehyde exposure. Lung 168:15-21.

Hayashi, T., C.A. Reece and T. Shibamoto. 1986. Gas chromatographic determination of formaldehyde in coffee via thiazolidine derivative. J. Assoc. Off. Anal. Chem. 69:101-105.

Heck, H.D., M. Casanova-Schmitz, P.B. Dodd, E.N. Schachter, T.J. Witek and T. Tosun. 1985. Formaldehyde (CH2O) concentrations in the blood of humans and Fischer-344 rats exposed to CH2O under controlled conditions. Am. Ind. Hyg. Assoc. J. 46:1-3.

Hodgson, A.T. and H. Levin. 2003. Volatile Organic Compounds in Indoor Air; A review of concentrations Measured in North America Since 1990. Lawrence Berkeley National Laboratory, Berkeley, CA. LBNL-51715.

IARC (International Agency for Research on Cancer). 2004. Tobacco Smoke and Involuntary Smoking. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. Vol. 83. World Health Organaization. International Agency for Research on Cancer, Lyon, France.

IARC (International Agency for Research on Cancer). 2006. Formaldehyde. In: IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. Volume 88, Formaldehyde, 2-Butoxyethanol and 1-tert-Butoxypropan-2-ol. World Health Organization. International Agency for Research on Cancer. Lyon, France. pp. 39-325.

Jarabek, A.M. 1995. Consideration of temporal toxicity challenges current default assumptions. Inhalation Toxicol. 7:927-946.

Jarke, F.H., A. Dravnieks and S.M. Gordon. 1981. Organic contaminants in indoor air and their relation to outdoor contaminants. ASHRAE Trans. 87:153-166.

Krakowiak, A., P. Gorski, K. Pandrak and U. Ruta. 1998. Airway response to formaldehyde inhalation in asthmatic subjects with suspected respiratory formaldehyde sensitization. Am. J. Ind. Med. 33:274-281.

Kulle, T.J. 1993. Acute odor and irritation response in health nonsmokers to formaldehyde exposure. Inhal. Toxicol. 5:323-332.

Kulle, T.J., L.R. Sauder, R. Hebel, D.J. Green and M.D. Chatham. 1987. Formaldehyde dose-response in healthy nonsmokers. J. Air Pollut. Control Assoc. 37:919-924.

Kushch, I., K. Schwarz, L. Schwentner, B. Baumann, A. Dzien, A. Schmid, K. Unterkofler, G. Gastl, P. Span, D. Smith and A. Amann. 2008. Compounds enhanced in a mass spectrometric profile of smokers' exhaledbreath versus non-smokers as determined in a pilot study using PTR-MS. J. Breath Res. 2.

Lang, I., T. Bruckner and G. Triebig. 2008. Formaldehyde and chemosensory irritation in humans: A controlled human exposure study. Regul. Toxicol. Pharmacol. 50:23-36.

Lawrence, J.F. and J.R. Iyengar. 1983. The determination of formaldehyde in beer and soft drinks by high performance liquid chromatography of the 2,4-dinitrophenylhydrazone dertivative. Int. J. Environ. Anal. Chem. 15:47-52.

Lemus, R., A.A. Abdelghani, T.G. Akers and W.E. Horner. 1998. Potential health risks from exposure to indoor formaldehyde. Rev. Environ. Health 13:91-98.

Lipari, F. and S.J. Swarin. 1982. Determination of formaldehyde and other aldehydes in automobile exhaust with an improved 2,4-dinitrophenylhydrazine method. J. Chromatogr. 247:297-306.

Miller, F.J., P.M. Schlosser and D.B. Janszen. 2000. Haber's rule: A special case in a family of curves relating concentration and duration of exposure to a fixed level of response for a given endpoint. Toxicology 149:21-34.

Moser, B., F. Bodrogi, G. Eibl, M. Lechner, J. Rieder and P. Lirk. 2005. Mass spectrometric profile of exhaled breath--field study by PTR-MS. Respir. Physiol. Neurobiol. 145:295-300.

Newsome, J.R., V. Norman and C.H. Keith. 1965. Vapor phase analysis of tobacco smoke. Tobacco Sci.(9):102-110.

Noisel, N., M. Bouchard and G. Carrier. 2007. Evaluation of the health impact of lowering the formaldehyde occupational exposure limit for Quebec workers. Regul. Toxicol. Pharmacol. 48:118-127.

NRC (National Research Council. Committee on Aldehydes). 1981. Formaldehyde and Other Aldehydes. National Academy Press, Washington, DC.

OECD (Organisation for Economic Co-Operation and Development). 2002. Formaldehyde. CAS No: 500-00-0. SIDS Initial Assessment Report for SIAM 14. UNEP (United Nations Environment Programme), Paris, France.

