Exhibit C

RJAMES.TXT

11          (Pause in proceedings.)

12               THE VIDEOGRAPHER:  Back on video

13     record.  This is the beginning of Tape No. 4.

14     The time is 2:38.

15  BY MR. PINEDO:

16     Q.   Let me ask you, sir, before we discuss the

17  next paper in this series of Exhibits 20, 21, 22.

18  You've already told us about Exhibit 20 relating to

19  eczema.  Did you have any discussions --

20     A.   I talked about 21.

21     Q.   21.  All right.  So we yet need to talk

22  about 20 and 22; is that right?

23     A.   Yes.

24     Q.   Have you had any discussions with any of the

25  attorneys for Fleetwood as to how you might be able to

                                                        139


1  improve your testimony after your testimony in the

2  Alexander case?

3     A.   No.

4     Q.   Have you had any discussions besides

5  discussions with Mr. Weinstock, the attorney for Gulf

6  Stream in that travel trailer case, as to how you

7  might be able to improve your testimony in the future?

8     A.   No.  I thought he would be handling the next

9  case, which is why I talked to him.  My understanding

10  is that I probably won't see him again the next two

11  cases, so I don't know that I will.

12     Q.   What is the next paper that you have before

13  you there?

14     A.   The next paper, since we've talked about it,

                          Page 121

RJAMES.TXT

15    and it's cited in the Matsunaga et al., 2008, paper,

16    and I'm going to hand this to you so you can spell it

17    right now.

18        Q.   So Matsunaga was cited in the first paper we

19    discussed?

20        A.   No.  Matsunaga cites the first paper we

21    discussed as a mechanistic argument, and it has

22    bearing because of the findings that he's using here.

23    If he's going to interpret it that way, then he's

24    creating confounders.  I'll explain that.

25        Q.   Matsunaga is Exhibit No. 22; is that right?

140

1         A.   Yes.

2         Q.   What are your comments and criticisms on

3     Matsunaga?

4         A.   All right.  I've got a number of

5     experimental design and flaw problems with this paper.

6     When you look at the methods, in the first column,

7     lower portion of page 79 -- you can come here and look

8     if you'd like me to point to them.

9              And in the first part, they're talking about

10    how they collected the population, and they had about

11    3,600 eligible subjects of which they were only able

12    to sign up 627.  So they had a 17 percent response

13    rate.

14             Anytime you get a very, very low response

15    rate for eligible participants, it suggests you may

16    have a selection bias in your population.  You're not

17    getting a full snapshot of the population, and so it

18    always creates a problem as to whether you're skewing

RJAMES.TXT

19   the results one way or another because you haven't got

20   a representative sample of the population.

21          Then, because they couldn't get enough out

22   of the prefecture -- which I guess is a state, would

23   be a version of a state in Japan -- they go to other

24   areas and they talk about how they finally got enough

25   participants to end up with 998 that they could use in

                                                         141


1    this study.

2           They had to try several avenues.  They do

3    not tell you what the response rates, but the fact

4    that they had to try so many times suggests, again, it

5    was likely a low response rate.  Certainly, given a

6    response rate this low, this study started out with a

7    poor response rate, and so you have questions about

8    selection and bias.

9           Then the first thing I noticed, particularly

10   because they had cited this paper (indicating) --

11       Q.   And "this paper," you're referring to?

12       A.   I'm referring to 21, which is the

13   Eberlein-Konig about nitrogen dioxide and formaldehyde

14   on parameters of skin function.

15       Q.   Please continue with the Matsunaga paper.

16       A.   Okay.  They took sampling, and they measured

17   both formaldehyde and nitrogen dioxide, but then they

18   say -- and they looked for decimates, which they used.

19   They filled out a questionnaire, and then they ignored

20   data on diet and the concentrations of nitrogen

21   dioxide were not used in this study because they'll be

22   in other papers.

