UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 | |
| FORMALDEHYDE | * | | |
| PRODUCTS LIABILITY | * | | |
| LITIGATION | * | SECTION: N(5) | |
| | * | | |
| This Document Relates to: | * | JUDGE: ENGELHARDT | |
| *Dubuclet v. Fleetwood Enterprises, Inc., et al.* | * | | |
| Case No. 07-9228 | * | MAG: CHASEZ | |

*****************************************************************************

**FLEETWOOD ENTERPRISES, INC.'S OPPOSITION TO
PLAINTIFFS' MOTION TO EXCLUDE THE
TESTIMONY OF HOWARD I. MAIBACH, M.D.**

**May It Please The Court:**

Through undersigned counsel, comes Defendant Fleetwood Enterprises, Inc. ("Fleetwood") who respectfully submits this memorandum in opposition to Plaintiff's Motion to Exclude the Testimony of Howard I. Maibach, M.D. ("Plaintiff's Motion to Exclude") (Rec. Doc. 6650), and in support thereof would demonstrate unto the Court as follows:

**I. INTRODUCTION**

Plaintiff Timia Dubuclet brings this motion to exclude in whole the testimony of one of the world's most preeminent dermatologists and a scholar on the subject of atopic dermatitis. Simply put Dr. Maibach has rendered both the general and specific causation opinion that formaldehyde in gaseous state neither causes nor exacerbates atopic dermatitis (eczema) either generally or in Timia specifically. Plaintiff claims that Dr. Maibach's opinions are unreliable because Dr. Maibach does not apply recognized principles of false-negatives. As explained

more fully below, this allegation is wholly without merit and Plaintiff's Motion to Exclude must be denied.

## II.  DAUBERT STANDARD OF REVIEW

Federal Rule of Evidence 702 permits a witness who, through his expertise, has the knowledge, skill, experience, training or education to offer scientific, technical, or other specialized knowledge to testify regarding that knowledge if it will assist the trier of fact to understand the evidence or to determine a fact in issue. Once the expert is deemed qualified, his testimony is admissible if it is based upon sufficient facts or data, it is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.[1]  As this Court has recognized, "The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals* provides the analytical framework for determining whether expert testimony is admissible under Rule 702."[2]  The reliability inquiry is flexible, and several nonexclusive factors may be considered, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, and (4) whether the technique is generally accepted in the relevant scientific community.[3]  It is important to note that the trial court's role as gatekeeper is *not* intended to serve as a replacement for the adversary system.[4]  Rather, as *Daubert* makes clear, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

---

[1] Fed. R. Ev.  *Id.* 702.
[2] Order dated July 15, 2009, at 3 (Rec. Doc. 2181) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002)).
[3] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993) (discussing the four nonexclusive factors); Order dated July 15, 2009 at 4 (Rec Doc. 2181) (citing *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).
[4] *Pipitone*, 288 F.3d at 250.

proof are the traditional and appropriate methods to attack potentially shaky but admissible evidence."[5]

### III. ARGUMENT

**DR. HOWARD MAIBACH, ONE OF THE WORLD'S LEADING TEACHERS, CLINICIANS, AND RESEARCHERS IN THE FIELD OF DERMATOLOGY, DID NOT FAIL TO CONSIDER THE POSSIBILITY OF A FALSE NEGATIVE ARISING FROM THE VERY PATCH TEST USED BY PLAINTIFF'S DOCTOR WHICH DR. MAIBACH CO-DEVELOPED AND PATENTED WITH THE RESULT THAT PLAINTIFF'S CHALLENGE TO DR. MAIBACH'S OPINION ON THIS AND OTHER LIMITED GROUNDS IS WHOLLY WITHOUT MERIT AND MUST BE DENIED.**

A.   **Introduction**.

We as members of the legal profession – whether from the perspective of the Bench or from the perspective of the Bar -- have the opportunity to see "expert witnesses" from every walk of life.  Rarely do we have the opportunity to be associated with one who has truly gained the international reputation of being a leader in his field.  Not only does Dr. Maibach lecture around the world, he has been honored domestically and internationally by numerous scientific societies and is on the peer review board of more than 50 domestic and international scientific publications.  He is the author of more than 2,300 scientific papers, many of which deal directly or indirectly with the subject of formaldehyde.  *See* Exhibit 1 to the Affidavit of Dr. Maibach which is attached to this response as Exhibit A.[6]  Rather than seeking to challenge Dr. Maibach's well taken position that gaseous formaldehyde neither exacerbates nor causes atopic dermatitis, plaintiff seeks to challenge his opinion with a rifle shot -- but preposterous rifle shot

---

[5] *Daubert.*, 509 U.S. at 595.
[6] Numerous of his publications are either cited by plaintiff's witnesses directly or cited in other articles relied upon by plaintiff's witnesses.

