UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
|      FORMALDEHYDE PRODUCTS | * | |
|      LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |
| THIS DOCUMENT IS RELATED TO | * | |
| | * | |
| *Dubuclet v. Fleetwood Enterprises, Inc.* | * | |
|  Docket No. 07-9228; | * | |

**PLAINTIFF'S RESPONSE TO DEFENDANT FLEETWOOD ENTERPRISES, INC.'S MOTION *IN LIMINE* TO LIMIT TESTIMONY OF MARCO KALTOFEN, P.E.**

Plaintiff, Elisha Dubuclet, individually and on behalf of Timia Dubuclet, files this response to Defendant Fleetwood Enterprises, Inc.'s Motion in Limine to Limit Testimony of Marco Kaltofen, P.E.

**I.**

**EXHIBITS**

Exhibit A.    Affidavit of Marco Kaltofen, PE

Exhibit B.    Excerpts from Kaltofen Deposition in Alexander

Exhibit C.    Marco Kaltofen Curriculum Vitae

Exhibit D.    ASTM Standard E 1333

## II.

## **BACKGROUND**

The Court has already addressed several of the issues raised in Defendant's Memorandum of Law in Support of Its Motion in Limine to Limit the Testimony of Marco Kaltofen in an order issued in the *Alexander* travel trailer case involving Gulf Stream. Court Rec. 2484. The Affidavit Marco Kaltofen issued in this case is similar in several respects to the Affidavit that was issued in *Alexander*. The primary differences are that his Affidavit in *Alexander* focused on Gulf Stream travel trailers and the Alexander unit in particular while his Affidavit in the instant case contains a discussion on Fleetwood trailers and the Dubuclet trailer in particular.

At the outset, Defendants request that the same limitations be imposed on Kaltofen's testimony in the instant case as were in the *Alexander* case. Plaintiff does not contest any of the rulings on the seven opinions that the Court specifically examined in the *Alexander* case, however Plaintiff is not stipulating that she will not seek testimony from Kaltofen on the remaining matters contained in his *Dubuclet* Affidavit. Plaintiffs also recognize that Defendant in its Memorandum is arguing about issues not covered in the Court's prior ruling with regard to Marco Kaltofen. Plaintiffs would further note that they offered Marco Kaltofen for deposition; however, Defendant chose not to depose him. To the extent deposition quotes are necessary to shed more light on Mr. Kaltofen's opinions and his basis and qualifications therefore, depositions excerpts from the *Alexander* case will be used in support of this response.

## III.

## ARGUMENT

Opinions 1, 2, 3, and 5

In their Memorandum, Defendants address several Opinions that were previously addressed by the Court. Defendants, state with regard to Opinions Nos. 1, 2, and 5, Kaltofen has to be clear that his testing was not done by him and is not his opinion, but rather is rather information that he considered in forming his ultimate opinions. Defendant's Memo, p. 5. Plaintiff has no dispute with this. Plaintiff further has no disagreement with the request with regard to Opinion No. 3, "to the extent that he relies on the research of others, he must attribute it to others and explain why it is applicable herein in formulating his ultimate opinions" Defendant's Memo, p. 5. Plaintiff has no dispute with this.

Opinion No 4

With regard to Opinion No. 4, Fleetwood argues that this opinion should be excluded claiming it is based on Paul Hewett's original affidavit and Paul Hewett substantially modified his opinions. Defendant's Memo, p. 5. This is a misconstruing of what Kaltofen said in Opinion 4, on page 7 of his Affidavit. Kaltofen wrote, "Of the 17,980 records *fully reviewed at the time of the affidavit*, 1518 units were Fleetwood units. The mean result was 0.146 parts per million, (PPM), of formaldehyde in indoor air [*emphasis added*]." See Exhibit A, p. 7. What Kaltofen wrote in July 2009 was and still is true as Kaltofen was looking at the units Hewett had analyzed *at that time*. After Kaltofen completed his Affidavit, Hewett did an additional analysis where he examined the data differently by looking at the measurements for occupied and unoccupied trailers separately. Therefore the data is not outdated as Defendant alleges in their

Memorandum, p. 10. The statement by Kaltofen that the mean for the Fleetwood data set he looked at was 0.147 ppm should not be excluded as it was accurate at that time and remains accurate today.

Defendants further take issue that Kaltofen is not "qualified" to render his Opinion No. 4, on the mean of the formaldehyde level since he is not a statistician "yet he purports analyze data." Defendant's Memo p. 8. This criticism is without merit. Kaltofen is merely recounting a result from a computer program that automatically calculated the mean or the average. One does not need to be a statistician to calculate an average or to report an average. In his work, Marco Kaltofen has routinely and extensively collected data and is acquainted with the means and methods of summarizing data. Exhibit A. pp. 1-2 and Exhibit C. Marco Kaltofen is a Massachusetts Registered Professional Engineer, and president and owner of Boston Chemical Data Corporation, an environmental engineering consulting company. Exhibit A, p. 1; Exhibit B, pp. 341-42. In the course of his career, he has performed and evaluated tens of thousands of tests on air, water, and soil to determine the content of various contaminants. Exhibit B, p. 343. Because of his background in environmental engineering, he was asked to examine and evaluate the results of the totality of the FEMA trailer formaldehyde testing conducted by various entities; and based on the data, to derive an opinion of the average level of formaldehyde that could be expected to have been present on average. Exhibit B, pp. 358-60. Any analysis in determining a mean or average is typical and routine for his line of work and it does not take a statistician to determine a mean. Marco Kaltofen is qualified to render the Opinion No. 4.

