UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
|      FORMALDEHYDE PRODUCTS | * | |
|      LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |
| THIS DOCUMENT IS RELATED TO | * | |
| | * | |
| *Dubuclet v. Fleetwood Enterprises, Inc., et al,* | * | |
| Docket No. 07-9228; | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S RESPONSE TO DEFENDANT FLEETWOOD ENTERPRISES, INC.'S
MOTION TO EXCLUDE THE TESTIMONY OF ALEXIS MALLET, JR.**

Plaintiff responds to Defendant Fleetwood Enterprises, Inc.'s ("Defendant" or "Fleetwood") Motion to Exclude the Testimony of Alexis Mallet, Jr. (Docket Entry No. 6655) and, in support, would show the following:

**I.      Objection to Response Deadline and Request for Continuance of Response**

The subject motion was filed on November 9, 2009. The Court ordered Plaintiff to respond by November 13, 2009. The subject motion raises significant issues. It is unfair and prejudicial to compel Plaintiff to respond to this substantial motion within four business days. Further, such a short response date violates Local Rule 7.2. Accordingly, Plaintiff objects to the extremely brief response date and seeks a continuance of time to respond in more detail. However, Plaintiff has endeavored to provide the most comprehensive response possible in this short deadline and respectfully contends that her response shows in detail why the Motion should be denied.

**II.     Legal Background.**

Defendant's Motion to Exclude is one to exclude evidence, specifically expert testimony. Therefore, the Federal Rules of Evidence should govern the Court's analysis of the motion.

FED. R. EVID. 401 provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

FED. R. EVID. 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

FED. R. EVID. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Expert testimony need only be based on a reliable and scientifically valid methodology

that fits the facts of a case. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The inquiry into the expert's testimony is "a flexible one" where the individual factors are neither exclusive nor dispositive. *See Id.* at 594-95. As such, this Court essentially considers whether the expert retains a broad range of knowledge, skills and training. *Id.*

In analyzing the reliability of proposed expert testimony, the role of the Court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 153 (1999). While extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony whose knowledge is based on experience. *See Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000)(citing *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000), *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 590 (7th Cir. 2000); *Kumho*, 526 U.S. at 156 ("No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.")

The court's role as gatekeeper should not replace the adversary system. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 595. It is certainly not the trial Court's role to determine whether the expert's conclusions are actually correct. *Id.* at 595. So long as the testimony rests upon "good grounds" it should be tested by the adversary process -- competing expert testimony and active cross-examination – rather than excluded from juror's scrutiny for fear that they will not grasp its complexities or satisfactorily

weigh its inadequacies. *See Ruiz-Trioche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)(citing *Daubert*, at 596).

### III. Mr. Mallet is Qualified to Give an Expert Opinion.

When this issue was previously raised by Gulf Stream in the *Alexander* trial, this Court determined that Mr. "Mallet does have relevant experience to support certain of the opinions he has offered" and that the attacks on his expertise "are more appropriately raised as part of the *voir dire* of this expert." *See* Order and Reasons, p. 2, Docket Entry No. 3218.

Mr. Mallet has been involved in the building industry for over thirty-five (35) years. *See* Deposition of Alexis Mallet, Jr. in the *Alexander* matter, p. 381 (hereafter "*Alexander* Depo."), relevant portions attached as **Exhibit A.** He is licensed as a general contractor, residential building contractor and manufactured housing installer. *Id*. at 379. As can be seen on his CV, Mr. Mallet has an impressive list of certifications, licenses, recognitions and education experiences. CV of Alexis Mallet, Jr., attached as **Exhibit B**. The last he knew, Mr. Mallet is also the only non-engineer member of the Investigative Engineers Association. *Alexander* Depo., pp. 388-89. In fact, on November 13, 2009, he gave a lecture as a paid presenter to the Investigative Engineers Association on the topics of building sciences,[1] air temperature, moisture, water management, mechanical systems and how they interrelate with building design, construction and materials. *See* Declaration of Alexis Mallet, Jr., at ¶ 3, attached as **Exhibit D**. Mr. Mallet also has training in the field of indoor air quality. *Alexander* Depo., pp. 33-34.

