Exhibit A

# Transcript of the Testimony of
# Paul Hewett, PhD, CIH

**Date taken: October 22, 2009**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Dubuclet)**

***Note***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

Page 62

1   It's a representation or an approximation.
2           Then you can use the model for
3   various purposes.  In this case, you can use
4   it for either forward or backward
5   extrapolation.
6       Q.   And you would agree with me that
7   the first moment that I have seen this
8   report from you with this new equation and
9   this new estimation was about a minute ago.
10  Correct?
11      A.   Well, it was more than a few
12  minutes ago.
13      Q.   Well, no.  We just got to this
14  page, didn't we?
15      A.   Yes.
16      MS. DALY:
17           So I'm going to put on the record
18  right now, I reserve the right to strike the
19  entire second report.
20           In the alternative, if the Court
21  doesn't do that, I reserve the right to come
22  back after such time as I have had the
23  ability to get the necessary expert to
24  assist me with reading something that is an
25  equation so difficult that the court

Page 63

 1   reporter can barely even take it down.
 2           And we will go forward, but it is
 3   subject to my reservation on those two
 4   issues.
 5       MR. PINEDO:
 6           I will just say this:  We produced
 7   him on his report as it was in July.  You
 8   have asked about additional analyses.  This
 9   is the additional analysis.
10       MS. DALY:
11           Chris, you know that this is
12   ridiculous.  This is ridiculous that we were
13   handed this this morning.
14       MR. PINEDO:
15           I will tell you what is
16   ridiculous --
17       MS. DALY:
18           We will see what the judge says.
19   We will just see what the judge says.
20       MR. PINEDO:
21           Let me finish my sentence.
22       MS. DALY:
23           Sure.
24       MR. PINEDO:
25           This is not your first deposition.

Page 64

1  You know the court reporter cannot take down
2  two people at the same time.
3       MS. DALY:
4            Thank you.
5       MR. PINEDO:
6            Please do not interrupt me when
7  I'm talking.
8            He prepared his report in July.
9  We produced the reliance materials for his
10 July report.  This is part of his file.
11           I am not putting him forward, I
12 will tell you right now, on the decay
13 coefficient.  He is not going to be put
14 forward on the decay coefficient.
15      MS. DALY:
16           Does that mean I don't need to go
17 through it?  Are you withdrawing him on 3.5
18 so I don't have to discuss it with the
19 tables that go with it?
20      MR. PINEDO:
21           The plaintiffs are not going to
22 offer him for the analysis in Section 3.5
23 relative to the formaldehyde decay
24 coefficient.
25      MS. DALY:

Page 75

1  are above .008 or .016. So if you take some
2  away, the rest of them are still in the same
3  place.
4  So you end up with statistics that
5  will be different. The confidence intervals
6  will be different, but the conclusions will
7  remain the same.
8  EXAMINATION BY MS. DALY:
9  Q. I understand. And what you were
10 asked to do was to look at what percentage
11 of the units tested were over the .008 ppm
12 level?
13 A. Right.
14 Q. And you are not going to testify
15 about medical issues, medical conditions
16 that could occur at .008 ppm, below that or
17 above that. Correct?
18 A. No, I will not.
19 Q. All right. I think the consensus
20 amongst the defense parties here is that it
21 probably makes more sense to stop now
22 because I am now just coming into the
23 results section, and it is going to be
24 different.
25 Other than what you just said

Page 76

1   about what you anticipate, sort of the big
2   results to be, correct?
3       A.   Yes.
4       Q.   So my thought is, let's stop here
5   and revisit all this when we have your --
6   what do you want to call it?
7       MR. PINEDO:
8            Expanded data set of Pioneer
9   observations.
10      MS. DALY:
11           An additional report, we will just
12  call it that.
13           Thank you for your time.
14      MR. PINEDO:
15           Do we have on it on the record I
16  will have an identification of those VIN
17  numbers within 24 hours?
18      MS. DALY:
19           Yes, sir.
20      MR. PINEDO:
21           Plaintiffs will reserve their
22  remaining questions until either when this
23  deposition is reconvened or the time of
24  trial.
25           (Which concluded the deposition.)

Page 58

1   report by adding the expanded Pioneer
2   data -- the number of trailers identified as
3   Pioneer that we looked at earlier in
4   Exhibit 3.
5        Q.   In Report No. 2, is there any
6   consideration given to Fleetwood units with
7   VIN numbers that begin with the 4C1J?
8        A.   No.
9        Q.   All right.  Now, 3.2 on your new
10  report versus the first report, is there any
11  difference there?
12       A.   I don't believe so.
13       Q.   You have added a reference?
14       A.   Yeah, it looks like I added one
15  reference, Gibbons and Coleman.
16       Q.   3.3, how does that compare with
17  the original report?
18       A.   It's virtually identical.  I don't
19  see any difference.
20       Q.   Compliance statistics section?
21       A.   Well, that would be the same
22  except that we now have two additional
23  tables that cover travel trailers.
24       Q.   Okay.  3.5 is new?
25       A.   3.5 is new.

Page 59

```
 1      Q.   Tell me about it.
 2      A.   Well, as I mentioned, I was asked
 3   early on with the Gulf Stream report to say
 4   something about exposures at earlier points
 5   in time.  To do that with the Gulf Stream
 6   data, I adopted a simple model because it
 7   was all I -- it had to be simple due to the
 8   information I had, which correlated the
 9   formaldehyde level with the age of the
10   trailer at the time of sampling.
11           Well, now, latter part of August
12   into September, I now have the complete CDC
13   and Bureau Veritas data sets that have all
14   of the information that the CDC utilized to
15   write their report which was published, I
16   think, in the middle of 2008.
17      Q.   Okay.
18      A.   So I took the original FEMA/CDC
19   data, reproduced their analysis, they're
20   virtually identical numbers, so I was
21   pleased about that.
22           I compared the CDC and the Bureau
23   Veritas data.  They are virtually identical
24   data sets.  You recall, from statistics we
25   discussed earlier in Exhibit 3, that they do
```

Page 60

1   have very similar characteristics.
2           So I combined the data and used
3   it, the combined data set to estimate the
4   coefficients of a more expanded, better,
5   improved model, modeling formaldehyde
6   exposures as a function of the temperature,
7   relative humidity, whether or not windows
8   had been open prior to sampling, whether or
9   not there was visible mold in the living
10  spaces and the age of the trailer at the
11  time of sampling.
12          Now, the age of the trailer at the
13  time of sampling is something that FEMA/CDC
14  did not look at.
15          Now, having the larger data set of
16  Bureau Veritas and FEMA/CDC, I was able to
17  calculate the regression for model
18  coefficients.
19       Q.   So this entire Section 3.5,
20  "Estimation of the Formaldehyde Decay
21  Coefficient," is new in this Report 2?
22       A.   It is new, yes.
23       Q.   And it includes, among other
24  things, two different equations.  I don't
25  even know if you can read those for the