UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * * * | MDL NO. 1873 |
| | | | SECTION: N(5) |
| This Document Relates to: *Dubuclet v. Fleetwood Enterprises, Inc.* | | * * * | |
| | | | JUDGE: ENGELHARDT |
| Case No. 07-9228 | | * * | |
| | | * | MAG: CHASEZ |

*****************************************************************************

**DEFENDANT FLEETWOOD ENTERPRISES, INC'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
**<u>MOTION TO EXCLUDE CERTAIN COMMENTS TO THE JURY</u>**

Fleetwood Enterprises, Inc. (hereinafter "Fleetwood") has moved this Court to exclude certain comments that Fleetwood anticipates may be made to the jury in this case. As will be argued below, there are several categories of comments that Fleetwood anticipates will be made at trial that are irrelevant, and which will unduly prejudicial Fleetwood if made in front of the jury. Those comments include:

1. Reference to impact on jurors or others as taxpayers in this country of FEMA's storage of travel trailers it purchased for the response to Hurricanes Katrina and Rita.

2. Reference to the residents of FEMA EHUs as "victims."

3. Reference to shortages or substitutions of products in FEMA units.

4. Reference to a broken formaldehyde test in found in the Dubuclet unit.

5. Reference that the travel trailer industry was "plagued" with formaldehyde problems in the 1970s.

6. Reference to Dr. Wedner practicing medicine without a medical license.

1

### I.     Timia Dubuclet's Allegations

Timia Dubuclet has brought a product liability action against Fleetwood under the Louisiana Products Liability Act.  The alleged defects in the Emergency Housing Unit ("EHU") in which Timia resided include, among other allegations:

- Failure to ensure that the products at issue, the Housing Units, met or exceeded industry and government standards.[1]

- Inherent characteristics, known to Defendants, which gave the products such a potential for causing health problems as to render the products unreasonable per se.[2]

- Lack of warnings or lack of sufficient warnings of the inherently dangerous properties of the products when used in the fashion for which they were anticipated or should have been anticipated being used.[3]

- Defective designs calling for the inclusion of materials which included formaldehyde, when equally suitable materials which did not contain formaldehyde were available.[4]

### II.     Argument & Citation to Authority

Under the Federal Rules of Evidence, only relevant evidence is admissible.  Fed. Rule Evid. 402.  Evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.  *Brookshire Bros. Holding, Inc. v. Total Containment, Inc.*, Civ. No. 04-1150, 2007 WL 2491807, *2 (W.D. La. Aug. 30, 2007); Fed. Rule Evid. 401.  The Court, however, may still exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  Fed. Rule Evid. 403.

---

[1] *Aldridge* Nov. 30, 2007 Compl. at p. 22 (paragraphs are unnumbered).
[2] *Id.* at p. 25.
[3] Id. at 26.
[4] *Id*. at p. 26.

2

**A.      Plaintiff should not be permitted to appeal to the juror as taxpayers.**

Fleetwood requests that Plaintiff's counsel refrain from referring to the impact of FEMA's decision not to utilize travel trailers on the jurors as "taxpayers". In the closing arguments of the *Alexander* bellwether trial, Plaintiff's counsel attempted to incense the jurors against the defendants in this case by appealing to them as taxpayers:

> If those trailers weren't dangerous, would there
> be 30,000 of them sitting in a field? Any taxpayer -- any
> And they're still spending money.
> …
>
> I'm a taxpayer. The judge is a taxpayer. The
> case manager is a taxpayer. The court reporter is a taxpayer.
> The clerk's a taxpayer. Many people in this room are
> taxpayers. And I know you're all taxpayers. You should be
> appalled. You should be absolutely appalled. That is not
> right.
> …
>
> They laughed all the
> way to the bank. And guess who's left holding the bag? The
> federal government.
> Who is the federal government anyway? We're the
> federal government. We're the taxpayers. We pay the taxes.
> We bought those trailers. We bought a bunch of junk is what we
> bought.

Transcript of *Alexander* proceedings, September 24, 2009, attached hereto as Exhibit A, pp. 73-74.

This type of "golden rule" argument is improper and specifically prohibited in this circuit. Fifth Circuit courts have forbidden counsel to explicitly request a jury to place themselves in the plaintiff's position, explaining that "such arguments encourage the jury to decide the case on the basis of personal interest and bias rather than on the evidence." *See, e.g., Whitehead v. Food Max,* 163 F.3d 265, 278 (5th Cir. 1998) (internal citations omitted). Because such irrelevant and inflammatory comments are clearly intended to encourage the jury to decide the case on how it

has or may impact them personally, as taxpayers, rather than deciding the case strictly on the evidence and law presented, such comments should be prohibited.

