Exhibit A



IMPORTANT NOTICE

Certain of our wood product suppliers have advised that urea-formaldehyde is used in the production of particle board, hardwood plywood or paneling which they supply us and which we utilize in our finished product. These suppliers have requested that we communicate this to our customers.

For your information, we are reproducing samples of statements which have been provided to us by our suppliers.

WARNING: THIS PRODUCT IS MANUFACTURED WITH UREA-FORMALDEHYDE RESIN, FORMALDEHYDE VAPOR MAY IN SOME PEOPLE CAUSE HEADACHES, EYE, NOSE AND THROAT IRRITATION, AND AGGRA-VATION OF ALLERGIES AND RESPIRATORY PROB-LEMS SUCH AS ASTHMA. PROPER VENTILATION SHOULD REDUCE THE RISK OF SUCH PROBLEMS.

Chairman ......... ......al Corporation

WARNING: IMPORTANT: THIS PRODUCT CONTAINS A UREA-FORMALDEHYDE RESIN AND MAY RELEASE FORMALDEHYDE VAPORS IN LOW CONCENTRA-TIONS. FORMALDEHYDE CAN BE IRRITATING TO THE EYES AND UPPER RESPIRATORY SYSTEM OF THOSE ESPE-CIALLY SUSCEPTIBLE PERSONS SUCH AS THOSE WITH ALLERGIES OR RESPIRATORY AILMENTS. USE WITH ADEQUATE VENTILATION. IF SYMPTOMS DEVELOP, CONSULT YOUR PHYSICIAN.
Georgia-Pacific Corporation

WARNING: THIS PRODUCT IS MANUFACTURED WITH A UREA-FORMALDEHYDE RESIN AND WILL RELEASE SMALL QUANTITIES OF FORMALDEHYDE. FORMAL-DEHYDE LEVELS IN THE INDOOR AIR CAN CAUSE TEMPORARY EYE AND RESPIRATORY IRRITATION, AND MAY AGGRAVATE RESPIRATORY CONDITIONS OR ALLERGIES. VENTILATION WILL REDUCE INDOOR FORMALDEHYDE LEVELS.
Weyerhaeuser Company

Ventilation is important in maintaining a comfortable environ-ment, and we direct your attention to the discussion of ventilation contained in your Owner's Manual.

PENGAD 800-631-6989

DEPOSITION
EXHIBIT
2
Leidig

PENGAD 800-631-6989

DEPOSITION
EXHIBIT
2
Smith

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: FEMA TRAILER          )   MDL NO. 07-1873

                             )

FORMALDEHYDE PRODUCTS         )   SECTION:  "N" (5)

                             )

LIABILITY LITIGATION          )   JUDGE ENGELHARDT



VIDEOTAPED AND ORAL DEPOSITION OF

JASON LEIDIG

VOLUME 1




        VIDEOTAPED AND ORAL DEPOSITION OF JASON LEIDIG, a
witness produced at the instance of the Plaintiffs, and
duly sworn, was taken in the above-styled and numbered
cause on the 3rd day of November, 2009, from 1:40 p.m.
to 3:22 p.m., before Mary LaBounty, a Certified
Shorthand Reporter in and for the State of Texas,
reported by machine shorthand, at Associated Court
Reporters, 425 Austin Avenue, 14th Floor, Waco, Texas,
pursuant to the Texas Rules of Civil Procedure and the
provisions stated on the record.

Jason Leidig                        I                    November 3, 2009

Page 69

1    product, you save money on service cost.

2         Q.   Do you know if anyone from Fleetwood ever

3    talked with somebody from FEMA about the importance that

4    Fleetwood held using low-formaldehyde-emitting wood

5    product?

6         A.   None, whatsoever.

7         Q.   Would you say it's common knowledge in the

8    industry from your experience that Fleetwood uses

9    low-formaldehyde-emitting wood products in its products?

10        A.   It would be hard for me to answer that.

11             MR. DINNELL:  Okay.  I think I'm done, so

12   I'll go ahead and pass the witness.

13                      CROSS-EXAMINATION

14   BY MS. DALY:

15        Q.   Will you look at Exhibit 1, Mr. Leidig.

16        A.   Okay.

17        Q.   Look at page two, the entry by Rene

18   Rodriguez --

19        A.   Okay.

20        Q.   -- July 12, 2006.  Okay.  In that e-mail

21   Rodriguez is saying that an occupant of some unit,

22   quote, "wants to know what types of chemicals are in the

23   unit," correct?

