Exhibit D

# Deposition of

## JESSICA GUAY

*Taken On*
*November 4, 2009*

**Transcript provided by:**

# HUTCHINGS℠
## COURT REPORTERS, LLC
CSR 649

**GLOBAL LEGAL SERVICES**

**800.697.3210**

CERTIFIED COPY


UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: FEMA TRAILER              )

      FORMALDEHYDE PRODUCTS  )  MDL NO. 07-1873

      LIABILITY LITIGATION   )

_____ )



     DEPOSITION OF JESSICA GUAY, a witness herein,

noticed by BENCOMO & ASSOCIATES at 3403 Tenth

Street, Suite 640, Riverside, California, at

11:09 a.m., Wednesday, November 4, 2009, before

Raquel Ann Fisher, CSR 12709.



Hutchings Number 237282

Page 2

1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFFS' STEERING COMMITTEE:

4    BENCOMO & ASSOCIATES

5    BY RAUL R. BENCOMO

6    639 Loyola Avenue, Suite 2110

7    New Orleans, Louisiana  70113-3125

8

9    FOR UNITED STATES GOVERNMENT:

10   UNITED STATES DEPARTMENT OF JUSTICE

11   CIVIL DIVISION, ROOM 8220-N

12   BY ADAM DINNELL

13   1331 Pennsylvania Avenue, N.W.

14   Washington, D.C.  20004

15

16   FOR FLEETWOOD ENTERPRISES, INC.:

17   NELSON, MULLINS, RILEY & SCARBOROUGH

18   BY TAYLOR T. DALY

19   201 17th Street, Suite 1700

20   Atlanta, Georgia  30364

21

22

23

24

25

Page 3

```
 1   FOR CRUM & FORSTER:

 2   LOBMAN, CARNAHAN, BATT, ANGELLE & NADER

 3   BY HEATHER CHEESBRO (Appearing Telephonically)

 4   400 Poydras Street

 5   Texaco Center, Suite 2300

 6   New Orleans, Louisiana  70130

 7

 8   FOR JAYCO, INC. and STARCRAFT RV, INC.:

 9   WILLINGHAM, FULTZ & COUGILL, LLP

10   BY THOMAS L. COUGILL (Appearing Telephonically)

11   Niels Esperson Building

12   808 Travis, Suite 1608

13   Houston, Texas  77002

14

15   FOR LIBERTY MUTUAL INSURANCE CORPORATION:

16   LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD

17   BY KRISTOPHER M. REDMANN (Appearing Telephonically)

18   601 Poydras Street, Suite 2775

19   New Orleans, Louisiana  70130

20

21

22

23

24

25
```

Page 4

```
 1   FOR KEYSTONE RV COMPANY, THOR CALIFORNIA,

 2   THOR INDUSTRIES, DUTCHMEN MANUFACTURING, DS CORP (dba

 3   CrossRoads RV) and KZ RV, LP:

 4   JONES WALKER LAW FIRM

 5   BY WILLIAM LAMPTON (Appearing Telephonically)

 6   Four United Plaza, Fifth Floor

 7   8555 United Plaza Boulevard

 8   Baton Rouge, Louisiana  70809

 9

10   FOR FLUOR ENTERPRISES, INC.:

11   MIDDLEBERG, RIDDLE & GIANNA

12   BY LEZLY L. PETROVICH (Appearing Telephonically)

13   201 St. Charles Avenue, Suite 3100

14   New Orleans, Louisiana  70170-3100

15

16   Also Present:  Barbra Westmore, Videographer

17

18                        I N D E X

19   WITNESS:   JESSICA GUAY

20   EXAMINATION BY:                           PAGE

21   MR. BENCOMO                               7, 24

22   MR. DINNELL                               15

23   MS. DALY                                  21, 25

24

25
```

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.        November 4, 2009                                    JESSICA GUAY

Page 5

1                         E X H I B I T S

2    Exhibit identification within the transcript is flagged

     with "[EXH]" as an identifier.

3

4    PLAINTIFF   DESCRIPTION                    IDENTIFIED   MARKED

5    1           Documents Bates Labeled            9          26

                 FEMA 17-005860 through

6                FEMA 17-005862

                 [EXH-1]

7

     2           Important Notice                  22          26

8                [EXH-2]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HUTCHINGS COURT REPORTERS, LLC – GLOBAL LEGAL SERVICES
800.697.3210

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.      November 4, 2009                    JESSICA GUAY

Page 6

1         THE VIDEOGRAPHER:  Good morning.  We are on the

2    record.  My name is Barbra Westmore.  I'm the video

3    technician with Hutchings Management Corporation located

4    at 6055 East Washington Boulevard in Los Angeles,

11:09  5    California.