Owen, B.A., C.S. Dudney, E.L. Tan and C.E. Easterly. 1990. Formaldehyde in drinking water: Comparative hazard evaluation and an approach to regulation. Regul. Toxicol. Pharmacol. 11:220-236.

Paustenbach, D., Y. Alarie, T. Kulle, N. Schachter, R. Smith, J. Swenberg, H. Witschi and S.B. Horowitz. 1997. A recommended occupational exposure limit for formaldehyde based on irritation. J. Toxicol. Environ. Health 50:217-263.

Pazdrak, K., P. Gorski, A. Krakowiak and U. Ruta. 1993. Changes in nasal lavage fluid due to formaldehyde inhalation. Int. Arch. Occup. Environ. Health 64:515-519.

Pickrell, J.A., B.V. Mokler, L.C. Griffis, C.H. Hobbs and A. Bathija. 1983. Formaldehyde release rate coefficients from selected concumer products. Environ. Sci. Technol. 17:753-757.

Reed CE, Frigas E. 1984. Does formaldehyde cause allergic respiratory disease? In: Gammage RB, Kaye SV, Jacobs VA, ed. Indoor air and human health. Chelsea, MI: Lewis Publishers, Inc., 379-386.

Sauder, L.R., D.J. Green, M. D. Chatham and T.J. Kulle. 1987. Acute pulmonary response of asthmatics to 3.0 ppm formaldehyde. Toxicol. Ind. Health 3:569-578.

Sauder, L.R., M.D. Chatham, D.J. Green and T.J. Kulle. 1986. Acute pulmonary response to formaldehyde exposure in healthy nonsmokers. J. Occup. Med. 28:420-424.

Schachter, E.N., T.J. Witek, D.J. Brody, T. Tosun , G.J. Beck and B.P. Leaderer. 1987. A study of respiratory effects from exposure to 2.0 ppm formaldehyde in occupationally exposed workers. Environ. Res. 44:188-205.

Schachter, E.N., T.J. Witek, T. Tosun, B.P. Leaderer and G.J. Beck. 1986. A study of respiratory effects from exposure to 2 ppm formaldehyde in healthy subjects. Arch. Environ. Health 41:229-239.

Sheldon, L.S., R.W. Handy, T.D. Hartwell, R.W. Whitmore, H.S. Zelon, and E.D. Pellizzari. 1988a. Indoor Air Quality in Public Buildings. Volume I. EPA 600/6-88/009a. August 1988. USEPA. Office of Acid Deposition, Monitoring and Quality Assurance.

Sheldon, L., H. Zelon, J. Sickles, C. Eaton, and T. Hartwell. 1988b. Indoor Air Quality in Public Buildings. Volume I. EPA 600/6-88/009b. August 1988. USEPA. Office of Acid Deposition, Monitoring and Quality Assurance.

Sheppard, D., W.L. Eschenbacher and J. Epstein. 1984. Lack of bronchomotor response to up to 3 ppm formaldehyde in subjects with asthma. Environ. Res. 35:133-139.

Stock, T.H. 1987. Formaldehyde concentrations inside conventional housing. J. Air Pollut. Control Assoc. 37:913-918.

Stock, T.H. and S.R. Mendez. 1985. A survey of typical exposures to formaldehyde in Houston area residences. Am. Ind. Hyg. Assoc. J. 46:313-317.

Uba, G., D. Pachorek, J. Bernstein, et al. 1989. Prospective study of respiratory effects of formaldehyde among healthy and asthmatic medical students. Am. J. Ind. Med. 15:91-102.
Waddell, W.J. 1993. The science of toxicology and its relevance to MCS. Regul. Toxicol. Pharmacol. 18:13-22.

Witek, T.J., E.N. Schachter, T. Tosun, G.J. Beck and B.P. Leaderer. 1987. An evaluation of respiratory effects following exposure to 2.0 ppm formaldehyde in asthmatics: Lung function, symptoms, and airway reactivity. Arch. Environ. Health 42:230-237.

World Health Organization. International Agency for Research on Cancer. 1995. Wood Dust and Formaldehyde. IARC Monographs on the Evaluation of Carcinogenic Risk to Humans. Vol. 62. International Agency for Research on Cancer, Lyon, France. http://monographs.iarc.fr/ENG/Monographs/vol62/index.php.

World Health Organization. International Agency for Research on Cancer. 2004. Tobacco Smoke and Involuntary Smoking. IARC Monographs on the Evaluation of Carcinogenic Risk to Humans. Vol. 83. International Agency for Research on Cancer, Lyon, France. http://monographs.iarc.fr/ENG/Monographs/vol83/index.php.

World Health Organization. International Programme on Chemcial Safety. 1989. Formaldehyde. Environmental Health Criteria 89. World Health Organization, Geneva, Switzerland. http://www.inchem.org/documents/ehc/ehc/ehc89.htm