                          Page 123

RJAMES.TXT

23          The problem with that is they've got papers
24      about how diet can affect allergic responses and,
25      they've already -- at the back of the paper, they

142

1       state that this may provide mechanistic information.
2       Well, I don't think that's true, but if you were to
3       assume it was, then nitrogen dioxide is a clear
4       confounder because it both increased the TWEL, but it
5       increased the skin roughness, which the formaldehyde
6       did not.
7          Q.   And that case, you're referring to what
8       Eberlein-Konig, the findings in Eberlein-Konig,
9       Exhibit No. 21?
10         A.   Yes.  So when they cite the review -- so
11      when they cite the review and they cite the basis for
12      their opinions, they know they've got a confounder
13      that they sampled for, but they don't put it in the
14      analysis.  That may explain a lot of the results that
15      we're seeing.
16          And they point out that the levels of
17      nitrogen dioxide that were used here and may well be
18      in here are levels that you see in homes so --
19         Q.   The level of nitrogen dioxide used in
20      here --
21         A.   Here, this study and the Eberlein study was
22      consistent with background levels.  So if you're
23      saying that these effects are meaningful, then you
24      sample the chemical at levels that would provide
25      meaningful effects according to their own arguments,

Page 124

RJAMES.TXT

143

1    but you ignored it in the analysis.  That's, in my
2    opinion, just bad experimental design.  You're
3    ignoring confounding influences.
4            Okay.  Then it goes down to the
5    self-reported questionnaires.  Basically they
6    collected medical information for the previous two
7    months based on questionnaire data.  So none of this
8    is diagnostic data.
9            None of this is data, a doctor saying they
10   had a true eczema response or they said they had a
11   continuing flare-up, whatever.  It's just the worst
12   kind of information is anecdotal information.  And
13   it's taken a year before the day that they fill out
14   their questionnaire, and that's the day that they do
15   the indoor sampling.
16           Okay.  So studies of indoor air show that
17   there are seasonal variations.  So you've got a one
18   snapshot of what the concentration is, and they use
19   that to categorize people even though, throughout the
20   year, that level can fluctuate.  And they're tying the
21   anecdotal histories to that as a meaningful indication
22   of whether those levels exacerbated a case of eczema.
23           It's sort of putting temporality out of
24   whack.  You're saying the disease comes before the
25   exposure.  So again, I thought it's another serious

144

1    design flaw in this particular paper.
2        Q.  When you're finished with that one, we'll

RJAMES.TXT

3       take a look at the last one.

4           A.   Yeah, sure.  Sure.  Then you go to the Table

5       3, which is exposed to be their analysis, and there's

6       two problems with their analysis that just stand out.

7           Q.   Just so we're clear, we're talking about

8       Table 2 in the Matsunaga paper?

9           A.   Yes.  We're talking about Exhibit 22.  Okay.

10      They do all of these analyses, and they get a single,

11      barely significant finding.  I'd say anything that's

12      101 or 1.0 is on the cusp of being significant.  I

13      mean, mathematically, this is just over the

14      statistically significant line.

15          Q.   You're talking about the confidence

16      interval; right?

17          A.   I'm talking about the confidence interval

18      for the adjusted odds ratio when they're comparing two

19      data points, which is the column farthest right in

20      Table 2.

21          Q.   And the odds ratio they have calculated is

22      2.25; is that right?

23          A.   Yes.  Now, the problem with this data is a

24      number of things.

25          Q.   Let me just stop you there if I could.

                                                        145


1           A.   Sure.

2           Q.   In the 95 per confidence interval for that

3       odds ratio, it's 1.01 to 5.01; is that correct?

4           A.   Yes.

5           Q.   So you be 95 percent certain the true odds

6       ratio falls between 1.01 and 5.01; is that right?

                          Page 126

RJAMES.TXT

7      A.   For that particular number.

8      Q.   And the point estimate that they have for

9  that odds ratio is greater than 2.  In fact it's 2.25;

10 is that right?