3

-- assertion that Dr. Maibach failed to consider the possibility of a so called "false negative" in rendering his opinion.  The word "preposterous" is chosen carefully.  Attached as Exhibit 2 to Dr. Maibach's affidavit are two pages from Dr. Maibach's 2009 book Patch Testing and Prick Testing recently published by Springer in Berlin.  Exhibit 2 is in fact two charts which detail some of the possibilities of both false positive and false negative patch tests.  For sake of clarification, a false negative patch test is a negative patch test in a patient with clinical manifestation of allergic contract dermatitis.  This is contrasted with a false positive patch test which is a positive patch test in a patient with no clinical manifestations of allergic contact dermatitis.  Maibach Aff. ¶ 2.  As Dr. Maibach notes in his affidavit, good medical practice demands that the patient be evaluated to ascertain the clinical meaning of any laboratory test – including the human diagnostic patch test.  As a result, the implication within plaintiff's memorandum that Dr. Maibach is unaware of and disregarded false negative responses is incorrect.  Maibach Aff. ¶ 3.

      **B.**    **Use of a Patch Test in the Clinical Setting**

The patch test does not stand alone in diagnosing skin disease.  The diagnostic patch test is simply one marker in the armamenture of the clinician in diagnosing disease.  The entire presentation of the patient must be reviewed by the attending health care worker in light of the entire clinical situation including, among other things, the patient's medical history, history of putative allergenic exposure, clinical examination, and clinical course.  Maibach Aff. ¶ 12.  In fact, Dr. Maibach has published three articles on the clinical analysis of patients using the patch test.  A discussion of this analysis is more fully described in Ale S., Maibach H. (2002)

Scientific basis of patch testing. Dermatol Beruf Umwelt 50:43-50, 91-96, 131-133; Ale S., Maibach H. (1995) Clinical relevance in allergic contact dermatitis. Dermatosen 43:119-121; Ale S., Maibach H. (2001) Operational definition of occupational allergic contact dermatitis. In: Kanerva L., Menné T., Wahlberg J., Maibach H. (eds) Handbook of Occupational dermatology. Springer, Berlin. pp. 344-350.

Applying this methodology in rendering his opinion – a methodology that is utilized throughout the world -- Dr. Maibach has determined from a review of Timia's medical records that she has suffered from her rash (dermatitis) since she was 6 weeks old to the present and she did not objectively demonstrate a clinically significant increase of disease during the time in trailer residence. Maibach Aff. ¶ 13. This opinion is not challenged by plaintiff's Daubert motion. Indeed, the negative patch test result is consistent with Timia's clinical picture and further supports Dr. Maibach's opinion that neither the world's medical literature nor the overall clinical presentation of Timia can support a claim that her eczema was either caused or aggravated by her exposure to formaldehyde. Maibach Aff. ¶ 13.

It is undisputed in this case that Timia's own attending physician chose the T.R.U.E. Test™ as the patch test to determine whether or not Timia was allergic to formaldehyde. While the patch test did reveal a Type IV allergic contact dermatitis reaction to 3 other putative allergens, Timia did not react to formaldehyde. As noted above, patch testing is not a specific, pathognomonic diagnostic tool. It suffers from the imprecision of medical science and is capable of producing both false positive results and false negative results as shown above. Interestingly, plaintiff's moving papers do not address the possibility of a false positive test to the other three allergens to which Timia reacted; rather, their efforts center on the possibility of a false negative.

Fleetwood is somewhat puzzled by the point of the challenge. It would appear at best that such challenge goes to the weight, and not the admissibility of Dr. Maibach's well credentialed opinion. It is well settled within the Fifth Circuit that questions relating to the basis and sources of the expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left to the jury's consideration. Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 562 (5th Cir. 2004) (internal citations and quotations omitted).

It is rare that a litigant sponsoring an expert witness can ask the following rhetorical question: who is better qualified in the world to give such an opinion than he who has been writing, teaching, lecturing, and researching on this issue for 50 years and who is the true developer and patent holder of the very patch test used on the plaintiff now questioned by plaintiff's motion? [While it is always true that this opinion could be rejected by the jury, it passes Daubert muster with flying colors and should not be rejected by the Court].

    C.    **Development and Efficacy of the T.R.U.E. Test™**.

In addition to suggesting -- improperly -- that Dr. Maibach's opinion failed to consider false negatives, plaintiff's moving papers seem to suggest that the T.R.U.E. Test™, used and sold internationally, is itself unreliable. Importantly, it was plaintiff's own doctor that choose to use the T.R.U.E. Test™, and now they appear to be discrediting their own doctor.