Opinion No. 6

Defendant takes issue with Kaltofen's Opinion No. 6 that of the two testing results from the trailer, that 0.23 ppm "is the more conservative value of her actual exposure during the time Ms. Dubuclet resided in the trailer." Defendant alleges that "any testimony from Kaltofen is cumulative of other plaintiff experts who can more directly address the testing of the Dubuclet trailer." Defendants Memo, p. 6. Defendants miss the point. Bill Scott did indeed take the test that resulted in the .23 ppm measurement and Bill Scott can talk about the test and the procedure he used for the test. Mr. Kaltofen is not just talking about the testing, he is more precisely talking about the "exposure" the Dubuclets experienced and he is well-qualified to opine on the same. As noted above, Kaltofen owns environmental testing laboratory and has done work as an environmental chemist. He has frequently been involved in projects where assessed exposure to toxic substances and contaminants. Exhibit A, pp. 1-2, Exhibit C, p. 3. He has also examined conducted environmental and human health risk assessments. Exhibit C, p. 4. Therefore, his Opinion No. 4 is not cumulative as Defendant alleges and should not be excluded.

Opinion No. 7.

Defendants challenge Opinion No. 7 wherein Mr. Kaltofen writes:

> Overall based on the May 15, 2009 state of the BCD electronic database, the 5th percentile data point exceeded the ATSDR MRL of 0.008 PPM. That is 95 percent of the data was higher than the MRL (Minimum Risk Level, 0.008 PPM). This is despite the fact that the EHU's were often sampled after residences had ended, with an associated decline in EHU age and formaldehyde concentration. Exhibit A, p. 9.

Defendants claim this should be excluded because it falls outside of "Kaltofen's expertise", is not supported by reliable data, and is based on CDC data. Defendants Memo, pp. 6-7. The Defendants misapprehend Mr. Kaltofen's opinion in several respects. What Kaltofen is talking

about here is not CDC data, but his own data, the BCD or Boston Chemical Data – the data from his own environmental engineering firm. This is data that Mr. Kaltofen is very familiar with and uniquely qualified to talk about. Furthermore, although the Defendants state there are "errors" in the data, the do not point out a single error. Moreover, as stated in the Affidavit and in the quote above, the BCD is kept in an electronic database. Exhibit A, p. 9. It was easy for Kaltofen to look at his own data in the database and determine a), that BCD had 45 Fleetwood measurements, and b) that each of those measurements was over the 0.008 ppm level. If all of the data are above 0.008, it is a foregone conclusion that at least 95% are above the MRL of 0.008. Mr. Kaltofen used the 95% and 5th percentile as those are parameters for data often used in the field. Mr. Kaltofen has vast experience with summarizing data as set forth in Plaintiff's response to Opinion No. 4 above. This analysis is not beyond his expertise.

Later in their Memorandum defendants misquote Kaltofen's Opinion No 7 in rambling critique set forth on pages 10-15 of their Memorandum, and wherein they also quote his testimony from *Alexander*. A large part of their critique in this regard was assuming that if Kaltofen was asked similar questions in the *Dubuclet* case as he was asked in *Alexander*, his responses would be similar. Suffice it to say that the defendants have elected not to depose Kaltofen in the instant case, and his Opinion No 7 has been thoroughly dealt with above. Lastly, Defendants claim it would be cumulative for Kaltofen to talk about this data. This argument is without merit as it would not be cumulative for Kaltofen to talk about his own data that he collected and a summary of the same.

Opinion No. 8

In Opinion No. 8 Kaltofen writes:

> A standard method exists for correcting actual temperature and humidity conditions to standard temperatures. The average temperature and humidity during the period Ms. Dubuclet resided in the unit was larger than the range of values used in this formula, which is only 5 deg. F. Exhibit A, p. 15.

Defendants lamely criticize this opinion. Defendant's Memo, pp. 15-16. The truth of the matter is that the American Society for Testing and Materials (ASTM) has come up with a protocol for standardizing formaldehyde measurements when the temperature and humidity may differ, ASTM E 1333. Exhibit D. It is well-accepted in science and has been affirmed by Defense as well as Plaintiff experts in this litigation and also by the United States Centers for Disease Control that as the temperature and humidity increase formaldehyde levels increase inside travel trailers. The American Society of Testing Materials came up with ASTM E 1333 to provide a way to equalize measurements based upon differing temperature and humidity levels. Exhibit D, p. 1. The standard specifically states that it "measures formaldehyde concentrations in air and emission rates from wood products containing formaldehyde under conditions designed to simulate product use." Exhibit D, p.1, Section 1.1. In the parlance of engineers, it is referred to as a "correction" factor, but it is better described as a "standardization factor." The key thing to note here is that Kaltofen says a method "exists" and the standard does indeed exist. The standard was published in 1996 and reapproved in 2002 by the ASTM. See Exhibit D, p. 1 and footnote 1. A second key point to consider is that Kaltofen did not perform any such calculation as set forth in E 1333 to "correct" or standardize any formaldehyde measurements in this case based on the standard. Exhibit A, pp. 15-16.