---

[1] The Department of Housing and Urban Development ("HUD") defines building science as "the study of the interaction between occupants, building components/systems, and environment" with a focus "on flows of heat, air [and] moisture." Building Science Basics, at p. 2, found at http://www.hud.gov/webcasts/archives/2007-06-14slide2.pdf, attached as **Exhibit C**.

In addition to his extensive involvement in the building industry, Mr. Mallet has also served as an expert in over 45 cases. *See* Alexis Mallet's List of Trail Testimony and/or Depositions, attached as **Exhibit E**; *see* Declaration of Alexis Mallet, Jr., at ¶ 2. Recently, he served as an expert of building design and construction defects and failures. *See Aucoin v. Southern Quality Homes, LLC*, 2008 WL 498668 (La. 2/26/08). Despite serving as an expert witness on numerous occasions, Mr. Mallet has never been excluded. Mallet Declaration, at ¶ 2.

Specifically, Mr. Mallet has worked on nearly one hundred (100) travel trailers, and many more mobile homes, since 1985. *Alexander* Depo., pp. 42-43. As a result of this work, he has become familiar with the materials used in these units, as well as the building methods and styles of travel trailers. *Id*. at p. 380. When asked what kind of work he has done on mobile homes and travel trailers, Mr. Mallet replied:

> Well, everything from analysis of defects and failures, analyzing the moisture issues, negative air pressure issues, comparison of the construction to the codes and standards under which they're built to determine if they're in compliance with those codes and standards, infrared thermography, indoor air quality testing, repairs to those facilities from either fire damage, water damage, mold damage, windstorm damage or some other event, such as a casualty, an accident, where a car may have run into a mobile home or into a camper, thing of that nature. We would take them apart and put them back together.

*Id*. at pp. 384-85. He has a long history of doing work related to hurricanes related to all sorts of structures, including trailers. *Id*. at pp. 382-83.

Louisiana courts have consistently held that general contractors may testify as experts related to building defects. *Mitchell v. Popiwchak*, 95-1423 (La.App. 4 Cir. 6/26/96), 677 So.2d 1050, 1054-55; *Cruz v. Bertuc*ci, 95-200 (La.App. 5 Cir. 11/15/95), 665 So.2d 460, 463.

This wealth of personal experience in the building industry allows Mr. Mallet to give

expert opinions on the construction of, and materials used in, Plaintiff's trailer.

Despite Fleetwood's claims that Mr. Mallet purely relies on the expert opinions of others, Mr. Mallet also performed his own inspection of the trailer. *See* The Expert Report of Alexis Mallet Report, p. 5, attached to Defendant's Motion as Exhibit A. Regardless, an expert may give opinions, "based, in part, upon report of others which are not in evidence but which the expert customarily relies upon in the practice of his profession." *Jenkins v. U.S.*, 307 F.2d 637, 641 (C.A.D.C. 1962) (an expert may give opinions, "based, in part, upon report of others which are not in evidence but which the expert customarily relies upon in the practice of his profession"); *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F.Supp.2d 908, 934 (W.D. Wis. 2007)(experts may rely on the reports of others); *In re Lake States Commodities, Inc.*, 272 B.R. 233, 242 (Bkrtcy. N.D. Ill. 2002)(an expert can rely on another expert's report, even if it is inadmissible hearsay). Mr. Mallet stated that, in the course of his business, he will consult with engineers. *Alexander* Depo., pp. 390-91.

**IV.    Mallet Opinions.**

Candidly, some of those opinions provide background facts, upon which Mr. Mallet rests his other opinions. *Daubert* mandates the Court to ensure that an expert's testimony rests on a reliable foundation. *Daubert*, 509 U.S. at 592-93 (1993). The facts on which the witness relies must be of the type normally relied on by experts in the field. *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3rd Cir. 2002). The reasoning from the facts to the opinions must be adequately explained and contain no analytical gaps. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). As the Court has previously noted, experts may (and in fact are expected to) provide the facts upon which their opinions are based. *See* Docket Entry No. 2800, pp. 1-2. However,

several of the paragraphs that Fleetwood exclude contained some of the facts and reasoning that Mr. Mallet used to arrive at his opinions.