    **B.**  **Plaintiff and her family should not be referred to as "victims."**

Fleetwood requests that Plaintiff's counsel and their witnesses refrain from referring to Plaintiff and her family as "victims" -- whether they are referring to her as a "victim of Hurricane Katrina" or a "victim" related to any possible Fleetwood action. That term connotes one who has been maliciously harmed by another, and using that term to refer to Plaintiff or her family as a victim of any action by Fleetwood, particularly if used in conjunction with the phrase "a victim of Katrina," is only meant to invoke sympathy from the jury. Such an argument is meant to distract the jury from the facts presented in the case to have the jury focus on only the plights in Plaintiff's life. Under a Rule 403 analysis, courts will consider whether the proffered evidence "is calculated to arouse jury sympathy of the unfairly prejudicial genre" that could cause the jury to punish a defendant for actions for which it is not on trial. *See Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 355 (5th Cir. 1995). Fleetwood asks that this case be decided by a jury based as much as possible on a presentation of the facts, as opposed to argument intended to invoke sympathy that any person feels for someone displaced by a natural disaster.

    **C.**  **Plaintiff should not be permitted to reference shortages of materials of substitutions of products in any of Fleetwood's travel trailers.**

Fleetwood requests that Plaintiff's counsel and their witnesses refrain from referring to shortages or substitutions of products in FEMA emergency housing units. Even if some manufacturing defendants in other cases may have experienced shortages or made substitutions of products, there is absolutely no evidence that any product was substituted by Fleetwood in the construction of the travel trailers Fleetwood manufactured for FEMA for its use post-Katrina and

no evidence that any materials were substituted in the construction of the Dubuclet unit itself.

Charles Reick, Fleetwood's Director of Materials, testified unequivocally as follows:

> **Q.** The unit involved in this case, the Dubuclet unit, was produced at Plant 40. Do you understand that?
>
> **A.** That's correct.
>
> **Q.** Okay. How do you know Plant 40 was utilizing LFE products?
> **A.** They were ordering from the suppliers that were spec'd in that met the low formaldehyde-emitting products. . . suppliers were notified via a multitude of ways -- the supplier agreement, engineering bulletins, what I called a wood products manual -- that mentioned that these products needed to be low-emitting formaldehyde, and that would be the only ones that we would use in our products. . .
>
> **Q.** Did there ever come a time during the production of the FEMA units following Katrina that you got any -- any information that there were shortages of a particular type of LFE product?
> **A.** The -- we did experience shortages. They were an issue of the size, the dimensions of wood. The -- we ran out of a particular size, 48 by maybe 81 inches, and we had to substitute 48 by 96. Same product, just different dimensions, and if not in most cases, paid an upcharge to buy a larger piece because we couldn't get the shorter pieces . . .
>
> **Q.** But Fleetwood still paid the extra charge to have the LFE?
>
> **A.** That's correct.

Deposition of Charles Reick, taken on October 6, 2009, attached hereto Exhibit B, pp. 70-72.

Danny McBride, Plant 40 Production Manager, also specifically testified that Plant 40 -- the plant that manufactured the Dubuclet unit -- never experienced a shortage of wood products or made any substitutions of materials in the units it manufactured. *See* Deposition of Danny McBride, taken on November 6, 2009, attached hereto as Exhibit C, pp. 91-94, 96-97.

Furthermore, there should be no reference to any shortages or substitutions on any of Fleetwood's manufactured housing units as there is no evidence that such a shortage or

substitution occurred.  Even if there were such evidence, it would be totally irrelevant to the Dubuclet unit, which is indisputably a travel trailer.  Plaintiff's examined former Fleetwood employee Steven Smith, who at the time of the production of units for FEMA post-Katrina, was the Vice President Western Division for Fleetwood's Manufactured Housing Division on an email from October 2005 sent to Smith by Fleetwood employee William Farish, then the Director of Engineering for the Manufactured Housing Division of Fleetwood.  In that email Mr. Farish comments that, in light of the FEMA contracts for manufactured housing, there could be an OSB product shortage and the Manufactured Housing Division of Fleetwood might have to deviate from its long standing policy of not using particleboard for decking in the manufactured housing units to be delivered to the Gulf Coast, there is no evidence that Fleetwood experienced any such shortage or had to make any substitution of product.  In fact, in his deposition, Mr. Smith testified that Mr. Farish's email was written to address the possibility of a need for materials substitution if circumstances made that necessary, but that his "recollection is that we did not have to [make this substitution]."  Deposition of Steve Smith, taken on November 3, 2009, attached hereto as Exhibit D, pp. 111-14.  Plaintiff, on the other hand, has presented absolutely no evidence that this substitution did occur.  Again, even if it did occur, any substitutions made with respect to products used in manufactured housing units would have no relevance to the Dubuclets who resided in a Fleetwood travel trailer.  For these reasons, Fleetwood respectfully requests that Plaintiff and her witnesses be precluded from making any reference to material shortages of substitution of materials in any Fleetwood unit.