24        A.   Yes.

25        Q.   All right.  And then his last sentence is,

Jason Leidig                    I                November 3, 2009

```
 1    quote, "This looks like it is going to turn into

 2    something negative for us, so I wanted to give everyone

 3    a heads up," end quote, correct?

 4         A.    Correct.

 5         Q.    The people that are copied on that e-mail from

 6    Rene Rodriguez, is there anybody on there that you

 7    recognize to be a Fleetwood employee?

 8         A.    No, I don't.

 9         Q.    Okay.  And as of July of 2006 when

10    Mr. Rodriguez is saying "This looks like it could be

11    negative for us.  I wanted to give everyone a heads up,"

12    is it your understanding that the Wall Street Journal

13    article and lots of publications have been written about

14    FEMA Katrina people complaining about formaldehyde in

15    their units by this time?

16         A.    Yeah.

17                    MR. PINEDO:  Object to the form.

18                    MR. DINNELL:  Objection to the foundation.

19         A.    (By the witness)  Yeah, I somewhat recall, you

20    know, about that time frame that coming out.

21         Q.    (By Ms. Daly)  All right.  And this is July

22    of 2006, correct?

23         A.    Yes.

24         Q.    All right.  Now, in all the questioning you've

25    had about this Exhibit 1, you do not know as we're
```

Jason Leidig                    I                November 3, 2009

Page 71

1    sitting here today what label or labels they are

2    referencing in this e-mail series, correct?

3         A.   No, I cannot.

4         Q.   All right.  If you look on page one in Jessica

5    Guay's response, she talks in the -- in the first

6    sentence about chemicals in the trailer, correct?

7         A.   Correct.

8         Q.   All right.  And then there's a little second

9    paragraph, and in that second paragraph it says, quote,

10   "Also you should know that urethane foam is flammable,"

11   and she goes on to talk about urethane foam, correct?

12        A.   Sure.  Yes.

13        Q.   Exhibit 2 to your deposition that you were

14   asked about, which is entitled "Important Notice" that

15   you were vaguely familiar with I think you said, is

16   there anything in that notice that relates to urethane

17   foam?

18        A.   I'm not seeing anything.

19        Q.   All right.  So, the fact that she's -- she's

20   also referring to urethane foam in this e-mail which she

21   starts off talking about harmful chemicals in the

22   trailer -- the urethane foam issue is not on this

23   important notice.  True?

24        A.   Correct.

25        Q.   Which may indicate that we're talking about a

Jason Leidig                    I                 November 3, 2009

                                                         Page 72

 1     different label than what's Exhibit 2, correct?

 2                    MR. PINEDO:  Objection, form.

 3          A.    (By the witness)  It could be.

 4          Q.    (By Ms. Daly)  Okay.  So, really you don't

 5     know what Jessica Guay is looking at and what she's

 6     talking about in this e-mail, do you?

 7          A.    No, I cannot recall.

 8                    MS. DALY:  Okay.  That's all I have.

 9                    REDIRECT EXAMINATION

10     BY MR. PINEDO:

11          Q.    Taking a look again, sir, at Exhibit Number 1,

12     do you have that in front of you?

13          A.    Yes.

14          Q.    The second paragraph where Jessica Guay is

15     responding on Monday, July 17th, 2006, the only chemical

16     that she talks about is formaldehyde; isn't that right?

17          A.    I'm sorry?

18          Q.    The only chemical that she's talking about is

19     formaldehyde; isn't that right?  Because urea (sic) foam

20     is not a chemical, is it?

21                    MS. DALY:  Objection, lack of foundation.

22          A.    (By the witness)  Yes.

23          Q.    (By Mr. Pinedo)  I only have one copy of

24     these, and I'm going to need to come around here.  I'll

25     let Ms. Taylor take a peek at them.  I just have some

Jason Leidig                    I                November 3, 2009

Page 56

 1    was to try to get them to the right person.

 2         Q.   (By Mr. Dinnell)  Okay.  Because by getting

 3    them to the right person, you could try to get them the

 4    response that they needed?