6         This is the videotaped deposition of Jessica Guay

7    beginning at 11:09 a.m. on November 4, 2009, In Re:

8    FEMA Formaldehyde Products Liability Litigation, Case

9    Number 07-1873, taken at 3403 Tenth Street in Riverside,

11:10  10   California.

11        May we have introductions beginning with Counsel,

12   please?

13        MR. BENCOMO:  Good morning.  Raul Bencomo

14   representing Plaintiffs' Steering Committee.

11:10  15        MR. DINNELL:  Adam Dinnell on behalf of The United

16   States.

17        MS. DALY:  Taylor Daly for Fleetwood.

18        THE WITNESS:  Jessica Guay.

19        (Continued on following page.)

20

21

22

23

24

25

Page 7

1                          JESSICA GUAY,

2     a witness herein, having been sworn, testifies as

3     follows:

4

5                          -EXAMINATION-

6

7         BY MR. BENCOMO:

8         Q.   Would you please state your full name for the

9     record?

11:10   10     A.   Jessica Guay.

11        Q.   And Ms. Guay, what is your current address?

12        A.   4655 Minnier Avenue, Riverside, California,

13     92505.

14        Q.   What is your date of birth, ma'am?

11:10   15     A.   5/28/82.

16        Q.   Thank you very much.

17        Ms. Guay, were you ever employed by Fleetwood?

18        A.   Yes.

19        Q.   And in what capacity were you employed by

11:10   20     Fleetwood?

21        MS. PETROVICH:  Raul, this is Lezly.  Sorry to

22     interrupt.  Can you have the witness speak a little

23     louder?

24        MR. BENCOMO:  Sure.  Thank you.

11:11   25     THE WITNESS:  Can you restate your question?

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.        November 4, 2009                    JESSICA GUAY

Page 8

1        MR. BENCOMO:  Would you please read the question

2   back?

3        (The record is read by the reporter.)

4        THE WITNESS:  As a customer service representative.

11:11   5        MR. BENCOMO:

6        Q.  And what year would that have been or years

7   that you worked for Fleetwood?

8        A.  From 2004 to 2007.

9        Q.  And as a customer service representative, what

11:11  10   exactly was your background?  Did you have any

11   background in that field before?

12        A.  In customer service, yes.

13        Q.  Now, did you have any specific duties while

14   working for Fleetwood in customer service?

11:11  15        A.  I'm just assisting the customers with their

16   calls, any minor technical assistance.

17        Q.  And would the customers normally make contact

18   with you via an (800) number?

19        A.  Yes.

11:12  20        Q.  And when you say "customers," did that run the

21   gamut for everything from travel trailers to

22   manufactured housing and park models or was it

23   restricted to, for instance, travel trailer?

24        A.  At that time the department specifically

11:12  25   handled motor homes and travel trailers.

Page 9

1        Q.  And the customers who would normally contact

2   you via that (800) number were the owners, if you will,

3   of particularly the motor home or travel trailer?

4        A.  Correct.

11:12   5        Q.  Now I'm going to show you a string of e-mails

6   that has previously been identified and produced in

7   connection with a congressional hearing and ask you to

8   please review these documents.  And they are Bates

9   labeled FEMA 17-005860, 005861 and 005862.  [EXH-1]

11:13   10       Now I refer you specifically to the bottom e-mail

11  005860 from a Jason Leidig.

12       Do you recall Mr. Leidig, the bottom of the first

13  page?

14       A.  No, I don't.

11:13   15       Q.  Now, in that e-mail he refers to you as Jessie.

16       Did they call you Jessie at Fleetwood?

17       A.  Yeah.  I go by Jessie.

18       Q.  Okay.

19       And in it he writes, "I appreciate you taking the

11:14   20  time to take my call today and explaining to me the

21  purpose of the warning label and it being secured in the

22  window of the travel trailer units."

23       Do you see that?

24       A.  Correct.

11:14   25       Q.  Now, what warning label was he referring to, do

Page 10

1    you know?

2         A.  Right offhand I don't specifically know.  There

3    is a couple labels that typically are posted in the

4    trailers.