11     A.   Yes.  And can I give you analysis now.

12     Q.   Yes.  Can you please continue with what you

13 were telling us.

14     A.   All right.  Thanks.  The problem with this

15 is, in the first analysis, they have without any prior

16 justification, split the entire population into four

17 groups.

18          The first three groups contain 30 percent of

19 the population, so 90 percent of the population is

20 taken up in the first exposure points, exposure

21 ranges, and only 10 percent in the last exposure

22 quartile, that greater than 47.

23          So they've weakened the study.  Typically

24 persons with pick quartiles, they put even number

25 subjects because then you have the same robustness of

                                                     146


1  data in each of the exposure groups because you're

2  attempting to compare them back to the lowest exposed

3  group, which you're setting the odds ratio arbitrarily

4  at 1.

5          So by doing that, they made this calculation

6  unstable.  This is a weaker number statistically

7  because it's based on far fewer numbers.

8      Q.   When you stay "this calculation," which

9  calculation are you referring to?

10     A.   I'm talking about any calculation for the

                       Page 127

RJAMES.TXT

11    high exposure group, whether it be for -- the first

12    one is asthma, I believe.  Asthma, atopic eczema, or

13    allergic rhinitis.

14         Q.    The odds ratio that they have calculated for

15    2.25, that's for people having atopic eczema; is that

16    correct?

17         A.    Yes.  In this calculation, not the first

18    calculation I'm talking about.  So what they did is

19    they skewed the data so that the high dose group is

20    the least stable.  It has your least likely to know

21    what the true prevalence is because you've got the

22    smallest numbers.

23         When you've got a smaller population, then a

24    single yes or no has a much more dramatic effect.

25    When you're doing a epidemiology study, you always

147

1     want your observation group to be as big as your

2     control group.  Most people prefer it to be twice the

3     size.

4          You want an adequate analysis of what's

5     normal, and then you want an adequate analysis of the

6     higher exposure group.  They have not done that.  They

7     have skewed this towards the other exposure groups,

8     which weakens your reliabilities on any of the

9     high-dose groups.

10         Then what they did is, with the crude and

11    adjusted rates, they could find no difference, so they

12    weakened the study further, and they now combine all

13    three first exposure groups, 90 percent of the

14    population, and call that the background group, and

Page 128

RJAMES.TXT

15     now look at the upper 10 percent.

16           This is just an attempt to skew this to a

17     higher number and a number that will be mathematically

18     significant whether it's real or not.  The strongest

19     study -- just let me finish -- is when you do a

20     full-dose response.  And the full-dose response should

21     have been 25 percent on each one of these categories,

22     in my opinion.

23           Q.   You don't know for sure that they were

24     attempting to skew the results, do you?

25           A.   Well, I just know that it's skewed.  I just

                                                        148


1      know that they changed it until they finally got a

2      significant number.  Let me help you a little bit with

3      this.

4            Q.   Let me ask you a question.

5            A.   Do I get to give you my explanation?  I

6      think I can clarify it with some questions you're

7      going to ask me.

8            Q.   Well, let me ask you this question:  This is

9      published in what journal?

10           A.   Ambient formaldehyde and allergen -- oh, no,

11     the Annals of Epidemiology 2008.

12           Q.   To your knowledge, is that a peer review

13     journal?

14           A.   I'm sure it is.

15           Q.   So you don't think a peer review journal

16     would knowingly publish an article which skewed data

17     and results, do you?

18           A.   I don't think they would knowingly.  I think

                          Page 129

RJAMES.TXT

19   sometimes they ignore the fact that practices,

20   improper practices are done to maybe weaken the data.

21   and they give the authors a lot of leeway.  Now, the

22   key -- one of the key points in this is it sort of

23   doesn't --

24            I mean I see errors of why this would be the

25   lone significant number.  But the other problem is is

                                              149

1    they've done a statistical analyses for each of these

2    diseases.  That's a 24 -- total of 24 statistical

3    analyses.  At the 5 percent confidence limit, you

4    would expect 1 out of 20 to be significantly different

5    due to chance alone.