Plaintiff's misplaced attempt to discredit the reliability of the T.R.U.E. Test™ fails. Dr. Maibach, together with his colleague from Sweden, Dr. Torkel Fischer developed the T.R.U.E. Test™ at Dr. Maibach's research laboratory at the University of California, San Francisco. Maibach Aff. ¶ 5. It was designed to provide the health care practitioner a more pharmaceutically precise and simple to use pre-packaged diagnostic unit. Id.

The T.R.U.E. Test™ is not the only patch test system utilized by health care practitioners around the world. The most widely used patch system (commonly known as the Finn chamber system), [containing a series of small aluminum discs into which the putative allergens are placed] employs syringes or other containers of the putative allergens in a substance known scientifically as Petrolatum (the same thing as Vaseline). Depending on the allergen, some are placed in containers of water. Maibach Aff. ¶ 6. Accurately loading the small Finn chambers with the solid or the liquid is technically demanding and time consuming with the result that it is not a method of choice for clinicians who test but a few patients yearly -- likely one of the reasons that Timia's attending physician chose the T.R.U.E. Test™. Id.

The eventually developed and commercially available pre-packaged T.R.U.E. Test™ met its pre-development goal of devising a pre-packaged, ready to use device that does not require technical training. Maibach Aff. ¶ 7. The T.R.U.E. Test™ is a registered drug. It is registered with the United States Food and Drug Administration and is sold in other countries throughout the world including Sweden and Japan. Not only must it meet approval by the FDA, but it is concomitantly mandated that patch test results be reproducible from patch test to patch test. The currently utilized material in the T.R.U.E. Test™, including the formaldehyde utilized, meets this goal. Hansen, J. et al., Proestrogens of formaldehyde applied in patch test of formaldehyde contact allergy, J. Am. Acad. Derm. Oct. 1989, 838-840. Perhaps it should be noted that Dr. Maibach's opinions with respect to the efficacy of the T.R.U.E. Test™ are not colored by monetary gain in light of the fact that he declined any royalties for the sale of the test to health care providers. Maibach Aff. ¶ 8.

### D.     Plaintiff's Reliance on the 2009 DeGroot Paper is Misplaced.

Concordance, that is, reproducibility of results from patch test to patch test has been studied and its results are considered superb.  Maibach Aff. ¶ 9.  Dr. Maibach's former research fellow conducted an analysis of positive patch test results that demonstrated 95% left to right concordance in the positive patch test results.  Maibach Aff. ¶ 9.

In contrast to the precisely developed and controlled environment of the T.R.U.E. Test™ system (an environment that is not subject to human variability), the Finn chamber system is plagued with the possibility of human error.  In loading the putative allergen challenges within the more commonly used Finn chamber system, there is much room for technical error in loading the chamber, and, especially in the case of the Finn chamber with formaldehyde in water solution, allowing it to evaporate before application to the skin.  Gilpins, S., Hui, X., Maibach, H., Volatility of Fragrance Chemicals:  Patch Testing Implications, Dermatitis, Vol. 20, No. 4 (July/August) 2009, pp. 200-207.  Maibach Aff. ¶ 10.

Plaintiff in her moving papers did not appear to understand the difference between the Finn chamber and the T.R.U.E. Test™.  Plaintiff's moving papers spend some time discussing a 2009 meta-analysis by Dr. Anton DeGroot.  Dr. DeGroot is a colleague, fellow researcher and good friend of Dr. Maibach.  Maibach Aff. ¶ 11.  Plaintiff's moving papers fail to understand that the DeGroot article looks at Finn Chamber patch testing only and does not in any way address patch testing done with the T.R.U.E. Test™.  Simply put, plaintiff's argument fails to consider the dosing confounding errors incurred when clinicians try to dose the Finn chamber. These problems are well discussed in Bruze, M., Isaksson, M., Gruvberger, B., Frick-Engfeldt,

M., Recommendation of appropriate amounts of petrolatum preparation to be applied at patch testing, Contact Dermatitis, 2007 56(5):281-285. Any inference that the T.R.U.E. Test™ false negative would be the same as the Finn chamber false negatives for formaldehyde is misplaced in that the dose (milligrams per centigram squared) is precise in the T.R.U.E. Test™ but not in the dosing in the Finn chamber. Maibach Aff. ¶ 11.