Defendant goes into detail in a misplaced attempt to discredit Mr. Kaltofen's opinions on temperature and humidity. *See* Defendant's Memo, pp. 15-16. Mr. Kaltofen discussed correction factors in *Alexander* only to illustrate the extent of the effect temperature and humidity have on formaldehyde concentration. *See* Exhibit B, pp. 139, 380. In *Alexander* Kaltofen testified

unequivocally that he was not using the calculation to extrapolate from test results to a specific level of formaldehyde at any specific time or place. *See* Exhibit B, pp. 191, 195, 232-33, 378, 380.

95% Probability

On pages 10-15, of Defendant's Memo they engage in a confusing discussion of Kaltofen's "opinions on a 95% probability of identifying the formaldehyde level for any given EHU". In its efforts to discredit him, Defendant Fleetwood distorts Mr. Kaltofen's testimony. Contrary to Defendant's characterization, Mr. Kaltofen never testified that he could predict a specific formaldehyde concentration in a previously untested EHU at a 95%, or any other confidence level. Likewise, he never attempted to substitute a "corrected" result for an actual test result. Defendant's arguments, which failed to address the testimony that Mr. Kaltofen actually offered, cannot negate the reliability of Mr. Kaltofen's actual opinions.

As explained by Mr. Kaltofen, many factors are known to affect the level of formaldehyde concentrations in units such as the FEMA trailers. *See* Exhibit A, p. 13; Exhibit B, p. 146. Mr. Kaltofen noted in the same trailer, the formaldehyde concentration will vary with differing temperatures and humidity levels. *See* Exhibit A, p. 13, Exhibit B, p. 147. Ventilation rates, which are dependent on factors such as whether windows and doors are open or closed and whether air conditioning is utilized, vary even during the space of a day. *See* Exhibit B, pp. 147-48, 150. Even behavior of the occupants of the trailers, such as whether or not they smoked, can affect indoor formaldehyde concentration. *See* Exhibit B, pp. 147-48. Because so many of the factors that impact formaldehyde concentration vary constantly, a single test result will not be representative of an average concentration over time in any particular unit. *See* Exhibit A, p. 13-14; Exhibit B, pp. 159.

Mr. Kaltofen carefully described how statistical sampling overcomes the problem of constantly changing variables. *See* Exhibit A, p. 13; Exhibit B, pp. 152-53, 192. When the formaldehyde concentration is measured in an appropriate sample size of units, all tested at different times and under different conditions, the results represent a statistically reliable profile of the units as a whole. *See* Exhibit A, p. 14; Exhibit B, p. 192. The statistical profile provides a more accurate representation of an individual unit over time than would a single measurement of the unit at any one time. *See* Exhibit A, p. 14; Exhibit B, pp. 81-82, 85.

Reliability of the data to the 95% confidence interval that Defendant criticizes is the CDC's determination, not that of Mr. Kaltofen. In its July, 2008 final report, the CDC concluded that 95% confidence in the data could be achieved by testing a minimum of 38 randomly selected units. *See* Exhibit A, p. 14; Exhibit B, pp. 395-97. Mr. Kaltofen's evaluation, which included over 10,000 test results and far exceeded the CDC's criteria, necessarily encompassed a wide variety of variables: different manufacturers, different manufacturing dates, different components, different sizes and volumes, differing occupant habits, differing occupancy status, and the different climatic variables present at the different testing dates. *See* Exhibit A, p. 13; Exhibit B, pp. 149-51. Using so many test results that encompassed such a wide range of variables resulted in a better representation of the average formaldehyde concentration over time for any one unit than would have an actual test result of the unit at any one point in time. *See* Exhibit A, pp. 13-14; Exhibit B, pp. 81-82, 84-85. Mr. Kaltofen's adoption of the methodology used by the CDC in its own report is yet another indicia of reliability.

## CONCLUSION AND PRAYER

For the reasons stated in this Response, Plaintiff respectfully requests that the Court deny Defendant Fleetwood Enterprises, Inc.'s Motion in Limine to Limit the Testimony of Marco Kaltofen, P.E.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:  s/Gerald E. Meunier
GERALD E. MEUNIER, #9471
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:    504/528-9973
gmeunier@gainsben.com

s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:    504/528-9973
jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS'
STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
ROBERT BECNEL, #14072
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
DENNIS REICH, Texas #16739600
MIKAL WATTS, Texas # 20981820

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing document has been served upon counsel of record as indicated below in accordance with the Federal Rules of Civil Procedure on November 13, 2009.

                                                  /s/Gerald E. Meunier
                                                  GERALD E. MEUNIER