Also, an expert witness is permitted to give testimony that embraces an ultimate issue to be decided by the trier of fact. *Berckeley Inv. Group v. Colkitt*, 455 F.3d 195, 217 (3rd Cir. 2006). Only legal opinions are prohibited. *Id*. An expert opinion is not a legal opinion if: (1) the expert does not use legal terms; (2) if any of the potentially legal terms have a separate meaning when used in the vernacular; or (3) if the witness does not track the language of either a legal principle of an applicable statute. *See U.S. v. Perkins*, 470 F.3d 150, 157-58 (4th Cir. 2006). As such, Mr. Mallet's opinions do not invade the province of the jury.

In sum, Mr. Mallet has the experience and training to provide his expert opinions and his opinions will assist the jury in reaching a decision without invading in its province  Therefore, Defendant's Motion should be denied.

### A. Statement No. 1

As discussed above, Mr. Mallet has experience in the construction industry and has built, repaired and rebuilt hundreds of housing units. Additionally, he has repaired and rebuilt multiple travel trailers in the course of his career and is very familiar with their construction, design and components. Mallet Declaration, at ¶ 6. Based on this experience, he is aware that not having the right insulation, including the thickness of the insulation, can lead to the formation of condensation in the roof and wall cavities. *See* Deposition of Alexis Mallet, Jr. in the *Dubuclet* matter, p. 115, relevant portions attached as **Exhibit F** (hereafter "*Dubuclet* Depo."). This experience also allows him to opine that the space in the wall cavities was insufficient to prevent condensation from forming in the cavities.

Mr. Mallet also testified that he would not expect to find water stain on the ceiling or furniture as Ms. Dubuclet cleaned the trailer two to three times a week. *Dubuclet* Depo., pp. 113-14. Further, any condensation in the wall and ceiling cavities would not necessarily show because they were covered by a vinyl vapor barrier. *Id*. at p. 114. In Mr. Mallet's experience, vinyl covering has a low or medium PERM rating and is classified as a vapor barrier or vapor retarder. Mallet Declaration, at ¶ 7. Due to this PERM rating, one would not expect there to be any water stains in the event of water intrusion. *Alexander* Depo., p. 129. And while Mr. Mallet may not have seen any condensation, the thermographic images did indicate areas of the trailer where condensation was occurring. Mallet Declaration, at ¶ 13.

While Fleetwood attempts to shift the blame to FEMA for incorrect usage of their units, as will be more fully discussed below, Fleetwood was aware that it was selling a product that did not meet FEMA standards. Fleetwood's Owner's Manual and warnings inside the trailer states as much. Further, the insulation in the trailer was inadequate for the Gulf Coast. *Dubuclet* Depo., pp. 130-132.

Mr. Mallet is qualified to offer an opinion on the HVAC system because he has supervised the installation of and designed hundreds of heating and air conditioning systems in housing units. *Id*. at ¶ 9.

B. **Statement No. 2**

When this issue was previously raised by Gulf Stream in the *Alexander* trial, this Court ruled that Mr. Mallet was allowed to opine on this subject matter. *See* Order and Reasons, p. 2, Docket Entry No. 3218.

As discussed above, while Mallet may not have known the exact perm rating of the vinyl

used in the Plaintiff's trailer, he is aware that vinyl coverings are classified as vapor barriers or vapor retarders. Therefore, combined with Ms. Dubuclet's cleaning habits, it is not surprising that there were no water stains on the ceiling or furniture. However, this does not mean that there was not any water vapor intrusion or a build-up of moisture in the wall cavity in the form of water vapor.

Additionally, the type of structure (*e.g.* travel trailer, mobile home) has no bearing on the appropriate location of the vapor barrier. *Alexander* Depo., p. 131. As Mr. Mallet testified, "regardless of what the exterior construction is, if it's constructed in this fashion with a vapor barrier on the interior of the wall, the results are the same." *Id*. This is a basic tenet of construction in hot, humid climates such as southern Louisiana.