    **D.**  **Plaintiff should not be permitted to reference any glass debris or infer that undisclosed testing took place in Dubuclet unit.**

  Fleetwood asks that this Court not permit any reference or testimony regarding the glass debris that Plaintiff's expert, William D. Scott, observed in the Dubuclet unit. Fleetwood

6

anticipates that Plaintiff will attempt to offer this observation into evidence in order to insinuate that some party has done testing that it has not produced and wishes to hide from the jury. In Scott's affidavit, he notes that he found glass debris on the kitchen counter:

> Glass debris was found on the Kitchen counter in the space between the sink and cooktop insert. This debris, based on morphology, suggests that a glass envelop, similar to that used for active (tube) sampling, was opened at the counter location. This debris was noted and photographed in the course of the Preliminary Site Visit.[5]

Additionally, under the heading "Additional Sampling" he noted that he collected this glass debris:

> The glass debris observed on July 2, 2009, during the Pre-Sampling Inspection, was collected. The glass debris was transferred, using a non-shedding nylon ½" brush, to a laboratory certified glass container with screw top, and placed, under chain of custody, into secure storage at the Scott Group office. This sample is designated 3070-01-FW. The Chain of Custody document and photographs are contained in Attachment 7.[6]

No further analysis was done on this glass debris, as noted by the Chain of Custody document.[7] At Scott's deposition, he stated that "[i]t was obvious that somebody else had been in there testing before me."[8] He admits that he has "no idea" where or when such alleged testing took place.[9]

      Any evidence of the glass debris is not relevant to Scott's opinions in this matter. He does not rely on it for any of his testing results. He was simply documenting his observations, but it has no effect on his testing. Indeed, he has so little information that it does not even provide sufficiently reliable information from which he could possibly draw any conclusion. The record does not show who—if anyone—conducted such a test. It is not known from the glass debris

---

[5] Scott Aff., attached hereto as Exhibit E, p. 2.
[6] Scott Aff. at 8 (Ex. E); Att. 7 to Scott Aff. (Ex. E).
[7] Att. 7 to Scott Aff. (Ex. E).
[8] Deposition of William Scott, taken on October 21, 2009, attached hereto as Exhibit F, pp. 29-30.
[9] *Id*.

7

found when the test would have been done, whether it was accomplished, or what the test actually consisted of.  No designated expert from any other party has referenced any Dubuclet testing that took place prior to Scott's testing.  FEMA has not indicated that it tested this unit. Therefore, even if Scott is correct that there was testing done in this unit before the 2009 testing, it must have been done by a consulting expert and therefore not subject to discovery under Federal Rule of Civil Procedure 26. Permitting such evidence would not help the jury in resolving the issues in this case.

Even if this glass debris from a supposed test were considered relevant, the amount of unknown information and the implications that the jury would make from admitting this evidence would unduly prejudice Fleetwood. If Plaintiff were permitted to offer this evidence to the jury, it would only be to have the jury infer that Fleetwood must have conducted an earlier test, and must not have liked the results, and is therefore hiding the results from the jury. This inference has implications on the formaldehyde level: Plaintiff would offer this to improperly suggest to the jury that the actual formaldehyde level is higher than the test results show. This inference has implications on Fleetwood's character: Plaintiff would offer this to improperly suggest that Fleetwood is secretive and not being honest with the jury. Each of these implications has no basis in fact. Rather, it would unduly prejudice Fleetwood by allowing the jury to make inferences that have no reasonable basis on the facts in the case. For these reasons, Fleetwood requests that all testimony and argument regarding this glass debris be excluded.