 5         A.   Exactly.

 6         Q.   Now, we've talked about this e-mail earlier

 7    today, and I just want you to take a look again at

 8    Exhibit 1 on the second page -- page two of three, and

 9    this is stamped at the top FEMA17-5861.  There's an

10    e-mail from Lydell Broom, and the e-mail address is

11    lydellbroom@dhs.gov, correct?

12         A.   Yes.

13         Q.   And you knew Lydell Broom to be a FEMA

14    employee, right?

15         A.   Correct.  Yes.

16         Q.   And you had previous conversations or e-mails

17    with Lydell Broom prior to this point in time?

18         A.   Yes, I had.

19         Q.   And that's part of keeping a rapport with some

20    of the FEMA reps that you mentioned earlier?

21         A.   Correct.

22         Q.   Now, Lydell Broom sent you an e-mail on

23    July 13th, 2006, that begins, "good morning, Jason,"

24    right?

25         A.   Yes.

Jason Leidig                    I                November 3, 2009

Page 57

1        Q.   And the Jason we're talking about is you,

2    Jason Leidig, right?

3        A.   Yes, it is.

4        Q.   And she mentions that per our conversation

5    this morning she was going to forward a file that

6    contains pictures of a mobile home that she spoke to you

7    about in California, right?

8        A.   Yes.

9        Q.   And since we've gone into this a bit further,

10   she may have been talking about a travel trailer, not a

11   mobile home, right?

12       A.   Correct.

13       Q.   And she wanted you to verify if Fleetwood

14   placed a sign that was depicted in one of these pictures

15   inside the unit that she was talking about, right?

16       A.   Yes.

17       Q.   And to give you more information about what

18   type of chemicals were being referenced in this sign

19   that had been placed in the Fleetwood unit, right?

20       A.   I'm sorry.  Could you repeat that?

21       Q.   The FEMA employee, Lydell Broom, was asking

22   you through this e-mail, one, whether Fleetwood placed

23   this sign that she saw in the unit --

24       A.   Okay.

25       Q.   -- and, two, what the sign was talking about

Jason Leidig                    I                November 3, 2009

Page 58

1    in terms of chemicals that were being used inside the

2    unit, right?

3           A.    Correct.   That's what she was asking.

4           Q.    Okay.   And the FEMA employee, Ms. Broom,

5    was -- at least as she told you in this e-mail, was

6    doing this to try to help out an occupant who wanted

7    this information to provide to his doctor, correct?

8           A.    Yes.

9           Q.    All right.   So, after this initial e-mail from

10   the FEMA employee, Ms. Broom, on July 13th, 2006, you

11   wrote an initial response back to Ms. Broom that we have

12   in Exhibit Number 3 there.

13          A.    Yes, I don't have that.

14                MS. DALY:   Where's 3?

15                THE WITNESS:   I think it's over here

16   somewhere.   Thank you.   Okay.

17          Q.    (By Mr. Dinnell)   All right.   And the first

18   e-mail in Exhibit Number 3 says "from Jason Leidig," and

19   that's your former e-mail address when you worked at

20   Fleetwood, right?

21          A.    That's correct.

22          Q.    And this is on Friday, July 14th, 2006, at

23   11:54 a.m., right?

24          A.    Yes.

25          Q.    So, this is actually -- the following day

Jason Leidig                    I                November 3, 2009

Page 59

1     after Lydell Broom from FEMA sent you that initial

2     e-mail, you gave her a response, right?

3          A.    Uh-huh.

4          Q.    And you told the FEMA employee that from what

5     you could see from the pictures she sent you, what she

6     was talking about was a FEMA travel trailer built at a

7     Fleetwood California plant, right?

8          A.    Correct.

9          Q.    And that you were going to work with the

10    quality assurance manager to find out why the sign was

11    placed in the unit, right?

12         A.    Yes.

13         Q.    Because the FEMA employee was coming to you

14    asking for information as to why this sign about

15    chemicals was in the unit, right?

16         A.    Exactly.

17         Q.    And she wanted to get that information to

18    provide it along to this occupant and that occupant's

19    doctor who had a concern, right?