11:14    5         Q.  So in this instance you don't know which label

6    he would be referring to?

7         A.  No.  Not right offhand.  I can't recall.

8         Q.  And you don't have nothing that refreshes your

9    recollection as it pertains to this e-mail?

11:14    10        A.  Unfortunately, no.

11        Q.  Now, when you say warning label in the trailer,

12   do you know where a warning label, if there was such a

13   label, might have been located inside of a trailer?

14        A.  Typically near the entry doorway, the bedrooms

11:15    15   sometimes, bathrooms, somewhere near the sofa window

16   area.  It can kind of vary, but those are kind of a lot

17   of the areas you would find.

18        Q.  So you are aware of the fact that the warnings

19   might vary from location to location within a travel

11:15    20   trailer?

21        A.  Yes.

22        Q.  And in the bathroom, where might a warning be

23   located in the bathroom?

24        A.  Around the mirror area in a vanity part.

11:15    25        Q.  You mean on the outside mirror on the vanity?

Page 11

1        A.   Yeah.   In the bathroom but like around the

2    mirror area.

3        Q.   And this is based on your actually having seen

4    some of these warnings?

11:15   5        A.   Correct.

6        Q.   And you worked at which plant?

7        A.   First plant was on Fleetwood Drive in

8    Riverside.   And the second plant was Rialto Avenue in

9    Rialto, California.

11:16  10        Q.   Did you ever work at the Longview, Texas plant?

11        A.   No.

12        Q.   Do you have any knowledge of anything as it

13    pertains to the Longview, Texas plant?

14        A.   No.

11:16  15        Q.   And, for instance, with reference to Owner's

16    Manuals, do you have any idea whether or not an Owner's

17    Manual would or would not have been included with a

18    travel trailer coming out of the Longview, Texas plant?

19        A.   No.

11:16  20        Q.   Now, look at the subsequent e-mail that is from

21    you on July 17, 2006 at 10:01 a.m.

22        Do you see that?

23        A.   Yes.

24        Q.   Would you mind reading that e-mail into the

11:16  25    record, please?

Page 12

1        A.   "Hello.  I understand that you are all very

2    concerned with the notice that you see in the trailer

3    advising of harmful chemicals in the trailer that can

4    cause cancer or birth defects.  These products are

11:16   5    manufactured with urea-formaldehyde resin.  Formaldehyde

6    vapor may in some people cause headaches, eye, nose, and

7    throat irritation and aggravation of allergies and

8    respiratory problems, such as asthma.  Proper

9    ventilation should reduce the risk of such problems."

11:17   10       Q.   Let me stop you there if I may because I will

11    ask you about the next paragraph.

12        Where did you obtain that information from that you

13    just read to us?  Who would have given you that

14    information?

11:17   15       A.   Typically at that time that would have been

16    something that I would have looked through in the

17    Owner's Manual.  I believe possibly there's a notice

18    that contains something to that nature.  And I would

19    have also then discussed with any leads I had at that

11:17   20    time, as like supervisors.

21        Q.   And who was your lead or leads at that time?

22        A.   Angelo Alanzo.

23        Q.   And who else?  Anybody else?

24        A.   Department supervisor would have been

11:17   25    Gina Privitt.  That's about it that I can recall.

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.          November 4, 2009                    JESSICA GUAY

Page 13

1        Q.   Before you sent an e-mail such as the ones that

2   you are reading from now, did you have to get approval

3   of the content of the e-mail?

4        A.   It's recommended, but not necessarily.

11:18   5        Q.   Do you know whether or not you obtained

6   approval for this e-mail or not?

7        A.   I would have consulted with someone.  I don't

8   know necessarily if I can recall if I had approval.

9        Q.   Would you please continue reading the document.

11:18   10        A.   "Also you should know that urethane foam is

11   flammable.  Urethane foam will burn rapidly in an

12   enclosed space, the resulting deficiency of oxygen will

13   present a danger of suffocation to the occupants.

14   Hazardous gases released by the burning foam can be

11:18   15   incapacitating or fatal to human beings if inhaled in

16   sufficient quantities.  I'm not sure if these trailers

17   came with Owner's Manuals, but if so they do outline

18   what I just wrote.  I hope this will answer your

19   questions.  If we can be of further assistance, you can

11:19   20   also reach us at (800) 445-3307."

21        Q.   And this was the (800) number that you just

22   referred to that owners would actually call into?