6            So they get one significant finding out of

7    24 tries, and you'd expects at least one.  So not only

8    are there -- have you sort of changed the definition

9    to make this what I consider a sort of unstable,

10   unreliable number.  But that lone finding is the only

11   significant finding, and you would expect one due to

12   chance alone.  You cannot say that this is not a

13   chance finding.

14       Q.   But that one is for the people who are in

15   the highest exposed group, aren't they?

16       A.   So.  I mean I've seen similar problems where

17   it's the second group, third group, or lowest group.

18       Q.   Can you answer my question, please.

19       A.   I did, yeah.  I said yes.  But I've seen

20   these kinds of problems when you have these kinds of

21   data with different exposure groups.  It's not limited

22   to high dose, high dose phenomenon.

                          Page 130

RJAMES.TXT

23          So this is a chance finding, and you cannot

24  eliminate chance from your analysis or use of this

25  finding.

                                                        150


1       Q.   Let me stop you right here.  If they --

2       A.   Potentially chance.

3       Q.   If you would find a significant result,

4   statistically significant result with a low exposure

5   group, then you would have a greater suspicion that it

6   was a chance finding than if it was found in the

7   highest exposure group; isn't that right?

8       A.   Oh, yes.  I think that because it's an

9   inverse dose response group, that would be more

10  important -- because it would suggest an inverse dose

11  response, it would give you more evidence.

12      Q.   I would give you more evidence that --

13      A.   That it's another chance finding.  You would

14  really then expect it to be a chance finding.

15      Q.   But that's not the case here, is it?

16      A.   No.  It's statistical chance handles it by

17  itself.  The other thing is then you go to Table 3.

18      Q.   Let me stop you right there.  That wasn't

19  the intent of my question is that --

20      A.   I'm sorry.

21      Q.   That the case we have here is there is

22  statistical significant finding with the highest

23  exposure group as opposed to with the lowest exposure

24  group.

25      A.   Well, when they redefine all other exposures

                                                        151

RJAMES.TXT

1    as the lowest group, that's when they see a
2    significant finding.  They start with three exposure
3    groups.  I think they should have given equal strength
4    and size to each group, but they started with four.
5    They didn't find anything.  They now change the
6    definition, and now it's statistically significant.
7            I'm not surprised that you can get a
8    significant finding that way, but given the fact that
9    it can be due to chance alone because of the way it
10   was performed and because it could be due to chance
11   alone, I did not find this a particularly strong or
12   relevant finding.
13       Q.   But you're not testifying you know for sure
14   that their finding there is due to chance with regard
15   to the odds ratio for people with atopic dermatitis?
16       A.   I would say the way I said it.  When you
17   look at or anyone uses this finding, they can never
18   rule out the fact that it may be due to chance.
19       Q.   I understand your testimony, but you're not
20   offering sworn testimony today that their finding on
21   the odds ratio, 2.25 for those who had atopic
22   dermatitis, is due to chance, are you?
23       A.   No.  It doesn't matter.  This is a
24   confounded finding that may be due to chance alone.
25   So you always limit the relevance and the weight you

                                                    152


1    would give that type of -- that type of study.
2        Q.   Objection.  Move to strike everything as
3    nonresponsive after the word no.
                     Page 132

RJAMES.TXT

4          A.    I object.  It was absolutely responsive.

5    All right.  Then you go on to the next page.  They

6    start talking about this study by Eberlein-Konig, and

7    of course ignore the fact that the better data was for

8    nitrogen dioxide.

9              And they conclude that the exposure to

10   formaldehyde may exacerbate -- they have no real link

11   -- or alternatively it might be attributed to an

12   unrecognized environmental factor associated with FA.

13             Well, one unrecognized factor they ignored

14   was nitrogen dioxide.  The other factor can be that

15   where  you have high formaldehyde levels, you have

16   higher levels of VOCs in general.