Putting aside the misplaced use of the DeGroot paper to challenge the efficacy of results of the T.R.U.E. Test™, plaintiff's argument that the DeGroot article undermines the opinion of Dr. Maibach stands logic on its head. At best, the results of the DeGroot meta-analysis reveal that by using the Finn chamber as the test system, false negatives can be as high as 40%. Even assuming a 40% false negative rate, it necessarily means that the test results are correct 60% of the time. If the test results are correct 60% of the time, it means that it is scientifically and medically more probable than not that the formaldehyde test result from the patch test is correct. For the plaintiff to argue otherwise is to say that night is day. Put simply, plaintiff's use of the DeGroot article to support a Daubert challenge widely misses the mark.

> **E.** **Dr. Maibach's Opinions are Entirely Consistent with the Fact That Ms. Dubuclet was Patch Test Positive to Three Other Putative Allergens When Tested by the T.R.U.E. Test™.**

This response to plaintiff's motion will end by addressing the straw argument suggested on the very first page of her memorandum. Plaintiff's set up the false syllogism that because the three putative allergens to which Timia was patch test positive "are made from formaldehyde," and since Dr. Maibach's opinion is that she is not suffering from a formaldehyde allergy, Dr. Maibach's opinion must be unreliable. As will be demonstrated below, not only is the suggested syllogism wrong, the argument is grossly misplaced.

Plaintiff appears to lack the understanding of the complex chemicals involved in the putative allergens to which Timia was patch test positive. Dr. Maibach, as the co-patent holder and developer of the T.R.U.E. Test™ is aware of the chemical composition of those allergens. Maibach Aff. ¶ 14. First, the epoxy resin -- to which Timia was patch test positive -- is not known either to release formaldehyde or to cross react with formaldehyde. Maibach Aff. ¶ 14. Thus, Timia's patch test result is of no clinical relevance to the formaldehyde issue presented in this case. Id. Second, imidazolidnyl urea -- to which Timia was patch test positive -- has at least two separate allergens: one identified with formaldehyde and the other releasing other sensitizers. Id. Studies show that approximately half of the patients who are patch test positive to imidazolidnyl urea are patch test negative to formaldehyde. Id. Imidazolidnyl urea acts as a preservative in skin creams and other cosmetics and has only been known to be a contact allergen when it is smeared on the skin. Id. Thus, it has no clinical relevance to any *gaseous* formaldehyde exposure Ms. Dubuclet may have had. Id. Third, p-tert butylphenol formaldehyde – the third putative allergen to which Ms. Dubuclet was patch test positive -- is a resin consisting of numerous complex monomers and trimers and has been studied extensively by the Swedish researchers Eric Zimerson and Magnus Bruze. Id. Zimerson E., Contact Allergy to trimers in p-tert-butylphenol-formaldehyde resin, 2002 Exogenous Dermatology 1(4): 207-216; Zimerson E., Bruze M., Contact allergy to the monomers in p-tert-butylphenol-formaldehyde resin. Id. Contact Dermatitis 2002, 46, 147-153. Id. In a patch test study group who were patch test positive for phenolic resins, none (0.0%) were patch test positive to both p-tert butylphenol formaldehyde and formaldehyde. Id. Bruze, M., Contact Sensitizers in Resins Based on Phenol

and Formaldehyde, Lund 1985, p. 91.  Thus, to suggest that one who is patch test positive to p-tert butylphenol formaldehyde is also sensitized to formaldehyde is incorrect.  Id.

Accordingly, there is absolutely nothing inconsistent with Dr. Maibach's opinion and Timia's three positive results when Dr. Maibach's opinion is viewed in the light of what the three other putative allergens contain.  Put simply, she was negative to formaldehyde but positive to three other chemicals that are wholly irrelevant to exposure to gaseous formaldehyde.

## IV. CONCLUSION

For all of these reasons, therefore, plaintiff's Daubert challenges to the well taken opinions of Dr. Maibach are misplaced with a result that plaintiff's motion must be denied.

This 13th day of November, 2009.

Respectfully submitted:

 /s/ Richard K. Hines, V
Richard K. Hines, V
GA Bar No. 356300
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

Jerry L. Saporito
LA Bar No. 11717
LEAKE & ANDERSSON, L.L.P.
1700 Energy Centre
1100 Poydras St.
New Orleans, LA 70163-1701
(504) 585-7500 (phone)
(504) 585- 7775 (fax)

Counsel for Fleetwood Enterprises, Inc.

## **C E R T I F I C A T E OF SERVICE**

I hereby certify that a copy of the foregoing has this date been serves on all counsel of record in this proceeding by:

( )  Hand Delivery	( )  Prepaid U.S. Mail

( )  Facsimile	( )  Federal Express

(X)  CM/ECF

New Orleans, Louisiana, this 13th day of November, 2009.

    */s/ Richard K. Hines, V*
Richard K. Hines, V
Georgia Bar No. 356300
richard.hines@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW
Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)