Based on his many years of experience of inspecting structures with vinyl wall covering, moisture problems are inherent with this type of construction in this area. In addition, there are numerous studies relating to the problems related to moisture build-up in housing units with vinyl wall coverings. Mallet Declaration at ¶ 8.

C.  **Statement 3**

When this issue was previously raised by Gulf Stream in the *Alexander* trial, this Court ruled that Mr. Mallet was allowed to opine on this subject matter. *See* Order and Reasons, p. 2, Docket Entry No. 3218.

Mallet has proposed the vapor barrier that would prohibit the travel of air into the air in an unintended fashion. Vapor barriers are used on many residential structures. Mr. Mallet has merely suggested a construction design and alternative that is used in residential construction and for which there is no prohibition to install in a travel trailer. *Alexander* Depo., pp. 152-53.

Fleetwood contends that Mr. Mallet cannot cite to any literature or standard that requires, specifies or recommends the use of such a vapor barrier. However, when the transcript is examined more closely, he stated that "in all buildings utilized in this temperature zone or climate zone, a vapor barrier should be on the exterior side of the exterior walls." *Id*. at p. 152.

### D. Statements 4 and 5

The summary of Mr. Mallet's fourth and fifth statements are that, based on the circumstances, these trailers would be used for a long time. Based on the construction means and methods, it was obvious that these trailers were not adequately designed to serve for the period of time for which it was foreseeable that they would be used. Therefore, they should have built for a higher quality and grade of material with a greater attention to workmanship.

While Fleetwood does account for the potential of long-term usage of travel trailers in its Owner's Manual, the manual is written for trailers "that are going to be utilized in frigid and cold climate areas" and not for hot and humid areas like New Orleans. *Dubuclet* Depo., p. 124. And, as discussed above, both the insulation and moisture barriers were inadequate for long-term usage. Despite this, Fleetwood placed a sticker on the Dubuclet trailer that "certifie[d] compliance with FEMA specifications that … [the trailer was] not intended for recreational purposes." *Id*. at 191. This shows that Fleetwood was aware of the intended use and did not build a product to meet those needs as required by the FEMA specifications.

### E. Statement 6

Mallet offers the opinion that Fleetwood knew or should have known that the use of formaldehyde-emitting materials would be a problem for the occupants. His opinion is based on his prior experience in the construction industry and having built a variety of structures where he

had to follow HUD guidelines.  Mr. Mallet has used wood products containing formaldehyde in housing units that he has built and repaired in the past.  He is further aware that when a structure is small with a lot of formaldehyde-emitting materials, it can raise the level of formaldehyde to unsafe levels.  And, stated above, he has training in the field of indoor air quality.

Further, Mallet based his opinions on a July 1978 report by RADCO that was prepared for Fleetwood.  Mallet Report, pp. 52-53.  Nearly 30 years before Ms. Dubuclet's trailer was built, Fleetwood was well aware that the component parts of its trailer contained formaldehyde and was aware, or should have been aware, of the potential danger that formaldehyde posed to trailer residents.  *Id*.

### Statement 7

When this issue was previously raised by Gulf Stream in the *Alexander* trial, this Court ruled that Mr. Mallet was allowed to opine on this subject matter.  *See* Order and Reasons, p. 3, Docket Entry No. 3218.

Mallet states that the information provided by Dr. Smulski serves as the basis of which he predicates his other opinions.  *Dubuclet* Depo., p. 110.  However, the composition of the wood products is an important factor in his analysis in alternative design.  Mallet is not stating this as his independent opinion; he is stating this as a predicate to his analysis on alternative design.

### F.  Statement 8

When this issue was previously raised by Gulf Stream in the *Alexander* trial, this Court ruled that Mr. Mallet was allowed to opine on this subject matter.  *See* Order and Reasons, p. 3, Docket Entry No. 3218.

Mallet offers the opinion that the means and methods, and materials used in the trailer

contributed to the elevated levels of formaldehyde. Although Mr. Mallet has never constructed a trailer from scratch, he has constructed hundreds of other housing units and repaired and rebuilt multiple travel trailers. He is aware of the means and methods of construction for the same. Mr. Mallet is also aware that formaldehyde based wood products emit more formaldehyde when they are exposed to heat and moisture. Therefore, he is qualified to offer the opinion that if a housing unit is constructed in such a manner that moisture and external air infiltrate the housing structure, it will increase the formaldehyde that the wood products emit. Mr. Mallet does not need to be an engineer to understand the principles of construction that would relate to this matter.