    **E.**    **No testimony, evidence, or argument should be admitted that Fleetwood has been "plagued" by formaldehyde gas problems.**

Fleetwood requests that Plaintiff not be permitted to argue that Fleetwood has been "plagued" by formaldehyde gas problems. Plaintiff's designated wood sciences expert Stephen Smulski, Ph.D., wrote in his report that the manufactured housing industry has been "plagued"

8

with formaldehyde gas problems -- attempting to connect the current lawsuit, involving a travel trailer, with HUD-Code manufactured houses from the 1970s and early 1980s:

> The current formaldehyde gas problem in the FEMA-supplied travel trailers could have been prevented had Fleetwood Enterprises, Inc. (and FEMA) employed the mitigation techniques detailed in the extensive body of literature documenting an identical formaldehyde gas problem that plagued HUD-Code manufactured houses in the 1970s and early 1980s for identical reasons.[10]

Mr. Smulski did not quantify in his report in this case or in his deposition the number of complaints he knows that the industry in general, or Fleetwood in specific, received. In his deposition, he testifies that he bases this opinion on his authorship of an article from 1987 titled "Formaldehyde Indoors."[11] In that article, he does not use the word "plagued."[12] In fact, his article does not address Fleetwood, or any other manufacturer, specifically.[13] He states in that article that "[i]n the mid-1970's the Consumer Product Safety Commission (CPSC) began to receive complaints from owners of new mobile and manufactured homes."[14] Based on this statement, and the fact that Smulski did not cite anything specific to complaints received by Fleetwood, he should not be permitted to characterize Fleetwood's historical complaints in the 1970s and 80s relating to formaldehyde in its manufactured housing units as a "plague" of formaldehyde issues. While Fleetwood understands that its historical knowledge of formaldehyde is fair game, this unfounded characterization of Fleetwood or the travel trailer industry does not make any fact that is of consequence to the determination of the action more or less probable than it would be without this unfair characterization.

---

[10] Smulski Aff., attached hereto as Exhibit G, pp. 8-9 (paras. 24-25).
[11] Deposition of Stephen Smulski, taken on October 20, 2009, attached hereto as Exhibit H, pp. 69-70. This article is attached as Exhibit I.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 10.

Moreover, this characterization unduly prejudices Fleetwood because it would be offered with the intention of portraying Fleetwood as accumulating knowledge over nearly forty years of alleged complaints about formaldehyde, never doing anything different—a characterization that is not supported by the evidence. Because it is not supported by the evidence, it also misleads the jury. This comment adds nothing to the liability debate to be had at trial, and should be excluded as irrelevant and unduly prejudicial to Fleetwood.

### F. Plaintiff should not be permitted to make any reference to Dr. Wedner practicing medicine without a medical license.

As this Court is aware, Plaintiff's counsel has made great note of Dr. Wedner's medical licensing status in the state of Louisiana. For all the reasons stated in Fleetwood's original Opposition to Plaintiff's Motion to Strike Dr. Wedner [Rec. Doc. 4854] and in its later Opposition to Plaintiff's Motion for Reconsideration on Motion to Strike Dr. Wedner [Rec. Doc. 5817], the Louisiana state medical licensing statute is not at issue in this federal court. Dr. Wedner's licensing status in the state of Louisiana has absolutely no relevance to any fact at issue and it certainly has no bearing on his well-qualified expert opinions rendered in this case. Plaintiff's counsel only seeks to introduce such evidence in order to cast personal aspersions on Dr. Wedner. However, because the Louisiana statute has no place in this federal case, such reference would serve only to mislead and confuse the jury. Therefore, Fleetwood respectfully requests that Plaintiff be precluded from making any reference as to Dr. Wedner's lack of a medical license in the state of Louisiana.

### III. Conclusion

For the foregoing reasons, Fleetwood Enterprises, Inc. respectfully requests that this issue an Order Court excluding the above-described comments that Fleetwood anticipates may be made to the jury in this case because they are irrelevant, and may also be unduly prejudicial.

This 16th day of November 2009.

        Respectfully submitted:


        */s/ Richard K. Hines, V*
        Richard K. Hines, V
        GA Bar No. 356300
        NELSON MULLINS RILEY & SCARBOROUGH, LLP
        Atlantic Station
        201 17th Street, NW, Suite 1700
        Atlanta, GA  30363
        (404) 322-6000 (phone)
        (404) 322-6050 (fax)

        Jerry L. Saporito
        LA Bar No. 11717
        LEAKE & ANDERSSON, L.L.P.
        1700 Energy Centre
        1100 Poydras St.
        New Orleans, LA 70163-1701
        (504) 585-7500 (phone)
        (504) 585- 7775 (fax)

        Counsel for Fleetwood Enterprises, Inc.

## **C E R T I F I C A T E OF SERVICE**

I hereby certify that a copy of the foregoing has this date been serves on all counsel of record in this proceeding by:

( )   Hand Delivery          ( )   Prepaid U.S. Mail

( )   Facsimile              ( )   Federal Express

(X)   CM/ECF

New Orleans, Louisiana, this 16th day of November 2009.

                                            /s/ Richard K. Hines, V
                                            Richard K. Hines, V
                                            Georgia Bar No. 356300
                                            richard.hines@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW
Suite 1700
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)