20         A.    Correct.

21         Q.    And your response to the FEMA employee was

22    then that you were just guessing but you thought the

23    sign was put in the unit due to formaldehyde that's used

24    in the lumber, so you were notifying the FEMA employee

25    that your thought was, maybe this notice has to do with

Jason Leidig                    I                November 3, 2009

Page 60

1   formaldehyde that's used in the lumber of the unit,

2   right?

3          A.   Correct.

4          Q.   But that you would -- and it says further in

5   your e-mail that you'd work to confirm that by the end

6   of the business day, correct?

7          A.   Yes.

8          Q.   Now, what was it that gave you the initial

9   idea to tell the FEMA employee that this sign about

10  chemicals in the unit that they were asking about had to

11  do with formaldehyde?

12         A.   It's purely speculation because I can't

13  clearly recall what the picture was of, but I'm sure

14  that there was some indication -- for one, when I saw

15  the sign I knew that it had to be something meeting some

16  requirement, and I know for the materials that we use

17  formaldehyde is something that -- you know, that we have

18  a sign in manufactured homes for.  And it was kind of

19  similar enough to what we put in for formaldehyde that

20  I -- and that's why I took the guess as far as, you

21  know, it being there for formaldehyde.

22         Q.   And is it true that your initial reason for

23  guessing it was formaldehyde and telling that it could

24  be formaldehyde to the FEMA employee was based upon your

25  background in dealing with manufactured homes for

Jason Leidig                    I                November 3, 2009

                                                      Page 61

 1    Fleetwood?

 2         A.   Correct.

 3              MR. PINEDO:  Objection, form.

 4         Q.   (By Mr. Pinedo)  Because you had seen notices

 5    about formaldehyde in the context of manufactured homes,

 6    right?

 7         A.   Correct.  Yes.

 8         Q.   You then followed up as we see in Exhibit

 9    Number 1, and just as you had told the FEMA employee

10    that you would do, you spoke with somebody else that had

11    more knowledge about travel trailers and why this sign

12    about chemicals may be placed in these units, right?

13         A.   Yes.

14         Q.   And that person was Jessica Guay, correct?

15         A.   That's correct.

16         Q.   And that would be another employee of

17    Fleetwood during that time period, right?

18         A.   Yes.

19         Q.   And Jessica Guay then responded to the FEMA

20    employees telling them that, yes, the chemical that's

21    being referenced in these notices is in fact

22    formaldehyde.

23              MS. DALY:  Object to the form.  That's not

24    what the document says.  It speaks for itself.

25         Q.   (By Mr. Dinnell)  Well, let's look at the

Jason Leidig                    I                November 3, 2009

1    document.  If you look at Exhibit 1 from Jessica Guay,

2    her e-mail is to a list of individuals, right?

3         A.   Yes.

4         Q.   Do you know if she ever forwarded on to you

5    your -- this response to the FEMA individuals and

6    others?

7         A.   Yes, it's right here.  It's in the "to" you

8    can see where she just replied to everybody that was on

9    the original e-mail that Lydell copied.  She just simply

10   replied to everybody.

11              MS. DALY:  I think he's asking you if you

12   received it.

13              MR. DINNELL:  Right.

14              THE WITNESS:  I'm sorry?

15              MS. DALY:  If you received it.  If you

16   received this one.

17              THE WITNESS:  Yeah.  I mean, because -- I

18   thought somewhere -- yeah, I think at some point I did

19   receive this e-mail.  I think she might have blind

20   copied me because this is familiar -- what I'm reading

21   here.

22        Q.   (By Mr. Dinnell)  And in this e-mail that you

23   said you think that you received, Ms. Guay from

24   Fleetwood tells these other individuals which are the

25   individuals from FEMA that were mentioned on the earlier

Jason Leidig                    I                 November 3, 2009

Page 63

1    e-mail that the notice is advising of chemicals in the

2    trailer, and then the Fleetwood employee, Ms. Guay, then

3    says, "These products are manufactured with

4    urea-formaldehyde resin."  Do you see that?

5         A.   Yes.

6         Q.   And then she reports, "Formaldehyde vapor may

7    in some people cause headaches, eye, nose and throat

8    irritation and aggravation of allergies and respiratory

9    problems such as asthma," right?  Did I read that

10   correctly?