23        A.   Correct.

24        Q.   And the subject of this e-mail is "Harmful

11:19   25   Chemicals Notice"; correct?

Page 14

1        A.   Yes.

2        Q.   You said you worked at two plants, I believe?

3        A.   Correct.

4        Q.   And those were not manufactured housing plants;

11:19   5    they were travel trailer plants?

6        A.   The first plant was customer service but at the

7    location of the Class C Motor Homes.   And the second

8    plant was at the, like, lower end travel trailers.

9        Q.   What is a lower end travel trailer as opposed

11:19   10   to higher end travel trailer?

11       A.   Not -- generally like not the -- not like a

12   fifth wheel.   It's typically considered more -- the ones

13   that go in the back of the trucks, those are considered

14   a little more higher end than some.   So it's kind of

11:20   15   your basics.

16       Q.   So you worked at that plant?

17       A.   Yeah.

18       Q.   And what was the name of the plant and where

19   was it located?

11:20   20       A.   It was like the Prowler.   We built Prowler and

21   something else there.   But it was in Rialto.

22       Q.   Rialto, California?

23       A.   Correct.

24       Q.   Now, did you ever have occasion to smell

11:20   25   chemicals while working at that plant?

Page 15

1      A.  When I would go inside any of the trailers from

2   time to time, naturally, because they are just produced,

3   you have a smell of chemicals right off the bat, yeah.

4      Q.  And you experienced this on more than one

11:20   5   occasion?

6      A.  Yeah.

7      Q.  How long did you work at that plant?

8      A.  About a year.

9      MR. BENCOMO:  Thank you.  I don't have any other

11:21  10   questions in connection with the witness' testimony.  I

11   would offer, introduce, and file into evidence as Guay

12   Number 1 the three pages that I referred to,

13   FEMA 17-005860 through 5862.

14      MS. DALY:  And we're reserving our objections to

11:21  15   that exhibit at this time.

16

17                    -EXAMINATION-

18

19      BY MR. DINNELL:

11:21  20      Q.  Ms. Guay, my name's Adam Dinnell and I

21   represent the United States.

22      Without looking at this document, do you have any

23   independent recollection of sending an e-mail to

24   Lydell Broom and other individuals on July 17, 2006?

11:22  25      A.  No.  Without looking at the document, I don't.

Page 16

1        Q.  And that was over three years ago; right?

2        A.  Yes.

3        Q.  But since you got here today, you've had a

4   chance to look at these documents and read this e-mail

11:22   5   chain; correct?

6        A.  Yes.

7        Q.  And this is what we marked as Deposition

8   Exhibit Number 1; okay?

9        A.  Yes.

11:22  10        Q.  Based on these e-mails, do you now have an

11   understanding of an e-mail you sent on July 17, 2006 to

12   various individuals?

13        A.  I do have an understanding.

14        Q.  Does that refresh the recollection of what you

11:22  15   said to those individuals?

16        A.  It still doesn't ring a lot of bells to me.

17   But I wrote it, so yeah.

18        Q.  And the address of your e-mail is listed right

19   there, and that's consistent with what your e-mail

11:22  20   address was at the time you worked at Fleetwood?

21        A.  That is correct.

22        Q.  Now, I believe you said you worked for

23   Fleetwood, which is a company that makes travel trailers

24   and motor homes and manufactured homes, as a customer

11:23  25   service representative from 2004 to 2007; is that

Page 17

11:23

11:23

11:23

11:24

11:24

```
 1    correct?

 2         A.  Correct, yes.

 3         Q.  And based on your review of these documents, in

 4    July of 2006 a man named Jason Leidig approached you

 5    with an inquiry; correct?

 6         A.  Yes.

 7         Q.  And Jason Leidig also worked at Fleetwood?

 8         A.  I don't believe.  I really don't recall.

 9         Q.  So you don't know who he worked for, but he

10    approached you and asked you to answer some questions

11    that have been brought up regarding notice found in

12    travel trailers?

13         A.  Correct.

14         Q.  And that question was about a notice that talks

15    about chemicals made or chemicals that were found in

16    travel trailers?

17         A.  Yes.

18         Q.  Now, if you look back at the second page of

19    Exhibit 1, the initial question about this notice was

20    from somebody named Lydell Broom from DHS/FEMA HQ;

21    correct?

22         A.  Yes.

23         Q.  And that individual had seen a notice about

24    chemicals in some of the Fleetwood travel trailers based

25    on this e-mail chain; right?
```

Page 18

1      A.  Correct.

2      MS. DALY:  Objection to the form.

3      MR. DINNELL:

4      Q.  Now, based on the e-mail chain, Jason Leidig

11:24  5  asked you to e-mail a list of individuals, respond and

6  explain on behalf of Fleetwood what the purpose of that

7  warning label is; correct?