17             It's the problem with these kinds of

18   studies.  You go into a normal population and you look

19   at one factor as a potential explanation for the

20   disease, and you have to --

21             By doing that, you ignore all other

22   contributions, all other confounders, all other

23   factors basically, and so they're very weak studies

24   when you do them this way.  So they give that -- they

25   give that concession.

                                              153


1              Then the next couple of paragraphs, they

2    talk about how their results are consistent or

3    inconsistent with the random number of studies, which

4    basically shows that when you do a study similar to

5    this type, you get different results each time you do

6    it, which I think, again, weakens the impact of this

7    paper.

                        Page 133

RJAMES.TXT

8          There's no consistency.  They fully admit
9   that some of the findings for asthma and others are
10  inconsistent with other studies.
11         Let's see.  What else?  They talk about
12  here, in the lower part of page 82, the main emission
13  sources of formaldehyde are gas appliances, fireplaces
14  -- emission sources of formaldehyde in homes are gas
15  appliances, open fireplaces, tobacco products,
16  furniture, wood chipboards, and other building
17  materials containing formaldehyde.
18         Most of those sources also emit a number of
19  other chemicals, some of which are aldehydes and
20  ketones that are irritating.  They also have other
21  irritant gases that are emitted, and some of the
22  volatile organics could be irritants.
23         So again, they're talking about sources for
24  formaldehyde, ignoring the fact that it's source of a
25  lot of other chemicals.  And finally, the real -- a

154


1   major problem I have with this paper is the very last
2   concession that they make.
3          This is a cross-sectional study; therefore,
4   they cannot establish a cause and effect for the
5   associations.  They say plural, but there was one
6   single association under study, and that further
7   evaluations and prospective studies are needed to draw
8   a conclusion about their results.
9          So this is a cross-sectional study.  That
10  means it's a hypothesis-generating study.
11  Epidemiologists would look at this as a study that may

RJAMES.TXT

12    suggest something that needs to be studied.  This is

13    not the kind of study I would give weight to and reach

14    a causation conclusion on.

15         Q.   When they say associations, and you said it

16    was a single association, you're talking about one

17    statistically significant association; is that right?

18         A.   Yes.  But if you're going to talk about an

19    association, only the statistically significant ones

20    are the ones that you have now attempted to rule out

21    chance.  All of the other weaker ones have been not

22    been ruled out by chance, bias, confounding, and so

23    they're not really associations.  To be an

24    association, it has to be statistically significant.

25         Q.   And you have now completed your comments and

                                                          155


1     criticisms on the Matsunaga paper, which we have

2     marked as Exhibit No. 22; is that right?

3          A.   Except for one other thing on Table 3, and I

4     started to go through this and you interrupted me.

5     That table argues that there is a higher incidence of

6     atopic eczema in people without a family history of

7     eczema or allergic history, history of allergies.

8               And there's almost no association with

9     families that do have allergies.  This is biologically

10    implausible.  So they're giving a finding saying

11    you're at greater risk when you don't have a family

12    history of allergies, which is, my understanding, not

13    consistent with the literature.

14              In fact they used the family history as an

15    adjustment factor when they adjusted the odds ratios

RJAMES.TXT

16   because it should have a contribution.  So again,

17   there's another internal inconsistency in this paper.

18        Q.   Well, that's not necessarily internally

19   inconsistent if there is something different about

20   atopic eczema due to exposure to formaldehyde as

21   opposed to the distinction for those who have a family

22   history between intrinsic and extrinsic atopic eczema;

23   is that right?

24                   MR. HINES:  Object to form.

25   Foundation.

                                                 156


 1        A.   I don't know how to answer your question

 2   because it was long.  I would just say that a familial

 3   history is a risk factor.  Based on the not, you can

 4   always raise a hypothesis or possibility that has not

 5   been evaluated to say there's another possibility.

 6             That's fine.  You can raise a possibility.

 7   I would say that's less likely to be true than the

 8   general rule.  There's not proof that that possibility

 9   is real.  I'm just saying it's inconsistent with what

10   we believe biologically.