Even though the slide-out was pulled out and not properly leveled on the day of the inspection, it has not effect on Mr. Mallet's conclusions. *Dubuclet* Depo., p. 259. While this would have affected the results of thermographic images taken of the marriage wall (the area where the slide-out meets the main box of the trailer), it would have had no affect on the thermographic images taken of other parts of the trailer. Mallet Declaration, at ¶ 14. Additionally, assuming the trailer had been built to FEMA specifications, it would have been designed for multiple deactivations and reactivations and therefore the thermographic images would be representative of the conditions of the trailer while Plaintiff was living in it. *Id*. at ¶ 16.

### G. Statement 9

When this issue was previously raised by Gulf Stream in the *Alexander* trial, this Court ruled that Mr. Mallet was allowed to opine on this subject matter. *See* Order and Reasons, p. 3, Docket Entry No. 3218.

Fleetwood criticizes Mallet's ability to render opinions on the air conditioning and heating system. Mr. Mallet offers the opinion to the defect in the duct work in the travel trailer

allow for external hot, moist air to be drawn in to the trailer. As discussed above, Mr. Mallet is uniquely qualified to offer an opinion because he has supervised the installation of and designed hundreds of heating and air conditioning systems in housing units. Mallet Declaration, at ¶ 9. It is a basic tenet of heating and air conditioning that if there are leaks in the duct work, it will cause negative air pressure and external hot, humid air will be drawn in to the building from the outside environment. This is particularly true in southern climates such as Louisiana. Further, Mr. Mallet testified during the *Alexander* trial about a negative pressure situation in a travel trailer. *See* September 17, 2009 Afternoon Trial Transcript, pp. 259 & 279-80, relevant portions attached as **Exhibit G**.

Additionally, it requires very little technical knowledge to know whether or not a duct system is leaking. It does not involve the design or construction of the entire HVAC system and is not a mechanical issue. *Id.* at ¶ 10.

Finally, Mr. Mallet never opined in his report on the Dubuclet trailer that the HVAC system did not meet ASHRAE or SMACNA standards.

### H. Statements 10 & 11

When this issue was previously raised by Gulf Stream in the *Alexander* trial, this Court ruled that Mr. Mallet was allowed to opine on this subject matter. *See* Order and Reasons, p. 3, Docket Entry No. 3218.

Fleetwood criticizes Mr. Mallet's opinion that the manufacturer or Fluor should have designed a safe means of jacking the trailer by either increasing the rigidity of the metal frame or using a jacking system that would evenly lift the entire unit. However, when the record is examined, Mr. Mallet has an operational understanding of engineering principles as he has been

involved in rehabilitating buildings and houses that have suffered structural damage due to defects. Mallet Declaration, at ¶ 11. In the hundreds of times that he has been involved in these projects, he has become aware of the basic engineering principles that houses and buildings shifting and those forces which are necessary to cause structural damage. Furthermore, in building hundreds of housing units and buildings, he has become intimately familiar with the types of construction materials used, as well as their load bearing characteristics.

Despite Fleetwood's claim to the contrary, the excess sealant on the roof is likely an indication that there was a leak or a perceived leak. Mallet Declaration, at ¶ 17; *see also* Mallet Report, p. 55. There was also evidence of roof buckling which could "have been caused during jacking and/or is a result of a roof leak." Mallet Report, p. 22.

### I. Statement 12

Mr. Mallet's twelfth statement primarily revolves around the lack of clarity concerning the instructions to ventilate the trailer. While there were warnings in the trailer concerning formaldehyde, Fleetwood did not instruct the occupants how long or to what extent to ventilate the trailer. Without such clarity, any warnings were wholly inadequate.