11        A.   Yes.

12        Q.   And then she advises these individuals from

13   FEMA that proper ventilation should reduce the risk of

14   such problems, right?

15        A.   Yes.

16        Q.   And the risk of such problems that's being

17   referred to in this e-mail is problems from formaldehyde

18   vapor, correct?

19        A.   Correct.

20        Q.   Is that recommend --

21             MS. DALY:  Object to the form.

22        Q.   (By Mr. Dinnell)  Is that recommendation of

23   ventilation in keeping with what you knew about

24   formaldehyde from your experience in manufactured homes?

25             MR. PINEDO:  Objection, form.

Jason Leidig                    I                    November 3, 2009

Page 67

1   storage?

2                    THE WITNESS:  Storage location, yeah, or

3   staging areas.

4        A.   (By the witness)  -- would be if they had an

5   issue with one of my homes or if I developed a rapport

6   well enough with them -- Lydell being one of them --

7   that she would communicate to me personally if she had

8   room for units that could be received.

9        Q.   Okay.  Aside from those communications, did

10  you have any other kind of direct contact with FEMA

11  employees?

12       A.   No.

13       Q.   Did you ever discuss the topic of formaldehyde

14  with anyone from FEMA?

15       A.   Other than Lydell, no.  That -- I had no other

16  conversations concerning formaldehyde.

17       Q.   And other than Lydell, does that just mean the

18  one conversation that --

19       A.   Yes.

20       Q.   -- we've talked about through Exhibits 1 and

21  3?

22       A.   Correct.

23       Q.   Okay.  And other than that one communication,

24  can you recall any other discussions with FEMA employees

25  about odors or smells inside of Fleetwood products?

Jason Leidig                          I                   November 3, 2009

Page 23

1    travel trailer, and it was tied to AC.

2         Q.   But you weren't the person in charge of

3    receiving complaints for --

4         A.   Oh, no.

5         Q.   -- travel trailers, were you?

6         A.   The only reason they would call me is because

7    I developed a rapport with the FEMA reps, and because of

8    that, they knew I would get something done for them.

9         Q.   Uh-huh.

10        A.   So, if they just didn't know who else to call,

11   they would call me.

12        Q.   All right.  Well, let's go to this memo that

13   we have as Exhibit 1, and it's on the second page of

14   Exhibit 1.  Do you have that in front of you?

15        A.   Yes.

16        Q.   Thursday, July 13th, 2006, at 9:31, Lydell

17   Broom writes you an e-mail.  It starts out, "good

18   morning, Jason."  Do you see that?

19        A.   Yes, I do.

20        Q.   It says, "Per our conversation this morning,

21   I'm forwarding the file that contains pictures of the

22   mobile home unit I spoke about in California."  What

23   does she mean, mobile home unit she spoke about in

24   California?

25        A.   I can't recollect -- recollect that.

Jason Leidig                    I                    November 3, 2009

Page 25

1        Q.   And then if we look on the first page of

2   Exhibit 1, it says, "I understand that you're all very

3   concerned with the notice that you see in the trailer."

4   Do you see that?

5        A.   Yes.

6        Q.   All right.  Well, let me ask you, when did

7   Lydell Broom call you?  Was it that same day or the

8   prior day?  This e-mail is sent at 9:31 a.m.

9        A.   It would have been the same day or prior.  I

10  was always quick to follow up with any FEMA rep, so it

11  would have been, you know, within 24 hours or less.

12       Q.   Okay.  And she writes in her e-mail at 9:31

13  a.m. on July 13th, "I look forward to receiving your

14  responses first thing tomorrow morning upon your return

15  trip from California."  So, you were in California at

16  the time that you talked to her; is that right?

17       A.   At the time that she wrote this, I was

18  actually -- I came out to California for the interview

19  for the promotion, and I was considering the job.  So,

20  it was on the cusp of me actually moving out here and

21  taking the position.

22       Q.   Do you remember anything about the pictures of

23  the unit that she would have forwarded to you?

24       A.   No.  Because at that time I was working 60 to

25  80 hours, you know, a week, and also with me being out

Jason Leidig                    I              November 3, 2009

Page 26

1    in California -- once I understood that it was a travel

2    trailer issue, you know, I knew I couldn't do anything

3    with it, so I would just put it in the right hands of

4    somebody that could.