8      A.  Yes.

9      Q.  And your response is contained on Exhibit 1

11:24  10  through the e-mail you sent July 17, 2006 at 11:01 a.m.;

11  right?

12     A.  Right.

13     Q.  Among the recipients of your e-mail -- and your

14  e-mail is titled, "Harmful Chemicals Notice"; right?

11:24  15     A.  Yes.  It is a reply on -- that is the subject.

16     Q.  Reply on Harmful Chemicals Notice.

17     A.  Yes.

18     Q.  From Jessica Guay, Jessica.Guay@fleetwood.com.

19     That was you; correct?

11:25  20     A.  Yes.

21     Q.  To Lydell Broom, the individual that we talked

22  about earlier with the FEMA DHS e-mail address; right?

23     A.  Yes.

24     Q.  And then other individuals named Stephen

11:25  25  Miller, Ronald Goins, Colonel Scott, and James

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.         November 4, 2009                    JESSICA GUAY

Page 19

1    Kaczorowski; correct?

2         A.  Correct.

3         Q.  And as a customer service representative for

4    Fleetwood, you made the statement in this e-mail to the

11:25    5    FEMA individual, Lydell Broom, and others that proper

6    ventilation should reduce the risk of such problems.

7         And by such problems, you were talking about

8    formaldehyde; correct?

9         MR. BENCOMO:  Objection.  Form of the question.

11:25    10       MS. DALY:  Object to the form.

11       MR. DINNELL:

12       Q.  So let's go through the e-mail that you sent.

13       In the e-mail to Ms. Broom of FEMA and other

14   recipients, you give them the following information

11:25    15   about the notice that they were asking about.

16       "I understand that you are all very concerned with

17   the notice that you see in the trailer advising of

18   harmful chemicals that in the trailer that can cause

19   cancer or birth defects"; correct?

11:26    20       A.  Yes.

21       Q.  And then, "These products are manufactured with

22   urea-formaldehyde resin"; right?

23       A.  Right.

24       Q.  You then said, "Formaldehyde vapor may in some

11:26    25   people cause headaches, eye, nose, and throat irritation

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.          November 4, 2009                    JESSICA GUAY

Page 20

1   and aggravation of allergies and respiratory problems

2   such as asthma"; correct?

3        A.  Right.

4        Q.  And then you state in the e-mail, "Proper

11:26    5   ventilation should reduce the risk of such problems";

6   correct?

7        A.  Correct.

8        Q.  And that statement was made in this e-mail to

9   Lydell Broom and other individuals with FEMA e-mail

11:26   10   addresses based on -- as a part of your job as a

11   customer service representative for Fleetwood; correct?

12        A.  Yes.

13        Q.  And that was consistent with your review of the

14   Fleetwood Owner's Manual and what it says about

11:26   15   formaldehyde and ventilation?

16        MS. DALY:  Objection.  She's already said she

17   doesn't even know what label she was responding to.

18   She's already established that.

19        MR. DINNELL:

11:27   20        Q.  Well, down at the bottom of this e-mail, and I

21   believe it was your earlier testimony, when you wrote

22   this e-mail, is it correct based upon your recollection

23   you would have searched for information in Owner's

24   Manuals and you would have potentially asked your

11:27   25   supervisors before sending out the e-mail; right?

Page 21

1      A.  Yes.

2      MR. DINNELL:  I will pass the witness.  Thank you.

3

4                   -EXAMINATION-

5

6      BY MS. DALY:

7      Q.  Quickly, Ms. Guay.  In this e-mail string,

8  there is reference to the fact that this unit was built

9  in California.

11:27   10     Did you see that?

11      A.  Where is that located?

12      Q.  See on the Lydell Broom, page 2?  It's talking

13  about "contains pictures of the mobile home unit I spoke

14  about in California."

11:28   15     A.  Okay.

16      Q.  And you were located in California?

17      A.  That's correct.

18      Q.  All right.

19      Do you know where this unit that they are talking

11:28   20  about was built, whether it was a California unit or

21  not?