11        Q.   Well, Timia Dubuclet, she didn't have a

12   family history of eczema, did she?

13        A.   I don't know.  That part I don't know.

14        Q.   Those criticisms that you have mentioned of

15   the Matsunaga paper, Exhibit No. 22, those are not

16   contained anywhere in your report, are they?

17        A.   No, I didn't read these until after I had

18   submitted my first report.

19        Q.   All right.  Was there another paper?

                        Page 136

RJAMES.TXT

20      A.    There's one last paper.

21      Q.    Relating to eczema and formaldehyde

22 exposure.  That's Exhibit No. 20, and who's the author

23 on this?

24      A.    The author on this is Takahashi.  It's

25 Exhibit 20, and it's the year 2007.

                                                    157


1       Q.    All right.  And what are your comments on

2 that?

3       A.    I didn't find this paper particularly

4 relevant either.  They did patch testing on some

5 medical students before they did gross anatomy, which

6 is where they open up cadavers which are in Formalin

7 solution.

8             They got to patch, it says positive people.

9 After it, one admitted that he had had direct dermal

10 contact while he was working on the cadaver, so it was

11 a contact-initiated response.  With the other person,

12 they're not clear.  She just -- she was an atopic

13 person.

14            She had a history of atopic dermatitis, and

15 she just found being in the room so irritating that

16 she did not participate much.  So when I looked

17 through this, I don't find any evidence that airborne

18 formaldehyde worsens or induces the condition of

19 eczema.

20            In fact, if you go to Table 2, you look at

21 students with a history of atopic dermatitis and what

22 the number of symptoms were that they complained at

23 the beginning of that anatomy course and whether they

RJAMES.TXT

24   got worse after spending too much exposure.

25         And the answer is no.  They're not

                                                    158


1    significantly different.  Where, depending on whether

2    they're complaining of eye irritation or whatever it

3    was, all of the students, students with allergic

4    rhinitis or bronchial asthma all complained of more

5    symptoms.

6          So it says for this -- this analysis says

7    that the incidence of symptoms before and after

8    anatomy are essentially the same.  So I don't find any

9    convincing evidence in this piece of paper either that

10   would be relevant to the fact that airborne exposure

11   causes or exacerbates atopic eczema.

12       Q.   That's the Takahashi paper, which has been

13   marked as Exhibit No. 20; is that right?

14       A.   Correct.

15       Q.   And you did not include any of those

16   comments or criticisms of the Takahashi paper in your

17   report that we've marked in this case as Exhibit 3; is

18   that right?

19       A.   That's right.  I guess I didn't know I

20   wasn't allowed to have new opinions but --

21       Q.   And when did you receive those papers?

22       A.   I don't know.  Weeks before I reviewed them.

23       Q.   Do you have any idea how many weeks before?

24       A.   No.  It may have been three weeks, four

25   weeks.  I just knew that when I had to get ready for

                                                    159

                         Page 138

RJAMES.TXT

1  deposition, that I would have to go through those

2  papers because I was asked to go through those papers.

3      Q.   By Michele Greif, the attorney for the

4  United States?

5      A.   Yes.

6      Q.   The attorney for Fleetwood didn't ask you to

7  go through those papers, did he?

8      A.   He talked -- we had a talk earlier to make

9  sure that I had gone through them.  I got the papers

10  from Michelle, saying that these would be attached to

11  my file and that I should go through them.  So that

12  was the first indication, yes.

13      Q.   Mr. Hines told you to include those papers

14  in your file?

15      A.   I included them because I was sent them in

16  this case.

17      Q.   Did somebody tell you to include them in

18  your files?

19      A.   No.  I think your -- you asked for

20  everything in my file that I had received from the

21  attorneys or that I had pulled and relied on.  So of

22  course these would be in there because the attorney

23  said send me these papers.