### J. Statement 13

Mr. Mallet's extensive experience in the construction trades industry allows him to opine on whether or not Fleetwood conformed to the August 12, 2004 FEMA specifications that they were required to. By delivering the trailer to FEMA, Fleetwood warranted to FEMA and Plaintiff that their trailer met or exceeded the FEMA specifications. However, as discussed above, Fleetwood failed to construct a product that was of a "superior grade quality of workmanship." However, even if Plaintiff's claim for breach of express warranty is dismissed,

Mr. Mallet should still be allowed to testify on whether or not the trailer was constructed with superior quality workmanship as he was in the *Alexander* trial. *See* Trial Transcript, pp. 233-34, 236, 252-53 & 260.

### K. Statements 14 and 15

Fleetwood is critical of Mallet's conclusion that the product was unreasonably dangerous because it did not utilize techniques, technologies, materials and workmanship to meet the new FEMA specification of 0.016 ppm. Plaintiff concedes that this standard was not in effect in when this trailer was manufactured. However, the methods and means to construct these travel trailers with a significantly reduced formaldehyde level, including, but not limited to 0.016 ppm, existed in 2005. Mallet report, p. 56. This is specifically why Mr. Mallet offers design alternatives for low-emitting and no-emitting building materials to be used in construction of the trailer. Mallet Report, pp. 45-51. In 2005, all of these materials were readily available and relatively inexpensive. Mallet Declaration, at ¶ 15. For example, hard board would be an inexpensive material to use in lieu of luan of the same thickness. *Id*. The fact that the materials Mr. Mallet suggests may or may not be currently used in travel trailers is immaterial since they were available in 2005 and could have been used by Fleetwood to build Plaintiff's trailer. The fact that he has not tested these materials personally is also irrelevant since he is allowed to rely on outside facts.

Furthermore, contrary to what Fleetwood states, Mr. Mallet did calculate the cost of these new materials. Fleetwood has never revealed in discovery, despite repeated requests, the unit cost of the products and structures utilized in the trailer. Therefore, Plaintiff cannot be faulted for determining an increased cost, as Fleetwood has never produced the actual numbers.

However, Mr. Mallet did come up with the cost for the alternative materials and structures he suggested. Mallet Report, pp. 45-51.

Additionally, Fleetwood criticizes Mallet as stating that he had no specific evidence of a design that existed when the trailer left Fleetwood's control. The truth of the matter is that, other than using a vapor barrier, what Mr. Mallet has suggested is merely the use of building materials that were either low-emission or non-emitting formaldehyde products which clearly were available and do not constitute a "different design." It stands to reason that if Fleetwood had used non-formaldehyde emitting products, this travel trailer would have had a concentration of less than 0.016 ppm.

## CONCLUSION AND PRAYER

Wherefore, Plaintiff respectfully requests that the Court deny Fleetwood's Motion.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:  s/Gerald E. Meunier
 GERALD E. MEUNIER, #9471
 **PLAINTIFFS' CO-LIAISON COUNSEL**
 Gainsburgh, Benjamin, David, Meunier &
 Warshauer, L.L.C.
 2800 Energy Centre, 1100 Poydras Street
 New Orleans, Louisiana 70163
 Telephone:  504/522-2304
 Facsimile:  504/528-9973
 gmeunier@gainsben.com

 s/Justin I. Woods
 JUSTIN I. WOODS, #24713
 **PLAINTIFFS' CO-LIAISON COUNSEL**
 Gainsburgh, Benjamin, David, Meunier &
 Warshauer, L.L.C.
 2800 Energy Centre, 1100 Poydras Street
 New Orleans, Louisiana 70163
 Telephone:  504/522-2304
 Facsimile:  504/528-9973
 jwoods@gainsben.com

 **COURT-APPOINTED PLAINTIFFS'
 STEERING COMMITTEE**
 ANTHONY BUZBEE, Texas # 24001820
 RAUL BENCOMO, #2932
 FRANK D'AMICO, #17519
 MATT MORELAND, #24567
 LINDA NELSON, #9938
 MIKAL WATTS, Texas # 20981820
 ROBERT BECNEL
 DENNIS REICH, Texas # 167396

**CERTIFICATE OF SERVICE**

    I hereby certify that on November 13, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

                                                s/Gerald E. Meunier
                                                GERALD E. MEUNIER, #9471