5         Q.   And after reviewing this e-mail, you're

6    convinced that what was being discussed here was a

7    travel trailer as opposed to a mobile home?

8         A.   Oh, certainly or I would have dealt with the

9    issue, myself, if it would have been a mobile home or

10   you would have seen me putting it in somebody's hands

11   that was with mobile homes or manufactured house.

12        Q.   And it was a Fleetwood travel trailer, wasn't

13   it, that's being discussed here?

14        A.   Yeah, I believe so because Jessica Guay, you

15   know, recognized it as such, I believe, or she wouldn't

16   have responded to it the way she did.

17        Q.   All right.  Let's turn to page one of

18   Exhibit 1.  It's from you, Jason Leidig, on Friday the

19   14th of July, 2006, at 2:15 p.m.; is that right?

20        A.   Yes.

21        Q.   And it's copied to James Kaczorowski.  Who's

22   he?

23        A.   If I'm not mistaken, I think that's -- I

24   believe that's some people that are associated with FEMA

25   or some FEMA contractors.

Jason Leidig                    I              November 3, 2009

Page 27

1        Q.   All right.   The next name is Scott Colonel.

2   Do you know who that is?

3        A.   No, I do not.   Same thing there, I would only

4   think they would be somebody associated with FEMA.

5        Q.   Ronald Goins, do you know who that is?

6        A.   No, I do not.

7        Q.   Stephen Miller, do you know who that is?

8        A.   No.

9        Q.   And Lydell Broom we have discussed; is that

10  right?

11       A.   Correct.

12       Q.   And it's sent to Owner Relations 15.   What is

13  Owner Relations 15?

14       A.   I do not have a clue.

15       Q.   Well, when we see -- when we go above your

16  e-mail sent at July 14th, 2006, at 2:15 p.m., Jessica

17  Guay responds to you on behalf of Owner Relations 15; is

18  that right?

19       A.   Yeah.   I would think that's probably just a

20  standard e-mail address that is used by the service

21  department there at plant 15.   That would be my guess.

22       Q.   Were -- complaints or concerns related to

23  travel trailers, were they channelled to Owners

24  Relations 15?

25       A.   The only reason I would have channelled this

Jason Leidig                        I                   November 3, 2009

Page 30

```
 1    warning label and it being secured in the window of
 2    travel trailer units.  Could you please respond to all
 3    the recipients in this e-mail and explain the purpose of
 4    the warning label and reference the code that requires
 5    its placement in the window of the travel trailer unit.
 6    I appreciate your assistance with this."  That's what
 7    you wrote to Jessica Guay; is that right?
 8         A.   Yes.
 9         Q.   Do you have -- without looking at this e-mail,
10    do you have any independent recollection of what Jessica
11    Guay told you on Friday, July the 14th?
12         A.   Goodness, no.
13         Q.   We had a -- but there were pictures that
14    Lydell Broom forwarded to you with the prior e-mail; is
15    that right?
16         A.   Yes.
17         Q.   We had a prior deposition.  We'll go ahead and
18    mark this particular Deposition Exhibit Number 2 as
19    Exhibit Number 2 to your deposition, as well.  Do you
20    know if that is the notice that was discussed here in
21    this set of e-mails?
22         A.   It does look vaguely familiar, but
23    definitively I couldn't tell you.
24              MS. DALY:  Chris, can I ask a question?
25              MR. PINEDO:  Sure.
```

Jason Leidig                    I              November 3, 2009

                                                     Page 34

 1     to her.  You wrote her e-mail, and you asked her to give

 2     the same explanation that she gave you in the

 3     discussion; is that right?

 4          A.   Correct.

 5          Q.   Do you know if this was the end of the issue

 6     or if there was any follow-up after this?

 7          A.   I know that I was taken out of the loop after

 8     this.  For me, this was the end of discussion.  I never

 9     heard anything else regarding it.

10          Q.   At the top, we have Jill Igert who had printed

11     this out as it appears.  Do you know who Jill Igert is?

12          A.   No, I do not.

13          Q.   And there's a string of names after that:

14     Margarita Dibenedetto, Tracy Haynes, George Smith, Rene

15     Rodriguez, Gail Haubrich.  Do you know who any of those

16     individuals are?