22      A.  Well, if it was built in California, then

23  chances are it was built in Rialto, California.

24      Q.  Okay.

11:28   25     And that's where you were when you answered this

Page 22

```
          1    e-mail?

          2         A.   2006.   Yeah, I believe I was in Rialto.

          3         Q.   Okay.

          4         I'm going to show you what's been previously

11:28     5    marked, but I'm going to mark it for your deposition as

          6    Exhibit 2, and it's entitled "Important Notice" and ask

          7    whether you've ever seen that before?  [EXH-2]

          8         A.   Yes.

          9         Q.   And what do you know about that?

11:28    10         A.   (No audible response.)

         11         Q.   Where have you seen that before?

         12         A.   It's a -- like a paper that will be in the

         13    Owner's Manual and I think a warning label in the

         14    trailers.

11:29    15         Q.   That's a travel trailer warning in your

         16    recollection?

         17         MR. BENCOMO:   Objection.   Form of the question.

         18         THE WITNESS:   Yes.

         19         MS. DALY:

11:29    20         Q.   Would you take a moment to read that?

         21         A.   Okay.

         22         Q.   I'm going to ask you two questions about it.

         23         Does that warning reference any chemical other than

         24    formaldehyde?

11:29    25         A.   I'm not seeing right off the bat, no.
```

Page 23

1          Q.   Does it reference urethane foam?

2          A.   No.

3          Q.   Does it reference "can cause cancer or birth

4     defects"?

11:30   5          A.   I'm not seeing that.

6          Q.   Then if you go back and look at your July 17

7     10:01 a.m. e-mail --

8          A.   Yes.

9          Q.   -- in the first sentence you reference "notice

11:30  10     that you see in the trailer advising of harmful

11     chemicals in the trailer that can cause cancer or birth

12     defects"; correct?

13          A.   Yes.

14          Q.   You would not then have gotten that information

11:30  15     off Exhibit 2, the Important Notice; correct?

16          MR. BENCOMO:   Objection.  Form of the question.

17          THE WITNESS:   That would be correct.

18          MS. DALY:

19          Q.   You also reference in the second paragraph of

11:30  20     your e-mail the urethane foam flammability issue.

21          A.   Uh-huh.

22          Q.   AND that is also not on Exhibit 2, the

23     Important Notice?

24          A.   That's correct.

11:30  25          Q.   So with respect to that chemical, you would

Page 24

```
        1    have had to look elsewhere to respond in that way;
        2    correct?
        3         A.  Yes.
        4         MS. DALY:  That's all I've got.
11:30   5         MR. BENCOMO:  I just have a quick follow-up.
        6
        7                        -EXAMINATION-
        8
        9    BY MR. BENCOMO:
11:31  10         Q.  You did not know where in fact that trailer
       11    that you make reference to was built; is that correct?
       12         A.  No, not offhand.  Without actually looking at
       13    the VIN number, I can't tell you.
       14         Q.  Now, what does "proper ventilation" mean to
11:31  15    you?
       16         A.  Opening your windows, venting out the trailer,
       17    all the vents and the windows.
       18         Q.  What does adequate ventilation mean to you as
       19    opposed to proper ventilation?
11:31  20         A.  I would still say opening like the top vents
       21    they have on the ceiling and any of the windows.
       22         Q.  Now, do you know how many windows were in the
       23    travel trailers that were sold to FEMA?
       24         A.  Right off bat, I do not.
11:32  25         MR. BENCOMO:  I don't have any further questions.
```

Page 25

1    Thank you for coming.

2        MS. DALY:  I'm sorry.  We're rushing, and I forgot

3    to ask one question.

4

5                         -EXAMINATION-

6

7        BY MS. DALY:

8        Q.  When you were in your position as customer

9    service person in this period of 2005-2006, were you

11:32  10  familiar with the fact that Fleetwood was doing a

11   production of units for use by FEMA for the Katrina

12   Hurricane?

13       A.  Yes.

14       Q.  And did you receive any calls from occupants of

11:32  15  those units that identified themselves as occupants in

16   those units?

17       A.  Typically I didn't receive too many of those.

18   We had a special FEMA team.  But not too many calls.

19       Q.  Did you ever receive a call from an occupant of

11:32  20  a FEMA unit complaining of formaldehyde or odors?

21       A.  Other than this one, this is the only one I can

22   recall at this time, being that, you know, I now see

23   this e-mail back in present.