24      Q.   And when did you first tell either Mr. Hines

25  or Michele Greif that you had some opinions about

                                                    160

1  these papers?

2      A.   I don't remember the first time.

3      Q.   Was it relatively close to when you first

                   Page 139

RJAMES.TXT

4    received them?

5          A.    I don't know.  I receive things.  I'm busy.

6    I'm like you.  I've got fires.  I put things on the

7    back burner.  I don't know when I talked to anybody

8    about the first time of going through these papers.

9          Q.    Let's look at page 49 of your report,

10   Exhibit 3.

11               Since we're moving on, I want to make it

12   clear that plaintiffs will be filing a motion to

13   exclude any and all testimony or opinions regarding

14   these three papers since it was not included in this

15   report.

16               All right.  Do you have page 49 of your

17   report in front of you, sir?

18         A.    Yes, I to.

19         Q.    And that has related issues, subjective odor

20   and irritation, perception; is that right?

21         A.    Yes.

22         Q.    And that is a new section to your report.

23   It was not included in your report in Alexander

24   Cooper, was it?

25         A.    In the sense that I mentioned the Dalton

                                                            161


1    paper, but I've expanded on this to make it more --

2    when you saw the report, you would get a better impact

3    of the importance I was relying on the Dalton studies.

4          Q.    And did anybody ask you to expand this

5    section?

6          A.    No.  I just thought I should make it more

7    clear.

                         Page 140

RJAMES.TXT

8      Q.   Why did you think you should make it more

9   clear?

10      A.   I think in the first report I cited Dalton

11   or several Dalton studies, and the Dalton studies are

12   important because they go hand in hand with the

13   chamber studies.  The chamber studies show that people

14   respond to clean air with subjective complaints and

15   often complain of throat or nose irritation, which has

16   a much higher threshold from most irritants, and

17   particularly for formaldehyde as an irritant.

18          And this goes through a lot of the

19   psychosocial behavior that goes into the

20   interpretation of odors and how they lead to the

21   reporting of symptoms.  And so I think it helps

22   explain why people that have clean air might have a 20

23   or 30 percent reporting of eye irritation even though

24   there's no volatile organics in the air because it's

25   been charcoal-filtered or otherwise had chemicals

                                                        162


1   removed.  It also goes to show you how people can

2   change perceptions.

3      Q.   Now, Section 5.5 is a new part of your

4   report as well, isn't it?

5      A.   Yes -- let's see.

6      Q.   Related issues --

7      A.   Oh, yeah, I think I've got it as 5.4 on the

8   new one.  I think there was a numbering error, but

9   you're talking about related issues, reporting basis

10   in environmental and ecological studies.  Are we

11   talking about the same section?

                        Page 141

RJAMES.TXT

12      Q.    Yes.

13      A.    Yes, that's a new section.  I thought that

14  that would go hand in hand with the expansion of the

15  Dalton study.  I mean I've been aware of for years

16  these studies and other studies I've had personal

17  experiences with.  A reporting concern started by one

18  person or a neighborhood leads to an increase in

19  complaints when there's no real exposure.

20      Q.    Let's go to your section on ATSDR MRLs that

21  you have added to in this report; is that right?

22      A.    You'd have to show me the first report.  At

23  first I thought maybe I added to it, but when I looked

24  at it, I hadn't added the De Rosa paper, the Selene

25  paper.  I had cited basically from the HTML, the

                                                      163

1   website where you can get all of this information.

2           So I'm not sure, as I look at this, that

3   this is any longer or any different.  It might be.  I

4   might have included more quotes.  If I did, I included

5   more quotes from the same source, it looks like.  Or I

6   added the quotes from the formaldehyde ATSDR.

7           What I may have done the first time, let's

8   say, if you go to the general statements about MRLs,

9   and then here it is.