17          A.   No, I do not.

18          Q.   So, when we talk about trend analysis, it

19     wasn't your duty to track trends regarding complaints.

20     It was mainly sales and things of that matter?

21          A.   Yeah, it was -- yeah, just assisting the

22     business development managers in just their daily

23     activities which is, you know, developing sales.

24          Q.   And, for example, one of those was Doug

25     Henriquez; is that right?

Jason Leidig                    I                    November 3, 2009

Page 37

1          A.   You mean manufacturing homes or --

2          Q.   Yes.

3          A.   I would have to reference the HUD manual and

4    DAPIA to be certain, but if I'm not mistaken, I believe

5    that Fleetwood went out of its way to acquire

6    low-emitting materials in the use of every aspect of the

7    building of those homes.

8          Q.   Let's go back to Exhibit 1 on the second page.

9    It says, "Lydell, can you get in touch with Fleetwood

10   and inquire if they placed this notice in the unit?  No

11   one I can find has seen it in any of the EHSS."  My

12   question to you is, do you know what the EHSS is that

13   they're referring to?

14         A.   You've got me on that one.  I don't know what

15   that is.

16         Q.   Besides this contact with Jessica Guay, do you

17   remember any other contact with Jessica Guay?

18         A.   No.  The only other contact I had with a

19   travel trailer associate would have been out of the

20   Longview plant regarding an AC unit.

21         Q.   Was there some kind of problem or issue with

22   the AC unit?

23         A.   Yes, and they had it remedied the next day.

24         Q.   What do you understand the problem was?

25         A.   I just believe the air-conditioning unit --

Jason Leidig                    I              November 3, 2009

                                                   Page 40

 1    the wood?  And this is the e-mail we've now marked as

 2    Exhibit Number 1.

 3         A.   Not necessarily.  I was just speaking out of

 4    my experience with manufactured housing.  You know, I

 5    know that, you know, a majority of the wood and luan and

 6    whatnot that we use has formaldehyde in it.  So, what

 7    she's speaking here as far as the reasoning for the

 8    notice, I wouldn't have any idea.

 9         Q.   But at least when we look at Jessica Guay's

10    response, the first paragraph what she's talking about

11    is formaldehyde; is that right?

12              MS. DALY:  Object to the form.

13         A.   (By the witness)  Yeah, the urea-formaldehyde

14    resin.

15         Q.   (By Mr. Pinedo)  That's what Jessica Guay is

16    talking about; is that right?

17         A.   Correct.  Yes.

18              MS. DALY:  Object, lack of foundation.

19         Q.   (By Mr. Pinedo)  But you're aware that the

20    luan used in manufactured housing by Fleetwood contains

21    formaldehyde?

22         A.   Yes.

23         Q.   What other wood products are you aware of used

24    in manufactured housing produced by Fleetwood that

25    contains formaldehyde?

Jason Leidig                    I              November 3, 2009

Page 42

1    manufacturers that shipped into that -- you know, into

2    the Katrina incident, so, you know, I don't know how

3    negative it is for Fleetwood.

4         Q.   You're aware there's lawsuits that have been

5    filed against Fleetwood surrounding formaldehyde in

6    these travel trailers?

7         A.   Correct.

8         Q.   It says in this e-mail here "WIP page

9    attached."  What does that mean, WIP page?

10              MS. DALY:  Objection, lack of foundation.

11        A.   (By the witness)  I don't know.  WIP page

12   attached.  I don't know.

13        Q.   (By Mr. Pinedo)  Referring again to Exhibit

14   Number 1, Jessica Guay when she responds on July 17th,

15   2006, at 10:01 a.m.  She ends her e-mail saying, "I hope

16   this will answer your question.  If we can be of further

17   assistance, you can also reach us at 800-445-3307."  Do

18   you know whose phone number that was at that time?

19        A.   Well, just guessing, I would think that that

20   would be the service department's toll free number.

21   It's standard practice for service departments and sales

22   departments at the plants to have a toll free number.

23        Q.   And when we look at your e-mail on Exhibit 1,

24   for example, it gives your name when you send out on

25   Friday, July 14th at 2:15 p.m., Jason Leidig, senior