24       Q.  So when you say "other than this one," you mean

11:32  25  this e-mail stream we've been talking about, Exhibit 1?

Page 26

1        A.  Yes.

2        MS. DALY:  Thank you very much.

3        MR. BENCOMO:  Thank you, Ms. Guay.

4        THE VIDEOGRAPHER:  This concludes the videotaped

11:33   5   deposition of Jessica Guay.  The time is 11:32 a.m.  We

6    are off the record.

7        THE REPORTER:  Copies, Counsel?

8        MR. DINNELL:  Sure.

9        MS. DALY:  We are getting a hard copy and an

11:38   10  electronic version for both depos.

11        (Whereupon the documents referred to are marked by

12   the reporter as Plaintiff Exhibits 1 and 2 for

13   identification.)

14        (The proceedings concluded at 11:38 a.m.)

15        (Signature on following page.)

16                           ***

17

18

19

20

21

22

23

24

25

Page 27

1          I declare under penalty of perjury under the laws

2     of the State of California that the foregoing is true

3     and correct.

4

5          Executed at _____, California,

6          on _____.

7

8

9          _____

                          JESSICA GUAY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 28

1    STATE OF CALIFORNIA ) ss

2         I, Raquel Ann Fisher, CSR 12709, do hereby declare:

3

4         That, prior to being examined, the witness named in

5    the foregoing deposition was by me duly sworn pursuant

6    to Section 2093(b) and 2094 of the Code of Civil

7    Procedure;

8

9         That said deposition was taken down by me in

10   shorthand at the time and place therein named and

11   thereafter reduced to text under my direction.

12

13        I further declare that I have no interest in the

14   event of the action.

15

16        I declare under penalty of perjury under the laws

17   of the State of California that the foregoing is true

18   and correct.

19

20        WITNESS my hand this _____ day of

21   _____, 20 _____.

22

23   _____

     Raquel Ann Fisher, CSR 12709

24

25

# IMPORTANT NOTICE

Certain of our forest product suppliers have advised that urea-formaldehyde is used in the production of particle board, hardwood plywood or paneling which they supply us and which we utilize in our finished product. These suppliers have requested that we communicate this to our customers.

For your information, we are reproducing samples of statements which have been provided to us by our suppliers.

WARNING: THIS PRODUCT IS MANUFACTURED WITH UREA-FORMALDEHYDE RESIN. FORMALDEHYDE VAPOR MAY IN SOME PEOPLE CAUSE HEADACHES, EYE, NOSE AND THROAT IRRITATION, AND AGGRAVATION OF ALLERGIES AND RESPIRATORY PROBLEMS, SUCH AS ASTHMA. PROPER VENTILATION SHOULD REDUCE THE RISK OF SUCH PROBLEMS.
*Champion International Corporation*

WARNING: IRRITANT: THIS PRODUCT CONTAINS A UREA-FORMALDEHYDE RESIN AND MAY RELEASE FORMALDEHYDE VAPORS IN LOW CONCENTRATIONS. FORMALDEHYDE CAN BE IRRITATING TO THE EYES AND UPPER RESPIRATORY SYSTEM OF ESPECIALLY SUSCEPTIBLE PERSONS SUCH AS THOSE WITH ALLERGIES OR RESPIRATORY AILMENTS. USE WITH ADEQUATE VENTILATION. IF SYMPTOMS DEVELOP, CONSULT YOUR PHYSICIAN.
*Georgia-Pacific Corporation*

WARNING: THIS PRODUCT IS MANUFACTURED WITH A UREA-FORMALDEHYDE RESIN AND WILL RELEASE SMALL QUANTITIES OF FORMALDEHYDE. FORMALDEHYDE LEVELS IN THE INDOOR AIR CAN CAUSE TEMPORARY EYE AND RESPIRATORY IRRITATION, AND MAY AGGRAVATE RESPIRATORY CONDITIONS OR ALLERGIES. VENTILATION WILL REDUCE INDOOR FORMALDEHYDE LEVELS.
*Weyerhaeuser Company*

Ventilation is important in maintaining a comfortable environment and we direct your attention to the discussion of ventilation contained in your Owner's Manual.

W13-0125   2/84



Δ π EXHIBIT 2
Deponent Iburay
Date 11/4/09 Rptr. RF
WWW.DEPOBOOK.COM

FLE-00012455

CONFIDENTIAL