10      Q.    I'm passing you your report now in Alexander

11  Cooper, and if you could compare that to what you had

12  in your report in the Dubuclet case and tell us what

13  is --

14      A.    Yeah, what's added.  Okay.  The thing that

15  is new is I pulled quotes right out of Appendix A that

                        Page 142

RJAMES.TXT

16      are in the specific ATSDR document on formaldehyde to

17      show that not only are these limitations in the

18      general area where you find MRLs, they are in the

19      specific MRL calculations for formaldehyde.

20          Q.    And where are those new quotations in your

21      report?

22          A.    It says, in particular the ATSDR talks in

23      profile.  1999 itself points out the following

24      caveats, and there is three or four quotes, and it

25      also says page A-1 because it's Appendix A-1 of the

                                                        164


1       ATSDR document profile.

2           Q.    And those new quotes are on page 63; is that

3       right?

4           A.    Yes.  63 to 64, it looks like.  And then,

5       like I said, I've given you additional papers.

6           Q.    And you would agree with me that the ATSDR

7       minimum risk levels do not relate to cancer risk, do

8       they?

9           A.    Yes.  Typically the ATSDR does not use any

10      serious effect.  So again, one of the misnomers is is

11      that they will often use a less serious toxicity in

12      their calculation versus a serious toxicity, like

13      might be used by the EPA.

14              So that, again, then you add safety factors.

15      You're really preventing sort of a nonserious or

16      permanent toxicity, and so it's really not meaningful

17      to say above that line.  Then you know that the person

18      is going to get sick.  And again, that's explained in

19      Selene and some of the other papers.

RJAMES.TXT

20          There's four or five papers that ATSDR

21   scientists have published on the derivation of MRLs.

22      Q.   Objection.   Nonresponsive, everything after

23   yes.  Sir, you do not know the increased risk that

24   Timia Dubuclet has to cancer because of her exposure

25   to formaldehyde while she was living in this travel

                                                    165


1   trailer for 15, 16 months, do you?

2              MR. HINES:  Object to form.

3       Foundation.

4              THE WITNESS:  I'm not sure she has any.

5   BY MR. PINEDO:

6       Q.   You haven't made any calculations on that?

7       A.   I haven't made any calculation.  It might be

8   zero.

9       Q.   And you haven't examined her either, have

10   you?

11      A.   I was not asked to do that, no.

12      Q.   So since you haven't examined it, you cannot

13   offer sworn testimony that her increased risk of

14   cancer, due to formaldehyde exposure in this travel

15   trailer for 15, 16 months, was zero, can you?

16      A.   No.  I don't even know how we got off on

17   this tangent.

18      Q.   And your report on page 64, in the middle of

19   the paragraph, you talk about Dr. Farber and the test

20   that was done?

21      A.   Yes.

22      Q.   You don't know if there was a -- well, let

23   me start over.  Do you understand that she was tested

                         Page 144

RJAMES.TXT

24    positive for two things on the TRUE test?

25        A.   Yes.

                                                    166

 1        Q.   And those two things that she tested

 2    positive for, the one thing they were in common is

 3    formaldehyde; is that right?

 4        A.   I understood that to be true, yes.

 5        Q.   And with regard to the panel that was

 6    specific to formaldehyde -- I believe it's Item No. 21

 7    on the TRUE test -- that was negative, wasn't it?

 8        A.   That's correct.

 9        Q.   And you cannot rule out that the negative

10    test result for formaldehyde for Timia Dubuclet was

11    due to a false negative, can you?

12        A.   I don't know what the false positive or

13    false negative rate is for that test, no.

14        Q.   So your answer is no, you cannot rule out

15    it's a false negative with regard to the

16    formaldehyde-specific finding on Timia Dubuclet?

17             MR. HINES:  Object to form.

18        Foundation.

19             THE WITNESS:  With the limited

20        information I have sitting here today, I can't --

21        I don't know whether I could if I looked up the

22        sensitivity and specificity of the test.

23    BY MR. PINEDO:

24        Q.   Suffice it to say, you have not looked up

25    the sensitivity and the specificity of the TRUE test,

                                                    167